> More broadly stated, if a plaintiff's reasonable and diligent investigation
> discloses only one kind of wrongdoing when the injury was actually
> caused by tortious conduct of a wholly different sort, the discovery rule
> postpones accrual of the statute of limitations on the newly discovered
> claim.

Id. at 813. In analyzing the discovery rule, the term "wrongdoing" is used not in a technical or legal
sense, but in its everyday meaning. Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1111 (1988) ("In this
context, 'wrong,' 'wrongdoing,' and 'wrongful' are used in their lay understanding.").

Here, on one hand, we have a breach of contract claim or copyright infringement claim
based on alleged copying or "borrowing" of Mattel's undisputed rights in Toon Teens and/or Diva
Starz to create Bratz that perhaps Mattel was on notice of as early as 2001, and which Mattel
admittedly investigated as early as 2002, but upon which Mattel ultimately chose not to file suit.
On the other hand, we have the claims asserted here, for breach of contract and copyright
infringement, based on Mattel's (disputed) ownership rights to the Bratz drawings pursuant to
Bryant's employment agreement with Mattel and in light of the (disputed) fact that Carter Bryant
created these works during the period of his employment with Mattel. Applied to the present case,
in the Court's view, the question the Court must ask is whether the first type of claim is based on
qualitatively different type of "wrongdoing" – as that term might be understood by lay persons –
than that which gives rise to the present claims.

Thus framed, the Court considers the two claims: Although they are similar in that they
both include the wrongdoing of the failure to keep one's promise to maintain confidentiality, they
are qualitatively different, however, in that the former situation involves the alleged taking of rights
known to Mattel while the latter involves the alleged concealment of certain creations that belong
to Mattel in the first instance in order to facilitate the taking of rights unknown to Mattel. This
fundamental difference leads the Court to the conclusion that the latter claims, those asserted
here, involve a different element of "wrongdoing" than do the unasserted claims based on Toon
Teens and/or Diva Starz.

The burden of proof on the discovery rule issue is on Mattel.[2]  Examining the claim Mattel
asserts, rather than the claim Mattel chose not to assert, the Court must determine whether Mattel
had knowledge of any one of the three generic elements of wrongdoing, causation, or damages,
coupled with suspicion of the remaining generic elements. This determination cannot be made on
the undisputed record before the Court.

Rather, MGA has raised triable issues of fact precluding summary judgment on the statute
of limitations issue. Any of the following could be the date upon which MGA claims against Carter

---

[2]  See Fox, 35 Cal.4th at 803 (imposing upon a plaintiff that seeks to take advantage of the
discovery rule a requirement that it "plead[] and prove[] that a reasonable investigation at that time
would not have revealed a factual basis for that particular cause of action).

MINUTES FORM 90                                                        Initials of Deputy Clerk: gg
CIVIL -- GEN                              Page 7                        Time:  0/00

EXHIBIT 12 PAGE 136

Bryant accrued: The July 18, 2003, Wall Street Journal article; the September 23, 2003, date of receipt of the City World "claim"; the October 17, 2003, date of counsel's letter to Mattel regarding the City World litigation; or the November 24, 2003, date of receipt of the MGA-Bryant agreement that pre-dated Bryant's resignation of his employment.[3]

The accrual of a copyright claim, as the parties recognize, approximates the state-law standard discussed herein. See Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004) ("Thus, . . . the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances."). Accordingly, the Court makes the same conclusion regarding the accrual date of Mattel's copyright claim against Carter Bryant as it does regarding the accrual date of Bryant's state-law claims.

As stated earlier, although Bryant is no longer a party to this action, the parties recognize, as does the Court, that the timeliness of the claims asserted against Carter Bryant is relevant because of the potential that Mattel's claims against the MGA entities and Isaac Larian may, pursuant to Fed. R. Civ. P. 15(c), relate back to those claims. Mattel embraces the concept of relation back; MGA rejects it.

Although such distinction has not been particularly important at other points in this litigation, the Court has referred to the MGA entities and Isaac Larian collectively as MGA. More specifically, as to Phase 1, there are two separate MGA entities: MGA Entertainment, Inc. and MGA Entertainment HK Limited. There is also MGA's CEO, Isaac Larian. This distinction is important to the Court's analysis of relation back.

MGA Entertainment, Inc., but not Isaac Larian or the other MGA entity, intervened in this action on December 7, 2004. Therefore, based on the status of MGA Entertainment, Inc., as a party, the standard for whether the claims relate back differs from that governing the relation back of claims against MGA Entertainment HK Limited. See infra. As this Court has noted before, the Phase 1 claims against MGA sought to be asserted by Mattel on November 20, 2006, which arise out of the same factual allegations as do the claims asserted by Mattel against Carter Bryant on April 27, 2004, relate back to the date that complaint was filed. See Court's Jan. 12, 2007, Order at 13-15. The Court does not revisit that issue now.

MGA argues that "some courts have dis-allowed 'relation back' of claims against intervening defendants." MGA Opp. at 25 n.21 (emphasis in the original). However, in support of this argument, MGA cites a two-page Texas appellate court decision which does not cite to or interpret Fed. R. Civ. P. 15(c), Davis v. Outdoor Equip. Co., 551 S.W.3d 72, 73 (Tex. Ct. App. 1977), which the Court finds unpersuasive.

As to the new parties sought to be added on November 20, 2006 (MGA Entertainment HK

---

[3]    The analysis is slightly different for the conversion claim. See infra at 9-10.

EXHIBIT 12 PAGE 137

Limited and Isaac Larian), MGA challenges the timeliness of the amendment to add these parties based on whether their identities were known to Mattel at an earlier date. The Court has already held that the claims against them relate back to the April, 2004, complaint. See Court's Jan. 12, 2007, Order at 15-16 n.5. The Court will not revisit that issue either.

The Court rejects the proposition, however, that the claims against both MGA entities did not arise until the date of Carter Bryant's deposition. Whatever the date on which the claims against Carter Bryant arose is ultimately found to be, the August 2002 anonymous letter should have given Mattel a suspicion of that MGA Entertainment, Inc., participated in any wrongdoing by Carter Bryant. See Zeller Decl. Ex. 63 (alleging that Carter Bryant "worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls").

The same is not true as to MGA Entertainment HK Limited and as to Isaac Larian, whom the anonymous letter did not implicate. Therefore, the claims against these defendants arose no earlier than November 4, 2004.

Intentional interference with contractual relations is subject to a two-year statute of limitations. MGA contends that the claim accrues upon the breach of contract, and therefore argues that the claim was untimely before it was asserted against Carter Bryant. They make a similar argument regarding Mattel's conversion claim, which carries with it a three-year statute of limitations.

However, the statute of limitations for breach of contract is tolled during a period of fraudulent concealment. Gryczman v. 4550 Pico Partners, Ltd., 107 Cal.App.4th 1, 5 (2003). The rationale for such tolling easily extends to intentional interference with contractual relations claim, which includes the element of a breach of a contract. The limitations period is likewise tolled during a period of fraudulent concealment as to a conversion claim. AmerUS Life Ins. Co. v. Bank of America, 143 Cal.App.4th 631, 639 (2006) ("To the extent our courts have recognized a 'discovery rule' exception to toll the statute, it has only been when the defendant in a conversion action fraudulently conceals the relevant facts or where the defendant fails to disclose such facts in violation of his or her fiduciary duty to the plaintiff.") Mattel has raised a triable issue of fact as to whether the evidence of the breach and the tortious interference thereof was fraudulently concealed from them before the July 18, 2003, Wall Street Journal article.

The Court will permit further briefing from the parties on the limited issue of what further conclusions regarding the timeliness of each claim should be drawn as a result of this Order. The parties' simultaneous briefs shall be limited to seven pages in length, and shall not re-argue any point upon which the Court has ruled in this Order or its previous two summary judgment Orders. The briefs shall be e-filed no later than 8:30 a.m., Thursday, May 29, 2008, and a courtesy copy must be provided to chambers at the same time. The parties shall also file, as exhibits thereto, their revised proposed special interrogatories on the issue of statute of limitations.

**IT IS SO ORDERED.**

MINUTES FORM 90
CIVIL -- GEN

Page 9

Initials of Deputy Clerk: gg
Time:  0/00

EXHIBIT 12 PAGE 136

# EXHIBIT 13

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                          Date:  June 2, 2008
Title:     CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx):  MATTEL, INC. v. CARTER BRYANT
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC. v. MATTEL, INC.
=================================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

       Jim Holmes
       Courtroom Deputy Clerk

ATTORNEYS PRESENT FOR CARTER BRYANT:      ATTORNEYS PRESENT FOR MATTEL:

None Present                              None Present


ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:

None Present

PROCEEDINGS:   **FURTHER AND FINAL ORDER RE STATUTE OF LIMITATIONS DEFENSE
               (IN CHAMBERS)**

       In an order dated May 27, 2008, the Court made several rulings regarding the timeliness of
Mattel's claims ("SOL Order").  At that time, the Court invited further, limited briefing from the
parties regarding "what further conclusions regarding the timeliness of each claim should be
drawn" in light of the Court's rulings.  The parties filed further briefing in conformity with the Court's
Order, which the Court has reviewed.

       As a result of the briefing, the Court discusses the following issues:  (1) Clarification of the
Court's Ruling Regarding the August 2002 Anonymous Letter; (2) Clarification of the Court's
Ruling Regarding Fraudulent Concealment and Mattel's Claims for Intentional Interference with
Contractual Relations and Conversion; and (3) Accrual of Mattel's Copyright Claim.

EXHIBIT 12 PAGE 139

### I. Clarification of the Court's Ruling Regarding the August 2002 Anonymous Letter

The parties differ on their interpretation of the Court's holding as to the earliest accrual date of Mattel's claims. Although the Court's SOL Order, read as a whole, is most reasonably interpreted as clarified herein, MGA, quite understandably, interprets the Court's Order in a manner more favorable to its position regarding the statute of limitations defense. Accordingly, the Court clarifies its Order as set forth below.

In a key paragraph of the SOL Order, the Court articulates the four possible accrual dates of those state-law claims, asserted by Mattel against Carter Bryant, that are subject to the discovery rule:[1]

> MGA has raised triable issues of fact precluding summary judgment on the statute of limitations issue. Any of the following could be the date upon which MGA claims against Carter Bryant accrued: The July 18, 2003, Wall Street Journal article; the September 23, 2003, date of receipt of the City World "claim"; the October 17, 2003, date of counsel's letter to Mattel regarding the City World litigation; or the November 24, 2003, date of receipt of the MGA-Bryant agreement that pre-dated Bryant's resignation of his employment.

SOL Order at 7-8. This portion of the Court's Order implicitly rejects MGA's contention that the August, 2002, letter could give rise to Mattel's claims against Bryant.

As set forth in the SOL Order, a claim accrues where a plaintiff has **_knowledge_** of at least one of the three generic elements of wrongdoing, causation, and harm. Fox v. Ethicon Endo-Surgery, Inc., 35 Cal.4th 797, 807 (Cal. 2005) (citation omitted). The SOL Order did not explicitly state, as the Court does now, that there is no evidence that Mattel had any **_knowledge_** of any one of the three generic elements of its claims, and thus no claim accrued, prior to the earliest date identified by the Court, which is July 18, 2003.

MGA's argument that Mattel's claims against Carter Bryant could have accrued in August 2002, is based on a statement made by the Court's regarding when the claims against MGA Entertainment, Inc., accrued:

> The Court rejects the proposition, however, that the claims against both MGA entities did not arise until the date of Carter Bryant's deposition. Whatever the date on which the claims against Carter Bryant arose is ultimately found to be, the August 2002 anonymous letter should have given Mattel a suspicion of that MGA
Entertainment, Inc., participated in any wrongdoing by Carter Bryant. See Zeller Decl. Ex. 63

---

[1]      This portion of the Court's Order does not apply to Mattel's claims for intentional interference with contractual relations and conversion, which are addressed infra, in Section II.

Initials of Deputy Clerk: jh

EXHIBIT 13 PAGE 146

(alleging that Carter Bryant "worked out a deal with MGA that let him collect a large sum of money each year from MGA in exchange for his secrecy about the dolls").

SOL Order at 9. Mattel's understanding of this part of the SOL Order, that the claims against MGA Entertainment, Inc., accrued on the same date as did the claims against Carter Bryant, is correct. See Mattel Supp. Brief at 6 n.4.

### II. Clarification of the Court's Ruling Regarding Fraudulent Concealment and Mattel's Claims for Intentional Interference with Contractual Relations and Conversion

The Court's statute of limitations analysis regarding Mattel's claims for intentional interference with contractual relations and conversion was rather inartfully articulated. The Court's ruling was meant to convey that although the remainder of the state-law claims asserted by Mattel are subject to the discovery rule, these two claims are not. Therefore, the conclusions drawn by the Court regarding the possible accrual dates for the remaining state-law claims do not apply to Mattel's claims for intentional interference with contractual relations and conversion. Instead, these claims, having arisen around the time Bryant resigned from Mattel, are time-barred unless the relevant limitations periods have been extended by a period of fraudulent concealment.

Whether a period of fraudulent concealment exists, as well as the duration of any such period, cannot be determined on the undisputed record and are therefore questions of fact for the jury.

### III. Accrual of Copyright Claim

The supplemental briefing brings into focus an issue not addressed by the SOL Order: The accrual date of Mattel's copyright claim.

MGA refers to two arguments it made in its partial summary judgment papers regarding the statute of limitations and Mattel's copyright claim. First, MGA argues that the date Mattel registered its copyrights impacts upon the Court's application of the relation-back doctrine; second, MGA argues that the "rolling" statute of limitations regarding copyright claims is inapplicable when the gravamen of the claim is a claim of ownership rather than infringement.

Mattel did not address this issue in its supplemental briefing, which was filed concurrently with MGA's supplemental briefing. In its partial summary judgment papers, however, Mattel had responded to these arguments.

In reviewing the supplemental briefs, as well as the relevant portions of the partial summary judgment papers, and reflecting upon the hearings held on this matter, the Court concludes that it need not resolve MGA's two arguments.

In the SOL Order, the Court's analysis equated the accrual of Mattel's copyright claim with

EXHIBIT 13 PAGE 141

the accrual with certain of Mattel's state-law claims; as explained below, this analysis overlooks important concepts of copyright law.

As noted by the Court in its order regarding summary judgment, in order to establish copyright infringement, a plaintiff must establish three elements: (1) ownership of a valid copyright, (2) the defendant's access to the original, and (3) substantial similarity between the copyrighted work and the allegedly infringing work. Lamps Plus, Inc. v. Seattle Lighting Fixture Co., 345 F.3d 1140, 1144 (9th Cir. 2003). Here, although the date Mattel received details regarding the City World litigation is in dispute, it is uncontroverted that Mattel did not receive copies of the Bratz drawings prior to November 23, 2003. Without the drawings, Mattel could not assess the substantial similarity factor to determine whether it could assert a claim that the Bratz dolls infringed Mattel's rights to them. Accordingly, on the undisputed record, the Court concludes that Mattel's copyright claim did not accrue prior to November 23, 2003.

Therefore, when first asserted on November 20, 2006, Mattel's copyright claim was timely in its own right, and the Court need not resolve MGA's two arguments regarding relation back and the rolling statute of limitations.[2]

**IT IS SO ORDERED.**

---

[2] In accordance with the foregoing, the Court VACATES the following language from the SOL Order:

> The accrual of a copyright claim, as the parties recognize, approximates the state-law standard discussed herein. See Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004) ("Thus, . . . the statute of limitations does not prohibit recovery of damages incurred more than three years prior to the filing of suit if the copyright plaintiff was unaware of the infringement, and that lack of knowledge was reasonable under the circumstances."). Accordingly, the Court makes the same conclusion regarding the accrual date of Mattel's copyright claim against Carter Bryant as it does regarding the accrual date of Bryant's state-law claims.

SOL Order at 8.

Initials of Deputy Clerk: jh

EXHIBIT 13 PAGE 142

# EXHIBIT 14

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                          Date: July 24, 2008

Title:   CARTER BRYANT -v- MATTEL, INC.
         AND CONSOLIDATED ACTIONS
========================================================================
=

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

         Jim Holmes                                None Present
         Courtroom Deputy Clerk                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:          ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn                              Thomas J. Nolan
B. Dylan Proctor                          Carl Alan Roth
Michael T. Zeller                         Jason Russell
Jon Corey                                 Lauren Aguiar
William Price                             David Hansen
Scott B. Kidman

PROCEEDINGS:   **POST-PHASE1A ORDER RE MOTION FOR PARTIAL SUMMARY
               JUDGMENT ON THE ISSUE OF SUBSTANTIAL SIMILARITY;**

               **ORDER RE PROCEEDINGS REGARDING LACHES AND OTHER
               EQUITABLE DEFENSES**

               **ORDER RE FRAUDULENT CONCEALMENT JURY ISSUE**

        These matters were heard on Friday, July 18, 2008, and again on Monday, July 21, 2008, at
which time the Court announced its rulings. This Order sets forth those rulings and the rationale
therefor.

EXHIBIT 14  PAGE 143

## I. SUBSTANTIAL SIMILARITY AND SCOPE OF PROTECTABILITY

At a post-Phase 1A hearing on remaining legal issues to be addressed prior to commencement of the Phase 1B trial, counsel for MGA raised an issue regarding the scope of the protection to be given to the copyrighted drawings. This issue, in turn, implicates the arguments raised by the parties in the motions for partial summary judgment regarding originality and protectability (raised by MGA) and substantial similarity (an element of copyright infringement upon which Mattel seeks summary judgment).

To address these issues, the Court begins its analysis with a recitation of the elements of copyright infringement, which are (1) ownership of a valid copyright, (2) access by the defendant to the original, and (3) substantial similarity of the original and allegedly infringing works. North Coast Industries v. Jason Maxwell, Inc., 972 F.2d 1031, 1033 (9th Cir. 1992).

The first element, although not amenable to resolution on summary judgment, was decided by the jury's verdict in Phase 1A. The second element was not contested by MGA, and in any event, was also decided by virtue of the jury verdict. Thus, although the Court previously deferred the issue of substantial similarity, it is now appropriate to consider whether the record on summary judgment allows the Court to adjudicate the final element of copyright infringement in favor of Mattel.

To determine substantial similarity, the Court must apply both the extrinsic test and the intrinsic test.

To apply the extrinsic test, the Court must first examine the specific expressive elements of the works at issue and compare them to those found in the allegedly infringing work. Dr. Seuss Enterprises v. Penguin Books, Inc., 109 F.3d 1394, 1398 (9th Cir. 1997). This involves analytically dissecting works into their components in order to determine whether some – or all – similarities are attributable to unprotected elements, which must be filtered out of the analysis before a conclusion regarding substantial similarity is reached. Id. To apply the extrinsic test to visual works, such as the drawings at issue here, "[t]he basic mode of analysis for comparison of the literary elements applies . . . [, and] unprotect[a]ble elements should not be considered when applying the extrinsic test to art work." Cavalier v. Random House, Inc., 297 F.3d 815, 825-26 (2002). However, "[t]he precise factors evaluated for literary works do not readily apply to art works. Rather, a court looks to the similarity of the objective details in appearance." Id. at 826.

To apply the intrinsic test, the Court examines the overall similarity of expression in the two works from the perspective of the ordinary observer. Olson v. National Broadcasting Co., 855 F.2d 1446, 1448-49 (9th 1988).

In applying both the extrinsic and intrinsic tests, the Court must be mindful of the so-called "inverse ratio rule" which states that where, as here, a high degree of access to the original works

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

2

EXHIBIT 14 PAGE 144

is shown, the burden to show substantial similarity is reduced. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir.2000).

In applying these principles, the Court cannot conclude that Mattel has shown that it is entitled to summary judgment on the issue of substantial similarity. On summary judgment, MGA offered evidence from its doll design expert pointing out a number of differences between the Bratz dolls and the registered drawings. Additionally, it offered the evidence of Paula Garcia regarding the changes that MGA wished to make in the process of creating the dolls from the drawings to make them less "edgy" and to better appeal to the "tween" market. MGA also offered evidence that its sculptor was given a certain amount of artistic freedom in creating the sculpt. All these combine to create a triable issue of fact regarding whether the dolls are substantially similar to the drawings.

Related to this issue is the one raised by MGA at Friday's hearing: What is the scope of the protectability of the copyrighted drawings? The Court cannot conclude that the scope is, as MGA contends, limited to the "thin" protection that would prohibit little more than virtual copying.

The Court's analysis begins with a presumption of protectability conferred by the registration of the drawings. Where, as here, the relevant works have registered copyrights, registration is prima facie evidence of the validity of a copyright. See 17 U.S.C. § 410(c). This presumption can be rebutted by the defendant's showing that the plaintiff's work is not original, that is, that it is unworthy of copyright protection. Three Boys Music Corp. v. Bolton, 212 F.3d 477, 489 (9th Cir. 2000) (citation omitted). "Originality in this context means little more than a prohibition of actual copying." Id. (internal quotation marks and citation omitted).

In this vein, the Supreme Court described the low threshold for copyrightability:

The sine qua non of copyright is originality. To qualify for copyright protection, a work must be original to the author. . . . Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.

Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345 (1991). The Court elaborated: The "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." Id. (internal quotation marks omitted).

Based on the record before the Court, it does not appear that MGA has contended that the registered drawings are unworthy of any protection; rather, it contends that it is worthy only of "thin" protection. The Court is guided on this point by the case of Satava v. Lowry, 323 F.3d 805 (9th Cir. 2003).

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk:  jh

3

EXHIBIT 14 PAGE 145

In that case, an artist (Satava) began making glass-in-glass jellyfish sculptures. Id. at 807.
When a second artist (Lowry) began making extremely similar sculptures, Satava sued for
copyright infringement. Id. at 808-09. The idea to do such a sculpture was held to be beyond
copyright protection. Id. at 810. Also outside the scope of copyright protection were the "elements
of expression that naturally follow from the idea." Id. Thus, the Ninth Circuit held that Satava's
sculptures were unprotected to the extent the physiology of jellyfish drove the presentation of the
sculptures. Id. Relatedly, to the extent that traditional methods of glass-in-glass sculpture also
influenced the presentation, the sculptures were also unprotected. Id.

Certain features did warrant protection, however. For instance, although the Court found
unprotectable depiction of jellyfish swimming vertically, with bright colors, or with tendril-like
tentacles attached to rounded bells, the Court found protectable Satava "distinctive curls of
particular tendrils; the arrangement of certain hues [of color]; [and] the unique shape of the
jellyfishes' bells." Id. at 811-12.

After this analysis, the Ninth Circuit did not place a high qualitative value on Satava's
copyright. The Court stated it this way:

> Satava's copyright on these original elements (or their combination) is "thin,"
> however, comprising no more than his original contribution to ideas already in the
> public domain. Stated another way, Satava may prevent others from copying the
> original features he contributed, but he may not prevent others from copying
> elements of expression that nature displays for all observers, or that the
> glass-in-glass medium suggests to all sculptors. Satava possesses a thin copyright
> that protects against only virtually identical copying.

Id. at 812.

The drawings at issue here, however, are not like Satava's jellyfish sculptures. Jellyfish
anatomy is much simpler than human anatomy. Correspondingly, in general, there are far more
variations in humans (at least that we humans discern). For instance, we regularly take notice of a
vast number of particularized differences in facial features, ethnicity, size, shape, proportions, hair
color, and hair texture and, of course, various particularized combinations and permutations
thereof. Specifically, in the context of the content of the copyrighted drawings at issue, we can
also observe the many details of the clothing which adorn the depicted figures.[1] Moreover, an

---

[1] As noted by the Court at Monday's conference, the Court rejects the argument raised by MGA, stated
elsewhere in the record, that the protectability of doll clothing is limited in the same manner as is human clothing.
Briefly stated, "[a]s a general rule, items of clothing are not entitled to copyright protection. . . . This is because items of
clothing are generally considered useful articles, and useful articles are not entitled to protection under the Copyright
Act." Express, LLC v. Fetish Group, Inc., 424 F.Supp.2d 1211, 1224 (C.D. Cal. 2006) (citations omitted). This general
rule is tempered by a limited protection extended to "pictorial, graphic, or sculptural features" even when incorporated
into useful articles. 17 U.S.C. § 101. The doll clothing at issue here -- as well as the clothing depicted in the

EXHIBIT 14 PAGE 146

artistic expression based on a drawing is much less limited than a glass-in-glass sculpture.

Accordingly, although the Court has denied the motion for summary judgment on the substantial similarity issue, the Court cannot go so far as to find that the registered drawings are subject to only the "thin" protection -- the protection against copying -- referred to in Satava. The relevant test to be employed on this issue in this case -- and upon which the jury will ultimately be instructed -- is the test regarding the extrinsic and intrinsic analyses set forth above.

## II. LACHES AND OTHER EQUITABLE DEFENSES

At the hearing on Friday, July 18, 2008, three separate issues regarding the affirmative defense of laches were raised:  (1) Whether there is, as MGA contends, a presumption that laches applies when, as here, a copyright claim would be time-barred but for the relation-back doctrine;[2] (2) whether the Court should grant Mattel's summary judgment motion as to MGA's laches defense; and (3) whether the defense is legal (and must be presented to a jury) or equitable (and therefore should be decided by the Court, perhaps outside the presence of the jury). In the ensuing discussion, the Court addresses each of these issues in turn.

The Court first considers whether there is, as MGA contends, a presumption that laches applies where, as here, a copyright claim would be time-barred but for the relation-back doctrine.

This argument is clearly based on the Jarrow Formulas case, cited at footnote 27 of MGA's opposition to Mattel's motion for partial summary judgment, which MGA relies upon to argue that, notwithstanding any contention that Mattel's copyright claim is timely based on the relation-back doctrine, there is a presumption that claims filed outside the limitations period are time barred. MGA reads Jarrow Formulas far too broadly. That case did not consider how laches should apply when a claim that was otherwise outside the limitations period was saved by the relations-back doctrine. Therefore, its discussion regarding a "reversal" of the presumption of nonapplicability of laches is of little relevance here.[3]

---

copyrighted drawings – are not useful articles. The clothing is part of a toy, and the proposition that toys are unprotectable because they are "useful articles" as that term is used in copyright law has been rejected by courts. See, e.g., Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 974 (6th Cir. 1983); Spinmaster, Ltd. v. Overbreak LLC, 404 F.Supp.2d 1097, 1103 (N.D. Ill. 2005).

[2] The Court previously held that Mattel's copyright claim was timely as to MGA Entertainment because it was brought within the relevant statute of limitations.  As to the remaining defendants, the claim was timely in light of the relation-back doctrine.

[3] The court's discussion regarding this issue states:

In sum, we presume that laches is not a bar to suit if the plaintiff files within the limitations period for the analogous state action; the presumption is reversed if the plaintiff files suit after the analogous limitations period has expired. For purposes of laches, the limitations period may expire even though

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN

EXHIBIT 14 PAGE 147

The Court, in its own research, has been unable to locate any authority that suggests that a related-back claim would be especially vulnerable to the defense of laches. To the contrary, to the extent that such authority is found, it suggests the contrary. See e.g., In re Prempro Products Liability Litigation, 417 F.Supp.2d 1058, 1061 (E.D. Ark. 2006) (dismissing certain plaintiffs from a case, allowing them to re-file their claims in a separate complaint, and clarifying that "for application of . . . laches . . . the filing date of [the new complaint] will be deemed to relate back to the date [of the dismissed complaint]"); Bush v. Sumitomo Bank and Trust Co., Ltd., 513 F.Supp. 1051, 1054 (D.C.Tex., 1981) (noting that the court would consider the related-back date of an amended claim to assess the merits of a laches defense); E.I. duPont de Nemours & Co. v. Phillips Petroleum Co., 621 F.Supp. 310, 313 (D.C. Del.,1985) (noting that the applicability of laches did not need to be addressed in light of the fact that the proposed complaint related back to the original pleading pursuant to Fed. R. Civ. P. 15(c)).

The language of the rule allowing relation-back is in accord because it suggests that an amendment that relates back should be treated as if it was filed on the date of the original pleading. See Fed. R. Civ. P. 15(c) ("[a]n amendment to a pleading relates back to the date of the original pleading").

Therefore, in the absence of persuasive authority, the Court is unwilling to apply the "reversed" presumption suggested by MGA. Instead, the Court will continue to be guided by the touchstones of the doctrine of laches: Unreasonable delay and resulting prejudice.

The Court next considers whether the Court should grant Mattel's summary judgment motion as to MGA's laches defense. The Court previously deferred, as it does now, the motion for summary judgment on the remaining affirmative defenses. The Court will consider those at the close of Phase B of the trial as set forth below.

Finally, the Court considers whether the defense of laches is legal (and must be presented to a jury rather than the Court) or equitable (and therefore should be decided by the Court, perhaps outside the presence of the jury).

At Friday's hearing, counsel for MGA stated that MGA had argued in written briefs before the Court that laches, at least insofar as it is applied to a claim of copyright infringement, is a legal defense that must be submitted to the jury. Tr. at 96. When questioned as to the source of the authority, counsel eventually identified the case of Haas v. Leo Feist, 234 F. 105 (S.D.N.Y. 1916). Tr. 102, 106. Referring to this case, counsel contended that "most courts agree that was the first time that laches was applied as a legal defense to copyright." Tr. at 102. However, this case does not address the defense of laches. It does not address what, if any, affirmative defenses to a

---

part of the defendant's conduct occurred within the limitations period.

Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002).

MINUTES FORM 90                                                          Initials of Deputy Clerk:  jh
CIVIL -- GEN

EXHIBIT 14  PAGE 148

copyright claim should be presented to a jury.  The case does not even involve a trial by jury.  This case was cited in MGA's opposition to Mattel's motion for partial summary judgment, but for an entirely different proposition, relating to the merits of the laches defense.

At Monday's hearing, the Court articulated its ruling on this issue on the record in much the same form that it appears herein.  The Court referred specifically to the representations of counsel set forth above, noting that the Haas case did not involve a trial by jury and further did not address the defense of laches.  Tr. at 5303.

After the Court articulated its ruling, counsel for MGA revealed that perhaps he "wasn't as clear as [he] should have been" regarding this argument, explaining that Haas was "the case from which most courts agree the doctrine of laches could apply to a copyright case."  Tr. at 5306.  This contention was clear from counsel's argument the previous Friday.  What was not clear, however, and what ultimately became clear during Monday's hearing after the Court articulated its ruling, was the source of MGA's briefing on this issue, which was MGA's opposition to Mattel's motion in limine #4 and not MGA's summary judgment papers (which the Court had reviewed at length and in vain in its attempt to locate counsel's argument on this issue).  Tr. at 5306.

Although the Court informed counsel that the briefing to which he referred was not included in the materials that the Court instructed the parties to prepare in advance of the Friday hearing, counsel nevertheless asked that the Court to "take another look" at its opposition to the motion in limine, citing specifically the cases of Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 896 (9th Cir. 1997), and United States Fidelity & Guar. Co. v. Lee Investments LLC, 551 F.Supp.2d 1114, 1128 (E.D. Cal. 2008).[4]  Both these cases, as well as a third case cited in MGA's opposition to Mattel's motion in limine #4, San Francisco Bay Area Rapid Transit Dist. v. Spencer, No. C-04-04632 SI, 2007 WL 1450350 at *10 (N.D.Cal., May 14, 2007), merely represent examples of cases in which trial courts submitted resolution of certain equitable affirmative defenses to the jury.  These cases do not stand for the proposition that a Court must submit for the jury's consideration the ultimate conclusion regarding equitable affirmative defenses.[5]

The defense of laches to a copyright claim is clearly an equitable defense.  See, e.g., Kling v. Hallmark Cards Inc., 225 F.3d 1030, 1036 (9th Cir. 2000) (beginning its analysis of whether

---

[4]  Despite counsel's contention that his argument is based on authority derived from the Haas case, that case is not cited in MGA's opposition to Mattel's motion in limine #4.

[5]  MGA's other concern, that the jury's role as factfinder not be usurped, is a valid one.  Notwithstanding Mattel's contention that there are no facts that are relevant to both the legal claims and the equitable affirmative defenses, see Mattel's reply to motion in limine #4 at 7-9, the Court will consider MGA's timely proposal for any special interrogatories it deems appropriate to address this concern.  As previously indicated by the Court, the parties' proposed jury instructions (which should include any proposed special interrogatories) and verdict forms must be filed no later than July 24, 2008, with indexed and tabbed courtesy copies (in a three-ring binder) provided to the Court.

EXHIBIT 14  PAGE 149

laches applied to a copyright claim by noting that laches is an "equitable defense"); Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996) (distinguishing the defense of statute of limitations as "legal" defense from the defense of laches an "equitable" defense). As such, it will be tried to the Court. See e.g., Danjaq LLC v. Sony Corp., 263 F.3d 942, 962 (9th Cir. 2001) (noting that although the plaintiff had a jury trial right as to his copyright infringement claims, he did not have a right to a jury on the equitable defense of laches); accord Granite State Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1027 (9th Cir.1996) ("A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature.").

The Court previously suggested that it was inclined to seek an advisory jury verdict on the affirmative defenses; however, the Court is now disinclined to do so based on the risk of jury confusion. The Court is of the opinion that this jury's attention should be focused on the narrow range of issues it is being asked to decide in Phase B.

Therefore, the Court will have the parties present to the jury evidence relevant only to the remaining claims, the issue of fraudulent concealment (as discussed below), and any legal defenses to the remaining claims.

## III. FRAUDULENT CONCEALMENT JURY ISSUE

Also discussed at Friday and Monday's hearing was the issue of fraudulent concealment and its relationship with the previously-adjudicated statute of limitations issue. From the Court's perspective, two issues need to be resolved.

First is the jury's role with respect to a finding of fraudulent concealment. Both parties agree that the issue of whether Mattel has established a period of fraudulent concealment should be submitted to the jury. However, at Friday's hearing, Mattel suggested that the Court's findings as a matter of law on summary judgment regarding the statute of limitations places limitations on the time period during which the jury may find fraudulent concealment. Tr. at 100. Specifically, Mattel attempted to link the Court's findings regarding the earliest possible accrual date of Mattel's claims -- other than conversion and intentional inference with contractual relations -- with the period of fraudulent concealment to be determined by the jury regarding these two claims.

The Court's conclusion regarding the narrow range of possible accrual dates for Mattel's state-law claims, other than the conversion and intentional interference with contractual relations claims, was linked to a specific test relating to California's so-called "discovery rule," which the Court will not repeat here. See May 27, 2008, Order re Statute of Limitations Defense at 4 - 8. In the Court's June 2, 2008, Further and Final Order Re Statute of Limitations Defense, the Court noted that, because the claims for conversion and intentional interference with contractual relations are not subject to the discovery rule, "the conclusions drawn by the Court regarding the possible accrual dates for the remaining state-law claims do not apply to" these claims. Id. at 3. As noted by the Court in that Order, "[w]hether a period of fraudulent concealment exists, as well as the

MINUTES FORM 90                                                    Initials of Deputy Clerk: jh
CIVIL -- GEN

8

EXHIBIT 14 PAGE 150

duration of any such period, . . . are . . . questions of fact for the jury." Id. If Mattel believes that
this approach is erroneous, then it may file, in an introductory statement to its proposed jury
instructions, a short statement of legal argument in support of its position, to which, of course,
MGA may respond.

Second is the scope of the relevant evidence regarding fraudulent concealment. As
articulated by the Court at Monday's hearing (and before that, in its statute of limitations summary
judgment orders cited above), the relevant issues – or, stated otherwise, the ultimate facts -- are
whether and for what time period the MGA defendants fraudulently concealed from Mattel the fact
that Carter Bryant worked on the Bratz drawings during his period of employment with Mattel. See
Tr. at 5317-19. The relevant evidence, of course, may extend beyond that boundary. See Fed. R.
Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any
fact that is of consequence to the determination of the action more probable or less probable than
it would be without the evidence.") (emphasis added). For instance, evidence of Mattel's
knowledge of (and evidence regarding MGA's concealment of) the fact that Carter Bryant was
involved at some point with the Bratz project in general is relevant to -- but by no means
dispositive of -- the ultimate facts of whether and for what time period the MGA defendants
fraudulently concealed from Mattel the fact that Carter Bryant worked on the Bratz drawings during
his period of employment with Mattel.

This distinction is in accord with that made by the Court yesterday regarding the admission
of "Phase 2 evidence" in Phase 1B. Although the relevant issues have been, more or less, neatly
dissected into various phases to facilitate efficient adjudication, the relevant evidence is not as
conducive to any surgical cuts and has thus far managed to allude such neat dissection.
Therefore, although counsel should conduct themselves in accordance with the general principles
articulated herein and elsewhere on the record, relevancy, and other limits thereon placed on
admissibility of evidence, most notably Fed. R. Evid. 403, will continue to be determined by the
Court as objections are raised at trial.

**IT IS SO ORDERED.**

EXHIBIT 14 PAGE 151

# EXHIBIT 15

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2      johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3      michaelzeller@quinnemanuel.com
      Jon D. Corey (Bar No. 185066)
4      joncorey@quinnemanuel.com
      865 South Figueroa Street, 10th Floor
5   Los Angeles, California 90017-2543
      Telephone:   (213) 443-3000
6   Facsimile:   (213) 443-3100

7   Attorneys for Mattel, Inc.

8

9                  UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                      EASTERN DIVISION

12

13   CARTER BRYANT, an individual,          CASE NO. CV 04-9049 SGL (RNBx)

14              Plaintiff,                   Consolidated with Case No. CV 04-
                                             09059 and Case No. CV 05-02727
15        vs.
                                             **MATTEL, INC.'S TRIAL BRIEF RE
16   MATTEL, INC., a Delaware corporation,   JOINT AUTHORSHIP AND
                                             OWNERSHIP OF EXHIBIT NO.
17              Defendant.                    1136**

18   AND CONSOLIDATED ACTIONS                **Phase 1B**
                                             Trial Date:   July 23, 2008
19

20

21

22

23

24

25

26

27

28

1 **Preliminary Statement**

2       Despite a jury verdict that unequivocally resulted in Mattel's sole copyright

3 ownership of the sculpt identified as Exhibit 1136, MGA began suggesting in recent

4 days that it may have a co-ownership interest with Mattel in that sculpt. Apparently,

5 MGA's theory is predicated on principles of joint authorship under federal copyright

6 law. So says MGA, when Margaret Leahy recast certain two-dimensional Bratz

7 characters of Carter Bryant that were created by him when he was a Mattel employee

8 into a three-dimensional form, she was a co-author—and hence, co-owner—of the

9 sculpt she produced. MGA claims to have acquired Leahy's ownership interest in the

10 sculpt via written assignment. MGA's argument, however, both contradicts the jury's

11 verdict and fails to establish any co-ownership rights as a matter of law. It also has

12 been waived, having never been raised in the Final Pretrial Conference Order.

13 **Argument**

14 I.   **MARGARET LEAHY WAS NOT A JOINT AUTHOR OF THE**

15     **SCULPT THAT IS IDENTIFIED AS EXHIBIT NO. 1136**

16       Though the Copyright Act defines a "joint work" as one "prepared by two

17 or more authors with the intention that their contributions be merged into inseparable or

18 interdependent parts of a unitary whole," the term "joint author" was left undefined. 17

19 U.S.C. § 101. That determination, Congress decided, was best left to the courts.

20       In the Ninth Circuit, a multifactor test is applied for joint authorship in the

21 absence of a contract: (1) whether the putative author superintended the work by

22 exercising control; (2) whether the putative coauthors made objective manifestations of

23 a shared intent to be coauthors; and (3) whether the audience appeal of the work turns

24 on the contributions of all of the putative coauthors and "the share of each in its success

25 cannot be appraised." Aalmuhammed v. Lee, 202 F.3d 1227, 1234 (9th Cir. 1999)

26 (consultant on film, *Malcolm X*, held not to be coauthor of film). Further, a "joint

27 work" requires each author to make an independently copyrightable contribution to the

28

EXHIBIT 15 PAGE 153

1    work. Id. at 1231 ("A 'joint work' in this circuit 'requires each author to make an
2    independently copyrightable contribution' to the disputed work.'") (citations omitted).

3              Here, MGA has not satisfied, and cannot satisfy, this test. First, it
4    introduced no evidence in Phase 1(a) that Leahy had control over the sculpt's creation.
5    To the contrary, the evidence showed that it was Carter Bryant, not Leahy, who
6    superintended and exercised control over the creation of the sculpt. As Aalmuhammed
7    stated, "[c]ontrol in many cases will be the most important factor" and the "absence of
8    control is strong evidence of the absence of co-authorship." Id. at 1234-35. Bryant
9    was the "inventive or mastermind" behind the sculpt, and he used Leahy's services to
10   realize his vision of translating two-dimensional Bratz works into a three-dimensional
11   one. Regardless of whether Leahy made creative contributions of her own in carrying
12   out her charge, Bryant was not bound to accept of any of them, and all were subject to
13   his approval. This was made clear even at Bryant's first review of the sculpt, where
14   Bryant gave specific directions for revisions, which Leahy testified were incorporated
15   into the sculpt. Trial Transcript at 4362:17-4363:10.

16             Second, MGA presented no facts whatsoever to demonstrate that Carter
17   Bryant ever made objective manifestations of intent to be a co-author with Leahy.
18   Indeed, nobody—including Leahy—made any indication that at the time of creation of
19   the sculpt, Leahy was intended to be a co-author. MGA's lack of such evidence in this
20   regard speaks volumes. Having failed to adduce such evidence in Phase 1(a) relating to
21   Bratz ownership, MGA cannot now be allowed to introduce it, in violation of the
22   Court's phasing Orders.

23             Third, MGA adduced no evidence that the audience appeal of the sculpt
24   turned on any contribution of Leahy. Again, to the contrary, the Phase 1(a) trial
25   evidence and verdict established that it was Bryant -- and Bryant alone -- who designed
26   and provided the "blueprint" upon which the sculpt was based. Leahy's services were
27   merely a conduit in recasting the "blueprint" into a tangible object, and Leahy herself
28   testified herself that her job was merely to turn the concept drawing into a producible

07209/2598945.1

EXHIBIT 15 PAGE 154

1   sculpt. Trial Transcript at 4365:5-11. Any competent sculptor could have performed
2   that task. Thus, not only has MGA failed to prove joint authorship, but its current
3   contention seeks to contradict the jury's finding that this blueprint drawing on which
4   the sculpt was based was created by Bryant while he was employed by Mattel.

5          More fundamentally, as Phase 1(a) testimony also proved, Leahy's
6   contribution to the sculpt was not even sufficiently original to merit copyright
7   protection, which is a requisite of joint authorship in this Circuit, as well as a
8   constitutional requirement of authorship as made clear in Feist Publications, Inc. v.
9   Rural Telephone Service Company, Inc., 499 U.S. 340, 346 (1991) ("Originality is a
10   constitutional requirement."). Any contribution Leahy might have made to the Exhibit
11   1136 sculpt was simply to recast a two-dimensional work into one that was three-
12   dimensional and was guided by functional considerations, e.g., making nose larger in
13   sculpt so the bone structure would "make sense" (Trial Transcript at 4262:16-24),
14   making the ankles larger so they would not break (Trial Transcript at 4159:8-15), and
15   making the sculpt manufacturable (Trial Transcript at 4365:5-11). Courts have
16   routinely held such minimal or functional contributions do not meet the standards for
17   copyright protection. See, e.g., L. Batlin & Son, Inc. v. Snyder, 536 F.2d 486, 490-92
18   (2d Cir. 1976) (en banc) (transforming antique Uncle Sam bank into medium of molded
19   plastic replica held to contain insufficient originality to merit copyright protection);
20   Entertainment Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211,
21   1222-23 (differences in form, texture, and proportionality between three-dimensional
22   inflatable costumes and the two-dimensional cartoon characters upon which they were
23   based stemmed from unprotectable functional considerations).

24          MGA failed to establish in Phase 1(a) that Leahy was a joint author of the
25   Exhibit 1136 sculpt and, indeed, the only evidence that was introduced showed that she
26   was not. Of necessity, Leahy had no rights in the sculpt to convey to MGA. See 17
27   U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is
28

07209/2598945.1

-3-
TRIAL BRIEF RE JOINT AUTHORSHIP AND OWNERSHIP

EXHIBIT 15 PAGE 155

1 | not valid unless an instrument of conveyance . . . is in writing and signed by the *owner*

2 | of the rights conveyed . . . .") (emphasis added).[1]

3 | **II.   MGA COULD NOT HAVE ACQUIRED A COPYRIGHT INTEREST**

4 | **IN EXHIBIT 1136 FROM MARGARET LEAHY BECAUSE IT WAS**

5 | **AN UNAUTHORIZED DERIVATIVE WORK OF MATTEL'S**

6 | **PROPERTY**

7 | Even assuming that Margaret Leahy's efforts on the sculpt met the

8 | standards for joint authorship—and they do not—MGA's co-ownership contention still

9 | fails. One of the exclusive rights afforded a copyright owner is the right "to prepare

10 | derivative works based on the copyrighted work" that he owns. 17 U.S.C. § 106(2). A

11 | derivative work that has been created without authorization of the owner of the

12 | underlying copyright is infringement, and as such, courts deny copyright protection and

13 | rights to the preparer(s) of the unauthorized derivative work. 17 U.S.C. § 103(a)

14 | (protection for work employing preexisting material in which copyright subsists does

15 | not extend to any part of the work in which such material has been used unlawfully);

16 | Pickett v. Prince, 207 F.3d 402, 406 (7th Cir. 2000) (creator of unauthorized guitar

17 | shaped like copyright protectible symbol associated with musical artist Prince had no

18 | claim to copyright); Anderson v. Stallone, 1989 WL 206431 at *5-11 (C.D. Cal. April

19 | 25, 1989) (holding that infringing derivative work is not entitled to copyright

20 | protection, thus denying creator of unauthorized treatment based on popular *Rocky*

21 |

22 |

23 | [1]   Mattel does not brief here the other fatal defects in Leahy's purported attempts to contractually transfer rights to MGA. As the Court is aware, Mattel has sought

24 | declaratory relief of ownership in the Bratz properties, including as a necessary component that MGA contracts supposedly transferring such rights are invalid. At

25 | the conclusion of the trial evidence, Mattel will seek declaratory relief based upon

26 | the jury's findings and the Court's prior legal rulings. If the issue regarding Leahy's

27 | supposed joint authorship remains at that time, Mattel will brief the contractual defects in MGA's claims of co-ownership.

28 |

EXHIBIT 15 PAGE 156

1   movie franchise any copyright protection or ability to enjoy any rights associated with
2   copyright ownership).

3          Here, there is no question that neither Carter Bryant, nor Margaret Leahy,
4   received authorization to create any derivative work based on Bratz drawings that
5   belong to Mattel. True, Leahy apparently had Bryant's consent, but that is irrelevant.
6   Bryant was never in a position to authorize the preparation of derivative works
7   employing material from his drawings since they were owned by Mattel. As the jury
8   has found, Bryant reduced his ideas for a new line of fashion dolls to tangible form
9   during the term of his Mattel employment and, under this Court's rulings, they were
10  assigned to Mattel based on the Inventions Agreement he had executed. Therefore, the
11  only entity that could have granted authorization to prepare derivative works based on
12  Bryant's drawings was Mattel. Tellingly, MGA has introduced no evidence that Mattel
13  granted such permission. Nor could it: it does not exist.

14         Because Leahy's actions constituted at best the preparation of an
15  unauthorized derivative, neither she nor MGA could acquire any rights in it. Pickett,
16  207 F.3d at 406; Anderson, 1989 WL 206431 at *5-11.[2]  As a consequence, MGA's
17  arguments that it is a co-owner of Exhibit 1136 are both legally erroneous and
18  inconsistent with the Phase 1(a) verdict for these reasons as well.

19  _____
20  [2]  MGA suggested recently at one point that it should be permitted to show that
    Leahy is a joint author of Exhibit 1136 because the jury verdict form asked whether
21  Bryant had created the work "alone or jointly with others" during the term of his
    Mattel employment. MGA misapprehends the significance of this language. The
22  language comes from Mattel's Inventions Agreement that was designed to protect
    Mattel, not to protect third parties such as Leahy or MGA who were secretly and
23  illegally working with Mattel employees. In any event, because the evidence does
24  not establish joint authorship by Leahy under the Copyright Act as discussed above,
    the "alone or jointly with others" language cannot support MGA's argument.
25  Further, as also discussed above, because Leahy's work on the sculpt was at best the
26  preparation of an authorized derivative work, she could not have acquired any rights
27  (footnote continued)

28

EXHIBIT 15 PAGE 157

**III.    MGA HAS WAIVED ANY CO-OWNERSHIP CLAIM.**

MGA did not disclose its belated contention about Leahy's alleged joint authorship giving rise to co-ownership by MGA in the Final Pretrial Conference Order. Accordingly, MGA's recent claim of co-ownership fails not only on substantive grounds as shown above, but it has been waived as well.  Fed. R. Civ. P. 16; United States v. First National Bank of Circle, 652 F.2d 882, 886 (9th Cir. 1981) (theory barred if not included in pretrial order).

DATED: August 10, 2008                QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


                                      By /s/ Michael T. Zeller
                                         Michael T. Zeller
                                         Attorneys for Mattel, Inc.

_____

for that independent reason. The "alone or jointly with others" language does not alter that conclusion either.

07209/2598945.1

EXHIBIT 15 PAGE 158

# EXHIBIT 16

**SEND**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                      Date:  July 25, 2008
Title:      MATTEL, INC. -v- MGA ENTERTAINMENT, INC.
            AND CONSOLIDATED ACTIONS
===========================================================================
=

PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

      Jim Holmes                              Theresa Lanza
      Courtroom Deputy                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn                        Thomas J. Nolan
William Price                        Lauren E. Aguiar

PROCEEDINGS:    **ORDER REGARDING JUROR NO. 8**

      The Court, pursuant to stipulation of counsel, conducted an in camera interview of all 10
jurors concerning the issue of allegedly improper statements made by one of the jurors during
deliberations of Phase 1(a) of this trial.  The allegation was initially brought to the Court's attention
via a note submitted by Juror No. 6.  Having fully considered the answers to the Court's questions
given by each of the 10 jurors and their manner and demeanor while answering the Court's
questions, the Court finds as follows:

1.    Juror No. 8 made grossly inappropriate remarks concerning defendant Isaac Larian
      based on his ethnicity during jury deliberations.  Specifically, Juror No. 8 indicated
      that her husband, an attorney, has told her about client or clients who are Iranian and
      who are stubborn, rude, stingy, are thieves, and have stolen other person's ideas.
      Although Juror No. 8 minimized her remarks and insisted that she did not mean to do
      anything wrong, the relative consistency and degree of detail of the other jurors who
      heard her make the remarks, combined with other factors that lend credibility to the
      other jurors' account of the remarks and not to Juror No. 8, leads the Court to
      conclude that Juror No. 8 made the remarks, or something close to the remarks, set
      forth above.

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                          1

EXHIBIT 16 PAGE 159

2.    The remarks described above were heard, in varying degrees, by some but not all of the jurors. At least one juror did not hear the remarks at all, and other jurors only heard portions or snippets of the remarks. Several of the jurors clearly heard all of the remarks.

3.    The juror foreperson immediately admonished Juror No. 8 for making the remarks and strongly instructed that there was no room in the jury deliberation process for such remarks. Contemporaneously, several other jurors also registered their disapproval with Juror No. 8's comments, some very emotionally.

4.    The remarks were made toward the end of the deliberation and after the jury had reached agreement on the Verdict Form questions that were ultimately returned unanimously. The remarks were made while the jury was attempting to resolve the question of the four outstanding questions, questions which it was ultimately never able to return a unanimous verdict on.

5.    Although the remarks offended and upset several of the jurors, the remarks did not, in any way, effect or influence the decision made by the jury. All of the jurors clearly indicated, by both their verbal and non-verbal response to the Court's questioning, that the remarks had no impact on their decision in Phase 1(a).

6.    Some of the jurors believed that it was important that, going forward, Juror No. 8 should be removed from the jury. One juror indicated that she was afraid that, if Juror No. 8 remained on the jury, she would overcompensate for Juror No. 8's apparent bias and not be fair to Mattel. Another juror indicated she felt uncomfortable continuing to serve with Juror No. 8 after the remarks were made.

7.    All of the jurors clearly indicated, by both their verbal and non-verbal responses to the Court's questioning, that the remarks would have no effect on any deliberations or decision in Phase 1(b) of the trial. All jurors believed that they would be completely fair to all parties.

Juror No. 8 was, with the agreement of counsel for both parties, ORDERED excused from the jury panel. Furthermore, the Court ORDERS Juror No. 8 not to discuss her service on this case with anyone until the case has been concluded. The Courtroom Deputy Clerk will promptly notify Juror No. 8 once the case had concluded.

Counsel for MGA and Isaac Larian have orally moved for a mistrial. The Court has excused the jury until August 5, 2008, at 9:00 a.m. and will afford MGA and Isaac Larian an opportunity to brief its motion. The motion is due to be delivered to the Court by July 29, 2008; opposition is due to be delivered to the Court by July 31, 2008; an optional reply is due to be delivered to the Court by August 1, 2008; and a hearing will be held on August 4, 2008, at 1:00 p.m.

**IT IS SO ORDERED.**

Time: 02/16

MINUTES FORM 90                                        Initials of Deputy Clerk __jh_____
CIVIL -- GEN                          2

EXHIBIT 16  PAGE 160

# EXHIBIT 17

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
## CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                    Date:  August 8, 2008

Title:      CARTER BRYANT -v- MATTEL, INC.
            AND CONSOLIDATED ACTIONS
==============================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            Jim Holmes                           None Present
            Courtroom Deputy Clerk               Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                            None Present


PROCEEDINGS:  **ORDER DENYING MOTION FOR MISTRIAL**

    This matter is before the Court on MGA's motion for a mistrial.[1]  The matter was heard on
August 4, 2008, at which time the Court announced its ruling.  This Order reiterates that ruling and
sets forth the rationale for the Court's ruling.

### I. BACKGROUND

    After the verdict in Phase 1(a) had been rendered, on July 25, 2008, and the day after
opening arguments in Phase 1(b) trial, Juror No. 6 delivered to the Court a note, stating:

    HEY, JUDGE LARSON, THERE IS AN ISSUE THAT CONCERNS
    ME THAT I'D LIKE TO TALK TO YOU ABOUT.  THE THING IS, I DON'T FEEL

---

    [1]  Herein, the Court refers collectively to the MGA entities defendants and Isaac Larian as "MGA."

EXHIBIT 17 PAGE 161

COMFORTABLE TALKING ABOUT IT IN FULL COURT.  COULD I SPEAK WITH YOU AT SIDE-BAR WITH THE LAWYERS AND COURT REPORTER PRESENT?  OTHERWISE, I'LL KEEP THIS TO MYSELF.  THANKS, [JUROR] NUMBER 6.

July 25, 2008, Unsealed Tr. at 4.  After a preliminary interview with Juror No. 6 in the presence of counsel, counsel agreed that the Court should interview Juror No. 6 in camera, outside the presence of counsel.  Unsealed Tr. at 12-13.

The Court's interview with Juror No. 6 revealed that Juror No. 8 made inappropriate remarks regarding defendant Isaac Larian's ethnicity.  As a result of this interview, the Court determined that interviews of additional jurors was necessary; counsel consented to the additional interviews.  Thereafter, the Court interviewed in chambers each juror individually.

The transcripts of the juror interviews shall remain in camera and under seal; nevertheless, those interviews may be summarized as follows:  All ten jurors were interviewed, including Juror No. 8.  All jurors except one, Juror No. 2, were able to confirm that comments regarding the ethnicity and/or national origin of Isaac Larian were made in the jury room.  Juror No. 8 herself confirmed that she made comments regarding Mr. Larian's ethnicity and/or national origin.  Of those nine jurors, six (including Juror No. 8 herself) recounted that the remarks at issue were attributed by Juror No. 8 to her attorney-husband and that the remarks represented his assessment of individuals of Persian ethnicity and/or Iranian national origin.[2]  Of the remaining nine jurors, four of those independently recalled that Juror No. 8 used the word "stubborn" in recounting her husband's assessment of Persians and/or Iranians.  One juror specifically recalled a remark to the effect that Persians and/or Iranians "stole ideas."  Another juror recalled the adjective "stingy" being used; yet another recalled the adjective "rude"; and finally, another recalled the verb "lie" being used.  Juror No. 8's account differed:  She explained her remark was about immigrants and the potential for a language barrier problem.

As a result of those interviews, the Court made certain factual findings, which were set forth

---

[2]  Although the distinction is not of any particular relevance to the Court's current inquiry, and is one that neither the Court nor the parties have focused upon thus far, for the sake of precision, the Court must take note of the exact nature of the improper remarks.  Notably, it is unclear from the record whether the remarks were directed toward what the Court understands to be Mr. Larian's ethnicity (Persian) or his national origin (Iranian), or both.  It appears to the Court that either they were directed toward both or that the speaker was unaware of any distinction to be made.  Regardless, this point does not bear on the Court's analysis and these remarks were inappropriate in any event.  Having taken note as to what the remarks were directed, the Court also takes note of to what the remarks were not directed:  Clearly, from the record, the remarks were not directly reflective of a broader group of ethnicities and/or national origins generically described as those from "the Middle East," although it is clear that Persians and/or Iranians fall into this broader category.  Compare Tr. at 317 (MGA and Mr. Larian's counsel's reference to Mr. Larian having left "the Middle East" at an early age).  Similarly, the remarks were not directed toward Mr. Larian's race (Caucasian) rather than his ethnicity or national origin, as suggested by MGA.  See Motion at 25 (referring to Juror No. 8's "racial bias").  Finally, it is also clear from the record (and no party has suggested otherwise), that although Mr. Larian revealed his religion during his testimony (Jewish), the remarks were not directed toward his religion.

EXHIBIT 11 PAGE 162

in detail in the Court's July 25, 2008, Order.[3]  The Court found that specific inappropriate comments based on Mr. Larian's ethnicity were made during jury deliberations; that the jury foreperson and other jurors immediately admonished Juror No. 8 that there was no room in the deliberation process for such remarks; that the remarks were made toward the end of the deliberation process while the jury was attempting to reach a unanimous verdict on four specific drawings that were the subject of dispute among the jurors;[4] that the remarks did not influence the jury's verdict in Phase 1(a); that some jurors believed that Juror No. 8 should be removed from the jury; and that all jurors indicated that the remarks would have no effect on any deliberations or decision to be made in Phase 1(b) of this trial.  See docket # 4155 at ¶¶ 1-7.

After interviewing the jurors, the Court met with counsel, who agreed with the Court's assessment that Juror No. 8 should be excused.  Thereafter, the Court met with Juror No. 8 in chambers with counsel present.  The Court explained to Juror No. 8 that she would be excused from further service in this case based on the statements she had made and ordered her to refrain from speaking about this case until the conclusion of Phase 1(b) of this trial.

In a letter to the Court dated July 29, 2008, Juror No. 8 reiterated her denial of wrongdoing and, in her view, the "neutral context" in which she posited certain statements relating to Isaac Larian's ethnicity and/or national origin.  The letter also delves into Juror No. 8's subjective beliefs regarding the responsible approach she believes she took in the jury's deliberations.  She also conveyed her personal negative reaction to the Court's factual findings and decision to dismiss her from the jury.

Based on the Court's findings, MGA made an oral motion for a mistrial on July 25, 2008. The Court granted leave to MGA to file its motion in written form and set an expedited briefing schedule for that motion.  It is MGA's written motion that is presently before the Court.

## II. AMENDMENT TO COURT'S JULY 25, 2008, ORDER

### A.   Improper Remarks

Upon review of the transcript of the juror interviews, the Court finds that it must amend the factual findings set forth in its July 25, 2008, Order.  Specifically, the Court previously found, in ¶ 1 of that Order, that Juror No. 8 remarked to the other jurors that her husband has told her about a "client or clients who are Iranian and who are stubborn, rude, stingy, are thieves, and have stolen other person's ideas."  Id.

---

[3] Upon a more deliberated and comprehensive review of the transcript of the juror interviews, the Court finds that it must make a slight amendment the factual findings set forth in its July 25, 2008, Order.  That amendment, and the reasons therefor, are set forth infra, section II.

[4] The jury was ultimately unable to reach a verdict on these four drawings.

EXHIBIT 17 PAGE 163

Although only one juror specifically recounted the remark regarding stealing another's ideas, the Court finds that the remark was made. It does so based on the fact that the juror recounting this fact was the same juror who brought this incident to the Court's attention, and who therefore had ample time to reflect upon his recollection before reporting it. Moreover, the content of this juror's interview and his demeanor throughout leads the Court to conclude that he not only recalled the details of this incident but that he also understood at the time the remarks were made that the notion of the theft of ideas was an important issue in Phase 1(a) of the trial. Finally, his recollection is supported by another juror's recollection that the term "lie" was used.

Relatedly, however, although the Court previously found that the term "thieves" was used, a review of the transcript of the interviews reveals that no juror recounted the use of that term.

The Court finds that Juror No. 8 used the term "stubborn" because it was specifically recalled, without prompting by the Court, by four of the eight jurors who heard the remarks.

The Court does not find that the adjective "stingy" was used. Only one juror recalled use of that term and, by her own admission, her recollection was not clear on this issue. In fact, the juror stated that she didn't remember the term Juror No. 8 used, but stated that she thought it was "stingy or something" or "[s]omething on that order."

The Court finds that Juror No. 8 used the term "rude" as recounted by one juror. Based on her statements during the Court's interview and her demeanor during the interview, the Court finds that the juror who recounted the use of the term "rude" was not equivocal in her recollection of the use of that term. The juror who recounted the use of the term "rude" was also personally involved in the immediate admonishment given to Juror No. 8 that there was no room in the deliberation process for such remarks and thus was, in the Court's view, fully engaged in this incident.

Accordingly, the Court **AMENDS** the factual findings set forth in the July 25, 2008, Order, by **VACATING** the second sentence of ¶ 1 and **SUBSTITUTING** the following sentence: "Specifically, Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas."

## B.    Effect of Remarks on Jury

The Court does not find it necessary to amend its factual findings regarding the effect of the remark on the other jurors, set forth at ¶ 5 of the Court's July 25, 2008, Order. Specifically, the Court found that "the remarks did not, in any way, effect or influence the decision made by the jury."

At the time of the juror interviews, the Court inquired of a number of the remaining jurors (and all jurors asked responded in the negative) whether Juror No. 8's comments affected their deliberations. The Court previously expounded upon the finding of fact set forth in ¶ 5 by noting

EXHIBIT 17 PAGE 164

that "[a]ll the jurors clearly indicated, by both their verbal and non-verbal response to the Court's questioning, that the remarks had no impact on their decision in Phase 1(a)."

As acknowledged by both parties in connection with the present motion, Rule 606(b) of the Federal Rules of Evidence bars consideration of the jury's mental processes.[5] Therefore, the Court finds it appropriate to more fully articulate the basis for its finding of fact that the remarks had no impact on the jury's decision in Phase 1(a). The Court has re-examined the transcript of its juror interviews and reconsidered whether this factual finding should be made if the Court does not consider any juror's answer that may have been based on his or her mental processes. Excising such evidence, the Court reaffirms the finding set forth in ¶ 5 on an alternative, independent basis. Specifically, the Court finds that the improper remarks had no effect on the jury's decision based on the reaction of the individual jurors to the remarks and based on the timing of the remarks.

### III. FED. R. EVID. 606(b)

Both sides take positions on the Court's interviews of the jurors and how the fruits thereof may be considered. Mattel contends that the information obtained from the juror interviews may not, consistent with Fed. R. Evid. 606(b), be considered at all in connection with the current motion. MGA, for its part, contends that although information may be used to establish the existence of bias, the Court's inquiry must end there and a mistrial must be declared based on that limited inquiry. In the Court's view, neither side is correct about how the Court must apply Rule 606(b) and, in any event, both sides consented to the Court's interviews of the jurors without any limitation on how the results thereof could be used, thereby waiving the objections they now raise.

The Court's analysis begins with the language of the relevant Federal Rule of Evidence:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b).

---

[5] See Motion at 18; Opp. at 3; Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co., 206 F.3d 900, 908 (9th Cir. 2000) (citing Rushen v. Spain, 464 U.S. 114, 120 n.5 (1983)).

Initials of Deputy Clerk: jh

EXHIBIT 11 PAGE 165

At issue here are Juror No. 8's recounting of statements made by her attorney-husband. These statements clearly were not part of the evidence submitted to the jury. Therefore, the Court concludes that the statements constituted "extraneous prejudicial information" into which the Court may inquire.

In cases in which extraneous information has been received by the jury, the Ninth Circuit directs the trial court to consider the following factors to determine whether a new trial is warranted:

(1) [W]hether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).

As to the first factor, it is clear that the material was actually received in the jury room.

As to the second and fourth factors, the Court found, as set forth in the July 25, 2008, Order, that the remarks were made toward the end of the deliberation and after the jury had reached agreement on the Verdict Form questions that were ultimately returned unanimously. All remaining jurors who heard the remark were in agreement that the remarks came very near the end of their deliberations, and four of them specifically recalled that the remarks were made after agreement had been reached on all subjects upon which the jury ultimately reached a verdict.

As to the third factor, the Court notes that all remaining jurors who heard the remark were either involved in or witnessed an immediate admonishment of Juror No. 8 that a jury room was no place to express such remarks. By all accounts, there was no discussion or consideration of the substance of Juror No. 8's remarks.

As to the fifth factor, the Court can discern no other issues that suggest in any way that the extrinsic material affected the verdict. In fact, the Court is very confident, based on both the verbal and, even more importantly, non-verbal responses to the Court's questioning that the extrinsic material had no effect on the verdict.

Thus, application of the Estrada factors clearly compel the conclusion that MGA's motion for mistrial be denied.

In any event, prior to the Court's interview of the jurors, both sides consented thereto without limitation, and thereby have waived any objection to the Court's inquiry or use of the

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

6

EXHIBIT 11 PAGE 166

information from those interviews.

## IV. VOIR DIRE OF JUROR NO. 8

MGA also argues that the motion for mistrial should be granted because Juror No. 8 was dishonest in her responses – or more accurately, in her failure to respond -- to certain questions during voir dire. Claims of this type of juror misconduct are evaluated in accordance with McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). The Ninth Circuit has articulated the relevant inquiry as follows: "(1) [W]hether 'a juror failed to answer honestly a material question on voir dire;' and (2) whether 'a correct answer would have provided a valid basis for a challenge for cause.'" Price v. Kramer, 200 F.3d 1237, 1254 (9th Cir. 2000) (quoting McDonough Power Equip.)).

At the outset, the Court must again note its factual finding is not that Juror No. 8 was biased in the legal sense, see section VI, infra, or even that she herself held certain preconceptions regarding Persians and/or Iranians. Rather, the Court found that "Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." MGA's argument regarding dishonesty in voir dire is based on an unsound premise -- that the Court has found Juror No. 8 held the views expressed by her statements. See e.g., Motion at 21 ("Where a potential juror does not truthfully disclose biases or prejudices that would render them unable to be impartial and then participates in the verdict, a civil litigant has a right to a mistrial.").

Nevertheless, the Court is mindful of the Ninth's Circuit's suggestion that those who use racial slurs – and thus, by extension, statements regarding ethnocentric bias – generally subscribe to the views that the use of such terms imply. See e.g., United States v. Henley, 238 F.3d 1111, 1121 (9th Cir. 2001). Assuming, however, that the Court were to make the factual finding upon which MGA's argument is premised, MGA's argument would still be unpersuasive.

Counsel for MGA and Mr. Larian did not, in voir dire, ask any specific questions about Mr. Larian's ethnicity and/or national origin. The closest reference in voir dire related to Mr. Larian's experience as an "immigrant" from the "Middle East" and disclosure that the claims at issue involved allegations of dishonesty on his part. Motion at 24. Counsel for MGA and Mr. Larian failed to ask questions designed to ferret out preconceptions regarding Persians and/or Iranians (or even Middle Easterners in general), nor did he ask any questions regarding the jury panel's personal experiences or business dealings – or those of their family or friends – with other individuals who share Mr. Larian's ethnicity and/or national origin. MGA simply cannot fault a juror for failing to answer a question during voir dire that it did not ask. See e.g., Sanders v. Lamarque, 357 F.3d 943, 949 (9th Cir. 2004) (no juror dishonesty in failure to disclose past gang-related issues where questions were posed to jury panel in present tense); Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1460 (9th Cir. 1989) (no duty to disclose past employment where juror was questioned regarding present but not past employment); U.S. v. Aguon, 851 F.2d 1158, 1170 (9th

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

7

EXHIBIT 17 PAGE 167

Cir. 1988) (no duty to disclose juror was under investigation for crime similar to the one at issue in the case in which he served as a juror).

The question wasn't asked; therefore, there was no answer to all, let alone a dishonest answer. Therefore the first part of the McDonough Power Equip. test has not been met. Moreover, in the absence of an answer, the Court cannot consider whether that answer would have provided a basis for a challenge for cause. The second part of the McDonough Power Equip. test has not been met.

The Court accordingly rejects MGA's contention that Juror No. 8 was dishonest in her voir dire answers.

## V. APPLICABILITY OF SIXTH AMENDMENT PRECEDENT TO CIVIL TRIALS

The Sixth Amendment to the United States Constitution guarantees an accused the right to a fair trial. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."). Pursuant to the Sixth Amendment, the Ninth Circuit has held that "[t]he bias . . . of even a single juror would violate [an accused's] right to a fair trial." Estrada v. Scribner, 512 F.3d 1227, 1239 (9th Cir. 2008) (internal quotation marks and citation omitted). MGA contends that this principle should be applied to the current civil trial because a fair trial by jury is also guaranteed to civil litigants by virtue of the Seventh Amendment. See U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.").

MGA argues because both the Sixth and Seventh Amendments guarantee the right to a fair trial, "the standards governing the Sixth and Seventh Amendment rights to a fair and impartial jury are the same." Motion at 12 n.4. It makes this contention in support of its overarching argument that the presence of one biased juror violates this right and, therefore, the Court should declare a mistrial without further inquiry. Id. at 12-13. However, this argument is unpersuasive both on the facts as found by the Court and on the authority cited by MGA in support of its argument.

As a factual matter, the Court has not found, and there is not evidence before the Court to support a finding, that Juror No. 8 was biased in the legal sense of that term. See section VI, infra.

Moreover, in support of its argument, MGA cites authority that does not support the broad proposition it advances. Specifically, MGA cites Sea Hawk Seafoods v. Alyeska Pipeline Service

EXHIBIT 17 PAGE 168

Co., 206 F.3d 900, 906 n.4 (9th Cir. 2000); Rinker v. County of Napa, 724 F.2d 1352, 1354 (9th
Cir. 1983); and Caterpillar, Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1371 n.2 (Fed. Cir. 2004) .

A reading of the relied-upon footnote in the Sea Hawk case, as well as the text to which it is
appended, reveals only the Ninth Circuit applies precedent on a specific Rule 606(b) issue
developed in criminal cases (which implicate the Sixth Amendment) to civil cases (which implicate
the Seventh Amendment). 206 F.3d at 906 ("Our precedents distinguish between introduction of
'extraneous evidence' to the jury, and ex parte contacts with a juror that do not include the
imparting of any information that might bear on the case. Our precedents are mostly in criminal
cases, but we have applied the same rules in civil cases."). Absent from this case is any
articulation of the wholesale incorporation of Sixth Amendment principles in cases implicating the
Seventh Amendment.

In Rinker, the Ninth Circuit considered the issue of an unauthorized communication between
a party and a juror regarding the jury's ongoing deliberations. 724 F.2d at 1353. It appears that
MGA cites this case for the unremarkable proposition that "the integrity of the jury system is no
less to be desired in civil cases." Id. (internal quotation marks and citation omitted). This
proposition, like that stated in Sea Hawk, stops well short of the wholesale incorporation of Sixth
Amendment principles to cases implicating the Seventh Amendment that MGA advances.

However, MGA's position is supported, at least up to a point, by the Ninth Circuit's reliance
in Rinker, on a criminal case that sets up a rebuttable presumption of prejudice in cases in which a
jury is presented with an outside influence such as a party's unauthorized communication with a
juror. 724 F.2d at 1354 (citing United States v. Armstrong, 654 F.2d 1328, 1332 (9th Cir. 1981)).
Nevertheless, this case severely undercuts MGA's overarching argument that the presence of one
biased juror violates this right and therefore the Court should declare a mistrial without further
inquiry. In Rinker, the Ninth Circuit specifically noted that the district court failed to undertake an
extensive enough investigation into the jury incident. Rinker, 724 F.2d at 1354 ("Given the added
fact that in questions about jury incidents, we are ultimately not so concerned with their nature as
with the prejudice they may have worked on the fairness of the defendant's trial, we conclude that
the question of prejudicial effect deserved more consideration.") (internal quotation marks,
alteration mark, and citations omitted).

Finally, the cited-to portion of Caterpillar, when read in conjunction with the authority upon
which it relies, Skaggs v. Otis Elevator Co., 164 F.3d 511, 514 (10th Cir. 1998), again stands only
for the unremarkable proposition that both the Sixth and the Seventh Amendments guarantee the
right to a fair trial, and that, therefore, juror issues arising in criminal cases are "germane" to civil
cases. The Caterpillar case, like Sea Hawk and Rinker, does not suggest that there has been a
wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh
Amendment.

None of the cases cited by MGA support the contention that the mere presence of a juror

EXHIBIT 11 PAGE 169

who makes improper remarks based on a party's ethnicity compels the Court to grant a mistrial
without further inquiry. Therefore, as set forth in section III, supra, the Court has applied the test
set forth in Estrada and denied the motion.

Related to MGA's argument discussed in this section is its argument that it is entitled to the
unanimous verdict of all ten jurors. Implicit in this argument is that because Juror No. 8 was
biased, her verdict should be treated as having been, more or less, excised from the jury's verdict,
and thus MGA is left with a unanimous verdict of nine jurors although ten jurors deliberated. For
support, MGA relies upon Parker v. Gladden, 385 U.S. 363 (1966).

In Parker, an accused was convicted of second-degree murder in a state-court proceeding.
Id. at 363. During the jury's sequestration, a bailiff made statements on two occasions to two
different jurors regarding his opinion of defendant's guilt, as well as his opinion that if the defendant
was not guilty, the Supreme Court, through the appeal process, would "correct" the verdict. Id.
The Supreme Court rejected the argument that, although a jury of twelve deliberated, the verdict
could stand on the untainted verdict of the remaining ten jurors, as a jury of ten was permissible
under the laws of the state in which the defendants was convicted. Id. at 365. The Supreme
Court's decision was influenced, however, by a number of concerns not at issue here.

First, the Court was concerned with the weight of authority statements of the bailiff, as "an
officer of the State" carried. Second, the Court was also concerned with the defendant's right to
cross-examination. Neither of those issues are implicated here. The statements in the instant
case were made not by any authority figure but by a peer. Certainly, there is no indication here
that the other jurors accorded any additional weight to her statements because they were
attributed to her attorney-husband. To the contrary, the record is clear that the other jurors gave
no weight to her statements and, beginning with the foreperson, other jurors strongly rebuked Juror
No. 8 for making the remarks. Accordingly, the concern of the lack of the opportunity to cross
examine Juror No. 8 regarding her statements is of no moment because the remaining jurors could
not have given any less weight to her statements.

In addition to the concerns regarding the appearance of official imprimatur on and lack of
the right of cross-examination as to the remarks at issue in Parker, the Court was also concerned
with the defendant's Confrontation Clause rights. That right is not implicated here. Austin v.
United States, 509 U.S. 602, 608 n.4 (1993) (Confrontation Clause does not apply in civil cases).

Accordingly, the Court does not read Parker as requiring the Court to grant MGA's motion.

## VI. PRECONCEPTIONS AND PARTIALITY

In the events that gave rise to the present motion and in the proceedings that followed on
the heels of those events, the term "bias" has been used, sometimes by the Court, without regard
to the term's specific legal meaning in this particular context. When the Court and the parties use

EXHIBIT 11 PAGE 170

the term "bias," what is implicated is a juror's impartiality -- or more precisely, lack thereof. Cases decided under the Sixth Amendment jury trial right in a criminal case, cited by MGA, indeed conclude that the right is violated where just one biased juror participates in a verdict. See Motion at 3 (citing, e.g., United States v. Henley, 238 F.3d 1111, 1120 (9th Cir. 2001)). However, this rule invites the inquiry of what is meant by the term "bias."

Supreme Court precedent establishes what is not required of jurors. Courts do not require that jurors who are called upon to serve be without preconceived notions. Irvin v. Dowd, 366 U.S. 717, 723 (1961). Specifically, in the cited case, the Court did not require that the jurors be without preconceived notions of the guilt or innocence of a criminal defendant, which was the ultimate issue in the case. Id. ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.") (citation omitted). In a human system, we cannot expect perfection. Truly, perfect justice is not of this world. Our legal system and precedent take into account our inherent imperfections. Indeed, as has been observed before, and this Court today concurs, if a standard of perfection on jury verdicts were to be imposed, "[i]t is doubtful whether more than one in a hundred verdicts would stand such a test." Jorgensen v. York Ice, 160 F.2d 432, 435 (2d Cir.1947) (Hand, J.).

MGA contends that "'[d]oubts regarding bias must be resolved against the juror.'" United States v. Gonzalez, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991)). The case upon which MGA relies was decided at the voir dire stage when the question at issue was whether a juror who was unable to state on the record that she was able to serve fairly and impartially. See id. ("When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict."). Juror No. 8 had no such difficulty here. This Court repeatedly asked the venire, including Juror No. 8, whether each could be fair and impartial, and Juror No. 8 responded affirmatively. Notwithstanding MGA's protestations to the contrary, prospective jurors are presumed to be impartial. See Irvin, 366 U.S. at 723.

With this standard in mind, the Court cannot, and reiterates that it has not, found that Juror No. 8 is biased -- i.e., not impartial -- in the legal sense. Instead, as more fully set forth elsewhere, the Court has found only that Juror No. 8 introduced into the jury inappropriate comments attributed to her attorney-husband.

As explained at length herein, the jury's verdict in Phase 1(a) need not be set aside on the basis of a juror's bias.

EXHIBIT 17 PAGE 171

## VII. CONCLUSION

Nothing is more important to this Court than providing a fair trial to all parties. The right to trial by jury is certainly among the greatest contributions to the rule of law in the last millennium; nevertheless, this human system, as recognized by the Supreme Court, it is not a perfect system, nor could it survive if such was the standard. See e.g., Tanner v. United States, 483 U.S. 107, 120 (1987) (O'Connor, J.) ("There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it.").

The Court deeply regrets that Juror No. 8 introduced remarks into the jury room that have no place in any courthouse, as evidenced by Juror No. 8's dismissal from the jury. At the same time, the Court is encouraged, and deeply so, by the swift and decisive response of the foreperson and other jurors who heard the extraneous remarks, a response that demonstrates that this jury fully shares the Court's commitment to fairness and justice for all of the parties.[6] This jury reacted to extraneous, potentially prejudicial information exactly as a just society would have them react. They are to be commended, not disbanded.

After careful and deliberate consideration of the circumstances present, the Court finds that a mistrial is not required.

The motion for mistrial is **DENIED**.

**IT IS SO ORDERED.**

---

[6] Defendants complain that the jury failed to report the incident to the Court in a timely manner. However, it is clear from the record that the jurors acted very promptly. Immediately after the remarks were made, the foreperson and several other jurors immediately admonished Juror No. 8. Juror No. 10 submitted a note to the Court on the same day of the remarks indicating her discomfort with jury service (which she subsequently revealed to the Court was prompted by her disgust with Juror No. 8's remarks.) Juror No. 6 submitted his note to the Court, quoted in the opening paragraph of this Order, the second trial day after the remarks were made. His delay was due in part to his mistaken assumption that Juror No. 10's note reported the remark to the Court. His delay was also due to, and the foreperson's failure to report the remark was due to, the Court's own jury instruction on July 10, 2008. See docket # 4115 at 35. As such, the limited delay in bringing the matter to the Court's attention does not strike the Court as in any way indicating the jurors' acquiescence to the remarks; to the contrary, the jurors were rightfully outraged. Rather, their delay was due to the uncertainty about the propriety of submitting such information to the Court. This sentiment is borne out in Juror No. 6's remark.

EXHIBIT 17 PAGE 172

# EXHIBIT 18

1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     John B. Quinn (Bar No. 090378)
2    johnquinn@quinnemanuel.com
     Michael T. Zeller (Bar No. 196417)
3    michaelzeller@quinnemanuel.com
     Jon D. Corey (Bar No. 185066)
4    joncorey@quinnemanuel.com
     865 South Figueroa Street, 10th Floor
5    Los Angeles, California  90017-2543
     Telephone:  (213) 443-3000
6    Facsimile:  (213) 443-3100

7  Attorneys for Mattel, Inc.

8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                   EASTERN DIVISION

| | |
|---|---|
| 12  CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13          Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| 14      vs. | **MATTEL, INC.'S OPPOSITION TO DEFENDANTS' MOTION FOR MISTRIAL** |
| 15  MATTEL, INC., a Delaware corporation, | |
| 16          Defendant. | Date:        August 4, 2008 |
| 17  AND CONSOLIDATED ACTIONS | Time:       1:00 pm. |
| 18 | **Phase 1** Pre-Trial Conference: May 19, 2008 Trial Date:   May 27, 2008 |
| 19 | |

20

21

22

23

24

25

26

27

28

1           **2.**    **Even If Juror Statements Were Admissible, MGA Has Not**
2                 **Shown Actual or Implied Bias**

3       A mistrial cannot be ordered even if the jurors' statements were admissible to

4 show Juror No. 8's mental state. There is a difference between having

5 preconceptions--even highly inappropriate ones--and being biased under the law.

6 As the Ninth Circuit has explained, "[t]he type of after-acquired information that

7 potentially taints a jury verdict should be carefully distinguished from the general

8 knowledge, opinions, feelings, *and bias* that every juror carries into the jury room."

9 Hard, 870 F.2d at 1461 (emphasis added). A litigant "is entitled to a fair trial but

10 not a perfect one, for there are no perfect trials." McDonough, 464 U.S. at 553

11 (quotations omitted); see also Brown v. United States, 411 U.S. 223, 231-32 (1973)

12 (same). As Judge Learned Hand stated, "it would be impracticable to impose the

13 counsel of absolute perfection that no verdict shall stand, unless every juror has been

14 entirely without bias, and has based his vote only upon evidence he has heard in

15 court. It is doubtful whether more than one in a hundred verdicts would stand such

16 a test". Jorgensen v. York Ice Mach. Corp., 160 F.2d 432, 435 (2d Cir. 1947); see

17 McDonough, 464 U.S. at 553 ("Trials are costly, not only for the parties, but also for

18 the jurors performing their civic duty and for society which pays the judges and

19 support personnel who manage the trials. It seems doubtful that our judicial system

20 would have the resources to provide litigants with perfect trials, were they possible,

21 and still keep abreast of its constantly increasing case load.").

22       A fair trial requires that jurors be "impartial" in considering the evidence. A

23 juror is impartial if she can disregard her preconceptions "and render a verdict based

24 on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723 (1961); see

25 also United States v. Angel, 355 F.3d 462, 470 (6th Cir. 2004) (same); Poynter v.

26 Ratcliff, 874 F.2d 219, 221 (4th Cir. 1989) (same). The law does not assume that all

27 jurors have no biases. Rather, "[t]he proper inquiry is whether juror bias rises to the

28 level of a constitutional deprivation." United States v. Hanley, 190 F.3d 1017, 1031

EXHIBIT 18  PAGE 174

1  (9th Cir. 1999); see United States v. Hendrix, 549 F.2d 1225, 1230 (9th Cir. 1977)

2  ("we are not convinced that Hendrix was denied his right to a trial by an impartial

3  jury. Any juror misconduct or bias did not prejudice Hendrix to the extent that he

4  did not receive a fair trial.").

5      First, there is no basis for a finding of implied bias under Ninth Circuit law.

6  "Implied bias will be found only in 'exceptional' or 'extraordinary' cases." Sanders,

7  357 F.3d at 949 (citing Smith v. Phillips, 455 U.S. 209, 222 (1982) (J. O'Connor

8  concurring)).   In Smith, Justice O'Connor identified the "extreme examples" that

9  might justify a finding of implied bias: "a revelation that the juror is an actual

10  employee of the prosecuting agency, that the juror is a close relative of one of the

11  participants in the trial or the criminal transaction, or that the juror was a witness or

12  somehow involved in the criminal transaction." Smith, 455 U.S. at 222. Following

13  Justice O'Connor's examples, courts have recognized implied bias only where a

14  juror has an intimate relationship to the issues being decided or to someone involved

15  in the trial. See, e.g., Fields, 503 F.3d at 766 (citing "a relationship to the crime

16  itself or to someone involved in a trial" or "repeated[] lie[s] about a material fact to

17  get on the jury" as exceptional circumstances supporting a finding of implied bias).

18  Here, Juror No. 8's remarks do not demonstrate the sort of intimate relationship to

19  the issues or individuals in the trial necessary to support a finding of implied bias.

20      MGA also cannot show "actual bias" under Ninth Circuit law.[4]   Unlike

21  implied bias, which is "a bias attributable in law to the prospective juror regardless

22  of actual partiality," United States v. Wood, 299 U.S. 123, 134 (1936), "actual bias"

23

---

24     [4]  MGA may claim that Mattel acknowledged Juror No. 8's bias in the legal sense in agreeing she should be removed from the jury. Not so. Mattel agreed that Juror No. 8

25  should be excused because her statements "offended and upset several of the jurors" and, if anything, her continued service threatened to cause unfairness to Mattel.  It was entirely

26  appropriate to excuse Juror No. 8, but that does not require a mistrial. See, e.g., Fed. R. Civ. P. 47(c) ("During trial or deliberation, the court may excuse a juror for good cause.");

27  Fed. R. Civ. P. 47, Ad. Comm. Note ("[T]he court may in appropriate circumstances excuse a juror during the jury deliberations without causing a mistrial. Sickness, family

28     (footnote continued)

1   is "bias in fact." <u>Fields</u>, 503 F.3d at 767. "Actual bias is typically found when a

2   prospective juror states that he can not be impartial, or expresses a view adverse to

3   one party's position and responds equivocally as to whether he could be fair and

4   impartial despite that view." <u>Id.</u>

5        A juror is presumed to be impartial. <u>Irvin</u>, 366 U.S. at 723 (1961); <u>see</u> <u>United</u>

6   <u>States v. Hyatt</u>, 2007 WL 1454280, at *2 (E.D. Cal. 2007) ("In evaluating a claim of

7   juror misconduct [or bias], [the court] begin[s] with the presumption that the juror is

8   impartial [and followed the instructions given by the court].") (citation omitted).

9   The "mere existence" of preconceived notions--even notions regarding guilt or

10   innocence--does not rebut the presumption of a juror's impartiality. <u>Irvin</u>, 366 U.S.

11   at 723. "It is sufficient if the juror can lay aside his impression or opinion and

12   render a verdict based on the evidence presented in court." <u>Id.</u> The Supreme Court

13   has *repeatedly* emphasized this key distinction between having preconceptions and

14   being biased: "To hold that the mere existence of any preconceived notion as to the

15   guilt or innocence of an accused, without more, is sufficient to rebut the

16   presumption of a prospective juror's impartiality would be to establish an

17   impossible standard. It is sufficient if the juror can lay aside his impression or

18   opinion and render a verdict based on the evidence presented in court." <u>Murphy v.</u>

19   <u>Florida</u>, 421 U.S. 794, 800 (1975) (citation omitted).

20        Moreover, while not necessarily conclusive, "[i]n determining whether a

21   district court has abused its discretion in refusing to remove a juror for actual bias

22   [the Ninth Circuit] accords significant weight to a juror's definitive statement that he

23   can serve impartially," such as the statement made by Juror No. 8 here. <u>United</u>

24   <u>States v. Gonzalez</u>, 214 F.3d 1109, 1112 n.3 (9th Cir. 2000). MGA's claims that

25   Juror No. 8's statement that she could serve impartially "should be disregarded" or

26

27   emergency or *juror misconduct that might occasion a mistrial* are examples of

28   appropriate grounds for excusing a juror.") (emphasis added).

1    are "irrelevant" are incorrect; it is entitled to "significant weight" under the law. Id.
2    Further, the Court instructed the jury to consider only the evidence and to disregard
3    any preconceptions they might have.[5]   The jurors are presumed to have done so.
4    See, e.g., Kansas v. Marsh, 548 U.S. 163, 179 (2006).

5         There is no evidence that any preconceived notions Juror No. 8 had affected
6    her verdict in this case.  To the contrary, Juror No. 8, in the Court's questioning,
7    sought to minimize the import of her remarks,[6] and the remaining jurors rejected
8    them.[7]  This is consistent with the timing of the remark itself.  It was only "after the
9    jury had reached agreement on the Verdict Form questions that were ultimately
10   returned unanimously" that Juror No. 8 remarked that her husband had a past
11   experience that was consistent with her assessment of the evidence.[8]  The evidence
12   does not rebut the presumption that Juror No. 8 followed the Court's instructions to
13   disregard any preconceptions and consider only the evidence when deliberating.

14        Even in criminal trials, courts have held that a juror's grossly inappropriate
15   ethnic or racial slurs do not necessarily warrant a finding of actual bias.  For
16   example, in United States v. McClinton, 135 F.3d 1178, 1184 (7th Cir. 1998), two
17   jurors noticed that a woman sat with one African-American defendant one day, and
18   with the other African-American defendant on another.  One juror said the
19   defendants passed her around "like the coke," and another responded, "like a
20   commodity."  One said, "They do that, you know.  That's what they do."  The
21   district court interviewed both jurors and excused one, but *refused* to excuse the
22   other, concluding he could "put aside his feelings and deliberate fairly and

23

24   [5]   May 27, 2008 Trial Transcript at 54:3-8, attached as Exhibit 2 to the concurrently
     filed declaration of B. Dylan Proctor ("Proctor Dec.") ("You must follow the law as I give
25   it to you whether you agree with it or not, and you must not be influenced by any personal
     likes or dislikes, opinions, prejudices, or sympathy that means that you must decide the
26   case solely on the evidence before you.  You will recall that you took an oath to do so
     when we assemble last week."); July 10, 2008 Trial Transcript at 4796:17-24 (same),
27   Proctor Dec., Exh. 3.
     [6]   See Order Regarding Juror No. 8 [Docket No. 4155], Finding of Fact No. 1.
28   [7]   Id., Finding of Fact No. 3.

1  impartially in this case". The Seventh Circuit affirmed: "if we accepted the

2  defense's argument, then we would be saying that this Court does not believe that

3  jurors can set aside a statement they have heard or an impression they have. We

4  believe this notion underestimates a vast number of potential jurors." Id. at 1188.

5  See also Tavares v. Holbrook, 779 F.2d 1, 1-2 (1st Cir. 1985) (now Justice Breyer

6  holding that jurors who had referred to an African-American defense witness by

7  stereotypical name could still be fair and impartial); United States v. Foghorn, 2006

8  WL 4017477, at *8, 30 (D.N.M. 2006) (evidence that a juror said "those poor

9  Indians and their alcohol" during deliberations did not show bias).[9]

10  Mattel does not in any way condone the comments made by Juror No. 8. But

11  they are insufficient under the law to rebut the essential presumption that, whatever

12  individual comments may be made in the jury room, jurors will follow the Court's

13  instructions and reach their judgments based on the evidence presented.[10]

14  **B.   A Mistrial Should Not Be Declared Based on Voir Dire**

15  MGA also argues that it is entitled to a mistrial because Juror No. 8 allegedly

16  failed to disclose her bias during voir dire. MGA's argument is wrong on the facts

17  and contrary to Ninth Circuit law.

18  The Supreme Court and Ninth Circuit have long held that pre-trial voir dire is

19  the time for ferreting out potential biases. McDonough Power Equipment, Inc. v.

20  Greenwood, 464 U.S. 548, 554 (1984); Hard v. Burlington N. R. Co., 870 F.2d

21

22  [8]  Id., Finding of Fact No. 4.
    [9]  In both McClinton and Tavares, unlike here, the jurors made their offensive remarks
23  *before* jury deliberations commenced. And Foghorn actually held that Rule 606 precluded
    the evidence, but ruled it insufficient to even require a hearing in the alternative.
24  [10]  Defendants cite United States v. Henley, 238 F.3d 1111 (9th Cir. 2001), as an
    example of a case where a single use of a racial slur was enough to establish bias. But
25  Henley never made that finding. Rather, the Court found, in assessing voir dire honesty
    issues, that "it is necessary to determine precisely what [the juror] did or did not say before
26  evaluating the truthfulness of his voir dire responses." Id. at 1121. Defendants also rely
    on United States v. Heller, 785 F.2d 1524 (11th Cir. 1986). But that case involved far more
27  than the isolated matter at issue here--there were numerous anti-Semitic jokes and
    comments made by multiple jurors throughout trial and deliberations, greeted by "gales of
28  laughter." Id. at 1525-1526.

1   questions.[29]

2   While Mattel disagrees with this argument, the Court ordered that both damages and

3   liability would be tried before a single jury without resolving the issue.

4       In light of the possibility that a court could ultimately rule that the same jury

5   *must* decide both liability and damages in this case, the Court should allow the trial

6   to proceed to a final Phase 1(b) verdict.  Should it not do so, Mattel could be

7   deprived of meaningful appellate review.  Even if Mattel were successful on appeal

8   in arguing that a mistrial should not have been granted, the Phase 1(a) verdict would

9   still be in jeopardy, and arguably could not be reinstated, since the same jury would

10   no longer be available to determine damages.  Conversely, if the trial is completed,

11   and even if this Court later decides a mistrial is necessary, a later appellate decision

12   in Mattel's favor would require simply reinstating the verdict.

13       The parties have spent many millions of dollars and several months

14   presenting their cases.  The Court and the jury have spent months hearing the

15   evidence.  The parties have a limited amount of time left to present the balance of

16   their cases. Completing Phase 1(b) comports with both fairness and efficiency. The

17   Court should not grant any mistrial now, since stopping trial just as it is nearing

18   completion risks the possibility that all this effort will be undone to no purpose, and

19   would deny Mattel the full right to appeal any decision granting a mistrial.

20

21   DATED:  July 31, 2008      QUINN EMANUEL URQUHART OLIVER &
22                     HEDGES, LLP

23

24                   By /s/ John B. Quinn
                   John B. Quinn
25                      Attorneys for Mattel, Inc.

26

27   [29]   MGA's Supplemental Brief Regarding Claims to be Tried in Phase One Trial, filed
28   June 20, 2007 (emphasis added), Proctor Dec., Exh. 5.

# EXHIBIT 19

CONSOLIDATED FINANCIAL STATEMENTS

MGA Entertainment, Inc.
Years Ended December 31, 2006 and 2005



Exhibit 659
Tonnu
9 / 24 / 07   Pgs. 16
J'ana Siegers, CSR 10845

Confidential - Attorney's Eyes Only

MGA 0868707

EXHIBIT 19 PAGE 180

EX 659-0001

## MGA Entertainment, Inc.

### Consolidated Financial Statements

Years Ended December 31, 2006 and 2005

## Contents

Report of Independent Auditors...........................................................................................................1

Consolidated Financial Statements

Consolidated Balance Sheets...............................................................................................................2
Consolidated Statements of Income....................................................................................................3
Consolidated Statements of Stockholders' Equity..............................................................................4
Consolidated Statements of Cash Flows.............................................................................................5
Notes to Consolidated Financial Statements......................................................................................6

Confidential - Attorney's Eyes Only

MGA 0868708

EXHIBIT 19 PAGE 181

EX 659-0002



ERNST & YOUNG

■ Ernst & Young LLP
Warner Center Plaza 5
Suite 500
21800 Oxnard Street
Woodland Hills
California 91367-7534

■ Phone: (818) 703-4700
Fax:    (818) 347-9215
www.ey.com

### Report of Independent Auditors

Board of Directors and Stockholders
MGA Entertainment, Inc.

We have audited the accompanying consolidated balance sheets of MGA Entertainment, Inc. (the "Company") as of December 31, 2006 and 2005, and the related consolidated statements of income, stockholders' equity and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2006 and 2005, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States.

*Ernst + Young LLP*

Woodland Hills, California
March 23, 2007

A Member Practice of Ernst & Young Global

1

Confidential - Attorney's Eyes Only

MGA 0868709

EXHIBIT 19  PAGE 182

EX 659-0003

## MGA Entertainment, Inc.

### Consolidated Balance Sheets

|  | December 31 | | |
| --- | --- | --- | --- |
|  | 2006 | | 2005 |
|  | (In thousands, except shares) | | |
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 29,695 | $ 59,732 |
| Accounts receivable, net of allowances of $35,469 in 2006 and $29,473 in 2005 | | 186,555 | 114,043 |
| Inventories | | 95,865 | 30,794 |
| Prepaid expenses and other current assets | | 16,939 | 5,417 |
| Total current assets | | 329,054 | 209,986 |
| Property and equipment: | | | |
| Land | | 3,912 | — |
| Buildings | | 26,694 | — |
| Equipment | | 92,292 | 57,490 |
| Leasehold improvements | | 4,555 | 4,179 |
| | | 127,453 | 61,669 |
| Accumulated depreciation and amortization | | (65,649) | (40,394) |
| Property and equipment, net | | 61,804 | 21,275 |
| Trademarks | | 29,699 | — |
| Product line | | 3,820 | — |
| Episodic production costs and other | | 12,565 | 6,009 |
| Deferred financing cost | | 1,533 | — |
| Total assets | $ | 438,475 | $ 237,270 |
| **Liabilities and stockholders' equity** | | | |
| Current liabilities: | | | |
| Accounts payable | $ | 57,336 | $ 5,871 |
| Accrued liabilities | | 115,741 | 78,382 |
| Accrued royalties | | 4,514 | 5,973 |
| Total current liabilities | | 177,591 | 90,226 |
| Deferred income tax liabilities | | 1,940 | 1,659 |
| Long-term loan | | 150,000 | — |
| Notes payable | | 411 | — |
| Other long-term payables | | 846 | — |
| Stockholders' equity | | | |
| Common stock, no par value — authorized, 100,000,000 shares; issued and outstanding — 22,200,000 shares | | 225 | 225 |
| Retained earnings | | 107,659 | 145,313 |
| Accumulated other comprehensive loss | | (197) | (153) |
| Total stockholders' equity | | 107,687 | 145,385 |
| Total liabilities and stockholders' equity | $ | 438,475 | $ 237,270 |

*See accompanying notes.*

2

Confidential - Attorney's Eyes Only

MGA 0868710

EXHIBIT 19 PAGE 183

EX 659-0004

## MGA Entertainment, Inc.

### Consolidated Statements of Income

| | Years Ended December 31 | |
| | 2006 | 2005 |
|---|---:|---:|
| | *(In thousands)* | |
| Net sales | $ 759,859 | $ 706,382 |
| Cost of sales | 435,311 | 393,317 |
| Gross profit | 324,548 | 313,065 |
| Operating expenses: | | |
| Sales and marketing | 92,864 | 79,680 |
| General and administrative | 113,254 | 91,414 |
| Income from operations | 118,430 | 141,971 |
| Other income (expenses): | | |
| Interest income, net | 2,310 | 2,694 |
| Other income (expense) | (3,233) | 1,225 |
| Total other income (expenses) | (923) | 3,919 |
| Income before provision for income taxes | 117,507 | 145,890 |
| Provision for income taxes | 12,138 | 13,129 |
| Net income | $ 105,369 | $ 132,761 |

*See accompanying notes.*

3

Confidential – Attorney's Eyes Only

MGA 0868711

EXHIBIT 19  PAGE 184

EX 659-0005

MGA 0868712

EX 659-0006

Confidential - Attorney's Eyes Only

MGA Entertainment, Inc.

Consolidated Statements of Stockholders' Equity

*(In thousands, except shares)*

| | Common Stock | | Retained Earnings | Accumulated Other Comprehensive loss | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Number of Shares | Amount | | | |
| Balance at January 1, 2005 | 22,200,000 | $ 225 | $ 164,348 | $ (112) | $ 164,461 |
| Distributions to stockholders | — | — | (151,796) | — | (151,796) |
| Net income | — | — | 132,761 | — | 132,761 |
| Foreign currency translation loss | — | — | — | (41) | (41) |
| Comprehensive income | | | | | 132,720 |
| Balance at December 31, 2005 | 22,200,000 | 225 | 145,313 | (153) | 145,385 |
| Distributions to stockholders | — | — | (143,023) | — | (143,023) |
| Net income | — | — | 105,369 | — | 105,369 |
| Foreign currency translation loss | — | — | — | (44) | (44) |
| Comprehensive income | | | | | 105,325 |
| Balance at December 31, 2006 | 22,200,000 | $ 225 | $ 107,659 | $ (197) | $ 107,687 |

*See accompanying notes.*

4

# MGA Entertainment, Inc.

## Consolidated Statements of Cash Flows

|  | Years Ended December 31 | |
|---|---|---|
|  | 2006 | 2005 |
|  | (In thousands) | |
| **Operating activities** | | |
| Net income | $ 105,369 | $ 132,761 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 22,639 | 16,287 |
| Loss on disposal of property and equipment | 74 | 7 |
| Deferred income taxes and others | 1,127 | (1,676) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (72,512) | (85,129) |
| Inventories | (22,387) | 21,224 |
| Prepaid expenses and other current assets | (10,050) | 4,441 |
| Episodic production costs and others | (6,556) | 1,618 |
| Accounts payable | 51,465 | (15,309) |
| Accrued liabilities and other | 37,359 | 4,680 |
| Accrued discounts and allowances | — | (29) |
| Accrued royalties | (1,459) | 332 |
| Net cash provided by operating activities | 105,069 | 79,207 |
| **Investing activities** | | |
| Acquisition of Business, net of cash acquired | (125,238) | — |
| Purchase of property and equipment, net | (15,679) | (18,308) |
| Proceeds from sale of fixed assets | — | 43 |
| Net cash used in investing activities | (140,917) | (18,265) |
| **Financing activities** | | |
| Borrowing under long-term loan | 150,000 | — |
| Deferred financing costs | (1,533) | — |
| Borrowings from officers | 411 | — |
| Repayment of advances to stockholders | — | 5,195 |
| Distributions to stockholders | (143,023) | (151,796) |
| Net cash provided by (used in) financing activities | 5,855 | (146,601) |
| Effect of exchange rate on cash | (44) | (41) |
| Net decrease in cash and cash equivalents | (30,037) | (85,700) |
| Cash and cash equivalents at beginning of year | 59,732 | 145,432 |
| Cash and cash equivalents at end of year | $ 29,695 | $ 59,732 |
| **Supplemental disclosure of cash flow information** | | |
| Cash paid during the year for: | | |
| Interest | $ 1,226 | $ — |
| Income taxes | $ 5,574 | $ 3,017 |

*See accompanying notes.*

5

Confidential - Attorney's Eyes Only

MGA 0868713

EXHIBIT 19 PAGE 186

EX 659-0007

## MGA Entertainment, Inc.

## Notes to Consolidated Financial Statements

December 31, 2006

### 1. Summary of Significant Accounting Policies

#### Principles of Consolidation

The accompanying consolidated financial statements include MGA Entertainment, Inc. (MGA or the "Company") and subsidiaries, all of which are wholly owned. All significant intercompany balances and transactions have been eliminated. The consolidated entities are collectively referred to as the Company.

The Company creates innovative lines of proprietary and licensed branded consumer entertainment products, including toys and games, dolls, consumer electronics, home décor and lifestyle products. During the years ended December 31, 2006 and 2005, a majority of its revenue was derived from the sale of toys, dolls and other products in the Company's "Bratz" branded product line. The Company sells its products to foreign and domestic retail and wholesale customers. In addition, the Company licenses its brands on a wide range of products from shoes to video games.

#### Cash and Cash Equivalents

The Company considers all highly liquid instruments with an original maturity of three months or less to be cash equivalents.

#### Revenue Recognition

Revenue, net of estimated returns, discounts and allowances, is recognized when a product is shipped and both title and risk of loss have passed to the customer. Shipping and handling costs are included in cost of sales. Sales returns and allowances for the years ended December 31, 2006 and 2005, amounted to $64,906,000 and $43,631,000, respectively.

#### Royalty Income

The Company licenses the distribution of certain products in exchange for a royalty, generally based on a percentage of sales of the licensed products. Certain license arrangements provide for advance royalty payments. At December 31, 2006 and 2005, unearned royalties amounted to $8,920,000 and $6,376,000, respectively, and were included in accrued liabilities in the accompanying consolidated balance sheets. Royalty income from third parties of approximately $43,212,000 and $43,919,000 is included in net sales for the years ended December 31, 2006 and 2005, respectively.

6

Confidential - Attorney's Eyes Only

MGA 0868714

EXHIBIT 19 PAGE 161

EX 659-0008

## MGA Entertainment, Inc.

### Notes to Consolidated Financial Statements (continued)

**1. Summary of Significant Accounting Policies (continued)**

**Concentrations**

Financial instruments that subject the Company to credit risk consist primarily of cash and cash equivalents and accounts receivable. The Company maintains cash and cash equivalents balances with certain high-quality major financial institutions in excess of federally insured deposit limits.

For the years ended December 31, 2006 and 2005, sales to the three largest customers accounted for approximately 30%, 13%, and 12%, and 28%, 11%, and 13%, respectively, of sales. The same three significant customers represented approximately 44%, 15%, and 8%, and 44%, 17%, and 8%, of accounts receivable at December 31, 2006 and 2005, respectively.

The Company performs periodic credit evaluations of its customers and maintains allowances for potential credit losses. The Company estimates credit losses based on management's evaluation of historical experience and current industry trends. Although the Company expects to collect amounts due, actual collections may differ from the estimated amounts.

Inventory purchases from two significant vendors in Asia accounted for a majority of inventory purchases for the years ended December 31, 2006 and 2005.

**Foreign Currency Translation**

Assets and liabilities of foreign subsidiaries with functional currencies other than the U.S. dollar are translated into U.S. dollars using the exchange rates in effect at the balance sheet date. Results of their operations are translated using the average exchange rates during the period. The resulting foreign currency translation adjustment is insignificant. Transaction gains and losses are recorded in the accompanying consolidated statements of income.

**Inventories**

Inventories are stated at the lower of cost or market, cost being determined using the first-in, first-out method. Inventories are composed primarily of finished goods and raw materials.

7

Confidential - Attorney's Eyes Only

MGA 0868715

EXHIBIT 19 PAGE 188

EX 659-0009

## MGA Entertainment, Inc.

### Notes to Consolidated Financial Statements (continued)

#### 1. Summary of Significant Accounting Policies (continued)

**Property and Equipment**

Property and equipment are stated at cost, less accumulated depreciation and amortization. Property and equipment are depreciated using the straight-line method over the estimated useful lives of the related assets, generally ranging from one to five years. Leasehold improvements are amortized over the shorter of the lease term or the estimated life of the improvement.

**Royalty Expense**

Advance royalties, paid by the Company for the right to use certain trade names and characters, are included in prepaid expenses and other current assets, and are amortized at the contractual royalty rate based on actual net product sales. Minimum guaranteed royalty commitments are expensed when it is determined by the Company that the minimum will not be attained through future sales of the related products. Royalty liabilities, in excess of the minimum guaranteed amount, are recorded when such amounts are earned by the licensor. Royalties expense totaled $10,199,000 in 2006 and $7,455,000 in 2005, and is included in cost of sales in the accompanying consolidated statements of income.

**Episodic Production Costs**

Episodic productions are costs related to the production of videos for airing and distribution featuring some of the Company's products and characters. Production costs are capitalized and then expensed based on revenue received in relation to the total expected revenue from the production. Episodic production costs of approximately $5,307,000 and $15,274,000 were expensed into costs of sales for the years ended December 31, 2006 and 2005, respectively.

**Advertising Costs**

Advertising costs are generally expensed as incurred and for the year ended December 31, 2006 and 2005, amounted to $54,769,000 and $44,297,000, respectively.

**Income Taxes**

The Company accounts for United States, foreign and state income taxes in accordance with SFAS No. 109, *Accounting for Income Taxes*. Under this method, deferred income taxes and liabilities are computed based on the temporary differences between the financial statement and

8

Confidential - Attorney's Eyes Only

MGA 0868716

EXHIBIT 19 PAGE 189

EX 659-0010

MGA Entertainment, Inc.

Notes to Consolidated Financial Statements (continued)

**1. Summary of Significant Accounting Policies (continued)**

income tax bases of assets and liabilities using the statutory marginal income tax rate in effect for the years in which the differences are expected to reverse. Valuation allowances are established when necessary to reduce deferred income tax assets to the amount expected to be realized.

The Company has elected to be taxed as an S Corporation for United States federal income tax and California franchise tax purposes. As an S Corporation, United States taxable income is allocated to stockholders based on their respective ownership. Additionally, S Corporations are subject to a California franchise tax of 1.5% of taxable income. The Company also records income tax provisions for income earned in foreign jurisdictions.

The provision for income taxes is composed of the following (dollars in thousands):

|  | 2006 | 2005 |
|---|---|---|
| State income taxes | $  1,665 | $  2,767 |
| Foreign income taxes | 10,473 | 10,362 |
|  | $  12,138 | $  13,129 |

**Impairment of Long-Lived Assets**

The Company reviews the recoverability of other long-lived assets whenever events or changes in circumstances indicate that the carrying value of such assets may not be recoverable. If the expected future cash flows from the use of such assets (undiscounted and without interest charges) are less than the carrying value, the Company's policy is to record an impairment loss for the difference between the carrying value and estimated fair value of the assets.

**Use of Estimates**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the periods reported. Actual results could materially differ from those estimates.

9

Confidential - Attorney's Eyes Only

MGA 0868717

EXHIBIT 14 PAGE 190

EX 659-0011

## MGA Entertainment, Inc.

### Notes to Consolidated Financial Statements (continued)

#### 1. Summary of Significant Accounting Policies (continued)

**Reclassifications**

Certain amounts in 2005 consolidated financial statements have been reclassified to conform to current presentation. Significant reclassifications included in the accompanying consolidated financial statements for 2005 including a reclassification of approximately $2,650,000 of allowance from accrued liabilities to a reduction of accounts receivable and a reduction of approximately $1,950,000 from other income to cost of sales.

#### 2. Little Tikes Acquisition

On November 6, 2006, the Company completed the purchase of certain assets of The Little Tikes Company (the "Little Tikes"), a division of Newell Rubbermaid, Inc. The purchase price was approximately $125,238,000, inclusive of transaction costs incurred by the Company and the assumption of certain liabilities relating to the business and the purchased assets. The Company used the purchase method to account for the combination.

Results of operation of Little Tikes for the period of November 6, 2006 to December 31, 2006, are included in the accompanying consolidated statements of income. The purchased price paid for Little Tikes was allocated to the assets acquired for financial reporting purposes in accordance with Statement of Financial Accounting Standards (SFAS) No. 141, *Business Combinations*.

The purchase price was allocated to the assets acquired as follows (dollars in thousands):

| | | |
|---|---|---|
| Current assets | $ | 44,156 |
| Property and equipment | | 47,563 |
| Trademarks | | 29,699 |
| Product lines | | 3,820 |
| | $ | 125,238 |

The trademark is considered an indefinite life intangible and will not be amortized, but will be reviewed for impairment annually. Product lines will be amortized over five years.

In connection with the purchase, the Company agreed to purchase certain transition services from the seller for a period not to exceed 12 months. Transition services include items such as accounting, human resources and data processing services. The Company recorded a charge to operations of approximately $600,000 for the period from acquisition to December 31, 2006, for these services.

10

Confidential - Attorney's Eyes Only

MGA 0868718

EXHIBIT 19 PAGE 191

EX 659-0012

MGA Entertainment, Inc.

Notes to Consolidated Financial Statements (continued)

**2. Little Tikes Acquisition (continued)**

Included in prepaid expenses and other current assets is approximately $6.8 million for a working capital adjustment related to the purchase. If the final working capital adjustment varies, the purchase price and related allocations would be revised.

**3. Long-Term Loan**

The Company has a $200 million LIBOR Rate Revolving Loan of which $150,000,000 was outstanding at as of December 31, 2006. It bears interests at LIBOR plus applicable margin (total rate of 6.255 percent at December 31, 2006). Interest expenses amounted to $1,693,000 for the year ended December 31, 2006. The Company will be charged a Commitment Fee of Unused Amount of the facility. Commitment fees incurred for the year ended December 31, 2006, approximated $15,000. The loan is secured by accounts receivable, inventory and the stock of certain subsidiaries and is due in 2011.

The loan agreement requires the Company to maintain certain financial ratios and restricts the amount of distributions to the shareholders to an amount computed quarterly. At December 31, 2006, the Company was in compliance with terms of the agreement.

**4. Related-Party Transactions**

**Notes Payable to Related Parties**

During 2006 and 2005, the Company had notes payable to stockholders, a former stockholder and others related to the stockholders. Borrowings were unsecured advances, and bear interest 3%. Interest of $70,000 and $271,000 was earned related to these notes in 2006 and 2005.

**Leases**

The Company has entered into facilities lease agreements with entities owned by the majority stockholder of the Company with a total remaining commitment of $26,360,000 at December 31, 2006. (See Note 4.)

11

Confidential - Attorney's Eyes Only

MGA 0868719

EXHIBIT 19 PAGE 192

EX 659-0013

MGA Entertainment, Inc.

Notes to Consolidated Financial Statements (continued)

## 5. Employee Benefit Plan

The Company has a 401(k) plan covering eligible employees. Employer contributions are made at a rate of 25% of the employee's contributions, up to 5% of the employee's salary. Total contributions are not to exceed the annual amounts deductible under federal income tax regulations. The Company contributed $622,000 and $366,000 to the 401(k) plan for the years ended December 31, 2006 and 2005, respectively.

## 6. Commitments and Contingencies

### Leases

The Company leases facilities and certain equipment under noncancelable operating leases expiring during 2009. The leases are generally on a net-rent basis, whereby the Company pays taxes, maintenance and insurance.

The future minimum lease commitments under these leases are as follows (dollars in thousands):

|  | Related Party | Other | Total |
|---|---|---|---|
| Year ending December 31: | | | |
| 2007 | $ 5,272 | $ 4,297 | $ 9,569 |
| 2008 | 5,272 | 4,084 | 9,356 |
| 2009 | 5,272 | 3,569 | 8,841 |
| 2010 | 5,272 | 1,434 | 6,706 |
| 2011 | 5,272 | 1,502 | 6,774 |
|  | $ 26,360 | $ 14,886 | $ 41,246 |

Total rent expense was $8,214,000 and $7,405,000 for the years ended December 31, 2006 and 2005, respectively, including $4,064,000 in 2006 and $2,786,000 in 2005, paid to the partnerships in which stockholders are partners.

### Litigation

In April 2004, an action was filed by Mattel, Inc. (Mattel) against an independent contractor of the Company, whose original 1998 drawings inspired MGA's creation of the dolls sold since 2001 by the Company under the trade name "Bratz." The complaint alleged causes of action for breach of contract, breach of the duty of loyalty, breach of fiduciary duty, unjust enrichment and conversion. The complaint alleged that the contractor performed services for an unnamed

12

Confidential - Attorney's Eyes Only

MGA 0868720

EXHIBIT 19 PAGE 193

EX 659-0014

## MGA Entertainment, Inc.

### Notes to Consolidated Financial Statements (continued)

**6. Commitments and Contingencies (continued)**

"competitor" while employed by Mattel and that the contractor allegedly misappropriated Mattel property for his own gain and the gain of the unnamed "competitor," in violation of a Mattel inventions and assignments agreement and conflict of interest agreement previously executed by the contractor. While the Company was not named in the complaint, it intervened in the case due to the substantial interest the Company has in the outcome of the case. The contractor and the Company continue to vigorously defend this action. Due to the length of time required to resolve the issue of jurisdiction, including Mattel's appeal, which was denied, discovery in this matter is still in its beginning stages and it is too early for legal counsel to assess, with any degree of certainty, whether there will ultimately be any significant adverse effect on the Company's financial statements or its business. The case has been set for trial in February 2008. As noted above, the Company is vigorously contesting the suit and claims.

On November 20, 2006, Mattel, Inc. filed a motion to amend its complaint, and included the proposed amended pleading as an exhibit. In addition to reiterating its prior claims for alleged conversion and unfair competition, Mattel sought leave to add the Company, MGA Entertainment (HK) Limited, MGAE de Mexico, SRL de CV, an officer of the Company and an employee, as defendants and to assert additional claims relating to alleged copyright infringement, alleged RICO violations, alleged misappropriation of trade secrets, alleged intentional interference with contracts, as well as alleged breaches of the duty of loyalty, alleged aiding and abetting the breach of duty of loyalty and declaratory relief. The Company opposed the amendment of the original complaint to add these additional causes of action and Defendants and the Court agreed on January 12, 2007, granting Mattel leave to file these additional claims as part of an amended answer and counterclaim in the action entitled MGA Entertainment, Inc. v. Mattel, Inc. filed in April 2005. The Company's position regarding these counterclaims in this litigation remains as discussed above, that it will be vigorously contesting Mattel's position in the suit and Mattel's additional counterclaims.

The Company is also subject to other claims arising in the ordinary course of business. In the opinion of management, the ultimate resolution of all pending claims and legal proceedings will not have a materially adverse effect on the Company's business or financial condition.

13

Confidential - Attorney's Eyes Only

MGA 0868721



EX 659-0015

MGA Entertainment, Inc.

Notes to Consolidated Financial Statements (continued)

**7. Phantom Stock Plan**

The Company has a phantom stock plan, with aggregate authorized units of 995,000. The phantom stock plan provides unit awards to be granted at fair value as determined by the Company's board of directors. Awards vest over five years. As of December 31, 2006, the Company had outstanding 475,000 units under the plan. Upon death, termination without cause or a change in control, the holder of the unit is entitled to a cash payment equal to the difference between the current fair market value and the fair market value on the date of grant times the number of vested units held. At December 31, 2006, the Company recorded an accrued expense amounting to approximately $1,011,000, related to 74,500 units of vested phantom stocks.

14.

Confidential - Attorney's Eyes Only

MGA 0868722

EXHIBIT 19 PAGE 195

EX 659-0016

# EXHIBIT 20

**For Immediate Release -**



# GET THE RETAIL RUNWAY READY FOR *AMERICA'S NEXT TOP MODEL* FASHION DOLLS BY MGA ENTERTAINMENT

**Los Angeles, CA**—February 12, 2008—While aspiring models make their way onto the runway on *America's Next Top Model*™, young girls around the world can join in on the fashionable fun of this international phenomenon with the first ever *America's Next Top Model (ANTM)* fashion dolls! MGA Entertainment, manufacturer of the popular *Bratz*™ dolls, has teamed up with CBS Consumer Products to produce the new line of fashion dolls debuting this spring at retailers across the country. The dolls are based on the popular CW show of the same name, starring supermodel Tyra Banks, that is now in its tenth cycle and premiering on Wednesday, February 20 (8:00-9:00 p.m. ET).

The doll line launches with three characters in two different clothing lines—swimwear and casual daywear. Individual dolls come with a bonus daywear outfit and a handful of glamorous accessories essential to making it in the fast-paced world of modeling. Each doll has her very own back story bringing the glamour, beauty and responsibilities of the modeling world to life for young girls with fashion dreams.

"*America's Next Top Model* has been such an extraordinary phenomenon and MGA is proud to unveil the only line of fashion dolls from the hit TV show," says MGA's President and Chief Executive Officer **Isaac Larian**.  "We strongly believe in the show's message of pursuing one's dreams and hope that this doll line continues to promote that same message."

**Liz Kalodner,** Executive Vice President and General Manager of CBS Consumer Products, comments "the new fashion doll line extends the *America's Next Top Model* experience, enabling girls to explore a world in which creativity and individuality are valued."

The dolls are not modeled or based on any particular contestants or participants on the top-rated TV show.

MSRP is $9.99 for ANTM swimwear dolls and $14.99 for ANTM daywear dolls.

EXHIBIT 20 PAGE 1

**For Immediate Release -**

### About MGA Entertainment, Inc.

MGA Entertainment, a consumer entertainment products company headquartered in Van Nuys, California, manufactures innovative lines of proprietary and licensed products including toys and games, dolls, consumer electronics, home décor, stationery and sporting goods. The MGA family includes such brands as the multi award-winning Bratz™, Bratz Babyz™, Bratz Kidz™, Lil' Bratz™, Yummi-Land™, Rescue Pets™, and the recently acquired Little Tikes® brand. MGA has also holds worldwide licensing rights for Zapf Creation®. For more information please visit: www.mgae.com  www.bratz.com  www.littletikes.com  www.zapf-creation.com

### About CBS Consumer Products

CBS Consumer Products, a unit of CBS Entertainment, manages worldwide licensing and merchandising for a diverse slate of television brands and series from CBS, CBS Paramount Network Television and CBS Television Distribution, as well as from the company's extensive library of titles. Additionally, the group oversees the CBS Retail Store and online sales of programming merchandise. For more information, visit www.CBS.com.

# # #

For more information, contact:

| **For MGA Entertainment:** | **For CBS Consumer Products:** |
|---|---|
| Dave Malacrida / 818.894.2525 ext. 6590 | JP Shields |
| Sandra Ravan / 818.894.2525 ext. 6592 | Bender / Helper Impact |
| DMalacrida@mgae.com | Tel: (212) 689-6360 |
| SRavan@mgae.com | JP_Shields@bhimpact.com |

EXHIBIT 20 PAGE 14

# EXHIBIT 21

Case 2:04-cv-09049-DOC-RNB   Document 4513-6   Filed 12/23/08   Page 72 of 82   Page ID
#:131387
Cap 559A rule 32 Renewal of registration                                                    Page 1 of 1



雙語法例資料系統
*Bilingual Laws Information System*

## Individual Section Mode

| Previous section of enactment | Next section of enactment | Switch language | Back to the List of Laws |
|---|---|---|---|

### Contents of Section

▼

| Chapter: | 559A | Title: | TRADE MARKS RULES | Gazette Number: | L.N. 30 of 2003; L.N. 31 of 2003 |
|---|---|---|---|---|---|
| Rule: | 32 | Heading: | **Renewal of registration (s. 50(1), (3) & (7) of the Ordinance) (Form T8) (Fee Nos. 7 & 8)** | Version Date: | 04/04/2003 |

(1) Renewal of the registration of a trade mark shall be effected by filing a request for renewal on the specified form and paying the applicable fee for renewal at any time within the 6-month period ending on the date of expiry of the registration.

(2) If a request for renewal is not filed, or the applicable fee for renewal is not paid, within the period specified in subrule (1), the Registrar shall publish a notice of that fact in the official journal.

(3) Renewal of the registration of a trade mark may also be effected by filing a request for renewal on the specified form and paying the applicable fee for renewal and the applicable fee for late renewal within 6 months after the date of expiry of the registration.

(4) Where the Registrar renews the registration of a trade mark under this rule, he shall publish a notice of the renewal and of the date of the renewal in the official journal.

(5) This rule does not apply to the renewal of the registration of a trade mark to which rule 33 applies.

| Previous section of enactment | Next section of enactment | Switch language | Back to the List of Laws |
|---|---|---|---|

EXHIBIT 21 PAGE 196

# EXHIBIT 22

# The UK Statute Law Database

**OPSI**
Office of Public Sector Information

Show text without annotations

## Trade Marks Act 1994 (c. 26)

**Warning:** This content may not be up-to-date. Please check the **Update Status Warning** message at the top of the **Results within Legislation** page.

**Version 1 of 1**



## Trade Marks Act 1994

**1994 c. 26**

An Act to make new provision for registered trade marks, implementing Council Directive No. 89/104/EEC of 21st December 1988 to approximate the laws of the Member States relating to trade marks; to make provision in connection with Council Regulation (EC) No. 40/94 of 20th December 1993 on the Community trade mark; to give effect to the Madrid Protocol Relating to the International Registration of Marks of 27th June 1989, and to certain provisions of the Paris Convention for the Protection of Industrial Property of 20th March 1883, as revised and amended; and for connected purposes.                                     [21st July 1994]

$B$e it enacted by the Queen's most Excellent Majesty, by and with the advice and consent of the

EXHIBIT 22 PAGE 199

*Duration, renewal and alteration of registered trade mark*

Duration of
registration.

**42.** — (1) A trade mark shall be registered for a period of ten years from the date of registration.

(2) Registration may be renewed in accordance with section 43 for further periods of ten years.

Renewal of
registration.

**43.** — (1) The registration of a trade mark may be renewed at the request of the proprietor, subject to payment of a renewal fee.

(2) Provision shall be made by rules for the registrar to inform the proprietor of a registered trade mark, before the expiry of the registration, of the date of expiry and the manner in which the registration may be renewed.

(3) A request for renewal must be made, and the renewal fee paid, before the expiry of the registration.

Failing this, the request may be made and the fee paid within such further period (of not less than six months) as may be prescribed, in which case an additional renewal fee must also be paid within that period.

(4) Renewal shall take effect from the expiry of the previous registration.

(5) If the registration is not renewed in accordance with the above provisions, the registrar shall remove the trade mark from the register.

Provision may be made by rules for the restoration of the registration of a trade mark which has been removed from the register, subject to such conditions (if any) as may be prescribed.

(6) The renewal or restoration of the registration of a trade mark shall be published in the prescribed manner.

**Annotations:**

**Commencement Information**
I11   S. 43 wholly in force at 31.10.1994; s. 43 not in force at Royal Assent see s. 109; s.43(2)(3)(5)(6) in force for certain purposes at 29.9.1994 and at 31.10.1994 insofar as s. 43 not already in force by S.I. 1994/2550, arts. 2, 3(1), Sch.

Alteration of
registered
trade mark.

**44.** — (1) A registered trade mark shall not be altered in the register, during the period of registration or on renewal.

EXHIBIT 12 PAGE 200

# EXHIBIT 23

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059 and<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| Defendant. | NOTICE OF MOTION AND MOTION OF MATTEL, INC. TO STRIKE DECLARATION OF PAUL K. MEYER FILED IN SUPPORT OF THE MGA PARTIES' OPPOSITION TO MATTEL'S MOTION FOR PERMANENT INJUNCTION; AND |
| AND CONSOLIDATED ACTIONS | |
| | MEMORANDUM OF POINTS AND AUTHORITIES |
| | Date:       November 10, 2008<br>Time:       1:00 p.m.<br>Place:      Courtroom 1 |

2670592_6.DOC

1 │ TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2 │       PLEASE TAKE NOTICE that on November 10, 2008, at 1:00 p.m., or as

3 │ soon thereafter as this matter may be heard, in the Courtroom of the Honorable Steven G.

4 │ Larson, located at 3470 Twelfth Street, Riverside California 92501, plaintiff and

5 │ counterclaimant Mattel, Inc. ("Mattel") will, and hereby does, move the Court for an

6 │ order striking the Declaration of Paul K. Meyer (the "Meyer Declaration") filed in

7 │ support of the MGA Parties' Opposition to Mattel's Motion for Permanent Injunction or,

8 │ in the alternative, for an order striking paragraphs 6 through 18 of the Meyer

9 │ Declaration.

10 │       This Motion is made pursuant to <u>Federal Rules of Evidence</u> 401, 402, 403

11 │ and 702 on the grounds that the testimony is not "scientific, technical, or other

12 │ specialized knowledge," is unreliable, lacks foundation and will not assist the Court.

13 │       This Motion is based on this Notice of Motion and Motion, the

14 │ accompanying Memorandum of Points and Authorities, the Supplemental Declaration of

15 │ Scott B. Kidman in Support of Mattel, Inc.'s (1) Motion for Constructive Trust and

16 │ Finding of Liability and Injunctive Relief Under Cal. Bus. & Prof. Code § 17200; and (2)

17 │ Motion for Declaratory Judgment of Ownership of Bratz Works ("Supp. Kidman Dec."),

18 │ the records and files of this Court, and all other matters of which the Court may take

19 │ judicial notice.

20 │       This motion is made following the conference of counsel pursuant to L.R. 7-

21 │ 3 which took place on October 15, 2008.

22 │

23 │ DATED:  October 20, 2008       QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

24 │

25 │

26 │       By /s/ John B. Quinn

27 │         John B. Quinn
        Attorneys for Mattel, Inc.

28 │

2670592_6.DOC

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

**EXHIBIT 22 PAGE 202**

1

## TABLE OF CONTENTS

2

**Page**

3

PRELIMINARY STATEMENT ............................................................................... 1

4

BACKGROUND ................................................................................................... 2

5

6

ARGUMENT ......................................................................................................... 4

7   I.       EXPERT TESTIMONY MUST BE BASED ON SUFFICIENT FACTS,
            RELIABLE METHODS AND THE PROPER APPLICATION OF
8           THOSE METHODS TO THE FACTS. ............................................................. 4

9

10  II.      MR. MEYER'S OPINION CONCERNING A REASONABLE
            ROYALTY RATE IS INADMISSIBLE. ........................................................... 5

11          A.    Mr. Meyer's Opinion Does Not Satisfy Daubert. ..................................... 5

12
            B.    Mr. Meyer's Opinion Does Not Consider Any Generally Accepted
13                Standards to Determine a Reasonable Royalty Rate. ............................... 6

14          C.    Mr. Meyer's Methodology Is Not Reliable. ............................................. 9

15
            D.    Mr. Meyer's Opinion Lacks Foundation. .............................................. 11
16

17  III.     MR. MEYER'S CONCLUSORY OPINION CONCERNING MGA'S
            ABILITY TO PAY IS INADMISSIBLE. ........................................................ 13

18
    CONCLUSION .................................................................................................... 14
19

20

21

22

23

24

25

26

27

28

EXHIBIT 12 PAGE 203

1

## TABLE OF AUTHORITIES

2                                                                                              **Page**

3                                                     Cases

4   In re Air Disaster at Lockerbie Scotland,
5       37 F.3d 804 (2nd Cir. 1994) ................................................................................. 12

    Bose Corp. v. JBL, Inc.,
6       112 F. Supp. 2d 138 (D.Mass. 2000) ................................................................. 6, 8

7   Champagne Metals v. Ken-Mac Metals, Inc.,
8       458 F.3d 1073 (10th Cir. 2006) ......................................................................... 9, 10

9   DSU Medical Corp. v. JMS Co.,
        296 F. Supp. 2d 1140 (N.D. Cal. 2003) .................................................................. 5
10
    Daubert v. Merrell Dow Pharmaceuticals, Inc.,
11      509 U.S. 579 (1993) ..................................................................... 1, 4, 5, 6, 10, 11

12  Daubert v. Merrell Dow Pharmaceuticals, Inc.,
13      43 F.3d 1311 (9th Cir. 1995) ................................................................................. 4

14  Fedorczyk v. Caribbean Cruise Lines, Ltd.,
        82 F.3d 69 (3d Cir. 1996) ....................................................................................... 9

15  Georgia-Pacific Corp. v. United States Plywood Corp.,
16      318 F. Supp. 1116 (S.D.N.Y. 1970) ............................................................. 6, 8, 9, 10

17  Guidroz-Brault v. Missouri Pac. R.R. Co.,
        254 F.3d 825 (9th Cir. 2001) .................................................................................. 9

18  Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am., Corp.,
19      103 F. Supp. 2d 268 (S.D.N.Y. 2000) ................................................................. 4, 5

20  Kumho Tire Co. v. Carmichael,
        526 U.S. 137 (1999) ...................................................................................... 4. 5. 9
21
    McGlinchy v. Shell Chem. Oil,
22      845 F.2d 802 (9th Cir. 1988) ............................................................................ 5, 12

23  McLean v. 988011 Ontario Ltd.,
        224 F.3d 797 (6th Cir. 2000) ............................................................................... 12
24
    Micro Chemical, Inc. v. Lextron, Inc.,
25      317 F.3d 1387 (Fed. Cir. 2003) .............................................................................. 8

26  Micro International Limited v. Monolithic Power Systems, Inc.,
27      399 F. Supp. 2d 1064 (N.D.Cal. 2005) ................................................................... 9

28

Ralston-Purina Co. v. Bertie,
  541 F.2d 1363 (9th Cir. 1976) ................................................................... 5

Riles v. Shell Exploration and Production Co.,
  298 F.3d 1302 (Fed. Cir. 2002) ............................................................. 6, 8

Sands, Taylor & Wood v. The Quaker Oats Company,
  34 F.3d 1340 (7th Cir. 1994) .................................................................... 8

TWM Mfg. Co. v. Dura Corp.,
  789 F.2d 895 (Fed. Cir. 1986) .................................................................. 6

Talley v. Danek Med., Inc.,
  179 F.3d 154 (4th Cir. 1999) .................................................................. 12

United States v. Sepulveda,
  15 F.3d 1161 (1st Cir. 1993) .................................................................. 11

Utah Medical Products, Inc. v. Graphic Controls Corp.,
  350 F.3d 1376 (Fed. Cir. 2003) ............................................................. 11

Vermont Microsystems, Inc. v. Autodesk, Inc.,
  88 F.3d 142 (2d Cir. 1996) ...................................................................... 6

**Statutes**

Fed. R. Evid. 702 ............................................................................. 4, 9 11

EXHIBIT 23 PAGE 105

2670592_6.DOC

1

2

## **MEMORANDUM OF POINTS AND AUTHORITIES**

3

## **Preliminary Statement**

4        MGA has submitted the Declaration of Paul K. Meyer (the "Meyer

5  Declaration") in opposition to Mattel's Motion for Permanent Injunction.  The Meyer

6  Declaration purports to furnish a reasonable royalty rate as part of MGA's argument that

7  the Court should order royalty payments on MGA's infringing products rather than

8  permanently enjoin their sale.  However, the opinion expressed in the Meyer Declaration

9  does not satisfy *any* of the Daubert factors of reliability and it should be excluded as a

10  result.

11        As Mr. Meyer has admitted, he has no experience or expertise in matters

12  relating to the manufacture or sale of fashion dolls.  He thus offers no opinion tied at all

13  to toy industry practices relating to royalties on fashion dolls or even to the royalty rates

14  that MGA has been paid for Bratz.  Instead, Mr. Meyer invents his own unsupportable

15  "methodology" to derive an infinitesimal royalty rate that amounts to a fraction of a

16  single percent and that neither he nor MGA can even state bears any relation to real

17  world transactions.  As his starting point, Mr. Meyer takes the *revenues* he calculated for

18  the entire line of Bratz products -- including products that are not the subject of Mattel's

19  injunction request.  He then divides those total revenues by what he deems to be the

20  *profits* for the products that he speculates the jury found to be infringing.  From these

21  faulty premises, Mr. Meyer then divines a royalty rate for a third set of products, *i.e.* the

22  products that are the subject of Mattel's motion for a permanent injunction.  Mr. Meyer

23  does not cite *any* publication, treatise, study or other source to validate his

24  "methodology."  His opinion also lacks foundation because, among other things, it relies

25  on speculative assumptions of how the jury determined damages for copyright

26  infringement.

27        As the Court is aware, Mr. Meyer already has had several opinions excluded

28  because the Court found that they were indefensible and did not pass muster under

1

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

EXHIBIT 22 PAGE 204