1  Daubert.  At trial, Mr. Meyer disavowed competence in basic accounting principles as
2  they relate to damages.  His opinion here is even less reliable than other opinions
3  previously excluded by the Court.

4          The Meyer Declaration lacks the reliability and foundation required for an
5  expert opinion and, accordingly, it should be stricken.

6
7                              **Background**

8          As the Court knows, Mr. Meyer is a certified public accountant who
9  testified for MGA at trial.  He advanced a number of apportionment approaches,[1]
10  including several that the Court excluded.  As to one of his approaches, the Court
11  commented: "I understand what he did.  But I have no confidence that there's any
12  scientific basis for what he did. . . . I don't see how this is defensible at all."[2]  On another
13  approach, Mr. Meyer had to concede that, although MGA made profits from Bratz of
14  over $250 million from 2005 through 2007, according to his methodology no portion of
15  those profits was attributable to the intellectual property.[3]  And, as the Court will recall,
16  despite being a CPA, Mr. Meyer claimed to be unable to say whether compensatory
17  damages paid by a corporation would be tax deductible.[4]

18          Mr. Meyer has now advanced a similarly flawed opinion about a royalty
19  rate.  His methodology "is to accept the finding of the jury regarding the *value of the*
20  *copyrights* and convert that value into a running royalty rate to apply to future infringing
21  sales, if any."[5]  But the jury did not make a finding regarding the "value of the

22
23     [1]    Mr. Meyer's apportionment approaches included royalties paid to Mr. Bryant
24  for his contributions to the Bratz doll line, work tasks to develop the original Bratz
25  doll and sales variations among Bratz products.
       [2]    Trial Tr. at 7754:4-19.
26     [3]    Trial Tr. at 7779:7-7780:24.
27     [4]    Trial Tr. at 7771:10-7773:4.
       [5]    Meyer Declaration, ¶ 15 (emphasis added).
28

1   copyrights."[6]  As his declaration shows on its face, Mr. Meyer speculates about what the
2   jury did find.[7]  Mr. Meyer obviously does not know the basis of the verdict, and his
3   various alternatives as to what the jury *may* have found -- which he tellingly calls
4   "possible interpretations" of the verdict -- are pure conjecture.  Importantly, Mr. Meyer's
5   speculation about what the jury did or did not do is a predicate to his opinion.  His lack
6   of knowledge renders his opinion useless.

7           As his declaration reveals, Mr. Meyer calculates his royalty rate "*[b]ased on*
8   *the jury's finding*" about which he speculates.[8]  He compares the purported "value of the
9   copyrights," based on his "possible interpretations" of the verdict, with the revenue from
10  the sale and licensing of the full line of Bratz-related products of $3.1 billion.[9]  In doing
11  so, not only does Mr. Meyer rely on inadmissible and incompetent "possible
12  interpretations" of the verdict, but he compares apples to oranges.  He has divided *profits*
13  by *revenues*.[10]  Moreover, these numbers may relate to different sets of products.  The
14  revenues are for the sale and licensing of all Bratz products, but it cannot be determined
15  whether the jury's verdict represents its calculation of MGA's profits on all of those
16  products or on some subset.  So, Mr. Meyer compares revenues on one defined set of
17  products to profits on an undefined set of products.

18          Even more problematical, Mr. Meyer uses these numbers to establish a
19  purported royalty rate for a distinct third set of products -- the products for which Mattel
20  seeks a permanent injunction.  Mattel does not seek to enjoin the sale and license of all
21  Bratz products (which included products that Mattel did not accuse of infringement but
22  instead sought indirect profits recovery on and on which Mr. Meyer bases the revenue

23

---

24      [6]   Phase B Verdict Form as Given, Question No. 11.
25      [7]   Meyer Declaration, ¶¶ 12 and 13 (emphasis added).
        [8]   Meyer Declaration, ¶ 16 (emphasis added).
26      [9]   Meyer Declaration, ¶ 15.
        [10]  Had Mr. Meyer used his own calculation of profits rather than revenues in his
27  analysis, his royalty rate would have been approximately ten times higher.
28

1   numbers in his opinion); rather, it seeks to enjoin the sale and license of those products

2   which contain protectable elements of its copyrighted works.

3          Finally, Mr. Meyer addresses a separate subject, *i.e.* Mattel's argument that

4   it would suffer irreparable harm absent a permanent injunction because MGA does not

5   have the ability to pay the judgment, future damages or royalties.[11] As shown below, his

6   testimony is immaterial and erroneous as to this issue because he relies on a statement by

7   a Mattel expert based on data through June 30, 2008.  This time period was not only

8   before the Phase 1(a) verdict that MGA claimed changed its financial condition, but

9   there is no evidence that pre-June 30 financial information has any relevance to MGA's

10  current financial condition.  In fact, in August 2008, MGA represented to the Ninth

11  Circuit and the Court that it was in dire financial straits and "may not be able to

12  survive."[12]  At trial MGA and Meyer urged the jury to reject the valuation of Mattel's

13  expert. Surprisingly, Mr. Meyer, a purported valuation expert, does not do any analysis

14  or valuation of his own to show MGA's financial condition even though he surely has

15  access to such information from his client, MGA.

16

17                                    **Argument**

18  I.    **EXPERT TESTIMONY MUST BE BASED ON SUFFICIENT FACTS,**

19        **RELIABLE METHODS AND THE PROPER APPLICATION OF**

20        **THOSE METHODS TO THE FACTS.**

21          Federal Rule of Evidence 702 provides that an expert witness with

22  "scientific, technical, or other specialized knowledge" may testify in the form of an

23  opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

24  the product of reliable principles and methods, and (3) the witness has applied the

25  principles and methods reliably to the facts of the case." Fed. R. Evid. 702. See also

26  ─────────────────────

27  [11]   Meyer Declaration, ¶ 18.
    [12]   Hutnyan Dec., Ex. 84 at ¶¶ 3 and 4.

28

1   Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-92 (1993) ( Rule 702
2   "establishes a standard of evidentiary reliability . . . as a precondition to admissibility");
3   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).  "[T]he trial judge must
4   ensure that any and all scientific testimony or evidence admitted is not only relevant, but
5   reliable." Daubert, 509 U.S. at 589.

6          The burden of demonstrating that expert testimony is reliable rests with the
7   party offering the testimony. Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.,
8   103 F. Supp. 2d 268, 279 (S.D.N.Y. 2000).  Assessment of the reliability of an expert's
9   opinion involves an examination of both the factual bases and assumptions underlying
10  the opinion, and the soundness of the expert's methodology. See Johnson, 103 F. Supp.
11  2d at 284.  Accordingly, the Court must make a "preliminary assessment of whether the
12  reasoning or methodology underlying the testimony is scientifically valid and of whether
13  that reasoning or methodology properly can be applied to the facts in issue." Daubert,
14  509 U.S. at 592-593.

15         Courts in the Ninth Circuit do not hesitate to exclude unreliable expert
16  testimony. See, e.g., McGlinchy v. Shell Chem. Oil, 845 F.2d 802, 807 (9th Cir. 1988);
17  and Ralston-Purina Co. v. Bertie, 541 F.2d 1363, 1367 (9th Cir. 1976).  In particular,
18  where the proffered methodology is not grounded in established legal principles or is
19  divorced from economic realities, the Court is well within its discretion to exclude the
20  expert testimony.  See DSU Medical Corp. v. JMS Co., 296 F. Supp. 2d 1140, 1147
21  (N.D. Cal. 2003) (trial court should exclude opinion evidence based on "the *ipse dixit* of
22  the expert").

23

24  **II.   MR. MEYER'S OPINION CONCERNING A REASONABLE**
25          **ROYALTY RATE IS INADMISSIBLE.**
26          **A.   Mr. Meyer's Opinion Does Not Satisfy Daubert.**
27          In Daubert, the Supreme Court set out five factors relevant to determining
28  the reliability of expert opinion testimony: (i) whether the technique can be, or has been,

2670592_6.DOC

5

1   tested; (ii) whether it has been subjected to peer review and publication; (iii) whether
2   there is a known or potential error rate; (iv) whether there are standards controlling the
3   technique's operation; and (v) whether there is "general acceptance" of the technique.
4   509 U.S. at 593-594.[13]

5           On remand from the Supreme Court, the Ninth Circuit in Daubert v. Merrell
6   Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995), identified other factors to
7   determine the reliability of expert opinion testimony, including whether the testimony
8   grew out of research conducted independent of the litigation and whether there is some
9   "objective source" such as a treatise, policy statement or published article supporting the
10  method. 43 F.3d at 1317-1319. The Ninth Circuit found that the plaintiffs had made no
11  such showings and, therefore, the expert testimony was inadmissible. 43 F.3d at 1319.

12          Mr. Meyer's opinion testimony fails all these tests. MGA presents no
13  evidence that (i) the technique can be, or has been, tested; (ii) it has been subjected to
14  peer review or publication; (iii) there is a known or potential error rate; (iv) there are
15  standards controlling its operation; or (v) there is "general acceptance" or any acceptance
16  of the technique. MGA also has fails to show that Mr. Meyer's testimony arose out of
17  independent research or is supported by anything other than his *ipse dixit*.

18          Mr. Meyer's declaration does not satisfy, or even purport to satisfy, *any* of
19  the factors used to establish reliability of expert testimony.

20  **B.    Mr. Meyer's Opinion Does Not Consider Any Generally Accepted**
21          **Standards to Determine a Reasonable Royalty Rate.**

22          Although there are well-known and generally accepted methods to
23  determine reasonable royalty rates, Mr. Meyer does not purport to use any of them.
24  When there is no established royalty rate, a court "must retroactively construct a
25  hypothetical 'arms-length' negotiation between a willing licensor and a willing licensee

26  ─────────────────────────────
27  [13]   *Daubert* is not limited to "scientific" testimony. Kumho, 526 U.S. at 147-148.
28

2670592_6.DOC

EXHIBIT 22 PAGE 211

1 │ to determine the royalty rate upon which the parties would have agreed." <u>Bose Corp. v.</u>
2 │ <u>JBL, Inc.</u>, 112 F. Supp. 2d 138, 165 (D.Mass. 2000), citing <u>TWM Mfg. Co. v. Dura</u>
3 │ <u>Corp.</u>, 789 F.2d 895, 898-899 (Fed. Cir. 1986). <u>See also Riles v. Shell Exploration and</u>
4 │ <u>Production Co.</u>, 298 F.3d 1302, 1311 (Fed. Cir. 2002) ("'reasonable royalty' contemplates
5 │ a hypothetical negotiation"); <u>Vermont Microsystems, Inc. v. Autodesk, Inc.</u>, 88 F.3d 142,
6 │ 151 (2d Cir. 1996).

7 │      One well-established methodology to calculate a reasonable royalty is set
8 │ forth, for example, in <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F.
9 │ Supp. 1116 (S.D.N.Y. 1970), <u>modified and aff'd</u>, 446 F.2d 295 (2d Cir. 1971), where the
10 │ court set out fifteen factors to analyze as part of this hypothetical negotiation:

11 │     "1.   The royalties received . . . proving or tending to prove
12 │     an established royalty.

13 │     "2.   The rates paid by the licensee for the use of other
14 │     patents comparable to the patent in suit.

15 │     "3.   The nature and scope of the license, as exclusive or non-
16 │     exclusive, or as restricted or non-restricted . . . .

17 │     "4.   The licensor's established policy and marketing program
18 │     to maintain his patent monopoly by not licensing others . . . or
19 │     by granting licenses under special conditions . . . .

20 │     "5.   The commercial relationship between the licensor and
21 │     licensee, such as, whether they are competitors in the same
22 │     territory in the same line of business . . . .

23 │     "6.   The effect of selling the patented specialty in promoting
24 │     sales of other products of the licensee . . . .

25 │     "7.   The duration of the patent and the term of the license.

26 │     "8.   The established profitability of the product . . . ; its
27 │     commercial success; and its current popularity.

28

2670592_6.DOC

MATTEL'S MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

**EXHIBIT 23 PAGE 212**

1           "9.    The utility and advantages of the patent property over

2           the old modes or devices . . . .

3           "10.   The nature of the patented invention; the character of the

4           commercial embodiment of it as owned and produced by the

5           licensor; and the benefits to those who have used the invention.

6           "11.   The extent to which the infringer has made use of the

7           invention; and any evidence probative of the value of that use.

8           "12.   The portion of the profit or of the selling price that may

9           be customary in the particular business or in comparable

10          businesses . . . .

11          "13.   The portion of the realizable profit that should be

12          credited to the invention as distinguished from non-patented

13          elements, the manufacturing process, business risks, or

14          significant features or improvements added by the infringer.

15          "14.   The opinion testimony of qualified experts.

16          "15.   The amount that a licensor (such as the patentee) and a

17          licensee (such as the infringer) would have agreed upon (at the

18          time the infringement began) if both had been reasonably and

19          voluntarily trying to reach an agreement . . . ."

20

21        Some courts have commented that the Georgia-Pacific factors are the

22 "standard approach to determining a royalty rate." Bose, 112 F. Supp. 2d at 165. See

23 also Micro Chemical, Inc. v. Lextron, Inc., 317 F.3d 1387, 1393 (Fed. Cir. 2003) (expert

24 properly applied the "accepted Georgia-Pacific methodology"); Sands, Taylor & Wood

25 v. The Quaker Oats Company, 34 F.3d 1340, 1352 (7th Cir. 1994).  In Riles v. Shell

26 Exploration and Production Co., supra, 298 F.3d at 1313, the Federal Circuit held that

27 expert testimony as to a reasonable royalty rate was inadmissible because it "did not

28 reflect what royalty rate a hypothetical negotiation between Shell and Riles would have

1 | yielded . . . . Riles did not provide any evidence or testimony to show that [the expert's]
2 | models reflected what the parties might have agreed to . . . ."

3 |    Here, Mr. Meyer did not consider a hypothetical negotiation between Mattel
4 | and MGA and did not discuss any standard, recognized methodology such as the
5 | Georgia-Pacific factors. Instead, he devised his own methodology which is unsupported
6 | by any testing, peer review, independent research or other type of objective source. Mr.
7 | Meyer did so even though he is unquestionably aware of the standards commonly used to
8 | determine a reasonable royalty rate, *i.e.*, the hypothetical negotiation and the Georgia-
9 | Pacific factors, because he performed an analysis based on those standards in 02 Micro
10 | International Limited v. Monolithic Power Systems, Inc., 399 F.Supp.2d 1064, 1078
11 | (N.D.Cal. 2005), for example. Because it is not based on any recognized methodology,
12 | Mr. Meyer's opinion fails to meet Daubert's requirements.

13 |    **C.** **Mr. Meyer's Methodology Is Not Reliable.**

14 |    A trial judge must ensure that an expert's testimony "is the product of
15 | reliable principles and methods." Fed. R. Evid. 702; Kumho, 526 U.S. at 152. See also
16 | Guidroz-Brault v. Missouri Pac. R.R. Co., 254 F.3d 825, 831 (9th Cir. 2001).
17 | Accordingly, the Court should "assess the reasoning and methodology underlying the
18 | expert's opinion, and determine whether it is both scientifically valid and applicable to a
19 | particular set of facts." Champagne Metals v. Ken-Mac Metals, Inc., 458 F.3d 1073,
20 | 1079 (10th Cir. 2006). See also Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69,
21 | 75 (3d Cir. 1996). Mr. Meyer's methodology is neither scientifically valid nor applicable
22 | to the facts of this case.

23 |    Mr. Meyer says that his determination of the royalty rate is based on the
24 | jury's finding of "the value of the copyrights."[14] However, the jury determined damages
25 | for infringement of Mattel's copyrights (*i.e.*, MGA's profits), not the "value of the

26 |
27 | ———————————
  [14] Meyer Declaration, ¶¶ 15 and 16.
28 |

1  copyrights."[15] Nevertheless, based on his "possible interpretations" of the verdict, Mr.
2  Meyer adopts the profit figures of $6 million and $10 million from the jury verdict form
3  (respectively the amounts of damages for copyright infringement awarded against MGA
4  alone and against the three MGA defendants collectively) as the jury's purported finding
5  of the ostensible "value of the copyrights."[16]

6        Not only does Mr. Meyer groundlessly conflate infringement damages with
7  the value of the copyrights, Mr. Meyer proceeds to calculate a royalty rate by dividing
8  those "values of the copyrights" by the revenues of $3.1 billion from the past sale and
9  licensing of *all* Bratz-related products. However, Mr. Meyer admittedly speculates about
10  which products the jury found to be infringing:   "[T]he jury *may* have found that the
11  number of infringing products was quite small."[17] Likewise, he does not know how the
12  jury calculated profits or what apportionment analysis it used.  His methodology is based
13  on conjecture.

14        Mr. Meyer also fails to consider the scope of the products that are the
15  subject of Mattel's motion for permanent injunction. At trial, Mattel sought damages for
16  copyright infringement as well as for indirect profits resulting from the infringement.
17  The $3.1 billion figure Mr. Meyer uses in his calculation represents the revenues from all
18  Bratz related products -- including products that Mattel did not accuse of direct copyright
19  infringement.   In contrast, Mattel's motion for permanent injunction concerns only
20  products that contain protectable elements of its copyrighted works.  Because Mr.
21  Meyer's calculation of the royalty rate is based on products whose sale or license Mattel
22  does not seek to enjoin, his calculation is not only speculative, but it fails to fit the facts
23  of this case as <u>Daubert</u> requires. Mr. Meyer does not explain why it is appropriate or
24  defensible to use different measures from two possibly different sets of products to

25  _____
   [15]   See Court's Phase B Jury Instructions as Given, Jury Instruction No. 41 and
26  Phase B. Verdict Form as Given, Question No. 11.
   [16]   Meyer Declaration, ¶ 15.
27
28

1  determine a royalty rate for yet a third set of products.  Nor does he cite any source to

2  validate this methodology.  See Champagne Metals, supra, 458 F.3d at 1079-1080

3  (expert testimony properly excluded where the allegedly anti-competitive conduct

4  occurred in one market while the expert testimony was based on a different market).

5  　　　　Thus, Mr. Meyer's methodology fails to meet any of the Daubert tests, fails

6  to use any accepted royalty calculation methodology such as the Georgia-Pacific factors,

7  and fails to meet any other standard of scientific validity.

8  ## D.   Mr. Meyer's Opinion Lacks Foundation.

9  　　　　The Court not only must determine that an expert's methodology is

10  scientifically valid, but also must ensure that the expert has sufficient foundation to

11  render an opinion.  Daubert, 509 U.S. at 592-593.  Courts should strike "opinions

12  advanced by an expert [that] rest on a wholly inadequate foundation."  United States v.

13  Sepulveda, 15 F.3d 1161, 1183 (1st Cir. 1993).  Mr. Meyer asserts three bases for his

14  opinion, none of which establishes sufficient foundation.

15  　　　　First, Mr. Meyer states in conclusory fashion that he has worked on a

16  number of royalty claims, including claims involving intellectual property.[18]  He fails to

17  disclose any information about the nature of the claims, what analysis or work he

18  performed, the results of his work or anything else about this experience.  An expert

19  witness who primarily relies on his or her experience must explain "how that experience

20  leads to the conclusion reached, why that experience is a sufficient basis for the opinion,

21  and how that experience is reliably applied to the facts." Jones, Rosen, Wegner & Jones,

22  Federal Civil Trials & Evidence (TRG 2007), ¶ 8:1522; see also Fed. R. Evid. 702, Adv.

23  Comm. Note (2000).  In fact, what is known is that, as Mr. Meyer has conceded, he has

24  never previously performed an analysis involving the manufacture or sale of fashion

25

26

27  [17]   Meyer Declaration, ¶ 12 (emphasis added).

28  [18]   Meyer Declaration, ¶ 5.

2670592_6.DOC

1  dolls.[19]  Consequently, there is no basis to conclude that his previous experience bears on

2  the issues here.

3  Mr. Meyer also claims that he reviewed licensing information produced by

4  Mattel and MGA and had discussions with MGA licensing personnel.[20]  However, he

5  does not say what licensing information he reviewed, what products were involved, with

6  whom at MGA he had such discussions, how any of that information relates to the

7  royalty rate he derives or that any of the information he received involved products that

8  are comparable to the products that are the subject of Mattel's motion for permanent

9  injunction. Accordingly, this cannot be sufficient foundation for his opinion.  See Utah

10  Medical Products, Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1385 (Fed. Cir. 2003)

11  (upholding district court's exclusion of expert testimony concerning a royalty rate where

12  the expert did not show that license agreements relied upon were "comparable").

13  Equally troubling, a logical reading of his declaration suggests that his proffered opinion

14  is inconsistent with whatever actual royalty information he received because that

15  information does not figure in the methodology which he claims to have utilized.

16  Finally, although his opinion is admittedly "[b]ased on the jury's finding,"[21]

17  Mr. Meyer relies on his conjecture as to what the jury found: "The relatively small size

18  of the copyright infringement award *may* indicate certain findings by the jury.  For

19  example, the jury *may* have found that the number of infringing products was quite

20  small. . . .  Alternatively, the jury *may* have concluded that the contribution of the

21  copyrights to MGA's Bratz profits associated with the infringing sales was quite low

22  . . . ."[22]  Mr. Meyer has to speculate both as to how the jury computed profits and the

23  scope of the products it found to be infringing.  Expert opinions are excluded if based on

24  speculative assumptions.  McGlinchy, 845 F.2d at 807; In re Air Disaster at Lockerbie

25  _____

26  [19]  Meyer Tr. at 13:3-6, 14:14-22, Supp. Kidman Dec., Ex. Q.
   [20]  Meyer Declaration, ¶ 14.
27  [21]  Meyer Declaration, ¶ 16.

28

1  Scotland, 37 F.3d 804, 824 (2nd Cir. 1994); McLean v. 988011 Ontario Ltd., 224 F.3d
2  797, 800-801 (6th Cir. 2000); Talley v. Danek Med., Inc., 179 F.3d 154, 162 (4th Cir.
3  1999).

4          Therefore, there is insufficient foundation for Mr. Meyer's opinion, and it
5  should be excluded for this reason as well.

6

7  **III.    MR. MEYER'S CONCLUSORY OPINION CONCERNING MGA'S**
8  **ABILITY TO PAY IS INADMISSIBLE.**

9          Mr. Meyer attempts to rebut Mattel's showing that it would suffer
10  irreparable harm absent a permanent injunction because MGA does not have the ability
11  to pay the judgment, future damages or royalties. He declares that Mattel's expert, Mr.
12  Wagner, concluded that the *present value* of MGA's *projected future income* from Bratz
13  is $283.7 million based on data through June 30, 2008. Mr. Meyer then opines that such
14  an amount should be sufficient to satisfy any past or future damage award.[23]

15          Mr. Meyer's opinion on this score fails under Daubert to establish MGA's
16  ability to pay. Not only did Mr. Meyer and MGA criticize and urge the jury at trial to
17  ignore Mr. Wagner's testimony, but Mr. Wagner opined on future cash flows. A possible
18  future income stream does not mean that MGA has the cash to pay a current judgment.
19  Equally importantly, the $283.7 million figure Mr. Wagner calculated was based on data
20  as of June 30, 2008. This was before the Phase 1(a) verdict. After the Phase 1(a) verdict
21  against MGA and Larian, both repeatedly claimed to the Court and the jury that the
22  verdict caused MGA catastrophic losses. Indeed, in August 2008, MGA represented to
23  the Ninth Circuit and the Court that it was in dire financial straits.[24] Mr. Larian declared
24  that MGA was "hemorrhag[ing] cash," had lost the use of existing lines of credit and had

25

26  [22]   Meyer Declaration, ¶¶ 12 and 13 (emphasis added).
27  [23]   Meyer Declaration, ¶ 18.
28  [24]   Hutnyan Declaration, Ex. 84 at ¶ 5.

EXHIBIT 22 PAGE 124

1   been unable to secure new lines of credit.  He swore that MGA "may not be able to
2   survive."[25]

3          Finally, if anything, Mr. Meyer's declaration tends to refute his own
4   conclusion and to confirm that MGA still remains in significant financial trouble and
5   cannot pay the judgment, let alone make future payments. Mr. Meyer, a purported
6   valuation expert for MGA who has interviewed MGA personnel, plainly has access to
7   MGA's actual financial information. Indeed, MGA has now fronted him as its witness to
8   establish the supposed soundness of MGA. Yet, Mr. Meyer does not offer any valuation
9   or analysis of his own, let alone a current one.  From this failure, the Court can
10  reasonably draw an adverse inference against MGA as to its financial condition.  See
11  Singh v. Gonzales, 491 F.3d 1019, 1024 (9th Cir. 2007) (holding that "'[w]hen a party
12  has relevant evidence in his control which he fails to produce, that failure gives rise to an
13  inference that the evidence is unfavorable to him,'" quoting Int'l Union, United
14  Automobile, Aerospace and Agric. Implement Workers v. N.L.R.B., 459 F.2d 1329,
15  1336 (1972)).

16         Mr. Meyer's opinion as to MGA's current financial status and ability to pay
17  is not reliable and should be excluded.

18

19                              **Conclusion**
20         For the foregoing reasons, Mattel respectfully requests that the Court strike
21  the Meyer Declaration or, in the alternative, strike paragraphs 6 through 18 thereof.
22  DATED:  October 20, 2008            QUINN EMANUEL URQUHART OLIVER &
                                         HEDGES, LLP
23

24

25                                       By  /s/ John B. Quinn
                                             John B. Quinn
26                                           Attorneys for Mattel, Inc.

27  ───────────────────
         [25]   Hutnyan Declaration, Ex. 84 at ¶¶ 3 and 4.
28

# EXHIBIT 24

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
(johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with Case No. CV 04-09059 and Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | Hon. Stephen G. Larson |
| Defendant. | MATTEL, INC.'S REPLY IN SUPPORT OF MOTION TO STRIKE DECLARATION OF PAUL K. MEYER FILED IN SUPPORT OF MGA PARTIES' OPPOSITION TO MATTEL'S MOTION FOR PERMANENT INJUNCTION |
| AND CONSOLIDATED ACTIONS. | |
| | Date: November 10, 2008 Time: 1:00 p.m. Place: Courtroom 1 |

07209/2687220.6

1

# **TABLE OF CONTENTS**

2                                                                                                    **Page**

3

4   PRELIMINARY STATEMENT ................................................................................. 1

5   ARGUMENT ........................................................................................................... 1

6   I.      AN INJUNCTION, NOT A ROYALTY, IS THE PROPER REMEDY ......... 1

7   II.     MEYER'S ROYALTY OPINIONS ARE INADMISSIBLE ............................ 4

8           A.     The Jury Did Not Make Factual Findings Which Bind The Court
                   to Deny An Injunction Or Adopt A Compulsory Royalty ....................... 4
9
            B.     Meyer's Royalty Is Not Properly "Informed By" The Verdict ............... 6
10
            C.     Meyer's Royalty Opinions Are Unreliable ............................................. 8
11
            D.     Meyer's Royalty Opinions Lacks Foundation ....................................... 11
12
    III.    MEYER'S ABILITY TO PAY OPINION IS INADMISSIBLE .................... 12
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-i-

EXHIBIT 14 PAGE 221

# TABLE OF AUTHORITIES

**Page**

## Cases

A&M Records, Inc. v. Napster, Inc.,
  239 F.3d 1004 (9th Cir. 2001) ........................................................................ 2

Abend v. MCA, Inc.,
  863 F.2d 1465 (9th Cir. 1988) .......................................................... 1, 2, 3, 4

Amado v. Microsoft Corp.,
  517 F.3d 1353 (Fed. Cir. 2008) ....................................................................... 7

Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.,
  405 F.3d 764 (9th Cir. 2005) ............................................................................ 8

Bose Corp. v. JBL, Inc.,
  112 F. Supp. 2d 138 (D. Mass. 2000) ............................................................. 8

Broadcom Corp. v. Qualcomm, Inc.,
  2007 U.S. Dist. LEXIS 97647 (C.D. Cal. 2007) ...................................... 6, 7, 9

Burton v. Armontrout,
  975 F.2d 543 (8th Cir. 1992) ............................................................................ 4

Business Trends Analysts, Inc. v. Freedonia Group, Inc.,
  887 F.2d 399 (2d Cir. 1989) ........................................................................... 11

Cadence Design Sys. v. Avant! Corp.,
  125 F.3d 824 (9th Cir. 1997) ............................................................................ 2

Daubert v. Merrell Dow Pharms., Inc.,
  43 F.3d 1311 (9th Cir. 1995) ..................................................................... 8, 10

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579 (1993) ............................................................................. 8, 10, 11

Dun v. Lumberman's Credit Ass'n,
  209 U.S. 20 (1908) ............................................................................................ 3

eBay, Inc., v. MercExchange, LLC,
  547 U.S. 388 (2006) .................................................................................. 1, 2, 4

Fonar Corp. v. Gen. Elec. Co.,
  107 F.3d 1543 (Fed. Cir. 1997) ...................................................................... 10

Georgia-Pacific Corp. v. United States Plywood Corp.,
  318 F. Supp. 1116 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir. 1971) ....................................................................................................... 6, 9, 10

-ii-

1  Los Angeles Police Protective League v. Gates,
        995 F.2d 1469 (9th Cir. 1993) ................................................................. 5
2
   McGlinchy v. Shell Chem. Oil,
3       845 F.2d 802 (9th Cir. 1988) ................................................................. 11

4  Micro Chemical, Inc. v. Lextron, Inc.,
        317 F.3d 1387 (Fed. Cir. 2003) ............................................................. 9
5
6  Newton v. Diamond,
        204 F. Supp. 2d 1244 (C.D. Cal. 2002) ................................................ 6
7
   Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,
8       585 F.2d 821 (7th Cir. 1978) ................................................................. 5

9  Paice v. Toyota,
        504 F.3d 1293 (Fed. Cir. 2007) ............................................................. 7
10
11 Practice Mgmt Info. Corp. v. Am. Med. Ass'n,
        121 F.3d 516 (9th Cir. 1997) ................................................................. 3

12 Richard Feiner & Co. v. Turner Entm't,
        926 F. Supp. 40 (S.D.N.Y. 1996) ......................................................... 4
13
14 Richart Feiner & Co. v. Turner Entm't,
        1997 WL 603447 (S.D.N.Y. Sept. 30, 1997) ....................................... 4

15 Roberts v. Coll. of the Desert,
        870 F.2d 1411 (9th Cir. 1988) ........................................................... 4, 5
16
17 Sands, Taylor & Wood v. The Quaker Oats Co.,
        34 F.3d 1340 (7th Cir. 1994) ................................................................. 9
18
   Snider v. Consol. Coal Co.,
19      973 F.2d 555 (7th Cir. 1992) ................................................................. 6

20 Stryker Corp. v. Davol, Inc.,
        75 F. Supp. 2d 746 (W.D. Mich. 1999) ................................................ 6
21
22 Universal City Studios v. Sony Corp,
        659 F.2d 963 (9th Cir. 1981) ................................................................. 3

23 Vermont Microsystems, Inc. v. Autodesk, Inc.,
        88 F.3d 142 (2d Cir. 1996) .................................................................... 8
24
25 Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,
        259 F.3d 1101 (9th Cir. 2001) ............................................................... 8
26

                              **Statutes**
27
28 42 U.S.C. § 1981 ............................................................................................ 8

| | |
|---|---|
| 1 | <div align="center">**Miscellaneous**</div> |
| 2 | 6 Patry on Copyright § 22:101 ....................................................................... 5 |
| 3 | Weil, Wagner & Frank, Litigation Services Handbook: The Role of the Financial |
| 4 | Expert, 22:6 at 22.16-30 (4th Ed. 2007)................................................................. 9 |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

EXHIBIT 24   PAGE 224

1                                **Preliminary Statement**

2           MGA all but ignores the <u>Daubert</u> tests and the fatal failings of Mr. Meyer's

3    methodology, and instead treats its "opposition" as an unauthorized surreply to Mattel's

4    injunction motion. The effort is both improper and unpersuasive. MGA's argument that

5    the Court is bound by the jury's damages award in shaping equitable relief is wrong. Its

6    argument that a royalty is preferable to an injunction continues to misgauge the equities

7    and miscite precedent. And its argument that the jury implicitly adopted a prospective

8    royalty rate—or that Meyer can glean such a rate from its verdict—is a misleading

9    revisionist history. The jury did not determine any royalty rate, let alone a prospective

10   one, and was not asked to. Meyer's simplistic, incongruous arithmetic is based on jury

11   findings that were not made. His unreliable opinion should be stricken.

12          As to ability to pay, Meyer ignores MGA's repeated complaints about its dire

13   financial problems and instead relies solely on projections by a Mattel expert based on

14   months-old data which Meyer himself disputed. Meyer has access to MGA's *current*

15   financial information (which Mattel lacks). His parroting of outdated projections, in lieu

16   of actual analysis of MGA's current finances, is not proper expert testimony.

17                                    **Argument**

18   **I.     AN INJUNCTION, NOT A ROYALTY, IS THE PROPER REMEDY**

19          MGA mischaracterizes the law in arguing that a royalty payment is the preferred

20   remedy for continuing copyright infringement. Its effort to analogize this case to <u>Abend</u>

21   <u>v. MCA, Inc.</u>, 863 F.2d 1465 (9th Cir. 1988), is no more successful now than in its

22   injunction opposition, and its deceptive misquote of Justice Kennedy's concurrence in

23   <u>eBay</u> (noted in Mattel's reply to that opposition) cannot be dismissed as a simple mistake

24   now that it has been repeated. Most tellingly, MGA continues to ignore the only two

25   post-<u>Abend</u> cases where the Ninth Circuit has addressed requests for royalties in lieu of

26   copyright injunctions, each of which rejected the royalty request.

27          <u>Abend</u>, as Mattel has shown, involved what the Ninth Circuit has described as

28   "special circumstances" in which *the defendant had done nothing wrong* but lost the

07209/2687220.6

-1-

1   rights to a story on a "technicality;" an injunction would have prohibited the defendant
2   from distributing a motion picture it lawfully created ("Rear Window"), and the public
3   would have been denied the chance to view a classic film.  Since <u>Abend</u> the Ninth
4   Circuit has rejected royalty arguments in the only two published cases in which they
5   were sought, specifically emphasizing the "special circumstances" in <u>Abend</u> that MGA
6   seeks to dismiss as irrelevant. <u>Compare</u> <u>Cadence Design Sys. v. Avant! Corp.</u>, 125 F.3d
7   824, 829 (9th Cir. 1997) (Abend involved "special circumstances") <u>with</u> MGA Opp. at 3
8   n.2 (attacking Mattel for treating <u>Abend</u> as a "special circumstances" case); <u>see also</u>
9   <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004 (9th Cir. 2001).

10         Instead of addressing these cases (much less explaining how MGA, which at no
11   time had the right to produce products based on Bryant's designs, can analogize its
12   situation to Paramount's loss of rights to a film based on a technicality a dozen years
13   after it was lawfully made), MGA relies on what appears, the second time around, to be
14   an intentional effort to mislead. According to MGA, Justice Kennedy stated in his <u>eBay</u>
15   concurrence: "When the patented invention is but a small component of the product the
16   companies seek to produce . . . an injunction may not serve the public interest."  MGA
17   Opp. at 3, citing <u>eBay, Inc., v. MercExchange, LLC</u>, 547 U.S. 388, 396-97 (2006)
18   (Kennedy, J., concurring). But—as Mattel previously pointed out when MGA used the
19   same language in its injunction opposition—the language omitted by MGA's ellipsis
20   entirely changes the meaning of Justice Kennedy's statement: "When the patented
21   invention is but a small component of the product the companies seek to produce ***and the***
22   ***threat of an injunction is employed simply for undue leverage in negotiations, legal***
23   ***damages may well be sufficient to compensate for the infringement and*** an injunction
24   may not serve the public interest." <u>Id.</u> (emphasized language omitted from MGA's
25   citation). This is not a case in which "the threat of an injunction is employed simply for
26   leverage in negotiations," nor will legal damages be sufficient as Mattel has shown.[1]

27
_____

28   [1] MGA also continues to ignore the three other concurring Justices in <u>eBay</u>: "From at least the
     early 19th century, courts have granted injunctive relief upon a finding of infringement in the
     (footnote continued)

MATTEL'S REPLY IN SUPPORT OF MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

EXHIBIT 24 PAGE 226

Case 2:04-cv-09049-DOC-RNB  Document 4513-7  Filed 12/23/08  Page 22 of 55  Page ID
#:131419
Case 2:04-cv-09049-SGL-RNB    Document 4401    Filed 11/03/2008    Page 8 of 17

1    MGA's only other authority for what it wrongly describes as the Supreme Court's

2    "long recongni[tion]" of "the injustice of imposing an injunction" under "such

3    circumstances," Opp. at 3, is no more persuasive. In Dun v. Lumberman's Credit Ass'n,

4    209 U.S. 20, 23-24 (1908), the Supreme Court affirmed the denial of an injunction

5    because at most "a few names" from the plaintiff's book may have been used by an agent

6    of the defendants among the tens of thousands included in the challenged directory. But

7    no royalty was awarded either. The Court held no equitable relief was appropriate.

8        Indeed, in *none* of the copyright cases cited by MGA did the court actually impose

9    a royalty. Universal City Studios v. Sony Corp, 659 F.2d 963, 976 (9th Cir. 1981), cited

10   Nimmer for the proposition that "when great public injury would result from an

11   injunction, a court could award damages or a continuing royalty," but actually *reversed*

12   the rejection of an injunction and reaffirmed the "general rule" that a copyright plaintiff

13   is entitled to a permanent injunction when liability and a threat of continued violations

14   have been established. MGA's reliance on Practice Mgmt Info. Corp. v. Am. Med.

15   Ass'n, 121 F.3d 516, 519 (9th Cir. 1997), is even more misplaced. A publisher who

16   resold medical reference works in which the AMA held the copyright sued in that case to

17   declare the copyright invalid, claiming the AMA's right to limit publication posed a

18   threat to public access. The Ninth Circuit rejected the argument, finding the AMA had

19   no incentive to limit publication and that other remedies would be available if it did so,

20   "including 'fair use' and due process defenses for infringers and perhaps, most relevantly,

21   mandatory licensing at a reasonable royalty could be required in light on the great public

22   injury that would result if adequate access to the [copyrighted work] were denied." Far

23   from supporting MGA's claim that Abend had nothing to do with special circumstances,

24   the dicta in these cases establishes just the opposite. No "great public injury would

25   result" if MGA were restricted to using sculpts and designs of its own, nor would MGA

26
───────────────────────────────────────
    vast majority of patent cases. This 'long tradition of equity practice' is not surprising, given the
27   difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to
    *use* an invention against the patentee's wishes -- a difficulty that often implicates the first two
28   (footnote continued)

1   be deprived of profits it can lawfully obtain from exploiting its own designs; as MGA

2   trumpeted during trial, it is capable of creating non-infringing designs.[2]  MGA's other

3   cases are even less persuasive.[3]  The proper remedy is an injunction, not a royalty.

## II.    MEYER'S ROYALTY OPINIONS ARE INADMISSIBLE

5        MGA argued in its opposition to Mattel's injunction motion that "the only

6   reasonable reading of the jury's verdict is that there is *no* ongoing infringement,"[4] and

7   claimed that purported finding binds the Court to deny prospective equitable relief.

8   MGA now concedes the jury may have found at least "*limited* ongoing infringement,"

9   Opp. at 1 (emphasis added), and claims this interpretation justifies Meyer's royalty

10  opinions.  The jury did not find facts that provide a basis for a royalty calculation (nor, as

11  MGA now concedes, did it find no ongoing infringement).  Meyer's opinion, which is

12  based solely on alleged "facts already determined by the jury," thus lacks foundation.

### A.    The Jury Did Not Make Factual Findings Which Bind The Court to Deny An Injunction Or Adopt A Compulsory Royalty

A court sitting in equity generally must find the pertinent facts for itself.  The

Court recognized this pre-verdict:  "I'm going to have to re-evaluate all the products

myself before I can make the injunctive findings or grant the injunctive relief."[5]  MGA

correctly asserts that an equity court must "adhere to a jury's findings," both explicit and

implicit (Opp. at 8), but a court is only bound as to findings "necessarily and *actually*

decided by the jury." Roberts v. Coll. of the Desert, 870 F.2d 1411, 1418 (9th Cir. 1988)

(italics in original) (internal citations omitted); see Burton v. Armontrout, 975 F.2d 543,

545 (8th Cir. 1992) (general verdict of no liability does not preclude injunction based on

---

23  factors of the traditional four-factor test."  eBay, 547 U.S. at 395 (Roberts, C.J., Scalia & Ginsburg, JJ., concurring) (italics in original).

24  [2]  See, e.g, Trial Tr. at 6172:13-21 (Larian testifying that MGA would have "found something else" absent Bryant's designs).

25  [3]  For example, Richard Feiner & Co. v. Turner Entm't, 926 F. Supp. 40, 43-44 (S.D.N.Y. 1996) does "consider" awarding a continuing royalty in lieu of an injunction, MGA Opp. at 3

26  n.3, but MGA fails to acknowledge, as Mattel showed before, that the court *refused* a royalty and instead issued an injunction, finding Abend inapplicable.  Id. at 44; see also Richart Feiner

27  & Co. v. Turner Entm't, 1997 WL 603447, at *3 (S.D.N.Y. Sept. 30, 1997) (issuing injunction and finding Abend inapplicable).

28  [5]  MGA Opp. to Mot. for Perm. Inj. at 29 (emphasis added). Trial Tr. at 8015:19-23.

07209/2687220.6

-4-

1   same claim). Because the standard is one of *necessary* implication, a court is bound by a
2   general damages verdict when adjudicating equitable claims only if that verdict "makes it
3   a mathematical certainty" that the jury found facts that are controlling.  Ohio-Sealy
4   Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 844 (7th Cir. 1978).  Absent that degree
5   of certainty, there is no way to tell what the jury "necessarily and *actually* decided," and
6   an equity court must find the facts for itself. Roberts, 870 F.2d at 1418.

7        MGA claims Mattel is "wrong" in saying "the Court is bound only by specific
8   findings of the jury and that the size of a damages award is relevant to the availability of
9   equitable relief only where the amount of the verdict 'makes it a mathematical certainty'
10  that the jury made certain findings." (Opp. at 7-8.)  Yet the only authority MGA cites—
11  Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993)—
12  supports Mattel's position, not MGA's. The Ninth Circuit reversed a denial of equitable
13  relief in that case because the trial court's key factual finding contradicted a finding the
14  jury "necessarily" made. Id. at 1473-74.  The jury found for the plaintiff and awarded
15  damages which, in light of the jury instructions, *necessarily* implied a finding that
16  plaintiff "would not have been discharged except for his refusal to be illegally searched."
17  Id. at 1474.  The trial court nonetheless denied injunctive relief because of its view that
18  plaintiff "would have been fired in any event." Id. at 1472.  The district court's rejection
19  of a finding the jury had necessarily made was held improper. Id. at 1475.

20       Unlike Gates, the jury here was not even asked to make findings regarding the
21  scope of MGA's ongoing infringement and appropriate remedies for that infringement,
22  and it made no such findings either expressly or by necessary implication. Mattel sought
23  an award of damages from the jury for *past* infringement; awards of "future" copyright
24  damages are not available. See 6 Patry on Copyright § 22:101 ("Future damages are not
25  awardable"); id. § 22:116 (same, regarding "future[] profits").  An injunction (or,
26  theoretically, a prospective royalty) is designed to redress future harm. Id. § 22:78
27  ("May the court award a permanent injunction if monetary damages have already been
28  awarded by the trier of fact?  The answer is clearly yes: monetary damages are awarded

1    for past harm, while injunctive relief is intended to prevent future harm."). The jury had
2    no occasion to address the issues now before the Court:  the scope of ongoing
3    infringement;  the extent to which that infringement will injure Mattel;  and the
4    appropriate remedy for those injuries. Mattel did not seek to prove its future injuries at
5    trial, including market share losses, because the issue was not before the jury.[6] That
6    alone precludes any estoppel. See, e.g., Snider v. Consol. Coal Co., 973 F.2d 555, 559
7    (7th Cir. 1992) (court not bound by jury finding where all relevant evidence was not
8    introduced before jury).[7]

9        **B.    Meyer's Royalty Is Not Properly "Informed By" The Verdict**

10       MGA claims that courts awarding royalties give "substantial weight to the jury's
11   explicit and implicit determinations," and argues Meyer's opinions therefore "rest[] on an
12   appropriate and sufficient factual basis." (Opp. at 7.) Yet MGA does not cite a single
13   case in which any court or any expert extracted a prospective royalty rate from a past
14   damages verdict where neither party put royalty evidence before the jury. In Stryker,
15   although the jury *expressly* found a 20% royalty rate for past patent infringement the
16   court still entered a permanent injunction and also doubled that royalty rate when
17   awarding damages for infringements occurring between the dates of the jury's verdict
18   and entry of the permanent injunction. Stryker Corp. v. Davol, Inc., 75 F. Supp. 2d 746,
19   747-48 (W.D. Mich. 1999). In Broadcom, the jury adopted a royalty rate expressly
20   introduced into evidence at trial as to two patents; the court still entered a permanent
21   injunction and also trebled that royalty rate as to infringements between the dates of the
22   verdict and injunction (after finding the rate consistent with Georgia-Pacific factors).
23   Broadcom Corp. v. Qualcomm, Inc., 2007 U.S. Dist. Lexis 97647, *28-30 (C.D. Cal.

24   _____
     [6] Even MGA claims only that Mattel sought to prove *MGA's* future profits, not that Mattel
25   sought to prove the amount of its own future injuries.
     [7] MGA's assertion that the jury found *"de minimis* infringement" is mistaken. By definition,
26   *de minimis* infringement is not actionable, whereas here the jury found for Mattel on liability.
     Newton v. Diamond, 204 F. Supp. 1244, 1256-57 (C.D. Cal. 2002) ("To establish that the
27   infringement of a copyright is *de minimis*, *and therefore not actionable*, the alleged infringer
     must demonstrate that the copying of the protected material is so trivial 'as to fall below the
28   (footnote continued)

-6-
MATTEL'S REPLY IN SUPPORT OF MOTION TO STRIKE DECLARATION OF PAUL K. MEYER

EXHIBIT 24 PAGE 230

1  2007).[8]  Courts that conclude a prospective royalty is appropriate may modify even past

2  royalty rates *expressly* adopted by juries.  See Amado v. Microsoft Corp., 517 F.3d 1353,

3  1361 (Fed. Cir. 2008) ("Microsoft argues that the district court was entitled to award

4  Amado no more than \$0.04 per infringing unit, the amount the jury found to be a

5  reasonable royalty. We easily dispose of this argument as well. The jury's award of \$0.04

6  per unit was based on Microsoft's infringing conduct that took place prior to the verdict.

7  There is a fundamental difference, however, between a reasonable royalty for pre-verdict

8  infringement and damages for post-verdict infringement."); Paice v. Toyota, 504 F.3d

9  1293, 1317 (Fed. Cir. 2007) (cited by MGA) ("[P]re-suit and post-judgment acts of

10 infringement are distinct, and may warrant different royalty rates given the change in the

11 parties' legal relationship and other factors.").  But Mattel is aware of no court that has

12 done what MGA now asks the Court to do—use a past damages verdict where royalty

13 evidence was not even before the jury to "inform" a prospective royalty rate.

14       This case should not be the first.  Meyer purports to extrapolate from the jury's

15 verdict but acknowledges no one knows what the jury's actual findings were, postulating

16 various alternatives.[9]  Nor are those that Meyer mentions the universe of possible

17 "interpretations" of the verdict.  MGA invited the jury to reduce its award based on

18 MGA's dire financial straits (though it now seeks to disavow its assertions). Meyer and

19 MGA also ignore the evidence showing that MGA's after tax profits from sales of core

20 Bratz dolls totaled approximately \$200 million[10]—double the jury's total award of \$100

21

---

22 quantitative threshold of substantial similarity, which is always a required element of actionable copying.'") (internal citation omitted, emphasis added).

23  [8]  As to a third patent, the court ordered negotiations to determine the hypothetical value of a license and, were that to fail, briefing to determine a royalty rate for pre-injunction infringements because—as in our case—"the trial record encompass[es] no evidence of a

24 reasonably royalty on infringing products."  Id. at *22.

[9]  Meyer Declaration, ¶¶ 12 and 13.

25 [10]  As Trial Exhibit 13931 shows, MGA's gross revenue from all core Bratz fashion dolls for the period 2001 through June 2008, totaled \$1,323,614,853.  See Trial Exhibit 13931-0004,

26 0009, 0014, 0019, 0024, 0029, 0034, 0038, 0043, Proctor Decl. Exh. 1. According to the Exhibit, MGA incurred costs related to the core Bratz fashion dolls of \$1,023,784,633 during the same period.  Id.  The resulting pre-tax profits are \$299,830,220. Subtracting taxes paid by

27 MGA as a company (\$19,164,538) and those paid by shareholders (\$80,162,946), id., shows that, according to the Exhibit, MGA's total income from all core Bratz fashion dolls, after taxes,

28 for the period 2001 through June 2008 was \$200,502,737.

1  million.[11]  Those numbers hardly support MGA's claim that the jury found only limited

2  wrongdoing. The scope of what the jury actually found infringing and its apportionment

3  findings are unknown; speculating about them is not a proper expert methodology.

4       **C.    Meyer's Royalty Opinions Are Unreliable**

5       MGA all but concedes that Meyer's opinion fails to satisfy <u>Daubert</u> or <u>Kumho</u>

6  <u>Tire</u>. There is no dispute that (i) Meyer's methodology has not been tested; (ii) it has not

7  been subjected to peer review or publication; (iii) there is no known or potential error

8  rate; (iv) there are no standards controlling the methodology's operation; and (v) "general

9  acceptance" (or any acceptance) of the methodology has not been established. <u>Daubert</u>

10 <u>v. Merrell Dow Pharms., Inc.,</u> 509 U.S. 579, 593-94 (1993). There is also no "objective

11 source" such as a treatise, study or article supporting the methodology.  <u>Daubert v.</u>

12 <u>Merrell Dow Pharms., Inc.,</u> 43 F.3d 1311, 1317-19 (9th Cir. 1995). MGA claims the

13 "presence or absence of any particular <u>Daubert</u> factor does not necessarily indicate

14 reliability" (Opp. at 4), but Meyer's declaration satisfies *none* of the factors. MGA has

15 not met its burden of demonstrating that Meyer's methodology is reliable.

16      Meyer did not employ any generally accepted rules for determining royalty rates.

17 When no established royalty rate exists, for example, courts construct hypothetical

18 negotiations to determine the royalty rates upon which the parties would agree. <u>See, e.g.,</u>

19 <u>Vermont Microsystems, Inc. v. Autodesk, Inc.,</u> 88 F.3d 142, 151 (2d Cir. 1996); <u>Bose</u>

20 <u>Corp. v. JBL, Inc.,</u> 112 F. Supp. 2d 138, 165 (D. Mass. 2000).  One often accepted

21 ----

[11]    MGA argues the jury's full damages award of $100 million must be ignored because its
22  copyright verdict was $10 million (Opp. at 5 n.5), but ignores the controlling Ninth Circuit
authority cited by Mattel. <u>Bains LLC v. Arco Prods. Co., Div. of Atl. Richfield Co.,</u> 405 F.3d
23  764, 771-72 (9th Cir. 2005) (award of $1 for 42 U.S.C. § 1981 violation did not show no
economic harm because jury awarded $50,000 for breach of contract and jury may have thought
24  "putting the same $50,000 under both the § 1981 and the breach of contract causes of action
would be double counting"). MGA also argues the $100 million verdict is "duplicative" (Opp.
25  at 14 n.13), but that unproven contention is both speculative and waived. <u>Yeti by Molly, Ltd. v.</u>
<u>Deckers Outdoor Corp.,</u> 259 F.3d 1101, 1110 (9th Cir. 2001) ("The verdict form required the
26  jury to assign a separate damages figure for each cause of action. Deckers waived the argument
that the jury double-counted by returning five damages figures (one for each cause of action)
27  for each plaintiff. By failing to raise this argument until after the jury was discharged, the
district court had no chance to develop a record of how the jury apportioned damages. Without
28  this record, we decline to speculate and allow the verdicts to stand."). And, as MGA knows, its
(footnote continued)

EXHIBIT 1A PAGE 232

1  methodology to analyze a hypothetical negotiation is application of the <u>Georgia-Pacific</u>
2  factors.   <u>Georgia-Pacific Corp. v. United States Plywood Corp.</u>, 318 F. Supp. 1116
3  (S.D.N.Y. 1970), <u>modified and aff'd</u>, 446 F.2d 295 (2d Cir. 1971); <u>see also</u> <u>Micro</u>
4  <u>Chemical, Inc. v. Lextron, Inc.</u>, 317 F.3d 1387, 1393 (Fed. Cir. 2003); <u>Sands, Taylor &</u>
5  <u>Wood v. The Quaker Oats Co.</u>, 34 F.3d 1340, 1352 (7th Cir. 1994).

6      Cases relied upon by MGA use this analysis. In <u>Standard Mfg. Co.</u>, for example,
7  the court based its royalty rate on a "hypothetical negotiation" between the parties and
8  engaged in an eight page discussion of the <u>Georgia-Pacific</u> factors to multiply a "baseline
9  royalty rate" by a factor of four to arrive at a royalty rate of 16.31%. 42 Fed. Cl. 748,
10 767-75 (1999).  In <u>Broadcom</u> the court required an actual negotiation to determine the
11 rate that would be agreed upon post-verdict.  2007 U.S. Dist. LEXIS 97647, at *22.
12 MGA cites Weil, Wagner & Frank, but ignores its instruction that experts "should make
13 explicit use of the 15 <u>Georgia-Pacific</u> factors."   Weil, Wagner & Frank, <u>Litigation</u>
14 <u>Services Handbook: The Role of the Financial Expert</u>, 22:6 at 22.16-30 (4th Ed. 2007).

15      MGA concedes that Meyer has failed to consider a hypothetical negotiation or any
16 of the <u>Georgia-Pacific</u> factors.  While MGA claims some of the <u>Georgia-Pacific</u> factors
17 do not apply in this case, MGA cannot explain why Meyer should not have considered
18 the many that do, including (i) royalties received in the past by Mattel or MGA; (ii) the
19 rates paid for the use of comparable intellectual property; (iii) the nature and scope of the
20 hypothetical license, as exclusive or non-exclusive, or as restricted or non-restricted; (iv)
21 Mattel's policies and marketing programs regarding licensing to third parties or granting
22 licenses under special conditions; (v) the commercial relationship between Mattel and
23 MGA, including that they are competitors in the same territory in the same line of
24 business; (vi) the effect of selling the products at issue on sales of other products; (vii)
25 the term of the imposed license; (viii) the profitability of the products and their current
26 popularity; (ix) the competitive advantages of the products; (x) the portion of the profit

27

28 claim is factually false. <u>See</u> Trial Tr. at 8356:13-8357:9 (the Court quoting juror's email: "For
   the record, the jury intended that Mattel receive the full award amount when added up.").

1    or of the selling price that may be customary in the doll business or in comparable

2    businesses; or (xi) the opinions of other experts or persons knowledgeable about the

3    industry. MGA offers no excuse for Meyer's failure to take these factors into account.[12]

4         MGA offers no support other than Meyer's word that his methodology is reliable.

5    MGA claims two cases, Standard Mfg. and Fonar Corp. v. Gen. Elec. Co., 107 F.3d

6    1543, 1552, 1556 (Fed. Cir. 1997), "comput[ed] a retrospective royalty by dividing

7    infringing profits by revenue" (Opp. at 9), but *neither court* did so. In Standard Mfg., the

8    court computed the royalty rate for patent infringement by determining a baseline rate

9    and adjusting it in light of the Georgia-Pacific factors; it did not divide profits by

10   revenues. 42 Fed. Cl. at 766-76. See also Fonar Corp., 107 F.3d at 1552 (no division of

11   revenues by profits). Moreover, MGA does not even claim to have cited a single case

12   that extrapolates a prospective royalty rate by speculating about what a jury *not*

13   presented with royalty evidence may have found, which is Meyer's only methodology.

14        Even if Meyer's "methodology" met Daubert standards, which it does not, Meyer

15   cannot explain how it properly can be applied to the facts of this case. Daubert, 509 U.S.

16   at 592-93. Meyer uses the revenues from the past sale and licensing of all Bratz-related

17   products, but admits he does not know which products the jury found infringing.[13] He

18   ignores that the set of products Mattel seeks to enjoin is a different set of products than

19   that used to derive the revenue figure.[14] He further ignores that not all Bratz dolls, much

20   less all Bratz-related products, were introduced into evidence. Meyer cannot say how the

21   jury calculated profits or what apportionment percentage it used. He cannot validly

22

---

23   [12] MGA argues the cases Mattel cited involve awards of retrospective rather than prospective
     royalties, but fails to articulate why the hypothetical negotiation and the Georgia-Pacific factors
24   should not apply to prospective royalties. MGA also claims Mattel contests only Meyer's
     conclusions and not his methodology, but Meyer's failure to apply a recognized methodology or
25   consider applicable factors is clearly a methodological flaw.
     [13] Meyer Declaration, ¶ 12 (emphasis added).
     [14] MGA claims Mattel has not identified any Bratz product included in the $3.1 billion revenue
26   figure but not included in the scope of the proposed injunction. As explained in Mattel's
     opening brief, the revenue figure included all Bratz-related products while the injunction
27   concerns only those products that embody or depict the copyrighted works. Thus, the proposed
     copyright injunction does not include products that do not have a Bratz image on them or their
28   packaging or their marketing materials; the revenue figures did include such matters.

1   compare MGA's revenues to the jury's verdict, even if that were a proper methodology.[15]

2       **D.      Meyer's Royalty Opinions Lacks Foundation**

3           The Court not only must determine that an expert's methodology is scientifically

4   valid, but also must ensure that the expert has sufficient foundation to render the opinion.

5   Daubert, 509 U.S. at 592-593.  Meyer's opinion lacks foundation for three reasons:  He

6   has to speculate as to what the jury found; he has no experience to support his

7   methodology; and he does not base his opinion on any real world licensing information.

8           First, MGA claims that Meyer's analysis is based on "facts" determined by the

9   jury.  But his opinion is based on conjecture as to what the jury found; not even Meyer

10  calls them facts:  "The relatively small size of the copyright infringement award *may*

11  indicate certain findings by the jury;" "the jury *may* have found that the number of

12  infringing products was quite small;" [a]lternatively, the jury *may* have concluded that

13  the contribution of the copyrights to MGA's Bratz profits associated with the infringing

14  sales was quite low."[16]  Meyer's opinions are expressly based on his speculative "possible

15  interpretations" of the verdict.[17]  Expert opinions based on speculative assumptions are

16  inadmissible.  See McGlinchy v. Shell Chem. Oil, 845 F.2d 802, 807 (9th Cir. 1988).

17          Second, MGA concedes Meyer has no experience with fashion dolls or toys, and it

18  offers no argument that royalty rates are calculated in the same manner for different

19  forms of intellectual property in different industries.  If Meyer had ever before calculated

20  a royalty rate using the proffered methodology, or had any experience relevant to a

21  royalty rate for the products at issue, MGA would have introduced evidence of it.

22  MGA's citation to Meyer's unspecified work on unspecified royalty claims does not meet

23  the basic foundational requirements for admitting Meyer's opinion.

24

25  [15]   Meyer's opinion is also flawed because he assumes the numbers in the jury verdict equal the "value of the copyrights."  The case MGA cites for this point (Opp. at 9), Business Trends

26  Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 407 (2d Cir. 1989), does not say that at all.  The value of a copyright is based not only on past profits for the years considered by the

27  jury but also on other factors such as past, present and future market conditions.  Moreover, Meyer's and MGA's theory overlooks that the jury assessed *MGA's* profits, not Mattel's.

28  [16]   Meyer Declaration, ¶¶ 12 and 13.
    [17]   Meyer Declaration, ¶ 10.

-11-

1   Finally, although Meyer claims he reviewed licensing information produced by

2   Mattel and MGA, MGA does not identify that information or indicate how it relates to

3   his royalty rate.  MGA does not offer evidence that Meyer reviewed any real world

4   licensing information relating to his analysis.  His opinion lacks foundation.

5   **III.    MEYER'S ABILITY TO PAY OPINION IS INADMISSIBLE**

6   MGA misses the point as to ability to pay.  The question is whether MGA can

7   likely pay the amount of the judgment and future damage awards.  Meyer offers no

8   opinion that MGA has assets sufficient to do so.  Instead, Meyer parrots projections

9   Wagner made based on MGA's profit and loss information through June 30, 2008 and

10  MGA's own future projections.[18]  But those projections were contingent on MGA's

11  ability to pay for the products it projected to sell, and the circumstances have changed—

12  Larian declared on August 7, 2008 that MGA lost its line of credit and was rapidly

13  depleting cash reserves.[19]  Meyer has not contradicted Larian's declaration, nor opined

14  that MGA has the required access to cash or credit, nor opined that the prior projections

15  are still valid.  It is no answer to the ability to pay question to refer to prior projections

16  based on dated MGA information.  Meyer, unlike Mattel, has access to MGA's current

17  cash and asset information.  The exclusive reliance on another expert's opinion based on

18  outdated information, by someone who should have the ability to provide his own

19  opinion based on current financial information, flatly fails under Daubert.[20]

20  DATED:  November 3, 2008          QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP

21

22

23                                    By    /s/ John B. Quinn
                                         John B. Quinn

24                                       Attorneys for Mattel, Inc.

---

25  [18]   Trial Exhibit 13932-1 to -6, Decl. of Stephen M. Hauss ISO Mattel, Inc.'s Reply in Support
     of Motion for Permanent Injunction, Exh. 5; Trial Tr. at 6398:10-13, 6448:21-6449:5.

26  [19]   Decl. of Isaac Larian in support of MGA's Petition for a Writ of Mandamus, dated August 7,
     2008, ¶ 3, attached as Exhibit 84 to the Decl. of Diane C. Hutnyan dated September 29, 2008.

27  [20]   MGA protests that its "purported inability to pay non-copyright damages does not support
     issuance of an injunction for alleged copyright infringement," Opp. at 15 n.13 (underline in
     original), but that too misses the point.  The question is not *why* MGA cannot satisfy future

28  damage awards, but whether it likely can do so.  The available evidence shows it cannot.

# EXHIBIT 25

Version: May 29, 2008. 11:48 am
URL: www.zapfcreation.com
Home Company > Supervisory board >



INTERNATIONAL

## Supervisory Board

| | |
|---|---|
| **Dr. Harald Rieger (Chairman)** <br> Attorney Kaye Scholer (Germany) LLP | Frankfurt (Germany) |
| **Nicolas Mathys (Deputy Chairman)** <br> Partner Zulauf Asset Management | Baar (Switzerland) |
| **Ron Brawer (Member)** <br> Executive Vice President Sales & Marketing, MGA Entertainment Inc. | Los Angeles (USA) |
| **Isaac Larian (Member)** <br> CEO of MGA Entertainment Inc. | Los Angeles (USA) |
| **Gustavo Perez (Member)** <br> CEO of Betham Capital Investment | New York (USA) |
| **Miguel Perez-Carballo Villar (Member)** <br> Chief Executive Officer and Managing Director of Norte Motor. S.A. and Managing Director of Uria Motor. S.A. | Oviedo (Spain) |

© 2008 Zapf Creation AG

EXHIBIT 15 PAGE 237



INTERNATIONAL

setting free a child's imagination

Brands    Consumer Service    Play & Learn    Media    Investors    Company

Search

**Company profile**
**Management board**
**Supervisory board**

Supervisory board reports

**Corporate Governance**
**Social responsibility**
**History**
**Career**
**Contact**

## Supervisory Board

Dr. Harald Rieger (Chairman)                          Frankfurt
Attorney Kaye Scholer (Germany) LLP                   (Germany)

Nicolas Mathys (Deputy Chairman)                      Baar
Partner Zulauf Asset Management                       (Switzerland)

Ron Brawer (Member)                                   Los Angeles
Executive Vice President Sales & Marketing, MGA Entertainment   (USA)
Inc.

Isaac Larian (Member)                                 Los Angeles
CEO of MGA Entertainment inc                          (USA)

Gustavo Perez (Member)                                New York
CEO of Betnam Capital Investment                      (USA)

Miguel Perez-Carballo Villar (Member)                 Oviedo
Chief Executive Officer and Managing Director of Norte Motor,   (Spain)
S.A. and Managing Director of Ume Motor, S.A.

Print this page 🖶   Bookmark 🏷

© 2008 Zapf Creation AG

**Supervisory Board Reports**

Please choose one of the
Board Reports to download:

Report 2005 (English, PDF, 46 kb) >
Report 2004 (English, PDF, 30 kb) >
Report 2003 (English, PDF, 23 kb) >
Report 2002 (English, PDF, 19 kb) >
Report 2001 (English, PDF, 21 kb) >
Report 2000 (English, PDF, 30 kb) >
Report 1999 (English, PDF, 11 kb) >

Our Company Profile

Download it here >
(English, PDF, 1.2 MB)

# EXHIBIT 26

Version: February 25, 2008, 12:28 pm
URL: www.zapfcreation.com
Home Consumer Service > Find what you are looking for > Country Contacts >



INTERNATIONAL

## Company Contacts in Russian Federation

SAKS Igrushki
Korp. 8, 132, Profsoyuznaya str.
Moscow, 117321
Fon: +7 495 961 00 12
Fax: +7 495 338 23 03
E-Mail: info@saks.ru

**Back to country index**

© 2008 Zapf Creation AG



INTERNATIONAL

**Zapf Creation**

setting free a child's imagination

Search

Brands   Consumer Service   Play & Learn   Media   Investors   Company

Tips & Care
• Find what you are looking for
• Country Contacts
  Products

Consumer Care Contact

Pull here!

Product guide

Zapf Creation International

Playground for 3–

Magic World for 6–

# Company Contacts in Russian Federation

SAKS Igrushki
Korp 6 132, Profscyuznaya str
Moscow, 117321
Fon: +7 495 981 08 12
Fax: +7 495 333 23 03
E-Mail: info@saks.ru

⊕ Back to country index

Print this page 🖳   Bookmark 🔖

© 2008 Zapf Creation AG

EXHIBIT 14 PAGE 240

# EXHIBIT 27

Version. February 25, 2008, 12:28 pm
URL www.zapfcreation.com
Home Consumer Service >   Find what you are looking for >   Country Contacts >



INTERNATIONAL

## Company Contacts in Serbia and Montenegro

Dexy Co.
Milentija Popovica 9
11070 Novi Beograde
Fon: +381 11 31 86 776
Fax: +381 11 31 86 777
E-Mail: jasmina@dexy.co.yu

**Back to country index**

© 2008 Zapf Creation AG



INTERNATIONAL

setting free a child's imagination

Search

Brands    Consumer Service    Play & Learn    Media    Investors    Company

Tips & Care
• Find what you are
  looking for
• Country Contacts
  Products

Consumer Care
Contact

Pull here!

Product guide >

Zapf Creation
International >

Playground for 3–

Magic World for 6–

## Company Contacts in Serbia and Montenegro

Dexy Co
Milentija Popovica 9
11070 Novi Beograde
Fon +381 11 21 68 776
Fax +381 11 21 68 777
E-Mail jasmina@dexy.co.yu

⚙ Back to country index

Print this page 🖶    Bookmark 📑

© 2006 Zapf Creation AG

# EXHIBIT 28

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                                    Date: December 3, 2008
Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
================================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          James Holmes                              None Present
          Courtroom Deputy Clerk                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                             None Present

PROCEEDINGS:

**ORDER FINDING IN FAVOR OF MATTEL AS TO THE MGA PARTIES' AFFIRMATIVE DEFENSES**

**ORDER GRANTING MATTEL'S MOTION FOR DECLARATORY JUDGMENT (DOCKET #4303)**

**ORDER GRANTING MATTEL'S MOTION FOR CONSTRUCTIVE TRUST AND § 17200 INJUNCTIVE RELIEF (DOCKET #4305)**

**ORDER GRANTING MATTEL'S MOTION FOR PERMANENT INJUNCTION (DOCKET #4306)**

**ORDER DENYING AS MOOT MOTION TO STRIKE PORTIONS OF HUTNYAN DECLARATIONS AND EXHIBITS THERETO (DOCKET #4351)**

**ORDER DENYING MOTION TO STRIKE THE PROCTOR, KEISER, AND HOLLANDER DECLARATIONS (DOCKET #4352)**

**ORDER DENYING AS MOOT MOTION TO STRIKE MEYER DECLARATION (DOCKET #4377)**

**ORDER STAYING COURT'S ORDER PENDING CONSIDERATION OF THE PARTIES' POST-**

MINUTES FORM 90
CIVIL -- GEN                                1                Initials of Deputy Clerk: jh

EXHIBIT 28
PAGE 243

**TRIAL MOTIONS**

**ORDER SETTING FORTH FURTHER BRIEFING SCHEDULE**

**ORDER REGARDING DISCOVERY MASTER PROPOSALS FOR PHASE 2**

**ORDER REGARDING JOINTLY LODGED LAPTOP COMPUTER**

**ORDER REGARDING SERVICE OF PERMANENT INJUNCTION**

**FILED CONCURRENTLY HEREWITH:**

**(1) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING
DECLARATORY JUDGMENT**

**(2) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING MATTEL'S
MOTION FOR CONSTRUCTIVE TRUST AND FOR FINDING LIABILITY AND INJUNCTIVE
RELIEF PURSUANT TO CAL. BUS. & PROF. CODE § 17200**

**(3) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING MATTEL'S
MOTION FOR PERMANENT INJUNCTION**

These matters were heard on November 10, 2008, after extensive briefing by the parties.
After a two-phase jury trial, the Court considers certain equitable issues (referred to as Phase 1C
of the trial) and enters the following Order. Filed concurrently herewith are: (1) Mattel's Proposed
Order (as modified by the Court) Granting Declaratory Judgment; (2) Mattel's Proposed Order (as
modified by the Court) Granting Mattel's Motion for Constructive Trust and for Finding Liability and
Injunctive Relief Pursuant to Cal. Bus. & Prof. Code § 17200; and (3) Mattel's Proposed Order (as
modified by the Court) Granting Mattel's Motion for Permanent Injunction.

In reaching the rulings set forth herein, the Court has considered the parties' briefs and
exhibits submitted during Phase 1C of the trial, the arguments of counsel, as well as the entire
record (including the evidence properly submitted in Phase 1A and Phase 1B of the trial) and its
previous Orders.

The Court refers collectively to all defendants herein, including MGA CEO Isaac Larian
("Larian"), as "the MGA parties". MGA Entertainment, Inc., is referred to as "MGAE".

The Court has carefully and deliberately considered the parties' well-presented legal and
equitable arguments, authorities, and evidence concerning the motions identified above. In its
final analysis, the Court finds, as did the jury, that the preponderance of evidence establishes that
Carter Bryant ("Bryant") created and developed the name, the concept, and, together with
Margaret Leahy, the prototypical sculpt for the hugely-successful Bratz brand of female fashion

EXHIBIT __28__
PAGE __244__

Case 2:04-cv-09049-DOC-RNB   Document 4513-7   Filed 12/23/08   Page 44 of 55   Page ID
#:131441
Case 2:04-cv-09049-SGL-RNB     Document 4439       Filed 12/03/2008     Page 3 of 17

dolls while working as an employee of Mattel and while bound by the terms of an Inventions Agreement, which provided that all rights to such property, and the property itself, belong to Mattel. Moreover, the Court further finds, as did the jury, that the preponderance of the evidence establishes that Isaac Larian and MGAE intentionally interfered with Bryant's contractual relations with Mattel, aided and abetted Bryant's breach of fiduciary duty to Mattel, aided and abetted Bryant's breach of his duty of loyalty to Mattel, and unlawfully converted certain property of Mattel. Finally, the Court finds, as did the jury, that the preponderance of the evidence establishes that the MGA parties, in further developing, producing, and marketing its Bratz brand of female fashion dolls, are liable to Mattel for copyright infringement.

## I. The MGA Parties' Affirmative Defenses

Through its "Statement of Position Regarding Phase 1C Issues" (docket #4308), the MGA parties seek the Court's verdict in their favor as to their affirmative defenses of laches, estoppel, and waiver. As set forth below, the Court rules in favor of Mattel, and against the MGA parties as to these three remaining affirmative defenses.[1]

### A.   Laches

Laches is an equitable defense that may bar a claim where a defendant establishes "(1) lack of diligence by the plaintiff, and (2) prejudice to the defendant." Grand Canyon Trust v. Tucson Elec. Power Co., 391 F.3d 979, 987 (9th Cir. 2004). The MGA parties establish neither element.

Because the Court has already found that all the claims asserted against the MGA parties were filed within the applicable limitations periods, the Court starts with the presumption that laches is inapplicable. Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002).

Mattel has not delayed in bringing its claims against the MGA parties. The Court has already found, based on the undisputed evidence, that Mattel had no reason to know of its claims against Bryant until November 23, 2003, and that it had no knowledge of its claims against MGA and Larian until Bryant was deposed approximately a year later on November 4, 2004. MGAE intervened in Mattel's suit against Bryant approximately one month later on December 7, 2004. See Dec. 7, 2004, Stip. & Order (04-9059 docket #36) ("MGA[] believes . . . that it has a significantly protectable interest relating to the subject matter of the action, . . . and that MGA's interest is not adequately represented by the existing parties."). Thereafter, the parties briefed Mattel's motion to remand (filed on December 1, 2004, and denied on March 4, 2005), before a stay was entered in the case on May 20, 2005, pending the Ninth Circuit's consideration of an

---

[1]   By advancing only the affirmative defenses of laches, estoppel, and waiver in their Phase 1C brief, the MGA parties have implicitly waived the right to pursue any other affirmative defenses that they have not already expressly waived.

EXHIBIT 28
PAGE 245

Case 2:04-cv-09049-DOC-RNB Document 4513-7 Filed 12/23/08 Page 45 of 55 Page ID
#:131442
Case 2:04-cv-09049-SGL-RNB    Document 4439    Filed 12/03/2008    Page 4 of 17

interlocutory appeal. After MGAE's intervention and before the stay was entered, the parties,
including MGAE, engaged in discovery, and the Court considered certain discovery motions,
including a motion to compel the deposition of Isaac Larian filed on March 17, 2005. The stay
remained in place until after the Ninth Circuit affirmed the Court's denial of the motion to remand; it
was lifted on May 16, 2006. Six months later, on November 17, 2006, Mattel sought leave to file
its claims against the MGA parties. On this record, the Court finds no lack of diligence by Mattel.

Nor have the MGA parties shown they suffered resulting prejudice. MGAE was permitted to
intervene in the lawsuit filed by Mattel against Carter Bryant only one month after it became
evident that its rights could potentially be affected, and it did so with the express purpose of
protecting its own rights. The other MGA parties have not shown that they suffered any prejudice
unique to them or that the intervention by MGAE was not designed to protect their rights.

Moreover, the record does not support the evidentiary prejudice claimed by the MGA
parties, and the record is devoid of any expectation-based prejudice (i.e., evidence of what MGA
would have done differently had the claims against them been asserted sooner). Indeed, to the
contrary, the record reveals that the MGA entities have continued to promote (and profit from) the
Bratz brand during the entire pendency of the current litigation.

Because of the presumption that laches will not bar timely claims, and because the Court
finds that the MGA parties have failed to establish either element of laches, the Court finds in favor
of Mattel as to the affirmative defense of laches.

## B.    Estoppel

For equitable estoppel to preclude Mattel's claims here, the MGA parties must establish
four elements:

> (1) [T]he party to be estopped must be apprised of the facts; (2) he
> must intend that his conduct shall be acted upon, or must so act that
> the party asserting the estoppel has a right to believe it was so
> intended; (3) the other party must be ignorant of the true state of facts;
> and (4) he must rely upon the conduct to his injury.

Strong v. County of Santa Cruz, 15 Cal.3d 720, 725 (1975).

The MGA parties cannot establish the first element because, as noted above, the Court has
already found, based on the undisputed evidence, that Mattel had no reason to know of its claims
against Bryant until November 23, 2003, and that it had no knowledge of its claims against MGA
and Larian until Bryant was deposed almost a year later.

The MGA parties have produced no evidence that Mattel intended them to act upon any
apparent intention to refrain from asserting any claims against them. To the contrary, MGAE
quickly intervened in Mattel's suit against Bryant to protect its interests.

EXHIBIT 28
PAGE 246

Case 2:04-cv-09049-DOC-RNB   Document 4513-7   Filed 12/23/08   Page 46 of 55   Page ID
#:131443
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/ᴗᴗ/2008      Page 5 of 17

Moreover, the MGA parties had no basis upon which to rely on Mattel's conduct. As found by the jury, they had superior knowledge regarding Bryant's creation of the Bratz drawings (and the timing of that creation).

Because the Court finds that the MGA parties cannot establish all the elements of estoppel, the Court finds in favor of Mattel as to the affirmative defense of estoppel.

### C.    Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." United States v. King Features Entertainment, Inc., 843 F.2d 394, 399 (1988).

Here, the MGA parties contend that Mattel's tolerance of its employees' "moonlighting" for its competitors was so widespread as to constitute such a relinquishment. Although such implied waivers may be found where a plaintiff's conduct "is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished," Medico-Dental etc. Co. v. Horton & Converse, 21 Cal.2d 411, 432 (1942), no such conduct is present here.

No evidence of record suggests that Mattel tolerated the type of conduct in which Bryant engaged. The Court has previously addressed, and will not belabor here, the distinctions to be made between the limited evidence regarding "moonlighting" in the record and the conduct in which Bryant engaged. The evidence establishes, and the jury found, that while employed by Mattel as a fashion designer, Bryant preliminarily developed designs for and pitched a line of fashion dolls to Mattel's direct competitor. There is no evidence that Mattel has ever tolerated this type of conduct. Instead, several witness testified to their belief that such conduct would result in immediate termination of the offending employees. Indeed, the record is replete with details of the steps taken by Bryant, the MGA parties, and MGA employees to conceal the extent of Bryant's involvement in the Bratz project while he was employed by Mattel.

The Court finds in favor of Mattel as to the affirmative defense of waiver.

### II.  Declaratory Relief Motion (docket #4303)

In its motion for declaratory judgment, Mattel seeks, pursuant to its thirteenth cause of action, a declaration of its rights (and the MGA parties' lack of rights) regarding the Bratz-related works, including certain drawings, sculpts, and ideas.[2]  Mattel also seeks imposition of a

---

[2]  The parties and the Court are all equally aware that ideas are not copyrightable. However, they are, as set forth in the Court's summary judgment order, assignable under California state law. As noted in the Court's summary judgment order, such an assignment was made by Bryant to Mattel.

MINUTES FORM 90
CIVIL -- GEN                                                    5

Initials of Deputy Clerk: jh

EXHIBIT  28
PAGE  247

Case 2:04-cv-09049-DOC-RNB Document 4513-7 Filed 12/23/08 Page 47 of 55 Page ID
#:131444
Case 2:04-cv-09049-SGL-RNB     Document 4439     Filed 12/ᴗᴗ/2008     Page 6 of 17

constructive trust as to MGA's copyright registrations in certain Bratz drawings. As detailed in the concurrently filed Order, the Court **GRANTS** Mattel's Motion for Declaratory Judgment (docket #4303).

In opposition, the MGA parties contend that the relief sought by Mattel should not be granted because it is preempted by the Copyright Act. The Court rejects this argument. The Court's ruling regarding preemption is set forth in the Court's summary judgment order, which the Court does not here modify.

Declaratory relief is generally granted "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (1984).

Here, considering this legal standard and based on the relationship among the parties, the jury's verdicts, the Court's previous Orders, and the entire record, the Court finds that the declaratory relief sought by Mattel is appropriate.[3] Concurrently herewith, the Court has entered, as modified, Mattel's proposed order for declaratory relief.

### III. Motion for Constructive Trust and § 17200 Injunctive Relief (docket #4505)

As set forth more fully in its Motion, Mattel seeks, pursuant to California state law, imposition of a constructive trust over the trademarks "Bratz" and "Jade." Mattel also seeks, pursuant to its twelfth cause of action, a finding that the MGA parties violated Cal. Bus. & Prof. Code § 17200 on the basis of the jury's findings that the MGA parties converted Mattel's property, tortiously interfered by Mattel's contractual relations, and aided and abetted Bryant's breaches of his fiduciary duty and the duty of loyalty. Pursuant to this finding, and in addition to imposition of a constructive trust as to the Bratz and Jade marks, Mattel seeks an injunction prohibiting the MGA parties from using these marks. As detailed in the concurrently filed Order, the Court **GRANTS** Mattel's Motion for Constructive Trust and § 17200 Injunctive Relief (docket #4305).

### A.     Constructive Trust

Cal. Civ. Code § 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civ. Code § 2224 explicitly addresses things gained by wrongful acts: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." The parties agree on the resulting elements, which may be stated as

---

[3]   The appropriateness of the constructive trust remedy is discussed below, in a separate section, but applies equally here.

MINUTES FORM 90
CIVIL -- GEN

6

Initials of Deputy Clerk: jh

EXHIBIT **26**
PAGE **248**

Case 2:04-cv-09049-DOC-RNB Document 4513-7 Filed 12/23/08 Page 48 of 55 Page ID
#:131445
Case 2:04-cv-09049-SGL-RNB Document 4439 Filed 12/03/2008 Page 7 of 17

follows: "(1) the existence of a *res* (property or some interest in property); (2) the right of a complaining party to that *res*; and (3) some wrongful acquisition or detention of the *res* by another party who is not entitled to it. Communist Party v. 522 Valencia, Inc., 35 Cal.App.4th 980, 990 (1995).

Significantly, because the purpose of a constructive trust is to prevent unjust enrichment, enhancement of value is given to the beneficiary of the constructive trust. Haskel Engineering & Supply Co. v. Hartford Acc. & Indem. Co., 78 Cal.App.3d 371, 375 (1978)

Here, the jury found that the MGA parties wrongfully acquired the idea for the name "Bratz" along with the idea and preliminary drawings for a line of fashion dolls. The same is true for the one Bratz character who retained the name given her by Carter Bryant: "Jade."[4] In addition to wrongfully acquiring them, the MGA parties continue to wrongfully retain them. The MGA parties enhanced the value of the names by acquiring trademark rights to them. California law requires, in this instance, that a constructive trust be imposed as to these marks. Mattel is the beneficiary of the constructive trust and MGA's trademarks in "Bratz" and "Jade" inure to Mattel's benefit.

In making this conclusion, the Court has considered, and rejected, the MGA parties' argument that Mattel has disavowed an intention to seek this remedy or waited too long to seek it. Mattel has conceded that it is not asserting a trademark infringement claim. It cannot, because it has not used the relevant marks in commerce, and one must do so to acquire trademark rights. Conversive, Inc. v. Conversagent, Inc., 433 F.Supp.2d 1079, 1089 (C.D. Cal. 2006) (citing Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 (9th Cir. 1999)). However, Mattel has not disavowed its intent to seek a constructive trust over the marks that were created by Bryant, with rights thereto acquired by the MGA parties through registration and use in commerce. This remedy is well within the scope of relief that is sought in Mattel's second amended answer and counterclaims, see SAAC at 73 ¶ 9 (Prayer for Relief) (seeking "imposition of a constructive trust over Bratz, including without limitations registrations and applications for registrations relating thereto made or filed by [the MGA parties] and third parties, and all profits, monies, royalties and any other benefits derived or obtained from [the MGA parties'] exercise of ownership, use, sale, distribution and licensing of Bratz"), and the Court has rejected all timeliness challenges to Mattel's claims.

## B.   § 17200 Violation

The record reveals sufficient evidence of injury-in-fact to Mattel to confer standing upon it to assert its § 17200 claim. Specifically, as testified to by Mattel officers (and acknowledged by MGAE officers and attorneys), Mattel has suffered lost market share as a result of the sales of the Bratz dolls. Moreover, the jury was instructed that "harm" to Mattel was a necessary element of a number of state law claims. See Final Jury Instructions as Given [Phase 1A], docket #4115, at

---

[4]   Bryant's other characters were re-named before they were marketed: Zoe became the now-familiar Cloe, Hallidae became Sasha, and Lupe became Yasmin.

EXHIBIT 28
PAGE 249

Case 2:04-cv-09049-DOC-RNB   Document 4513-7   Filed 12/23/08   Page 49 of 55   Page ID
#:131446
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008      Page 8 of 17

Instruction Nos. 22, 25-27, and 29 (intentional interference with contractual relations, aiding and abetting breaches of fiduciary duty and the duty of loyalty, and conversion). The jury's finding in favor of Mattel as to those claims necessarily implies a factual finding by the jury as to the specified element of harm to Mattel and, as explained in more detail below, the Court is bound by that implicit factual finding. Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993) (finding that by awarding damages on a specific claim, the jury implicitly found that the plaintiff had proven one particular element of that claim).

As set forth in a previous Order, this claim is only partially preempted by the Copyright Act. The preempted portion of Mattel's § 17200 claim did not survive summary judgment and is not at issue here.

Based on the jury's findings that the MGA parties converted Mattel's property, tortiously interfered with its contractual relations, and aided and abetted Bryant's breaches of his fiduciary duty and the duty of loyalty, the Court finds that the MGA parties also violated Cal. Bus. & Prof. Code § 17200.

## C.      § 17200 Injunctive Relief

Where a Court finds violation of § 17200, it has broad powers to shape appropriate injunctive relief:

> Any person who . . . has engaged . . . in unfair competition may
> be enjoined in any court of competent jurisdiction. The court may make
> such orders or judgments, . . . as may be necessary to prevent the use
> or employment by any person of any practice which [either] constitutes
> unfair competition, . . . or as may be necessary to restore to any person
> in interest any money or property, real or personal, which may have
> been acquired by means of such unfair competition.

Cal. Bus. & Prof. § 17203.

The injunction sought by Mattel's proposed order (as modified by the Court) is necessary to restore to Mattel the property acquired as a result of the MGA parties' unfair competition.

For the reasons set forth above, concurrently herewith, the Court has entered, as modified, Mattel's proposed order for constructive trust and § 17200 injunctive relief.

### IV. Motion for Permanent Injunction (docket #4306)

## A.      Facts Supporting Injunctive Relief

The present motions, to varying degrees, implicate the question of to what extent a Court trying equitable claims is bound by a jury's factual findings related to the same underlying conduct.

MINUTES FORM 90
CIVIL -- GEN                                                    8                    Initials of Deputy Clerk: jh

EXHIBIT 28
PAGE 250

The question comes into sharpest focus in Mattel's Motion for Permanent Injunction.

"[W]here legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are based on the same facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993) (internal quotation marks and citation omitted). In the absence of an express finding, a court must determine whether implicit factual determinations by the jury can be inferred, and should consult the jury's verdict and the jury instructions to make this determination. Id. (finding, based on an examination of the jury instructions and the jury's verdict awarding damages as to a specific claim, that the jury implicitly found that plaintiff had proven one particular element of that claim).

The Court is certainly aware that the jury returned an award of damages that was far less than that sought by Mattel. Moreover, the Court is aware that a controversy exists as to the actual amount of the jury's verdict. See Mattel's Submission Regarding Email from Juror No. 7 and Request to Recall the Jury, docket #4288 (denied by Order dated September 3, 2008, docket #4295).

MGA has argued that the jury has found that only the so-called "first generation" Bratz dolls were infringing. The jury made no express finding on this issue; the general verdict form they were provided did not request such a detailed finding. Thus, in accordance with Gates, the Court looks to the jury instructions to determine any implicit findings.

The jury was instructed that "Mattel is entitled to recover any profits attributed to the infringement." MGA attempts to equate the $10 million figure awarded by the jury for copyright infringement to the amount of profits related to the first generation Bratz dolls. The difficulty with this "equation" is that it is woefully unbalanced. To be sure, MGA's damages expert presented evidence that the first generation Bratz dolls netted approximately $4 million in profits; had the jury awarded this amount as copyright damages, then the Court might be persuaded that the jury implicitly found that the infringement was limited to the first generation Bratz dolls. But that is not the case. The factual finding advanced by MGA cannot be inferred from the jury award.

In making this ruling, the Court is mindful of the jury's note that queried whether they could find infringement as to the first generation dolls and no other dolls. The Court, without objection from counsel, answered that question affirmatively. Although this note reveals that the jury considered limiting their finding of infringement to the first generation, it does not reveal that they ultimately chose that conclusion. Again, had the jury awarded an amount equal to the amount of profits generated by the first generation Bratz dolls, the Court would find, based on the award and the jury's note, that the jury implicitly found infringement as to the first generation Bratz dolls only.

Alternatively, counsel posited at oral argument, that the jury found that a large portion of the

EXHIBIT 28
PAGE 251

Bratz dolls infringed Mattel's copyrights, but only in very minute ways.[5] Counsel likened the jury's damage award to a rug that, no matter which way one moved it, simply would not cover the floor. See Nov. 10, 2008, Tr. at 100-101. Counsel explained that the jury's findings led to one conclusion or the other and, regardless of which conclusion was chosen, the jury's finding did not support an injunction:

> The rug is too small for an injunction, regardless of how you allocate that money. You either come up with a vanishingly small subset of infringing products, or you come up with a vanishingly small percentage of infringement by all of the products. And the jury has put that cap for us.

Id. Although colorful, counsel's metaphor is not helpful. Assuming that the Court would be bound by a jury's factual finding in a case where only two possible inferences -- both of which would lead the Court to the same conclusion -- were possible, this is not that case.

Where a jury returns a monetary award based on a particular piece of evidence such as an expert report, the Court will infer the factual findings that necessarily flow from it. But where, as here, the Court and the parties are left to hazard various guesses as to the jury's intentions, the Court can make no principled inferences and must therefore engage in its own fact-finding.[6]

The Court has carefully examined each of the exhibits attached to the proposed preliminary injunction, as well as the actual exhibits being stored in Courtroom Four of the U.S. Courthouse in Riverside, and finds that the dolls depicted in Exs. 3 and 4, and the products depicted in Exs. 5 and 6, are, pursuant to the standard set forth in the Court's Orders dated July 24, 2008, and August 15, 2008, substantially similar to Mattel's registered copyrighted drawings and are embodiments of the sculpts depicted in Exs. 1 and 2. In doing so, the Court has first examined the specific expressive elements of the works at issue and has compared them to those found in the exhibits referenced

---

[5]   This argument was not raised in the opposition papers filed by the MGA parties, and is rejected for that reason as well. See Opp. at 21 ("Here, the circumstances clearly show that the only reasonable conclusion to draw is that the jury's infringement finding was limited to a small universe of products, specifically the first generation Bratz dolls as clothed and packaged.") (emphasis added).

[6]   The MGA parties hazard such a guess in their opposition, wherein they attempt to explain how, in the jury's mind, $4 million in first-generation profits could equate to $10 million total copyright infringement award: "The jury's decision to award $6 million against MGA[E] (and $10 million total) rather than simply the $4 million] argued by MGA as profits for the first generation may be due to the jury believing that MGA's proffer of $4 million in profits on nearly $80 million revenue was a bit low." Opp. at 21 n.30. This guessing game illustrates why no factual findings can be inferred from the jury's copyright infringement award and why the Court is obligated to make its own factual findings.

Initials of Deputy Clerk: jh

EXHIBIT 28
PAGE 252

above, and the Court has then further examined the overall similarity of the expression in various works from the perspective of the ordinary observer. Although the Court recognizes that there are differences between the works, the Court ultimately finds that those dolls and products set forth in the above-referenced exhibits are **substantially similar** to Mattel's registered copyrighted drawings and are embodiments of the sculpts depicted in Exs. 1 and 2. Especially important to the Court's conclusion is the consistency of the particularized expression of the dolls' heads, lips, eyes, eyebrows, eye features, noses, as well as the particularized expression of certain anatomical features relative to others (most notably the doll lips, doll eyes, doll eyebrows, and certain other doll eye features) and de-emphasis of certain anatomical features (most notably the minimalized doll nose and thin, small doll bodies). Also important to the Court is the particularized, synergistic compilation and expression of the human form and anatomy that quite clearly expresses a unique style and conveys a distinct look or attitude, especially as perceived by the intended consumer market (7-12 year old girls). The evidence on this latter point is particularly compelling, supported by both analytical and market analysis. Together, these features clearly give each of the dolls the particularized expression to which the Court referred in its July 24, 2008, and August 15, 2008, Orders.

## B.   Standard for Awarding Permanent Injunctive Relief

The Supreme Court recently announced the standard for granting a permanent injunction:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

### 1.   Irreparable Injury

The Court begins, then, by looking to whether Mattel has established that it will suffer irreparable injury if an injunction is not granted.

Prior to the eBay decision, where a plaintiff sought a preliminary injunction, irreparable injury was presumed in intellectual property cases; in light of the eBay decision, some doubt has been cast on whether courts should continue to apply that presumption. See Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 702 (Fed. Cir. 2008) (noting that the continuing viability of the presumption is "an open question").

Mattel has established its exclusive rights to the Bratz drawings, and the Court has found

MINUTES FORM 90                                                        Initials of Deputy Clerk: jh
CIVIL -- GEN                                    11

EXHIBIT 28
PAGE 253

that hundreds of the MGA parties' products -- including all the currently available core female
fashion dolls Mattel was able to locate in the marketplace -- infringe those rights. The MGA parties
have evinced an intention to continue marketing those dolls. This represents a wholesale inability
on the part of Mattel to enforce its exclusive rights under the Copyright Act, amounting to
irreparable harm. Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d 958, 968 (8th Cir.
2005).

MGA criticizes Mattel's reliance on Taylor, citing Metro-Goldwyn-Mayer Studios, Inc. v.
Grokster, Ltd., 518 F.Supp.2d 1197, 1211 n.13 (C.D. Cal. 2007) (Wilson, J.). The Grokster case
holds that, in copyright permanent injunction cases, a presumption of irreparable injury is not
permitted in light of eBay. In Grokster, the court rejected the rationale of Taylor, stating:

> [T]his Court is not persuaded by the Eighth Circuit's pre-eBay
> conclusion in Taylor Corp. v. Four Seasons Greetings, LLC, 403 F.3d
> 958, 968 (8th Cir. 2005), that because "[a plaintiff] certainly has the right
> to control the use of its copyrighted materials, . . . irreparable harm
> inescapably flows from the denial of that right." In substance, such
> language is nothing more than a disguised presumption, particularly
> with the use of the word "inescapably." After eBay, Plaintiffs cannot rely
> on the pure fact of infringement in order to establish irreparable harm.

Grokster, 518 F. Supp.2d at 1211 n.13. Judge Wilson's point is well-taken. Although the Taylor
court did not purport to apply a presumption of irreparable harm, its use of the word "inescapably"
in this phrase certainly could indicate that it was merely presuming irreparable harm. However, a
review of the Taylor case makes clear that the Eighth Circuit considered the implications of
allowing an infringer to continue to infringe: "[I]n copyright infringement actions, the denial of a
request for injunctive relief could otherwise "amount to a forced license to use the creative work of
another." Taylor Corp., 403 F.3d at 967-68. This rationale removes Taylor further from the
application of a "disguised presumption" of irreparable harm and closer to an actual finding of
irreparable harm.

At least one district court within the Ninth Circuit is in accord with the Court's decision today,
as it has decided, post-eBay, that a plaintiff who establishes past infringement and the threat of
future infringement amounts to irreparable harm. Designer Skin, LLC v. S & L Vitamins, Inc., 2008
WL 4174882 at *5 (D. Ariz. 2008) (Teilborg, J.). Judge Teilborg's rationale is well articulated:

> Whatever else might be said against the propriety of a rule that holds
> that past infringement plus the threat of future infringement equals
> irreparable harm, it seems clear to this Court that such a rule would not
> run afoul of eBay's directives. First of all, the eBay Court did not
> address the showing necessary to establish "irreparable harm." It
> merely held that the plaintiff has the burden of proving it. Second, this
> two-part test does not resurrect the presumption of irreparable harm
> impliedly laid to rest by the eBay court. It simply recognizes that a

Initials of Deputy Clerk: jh

EXHIBIT  28
PAGE  254

> plaintiff meets the burden of proving irreparable harm by making this two-part showing. And finally, the two-part test does not represent a rule [prohibited by eBay] that an injunction automatically follows a determination that a copyright has been infringed. . . . In exercising their equitable discretion, courts would still have the freedom to deny injunctive relief when the public interest or the balance of hardships weighs against such relief.

Designer Skin, 2008 WL 4174882 at *5 (citation omitted).

Indeed, this is not so complex an issue as applied to the facts of this particular case. The statutory directive to the Court is clear: "Any court having jurisdiction of a civil action arising under this title may, . . . grant temporary and final injunctions on such terms as it may deem reasonable *to prevent or restrain infringement of a copyright*." 17 U.S.C. § 502 (emphasis added). The Court can envision no case more appropriate for a finding of irreparable harm. Here, as the record shows and as the jury found, an employee bound by contract and fiduciary duty to communicate to his employer (and keep confidential from all others) all copyrightable works he creates during the term of his employment, not only fails to so communicate but actually secretly purports to convey the rights thereto to a direct competitor of his employer. The rights to those works are actively concealed from their true owner (by both the employee and the competitor) for years while the competitor exploits the works, reaping profits therefrom totaling hundreds of millions of dollars. After millions of pages of discovery are produced, thousands of filings are submitted, scores and scores of motions are decided by the Court, and after months of trial and two jury verdicts in favor of the plaintiff, defendants remain steadfast in their intention to continue to produce their infringing products. Viewed in this light, Mattel has established irreparable injury on the basis of the MGA parties' past infringement and the high probability of continued acts of infringement.

## 2.   Inadequate Legal Remedies

Unless MGA is enjoined, Mattel would be forced to sue each retailer and distributor to stop the sale and distribution of the infringing dolls; therefore, the legal remedies are inadequate. See Continental Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1105 (9th Cir. 1994).

## 3.   Balance of Equities

Factually, the hardship on MGA weighs very heavily upon the Court. The Court has expressed its concerns in this regard on the record. The evidence at trial showed that, at least historically, Bratz is the brand that has made MGA profitable. And the proposed injunction addresses the core of that brand -- most notably, the female fashion dolls.

However, where, as here, the only hardship that will be suffered is lost profits from the cessation of its infringing activities, the Court, in the final analysis, must afford this very little -- if any -- weight. Triad Systems Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has

EXHIBIT 28
PAGE 255

Case 2:04-cv-09049-DOC-RNB   Document 4513-7   Filed 12/23/08   Page 55 of 55   Page ID
#:131452
Case 2:04-cv-09049-SGL-RNB      Document 4439      Filed 12/03/2008    Page 14 of 17

been shown likely to be infringing, such an argument in defense merits little equitable consideration
. . . .") (internal quotation marks and citations omitted), accord, Cadence Design Systems, Inc. v.
Avant! Corp., 125 F.3d 824, 829-30 (9th Cir. 1997) (collecting cases). The balance of equities
favor Mattel.

### 4.    Public Interest

There is a strong economic interest, especially in these troubled economic times, in
maintaining a profitable enterprise as a going concern. However, there is also a strong public
interest in enforcing copyright laws in a uniform manner. Indeed, nothing is more essential to long-
term economic prosperity than the stability provided by the rule of law. Although the MGA parties
raise excellent points in their opposition, in the end, the public interest is served by precluding
defendants from engaging in copyright infringement. The injunction issued by the Court does no
more than that.

### C.    Scope of Injunction

The scope of the permanent injunction is set forth in a separate order. Four issues raised in
the parties' papers warrant the brief discussion that follows.

### 1.    Impoundment and Destruction

As set forth more fully in its motion, Mattel seeks impoundment of Bratz dolls and
destruction of the specialized plates, molds, and matrices used to make them. Impoundment of
existing infringing products and the destruction of the means to make those products are clearly
remedies contemplated by the Copyright Act. See 17 U.S.C. § 503(a). The MGA parties argue
that these remedies are inappropriate because there is no ongoing infringement or, at the very
least, its products infringe very little. In its findings supporting the issuance of a permanent
injunction, the Court has rejected this premise, and the Court finds that the requested
impoundment and destruction is an appropriate remedy.[7]

### 2.    Recall

In light of the scope of infringement found by the Court, and in light of the fact that the
injunction addresses products that directly compete with Mattel's products, the Court has ordered
the recall of infringing products from retailers. See CyberMedia, Inc. v. Symantec Corp., 19
F.Supp.2d 1070, 1079 (N.D. Cal.1998); Patry on Copyright, § 22:81.

---

[7]   No party shall destroy any of the implements used to make the Bratz dolls that are the
subject of the permanent injunction absent a specific order of this Court authorizing such
destruction.

MINUTES FORM 90                                                   Initials of Deputy Clerk: jh
CIVIL -- GEN                              14

EXHIBIT  28
PAGE  250