QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | **MATTEL, INC.'S *EX PARTE* APPLICATION FOR APPOINTMENT OF A RECEIVER FOR MGA OR FOR ALTERNATIVE RELIEF; AND** |
| Defendant. | |
| AND CONSOLIDATED ACTIONS | **MEMORANDUM OF POINTS AND AUTHORITIES** |
| | [Declaration of Michael T. Zeller and Proposed Order filed concurrently] |

Mattel, Inc. ("Mattel") hereby respectfully applies *ex parte*, pursuant to Fed. R. Civ. P. 66 and Local Rule 7-19, for an Order Appointing a Receiver for MGA Entertainment, Inc., or for alternative relief, including without limitation for expedited discovery.

Mattel makes this Application on the grounds that MGA has filed, both in this Court and in the Ninth Circuit, stay applications based on MGA's claims of imminent financial insolvency, including for reasons that MGA admits are unrelated to the prospect of injunctive relief.  Regardless of whether MGA's assertions are credited, MGA's repeated, conflicting assertions about its financial condition raise serious doubts about its ability to (a) pay the Phase 1 trial damages award and any award rendered in Phase 2 trial to Mattel and (b) maintain and preserve the Bratz intellectual property that the jury and this Court determined are Mattel's. Furthermore, there is mounting evidence that MGA and Larian have engaged in questionable business arrangements and failed to disclose to the Court and Mattel significant financial information, including the identity of the ultimate source of the funding that MGA has been receiving since Phase 1B from a series of off-shore, non-operating entities.  A receiver should be appointed, and MGA and Larian should be ordered to pay the costs and fees associated with the receiver. Alternatively, Mattel seeks leave to take expedited discovery into this subject matter.

Good cause exists to seek this relief on an *ex parte* basis.  MGA claims that its demise is imminent, and Mattel recently learned of additional questionable practices by MGA and Larian.  Although Mattel has also asked for the appointment of a receiver as a condition for any stay pending appeal, this Application seeks appointment of a receiver regardless of the outcome of MGA's stay applications and further relief such as expedited discovery.

Pursuant to Local Rule 7-19, on December 24, 2008, Mattel's counsel gave notice of this Application and the relief being sought to counsel for the MGA

-1-

1  Parties, Jason Russell of Skadden, Arps, Slate, Meagher & Flom LLP (telephone:

2  213-687-5000; address: 300 South Grand Avenue, Suite 3400, Los Angeles,

3  California 90071).  Counsel for defendants stated that the MGA Parties oppose this

4  Application.

5       This Application is based on this Notice of Application, the accompanying

6  Memorandum of Points and Authorities, the Declaration of Michael T. Zeller (and

7  its exhibits) filed concurrently herewith, the lodged Declarations of Michael J.

8  Wagner and Jon D. Corey, the records and files of this Court, including without

9  limitation the Phase 1 trial record, and all other matters of which the Court may take

10  judicial notice.

11

12  DATED:  December 28, 2008        QUINN EMANUEL URQUHART OLIVER &
                                    HEDGES, LLP
13

14                                  By /s/ Michael T. Zeller
15                                    Michael T. Zeller
                                      Attorneys for Mattel, Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## Preliminary Statement

This Court should appoint a receiver. This is true regardless of whether or not there is a stay of any kind of this Court's orders, and whether or not the Court imposes any conditions on any such stay. The receiver should, subject to this Court's authority, act to preserve the value of Bratz, oversee and control all financial and business aspects of Bratz, including the revenues generated by it, and ensure that assets are not dissipated. At a minimum, the receiver should be authorized to investigate and monitor any and all financial and business matters involving Bratz and to report them to the Court and to Mattel.

Pursuant to the <u>Rules</u> and their inherent powers of equity, federal district courts may appoint receivers to preserve assets and rights during litigation. Each of the factors that courts typically consider weighs in favor of appointing a receiver here. MGA professes to be on the verge of collapse and insolvency. Accurate or not, it is beyond dispute that MGA and Larian have revised their claims as to MGA's financial picture repeatedly and radically. During the Phase 1B trial, when it suited MGA's purpose, MGA proclaimed to the Ninth Circuit and the jury that it was in financial extremis. When Mattel then sought an injunction and noted that those assertions demonstrated the threat of irreparable harm to Mattel, MGA disavowed them. Now, MGA again represents that it is imminently going to go out of business -- while its counsel swears at the same time to the Court of Appeals that MGA is worth hundreds of millions of dollars (and even though MGA's own financial expert testified at trial no valuation of MGA was possible).

MGA's about-faces alone amply show that MGA cannot be trusted to accurately report its financial condition, let alone preserve Bratz assets, pay Mattel the damages that Mattel has been awarded or protect Mattel's interests in the Bratz intellectual property. Equally troubling, MGA has sweepingly claimed that it cannot obtain credit, but it failed to disclose to Mattel or the Court that MGA has

been receiving since the Phase 1B verdict significant funding through non-operating, off-shore companies that were first formed during trial and that have mail-drops for "offices."  Whatever their purpose may be, these arrangements serve to conceal the ultimate source of MGA's funding.

And certainly MGA has not revealed in this case the source of its undisclosed funding, either at trial, in its ex parte papers or in discovery.  To this day, MGA has failed to produce audited financial statements for 2007, the last full calendar year, or updated financials for 2008, despite Court Orders that MGA produce such information.  Indeed, the Court again had to order -- on the eve of trial -- that such information be produced because MGA and Larian had violated prior Court Orders compelling complete financial information.  It is beyond dispute that MGA must have financial records in its possession.  Its failure to produce them further confirms that equitable relief in the form of a receiver is needed at this point.

Nor are these the only irregularities.  MGA has funneled millions of dollars to Isaac Larian's relatives.  Mattel recently learned that Larian formed a new entity, IGWT, that is selling Bratz inventory.  MGA has never disclosed this either, or disclosed the terms of its arrangements with IGWT, including whether MGA's claims of financial distress account for IGWT's revenues from Bratz.  The jury also found that MGA engaged in fraudulent concealment and committed intentional torts against Mattel, and MGA has destroyed and altered evidence in this case.  MGA also bribed three Mattel employees (in addition to Bryant) to work on hundreds of Bratz dolls over a five-year period.  That scheme continued for a year even after this suit was filed, and MGA failed to disclose it in the face of Court Orders compelling discovery.  To date, five different MGA-affiliated witnesses -- including one MGA executive and another MGA manager -- have refused to answer questions at deposition by invoking the Fifth Amendment.

On this record, the need for a receiver is evident.  Mattel respectfully requests that this Court appoint a receiver.

**Argument**

**I.     THE COURT HAS AUTHORITY TO APPOINT A RECEIVER**

Fed. R. Civ. P. 66 as well as this Court's "inherent equitable power" empower it to appoint a receiver, who acts and serves as an officer of the Court.   In re McGaughey, 24 F.3d 904, 907 (7th Cir. 1994).   See also Liberte Capital Group, LLC v. Capwill, 462 F.3d 543, 551 (6th Cir. 2006) (authority to appoint equitable receiver is part of federal court's "traditional, common law powers of equity."). "Receivership is an equitable remedy and a receiver will be appointed when the most speedy and perfect administration of justice and the rights of the parties interested in the property will be best secured by such action." View Crest Garden Apartments v. United States, 281 F.2d 844, 849 (9th Cir. 1960) (internal cites omitted).   The decision whether to appoint a receiver is committed to the district court's discretion.   Id.   See also National Partnership Investment Corp. v. National Housing Dev. Corp., 153 F.3d 1289, 1292 (11th Cir. 1998) (same).[1]

**II.    ALL RELEVANT FACTORS WEIGH IN FAVOR OF APPOINTING A RECEIVER**

A primary purpose in appointing a receiver is "to protect, conserve and administer property pending final disposition of a suit." In re McGaughey, 24 F.3d at 907.   Federal courts considering the following factors in deciding whether to appoint a receiver:

(1) fraudulent conduct on defendant's part; (2) imminent danger of the property being lost, concealed, injured, diminished in value, or

_____

[1]   California statutes also authorize the appointment of a receiver in "all other cases where necessary to preserve the property or rights of any party." Cal. Civ. Proc. Code § 564(b); see also Resolution Trust Corp. v. Bayside Developers, 43 F.3d 1230, 1242 (9th Cir. 1995) (affirming appointment of receiver under Cal. Civ. Proc. Code § 564(b)).   Regardless of whether federal or state law is applied here, appointment of a receiver here is appropriate for the reasons discussed below.

squandered; (3) inadequacy of legal remedies; (4) probability that harm to plaintiff by denial of appointment would outweigh injury to parties opposing appointment; (5) plaintiff's probable success in the action and the possibility of irreparable injury to plaintiff's interest in the property; (6) whether plaintiff's interests sought to be protected will in fact be well-served by receivership.

New York Life Ins. Co. v. Watt West Inv. Corp., 755 F. Supp. 287, 292 (E.D. Cal. 1991).

Each of these factors favors appointment of a receiver in this case. Absent the appointment of a receiver, Mattel will have no assurance that it will receive the jury award it has already obtained or any future jury award for Phase 2 and no assurance that the Bratz intellectual property and related assets will have any value by the end of this case. A receiver can assure that Mattel will not be left without a remedy.

**A.   Defendants' Conduct Bears Indicia Of Fraud**

MGA and Larian have a mounting record of highly dubious and likely fraudulent actions that raises serious questions.

First, MGA claims imminent insolvency as soon as December 31, 2008. Yet, it has presented no audited balance sheet showing its financial condition, much less its current solvency, and has produced no audited balance sheet for any fiscal year after 2006.[2] MGA also has made wholly inconsistent representations about its net worth to the jury, to this Court and to the Ninth Circuit. In one particularly glaring example, MGA's own financial expert swore at trial that it was not possible to ascertain the value of MGA, and Larian plead poverty to both the jury and the Ninth Circuit at that time. Yet, just a week ago, MGA's counsel represented under oath to

---

[2]   December 18, 2008 Declaration of Michael Wagner ("Wagner Dec.") ¶ 7, attached as Exhibit 1 to Notice of Lodging, dated December 29, 2008 and filed concurrently herewith.

the Ninth Circuit that MGA was worth "hundreds of millions of dollars."[3]  The vast discrepancies, as well as MGA's efforts throughout this case to thwart discovery and its repeated failures to otherwise provide proper documentation about its financial status and transactions, properly give rise to an adverse inference that MGA's financial claims are not to be trusted.

Second, MGA represented to the Court that it has been unable to obtain credit. Since the Phase 1B verdict, however, a new creditor, Omni 808 International, LLC ("Omni") has take an security interest in all or substantially all of MGA's assets.[4]  Omni's registered address is the same as OmniNet Capital, a private equity firm owned and controlled by the Nazarian family, including brother-in-law Neil Kadisha.[5]

Omni 808 does not appear to be an operating entity of OmniNet or any other company.  Rather, it is a single-purpose entity formed on August 12, 2008 -- near the end of trial as the damages verdict was looming.[6]  It appears that a company called Vision Capital, LLC owns, and presumably funded, Omni 808.  Vision Capital, like Omni 808, is not an operating entity and also was newly formed during

---

[3]   December 23, 2008 Declaration of Jon Corey ("Corey Dec.") ¶¶ 3-5 and Exs. 2-6, 28, Notice of Lodging, Ex. 2.

[4]   December 23, 2008 Corey Dec. ¶ 2 and Ex. 1.

[5]   Compare Omni registration information (with address of 9420 Wilshire Boulevard, 4th Floor, Beverly Hills, CA 90212) Corey Dec., Ex. 1 at UCC Financing Statement Amendment ¶ 7(c) with OmniNet Capital address (with address of 9420 Wilshire Boulevard, 4th Floor, Beverly Hills, CA 90212), Omninet "Contact Us", attached as Exhibit 8 to the Declaration of Michael T. Zeller ("Zeller Dec."), dated December 29, 2008 and filed concurrently herewith; see also Omninet "About Us", Zeller Dec., Ex. 9.

[6]   Omni 808 Investors LLC Certificate of Status and Articles of Organization, Zeller Dec. Ex. 2.

trial.[7]  Vision Capital in turn borrowed the money from Lexington Financial Limited -- an offshore company with a mail-drop address in London[8] and registered in the Caribbean island of Nevis, a country notorious for its corporate secrecy laws.[9] Vision Capital secured that loan from Lexington Financial with its ownership interest in Omni and perfected that as a purported security interest on August 29, 2008  -- three days after the Phase 1B jury verdict.[10]  The public records Mattel has obtained thus far as part of its own investigation do not disclose who provided Lexington Financial with the funds that it loaned to Vision Capital and in turn to Omni 808 and then MGA.

The structure of these non-operating companies conceals the actual source of the funds provided to MGA.  The formation of these companies during trial, coupled with their use of mail-drop "offices" and utilization of off-shore jurisdictions, only further adds to the questions.  Maybe there is an innocent explanation for MGA's sudden funding -- during trial -- by a newly formed offshore corporation that appears to be a shell, that obscures its funding sources for MGA and that is now apparently one of MGA's largest creditors (and perhaps its largest).  Mr. Fred Mashian, a Sunset Boulevard "estate-planning" attorney identified as the Lexington

---

[7]   Vision Capital, LLC Certificate of Formation dated August 19, 2008, Zeller Dec. Ex. 3.

[8]   UCC Financing Statement dated August 29, 2008, Zeller Dec., Ex. 4; December 12, 2008 letter from Registrar Clevelan Williams, Zeller Dec., Ex. 5. Office Front "Home" (offering website by Office Front allowing a person to obtain a "virtual office" for as little as £10 a month), Zeller Dec., Ex. 7.

[9]   UCC Financing Statement dated August 29, 2008, Zeller Dec., Ex. 4 (with Lexington Capital taking a security interest in Vision Capital's ownership interest in Omni 808 Investors LLC); "Offshore-Based Limited Liability Company (LLC)" at www.offshore-protection.com/nevisLLC.html, Zeller Dec. Ex. 6.

[10]   Zeller Dec. Ex. 4 (August 29, 2008 Lexington Financial UCC financing statement).

Financial contact on the financing statement,[11] may be able to provide it. Or not. It is a common (but unlawful) tactic for shareholders of a company to create the impression of an arms-length loan to a troubled corporation (rather than a proper capital contribution) while concealing that the shareholder is the source of the funds.[12]

But in any event what likely cannot be explained – and what MGA has never explained – is MGA's failure to mention to this Court or Mattel in its *ex parte* stay papers that it was receiving this substantial funding recently, let alone disclose its true source, despite its sweeping claims to this Court that it cannot obtain credit.

<u>Third</u>, Mattel first learned late on December 23, 2008 (and has since continued to investigate) that Isaac Larian has been setting up yet more new entities recently. One, called IGWT Group, appears to be selling Bratz products and conducting Bratz business in lieu of MGA. What is known is that Larian recently created this new company and registered its place of business as his home address.[13] Regardless of the particulars, MGA's spate of "emergency" filings relies on claims about Bratz inventory, but makes no mention of this entity or discloses on what terms IGTW is obtaining Bratz inventory or whether MGA's claims of financial distress include proper accounting of IGWT's revenues from Bratz product inventory that Larian and IGWT are selling. Farhad Larian also appears have

---

[11]   Zeller Dec. Ex. 4 (Lexington Financial UCC financing statement).

[12]   One reason this is done is so that a shareholder's sham creditor can claim priority in any bankruptcy over unsecured creditors, rather than being last in line as an owner. <u>In re Lifschultz Fast Freight</u>, 132 F.3d 339, 343 (7th Cir. 1996) (noting that "[e]quityholders come last in bankruptcy, which generally means they get nothing at liquidation. To avoid this, an owner might disguise her equity claim as debt. The doctrine of equitable subordination empowers a bankruptcy court to foil this queue-jumping."); <u>see generally</u> <u>In re Mobile Steel</u>, 563 F.2d 692 (5th Cir. 1977); 11 U.S.C. section 510(c) (authorizing equitable subordination).

[13]   Zeller Dec. Ex. 11 (IWGT Group, LLC registration information).

involvement with this entity.   As discussed below, Farhad Larian admitted to destroying evidence about Bratz after this suit was filed to keep Mattel from obtaining it.

Fourth, MGA has paid hundreds of millions of dollars to Larian and his family members as distributions, compensation, bonuses or never-to-be-repaid loans, including throughout the pendency of this litigation.   Although Mattel asked during discovery, MGA had no meaningful explanation for the large payments to many of Larian's family members.[14]   This, too, is suggestive of misconduct.   Cf. World Fuel Services Corp. v. Moorehead, 229 F. Supp. 2d 584, 589 (N.D. Tex. 2002) (inferring possibility of fraudulent conduct based on questionable business transactions with friends and associates); Haase v. Chapman, 308 F. Supp. 399, 405 (W.D. Mo. 1969) (noting that transaction at issue "bears two well-defined badges of fraud: transfer pending the writ of execution and transfer to a relative.") (citations omitted).

Fifth, MGA and Larian have destroyed and altered evidence in this case. While still a Mattel employee, Bryant sent his signed MGA contract using a Mattel fax machine.   Larian instructed an MGA executive to white-out the fax header showing it came from Mattel before sending it to an MGA lawyer.[15]   That copy also had the contract's date of September 18, 2000 whited-out.[16]   Furthermore, after Bryant began working with MGA, Bryant put "1998" dates on Bratz drawings -- dates that Bryant admitted were wrong.[17]   MGA then used the false dates on those

---

[14]   Corey Dec. ¶¶ 7-11, Exs. 9-19.

[15]   Trial Tr. (O'Connor) at 1327:23-1329:11.

[16]   TX 5904.

[17]   Carter Bryant's Responses to Mattel, Inc.'s Fifth Set of Requests for Admission to Carter Bryant, dated July 9, 2007, Response Nos. 27 and 29 at 25, 27-28, Zeller Dec., Ex. 12.

drawings in filings with the U.S. Copyright Office.[18]   And, in 2005, after he knew this suit had been filed, Farhad Larian, a former MGA executive and director who was still working as a paid consultant for MGA at the time, destroyed ten to twelve boxes of documents and numerous emails and computer files containing information about Bratz from the 2000 and 2001 time period.[19]   He intentionally did so to keep the documents from Mattel in this case.[20]

Nor have the Larians' attempts to subvert the judicial process been confined to this case.   In an email exchange, Farhad Larian confirmed that Isaac Larian had instructed him (Farhad) to falsely tell attorneys that certain original documents could not be found in an insurance claim suit involving MGA.[21]

Sixth, in addition to Bryant, MGA bribed at least another three Mattel employees to secretly work on virtually every Bratz doll that MGA ever produced -- misconduct that MGA continued for some five years, even after this lawsuit was filed.[22]   Specifically, from 2000 to 2005, MGA funneled millions of dollars in payments to its agents and contractors Veronica and Peter Marlow.[23]   Through the Marlows, MGA secretly paid three then-Mattel Design Center employees to work on hundreds of Bratz products over a five-year period -- and did so by paying them in cash and utilizing false names and false Social Security numbers to hide the

---

[18]   See Certificate of Registration VA 1-218-491 (Yasmin drawing), TX 511; Certificate of Registration VA 1-218-488 (Sasha drawing), TX 507; Certificate of Registration VA 1-218-487 (Jade drawing), TX 505; Certificate of Registration VA 1-218-490 (Cloe drawing), TX 509; Certificate of Registration VA 1-218-489 (Bratz group drawing), TX 513.

[19]   Deposition Transcript of Farhad Larian, Vol. 1 ("F. Larian Tr. Vol. 1"), dated February 4, 2008, at 53:10-16, 56:9-57:5, 65:25-67:2, Zeller Dec., Ex. 13.

[20]   F. Larian Tr. Vol. 1 at 56:12-57:2, Zeller Dec., Ex. 13.

[21]   Trial Tr. (F. Larian) at 3785:19-24; TX 13380.

[22]   Trial Tr. (Marlow) at 3672:21-3674:21, 3920:13-20.

[23]   Trial Tr. (Marlow) at 3649:20-3650:1.

scheme.[24]  Even after this suit was filed in 2004, MGA continued its bribery of these Mattel employees for another year.[25]  Yet, for over three years in discovery in this action, MGA never disclosed these facts, despite Court Orders compelling MGA to fully disclose its payments to Mattel employees.   MGA's illegal conduct was exposed only in the course of Veronica Marlow's deposition in late December 2007 -- a deposition which MGA had long obstructed by repeated cancellations and eventually had to be compelled.[26]

At their subsequent depositions, Peter Marlow and two of the employees MGA had long bribed then all refused to answer hundreds of questions about the misconduct by invoking the Fifth Amendment.[27]  In fact, Marlow alone asserted the Fifth Amendment 140 times.[28]  The Ninth Circuit has consistently held that in civil cases, courts may draw an adverse inference from refusals to testify based on the Fifth Amendment.  SEC v. Colello, 139 F.3d 674, 677 (9th Cir. 1998) (citing Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); United States v. Solano-Godines, 120 F.3d 957, 962 (9th Cir. 1997).  A court also may draw an adverse inference against a party based on a non-party's invocation where, as here, the relationship warrants it.

---

[24]   Trial Tr. (Marlow) at 3673:5-3674:1.

[25]   Trial Tr. (Marlow) at 3670:5-22.

[26]   Mattel, Inc.'s Motion for Order Confirming that the Discovery Master Hears and Resolves All Discovery Disputes, Including Those With Third Parties, dated December 13, 2007, at 5:18-6:4, Docket No. 1244.

[27]   Zeller Dec., ¶ 13 (and example deposition pages attached thereto as Exs. 14-16).  See, e.g., Deposition Transcript of Peter Marlow, Vol. 1, dated May 2, 2008 at 105:23-108:3, Zeller Dec., Ex. 14; Deposition Transcript of Ana Cabrera, dated May 2, 2008, at 179:8-181:16, Zeller Dec., Ex. 15; Deposition Transcript of Beatriz Morales, dated April 29, 2008 at 197:21-201:5, Zeller Dec., Ex. 16.  MGA paid the attorney's fees for each of these witnesses, and Marlow was represented by MGA's longtime counsel.  As the Court will recall, Mr. Marlow attempted to claim at one point, implausibly, that he did not to know who was paying his counsel.

[28]   Zeller Dec., ¶ 13.

See Libuti v. United States, 107 F.3d 110, 123 (2d Cir. 1997); In re Tableware Antitrust Litigation, 2007 WL 781960 *4-5 (N.D. Cal., March 13, 2007). Thus, while the indisputable facts relating to this multi-year scheme alone point to fraudulent conduct by MGA, well-settled law supports drawing an adverse inference against MGA from the refusals to testify as well.

Seventh, as explained in further detail below, MGA stole Mattel trade secrets. The three former Mattel employees who left to start MGA's Mexico City office took thousands and thousands of pages of Mattel trade secrets with them. When Mexican law enforcement authorities executed a search warrant, they found these stolen Mattel trade secret documents in MGA's Mexico City offices, and MGA produced from its files in this case copies of some of the stolen trade secrets before Phase 2 discovery was stayed.[29]

Recently, with leave of this Court, Mattel deposed one of the three former Mattel employees who formed MGA's division in Mexico, Gustavo Machado. Separately, Mattel also took the deposition of another MGA manager and former Mattel employee, Jorge Castilla, who had copied electronic files from Mattel's computer servers, including Mattel's international strategic plan, and took them when he left for MGA. Both Mr. Machado and Mr. Castilla invoked their alleged right against self incrimination and refused to answer questions at deposition.[30] As noted, under the law these refusals to testify support an adverse inference against MGA.

Finally, the jury determined that MGA engaged in acts of fraudulent concealment against Mattel.[31] This finding is binding on MGA. It was also amply

---

[29]   Second Amended Answer and Counterclaims ¶¶ 43-53.

[30]   Zeller Dec., ¶¶ 14-15 (and example deposition pages attached thereto as Exhs. 17 and 18).

[31]   August 26, 2008 Jury Verdict Form at 8:4-7, 8:16-19, Zeller Dec., Ex. 10.

supported by evidence showing MGA's efforts to mislead Mattel, the Government and the courts about the genesis of Bratz.   Larian, for example, variously: (1) identified himself, not Bryant, as the creator of Bratz; (2) claimed that he, Larian, "was the inspiration behind the Bratz dolls";[32] (3) averred that he "modeled the idea for Bratz after [his] own children who wear midriff-bearing shirts, low-rise jeans and baseball caps";[33] (5) claimed that Bratz originated "after a challenge from a Walmart Buyer to design and bring a product that will beat Barbie";[34] (4) stated it was his son's "idea for Bratz;"[35] and (5) declared under penalty of perjury to the U.S. Patent and Trademark Office that he personally -- and alone -- created the Bratz removable feet,[36] even though both Bryant and Larian admitted that in reality Bryant created that invention and had presented the removable feet to MGA.[37]   Indeed, Bryant admitted at trial that he too -- at MGA's request -- submitted sworn statements to the U.S. Patent and Trademark Office that included false dates.[38] Larian further admitted that he did not personally -- and alone -- create the Bratz packaging either, even though he had sworn under oath to the U.S. Patent and Trademark Office that he had done so.[39]

This evidence speaks for itself, but additional evidence confirms that MGA's statements were designed to deceive.   After Bryant left Mattel, Larian instructed other MGA employees in an email that "[t]here must be no mention" of Bryant

---

[32]  TX 947 at ¶ 8.

[33]  TX 4941 at TX 4941-0001.

[34]  TX 630-0001.

[35]  TX 6000 at TX 6000-0002.

[36]  See TX 500.

[37]  See TX 1 at TX 1-0004; see also Trial Tr. 2733:16-18.

[38]  Trial Tr. (Bryant) at 2597:22-2598:1.

[39]  Deposition Transcript of Isaac Larian, Vol. II ("Larian Tr. Vol. II"), dated March 26, 2008, at 470:8-471:20, Zeller Dec., Ex. 19; TX 615.

outside MGA.[40]   Similarly, MGA employee Dee Dee Valencia wrote to Larian, without contradiction by Larian, that "I know we want to keep Carter under wraps".[41]   A later document identifying MGA employees who came from Mattel listed Bryant's dates of employment at MGA as "????-PRESENT" and his Mattel dates as "DON'T ASK."[42]   Rachel Harris, a then-MGA employee, testified at trial that MGA executive Paula Garcia told her in October 2000 that they were not to mention that Bryant was coming to MGA for a meeting because he was still employed by Mattel and that Mattel would be upset if it knew.[43]   Harris also testified that Larian told MGA employees that they were not to mention Bryant's involvement "outside of MGA"[44] and that Larian said, if asked, he planned to say either that he came up with Bratz or that the inspiration came from his daughter.[45] And, as shown above, that was what Larian in fact subsequently did.[46]

There is abundant indicia of fraudulent -- and, at best, highly questionable -- conduct by MGA and Larian that meets the standards which other courts have found sufficient under this factor.[47]   This factor weighs heavily in favor of a receiver.

---

[40]   TX 4507-0001.

[41]   TX 4942-0001.

[42]   TX 1932 at MGA 1134726-20.

[43]   Trial Tr. 2375:22-25, 2377:7-24.  Harris testified that Mercedeh Ward, who was in charge of engineering for Bratz at MGA, also told Harris that she should not say anything about Bryant's involvement with Bratz "outside of MGA."  Trial Tr. 2378:12-2379:16, 2381:17-2382:4.

[44]   Trial Tr. 2382:13-2383:9.

[45]   Trial Tr. 2388:15-2389:6.

[46]   MGA admitted that there was no public statement recognizing Bryant as Bratz's creator until July 18, 2003, when the *Wall Street Journal* published an article saying so.  Trial Tr. 1572:9-19.

[47]   See, e.g., Chase Manhattan Bank v. Turabo Shopping Ctr., Inc., 683 F.2d 25, 26-27 (1st Cir. 1982) ("evidence [of] unfair and arguably fraudulent dealing" sufficient on factor); Brill & Harrington Investments v. Vernon Sav. and Loan
(footnote continued)

### B.   Mattel's Property Interests Are At Risk.

MGA's claimed dire financial condition increases the risk that profits from Bratz sales will be concealed or dissipated.  See New York Life Ins. Co., 755 F. Supp. at 292 (receivership appropriate where defendant was experiencing financial difficulty and adequacy of security was doubtful); World Fuel Services Corp., 229 F. Supp. 2d at 589 (that defendant's "financial condition since entry of judgment has dramatically deteriorated" favored receivership).  But, whether or not MGA's latest prognostications of financial doom are credited, entrusting MGA with the task of identifying the revenues and profits attributable to Bratz and preserving them so that Mattel can be paid its damages award is as unworkable as the royalty remedy previously rejected by the Court.  (Order at 15).

Absent the appointment of a receiver, there is also a very real danger that Mattel's intellectual property will be damaged or impaired because MGA may have neither the incentives nor resources to maintain it.  If MGA's claims of financial hardship and unwilling suppliers are to be credited, the quality of the Bratz products embodying Mattel's intellectual property may suffer; bringing inferior products to market would damage the value of Bratz and thus cause irreparable harm.[48]  MGA

---

Ass'n, 787 F. Supp. 250, 254 (D.D.C. 1992) (finding, as basis for appointment of receiver, defendants' "financial condition, if not precarious, is at least suspect" and that "it is likely that they are in no financial position to give assurance that they are now and will remain fully able to reply the amounts owed."); New York Life, 755 F. Supp. at 292 (showing that "the financial strength of the defendants is at least doubtful" is sufficient to favor appointment of receiver).  As this also makes clear, smoking gun proof of actual fraud is not required to support a district court's discretionary decision to appoint a receiver.

[48]   See Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods.  Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.").

also has little incentive—and may lack the financial resources—to prevent third parties from infringing, diluting, tarnishing or otherwise irreparably damaging the value of Mattel's intellectual property during any appeal.  MGA could fail to renew registrations[49] or attempt to encumber Mattel's rights through transactions with third parties.   It may be tempted by transactions that maximize short-term gain but damage Mattel's property in the long term.  Knowing that it is likely to lose control of Bratz rights, MGA does not have the incentives it once had to maintain these properties for Mattel's benefit or to prevent third parties from damaging their value.

For example, The evidence is more than sufficient to allow the Court to conclude that Mattel's property is in real danger of dissipation and that it will never receive any amount of damages award it is owed.

**C.    Legal Remedies Are Not Adequate**

MGA itself has argued to the Court that it is currently in financial extemis, and may not exist past December 31, 2008.  MGA claims that that its imminent demise is due to a handful of orders that will supposed be cancelled by or soon after December 31, 2008, even though at trial it attributed the decline of the Bratz brand to loss of market share due to competing products,[50] and is more likely a result of excess debt and the fact that Mr. Larian and family members have siphoned money from the company for years.[51]  The Court does not have to determine causation, however.  MGA claims to be on the brink of destruction.  It cannot therefore deny

---

[49]   For example, the United States and other countries require that a trademark registrant periodically submit affidavits of continued use and pay renewal fees to maintain trademark registrations.  See, e.g., 15 U.S.C. § 1058; Declaration of Dylan Proctor, dated December 23, 2008 and previously submitted to the Court, Exhs. 21-22.  MGA could fail to comply with these requirements and thereby forfeit Mattel's rights.

[50]   Trial Tr. (Larian) at 6252:19-6253:12.

[51]   Wagner Dec. ¶ 14 and Ex. G; Corey Dec. ¶¶ 7-11, Exs. 9-19.

that Mattel's legal remedy--of waiting for months or longer to execute on a judgment based on the verdict that it does have and then proceed though another trial of the Phase 2 claims that may take more than a year--is inadequate.

### D.   Mattel's Probable Success Is High (And Already Established), And Mattel's Faces The Serious Prospect Of Irreparable Injury

Mattel has already succeeded in Phase 1, subject to certain post-trial briefing, so Mattel's probability of success is high.

Mattel has Phase 2 claims for RICO and trade secret theft, among others, to be tried as well.  On these, Mattel's likelihood of success is high.  For example, Mattel's RICO and trade secret claims are based on allegations that MGA has, in both the United States and Mexico, misappropriated and used Mattel trade secrets. In Mexico, criminal authorities executed a search warrant on MGA's Mexico City offices and discovered electronic media and paper documents that had been taken from the offices of Mattel's Mexico subsidiary and copied from Mattel's computer systems in the United States and in Mexico.  These electronic and paper documents included Mattel's earliest, pre-release line lists, customer pricing, profit margin and profitability information, customer and licensee lists, among other things.[52]

The adverse inferences that may be drawn from MGA's invocation of the Fifth Amendment confirms that Mattel's trade secrets were stolen.  Machado, an MGA executive and defendant in this action, was deposed on this subject on October 14, 2008, but repeatedly invoked his ostensible privilege against self incrimination as noted above and refused to respond to any substantive question about the theft or use of Mattel's trade secrets.  In addition, Castilla, a current MGA manager and former Mattel employee, created an electronic folder titled "To Take" on his computer and filled it with confidential and proprietary Mattel files, including Mattel's International Strategic Plan.  As also noted above, when Mr. Castilla was

---

[52]   Second Amended Answer and Counterclaims ¶¶ 48-53.

deposed on October 22, 2008, he repeatedly invoked his alleged right against self incrimination and refused to provide substantive answers to Mattel's questions about his theft.

### E. Mattel's Interests Will Be Well-Served By The Appointment, And It Is Highly Probable That Harm To Mattel By Denial Of Appointment Would Outweigh Injury To Defendants

MGA has no legitimate claim of cognizable injury from the appointment of a receiver. Mattel suggests the appointment of a receiver with experience in the toy industry, to operate the company under the guidance of the Court and without shareholder interference, to maximize MGA's long term profits and viability. MGA may not claim injury when the sole charter is to preserve its assets and long-term existence. To the contrary, MGA, its shareholders and employees should welcome such a receiver, given that the current executive staff is responsible for MGA's apparent impeding financial crisis.

### III. ALTERNATIVELY, EXPEDITED DISCOVERY SHOULD BE ORDERED

"[T]he form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." 12 Wright, Miller & Marcus, Federal Practice and Procedure 2d § 2983. Mattel respectfully submits that the existing evidence is sufficient to warrant the appointment of a receiver. However, as the Court is aware, Mattel's pre-trial discovery efforts into MGA's financials were significantly thwarted.[53] Then, during Phase 1B trial, MGA and Larian radically revised even what little they had disclosed and offered entirely new financial information. This was then followed by MGA's attempts to retreat from its own sworn statements in opposing Mattel's injunction, only to be promptly contradicted by MGA's current (and wholly conclusory and inconsistent) claims

---

[53]   Trial Tr. at 5957:22-5958:20.

1  about its financial status.   Nor has MGA produced its actual financial records,[54] and

2  Mattel has never had the opportunity to take discovery into that information or into

3  subsequent events involving MGA's finances.[55]

4        Accordingly, in the event that the Court believes that additional evidence is

5  appropriate or necessary before proper consideration of Mattel's application, Mattel

6  requests in the alternative expedited discovery regarding MGA's and Larian's

7  finances.   Such discovery should include (without limitation) the depositions of

8  Isaac Larian, Farhad Larian, the other officers and agents of IGWT, Omni,

9  Lexington, their various affiliates and any other persons or entities doing business

10 with them and any other person or entity with knowledge of the pertinent facts.   It

11 also should include (without limitation) the production of complete records showing

12 the sources of all funds and credit to MGA, the identity of IGWT, Omni and

13 Lexington, the arrangements that MGA and the Larians have with these and other

14 creditors, their current net worth and assets, transactions between MGA and/or Isaac

15 Larian and any person or company owned, in whole or in part, by Mr. Larian or

16 persons related to him.

17

18

19

20

21

22

23

24

25

26

27

28

---

[54] See, e.g., Federal Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 566 (5th Cir. 1987) (recognizing adverse inference permissible based upon defendants' failure to provide information regarding net worth to assist court in fashioning injunction).

[55]   Zeller Dec., ¶ 16.

1

## <u>Conclusion</u>

2          For the foregoing reasons, Mattel respectfully requests that the Court appoint

3   a receiver.  In the alternative, the Court should grant Mattel expedited discovery into

4   MGA's and Larian's finances.

5

6   DATED:  December 28, 2008          QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
7

8                                      By /s/ Michael T. Zeller
9                                         Michael T. Zeller
                                          Attorneys for Mattel, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28