# Exhibit 1

**ORIGINAL FILED**

OCT 2 4 2006

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

In re:  THE UZYEL IRREVOCABLE
TRUST NO. 1, established February 26, 1988

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE N0.: BP 058 899**

**STATEMENT OF DECISION**

**CASE NO. BP 058 898**

In re:  THE UZYEL IRREVOCABLE
TRUST NO. 2, established February 26, 1988

"The truth is rarely pure and never simple"

Oscar Wilde

On May 1, 1986, Rafael Uzyel ("Rafael"), 40 years of age, was driving his Mercedes Benz back to Southern California from Mammoth, California with his wife Dafna, 28 years of age, and their two small children, Izzet, 6 years of age, and Joelle, 4 years of age, when Rafael suffered a heart attack and died.

Rafael was successful in the fabric business.  He and his wife were worth several million dollars, having an apartment in Israel, cash in Switzerland, cash and real property in Beverly Hills, California.

Rafael had a sister, Lillian Nomaz, living in Switzerland.  She was the cause of Dafna becoming the victim of an avalanche of legal events that are beyond bizarre and well beyond her intellectual ability to cope with.

Ms. Nomaz had concern that Dafna would be unable to handle what she considered to be her brother's money in Switzerland, to the detriment of her niece and nephew.  This concern caused Dafna to become the victim of two persons.  The first was an attorney, Hugo DeCastro, who was grossly unethical in his representation of Dafna.  The second was Neil Kadisha ("Kadisha") the Respondent, who became a monumentally self-serving trustee of two trusts that were established with Dafna's money.

Kadisha was heavily involved in two corporations (Omninet Corporation and Qualcomm) that were in dire need of millions of dollars to stave off impending bankruptcies.  He took and used trust assets for his own financial interests (much of which was tied to the two failing corporations) disregarding the welfare of Dafna and her children and completely without regard to his duties and responsibilities as a trustee, which he later tried to clean up with atrocious amendments to the trust agreements.  Kadisha took unconscionable advantage of Dafna who, after the death of her husband, was in many ways similar to a person requiring evaluations as a developmentally disabled person in need of protection from those who would take advantage of her in a foreign and incredible economic adjustment.

Among his derelictions as trustee for Dafna and her children, Kadisha prepared accountings to cover up, mislead and deceive Dafna (even if it be assumed arguendo she could have understood them—which intellectually she could not).  Kadisha took and used trust money for his own benefit including but not limited to his investment in two corporations.  Dafna never had a chance in her dealings with DeCastro or Kadisha.  There is no way this can ever be over-emphasized.  After witnessing Dafna on the witness stand for days on end, the court was and is thoroughly convinced of Dafna's lack of learning and intellectual capacity to know really what

---

**STATEMENT OF DECISION**

2

Exhibit 1
Page 8

was going on in her life with the creation of the subject trusts and all that followed in relation thereto. What Dafna needed was a conservator truly interested in her well being and an excellent attorney, to insure the protection of her legal interests. What she got was DeCastro, a grossly conflicted attorney, and a trustee, Kadisha, who was in dire need of large amounts of cash to help stave off and prevent the bankruptcy of two corporations he was deeply involved with.

The legal treatment of Dafna by DeCastro is appalling. He had in his hands a young widow attempting independent living with two small children to look after. He cared not about them but about his own pocket book. It is almost inconceivable but true what he did. DeCastro concocted a trust agreement with escape clauses designed to relieve Kadisha of any warranty he would provide lawful trustee services to Dafna and her children. Poor dumb Dafna, a perfect victim. The first was the exculpatory clause. The second was the conflict of interest clause. DeCastro did not want Dafna to notice he was having her sign a document blatently against her interest. And on behalf of Kadisha, he concealed from Dafna at least three things: (1) his conflict of interest in representing Kadisha while holding himself out as her attorney, (2) that Dafna should seek independent counsel, and (3) he never bothered to explain the terms and condition of the trust to her English, Hebrew or Persian. (Farsi) DeCastro capped it off by charging Dafna immense attorney fees, which Kadisha paid from Dafna's money which had gone into the trusts.

Equally disturbing is the production by a law firm of three amendments to the original trust agreement re Trust 2, relieving Kadisha from any and all civil liability for any wrongdoing. And as in the creation of the original Trust 2 agreement, Dafna never had independent legal representation nor was she advised to seek independent counsel.

The amendments to the trust documents were designed to give life support to Kadisha's wanton and outrageous regimen of irresponsibility and self-dealing. They were elaborate, yet transparent precautions designed to avoid answering for his defaults. They reflect a sickening and callous disregard of treating an unfortunate person with dignity and respect. No law firm's name appeared on the amendments nor did the individual name of a lawyer. Apparently the drafter knew Mrs. Uzyel was not represented by an attorney because the document makes no

reference to her being represented and no acknowledgment is provided at the end of the amendments to indicate by a lawyer's signature that he had fully advised Dafna about the amendments and approved of her executing the same. The drafter had to know it would be difficult even for a down-and-out attorney sipping Ripple in pigeon park to batter his remaining conscience and sign such garbage for the benefit of a trustee.

Kadisha is seeking to provide answers and justification of his conduct as trustee not only comes up with the novel idea that Dafna is to blame for it all, and were it not for her "thicket," he comes up with a "single investment" defense. This is based upon the fact that everything involved in his trusteeship really involves Qualcomm stock as a single investment and that in the end, the Qualcomm stock investment reaped the astonishing gain of 5,000%, so what are the beneficiaries' damages? Of course this would take even more adjustment in the testimony of Kadisha's oath helpers and the records that do exist.

What Kadisha really hopes is that when the court looks at the end result and finds one lucky investment resulted in a total gain to the trust; far more than had the trust money been invested according to the prudent investment rules, and this should wipe out any theft or willful misuse of trust money. Respondent would have the court to understand this was "surely a prudent strategy for the Trust under all of the circumstances." Kadisha believed it to be prudent strategy to commit perjury and violate all laws applicable to trustees.

It is prudent to reveal all of the facts and circumstances relevant to this case to arrive at an equitable resolution of this case. Even though it would appear Respondent would like to pick bits and pieces from the total picture and in re-colorization have the picture reveal himself as the innocent victim of the clever and deceitful Dafna. In fact, Kadisha has attempted to turn the tables on the truth of the situation and declares unabashedly that it is Dafna who created what he defines as a "thicket" to prevent true facts to be exposed in regard to Kadisha's defenses. It is quite the other way around. It is Kadisha who engages in monumental "thicket" building. One deceitful answer by Kadisha under oath must be taken as a very large and unacceptable "thicket." If you then multiply all the false answers under oath Kadisha has given the "thicket" is great enough for the court to declare all issues against Kadisha. Additionally, you have Kadisha's

---

**STATEMENT OF DECISION**

4

Exhibit 1
Page 10

self-serving so called "accountings" which leave him with an escape hatch to declare whether his taking of trust money is a "loan" or an "investment" depending on what turns out to be advantageous to him at the time. Further, Kadisha had to harbor the ever present thought that if Dafna went to an attorney with inquiry about Kadisha's camouflaged accounting his trusteeship would come to an abrupt end followed by legal action against him. Kadisha comes up with the real hallmark of "thicket" building in having created for his benefit amendments to the Trust 2 agreements to exculpate him from every known trustee sin known to man. Kadisha's "thicket" argument as a new arsenal is totally lacking in firepower. It's a dud.

As in most litigated civil cases, getting a fact squarely in the cross-hairs of the truth does not occur with great frequency, but more often than not proof falls within or without the newly minted standard of "more likely true than not." This new standard is a confirmation that the word "fact" is a slippery word. Facts in science may be well determined by scale and measurement but not when based upon different human observation or opinion. Fitting facts to law may be equally slippery. The court has used Petitioner's Statement of Fact where deemed accurate, altering, amending or deleting same to fit the court's findings and conclusions.

After Rafael's death, Dafna's financial condition was precarious. She had virtually no liquid assets with which to pay even her family's basic expenses. (TE 10.) Dafna did not know how to take control of these assets or how to provide liquidity for her family's expenses. She, therefore, sought the advice of Kadisha, a social friend of her family. (RT 65, 5-16-02.)

In or about August 1986, Kadisha referred Dafna to his own attorney, Hugo DeCastro ("DeCastro") and his law firm, DeCastro, West, et al. ("DeCastro West"). (RT 67, 5-16-03; TE 1624A.) She retained DeCastro and DeCastro West to marshal Raphael's assets and (later on) to form the Trusts. (TE 2, 3, 4.) Dafna did not know DeCastro or his firm and did not know what Kadisha's and DeCastro's relationship was. (TE 4; RT 41, 1-21-03.) During the same period in which DeCastro and DeCastro West represented Dafna, they also represented Kadisha and/or

several of his entities. (RT 99, 10-30-03.) Dafna was never informed of this fact. (RT 41, 1-21-03.)

From the inception of DeCastro's (conflicted) representation of Dafna in 1986 through 1989, DeCastro West's invoices reflect that DeCastro consulted almost exclusively with Kadisha regarding Dafna's rights. (TE 1733.) For example, in June 1987, DeCastro called Kadisha to confer with him four times, but never called Dafna. (RT 10, 10-30-03; TE 1733, July 6, 1987 statement.) In October through December 1987, DeCastro West consulted with Kadisha 15 times while the trust was being drafted, but never consulted with Dafna. (TE 1733, November 6, 1987 statement and December 4, 1987 statement.) From inception through the formation of the Trusts, DeCastro also sent copies of virtually every piece of correspondence pertaining to Dafna to Kadisha for comment or action. (TE 5, 6, 7, 8, 11, 12, 15, 3004, 3016, 3018, 3020, 3022, 3024, 3025, 3027, 3032, 3036, 3039, 3057, 3060, 3063, 3068.)

### Kadisha's Trust Financial Transactions with Dafna.

From the inception of DeCastro's representation until February 26, 1988 (the date the Uzyel Trusts were formed, Dafna received $4,000 per month from Switzerland. This was not enough to cover her family's living expenses. To make ends meet, Kadisha advanced Dafna money. He claims he advanced $140,523.06 to Dafna prior to the formation of the Trusts. (TE 22.)

Kadisha never memorialized this purported debt in a writing that was given to Dafna or that indicated the date of receipt or any agreement regarding repayment, whether interest was to accrue, the rate of interest, or the date of repayment. Nor did Kadisha inform DeCastro of the purported advances. (RT 30, 11-20-03.) Kadisha admitted that "[t]here was no note for this

advance and no assurance of repayment.  It was like an advance to our sister." (TE 1624a, 2:2-4; RT 109, 5-22-02.)

DeCastro's retainer letter to Dafna described his firm's relationship with Kadisha as a "special relationship" but did not explain what that "special relationship" was.  (TE 4.)  DeCastro testified that what it meant was that he was representing entities in which Kadisha was part owner or employee.  (RT 11, 10-30-03.)  However, DeCastro did not inform Dafna that Kadisha or his related entities were DeCastro West clients.  (TE 4.)  DeCastro and DeCastro West also represented Kadisha in his capacity as Trustee of the Uzyel Trusts after their formation in 1988. (TE 47.)  Dafna was not informed of the conflicts of interest and did not waive them.  (RT 100, 10-30-03.)

DeCastro should have known from his contact with Dafna that she was incapable of understanding the legal intricacies regarding her estate and financial affairs.[1]  Before Rafael died, Dafna had never signed loan documents or even opened a bank account by herself.  (RT 39, 1-21-03.)  De Castro should also have known that Dafna's understanding of English was limited. Nevertheless, DeCastro's (limited) communications with Dafna were in English.  He incorrectly assumed that Kadisha (who spoke to Dafna mainly in Hebrew and Persian) was explaining everything to Dafna—but Dafna testified that Kadisha never explained any of the documents he had her sign.  (RT 60, 1-21-03.)

Lillian Nomaz ("Nomaz"), Rafael's sister, objected to Dafna taking control of the Swiss assets and transferring them to the United States.  From August 1986 through December 1989, DeCastro and his firm (on Dafna's behalf, before the formation of the Trusts and on Kadisha's

---

[1] Since many relevant events in this case occurred some 10-12 years prior to Dafna's trial testimony, her understanding of the English language, business and finances was even more limited than the (lack of) understanding she displayed at trial.

STATEMENT OF DECISION

Exhibit 1
Page 13

behalf after the formation of the Trusts) engaged in legal proceedings with Nomaz (with the assistance of local counsel) to marshal the Swiss assets. (See, e.g., TE 12, 14, 15, 20, 41.)

The establishment of Trust 1 to hold the Swiss assets for Dafna's Izzet's and Joelle's benefit was the vehicle for settling the dispute with Nomaz. (See, e.g., TE 3039, 3051.) In December 1987, after DeCastro consulted exclusively with Kadisha throughout the month regarding trust issues (TE 1733, January 11, 1988 statement), Kadisha was selected to be the trustee. (TE 20.)

Nomaz did not insist upon establishing a second trust for any of Dafna's other assets or for the portion of the Swiss funds that Dafna was to receive under their settlement agreement. The correspondence between Dafna's and Nomaz' attorneys mention only a single trust, which early on was referred to as the "Dafna Uzyel Irrevocable Trust." (See, e.g., TE 20, 3039, 3051, 3063.) In a June 30, 1988 letter to Nomaz' counsel, DeCastro West confirmed that the Uzyel Irrevocable Trust No. 2 ("Trust 2"), which gave Kadisha control over the bulk of Dafna's assets, was *not* related to the Nomaz dispute. (TE 86.)   Kadisha must have known this since he, rather than Dafna, was routinely consulted by DeCastro regarding the trusts. (TE 1733.) Nonetheless, he falsely stated in an October 2, 2000 declaration that the settlement required establishing *both* Trusts. (TE 1624a, 2:1-22.) Kadisha's self-serving statement was an obvious attempt to obscure the fact that Kadisha was intimately involved in the creation of Trust 2, which gave him immediate control of Dafna's U.S. assets -- even if the foreign assets never materialized.

On February 26, 1988, the operative trust instruments for Trust 1 and Trust 2 were signed by Dafna, as Settlor, and Kadisha, as Trustee. (TE 44, 44a.) Dafna also assigned her interest in various assets to the Trusts, including the Strathmore Residence to Trust 2. (TE 43.) Since the Swiss and Israeli assets had not yet been marshaled, Trust 1 had no assets. The only major asset

---

of Trust 2 was the Strathmore Residence, which was lien-free and worth approximately $3.0 to $3.5 million.  (TE 46, 137.)

Trust 1 provides, *inter alia*:

- The Trust may not be revoked, altered or amended, except as provided in the Agreement.  (A. 4.)

- The Trust is for the primary benefit of Dafna, Izzet and Joelle.  (A.5.)

- If Kadisha ceases to act as Trustee, Trust Services of America shall be the successor trustee.  (A.6.)

- The trust estate is to be immediately divided into two separate shares, one for Izzet and one for Joelle.  (A.7.)

- The greater of $5,000 per month or an amount equal to 75% of the Trusts' net income is to be distributed to Dafna each month.  (B.1 and B.2.)

- *If in the discretion of the Trustee*, Dafna needs additional funds for reasonable support, health or education, the Trustee shall pay such amount *as the Trustee shall deem necessary* to meet said needs, taking into account the beneficiary's accustomed standard of living and other income.  (B.3, emphasis added.)

- The Trust estate shall at all times be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, and within those guidelines to maximize the income from the Trust estate.  (Article C.)

- The Trustee may lend money upon adequate interest and security.  (Article C.)

- The Trustee may employ and rely upon the professional advice of accountants, brokers, attorneys, and investment advisors necessary for the administration of the Trust. (C.9.)

- While Izzet and Joelle are minors, a copy of any accounting shall be sent to Nomaz. (D.6.)

- Any Trustee may resign upon 30 days' prior written notice. (D.10.)

  Trust 2 provides, *inter alia*, that:

- The trust is established for the primary benefit of Dafna. (A.5.)

- If Kadisha ceases to act as a trustee for any reason other than his removal by Dafna, then Dafna shall have the option to (i) terminate the Trust, in which case Dafna or any person designated by her, shall serve as successor trustee, or (ii) designate a corporate trustee. (A.6.)

- Dafna may at any time after 60 days' prior written notice, remove Kadisha as trustee and replace him with a corporate trustee. (A.7.)

- The Trust shall terminate upon the first to occur of (i) December 31, 2002, and (ii) Dafna's death. (A.8.)

- Dafna shall be provided $20,000 per month reduced by (a) all income distributed during the year to Dafna from Trust 1, (b) all income received other than (i) earned income, (ii) separate income of Dafna's spouse, and (iii) income distributed to Dafna pursuant to any other provision of this instrument. The distributions to Dafna shall be adjusted annually by a factor equal to 1 plus the percentage increase in the CPI. (B.2.1.)

- The Trustee shall pay from the Trust estate all federal and state income taxes. (B.3.)

- *If in the discretion of the Trustee*, Dafna needs additional funds for reasonable support, health or education, Trustee shall pay such amount *as the Trustee shall deem necessary* to meet said needs, taking into account the beneficiary's accustomed standard of living and other income.  (B.4, emphasis added.)

- Dafna shall have the right to demand withdrawal of up to $100,000 from the Trust estate beginning on the third, sixth, ninth and twelfth annual anniversary dates. (B.5.)

- While any of the foregoing rights remain unpaid, the Trustee shall retain sufficient borrowable or transferable assets to satisfy the withdrawal rights. (B.5.1.)

- After the sale of the Strathmore residence, the Trustee is required to purchase a substitute residence if requested by Dafna, and expend no more than $1.0 million, subject to CPI increases.  (B.6.2.)

- Upon the termination of the Trust, the entire Trust estate shall be distributed to Dafna.  (B.7.)

- The Trust estate shall at all times be invested in a conservative manner with primary consideration being given to preserving the principal and protecting against inflation, and within such guidelines to maximize the income from the Trust estate.  (Article C.)

- The Trustee may hold Trust assets without liability for failure to invest in properties having greater income or appreciation.  (C.5.)

---

- The Trustee may lend money upon adequate interest and security.  (Article C.)

- The Trust may employ and rely upon the professional advice of accountants, brokers, attorneys, and investment advisors necessary for the administration of the Trusts.  (C.9.)

- The Trustee may resign upon 60 days' prior written notice.  (D.6.)

Prior to assuming the duties as a Trustee, Kadisha read and understood the contents of the trust instruments (RT64, 5-20-02), and may have consulted with DeCastro as to his duties. (RT49, 5-20-02.)  Kadisha understood, among other things, that Dafna was the beneficiary of Trust 2, and that he was to conduct his duties as Trustee on her behalf.  **(RT 66-67, 5-20-02.)** Additionally, he understood that he was to distribute to Dafna $20,000 per month per the terms of Trust 2 reduced by distributions from Trust 1 in an amount equal to 75% of its net income. (RT 141, 5-28-02, RT 24, 5-21-02.)[2]

Trust 1, negotiated by Nomaz through independent counsel, does not contain the "Exculpation of Neil Kadisha" clause that appears in Trust 2 (TE 44, TE 44A at ¶ D.10) – which was prepared by DeCastro's firm in the course of its conflicted representation of Dafna.  (TE 44A.)  The "Exculpation of Neil Kadisha" clause of Trust 2 states:

> This Trust has been established, and NEIL KADISHA is serving as Trustee at the request of and for the benefit of Settlor.  NEIL KADISHA is not a professional Trustee, and is serving without compensation (other than reimbursement for actual expenses) solely as an accommodation and assistance to Settlor.  To induce NEIL KADISHA to serve as Trustee hereunder, Settlor agrees as follows:  (i)  NEIL KADISHA shall not be responsible to Settlor for any acts or omissions as Trustee hereunder, specifically

---

[2] From the inception of the trusts until Kadisha turned over the assets to the beneficiaries in September 2000, he never distributed to Dafna 75% of Trust 1's net income.  This resulted in Trust 1 owing Dafna approximately $1,600,000, without interest as of 1998.  If Dafna had $1,600,000, she would not have required distributions from Trust 2 in the same amount.  Then Trust 2 would not have had to borrow money from Trust 1 which was the main reason Kadisha used to justify the Purported October 1998 Sale.

including but not limited to his decision to make or not make discretionary distributions to Settlor hereunder (including any losses which Settlor might sustain due to Settlor's failure to invest or utilize in a prudent manner any property distributed hereunder), unless such acts or omissions constitute gross negligence, bad faith or intentional wrongdoing on the part of NEIL KADISHA. . . The provisions of this Paragraph limiting NEIL KADISHA's liability shall be in addition to any other limitations on liability provided by this instrument of law.

At the time the Trusts were created, Dafna did not read (and could not have read and understood) the Trust instruments (which were in English). (RT 48, 1-21-03.) The Trust instruments were not explained to her, and she did not know which assets were going into which trust. (RT 6, 4-2-03; RT 49, 1-21-03.) Dafna did not understand how Kadisha was going to get the money to make the monthly distributions to her (RT 4, 4-2-03) or how Kadisha was going to invest the trust assets (RT 17, 4-22-03). On March 11, 1988, for the second time Dafna executed a quitclaim deed transferring her interest in the Stathmore Residence to Kadisha as Trustee of Trust 2. (TE 46, 520.) At that time, Dafna did not understand the significance of a quitclaim deed. (RT 54, 1-21-03.)

It will be seen, as hereinafter set forth, that when looked at in singular dealing with Trust 2 or jointly taken as a whole, Kadisha was no more than a common thief in his monumental takings of Trust 2's money for his own use and benefit. And as herein above stated, Kadisha gains absolutely no benefit for any trust documents as being the product of unbelievable conflicts of interest of himself, his original attorney Hugo DeCastro and others. Kadisha's defenses rest beyond denials but upon a grossly contrived conception a thief can steal money and keep the benefits therefrom. And further that if he elects at some point to return the money with interest, he is to be forgiven for his thefts. He is sadly mistaken. Below is a list of takings:

| DATE | AMOUNT |
|------|--------|
| 12/07/88 | $600,000 |
| 12/07/88 | $400,000 |
| 06/12/89 | $700,000 |
| 06/21/89 | $550,000 |
| 08/08/89 | $390,000 |
| 05/19/92 (Rahban) | $1,400,000 |
| 06/11/92 | $350,000 |
| 06/18/02 | $200,000 |
| 07/06/92 | $250,000 |
| 02/25/93 | $500,000 |
| 03/23/93 | $ 20,000 |
| 05/06/96 | $216,000 |
| 05/17/96 | $600,000 |
| **TOTAL TAKINGS** | **$6,176,000** |

A.   **Kadisha's Breaches of Trust**

1.   **Kadisha's first act as Trustee was to misappropriate $500,000 from Trust 2.**

Although Trust 2 provided that Dafna was to receive distributions of $20,000 per month (TE 44A, ¶B.2.1.), between January 11, 1988 (when the Trusts were created) to mid-April 1988, Kadisha did nothing to provide liquidity for Trust 2 to make these distributions, even though the only asset under Kadisha's control was the Strathmore Residence and Kadisha had no assurance that the Swiss and Israeli assets would be repatriated to the United States. (TE 22, 46, 69, 72.)

In Mid-April and May 1988 when Kadisha himself needed money, he borrowed $500,000 secured by the Strathmore Residence (the "Namco Loan"), which was lien free and worth approximately $3 to $3.5 million.[3] (TE 88) Kadisha deposited the Namco Loan proceeds – which belonged to Trust 2 – into his personal Union Bank checking account (of which he and his brother Daniel was signatories). (TE 55, 63, 65, 65a, 65b, 68, 137; RT 59, 9-17-02; RT 68, 5-22-

---

[3] In 1988, Kadisha told Dafna that it was not a good time to sell the Strathmore Residence (RT 92, 5-28-02). This was untrue. Since mid-1988, Kadisha had received communication from brokers as to the value of the Strathmore Residence and an offer to purchase. (TE 88, 91, 140)

02.) Kadisha spent the entire $500,000 within three weeks *for his own purposes.* (TE 68, 76, 93, 121.)[4]  No portion of the actual Namco Loan proceeds were ever expended for Trust 2's or Dafna's benefit.  (TE 68, 76, 93, 121.)

Kadisha did not sign a promissory note or prepare any other document (including a confirming letter to Dafna) that showed that he took the $500,000, that he deposited it into his own bank account, or that he used it for his own expenses and investments.  (RT 68, 5-22-03; RT 69-71, 5-23-02.)  Nor did he tell DeCastro about the loan (RT 69, 5-22-02) although he knew DeCastro was representing Dafna at the time (TE 22; RT 45, 11-13-03).[5]

Between May 17, 1988, when Kadisha deposited the Namco Loan proceeds into his Union Bank account, and June 6, 1988, when the Namco Loan proceeds were exhausted, Kadisha made two deposits totaling $12,000 into Trust 2's account.  (TE 22.)  On May 26, 1988 and June 1, 1988, Kadisha deposited $5,000 and $7,000, respectively, from his Wells Fargo Bank account into Trust 2's account.  (TE 22, 65c; RT 80-100, 5-22-02.)  In the Trust Accountings, Kadisha termed these deposits "loans."  (TE 22.)  Kadisha also paid the interest payments on the Namco Loan from his Wells Fargo account, as well as all advances he made to Trust 2 in 1988.  (TE 22, 65c, 68, 76, 93, 121; RT 9, 9-17-02.

Even though Kadisha claims that the purpose of the Namco Loan was to acquire funds for Dafna's needs, Kadisha did not use any of the funds from his Union Bank account to pay Trust 2's obligations during the remainder of 1988.  (TE 22, 68, 76, 93, 121.)  This was so even

---

[4] Kadisha's deposit of the $500,000 Namco Loan proceeds into his personal Union Bank Account on May 17, 1988 brought Kadisha's account balance to $568,154.58.  (TE 68.)  By June 6 – 20 days later – Kadisha's balance had been reduced to approximately $17,000.  (TE 76.)

[5] Kadisha testified that he borrowed the $500,000 after he and Dafna met in the Spring and established a budget of $500,000 for Dafna's needs for the remainder of 1988.  (RT 46, 6-24-03)  Dafna denies meeting with Kadisha and denies that Kadisha told her he was borrowing $500,000.  (RT 54, 1-21-03.)  The fact that Kadisha spent the entire $500,000 for his own purposes also belies Kadisha's testimony.  Moreover, Kadisha has never produced a copy of the alleged budget nor any other document corroborating his alleged meeting with Dafna.

though Kadisha knew, in April 1988, that Dafna could not pay her children's school tuition (TE 61) and that Dafna only had $20 left from the monthly Swiss distributions in DeCastro's trust account. (TE 3105.) Kadisha did not honor DeCastro's agreement with Stephen S. Wise (Izzet's and Joelle's school) to pay the tuition by June 28, 1988, nor did he distribute $20,000 per month to Dafna, as called for by Trust 2's terms. (TE 22.) In fact, during the period in which Kadisha held the misappropriated Namco Loan proceeds, he even defaulted on the Namco Loan. (TE 65a, 65c, 97, 158).

## 2.    Kadisha's Conflicting Explanations for His Use of the Namco Loan Proceeds

In the course of these proceedings, Kadisha has given *seven* conflicting explanations for his purported use of the Namco Loan Proceeds:

### a.    First Explanation.

Kadisha initially testified at deposition that he did not recall how he spent the $500,000 Namco Loan proceeds. (Kadisha depo, Vol. 3, 661:14-662:11; RT 104, 5-22-02.)

### b.    Second Explanation.

In an October 2, 2000 Declaration, Kadisha stated:

> A major portion of that money, at least three hundred thirty thousand dollars ($330,000), was a partial payback against advances that my wife and I had made to Petitioner before the Trusts were funded. The balance of the funds of that borrowing was invested in the project known as 900 Million Productions, Inc. (TE 1624a at 7:13-17.)

This explanation is incorrect because Kadisha did not use any portion of the Namco Loan proceeds to repay himself for monies he previously allegedly advanced to Dafna or the Trust. (TE 22; RT 41, 9-17-02.) Moreover, according to documents filed in a bankruptcy proceeding

---

for 900 Million Productions, Inc., that business did not commence operations until February 1990. (TE 411.)

c.      **Third Explanation.**

On April 19, 2001, during his deposition, Kadisha testified that "a substantial amount of the Namco Loan Proceeds was:

> "Utilized to pay for repair of Strathmore house. Part of it has gone to pay legal fees and almost the rest of the balance has gone – other than what was left at the end in sometimes in December, rest of it has gone for – has been paid to Dafna either through Trust or directly."

(Kadisha depo, Vol. 3, 604:13-24; RT 108, 5-22-02.)[6]

d.      **Fourth Explanation.**

At a subsequent session of his deposition (on May 17, 2001), Kadisha testified that $400,000 of the $500,000 Namco Loan proceeds was used as a down payment for the purchase of his home located at 2346 Kimridge from Dan Investments. (Kadisha depo., vol. 7, 1245:19-23; RT 12, 5-23-02.) Dan Investments was a partnership allegedly in the business of constructing and developing residential properties. Kadisha, his brother Daniel Kadisha, and a friend named Nick Nikka were the partners. (RT 93, 5-22-02.)[7]

e.      **Fifth Explanation.**

Prior to the trial (but after more than 30 days for making changes to his deposition had passed), Kadisha changed his deposition testimony to state that only $150,000 of the Namco Loan proceeds was used for a down payment to Dan Investments on the Kimridge residence. (TE 1826.) Kadisha also produced the *front only* of a check purportedly written to Dan

---

[6] During 1988, Kadisha only expended $6,408 for repairs to the Strathmore Residence. (TE 22)
[7] From May through August 1988, Kadisha only used two checks to Dan Investments. One on May 27 for $150,000, and another on June 22 for $120,000. (TE 22)

Investments on May 23, 1988 in the amount of $150,000. (TE 70.) Kadisha, however, has never accounted for Dan Investment's use of the funds other than to speciously claim that it was used for a "down payment" in connection with the Kimridge sale – which did not occur until eight months later. (TE 205.) As will be discussed in more detail later in this brief, during the eight months in which Dan Investments would have had to have held the money, Kadisha's actions demonstrate that he was extremely short of cash.

### f.   Sixth Explanation.

In a verified answer to Interrogatory No. 18 (Special Interrogatories to Kadisha, Set No. 4, dated March 23, 2001), Kadisha stated that the proceeds of the Namco Loan were used:

> [T]o repay Respondent for the advances he had theretofore made to Dafna Uzyel, to pay interest on those advances, to fund the repair of Dafna Uzyel's house and to prepare it for sale, to pay Dafna Uzyel's attorney's fees, and to prepare it for sale, to pay Dafna Uzyel, to purchase life insurance on Respondent's life for the benefit of the Trust, to pay insurance premiums for Dafna Uzyel."

(TE 1812.)

### g.   Seventh Explanation.

During trial, Kadisha testified that he used $240,000 of the Namco Loan proceeds to pay down his Union Bank credit line; wrote a check to Dan Investments for $150,000; loaned $100,000 to Nasser Ebrahimian, and transferred $54,000 to Stadco, a company of which Kadisha was a shareholder.[8] (RT 11-17, 6-23-03.)

Thus, during a two-year period, Kadisha provided, under oath, seven different versions of how he purportedly utilized the $500,000 Namco Loan proceeds.

---

[8] Kadisha owned 20% of Stadco. (RT 95, 5-22-02)

Exhibit 1
Page 24

On May 26, 1988, nine days after he deposited the $500,000 into his Union Bank account he repaid $240,000 he owed Union on his line of credit. (TE 68, 76)

With respect to his latest explanation, Kadisha did not provide any evidence of what he did with funds he subsequently borrowed against his Union Bank credit line after paying it down with $240,000 of the Namco Loan proceeds (TE 76, 93, 121). Nor, as noted, did Kadisha properly account for what Dan Investments did with the $150,000 it purportedly received. Writing a check to Dan Investments was the same thing as writing a check to Kadisha. Kadisha did not call his partners, Nick Nikka and/or Daniel Kadisha, as witnesses to corroborate what happened to that $150,000.

The only (and completely obscure) trust accounting entry related to the Namco Loan is contained in Account 1500 of Trust 2's General Ledger Detail Activity Report. (TE 22) The entry, which is titled "Investment – N Kadisha," shows a debit on December 5, 1988 for "Escrow Proceeds" for $508,334.53. (TE 22.) Kadisha claims that he provided Dafna with a copy of the general ledger in early 1989. (RT 47-51, 6-4-02) Dafna denies receiving this accounting until 1997. (RT 74, 1-21-03.) Moreover, at trial, Michael Feldman ("Feldman") (the accountant who prepared tax returns and financial reports for the Trusts) admitted that Trust 2's general ledger does not contain any reference to the Namco Loan, that Dafna would need an accountant to understand the accountings (RT 6, 1-24-03), and that Dafna would not know what "escrow proceeds" pertained to (RT 133, 1-23-03).

### 3. The History of Qualcomm's Purchase of Omninet's Assets

In 1986, Kadisha, his father-in-law, Parviz Nazarian ("Parviz"), and Parviz' brother, Younes Nazarian ("Younes," and collectively the "Nazarian Group") were significant investors in Omninet Communications Services, a California limited partnership. Omninet Corporation

Exhibit 1
Page 25

("Omninet Corp.") was the general partner of Omninet Ltd. Which was the general partner of Omninet Communication Services. (TE 1755, 7, pp. 7-8; TE 1776, ¶4.)

In February 1986, Omninet Corp. and Qualcomm entered into a Satellite Mobile Terminal Development agreement, and in February 1987, entered into a Memorandum of Agreement (which was amended various times) under which Omninet Corp. was to produce Omnitracs, a satellite communication system that provided two-way messaging and position reporting services to mobile users. (TE 1776, Exhs. A&B.) The contracts provided, *inter alia*, that if Omninet Corp. defaulted under the agreement, ownership of the Omnitracs technology would go to Qualcomm. (*Id.*) Kadisha stated that a default on the contract and loss of the ability to develop the Omnitracs technology would have been the "death knell" for Omninet Corp. (TE 16, 1753, 1754, 1755, 1776, ¶¶2, 3, 15, p. 19 of Exh. 1776.)

### a.   In the Fall of 1987, Omninet Corp. was in Dire Need of Capital.

In the Fall 1987, Omninet Corp. was in dire need of capital. As a result, it authorized the sale of limited partnership interests in Omninet Limited and Omninet Communications Services. Omninet Corp. also arranged for a $3 million loan from Sanwa Business Credit guaranteed by Omninet and Stadco. (TE 1753, 1754, 1755.) Omninet Corp. was unsuccessful at attracting equity investors for Omninet Communications Services.

The Omninet Corp. board was divided into two factions: 1) the Nazarian Group, and 2) a group of investors Kadisha has termed the "Kalantari Group." The Board of Directors deadlocked on how to obtain further financing.

In early 1988, Omninet was, again, in need of additional capital. Omninet arranged for a $330,000 loan from Sanwa Business Credit guaranteed by Stadco. (TE 49, 64.) During this time, the warring factions within the Omninet entities (including the Nazarian Group and the

Kalantari Group) were unable to agree upon a financial plan to save the Omninet entities. (TE 1756.) On April 4, 1988, Kadisha informed the board of Omninet Corp. that the company was virtually insolvent and that Qualcomm had served a notice of default under its agreement. He advised the company to file bankruptcy since the shareholders were unable to resolve their differences. (TE 1756, 1758, 1761, 1776.)

### b. Qualcomm's Lawsuit Against Omninet.

On June 21, 1988, Qualcomm sued Omninet Corp., Omninet Ltd. and Omninet Communications Services for, among other things, breach of contract and possession of the intellectual property rights for Omnitracs. (TE 84.)

On July 27, 1988, Kadisha informed Omninet Corp.'s Board of Directors that the company was "most likely doomed" unless a settlement could be reached with Qualcomm. This was because Omninet Corp. had, in fact, breached its agreements with Qualcomm. (TE 1776.)

At that point, Omninet Corp. had no revenues, had current liabilities in excess of $11.5 million (including $1.7 million owed to Sanwa Business Credit, $1.7 million owed to Sanwa bank, $1.4 million to Stadco, $1.7 million to trade creditors, and $1.9 million to Federal Express), and was involved in more than 10 lawsuits with creditors and former employees. (TE 1776) Moreover, Omninet had been unable to obtain credit to fund its operations or to attract new equity investors.

### c. Omninet Corp. Authorized Kadisha to Negotiate With Qualcomm and Get "The Best Deal" Possible.

On July 27, 1988, Omninet Corp.'s Board of Directors authorized Kadisha to negotiate with Qualcomm and to obtain "the best deal possible." Kadisha reported the results of his discussions with Qualcomm to the Board:

---

**STATEMENT OF DECISION**

21

Exhibit 1
Page 27

- Qualcomm rejected the idea of a merger;

- Omninet's creditors rejected selling substantially all of Omninet's assets to Qualcomm in exchange for stock – they would not agree to allow Omninet's assets to be transferred, except for cash;

- Qualcomm was willing to pay $4 million in cash, $1 million on conditional notes, and 200,000 shares of Qualcomm's common stock for Omninet's assets. Qualcomm would also assume certain Omninet liabilities and write off its Omninet receivable;

- However, Qualcomm had its own financial problems and, with only about $200,000 in cash reserves, did not have the $4 million to fund the settlement. Since Omninet was in breach, Qualcomm would also inherit Omninet's problems. Therefore, a group (primarily Kadisha, Parviz and Younes) agreed to purchase Qualcomm stock to make funds available to Qualcomm so that it could purchase Omninet's assets.

- Kadisha reported to the Board: "[T]o find a group of people who are willing to invest in a troubled company like Qualcomm $4,000,000 where the money goes in and goes out is not easy, and I am glad to report that we have a group of investors who are willing to do that." (TE 1776.)

Immediately before Kadisha's negotiations with Qualcomm, Omninet, Kadisha, Parviz and Younes still owed several million dollars to various vendors and suppliers, remained indebted to Sanwa on several loans, and Kadisha, Parviz and Younes had personally guaranteed various leases and loans to Omninet. (TE 1776.)

///

///

### d.     <u>The Settlement of the Qualcomm Lawsuit.</u>

In August 1988, Kadisha negotiated a settlement of the Qualcomm lawsuit. The settlement was memorialized in the Stock Purchase Agreement (TE 101) and the Mutual Settlement Agreement (TE 102) which provided, *inter alia*:

(1) That Qualcomm pay the Omninet group $5 million ($4 million in cash on August 8, 1988, and $1 million evidenced by ten $100,000 Promissory Notes), plus 200,000 shares of common stock, and the cancellation of all Omninet's debts to Qualcomm;

(2) that Omninet assign and transfer to Qualcomm substantially all rights and assets for the Omnitracs products and services;

(3) that the Nazarian group (i) provide for a period at least two years, or until Qualcomm raised at least $15 million in equity, a $1.5 million bank line of credit and a bank term loan of approximately $172,654, (ii) personally guarantee the Federal Express transponder sublease (for satellite transponder services) until May 8, 1990 at a total cost of approximately $7,714,000 (of which $1,976,000 was personally guaranteed, and (iv) cause to be made available the financing represented by two equipment leases totaling approximately $314,000;

(4) that Kadisha, Parviz and Younes, as well as other Omninet partners and shareholders and officers, purchase 4 million shares of Qualcomm stock, and loan Qualcomm $750,000; and

(5) that Kadisha, Parviz and Younes guarantee certain Qualcomm loans and provide additional loans to Qualcomm and/or guarantees of Qualcomm's indebtedness. (TE 101, 102.)

In addition, Qualcomm assumed and agreed to pay when due (i) the interest accruing after August 8, 1988 and one-half of the principal on a December 9, 1987 $3 million installment note from Omninet Communications Services to Sanwa Business Credit Corp. (due in 2 years), and (ii) a May 31, 1988 installment note in the amount of $177,021 and from Omninet Communications Services to Sanwa Business Credit Corp. (TE 100.)

As previously noted, the deal was consummated on August 8, 1988. As a result of the transaction, Qualcomm received $4,000,000 in cash from the sale of its stock and then immediately paid $4,000,000 to Omninet along with the ten (10) $100,000 promissory notes, and 200,000 shares of its common stock. Therefore, after the transaction, Qualcomm's cash position did not change, its notes payable increased by $1,000,000 and its capital stock increased by 200,000 shares.

### 4. Kadisha's August 8, 1988 Qualcomm Stock Purchase.

On August 8, 1988, the Qualcomm deal closed. Kadisha testified that the purchase price for his Qualcomm stock was a combination of cash, loans and guarantees (RT 59 & 69, 9-17-02), and that he, Parviz and Younes had to loan Qualcomm $750,000 as a specific condition for purchasing the Qualcomm stock (RT 50, 9-18-02).

In order to purchase their portion of the 4,000,000 shares of Qualcomm stock, Kadisha, Parviz and Younes borrowed $8.5 million from Sanwa Business Credit (the "Sanwa Loan"). The Sanwa Loan was secured by a deed of trust on property owned by Broadway Partners (of which Kadisha was a 20% principal (RT 7, 5-28-02)) and a $1 million certificate of deposit of Parviz.

The $8.5 million loan proceeds were first applied to satisfy the existing deed of trust on the Broadway Partners' property.  After that was paid off, there was $3.5 million remaining from the loan proceeds to satisfy Kadisha's, Parviz, and Younes' obligations to:  (1) pay Qualcomm $3,156,000 for 3,156,000 shares of Qualcomm stock (at $1 per share), and (2) loan Qualcomm $750,000.  (TE 101, 102, 120.)  (Other parties purchased the balance of the 4 million shares.)

As reflected on bank records and documents produced by Kadisha, Kadisha, Parviz, and Younes were each allocated $1,052,000 from the Sanwa Loan to purchase 1,052,000  shares each, or a total of $3,156,000 for 3,156,000 shares.  (TE 120D, 120E.)  The balance of the remaining loan proceeds, after deducting this $3,156,000 was $344,000.  The $344,000 was applied to pay a portion of the $750,000 loan that was required as a condition of closing.  (TE 120D, 120E; RT 114, 5-23-02; RT 30-37, 10-8-02; RT 3, 11-21-02.)

At closing, Sanwa issued cashier's checks to Qualcomm for the shares purchased by Parviz (1,052,000 shares), Younes (1,052,000 shares) and Kadisha (662,000 shares), and also issued cashier's checks totaling $390,000 for 390,000 shares allegedly purchased by Kadisha's friends and family members.  (RT 30, 10-8-02; TE 3201.)

On August 8, 1988, and August 9, 1988, Kadisha's friends and family members reimbursed Kadisha $390,000 for the cashier's checks issued by Sanwa Bank.

Kadisha deposited the $390,000 in checks he received from his friends and family members into his Wells Fargo Bank account.  He did not produce any evidence that showed what the balance was in that account on August 9, 1988 after the $390,000 deposit.  Therefore, the record reflects only that it contained $390,000.  Kadisha did not use this $390,000 to reduce the outstanding balance of the Sanwa Loan (RT 37, 10-8-02), or to repay Trust 2 the $428,000 Kadisha owed it for the misappropriated Namco Loan proceeds (TE 22), or to pay off the Namco

Loan (TE 150). Thus, Kadisha, alone of his partners, ended up with cash from the transaction, in the amount of $390,000.

At his deposition, Kadisha testified that he did not loan his friends and family members money to purchase their shares. (RT 114, 5-23-02.) Kadisha *did* loan them money, however, since the cashiers checks issued by Sanwa Bank came from Kadisha's portion of the Sanwa Loan, and his friends and family members later reimbursed him for the $390,000 Kadisha had advanced, through Sanwa, on their behalf. Moreover, on the one-year anniversary of the Qualcomm stock purchase, August 8, 1989, *Kadisha took $390,000 from Trust 2.* (TE 121, 272) He has never credibly accounted for the use of those funds. As will be discussed later, when a trustee fails to account for the use of trust funds, all presumptions must be taken against him. The Court may therefore presume that the $390,000 Kadisha borrowed on the anniversary date of the Qualcomm stock purchase was used to reimburse his friends and family members for *their loan* to him of $390,000, which he used to consummate his remaining loan obligations in the Qualcomm stock deal.)

After applying the entire $3.5 million from the Sanwa Loan proceeds ($3,156,000 to the stock and $344,000 to the required $750,000 loan), an additional $406,000 was needed to fund the balance of the $750,000 loan. (TE 120E, 120F.) As a result, Parviz and Younes had to come up with an additional $135,000 each and Kadisha had to come up with $136,000. (TE 120F.)

Kadisha testified that his $136,000 came from the same Wells Fargo Bank account into which he had deposited the $390,000 he received from family and friends for their purported purchases of 390,000 shares of Qualcomm stock. (TE 120F, 320, 3843, 3857, 3867.) Kadisha conceded that the $136,000 did not come from the Broadway loan proceeds. (RT 30, 5-28-02; 82, 10-8-02.)

At the time Kadisha issued his personal $136,000 check to Qualcomm from his Wells Fargo Bank account, he owed Trust 2 $428,000 for the misappropriated Namco Loan proceeds. As will be discussed in detail later, the evidence shows that Kadisha could not afford to repay Trust 2 for the misappropriated Namco Loan proceeds and still fund his remaining $136,000 obligation in the Qualcomm stock purchase.

### 5. Kadisha's Instructions From Attorney DeCastro Re: "Requirements of Trustee."

On August 30, 1988, after a telephone conversation between DeCastro and Kadisha, DeCastro had delivered a letter to Kadisha enclosing a memorandum entitled "Requirements of Trustee" (TE 122) which advised him, *inter alia*, that:

- The laws regarding duties and liabilities of trustees are extremely technical and strict, and it is not a defense for a trustee to be acting in good faith or with good intention.

- **Kadisha could not rely on Dafna's request or approval regarding any of his actions.**

- **For Dafna to approve his actions, she would have to be independently represented by legal counsel who could advise her as to the significance and consequences of the situation.**

- Even Dafna's informed and advised approval would not necessarily protect Kadisha against claims by others, including her children.

- A trustee must invest Trust funds in a reasonable and prudent manner. It is an objective standard based upon what a reasonably prudent investor would do under the same circumstances.

- In exercising investment judgment, Kadisha had to consider the safety of the principal as well as producing a reasonable amount of income.

- In investing, there is a specific obligation of diversification.

- Investments must be protected.

- **A trustee is prohibited from self-dealing in trust transactions, even if undertaken in complete good faith.**

- **A trustee cannot receive even incidental benefits in connection with trust transactions, and the courts are very strict in enforcing this prohibition against self-dealing.**

- **A trustee cannot commingle Trust assets with his personal property.**

- A trustee has a duty of fiduciary loyalty and must avoid any actual or potential conflict of economic interest with the Trust and its beneficiaries.

- A trustee has the duty to utilize all of his skills for the benefit of the Trust.

- **A trustee must give the beneficiaries reasonable information so that Dafna would have a relatively current opportunity to question, object and correct any problems.**

- **Prior to taking any action on the part of the Trust that was controversial or uncertain, Kadisha should seek court approval.**

- The trustee should utilize skilled, professional investment advisors.

- If there were any questions regarding the propriety of a particular act under Kadisha's fiduciary obligations as a trustee, he should seek legal advise and, where appropriate, petition the court for advance instructions.

Kadisha acknowledged that on August 29, 1988, DeCastro informed him that he was sending this memorandum. (RT 45, 11-18-02.) On August 30, 1988, Kadisha received DeCastro's memorandum, which was hand-delivered. (TE 122; RT 42, 11-18-02.) Kadisha read it, including paragraph B which informed him that he could not engage in self dealing with the trusts assets. Nonetheless, Kadisha still refused to repay Trust 2 for the Namco Loan proceeds he owed it as of August 30, 1988, and defaulted on repaying the Namco Loan when it was due on September 1, 1988. (RT 48, 11-18-02; TE 97.)

<u>6.</u>     <u>Kadisha's Improper $100,000 Loan to Qualcomm.</u>

In September and October 1988, Qualcomm was experiencing continuing financial problems, and along with Omninet, had defaulted on certain loans from Sanwa Business Credit to Omninet. (TE 137) These loans were partially assumed by Qualcomm as part of the settlement agreement with Omninet. (TE 100, 101, 102.)

On about September 13, 1988, to buttress his Qualcomm holdings, Kadisha loaned Qualcomm $100,000 from funds in his Independence Bank account. (RT 87, 10-8-02) This brought the total of his loans to Qualcomm to $350,000 ($100,000 plus $250,000, his one-third of the $750,000 loan that was required to consummate the stock sale). (TE 125, 127, 128.) In consideration for his $100,000 loan, Kadisha received a warrant to purchase 43,750 shares of Qualcomm preferred stock for $8 per share. (TE 126.)

At this time, the due date of the Namco Loan (September 1, 1988) had passed, Kadisha did not repay it (notwithstanding his recent advice regarding self-dealing and conflicts of interest from DeCastro (TE 122)), the Namco Loan was in default, and Kadisha still owed Trust 2 for the misappropriated Namco Loan Proceeds. (TE 22, 97.)

**7.** **Five months after Kadisha misappropriated $500,000 from Trust 2, and after defaulting on the Namco Loan, Kadisha has Trust 2 borrow $2,000,000 secured by the Strathmore Residence, and used the proceeds for his own needs.**

In early October 1988, Sanwa Business Credit served Stadco and Omninet entities with a notice of default under the terms of their loans because the interest had been past due since July 1988. (TE 137.)

By October 1988, Kadisha also knew that Qualcomm needed additional funding, and he had already expended all of the Namco Loan $500,000 proceeds. Therefore, in or about early October 1988, *after defaulting on the Namco Loan*, Kadisha, acting for Trust 2, applied for a $2.0 million loan from Imperial Bank to be secured by the Strathmore Residence. (TE 139.)

If Kadisha's testimony that the purpose of the $500,000 Namco Loan was to provide for Dafna's living expenses had been true (and Kadisha had not misappropriated all of the Namco Loan proceeds), as of October 31, 1988, there should have been $314,000 in unexpended Namco Loan proceeds for Trust 2's use. In other words, the Imperial Loan was not necessarily *for Trust 2's purposes* and it was not necessary to incur the expense of the Imperial Loan. (TE 22, 186.)

Moreover, on about November 1, 1988, Kadisha received an offer from Forkay Development to purchase the Strathmore Residence for $3 million. (TE 140.) But on about November 4, 1988, Kadisha received Imperial's loan approval, and the loan went forward. (TE 143.)

On November 10, 1988, Kadisha prepared a letter for Dafna to sign that stated that the purposes of the Imperial Loan were to provide an investment fund for the Trust and to reimburse Kadisha for money he had purportedly advanced to Dafna. (TE 146.) On the same day, Kadisha

allegedly sent Dafna a letter that contradictorily stated that she needed cash for her pending

marriage and to bring all of her debts current. (TE 147.)  Neither of these letters mentions the

*actual use* Kadisha made of the Imperial Loan proceeds, which was entirely for his own

purposes, not Dafna's or the Trust's.

The Imperial Loan closed on December 2, 1988. (TE 158.)  Kadisha used the loan

proceeds to repay the Namco Loan (even though he had used the Namco Loan proceeds for his

own benefit rather than the Trust's). (TE 153, 157, 158, see item no. 504, "Payoff of first

mortgage loan $505,000" and item no. 506, "Interest 11/11 to 12/18 $3,839.56").  After

deductions for the repayment of the Namco Loan and other closing costs, the net proceeds of the

Imperial Loan was approximately $1.4 million. (TE 158.)  Kadisha breached his fiduciary duties

by misappropriating $1 million of the net proceeds to himself (in takings of $600,000 and

$400,000 respectively) and by loaning $300,000 to Qualcomm in an extremely risky loan purely

to shore up his own Qualcomm holdings. (TE 164, 166, 167, 152, 1776.)

Kadisha did not document the $600,000 and $400,000 loans to himself – he did not sign

promissory notes, provide for when they would be repaid, provide for the payment of interest, or

provide security for the loans as required by paragraph C.6. of Trust 2. (TE 44A.)  The $300,000

loan from the Imperial Loan proceeds to Qualcomm, which will be discussed in more detail

below, was extraordinarily risky and in no way an appropriate trust investment.  At the end of

1988, after Kadisha's improper misappropriations to himself and to Qualcomm, Trust 2 had

approximately $54,000 left in cash and no projected income in 1989. (TE 22.)

///

///

8.      **Kadisha's Improper $300,000 Loan to Qualcomm From Trust 2.**

As part of the Qualcomm stock deal, Kadisha became a Qualcomm director. He testified that one of his duties as a Qualcomm director was to raise money for Qualcomm. (RT 14, 5-30-02.)

On August 20, 1988, Qualcomm issued a Private Placement Memorandum (the "PPM") (TE 119) for Series "A" warrants to purchase Qualcomm common stock. For each $8 loaned (of the total $8 million Qualcomm was attempting to raise) a lender would receive a warrant to purchase 1 share of Qualcomm common stock for $8 per share. The PPM provided, among other things: (1) that Qualcomm was a private company that had only been in business for a few years; (2) that Qualcomm had lost money from its inception; (3) that, as a result of Qualcomm's settlement with Omninet, its largest customer, substantial Omninet accounts receivable would be written off resulting in a significant loss; (4) that the investment was very risky; and (5) that even if fully subscribed, the company would need to raise substantial amounts of new money.

On November 23, 1988, Kadisha signed a subscription agreement as Trustee of Trust 2, committing Trust 2 to loan Qualcomm $300,000 for which it would receive a warrant to purchase 37,500 shares of Qualcomm stock for $8 per share. (TE 152.) Trust 2 did not have any cash or liquid assets with which to make the loan when Kadisha signed the subscription agreement. (TE 22.) Kadisha testified that at the time of the loan, he had read the Qualcomm PPM. (TE 119; RT 55, 5-23-02.)

On December 7 1988 (5 days after the Imperial Loan closed), Kadisha forwarded Trust 2's check for $300,000 to Qualcomm. (TE 168, 169.) On December 8, 1988, Qualcomm negotiated Trust 2's check. (TE 168.) Qualcomm, however, did not issue its promissory note for the loan until January 11, 1989. (TE 193.) The note provided for a five-year term, with interest

to be paid as follows:  on the first anniversary date, quarterly during years 2-4, and, in 12 equal installments of principal and interest in the 5th year.  In addition to the Qualcomm promissory note, Trust 2 received a Qualcomm Series A warrant (No. 00045) granting it the right to purchase 37,500 shares of common stock at $8 per share at any time prior to January 11, 1994.  (TE 194.)

At the time Kadisha had Trust 2 loan $300,000 to Qualcomm, he knew that Qualcomm was troubled financially and that it was a very risky loan.  In a declaration executed in connection with another lawsuit, Kadisha acknowledged that investing in Qualcomm was "exceedingly risky" from August 1988 through Qualcomm's initial public offering in December 1991.  (TE 1776.)

Kadisha stated:

> I was one of the investors who signed the Stock Purchase Agreement with Qualcomm and I in fact purchased in excess of 660,000 shares for my own account pursuant to that Agreement.  I consider myself to be a knowledgeable investor.  In my opinion, **Qualcomm was an extremely risky investment.  At that time, it had no proven products, and Omninet Corporation had been its major, dominant customer**; Qualcomm was privately held, so that there was no secondary market for Qualcomm's shares; and Qualcomm's financial statements, attached to the Stock Purchase Agreement, showed that **Qualcomm had consistently lost money – indeed, it had lost over $3.6 million in the first ten months of fiscal 1988.**

He also stated:

> The court should recognize that we did not simply step out of Omninet and into a lucrative investment with Qualcomm.  Quite the contrary is true.  I have been a director of Qualcomm since my initial investment pursuant to the Stock Purchase Agreement in August 1988.  **For over three years, Qualcomm's very survival was questionable.  During that time, Qualcomm's losses continued to mount, and I considered my entire investment to be a substantial risk of loss.**

---

**STATEMENT OF DECISION**

Exhibit 1
Page 39

(Emphasis Added)

As will be discussed later, Kadisha's loan of $300,000 of Trust 2's funds to Qualcomm was made solely for one purpose only – to protect Kadisha's interests which were vitally connected to Qualcomm's continuing viability.

### 9. The Financial Condition of the Trust Produced by Kadisha's Self-dealing.

On December 31, 1988, after Kadisha had applied virtually all of Trust 2's assets for his own use, Trust 2 had about $54,000 in cash, a $300,000 unsecured, promissory note from Qualcomm (with no interest due for 1 year), and the Strathmore Residence that had been encumbered by a $2 million lien for the Imperial Loan proceeds utilized by Kadisha. (TE 22.) Kadisha had also two undocumented and unsecured distributions to himself from the Imperial Loan proceeds (one in the amount of $600,000 and the other in the amount of $400,000) which Kadisha was not making monthly payments of interest or principal. (TE 164, 165, 166, 167)

As well, at that time, it was uncertain whether any of the assets in Switzerland or Israel would be repatriated to the United States.

Although the terms of Trust 2 required distributions of $20,000 per month to Dafna, in addition to paying her taxes, as of the beginning of 1989 (TE 44, 44a), the Trusts had no earning power and no liquid assets to make any distributions above the $54,000 Trust 2 had in its bank account. The Trusts, and the Uzyels, were unknowingly and unwittingly forced to rely upon Kadisha's good will to provide money for their living expenses. (TE 22, 186, 186a, 186b.)

### 10. Relevant Events from January – June 1989.

On January 10, 1989, DeCastro advised local counsel in Switzerland that Dafna was desperately in need of cash. (TR 3277.) There is no evidence that Kadisha ever informed

---

DeCastro about the $500,000 Namco Loan, the $2 million Imperial Loan, the $300,000 Qualcomm loan, the Halico loan or Kadisha's professed investment strategy of using the Trust's cash for his own purposes and paying interest at a higher rate than the Trust could earn by depositing it in a bank.  (RT 60, 5-24-02; 87, 11-13-03; 76-77, 11-13-03; 87, 11-13-03)

### a.    First Amendment to Qualcomm's PPM

On about February 3, 1989, Qualcomm amended its August 20 1988 PPM to reflect additional  losses for the period ending December 31, 1988 and to increase the loss for the year ending September 30, 1988.  The amendment reiterated all of the risks set forth in the original PPM, explained the prior fiscal year, and included a detailed explanation of the Omninet transaction – including the disastrous effect the transaction had had on Qualcomm's balance sheet and the company's future prospects.  (TE 202.)

### b.    Omninet and Qualcomm defaulted on Their Sanwa Business Credit Loans

The Omninet obligations that Qualcomm assumed as part of the settlement agreement included a $3 million installment note dated December 9, 1987 and due, after extension, on September 30, 1988, as well as certain other notes.

In February 1989, Kadisha executed a guarantee to Sanwa Business Credit for any loan or other financial accommodations made by Sanwa Business Credit to Omninet Communications Services. (TE 215.)  Omninet Communications Services also gave Sanwa Business Credit a lien on its interest in the Mutual Settlement and Purchase Agreements with Qualcomm.  (TE 214.)

On April 14, 1989, Sanwa Business Credit advised Kadisha, Parviz, Younes, the Omninet entities, and Stadco that the Sanwa Business Credit loan was coming due, and the due date would not be extended, under any circumstances, beyond May 31, 1989.  Sanwa Business Credit

---

**STATEMENT OF DECISION**

Exhibit 1
Page 41

therefore suggested that the Omninet entities take all appropriate steps to obtain other financing. It is also informed Kadisha, et al., that if the obligations were not paid on or before May 31, 1989, Sanwa Business Credit would enforce its rights under all of its agreements, including its guarantees.  (TE 228, 299.)

### c. Qualcomm Issued an April 26, 1989 PPM to Raise $20 Million.

On April 26, 1989, Qualcomm issued a PPM to sell 2.5 million shares of its Series "B" Convertible Preferred Shares of Stock at $8.00 per share (The "April PPM").  (TE 230.)  The April PPM set forth the following risk factors:

- Qualcomm had a limited operating history and had incurred losses since its inception;

- There was no public market for the company's stock;

- As a result of its transactions with Omninet, Qualcomm had written off large receivables, had assumed several million dollars in debt and other financing obligations, and had assumed the transponder sublease with Federal Express;

- Qualcomm had limited experience as a service provider for Omnitracs products;

- Omnitracs was its main product and there were no assurances that a large number of mobile terminals would be placed in service;

- Due to its limited manufacturing experience, Qualcomm was highly dependent on its suppliers and subcontractors;

- There was a decline in quarterly sales from June 1988 to April 1999;

- For the fiscal year ended September 20, 1988, Qualcomm sustained a loss of $6,868,600 through December 30, 1988, sustained a loss of $3,292,400, and through March 31, 1989 was $5,500,400;

- As of March 31, 1989, Qualcomm had used $2,813,000 of Qualcomm's $4 million revolving line of credit with City National Bank (which was personally guaranteed by, inter alia, Parviz, Younes, and Kadisha); and

- Parviz had personally guaranteed up to $1,716,000 in payments under the Federal Express transponder sublease, a $1,500,000 bank line of credit and a $172,654.00 term loan.

### d.   Kadisha's May 31, 1989 letter to Sanwa Business Credit.

On May 31, 1989, Omninet Communication Services sent a letter to Sanwa Business Credit (TE 242) that was signed by Kadisha and which confirmed that:

- On February 28, 1989, Sanwa Business Credit entered into an agreement with Omninet Communications Services which delayed the collection of certain loan agreements, installment notes and promissory notes;

- As of February 28, Qualcomm, all the Omninet entities and Kadisha believed they would be able to refinance Sanwa Business Credit debt by May 1989 – although as of the date of the letter, they were unable to refinance;

- Qualcomm had delivered a $750,000 check to Sanwa Business Credit;

- Sanwa Business Credit would return $90,000 that had been paid by Stadco in March or April 1989;

- The balance of $750,000 of principal due under a certain promissory note would not be due until October 31, 1989;

- The installment notes aggregating approximately $170,000 would continue in accordance with their original term, and Sanwa Business Credit would not claim default so long as the terms of this letter were adhered to.

e.    **Qualcomm's second supplement to the April PPM.**

On June 5, 1989, Qualcomm published a second supplement to the April PPM in which it amended the original PPM as follows:

- Qualcomm revised its five-year business plan downward to reflect a decrease in the previously forecasted sales of Omnitrac terminals because the actual orders did not meet the prior forecast;

- Per the revised forecast, Qualcomm was not expected to achieve a cash break-even, even on a monthly basis, until April 1990 rather than the previously projected in October 1989.

- In addition, for the fiscal year ending September 29, 1989, sales had decreased by $15,744,000, and the forecasted loss was projected to increase from $10,623,000 to $14,547,000.

11.    **At the Height of Qualcomm's extreme financial difficulties, Kadisha converted Trust 2's unsecured $300,000 promissory note to equity.**

On May 16, 1989, Kadisha, as Trustee of Trust 2, cancelled Qualcomm's $300,000 promissory note (TE 193) and, in consideration, on June 5, 1989, purchased 37,500 shares of Qualcomm's preferred at $8 per share. (TE 246.) This was at a time when the financially troubled Qualcomm was desperately trying to raise money from other investors. (TE 230.) Kadisha, by canceling the $300,000 note for the benefit of Qualcomm (and therefore himself) removed the debt from Qualcomm's balance sheet and eliminated the requirement that Qualcomm pay interest to Trust 2. It also transformed an already risky debt investment to an even riskier equity investment. (TE 119, 202, 230, 237, 245.) At this time, Kadisha had stripped Trust 2 of virtually all of its cash, was not paying interest on the loans to himself (TE 22, 186),

and did not know whether or when the Swiss or Israeli assets would be repatriated to the United States.  In other words, Trust 2 had *no* investments that were actively generating income for Dafna.

On June 8, 1989, Sanwa Business Credit sent a letter to Kadisha, Parviz, Younes, Stadco and the Omninet entities which provided, inter alia, that all of the obligations under the promissory notes, dated December 9, 1987 and May 31, 1988 as well as promissory notes dated February 23, 1988 and May 16, 1988, were immediately due and payable; that, on July 31, 1988, the parties executed an extension agreement which expired on September 30, 1988 which resulted in the parties executing a forbearance agreement, dated February 28, 1989, which expired on May 31, 1989; and informed them that it would refrain from filing a lawsuit on their defaulted loans if they agreed to the terms of the letter, which included Kadisha and Qualcomm guaranteeing all the debts.  (TE 252.)  On June 9, 1989, Qualcomm's Board of Directors met, with Kadisha present, and approved the terms of the June 9, 1989 Sanwa Business Credit letter. (TE 252, TE 253.)

On June 12, 1989 and June 21, 1989, Kadisha took $700,000 and $550,000 from Trust 2 (TE 254, 257) and deposited the money in his Union Bank account.  Kadisha then used the funds to make two loans to Stadco totaling approximately $1,200,000; on June 23, 1989, for $350,000 (TE 260.), and another on July 10, 1989 for $936,667.  (TE 266)  Kadisha never explained what Stadco did with the proceeds.

### 12.    Qualcomm offered to unwind Trust 2's stock purchase and Kadisha declined.

On June 22, 1989, Qualcomm wrote Kadisha that it had closed the Series "B" preferred stock sale.  (TE 259.)  Qualcomm enclosed, with its letter, a First Amended Schedule II to the

PPM which, among other things: (1) advised that Qualcomm had continued to sustain substantial operating losses since the last balance sheet; (2) summarized the terms of Qualcomm's agreement with Sanwa Business Credit pertaining to the defaulted loans; and (3) granted Kadisha the right to unwind Trust 2's purchase of the Series "B" preferred convertible stock.

Nothwithstanding the negative financial news and the continuing pressure from Sanwa Business Credit, Kadisha refused to unwind the transaction. This confirms that Kadisha's objectives with regard to Trust 2's extremely risky investment in Qualcomm were self-serving, and calculated to protect his own interests rather than Trust 2's.

### 13. Kadisha's purported purchase of Qualcomm stock from Leon Farahnik and Atta Nikka and Rudy Kadisha.

Between June 1990 through May 1991, Kadisha purchased 105,000 shares of Qualcomm stock from Leon Farahnik ("Farahnik") (30,000 shares), Atta Nikka ("Nikka") (30,000 shares) and Rudy Kadisha ("Rudy") (45,000 shares). (TE 130, 132, 355, 356, 373, 417, 419, 420, 425, 432, 437b.) Petitioners contend the Faranik purchase was made with Trust funds, and the stock, therefore, properly belongs to Trust 2. Petitioners also contend the Nikka and Rudy purchases were not true purchases as Nikka and Rudy were strawmen for Kadisha in the August 8, 1988 purchase. The court does not so find with respect to the Nikka and Rudy purchases.

#### a. The Farahnik Purchases

Kadisha was chosen to be the trustee of both Uzyel Trusts in November or December of 1987. Trust instruments were executed on January 11, 1988, and Dafna assigned her property to Trust 2 at that time (TE 31, 33.) ( New trusts were executed in February 1988).

---

On February 8, 1988, Kadisha borrowed $85,000 from his Union Bank line of credit (which was automatically deposited into his Union Bank account), and on February 10, 1988, loaned Farahnik $75,000. (TE 38, 40.) Kadisha could not have made the $75,000 loan without the $85,000 he borrowed from his Union Bank line of credit because he did not have sufficient funds in his account to do so.

On March 3, 1988 and March 18, 1988, Kadisha drew down $100,000 and $55,000, respectively, from his Union Bank line of credit, and the funds were deposited automatically into his Union Bank account. On March 24, 1988, Kadisha loaned Farahnik $76,000. (TE 40, 52, 60, 68, 76.) Without the $155,000 that he borrowed from his Union Bank line of credit, Kadisha could not have made the $76,000 loan to Farahnik because it would have overdrawn his account.

On April 1, 1988, Kadisha loaned Farahnik an additional $70,000 from other funds that did not come from his Union Bank line of credit. (TE 38, 60, 1044, 1076.)

Kadisha thus loaned Farahnik a total of $221,000. The $75,000 and $76,000 loans (totaling $151,000) were funded by Kadisha's Union Bank line of credit borrowings, which were repaid with Trust 2's funds when Kadisha misappropriated the $500,000 Namco Loan proceeds for his own use. Throughout discovery and a good portion of trial, Kadisha prevented Petitioners from discovering the fact that he had repaid his Union Bank line of credit advances from the Namco Loan proceeds.

In discovery, under penalty of perjury, Kadisha gave six different and untrue accounts of what he did with the Namco Loan proceeds. None of the six explanations disclosed that he had used a portion of the Namco Loan proceeds to pay down his Union Bank line of credit. It was only during trial, in Kadisha's *seventh* explanation, that he admitted that he had used $240,000 of the Namco Loan proceeds to pay down his Union Bank line of credit for the $240,000 he had

borrowed. (TE 68, 76.) Kadisha's admission established that he used Trust 2's funds to repay the Union Bank line of credit for funds he had borrowed to loan to Farahnik.

On May 31, 1991, Kadisha and Farahnik entered into a Stock Purchase and Sale Agreement in which Farahnik sold 30,000 shares of Qualcomm stock to Kadisha at $7 per share for a total purchase price of $221,000.[9]  Kadisha paid for the Qualcomm stock by canceling $210,000 of Farahnik's $221,000 debt to Kadisha.  However, since the ultimate funding of $112,302 of this $210,000 came from Trust 2's funds, Trust 2 is entitled to 53.48% of the value of the 30,000 shares of Qualcomm stock he acquired, or 21,571 shares and the value of their progeny as of the date the trusteeship of Kadisha was terminated.  (See Damages:  Re The Loan to Farahnik. (Page 122 Et. Seq.

The court will not impress a constructive trust on Qualcomm stock held by Kadisha, which will avoid getting into the questionable strict tracing rule Respondent finds so comforting. Damages will suit the situation quite well.  The court will cover that later on under "Damages."

**b.      The Rudy Kadisha Purchase.**

Rudy, Kadisha's uncle, was a member of the group of family members and friends that purportedly purchased 390,000 shares of Qualcomm stock in the Qualcomm stock deal.  (TE 101.)  On September 30, 1988, Qualcomm issued Rudy Share Certificate No. 159 for 79,000 shares. (TE 130.)  Petitioners contend Rudy was "Merely a strawman for Kadisha."  There is insufficient evidence to prove this allegation is more likely true than not.

**c.      The Atta Nikka Purchase.**

---

[9] On March 27, 1990, Qualcomm confirmed that Omninet had transferred 30,000 shares of stock to Farahnik.  (TE 343.)

On September 3, 1988, Qualcomm issued Nikka Share Certificate No. 174 for 30,000 shares of its common stock.  (TE 132.)  On June 14, 1990, Nikka executed a Transferor Statement to Qualcomm stating, under penalty of perjury, that he was selling his 30,000 shares of Qualcomm stock to Kadisha at $7 per share *for cash*.  (TE 355.)

On the very same day, Kadisha executed a Promissory Note to Nikka for $210,000 with annual interest of 20%, but filed a Transferee Statement stating, under penalty of perjury, that he was buying Nikka's 30,000 shares for $7 per share "to be purchased for cash."  (TE 356, 372.)[10] Obviously, both Nikka's Transferor Statement and Kadisha's Transferee Statements (made under penalty of perjury) are false since Kadisha did not pay cash for the shares.

Kadisha also testified that he has been paying interest of 20% on the purported note to Nikka since June 1990.  Unquestionably, this fact is curious since Kadisha could have paid Nikka off by borrowing money on his margin account at a much lower rate of interest, as in the fact, the interest Kadisha has allegedly paid on the note to Nikka exceeds the amount of principal.

Petitions claim the clear implication is the purported sale by Nikka to Kadisha of 30,000 shares of Qualcomm stock is a sham, that Kadisha paid nothing for the shares, and that Nikka was another strawman holding shares for Kadisha.  But the evidence does not support the contention as being more likely true than not.

### 14. Kadisha induced Dafna to enter into three shocking Trust amendments.

Kadisha, on his own initiative, had three amendments to Trust 2 prepared, which he induced Dafna to sign, and which must be characterized as *shocking*.  Dafna signed the first of

---

[10] On about October 14, 1990, Qualcomm issued its Share Certificate No. 29 to Kadisha for the 30,000 shares of common stock.

these on June 14, 1991 (TE 122), the second on February 14, 1992 (TE 428), and the third on July 30, 1992 (TE 528).

Each of the amendments was presented to Dafna as a condition to getting something that she wanted.[11]  She was handed the amendment, with no prior chance to review it and no admonition for insistence that she seek independent counsel.  (RT 93, 1-21-03; 38, 11-10-03)  This contradicted DeCastro's earlier written advice to Kadisha that:

> You cannot rely upon Dafna's request or approval regarding any contemplated Trustee action.  In order to safeguard you from possible personal liability to Dafna, she would have to be independently represented by legal counsel who could advise her as to the significance and consequences of the situation.
> (TE 122.)

Kadisha was also fully aware of Dafna's inability to understand a legal document.  Kadisha testified at trial that he himself could not understand a legal document he was asked about without the advice of counsel (i.e., TE 1154, a lease between Carson '93 and Texollini, which Kadisha signed on behalf of Carson o'93 as the CEO of Texollini, the general partner of Carson '93).  There certainly was no reason for Kadisha to have believed that Dafna could understand a legal document without the assistance of counsel.

DeCastro had also advised Kadisha that:

> For reliable protection, a Trustee must seek formal Court approval.  Before taking any action on behalf of the Trusts which is controversial or uncertain, you can petition to the Court and, in a short period of time, have the Court authorize and instruct you as to whether you may take the proposed action.

---

[11] The language of the amendments corroborates Dafna's testimony.  The first amendment provided for satisfying $140,000 of Dafna's debt and $50,000 of Ron's debt (TE 428).  The second amendment provided for an increase in monthly distributions to Dafna and for reimbursing her for certain debts she had paid.  The third amendment confirmed that funds would be made available to purchase a residence which Dafna wanted (although the original Trust required that funds be made available for that purpose.)  (TE 44a, 528.)

STATEMENT OF DECISION

44

Exhibit 1
Page 50

(TE 122.)  Kadisha never petitioned the Court for instructions regarding he amendments or any of the numerous other controversial actions he took.

The first amendment purported to change the method by which Kadisha could be removed as a trustee (i.e., "Settlor shall have the right to remove the trustee of the trust *only upon 36 months written notice*."  (TE 428.)  The first amendment also purported to:

(1) authorize Kadisha to manage the Trust assets in any manner that he determines "in his sole discretion" so long as there is no loss of principal and trust income does not fall below the income that would be earned on a one-year Bank of America certificate of deposit;

(2) authorize Kadisha to lend Trust assets to enterprises in which he has an interest and to "hold, manage and administer Trust assets in ways which might be characterized as conflicts of interest or acts of self dealing."

(3) waive the duty of loyalty contained in Probate Code section 16004;

(4) authorize Kadisha to make loans or investments "which might be deemed not prudent;" and

(5) waive the prudent person standard for Kadisha's administration of the Trust.

The first, second and third amendments also purported to release Dafna's claims against Kadisha.  Kadisha testified at trial that the only purpose of the releases was to protect Kadisha because he had been distributing more funds to Dafna than were called for by the Trust.  (RT 6, 6-11-02; 15-17, 6-12-02.)

### 15.    The Improper May 1992 sale of Qualcomm Stock and sham Rahban loans.

a.    **Kadisha was under extreme financial pressure in 1992.**

---

During 1992, Kadisha was under extreme financial pressure.  His cash flow was negative, and he was faced with the prospect of having to repay the Trusts for the millions of dollars he had unlawfully taken from 1988 through 1991.  (TE 1930.1)

Kadisha's general ledger account activity detail report for 1992 demonstrates his cash flow problems and his attempts to stay afloat by arranging new loans to pay off old ones.  (TE 1930.1)  It also shows that despite the new loans, Kadisha issued several NSF checks in 1992, had a negative cash flow in 11 of the 12 months of 1992, and ended up with a total deficit of $1,016,012 in 1992.  (TE 1930.1)

Loan proceeds came into and out of Kadisha's account as follows.

| DATE | CASH IN TO KADISHA | CASH OUT |
|------|--------------------|----------|
| 2-10-92 | | Loan from Shearson $500,000 |
| 2-10-93 | | Loan from Kadisha to Stadco 500,000 |
| 2-19-92 | | Kadisha repaid Trust 2 $90,000 |
| | Loan from Daniel $550,000 | |
| 2-28-92 | | Kadisha repaid Trust 2 $170,000 and $16,000 |
| 2-28-92 | | Kadisha loaned Stadco $350,000 |
| 3-02-92 | Loan from Daniel $200,000 | |
| 3-03-92 | | Kadisha loaned Stadco $200,000 |
| 3-09-92 | | Kadisha repaid Trust 2 $50,000 |
| 3-16-92 | Stadco loan repayment $250,000 | |
| 3-16-92 | | Kadisha repaid Trust 1 $200,000 and $58,482.19 |
| 3-18-92 | Stadco loan repayment $350,000 | |
| 3-18-92 | Stadco loan repayment $500,000 | |
| 3-19-92 | Stadco loan repayment $600,000 and $200,000 | |
| 3-20-92 | | Kadisha repaid Trust 1 $1.4 million |
| 3-20-92 | | Kadisha repaid Trust 1 $393,917.81 interest. |
| 3-27-92 | Union Bank loan $200,000 | |

| DATE | CASH IN TO KADISHA | CASH OUT |
|---|---|---|
| 3-27-92 | | Kadisha repaid Trust 1 $89,000 Principal |
| | | Kadisha repaid Trust 1 $19,304.47 Interest. |
| | | Kadisha repaid Trust 1 $61,000 principal. |
| | | Kadisha repaid Trust 1 $13,231.15 interest. |
| 3-30-92 | | Kadisha repaid Trust 2 $16,000 |
| 4-08-92 | | Union Bank NSF Charge $130 |
| 4-09-92 | | Kadisha repaid Trust 2 $30,000 |
| 4-14-92 | Shearson loan $200,000 | |
| 4-14-92 | Shearson loan $400,000 | |
| 4-14-92 | | Kadisha repaid Trust 2, $11,298.25 |
| | | Kadisha repaid Trust 2 $152,853.86 interest |
| | | Kadisha repaid Trust 2 $156,341 |
| | | Kadisha repaid Trust 2 $165,053 |
| 4-15-92 | Bank Leumi loan $400,000 | |
| 5-06-92 | Shearson loan $500,00 | |
| 5-18-92 | | Kadisha repaid Trust 2 $259,774.19 Interest |
| 5-19-92 | | Kadisha repaid Trust 2 $419,000 |
| 5-27-92 | Shearson loan $640,000 | |
| 5-28-92 | | Kadisha repaid Trust 2 $4,813.88 |
| | | Kadisha repaid Trust 2 $130,000 |
| | | Kadisha repaid Trust 2 $33,012.88 |
| | | Kadisha repaid Trust 2 $390,000 |
| | | Kadisha repaid Trust 2 $142,237.81 |
| | | Kadisha repaid Trust 2 $550,000 |
| | | Kadisha repaid Trust 2 $209,994.52 |
| 6-01-92 | Shearson loan $900,000 | |
| 6-05-92 | Shearson loan $450,000 | |
| 6-11-92 | Trust 2 loan $350,000 | |
| | | Kadisha repaid Bank Leumi $400,000 |
| | | Kadisha repaid Union Bank $300,000 |
| 6-16-92 | | Kadisha repaid Shearson $230,000 |
| | | Kadisha repaid Daniel $50,000 |
| 6-17-92 | | Kadisha repaid Daniel $50,000 |

**STATEMENT OF DECISION**

47

Exhibit 1
Page 53

| | | |
|---|---|---|
| 6-18-92 | Loan from Trust 2 $200,000 | |
| 6-18-93 | | |
| 7-08-92 | | Union Bank NSF Charge $30 |
| 7-09-92 | Loan from Trust 2 $250,000 | |
| 7-09-92 | | Kadisha repaid Daniel $550,000 |
| 7-14-92 | | Union Bank NSF Charge $10 |
| 7-31-92 | | First Credit Bank late fee $157.75 |
| 8-03-92 | | Union Bank NSF Charge $20 |
| | Bank Leumi loan $400,000 | |

| DATE | CASH IN TO KADISHA | CASH OUT |
|---|---|---|
| 10-05-92 | First Boston loan $500,000 | |
| 12-09-92 | | Union Bank NSF Charge $30 |
| 12-24-92 | | Union Bank NSF Charge $10 |

### b.    Kadisha sold Trust 2's Qualcomm stock to raise cash for his Own use.

In May 1992, in order to raise cash for his own use, Kadisha sold Trust 2's 37,500 shares of Qualcomm stock for approximately $800,625 (the "1992 Stock Sale.") (TE 505.) Kadisha made the 1992 Stock Sale without consulting an independent investment advisor (as DeCastro had advised Kadisha to do), without consulting with Dafna and without any economic justification. Although the proceeds were funneled to Kadisha, he testified that he did not have a plan for how to use the proceeds when he made the sale. Kadisha's first communication with anyone regarding the 1992 Stock Sale was to provide instructions to Shearson on the date he initiated the sale. He did not consult with Dafna prior to the sale or even inform her of it afterwards. (RT 40, 6-17-02; RT 44, 6-17-02; RT 58, 6-17-02)

In fact, Kadisha's sole reason for the 1992 Stock Sale was to funnel Trust money back to himself – which he did in the form of phantom loans to a David Rahban ("Rahban"), *an individual whom neither the accountant for the Trusts (Feldman) or Kadisha's secretary and booker, Theresa Mikhaili ("Mikhaili") had ever heard of.*

### c.     <u>The purported loan by Trust 2 to "Rahban."</u>

On May 18, 1992, Kadisha deposited $1,478,823.96 into Trust 2. This consisted of the proceeds from the 1992 Stock Sale ($801,047), and $677,776.96 from Kadisha to repay principal and interest on his outstanding loans from Trust 2. (TE 563d.) The very next day, Kadisha allegedly loaned $1.4 million to David Rahban ("Rahban") from Trust 2. (TE 563d.)

There is, however, no credible evidence that there was a David Rahban. The Court finds that Rahban claim of loans to Rahban to be willfully false.

A little more than a week after the purported $1.4 million loan to "Rahban," Kadisha repaid Trust 2 $1,471.936.68 for the outstanding principal and interest he owed on a portion of his loans. (TE 563D.) *There was no loan to Rahban.* The $1.4 million loan to "Rahban" actually went to Kadisha. Kadisha took $1.4 million out of the Trust and used it to repay $1,471.936.68 of principal and interest on his prior loans. Thus, with the help of the 1992 Stock Sale proceeds, Kadisha was able to retain the use of $1.4 million of Trust 2's funds – without having any direct accountability for the money.

According to Kadisha's accountings, as of December 31, 1992, Trust 2's assets consisted of $817,129.66 in cash, unsecured loans to Kadisha in the amount of $800,000 and the unsecured "loan" to "Rahban" (i.e., Kadisha) in the amount of $1.4 million. (TE 563c.) Kadisha acknowledged that the borrowings from Trust 2 accounted for over 70% of Trust 2's assets. (TE 563d.)

### d.     <u>The evidence shows that there was no loan to Rahban.</u>

Feldman, who had been hired by Kadisha to prepare the Trust accountings could not recall any investment made by either Trust to Rahban. Feldman also had never met Rahban and did not even know who Rahban was. (RT 62, 1-14-03.)

Mikhaili, who was Kadisha's assistant and who maintained the Trust records and made the accounting entries, also could not recall any investment made by either Trust to Rahban. She too had never met Rahban and did know who Rahban was. (RT 76, 3-10-04) Mikhaili could not recall keeping a file for Rahban or seeing a promissory note for him. (RT 81, 3-10-04) When asked to review account 1610 of the Trust accountings pertaining to the purported loans to Rahban by Trust 1 and Trust 2, Mikhaili said that she did not make the entries. (RT 77-80, 3-10-04; RT 81, 3-10-04.) Kadisha was not able to produce copies of the executed promissory notes. (RT 81, 6-17-02.)

Kadisha also testified that Rahban resided somewhere in Switzerland, Israel and Iran; he did not have any assets in the United States, and that he had not received or reviewed Rahban's financial statement before allegedly loaning money to him. (RT 81-84, 6-17-02; RT 90, 6-17-02; RT 22, 6-18-02.) Kadisha never discussed the terms of the purported loans with Dafna, or even with Ron Levi, whom Kadisha claims was Dafna's agent for her financial affairs. (RT 52, 11-10-03.)

Moreover – and not uncoincidentally – the purported loan to Rahban from Trust 2 was also made on precisely the same (non)-terms as all of the undisguised loans Kadisha made to himself – there was no security for the loan, no points were paid and interest was purportedly to be paid annually.[12] (TE 494, 495, 503; all Trust Accountings for the period 1992-1999.)

_____

[12] At deposition, Kadisha admitted that the Rahban loans were unsecured – even though the Trust instruments required that any Trust loans be made on "adequate security." (TE 44, 44a; RT 91, 6-17-02.) However, at trial, Kadisha adopted a new position, i.e., that the promissory notes were "secured" because he personally guaranteed them. Kadisha did not, however, produce any written guaranty. (RT 89, 6-17-02.) Instead, he (speciously) claimed that the following language in paragraph 1 from the (unenforceable) First Amendment to Trust 2 constituted his guaranty: "...relying on trustee's personal ability to assure that the guarantee of the first sentence of paragraph 1 is honored." (TE 428.) This is clearly not a guaranty. According to Kadisha, the First Amendment was drafted by Irell & Manella, which undoubtedly was able to draft an express guaranty that satisfied the requirements of the Civil Code if that is indeed what was intended. Kadisha did not call anyone from Irell & Manella at trial to confirm that the language he is now referring to as his personal guaranty was, in fact, intended to be a guaranty. Moreover, it is not believable that Kadisha, without any consideration, would guarantee a total of $2.6 million in purported loans to

Exhibit 1
Page 56

Kadisha also engaged in the same elaborate sham with Trust 1.  In March 1992, Kadisha

paid Trust 1 approximately $2.2 million in principal and interest.  (TE 491b.)  He thereafter, on

April 16, 1992,  purportedly loaned $1.2 million to Rahban.  (TE 494, 495, 550D, 560A.)

Kadisha thereby retained the use of $1.2 million of Trust 1's funds and was not directly

accountable for the debt.  Trust 1's accountings also show that the interest payments on the

"Rahban" loan were not made when due.  (RT 133, 6-17-02.)  Kadisha did not charge "Rahban,"

i.e., himself, any additional interest or points for the untimely interest payments.  (RT 146, 6-17-

02.)[13]

    e.   **Petitioner's Expert, Irwin Goldring, opined that the 1992 sale fell below the
standard of care.**

Petitioner's expert, Irwin Goldring, opined that the 1992 Stock Sale fell below the

standard of care for a California trustee because:  (1) Kadisha used the proceeds for self-dealing

loans to himself, or made unsecured loans to Rahban; (2) he did not consult with an investment

advisor to determine whether the sale made sense, and (3) he did not have a plan to diversify the

sale proceeds if the sale did make sense.  (RT 42-44, 7-30-03.)

Kadisha has incorrectly claimed that Mr. Goldring agreed on cross-examination that the

1992 Stock Sale was a proper exercise of fiduciary power.  Kadisha misrepresents Mr.

Goldring's testimony.  What Mr. Goldring agreed with was that Kadisha should never have

---

Rahban, a foreign national with no assets in the United States, without retaining a record of Rahban's address, phone
number or other contact information to enable him or a successor trustee to contact Rahban. Kadisha did not need
this information, however, since he had the money. The creation of the Rahban "loans" was simply part of
Kadisha's pattern of creating phony transactions, backdating documents and transferring assets to avoid taxes and
his creditors. and

[13] As to Trust 1's $1.2 million "loan:" no interest payments were made when due in 1994. The "loan" was brought
current by a double interest payment in 1995.  In 1996, interest of $144,000 was owed.  Only $36,000 was paid,
leaving a balance of $108,000, which was not paid until over three years later in 1999.  (TE 3553.)  As to Trust 2's
$1.4 million loan, no interest payments were made when due in 1994. Instead of making the next interest payment
when due on May 19, 1995, "Rahban" made two payments, totaling $308,000, in July 1995.  On May 19, 1996,
interest in the amount of $154,000 was due, but only $38,500 was paid, leaving a balance of $115,500 that was not
paid until more than two years later. (TE 3553.)

Exhibit 1
Page 57

loaned Qualcomm $300,000 from Trust 2 (which was how Trust 2 got its Qualcomm stock), and that once he acquired the stock (in breach of his fiduciary duties), he should have sold it to diversify Trust 2's investments. (RT 42-44, 7-30-03)  Mr. Goldring *did not agree* that it was a proper exercise of fiduciary duty for Kadisha to sell Trust 2's Qualcomm stock solely for the purpose of raising cash for his own use rather than for diversifying the Trust's investments.  In other words, although a sale of the stock to diversify the Trust's assets would have been proper, a sale of the stock to promote Kadisha's self-dealing was not.

### 16.   Kadisha made millions of dollars of improper loans to himself, his businesses and his friends from the Trusts

Kadisha made millions of dollars of  misappropriations (takings) from the Trusts to himself.  Dan Investments or his friends.  The following schedule sets forth the date of each taking, the amount, the Trust from which it was made, and the trial exhibits documents for each taking.

| 12/07/88 | $600,000 | Trust 2 | TE 166,176 |
| 12/07/88 | $400,000 | Trust 2 | TE 164,165 |
| 06/12/89 | $700,000 | Trust 2 | TE 254, 255, 1719a |
| 06/21/89 | $550,000 | Trust 2 | TE 257,258 |
| 12/14/89 | $200,000 | Trust 1 | TE 173, 303, 304[14] |
| 08/08/89 | $390,000 | Trust 2 | TE 271,272[15] |
| 01/22/90 | $1,400,000 | Trust 1 | TE 332,333[16] |

---

[14] Kadisha made the check for the 12/14/89 loan payable to himself.  He did not have a note documenting the loan prepared until after he had repaid the loan in 1992.  When the note was prepared, the obligor was not Kadisha, but Dan Investments, the real estate partnership in which Kadisha was a partner.

[15] On August 8, 1988, Kadisha received checks totaling $390,000 from his family and friends who purchased 390,000 shares of Qualcomm stock.  On August 8, 1989, the one year anniversary, Kadisha took from Trust 2 $390,000.

| 06/15/90 | $130,000 | Trust 2 | TE 357 |
| 07/25/90 | $ 61,000 | Trust 1 | TE 364, 3409[17] |
| 07/26/90 | $ 89,000 | Trust 1 | TE 365, 365a, 366[18] |
| 06/11/92 | $350,000 | Trust 2 | TE 509, 510 |
| 06/18/92 | $200,000 | Trust 2 | TE 513,514 |
| 07/09/92 | $250,000 | Trust 2 | TE 518, 519 |
| 02/25/93 | $500,000 | Trust 2 | TE 573, 574 |
| 03/04/93 | $500,000 | Trust 1 | TE 576[19] |
| 01/31/95 | $120,000 | Trust 1 | TE 760 |

Each of the promissory notes for the loans prior to January 1, 1992, were prepared in 1992 (after they had been repaid) and backdated to the date the funds had been borrowed. Thus, the loans were undocumented while they remained outstanding. The Trusts' general ledger detail reports for 1988 through 1991 show that Kadisha did not make any interest payments on any of the loans from the date the monies were borrowed until they were repaid in 1992. Each of the promissory notes that were prepared in 1992 state that interest and principal were to be paid

---

[16] Kadisha made the check for the 1/22/90 loan payable to himself. As with the other (pre-1992) loans, Kadisha did not contemporaneously execute a promissory note for the loan and no note was prepared until after the loan had been repaid in 1992. When the note was prepared in 1992, Dan Investments was again named as the obligor, rather than Kadisha. During deposition, Kadisha testified that Nick Nikka, another partner of Dan Investments, executed the note. (See Kadisha Depo., V10, 1679:9-12) Prior to trial, Kadisha changed his deposition testimony to state that he believed he may have signed Nick Nikka's name to the note with Mr. Nikka's approval. (TE 1826) As well, Kadisha's 1992 General Ledger (his personal accounting for his Union Bank account) reflects that Kadisha' repaid the loan from his Union Bank account, rather than an account designed as a Dan Investments account. (TE 560 at K001966)

[17] TE 364 is a check to Kadisha for $61,000. Once again, the obligor on the promissory note which was prepared in 1992 after the loan had been repaid, was Dan Investments, not Kadisha. Kadisha repaid the loan from his Union Bank account, rather than from the account designated as a Dan Investments account. (TE 560)

[18] TE 365a is a copy of a 7/26/90 wire transfer from Trust 1 to Fred Pourbaba, a longtime friend of Kadisha. There is no note from Mr. Pourbaba to Trust 1, however. Rather, TE 365 is a copy of a promissory note dated 7/26/90 for $89,000 from Dan Investments to Trust 1. This note was also prepared in 1992 after the loan had been repaid. And, once again, Kadisha's 1992 general ledger shows that he repaid the loan from his Union Bank account rather than from an account designated as a Dan Investments account. (TE 560)

[19] This check was issued to Union Bank to purchase a cashier's check for $500,000 to Kadisha's friend and business associate, Leon Farahnik.

on the respective maturity dates, even though they had actually already been paid at the time the notes were prepared.  Also, even though the notes had already been paid and the actual maturity dates were therefore unknown, the maturity dates set forth in the notes differ from the dates the notes were paid.

During the deposition, Kadisha testified that he executed each of the promissory notes on the date depicted on the note.  At trial, he admitted that this was untrue and that the notes were not actually prepared until after Kadisha repaid the loans in the spring of 1992.  (RT 72, 8-7-02)

Even if Kadisha could have made loans to himself as a trustee, the unsecured loans he made violated the terms of the Trusts, which required that loans of Trusts funds be "upon adequate interest and adequate security."  (TE 44, 44a)  He also misleadingly labeled all of his borrowings from 1988-1991 in the Trusts' general ledger detail activity reports as "investments Kadisha."

17. **Kadisha used Trust funds to help fund a real estate purchase by the Carson '93 partnership while he was a shareholder, president and CEO of the general partner Texollini**

The limited partnership known as Carson '93 was formed on July 12, 1993.  (TE 608.) The general partner was Texollini, of which Kadisha was a shareholder, president and CEO.  (TE 161e, 607.)  Kadisha made Trust 1 and Trust 2 limited partners, along with Texollini, Kadisha, Kadisha's brother (Daniel Kadisha), Kadisha's father (Abraham Kadisha), Kadisha's father-in-law (Parviz Nazarian), and Kadisha's friend (Farahnik).  (TE 608.)

On July 19, 1993, Trust 1 contributed capital of $475,000 to Carson '93, and on July 19, 1993, Trust 2 contributed capital of $125,000.  (TE 614, 626; 3497.)  (TE 607.)  Texollini made

capital contributions to Carson '93 of $20,000 as a general partner and $480,000 as a limited partner. (TE 608.)

Carson '93 was formed to acquire a commercial property located at 2575 El Presidio, Carson, California (the "Presidio Property"). (TE 616a-i.) The partnership borrowed $2.4 million from First Credit Bank to purchase the Presidio property. (The total purchase price was $4 million.) The loan was secured by a first deed of trust on the property. Concurrently with the closing of the $2.4 million loan, Texollini, Inc. borrowed an additional $500,000. Texollini's loan was secured by a second deed of trust on the *partnership property*, which made the partnership liable if Texollini defaulted on its loan.

As a condition to obtaining the First Credit Bank loans, Texollini submitted an estoppel certificate to First Credit Bank that stated that Texollini accepted possession of the Presidio Property, that all of the tenant improvements that were to be made had been satisfactorily completed, that the Presidio Property was in good condition and repair, and that Texollini was not aware of any breach or default by the seller. (TE 616i.) Although the estoppel certificate acknowledged that all tenant improvements had been completed, the seller remitted $250,000 to Texollini at the time of the closing. (TE 618.)

No evidence was presented that Petitioners were aware of any of the following:

- That Trust 1 and Trust 2 had invested $600,000 in Carson '93;

- That Texollini was both the general partner of the landlord and the tenant;

- That the limited partnership agreement purported to waive the conflict of interest between Texollini, as both landlord and tenant;

- That Texollini, Kadisha and family and friends controlled all of the votes necessary to approve any transaction between Carson '93 and Texollini;

- That Texollini was allowed to place a second deed of trust on the Presidio Property for its $500,000 loan, thus making the partnership property liable if Texollini defaulted.

From 1993 to 1998, Carson '93 made distributions to each of the partners on a pro rata basis. Petitioners contend that since Texollini, Inc. was reimbursed its $500,000 capital contribution at the closing, Texollini did not have an investment in the partnership and should not have received pro rata distributions with the other partners. Such contention is not supported by the evidence.

On August 1, 1993, Carson '93 as landlord and Texollini, Inc. as tenant, entered into a lease of the Presidio Property to Texollini, Inc. Petitioner claims the rent was below market terms. (TE 623; RT 44, 7-21-03) The evidence fails to support this contention.

On January 10, 1997, Kadisha purchased Trust 2's interest in Carson '93 for $190,000. (TE 921.) Kadisha did not obtain an independent appraisal of the value of Trust 2's interest, and Kadisha was both the buyer (as an individual) and the seller (as the trustee of Trust 2).

In about September 1998, Carson '93 refinanced the Presidio Property and obtained a $4.0 million loan. (TE 1161; TE 1185). Partnership distributions were made in conjunction with this refinancing, and Kadisha received the distribution that would have been received by Trust 2 if Kadisha had not bought its interest.

In about November 2000, Kadisha sold his interest in Carson '93 to his brother Daniel, at a profit. (TE 1628)

18.    **In 1999, Kadisha divested Trust 2 of all of the Qualcomm stock it acquired in 1994. Dafna claims the sale was in bad faith and solely to economically harm her.**

On January 10, 1994, Trust 2 acquired 31,674 additional shares of Qualcomm stock when Kadisha exercised Trust 2's warrants (acquired as a result of its $300,000 loan to Qualcomm). (TE 672.)  The stock split 2-for-1 in February 1994.  (TE 710.)  Trust 2's 31,674 shares of Qualcomm stock therefore doubled to 63,348 shares.

Petitioner Dafna claims that in 1999, Kadisha divested Trust 2 of all of its 63,348 shares of Qualcomm stock – to hurt Dafna by depriving her of the economic benefit of Qualcomm's expected increase in value.  The court finds the evidence insufficient for the court to conclude Kadisha sold the subject shares to "hurt Dafna."

    a.        **Kadisha held Trust 2's Qualcomm stock when Qualcomm's economic news was bad, and sold it when Qualcomm's economic news was good.**

From April 1994 until December 31, 1998, Trust 2's Qualcomm stock traded in a range of $20 to $70 per share.  (TE 1960.)

On September 23, 1996, Ericsson, the Swedish communications giant, filed suit against Qualcomm alleging that Qualcomm's CDMA products (its core products) infringed on Ericsson's patents.  (TE 1353.1)  Kadisha understood that if Ericsson prevailed in the lawsuit, it would be a significant threat to Qualcomm.  (RT 31, 8-6-02.)  Qualcomm's 10-Qs for the periods ending June 30, 1996 and September 29, 1996 also reported economic setbacks.  (TE 873.1, 886.)  In spite of the bad news, Kadisha believed in Qualcomm's future and held onto both his and Trust 2's Qualcomm stock.  (RT 69-70, 8-2-02.)

In 1997, Kadisha was concerned about Qualcomm's ability to compete, even though its finances were improving.  (RT 39, 8-5-02.)  He believed that there would be lower earnings during the second quarter of 1998.  (RT 45, 8-5-02.)  Nonetheless, Kadisha did not sell any of

Trust 2's stock.  As a Qualcomm director and a member of Qualcomm's audit committee, Kadisha was able to obtain extensive financial information about Qualcomm, and to fully evaluate Qualcomm's prospects.

In about June 1998, Kadisha, frustrated with dealing with Dafna, hired Arnold Kahn and Ricky Van Rijn to take over administering the Trusts.  (TE 1717.)  Over the next year, Kadisha did not meet with any of the beneficiaries – even after Dafna expressed dissatisfaction with Arnold Kahn in a letter copied to Kadisha.  (TE 1223.)

On December 8, 1998, Kadisha entered into a cashless collar transaction covering 500,000 shares of his own Qualcomm stock (roughly one-third of his stock).  (RT 103, 7-10-02; TE 3817.)  The collar protected Kadisha from a decline in the Qualcomm stock price but allowed him to benefit if the share price rose by a significant amount.  (TE 3817.)[20]

From January through April 1999, Qualcomm reported large increases in its revenues, income, and earnings and its economic prospects were booming.  (TE 1028, 1103, 1107, 1331, 1353.)

In January 1999, Qualcomm reported the highest quarterly revenues in its 13-year history.  (TE 1331.)  In the second quarter of 1999 (excluding a non-recurring charge), Qualcomm reported record net income of 250% over the same quarter in the prior year.  (TE 1366.)

On or about April 20, 1999, Qualcomm reported that its pending patent litigation with Ericsson had settled.  (TE 1366.)  As part of the settlement, Ericcson had agreed that Qualcomm's CDMA technology would be the global standard for mobile phones rather than

---

[20] Simplistically, the Collar provided a "put" and "call" with a floor and ceiling price.  If the stock fell below the "floor price" on the settlement date, Kadisha could "put" the 500,000 shares.  If the price rose above the "ceiling price" on the settlement date, Kadisha could either pay the difference or deliver that number of shares equal to the difference between the "ceiling price" and the average price of the shares prior to the settlement date.

STATEMENT OF DECISION

Exhibit 1
Page 64

Ericcson's GSM technology – the most popular mobile standard and the one favored by European companies.

On April 4, 1999, Qualcomm declared a 2-for-1 stock split.  (TE 1362)

On April 16, 1999, Kadisha attended a Qualcomm audit committee meeting to discuss Qualcomm's financial results for the first quarter of 1999, and its pending press release, which the committee reviewed and approved.  (TE 1851 bates 1380-1382.)  On April 20, 1999, Qualcomm issued the press release, which announced Qualcomm's second quarter *record* earnings and described the effect of the Ericsson settlement.  (TE 1366.)  Dr. Irwin Jacobs, Qualcomm's CEO, called the Ericsson settlement "pivotal" in Qualcomm's history.  He said:

> We saw robust demand for CDMA phones and chip sets, and we announced innovative new products . . . Our royalty revenues grew significantly as a result of increased CDMA product shipments by our licensees, which we believe as a clear indicator of the growth of CDMA technology around the globe.  Our focus is to continue to support the growth of CDMA, to strengthen and grow our core business and to improve operational efficiency and profitability.

(TE 1366.)

The press release also reported that Qualcomm's net income, excluding non recurring items, had increased 250% over the same period in the prior year, and that revenues in the second quarter of fiscal 1999 had increased 23% over the second quarter of the fiscal 1988." (TE 1366.)

Between January 1, 1999 through April 27, 1999, Qualcomm's stock price reflected the company's financial success – it rose from approximately $50 per share to approximately $200 per share.  (TE 1960.)

On April 26, 1999, Kadisha attended what must have been a jubilant Qualcomm board of directors meeting in light of the Ericsson settlement.  (TE 1367.)  Kadisha agreed that the fact

that the Ericcson settlement provided for a single CDMA standard was an "enormous advantage" for Qualcomm.  (RT 21, 8-6-02.)

Although Kadisha held Trust 2's Qualcomm stock when Qualcomm's economic news was bad, when the economic news was *extraordinary*, Kadisha sold the 53,348 shares of Trust 2's Qualcomm stock on April 27, 28 and 29, 1999 (the "1999 Stock Sale").  (TE 976.)

**b.**        Kadisha's untrue pretexts for the 1999 Stock Sale

Kadisha testified that the reasons for the 1999 Stock Sale were:  (1) that the sale was in accordance with his long term strategy for Trust 2, which was purportedly to increase the principal to a level that, with very conservative investments, would support the Uzyels with an income of $400,000 to $500,000 per year, and (2) that holding the stock of a publicly traded company was too risky for Trust 2, because (among other things) Kadisha did not have control over the investment.  (RT 29, 7-11-02; RT 100, 7-10-02; RT 88, 9-10-02.)

The first reason – that Kadisha's strategy was to increase the principal to a point where it would yield income of $400,000 to $500,000 a year with conservative investments is untrue because:

- Kadisha had been distributing over $400,000-$500,000 per year to Dafna (including over $600,000 in 1994 and 1995, over $900,000 in 1996 and over $500,000 in 1990, 1993 and 1997), and *knew* that Dafna was unable to cover all of her expenses with these distributions because she was constantly asking him for more money.  (TE 4643; Trust accountings from 1988-1999.)  It is not believable that Kadisha had a long term strategy that provided for far *less* income to Dafna.

- Kadisha did not have any conservative investments in mind at the time of the sale that would yield $400,000 to $500,000 per year, in accordance with his purported strategy. Kadisha did not consult with an investment advisor to determine how to produce that level of income and did not receive any written recommendations for investing the proceeds of the April 1999 Sale. (RT 33-35, 7-11-02.)

- In fact, the major investments Kadisha made with the proceeds were *not* conservative investments. Kadisha invested in two highly risky funds: The Directors Fund ($2 million) and the Value Realization Fund ($1 million). Both Funds employed leverage, were illiquid, used short selling and advised their investor that a percent of the Funds' investments would be risky. In fact, as Kadisha was well aware, the Value Realization Fund had lost money in 1998. (RT 138, 9-10-02; TE 1357, 1358, 1501, 1504.) The Value Realization Fund continued to lose money in 1999 and the Directors Fund also lost money. (TE 1402)

- The Trust income Kadisha was able to generate – following his purported strategy – was far below $400,000 to $500,000 per year. (RT 110, 9-10-02. TE 1310, 1373, 1357, 1608; Trust accountings for 1990-2000.)

- Kadisha never told Dafna he was going to sell Trust 2's Qualcomm stock and never discussed with her whether she agreed with his purported strategy of providing her with an annual income of $400,000 to $500,000 per year *from her assets,* or whether $400,000 to $500,000 per year was sufficient for her needs. (RT 34, 7-11-02.) Nor did Kadisha consult with Arnold Kahn, whom he had hired to administer the Trust.

- Kadisha did not even inform Dafna of the sale after it had taken place. If the sale had been as wildly beneficial to Dafna as Kadisha claims it was, why did he forego letting Dafna in on the good news?

Kadisha's purported second reason for the April 1999 Sale (that holding the stock of a public company was risky and that Kadisha did not have control over the investment) is also untrue because:

- Kadisha's investments from the sale proceeds, the Directors Fund and the Value Realization Fund, both purchased stocks of public companies. (TE 1359, 1358)

- Kadisha had no control over what the Directors and Value Funds invested in, and there were restrictions on Kadisha's ability to redeem the Trust's investments. (RT 121, 9-10-02.)

- Although Kadisha claimed that continuing to hold Trust 2's Qualcomm stock was too risky, Kadisha contradictorily continued to hold Trust 1's shares as, in his words, a "conservative investment strategy." (RT 31, 7-11-02.)

Kadisha's confidence that Qualcomm stock would appreciate is also demonstrated by the fact that he continued to hold onto his Qualcomm stock, except for a small number of shares he acquired through the exercise of options. (TE 1930.1-11.)

### 19.    The Purported October 8, 1998 Sale was a phony, backdated transaction.

Concurrently with the 1999 Sale, Kadisha created a phony, backdated sale to conceal the fact that he had transferred Trust 2's remaining 10,000 shares of Qualcomm stock and all of its Leap Wireless stock to Trust 1 *at the same time* he made the 1999 Sale (the "October 1998

Sale"). The evidence at trial overwhelmingly showed that the October 1998 Sale was a phony,
backdated transaction for the following reasons:

First.  None of the people who regularly assisted Kadisha with the Trusts learned that
there had supposedly been a sale in October 1998 until at least June 1999.  That includes:  (1) Jo
Sharma, who had maintained that the Trust records since January 1, 1995, (RT 74, 110, 11-12-
02; 132, 129-9-02); (2) Arnold Kahn, the attorney Kadisha had hired to administer the Trusts, (3)
David Gottlieb, whom Kadisha had retained to document all of the Trust transactions and to do
retroactive accountings frm the inception of the Trusts (RT 49, 1-7-03); (4) Ricky Van Rijn, a
paralegal whom Kadisha had hired to assist in preparing the Trust accountings (RT 136-137, 1-6-
03); (5) Ron Panting, a retired CPA whom Kadisha had hired to review the Trust accountings;
and (6) Feldman, who had prepared the Trusts' tax returns since 1988 (and who would have
needed the information about the purported October 1988 Sale for Dafna's 1998 tax returns).
(RT 9, 1-22-03; 15, 1-14-03.)[21]

---

[21] There is only one person (besides Kadisha) who claims to have known about the sale on October 8, 1998 and his
testimony is not believable. At deposition, Kadisha testified that he could not remember who prepared the stock
purchase agreement for the Purported October 1998 Sale (TE 1201) or even if it was prepared by an attorney. (RT
49, 7-11-02; RT 115, 7-31-02; RT 47, 7-12-02.) At trial, Kadisha suddenly remembered that his *brother-in-law and
business parther*, Benjamin Nazarian prepared the stock purchase agreement. (RT 25, 7-15-02.) A very nervous
Benjamin Nazarian testified at trial that he prepared the stock purchase agreement (TE 1201) on October 8, 1998,
shortly after his graduation from law school and admission to the California Bar. (RT 96, 7-31-02; RT 117-118, 7-
31-02.) Mr. Nazarian's testimony is not believable for many reasons. For one, Kadisha was working with both
Attorney Arnold Kahn and Irell & Manella on Trust matters in October 1998, but the stock purchase agreement,
*which no one else knew about* was supposedly drafted by Mr. Nazarian. (RT 4, 7-15-02.) Three, Nazarian did not
do any of the things an attorney representing a client would do. He did not maintain a file copy of the stock
purchase agreement, did not maintain a computer copy, and did not give a copy to his secretary. (RT 27, 8-1-02; RT
115, 131, 7-30-02.) He did not prepare a promissory note for the balance of the purchase price, which under the
terms of the stock purchase agreement was not due, with interest, until June 1999. Nor did he prepare a UCC filing
to secure the debt. (RT 130, 7-31-02; RT 126, 7-31-02.) He never saw an executed copy of the agreement and
never inquired whether the sale was executed. (RT 112, 113, 131, 7-31-02.) On October 8, 1998, when he
supposedly prepared the stock purchase agreement, he did not talk with Kadisha about it. (RT 137, 7-31-02.)
    Josephine Sharma, Kadisha's assistant from 1995 through the trial, testified at trial that on or about October
8, 1998 Kadisha asked her to prepare interest calculations for how much interest Trust 2 owed Trust 1, that she gave
the calculations to Kadisha around October 8, 1998, and that after the pretextural 1999 sale, she back dated
promissory notes evidencing advances from Trust 1 to Trust 2. The Court finds her testimony because there were
glaring inconsistencies between her trial and her deposition testimony. At her deposition she testified that: when
Kadisha asked her to prepare the interest calculations, he didn't tell her the reason, she could not remember when

Second.  Kadisha's reason for the purported October 1998 Sale was untrue.  Kadisha claimed that the main reason for the purported sale was for Trust 2 to repay money it allegedly owed to Trust 1.  (RT 76, 7-11-02.)  However, it was actually the other way around.  Trust 1 actually owed Trust 2 money because Kadisha had not been distributing to Dafna 75% of Trust 1's net income as required by the terms of Trust 1.  (RT 15, 7-30-02; TE 44, 44a.)  In late September or early October 1998, Ricky Van Rijn informed Kadisha that his accountings erroneously showed Trust 2 owing Trust 1 money when it was actually the other way around.  (TE 1740; RT 33, 7-8-02; RT 7, 7-15-02.)

Third.  The stock purchase agreement for the purported October 1998 sale provided for an installment sale, with a balance of $203,729 due (with interest) on June 8, 1999.  (TE 1201.)  No promissory note for the unpaid balance was prepared until June 1999.

Fourth.  The terms of the stock purchase agreement do not make economic sense.  Kadisha claims that Trust 2 owed Trust 1 money.  The amount he claims Trust 2 owed was greater than the value of the Qualcomm and Leap Wireless stock on October 8, 1998.  There was therefore no economic reason to make the sale an installment sale and for Trust 1 to pay interest to Trust 2 on an unpaid balance of the purchase price for the stock.  Kadisha could simply have credited Trust 2 for the full value of the stock (against the amount Trust 2 allegedly owed Trust 1).  The only reason to make the sale an installment sale was to explain why the Qualcomm and Leap Wireless shares were not transferred from Trust 2 to Trust 1 on October 8, 1988 when the sale purportedly occurred.

she prepared the interest calculations but thought it was sometime during the last 6 months of the year, she didn't remember if she gave them to Kadisha, and she never placed a copy of the alleged calculations in any trust file.

Kadisha's story that he asked Sharma for interest calculations in October 1998 is unbelievable.  Why would Kadisha not tell Sharma the purpose of the calculations?  Why didn't Sharma keep a copy of her interest calculation in the Trust files or on her computer?  Why was Sharma's memory so much more precise at trial as to when she was asked to prepare the interest calculations and whether she gave them to Kadisha than at her deposition?  The inevitable conclusion is that Kadisha never asked Sharma to prepare interest calculations in 1998.

Fifth.  The Purported October 1998 Sale created an unnecessary capital gain tax liability for Trust 2.  Since, there was no testimony that Trust 1 required immediate repayment for the amount Kadisha claims Trust 2 owed it, and the repayment only eliminated a payable between the Trusts (which could be dealt with at any time), there was no reason for Kadisha to have Trust 2 incur a tax liability in order to repay a phantom debt.

Sixth.  Kadisha's explanation for not giving Sharma a copy of the stock purchase agreement for the Purported October 1998 Sale until June 1999 is ridiculous – Kadisha claimed that "he left it in his briefcase."  (RT 24, 7-15-02.)

Seventh.  The Purported October 1998 Sale was not contemporaneously recorded in the Trust accountings.  Sharma testified that she closed the 1998 Trust general ledger on August 20, 1999.  (RT 63, 12-3-02.)  On *August 6, 1999*, she prepared a general journal entry recording the Purported October 1998 Sale in the Trust accounting for the first time.  (RT 96, 12-10-02; TE 1294.)

Eighth.  The Purported October 1998 Sale was not reported in the Trusts' original 1998 tax returns.  On about August 9, 1999, Feldman prepared the Trusts' 1998 tax returns and forwarded them to Kadisha for his signature.  (TE 1409.)  Although the returns did not report the Purported October 1998 Sale – and were therefore incorrect – Kadisha signed the returns.  (TE 1249, 1279.)  At his deposition, Feldman testified that the reason the Purported October 1998 Sale was not reported in the original tax returns was because he did not have the information about the sale when he prepared the returns.  (TE 1294, RT 46-47, 12-4-03.)  Feldman was impeached with this deposition testimony when he tried to change his testimony at trial to claim that he did not initially report the sale because he did not think it was a taxable event.  (TE 1249, 1279; RT 46-47, 12-4-03.)  (Feldman was also impeached by the fact that it *was* a taxable event.)

Ninth.  The sale of the Leap Wireless stock does not make economic sense.  On September 12, 1998, Qualcomm declared a stock dividend of one share of Leap Wireless Stock for every 4 shares of Qualcomm stock owned by a shareholder.  This was a taxable event.  On September 23, 1998, Trust 2 received a Leap Wireless share certificate for 15,837 shares.  As a result of the dividend, Trust 2 incurred approximately $108,000 in taxable income.

On October 8, 1998, when Kadisha purportedly sold Trust 2's 15,837 shares of Leap Wireless stock to Trust 1, the total value of the stock was $46,361 ($3.013 per share).  If Kadisha had actually sold the Leap Wireless shares on October 8, Trust 2 would have received less consideration for the stock than Dafna's tax liability cost.

In reality, Kadisha did not transfer the stock from Trust 2 to Trust 1 until 1999 when the stock's price had increased from approximately $3 per share to $20 per share and was projected to go even higher, which it did.  By the end of 1999, the Leap Wireless stock had risen to approximately 80 per share.  (TE 1392.)

Tenth.  Although Kadisha claims that the Purported October 1998 Sale occurred on October 8, 1998, he did not open a brokerage account for Trust 1 for the stock until June or July 1999, Kadisha opened a brokerage account for Trust 1 at Lehman Brothers.  (RT 82, 7-15-02.) (The documents state that they were executed in May 1999.  TE 1378, 1379.)

Eleventh.  For the reasons previously set forth, Nazarian's testimony that he prepared the sale document on October 8, 1998 is not believable.  (RT 137-138, 7-30-02.)

## 20.    Izzet's and Ron's pre-litigation meeting with Kadisha in 1999.

In about June 1998, Izzet and Ron Levi ("Ron") met with Kadisha to request a one-time distribution to Dafna of approximately $300,000.  (RT 80, 11-10-03.)  Kadisha told Izzet and Ron that he had sold Trust 2's Qualcomm stock, but he did not tell them how many shares he had

sold, what the net proceeds were, or that Trust 1 held 10,000 shares of Qualcomm stock. (RT 129, 11-10-03.) Kadisha also told Izzet and Ron that he was in the process of having an accounting prepared (RT 81, 11-10-03), that he wanted to resign as trustee and hand matters over to Dafna, Izzet, and Ron, that he wanted them to prepare a budget, and that he would give Dafna a $150,000 advance when he received the budget and another $150,000 when Dafna executed some paperwork. (RT 89-91, 11-10-03.) Izzet and Ron Levi testified that they were not shown the 1998 general ledger for either Trust at the meeting. (RT 102, 11-10-03.)

On June 28, 1999, Dafna, Ron and Izzet wrote to Kadisha confirming what had happened at the meeting, in particular, Kadisha's representation that if they signed the paperwork, he would release the requested funds. (TE 1390.)

On July 14, 1999, Marc Smith ("Smith"), an attorney with Krane & Smith, informed Kadisha that his law firm was representing Petitioners, and that he was following up on their request that Kadisha distribute $150,000 to them. (TE 1403.) Kadisha did not make the distribution.

On October 6, 1999, Arnold Kahn forwarded a proposed modified Trust Agreement to Ron. (TE 3592, TE 1745.) It provided, *inter alia*, that:

1. The modified Trust could be further modified by a writing signed by the Settlor and Kadisha, but not by the Settlor and any other trustee.

2. Under the terms of the original Trust, Dafna was entitled to certain distributions of the Trust's income. Dafna, by executing the modification waived her right to any payments which had accrued under the terms of the original Trust, but not been paid.

3. At any time, Kadisha could designate one or more persons to serve with him as a co-trustee, as his successor, or as a successor to his designated co-trustees. Additionally,

Kadisha could designate different people to hold different powers and could waive bond for all co-trustees and designated successors.

4. Kadisha would not be liable for any action as a trustee or for his failure to act unless such action or failure to act was found to be the result of gross negligence or bad faith.

5. The Trustee could resign upon written notice.

6. A majority in percentage interest of all of the income beneficiaries could remove the Trustee for "reasonable cause."

7. "Reasonable cause" for all trustees other than Kadisha, was defined as (a) legal incapacity; (b) willful or negligent management; (c) abuse or abandonment; (d) if the trustee was charged with a felony or serious misdemeanor; (e) an act of stealing, dishonesty, fraud, embezzlement; and (f) a variety of other reasons as set forth in paragraph 3.8.b(i).

8. "Reasonable cause" as applied to Kadisha, was limited to gross negligence and willful misconduct.

9. The Trustee would not be obligated to render an annual accounting.

21.    **On October 27, 1999 Petitioners filed a petition for breach of trust against Kadisha.**

On October 27, 1999, Petitioners filed a petition against Kadisha for breach of fiduciary duty.  (TE 1435.)

On January 13, 2000, Kadisha paid $13,761 to his attorneys from Trust 2.  On February 23, 2000, Kadisha – without court approval or Petitioners' consent – Kadisha withdrew $250,000

from Trust 2 and $125,000 each from Izzet and Joelle's trusts and deposited it into Marvin Burns's trust account to pay his legal fees.  (RT 56, 9-26-02.)

On May 1, 2000, Kadisha wrote to Izzet (who was only a college student and not represented by an attorney) and advised him not to allow the trust assets to be distributed to Dafna, or to follow the advice of his attorneys, his mother or his father.  (TE 1558.)

On May 15, 2000, Petitioners prepared Notices of Termination of Trusts (TE 1560a, b) which Kadisha received on  June 7, 2000.  (TE 1573; RT 125-9-19-02.)  On about June 19, 2000, Petitioners filed a motion to confirm the termination of the Trusts and to compel Kadisha to turn over the Trusts' assets and return the $500,000 Kadisha had improperly withdrawn to pay his attorneys' fees.  (TE 1571.)  Kadisha filed objections and declarations in opposition to Petitioner's Motion.  (TE 1573.)  He contended that Dafna was not the settlor of the Trusts and she therefore could not terminate Trust 2 and she, Izzet and Joelle could not terminate Trust 1.

On August 4, 2000, Judge Klausner confirmed that the Trusts were terminated and ordered Kadisha to turn over the Trust assets and to return the $500,000 he had taken from the Uzyel Trusts to pay his legal fees.  (TE 1606, 1607.)  Kadisha refused to return the $500,000, and appealed Judge Klausner's order.  He also refused to turn the Trust assets over until mid-September 2000.  (TE 4641.)

22. **Kadisha Breached his Fiduciary Duties in Allowing the Value of Trust 1's Qualcomm Stock to Dramatically Decline.**

In January 2000, Trust 1 owned 80,000 shares of Qualcomm stock.  This was because the 10,000 shares Kadisha improperly transferred from Trust 2 to Trust 1 split 2-for-1 in April 1999, resulting in Trust 1 holding 20,000 shares.  These shares split 4-for-1 in December 1999, resulting in Trust 1 holding 80,000 shares.  On December 31, 1999, the value of these 80,000

shares was approximately $14,090,000 and they constituted 90% of the value of Trust 1's assets. (TE 1394, 1960.)  By the time Kadisha turned over the 80,000 shares of Qualcomm stock to Petitioners in September 2000, the value of the stock had declined by over $10 million to $5,299,944.

Kadisha admitted that he was watching the price of Qualcomm stock on a daily basis during 2000.  (RT 22, 8-7-02.)  Therefore, he was aware of the dramatic price declines Trust 1's Qualcomm stock was experiencing in the first and second quarters of 2000.  He was aware, for example, that the price of the stock declined by $1.6 million on January 3 – a decline of over 10% in a single day – and that the price of the stock had fallen again before the market opened on January 4, 2000.  He was aware of further multi-million dollar declines in the stock price in subsequent months.  The nearly $1.6 million decline in value in one day should have been a wake-up call for Kadisha to take immediate action to preserve Trust principal.  Nevertheless, he did nothing.  He got another wake-up call when the market opened on January 4, and again did nothing to preserve Trust principal.  He never informed Petitioners or their counsel about the situation, and he never consulted with an investment advisor about stemming the Trust's losses. When he finally turned the assets over to Petitioners, the value of  Trust 1's Qualcomm stock had declined by approximately 60%, from $15,940,000 to $5,299.944.

## 23.   During This Same Period of Time, Kadisha Was Diversifying His Own Personal Investments

During this time period of January through June 2000, Kadisha was diversifying his own investments by purchasing millions of dollars of stock in a variety of publicly traded companies. (TE 1931; LB 363-389.)

Exhibit 1
Page 76

In addition to being aware of the daily volatility of the Qualcomm stock, Kadisha, as a member of Qualcomm's audit committee and its board of directors, was well aware of the depressed nature of Qualcomm's business during the first half of 2000.  Qualcomm's 10-Q for the period ending March 26, 2000 indicated a substantial decrease in revenues.  (TE 1539.1.) Qualcomm's 10-Q dated June 25, 2000 rendered a similar report.  (TE 1576.1.)

### 24. <u>Kadisha's Trust Accountings Were Fraudulent, Misleading, and Inaccurate and Concealed his Wrongdoings.</u>

Four sets of fiscal reports have been prepared for the Trusts.  (They are termed "financial reports" here because they do not comply with Probate Code section 16062 requirements for a trust accounting.)  The first reports were prepared in the format illustrated by TE 22 by Feldman using a program called the "Dec-easy" program and consisted of "G/L Account Activity Detail Reports."  Beginning in the Fall of 1991, Feldman created financial reports in a different format using the Peachtree program (illustrated by TE 392a).

In 1998, Kadisha retained Arnold Kahn of Greenberg, Glusker, et al. and Riky Van Rijn, to, among other things, prepare "accountings" from 1988 through the present (TE 1120; see TE 389 as an example of the "accountings" prepared by Ricky Van Rijn).  Then, in late 1998 and early 1999, Kadisha, retained the services of David Gottlieb of Grobstein Horwath after consulting with Ron Panting (a former partner of Peat Marwick who advised Kadisha that there were errors in the Arnold Kahn and Van Rijn "accountings").  In late 1999, Grobstein began preparing new accountings from 1988 through the present (see, e.g., TE 389A).  The final version of Grobstein's accountings were presented to Petitioners in June 2001 after litigation was underway.  Petitioners contend that the Grobstein accountings are still erroneous in that, among other things, they do not account for monies that should have been distributed from Trust 1 to

---

Exhibit 1
Page 77

Dafna from 1989-1999 but were not, they incorrectly reflect inter-Trust loans, and they understate David Rahban's interest payments.

Kadisha contends that annual accountings were given to either Ron or Dafna during the first quarter of each year. (For example, the 1988 accounting would have been given to Ron or Dafna in the first quarter of 1989.) Kadisha also testified, however, that he gave Dafna or Ron Levi general ledger activity detail reports for 1988 through 1990 in the format which Feldman testified was not created until the Fall of 1991. (T1 1900 Investments by Neil Kadisha; TE (Trust 2) 183g, 319j, 395e; TE (Trust 1) 183a, 319b, 394a) Feldman testified that he never gave Dafna copies of the accountings for 1988-1991. (RT 132, 1-23-03; RT 15, 1-24-03) Moreover, Sharma testified at trial that after she began working for Kadisha on January 1, 1995, she never disseminated accountings to Dafna for January 1, 1995 through the end of 1999. (RT 9, 12-9-02)

Even if Dafna had received the accountings, they were confusing and/or intentionally misleading.

Feldman testified that the accountings were not set up in a typical balance sheet format (RT 8, 1-24-03); that some transactions had been entered on an accrual basis and others on a cash basis (RT 30, 12-12-02); that from 1988 to 1991 all monies remitted by Kadisha to the Trust were (mis)labled as "loans," (RT 31, 12-11-02) and that Dafna would have been unable to understand what the "interest accruals" in account 1500 of Trust 2's 1989 accounting pertained to. (RT 30, 12-12-02). Feldman also testified that Dafna would have needed some knowledge of accounting to have understood the accountings. (RT 6, 1-24-03)

All of the loans to Kadisha were recorded in an account misleading labeled "Investment – N. Kadisha." Feldman testified that he was the one who came up with the idea of using the term "investment" instead of "loan" in the accountings to describe the money Kadisha was taking

from the Trusts.  (RT 36, 12-11-02)  Feldman also testified that reading "investment Kadisha" would not mean loan receivable Kadisha (RT 110, 1-27-03).  It is highly unlikely that Feldman was telling the truth.  It is inconceivable that Feldman, who is a CPA, does not know that the Kadisha loans should have been labeled "loan receivables" to disclose what they actually were.

Petitioners' expert, Irving Goldring, who is a CPA, testified that the trust accountings were not in a proper trust accounting format.  Moreover, even after the trust accounting format was changed in 1991, it was still not a proper format (RT 15, 7-30-03).  Goldring also testified that there was no mention in the accountings of the warrants owned by Trust 2 (RT 12, 7-30-03); that even when Trust 2 received 31,679 shares of Qualcomm stock, it was not reflected in Trust 2's accountings (RT 17, 7-30-03), that the trust accountings should have been prepared so that the beneficiary could understand them (RT 29-33, 7-30-03); and that it was the trustee's responsibility to consider the education, economic and business sophistication, and experience of the beneficiary when preparing his accountings (RT 29-33, 7-30-03).

Kadisha, a sophisticated businessman and a Qualcomm director, was *himself* unable to answer questions at trial about the "accountings" and repeatedly testified that *he* could not understand them.  Kadisha admitted:  (1) that he had not reviewed the accountings for accuracy (RT 15, 6-18-02); (2) that he did not understand what the term "CR" in the "accountings" meant (RT 18, 6-18-02); (3) that he did not know what the term "BJ" in the "accountings meant" (8, 6-18-02); (4) that he did not know what the term "journal entries" in the "accountings" meant (RT 77, 7-15-02); (5) that the "debit column" in Trust 2's 1988 accounting (TE 22) was "to reflect monies going *out* of the Trust" (RT 59, 6-24-03) when, in truth, it is monies coming *in*; (6) that he did not know what the "net worth" account reflected; and (7) that he would need an accountant to help him understand the meaning of certain entries.  (RT 154, 5-28-02).

When Kadisha prepared the "accountings," he knew that Dafna had trouble understanding English, and that she had a limited education and virtually no business experience. During trial, in a conversation with Izzet, Kadisha stated that she (and Ron) were "stupid." (RT 7, 11-05-03.) (Initially, when Izzet testified about this conversation with Kadisha, the Court ruled that Kadisha's opinion of Dafna and Ron was of no concern to the Court. (RT 72, 11-5-03.) However, after pondering the statement, the court indicated that Kadisha's remark would be taken under submission. The court finds Kadisha's remark about Mrs. Uzyel being "Stupid" goes to reveal his state of mind in his dealings with Mrs. Uzyel.

# I.   LEGAL DISCUSSION

## A.   The Trustee's duties.

### 1.   A Trustee is held to the highest standard of conduct and must act *solely* in the interests of the beneficiaries.

Many forms of conduct permissible in a workday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.* As to this there has developed a tradition that is *unbending* and *inveterate…*Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

Emphasis added; *Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles* (1954) 269 P.2d 641, 649, citing Cardozo, J. in *Meinhard v. Salmon* (1928) 249 N.Y. 458, 465, 164, N.E. 454, 546.

Modern commentators agree with Justice Cardozo that a special standard of conduct is imposed upon a trustee:

All of his conduct which has any bearing on the affairs of the trust must be actuated by consideration of the welfare of the beneficiaries and them alone. He is in a position of such intimacy with

STATEMENT OF DECISION

Exhibit 1
Page 80

those he is representing and has such great control over their property that a higher standard is established by the court of equity than would prevail in an ordinary business relation.

Trusts, 6th Ed. (1987) George Bogert, p. 342.

A trustee must administer the trust *solely* in the interests of the beneficiaries. Probate Code §16002. Thus, he cannot "serve himself first and his *cestuis* [beneficiaries] second." *Heckman v. Ahmanson* (1985) 168 Cal.App.3d 119, 126. Said another way, "[o]ne who assumes...a fiduciary role cannot abandon it for personal aggrandizement." *Id.* At p. 129.

A trustee must also show "*an utmost good faith* in dealing with beneficiaries." Emphasis added; *Allen v. Meyers* (1936) 5 Cal.2d 311, 54 P.2d 540. "Good faith" has been defined as "the state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, being faithful to one's duty or obligation." *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187, 192. Therefore, a trustee must show *the greatest degree of honesty*, the *greatest degree of freedom from intent to defraud*, and *the greatest degree of faithfulness to his fiduciary duties*.

2.    **"Unbending and inveterate" standards are imposed upon a trustee because his control of the trust assets creates the temptation to act for his own benefit rather than for the benefit of the beneficiaries.**

The "unbending and inveterate" standards referred to by Justice Cardozo are imposed upon a trustee because his control of the trust assets creates the temptation to act for his own benefit rather than for the benefit of the beneficiaries:

His duty calls upon him to act for the best interests of his principal; his self-interest prompts him to make the best bargain for himself. Humanity is so constituted that when these conflicting interests

arise the temptation is usually too great to be overcome, and duty is sacrificed to interest.

*Western States Life Ins. Co. v. Lockwood* (1913) 135 P. 496, 499.  The law, in other words, recognizes "'the well-known inability of human beings to serve two masters at once or to act satisfactorily when faced with conflicting interest.'"  Citations omitted; *Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles, supra*, 269 P.2d at 649.  But the law does more than recognize human frailty.  It also compensates for it.  To prevent trustees from succumbing to temptation, the *"policy of the law is to put fiduciaries beyond the reach of temptation by making it unprofitable for them to yield to it."*  *MacIsaac v. Pozzo* (1947) 81 Cal.App.2d 278, 285, 183 P.2d 910, 914.

3.   **The policy of putting fiduciaries "beyond the reach of temptation by making it unprofitable for them to yield to it" is effectuated by the fundamental rule that a trustee cannot benefit, gain, or profit *in any way* from dealing with the trust assets or from his position as trustee.**

The policy of putting fiduciaries "beyond the reach of  temptation by making it unprofitable for them to yield to it" is effectuated by the fundamental rule that a trustee cannot benefit, gain or profit *in any way* from dealing with the trust assets or his position as trustee.

> A trustee is at all times disabled from obtaining any personal benefit, advantage, gain, or profit out of administration of the trust, dealing with the trust property, or the trustee's relation to the trust estate…Nothing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to obtain a personal advantage in dealings with the trust estate…*Any benefit or profit obtained by the trustee inures to the trust estate*, even though no injury was intended and none was in fact done to the trust estate.

Emphasis added; 76 Am. Jur. 2D.  *Trusts* §383 (1964).

---

Exhibit 1
Page 82

As the foregoing quotation notes: "[n]*othing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to obtain a personal advantage in dealings with the trust estate.*" Emphasis added; *Id.*

There is, in California, the same "*inexorable requirement that a trustee not obtain any advantage*" over the beneficiary. Emphasis added; *Kenney v. Citizens Nat. Trust & Savings Bank of Los Angeles, supra,* 269 P.2d at 651. The California Probate Code specifically provides that the trustee: (1) "has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust;" (2) has a duty not "to take part in any transaction in which the trustee has an interest adverse to the beneficiary;" and (3) "has a duty to administer the trust *solely* in the interest of the beneficiary." Prob. Code §16004(a); emphasis added, Prob. Code §16002. A trustee breaches these fiduciary duties when he uses the trust assets or his position as trustee for his own advantage.

### 4.   The Trustee also has a duty to Make the Trust Property Productive.

The trustee has a duty to take reasonable steps to marshal the trust property, to keep control of it and to preserve it. Prob. Code §16006.

### 5.   The Trustee has a duty to enforce the trust's claims, including claims against himself.

The trustee has a duty to make the trust property productive "*in furtherance of the purpose of the trust*," not, of course, in furtherance of the trustees' own interests. Probate Code §16007.

///

///

---

6.     **The Trustee has a duty to enforce the trust's claims, including claims against himself.**

The trustee also has a duty to enforce claims that are part of the trust property.  Prob. Code §16010.  No case holds that there is an exception to this rule where the trusts' claim lies against the trustee.  Indeed, allowing such an exception would weaken the public policy of putting fiduciaries "beyond temptation" by providing them with a safe harbor for claims that involve their own wrongdoing.

7.     **The Trustee has a duty to account.**

The trustee also has a duty to keep the beneficiaries reasonably informed of the trust and its administration and to account at least annually.  Prob. Code §§16061, 16062(a).  Although the terms of a trust may regulate the amount or frequency of information which the trustee must give, "the beneficiary is always entitled to such information as is necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust."  Restatement of Trusts 2., §173, comment c.  And, a trustee may not take advantage of a beneficiary by even the slightest misrepresentation or concealment.  *In re McCabe's Estate* (1950) 220 P.2d 614, 98 Cal.App.2d 503.

a.     **The duty to account includes accounting for the Trustee's personal use of trust assets.**

Once  it has been established that a fiduciary has breached his or her fiduciary duties, the burden shifts to the fiduciary to render an accounting.  *Franklin v. Mortgage Guarantee & Security Co.* (1932) 57 F.2d 834, 835 ["…once a fiduciary relation is established, the burden rests upon the trusted agent to show *full disclosure* of all transactions attacked;" emphasis added].

The trustee's duty to account thus encompasses all of his dealings with trust funds, including his personal use of such funds. *Kinert v. Wright* (2nd Dist. 1947) 81 Cal.App.2d 919, 925, 185 P.2d 364. Accordingly, where a trustee has made personal use of trust funds, he must fully disclose to the beneficiaries each and every transaction that he has undertaken with the trust funds and any profit he has derived from those transactions. Otherwise (since the trustee will normally be in exclusive possession of the facts regarding his improper actions), there is little chance that the beneficiaries will be able to redress the trustee's breaches of trust. In this case, Kadisha not only failed to disclose the transactions he undertook with trust funds, but he successfully prevented Petitioners from obtaining the records in discovery to piece this together for themselves.

b.   **Any doubts arising from the Trustee's failure to account must be construed against the Trustee.**

Since a trustee must prove "every item of their account by 'satisfactory evidence'; the burden is on them and not on the beneficiary; and any doubt arising from their failure to keep proper records, or from the nature of the proof they produce, must be resolved against them." *In re McCabe's Estate, supra*, 98 Cal.App.2d at 508, citing *Purdy v. Johnson* (1917) 174 Cal.521.

> Not only is the highest good faith required of a trustee, but he must be held to strict accountability, with all doubts resolved against him, to the end that he may not be permitted…to profit from his own negligence or fault.

*Id.* At p. 509.

In other words, since a trustee has a fiduciary duty to fully disclose everything he has done with trust assets, he cannot be allowed to gain any advantage from breaching this duty. Thus, where a trustee has breached this duty by failing to make a full disclosure, all presumptions are taken against him.

8.    **The Trustee has a duty to keep trust property separate and to avoid commingling.**

The trustee has a duty to keep the trust property separate and to avoid commingling trust funds with his own.  Prob. Code §16009.  A trustee violates this duty when he deposits trust money into his own account.  *In re Evans Estate* (1944) 62 Cal.App.2d 249, 144 P.2d 625, 630; Restatement of Trusts, 2d., §179, Comment b.

One reason for prohibiting a trustee from commingling trust funds with his own funds is based upon the fact that money is fungible, i.e., the purchasing power of one dollar may be substituted for the purchasing power of any other dollar.  If a trustee deposits trust funds into his own account, it is impossible to tell which dollars (if any) were used for trust purposes and which were used for the trustee's own purposes.

The problem, however, goes beyond commingling funds within a single account if the rule that a trustee cannot benefit from any advantage gained from the trust assets is to be upheld.

Assume that a trustee had accounts at Bank 1 and Bank 2, each with $1,000 in deposits.  The trustee improperly commingled $1,000 of trust funds with his own $1,000 in his Bank 1 account, bringing the total balance to $2,000.  The trustee then spent the entire $2,000 balance for his rent.

Since the trustee only spent $1,000 of his own funds for his rent instead of $2,000, he did not have to use the $1,000 in his Bank 2 account for rent.  The trustee therefore had $1,000 left which he used to invest in a profitable stock – something that he could not have done if he had been required to use the $1,000 from his Bank 2 account to pay his rent.

Therefore, while the trust's money was deposited only into Bank 1, and the actual trust dollars went to pay the trustee's rent, the trustee received the same benefit he would have

Exhibit 1
Page 86

received had the trustee deposited the trust's money into Bank 2, and purchased the stock from the commingled funds in the Bank 2 account. In other words, the fungibility of money allows a trustee to improperly benefit from the use of trust funds simply by commingling the trust assets with his own assets and treating them interchangeably.

9.   **The Trustee has a duty to prudently invest the trust's assets.**

Prior to the adoption of the Uniform Prudent Investor Act in 1995, the trustee's duty with regard to investments was governed by the following principles:

> The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man [sic] of ordinary prudence would exercise in dealing with his own property."

*Restatement Second* §174.

California adopted the Uniform Prudent Investor Act in 1995. (Prob. Code, 16045-16054.) The Act applies to all trusts existing on January 1, 1996 and governs decisions or actions occurring after that date. (Prob. Code, 16054.) Its relevant provisions include the following:

> **16047.**  (a) A trustee shall invest and manage trust assets as prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution.
>
> (b) A trustee's investment and management decisions respecting individual assets and courses of action must be evaluated not in isolation, but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.
>
> (c) Among circumstances that are appropriate to consider in investing and managing trust assets are the following, to the extent relevant to the trust or its beneficiaries:
>
> (1)  General economic conditions.
>
> (2)   The possible effect of inflation or deflation.

---

Exhibit 1
Page 87

(3) The expected tax consequences of investment decisions or strategies.

(4) The role that each investment or course of action plays within the overall trust portfolio.

(5) The expected total return from income and the appreciation of capital

(6) Other resources of the beneficiaries known to the trustee as determined from information provided by the beneficiaries.

(7) Needs for liquidity, regularity of income, and preservation or appreciation of capital.

(8) An asset's special relationship or special value, if any, to the purpose of the trust or to one or more of the beneficiaries.

**16048**. In making and implementing investment decisions, the trustee has a duty to diversify the investments of the trust unless, under the circumstances, it is prudent not to do so.

### B.   <u>Where the Trustee uses the trust estate or his position as trustee for his own advantage, any resulting benefit, gain or profit properly belongs to the trust estate.</u>

Where the trustee uses the trust estate or his position as a trustee for his own advantage, any resulting benefit, gain or profit properly belongs to the trust estate. 76 Am. Jur. 2d *Trusts* §383 (1964) ["Nothing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to obtain a personal advantage in dealings with the trust estate . . . *Any benefit or profit obtained by the trustee inures to the trust estate* . . ." Emphasis added.]

For example, in *Purdy v. Johnson* (1917) 163 P. 893, 897 (an old but often cited case), the California Supreme Court determined that the trustees' use of trust property to secure repayment of advances made by them personally was a breach of trust:

> In so doing [the trustees] were assuming a position antagonistic to that of their beneficiaries, and *any advantage or profit received by*

*them through the transaction is deemed in law to belong to the beneficiaries.*

*Estate of Pitzer* (1984) Cal.App.3d 979 also shows that a trustee must disgorge his profit even if he gained only an indirect advantage from the use of trust property.  In *Estate of Pitzer*, the trustee bank loaned $115,000 of its own funds to the buyer of (trust) real estate and took back a deed of trust on the property to secure the loan.  The trustee was required to disgorge its *entire* profit even though the loan was made *from the bank's own funds* and the trustee's profit was therefore not directly or entirely attributable to the use of trust property.  The trustee did, however, reap *an advantage* from the trust property and was therefore required to surrender its entire profit.

The holdings in *Purdy v. Johnson* and *Estate of Pitzer* derive from the fundamental equitable principle that "[n]o one can take advantage of his own wrong."  Civil Code §3517.  Thus, in California, as elsewhere:  "*[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency.*'"  *Terry v. Bender* (1956) 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P.2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr. 429, 446.

## 1. <u>The rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee is particularly applicable where, as here, the Trustee intentionally set out to acquire control over the Trustee assets for his own benefit.</u>

The unbending rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee is especially applicable where, as here, the Trustee *intentionally* set out to acquire control over the trust assets

---

and to use them for his own benefit.  The evidence *abundantly* showed that this is precisely what Kadisha did.

The evidence showed that he intentionally set out to take advantage of Dafna Uzyel's inexperience and lack of sophistication to gain control of the Uzyel Trust assets, and that he consistently used those assets for his own benefit throughout his 12-year tenure as Trustee.

When Rafael died suddenly in May 1996, Dafna was 28 years old, uneducated, inexperienced, unable to read or speak English, and unequipped to handle the precarious financial situation that her husband's death had thrown her into.  Kadisha inserted himself into Dafna's life, gained her confidence, and took her to his own lawyer, who, despite a conflict of interest, undertook Dafna's representation.  The result was that Dafna's substantial assets were placed in trust in the Uzyel Trusts under Kadisha's control.

In the years that followed, Kadisha took full advantage of his control over Dafna's assets and Dafna's inability to understand the legal or financial intricacies of her situation or his actions.

Kadisha's first act as Trustee was to misappropriate Trust 2's $500,000 Namco Loan proceeds which he deposited into his personal checking account and spent entirely on his own expenses and investments.

Five months after exhausting the Namco Loan proceeds, and after defaulting on the Namco Loan, Kadisha took out another $2 million loan (the Imperial Loan) against Trust 2's Strathmore Residence.  He also used the proceeds of this loan for his own purposes rather than for Trust 2's.  He used the proceeds to repay the Namco Loan (even though he had spent the Namco Loan proceeds on himself), to make undocumented, unsecured loans totaling $1 million to himself, and to loan Qualcomm $300,000 in an unsecured, extremely risky loan made purely

to shore up Kadisha's own Qualcomm holdings.  (TE 153, 157, 158, see item No. 504, "Payoff of first mortgage loan $505,000" and item No. 506, "Interest 11/11 to 12/18 $3,839.56;" TE 158; 164, 166, 167, 152, 1776.)

Kadisha thereafter used the Trusts as a veritable piggy bank for *over $5 million* in unsecured, undocumented loans to himself, his real estate partnership (Dan Investments), and his friends.  (TE 44, 44A; 164-166, 167, 173, 254, 255, 257, 258, 271, 272, 303, 304, 332, 333, 357, 364-366, 509, 510, 513, 514, 518, 519, 560, 573, 574, 576, 580, 760, 1719a, 3409.)  In 1992, Kadisha improperly sold Trust 2's Qualcomm stock to raise cash for his own use.  He used Trust funds to help fund a real estate purchase by the Carson '93 partnership while he was a shareholder, president and CEO of the general partner Texollini.  And, after this lawsuit was commenced, Kadisha improperly withdrew $500,000 from the Trusts to pay for his legal fees.  The fact that Kadisha took *half a million dollars for his own use* from the Trusts without any authorizing provision in the trust instruments demonstrates his attitude that the Trusts existed for his benefit rather than for the benefit of the beneficiaries.

In fact, although the evidence shows numerous (egregious) instances in which Kadisha used Trust assets or his position as Trustee for his own benefit, there is no evidence of any instances in which Kadisha acted *in the beneficiaries' interests*.  In short, Kadisha did precisely the opposite of what the duty of loyalty compelled him to do.  Rather than administering the trust and dealing with the trust assets solely for the interest of the beneficiaries, he administered the trust and dealt with the trust assets *solely for his own benefit*.

///

///

///

---

**STATEMENT OF DECISION**

85

Exhibit 1
Page 91

## 2.  Kadisha is therefore not entitled to be excused from liability on equitable considerations.

Probate Code §16440(b) permits a court, in its discretion, to excuse a trustee from liability for a breach of trust if it would be equitable to do so.  This is not a case in which the trustee is entitled to equitable consideration, e.g., a case where a well-intentioned trustee made a good-faith error in judgment.  This is a case where the Trustee – throughout his tenure as Trustee – consistently breached virtually every fiduciary duty he had and intentionally took advantage of the beneficiaries' youth, inexperience and lack of education to use the Trust assets as his personal piggy bank.  The equities in this case must lie with Kadisha's victims.  In other words, the rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee must be rigorously applied and all doubts resolved in Petitioners' favor.

## 3.  _Nickel v. Bank of America_ reflects the law in California that a trustee who has committed a breach of trust must disgorge any profit derived from the breach.

As previously noted, in California, as elsewhere, "[a] "*[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency.*'"  *Terry v. Bender* (1956 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P. 2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr. 429, 446.  *Nickel v. Bank of America* (2002) 290 F.3d 1134, reflects the law in California that a trustee who has committed a breach of trust must disgorge any profit derived from the breach, since the profit properly belongs to the trust and its beneficiaries.

---

In *Nickel*, the trustee bank breached its fiduciary obligations by overcharging 2,500 trusts for its trustee's fees. After discovering the error, the successor trustee bank repaid the fees with interest. The trial court found that this was a sufficient remedy, and that the profits that would have accrued to the 2,500 trusts was speculative because the overcharges could not be traced into any particular loans or investments of the bank. The Ninth Circuit Court of Appeal *reversed.*

The Court of Appeal began its analysis with the "elementary rule of restitution" that "if you take my money and make money with it, your profit belongs to me," citing §1 of the *Restatement of Restitution. Nickel v. Bank of America, supra,* 290 F.3d at 1138. This "elementary rule" reflects the broad purpose of restitution and the maxim of jurisprudence in California that "[n]o one can take advantage of his own wrong." *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237; Civil Code §3517.

Section 1 of the *Restatement of Restitution* states the general rule that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." The *Restatement* also recognizes, however, that in the context of a fiduciary relationship, the unjust enrichment need not be at the beneficiary's expense. That is, "where a person in a fiduciary relation to another makes a profit in connection with transactions conducted by him as a fiduciary, he is ordinarily accountable to his beneficiary for the profit, although the beneficiary suffered no loss." *Restatement of Restitution* §1, comment e (1937).

The *Restatement* also explains: "A person is enriched if he has received a benefit." "The word 'benefit'…denotes any form of advantage." And, "a person is unjustly enriched if the retention of the benefit (i.e., retention of any form of advantage) would be unjust." *Restatement of Restitution* §1, comments a and b (1937). A trustee who profits through *"any form of*

*advantage"* derived from the fiduciary relationship or the trust estate is *unjustly* enriched because the profit belongs to the trust. The trustee must therefore disgorge the profit.

The principle is codified in the California Probate Code. Probate Code §16004 imposes a duty on a trustee *not* to *use or deal with* trust property for the trustee's own profit. "A violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." Probate Code §16400. Thus, if a trustee uses or deals with trust property for the trustee's own benefit, he has committed a breach of trust. If the trustee derives a profit from the breach of trust, he is liable for that profit, i.e., he is required to disgorge it. Probate Code §16440(a)(2).

The *Nickel* Court concluded that because money is *"fungible,"* the bank *did* benefit from retaining the overcharges:

> "The money misappropriated from the trusts added directly to what the banks had to loan or to invest or, if not directly loaned or invested, was used to meet expenses, freeing an equal amount for loan or investment." *Id.* at 1139.

The overcharges, which were the product of the trustee's breach of fiduciary duties, thus caused an addition to profit in either case. *Id.* at 1138.

The Court of Appeal concluded that the bank's repayment of the overcharges with simple interest to the 2,500 trusts was not a sufficient remedy because it did not "give the trusts an amount close to equaling a share in the profits made with their money." *Id.* at 1139. It found instead that the appropriate remedy was "to allot these unwitting and unwilling contributors a proportionate share of the banks' profits during the years of misappropriation." *Id.* at 1139.

The Court's decision thus reflects the principle that a trustee who profits through *"any form of advantage"* derived from the trust assets or the trustee's position is unjustly enriched, and must disgorge the profits. The trustee in *Nickel* benefited because the misappropriated overcharges added to the capital it had available for investment, and therefore added to the

---

Exhibit 1
Page 94

trustee's profit during the period of misappropriation regardless of whether the overcharges directly or indirectly produced the addition to profit. In either case, the trustee was unjustly enriched and was required to disgorge the portion of the profit attributable to the use of the trusts' funds during the period of misappropriation.

### 4. The trustee in Nickel profited from using the misappropriated overcharges in its business because it had the benefit of the use of money it would not have had if it had not breached its fiduciary duties.

The trustee in *Nickel* benefited each time it made a transaction with its own funds rather than repaying the misappropriated overcharges because so long as it retained possession of the overcharges rather than repaying them, they added to the total capital that was available to the bank for investment.

In addition to breaching the fiduciary duty not to deal with trust property for his own profit (Prob. Code §16010, a trustee who fails to repay a trust for misappropriated funds also breaches other fiduciary duties, i.e.: (1) the duty to take and keep control of and preserve the trust property (Probate Code §16007), (2) the duty to make the trust property productive "in furtherance of the purpose of the trust," (3) the duty to keep the trust's property separate from the trustee's property (Prob. Code §16009, (4) the duty to enforce the trust's claims – including claims against himself for money the trustee has misappropriated from the trust (Prob. Code §16010), (5) the duty not to take part in any transaction in which the trustee has an interest adverse to the beneficiary (Prob. Code §16004(a), and (6) the duty to place the beneficiaries' interests ahead of his own (*Heckman v. Ahmanson* (1985) 168 Cal.App.3d 119, 126: [The trustee cannot "serve himself first and his cestuis [beneficiaries] second." He cannot abandon his fiduciary role "for personal aggrandizement." *Id.* at p. 129.

The *Nickel* Court required the trustee to disgorge the profit earned in such circumstances by giving the beneficiaries a proportionate share of the trustee's profits during the period in which the trustee retained and had the use of the misappropriated and fungible overcharges. As is shown below, the *Nickel* remedy is an appropriate equitable remedy as it gives the beneficiaries the benefit of the use of their funds, and it gives the trustee the benefit of the use of his funds.

## 5. Nickel's remedy of giving the beneficiaries a share of the profits earned during the period of misappropriation is eminently equitable.

Nickel awarded the plaintiff beneficiaries a proportionate share of the trustee's profits during the period of misappropriation. It thus gave the beneficiaries the benefit of the use of their money, and it gave the trustee the benefit of the use of his money during the period of misappropriation.

As will be discussed in more detail later in this brief, Petitioners are seeking the *Nickel* remedy on several of their claims – a proportionate share of Kadisha's profits during the period of misappropriation – i.e., a proportionate share of his Qualcomm stock. Contrary to what Kadisha claims, this remedy does not give Petitioners something that does not belong to them.

## 6. An award of interest is not a sufficient remedy for the trustee's use of the trust funds.

An award of interest is not a sufficient remedy for the trustee's use of the trust funds. It is insufficient because it allows the trustee to retain a gain that was achieved from dealing with the trust for his own benefit. If a trustee did not have to disgorge this gain, there would be an enormous incentive for him to use trust funds for his own investments. (For one thing, it would be easier to dip into trust funds that the trustee wholly controls than to qualify for a bank loan for

---

**STATEMENT OF DECISION**

90

Exhibit 1
Page 96

the trustee's speculative investments.)  Providing that kind of incentive, however, runs contrary to the fundamental purpose of the trust law, which is to "put fiduciaries beyond the reach of temptation by making it profitable for them to yield to it."

*MacIsaac v. Pozzo* (1943) 81 Cal.App.2d 278.

Interest is also an insufficient remedy because it does not give the beneficiaries, who are unknowing and unwitting lenders, a return for the risk.

Kadisha's track record of losing hundreds of millions of dollars underscores the enormous risk that was forced upon Petitioners in this case.  (TE 1930.1-1930.11)  It appears from Kadisha's frequent applications to the Court for living expenses that virtually the only substantial successful investment Kadisha has made has been Qualcomm.  Had Qualcomm gone the way of a multitude of other dot coms, Petitioners would have had no recourse against Kadisha because of the failure of his other investments.  Since they were forced to unwittingly share in the risk of Kadisha's investment decisions, they are also entitled to share in the benefits, including the benefits of the Qualcomm stock purchase.

### 7. <u>Kadisha incorrectly contends that tracing the trustee's profit to actual trust dollars is necessary to establish that the trustee profited from trust assets.</u>

Tracing was laid to rest as the exclusive remedy for the unlawful taking and use of trust assets by a trustee by *Nickel v. Bank of America* (2002) 290 F.3d 1134.  *Nickel* brought about a much needed equitable change.  A change like *Nickel* invites a fury of attack by packs of perennially misanthrophic malcontents.  They cannot be missed.  Their number is legion.  They are everywhere, eyes wild, fangs barred – fiercely incensed by the mere notion of anything that resembles change.  The objectors have for the most part gone away – but not Kadisha.  It is he,

the architect of concealment and camouflaged accountings that look to the tracing doctrine as his salvation.  And while the court is not going to reach out and order a taking of Kadisha's Qualcomm stock, opting instead to award damages as was done in *Nickel*, a discussion of "tracing" is in order as it is a course of action available to the court which has been considered but not requisite to awarding monetary damages to Petitioners.

Kadisha incorrectly and throughout the trial steadfastly maintains that directly tracing the trustee's personal profit to actual trust dollars is necessary to establish that the trustee profited from trust assets.  This is tantamount to saying:  (1) that causation requires tracing; and (2) that the only possible way a trustee can benefit from the trust assets or his position as trustee is where he uses actual trust dollars for a personal investment.  Kadisha has not, however, offered a single authority that supports his position – *nor are there any*.  In fact, the only decision that directly discusses this point – *Nickel v. Bank of America* (2002) 290 F.3d 1134, 1138 – says precisely the *opposite*, that under California law, "[t]raceability and causation are *not* the same."  Emphasis added.

The Court of Appeal in *Nickel* specifically found that the trial court *erred* "in reading a requirement of traceability into a tortfeasor's obligation to make whole its victims."  *Nickel v. Bank of America, supra,* 290 F.3d at 1138.  In other words, the trial court erred because it required the plaintiffs to trace the path of the overcharges into particular loans or investments of the bank.  The Court of Appeal stated pointedly:  "A requirement of traceability nullifies the bank tortfeasor's obligation to cough up the profits it has made by the use of what it has wrongfully taken."  *Id.*

The Court reasoned:

> "Traceability and causation are not the same.  If the bank had taken the overcharges and thrown the money out the window, there

STATEMENT OF DECISION

Exhibit 1
Page 98

would be no causation, and, if the banks could prove they had done this, the plaintiff would lose." *Id.*

In other words, if the bank had thrown the overcharges out the window, it would not have received a benefit from them. However, because money is "*fungible,*" the bank *did* receive a benefit from the overcharges:

> "The money misappropriated from the trusts added directly to what the banks had to loan or to invest or, if not directly loaned or invested, was used to meet expenses, freeing an equal amount for loan or investment." *Id.* at 1139.

The overcharges, which were the product of the trustee's breach of fiduciary duties, thus caused an addition to profit *in either case. Id.* at 1138. *Nickel* says, in other words, that adding the misappropriated funds to the trustee's own funds *caused* the trustee's additional profit, because the trustee either had additional funds to directly invest or it had additional funds to pay its expenses – which freed up an equal amount for investment.

*Nickel* also says that because money is fungible, requiring beneficiaries to trace the profit to actual trust dollars would allow the trustee to escape liability for the profit earned by indirectly using the beneficiaries' money. If a trustee uses misappropriated funds to buy groceries, he benefits because he can invest the funds he would otherwise have had to spend for groceries. Because money is fungible, however, there is no demonstrable connection between a dollar that is used to buy groceries and another dollar that is thereby freed up and can be invested. Showing which dollar actually produced (i.e., caused) the profit is therefore not *possible* in this context. *Nickel* therefore correctly concludes that tracing is not an element of causation.

///

///

///

---

Exhibit 1
Page 99

## 8. <u>Kadisha's incorrect formulation of the law also contradicts the "inveterate and unbending" rule that a trustee cannot gain *any advantage* from the trust estate or his position as trustee.</u>

Kadisha's incorrect formulation of the law also contradicts the "inveterate and unbending rule" that a trustee cannot gain *any advantage* from the use of trust assets or his position as trustee. His incorrect formulation of the law can be summed up in the following propositions:

(1) If a trustee uses $1,000 of trust funds for his personal investments, the trustee is liable to the trust's beneficiaries for the trustee's profit. According to Kadisha, this is because *the trustee's profit can be directly traced to trust funds.*

(2) However, if a trustee uses $1,000 of trust funds to pay his obligations and thereby frees up $1,000 of his own funds for investment, the trustee is *not* liable to the beneficiaries for the trustee's profit from that $1,000. According to Kadisha, this is because *the profit can be "traced away" to the trustee's separate funds.* ("Tracing away" is a term invented by Kadisha – it does not appear in any decision by any California court.)

Kadisha's incorrect formulation of the law contradicts the rule that a trustee breaches his fiduciary duties when he gains *any advantage* from the trust assets or his position as trustee. In both of the above scenarios, the trustee has an additional $1,000 for his own investments that he would not have had if he had not breached his fiduciary duties. And, under both scenarios, the trustee would earn the same profit on that $1,000. *The trustee would therefore benefit equally under either scenario.* Nonetheless, Kadisha claims that tracing (and what he terms "tracing

Exhibit 1
Page 100

away") dictates that the trustee is liable for the trustee's profit under the first scenario, and the trustee is *not* liable for his profit under the second.

Kadisha utterly disregards the express holding of *Nickel*, the rule in California that *"[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency,"*[22] and the equitable principle that "no one can take advantage of his own wrong" because it allows trustees to use trust assets for their own benefit so long as the benefit is *indirect*. Kadisha's scheme also violates the fundamental rule that a party cannot do indirectly what it cannot do directly. See, e.g., Civ. Code §3511: "Where the reason is the same, the rule should be the same."

Nonetheless, a trustee would escape liability under Kadisha's formulation of the law by doing the following: (1) openly depositing trust funds into an account in his own name, (2) using the trust funds in that account to pay for his living expenses and debts, (3) funding his personal investments from a different account containing the money the trustee saved by using trust funds instead of his own funds to pay his expenses and debts; and (4) using the bank statements from each of these accounts to "trace away," i.e., to prove that he used trust dollars only for his personal expenses – which did not produce a profit – and that only his own dollars were used for the personal investments that did produce a profit.

Kadisha's faulty reasoning would act as an incentive for wrongdoing by making it *profitable* for trustees to breach their fiduciary duties – in direct contradiction to the public policy of putting trustees beyond temptation "by making it *unprofitable* for them to yield to it." *MacIsaac v. Pozzo, supra*, 81 Cal.App.2d at 285.

///

---

[22] *Terry v. Bender* (1956 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P.2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr.429, 446.

### 9. **The language of the California Probate Code also confirms that tracing is not a requirement for causation.**

The language of the California Probate Code also confirms that tracing is not a requirement of causation.

Probate Code §16440, which codifies a trustee's liability for a breach of trust, provides (among other things) that "if the trustee commits a breach of trust," he is chargeable with (among other things) "any profit made by the trustee through the breach of trust, with interest." Probate Code §16440(a). It does *not* provide that if the trustee commits a breach of trust, he is only chargeable with a profit "that can be traced to actual trust dollars." The Legislature did not, in other words, place the stringent limitation Kadisha proposes on the trustee's liability.

The actual issue regarding causation can be seen by applying the applicable standard of proof of Probate Code §16440. The standard of proof in a breach of fiduciary duty case is preponderance of the evidence – i.e., more likely than not. Evidence Code §115. Applying this standard to Probate Code §16440 the relevant questions are thus: (1) whether it is more likely than not that the trustee breached his fiduciary duties (duty, breach); (2) whether it is more likely than not that the trustee profited from the breach of trust (causation); and (3) what is the trustee's profit (damages).[23]

The fact that tracing is not a requirement for causation can also be confirmed by referring to Probate Code §16420, which lists the *remedies* for a breach of trust and includes tracing as a

---

[23] These are all questions of fact for the Court and its determinations can be overturned on appeal only if there is no substantial evidence that supports them. *Bowers v. Bernard* (1984) 150 Cal.App.3d 870, 873 [T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." Emphasis in original.]

*remedy* (one of many), not an element of liability (which causation is).  Probate Code §16420(a)(9).

## 10. Efron v. Kalmonovitz does not hold, as Kadisha claims, that tracing is an element of causation.

Kadisha relies upon *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187 for his mistaken theory that causation requires tracing.  Kadisha incorrectly contends that *Efron* demonstrates that "fungibility" and "freeing up assets" are not enough to show causation and that it is therefore necessary to show that actual trust dollars were used to purchase an asset (i.e., strict tracing) to establish causation.  (Respondent's Reply Memorandum in Support of His Motion for Judgment on Petitioners' Claims Regarding Respondent's Qualcomm Stock, 5:18-22)

*Efron* did not, however, deal with the issues of "fungibility" or "freeing up assets" since the misappropriated assets in that case *were not fungible assets.*  Nor did it state or imply that tracing is an element of causation, as Kadisha has been contending.  When it talked about tracing at all, it talked about it only in the context of the appropriate *remedy* to be applied, not as an element of liability.

In *Efron*, S & P Corporation ("S&P") was owned by Kalmonovitz, who was also the majority shareholder of the Maier Brewing Company ("Maier").  S&P was a real estate investment company, and Maier was a brewery.  Kalmonovitz breached his fiduciary duties to the minority shareholders in acquiring Maier's assets.  Kalmonovitz continued to run the brewery after the fraudulent sale but the evidence at trial left substantial doubts that the brewery was profitable.  Nevertheless, the trial court impressed a constructive trust on the real property purchased by S&P after the Maier acquisition.  The Court of Appeal reversed.  It concluded, essentially, that there was no evidence that Kalmonovitz actually received any benefit from the

Maier assets, and it remanded the case back to the trial court for further findings to determine whether Kalmonovitz earned a profit or cash surplus from the Maier assets and whether he used that profit or cash surplus in some way to acquire the properties.

In other words, the trial court had failed to make any findings that there was a causal connection between the brewery assets and S&P's real estate acquisitions. Because the brewery assets Kalmonovitz improperly acquired were fungible, the causal connection between those assets and S&P's real estate acquisitions had to be established in a different way than it can be established in a case involving fungible cash. Adding the non-fungible brewery equipment to Kalmonovitz' holdings did not have the same economic impact that adding fungible cash to his holdings would have had because the assets by themselves did not add to the store of capital that was available to Kalmonovitz for investment. The issue in *Nickel* and the issue in this case (with respect to Petitioners' claim regarding Kadisha's Qualcomm stock acquisition) involves the economic effect of fungible cash on the store of capital that the trustee has available for investment. *Efron*, does not address that fact situation and is therefore distinguishable and inapplicable.

*Efron* is also distinguishable because the fiduciary was a director rather than a trustee. A trustee has additional statutory duties. For example, a trustee has statutory duties to marshal, control and preserve the trust property and to pursue claims held by the trust, even if it involves a claim against the trustee. The trustee bank in *Nickel* and Kadisha were therefore duty bound to restore the funds they misappropriated to the trusts. By breaching this fiduciary duty, they each benefited because they had cash for investment that they would not have had if they had repaid the rightful owners for the misappropriated funds. Kadisha and the *Nickel* trustee thus gained an improper – and disgorgeable benefit – by breaching a duty that Kalmonovitz did not have.

---

Exhibit 1
Page 104

**11. <u>The disgorgement of an advantage, benefit, gain or profit obtained</u>**

**<u>through a breach of fiduciary duty may be accomplished by imposing a</u>**

**<u>constructive trust on the advantage, benefit, gain or profit.</u>**

There are numerous (nonexclusive) remedies to redress a trustee's breach of trust, including payment of money, imposition of a constructive trust, and tracing. Prob. Code §16420(a)(3)(8)(9). (Notably, the imposition of a constructive trust and tracing are listed as separate remedies. Their intentional separation strongly argues against Kadisha's other theory that all constructive trusts require strict tracing.)

The *Restatement of Restitution* (upon which Kadisha relies) provides, however, that if a fiduciary has made a profit through violating a fiduciary duty, he can be compelled to surrender the profit through the remedy of a constructive trust. *Restatement of Restitution* §160, comment d (1937).

California law is in accord:

> *Where trustees have acquired property by virtue of a breach of their fiduciary duty of loyalty to a beneficiary*, the latter may proceed against them personally to recover damages for the fraud *or may charge them as constructive trustee of the property for his own benefit as rightful owner.*

*Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles, supra,* 269 P.2d at 652.

This rule is codified in Civil Code §2224 which states: "One who gains a thing by …the violation of a trust…is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Civil Code §2224 is part of the "comprehensive legislative design to inhibit the temptation of a trustee to use his fiduciary position for personal gain." *Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles, supra,* 269 P.2d at 650.

---

**STATEMENT OF DECISION**

Exhibit 1
Page 105

Probate Code §16420(a)(8) is another part of this legislative scheme.  It provides that if a trustee commits a breach of trust, a beneficiary may (among other remedies) commence an action to impose a constructive trust *on trust property*.  A profit, benefit, or gain acquired by a trustee through a breach of trust indisputably belongs to the trust and is *therefore trust property*. *Purdy v. Johnson, supra*, 163 P.2d at p. 897 [any advantage or profit received by the trustee through a breach of trust "is deemed in law to belong to the beneficiaries."]  As *trust property*, a trustee's illicit profit is subject to a constructive trust under Probate Code §16420(a)(8).  See, for example, *Heckman v. Ahmanson* (1985) 168 Cal.App.3d at 123 [plaintiff shareholders entitled to a constructive trust on greenmail profits earned through a breach of fiduciary duty]; *Bank of America National Trust & Savings Ass'n. v. Ryan* (1962) 207 Cal.App.2d 698, 705.

## 12. The essence of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrondoing.

"The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing." *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237.

*Martin v. Kehl* also noted that the only conditions necessary to create a constructive trust are set forth in Civil Code §2223 (which states:  "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner" and §2224 (which states ["o]ne who gains a thing by…the violation of a trust, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.") *Martin v. Kehl, supra,* 145 Cal.App.3d at p. 237.  Notably, the "only conditions" for creating a constructive trust do not mention "tracing."

Moreover "[i]n order to provide the necessary flexibility to apply an equitable doctrine to individual cases, these sections state general principles for a court's guidance rather than restrictive rules." *Id.* at page 237.  Thus:

> It has been pointed out that a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.

*Id.* at p. 238.

In other words, "[a]ll that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment."  *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116.

Where a trustee acquires property by an advantage gained from the trust assets or his position as trustee, the acquisition is wrongful (as it is the result of the trustee's breach of duty) and the keeping of the property, which rightfully belongs to the trust, constitutes unjust enrichment.  Therefore, where a trustee acquires property by an advantage gained from the trust assets or his position as trustee, the beneficiaries are entitled to the remedy of a constructive trust.

**13.**  <u>**Kadisha gained numerous advantages from the "administration of the trust, dealing with trust property, or the trustee's relation to the trust estate," and he is therefore liable for and must disgorge his profits.**</u>

    **a.**  **Kadisha benefits from the use of Trust assets in 1988 through 1989.**

Kadisha benefited from the use of Trust assets during 1988 and 1989 by, among other things:

---

- Misappropriating the $500,000 Namco Loan proceeds for his own use,

- Defaulting on the Namco Loan and buying Qualcomm stock for himself instead of repaying Trust 2 for the misappropriated Namco Loan proceeds,

- ~~Loaning Qualcomm $100,000 to protect his Qualcomm holdings instead of repaying Trust 2 for the misappropriated Namco Loan proceeds,~~

- Using Trust assets to secure an unnecessary $2 million loan to raise cash for Trust 2 to loan Qualcomm $300,000 in an extremely risky loan, ~~to insure Qualcomm's survival until it could raise other money,~~

- Selling the Strathmore Residence, misappropriating the proceeds and loaning $1,250,000 to Stadco, a corporation in which Kadisha, Parviz and Younes had a substantial investment, and which had guaranteed Omninet's Sanwa loans;

- Converting the risky $300,000 note to an even riskier equity investment to help Qualcomm, and

- Misappropriating from the Trust to pay back the $390,000 money that his family and friends advanced that he used to meet his obligations in the 1998 Qualcomm stock acquisition.

**Kadisha's claims that he did not need to use the Trust asset because he had other money available is not credible.**

Kadisha's claims that he had other money available to him at the time of the Qualcomm stock purchase are not credible.  Although he testified that he transferred $750,000 from an offshore account to his Independence Bank account on July 1988, this is unbelievable (RT 89, 10-8-02).

---

Tellingly, Kadisha did not produce at trial a copy of the account statement showing the purported transfer. Instead, he called Parviz Semsar ("Semsar"), a former Independence Bank employee who testified, incredibly, that he remembered receiving the transfer – some 15 *years ago* from among the 300 *accounts* (including 50 hight net worth accounts) he was handling at the time. (RT 15, 2-23-04, RT 21, 2-23-04.) Semsar also testified that Kadisha deposited the overseas proceeds into certificates of deposit that remained at Independence Bank as of September 1988. (RT 17-19, 2-23-04.)

In addition to being incredible, Semsar's testimony is contradicted by the documentary evidence. Kadisha's January 27, 1988 financial statement (TE 35) reflects "cash overseas" of $650,000. The October 24, 1988 financial statement that Kadisha submitted to Imperial Bank (for purposes of the Imperial Loan) does not mention either an Independence Bank account or the purported certificates of deposit and reflects overseas deposits of $600,000. (TE 139.) Thus, if Kadisha had $650,000 in overseas cash on January 27, 1988, and still had overseas cash of $600,000 on October 24, 1988, he did not transfer $750,000 as he and Semsar testified.[24]

**Kadisha's actions at the time of the Qualcomm stock transaction are a more reliable indicator of his financial condition – and they are not the actions of a man with a surplus of cash.**

Kadisha's actions at the time of the Qualcomm stock transaction are a more reliable indicator of his financial condition – and they were not the actions of a man with a surplus of cash. The evidence shows that Kadisha was, in fact, short of cash and could not have completed the Qualcomm stock purchase if he had repaid Trust 2 the $428,000 he owed it. For example:

---

[24] ~~Semsar's testimony represents one of many instances of Kadisha's pattern of soliciting untrue or dubious~~ trial testimony from third-party witnesses.

- As of January 27, 1988, Kadisha had only $84,000 in cash in the United States. Kadisha never produced any evidence as to how much money he had in the United States as of August 8, 1988, and the Court infers from that, that the evidence would have been favorable of Kadisha. (TE 35.)

- He had $400,000 tied up in a loan to Stadco. (TE 35.)

- He paid exorbitant points and interest on the Namco Loan – 3 points and 13% on a 4-month loan. (TE 63.)

- He used the entire $500,000 of the Namco Loan proceeds for his personal needs within three weeks. (TE 68, 76.)

- On August 1, 1988, Kadisha was in default on the Namco Loan. (TE 97)  On August 8, 1988, when he entered into the Qualcomm stock purchase, Kadisha had not made the July 1 or August 1 payments on the Namco Loan. (TE 65c.)

- Kadisha did not pay the tuition for Izzet's and Joelle's schooling that was due by the end of June. (TE 61, TE 22, p. 1.)

- For several months in 1988, Kadisha did not pay Dafna the $20,000 a month she was entitled to under the terms of Trust 2. (TE 22.)

- In the Spring of 1988, Ominet was bankrupt and in danger of losing the rights to the technology that formed its core business. (TE 1776)

- Kadisha (alone of his partners) engineered his participation in the Broadway loan/Qualcomm deal so that he ended up with $390,000 in cash which he used to fund $136,000 of a $750,000 loan he was required to make as part of the deal. (The fact that Kadisha took out yet another loan shows that he needed additional cash *on the very day* of the Qualcomm stock purchase.)

---

**STATEMENT OF DECISION**

104

Exhibit 1
Page 110

- Kadisha did not produce an August 1988 bank statement for his Wells Fargo account at trial (although he did produce his Union Bank account statement for August 1988) to show what his balance was on August 8-9, 1988 after his purported deposit of the $390,000 he received from friends and family. His failure to produce the statement raises the inference that the $390,000 Kadisha eked out of the transaction represented substantially all of the funds in the account and that Kadisha could *not have* both repaid Trust 2 for misappropriated Namco Loan proceeds and come up with $136,000 to meet his obligations in the Qualcomm stock purchase.

- Kadisha was unable to repay the Namco Loan when it was due 21 days after the Qualcomm stock purchase, or when he received a strong warning memo from Hugo DeCastro on August 30, 1988, or when he used Trust 2's funds rather than his own to repay the Namco Loan in December 1988.

- In May 1988, when Kadisha, Parviz Nazarian and Younes Nazarian agreed to purchase the interests of Raminfar and Shoohed, partners in Omnin, Kadisha stated, **"...we certainly had no cash to spare."** (TE 1776).

- Kadisha (alone of his partners) engineered his participation in the Broadway loan/Qualcomm deal so that he ended up with $390,000 in cash, which he useed to fund $136,000 of a $750,000 loan he was required to make as part of the deal. (The fact that Kadisha took out yet another loan shows that he needed additional cash on the very day of the Qualcomm stock purchase.)

- Kadisha did not produce his August 1988 Wells Fargo Bank account statement (although he did produce his Union Bank account statement for August 1988) to show his balance on August 8-9, 1988 after his purported deposit of the $390,000 he received from friends

and family.  His failure to produce the statement raises the inference that the $390,000 Kadisha eked out of the transaction represented substantially all of the funds in the account and that Kadisha could not have both repaid Trust 2 for misappropriated Namco Loan proceeds and come up with $136,000 to meet his obligations in the Qualcomm stock purchase.

• Kadisha was unable to repay the Namco Loan when it was due 21 days after the Qualcomm stock purchase, or when he received a strong warning memo from DeCastro on August 30, 1988, or when he used Trust 2's funds rather than his own to repay the Namco Loan in December 1988.

• In December 1988, Kadisha did not have money of his own to loan to Qualcomm when Qualcomm needed money, and he had Trust 2 loan Qualcomm $300,000.

All of these actions speak volumes about Kadisha's cash *shortage* at the time of the Qualcomm stock purchase.  Kadisha benefited from continuing to hold Trust 2's $428,000 at the time of the Qualcomm stock purchase because the Trust's money made up for Kadisha's cash shortage.  (Kadisha had $428,000 more than he would have had if he had repaid Trust 2 for the misappropriated funds because repaying Trust 2 would have reduced his available cash by $428,000.)  Moreover, his actions demonstrate that he could not have both repaid Trust 2 for the misappropriated Namco Loan proceeds, as his fiduciary duties required him to do *before* pursuing his own interests, and fund his $136,000 obligation in the Qualcomm stock purchase.

///

///

///

---

**STATEMENT OF DECISION**

106

Exhibit 1
Page 112

**Kadisha benefited from the Use of Trust assets when he loaned Qualcomm $300,000 of Trust 2's money in an extremely risky investment in order to shore up his own Qualcomm holdings.**

The financial interests of Kadisha and his wife's family were tied to the success of Omninet. Omninet had a contract with Qualcomm under which Omninet produced Omnitracs, a satellite communications system. (TB 1776, Exhs. A&B.) The contract provided that if Omninet defaulted on its performance, ownership of the Omnitracs technology would go to Qualcomm. Kadisha believed that a default on the contract and loss of Omnitracs technology would have been the "death knell" for Omninet. (TE 16, 1753, 1754, 1755, 1776, p. 19 ¶¶2, 3, and 15.)

In the Fall of 1987, Omninet was in dire financial straits. Its attempts to raise equity capital were unsuccessful. By April 1988, it was insolvent and the shareholders were deadlocked as to how to raise additional capital. Kadisha, who was on the Board of Directors, recommended that it file for bankruptcy. In June 1988, Qualcomm sued Omninet for defaulting on the contract. In a last-ditch effort to save Omninet, Kadisha negotiated a sale of Omninet to Qualcomm.

Qualcomm was in equally dire straits – it was losing money and had only $200,000 in cash. In August 1988, Kadisha, Parviz and Younes agreed to purchase 3,156,000 shares of Qualcomm stock at $1 per share, loan Qualcomm $750,000 and guarantee certain other obligations to Qualcomm. This enabled Qualcomm to pay $4 million to purchase Omninet's assets, including the Omnitracs technology.

The Omninet acquision further weakened Qualcomm's finances. In November 1988, Kadisha (who was now a Qualcomm director) knew that Qualcomm was consistently losing money and needed additional funding to survive. Kadisha was strapped for cash himself and did not have funds to loan to Qualcomm. He had already expended all of the Namco Loan proceeds

for his own use and defaulted on the Namco loan.  Therefore, on November 23, 1988, Kadisha signed an agreement committing Trust 2 to loan Qualcomm $300,000.  Trust 2 at the time of the signing did not have a single dime to make the $300,000 loan since Kadisha had already stripped the Trust of its only cash (i.e., the proceeds of Namco Loan).  Only on December 7, 1988, after Kadisha used Dafna's home (the Strathmore Residence) as security for a totally unnecessary $2,000,000 loan from Imperial Bank, did Kadisha have the money to have Trust 2 make the $300,000 loan to Qualcomm.

There can be no doubt that Kadisha knew that Qualcomm was troubled financially and that it was a very risky loan.  In Kadisha's own words:

> "I was one of the investors who signed the Stock Purchase Agreement with Qualcomm, and I in fact purchased in excess of 660,000 shares for my own account pursuant to that Agreement.  I consider myself to be a knowledgeable investor.  **In my opinion, Qualcomm was an extremely risky investment.**  At that time, it had no proven products, and Omninet Corporation had been its major, dominant customer; Qualcomm was privately held, so that there was no secondary market for Qualcomm's shares; and Qualcomm's financial statements, attached to the Stock Purchase Agreement, showed that Qualcomm had consistently lost money – indeed, it had lost over $3.6 million in the first ten months of fiscal 1988."

And:

> "The Court should recognize that we did not simply step out of Omninet and into a lucrative investment with Qualcomm.  Quite the contrary is true.  **I have been a director of Qualcomm since my initial investment pursuant to the Stock Purchase Agreement in August 1988.  For over three years, Qualcomm's very survival was questionable.**  During that time, Qualcomm's losses continued to mount, and I considered my entire investment to be a substantial risk of loss."

Tellingly, Kadisha never advised Dafna of the $300,000 loan.  (RT 76, 1-21-03.)  Nor did he seek DeCastro's advice about the propriety of the loan or his obvious conflicts of interest. The $300,000 loan violated DeCastro's advice to Kadisha that:  (1) a trustee cannot receive even

incidental benefits in connection with trust transactions, (2) a trustee must avoid actual or potential conflicts of economic interest with the Trust or its beneficiaries, (3) a trustee must keep the trust beneficiaries reasonably informed about the trust's activities, (4) prior to taking any controversial or uncertain action, Kadisha should seek court approval; and (5) Kadisha should seek legal advise and, where appropriate, petition the court for instructions if there were any questions regarding the propriety of a particular act under Kadisha's fiduciary obligations as a trustee.  (TE 122.)

The loan was exceedingly risky and was not a loan that any reasonable trustee would have made; the loan violated the terms of the Trust; Qualcomm was losing money; Kadisha's own Qualcomm investments were at risk, and he loaned Trust 2's money to Qualcomm to shore up his own Qualcomm holdings and to fulfill his duties as a Qualcomm director to raise money.

The only conclusion that can be drawn from the evidence is that the loan was made for Kadisha's benefit, since it is evident that the loan was not made for Dafna's benefit, and Kadisha was the only other person who stood to benefit from the loan.  Kadisha's loan of $300,000 to Qualcomm was made for one purpose only – to help protect Kadisha's interests which were vitally connected to Qualcomm's continuing viability.  This was a conflicted situation where Kadisha acted to obtain necessary cash for Qualcomm, leaving Trust 2  with a long shot that would out shadow anything offered at Santa Anita.

| **FARAHNIK TIME LINE** | |
|---|---|
| January 11, 1988: | The trust instruments are executed. |
| February 8, 1988: | Kadisha draws down $85,000 from his Union Bank line of Credit and deposits it into his personal Union Bank account. |
| February 8, 1988: | Kadisha deposits $3,000 into his personal Union Bank Account. |

| FARAHNIK TIME LINE (CONT'D) | |
|---|---|
| February 10, 1988: | Kadisha loans Farahnik $75,000 from Hisunien Bank account (See February 8, 1988 above). |
| February 26, 1988: | The final version of the Trust instruments are executed. |
| March 3, 1988: | Kadisha draws down $100,000 from his Union Bank line of credit and deposits it into his personal Union Bank account. |
| March 18, 1988: | Kadisha draws down $55,000 from his Union Bank line of credit and deposits it into his personal Union Bank account. |
| March 18, 1988: | As of this date, Kadisha has drawn down $240,000 on his Union Bank line of credit consisting of: (i) $85,000 on February 8, 19888, (ii) $100,000 on March 3, 1988; and (iii) $55,000 on March 18, 1988). |
| March 24, 1988: | Kadisha loans Farahnik $76,000. If Kadisha had not drawn down the $155,000 (consisting of $100,000 on March 3, 1988 and the $55,000 on March 18, 1988) his Union Bank account would have been overdrawn approximately $19,000, and he would have been able to loan Farahnik $76,000. |
| April 5, 1988: | Kadisha loans Farahnik $70,000 bringing the total loans to $221,000 ($75,000 on February 10, 1988; $76,000 on March 24, 1988; and $70,000 on April 5, 1988). On these funds, only $151,000 came from Kadisha's Union Bank line of credit ($75,000 on February 10, 1988 and $76,000 on March 24, 1988). |
| April 1988: | Kadisha causes Trust 2 to apply for a $500,000 loan from Namco to be secured by the Strathmore Residence. |
| May 17, 1988: | Kadisha deposits the $500,000 Namco Loan proceeds into his personal Union Bank account. |
| May 26, 1988: | Kadisha uses $240,000 of the $500,000 Namco Loan proceeds to repay Union Bank the $240,000 he had drawn down in February and March 1988 from his line of credit, of which $151,000 was loaned to Farahnik. |

Kadisha used trust assets to acquire 30,000 shares of Qualcomm stock from Farahnik (Which has nothing to do with Farahnik's original purchase thereof by money other than from either Trust 1 or 2).

One of the principal claims of Petitioner Dafna Uzyel relates to Kadisha loaning money to Farahnik—which he used to buy Qualcomm stock—and to subsequent forgiveness by Kadisha of the loan money due him in exchange for receiving 30,000 shares of Qualcomm stock. The Petitioner contends the two transactions between Kadisha and Farahnik resulted in damages to Petitioner because Trust 2's money was used by Kadisha to (1) make the original loans to Farahnik by which he was able to purchase the subject shares of Qualcomm stock, and (2) the second claim of Petitioner Dafna Uzyel that Kadisha used some of Trust 2's money to acquire the subject shares of Qualcomm stock is valid. The first claim is not.

While Petitioner Dafna Uzyel would have it in respect to the first claim that Kadisha had his eye on Trust 2's probable assets at the time he loaned Farahnik the $76,000 on March 24, 1988 and $70,000 on April 5, 1988, such contention is without proof, falling into the legal junkyard of speculation.

The second claim is valid.

Kadisha loaned Farahnik a total of $221,000. (The $7,000 and the $76,000 loans totaling $151,000) were funded by Kadisha's Union Bank line of credit advance—which was repaid with Trust 2's funds when Kadisha misappropriated the $500,000 Namco loan proceeds (the property of Trust 2) for his own use. The court finds beyond any doubt the acquisition of the subject 30,000 shares of Qualcomm was enabled by Kadisha embezzlement of practically all the subject Namco loan proceeds. The damages are detailed subsequently under the Damages section.

///

---

STATEMENT OF DECISION

111

Exhibit 1
Page 117

## DAMAGES

"Equitable relief is flexible and expanding, and the theory that 'for every wrong there is a remedy' (CC 3523) may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs" (See Witkin, 9th Ed. Vol. 11, Equity #3, pg. 681). By classification, this case falls within the jurisdiction of the probate court which can fashion an equitable remedy against a trustee who has breached his lawful duties to the beneficiaries and caused them damages or the right to a constructive trust of assets acquired by trust money.

Kadisha's reliance on certain terms of trust agreements as escape hatches to relieve himself of his numerous derelictions as trustee and damages resulting therefrom is, as stated elsewhere in this opinion, totally lacking in merit as the trust agreements are the product of fraud by the respondent.

Respondent contends that Petitioners have not presented any "damage model" upon which the Court can calculate damages. Although it is unclear what Respondent means by a "damage model," the evidence, case law and common sense provide an adequate basis for calculating Petitioners' damages. Respondent's argument is also belied by the fact that Respondent presented his own formulas for calculating damages, in the event the Court awarded them.

"Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty." (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District 1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 371, and *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778]) "**The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.**" (Emphasis

added; *Id.* At p. 874, citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) "**This is especially true where…it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits…or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.**" (Emphases added; *Id.* Citing *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140; *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12 and *James v. Herbert* (1957) 149 Cal.App.2d 741, 749.) The selection of which measure of damages to apply is within the sound discretion of the trier of fact. (Id.)  The measure that most appropriately compensates the injured party for the loss sustained should be adopted.  *Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740, 749.

Furthermore, this is a court of equity and:

"The object of equity is to do right and justice. It 'does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.' 'It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.' [Citations omitted.] 'The powers of a court of equity, dealing with the subject-matters within its jurisdiction, are not cribbed or confined by the rigid rules of law. From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees. It is the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions.' [Citation omitted.] Equity acts 'in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.' [Citation omitted.]"

*Toscano v. Green Music* (2004) 124 Cal.App.4th 685, 693-694.

The Court has been cognizant of these principles in arriving at its damages award on the following claims.

The Court is using the date of September 18, 2000 as the date for determining Petitioners' damages on certain of their claims.  This was the last day upon which Kadisha turned over Trust assets to Petitioners.  Therefore, the assets were under Kadisha's control and subject to his fiduciary duties until September 18, 2000.

During trial, Kadisha attempted to introduce evidence about what happened to the assets once Petitioners regained control of them.  The Court ruled that such evidence was irrelevant. Kadisha's argument in support of introducing the evidence was, in substance, that Petitioners should have done something after he turned over the assets to them to mitigate, for example, the $10 million loss Petitioners suffered when he stood idly by while the value of Trust 1's Qualcomm stock plummeted.  In other words, Kadisha is looking to Petitioners as if they have a fiduciary duty to him to cure his intentional breaches of duty.  This is another of Kadisha's attempts to blame the victim and the Court rejects it.  Kadisha had control of the assets until September 18, 2000, they were subject to his fiduciary duties until then, and that is the date the Court is using to calculate damages. *see amendment*

## Damages: Re $300,000 loan to Qualcomm from Trust 2.

Since it is evident that the loan was not made for Dafna's benefit, and that Kadisha was the only other person who stood to benefit from the loan, the only conclusion that can be drawn is that Kadisha made the loan for his own benefit; Qualcomm was losing money; Kadisha's own Qualcomm's investments were at risk, and he loaned Trust 2's money to Qualcomm to aid Qualcomm, which in turn would improve his holdings of Qualcomm stock.

Kadisha is incorrect when he argues that he should be excused from liability because of the high rate of return earned by the $300,000 loan to Qualcomm.  The loan was an extremely bad gamble by Kadisha and violated every investment rule for trustees in the book.  But Kadisha

got lucky and the gamble paid off.  Naturally, Kadisha expects to be rewarded, and all his derelictions excused because of one lucky bet, but such is not the case.  Otherwise, trustees would be given license to steal millions of dollars but be excused by some lucky bet.  No such license is issued by any decision.

In fact, the opposite is true.  Probate Code section 16440 gives courts discretion to excuse a trustee from liability only where the trustee has acted reasonably and in good faith, and it would be equitable to excuse the trustee's liability.  In fact, Kadisha *intentionally* set out to take advantage of Dafna's inexperience and lack of sophistication to gain control over the trust assets so that he could use them for his own benefit.  Subjecting Dafna and her children to such extreme risk in a conflicted transaction to loan Qualcomm $300,000 made purely to protect his own investment – when Kadisha knew that Dafna was utterly incapable of replenishing the Trust principal if this risky investment failed – was neither reasonable nor in good faith.  Kadisha never stopped to consider the welfare of Dafna and her children.  He was solely interested in his own financial welfare, and there is no evidence of any instances in which Kadisha acted in the beneficiaries' interests.  There is *no* evidence that Kadisha acted reasonably and in good faith.

Nor did Kadisha provide any financial analysis to show how Trust 2's $300,000 loan to Qualcomm would actually contribute to generating the required monthly distributions.  Qualcomm was a private company and losing more money than it was able to make or raise from investors.  There was thus no performance or financial data from which to project what the future value of Trust 2's $300,000 loan would be and therefore how it would enable Trust 2 to make $20,000 monthly distributions to Dafna.  In fact, because Kadisha agreed to defer interest on the loan to help Qualcomm, Trust 2's ability to generate the monthly distributions was *reduced by* the $300,000 loan, not enhanced.

---

**STATEMENT OF DECISION**

Exhibit 1
Page 121

Kadisha also incorrectly contends that Qualcomm did not need Trust 2's money because it could raise all of the cash it needed, and that Kadisha did not, therefore benefit from Trust 2's loan to Qualcomm.  The evidence is exactly the opposite – Qualcomm was losing money, it needed additional working capital that it could not raise, and it needed Trust 2's $300,000.

Entering into the $300,000 loan transaction with Trust 2, which provided the beneficial right to acquire 37,500 shares of Qualcomm stock at $8 per share, is one indication that Qualcomm was *not* wallowing in cash, as suggested by Kadisha, particularly since Qualcomm made repayment of the loan a five-year obligation with deferred interest.

As well, at the time of Trust 2's loan on December 7, 1988, Qualcomm's liabilities (including its payroll and short-term payables) exceeded its available cash by millions of dollars. Qualcomm was consistently losing money.  Its financial position had been further weakened by the Omninet transaction.  On the date of Trust 2's loan, December 7, 1988, Qualcomm's August 20, 1988 "Series A" offering had not raised all of the money Qualcomm needed.  In fact, the evidence was that as of December 1988, Qualcomm had raised only $300,000 in addition to Trust 2's loan.  In February 1989, Qualcomm amended its "Series A" PPM.  The amended PPM disclosed that a substantial portion of the money that had ultimately been raised came from officers and directors, not unaffiliated third parties.  It also admitted that there was no assurance that Qualcomm would be able to raise all of the financing it needed.

Kadisha, as a director, was intimately familiar with these facts.  The evidence of Qualcomm's financial conditions shows that the $300,000 loan was so risky that no faithful trustee would have made it.  The evidence amply supports the inference that Trust 2's $300,000 contribution was looked for aid by Qualcomm in its financial dilemma.

**STATEMENT OF DECISION**

Exhibit 1
Page 122

Petitioners were not required to show precisely what Qualcomm did with Trust 2's money, as Kadisha contends.   Since money is fungible, it would have been impossible for Petitioners to determine precisely how Qualcomm used their $300,000.  It is abundantly clear, however, that Qualcomm needed additional cash to survive.  In each of its PPM's between August 20, 1988 and August 24, 1989, Qualcomm consistently indicated that even if it raised the money sought, it would need more money, and it was uncertain whether it would be able to raise enough money to continue operating.  The evidence is thus clear that Qualcomm was struggling to survive, that it needed more money, that Kadisha knew it needed more money to survive, and, that during this period he loaned it $300,000 of Trust 2's money.  Moreover, Petitioners are aided by the presumption of Probate Code section 16004(c).  They established that Kadisha breached his fiduciary duties by making the $300,000 loan for his own benefit.  The burden then shifted to Kadisha to show that he did not benefit from the loan.  Kadisha failed to meet this burden.

Kadisha incorrectly contends that the loan was a permissible exercise of his fiduciary duties because only a small percentage of the Trust's principal was at risk.  Kadisha is wrong.  The loan was a conflicted transaction that breached his fiduciary duties regardless of whether it involved 10% or 100% of the value of the Trust assets.  Moreover, Kadisha also misappropriated the rest of the Imperial Loan proceeds for his own use so the $300,000 loan was Trust 2's only documented asset (other than the now heavily mortgaged Strathmore Residence).

Kadisha's claim that he is entitled to the protection of the conflict of interest provision in the Trust is equally far fetched.  The Court finds that the conflict of interest provision, and others, are unconscionable as created, and Kadisha therefore cannot rely on them.

Kadisha also testified that he was forced to make such a risky investment to meet the terms of the Trusts, which required him to make $20,000 monthly distributions to Dafna. As previously noted, the Court is disregarding Kadisha's testimony. As well, Kadisha was regularly consulted throughout the preparation of Trust 2, and he expressly agreed to be bound by its terms. If he thought that the Trust's assets were not substantial enough to generate monthly $20,000 distributions through conservative investments, why did he agreed to be bound by the requirement that the trust estate be conservatively invested, "with primary consideration being given to preserving principal. Kadisha did not offer any credible evidence that in December 1988 when the loan was made, the trust's assets were too unsubstantial to make the required distributions to Dafna with conservative investments.

Having determined all of the above, the Court is unable to find Petitioner's claim for damages in the sum of $19,202,211 as being Trust 2's proportionate share of Kadisha's Qualcomm stock transactions, plus prejudgment interest from September 20, 2000. The method of calculation is unsupportable proof of damages. What the Petitioners would do is take the percentage $300,000 was at the time of the loan to the total cash investments of Kadisha and determine this to be 22.86%. This percentage was taken by adding Kadisha's Qualcomm stock investments as $662,000, $250,000, $100,000 and the $300,000 for a total of $1,312,000. The $300,000 is 22.86% of the $1,312,000. But while practically everything Kadisha did in his so-called management of the Trusts was done by embezzlement of trust money for his own interests and without regard to any of his obligations as trustee his gain in loaning the $300,000 has not been shown by Petitioners, even by the use of power-point boards, which Yossi Vardi, a tech investor and distinguished prankster from Israel remarked: "Power Point presentations damage

your brain. If you look at too many, you become immoral." The court did not look at too many but enough to discount Petitioner's theory of damages by the formula above described.

The court is not denying that Kadisha benefited Qualcomm in some degree by the $300,000 loan but it was hardly the economic lifeline the Petitioners would have it. And Kadisha probably benefited himself in the eyes of Qualcomm's Board of Directors by showing his dedication and financial acumen in obtaining the $300,000 for Qualcomm. And obviously in some hardly calculable measure increased the value of his Qualcomm stock. But saying the foregoing does not equate to proof of damages suffered by Trust 2 in Kadisha's making of the subject $300,000 loan.

Petitioner's claim for damages against Kadisha for his loaning $300,000 of Trust 2's money acquired by Kadisha in the making of the Namco loan is denied.

### Damages:  Re the Farahnik loan, funding by Trust 2, and Acquisition by Kadisha.

Because Kadisha used a portion of the Namco Loan proceeds (the property of Trust 2) to wipe out his obligation to Union Bank, there was clearly substitute funding of $112,302 of the Farahnik loans by the use of Trust 2's money. Kadisha, by his actions and conduct, had to know that what he was doing with Trust 2's money was wrongful. He abstained from making any note to trust 2 concurrent with his taking of the Namco Loan proceeds. He never had a note signed by Farahnik to Trust 2 concurrent with Kadisha paying off Union Bank with Trust 2's money. He gave six different, incorrect explanations for what he did with the Namco Loan proceeds prior to trial to prevent Petitioners from discovering that he had used a portion of the proceeds to pay off his Union Bank line of credit for funds he had borrowed to loan to Farahnik.

Under the circumstances of this case, the idea that Kadisha, being guilty of perjury among other misdeeds as trustee, can suggest that he should be the total beneficiary of millions of dollars of profit on the 30,000 shares of Qualcomm stock he acquired from Farahnik made possible by the use of Trust 2's money is unbelievable. He would have it that Dafna and her children are well rewarded by his paying 13% on the money he took from Trust 2 via the Namco Loan. Equity is shocked by such a conception of justice. It is tantamount to rewarding a thief for stealing money. Kadisha must instead disgorge any profit, benefit or advantage he acquired through his dealings with trust assets.

Petitioner Dafna Uzyel is awarded $15,818,000, plus prejudgment interest at 10% per annum from September 19, 2000. The amount is calculated as follows:

Petitioners are entitled to a proportionate share of the 30,000 shares. The court arrives at the $112,302 figure by first determining that $151,000 is part of the amount Kadisha wrongfully stole in taking practically all the $500,000 Namco loan proceeds for his own use. But the court is giving Kadisha credit for $38,698 of his own money ($10,000 being highly questioned by Petitioners, who contend he got $10,000 of Trust 2's money and used it for his own purposes) which reduces the Petitioner's correct contention that the $112,302 was used by Kadisha in the acquisition off the subject 30,000 shares of Qualcomm stock and said stock so acquired is their property or they are entitled to damages equal to the value of the stock and its progeny as of the date of termination of the trusts in September 2000. Damages are computed as follows: Using the 17,540 shares as acquired by Trust 2 by Kadisha's use of Trust 2 money there followed stock splits bringing the total stock held by Kadisha from 30,000 to 480,000 shares in September 2000. Applying 53.48 percent to 480,000 reveals Trust 2 owns or is entitled to the value of 256,704 shares which multiplied by $61.62 a share (being the lowest price between September 14 and

---

**STATEMENT OF DECISION**

Exhibit 1
Page 126

September 18, 2000) brings the value of the subject shares to $15,818,000.  Petitioner Dafna Uzyel is awarded $15,818,000 as damages, plus interest at 10% per annum from September 18, 2000.

The Court rejects Kadisha's  reason for asserting that the percentage of Trust 2's shares should be other than 53.48% is that the consideration for Kadisha's acquisition of the misappropriated shares was $221,000 rather than $210,000.  The Stock Purchase and Sale Agreement between Kadisha and Farahnik for the acquisition of the misappropriated shares specified consideration of $210,000.  There is no evidence that the consideration for the shares was $221,000.

**Damages – Kadisha's 1992 Sale of Trust 2's 37,500 Shares of Qualcomm Stock:**

Kadisha was self-dealing when he sold Trust 2's assets when he sold Trust 2's 37,500 shares of stock in May 1992.  He needed money for his own use, being under substantial financial pressure.  But this time, he did not use any "loan" or "investment" acknowledgement of his taking.  Instead, he concocted a phony loan of $1,400,000 to a real or fictitious person by the name of David Rahban who reputedly lives in Switzerland or Israel.  He might just as well be living on the moon or on Mars with an odd-shaped head.  Nothing by way of a note, letter, address, security or usual evidence of a loan has been provided by Kadisha.  The Court finds Kadisha is not telling the truth.  That in fact, he just took the money for his own use.  That in addition to the $1,400,000, he took $1,200,000 with the same phony ploy that it was a loan to Rahban.  Good story telling is not a major or credential of Kadisha.  He does it badly.  Theresa Makhaili, Kadisha's assistant, gave untrue testimony on direct examination to support Kadisha's untrue testimony about the Rahban loan.  However, she admitted on cross-examination that she

never knew Rahban, never saw a promissory note from Rahban, and never had an address for him. Mikhaili, who kept the Trust records, also admitted on cross-examination that she did not make the entries on the Trust accounting that showed Rahban's purported $1.4 million loan, or his alleged payments. The Court finds that Kadisha and Mikhaili are not telling the truth when they claim that Kadisha loaned $1.4 million to Rahban. That in fact Kadisha sold Trust 2's Qualcomm stock solely for his own benefit and took the proceeds of the sale, along with other Trust funds, for his own use in the guise of the phony loan to Rahban.

The May 1992 sale and the Rahban loan represent two separate transactions (albeit closely related ones) and different damages pertain to each. The May 1992 sale violated Kadisha's fiduciary duty of loyalty, his duty to refrain from using Trust assets for his own purposes, his duty to keep the Trust assets separate from his own, and his duty to prudently invest Trust 2's assets. (The "Rahban" loan is dealt with in the section in the decision on Kadisha's misappropriations.) Although courts generally do not like to second-guess a trustee's investment decisions, Kadisha's self-dealing in selling Trust 2's Qualcomm stock to raise cash for his own use did <u>not</u> constitute prudent investing. Furthermore, Kadisha did not consult with an investment advisor about the advisability of the sale, or invest or diversify the sale proceeds (he embezzled them instead), or tell Dafna about the sale either beforehand or afterwards.

Petitioners have also raised the issue of Kadisha's bad faith in selling Trust 2's Qualcomm stock for his own use. There is no question that Kadisha had an ever-present, continuing appetite for the use of trust assets for his own benefit. This is crystal clear. But when Kadisha sold Trust 2's stock at its then market value for his own beneficial use, was this "bad faith?"

"Bad faith implies or involves actual or constructive fraud, or a design to mislead or deceive another, or a neglect to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interest or sinister motive. The term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong, because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or ill will." Black's Law Dictionary; 5th Edition.

Kadisha breached his fiduciary duties in many ways, including, but not limited to using trust assets for his own benefit. Selling Trust 2's Qualcomm stock to raise cash for his own use and concocting the fiction of the Rahban loan to cover up his embezzlement of the sale proceeds were conscious doings of wrong. Kadisha was not merely negligent. His purpose was dishonest. His acts were the turning aside of moral conduct. In short, they were in bad faith – and they breached Kadisha's duty to treat Trust 2's beneficiaries with the *utmost* good faith.

Probate Code section 16440(a) provides that if a trustee commits a breach of trust, he is chargeable with any of the following that is appropriate under the circumstances: (1) any loss or depreciation in the value of the trust estate resulting from the breach of trust, with interest; (2) any profit made by the trustee through the breach of trust, with interest; or (3) any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

Kadisha's actions in selling Trust 2's Qualcomm stock in 1992 with no economic justification and for his own benefit resulted in a loss to the value of Trust 2, and/or lost profits, because of the subsequent increase in the value of Qualcomm stock. By absconding with the sale proceeds, Kadisha also foreclosed Trust 2's ability to make other profitable investments. That opportunity was lost to Trust 2 forever. In addition, because Kadisha sold Trust 2's stock to

raise the cash he needed, he did not have to sell his own stock. He therefore profited from the appreciation of *his* stock but prevented Trust 2's beneficiaries from similarly profiting from the appreciation of *their* stock.

The Court cannot excuse Kadisha from liability for the Trust's loss (and his corresponding gain) under Probate Code section 16440(b). That section states: "If the trustee has acted *reasonably and in good faith* under the circumstances as known to the trustee, the Court, in its discretion, may excuse the trustee in whole or in part from liability under subsection (a) *if it would be equitable to do so.* Kadisha did not act reasonably or in good faith in selling Trust 2's Qualcomm stock for his own purposes and attempting to conceal his wrongdoing in the fraudulent guise of the Rahban loan. Kadisha therefore cannot be excused from liability for Trust 2's loss from his self-dealing sale of its Qualcomm stock (or for his corresponding gain).

Accordingly, on this claim, the proper measure of damages is $35,389,242, plus prejudgment interest from September 19, 2000. This is calculated as follows.

Kadisha improperly sold 37,500 shares of Trust 2's Qualcomm stock in May 1992 for $801,000. Interest on the $801,000 as of September 18, 2000 was $781,750 (using 13% interest from May 1 1992 until November 30, 1996 and 10% thereafter.) Petitioners' total benefit from the May 1992 stock sale was therefore $801,000 plus $781,750 or $1,582,758 ("Petitioner's 1992 Sale Benefits"). On September 18, 2000, 37,500 shares, after stock splits, had grown to 600,000 shares. Using the stock price of $61.62 per share that the Court has used on other claims, the 600,000 shares were worth $36,972,000 on September 18, 2000. After deducting Petitioners' 1992 Sale Benefits ($1,582,758) from $36,972,000, the damages are $35,389,242.

Exhibit 1
Page 130

In considering what measure of damages to assess against Kadisha for his many derelictions as trustee, the Court is fully aware of his effort to have the court ignore the totality of his conduct, which reveals his complete pattern of treating Trust 2's assets as those which he could embezzle and use for his own purposes, and have the court focus on denial of each embezzlement, converting each to some sort of minor transgression of his trustee's duties. The compartmental device of Respondent's as a cover-up is not acceptable to the court as a blind-sided approach. This is not to say the court ignores analyzing each of the claimed abuses of his trust as alleged by the Petitioners but such analysis may reveal a pattern of conduct that produces a true picture of Kadisha's embezzlement driven takings. A look below the surface of the veneer of his argument reveals the truth.

Petitioners, in seeking damages elect to ignore the sale of the 37,500 shares and treat it as though it had never happened, contending Kadisha's sale was a part of his intent to embezzle Trust 2's money, and, therefore, the Court must treat the sale as not having been made, and the stock should have been held until the termination of Trust 2 when it was worth $35,389,942.

The truth of the business is that Kadisha needed money, and this is plainly obvious as he then made the fictitious "loans" to Rebhan. They were nothing more than a clear integral part of the embezzlement by Kadisha of Trust 2's money.

Kadisha's defense is that all is forgiven once he repaid the Rebhan embezzlements and paid interest thereon. As empathized herein, Kadisha as embezzler does not determine when he is to return the embezzled money or what penalty shall be imposed upon him for his embezzlement. The Petitioners have the option on how to treat the embezzlement. They were never consulted about the sale and obviously Kadisha did not suggest the Petitioners seek legal

advice about the sale.  So Petitioners have every right to contend we are seeking damages against you for the amount of money our Qualcomm stock was worth had you held it until your control over the trusts were terminated.  Hence, the Petitioner Dafna Uzyel is awarded $35,389,242 in damages as computed above, plus interest at the legal rate of 10% per annum as andd from September 18, 2000.

### Damages:  Kadisha's Misappropriations of Trust Funds.

The Uzyel Trusts provide that:  (1) [t]he principal of the Trust estate be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, (2) within such guidelines to maximize the income from the trust estate, and (3) the trustee may lend money at an adequate interest rate and with adequate security.

Kadisha's misappropriation of millions of dollars of trust money from 1988 to 1996 were not loans made at an adequate interest rate or with adequate security, as Kadisha contends. Kadisha embezzled the funds in flagrant violation of his fiduciary duties.  In fact, Kadisha could have been charged under the Penal Code for Grand Theft (Penal Code section 487) for embezzlement for his misappropriations.  Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been entrusted."

Fortunately, this does not require the Court to forego awarding damages, as Kadisha erroneously contends.

Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty. (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District,

1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 317 and

*Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778].) **"The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."** (Emphasis added; *Id.* At p. 874, citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) **"This is especially true where…it is the wrongful act of the defendant that have created the difficulty in proving the amount of loss of profits…or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled."** (Emphasis added; *Id.* Citing *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140; *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12, and *James v. Herbert* (1957) 149 Cal.App.2d 741, 749.) The selection of which measure of damages to apply is within the sound discretion of the trier of fact. (Id.) The measure that most appropriately compensates the injured party for the loss sustained should be adopted. *Strebel v. Brenlar Investments, Inc., supra,* 135 Cal.App.4th at p. 749.

Furthermore, this is a court of equity and:

> "The object of equity is to do right and justice. It 'does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.' 'It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.' [Citations omitted.] 'The powers of a court of equity, dealing with the subject matters within its jurisdiction are not cribbed or confined by the rigid rules of law. From the very nature of equity, a wide play is left the conscience of the chancellor in formulating his decrees. It is of the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions.' [Citation omitted.] Equity acts 'in order to meet the requirements of every case, and to

---

**STATEMENT OF DECISION**

Exhibit 1
Page 133

satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.' [Citation omitted.]"

*Toscano v. Green Music, supra,* (2004) 124 Cal.App.4th 693-694.

In the case before the court, prime consideration must be given to section 16440 of the Probate Code. It provides, in pertinent parts, as follows:

"(a)    If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances.

(1)    Any loss or depreciation in value of the trust estate, with interest.

(2)    Any profit made by the trustee through the breach of trust, with interest.

(3)    Any profit that would have accrued to the trust estate if the loss of profit is the result of breach of trust."

It is the Respondent's position that "Whether takings were unauthorized "loans" or even outright "looting" makes no difference -- the liability is limited to 10% simple interest."

The Respondent's position requires analysis.

The Respondent ignores Section 16440, Section (a)(1). This section clearly states the trustee is liable for "any loss or depreciation in the value of the trust estate, with interest."

There are clearly two factors, i.e., (1) the loss, and (2) the interest on the loss. Obviously, if the trustee lost thousands of dollars for which he is liable, the loss is not reduced to simple interest at 10%. The interest accrues on the money lost. The statute so states, "with interest."

With the foregoing in mind, how can the court fix loss or profit by Kadisha's unlawful takings of trust money?

The Petitioners gear the Petitioners' right to damages under the claim the Petitioners lost money by Kadisha's takings in that the 13% interest rate Kadisha set as his idea of a fair return should be disregarded in favor of the court determining from the evidence that a higher amount than just interest (the 13%) should be paid upon the evidence presented that high quality second trust deeds, at the time of the takings, were paying 15%, plus five points.

Two experts were presented, Charles Bercy for Petitioners and George Katzer for the Respondent. Bercy had 2nd Trust Deeds paying 15%, plus five points. Katzer had 2nd Trust Deeds paying 11 to 13% and three to six points.

But no matter how you cut or slice it, Petitioners are talking about interest on money used wrongfully by Kadisha. The loss element is not present as contemplated by the statute which contemplates action by the trustee in dealing with a trust asset improperly causes a loss. The loss is recoverable, plus interest. The failure to maximize interest on money taken is not the kind of loss contemplated by the statute. Obtaining interest on money is a value judgment requiring many considerations not the least of which is the security, if any, supporting the loan. Second trust deeds require acute attention to the value marketability of the subject property and the percentage of that figure which the first trust deed represents. And the holder of the second must be able to cover or take over the first trust deed. And always, there is the haunting question of a real estate slump substantially reducing the market value of the property, placing second trust deeds in jeopardy. The bottom line as to second trust deeds buyers is whether the interest rate (and perhaps points) is commensurate with the risk. So it is really all about interest and being

about interest.  There is no compensable "loss" under the terms of Probate Code 16440(a)(1)(2) by the Respondent not investing in second trust deeds as opposed to his paying 15%.  Hence, Petitioner's request for damages arising out of Respondent's failure to pay the equivalent second trust deed interest rates (and points) on the money he purloined from the trusts is denied. Petitioners are entitled to 10% percent simple interest on the money taken, but Kadisha gets no credit for his paying the excess over 10%, i.e, three percent.

RE:  KADISHA'S FORFEITURE OF ANY RIGHT TO ENFORCE ANY PROVISIONS IN ANY OF THE TRUST INDENTURES AGAINST THE PETITIONERS.

Kadisha is grossly in error when he says that he was allowed to make loans to himself because of the Trusts' conflict of interest clauses.

Civil Code section 1670.5 provides that if a court, as a matter of law, finds that a contract or any clause of the contract was unconscionable at the time it was made, it may refuse to enforce the contract or the unconscionable clause, or limit the application of an unconscionable clause so as to avoid an unconscionable result.  The Court may also enforce the remainder of the contract.  This section applies either directly or by analogy to the Trusts.

In determining whether a provision is unconscionable, the Court must look to the facts at the time the instrument was executed.  The facts at the time the Trusts were executed are as follows.

After her husband's death, Dafna was under Kadisha's influence, dependent on him and in a confidential relationship with him.  Dafna needed legal advise, and Kadisha referred her to his own attorney, Hugo DeCastro.  Even prior to being appointed Trustee, DeCastro

---

**STATEMENT OF DECISION**

130

Exhibit 1
Page 136

communicated almost exclusively with Kadisha about the status of Dafna's assets rather than Dafna. After Kadisha was chosen to be the trustee, DeCastro represented both Kadisha, as trustee, and Dafna, as the settler. As a result of his firm's involvement with the financially troubled Omninet, DeCastro also knew that Kadisha needed money. DeCastro never represented Dafna with the requisite undivided loyalty and never fully protected her from Kadisha's need for money and the penchant for avoiding his legal and ethical duties. In fact, he promoted Kadisha's interests over Dafna's.

The purported exculpatory provision and the conflict of interest provisions are prime examples. As to the conflict of interest provisions, DeCastro knew that Kadisha needed money to support his various business interests – particularly the failing Omninet. This knowledge should have prompted him to craft Trust provisions that protected Dafna and her children from Kadisha using Trust funds to satisfy this need. Instead, he did the opposite by inserting conflict of interests provisions into both Trusts that Kadisha interpreted as invitations to use the Trust assets exclusively for his own benefit.

In fact, there is an even more fundamental issue as to why Trust 2 was set up in the first place. Only Trust 1 (which was established for Izzet's and Joelle's benefit) was a condition to the settlement with Lillian Nomaz. Dafna was not required by the settlement (or any other reason) to limit her access to her own assets by placing them in a trust. An attorney who was protecting Dafna's interests would undoubtedly have pointed that out to her. Instead, Dafna's assets wound up in Trust 2, under the control of Kadisha, who DeCastro knew needed money. There can be no doubt that DeCastro was acting in Kadisha's interests rather than Dafna's in establishing Trust 2.

STATEMENT OF DECISION

131

Exhibit 1
Page 137

The egregiousness of DeCastro's improper favoritism towards Kadisha is amplified by the fact that Dafna was incapable of understanding DeCastro's conflict of interest, the danger that that conflict of interest posed or any of the Trust provisions.  (DeCastro never even informed Dafna of the conflict.)  Dafna was thus essentially unrepresented, incapable of understanding the Trust provisions, and a victim of Kadisha's plan to gain control of her assets and DeCastro's acquiescence in Kadisha's plan.

The Court is not going to set forth all the sections of the various trust agreements that cannot be enforced by the Respondent due to the facts Mrs. Uzyel was never independently represented.  DeCastro, her purported lawyer in the making of the original agreements, was never really her lawyer.  He was Respondent's lawyer and was grossly conflicted, exhibited by his including covenants against her interest.  There are two major ones, the first allowing the Respondent to engage in conflict of interest transactions; and the second being an exculpatory clause holding the Respondent harmless for his conduct as trustee.  There is no need to mention the others unless Respondent attempts to rely upon same.  All sections against Mrs. Uzyel's interest shall be disregarded and declared void.  While there is evidence amendments to the trust agreements were prepared by counsel, they exhibited their desire not to be accused of creating such outrageous documents by leaving their name off of same.  But with or without the name of counsel, they are outrageous and no provisions of any of them may be enforced against Mrs. Uzyel.  They are void as to enforcements against her.

The Court has already indicated that Kadisha's misappropriations were not "loans" as he insists on calling them.  Even if they were loans, they violated the terms of the Trusts because they were unsecured.  Contrary to Kadisha's contention, the $5 million dollar life insurance policy that he took out naming the Trusts as beneficiaries did not constitute adequate security

since it only protected the Trusts in the event Kadisha died. This was highly unlikely since Kadisha was only in his thirties at that time. The real reason for the life insurance was to protect Kadisha's family if he died and Petitioners discovered that he had taken millions of dollars from the Trusts. If he lived, there was no security for the misappropriations.

Kadisha's claim that he "guaranteed" the Trust and that his guaranty was adequate security is nonsense. For one thing, nothing in the Trusts constitutes such a "guaranty." Even if the Trust contained such a "guaranty," Kadisha's financial condition would have made it impossible for him to honor it. Finally, since the Court is disregarding all of Kadisha's and his witnesses' trial testimony, there is no evidence to support any of Kadisha's contentions regarding his misappropriations.

Kadisha also incorrectly claims that Probate Code section 16441(a) limits the Court's ability to measure Petitioners damages to 10% (rather than the 15% the Court is awarding). Respondent's argument is incorrect. Probate Code section 16441(a) only applies to interest on the awards made under Probate Code section 16440, not to the awards themselves.

**Damages: Kadisha's Conflicts Re the Carson '93 Partnership.**

Kadisha, confident of never having to answer for his trustee duty derelictions marched the Trusts into another incredible conflict of interest arrangement.

Carson '93 was formed on July 12, 1993. (TE 608.) The general partner was Texollini, of which Kadisha was a shareholder, president and CEO. (TE 161e, 607.) The limited partners were Texollini, Kadisha, Kadisha's brother (Daniel Kadisha), Kadisha's father (Abraham Kadisha), Kadisha's father-in-law (Parviz Nazarian), and Kadisha's friend (Leon Farahnik). (TE

608.)  Trust 1 contributed capital of $475,000 to Carson '93, and Trust 2 contributed capital of $125,000.  (TE 614, 626; 3497.)

Texollini made capital contributions to Carson '93 of $20,000 as a general partner and $480,000 as a limited partner.  (TE 608.)  Carson '93 was formed to acquire the Presidio Property, which it purchased for $4 million.  (TE 616a-i.)  Carson '93 borrowed $2.4 million from First Credit Bank to purchase the Presidio Property.  The loan was secured by a first deed of trust on the property.  Concurrently with the closing of the $2.4 million loan, Texollini borrowed an additional $500,000.  Texollini's loan was secured by a second deed of trust on the partnership property, which made the partnership liable if Texollini defaulted on its loan.  (TE 617 a-g, 618.)

Texollini also received an additional $250,000 at the closing to make tenant improvements.

Petitioners are in error in their assumption Texollini got its $500,000 back, and therefore had no money in the deal, and hence should not have shared pro-rata with the other investors.  Texollini was still liable on its 2nd trust deed.

Petitioners also failed to make their case in contending Texollini got a rent advantage from Carson '93 due to Kadisha's conflict of interest.  Petitioner's expert, Smart, got up-ended by respondent's expert Andrew Minstein.  Smart failed to do his homework in failing to inspect the interior of the subject property, which was ill-suited for warehousing or manufacturing without substantial modification.

In January 1997, Kadisha purchased Trust 2's interest in Carson '93 for $190,000 without obtaining an independent appraisal of the value of Trust 2's interest or Dafna's consent. (TE 921) The purchase breached Kadisha's fiduciary duty to avoid conflicts of interest since he was both the buyer (as an individual) and the seller (as the Trustee of Trust 2), and he set the price. Following Kadisha's purchase of Trust 2's interest, Carson '93 refinanced the Presidio Property for $4 million and made distributions to the partners. Kadisha received the distributions that Trust 2 would have received in the absence of Kadisha's improper sale of Trust 2's interest to himself. Additionally, in November 2000, Kadisha sold his Carson '93 limited partner interest, which included Trust 2's partnership interest. Kadisha profited from his wrongful acquisition of Trust 2's interest and must disgorge his profit.

**Accordingly, on this claim, Petitioners are awarded damages for Kadisha's profits in the amount of $224,533 plus prejudgment interest at the rate of 10% per annum from September 19, 2000.[25]**

---

[25] Carson 93 Damages Calculation:

| DATE | AMOUNT | 10% SIMPLE INTEREST | DAMAGES |
|---|---|---|---|
| January, 1997 (Respondent Buys Trust 2's Interest. | ($190,000) | | ($190,000 |
| October, 1988 ($2 Million Refinancing Distribution) | $147,060 | ($38,000) | ($ 80,940) |
| February, 1999 ($500,000 Refinancing Distribution) | $ 36,765 | ($ 1,417) | ($ 45,592) |
| November, 2000 (Respondent Sells Trust 2's Interest) | $194,000 | ($ 1,028) | $143,380 |
| June 30, 2006 | | $81,153 | $224,533 |

Kadisha incorrectly contends that his 1997 purchase of Trust 2's Carson '93 Ltd partnership interest was with Dafna's consent, at fair market value, and that Petitioner's measure of damages is incorrect.

The Court does not believe Kadisha's testimony that in December 1996 he met with Ron Levi, who informed him that Dafna wanted to sell Trust 2's Carson '93 Ltd partnership interest in order to have money with which to purchase a home. Ron Levi denies that there was any such meeting. Even if there had been a meeting, Kadisha has not established that Ron Levi was Dafna's agent. His acts, if any, therefore are not binding on Dafna.

Kadisha's testimony is also not believable because he was already obligated under the Trust and amendments to make up to $1 million available for the acquisition of a home for Dafna. There was therefore no need to sell the partnership interest. Moreover, if Kadisha had intended to use the funds to buy a house for Dafna, why did he cause Trust 2 to use $105,000 of the $190,000 he paid for the partnership interest to repay Trust 1 for monies advanced?

As to damages, Respondent argues that Petitioners suffered no damages because he paid fair market value for Trust 2's partnership interest. Andrew Minstein testified, however, that fair market value is the price a willing buyer will pay a willing seller in an arm's length transaction. Since Kadisha was both the buyer and the seller, the sale was not an arm's length transaction between a willing seller and a willing buyer who come to a meeting of the minds. This was an egregiously conflicted transaction.

Dafna was not given an opportunity to consult an independent advisor about the sale or negotiate an arm's length transaction. Dafna was never given that choice. She was not a willing

---

**STATEMENT OF DECISION**

Exhibit 1
Page 142

seller.  Kadisha established the price, without obtaining an appraisal or Dafna's consent.  The Court is therefore disregarding Minstein's testimony.

Kadisha also incorrectly contends that Petitioners' damages should not include any distributions Kadisha received from the 1998 refinance of the Carson '93 Ltd property because Petitioners would thereby receive the benefit of the distributions without being saddled with the liability for the loan.  Kadisha has not proffered a statute or case that permits such a result.  Adopting Kadisha's argument would allow Kadisha to improperly benefit from the use of Trust assets – which the Court will not allow.

Probate Code section 16440 mandates that Kadisha disgorge any profit he received from a breach of fiduciary duty.  As a result of Kadisha's improper purchase, he received Trust 2's share of operating cash flow distributions, refinance distributions, and the proceeds from the sale of Kadisha's Carson '93 Ltd partnership interest.  Kadisha produced no evidence that he repaid any portion of the refinance money or is liable for repaying it.

The Petitioners seek damages against Kadisha arising out of Kadisha's sale of Trust 2's 53,348 shares of Qualcomm stock in April 1999.

Since equity is the laboratory for ascertaining and formulating justice unavailable at law, a consideration of the facts relevant to Kadisha's selling 53,348 shares owned by Trust 2 must be considered.

It is difficult to glean just what Kadisha had in mind when he made the sale.  There is no evidence he considered or complied with Probate Code section 16047(a) which provides:

"A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the Trust."

There is no evidence Kadisha acted as a "prudent investor."  And he never sought professional advice about the sale.  Further, the catch-all phrase "and other circumstances of the trust" is of no help to Kadisha.

Kadisha's unacceptable creativity as to the facts as to why he made the sale and what he did by altering the facts concerning the sale are of substantial concern to the Court, certainly revealing some sort of character defect but not of such magnitude as to alone give cause for the Court to award damages.

**Damages:  Re Claim that Kadisha breached his fiduciary duties and retaliated against Petitioners for suing him by not taking any action as Trust 1's 80,000 shares of Qualcomm stock radically declined in value.**

Kadisha neglected and refused to take any action to preserve the value of Trust 1's 80,000 shares of Qualcomm stock after Petitioners sued him.  On October 27, 1999, Petitioners filed their initial petition against Kadisha.  On January 3, 2000, the value of Trust 1's Qualcomm stock at the opening of the market was $15,940,000 and the stock constituted approximately 90% of Trust 1's assets.  (TE 1394, 1960.)  By the time Kadisha turned over the 80,000 shares of Qualcomm stock to Petitioners in September 2000, the value of the stock had declined by over $10 million to $5,299,944.

At the same time the stock value was declining, Kadisha was diversifying his own stock portfolio by buying millions of dollars of stock in other public companies.

Kadisha knew that he was duty-bound to fulfill the requirement of Trust 1 "that the principal of the trust estate at all times be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, and with such guidelines to maximize the income from the trust estate." (Trust 1, Art. C., TE 44.) He also had fiduciary duties "to preserve the trust property" under Probate Code section 16006, to act as a prudent investor under Probate Code section 16047, and to diversify the Trust assets under Probate Code section 16048.

Kadisha's failure to diversify Trust 1's assets and to hold approximately 90% of the assets in Qualcomm stock was neither conservative nor prudent because it placed all of the Trust's eggs in one basket.  It also illustrates that Kadisha did not have an investment strategy for Trust 1's assets, as required by Probate Code section 16047.  As a result of Kadisha's failure to diversify Trust 1's assets, Trust 1 was extremely vulnerable to volatility in the price of Qualcomm stock.  This vulnerability became reality.  On January 3, 2000, the first trading day in 2000, the stock opened at $199.25 per share.  It traded as low as $174, and closed at $179.31.  Therefore, in one trading day, Trust 1's Qualcomm stock declined in value by approximately $1,595,200 or about 10%.  The stock declined further after the close of business and opened nearly seven points lower the next day.  Thus, the stock lost another $560,000 overnight.  In total, the stock had declined by about 13% by the opening of the market on January 4, 2000.

Kadisha admitted that he was following the price of Qualcomm stock on a daily basis in 2000.  (RT 22, 8-7-03.)  Therefore, he was aware of these dramatic price declines.  The nearly

$1.6 million decline in value in one day should have been a wake-up call for Kadisha to take immediate action to preserve Trust principal.  Nevertheless, he did nothing.  He got another wake-up call when the market opened on January 4, and again on January 5, and he did nothing to preserve Trust principal.  He never informed Petitioners or their counsel about the situation, and he never consulted with an investment advisor about stemming the Trust's losses.  When he finally turned the Trust assets over to Petitioners, the value of Trust 1's Qualcomm stock had declined by approximately 60%, from $15,940,000 to $5,299,944.

The Court finds that when Trust 1's 80,000 shares of Qualcomm stock declined in value from $176.12 (January 3, 2000) to $156.44 (January 5, 2000) {TE 4633}, it was an unacceptable breach of duty by Kadisha to not act to preserve the asset.  Kadisha was required under the terms of the Trust and the Probate Code to preserve the Trust's principal and had demonstrated the investment skills that would have enabled him to do so.[26]  Nevertheless, he did nothing to preserve Trust principal in January 2000 or at any other time over the nine-month catastrophic drop in the share value of Trust 1's Qualcomm stock.

He did nothing, in fact, other than watch the stock continue to decline.  Kadisha's continuing to hold the stock was a gambler's choice not available to him.  He could gamble with his own stock, but not the beneficiaries.'  By doing nothing to preserve the value of Trust 1's Qualcomm stock upon a $19.68 per share (or a total of $1,575,400) decline in value, Kadisha violated his fiduciary duties to preserve principal, to use the full extent of his skills in investing

---

[26] From 1991 through 2000, Kadisha was a Qualcomm director, owned and sold thousands of shares of his Qualcomm stock, bought and sold stock in other companies, and demonstrated extensive knowledge of complex transactions in dealing with publicly traded stock.  For example, in December 1998, Kadisha collared 500,000 shares of his Qualcomm stock.  In preserving Trust 1's Qualcomm stock after it lost 15% of its value, he could have sold it, entered into a collar, purchased a "put," placed a stop-loss order with the broker, or utilized other available options.

the Trust assets and to act as a prudent investor.  A prudent trustee cannot stand idly by when the stock market goes into a free fall, particularly when a stock comprises about 90% of the trust assets.  It requires a different state of mind than a gambler's choice.

**Accordingly, on this claim, the Court awards Petitioners the sum of $5,792,000 plus prejudgment interest from September 19, 2000.  The amount represents the difference between what Petitioners should have received if Kadisha had protected the stock upon a 19.68 decline and what they actually received (i.e., the value of Trust 1's Qualcomm stock when it was finally turned over to them).  (The $5,792,000 is arrived at by multiplying the total value of the subject 30,000 shares of stock on January 5, 2000 at 156.44 per share) which equals $11,715,200.  Deducting the 75.05 per share due September 20, 2000 (which totals $5,923,200) = $5,792,000.**

Kadisha argues (incorrectly) that he should not be found liable for Trust 1's losses because there were periods in which Qualcomm's stock rose (briefly) during the nine-month decline, and it was therefore impossible to predict its future price.  However, Kadisha has it backwards.  He created the situation in which 90% of the principal of Trust 1 was highly sensitive to fluctuations in the price of Qualcomm stock by holding such a high concentration of stock rather than diversifying.  The unpredictability of the stock price only made it more imperative that Kadisha take action when the stock's price began to fall so precipitously since he had made Trust 1 so vulnerable to dips in the price of its Qualcomm stock.

Furthermore, Kadisha's failure to take advantage of any of the price increases to minimize the beneficiaries' losses adds to the deplorability of his conduct rather than excusing it.  It also supports Petitioners' claim that he was intentionally retaliating against them for suing him.

Kadisha also incorrectly contends, based upon the testimony of his expert DeBard, that he should not be found liable for Trust 1's losses because analysts were recommending buying or holding Qualcomm stock during 2000. No analysts' reports were introduced into evidence, although DeBard testified that he reviewed some such reports. The analysts' reports are, however, irrelevant. For one thing, Kadisha never read any of them. Even more importantly, the advice that an analyst would or would not give an investor is irrelevant to what a trustee must do to fulfill his fiduciary duties. DeBard admitted that he did not know that a trustee's fiduciary duties are. Kadisha did not offer any expert testimony on what a trustee should have done in this situation. Petitioners' expert testified that a trustee should have acted to preserve the Trust principal, and the Court agrees.

Ordinarily, in cases where the trustee has acted in good faith and with undivided loyalty to the beneficiaries, courts are reluctant to second guess his investment decisions. Kadisha was not such a trustee. He never served the interests of the beneficiaries, and his retaliation against them for suing him is just another demonstration of his consistent and overwhelming bad faith.

Kadisha also incorrectly argues that Petitioners should have mitigated their damages because on January 26, 2000 he allowed Petitioners to copy his trust files, and included within the thousands of pages of documents was a copy of Trust 1's December 31, 1999 Lehman Brothers account statement. Producing copies of Trust documents to Petitioners did not relieve Kadisha of his duty to continue to prudently manage the assets and preserve principal or shift Kadisha's duty to Petitioners. Both the duty and the opportunity to reduce Petitioners' damages laid with Kadisha. It is unreasonable for Kadisha to claim that Petitioners – who did not have his knowledge of the situation or any control over the stock – should have done what he did not do. In essence, Kadisha is arguing that the Trust beneficiaries should have forced him to do his duty

or suffer the consequences of his malfeasance.  This argument is inimical to the spirit, policy and word of the law governing the conduct of trustees, and the Court rejects it.

Moreover, as a practical matter, Kadisha's control of the stock prevented Petitioners from being able to do anything to mitigate their damages.  They would have had to wrest control of the stock from Kadisha.  Kadisha's resistance to turning over the Trust assets when Petitioners applied to the Court for a formal turn-over order illustrates that even if they had discovered that Trust 1 still owned Qualcomm stock, they would not have been able to gain control of the stock in time to prevent their losses.  They were not, however, required to do so.  The duty to preserve the principal and prevent the beneficiaries' losses was Kadisha's alone.

**Damages:  The DNK Trusts**

The Court finds the Petitioners have no claim to any of the Qualcomm stock held in the DNK trust, and therefore will not award any damages.  However, the Court finds that Petitioners claim was legally tenable and brought in good faith.

**Damages:  Kadisha's Taking of Trust Funds for His Legal Fees.**

On January 13, 2000, Kadisha paid his attorney $13,761 from Trust 2's funds.  On February 23, 2000, Kadisha took $250,000 from Trust 1 and $250,000 from Trust 2 to pay his legal fees in this case.  The takings were done without Court approval or the consent of the beneficiaries.  Judge Gary Klausner ordered Kadisha to return the total sum of $500,000, but to date, he has not done so.  While orders of the court can be appealed, Kadisha's action in refusing to abide with the Court's order was frivolous, and it is with much restraint the Court does not impose a substantial sanction upon him.

**Kadisha is herewith surcharged $543,055, plus interest at 10% per annum from September 19, 2000.**[27]

Respondent incorrectly argues that Petitioners' counsel stipulated at the Court of Appeal that the $500,000 was deemed returned, and that based on this stipulation, interest should not be awarded from the date of the stipulation. The Court has read the transcript of the oral argument before the Court of Appeal and disagrees with Respondent's interpretation. The $500,000 was not returned as Petitioners did not have the use of or control over the funds. The $500,000 was then, and is still now, in Mr. Burn's trust account until the Court's judgment.

Respondent also incorrectly claims that he should not be required to pay interest because he too had no control over the funds. However, whether or not Kadisha was able to control the use of the funds is irrelevant. The $500,000 was not his to take and his taking of it deprived Petitioners of the use of their money. He could have ended his obligation to pay interest by returning the money when Judge Klausner ordered him to instead of appealing the order.

**Damages:  Failure of Kadisha to exercise preferential rights.**

On September 29, 1989, Qualcomm informed Trust 2 that it had preferential right to purchase 6,630 shares of Qualcomm shares "C" Convertible Preferred stock for $8.00 per share. Kadisha did not exercise Trust 2's preferential rights. The court finds there was no obligation for Kadisha to exercise Trust 2's preferential rights, even though it would appear an advantage to do so. The same opinion applies to Trust 2's preferential rights to acquire Qualcomm stock on September 7, 1999. Petitioners' claim(s) in regard to said preferential rights are denied.

**Damages:  Punitive Damages**

---

[27] The Court calculated the $543,055 surcharge as follows:  $13,761 (the amount Kadisha paid Burns from Trust 2) plus interest at 10% per annum from January 13, 2000 until September 18, 2000 = $14,696 plus $500,000 plus interest at 15% per annum from February 23, 2000 until September 18, 2000 = $528,359.  $14,696 plus $528,359 equals $543,055.

The Court accepts the rule that punitive damages may not be awarded for litigation conduct, including giving false testimony and suborning perjury. But it is a "most unfortunate rule and a most grievous one, and no doubt the legislature and the courts would be glad to redress it if a rule could be devised that would remedy the evil without producing mischief far worse than the evil to be remedied." *United States v. Throckmorten*, 98 U.S. 65, 66, cited in *Kachig v. Booth* (1971) 22 Cal.App.3d 626. With all the remarkable talent of our judges and lawyers, a rule should be developed to give effectiveness to Penal Code section 118, which provides:

> "(a) every person who, having taken an oath that he or she will testify, declare, depose or certify truly before any competent tribunal, officer or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares deposes or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions or certification is permitted by law of the State of California under penalty of perjury and willfully states as true and material matter which he or she knows to be false, is guilty of perjury."

The "litigation conduct" rule does not fall within the category "if it ain't broken, don't try and fix it." The rule is deeply flawed and needs to be fixed.

The Court finds no support for maintaining the rule based upon the pronouncements contained in *Kachig v. Boothe* (1971) 22 Cal.App.3d 626, nor in *Silberg v. Anderson* (1990) 50 Cal.App.3d 205 or *Rasheen v. Cohen* (2006) 37 Cal.4th 1048. In *Kachig v. Boothe*, the Court finds "the lack of any really effective remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the probability of civil liability for what they say." But perjury is not a "civil remedy" as it falls under the category of "Crimes Against Public Justice." Public justice should prevent witnesses from the license to lie provided by

---

section 47(b)(2).  The said section puts a cancer into the system of justice on an unsupportable premise that people free to testify from liability for what they say will foster truthful answers. This is the very error of *Silberg* in holding that the "litigation conduct" rule promotes "complete and truthful testimony."  This is plain wrong.  It does the opposite.  To allow witnesses to plan, scheme and design to give false testimony as allowable by Section 47(b)(2) is shocking if the idea of justice under the law is considered.

But just as though for what seemed ages, the law supported contributory negligence as a complete bar to recovery and fault divorce was adhered to as something that came down from the mount, they both, like others, fell by the wayside as lacking common sense.  And perhaps common sense may light up the road to improved justice by eliminating the concept of "litigation conduct" as a shield for witnesses against civil suits or the possibility a charge of perjury may be brought by the District Attorney.

Section 47(b)(2) does not repeal or invalidate Section 118 of the Criminal Code regarding perjury directly or by inference as a crime against Public Justice.  Said section 11888 declares in relevant part:

"Section 118.  Perjury Defined.

"Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations or depositions or certification is permitted by law of the State of

California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury."

Now perhaps the legislature should amend Penal Code section 118 to state it does not apply to civil suits or it should be put to the voters of the State of California as to whether Penal Code section 118 shall cease to apply to civil lawsuits. The court cannot do this not having the power to legislate.

But there are other fundamental issues that need to be addressed as to the application of Civil Code section 47(b)(2) and *Booth, Silberg and Cohen.*

One of the first in what appears to this court to be erroneous is the application of the "witness shield law" (Civil Code Section 47(b)(2)) to the equal application to both a party as a witness, and a witness as a party. There is a rather monumental difference. A party originates documents and testimony (depositions in trial) so he does not fall within the classification of a person more likely to tell the truth without fear of being sued by anyone, including the District Attorney. He is the instigator of a complaint or an answer, which may or may not contain an oath of affirmation, and it would render allegations in pleadings and depositions meaningless if the party swearing to tell the truth is not bound thereby. While it is true that asking a District Attorney to bring an action against a party for false testimony is beyond rare because the District Attorney is too busy with his crush of work and the outcome of any action for perjury is doubtful. This does not mean the threat of perjury should be dropped. And if it is to be dropped from civil cases, this would have to be done by the Legislature, not the courts. While this court does not approve of the "witness shield" at all, a witness for a party is in an entirely different category from that of a party witness. Some may be truthfully supportive. Others may be supportive fabricators. Some may be dragged in by subpoena. Few really want to go to court

and testify.  So granting them a "witness shield" as a method of eliciting truthful answers is a far cry from allowing a party to lie under oath and give false testimony in depositions.  So the "witness shield" should not be applied to a party.

A second very major problem that is not addressed in Section 47(b)(2) or in *Kachig*, *Silberg or Rasheen* is the matter of instructing the jury about the "witness shield."  The new Civil Jury Instructions in the Preliminary Admonitions of Sections 100 and 107, nor in the swearing of witnesses, advise the jury properly.

The following instruction, or one containing words of the same effect, should be given sua sponte to the jury as a preliminary instruction:

"You are instructed that the law no longer requires a witness before testifying to swear to tell the truth and nothing but the truth in the matter before the court.  The elimination of swearing the witness to tell the truth has been abolished because the law has determined that allowing a witness to testify in any way he desires, including telling a lie, without fear of someone filing a suit against him for what he says and without the possibility of the District Attorney charging the witness with perjury, results in the witness being more likely to tell the truth."

The reason for so instructing the jury is crystal clear.  If the court fails to so instruct the jury, there becomes a due process problem when the witness is sworn to tell the truth.  An objection properly lies because the law has declared the witness does not have to tell the truth.  The request of the witness to take an oath to tell the truth would constitute an attempt by the court to get an implied waiver of the witness's right not to tell the truth.  But it cannot constitute a waiver because a waiver must be explicit in its terms.  The court can only back off stating, "The objection is sustained.  In lieu of having the witness swear to tell the truth, I will now instruct as follows:  Pursuant to what the law has determined to be the "litigation privilege," you

are now free to testify in any way you desire, including telling a lie, without fear that whatever you say no civil action or criminal charge of perjury will be brought against you.  By the "litigation privilege," the law has declared you are more likely to tell the truth.  And then to the witness: "Please state your name."

In respect to the foregoing, the jury should be instructed as part of any instruction advising them of their right to determine the credibility of any witness the following:

"The fact that the witnesses in this case have not been sworn to tell the truth, but to the contrary can testify as they so desire, including telling a lie, increases your awareness that you and you alone determine whether to believe all of a witness' testimony, part of it, or none at all."

While the case before the court is obviously not a jury trial, the foregoing further lights up the "witness shield" deficiency.

Finally, no case known to this court over 59 years in the law business has presented the problem more forcefully than in considering awarding punitive damages against Kadisha for his untruthful answers in giving answers to questions asked in the taking of his depositions or during trial, but the Court's soap-box presentation against the "Litigation Exemption" must fall by the wayside as the Court is bound by the exception as it now stands.

The Court will, hence, limit its considerations to acts of Kadisha prior to litigation.  And they are more than several.

As in all cases considering the applicability of a statute to be applied to the facts, so it is with a consideration of punitive damages.  The Court must look to the applicable provisions of Civil Code section 3294, which are as follows:

"3294:  Exemplary damages; when allowable; definitions:

(a) in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that

the defendant has been guilty of oppression, fraud or malice, the plaintiff, in addition to actual damages, may recover damages for the sake of example and by way of punishing the defendant.

(c) As used in this section, the following definitions apply:

(1) 'Malice' means the conduct which is intended by the defendant to cause injury to the plaintiff **OR** despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety or others.

(2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

(3) 'Fraud' means an intentional misrepresentation, deceit or concealment of a material fact known to the defendant with the intention on the part of the defendant and thereby depriving a person of property or legal rights or otherwise causing injury."

The exemplary (or better referred to as the punitive damage section 3294) has been with us for about 134 years, with some modifications, the most important being the addition of the word "despicable" in the definition of malice.

It is Civil Code section 3294 which must guide the Court and any applicable decisions relating thereto as applied to the facts of this particular case.  It must be noted that the Legislature has not deemed it fit to amend section 3294 to include any dictionary definitions of any terms in the section or court determinations concerning same, although this Court would be bound by same if applicable.  And it must also be noted that the punitive damage jury instruction formerly given, BAJI 14.71, and the new CACI instruction 3941 add a definition to the definitions of Civil Code section 3294 in respect to "despicable conduct," which states:

"'Despicable conduct' is conduct that is so vile, base or contemptible that it would be looked down on as despised by reasonable people."

*Simon v. San Paolo* (2005) 35 Cal.4th 1159, held that "at a minimum, California law requires conduct done with 'willful and conscious disregard of the rights or safety of others' or despicable conduct done 'in conscious disregard' of a person's rights." "Conscious disregard" means that 'the defendant was aware of the probable dangerous consequences of his conduct and that he willfully and deliberately failed to avoid those consequences." *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 895-896.

The Court finds that Kadisha's acts, as enumerated below and throughout this decision, constitute conduct that was vile, base, and contemptible, and would be looked down on as despised by reasonable people. The Court also finds that these acts were intentional, or done with a willful and conscious disregard of Petitioners' rights. The Court is persuaded by clear and convincing evidence that Kadisha was aware of the financially dangerous consequences of his conduct and willfully and deliberately failed to avoid those consequences.

In addition to Civil Code section 3294 and California judicial decisions, in *BMW v. Gore* (1996) 517 U.S. 559 and *State Farm v. Campbell* (2003) 538 U.S. 408, the United States Supreme Court set forth constitutional guideposts for determining whether punitive damages should be awarded and their amount. These guideposts are: (1) the degree of reprehensibility of a respondent's misconduct; (2) the disparity between the actual or potential harm suffered by Petitioners and the punitive damage award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases.

The degree of reprehensibility of the defendant's conduct is the most important indicia of the reasonableness of the punitive damages award against a defendant. *State Farm*, supra, 538 U.S. at 419.

---

**STATEMENT OF DECISION**

Exhibit 1
Page 157

There are five factors to be evaluated in determining the reprehensibility of the defendant's conduct: (a) whether the harm caused was physical as opposed to economic; (b) whether the tortuous conduct evinced an indifference to or a reckless disregard of the health or safety of others; (c) whether the target of the conduct had financial vulnerability; (d) whether the conduct involved repeated actions or was an isolated incident; and (e) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*

These factors were adopted for use in California in *Simon,* and *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191. In determining the reprehensibility of Kadisha's conduct, the Court has considered Petitioners' financial vulnerability, the recidivism of Kadisha's acts and omissions, and whether the harm was the result of malice, trickery or deceit, or mere accident.

With the foregoing in mind, the Court finds that Petitioners have shown, by clear and convincing evidence, that they are entitled to punitive damages against Kadisha for his conduct in the management of both Trusts 1 and 2.

In considering Kadisha's conduct, the total pattern of Kadisha's conduct comes into play. His malice, fraud, recidivism, and reprehensibility may be singular. The evidence of his overall conduct over the 12 years of his trusteeship establishes by clear and convincing evidence that none of his acts were innocent or an accident, and that each of them was undertaken with a conscious disregard of Petitioners' rights and their extreme financial vulnerability.

The following facts, among others, support the Court's finding by clear and convincing evidence that Kadisha's acts were extremely reprehensible.

Throughout Kadisha's trusteeship and, in particular, from 1988 through 1992, Petitioners were extremely financially vulnerable. Dafna had a 10th-grade education, minimal understanding of the English language, and a total lack of financial business experience. Her only job

experience in her entire life had been a short stint as a makeup artist. Prior to her husband's death, she had never even opened a bank account by herself. During this same period, Kadisha misappropriated substantially all of the Trust's assets for his own use to bolster his shaky finances and the shaky finances of business in which he was heavily invested, including Omninet and Qualcomm. Dafna did not have any assets to replace the Trust assets that Kadisha put at extreme risk for his own benefit, and she had no skills with which to earn enough income to support herself and her two young children if Kadisha lost the Trust principal. Izzet and Joelle, who were the primary beneficiaries of Trust 1, were minors when Kadisha was risking the trust assets for his own benefit.

In addition, in 1988 Kadisha took the entire $500,000 Namco Loan proceeds and used the money to pay his personal loans and expenses. Kadisha defaulted on the loan, exposing Petitioners to the possibility of losing the Strathmore Residence, which was the security for the loan. The Strathmore Residence was the only Trust asset at the time and represented the vast bulk of Dafna's property. Kadisha did not document his taking of the Namco Loan proceeds. His accountant testified that Kadisha's purported accountings would not apprise a reader of the Namco Loan.

Also in 1988, Kadisha loaned $300,000 of Trust 2's funds to Qualcomm, knowing that there was a substantial likelihood that the entire $300,000 would be lost. In order to raise cash for the $300,000 Qualcomm loan, Kadisha took out a second loan on the Strathmore Residence (the "Imperial Loan"). He misappropriated $1 million of the $2 million Imperial Loan proceeds for his own use. (The balance was used to repay the delinquent Namco Loan and fund the $300,000 extremely risky loan to Qualcomm.) If Kadisha was not able to repay the $1 million

he misappropriated and Qualcomm went under, Petitioners would have lost substantially all of the then-existing Trust assets.

From 1988-1991, Kadisha misappropriated virtually all of the Trusts' cash for his personal use, without documentation or security. Kadisha's own finances were in turmoil. His inability to repay the Trusts for his misappropriations is amply demonstrated by the fact that he did not repay them. Petitioners were therefore at extreme risk of losing all of their assets.

In 1992, Kadisha sold all of Trust 2's Qualcomm stock to raise cash for his own use. He then misappropriated the sale proceeds for his own use, but claimed that he had loaned the money to Rahban. Kadisha knew there was no Rahban, and that even if there was, Rahban had no assets in the United States, and the supposed loan was unsecured. In 1992, Kadisha's expenditures exceeded his cash by over $1 million. Kadisha was therefore not only putting the sale proceeds at extreme risk by taking it when his finances were in the red, but he was throwing up a smoke screen that the beneficiaries would have to penetrate if he could not repay the money.

In 1993, Kadisha invested $600,000 of the Trusts' funds in Carson '93 Ltd. so that the partnership could purchase real property to lease to Texollini. Kadisha was the CEO and a substantial shareholder of Texollini. Texollini was not only the tenant, but also the general partner of Carson '93. There were thus not only conflicts of interest here, but lawyers of conflicts.

Kadisha's expert, Andrew Minstein, made it abundantly clear, at trial, that Carson '93's purchase of the 2575 El Presidio building was an imprudent investment. He testified that the El Presidio property had numerous physical deficiencies and was burdened by restrictive CC&R's.

The Court therefore finds by clear and convincing evidence that Dafna, Izzet and Joelle were all extremely vulnerable financially, and that Kadisha consistently disregarded their financial vulnerability for his own gain.

### Kadisha's Recidivism and Intentional Versus Accidental Acts

"[C]ertainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law. [Citations omitted.]  Our holdings that a recidivist may be punished more severely than a first offender recognized that repeated misconduct is more reprehensible than an individual instance of malfeasance." *Johnson*, *supra*, 35 Cal.4th at page 1203, citing *BMW*.

Kadisha did not engage in an isolated act of misconduct – he repeatedly, systematically and intentionally engaged in conduct that he knew was prohibited to him as a trustee.  Kadisha's numerous and egregious acts establish, by clear and convincing evidence, a pattern of extreme recidivism.  As previously noted, his course of conduct also establishes that his acts were intentionally malicious and/or fraudulent or undertaken with a conscious disregard of Petitioners' rights and that none of them was inadvertent or an accident.

### Kadisha's Malice and Fraud

Respondent's first line of defense is to attempt to overcome Kadisha's deficiencies by the very large ultimate financial gain by the Petitioners.  But malice or fraud is not waived, ignored, or forgiven by a fortuitous financial gain.  The almighty dollar does not bear a cross or other religious symbol.

Kadisha took advantage of Petitioners for his own benefit throughout his trusteeship.  He exploited Dafna's helplessness after the death of her husband, her lack of experience, and her

---

STATEMENT OF DECISION

Exhibit 1
Page 161

cognitive insufficiencies to gain control of her assets.  He intentionally and consistently violated his fiduciary duties.  He looted the Trusts.  He induced Dafna to sign unconscionable amendments.  He concealed his wrongdoings with fraudulent accountings, backdated promissory notes and phony transactions.  As one example of his fraud, Kadisha intentionally concealed from the beneficiaries that fact that he had used $240,000 of Namco Loan proceeds to repay his Union Bank line of credit and, in connection therewith, had acquired 21,571 shares of Farahnik's Qualcomm stock as another example of his fraud, Kadisha stole money from the Trusts under the guise of making loans to David Rahban, whom the Court has found to be a non-existent person in the claimed loan transaction.  Had the District Attorney stepped in after the taking, he could have charged Kadisha with Grand Theft (Penal Code section 487) or embezzlement.  Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been entrusted."

Kadisha's malice and/or fraud also includes his bad faith stock sales in 1992 and 1999; his persistent refusal to account for his use of Trust funds; his intentional self-dealing with trust assets, his continuing exploitation of Dafna's inability to understand or grasp almost anything about the Trusts; his use of money or promise of money, as a carrot to get Dafna to sign trust amendments that purported to relieve Kadisha of his fiduciary duties and release him from liability for his egregious acts; his use of Ron Levi, Dafna's second husband, as a willing dupe (having the same cognitive insufficiency as Dafna); his retaliation against Petitioners for suing him by allowing Trust 2's Qualcomm stock to decline in value by over $10 million; his taking of $500,000 from Petitioners to pay his legal fees and refusing to return it after Judge Gary Klausner ordered him to do so; his backdating of promissory notes and creating backdated, phony transactions; his misappropriations of over $10 million of the Trusts' cash without

adequate security or even the most minimal documentation; investing Trust funds in Carson '93 Ltd. for Kadisha's own economic benefit, and purchasing Trust 2's partnership interest without Dafna's knowledge in yet another conflicted transaction.

Each of these acts was malicious or fraudulent, despicable, and done with intentional or willful and conscious disregard of Petitioners' rights.

Kadisha would like the Court to believe he was well fixed financially at all times so it cannot be said that he acted with malice, i.e., that his conduct was despicable and done with a willful and knowing disregard of Petitioners' rights.

The clear and convincing evidence is to the contrary. While the Court might entertain the thought early on in his acting that Kadisha made a simple mistake in taking all of the available cash from the Namco Loan available to Dafna for the support of herself and her children, such a thought dissipates like fog on a hot summer day as Kadisha set the course of his entire trusteeship on the impermissible taking of Trust assets, false accountings, back-dating of notes and the many other intentional breaches of trust hereinbefore set forth.

Kadisha's actions immediately after the Namco taking fortify the Court's position. After defaulting on the Namco Loan, Kadisha procured an additional loan of $2 million on Dafna's home (i.e., the "Imperial Loan"). Kadisha took practically all of the imperial Loan proceeds for his own use. He amazingly used her money to pay off his taking of the Namco Loan proceeds. Swindlers present and past would marvel at this taking, and they would marvel at how Kadisha was able to bypass the consent of Dafna to such a huge taking.

But the Namco and Imperial Loans were only the beginning of Kadisha's malice and fraud. The Court has found that Kadisha's acts in loaning Qualcomm $300,000 and subsequently converting the loan to equity (which plunged the Trust into even more troubled

financial waters) was by clear and convincing evidence conduct that was despicable and done with willful and knowing disregard of Petitioners' rights. These acts and the subsequent acts of Kadisha discussed above and in the earlier discussion of the United States Supreme Court guidelines are contemptible in "that [they] would be looked down upon as despised by reasonable people.

Kadisha also contends that the Court can only award punitive damages on a claim on which it has awarded compensatory damages. The California and United States Supreme Courts disagree. *Johnson*, citing *State Farm*, stated that the relevant relationship is between punitive damages and actual or potential harm. *Johnson, supra*, 35 Cal.4th at page 1207. The potential harm that is properly included in the analysis is "harm that is likely to occur from the defendant's conduct." *Simon, supra*, 35. Cal.4th at page 1177. In arriving at its conclusions, the Court has considered the claims on which Petitioners were awarded compensatory damages, and also the claims on which there was potential harm. The Court can, and has also considered the totality of Kadisha's conduct in arriving at its conclusions regarding Kadisha's deliberateness in disregarding Petitioners' rights and his recidivism, among other things.

**Punitive Damages Award**

**The Court fixes punitive damages against Kadisha at $5 million for his numerous pre-litigation acts as trustee.**

While it may be repetitive, Kadisha didn't borrow Trust funds – he embezzled them, millions of dollars of them. He made bad-faith sales of Trust 2's Qualcomm stock in 1992 and 1999. He backdated notes in an effort to cover up his wrongful takings. He intentionally and carelessly caused accountings to be prepared that were deliberately designed to deceive and did deceive Dafna. Although thoroughly advised by his counsel, DeCastro, as to his limitations and

obligations as a trustee, he totally ignored DeCastro's advice and repeatedly entered into conflicted transactions. He considered his beneficiary Dafna "stupid," and took every opportunity to blatantly and deliberately breach his fiduciary duty of loyalty to her and her children. He contrived a phony transaction that robbed her of $3 million. He willfully, maliciously and despicably induced Dafna to execute Trust amendments by which she released all of his then-existent derelictions of duty and purported to give him unfettered control over her assets. He retaliated against Petitioners for suing him by doing nothing while the Trusts' only remaining Qualcomm stock catastrophically declined. He invented the fiction of the Rahban loans to conceal his stealing over $2 million of Trust funds. He placed the Petitioners in financial jeopardy over and over again by risking the Trust assets on his own speculative ventures.

While Petitioners would like to see the Court award punitive damages against Kadisha in a sum vastly greater, and one calculated at least two, three or four times the compensatory damages as fixed by the court, what the Court has done is apply ample punishment to Kadisha, knowing that making him pay $5 million will batter his delusion that he can prevail over his abandonment of principle and obligations under the law and engage in malicious and fraudulent conduct. Ample notice will be given to those who elect to assume the duties and obligations of a trustee that the laws respecting trustee mean what they say and are not to be ignored.

Consistent with the Supreme Courts' guidelines, the Court in arriving at the amount of punitive damages has taken into account Kadisha's financial condition. Throughout the trial, Kadisha made numerous applications for the release of funds from his Qualcomm stock that was subject to the Court's restraining order. In each of these applications, Kadisha attached a copy of his then current general ledger. During the punitive damages phase of the trial, Kadisha

produced his October 2005 financial statement. The financial documents produced by Kadisha show that he has net assets in excess of $100,000,000. The Court's award of $5,000,000 therefore does not offend the Supreme Court's guideline.

**Damages: Attorney fees.**

Petitioners are clearly entitled to recover attorney fees under section (b) of Probate Code section 17211, which states in applicable part, as follows:

(b)     If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred.

Kadisha incorrectly contends that Petitioners' claims do not come within the purview of this section because: (1) this is not an action on a "trustee's account" and (2) Petitioners' claims are surcharge claims and therefore unrelated to Kadisha's account. Kadisha is wrong on both counts.

Typically, in a trust proceeding, the trustee files his accounting with the court and asks the court to approve it. In response, the beneficiaries assert their objections to the accounting, if any, and their surcharge claims against the trustee, if any. In fact, the beneficiaries must assert their surcharge claims against the trustee in this proceeding or their claims will be deemed waived. *Coberly v. Superior Court* (1965) 231 Cal.App.2d 685, 688. As *Coberly* illustrates, the proceedings regarding the trustee's account encompass more than the trustee's written accounting. In deciding the beneficiaries' claims against the trustee, the court also assesses the reasonableness and propriety of the trustee's actions in administering the trust. The beneficiaries' surcharge claims are thus part and parcel of the proceeding on the trustee's

accounting. This was made explicit in *Estate of Fain* (1999) 75 Cal.App.4th 973, 991, which held that a surcharge claim for breach of fiduciary duty is a matter "relating to an account."

Kadisha's failure to file his purported accountings with the court forced Petitioners to bring them before the court themselves. Kadisha provided Petitioners with a set of purported accountings (from the commencement of the Trusts) in 2000 and a set of revised purported accountings in 2001. Petitioners objected to Kadisha's purported accountings in their pleadings; the accountings were admitted into evidence at trial; and Petitioners adduced substantial evidence that established by clear and convincing evidence that the accountings were fraudulent and misleading. *Days* of trial were devoted to testimony and argument about the accountings, and Kadisha himself relied on the accountings for two of his affirmative defenses. In deciding this case (including ruling on Kadisha's affirmative defenses), the Court was required to make findings about the accountings. Thus, the fact that Petitioners initiated this action and attacked Kadisha's accountings – rather than Kadisha initiating the action of formally requesting court approval of his accountings – does not make this action any less of a proceeding on a trustee's account than it would have been if Kadisha had initiated the proceedings.

Although Kadisha is now arguing something different, his reliance on the accountings for two of his affirmative defenses tacitly acknowledges that this proceeding is an action on a trustee's account. One of Kadisha's (unsuccessful) affirmative defenses is based on the (erroneous) claim that Petitioners' claims are barred by the statute of limitation because Dafna allegedly received accountings that put her on notice of the claims more than three years before Petitioners commenced this action. Another of Kadisha's (failed) affirmative defenses is based on the (incorrect) contention that the accountings he allegedly provided to Dafna are binding on the beneficiaries pursuant to the terms of the Trusts. If this action was not related to his

accountings, as Kadisha now claims, why did he assert affirmative defenses that are based on them?

Moreover, in Respondent's objections to Petitioners' petitions, he requested attorney's fees.  In addition, Respondent repeated this request during trial and represented to the Court that Respondent was requesting attorney's fees.  Obviously, this constitutes to the Court Respondent's acknowledgement that attorney's fees are awardable in this case.

It is inconceivable that the Legislature intended – as Kadisha belatedly suggests – that beneficiaries can recover their attorney's fees for the trustee's bad faith defense of his account only if the trustee files an accounting with the Court.  That would produce the absurd result that a trustee could mount an unreasonable and bad faith opposition to the beneficiary's challenge to his administration of the trust and avoid the imposition of attorney's fees simply by refusing to file an accounting.  Statutes may not be interpreted to produce so absurd a result.

The Court concludes that this matter falls within the purview of Probate Code section 17211.

### Without reasonable cause and in bad faith

The Court also finds that the requirements of Section 17211 are satisfied because Kadisha's contest was without reasonable cause and in bad faith.

In analyzing "reasonable cause," courts have relied upon the definition of "probable cause" used in malicious prosecution actions.  In those actions, a finding of "probable cause" requires the court to objectively determine the reasonableness of the defendant's conduct in bringing a claim on the basis of the facts known to him at the time and whether, based on those facts, the claim was legally tenable.  What facts were known to the Respondent, is a question of fact.  Whether a claim is legally tenable is a question of law, and is determined by whether any

reasonable attorney would have thought the claim tenable. *Sheldon Appel v. Albert & Oliker* (1989) 47 Cal.3d 863, 878. Since, in this case, the Court is the trier of fact, it was required to determine: (1) what facts Kadisha had in possession when he mounted his opposition to Petitioners' challenges to his account of his administration of their Trusts, and (2) whether, based on those facts, any reasonable attorney would have thought his opposition as to each claim was legally tenable. (See, e.g., *Crowley v. Kattelman* (1944) 8 Cal.4th 666.)

Kadisha cannot escape liability for his opposition to a claim that was unreasonable by joining it with the opposition to a claim for which he had probable cause (if any). *Appel, supra*, 47 Cal.3d 677. (The rule was first enunciated in *Bertero v. National General* (1974) 13 Cal.3d 43, and *Appel* affirms it.)

The following are some of the facts Kadisha knew when he opposed Petitioners' claims.

**Kadisha's 1988 Acquisition of Qualcomm Stock and his $300,000 Loan to Qualcomm.**

With respect to this claim, Kadisha knew, among other things, that:

- Following the death of Dafna's husband, he intended to and succeeded at gaining control over Dafna's assets so that he could use them for his own purposes. He knew that Dafna was dependent on him, that she had only a 10th-grade education, no business experience and only limited English, and that he could take full advantage of her. He took her to his attorney, DeCastro, whose firm was an advisor to Omninet and was well aware of Kadisha's financial difficulties, and who did not protect her from Kadisha's overreaching.

- Only the establishment of Trust 1 was a condition of the settlement with Lillian Nomaz over the foreign assets. There was no need for Dafna to put her other assets into Trust 2

under his control, and the creation of Trust 2 was the product of DeCastro's representation of him, not Dafna.

- He pocketed the entire $500,000 Namco Loan proceeds as part of his plan to use the Trust assets for his own purposes and never used a dime of it for Dafna's benefit or Trust 2's. His misappropriation of the Namco Loan proceeds left Trust 2 with zero cash to pay Dafna the $20,000 per month distributions she was entitled to under the terms of the Trust, or even all of her expenses. Kadisha did not make the required monthly distributions to Dafna. He also failed to pay Joelle's and Izzet's overdue tuition after DeCastro negotiated a grace period so that Joelle and Izzet could stay in school.

- Qualcomm's $4 million purchase of Omninet's assets in August 1988 (through which Kadisha obtained his stock) further weakened an already weak Qualcomm. In November 1988, Kadisha (who was now a Qualcomm director) knew that Qualcomm was consistently losing money and needed additional funding to survive. Kadisha did not have funds of his own to loan to Qualcomm, or even to repay the overdue Namco Loan. Therefore, he took out an unnecessary $2 million loan secured by the Strathmore Residence, and loaned Qualcomm $300,000 from the loan proceeds. (He also used over $500,000 of the proceeds to repay the Namco Loan and misappropriated most of the rest.)

- Kadisha knew when he made the conflicted $300,000 loan that Qualcomm was in dire financial straits, that it was consistently losing money, that Qualcomm needed money to survive until it could raise additional capital, and that the loan was extremely risky. He therefore knew that the loan was not a conservative investment as he (ludicrously) claimed at trial. He also knew, from DeCastro's memo, that he could not benefit, even

incidentally, from the use of Trust assets, and that he was prohibited from engaging in conflicted transactions.

### The 1992 Stock Sale.

When he opposed this claim, Kadisha knew, among other things, that:

- He did not have any economic justification for the sale.

- He sold Trust 2's stock purely to raise cash for his own use.

- He funneled the cash to himself through a fictitious, phantom loan to David Rahban.

- He had fraudulent trust accountings prepared to reflect a loan to Rahban when he knew that there was no such loan.

## Acquisition of Qualcomm Stock from Farahnik

When he opposed this claim, Kadisha knew, among other things, that:

- He loaned money to Farahnik which he borrowed from his Union Bank line of credit because he knew that he would have control of Dafna's assets and could use them to repay the Union Bank line of credit for the money he borrowed to loan to Farahnik.

- He used $240,000 of the Namco Loan proceeds to repay his Union Bank line of credit. He knew, however, that he could not admit this because DeCastro had advised him that using Trust assets for his own benefit was a breach of his fiduciary duties.

- He knew that the first six explanations that he gave for what he did with the Namco Loan proceeds were made under penalty of perjury, but that he nevertheless did not disclose in any of those explanations that he had used $240,000 of the Namco Loan proceeds to pay down his Union Bank line of credit.

- He knew that there were no entries in the accounting or any other documents that would notify Petitioners of his actions.

### Carson '93 Ltd.

When he opposed this claim, Kadisha knew, among other things, that:

- He was prohibited from engaging in conflicted transactions.

- Nonetheless, he invested $600,000 of Trust funds to enable his partnership to buy a property to house his corporation.

- He intentionally engaged in yet another conflicted transaction when he bought Trust 2's interest in Carson '93, without Dafna's consent, an appraisal or Court approval.

### Kadisha's misappropriations.

When he opposed this claim, Kadisha knew, among other things, that:

- His takings were not "loans" as he persisted in claiming throughout trial. He had embezzled the money for his own use without executing a promissory note or any other form of documentation; he only paid interest retroactively when, years later, he had enough money to repay the misappropriations; and he had fraudulent accountings prepared that concealed his takings.

- He backdated promissory notes prepared after he repaid the misappropriations and knew that he had to conceal the fact that they were backdated, as demonstrated by his untruthful testimony at his deposition about the preparation and execution of the notes.

- He intentionally designed his accountings to conceal his misappropriations.

### The 2000 Stock Decline.

When he opposed this claim, Kadisha knew, among other things, that:

- He did not inform Petitioners that Trust 1 owned Qualcomm stock.

- He was watching the stock on a daily basis in 2000, and would do nothing to preserve the value of Trust 1's Qualcomm stock.

- He never diversified Trust 1's assets to reduce Petitioners' risk.

- He never acted in Petitioners' best interests during the entire time he was trustee.

- He did not do anything to staunch the losses to Trust 1's Qualcomm stock because he was retaliating against Petitioners for suing him.

- After Petitioners sued him, he used his control of Petitioners' assets to extort them to settle.

### $500,000 Legal Fees

When he opposed this claim, Kadisha knew, among other things, that:

- He ignored DeCastro's admonition that he not obtain any benefit or advantage from the use of trust assets.

- He ignored DeCastro's admonition that whenever he contemplated an act that could be beneficial to himself, he should obtain court approval.

- He did not provide any form of notice to Petitioners that he was taking the money.

- He opposed Petitioners' attempts to terminate the trusts and require him to turn over the Trust assets.

### Affirmative Defenses

In asserting his (baseless) affirmative defenses, Kadisha knew, among other things, that he had not given Dafna the accountings he claimed he had given her; that his accountings concealed rather than disclosed his malfeasance; that he had never acted for the benefit of Petitioners; that the three egregious trust amendments that purportedly exculpated and released him had been extracted from Dafna through economic coercion; and that he had intentionally ignored DeCastro's advice regarding what his fiduciary duties were over and over again.

---

**STATEMENT OF DECISION**

167

Exhibit 1
Page 173

But one of the most important things that Kadisha knew, which relates to his opposition to each of Petitioners' claims as well as his affirmative defenses, is that he would have to give false testimony and suborn perjury in order to prevent his wrongdoings from being discovered by the Court.

### Would any reasonable attorney have thought Kadisha's opposition legally tenable?

The next question is, based on those facts, would any reasonable attorney have thought Kadisha's opposition legally tenable? The answer is a resounding no.

Rule 5-200 of the California Rules of Professional Conduct provides that an attorney, in presenting a matter in court, shall only provide a defense that is consistent with truth and shall not seek to mislead the judge with a false statement of fact. No reasonable attorney could believe that presenting the facts outlined above in a way that is consistent with the truth could result in Kadisha's exoneration on any legal ground. And no reasonable attorney could have put Kadisha and his witnesses on the stand knowing that they would have to give untrue testimony (as they did) in order to provide a defense. In addition, a reasonable attorney would have known that if the Court did not believe Kadisha or his witnesses, it could disregard all of their testimony (as the Court has done), and that, as a result, Kadisha would have no evidence to support his opposition. In short, no reasonable attorney could have believed that an opposition based on false testimony was legally tenable.

Since no reasonable attorney would have thought Kadisha's opposition legally tenable, the Court finds that Kadisha's opposition was unreasonable.

### Bad Faith

Probate Code section 17211 also requires the Court to find that Kadisha's opposition was in bad faith. The Court finds that it was.

---

**STATEMENT OF DECISION**

Exhibit 1
Page 174

In determining whether Kadisha's opposition was in bad faith, the Court must determine whether Kadisha's opposition was subjectively in bad faith. "Bad faith" is closely analogous to "malice" as defined in malicious prosecution actions. "[T]he malice required in an action for malicious prosecution is not limited to actual hostility or ill will towards plaintiff, but exists when the proceedings are instituted primarily for an improper purpose."

"Good faith" has been defined as "that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, being faithful to one's duty or obligation." *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187, 192.

The question is therefore whether Kadisha's opposition was conducted primarily for an improper purpose. Throughout Kadisha's trusteeship, he acted in bad faith and in total derogation of his fiduciary duties. There can be no doubt that Kadisha knew that what he did was wrong – he did exactly what DeCastro advised him not to do and then tried to cover up his misconduct.

As well, since the Court has concluded that Kadisha knew what he did was wrong, the conclusion that he mounted his opposition for an improper purpose must follow. The Court has found that Kadisha acted in bad faith by continuously breaching his fiduciary duties throughout his trusteeship, and with intentional, willful and conscious disregard of Petitioners' rights. The court has also found that Kadisha perjured and suborned perjury at trial. The Court therefore concludes that he would have lied to his lawyer and never conveyed any of the facts set forth above and therefore no lawyer could have presented a tenable opposition to Petitioners' claims.

The finding that Kadisha knew that what he did was wrong is bolstered by the Evidence Code.

---

Exhibit 1
Page 175

A presumption is an assumption of fact that the law requires to be made from another fact or facts.  (Evidence Code §600(a))  A party is presumed to intend the ordinary consequences of his voluntary act, and an unlawful intent is presumed from the doing of an unlawful act.  (Evidence Code §§665, 668)  Since Kadisha's breaches of fiduciary duty, perjury and suborning of perjury were both intentional and unlawful, and an unlawful intent is presumed from the doing of an unlawful act, the court can presume that Kadisha acted with an unlawful intent.

Kadisha incorrectly contends that because Petitioners had probable cause to bring their claims, this means that he had probable cause to oppose them.  The Court rejects this.  Kadisha also incorrectly contends that since the trial has lasted four years, he had reasonable cause to oppose Petitioners' claims.  The Court rejects this too.

### The Amount of the Attorney Fee Award.

Petitioners could not afford to pay their counsel on an hourly basis, and therefore entered into a contingency fee agreement with their attorneys ("Fee Agreement"), which the parties amended in 2000.  The Court is not limited to an award of attorney fees based solely on the Fee Agreement.  It is to award a reasonable fee based on factors enumerated by the California Supreme Court and various Courts of Appeal.

In entering into the Fee Agreement, Petitioners never anticipated the length of the trial (over four years), which was due in part to Kadisha's perjury and suborning of perjury, and the full complexity of the issues and proof required.  In determining the amount of attorneys' fees, the Court took into account the following:

1.      The contingency fee agreement;

2.      A loadstar amount based on the number of hours of work performed, and the reasonable hourly rate an attorney would charge (assuming his fees were paid monthly).

---

**STATEMENT OF DECISION**

Exhibit 1
Page 176

3.      An enhancement of the loadstar.

4.      The novelty of claims.  Any one of the numerous claims in this case, if brought separately, would have required a complicated trial.  The trial was conducted over four years, with approximately 3,000 exhibits, 20,000 pages of trial testimony and arguments as well as Kadisha's applications for funds.

5.      The complexity and difficulty of proof.  Counsel was required to examine thousands of pages of Kadisha's personal records, his business records, and the Trust's records. This included hundreds of pages of complex documents produced by Qualcomm, including its voluminous securities filings.  Counsel took 19 depositions that consumed over 50 days. Counsel's evaluation of the documents was made more difficult by the fact that Kadisha lied about his entries in the purported accountings, his backdating and his creation of phony transactions, among other things.  An extraordinary effort was required to expose the perjury of Kadisha and his witnesses in discovery and at trial.  In addition, the case required the analysis of numerous factual and legal issues in addition to the breach of fiduciary duty issues.  There were accounting issues, real estate issues, partnership issues, contract issues, and professional responsibility issues, among others.

6.      Counsel for Petitioners demonstrated extraordinary excellence in connection with briefs, oral arguments, direct and cross-examination, as well as discovering and proving Petitioners' claims against Kadisha;

7.      Samuel Krane, counsel for Petitioners, testified that this matter, which has thus far encompassed over seven years (including over four years in trial) precluded him and his firm from accepting other employment;

---

**STATEMENT OF DECISION**

Exhibit 1
Page 177

8.   Counsel for Petitioners have never been paid one dollar for legal fees over seven years; and

9.   By taking this matter on a contingency, Petitioners' counsel was gambling on the outcome, and, therefore, the amount of fees they would receive.

10.   Its own experience as a practicing attorney for approximately 18 years, and a judge for approximately 24 years during which the Court has heard many, many motions for attorney fees.[28]

The California Supreme Court has stated:  "[A] contingent fee must be higher than the fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders, but for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case which cancels the debt of the client to the lawyer) is much higher than that of conventional loans."  *Ketchum v. Moses* (2001) 24 Cal.4[th] 1122.

Kadisha erroneously contends that the language of Probate Code §17211 which states: "…including attorneys' fees incurred to contest the account," limits the Court's award of attorney fees to fees that were actually incurred."  In *Ketchum*, the California Supreme Court held that the analogous phrase "his or her attorneys' fees and costs" in Code of Civil Procedure section 425.16(c) did not indicate a legislative intent to limit a prevailing party's attorneys' fees to "actual expenses caused by the improper pleading."  In other words, the simple omission of the word "reasonable" does not imply any such purpose.  Therefore, *Ketchum* allowed the trial court to determine the loadstar and enhance it in a contingency fee case.  Consistent with the

---

[28] Appointed to Pasadena Municipal Court in 1965; appointed to Superior Court (L.A. County) in 1967.  Retired in 1986.  Assigned Judge Since about 1991/1992.

Supreme Court's holding in *Ketchum*, this Court has calculated attorney's fees in precisely the same way.

Kadisha also incorrectly argues that when you divide the Court's award by the number of hours Petitioners' counsel worked on this case, the result is an hourly rate in excess of any reasonable hourly rate. This is a nonsensical analysis in a case, such as this, where the Court has enhanced the award.

The issue of apportionment that Kadisha has raised and any other issues involving attorney's fees will be dealt with when the court rules on Petitioners motion for attorneys' fees, which will be heard after entry of judgment.

## IV.   KADISHA'S AFFIRMATIVE DEFENSES

Since the court has found that Kadisha and his witnesses gave perjured testimony and is disregarding their testimony, Respondent has not produced any credible evidence to support any of his defenses.

Nevertheless, in analyzing Respondent's defenses, the court finds some review of important facts very revealing as to how equity should consider Respondent's defenses and, in particular, the statute of limitations defense.

The court granted Dafna's request to be questioned and give her answers in Hebrew, the court finding her oral communication ability, however, weak, would be better in Hebrew. While Respondent cites pages of her testimony, they do not reveal the bewildered look on her face as she sought to understand Nussbaum's questions. "I don't remember," is the best she could do. The court finds these answers were not evasive. Dafna is plain and simply a person who lacks understanding of financial matters, let alone what trusts are all about and her rights to know how her funds and her children's funds were being handled by Kadisha.

Exhibit 1
Page 179

The court has already covered the appalling legal representation by DeCastro. The more the court reviews his conduct, the more disgusting the picture becomes.

Equally appalling as DeCastro's representation of Dafna is the production by a law firm of three amendments to the original Trust agreement re Trust 2, relieving Kadisha from any and all liability for anything, as herein before stated, as well as the fact a reasonable person could well consider the amendments as acknowledgment of wrong doing and, further the obtaining of all waivers was without consideration. Equity cannot permit such an attempted travesty of justice.

Respondent seeks legal cover in the statute of limitations by advancing a very chilling ~ proposition akin to "buyer beware." Respondent urges upon the court the belief, a very chilling one, that beneficiaries must assume their trustee is not to be trusted based upon some sort of due diligence requirement. Apparently, Respondent would have it that all beneficiaries employ Pinkertons and constant auditors to investigate everything a trustee does, and if not, the beneficiaries will be victimized not only by their trustee, but also the statute of limitations. The court finds this profoundly shocking. There must be medication for Respondent to overcome this aberration.

Probate Code sections 16460 and 16460(b) re the Statute of Limitations cannot be applied to bar Petitioners' claims. How could equity ever think of applying the Statute of Limitations to a helpless, not-too-bright lady when her lawyer and trustee have left her bereft of any thought of inquiry as to their conduct? Consideration of Dafna is in many ways similar to drafting a complete evaluation of a developmentally disabled person in need of protection from those who would take advantage of her in an incredibly difficult social and economic adjustment.

**STATEMENT OF DECISION**

174

Exhibit 1
Page 180

An interesting question arises when a defendant seeks to raise the Statute of Limitations as a barrier to his fraudulent conduct. Mildred Lillie, one of the all-time great Appellate Court Justices of the State of California had zero tolerance for a witness testifying falsely under oath. In one case, she declared that a witness giving false testimony under oath was not entitled to the attorney-client privilege. The court is certain she would regard, as does this court, the idea that a witness can give false testimony and later attempt to change the impact thereof by an "amendment" should be treated as contemptuous of testifying truthfully as a cornerstone of the judicial process, i.e., having the duty to tell the truth under oath. The court having found Kadisha as giving false testimony under oath, he should be deprived of any benefit of a statute of limitations. His fraud is a continuing thread during his term as trustee eliminating his statute of limitations defense.

While Petitioners have pointed out the lacking of ability of Kadisha to charge Dafna with inquiry or notice, the court cannot express too strongly her intellectual inability in matters Respondent would like to show knowledge, duty to inquire or whatever. Dafna was badgered by Respondent with an array of questions that left her baffled as to how to answer. A typical question was to ask her if she received a certain document. When she would answer "No," then the following question would be asked: "Do you have any reason to believe you did not receive this document?" Dafna would look bewildered and then say she didn't see or get the document counsel referred to. The examination of Dafna took many days and only offered further proof she was not capable of being "reasonably capable of understanding any account or report," or if present with some document, "reasonably should have inquired into the existence of the claim."

The court cannot accept, as Kadisha urges, that the provisions of Probate Code Sections 16460(a) and 16460(b) can be used to shield a trustee who has unlawfully used trust funds,

stolen trust money and committed perjury. There is also no way a beneficiary can be reasonably capable of knowing what the trustee has done as to wrongdoing if that cannot be ascertained from an account or report which provides insufficient information for the beneficiary to reasonably know the claim or be put on notice of the claim.

The Legislature has not provided and determined a trustee can keep a little black book of all his misdeeds and then run up the victory flag after the statutory period has run. In fact, the Legislature in 2004 recognized a deficiency in Probate Code sections 16460(a) and 16460(b) and enacted Probate Code section 16461 which provides for a specified notice and a period in which a beneficiary may object. But in doing this, the Legislature did not find any notice requirement where the trustee has committed fraud, perjury or outright theft of trust assets.

The court must put to rest any idea that Ron Levi is a responsible factor in determining Dafna's mental capacity to know or understand the terms and conditions of the trust documents or the so-called accountings made by Kadisha or his employee or anything relating to what Kadisha was doing with trust money. Levi is as dumb as a fence post. He is not a party to this action. There is no legal document authorizing Levi to act as Dafna's agent. There is no evidence that Dafna made or regarded Levi as her agent. There is no evidence Levi read any trust documents. He was, at best, a delivery boy. He got checks from Kadisha. The fact he may have received documents is meaningless. Proof would have to be that he read and understood them. If he did, he would not know how to interpret them, and his understanding would not be binding on Dafna. He had no knowledge of Kadisha's self dealing and using trust funds to his own advantage. Accountings (if they can be so improperly labeled) were meaningless to him. Levi's sole interest was how much Dafna was getting from Kadisha.

---

**STATEMENT OF DECISION**

Exhibit 1
Page 182

Allowing Kadisha to have control of the Uzyel assets was a recipe for disaster. Kadisha, looking for glue everywhere to bolster up his claim of knowledge, dug up a letter to Kadisha with an acknowledgment by Dafna, Ron Levi and Izzet that $400,000 annual income would be sufficient for their living expenses. Dafna and Ron Levi is no brainer combination. Levi should not be allowed to tell time. Dafna's sole interest, perhaps better defined as an obsession, was to get money. Perhaps a psychiatrist could peel the layers of lifetime events and reveal her compulsion. Money may well have been an opiate to relieve her of the incomprehensible life without her husband. To try and tag Izzet or Joelle with any of the knowledge requirements of Probate Code sections 16460(a) and (b) they try and impute their knowledge to their mother is beyond silly.

The concept of Kadisha trying to use Probate Code section 16460(a) and (b) is without merit. Kadisha had no respect for the obligations of a trustee; he had no hesitation to take nearly all the trust money obtained by loans on trust property for his own use and benefit, yet he would proffer knowledge about trust and his conduct by a letter written without any legal advice in an attempt to get money to live on. (A standard few know, but one to which they had become accustomed.) Dafna had to plead for money. In fact, that is what brought her to Krane & Smith. Dafna had the idea she was to get money from Trust 2. Her trust. Her money. Ron Levi, a signatory to the letter is as dumb as a fence post. A perfect match for Dafna. He had no authority in the matter. Kadisha would make him an agent for Dafna. He was no such thing. In any event, an agent does not sign a letter upon which the signature of the principle appears. It is a legal nothing. He had absolutely no standing – a rooter for the team. And what did young Izzet and Joelle know of all the horrors of Kadisha as a trustee? Nothing. Izzet testified and appears to be a fine young man who, hopefully, can be of assistance to his mother in the future.

In short, the letter is not evidence of knowledge but quite to the contrary. With knowledge about Kadisha's helmsmanship of the trusts acquired by an able lawyer, Kadisha would have been long gone.

The other acts claimed by Kadisha to show knowledge about the trusts are equally without merit. To suggest the accountings gave notice to Dafna is absurd. (To suggest the accountings gave notice to a reasonable person is equally absurd.) As to conversations, Dafna is purported to have had with Kadisha's other helpers, the court finds more probably not true than true. None of the instances recited in Respondent's brief convinces the court that Dafna ever had the wherewithal mentally to make any value judgment about what was going on with the trusts, or the fact she had been deprived of representation by DeCastro acting as her attorney when in truth and fact he was Kadisha's lawyer.

Mr. Nussbaum, a counsel for Kadisha, sought to show Dafna's right to sue Kadisha on some of her claims and those of her children fail pursuant to the Probate Code sections 16460(a) and (b) because of knowledge of Levi. Of course, Levi's knowledge (if any) about anything cannot be imputed to Dafna or her children. Mr. Nussbaum used a trick question on Levi as he had done with Dafna. He had Levi look at a trial document 3492. He then asked Mr. Levi, "Do you have any reason to believe you didn't get...I'm sorry. Do you have any reason to believe that you did not get a copy of that letter and the enclosure?" Dumb Levi says, "No." The trick of Nussbaum's question is the assumption he did receive the document. The court does not buy the answer as evidence he received the subject document. Nussbaum asked Dafna his usual question, "Q. Do you have any reason to believe you didn't receive it?" Dafna was definitely confused and answered that she had not received the document.

In his examination of Levi, Nussbaum asked, "And is it your best recollection that you did receive this letter and the enclosures?" Levi is now confused. He answers, "I don't remember if I get it, but I think I did. I'm not sure. Usually when I used to get letters, I used to get an explanation before, so I didn't really read this letter. It was either verbally explained to me or whatever, but I never bothered to read whatever is inside." This answer affirms that as to the subject exhibit Levi was presented with, he does not say he read it or knew what it was about. "Usually," is not definite to prove he knew what was in Exhibit 3492. In no event can his answer be used for proof of the contents, particularly given Levi's mentality rating. The court's general inquiry was not about Exhibit 3492, yet Respondent argues, "Mr. Levi's testimony confirms Mikhaili's testimony that she had given TE 3492 to Mr. Levi with the 1992 Trust General Ledgers. It does no such thing. All Levi's testimony is in response to the court's inquiry was he "got a general ledger account." He did not identify the account.

Respondent further states: "'everything' Mr. Levi received concerning the trusts he passed on to Dafna." There is no evidence that Mr. Levi received "everything." What Levi received as a delivery boy in no way falls within *Clark Equipment Co. v. Wheat*, 92 Cal.App.3d 503. No notice can be imputed to Dafna by Levi acting as a delivery boy. The Respondents' following statement is just wild conjecture.

"The 1992 Trust General Ledger accountings Mr. Levi received and discussed with Dafna contained ample information, at minimum, to cause a reasonable person to suspect that Mr. Kadisha might personally be engaged in financial transactions with the trusts." The Respondent then lists what it would take an able trial lawyer or CPA to discern as "the fuel for that suspicion."

The wild conjecture is based upon the fact Levi and Dafna "discussed" the accountings. There is not a vestige of acceptable evidence that they did. Respondent would have the court draw an inference of knowledge of what Levi and Dafna discussed. It is the court's opinion that the Levis together or singly could not understand the so-called accountings. The Respondent is grasping at thin air in attempting to use the so-called accountings as placing Dafna on notice of anything. To the contrary, the so-called accountings were designed to deceive and hide Kadisha's devious and gross abuse of the trust assets given to his care.

Kadisha's "accountings" are basically fraudulent as they fail to disclose the willful and unlawful taking by Kadisha of trust money, his conflicted transactions and his profits from Trust assets. The Respondent cannot rely on such concealment as a statute of limitations defense. If you fraudulently and unlawfully administer a trust, there is no way you can charge a beneficiary with knowledge or duty to inspect – it is not the beneficiary's duty to be on constant vigilance for fraudulent conduct of the trustee. A beneficiary must have the comfort a trust is supposed to provide, not administered by a dishonest person. Concealment and fraud cannot be used as a sword in favor of the statute of limitations. What Kadisha is really saying is that if I can cleverly disguise my so-called accounting but provide some slight clue as to my wrongful dealing and you are not smart enough to find it, you can suffer without equity's assistance. It does not work that way.

There is a further basis for disallowing Kadisha to escape from liability by use of the statute of limitations. The court finds the case of *Gold v. Weissman* (2004) 114 Cal.App.4th 1195 supportive of the concept that where a trustee continues to act as a trustee on any claim of breach of a trustees duties, the statute of limitations will be tolled, and the breach need not involve the same matter, but only that the trustee continued to act as trustee.

While the *Gold* case involved malpractice, the same assumptions are made, i.e., duty, and the continued duty tolls the statute. It is particularly applicable in this case where Kadisha has control of trust documents and the creation or modification of same over which Dafna would have no knowledge or control. It cannot be just to allow Kadisha to drop the iron curtain on any of his derelictions as long as he is in power and places an innocent, bewildered beneficiary from having the right of legal action.

Kadisha's arguments regarding the statute of limitations, laches, failure to mitigate, equitable estoppel, unclean hands, and ratification/affirmation are all fatally defective. These arguments either fail to comply with the express language of the Probate code or are based on inapposite or miss-cited cases cited by Respondent. Most critical, Kadisha disingenuously argues that the true meaning of his intentionally misleading and deceptive accountings – which Kadisha claims he gave to Dafna – could have been deciphered by his hypothetical "reasonable person beneficiary." The threshold question, assuming arguendo that Dafna actually received the "accountings," (which the Court does not believe she did) is whether *Dafna* was "reasonably capable" of understanding them. Since it required a Herculeon effort by Petitioners' counsel and their experts to unravel Kadisha' accountings," the answer can only be no.

In short, the evidence unequivocally showed that Kadisha exploited Dafna's lack of capacity to reasonably understand the accountings. Since Dafna was not reasonable capable of understanding the "accountings," therefore, she cannot be deemed to have received them under Probate Code section 16460(b)(1) and the three-year limitations period did not commence running.

Kadisha's argument that Petitioner's pre-1996 claims are barred by the statute of limitations because Petitioners allegedly received accountings and other documents

("Respondent's Documents") for the years 1988-1992 that would have put a reasonable person on notice of financial transactions between Kadisha and the Trusts pointedly ignores Probate Code sections 16460(b) and 16460(b)(1).[29]  Since this analysis must be based on *Dafna's* capabilities and Dafna was *not* reasonably capable of understanding Respondent's documents, she cannot be deemed to have received them, and therefore the statute of limitations cannot be deemed to have commenced running.

It is undeniable that for the entire duration of Kadisha's trusteeship, Dafna could *not* have understood the accountings.  This is underscored by Kadisha's admission during trial that even *he* could not understand the critical components of the accountings that he professes Dafna should have understood.  Finally, although Kadisha knew that he did not understand the accountings, and that Dafna (whom he described as "stupid") could not have understood them, i.e., Hugo DeCastro ("DeCastro") and Aaron Doodkevitch ("Doodkevitch"), Dafna's accountant.

Even assuming arguendo that Kadisha *could* have established at trial that Dafna was reasonably capable of understanding Kadisha's accountings – which he did not – Respondent's Documents do not meet the disclosure requirements of Probate Code section 16460(a), nor did they disclose Petitioners' claims.  Under that section, the statute of limitations does not begin running unless the accountings received by the beneficiary adequately disclosed the existence of a claim.[30]  The issue framed by this section is whether *Dafna* knew or, given her capabilities, should have known of the existence of her claims.  Kadisha's argument that this issue must be decided on the basis of what a hypothetical "reasonable person beneficiary" should have

---

[29] Sections 16460(b) and 16460(b)(1) provide, inter alia, that:  "For purposes of subdivision (a), a beneficiary is deemed to have received the accounting or report as follows:  (1)  In the case of an adult *who is reasonably capable of understanding the account or report,* if it is received by the adult personally."  (Emphasis added.)
[30] An account or report adequately disclosed the existence of a claim if it provide sufficient information so that *the beneficiary* knows of the claim or reasonably should have inquired into the existence of the claim."  (Probate Code section 16460(a).)

understood is not supported by his inapposite cases, the plain wording of the statute, or logic.[31]

In addition to the plain wording of the statute, Goldring, Petitioners' expert testified that under the standard of care for a California trustee, (1) trust accountings should be prepared so that the beneficiary can understand them; and (2) it is the trustee's responsibility to consider the education, economic and business sophistication, and experience of the beneficiary when preparing his accountings.  (RT 17, 7-30-03; RT 29-33, 7-30-03.)  These are obvious corollaries to Probate Code section 16460's rule that an accounting is not deemed received by a beneficiary unless the beneficiary can understand it.

The evidence established that Respondent's Documents were *intended* to confuse and mislead Dafna or anyone else who might see them.  Kadisha is estopped to now argue that Dafna should have discovered and pierced through his deliberate and fraudulent deceptions (e.g., Kadisha identifying his misappropriations of Trust funds "investments" and backdating promissory notes to retroactively convert his takings into loans).

Even if a "reasonable person beneficiary" standard applies, Respondent's Documents did not disclose Petitioners' claims to a reasonable person and would not have put a reasonable person on notice.  They were *intentionally* misleading, deceptive, confusing and fraudulent and were designed to hide Kadisha's breaches of fiduciary duty.

In sum, there is no credible evidence that Dafna received Respondent's Documents.  Even if Dafna had received the documents, she could not have understood them.  She lacked the intelligence and education to do so.  Kadisha's accountant admitted that understanding the

---

[31] In determining a reasonable person standard, should an inexperienced, elderly uneducated beneficiary be held to the same standard as a Wharton graduate CFO beneficiary?  Or vise versa?  That would obviously impose an impossible burden on the elderly beneficiary.  Is a "reasonable person beneficiary" then the average of the two?  That would still impose an impossible burden on the elderly beneficiary.  Kadisha's objective reasonable person standard – which is derived exclusively from non-Trust cases – simply does not make sense in the trust context where the duty of loyalty is owed to a specific individual with specific characteristics.

accountings would require specialized knowledge about accounting. And, it took Petitioners' counsel hundreds of hours to uncover Kadisha's acts from his documents. Dafna, therefore, cannot be deemed to have "received" Respondent's Documents under Probate Code section 16460(b)(1) even if they had been personally delivered to her. Even if Dafna could be deemed to have received Respondent's Documents, they would not have revealed to her, or any reasonable person, the basis for Petitioners' claims or further inquiry. Therefore, Kadisha's statute of limitations defense must fail.

### The evidence conclusively proved that Dafna was not reasonably capable of understanding Respondent's Documents.

The evidence abundantly illustrated that Dafna was not reasonably capable of understanding the accountings. At trial, Dafna repeatedly demonstrated a total lack of understanding of even the simplest financial matter or legal concept. The Court during trial made the following observation:

> "Ms. Uzyel may be a very delightful mother and a wonderful person, but **when it comes to these financial matters, she was practically brain-dead in the handling of financing and knowing what's going on.** This is just – **she's just incompetent. What she needed was a conservator in this matter.**"

The court has not changed its opinion.

The inability to understand financial matters Dafna demonstrated at trial was undoubtedly even more pronounced in 1988 through 1992, when Kadisha contends Dafna received the documents that purportedly disclosed her pre-1996 claims.

Preliminarily, Dafna's primary language was Hebrew; she had trouble understanding English or reading a newspaper; and when she spoke to Kadisha, it was in Hebrew or Farsi. (RT

---

17, 6-18-02; RT 29, 1-21-03; RT 35, 1-21-03; RT 39, 1-21-03.)  The accountings, however, were in English.

Dafna only had a 10th-grade education, and the only job she held in her entire life was a makeup artist after high school.  (RT 27, 1-21-03.)  Dafna stopped working after her marriage. (RT 28, 1-21-03.)  Before Dafna's husband died, she had never opened a bank account herself or signed a loan document.  (RT 39, 1-21-03.)  Kadisha admitted Dafna and Ron Levi were "stupid."  (RT 7 1-72, 11-5-03.)  Kadisha's accountant, Michael Feldman, admitted that Dafna would have required knowledge of accounting to understand the accountings.  (RT 6, 1-24-03.)

## Kadisha's other affirmative defenses must also fail.

### A.    Laches.

Kadisha argues that laches bars Petitioners' claims for lost profits for Kadisha's purported "loans" to himself, the "Rahban" loans, and the Farahnik loans.  His laches' argument relies mainly upon the unsupportable premise that the accountings disclosed that Kadisha was "loaning" Trust funds to himself so that Petitioners knew about the improper "loans" but did nothing.  As discussed at length above, Kadisha's accountings concealed rather than disclosed his misappropriations of Trust funds.

The accountings misleadingly showed Kadisha's unlawful taking of trust monies from December 1988 – 1991 as "investments Kadisha" not loans receivable from Kadisha.

The accountings also failed to disclose that the Rahban loans were disguised unsecured loans to Kadisha.  Kadisha cannot be equitably permitted to argue that the delay in discovering his misconduct, which was created by his own attempts to conceal it, bars Petitioners' claims.

Kadisha's claims to having been prejudiced are equally unfounded.  He first claims that by not complaining about the "loans," Petitioners "gulled" him into staying on as Trustee when

---

**STATEMENT OF DECISION**

Exhibit 1
Page 191

he wanted to resign. The evidence, however, demonstrated that Kadisha never had any intention of resigning, and, in fact, *could not* resign because a successor trustee would have readily discovered his malfeasance. For example, Kadisha drafted the June 14, 1991 First Amendment which, among other things, amended paragraphs A.6 and A.7 of the original trust agreement, to now require that Dafna give him 36 months' notice before she could remove him as Trustee (and to then allow Kadisha to select his successor.) (TE 428.) These provisions were an obvious stalling device to give Kadisha time to repay the Trusts for the millions of dollars he had misappropriated from them, and shows that he *could not* resign because of the risk of discovery. The most compelling evidence to debunk Kadisha's contention is that in 1999, he had Kahn draft a modified trust agreement (TE 3592), which provided, among other things, that Kadisha could only be removed for cause, that Kadisha had the right to choose a co-trustee, and that he had the power to choose a successor trustee.[32]

As well, in 1999, after commencing this litigation, Petitioners attempted to terminate the Trusts and recover the Trust assets. Kadisha refused to voluntarily comply with Petitioners' notices of termination, and they were forced to seek turnover orders from the Court. Even then, Kadisha dragged his feet in turning over the assets. In other words, throughout his trusteeship, Kadisha actively sought to prolong his tenure as Trustee. In fact, when he was given the opportunity to be released from his trusteeship, he refused.

Kadisha also claims that Petitioners "gulled" him into continuing his "high-income-yielding strategy." This refers to Kadisha's absurd claim that he was forced to make risky investments and loan Trust funds to himself in order to meet Dafna's income needs. This specious claim is simply another form of the "blaming the victim" defense. Petitioners' Closing

---

[32] "For Cause" was more restrictive than the definition for any other trustee.

Brief also points out that Kadisha *could not* have repaid the loans because he did not have the funds to repay them (hence, the provision he inserted in the First Amendment).  Kadisha initiated his breaches of fiduciary duty of his own free will and continued breaching his fiduciary duties of his own free will – he was not "gulled" into it by Petitioners.

Kadisha's claims that if Petitioners had complained about the "loans," he could have sought Court approval before continuing on in the same vein.  This claim is also absurd because it would have required that Kadisha go to the Court, voluntarily disclose his improper activities, and seek its blessing to continue breaching his fiduciary duties.  (One can imagine the difficulties of explaining to the Court that the "loans" were unsecured, as required by the Trust, or that there were no signed notes documenting them, or that "Rahban" lived somewhere in Iran or Europe and did not have any assets in the U.S.)  Seeking court approval was something Kadisha would not have done under any circumstances.  His failure to do so was therefore not the result of anything Petitioners did or did not do.

### A.    Failure to mitigate.

A party is only obligated to mitigate when he is harmed, is aware of the harm, and has the ability to mitigate his damages.  In this case, Kadisha concealed his breaches, and now claims that Petitioners should have mitigated.  But Petitioners did not know the full extent of Kadisha's breaches until trial.  Even then, Kadisha lied and obfuscated the true facts.  The court will not reward Kadisha for his egregious breaches and his extensive concealment of these breaches.

### B.    Equitable estoppel.

For a court to impose equitable estoppel, it would have to find that it was Petitioners' failure to act that prejudiced Kadisha.  It is, however, Kadisha who should be equitably estopped from raising this defense.  It is he who concealed his breaches and lulled Petitioners into

believing that he was acting in their best interests when the opposite was true. Furthermore, Kadisha was always aware of his own wrongdoing because it was intentional. Therefore, his defense of his wrongdoing cannot have been compromised in any way by Petitioners' failure to discover them earlier. Kadisha's contention that Petitioners intended to mislead Kadisha by not complaining about his actions is absurd. Since he concealed his wrongdoings, Petitioners could not possibly have complained about them.

### C.   Unclean hands.

Petitioners did not, as noted above, "encourage" Kadisha to breach his fiduciary duties. Kadisha did that of his own volition. Kadisha was completely in charge of the Trust assets, and the flow of information and money to Dafna. He not only held all of the cards but was unquestionably stronger than Petitioners in terms of intelligence, education and experience. He thought Dafna was "stupid." Kadisha's unclean hands defense is a ridiculous attempt to claim that he was helplessly misled by a woman he regarded with contempt, and her minor children.

### D.   Ratification/Affirmation.

An enforceable ratification or affirmation of Kadisha's breaches required full disclosure to Dafna of her material rights and the material facts, and the transaction in question involved a bargain with the trustee that was fair and reasonable to the beneficiaries. (Prob. Code §16465.) Kadisha has not claimed that he or anyone else made such a disclosure to Dafna, or proven that the acts or omissions allegedly ratified or affirmed were fair and reasonable to the beneficiaries.

Kadisha asks that he be excused from surcharge under Probate Code section 16440(b) for Petitioners' loss when he failed to act to preserve the value of Trust 1's Qualcomm stock during its 2000 freefall because his conduct as Trustee "was in good faith." Although his closing brief concludes that the evidence at trial established his good faith, it does not point to a single piece

of evidence that does so. To the contrary, Petitioners proved by clear and convincing evidence that Kadisha did *not* act in good faith and that he retaliated against Petitioner's.

## CONCLUSION

From the inception of the Trusts, Kadisha totally ignored the Trusts' terms, DeCastro's memorandum detailing his duties as a trustee, his fiduciary duties, and his duty of loyalty in favor of his own economic self-interest. Even a perfunctory review of his defenses exposes their defects. No respondent could, in good faith, believe that the statute of limitations or the other asserted defenses would bar Petitioners' claims. Kadisha's acts and omissions were flagrant, numerous and deceptively hidden. Kadisha's actions are not worthy of reward, but, to the contrary, call for compensation, the disgorgement of profits and punitive damages.

Kadisha has the arrogance to ask equity to uphold provisions in the trust agreements which inure to his benefit. Cheat Dafna's trust. Steal from Dafna's trust. Take from Dafna's trust what you want for personal gain. Kadisha lost any such rights. Equity under the circumstances will give to Dafna and her children any benefits of the trust agreements. Kadisha forfeited any considerations in his favor by his dishonest and deceitful conduct.

Kadisha attempts to make a mark against Dafna because in mid-1999, Dafna employed Krane & Smith. Kadisha neglects to mention that Dafna went to Krane & Smith re enforcement of certain provisions in Trust 2 that she be paid $300,000, and she had not received said sum at any time. Little did Krane & Smith know or have any inkling at that time of what a can of worms they had gotten themselves into. Obviously, they did not know of the many derelictions of Kadisha as trustee of Trust 1 or Trust 2, yet Kadisha accuses them of playing "dog in the manger," waiting to see if Qualcomm stock would rise or fall. He further charges that "no

professional or lay trustee should be subject to such "Heads-I-win, tails-you-lose" conduct. The foregoing accusation is pure desperation on behalf of Kadisha. It is an attack on the moral fiber of Krane & Smith, who have represented Dafna and her children with extraordinary excellence, reflecting both legal ability and the very best of moral character.

Samuel Krane of Krane & Smith shall now cause to be prepared a judgment based upon this Statement of Decision. Said judgment shall be filed and served within 15 days from the date of mailing of this Statement of Decision, but Krane may request additional time from the court (ex parte) upon good cause being shown.

Dated: October 24, 2006

*Henry Shatford*

Honorable Henry W. Shatford (A)
Judge of the Los Angeles Superior Court

**STATEMENT OF DECISION**

190

Exhibit 1
Page 196

professional or lay trustee should be subject to such "Heads-I-win, tails-you-lose" conduct.  The foregoing accusation is pure desperation on behalf of Kadisha.  It is an attack on the moral fiber of Krane & Smith, who have represented Dafna and her children with extraordinary excellence, reflecting both legal ability and the very best of moral character.

Samuel Krane of Krane & Smith shall now cause to be prepared a judgment based upon this Statement of Decision. Said judgment shall be filed and served within 15 days from the date of mailing of this Statement of Decision, but Krane may request additional time from the court (ex parte) upon good cause being shown.


Dated:  October 24, 2006

_Henry Shatford_
Honorable Henry W. Shatford (A)
Judge of the Los Angeles Superior Court


**STATEMENT OF DECISION**

190

Exhibit 1
Page 197

# Exhibit 2

Back to top

Global Home > US Home > Media Center > News Release - November 17, 2007

Print | Email A Friend

# MGA Entertainment's Isaac Larian Named Ernst & Young Entrepreneur Of The Year 2007 National Winner

PALM SPRINGS, CA, NOVEMBER 17, 2007 – Isaac Larian, president and chief executive officer of MGA Entertainment was today named the Ernst & Young Entrepreneur Of The Year® 2007 overall national winner. He was also named the Ernst & Young Entrepreneur Of The Year 2007 national award winner in the Retail and Consumer Products Category. Now in its 21st year, the awards recognize leaders and visionaries who demonstrate innovation, financial success and personal commitment as they create and build world-class businesses.

Larian was recognized for transforming MGA Entertainment into the largest privately held toy company in the world. "Isaac Larian has lived the American dream. He came to this country with little, found work as a dishwasher, and through passion, focus and entrepreneurial spirit, created a thriving enterprise that has redefined the toy industry," said James S. Turley, chairman and CEO, Ernst & Young LLP. "For 21 years, we have honored the dedication and drive that defines entrepreneurs through the Ernst & Young Entrepreneur Of The Year awards. We're proud to add Isaac Larian's name to this distinguished list of business leaders."

Larian was honored as both the Overall Ernst & Young Entrepreneur Of The Year 2007 national winner as well as the national winner in the Retail and Consumer Products Category at a gala in Palm Springs. Awards were given in nine additional categories. All Ernst & Young Entrepreneur Of The Year winners were selected by an independent panel of judges from approximately 400 regional award recipients.

**Negotiation Skills Learned Early**
Larian worked for his father's small textile business in Iran as a teenager. It was there he learned the art of negotiation. Those skills came in handy years later when he launched Micro Games of America, acting as a licensee of other company's products, including Nintendo, Power Rangers and Hello Kitty. Larian soon learned that being a licensor of products provided greater growth opportunities and he began building his company's own brands, licensing them to others.

In 1998, Larian changed his company's name to MGA Entertainment, transforming the business into a full consumer entertainment products company. It currently manufactures and produces more than 20 product lines of toys and games, dolls, consumer electronics, home décor, stationary and sporting goods. MGA's products include household names such as Bratz, Yummi-Land, Storytime Collection, Rescue Pets, Miuchiz, West Coast Choppers, Market Racers and Marvel toys.

**Battle of the Dolls**
With trends in toys changing as quickly as fashion, it's notable that Larian's biggest splash in the market has come from fashion conscious dolls. Since their introduction, the Bratz dolls have grown into a billion dollar franchise, and become the number one fashion doll brand in the world. That came after unseating Barbie, whose reign as the top doll had lasted for more than 40 years. The Bratz won Family Fun magazine's Toy of the Year Award four years in a row and the dolls have spawned a feature film, fashion magazines, apparel collections, a website, online promotions and a host of related products. MGA currently has more than 400 licensees worldwide, creating a range of new Bratz themed products—from Bratz Stylin' Cosmetix to Bratz Sporty Flair Bedding.

In 2006, Larian began expanding his product lines for children under six, purchasing Little Tikes, the maker of durable plastic toys and playsets for toddlers and young children. His eye toward growth continued in May 2007, as MGA acquired Smoby—rescuing France's largest toy company, and Europe's second largest, from bankruptcy.

**Open Door Brings in Good Ideas**
Despite the company's growth, Larian continues to run MGA Entertainment with the same entrepreneurial focus. Brainstorming is a big part of the company's culture and Larian maintains an open-door policy. He credits MGA's 500 employees and product designers as the source of many of the company's bestselling ideas. In 2002 an intern suggested an idea for an accessory—a spa for the Bratz dolls. That became the first Bratz playset and won the Toy Industry Association People's Choice Toy of the Year award. With all his success in the toy business, no one is having more fun than Larian himself.

**Entrepreneur Of The Year 2007 National Finalists in the Retail and Consumer Products Category**
The Ernst & Young Entrepreneur Of The Year national finalists in the Retail and Consumer Products Category were Michael J. Hagan, chairman and CEO of NutriSystem, Inc. (NASDAQ:NTRI), a leading provider of weight management and fitness products and services based in Pennsylvania; Tony Hsieh, CEO of Zappos.com, Inc., an online shoe and handbag retailer headquartered in Henderson, Nevada; and Tom Campion, founder and chairman of Zumiez (NASDAQ:ZUMZ), based in Everett, Washington, a mall-based specialty retailer of action sports related apparel, footwear, equipment and accessories.

**Additional Entrepreneur Of The Year Category Award Winners**

- Marc Benioff of San Francisco based Salesforce.com, Inc. (NYSE:CRM) was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Technology Category.

Exhibit 2
Page 198

- William Gay of W. G. Way Mechanical Contractor, Inc . in Jacksonville, Florida was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Real Estate, Hospitality & Construction Category.
- Harold Hamm of Continental Resources, Inc. (NYSE:CLR) in Enid, Oklahoma was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Energy, Chemicals & Mining Category.
- Ronald J. Kruszewski of Stifel Financial Corp. (NYSE:SF) in St. Louis, Missouri was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Financial Services Category.
- Harold "Max" Messmer, Jr. of Robert Half International Inc. (NYSE:RHI) in Menlo Park, California was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Services Category.
- Pamela B. Morris of CareSource Management Group in Dayton, Ohio was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Health Sciences Category.
- Michael V. Roberts and Steven C. Roberts of the Roberts Hotels Group in St. Louis, Missouri, were named the Ernst & Young Entrepreneur Of The Year 2007 national winners in the Emerging Category.v
- Manu Shah of M S International, Inc . of Orange, California was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Distribution, Manufacturing & Security Category.
- Michael Walrath of New York's Right Media was named the Ernst & Young Entrepreneur Of The Year 2007 national winner in the Media, Entertainment & Communications Category.

**Sponsors**

Founded and produced by Ernst & Young LLP, the Entrepreneur Of The Year Awards are pleased to have Bank of America as the national presenting sponsor, as well as SAP America and the Ewing Marion Kauffman Foundation as national sponsors.

**About The Ernst & Young Entrepreneur Of The Year® Program**

The Entrepreneur Of The Year awards program was created and is produced by professional services firm Ernst & Young LLP. As the first award of its kind, the Ernst & Young Entrepreneur Of The Year Award recognizes outstanding entrepreneurs who are building and leading dynamic and growing businesses. The program, which celebrated its 20th anniversary in 2006, honors entrepreneurs through regional, national and global award programs in over 125 cities and 40 countries.

**About the Ernst & Young Strategic Growth Markets Practice**

Ernst & Young's Strategic Growth Markets (SGM) practice guides the best high-growth companies. Our multi-disciplinary team of elite professionals provides perspective and advice to help our clients accelerate market leadership. SGM delivers assurance, tax, transactions and advisory services to thousands of companies spanning all industries. Ernst & Young is the undisputed leader in taking companies public, advising key government agencies on the issues impacting high-growth companies, and convening the experts who shape the business climate. For more information, please visit us at www.ey.com/us/strategicgrowthmarkets.

**About Ernst & Young**

Ernst & Young is a global leader in assurance, tax, transaction and advisory services. Worldwide, our 130,000 people are united by our shared values and an unwavering commitment to quality. For more information, please visit www.ey.com.

*Ernst & Young refers to the global organization of member firms of Ernst & Young Global Limited, each of which is a separate legal entity. Ernst & Young Global Limited, a UK company limited by guarantee, does not provide services to clients.*

*This press release has been issued by EYGM Limited, a member of the global Ernst & Young organization that also does not provide any services to clients.*

###

Ernst & Young refers to one or more of the member firms of Ernst & Young Global Limited (EYG), a UK private company limited by guarantee. EYG is the principal governance entity of the global Ernst & Young organization and does not provide any services to clients. Services are provided by EYG member firms. Each of EYG and its member firms is a separate legal entity and has no liability for another such entity's acts or omissions. Certain content on this site may have been prepared by one or more EYG member firms.

Exhibit 2
Page 199

# Exhibit 3

Case 2:04-cv-09049-DOC-RNB   Document 4600-3   Filed 01/02/09   Page 197 of 210   Page ID #:133003

Back to top

Global Home > US Home > Services > Strategic Growth Markets > Entrepreneur Of The Year Awards > Southeast Area Program

Print | Email A Friend

# The Southeast Area
# Ernst & Young
# Entrepreneur Of The Year Program

We're looking for entrepreneurial leaders and visionaries — men and women who create market-leading businesses, contribute to the strength of their communities and the economy, and help raise the bar of business excellence.

Celebrating entrepreneurs and the businesses they build and grow has been a priority for Ernst & Young for more than two decades, and we are proud to continue this distinguished tradition through the Ernst & Young Entrepreneur Of The Year® — the most prestigious business award for entrepreneurs.

The Entrepreneur Of The Year award recognizes the men and women who excel at what they do — pioneers and innovators such as Michael Dell of Dell Inc.; Pierre Omidyar of eBay, Inc.; Herb Kelleher of Southwest Airlines; Jim McCann of 1-800-Flowers.com; Richard Caruso of Integra LifeSciences Corp.; and Isaac Larian of MGA Entertainment.

**Nationally Sponsored by**



KAUFFMAN
The Foundation of Entrepreneurship

**2008 program contacts**

Southeast Area
Darlene Pearson-Lowe
+1 404 817 5481

Alabama/Georgia/Tennessee
Taylor Van Acker
+1 404 817 5275

Carolinas
Amanda Dudley
+1 704 331 1925

Florida
Bev Eha
+1 813 225 4893

Watch the webcast of the Alabama / Georgia / Tennessee Entrepreneur Of The Year banquet

Exhibit 3
Page 200

On 26 June at The Grand Hyatt Atlanta in Buckhead, we revealed the 2008 award recipients for the Alabama / Georgia / Tennessee region. If you missed the live webcast of the banquet, stay tuned for the archived version.

Ernst & Young refers to one or more of the member firms of Ernst & Young Global Limited (EYG), a UK private company limited by guarantee. EYG is the principal governance entity of the global Ernst & Young organization and does not provide any services to clients. Services are provided by EYG member firms. Each of EYG and its member firms is a separate legal entity and has no liability for another such entity's acts or omissions. Certain content on this site may have been prepared by one or more EYG member firms.

Exhibit 3
Page 201

# Exhibit 4

Back to top

Global Home > US Home > Services > Strategic Growth Markets > Strategic Growth Forum > Entrepreneur Of The Year Awards

Print | Email A Friend

# Ernst & Young
# Entrepreneur Of The Year Awards

The culmination of the 2007 Strategic Growth Forum was a weekend celebration of entrepreneurship featuring the 21st annual Ernst & Young Entrepreneur Of The Year awards.

Isaac Larian, president and CEO of MGA Entertainment, was honored as the Ernst & Young Entrepreneur Of The Year® 2007 on Nov. 17. Larian was chosen from among 10 national Entrepreneur Of The Year category winners representing 26 U.S. regions. Larian's company is the creator and licensor of a number of popular toy brands, including the top-selling Bratz fashion dolls.

Ernst & Young refers to one or more of the member firms of Ernst & Young Global Limited (EYG), a UK private company limited by guarantee. EYG is the principal governance entity of the global Ernst & Young organization and does not provide any services to clients. Services are provided by EYG member firms. Each of EYG and its member firms is a separate legal entity and has no liability for another such entity's acts or omissions. Certain content on this site may have been prepared by one or more EYG member firms.

Exhibit 4
Page 202

# Exhibit 5

1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
2 | (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
  Timothy L. Alger (Bar No. 160303)
5 | (timalger@quinnemanuel.com)
  865 South Figueroa Street, 10th Floor
6 | Los Angeles, California 90017-2543
  Telephone: (213) 443-3000
7 | Facsimile: (213) 443-3100

8 | Attorneys for Mattel, Inc.

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | EASTERN DIVISION

| | |
|---|---|
| 12 CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 13        Plaintiff, | Consolidated with |
| 14      v. | Case No. CV 04-09059<br>Case No. CV 05-02727 |
| 15 MATTEL, INC., a Delaware<br>corporation, | MATTEL, INC.'S FIRST SET OF<br>REQUESTS FOR DOCUMENTS AND<br>THINGS RE CLAIMS OF UNFAIR |
| 16        Defendant. | COMPETITION TO MGA |
| 17 | ENTERTAINMENT, INC. |
| 18 AND CONSOLIDATED CASES. | |

19

20

21          Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Mattel,

22 | Inc. hereby requests that MGA Entertainment, Inc. ("MGA") respond to these

23 | document requests ("Requests") and make available for inspection and copying

24 | originals of the following documents within 30 days of service at the offices of

25 | Quinn Emanuel Urquhart Oliver & Hedges, LLP, 865 South Figueroa Street, 10th

26 | floor, Los Angeles, CA 90017.  MGA shall be obligated to supplement responses to

27 | these requests at such times and to the extent required by Rule 26(e) of the Federal

28 | Rules of Civil Procedure.

07975/1928319.2

Exhibit 5
Page 203

12-15

1   REQUEST FOR PRODUCTION NO. 155:

2   　　　　All DOCUMENTS RELATING TO the allegation in Paragraph 113 of

3   YOUR COMPLAINT that MATTEL has "willfully and maliciously used its power,

4   influence and intimidation to threaten certain retailers, suppliers, licensees,

5   distributors and manufacturers so as to limit, if not prevent, MGA from doing

6   business with these retailers, suppliers, licensees, distributors and manufacturers,

7   using its power and influence to intimidate and manipulate industry bodies."

8

9   REQUEST FOR PRODUCTION NO. 156:

10   　　　　All DOCUMENTS RELATING TO the allegation in Paragraph 113 of

11   YOUR COMPLAINT that MATTEL has "used its power and influence to attempt

12   to, if not actually, intimidate and threaten MGA's current and potential employees so

13   as to cause MGA competitive injury."

14

15   REQUEST FOR PRODUCTION NO. 157:

16   　　　　YOUR quarterly and annual profit and loss statements (both audited

17   and unaudited) for the years 2000 through the present, inclusive.

18

19   REQUEST FOR PRODUCTION NO. 158:

20   　　　　YOUR quarterly and annual financial statements (both audited and

21   unaudited) for the years 2000 through the present, inclusive.

22

23   REQUEST FOR PRODUCTION NO. 159:

24   　　　　YOUR annual reports for each of the years 2000 through the present,

25   inclusive.

26

27

28

Exhibit 5
Page 204
-45-

07975/1928319.2

REQUEST FOR PRODUCTION NO. 166:

To the extent not produced in response to any other Request for Production, all DOCUMENTS and tangible things upon which YOU intend to rely upon in this action.

DATED:  December 18, 2006         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____
Timothy L. Alger
Attorneys for Mattel, Inc.

# **PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is NOW Messenger Service, 1301 West Second Street, Suite 206, Los Angeles, California 90026.

On December 18, 2006, I true copies of the following document(s) described as:

## **MATTEL, INC.'S FIRST SET OF REQUESTS FOR DOCUMENTS AND THINGS RE CLAIMS OF UNFAIR COMPETITION TO MGA ENTERTAINMENT, INC.**

on the parties in this action as follows:

| | |
|---|---|
| Diana M. Torres, Esq.<br>O'Melveny & Myers<br>400 So. Hope Street<br>Los Angeles, CA  90071<br>Telephone: (213) 430-6000<br>Facsimile: (213) 430-6407 | Keith A. Jacoby, Esq.<br>Littler Mendelson<br>2049 Century Park East, 5th Floor<br>Los Angeles, CA  90067-3107<br>Telephone: (310) 553-0308<br>Facsimile: (310) 553-5583 |

[√ ]    [PERSONAL] by personally delivering the document listed above to the person(s) at the address(es) set forth above.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made

Executed on December 18, 2006 at Los Angeles, California.

_____
David Quintana

Exhibit 5
Page 206
Case No. SACV 05-00953 JVS (ANx)
PROOF OF SERVICE

07209/2020338.1

# Exhibit 6

1   Hon. Edward A. Infante (Ret.)
    JAMS
2   Two Embarcadero Center
    Suite 1500
3   San Francisco, California  94111
    Telephone:     (415) 774-2611
4   Facsimile:      (415) 982-5287

5

6                      UNITED STATES DISTRICT COURT

7                     CENTRAL DISTRICT OF CALIFORNIA

8                              EASTERN DIVISION

9

10

11  CARTER BRYANT, an individual,          CASE NO. C 04-09049 SGL (RNBx)
                                           JAMS Reference No.1100049530
12             Plaintiff,

13        v.                               Consolidated with
                                           Case No. CV 04-09059
14  MATTEL, INC., a Delaware corporation,  Case No. CV 05-2727

15             Defendant.                  **ORDER GRANTING IN PART AND
                                           DENYING IN PART MATTEL'S
16                                         MOTION TO COMPEL PRODUCTION
                                           OF DOCUMENTS BY MGA;
17                                         DENYING REQUEST FOR
                                           MONETARY SANCTIONS**
18  CONSOLIDATED WITH
    MATTEL, INC. v. BRYANT and
19  MGA ENTERTAINMENT, INC. v. MATTEL,
    INC.
20

21                         I.  INTRODUCTION

22        On June 26, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production of

23  Documents by MGA Entertainment, Inc. ("MGA") and for Award of Monetary Sanctions.  Mattel

24  seeks an order compelling MGA "to produce documents responsive to Mattel's First Set of

25  Requests for Documents and Things Re Unfair Competition Claims, including, without limitation,

26  Request Nos. 1, 3-10, 12-13, 16-18, 19-20, 26-27, 29-30, 32-40, 42-43, 45, 48-52, 54-56, 58-60,

27

28
    Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

Exhibit 6
Page 207

1    65-119, 137-140, 157-161, 164 and 166," and for sanctions in the amount of $4,500, which

2    represents a portion of the costs incurred by Mattel in bringing this motion.  Mattel's Motion at

3    p.1.  On July 3, 2007, MGA submitted its opposition brief, and on July 9, 2007, Mattel submitted

4    a reply brief.  The matter was heard via telephonic conference on August 13, 2007.  Having

5    considered the motion papers and comments of counsel at the hearing, Mattel's motion to compel

6    is granted in part and denied in part, and the request for sanctions is denied.

7                                    II. BACKGROUND

8           This consolidated action includes MGA's claims for unfair competition against Mattel.

9    Among other things, MGA alleges that Mattel has engaged in "serial copycatting" of MGA

10   products, packaging and advertising, including Bratz dolls and other Bratz products, Bratz

11   packaging and Bratz television commercials.  MGA also alleges that Mattel engaged in improper

12   conduct in dealing with retailers, licensees, employees and industry organizations.

13          After MGA filed its claims against Mattel, Mattel sought and was granted leave to file

14   several counterclaims against MGA, including claims for copyright infringement, violation of

15   RICO, conspiracy to violate RICO, misappropriation of trade secrets and unfair competition.

16   Among other things, Mattel alleges that MGA has induced Mattel employees to steal Mattel's

17   trade secrets, confidential information and other property and take it with them to their new

18   employment with MGA.  Mattel also alleges that Bryant conceived, created and developed Bratz

19   designs while he was employed by Mattel as a designer, that he concealed his Bratz work from

20   Mattel, and that he sold Bratz to MGA while he was a Mattel employee.  Mattel alleges that it is

21   the rightful owner of the Bratz designs and that MGA is engaging in copyright infringement of

22   the Bratz designs.

23          On December 18, 2006, Mattel propounded its First Set of Requests for Production of

24   Documents and Things re Claims for Unfair Competition to MGA (the "Requests for

25   Production").  The Requests for Production consist of 166 requests seeking information that

26

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

Exhibit 6
Page 208

1   Mattel contends is relevant primarily to MGA's claims for unfair competition and Mattel's

2   defenses thereto.

3        In the meantime, MGA served its initial disclosures related to its unfair competition

4   claims.  Mattel immediately filed a motion to compel MGA to provide complete initial

5   disclosures in compliance with Rule 26, Fed.R.Civ.P.  Although the initial disclosures were

6   wholly inadequate, the Discovery Master denied the motion to compel, reasoning that it would be

7   more efficient and orderly for the parties to proceed with Mattel's pending Requests for

8   Production.

9        MGA served its responses to Mattel's Requests for Production on January 17, 2007.

10  MGA objected and refused to produce documents responsive to approximately two-thirds of

11  Mattel's requests.  As to the remaining requests, MGA agreed to produce "relevant and non-

12  objectionable documents," subject to its General and Specific Objections.

13       Thereafter the parties met and conferred in person and exchanged a few letters.  On

14  February 9, 2007, counsel for MGA advised Mattel by letter that MGA, subject to its General and

15  Specific objections, agreed to produce all "relevant and non-objectionable documents" responsive

16  to Request Nos. 1-4, 11, 13-15, 18, 21-26, 28-29, 31-36, 44-51, 53, 61-64, 118, 120-137, 141-156,

17  162-163, 165 and 166.  Kidman Decl., Ex. 14.  As to Request Nos. 9, 10 and 12, MGA also

18  agreed to produce "documents sufficient to show the timing of, and relevant facts regarding"

19  certain specified products.  Id.  Counsel for MGA sent another letter on February 16, 2007,

20  advising Mattel that MGA would produce documents responsive to Request Nos. 29 and 30.

21  Bradley Decl., Ex. 1.  On May 21, 2007, MGA advised Mattel by letter that it agreed, in essence,

22  to withdraw its restriction to "relevant and non-objectionable documents" in its responses to the

23  Requests For Production.  Bradley Decl., Ex. 3.  On May 31, 2007, MGA served supplemental

24  responses to Mattel's Requests for Production, which no longer included the phrase "relevant and

25  non-objectionable."  Kidman Decl., Exs. 11 and 16.

26

27

28

1    In its opening brief, Mattel contends that MGA has improperly refused to produce

2   documents relating to:  the creation, origin, timing and ownership of the contested MGA products

3   and packaging, including the contested Bratz products and packaging (Request Nos. 5, 6-8, 16,

4   17, 19, 20, 38, 39, 48); MGA's alleged theft of Mattel's trade secrets and confidential information

5   by, among other things, targeting and recruiting current and former Mattel employees (Request

6   Nos. 42, 59, 60, 65-117, 138-140, 160, 161 and 164); damages (Request Nos. 27, 30 and 157-

7   159); facts MGA contends support its unfair competition claims (Request Nos. 45, 119 and 166).

8   Mattel contends that MGA has no legitimate basis for refusing to produce these categories of

9   documents because they are directly relevant to the claims and defenses in the case.  Mattel also

10   contends that MGA has improperly restricted the scope of its document production in response to

11   Request Nos. 1, 3, 4, 13, 18, 29, 49, 52 and 137.

12    MGA contends that Mattel's motion should be denied in its entirety for three reasons.

13   First, Mattel is seeking documents MGA already agreed to produce as a result of the meet and

14   confer process.  Second, Mattel is seeking documents that may be precluded by other motions

15   pending before the district court.  Third, Mattel is seeking documents that constitute an

16   unreasonable and overbroad fishing expedition.

17    As to the first point, MGA contends that it has already agreed to produce documents

18   responsive to Request Nos. 9, 10, 12, 26, 29, 30, 32-36, 45, 48-51, 118, 137, and 166.  Moreover,

19   MGA represents that it has produced more than 110,000 pages of documents, including

20   documents relating to the origin, infringement, design and tooling of Bratz and has also provided

21   Mattel with access to Bratz molds and sculpts.  MGA also represents that it is continuing to

22   search for and produce documents responsive to Mattel's requests on a rolling basis.

23    MGA also asserts that it "has revisited certain of Mattel's requests, and so as to avoid

24   further burdening the Court, MGA agrees to produce non-privileged documents in its possession,

25   custody or control, subject to its previously stated General and Specific Objections, that are

26

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

Exhibit 6
Page 210