1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
2     John B. Quinn (Bar No. 090378)
      johnquinn@quinnemanuel.com
3     Michael T. Zeller (Bar No. 196417)
      (michaelzeller@quinnemanuel.com)
4     Jon D. Corey (Bar No. 185066)
      (joncorey@quinnemanuel.com)
5     Timothy L. Alger (Bar No. 160303)
      (timalger@quinnemanuel.com)
6   865 South Figueroa Street, 10th Floor
    Los Angeles, California 90017-2543
7   Telephone:  (213) 443-3000
    Facsimile:  (213) 443-3100

8   Attorneys for Mattel, Inc.

9                UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                    EASTERN DIVISION

12  | CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |

13  Plaintiff,

Consolidated with
Case No. CV 04-09059
14  vs.                              Case No. CV 05-02727

15  MATTEL, INC., a Delaware        **DECLARATION OF MICHAEL T.**
    corporation,                    **ZELLER IN SUPPORT OF MATTEL,**
16                                  **INC.'S *EX PARTE* APPLICATION FOR**
    Defendant.                      **APPOINTMENT OF A RECEIVER**
17                                  **FOR MGA OR FOR ALTERNATIVE**
                                    **RELIEF**
18  AND CONSOLIDATED ACTIONS

19                                  Hearing Date:  January 5, 2009
                                    Time:          10:00 a.m.
20                                  Place:         Courtroom 1

21                                  **Phase 1C**

22

23

24

25

26

27

28

ORIGINAL

07209/2748274.1

## DECLARATION OF MICHAEL T. ZELLER

I, Michael T. Zeller, declare as follows:

1.      I am a member of the bars of the States of California, New York and Illinois and a partner at Quinn Emanuel Urquhart Oliver & Hedges, LLP, attorneys for plaintiff and counter-defendant, Mattel, Inc. ("Mattel").  I make this declaration of personal, firsthand knowledge and, if called and sworn as a witness, I could and would testify competently thereto.

2.      Attached as Exhibit 1 is a true and correct copy of the Statement of Decision of the Los Angeles Superior Court in In re Uzyel Irrevocable Trust, dated October 24, 2006, No. BP 058 898. In this action, Neil Kadisha was found liable for taking millions of dollars as part of a 12-year-long pattern of fraudulent conduct that included perjury, fabrication of financial records, sham transactions, preparation of back-dated documents, fraudulent accountings, acts of looting, embezzlement and other misappropriations of funds, breaches of fiduciary duty, conflicts of interest and illegal self-dealing.  Thus, for example, the Los Angeles Superior Court found:

- "Kadisha was heavily involved in two corporations (Omninet Corporation and Qualcomm) that were in dire need of millions of dollars to stave off impending bankruptcies. He took and used trust assets for his own financial interests (much of which was tied to the two failing corporations)..." In re Uzyel Irrevocable Trust, October 24, 2006, at 2:13-16.
- "Kadisha prepared accountings to cover up, mislead and deceive..." Id. at 2:22-23.
- "Kadisha believed it to be prudent strategy to commit perjury..." Id. at 4:17-18.
- "Kadisha was no more than a common thief in his monumental takings of ... money for his own use and benefit." Id. at 13:19-20.

- "Kadisha's first act as Trustee was to misappropriate $500,000..." Id. at 14:13-14.
- "At this time, Kadisha had stripped Trust 2 of virtually all of its cash..." Id. at 38:27-28.
- "In discovery, under penalty of perjury, Kadisha gave six different and untrue accounts of what he did with the Namco Loan proceeds." Id. at 41:23-24.
- "The creation of the Rahban 'loans' was simply part of Kadisha's pattern of creating phony transactions..." Id. at 50-51 n.12.
- "Kadisha created a phony, backdated sale to conceal..." Id. at 62:24-25.
- "Kadisha's Trust Accountings Were Fraudulent, Misleading, and Inaccurate and Concealed his Wrongdoings." Id. at 71:7-8.
- Kadisha "misappropriat[ed]" loan proceeds, trust property and trust funds. Id. at 102:1-20.
- "The court finds beyond any doubt that the acquisition of the subject 30,000 shares of Qualcomm was enable by Kadisha embezzlement of practically all the subject Namco loan proceeds." Id. at 111:24-27.
- "[T]he trust agreements are the product of fraud by the respondent [Kadisha]." Id. at 112:12-23.
- "The loan was a conflicted transaction that breached [Kadisha's] fiduciary duties..." Id. at 117:19.
- "[P]ractically everything Kadisha did in so-called management of the Trusts was done by embezzlement of trust money for his own interests and without regard to any of his obligations as trustee..." Id. at 118:22-24.
- "Kadisha, being guilty of perjury among other misdeeds..." Id. at 120:1-2.

1      • "Kadisha was self-dealing" and "concocted a phony loan of
2      $1,400,000..." Id. at 121:14-18.

3      • "Kadisha's misappropriation of millions of dollars of trust money from
4      1988 to 1996 were not loans made at an adequate interest rate or with
5      adequate security, as Kadisha contends. Kadisha embezzled the funds in
6      flagrant violation of his fiduciary duties." Id. at 126:16-18.

7      • Kadisha "intentionally retailiat[ed]" against petitioners "for suing him."
8      Id. at 141:27-28.

9      • "In considering Kadisha's conduct, the total pattern of Kadisha's conduct
10     comes into play. His malice, fraud, recidivism, and reprehensibility may
11     be singular. The evidence of his overall conduct over the 12 years of his
12     trusteeship establishes by clear and convincing evidence that none of his
13     acts were innocent or an accident..." Id. at 152:17-20.

14     • "Kadisha misappropriated substantially all of the Trust's assets for his
15     own use to bolster his shaky finances and the shaky finances of
16     businesses in which he was heavily invested, including Omninet and
17     Qualcomm." Id. at 153:2-6.

18     • "Kadisha did not engage in an isolated act of misconduct -- he
19     repeatedly, systematically and intentionally engaged in conduct that he
20     knew was prohibited to him as a trustee." Id. at 155:13-14.

21     • "He [Kadisha] intentionally and consistently violated his fiduciary
22     duties. He looted the Trusts. ... He concealed his wrongdoings with
23     fraudulent accountings, backdated promissory notes and phony
24     transactions." Id. at 156:1-5.

25     • "[A]s another example of his fraud, Kadisha stole money from the
26     Trusts under the guise of making loans to David Rahban, whom the
27     Court has found to be a non-existent person in the claimed loan
28     transaction." Id. at 156:8-11.

1      •   "Kadisha's malice and/or fraud also includes ... his intentional self-
2          dealing with trust assets, ... his backdating of promissory notes and
3          creating backdated, phony transactions; his misappropriations of over
4          $10 million of the Trusts' cash without adequate security or even the
5          most minimal documentation". Id. at 156:16-157:1.

6      •   "Kadisha set the course of his entire trusteeship on the impermissible
7          taking of Trust assets, false accountings, back-dating of notes and the
8          many other intentional breaches of trust hereinbefore set forth." Id. at
9          157:14-17.

10    •   "While it may be repetitive, Kadisha didn't borrow Trust funds -- he
11       embezzled them, millions of dollars of them. ... He backdated notes in
12       an effort to cover up his wrongful takings. He intentionally and
13       carelessly caused accountings to be prepared that were deliberately
14       designed to deceive and did deceive". Id. at 158:23-28.

15    •   "He [Kadisha] backdated promissory notes prepared after he repaid the
16       misappropriations and knew that he had to conceal the fact that they
17       were backdated, as demonstrated by his untruthful testimony at his
18       deposition about the preparation and execution of the notes." Id. at
19       166:18-20.

20    •   "He [Kadisha] intentionally designed his accountings to conceal his
21       misappropriations." Id. at 166:22.

22    •   "But one of the most important things that Kadisha knew, which relates
23       to his opposition to each of Petitioners' claims as well as his affirmative
24       defenses, is that he would have to give false testimony and suborn
25       perjury to prevent his wrongdoings from being discovered by the Court."
26       Id. at 168:1-5.

27    •   "Kadisha perjured and suborned perjury at trial." Id. at 169:22.

28

-4-

1    3.  Attached as Exhibit 2 is a true and correct copy of a press release

2 found on the Ernst & Young website at http://www.ey.com/global/Content.nsf/

3 US/Media_-_Release_-_11-17-07GDC.

4    4.  Attached as Exhibit 3 is a true and correct copy of a press release

5 found on the Ernst & Young website at http://www.ey.com/global/Content.nsf/US/

6 EGCS_-_EOY_-_Regional_Programs_-_SEA_-_Overview.

7    5.  Attached as Exhibit 4 is a true and correct copy of a press release

8 found on the Ernst & Young website at http://www.ey.com/global/Content.nsf/US/

9 SGM_-_Strategic_Growth_Forum_-_EOY.

10    6.  Attached as Exhibit 5 is a true and correct copy of excerpts of

11 Mattel, Inc.'s First Set of Requests For Documents and Things Re Claims of Unfair

12 Competition to MGA Entertainment, Inc., dated December 18, 2006.

13    7.  Attached as Exhibit 6 is a true and correct copy of the Discovery

14 Master's Order Granting in Part and Denying in Part Mattel's Motion to Compel

15 Production of Documents by MGA, dated August 13, 2007.

16    8.  Attached as Exhibit 7 is a true and correct copy of the Discovery

17 Master's Order Regarding Mattel, Inc.'s Motion to Enforce the Court's Order of

18 May 15, 2007, dated December 19, 2007.

19    9.  Attached as Exhibit 8 is a true and correct copy of the Discovery

20 Master's Order Re Mattel, Inc.'s Motion to Enforce the Court's Order of May 15,

21 2007 to Compel MGA to Produce Compelled Documents in Unredacted Form and

22 For Sanctions, dated December 19, 2007.

23    10.  Attached as Exhibit 9 is a true and correct copy of the Discovery

24 Master's Order Re Mattel, Inc.'s Motion To Compel Production of Documents

25 Withheld As Privileged, dated December 19, 2008.

26    11.  Attached as Exhibit 10 is a true and correct copy of the

27 Discovery Master's Order Granting in Part Mattel's Motion to Enforce the Court's

28

1  Order of May 16, 2007, to Compel MGA to Produce Witnesses For Deposition

2  Pursuant To Rule 30(B)(6), And Granting Request For Sanctions.

3

4          I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct, and this declaration was executed this

6  2nd day of January, 2009, at Los Angeles, California.

7

8                           /s/ Michael T. Zeller

                         Michael T. Zeller

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ORIGINAL FILED

## OCT 2 4 2006

## LOS ANGELES SUPERIOR COURT

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re:  THE UZYEL IRREVOCABLE TRUST NO. 1, established February 26, 1988 | ) ) ) ) ) ) **CASE NO.: BP 058 899** <br><br> **STATEMENT OF DECISION** |
| In re:  THE UZYEL IRREVOCABLE TRUST NO. 2, established February 26, 1988 | ) ) ) ) ) ) ) **CASE NO. BP 058 898** |

"The truth is rarely pure and never simple"

Oscar Wilde

On May 1, 1986, Rafael Uzyel ("Rafael"), 40 years of age, was driving his Mercedes Benz back to Southern California from Mammoth, California with his wife Dafna, 28 years of age, and their two small children, Izzet, 6 years of age, and Joelle, 4 years of age, when Rafael suffered a heart attack and died.

---

Exhibit 1
Page 7

1   Rafael was successful in the fabric business.  He and his wife were worth several million

2   dollars, having an apartment in Israel, cash in Switzerland, cash and real property in Beverly

3   Hills, California.

4       Rafael had a sister, Lillian Nomaz, living in Switzerland.  She was the cause of Dafna

5   becoming the victim of an avalanche of legal events that are beyond bizarre and well beyond her

6   intellectual ability to cope with.

7       Ms. Nomaz had concern that Dafna would be unable to handle what she considered to be

8   her brother's money in Switzerland, to the detriment of her niece and nephew.  This concern

9   caused Dafna to become the victim of two persons.  The first was an attorney, Hugo DeCastro,

10  who was grossly unethical in his representation of Dafna.  The second was Neil Kadisha

11  ("Kadisha") the Respondent, who became a monumentally self-serving trustee of two trusts that

12  were established with Dafna's money.

13      Kadisha was heavily involved in two corporations (Omninet Corporation and Qualcomm)

14  that were in dire need of millions of dollars to stave off impending bankruptcies.  He took and

15  used trust assets for his own financial interests (much of which was tied to the two failing

16  corporations) disregarding the welfare of Dafna and her children and completely without regard

17  to his duties and responsibilities as a trustee, which he later tried to clean up with atrocious

18  amendments to the trust agreements.  Kadisha took unconscionable advantage of Dafna who,

19  after the death of her husband, was in many ways similar to a person requiring evaluations as a

20  developmentally disabled person in need of protection from those who would take advantage of

21  her in a foreign and incredible economic adjustment.

22      Among his derelictions as trustee for Dafna and her children, Kadisha prepared

23  accountings to cover up, mislead and deceive Dafna (even if it be assumed arguendo she could

24  have understood them—which intellectually she could not).  Kadisha took and used trust money

25  for his own benefit including but not limited to his investment in two corporations.  Dafna never

26  had a chance in her dealings with DeCastro or Kadisha.  There is no way this can ever be over-

27  emphasized.  After witnessing Dafna on the witness stand for days on end, the court was and is

28  thoroughly convinced of Dafna's lack of learning and intellectual capacity to know really what

---

STATEMENT OF DECISION

2

Exhibit 1
Page 8

1   was going on in her life with the creation of the subject trusts and all that followed in relation

2   thereto.  What Dafna needed was a conservator truly interested in her well being and an excellent

3   attorney, to insure the protection of her legal interests.  What she got was DeCastro, a grossly

4   conflicted attorney, and a trustee, Kadisha, who was in dire need of large amounts of cash to help

5   stave off and prevent the bankruptcy of two corporations he was deeply involved with.

6   　　　　The legal treatment of Dafna by DeCastro is appalling.  He had in his hands a young

7   widow attempting independent living with two small children to look after.  He cared not about

8   them but about his own pocket book.  It is almost inconceivable but true what he did.  DeCastro

9   concocted a trust agreement with escape clauses designed to relieve Kadisha of any warranty he

10  would provide lawful trustee services to Dafna and her children.  Poor dumb Dafna, a perfect

11  victim.  The first was the exculpatory clause.  The second was the conflict of interest clause.

12  DeCastro did not want Dafna to notice he was having her sign a document blatently against her

13  interest.  And on behalf of Kadisha, he concealed from Dafna at least three things: (1) his

14  conflict of interest in representing Kadisha while holding himself out as her attorney, (2) that

15  Dafna should seek independent counsel, and (3) he never bothered to explain the terms and

16  condition of the trust to her English, Hebrew or Persian. (Farsi)  DeCastro capped it off by

17  charging Dafna immense attorney fees, which Kadisha paid from Dafna's money which had

18  gone into the trusts.

19  　　　　Equally disturbing is the production by a law firm of three amendments to the original

20  trust agreement re Trust 2, relieving Kadisha from any and all civil liability for any wrongdoing.

21  And as in the creation of the original Trust 2 agreement, Dafna never had independent legal

22  representation nor was she advised to seek independent counsel.

23  　　　　The amendments to the trust documents were designed to give life support to Kadisha's

24  wanton and outrageous regimen of irresponsibility and self-dealing.  They were elaborate, yet

25  transparent precautions designed to avoid answering for his defaults.  They reflect a sickening

26  and callous disregard of treating an unfortunate person with dignity and respect.  No law firm's

27  name appeared on the amendments nor did the individual name of a lawyer.  Apparently the

28  drafter knew Mrs. Uzyel was not represented by an attorney because the document makes no

**STATEMENT OF DECISION**

3

Exhibit 1
Page 9

reference to her being represented and no acknowledgment is provided at the end of the amendments to indicate by a lawyer's signature that he had fully advised Dafna about the amendments and approved of her executing the same.  The drafter had to know it would be difficult even for a down-and-out attorney sipping Ripple in pigeon park to batter his remaining conscience and sign such garbage for the benefit of a trustee.

Kadisha is seeking to provide answers and justification of his conduct as trustee not only comes up with the novel idea that Dafna is to blame for it all, and were it not for her "thicket," he comes up with a "single investment" defense.  This is based upon the fact that everything involved in his trusteeship really involves Qualcomm stock as a single investment and that in the end, the Qualcomm stock investment reaped the astonishing gain of 5,000%, so what are the beneficiaries' damages?  Of course this would take even more adjustment in the testimony of Kadisha's oath helpers and the records that do exist.

What Kadisha really hopes is that when the court looks at the end result and finds one lucky investment resulted in a total gain to the trust; far more than had the trust money been invested according to the prudent investment rules, and this should wipe out any theft or willful misuse of trust money.  Respondent would have the court to understand this was "surely a prudent strategy for the Trust under all of the circumstances."   Kadisha believed it to be prudent strategy to commit perjury and violate all laws applicable to trustees.

It is prudent to reveal all of the facts and circumstances relevant to this case to arrive at an equitable resolution of this case.  Even though it would appear Respondent would like to pick bits and pieces from the total picture and in re-colorization have the picture reveal himself as the innocent victim of the clever and deceitful Dafna.  In fact, Kadisha has attempted to turn the tables on the truth of the situation and declares unabashedly that it is Dafna who created what he defines as a "thicket" to prevent true facts to be exposed in regard to Kadisha's defenses.  It is quite the other way around.  It is Kadisha who engages in monumental "thicket" building.  One deceitful answer by Kadisha under oath must be taken as a very large and unacceptable "thicket."  If you then multiply all the false answers under oath Kadisha has given the "thicket" is great enough for the court to declare all issues against Kadisha.  Additionally, you have Kadisha's

self-serving so called "accountings" which leave him with an escape hatch to declare whether his taking of trust money is a "loan" or an "investment" depending on what turns out to be advantageous to him at the time. Further, Kadisha had to harbor the ever present thought that if Dafna went to an attorney with inquiry about Kadisha's camouflaged accounting his trusteeship would come to an abrupt end followed by legal action against him. Kadisha comes up with the real hallmark of "thicket" building in having created for his benefit amendments to the Trust 2 agreements to exculpate him from every known trustee sin known to man. Kadisha's "thicket" argument as a new arsenal is totally lacking in firepower. It's a dud.

    As in most litigated civil cases, getting a fact squarely in the cross-hairs of the truth does not occur with great frequency, but more often than not proof falls within or without the newly minted standard of "more likely true than not." This new standard is a confirmation that the word "fact" is a slippery word. Facts in science may be well determined by scale and measurement but not when based upon different human observation or opinion. Fitting facts to law may be equally slippery. The court has used Petitioner's Statement of Fact where deemed accurate, altering, amending or deleting same to fit the court's findings and conclusions.

    After Rafael's death, Dafna's financial condition was precarious. She had virtually no liquid assets with which to pay even her family's basic expenses. (TE 10.) Dafna did not know how to take control of these assets or how to provide liquidity for her family's expenses. She, therefore, sought the advice of Kadisha, a social friend of her family. (RT 65, 5-16-02.)

    In or about August 1986, Kadisha referred Dafna to his own attorney, Hugo DeCastro ("DeCastro") and his law firm, DeCastro, West, et al. ("DeCastro West"). (RT 67, 5-16-03; TE 1624A.) She retained DeCastro and DeCastro West to marshal Raphael's assets and (later on) to form the Trusts. (TE 2, 3, 4.) Dafna did not know DeCastro or his firm and did not know what Kadisha's and DeCastro's relationship was. (TE 4; RT 41, 1-21-03.) During the same period in which DeCastro and DeCastro West represented Dafna, they also represented Kadisha and/or

---

several of his entities.  (RT 99, 10-30-03.)  Dafna was never informed of this fact.  (RT 41, 1-21-03.)

From the inception of DeCastro's (conflicted) representation of Dafna in 1986 through 1989, DeCastro West's invoices reflect that DeCastro consulted almost exclusively with Kadisha regarding Dafna's rights.  (TE 1733.)  For example, in June 1987, DeCastro called Kadisha to confer with him four times, but never called Dafna.  (RT 10, 10-30-03; TE 1733, July 6, 1987 statement.)  In October through December 1987, DeCastro West consulted with Kadisha 15 times while the trust was being drafted, but never consulted with Dafna.  (TE 1733, November 6, 1987 statement and December 4, 1987 statement.)  From inception through the formation of the Trusts, DeCastro also sent copies of virtually every piece of correspondence pertaining to Dafna to Kadisha for comment or action.  (TE 5, 6, 7, 8, 11, 12, 15, 3004, 3016, 3018, 3020, 3022, 3024, 3025, 3027, 3032, 3036, 3039, 3057, 3060, 3063, 3068.)

### Kadisha's Trust Financial Transactions with Dafna.

From the inception of DeCastro's representation until February 26, 1988 (the date the Uzyel Trusts were formed, Dafna received $4,000 per month from Switzerland.  This was not enough to cover her family's living expenses.  To make ends meet, Kadisha advanced Dafna money.  He claims he advanced $140,523.06 to Dafna prior to the formation of the Trusts.  (TE 22.)

Kadisha never memorialized this purported debt in a writing that was given to Dafna or that indicated the date of receipt or any agreement regarding repayment, whether interest was to accrue, the rate of interest, or the date of repayment.  Nor did Kadisha inform DeCastro of the purported advances.  (RT 30, 11-20-03.)  Kadisha admitted that "[t]here was no note for this

advance and no assurance of repayment.  It was like an advance to our sister." (TE 1624a, 2:2-4; RT 109, 5-22-02.)

DeCastro's retainer letter to Dafna described his firm's relationship with Kadisha as a "special relationship" but did not explain what that "special relationship" was.  (TE 4.)  DeCastro testified that what it meant was that he was representing entities in which Kadisha was part owner or employee.  (RT 11, 10-30-03.)  However, DeCastro did not inform Dafna that Kadisha or his related entities were DeCastro West clients.  (TE 4.)  DeCastro and DeCastro West also represented Kadisha in his capacity as Trustee of the Uzyel Trusts after their formation in 1988.  (TE 47.)  Dafna was not informed of the conflicts of interest and did not waive them.  (RT 100, 10-30-03.)

DeCastro should have known from his contact with Dafna that she was incapable of understanding the legal intricacies regarding her estate and financial affairs.[1]  Before Rafael died, Dafna had never signed loan documents or even opened a bank account by herself.  (RT 39, 1-21-03.)  De Castro should also have known that Dafna's understanding of English was limited.  Nevertheless, DeCastro's (limited) communications with Dafna were in English.  He incorrectly assumed that Kadisha (who spoke to Dafna mainly in Hebrew and Persian) was explaining everything to Dafna—but Dafna testified that Kadisha never explained any of the documents he had her sign.  (RT 60, 1-21-03.)

Lillian Nomaz ("Nomaz"), Rafael's sister, objected to Dafna taking control of the Swiss assets and transferring them to the United States.  From August 1986 through December 1989, DeCastro and his firm (on Dafna's behalf, before the formation of the Trusts and on Kadisha's

---

[1] Since many relevant events in this case occurred some 10-12 years prior to Dafna's trial testimony, her understanding of the English language, business and finances was even more limited than the (lack of) understanding she displayed at trial.

**STATEMENT OF DECISION**

7

Exhibit 1
Page 13

behalf after the formation of the Trusts) engaged in legal proceedings with Nomaz (with the assistance of local counsel) to marshal the Swiss assets. (See, e.g., TE 12, 14, 15, 20, 41.)

The establishment of Trust 1 to hold the Swiss assets for Dafna's Izzet's and Joelle's benefit was the vehicle for settling the dispute with Nomaz. (See, e.g., TE 3039, 3051.) In December 1987, after DeCastro consulted exclusively with Kadisha throughout the month regarding trust issues (TE 1733, January 11, 1988 statement), Kadisha was selected to be the trustee. (TE 20.)

Nomaz did not insist upon establishing a second trust for any of Dafna's other assets or for the portion of the Swiss funds that Dafna was to receive under their settlement agreement. The correspondence between Dafna's and Nomaz' attorneys mention only a single trust, which early on was referred to as the "Dafna Uzyel Irrevocable Trust." (See, e.g., TE 20, 3039, 3051, 3063.) In a June 30, 1988 letter to Nomaz' counsel, DeCastro West confirmed that the Uzyel Irrevocable Trust No. 2 ("Trust 2"), which gave Kadisha control over the bulk of Dafna's assets, was *not* related to the Nomaz dispute. (TE 86.) Kadisha must have known this since he, rather than Dafna, was routinely consulted by DeCastro regarding the trusts. (TE 1733.) Nonetheless, he falsely stated in an October 2, 2000 declaration that the settlement required establishing *both* Trusts. (TE 1624a, 2:1-22.) Kadisha's self-serving statement was an obvious attempt to obscure the fact that Kadisha was intimately involved in the creation of Trust 2, which gave him immediate control of Dafna's U.S. assets -- even if the foreign assets never materialized.

On February 26, 1988, the operative trust instruments for Trust 1 and Trust 2 were signed by Dafna, as Settlor, and Kadisha, as Trustee. (TE 44, 44a.) Dafna also assigned her interest in various assets to the Trusts, including the Strathmore Residence to Trust 2. (TE 43.) Since the Swiss and Israeli assets had not yet been marshaled, Trust 1 had no assets. The only major asset

of Trust 2 was the Strathmore Residence, which was lien-free and worth approximately $3.0 to $3.5 million.  (TE 46, 137.)

Trust 1 provides, *inter alia*:

- The Trust may not be revoked, altered or amended, except as provided in the Agreement. (A. 4.)

- The Trust is for the primary benefit of Dafna, Izzet and Joelle.  (A.5.)

- If Kadisha ceases to act as Trustee, Trust Services of America shall be the successor trustee.  (A.6.)

- The trust estate is to be immediately divided into two separate shares, one for Izzet and one for Joelle.  (A.7.)

- The greater of $5,000 per month or an amount equal to 75% of the Trusts' net income is to be distributed to Dafna each month.  (B.1 and B.2.)

- *If in the discretion of the Trustee*, Dafna needs additional funds for reasonable support, health or education, the Trustee shall pay such amount *as the Trustee shall deem necessary* to meet said needs, taking into account the beneficiary's accustomed standard of living and other income.  (B.3, emphasis added.)

- The Trust estate shall at all times be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, and within those guidelines to maximize the income from the Trust estate.  (Article C.)

- The Trustee may lend money upon adequate interest and security.  (Article C.)

- The Trustee may employ and rely upon the professional advice of accountants, brokers, attorneys, and investment advisors necessary for the administration of the Trust. (C.9.)

- While Izzet and Joelle are minors, a copy of any accounting shall be sent to Nomaz. (D.6.)

- Any Trustee may resign upon 30 days' prior written notice. (D.10.)

Trust 2 provides, *inter alia*, that:

- The trust is established for the primary benefit of Dafna. (A.5.)

- If Kadisha ceases to act as a trustee for any reason other than his removal by Dafna, then Dafna shall have the option to (i) terminate the Trust, in which case Dafna or any person designated by her, shall serve as successor trustee, or (ii) designate a corporate trustee. (A.6.)

- Dafna may at any time after 60 days' prior written notice, remove Kadisha as trustee and replace him with a corporate trustee. (A.7.)

- The Trust shall terminate upon the first to occur of (i) December 31, 2002, and (ii) Dafna's death. (A.8.)

- Dafna shall be provided $20,000 per month reduced by (a) all income distributed during the year to Dafna from Trust 1, (b) all income received other than (i) earned income, (ii) separate income of Dafna's spouse, and (iii) income distributed to Dafna pursuant to any other provision of this instrument. The distributions to Dafna shall be adjusted annually by a factor equal to 1 plus the percentage increase in the CPI. (B.2.1.)

---

- The Trustee shall pay from the Trust estate all federal and state income taxes. (B.3.)

- *If in the discretion of the Trustee*, Dafna needs additional funds for reasonable support, health or education, Trustee shall pay such amount *as the Trustee shall deem necessary* to meet said needs, taking into account the beneficiary's accustomed standard of living and other income. (B.4, emphasis added.)

- Dafna shall have the right to demand withdrawal of up to $100,000 from the Trust estate beginning on the third, sixth, ninth and twelfth annual anniversary dates. (B.5.)

- While any of the foregoing rights remain unpaid, the Trustee shall retain sufficient borrowable or transferable assets to satisfy the withdrawal rights. (B.5.1.)

- After the sale of the Strathmore residence, the Trustee is required to purchase a substitute residence if requested by Dafna, and expend no more than $1.0 million, subject to CPI increases. (B.6.2.)

- Upon the termination of the Trust, the entire Trust estate shall be distributed to Dafna. (B.7.)

- The Trust estate shall at all times be invested in a conservative manner with primary consideration being given to preserving the principal and protecting against inflation, and within such guidelines to maximize the income from the Trust estate. (Article C.)

- The Trustee may hold Trust assets without liability for failure to invest in properties having greater income or appreciation. (C.5.)

- The Trustee may lend money upon adequate interest and security. (Article C.)

- The Trust may employ and rely upon the professional advice of accountants, brokers, attorneys, and investment advisors necessary for the administration of the Trusts. (C.9.)

- The Trustee may resign upon 60 days' prior written notice. (D.6.)

Prior to assuming the duties as a Trustee, Kadisha read and understood the contents of the trust instruments (RT64, 5-20-02), and may have consulted with DeCastro as to his duties. (RT49, 5-20-02.) Kadisha understood, among other things, that Dafna was the beneficiary of Trust 2, and that he was to conduct his duties as Trustee on her behalf. (RT 66-67, 5-20-02.) Additionally, he understood that he was to distribute to Dafna $20,000 per month per the terms of Trust 2 reduced by distributions from Trust 1 in an amount equal to 75% of its net income. (RT 141, 5-28-02, RT 24, 5-21-02.)[2]

Trust 1, negotiated by Nomaz through independent counsel, does not contain the "Exculpation of Neil Kadisha" clause that appears in Trust 2 (TE 44, TE 44A at ¶ D.10) – which was prepared by DeCastro's firm in the course of its conflicted representation of Dafna. (TE 44A.) The "Exculpation of Neil Kadisha" clause of Trust 2 states:

> This Trust has been established, and NEIL KADISHA is serving as Trustee at the request of and for the benefit of Settlor. NEIL KADISHA is not a professional Trustee, and is serving without compensation (other than reimbursement for actual expenses) solely as an accommodation and assistance to Settlor. To induce NEIL KADISHA to serve as Trustee hereunder, Settlor agrees as follows: (i) NEIL KADISHA shall not be responsible to Settlor for any acts or omissions as Trustee hereunder, specifically

---

[2] From the inception of the trusts until Kadisha turned over the assets to the beneficiaries in September 2000, he never distributed to Dafna 75% of Trust 1's net income. This resulted in Trust 1 owing Dafna approximately $1,600,000, without interest as of 1998. If Dafna had $1,600,000, she would not have required distributions from Trust 2 in the same amount. Then Trust 2 would not have had to borrow money from Trust 1 which was the main reason Kadisha used to justify the Purported October 1998 Sale.

1  including but not limited to his decision to make or not make
2  discretionary distributions to Settlor hereunder (including any
3  losses which Settlor might sustain due to Settlor's failure to invest
   or utilize in a prudent manner any property distributed hereunder),
4  unless such acts or omissions constitute gross negligence, bad faith
   or intentional wrongdoing on the part of NEIL KADISHA. . . The
5  provisions of this Paragraph limiting NEIL KADISHA's liability
   shall be in addition to any other limitations on liability provided by
6  this instrument of law.

7      At the time the Trusts were created, Dafna did not read (and could not have read and
8  understood) the Trust instruments (which were in English).  (RT 48, 1-21-03.)  The Trust
9  
10  instruments were not explained to her, and she did not know which assets were going into which
11  trust.  (RT 6, 4-2-03; RT 49, 1-21-03.)  Dafna did not understand how Kadisha was going to get
12  the money to make the monthly distributions to her (RT 4, 4-2-03) or how Kadisha was going to
13  invest the trust assets (RT 17, 4-22-03).  On March 11, 1988, for the second time Dafna executed
14  a quitclaim deed transferring her interest in the Stathmore Residence to Kadisha as Trustee of
15  Trust 2.  (TE 46, 520.)  At that time, Dafna did not understand the significance of a quitclaim
16  
17  deed.  (RT 54, 1-21-03.)

18      It will be seen, as hereinafter set forth, that when looked at in singular dealing with Trust
19  2 or jointly taken as a whole, Kadisha was no more than a common thief in his monumental
20  takings of Trust 2's money for his own use and benefit.  And as herein above stated, Kadisha
21  gains absolutely no benefit for any trust documents as being the product of unbelievable conflicts
22  of interest of himself, his original attorney Hugo DeCastro and others.  Kadisha's defenses rest
23  beyond denials but upon a grossly contrived conception a thief can steal money and keep the
24  benefits therefrom.  And further that if he elects at some point to return the money with interest,
25  he is to be forgiven for his thefts.  He is sadly mistaken.  Below is a list of takings:
26  
27  
28  

---

**STATEMENT OF DECISION**

Exhibit 1
Page 19

| DATE | AMOUNT |
|---|---|
| 12/07/88 | $600,000 |
| 12/07/88 | $400,000 |
| 06/12/89 | $700,000 |
| 06/21/89 | $550,000 |
| 08/08/89 | $390,000 |
| 05/19/92 (Rahban) | $1,400,000 |
| 06/11/92 | $350,000 |
| 06/18/02 | $200,000 |
| 07/06/92 | $250,000 |
| 02/25/93 | $500,000 |
| 03/23/93 | $ 20,000 |
| 05/06/96 | $216,000 |
| 05/17/96 | $600,000 |
| **TOTAL TAKINGS** | **$6,176,000** |

A.   **Kadisha's Breaches of Trust**

   **1.**   **Kadisha's first act as Trustee was to misappropriate $500,000 from Trust 2.**

Although Trust 2 provided that Dafna was to receive distributions of $20,000 per month (TE 44A, ¶B.2.1.), between January 11, 1988 (when the Trusts were created) to mid-April 1988, Kadisha did nothing to provide liquidity for Trust 2 to make these distributions, even though the only asset under Kadisha's control was the Strathmore Residence and Kadisha had no assurance that the Swiss and Israeli assets would be repatriated to the United States. (TE 22, 46, 69, 72.)

In Mid-April and May 1988 when Kadisha himself needed money, he borrowed $500,000 secured by the Strathmore Residence (the "Namco Loan"), which was lien free and worth approximately $3 to $3.5 million.[3] (TE 88) Kadisha deposited the Namco Loan proceeds – which belonged to Trust 2 – into his personal Union Bank checking account (of which he and his brother Daniel was signatories). (TE 55, 63, 65, 65a, 65b, 68, 137; RT 59, 9-17-02; RT 68, 5-22-

---

[3] In 1988, Kadisha told Dafna that it was not a good time to sell the Strathmore Residence (RT 92, 5-28-02). This was untrue. Since mid-1988, Kadisha had received communication from brokers as to the value of the Strathmore Residence and an offer to purchase. (TE 88, 91, 140)

1   02.)  Kadisha spent the entire $500,000 within three weeks *for his own purposes*.  (TE 68, 76, 93,

2   121.)[4]  No portion of the actual Namco Loan proceeds were ever expended for Trust 2's or

3   Dafna's benefit.  (TE 68, 76, 93, 121.)

4

5        Kadisha did not sign a promissory note or prepare any other document (including a

6   confirming letter to Dafna) that showed that he took the $500,000, that he deposited it into his

7   own bank account, or that he used it for his own expenses and investments.  (RT 68, 5-22-03; RT

8   69-71, 5-23-02.)  Nor did he tell DeCastro about the loan (RT 69, 5-22-02) although he knew

9   DeCastro was representing Dafna at the time (TE 22; RT 45, 11-13-03).[5]

10

11        Between May 17, 1988, when Kadisha deposited the Namco Loan proceeds into his

12  Union Bank account, and June 6, 1988, when the Namco Loan proceeds were exhausted,

13  Kadisha made two deposits totaling $12,000 into Trust 2's account.  (TE 22.)  On May 26, 1988

14  and June 1, 1988, Kadisha deposited $5,000 and $7,000, respectively, from his Wells Fargo

15  Bank account into Trust 2's account.  (TE 22, 65c; RT 80-100, 5-22-02.)  In the Trust

16  Accountings, Kadisha termed these deposits "loans."  (TE 22.)  Kadisha also paid the interest

17  payments on the Namco Loan from his Wells Fargo account, as well as all advances he made to

18  Trust 2 in 1988.  (TE 22, 65c, 68, 76, 93, 121; RT 9, 9-17-02.

19

20        Even though Kadisha claims that the purpose of the Namco Loan was to acquire funds

21  for Dafna's needs, Kadisha did not use any of the funds from his Union Bank account to pay

22  Trust 2's obligations during the remainder of 1988.  (TE 22, 68, 76, 93, 121.)  This was so even

23

24

25

26  [4] Kadisha's deposit of the $500,000 Namco Loan proceeds into his personal Union Bank Account on May 17, 1988
    brought Kadisha's account balance to $568,154.58.  (TE 68.)  By June 6 – 20 days later – Kadisha's balance had
    been reduced to approximately $17,000.  (TE 76.)

27  [5] Kadisha testified that he borrowed the $500,000 after he and Dafna met in the Spring and established a budget of
    $500,000 for Dafna's needs for the remainder of 1988.  (RT 46, 6-24-03)  Dafna denies meeting with Kadisha and

28  denies that Kadisha told her he was borrowing $500,000.  (RT 54, 1-21-03.)  The fact that Kadisha spent the entire
    $500,000 for his own purposes also belies Kadisha's testimony.  Moreover, Kadisha has never produced a copy of
    the alleged budget nor any other document corroborating his alleged meeting with Dafna.

though Kadisha knew, in April 1988, that Dafna could not pay her children's school tuition (TE 61) and that Dafna only had $20 left from the monthly Swiss distributions in DeCastro's trust account. (TE 3105.) Kadisha did not honor DeCastro's agreement with Stephen S. Wise (Izzet's and Joelle's school) to pay the tuition by June 28, 1988, nor did he distribute $20,000 per month to Dafna, as called for by Trust 2's terms. (TE 22.) In fact, during the period in which Kadisha held the misappropriated Namco Loan proceeds, he even defaulted on the Namco Loan. (TE 65a, 65c, 97, 158).

### 2. Kadisha's Conflicting Explanations for His Use of the Namco Loan Proceeds

In the course of these proceedings, Kadisha has given *seven* conflicting explanations for his purported use of the Namco Loan Proceeds:

#### a. First Explanation.

Kadisha initially testified at deposition that he did not recall how he spent the $500,000 Namco Loan proceeds. (Kadisha depo, Vol. 3, 661:14-662:11; RT 104, 5-22-02.)

#### b. Second Explanation.

In an October 2, 2000 Declaration, Kadisha stated:

> A major portion of that money, at least three hundred thirty thousand dollars ($330,000), was a partial payback against advances that my wife and I had made to Petitioner before the Trusts were funded. The balance of the funds of that borrowing was invested in the project known as 900 Million Productions, Inc. (TE 1624a at 7:13-17.)

This explanation is incorrect because Kadisha did not use any portion of the Namco Loan proceeds to repay himself for monies he previously allegedly advanced to Dafna or the Trust. (TE 22; RT 41, 9-17-02.) Moreover, according to documents filed in a bankruptcy proceeding

for 900 Million Productions, Inc., that business did not commence operations until February 1990.  (TE 411.)

### c.    Third Explanation.

On April 19, 2001, during his deposition, Kadisha testified that "a substantial amount of the Namco Loan Proceeds was:

> "Utilized to pay for repair of Strathmore house. Part of it has gone to pay legal fees and almost the rest of the balance has gone – other than what was left at the end in sometimes in December, rest of it has gone for – has been paid to Dafna either through Trust or directly."

(Kadisha depo, Vol. 3, 604:13-24; RT 108, 5-22-02.)[6]

### d.    Fourth Explanation.

At a subsequent session of his deposition (on May 17, 2001), Kadisha testified that $400,000 of the $500,000 Namco Loan proceeds was used as a down payment for the purchase of his home located at 2346 Kimridge from Dan Investments.  (Kadisha depo., vol. 7, 1245:19-23; RT 12, 5-23-02.)  Dan Investments was a partnership allegedly in the business of constructing and developing residential properties.  Kadisha, his brother Daniel Kadisha, and a friend named Nick Nikka were the partners.  (RT 93, 5-22-02.)[7]

### e.    Fifth Explanation.

Prior to the trial (but after more than 30 days for making changes to his deposition had passed), Kadisha changed his deposition testimony to state that only $150,000 of the Namco Loan proceeds was used for a down payment to Dan Investments on the Kimridge residence.  (TE 1826.)  Kadisha also produced the *front only* of a check purportedly written to Dan

---

[6] During 1988, Kadisha only expended $6,408 for repairs to the Strathmore Residence.  (TE 22)
[7] From May through August 1988, Kadisha only used two checks to Dan Investments.  One on May 27 for $150,000, and another on June 22 for $120,000.  (TE 22)

Exhibit
Page 28

Investments on May 23, 1988 in the amount of $150,000. (TE 70.) Kadisha, however, has never accounted for Dan Investment's use of the funds other than to speciously claim that it was used for a "down payment" in connection with the Kimridge sale – which did not occur until eight months later. (TE 205.) As will be discussed in more detail later in this brief, during the eight months in which Dan Investments would have had to have held the money, Kadisha's actions demonstrate that he was extremely short of cash.

f.    **Sixth Explanation.**

In a verified answer to Interrogatory No. 18 (Special Interrogatories to Kadisha, Set No. 4, dated March 23, 2001), Kadisha stated that the proceeds of the Namco Loan were used:

> [T]o repay Respondent for the advances he had theretofore made to Dafna Uzyel, to pay interest on those advances, to fund the repair of Dafna Uzyel's house and to prepare it for sale, to pay Dafna Uzyel's attorney's fees, and to prepare it for sale, to pay Dafna Uzyel, to purchase life insurance on Respondent's life for the benefit of the Trust, to pay insurance premiums for Dafna Uzyel."

(TE 1812.)

g.    **Seventh Explanation.**

During trial, Kadisha testified that he used $240,000 of the Namco Loan proceeds to pay down his Union Bank credit line; wrote a check to Dan Investments for $150,000; loaned $100,000 to Nasser Ebrahimian, and transferred $54,000 to Stadco, a company of which Kadisha was a shareholder.[8] (RT 11-17, 6-23-03.)

Thus, during a two-year period, Kadisha provided, under oath, seven different versions of how he purportedly utilized the $500,000 Namco Loan proceeds.

---

[8] Kadisha owned 20% of Stadco. (RT 95, 5-22-02)

STATEMENT OF DECISION

18

Exhibit 1
Page 24

On May 26, 1988, nine days after he deposited the $500,000 into his Union Bank account he repaid $240,000 he owed Union on his line of credit.  (TE 68, 76)

With respect to his latest explanation, Kadisha did not provide any evidence of what he did with funds he subsequently borrowed against his Union Bank credit line after paying it down with $240,000 of the Namco Loan proceeds (TE 76, 93, 121).  Nor, as noted, did Kadisha properly account for what Dan Investments did with the $150,000 it purportedly received.  Writing a check to Dan Investments was the same thing as writing a check to Kadisha.  Kadisha did not call his partners, Nick Nikka and/or Daniel Kadisha, as witnesses to corroborate what happened to that $150,000.

The only (and completely obscure) trust accounting entry related to the Namco Loan is contained in Account 1500 of Trust 2's General Ledger Detail Activity Report.  (TE 22)  The entry, which is titled "Investment – N Kadisha," shows a debit on December 5, 1988 for "Escrow Proceeds" for $508,334.53.  (TE 22.)  Kadisha claims that he provided Dafna with a copy of the general ledger in early 1989.  (RT 47-51, 6-4-02)  Dafna denies receiving this accounting until 1997.  (RT 74, 1-21-03.)  Moreover, at trial, Michael Feldman ("Feldman") (the accountant who prepared tax returns and financial reports for the Trusts) admitted that Trust 2's general ledger does not contain any reference to the Namco Loan, that Dafna would need an accountant to understand the accountings (RT 6, 1-24-03), and that Dafna would not know what "escrow proceeds" pertained to (RT 133, 1-23-03).

### 3.    The History of Qualcomm's Purchase of Omninet's Assets

In 1986, Kadisha, his father-in-law, Parviz Nazarian ("Parviz"), and Parviz' brother, Younes Nazarian ("Younes," and collectively the "Nazarian Group") were significant investors in Omninet Communications Services, a California limited partnership.  Omninet Corporation

("Omninet Corp.") was the general partner of Omninet Ltd. Which was the general partner of Omninet Communication Services. (TE 1755, 7, pp. 7-8; TE 1776, ¶4.)

In February 1986, Omninet Corp. and Qualcomm entered into a Satellite Mobile Terminal Development agreement, and in February 1987, entered into a Memorandum of Agreement (which was amended various times) under which Omninet Corp. was to produce Omnitracs, a satellite communication system that provided two-way messaging and position reporting services to mobile users. (TE 1776, Exhs. A&B.) The contracts provided, *inter alia*, that if Omninet Corp. defaulted under the agreement, ownership of the Omnitracs technology would go to Qualcomm. (*Id.*) Kadisha stated that a default on the contract and loss of the ability to develop the Omnitracs technology would have been the "death knell" for Omninet Corp. (TE 16, 1753, 1754, 1755, 1776, ¶¶2, 3, 15, p. 19 of Exh. 1776.)

    a.    <u>In the Fall of 1987, Omninet Corp. was in Dire Need of Capital.</u>

In the Fall 1987, Omninet Corp. was in dire need of capital. As a result, it authorized the sale of limited partnership interests in Omninet Limited and Omninet Communications Services. Omninet Corp. also arranged for a $3 million loan from Sanwa Business Credit guaranteed by Omninet and Stadco. (TE 1753, 1754, 1755.) Omninet Corp. was unsuccessful at attracting equity investors for Omninet Communications Services.

The Omninet Corp. board was divided into two factions: 1) the Nazarian Group, and 2) a group of investors Kadisha has termed the "Kalantari Group." The Board of Directors deadlocked on how to obtain further financing.

In early 1988, Omninet was, again, in need of additional capital. Omninet arranged for a $330,000 loan from Sanwa Business Credit guaranteed by Stadco. (TE 49, 64.) During this time, the warring factions within the Omninet entities (including the Nazarian Group and the

Kalantari Group) were unable to agree upon a financial plan to save the Omninet entities. (TE 1756.) On April 4, 1988, Kadisha informed the board of Omninet Corp. that the company was virtually insolvent and that Qualcomm had served a notice of default under its agreement. He advised the company to file bankruptcy since the shareholders were unable to resolve their differences. (TE 1756, 1758, 1761, 1776.)

### b. **Qualcomm's Lawsuit Against Omninet.**

On June 21, 1988, Qualcomm sued Omninet Corp., Omninet Ltd. and Omninet Communications Services for, among other things, breach of contract and possession of the intellectual property rights for Omnitracs. (TE 84.)

On July 27, 1988, Kadisha informed Omninet Corp.'s Board of Directors that the company was "most likely doomed" unless a settlement could be reached with Qualcomm. This was because Omninet Corp. had, in fact, breached its agreements with Qualcomm. (TE 1776.)

At that point, Omninet Corp. had no revenues, had current liabilities in excess of $11.5 million (including $1.7 million owed to Sanwa Business Credit, $1.7 million owed to Sanwa bank, $1.4 million to Stadco, $1.7 million to trade creditors, and $1.9 million to Federal Express), and was involved in more than 10 lawsuits with creditors and former employees. (TE 1776) Moreover, Omninet had been unable to obtain credit to fund its operations or to attract new equity investors.

### c. **Omninet Corp. Authorized Kadisha to Negotiate With Qualcomm and Get "The Best Deal" Possible.**

On July 27, 1988, Omninet Corp.'s Board of Directors authorized Kadisha to negotiate with Qualcomm and to obtain "the best deal possible." Kadisha reported the results of his discussions with Qualcomm to the Board:

---

- Qualcomm rejected the idea of a merger;

- Omninet's creditors rejected selling substantially all of Omninet's assets to Qualcomm in exchange for stock – they would not agree to allow Omninet's assets to be transferred, except for cash;

- Qualcomm was willing to pay $4 million in cash, $1 million on conditional notes, and 200,000 shares of Qualcomm's common stock for Omninet's assets.  Qualcomm would also assume certain Omninet liabilities and write off its Omninet receivable;

- However, Qualcomm had its own financial problems and, with only about $200,000 in cash reserves, did not have the $4 million to fund the settlement.  Since Omninet was in breach, Qualcomm would also inherit Omninet's problems.  Therefore, a group (primarily Kadisha, Parviz and Younes) agreed to purchase Qualcomm stock to make funds available to Qualcomm so that it could purchase Omninet's assets.

- Kadisha reported to the Board:  "[T]o find a group of people who are willing to invest in a troubled company like Qualcomm $4,000,000 where the money goes in and goes out is not easy, and I am glad to report that we have a group of investors who are willing to do that."  (TE 1776.)

Immediately before Kadisha's negotiations with Qualcomm, Omninet, Kadisha, Parviz and Younes still owed several million dollars to various vendors and suppliers, remained indebted to Sanwa on several loans, and Kadisha, Parviz and Younes had personally guaranteed various leases and loans to Omninet.  (TE 1776.)

///

///

d.     <u>The Settlement of the Qualcomm Lawsuit.</u>

In August 1988, Kadisha negotiated a settlement of the Qualcomm lawsuit. The settlement was memorialized in the Stock Purchase Agreement (TE 101) and the Mutual Settlement Agreement (TE 102) which provided, *inter alia*:

(1) That Qualcomm pay the Omninet group $5 million ($4 million in cash on August 8, 1988, and $1 million evidenced by ten $100,000 Promissory Notes), plus 200,000 shares of common stock, and the cancellation of all Omninet's debts to Qualcomm;

(2) that Omninet assign and transfer to Qualcomm substantially all rights and assets for the Omnitracs products and services;

(3) that the Nazarian group (i) provide for a period at least two years, or until Qualcomm raised at least $15 million in equity, a $1.5 million bank line of credit and a bank term loan of approximately $172,654, (ii) personally guarantee the Federal Express transponder sublease (for satellite transponder services) until May 8, 1990 at a total cost of approximately $7,714,000 (of which $1,976,000 was personally guaranteed, and (iv) cause to be made available the financing represented by two equipment leases totaling approximately $314,000;

(4) that Kadisha, Parviz and Younes, as well as other Omninet partners and shareholders and officers, purchase 4 million shares of Qualcomm stock, and loan Qualcomm $750,000; and

(5) that Kadisha, Parviz and Younes guarantee certain Qualcomm loans and provide additional loans to Qualcomm and/or guarantees of Qualcomm's indebtedness. (TE 101, 102.)

In addition, Qualcomm assumed and agreed to pay when due (i) the interest accruing after August 8, 1988 and one-half of the principal on a December 9, 1987 $3 million installment note from Omninet Communications Services to Sanwa Business Credit Corp. (due in 2 years), and (ii) a May 31, 1988 installment note in the amount of $177,021 and from Omninet Communications Services to Sanwa Business Credit Corp. (TE 100.)

As previously noted, the deal was consummated on August 8, 1988. As a result of the transaction, Qualcomm received $4,000,000 in cash from the sale of its stock and then immediately paid $4,000,000 to Omninet along with the ten (10) $100,000 promissory notes, and 200,000 shares of its common stock. Therefore, after the transaction, Qualcomm's cash position did not change, its notes payable increased by $1,000,000 and its capital stock increased by 200,000 shares.

### 4.    Kadisha's August 8, 1988 Qualcomm Stock Purchase.

On August 8, 1988, the Qualcomm deal closed. Kadisha testified that the purchase price for his Qualcomm stock was a combination of cash, loans and guarantees (RT 59 & 69, 9-17-02), and that he, Parviz and Younes had to loan Qualcomm $750,000 as a specific condition for purchasing the Qualcomm stock (RT 50, 9-18-02).

In order to purchase their portion of the 4,000,000 shares of Qualcomm stock, Kadisha, Parviz and Younes borrowed $8.5 million from Sanwa Business Credit (the "Sanwa Loan"). The Sanwa Loan was secured by a deed of trust on property owned by Broadway Partners (of which Kadisha was a 20% principal (RT 7, 5-28-02)) and a $1 million certificate of deposit of Parviz.

The $8.5 million loan proceeds were first applied to satisfy the existing deed of trust on the Broadway Partners' property. After that was paid off, there was $3.5 million remaining from the loan proceeds to satisfy Kadisha's, Parviz, and Younes' obligations to: (1) pay Qualcomm $3,156,000 for 3,156,000 shares of Qualcomm stock (at $1 per share), and (2) loan Qualcomm $750,000. (TE 101, 102, 120.) (Other parties purchased the balance of the 4 million shares.)

As reflected on bank records and documents produced by Kadisha, Kadisha, Parviz, and Younes were each allocated $1,052,000 from the Sanwa Loan to purchase 1,052,000 shares each, or a total of $3,156,000 for 3,156,000 shares. (TE 120D, 120E.) The balance of the remaining loan proceeds, after deducting this $3,156,000 was $344,000. The $344,000 was applied to pay a portion of the $750,000 loan that was required as a condition of closing. (TE 120D, 120E; RT 114, 5-23-02; RT 30-37, 10-8-02; RT 3, 11-21-02.)

At closing, Sanwa issued cashier's checks to Qualcomm for the shares purchased by Parviz (1,052,000 shares), Younes (1,052,000 shares) and Kadisha (662,000 shares), and also issued cashier's checks totaling $390,000 for 390,000 shares allegedly purchased by Kadisha's friends and family members. (RT 30, 10-8-02; TE 3201.)

On August 8, 1988, and August 9, 1988, Kadisha's friends and family members reimbursed Kadisha $390,000 for the cashier's checks issued by Sanwa Bank.

Kadisha deposited the $390,000 in checks he received from his friends and family members into his Wells Fargo Bank account. He did not produce any evidence that showed what the balance was in that account on August 9, 1988 after the $390,000 deposit. Therefore, the record reflects only that it contained $390,000. Kadisha did not use this $390,000 to reduce the outstanding balance of the Sanwa Loan (RT 37, 10-8-02), or to repay Trust 2 the $428,000 Kadisha owed it for the misappropriated Namco Loan proceeds (TE 22), or to pay off the Namco

---

Loan (TE 150). Thus, Kadisha, alone of his partners, ended up with cash from the transaction, in the amount of $390,000.

At his deposition, Kadisha testified that he did not loan his friends and family members money to purchase their shares. (RT 114, 5-23-02.) Kadisha *did* loan them money, however, since the cashiers checks issued by Sanwa Bank came from Kadisha's portion of the Sanwa Loan, and his friends and family members later reimbursed him for the $390,000 Kadisha had advanced, through Sanwa, on their behalf. Moreover, on the one-year anniversary of the Qualcomm stock purchase, August 8, 1989, *Kadisha took $390,000 from Trust 2.* (TE 121, 272) He has never credibly accounted for the use of those funds. As will be discussed later, when a trustee fails to account for the use of trust funds, all presumptions must be taken against him. The Court may therefore presume that the $390,000 Kadisha borrowed on the anniversary date of the Qualcomm stock purchase was used to reimburse his friends and family members for *their loan* to him of $390,000, which he used to consummate his remaining loan obligations in the Qualcomm stock deal.)

After applying the entire $3.5 million from the Sanwa Loan proceeds ($3,156,000 to the stock and $344,000 to the required $750,000 loan), an additional $406,000 was needed to fund the balance of the $750,000 loan. (TE 120E, 120F.) As a result, Parviz and Younes had to come up with an additional $135,000 each and Kadisha had to come up with $136,000. (TE 120F.)

Kadisha testified that his $136,000 came from the same Wells Fargo Bank account into which he had deposited the $390,000 he received from family and friends for their purported purchases of 390,000 shares of Qualcomm stock. (TE 120F, 320, 3843, 3857, 3867.) Kadisha conceded that the $136,000 did not come from the Broadway loan proceeds. (RT 30, 5-28-02; 82, 10-8-02.)

At the time Kadisha issued his personal $136,000 check to Qualcomm from his Wells Fargo Bank account, he owed Trust 2 $428,000 for the misappropriated Namco Loan proceeds. As will be discussed in detail later, the evidence shows that Kadisha could not afford to repay Trust 2 for the misappropriated Namco Loan proceeds and still fund his remaining $136,000 obligation in the Qualcomm stock purchase.

      **5.**        **<u>Kadisha's Instructions From Attorney DeCastro Re: "Requirements of Trustee."</u>**

On August 30, 1988, after a telephone conversation between DeCastro and Kadisha, DeCastro had delivered a letter to Kadisha enclosing a memorandum entitled "Requirements of Trustee" (TE 122) which advised him, *inter alia*, that:

- The laws regarding duties and liabilities of trustees are extremely technical and strict, and it is not a defense for a trustee to be acting in good faith or with good intention.

- **Kadisha could not rely on Dafna's request or approval regarding any of his actions.**

- **For Dafna to approve his actions, she would have to be independently represented by legal counsel who could advise her as to the significance and consequences of the situation.**

- Even Dafna's informed and advised approval would not necessarily protect Kadisha against claims by others, including her children.

- A trustee must invest Trust funds in a reasonable and prudent manner. It is an objective standard based upon what a reasonably prudent investor would do under the same circumstances.

---

- In exercising investment judgment, Kadisha had to consider the safety of the principal as well as producing a reasonable amount of income.

- In investing, there is a specific obligation of diversification.

- Investments must be protected.

- **A trustee is prohibited from self-dealing in trust transactions, even if undertaken in complete good faith.**

- **A trustee cannot receive even incidental benefits in connection with trust transactions, and the courts are very strict in enforcing this prohibition against self-dealing.**

- **A trustee cannot commingle Trust assets with his personal property.**

- A trustee has a duty of fiduciary loyalty and must avoid any actual or potential conflict of economic interest with the Trust and its beneficiaries.

- A trustee has the duty to utilize all of his skills for the benefit of the Trust.

- **A trustee must give the beneficiaries reasonable information so that Dafna would have a relatively current opportunity to question, object and correct any problems.**

- **Prior to taking any action on the part of the Trust that was controversial or uncertain, Kadisha should seek court approval.**

- The trustee should utilize skilled, professional investment advisors.

- If there were any questions regarding the propriety of a particular act under Kadisha's fiduciary obligations as a trustee, he should seek legal advise and, where appropriate, petition the court for advance instructions.

Kadisha acknowledged that on August 29, 1988, DeCastro informed him that he was sending this memorandum. (RT 45, 11-18-02.) On August 30, 1988, Kadisha received DeCastro's memorandum, which was hand-delivered. (TE 122; RT 42, 11-18-02.) Kadisha read it, including paragraph B which informed him that he could not engage in self dealing with the trusts assets. Nonetheless, Kadisha still refused to repay Trust 2 for the Namco Loan proceeds he owed it as of August 30, 1988, and defaulted on repaying the Namco Loan when it was due on September 1, 1988. (RT 48, 11-18-02; TE 97.)

### 6. Kadisha's Improper $100,000 Loan to Qualcomm.

In September and October 1988, Qualcomm was experiencing continuing financial problems, and along with Omninet, had defaulted on certain loans from Sanwa Business Credit to Omninet. (TE 137) These loans were partially assumed by Qualcomm as part of the settlement agreement with Omninet. (TE 100, 101, 102.)

On about September 13, 1988, to buttress his Qualcomm holdings, Kadisha loaned Qualcomm $100,000 from funds in his Independence Bank account. (RT 87, 10-8-02) This brought the total of his loans to Qualcomm to $350,000 ($100,000 plus $250,000, his one-third of the $750,000 loan that was required to consummate the stock sale). (TE 125, 127, 128.) In consideration for his $100,000 loan, Kadisha received a warrant to purchase 43,750 shares of Qualcomm preferred stock for $8 per share. (TE 126.)

At this time, the due date of the Namco Loan (September 1, 1988) had passed, Kadisha did not repay it (notwithstanding his recent advice regarding self-dealing and conflicts of interest from DeCastro (TE 122)), the Namco Loan was in default, and Kadisha still owed Trust 2 for the misappropriated Namco Loan Proceeds. (TE 22, 97.)

7.   **Five months after Kadisha misappropriated $500,000 from Trust 2, and after defaulting on the Namco Loan, Kadisha has Trust 2 borrow $2,000,000 secured by the Strathmore Residence, and used the proceeds for his own needs.**

In early October 1988, Sanwa Business Credit served Stadco and Omninet entities with a notice of default under the terms of their loans because the interest had been past due since July 1988. (TE 137.)

By October 1988, Kadisha also knew that Qualcomm needed additional funding, and he had already expended all of the Namco Loan $500,000 proceeds. Therefore, in or about early October 1988, *after defaulting on the Namco Loan*, Kadisha, acting for Trust 2, applied for a $2.0 million loan from Imperial Bank to be secured by the Strathmore Residence. (TE 139.)

If Kadisha's testimony that the purpose of the $500,000 Namco Loan was to provide for Dafna's living expenses had been true (and Kadisha had not misappropriated all of the Namco Loan proceeds), as of October 31, 1988, there should have been $314,000 in unexpended Namco Loan proceeds for Trust 2's use. In other words, the Imperial Loan was not necessarily *for Trust 2's purposes* and it was not necessary to incur the expense of the Imperial Loan. (TE 22, 186.)

Moreover, on about November 1, 1988, Kadisha received an offer from Forkay Development to purchase the Strathmore Residence for $3 million. (TE 140.) But on about November 4, 1988, Kadisha received Imperial's loan approval, and the loan went forward. (TE 143.)

On November 10, 1988, Kadisha prepared a letter for Dafna to sign that stated that the purposes of the Imperial Loan were to provide an investment fund for the Trust and to reimburse Kadisha for money he had purportedly advanced to Dafna. (TE 146.) On the same day, Kadisha

allegedly sent Dafna a letter that contradictorily stated that she needed cash for her pending marriage and to bring all of her debts current. (TE 147.) Neither of these letters mentions the *actual use* Kadisha made of the Imperial Loan proceeds, which was entirely for his own purposes, not Dafna's or the Trust's.

The Imperial Loan closed on December 2, 1988. (TE 158.) Kadisha used the loan proceeds to repay the Namco Loan (even though he had used the Namco Loan proceeds for his own benefit rather than the Trust's). (TE 153, 157, 158, see item no. 504, "Payoff of first mortgage loan $505,000" and item no. 506, "Interest 11/11 to 12/18 $3,839.56"). After deductions for the repayment of the Namco Loan and other closing costs, the net proceeds of the Imperial Loan was approximately $1.4 million. (TE 158.) Kadisha breached his fiduciary duties by misappropriating $1 million of the net proceeds to himself (in takings of $600,000 and $400,000 respectively) and by loaning $300,000 to Qualcomm in an extremely risky loan purely to shore up his own Qualcomm holdings. (TE 164, 166, 167, 152, 1776.)

Kadisha did not document the $600,000 and $400,000 loans to himself – he did not sign promissory notes, provide for when they would be repaid, provide for the payment of interest, or provide security for the loans as required by paragraph C.6. of Trust 2. (TE 44A.) The $300,000 loan from the Imperial Loan proceeds to Qualcomm, which will be discussed in more detail below, was extraordinarily risky and in no way an appropriate trust investment. At the end of 1988, after Kadisha's improper misappropriations to himself and to Qualcomm, Trust 2 had approximately $54,000 left in cash and no projected income in 1989. (TE 22.)

///

///

8.   **Kadisha's Improper $300,000 Loan to Qualcomm From Trust 2.**

As part of the Qualcomm stock deal, Kadisha became a Qualcomm director.  He testified that one of his duties as a Qualcomm director was to raise money for Qualcomm.  (RT 14, 5-30-02.)

On August 20, 1988, Qualcomm issued a Private Placement Memorandum (the "PPM") (TE 119) for Series "A" warrants to purchase Qualcomm common stock.  For each $8 loaned (of the total $8 million Qualcomm was attempting to raise) a lender would receive a warrant to purchase 1 share of Qualcomm common stock for $8 per share.  The PPM provided, among other things:  (1) that Qualcomm was a private company that had only been in business for a few years; (2) that Qualcomm had lost money from its inception; (3) that, as a result of Qualcomm's settlement with Omninet, its largest customer, substantial Omninet accounts receivable would be written off resulting in a significant loss; (4) that the investment was very risky; and (5) that even if fully subscribed, the company would need to raise substantial amounts of new money.

On November 23, 1988, Kadisha signed a subscription agreement as Trustee of Trust 2, committing Trust 2 to loan Qualcomm $300,000 for which it would receive a warrant to purchase 37,500 shares of Qualcomm stock for $8 per share.  (TE 152.)  Trust 2 did not have any cash or liquid assets with which to make the loan when Kadisha signed the subscription agreement.  (TE 22.)  Kadisha testified that at the time of the loan, he had read the Qualcomm PPM.  (TE 119; RT 55, 5-23-02.)

On December 7 1988 (5 days after the Imperial Loan closed), Kadisha forwarded Trust 2's check for $300,000 to Qualcomm.  (TE 168, 169.)  On December 8, 1988, Qualcomm negotiated Trust 2's check.  (TE 168.)  Qualcomm, however, did not issue its promissory note for the loan until January 11, 1989.  (TE 193.)  The note provided for a five-year term, with interest

to be paid as follows: on the first anniversary date, quarterly during years 2-4, and, in 12 equal installments of principal and interest in the 5th year. In addition to the Qualcomm promissory note, Trust 2 received a Qualcomm Series A warrant (No. 00045) granting it the right to purchase 37,500 shares of common stock at $8 per share at any time prior to January 11, 1994. (TE 194.)

At the time Kadisha had Trust 2 loan $300,000 to Qualcomm, he knew that Qualcomm was troubled financially and that it was a very risky loan. In a declaration executed in connection with another lawsuit, Kadisha acknowledged that investing in Qualcomm was "exceedingly risky" from August 1988 through Qualcomm's initial public offering in December 1991. (TE 1776.)

Kadisha stated:

> I was one of the investors who signed the Stock Purchase Agreement with Qualcomm and I in fact purchased in excess of 660,000 shares for my own account pursuant to that Agreement. I consider myself to be a knowledgeable investor. In my opinion, **Qualcomm was an extremely risky investment. At that time, it had no proven products, and Omninet Corporation had been its major, dominant customer;** Qualcomm was privately held, so that there was no secondary market for Qualcomm's shares; and Qualcomm's financial statements, attached to the Stock Purchase Agreement, showed that **Qualcomm had consistently lost money – indeed, it had lost over $3.6 million in the first ten months of fiscal 1988.**

He also stated:

> The court should recognize that we did not simply step out of Omninet and into a lucrative investment with Qualcomm. Quite the contrary is true. I have been a director of Qualcomm since my initial investment pursuant to the Stock Purchase Agreement in August 1988. **For over three years, Qualcomm's very survival was questionable. During that time, Qualcomm's losses continued to mount, and I considered my entire investment to be a substantial risk of loss.**

(Emphasis Added)

As will be discussed later, Kadisha's loan of $300,000 of Trust 2's funds to Qualcomm was made solely for one purpose only – to protect Kadisha's interests which were vitally connected to Qualcomm's continuing viability.

### 9.  The Financial Condition of the Trust Produced by Kadisha's Self-dealing.

On December 31, 1988, after Kadisha had applied virtually all of Trust 2's assets for his own use, Trust 2 had about $54,000 in cash, a $300,000 unsecured, promissory note from Qualcomm (with no interest due for 1 year), and the Strathmore Residence that had been encumbered by a $2 million lien for the Imperial Loan proceeds utilized by Kadisha.  (TE 22.) Kadisha had also two undocumented and unsecured distributions to himself from the Imperial Loan proceeds (one in the amount of $600,000 and the other in the amount of $400,000) which Kadisha was not making monthly payments of interest or principal.  (TE 164, 165, 166, 167)

As well, at that time, it was uncertain whether any of the assets in Switzerland or Israel would be repatriated to the United States.

Although the terms of Trust 2 required distributions of $20,000 per month to Dafna, in addition to paying her taxes, as of the beginning of 1989 (TE 44, 44a), the Trusts had no earning power and no liquid assets to make any distributions above the $54,000 Trust 2 had in its bank account.  The Trusts, and the Uzyels, were unknowingly and unwittingly forced to rely upon Kadisha's good will to provide money for their living expenses.  (TE 22, 186, 186a, 186b.)

### 10.  Relevant Events from January – June 1989.

On January 10, 1989, DeCastro advised local counsel in Switzerland that Dafna was desperately in need of cash.  (TR 3277.)  There is no evidence that Kadisha ever informed

DeCastro about the $500,000 Namco Loan, the $2 million Imperial Loan, the $300,000 Qualcomm loan, the Halico loan or Kadisha's professed investment strategy of using the Trust's cash for his own purposes and paying interest at a higher rate than the Trust could earn by depositing it in a bank.  (RT 60, 5-24-02; 87, 11-13-03; 76-77, 11-13-03; 87, 11-13-03)

### a.     First Amendment to Qualcomm's PPM

On about February 3, 1989, Qualcomm amended its August 20 1988 PPM to reflect additional  losses for the period ending December 31, 1988 and to increase the loss for the year ending September 30, 1988.  The amendment reiterated all of the risks set forth in the original PPM, explained the prior fiscal year, and included a detailed explanation of the Omninet transaction – including the disastrous effect the transaction had had on Qualcomm's balance sheet and the company's future prospects.  (TE 202.)

### b.     Omninet and Qualcomm defaulted on Their Sanwa Business Credit Loans

The Omninet obligations that Qualcomm assumed as part of the settlement agreement included a $3 million installment note dated December 9, 1987 and due, after extension, on September 30, 1988, as well as certain other notes.

In February 1989, Kadisha executed a guarantee to Sanwa Business Credit for any loan or other financial accommodations made by Sanwa Business Credit to Omninet Communications Services.  (TE 215.)  Omninet Communications Services also gave Sanwa Business Credit a lien on its interest in the Mutual Settlement and Purchase Agreements with Qualcomm.  (TE 214.)

On April 14, 1989, Sanwa Business Credit advised Kadisha, Parviz, Younes, the Omninet entities, and Stadco that the Sanwa Business Credit loan was coming due, and the due date would not be extended, under any circumstances, beyond May 31, 1989.  Sanwa Business Credit

---

therefore suggested that the Omninet entities take all appropriate steps to obtain other financing. It is also informed Kadisha, et al., that if the obligations were not paid on or before May 31, 1989, Sanwa Business Credit would enforce its rights under all of its agreements, including its guarantees. (TE 228, 299.)

        .c.    **Qualcomm Issued an April 26, 1989 PPM to Raise $20 Million.**

On April 26, 1989, Qualcomm issued a PPM to sell 2.5 million shares of its Series "B" Convertible Preferred Shares of Stock at $8.00 per share (The "April PPM"). (TE 230.) The April PPM set forth the following risk factors:

- Qualcomm had a limited operating history and had incurred losses since its inception;

- There was no public market for the company's stock;

- As a result of its transactions with Omninet, Qualcomm had written off large receivables, had assumed several million dollars in debt and other financing obligations, and had assumed the transponder sublease with Federal Express;

- Qualcomm had limited experience as a service provider for Omnitracs products;

- Omnitracs was its main product and there were no assurances that a large number of mobile terminals would be placed in service;

- Due to its limited manufacturing experience, Qualcomm was highly dependent on its suppliers and subcontractors;

- There was a decline in quarterly sales from June 1988 to April 1999;

- For the fiscal year ended September 20, 1988, Qualcomm sustained a loss of $6,868,600 through December 30, 1988, sustained a loss of $3,292,400, and through March 31, 1989 was $5,500,400;

- As of March 31, 1989, Qualcomm had used $2,813,000 of Qualcomm's $4 million revolving line of credit with City National Bank (which was personally guaranteed by, inter alia, Parviz, Younes, and Kadisha); and

- Parviz had personally guaranteed up to $1,716,000 in payments under the Federal Express transponder sublease, a $1,500,000 bank line of credit and a $172,654.00 term loan.

### d. Kadisha's May 31, 1989 letter to Sanwa Business Credit.

On May 31, 1989, Omninet Communication Services sent a letter to Sanwa Business Credit (TE 242) that was signed by Kadisha and which confirmed that:

- On February 28, 1989, Sanwa Business Credit entered into an agreement with Omninet Communications Services which delayed the collection of certain loan agreements, installment notes and promissory notes;

- As of February 28, Qualcomm, all the Omninet entities and Kadisha believed they would be able to refinance Sanwa Business Credit debt by May 1989 – although as of the date of the letter, they were unable to refinance;

- Qualcomm had delivered a $750,000 check to Sanwa Business Credit;

- Sanwa Business Credit would return $90,000 that had been paid by Stadco in March or April 1989;

- The balance of $750,000 of principal due under a certain promissory note would not be due until October 31, 1989;

- The installment notes aggregating approximately $170,000 would continue in accordance with their original term, and Sanwa Business Credit would not claim default so long as the terms of this letter were adhered to.

e.   **Qualcomm's second supplement to the April PPM.**

On June 5, 1989, Qualcomm published a second supplement to the April PPM in which it amended the original PPM as follows:

- Qualcomm revised its five-year business plan downward to reflect a decrease in the previously forecasted sales of Omnitrac terminals because the actual orders did not meet the prior forecast;

- Per the revised forecast, Qualcomm was not expected to achieve a cash break-even, even on a monthly basis, until April 1990 rather than the previously projected in October 1989.

- In addition, for the fiscal year ending September 29, 1989, sales had decreased by $15,744,000, and the forecasted loss was projected to increase from $10,623,000 to $14,547,000.

11.   **At the Height of Qualcomm's extreme financial difficulties, Kadisha converted Trust 2's unsecured $300,000 promissory note to equity.**

On May 16, 1989, Kadisha, as Trustee of Trust 2, cancelled Qualcomm's $300,000 promissory note (TE 193) and, in consideration, on June 5, 1989, purchased 37,500 shares of Qualcomm's preferred at $8 per share. (TE 246.) This was at a time when the financially troubled Qualcomm was desperately trying to raise money from other investors. (TE 230.) Kadisha, by canceling the $300,000 note for the benefit of Qualcomm (and therefore himself) removed the debt from Qualcomm's balance sheet and eliminated the requirement that Qualcomm pay interest to Trust 2. It also transformed an already risky debt investment to an even riskier equity investment. (TE 119, 202, 230, 237, 245.) At this time, Kadisha had stripped Trust 2 of virtually all of its cash, was not paying interest on the loans to himself (TE 22, 186),

and did not know whether or when the Swiss or Israeli assets would be repatriated to the United States.  In other words, Trust 2 had *no* investments that were actively generating income for Dafna.

On June 8, 1989, Sanwa Business Credit sent a letter to Kadisha, Parviz, Younes, Stadco and the Omninet entities which provided, inter alia, that all of the obligations under the promissory notes, dated December 9, 1987 and May 31, 1988 as well as promissory notes dated February 23, 1988 and May 16, 1988, were immediately due and payable; that, on July 31, 1988, the parties executed an extension agreement which expired on September 30, 1988 which resulted in the parties executing a forbearance agreement, dated February 28, 1989, which expired on May 31, 1989; and informed them that it would refrain from filing a lawsuit on their defaulted loans if they agreed to the terms of the letter, which included Kadisha and Qualcomm guaranteeing all the debts.  (TE 252.)  On June 9, 1989, Qualcomm's Board of Directors met, with Kadisha present, and approved the terms of the June 9, 1989 Sanwa Business Credit letter. (TE 252, TE 253.)

On June 12, 1989 and June 21, 1989, Kadisha took $700,000 and $550,000 from Trust 2 (TE 254, 257) and deposited the money in his Union Bank account.  Kadisha then used the funds to make two loans to Stadco totaling approximately $1,200,000; on June 23, 1989, for $350,000 (TE 260.), and another on July 10, 1989 for $936,667.  (TE 266)  Kadisha never explained what Stadco did with the proceeds.

## 12.   Qualcomm offered to unwind Trust 2's stock purchase and Kadisha declined.

On June 22, 1989, Qualcomm wrote Kadisha that it had closed the Series "B" preferred stock sale.  (TE 259.)  Qualcomm enclosed, with its letter, a First Amended Schedule II to the

PPM which, among other things:  (1) advised that Qualcomm had continued to sustain substantial operating losses since the last balance sheet; (2) summarized the terms of Qualcomm's agreement with Sanwa Business Credit pertaining to the defaulted loans; and (3) granted Kadisha the right to unwind Trust 2's purchase of the Series "B" preferred convertible stock.

Nothwithstanding the negative financial news and the continuing pressure from Sanwa Business Credit, Kadisha refused to unwind the transaction.  This confirms that Kadisha's objectives with regard to Trust 2's extremely risky investment in Qualcomm were self-serving, and calculated to protect his own interests rather than Trust 2's.

### 13.    Kadisha's purported purchase of Qualcomm stock from Leon Farahnik and Atta Nikka and Rudy Kadisha.

Between June 1990 through May 1991, Kadisha purchased 105,000 shares of Qualcomm stock from Leon Farahnik ("Farahnik") (30,000 shares), Atta Nikka ("Nikka") (30,000 shares) and Rudy Kadisha ("Rudy") (45,000 shares).  (TE 130, 132, 355, 356, 373, 417, 419, 420, 425, 432, 437b.)  Petitioners contend the Faranik purchase was made with Trust funds, and the stock, therefore, properly belongs to Trust 2.  Petitioners also contend the Nikka and Rudy purchases were not true purchases as Nikka and Rudy were strawmen for Kadisha in the August 8, 1988 purchase.  The court does not so find with respect to the Nikka and Rudy purchases.

### a.    The Farahnik Purchases

Kadisha was chosen to be the trustee of both Uzyel Trusts in November or December of 1987.  Trust instruments were executed on January 11, 1988, and Dafna assigned her property to Trust 2 at that time (TE 31, 33.)  ( New trusts were executed in February 1988).

---

On February 8, 1988, Kadisha borrowed $85,000 from his Union Bank line of credit (which was automatically deposited into his Union Bank account), and on February 10, 1988, loaned Farahnik $75,000. (TE 38, 40.) Kadisha could not have made the $75,000 loan without the $85,000 he borrowed from his Union Bank line of credit because he did not have sufficient funds in his account to do so.

On March 3, 1988 and March 18, 1988, Kadisha drew down $100,000 and $55,000, respectively, from his Union Bank line of credit, and the funds were deposited automatically into his Union Bank account. On March 24, 1988, Kadisha loaned Farahnik $76,000. (TE 40, 52, 60, 68, 76.) Without the $155,000 that he borrowed from his Union Bank line of credit, Kadisha could not have made the $76,000 loan to Farahnik because it would have overdrawn his account.

On April 1, 1988, Kadisha loaned Farahnik an additional $70,000 from other funds that did not come from his Union Bank line of credit. (TE 38, 60, 1044, 1076.)

Kadisha thus loaned Farahnik a total of $221,000. The $75,000 and $76,000 loans (totaling $151,000) were funded by Kadisha's Union Bank line of credit borrowings, which were repaid with Trust 2's funds when Kadisha misappropriated the $500,000 Namco Loan proceeds for his own use. Throughout discovery and a good portion of trial, Kadisha prevented Petitioners from discovering the fact that he had repaid his Union Bank line of credit advances from the Namco Loan proceeds.

In discovery, under penalty of perjury, Kadisha gave six different and untrue accounts of what he did with the Namco Loan proceeds. None of the six explanations disclosed that he had used a portion of the Namco Loan proceeds to pay down his Union Bank line of credit. It was only during trial, in Kadisha's *seventh* explanation, that he admitted that he had used $240,000 of the Namco Loan proceeds to pay down his Union Bank line of credit for the $240,000 he had

borrowed. (TE 68, 76.) Kadisha's admission established that he used Trust 2's funds to repay the Union Bank line of credit for funds he had borrowed to loan to Farahnik.

On May 31, 1991, Kadisha and Farahnik entered into a Stock Purchase and Sale Agreement in which Farahnik sold 30,000 shares of Qualcomm stock to Kadisha at $7 per share for a total purchase price of $221,000.[9] Kadisha paid for the Qualcomm stock by canceling $210,000 of Farahnik's $221,000 debt to Kadisha. However, since the ultimate funding of $112,302 of this $210,000 came from Trust 2's funds, Trust 2 is entitled to 53.48% of the value of the 30,000 shares of Qualcomm stock he acquired, or 21,571 shares and the value of their progeny as of the date the trusteeship of Kadisha was terminated. (See Damages: Re The Loan to Farahnik. (Page 122 Et. Seq.

The court will not impress a constructive trust on Qualcomm stock held by Kadisha, which will avoid getting into the questionable strict tracing rule Respondent finds so comforting. Damages will suit the situation quite well. The court will cover that later on under "Damages."

### b.   The Rudy Kadisha Purchase.

Rudy, Kadisha's uncle, was a member of the group of family members and friends that purportedly purchased 390,000 shares of Qualcomm stock in the Qualcomm stock deal. (TE 101.) On September 30, 1988, Qualcomm issued Rudy Share Certificate No. 159 for 79,000 shares. (TE 130.) Petitioners contend Rudy was "Merely a strawman for Kadisha." There is insufficient evidence to prove this allegation is more likely true than not.

### c.   The Atta Nikka Purchase.

---

[9] On March 27, 1990, Qualcomm confirmed that Omninet had transferred 30,000 shares of stock to Farahnik. (TE 343.)

On September 3, 1988, Qualcomm issued Nikka Share Certificate No. 174 for 30,000 shares of its common stock.  (TE 132.)  On June 14, 1990, Nikka executed a Transferor Statement to Qualcomm stating, under penalty of perjury, that he was selling his 30,000 shares of Qualcomm stock to Kadisha at $7 per share *for cash*.  (TE 355.)

On the very same day, Kadisha executed a Promissory Note to Nikka for $210,000 with annual interest of 20%, but filed a Transferee Statement stating, under penalty of perjury, that he was buying Nikka's 30,000 shares for $7 per share "to be purchased for cash."  (TE 356, 372.)[10] Obviously, both Nikka's Transferor Statement and Kadisha's Transferee Statements (made under penalty of perjury) are false since Kadisha did not pay cash for the shares.

Kadisha also testified that he has been paying interest of 20% on the purported note to Nikka since June 1990.  Unquestionably, this fact is curious since Kadisha could have paid Nikka off by borrowing money on his margin account at a much lower rate of interest, as in the fact, the interest Kadisha has allegedly paid on the note to Nikka exceeds the amount of principal.

Petitions claim the clear implication is the purported sale by Nikka to Kadisha of 30,000 shares of Qualcomm stock is a sham, that Kadisha paid nothing for the shares, and that Nikka was another strawman holding shares for Kadisha.  But the evidence does not support the contention as being more likely true than not.

### 14.   Kadisha induced Dafna to enter into three shocking Trust amendments.

Kadisha, on his own initiative, had three amendments to Trust 2 prepared, which he induced Dafna to sign, and which must be characterized as *shocking*.  Dafna signed the first of

---

[10] On about October 14, 1990, Qualcomm issued its Share Certificate No. 29 to Kadisha for the 30,000 shares of common stock.

these on June 14, 1991 (TE 122), the second on February 14, 1992 (TE 428), and the third on July 30, 1992 (TE 528).

Each of the amendments was presented to Dafna as a condition to getting something that she wanted.[11]  She was handed the amendment, with no prior chance to review it and no admonition for insistence that she seek independent counsel.  (RT 93, 1-21-03; 38, 11-10-03)  This contradicted DeCastro's earlier written advice to Kadisha that:

> You cannot rely upon Dafna's request or approval regarding any contemplated Trustee action.  In order to safeguard you from possible personal liability to Dafna, she would have to be independently represented by legal counsel who could advise her as to the significance and consequences of the situation.
> (TE 122.)

Kadisha was also fully aware of Dafna's inability to understand a legal document.  Kadisha testified at trial that he himself could not understand a legal document he was asked about without the advice of counsel (i.e., TE 1154, a lease between Carson '93 and Texollini, which Kadisha signed on behalf of Carson o'93 as the CEO of Texollini, the general partner of Carson '93).  There certainly was no reason for Kadisha to have believed that Dafna could understand a legal document without the assistance of counsel.

DeCastro had also advised Kadisha that:

> For reliable protection, a Trustee must seek formal Court approval.  Before taking any action on behalf of the Trusts which is controversial or uncertain, you can petition to the Court and, in a short period of time, have the Court authorize and instruct you as to whether you may take the proposed action.

---

[11] The language of the amendments corroborates Dafna's testimony.  The first amendment provided for satisfying $140,000 of Dafna's debt and $50,000 of Ron's debt (TE 428).  The second amendment provided for an increase in monthly distributions to Dafna and for reimbursing her for certain debts she had paid.  The third amendment confirmed that funds would be made available to purchase a residence which Dafna wanted (although the original Trust required that funds be made available for that purpose.)  (TE 44a, 528.)

(TE 122.)  Kadisha never petitioned the Court for instructions regarding he amendments or any of the numerous other controversial actions he took.

The first amendment purported to change the method by which Kadisha could be removed as a trustee (i.e., "Settlor shall have the right to remove the trustee of the trust *only upon 36 months written notice*." (TE 428.)  The first amendment also purported to:

(1) authorize Kadisha to manage the Trust assets in any manner that he determines "in his sole discretion" so long as there is no loss of principal and trust income does not fall below the income that would be earned on a one-year Bank of America certificate of deposit;

(2) authorize Kadisha to lend Trust assets to enterprises in which he has an interest and to "hold, manage and administer Trust assets in ways which might be characterized as conflicts of interest or acts of self dealing."

(3) waive the duty of loyalty contained in Probate Code section 16004;

(4) authorize Kadisha to make loans or investments "which might be deemed not prudent;" and

(5) waive the prudent person standard for Kadisha's administration of the Trust.

The first, second and third amendments also purported to release Dafna's claims against Kadisha.  Kadisha testified at trial that the only purpose of the releases was to protect Kadisha because he had been distributing more funds to Dafna than were called for by the Trust.  (RT 6, 6-11-02; 15-17, 6-12-02.)

### 15.   The Improper May 1992 sale of Qualcomm Stock and sham Rahban loans.

a.   Kadisha was under extreme financial pressure in 1992.

During 1992, Kadisha was under extreme financial pressure.  His cash flow was negative, and he was faced with the prospect of having to repay the Trusts for the millions of dollars he had unlawfully taken from 1988 through 1991.  (TE 1930.1)

Kadisha's general ledger account activity detail report for 1992 demonstrates his cash flow problems and his attempts to stay afloat by arranging new loans to pay off old ones.  (TE 1930.1)  It also shows that despite the new loans, Kadisha issued several NSF checks in 1992, had a negative cash flow in 11 of the 12 months of 1992, and ended up with a total deficit of $1,016,012 in 1992.  (TE 1930.1)

Loan proceeds came into and out of Kadisha's account as follows.

| DATE | CASH IN TO KADISHA | CASH OUT |
| --- | --- | --- |
| 2-10-92 | | Loan from Shearson $500,000 |
| 2-10-93 | | Loan from Kadisha to Stadco 500,000 |
| 2-19-92 | | Kadisha repaid Trust 2 $90,000 |
| | Loan from Daniel $550,000 | |
| 2-28-92 | | Kadisha repaid Trust 2 $170,000 and $16,000 |
| 2-28-92 | | Kadisha loaned Stadco $350,000 |
| 3-02-92 | Loan from Daniel $200,000 | |
| 3-03-92 | | Kadisha loaned Stadco $200,000 |
| 3-09-92 | | Kadisha repaid Trust 2 $50,000 |
| 3-16-92 | Stadco loan repayment $250,000 | |
| 3-16-92 | | Kadisha repaid Trust 1 $200,000 and $58,482.19 |
| 3-18-92 | Stadco loan repayment $350,000 | |
| 3-18-92 | Stadco loan repayment $500,000 | |
| 3-19-92 | Stadco loan repayment $600,000 and $200,000 | |
| 3-20-92 | | Kadisha repaid Trust 1 $1.4 million |
| 3-20-92 | | Kadisha repaid Trust 1 $393,917.81 interest. |
| 3-27-92 | Union Bank loan $200,000 | |

| DATE | CASH IN TO KADISHA | CASH OUT |
|---|---|---|
| 3-27-92 | | Kadisha repaid Trust 1 $89,000 Principal |
| | | Kadisha repaid Trust 1 $19,304.47 Interest. |
| | | Kadisha repaid Trust 1 $61,000 principal. |
| | | Kadisha repaid Trust 1 $13,231.15 interest. |
| 3-30-92 | | Kadisha repaid Trust 2 $16,000 |
| 4-08-92 | | Union Bank NSF Charge $130 |
| 4-09-92 | | Kadisha repaid Trust 2 $30,000 |
| 4-14-92 | Shearson loan $200,000 | |
| 4-14-92 | Shearson loan $400,000 | |
| 4-14-92 | | Kadisha repaid Trust 2, $11,298.25 |
| | | Kadisha repaid Trust 2 $152,853.86 interest |
| | | Kadisha repaid Trust 2 $156,341 |
| | | Kadisha repaid Trust 2 $165,053 |
| 4-15-92 | Bank Leumi loan $400,000 | |
| 5-06-92 | Shearson loan $500,00 | |
| 5-18-92 | | Kadisha repaid Trust 2 $259,774.19 Interest |
| 5-19-92 | | Kadisha repaid Trust 2 $419,000 |
| 5-27-92 | Shearson loan $640,000 | |
| 5-28-92 | | Kadisha repaid Trust 2 $4,813.88 |
| | | Kadisha repaid Trust 2 $130,000 |
| | | Kadisha repaid Trust 2 $33,012.88 |
| | | Kadisha repaid Trust 2 $390,000 |
| | | Kadisha repaid Trust 2 $142,237.81 |
| | | Kadisha repaid Trust 2 $550,000 |
| | | Kadisha repaid Trust 2 $209,994.52 |
| 6-01-92 | Shearson loan $900,000 | |
| 6-05-92 | Shearson loan $450,000 | |
| 6-11-92 | Trust 2 loan $350,000 | |
| | | Kadisha repaid Bank Leumi $400,000 |
| | | Kadisha repaid Union Bank $300,000 |
| 6-16-92 | | Kadisha repaid Shearson $230,000 |
| | | Kadisha repaid Daniel $50,000 |
| 6-17-92 | | Kadisha repaid Daniel $50,000 |

STATEMENT OF DECISION

Exhibit 1
Page 53

| DATE | | CASH IN | CASH OUT |
|------|---|---------|----------|
| 6-18-92 | | Loan from Trust 2 $200,000 | |
| 6-18-93 | | | |
| 7-08-92 | | | Union Bank NSF Charge $30 |
| 7-09-92 | | Loan from Trust 2 $250,000 | |
| 7-09-92 | | | Kadisha repaid Daniel $550,000 |
| 7-14-92 | | | Union Bank NSF Charge $10 |
| 7-31-92 | | | First Credit Bank late fee $157.75 |
| 8-03-92 | | | Union Bank NSF Charge $20 |
| | | Bank Leumi loan $400,000 | |

| DATE | CASH IN TO KADISHA | CASH OUT |
|------|--------------------|----------|
| 10-05-92 | First Boston loan $500,000 | |
| 12-09-92 | | Union Bank NSF Charge $30 |
| 12-24-92 | | Union Bank NSF Charge $10 |

   b.    **Kadisha sold Trust 2's Qualcomm stock to raise cash  for his Own use.**

   In May 1992, in order to raise cash for his own use, Kadisha sold Trust 2's 37,500 shares of Qualcomm stock for approximately $800,625 (the "1992 Stock Sale.") (TE 505.)  Kadisha made the 1992 Stock Sale without consulting an independent investment advisor (as DeCastro had advised Kadisha to do), without consulting with Dafna and without any economic justification.  Although the proceeds were funneled to Kadisha, he testified that he did not have a plan for how to use the proceeds when he made the sale.  Kadisha's first communication with anyone regarding the 1992 Stock Sale was to provide instructions to Shearson on the date he initiated the sale.  He did not consult with Dafna prior to the sale or even inform her of it afterwards.  (RT 40, 6-17-02; RT 44, 6-17-02; RT 58, 6-17-02)

   In fact, Kadisha's sole reason for the 1992 Stock Sale was to funnel Trust money back to himself – which he did in the form of phantom loans to a David Rahban ("Rahban"), *an individual whom neither the accountant for the Trusts (Feldman) or Kadisha's secretary and booker, Theresa Mikhaili ("Mikhaili") had ever heard of.*

---

**STATEMENT OF DECISION**

48

Exhibit 1
Page 54

c.     **The purported loan by Trust 2 to "Rahban."**

On May 18, 1992, Kadisha deposited $1,478,823.96 into Trust 2.  This consisted of the proceeds from the 1992 Stock Sale ($801,047), and $677,776.96 from Kadisha to repay principal and interest on his outstanding loans from Trust 2.  (TE 563d.)  The very next day, Kadisha allegedly loaned $1.4 million to David Rahban ("Rahban") from Trust 2.  (TE 563d.)

There is, however, no credible evidence that there was a David Rahban.  The Court finds that Rahban claim of loans to Rahban to be willfully false.

A little more than a week after the purported $1.4 million loan to "Rahban," Kadisha repaid Trust 2 $1,471,936.68 for the outstanding principal and interest he owed on a portion of his loans.  (TE 563D.)  *There was no loan to Rahban.*  The $1.4 million loan to "Rahban" actually went to Kadisha.  Kadisha took $1.4 million out of the Trust and used it to repay $1,471,936.68 of principal and interest on his prior loans.  Thus, with the help of the 1992 Stock Sale proceeds, Kadisha was able to retain the use of $1.4 million of Trust 2's funds – without having any direct accountability for the money.

According to Kadisha's accountings, as of December 31, 1992, Trust 2's assets consisted of $817,129.66 in cash, unsecured loans to Kadisha in the amount of $800,000 and the unsecured "loan" to "Rahban" (i.e., Kadisha) in the amount of $1.4 million.  (TE 563c.)  Kadisha acknowledged that the borrowings from Trust 2 accounted for over 70% of Trust 2's assets.  (TE 563d.)

d.     **The evidence shows that there was no loan to Rahban.**

Feldman, who had been hired by Kadisha to prepare the Trust accountings could not recall any investment made by either Trust to Rahban.  Feldman also had never met Rahban and did not even know who Rahban was.  (RT 62, 1-14-03.)

1   Mikhaili, who was Kadisha's assistant and who maintained the Trust records and made

2   the accounting entries, also could not recall any investment made by either Trust to Rahban.  She

3   too had never met Rahban and did know who Rahban was.  (RT 76, 3-10-04)  Mikhaili could not

4   recall keeping a file for Rahban or seeing a promissory note for him.  (RT 81, 3-10-04)  When

5

6   asked to review account 1610 of the Trust accountings pertaining to the purported loans to

7   Rahban by Trust 1 and Trust 2, Mikhaili said that she did not make the entries.  (RT 77-80, 3-10-

8   04; RT 81, 3-10-04.)  Kadisha was not able to produce copies of the executed promissory notes.

9   (RT 81, 6-17-02.)

10

11       Kadisha also testified that Rahban resided somewhere in Switzerland, Israel and Iran; he

12   did not have any assets in the United States, and that he had not received or reviewed Rahban's

13   financial statement before allegedly loaning money to him.  (RT 81-84, 6-17-02; RT 90, 6-17-02;

14   RT 22, 6-18-02.)  Kadisha never discussed the terms of the purported loans with Dafna, or even

15   with Ron Levi, whom Kadisha claims was Dafna's agent for her financial affairs.  (RT 52, 11-

16

17   10-03.)

18       Moreover – and not uncoincidentally – the purported loan to Rahban from Trust 2 was

19   also made on precisely the same (non)-terms as all of the undisguised loans Kadisha made to

20   himself – there was no security for the loan, no points were paid and interest was purportedly to

21   be paid annually.[12]  (TE 494, 495, 503; all Trust Accountings for the period 1992-1999.)

22

23

24   [12] At deposition, Kadisha admitted that the Rahban loans were unsecured – even though the Trust instruments required that any Trust loans be made on "adequate security." (TE 44, 44a; RT 91, 6-17-02.)  However, at trial,

25   Kadisha adopted a new position, i.e., that the promissory notes were "secured" because he personally guaranteed them.  Kadisha did not, however, produce any written guaranty.  (RT 89, 6-17-02.)  Instead, he (speciously) claimed

26   that the following language in paragraph 1 from the (unenforceable) First Amendment to Trust 2 constituted his guaranty: "…relying on trustee's personal ability to assure that the guarantee of the first sentence of paragraph 1 is

27   honored." (TE 428.)  This is clearly not a guaranty.  According to Kadisha, the First Amendment was drafted by Irell & Manella, which undoubtedly was able to draft an express guaranty that satisfied the requirements of the Civil

28   Code if that is indeed what was intended.  Kadisha did not call anyone from Irell & Manella at trial to confirm that the language he is now referring to as his personal guaranty was, in fact, intended to be a guaranty.  Moreover, it is not believable that Kadisha, without any consideration, would guarantee a total of $2.6 million in purported loans to

Kadisha also engaged in the same elaborate sham with Trust 1.  In March 1992, Kadisha paid Trust 1 approximately $2.2 million in principal and interest.  (TE 491b.)  He thereafter, on April 16, 1992,  purportedly loaned $1.2 million to Rahban.  (TE 494, 495, 550D, 560A.)  Kadisha thereby retained the use of $1.2 million of Trust 1's funds and was not directly accountable for the debt.  Trust 1's accountings also show that the interest payments on the "Rahban" loan were not made when due.  (RT 133, 6-17-02.)  Kadisha did not charge "Rahban," i.e., himself, any additional interest or points for the untimely interest payments.  (RT 146, 6-17-02.)[13]

e.    **Petitioner's Expert, Irwin Goldring, opined that the 1992 sale fell below the standard of care.**

Petitioner's expert, Irwin Goldring, opined that the 1992 Stock Sale fell below the standard of care for a California trustee because:  (1) Kadisha used the proceeds for self-dealing loans to himself, or made unsecured loans to Rahban; (2) he did not consult with an investment advisor to determine whether the sale made sense, and (3) he did not have a plan to diversify the sale proceeds if the sale did make sense.  (RT 42-44, 7-30-03.)

Kadisha has incorrectly claimed that Mr. Goldring agreed on cross-examination that the 1992 Stock Sale was a proper exercise of fiduciary power.  Kadisha misrepresents Mr. Goldring's testimony.  What Mr. Goldring agreed with was that Kadisha should never have

Rahban, a foreign national with no assets in the United States, without retaining a record of Rahban's address, phone number or other contact information to enable him or a successor trustee to contact Rahban. Kadisha did not need this information, however, since he had the money. The creation of the Rahban "loans" was simply part of Kadisha's pattern of creating phony transactions, backdating documents and transferring assets to avoid taxes and his creditors. and

[13] As to Trust 1's $1.2 million "loan:"  no interest payments were made when due in 1994. The "loan" was brought current by a double interest payment in 1995. In 1996, interest of $144,000 was owed. Only $36,000 was paid, leaving a balance of $108,000, which was not paid until over three years later in 1999. (TE 3553.) As to Trust 2's $1.4 million loan, no interest payments were made when due in 1994. Instead of making the next interest payment when due on May 19, 1995, "Rahban" made two payments, totaling $308,000, in July 1995. On May 19, 1996, interest in the amount of $154,000 was due, but only $38,500 was paid, leaving a balance of $115,500 that was not paid until more than two years later. (TE 3553.)

Exhibit 1
Page 57

loaned Qualcomm $300,000 from Trust 2 (which was how Trust 2 got its Qualcomm stock), and that once he acquired the stock (in breach of his fiduciary duties), he should have sold it to diversify Trust 2's investments. (RT 42-44, 7-30-03)  Mr. Goldring *did not agree* that it was a proper exercise of fiduciary duty for Kadisha to sell Trust 2's Qualcomm stock solely for the purpose of raising cash for his own use rather than for diversifying the Trust's investments.  In other words, although a sale of the stock to diversify the Trust's assets would have been proper, a sale of the stock to promote Kadisha's self-dealing was not.

**16.**    **Kadisha made millions of dollars of improper loans to himself, his businesses and his friends from the Trusts**

Kadisha made millions of dollars of  misappropriations (takings) from the Trusts to himself. Dan Investments or his friends.  The following schedule sets forth the date of each taking, the amount, the Trust from which it was made, and the trial exhibits documents for each taking.

| | | | |
|---|---|---|---|
| 12/07/88 | $600,000 | Trust 2 | TE 166,176 |
| 12/07/88 | $400,000 | Trust 2 | TE 164,165 |
| 06/12/89 | $700,000 | Trust 2 | TE 254, 255, 1719a |
| 06/21/89 | $550,000 | Trust 2 | TE 257,258 |
| 12/14/89 | $200,000 | Trust 1 | TE 173, 303, 304[14] |
| 08/08/89 | $390,000 | Trust 2 | TE 271,272[15] |
| 01/22/90 | $1,400,000 | Trust 1 | TE 332,333[16] |

---

[14] Kadisha made the check for the 12/14/89 loan payable to himself. He did not have a note documenting the loan prepared until after he had repaid the loan in 1992. When the note was prepared, the obligor was not Kadisha, but Dan Investments, the real estate partnership in which Kadisha was a partner.
[15] On August 8, 1988, Kadisha received checks totaling $390,000 from his family and friends who purchased 390,000 shares of Qualcomm stock.  On August 8, 1989, the one year anniversary, Kadisha took from Trust 2 $390,000.

| 06/15/90 | $130,000 | Trust 2 | TE 357 |
| 07/25/90 | $ 61,000 | Trust 1 | TE 364, 3409[17] |
| 07/26/90 | $ 89,000 | Trust 1 | TE 365, 365a, 366[18] |
| 06/11/92 | $350,000 | Trust 2 | TE 509, 510 |
| 06/18/92 | $200,000 | Trust 2 | TE 513, 514 |
| 07/09/92 | $250,000 | Trust 2 | TE 518, 519 |
| 02/25/93 | $500,000 | Trust 2 | TE 573, 574 |
| 03/04/93 | $500,000 | Trust 1 | TE 576[19] |
| 01/31/95 | $120,000 | Trust 1 | TE 760 |

Each of the promissory notes for the loans prior to January 1, 1992, were prepared in 1992 (after they had been repaid) and backdated to the date the funds had been borrowed. Thus, the loans were undocumented while they remained outstanding. The Trusts' general ledger detail reports for 1988 through 1991 show that Kadisha did not make any interest payments on any of the loans from the date the monies were borrowed until they were repaid in 1992. Each of the promissory notes that were prepared in 1992 state that interest and principal were to be paid

[16] Kadisha made the check for the 1/22/90 loan payable to himself. As with the other (pre-1992) loans, Kadisha did not contemporaneously execute a promissory note for the loan and no note was prepared until after the loan had been repaid in 1992. When the note was prepared in 1992, Dan Investments was again named as the obligor, rather than Kadisha. During deposition, Kadisha testified that Nick Nikka, another partner of Dan Investments, executed the note. (See Kadisha Depo., V10, 1679:9-12) Prior to trial, Kadisha changed his deposition testimony to state that he believed he may have signed Nick Nikka's name to the note with Mr. Nikka's approval. (TE 1826) As well, Kadisha's 1992 General Ledger (his personal accounting for his Union Bank account) reflects that Kadisha' repaid the loan from his Union Bank account, rather than an account designed as a Dan Investments account. (TE 560 at K001966)

[17] TE 364 is a check to Kadisha for $61,000. Once again, the obligor on the promissory note which was prepared in 1992 after the loan had been repaid, was Dan Investments, not Kadisha. Kadisha repaid the loan from his Union Bank account, rather than from the account designated as a Dan Investments account. (TE 560)

[18] TE 365a is a copy of a 7/26/90 wire transfer from Trust 1 to Fred Pourbaba, a longtime friend of Kadisha. There is no note from Mr. Pourbaba to Trust 1, however. Rather, TE 365 is a copy of a promissory note dated 7/26/90 for $89,000 from Dan Investments to Trust 1. This note was also prepared in 1992 after the loan had been repaid. And, once again, Kadisha's 1992 general ledger shows that he repaid the loan from his Union Bank account rather than from an account designated as a Dan Investments account. (TE 560)

[19] This check was issued to Union Bank to purchase a cashier's check for $500,000 to Kadisha's friend and business associate, Leon Farahnik.

STATEMENT OF DECISION

53

Exhibit 1
Page 59

on the respective maturity dates, even though they had actually already been paid at the time the notes were prepared.  Also, even though the notes had already been paid and the actual maturity dates were therefore unknown, the maturity dates set forth in the notes differ from the dates the notes were paid.

During the deposition, Kadisha testified that he executed each of the promissory notes on the date depicted on the note.  At trial, he admitted that this was untrue and that the notes were not actually prepared until after Kadisha repaid the loans in the spring of 1992.  (RT 72, 8-7-02)

Even if Kadisha could have made loans to himself as a trustee, the unsecured loans he made violated the terms of the Trusts, which required that loans of Trusts funds be "upon adequate interest and adequate security." (TE 44, 44a)  He also misleadingly labeled all of his borrowings from 1988-1991 in the Trusts' general ledger detail activity reports as "investments Kadisha."

17.  **Kadisha used Trust funds to help fund a real estate purchase by the Carson '93 partnership while he was a shareholder, president and CEO of the general partner Texollini**

The limited partnership known as Carson '93 was formed on July 12, 1993.  (TE 608.)  The general partner was Texollini, of which Kadisha was a shareholder, president and CEO.  (TE 161e, 607.)  Kadisha made Trust 1 and Trust 2 limited partners, along with Texollini, Kadisha, Kadisha's brother (Daniel Kadisha), Kadisha's father (Abraham Kadisha), Kadisha's father-in-law (Parviz Nazarian), and Kadisha's friend (Farahnik).  (TE 608.)

On July 19, 1993, Trust 1 contributed capital of $475,000 to Carson '93, and on July 19, 1993, Trust 2 contributed capital of $125,000.  (TE 614, 626; 3497.)  (TE 607.)  Texollini made

capital contributions to Carson '93 of $20,000 as a general partner and $480,000 as a limited partner. (TE 608.)

Carson '93 was formed to acquire a commercial property located at 2575 El Presidio, Carson, California (the "Presidio Property"). (TE 616a-i.) The partnership borrowed $2.4 million from First Credit Bank to purchase the Presidio property. (The total purchase price was $4 million.) The loan was secured by a first deed of trust on the property. Concurrently with the closing of the $2.4 million loan, Texollini, Inc. borrowed an additional $500,000. Texollini's loan was secured by a second deed of trust on the *partnership property*, which made the partnership liable if Texollini defaulted on its loan.

As a condition to obtaining the First Credit Bank loans, Texollini submitted an estoppel certificate to First Credit Bank that stated that Texollini accepted possession of the Presidio Property, that all of the tenant improvements that were to be made had been satisfactorily completed, that the Presidio Property was in good condition and repair, and that Texollini was not aware of any breach or default by the seller. (TE 616i.) Although the estoppel certificate acknowledged that all tenant improvements had been completed, the seller remitted $250,000 to Texollini at the time of the closing. (TE 618.)

No evidence was presented that Petitioners were aware of any of the following:

- That Trust 1 and Trust 2 had invested $600,000 in Carson '93;

- That Texollini was both the general partner of the landlord and the tenant;

- That the limited partnership agreement purported to waive the conflict of interest between Texollini, as both landlord and tenant;

- That Texollini, Kadisha and family and friends controlled all of the votes necessary to approve any transaction between Carson '93 and Texollini;

- That Texollini was allowed to place a second deed of trust on the Presidio Property for its $500,000 loan, thus making the partnership property liable if Texollini defaulted.

From 1993 to 1998, Carson '93 made distributions to each of the partners on a pro rata basis. Petitioners contend that since Texollini, Inc. was reimbursed its $500,000 capital contribution at the closing, Texollini did not have an investment in the partnership and should not have received pro rata distributions with the other partners. Such contention is not supported by the evidence.

On August 1, 1993, Carson '93 as landlord and Texollini, Inc. as tenant, entered into a lease of the Presidio Property to Texollini, Inc. Petitioner claims the rent was below market terms. (TE 623; RT 44, 7-21-03) The evidence fails to support this contention.

On January 10, 1997, Kadisha purchased Trust 2's interest in Carson '93 for $190,000. (TE 921.) Kadisha did not obtain an independent appraisal of the value of Trust 2's interest, and Kadisha was both the buyer (as an individual) and the seller (as the trustee of Trust 2).

In about September 1998, Carson '93 refinanced the Presidio Property and obtained a $4.0 million loan. (TE 1161; TE 1185). Partnership distributions were made in conjunction with this refinancing, and Kadisha received the distribution that would have been received by Trust 2 if Kadisha had not bought its interest.

In about November 2000, Kadisha sold his interest in Carson '93 to his brother Daniel, at a profit. (TE 1628)

18. **In 1999, Kadisha divested Trust 2 of all of the Qualcomm stock it acquired in 1994. Dafna claims the sale was in bad faith and solely to economically harm her.**

---

On January 10, 1994, Trust 2 acquired 31,674 additional shares of Qualcomm stock when Kadisha exercised Trust 2's warrants (acquired as a result of its $300,000 loan to Qualcomm). (TE 672.)  The stock split 2-for-1 in February 1994.  (TE 710.)  Trust 2's 31,674 shares of Qualcomm stock therefore doubled to 63,348 shares.

Petitioner Dafna claims that in 1999, Kadisha divested Trust 2 of all of its 63,348 shares of Qualcomm stock – to hurt Dafna by depriving her of the economic benefit of Qualcomm's expected increase in value.  The court finds the evidence insufficient for the court to conclude Kadisha sold the subject shares to "hurt Dafna."

        a.         **Kadisha held Trust 2's Qualcomm stock when Qualcomm's economic news was bad, and sold it when Qualcomm's economic news was good.**

From April 1994 until December 31, 1998, Trust 2's Qualcomm stock traded in a range of $20 to $70 per share.  (TE 1960.)

On September 23, 1996, Ericsson, the Swedish communications giant, filed suit against Qualcomm alleging that Qualcomm's CDMA products (its core products) infringed on Ericsson's patents.  (TE 1353.1)  Kadisha understood that if Ericsson prevailed in the lawsuit, it would be a significant threat to Qualcomm.  (RT 31, 8-6-02.)  Qualcomm's 10-Qs for the periods ending June 30, 1996 and September 29, 1996 also reported economic setbacks.  (TE 873.1, 886.)  In spite of the bad news, Kadisha believed in Qualcomm's future and held onto both his and Trust 2's Qualcomm stock.  (RT 69-70, 8-2-02.)

In 1997, Kadisha was concerned about Qualcomm's ability to compete, even though its finances were improving.  (RT 39, 8-5-02.)  He believed that there would be lower earnings during the second quarter of 1998.  (RT 45, 8-5-02.)  Nonetheless, Kadisha did not sell any of

Trust 2's stock.  As a Qualcomm director and a member of Qualcomm's audit committee, Kadisha was able to obtain extensive financial information about Qualcomm, and to fully evaluate Qualcomm's prospects.

In about June 1998, Kadisha, frustrated with dealing with Dafna, hired Arnold Kahn and Ricky Van Rijn to take over administering the Trusts.  (TE 1717.)  Over the next year, Kadisha did not meet with any of the beneficiaries – even after Dafna expressed dissatisfaction with Arnold Kahn in a letter copied to Kadisha.  (TE 1223.)

On December 8, 1998, Kadisha entered into a cashless collar transaction covering 500,000 shares of his own Qualcomm stock (roughly one-third of his stock).  (RT 103, 7-10-02; TE 3817.)  The collar protected Kadisha from a decline in the Qualcomm stock price but allowed him to benefit if the share price rose by a significant amount.  (TE 3817.)[20]

From January through April 1999, Qualcomm reported large increases in its revenues, income, and earnings and its economic prospects were booming.  (TE 1028, 1103, 1107, 1331, 1353.)

In January 1999, Qualcomm reported the highest quarterly revenues in its 13-year history.  (TE 1331.)  In the second quarter of 1999 (excluding a non-recurring charge), Qualcomm reported record net income of 250% over the same quarter in the prior year.  (TE 1366.)

On or about April 20, 1999, Qualcomm reported that its pending patent litigation with Ericsson had settled.  (TE 1366.)  As part of the settlement, Ericcson had agreed that Qualcomm's CDMA technology would be the global standard for mobile phones rather than

---

[20] Simplistically, the Collar provided a "put" and "call" with a floor and ceiling price.  If the stock fell below the "floor price" on the settlement date, Kadisha could "put" the 500,000 shares.  If the price rose above the "ceiling price" on the settlement date, Kadisha could either pay the difference or deliver that number of shares equal to the difference between the "ceiling price" and the average price of the shares prior to the settlement date.

STATEMENT OF DECISION

Exhibit 1
Page 64

Ericcson's GSM technology – the most popular mobile standard and the one favored by European companies.

On April 4, 1999, Qualcomm declared a 2-for-1 stock split. (TE 1362)

On April 16, 1999, Kadisha attended a Qualcomm audit committee meeting to discuss Qualcomm's financial results for the first quarter of 1999, and its pending press release, which the committee reviewed and approved. (TE 1851 bates 1380-1382.) On April 20, 1999, Qualcomm issued the press release, which announced Qualcomm's second quarter *record* earnings and described the effect of the Ericsson settlement. (TE 1366.) Dr. Irwin Jacobs, Qualcomm's CEO, called the Ericsson settlement "pivotal" in Qualcomm's history. He said:

> We saw robust demand for CDMA phones and chip sets, and we announced innovative new products . . . Our royalty revenues grew significantly as a result of increased CDMA product shipments by our licensees, which we believe as a clear indicator of the growth of CDMA technology around the globe. Our focus is to continue to support the growth of CDMA, to strengthen and grow our core business and to improve operational efficiency and profitability.

(TE 1366.)

The press release also reported that Qualcomm's net income, excluding non recurring items, had increased 250% over the same period in the prior year, and that revenues in the second quarter of fiscal 1999 had increased 23% over the second quarter of the fiscal 1988." (TE 1366.)

Between January 1, 1999 through April 27, 1999, Qualcomm's stock price reflected the company's financial success – it rose from approximately $50 per share to approximately $200 per share. (TE 1960.)

On April 26, 1999, Kadisha attended what must have been a jubilant Qualcomm board of directors meeting in light of the Ericsson settlement. (TE 1367.) Kadisha agreed that the fact

that the Ericcson settlement provided for a single CDMA standard was an "enormous advantage" for Qualcomm.  (RT 21, 8-6-02.)

Although Kadisha held Trust 2's Qualcomm stock when Qualcomm's economic news was bad, when the economic news was *extraordinary*, Kadisha sold the 53,348 shares of Trust 2's Qualcomm stock on April 27, 28 and 29, 1999 (the "1999 Stock Sale").  (TE 976.)

   **b.**    **<u>Kadisha's untrue pretexts for the 1999 Stock Sale</u>**

Kadisha testified that the reasons for the 1999 Stock Sale were:  (1) that the sale was in accordance with his long term strategy for Trust 2, which was purportedly to increase the principal to a level that, with very conservative investments, would support the Uzyels with an income of $400,000 to $500,000 per year, and (2) that holding the stock of a publicly traded company was too risky for Trust 2, because (among other things) Kadisha did not have control over the investment.  (RT 29, 7-11-02; RT 100, 7-10-02; RT 88, 9-10-02.)

The first reason – that Kadisha's strategy was to increase the principal to a point where it would yield income of $400,000 to $500,000 a year with conservative investments is untrue because:

- Kadisha had been distributing over $400,000-$500,000 per year to Dafna (including over $600,000 in 1994 and 1995, over $900,000 in 1996 and over $500,000 in 1990, 1993 and 1997), and *knew* that Dafna was unable to cover all of her expenses with these distributions because she was constantly asking him for more money.  (TE 4643; Trust accountings from 1988-1999.)  It is not believable that Kadisha had a long term strategy that provided for far *less* income to Dafna.

- Kadisha did not have any conservative investments in mind at the time of the sale that would yield $400,000 to $500,000 per year, in accordance with his purported strategy. Kadisha did not consult with an investment advisor to determine how to produce that level of income and did not receive any written recommendations for investing the proceeds of the April 1999 Sale. (RT 33-35, 7-11-02.)

- In fact, the major investments Kadisha made with the proceeds were *not* conservative investments. Kadisha invested in two highly risky funds: The Directors Fund ($2 million) and the Value Realization Fund ($1 million). Both Funds employed leverage, were illiquid, used short selling and advised their investor that a percent of the Funds' investments would be risky. In fact, as Kadisha was well aware, the Value Realization Fund had lost money in 1998. (RT 138, 9-10-02; TE 1357, 1358, 1501, 1504.) The Value Realization Fund continued to lose money in 1999 and the Directors Fund also lost money. (TE 1402)

- The Trust income Kadisha was able to generate – following his purported strategy – was far below $400,000 to $500,000 per year. (RT 110, 9-10-02. TE 1310, 1373, 1357, 1608; Trust accountings for 1990-2000.)

- Kadisha never told Dafna he was going to sell Trust 2's Qualcomm stock and never discussed with her whether she agreed with his purported strategy of providing her with an annual income of $400,000 to $500,000 per year *from her assets,* or whether $400,000 to $500,000 per year was sufficient for her needs. (RT 34, 7-11-02.) Nor did Kadisha consult with Arnold Kahn, whom he had hired to administer the Trust.

STATEMENT OF DECISION

61

Exhibit 1
Page 67

- Kadisha did not even inform Dafna of the sale after it had taken place.  If the sale had been as wildly beneficial to Dafna as Kadisha claims it was, why did he forego letting Dafna in on the good news?

Kadisha's purported second reason for the April 1999 Sale (that holding the stock of a public company was risky and that Kadisha did not have control over the investment) is also untrue because:

- Kadisha's investments from the sale proceeds, the Directors Fund and the Value Realization Fund, both purchased stocks of public companies.  (TE 1359, 1358)

- Kadisha had no control over what the Directors and Value Funds invested in, and there were restrictions on Kadisha's ability to redeem the Trust's investments. (RT 121, 9-10-02.)

- Although Kadisha claimed that continuing to hold Trust 2's Qualcomm stock was too risky, Kadisha contradictorily continued to hold Trust 1's shares as, in his words, a "conservative investment strategy."  (RT 31, 7-11-02.)

Kadisha's confidence that Qualcomm stock would appreciate is also demonstrated by the fact that he continued to hold onto his Qualcomm stock, except for a small number of shares he acquired through the exercise of options.  (TE 1930.1-11.)

### 19. The Purported October 8, 1998 Sale was a phony, backdated transaction.

Concurrently with the 1999 Sale, Kadisha created a phony, backdated sale to conceal the fact that he had transferred Trust 2's remaining 10,000 shares of Qualcomm stock and all of its Leap Wireless stock to Trust 1 *at the same time* he made the 1999 Sale (the "October 1998

Sale"). The evidence at trial overwhelmingly showed that the October 1998 Sale was a phony, backdated transaction for the following reasons:

First. None of the people who regularly assisted Kadisha with the Trusts learned that there had supposedly been a sale in October 1998 until at least June 1999. That includes: (1) Jo Sharma, who had maintained that the Trust records since January 1, 1995, (RT 74, 110, 11-12-02; 132, 129-9-02); (2) Arnold Kahn, the attorney Kadisha had hired to administer the Trusts, (3) David Gottlieb, whom Kadisha had retained to document all of the Trust transactions and to do retroactive accountings frm the inception of the Trusts (RT 49, 1-7-03); (4) Ricky Van Rijn, a paralegal whom Kadisha had hired to assist in preparing the Trust accountings (RT 136-137, 1-6-03); (5) Ron Panting, a retired CPA whom Kadisha had hired to review the Trust accountings; and (6) Feldman, who had prepared the Trusts' tax returns since 1988 (and who would have needed the information about the purported October 1988 Sale for Dafna's 1998 tax returns). (RT 9, 1-22-03; 15, 1-14-03.)[21]

---

[21] There is only one person (besides Kadisha) who claims to have known about the sale on October 8, 1998 and his testimony is not believable. At deposition, Kadisha testified that he could not remember who prepared the stock purchase agreement for the Purported October 1998 Sale (TE 1201) or even if it was prepared by an attorney. (RT 49, 7-11-02; RT 115, 7-31-02; RT 47, 7-12-02.) At trial, Kadisha suddenly remembered that his *brother-in-law and business partner*, Benjamin Nazarian prepared the stock purchase agreement. (RT 25, 7-15-02. ) A very nervous Benjamin Nazarian testified at trial that he prepared the stock purchase agreement (TE 1201) on October 8, 1998, shortly after his graduation from law school and admission to the California Bar. (RT 96, 7-31-02; RT 117-118, 7-31-02.) Mr. Nazarian's testimony is not believable for many reasons. For one, Kadisha was working with both Attorney Arnold Kahn and Irell & Manella on Trust matters in October 1998, but the stock purchase agreement, *which no one else knew about* was supposedly drafted by Mr. Nazarian. (RT 4, 7-15-02.) Three, Nazarian did not do any of the things an attorney representing a client would do. He did not maintain a file copy of the stock purchase agreement, did not maintain a computer copy, and did not give a copy to his secretary. (RT 27, 8-1-02; RT 115, 131, 7-30-02.) He did not prepare a promissory note for the balance of the purchase price, which under the terms of the stock purchase agreement was not due, with interest, until June 1999. Nor did he prepare a UCC filing to secure the debt. (RT 130, 7-31-02; RT 126, 7-31-02.) He never saw an executed copy of the agreement and never inquired whether the sale was executed. (RT 112, 113, 131, 7-31-02.) On October 8, 1998, when he supposedly prepared the stock purchase agreement, he did not talk with Kadisha about it. (RT 137, 7-31-02.)

Josephine Sharma, Kadisha's assistant from 1995 through the trial, testified at trial that on or about October 8, 1998 Kadisha asked her to prepare interest calculations for how much interest Trust 2 owed Trust 1, that she gave the calculations to Kadisha around October 8, 1998, and that after the pretextural 1999 sale, she back dated promissory notes evidencing advances from Trust 1 to Trust 2. The Court finds her testimony because there were glaring inconsistencies between her trial and her deposition testimony. At her deposition she testified that: when Kadisha asked her to prepare the interest calculations, he didn't tell her the reason, she could not remember when

Second.  Kadisha's reason for the purported October 1998 Sale was untrue.  Kadisha claimed that the main reason for the purported sale was for Trust 2 to repay money it allegedly owed to Trust 1.  (RT 76, 7-11-02.)  However, it was actually the other way around.  Trust 1 actually owed Trust 2 money because Kadisha had not been distributing to Dafna 75% of Trust 1's net income as required by the terms of Trust 1.  (RT 15, 7-30-02; TE 44, 44a.)  In late September or early October 1998, Ricky Van Rijn informed Kadisha that his accountings erroneously showed Trust 2 owing Trust 1 money when it was actually the other way around.  (TE 1740; RT 33, 7-8-02; RT 7, 7-15-02.)

Third.  The stock purchase agreement for the purported October 1998 sale provided for an installment sale, with a balance of $203,729 due (with interest) on June 8, 1999.  (TE 1201.)  No promissory note for the unpaid balance was prepared until June 1999.

Fourth.  The terms of the stock purchase agreement do not make economic sense.  Kadisha claims that Trust 2 owed Trust 1 money.  The amount he claims Trust 2 owed was greater than the value of the Qualcomm and Leap Wireless stock on October 8, 1998.  There was therefore no economic reason to make the sale an installment sale and for Trust 1 to pay interest to Trust 2 on an unpaid balance of the purchase price for the stock.  Kadisha could simply have credited Trust 2 for the full value of the stock (against the amount Trust 2 allegedly owed Trust 1).  The only reason to make the sale an installment sale was to explain why the Qualcomm and Leap Wireless shares were not transferred from Trust 2 to Trust 1 on October 8, 1988 when the sale purportedly occurred.

---

she prepared the interest calculations but thought it was sometime during the last 6 months of the year, she didn't remember if she gave them to Kadisha, and she never placed a copy of the alleged calculations in any trust file.

Kadisha's story that he asked Sharma for interest calculations in October 1998 is unbelievable.  Why would Kadisha not tell Sharma the purpose of the calculations?  Why didn't Sharma keep a copy of her interest calculation in the Trust files or on her computer?  Why was Sharma's memory so much more precise at trial as to when she was asked to prepare the interest calculations and whether she gave them to Kadisha than at her deposition?  The inevitable conclusion is that Kadisha never asked Sharma to prepare interest calculations in 1998.

STATEMENT OF DECISION

Exhibit 1
Page 70

Fifth.  The Purported October 1998 Sale created an unnecessary capital gain tax liability for Trust 2.  Since, there was no testimony that Trust 1 required immediate repayment for the amount Kadisha claims Trust 2 owed it, and the repayment only eliminated a payable between the Trusts (which could be dealt with at any time), there was no reason for Kadisha to have Trust 2 incur a tax liability in order to repay a phantom debt.

Sixth.  Kadisha's explanation for not giving Sharma a copy of the stock purchase agreement for the Purported October 1998 Sale until June 1999 is ridiculous – Kadisha claimed that "he left it in his briefcase." (RT 24, 7-15-02.)

Seventh.  The Purported October 1998 Sale was not contemporaneously recorded in the Trust accountings.  Sharma testified that she closed the 1998 Trust general ledger on August 20, 1999. (RT 63, 12-3-02.)  On *August 6, 1999*, she prepared a general journal entry recording the Purported October 1998 Sale in the Trust accounting for the first time. (RT 96, 12-10-02; TE 1294.)

Eighth.  The Purported October 1998 Sale was not reported in the Trusts' original 1998 tax returns.  On about August 9, 1999, Feldman prepared the Trusts' 1998 tax returns and forwarded them to Kadisha for his signature. (TE 1409.)  Although the returns did not report the Purported October 1998 Sale – and were therefore incorrect – Kadisha signed the returns. (TE 1249, 1279.)  At his deposition, Feldman testified that the reason the Purported October 1998 Sale was not reported in the original tax returns was because he did not have the information about the sale when he prepared the returns. (TE 1294, RT 46-47, 12-4-03.)  Feldman was impeached with this deposition testimony when he tried to change his testimony at trial to claim that he did not initially report the sale because he did not think it was a taxable event. (TE 1249, 1279; RT 46-47, 12-4-03.)  (Feldman was also impeached by the fact that it *was* a taxable event.)

STATEMENT OF DECISION

65

Exhibit 1
Page 71

Ninth. The sale of the Leap Wireless stock does not make economic sense. On September 12, 1998, Qualcomm declared a stock dividend of one share of Leap Wireless Stock for every 4 shares of Qualcomm stock owned by a shareholder. This was a taxable event. On September 23, 1998, Trust 2 received a Leap Wireless share certificate for 15,837 shares. As a result of the dividend, Trust 2 incurred approximately $108,000 in taxable income.

On October 8, 1998, when Kadisha purportedly sold Trust 2's 15,837 shares of Leap Wireless stock to Trust 1, the total value of the stock was $46,361 ($3.013 per share). If Kadisha had actually sold the Leap Wireless shares on October 8, Trust 2 would have received less consideration for the stock than Dafna's tax liability cost.

In reality, Kadisha did not transfer the stock from Trust 2 to Trust 1 until 1999 when the stock's price had increased from approximately $3 per share to $20 per share and was projected to go even higher, which it did. By the end of 1999, the Leap Wireless stock had risen to approximately 80 per share. (TE 1392.)

Tenth. Although Kadisha claims that the Purported October 1998 Sale occurred on October 8, 1998, he did not open a brokerage account for Trust 1 for the stock until June or July 1999, Kadisha opened a brokerage account for Trust 1 at Lehman Brothers. (RT 82, 7-15-02.) (The documents state that they were executed in May 1999. TE 1378, 1379.)

Eleventh. For the reasons previously set forth, Nazarian's testimony that he prepared the sale document on October 8, 1998 is not believable. (RT 137-138, 7-30-02.)

## 20.    Izzet's and Ron's pre-litigation meeting with Kadisha in 1999.

In about June 1998, Izzet and Ron Levi ("Ron") met with Kadisha to request a one-time distribution to Dafna of approximately $300,000. (RT 80, 11-10-03.) Kadisha told Izzet and Ron that he had sold Trust 2's Qualcomm stock, but he did not tell them how many shares he had

---

Exhibit 1
Page 72

sold, what the net proceeds were, or that Trust 1 held 10,000 shares of Qualcomm stock. (RT 129, 11-10-03.) Kadisha also told Izzet and Ron that he was in the process of having an accounting prepared (RT 81, 11-10-03), that he wanted to resign as trustee and hand matters over to Dafna, Izzet, and Ron, that he wanted them to prepare a budget, and that he would give Dafna a $150,000 advance when he received the budget and another $150,000 when Dafna executed some paperwork. (RT 89-91, 11-10-03.) Izzet and Ron Levi testified that they were not shown the 1998 general ledger for either Trust at the meeting. (RT 102, 11-10-03.)

On June 28, 1999, Dafna, Ron and Izzet wrote to Kadisha confirming what had happened at the meeting, in particular, Kadisha's representation that if they signed the paperwork, he would release the requested funds. (TE 1390.)

On July 14, 1999, Marc Smith ("Smith"), an attorney with Krane & Smith, informed Kadisha that his law firm was representing Petitioners, and that he was following up on their request that Kadisha distribute $150,000 to them. (TE 1403.) Kadisha did not make the distribution.

On October 6, 1999, Arnold Kahn forwarded a proposed modified Trust Agreement to Ron. (TE 3592, TE 1745.) It provided, *inter alia*, that:

1. The modified Trust could be further modified by a writing signed by the Settlor and Kadisha, but not by the Settlor and any other trustee.

2. Under the terms of the original Trust, Dafna was entitled to certain distributions of the Trust's income. Dafna, by executing the modification waived her right to any payments which had accrued under the terms of the original Trust, but not been paid.

3. At any time, Kadisha could designate one or more persons to serve with him as a co-trustee, as his successor, or as a successor to his designated co-trustees. Additionally,

Kadisha could designate different people to hold different powers and could waive bond for all co-trustees and designated successors.

4. Kadisha would not be liable for any action as a trustee or for his failure to act unless such action or failure to act was found to be the result of gross negligence or bad faith.

5. The Trustee could resign upon written notice.

6. A majority in percentage interest of all of the income beneficiaries could remove the Trustee for "reasonable cause."

7. "Reasonable cause" for all trustees other than Kadisha, was defined as (a) legal incapacity; (b) willful or negligent management; (c) abuse or abandonment; (d) if the trustee was charged with a felony or serious misdemeanor; (e) an act of stealing, dishonesty, fraud, embezzlement; and (f) a variety of other reasons as set forth in paragraph 3.8.b(i).

8. "Reasonable cause" as applied to Kadisha, was limited to gross negligence and willful misconduct.

9. The Trustee would not be obligated to render an annual accounting.

### 21. On October 27, 1999 Petitioners filed a petition for breach of trust against Kadisha.

On October 27, 1999, Petitioners filed a petition against Kadisha for breach of fiduciary duty. (TE 1435.)

On January 13, 2000, Kadisha paid $13,761 to his attorneys from Trust 2. On February 23, 2000, Kadisha – without court approval or Petitioners' consent – Kadisha withdrew $250,000

Exhibit 1
Page 74

from Trust 2 and $125,000 each from Izzet and Joelle's trusts and deposited it into Marvin Burns's trust account to pay his legal fees.  (RT 56, 9-26-02.)

On May 1, 2000, Kadisha wrote to Izzet (who was only a college student and not represented by an attorney) and advised him not to allow the trust assets to be distributed to Dafna, or to follow the advice of his attorneys, his mother or his father.  (TE 1558.)

On May 15, 2000, Petitioners prepared Notices of Termination of Trusts (TE 1560a, b) which Kadisha received on June 7, 2000.  (TE 1573; RT 125-9-19-02.)  On about June 19, 2000, Petitioners filed a motion to confirm the termination of the Trusts and to compel Kadisha to turn over the Trusts' assets and return the $500,000 Kadisha had improperly withdrawn to pay his attorneys' fees.  (TE 1571.)  Kadisha filed objections and declarations in opposition to Petitioner's Motion.  (TE 1573.)  He contended that Dafna was not the settlor of the Trusts and she therefore could not terminate Trust 2 and she, Izzet and Joelle could not terminate Trust 1.

On August 4, 2000, Judge Klausner confirmed that the Trusts were terminated and ordered Kadisha to turn over the Trust assets and to return the $500,000 he had taken from the Uzyel Trusts to pay his legal fees.  (TE 1606, 1607.)  Kadisha refused to return the $500,000, and appealed Judge Klausner's order.  He also refused to turn the Trust assets over until mid-September 2000.  (TE 4641.)

## 22.  Kadisha Breached his Fiduciary Duties in Allowing the Value of Trust 1's Qualcomm Stock to Dramatically Decline.

In January 2000, Trust 1 owned 80,000 shares of Qualcomm stock.  This was because the 10,000 shares Kadisha improperly transferred from Trust 2 to Trust 1 split 2-for-1 in April 1999, resulting in Trust 1 holding 20,000 shares.  These shares split 4-for-1 in December 1999, resulting in Trust 1 holding 80,000 shares.  On December 31, 1999, the value of these 80,000

shares was approximately $14,090,000 and they constituted 90% of the value of Trust 1's assets. (TE 1394, 1960.)  By the time Kadisha turned over the 80,000 shares of Qualcomm stock to Petitioners in September 2000, the value of the stock had declined by over $10 million to $5,299,944.

Kadisha admitted that he was watching the price of Qualcomm stock on a daily basis during 2000.  (RT 22, 8-7-02.)  Therefore, he was aware of the dramatic price declines Trust 1's Qualcomm stock was experiencing in the first and second quarters of 2000.  He was aware, for example, that the price of the stock declined by $1.6 million on January 3 – a decline of over 10% in a single day – and that the price of the stock had fallen again before the market opened on January 4, 2000.  He was aware of further multi-million dollar declines in the stock price in subsequent months.  The nearly $1.6 million decline in value in one day should have been a wake-up call for Kadisha to take immediate action to preserve Trust principal.  Nevertheless, he did nothing.  He got another wake-up call when the market opened on January 4, and again did nothing to preserve Trust principal.  He never informed Petitioners or their counsel about the situation, and he never consulted with an investment advisor about stemming the Trust's losses. When he finally turned the assets over to Petitioners, the value of  Trust 1's Qualcomm stock had declined by approximately 60%, from $15,940,000 to $5,299,944.

### 23.   During This Same Period of Time, Kadisha Was Diversifying His Own Personal Investments

During this time period of January through June 2000, Kadisha was diversifying his own investments by purchasing millions of dollars of stock in a variety of publicly traded companies. (TE 1931; LB 363-389.)

In addition to being aware of the daily volatility of the Qualcomm stock, Kadisha, as a member of Qualcomm's audit committee and its board of directors, was well aware of the depressed nature of Qualcomm's business during the first half of 2000. Qualcomm's 10-Q for the period ending March 26, 2000 indicated a substantial decrease in revenues. (TE 1539.1.) Qualcomm's 10-Q dated June 25, 2000 rendered a similar report. (TE 1576.1.)

### 24.   Kadisha's Trust Accountings Were Fraudulent, Misleading, and Inaccurate and Concealed his Wrongdoings.

Four sets of fiscal reports have been prepared for the Trusts. (They are termed "financial reports" here because they do not comply with Probate Code section 16062 requirements for a trust accounting.) The first reports were prepared in the format illustrated by TE 22 by Feldman using a program called the "Dec-easy" program and consisted of "G/L Account Activity Detail Reports." Beginning in the Fall of 1991, Feldman created financial reports in a different format using the Peachtree program (illustrated by TE 392a).

In 1998, Kadisha retained Arnold Kahn of Greenberg, Glusker, et al. and Riky Van Rijn, to, among other things, prepare "accountings" from 1988 through the present (TE 1120; see TE 389 as an example of the "accountings" prepared by Ricky Van Rijn). Then, in late 1998 and early 1999, Kadisha, retained the services of David Gottlieb of Grobstein Horwath after consulting with Ron Panting (a former partner of Peat Marwick who advised Kadisha that there were errors in the Arnold Kahn and Van Rijn "accountings"). In late 1999, Grobstein began preparing new accountings from 1988 through the present (see, e.g., TE 389A). The final version of Grobstein's accountings were presented to Petitioners in June 2001 after litigation was underway. Petitioners contend that the Grobstein accountings are still erroneous in that, among other things, they do not account for monies that should have been distributed from Trust 1 to

Exhibit 1
Page 77

Dafna from 1989-1999 but were not, they incorrectly reflect inter-Trust loans, and they understate David Rahban's interest payments.

Kadisha contends that annual accountings were given to either Ron or Dafna during the first quarter of each year. (For example, the 1988 accounting would have been given to Ron or Dafna in the first quarter of 1989.)  Kadisha also testified, however, that he gave Dafna or Ron Levi general ledger activity detail reports for 1988 through 1990 in the format which Feldman testified was not created until the Fall of 1991. (T1 1900 Investments by Neil Kadisha; TE (Trust 2) 183g, 319j, 395e; TE (Trust 1) 183a, 319b, 394a) Feldman testified that he never gave Dafna copies of the accountings for 1988-1991. (RT 132, 1-23-03; RT 15, 1-24-03)  Moreover, Sharma testified at trial that after she began working for Kadisha on January 1, 1995, she never disseminated accountings to Dafna for January 1, 1995 through the end of 1999.  (RT 9, 12-9-02)

Even if Dafna had received the accountings, they were confusing and/or intentionally misleading.

Feldman testified that the accountings were not set up in a typical balance sheet format (RT 8, 1-24-03); that some transactions had been entered on an accrual basis and others on a cash basis (RT 30, 12-12-02); that from 1988 to 1991 all monies remitted by Kadisha to the Trust were (mis)labled as "loans," (RT 31, 12-11-02) and that Dafna would have been unable to understand what the "interest accruals" in account 1500 of Trust 2's 1989 accounting pertained to.  (RT 30, 12-12-02).  Feldman also testified that Dafna would have needed some knowledge of accounting to have understood the accountings.  (RT 6, 1-24-03)

All of the loans to Kadisha were recorded in an account misleading labeled "Investment – N. Kadisha."  Feldman testified that he was the one who came up with the idea of using the term "investment" instead of "loan" in the accountings to describe the money Kadisha was taking

from the Trusts.  (RT 36, 12-11-02)  Feldman also testified that reading "investment Kadisha" would not mean loan receivable Kadisha (RT 110, 1-27-03).  It is highly unlikely that Feldman was telling the truth.  It is inconceivable that Feldman, who is a CPA, does not know that the Kadisha loans should have been labeled "loan receivables" to disclose what they actually were.

Petitioners' expert, Irving Goldring, who is a CPA, testified that the trust accountings were not in a proper trust accounting format.  Moreover, even after the trust accounting format was changed in 1991, it was still not a proper format (RT 15, 7-30-03).  Goldring also testified that there was no mention in the accountings of the warrants owned by Trust 2 (RT 12, 7-30-03); that even when Trust 2 received 31, 679 shares of Qualcomm stock, it was not reflected in Trust 2's accountings (RT 17, 7-30-03), that the trust accountings should have been prepared so that the beneficiary could understand them (RT 29-33, 7-30-03); and that it was the trustee's responsibility to consider the education, economic and business sophistication, and experience of the beneficiary when preparing his accountings (RT 29-33, 7-30-03).

Kadisha, a sophisticated businessman and a Qualcomm director, was *himself* unable to answer questions at trial about the "accountings" and repeatedly testified that *he* could not understand them.  Kadisha admitted:  (1) that he had not reviewed the accountings for accuracy (RT 15, 6-18-02); (2) that he did not understand what the term "CR" in the "accountings" meant (RT 18, 6-18-02); (3) that he did not know what the term "BJ" in the "accountings meant" (8, 6-18-02); (4) that he did not know what the term "journal entries" in the "accountings" meant (RT 77, 7-15-02); (5) that the "debit column" in Trust 2's 1988 accounting (TE 22) was "to reflect monies going *out* of the Trust" (RT 59, 6-24-03) when, in truth, it is monies coming *in*; (6) that he did not know what the "net worth" account reflected; and (7) that he would need an accountant to help him understand the meaning of certain entries.  (RT 154, 5-28-02).

When Kadisha prepared the "accountings," he knew that Dafna had trouble understanding English, and that she had a limited education and virtually no business experience. During trial, in a conversation with Izzet, Kadisha stated that she (and Ron) were "stupid." (RT 7, 11-05-03.) (Initially, when Izzet testified about this conversation with Kadisha, the Court ruled that Kadisha's opinion of Dafna and Ron was of no concern to the Court. (RT 72, 11-5-03.) However, after pondering the statement, the court indicated that Kadisha's remark would be taken under submission. The court finds Kadisha's remark about Mrs. Uzyel being "Stupid" goes to reveal his state of mind in his dealings with Mrs. Uzyel.

## I.   LEGAL DISCUSSION

### A.   The Trustee's duties.

#### 1.   A Trustee is held to the highest standard of conduct and must act *solely* in the interests of the beneficiaries.

> Many forms of conduct permissible in a workday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. *Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.* As to this there has developed a tradition that is *unbending* and *inveterate...*Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd.

Emphasis added; *Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles* (1954) 269 P.2d 641, 649, citing Cardozo, J. in *Meinhard v. Salmon* (1928) 249 N.Y. 458, 465, 164, N.E. 454, 546.

Modern commentators agree with Justice Cardozo that a special standard of conduct is imposed upon a trustee:

> All of his conduct which has any bearing on the affairs of the trust must be actuated by consideration of the welfare of the bene- ficiaries and them alone.  He is in a position of such intimacy with

those he is representing and has such great control over their property that a higher standard is established by the court of equity than would prevail in an ordinary business relation.

Trusts, 6th Ed. (1987) George Bogert, p. 342.

A trustee must administer the trust *solely* in the interests of the beneficiaries. Probate Code §16002. Thus, he cannot "serve himself first and his *cestuis* [beneficiaries] second." *Heckman v. Ahmanson* (1985) 168 Cal.App.3d 119, 126. Said another way, "[o]ne who assumes...a fiduciary role cannot abandon it for personal aggrandizement." *Id.* At p. 129.

A trustee must also show "*an utmost good faith* in dealing with beneficiaries." Emphasis added; *Allen v. Meyers* (1936) 5 Cal.2d 311, 54 P.2d 540. "Good faith" has been defined as "the state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, being faithful to one's duty or obligation." *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187, 192. Therefore, a trustee must show *the greatest degree of honesty*, the *greatest degree of freedom from intent to defraud*, and *the greatest degree of faithfulness to his fiduciary duties*.

## 2. "Unbending and inveterate" standards are imposed upon a trustee because his control of the trust assets creates the temptation to act for his own benefit rather than for the benefit of the beneficiaries.

The "unbending and inveterate" standards referred to by Justice Cardozo are imposed upon a trustee because his control of the trust assets creates the temptation to act for his own benefit rather than for the benefit of the beneficiaries:

His duty calls upon him to act for the best interests of his principal;
his self-interest prompts him to make the best bargain for himself.
Humanity is so constituted that when these conflicting interests

---

STATEMENT OF DECISION

Exhibit 1
Page 81

1  arise the temptation is usually too great to be overcome, and duty
2  is sacrificed to interest.

3  *Western States Life Ins. Co. v. Lockwood* (1913) 135 P. 496, 499. The law, in other

4  words, recognizes "'the well-known inability of human beings to serve two masters at once or to

5  act satisfactorily when faced with conflicting interest.'" Citations omitted; *Kenny v. Citizens*

6  *Nat. Trust & Savings Bank of Los Angeles, supra*, 269 P.2d at 649. But the law does more than

7  recognize human frailty. It also compensates for it. To prevent trustees from succumbing to

8  temptation, the "*policy of the law is to put fiduciaries beyond the reach of temptation by making*

10  *it unprofitable for them to yield to it.*" *MacIsaac v. Pozzo* (1947) 81 Cal.App.2d 278, 285, 183

11  P.2d 910, 914.

12

13  **3.     The policy of putting fiduciaries "beyond the reach of**

14  **temptation by making it unprofitable for them to yield to it" is**

15  **effectuated by the fundamental rule that a trustee cannot**

16  **benefit, gain, or profit *in any way* from dealing with the trust**

17  **assets or from his position as trustee.**

19  The policy of putting fiduciaries "beyond the reach of temptation by making it

20  unprofitable for them to yield to it" is effectuated by the fundamental rule that a trustee cannot

21  benefit, gain or profit *in any way* from dealing with the trust assets or his position as trustee.

22  A trustee is at all times disabled from obtaining any personal
23  benefit, advantage, gain, or profit out of administration of the trust,
   dealing with the trust property, or the trustee's relation to the trust
24  estate...Nothing in the law of fiduciary trusts is better settled than
   that the trustee shall not be allowed to obtain a personal advantage
25  in dealings with the trust estate...*Any benefit or profit obtained by*
   *the trustee inures to the trust estate*, even though no injury was
26  intended and none was in fact done to the trust estate.

27

28  Emphasis added; 76 Am. Jur. 2D. *Trusts* §383 (1964).

---

STATEMENT OF DECISION

Exhibit 1
Page 82

As the foregoing quotation notes: "[n]*othing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to obtain a personal advantage in dealings with the trust estate.*" Emphasis added; *Id.*

There is, in California, the same "*inexorable requirement that a trustee not obtain any advantage*" over the beneficiary. Emphasis added; *Kenney v. Citizens Nat. Trust & Savings Bank of Los Angeles, supra,* 269 P.2d at 651. The California Probate Code specifically provides that the trustee: (1) "has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust;" (2) has a duty not "to take part in any transaction in which the trustee has an interest adverse to the beneficiary;" and (3) "has a duty to administer the trust *solely* in the interest of the beneficiary." Prob. Code §16004(a); emphasis added, Prob. Code §16002. A trustee breaches these fiduciary duties when he uses the trust assets or his position as trustee for his own advantage.

### 4.   The Trustee also has a duty to Make the Trust Property Productive.

The trustee has a duty to take reasonable steps to marshal the trust property, to keep control of it and to preserve it. Prob. Code §16006.

### 5.   The Trustee has a duty to enforce the trust's claims, including claims against himself.

The trustee has a duty to make the trust property productive "*in furtherance of the purpose of the trust,*" not, of course, in furtherance of the trustees' own interests. Probate Code §16007.

///

///

6.   **The Trustee has a duty to enforce the trust's claims, including claims against himself.**

The trustee also has a duty to enforce claims that are part of the trust property.  Prob. Code §16010.  No case holds that there is an exception to this rule where the trusts' claim lies against the trustee.  Indeed, allowing such an exception would weaken the public policy of putting fiduciaries "beyond temptation" by providing them with a safe harbor for claims that involve their own wrongdoing.

7.   **The Trustee has a duty to account.**

The trustee also has a duty to keep the beneficiaries reasonably informed of the trust and its administration and to account at least annually.  Prob. Code §§16061, 16062(a).  Although the terms of a trust may regulate the amount or frequency of information which the trustee must give, "the beneficiary is always entitled to such information as is necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust."  Restatement of Trusts 2., §173, comment c.  And, a trustee may not take advantage of a beneficiary by even the slightest misrepresentation or concealment.  *In re McCabe's Estate* (1950) 220 P.2d 614, 98 Cal.App.2d 503.

a.   **The duty to account includes accounting for the Trustee's personal use of trust assets.**

Once it has been established that a fiduciary has breached his or her fiduciary duties, the burden shifts to the fiduciary to render an accounting.  *Franklin v. Mortgage Guarantee & Security Co.* (1932) 57 F.2d 834, 835 ["...once a fiduciary relation is established, the burden rests upon the trusted agent to show *full disclosure* of all transactions attacked;" emphasis added].

The trustee's duty to account thus encompasses all of his dealings with trust funds, including his personal use of such funds. *Kinert v. Wright* (2nd Dist. 1947) 81 Cal.App.2d 919, 925, 185 P.2d 364. Accordingly, where a trustee has made personal use of trust funds, he must fully disclose to the beneficiaries each and every transaction that he has undertaken with the trust funds and any profit he has derived from those transactions. Otherwise (since the trustee will normally be in exclusive possession of the facts regarding his improper actions), there is little chance that the beneficiaries will be able to redress the trustee's breaches of trust. In this case, Kadisha not only failed to disclose the transactions he undertook with trust funds, but he successfully prevented Petitioners from obtaining the records in discovery to piece this together for themselves.

    b.     **<u>Any doubts arising from the Trustee's failure to account must be construed against the Trustee.</u>**

Since a trustee must prove "every item of their account by 'satisfactory evidence'; the burden is on them and not on the beneficiary; and any doubt arising from their failure to keep proper records, or from the nature of the proof they produce, must be resolved against them." *In re McCabe's Estate, supra,* 98 Cal.App.2d at 508, citing *Purdy v. Johnson* (1917) 174 Cal.521.

> Not only is the highest good faith required of a trustee, but he must be held to strict accountability, with all doubts resolved against him, to the end that he may not be permitted...to profit from his own negligence or fault.

*Id.* At p. 509.

In other words, since a trustee has a fiduciary duty to fully disclose everything he has done with trust assets, he cannot be allowed to gain any advantage from breaching this duty. Thus, where a trustee has breached this duty by failing to make a full disclosure, all presumptions are taken against him.

---

**STATEMENT OF DECISION**

79

Exhibit 1
Page 85

8.   **The Trustee has a duty to keep trust property separate and to avoid commingling.**

The trustee has a duty to keep the trust property separate and to avoid commingling trust funds with his own.  Prob. Code §16009.  A trustee violates this duty when he deposits trust money into his own account.  *In re Evans Estate* (1944) 62 Cal.App.2d 249, 144 P.2d 625, 630; Restatement of Trusts, 2d., §179, Comment b.

One reason for prohibiting a trustee from commingling trust funds with his own funds is based upon the fact that money is fungible, i.e., the purchasing power of one dollar may be substituted for the purchasing power of any other dollar.  If a trustee deposits trust funds into his own account, it is impossible to tell which dollars (if any) were used for trust purposes and which were used for the trustee's own purposes.

The problem, however, goes beyond commingling funds within a single account if the rule that a trustee cannot benefit from any advantage gained from the trust assets is to be upheld.

Assume that a trustee had accounts at Bank 1 and Bank 2, each with $1,000 in deposits.  The trustee improperly commingled $1,000 of trust funds with his own $1,000 in his Bank 1 account, bringing the total balance to $2,000.  The trustee then spent the entire $2,000 balance for his rent.

Since the trustee only spent $1,000 of his own funds for his rent instead of $2,000, he did not have to use the $1,000 in his Bank 2 account for rent.  The trustee therefore had $1,000 left which he used to invest in a profitable stock – something that he could not have done if he had been required to use the $1,000 from his Bank 2 account to pay his rent.

Therefore, while the trust's money was deposited only into Bank 1, and the actual trust dollars went to pay the trustee's rent, the trustee received the same benefit he would have

---

received had the trustee deposited the trust's money into Bank 2, and purchased the stock from the commingled funds in the Bank 2 account. In other words, the fungibility of money allows a trustee to improperly benefit from the use of trust funds simply by commingling the trust assets with his own assets and treating them interchangeably.

9. <u>**The Trustee has a duty to prudently invest the trust's assets.**</u>

Prior to the adoption of the Uniform Prudent Investor Act in 1995, the trustee's duty with regard to investments was governed by the following principles:

> The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man [sic] of ordinary prudence would exercise in dealing with his own property."

*Restatement Second* §174.

California adopted the Uniform Prudent Investor Act in 1995. (Prob. Code, 16045-16054.) The Act applies to all trusts existing on January 1, 1996 and governs decisions or actions occurring after that date. (Prob. Code, 16054.) Its relevant provisions include the following:

> 16047. (a) A trustee shall invest and manage trust assets as prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution.
>
> (b) A trustee's investment and management decisions respecting individual assets and courses of action must be evaluated not in isolation, but in the context of the trust portfolio as a whole and as a part of an overall investment strategy having risk and return objectives reasonably suited to the trust.
>
> (c) Among circumstances that are appropriate to consider in investing and managing trust assets are the following, to the extent relevant to the trust or its beneficiaries:
>
> (1) General economic conditions.
>
> (2) The possible effect of inflation or deflation.

(3) The expected tax consequences of investment decisions or strategies.

(4) The role that each investment or course of action plays within the overall trust portfolio.

(5) The expected total return from income and the appreciation of capital

(6) Other resources of the beneficiaries known to the trustee as determined from information provided by the beneficiaries.

(7) Needs for liquidity, regularity of income, and preservation or appreciation of capital.

(8) An asset's special relationship or special value, if any, to the purpose of the trust or to one or more of the beneficiaries.

**16048.** In making and implementing investment decisions, the trustee has a duty to diversity the investments of the trust unless, under the circumstances, it is prudent not to do so.

### B.    Where the Trustee uses the trust estate or his position as trustee for his own advantage, any resulting benefit, gain or profit properly belongs to the trust estate.

Where the trustee uses the trust estate or his position as a trustee for his own advantage, any resulting benefit, gain or profit properly belongs to the trust estate.  76Am. Jur. 2d *Trusts* §383 (1964) ["Nothing in the law of fiduciary trusts is better settled than that the trustee shall not be allowed to obtain a personal advantage in dealings with the trust estate . . . *Any benefit or profit obtained by the trustee inures to the trust estate . . .*"  Emphasis added.]

For example, in *Purdy v. Johnson* (1917) 163 P. 893, 897 (an old but often cited case), the California Supreme Court determined that the trustees' use of trust property to secure repayment of advances made by them personally was a breach of trust:

In so doing [the trustees] were assuming a position antagonistic to that of their beneficiaries, and *any advantage or profit received by*

*them through the transaction is deemed in law to belong to the beneficiaries.*

*Estate of Pitzer* (1984) Cal.App.3d 979 also shows that a trustee must disgorge his profit even if he gained only an indirect advantage from the use of trust property.  In *Estate of Pitzer*, the trustee bank loaned $115,000 of its own funds to the buyer of (trust) real estate and took back a deed of trust on the property to secure the loan.  The trustee was required to disgorge its *entire* profit even though the loan was made *from the bank's own funds* and the trustee's profit was therefore not directly or entirely attributable to the use of trust property.  The trustee did, however, reap *an advantage* from the trust property and was therefore required to surrender its entire profit.

The holdings in *Purdy v. Johnson* and  *Estate of Pitzer* derive from the fundamental equitable principle that "[n]o one can take advantage of his own wrong."  Civil Code §3517.  Thus, in California, as elsewhere:  "*[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency.*'"  *Terry v. Bender* (1956) 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P.2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr. 429, 446.

1. **The rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee is particularly applicable where, as here, the Trustee intentionally set out to acquire control over the Trustee assets for his own benefit.**

The unbending rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee is especially applicable where, as here, the Trustee *intentionally* set out to acquire control over the trust assets

and to use them for his own benefit.  The evidence *abundantly* showed that this is precisely what Kadisha did.

The evidence showed that he intentionally set out to take advantage of Dafna Uzyel's inexperience and lack of sophistication to gain control of the Uzyel Trust assets, and that he consistently used those assets for his own benefit throughout his 12-year tenure as Trustee.

When Rafael died suddenly in May 1996, Dafna was 28 years old, uneducated, inexperienced, unable to read or speak English, and unequipped to handle the precarious financial situation that her husband's death had thrown her into.  Kadisha inserted himself into Dafna's life, gained her confidence, and took her to his own lawyer, who, despite a conflict of interest, undertook Dafna's representation.  The result was that Dafna's substantial assets were placed in trust in the Uzyel Trusts under Kadisha's control.

In the years that followed, Kadisha took full advantage of his control over Dafna's assets and Dafna's inability to understand the legal or financial intricacies of her situation or his actions.

Kadisha's first act as Trustee was to misappropriate Trust 2's $500,000 Namco Loan proceeds which he deposited into his personal checking account and spent entirely on his own expenses and investments.

Five months after exhausting the Namco Loan proceeds, and after defaulting on the Namco Loan, Kadisha took out another $2 million loan (the Imperial Loan) against Trust 2's Strathmore Residence.  He also used the proceeds of this loan for his own purposes rather than for Trust 2's.  He used the proceeds to repay the Namco Loan (even though he had spent the Namco Loan proceeds on himself), to make undocumented, unsecured loans totaling $1 million to himself, and to loan Qualcomm $300,000 in an unsecured, extremely risky loan made purely

---

Exhibit 1
Page 90

to shore up Kadisha's own Qualcomm holdings. (TE 153, 157, 158, see item No. 504, "Payoff of first mortgage loan $505,000" and item No. 506, "Interest 11/11 to 12/18 $3,839.56;" TE 158; 164, 166, 167, 152, 1776.)

Kadisha thereafter used the Trusts as a veritable piggy bank for *over $5 million* in unsecured, undocumented loans to himself, his real estate partnership (Dan Investments), and his friends. (TE 44, 44A; 164-166, 167, 173, 254, 255, 257, 258, 271, 272, 303, 304, 332, 333, 357, 364-366, 509, 510, 513, 514, 518, 519, 560, 573, 574, 576, 580, 760, 1719a, 3409.) In 1992, Kadisha improperly sold Trust 2's Qualcomm stock to raise cash for his own use. He used Trust funds to help fund a real estate purchase by the Carson '93 partnership while he was a shareholder, president and CEO of the general partner Texollini. And, after this lawsuit was commenced, Kadisha improperly withdrew $500,000 from the Trusts to pay for his legal fees. The fact that Kadisha took *half a million dollars for his own use* from the Trusts without any authorizing provision in the trust instruments demonstrates his attitude that the Trusts existed for his benefit rather than for the benefit of the beneficiaries.

In fact, although the evidence shows numerous (egregious) instances in which Kadisha used Trust assets or his position as Trustee for his own benefit, there is no evidence of any instances in which Kadisha acted *in the beneficiaries' interests*. In short, Kadisha did precisely the opposite of what the duty of loyalty compelled him to do. Rather than administering the trust and dealing with the trust assets solely for the interest of the beneficiaries, he administered the trust and dealt with the trust assets *solely for his own benefit*.

///

///

///

## 2. <u>Kadisha is therefore not entitled to be excused from liability on equitable considerations.</u>

Probate Code §16440(b) permits a court, in its discretion, to excuse a trustee from liability for a breach of trust if it would be equitable to do so.  This is not a case in which the trustee is entitled to equitable consideration, e.g., a case where a well-intentioned trustee made a good-faith error in judgment.  This is a case where the Trustee – throughout his tenure as Trustee – consistently breached virtually every fiduciary duty he had and intentionally took advantage of the beneficiaries' youth, inexperience and lack of education to use the Trust assets as his personal piggy bank.  The equities in this case must lie with Kadisha's victims.  In other words, the rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee must be rigorously applied and all doubts resolved in Petitioners' favor.

## 3. <u>*Nickel v. Bank of America* reflects the law in California that a trustee who has committed a breach of trust must disgorge any profit derived from the breach.</u>

As previously noted, in California, as elsewhere, "[a] "*[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency.*'" *Terry v. Bender* (1956 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P. 2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr. 429, 446.  *Nickel v. Bank of America* (2002) 290 F.3d 1134, reflects the law in California that a trustee who has committed a breach of trust must disgorge any profit derived from the breach, since the profit properly belongs to the trust and its beneficiaries.

In *Nickel*, the trustee bank breached its fiduciary obligations by overcharging 2,500 trusts for its trustee's fees. After discovering the error, the successor trustee bank repaid the fees with interest. The trial court found that this was a sufficient remedy, and that the profits that would have accrued to the 2,500 trusts was speculative because the overcharges could not be traced into any particular loans or investments of the bank. The Ninth Circuit Court of Appeal *reversed*.

The Court of Appeal began its analysis with the "elementary rule of restitution" that "if you take my money and make money with it, your profit belongs to me," citing §1 of the *Restatement of Restitution*. *Nickel v. Bank of America, supra,* 290 F.3d at 1138. This "elementary rule" reflects the broad purpose of restitution and the maxim of jurisprudence in California that "[n]o one can take advantage of his own wrong." *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237; Civil Code §3517.

Section 1 of the *Restatement of Restitution* states the general rule that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." The *Restatement* also recognizes, however, that in the context of a fiduciary relationship, the unjust enrichment need not be at the beneficiary's expense. That is, "where a person in a fiduciary relation to another makes a profit in connection with transactions conducted by him as a fiduciary, he is ordinarily accountable to his beneficiary for the profit, although the beneficiary suffered no loss." *Restatement of Restitution* §1, comment e (1937).

The *Restatement* also explains: "A person is enriched if he has received a benefit." "The word "benefit"...denotes any form of advantage." And, "a person is unjustly enriched if the retention of the benefit (i.e., retention of any form of advantage) would be unjust." *Restatement of Restitution* §1, comments a and b (1937). A trustee who profits through *"any form of*

*advantage"* derived from the fiduciary relationship or the trust estate is *unjustly* enriched because the profit belongs to the trust. The trustee must therefore disgorge the profit.

The principle is codified in the California Probate Code. Probate Code §16004 imposes a duty on a trustee *not* to *use or deal with* trust property for the trustee's own profit. "A violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." Probate Code §16400. Thus, if a trustee uses or deals with trust property for the trustee's own benefit, he has committed a breach of trust. If the trustee derives a profit from the breach of trust, he is liable for that profit, i.e., he is required to disgorge it. Probate Code §16440(a)(2).

The *Nickel* Court concluded that because money is *"fungible,"* the bank *did* benefit from retaining the overcharges:

> "The money misappropriated from the trusts added directly to what the banks had to loan or to invest or, if not directly loaned or invested, was used to meet expenses, freeing an equal amount for loan or investment." *Id.* at 1139.

The overcharges, which were the product of the trustee's breach of fiduciary duties, thus caused an addition to profit in either case. *Id.* at 1138.

The Court of Appeal concluded that the bank's repayment of the overcharges with simple interest to the 2,500 trusts was not a sufficient remedy because it did not "give the trusts an amount close to equaling a share in the profits made with their money." *Id.* at 1139. It found instead that the appropriate remedy was "to allot these unwitting and unwilling contributors a proportionate share of the banks' profits during the years of misappropriation." *Id.* at 1139.

The Court's decision thus reflects the principle that a trustee who profits through *"any form of advantage"* derived from the trust assets or the trustee's position is unjustly enriched, and must disgorge the profits. The trustee in *Nickel* benefited because the misappropriated overcharges added to the capital it had available for investment, and therefore added to the

trustee's profit during the period of misappropriation regardless of whether the overcharges directly or indirectly produced the addition to profit. In either case, the trustee was unjustly enriched and was required to disgorge the portion of the profit attributable to the use of the trusts' funds during the period of misappropriation.

### 4. <u>The trustee in Nickel profited from using the misappropriated overcharges in its business because it had the benefit of the use of money it would not have had if it had not breached its fiduciary duties.</u>

The trustee in *Nickel* benefited each time it made a transaction with its own funds rather than repaying the misappropriated overcharges because so long as it retained possession of the overcharges rather than repaying them, they added to the total capital that was available to the bank for investment.

In addition to breaching the fiduciary duty not to deal with trust property for his own profit (Prob. Code §16010, a trustee who fails to repay a trust for misappropriated funds also breaches other fiduciary duties, i.e.: (1) the duty to take and keep control of and preserve the trust property (Probate Code §16007), (2) the duty to make the trust property productive "in furtherance of the purpose of the trust," (3) the duty to keep the trust's property separate from the trustee's property (Prob. Code §16009, (4) the duty to enforce the trust's claims – including claims against himself for money the trustee has misappropriated from the trust (Prob. Code §16010), (5) the duty not to take part in any transaction in which the trustee has an interest adverse to the beneficiary (Prob. Code §16004(a), and (6) the duty to place the beneficiaries' interests ahead of his own (*Heckman v. Ahmanson* (1985) 168 Cal.App.3d 119, 126: [The trustee cannot "serve himself first and his cestuis [beneficiaries] second." He cannot abandon his fiduciary role "for personal aggrandizement." *Id.* at p. 129.

The *Nickel* Court required the trustee to disgorge the profit earned in such circumstances by giving the beneficiaries a proportionate share of the trustee's profits during the period in which the trustee retained and had the use of the misappropriated and fungible overcharges.  As is shown below, the *Nickel* remedy is an appropriate equitable remedy as it gives the beneficiaries the benefit of the use of their funds, and it gives the trustee the benefit of the use of his funds.

### 5.  <u>Nickel's remedy of giving the beneficiaries a share of the profits earned during the period of misappropriation is eminently equitable.</u>

Nickel awarded the plaintiff beneficiaries a proportionate share of the trustee's profits during the period of misappropriation.  It thus gave the beneficiaries the benefit of the use of their money, and it gave the trustee the benefit of the use of his money during the period of misappropriation.

As will be discussed in more detail later in this brief, Petitioners are seeking the *Nickel* remedy on several of their claims – a proportionate share of Kadisha's profits during the period of misappropriation – i.e., a proportionate share of his Qualcomm stock.  Contrary to what Kadisha claims, this remedy does not give Petitioners something that does not belong to them.

### 6.  <u>An award of interest is not a sufficient remedy for the trustee's use of the trust funds.</u>

An award of interest is not a sufficient remedy for the trustee's use of the trust funds.  It is insufficient because it allows the trustee to retain a gain that was achieved from dealing with the trust for his own benefit.  If a trustee did not have to disgorge this gain, there would be an enormous incentive for him to use trust funds for his own investments.  (For one thing, it would be easier to dip into trust funds that the trustee wholly controls than to qualify for a bank loan for

the trustee's speculative investments.)  Providing that kind of incentive, however, runs contrary to the fundamental purpose of the trust law, which is to "put fiduciaries beyond the reach of temptation by making it profitable for them to yield to it."

*MacIsaac v. Pozzo* (1943) 81 Cal.App.2d 278.

Interest is also an insufficient remedy because it does not give the beneficiaries, who are unknowing and unwitting lenders, a return for the risk.

Kadisha's track record of losing hundreds of millions of dollars underscores the enormous risk that was forced upon Petitioners in this case.  (TE 1930.1-1930.11)  It appears from Kadisha's frequent applications to the Court for living expenses that virtually the only substantial successful investment Kadisha has made has been Qualcomm.  Had Qualcomm gone the way of a multitude of other dot coms, Petitioners would have had no recourse against Kadisha because of the failure of his other investments.  Since they were forced to unwittingly share in the risk of Kadisha's investment decisions, they are also entitled to share in the benefits, including the benefits of the Qualcomm stock purchase.

### 7. <u>Kadisha incorrectly contends that tracing the trustee's profit to actual trust dollars is necessary to establish that the trustee profited from trust assets.</u>

Tracing was laid to rest as the exclusive remedy for the unlawful taking and use of trust assets by a trustee by *Nickel v. Bank of America* (2002) 290 F.3d 1134.  *Nickel* brought about a much needed equitable change.  A change like *Nickel* invites a fury of attack by packs of perennially misanthrophic malcontents.  They cannot be missed.  Their number is legion.  They are everywhere, eyes wild, fangs barred – fiercely incensed by the mere notion of anything that resembles change.  The objectors have for the most part gone away – but not Kadisha.  It is he,

the architect of concealment and camouflaged accountings that look to the tracing doctrine as his salvation. And while the court is not going to reach out and order a taking of Kadisha's Qualcomm stock, opting instead to award damages as was done in *Nickel*, a discussion of "tracing" is in order as it is a course of action available to the court which has been considered but not requisite to awarding monetary damages to Petitioners.

Kadisha incorrectly and throughout the trial steadfastly maintains that directly tracing the trustee's personal profit to actual trust dollars is necessary to establish that the trustee profited from trust assets. This is tantamount to saying: (1) that causation requires tracing; and (2) that the only possible way a trustee can benefit from the trust assets or his position as trustee is where he uses actual trust dollars for a personal investment. Kadisha has not, however, offered a single authority that supports his position – *nor are there any*. In fact, the only decision that directly discusses this point – *Nickel v. Bank of America* (2002) 290 F.3d 1134, 1138 – says precisely the *opposite*, that under California law, "[t]raceability and causation are *not* the same." Emphasis added.

The Court of Appeal in *Nickel* specifically found that the trial court *erred* "in reading a requirement of traceability into a tortfeasor's obligation to make whole its victims." *Nickel v. Bank of America, supra*, 290 F.3d at 1138. In other words, the trial court erred because it required the plaintiffs to trace the path of the overcharges into particular loans or investments of the bank. The Court of Appeal stated pointedly: "A requirement of traceability nullifies the bank tortfeasor's obligation to cough up the profits it has made by the use of what it has wrongfully taken." *Id.*

The Court reasoned:

"Traceability and causation are not the same. If the bank had taken the overcharges and thrown the money out the window, there

1    would be no causation, and, if the banks could prove they had done
2    this, the plaintiff would lose." *Id.*

3        In other words, if the bank had thrown the overcharges out the window, it would not have

4    received a benefit from them.  However, because money is *"fungible,"* the bank *did* receive a

5    benefit from the overcharges:

6
7        "The money misappropriated from the trusts added directly to what
         the banks had to loan or to invest or, if not directly loaned or
8        invested, was used to meet expenses, freeing an equal amount for
         loan or investment." *Id.* at 1139.
9

10       The overcharges, which were the product of the trustee's breach of fiduciary duties, thus

11   caused an addition to profit *in either case. Id.* at 1138. *Nickel* says, in other words, that adding

12   the misappropriated funds to the trustee's own funds *caused* the trustee's additional profit,

13   because the trustee either had additional funds to directly invest or it had additional funds to pay

14   its expenses – which freed up an equal amount for investment.

15
16       *Nickel* also says that because money is fungible, requiring beneficiaries to trace the profit

17   to actual trust dollars would allow the trustee to escape liability for the profit earned by indirectly

18   using the beneficiaries' money.  If a trustee uses misappropriated funds to buy groceries, he

19   benefits because he can invest the funds he would otherwise have had to spend for groceries.

20   Because money is fungible, however, there is no demonstrable connection between a dollar that

21   is used to buy groceries and another dollar that is thereby freed up and can be invested.  Showing

22
23   which dollar actually produced (i.e., caused) the profit is therefore not *possible* in this context.

24   *Nickel* therefore correctly concludes that tracing is not an element of causation.

25   ///
26   ///
27   ///
28   ///

STATEMENT OF DECISION

93

Exhibit 1
Page 99

8. <u>**Kadisha's incorrect formulation of the law also contradicts the "inveterate and unbending" rule that a trustee cannot gain *any advantage* from the trust estate or his position as trustee.**</u>

Kadisha's incorrect formulation of the law also contradicts the "inveterate and unbending rule" that a trustee cannot gain *any advantage* from the use of trust assets or his position as trustee. His incorrect formulation of the law can be summed up in the following propositions:

(1) If a trustee uses $1,000 of trust funds for his personal investments, the trustee is liable to the trust's beneficiaries for the trustee's profit. According to Kadisha, this is because *the trustee's profit can be directly traced to trust funds.*

(2) However, if a trustee uses $1,000 of trust funds to pay his obligations and thereby frees up $1,000 of his own funds for investment, the trustee is *not* liable to the beneficiaries for the trustee's profit from that $1,000. According to Kadisha, this is because *the profit can be "traced away" to the trustee's separate funds.* ("Tracing away" is a term invented by Kadisha – it does not appear in any decision by any California court.)

Kadisha's incorrect formulation of the law contradicts the rule that a trustee breaches his fiduciary duties when he gains *any advantage* from the trust assets or his position as trustee. In both of the above scenarios, the trustee has an additional $1,000 for his own investments that he would not have had if he had not breached his fiduciary duties. And, under both scenarios, the trustee would earn the same profit on that $1,000. *The trustee would therefore benefit equally under either scenario.* Nonetheless, Kadisha claims that tracing (and what he terms "tracing

away") dictates that the trustee is liable for the trustee's profit under the first scenario, and the trustee is *not* liable for his profit under the second.

Kadisha utterly disregards the express holding of *Nickel*, the rule in California that *"[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency,"*[22] and the equitable principle that "no one can take advantage of his own wrong" because it allows trustees to use trust assets for their own benefit so long as the benefit is *indirect.* Kadisha's scheme also violates the fundamental rule that a party cannot do indirectly what it cannot do directly. See, e.g., Civ. Code §3511: "Where the reason is the same, the rule should be the same."

Nonetheless, a trustee would escape liability under Kadisha's formulation of the law by doing the following: (1) openly depositing trust funds into an account in his own name, (2) using the trust funds in that account to pay for his living expenses and debts, (3) funding his personal investments from a different account containing the money the trustee saved by using trust funds instead of his own funds to pay his expenses and debts; and (4) using the bank statements from each of these accounts to "trace away," i.e., to prove that he used trust dollars only for his personal expenses – which did not produce a profit – and that only his own dollars were used for the personal investments that did produce a profit.

Kadisha's faulty reasoning would act as an incentive for wrongdoing by making it *profitable* for trustees to breach their fiduciary duties – in direct contradiction to the public policy of putting trustees beyond temptation "by making it *unprofitable* for them to yield to it." *MacIsaac v. Pozzo, supra,* 81 Cal.App.2d at 285.

///

---

[22] *Terry v. Bender* (1956 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P.2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr.429, 446.