Redacted

1  one side of its face was longer than the other side having previously criticized the exact same doll
2  only weeks earlier on the exact opposite grounds, namely that the opposite side of its face was too
3  long; and finally, Ms. Treantafelles' testimony concerning F4A's "shippable and sellable product"
4  which stood in stark contrast to that of Ms. O'Connor and MGA's expert. Moreover, it was not
5  lost on the arbitrator that prior to February 27, Mr. Larian as well as Ms. Treantafelles and
6  Ms. O'Connor had a number of favorable impressions and/or comments regarding F4A's product
7  quality, in stark contrast to their virtually one-sided post-litigation views. All of this conduct, of
8  course, must be placed against the backdrop that MGA was interested in developing its own line
9  of "Bratz" plush dolls at the same time it was "working with" F4A.
10     4.     The testimony of Ms. Mills-Winkler, MGA's expert, helped convince the arbitrator
11 that there were legitimate quality concerns on the horizon for F4A in the future, and, along with
12 the other growing evidence of the inability of the principals of MGA and F4A to get along or have
13 the kind of faith and trust in one another necessary to the survival of any licensor-licensee
14 relationship, coupled with F4A's sometimes overly aggressive efforts to get to market in the face
15 of MGA's envisioned "mother may I micro-management" approach, convinced the arbitrator that
16 this relationship was not to be long lived. This does not mean, however, that MGA's expert's
17 studied after-the-fact review in June, 2002 can justify the strong evidence of bad faith by MGA
18 that occurred in February and March. Indeed, the arbitrator's finding that there were quality
19 concerns on the horizon in the future stems from the fact that Ms. Mills-Winkler's post-mortem
20 review of the dolls identified alleged defects well beyond any ever raised by MGA during the
21 actual relationship between the parties. The arbitrator does not need to determine, however, what
22 portion of this analysis constituted overreaching by a hired expert, since this case must be decided
23 upon and viewed through the prism of the criticisms which arose during the actual relationship
24 between the parties and not after, particularly when the custody and care and condition of the dolls
25 post-termination is hotly contested.
26     5.     F4A did not breach the license by making the dolls that it made, and it did not
27 infringe the copyright or trademark rights of MGA either through the making and selling of the 18
28 inch, 10.5 inch, and Bean Bag Blitz dolls (because these were approved by MGA for manufacture

- 6 -

Redacted

Exhibit 5
Page 110

CONFIDENTIAL - ATTORNEYS' EYES ONLY               DR 03350

1  and distribution) or through the showing of the Giant size, Pillowhead, and 8 inch dolls (because
2  they had the contractual right to show and also because the products were never launched; F4A
3  never sold these dolls as defined in the contract).
4      6.   MGA terminated the agreement on April 24, 2002. The arbitrator cannot conduct a
5  lobotomy on MGA's executives, probing all of the circumstances, legitimate or illegitimate, that
6  may have entered into the April 24th termination. The arbitrator does believe there was a lack of
7  communication and follow-through by F4A on the changes required by MGA and those
8  undertaken unilaterally by F4A, and certain overzealous conduct by F4A that could have
9  legitimately led to such a termination. Examples of F4A's conduct that lead the arbitrator to this
10 conclusion include the fact that F4A unilaterally made changes to the belt of the Cloe doll only
11 notifying MGA after the fact, and not bringing the change, or the reason therefor to the attention
12 of MGA. Similarly, F4A appears to concede that it did not provide samples of its packaging for
13 the dolls for approval (as required by paragraph 7(b) of the agreement) until late April, 2002, with
14 the 12 production samples that it was providing at that time. Moreover, F4A appears to take the
15 inconsistent position that it was not even providing the 12 samples for the purposes of approval by
16 MGA. Additionally, F4A did not provide its production samples until approximately one month
17 after the "commencement" of distribution, which the arbitrator does not believe to be consistent
18 with the intent of paragraph 7(f) of the agreement. Although it would have been relatively easy
19 on this record to find MGA's April 24th termination in and of itself pretextual <u>in light of the</u>
20 <u>reasons given at the time</u>, and thereby increase F4A's damages, the arbitrator has declined to do
21 that in light of the fact that this relationship was doomed. Indeed, the relationship between the
22 parties by April evinced such a lack of trust that no cure efforts could salvage it. By April 3, Mr.
23 Bachrach of F4A himself acknowledged understatedly that the relationship was going through
24 difficult times. In short, these parties by April needed a divorce, and the arbitrator has declined to
25 increase F4A's damages even if some of the justification for the April 24th termination was
26 pretextual in nature.
27     7.   Given that MGA was the "first to breach" as discussed further in this opinion and
28 because MGA terminated the agreement on April 24, MGA has not persuaded the arbitrator that

- 7 -

Redacted

Exhibit 5
Page 111

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DR 03351

Redacted

1  F4A breached the agreement by not providing MGA with a royalty statement and an audit,
2  obligations which would not have arisen until after April 24. As discussed later, however, the
3  arbitrator believes that MGA's right to an audit still exists if MGA wishes to pursue it under the
4  conditions outlined herein.

5      8.   MGA has not provided persuasive evidence necessary to convince the arbitrator of
6  any acts of "dumping," or deep discount selling by F4A. Among other reasons, the arbitrator does
7  not believe that MGA presented sufficient evidence to rebut F4A's explanation that the prices at
8  issue were "FOB Hong Kong" and that F4A therefore was within the parameters of the parties'
9  agreement.

10      9.   The above findings lead to the conclusion that MGA was "the first to breach" and
11  that this constituted an anticipatory breach of the agreement. The arbitrator does not believe,
12  however, that F4A is therefore entitled to the massive damages it claims. To the contrary, the
13  arbitrator believes the award in this case should be a relatively modest one. As set forth above, in
14  light of the parties' relationship, and the acts of both parties, F4A's damages are relatively limited
15  because this would not have been the incredibly profitable enterprise for F4A that F4A argues in
16  its damages claim. Moreover, by April 24, 2002, the relationship between the parties had
17  deteriorated to the point that MGA cannot be faulted for terminating the relationship. This does
18  not, however, alter the arbitrator's finding that no copyright or trademark infringement can be
19  found on this record due to the anticipatory breach by MGA.

20      10.   Thus, in the view of the arbitrator F4A should initially receive as part of its
21  damages $350,000, representing partial return of its license fee and alleged startup costs and
22  expenses owing to MGA's breach through pretextual exercise of dissatisfaction.

23      11.   F4A should also receive some compensatory damages for the unrealized profits that
24  it could have earned in the absence of a breach before the relationship would have inevitably
25  collapsed without any bad faith conduct. The damages figure offered by F4A's expert, Mr. Harris,
26  is too high to reflect this limited profit realization, and the arbitrator agrees with several of the
27  arguments put forward by MGA in its post-arbitration briefing regarding the assumptions
28  supporting Mr. Harris's opinion. Although such matters are not an exact science, the Court

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

562991

- 8 -

Redacted

Exhibit 5
Page 112

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Redacted

believes that a compensatory award of $948,015, is appropriate to compensate F4A for profits it could legitimately expect to have received before its relationship with MGA collapsed for reasons unrelated to bad faith.

The arbitrator calculates this amount as follows:

First, using the analysis offered by F4A's expert, Mr. Harris, the arbitrator notes that Mr. Harris utilizes a different profit margin for each of the three types of dolls as to which the arbitrator finds damages are warranted (18", 10.5" and Bean Bag Blitz). Based upon Attachment H to Mr. Harris's report, the profit margin for 18 inch dolls is approximately 25%, for 10.5 inch dolls approximately 30%, and for Bean Bag Blitz dolls approximately 20%. Likewise, Mr. Harris offers a different ratio of cost of goods sold ("COGS") for each of the three dolls, respectively, approximately 49% for 18 inch dolls, approximately 44% for 10.5 inch dolls, and approximately 55% for Bean Bag Blitz dolls. The arbitrator finds these amounts to be persuasive, and utilizes them in calculating F4A's damages.

Second, the arbitrator believes that in light of the findings herein regarding the parties' conduct in connection with the contract, the arbitrator recommends a lifting of the District Court's injunction only with respect to products already shipped to retailers so that those products may be sold by the stores that have already paid for and received them. Thus, no damages are required with respect to products for which F4A has already been paid. The arbitrator further provides damages to F4A for products in the first category of Attachment H to Mr. Harris's report that are listed as "Unshipped Initial Sales – Known Retailers." Using the amounts set forth in Mr. Harris's report for each of the three dolls, and the profit margins set forth previously, the arbitrator finds that F4A's expected profit on these categories would total $178,308 ($175,534 attributable to the 10.5" dolls, $2774 attributable to the Bean Bag Blitz, and $0 attributable to the 18" dolls) and awards that amount. Additionally, the arbitrator finds that F4A is entitled to damages for products in the first category of Attachment H to Mr. Harris's report that are listed as "Additional Initial Sales to Expected Retailers," but that the amounts in this category should be discounted based upon the arbitrator's finding that the parties' relationship was doomed to imminent collapse. Thus, the arbitrator does not believe that all of the amounts suggested by Mr. Harris could

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

- 9 -

Redacted

Exhibit 5
Page 113

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                           DR 03353

Redacted

1  legitimately be expected to be sold. Moreover, the arbitrator finds persuasive some of the
2  arguments offered by MGA regarding the methodology used by Mr. Harris to estimate "expected"
3  orders. Using the amounts set forth in Mr. Harris's report for each of the three dolls, and the profit
4  margins set forth previously, Mr. Harris's report would yield a figure of $839,414 representing the
5  profit on this category of sales ($302,934 attributable to the 18" dolls, $502,360 attributable to the
6  10.5" dolls, and $34,120 attributable to the Bean Bag Blitz). The arbitrator finds that it is
7  appropriate to reduce that amount by 50%; thus the arbitrator awards $419,707 in connection with
8  this category. The arbitrator finds the remaining categories of damages listed in Mr. Harris's
9  report to be too speculative to award, and further finds that in light of the finding that the parties'
10 relationship was doomed to imminent collapse regardless of the breaches found, no further
11 damages are appropriate. Thus, in addition to the return of the $350,000 as partial reimbursement
12 of the license fee and startup costs and expenses, the arbitrator awards $598,015 as compensatory
13 damages.
14            Third, the arbitrator's award of damages in connection with these products as set forth
15 above is based on the fact that an injunction has been entered preventing the sale of these products.
16 Consequently, if the injunction is not lifted, F4A will be required to return the amounts paid to the
17 purchasers of these products. Under those circumstances, the arbitrator would hold that F4A
18 should receive its expected profit and cost of goods sold with respect to these products (since these
19 products will effectively not be sold, and no royalty should be due to MGA thereon. The
20 arbitrator has made an alternative calculation of damages should the injunction not be lifted, which
21 is materially greater than those damages already calculated. The arbitrator will therefore enter the
22 award set forth previously in this opinion, but retains jurisdiction to alter or amend it in light of the
23 subsequent proceedings anticipated by this order.
24      12.   The arbitrator has carefully considered all of MGA's arguments regarding why no
25 award whatsoever should be made to F4A, as well as all of F4A's arguments as to why its damages
26 should be several times higher than awarded. All of these arguments are unavailing.
27      13.   While the arbitrator does not believe that an extensive legal discussion is useful in
28 this case, where the general legal principles at issue are not seriously in dispute and the findings

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

SG2992

- 10 -

Redacted

Exhibit 5
Page 114

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DR 03354

are based largely upon assessing the weight and credibility of the evidence presented, the following brief discussion should address the primary legal issues involved in this award: the contractual implied covenant of good faith and fair dealing, and the basic principle of copyright or trademark infringement by a licensee.

14. As F4A points out, the Ninth Circuit's recent decision in *Chodos .v West Publishing Co., Inc.*, 2002 WL 1253721 (9th Cir., June 7, 2002) restates the broad principle that under California law, a covenant of good faith and fair dealing is an implied term in every contract. *Id.* at *3 (citing *Carma Developers (Cal.) v. Marathon Dev. Cal.*, 2 Cal. 4th 342, 372-73 (1992)). As the Ninth Circuit pointed out, "The covenant of good faith 'finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.'" *Id.* In *Chodos*, like this case, the defendant had a contractual right to reject submissions (there by an author) within its sole discretion. Nonetheless, the Ninth Circuit recognized that "because the standard Author Agreement obligates the publisher to make a judgment as to the quality or literary merit of the author's work – to determine whether the work is 'acceptable' or 'unacceptable' – it must make that judgment in good faith, and cannot reject a manuscript for other, unrelated reasons." Id. at *4 (citing *Third Story Music v. Waits*, 41 Cal. App. 4th 798, 804 (1995)). Similarly, here, although MGA had negotiated for the right to accept or reject F4A's submissions within its sole discretion, California law nonetheless imposes a duty to act in good faith in exercising this discretion.

15. Courts generally recognize, and the parties appear to agree that where a party has a right to accept or reject a submission from another contracting party, even within its sole discretion, it must exercise that right honestly and in good faith. *See*, MGA Post-Arbitration Brief at 25, citing *Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 363 (1997). Here, as set forth above, and based upon the evidence and argument submitted, the arbitrator finds that MGA did not live up to this standard as required under California law.

16. Additionally, MGA has asserted counterclaims for copyright and trademark infringement by its licensee, F4A. As MGA recognizes, to assert such claims, MGA must show that F4A was acting outside the scope of the license agreement. *See* MGA Arbitration Brief at 14,

- 11 -

Redacted

Exhibit 5
Page 115

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DR 03355

citing *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999) and *Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668 (2d Cir. 1968). Here, as set forth above, the arbitrator finds that MGA has not proven that any sales or showing of products by F4A was outside the scope of the license agreement. As such, because F4A's acts were not outside the license agreement, MGA cannot recover on its theories of copyright and trademark infringement.

## VI. SPECIAL INTERROGATORIES

Prior to the conclusion of the case, the arbitrator asked the parties to submit no more than 10 special interrogatories which they would like to have answered by the arbitrator in connection with the decision. The arbitrator emphasized to the parties that they were limited to 10 interrogatories apiece, and that the interrogatories should be as straightforward and single issue focused as those submitted to a jury. F4A submitted 9 special interrogatories, the answers to which are set forth below. Similarly, MGA submitted 10 interrogatories, some of which were compound and contained multiple subparts, effectively increasing the number of MGA interrogatories to 23. A number of the MGA interrogatories were also "factually loaded" in such a way that they could not be answered in a straightforward fashion; indeed, some would have required a lengthy opinion to dissect the various subparts. Those interrogatories submitted by MGA which were consistent with the arbitrator's request have been answered below. The arbitrator has not attempted to salvage the remainder. The arbitrator believes these answers will be helpful to the parties in further understanding the award.

### A. F4A'S SPECIAL INTERROGATORIES

SPECIAL INTERROGATORY NO. 1:

Do you find by a preponderance of the evidence that MGA breached the License Agreement by revoking its approval of FUN 4 ALL's right to manufacture and distribute the 10.5 inch plush doll, the 18 inch plush doll, and the Bean Bag Blitz?

Yes __X__  No_____

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DR 03356

Redacted

**SPECIAL INTERROGATORY NO. 2:**

Do you find by a preponderance of the evidence that MGA breached the License Agreement by revoking its approval of FUN 4 ALL's right to manufacture and distribute the Giant Size plush doll?

Yes _____   No  X

**SPECIAL INTERROGATORY NO. 3:**

Do you find by a preponderance of the evidence that MGA breached the License Agreement by refusing to approve FUN 4 ALL to manufacture and distribute the 8 inch plush doll, irrespective of the merits of FUN 4 ALL's proposal?

Yes _____   No  X

**SPECIAL INTERROGATORY NO. 4:**

Do you find by a preponderance of the evidence that from and after February 17, 2002, MGA breached the License Agreement by refusing in good faith to consider any other concepts for plush Bratz products that FUN 4 ALL submitted to MGA for approval, irrespective of the merits of FUN 4 ALL's proposals?

Yes _____   No  X

**SPECIAL INTERROGATORY NO. 5:**

Do you find by a preponderance of the evidence that MGA breached the License Agreement with FUN 4 ALL on April 24, 2002, when it terminated the Agreement on grounds not set forth in the Agreement?

Yes _____   No  X

**SPECIAL INTERROGATORY NO. 6:**

Do you find by a preponderance of the evidence that MGA breached the License Agreement and the covenant of good faith and fair dealing implied as a matter of law into that contract, by interfering with or frustrating FUN 4 ALL's reasonable expectations as a licensee under the License Agreement?

Yes  X    No _____

- 13 -

Redacted

Exhibit 5
Page 117

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                   DR 03357

Redacted

**SPECIAL INTERROGATORY NO. 7:**

Do you find by a preponderance of the evidence that, at the time MGA entered into the License Agreement with FUN 4 ALL, MGA did not intend to give FUN 4 ALL's proposals a good faith evaluation?

Yes _____ No __X__

**SPECIAL INTERROGATORY NO. 8:**

Do you find by a preponderance of the evidence that MGA intentionally interfered with FUN 4 ALL's contract with K-Mart, by informing K-Mart on May 6, 2002 that K-Mart was bound by the preliminary injunction which was not entered until May 9, 2002?

Yes _____ No __X__

**SPECIAL INTERROGATORY NO. 9:**

Do you find by a preponderance of the evidence that FUN 4 ALL was acting within its rights, as set forth in the License Agreement and based upon the course of conduct between the parties, when FUN 4 ALL distributed the 10.5 inch plush dolls and the 18 inch plush dolls to K-Mart, Kaybee Toys and Ames?

Yes __X__ No _____

**B.  RESPONDENT MGA'S SPECIAL INTERROGATORIES**

1. Do you find by a preponderance of the evidence that MGA had "absolute approval of the Licensed Articles and all Packaging and Promotional Material at all stages of the development and application thereof, and prior to any use thereof by or on behalf of Licensee," pursuant to paragraph 7(b) of Schedule A of the license agreement?

Yes __X__ No _____ (Subject to the implied covenant of good faith and fair dealing)

5. Do you find by a preponderance of the evidence that MGA acted within the scope of paragraph 7(a) of Schedule A of the license agreement in disapproving FUN 4 ALL's March 2002 samples on quality grounds and instructing FUN 4 ALL not to ship the goods into the market (MGA Exhibit 141)?

Yes _____ No __X__

- 14 -

Redacted

Exhibit 5
Page 118

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DR 03358

Redacted

8. Do you find by a preponderance of the evidence that MGA is entitled to recover from FUN 4 ALL the profits FUN 4 ALL derived from its breaches of the license agreement and its infringement of MGA's copyrights and trademarks (pursuant to 15 U.S.C. § 1117(a); 17 U.S.C. § 504(b)) in the amount of at least $1,018,484.72 (FUN 4 ALL's alleged 50% profit on $2,036,969.44 of shipped and unshipped orders per MGA Exhibit 154), minus any deductible expenses that have been proven by FUN 4 ALL?

Yes _____ No __X__

9. Do you find by a preponderance of the evidence that MGA is entitled to elect to recover statutory damages for willful infringement by FUN 4 ALL of MGA's copyrights pursuant to 17 U.S.C. § 504(c)(2)?

Yes _____ No __X__

10. Do you find by a preponderance of the evidence that Fun 4 All is not entitled to recover damages from MGA for any of the following reasons (a) MGA did not breach any express or implied provision of the license agreement; (b) the damages claimed by FUN 4 ALL are too speculative to support any award of damages; and/or (c) in accepting orders and/or commitments from retailers for Bratz plush products prior to receiving final approval of such products in writing from MGA, FUN 4 ALL assumed the risk that such products would not be approved?

Yes _____ No __X__ [(only ("b") has merit in part as set forth herein)]

## VII. PREVAILING PARTY FEE PROCEDURE

As set forth previously, the arbitrator finds F4A to be the prevailing party pursuant to paragraph 12(f) of the parties' agreement, California Civil Code § 1717, and California Code of Civil Procedure § 1032, taking into consideration the totality of the circumstances and claims related to this case. Pursuant to paragraph 12(f) of the parties' agreement, the arbitrator awards reasonable fees of attorneys, accountants and expert witnesses incurred by F4A. Accordingly, the parties are directed to meet and confer regarding the award of attorney, accountant and expert witness fees. Greenberg Glusker shall promptly disclose to MGA the basis for its fee and cost request and all reasonable non-privileged information associated with said request no later than 5:00 p.m. on July 9, 2002. If the parties have not reached a stipulation regarding the amount

- 15 -

Redacted

Exhibit 5
Page 119

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DR 03359

Redacted

1  associated with this aspect of the award, Greenberg Glusker shall file and serve its application
2  with all accompanying support with the arbitrator no later than 5:00 p.m. on July 17, 2002, and
3  MGA shall file and serve its objections no later than 5:00 p.m. July 26, 2002 (in light of the fact
4  that MGA will have had the request under review since July 9). Any hearing on these issues, if
5  necessary, will be set for July 31, 2002 at 8:30 a.m. in the Irell & Manella offices in Century City.
6  Counsel may attend this hearing telephonically if unable to attend in person. At that time, the
7  arbitrator will also decide any alterations or amendments which should be made to this award in
8  light of subsequent developments. Any request to alter or amend this award must be filed and
9  served by 5:00 p.m. on July 15, 2002 and any response thereto shall be filed and served by
10 July 24, 2002.
11 **VIII.  AUDIT PROTOCOL**
12      The parties have further disputed whether or not MGA is entitled to, and has received an
13 opportunity to, audit F4A's records in connection with the agreement.
14      Although there may well be a good faith misunderstanding between the parties on this
15 point, the fact is that the audit breach allegation was not a primary focus during the evidentiary
16 phase. However, if MGA truly wants a post-termination audit at this stage the arbitrator will grant
17 MGA's request. Since F4A has acknowledged that it does not object to an audit, and since the
18 arbitrator agrees with MGA that its right to an audit survives a termination of the agreement, the
19 arbitrator directs that the audit be undertaken forthwith pursuant to the limitations and provisions
20 of paragraph 6 of the parties' agreement. The arbitrator intends to resolve immediately, by
21 telephone if needed, any disputes that arise in connection with this audit. The arbitrator reserves
22 jurisdiction of this matter until such time as issues regarding an audit are resolved, and reserves
23 the right to award fees and costs in connection with any disputes arising out of the audit, as well as
24 jurisdiction to enter any orders necessary to enforce this award.
25 **IX.  ARBITRATOR COMPENSATION**
26      In light of the anticipated additional work in connection with this matter, the scheduled
27 hearing for July 31, and the additional work required by the preparation of this order, the parties
28

- 16 -

Redacted

Exhibit 5
Page 120

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    DR 03360

Redacted

1 are to each submit a check in the amount of $3,500 to the Irell & Manella Alternative Dispute
2 Resolution center on or before July 10, 2002.
3
4 Dated: June 30, 2002
5 Layn R. Phillips
Arbitrator
6 Irell & Manella, Alternative Dispute
Resolution Center

- 17 -

Redacted

Exhibit 5
Page 121

CONFIDENTIAL - ATTORNEYS' EYES ONLY          DR 03361