# EXHIBIT 1

CALENDARED

**RECEIVED**

MAR 0 7 2008

1   THOMAS J. NOLAN (Bar No. 66992)
    (tnolan@skadden.com)
2   JASON D. RUSSELL (Bar No. 169219)
    (jrussell@skadden.com)
3   MARINA V. BOGORAD (Bar No. 217524)
    (mbogorad@skadden.com)
4   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    300 South Grand Avenue
5   Los Angeles, CA  90071-3144
    Tel.: (213) 687-5000 / Fax: (213) 687-5600
6
    KENNETH PLEVAN (admitted *pro hac vice*)
7   (kplevan@skadden.com)
    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
8   Four Times Square, New York, NY 10046
    Tel.: (212) 735-3000 / Fax: (212) 735-2000
9
    Attorneys for MGA Entertainment, Inc., MGA Entertainment (HK) Limited,
10  MGAE de Mexico, S.R.L. de C.V., and Isaac Larian

11              UNITED STATED DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                    EASTERN DIVISION

14  CARTER BRYANT, an individual,          )  CASE NO. CV 04-9049 SGL (RNBx)
                                           )  Consolidated with Case  04-9059
15                      Plaintiff,         )  and Case No. 05-2727
                                           )
16            v.                           )  Honorable Stephen G. Larson
                                           )
17  MATTEL,    INC.,    a    Delaware      )  MGA PARTIES' NOTICE OF
    corporation,                           )  MOTION FOR PARTIAL SUMMARY
18                                         )  JUDGMENT, MOTION AND
                        Defendant.         )  MEMORANDUM OF POINTS AND
19                                         )  AUTHORITIES IN SUPPORT
    _____    )  THEREOF;
20  AND CONSOLIDATED ACTIONS              )
                                           )  SUBMITTED UNDER SEPARATE
21                                            COVER:
                                              1.  [PROPOSED] STATEMENT OF
22                                                 UNCONTROVERTED FACTS
                                                   AND CONCLUSIONS OF LAW;
23  **FILED  UNDER  SEAL  PURSUANT**          2.  REQUEST FOR JUDICIAL
    **TO PROTECTIVE ORDER**                       NOTICE;
24                                            3.  DECLARATION OF JASON D.
                                                  RUSSELL;
25                                            4.  DECLARATION OF ISAAC
                                                  LARIAN;
26                                            5.  [PROPOSED] ORDER; and
                                              6.  PROOF OF SERVICE.
27
                                              Hearing Date: April 23, 2008
28                                            Time: 10:00 a.m.

3-7-08

EXHIBIT ____1____

PAGE ____6____

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on April 23, 2008 at 10 a.m., or as soon thereafter
3  as the matter may be heard by the Honorable Stephen G. Larson in the above-referenced
4  court located at 3470 Twelfth St., Riverside, California 92501, Defendants MGA
5  Entertainment, Inc., MGA Entertainment (HK) Limited, MGAE de Mexico, S.R.L. de
6  C.V. (collectively, "MGA"), and Isaac Larian (together with MGA, the "MGA Parties")
7  will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for partial
8  summary judgment of plaintiff Mattel's First, Sixth, Eighth, Tenth, Eleventh, Twelfth,
9  and Thirteenth counterclaims in its Second Amended Answer and Counterclaims dated
10  July 12, 2007 on the following grounds:

11       First, all Mattel's counterclaims are time-barred because Mattel brought them
12  more than five and a half years after it was placed on notice of its potential claims;

13       Second, Mattel's interference with contract, conversion and unfair competition
14  claims (its Sixth, Eleventh, and Twelfth counterclaims, respectively) are preempted by
     the Copyright Act, as a matter of law;

15       Third, Mattel's statutory and common law unfair competition claims (the Twelfth
16  counterclaim) fail as a matter of law because Mattel cannot establish that MGA's or
17  Larian's conduct was unfair, fraudulent, or unlawful;

18       Fourth, Mattel's claim for intentional interference with contract (its Sixth
19  Counterclaim) fails because there is no evidence of breach, intent, or inducement;

20       Fifth, Mattel's claim for aiding and abetting a breach of fiduciary duty allegedly
21  owed by defendant Carter Bryant to Mattel (its Eighth Counterclaim) fails because
22  Bryant, as a matter of law, did not owe such a duty to Mattel.

23       This Motion is made on the ground that "the pleadings, depositions, answers to
24  interrogatories, and admissions on file, together with the affidavits . . . show that there is
25  no genuine issue as to any material fact and that [the MGA Parties are] entitled to a
     judgment as a matter of law." Fed. R. Civ. P. 56(c).

26       This Motion is based upon this Notice of Motion and accompanying
27  Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and

28

---

EXHIBIT ___1___
PAGE ___7___

Conclusions of Law filed concurrently under separate cover, the Declarations of Jason D. Russell and Isaac Larian filed concurrently under separate cover, the MGA Parties' Request for Judicial Notice filed concurrently under separate cover, the records and files of this court, and any other matter of which the court may take judicial notice.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on February 15, 2008.

DATED:  March 7, 2008

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____
Thomas J. Nolan
Attorneys for MGA Entertainment, Inc.,
MGA Entertainment (HK) Limited, MGAE
de Mexico, S.R.L. de C.V., and Isaac Larian

EXHIBIT 1
PAGE 8

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... vi

PRELIMINARY STATEMENT .............................................................. 1

FACTUAL BACKGROUND ................................................................. 4

1.   Bryant's Initial Meetings with MGA And His Contract With MGA ................... 4

2.   Mattel Becomes Aware of MGA's Ownership of BRATZ in February
     2001 and Suspects Bryant's Involvement In BRATZ Design .......................... 6

     (a)   February 2001 – Mattel sees the BRATZ at the Toy Fair ..................... 6

     (b)   June 2001 – BRATZ release in Spain piques Mattel's interest ................ 7

     (c)   BRATZ are introduced to the American market ............................... 7

     (d)   Mattel immediately concludes that BRATZ was
           copied from Mattel dolls ................................................. 8

     (e)   It was "common knowledge" within Mattel in 2001 that
           Bryant created BRATZ ..................................................... 8

3.   In March 2002, Mattel Launches An Internal Campaign
     To Investigate Its Alleged Rights In the BRATZ, Bryant's
     Creation Of The BRATZ Concept And MGA's Role In Its Development ........... 9

4.   Mattel Continues To Be Bombarded With Public Information About MGA,
     Larian And BRATZ Until It Sued Bryant in April 2004 ...................... 11

5.   Barbie's "House Is On Fire" Due to Brisk Sales of BRATZ .................... 12

6.   The History of the Litigation at Hand ........................................ 13

ARGUMENT ...................................................................... 15

I.   ALL CLAIMS AGAINST MGA AND LARIAN ARE TIME-BARRED ........ 15

     A.   Mattel Was On Notice Of Its Claims For Statute Of Limitations
          Purposes As Early As February 2001 And No Later Than March 2002 ... 17

     B.   As Mattel Was On Notice Of Its Claims By March 2002, Its Claims Are
          Time-Barred, Unless They Relate Back To An Earlier Pleading ............. 20

          1.   Mattel's Sixth, Eighth, and Tenth Counterclaims are time-barred
               by their respective two-year statutes of limitations and cannot be
               saved by any "relation-back" rules ................................... 20

               (a)   Mattel's Sixth Counterclaim for Intentional
                     Interference with Contract is time-barred ..................... 20

               (b)   Mattel's Aiding and Abetting claims are time-barred ......... 21

EXHIBIT  1
PAGE  9

2.    Mattel's First, Eleventh, and Thirteenth Counterclaims, as well as a portion of its Twelfth Counterclaim, are time-barred by their respective three-year statutes of limitations ................................... 23

(a)    Mattel's claim for copyright "infringement" is time-barred .............................................................. 23

(b)    Mattel's claim for conversion is time-barred and cannot be saved by any "relation-back" rules ............... 26

(c)    Mattel's common law unfair competition claim is time-barred ................................................. 26

3.    Mattel's remaining portion of its Twelfth Counterclaim for statutory unfair competition is time-barred by a four-year statute of limitation ................................... 28

4.    Mattel's claim for declaratory relief is time-barred ..................... 28

C.    As MGA And Larian Are New Parties In The '04 Action, And Were Not Omitted by "Mistake", The '04 Complaint Cannot Save Mattel's Claims ................................... 29

D.    The '05 Action Cannot Revive Mattel's Claims Against Larian ............. 33

II.    MATTEL'S CONVERSION, INTENTIONAL INTERFERENCE WITH CONTRACT, AND UNFAIR COMPETITION CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT ............................................. 35

A.    The BRATZ concept falls within Copyright Act's scope ....................... 35

B.    Mattel's conversion, intentional interference with contract, and unfair competition claims fail to meet the "extra element" test.......................... 36

1.    Mattel's conversion claim ............................................................. 36

2.    Mattel's intentional interference with contract claim ..................... 38

3.    Mattel's unfair competition claims ................................................. 39

III.    MATTEL'S UNFAIR COMPETITION CLAIMS FAIL............................... 41

A.    MGA's and Larian's Conduct Was Not Unfair................................... 41

B.    MGA and Larian's Conduct Was Not Fraudulent................................. 41

C.    MGA's and Larian's Conduct Was Not Unlawful .............................. 42

D.    Mattel's Common Law Unfair Competition Claims Also Fail ............... 44

IV.    MATTEL CANNOT ESTABLISH THAT LARIAN AND MGA INTENTIONALLY INTERFERED WITH BRYANT'S AT-WILL CONTRACT WITH MATTEL.......................................................... 45

EXHIBIT ___1___
PAGE ___10___

| | | | |
|---|---|---|---|
| 1 | A. | Bryant did not breach or disrupt his contract with Mattel | 47 |
| 2 | B. | MGA and Larian lacked the intent to induce Bryant to breach his contract | 47 |
| 3 | | | |
| 4 | C. | MGA and Larian did not induce Bryant to leave Mattel and therefore could not be the cause of his alleged breach | 48 |
| 5 | V. | AS BRYANT DID NOT OWE A FIDUCIARY DUTY TO MATTEL, THERE CAN BE NO AIDING AND ABETTING LIABILITY | 50 |
| 6 | | | |
| 7 | | CONCLUSION | 50 |

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT _____1_____

PAGE _____11_____

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

1-800 Contacts, Inc. v. Steinberg,
    107 Cal. App. 4th 568 (2003) ................................................... 47, 48, 49

40235 Washington Street Corp. v. Lusardi,
    No. Cir. 90-1472-R,
    1999 WL 33633157 (S.D. Cal. Jan. 19, 1999) ........................... 16

In re Adbox, Inc.,
    488 F.3d 836 (9th Cir. 2007) ........................................................ 34

AmerUS Life Insurance Co. v. Bank of America, N.A.,
    143 Cal. App. 4th 631 (2006) ....................................................... 26

American Mortgage Network v. LoanCity.com,
    No. D044550,
    2006 WL 3199291 (Cal. Ct. App. Nov. 7, 2006) ..................... 49

Ananda Church of Self-Realization v. Massachusetts Bay Insurance Co.,
    95 Cal. App. 4th 1273 (2002) ...................................................... 37

Ashlar Inc. v. Structural Dynamics Research Corp.,
    C-94-4344 WHO, 1995 WL 639599,
    36 U.S.P.Q. 2d 1402 (N.D. Cal. 1995) ............................... 25, 26

Bank of the West v. Superior Court,
    2 Cal. 4th 1254 (1992) ........................................................... 27, 44

Barksdale v. Robinson,
    211 F.R.D. 240 (S.D.N.Y. 2002) .................................................. 24

Barrington v. A.H. Robins Co.,
    39 Cal. 3d 146 (1985) ................................................................... 31

Bauer v. Interpublic Group of Companies, Inc.,
    255 F. Supp. 2d 1086 (N.D. Cal. 2003) .................................... 49

Big East Entertainment, Inc. v. Zomba Enterprises, Inc.,
    453 F. Supp. 2d 788 (S.D.N.Y. 2006) ........................................ 25

Bono v. Clark,,
    103 Cal. App. 4th 1409 (2002) .................................................... 26

Booth v. Quantum3D, Inc.,
    No. C. 04-5376 EMC,
    2005 WL 1512138 (N.D. Cal. June 15, 2005) ......................... 29

Boyer v. Jensen,
    129 Cal. App. 4th 62 (2005) ........................................................ 34

EXHIBIT ___1___

PAGE ___12___

Brewer-Giorgio v. Producers Video, Inc.,
   216 F.3d 1281 (11th Cir. 2000) ........................................................ 25

Brink v. First Credit Resources,
   57 F. Supp. 2d 848 (D. Ariz. 1999) .............................................. 31, 32

Brush Creek Media, Inc. v. Boujaklian,
   No. C-02-3491 EDL,
   2002 WL 1906620 (N.D. Cal. Aug. 19, 2002) ................................... 25

Butler v. Robar Enterprises, Inc.,
   208 F.R.D. 621 (C.D. Cal. 2002) ...................................................... 31

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,
   20 Cal. 4th 163 (1999) ................................................................ 27, 41

Charles Lowe Co. v. Xomox Corp.,
   No. C95-0498 SI,
   1999 WL 1293362 (N.D. Cal., Dec. 27, 1999) .................................. 21

Charter Oak Fire Insurance Co. v. Bokharian Jewish Community Centers,
Inc.,
   No. 01 CIV 4162,
   2002 WL 59420 (S.D.N.Y. Jan. 16, 2002) ........................................ 34

City of Vista v. Robert Thomas Securities, Inc.,
   84 Cal. App. 4th 882 (2000) ............................................................ 22

In re Conseco Insurance Co. Annuity Marketing & Sales Practices
Litigation,
   No. C-05-04726 RMW, C-06-00537 RMW,
   2007 WL 486367 (N.D. Cal. Feb. 12, 2007) ..................................... 28

Continental Car-Na-Var Corp. v. Moseley,
   24 Cal. 2d 104 (1944) ...................................................................... 46

Cortez v. Purolator Air Filtration Products Co.,
   23 Cal. 4th 163 (2000) ...................................................................... 28

Country Road Music, Inc. v. MP3.com, Inc.,
   279 F. Supp. 2d 325 (S.D.N.Y. 2003) .......................................... 25, 26

CrossTalk Productions v. Jacobson,
   65 Cal. App. 4th 631 (1998) ............................................................. 43

Davaloo v. State Farm Insurance Co.,
   135 Cal. App. 4th 409 (2005) ........................................................... 30

Del Madera Properties v. Rhodes & Gardner, Inc.,
   820 F.2d 973 (9th Cir. 1987) ....................................................... 35, 40

Della Penna v. Toyota Motor Sales, U.S.A., Inc.,
   11 Cal. 4th 376 (1995) ..................................................................... 39

EXHIBIT ___1___
PAGE ___13___

DeVoto v. Pacific Fidelity Life Insurance Co.,
618 F.2d 1340 (9th Cir. 1980) ............................................ 49

Dielsi v. Falk,
916 F. Supp. 985 (C.D. Cal. 1996) ............................... 36, 37

Diodes, Inc. v. Franzen,
260 Cal. App. 2d 244 (1968) ............................................ 46

Dover v. Sadowinski,
147 Cal. App. 3d 113 (1983) ............................................ 32

Engstrom v. Kallins,
49 Cal. App. 4th 773 (1996) ............................................ 29

FDIC v. McSweeney,
976 F. 2d 532 (9th Cir. 1992) ............................................ 22

Family Home & Finance Center, Inc. v. Federal Home Loan Mortgage
Corp.,
461 F. Supp. 2d 1188 (C.D. Cal. 2006) ........................... 45

Fisher v. Dees,
794 F.2d 432 (9th Cir. 1986) ............................................ 39

Fogerty v. Fantasy, Inc.,
510 U.S. 517 (1994) ............................................ 35

Fogel v. UNUM Corp.,
No. B146857,
2001 WL 1359112 (Cal. Ct. App. Nov. 6, 2001) ............... 49

Forcier v. Microsoft Corp.,
123 F. Supp. 2d 520 (N.D. Cal. 2000) ........................... 21

Fox v. Ethicon Endo-Surgery, Inc.,
35 Cal. 4th 797 (2005) ............................................ 17, 20

Gemcraft Homes, Inc. v. Sumurdy,
688 F. Supp. 289 (E.D. Tex. 1988) ........................... 39

Gilmore v. State of California,
No. 93-20788SW,
1995 WL 492625 (N.D. Cal. Aug. 10, 1995) ............... 31

Harper & Row Publishers v. Nation Enterprises,
723 F.2d 195 (2d Cir. 1983), rev'd on other grounds by, 471 U.S. 539
(1985) ............................................ 37, 38

Henderson v. Bolanda,
253 F.3d 928 (7th Cir. 2001) ............................................ 29

Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Insurance Associates
Inc.,
115 Cal. App. 4th 1145 (2004) ............................................ 22

EXHIBIT
PAGE    14

Idema v. Dreamworks, Inc.,
162 F. Supp. 2d 1129 (C.D. Cal. 2001) ............................................... 37, 39

Interloc Solutions, Inc. v. Technology Associates International Corp.,
No. CV071534 LEW GGHX,
2007 WL 2429715 (E.D. Cal. Aug. 24, 2007) ...................................... 46

International Trade Management, Inc. v. United States,
553 F. Supp. 402 (Cl. Ct. 1982) ............................................................ 25

Jolly v. Eli Lilly & Co.,
44 Cal. 3d 1103 (1988) .................................................................... 17, 20

Kasparian v. County of Los Angeles,
38 Cal. App. 4th 242 (1995) ................................................................. 39

Kilkenny v. Arco Marine Inc.,
800 F.2d 853 (9th Cir. 1986) ........................................................... 30, 32

Knoell v. Petrovich,
76 Cal. App. 4th 164 (1999) ................................................................. 21

Kodadek v. MTV Networks, Inc.,
152 F.3d 1209 (9th Cir. 1998) ............................................................. 40

Lanard Toys, Ltd. v. Novelty, Inc.,
511 F. Supp. 2d 1020 (C.D. Cal. 2007) ............................................ 39, 40

Levald, Inc. v. City of Palm Desert,
998 F.2d 680 (9th Cir. 1993) ............................................................... 29

Liberty Mutual Insurance Co. v. Fales,
8 Cal. 3d 712 (1973) ........................................................................... 15

Lindley v. General Electric Co.,
780 F.2d 797 (9th Cir. 1986) ............................................................... 16

In re Literary Works in Electronic Databases Copyright Litigation,
509 F.3d 116 (2d Cir. 2007) ................................................................. 25

Loree Rodkin Management Corp. v. Ross-Simons, Inc.,
315 F. Supp. 2d 1053 (C.D. Cal. 2004) ................................................ 25

Louisiana-Pacific Corp. v. ASARCO, Inc.,
5 F.3d 431 (9th Cir. 1993) ................................................................... 31

MJT Securities, LLC v. Toronto-Dominion Bank,
No. C 03-3815 CW,
2007 WL 1725421 (N.D. Cal. Jun. 14, 2007) ...................................... 50

Mattel, Inc. v. Bryant,
441 F. Supp. 2d 1081 (C.D. Cal. 2005), aff'd, 446 F.3d 1011 (9th Cir. 2006) .......................................................................................... 14, 38

EXHIBIT ___1___
PAGE ___15___

Mattel, Inc. v. Luce, Forward, Hamilton & Scripps,
No. B143260,
2001 WL 1589175 (Cal. Ct. App. Dec. 13, 2001)...................................... 1

McGee Street Productions v. Workers' Compensation Appeals Board,
108 Cal. App. 4th 717 (2003) ............................................................. 30, 32

Melchior v. New Line Productions, Inc.,
106 Cal. App. 4th 779 (2003) ............................................................. 35, 36

Menefee v. Ostawari,
228 Cal. App. 3d 239 (1991) ...................................................................... 21

Meridian Project Systems, Inc. v. Hardin Construction Co.,
No. Civ. S-04-2728 FCD DAD, 2006 WL 1062070,
79 U.S.P.Q. 2d 1691 (E.D. Cal. 2006).................................................... 36

Metro Traffic Control, Inc. v. Shadow Traffic Network,
22 Cal. App. 4th 853 (1994) ............................................................. 45, 46

Miguel v. Country Funding Corp.,
309 F.3d 1161 (9th Cir. 2002) .................................................................. 25

Minder Music Ltd. v. Mellow Smoke Music Co.,
No. 98 Civ. 4496 (AGS), 1999 WL 820575,
52 U.S.P.Q. 2d 1700 (S.D.N.Y. 1999)..................................................... 24

Motown Record Corp. v. George A. Hormel & Co.,
657 F. Supp. 1236 (C.D. Cal. 1987) ............................................ 36, 39, 40

National Rural Telecommunications Co-op. v. DIRECTV, Inc.,
319 F. Supp. 2d 1059 (C.D. Cal. 2003) .................................................. 42

In re Network Assocs., Inc. II Sec. Litig.,
No. C00-CV-4849,
2003 WL 24051280 (N.D. Cal. Mar 25, 2003) ....................................... 31

Netzer v. Continuity Graphic Associates, Inc.,
963 F. Supp. 1308 (S.D.N.Y. 1997) ....................................................... 24

Norgart v. Upjohn Co.,
21 Cal. 4th 383 (1999) ............................................................................ 31

Papenthien v. Papenthien,
16 F. Supp. 2d 1235 (S.D. Cal. 1998)...................................................... 29

Pembroke, By and Through Pembroke v. City of San Rafael,
No. C 92 1869 BAC,
1994 WL 443683 (N.D. Cal. Aug. 2, 1994) ............................................. 31

People v. Hood,
1 Cal. 3d 444 (1969) ............................................................................... 43

Percy v. San Francisco General Hospital,
841 F.2d 975 (9th Cir. 1988) .................................................................. 29

EXHIBIT ___1___
PAGE ___16___

Polar Bear Productions, Inc. v. Timex Corp.,
    384 F.3d 700 (9th Cir. 2004) ........................................... 17, 19, 23

Rambus Inc. v. Samsung Electronics Co., Ltd.,
    No. C05-02298 RMW, C05-00334 RMW,
    2007 WL 39374, (N.D. Cal. Jan. 4, 2007) ................................ 21

Reeves v. Hanlon,
    33 Cal. 4th 1140 (2004) ................................................ 46

Richard B. LeVine, Inc. v. Higashi,
    131 Cal. App. 4th 566 (2005) ........................................... 50

Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,
    477 F.3d 383 (6th Cir. 2007) ........................................... 24

Roley v. New World Pictures, Ltd.,
    19 F.3d 479 (9th Cir. 1994) ........................................ 17, 23

Ryan v. Carl Corp.,
    No. C97-3873 FMS,
    1998 WL 320817 (N.D. Cal. June 15, 1998) ............................. 25

Scherer v. Mark,
    64 Cal. App. 3d 834 (1976) ............................................. 32

Selby v. Newline Cinema Corp.,
    96 F. Supp. 2d 1053 (C. D. Cal. 2000) ................................. 39

Sidney v. Superior Court,
    198 Cal. App. 3d 710 (1988) ........................................... 34

Smith & Hawken, Ltd. v. Gardendance, Inc,
    No. C04-1664 SBA,
    2004 WL 2496163 (N.D. Cal. Nov. 5, 2004) ......................... 42, 44, 45

Snapp & Associates Insurance Services, Inc. v. Robertson,
    96 Cal. App. 4th 884 (2002) ........................................ 26, 28

Sony Pictures Entertainment, Inc. v. Fireworks Entertainment Group, Inc.,
    156 F. Supp. 2d 1148 (C.D. Cal. 2001) ................................. 39

South Carolina v. Catawba Indian Tribe, Inc.,
    476 U.S. 498 (1986) .................................................. 16

Strasberg v. Odyssey Group, Inc.,
    51 Cal. App. 4th 906 (1996) ........................................... 26

Stutz Motor Car of America, Inc. v. Reebok International, Ltd.,
    909 F. Supp. 1353 (C.D. Cal. 1995), aff'd, 113 F.3d 1258 (Fed. Cir. 1997) ...................................................................... 28

Sybersound Records, Inc. v. UAV Corp.,
    No. 06-55221,
    2008 WL 509245 (9th Cir. Feb. 27, 2008) ............................... 41

EXHIBIT ___1___
PAGE ___17___

*In re Syntex Corp. Securities Litigation,*
    855 F. Supp. 1086 (N.D. Cal. 1994), aff'd, 95 F. 3d 922 (9th Cir. 1996) 31

*Trembath v. Digardi,*
    43 Cal. App. 3d 834 (1974) ....................................................................... 21

*Triangle Film Corp. v. Artcraft Pictures Corp.,*
    250 F. 981 (2d Cir. 1918)........................................................................... 46

*Trindade v. Superior Court,*
    29 Cal. App. 3d 857 (1973) ....................................................................... 34

*Trovan, Ltd. v. Pfizer, Inc.,*
    No. CV-98-0094 LGB MCX,
    2000 WL 709149 (C.D. Cal. May 24, 2000) ............................................ 27

*Tu-Vu Drive-In Corp. v. Davies,*
    66 Cal. 2d 435 (1967) ............................................................................... 20

*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port District,*
    106 Cal. App. 4th 1219 (2003) ................................................................. 47

*United States v. Kubrick,*
    444 U.S. 111 (1979)................................................................................... 15

*Union Pacific Railroad Co. v. Nevada Power Co.,*
    950 F.2d 1429 (9th Cir. 1991) .................................................................. 30

*Universal City Studios, Inc. v. J.A.R. Sales, Inc.,*
    No. 82-4892-AHH(BX), 1982 WL 1279,
    216 U.S.P.Q. 679 (C.D. Cal. 1982) .......................................................... 35

*VL Systems, Inc. v. Unisen, Inc.,*
    152 Cal. App. 4th 708 (2007) ................................................................... 46

*Watermark Publishers. v. High Technology Systems, Inc.*
    No. 95-3839 IEG (CGA), 1997 WL 717677,
    44 U.S.P.Q. 2d 1578 (S.D. Cal. 1997)................................................ 23, 40

*Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.,*
    178 F. Supp. 2d 1099 (C.D. Cal. 2001) ............................................. 41, 42

*Weinstock, Lubin & Co. v. Marks,*
    109 Cal. 529 (1895) .................................................................................. 27

*Weissmann v. Freeman,*
    868 F.2d 1313 (2d Cir. 1989) ................................................................... 24

*Welles v. Turner Entertainment Co.,*
    503 F.3d 728 (9th Cir. 2007) .................................................................... 24

*Woo v. Superior Court,*
    75 Cal. App. 4th 169 (1999) ..................................................................... 33

EXHIBIT ___1___
PAGE ___18___

Worth v. Universal Pictures, Inc.,
5 F. Supp. 2d 816 (C.D. Cal. 1997) .......................................................... 38

Xtracash ATM, Inc. v. Karsh,
No. D037905,
2002 WL 31053855 (Cal. Ct. App. Sept. 16, 2002) ................................ 49

Zuill v. Shanahan,
80 F.3d 1366 (9th Cir. 1996) .................................................................... 24

## STATUTES

Cal. Bus. & Prof. Code § 17200 ............................................................ 26, 28

Cal. Bus. & Prof. Code § 17208 ............................................................ 27, 28

Cal. Civ. Proc. Code § 337(1) .................................................................... 22

Cal Civ. Proc. Code § 338 .................................................................. 23, 26, 27

Cal. Civ. Proc. Code § 339 .................................................................... 20, 21

Cal. Penal Code § 641.3 .............................................................................. 43

Fed. R. Civ. P. 13(a) & (b) .......................................................................... 34

Fed. R. Civ. P. 15(c) (3) .............................................................................. 16

17 U.S.C. §§ 101, et seq. .................................................................. 16, 23, 35

17 U.S.C. § 102 .......................................................................................... 35

17 U.S.C. § 301(a) ...................................................................................... 35

17 U.S.C. § 507(b) ...................................................................................... 23

18 U.S.C. §§ 1831, et seq. .......................................................................... 42

## MISCELLANEOUS

3 B.E. Witkin, California Procedure:  Actions (3d. 1985) ............................ 29

3 B.E. Witkin, California Procedure:  Actions (4th ed. 1996) .......... 21, 29, 34

Black's Law Dictionary 1399 (6th ed. 1997) .............................................. 43

M. Nimmer & D. Nimmer, Nimmer on Copyright ¶ 1.01[B][1] (2007) ...... 35

Restatement (Second) of Torts § 766, cmt. n. ............................................ 49

EXHIBIT ___1___
PAGE ___19___

## PRELIMINARY STATEMENT

For 50 years, Barbie has dominated the fashion doll market, and Mattel has enjoyed a monopoly. In early 2001, that monopoly became threatened when MGA released the BRATZ, an innovative take on the fashion doll concept.[1] Sales of the BRATZ were a phenomenon and quickly eroded Barbie's long-settled and dominant market position. By the end of 2003 and early 2004, the reality of Mattel's inability to compete had set in. According to internal Mattel documents, its executives were in a full-blown panic, concluding that "the House is on Fire" and the "Brand is in Crisis." These concerns were based on the fact that Barbie's market share had plummeted at a "chilling rate", while the BRATZ share was skyrocketing. (Ex. 35.)[2] Mattel made some feeble efforts to restore Barbie's luster, but all the cosmetic surgery in the world could not make this 50 year old grand dame competitive with the hip and fresh BRATZ designs, marketing, and packaging. As Mattel's senior executives lamented in early 2004, "we have been out-thought and out-executed." (Ex. 33.)

Having been, by its own admission, "out-thought and out-executed" in the market by MGA and with Barbie losing market share "at a chilling rate" to the BRATZ, Mattel decided to turn to the courts for relief. According to Mattel's own employees, "[t]here [were] competitive issues such as Bratz that were forcing the decline of Barbie.... [O]ne of the strategies for trying to defeat Bratz was to litigate [MGA] to death." (Ex. 21 (Brawer) at 232:19-233:22.) This is far from the first time that Mattel has tried litigation instead of competition; Mattel and its counsel have a well-earned reputation for overzealously suing anyone who had the temerity to enter the fashion doll market. Indeed, a California court found it to be "substantially true" that "Mattel aggressively defends against any entries in the fashion doll business and 'anyone who makes an 11 1/2 inch fashion doll paints a target on their back.'" Mattel, Inc. v. Luce, Forward, Hamilton & Scripps, 2001 WL 1589175, at *9 (Cal. Ct. App. Dec. 13, 2001). Given that Mattel's claims were devised to force MGA out of business, it comes as no surprise

---

[1]   "MGA" hereafter refers to MGA Enter., Inc., MGA Enter. (HK) Limited, MGAE de Mexico, S.R.L. de C.V., and the "MGA Parties" refers to Larian and MGA.

[2]   All "Ex." cites herein refer to documents attached as exhibits to the concurrently filed Declaration of Jason D. Russell in Support of the MGA Parties' Motion for Partial Summary Judgment, unless otherwise noted.

EXHIBIT ____1____

PAGE ___20___

that such claims are factually and legally untenable, and the MGA Parties are entitled to partial summary judgment on all Phase I claims asserted against them.

The claims ultimately filed by Mattel present a classic case of overreaching. The issue in this case can be simply stated as follows: did Bryant "conceive" or "reduce to practice" his idea for the BRATZ dolls while employed at Mattel and in such a manner that Mattel has a legitimate claim of ownership over the idea. Despite the simple nature of the issue here, Mattel, consistent with its strategy of litigation by attrition, has mushroomed this simple question into an unwieldy and complicated action by asserting a slew of state law and time-barred claims that lack merit and then trying to bury MGA under thousands of discovery requests and countless hours of expense. But an analysis of the relevant facts and applicable law makes clear that Mattel's claims have no merit. By this motion, the MGA Parties ask this Court to pare the case back to its essence, streamlining issues for the parties, the Court, and most importantly, the jury if one is needed. As shown below, all of Mattel's Phase I claims fail as a matter of law and should be dismissed on summary judgment with respect to the MGA Parties.

In the concurrently filed summary judgment motion of Carter Bryant ("Bryant Br."), Bryant establishes as a matter of law that Mattel has no legal right to ownership of the BRATZ concept under his agreements with Mattel. (Bryant Br. at III.B.1.) The MGA Parties join and incorporate those arguments herein by reference. If, as the MGA Parties conclude it should, the Court accepts Bryant's arguments, then there is no need to even review this brief, as there is no basis on which Mattel could prevail on any of its claims against any party. Assuming, for argument's sake, that the Court finds a genuine issue on the arguments in Bryant's motion for summary judgment, then all of Mattel's claims still fail for the reasons stated herein under settled law and undisputed facts.

First, assuming Mattel had any right to the BRATZ concept, Mattel's tactical decision to wait over *five and a half years* from when it was placed on notice of its potential claims renders all of its claims time-barred on their face. Mattel doubtless will argue that the "relation-back" doctrine saves their claims, and will point to this Court's earlier decisions that were made before any discovery had occurred. As shown below, Mattel's claims against MGA and Larian do not "relate back" to any earlier pleadings as

EXHIBIT ___1___

PAGE ___21___

a matter of law because MGA and Larian were new parties, and Mattel has no cause to argue any mistake or lack of knowledge about their identity. Quite the contrary, Mattel concedes it knew of all the facts needed to assert its claims long before it filed any action and yet chose not to assert claims against MGA or Larian until November of 2006. Under settled Ninth Circuit and California law precedent, there is no basis to permit relation back in these circumstances and, thus, all of Mattel's claims are time-barred. (See Section I, infra.)

Second, Mattel's interference with contract, conversion and unfair competition claims (its Sixth, Eleventh and Twelfth Counterclaims, respectively) are preempted by the Copyright Act as a matter of law because the gravamen of these claims is for ownership of the BRATZ concept, an issue that falls squarely within the exclusive protections of the Copyright Act. (See Section II, infra.)

Third, Mattel's statutory and common law unfair competition claims (the Twelfth Counterclaim) fail as a matter of law because Mattel cannot establish that MGA's or Larian's conduct was unlawful, fraudulent, or unfair. (See Section III, infra.)

Fourth, Mattel's claim for intentional interference with contract (its Sixth Counterclaim) fails because: (a) Bryant did not breach his contract with Mattel; (b) there is no evidence that MGA intended to cause Bryant to breach his contract given his representations (and the representations of his patent counsel) that his actions did not breach any contractual obligations to Mattel and that he owned the rights to the BRATZ concept free of claims by any party; and (c) there is no evidence that MGA induced Bryant to breach his contract with Mattel, as it is undisputed that Bryant approached MGA of his own accord. (See Section IV, infra.)

Finally, Mattel's claim for aiding and abetting a supposed breach of fiduciary duty allegedly owed by Bryant to Mattel (its Eighth Counterclaim) fails because Bryant, as a matter of law, did not owe such a duty to Mattel. (See Section V, infra.)

In sum, however viewed, all of Mattel's claims fail, and MGA and Larian are entitled to partial summary judgment of all of Mattel's Phase I claims.

EXHIBIT _____1_____

PAGE _____22_____

# FACTUAL BACKGROUND[3]

### 1.   Bryant's Initial Meetings with MGA And His Contract With MGA

In early 2000, Bryant showed the BRATZ drawings he created prior to returning to Mattel to Veronica Marlow, who he had met while she worked at Mattel. (UF ¶ 2.) [4] Marlow was then a freelance designer who was not working for MGA. (UF ¶¶ 2-3.) Nothing came of that conversation. Some months later, in July of 2000, while Bryant was cleaning out some stored boxes in his studio, he came across his BRATZ drawings, and realized that he "should really try and do something with these[.]" (UF ¶ 4.)

The first person he called was Marlow, asking if "she had any leads or if she could possibly help [him] pitch this idea." (UF ¶ 5.) Marlow suggested MGA, the first time Bryant had heard of it. (UF ¶¶ 6-7.) Bryant had had no contact with MGA personnel until he arrived at MGA headquarters in late August 2000 for the pitch meeting Marlow had arranged with Paula Garcia and Victoria O'Connor. (UF ¶¶ 8-9.) [5] At the meeting, Garcia and O'Connor received Bryant's drawings enthusiastically and asked him to meet MGA's owner Isaac Larian. (UF ¶ 11.)

At a second meeting, on September 1, 2000, Bryant showed his drawings to Garcia, Marlow, O'Connor, and Larian. (UF ¶ 12.) MGA asked whether the BRATZ concept was something Mattel had the rights to. (UF ¶ 14.) Specifically, Larian asked Bryant if the drawings were of "something that he was doing at Mattel or had done at Mattel, and he said, 'no.'" (UF ¶ 14.) As Larian explained, "I wanted to make sure when we w[ere] there that this idea that he was showing us was nothing that was at Mattel or Mattel had done." (Id.) For his part, Bryant was aware he had signed a confidentiality agreement when he returned to Mattel in January of 1999, but considered the BRATZ to be "a project that I had created while I was not employed with Mattel, so I didn't think there would be a problem." (UF ¶ 15.) Larian was impressed and wanted

---

[3]     Rather than repeat the facts set forth in Bryant's brief, the MGA Parties incorporate them by reference and add additional facts that are pertinent to consideration of the arguments herein.

[4]     Citations to "UF" refer to undisputed facts set forth in the MGA Parties' [Proposed] Statement of Uncontroverted Facts and Conclusions of Law filed concurrently herewith.

[5]     For introducing him to MGA, Bryant pays Marlow ten percent of his BRATZ royalties. (UF ¶ 10.)

EXHIBIT ___1___
PAGE ___23___

to acquire the rights to BRATZ, which Bryant insisted on licensing to MGA.  (Ex. 1
(Bryant) at 184:22-24.)

Negotiations ensued between the parties.  MGA requested copies of Bryant's
employment contract with Mattel because MGA "wanted to have MGA's attorneys take
a look at it to see if there would be any potential problems[.]" (UF ¶ 16.)  Specifically,
MGA's attorney David Rosenbaum wanted to see the document because he wanted to
insure "that the material that MGA was acquiring fell outside the scope of any
ownership or other obligation to Mattel." (UF ¶¶ 17-18.)  But Bryant was unable to
provide a copy of the document in response to that request because he did not have a
copy in his possession. (UF ¶ 19.)

Unable to review a copy of Bryant's Inventions Agreement, Rosenbaum sought
assurances from Bryant's attorney, Anne Wang, that Bryant's development of the
BRATZ concept fell outside the scope of Bryant's employment with Mattel. (UF ¶ 20.)
In response, Bryant and Wang, an experienced patent attorney, assured MGA that
Bryant "had created the doll at a time period separate from his employment and that it
was his own separate creation." (UF ¶¶ 15, 20-22.)[6]  In the contract between MGA and
Bryant, Bryant warranted that his contracting with MGA did not violate or breach any
existing contract with a third party, that the concept and drawings were "original," did
not infringe on any third party's contractual or intellectual property rights, were the
exclusive property of MGA, and indemnified MGA should a third party claim

---

[6]    See Ex. 7 (Wang) at 47:23-48:18 (Wang told Rosenbaum "that Carter was the creator
and the owner" and "that he had created the doll at a time period separate from his employment
and that it was his own separate creation"), 53:21-54:9 (agreeing "that no specific dates of
creation were discussed but that it was all discussed in terms of relative to [Bryant's]
employment at Mattel in a sense that [Wang] represent[ed] that [Wang] w[as] satisfied that it
had been created before that employment"); Ex. 1 (Bryant) at 22:2-3 ("I told MGA ... that
BRATZ were my creation"), 24:9-12 ("I owned the rights to the BRATZ and felt perfectly
comfortable assigning them to MGA"), 267:11-268:10; Ex. 5 (Larian) at 82:24-83:5 (Bryant
"told us – and we verified this later on – that he had done this in Missouri in 1998, when he
was not working for anybody"), 87:13-14, 91:19-21. See also Ex. 6 (Rosenbaum) at 80:3-12
(Wang "advised me that the work that Bryant had done in developing . . . 'the concept' was
done outside the scope of his employment with Mattel and had been done prior to his
employment with Mattel"), 82:15-18 (Wang told Rosenbaum "that she had reviewed the
chronology of his development of the work product and was satisfied that it fell outside the
scope of any employment obligations to Mattel"), 84:25-85:2, 114:22-24 (Wang "gave me no
reason to suspect that there was anything inside that fell within the scope of his employment at
Mattel").

EXHIBIT ____/____
PAGE ___24___

ownership of the BRATZ concept or drawings.  (UF ¶¶ 14, 23.)  Bryant signed the MGA contract on October 4, 2000.  (UF ¶ 23.)

MGA and Larian expected that on signing a contract with MGA, Bryant would immediately resign from Mattel and begin working "full time" on BRATZ.  (UF ¶¶ 24-26.)  Indeed, Larian instructed Bryant to quit his job at Mattel immediately because Bryant needed to work "16 hours a day on this STARTING NOW and NOTHING ELSE."  (UF ¶¶ 24- 25.)

### 2. Mattel Becomes Aware of MGA's Ownership of BRATZ in February 2001 and Suspects Bryant's Involvement In BRATZ Design

#### (a) February 2001 – Mattel sees the BRATZ at the Toy Fair

When he left Mattel in October 2000, Bryant told Mattel, and Mattel understood, that he was leaving to work on a line of dolls.  (UF ¶¶ 27-28.)  His supervisors suspected he was going to work for a competitor (UF ¶ 29), and the rumor within Mattel was that the competitor was MGA.  (UF ¶ 30.)  Soon thereafter, beginning in early 2001, MGA unveiled BRATZ prototypes at a series of toy fairs, first in Hong Kong in January 2001 and then in New York in February 2001.  (UF ¶¶ 31-32.)  Immediately following these initial exhibitions, MGA and the BRATZ received considerable publicity, appearing on a nationally syndicated clip of Toy Fair highlights hosted by "Toy Guy" Chris Byrne (Ex. 67), and in several public media sources (UF ¶ 35).  Larian began speaking publicly on behalf of MGA and BRATZ as early as February 2001.  (UF ¶ 36.)

Mattel attended the New York Toy Fair.  (UF ¶ 34.)  While there, MGA offered Mattel the opportunity to license and distribute the BRATZ.  (UF ¶ 37.)   Although Mattel apparently initially jumped at the chance to sell BRATZ, in March of 2001 Mattel wrote to MGA and stated that it would not license and distribute BRATZ because "some products are very similar to our own concepts and this is a very sensitive issue with the brand groups (Bratz and Samantha)."   (Id.)  Despite declining to distribute the BRATZ, Mattel nonetheless (unbeknownst to MGA) placed the BRATZ line into the Mattel product system, which came to light in April 2001, when MGA "received an e-mail today from a friend at Mattel who was surprised to find our Bratz and Scooter Samantha products loaded in the Mattel system after information had been

EXHIBIT ____1____
PAGE ____25____

received by Mattel Latin America." (UF ¶ 38.)

**(b)    June 2001 – BRATZ release in Spain piques Mattel's interest**

MGA spent the spring of 2001 finalizing the BRATZ, and released the first dolls to the consumers in Spain in June 2001. (UF ¶ 39.) This initial release caught the eye of a key Mattel employee, Adrienne Fontanella, who was the head of Mattel's Girls' Division. (UF ¶ 40.) By July 2001, although BRATZ had not yet been launched in the United States, Mattel's Marketing Division was well aware of its existence, and had begun monitoring BRATZ as a competitor of Barbie. (UF ¶ 41.) Fontanella's deposition testimony confirms Mattel's very early interest in BRATZ:

> Q. And did there come a time that you saw a BRATZ? A. Yes. Q. And where was that? A. I don't recall exactly but it was sometime probably in July. Q. July of 2001? A. Yes. Q. At that point was this one that was being marketed in the United States? A. No. Q. How did you get this first BRATZ? A. I had worldwide obviously responsibility and we had a – regular meetings where we met with our international marketing counterparts and they brought the doll to the attention and then I think they sent it to the Marketing group because we were always looking at anything competitive on the marketplace even if it was regional. Q. And so when you got to see BRATZ for the first time others in the Marketing group saw it as well? A. Yes.

(Id.) While the precise substance of Mattel's internal meetings regarding MGA and BRATZ in the summer of 2001 is unknown because Mattel did not produce its files, Mattel was closely watching MGA and BRATZ. Indeed, even Mattel's Chairman and CEO, Robert Eckert, knew about BRATZ "sometime in 2001" (UF ¶ 42) and even knew that BRATZ had gained market share on Barbie "in 2001." (UF ¶ 44.)

**(c)    BRATZ are introduced to the American market**

In the fall of 2001, BRATZ were released in the United States to widespread acclaim, with toy analysts predicting that the dolls would be a top-seller during the 2001 holiday season. Indeed, upon MGA's initial release of BRATZ in the U.S., the American media placed the dolls on the short list of hit toys for 2001. (UF ¶ 45.) Moreover, MGA's BRATZ dolls were named as one of the "Hot 1's To Watch" by an American news source in October 2001. (Id.) BRATZ rounded out 2001 with strong holiday sales and earned a coveted Toy of the Year nomination from the Toy Industry Association. (UF ¶ 45 ("'There's no rest in this business,' says MGA Head Elf, er, President Isaac Larian. 'We've had a fantastic year (in 2001), and we expect to double

EXHIBIT ____1____

PAGE ____26____

our business next year.'").)  The "rumblings" at Mattel about BRATZ were widespread by this time. (Ex. 18 (Simpson-Taylor) at 102:12-23, 103:3-19.)

### (d)   Mattel immediately concludes that BRATZ was copied from Mattel dolls

Mattel's immediate reaction upon seeing the first BRATZ dolls in 2001 was that they had been copied from Mattel's line of "Diva Starz" or "Toon Teens" dolls. (UF ¶ 47.) Ivy Ross, a former VP of Product and Visual Design at Mattel, believed it had been copied by BRATZ (UF ¶ 48), as did Lilly Martinez, Mattel's Design Manager and creator of Mattel's "Toon Teens." (UF ¶ 49.) On August 14, 2001, Debbie Hastie, a senior manager of the Mattel Product Design in the Design Center, wrote to Elise Cloonan, a Mattel designer that she believed BRATZ resembled Lilly Martinez's Toon Teens dolls. (UF ¶ 50.)[7] Even a reporter noted, "[w]hen I first saw BRATZ dolls at the Toy Fair this year, they reminded me of Mattel, Inc.'s electronic talking Diva Starz dolls." (UF ¶ 51.)

### (e)   It was "common knowledge" within Mattel in 2001 that Bryant created BRATZ

Shortly after Mattel's marketing department became aware of the BRATZ, word spread throughout Mattel that Carter Bryant was the creator of the BRATZ:

- Elise Cloonan testified that in 2001 it was "common knowledge" at the Mattel Design Center that Bryant was behind BRATZ, and that "everybody was abuzz" about BRATZ as a result. (UF ¶ 53.) The "rumor mill," as Cloonan put it, did not consist of simply "one or two people," but 10 to 20 within Mattel's Design Center and "[w]hen you hear [it] from 10 and 20 people, you figure it's probably true." (UF ¶ 53.)

- It was widely rumored within Mattel between Bryant's departure in October 2000 and the release of BRATZ in 2001 that Bryant was involved with MGA on the BRATZ, because when Mattel employees "heard that Carter Bryant was at MGA and... that there was now a fashion doll product from MGA, [they thought] that he may have been

---

[7]   See Ex. 28 (e-mail dated August 14, 2001 from Debbie Hastie to Elise Cloonan) ("[D]id you see the dolls by MGA called 'Brats'?  They look really close to Lillypad's Toon Teens.  I mean really close.  The face paint, eyes especially look like Lilly painted them herself.  They even have the same big feet that somehow bothered Mattel execs.  And they don't even have a feature.  Something that Mattel execs also were on our backs about.").

EXHIBIT ___1___
PAGE ___27___

involved in that fashion doll." (UF ¶ 54.)

- Ann Driskill, Mattel's Senior Director in Collectibles Division, testified that "after the [BRATZ] dolls came out" someone at Mattel told her Bryant had created them. (UF ¶ 52.)

- Margaret Leahy, a former Mattel designer, testified that in the summer of 2001, after she had gone to MGA, a friend from Mattel, Roxanna Powell, was "grilling" her "like somebody put her up to it," about whether "Carter [was] the designer on the doll or what was [MGA employee and former Mattel employee] Paula [Garcia's] involvement" in BRATZ. (UF ¶ 55.) Leahy testified that she confirmed to Powell that Bryant had indeed created the BRATZ dolls "as we know them now." (Id.)

Mattel was abuzz[8] about MGA's success with the BRATZ line and the competitive implications of that success, but once numerous Mattel employees confirmed that Bryant was indeed the creator of BRATZ, Mattel's interest in MGA and the genesis of BRATZ grew from a rumble to a full blown investigation.

### 3. In March 2002, Mattel Launches An Internal Campaign To Investigate Its Alleged Rights In the BRATZ, Bryant's Creation Of The BRATZ Concept And MGA's Role In Its Development

Toward the end of 2001 and continuing into early 2002, Mattel's Legal and Investigations Departments became involved in Mattel's ongoing inquiry into MGA's creation of BRATZ. (UF ¶ 56.) On March 15, 2002, Robert Simoneau, a Mattel employee in charge of Mattel's internal investigations, opened a formal "Incident Report" to investigate the alleged theft of proprietary information by Bryant. (UF ¶ 57.)[9]

Case No. 02-115, as it was called by Mattel, involved an investigation initiated pursuant to "[i]nformation received from Design Center staff, Evelyn Viohl and Ivy

---

[8]    UF ¶ 53 (citing Ex. 11 (Cloonan) at 315:10-316:18 ("A. I mean, I remember having conversations about it with Roxanna Powell, Bill Greening, and Janet Blaser, because I remember them constantly going 'Come on, come on, you know, you knew him, you had to have known something.'"), 316:10-316:18 (naming ten individuals who approached her about Bryant's involvement).)

[9]    Mattel has steadfastly refused to produce all the details concerning its investigation, and a motion to compel production of the withheld materials is scheduled to be heard after the filing of this motion. Once MGA has gained access to these materials, it will supplement its presentation to the Court with the newly obtained evidence.

EXHIBIT ___1___
PAGE ___28___

Ross that MGA Entertainment, headed by a person know as Isaac [Larian] has recently hired a number of former Mattel employees and is manufacturing products that appear to be Mattel designs." (UF ¶ 58.)  Larian is even listed on the report as a "suspect." (UF ¶ 59.)  Shortly after opening the investigation, Simoneau met with several Mattel design employees, who informed him they believed that Bryant had "plagiarized" an earlier design by Lilly Martinez when he created BRATZ for MGA.[10]  Counsel for Mattel also attended meetings regarding the investigation.  (UF ¶ 64.)[11]  Richard De Anda, head of Mattel's Security, also testified that Mattel's investigation of Bryant and MGA, as "a person of interest and a company of interest" for their work on BRATZ, began no later than March 2002.  (UF ¶¶ 62-63.)  Mattel confirmed in its discovery responses that this investigation, which, as the evidence shows, included inquiries into the activities of Carter Bryant and Isaac Larian, continued into the spring of 2002.  (UF ¶ 67.)  This investigation even involved Mattel's outside counsel, Michael Zeller.  (UF ¶¶ 66, 68.)

In August 2002, Mattel CEO Robert Eckert received an anonymous letter, in which Bryant is again accused of having created BRATZ while employed by Mattel and bringing it to MGA.  (UF ¶ 69.)  The letter specifically alleged that Bryant, a former Mattel employee, had taken the BRATZ concept to MGA Entertainment, confirming for Mattel's highest authority what nearly a year of "rumor and innuendo" had already revealed – that Bryant, Isaac Larian, and MGA had turned Bryant's idea into a highly successful line of dolls.  Eckert forwarded the letter to Alan Kaye, Senior Vice President of Mattel's Human Resources Department, and Kaye sent it to Richard De Anda, Mattel's' Head of Security, for further investigation.  (UF ¶¶ 70-71.)  De Anda wrote to Kaye regarding the letter, indicating that he had been "aware of this situation and ha[d]

---

[10]   UF ¶¶ 60-61 ("3/20 Met w/Ivy Ross on this case & discussed IP Protection Program. 3/28 Met w/ Cassidy Park [Mattel's VP of Product Design] to get more info on MGA issue. She suggested Carter Bryant as illustrator/former employee who may have plagiarized design of Lilly Martinez and created 'BRATZ' dolls for MGA.").

[11]   As part of his follow up, De Anda contacted an attorney in Mattel's Legal Department, Michelle McShane, who informed him she was already aware of the issue, and they arranged a meeting with Ivy Ross, Cassidy Park and Robert Simoneau "to try to understand – have a better idea of – of what they were communicating to us with regards to Carter Bryant utilizing or copying L[illy] Martinez's Tune Teens while at MGA to create Bratz" and agreed that Ms. McShane "would take the next step" in the investigation.  (UF ¶ 65.)

EXHIBIT ___1___
PAGE ___29___

been working on it for several months," and that "[t]he truth of the matter is that Carter Bryant did work for Mattel." (UF ¶ 73.) Further, Mattel admits that if the allegations in the letter were true, then Mattel would have been on notice of the same claims that it is asserting in this case. (UF ¶ 72.) Yet Mattel did nothing at all.

### 4. Mattel Continues To Be Bombarded With Public Information About MGA, Larian And BRATZ Until It Sued Bryant in April 2004

From August 2002, when Mattel's CEO received the anonymous letter accusing Bryant and MGA of wrongfully appropriating the BRATZ concept, to April 2004, when Mattel filed suit against Bryant,[12] Mattel was already familiar with MGA and BRATZ. (UF ¶ 78.)[13] By 2003, Mattel's flagship – the Barbie doll – had begun to lose market share to BRATZ. (UF ¶ 74.) In October 2003, Mattel re-hired Tim Kilpin to head up its Girls' Division to help revive the Barbie brand. (UF ¶ 75.) Kilpin, who had known Larian was involved with BRATZ from December 2001, was acutely aware of BRATZ' new-found dominance, having personally congratulated Larian on the success of BRATZ vis-à-vis Barbie in a December 12, 2001 e-mail. (UF ¶ 76.) With Kilpin at the helm, even Mattel was forced to admit that its knowledge of the circumstances surrounding its potential claims against Bryant, MGA, and Larian was complete. (Ex. 40 (Mattel's Supp. Resps. to MGA's First Set of Interrogs., Supp. Resp. No. 10.)[14]

---

[12]    Mattel admits in its 2004 Complaint, filed on April 27, 2004 as Case No. 04-9059 SGL (RNBx) (the "'04 Action") in California state court (hereinafter, the "'04 Complaint") against Bryant only, that it understood Bryant to have worked with a "competitor" in developing a concept while under agreement with Mattel. See '04 Compl. ¶ 12. This is clearly a reference to MGA who, as described above, Mattel had known since early 2001 was involved with BRATZ and Bryant.

[13]    See Paschal, With BRATZ, a toy maker's dreams come true, Reuters (February 14, 2002); Verdon, The dish on the DOLLS; the claws come out in the fashion toy competition; The lowdown on the high-fashion dolls, The New Jersey Record (November 23, 2002);; Bannon, Fashion Coup?  New Doll Grabs Some of Barbie's Limelight, Wall Street Journal (November 29, 2002); Bannon, Is It a Fashion Coup? Sassy BRATZ Grab Some of Barbie's Limelight – Upstart is Reaching Preteens With Street-Smart Look for Toy, Wall Street Journal (December 2, 2002); Tkacik, Dolled Up: To Lure Older Girls, Mattel Brings in Hip-Hop Crowd; It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'BRATZ': Battle of the Big Heads, Wall Street Journal (July 18, 2003); Goldman, BRATZ Dolls' Little Sisters to Challenge Barbie, Los Angeles Times (December 4, 2003); Hopkins, Look for BRATZ Story on the Silver Screen, The Daily News of Los Angeles (February 13, 2004); O'Neal, BRATZ packers are what's cool in a doll world, Chicago Sun-Times (March 5, 2004).

[14]    Despite everything Mattel knew of MGA and Bryant, it failed to register its alleged copyrights in Bryant's drawings until October 30, 2006. (UF ¶ 80.)

EXHIBIT  1
PAGE  30

### 5.   Barbie's "House Is On Fire" Due to Brisk Sales of BRATZ

Although Mattel had known all along about MGA and Bryant's success with BRATZ, when Kilpin took over the Girls Division, he quickly impressed upon everyone how BRATZ was destroying Barbie's market share. (UF ¶ 77.) In the months after Mr. Kilpin joined Mattel, Barbie's sales plummeted, giving Mr. Kilpin cause to up the ante and scream "fire!" in a crowded, and battered, doll house. (UF ¶ 77 (citing Ex. 35 ("2005 Barbie Spring Line Review," dated April 15, 2004), indicating that "The House is on Fire," that "Barbie is losing key attribute ratings with girls" and that "BRATZ is gaining share with core 5-8 year old girls."), Ex. 14 (Kilpin) at 235:19-22 ("Q. And what did you mean by 'The House is on Fire!'?  A. It's the same meaning as a brand in crisis in my view.")); see also UF ¶ 79.) By April 2004, then, Mattel was digging in for a full scale "Battle of the Dolls," to save its "meal ticket." (Ex. 70.)

In April 2004, internal Mattel reports noted in panic that, "Market share has dropped at a chilling rate." (Ex. 35.)  These same reports made clear how dire the competition Barbie faced was to Mattel's survival: a "rival-led Barbie genocide rapidly grows", and so Mattel concluded that its response to this competition "must be ... ruthless," "this is war and sides must be taken." (Id.) Unfortunately for Mattel, given the tremendous success of BRATZ, and the uniformly held view that MGA's genius in marketing, packaging, and fashion accessories for the line were the best in the business, even Mattel's own executives concluded that "[w]e have been out-thought and out-executed." (Ex. 33.)  So Mattel did what it always does when competition looms: it filed a lawsuit to drive its competitor out of business.  Indeed, discovery in this case revealed that Mattel expressly considered litigation as a means of driving MGA and BRATZ out of the market so that Barbie could reclaim her lost luster:

> There w[ere] competitive issues such as Bratz that were forcing the decline of Barbie.  Some of the comments around what the company was doing over and above our distribution problems were to face off with MGA with litigation as a business strategy.  That would be – it wouldn't be discussed much beyond that, but one of the strategies for trying to defeat Bratz was to litigate them to death.  To litigate the owners or to litigate MGA to death and that was one of the business strategies.

(Ex. 21 (Brawer) at 232:19-233:22.)

EXHIBIT ___1___
PAGE ___31___

6.   **The History of the Litigation at Hand**

The earliest pleading in these consolidated proceedings is Mattel's '04 Complaint, filed on April 27, 2004 against a single defendant – Bryant – and ten "Doe" defendants. Mattel's claims in that action focused on Bryant's involvement with an unnamed "competitor", which allegedly received from Bryant Mattel's intellectual property; this Complaint further alleged that Bryant used "Mattel's property and resources" for the benefit of himself and the aforementioned "competitor", and that Bryant "converted" Mattel's "intellectual property and intangible property" by "asserting ownership" of that property and providing it to "others." ('04 Compl. ¶¶ 12, 18, 23, 24, 30, 31, 36, 41 & 42.)

The '04 Complaint specified that no later than November 2003 Mattel already knew that "Bryant had secretly aided, assisted and worked for a Mattel competitor . . . by entering into an agreement with the competitor, during the time [he] was employed by Mattel." (Id. ¶ 12.) Mattel also knew that "Bryant's agreement with the competitor obligated Bryant to provide product design services to the competitor on a 'top priority' basis." (Id.)   Mattel also knew that Bryant's agreement with that competitor "provided . . . that Bryant would receive royalties and other consideration for sales of products on which [he] provided aid or assistance; that all work and services furnished by Bryant to the competitor under the agreement would be considered 'works for hire'; and that all intellectual property rights to preexisting work by Bryant purportedly would be assigned to the competitor." (Id.)   Mattel sought damages for the alleged misappropriation of its property and an injunction against Bryant and "those acting in concert and participation: with him, prohibiting them from "continuing to benefit from" Bryant's alleged misappropriation. (Id. ¶¶ 19, 27, 29, 34 & 45.)

Mattel thus was clearly on notice of the facts underlying its current claims against MGA and Larian by the time it filed the '04 Action; given that knowledge, Mattel's refusal to identify the alleged competitor it knew so much about could only be viewed as a strategic choice.  Mattel candidly admitted in its motion for leave to assert the claims at issue here that the discovery obtained by Mattel after it filed the '04 Complaint only "confirmed" what it had already suspected; namely, that "Bryant created BRATZ designs, and aided MGA, during his Mattel employment and that he did so using Mattel

EXHIBIT ___1___
PAGE ___32___

resources." (Memorandum of Points and Authorities in Support of Mattel, Inc.'s Motion for Leave to File Amended Complaint, at 5:7-10 (emphasis added).)

On May 14, 2004, Bryant filed its first notice of removal to this Court. On August 20, 2004, the action was remanded back to state court. Upon remand, Bryant counterclaimed against Mattel, asserting that the employment agreements at issue were invalid.[15] After an initial round of preliminary discovery, Bryant filed his second notice of removal on November 2, 2004.[16] Soon thereafter, the parties agreed that MGA would intervene "as a procedural matter" only.[17] On December 1, 2004, Mattel again moved to remand; that motion was denied by Judge Manella on March 4, 2005, whose decision was affirmed by the Ninth Circuit on May 2, 2006. See Mattel, Inc. v. Bryant, 441 F. Supp. 2d 1081 (C.D. Cal. 2005), aff'd, 446 F.3d 1011 (9th Cir. 2006).

On April 13, 2005, MGA filed its complaint against Mattel, alleging that Mattel had engaged in copycatting of MGA's BRATZ line of dolls and other wrongful behavior designed to stifle MGA as a competitor. (See MGA's Complaint in Case No. 05-2727 SGL (RNBx) (the "'05 Action").) MGA is the sole plaintiff in the '05 Action. On May 13, 2005, Mattel filed its original answer in the '05 Action (the "'05 Answer"). The litigation was thereafter stayed on May 20, 2005, while the appeal before the Ninth Circuit was pending. Notwithstanding the stay, on September 19, 2005, Mattel filed an amended answer in the '05 Action. The stay was lifted after the Ninth Circuit's opinion came down on May 2, 2006, and the Court consolidated the three cases filed to date on June 19, 2006. (Order Consolidating Case Nos. CV 04-9049, CV 04-9059, and CV 05-2727, dated June 19, 2006.)

On November 20, 2006, Mattel – for the first time in the *two and a half years*

---

[15]   See Bryant's Cross-Complaint dated August 24, 2004, Case No. 04-9059 SGL (RNBx). These counterclaims were dismissed along with Bryant's declaratory action on July 18, 2006. See Order Granting Mattel's Motion to Dismiss Bryant's Action for Declaratory Relief and Counterclaims, dated July 18, 2006.

[16]   On the same day, Bryant filed a complaint in federal court seeking a declaratory judgment that BRATZ do not violate Mattel's copyright. See Bryant's Complaint in Case No. in Case No. CV 04-9040, dated November 2, 2004.

[17]   See Stipulation and Order dated December 7, 2004, at 1:10-11, 1:14-15. Mattel was on notice that MGA did not consider Mattel's claims to be asserted against it via this procedural maneuver.   See Mattel, Inc., 446 F.3d at 1013 (on appeal taken after MGA's procedural intervention, noting MGA's argument that "Mattel seeks no relief from MGA").

---

EXHIBIT ___1___
PAGE ___33___

since the inception of this litigation – moved to assert claims against MGA and Larian. These claims focus on Mattel's claim of ownership of the BRATZ and allegations of infringement thereon by MGA and Larian.  Mattel also claims that MGA and Larian induced Bryant's breach of contract, fiduciary duty and duty of loyalty by collaborating with him on the BRATZ's development while Bryant was still in Mattel's employ; and engaged in conversion and unfair competition based on their role in Bryant's development of the BRATZ.  (Mattel, Inc.'s Second Amended Answer in Case No. 05-2727 and Counterclaims ("SAA") ¶¶ 82-170.)  On January 12, 2007, this Court granted Mattel leave to assert these claims as counterclaims in the '05 Action.

## ARGUMENT

### I.    ALL CLAIMS AGAINST MGA AND LARIAN ARE TIME-BARRED

The policies behind the statute of limitations considerations are well-known:

> Statutes of limitations, which "are found and approved in all systems of enlightened jurisprudence," represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that "the right to be free of stale claims in time comes to prevail over the right to prosecute them." ... [A]lthough affording plaintiffs what the legislature deems a reasonable time to present their claims, ... [these statutes] protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

U. S. v. Kubrick, 444 U.S. 111, 117 (1979).  The California Supreme Court is similarly adamant when it comes to keeping stale claims out of court.  See, e.g., Liberty Mut. Ins. Co. v. Fales, 8 Cal. 3d 712, 718 (1973) (statutes of limitations "are designed to promote justice by preventing the revival of hoary claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared").

Mattel's claims are all, on their face, time-barred.  The longest statute of limitation applicable here is four years, but it was not until November 20, 2006 – *i.e.*, over *five and a half* years after Mattel was on notice of its claims and more than *two and a half* years after Mattel first ventured into the litigation fray on its all-or-nothing war to eliminate BRATZ from its path on the way to world-wide doll hegemony, that Mattel first asserted its claims against MGA or Larian.  As shown herein, Mattel was on

EXHIBIT ____1____
PAGE ____34____

notice of its claims as early as February 2001 and no later than March 2002. Thus, the only way Mattel's claims can survive is if they relate back to Mattel's complaint in the '04 Action or its original answer filed in the '05 Action.[18]

However, neither of these pleadings saves Mattel's claims. First, most of Mattel's claims expired before the '04 Complaint, the earliest pleading filed in this litigation. Second, Mattel's claims cannot relate back to the '04 Complaint because both MGA and Larian are new parties to that action, and Mattel cannot prove that they were omitted from its '04 Complaint due to a mistake in identity, as is required for "relation-back" of claims against new parties asserted under federal law or for substitution of "Doe" defendants under California law.[19] Third, as for the '05 Action, wherein Mattel's claims are designated as counterclaims, Mattel's claims against Larian cannot relate

[18]    In its January 12, 2007 Order, the Court acknowledged the possibility of "relation back" to either of the pleadings, but denied Mattel's request to amend the '04 Complaint based on the judicial economy considerations. See January 12, 2007 Order at 13-15, 21-22. The Court suggested, however, that Mattel's claims against MGA and Larian could relate back to the '04 Complaint under Rule 15(c) of the Federal Rules of Civil Procedure as arising "out of the same conduct or transaction" contained in the '04 Complaint. Id. at 13-15. At the same time, the Court did not reach the issue of whether Rule 15(c)'s additional requirements for "relation back" of claims against new parties were satisfied. While the Court did touch on this issue under California law when dealing with addition of MGA and Larian as "Doe" defendants, see id. at 15-16 n.5, the Court did not have the benefit of the evidence set forth herein, establishing that Mattel was on notice of both the identity of MGA and Larian, as well as their involvement with Bryant in developing the BRATZ line of dolls, which alters the Court's prior analysis.

[19]    The timeliness of Mattel's first counterclaim for copyright infringement asserted under the Copyright Act is governed by federal law. See 40235 Washington Street Corp. v. Lusardi, 1999 WL 33633157, at *5 (S.D. Cal. Jan. 19, 1999) ("With federal question cases, federal common law determines whether a counterclaim 'relates back' to the date the action was commenced for statute of limitation purposes."); accord South Carolina v. Catawba Indian Tribe, 476 U.S. 498, 518 (1986) (for federal claims, "the statute of limitations is ... a matter of federal law"). Mattel's reliance on Lindley v. General Elec. Co., 780 F.2d 797, 800-01 (9th Cir. 1986) (cited in its Nov. 19, 2006 Mem. of Points and Authorities in Support of Mattel, Inc.'s Motion for Leave to File Amended Compl. at 12 n.43) for the proposition that California relation back standard applies insofar as its First Counterclaim is concerned is misplaced because Lindley was a diversity action dealing with California state law claims. Cf. Mattel's SAA ¶ 6 ("This Court has federal question jurisdiction over this action pursuant to . . . 17 U.S.C. §§ 101 et seq. . . . This Court has supplemental jurisdiction over Mattel's state law claims"); see also StreamCast Networks, Inc. v. Skype Techs., S.A., No. CV 06-391 FMC (ex), Mem. Op. at 10-11 (C.D. Cal. Sept. 14, 2006) (Ex. 69) (where plaintiff asserts both federal and California law claims, "relation-back" of the federal claims is governed by F.R.C.P. 15). However, as Mattel's other Phase I counterclaims are governed by California law, it is California law that determines their timeliness. See Fed. R. Civ. P. 15(c)(3), advisory committee notes (1991 Amendments).

back as a matter of law because Larian is not a plaintiff in that action and not an "opposing party" within the meaning of Rule 13 of the Federal Rules of Civil Procedure.[20]

**A.     Mattel Was On Notice Of Its Claims For Statute Of Limitations Purposes As Early As February 2001 And No Later Than March 2002**

Mattel has known or, at least, should have known of the facts underlying its claims against MGA and Larian as early as February of 2001, but in no event later than March 2002. Under the "discovery rule," which is applicable to most California causes of action,[21] a claim accrues when the party asserting it "has, or should have, inquiry notice of the cause of action." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807 (2005). Inquiry notice is triggered by a *mere suspicion* or any reason to *suspect* that wrongdoing has taken place. See Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1111 (1988) ("[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights") (emphasis added); see also Fox, 35 Cal. 4th at 803 ("a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action") (emphasis added).[22]

Here, the undisputed record shows that Bryant told Mattel in October 2000 that he was leaving to design a line of dolls. (UF ¶ 27.) The personnel supervising Bryant

---

[20]    Although in its January 12, 2007 Order (at p. 22) the Court noted that "[n]one of the substantive concerns raised by MGA and Bryant" such as the statute of limitations issue "would appear to be affected" if Mattel's claims were filed as counterclaims in the '05 Action, the Court did not appear to reach the issue of such concerns as applicable to Larian (as opposed to MGA), who was an entirely new party for purposes of the '05 Action.

[21]    The "discovery" rule does not apply to Mattel's claims for intentional interference with contract, conversion and statutory unfair competition, as these claims accrue upon the alleged wrongful act. (See infra Section I.B.)

[22]    Under federal law, which governs Mattel's copyright claim, the general standard is similar in that the statute of limitations is triggered when a plaintiff discovers, or reasonably could have discovered, the infringement. See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 706 (9th Cir. 2004); see also Roley v. New World Pictures, Ltd., 19 F.3d 479, 481 (9th Cir. 1994) (copyright infringement claims accrue "when one has knowledge of a violation or is chargeable with such knowledge"). However, because, as shown below, Mattel's copyright infringement claim is essentially a claim for copyright ownership, here the claim of copyright infringement accrued upon MGA's repudiation of Mattel's ownership in BRATZ, which occurred as soon as the dolls entered the market (see infra at pp. 24-25).

---

EXHIBIT ___1___

PAGE ___36___

had no doubt that he was going to a competitor (UF ¶¶ 28-29) and believed it to be MGA (UF ¶ 30). A little over two months after Bryant left to "to work on [his] own doll line," prototypes of the BRATZ dolls were exhibited by MGA at the Hong Kong and New York Toy Fairs in January and February 2001, respectively. (UF ¶¶ 31-32.) The New York Toy Fair is where speculation in the media started about alleged similarities between the BRATZ and Mattel's internal projects. (UF ¶ 51 ("When I first saw the Bratz dolls at Toy Fair this year, they reminded me of Mattel Inc.'s … Diva Starz dolls.").) At the same time, in February of 2001, Larian began generating publicity as the man behind MGA's BRATZ dolls. (UF ¶ 36.)

Mattel not only attended the New York Toy Fair (UF ¶ 34), it actually saw the BRATZ and discussed with MGA that Mattel might carry and sell BRATZ (UF ¶ 37). In March 2001, shortly after the fair, Mattel wrote MGA saying that Mattel would not carry BRATZ, noting that BRATZ "are very similar to our [Mattel's] own concepts and this is a very sensitive issue with the brand groups." (Id.) Despite not wanting to distribute BRATZ because of supposed similarities to Mattel's own products, Mattel apparently surreptitiously placed the BRATZ line into Mattel's computer systems, a fact that MGA confronted Mattel about in early April 2001. (UF ¶ 38 (expressing to Mattel that MGA "was surprised to find our Bratz and Scooter Samantha products loaded in the Mattel system after information had been received by Mattel Latin America").)

The undisputed record shows that Mattel's designers and executives (including the head of its Girls' Division) believed as soon as the BRATZ was first publicly unveiled (i.e., at the Toy Fairs) that the BRATZ was copied from Mattel products. (UF ¶¶ 47-50.)[23] That Mattel was concerned in early 2001 that the BRATZ supposedly was based on Mattel designs is confirmed by the fact that Mattel was writing to MGA as early as March 2001 expressing that the BRATZ was "very similar" to Mattel's own

---

[23]    See UF ¶¶ 42, 47 (citing Ex. 22 (Nordquist) at 195:5-17, 196:16-22 ("I thought they looked like they were a knockoff of Diva Starz."), Ex. 8 (Fontanella) at 93:13-94:22 (the Head of Mattel's Girls Division recalled her reaction upon seeing the BRATZ soon after their release that the BRATZ "copied Diva Starz"). Even Mattel's CEO had heard of BRATZ and MGA "sometime in 2001." Ex. 9 (Eckert) at 33:10-22 ("Q. Do you have – when did you first hear of BRATZ? A. I don't remember. Q. Can you give me a ballpark? A. Yes. Q. When was that? A. Sometime in the year 2001. Q. Is it possible that you heard of BRATZ in the year 2000? A. Yes. Q. But your best estimate is that you first heard of BRATZ in 2001, correct? A. Yes.").

products. The undisputed record also shows that as of the time in 2001 of the first release of the BRATZ (i.e., the Toy Fairs), it was "common knowledge" within Mattel that Bryant was working at MGA and was the designer of the BRATZ. (UF ¶¶ 52-54.)

The undisputed record reveals other facts that should have made Mattel "suspicious" about potential BRATZ-related claims against MGA, Larian, and Bryant as soon as BRATZ was unveiled in early 2001. For instance, Mattel certainly understood how long it takes to make a line of dolls (from 3 to 9 months Mattel has stated). Mattel understood that a line of dolls emanates from a sketch (Declaration of C.M. Anderson in support of Bryant's Motion for Partial Summary Judgment, dated March 7, 2008, Ex. 19 (Hoffman-Briggs Depo. at 56:25-57:7 ("So the designer creates a preliminary sketch of the doll? A. Yes.").) Mattel knew that Bryant was a designer who made sketches of doll lines (Bryant UF ¶ 31) and that BRATZ came on the market less than three months after Bryant left Mattel, where he had worked for a year and a half before BRATZ came on the market (id. ¶ 27). Mattel is a hands-down leader in suing potential infringers. (Ex. 70.) Thus, Mattel certainly had reason to suspect, upon seeing a new line of fashion dolls at the New York Toy Fair, that Bryant might have been the creator and that he potentially had done sketches on this line while at Mattel that he then gave to MGA. (See generally UF ¶¶ 27-41.) Consequently, Mattel's attendance at the New York Toy Fair was sufficient to place it on notice of its potential infringement claims as early as February 2001. Polar Bear Prods., 384 F.3d at 707 (attendance at trade show sufficient "discovery" to start statute of limitations on copyright infringement claim).

Mattel's knowledge or, at the very least, reasons to suspect MGA and Larian in the alleged wrongdoings continued to accumulate thereafter. By March 15, 2002, the facts known to Mattel materialized into its launch of a formal investigation into MGA and Larian's involvement in Bryant's creation and development of the BRATZ. (UF ¶¶ 56-58.) This launch of Mattel's formal investigation begs the following question: what more could one ask for to satisfy the "inquiry" notice standard, when the plaintiff, as Mattel did here, *actually inquired* into the circumstances surrounding the claims at issue? Indeed, at the time Mattel launched this formal investigation, Mattel found itself

EXHIBIT __1__
PAGE __38__

well beyond the required suspicion about the activities of MGA and Larian – as, by that time, it did not merely suspect the facts underlying its claims here, but took the matter even further and actually inquired into the circumstances surrounding the creation of BRATZ, as well as the role MGA and Larian played in their development and release.[24] It is possible that Mattel's investigation turned out to be extraordinarily inept (they were, after all, "out-thought and out executed" by MGA) – so much so that it did not discover the facts until four and a half years later, when it finally moved to assert its claims against MGA and Larian on November 20, 2006.  That, however, does not stop the clock on Mattel's claims.  Cf. Fox, 35 Cal. 4th at 803 (requiring a "reasonable" investigation).  Thus, there is no genuine issue that Mattel's claims accrued by March 15, 2002.

> **B.**    **As Mattel Was On Notice Of Its Claims By March 2002, Its Claims Are Time-Barred, Unless They Relate Back To An Earlier Pleading**

As Mattel did not assert its claims against MGA and Larian until November 20, 2006, those claims are time-barred, insofar as the statutes of limitations governing these claims range from two-years to four-years.  Thus, Mattel's longest surviving claim went stale no later than March 2006, more than *half a year before* Mattel first raised its claims here.  Thus, unless these claims relate back relate back to an earlier pleading – and, as shown below, they do not – they must be dismissed.

> **1.**    **Mattel's Sixth, Eighth, and Tenth Counterclaims are time-barred by their respective two-year statutes of limitations and cannot be saved by any "relation-back" rules**

>> **(a)    Mattel's Sixth Counterclaim for Intentional Interference with Contract is time-barred**

Mattel's Sixth Counterclaim asserts a cause of action for intentional interference with contract under California law.  (SAA ¶¶ 122-128.)  As such, it is governed by a two-year statute of limitations.  See Cal. Civ. Proc. Code § 339(1); Tu-Vu Drive-In Corp.

---

[24]   Compare Order Denying Defendants' Motion for Termination Sanctions, dated August 29, 2007 (observing that the internal investigation "may have raised suspicion on Mattel's part" concerning its claims) (emphasis added), with Jolly, 44 Cal. 3d at 1111 (inquiry notice is triggered by suspicion: "[o]nce the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights").

EXHIBIT ___1___
PAGE ___39___