578



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

**CERTIFIED COPY**

- - -

HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

- - -

MATTEL, INC.,                          )   PAGES 578-676
                                       )
                    PLAINTIFF,         )
                                       )
          VS.                          )   NO. CV 04-09049
                                       )
MGA ENTERTAINMENT, INC., ET. AL.,      )
                                       )
                    DEFENDANTS.        )
_____)   MORNING SESSION
AND CONSOLIDATED ACTIONS,              )
_____)


REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

RIVERSIDE, CALIFORNIA

THURSDAY, MAY 29TH, 2008

8:50 A.M.


THERESA A. LANZA, RPR, CSR
FEDERAL OFFICIAL COURT REPORTER
3470 12TH STREET, RM. 134
RIVERSIDE, CALIFORNIA   92501
951-274-0844
WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF MATTEL, INC.:

 4                        QUINN EMANUEL
                         BY:  JOHN QUINN
 5                             JON COREY
                              MICHAEL T. ZELLER
 6                             HARRY OLIVAR
                              TIMOTHY ALGER
 7                        865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                        LOS ANGELES, CALIFORNIA  90017
                         213-624-7707

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                             JASON RUSSELL
                              RAOUL KENNEDY
13                             LAUREN AGUIAR
                         300 SOUTH GRAND AVENUE
14                        LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
15

16

17

18

19

20

21

22

23

24

25
```

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

580

```
1                          I N D E X

2                                              PAGE

3   PLAINTIFF CASE (CONT'D)......................   589

4

5

6

7   PLAINTIFF
    WITNESS          DIRECT      CROSS     REDIRECT      RECROSS
8   PAULA DIANTHE GARCIA  (CONTINUED)

9   BY MR. PRICE          589

10

11

12

13            EXHIBITS            RECEIVED

14            1765                  627
              30                    631
15            323                   641
              1136                  647
16            1135                  647
              1105                  648
17            321                   654
              324                   657
18            325                   657
              924                   658
19            606                   661
              923                   667
20            1103                  671

21

22

23

24

25
```

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1    RIVERSIDE, CALIFORNIA; THURSDAY, MAY 29TH, 2008; 8:50 A.M.

2                            -oOo-

3         (WHEREUPON, THE CASE HAVING BEEN PREVIOUSLY

4         CALLED AND APPEARANCES GIVEN, THE FOLLOWING

5         PROCEEDINGS WERE HELD:)                                    08:50

6         **THE COURT:**   I'VE BEEN REVIEWING BINDERS DELIVERED TO

7    THE COURT, AND I RECEIVED WORD THAT MR. NOLAN WANTS TO TAKE

8    THIS UP.   THE COURT WANTS TO TAKE THIS UP AS WELL.   I WANT TO

9    GET A BETTER SENSE OF THE PARTIES' RESPECTIVE POSITIONS

10   CONCERNING STATUS OF THESE MOTIONS.                            08:50

11        **MR. NOLAN:**   YOUR HONOR, LAST NIGHT, AT YOUR REQUEST,

12   I WENT BACK AND LOOKED AT WHATEVER WAS AVAILABLE.   THE RECORD

13   IS NOT PERFECTLY CLEAR, BUT WHAT IS CLEAR IS THAT THERE IS NO

14   SPECIFIC STATEMENT FROM JUDGE INFANTE THAT IF YOU DON'T

15   PRIORITIZE SOMETHING, SOMETHING IS WAIVED; SO MGA CANNOT TAKE   08:51

16   THE POSITION -- I APOLOGIZE IF I INFERRED THAT FROM WHAT JUDGE

17   INFANTE WAS SAYING.   WE CLEARLY HAD NUMEROUS TIMES WHEN

18   JUDGE INFANTE WAS ASKING THE PARTIES TO PRIORITIZE THE RULINGS,

19   BUT WHEN HE DID ISSUE THE ORDER, IN EFFECT, HIS ORDER WAS

20   STATED, 'THAT'S IT; NO MORE.'                                  08:51

21        THERE WERE MOTIONS THAT HAD BEEN BRIEFED THAT HE HAD

22   NOT RULED ON, AND WE DO NOT HAVE ANY INDICATION THAT INDICATED

23   A WAIVER BY MATTEL OR BY US.

24        I THINK WHAT HAPPENED WAS WE SIMPLY RAN OUT OF TIME,

25   AND AS A CREDIT TO THE SHORTNESS OF LIFE AND OTHER COMMITMENTS, 08:51

1   THAT'S HOW IT WAS LEFT.  SO I CANNOT REPRESENT TO THE COURT

2   THAT WE ARE TAKING THE POSITION THAT THERE WAS AN ABSOLUTE

3   CLEAR WAIVER.  I WISH WE COULD.  I APOLOGIZE.

4        **THE COURT:**  I APPRECIATE THAT, COUNSEL.

5        ANYTHING FURTHER FROM MATTEL ON THIS POINT?                    08:52

6        **MR. QUINN:**  NO, YOUR HONOR.

7        **MR. COREY:**  NO, YOUR HONOR.

8        **THE COURT:**   I THINK IT'S INCUMBENT UPON THE COURT TO

9   MAKE SURE THAT THESE MOTIONS ARE RULED UPON BEFORE WE GO ANY

10  FURTHER -- NOT BEFORE WE GO ANY FURTHER, BUT AS WE GO FURTHER.    08:52

11       **MR. PRICE:**  SEE YA.

12       (LAUGHTER.)

13       **THE COURT:**  BOTH PARTIES INDICATED ON THE RECORD,

14  PRIOR TO OPENING STATEMENT, THAT THERE WAS NO PREJUDICE IN THE

15  COURT CONSIDERING THESE IN THE COURSE OF THE TRIAL, AND THAT'S   08:52

16  WHAT THE COURT IS GOING TO DO.  I'LL DO IT THIS WEEKEND, AND WE

17  PROBABLY SHOULD HAVE A HEARING ON MONDAY.

18       AS SOON AS I TAKE A LOOK AT MONDAY'S CALENDAR, I'LL

19  SET A HEARING TIME ON THIS TO GO THROUGH THEM ALL, AND I'LL

20  ISSUE ORDERS ON MONDAY.                                          08:53

21       MR. COREY?

22       **MR. COREY:**  IF I MAY TAKE A MINUTE AND TRY TO

23  MINIMIZE SOME OF THE BURDEN ON THE COURT.

24       **THE COURT:**  YOU CAN TAKE AS MANY MINUTES AS YOU WANT;

25  I'LL EAT INTO THE JURY'S TIME FOR THAT.                          08:53

583

1     **MR. COREY:**  THERE'S A LOT OF PAPER THAT WE PROVIDED

2   TO THE COURT, AND WE ELECTED TO DO THAT RATHER THAN EXPURGATE

3   THINGS FROM THE ACTUAL BRIEFS THAT WE THOUGHT WERE NO LONGER AT

4   ISSUE OR HAD BEEN RESOLVED THROUGH THE PASSAGE OF TIME.

5     **THE COURT:**  OKAY.                                          08:53

6     **MR. COREY:**  AND THE COURT, I THINK, HAS SEEN IN ITS

7   BINDERS THAT THERE'S A TABLE OF CONTENTS.  AND WHAT I'LL DO IS,

8   I'LL REFER TO THESE MOTIONS --

9     **THE COURT:**  I HAVE THAT RIGHT HERE IN FRONT OF ME.

10     **MR. COREY:**  WITH RESPECT TO MOTION NUMBER THREE,          08:53

11   WHICH IS THE WACHOVIA -- IT'S A MOTION THAT RELATES TO A NUMBER

12   OF DEPOSITION SUBPOENAS.  AND MATTEL PUT THIS IN ITS

13   SUPPLEMENTAL SUBMISSION THAT THE COURT REQUESTED.  IT WAS OUR

14   UNDERSTANDING THAT THE RULING ON THE WACHOVIA DOCUMENT SUBPOENA

15   WOULD ALSO GOVERN THE SCOPE OF THE WACHOVIA DEPOSITION          08:54

16   SUBPOENA.  AND THAT'S REFLECTED IN WHAT WE PROVIDED THE COURT

17   THIS MORNING.

18     I REPRESENTED THAT TO JUDGE INFANTE, AND I BELIEVE

19   JUDGE INFANTE JUST DIDN'T GET TO THAT WITH RESPECT TO THE

20   RULING THAT HE MADE ON THE WACHOVIA SUBPOENA.  SO WHAT WE'RE    08:54

21   DOING IS -- I DON'T THINK THE COURT NEEDS TO ADDRESS ANY OF THE

22   OTHER DEPOSITION SUBPOENAS IN MOTION NUMBER THREE, WITH THE

23   EXCEPTION OF THE WACHOVIA SUBPOENA.

24     **THE COURT:**  DO YOU AGREE, MR. NOLAN?

25     **MR. NOLAN:**  YES.                                          08:54

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

584

1        THE COURT:  OKAY.

2        MR. COREY:  THEN WITH RESPECT TO NUMBER EIGHT --

3        THE COURT:  I WAS HOPING YOU WERE ABLE TO CUT SOME OF

4   THIS OUT FROM NUMBER FOUR.  BUT NO?  YOU'RE SKIPPING RIGHT OVER

5   FOUR?                                                          08:55

6        MR. COREY:  LET ME CONFER WITH MY COLLEAGUES ON THAT,

7   AND I'LL PROVIDE AN ANSWER.

8        THE COURT:  FOUR IS THREE DIFFERENT MOTIONS RELATED

9   TO PRIVILEGE LOGS.

10       THESE ARE STILL IN DISPUTE ON ALL COUNTS?                 08:55

11       MR. COREY:  I'M NOT AS FAMILIAR WITH THAT AS I SHOULD

12  BE.  I CAN PROVIDE AN ANSWER TO THE COURT AT THE BREAK.

13       THE COURT:  OKAY.

14       MR. COREY:  IT IS THE LARGEST AMOUNT OF PAPER; I

15  RECOGNIZE THAT.                                                08:55

16       WITH RESPECT TO NUMBER EIGHT, THAT RELATES TO SOME

17  DISCREET REQUESTS FOR ADMISSIONS.  THERE'S A PORTION OF THAT

18  THAT RELATES TO CARTER BRYANT'S RESPONSES, WHICH I BELIEVE IS

19  NOW MOOT.

20       AND THE REQUESTS FOR ADMISSION 60, 63, 66, AND 69 ARE     08:55

21  ALL PHASE 1-B.

22       THE COURT:  OKAY.

23       MR. COREY:  WITH RESPECT TO NUMBER TEN, I BELIEVE

24  MR. ZELLER ALLUDED TO THIS EARLIER; IT'S CAPTIONED "MATTEL,

25  INC.'S EX-PARTE APPLICATION TO COMPEL DEPOSITIONS OF ANNA RHEE, 08:56

585

1  BEATRIZ MORALES, AND MARIE SALAZAR, FOR GUIDANCE AS TO EVIDENCE

2  RECEIVED FROM ANA CABRERA AND AN END FOR SANCTIONS."

3          NUMBER TWO ON THAT LIST, I BELIEVE, IS THE ONLY THING

4  THAT REMAINS A DISPUTE THAT THE COURT NEEDS TO RESOLVE IN

5  CONNECTION WITH THAT MOTION.

6          THE COURT:  FOR GUIDANCE AS TO EVIDENCE RECEIVED FROM

7  ANA CABRERA?

8          MR. COREY:  CORRECT.

9          THE COURT:  I'LL BE ASKING MGA IF THERE'S ANY

10 OBJECTION IN A SECOND.

11         LET'S GET THROUGH THIS LIST.

12         SO THE DEPOSITIONS ARE MOOTED?

13         MR. COREY:  CORRECT, YOUR HONOR.

14         THE COURT:  ALL RIGHT.

15         MR. COREY:  AND THAT'S WHAT I HAVE.

16         THE COURT:  ALL RIGHT.

17         IF YOU COULD CHECK ON THOSE SERIES OF PRIVILEGE LOG

18 MOTIONS; BECAUSE THAT ACTUALLY EXPANDS THE LIST, ESSENTIALLY,

19 FROM 11 TO 14.

20         MR. COREY:  I WILL DO THAT, YOUR HONOR.

21         THE COURT:  MR. NOLAN, ANY OBJECTIONS TO ANYTHING

22 THAT MR. COREY JUST STATED?

23         MR. NOLAN:  NO, YOUR HONOR.

24         THE COURT:  VERY WELL.

25         MR. COREY:  THEN ONE MORE HOUSEKEEPING MATTER.

08:56
08:56
08:57
08:57
08:57

586

1    WE PROVIDED THE COURTROOM DEPUTY WITH COPIES OF THE

2   DEPOSITION TRANSCRIPTS OF THE VIDEO WE ANTICIPATE PLAYING OF

3   STEVE LINKER AND RAMONA PRINCE.  I THINK THAT WILL BE ON TAP

4   FOR TOMORROW, POTENTIALLY ON TUESDAY.

5        **THE COURT:**  VERY WELL.

                                                        08:57

6        AND DO I HAVE THE PROPOSED ORDER FROM -- I HAD ASKED

7   FOR A PROPOSED ORDER THIS MORNING.

8        **MR. COREY:**  IT WAS E-FILED.  I HAVE A COPY.  I CAN

9   PASS IT TO THE COURTROOM DEPUTY.

10       **THE COURT:**  PLEASE.

                                                        08:58

11       **MR. QUINN:**  IF I MAY, YOUR HONOR.

12       WE HAD THAT ISSUE YESTERDAY.  THE COURT WAS GOING TO

13  LOOK AT, I THINK, THE ASHONG DEPOSITION DESIGNATIONS, AND

14  WHETHER THEY'D BE PLAYED ALL AT ONCE OR PLAYED EACH SIDE.

15       **THE COURT:**  THE COURT DID LOOK AT THEM.  I WILL GIVE    08:58

16  THE INSTRUCTION TO THE JURY THAT THEY ARE TO BE PLAYED ALL

17  TOGETHER IN CHRONOLOGY.  GOING THROUGH THEM, I JUST THINK IT

18  WOULD BE VERY DIFFICULT AND -- I DON'T WANT TO SAY

19  "MISLEADING," BECAUSE I CERTAINLY DON'T SUGGEST THAT THERE WAS

20  ANY INTENTION.

                                                        08:58

21       I UNDERSTAND WHY YOU WANT TO DO IT THAT WAY.  I JUST

22  THINK, FOR THE JURY'S CONVENIENCE, TO HEAR IT ALL MAKES SENSE.

23  BUT I CERTAINLY WILL INDICATE TO THE JURY THAT THEY SHOULD

24  TREAT THIS AS THE JOINT PRESENTATION.

25       **MR. QUINN:**  THANK YOU, YOUR HONOR.

                                                        08:58

1      FOR CHESS CLOCK PURPOSES, I SUPPOSE WE OUGHT TO

2  ACTUALLY FIGURE OUT THE RUNNING TIMES AND HOW MUCH TIME WAS

3  DESIGNATED BY EACH SIDE AND REACH AN AGREEMENT ON THAT AND

4  PROVIDE IT TO THE COURT.

5      **THE COURT:**  I'D APPRECIATE THAT.  SO I WON'T RUN THE

6  CLOCK; I'LL JUST ADVANCE THE CLOCK ONCE YOU TELL ME WHAT THOSE

7  TIMES ARE.  RIGHT NOW, PLAINTIFF HAS USED FOUR HOURS AND 27

8  MINUTES, AND DEFENSE HAS USED THREE HOURS, FOR WHAT IT'S WORTH.

9      HERE'S THE PROPOSED ORDER.

10     DOES THE COURT HAVE COURTESY COPIES ON THE

11  SUPPLEMENTAL BRIEFINGS ON THE STATUTE OF LIMITATIONS THAT I

12  ASKED FOR?

13     **MR. NOLAN:**  WE SUBMITTED OURS IN THE COURTESY BOX

14  THIS MORNING.

15     **THE COURT:**  EXCELLENT.

16     I THINK THAT WAS ALL WE NEEDED TO TAKE UP.  I SEE

17  WE'RE AT 9:00.

18     **MR. QUINN:**  WOULD IT BE ALL RIGHT IF AT THE END OF

19  THE DAY, WE GOT FROM THE COURT WHAT THE TOTALS ARE ON TIME?

20     **THE COURT:**  SURE.  REMIND ME IF I FORGET.  I

21  APPRECIATE THAT.

22     **MR. QUINN:**  THANK YOU, YOUR HONOR.

23     **MR. NOLAN:**  WE CAN RAISE THIS LATER.

24     THERE IS A WITNESS THAT WILL BE COMING UP THAT

25  MR. ZELLER WILL BE QUESTIONING, ANDREAS KOCH.  I HAD A

08:59
08:59
08:59
09:00
09:00

588

1    CONFERENCE THIS MORNING WITH MR. ZELLER.  HE DOESN'T KNOW IF

2    HE'S GOING TO GO INTO A PARTICULAR AREA.  HE'LL LET ME KNOW.

3    BUT IF HE IS GOING TO GO INTO THAT AREA -- IT HAS TO DO WITH

4    WORK ENVIRONMENT, CHARACTER ISSUES WITH RESPECT TO MR. LARIAN

5    THAT WE THINK ARE OBJECTIONABLE.  I DON'T WANT TO DO THAT IN          09:00

6    FRONT OF THE JURY.  IT'S, 'DO YOU THINK MR. LARIAN IS

7    UNETHICAL?'  WE HAVE AN OBJECTION, BUT I DON'T WANT TO DO THAT

8    IN FRONT OF THE JURY.

9            THE COURT:  ABSOLUTELY.  DEPENDING ON WHAT WE HAVE --

10   YOU'LL ALWAYS HAVE THE OPPORTUNITY IN THE MORNING BEFORE WE          09:00

11   START, THE MORNING BREAK, LUNCH -- I'LL ALWAYS BRING YOU BACK

12   ABOUT 15, 20 MINUTES BEFORE THE JURY COMES BACK -- AFTERNOON

13   BREAK, OR THE END OF THE DAY.  THOSE ARE THE TIMES TO DO THAT.

14           MR. NOLAN:  THANK YOU.

15           MR. ZELLER:  SO IF I UNDERSTAND, THEN, WE'LL TAKE IT         09:00

16   UP AT SOME POINT LATER IN THE DAY, DURING A BREAK?

17           THE COURT:  YES.

18           MR. ZELLER:  BECAUSE THERE IS AT LEAST ONE ISSUE THAT

19   I DO INTEND TO RAISE THAT MAY BE CAUSING MR. NOLAN CONCERN.

20   SOME, I'M NOT SO SURE ABOUT AT THE MOMENT.  PART OF IT DEPENDS       09:01

21   ON HOW THE REST OF THE DAY GOES AND WHAT DOORS ARE OPENED.  BUT

22   THERE IS ONE FOR CERTAIN THAT I INTEND TO ASK MR. KOCH.

23           THE COURT:  VERY WELL.

24           AT SOME POINT IN TIME TODAY OR TOMORROW, I'LL WANT TO

25   SPEAK TO COUNSEL FROM BOTH SIDES ABOUT THE DISCOVERY MASTER AND     09:01

1  THIS PROCESS GOING FORWARD.  I WANT TO DO THAT OFF THE RECORD

2  IN CHAMBERS.  THIS IS NOT WHAT I WAS EXPECTING IN TERMS OF

3  WHERE WE'D BE ONCE WE WERE IN TRIAL IN TERMS OF THESE MOTIONS.

4         I'D LIKE TO DISCUSS THAT OFF THE RECORD, SO I'LL CALL

5  YOU BACK AT SOME POINT IN TIME ON THAT.                     09:01

6         ANYTHING FURTHER?

7     **MR. ZELLER:**  NO, YOUR HONOR.

8     **MR. NOLAN:**  NO, YOUR HONOR.  THANK YOU.

9     **THE COURT:**  LET'S SEE IF THE JURY IS READY.

10        LET'S HAVE THE WITNESS BACK UP ON THE WITNESS STAND.   09:01

11  I THINK IT'S MS. GARCIA.

12        COURT IS IN RECESS.

13        (WHEREUPON, A BRIEF RECESS WAS HELD.)

14        (WHEREUPON, JURORS ENTER COURTROOM.)

15     **THE COURT:**  GOOD MORNING, COUNSEL.                    09:10

16        THIS IS NO REFLECTION ON ANY COUNSEL, BUT THE JURY

17  HAS REQUESTED, AND I'VE GIVEN PERMISSION, FOR THEM TO BRING

18  THEIR COFFEE INTO THE COURTROOM.  THEY ASSURED ME THAT IT'S NO

19  REFLECTION ON ANYBODY.

20        MR. PRICE?                                            09:10

21     **MR. PRICE:**  THANK YOU, YOUR HONOR.

22              **DIRECT EXAMINATION** (CONTINUED)

23  **BY MR. PRICE:**

24  Q   SINCE WE WERE HERE YESTERDAY, SINCE COURT ADJOURNED, HAVE

25  YOU HAD THE OPPORTUNITY TO TALK TO ANYONE ABOUT YOUR TESTIMONY?  09:10

590

1   A    I HAD A CONVERSATION WITH MY COUNSEL LAST NIGHT REGARDING

2   THE WAY I FELT YESTERDAY.

3   Q    DID YOU HAVE ANY OTHER CONVERSATION ABOUT YOUR TESTIMONY

4   OR ABOUT THE FACTS OF THIS CASE SINCE WE'VE ADJOURNED FROM

5   YESTERDAY?                                                          09:11

6   A    I TOLD HIM YESTERDAY JUST IN GENERAL THAT I --

7   Q    I DON'T WANT TO KNOW THE SUBSTANCE OF WHAT YOU TOLD YOUR

8   ATTORNEY.  I JUST WANT TO KNOW IF YOU TALKED WITH -- WELL, LET

9   ME ASK IT THIS WAY:  HOW LONG DID YOU HAVE DISCUSSIONS WITH

10  YOUR ATTORNEY ABOUT YOUR TESTIMONY?  WHAT WAS THE TIME FRAME?      09:11

11  A    MAYBE HALF AN HOUR.

12  Q    AND BEFORE YOU TOOK THE STAND YESTERDAY, DID YOU HAVE ANY

13  DISCUSSION WITH ANYONE ABOUT THE TESTIMONY YOU WERE GOING TO

14  GIVE?

15  A    I'M NOT SURE I UNDERSTAND.  CAN YOU PLEASE BE MORE            09:11

16  SPECIFIC.

17  Q    YESTERDAY I CALLED YOU TO THE STAND; CORRECT?

18  A    YES.

19  Q    AND SO CERTAINLY, YOU KNEW YOU WERE GOING TO BE A WITNESS

20  IN THIS CASE.                                                      09:11

21  A    YES.

22  Q    SO LET'S SAY IN THE LAST MONTH, HAVE YOU HAD ANY

23  DISCUSSIONS WITH ANYONE CONCERNING, LET'S SAY, THE FACTS OF

24  THIS CASE?

25  A    AGAIN, I'M -- I CAN TELL YOU THAT I PREPARED FOR MY          09:12

591

1    DEPOSITION TODAY, IF THAT'S WHAT YOU MEAN.

2    Q    NOT YOUR DEPOSITION.   THAT WAS --

3    A    I'M SORRY.   MY TESTIMONY TODAY.

4    Q    OKAY.

5         AND WHO DID YOU MEET WITH IN PREPARING FOR YOUR

6    TESTIMONY TODAY?

7    A    I'VE MET WITH MARCUS MUMFORD.

8    Q    THAT'S ONE OF THE ATTORNEYS.

9    A    YES.

10   Q    AND YOU WERE LOOKING THIS DIRECTION, SO HE'S SITTING HERE;

11   RIGHT?

12   A    YES.

13   Q    AND HOW LONG DID YOU MEET WITH MR. MUMFORD IN PREPARING

14   FOR YOUR TESTIMONY?

15   A    COLLECTIVELY, OR --

16   Q    YES.   ALL TOGETHER.

17   A    MAYBE ABOUT TWO DAYS.

18   Q    AND DID YOU MEET WITH ANYONE ELSE?

19   A    WITH LAUREN.

20   Q    WARREN?

21         **MS. AGUIAR:**   LAUREN.

22         **MR. PRICE:**   I'M SORRY.

23   **BY MR. PRICE:**

24   Q    ABOUT HOW LONG DID YOU MEET WITH LAUREN?

25   A    ABOUT THE SAME TIME.

09:12
09:12
09:12
09:13
09:13

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

592

1    Q    SO THIS WAS ON MORE THAN ONE OCCASION?

2    A    YES.

3    Q    ON HOW MANY OCCASIONS DID YOU MEET WITH THESE ATTORNEYS

4    FOR A COUPLE OF DAYS?

5    A    TWICE.                                                          09:13

6    Q    AND THEY WERE AT THE SAME TIME; THEY WERE BOTH TOGETHER?

7    A    YES.

8    Q    ANYONE ELSE THAT YOU TALKED TO TO PREPARE FOR YOUR

9    TESTIMONY?

10   A    NO.                                                            09:13

11   Q    HOW ABOUT LAST NIGHT?  DID YOU LOOK AT ANY DOCUMENTS TO

12   KIND OF GROUND YOUR TESTIMONY, TO HELP REFRESH YOUR MEMORY?

13   A    NO.

14   Q    WERE YOU SHOWN ANY DOCUMENTS?

15   A    NO.                                                            09:14

16   Q    NOW, I WANT TO FOCUS ON THIS SEPTEMBER 1ST MEETING THAT

17   YOU CLAIM IS THE FIRST MEETING YOU HAD WITH MR. BRYANT.

18          I BELIEVE YOUR TESTIMONY IS THAT AT THAT TIME, YOU

19   DIDN'T KNOW HE WAS STILL A MATTEL EMPLOYEE; CORRECT?

20   A    CORRECT.                                                       09:14

21   Q    AND, IN FACT, YOUR TESTIMONY IS THAT YOU DIDN'T KNOW THAT

22   MR. BRYANT WAS A MATTEL EMPLOYEE ON SEPTEMBER 1ST UNTIL 2004;

23   CORRECT?

24   A    YES.  AND I'D LIKE TO EXPLAIN WHY THAT WAS THE CASE.

25   Q    FIRST LET ME ASK YOU MY QUESTION.                             09:14

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

593

1       YOU DIDN'T KNOW HE WAS A MATTEL EMPLOYEE AS OF

2   SEPTEMBER 1ST; YOU DIDN'T KNOW THAT UNTIL SOMETIME IN 2004; IS

3   THAT RIGHT?

4   A    CORRECT.

5           MR. PRICE:  AND, YOUR HONOR, IF I MAY, I'D LIKE TO         09:14

6   PLAY FROM MS. GARCIA'S DEPOSITION ON THIS TOPIC.  IT'S

7   VOLUME I, PAGE 268, LINES 21 TO 25, AND THEN ACTUALLY GOING ON

8   TO 269, LINE 23.  AND THEN 271, LINE 19, TO 272, LINE 12.

9           THE COURT:  ANY OBJECTION?

10          MS. AGUIAR:  I NEED TO LOOK AT WHAT THAT IS.  AND I         09:15

11  DON'T THINK THERE'S BEEN A PROFFER OF WHY HE WOULD NEED TO PLAY

12  THE DEPOSITION FOR MS. GARCIA AT THIS POINT.

13          THE COURT:  LET'S TAKE A LOOK AT IT, AND THEN MAKE

14  YOUR LEGAL OBJECTION, COUNSEL.

15          MR. PRICE:  I BELIEVE YOU HAVE A COPY, YOUR HONOR.         09:15

16          THE COURT:  I DO.

17          MR. PRICE:  IT'S MAY 24, 2007, VOLUME I.  IT'S IN

18  THIS CASE; PAGE 268, LINE 21, THROUGH 269, LINE 23, AND THEN

19  271, LINE 19, TO 272, LINE 12.

20          MS. AGUIAR:  I'VE LOOKED AT THE EXCERPTS THAT             09:17

21  MR. PRICE HAS IDENTIFIED, AND I THINK --

22          THE COURT:  YOUR LEGAL OBJECTION, IF YOU HAVE ONE.

23          MS. AGUIAR:  NOT PROPER IMPEACHMENT.  NO BASIS TO

24  PLAY THIS SECTION OF HER DEPOSITION.

25          MR. PRICE:  MY RESPONSE, YOUR HONOR, IS, THE FIRST         09:17

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

1    PART IS INCONSISTENT.

2            **THE COURT:**  LET ME SEE YOU AT SIDE-BAR, COUNSEL.

3            (WHEREUPON, THE FOLLOWING PROCEEDINGS

4            WERE HELD AT SIDE-BAR:)

5            **MR. PRICE:**  THERE ARE TWO GROUNDS.  FIRST I BELIEVE

6    THE ANSWERS ARE INCONSISTENT.  BUT SECOND, UNDER 312(A), SHE'S

7    A PARTY WITNESS.  IN FACT SHE WAS A 30(B)(6) WITNESS, SO I'M

8    ENTITLED TO PLAY HER TESTIMONY, HER DEPOSITION TESTIMONY, FOR

9    ANY PURPOSE.

10           **THE COURT:**  I UNDERSTAND THAT.

11           COUNSEL, I DON'T UNDERSTAND WHY THERE IS AN

12   OBJECTION.  HE CAN PLAY THE TESTIMONY AS MUCH AS HE WANTS.

13           **MS. AGUIAR:**  I FEEL AS THOUGH, WHEN YOU READ THE

14   ENTIRETY OF THAT SECTION, THAT IT IS NOT INCONSISTENT WITH THE

15   TESTIMONY SHE JUST GAVE THIS MORNING.  AND HE'S TRYING TO

16   SUGGEST THAT SHE HAS GIVEN INCONSISTENT TESTIMONY DURING HER

17   DEPOSITION.  AND I THINK IT'S CLEAR, IF YOU READ ALL OF THE

18   QUESTIONS, THAT IT'S ENTIRELY CONSISTENT WITH WHAT SHE JUST

19   TESTIFIED TO THIS MORNING, WHICH IS THAT THE FIRST TIME SHE

20   BECAME AWARE THAT HE WAS EMPLOYED BY MATTEL AS OF SEPTEMBER 1ST

21   WAS NOT UNTIL 2004.

22           **THE COURT:**  FAIR ENOUGH.

23           IF YOU BELIEVE THERE'S ADDITIONAL DEPOSITION

24   TESTIMONY THAT SHOULD BE PLAYED TO PUT IT IN CONTEXT, THE COURT

25   WOULD ENTERTAIN THAT.  I THINK THAT'S THE WAY TO SOLVE THIS.

09:18
09:18
09:18
09:19
09:19

1    MR. PRICE HAS A RIGHT TO PLAY THE DEPOSITION.  IF YOU

2  THINK THAT YOUR OBJECTION IS NOT COMPLETE, JUST INDICATE THE

3  ADDITIONAL LINES THAT NEED TO BE PLAYED AND THE COURT WILL RULE

4  ON THAT.

5         **MS. AGUIAR:**  OKAY.

6         **MR. PRICE:**  ONE THING I WANT TO ASK THE WITNESS IF

7  THIS WITNESS IS PERTAINING TO SEPTEMBER 1ST MEETING; SO RATHER

8  THAN PLAYING ALL THIS, I'M GOING TO SAY --

9         **THE COURT:**  I WANT TO HEAR FROM COUNSEL AS TO WHAT

10  SHE WANTS TO SUPPLEMENT IT WITH.

11        **MS. AGUIAR:**  I THINK SHE NEEDS TO BE GIVEN THE

12  OPPORTUNITY -- AND I DON'T KNOW IF WE WANT TO BE DOING THIS,

13  BURNING TIME WITH THE JURY HERE -- BUT SHE WOULD NEED TO BE

14  GIVEN AN OPPORTUNITY TO READ THE PAGES BEFORE SHE CAN SAY THAT

15  SHE WILL MAKE A REPRESENTATION ABOUT WHAT THAT QUESTION IS.

16        **MR. PRICE:**  LOOK, SO AND SO, YOU SEE THESE QUESTIONS?

17  ARE THEY ABOUT SEPTEMBER 1ST?  LOOK AT THIS QUESTION.  ALL OF

18  THE QUESTIONS BEFORE THAT ARE ABOUT THE SEPTEMBER 1ST MEETING.

19  I'D LIKE TO PLAY THIS.  IF SHE WANTS TO PLAY SOMETHING ELSE --

20        **THE COURT:**  IF THERE'S SOMETHING ELSE YOU WANT PLAYED

21  RIGHT NOW, I WILL LET YOU DO THAT.  OTHERWISE, YOU CAN DO AS

22  MUCH AS YOU WANT ON CROSS-EXAMINATION.

23        **MS. AGUIAR:**  I UNDERSTAND THAT.

24        IF HE'S GOING TO ASK HER WHETHER A QUESTION SHE WAS

25  ASKED OVER A YEAR AGO PERTAINING TO A PARTICULAR MEETING, THEN

09:19
09:19
09:20
09:20
09:20

596

1  AT LEAST SHE OUGHT TO BE GIVEN --

2       THE COURT:  IF THAT'S THE QUESTION, RIGHT.

3       I BELIEVE, COUNSEL, YOU JUST WANT TO PLAY THE

4  DEPOSITION.

5       MR. PRICE:  I'M GOING TO DIRECT HER TO AN EARLIER

6  PAGE AND SAY 'DOES THIS QUESTION PERTAIN TO SEPTEMBER 1ST?'

7       THE COURT:  LAY A FOUNDATION FOR IT.

8       MS. AGUIAR:  BUT IF YOU DO THAT AND YOU ASK HER WHAT

9  THAT QUESTION PERTAINS TO, THEN SHE NEEDS TO BE GIVEN THE

10  OPPORTUNITY TO THEN --

11       THE COURT:  THE COURT AGREES WITH THAT.

12       MS. AGUIAR:  THANK YOU.

13       (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

14       THE COURT:  COUNSEL, YOU MAY PROCEED.

15  BY MR. PRICE:

16  Q   MS. GARCIA, I THINK I PUT VOLUME I IN FRONT OF YOU.

17       DO YOU HAVE THAT?  IT SHOULD BE RIGHT IN FRONT OF

18  YOU.

19       MAY 24, 2007.

20       AND I'D LIKE TO CALL YOUR ATTENTION FIRST TO

21  PAGE 268, LINE 21, AND I WANT YOU TO CONFIRM, IF YOU COULD --

22  IF YOU LOOK AT THE PAGES BEFORE THAT, AND TO GIVE YOU SOME

23  ASSISTANCE, I'LL CALL YOUR ATTENTION TO 263, LINE 8 -- THE

24  QUESTIONS BEFORE THAT ARE PERTAINING TO THE SEPTEMBER 1ST

25  MEETING.

09:20
09:21
09:21
09:21
09:22

1          DO YOU AGREE WITH THAT?

2    A    CAN YOU HELP ME TO IDENTIFY THIS REFERENCE TO

3    SEPTEMBER 1ST.

4    Q    YES.  THAT THE QUESTIONS PRIOR TO THE ONES STARTING AT

5    268, LINE 21, THAT THE TOPIC THAT'S BEING DISCUSSED IS WHAT

6    HAPPENED AT THE SEPTEMBER 1ST MEETING THAT YOU TESTIFIED ABOUT.

7    A    I APOLOGIZE.  I JUST DON'T HAVE A REFERENCE TO THE YEAR

8    2001 ANYWHERE.

9    Q    SEPTEMBER 1, 2000.  I APOLOGIZE.

10   A    BUT EVEN IN 2000, I DON'T HAVE A REFERENCE TO THAT

11   PARTICULAR YEAR.  COULD YOU HELP ME.

12   Q    SURE.

13         IF YOU LOOK AT THE BEGINNING OF THIS QUESTIONING --

14   AND WE GO TO 263, LINE 2, LINES 2 THROUGH 6, AND THEN LINES 8

15   THROUGH 11 -- DO YOU SEE THAT THE QUESTIONING FOR THOSE FEW

16   PAGES ARE ABOUT WHAT HAPPENED AT THE SEPTEMBER 1, 2000 MEETING?

17   A    OKAY.

18   Q    IS THAT CORRECT?

19   A    YES.

20   Q    SO 268, LINE 21, THE QUESTION, WHICH I'M GOING TO PLAY,

21   WAS, "MR. BRYANT, AT THAT TIME, AS YOU UNDERSTOOD IT, WAS A

22   DESIGNER AT MATTEL; ISN'T THAT TRUE?"

23         THE PHRASE "AT THAT TIME" IS REFERRING TO

24   SEPTEMBER 1, 2000; CORRECT?

25         **MS. AGUIAR:**  AGAIN, I'LL STATE MY OBJECTION THAT IF

598

1    HE'S GOING TO ASK THE WITNESS, SHE NEEDS TO BE GIVEN THE

2    OPPORTUNITY TO READ IT.

3              **THE COURT:**  SUSTAINED, COUNSEL.

4              LET HER TAKE A LOOK.

5              **MR. PRICE:**  I THINK SHE JUST DID.

6    **BY MR. PRICE:**

7    Q    LOOKING AT WHAT YOU JUST LOOKED AT, WHERE YOU'RE TALKING

8    ABOUT THE SEPTEMBER 1, 2000 MEETING, THE QUESTION AT 268,

9    LINE 21, WHICH SAYS, "MR. BRYANT, AT THAT TIME, AS YOU

10   UNDERSTOOD IT, WAS A DESIGNER AT MATTEL; ISN'T THAT TRUE?"

11             THE "AT THAT TIME," YOUR UNDERSTANDING WHEN YOU WERE

12   AT THE DEPOSITION, THAT WAS REFERRING TO SEPTEMBER 1, 2000,

13   WHICH WAS THE TIME YOU WERE TESTIFYING TO; CORRECT?

14             **THE COURT:**  LET ME STOP YOU THERE, COUNSEL.

15             WHERE DO YOU SUGGEST THE WITNESS BEGIN READING?

16             **MS. AGUIAR:**  I WANT HER TO BE GIVEN THE OPPORTUNITY

17   TO READ FROM WHERE HE POINTS HER TO, WHICH IS 262, I BELIEVE.

18             **MR. PRICE:**  263, LINE 3.

19             **MS. AGUIAR:**  263 THROUGH TO THE POINT WHERE HE IS

20   POINTING HER TO, WHICH IS 268, WHICH IS SEVERAL PAGES LATER.

21             **THE COURT:**  THANK YOU.

22             MS. GARCIA, YOU MAY DO THAT.

23             **THE WITNESS:**  MAY I READ FROM 263?

24   **BY MR. PRICE:**

25   Q    IF YOU COULD, TO YOURSELF, NOT OUT LOUD, READ 263, FROM

09:23

09:24

09:24

09:24

09:24

599

1    LINE 2 FORWARD, SO THAT YOU GET THE CONTEXT OF YOUR TESTIMONY

2    SO THAT YOU CAN TELL US WHETHER OR NOT THE PHRASE "AT THAT

3    TIME" REFERS TO THE SEPTEMBER 1, 2000 CONVERSATIONS.

4              (WITNESS READS DOCUMENT.)

5              **THE COURT:**   COUNSEL, HOW FAR DO YOU WANT HER TO READ?          09:27

6              **MR. PRICE:**   TO 268, LINE 21, SO SHE CAN CONFIRM THAT

7    "AT THAT TIME" REFERS TO THE SAME MEETING.

8              **MS. AGUIAR:**   I WOULD SUGGEST SHE READ TO 271.   THAT

9    IS THE CONCLUSION OF THIS LINE OF QUESTIONING.   SO I SUGGEST

10   THAT THE WITNESS GO TO 271 FOR PURPOSES OF ANSWERING HIS          09:27

11   QUESTION.

12             **MR. PRICE:**   THAT'S COMPLETELY UNNECESSARY.

13             **THE COURT:**   THE COURT AGREES.

14             YOU CAN FOLLOW UP WITH THAT ON CROSS-EXAMINATION,

15   COUNSEL.                                                          09:27

16             **THE WITNESS:**   I'M ON PAGE 268, AND I'VE GONE TO

17   LINE 21.

18             **MR. PRICE:**   SO THE QUESTION, "MR. BRYANT, AT THAT

19   TIME..."   YOU UNDERSTOOD THE TIME REFERRED TO WAS SEPTEMBER 1ST

20   OF 2000; CORRECT?                                                 09:28

21             THE WITNESS:   YES.

22             **MR. PRICE:**   SO WITH THAT, YOUR HONOR, I WOULD THEN

23   PLAY 268, LINE 21, THROUGH 269, LINE 23, AND THEN 271, LINE 19,

24   TO 272, LINE 12.

25             **THE COURT:**   YOU MAY DO SO.

                                                                      09:28

1          (DEPOSITION TESTIMONY IS PLAYED.)

2     **BY MR. PRICE:**

3     Q    NOW, MS. GARCIA, I WANT TO ASK YOU ABOUT THAT TESTIMONY.

4               OBVIOUSLY, WHEN YOU WERE THERE AT THE DEPOSITION --

5               **THE COURT:**  COUNSEL, JUST FOR THE RECORD, THE COURT          09:30

6     OVERRULES THE OBJECTIONS THAT WERE SET FORTH ON THE RECORD.

7               AND ALSO, JUST FOR THE RECORD, THE COURT REPORTER IS

8     NOT TRANSCRIBING THAT WHICH IS PLAYED; SO YOU'LL NEED TO LODGE

9     THAT WITH THE COURT FOR THE RECORD.

10              **MR. PRICE:**  THANK YOU, YOUR HONOR.                         09:31

11              **THE COURT:**  THANK YOU, COUNSEL.

12    **BY MR. PRICE:**

13    Q    MS. GARCIA, WHEN YOU WERE SITTING THERE AT THE DEPOSITION,

14    YOU WERE REPRESENTED BY AN ATTORNEY; CORRECT?

15    A    YES.                                                               09:31

16    Q    AND YOU COULD HEAR EVERYTHING THAT WAS GOING ON; YOU COULD

17    HEAR THE QUESTIONS AND WHAT YOUR ATTORNEY WAS SAYING; CORRECT?

18    A    YES.

19    Q    NOW, INITIALLY, WHEN YOU WERE ASKED, "MR. BRYANT, AT THAT

20    TIME," WHICH IS SEPTEMBER 1, 2000, "AS YOU UNDERSTOOD IT, WAS A         09:31

21    DESIGNER AT MATTEL; ISN'T THAT TRUE?"

22              YOUR ANSWER WAS "YES"; IS THAT CORRECT?

23    A    YES.  BUT I DON'T BELIEVE THAT ANSWER WAS CORRECT.

24    Q    WELL, IN FACT, YOU HEARD MS. TORRES SAY AT THE TIME THAT

25    MISSTATED YOUR TESTIMONY?  YOU HEARD HER SAY THAT; CORRECT?            09:31

1    A    YES.

2    Q    AS YOU'RE SITTING THERE?

3    A    YES.

4    Q    AND WHEN YOU HEARD THAT -- FIRST OF ALL, YOU DON'T RECALL

5    BEING ASKED THAT QUESTION BEFORE IN YOUR DEPOSITION; CORRECT?        09:32

6    THAT'S THE FIRST TIME YOU WERE ASKED THAT QUESTION?

7    A    I DON'T KNOW WHAT YOU MEAN.

8    Q    WELL, THIS WAS THE FIRST TIME, ON MAY 24, 2007, THAT YOU

9    HAD BEEN ASKED WHETHER OR NOT, AS OF SEPTEMBER 1, 2000, YOU

10   UNDERSTOOD THAT MR. BRYANT WAS A DESIGNER AT MATTEL?  IT'S THE        09:32

11   FIRST TIME YOU'D BEEN ASKED THAT; CORRECT?

12   A    YOU KNOW, I DON'T --

13          **MS. AGUIAR:**  OBJECTION, YOUR HONOR.  HE'S ASKING THE

14   WITNESS ABOUT A DEPOSITION THAT OCCURRED OVER A YEAR AGO AND

15   WHETHER OR NOT THIS WAS THE FIRST TIME SHE WAS ASKED A             09:32

16   PARTICULAR QUESTION.  UNLESS HE WANTS TO LET HER REVIEW THE

17   TRANSCRIPT, HOW CAN SHE POSSIBLY ANSWER THAT QUESTION?

18          **THE COURT:**  SO YOUR OBJECTION IS WHAT?

19          **MS. AGUIAR:**  THAT FOR COMPLETENESS, HE NEEDS TO LET

20   HER LOOK AT THE TRANSCRIPT.                                         09:32

21          **THE COURT:**  OVERRULED.

22          YOU'LL HAVE AN OPPORTUNITY TO FOLLOW UP ON

23   CROSS-EXAMINATION.

24   **BY MR. PRICE:**

25   Q    IT WAS AWHILE AGO, AND PERHAPS YOU DON'T REMEMBER, SO I'M       09:32

1  JUST GOING TO ASK ABOUT YOUR MEMORY; AND, OF COURSE, YOUR

2  COUNSEL CAN POINT OUT ANYWHERE IN THE TRANSCRIPT IN HER

3  EXAMINATION.

4       PRIOR TO THIS TIME IN THE DEPOSITION, HAD YOU BEEN

5  ASKED WHETHER OR NOT, AS OF SEPTEMBER 1, 2000, YOU UNDERSTOOD

6  MR. BRYANT WAS AN EMPLOYEE OF MATTEL?  DO YOU RECALL?

7  A    I DON'T RECALL.  I'M NOT SURE.

8  Q    BUT YOU DID UNDERSTAND, WHEN YOU ANSWERED "YES," THAT YOUR

9  ATTORNEY WAS SAYING THAT THIS MISSTATED YOUR TESTIMONY;

10 CORRECT?  YOU HEARD HER SAY THAT?

11 A    I HEARD HER SAY THAT.  I, TO THIS DAY, DON'T KNOW FOR SURE

12 WHAT THOSE LEGAL WORDS MEAN.

13 Q    NOW, WHEN YOU WERE THEN ASKED, 'WHEN IS IT THAT YOU BECAME

14 FIRST AWARE THAT MR. BRYANT WAS WORKING AT MATTEL,' YOU AGAIN

15 HEARD YOUR ATTORNEY SAY IT MISSTATES THE TESTIMONY; CORRECT?

16 A    YES.

17 Q    NOW, AT THAT POINT, WERE YOU THINKING, 'YOU KNOW, I MIGHT

18 HAVE MADE A MISTAKE BY SAYING I KNEW THAT MR. BRYANT WORKED AT

19 MATTEL WHEN I HAD THAT MEETING WITH HIM ON SEPTEMBER 1ST.'

20      AT THAT TIME, WAS THAT PLAYING IN YOUR MIND, THAT,

21 'YOU KNOW, THAT'S NOT SOMETHING I'M SUPPOSED TO SAY'?

22 A    NO.  ABSOLUTELY NOT.

23      I'M VERY CLEAR FOR --

24 Q    LET ME ASK YOU -- I THINK YOU ANSWERED THAT QUESTION.

25      **MS. AGUIAR:**  ACTUALLY --

09:33
09:33
09:33
09:33
09:33
09:34

1    **THE COURT:**  YOU MAY ANSWER IT.

2    ARE YOU FINISHED WITH THE ANSWER?

3    **THE WITNESS:**  THANK YOU.

4    I'M VERY, VERY CLEAR THAT ON THE SEPTEMBER 1, 2000

5    MEETING, I DO NOT REMEMBER HEARING ABOUT CARTER BRYANT BEING          09:34

6    EMPLOYED AT MATTEL AT THAT TIME.

7    **BY MR. PRICE:**

8    Q    SO THE FIRST QUESTION AND ANSWER, THEN, I THINK YOU SAID

9    THAT YOU NOW BELIEVE THAT WAS MISTAKEN.

10   A    I BELIEVE THAT MY ANSWER "YES" WAS A MISTAKE, NOW READING        09:34

11   IT TODAY.

12   Q    WELL, ACTUALLY, THIS ISN'T THE FIRST TIME YOU'VE READ

13   THIS; YOU HAD THE OPPORTUNITY TO READ YOUR TRANSCRIPT AND

14   CONSULT WITH YOUR ATTORNEY AND MAKE ANY CHANGES TO YOUR

15   TRANSCRIPT; CORRECT?                                                  09:34

16   A    I DON'T KNOW.  THIS WAS PART OF THE O'MELVENY TEAM.  I

17   DON'T KNOW IF I WAS PROVIDED THE OPPORTUNITY TO ACTUALLY REVIEW

18   THIS DOCUMENT.  I DON'T REMEMBER REVIEWING IT.

19   Q    DO YOU REMEMBER BEING TOLD YOU HAD THAT RIGHT?

20   A    NO, I DON'T REMEMBER THAT.                                       09:35

21   Q    THEN, WHEN YOU WERE ASKED, "ISN'T IT TRUE THAT WHEN YOU

22   HAD THIS MEETING THAT WE'VE BEEN DISCUSSING, WHICH YOU

23   REFERENCED AS BEING THE SEPTEMBER 1, 2000 MEETING, THAT BY THAT

24   TIME, BY THE TIME THAT MEETING WAS OVER, YOU YOURSELF WAS AWARE

25   THAT MR. BRYANT WAS EMPLOYED AS A DESIGNER AT MATTEL?" AND THEN       09:35

604

1    MS. TORRES SAID, "SAME OBJECTIONS."

2          WAS THERE SOMETHING ABOUT THAT QUESTION YOU DID NOT

3    UNDERSTAND?

4    A    I JUST REMEMBER THAT DAY BEING VERY, VERY CONFUSED WITH

5    THE QUESTIONS AND TRYING TO MAKE SURE I WAS ANSWERING THEM

6    CORRECTLY.

7          IF I HAD THE CHANCE, MAY I READ IT AGAIN TO MYSELF?

8    Q    SURE.

9          I'M WONDERING, WERE YOU REALLY CONFUSED BY THIS

10   QUESTION, OR WERE YOU JUST TRYING TO GIVE YOURSELF SOME TIME TO

11   THINK OF AN ANSWER?

12   A    NO.   I WAS HONESTLY CONFUSED WITH THE QUESTION.

13   Q    WELL, WHAT WAS CONFUSING ABOUT THE QUESTION:   "ISN'T IT

14   TRUE THAT WHEN YOU HAD THIS MEETING THAT YOU'VE BEEN

15   DISCUSSING, WHICH YOU REFERENCED AS BEING THE SEPTEMBER 1, 2000

16   MEETING, THAT BY THAT TIME, BY THE TIME THAT MEETING WAS OVER,

17   YOU YOURSELF WAS AWARE THAT MR. BRYANT WAS EMPLOYED AS A

18   DESIGNER AT MATTEL?"

19          WHAT WAS CONFUSING ABOUT THAT QUESTION?

20   A    YOU KNOW, I WAS NERVOUS IN DEPOSITION, VERY MUCH, AND

21   THERE WAS A LOT OF REFERENCES TO -- AND EVEN READING THIS

22   TODAY, 'ISN'T IT TRUE THAT WHEN YOU HAD THIS MEETING WHICH

23   YOU'VE BEEN DISCUSSING, SEPTEMBER 1ST, BY THAT TIME' -- I --

24   YOU KNOW, I WAS TRYING VERY HARD TO LISTEN TO THE QUESTION, BUT

25   I WAS CONFUSED.   I BELIEVE THAT I WAS CONFUSED.

09:35
09:35
09:36
09:36
09:36

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1    Q     BY THIS TIME, AFTER MS. TORRES HAD SAID THREE TIMES THAT

2    YOU HAD MISSTATED TESTIMONY, BY THAT TIME, WERE YOU UNDER THE

3    IMPRESSION THAT YOU WERE NOT SUPPOSED TO SAY "YES" TO THAT

4    QUESTION?

5    A     NO.   ABSOLUTELY NOT.

6    Q     THEN WE GO TO THE NEXT SECTION.

7          AND THEN YOU WERE ASKED, AFTER IT WAS REPHRASED, "AT

8    SOME POINT, YOU BECOME AWARE THAT MR. BRYANT WAS, AS OF

9    SEPTEMBER 1ST WHEN YOU HAD THIS MEETING, EMPLOYED BY MATTEL?"

10   AND YOU SAID, "SOMETIME IN 2004," SOMETIME THREE TO FOUR YEARS

11   AFTER THIS MEETING IS WHEN YOU FIRST BECAME AWARE.

12   A     THAT'S CORRECT.

13         IN 2004, I REMEMBER COLLECTING AT THE OFFICES OF

14   O'MELVENY, WHERE THERE WAS CONVERSATION ABOUT THE CASE THAT I

15   BELIEVE WAS POTENTIALLY TO COME TO SUIT, AND THERE WAS

16   CONVERSATION ABOUT HIS BEING EMPLOYED AT MATTEL AT THAT TIME,

17   AND I REMEMBER BEING INCREDIBLY SURPRISED.   I WAS ACTUALLY

18   SHOCKED BY THAT INFORMATION.

19   Q     SO YOUR TESTIMONY IS THAT THE FIRST TIME YOU WERE AWARE

20   THAT MR. BRYANT WORKED AT MATTEL WHEN HE WAS MEETING WITH YOU

21   ON SEPTEMBER 1ST WAS AFTER THERE WERE LAWSUITS FILED?

22   A     TO BE CLEAR, I'M NOT SURE, BECAUSE I'M NOT A LEGAL PERSON

23   AND I DON'T KNOW ALL OF THE OFFICIAL DEALINGS.   HOWEVER, I DO

24   KNOW THAT THERE WAS CONVERSATION OF EITHER THE SUIT HAPPENING

25   OR POTENTIALLY HAPPENING.   I CAN'T BE CERTAIN.

09:37
09:37
09:37
09:38
09:38

606

1   Q    NOW, WHEN YOUR DEPOSITION HAD BEEN TAKEN, I TAKE IT YOU

2   HAD NOT BEEN TOLD ABOUT ANYTHING THAT MS. O'CONNOR, WHO WAS AT

3   THIS MEETING, HAD TESTIFIED TO OR MR. BRYANT, WHO WAS AT THAT

4   MEETING, OR MR. LARIAN, WHO WAS AT THAT MEETING -- YOU HADN'T

5   BEEN TOLD ABOUT ANYTHING THEY HAD TESTIFIED TO; CORRECT?          09:38

6   A    THAT'S CORRECT.

7   Q    YOU'RE AWARE, OF COURSE, THAT ALL OF THOSE WITNESSES HAVE

8   TESTIFIED THAT MR. BRYANT INFORMED EVERYONE AT THAT MEETING

9   THAT HE THEN WORKED AT MATTEL.

10  A    I'M NOT SURE WHAT EVERYBODY'S TESTIFIED TO.  I ONLY KNOW     09:39

11  WHAT I KNOW.

12  Q    SINCE SEPTEMBER 1ST, CERTAINLY YOU'VE WORKED WITH

13  MR. BRYANT FOR A NUMBER OF YEARS; CORRECT?

14  A    YES.

15  Q    AND YOU'VE WORKED WITH MR. LARIAN; CORRECT?                 09:39

16  A    YES.

17  Q    AND MS. O'CONNOR; CORRECT?

18  A    I HAVEN'T WORKED WITH VICTORIA O'CONNOR FOR A NUMBER OF

19  YEARS.

20  Q    HOW LONG DID YOU WORK FOR HER AFTER SEPTEMBER 1ST?          09:39

21  A    I'M GOING TO GUESS A COUPLE OF MONTHS, MAYBE A YEAR.

22  Q    AND AT THIS MEETING -- I THINK YOU SAID THIS WAS

23  MR. LARIAN'S OFFICE?

24  A    YES.

25  Q    AND YOU WERE, I BELIEVE YOU SAID, AT A CONFERENCE TABLE?    09:39

1    A    YES.

2    Q    AND YOU COULD HEAR WHAT EVERYONE ELSE SAID AT THAT

3    MEETING; CORRECT?

4    A    IF I MIGHT HAVE THE OPPORTUNITY TO SAY THAT, AT THAT

5    MEETING -- IT WAS A VERY, VERY POWERFUL AND IMPORTANT MEETING      09:40

6    TO ME.   THAT WAS A DAY THAT I HAD THE CHANCE TO REVIEW SKETCHES

7    BY CARTER BRYANT; AND I WAS INCREDIBLY IN LOVE.   I WAS VERY

8    IMPRESSED.   I WAS VERY, VERY EXCITED ABOUT THE MATERIAL THAT I

9    SAW IN THAT CONFERENCE ROOM IN HIS OFFICE THAT DAY.

10            I WAS QUITE FOCUSED ON THE MATERIAL I SAW BEFORE          09:40

11    MYSELF.   IT'S POSSIBLE THAT CONVERSATION WAS EXCHANGED ACROSS

12    THAT TABLE AS I WAS GAZING AND PRETTY IN LOVE WITH THOSE

13    DRAWINGS.   I SIMPLY DON'T REMEMBER THEM.   I WASN'T REALLY

14    FOCUSED ON THAT.   I WAS VERY MUCH FOCUSED ON THE MATERIAL IN

15    FRONT OF ME.                                                      09:40

16    Q    SO YOUR TESTIMONY IS THAT YOU MAY NOT HAVE HEARD

17    DISCUSSIONS ABOUT WHERE MR. BRYANT WORKED AS OF SEPTEMBER 1ST

18    BECAUSE IT WAS THE FIRST TIME YOU HAD SEEN THE DRAWINGS AND YOU

19    WERE EXCITED ABOUT THEM.

20    A    THAT'S RIGHT.                                                09:41

21    Q    IN FACT, YOU HAD SEEN THOSE DRAWINGS AS EARLY AS MID

22    AUGUST, WHEN YOU AND MS. O'CONNOR AND MR. BRYANT MET; CORRECT?

23    A    CAN YOU PLEASE REPEAT THE QUESTION.

24    Q    IN FACT, YOU HAD SEEN THOSE DRAWINGS AND WERE EXCITED

25    ABOUT THEM AT LEAST AS OF AUGUST 18TH, WHEN YOU MET WITH          09:41

608

1   MS. O'CONNOR AND MR. BRYANT.

2   A    AS I'VE TESTIFIED BEFORE, I DO NOT REMEMBER SEEING THE

3   DRAWINGS PRIOR TO SEPTEMBER 1ST OF 2000.  IT'S POSSIBLE THAT

4   THERE WAS A MEETING THAT TRANSPIRED.  I PERSONALLY DO NOT

5   REMEMBER THEM.  I REMEMBER VERY, VERY VIVIDLY A MEETING ON          09:41

6   SEPTEMBER 1ST.

7   Q    SO AS YOU WERE ANSWERING THESE QUESTIONS AT YOUR

8   DEPOSITION ABOUT WHEN YOU LEARNED MR. MATTEL -- I KEEP SAYING

9   "MR. CARTER" FOR MR. BRYANT.  I APOLOGIZE.

10  A    WE ALL MAKE MISTAKES.                                          09:41

11  Q    IF I SAY "MR. CARTER," I DON'T MEAN JIMMY.  I MEAN

12  CARTER BRYANT.

13          SO WHEN YOU WERE TESTIFYING AND ASKED ABOUT WHEN YOU

14  FIRST BECAME AWARE ABOUT MR. CARTER BRYANT BEING AT MATTEL,

15  WHEN YOU FIRST WERE ASKED THAT AND YOU HEARD THESE OBJECTIONS,      09:42

16  DID IT EVER OCCUR TO YOU THAT IT MIGHT REFLECT POORLY ON YOU IF

17  YOU ADMITTED THAT YOU KNEW, DURING THIS TIME FRAME WHEN YOU

18  WERE WORKING WITH MR. BRYANT, THAT HE WAS ALSO WORKING AT

19  MATTEL?  DID THAT THOUGHT OCCUR TO YOU?

20  A    NO.  HOWEVER, MIGHT I SAY THAT IF IT WERE THAT                 09:42

21  CARTER BRYANT WAS WORKING AT MATTEL AT THE TIME OF THE

22  SEPTEMBER 1ST MEETING, I WOULDN'T THINK THAT WAS NECESSARILY A

23  BAD THING AT THAT TIME ANYWAY, EVEN SPEAKING ON THAT TODAY.

24  Q    BUT AS WE WENT OVER YESTERDAY, THE FACT THAT HE WORKED, AT

25  LEAST SOME PERIODS OF TIME, ASSISTING MGA, FROM SEPTEMBER 1ST       09:43

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

1    TO OCTOBER 19TH, YOU RECOGNIZE THAT WOULD BE IMPROPER IF HE WAS

2    STILL AT MATTEL.  YOU'VE TOLD US THAT; CORRECT?

3    A    I WANT TO BE CLEAR ABOUT THAT.

4         THAT EXCHANGE THAT WE HAD IN EARLY SEPTEMBER -- AND I

5    BELIEVE THAT I SAID THIS YESTERDAY -- THE TIME THAT CARTER

6    BRYANT EXCHANGED WITH US IN TERMS OF WORK EARLY IN SEPTEMBER

7    WAS NOT THAT HE WAS CREATING MATERIAL IN NO WAY FOR BRATZ AT

8    ALL.  CARTER SUPPORTED ME IN SOME EXPLORATIONS THAT I WAS

9    INTERESTED IN PURSUING.

10        AT THE MOMENT OF THIS EARLY SEPTEMBER, I WAS VERY

11   MUCH IN LOVE WITH THE CONCEPT, AND I WAS ASKING, YOU KNOW --

12   WORKING WITH ISAAC, IN HOPES THAT WE WERE GOING TO COMMIT TO A

13   PROJECT THAT COULD HAVE COST MGA A LOT OF MONEY, AND I WANTED

14   TO BE SURE THAT CERTAIN INSTINCTS OF MINE WERE PROVEN OUT

15   BEFORE THIS CONTRACT WAS SIGNED.

16        BECAUSE THOSE DOCUMENTS -- BECAUSE THAT PORTFOLIO

17   WASN'T OFFICIALLY OWNED BY MGA DURING THIS TIME PERIOD, I FELT

18   IT APPROPRIATE THAT SOME OF THESE EXPLORATIONS THAT I WAS DOING

19   AGAINST HIS PORTFOLIO CONTENT -- I FELT IT APPROPRIATE FOR

20   CARTER TO BE A PART OF THAT.  THOSE WERE EXAMPLES, LIKE THE

21   SCULPTING MEETING THAT HE WAS A PART OF IN EARLY SEPTEMBER WITH

22   ME.  THAT'S JUST A SINGLE EXAMPLE.

23   Q    LET ME ASK YOU ABOUT SOME OF THOSE.

24        YOU SAID THAT YOU FELT YOU NEEDED MR. BRYANT'S

25   SUPPORT DURING THIS TIME.  YOU WERE CHARACTERIZING IT AS

09:43

09:43

09:43

09:44

09:44

610

1   EXPLORATORY; CORRECT?  THOSE WERE YOUR WORDS; RIGHT?

2   A    YEAH.  I MEAN, I FELT IT APPROPRIATE FOR HIM TO BE WITH ME

3   AND EXPLORING HIS PORTFOLIO DRAWINGS THAT AT THAT TIME MGA DID

4   NOT SUPPORT.

5   Q    AT THE TIME, YOU WERE DOING THIS EXPLORATION AS AN MGA

6   EMPLOYEE?

7   A    THAT'S RIGHT.

8   Q    WERE YOU GETTING PAID FOR IT?

9   A    YEAH.

10  Q    OKAY.

11       IT WOULD HAVE BEEN INAPPROPRIATE, AS YOU TOLD US

12  YESTERDAY, FOR MR. BRYANT TO BE SUPPORTING YOU AS AN EMPLOYEE

13  OF MGA IN EXPLORING BRATZ AT THE SAME TIME HE'S WORKING FOR

14  MATTEL; CORRECT?

15       **MS. AGUIAR:**  OBJECTION.  MISSTATES THE WITNESS'S

16  TESTIMONY FROM YESTERDAY.

17       **THE COURT:**  REPHRASE, COUNSEL.

18  **BY MR. PRICE:**

19  Q    ISN'T IT TRUE THAT IT WOULD HAVE BEEN INAPPROPRIATE FOR

20  MR. CARTER BRYANT, AS AN EMPLOYEE OF MATTEL, TO BE SUPPORTING

21  YOU, AN EMPLOYEE OF MGA, IN EXPLORING THIS COMPETITIVE,

22  POTENTIALLY COMPETITIVE, PRODUCT?  THAT WOULD HAVE BEEN

23  INAPPROPRIATE IF HE WAS AN EMPLOYEE OF MATTEL AT THE TIME,

24  WOULD YOU AGREE WITH THAT?

25  A    NO, I DON'T AGREE WITH THAT.

09:44
09:45
09:45
09:45
09:45
09:45

611

1    Q    IS THIS SOMETHING THAT YOU DISCUSSED LAST NIGHT?

2    A    NO, I DID NOT.

3    Q    SO LET ME UNDERSTAND WHY YOU DON'T AGREE.

4         OF COURSE, WHEN YOU TOLD MATTEL THAT YOU WERE GOING

5    TO WORK FOR MGA TWO WEEKS HENCE, WHEN YOU GAVE YOUR NOTICE,      09:46

6    THEY TOOK YOU OUT OF THE DESIGN CENTER, THEY WALKED YOU OUT,

7    BECAUSE THEY DID NOT WANT YOU AT MATTEL WHEN YOU WERE GOING TO

8    BE WORKING FOR MGA LATER; CORRECT?

9    A    RIGHT.

10   Q    SO IN SEPTEMBER, MR. CARTER BRYANT WORKED AT MATTEL.        09:46

11        YOU NOW UNDERSTAND THAT; CORRECT?

12   A    YES.

13   Q    AND YOU'RE SAYING IT WAS APPROPRIATE FOR HIM, WHILE

14   WORKING AT MATTEL, TO ACTUALLY VISIT WITH YOU AND SUPPORT YOU

15   AS AN MGA EMPLOYEE IN EXPLORING A PRODUCT THAT WOULD BE          09:46

16   COMPETITIVE WITH MATTEL?  THAT'S NOW YOUR TESTIMONY?

17   A    MR. PRICE, ALL I CAN TELL YOU IS THAT AT THE TIME OF THIS,

18   EARLY SEPTEMBER, CARTER BRYANT WAS NOT WORKING WITH US; HE WAS

19   PITCHING US HIS CONCEPT.  HE WAS KIND OF WING-MANNING THE MGA

20   GROUP IN HOPES THAT WE WOULD COMMIT AND SIGN UP CONTRACTUALLY    09:47

21   TO HIS CONCEPT.  HE WAS NOT WORKING ON BRATZ IN THIS EARLY

22   SEPTEMBER TIME PERIOD.

23        I JUST WANT TO MAKE SURE I'M INCREDIBLY CLEAR ON

24   THAT.

25   Q    SURE.                                                      09:47

612

1    BUT YOU SAID THAT, FOR EXAMPLE IN SEPTEMBER, HE MET

2    WITH A SCULPTOR AND YOU; IS THAT RIGHT?

3    A    YES.

4    Q    AND THAT SCULPTOR WOULD HAVE BEEN WHO?

5    A    MARGARET LEAHY.

6         AND THE REASON WE MET WITH MARGARET IS THAT IN

7    REVIEWING CARTER BRYANT'S PORTFOLIO SKETCHES, MY INSTINCT IN

8    REVIEWING SOME OF THOSE SKETCHES WAS THAT THEY WERE VERY

9    PROFESSIONAL, VAVAVOOM; THEY WERE VERY SEXY.  AND IT WAS, YOU

10   KNOW -- IN REVIEWING THOSE SKETCHES, I WANTED TO BE SURE THAT

11   ONCE AND IF THE CONTRACTS WERE SIGNED, THAT IF WE ACTUALLY

12   STARTED TO SCULPT AGAINST HIS PORTFOLIO DRAWINGS -- I WANTED TO

13   SEE HOW THAT WOULD BE MATERIALIZED INTO 3-D, LIKE, HOW

14   APPROPRIATE IT WOULD BE AND HOW FAR IS THIS KIND OF VAVAVOOM OR

15   THIS SEXY...

16        SO BEING THAT THOSE DRAWINGS DON'T BELONG TO MGA, BUT

17   INTERESTED IN PROVING OUT THIS 3-D VERSION OF HIS SKETCHES, I

18   ASKED MARGARET LEAHY TO SCULPT A RENDITION OF HIS PORTFOLIO

19   SKETCHES.  AND, AGAIN, BEING THAT WE DIDN'T OWN THOSE PORTFOLIO

20   DRAWINGS, CARTER ACCOMPANIED ME IN THAT EXPLORATION.

21   Q    WHAT YOU JUST SAID IS THAT CARTER MET WITH YOU AND THE

22   SCULPTOR WHILE HE WAS AN EMPLOYEE AT MATTEL TO TRY TO SEE

23   WHETHER MGA WOULD DO THIS BRATZ DOLL?  YOUR TESTIMONY IS THAT

24   THERE'S NOTHING WRONG WITH THAT; RIGHT?

25   A    THAT'S RIGHT.

09:47
09:47
09:48
09:48
09:48

613

1    Q    AND IF YOU LOOK AT EXHIBIT 305, WHICH IS ALREADY IN

2    EVIDENCE.

3         OCTOBER 10TH -- REMEMBER, THAT'S WHEN YOU SAID TO

4    MS. O'CONNOR THAT MR. CARTER HAD BEEN WORKING AN AVERAGE OF

5    ABOUT FOUR HOURS A DAY AND YOU BEGAN WORKING ON THIS LINE THE          09:49

6    FIRST PART OF SEPTEMBER.

7         YOU RECALL THIS E-MAIL; CORRECT?

8    A    YES.  AND I RECALL SAYING TO YOU YESTERDAY THAT IT WAS

9    INCORRECT.

10        THE COURT:  COUNSEL, IS THIS THE EXACT COPY OF THIS           09:50

11   OVER HERE?

12        MR. PRICE:  NO.  THIS IS SEPARATE.  I'M TRYING TO

13   AVOID GOING UP AND DRAWING ON THAT SO THAT I STAY HERE AT

14   COUNSEL'S TABLE.

15        THE COURT:  HAVE YOU REVIEWED THIS, COUNSEL?           09:50

16        MS. AGUIAR:  I HAVE NOT.

17        THE COURT:  BEFORE YOU PUBLISH ANYTHING TO THE JURY,

18   MAKE SURE THE OTHER SIDE HAS A CHANCE TO SEE IT.

19   BY MR. PRICE:

20   Q    MA'AM, ON OCTOBER 10TH, YOU SENT THIS E-MAIL TO           09:50

21   MS. O'CONNOR; CORRECT?

22   A    MAY I SEE THE --

23   Q    IT'S EXHIBIT 305.

24   A    WAS THAT IN VOLUME I?

25   Q    YES.           09:50

614

1          AND IT'S IN EVIDENCE ALREADY.  I CAN QUICKLY PUT IT

2  BACK UP HERE FOR YOU.  YOU CAN LOOK AT THE SCREEN.

3          **MS. AGUIAR:**  COULD WE PUT THE WHOLE DOCUMENT ON THE

4  SCREEN?

5          **THE COURT:**  IS IT IN EVIDENCE?                              09:5(

6          **MR. PRICE:**  YES.

7          **THE COURT:**  IT'S IN EVIDENCE, COUNSEL.

8          IF IT'S IN EVIDENCE, IT MAY BE PUBLISHED.

9  **BY MR. PRICE:**

10  Q   SO THIS IS ON OCTOBER 10TH THAT YOU SENT THE E-MAIL;          09:5(

11  CORRECT?

12  A   YES.

13  Q   AND YOUR TESTIMONY WAS THAT THIS "4" WAS A TYPOGRAPHICAL

14  ERROR?

15  A   THE TERM "4 HOURS" WAS INCORRECT.                              09:51

16  Q   I THINK YOUR TESTIMONY WAS THAT IT WAS A TYPO; RIGHT?

17  A   RIGHT.

18  Q   NOW, I ASSUME YOUR COMPUTER KEYBOARD LOOKS LIKE -- YOU

19  TYPED THIS ON A COMPUTER KEYBOARD; CORRECT?

20  A   YES.                                                            09:51

21  Q   SO WHAT NUMBER DID YOU MEAN TO TYPE IN WHEN YOU TYPED

22  IN "4"?

23  A   YOU KNOW, I DON'T REMEMBER, BECAUSE THIS WAS A NUMBER OF

24  YEARS AGO, ALMOST EIGHT YEARS AGO NOW.  I DON'T REMEMBER

25  EXACTLY WHAT I MEANT TO TYPE OR WHAT BUTTON I PUSHED           09:51

615

1    INCORRECTLY.  I CAN ONLY TELL YOU TODAY THAT THE TERM "4 HOURS"

2    WAS INCORRECT.  THERE'S NO WAY THAT FOUR HOURS OF TIME

3    EXCHANGED FROM CARTER ON BRATZ AT THIS TIME WOULD BE POSSIBLE.

4         FURTHER, I SHOULD ALSO SAY THAT WHILE I KNOW THAT IT

5    WAS INCORRECT, OBVIOUSLY ISAAC CAUGHT MY MISTAKE AS WELL.          09:51

6         IF YOU LOOK ABOVE THE DOCUMENT, HE CORRECTED IT BY

7    SAYING THAT CARTER BRYANT SHOULD BE PAID FROM THE DATE THAT HE

8    SIGNED THE CONTRACT.

9    Q    I'M ASKING YOU WHEN YOU SENT YOURS OUT.  WE'LL GET TO

10   MR. LARIAN.                                                       09:52

11        THE COURT:  I'M SORRY.  IS THERE AN OBJECTION,

12   COUNSEL?

13        MS. AGUIAR:  I'D LIKE THE COMPLETE DOCUMENT ON THE

14   SCREEN IF HE'S GOING TO BE TESTIFYING TO IT.

15        THE COURT:  FAIR ENOUGH.                                     09:52

16        COUNSEL, LET'S HAVE THE FULL DOCUMENT ON THE SCREEN.

17        MR. PRICE:  THE WHOLE DOCUMENT CAN'T BE SEEN BY THE

18   JURY, BUT I THINK THIS IS WHAT YOU WANT SHOWN.

19        THE COURT:  COUNSEL, IS THAT CORRECT?

20        MS. AGUIAR:  THAT'S FINE.                                    09:52

21   BY MR. PRICE:

22   Q    DID YOU KNOW OF THE CONTRACT THAT CARTER BRYANT SIGNED?

23   A    NO.

24   Q    YOU HADN'T SEEN IT?

25   A    NO.                                                          09:52

616

1   Q    YOU DON'T KNOW WHAT ITS EFFECTIVE DATE IS?

2   A    NO.

3   Q    WERE YOU EVER INFORMED THAT THE CONTRACT THAT

4   CARTER BRYANT SIGNED WITH MGA WAS DATED AS OF SEPTEMBER 18,

5   2000?

6   A    I AM NOT FAMILIAR OF THE OFFICIAL CONTRACT SIGNING DATE.

7   I'M NOT A LEGAL PERSON.  I HAVE -- I'M NOT CERTAIN OF IT.

8   Q    CERTAINLY, YOU'RE NOT AWARE THAT AS OF SEPTEMBER 18, 2008,

9   MR. CARTER BRYANT WAS STILL AN EMPLOYEE AT MATTEL?

10  A    I'M NOT CERTAIN OF THAT.  IF YOU SAY THAT'S TRUE, THEN

11  I'LL UNDERSTAND IT TO BE TRUE.

12  Q    SO ANYWAY, MY QUESTION IS NOW, WHEN YOU TYPED THIS -- YOU

13  TESTIFIED THERE IS A TYPOGRAPHICAL ERROR -- IS IT TRUE THAT,

14  SITTING HERE TODAY, YOU CAN'T RECALL WHAT NUMBER YOU MEANT TO

15  GO TO ON THAT COMPUTER KEYBOARD WHEN YOU ACCIDENTALLY HIT "4"?

16  A    I SIT HERE TODAY AND I CAN TELL YOU THAT I DON'T BELIEVE

17  THAT THE NUMBER "4" WAS MAYBE MY MISTAKE.

18       THIS WAS, AGAIN, A NUMBER OF YEARS AGO.  MAYBE I

19  MEANT FOUR HOURS A WEEK OR WITHIN THE MONTH.  I CAN'T TELL YOU.

20  I CAN ONLY TELL YOU THAT DURING THIS PERIOD OF TIME, THERE

21  WASN'T ANYTHING FOR CARTER BRYANT TO HAVE BEEN DOING TO HAVE

22  WORKED FOUR HOURS A DAY ON BRATZ.

23       AND I WILL ALSO SAY THAT CARTER'S EXCHANGE DURING

24  THIS PERIOD OF TIME WOULD HAVE BEEN DURING THAT TIME WHEN HE

25  WAS SITTING WITH ME IN MY EXPLORATION TO PROVE OUT HIS SKETCH

09:53

09:54

09:54

09:54

09:54

09:55

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

1    DRAWINGS.  SO IT WASN'T NECESSARILY EVEN WORK; IT WAS HIS

2    SUPPORT WITH ME THROUGH MY EXPLORATION ON HIS SKETCH DRAWINGS

3    THAT MGA DID NOT OWN AT THE TIME.

4    Q    WHEN YOU WERE WORKING AT MATTEL, WERE YOU SUPPORTING MGA

5    WHILE YOU WERE AN EMPLOYEE AT MATTEL?                          09:55

6    A    NO.  I DIDN'T HAVE -- NO, THERE WASN'T AN OPPORTUNITY.  I

7    MEAN, THERE WAS NO SITUATION SIMILAR TO THIS, IF YOU'RE MAKING

8    A SIMILAR RELATIONSHIP.

9    Q    AND THE SUPPORT WAS TO TRY TO, ACCORDING TO YOU, DETERMINE

10   WHETHER MGA WOULD, IN FACT, MAKE THESE BRATZ DOLLS; CORRECT?   09:55

11   A    YES.

12   Q    WHICH WOULD OBVIOUSLY PRESUMABLY BE DONE BECAUSE OF THE

13   THOUGHT THAT IT WOULD BE OF SOME FINANCIAL BENEFIT TO MGA TO DO

14   SO.

15   A    I'M NOT SURE WHAT YOU MEAN.                               09:55

16   Q    YOU WOULD GO FORWARD WITH THE BRATZ DOLLS IF YOU THOUGHT

17   YOU WERE GOING TO MAKE MONEY ON THEM.

18   A    YES.

19   Q    AND SO WHAT YOU'RE SAYING MR. CARTER BRYANT WAS DOING IN

20   SEPTEMBER WAS ASSISTING MGA IN DETERMINING WHETHER OR NOT MGA   09:56

21   SHOULD PURSUE A COMPETITIVE DOLL PRODUCT LINE THAT WOULD MAKE

22   MGA MONEY.

23   A    NO.  THAT IS NOT WHAT I'M SAYING.

24          ALL I'M SAYING IS THAT I WAS INTERESTED IN PURSUING

25   SOME EXPLORATION ON CARTER'S SKETCHES THAT WERE WITHIN HIS      09:56

618

1  PORTFOLIO, AND BECAUSE I DID NOT OWN THOSE DRAWINGS, CARTER SAT

2  WITH ME IN SOME OF THAT EXPLORATION, BECAUSE FRANKLY, I DIDN'T

3  OWN THEM; THEY BELONGED TO HIM.  AND SO HE ACCOMPANIED ME.  IT

4  WAS THAT TIME THAT HE SPENT WITH ME DURING THAT EARLY

5  SEPTEMBER.                                                              09:56

6  Q    TALKING ABOUT SEPTEMBER, LET'S GO THROUGH TO EXHIBIT 18,

7  WHICH IS ALREADY INTO EVIDENCE, WHICH WE LOOKED AT.  THAT IS IN

8  VOLUME I.

9        WE WERE TALKING ABOUT SEVERAL OF THE ENTRIES HERE, IF

10  WE CAN SHOW EXHIBIT 18.                                                09:56

11        THIS IS SEPTEMBER 27TH, YOUR E-MAIL TO HONG KONG;

12  CORRECT?

13  A    WHERE SHOULD I BE LOOKING?

14  Q    THIS IS EXHIBIT 18.  IT'S IN YOUR VOLUME I.

15  A    OKAY.                                                             09:57

16  Q    AND WE'VE DISCUSSED THE BINDER THAT YOU SENT ON

17  SEPTEMBER 27TH.

18        IT INCLUDED THESE DRAWINGS; CORRECT?

19  A    I BELIEVE SO.  HIS PORTFOLIO DRAWINGS.

20  Q    AND YOU DIDN'T TELL HONG KONG, 'THEY DON'T BELONG TO US.'         09:57

21  A    NO.

22  Q    AND THAT'S BECAUSE, AS OF SEPTEMBER 18TH, THEY DID, AT

23  LEAST IF MR. BRYANT HAD THE RIGHT TO GIVE THEM TO YOU.

24  A    I DON'T UNDERSTAND YOUR QUESTION.

25  Q    AS OF SEPTEMBER 27TH, YOUR UNDERSTANDING WAS, YOU COULD          09:57

619

1  USE THOSE DRAWINGS; MGA COULD USE THEM.

2  A    NO.   THAT WAS NOT MY UNDERSTANDING AT ALL, WHATSOEVER.

3  Q    WELL, IN ADDITION TO SENDING THEM THE DRAWINGS -- WE'VE

4  GOT THIS DISCUSSION ABOUT CHANGE OF CLOTHES, ET CETERA --

5  ACTUALLY, I'LL GO DOWN TO THE NEXT TWO PARAGRAPHS.                    09:58

6         REMEMBER YESTERDAY, WE WERE TALKING ABOUT -- TELLING

7  THEM ABOUT THE PREFERRED HAIR VENDOR AND THE APPROXIMATE AMOUNT

8  AND WEIGHT OF HAIR?  DO YOU RECALL THAT?

9  A    I REMEMBER, YES.

10  Q    I'D LIKE YOU TO LOOK -- IT'S IN THE SAME BINDER -- AT           09:58

11  EXHIBIT 30.

12         HAVE YOU SEEN EXHIBIT 30 BEFORE?

13  A    I DON'T REMEMBER.  IT'S POSSIBLE THAT I HAVE.  I'M NOT

14  SURE.

15  Q    YOU KNEW THAT AS OF SEPTEMBER 18, 2000, MR. BRYANT WAS          09:58

16  SPEAKING WITH HAIR VENDORS AND REPRESENTING THAT HE WAS WORKING

17  WITH MGA ENTERTAINMENT?

18  A    I WANT TO BE CLEAR THAT I, AT THE TIME, DID NOT REALIZE

19  THAT CARTER BRYANT WAS REACHING OUT TO THE SARAN HAIR MATERIAL

20  OR THE SARAN MANUFACTURER.  I WILL JUST EXCHANGE FROM MY PART        09:59

21  THAT I REACHED OUT TO CARTER, AGAIN IN EXPLORING, YOU KNOW --

22  IN THE SORT OF EXPLORATION PERIOD, I ASKED HIM WHAT HIS THOUGHT

23  WOULD BE FOR HIS RECOMMENDATION ON A HAIR MATERIAL TYPE FOR

24  THIS FASHION DOLL HEAD, AND HE HAD GIVEN ME HIS RECOMMENDATION

25  ON SARAN HAIR.                                                       09:59

1      CARTER, I THINK, AT THAT POINT, TOOK IT A LITTLE

2  FURTHER AND COMMUNICATED WITH THE VENDOR, AND I THINK AT THIS

3  TIME, HE WAS DOING WHAT HE COULD TO MAKE SURE THAT WE HAD

4  INFORMATION WE NEEDED TO MAKE SURE TO COMMIT OR TO MAKE A

5  DECISION ON WHETHER TO PROCEED WITH BRATZ OR NOT.

6  Q     IN FACT, WHAT MR. BRYANT WAS SAYING WAS, HE INSISTED THAT

7  A CERTAIN TYPE OF HAIR BE USED ON THE BRATZ DOLLS; RIGHT?

8  A     I'M SORRY.  HE INSISTED -- WHEN?

9  Q     IN THIS TIME FRAME, HE WAS INSISTING THAT YOU USE -- IS IT

10  HOLLOW SARAN HAIR?

11  A     IT'S PRONOUNCED HOLLOW SARAN.

12      AND I DON'T REMEMBER ANY TIME THAT CARTER WAS

13  INSISTING ON USING THIS MATERIAL.  FOR ME, I ASKED FOR HIS

14  RECOMMENDATION, AND IT WAS MY UNDERSTANDING HE WAS RECOMMENDING

15  SARAN.

16  Q     WHEN DID YOU UNDERSTAND THAT MR. BRYANT HAD CONTACTED A

17  SARAN HAIR VENDOR AND REPRESENTED HE WAS WORKING WITH MGA?  YOU

18  SAID YOU WEREN'T AWARE ON SEPTEMBER 18TH.  WHEN DID YOU BECOME

19  AWARE OF IT?

20  A     I'M NOT SURE.

21      I THINK IT'S POSSIBLE THAT LATER -- I REMEMBER HIM

22  SHOWING US -- AND I BELIEVE THIS WAS POST CONTRACT -- YOU KNOW,

23  BOOKS OF THEIR HAIR MATERIAL TYPES AND ALL OF THEIR COLOR

24  SWATCHES.  I CAN'T BE SURE.

25  Q     WHEN YOU SAY "POST CONTRACT," WHAT DATE ARE YOU REFERRING

09:59

10:00

10:00

10:00

10:01

1    TO?

2    A    WELL, I ONLY KNOW -- AND I DON'T REMEMBER THE EXACT DATE,

3    BUT THE DATE IN WHICH MGA -- WHEN I WAS GIVEN THE GREEN LIGHT

4    TO PROCEED, TO START WORKING ON BRATZ.

5    Q    AND THAT'S BEFORE OCTOBER 19TH, WHEN CARTER BRYANT LEFT    10:01

6    MATTEL.

7    A    I UNDERSTOOD THEN AND NOW THAT THE CONTRACT WAS SIGNED

8    SOMETIME IN EARLY OCTOBER.

9    Q    ON EXHIBIT 18, LOOK AT THE FIRST PART OF THIS AGAIN.

10           WHEN YOU CONTACTED HONG KONG, WHAT YOU TOLD THEM WAS    10:01

11   THAT YOU WERE "SENDING TODAY A BINDER DESCRIBING THE NEW SMALL

12   DOLL LINE CALLED BRATZ."

13           ISN'T THAT WHAT YOU TOLD THEM?

14   A    THAT'S WHAT IT SAYS IN THE E-MAIL, YEAH.

15   Q    YOU DIDN'T SAY, 'WE'RE EXPLORING WHETHER WE'RE GOING TO DO   10:02

16   A SMALL DOLL LINE."  YOU TOLD THEM, 'I'M SENDING YOU MATERIAL

17   DESCRIBING THE NEW SMALL DOLL LINE CALLED BRATZ'; RIGHT?

18   A    YEAH.  BUT, I MEAN, ON THIS PARTICULAR SENTENCE OF THIS

19   PARTICULAR E-MAIL, YOU KNOW, I PROBABLY SHOULD NOT HAVE

20   INCLUDED THE WORD "THE."  I DON'T KNOW.  I WASN'T IN ANY WAY IN   10:02

21   THIS E-MAIL SUGGESTING TO HONG KONG THAT IT WAS A FINAL AND

22   CONFIRMED AND COMMITTED LINE BY MGA.  THIS WAS -- AND IF YOU

23   READ DOWN ON THE BOTTOM, "I'M HOPING THAT THIS INFORMATION" --

24   Q    LET'S GO BACK AND YOU CAN SHOW US THIS PART HERE.

25   A    IT'S, LIKE, THE THIRD SENTENCE FROM THE BOTTOM.    10:03

622

1           "I'M HOPING THAT THIS INFORMATION WILL HELP YOU HELP

2    ME GET AN IDEA OF HOW MUCH THESE COMPONENTS WILL COST."

3           THIS WAS AN E-MAIL THAT I SIMPLY SENT OUT TO

4    HONG KONG, ASKING THEM, IN PART OF THIS EXPLORATION -- IT WAS

5    MY INTENTION THAT HONG KONG WOULD RETURN TO ME SOME BALLPARK          10:03

6    COSTS ON A PROJECT LIKE THIS SO THAT I COULD CONFIRM WHETHER OR

7    NOT IT WAS WITHIN MGA'S BEST INTEREST; THAT IT WOULD, IN FACT,

8    RETURN MONEY FOR US; THAT WE WOULD BE PROFITABLE WITH A PRODUCT

9    LIKE THIS.

10   Q    SO YOU'RE TELLING HONG KONG THAT 'WE'VE GOT THIS NEW DOLL       10:03

11   LINE CALLED BRATZ; WE NEED TO KNOW HOW MUCH IT'S GOING TO COST

12   TO MAKE IT'?

13   A    NO, THAT'S NOT MY INTENTION OF THIS E-MAIL.

14   Q    HOW OFTEN IN YOUR CAREER AT MGA HAVE YOU TALKED TO

15   DESIGNERS OF COMPETITIVE COMPANIES, OF COMPETITORS, TO HAVE          10:03

16   THEM SUPPORT YOU IN EXPLORING WHETHER MGA WILL PURSUE A LINE OF

17   DOLLS THAT ARE COMPETITIVE WITH THAT COMPETITOR?

18   A    I'VE HAD A LOT OF INTERVIEWS WITH POTENTIAL CANDIDATES

19   THAT MAY DESIGN WITH ME AT MGA.  SOME OF THEM ACTUALLY HAVE

20   JOBS AT COMPETING COMPANIES.  AND IT WOULDN'T BE UNLIKELY FOR        10:04

21   THAT PERSON, IN THOSE MEETINGS, TO SUGGEST, 'HEY, LET ME KNOW

22   WHAT ELSE I CAN DO TO HELP YOU, YOU KNOW, BE CERTAIN OF ME OR

23   OF MY SKILLS AND MY ABILITY.'

24           I DON'T KNOW IF THAT ANSWERS YOUR QUESTION.

25   Q    I'M NOT TALKING ABOUT SOMEONE FROM ANOTHER COMPANY COMING       10:04

1    IN AND DOING A PITCH AND SAYING, 'HEY, WILL YOU HIRE ME?

2    HERE'S SOME OF MY WORK,' OR 'I'LL BE GLAD TO PROVE TO YOU THAT

3    I'M A GOOD DESIGNER.'  I'M SAYING, HOW OFTEN HAVE YOU WORKED

4    WITH A DESIGNER OF A COMPETITIVE COMPANY TO HAVE THAT DESIGNER

5    HELP YOU, MGA, EXPLORE HOW MUCH IT WILL COST TO BRING OUT A

6    COMPETITIVE PRODUCT?

7    A    I HAVEN'T, OTHER THAN THIS SITUATION, HAD OTHER EXCHANGES

8    WHERE OTHER PEOPLE MIGHT HAVE BROUGHT ME A DOLL THAT I WOULD BE

9    THIS MUCH INTERESTED IN, OR A CONCEPT AT ALL FOR THAT EXCHANGE.

10   Q    AND HERE ON SEPTEMBER 27TH, YOU TELL HONG KONG, "I'M GOING

11   TO SEND YOU A PDF BY THE END OF THIS WEEK."

12         THOSE OF US FAMILIAR WITH COMPUTERS HAVE A DIFFERENT

13   IDEA WHAT "PDF" IS.  PERHAPS, YOU COULD TELL THE JURY WHAT YOU

14   MEANT BY "PDF."

15   A    "PDF" STANDS FOR PRODUCT DEVELOPMENT FORM.  IT IS A FORM

16   THAT MGA -- IT'S AN MGA FORM, AND IT WAS A FORM THAT

17   ESTABLISHES A PRODUCT OFFICIALLY AT MGA.  AND IN THIS

18   REFERENCE, I SAID, "I'M SENDING YOU A PDF BY NEXT WEEK.  PLEASE

19   CALL ME IF YOU HAVE ANY QUESTIONS."

20         I DID NOT SEND A PDF THE FOLLOWING WEEK, AFTER

21   SEPTEMBER 27TH, BECAUSE I WAS WAITING TO GET ISAAC'S BUYOFF.

22   AND I DIDN'T UNDERSTAND THE CONTRACT TO BE OFFICIAL UNTIL MUCH

23   LATER, EARLY OCTOBER.

24         I DID SEND, HOWEVER, MY PDF OCTOBER 16TH.

25   Q    AND WE'LL GET TO THAT.

10:05
10:05
10:05
10:06
10:06

624

1        BUT AS OF SEPTEMBER 27TH, THEN, YOUR INTENTION AT

2   THAT TIME WAS THAT BY THE END OF THAT WEEK, YOU WERE GOING TO

3   HAVE A PDF, OFFICIAL PRODUCT DEVELOPMENT FORM, TO SEND TO

4   HONG KONG FOR THIS BRATZ LINE?  THAT WAS YOUR INTENTION AT THAT

5   TIME?                                                          10:06

6   A   I DON'T REMEMBER EXACTLY WHAT WAS HAPPENING WITH THE

7   CONTRACT AT THIS TIME.  IT MAY HAVE BEEN THAT I BELIEVED THAT

8   THE CONTRACT MAY HAVE BEEN SIGNED AROUND THAT TIME.  I'M NOT

9   SURE.

10  Q   WELL, LET ME JUST ASK YOU WHETHER THE FOLLOWING STATEMENT  10:07

11  IS TRUE -- AS OF SEPTEMBER 27TH, WAS THE FOLLOWING STATEMENT

12  TRUE, AS FAR AS YOUR INTENT:  "I'M GOING TO SEND YOU A PDF BY

13  THE END OF NEXT WEEK"?

14        WAS THAT STATEMENT A TRUE REFLECTION OF YOUR

15  INTENTION AS OF SEPTEMBER 27TH?                               10:07

16  A   IT MAY HAVE BEEN.  I DON'T KNOW THE CONTEXT AGAIN IN TERMS

17  OF WHEN, AND I DON'T REMEMBER THE CONVERSATIONS OR THE CONTEXT

18  IN WHICH MGA WAS CONFIRMING WHETHER OR NOT THE CONTRACT WOULD

19  HAVE BEEN OFFICIALLY SIGNED BY THEN OR NOT.  SO I CAN'T -- I

20  WOULDN'T THINK I WAS LYING, BUT I DON'T THINK THAT I WAS TRYING 10:07

21  TO SEND A PDF PREMATURELY OR INAPPROPRIATELY.

22  Q   I'M NOT SUGGESTING YOU WERE; I'M JUST TRYING TO SEE IF I

23  CAN GET YOU TO AT LEAST AGREE THAT ON SEPTEMBER 27TH, WHEN YOU

24  SAID, "I'M GOING TO SEND YOU A PDF BY THE END OF NEXT WEEK,"

25  THAT THAT WAS, IN FACT, YOUR INTENTION AS OF SEPTEMBER 27TH.    10:07

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

625

1   A    I DON'T REMEMBER WHAT WAS HAPPENING AROUND SEPTEMBER 27TH.

2   Q    WELL, DOES THIS DOCUMENT, WHICH YOU SENT, REFRESH YOUR

3   RECOLLECTION, THEN, THAT AS OF SEPTEMBER 27TH, YOU HAD DONE

4   ENOUGH IN EXPLORING THE BRATZ LINE THAT IT WAS YOUR INTENTION,

5   WITHIN A WEEK OF THIS, TO SEND A PDF FORM TO HONG KONG, WHICH         10:08

6   WAS AN OFFICIAL FORM SAYING, 'WE'RE STARTING THE LINE'?

7   A    NO.  FOR TWO REASONS.  FIRST, I DIDN'T ACTUALLY SEND MY

8   PDF UNTIL OCTOBER 16TH.  AND FINALLY, THIS VERY DOCUMENT -- I

9   BELIEVE THE SENTENCE JUST ABOVE IT -- PROVES THAT I WAS STILL

10  UNSURE AND I WAS STILL LOOKING TO HONG KONG TO HELP ME PROVIDE        10:08

11  MORE INFORMATION ON WHETHER OR NOT THIS WAS A VIABLE PRODUCT

12  FOR MGA TO PURSUE.  SO, NO, I DID NOT HAVE ALL OF THE

13  INFORMATION YET.

14  Q    THEN LET ME ASK YOU THIS:  IF IT WAS NOT YOUR INTENTION TO

15  DO THAT, THEN WHY WOULD YOU TELL HONG KONG IT WAS?  WHY WOULD        10:08

16  YOU TELL THEM, "I'M GOING TO SEND YOU A PDF BY THE END OF NEXT

17  WEEK" IF YOU HAD NO INTENTION OF DOING THAT?

18  A    AS I MENTIONED, I DON'T KNOW WHAT WAS HAPPENING THE WEEK

19  AFTER I SENT HONG KONG THIS E-MAIL.  IT'S POSSIBLE BACK THEN

20  THAT, IN FACT, I BELIEVED THAT THE CONTRACT MAY HAVE COME TO A       10:09

21  CLOSE OR THAT I MIGHT HAVE HAD -- I DIDN'T SEND MY PDF UNTIL

22  OCTOBER 16TH OF 2000.

23  Q    AND I KNOW.  I'M NOT ASKING WHEN YOU SENT IT.  I'M ASKING

24  YOUR INTENTION ON SEPTEMBER 27TH.  BUT IF YOU SAY YOU CAN'T

25  REMEMBER, THAT'S FINE.  I'LL MOVE ON.                                10:09

626

1          YOU CAN'T REMEMBER?

2    A    I CAN'T REMEMBER THE CONTEXT AT THIS TIME.

3    Q    GETTING BACK TO MR. BRYANT AND HIS SUPPORT WITH RESPECT TO

4    A HAIR VENDOR AND THE TYPE OF HAIR THAT WAS TO BE USED ON

5    BRATZ, THAT TOPIC, I'D LIKE YOU TO LOOK -- THIS IS IN THE                    10:09

6    SECOND VOLUME OF YOUR EXHIBITS -- I'D LIKE YOU TO LOOK AT

7    EXHIBIT 1765.

8          YOU SEE THAT'S A NUMBER OF E-MAILS AND EXCHANGES

9    BETWEEN YOU AND OTHER FOLKS AT MGA WITH THE SUBJECT "RE:

10   BRATZ"?                                                                      10:10

11   A    YES.

12         **MR. PRICE:**  YOUR HONOR, I MOVE EXHIBIT 1765 INTO

13   EVIDENCE.

14         **THE COURT:**  ANY OBJECTION?

15         **MS. AGUIAR:**  MY ONLY OBJECTION IS THAT IT INCLUDES AN               10:11

16   E-MAIL THAT'S OUTSIDE THE TIME FRAME THAT'S BEEN SET FOR PHASE

17   ONE.

18         **THE COURT:**  I'LL TAKE A LOOK.

19         **MR. PRICE:**  THE RESPONSE, YOUR HONOR, IS THAT -- I'VE

20   BEEN TOLD IT'S VOLUME I.  IT'S EXHIBIT 1765.                                 10:11

21         **THE COURT:**  HERE IT IS.  IT'S VOLUME II.

22         I UNDERSTAND YOUR OBJECTION, COUNSEL.  I'M GOING TO

23   OVERRULE IT, GIVEN THE CLOSE PROXIMITY TO THE TIME FRAME.

24         YOU MAY PROCEED, COUNSEL.

25         THERE'S NO OTHER OBJECTION?                                            10:12

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1          **MS. AGUIAR:**  NO.

2          **THE COURT:**  ADMITTED.

3          YOU MAY PUBLISH.

4    **BY MR. PRICE:**

5    Q    SO IF WE CAN LOOK A FEW PAGES INTO THIS.  IN FACT, I THINK          10:12

6    IT'S PAGE 3 OF THE EXHIBIT.

7          I'M JUST TRYING TO GET YOU A FRAME OF REFERENCE HERE.

8          DO YOU RECALL THAT SOMETIME AROUND OCTOBER 18TH,

9    THERE WAS AN E-MAIL EXCHANGE CONCERNING WHAT KIND OF HAIR WAS

10   GOING TO BE USED ON BRATZ?          10:13

11          I'M LOOKING HERE AT OCTOBER 18TH, 2:45 A.M.  IT'S

12   FROM SAMUEL WONG TO MS. WARD, AND OTHERS, INCLUDING YOURSELF.

13          "FOR ALL OUR CURRENT DOLLS, WE'RE USING LOCAL

14   PP HAIR; IT'S LOWER PRICED,' ET CETERA.

15          DO YOU SEE THAT?          10:13

16   A    YES.

17   Q    AND THEN YOU SEE RIGHT ABOVE IT, YOU RESPOND.  AND YOU'RE

18   RESPONDING TO MR. WONG.

19          IS MR. WONG IN HONG KONG, BY THE WAY?

20   A    YES.          10:13

21   Q    AND YOU'RE RESPONDING, "SAMUEL, CARTER, OUR DESIGNER, ON

22   BRATZ ALREADY SOUGHT INFORMATION ON THIS HAIR.  I HAVE SENT ALL

23   OF THIS INFORMATION TO YOU BY FAX."

24          DO YOU SEE THAT?

25   A    YES.          10:13

1    Q    AND IS THAT REFERRING TO THE INFORMATION THAT MR. BRYANT,

2    THE BRATZ DESIGNER, WENT OUT AND GOT IN SEPTEMBER OF 2000?

3    A    I BELIEVE SO.

4    Q    AND BY THIS TIME, OCTOBER 19TH, BRATZ WAS AN OFFICIAL MGA

5    PROJECT; CORRECT?                                                      10:14

6    A    CAN YOU REPEAT THE QUESTION.

7    Q    BY OCTOBER 19TH, YOU'LL AGREE, BRATZ WAS AN OFFICIAL MGA

8    PROJECT?

9    A    BY MY DEFINITION, GIVEN THAT I HAD DISTRIBUTED MY PDF ON

10   THE 16TH, YES.                                                        10:14

11   Q    AND IT SAYS HERE THAT YOU SENT THE INFORMATION BY FAX.

12            WAS IT IN SEPTEMBER, THEN, THAT MR. BRYANT GAVE YOU

13   THIS INFORMATION THAT YOU WERE THEN IN OCTOBER SENDING TO

14   HONG KONG BY FAX?

15   A    I DON'T REMEMBER.                                                10:14

16   Q    IS THAT YOUR BEST RECOLLECTION, WHERE HE PROVIDED THAT

17   SUPPORT, WHERE HE GAVE YOU THE INFORMATION THAT YOU SENT TO

18   HONG KONG ABOUT THE HAIR PROVIDER?

19   A    SITTING HERE TODAY, I ONLY REMEMBER CARTER BRYANT GIVING

20   ME HIS RECOMMENDATION ON HIS PREFERRED HAIR MATERIAL.  I DON'T        10:15

21   REMEMBER HIM GIVING ME ANY OTHER INFORMATION BEYOND THAT IN

22   SEPTEMBER, IF THAT'S WHAT YOU'RE ASKING.

23   Q    WHAT WERE YOU FAXING TO MR. WONG ON OCTOBER 19TH?

24   A    IT'S POSSIBLE THAT AROUND THIS TIME, THEN, CARTER MAY

25   HAVE, YOU KNOW, PROVIDED ME INFORMATION HE HAD GATHERED; AND AT       10:15

629

1    THAT TIME, I LIKELY FAXED IT ON TO SAMUEL.

2    Q    SITTING HERE TODAY, YOU CAN'T RECALL WHEN HE GAVE YOU THAT

3    INFORMATION.

4    A    NO.  BUT I DON'T BELIEVE THAT IT HAPPENED UNTIL WE GOT,

5    YOU KNOW, INTO THINGS LIKE PDF'S AND STARTED GETTING SOME          10:16

6    TRACTION ON THE PROJECT.

7    Q    HAVE YOU SEEN THAT FAX RECENTLY, THE FAX THAT YOU SENT,

8    WHICH HAD THE INFORMATION WHICH MR. BRYANT HAD COLLECTED FOR

9    MGA?

10   A    NO.                                                           10:16

11   Q    DID YOU AUTHORIZE MR. BRYANT IN SEPTEMBER, BY THE WAY, TO

12   MAKE REPRESENTATIONS TO VENDORS THAT HE WAS WORKING FOR MGA?

13   A    NO.  NOT NECESSARILY.

14   Q    YOU'LL AGREE THAT YOU WOULD HAVE THOUGHT, IF YOU HAD KNOWN

15   THAT, THAT THAT WAS INAPPROPRIATE, FOR HIM TO REPRESENT IN         10:16

16   SEPTEMBER THAT HE WAS WORKING FOR MGA WHEN, IN FACT, HE WAS

17   WORKING FOR MATTEL?

18   A    HE WAS WORKING WITH US TO GATHER SOME EXPLORATION MATERIAL

19   OR SOME -- HELPING US TO GATHER SOME OF OUR INFORMATION TO

20   DECIDE WHETHER THIS PROJECT WAS VIABLE OR NOT, IF THAT'S WHAT      10:16

21   YOU MEAN.  BUT HE WAS NOT WORKING ON THE BRATZ CONCEPT AT THAT

22   TIME.

23   Q    MY QUESTION WAS DIFFERENT.

24        IF YOU HAD KNOWN IN SEPTEMBER THAT MR. CARTER BRYANT

25   WAS REPRESENTING TO VENDORS THAT HE WAS WORKING FOR MGA, YOU       10:17

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

1   WOULD HAVE THOUGHT THAT WAS INAPPROPRIATE, RIGHT, BECAUSE HE

2   WAS WORKING AT MATTEL AT THE TIME?

3   A    I THINK I'D HAVE TO LOOK AT THE PARTICULAR LANGUAGE.

4   Q    IN THAT CASE, IF YOU COULD LOOK AT THE LANGUAGE ON

5   EXHIBIT 30, WHICH WE LOOKED AT EARLIER.                          10:17

6   A    IS THIS IN VOLUME I?

7   Q    IT'S IN VOLUME I; ONE OF THE FIRST 30.

8        I'M GOING TO GIVE YOU THE PRECISE LANGUAGE TO SEE IF

9   YOU WOULD AGREE THAT THIS WOULD BE INAPPROPRIATE.

10       IF MR. BRYANT HAD TOLD THE VENDOR THAT, QUOTE, 'THE         10:18

11  COMPANY I'M WORKING WITH IS CALLED MGA ENTERTAINMENT, AND WE

12  ARE LOCATED IN LOS ANGELES, CALIFORNIA' -- IF HE HAD BEEN

13  MAKING THOSE REPRESENTATIONS IN SEPTEMBER, WHILE HE WAS AN

14  EMPLOYEE AT MATTEL, YOU WOULD AGREE THAT THAT WOULD BE

15  INAPPROPRIATE?                                                   10:18

16  A    IN READING THIS CONTEXT, I FIND THIS TO BE NOT

17  INAPPROPRIATE.  AND THE REASON WHY IS --

18       **MR. PRICE:**  YOUR HONOR, I'D MOVE EXHIBIT 30 INTO

19  EVIDENCE.

20       **MS. AGUIAR:**  I'M SORRY.  WAS THE WITNESS DONE GIVING     10:18

21  HER ANSWER?

22       **THE COURT:**  I THOUGHT 30 WAS ALREADY IN.

23       IS IT NOT?

24       **MR. PRICE:**  I DON'T BELIEVE IT IS.  I JUST WANTED THE

25  JURY TO SEE IT WHILE SHE WAS GIVING HER ANSWERS.                 10:18

1     **THE COURT:**  COUNSEL, WE SHOULDN'T HAVE GOTTEN INTO IT

2  IF IT WASN'T IN EVIDENCE ALREADY.

3         LAY A FOUNDATION FOR EXHIBIT 30, COUNSEL.

4     **MR. PRICE:**  THE REASON, IF YOU RECALL, SHE ASKED

5  ABOUT SPECIFIC LANGUAGE, WHETHER SHE WOULD APPROVE OF THAT.

6  THAT'S WHY I READ THAT.

7     **THE COURT:**  ASK ANOTHER QUESTION, COUNSEL.

8  **BY MR. PRICE:**

9  Q    SO YOUR TESTIMONY IS THAT YOU BELIEVED THE LANGUAGE IN

10  EXHIBIT 30 IS APPROPRIATE?

11  A    YES.

12     **MR. PRICE:**  AND IN THAT CASE, YOUR HONOR, I JUST

13  REQUEST TO SHOW THE LANGUAGE TO THE JURY, SO WE CAN THEN ASK

14  HER WHY SHE THINKS IT'S APPROPRIATE.

15         SO I'D MOVE EXHIBIT 30 INTO EVIDENCE.

16     **THE COURT:**  ANY OBJECTION?

17     **MS. AGUIAR:**  I HAVE NO OBJECTION.

18     **THE COURT:**  IT'S ADMITTED.

19         NOW YOU MAY PUBLISH.

20  **BY MR. PRICE:**

21  Q    THE LANGUAGE I READ TO YOU, MS. GARCIA, WAS THIS HERE,

22  WHERE MR. BRYANT SAYS, "THE COMPANY I'M WORKING WITH IS CALLED

23  MGA ENTERTAINMENT, AND WE'RE LOCATED IN LOS ANGELES,

24  CALIFORNIA.  YOU CAN E-MAIL ME WITH ANY QUESTIONS AT

25  SOPHIESAYS@HOTMAIL.COM."

10:19
10:19
10:19
10:19
10:20

632

1        AND THEN YOU SEE ABOVE HERE, HE'S TALKING ABOUT USING

2    HOLLOW SARAN HAIR FIBER.

3        I BELIEVE YOU'RE GOING TO TELL US WHY -- IT'S YOUR

4    BELIEF THAT THIS WOULD HAVE BEEN ENTIRELY APPROPRIATE FOR

5    MR. BRYANT TO DO WHILE HE WAS STILL AN EMPLOYEE AT MATTEL?          10:20

6    A    THAT'S RIGHT.

7        I BELIEVE WHEN CARTER WROTE THIS -- THIS, JUST TO BE

8    CLEAR, IS THE TIME PERIOD YET AGAIN, PRIOR TO THE CONTRACT

9    BEING SIGNED AND DURING THE TIME THAT I WAS EXPLORING WHETHER

10   OR NOT MGA SHOULD PROCEED WITH THE BRATZ CONCEPT.  AND HE          10:20

11   SIMPLY SAYS, 'I'M WORKING WITH MGA.'

12       BUT THAT'S NOT TO SUGGEST NECESSARILY THAT HE IS

13   EMPLOYED AT MGA.  HE'S WORKING WITH ME ON SOME OF THESE

14   EXPLORATION EXERCISES, TO CONFIRM, YOU KNOW, SOME OF

15   MY QUESTIONS, SOME OF MY EXPLORATION.                              10:21

16       SO, YEAH.

17   Q    SO IN THAT CONTEXT, YOU BELIEVE THAT GIVEN THE CONTRACT HE

18   HAD AT MATTEL, AND THE CONTRACT YOU HAD, IT WAS APPROPRIATE,

19   WHILE HE WAS A MATTEL EMPLOYEE, TO TELL A THIRD PARTY THAT HE

20   IS WORKING WITH MGA AND WE -- YOU UNDERSTOOD THE "WE" TO REFER     10:21

21   TO MGA; CORRECT?

22   A    YES.  BOTH HE WAS -- AND HE LISTED HIS ADDRESS DOWN HERE.

23   HE'S LOCATED, HE LIVES IN, AND MGA WAS ALSO ESTABLISHED IN,

24   L.A.

25   Q    AND BY "WE," DID YOU THINK THAT REFERRED TO HIM AND MGA AS    10:21

633

1    SEPARATE ENTITIES?

2    A    YES.   THAT'S WHY HE LISTED HIS ADDRESS BELOW.

3    Q    THEN IF WE LOOK AT HIS ADDRESS BELOW, IT SAYS, "MGA

4    ENTERTAINMENT, ATTENTION:  CARTER BRYANT, 1319 WEST 160TH

5    STREET, GARDENA, CALIFORNIA, 90247, USA" -- BY READING THAT, IS    10:21

6    IT YOUR READING OF THIS THAT HE'S GIVING THE IMPRESSION THAT

7    THIS ADDRESS IS MGA ENTERTAINMENT'S ADDRESS AND IT'S TO GO TO

8    HIS ATTENTION?

9    A    I'M NOT SURE WHAT HIS INTENTION WAS IN WRITING THIS.

10   Q    FAIR ENOUGH.    10:22

11        THAT'S HOW YOU WOULD INTERPRET THAT, AS AN OBJECTIVE

12   READER OF THAT, THAT THAT IS SAYING THAT 'YOUR RESPONSE WILL GO

13   TO MGA ENTERTAINMENT, AND I AM WITH MGA ENTERTAINMENT AT THAT

14   ADDRESS'?

15        **MS. AGUIAR:**  OBJECTION, YOUR HONOR.  I THINK THE    10:22

16   WITNESS ANSWERED THE QUESTION.

17        **THE COURT:**  ASK ANOTHER QUESTION, COUNSEL.

18   **BY MR. PRICE:**

19   Q    SO IF WE COULD GO BACK TO YOUR CONTRACT WITH MATTEL THAT

20   WE TALKED ABOUT YESTERDAY.  I BELIEVE THAT'S EXHIBIT 1116,    10:22

21   WHICH IS GOING TO BE IN THAT SECOND VOLUME.

22        **THE COURT:**  COUNSEL, LET'S TAKE OUR MORNING RECESS

23   NOW, BEFORE YOU GO INTO ANOTHER AREA.

24        (WHEREUPON, JURORS DEPART COURTROOM.)

25        (JURORS ENTER COURTROOM.)    10:44

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

1        **THE COURT:**  GO AHEAD, COUNSEL.

2        **MR. PRICE:**  THANK YOU, YOUR HONOR.

3    Q    MS. GARCIA RIGHT BEFORE WE BROKE, I MENTIONED

4    EXHIBIT 1116; WE LOOKED AT IT YESTERDAY; IT'S ON THE SCREEN; GO

5    TO THE SECOND PAGE OF THAT.                                          10:44

6         THIS PARAGRAPH THAT WE TALKED ABOUT YESTERDAY, THIS

7    IS YOUR MATTEL AGREEMENT; CORRECT?

8    A    YES.

9    Q    AND WHERE IT SAYS HERE, "I SHALL NOT, WITHOUT THE

10   COMPANY'S EXPRESSED WRITTEN CONSENT, ENGAGE IN ANY EMPLOYMENT        10:45

11   OR BUSINESS OTHER THAN FOR THE COMPANY OR INVEST IN OR ASSIST

12   IN ANY MANNER, ANY BUSINESS COMPETITIVE WITH THE BUSINESS OR

13   FUTURE BUSINESS PLANS OF THE COMPANY."

14        FIRST OF ALL, YOU WILL AGREE THAT MGA WAS A

15   COMPETITIVE BUSINESS WITH MATTEL.                                    10:45

16   A    YES.

17   Q    WHAT YOU HAVE BEEN TELLING US IS THAT MR. BRYANT WAS

18   ASSISTING YOU IN EXPLORING MGA PURSUING THE BRATZ DOLL LINE;

19   CORRECT?

20   A    HE WAS ASSISTING IN EXPLORING HIS PORTFOLIO DRAWINGS,          10:46

21   WHICH MGA ACTUALLY AND IN MANY WAYS DID NOT USE AT ALL.

22   Q    THAT ISSUE IS FOR ANOTHER TIME.

23        BUT YOU'LL AGREE WITH ME THAT HE WAS, IN SEPTEMBER

24   AND OCTOBER, NO MATTER HOW YOU CHARACTERIZE IT, ASSISTING, IN

25   SOME MANNER, MGA.                                                    10:46

1    A    HE WAS NOT ASSISTING ON WORK THAT WE ACTUALLY MANUFACTURED

2    WITH.  HE WAS NOT ASSISTING IN DESIGN.

3    Q    MY QUESTION IS DIFFERENT; THAT'S WHY I SAID "IN ANY

4    MANNER."

5            NO MATTER HOW YOU CHARACTERIZE IT, YOU'LL AGREE THAT        10:47

6    MR. BRYANT, IN SEPTEMBER AND OCTOBER OF 2000, PRIOR TO

7    OCTOBER 19TH WHEN HE LEFT MATTEL, WAS ASSISTING, IN SOME

8    MANNER, MGA.  YOU'LL AGREE WITH THAT; RIGHT?

9    A    HE WAS ASSISTING US IN REVIEWING HIS -- IMPROVING HIS

10   PORTFOLIO DRAWINGS TO CONFIRM WHETHER, IN FACT, WE WOULD PURSUE    10:47

11   THEM IN OUR MANUFACTURED PRODUCT.

12   Q    YOU JUST SAID HE WAS ASSISTING US.  "US" MEANS MGA; RIGHT?

13   THAT'S WHAT YOU MEANT BY US?  MGA?

14   A    YES.

15   Q    AND I BELIEVE THEN YOUR TESTIMONY HERE TODAY IS THAT EVEN    10:47

16   IF YOU HAD KNOWN THAT MR. BRYANT WAS AN EMPLOYEE OF MATTEL UP

17   THROUGH OCTOBER 19TH, THAT IN YOUR VIEW, EVERYTHING HE DID IN

18   ASSISTING YOU WAS APPROPRIATE.

19   A    YES.

20   Q    LET'S TALK ABOUT WHAT ELSE HE DID TO ASSIST YOU.            10:48

21           WE'VE TALKED ABOUT THE HAIR.  WE'VE TALKED A LITTLE

22   ABOUT THE SCULPTING.  I WANT TO GO BACK TO THIS EXHIBIT 18;

23   THIS IS YOUR SEPTEMBER 27TH E-MAIL.

24           YOU SEE THAT ON SEPTEMBER 27TH, YOU ALSO SENT TO HONG

25   KONG PHYSICAL SAMPLES OF A BODY, AN OUTFIT, PIECES AND A PURSE    10:49

1   AND SHOES; CORRECT?

2   A    CORRECT.

3   Q    SO FOR THE BODY, YOU ACTUALLY SENT TO HONG KONG -- SO THEY

4   COULD DETERMINE THE COST OF THIS PROJECT, YOU SENT THEM A DOLL

5   THAT YOU COULD BUY IN A STORE.                                10:49

6   A    YES.

7   Q    AND YOU HAD MR. BRYANT GO OUT AND BUY THAT DOLL TO SEND TO

8   THEM.

9   A    I DON'T REMEMBER THAT TO BE TRUE.  I'M NOT SURE.

10  Q    CERTAINLY, IF MR. BRYANT WERE TO SAY HE'S THE ONE THAT      10:50

11  BOUGHT THAT DOLL, YOU COULD NOT DENY IT; CORRECT?

12  A    NO.

13  Q    WITH RESPECT TO THE DRAWINGS THAT WERE SENT, I'D LIKE YOU

14  TO LOOK AT ONE DRAWING THAT WAS SENT, EXHIBIT 302.  THIS IS THE

15  PACKET THAT MR. BRYANT GAVE YOU ON SEPTEMBER 1ST, EXCEPT FOR     10:50

16  THE FIRST PAGE.  IF YOU WOULD LOOK IN THERE.  IT HAS THESE

17  LITTLE NUMBERS AT THE BOTTOM, THESE BATES NUMBERS, LIKE MGA

18  006453.  IF YOU WOULD LOOK IN EXHIBIT 302, BATES NUMBER 006456.

19  IT'S 006456.  AND THIS IS ALREADY IN EVIDENCE, SO IT'S PAGE 4

20  OF THE DOCUMENT.                                               10:51

21        YOUR BEST RECOLLECTION IS YOU BELIEVE YOU SENT THIS

22  TO HONG KONG.

23  A    MAY I REFER BACK TO THE SEPTEMBER 27TH E-MAIL AGAIN,

24  PLEASE.

25  Q    IT DOESN'T GIVE THE EXACT -- WHAT YOU SENT.  I'M ASKING     10:51

1   FOR YOUR RECOLLECTION.  IF YOU WOULD LIKE, I CAN REFER YOU TO

2   YOUR DEPOSITION TESTIMONY.  WOULD THAT HELP?

3   A    IT'S POSSIBLE THAT I SENT THIS DRAWING.  I'M NOT SURE.

4   Q    IF YOU LOOK AT VOLUME III OF YOUR DEPOSITION; THIS IS

5   DATED OCTOBER 9, 2007.                                    10:51

6   A    WHERE SHOULD I BE REFERRING?

7   Q    I'LL ASK YOU THIS.

8        IS IT POSSIBLE THAT THIS PARTICULAR DRAWING 006456 IS

9   SOMETHING THAT YOU SENT TO HONG KONG?

10  A    IT'S POSSIBLE.  IT MAY NOT HAVE BEEN.  I'M NOT SURE.    10:52

11  Q    WHY DO YOU THINK THAT'S A POSSIBILITY THAT THAT'S THE KIND

12  OF THING YOU WOULD HAVE SENT TO HONG KONG ON SEPTEMBER 27TH?

13  A    CAN YOU PLEASE REPEAT.

14  Q    WHY DO YOU THINK THAT'S A POSSIBILITY THAT YOU WOULD HAVE

15  SENT THIS PAGE TO HONG KONG ON SEPTEMBER 27TH?            10:52

16  A    IT WAS PART OF CARTER'S PORTFOLIO DRAWINGS THAT I REMEMBER

17  REVIEWING ON SEPTEMBER 1ST. AND GIVEN THAT I HAD PRETTY MUCH

18  ONLY, YOU KNOW, ACCESSIBILITY OF THOSE DRAWINGS, IT MAY HAVE

19  BEEN THIS DRAWING MIGHT HAVE BEEN ONE OF THE DRAWINGS -- OR THE

20  DRAWING THAT I SENT TO HONG KONG.                         10:53

21  Q    IS ONE OF THE REASONS YOU WOULD HAVE SENT THIS IS BECAUSE

22  IT SHOWED THE REMOVABLE FEET AND THE REMOVABLE HAIR, TO SHOW

23  THE FUNCTIONALITY OF THE DOLL?

24  A    POSSIBLE.

25  Q    LET ME FOCUS THEN, IF I CAN, ON YOUR AND MR. BRYANT'S    10:53

1  ACTIVITIES WITH RESPECT TO SCULPTING OR USING A SCULPTOR IN

2  SEPTEMBER AND OCTOBER OF 2000, PRIOR TO OCTOBER 19TH.

3         IT'S CORRECT, IS IT NOT, THAT IT WAS ACTUALLY

4  MR. BRYANT WHO FIRST CONTACTED THE SCULPTOR, MS. LEAHY?

5  A    IT'S POSSIBLE.  I DON'T REMEMBER.

6  Q    YOU WOULD HAVE NO REASON TO DISPUTE HER TESTIMONY IF

7  MS. LEAHY SAID IT WAS MR. BRYANT WHO FIRST CONTACTED HER.

8  YOU'D HAVE NO REASON TO DISPUTE THAT.

9  A    NO.

10 Q    AND IN FACT, MS. LEAHY AND MS. BRYANT MET WITHOUT YOU

11 PRESENT INITIALLY SO HE COULD GIVE HER THE MATERIALS SO SHE

12 COULD BEGIN THE SCULPT.

13 A    I REMEMBER, IN FACT, THAT I WAS PRESENT AT THE MEETING.

14 IT'S POSSIBLE THAT I MAY NOT HAVE BEEN.  HOWEVER, I REMEMBER

15 BEING AT THE SCULPTING MEETING.

16 Q    I'M GOING TO GET TO MEETINGS THAT YOU WERE AT TOO.  BUT

17 YOU WOULD AGREE WITH ME THAT IF MR. BRYANT AND MS. LEAHY

18 TESTIFIED THAT IN SEPTEMBER, THEY MET AND HE GAVE HER THESE

19 MATERIALS FOR HER TO BEGIN HER SCULPTING WITHOUT YOU, WOULD YOU

20 AGREE THAT YOU COULDN'T DISPUTE THAT?

21 A    IT'S POSSIBLE.  I DON'T REMEMBER.

22 Q    WITH RESPECT TO THE TYPES OF MATERIALS THAT WERE GIVEN TO

23 MS. LEAHY, I WANT TO SHOW YOU SOME EXHIBITS AND SEE IF YOU'LL

24 AGREE THAT THOSE WERE GIVEN TO YOU.

25         IF YOU WOULD LOOK AT EXHIBIT 1130.

10:53
10:53
10:54
10:54
10:55

```
 1   A    IS THIS IN VOLUME II?

 2   Q    YES.  ANYTHING OVER 1,000 WILL BE IN VOLUME II, BUT I'LL

 3   TRY TO TELL YOU; AND, NO, THERE ARE NOT A THOUSAND DOCUMENTS IN

 4   THERE.

 5        DO YOU KNOW WHETHER OR NOT THOSE WERE GIVEN TO                    10:55

 6   MS. LEAHY, THE SCULPTOR?

 7   A    I'M NOT SURE WHAT WAS GIVEN TO MS. LEAHY.

 8   Q    SO YOU'RE NOT SURE WHETHER THIS WAS OR NOT; IS THAT

 9   CORRECT?

10   A    I DON'T REMEMBER WHAT MARGARET LEAHY WAS GIVEN.             10:56

11   Q    IF YOU WOULD LOOK AT EXHIBIT 1127; IT SHOULD BE RIGHT

12   BEFORE THAT.  DO YOU KNOW WHETHER THAT WAS GIVEN TO MS. LEAHY?

13   A    I DON'T KNOW FOR SURE.  BUT I WOULD THINK THAT -- I

14   WOULDN'T BE SURPRISED IF THIS WAS GIVEN TO MARGARET LEAHY.

15   Q    HOW ABOUT IF YOU WOULD LOOK AT -- I APOLOGIZE, BECAUSE     10:56

16   IT'S IN THE FIRST VOLUME -- EXHIBIT 323.  IF YOU WOULD LOOK

17   AT THAT.  323 IS A BIG DOCUMENT AND THERE ARE THESE BATES

18   NUMBERS AT THE BOTTOM; IT SAYS SL0044.

19        THAT'S AT PAGE 37 OF THAT EXHIBIT.

20   A    SL0044.                                                          10:57

21   Q    SL0044, WHICH IS, I THINK, PAGE 32 OF THE EXHIBIT.

22        DO YOU BELIEVE THAT WAS GIVEN TO MS. LEAHY, THE

23   SCULPTOR?

24   A    NO.

25   Q    IT IS YOUR BELIEF, THOUGH, THAT THIS DOCUMENT WAS CREATED  10:57
```

```
 1   AFTER OCTOBER 19TH; CORRECT?

 2   A    COULD YOU REPHRASE THAT.

 3   Q    IT'S YOUR BELIEF THIS DOCUMENT, WHICH IS SL0044 OF

 4   EXHIBIT 323, WAS CREATED PRIOR TO OCTOBER 19TH, WHEN MR. BRYANT

 5   LEFT MATTEL.                                                     10:58

 6   A    I DON'T REMEMBER WHEN THIS DOCUMENT WAS CREATED.  IT'S

 7   POSSIBLE THAT IT WAS CREATED AFTER THE 19TH.  AND THE REASON I

 8   KNOW THAT IS BECAUSE THIS DRAWING WAS A SKETCH THAT WAS CREATED

 9   BY CARTER IN RESPONSE TO WHAT HE SAW AS WHAT I TERMED THE FIRST

10   GENERATION SCULPT THAT MARGARET LEAHY CREATED; SO, IN FACT,     10:58

11   THIS IS A COPY -- I SHOULD BE CAREFUL TO SAY COPY -- BUT IT WAS

12   HIS VISUAL INTERPRETATION OF WHAT HE SAW AS THE FIRST

13   GENERATION SCULPT FROM MARGARET LEAHY.

14        THAT EXPLORATION DIDN'T HAPPEN UNTIL AT LEAST AFTER

15   APPROXIMATELY OCTOBER 15TH, MID OF OCTOBER.                     10:59

16   Q    I'M GOING TO DIRECT YOUR ATTENTION TO YOUR DEPOSITION TO

17   SEE IF THIS REFRESHES YOUR MEMORY.  IT'S VOLUME II; IT'S

18   MAY 25, 2007.  IF YOU LOOK AT EXHIBIT 591, IF YOU WOULD LOOK AT

19   LINES 12 THROUGH 592, LINE SEVEN, ANY PORTION OF THAT.

20        DOES THAT REFRESH YOUR MEMORY THAT THIS DRAWING WAS        11:00

21   CREATED SOME TIME BETWEEN OCTOBER 4TH AND OCTOBER 19TH, BEFORE

22   CARTER BRYANT LEFT MATTEL?

23   A    CAN YOU PLEASE REPEAT THE QUESTION.

24   Q    DOES THIS REFRESH YOUR MEMORY THAT THIS DRAWING, THIS

25   SL-44, WAS CREATED BETWEEN OCTOBER 4TH AND OCTOBER 19TH, BEFORE  11:00
```

1    THE TIME THAT CARTER BRYANT LEFT MATTEL?

2            DOES THIS REFRESH YOUR MEMORY?

3    A    NO.  IN FACT, IF I MIGHT, I THINK, IF I'M READING THIS

4    CORRECTLY, I ACTUALLY AGREE THAT IT WAS CREATED AFTER

5    OCTOBER 19TH IN MY DEPOSITION.                                    11:01

6    Q    IN THAT CASE, WE'LL PLAY IT.

7            **MR. PRICE:**  YOUR HONOR, I'LL REQUEST TO PLAY FROM

8    PAGE 591, LINE 12, TO 592, LINE SEVEN; IT'S VOLUME II, THE

9    MAY 25, 2007 DEPOSITION.

10           **THE COURT:**  ANY OBJECTION?                            11:01

11           **MS. AGUIAR:**  NO OBJECTION.

12           **THE COURT:**  THE OBJECTION SET FORTH IN THE TRANSCRIPT

13   IS OVERRULED AS WELL.  YOU MAY PROCEED.

14           **MR. PRICE:**  THANK YOU, YOUR HONOR.

15           (VIDEO DEPOSITION PLAYS. )                                11:01

16           **MR. PRICE:**  YOUR HONOR, I'D MOVE INTO EVIDENCE NOW AT

17   THIS POINT JUST EXHIBIT 323, PAGE 32, WHICH IS THAT SL-44.

18           **THE COURT:**  ANY OBJECTION?

19           **MS. AGUIAR:**  THAT'S FINE.  NO OBJECTION.

20           **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.               11:03

21           **MR. PRICE:**  SO THAT THE JURY KNOWS WHAT WE'VE BEEN

22   TALKING ABOUT, THIS IS THE DRAWING THAT WE'VE BEEN REFERRING TO

23   AS SL-44 ABOUT WHICH WE JUST PLAYED YOUR DEPOSITION TESTIMONY;

24   IS THAT CORRECT?

25   A    RIGHT.                                                       11:03

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1  Q    AND THIS DRAWING, THE PHYSICAL ACT WAS DONE BY

2  CARTER BRYANT.

3  A    THAT'S RIGHT.  HE CREATED THIS DRAWING IN RESPONSE TO A

4  SCULPT HE SAW FROM MARGARET LEAHY, OUR FIRST GENERATION SCULPT.

5  Q    LET ME ASK YOU THEN ABOUT YOUR KNOWLEDGE ABOUT MS. LEAHY       11:04

6  AND MR. BRYANT.

7         IT'S TRUE, IS IT NOT, THAT MS. LEAHY CREATED HER

8  FIRST SCULPT AND MET WITH MR. BRYANT AND NOT YOU AND THAT THEN

9  HE DISCUSSED WITH HER HOW TO REVISE IT?

10 A    AGAIN, I ACTUALLY BELIEVE THAT I WAS PRESENT AT THE          11:04

11 MEETING, AT ALL THE MEETINGS THAT CARTER AND MARGARET WERE

12 PRESENT AT.  THAT'S MY MEMORY.

13        IT'S POSSIBLE THAT I MAY NOT HAVE BEEN.

14        EITHER WAY, MARGARET WAS SCULPTING FOR ME PER MY

15 REQUEST OF WHICH I PAID HER FOR THE WORK DONE PER MY REQUEST.    11:04

16 Q    WHEN YOU SAY 'PER YOUR REQUEST,' YOU CAN'T DENY THAT IT

17 MAY HAVE BEEN CARTER BRYANT WHO ACTUALLY REQUESTED HER TO DO

18 THE SCULPTS.

19 A    THE WAY I REMEMBER IT, IN FACT, IS THAT I WANTED TO SCULPT

20 THAT FIRST GENERATION SCULPT BECAUSE, IN FACT, AS I MENTIONED    11:05

21 EARLIER, I WAS CONCERNED ABOUT THE WAY THAT CARTER'S DRAWINGS

22 AND HIS PORTFOLIO TRANSLATED ONCE IT BECAME A 3-D OBJECT.  SO

23 THE SCULPTING ACTIVITY TOOK PLACE BY MARGARET LEAHY IN EARLY

24 SEPTEMBER WAS PER MY REQUEST BECAUSE OF MY CONCERN ABOUT

25 CARTER'S DRAWINGS WOULDN'T TRANSLATE TO 3-D.                     11:05

643

1    Q    PERHAPS I DIDN'T UNDERSTAND EARLIER.

2         IS IT CORRECT THAT IF MR. BRYANT AND MS. LEAHY SAY

3    THAT HE'S THE ONE WHO CONTACTED HER, AND HE'S THE ONE WHO

4    LOOKED AT THE FIRST SCULPT AND HE'S THE ONE WHO GAVE COMMENTS

5    IN THAT FIRST SCULPT WITHOUT YOU, WOULD YOU DENY THAT, OR YOU          11:05

6    JUST DON'T RECALL ONE WAY OR THE OTHER?

7    A    I DON'T REMEMBER ONE WAY OR ANOTHER.

8         HOWEVER, I WILL REMIND YOU AGAIN, AS I MENTIONED, AT

9    THIS TIME I DON'T OWN THESE DRAWINGS.  THESE DRAWINGS BELONG TO

10   CARTER BRYANT, AS I UNDERSTOOD IT.  I WAS INTERESTED IN             11:06

11   PURSUING A SCULPT AGAINST HIS DRAWINGS.  SO I JUST WANT TO BE

12   CLEAR THAT IT IS FOR THAT REASON THAT HE WOULD BE PRESENT AT A

13   SCULPTING MEETING PRIOR TO THE CONTRACTS BEING SIGNED.

14   Q    YOUR TELLING US IT'S A POSSIBILITY THAT YOU PAID MS. LEAHY

15   FOR SCULPTS SHE DID THAT WERE REQUESTED NOT BY YOU, BUT BY            11:06

16   CARTER BRYANT.

17   A    THAT SCULPT WAS REQUESTED BY ME.  I ASKED FOR THAT SCULPT

18   TO BE CREATED.

19   Q    NOW I HAVE TO ASK YOU WHICH SCULPT, SO LET ME BE CLEAR.

20        THERE WAS MORE THAN ONE SCULPT; RIGHT?                          11:06

21   A    DEFINITELY.

22   Q    AND I THINK YOU'VE TOLD US THAT YOU CAN'T DENY THE

23   POSSIBILITY THAT MS. LEAHY CREATED THE SCULPT IN

24   SEPTEMBER/OCTOBER OF 2000, NOT AT YOUR REQUEST BUT AT

25   MR. BRYANT'S REQUEST.  YOU CAN'T DENY THAT, CAN YOU?                 11:07

644

1    A    I DON'T UNDERSTAND YOUR QUESTION.

2    Q    YOU CANNOT SIT HERE AND DENY THAT MS. LEAHY CREATED A

3    SCULPT IN LATE SEPTEMBER, EARLY OCTOBER OF 2000, AT

4    MR. BRYANT'S REQUEST, NOT AT YOUR REQUEST.

5    A    I KNOW THAT A SCULPT WAS PREPARED BY MARGARET LEAHY IN       11:07

6    EARLY SEPTEMBER, WHICH WE HAVE REFERRED TO AS THE EXPLORATORY

7    SCULPT.  IT WAS PER MY REQUEST BECAUSE I WAS UNCERTAIN OF HOW

8    CARTER BRYANT'S PORTFOLIO 2-D DRAWINGS WOULD TRANSLATE INTO

9    3-D.

10   Q    YOU REFERRED TO IT AS THE EXPLORATORY SCULPT.  DO YOU KNOW   11:07

11   WHAT DOCUMENT THAT IS?  ARE YOU AWARE OF A DOCUMENT THAT REFERS

12   TO THIS AS EXPLORATORY?

13   A    NO.  NOT IN PARTICULAR.

14   Q    ISN'T IT TRUE, MA'AM, THAT THE FIRST TIME THAT YOU MET

15   WITH MS. LEAHY TO DISCUSS A SCULPT WAS AFTER SHE HAD ALREADY     11:08

16   DONE A SCULPT AND MADE CHANGES AT MR. CARTER BRYANT'S

17   DIRECTION?

18   A    AS I MENTIONED EARLIER, I REMEMBER BEING AT ALL MEETINGS

19   THAT MARGARET PARTICIPATED WITH CARTER.  IT'S POSSIBLE THAT

20   OTHERS TOOK PLACE.  I DON'T REMEMBER THEM.  I BELIEVE I WAS AT   11:08

21   ALL OF THEM.

22   Q    THE ONE YOU REMEMBER BEING AT, YOU DO RECALL MR. BRYANT

23   GIVING HIS OPINIONS ABOUT THE SCULPT; CORRECT?

24   A    SURE.

25   Q    AND IT WAS YOUR INTENTION, THROUGH ALL OF THIS, TO REMAIN   11:08

1   TRUE TO CARTER BRYANT'S VISION, HIS IDEA, ABOUT BRATZ; THAT WAS

2   YOUR INTENTION AS YOU WERE MEETING WITH THE SCULPTOR; CORRECT?

3   A    I'M NOT SURE I UNDERSTAND YOUR QUESTION.

4         I CAN TELL YOU MY INTENTION WAS TO CREATE A SCULPT IN

5   -- I ASKED MARGARET TO CREATE A SCULPT TO MATCH WHAT SHE

6   UNDERSTOOD TO BE THE DRAWINGS IN CARTER'S PORTFOLIO.  I WANTED

7   TO SEE WHAT THAT DOLL WOULD LOOK LIKE WHEN IT WAS IN 3-D TO

8   MAKE SURE THAT THE SEXY, THE CURVATION, THE VAVAVOOM WAS

9   INAPPROPRIATE OR NOT TO BE TRANSLATED INTO A 3-D FORM AS A

10  DOLL.

11  Q    WHAT YOU TOLD HER WAS SHE WAS TO STAY TRUE TO MR. BRYANT'S

12  CONCEPTION, THE ONE HE GAVE YOU IN EARLY SEPTEMBER, IN GOING

13  FROM THAT 2-D DRAWING TO A 3-D DRAWING; IS THAT CORRECT?

14  A    THE WHOLE PROCESS OF THIS SCULPT WAS FLUID.  ONCE SHE PUT

15  IT INTO A 3-D FORM, THERE WAS DEFINITELY SOME REVISIONS MADE BY

16  BOTH CARTER AND I.  CARTER WAS MAKING REVISIONS TO TRY AND GET

17  IT CLOSER TO HIS DRAWINGS.  I MYSELF SAW IT THE FIRST TIME, SAW

18  THAT IT WAS VERY, VERY, IF I MIGHT USE THE WORD SEXY, AND I WAS

19  ACTUALLY TRYING TO CARVE MATERIAL AWAY OFF THE THIGHS AND HIPS

20  TO SEE WHAT THAT WOULD LOOK LIKE, TRYING TO MAKE IT A LITTLE

21  MORE MODEST; SO THERE WAS CHANGES AND EXCHANGES BEING MADE BY

22  BOTH OF US IN REVIEWING THIS SCULPT.

23  Q    CERTAINLY, YOU'LL AGREE THAT IT WAS BY BOTH OF YOU.  SO

24  LET'S GO TO THE ONE SIDE.  MR. CARTER BRYANT WAS MAKING CHANGES

25  TO THE SCULPT THAT YOU SAW; CORRECT?

11:08

11:09

11:09

11:10

11:10

646

1    A    HE WAS GIVING RECOMMENDATION, YES, SO IT WOULD REPRESENT

2    CLOSEST TO HIS PORTFOLIO DRAWINGS.

3    Q    AND THIS WAS AT A TIME IN OCTOBER, IN FACT, AFTER HE HAD

4    SIGNED A CONTRACT WITH MGA BUT WHILE STILL EMPLOYED WITH

5    MATTEL.                                                          11:1C

6    A    UH-HUH.  YES.

7         AND I WILL ALSO SAY THAT THIS SCULPT WAS TOTALLY --

8    THIS SCULPT THAT WE EXPLORED WITH DID NOT GO TO PRODUCTION, BY

9    THE WAY.  IT'S NOT A BODY THAT REPRESENTS BRATZ AND WHAT'S IN

10   THE MARKET TODAY.  BUT, YES.                                    11:1C

11        MR. PRICE:  YOUR HONOR, MOVE TO STRIKE THE TESTIMONY

12   AFTER THE YES, THIS TOOK PLACE BETWEEN A CERTAIN TIME PERIOD AS

13   BEING IRRELEVANT.

14        THE COURT:  IT'S NONRESPONSIVE.  IT'S STRICKEN.

15        THE JURY IS TO DISREGARD EVERYTHING AFTER THE ANSWER       11:11

16   'YES.'

17   BY MR. PRICE:

18   Q    NOW, AFTER YOU HAD A MEETING WITH MR. BRYANT AND WITH

19   MS. LEAHY, THERE WAS A CLAY SCULPT DONE AND GIVEN TO A COMPANY

20   CALLED GENTLE GIANT.                                            11:11

21   A    YES.

22   Q    AND FROM THAT, MOLDS WERE DONE; CORRECT?

23   A    YES.

24   Q    IN FACT, IF YOU WOULD LOOK AT -- AND THEN THERE WERE WHAT

25   ARE CALLED CASTINGS MADE FROM THESE MOLDS.                      11:11

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

```
 1   A     YES.

 2   Q     AND THE MOLD WAS DONE PRIOR TO OCTOBER 19TH.

 3   A     I CAN'T REMEMBER.

 4   Q     LET'S LOOK AT EXHIBIT 1136, WHICH WOULD BE IN YOUR SECOND

 5   VOLUME.  DO YOU RECOGNIZE EXHIBIT 1136?                          11:12

 6         WHAT IS EXHIBIT 1136?

 7   A     I BELIEVE THIS IS A CAST OF THE EXPLORATORY SCULPT.

 8   Q     AND CAN YOU TELL US WHEN THIS WAS DONE?

 9   A     I DON'T KNOW THE EXACT DATE.

10   Q     IT WAS BEFORE MR. BRYANT LEFT MATTEL, WASN'T IT?           11:13

11   A     VERY CLOSE; AROUND MID OCTOBER, AROUND THAT TIME.

12         MR. PRICE:  BY THE WAY, YOUR HONOR I'D MOVE

13   EXHIBIT 1136, THIS PHOTOGRAPH, INTO EVIDENCE.

14         MS. AGUIAR:  NO OBJECTION.

15         MR. PRICE:  MAY WE DISPLAY IT?                             11:13

16         THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

17   BY MR. PRICE:

18   Q     IF WE COULD LOOK AT EXHIBIT 1135.

19         PERHAPS YOU CAN TELL US WHAT EXHIBIT 1135 IS.

20   A     I BELIEVE IT IS ALSO A PHOTO OF AN EXPLORATORY CAST.       11:13

21         MR. PRICE:  I'D MOVE EXHIBIT 1135 INTO EVIDENCE.

22         THE COURT:  ANY OBJECTION?

23         MS. AGUIAR:  NO OBJECTION.

24         THE COURT:  YOU MAY PUBLISH.

25   BY MR. PRICE:                                                    11:14
```

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1   Q    THERE ARE SEVERAL PAGES HERE.

2   A    YES.

3   Q    IT SHOWS THE BODY, AND THE THIRD PAGE SHOWS THE ARM BY

4   ITSELF.

5   A    YES.                                                    11:14

6   Q    AND TO TRY AND GET YOU INTO THE TIME FRAME, THEN, IF YOU

7   WOULD LOOK AT EXHIBIT 1105, DO YOU SEE, THAT'S AN E-MAIL STRING

8   THAT STARTS AT THE BOTTOM WITH AN E-MAIL TO YOU FROM

9   CECELIA KWOK.

10  A    YES.                                                    11:15

11  Q    AND THAT'S AN E-MAIL THAT YOU RECEIVED ON OR ABOUT

12  OCTOBER 15TH; CORRECT?

13  A    YES.

14        MR. PRICE:   YOUR HONOR, MOVE EXHIBIT 1105 INTO

15  EVIDENCE.                                                    11:15

16        MS. AGUIAR:  NO OBJECTION.

17        THE COURT:   1105 IS IN EVIDENCE.  YOU MAY PUBLISH.

18  BY MR. PRICE:

19  Q    IT STARTS AT THE BOTTOM HERE.  PERHAPS YOU CAN TELL US WHO

20  CECELIA KWOK IS?                                             11:15

21  A    SHE'S MY COUNTERPART IN HONG KONG, MGA HONG KONG.

22  Q    AND SHE IS SENDING YOU THIS E-MAIL CONCERNING HAVING

23  RECEIVED THE ROUGH CLAY BODY FOR THE CAPTIONED ITEM.

24        DO YOU SEE THAT?

25  A    YES.                                                    11:15

1  Q    AND THE ITEM THERE IS BRATZ?

2  A    YES.

3  Q    AT LEAST AS OF OCTOBER 15TH, YOU HAD A ROUGH CLAY BODY

4  THAT YOU HAD SENT TO HONG KONG FOR THEIR USE; CORRECT?

5  A    NO, THAT'S NOT CORRECT.  CECELIA WAS INCORRECT BY MAKING A    11:16

6  REFERENCE TO A ROUGH CLAY BODY FOR BRATZ.  AND I'LL LEAVE IT AT

7  THAT.

8  Q    WHAT IS A ROUGH CLAY BODY?  PERHAPS YOU CAN TELL US WHAT

9  THAT PHRASE WOULD NORMALLY REFER TO TO SOMEONE IN THE TOY

10 INDUSTRY.    11:16

11 A    FIRST OF ALL, ROUGH CLAY IS A FORM OF SCULPT.  SCULPTORS

12 START -- THEY MAY WORK IN EITHER TWO MATERIAL TYPES; CLAY OR

13 WAX.  CLAY IS GENERALLY, AS I UNDERSTAND IT, LIKE A VERY

14 PRELIMINARY MATERIAL THAT THEY START WITH.

15       I KNOW THAT THIS INFORMATION IS INCORRECT BECAUSE WE    11:16

16 NEVER, EVER, EVER AND SO MUCH IN MY EXPERIENCE HAVE EVER

17 SHIPPED A CLAY TO HONG KONG.  BECAUSE CLAY, AS MOST WOULD KNOW,

18 IS A SOFT MATERIAL.  BY THE TIME IT TRANSPORTS TO HONG KONG, IT

19 GETS BEAT IN THE PACKAGE OR IT GETS HOT IN THE PARCELS, AND

20 THEY WILL ACTUALLY MELT.    11:17

21       SO THIS REFERENCE OF ROUGH CLAY IS ONE EXAMPLE OF WHY

22 SHE WAS INCORRECT.

23 Q    AND SCULPTORS WILL START WITH A ROUGH CLAY SOMETIMES;

24 CORRECT?

25 A    SURE.    11:17

1    Q    AND THEN YOU TAKE THAT AND TURN IT INTO A MORE DURABLE

2    MATERIAL; CORRECT?

3    A    YEAH.  I GUESS YOU COULD SAY THAT.

4    Q    HOW DO YOU DO THAT?

5    A    IN THE PROCESS, IT WOULD BE THAT YOU CREATE A CLAY AND          11:17

6    THEN THE PROCESS WOULD BE THAT YOU WOULD ACTUALLY MOLD THE

7    CLAY, AND THEN FROM THE MOLD YOU COULD ACTUALLY POUR CASTS.

8    BUT YOU CAN ALSO POUR WAX SO YOU CAN THEN START TO WORK IN A

9    WAX MATERIAL WHICH IS A STRONGER, DURABLE MATERIAL, STIFFER

10   MATERIAL, THAT ALLOWS YOU TO REFINE THE SCULPT EVEN MORE          11:17

11   FURTHER.

12   Q    SO FOR THERE TO BE A MORE DURABLE MATERIAL, YOU NEED TO GO

13   FROM THE CLAY TO A MOLD, AND THEN YOU USE THE MOLD TO CREATE

14   SOMETHING THAT MIGHT STAND UP TO INTERNATIONAL SHIPPING.

15   A    RIGHT.                                                        11:18

16   Q    IF YOU LOOK AT THE SECOND PAGE OF EXHIBIT 1105, THIS IS A

17   PHOTOCOPY; IT LOOKS LIKE IT'S OVER ELEVEN INCHES.

18            IS THIS WHAT WAS SENT TO HONG KONG PRIOR TO

19   OCTOBER 15TH?

20   A    THIS WAS SENT TO HONG KONG, YES.                             11:18

21   Q    WHAT WOULD YOU CHARACTERIZE THIS AS BEING?  IT'S NOT A

22   ROUGH CLAY SCULPT, BUT WHAT WOULD YOU CHARACTERIZE THIS AS

23   BEING?

24   A    I RECOGNIZE THIS TO BE A CAST OF THAT EXPLORATORY SCULPT.

25   AND I'D LIKE TO EXPLAIN THAT I SENT THAT SCULPT TO HONG KONG TO    11:18

1  GIVE THEM A GENERAL IDEA OF WHAT BRATZ IS.  I MEAN, THEY ARE

2  ALL OVER ON THE OTHER SIDE OF THE WORLD, AND I GAVE THIS TO

3  THEM JUST TO GIVE THEM A GENERAL IDEA.  THIS WAS NOT IN ANY WAY

4  THE FINAL WAX OR THE FINAL SCULPT, BUT IT GAVE THEM JUST A

5  GENERAL IDEA OF PROPORTION AND WHATNOT.                              11:19

6         CECILIA, I BELIEVE, SUGGESTED THAT IT WAS BRATZ AND

7  THAT IT WAS ACTUALLY A ROUGH WAX.  FIRST, IT IS NOT WAX BUT IT

8  ALSO DOES NOT REPRESENT WHAT I INTENDED TO ACTUALLY GO TO

9  PRODUCTION WITH.  THIS WAS TOO SEXY FOR ME.

10 Q    DO YOU RECALL WHAT MY QUESTION WAS?                             11:19

11 A    I THOUGHT I ANSWERED IT.

12 Q    IT WAS, SIMPLY -- THIS IS WHAT YOU SENT; YES?

13 A    YES.

14 Q    AND MR. BRYANT, BETWEEN OCTOBER 4TH AND PRIOR TO

15 OCTOBER 15TH, WHILE STILL WORKING AT MATTEL, WAS ASSISTING YOU     11:19

16 IN CONNECTION WITH THIS PARTICULAR SCULPT; CORRECT?

17 A    CARTER BRYANT PARTICIPATED IN THE MEETINGS OF THIS SCULPT

18 SINCE THIS WAS -- AS OF THIS TIME, THESE WERE HIS DRAWINGS AND

19 THEY WERE HIS CONCEPTS, AND SO HE PARTICIPATED WITH ME IN

20 PROVING THIS THING OUT INTO 3-D FORM.                              11:20

21 Q    AND HE ALSO ASSISTED YOU DURING THIS TIME FRAME WHEN,

22 BOTH, HE WAS STILL WORKING AT MATTEL AND HE HAD SIGNED A

23 CONTRACT WITH MGA; CORRECT?

24 A    CAN YOU PLEASE CONFIRM WHEN THE LAST DAY WAS THAT CARTER

25 BRYANT WORKED AT MATTEL.                                           11:20

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1    Q    OCTOBER 19TH.

2    A    OKAY.

3         CAN YOU PLEASE ASK THE QUESTION AGAIN.

4    Q    SO HE'S ASSISTING YOU IN DOING THESE SCULPTS IN THE TIME

5    FRAME WHERE HE HAS SIGNED A CONTRACT TO WORK WITH MGA AND HE'S        11:20

6    STILL EMPLOYED AT MATTEL; CORRECT?

7    A    YES.

8    Q    BY THE WAY, THAT, YOU THOUGHT, WOULD BE WRONG; THAT IS TO

9    HAVE ACTUALLY SIGNED A CONTRACT WITH A COMPETITOR AND BE

10   WORKING FOR THAT COMPETITOR WHILE STILL BEING EMPLOYED AT           11:20

11   MATTEL; THAT, YOU'LL AGREE, WAS WRONG.

12   A    IN THIS CASE I DO NOT FIND IT TO BE WRONG.

13   Q    LET MY TALK TO YOU, THEN, ABOUT SCULPTS.  WE'VE TALKED

14   ABOUT SCULPTS AND HAIR.  NOW LET'S TALK ABOUT PACKAGING.

15        DO YOU RECALL YESTERDAY, I ASKED YOU SOME QUESTIONS         11:21

16   ABOUT STEVE LINKER.

17   A    YES.

18   Q    AND I BELIEVE I SHOWED YOU EXHIBIT 320, WHICH IS IN

19   EVIDENCE.  IF WE COULD DISPLAY THAT.

20        DO YOU HAVE THAT?                                           11:21

21   A    YES.

22   Q    NOW, THIS TIME FRAME, OCTOBER 1ST, AT THAT TIME, DID YOU

23   KNOW THAT MR. BRYANT WAS STILL WORKING AT MATTEL?

24   A    NO.

25   Q    HE HAD SIGNED A CONTRACT WITH MGA BY THEN; CORRECT?        11:22

MAY 29TH, 2008        TRIAL DAY 4, MORNING SESSION

653

```
1   A     YES.

2   Q     AND I THINK YOUR TESTIMONY YESTERDAY IS YOU HAVE NO

3   RECOLLECTION OF THIS E-MAIL AT ALL FROM LIZ HOGAN CONCERNING

4   THE BRATZ PACKAGING; IS THAT RIGHT?

5   A     THAT'S RIGHT.  I DON'T REMEMBER IT.                        11:22

6   Q     WELL, YOU KNOW THAT THERE'S A STARBUCKS BETWEEN EL SEGUNDO

7   AND MANHATTAN BEACH BOULEVARD ON ROSECRANS AVENUE.

8   A     YES.

9   Q     IS THERE ONLY ONE IN THAT BLOCK, OR FIVE?

10  A     I BELIEVE THERE'S ONE.                                     11:22

11  Q     AND YOU HAVE MET FOLKS IN THAT STARBUCKS FOR MEETINGS WITH

12  VENDORS; CORRECT?

13  A     I DON'T REMEMBER ANY.  IT'S POSSIBLE.  I DON'T REMEMBER

14  ANY IN PARTICULAR.

15  Q     I'M TRYING TO HELP YOU.                                    11:23

16        DOES THAT HELP YOU RECALL THAT SOME TIME AROUND

17  OCTOBER 10TH OR 11TH THAT YOU AND MR. BRYANT MET WITH

18  MR. LINKER CONCERNING THE BRATZ PROJECT?

19  A     I DON'T REMEMBER.  IT'S POSSIBLE THAT MEETING TOOK PLACE.

20  I JUST SIMPLY DON'T REMEMBER.  IT WAS, LIKE, WHAT, NINE OR      11:23

21  EIGHT YEARS AGO.

22  Q     LET'S SEE IF THIS WILL HELP.

23        LOOK AT EXHIBIT 321, THEN.  CAN YOU SEE THAT 321 ON

24  ITS FACE APPEARS TO BE AN E-MAIL SENT FROM MS. HOGAN TO YOU,

25  DATED OCTOBER 15, 2000, REGARDING A PACKAGING ESTIMATE FOR      11:23
```

1    BRATZ?

2    A    YES.

3    Q    AND YOU RECEIVED THIS E-MAIL.

4    A    I DON'T REMEMBER.

5    Q    DO YOU HAVE ANY REASON TO BELIEVE THAT YOU DID NOT RECEIVE    11:24

6    THIS E-MAIL?

7    A    NO.

8         **MR. PRICE:**  YOUR HONOR, MOVE EXHIBIT 321 INTO

9    EVIDENCE.

10        **MS. AGUIAR:**  NO OBJECTION.    11:24

11        **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

12   **BY MR. PRICE:**

13   Q    IT'S DATED OCTOBER 14, 2000.

14        IS IT CORRECT, EVEN IF YOU DON'T RECALL THIS

15   PARTICULAR MEETING OR THESE DISCUSSIONS, THAT BY AUGUST 14TH,    11:24

16   YOU WERE RECEIVING ESTIMATES FROM SOMEONE?

17   A    AUGUST 14TH --

18   Q    I'M SORRY.  OCTOBER 14TH, YOU WERE RECEIVING ESTIMATES FOR

19   THE PACKAGING DESIGN FOR BRATZ?

20   A    I DON'T REMEMBER.  IT'S POSSIBLE.  I JUST DON'T REMEMBER    11:24

21   IT.

22   Q    LET'S GO TO THE SECOND PAGE.

23        DO YOU RECALL SEEING SOME DETAILED ESTIMATES IN THIS

24   TIME FRAME FOR THE PACKAGING, INCLUDING ESTIMATES FOR LOGO

25   DEVELOPMENT, FOR ALL THESE THINGS IT SAYS HERE ON THE SECOND    11:25

655

1  PAGE?

2       DOES HELP REFRESH YOUR MEMORY?

3  A    NO.

4  Q    IF YOU WOULD LOOK AT EXHIBIT 323.  I FOCUSED ON JUST ONE

5  PAGE OF THAT EARLIER, BUT IF YOU WOULD LOOK AT THAT.                    11:25

6       DO YOU RECOGNIZE THAT OR DOES IT REFRESH YOUR MEMORY

7  THAT, IN FACT, YOU GAVE TO MR. LINKER, OR YOU AND MR. BRYANT

8  GAVE TO MR. LINKER, A PACKET WHICH CONTAINED A NUMBER OF --

9  ACTUALLY, IT BASICALLY CONTAINED MR. BRYANT'S PRESENTATION THAT

10 HE HAD MADE SEPTEMBER 1ST?                                             11:25

11 A    I NEED THE CHANCE TO LOOK AT THIS.

12 Q    YES.  THAT'S WHAT I'M ASKING YOU TO DO.

13 A    CAN I ASK YOU, WHEN IT'S BELIEVED THAT THIS DOCUMENT WAS

14 GIVEN TO ME?

15 Q    LET ME BE CLEAR.                                                  11:26

16      FIRST, LET ME REPRESENT TO YOU THAT THE SECOND PAGE

17 AND THE PAGES AFTER PAGE 35, I'LL REPRESENT TO YOU, THAT'S NOT

18 SOMETHING THAT WAS GIVEN TO MR. LINKER IN OCTOBER.

19      MY QUESTION IS WHETHER OR NOT YOU RECALL GETTING THE

20 REST OF THIS.  THE FIRST PAGE IS A MANILA ENVELOPE AND THEN          11:26

21 THERE ARE PAGES AFTER THAT BETWEEN THE THIRD PAGE THROUGH

22 PAGE 35, AND I'M ASKING WHETHER OR NOT YOU RECALL GIVING THAT

23 INFORMATION TO EITHER MR. LINKER OR SOME OTHER PACKAGING VENDOR

24 IN OCTOBER?

25 A    I DON'T REMEMBER GIVING ANY PARTICULAR MATERIAL TO               11:27

656

1  STEVE LINKER, BECAUSE PERSONALLY I DON'T NECESSARILY REMEMBER

2  THAT MEETING.  IT'S POSSIBLE THAT I HAD THAT MEETING.

3         THE REASON WHY IT'S POSSIBLE IS THAT WE DID ACTUALLY

4  REACH OUT TO A FEW -- I REMEMBER REACHING OUT TO A FEW

5  PACKAGING VENDORS FOR THE CHANCE THAT THEY MAY TAKE A SHOT AT        11:27

6  DESIGNING BRATZ PACKAGING.  BY THE WAY, BRATZ PACKAGING WAS

7  CREATED IN-HOUSE.  WE NEVER USED FREELANCE VENDORS.  BUT WE

8  EXPLORED THAT.

9  Q    AND YOU CERTAINLY CANNOT DENY THAT MR. BRYANT ASSISTED YOU

10 IN OCTOBER IN EXPLORING BRATZ PACKAGING TO VENDORS.                   11:28

11 A    WELL, I HAVE TO SAY THAT I DON'T REMEMBER ANY EXPLORATION

12 THAT WAS CONDUCTED BY A FREELANCE VENDOR TO MGA.  IF ANY

13 CONVERSATIONS THAT I REMEMBER, IT WAS JUST INTRODUCING IDEAS OR

14 WHATNOT OR JUST, YOU KNOW, THEIR WORK ETHIC, WHO THE GROUPS

15 WERE, WHAT THEIR QUOTES MIGHT BE, WHAT THEIR PAY STRUCTURE WAS;      11:28

16 THAT TYPE OF THING.

17 Q    LOOK AT EXHIBIT 324.  YOU RECOGNIZE THAT AS BEING AN

18 E-MAIL SENT TO YOU FROM MS. HOGAN WITH THE PACKAGING ESTIMATE

19 FOR BRATZ, REVISED AS OF OCTOBER 19, 2000.

20 A    THAT'S WHAT I READ IT TO BE, YEAH.                              11:28

21 Q    YOU HAVE NO REASON TO BELIEVE THAT YOU DID NOT RECEIVE

22 THIS; CORRECT?

23 A    NO.

24 Q    DOUBLE NEGATIVE.

25        DO YOU HAVE ANY REASON TO BELIEVE THAT YOU DIDN'T           11:29

1   RECEIVE THIS?

2   A    NO.

3          **MR. PRICE:**  I'D MOVE EXHIBIT 324 INTO EVIDENCE.

4          **MS. AGUIAR:**  NO OBJECTION.

5          **THE COURT:**  IT'S ADMITTED.  YOU MAY PUBLISH.                          11:29

6   **BY MR. PRICE:**

7   Q    JUST TO COMPLETE THESE DOCUMENTS, COULD YOU TELL US WHAT

8   KERRI LEGG'S POSITION WAS IN OCTOBER OF 2000?

9   A    I BELIEVE KERRI LEGG'S RESPONSIBILITY WAS TO PROCESS PO'S

10  AND INVOICES FOR VENDOR SUBMISSIONS.                                            11:29

11  Q    WOULD SHE HAVE BEEN WORKING WITH YOU IF YOU WERE GETTING

12  BIDS FROM VENDORS?

13  A    YEAH.  IT'S POSSIBLE.  IT'S LIKELY.

14  Q    IF YOU WOULD LOOK AT EXHIBIT 325, DO YOU RECOGNIZE THAT AS

15  AN E-MAIL FROM MS. LEGG TO MR. LINKER AND MS. HOGAN, COPYING          11:29

16  YOU, FOR THE PACKAGING ESTIMATE FOR BRATZ?

17  A    YES.

18         **MR. PRICE:**  MOVE EXHIBIT 325 INTO EVIDENCE, YOUR

19  HONOR.

20         **MS. AGUIAR:**  NO OBJECTION.                                           11:30

21         **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

22  BY **MR. PRICE:**

23  Q    I'D LIKE YOU TO LOOK NOW -- YOU RECALL THAT YOU SPOKE TO

24  THE JURY EARLIER ABOUT THESE PDF'S, PRODUCT DEVELOPMENT FORMS.

25  IF YOU COULD, I'D LIKE YOU TO LOOK AT EXHIBIT 924; THAT'S STILL       11:30

1    IN THAT FIRST VOLUME.

2           DO YOU RECOGNIZE THAT AS AN E-MAIL SENT TO

3    CECELIA KOCH, SAMUEL WONG, FRANKIE TSANG, AROUND OCTOBER 16,

4    2000, CONCERNING SOME PDF'S?

5    A    YES.                                                              11:31

6           **MR. PRICE:**  YOUR HONOR, MOVE EXHIBIT 924 INTO

7    EVIDENCE.

8           **MS. AGUIAR:**  NO OBJECTION.

9           **THE COURT:**  ADMITTED.  YOU MAY DISPLAY IT.

10   **BY MR. PRICE:**                                                     11:31

11   Q    NOW, THESE FOLKS, ARE THESE THEIR HONG KONG FOLKS?

12   A    YEAH.

13   Q    AND ON OCTOBER 16TH, YOU SENT THEM AT THAT POINT SOME

14   PDF'S FOR THE BRATZ; CORRECT?

15   A    RIGHT.                                                           11:31

16   Q    AND I THINK YOU DESCRIBED THEM -- I DON'T WANT TO PUT

17   WORDS IN YOUR MOUTH.  COULD YOU TELL US EXACTLY WHAT THAT

18   MEANS.

19   A    A PDF IS A DOCUMENT THAT OFFICIATES TO HONG KONG AND TO

20   PEOPLE WITHIN OUR ORGANIZATION THAT MGA IS PURSUING A PRODUCT         11:32

21   FOR DEVELOPMENT.

22   Q    AND IF WE CAN SHOW THE FULL DOCUMENT, IT SAYS HERE,

23   "PLEASE NOTE, I RELEASED THE ROUGH CAST AND BODY TO YOU LAST

24   FRIDAY, AND THE DOLL IS EXPECTED TO BE BETWEEN NINE AND

25   9.5 INCHES TALL."                                                     11:32

```
 1            IS THAT BODY THE ONE WE LOOKED AT EARLIER THAT WAS
 2    MORE LIKE ELEVEN INCHES TALL?
 3    A    I BELIEVE SO, YES.
 4    Q    AND HERE YOU SAY, "HOWEVER, I PLAN TO SEND YOU A SOFT
 5    GOODS SWATCH PACKAGE WITH ALL THE PROPER FABRIC CONSTRUCTIONS,
 6    COLOR AND FABRIC ART BY OCTOBER 30TH."
 7            DO YOU SEE THAT?
 8    A    YES.
 9    Q    THAT WAS WELL ON ITS WAY AS OF THE DATE OF THIS, WHICH IS
10    OCTOBER 16, 2000; CORRECT?
11    A    YOU KNOW, I DON'T KNOW WHAT I MEANT BY THAT.  BUT I DO NOT
12    BELIEVE THAT SWATCHES WERE RELEASED ON OCTOBER 30TH.  IN FACT,
13    I KNOW THAT SWATCHES WERE NOT RELEASED ON OCTOBER 30TH.
14    Q    WHAT WORK HAD BEEN DONE ON THE SOFT GOODS AND THE PACKAGES
15    AS OF OCTOBER 16TH?
16    A    I'M NOT SURE THAT ANY, FRANKLY.  I DON'T REMEMBER ANY.
17    AND THE REASON I KNOW THAT IS BECAUSE I DON'T BELIEVE THAT
18    CARTER BEGAN EVEN SHOPPING FOR FABRICS UNTIL MID OCTOBER.  I
19    SHOULDN'T EVEN SAY FABRICS; HE WAS JUST INSPIRING IN THE OPEN
20    MARKET; LIKE DELIA'S AND FOREVER 21.
21    Q    SO WHAT MR. BRYANT WAS DOING IN MID OCTOBER, YOU SAID, WAS
22    INSPIRING SWATCH FABRICS.  WHAT WAS HE DOING FOR MGA IN MID
23    OCTOBER IN CONNECTION WITH THAT?
24    A    ALL I REMEMBER IS THAT CARTER BRYANT HAD A PRETTY
25    EXTENSIVE SHOPPING EXPERIENCE THAT I THINK HAPPENED AROUND THE
```

11:32
11:32
11:33
11:33
11:34

660

1    20TH OF OCTOBER.

2    Q    THE REASON I ASK YOU IS YOU HAD SAID MID OCTOBER, WHICH

3    WOULD PLACE IT BEFORE OCTOBER 19TH.

4         WHY DO YOU NOW SAY THAT DATE IS OCTOBER 20TH?

5    A    I JUST REMEMBER -- I BELIEVE AND I REMEMBER THAT IT          11:34

6    HAPPENED AFTER, YOU KNOW, AROUND THE MID OF OCTOBER, AFTER THE

7    SCULPTING WAS -- THE FIRST CAST HAD BEEN GENERATED AND THE

8    EXPLORATORY SCULPT HAD BEEN CAST AND HAD PASSED ON AND STARTED

9    OVER.

10   Q    IT'S JUST THAT YOU DON'T REMEMBER MANY SPECIFIC DATES IN     11:34

11   OCTOBER WITHOUT LOOKING AT AN E-MAIL; IS THAT CORRECT?

12   A    I DON'T KNOW WHAT YOU MEAN.

13   Q    YOU CAN'T REMEMBER SPECIFIC DATES IN OCTOBER THAT YOU DID

14   THINGS WITHOUT LOOKING AT AN E-MAIL TO REFRESH YOUR

15   RECOLLECTION; IS THAT FAIR?                                      11:34

16   A    NOT IN ALL CASES, BUT IF YOU COULD GIVE ME A PARTICULAR

17   EXAMPLE.  I DON'T UNDERSTAND.

18   Q    YOU'VE LEARNED, AT LEAST IN THIS EXAMINATION, THAT

19   MR. BRYANT WORKED AT MATTEL UNTIL OCTOBER 19TH; CORRECT?

20   A    YES.                                                        11:35

21   Q    AND THEN YOU JUST SAID HE WAS DOING THIS SHOPPING IN MID

22   OCTOBER; CORRECT?

23   A    YES.

24   Q    AND THEN YOU TOLD US YOU BELIEVE THAT WAS OCTOBER 20TH,

25   THE DAY AFTER HE LEFT MATTEL; CORRECT?                           11:35

```
 1   A     AND I SAID I BELIEVE.  I'M NOT SURE.

 2   Q     SO WHAT LED YOU TO THAT OCTOBER 20TH DATE, IF YOUR

 3   ORIGINAL BELIEF WAS SIMPLY SOMETIME IN THE MIDDLE OF OCTOBER?

 4   WHAT LEAD YOU TO THAT DATE, THE DAY AFTER HE LEFT MATTEL?

 5   A     TO ME, I RELATE HIS SHOPPING TO AFTER THE FIRST         11:35

 6   EXPLORATORY SCULPT WAS CASTED AND DONE AND SENT OFF TO HONG

 7   KONG AND WE STARTED OVER.  THAT'S HOW I MARK MY DATES.

 8   Q     WHO WAS WORKING ON THESE FASHIONS?  WHAT VENDOR?

 9   A     WHAT FASHIONS DO YOU MEAN?

10   Q     FOR BRATZ.                                              11:35

11   A     THAT WE WENT TO MANUFACTURING WITH?

12   Q     IN OCTOBER.

13   A     AS I SAID, I DON'T BELIEVE THERE WERE FASHIONS BEING

14   CONCEPTED OR CREATED.

15         I REMEMBER THE SHOPPING EXPERIENCE.                     11:36

16   Q     IF YOU WOULD LOOK AT EXHIBIT 606.

17         THESE ARE INVOICES FROM VERONICA MARLOW; IS THAT

18   CORRECT?

19   A     RIGHT.

20   Q     THOSE ARE INVOICES YOU APPROVED TO BE PAID.             11:36

21   A     YEP.

22         MR. PRICE:  MOVE TO ADMIT EXHIBIT 606 INTO EVIDENCE.

23         MS. AGUIAR:  NO OBJECTION.

24         THE COURT:  ADMITTED.  YOU MAY PUBLISH.

25   BY MR. PRICE:                                                 11:36
```

```
 1   Q    WOULD YOU LOOK AT THE SECOND PAGE HERE, IF YOU LOOK AT

 2   THIS, THIS WAS SENT TO YOU; CORRECT?

 3   A    YEP.

 4   Q    AND IT'S REGARDING BRATZ DOLLS RESEARCH DEVELOPMENT AND

 5   SUPPORT SERVICES; CORRECT?                                        11:37

 6   A    YES.

 7   Q    THIS TOOK PLACE SEPTEMBER 29TH THROUGH OCTOBER 20TH;

 8   CORRECT?

 9   A    YEP.

10   Q    THAT'S THE LAST DAY ON THIS INVOICE; CORRECT?                11:37

11   A    THAT'S RIGHT.

12   Q    AND WE'VE GOT A TOTAL HERE OF ABOUT 88 HOURS.

13   A    YEP.

14   Q    AND THIS WAS CONCERNING, AMONG OTHER THINGS, FASHION

15   RESEARCH, PATTERN AND SAMPLE DEVELOPMENT; CORRECT?               11:38

16   A    YES.

17   Q    AND FOR EXAMPLE, PATTERN AND SAMPLE DEVELOPMENT, THAT WAS

18   FOR THE FASHIONS ON THE DOLLS.

19   A    DO YOU MEAN THE FASHIONS THAT WE WENT TO MANUFACTURING

20   WITH?                                                            11:38

21   Q    THAT YOU WERE CONSIDERING USING ON THE BRATZ DOLLS.

22   A    I DON'T BELIEVE, AGAIN, THAT WE ACTUALLY WERE CREATING

23   FASHIONS AT THIS TIME.  IN FACT, WE DIDN'T RELEASE ANY SWATCH

24   PACKAGES OR ZONE PATTERNS UNTIL MID TO LATE DECEMBER OF 2000.

25   Q    YOU PAID FOR 21 HOURS OF PATTERN AND SAMPLE DEVELOPMENT     11:38
```

1  THAT TOOK PLACE BETWEEN SEPTEMBER 29TH AND OCTOBER 20TH;

2  CORRECT?

3  A    YES.

4  Q    WHAT WERE YOU PAYING FOR?

5  A    I WAS PROBABLY -- I'M NOT SURE, TO BE HONEST, BUT IT'S       11:39

6  POSSIBLE THAT SHE WAS SEWING AND SAMPLING ON THAT CAST BODY,

7  THE EXPLORATORY CAST BODY.

8  Q    AND SHE WAS DOING THAT AT YOUR DIRECTION.

9  A    I DON'T REMEMBER, BUT IT'S PROBABLE.  I PAID FOR IT, SO...

10  Q    AND TO BRING HER INTO CONTEXT, MS. MARLOW IS THE WOMAN WHO    11:39

11  YOU HAVE TESTIFIED BROUGHT MR. BRYANT TO YOU; CORRECT?

12  A    RIGHT.

13  Q    AND SHE WAS WORKING WITH HIM AS WELL DURING THIS TIME

14  FRAME; YOU KNEW THAT.

15  A    I REMEMBER DURING THIS TIME PERIOD -- IF I CAN TELL YOU       11:39

16  WHAT I REMEMBER -- I REMEMBER THAT SHE AND CARTER HAD -- SHE

17  HAD PARTICIPATED IN ONE OF THE SCULPT MEETINGS, WHICH HAPPENED

18  AT MGA'S OFFICES, AND SHE ALSO DID SOME -- I BELIEVE WHEN SHE

19  WRITES FASHION RESEARCH, SHE MEANT TO PROBABLY SAY FASHION

20  SHOPPING.                                                         11:40

21  Q    AND YOU UNDERSTOOD THAT SHE AND MR. BRYANT WERE WORKING

22  TOGETHER IN THE TIME FRAME BETWEEN OCTOBER 4TH AND

23  OCTOBER 19TH; CORRECT?

24  A    WORKING TOGETHER?  SHE WAS WORKING WITH ME.  I KNOW SHE

25  WORKED WITH ME.  AND AS I MENTIONED, I REMEMBER SOME OF THESE     11:40

664

1    SITUATIONS.

2         I DON'T THINK THIS INVOICE REPRESENTS SHE WAS

3    NECESSARILY AND PARTICULARLY WORKING WITH CARTER BRYANT.

4    Q    IT'S YES OR NO.  DO YOU RECALL SHE WAS WORKING WITH

5    CARTER BRYANT DURING THIS TIME FRAME?                    11:40

6    A    I RECALL THAT SHE WAS WORKING WITH ME DURING THIS TIME

7    FRAME.

8    Q    SO THE ANSWER IS NO, YOU DON'T RECALL HER WORKING WITH

9    CARTER BRYANT.

10   A    IT'S POSSIBLE SHE WAS WORKING WITH CARTER.  I'M NOT SURE.  11:40

11   Q    THIS IS ANOTHER INVOICE FOR BETWEEN OCTOBER 13TH AND

12   OCTOBER 20TH.  DO YOU SEE THAT?

13   A    YES.

14   Q    SO THE PRIOR INVOICE WAS FOR 80 HOURS, AND THEN YOU ALSO

15   PAID AN INVOICE FOR WORK DONE BETWEEN OCTOBER 13TH AND      11:41

16   OCTOBER 20TH OF ANOTHER 81 HOURS; CORRECT?

17   A    YEP.

18   Q    SO THAT'S 161 HOURS OF WORK THAT YOU PAID VERONICA MARLOW

19   FOR WORK ON BRATZ BETWEEN SEPTEMBER 29TH AND OCTOBER 20TH;

20   CORRECT?                                                   11:41

21   A    YEP.

22   Q    AND THE FOCUS OF HER WORK FOR THOSE 161 HOURS, YOUR

23   UNDERSTANDING, WAS THIS PATTERN MAKING AND ACTUAL SEWING;

24   RIGHT?

25   A    THAT'S WHAT IT SAYS, YEAH.                            11:42

1   Q    AND MR. BRYANT, WHO UNTIL OCTOBER 19TH WAS AN EMPLOYEE OF

2   MATTEL, WAS WORKING WITH HER ON THAT; CORRECT?

3   A    I DON'T KNOW IF CARTER WAS WORKING WITH HER ON THAT.  I

4   DON'T EVEN KNOW NECESSARILY WHAT SHE WAS WORKING ON BECAUSE,

5   AGAIN, I KNOW WHEN THE FINAL FASHIONS WERE DONE, AND WHEN THEY          11:42

6   WERE RELEASED, AND THAT DID NOT HAPPEN UNTIL DECEMBER.

7         AND, I DON'T REMEMBER THEM EVEN BEGINNING TO DESIGN

8   FASHIONS UNTIL, AGAIN, WHAT I CALLED MID OCTOBER.

9         SORRY.  THEY DIDN'T EVEN BEGIN TO DESIGN FASHIONS

10  UNTIL AFTER THEY WENT SHOPPING, AND I REMEMBER THAT THEIR            11:43

11  SHOPPING EXPERIENCE HAPPENED AROUND MID OF OCTOBER.

12  Q    WELL, MS. MARLOW DIDN'T DO THIS WORK WITHOUT BEING

13  REQUESTED TO DO SO BY SOMEBODY AT MGA; RIGHT?

14  A    RIGHT.

15  Q    AND IT'S YOUR BELIEF THAT YOU'RE THE ONE WHO ASKED HER TO       11:43

16  DO THIS; THAT IS, TO ACTUALLY LOOK AT PATTERNS AND BEGIN THE

17  SEWING OF THE FASHIONS.

18  A    I PAID FOR IT, SO...  IT'S POSSIBLE.

19  Q    WELL, NOT ONLY IS THIS POSSIBLE, THAT'S WHAT YOU THINK

20  HAPPENED; RIGHT?                                                    11:43

21  A    YES.

22  Q    AND SO YOU KNEW AT THE TIME THAT MS. MARLOW WAS SPENDING A

23  SIGNIFICANT AMOUNT OF TIME ACTUALLY SEWING AND CREATING

24  FASHIONS TO BE USED FOR BRATZ; FAIR TO SAY?

25  A    LIKE EVERYTHING ELSE THAT WAS HAPPENING AROUND THIS TIME,       11:44

666

```
 1   WE WERE PART OF THIS EXPLORATORY STAGE.  IF VERONICA MARLOW WAS

 2   SEWING DURING THIS PERIOD, I BELIEVE SHE WAS PROBABLY DOING

 3   SOME EXPLORATORY SEWING ON AN EXPLORATORY SCULPT WHICH WAS

 4   CASTED ON OCTOBER 15TH.

 5           BUT I DO NOT BELIEVE THE FASHIONS SHE WAS WORKING ON      11:44

 6   -- IN FACT, I KNOW THE FASHIONS SHE WAS WORKING ON AT THIS TIME

 7   WERE NOT THE FASHIONS WE WENT TO MANUFACTURE WITH.

 8   Q   WELL, I'M NOT ASKING ABOUT WHETHER THEY WERE THE FINAL

 9   ONES, BUT YOU DID ASK HER TO MAKE FASHIONS AND YOU PAID HER

10   SEVERAL THOUSAND DOLLARS FOR WORKING THE EQUIVALENT OF A        11:44

11   FOUR-WEEK, 40-HOUR WORK WORKWEEK ON THOSE FASHIONS; CORRECT?

12   A   I DON'T KNOW WHAT SHE WAS NECESSARILY AND PARTICULARLY

13   SEWING IN THE WAY OF FASHIONS.  IT'S POSSIBLE SHE WAS SEWING

14   THESE FASHIONS ON TO THE VERY, VERY SEXY VAVAVOOM BODY TO SEE

15   HOW THE FASHIONS WOULD LAY ONTO THAT BODY.  I CAN'T BE SURE.    11:45

16   Q   WE WERE TALKING ABOUT THIS OCTOBER 16TH TIME FRAME WHEN

17   YOU SENT THE PDF TO KOREA.  IF I COULD ASK YOU TO LOOK AT THAT.

18   A   TO HONG KONG.

19   Q   HONG KONG.  SOMEWHERE OVER THERE IF I COULD HAVE YOU LOOK

20   AT 923.  MY QUESTION IS, THAT'S ONE OF THE PDF FORMS THAT YOU   11:45

21   SENT; CORRECT?

22   A   YES.

23           MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 923 INTO

24   EVIDENCE.

25           THE COURT:  ANY OBJECTIONS?                             11:46
```

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

1          **MS. AGUIAR:**  NO OBJECTION.

2          **THE COURT:**  YOU MAY PUBLISH.  IT'S ADMITTED.

3    **BY MR. PRICE:**

4    Q    THIS IS CONCERNING THE BRATZ DOLL PACKS; CORRECT?

5    A    RIGHT.                                                    11:46

6    Q    AGAIN, OCTOBER 16TH DATE; CORRECT?

7    A    YES.

8    Q    AND BY THAT TIME, YOU HAD DISCUSSED THAT THERE WERE GOING

9    TO BE FOUR DIFFERENT DOLLS; CORRECT?

10   A    YES.                                                      11:46

11   Q    AND IN MR. BRYANT'S PRESENTATION TO YOU IN SEPTEMBER,

12   THERE WERE FOUR CHARACTERS THAT YOU PRESENTED, THE FOUR BRATZ;

13   CORRECT?

14   A    YES.  THOUGH, I WILL SAY THE FOUR CHARACTERS IN HIS

15   PORTFOLIO WERE NOT THE FOUR THAT I INTENDED HERE IN THIS PDF.   11:46

16   Q    AND YOU GOT THE DIMENSIONS HERE ALSO, YOU'RE TELLING

17   KOREA; CORRECT?

18   A    UH-HUH.

19   Q    WHAT'S THIS DIMENSION OF OCTOBER 16TH?  WHAT DIMENSIONS

20   ARE YOU REFERRING TO?                                          11:47

21   A    I BELIEVE I WAS REFERRING TO A PACKAGE DIMENSION.  THE

22   HEIGHT, WIDTH, AND DEPTH OF THE PACKAGE.

23   Q    LOOK IN YOUR SAME BINDER THERE -- ACTUALLY IT'S

24   DIFFERENT -- IT'S THE SECOND BINDER, EXHIBIT 1103.

25          COULD YOU TELL US WHAT EXHIBIT 1103 IS?                 11:48

| | | |
|---|---|---|
| 1 | A | IT SEEMS TO BE A DEVELOPMENT SCHEDULE. |
| 2 | Q | AND WHEN WAS THE DEVELOPMENT SCHEDULE CREATED? |
| 3 | A | I DON'T REMEMBER. |
| 4 | Q | SOMETIME IN OCTOBER? |
| 5 | A | I DON'T REMEMBER. |

6  Q     WELL, WOULD YOU HAVE CREATED THE DEVELOPMENT SCHEDULE IN

7  SEPTEMBER?

8  A     NO.

9  Q     WHEN IS THE EARLIEST YOU WOULD HAVE CREATED THE

10  DEVELOPMENT SCHEDULE?

11  A     PROBABLY AROUND THE RELEASE OF MY PDF, OCTOBER 16TH.

12  Q     BECAUSE WE ALREADY HAVE THIS UP HERE, 923, AS OF

13  OCTOBER 16TH, YOU'RE INFORMING KOREA THAT THERE'S A ROYALTY

14  RATE OF THREE PERCENT.

15  A     HONG KONG.

16  Q     I APOLOGIZE.

17        YOU'RE INFORMING HONG KONG THAT THERE'S A ROYALTY

18  RATE OF THREE PERCENT CORRECT?

19  A     YES.

20  Q     AND COULD YOU TELL THE JURY WHAT THAT'S REFERRING TO?

21  WHO'S GETTING THAT THREE PERCENT?

22  A     I BELIEVE THAT WAS CARTER'S ROYALTY.

23  Q     WERE YOU EMPLOYED ON A ROYALTY BASIS OR ON A SALARY BASIS?

24  A     SALARY BASIS.

25  Q     IT'S YOUR UNDERSTANDING THAT MR. BRYANT WAS GETTING A

11:48
11:48
11:49
11:49
11:49

MAY 29TH, 2008          TRIAL DAY 4, MORNING SESSION

```
 1  THREE PERCENT ROYALTY, BECAUSE ROYALTY -- THAT IS THREE PERCENT
 2  OF EACH DOLL SOLD?
 3  A    THAT WAS MY UNDERSTANDING, YES.
 4  Q    AND ACCESSORIES.
 5  A    ANYTHING THAT CARTER WORKED ON, HE WAS ATTRIBUTED                11:49
 6  THREE PERCENT.
 7  Q    AND THAT'S BECAUSE HE WAS THE CREATOR OF THIS.
 8  A    SORRY.  CAN YOU REPHRASE YOUR QUESTION.
 9  Q    HE WAS GETTING A ROYALTY, AS OPPOSED TO JUST A SALARY OR
10  GETTING PAID BY THE HOUR, HE WAS GETTING A ROYALTY ON ANYTHING      11:50
11  ASSOCIATED WITH BRATZ BECAUSE HE WAS THE CREATOR OF BRATZ.
12  A    I'M SORRY, I DON'T FEEL COMFORTABLE ANSWERING THESE KINDS
13  OF QUESTIONS AS I'M NOT REALLY FAMILIAR WITH LAW OR ANY OF THE
14  LEGAL TERMS OR ANY OF THE, YOU KNOW, CONTRACT OR UNDERSTANDING
15  BETWEEN -- I'M A CREATIVE PERSON.                                   11:50
16  Q    IF YOU DON'T KNOW WHAT THE BASIS WAS, THEN JUST SAY YOU
17  DON'T KNOW.  I DON'T WANT TO FORCE YOU TO SAY SOMETHING YOU
18  DON'T KNOW.
19         I'LL WITHDRAW THAT QUESTION, BECAUSE APPARENTLY YOU
20  DON'T KNOW THE ANSWER.                                             11:50
21         THE ONLY THING YOU DO KNOW IS THAT MR. BRYANT WAS
22  GOING TO GET A ROYALTY RATE OF THREE PERCENT ON BRATZ PRODUCTS.
23  A    I UNDERSTOOD THAT CARTER BRYANT WAS TO GET THREE PERCENT
24  ROYALTY ON ANY OF THE DOLLS THAT HE PERSONALLY DESIGNED.
25  Q    DO YOU HAVE ANY UNDERSTANDING AS TO HOW MUCH THAT HAS COME    11:50
```

```
 1   TO TO THE PRESENT?

 2   A    I HAVE NO IDEA.

 3   Q    WE WERE TALKING ABOUT 1103 WHICH YOU IDENTIFIED AS A

 4   PRODUCTION SCHEDULE YOU CREATED.

 5          MR. PRICE:  YOUR HONOR, IF WE COULD MOVE 1103 INTO    11:51

 6   EVIDENCE?

 7          MS. AGUIAR:  NO PROPER FOUNDATION FOR IT, YOUR HONOR.

 8          THE COURT:  1103, YOU SAID?

 9          I'LL SUSTAIN THE OBJECTION.  LAY FURTHER FOUNDATION.

10   BY MR. PRICE:                                               11:51

11   Q    YOU SAID THIS WAS A PRODUCTION SCHEDULE; YES?

12   A    YES.

13   Q    YOU SAID YOU CREATED THIS SCHEDULE; CORRECT?

14   A    I DIDN'T SAY THAT.  BUT I DO BELIEVE I DID CREATE THIS

15   SCHEDULE.                                                   11:51

16   Q    WELL, THANK YOU.  YOU MAY HAVE FILLED IN AN IMPORTANT

17   ELEMENT.

18          YOU SAID YOU THOUGHT YOU COULD SCHEDULE IT ABOUT THE

19   SAME TIME YOU WERE SENDING THESE PDF'S TO HONG KONG.

20   A    I'M NOT SURE, BUT I BELIEVE IT'S POSSIBLE.            11:51

21   Q    IT CERTAINLY WOULD NOT HAVE BEEN IN SEPTEMBER; CORRECT?

22          IT WOULD HAVE BEEN MID OCTOBER OR LATER; CORRECT?

23   A    CORRECT.

24          MR. PRICE:  WE MOVE EXHIBIT 1103 INTO EVIDENCE.

25          MS. AGUIAR:  NO OBJECTION.                          11:52
```

1    **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.

2    **BY MR. PRICE:**

3    Q    THIS SAYS "PDF, OCTOBER 16, 2000."

4    A    YES.

5    Q    SO THAT'S REFERRING TO THE PDF'S YOU SENT ON OCTOBER 16,     11:52

6    2000.

7    A    THAT'S RIGHT.

8    Q    SO DOES THAT INDICATE TO YOU THIS WAS DONE ABOUT THE TIME

9    YOU SENT THOSE; THAT IS, YOU WERE TALKING ABOUT SOMETHING WHICH

10   WAS HAPPENING RIGHT THEN OR HAD JUST HAPPENED?               11:52

11   A    I DON'T UNDERSTAND YOUR QUESTION.

12   Q    THIS OCTOBER 16TH DATE FOR PDF'S, THAT'S NOT A PREDICTION;

13   THAT'S SOMETHING HAPPENING RIGHT AT THE TIME OR THAT HAD

14   ALREADY HAPPENED.

15   A    YES.                                                    11:52

16   Q    SOME OF THESE DATES ARE PREDICTIONS, RIGHT, WHERE YOU'RE

17   THINKING CERTAIN THINGS ARE GOING TO HAPPEN; CORRECT?

18        FOR EXAMPLE, YOU HAVE MARCH 19, 2001, OR

19   DECEMBER 2000; CORRECT?

20   A    I CAN SAY THAT ANYTHING THAT ACTUALLY HAPPENED WAS DENOTED   11:53

21   IN GRAY OVER THE DATE.

22   Q    OKAY.

23        SO IT LOOKS LIKE THEN THE PDF ALREADY HAPPENED AND

24   THE CONTROL DRAWINGS TO L.A. DESIGNER ALREADY HAPPENED, BECAUSE

25   THOSE ARE THINGS THAT HAPPENED BEFORE YOU CREATED THIS        11:53

1    DOCUMENT.

2    A    RIGHT.

3    Q    SO IT'S ACCURATE TO SAY, THEN, THAT FOR THE SCULPTING, THE

4    CONTROL DRAWINGS, WHEN YOU SAY L.A. DESIGNER, YOU'RE REFERRING

5    TO THE SCULPTOR IN THIS DOCUMENT; CORRECT?                    11:53

6    A    I BELIEVE SO.

7    Q    AND BY OCTOBER 2ND, THE DRAWS TO BE USED BY THAT SCULPTOR,

8    CONTROL DRAWINGS, HAD ALREADY BEEN SENT TO HER, ACCORDING TO

9    YOUR SCHEDULE OF WHAT HAD ALREADY HAPPENED.

10   A    I HAVE A FEW THINGS I'D LIKE TO SAY ON THAT.              11:54

11   Q    FIRST, IS MY STATEMENT CORRECT?  BECAUSE THE WAY IT WORKS

12   IS I ASK A QUESTION AND YOU GIVE AN ANSWER.

13          IT'S TRUE, AS YOU WROTE DOWN HERE, THAT PREVIOUSLY,

14   ON OCTOBER 2ND, DRAWINGS HAD BEEN SENT TO THE SCULPTOR TO

15   CREATE THE SCULPTORS TO BE USED FOR THE BRATZ?                11:54

16   A    THAT IS THE DATE AS IT'S REPRESENTED IN THIS DOCUMENT.

17   Q    JUST TO BE CLEAR, YOU DID WRITE THIS DOCUMENT.

18   A    YOU KNOW, I FEEL THAT I KEEP WANTING TO COMPLETE MY

19   SENTENCES, BUT I FEEL YOU KEEP INTERRUPTING ME.

20          IF IT WOULD BE OKAY, I'D LIKE TO FINISH MY SENTENCE.    11:55

21   Q    SURE.  TELL ME WHAT YOU WANT TO SAY

22   A    I BELIEVE THIS DATE, OCTOBER 2ND OF 2000, IS INCORRECT.

23   THAT DATE REPRESENTS POSSIBLY THE RELEASE OF CARTER'S PORTFOLIO

24   DRAWINGS TO MARGARET WHICH WE TALKED ABOUT TO BE THE

25   EXPLORATORY SCULPT TO PROVE THAT CARTER'S DRAWINGS WERE TOO    11:55

```
 1   SEXY, IN MY VIEW.  WE DIDN'T ACTUALLY BEGIN SCULPT, WHICH I

 2   CALL THE FIRST GENERATION SCULPT, UNDER AFTER MID OF OCTOBER;

 3   SO I KNOW THIS DATE TO BE WRONG.

 4            AND I'D LIKE TO SPEAK ON THE SCHEDULE, SINCE WE'RE ON

 5   IT, IF I MAY, YOUR HONOR?                                         11:55

 6            THE COURT:  COUNSEL, ASK YOUR QUESTION.

 7   BY MR. PRICE:

 8   Q    SO WHO WOULD SEE THIS SCHEDULE?

 9   A    IT WOULD BE POSSIBLY HONG KONG OR SOME OF THE DEVELOPMENT

10   PEOPLE IN OUR GROUP.                                              11:56

11   Q    IS IT SOMETHING THAT WAS TO BE USED IN MGA'S BUSINESS?

12   A    YES.

13   Q    SO THERE'S A BUSINESS REASON TO CREATE THIS DOCUMENT.

14   A    YES.  IT WAS VERY, VERY PRELIMINARY AND VERY INCORRECT.

15   Q    AND YOUR TESTIMONY, WHAT YOU TOLD THE JURY, IS THAT THIS     11:56

16   OCTOBER 2ND DATE IS ANOTHER TYPOGRAPHICAL ERROR.

17   A    IT'S NOT A -- IT'S NOT NECESSARILY A TYPOGRAPHICAL ERROR.

18   I JUST WANT TO BE CLEAR THAT THE SCULPTING DEVELOPMENT PROCESS

19   THAT REPRESENTED THE SCULPT THAT WE WENT INTO MANUFACTURING,

20   THAT DRAWING WAS NOT HANDED OFF ON OCTOBER 2ND.                   11:57

21   Q    WELL, THEN, IF IT WASN'T, WHY DID YOU TYPE OCTOBER 2, 2000

22   IN THIS DOCUMENT IF THAT WASN'T THE DATE WHEN THE CONTROL

23   DRAWINGS WERE HANDED OVER TO THE SCULPTOR?

24   A    I'M NOT SURE.  SITTING HERE TODAY, I'M NOT SURE.

25   Q    IS IT YOUR TESTIMONY THAT THE OCTOBER 2ND DATE IS THERE      11:57
```

```
1   BECAUSE YOU WERE TYPING OR WORKING CARELESSLY AND TOO QUICKLY?

2   A    I DIDN'T UNDERSTAND.

3   Q    IS IT YOUR TESTIMONY THAT THE REASON IT SAYS OCTOBER 2ND

4   THERE, HAS THAT DATE, IS BECAUSE YOU WERE JUST TYPING OR

5   WORKING CARELESSLY OR TOO QUICKLY?                              11:58

6   A    NO.

7            MR. PRICE:  YOUR HONOR, IN THAT CASE, I'D LIKE TO

8   PLAY FROM VOLUME III, PAGE 824 -- AND IF WE CAN'T PLAY IT, WE ,

9   MIGHT READ IT -- PAGE 824, LINE 16 TO LINE 25.

10           THE WITNESS:  YES.                                     11:59

11           MS. AGUIAR:  WHAT DATE WAS THAT OF THE DOCUMENT?

12           MR. PRICE:  OCTOBER 9TH, 2007.

13           MS. AGUIAR:  NO OBJECTION.

14           THE COURT:  VERY WELL.  I'LL OVERRULE THE OBJECTION

15  SET FORTH IN THE RECORD.                                        11:59

16           (VIDEO DEPOSITION PLAYED. )

17  BY MR. PRICE:

18  Q    SO LOOKING IN THE DOCUMENT AND LOOKING AT THE OCTOBER 2ND

19  DATE, WHAT DID YOU INTEND YOUR FINGERS TO TYPE, INSTEAD OF TWO?

20  IN EXHIBIT 1103, WE'VE GOT CONTROLLED DRAWINGS THAT GUIDE THE   12:00

21  SCULPTOR BEING DONE ON OCTOBER 2, 2000.  WHAT DID YOU INTEND TO

22  DO WITH YOUR FINGER?  WHAT DID YOU INTEND TO PUSH?

23  A    THE DEPOSITION MATERIAL THAT YOU JUST SHOWED AND THE

24  ANSWERS THAT I GAVE WERE NOT IN REGARDS TO THE OCTOBER 2ND DATE

25  THAT WAS ON THE SCHEDULE.                                       12:01
```

1   Q    THE QUESTION WAS DO YOU HAVE AN UNDERSTANDING AS TO WHY

2   YOU PUT AN INCORRECT DATE OF OCTOBER 2, 2000, ON THIS FORM, FOR

3   AN EVENT THAT HAD ALREADY PASSED.  THE QUESTION WAS ABOUT THIS

4   DATE SPECIFICALLY, WAS IT NOT?

5   A    I APOLOGIZE.                                                    12:01

6        YES.  THIS SEEMS TO BE REFERRING TO THAT DATE.

7   Q    OKAY.  AND WHAT YOU SAID UNDER OATH WAS THAT THIS WAS

8   TYPING TOO QUICKLY; YOU DIDN'T MEAN TO PUSH THE TWO HERE, TO

9   SAY THAT'S THE DATE THAT THE GUIDING CONTROLLED DRAWINGS WERE

10  GIVEN TO THE DESIGNER.  SO MY QUESTION IS, WHAT DID YOU INTEND    12:01

11  TO PUSH?

12  A    I APOLOGIZE.  AND I WOULD LIKE TO BE CLEAR THAT I WILL

13  TELL YOU THAT I WAS WORKING CARELESSLY ON THIS DOCUMENT AND I

14  WORKED QUICKLY, AND I BELIEVE THERE ARE SOME INCORRECT DATES ON

15  THIS DOCUMENT.                                                    12:02

16       ON THE OCTOBER 2ND DATE, AS I MENTIONED, IT'S

17  POSSIBLE THAT DATE COULD HAVE BEEN THE DATE THAT WE PASSED THE

18  PORTFOLIO DRAWINGS TO MARGARET LEAHY FOR THE EXPLORATORY

19  SCULPT.  I CAN'T BE SURE.

20       **THE COURT:**  COUNSEL, I'M GOING TO STOP YOU HERE AND      12:02

21  WE'RE GOING TO TAKE OUR LUNCH BREAK.

22       WE'LL BE BACK AT 1:30, AND I WANT TO SEE COUNSEL BACK

23  AT 1:15.

24            (WHEREUPON JURORS DEPART COURTROOM.)

25            (CONCLUSION OF MORNING SESSION.)

1

2

3

4

5

6                                   CERTIFICATE

7

8    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
9    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
10   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

11

12                                                        5-30-08
                                                    _____
13   THERESA A. LANZA, RPR, CSR                            DATE
     OFFICIAL COURT REPORTER

14

15

16

17

18

19

20

21

22

23

24

25