1   UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA

3   - - -

4   **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5   - - -

6   MATTEL, INC.,                          :   PAGES 1976 - 2117
                                            :
7          PLAINTIFF,                       :
                                            :
8      VS.                                  :   NO. ED CV04-09049-SGL
                                            :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,                :   CV04-9059 & CV05-2727]
    ET AL.,                                 :
10                                          :
                                            :
11         DEFENDANTS.                      :
    _____

12

13

14

15   REPORTER'S TRANSCRIPT OF PROCEEDINGS

16   RIVERSIDE, CALIFORNIA

17   TUESDAY, JUNE 10, 2008

18   JURY TRIAL - DAY 10

19   AFTERNOON SESSION

20

21

22

23   **CERTIFIED COPY**

24

25

MARK SCHWEITZER, CSR, RPR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT
181-H ROYBAL FEDERAL BUILDING
255 EAST TEMPLE STREET
LOS ANGELES, CALIFORNIA 90012
(213) 663-3494

**Appearances of Counsel:**

On Behalf of Mattel:

    Quinn Emanuel
    By John B. Quinn, Esq.
      B. Dylan Proctor, Esq.
      Michael T. Zeller, Esq.
      Harry Olivar, Esq.
      John Corey, Esq.
      Diane Hutnyan, Esq.
      William Price, Esq.
    855 South Figueroa Street
    10th Floor
    Los Angeles, CA 90017
    (213) 624-7707


On Behalf of MGA Entertainment:

    Skadden, Arps, Slate, Meagher & Flom LLP
    By Thomas J. Nolan, Esq.
      Carl Alan Roth, Esq.
      Jason Russell, Esq.
      Lauren Aguiar, Esq.
      David Hansen, Esq.
      Matthew Sloan, Esq.
    300 South Grand Avenue
    Los Angeles, CA 90071-3144
    (213) 687-5000

I N D E X


**ISAAC LARIAN, PREVIOUSLY SWORN.**........................ 1992

**CROSS-EXAMINATION (CONTINUED)** BY MR. NOLAN:   .......... 1992


E X H I B I T S


(Exhibit 16925 received.)............................ 2015

(Exhibit 4900 received.)............................ 2032

(exhibit 16911 received.)............................ 2045

(Exhibit 16788 received.)............................ 2074

1    **Riverside, California; Tuesday, June 10, 2008**

2    **1:15 P.M.**

3    **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4         THE COURT:  For the record, we're going to be

5    bringing into the courtroom Juror No. 3.

6         (Whereupon Juror No. 3 enters.)

7         THE COURT:  We're back on the record in the

8    presence of Juror No. 3, Rhonda Johnstone.  We've received

9    your letter, and I've shared it with counsel.  There's two

10   issues that you raise.  I'll deal with the easier one first.

11        Concerning your doctor appointments, make them

12   whenever you need to make them, and we will accommodate that.

13   Just let us know.  That's fine.

14        JUROR NO. 3  thank you.

15        THE COURT:  I'm a little bit more concerned about

16   the other one, though, concerning the representations that

17   were made to you and then changed.

18        It kind of puts us all in a bit of an awkward

19   position.  We certainly understand your financial position.

20   It's not clear why the school district would not have --

21   would have done what they did.  So what I'd like to do is

22   have the Court or court staff reach out to the appropriate

23   person and find out if that can't be reversed, because we

24   really need you.  And at the same time, I don't want to

25   submit anyone to a financial hardship.  So it puts me between

1    a rock and a hard place.  Is that all right with you?

2           JUROR NO. 3:  Yeah, that's fine.  I don't know why

3    they did it either.  I thought I did my homework and

4    everything was cool.  And now I'm feeling guilty because I

5    didn't speak out.

6           THE COURT:  Don't you feel guilty at all.  It

7    sounds from your letter like you did everything you were

8    supposed to do.

9           JUROR NO. 3:  Well, I thought I did.

10          THE COURT:  And they changed the rules of the game

11   on you.  So what we're going to do is see if we can't bring

12   them back around to where they were previously and go from

13   there.  What I'd ask you to do is provide appropriate contact

14   information to Mr. Holmes, and then I'll have my staff reach

15   out to whoever that is.  You don't need to do so now.  He'll

16   take that up with you back in the room; all right?  Thank you

17   very much, ma'am.

18          (Whereupon the juror withdraws.)

19          THE COURT:  The juror has left.  The Court has

20   reached a decision -- a final decision with respect to Motion

21   in Limine No. 13, and I've written out my opinion, and I'll

22   want to have this included in the proposed order that's going

23   to be submitted to the Court.

24          The Court finds evidence that Carter Bryant

25   operated the safe exit feature of Evidence Eliminator on July

1    12th, 2004, over two months after the filing of the lawsuit

2    by Mattel on April 27, 2004, and only two days prior to his

3    counsel's imaging.  Hard drive of his 2000 desktop, which

4    permanently eliminated the residue of previously deleted

5    files and rendered such deleted files unrecoverable is

6    relevant to his credibility as a witness and is admissible of

7    his consciousness of guilt, which in turn is relevant to

8    various elements of liability in this trial.

9         Moreover, the Court has carefully considered and

10   weighed whether the probative value of this clearly relevant

11   evidence is substantially outweighed by the danger of unfair

12   prejudice to MGA or undue delay in the trial and has found

13   that as limited by this order, it does not.

14        The Court will instruct the jury that this evidence

15   may only be considered for purposes of evaluating Carter

16   Bryant's credibility and his consciousness of guilt.

17        The Court further declines to give an adverse

18   inference instruction, believing that the issue was

19   adequately covered by instructions on credibility of

20   witnesses and circumstantial evidence that are already part

21   of the instructions given to the jury.

22        So that is the Court's ruling.  Accordingly,

23   evidence of the July 12th, 2004, use of Evidence Eliminator

24   is permitted not withstanding that MGA's Motion in Limine

25   No. 13 is otherwise granted in full.

1982

1    I trust that Carter Bryant is going to be

2    testifying tomorrow as scheduled, Mr. Nolan?

3    MR. NOLAN:  Your Honor, I think so.  Although we've

4    been told from time to time that witnesses are coming up, and

5    then they are pulled off.

6    THE COURT:  This is better asked, I suppose, to

7    Mr. Price or Mr. Quinn.

8    MR. QUINN:  That's what we anticipate.  Of course,

9    it depends on how much longer we have Mr. Larian on the

10   stand, but we anticipate Mr. Bryant testifying tomorrow.

11   THE COURT:  Very well.  As discussed, and I know

12   you weren't back in the under seal discussion, but I'm sure

13   Mr. Zeller or Mr. Corey -- who will be doing the examination

14   of Mr. Carter?

15   MR. PRICE:  I will, your Honor.

16   THE COURT:  Mr. Bryant, I mean.  The Court is

17   really trying to limit this to exactly the one piece of

18   evidence that I do think is relevant.  And that's -- it's

19   largely because of the timing of the use of the safe exit

20   function that convinces the Court that for purposes of

21   credibility and consciousness of guilt, that it's admissible.

22   I do not believe the evidence is there for this

23   Court to find spoilation outright.  And that's not what this

24   is being admitted for.  This is simply going to the

25   credibility and for purposes of consciousness of guilt.  And

1    that's what the jury will be instructed.  So keep that in

2    mind in forming your questions.

3            MR. PRICE:  I will.

4            THE COURT:  And then as far as where Mr. Bryant

5    goes, that's entirely within his control in terms of his

6    response.

7            MR. NOLAN:  Your Honor, the Court has ruled.  Would

8    the Court entertain excluding reference to the name of the

9    program itself, Evidence Eliminator?  They still get in the

10   idea that just two days before an imaging of the hard drive,

11   a software package was used to run.  But the use of the term

12   Evidence Eliminator is the one that I think causes us to

13   chase down that issue from --

14           THE COURT:  I understand that.  And I'll tell you

15   what I'm grappling with in part here.  It's precisely the

16   name, Evidence Eliminator, and Mr. Bryant's purchase of

17   Evidence Eliminator that goes to, I think, the issue of his

18   credibility and consciousness of guilt.  That is part of the

19   relevance.  I was struck by his testimony, and this is not

20   the part that has to remain under seal so I can discuss this

21   openly, concerning his general lack of understanding about

22   computers.

23           I mean, he made several references to this in the

24   examination.  If he had been a very sophisticated user of

25   computers and had a very particularized understanding of why

1  he had to give this particular program, and it wasn't for

2  what one might think an Evidence Eliminator program is for,

3  perhaps his testimony on that point would have been more

4  convincing in terms of the very relief that you are seeking,

5  but it's precisely because he admits to having really no

6  understanding of it that his decision, then, to go out and

7  get Evidence Eliminator and pick that particular program is

8  part of what tips the balance in favor of this being

9  admissible for those purposes.

10        So no, I am not -- this is a tough decision to

11  make, but that's one of the factors, I think, in favor of its

12  admissibility, is its name.

13        MR. NOLAN:  I accept that, your Honor, with the

14  reservations we've already made.

15        My next point is it goes to -- you know, there's

16  literature and brochures describing what Evidence Eliminator

17  is.  There's no record evidence that Mr. Bryant consciously

18  read all of that advertisement.  What I'm really worried

19  about in this case is Mr. Price or Mattel going into what

20  that software package --

21        THE COURT:  Mr. Price needs to lay -- Mattel needs

22  to lay a foundation.  And you are preserving all of your

23  objections to any of this.  All I'm doing is denying a motion

24  in limine which would have categorically excluded this.  The

25  grant in part, the denial in part is all subject to every

1985

1   other right that you have to make any objections to any

2   evidence.

3         So the foundation for all of this still has to be

4   laid, and nothing is going to subsequently go before the jury

5   until and unless that foundation is laid, and I'll be paying

6   close attention to the foundation of this particular

7   evidence, given the controversial nature of this evidence.

8         MR. NOLAN:  Your Honor, does the Court expect or

9   entertain -- because I think Mr. Menz is on their witness

10  list -- that the Court will allow expert testimony from

11  Mattel with respect to the use and effect of --

12        THE COURT:  I don't know.  Only if that is

13  necessary.  It depends only how this plays out.  My hope,

14  Counsel, is that this can be something which can be dealt

15  with quickly and efficiently with Mr. Bryant, and then we

16  move right along.  But it largely depends on what -- I'm not

17  going to limit Mattel at this point and say that they can't

18  introduce expert testimony, but all I'm doing is denying a

19  party motion in limine.  That's it, nothing more.  And I'm

20  also indicating that the Court is disinclined at this point

21  to give a -- the adverse inference instruction because this

22  really isn't about spoilation as much as it is about

23  credibility and consciousness of guilt.

24        Any questions?

25        MR. PRICE:  You mentioned Mr. Bryant's transcript

1  under seal.  I assume, obviously, if he gives answers

2  inconsistent with what he's testified to under oath already,

3  I'll be able to use that for impeachment?

4          THE COURT:  Yes.  And since you had two counsel

5  present for that, you're in a position to -- I want to keep

6  that under seal as much as possible.  Obviously, for

7  impeachment purposes, you won't get into that until you've

8  raised that at sidebar.  Just for a perspective of efficient

9  management of the examination, I'll direct the court reporter

10 to provide under seal to counsel a copy of the transcript so

11 that it's available, but it's not to be used without an

12 express order from the Court authorizing any portion of it

13 being used.

14         MR. NOLAN:  Your Honor, I understand that you'll

15 fashion some type of instruction to the jury for the limited

16 purpose that it's being offered.  Would that include that it

17 is not, you know, offered against us, MGA, in any way,

18 because there's no evidence nor any suggestion that we were

19 ever aware of this or participated in it in any way.

20         THE COURT:  Let me work on that instruction.  The

21 way I had it worded was basically that this is only going to

22 be considered for purposes of evaluating Carter Bryant's

23 credibility, and you are correct that there is no evidence

24 that MGA had any connection with purchasing, installing, or

25 using Evidence Eliminator.

1    MR. NOLAN:  And I think just because -- I'm sorry.

2  I didn't mean to interrupt.

3    THE COURT:  No, that's all right.

4    MR. NOLAN:  Just because of the sensitive nature of

5  this, your Honor, and in light of the fact that there is no

6  dispute, and that Mr. Bryant's credibility will be an issue

7  as for him, I would respectfully ask that you add that to the

8  instruction.  It's much more important coming from you than

9  me trying to make a point on cross-examination.

10    THE COURT:  Very well.  What I will do, then, I'll

11  ask counsel for both sides to submit a proposed instruction

12  along these lines to the Court.  And that will help the Court

13  in formulating appropriate instruction.

14    Any other questions?

15    Very well.  Let's go ahead and bring the jury in.

16    MR. PRICE:  Your Honor, I have no questions on

17  that.  Given the exhibits that I've been provided to

18  Mr. Larian's testimony, there are a number of them, however,

19  which I don't want to have to object to in front of the jury

20  and would rather bring up ahead of time.

21    THE COURT:  I'm sorry.  Thank you.  This is the

22  Portuguese --

23    MR. PRICE:  Well, there's that and some more that

24  I'm a little worried about.  But I think it might be better

25  to handle those outside the presence of the jury.

1988

1          THE COURT:  Why don't we do that now.  Do we know

2   what those are?

3          MR. PRICE:  First there's the Portuguese one.

4   There are some exhibits, and I can give you the numbers which

5   basically go to e-mails from Mr. Larian saying, for example,

6   I've heard rumors that Mattel isn't allowing people to sell

7   both Barbie and Bratz.  I've heard rumors that Mattel is

8   challenging our legal rights, et cetera.  And those appear to

9   be inappropriate for this phase, and hearsay, quite frankly.

10  There are five of them.  And they are Exhibits 4900, 16901,

11  16904, 17270, and 17272.  They are based on hearsay, and they

12  are getting into Phase 2 issues, it appears, not just Phase

13  1-B.

14          THE COURT:  Okay.  I appreciate the heads up.  I'll

15  consider these in the context during Mr. Nolan's examination.

16          MR. NOLAN:  My only quick response would be, and

17  we'll do this at the time they are being offered for the

18  state of mind.  It seems to me Mattel opened the door pretty

19  wide by asking about -- Mr. Larian has already testified that

20  he was aware of rumors in the market with respect to lawsuits

21  or litigation by Mattel.  And I think for purposes of

22  corroboration that he sent out an e-mail to that effect, you

23  know, corroborates that testimony.  Mr. Price elicited it.

24          THE COURT:  The rumors --

25          MR. NOLAN:  And the other point --

1989

 1          THE COURT:  Let's not mix and match.  I think it's

 2  best that I consider these on an independent basis because

 3  it's one thing, Counsel, when it comes in, when you

 4  understand it's a party opponent, when it's your own party,

 5  the hearsay rules are different.

 6          MR. NOLAN:  Right.  The one point I do want to

 7  raise before the jury comes in is that with respect to that

 8  e-mail exchange between Mr. Rosembaum and Victoria O'Connor,

 9  that it says that Ann Wang confirmed the chronology.

10  Mr. Price elicited an answer from Mr. Larian, which was

11  overruled, where he said that he saw an e-mail to that

12  effect.  And he did not allow me to get it in through

13  Victoria O'Connor, but based on the fact that the jury has

14  heard and it's in the evidence, it's in the testimony that he

15  said that he saw the e-mail --

16          THE COURT:  What's the exhibit number?  I do recall

17  that.

18          MR. NOLAN:  18467.

19          THE COURT:  18467.  Very good.  But be careful on

20  this hearsay, Counsel, Mr. Nolan, because it's a whole

21  different game when you're asking to get your own client's

22  statements in as opposed to when an opposing party is trying

23  to get those statements in.

24          MR. PRICE:  And on 18467, you'll recall a couple

25  times Mr. Larian blurted out, and I've seen this e-mail, you

1990

1    actually had, and Mr. Nolan agreed to tell his client not to

2    do that anymore.

3                THE COURT:  Yes.

4                MR. PRICE:  And this document is one which again

5    has always been on the privileged log, they always maintain

6    was privileged, and we've got -- you heard all the arguments

7    last week, and you made your ruling.  So I think it would be

8    inappropriate to --

9                THE COURT:  What the Court overruled was that final

10   objection, only one of the series of objections, Counsel, and

11   it was to the existence of the e-mail without getting into

12   the actual substance of the communication.  I'm not going to

13   rule in advance.  If you can lay a proper foundation and deal

14   with whatever hearsay issues it may raise, we'll go from

15   there.  But the Court will be mindful.

16               MR. PRICE:  It's not a hearsay issue.  It's a

17   question of them trying to waive the privilege at the last

18   moment to use it as a sword.

19               THE COURT:  All right.  And what about the

20   Portuguese documents?  Were you able to work something out on

21   that?

22               MR. NOLAN:  There's no agreement.

23               THE COURT:  I'm sorry?

24               MR. NOLAN:  There's no agreement.

25               MR. PRICE:  We would be glad to give you the

1991

1    arguments.

2          THE COURT:  There is a foundational problem here,

3    Mr. Nolan.  There's nothing that indicates that this

4    particular witness ever saw these documents.  Nobody can

5    testify to what they actually say.  I mean, you can read the

6    numbers as we all can.  And I think we all can guess as to

7    what they mean.  But in terms of adequate foundation, I don't

8    know if that does it.

9          MR. NOLAN:  Well, your Honor, I guess what I would

10   do is make this proffer.  A, that I think that we could lay a

11   proper foundation that these are maintained as business

12   records at MGA, trademark registrations filed in various

13   countries.  The relevance of it, your Honor, is whether or

14   not you speak Portuguese or not, not you personally, but

15   anybody who reads it, is that Carter Bryant's name is

16   prominently displayed.  They offered evidence and made the

17   suggestion through an exhibit, an e-mail exchange with Dee

18   Dee Valencia that says we understand that you want to keep

19   Carter Bryant's name under wraps.

20         THE COURT:  Let me stop you there.  I understand

21   the relevance, and I'm with you on the relevance.  This was

22   strictly a foundational objection that Mr. Price made.  If

23   you can lay a business record foundation for this and

24   Mr. Larian can authenticate them as such, that's something

25   which is not before the Court right now.

1    MR. PRICE:  And I would -- what Mr. Nolan is trying

2 to show is that Mr. Larian did not mind Mr. Bryant's name was

3 public, even though that's inconsistent with what Mr. Nolan

4 said in his opening and what Mr. Larian said in my

5 examination of him.  Even if this is authenticated as a

6 business record, it doesn't go to Mr. Larian's state of mind,

7 which is what he's trying to offer it for.  That is, he would

8 need to show that Mr. Larian knew that their Brazilian

9 attorneys were going to put Mr. Bryant's name on this, and he

10 apparently doesn't know that.  If he says he knows that --

11    THE COURT:  Well, that's part of the foundation

12 that needs to be laid.  Mr. Nolan knows what he needs to do.

13    Very well.  Let's bring the jury in, and let's get

14 started.

15    **(WHEREUPON THE JURY ENTERS.)**

16    THE COURT:  Good afternoon, members of the jury.

17    Mr. Nolan, you may continue.

18    **ISAAC LARIAN, PREVIOUSLY SWORN.**

19    **CROSS-EXAMINATION (CONTINUED)**

20 BY MR. NOLAN:

21 **Q.**   Good afternoon.  Before we broke for lunch, Mr. Larian,

22 we were talking about Exhibit No. 01703.  Do you still have

23 that in front of you in the white book?

24 **A.**   Yes, I do.

25 **Q.**   And these are documents, some of which is in Portuguese,

1  just to reorient everybody.  Do you see that?

2  A.   Some in English translation, yes.

3  Q.   All right.  And these are trademark applications filed

4  in -- for Brazil in or around September 2002; correct?

5              MR. PRICE:  Objection.  Lack of foundation.

6              MR. NOLAN:  I'm just laying the foundation, your

7  Honor.

8              THE COURT:  I'm going to sustain the objection,

9  Counsel.  This is leading.  Let's start over.

10  Q.   BY MR. NOLAN:  Mr. Larian, I think it's undisputed, but

11  for the record, were you the CEO of MGA in September of 2002?

12  A.   I was.

13  Q.   Do you have an understanding as to whether or not in

14  September 2002 MGA had a practice of applying for various

15  trademark registrations in various countries?

16  A.   We did.

17  Q.   And do you understand -- do you have an understanding as

18  to whether or not those trademark registrations, once filed,

19  were maintained in the business records of MGA?

20  A.   They were.

21  Q.   And would you, as the CEO of MGA, assume that if

22  information needed to be corroborated with respect to whether

23  or not a trademark application was in fact filed, that people

24  could go to the files of MGA and actually confirm that a

25  document was filed in a particular country?

1994

1    MR. PRICE:  Objection.  Leading, lacks foundation.

2    THE COURT:  You need to rise, Counsel.

3    MR. PRICE:  Leading and lacks foundation.

4    THE COURT:  Sustained.

5  **Q.**   BY MR. NOLAN:  Do you have an understanding, as the CEO

6  of MGA, why MGA might maintain in its files copies of

7  trademark applications?

8  **A.**   So we can refer back to them in the future whether it is

9  to see somebody is infringing our name, somebody is using it,

10 not using it so we can refer back to it.

11 **Q.**   Do you have a recollection one way or the other as to

12 whether or not you authorized legal action to be filed

13 against anybody in Brazil?

14 **A.**   I did.  Against a company called Estella.

15 **Q.**   In any event, when was that lawsuit initiated, if you

16 know?

17 **A.**   Somewhere between 2002, 2003.

18 **Q.**   And do you understand the general circumstances behind

19 filing that lawsuit?

20 **A.**   Yes.

21 **Q.**   What were they?

22 **A.**   That company had come up with a doll that looked exactly

23 like Bratz dolls.

24 **Q.**   Now, in connection with -- and did you authorize the

25 filing of that lawsuit?

1995

1   A.   I did.

2   Q.   And in connection with the authorization of filing that

3   lawsuit, did it come to your attention, one way or the other,

4   as to whether or not in fact MGA had filed trademark

5   applications in Brazil?

6   A.   Yes.

7            MR. NOLAN:  Your Honor, we'd offer Exhibits 1703,

8   001, 002, 003, 004, and 005.

9            MR. PRICE:  Objection.  Lack of foundation.

10            THE COURT:  Sustained.

11   Q.   BY MR. NOLAN:  Mr. Larian, at any time do you recall

12   ever directing anybody within MGA to white-out the name

13   Carter H. Bryant from any trademark application?

14   A.   I did not.

15   Q.   Do you recall ever giving instructions to anybody at

16   MGA, words to the effect whatever you do, do not list Carter

17   Bryant on any application filed in any country?

18   A.   I did not.

19            MR. PRICE:  Object.  That assumes facts not in

20   evidence, which is that it would be called for, for a name to

21   be listed in the first place.

22            THE COURT:  Lay a foundation for that.

23   Q.   BY MR. NOLAN:  You're not a lawyer, are you?

24   A.   I'm not.

25   Q.   Let me just approach it a different way, then.

1996

1        This whole idea of concealment of Carter Bryant.  I

2   want to ask you this, Mr. Larian.  Was there ever a reason in

3   your mind to conceal Carter Bryant as the individual who drew

4   the initial concept drawings for what became later the doll

5   Bratz?

6   A.   Never.

7   Q.   Well, weren't you worried that Mattel might find out

8   that Carter Bryant was in fact affiliated with the Bratz

9   doll?

10  A.   I was not worried about that, no.

11  Q.   Mr. Price asked you numerous questions with respect to

12  statements made to various press articles.

13       Do you recall all those?

14  A.   Do I recall every question he asked?

15  Q.   Well, do you remember generally the questions about

16  newspaper articles?

17  A.   Yes.

18  Q.   Here's a question I have for you:  Do you recall ever

19  being asked specifically words to the effect, by the way, who

20  did the original concept drawings for Bratz?

21  A.   I know of no journalist who ever asked me that question.

22  Q.   Well, do you have Exhibit 1-A in front of you?  This is

23  The Wall Street Journal article.

24  A.   What exhibit number?

25  Q.   It's Exhibit 1-A.

1997

1       THE COURT:  In the black binder?

2       MR. NOLAN:  Yes, I'm sorry.

3       THE COURT:  I have a binder that starts with 10.

4       MR. PRICE:  I believe that document was loose,

5    because it was redacted so it was handed up.

6       THE CLERK:  One moment, your Honor.

7       MR. NOLAN:  I have an extra copy if that would

8    help.

9       THE COURT:  I think we have it as Exhibit 11.  Both

10   Mr. Larian and I -- is that the same one?

11      MR. NOLAN:  We have it marked as 1-A.

12      MR. PRICE:  Your Honor, I think 11 was the complete

13   article, and 1-A was the redaction.

14      THE COURT:  11 is the full article.

15      MR. NOLAN:  Right.

16      THE COURT:  Do you have an extra copy of the

17   redacted one?

18      MR. NOLAN:  I do.

19      THE COURT:  Thank you.

20   Q.   BY MR. NOLAN:  So you have that in front of you,

21   Mr. Larian?

22   A.   Yes, sir.

23   Q.   All right.  Now, I don't want this to become a balancing

24   act because I know there's a lot of exhibits in this case,

25   but I want you now to go to Exhibit 4942.  This is the e-mail

1998

1    exchange with Dee Dee Valencia.  Do you have that in front of

2    you?  And you can look in the white book or the black.

3    00942?

4    A.    Go ahead.

5          MR. NOLAN:  This is in evidence.  Can we have this

6    on the screen.

7    Q.    The date on this e-mail exchange between Dee Dee

8    Valencia and yourself is February 6, 2003; correct?

9    A.    That's correct.

10   Q.    Do you recall that Mr. Price asked you under features,

11   and it says signed by, I know we want to keep Carter under

12   wraps.

13         Do you see that?

14   A.    I do.

15   Q.    Do you see any response here, any specific response to

16   the statement of keeping Carter under wraps?

17   A.    I do not.

18   Q.    Now, in this exchange, Ms. Valencia is asking you about

19   features or collectible dolls for Bratz; correct?

20   A.    Yes.

21   Q.    Can you tell the jury whether or not you have ever

22   released a Bratz collectible doll?

23   A.    We have released a Bratz collectible doll in the past,

24   yes.

25   Q.    Have you at any time ever listed or disclosed the

1999

1   designer for any of those Bratz doll collectibles?

2   **A.**   We have never released any designer, whether Carter

3   Bryant or anybody else who designs a toy for us.   The name on

4   the product or on the press.   Furthermore, I don't know of

5   any toy company that does.

6   **Q.**   Well, in that regard, does Mattel have a competitive

7   doll that it offers for sale against Bratz in the market?

8   **A.**   Later on in 2002, they came up with a product called My

9   Scene Barbie, which is, yes, competitive with Bratz.

10  **Q.**   Now, Mr. Larian, you're in the industry.   It's a

11  competitive industry; yes?

12  **A.**   It is.

13  **Q.**   Can you tell the jury whether or not you know who the

14  designer was for the doll My Scene?

15  **A.**   I did not until I came to this court, no.

16  **Q.**   Now, after My Scene, did Mattel release another doll

17  called Flavas?

18  **A.**   They did.

19  **Q.**   And was that also in the competitive range where Bratz

20  is being sold?

21  **A.**   Yes, and that is in reference to this -- in The Wall

22  Street Journal.

23  **Q.**   We're going to get to the article in just a moment.

24          My question to you is this:   Do you know, have you

25  ever seen any advertisements or disclosures by Mattel of who

2000

1   the designer of Flavas is?

2   **A.**   I have not.

3   **Q.**   The date on this, sir, is February 6, 2003; correct?

4   **A.**   That is correct.

5   **Q.**   And Mr. Price was asking you to confirm that in fact it

6   was true that within MGA, MGA was keeping Carter Bryant under

7   wraps.  Yes?

8   **A.**   Yes.

9   **Q.**   And you deny that, yes?

10  **A.**   Absolutely.

11  **Q.**   Now please look at The Wall Street Journal article.

12          Now, The Wall Street Journal article I'm asking you

13  to look at is the redacted one, and I believe it's

14  Exhibit 1-A.

15          Do you have that?

16  **A.**   I do.

17  **Q.**   All right.  And could you tell the jury what the date of

18  The Wall Street Journal article is?

19  **A.**   Friday, July 18, 2003.

20  **Q.**   So approximately five months after an e-mail talking

21  about a design feature where somebody makes a comment about

22  keeping Carter under wraps, there's an article that's

23  published in the national press in July of 2003; correct?

24  **A.**   That is correct.

25  **Q.**   Were you interviewed for that story?

2001

1   A.    I was.

2   Q.    Were you asked in that story anything regarding Carter

3   Bryant?

4   A.    Yes.

5   Q.    Did you tell The Wall Street Journal -- let me put it

6   this way -- tell the jury whether or not you concealed from

7   The Wall Street Journal author Carter Bryant's involvement

8   with Bratz?

9   A.    I did not.

10  Q.    Did you know that when you were being interviewed by The

11  Wall Street Journal author of this article, that they were

12  going to publish a story with national distribution?

13  A.    You mean The Wall Street Journal?

14  Q.    Yes.

15  A.    I knew they were going to do a story, yes.

16  Q.    Did you ever tell that reporter --

17  A.    The reporter told me they are going to do a story.

18  Q.    Did you ever tell that reporter words to the effect,

19  please, on background, I'm going to tell you about Carter

20  Bryant, but I'm not going to let you print that in the press.

21  A.    I did not.

22  Q.    Now, following -- let me ask you this:  Do you know of

23  anything, Mr. Larian, that would have occurred between

24  February of 2003 and July of 2003 that would have led you to

25  believe in July of 2003, if you were concealing Carter

2002

1    Bryant, that it would be okay to release it to The Wall

2    Street Journal?

3    **A.**    I know of no event that would do that.

4    **Q.**    This Wall Street Journal article dealt with a doll that

5    was being offered by Mattel.  Yes?

6    **A.**    That's right.

7    **Q.**    Flavas?

8    **A.**    That's correct.

9    **Q.**    This story was being written about Mattel, not MGA;

10   correct?

11   **A.**    It was.

12   **Q.**    But notwithstanding that, you still released Carter

13   Bryant's name?

14            MR. PRICE:  Objection.  Leading.

15            MR. NOLAN:  I'll withdraw it.

16            THE COURT:  Sustained.

17            MR. NOLAN:  I'll withdraw that.

18   **Q.**    Did you know that The Wall Street Journal story was

19   about Mattel?

20   **A.**    Yes.  They were interviewing me about a line of dolls

21   that Mattel, they called it hip-hop dolls that they were

22   going to introduce called Flavas in response to Bratz.

23   **Q.**    Did you expect Mattel to read a story about its own doll

24   Flavas in The Wall Street Journal?

25   **A.**    Yes, the picture of Mr. Matt Bousquette, who was the

2003

1    president of Mattel, Barbie division at the time, was on the

2    front cover of this article, front cover of <u>The Wall Street</u>

3    <u>Journal</u> in 2003.

4    **Q.**   Was <u>The Wall Street Journal</u> article -- and let's turn it

5    around -- not to the attribution of Carter Bryant in the

6    story?

7              Mr. Larian, can you read what is published in <u>The</u>

8    <u>Wall Street Journal</u>?

9    **A.**   "Isaac Larian, chief executive of MGA, says he had never

10   heard of a project similar to the Bratz at Mattel.  He says

11   he chose Mr. Bryant's idea for the Bratz over several others

12   after holding a sort of fashion doll design contest in late

13   1999.

14             "Mr. Larian, who immigrated to the U.S. from Iran,

15   founded his company in the late 1970's."

16   **Q.**   On the second page of the exhibit, did you read this

17   paragraph?

18   **A.**   "MGA says the Bratz were designed by Carter Bryant, a

19   former member of the Barbie team."

20   **Q.**   Did you ever send out an e-mail to anybody within MGA

21   saying who said this to <u>The Wall Street Journal</u>?

22   **A.**   No, I said that to <u>The Wall Street Journal</u>.

23   **Q.**   Mr. Price asked you a number of questions about an

24   article that appeared in a publication where you were quoted

25   attributing the Bratz idea to your son Jason.

2004

1          Do you recall that line of questions?

2   **A.**    Yes.

3   **Q.**    First of all, approximately how many times have you been

4   interviewed with respect to articles being printed about

5   Bratz?

6   **A.**    Hundreds.

7   **Q.**    And do you recall specifically every conversation that

8   you've had with a writer?

9   **A.**    I do not.

10  **Q.**    I'd ask you to turn to Exhibit 12058.

11          Do you have that in front of you?

12  **A.**    I do.

13  **Q.**    This is an article published March 29, 2004.

14          Do you see this?

15  **A.**    I do.

16  **Q.**    And this is a download of it.  So it's not the actual

17  copy like The Wall Street Journal, but this is an article

18  that Mr. Price asked you about in the San Fernando Valley

19  Business Journal; correct?

20  **A.**    That's correct.

21          MR. NOLAN:  Your Honor, we'd offer into evidence

22  Exhibit 12058.

23          MR. PRICE:  Your Honor, we object to the entire

24  article.  We need to do the same process we did with The Wall

25  Street Journal.

2005

1        THE COURT:  Just the title?

2        MR. PRICE:  No, no.  With The Wall Street Journal,

3   how we had to redact that because of hearsay, et cetera, we

4   need to do the same thing with this article.

5        THE COURT:  Very well.  Why don't we go through

6   portions of it, Counsel, and we'll see what needs to come in

7   at the end.  You may examine on the document.

8        MR. NOLAN:  Thank you.

9   Q.   Mr. Larian, just in keeping with this --

10       May I just lead so that we can point to the

11  paragraph?

12       THE COURT:  Yes, you may lead on particular

13  paragraphs.

14       MR. NOLAN:  Thank you.

15  Q.   First of all, you see the date of March 29, 2004?

16  A.   Yes, I do.

17  Q.   And you see the headline of the story reads immigrant's

18  creative company shakes up toy industry?

19  A.   I do.

20  Q.   Now, do you have a specific recollection of being

21  interviewed by a gentleman by the name of Jeff Weiss?

22  A.   I do not.

23  Q.   In his story, there's a mention that MGA had been

24  awarded a family toy award by an organization in the

25  San Fernando Valley.

2006

1          Do you remember that occasion?

2   **A.**    I remember -- I remember we were awarded something in

3   San Fernando, but I don't remember the exact occasion.   I

4   think it was for businesses in San Fernando Valley.

5   **Q.**    Okay.   And for those who live in the Inland Empire, San

6   Fernando Valley, is that a geographic area where MGA is

7   located?

8   **A.**    Yes, we're in Van Nuys, which is part of San Fernando

9   Valley.

10  **Q.**    And just a rough guess, if you know, do you expect that

11  The Wall Street Journal has a wider circulation than the San

12  Fernando Valley Business Journal?

13  **A.**    Absolutely.

14  **Q.**    Okay.   Now, I want to turn your attention to the second

15  page of the document, and I'll ask you to take a look down to

16  the paragraph that has a quote.   It says:   "My oldest son."

17          Do you see that?

18  **A.**    I do.

19  **Q.**    And then following that, there's another quote starting

20  off with "Yasmin."   Do you see that?

21  **A.**    I do.

22  **Q.**    Okay.

23          MR. PRICE:   No objection to those two.

24          THE COURT:   Very well.

25          MR. NOLAN:   So if we could, Aaron, only present to

2007

1    the jury -- okay.

2    Q.   Now, these are two paragraphs that are included in the

3    March 29, 2004, <u>San Fernando Valley Business Journal</u> article;

4    correct?

5    A.   They are.

6    Q.   All right.  And the first one, I believe, is what

7    Mr. Price was questioning you about, and that is, "My oldest

8    son, 17-year-old Jason, is very creative and a music writer.

9    He has come up with some of our popular toys," Larian said.

10   "He came up with Commandobot, a robot that was the first ever

11   robot toy to work on voice recognition.  It was a fantastic

12   seller that was featured in <u>Wired</u> magazine."

13        Is this a true statement about Jason?

14   A.   It is true.

15   Q.   Is he very creative?

16   A.   He is.

17   Q.   Did he come up with the idea for Commandobot?

18   A.   He did.

19   Q.   And the last sentence says it was Jason's idea for

20   Bratz.

21   A.   That's a wrong statement.

22   Q.   Do you know if that's an accurate quote, Mr. Larian?

23   A.   It is not accurate.  I never said it.  If you see him,

24   you will know that he will not have anything to do with dolls

25   or creating -- looking at them.

2008

1  Q.   But here's my question --

2  A.   My wife is laughing back there.

3  Q.   Here's my question:  Can you offer the jury any

4  explanation as to why you would have disclosed to The Wall

5  Street Journal in July of 2003 that Carter Bryant was the

6  designer of Bratz and yet almost a year later was telling the

7  Valley Business Journal that it was really Jason's idea?

8  A.   There was no reason to hide Carter Bryant's name.  I had

9  told National, in my opinion the biggest financial newspaper

10  in the world that's published and distributed worldwide, not

11  only in the USA, that Carter Bryant was the designer behind

12  the idea for Bratz.  Why would I tell a local newspaper

13  perhaps with not less than 10-, 15,000 subscription that --

14  why would I hide it from them?

15  Q.   And let's just go to the next paragraph.

16       "Yasmin, my 15-year-old daughter, is involved in

17  the business as well.  She's particularly interested in

18  fashion and focus groups.  One of the Bratz is named after

19  her," Larian said.  My 10 -- first of all, is that a true

20  statement?

21  A.   Yes, and she goes to FIT now in New York.

22  Q.   Was Yasmin present at the first meeting with Carter

23  Bryant?

24  A.   She was.  She was in the office with me.  It was summer

25  vacation.  She was in the office with me.

2009

1   Q.   And what was the date of that meeting?

2   A.   September 1, 2000.

3   Q.   And then it goes on to say:  "My 10-year-old son Cameron

4   is also the namesake for one of the boy Bratz.  Cameron comes

5   up with different product ideas.  One of our best ideas was a

6   winter wonderland Bratz line.  We were on a family ski

7   vacation, and he said, 'Dad, should you do a Bratz winter

8   break.'  So we did it, and it sold wonderfully."

9        Was that a true statement?

10  A.   It is a true statement.

11  Q.   Did Jason design Bratz?

12  A.   No, Jason did not design Bratz.  Again, if you see

13  Jason, you will see that he is not interested in dolls.

14  Q.   Earlier, before the lunch hour, I showed you drawings

15  that had been sent to Wal-Mart that had Carter Bryant's name

16  on it.

17        I want to talk about toy fairs for a moment.  And I

18  know there's been some testimony, but can you give an

19  explanation to the jury about how toys are rolled out into

20  the market and talked about where they are located?

21  A.   Okay.  Usually what happens, right now that I'm sitting

22  here, there are customers at MGA showroom looking at product

23  ideas for spring of '09 that they will buy in November,

24  December, January of -- November, December of this year and

25  January of next year.

2010

1      So there are toy fairs.  There's one called the

2   pretoy fair, which is usually in October.  It has gone back

3   and forth in different places.  Right now it's in Dallas.

4      Then the next toy fair is in January in Hong Kong,

5   where everybody goes the first week of January in Hong Kong

6   and shows the products.

7      Then after Hong Kong there are various different

8   shows.  There is a show in Tokyo, and those dates change.

9   Anywhere between February to June.

10      And then there is a toy show in New York called

11   New York Toy Fair.  That's been around for a hundred years.

12      And then there is a show in Nuremberg, Germany,

13   which is basically another toy show about that time period.

14      During these shows, the customers go and see the

15   product ideas and over and over again to make a decision what

16   to buy for the next season.  So right now, for example, the

17   customers that I told you who are in our showroom, they are

18   looking at our product ideas.  They go to other people's

19   showroom to look at product ideas.  And then two months,

20   three months, they make a decision what to buy, again, for

21   spring of 2009.  They have already made the decisions for

22   fall of this year, fall 2008.

23   **Q.**   Mr. Larian, did you ever exhibit the Bratz line in toy

24   fairs in 2001?

25   **A.**    Yes.

2011

1   Q.   Which was the first toy fair that you exhibited a Bratz

2   doll?

3   A.   We had four prototype samples and the drawings, the hero

4   drawings of the dolls displayed in our Hong Kong showroom in

5   January 2001.   I don't recall the exact date, but it was

6   first week of January 2001.

7   Q.   You talk about having four prototypes.   Did you have the

8   actual doll yet?

9   A.   We did not.   Those were just what we call mock-up

10  samples that you make.   And they went over many, many

11  renditions before they became a doll because you have to

12  change the tooling.   You have to change the faces.   Sometimes

13  the clothing doesn't fit.   So you have to start with the

14  sculpting all over.

15         So what we had in Hong Kong were four samples with

16  clothing literally put on them and held on with little safety

17  pins, and the hair was basically taped with the scotchtape to

18  the head of the doll.

19  Q.   Now, after the Hong Kong toy fair in 2001, was there a

20  toy fair conducted in the United States?

21  A.   Yes.

22  Q.   And what city was that toy fair located?

23  A.   It was in New York in February 2001.

24  Q.   Let me ask you to open up your binder to 16925.   It's a

25  white binder.

2012

1              Now, Mr. Larian, before we get to this document, I

2    just want to try to set the stage for the New York Toy Fair.

3    Is that in your opinion a pretty big show?

4    A.    New York Toy Fair in that time in 2001 was a pretty big

5    show.  Now, in 2008, it's no longer a big show.

6    Q.    But in the year 2001, did a lot of manufacturers go to

7    it?

8    A.    I think everybody in the toy industry went to toy show

9    in New York in 2001.

10   Q.    Let me ask you this:  Is the toy fair that was conducted

11   in New York secret or confidential?

12   A.    It was by invitation only.  Only invited people could

13   come to the toy show.  The public could not just walk into

14   the showroom.

15   Q.    How did you control the people coming to the booth?  In

16   other words, did you record people who actually came and

17   looked at the Bratz line at the New York Toy Fair?

18   A.    They had to have a schedule in advance.  The name had to

19   be on the list, on the schedule list, and we had somebody

20   secretly at the front to check their name and make sure they

21   are on the schedule before they were allowed into the

22   showroom.

23   Q.    Now, I ask you to look at Exhibit 16925 and take a look

24   at it.  And my question will be do you recognize this

25   document, sir?

1 **A.**   Yes, this is the schedule of February 2001 toy show,

2 schedule of the people who were coming to the showroom.

3       MR. NOLAN:   Your Honor, we'd offer Exhibit 16925 in

4 evidence.

5       MR. PRICE:   Object on relevance and hearsay, your

6 Honor.

7       THE COURT:   I'm sorry.  What was the objection?

8       MR. PRICE:   Relevance and hearsay throughout this

9 time frame.

10       THE COURT:   One second.  Overrule the relevance,

11 Counsel.  Hearsay?

12       MR. NOLAN:   Your Honor, I'll lay a foundation.

13       THE COURT:   Very well.

14       MR. NOLAN:   Thank you.

15 **Q.**   Mr. Larian, with respect to Exhibit 16925, could you

16 explain again why log sheets are maintained or were

17 maintained at the New York Toy Fair?

18 **A.**   If you look at this, on the left-hand side, it has the

19 name of the MGA personnel who were meeting different

20 customers, and on the first page on line 20, for example, I

21 was meeting with a company called Factory to You --

22 **Q.**   Mr. Larian, without referring to anything specific,

23 could we talk about just the purpose of this document.

24       So on the first column it has a listing called MGA

25 personnel?

2014

1   **A.**   That's correct.

2   **Q.**   And then there's names listed under that?

3   **A.**   Yes, the name of the MGA personnel.  And the next column

4   is the name of customers.  On the next column is a buyer's

5   name.  And the next column again is the buyer's name.  And

6   the next column is a --

7   **Q.**   Did you only use such a log sheet for the February 2001

8   toy fair?

9   **A.**   No.  We have used this for every show.

10   **Q.**   Now, following the toy show, do you maintain the log

11   sheets?

12   **A.**   Yes, we do.

13   **Q.**   And are they kept in the ordinary course of business?

14   **A.**   They do.

15   **Q.**   And have you seen the log sheets following those

16   meetings?

17   **A.**   I have.

18   **Q.**   And why is it important for you -- strike that.

19           Is it important for you, as the CEO of MGA, to

20   review the people that have visited your showcase at the toy

21   fair?

22   **A.**   During that time, and we were a smaller company, I

23   wanted to get a recap, and I'm talking 2000, 2001 up to 2003,

24   2004 time period, I wanted to get a recap from our

25   salespeople of what happened with each customer, the buyer,

2015

1    et cetera.  So I wanted to know what has transpired.

2    **Q.**    And why was that important to you?

3    **A.**    Because these shows are very expensive.  We go to these

4    shows.  We show a lot of products.  I just want to make sure

5    that there's a follow-up to get orders.  The purpose of the

6    show is to go there and hopefully later on get orders for

7    your products.

8    **Q.**    So, Mr. Larian, did you review the document that we've

9    marked in this trial as Exhibit 16925 at or about the time of

10   the New York Toy Fair?

11   **A.**    Yes, I did.

12   **Q.**    And the entries on this time log, are these entries made

13   at or about the time of the toy fair?

14   **A.**    Actually, they are done before that.  Before we go to

15   the toy fair.

16              MR. NOLAN:  Your Honor, we'd offer Exhibit 16925.

17              MR. QUINN:  Objection.  Hearsay.

18              THE COURT:  It's admitted.

19              **(Exhibit 16925 received.)**

20              THE COURT:  You may publish.

21              MR. NOLAN:  May we have it on the screen?

22              THE COURT:  You may.

23   **Q.**    BY MR. NOLAN:  So this is -- now that we have had on the

24   screen the New York Toy Fair, Thursday, February 8, 2001.

25   MGA personnel, customer, buyer name, buyer name, and

2016

1    comments.

2           Do you see that?

3    A.   I do.

4    Q.   Now, I'd ask you to go to the page 015 of this document.

5    And if we could blow that up.   Number 35.

6           Now, do you see the name Martin under MGA

7    personnel?

8    A.   I do.

9    Q.   Do you know of anybody with the last name Martin was

10   working for MGA in February of 2001?

11   A.   It's not the last name.   Martin is his first name.   His

12   last name is Hitch, H-I-T-C-H.

13   Q.   And what was Mr. Hitch's position at MGA in February of

14   2001, if you know?

15   A.   He was in charge of international sales for MGA.

16   Q.   And under -- and the time is listed at 3:00.   Is that

17   3:00 in the afternoon?

18   A.   That's correct.

19   Q.   And then there's a customer name Mattel Mexico?

20   A.   That's correct.

21   Q.   The buyer name, do you see an individual's name there,

22   Mateo Romano and his boss?

23   A.   I do.   I know Mateo Romano.

24   Q.   Following the New York Toy Fair, do you know whether or

25   not MGA and representatives of Mattel ever had discussions

2017

1  about whether or not Mattel would license the Bratz dolls in

2  Latin America?

3  **A.**    We did.

4            MR. PRICE:  Object.  Relevance, lack of foundation.

5            THE COURT:  I'll overrule the objection to the

6  question as asked, but let's lay a foundation for this,

7  Counsel, before you get into the substance of it.

8  **Q.**    BY MR. NOLAN:  What is the basis for your understanding

9  with respect to any conversations that were going on between

10 representatives of Mattel on the one hand, in February of

11 2001, and conversations with representatives of MGA

12 concerning Bratz?

13 **A.**    In 2001, we wanted Mattel to license and distribute

14 Bratz.  I was getting regular feedback --

15           MR. PRICE:  Objection.  This is nonresponsive.

16           THE COURT:  It is nonresponsive.

17           MR. PRICE:  Move to strike.

18           THE COURT:  It is stricken.

19           Will the reporter read back the question.

20           (Record read.)

21           THE WITNESS:  The recaps I was getting from Martin

22 Hitch.

23 **Q.**    BY MR. NOLAN:  And were those recaps from Martin Hitch

24 at or about the time the conversations were being had?

25 **A.**    Or after.

1   Q.   Do you recall any conversations with Mr. Hitch where he

2   was asking you questions with respect to Mattel?

3            MR. PRICE:   Objection.   Hearsay.

4            THE COURT:   Without getting into the substance of

5   the questions.

6   Q.   BY MR. NOLAN:   Without disclosing the substance of the

7   conversations, do you recall having any conversations

8   following the New York Toy Fair with Martin Hitch?

9   A.   I do.

10  Q.   Do you recall having any conversations with Mr. Hitch

11  concerning appointments that he had with various customers at

12  the New York Toy Fair?

13  A.   Some of them I do.   Some of them I don't.

14  Q.   Do you recall any conversations with Mr. Hitch

15  concerning conversations that he had with representatives of

16  Mattel at the New York Toy Fair?

17  A.   Yes.

18  Q.   What did Mr. Hitch tell you about those conversations?

19           MR. PRICE:   Hearsay.

20           THE COURT:   Counsel?

21           MR. NOLAN:   Goes to his state of mind as to what

22  was being said at that time, your Honor.

23           THE COURT:   Let me see you at sidebar.

24           **(SIDEBAR CONFERENCE HELD.)**

25           THE COURT:   Counsel, how is this not going to the

1   truth of the matter asserted?

2           MR. NOLAN:  We're going to tie it up later.  The

3   actual e-mail exchange will go to -- my question is more to

4   his state of mind that he knew there was conversations being

5   had, and my next question would be did you ever tell anyone

6   not to offer Bratz to Mattel as a licensee.

7           THE COURT:  That's different than what you're

8   asking right now, for one thing.  You're asking right now for

9   the substance of the communications.

10          MR. NOLAN:  I was just laying the foundation that

11  there were conversations going on at Mattel that he -- that's

12  what he was told, and then the follow-up question would be

13  did you discourage that.  Answer is no.  There would be an

14  e-mail exchange from Mattel where they reject the opportunity

15  to be a licensee for Bratz because it looked too similar to

16  products within their own line.  This goes to the very time

17  period where he's alleged to be concealing Bratz and Carter

18  Bryant and everything else.

19          Our point is why would he approve an offer of a

20  license to Mattel if he was concerned about Carter Bryant.

21          MR. PRICE:  It's apples and oranges.  Whether

22  Mattel was offered a license is irrelevant.  There's no

23  testimony to any connection of that.  He told Mattel, by the

24  way, these were designed by Carter Bryant, your former

25  employee.  There's no connection at all here.  This is

1  irrelevant to anything in this phase.

2        THE COURT:  Did he disclose that it was Carter

3  Bryant?

4        MR. NOLAN:  No, there's no basis for that, your

5  Honor.  But they can cross-examine --

6        THE COURT:  Wait a second.  That's what would make

7  these relevant.  If he was -- I can see there, that would

8  blow the concealment theory out of the water if he was going

9  back to Mattel or any of Mattel's people and saying Carter

10  Bryant's involved in this.  But if he's just talking

11  licensing of Bratz, I don't see how that moves the ball

12  forward.

13        MR. NOLAN:  With all due respect, Mattel had full

14  rein in their examination to ask questions about Bratz

15  without drawing distinction between drawings and dolls.  And

16  much of the concealment that is mentioned in the evidence has

17  to deal with Bratz and the doll.  And I'm going through it

18  one by one to show him that this man had no guilty conscience

19  with respect to Bratz.  Some of the testimony that they

20  have --

21        THE COURT:  Let me stop you.  As I recall the

22  testimony, it was -- the evidence was that the questions were

23  geared towards concealing Carter Bryant.  I don't recall

24  anything about concealing Bratz.  And you can't -- this is, I

25  think, the apples and oranges that Mr. Price is referring to.

1   The fact that Mr. Larian was willing to talk about Bratz or

2   even Bratz with Mattel doesn't go to the issue of whether he

3   was willing to disclose Bryant.

4           For example, that trademark stuff you tried to get

5   in, I think that's relevant if you could have connected it to

6   Isaac Larian, if he would have been the one to say include

7   Carter Bryant on the trademark application, or if he would

8   have reviewed the trademark application before it went out.

9   What was missing there was a connection to Mr. Larian, and

10  what's missing here is a connection to Carter Bryant.  You

11  need to have both to rebut the concealment.

12          MR. NOLAN:  But it also -- your Honor --

13          THE COURT:  Do you understand what I'm saying?

14          MR. NOLAN:  I understand that, your Honor.  Let me

15  be more articulate.  This also goes to the issue of Mr. Quinn

16  was asking Ivy Ross about the similarities between Bratz on

17  the one hand and Toon Teens.  At this point in time, they are

18  making the contention that Bratz looks like Toon Teens.  And

19  what I'm saying is that if there's any sense on Mr. Larian's

20  part that these are in any way similar to, or he thought the

21  designs were being made that were similar to this, he would

22  have stayed a country mile away from Mattel --

23          THE COURT:  But that's not what this case is.  The

24  Toon Teens comes in or timing issues with respect to when

25  Carter Bryant developed Bratz.  Personally, I don't find it

2022

1   all that dispositive on the issue, but that's their argument,

2   and that's the limited basis that that came in.

3          MR. NOLAN:  The other point --

4          THE COURT:  We are mixing and matching here,

5   Counsel.

6          MR. NOLAN:  I know, but also in the order on

7   summary judgment, you said that the contract claims are time

8   barred unless there's concealment.

9          THE COURT:  Right.

10         MR. NOLAN:  And so the issue here, and it's very

11  relevant, is that on the concealment factor for the Bratz

12  dolls, for him to be contemplating a business transaction

13  with Mattel where the Bratz doll, which by their own

14  testimony has similarities to Toon Teens, suggests that they

15  were on notice right away the minute they saw the Bratz

16  dolls.

17         THE COURT:  It's not concealment of Bratz.

18         MR. NOLAN:  But it's concealment, your Honor -- we

19  believe that it should be concealment of the idea of Bratz,

20  the name Bratz, okay, number one, because remember they are

21  taking the position that Bratz was proprietary information

22  and known only within Mattel.

23         THE COURT:  This is 2001.  Everyone -- well, the

24  objection is sustained.

25         MR. NOLAN:  Okay.

2023

1          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

2          THE COURT:  You may proceed, Counsel.

3          MR. NOLAN:  Thank you.  And the objection was

4    sustained?

5          THE COURT:  Yes.

6    **Q.**   BY MR. NOLAN:  You recall a lot of testimony with

7    respect to the Yahoo fan site.  Do you recall that?

8    **A.**   I do.

9    **Q.**   All right.  First of all, I want to just make it

10   absolutely clear that the Yahoo fan site, was that hosted by

11   MGA?  In other words, did MGA control it?

12   **A.**   It was a fan who had set up the site.

13   **Q.**   Do you know an individual by the name of David Dees?

14   **A.**   I do not.

15   **Q.**   Could you look at Exhibit 04507 for a moment.  And this

16   is in evidence.

17          I want to first turn to the second page of it.  And

18   let's go down to the date of the e-mail exchange.

19   **A.**   I don't have it.

20   **Q.**   You don't have it?

21          THE COURT:  I don't either.

22          MR. NOLAN:  You don't have it either?

23          THE COURT:  4507?

24          MR. NOLAN:  04507.

25          THE COURT:  I do.  I'm sorry.  It's in the white

2024

1    one.  Very well.  We both have it.

2    Q.    BY MR. NOLAN:  Mr. Larian, do you have that now in front

3    of you?

4    A.    Yes, I do.

5    Q.    Okay.  You were shown this e-mail by Mr. Price; correct?

6    A.    Yes.

7    Q.    All right.  Now, I want to go, and let's just pick up

8    first where there's two e-mails, and I just want to make

9    certain we keep this into context.  Do you see on the bottom

10   of the first page, it says:  "Hi, Carter.  I thought you

11   would enjoy this letter.  I wrote to the Bratzworld club on

12   Yahoo.  It starts off with the club leader introducing it.

13   Dees."

14          Did I read that right?

15   A.    Yes.

16   Q.    Now, in the exchange, do you see that it's from David

17   Dees to Carter Bryant at an e-mail address sent Saturday,

18   March 29th.

19          Do you see that?

20   A.    Yes.

21   Q.    2002?

22   A.    That's correct.

23   Q.    And it starts off "Hi, Carter."

24   A.    Yes.

25   Q.    Okay.  And that's being forwarded from David Dees?

2025

1    A.    I think that's an e-mail that he is sending to Carter

2    Bryant.

3    Q.    Correct.  He's forwarding it to Carter a posting that

4    had been put on the Yahoo fan site; right?

5    A.    Yes.

6    Q.    So my question to you, Mr. Larian, is if there's a

7    concealment and Carter Bryant is being concealed from the

8    world, do you have any understanding as to how David Dees

9    would have known about Carter Bryant?

10   A.    I have no idea.

11   Q.    Do you have any idea how David Dees apparently had

12   Carter Bryant's e-mail address?

13   A.    I have no idea.

14   Q.    And just to put this into perspective, if you turn to

15   the second page, this is the Yahoo fan posting.  And this is

16   now "Hi, Christian."

17          Do you see that?

18   A.    I do.

19   Q.    And then there is -- and this is apparently the note

20   that David Dees is posting.  If you look down to the third

21   paragraph, it says:  "I am swamped right now with colorizing

22   lots of the new whacky funk styles, and there are new hats

23   and boas and tops that I get a kick out of.  However, I can't

24   take credit for creating the Bratz dolls, or even the first

25   Bratz illustrations, for that honor would go to a fellow

2026

```
 1    named Carter Bryant, who is truly a genius of fashion, and
 2    the soul, and the only person who first drew those great
 3    pouty lips and that extreme look that only our heroes share."
 4            Did I read that right?
 5    A.   You missed an S in the hero.
 6    Q.   Do you have any understanding as to how it is that David
 7    Dees had information in March of 2002 to be responding to
 8    Christian on a Yahoo fan site not controlled by MGA?
 9    A.   I have no idea.
10    Q.   You are forwarded this e-mail exchange by Paula to you,
11    and let's go up to where it's sent -- the first part of it.
12    It says:  "Victoria, Dave, who gave David Dees information
13    and what he does for us to this Yahoo lady and why?  This
14    Yahoo lady is giving us too much legal brief even though she
15    does not mean it.  Please do not send any information or
16    reply to her e-mails unless you have cleared it with me.
17            "Julie, Beth, Abe, there must be no mention about
18    Mattel or any of their properties, Carter, any MGA Bratz
19    arts, et cetera."
20            Do you see that?
21    A.   I do.
22    Q.   Now, Mr. Price pointed you to that information; correct?
23    A.   He did.
24    Q.   Do you have a recollection of who Julie, Beth, and Abe
25    were?
```

1   A.   Julie was the legal counsel for MGA.  Beth, and I don't

2   recall her last name, I think it was Cahill, was the

3   paralegal for MGA, and Abe, his last name was Mesieux.  And

4   he was, I believe, either the COO or the CFO of MGA at the

5   time.

6   Q.   All right.  Mr. Larian, when you read this, you read the

7   posting that it appeared on the Yahoo fan site; right?

8   A.   Yes.

9   Q.   Is the issue about the disclosure of Carter Bryant what

10  was a concern to you, or was there anything else about the

11  posting that was a concern?

12  A.   There was something else that was a concern.

13  Q.   And what was that, sir?

14  A.   I had received a letter, cease-and-desist letter from

15  these lawyers right here, telling me that this Yahoo fan club

16  had put, I think, name of Barbie or Diva Starz in his website

17  in regards to the Bratz website that this person had

18  created -- I don't know if it was a he or a she -- and that

19  Mattel claimed that that was a trademark infringement.  And

20  they gave us an ultimatum to do something about it.  And I

21  didn't want to get into a lawsuit with Mattel.  They sue

22  everybody.

23  Q.   Mr. Larian, in that cease-and-desist letter, and we'll

24  get to it --

25          MR. PRICE:  Your Honor, may I move to strike the

2028

1    last comment, "They sue everybody"?  No foundation.  Not

2    responsive.

3              THE COURT:  That's stricken.  The last line about

4    suing everybody is stricken.

5    Q.   BY MR. NOLAN:  Mr. Larian, in 2000, when you launched

6    Bratz, did you have any knowledge of Mattel ever filing

7    lawsuits against competitors at that time, sir, personal

8    knowledge?

9              MR. PRICE:  Object.  This is irrelevant.

10             THE COURT:  Overruled.

11             THE WITNESS:  Bratz was launched in 2001, not 2000.

12   And yes, Mattel had sued literally anybody who got into the

13   fashion doll business.  I can name them.

14   Q.   Mr. Larian --

15             MR. PRICE:  Move to strike.  Nonresponsive and

16   irrelevant.  And if we can have a sidebar, I'd make a proffer

17   on this.

18             THE COURT:  We need another sidebar.

19             (SIDEBAR CONFERENCE HELD.)

20             THE COURT:  I can see the relevance of -- you are

21   offering alternative explanation of this language as to why

22   he didn't want to have any mention of Mattel.  And that's

23   fair enough.  We got to watch Mr. Larian's statements about

24   they sue everybody, and we have to limit it to what he has a

25   foundation to say.

1          MR. NOLAN:  That's what I was trying to do.  And

2    with a little leeway, I'll say limited to only at the time in

3    2001, what was your understanding of the other lawsuits filed

4    by Mattel.

5          MR. PRICE:  The problem with this, your Honor, is

6    that -- and I know it can be covered in cross-examination,

7    but because it can be, there's still a 403 issue.  And at his

8    deposition, he said the only reason he wrote that e-mail was

9    because he got the cease and desist on not using Barbie and

10   Diva Starz.  His answer does not say Barbie sues everybody

11   for anything.  But he was concerned about that letter.  And I

12   actually brought that out.

13         Now, he's using that as an excuse to try to get

14   into evidence that Barbie is this, you know, Darth Vader --

15         THE COURT:  You can certainly impeach with that

16   information, and I'll give you leeway to ask these questions,

17   but we've got to come up with a way to keep Mr. Larian from

18   painting with this broad brush.

19         MR. NOLAN:  Your Honor, I'll make a proffer, and I

20   mean this with all due respect, I don't believe that

21   Mr. Price has read the entire transcript because there's

22   other testimony exactly on point with respect to knowledge of

23   the lawsuits.

24         THE COURT:  That you can work out, and I'll let the

25   adversarial process play out.  Even if you need to lead a

1    little bit on this, let's control the broad brush.

2         MR. PRICE:  I think this opens a door.  I have a

3    list of lawsuits they filed against competitors.  So I just

4    want to --

5         THE COURT:  I trust Mr. Nolan can control the

6    witness.

7         **(CONCLUSION OF SIDEBAR CONFERENCE.)**

8    **Q.**  BY MR. NOLAN:  Mr. Larian, could you just limit your

9    answer to your own personal knowledge about any lawsuits that

10   had been filed by Mattel against competitors in the fashion

11   doll industry in the year as of, let's say, 2001.

12   **A.**    The biggest one was Hasbro, who made a doll called

13   Cindy, that Mattel sued a company in Italy called Gio over a

14   doll called Tanya.

15        They sued the company called Lund over a doll

16   called Petra.  If you're talking about fashion dolls, those

17   are the ones I remember, and they also sued a company called

18   Goldberger over a doll called Radio City, a doll that they

19   had done.  I don't remember the exact date when that lawsuit

20   was filed.  Was it before 2001 or after?  I don't remember

21   that.

22   **Q.**    Prior to receiving the cease-and-desist letter from the

23   law firm of Quinn Emanuel, had you received any information

24   or intelligence about Mattel considering one way or the other

25   to sue concerning Bratz?

2031

1    MR. PRICE:  Objection.  This is 403, irrelevant.

2    THE COURT:  As phrased, Counsel, let's rephrase.

3  Be mindful of the Court's admonition at sidebar.

4  Q.   BY MR. NOLAN:  Keep your finger on this one e-mail,

5  Mr. Larian.  But I want you to go to Exhibit 04900.

6    Do you recognize Exhibit 04900?

7  A.   I'm sorry.  White book?  Black book?

8  Q.   It's in the white book.  Do you have it in front of you,

9  sir?

10  A.   Yes, I do.

11  Q.   Do you recall this document?

12  A.   May I have just one moment?

13  Q.   Sure.

14  A.   Yes, I do recall this.

15  Q.   First of all, what is it?

16  A.   It's an e-mail that I sent to everybody in sales at MGA,

17  and I copied Paula Treantafelles, Nana Ashong, Lon Ross,

18  David Malacrida, and the subject is Bratz.

19  Q.   And the date of this e-mail?

20  A.   June 29, 2001.

21  Q.   Did you send this out, Mr. Larian?

22  A.   I did.

23    MR. NOLAN:  Your Honor, we'd offer Exhibit 4900.

24    MR. PRICE:  It's irrelevant and contains hearsay.

25  Also 403.

2032

1    THE COURT:  I'm going to admit this over the

2    objection.  But I'm going to instruct the jury that this is

3    admitted not for the truth of what's set forth, but just for

4    evidence of Mr. Larian's state of mind at this time, just

5    what he was thinking when this statement was made.  It's

6    admitted subject to that limitation.

7        **(Exhibit 4900 received.)**

8        THE COURT:  You may publish.

9        MR. NOLAN:  Thank you.

10  **Q.**   This is an e-mail entitled Bratz.  It says MGA has full,

11  free, and clear rights to Bratz trademark and Bratz dolls.

12       Did you write that?

13  **A.**   I did.

14  **Q.**   Did you believe it when you sent it out?

15  **A.**   I did.

16  **Q.**   It says:  "I've been advised that Mattel is spreading

17  rumors that there are legal issues regarding Bratz.  This is

18  untrue."

19       Did you believe that to be true when you wrote that

20  in the e-mail?

21  **A.**   I did.

22  **Q.**   And it says:  "We are and will deliver our full capacity

23  of Bratz products with no delays."

24       Did you believe that at the time, sir?

25  **A.**   I did.

2033

1  Q.   In fact, did you deliver your full capacity of Bratz

2  products with no delays?

3  A.   I don't remember exactly if we did or not.

4  Q.   And then you said:  "If you or your customers have any

5  questions, please call me directly."

6       Do you see that?

7  A.   I do.

8  Q.   I want to go back to the David Dees e-mail.  There's

9  other information -- is there other information in the

10 posting on the website other than just Carter Bryant?  Do you

11 see that, sir, 4057?

12 A.   I'm looking at this.

13 Q.   We'll make it easier.  Why don't I take it from the top.

14 You see where it says:  "Hi, Christian, thanks so much for

15 your letter and interest in the world of Bratz.  I talked to

16 the art director at MGA, and she said that, of course, I am

17 not the one to be releasing any Bratz art ahead of time.  So

18 I will check and see if I can post some of that older air

19 brush art for you.  She also said MGA is in the process of

20 building a new website that is going to be packed to the hilt

21 with cool art of all the new fashions."

22       The question to you, Mr. Larian, is did you at any

23 time authorize anybody to be disclosing information with

24 respect to the status of any website that MGA was considering

25 for the Bratz line?

2034

1   A.    I did not.

2   Q.    And then you go on to the second paragraph.  It says:

3   "I work free-lance as an illustrator and have my own studio

4   at home where I paint at my leisure.  But if a job comes in,

5   you can be sure that it is usually being rushed."

6             And then it goes on and talks about the Bratz dolls

7   and Carter Bryant.

8             Do you see that?

9   A.    I do.

10  Q.    Okay.  First of all, it says in that next paragraph:  "I

11  am swamped right now with colorizing lots of the new whacky

12  funk styles, and there are new hats and boas and tops that I

13  got a kick out of."

14            Do you see that?

15  A.    I do.

16  Q.    Mr. Larian, at any time do you recall ever authorizing

17  anybody, including David Dees, to be posting on a Yahoo fan

18  site internal information regarding designs or styles or

19  fashions under consideration within MGA?

20  A.    No, I did not.

21  Q.    Now on page 3 it says:  "Let me tell you about MGA.  It

22  is located in North Hills, California, at the west end of the

23  beautiful San Fernando Valley, where I've lived for many

24  years."

25            And it goes on:  "Anyway, when you walk into the

1    big, high ceiling lobby, there is a real pretty receptionist

2    with reddish brown hair and that sometimes wears leopard

3    prints, and if you look to the left, you will see the stairs

4    wind up to the second floor where all the cool stuff happens.

5    And as you start up them, there is, to the right, a little

6    rock garden with plants, and it always has some of the new

7    toys, like robot dogs, insectobots, or baby dolls sitting in

8    there as if they are playing."

9           Sir, did you ever authorize anybody to ever

10   disclose, including David Dees, disclose the physical layout

11   of the MGA offices?

12   **A.**   I did not.

13   **Q.**   And then skip down.  It says:  "As you get to the top of

14   the stairs, that is, if you can get permission to come up to

15   this top secret place, the first thing you notice to your

16   right is two big doors opening into a spacious office with a

17   fancy glass deck, usually covered with toys, and sitting

18   there working busily away is a great fellow named Isaac, who

19   is the owner, president, and creator of most of the MGA toys.

20          "He always seems to leave his doors open, and when

21   I stop by to pick up a job, I glance in and wave if he

22   happens to look up."

23          Mr. Larian, as the CEO of MGA, did you ever

24   authorize anybody, including David Dees, to be laying out

25   information on a website, fan website where your office is

1    located and whether or not you keep the doors open or not?

2    **A.**    I did not.   That second floor where we have most of our

3    designs and other things done was off limits.   People could

4    not come there.

5    **Q.**    Now, the next paragraph says:   "The first big area past

6    there has lots of low partition cubicles with all the

7    business people who keep the finances working, but then the

8    next rows are the package and advertising designers, which is

9    sort of the frontline of the creativity, and as you continue

10   up the steps, there is a silly sign hanging there that says

11   Design Farm, and that is the beginning of the art studios.

12   It always freaks me out to go in there because it is a busy

13   beehive of toy ideas and designers flying around like a

14   tornado."

15          Did you ever authorize anybody, including David

16   Dees, to be posting internal information regarding the

17   construct of offices where finances are being kept, where

18   designs are being made within MGA?

19   **A.**    I did not.

20   **Q.**    Did this posting by David Dees upset you?

21   **A.**    It did.

22   **Q.**    Turn to Exhibit 17252.   This is the February 7, 2002,

23   letter from the law firm of Quinn Emanuel.

24          Do you see that?

25   **A.**    Yes, sir.

2037

1    **Q.**   This is in evidence.

2            Can we have this up, please, your Honor?

3            THE COURT:  You may.

4    **Q.**   BY MR. NOLAN:  Now, the date on this letter is February

5    7th, 2002; correct?

6    **A.**   It is.

7    **Q.**   And that is before the e-mail that you -- exchange you

8    had concerning David Dees that we just looked at; right?

9    **A.**   Yes, it is.

10   **Q.**   Were you surprised to get the cease-and-desist letter

11   from Mattel?

12           MR. PRICE:  Objection.  Irrelevant.

13           THE COURT:  Sustained.

14   **Q.**   BY MR. NOLAN:  What steps did you do, sir, to comply

15   with Mattel's lawyers' direction of a cease-and-desist

16   letter?

17   **A.**   I forwarded this letter to my attorney, Patricia Glaser,

18   and asked her to respond to it.

19   **Q.**   Did you take any other steps, sir?

20   **A.**   That's the only step I recall.

21   **Q.**   What about with respect to where you received the

22   information concerning the posting on the Yahoo website?

23   **A.**   To the best of my recollection, I don't think we gave

24   any more information to that website.  That was confidential.

25   **Q.**   Now, going back to this February 7th letter, do you see

1   the second paragraph, it says:  "The marks are being

2   infringed by the Bratz Yahoo discussion group website"?

3   **A.**   I do.

4   **Q.**   Do you know whether that Bratz Yahoo discussion group

5   website is the same Yahoo website we just walked through

6   regarding the David Dees e-mail?

7   **A.**   Yes, and it was set up by a Bratz fan.

8   **Q.**   Mr. Price was also asking you questions but hiring

9   people from Mattel.

10         Do you remember that question?

11   **A.**   I do, I do.

12   **Q.**   Do you believe there is anything wrong with hiring

13   employees who are employed at Mattel?

14   **A.**   No, it's not.

15   **Q.**   Mr. Larian, do you know whether or not Mattel has ever

16   hired MGA personnel to work for it?

17   **A.**   Yes, many.

18   **Q.**   Do you know --

19         MR. PRICE:  I object and move to strike as to time

20   frame.  I was limited to up to October 19 of 2000.

21         THE COURT:  Focus on the time frame, Counsel.  Can

22   you specify the time?

23         MR. NOLAN:  Your Honor, before, though, can I just

24   make a sidebar presentation on this point, your Honor, or do

25   you want me to wait?

2039

1          THE COURT:  I'm going to overrule the objection,

2    but just follow up, Counsel.

3          MR. NOLAN:  Thank you.

4    **Q.**   Do you know a woman named Tina Patel?

5    **A.**   Yes.

6    **Q.**   Was she employed a MGA?

7    **A.**   She was employed by MGA.

8    **Q.**   What was her position at MGA?

9    **A.**   She was the brand manager for Bratz line of product.

10   **Q.**   And thereafter, did she leave MGA?

11   **A.**   She was recruited by Mattel.

12   **Q.**   And was she hired at Mattel?

13   **A.**   She was.

14   **Q.**   And what was her position at Mattel?

15   **A.**   She became, to the best of my knowledge from the

16   industry, she became the brand manager for My Scene.

17         MR. PRICE:  Objection.  Lack of foundation.  It

18   appears to be --

19         THE COURT:  Foundation, Counsel.

20   **Q.**   BY MR. NOLAN:  Do you have knowledge, first of all, that

21   Tina Patel was hired at Mattel?

22   **A.**   I do.

23   **Q.**   And do you have knowledge as to whether or not Tina

24   Patel works in connection with a particular doll line at

25   Mattel?

2040

1    A.    At that time she worked, yes --

2           THE COURT:  It's a yes or no question.

3           THE WITNESS:  Yes.

4    Q.    BY MR. NOLAN:  And what is the basis for your knowledge

5    as to what doll line at Mattel Tina Patel went to work for

6    after she left MGA as the brand manager for Bratz?

7    A.    Chris Hackstead of Target told me --

8           MR. PRICE:  Objection.  Move to strike.  Hearsay.

9           THE COURT:  Sustained.

10          MR. NOLAN:  Okay.

11   Q.    Other than Chris telling you what the position of Tina

12   Patel is, do you have knowledge as to what line of doll Tina

13   Patel was working on after for she left MGA?

14   A.    Yes.

15   Q.    What's the basis for your knowledge?

16   A.    Again, it was industry-wide knowledge that she was

17   working on My Scene doll.

18          MR. PRICE:  Objection.  Move to strike.  It's based

19   on hearsay.

20          THE COURT:  Sustained.

21          MR. NOLAN:  Your Honor, I'll get it a different

22   way.

23          THE COURT:  Last answer is stricken.

24   Q.    BY MR. NOLAN:  Do you know whether or not Tina Patel is

25   still employed at Mattel?

1    A.    Yes.  She's not.

2    Q.    I asked you earlier whether or not you recall Mattel

3    advertising the identity of any of its designers.

4            Do you recall that?

5    A.    I do.

6    Q.    And your answer was what?

7    A.    I have not seen except for the Barbie collectible line

8    that sometimes in the catalog they give the name of a

9    designer.  The product that sold to the mass merchants, to

10   Wal-Mart, Target, Toys-R-Us, Kmart, Mattel, Hasbro, MGA, Spin

11   Master, nobody ever says oh, this product was designed by

12   this designer or by this inventor.

13   Q.    Now, have you ever disclosed, in any publication that

14   you are aware of, that Paula Treantafelles Garcia was the

15   project manager for the development of the Bratz dolls?

16   A.    I have not.

17   Q.    Were you trying to conceal Paula Treantafelles's

18   involvement with Bratz?

19   A.    I was not.

20   Q.    Have you ever disclosed in any publication that Veronica

21   Marlow was doing fashion designs for the Bratz dolls?

22   A.    I have not.

23   Q.    Were you trying to conceal Veronica Marlow's involvement

24   with Bratz?

25   A.    No.

2042

1   Q.   Do you know an individual by the name of Margaret Leahy?

2   A.   I do.

3   Q.   And who is Margaret Leahy?

4   A.   She's a free-lance sculptress.  She's very good in

5   sculpting dolls especially.

6   Q.   Was she involved in the sculpting of early prototypes

7   that led to the Bratz doll?

8   A.   Yes.  She was a final sculptor of the Bratz dolls.

9   Q.   Mr. Larian, have you ever disclosed to anybody that

10  Margaret Leahy was a sculptor involved in the Bratz doll?

11  A.   I have not.

12  Q.   By the way, who did the packaging for Bratz?

13  A.   A combination of people.  Aileen -- I don't know how to

14  pronounce the last name.

15  Q.   Store?

16  A.   Store.  I believe a lady named Rachel Harris.  Myself.

17  There was a lot people involved in final design of the

18  packaging for the Bratz dolls.

19  Q.   Were you trying to conceal them?

20  A.   I was not.

21  Q.   Mr. Larian, you talked about not seeing any designers

22  advertised by Mattel.

23       Have you seen that on some collectible Barbie dolls

24  certain designers are identified on the Mattel boxes?

25  A.   I have on the catalogs.  I have seen it on the catalogs.

2043

1   I'm not sure if I've seen it on the actual product.  But I

2   have seen the mail order catalogs that they send to the

3   homes.  They put the names of -- sometimes, some of the

4   designers of the fashions for Barbie.

5   **Q.**   Now, in fact, do you know that Carter Bryant, while

6   employed within Barbie Collectibles, actually had his name on

7   a particular collectible doll?

8   **A.**   I believe I saw that, yes.

9   **Q.**   Did you see that before or as part of this litigation?

10  **A.**   I saw it -- actually, I got a catalog, and I saw it on a

11  catalog after Carter Bryant had left Mattel.

12  **Q.**   Well, is the fact that Carter Bryant was listed as a

13  designer in the catalog, did that factor enter any decision

14  on your part to make an offer to him?

15  **A.**   No.  Again, it had nothing to do with it.

16  **Q.**   In 1999 and 2000, MGA hired Mattel employees; correct?

17  **A.**   I'm sorry.  Can you repeat that?

18  **Q.**   In 1999 and the year 2000, you authorized the hiring,

19  the recruiting and hiring of various Mattel employees;

20  correct?

21  **A.**   I did.

22  **Q.**   Did you have an understanding, one way or the other,

23  Mr. Larian, as to whether or not Mattel was laying off

24  employees in the year 1999 or 2000?

25  **A.**   They were, yes.

2044

1   Q.   How do you know that?

2   A.   They had purchased a company called The Learning

3   Company, and that company did not do well for them --

4           MR. PRICE:   Objection.

5           THE COURT:   This is nonresponsive.

6           MR. PRICE:   Move to strike.

7           THE COURT:   It's stricken.   The question is how did

8   you know that.

9   Q.   BY MR. NOLAN:   How did you know that, sir?

10  A.   Just industry knowledge.   It was all over the newspaper,

11  everywhere.

12  Q.   I want to ask you to go to Exhibit 16911.

13  A.   I have it.

14  Q.   Do you recognize this document?

15  A.   I do.

16  Q.   What is it?

17  A.   It starts as an e-mail I sent in March 2002, Mattel, to

18  John Handy, who was the senior vice-president of design at

19  Mattel, and the subject is people.

20  Q.   Is this an e-mail that you, yourself, sent out?

21  A.   I did.

22  Q.   On the date reflected on the e-mail?

23  A.   I did.

24  Q.   To the individual located on the address line?

25  A.   Yes.

2045

1            MR. NOLAN:  Your Honor, we'd offer this exhibit.

2            THE COURT:  Any objection?

3            MR. PRICE:  Only that it's outside the time frame.

4    Everything else, no.

5            THE COURT:  This is March of 2000.  Overruled.

6    It's admitted.

7            **(Exhibit 16911 received.)**

8            THE WITNESS:  I earlier said March of 2002.  I

9    meant 2000.

10   **Q.**   BY MR. NOLAN:  Correct.  I was going to ask you.  Just

11   go from here.  From Isaac Larian.  Mattel, John Handy.  Sent

12   date is March 6 of the year 2000.

13   **A.**   March 2, I'm sorry.  If you look at the bottom, the

14   first e-mail is March 2nd.

15   **Q.**   All right.  Let's start from the bottom.  Thank you.

16           It says:  "From Isaac Larian, sent March 2, 2000,

17   to Mattel, subject, people.  Hi, John, hope all is well with

18   you.  We are growing like mad and need to hire more good

19   people."

20           When you said "we," who were you referring to?

21   **A.**   MGA.

22   **Q.**   And you -- and who was John Handy?

23   **A.**   He was the senior vice-president of design at Mattel.

24   **Q.**   And you sent it directly to him at his e-mail address at

25   Mattel?

1  **A.**   I did.

2  **Q.**   And it says:   "With all that is happening at Mattel with

3  all the layoff, et cetera, please let me know if you know

4  some good people we can consider.   We are looking for," and

5  then you have "directors of marketing, product managers, and

6  it goes on, doll, plush, girls product designers, engineers.

7  Thanks for your help.   Best regards."

8          Do you see that?

9  **A.**   I do.

10  **Q.**   Did Mr. Handy respond to you?

11  **A.**   Yes, he did.

12  **Q.**   Did he respond on March 6, 2000, at 11:02 A.M.?

13  **A.**   He did.

14  **Q.**   And again, subject, people.   Do you see that?

15  **A.**   I do.

16  **Q.**   Isaac -- that's you; right?

17  **A.**   It is me.

18  **Q.**   "Raime is our Human Resource person.   We aren't

19  currently laying off anyone in my division, in fact, we're

20  looking for good people ourselves.   But I know The Learning

21  Company is having layoffs, and if anyone there is a fit for

22  your needs, Raime can let you know."

23          And then you say:   "Thanks, John.   And hi, Raime."

24  And now you've e-mailed and included Raime on the CC line;

25  correct?

1   **A.**   I did.

2   **Q.**   And Raime is within Mattel?

3   **A.**   She was in Human Resources at Mattel.

4   **Q.**   And it says:  "Thanks, John.  Hi, Raime.  Mary Claire

5   Tiffany is our HR director."  And Mary Claire Tiffany was

6   HR's director?

7   **A.**   At that time, yes.

8   **Q.**   And then you said her telephone number is (818)

9   894-2525.  That's the number for MGA?

10  **A.**   Yes.

11  **Q.**   And then you gave the direct extension?

12  **A.**   Yes, I did.

13  **Q.**   "Best regards, Isaac"?

14  **A.**   That's correct.

15  **Q.**   After sending this e-mail, did anyone from Mattel call

16  and you say words to the effect, Mr. Larian, what are you

17  doing e-mailing Mattel asking them for leads on employees?

18  **A.**   They did not.

19          THE COURT:  Let's take our break at this time.

20          (Recess taken.)

21          **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

22          THE COURT:  We're back on the record outside the

23  presence of the jury.  The Court has received Mattel's motion

24  for leave to submit the expert reports of 42 LLC regarding

25  the review of recently provided in electronic media and

1    discovery of evidence deleted from that media.

2            There's a declaration in support thereof.  I want

3    to give MGA an opportunity to respond.  How much time would

4    you need to file?  I trust you received that.  This was filed

5    yesterday.

6            MR. ROTH:  I believe we're simply going to work out

7    a schedule with respect to Mattel, their reports, potential

8    deposition, if necessary, and then rebuttal reports.  We're

9    not going to be responding to the motion.  We're simply

10   accepting the Court's view, that any guidance that that

11   report is --

12           THE COURT:  It seems fair.  We're going to have

13   stuff produced through the course of the trial past the

14   cut-off date.  But at the same time, I want to make sure that

15   you have an opportunity to respond and rebut any --

16           MR. ROTH:  Yes, your Honor.  We'll work out a

17   schedule in that regard.

18           THE COURT:  Very well.  In light of that

19   representation, I gather the motion is moot.

20           MR. ROTH:  That's right.

21           THE COURT:  Is that your view, Mr. Zeller?

22           MR. ZELLER:  I think that's substantially correct.

23   I'm a little hesitant to say it's completely moot at this

24   point.  We are optimistic that we'll reach a resolution, but

25   we don't have a resolution.  What we had offered, before we

1   filed the motion, was to come up with a schedule, you know,

2   pertaining to the reports.  Also to make Mr. Pavan, the

3   expert, available for deposition.

4           I know we have been tentatively talking about some

5   dates when that might happen for Mr. Pavan's deposition.  I'm

6   a little hesitant to take it completely off the table at the

7   moment.  I certainly agree the Court need not deal with it at

8   the moment, but I just wonder for administrative purposes if

9   it's easier just to perhaps see if the parties reach a

10  resolution.  Because then we'll have to re-file or renew it

11  and maybe then there would be more of a briefing schedule,

12  and obviously we're trying to avoid delay at this point.  I

13  mean, everyone, I think, recognizes that there's some urgency

14  in trying to get this resolved.

15          THE COURT:  I guess my only hesitation, Mr. Roth,

16  is I've read the motion, and it raises some concerns on the

17  Court's part.

18          MR. ROTH:  Are there any of them you'd like us to

19  address?

20          MR. ROTH:  I trust you've read the motion.

21          MR. ROTH:  Yes, I have.

22          THE COURT:  If you're not prepared to respond --

23          MR. ROTH:  I'm not prepared to respond now, your

24  Honor, no.  It's our view that the motion asked for

25  permission to file the reports, and it's our view, given the

1  Court's guidance from late last week, that that was

2  appropriate.  The Court wanted us to work out a schedule,

3  which we're attempting to do.

4          THE COURT:  And I think that solves the problem of

5  what to do with the evidence and how to get it in.  But given

6  the substantive picture of what is set forth therein, I think

7  that may warrant a response.  Brief response.

8          MR. ROTH:  If the Court feels that a substantive

9  response is appropriate, then we will file such a response.

10          THE COURT:  I think so.  Now, it may be that you're

11  not in a position to do so until you've had a chance to do --

12  I guess that's what I was trying to get at, is how much time

13  you're going to need to file a substantive response to this.

14          MR. ROTH:  I think, your Honor, we will take a look

15  at the motion overnight, and we think we should be able to

16  have a response to the motion by the end of this week, and if

17  there's any further delay, we'll let the Court know.

18          THE COURT:  Okay.  Very good.  I don't want that to

19  substitute for your efforts to reach a stipulation here.  But

20  I would be abdicating my responsibility if I didn't ask for a

21  response to the substance of what is set forth in this

22  motion.

23          MR. ROTH:  Yes, your Honor.

24          THE COURT:  Anything else that we need to take up?

25  There is that one objection that I said we'll take up later.

2051

1          Mr. Price is correct, Mr. Nolan, that I limited him

2   to a particular time period on when MGA was hiring Mattel

3   employees.   And I didn't so limit you.

4          MR. NOLAN:   Well, your Honor, I went back to the

5   time period, the exact same time period of 1999, 2000, an

6   e-mail that John Handy just came up with in 2000.

7          MR. PRICE:   Mattel was 2004.

8          MR. NOLAN:   But we didn't give a date on that.

9          THE COURT:   That's the point.   If you could perhaps

10  lead off with that and clarify that, Counsel, I would

11  appreciate that.   I understand this is 2000, and that's

12  within the time frame, and you're correct on that, but the

13  question itself in terms of --

14         MR. NOLAN:   Your Honor, I actually thought that he

15  did not get to answer because he couldn't lay the personal

16  foundation as to the time.

17         THE COURT:   He did.   I did permit the answer.

18         MR. NOLAN:   All right.   I'll say that it was 2004.

19         MR. PRICE:   I would renew my motion to strike about

20  Tina Patel because that is way past the time frame, and I've

21  got dozens of documents in 2004 about raiding Mattel

22  employees.

23         THE COURT:   One second.

24         MR. NOLAN:   Your Honor, we'll also --

25         THE COURT:   Give me a second.   The question that

1  was asked by Mr. Nolan was Mr. Larian, do you know whether or

2  not Mattel has ever hired MGA personnel to work for it?  Yes,

3  and then there was the objection that Mr. Price was limited

4  up to October 19, 2000, time frame.  I ask you to focus on

5  the time frame.  Specify a time.  And then you asked for the

6  sidebar, and I didn't want to do the sidebar at that time.  I

7  asked you to go back and clarify.  And that's -- you went on

8  to basically another -- you went on to the evidence in

9  question.

10           So what I'm asking you is can you clarify that this

11  is through focusing on prior to October of 2000 that the

12  hirings took place.  Otherwise, you're opening the door for

13  Mr. Price to stand up, and as he indicates, he'll want to go

14  beyond his time frame as well.

15           MR. NOLAN:  Well, your Honor, I understand that,

16  and I can limit it and ask him if he knows the exact date.

17  But I will say this.  Without going through the record, and I

18  can do this tonight, I respectfully disagree that there was a

19  limitation because I don't understand that there was a

20  limitation imposed on Mr. Price, why Mr. Price was allowed to

21  show to Mr. Larian an internal document prepared by MGA which

22  was subject to the claw back document -- that was subject to

23  the claw back motion.  That document was prepared in April

24  of -- I want to say 2007 or 2008.

25           MR. ROTH:  2006.

1      MR. NOLAN:  2006, I apologize, and listed all of

2   the MGA -- I'm sorry, all of the MGA employees who were

3   currently employed there and had previously worked at Mattel.

4   The objection was overruled.  He didn't get it in because

5   Mr. Larian had never seen the document.  So I'm just saying

6   that I don't --

7      THE COURT:  So it was not admitted in evidence.

8      MR. NOLAN:  It was not, but it was shown to him,

9   and he was questioned about it, and if you look at -- that

10  was Exhibit 1932.  It didn't get into evidence, but he was

11  questioned about it.  That was my point.  And it listed all

12  of the employees that were employed at MGA that were formerly

13  at --

14     MR. PRICE:  Here's what he was asked, your Honor,

15  and here's why it was relevant.  It was did you ever tell

16  anyone at MGA that, with respect to Carter Bryant's dates of

17  working for Mattel, that they were not to ask that question.

18     That's what was asked because that document --

19     THE COURT:  That document was used to get to the

20  don't ask portion of it.  And the rest of the document was

21  excluded and never admitted in evidence.

22     MR. PRICE:  In fact, none of it was admitted in

23  evidence because he said he couldn't authenticate it,

24  although I'm going to ask the Court to admit it in evidence

25  because it's been admitted to be authentic --

1          THE COURT:  I'm not admitting it in evidence.

2          Mr. Nolan, I didn't admit it in evidence, and I

3  think Mr. Price was limited to it.  And if you want to open

4  this up, I will open this up, but I'm going to give the same

5  leeway to Mr. Price.  You make the call.

6          MR. NOLAN:  We won't open it up.  I thought they

7  opened it up.

8          THE COURT:  Then you're going to have to do what I

9  suggested, and that is go back and close it up.

10          MR. NOLAN:  I'll say it was the 2004 thing, and

11  move on from there.

12          MR. PRICE:  Since it's in 2004 and he testified

13  about it, I just -- we will all agree it was 2004.  I think

14  the only thing to do now is to strike that testimony.  If it

15  stays in, it obviously opens up who is being hired by whom.

16  You know, past October 19.

17          THE COURT:  I thought it was 2000.  Are you saying

18  2004?

19          MR. NOLAN:  The Tina Patel incident was a date he

20  did not identify now, and that was 2004.  And then I went

21  back, your Honor, after you told me when you wouldn't have

22  the sidebar, or when I asked it, then I went back to the time

23  zone of 2000.

24          THE COURT:  So when you asked the question,

25  Mr. Larian, do you know whether or not Mattel has ever hired

1    MGA personnel, that was 2004?

2             MR. NOLAN:  Your Honor, I did not limit it -- I

3    will admit that I did not limit it to a particular time.  I

4    thought that the testimony with respect to Tina Patel was

5    closer in time.  I did not realize it was 2004.  And I don't

6    recall him answering the time frame.  That's what I'm willing

7    to go back and establish, that it was in 2004.  That's the

8    only question I asked on that basis.

9             THE COURT:  2004 is outside of the time frame.

10            MR. NOLAN:  Your Honor, that's why I backed off.

11   That was the one question.

12            MR. PRICE:  Well, it was followed up with what did

13   she do, and there were questions of what was she hired to do,

14   and all that have should come out.  We realize that --

15            MR. NOLAN:  We'll strike the testimony.

16            MR. PRICE:  Mr. Nolan said strike the testimony,

17   and I agree.

18            THE COURT:  All right.  I'll strike the testimony.

19            MR. NOLAN:  Also, your Honor, before you rule, at

20   page 1602 of the transcript, Mr. Price asked the following

21   question.  Let me rephrase, then.  In fact, you sustained my

22   objection.  Mr. Price, let me re- --

23            THE COURT:  What did I sustain your objection to,

24   Counsel?

25            MR. NOLAN:  The question -- it's just being printed

1   off now.  You sustained the objection to a contract question,

2   and then Mr. Price went on to a different subject, and here

3   it is, your Honor.  Question.  And I'm reading from 1601,

4   line 16.  All right.  So it's not a hypothetical.

5          "You understood in this contract that you signed

6   that one of the provisions was that MGA could not, MGA

7   personnel, could not do what you were doing to Mattel.  That

8   is, you couldn't have someone leave MGA and then seek to

9   rehire -- to hire MGA employees.

10          "Objection, your Honor.

11          "What's the objection?

12          "Foundation.  This contract was not entered into

13   and was not in force.  He didn't write it.  There's no

14   foundation for Mr. Larian."

15          You said sustained, foundation.

16          "Mr. Price:  Well, let me rephrase, then.  We've

17   looked at least on a few occasions you directed former Mattel

18   employees to contact people they knew at Mattel to try to

19   fill job vacancies at MGA; correct?

20          "Answer:  Former Mattel employees who were laid off

21   or we hired to work at MGA.  Is that what you're referring

22   to?

23          "I'm saying former Mattel employees who were

24   working at Mattel no matter how they got there, you asked

25   those former Mattel employees to contact folks currently

1    working at Mattel to see if they wanted to come to work for

2    MGA.

3              "Answer:  I did.

4              "And you understood that when this contract went

5    around, this draft contract which you signed, that it had a

6    provision which would have prohibited an MGA employee from

7    doing that if MGA left MGA."

8              With all due respect, your Honor, there was no time

9    limitation based on Mr. Price's questions.

10             MR. PRICE:  That is an absurd misrepresentation,

11   and Mr. Nolan, I think, has not been given the full

12   transcript.

13             MR. NOLAN:  I'm personally tired of these ad

14   hominem attacks about absurd misrepresentations.  I just read

15   from the transcript.

16             MR. PRICE:  And what I'm saying is Mr. Nolan must

17   not have been given the three pages prior to that because if

18   you recall, your Honor, what happened is after showing him

19   the draft contract that MGA was asking its employees to enter

20   into in August of 2000, that Mr. Larian, I pointed out the

21   provision saying you couldn't solicit employees.  And

22   Mr. Larian said we only solicited them if there were layoffs.

23   And then I showed him one, two, three, four e-mails, all

24   between -- prior to August of 2000 where he was soliciting

25   Mattel employees.

```
 1              It was within that time frame.  And it was followed
 2   up with, so basically you are doing to Mattel what you're
 3   saying your employees can't do.  It was all within that time
 4   frame.  And again, I think Mr. Nolan wasn't given the prior
 5   three or four pages.  But at no time did we go beyond that
 6   time frame.
 7              THE COURT:  Anything further, Mr. Nolan?
 8              MR. NOLAN:  Your Honor, without going back and
 9   looking at the transcript --
10              THE COURT:  I understand, and I don't believe you
11   made any intentional misrepresentation.  You were handed
12   papers.  I'm watching what's going on.  So I understand how
13   this is playing out.
14              But I do think -- I do think we need to limit this
15   to the time frame of 1999, 2000.  And to the extent that that
16   question that you asked was a 2004 question and answer, and
17   there's no way of rehabilitating that into a 2000 question, I
18   think the easiest thing to do is strike that so we're not
19   opening up a can of worms.  And that's what we'll do.
20              Let's bring in the jury.  And just for record,
21   that's the question, Mr. Larian, do you know whether or not
22   Mattel has ever hired MGA personnel to work for it?  Answer,
23   yes, many.
24              I'm simply going to explain that that was a timing
25   issue.
```

1    MR. PRICE:  And anything regarding Tina Patel?

2    THE COURT:  It's outside the time period.

3    **(WHEREUPON THE JURY ENTERS.)**

4    THE COURT:  Welcome back, ladies and gentlemen.

5  There is one question and answer that the court needs to

6  strike.  There was a question to Mr. Larian, do you know

7  whether or not Mattel has ever hired MGA personnel to work

8  for it.

9    The answer was yes.  I've sustained an objection on

10  the timing of that.  It comes from a time period that's not

11  relevant.  So that answer and question is stricken from the

12  record.

13    MR. PRICE:  Your Honor, the questions about

14  Ms. Patel were also outside the time frame.

15    THE COURT:  Yes, thank you.  It's Patel?

16    MR. NOLAN:  Tina Patel.

17    THE COURT:  And the question and answer related to

18  her is also outside the time frame, and that is stricken as

19  well.

20    Counsel, you may resume.

21    MR. NOLAN:  Thank you.

22  **Q.**  Mr. Larian, I want to go back a little bit, if I might,

23  just with respect to at least one other media story that you

24  were talking about.  And just to reorient you, you have

25  Exhibit 1-A in front of you, The Wall Street Journal article?

2060

1   **A.**   The redacted version?

2   **Q.**   Yes.

3   **A.**   Yes.

4   **Q.**   And again, that date is July 18th; right?  2003.  And

5   this is the article where you mentioned Carter Bryant as

6   being the designer of Bratz; correct?

7   **A.**   I did.

8   **Q.**   And do you recall that Mr. Price in his examination

9   referred you to an e-mail communication that you had with a

10   Chris Palmeri working for the Business Week?

11   **A.**   He did.

12   **Q.**   And just for orientation, that's Exhibit No. 4941.

13           Do you have that in front of you?  And I think

14   you'll have to go to the black book.

15           And this is in evidence, your Honor.

16           THE COURT:  Very well.

17           THE WITNESS:  Go ahead.

18   **Q.**   BY MR. NOLAN:  This is in evidence.  Do you have it in

19   front of you, Mr. Larian?

20   **A.**   I do.

21   **Q.**   Let's put this up.

22           Now, this is dated July 14, of 2003.

23           Do you see that?

24   **A.**   I do.

25   **Q.**   And in this fact checking e-mail, Mr. Palmeri is asking

2061

1   you to confirm certain things about what they are going to

2   say in the story.  And to go to the pertinent part, it says:

3   "We describe you as a 49-year-old immigrant, Iranian

4   immigrant, trained as a civil engineer, who modeled Bratz

5   after your own children, who wear midriff-baring shirts,

6   low-rise jeans, and baseball caps."

7           You remember that line of testimony?

8   **A.**   I do.

9   **Q.**   And you see the term "who modeled Bratz after your own

10  children."

11          Do you see that?

12  **A.**   I do.

13  **Q.**   And I believe Mr. Price asked you what did you mean, and

14  I think you admitted, unfortunately, like most dad's, that

15  their children wear midriff blouses and maybe hiphugging

16  jeans.  But in any event, that was a correct statement.

17  That's what you told Mr. Palmeri; correct?

18  **A.**   Yes.  And that's four days before The Wall Street

19  Journal.

20  **Q.**   Now I want to go to the actual story that ran in

21  Business Week.  And this is Exhibit 631.

22          Do you see this?

23  **A.**   I do.

24  **Q.**   The date of the Business Week publication is July 28,

25  2003; right?

```
 1   A.    It is.

 2   Q.    Now, that's about 10 days after The Wall Street Journal

 3   article; right?

 4   A.    It is.

 5   Q.    Now, once you had mentioned something to The Wall Street

 6   Journal with respect to Carter Bryant, did you have any

 7   intent to mislead or conceal information from Business Week?

 8   A.    I never had an intention to conceal Carter Bryant's

 9   name, mislead Business Week or anybody else.

10   Q.    Okay.  Now, you see the fact checking e-mail from Chris

11   Palmeri said that you had modeled Bratz after your own

12   children.

13         Do you see that?

14   A.    I do.

15         MR. NOLAN:  Your Honor, I'd offer 631 subject to an

16   agreement to redact certain portions of it similar to the way

17   we've done other articles.  And so I'll try to do this on the

18   fly.

19         THE COURT:  Very well.

20         MR. NOLAN:  All right.  So if I could just have the

21   first page displayed for the jury.

22         Aaron, if you don't mind putting 631, the front

23   page.

24   Q.    Do you see that?  Now, this is -- can you highlight the

25   date of this for me in the upper left-hand corner?  It may be
```

1   hard to read.  Do you see that'S July 28, 2003?

2   **A.**   It is.

3   **Q.**   Okay.  This is an -- and if you look at

4   Exhibit 631-0002, there's a commentary section.  Don't put

5   this up just yet.  Just show on the second page of this

6   exhibit the point that says commentary by Chris Palmeri.

7   **A.**   Yes.

8            MR. NOLAN:  I apologize for the delay.  We're just

9   doing this real time.

10  **Q.**   See under commentary, and if you read over the

11  commentary article by Palmeri runs over to page 0003, and

12  then just go to the last paragraph.

13           All right.  Now, this is the last paragraph,

14  Mr. Larian, that would I like to draw your attention to.  And

15  this is following the e-mail that you had received where you

16  confirmed that you modeled the Bratz after, I guess, Yasmin

17  and her friends.  I won't make a comment about whether or not

18  Cameron and Jason were wearing midriff shirts.

19           But let me go here for just a moment.  Here is what

20  the article says.  IT says:  "Mattel won't live or die on

21  every new toy it develops.  But it can't just rely on

22  Barbies, either.  Quote, like they say in business school, no

23  risk, no reward, says Isaac Larian, CEO of privately held

24  MGA."

25           Did you say that?

1   A.   I don't recall it.   But if -- I cannot deny that I said

2   that.

3   Q.   And then you go on, it says:   "He should know, he got

4   the idea for Bratz after seeing his own kids run around in

5   naval-baring tops and hiphuggers, as Eckert is finding out,

6   sometimes the best ideas are right in front of you."

7            Do you see that?

8   A.   I do.

9   Q.   In the fact checking e-mail that you had received a few

10  days before, you didn't say that you came up with the idea

11  from Bratz seeing Yasmin and her friends; correct?

12  A.   I did not.

13  Q.   Did you try in any fashion in this <u>Business Week</u>

14  interview to mislead or conceal Carter Bryant?

15  A.   No, this <u>Business Week</u> article was about 10 days after

16  <u>The Wall Street Journal</u> with Carter Bryant's name I gave to

17  the whole world.

18  Q.   And I guess I should ask you this question.   Is it true

19  that in about early or late -- early 2001, late 2000, that

20  your own children and their friends were wearing

21  midriff-baring shirts, low-rise jeans, and baseball caps?

22  A.   They were.

23  Q.   I want to deal with something, and then we'll move on to

24  the actual contract negotiations.

25            Were you here for opening statement?

1    **A.**    I was.

2    **Q.**    Did you hear Mr. Quinn say that you were -- words to the

3    effect, you used your wealthy Iranian parents' money to start

4    MGA?

5    **A.**    I did hear that.

6    **Q.**    Is that a true statement?

7    **A.**    It's absolutely not a true statement.

8    **Q.**    Let's talk about your origin, Mr. Larian.  You weren't

9    born in the United States, were you?

10   **A.**    No, I was born in Iran.

11   **Q.**    When did you come to the United States?

12   **A.**    I came in 1971.

13   **Q.**    How old were you?

14   **A.**    17.

15   **Q.**    Why did you come to the United States?

16   **A.**    I came to USA for a better life.

17   **Q.**    Did you become a United States citizen?

18   **A.**    I did.

19   **Q.**    When?

20   **A.**    1990.

21   **Q.**    Mr. Larian, when you left Iran, were your parents still

22   living there?

23   **A.**    They were.

24   **Q.**    Were they wealthy?

25   **A.**    No, they were not.

1    **Q.**   Tell the jury what kind of business they had.

2    **A.**   My father had a small textile shop where my mother

3    worked in it, and I recall since I was nine years old, after

4    school I would go and work in the shop, even in the summers,

5    until age 17, when I came to this country, and then my

6    brother also worked there, and my sister worked there.  So we

7    can make a living.

8    **Q.**   At some point in time, did you go back to Iran to get

9    your parents?

10   **A.**   I'm sorry.  Can you repeat that again?

11   **Q.**   At some point in time, did you return to Iran to take

12   your parents to the United States?

13   **A.**   I did.

14   **Q.**   And what year was that?

15   **A.**   I went back to Iran after the revolution, and I arranged

16   for -- first I brought my little sister to USA.  Then my

17   brother.  Then I arranged for my parents.  They could not --

18   we're Jewish.  So we could not get out.  They could not.

19   **Q.**   Why don't I ask you a follow-up question.

20   **A.**   I arranged for my parents to leave through Afghanistan

21   and Pakistan on camels and cars with my little sister, and

22   then they went to Austria, and then they came to USA as

23   refugees.

24   **Q.**   How much money did you have when you came to the United

25   States at the page of 17?

1  **A.**   I had $750.

2  **Q.**   What was your first job?

3  **A.**   I was a dishwasher at a coffee shop called Spires coffee

4  shop in Lawndale, California.  I worked from 11:00 to 7:00 in

5  the morning.

6  **Q.**   Did you go to school?

7  **A.**   Yes.  Yes.  I went to L.A. Southwest College during the

8  day, and I worked during the night.

9  **Q.**   Did you earn a degree?

10  **A.**   Yes, I have a degree.

11  **Q.**   What's your degree?

12  **A.**   I'm a civil engineer.

13  **Q.**   Where did you earn the degree?

14  **A.**   From California State University in Los Angeles.  Cal

15  State L.A.

16  **Q.**   Did your parents pay for you to go to college?

17  **A.**   They did not.  I waited tables.  I bused dishes.  I

18  waited tables until I graduated from university.

19  **Q.**   Tell us about the beginning of MGA.  When was it formed?

20  **A.**   1979.  I started the company, and I named it Surprise

21  Gift Wagon.  And I had a Ford Phoenix, and I imported brass

22  giftware from Korea, and I started mail order business.  I

23  would put advertisement in the different mail order

24  magazines, and people would send me a check, and I would mail

25  them the product, the brassware.

1    **Q.**    The Prize Gift Wagon, did that eventually turn into MGA?

2    **A.**    Surprise Gift Wagon became ABC International Traders,

3    Inc. in 1982.  We were in business of consumer electronics.

4    **Q.**    Did MGA have an early focus in terms of the type of toys

5    or games that you were focused on?

6    **A.**    We got into the toy business in 1987 when we became the

7    distributor for Nintendo game and watch, which was Nintendo

8    handheld games, the first games, Donkey Kong, Super Mario

9    Brothers, et cetera.

10    **Q.**    Mr. Price in his examination asked you questions about

11    various family members that received distributions from MGA.

12    **A.**    He did.

13    **Q.**    He listed your mom as somebody who receives

14    distributions; right?

15    **A.**    My mother receives a salary at the company.  My mother

16    is 70 years old, and she cooks and brings food for the

17    children to the office and other employees.

18    **Q.**    Is that what she gets paid for?

19    **A.**    Yes.

20    **Q.**    Does she own any part of MGA?

21    **A.**    She does not.

22    **Q.**    They also asked you about your father.  Was your father

23    an owner of MGA?

24    **A.**    He was not.

25    **Q.**    Was he an officer?

1   A.   He was -- we named him the Chairman of the company out

2   of respect for him.   My father has passed away.

3   Q.   When did your father pass away?

4   A.   January 21, 2008.

5   Q.   You have a brother by the name of Farhad; right?

6   A.   I do.

7   Q.   In the opening statement, Mr. Quinn described for the

8   jury a business dispute that you had with Mr. Farhad, your

9   brother Farhad; right?

10  A.   He did.

11  Q.   Was that dispute resolved?

12  A.   It was resolved, yes.

13  Q.   Did Farhad prevail in that lawsuit?

14  A.   He did not.

15  Q.   What happened in that lawsuit?

16  A.   It went all the way to arbitration, and he, before the

17  case was over, he got up, over the objection of his attorney,

18  dropped the case, and he apologized to me.

19  Q.   Prior to meeting Carter Bryant at your offices, had you

20  ever met Carter Bryant?

21  A.   I had not.

22  Q.   Do you recall the first time you saw Carter's concept

23  drawings for Bratz?

24  A.   The first time I saw it was on that September 1 meeting

25  that I had with him.

2070

1    **Q.**    Explain to the jury, if you can, what your first

2    reaction was, your personal reaction to the -- to Carter's

3    drawings?

4    **A.**    I thought they looked weird.

5    **Q.**    In what way?

6    **A.**    They looked like kind of alien looking.  They had these

7    big heads, his drawings, and small body.  I thought they

8    looked weird.

9    **Q.**    Did you show the drawings to anybody else that day in

10   your family?

11   **A.**    My daughter was there.

12   **Q.**    And that's Yasmin?

13   **A.**    That's correct.

14   **Q.**    She was here during the opening statements?

15   **A.**    She was.

16   **Q.**    Why did you show it to her?

17   **A.**    She was 11 or 12 at the time, and she was out of Barbie,

18   and I wanted to get her opinion as a little girl what did she

19   think about those drawings.

20   **Q.**    Why is it every time we ask you about the age of Yasmin,

21   you look at your wife?

22   **A.**    Because I'm afraid I will miss the age.

23   **Q.**    How long have you been married to your wife?

24   **A.**    24 years.

25   **Q.**    What did Yasmin say about the drawings?

2071

1   A.   She liked them.   She thought they were very cool.

2   Q.   So was it based simply on Yasmin telling you that they

3   were cool that you decided to launch Bratz?

4   A.   We did not decide that day to launch Bratz.

5   Q.   Were you here for the testimony of Victoria O'Connor?

6   A.   I was.

7   Q.   Victoria O'Connor testified to this jury that on that

8   day you made a decision to go forward with Bratz.

9            Do you recall that testimony?

10  A.   I did.

11  Q.   Is Ms. O'Connor wrong?

12  A.   She's mistaken.   Absolutely.

13  Q.   At that point in time, September 1st, did you own Carter

14  Bryant's drawings?

15  A.   No.   He always owned his drawings.

16  Q.   Had you even offered Mr. Bryant a job at MGA as of

17  September 1st?

18  A.   I don't recall I did that, no.   I don't know if I did or

19  not.   I must -- I might have told him come here as a fashion

20  designer, but I don't know if it was the same day or not.

21  Q.   Now, sometime between September 1st and the date of the

22  signing of the agreement -- do you have that time period in

23  mind?

24  A.   I'm sorry.   Can you say that again?

25  Q.   Sure.   Your testimony is that you met on September 1st

1    of the year 2000 with Carter Bryant; right?

2    **A.**    That's correct.

3    **Q.**    And you saw his drawings for the first time at that

4    meeting; correct?

5    **A.**    I did.

6    **Q.**    And then sometime later, I believe on October 4th, did

7    you execute a contract with Carter Bryant?

8    **A.**    I executed the contract with Carter Bryant on October 4,

9    2000.

10   **Q.**    And Mr. Price asked you whether or not during the period

11   of September 1st and October 4th you had any contact with

12   Mr. Bryant.

13              Do you recall those questions?

14   **A.**    I do.

15   **Q.**    And do you recall that you testified as to what your

16   personal number is at MGA?

17   **A.**    Yes, I do.

18   **Q.**    Okay.  My question is a little bit different.  And that

19   is during the period -- turn to the date the contract was

20   actually signed, October 4th, I believe; correct?

21   **A.**    Yes, sir.

22   **Q.**    Sometime prior to that, had you had a personal

23   conversation, telephonic conversation, with Carter Bryant

24   where you made him an offer for a job?

25   **A.**    I believe I did.

2073

1   **Q.**   And do you recall whether or not you called him at

2   Mattel or whether or not you called him at home?

3   **A.**   To the best of my recollection, I called him at home.

4   **Q.**   Do you have the specific date in mind?

5   **A.**   I don't know.  I don't.  I don't recall it exactly.

6   **Q.**   Do you recall whether or not -- what type of position

7   you offered Carter Bryant?

8   **A.**   I told him to come to MGA full time as a fashion

9   designer.

10   **Q.**   And what did Carter say in response to your offer?

11   **A.**   He said he does not want to work for anybody full time

12   anymore.  He wants to be a free-lance contractor.

13   **Q.**   Do you recognize having any discussions with Mr. Bryant

14   on the telephone with respect to -- I'm sorry.

15          Do you recall any information that you received

16   with respect to what Mr. Bryant's expectations were with

17   respect to receiving royalties?

18   **A.**   I'm sorry.  I don't understand your question.

19   **Q.**   Do you recall ever -- hold on for a minute.  I'll do it

20   a different way.  Can you turn to Exhibit 16788.  I'm sorry

21   for the delay.

22   **A.**   Go ahead.

23   **Q.**   16788.  Do you have that?

24   **A.**   I do.

25   **Q.**   And do you recognize this document?

1   **A.**   I do.

2   **Q.**   What is it?

3   **A.**   It's an e-mail.  The bottom one is an e-mail dated

4   September 12, 2000, from Victoria O'Connor to me, and on the

5   top is my e-mail to her on September 13, 2000.

6             MR. NOLAN:  Your Honor, we'd offer Exhibit 16788.

7             MR. PRICE:  No objection if it's not being offered

8   for the truth.

9             THE COURT:  Very good.  Again, ladies and

10  gentlemen, this is a document that's going to the witness's

11  state of mind, not whether or not any of the statements are

12  actually true or not.

13            It's admitted, and you may publish.

14            **(Exhibit 16788 received.)**

15  **Q.**   BY MR. NOLAN:  The date of this e-mail is September

16  13th, 2000.

17            Do you see that?

18  **A.**   Yes.  The one on the top is September 13.

19  **Q.**   And I want to turn to the first e-mail on this train,

20  which is always at the bottom, and you see from Victoria

21  O'Connor to Isaac Larian, subject, Carter Bryant, September

22  12, 2000, 4:40 P.M.

23            Do you see that?

24  **A.**   Yes, sir.

25  **Q.**   Sir, as of that date, in your mind was Carter Bryant

1    working for MGA?

2    **A.**    He was not.  We were still negotiating.

3    **Q.**    And it said -- there's an e-mail, and it says:  "I knew

4    it.  He called and said he wanted to make sure that if we

5    license out Bratz, he would like a royalty.  He said this was

6    his original intention for the property.  Do you want to tell

7    him no or me?"

8         And then you responded; correct?

9    **A.**    I did.

10    **Q.**    And you say:  "Tell him licensing royalties is a pie in

11    the sky in the future.  We are going to risk and spend

12    millions making this brand and line happen.  Maybe it does,

13    maybe it does not.  If it does, we made the brand and not

14    him.  The answer is no.  Explain the above logic to him."

15         Did you type that e-mail in response to Victoria

16    O'Connor's question?

17    **A.**    I did.

18    **Q.**    When you said we are going to risk and spend millions,

19    who are you referring to?

20    **A.**    MGA Entertainment.

21    **Q.**    And when you said making this brand and line happen,

22    which brand were you thinking of?

23    **A.**    The Bratz brand.

24    **Q.**    When you say maybe it does, maybe it does not.  If it

25    does, we made the brand and not him, what did you mean by

1    that?

2    **A.**    In the toy business and in -- there is no guarantees

3    that a toy is going to become a hit or a brand, and

4    especially in the fashion doll business, where at the time

5    Barbie owned over 90 percent market share.  And nobody has

6    ever been able to compete with Barbie.

7         So this was a major, major risk, financial risk for

8    us to go and work and build this brand.

9    **Q.**    Mr. Larian, in September of -- September 13th, 2000, had

10   every idea that you had ever come up with turned out to be a

11   success?

12   **A.**    No.

13   **Q.**    We've heard a little bit about Singing Bouncy Baby and

14   Prayer Angels.

15        Were there other toys that you had hoped to

16   introduce and thought they were going to be successful?

17   **A.**    I did.

18   **Q.**    And can you give us some examples where although you

19   thought they were going to be success, they turned out to be

20   not successful?

21   **A.**    In the doll area, the biggest one I remember was a doll

22   that we called -- that we launched in 2000 called My Dream

23   Baby.  This was a doll that actually, when you fed it, it

24   actually physically grew.  It had a voice recognition chip in

25   it so eventually it was supposed to learn and listen to your

1    commands and do different things.

2            It would grow also emotionally as you took care of

3    it.

4            And this doll was received with a lot of fanfare

5    and a lot of press, and we sold a lot of them in 2000.  But

6    in January of 2001, literally all of them came back.  Because

7    the voice recognition did not work.  That doll was too

8    complicated, and it did not sell well.  That's just one

9    example.  I can give you a lot of examples.

10   **Q.**   Do you remember Monkey See, Monkey Do?

11   **A.**   Yes.

12   **Q.**   What was it, first of all?

13   **A.**   Monkey See, Monkey Do was a toy that we came up with

14   that again, it had what we call light sensors.  So when you

15   put it in the dark, and like in the closet, you open it, it

16   will jump up and down and scream and react, and when you talk

17   to it, it talks back in monkey language.  But that doll --

18   that never made it.  We made the product.  Nobody bought it.

19   **Q.**   Did you lose money on it?

20   **A.**   Yes, we did.

21   **Q.**   So when you said you were going to risk and spend

22   millions making this brand line happen, it's true that at or

23   about this time you had great hopes for Bratz; right?

24   **A.**   I did.

25   **Q.**   But as you were sitting there in September and October

1   of 2003, did you believe you were taking the risk?

2   **A.**   In 2003?

3   **Q.**   Thank you.  In 2000, September and October 2000.

4   **A.**   Absolutely.  We were taking probably the biggest risk in

5   the -- financial risk in the history of the company.

6   **Q.**   Did you -- you heard Victoria O'Connor testify that you

7   did not direct her to confirm personally Carter's

8   representations to you about the origins of his drawings;

9   right?

10  **A.**   I heard her testimony, yes.

11  **Q.**   Is it true that Victoria O'Connor was tasked by you to

12  deal with the lawyers to come up with a contract in this

13  case?

14  **A.**   Absolutely, yes, she was.

15  **Q.**   Is Victoria O'Connor a lawyer?

16  **A.**   She's not a lawyer.

17  **Q.**   Did you expect her to negotiate the contract with Carter

18  Bryant?

19  **A.**   Yes, through a lawyer.

20  **Q.**   Victoria O'Connor also testified that prior to meeting

21  with Carter Bryant, you had considered other possibilities

22  for fashion dolls; correct?

23  **A.**   Yes.  And that's true.

24  **Q.**   Now, there was this discussion in the article, we saw it

25  in The Wall Street Journal article, about sort of a contest.

1          Do you understand that testimony?

2   **A.**    Yes, I do.

3   **Q.**    And I don't want to belabor this, but when you say sort

4   of a contest, is this a contest that, you know, was published

5   in periodicals?

6   **A.**    No, it was not.

7   **Q.**    Was Victoria O'Connor testifying truthfully when she

8   said that you and her were considering other fashion dolls?

9   **A.**    Yes.  I had told Victoria O'Connor, again, as I said

10  earlier, Ron Stover, the buyer at Wal-Mart, had challenged me

11  to come up with a toy that can compete with Barbie, and he

12  will buy it.  Frankly speaking, I thought at the time he was

13  being a little bit sarcastic.  But I had asked Victoria

14  O'Connor, who was in licensing, to talk to other people to

15  come up with an idea for a fashion doll.

16  **Q.**    Now, was Paula Garcia employed at MGA while you were

17  having discussions with Victoria O'Connor about looking for

18  fashion dolls?

19  **A.**    I don't know the exact dates.  It's possible.  I know

20  Paula started in April 2000.  I think Victoria came before

21  her.

22  **Q.**    In any event, when Paula Treantafelles Garcia came on

23  board, did she have a specific area of responsibility?

24  **A.**    She was in charge of all dolls.  Large dolls, all the

25  dolls.

1  **Q.**   But at that time was MGA making a fashion doll?

2  **A.**   In 2000?

3  **Q.**   In 2000.

4  **A.**   When she started to work at MGA?

5  **Q.**   Yes.

6  **A.**   Again, I'm going to go back, if you look at the industry

7  definition for fashion doll, no, we did not.  But if you

8  adapt the definition that Ivy Ross gave to fashion doll, then

9  yes, we did.

10 **Q.**   My question, though, is this, and it's a little bit more

11 precise.  When you were meeting and considering other ideas

12 for fashion dolls before you met with Carter Bryant, was

13 Paula Garcia part of those discussions, or was it you and

14 Victoria O'Connor?

15 **A.**   Victoria O'Connor was in charge of licensing, talking to

16 other designers.  So I don't think Paula Garcia was part of

17 that discussion, no.

18 **Q.**   And at some point in time -- strike that.

19        As of September 1st, you knew Carter Bryant was an

20 employee of Mattel; yes?

21 **A.**   When I met with him, he told me on September 1, 2000,

22 that he works for Mattel.

23 **Q.**   Did you stop the discussion immediately once you heard

24 that?

25 **A.**   I did not.

1    Q.    Did you have any concern about whether or not you wanted

2    to get designs from Mattel?

3    A.    I'm sorry?  Can you repeat?

4    Q.    At that meeting, when he told you he was employed at

5    Mattel, did that raise a concern to you about whether or not

6    you were going to get a design from Mattel?

7    A.    Yes.

8    Q.    Did you want anything that Mattel was doing?

9    A.    I did not want anything that Mattel was doing.

10   Q.    Did you say anything to Mr. Bryant with respect to that?

11   A.    I did.

12   Q.    What did you say?

13   A.    I asked him do these belong to Mattel?  Is this

14   something that Mattel is doing?  And he said no.

15   Q.    Why did you ask that question?

16   A.    Because if this was something that he was doing for

17   Mattel or it belonged to Mattel, I was not interested in it.

18   Q.    At some point in time, did you learn that Carter Bryant

19   had retained a lawyer?

20   A.    Yes.

21   Q.    Do you remember the name of that lawyer?

22   A.    Yes.

23   Q.    What was the name of Mr. Bryant's lawyer?

24   A.    Ann Wang.

25   Q.    And were you, MGA, represented by counsel?

1   A.    Yes, we were.

2   Q.    And his name was?

3   A.    David Rosembaum.

4   Q.    Now, during the course of those negotiations -- strike

5   that.

6         Victoria O'Connor testified that during those

7   negotiations, she would keep you apprised of the status of

8   the negotiations; correct?

9   A.    Yes, she did.

10  Q.    Were there points in those discussions when you had

11  doubt as to whether or not a deal would actually be struck

12  with Mr. Bryant?

13  A.    Yes.

14  Q.    Can you explain for us the basis for your understanding

15  of that?

16  A.    He wanted to have -- the most major one that I remember

17  is that he wanted to have royalties on anything that we do

18  for Bratz, and I said no.  We're going to build that brand.

19  If MGA invests a lot of money and we build it, we're not

20  going to give royalties to Carter Bryant for that.  And that

21  contract negotiation almost fell apart on October 3rd, 2000.

22  Q.    And why did it almost fall apart?

23  A.    Because he through his lawyer was not accepting that.

24  Q.    And how do you know this?

25  A.    How did I know it?  Because I did call him myself on

1    that.

2    **Q.**    Did you -- let me ask you to take a look at

3    Exhibit 18467.

4    **A.**    I have it.

5    **Q.**    Before I ask you about that, Mr. Larian, I want to ask

6    you, did Carter Bryant ever agree to be hired as an employee

7    at MGA?

8    **A.**    No, he did not.  He did not want to become an employee.

9    **Q.**    Did you ever offer him a position as an employee of MGA?

10   **A.**    I did.

11   **Q.**    And was that in a telephone conversation you had with

12   him?

13   **A.**    That's correct.

14   **Q.**    Did Mr. Bryant tell you why he did not want to become an

15   employee at MGA?

16              MR. PRICE:  Object, unless it's not offered for the

17   truth.

18              THE COURT:  Is it being offered for the truth,

19   Counsel?

20              MR. NOLAN:  No, your Honor.  For state of mind at

21   this point in time.

22              THE COURT:  Very well, very well.

23   **Q.**    BY MR. NOLAN:  What did Mr. Bryant say to you?

24   **A.**    I'm sorry.  Can you repeat the question?

25   **Q.**    Sure.  After you offered Carter Bryant a position as a

 1  full-time employee at MGA, what did Mr. Bryant say to you?

 2  **A.**    He did not want to become an employee.  He wanted to be

 3  a free-lance designer.  He wanted to go back to Israel to be

 4  near his parents.  So he did not want to work as a full-time

 5  employee.

 6  **Q.**    At any point after -- I'm sorry.  At any point before

 7  the lawyers started negotiating, did Carter Bryant make any

 8  statement to you with respect to when he conceived of the

 9  idea for his drawings known as Bratz?

10  **A.**    He did.

11  **Q.**    What did he tell you?

12  **A.**    He said he did these in 1998 when he lived in Missouri

13  with his parents.

14  **Q.**    At some point in time -- now, let me go to -- let me ask

15  you to take a look at Exhibit 18467.

16        And without disclosing the contents of it,

17  Mr. Larian, first of all, can you identify that as an e-mail?

18  **A.**    Just give me one second, please.  This is an e-mail

19  exchange.  Go ahead.

20  **Q.**    Have you seen -- did you see this document, this e-mail?

21  **A.**    Yes, I'm copied on it.

22  **Q.**    Did you read this e-mail?

23  **A.**    Did I received it?

24  **Q.**    Yes.

25  **A.**    I don't recall if I did or not.

1  **Q.**   Do you see that it's dated September -- the top part is

2  dated September 28, 2000?

3  **A.**   Yes, I do.

4  **Q.**   And the bottom part is also an e-mail exchange on

5  September 28, 2000, from Victoria O'Connor to David Rosembaum

6  and was copied to you; correct?

7  **A.**   That's correct.

8  **Q.**   Now, during questions that Mr. Price was asking of you,

9  you made reference to seeing an e-mail that contained certain

10  representations concerning the origins of Bratz.

11        Do you recall that?

12  **A.**   I do.

13        MR. PRICE:   I'm going to object to further inquiry

14  on this based on the Court's order.

15        THE COURT:   Further inquiry, that's premature,

16  Counsel.

17  **Q.**   BY MR. NOLAN:   In signing the October 4 employment

18  agreement with Carter Bryant --

19  **A.**   There was no employment agreement with Carter Bryant.

20  **Q.**   I apologize.   The consulting agreement with Carter

21  Bryant.   Did you rely on representations that were made to

22  you with respect to -- strike that.   Let me ask it a

23  different way.

24        Did you know ahead of time, before you signed the

25  contract, of any factual confirmation received from your

1  lawyer concerning the chronology of the Bratz drawings?

2           MR. PRICE:  Object.  That violates the Court's

3  order.

4           THE COURT:  I'm sorry?

5           MR. PRICE:  I object.  It violates the Court's

6  order.

7           THE COURT:  Counsel, let's go to sidebar.

8           **(SIDEBAR CONFERENCE HELD.)**

9           THE COURT:  Mr. Nolan?

10          MR. NOLAN:  Your Honor, at page 1705 of this trial

11  transcript, starting at line 6, question by Mr. Price:

12          "So you're saying that Ms. O'Connor was given proof

13  of a story that these drawings were not done while Mr. Bryant

14  was at Mattel?

15          "Answer:  Ms. O'Connor went to David Rosembaum who

16  went to Anna Wang, who is Carter Bryant's lawyer, and

17  according to an e-mail that I have seen, his lawyer came back

18  and said she has proof she knows it was done in 1998 when

19  Carter said that the initial drawings --

20          "Question by Mr. Price:  Since this is a critical

21  question as to whether or not those drawings belonged to

22  Mattel, your response was what proof are you talking about

23  besides Mr. Bryant's word?  That was your response; correct?

24          "I did not ask that specific question that you just

25  asked.  I did not."

1          And then there's a long line about what kind of

2     investigation he did and stuff like that.  He testified that

3     he saw an e-mail exchange, and I believe that based on that,

4     your Honor, your ruling with respect to the production of

5     these documents prevented me from asking Victoria O'Connor

6     about them, but you did not restrict us from asking questions

7     to Mr. Larian about it.

8          I will also represent that during his deposition in

9     this case, Mr. Larian also testified with respect to an

10    e-mail that he saw, confirmation about this.  So there's no

11    surprise.  This is a factual assertion, and I think I should

12    be allowed, based on this testimony, to put in this e-mail,

13    which is an e-mail that's referenced and not have to wait to

14    do it during David Rosenbaum.

15         MR. PRICE:  I don't think he should be able to do

16    it under either.  This is part of the implied waiver, which

17    you know very well.  The question was did he rely on this

18    communication from counsel.  And they prohibited us from

19    going into that at all.  We've been through this -- I luckily

20    wasn't present.

21         But you, your Honor, and Mr. Zeller and others have

22    gone through this for a long time.  And we finally get this

23    e-mail last week.  And I think you're right.  That is unfair

24    surprise.  They shouldn't be able to now say well, we're

25    waiving the privilege --

1          THE COURT:  Counsel's suggestion is that your

2   question and the unobjected to answer opened the door for

3   this at this point?

4          MR. PRICE:  Well, he points out an answer which

5   pertains to privileged material.  I can't control that.

6   Mr. Nolan keeps trying to say we opened the door because he

7   blurts out answers which he's not supposed to blurt out

8   pursuant to the Court's order.

9          THE COURT:  Well, it's more than -- I mean, what

10  were you referring to in your question?  If not this e-mail

11  or that advice?

12         MR. PRICE:  Well, the question was he said he told

13  Ms. O'Connor to find out.  My question was --

14         THE COURT:  I presume the proof was whether or not

15  Carter Bryant's attorney, namely, Anna Wang, brought back.

16         MR. PRICE:  The answer should have been yes or no.

17  Now, I can't move to strike every time he blurts out an

18  answer.  He's summarizing what he just said.

19         MR. NOLAN:  There was no motion to strike.  He came

20  in.  He asked specifically about the proof.  He moved on, and

21  then he started talking about the inadequacies of just

22  accepting the representations from Carter Bryant.  He went

23  right on with it, your Honor, and cross-examined him

24  extensively on that.  Factual as well as hypothetical

25  questions, and he did so knowing that what the Court's ruling

1    was --

2            Well, your Honor, I think when this issue came up,

3    you went back and you looked at the motions in limine that

4    were actually argued with respect to Mr. Rosembaum's

5    documents, and I think you drew a distinction between the

6    factual assertions and the privileged material, and then you

7    said since this was just given to them last night, the night

8    before Victoria O'Connor, that it would be a surprise, and

9    you shouldn't be allowed to use it with Victoria O'Connor.

10           THE COURT:  The Court did make this distinction

11   between factual and legal.  And what about the e-mail here

12   brings it into the latter?

13           MR. ZELLER:  You know, your Honor, I would say

14   this.  Is that if this -- let me start with this point, your

15   Honor.  This is one that we have made all along.

16           If there is a waiver, it is all the way, and it is

17   all the way through today, because copyright infringement is

18   a continuing wrong.  There is authority for the proposition.

19   That is how far the waiver goes.  If he is going to rely upon

20   state of mind at that time, his state of mind at all times is

21   relevant for purposes of copyright infringement.  We have

22   made that -- it has never been refuted by MGA.

23           Now, of course, what they have done, and just to

24   correct one statement that Mr. Nolan made, it is true that

25   Isaac Larian blurted out yet again at his deposition