1    previously the point about the e-mail, but when we tried to

2    follow up, and this is in the record, they instructed, they

3    invoked the privilege.  We didn't receive these documents

4    until the course of trial.  So it's not just simply a waiver

5    issue that could have been dealt with in the normal course of

6    the case.

7            Now what we're dealing with is also a severe

8    prejudice issue.  We had been denied discovery into this

9    whole waiver matter.  Even -- so that is something that just

10   can't really be cured, and that doesn't seem to -- the

11   alleged door opening --

12           THE COURT:  But the question, again, is what is the

13   attorney-client communication here?  This is simply a factual

14   issue, and that was the distinction that I made last week.

15   How is this --

16           MR. ZELLER:  But as the Court has pointed out, if

17   they -- they asserted privilege over these communications and

18   over this very communication.  That was their assertion.

19   If -- and this has been Judge Infante's point all along.  He

20   said this from the very first ruling he made in the case.  If

21   it's factual, it's not privileged.  They asserted privilege.

22   That was their choice.  If they were going to rely upon those

23   documents and they were truly not privileged, they should

24   have been produced a year and a half ago, if not two years

25   ago.

1      So I think that you know, they are doing precisely

2  what the Ninth Circuit has said is not proper.  Number one, a

3  belated waiver, and number two, extremely limited one,

4  because they only want to show the jury and the court a very

5  small fraction of what those communications are.

6      THE COURT:  So, Counsel, I guess the question to

7  you is would you be willing to waive entirely?

8      MR. NOLAN:  Your Honor, the answer is no because of

9  the breadth of the waiver.  What this has been is a history

10 of negotiations back and forth where we said to Mattel we are

11 going to produce, you know, the factual exchange of

12 e-mails --

13     THE COURT:  But the bottom line is it wasn't

14 produced and provided.

15     MR. NOLAN:  Right.  But this is a redo argument of

16 what we had the day that Victoria O'Connor was on the stand.

17 You indicated on the record -- you went back and looked at

18 the arguments that had been had the previous Monday with

19 respect to factual assertions --

20     THE COURT:  This is a factual assertion.

21     MR. NOLAN:  It is.  It doesn't constitute a waiver

22 of anything.  It's a factual assertion made from Carter

23 Bryant --

24     THE COURT:  But the e-mail speaks to an attorney

25 opining that the drawings are made outside the scope of

1    employment.

2         MR. NOLAN:  Your Honor, but this is Ann Wang, who

3    says I spoke with -- I'm sorry.  This is David Rosembaum

4    saying I spoke with Carter's lawyer and e-mailed her a copy

5    of the draft.  And he goes on.  And she said that she has

6    reviewed the chronology of the creation of this design and is

7    satisfied that Carter created this outside the scope of his

8    employment at Mattel.

9         It's simply a factual recitation as to chronology

10   of dates.  In other words, that he did it before he went to

11   work at Mattel.  That's simply the factual recitation that is

12   being made.

13        MR. ZELLER:  If I may interject --

14        MR. NOLAN:  May I go on?  I'm sorry.

15        She says she understands the concerns here.

16   Apparently he conceived of this product in 1998.  So I

17   recommend that your patent attorneys review this project as

18   soon as possible to avoid any time limitations in the patent

19   law.

20        So she is saying that it was done in 1998.  That's

21   a factual assertion as to evidence that's going to come into

22   this case.

23        MR. ZELLER:  MGA is on the horns of a dilemma at

24   this point.  Number one, if, as Mr. Nolan now represents

25   years into the litigation, that e-mail is not entirely

1   privileged, well, then they were in violation of a court

2   order, and specifically the January 25, 2007, order of Judge

3   Infante that the Court is now, of course, very familiar with,

4   in which all such documents were ordered produced long ago.

5          So either they have violated that court's order or

6   the court's order, or number two, they are at this point

7   revealing privileged communications.  Those are the only

8   alternatives at this point.

9          And in either case, it's either a complete

10  wholesale waiver --

11         THE COURT:  Let me stop you there.  Why wasn't this

12  produced if this is not privileged?

13         MR. NOLAN:  At the time of the production and the

14  time that this issue came up, and I wasn't personally

15  involved --

16         THE COURT:  I know that.  You are unfortunately

17  held responsible with prior counsel.

18         MR. NOLAN:  Mattel has taken the position in

19  various privilege assertions that they were making that the

20  factual recitations would not be disclosed because it would

21  be considered a waiver of the privilege.

22         We offered a scenario where both sides could work

23  out an exchange where the factual assertions would be

24  exchanged -- at the very time we were also working on the

25  investigative report.  That whole issue.

1    THE COURT:  I understand.

2    MR. NOLAN:  So then what happened, your Honor, is

3  both of us made a motion to Judge Infante.  We asked for a

4  disclosure of the factual assertions containing --

5    THE COURT:  When was this disclosed?

6    MR. NOLAN:  Oh, we had these arguments just a week

7  ago just before Victoria O'Connor.

8    MR. ZELLER:  We have never had these documents,

9  your Honor, until the midst of trial.  And that, I think, is

10  undisputed.

11    THE COURT:  You may continue to examine on areas

12  that have been brought up.  I'm not going to let the document

13  itself in.  But you can certainly -- Mr. Price did elicit

14  that there was an e-mail that he relied upon related to the

15  chronology.  And I'll permit you to examine on that.  As far

16  as the document itself, given the totality of the

17  circumstances here, I'm going to sustain objection to the

18  admission of the document.  But you can ask about the e-mail

19  and the chronology that he received.

20    MR. ZELLER:  And just so, if I may, your Honor, to

21  the extent he starts going into those communications that we

22  were not allowed to take discovery on, which also occurred at

23  the deposition, so it wasn't just the documents we were

24  denied, we were also denied the opportunity to cross-examine

25  Mr. Larian about these very same --

1    THE COURT:  And you're going to have an opportunity

2 to cross-examine when Mr. Price stands back up.

3    MR. PRICE:  And I'm not going to make any more

4 objections on this.  They are reserved.

5    THE COURT:  Very well.  It's understood.  The

6 document is not in.

7    MR. NOLAN:  I understand.

8    THE COURT:  Very well.

9    **(CONCLUSION OF SIDEBAR CONFERENCE.)**

10    MR. NOLAN:  Your Honor, I apologize.  Mr. Larian

11 went to the restroom.

12    THE COURT:  There's no need to apologize about

13 that.

14    And just for the record, we're going to be ending

15 in about 10 minutes because we have a juror who has a car

16 issue.  And we don't want to have any tickets.

17    Mr. Nolan.

18    MR. NOLAN:  Thank you.

19 **Q.**   Mr. Larian, before signing the consulting agreement with

20 Carter Bryant on October 4th, had you had conversations with

21 Victoria O'Connor?

22 **A.**   I did.

23 **Q.**   Did Ms. O'Connor tell you anything about a chronology of

24 when the drawings were done?

25 **A.**   She did.

2096

1   Q.   Based on what Ms. O'Connor advised you, did you go

2   forward and sign the agreement?

3   A.   I did.

4   Q.   When you signed the consulting agreement with

5   Mr. Bryant, what was your belief and understanding as to when

6   Carter Bryant did the concept drawings for Bratz?

7   A.   In 1998 in Missouri, when he was living with his

8   parents.

9   Q.   If you had believed that he had done these drawings, the

10  master drawings while at Mattel, would you have ever signed

11  the contract?

12  A.   I would not have signed it if he had done it at Mattel,

13  no.

14  Q.   Would you have ever risked millions of dollars to

15  develop Bratz?

16  A.   No, I would not.

17  Q.   By the way, after you released Bratz, did you ever

18  receive a letter from Mattel directly or through their

19  lawyers saying words to the effect, hey, Bratz is a name that

20  was proprietary to Mattel?  Did you ever receive such a

21  letter?

22  A.   I did not.

23  Q.   Did you ever receive a letter from anybody at Mattel or

24  their lawyers, any law firm, saying gee, the pose of one of

25  the doll drawings, Chloe, the pose is similar to Toon Teens?

1          MR. PRICE:  Object.

2          THE COURT:  Sustained.

3  **Q.**   BY MR. NOLAN:  Had you ever heard of Toon Teens before

4  this litigation?

5  **A.**   I had not.

6  **Q.**   Had you ever heard that Mattel was considering the name

7  of Bratz for any project?

8  **A.**   No.

9  **Q.**   Did Carter Bryant ever tell you any information

10  regarding product lines at Mattel?

11  **A.**   No, never.

12  **Q.**   Let me turn to 16789.  Do you have it?

13  **A.**   I do.

14  **Q.**   Do you recognize it?

15  **A.**   Yes, I do.

16  **Q.**   And what is it?

17  **A.**   It's an e-mail dated at the bottom, starts as an e-mail

18  on October 5, 2000, at 11:32 A.M. from me to Carter Bryant,

19  copy to Paula Treantafelles and Victoria O'Connor.

20          MR. NOLAN:  We'd offer Exhibit 16789.

21          THE COURT:  It's already in evidence, Counsel.

22          MR. NOLAN:  I apologize.  Can we have it up?

23  **Q.**   Mr. Larian, when you signed the consulting agreement

24  with Carter Bryant on October 4th, did you have an

25  understanding as to whether or not Carter Bryant was going to

1   resign that very day?

2   **A.**   I did.

3   **Q.**   Tell the jury what your understanding was.

4   **A.**   I told him that once his contract is signed, he needs to

5   leave Mattel and work full time on Bratz.

6   **Q.**   Now, in this e-mail that you sent to Mr. Bryant on

7   October 5th, 2000, at 11:32 A.M., that is the day after

8   you've signed the consulting agreement with Carter Bryant;

9   right?

10  **A.**   It is.

11  **Q.**   In fact, it's the very next morning.

12  **A.**   It is.

13  **Q.**   And you say:  Carter, now that we have the agreement in

14  place, we need you and Paula to focus 200 percent on getting

15  this done.  Think different.  Think the fashion.  Think and

16  design the accessories.  Think about the commercial.  Think

17  about the New York showroom presentation.  We are thinking a

18  catwalk.  Think about all the royalty you are going to make.

19          "Carter, this is your big break in business life.

20  I have put my whole resources, money, people, development,

21  et cetera, on this to make your dream happen because I

22  believe in young people's dreams.  Now it is up to you.  You

23  need to put 16 hours a day starting now on this and nothing

24  else.  That is the only way it will happen.  Let's do it.

25  Isaac."

1          Is that what you wrote to Carter Bryant?

2   **A.**    I did.

3   **Q.**    When you wrote to Carter Bryant on October 5th and told

4   him you wanted him to work 16 hours a day, did you believe

5   that Carter Bryant had already resigned from Mattel?

6   **A.**    I believed that Carter Bryant had followed my

7   instructions, resigned, and left Mattel on October 4, 2000,

8   after he signed the agreement.

9   **Q.**    Do you know what, if anything, Carter Bryant did between

10  the day of October 4, 2000, to October 20th of 2000?

11  **A.**    What do you mean anyway?

12  **Q.**    Meaning do you know whether or not he was doing any work

13  at MGA?

14  **A.**    I know he was not doing any work at MGA.   There was

15  nothing to be done at MGA.

16  **Q.**    Were you expecting him to be working on fashions and

17  other things for the Bratz dolls?

18  **A.**    I did.

19  **Q.**    Did you know that he was working at Mattel during the

20  two-week period of time of October 4th through October 19th?

21  **A.**    I did not.

22  **Q.**    Did you know that Carter Bryant gave two weeks' notice

23  to Mattel?

24  **A.**    I did not until Mattel filed the lawsuit against Carter

25  Bryant.

1  **Q.**   Would you have ever sent an e-mail suggesting to Carter

2  Bryant that he work 16 hours a day on Bratz development if he

3  was still working at Mattel?

4  **A.**   Absolutely not.

5           THE COURT:  Now would be a good time.  Very well.

6           I'll excuse the jury for this evening.  I'll see

7  you at 9:00 tomorrow morning.

8           **(WHEREUPON THE JURY WITHDRAWS.)**

9           THE COURT:  Please be seated.  Is there anything

10 further from counsel at this time?

11          MR. NOLAN:  No, your Honor.  Just maybe a lineup

12 for tomorrow.

13          MR. QUINN:  You'll recall, we have that journalist

14 that we promised we'd put on tomorrow at 9:00 A.M.,

15 Mr. Weiss.

16          THE COURT:  Very well.

17          MR. QUINN:  And we'll be continuing with

18 Mr. Larian, and then Rachel Harris and Mr. Armstrong, and

19 then I guess there's an issue we would like to discuss, and

20 perhaps bring up with the Court about Mr. Menz, the expert

21 regarding Evidence Eliminator, and then it would be Carter

22 Bryant.

23          MR. ZELLER:  And I think in terms of the -- our

24 understanding of Mr. Menz's testimony in light of what the

25 Court was saying earlier is that he would be considered by

1    the Court only after Carter Bryant testifies?

2           THE COURT:  Yes.  I'm trying to keep this as narrow

3    and focused as possible.  And my concern about having

4    Mr. Menz first is that that opens it up.  And that requires

5    MGA then to bring in their expert, and I'm hopeful that

6    somehow this could be handled through Carter Bryant's

7    testimony.

8           MR. ZELLER:  And I assume what the Court's thinking

9    is is that if he is not making assertions that contradict

10   what our expert has found and is opining on, then it would

11   essentially render our -- it would obviate the need for our

12   expert.

13          THE COURT:  Exactly.

14          MR. ZELLER:  Fair enough, your Honor.  One other

15   kind of administrative type matter I would like to raise

16   pertains to the admission of certain kinds of evidence.  As

17   the Court is aware, you know, we've faced this with at least

18   a couple of witnesses.  It has been rather slow going in

19   terms of getting some evidence admitted.  We have certain

20   categories of evidence that really there should be no dispute

21   about the admissibility.  It's already acknowledged by MGA

22   that these documents are authentic.  They are from our

23   perspective in fact self-authenticating type documents and

24   are admitted, and in particular, what I'm referring to are

25   court pleadings, statements that MGA has made.

1    We in fact had something of an issue here today

2  with Mr. Larian in terms of one of the -- one of those

3  pleadings in which he, of course, kind of disavowed knowing.

4    We're rather concerned that we're going to continue

5  to get this kind of bandying, particularly as the Court has

6  already seen with Lucy Arant's.  Even where some of their

7  fingerprints are on the documents.

8    THE COURT:  Well, the problem with the Court's --

9  the Court's ruling on that is that they come in assuming that

10  there's something particularly relevant about the proceeding.

11  They don't come in wholesale.

12    MR. ZELLER:  And I understand.  And I don't

13  think -- I'm sorry.

14    THE COURT:  No.  The bottom line, if there's a way

15  to expedite the admission of evidence by stipulation, the

16  Court's all in favor of that.  But absent that, the Court is

17  not inclined to.

18    MR. ZELLER:  And what I'm really ultimately going

19  to suggest, your Honor, is an evidentiary hearing of some

20  kind.  I don't know why the jury's time should be burned up

21  when we call witnesses like Daphne Gronich, who for many

22  purposes are simply to put in documents.  These are pleadings

23  that as an officer of the court she shouldn't be shy about

24  saying they are in fact the documents of MGA.

25    Of course, I think the relevance of them will be

1   self-evident on their face.  The one, for example, that we

2   talked about with Isaac Larian today is a court pleading that

3   MGA submitted where it said that Carter Bryant created the

4   Bratz drawings, the ones that are at issue, in 1999.

5           So, I mean, the relevance of at least some of these

6   documents, I think, is really beyond question.  And so what

7   we're concerned about is, as we call Daphne Gronich, she says

8   gee, I don't remember this.  I can't tell you anything about

9   it.

10          So we call the former general counsel, and the

11  former general counsel says you know, I don't know.  I don't

12  remember that pleading.  And so we do end up very much in

13  kind of a bandying situation where there can be no legitimate

14  dispute about the authenticity of these documents, that they

15  are court pleadings that were submitted by MGA, and if the

16  only issue is relevance, that's something the Court can

17  pretty much in many instances determine without necessarily a

18  sponsoring witness.

19          So I guess what I'm raising with the Court

20  ultimately is, because we have made efforts to try to

21  stipulate to the admissibility and the introduction of these

22  exhibits, and frankly, just get a response that was

23  basically, well, they are all authentic, but none of them are

24  admissible.

25          You know, so that's going to leave a fair amount of

2104

1  time that we will have to use of our 60 hours just putting

2  witnesses up who are probably going to fight in any event,

3  and then we may have to call them serially to finally get

4  somebody -- or maybe ultimately it is that we propound a

5  trial subpoena on MGA for Custodian of Records.  We have an

6  evidentiary hearing in which we go through outside the

7  presence of the jury and get these documents admitted.

8           THE COURT:  Mr. Nolan?

9           MR. NOLAN:  Your Honor, I have been here since the

10  start of trial.

11           THE COURT:  So have I, Counsel.

12           MR. NOLAN:  I don't know whether or not Mr. Zeller

13  has been.  Because, your Honor, I remember so long ago, when

14  they had two of their own people on the stand, Ivy Ross and

15  Lily Martinez.  I showed them both documents that their names

16  were on, and they did not know it.  I showed Ivy Ross a book

17  that said that she was interviewed by the author, that

18  contained quotes made in that book, and she denied ever

19  having read the book.

20           Then Lily Martinez is shown the My Scene 360

21  document where it says that Carter Bryant is the creator of

22  Bratz.  This was an internal document used to impeach her, to

23  impeach her, and she denied having seen the document even

24  though her name was on it.  And I didn't get that document

25  into evidence because I didn't have the foundation.

1           So, your Honor, Mr. -- I'll attribute it to

2    Mr. Zeller just not remembering because it seems so long ago.

3    But the game that has been struck is a game that is going to

4    be played fairly by both sides, and I reject the notion that

5    they can do wholesale documents.

6           I'm tired, your Honor, of hearing this claim, ad

7    hominem attacks against me, my team, Isaac Larian, when they

8    don't have -- they don't have the integrity to stand up and

9    say that their own people are denying documents.   I'm tired

10   of it.

11          MR. ZELLER:   I'm sure Mr. Nolan knows I have been

12   here.   And I have been participating, and I actually do

13   recall quite specifically the documents that Mr. Nolan was

14   raising.   Those were not documents authored by either

15   Ms. Martinez or Ms. Ross.   They were not recipients of those

16   documents.   They had not seen those documents before.   They

17   were created by people.   There is no evidence as to who

18   created them and when and under what circumstances.

19          That is a considerably different issue than

20   instances where we have -- what the Court is going to see is

21   a parade of lawyers potentially coming in and doing what Lucy

22   Arant did, and basically saying, at least on our examination,

23   saying that there is just no -- really fighting over

24   everything.   And saying I just don't remember everything.

25   When there is in fact no question as to the authenticity of

1    those documents and that those things are relevant.

2          I mean, obviously, too, on a number of these

3    documents where the two instances that Mr. Nolan has raised,

4    they also -- there are questions about the authenticity.

5    These were not the witnesses' documents.  It's that simple.

6    MGA does not have that argument available to it when it talks

7    about its own court pleadings and its own products for that

8    matter, where actually there's another issue concerning

9    whether or not some of these Bratz dolls even came out in

10   2002 that we're getting a run around on, you know.

11         So this is something that is, you know, threatening

12   to burn up yet more time of the Court's time and the jury's

13   time even more importantly.  And it just seems like there

14   should be some way of dealing with this without penalizing us

15   for our jury time.

16         MR. PRICE:  I agree.  It goes both ways.  If the

17   document is authentic and there's no valid hearsay relevance

18   objection, then we should let it in.  And we should agree

19   that it's authentic.  If Mr. Nolan wants to identify

20   documents where the only issue is authenticity, then, you

21   know, we can probably get those in as well if there's an

22   agreement as to relevance.  The quick way to do that is to

23   say we want to get in these three documents because Mr. Nolan

24   agrees they are authentic.

25         We think they are relevant; he doesn't.  Mr. Nolan

1    can say these are authentic -- but he's right.  If it's

2    authentic, authenticity should be off the table.

3              MR. NOLAN:  We'll work this out.  I find it a

4    breath of fresh air or incredibly frustrating that what

5    Mr. Price can now say so many days into this trial is that if

6    it's authentic, there shouldn't be an issue.  I'm looking at

7    the document that we tried to get in, to 4436, with Lily

8    Martinez, which has a Mattel production number, which is

9    entitled My Scene 360 meeting.  It's an internal document.

10   It is dated.

11             And I was blocked from getting into this, your

12   Honor.  Not because it wasn't authentic.

13             So I guess we'll work this out, but I just want it

14   to be fair both ways.

15             THE COURT:  Very well.

16             MR. ZELLER:  Again, your Honor, I think the Court

17   just needs to look at that document.  There is no author on

18   it.  It was not authored by Lily Martinez.  She had not seen

19   it before.  This was not a situation of Lily Martinez saying

20   why, yes, this is a document with my name on it, but I have

21   no recollection of it.  That is the situation I am talking

22   about.  And that's the one that causes me concern.

23             And with respect to authenticity, I would just

24   direct the Court's attention to the fact that there is

25   something that's called a revised joint Phase 1

1   Exhibit stipulation, and in that, this is dated May 26, 2008,

2   in which the parties have objected to certain exhibits on the

3   ground that they lack authentication.

4           As to exhibits to which no authentication exhibit

5   has been made, the parties stipulate as to their

6   authenticity.  So I mean there are a subset of documents in

7   which authenticity is in fact at issue, and that's fair

8   enough.

9           But what we're talking about and the issue I'm

10  particularly raising are pleadings that are not the subject

11  of a reservation in which there's no question that they are

12  authentic, and which there can be no real dispute that they

13  are relevant.  The only issue is whether or not we have to

14  have a sponsoring witness such as one of their former

15  lawyers, their former general counsel, one of their former

16  in-house people come in and say I don't remember this

17  document and then have a fight from there.

18          THE COURT:  Okay.  Ms. Aguiar.

19          MS. AGUIAR:  I always seem to have to wait until

20  the end, but I don't mind.

21          What I do mind, though, is Mr. Zeller starting off

22  by saying that he wanted to raise an issue with you about the

23  fact that we haven't been able to agree to this.  I sent

24  Mr. Zeller an e-mail last Wednesday, Wednesday, June 4th.

25  Mike, I want to follow up on a conversation we had in court

1  today regarding Daphne Gronich.  Daphne Gronich is the person

2  Mr. Zeller just mentioned.

3          "With regard to Ms. Gronich, you mentioned that the

4  scope and length of the testimony Mattel seeks to elicit from

5  her will depend in part on the pleadings or other court

6  papers you want to get into evidence.

7          "To the extent you plan to call Ms. Gronich for the

8  purpose of authenticating or admitting documents, I'd like to

9  suggest that you send us a list of those documents so we can

10 consider them ahead of time.  We can narrow the

11 nonsubstantive aspects of her testimony and streamline that

12 part of her investigation."

13         I didn't get a response back to that e-mail, but I

14 affirmatively suggested it almost a week ago now.

15         So just to make a productive suggestion with regard

16 to things like that, perhaps Mr. Zeller could respond to the

17 e-mail that I sent him almost a week ago, and if we know what

18 documents they want to get in with that particular witness,

19 we can consider it and perhaps we can alleviate some of these

20 concerns, and if we can do the same with them and they will

21 give us the same courtesy, I think we might be able to

22 eliminate having to waste another 15 minutes of your time on

23 an issue that I already offered to resolve.

24         THE COURT:  Thank you, Counsel.

25         MR. ZELLER:  I apologize for prolonging this, your

1    Honor, but number one, we not only responded to that e-mail,

2    we gave them a stack of the documents to look at.  The

3    response that I received from Mr. Roth was that they

4    acknowledged that all of these pleadings are authentic, but

5    they are not admissible.  That was their position.  So not

6    only did I respond to the e-mail, I gave them more than a

7    list.  I gave them the actual documents so they didn't even

8    have to pull them.  That's point one.

9         Point two is that her e-mail was actually a

10   response to my initial request of let's work this out.

11        So honestly, we have gone round and round with MGA,

12   and I think the Court's getting -- I hope is getting a sense

13   of the frustration we felt because we have --

14        THE COURT:  I don't know about the frustration you

15   felt.  I know the frustration I'm feeling.  That's all I can

16   speak to.

17        MR. ZELLER:  Probably not good to compare those.

18        THE COURT:  Counsel, do you have anything more to

19   say right now?  I'm just about done.

20        MR. ZELLER:  I want to assure the Court that we

21   have attempted to stipulate and work these things out for

22   many days, and I'm just concerned that we'll have more time

23   loss.

24        MR. QUINN:  On a different subject --

25        THE COURT:  Can I wrap this subject up first?

1        MR. QUINN:  Sure.

2        THE COURT:  If you're interested.  There are two

3   ways that evidence is going to be admitted and considered by

4   this jury.  Number one is by introducing it through a

5   competent witness, and number two is by stipulation.  And I

6   know I have counsel before me who know how to do either.  I

7   prefer the latter in the interests of time and efficiency,

8   but if you cannot stipulate, then the only way it comes in is

9   through admission.

10        Now, the time concern, and I say this to both

11   sides, is something that the Court is mindful of.  And if it

12   becomes clear that one side or the other is abusing the time,

13   the Court will make in its discretion to manage the trial

14   appropriate adjustments.  So that's something that we'll see

15   how it plays out.

16        But as for how the evidence is going to be

17   admitted, I'm not now in the middle of this trial going to

18   change the rules that I think I set out pretty clearly at the

19   beginning of the trial as to how evidence is going to come

20   in.

21        MR. PRICE:  May I ask the following?  If there's a

22   stipulation on authenticity and the only issues are hearsay

23   and relevance, a witness couldn't tell you that, could be

24   apparent on its face.  So I'm wondering for those few

25   documents, can we say, your Honor, there's a stipulation on

1   authenticity.  You just have to make a judgment as to whether

2   it's relevant.

3           THE COURT:  Either you can stand up in front of

4   this jury and represent to the jury that there is a

5   stipulation regarding admissibility, or call a witness.

6           MR. PRICE:  Okay.

7           THE COURT:  That's the only way to keep in my view

8   the playing field level.

9           MR. PRICE:  I guess my question is can we say, your

10  Honor, with this document, in front of the jury, there's a

11  stipulation as to authenticity.  We move it in.  And if the

12  objection is on relevance, you can decide that on the face of

13  the document.

14          THE COURT:  You can move evidence -- attempt to

15  move evidence in at any point in time, Counsel, and I know

16  that MGA knows how to make an objection, and I think I know

17  how to make a ruling.

18          MR. PRICE:  I just want to make sure because your

19  comment was if there's no stipulation as to admissibility, we

20  couldn't do that.  I want to make sure we can say that your

21  Honor, there's no stipulation as to admissibility.  There is

22  as to authenticity.  We move it in.  They disagree on

23  relevance, and then just treat it like any other piece of

24  evidence.

25          THE COURT:  Counsel, you can make whatever motions

1   you feel you want to make.

2          Mr. Quinn, you had another issue?

3          MR. QUINN:  Your Honor, another witness out of

4   order.  Rachel Harris waited around all afternoon.  She's

5   coming back tomorrow.  She has a son's graduation tomorrow

6   afternoon.  We expect the direct exam of 20 minutes.  I don't

7   know what they have in mind.  As much as we're eager to get

8   to Mr. Larian's recross, we'd request permission to call her

9   after Mr. Weiss so that she can, you know -- already waited

10  one day and won't have to wait another or come back another

11  day, because otherwise, I'm afraid we won't get to her

12  tomorrow before she has to leave.

13         THE COURT:  Mr. Nolan, how much longer do you think

14  you have of Mr. Larian?

15         MR. NOLAN:  I think it's going to be 10 minutes.

16         THE COURT:  Okay.  Then why don't we go ahead and

17  call Mr. Weiss, as we all agreed to, let Mr. Nolan finish up

18  with Mr. Larian, and it sounds like you'll have plenty of

19  time in the morning to call Ms. Harris.

20         MR. PRICE:  And the request would be would we be

21  able to call her before we do our redirect.

22         THE COURT:  How long do you imagine your redirect

23  will be?

24         MR. PRICE:  Redirect is always more fun than the

25  initial one.  There's a lot of ammunition.  So -- and I'm

1    terrible at predicting those things.

2            THE COURT:  When is the graduation?

3            MR. QUINN:  It's tomorrow afternoon, and she can

4    only be here in the morning.

5            MR. NOLAN:  Your Honor, what about on -- I forget

6    what day is today?  What about the following, before Carter

7    Bryant takes the stand?

8            THE COURT:  It looks like Carter Bryant will not be

9    taking the stand now until Thursday; is that correct?

10           MR. QUINN:  Ms. Harris can come Thursday.

11           MR. PROCTOR:  Thursday morning she can come.

12           THE COURT:  Very well.  Why don't we start Thursday

13   morning with her.

14           MR. PROCTOR:  Do we have leave to take her out of

15   order Thursday morning?

16           THE COURT:  If necessary.  Very well.  All right.

17   That takes care of that issue.  So it looks like Carter

18   Bryant will not be until Thursday?

19           MR. PRICE:  He might be tomorrow because after we

20   finish with Mr. Larian, then we'll have Mr. Armstrong, and

21   then Mr. Bryant.

22           THE COURT:  Okay.  Very good.

23           MR. PROCTOR:  And, your Honor --

24           THE COURT:  You know, I don't mean to make light of

25   Mr. Seller's or Ms. Aguiar's or Mr. Nolan's position.  I

1    really do strongly encourage counsel to stipulate to some of

2    these exhibits if you can.  But I'm not going to adopt a

3    procedure now of -- in this trial, given where we are at this

4    point and just with the -- and I don't mean this in a

5    negative way, but in a zealous way that you are both

6    advocating and protecting your respective clients' rights, I

7    think I need to insist on a certain extent of formality with

8    the introduction of the exhibits.

9           And if I sense an abuse of the time, I can adjust

10   the clocks accordingly, but I think for now we can proceed as

11   we've been proceeding, as frustrating as that may be.

12          Anything else?

13          MR. PROCTOR:  On the scheduling issue, number one,

14   Odom, I believe the Court has an Odom video binder.  We would

15   intend to play that tomorrow.

16          THE COURT:  Sierra Odom.  And yes, I've gone

17   through, and I've already -- I'll make these rulings tomorrow

18   morning.  I've already made them.  I just need to -- I have

19   other things I need to attend to.

20          MR. PROCTOR:  Sure.  And the second point, on

21   Harris --

22          THE COURT:  And on Prince as well, but that's not

23   tomorrow.

24          MR. PROCTOR:  That's not tomorrow.  And I'm trying

25   to work it out with the other side.  There may be some

1    corrections to that.

2            THE COURT:  I'll leave that aside.

3            MR. PROCTOR:  On Harris, it seems likely at least

4    that we're going to get Mr. Bryant on the stand tomorrow late

5    afternoon.  He'll still be on the stand Thursday, Thursday

6    morning and the other time Ms. Harris is available.  So she

7    may need to be taken out of order.

8            THE COURT:  That's fine.  We'll take her out of

9    order Thursday morning.

10           All right.  Anything else?

11           All right.  Have a good evening, and I'll see you

12   tomorrow, be here at quarter to 9:00.

13

14            (Proceedings concluded at 5:10 P.M.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                              **C E R T I F I C A T E**

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on June 10, 2008.

15

16

17   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
18   License No. 10514

19

20

21

22

23

24

25