1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6  MATTEL, INC.,                    :   PAGES 4022- 4201
                                    :
7           PLAINTIFF,              :
                                    :
8      VS.                          :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
   ET AL.,                          :
10                                  :
           DEFENDANTS.              :
11  _____:

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17           WEDNESDAY, JULY 2, 2008

18            JURY TRIAL - DAY 19

19             AFTERNOON SESSION

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

CERTIFIED COPY

1    **Appearances of Counsel:**

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

# I N D E X

ROBERT TONNER, SWORN.................................. 4027

EXAMINATION BY MS. AGUIAR:........................... 4027

EXAMINATION BY MR. COREY:............................ 4036

FURTHER EXAMINATION BY MS. AGUIAR:................... 4047

FURTHER EXAMINATION BY MR. COREY:.................... 4059

ROBERT A. ECKERT, PREVIOUSLY SWORN................... 4070

DIRECT EXAMINATION (CONTINUED) BY MR. NOLAN:  ........ 4070

CROSS-EXAMINATION BY MR. QUINN: ..................... 4071

REDIRECT EXAMINATION BY MR. NOLAN: .................. 4075

RECROSS-EXAMINATION BY MR. QUINN: .................. 4077

DAPHNE GRONICH, SWORN............................... 4079

DIRECT EXAMINATION BY MR. QUINN: ................... 4079

CROSS-EXAMINATION BY MR. ROTH:...................... 4092

REDIRECT EXAMINATION BY MR. QUINN: ................. 4096

MITCHELL KAMARCK, SWORN............................. 4099

DIRECT EXAMINATION BY MR. QUINN: .................. 4103

MARGARET ANN LEAHY, SWORN........................... 4113

DIRECT EXAMINATION BY MR. NOLAN: ................... 4114

1

## E X H I B I T S

2

3    (Exhibit 13614 received.)........................... 4074

4    (Exhibit 1932 received.)............................ 4080

5    (Exhibit 5561 received.)............................ 4086

6    (Exhibit 10234-39 through -53 received.)............ 4106

7    (Exhibit 1137-14 received.)......................... 4142

8    (Exhibit 1137-15 received.)......................... 4149

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Riverside, California; Wednesday, July 2, 2008**

**12:40 P.M.**

**(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

1
2
3
4      THE COURT:  Very well.  Counsel?

5      MS. AGUIAR:  Your Honor, if it would make sense,

6 shall we start by having Mr. Tonner -- would you like him to

7 take the stand, and then we'll walk him through some of the

8 areas of his anticipated testimony?

9      THE COURT:  That sounds good.  Thank you.

10      MR. COREY:  Ms. Aguiar has said that she was going

11 to have the witness testify about the 2-D to 3-D conversion

12 from the drawings to the dolls.  And I reminded the Court

13 that that was an issue that would remain pending, and then I

14 went back and looked at the hearing transcript dealing with

15 that particular motion, and there was an agreement among

16 parties that that issue would be reserved for 1-B, something

17 that the court recognized.  And that was something that the

18 Court recognized.  I can read that if the Court would like.

19      THE COURT:  Ms. Aguiar?

20      MS. AGUIAR:  Sure.  I actually think, and I

21 appreciate why Mr. Corey is trying to pitch this as a 2-D to

22 3-D issue.  I think that the way the testimony has come out

23 in the trial, and I think that Mattel's verdict form, the

24 witnesses who have testified and the evidence that has come

25 in concerning sculpting and the sculpts, I don't think that

1   is the quick answer to it.

2          THE COURT:  Well, let me hear what it is.  Maybe

3   this would be better served, and Mr. Corey can make the

4   argument once I've heard exactly what this witness is going

5   to discuss along those lines.  So let's begin with the

6   swearing in of the witness.

7          THE CLERK:  Please raise your right hand.

8                  **ROBERT TONNER, SWORN.**

9          THE CLERK:  Could you please state your name for

10   the record, and spell your last name.

11          THE WITNESS:  Robert Tonner, T-O-N-N-E-R.

12          THE COURT:  Very well.  Counsel, why don't you go

13   ahead and lead the witness through.

14                   **EXAMINATION**

15   BY MS. AGUIAR:

16   **Q.**  Mr. Tonner, you were here this morning at the hearing,

17   and if you'll recall, the judge identified four areas --

18   well, actually we all identified four areas of potential

19   testimony.

20          Do you recall that?

21   **A.**  Yes.

22   **Q.**  Okay.  And what I'd like to do is to walk you through

23   them one by one and ask you generally speaking what the

24   substance of your testimony that you -- what is the substance

25   of the testimony that you anticipate giving.  I will ask you

4028

 1   some questions as we go along, but I'd really like you to

 2   explain to the judge what it would be.  Then Mr. Corey is

 3   going to have the opportunity to do some follow-up questions.

 4           MR. COREY:  So we're just asking the witness to

 5   elicit --

 6           THE COURT:  Let's give him a little bit more

 7   direction than that.

 8           MS. AGUIAR:  I will give him some direction, but I

 9   would like him to explain what he would offer tomorrow on the

10   stand.

11   Q.   As a preliminary matter, before we get into the four

12   areas, I just want to confirm, you are not here to tell the

13   Court, to tell the jury that Mr. Bryant is telling the truth,

14   are you?

15   A.   No.

16   Q.   And you are not anticipating telling the jury that you

17   believe what Carter Bryant says and that he is a credible

18   witness.

19   A.   No, I in no way am doing that.

20   Q.   The first subject matter that we articulated today is

21   the inspiration process, the creative inspiration process.

22   Could you tell us on that particular issue what experience

23   you bring to the table and what you would add in giving

24   testimony in that area?

25   A.   Well, I've been in the design world for 35 years,

4029

```
 1   whether it's fashion design or doll design.  I've worked
 2   with, you know, literally probably hundreds of different
 3   designers, whether it's in doll design or in fashion design,
 4   whether it's students or professionals.  I have a staff of
 5   designers who are creative people with me and personal
 6   experience, and 35 long years of personal experience.  Also,
 7   you know, I've studied doll history, contemporary doll
 8   history, and I certainly have an idea of how people came up
 9   with ideas as general knowledge in the doll world also.
10   Q.    So can you give us an example of personal experience
11   that you have that would demonstrate to the jury the creative
12   inspiration process?
13   A.    Sure.  I did this doll in 1999.  It's a doll that I kind
14   of started my company to do.  I'm a fashion designer.  So I
15   wanted a fashion doll to put out on the market.  So I named
16   her Tyler Wentworth.  Now, these days you put stories with
17   the dolls.  So what I wanted to do was come up with a story
18   line for this doll that was unique and not out there.
19          Now, it's not going to sound too unique.  It
20   doesn't sound so much like genius, but I go through this -- I
21   go through a process that's kind of very linear.  I have the
22   doll.  And I have this idea and this idea.  I put them
23   together.  I needed to come up with what this doll's
24   profession would be.  And it had to be in fashion.
25          Well, everyone's done models and people have done,
```

1    you know, fashion editors, and I used to be a designer.  I'm

2    looking through Vogue magazine.  And bingo, it hits me, she's

3    a fashion designer.  So, you know, it's this line of going

4    from one idea to another idea to another idea.

5    Q.   So that's in your personal experience.  Do you also see

6    the design inspiration process at work in people that you

7    work with and people who work for you?

8    A.   Yes, all the time.  I have a designer who works for me

9    now.  He was hired as a clothing designer, but he wanted to

10   pitch to me a doll -- his own idea.  So in his presentation,

11   he takes, you know, and, believe it or not, it happened to be

12   Barbara Streisand and the Munsters.

13            MS. AGUIAR:  Okay.  Nothing will surprise me in

14   this case.

15            THE COURT:  You took the words right out of my

16   mouth.

17            THE WITNESS:  So he brings me this, and he brought

18   a sketch.  And you know what?  I kind of had the same

19   response you did.  But I thought it's worth a try.  So we did

20   it.  But he explained to me the process and how he went about

21   it and how he got this idea.

22   Q.   BY MS. AGUIAR:  And then you also have been in the

23   industry for quite some time.  Based on that, do you have

24   industry knowledge regarding design inspiration stories and

25   that so-called "ah-ha moment" with regard to others in the

1   industry generally?

2   **A.**   Well, there's a very, very famous one where Ruth Handler

3   from Mattel, coming up with Barbie, it was generally accepted

4   that she -- well, let me do this another way.

5          The story is that Ruth Handler was looking to put a

6   doll on Mattel.  And she wanted -- she kind of wanted a

7   fashion doll because she's looking at her daughter playing

8   with these very sophisticated paper dolls.

9   **Q.**   Sophisticated what?

10  **A.**   Paper dolls, very popular in the 50's.  And they were

11  done by very accomplished artists, and the clothes were very

12  sophisticated.  But what was out on the market was baby-like

13  fashion dolls, if you could find them.  I mean, you know,

14  babylike.  So she wanted to come up with her own doll.

15  Traveling in Europe, she comes across a doll called Bild

16  Lily.  So this, according to what I've read about this, it

17  was kind of a doll that was in men's tobacco shops.  It was

18  more of an adult kind of novelty rather than a doll, but she

19  likes the proportion because it was much more adultlike.  So

20  she -- I -- and in reading her excerpt of that in her

21  autobiography, that was kind of her ah-ha moment where she,

22  you know, put all the pieces together, and that's Barbie.

23  **Q.**   Do you have an understanding, based on reading testimony

24  and depositions, as to what Carter Bryant's testimony is

25  about these sources of his inspiration?

1    **A.**   Yes, I do.

2    **Q.**   What do you understand those to be?

3    **A.**   Well, my understanding is there's two main ones.  And

4    for any designer there's a lot more, but two main ones.  He

5    had picked up a copy of August 1998 <u>Seventeen</u> magazine.  And

6    he also -- there's a high school near to him.  I believe it

7    was Kickapoo High School.  And he saw some kids out in front

8    of the high school, whatever, he liked their energy.  He

9    liked kind of their style, and those two things kind of

10   jelled for him, and that was his ah-ha moment.

11   **Q.**   Now, are you here to tell the jury that what Carter says

12   was his design inspiration is in fact a true story?

13   **A.**   I have no way of knowing that, no.

14   **Q.**   Do you think that what he cites as the particular

15   sources of his inspiration are consistent with your personal

16   experience of the people who work for you and with the

17   industry stories that you are aware of?

18   **A.**   I think it's totally consistent in that it is specific.

19   I mean, it's a really specific sort of thing.

20            I mean, you know, it's very easy to see from my

21   point of view the magazine inspirations.  And then the high

22   school thing is one of those things where you're driving by,

23   and it hits you.  So that's -- that's where -- it is

24   consistent with the way these things happen.

25            THE COURT:  Let me, if I may, Counsel.

4033

1          MS. AGUIAR:  Absolutely.  Thank you.

2          THE COURT:  I have a few questions on this.  You've

3   related your experience about how you developed a particular

4   doll or designed a particular doll.  You made reference to

5   this individual that pitched a doll to you, the Barbara

6   Streisand doll.  What was that individual's name?

7          THE WITNESS:  Joe.

8          THE COURT:  And Ms. Handler of Mattel.  I've got to

9   play this gate-keeping function of determining whether or not

10   the testimony that's called for here and whether or not it's

11   got a sufficient enough empirical base to support it.

12          When we're dealing with something artistic like the

13   design of a doll, as opposed to something which is, say, by

14   nature scientific, like a chemical experiment that there's

15   only one way of reaching that chemical experiment -- and

16   scientists may argue about it -- but there's ways of

17   demonstrating through hypothesis testing or whatever how to

18   develop that.  My sense is -- and it's only a sense at this

19   point -- is that different artists, whether we're talking

20   about actors or painters or designers, artists of various

21   sorts have different methods.

22          I mean, we've read a lot about that in the context

23   of acting performers, that there's different methods for

24   acting.  Some people, you know, adopt a particular school of

25   acting.  Others have different ways of going about it.  And

1    it's only speculation, but I'd be curious as to your thoughts

2    on this.  Is it possible that the same thing can be said for

3    creative designers in the doll business, that they might have

4    different methods for the creative process?  Or is it your

5    testimony or is it your opinion that everyone essentially has

6    the same creative process or goes through the same creative

7    process?

8              THE WITNESS:  You know, of course, everybody is

9    different.  And the way they see the world and all that and

10   the way they take in information is very different.

11             But, you know, in 35 years, I've never seen an

12   artist or designer come to something without taking those

13   steps.

14             Now, you know, there can be simpler steps.  For

15   instance, if a, you know, if somebody is doing a dress and

16   you have parameters already, then the inspiration may just be

17   the color.  It may be a very simple thing you don't even

18   think of as inspiration.  You look around and see a post-it,

19   and that's the green you want to use.

20             THE COURT:  So it's your sense that everyone has

21   these ah-ha moments to the extent they are doing something --

22   we all sit on the shoulders of other people, in other words,

23   we all have these inspiring moments.

24             THE WITNESS:  Yes.

25             THE COURT:  Can you tell, can you identify --

1    there's a dispute in the evidence here.  MGA takes the

2    position that the ah-ha moment for Mr. Bryant was the

3    Seventeen magazine and the Kickapoo High School, as you

4    identified.  Mattel takes the position that the ah-ha moment

5    may have been when he was exposed to certain dolls that he

6    saw over at Mattel.

7              Are you able to, in any kind of scientific way or

8    any kind of reliable way, discern which really was the ah-ha

9    moment for Mr. Bryant?

10             THE WITNESS:  Well, you know, I can't know that.

11   But what I can take you through is the sketches -- I believe

12   it's the Toon Teen sketches that Mattel says was inspiration.

13   And I can take you through what Mr. Bryant says.

14             Now, in my opinion, after looking at what makes

15   sense from A to B to C, Toon Teens doesn't look as -- that's

16   not a strong enough case, and I don't want to do anybody's

17   job here, but that's not as strong a thing for me as what he

18   described.

19             THE COURT:  That does not make as strong a case.

20             THE WITNESS:  Right.

21             THE COURT:  Could it be that that was the

22   inspiration?

23             THE WITNESS:  My opinion is that that's highly

24   unlikely.  But it could be the case.

25             THE COURT:  Why?

1          THE WITNESS:  Well, um, the dolls are -- to me they

2    are like night and day.  And Carter Bryant, he's an

3    accomplished artist.  So he doesn't put a line down -- you

4    know, he knows what he's doing when he's putting lines down

5    and when he's doing what he needs to do.  So he's going to --

6    he's going to look at something and be able to ascertain the

7    pros and cons of what he's looking at.  I don't know if

8    that's clear.  But he's going to know what he's looking at

9    when he looks at something.

10          So, you know, for instance, there's a Paris Blue

11   ad, and there's the Toon Teens.  And I can easily show where

12   the Bratz sketches are much more -- seem to be much more

13   based on the Paris Blue.  The Toon Teens, it's a totally

14   different doll, totally different concept.

15          MS. AGUIAR:  And that sort of takes us, your Honor,

16   into the second piece.

17          THE COURT:  And before we go any further,

18   Mr. Corey, I'll give him a chance to ask any questions that

19   he might have at this point.

20                          **EXAMINATION**

21   BY MR. COREY:

22   Q.   Good afternoon, Mr. Tonner.

23   A.   Afternoon.

24   Q.   When the Court was asking a question, you acknowledged

25   that it's entirely possible that Mr. Bryant was inspired by

1   the Toon Teens drawings; correct?

2   A.   Yes.

3   Q.   You can't preclude that possibility.

4   A.   Exactly.

5   Q.   And you are basing your -- you said that -- let's see, I

6   wrote it down.  You said you have an idea of how people come

7   up with ideas in the doll world; is that right?

8   A.   Well, my firsthand knowledge of how people come up with

9   ideas in the doll world.

10  Q.   Sure.  You talk to people, and you related a number of

11  anecdotes for us; right?

12  A.   Right.

13  Q.   And you said these people have kind of these ah-ha

14  moments.

15  A.   Right.

16  Q.   And I think what you said was that Carter Bryant's

17  story, at least as it was related to you, is another one of

18  these ah-ha moments.

19  A.   Correct.

20  Q.   But you can't say when that ah-ha moment occurred;

21  right?

22  A.   No.  I have no knowledge of that.

23  Q.   As a matter of fact, somebody has to decide whether they

24  believe Mr. Bryant or not as to when that ah-ha moment

25  occurred; correct?

1    **A.**    Correct.

2    **Q.**    And you were talking to the judge when he was asking you

3    some questions.  You said that you find Mr. Bryant's story to

4    be credible because you see more similarities between what he

5    identified as being his inspiration, the <u>Seventeen</u> magazine

6    ads, and the Toon Teens drawings.  Is that fair?

7              MS. AGUIAR:  I have been trying not to object

8    because I don't think it's really the proper venue, but I

9    don't really think he said he found the story credible.

10             THE COURT:  Why don't you clarify.

11   **Q.**    BY MR. COREY:  You found Mr. Bryant's story to be more

12   consistent with the <u>Seventeen</u> magazine drawings than the Toon

13   Teen --

14   **A.**    I'm sorry.  Do that again.

15   **Q.**    Sure.  I apologize.

16             You said that you found Mr. Bryant's ah-ha story to

17   be more consistent in the context of viewing the <u>Seventeen</u>

18   magazine ads than in seeing the Toon Teens drawings or the

19   Toon Teens dolls.

20   **A.**    Yes.

21   **Q.**    And that was because the -- you found the <u>Seventeen</u>

22   magazine ads from the August '98 magazine to be more similar

23   to the Bratz drawings than the Toon Teens drawings and the

24   Toon Teens dolls.

25   **A.**    Well, it wasn't just -- it -- there were multiple things

4039

1   in that Seventeen magazine that I believe he spoke about.

2   And the high school thing, that makes sense to me because

3   that's kind of out of the norm.  If you were going to pull

4   from the air or something like that, you'd probably pick

5   something that was more substantial or something that you

6   could really document, I would think.

7           But anyway, when I look at Toon Teens and I look at

8   the illustrations and what was in Seventeen magazine and

9   everything he said about it, it just -- it makes artistic --

10  it's logical artistically, if that's a phrase, that he would

11  go from A to B to C that way.

12  Q.   It sounds credible to you?

13  A.   Well, it sounds consistent.  It sounds consistent with

14  what my knowledge is and my experience and all that.

15  Q.   And that really is what we're going to, is consistent

16  with what?  Is there some empirical -- are there 12 steps

17  that artists have to follow to come up with an idea that

18  meets some set of standards?

19  A.   You know, there's no book.  There's no society or

20  whatever that sets aside laws of how a creative person has to

21  work.  So in that way, it's going to be very difficult to get

22  a measurement if that's what you're all looking for.  You

23  just can't get a measurement.

24          But what I do offer is hundreds and hundreds of

25  designers, sketchers, you know, clothing designers, doll

4040

1   designers, concepts, all this kind of stuff, and it usually

2   works the same way.  And I've heard so many of the stories

3   that I feel like -- well, in my opinion, his is a good one.

4          THE COURT:  Have you ever been surprised at the

5   ah-ha moment?  Like wow, that's unusual that that was your

6   inspiration?  Or does it always -- does it always make sense

7   like, okay, that's consistent, as you would say?

8          THE WITNESS:  Yeah, I'm surprised myself when I

9   have an ah-ha moment.  Because I can be, you know, shopping

10  in the grocery store and I see a color or a character on the

11  cereal box, and you're not going to copy it, but you go, you

12  know what?  I mean, there's something about --

13         THE COURT:  This is my problem.  To testify to the

14  jury that it's more likely that it was the Paris Blues ad as

15  opposed to the Toon Teens, you're going to be objectively, or

16  you seek to objectively compare the Paris Blues ads to Bratz

17  versus the Toon Teens, but maybe it was just something that

18  you wouldn't pick up, that everyone in this room wouldn't

19  pick up, but the artistic genius of Carter Bryant picked up

20  on Toon Teens that was his ah-ha moment as opposed to what

21  might be the obvious or logical connection.

22         Do you see --

23         THE WITNESS:  I totally see what you're saying.

24  Yes, it is possible.

25         THE COURT:  Okay.  And that's what I'm struggling

1   with.  Without that scientific measurement, how do we --

2   we're talking about art.  Artists.

3          THE WITNESS:  That is a control.  And with all of

4   these years and these people, it usually makes some sort of

5   sense.  And right offhand, I don't think of a whacky example

6   where, you know, you're doing a doll design and you use a

7   whale for, I don't know, it's usually closer to that.

8   Q.   BY MR. COREY:  I'll provide you with a real world

9   example.  You know who Salvador Dali is; correct?

10  A.   Yes.

11  Q.   You are familiar with his paintings?

12  A.   Yes.

13  Q.   Have you read any books or a biography of him?

14  A.   No.

15  Q.   Do you know what his inspiration was?

16  A.   Well, knowing the pictures, I couldn't even imagine.

17  Q.   I'll represent it's memories of his birthing process.

18  That's what he claims his inspiration to be.  Does that sound

19  consistent, to be consistent with an ah-ha moment for an

20  artist?

21  A.   For him.

22  Q.   But it's entirely plausible; correct?

23  A.   Yes.

24  Q.   Now, I want you to -- have you ever been to Mattel

25  design center?

1   A.   No.

2   Q.   But you know that Carter Bryant worked there?

3   A.   Yes.

4   Q.   And I want you to assume that he saw the Toon Teens

5   drawings in Lily Martinez's cubicle.  And you've seen the

6   Steve Madden ad from 1999.

7   A.   Angel Devil, yes.

8   Q.   And you've seen this ad before; correct?

9   A.   Yes.

10  Q.   Okay.  And if Carter Bryant after in the design center

11  saw Toon Teens and then saw this ad from the Seventeen

12  magazine in 1999 and then came up with the idea for Bratz,

13  that's also a consistent ah-ha story; correct?

14  A.   Yes.

15  Q.   And in your opinion you believe that the images in this

16  ad are closer to the Bratz drawings than the images from the

17  1998 Seventeen magazine in the Steve Madden ad?

18       MS. AGUIAR:  Your Honor, I believe what Mr. Corey

19  is referring to is an answer from his deposition where he was

20  talking about the Bratz dolls.

21       THE COURT:  Why don't we put those two ads up.  Can

22  we put the two ads?  The one from -- because I do know what

23  we're talking about.  I think this is an interesting point.

24  And I would appreciate your opinion on this.

25       MS. AGUIAR:  Your Honor, if we're getting into the

1   second area, I know Mr. Corey has asked him about the first

2   area.   Could I actually then take him through the second?

3   Because I think we're already --

4           THE COURT:  We really need to get on to the other

5   areas.

6           MS. AGUIAR:  We do.  But if we can get these two

7   up, I'm happy to walk him through it.  And then if Mr. Corey

8   has -- so can I take him through these?

9           MR. COREY:  I'm not sure what the Court wants to

10  do.

11          MS. AGUIAR:  I mean, is this what you were

12  referring to?

13          THE COURT:  Yes.

14          MR. COREY:  And I think the Court had a question

15  for the witness, if I recall.

16          THE COURT:  Any question on these, you are familiar

17  with the Bratz doll, of course.

18          THE WITNESS:  Yes.

19          THE COURT:  As between these two, are you able to

20  say that one is more or less likely to have been the

21  inspiration or is a more plausible inspiration than the

22  other?

23          THE WITNESS:  No.  And I'll tell you why.

24  Everything designed and everything that was going on at that

25  time was headed this way.  And you know, what was in that

1    August '98 magazine was a bunch of images that were not like

2    Steve Madden.  They had big feet, but they also had big heads

3    and this and that.  So to say that it's more likely that it

4    was that one, I don't -- I don't necessarily buy that.  I

5    mean, it could have been, but I don't.

6              THE COURT:  You couldn't say one way or another.

7              THE WITNESS:  No.

8              THE COURT:  Anything further, Mr. Corey?

9              MR. COREY:  No, your Honor.

10             THE COURT:  Let's go to the next area, Counsel.

11   You can take this down.

12             MS. AGUIAR:  With regard to the comparison, though,

13   of Toon Teens versus the sketches, yu know, Mr. Tonner would

14   offer very specific, based on his experience, artistic

15   observations of the differences between the Toon Teens

16   drawings and the Bratz sketches.  And I think Aaron may have

17   a graphic.

18             THE COURT:  Why don't we do that.

19             MS. AGUIAR:  That has the Toon Teens and the Bratz.

20             THE COURT:  Very good.

21             MS. AGUIAR:  So if Mr. Tonner could maybe explain

22   to the Court what he sees and why perhaps you are looking at

23   it with an experienced eye that would assist the jury in

24   understanding the differences.

25             THE WITNESS:  There are surface similarities for

4045

1   example, they are both standing upright.  They are both semi

2   turned to the side just like a three-quarter view, and they

3   both have their arms out.

4          But that's kind of where it stops for me.  Because

5   the proportions are totally different.  Although they had the

6   same, you know, relatively the same size head and feet,

7   everything going on in between is totally different.  And

8   that says something different to a dollmaker.

9          For instance, the Toon Teen doll has -- she has a

10  large set of feet, but, I mean, between the neck and the

11  feet, she's got a little girl's body.  She does not have a

12  teenager's body, whereas the Bratz drawing is very shapely,

13  thin ankles, delicate hands, and there's a triangular thing

14  going on with the Toon Teens that is just not there with the

15  Bratz drawing.

16  Q.   When you say a triangular thing --

17         MR. COREY:  Your Honor, excuse me.  While this is

18  fascinating, I do want to note an objection that this is not

19  in his report, nor is that Toon Teens image in his report.

20         THE COURT:  Please continue.

21         THE WITNESS:  A triangular shape.  The Toon Teen

22  figure has very narrow shoulders.  She has a thin little

23  neck, and she just gets bigger as she goes down.  There's no

24  ankles per se.  Her ankle is probably wider than her thigh.

25  Same with the hands and the upper shoulder.  And the point

1    here is that, you know, I think it's an adorable sketch, the

2    Toon Teens.  I think it's adorable.  But it's apples and

3    oranges as far as doll design goes.

4             THE COURT:  Okay.  Could we do the same thing now

5    with one of the sources that he --

6             MS. AGUIAR:  You mean with one of the magazine ones

7    from '98?  Is that what you were thinking?

8             THE COURT:  Yes, exactly.

9             MS. AGUIAR:  Which one would you like?  There are a

10   few.  There's the Paris Blues.  There's the -- I think what

11   the judge --

12            THE COURT:  Well, I've had enough of Toon Teens.

13   We need to have the Bratz doll --

14            MS. AGUIAR:  Lupe or Zoe or one of the Bratz.  And

15   which one?

16            THE WITNESS:  Well, Paris Blues is the easiest one,

17   but you can also do Coke.

18            Now, from top to bottom, there are a lot of

19   similarities here.  And yes, there are a lot of differences,

20   but you have, forgetting the hair thing, but you have eyes

21   that are kind of sultry.  They both have -- they are lidded,

22   or she has a lot of eyelashes, the Paris Blues one.  They

23   definitely have a teenage body, and the proportion is more

24   Bratzlike.

25            Now, the Paris Blues does a little bit more with

1  hair, but the proportion is similar.

2  **FURTHER EXAMINATION**

3  BY MS. AGUIAR:

4  **Q.**   Can you talk about specifics with us when you talk about

5  proportion?  Because there is terminology that is in your

6  everyday lexicon and is not in that of the jury.  So if you

7  could break that down.

8  **A.**   The Paris Blues ad has this natural teenage body.  So

9  between the head, which is stylized, and the feet, which are

10  clunky oversized, she has a more natural body, as does the

11  Bratz doll.

12         MS. AGUIAR:  So we also have other graphics, which

13  I won't go into now in the interests of time, which do some

14  comparisons like this, your Honor, and measure sort of the

15  proportions of the body, like going back to the Toon Teens

16  one.  Mr. Tonner has worked with us on a graphic that, you

17  know, compares the proportions of the body that on first

18  blush, this jury looks at these two things and says oh, well,

19  yeah, boy, these look really similar, but if you look at the

20  shape of the hand on the left and the length of the hand on

21  the right, the arm, the waist --

22         THE COURT:  I see those differences.  I guess my

23  question is is that what's dispositive to the creative vision

24  of the design artist?

25         THE WITNESS:  Well, I would say he may -- had he

4048

1   seen it, I have no way of knowing that, but had he seen it, I

2   would think that he would do what I did.  Oh, that's very

3   cute.

4          THE COURT:  Have you done the same thing, the

5   measurements with, let's say, the Steve Madden ad or the --

6          MS. AGUIAR:  In fact, with the Angel Devil ad, as

7   compared to -- we have one that compares the Angel Devil ad

8   to Zoe, and again, this is stuff that Mr. Tonner was asked

9   about in his deposition.  And he mentions --

10         THE COURT:  You've done that with the sources for

11  Mattel.  But what about your own sources, the Paris Blues

12  ads?  Have you compared the hand size, the waist size?

13         MS. AGUIAR:  We certainly could do that.

14         THE COURT:  Because those differences seem to exist

15  on the ads from the Seventeen magazine, at least visually.

16  Is that accurate?

17         THE WITNESS:  I'd have to look at it again.

18         THE COURT:  Well, there's a difference between the

19  size of the hand, the size of the feet, the size of the waist

20  in the Seventeen magazine from '98 and the Bratz doll, at

21  least what was up there.

22         THE WITNESS:  Right.  They are not the same.  He

23  didn't try to copy that.  But --

24         MS. AGUIAR:  I mean, if you look at the hands and

25  the arms, the waist, the size of the ankles, they are

```
 1   actually pretty much the same.
 2          THE WITNESS:  If you measured them, they would be
 3   different.
 4          THE COURT:  That's my point.
 5          THE WITNESS:  There are these slight differences.
 6   But the proportion of differences --
 7          THE COURT:  You haven't done those measurements.
 8          THE WITNESS:  No.
 9          THE COURT:  Very good.
10          MS. AGUIAR:  And then the posing is what Mr. Quinn
11   mentioned in his opening.  Sorry to ask Aaron to keep popping
12   back and forth, but the posing of the Toon Teens versus the
13   Bratz, again, looks to Mattel's argument, is similar, but
14   Mr. Tonner's view, which he can maybe explain to you, is that
15   they are quite different.  So I don't know whether you wanted
16   to address the differences in the posing.
17          THE COURT:  Well, again, if you would address the
18   posing of this, but also the '99 Steve Madden ad.  Is the
19   posing different there as well with the Devil?
20          MS. AGUIAR:  Yes, and the Angel Devil ad.
21   Q.   So, Mr. Tonner, if you can discuss the differences in
22   the posing of the Bratz and the Toon Teens.
23   A.   Well, the first one I've seen, when I looked at these
24   things, is that Mr. Bryant's sketch of Bratz looks grounded
25   whereas the Toon Teen looks a little off balance.  Both hands
```

1   are up, and they are both -- I mean, there will similarities,

2   such as both hands are up.  The arms are out to the side.

3   They are both looking -- they are both facing the same way.

4           But there's a knock-kneed thing on the Bratz

5   drawing.  She's pigeon-toed.  The Toon Teens is a little bit

6   more cartoony, but it looks to me like there's a V-shape

7   going, which is consistent with how this is drawn.

8           So she's standing with these big feet wide apart.

9   So there's a V there.

10          A little -- we're in the pose.  The Bratz has a

11  little bit of a hip thrust, and she's turned a bit more

12  toward the camera, if you would.  And the head sits -- the

13  head and the neck sit more forward on the body, which gives

14  her that grounded sort of look, as opposed to the Toon Teen,

15  which looks like she could fall backwards.

16  **Q.**   And I know your Honor wants to move --

17          THE COURT:  Why don't you put up the <u>Seventeen</u> and

18  Angel ad.

19          MS. AGUIAR:  We have that, your Honor.  And it

20  shows the two.  And if you could address the differences in

21  terms of proportion and then if you could go and then address

22  the --

23          THE COURT:  Actually, why don't you go through the

24  very same standards that you just did a moment ago of stance

25  and pose.

1          THE WITNESS:  Again, Bratz.  I mean, I understand

2    that he used a croqui, or what he calls a master sketch to

3    draw his drawing.  So they are all about the same.  So the

4    same things apply here.  The feet are kind of turned in kind

5    of pigeon-toed.  He has a knock-kneed sort of thing going on.

6    You can't see under the skirt, but the thighs should --

7          THE COURT:  So you're saying these are similar.

8          MS. AGUIAR:  No, I think he was saying the two

9    Bratz are similar.

10          THE COURT:  That's not what I'm asking.  Compare

11   these two before you.  Are they similar or dissimilar?

12          THE WITNESS:  Dissimilar.  Her feet are apart, and

13   they are facing forward.  They are not turned in.  The knees

14   are apart.  The arms are in different positions.  And the

15   proportion is different.  She's also squatting.

16          THE COURT:  Wait a second.  In the Paris Blues ad,

17   the person was sitting and not standing.

18          THE WITNESS:  Well, yes.  But we're not

19   comparing --

20          THE COURT:  Counsel, I'm starting to get a sense

21   that this is extraordinarily anecdotal.  I'm hearing this is

22   a mix master.  You just said it's significant that her arms

23   are different, in different --

24          THE WITNESS:  Yes, they are in different --

25          THE COURT:  But in the Paris Blues ad, her arms are

1    different.

2              THE WITNESS:  Well, Paris Blues was for proportion.

3    This was for a pose.

4              THE COURT:  This is a mix master.

5              MS. AGUIAR:  What we're trying to address is

6    Mattel's argument that this is the same, that the poses are

7    the same in Toon Teens or that this is the same.  And from an

8    artistic perspective, he's just trying to point out that

9    there are differences.

10             THE COURT:  There are differences, and there are

11   similarities.  I think that is clear to everybody in the

12   courtroom.

13             MS. AGUIAR:  And both of Mattel's witnesses who

14   were fact witnesses, Ivy Ross and Lily Martinez, were not

15   presented as experts, but they design dolls.  They are head

16   of the girls division and are artistic people.  And they were

17   up on the stand talking about Toon Teens.  And so you have

18   evidence in the record.

19             I appreciate why your Honor is starting to get the

20   sense well, you know, you look at everything, and you can see

21   similarities and differences.  I don't -- but the problem is

22   that we've had testimony from Mattel witnesses in this case

23   about these precise issues.  And so to say, all of a sudden

24   at this point in the trial, well, we can see similarities and

25   differences in everything --

1    THE COURT:  Counsel, I can only deal with the

2    objection that's before me.  And I'm not saying that there

3    aren't other witnesses yet to be called that can't address

4    these issues.  I'm simply saying from an expert standpoint,

5    bringing somebody unrelated to the facts of this case, what

6    I've heard now is there is no basis under Daubert to permit

7    this line of questioning.  And perhaps there may be something

8    different in the color or the sculpting.

9    MS. AGUIAR:  Okay.  So why don't we go to the last

10   two.

11   Q.   Mr. Tonner, with regard to color -- I'll do the last

12   two, and then Mr. Corey can follow up.

13        The last two are the colorization and the evening

14   wear from the pitch book and then the sculpting issue.

15        Do you have an understanding that Mr. Bryant did

16   the original sketches in black and white and then added color

17   at a later time?

18   A.   Yes.

19   Q.   Can you explain to the Court, based on your experience,

20   what you believe the -- what was the impact of the color?

21   A.   The impact of the color would be a pleasing

22   presentation.  As far as -- the interesting thing about the

23   Bratz thing was the idea about it was the concept and the

24   idea.  And if he -- however he got that across.  It's very

25   easy to do a beautiful black and white illustration that

1    would get the same point across.  The color -- you get the

2    same point across.

3           The Bratz -- and on to the fashions, the Bratz were

4    fashion dolls.  I mean, from the beginning they were fashion

5    dolls.  So by adding fashion doesn't change anything.  You

6    know, so I -- I see those as not necessarily important

7    points.

8    **Q.**   In your experience, though, have you seen people come up

9    with doll concepts and express those in a black and white

10   drawing and then seen them later in a colorized version?

11   **A.**   Well, yes.

12   **Q.**   And in your experience, does the addition of color in

13   something like this -- and let's put aside for the moment

14   color concept dolls.  So let's put that aside because we'll

15   talk about that in a moment.

16          Does a color change the original idea or the

17   concept for the doll that you originally saw, whether you saw

18   it in black and white?

19   **A.**   No, unless there was some reason to insert color into

20   the concept, color doesn't necessarily add anything.  In

21   fact, when he's doing his illustrations --

22          THE COURT:  I'm sorry.  Color doesn't add anything

23   to what?

24          THE WITNESS:  To a concept.

25          THE COURT:  Color does not add anything to a

1    concept from an artistic perspective?

2              THE WITNESS:  Well, to put -- okay.  I have to go

3    back here.  If you're presenting a doll idea and you do it in

4    black and white, you can do it just as effectively in black

5    and white as color.  I mean, people use color a lot because

6    it's an easier way to make somebody pop.  So it would add

7    excitement.  It would add interest to the sketches.

8              But I have seen very, you know, very detailed

9    beautiful black and white renderings also that get the point

10   across.  I mean, that's really the -- doing the illustrations

11   is to show somebody else, the point of that is to get the

12   idea across.

13             THE COURT:  What do you base that opinion on?

14             THE WITNESS:  35 years of experience.  If I want to

15   try to explain something to somebody, the easiest way,

16   instead of like talking it through, would be to show them a

17   sketch.

18             THE COURT:  And color doesn't add anything to that?

19             THE WITNESS:  It's not necessary.  And it

20   depends -- you know, again, it's like black and white, again,

21   could be very dramatic and very dynamic.  Color could do the

22   same thing.  Or if it's badly colored, you could hurt a

23   concept.

24   Q.   BY MS. AGUIAR:  In other words, in this particular case,

25   have you looked at the sketches in black and white and looked

1    at them in color?

2    A.    Yes.

3    Q.    And is it -- do you believe that the addition of the

4    color changed anything about Mr. Bryant's idea for Bratz?

5    A.    No.

6    Q.    Can you give the Court some examples of a doll where the

7    color in the doll or in the drawing was much more a part of

8    the concept?  Can you explain the whole idea of a color

9    concept doll?

10   A.    Well, personally I did a group of play dolls about 10

11   years ago, and in developing their personalities and the

12   style of the dolls, we gave them a favorite color.  So the

13   dolls came dressed in that color.  And the girly doll was in

14   pink, and the tomboy was in blue and all of that commercial,

15   I would say something like Strawberry Shortcake would come in

16   red and green.  That's where color is important to a concept.

17          But if I may, the -- when Carter was coloring

18   these, I've read nothing or seen nothing of what he said or

19   anything that I've looked at that says the color was

20   important.  For all I know, he ran out of red over here.  So

21   he colored it yellow.

22   Q.    In other words, do you understand Bratz to be a doll

23   idea where color plays a central role?

24   A.    No.

25   Q.    The clothes and what have you?

1   A.   No.

2           THE COURT:   And again, why do you hold that opinion

3   with respect to Bratz besides your 35 years of experience?

4           THE WITNESS:   They have -- it's even hair color.

5   If they are trying to design a personality, like Cloe always

6   has blonde.   She doesn't always have blonde.   She has

7   multiple hair colors.   So color is not specific to a

8   character.   And it doesn't enhance it or whatever.   I think

9   what they do, I mean, you know, I'm not there.   But I would

10  think what they would do is they'd do a great design and

11  match the hair and stuff like that to work with a great

12  design.

13          Mr. Bryant, showing the sketches to a talented

14  staff, they would understand that there would be color and

15  fabrics and all of this.

16          THE COURT:   Anything further on this, Counsel?

17          MS. AGUIAR:   I'll just go to the last area, the

18  sculpting.

19  Q.   Can you tell the judge briefly what your experience is

20  with sculpting?

21  A.   I've been sculpting since I was 29, which is a long time

22  ago.   And I used to do all the sculpting for a company, and I

23  probably do about half of it now.

24  Q.   Can you discuss the importance in your opinion of the

25  sculptor to the process of doll design?

1    A.   Well, it's crucial.  I think it's crucial.  You have to

2    get somebody who -- and that's why people hire good

3    sculptors.  They see somebody with talent whose dolls

4    consistently come out well.  If somebody is a talented doll

5    designer, you know, they are sought after.

6    Q.   Can you explain, when a sculptor is working from a

7    drawing, what kind of drawing that would need to be in order

8    for the sculptor to simply be executing on the vision that is

9    in the drawing?  In other words, what would that drawing need

10   to look like or include?

11   A.   Well, when we do projects that are, say, Disney or when

12   we try to do a portrait or whatever, we get actual

13   turnarounds.

14   Q.   Can you explain to the judge what that means?

15   A.   Yes, it's a side view, front view, back view.  So that

16   you get a whole sense of how every angle looks.  You have

17   three-quarter view.  Same with a portrait.  You want to nail

18   it.

19   Q.   And you obviously don't know specifically what

20   Mr. Bryant's involvement was in the sculpting process in this

21   case.

22   A.   No.

23   Q.   But you've had experience with sculpting things from

24   drawings such as the ones in this case.

25   A.   You mean one without turnarounds?

1   Q.   Yes.

2   A.   Yes.

3   Q.   And what does that result in?  In other words, what's

4   the result when you have an illustration like this that

5   doesn't have all of that information in it?

6   A.   Well, you leave a lot up to the sculptor then.

7            MS. AGUIAR:  Anyway, your Honor, I know we're

8   running short on time.  So I'll wrap up.

9            THE COURT:  Very well.

10           Mr. Corey, do you have anything further?

11           MR. COREY:  Yes, unless the Court tells me that I

12   don't need anything further.

13           THE COURT:  Well, if you'd address the sculpting

14   issue.

15           MR. COREY:  Sure.  Do you want me to address it by

16   argument or by questioning the witness?  I'm just not clear.

17           THE COURT:  I'm sorry?

18           MR. COREY:  Do you want me to address it with the

19   Court?

20           THE COURT:  No, to the witness.  I'll give you both

21   a chance to argue as soon as we finish the questioning.

22                    **FURTHER EXAMINATION**

23   BY MR. COREY:

24   Q.   Mr. Tonner, did you ever talk to -- you understand that

25   Ms. Leahy did some sculpts for the Bratz dolls?

1   **A.**   Yes.

2   **Q.**   Did you ever talk to her about the sculpts?

3   **A.**   Not about the sculpts, no.

4   **Q.**   You talked to her, you just didn't talk to her about the

5   sculpts?

6   **A.**   Correct.

7   **Q.**   And isn't it also fair to say that you have no idea what

8   the stage of the sculpting process was as of October 19,

9   2000?

10   **A.**   I have no idea.

11   **Q.**   So you can't differentiate between what was done before

12   or after October 19, 2000?

13   **A.**   Correct.

14   **Q.**   Did anyone at MGA or Ms. Leahy's counsel ever identify

15   for you which sculpts were done, may have been done prior to

16   October 19th, 2000?

17   **A.**   I saw sculpts in various stages.  And it was spelled out

18   to me which came first.  I don't remember, you know, if they

19   said exactly what date anything was done.

20   **Q.**   And you testified that you are a sculptor.

21   **A.**   Yes.

22   **Q.**   And you've prepared sculpts both from drawings -- you've

23   prepared sculpts from drawings; right?

24   **A.**   Both.  And with vague reference.

25   **Q.**   You've actually started sculpting without the benefit of

1    drawings.

2    A.    Yes.

3    Q.    And you've started sculpting using sketches as a

4    guideline?

5    A.    Yes.

6    Q.    And using engineering drawings as a guideline?

7    A.    Yes.

8    Q.    And you actually don't have any factual basis to make an

9    assessment as to what happened in this case.

10   A.    No, no factual, no.

11   Q.    So what you are opining on is you look at the sculpt,

12   and the sculpt looks pretty good to you.

13   A.    No.   What I'm talking about is what I've been told that

14   was shown to Margaret as far as -- or given to Margaret and

15   what she came up with.   I compared the two.

16   Q.    So what exactly is your opinion that you are giving with

17   respect to the sculpts?

18   A.    I think that the sculpt is very professional.   And I

19   think that it's -- there's similarities to the sketch, but

20   she had a lot of latitude.

21   Q.    And you don't know if she had that latitude before or

22   after October 19, 2000?

23   A.    No, I don't.

24              MR. COREY:   Nothing further.

25              THE COURT:   Very well.   You may step down.

1          Any further argument at this time?

2          MR. COREY:  Addressing both the colorization issue,

3    if the Court thinks I need to, the jury, as far as I'm aware

4    is not colorblind.  They are fully capable of assessing what

5    drawings have color and what drawings don't have color.  It's

6    not really even an issue in 1-A.  The issue in 1-A is when

7    the drawings were created regardless of whether they have

8    color or not.

9          I mean, I think the way Mr. Price put it is when

10   the paper went from being blank to not blank.  And I think

11   the fact that you want to put somebody up to talk about when

12   color was or was not added doesn't add or subtract from any

13   of the claims --

14         THE COURT:  Let me ask you this.  To what extent is

15   Mattel going to be relying on the color drawings or the

16   colorization as a basis for its breach of contract claims?

17         MR. COREY:  Mattel is going to be claiming any

18   works that Mr. Bryant did while he was employed at Mattel.

19   So I don't know that I can parse it any more finely than

20   that.  But, I mean, it's entirely possible that in 1-B, when

21   we start talking about what is and is not protectable in the

22   Copyright Act, this may be something that we need to revisit

23   again.

24         With respect to the -- to whether the witness

25   should be called to testify or permitted to testify about the

1  sculpts, he doesn't have a basis to draw a distinction as to

2  what belongs in this phase and what doesn't belong in this

3  phase.   And I think the parties recognize that, and I'll read

4  very quickly from page 72 of the transcript of May 22nd,

5  2008.   Starting at line 25.   This is Mr. Nolan:

6          "To now say that based on that, your Honor, we

7      should be further punished by not being able to

8      make an argument, it's out in the public domain and

9      cited in copyright cases, cited by experts and kind

10     of common in the industry as to the difficulty

11     between going from 2-D to 3-D, I think, would be a

12     breath-taking punitive sanction that is not

13     supported by the record, and I'll submit on that.

14         "THE COURT:   This would be a 1-B issue, I

15     presume.

16         "MR. NOLAN:   Yes.

17         "MR. QUINN:   It would be 1-B."

18         And then skipping to the bottom at line 23, this is

19  what the Court says:

20         "I'm going to defer a ruling on this one until

21     before the 1-B trial."

22         And I think the Court has heard that that's exactly

23  what this witness is being proffered for.

24         THE COURT:   Thank you, Counsel.

25         Ms. Aguiar.

1            MS. AGUIAR:  I'll address the colorization and the

2    sculpting points.  I think that's sort of what we're down to.

3    On colorization, you put your finger on it by asking that

4    question of Mr. Corey.  What is the implication of the color

5    for their breach of contract claim?  And it's absolutely an

6    issue for this phase.  Because if they are going to claim all

7    drawings that he did while he was at Mattel, we all know, and

8    frankly, the record at this point is undisputed, he did the

9    color when he was -- after 1998.  But they were the same

10   drawings.

11           I think the record is also very clear that each one

12   of those drawings was originally created in 1998.  And so

13   this is very much an issue.  I appreciate Mr. Corey starting

14   off his answer to your question by saying it's not a 1-A

15   issue.  But then his answer to your next question was, well,

16   of course, it is.

17           THE COURT:  I don't disagree with you on that

18   point.

19           MS. AGUIAR:  Okay.

20           THE COURT:  I agree with you on that point.

21           MS. AGUIAR:  And I think that's an issue, your

22   Honor, respectfully, that we will have to discuss at issue in

23   the charging conference because it's going to relate very

24   much to what this jury finds they own.  Because if the idea

25   and the drawings were done in '98, and all he did was color

1    them in '99, then it's relevant to have an expert testify on

2    that, and it's relevant if the jury is going to be asked

3    about that, which they are.  It's in the verdict forms.

4            If there's no implication, and they find that the

5    drawings are essentially the same drawings, except that they

6    are colored in, then that doesn't translate to ownership.

7            THE COURT:  Right.

8            MS. AGUIAR:  Okay.  And then with regard to

9    sculpting, I think yes, it's true that this witness doesn't

10   know what happened between certain dates, but again, getting

11   back to the verdict form, just because we're almost getting

12   to that point and the parties have been amending it to

13   reflect how this case has been tried, they are asking this

14   jury whether Mr. Bryant created or directed someone else to

15   create these 3-D things.

16           So if the jury is going to have to decide, well,

17   was it him that did it or was it the sculptor, I think it's

18   pertinent to have a sculpting expert talk about the fact that

19   it's critical for the process, and what Mr. Bryant provided

20   could have resulted in 16 different sculpts, but it resulted

21   in this one because of the sculptor, not because of

22   Mr. Bryant.  What Mr. Corey read from a hearing that happened

23   before we had our first day of trial, as your Honor observed

24   earlier today, things change.

25           THE COURT:  Things change.  And no one should

1   presume that any particular question is going to be asked of

2   the jury.  The Court will make that determination.

3           MS. AGUIAR:  Of course.  I just mean that both

4   sides --

5           THE COURT:  I just don't want Mattel to think they

6   have already figured out the verdict form.

7           MS. AGUIAR:  Thank you, your Honor.

8           THE COURT:  All right.  If there's nothing further,

9   the Court is prepared to rule on this motion and the motion

10  for waiver.

11          Okay.  Let me begin with the earlier motion that we

12  discussed, the motion regarding waiver.  The Court is going

13  to deny that motion.  I do believe that there was a waiver of

14  the privilege; however, I do not believe the scope extends as

15  far as Mattel is seeking.  However, having said that, if MGA

16  goes any further down this road at all, the Court will

17  revisit this ruling.

18          Regarding the motion to preclude the expert

19  witness, Mr. Robert Tonner, the Court grants that motion.

20  Putting aside the issue of the relevance of any of this, the

21  Court has a much more fundamental problem, after considering

22  the testimony of Mr. Robert Tonner.  And I will only --

23  certainly not to embarrass anybody, but I simply don't find

24  Mr. Tonner credible.  I find his testimony lacking in

25  credibility.  And I find it to be tailored testimony and not

1   suitable for an expert witness.  And exercising its Daubert

2   required function, the Court precludes the testimony of

3   Mr. Tonner.

4          If parties would seek a further elaboration of the

5   Court's reasoning on this, the Court is happy to provide it.

6   I'm always reluctant to do so when one requires the Court to

7   comment on the character and credibility of the witness.

8   Based on the Court's assessments of the testimony that was

9   given here in response not only to counsel's questions but

10  the Court's questions, I simply don't find this witness to be

11  credible as an expert or in any other way.

12         So motion in limine to exclude Mr. Tonner's

13  testimony is granted.

14         MS. AGUIAR:  Just one clarification, your Honor.  I

15  don't know that it will become an issue, but Mattel has an

16  expert who essentially is very much along the same lines as

17  Mr. Tonner in terms of his -- I don't want to say they have

18  the same background, but they have similar comparisons that

19  they are drawing, very similar graphics, and the bar graphics

20  were drawn from their expert.  We tried to make the points we

21  were -- we think needed to be made.

22         So I don't think this is what you are saying, but

23  if we could have some guidance on whether this area of

24  testimony -- you seem to be saying apart from commenting on

25  Mr. Tonner himself, that this area of testimony is just

1    not -- you used the word scientific.

2           THE COURT:  That's not what I'm saying.  I'm

3    putting aside the issue of relevancy on this.  I'm simply

4    commenting on Mr. Tonner.  It's a fundamental issue.  I don't

5    find him credible.  He was making differences and pointing

6    out differences and trying to make observations that I think

7    were internally inconsistent.  And the clear impression that

8    he left the Court with is that he is tailoring his testimony.

9    And I don't make that conclusion lightly.  But that is the

10   Court's assessment after having heard the testimony.

11          There's a whole series of proposed experts, and the

12   Court will submit every expert proffered that's not

13   stipulated to to the same evaluation, at least those I

14   identified during the motions in limine.  And I'm not going

15   to advise on a future witness at this time.

16          MS. AGUIAR:  Okay.  No, I appreciate that.

17          THE COURT:  And that's not to say that I don't have

18   concerns as I've already expressed about the relevancy.  So

19   I'm not suggesting the other.  But I'm making this decision,

20   quite frankly, based strictly on a credibility finding.

21          MS. AGUIAR:  Thank you.

22          MR. NOLAN:  Your Honor, briefly on that.  Your

23   Honor, with respect to the topics that were proposed for 1-A

24   for Mr. Tonner, which was what we went through --

25          THE COURT:  We're done with Mr. Tonner, Counsel.

1          MR. NOLAN:   Okay.

2          THE COURT:   Court is in recess while we bring the

3     jury in.

4          MS. AGUIAR:   Your Honor, I'm sorry.

5          THE COURT:   Yes.

6          MS. AGUIAR:   There's one witness who may go right

7     after Mr. Eckert.  And there's an issue with regard to a

8     document that pertains to that witness.  Do you want to

9     assume that we're going to have another break before we get

10    to him?

11         THE COURT:   What document is that?

12         MS. AGUIAR:   The witness is Mitch Kamarck.  And one

13    of the documents that has been put on the list to get in

14    through him is the document that's the subject of the Raymond

15    Black declaration.  And I'm happy to take this up whenever

16    your Honor would like.

17         THE COURT:   Yes, this is the English --

18         MS. AGUIAR:   Exactly.  And we can do that later,

19    but it is an issue.

20         THE COURT:   Mr. Quinn --

21         MR. QUINN:   We're not offering the document she's

22    concerned about.

23         THE COURT:   Very good.  That takes care of that.

24    Very good.

25         Brief recess, and we'll bring the jury in.

```
 1              (Recess taken.)

 2              (WHEREUPON THE JURY ENTERS.)

 3              THE COURT:  Mr. Eckert, members of the jury.

 4         Counsel, you may continue.

 5              ROBERT A. ECKERT, PREVIOUSLY SWORN.

 6              DIRECT EXAMINATION (CONTINUED)

 7    BY MR. NOLAN:

 8    Q.   Mr. Eckert, just before the break, I asked you about

 9    Mr. De Anda.  And I was just curious as to whether or not,

10    following your deposition in this case, you took any steps to

11    determine whether or not Mr. De Anda had approval to conduct

12    a separate business on the side.

13    A.   Yes, I did.  That afternoon I clarified it.

14    Q.   And what did you do in that regard?

15    A.   I asked Alan Kaye, who is the head of Mattel Human

16    Resources, and I believe Mr. De Anda's direct supervisor, if

17    what you told me at the deposition was true.  He said it was,

18    and that he had approved it.

19    Q.   Okay.  Great.  Thank you.  And during the lunch break,

20    did you have an opportunity to meet with your lawyers again?

21    A.   I had lunch with my lawyers.  I don't know if I'd call

22    it a meeting.

23    Q.   Okay.  Is Mattel's general counsel in the audience?

24    A.   Yes, he is.

25    Q.   And could you point him out to us?
```

1   A.    That man.

2   Q.    Mr. Norma.

3   A.    Mr. Norma.

4   Q.    During the lunch did you go over any of the topics that

5   would be asked of you under cross-examination?

6   A.    No.

7           MR. NOLAN:   Thank you.   Nothing further.

8           THE COURT:   Thank you.

9           Mr. Quinn.

10                          **CROSS-EXAMINATION**

11  BY MR. QUINN:

12  Q.    Good afternoon, Mr. Eckert.

13  A.    Good afternoon, Mr. Quinn.

14  Q.    Yesterday afternoon, Mr. Nolan made a comment to you

15  about how you haven't been here during the trial since the

16  opening statement.

17          Do you recall being asked that?

18  A.    Yes, I do.

19  Q.    And do you have an understanding that there is an order

20  that the court has entered that folks who are on the witness

21  list who are going to be witnesses cannot attend the trial

22  until after they have testified?

23  A.    I don't know about an order, but I know I've been told I

24  cannot attend the trial until I've testified.

25  Q.    You've asked if you could attend?

1  A.   Repeatedly, as you know.

2  Q.   As I know.   Indeed, you were asked some questions about

3  Mr. Kilpin and your interview of Mr. Kilpin.

4       Did you indicate that he had worked for Mattel

5  before?

6  A.   I believe he may have.

7  Q.   Now, when you interviewed with Mr. Kilpin for a

8  potential job at Mattel, did he bring with him a project that

9  he had been working on at Disney and offer it to Mattel?

10  A.   No, not that I'm aware of.

11  Q.   Did you assign some work to Mr. Kilpin and pay him to do

12  work for Mattel while he was still employed by Disney?

13  A.   No.

14  Q.   Did he work with Mattel on a project while he was still

15  employed by Disney?

16  A.   He may have, as a licensor, worked on projects, on dolls

17  or something that Mattel created.

18  Q.   Can you explain that to the jury, what you are referring

19  to there?

20  A.   Well, as an example, the Kung Fu Panda movie is produced

21  by DreamWorks, and under license, we make the toys that go

22  with the Kung Fu Panda movie.   So in that relationship,

23  Disney and Mattel are actually partners in the toy business.

24  Q.   So if he worked on something like that where Disney was

25  a licensor, did you say?

1  **A.**   Yes.

2  **Q.**   That is the sort of thing that you have in mind?

3  **A.**   If he did anything, yes.

4  **Q.**   But you didn't have some Mattel project that he was

5  working with Mattel on for Mattel's account while you were

6  interviewing him.

7  **A.**   No, that's correct.

8  **Q.**   You were asked some questions about Cassidy Park and

9  whether she was a Mattel employee yesterday.  Is it possible

10 that Ms. Park could today be a part-time Mattel employee and

11 you wouldn't necessarily know it?

12          MR. NOLAN:  Objection.  Lack of foundation.  Calls

13 for speculation.

14          THE COURT:  It's foundational.  Well, actually, why

15 don't ask you it in a more foundational way without specific

16 reference to Ms. Park.

17 **Q.**   BY MR. QUINN:  How many folks are employed by Mattel

18 today?

19 **A.**   Approximately 35,000.

20 **Q.**   And you don't know them all?

21 **A.**   No, I don't.

22 **Q.**   And do you know how many part-time employees there are?

23 **A.**   No, I don't.

24 **Q.**   And would you know if somebody like Cassidy Park was a

25 part-time employee necessarily?

1   A.   Not necessarily.

2   Q.   Is there a binder up there with your name on it, sir, a

3   black binder, Mr. Eckert?

4   A.   There is.

5   Q.   If you'd turn, please, to Exhibit 13614.

6   A.   I have it.

7   Q.   Can you identify that document for us?

8   A.   Yes.

9   Q.   And what is it?

10  A.   It says employee confidential, and it appears to be the

11  Word inventions agreement.

12  Q.   And that's signed by whom?

13  A.   It's signed by me, Robert A. Eckert, and it is signed by

14  Alan Kaye.

15          MR. QUINN:  We'd offer that in evidence, your

16  Honor.

17          MR. NOLAN:  No objection.

18          THE COURT:  It's admitted, and you may publish.

19          **(Exhibit 13614 received.)**

20  Q.   BY MR. QUINN:  Is it your understanding, Mr. Eckert,

21  that you signed the same inventions agreement that Mr. Bryant

22  signed?

23          MR. NOLAN:  Objection.  Lack of foundation.

24          THE COURT:  Lay a foundation, Counsel.

25  Q.   BY MR. QUINN:  Have you seen Mr. Brian's inventions

1   agreement?

2   **A.**   Yes, I have.

3   **Q.**   Do you have an understanding as to whether or not the

4   inventions agreement that you signed is substantially the

5   same as the inventions agreement that Mr. Bryant signed?

6   **A.**   It's been a while since I read them both word for word,

7   but I believe they are the same.

8   **Q.**   All right.  Can you tell the jury how many toys, how

9   many different toy products Mattel sells?

10  **A.**   Well, in any given year, it's in the neighborhood of 8-

11  to 9,000 different toys.

12  **Q.**   And of those 8- to 9,000 toys, approximately how many

13  are new each year?

14  **A.**   About 80 percent.

15          MR. QUINN:  Nothing further.

16          THE COURT:  Mr. Nolan?

17          MR. NOLAN:  Very, very brief.

18                  **REDIRECT EXAMINATION**

19  BY MR. NOLAN:

20  **Q.**   We just had up there your inventions agreement?

21  **A.**   Yes.

22  **Q.**   And it's similar to Carter Bryant's?

23  **A.**   I believe so.

24  **Q.**   Were you represented by counsel when you were

25  negotiating your employment contract with Mattel?

1    MR. QUINN:  Ambiguous whether it means the

2    inventions agreement or some other agreement.

3         THE COURT:  Clarify, Counsel.

4         MR. NOLAN:  I was referring to the --

5    Q.   Do you have an employment agreement with Mattel?

6    A.   I do.  Separate from this.

7    Q.   Separate and apart from this document?

8    A.   Yes.

9    Q.   Were you represented by counsel while you were

10   negotiating your employment agreement with Mattel?

11   A.   That is the one separate from this one?

12   Q.   Separate from this one.

13   A.   Yes, I was.

14   Q.   Okay.  You signed the inventions agreement as part of

15   your initiation as an employee at Mattel; correct?

16   A.   It appears I signed it perhaps the day after I joined

17   the company.

18   Q.   And isn't it true that, at all times leading up to the

19   decision as to whether or not you would execute your

20   employment agreement and accept employment at Mattel, you

21   were represented by counsel?

22   A.   At the time I accepted my employment agreement, I was

23   represented by counsel, yes.

24   Q.   Sir, do you have any knowledge as to whether or not

25   Carter Bryant was represented by counsel when he signed the

1    inventions agreement?

2    **A.**    The inventions agreement or an employment agreement?

3    I'm --

4    **Q.**    Well, let me --

5    **A.**    You're talking about both of them.  I've just trying to

6    clarify which one you're talking about.

7    **Q.**    Let me ask you this:  Did Carter Bryant have an

8    employment agreement with Mattel?

9    **A.**    I don't know.

10   **Q.**    With respect to the inventions agreement and

11   confidentiality agreement, the one that you just saw on the

12   screen.

13   **A.**    Yes.

14   **Q.**    Do you have any knowledge of whether or not Carter

15   Bryant had an employee -- had an attorney?

16   **A.**    No, I don't have any knowledge of that.

17           MR. NOLAN:  Nothing further.  Thank you.

18                   **RECROSS-EXAMINATION**

19   BY MR. QUINN:

20   **Q.**    Mr. Eckert, did you have an attorney advise you with

21   respect to that inventions agreement?

22   **A.**    No, I did not.

23           MR. QUINN:  Nothing further.

24           THE COURT:  Did you move 13614 into evidence?

25           MR. QUINN:  I thought I did, your Honor.

4078

1   THE COURT:  And there was no objection; correct?

2   MR. NOLAN:  No objection.

3   THE COURT:  Very well.  It was received.

4   Nothing further, Mr. Nolan?

5   MR. NOLAN:  Nothing further.

6   THE COURT:  Mr. Eckert, you are excused.  And now

7 you may sit in the court.

8   THE WITNESS: I'll look forward to it, but I don't

9 have to sit here?

10   THE COURT:  No.  That seat is going to be occupied.

11   Mr. Nolan, your next witness.

12   MS. AGUIAR:  We're flip-flopping again.  We're back

13 into Mattel's case because there were witnesses that weren't

14 available last week.  So we've agreed to let them take them

15 out of order.  So another one of the witnesses they would

16 like to call is Daphne Gronich.

17   THE COURT:  Very well.  Thank you, Counsel.

18   Mr. Quinn, if you'd call your witness for the

19 record.

20   MR. QUINN:  Yes.  Mattel calls Daphne Gronich.  And

21 if I may approach the witness stand to put some documents up

22 here, your Honor.

23   THE COURT:  Very well.

24   THE CLERK:  Please raise your right hand.

25     **DAPHNE GRONICH, SWORN.**

1        THE CLERK:  Thank you.  Please be seated.  Please

2   state your full name for the record and spell the last name.

3        THE WITNESS:  Daphne Gronich, G-R-O-N-I-C-H.

4        THE CLERK:  Thank you.

5                    **DIRECT EXAMINATION**

6   BY MR. QUINN:

7   Q.   Good afternoon, Ms. Gronich.  My name is John Quinn.  I

8   represent Mattel.  Did I say your name right, "Gronich"?

9   A.   No, it's "Gronich."

10  Q.   Thank you.  You were previously employed by MGA?

11  A.   Yes, I was.

12  Q.   Was your position general counsel, as I understand it?

13  A.   That is correct.

14  Q.   That means you were the top lawyer in house at MGA?

15  A.   That is correct.

16  Q.   And during what period of time were you the general

17  counsel of MGA?

18  A.   From December of 2003 through November of 2007.

19  Q.   So that would be roughly three years, four years

20  approximately?

21  A.   Yes.

22  Q.   Okay.  There's a couple -- this is going to be real

23  quick.  There's just a couple of documents that we've put in

24  front of you there.  And I'll first ask you to take a look at

25  the document that's marked Exhibit 1932.

1          Do you see that?

2   **A.**    Yes.

3   **Q.**    In the lower right-hand corner.

4          And do you recognize this -- you see the Bates

5   number there at the bottom.  It says MGA, and then there's a

6   number?

7   **A.**    Yes.

8   **Q.**    All right.  And you recognize this as a document that

9   was prepared at MGA and produced by MGA during this case.

10  **A.**    It appears to have been produced by MGA.  And I don't

11  know that I recognize this specific document, but I have seen

12  it.

13  **Q.**    You know that that is something that was created at MGA?

14  **A.**    I believe that it was, yes.

15          MR. QUINN:  Your Honor, we offer Exhibit 1932.

16          THE COURT:  Any objection?

17          MR. ROTH:  No objection.

18          THE COURT:  It's admitted.

19          **(Exhibit 1932 received.)**

20          MR. QUINN:  Permission to publish.

21          THE COURT:  You may.

22  **Q.**    BY MR. QUINN:  If we do look at the first page of 1932.

23  This is actually a multi-page document with several columns

24  on it; correct?

25  **A.**    Not all the columns appear on the same pages, but yes,

1  that is correct.

2  Q.   Just to give the jury an idea, because I don't intend to

3  display every page, it's got -- there are columns on each of

4  the pages, and it's about eight pages in length; correct?

5  A.   Well, the first columns -- A, B, C, D -- are on the

6  first pages.  It appears to be seven pages in length.  And

7  then there's the E, F, and G on the last three or four pages.

8  Q.   Right.  It goes from page Nos. 1 through 8 in the

9  exhibit numbers.  I think you'll see that.

10  A.   Yes.

11  Q.   Okay.  We're looking at the first page now, and this is

12  a list -- the title at the top on the first page is Former

13  Mattel Employees, April 20, 2006.

14          Do you see that?

15  A.   Yes.

16  Q.   And there's a list there of active employees in the

17  first column.  Then an identification of their position at

18  MGA.  Then a list of their dates of employment at MGA --

19  correct? -- on the first page?

20  A.   Yes.

21  Q.   And then on column D, if we can pull that up, it lists

22  the Mattel dates of employment of each of those persons;

23  correct?

24  A.   That's correct.

25  Q.   So you understand that this document lists folks

4082

1   employed by MGA, at least as of the time this document was

2   prepared, who were then employed by MGA.  I'm sorry.  Folks

3   previously employed by Mattel who were then employed by MGA

4   and what their positions were; correct?

5   **A.**   That's what the document appears to be.  I don't know

6   for a fact that they were all -- the people listed as active

7   employees were then all actually active.

8   **Q.**   Okay.  But it at least appears to be an effort to

9   identify those MGA employees who used to work at Mattel.

10   Would you agree with that?

11   **A.**   Yes.

12   **Q.**   And column C is MGA dates of employment, and column D is

13   Mattel dates of employment; correct?

14   **A.**   That's what the columns say, yes.

15   **Q.**   And --

16   **A.**   I can't speak to the accuracy of the information, but

17   that's what the columns state.

18   **Q.**   All right.  But this was a document which, as you've

19   indicated, you know was prepared at MGA; correct?

20   **A.**   Well, it was prepared in the context of this litigation,

21   for this litigation.

22   **Q.**   My question really is it is a document that you know was

23   prepared at MGA; correct?

24   **A.**   As far as I know, yes.

25   **Q.**   All right.  And if you turn to page 1932-4, you will see

4083

1    Carter Bryant's name there; correct?

2    **A.**    Yes.

3    **Q.**    And in column -- under column C, MGA dates, it says

4    question mark, question mark, question mark, question mark to

5    present.

6              Do you see that?

7    **A.**    Yes.

8    **Q.**    And then for Mattel dates, it says don't ask; correct?

9    **A.**    That's what it says.

10   **Q.**    And then if you'd take a look at the other exhibit,

11   Exhibit 5561, which is before you there.  Now, you are

12   familiar with some people by the name of Peter and Veronica

13   Marlow?

14   **A.**    I'm not personally familiar with them, no.

15   **Q.**    You know who they are.

16   **A.**    I believe so, yes.

17   **Q.**    And while you were employed at MGA, you had some

18   involvement in connection with this case; correct?

19   **A.**    That is correct.

20   **Q.**    And you knew that they were witnesses or potential

21   witnesses in this case; correct?

22   **A.**    I don't know that I knew that Peter Marlow was a

23   potential witness.

24   **Q.**    He is now, I can --

25              THE COURT:  Wait a second.  Counsel, that's

1   testifying.

2            MR. ROTH:  Your Honor, counsel is moving quite

3   closely here to attorney-client privilege questions.

4            THE COURT:  Are you making an objection, Counsel?

5            MR. ROTH:  Attorney-client privilege.

6            THE COURT:  I want to strike the last question and

7   answer.  Let's take it from the top, Counsel.

8            MR. QUINN:  All right.

9   **Q.**   Let me just -- I think you indicated -- is it true that

10  you knew that Veronica Marlow was a witness or a potential

11  witness in this case?

12  **A.**   Well, anything I know about that comes from my role as

13  general counsel and my involvement in this litigation.  So I

14  have no personal knowledge of her knowledge about issues in

15  this litigation apart from my role as general counsel and

16  counsel involved in the conduct of this litigation.

17  **Q.**   So you are --

18  **A.**   So anything I could tell you would only result from what

19  I know in my role as counsel.

20  **Q.**   All right.  So whatever you know on the issue of whether

21  or not they are witnesses, that's information you would have

22  acquired acting as a lawyer.  That's what you're telling us.

23  **A.**   That is correct.

24  **Q.**   Okay.  You do know, though, that MGA agreed to provide

25  an attorney for Veronica Marlow; correct?

1    A.    I don't believe that's correct.

2    Q.    Do you know whether -- you see this letter here?

3    A.    Yes.

4    Q.    MGA was previously represented by the law firm of

5    O'Melveny & Myers?

6    A.    That is correct.

7    Q.    And have you seen this letter before?

8    A.    I'm not copied on it, and I did not see it at the time

9    it was sent.

10   Q.    All right.

11   A.    So I see what it says, but --

12   Q.    All right.  But you've seen correspondence from the firm

13   of O'Melveny & Myers during this time period when O'Melveny

14   was representing MGA; correct?

15   A.    Only in my role as counsel for MGA, that is correct.

16   Q.    And does this appear to you to be a copy of a letter

17   from MGA's counsel to another lawyer?

18   A.    It appears to be a copy, yes.

19   Q.    Written by MGA's counsel during the time they were

20   representing MGA; correct?

21   A.    That is factually correct, yes.

22         MR. QUINN:  We'd offer this exhibit, your Honor,

23   Exhibit 5561.

24         THE COURT:  Counsel?

25         MR. ROTH:  Your Honor, objection.  Foundation.  No

1    connection with this witness.

2              THE COURT:  What's the foundational issue?

3              MR. ROTH:  The witness has not seen this document,

4    is not copied on it.

5              THE COURT:  I understand that.  But what's the

6    foundational concern?

7              MR. ROTH:  She has no knowledge regarding this

8    document.  Therefore, she has no basis upon which to sponsor

9    it.

10             THE COURT:  Anything else?

11             MR. ROTH:  No.

12             THE COURT:  Very well.

13             MR. QUINN:  She's indicated it appears to be a copy

14   of a letter from a counsel.

15             THE WITNESS:  Your Honor, I had said --

16             THE COURT:  Please.

17             THE WITNESS:  I'm sorry.  I had said I hadn't --

18             THE COURT:  Please.  Thank you.

19             Very well.  The document is admitted.  You may

20   publish.

21             **(Exhibit 5561 received.)**

22   **Q.**  BY MR. QUINN:  If we could just enlarge that.  This is a

23   letter from MGA's counsel to a lawyer at another law firm on

24   the subject of the representation of Veronica and Peter

25   Marlow.

1          Do you see that?

2    A.    I do see that, yes.

3    Q.    And it says this is to confirm that, because of her work

4    for MGA Entertainment, Inc., MGA has agreed to be responsible

5    for the fees and costs incurred in your representation of

6    Veronica Marlow, and for her husband, Peter Marlow, in

7    connection with the Mattel versus Bryant lawsuit.  You may

8    direct your invoices to, and then there's your name; correct?

9    A.    That's correct.

10   Q.    The date of this is March 18, 2005.  You were the

11   general counsel of MGA, that is, the top in-house lawyer at

12   MGA as of that date?

13   A.    Yes, I was.

14   Q.    And your job at that time included approving and

15   arranging for the retention of outside counsel to represent

16   people who were witnesses or might be witnesses in this case.

17   Isn't that true?

18          THE WITNESS:  Could I have the question read back,

19   please?

20          THE COURT:  Yes, you may.

21          (Record read.)

22          THE WITNESS:  In general terms, it was true.  But I

23   was not always aware of all of the facts.

24   Q.    BY MR. QUINN:  There were a lot of different lawyers who

25   were retained for a lot of different potential witnesses by

1   MGA; correct?

2   **A.**   I think that's overstating it.

3   **Q.**   Do you know how many different witnesses MGA hired

4   lawyers to represent?

5   **A.**   No, I do not.

6   **Q.**   Can you give us an estimate of how many?

7   **A.**   I really can't.

8   **Q.**   Was it more than 20?

9   **A.**   I don't believe so.

10  **Q.**   Was it more than 10?

11  **A.**   I really don't know.

12  **Q.**   Did you -- did MGA enter into something called a joint

13  defense, joint defense agreement with Veronica and Peter

14  Marlow?

15  **A.**   I honestly don't know.

16  **Q.**   Do you know what a joint defense agreement is?

17  **A.**   Yes, I believe so.

18  **Q.**   That's an agreement where two parties can have lawyers

19  that represent them and the lawyers can have privileged

20  communications between them that others can't ask about?

21          MR. ROTH:   Your Honor, counsel --

22  **Q.**   BY MR. QUINN:   Isn't that true?

23          MR. ROTH:   Counsel is testifying about the content

24  of what he understands --

25          THE COURT:   I'm going to sustain the objection.

1   **Q.**   BY MR. QUINN:   What is your understanding of a joint

2   defense agreement?

3           MR. ROTH:   Your Honor, relevance.

4           THE COURT:   It's foundational.   Overruled.

5           THE WITNESS:   Is that the parties involved in a

6   joint defense agreement share certain issues in common as to

7   which their attorneys can have discussions which would be

8   deemed privileged.

9   **Q.**   BY MR. QUINN:   In other words, they are privileged and

10  cannot be inquired into.   That's your understanding; correct?

11  **A.**   That is correct.

12  **Q.**   So that if MGA had a joint defense agreement with

13  Veronica and Peter Marlow and had retained counsel to

14  represent Veronica and Peter Marlow, MGA's lawyers could talk

15  to the Marlows' lawyers and have discussions, and those

16  discussions could not be inquired into; correct?

17          MR. ROTH:   Your Honor, I'm going to object to any

18  questions of counsel with regard to whether or not a joint

19  defense existed here or was appropriate here.

20          THE COURT:   On what grounds, Counsel?

21          MR. ROTH:   Attorney-client privilege.

22          MR. QUINN:   Mere existence.

23          THE COURT:   Existence is permitted.   Overruled.

24  **Q.**   BY MR. QUINN:   Do you need the question again, ma'am?

25  **A.**   Yes, please.

1    Q.    So if there were a joint defense agreement between MGA

2    and the Marlows, that would mean that MGA's lawyers could

3    have these confidential privileged communications with the

4    lawyers that they hired for the Marlows, and those

5    communications could not be inquired into.  That's your

6    understanding; correct?

7    A.    Well, I think it's -- I'm having difficulty answering it

8    as a hypothetical because my understanding is we were not --

9    MGA at the time was not retaining counsel for the Marlows,

10   notwithstanding this document and that the Marlows' defense

11   was going to be paid for and undertaken by Carter Bryant, not

12   MGA.  So this is at odds with my understanding of what the

13   situation was.

14         THE COURT:  Further question is going to require

15   further foundation, Counsel.

16         MR. QUINN:  I understand, your Honor.

17   Q.    I will represent to you that there was testimony that a

18   joint defense privilege -- if it is in evidence, that a joint

19   defense privilege was asserted in Mr. Marlow's deposition.

20   Are you aware of that?

21   A.    No, I'm not.

22         MR. NOLAN:  Your Honor, I apologize.  I'm going to

23   object to that last question.  It's not a fair representation

24   of the testimony.

25         MR. QUINN:  I'm being double-teamed, your Honor.

1          THE COURT:  You are.

2          MR. QUINN:  She's very well represented by any one

3    of these fine lawyers.

4          THE COURT:  Mr. Roth?

5          MR. ROTH:  I understand that does not comport with

6    the facts.  I believe that --

7          THE COURT:  Let me see you at sidebar, Counsel.

8          **(SIDEBAR CONFERENCE HELD.)**

9          THE COURT:  Okay.  What's the deal on joint defense

10   agreement?

11         MR. QUINN:  It was asserted, and then in the

12   deposition it was asserted, joint defense privilege,

13   objection made, instructed not to answer.  Then later on in

14   the deposition, it was withdrawn.

15         MR. NOLAN:  Your Honor --

16         THE COURT:  Okay.  The fundamental problem, before

17   we even get to that, is this witness has no clue apparently

18   of the existence and the extent to which a joint defense

19   agreement -- that's what I was suggesting there was a

20   foundational issue here.  I don't think there's a basis to --

21         MR. QUINN:  Ask her any more about it?

22         THE COURT:  Right.

23         MR. QUINN:  Understood.

24         MR. NOLAN:  Your Honor, we'd ask that the question

25   be stricken.

4092

1        MR. QUINN:  The question be stricken?

2        THE COURT:  What's going to be stricken is your

3   representation.  That's going to be disregarded.

4        MR. QUINN:  All right.

5        THE COURT:  We'll move along.

6        **(CONCLUSION OF SIDEBAR CONFERENCE.)**

7        THE COURT:  The jury will disregard the last

8   preamble to the question, and counsel may ask your next

9   question.

10       MR. QUINN:  I have no other questions at this time,

11  your Honor.

12       THE COURT:  Very well.  Then Mr. Roth may ask his

13  next question.

14                    **CROSS-EXAMINATION**

15  BY MR. ROTH:

16  Q.   Good afternoon, Ms. Gronich.  Very quickly.  I'd like

17  you to refer back to Exhibit 1932.  Do you have it there in

18  front of you?

19  A.   Yes, I do.

20  Q.   Good.  And I'm going to take you, again very quickly,

21  four pages back into the document that has the very small box

22  on it.

23       Do you see that?

24  A.   With the four columns?

25  Q.   Yes.  And that was the page that counsel referred you

1  to.

2          Do you recall that?

3  A.   Yes.

4  Q.   Okay.  And there are line numbers in the far left

5  starting at 121 going down to 128.

6          Do you see that?

7  A.   Yes, I do.

8  Q.   And there was reference to line 123 in the far

9  right-hand columns that "don't ask"; is that right?

10 A.   That is correct.

11 Q.   We can put that up.  And you'll see Bryant, comma,

12 Carter, far right-hand column, it says:  "Don't ask."

13         Do you see that?

14 A.   Yes, I do.

15 Q.   And then 126, Rhee, Anna, don't ask.  Do you see that?

16 A.   Yes.

17 Q.   Do you have an understanding as to why it says don't ask

18 in the far right-hand column next to Carter Bryant's name?

19 A.   Yes, I do.

20 Q.   What is that understanding?

21         MR. QUINN:  Excuse me.  Foundation.

22         THE COURT:  Sustained.

23 Q.   BY MR. ROTH:  Ms. Gronich, were you involved in the

24 preparation of what is before you, Exhibit 1932?

25 A.   Yes, as far as I know, yes.

1   **Q.**   Can you explain to the Court what that involvement was?

2   **A.**   In the context of the litigation with Mattel, and as

3   parts of conducting discovery and preparing to review the

4   documents and records at the company, I asked that a list be

5   put together of people at MGA.  I'm trying to say this in a

6   way that doesn't reveal privileged information.  But a list

7   was created that listed then MGA employees that had

8   previously been employed by Mattel, and therefore, it listed

9   active employees and the page that I was asked about earlier

10   listed temps, and those particular people were part-time

11   employees.

12   **Q.**   Okay.  So you are familiar with the creation of this

13   document?

14   **A.**   Yes, I am.

15   **Q.**   Okay.  And given that understanding now, do you have an

16   understanding as to why it says don't ask opposite Carter

17   Bryant's name?

18   **A.**   Yes.  Because the people that were preparing this

19   document were told not to contact either Mr. Bryant or

20   Ms. Rhee because they were then represented by counsel.  And

21   we did not want to have any of our employees contacting them

22   directly.

23   **Q.**   Why is it important that individuals who are represented

24   by counsel not be contacted directly?

25   **A.**   Well, when parties are represented by counsel in

4095

1   litigation, individuals at a party are not allowed to contact

2   witnesses or other parties who are represented by counsel

3   because that would be improper.

4   **Q.**   Okay.  Focusing specifically on Anna Rhee, did you know

5   whether Mattel was paying Anna Rhee's lawyers under a joint

6   defense agreement?

7            MR. QUINN:  Lacks any foundation.

8            THE COURT:  Sustained.

9   **Q.**   BY MR. ROTH:  Do you have an understanding one way or

10  the other as to the arrangements between Anna Rhee and her

11  counsel?

12           MR. QUINN:  Same objection.

13           THE COURT:  This is a foundational question.  It's

14  a yes or no question.

15           THE WITNESS:  Could you repeat it?

16  **Q.**   BY MR. ROTH:  Do you have an understanding one way or

17  the other as to the arrangements between Anna Rhee and her

18  counsel?

19  **A.**   No.

20           MR. ROTH:  No further questions.

21           THE COURT:  Mr. Quinn, anything further?

22  ///

23  ///

24                    **REDIRECT EXAMINATION**

25  BY MR. QUINN:

1   **Q.**   You don't have any information at all, do you, that

2   there's any kind of a joint defense agreement between Mattel

3   and Anna Rhee, do you?

4   **A.**   I have no information, but that's separate and apart

5   from the fact that she was represented by counsel.

6   **Q.**   But you simply don't have any information at all in that

7   regard that there's any type of joint defense.

8   **A.**   I personally do not.

9   **Q.**   Has anybody asserted any types of claims, to your

10  knowledge, against Anna Rhee or suggested that Anna Rhee has

11  some liability so far as you know?

12  **A.**   I don't see the question being relevant to my answer,

13  and I'm sorry if I'm being a little obtuse.  Anna Rhee, at

14  this point in time, in April of '06, had been deposed, and

15  her counsel would not allow anybody from MGA to be present or

16  to communicate with her and had made that very clear.

17           As to who may or may not have been paying her fees,

18  I don't know, but we clearly were in a position and were told

19  not to contact her even before that.

20  **Q.**   My question related to a need for a joint defense.  My

21  question is do you have any information that anybody has ever

22  asserted any claims against Anna Rhee?

23  **A.**   I have no personal information.

24  **Q.**   Or that she has any personal liability at all.

25  **A.**   I'm not familiar with that.

1    Q.   Now, in answer to counsel's questions about

2    Exhibit 1932, you shared with us some information that you

3    know about the preparation of that document; correct?

4    A.   I'm not sure I shared information.   I said I was

5    familiar with the preparation of the document.

6    Q.   Well, you explained to us, you gave us -- you gave us

7    a -- an account of what don't ask means, didn't you?

8    A.   Yes.

9    Q.   Didn't you just do that?

10   A.   Yes.

11   Q.   All right.   And you learned -- I guess what you know

12   about that is information that was acquired while you were

13   acting as a lawyer for MGA; correct?

14   A.   I'm afraid I'm having difficulty answering it because

15   what I learned about this, I had a role in this document and

16   in the discovery and in the litigation.   So I'm having

17   difficulty answering your question without disclosing

18   privileged communications.

19   Q.   Well, you didn't have any problem answering MGA's

20   counsel's question and explaining what you learned in

21   creating that document in your role as a lawyer; right?   You

22   were the general counsel of MGA; right?

23   A.   That is correct.

24   Q.   And when I asked you earlier about whether Peter Marlow

25   and Veronica Marlow were witnesses or potential witnesses,

1    you told us you couldn't answer that question because even to

2    answer that question would invade the attorney-client

3    privilege.  Isn't that what you told us?

4    A.   I don't think that's entirely what I said, but

5    essentially yes.

6    Q.   So you have no trouble lifting the veil on the privilege

7    when you are asked questions by MGA's counsel.  It's only

8    when I asked you a question about whether somebody is a

9    potential witness, you decide you can't answer because you

10   were acting as an attorney.

11   A.    No, that's not entirely accurate because in this

12   particular case, I have personal knowledge.  And in the

13   other, I actually didn't.

14   Q.   You said it was privileged.  When I asked you, you said,

15   "Anything I know about whether Peter Marlow and Veronica

16   Marlow are witnesses or potential witnesses is privileged."

17   That's what your testimony was; correct?

18   A.   I have to stand by the answer I just gave.  I have

19   personal knowledge as to this.

20           MR. QUINN:  Nothing further.

21           MR. ROTH:  Nothing further, your Honor.

22           THE COURT:  Very well.  You are excused, ma'am.

23   Thank you.

24           We're back to MGA now.

25           MS. AGUIAR:  Well, actually, one might think.  But

1    we also are accommodating Mattel on another witness.

2              THE COURT:  Very well.

3              MS. AGUIAR:  Mitch Kamarck is another witness that

4    Mattel wanted.  So we're also agreeing to let them take him

5    now.

6              MR. QUINN:  I should say, your Honor, this was the

7    subject of agreement between both parties with the Court's

8    endorsement.

9              THE COURT:  Understand, yes, duly noted.

10             THE CLERK:  Good afternoon.  Please raise your

11   right hand.

12             **MITCHELL KAMARCK, SWORN.**

13             THE CLERK:  Thank you, sir.  Please be seated.

14   Please state your full name for the record, and spell the

15   last name.

16             THE WITNESS:  Yes, it's Mitchell Kamarck,

17   K-A-M-A-R-C-K.

18             THE CLERK:  Thank you.

19             MR. QUINN:  Your Honor, may we approach to deliver

20   some volumes?

21             THE COURT:  Yes.

22             MS. AGUIAR:  Your Honor, can we do -- I'm sorry to

23   do this, but a quick sidebar?

24             THE COURT:  Yes.

25             **(SIDEBAR CONFERENCE HELD.)**

 1           THE COURT:  Counsel?

 2           MS. AGUIAR:  I -- Mr. Zeller and I have had ongoing

 3   discussions regarding these document witnesses.  And he has

 4   provided us a universe of documents that might be the subject

 5   of questioning for each witness.  And so with regard to

 6   Mr. Kamarck, we had extensive e-mail communications, a copy

 7   of which I have here, and he identified when Mr. Kamarck was

 8   first going to testify, which I think was a couple of weeks

 9   ago, the documents that they would go over with him.

10           The exhibits are -- and they listed four exhibits.

11   When I then realized that one of them was 1932, which was

12   Ms. Gronich's, I said per my earlier e-mails, she's the

13   witness for that one.  And then recently, a couple of days

14   ago, I've confirmed or wrote to him to confirm that the

15   documents from Mr. Kamarck would be the ones that they

16   previously told, and they say the documents are among the

17   ones we've previously listed.

18           He was just handed a gigantic binder, and we've

19   been trying to work together on this to prepare witnesses

20   according to what they have told us.  We've had notice on

21   four documents, one of which is already in through

22   Ms. Gronich, and from the size of the binder they just handed

23   him, this does not comport.

24           MR. QUINN:  There will be no surprises, I promise.

25           THE COURT:  Someone's phone just went off.  I'm

1    going to have to make an announcement on the electronic

2    devices.  I've tried not to instill the rule that district

3    judges have.  I know it's a tremendous inconvenience to the

4    parties.  At the same time, we've got to put these things on

5    vibrate mode, because it's getting annoying.

6              In any event, Mr. Zeller?

7              MR. ZELLER:  What I would say is this.  First of

8    all, the earlier e-mail that's being referenced are not those

9    four exhibits.  It was an earlier e-mail which in fact had

10   many exhibits set forth.  It was one sent by Tammy Gih.  I

11   don't have that e-mail with me; however, she had in the prior

12   days sent a rather extensive list of exhibits that were still

13   up in the air that we were seeking to get into evidence one

14   way or another, whether it was through Mr. Kamarck,

15   Ms. Gronich, whether the Custodian of Records and so on.

16             So there is, yes, it refers to my earlier e-mail,

17   but then there's also a chain that refers to Tammy Gih's

18   earlier e-mails, whether it's part of this chain or a

19   different chain, that I cannot say because we're sandbagged

20   by this.

21             I will also say, your Honor, that we have

22   repeatedly objected with Mr. Eckert in particular to --

23             THE COURT:  I know you have.

24             MR. ZELLER:  About documents --

25             THE COURT:  That you received as of last night.

1          MR. ZELLER:   That were not produced in discovery in

2    the case.

3          THE COURT:   And I've overruled the objections.

4          MR. ZELLER:   And these were identified previously

5    as trial exhibits.   What we were trying to do as a courtesy

6    that's being turned against us, I think under those

7    circumstances is particularly unfair, but those documents

8    that are part of this binder have been trial exhibits for

9    some period of time.   They were produced in discovery and

10   were MGA documents.

11         THE COURT:   It's her turn.

12         MR. QUINN:   I was just trying to be helpful.   I

13   thought I could say something.   Every once in a while --

14         MS. AGUIAR:   If I want to say something helpful,

15   why don't you go ahead.

16         MR. QUINN:   I'm confident there will be no

17   surprises, this will be really short, and you'll see this was

18   a waste of trees to put this binder together.   And if it's

19   not, I'll buy you dinner.

20         MS. AGUIAR:   I'm not trying to misrepresent

21   anything.   So that's why I brought the e-mail chain.   I just

22   try to prepare the witnesses so that when they get up, that

23   they will be able to testify.   The reason I asked for these

24   is that this witness would be able to testify and not say

25   well, I'm --

1          THE COURT:  Why don't we trust Mr. Quinn's

2    representation.  I do see your list here.  I also understand

3    that -- I mean, I have overruled a number of objections to

4    apparently exhibits that have come up at the last minute.

5          MS. AGUIAR:  Absolutely, and I'm not complaining

6    that these exhibits have not been produced.  I'm just saying

7    we're trying to prepare witnesses for, you know --

8          THE COURT:  I appreciate that.  And if this becomes

9    an issue during -- I'll accept Mr. Quinn's representation.

10   If this becomes an issue, we'll revisit this.

11          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

12          THE COURT:  I see we have six exhibits in the

13   binder.  Is that correct?

14          MR. QUINN:  I don't have the same binder.

15          THE COURT:  Very well.  Let's proceed.

16                    **DIRECT EXAMINATION**

17   BY MR. QUINN:

18   **Q.**   Good afternoon, Mr. Kamarck.

19   **A.**   Good afternoon.

20   **Q.**   My name is John Quinn.  I represent Mattel.  We just had

21   a lady on the stand, Daphne Gronich, who was a general

22   counsel at one point of MGA, and you were a general counsel

23   of MGA at one point, as I understand it; is that correct?

24   **A.**   That's correct.

25   **Q.**   And Ms. Gronich was after you, or you were before her?

1    A.    Yeah, I mean there was an overlap, but yes.

2    Q.    Okay.  And when you were general counsel, you were the

3    top legal officer in house at MGA?

4    A.    When I was general counsel, I was top legal officer.

5    Q.    And you were in charge, when you were general counsel,

6    of MGA's legal affairs?

7    A.    When I was general counsel.

8    Q.    And one of the kinds of legal affairs that MGA had was

9    various kinds of litigation relating to intellectual

10   property, knockoffs, piracy, things like that?

11   A.    Correct.

12   Q.    Including litigation over in Hong Kong?

13   A.    Correct.

14   Q.    That you had some oversight responsibility for?

15   A.    Um, when I was general counsel.

16            MR. QUINN:  At this point, your Honor, I would like

17   to read from a Request for Admission.  It's a Request for

18   Admission 79.  And it's been marked as Exhibit 10277.  And

19   the particular request for admission No. 79 appears on

20   10277-101.

21            THE WITNESS:  May I look at it, or do you want me

22   to wait?

23            MR. QUINN:  Of course.

24            THE COURT:  Any objection?

25            MS. AGUIAR:  No objection, your Honor.

```
 1              THE COURT:  Very well.  You may read the request,
 2    Counsel.
 3              MR. QUINN:  "Request for Admission 79.  Admit that
 4    the document attached hereto as Exhibit 2 is an authentic and
 5    genuine copy of a statement of claim you" -- meaning MGA --
 6    "filed on or about October 16th, 2003."
 7              And the answer to that request for admission is
 8    Admit.
 9    Q.    Do you see that, sir?
10    A.    I do see that.
11    Q.    And --
12              THE COURT:  And just for the jury's reference, the
13    jury may treat answers to requests for admissions as -- treat
14    that as evidence in this case.
15              MR. QUINN:  And the referenced statement of claim,
16    your Honor, appears at Exhibit 10234-39 through 53.  And we
17    would offer that in evidence, your Honor.
18              THE COURT:  Any objection?
19              MS. AGUIAR:  Your Honor, is Mr. Quinn wanting to
20    admit just that portion of 10234?
21              MR. QUINN:  Yes, 10234-39 through -53.
22              MS. AGUIAR:  No objection.
23              THE COURT:  Very well.  It's admitted.  You may
24    publish.
25              (Exhibit 10234-39 through -53 received.)
```

4106

1  **Q.**   BY MR. QUINN:  And if we could put that up on the

2  screen, and perhaps just enlarge the caption at the top.

3  This is a -- in relates to a case in Hong Kong that MGA

4  Entertainment brought against Uni-Fortune Industrial Limited

5  and Fu Wei Toys Company Limited?

6          Do you see that, sir?

7  **A.**   Yes, I do.

8  **Q.**   And this is one of these anti-piracy cases, these

9  intellectual property cases?

10  **A.**   That would be my guess.

11  **Q.**   And if you'd take a look at -- and this relates to

12  Bratz, doesn't it?  I think you can see on the statement of

13  claim there on page --

14  **A.**   I see the Bratz.  I'm sorry.  I see the Bratz reference.

15  **Q.**   So in other words, MGA is bringing a case against

16  somebody who they think is knocking off Bratz in Hong Kong;

17  correct?

18  **A.**   That appears to be what this document says.

19  **Q.**   And what is alleged here, what MGA alleges on page

20  10234-42, if we could go to that page.  And blow up that

21  subparagraph G at the bottom, what it says there is -- what

22  MGA says in its statement of claim, which that's like a

23  complaint over there.  That's something you file to start a

24  case?

25  **A.**   I assume so.

1  **Q.**   It says:  Carter Bryant hereinafter referred to as

2  Mr. Bryant, was commissioned by the plaintiff to make the

3  design drawings referred to in subparagraphs A and E hereof.

4  At all material times, it was the understanding and agreement

5  between the plaintiff and Mr. Bryant that copyright

6  subsisting in the artistic works should vest in plaintiff.

7  Pursuant thereto, a confirmatory assignment was made between

8  the plaintiff and Mr. Bryant in September of 2000."

9         Do you see that?

10  **A.**   I do see that.

11  **Q.**   And it refers to here subparagraphs A above, the design

12  drawings in subparagraphs A through E above.

13         Do you see that?

14  **A.**   Yes.

15  **Q.**   And if we could go up to A on the previous page, 0041.

16  We can see what's referred to there.  A refers to 18 design

17  drawings of various Bratz fashion dolls made between the

18  years 1998 and 2000.

19         Do you see that?

20  **A.**   I do see that reference.

21         MR. QUINN:  And now I'd like to read Request for

22  Admission 83, your Honor.  And the response, which appears at

23  Exhibit 10277-103 to 104.

24         THE COURT:  Any objection?

25         MS. AGUIAR:  No objection, your Honor.

1          THE COURT:  You may proceed.

2          MR. QUINN:  "Request for Admission 83.  Admit that

3    the set of 18 Bratz design drawings referenced in paragraph

4    3-A in the document attached hereto to as Exhibit 2 includes

5    at least one of the Bratz pitch materials."

6          That's a defined term.  The Bratz pitch materials

7    means each and every Bratz work which was displayed, shown,

8    provided, or offered to you on or before the date on which

9    you executed the Bryant MGA agreement.

10         So going back to Request for Admission 83, admit

11   that the set of 18 Bratz design drawings referenced in

12   paragraph 3-A in the document attached hereto to as Exhibit 2

13   includes at least one of the Bratz pitch materials.

14         The response is:  "Subject to and without waiving

15   the foregoing objections, MGA responds, MGA admits that the

16   18 design drawings referenced in Exhibit 2 include the

17   designs drawn by Mr. Bryant and shown to MGA at pitch

18   meetings, though these 18 design drawings also may contain

19   handwritten notations made at some point after Mr. Bryant's

20   pitch meetings with MGA."

21         Do you see that, sir.

22   A.   I do.

23   Q.   Okay.  So if we can go back to that statement of claims,

24   page 10234-42, what MGA is saying in this paragraph here --

25   let me just back up for a second.

```
 1            Now, as a lawyer having responsibility for
 2   supervising litigation in Hong Kong and elsewhere, you know
 3   that what is said in one of these statements of claims that's
 4   filed with the court, that that's important.
 5   A.    I do.
 6   Q.    And it's important that what you say is accurate;
 7   correct?
 8   A.    Correct.
 9   Q.    And MGA is filing this case because it's trying to get
10   the court to do something essentially; correct?
11   A.    I believe so.
12   Q.    And in order to get the court to act and to do
13   something, MGA presents this statement of claim and files it
14   with the court; correct?
15   A.    I believe that's how it works in Hong Kong.
16   Q.    Representing what the facts are.  Or representing to the
17   court what the facts are that are the basis for its claim;
18   correct?
19   A.    That's my understanding of Hong Kong.
20   Q.    All right.  And in this case in Hong Kong, what MGA
21   represented, when it was trying to get the court to act, was
22   that these original Bratz pitch materials were commissioned,
23   that Carter Bryant was commissioned to create these original
24   Bratz pitch materials; correct?
25            MS. AGUIAR:  Objection.  Foundation and
```

1    mischaracterizing the document.

2            THE COURT:   I'll sustain the foundation.

3    Q.    BY MR. QUINN:   Sir, this is one of the cases you had

4    responsibility for supervising?

5    A.    No.

6    Q.    Were you familiar with this case?

7    A.    Generally familiar that there was cases being handled

8    out of Hong Kong.   This case, as I looked at it, doesn't ring

9    a bell with me.

10   Q.    You might have had some responsibility for it.   You

11   might not.   As you sit here now, you just don't recall?

12   A.    No, I believe another person probably was handling this.

13   Q.    Somebody who worked for you?

14   A.    Yes.

15   Q.    One of the other lawyers in the department?

16   A.    It would have been, yes.

17   Q.    Who reported to you?

18   A.    Who reported to me.

19   Q.    All right.   Well, that person who reported to you -- and

20   by the way, you'd hire obviously a lawyer in Hong Kong to

21   prosecute this case for you; correct?

22   A.    William Fan had been hired prior to me starting to

23   prosecute the matters in Hong Kong.   He wasn't my choice.

24   But yes.

25   Q.    Fan is the name of the barristers or foreign or however

4111

1   they call them in Hong Kong who was representing this matter?

2   A.   Correct.

3   Q.   And when he needed information about the history of the

4   Bratz and the Bratz drawings in order to make representations

5   to a court, he would have to go to MGA to get that

6   information; correct?

7   A.   Well, he had done matters before I started on the Bratz

8   dolls.  So I'm not sure where he got the information from,

9   but I assume it would be from MGA.

10  Q.   From MGA.  It makes sense.  He had never worked at MGA's

11  offices in Van Nuys.

12  A.   Not that I'm aware of.

13  Q.   Right.  So the information that he got that he put in

14  this statement of claim which became a representation to the

15  Court when MGA was trying to get the Court to do something

16  for it, that's information ultimately he would have gotten

17  from MGA; correct?

18  A.   I would assume so, yes.

19  Q.   And in this case, the information that he got from MGA

20  and that he put in the statement of claim was that these

21  original design drawings, which were part of the Bratz pitch

22  materials were commissioned by MGA; correct?

23  A.   I'm sorry.  What is the question?

24  Q.   The information that he got and that he put in the

25  statement of claim was that the original Bratz -- these

4112

```
 1   drawings back at the Bratz pitch materials were commissioned

 2   by MGA; correct?

 3   A.   I honestly don't have a basis for saying where he got

 4   that information from.

 5   Q.   That's what he said.

 6   A.   I'm sorry?

 7   Q.   That's what he represented.

 8   A.   Mr. Fan said he received this information from MGA?

 9   Q.   No.  The representation he made was that these drawings

10   were commissioned by MGA.

11   A.   Yes.

12   Q.   And he said that acting as the attorney for MGA, saying

13   that on behalf of MGA; correct?

14   A.   Yeah, represented MGA, and this is his writing.

15   Q.   And he said that this agreement that MGA entered into

16   with Mr. Bryant in September of 2000 was merely confirmatory.

17   That's the word he used?

18   A.   That's the word he used.

19           MR. QUINN:  Nothing further.

20           THE COURT:  Cross-examination.

21           MS. AGUIAR:  I have no questions, your Honor.

22           THE COURT:  Very well.  Let's take our afternoon

23   break.

24           (Recess taken.)

25           THE COURT:  Counsel?
```

1        MR. NOLAN:  Thank you, your Honor.

2        MR. NOLAN:  I believe that that last interruption

3   of witnesses is the last of the reserved group of witnesses

4   that Mattel listed.

5        THE COURT:  Very well.

6        Is that true, Mr. Quinn?

7        MR. QUINN:  I believe so.

8        THE COURT:  So now you are formally resting?

9        MR. QUINN:  Yes.

10       MR. NOLAN:  In that regard, your Honor, can we take

11  one minute at sidebar?

12       THE COURT:  I understand what that's for, and I'll

13  give you leave to raise that at the end of the day.

14       MR. NOLAN:  All right.  MGA will call as its next

15  witness Margaret Leahy.

16       THE CLERK:  Good afternoon.  Would you please take

17  the witness stand, ma'am.

18       Thank you.  Please raise your right hand.

19            **MARGARET ANN LEAHY, SWORN.**

20       THE CLERK:  Thank you.  Please state your full name

21  for the record, and spell the last name.

22       THE WITNESS:  Margaret Ann Leahy, L-E-A-H-Y.

23       THE CLERK:  Thank you.

24                **DIRECT EXAMINATION**

25  BY MR. NOLAN:

4114

1  Q.    Good afternoon, Mrs. Leahy.

2         It would help, during the course of the day, if you

3  would adjust the microphone.   Thanks.

4         Mrs. Leahy, I was wondering if you could tell us

5  how you are currently employed?

6  A.    I work for the Disney Stores.

7  Q.    What do you do for the Disney Stores?

8  A.    I'm a sculptor.

9  Q.    We've heard a lot about sculptors.   I think you're the

10  first we've met.   Can you tell us what a sculptor does?

11  A.    I make the very first prototype for the toys.   And then

12  they ship it to Asia and mass produce it.   So usually we

13  start in a clay or a wax and proceed to -- eventually, we end

14  up with the toy and send it for tooling in Asia.

15  Q.    When you say that you do the first prototype of toys, is

16  there a certain type of toy that you sculpt?

17  A.    I sculpt mainly girls' toys.   That's been my strength

18  over the past 13 years.

19  Q.    Let's go back and just set your background.

20         Where did you attend college?

21  A.    I went to Virginia Commonwealth University.

22  Q.    And when did you graduate?

23  A.    I graduated in 1988.

24  Q.    And what, if anything, did you do next?

25  A.    Next I moved to California from Virginia, I worked at a

1  frame store, and then I got a job at the natural history

2  museum making permanent exhibits.

3  Q.    And tell us about any training that you've had with

4  respect to sculpting and art generally.

5  A.    I have a Bachelor's of Fine Arts degree in sculpting

6  with painting and print-making minor, as well as art history.

7  All of my jobs after college have been some kind of

8  sculpting, whether it's very, very big sculptures or very,

9  very tiny sculptures.

10  Q.    And is that what your degree was in?

11  A.    Sculpting, yeah, it's a Fine Arts degree.

12  Q.    Did there come a time when you went to work for Mattel?

13  A.    I started in '94, I think, or early '95.

14  Q.    And what was your level entry position at Mattel?

15  A.    I think the title was just sculptor.

16  Q.    Did you have a job before going to Mattel, or was Mattel

17  your first job?

18  A.    I worked in the set business.  So we moved from job to

19  job.  Once the job was finished, we'd have to go look for new

20  work.

21  Q.    Now, how long did you work for Mattel?

22  A.    Five or six years.

23  Q.    Was that work for an uninterrupted period of time?

24  A.    Yes.

25  Q.    So that would have been from approximately 1994 through

1   1999, 2000?

2   **A.**   Correct, 2000.

3   **Q.**   When did you leave Mattel employment?

4   **A.**   I left Mattel in mid-September of 2000.

5   **Q.**   At the time that you left Mattel, that is, mid-September

6   of 2000, what was your position at Mattel?

7   **A.**   I was a manager.

8   **Q.**   Of what particular department?

9   **A.**   Of the Disney group.

10  **Q.**   And what was the Disney group?

11  **A.**   The Disney group was the group Mattel devoted to

12  specifically developing all of their Disney dolls as well as

13  any Disney property.  It went through one group.

14  **Q.**   During the approximate six years that you've worked at

15  Mattel, were you always doing sculpting?

16  **A.**   Sculpting and managing.

17  **Q.**   Were you always assigned to the Disney group during

18  those six years?

19  **A.**   No.  Sometimes I would do other work for other groups.

20  When I started, I did work for Nickelodeon.  It was mainly

21  the licensed groups.  I did a little bit of work for Barbie,

22  but not much.

23  **Q.**   Are you married?

24  **A.**   Yes.

25  **Q.**   And who is your husband?

1    A.    My husband is Dan Leahy.

2    Q.    And where does Mr. Leahy work?

3    A.    He works at Mattel as well.

4    Q.    Does he currently work at Mattel?

5    A.    Yes, he does.

6    Q.    In what department does Mr. Leahy work?

7    A.    He works in the sound department.

8    Q.    What does he do at Mattel?

9    A.    He's the manager of the sound department.  I don't know

10   exactly what he does.  We don't talk about it too much.  Two

11   kids.  We don't finish a lot of sentences.

12   Q.    Let's round out your family.  Do you have children?

13   A.    Yes.

14   Q.    And what are their ages?

15   A.    Ages four and eight.

16   Q.    How long has your husband been working at Mattel?

17   A.    Maybe seven or eight years.  He started right about when

18   I left.

19   Q.    To your knowledge, when you left Mattel in mid-September

20   of 2000, did you leave on good terms with Mattel?

21   A.    Yes.

22   Q.    And since leaving Mattel in mid-September of 2000, have

23   you done any work for Mattel?

24   A.    I did a handful of work for Mattel, maybe two or three

25   jobs.

1  Q.    After leaving Mattel in mid-September of 2000, did you

2  stay at home, or did you establish a business?

3  A.    Well, I worked from home as a sole proprietor.  And then

4  I eventually incorporated.

5  Q.    When you say sole proprietor, did you have your own

6  business?

7  A.    I had my own business name, fictitious business name.

8  Q.    What was that name?

9  A.    Then was Leahy 3-D Design.

10  Q.    When you were employed at Mattel, did you sign an

11  inventions agreement, confidentiality agreement?

12  A.    I remember signing an agreement.

13  Q.    And was that when you first started working at Mattel?

14  A.    You start as a temp there.  So I don't know if I signed

15  it when I started as a temp or when I started on full time.

16  Q.    When you resigned from Mattel in mid-September of 2000,

17  did you have an understanding, one way or the other, as to

18  whether you could do free-lance work for Mattel immediately?

19  A.    Can you repeat the question?

20  Q.    Sure.  Do you have a date certain in your mind as to

21  when you resigned from Mattel in 2000?

22  A.    I know I gave two weeks' notice.  So it would have been

23  early September.

24  Q.    Are you aware of a policy at Mattel that after you

25  resign, you're not allowed to do free-lance work for Mattel

1  for a particular period of time?

2  **A.**   Oh, so after you quit.

3  **Q.**   After you quit.

4  **A.**   Yeah, I was aware of that policy.  It changed all the

5  time, the amount of time.  And it wasn't always honored, I

6  guess.  People would do work right away.  Some people

7  wouldn't do work right away.

8  **Q.**   Did you do work for Mattel right away after leaving in

9  September of 2000?

10  **A.**   No, I didn't.

11  **Q.**   I want to concentrate a little bit more during the six

12  years you were working at Mattel.

13          Did you ever, while you were employed at Mattel, do

14  work on the side?

15          MR. PRICE:  Objection, your Honor.  If we could

16  have a sidebar on this.

17          THE COURT:  You may.

18          **(SIDEBAR CONFERENCE HELD.)**

19          THE COURT:  Yes, Mr. Price.

20          MR. PRICE:  This is one of those apples to apples

21  issues.  Ms. Leahy testified in her deposition that she knew

22  her agreement prevented her from working but that her

23  supervisor told her that it was okay for her to do so because

24  she needed the money.  So therefore, because her supervisor

25  said it was okay, even though her agreement said it wasn't,

1   she thought it was okay, and she did.

2          It has no relevance to this case.

3          MR. NOLAN:  Your Honor, I would represent that I

4   believe her testimony will be that although she asked her

5   supervisor with respect to one or I don't know how many jobs,

6   but she did do moonlighting side jobs without the permission

7   of Mattel and that the practice was well known, and she will

8   identify people that were doing it.

9          MR. PRICE:  Well, two things.  One, that would be

10  surprising because at her deposition she couldn't give a

11  single name when asked about moonlighting, but two, it's

12  irrelevant as to Carter Bryant's understanding of his

13  obligations.  The only reason we were able to get to his

14  understanding was for his understanding of his agreement.

15  This is a side show because we're going to have to be

16  bringing in witnesses now from her department saying no, this

17  wasn't --

18          THE COURT:  Well, I've already tried to set

19  parameters on this.  You raised the apples to apples.  If

20  there are other employees at Mattel who did what you allege

21  Carter Bryant worked on and there was acquiescence by Mattel

22  in doing so, that may be evidence of a practice, a custom

23  that might be relevant to determining whether or not a duty

24  of loyalty was in fact -- or whether a contract was breached.

25          MR. PRICE:  I think actually, your Honor, the

1   position was that if they got permission from Mattel, that

2   doesn't mean that there's a wholesale -- everybody can do

3   this.  Her testimony, and I'll show it to you in the

4   deposition, is her supervisor is the one who told her to do

5   it.

6          THE COURT:  Right.  And if that's the case, and

7   there's nothing more than that, then I agree with you.  It's

8   a different case, but what Mr. Nolan is suggesting is that

9   that's not the case, that there was other work that she did.

10  I do agree we're not going to start bringing that through

11  hearsay what other people did.  But in terms of what she

12  actually did, if she understood her agreement to permit her

13  to do this work without authorization, that argue -- that's

14  the apple to apple comparison.

15         MR. PRICE:  I think we need a proffer because it's

16  inconsistent with the deposition testimony.

17         THE COURT:  Then you can cross-examine her.

18         MR. PRICE:  But what if -- if Mr. Nolan is wrong,

19  then it's going to get in front of the jury, and we're going

20  to have to move to strike.  Does he have a good faith basis

21  that she's going to say I'm telling you at her deposition she

22  said her supervisor said it's okay for you to do outside

23  work.

24         THE COURT:  You're saying that that's not the case?

25         MR. NOLAN:  Yes, that's my understanding.  But your

1    Honor, let me just do it this way, and I'll be fair about it.

2    I'll ask her, as I did, did she ever do work outside.  Did

3    you ever do such work without the knowledge or permission of

4    your supervisor.

5              THE COURT:  Let's do this.

6              Ms. Leahy, would you come around over here?  We

7    need to ask you a question outside the presence of the jury.

8              All right.  I'm first going to allow Mr. Nolan to

9    ask you, and then Mr. Price can ask you questions.  You're

10   still under oath.  We just can't let the jury hear this yet.

11             THE WITNESS:  Okay.

12   Q.   BY MR. QUINN:  During the period of time that you were

13   employed at Mattel, did you do side projects outside of

14   Mattel?

15   A.   Yes, I did.

16   Q.   For which you were paid?

17   A.   Correct.

18   Q.   On approximately how many occasions did you do such

19   projects?

20   A.   Maybe about seven or eight.

21   Q.   Did you, in connection with those seven or eight

22   projects, always have the permission of your supervisor at

23   Mattel?

24   A.    I didn't necessarily have the permission of him.  But he

25   told me how to do it.  There was a time when my husband

1    wasn't working, and we didn't have a lot of money.  And he

2    said well, he felt badly for me.  So he said here's a way you

3    can make extra money.

4    Q.    And did that apply for each of the jobs that you did?

5    A.    No, it didn't.  I didn't tell him about any of the jobs

6    that I was doing at the time.  He just told me how to do it.

7    Q.    Did you ask him for written permission to do these

8    outside jobs?

9    A.    No, I did not.

10   Q.    My understanding is that your supervisor was Michael

11   Hebden?

12   A.    Yes.

13   Q.    And my understanding is you told him about your

14   financial situation?

15   A.    Well, we were very close.  He knew about it.

16   Q.    And he was your supervisor?

17   A.    Yes.

18   Q.    And he said that one way you can make money is to

19   contact vendors, other vendors for extra work; right?

20   A.    That's what he told me, yes.

21   Q.    And he didn't tell you a specific vendor to contact?

22   A.    No, he didn't tell me a specific vendor.  He said check

23   with the vendors you are working with and see if they have

24   any extra runoff work.

25   Q.    He said as far as he was concerned, that's okay if you

1    did that?

2    **A.**    Well, I don't know if he said that verbatim.

3    **Q.**    He's the one who said here's what you should do.

4    Contact these vendors and get some extra work.

5    **A.**    Correct.

6    **Q.**    And your understanding was that your written employment

7    agreement, under that agreement, that would have been

8    prohibited?

9    **A.**    I knew it was considered a conflict of interest in the

10   employment agreement.  But it was a very common thing for

11   people to do in the toy business as well as Mattel.

12   **Q.**    But your supervisor is the one who suggested that you do

13   it to help make ends meet; correct?

14   **A.**    He said this is a way you can do it.  He didn't --

15   **Q.**    Right.  And you didn't feel it was necessary to tell him

16   you were doing what he said to do.

17   **A.**    Yeah, I didn't want to tell him.

18              THE COURT:  Let me ask and try to cut to the chase.

19              Did you understand -- you mentioned a conflict of

20   interest.  Did you understand what you were doing, the

21   moonlighting, the working for the other vendors, to be in

22   conflict with your agreement with Mattel?

23              THE WITNESS:  I knew I could lose my job over it,

24   but it was such a common thing, that everybody did it, and at

25   that point I was going to lose my car.

1          THE COURT:  Again, I'm not asking for whatever

2    rationalization you may have imposed on it.  And I'm not

3    trying to make a moral judgment here.  Just in terms of your

4    understanding with your contract with Mattel, did you or did

5    you not believe that your contract authorized you to do that?

6          THE WITNESS:  I didn't believe that my contract

7    authorized me to do that.

8          THE COURT:  Thank you, ma'am.  You may return to

9    the witness stand.

10          (Whereupon the witness withdraws.)

11          THE COURT:  To me, that's the issue.  It's not what

12    was going on or what wasn't going on.  It's whether or not --

13    and I think to the extent that there are people, and I have

14    allowed both sides to get into asking questions about

15    understandings of the contract.  And I'll certainly allow you

16    to do that with this witness.  I've allowed that on both

17    sides by any number of Mattel, and even MGA employees.

18    Although I'm still pressed with, I'm not so sure about the

19    relevance with the MGA employees.

20          But in any event, both sides have done that.  But I

21    think to get now into evidence of moonlighting where it's

22    acknowledged that it's in conflict with the contract, not

23    withstanding that it may be common, I think it gets outside

24    the field.

25          MR. NOLAN:  Your Honor, I'm not going to argue the