```
 1   point at this time.  If there's a 1-B case --
 2              THE COURT:  That's going to be different.  We will
 3   revisit the issue in 1-B.
 4              MR. NOLAN:  And she will clearly be a 1-B witness
 5   as well if we get there, and that's probably a better place.
 6   So I would just ask the Court --
 7              THE COURT:  I can see this going to the issue of
 8   damages.  We're -- absolutely.  So for 1-A purposes, we're
 9   just focusing on the breach of contract.  I think based on
10   the answer to the Court's question, I'm going do sustain the
11   objection.
12              MR. NOLAN:  Okay.  Thank you.
13              (CONCLUSION OF SIDEBAR CONFERENCE.)
14              MR. NOLAN:  May I proceed, your Honor?
15              THE COURT:  You may.  Thank you, Counsel.
16   Q.   BY MR. NOLAN:  Do you know -- had you heard of MGA
17   prior to your resignation from Mattel in mid-2000?  In
18   mid-September of 2000?
19   A.   No, I never heard of them.
20   Q.   Did you know a woman by the name of Paula Treantafelles
21   Garcia before you resigned from Mattel in September of 2000?
22   A.   No, I didn't know Paula then.
23   Q.   Did you know an individual by the name of Carter Bryant
24   prior to resigning from Mattel in mid-September of 2000?
25   A.   I knew who he was.  And we had met on one -- briefly
```

1   right before he left on a project he was working on at

2   Mattel.

3   Q.   And how did you know who Carter Bryant was?

4   A.   Well, the way it worked there is we have the sculpting

5   department.

6   Q.   You're talking about at Mattel?

7   A.   At Mattel.  And when a designer had a project to do,

8   he'd bring it to the sculpting department.  And as the

9   manager, I would put all of that together.  Say okay, what do

10  you have to do?  And this sculptor, you know, this is Carter,

11  would go off and do what he wants you to do.

12  Q.   And was there a time while you were at Mattel and

13  manager of the sculpting department that Carter Bryant

14  brought in a project to have sculpted at Mattel?

15  A.   It was a project called Spring Fawn, F-A-W-N, or

16  something like that.  And he just needed like a little fawn

17  sculpted for his doll.  It wasn't a big job.

18  Q.   Did you personally do that sculpt for him?

19  A.   No, I didn't.

20  Q.   Did you know Carter Bryant socially while you were

21  working at Mattel?

22  A.   No, I didn't.

23  Q.   In fact, could you estimate for us the amount of time

24  that you had actually spent talking to Carter Bryant prior to

25  your resignation in mid-September of 2000?

1   A.   Well, it was only that one meeting, and it was probably

2   about 10 minutes at the most.

3   Q.   Did you have an intent, when you resigned from Mattel,

4   with respect to whether or not you'd go into the free-lance

5   business?

6   A.   Well, it was a tough decision to leave Mattel because it

7   was a good salary job.  But we had just adopted our daughter.

8   And I didn't want to drive that far and be gone for 12 hours

9   a day.  So I made the decision to go free-lance.

10  Q.   Before leaving Mattel, did you tell people at Mattel of

11  your intent to free-lance in sculpting?

12  A.   I don't remember if I told anybody I was going to

13  free-lance.

14  Q.   At some point in time, did you receive a phone call from

15  Carter Bryant?

16  A.   I did after I was -- after I left Mattel.

17  Q.   And do you recall where you were when you received that

18  phone call?

19  A.   I was in my studio, my previous house, which was in the

20  garage.

21  Q.   And can you give the jury the best estimate of when you

22  received a phone call from Carter Bryant?

23  A.   It was in mid-September after I left.  Somewhere around

24  there.

25  Q.   And can you recount for us what Carter Bryant said to

4129

1    you during the phone call?

2    **A.**    He said he had a project to sculpt, and I asked who it

3    was for.  And he said MGA Entertainment, and they were in

4    North Hills at the time.

5    **Q.**    Now, prior to this phone call with Carter Bryant, had

6    you heard of MGA Entertainment before?

7    **A.**    No, I had never heard of them.

8    **Q.**    How long did this phone call take place with Carter?

9    **A.**    It was maybe five minutes.

10   **Q.**    Did you ask Mr. Bryant how he obtained your telephone

11   number?

12   **A.**    I didn't ask how he got my number.

13   **Q.**    In any event, sometime after that phone call, did you

14   have an occasion to meet with Mr. Bryant?

15   **A.**    Yeah, he came over to my house and brought some drawings

16   over.

17   **Q.**    Do you recall the date of the first meeting with Carter

18   Bryant?

19   **A.**    I don't know the exact date.

20   **Q.**    Can you estimate how many days after your phone call

21   with Carter Bryant did you meet with him?

22   **A.**    It was probably -- maybe a week, week and a half.

23   **Q.**    And where did this meeting take place?

24   **A.**    It was at my house.

25   **Q.**    To the best of your recollection, was anybody else

1   present other than you and Mr. Bryant?

2   A.   Just my new daughter.

3   Q.   And can you recount for us, first of all, how long did

4   that meeting take place at your house?

5   A.   Maybe 20 minutes.

6   Q.   Now, during that meeting did Mr. Bryant show you

7   anything?

8   A.   He showed me a binder with his drawings in it.

9   Q.   When you say a binder of his drawings, was there

10  anything else that he showed you other than a binder?

11  A.   He had a Steve Madden ad that he had taken out of a

12  magazine.

13  Q.   What did Mr. Bryant ask you to do at that meeting, if

14  anything?

15  A.   Well, he came over, showed me his concept and showed me

16  the Steve Madden ad, and said this is the basic trend we're

17  going for, and he asked me to just come up with a model of

18  what I thought it would be.

19  Q.   Focusing for a moment on what you described as the

20  concept drawings, had you seen the concept drawings before

21  you had a meeting with Mr. Bryant at your house in late

22  September?

23  A.   No, I hadn't.

24  Q.   Do you recall how many drawings, how many concept

25  drawings Mr. Bryant showed you at that first meeting?

1   A.   I don't know how many.

2   Q.   Could you describe for us the concept drawings that you

3   saw at the first meeting?

4   A.   They were very basic drawings.   Some of them had color

5   on them.   Some of them were just lines with black and white.

6   It was of four different girls with big heads and big feet.

7   Q.   What did Mr. Bryant ask you, if anything, to do at that

8   meeting?

9   A.   He said, "Here's my idea.   Just take it and run with it.

10   Let me know when you've sculpted something."

11   Q.   Did Mr. Bryant provide to you on that day any -- well,

12   let me ask you this:   Are you -- have you ever worked with

13   engineering drawings?

14   A.   Yes, I have.

15   Q.   Did Mr. Bryant have in his notebook at the first meeting

16   any engineering drawings?

17   A.   No, none whatsoever.   They were just really rough

18   sketches.

19   Q.   I want to move just aside for just a second.

20        Do you know a woman by the name of Ivy Ross?

21   A.   Yes, I do.

22   Q.   And how do you know Ivy Ross?

23   A.   Ivy Ross was my boss at the Disney Store.

24   Q.   Does she still work at the Disney Store?

25   A.   No, she doesn't.

4132

1    Q.   But you do?

2    A.   Yeah, I still work there.

3    Q.   Okay.  I represent to you that Ivy Ross appeared as a

4    witness in this case for Mattel.  And she talked about your

5    sculpting.

6    A.   Right.

7    Q.   And I believe that she referenced a presentation that

8    you made as an employee of the Disney stores with respect to

9    how a sculptor stays true to the designs of the designer.

10   Did you make that presentation?

11           MR. PRICE:  Objection.  Misstates the testimony.

12           MR. NOLAN:  I'll rephrase it.

13           THE COURT:  Thank you, Counsel.

14   Q.   BY MR. NOLAN:  While at the Disney Store, have you ever

15   made a presentation either in a training format or in any

16   format, with respect to sculptors following the drawings of

17   designers?

18   A.   No, I've never given a presentation there.

19   Q.   Going back to this first meeting that you had with

20   Carter Bryant, other than giving you the concept drawings and

21   telling you to do your magic, did Carter Bryant give you

22   specific directions about what he wanted the sculpt to

23   include?

24           MR. PRICE:  Object to the preface as misstating her

25   testimony.

1          THE COURT:  Rephrase it again, Counsel.

2     Q.   BY MR. NOLAN:  During this first meeting, did Carter

3     Bryant give you any directions with respect to how he wanted

4     the sculpt to look?

5     A.   Well, not really.  I mean, I was really excited about

6     this job because for the first time after working at Mattel

7     for six years --

8          MR. PRICE:  Objection.  Beyond the scope of the

9     question.

10         MR. NOLAN:  I can try to break it down.

11         THE COURT:  Very well.

12    Q.   BY MR. NOLAN:  Set aside for a moment the excitement,

13    and we'll get to that in just a moment.  I want to ask you,

14    at this first meeting did Carter Bryant tell you with certain

15    direction as to how he wanted you to sculpt the project he

16    asked you to sculpt?

17    A.   No, he didn't give me any direction.

18    Q.   Have you worked in the past at any time with designers

19    who, when they give you a project to do a sculpt, include

20    specific directions to follow?

21    A.   Yeah.  I've had designers give me very specific control

22    drawings.

23    Q.   And tell us, since we're not sculptors, what information

24    designers provide to you when they want you to follow their

25    concept drawings exactly.

1  A.   Well, there's a lady at MGA named Christine Nedahoshian

2  (phonetic), who had very set ideas in her mind of what she

3  wanted.  She would do turnarounds, we call them, where you

4  have a front view, a side view, and a back view with the

5  joints included, measurements of the joints, and what kind of

6  joints they would be in the doll.  And she's very specific

7  about it.

8  Q.   You used some terms I want to make certain we're all

9  clear about.  And you referenced turnaround drawings.  What

10  do you mean by a turnaround drawing?

11  A.   A turnaround drawing in our industry as well as the

12  animation industry is when you have multiple views of your

13  subject.

14  Q.   Then you also made reference to joints.  And how do you

15  use that term in the context of sculpting?

16  A.   Well, a doll is called articulation, and if you'll

17  notice on a doll, they usually have joints so you can move

18  the arms and move the legs, sometimes the knees, sometimes

19  the hands.  It depends on how much money you want to put into

20  the doll, but that's what a joint is.  And there's very

21  specific ways to do joints just within the laws of physics.

22  So you need pretty specific measurements and direction as far

23  as the joints go.

24  Q.   At any time that you were doing sculpts for MGA, did you

25  ever receive from Carter Bryant turnaround drawings?

1          MR. PRICE:  Objection as to time frame.

2          MR. NOLAN:  I'll narrow it.

3   **Q.**   At the first meeting at the end of September of 2000,

4   did Carter Bryant provide to you any turnaround drawings?

5   **A.**   No, he didn't.

6   **Q.**   At that first meeting did Carter Bryant provide to you

7   any engineering drawings?

8   **A.**   No, not at all.  It was just the one view, the one

9   concept sketch.

10  **Q.**   It was just simply two dimensional?

11  **A.**   Just a two-dimensional kind of a three-quarter view.

12  **Q.**   Did Carter Bryant at that first meeting provide to you

13  any directions or instructions with respect to how you should

14  deal with joints on the sculpt that you were going to be

15  making?

16  **A.**   No, not at that time, he didn't.

17  **Q.**   After this 20-minute meeting, what did you do next?

18  **A.**   Well, I was very excited about the project.

19  **Q.**   Let's stop there.  Why were you excited?

20  **A.**   I was excited because it was a new project that I

21  actually had artistic license on, like in Mattel it's a very

22  structured environment, and the designers are in control of

23  everything.

24          So this was pretty fun to me because number one, it

25  was my first job, one of my first jobs out of the free-lance

4136

1    gate, and I wanted to do a good job, and I had so much

2    artistic license to put in, it was like a treat.

3    Q.   And did you in fact prepare a sculpt following that

4    first meeting?

5    A.   Yes, I did.

6    Q.   And how did you make that first sculpt?  What was it

7    made out of?

8    A.   I made it out of clay.  I just roughed it out really

9    quick.  We have these really hard blocks of change, and I put

10   them under a light so it melts, and then you just kind of

11   mold it together real quick to come up with the figure.

12   Q.   And approximately how long did it take for you to do

13   this first sculpt?

14   A.   A couple days.  Two or three days.

15   Q.   And during those two or three days, was Carter Bryant at

16   your side?

17   A.   No, he wasn't there.

18   Q.   Now, during this two- or three-day period of time, did

19   you ever call Carter Bryant and ask him for any directions or

20   instructions?

21   A.   I don't remember calling him.

22   Q.   Do you recall having a next meeting with Mr. Bryant?

23   A.   Yeah, I remember meeting with him to show him that clay

24   sculpt.

25   Q.   And do you still have that clay sculpt?

4137

1   **A.**   No, the clay sculpt was destroyed during the molding

2   process.   It doesn't exist anymore.

3   **Q.**   Is that a typical result of the molding process, that

4   the original clay gets destroyed?

5   **A.**   Most of the time with clay, because it's soft, it gets

6   kind of mushed coming out.

7   **Q.**   And when you next met with Mr. Bryant, did you show him

8   this first clay sculpt?

9   **A.**   Yes, I did.

10  **Q.**   And where was this meeting at?

11  **A.**   This meeting was at my house.

12  **Q.**   And was anybody else present at this meeting?

13  **A.**   I'm not sure if anybody was there or not.   There were

14  several meetings with Paula and Veronica and Carter and some

15  meetings with just Carter.

16  **Q.**   In any event, at this meeting at your house, do you

17  recall the date of that meeting?

18  **A.**   I think it was on September 29th.

19  **Q.**   Now, by recalling the date of the meeting as being

20  September 29th, are you able to estimate for us when the

21  first contact with Carter Bryant occurred?   How many days

22  before that meeting?

23  **A.**   You mean the first phone call?

24  **Q.**   Yes.

25  **A.**   Well, it would have been a week and a half, two weeks.

1  Q.   And what about the first initial meeting that you had

2  with Carter Bryant, where you saw the conflict drawings for

3  the first time?

4  A.   Well, it took me a couple days to do the sculpt.  So you

5  know, it would be three, four days.

6  Q.   So around September 26 or September 27?

7  A.   Something like that.

8  Q.   All right.  So let's turn to the September 29th meeting.

9  And you are working with a clay sculpt.  Is this right?

10 A.   Right.

11 Q.   And can you describe for us how long the September 29th

12 meeting took?

13 A.   It was probably around the same, around 20 minutes.

14 Q.   Now, is it possible that Paula Treantafelles Garcia was

15 also present at that meeting?

16 A.   It's possible.  Like I said, there were several meetings

17 then.  You know, I had a newborn.  So I didn't have a lot of

18 sleep.  And I don't remember everything.

19 Q.   Now, the sculpt that you showed on September 29th, was

20 that a final sculpt?

21 A.   No, not at all.

22 Q.   Did you receive any comments from anyone with respect to

23 that sculpt?

24 A.   There were -- yeah, there were comments made.

25 Q.   And can you describe generally for us what those

1  comments were?

2  **A.**   Well, generally I remember Paula thinking it was too

3  big.  It was too tall.  It was about this tall, and the Bratz

4  ended up being about 10 inches.  And Paula thought it looked

5  too old for what they were trying to achieve.

6  **Q.**   When you say too old, what do you mean?

7  **A.**   Too old, too mature.  I had her very fleshed out with

8  hips and thighs and arms and, you know.

9  **Q.**   Can you recall any other comments or feedback that you

10 received in connection with that first initial sculpt?

11 **A.**   They wanted the waist thinner, the legs thinner, minor

12 things like that.

13 **Q.**   Now, did you have a practice, Mrs. Leahy, of maintaining

14 a calendar or some book where you could record your daily

15 schedules and any comments that were being made with respect

16 to work you were doing?

17 **A.**   I had a notebook that I'd write comments in.

18 **Q.**   I'd ask you to look in the white notebook that's before

19 you at Exhibit 1137.

20          Do you have that in front of you?

21 **A.**   Yes, I do.

22 **Q.**   And can you identify that for us?

23 **A.**   It's Wonder Woman.

24 **Q.**   I'm sorry.  I can't see it.  I'm sure it is Wonder

25 Woman?

1        THE COURT:  The Court will take judicial notice

2   that that appears to be Wonder Woman.

3        MR. NOLAN:  I don't know why I always get the

4   levity moments.

5        THE COURT:  It's a requirement.

6   Q.   BY MR. NOLAN:  Other than it being Wonder Woman, does it

7   serve any other purpose?

8   A.   It was my notebook.

9   Q.   I'd like you to turn your attention to page 14 of the

10  document.  Do you see what's set forth on September 29th?

11  A.   Yes.

12  Q.   And, in fact, is that a calendar that you used in the

13  year 2000 for a notebook?

14  A.   Yeah, this is the notebook I used when I first started.

15  Q.   And does it contain your handwritten notations?

16  A.   Yes, it does.

17  Q.   And did you make notations on this page, page 14,

18  concerning the comments made in response to your first clay

19  sculpt?

20  A.   Yes, that's here.

21        MR. NOLAN:  Your Honor, we'd offer 1137-14.

22        THE COURT:  Any objection?

23        MR. PRICE:  At this point it's still hearsay, your

24  Honor.

25        THE COURT:  Counsel?

1   **Q.**   BY MR. NOLAN:   Well, you were in business at the time;

2   correct?

3   **A.**   Yes.

4   **Q.**   You were a sole proprietor?

5   **A.**   Yes.

6   **Q.**   And you were working in connection with a matter that

7   you had been retained by MGA; correct?

8   **A.**   Correct.

9   **Q.**   And was it your practice to make notes in connection

10   with a project that you were asked to perform for MGA?

11   **A.**   Yes, it was.

12   **Q.**   And when you would make these notes, were they

13   contemporaneous to situations or comments that were being

14   made in your presence?

15   **A.**   Yeah, usually with a lot of people there, the comments

16   are going so fast, I just kind of jot them down and translate

17   them so I'll remember to make the changes after they leave.

18   **Q.**   And would one of the purposes for making these

19   handwritten notations be to be able to go back and make

20   certain that you captured the comments that were being made?

21   **A.**   Correct.

22   **Q.**   And you did that in the ordinary course of your business

23   as a sculptor; correct?

24   **A.**   Most of the time.

25           MR. NOLAN:   Your Honor, again I'd offer 1137-14 as

1    a business record maintained by Mrs. Leahy and containing

2    business records pertinent to the job that she was hired to

3    do for MGA.

4            MR. PRICE:  I'm not going to object at this time.

5            THE COURT:  Very well.  Then it's admitted.

6            **(Exhibit 1137-14 received.)**

7            THE COURT:  You may publish.

8    Q.   BY MR. NOLAN:  And why don't we go to the front page, if

9    we could, just so that everybody could share the joke.

10           Okay.  That's the front page of your calendar;

11   correct?

12   A.   Correct.

13   Q.   Now let's turn to page 14.  All right.  And I know the

14   lighting and the coloring is not very strong, but I'll ask

15   Aaron to highlight here.  And ask you, do you recognize this?

16   A.   Yes, I do.

17   Q.   And first of all, whose handwriting is that?

18   A.   That's mine.

19   Q.   And do you see a date on the upper right-hand corner?

20   A.   Yes.

21   Q.   And that's September 29, 2000?

22   A.   Yes.

23   Q.   And next to it is the name Fiona.

24           Do you see that?

25   A.   Yes.

1   Q.   Who is Fiona?

2   A.   Fiona's the name of my daughter, and we were originally

3   calling the sculpt Fiona.

4   Q.   When you were saying we were naming it Fiona, who were

5   you referring to?

6   A.   Carter.  He liked the name, but we couldn't use it in

7   the end.

8   Q.   In any event, could you read for the jury what you've

9   written down on this notation?

10   A.   It says:  "September 29, 2000, Fiona, head bigger, 2.575

11   inches, a smaller waist, smaller hips, thighs, and ankles,

12   the neck longer, thickness okay, feet, bulkier on top."

13   Q.   And do you have a specific recollection, as you are

14   sitting here today, as to who made these comments to you on

15   September 29th?

16   A.   I don't have a specific recollection of who made what

17   comments.

18   Q.   Can you explain whether or not Carter Bryant's concept

19   drawings were used in any fashion by you in making -- I'm

20   sorry, in receiving these comments from people at the

21   meeting?

22        MR. PRICE:  Objection.  Assumes facts not in

23   evidence, people at the meeting.

24        THE COURT:  Sustained.

25   Q.   BY MR. NOLAN:  The comments that you received at the

4144

1    meeting, Mrs. Leahy, were these comments directed to trying

2    to make the sculpt look exactly like the concept drawings?

3    **A.**    No, not at all.

4    **Q.**    Do you know whether or not you even had the concept

5    drawings at this meeting?

6    **A.**    I don't remember.

7    **Q.**    Do you have a recollection that the concept drawings

8    were being used as a reference point at this meeting?

9    **A.**    Well, Carter gave me two things.  The concept drawings

10   as well as the Steve Madden ad.  And the concept drawings

11   were really basic and not very practical as far as the

12   sculpting standpoint.  So I went more by the Steve Madden ad

13   because it was a photo implying three dimensions.  So it was

14   a little easier to come up with something from that than from

15   his sketches.

16   **Q.**    Now, you said that the concept drawings were not very

17   practical from a sculpting point of view.  Can you express

18   that in layman's language as to what you mean?

19   **A.**    They were very basic drawings.  They didn't have any

20   measurements on them.  They didn't have any indication of

21   where the joints would be or what the play value of the doll

22   would be, meaning the articulation.

23         I couldn't really use them to come up with

24   something in the three-dimensional world.

25   **Q.**    Now, you made reference to a Steve Madden ad.  Do you

1  know whether or not the Steve Madden ad was present at the

2  September 29th meeting?

3          MR. PRICE:  Object.  It's ambiguous as to which

4  Steve Madden ad.

5          THE COURT:  Sustained.  You can lay a foundation

6  for which, Counsel.

7          MR. NOLAN:  Yes.

8  Q.   First, why don't you ask you to take a look at

9  Exhibit 302.  And do you recognize 302?

10  A.   Yes, I do.

11  Q.   And do you recognize 302?

12  A.   Me?

13  Q.   Yes.

14  A.   Yes.

15  Q.   What is 302?

16  A.   It was one of the drawings in the binder he gave me.

17          MR. NOLAN:  Your Honor, this is in evidence.  May I

18  publish it?

19          THE COURT:  You may proceed.

20  Q.   BY MR. NOLAN:  Now, 302 is an exhibit that contains a

21  number of pages and number of drawings.

22          Do you remember whether or not all of these

23  drawings were presented to you by Carter Bryant at that first

24  meeting?

25  A.   I know he gave me a binder full of drawings.  I can't

4146

1  say for sure each individual specific drawing that was in

2  there.

3  Q.   But do you recall the drawing that's depicted as the

4  first page of Exhibit 302?

5  A.   Yes, I do.

6  Q.   And when you were saying earlier that Carter's concept

7  drawings were two dimensional and not very practical from a

8  sculpting point of view, were you referring to these

9  drawings?

10  A.   Yes, I was.

11  Q.   Now, we made reference to a Steve Madden ad.  I want to

12  just ask if you can look at 1127.  And do you recognize 1127?

13  A.   Yes, I do.

14  Q.   And how -- what is it?

15  A.   That was the tear sheet he gave me of the Steve Madden

16  ad.

17          MR. NOLAN:  Your Honor, this is also in evidence.

18  May I have this on the screen?

19          THE COURT:  You may.

20  Q.   BY MR. NOLAN:  What instructions, if any, did Carter

21  Bryant give you with respect to why he was giving you this

22  particular tear sheet?

23  A.   Well, he didn't necessarily give me any instructions.

24  He just said, "Here's some inspiration."

25  Q.   Did he ask you to copy specifically the Steve Madden ad?

1   A.    No, not at all.

2   Q.    Did you use the Steve Madden ad as a reference at all in

3   any of your sculpting?

4   A.    I did.

5   Q.    Now, the Steve Madden ad appears to be a photograph;

6   correct?

7   A.    It's an altered photograph.

8   Q.    I'm sorry.  Actually, it's like two models that are

9   morphed down?

10   A.    Right.

11   Q.    And what use, if any, did you make of this ad?

12   A.    Well, like I said, this ad has three dimensions to it.

13   So I used a lot of the upper body of the girl on the right

14   because I can see more of her actual body.  A lot of the

15   lower body on the left for the same reason.

16   Q.    Was it your understanding that Carter Bryant had

17   designed the figures depicted in the Steve Madden ad?

18   A.    That he designed the --

19   Q.    The Devil and Angel drawing?

20   A.    No.

21   Q.    Following the meeting on September 29th, what next

22   happened?  And by the way, do you have the September 29th

23   sculpt?

24   A.    No.  I have a cast of it.

25   Q.    What next happens?

1   A.   Well, I made the changes they asked for.  And then I had

2   that cast made.

3   Q.   And after your meeting on September 29th, you continued

4   to work on doing the sculpt; correct?

5   A.   Correct.

6   Q.   And over what period of time are we now talking about?

7   A.   We got into October.  So maybe a week or two.

8   Q.   So we're into early October of 2000; is that correct?

9   A.   Correct.

10  Q.   Now, was Carter Bryant with you from September 29th,

11  2000, through the time that you did the next iteration of the

12  sculpt?

13  A.   Was he with me at my house?

14  Q.   Yes.

15  A.   No.

16  Q.   Did he come and give you any directions about the sculpt

17  from -- after the September 29th meeting to the next meeting

18  that you had?

19  A.   No, he didn't.

20  Q.   Do you recall Carter ever calling you and saying by the

21  way, you know, I want specifically you to do this, this, and

22  this during this period of time of September through --

23  September 29th through the date that you come up with the

24  next sculpt?

25  A.   No.  Carter never gave me any specifics on anything.

1   Q.   Did you -- do you recall when the next meeting was that

2   you had with respect to the sculpt?

3   A.   It was in early October.

4   Q.   And where was this meeting at?

5   A.   At my house.

6   Q.   And by looking at your notebook, Exhibit 1137, is there

7   a way that you can fix the date of this meeting?

8   A.   It's October 6th.

9   Q.   And is that depicted on page 15 of Exhibit 1137?

10  A.   Yes, it is.

11  Q.   And are the notations on the 15th page your handwriting?

12  A.   Yes, they are.

13  Q.   And they were done at or about the time of the events

14  that are recorded there?

15  A.   Correct.

16          MR. NOLAN:   Your Honor, we'd offer 1137-15.

17          MR. PRICE:   No objection.

18          THE COURT:   It's admitted.

19          (Exhibit 1137-15 received.)

20  Q.   BY MR. NOLAN:   Now, this is the very next page.   I'd

21  like to have this blown up, Aaron, if you don't mind.

22          And again, there is all in your handwriting?

23  A.   Yes, it is.

24  Q.   And you see this is Fiona, October 6th; correct?

25  A.   Correct.

4150

1    Q.    And can you now tell us who you -- first of all, this

2    meeting is where?  At your house?

3    A.    Yes, it's at my house.

4    Q.    And is it true that October 6th is a Friday?

5    A.    I'd have to look at the calendar.

6    Q.    Okay.  In any event, as a long-time employee of Mattel,

7    do you know what the hours of work are at Mattel on Fridays?

8    A.    You work until 1:00.

9    Q.    So do you recall, if I told you that October 6th is a

10   Friday, do you have a recollection of, first of all, where

11   the meeting took place and approximately what time?

12   A.    I know the meeting was at my house.  And I couldn't tell

13   you the time.

14   Q.    Was anybody else present other than yourself?

15   A.    Well, like I said, I had a few meetings with Carter

16   alone and some with Paula and Veronica.  So it was either

17   just Carter or Veronica and Paula.

18   Q.    Okay.  And directing your attention now to the notations

19   here, did you have another sculpt -- another iteration of the

20   sculpt available at this meeting?

21   A.    Yes.

22   Q.    And did you receive comments back regarding that sculpt?

23   A.    Yes, I did.

24   Q.    And can you just read for us your notations here and

25   what they mean to you?

1  A.   It says Fiona, October 6th.  Invoice.  Which would mean

2  they wanted me to send an invoice.  Ankles, skin, yes, legs

3  skinnier from the inside, the bust, more definition.  Carve

4  chest in more for perky, meaning more perky, the body

5  smaller, the head bigger by 2 percent, bigger lips, and cheek

6  bones.

7         MR. NOLAN:  Your Honor, through the magic of

8  technology, I think we can establish that October 6th is in

9  fact a Friday, and I believe that Mr. Price will stipulate to

10 the fact that October 6, 2000, was on a Friday.

11        MR. PRICE:  I will stipulate.

12        THE COURT:  Very well.

13 Q.   BY MR. NOLAN:  Now, again, at the October 6th meeting,

14 did you have Carter Bryant's concept drawings there as your

15 guide?

16 A.   I think it was just the sculpt at this point.

17 Q.   What about the Steve Madden ad?  Was the Steve Madden ad

18 there?

19 A.   I don't remember.  I think it was just the sculpt at

20 this point.

21 Q.   Do you recall who it was that gave the specific comments

22 with respect to making the ankles skinnier or the bust have

23 more definition?

24 A.   Well, looking at this now, I can remember Carter wanted

25 the ankles skinnier, which is hard to do in production.

1    Veronica wanted the legs skinnier from the inside so you can

2    dress the doll and pull the pants up.  If the legs are too

3    close together, there's not enough room for the fabric

4    inside.  Paula made the perky breast comment.  And I think

5    Paula wanted the head bigger and body smaller.

6    Q.   Do you have a recollection amongst the three of them --

7    Carter Bryant, Paula Treantafelles Garcia, or Veronica

8    Marlow -- as to whether or not it was Carter that was

9    directing this meeting?

10             MR. PRICE:  Objection.  Assumes facts not in

11   evidence about the other attendees.

12             THE COURT:  Lay further foundation, Counsel.

13   Q.   BY MR. NOLAN:  Do you have a recollection at this

14   October 6th meeting as to who was present with you at the

15   meeting?

16   A.   Well, I do now after looking at the comments.

17   Q.   And what is it about the comments that refreshes your

18   recollection as to who was there?

19   A.   Well, I remember Paula making the perky breast comment

20   specifically, and like I said, I remember Veronica making the

21   comment about the space in between the legs so the fabric

22   would fit over when you're putting pants on.  And I remember

23   Paula wanting the body smaller and the head bigger as well.

24   Q.   Do you recall whether or not you had an impression at

25   this time as to whether or not Carter Bryant was in control

1  of the meeting and giving everybody the directions?

2           MR. PRICE:  Objection.  Calls for a

3  characterization.

4           MR. NOLAN:  Just her observation.

5           THE COURT:  Just based on your physical

6  observations, sense of the meeting.  Overruled.

7  **Q.**   BY MR. NOLAN:  You can answer.

8  **A.**   Carter is a very quiet guy.  So most of the time he

9  would just sit back, and I remember Paula making the gist of

10  the comments.

11  **Q.**   Now, by the October 6th meeting, had you started to

12  focus on any of the hip joints on your sculpt?

13  **A.**   I brought it up to them.  I asked what kind of joints

14  they wanted.  At the top of this page, there's a scribble of

15  my drawing to explain to them what a ball joint is.

16  **Q.**   And is this your effort to try to show how the hip joint

17  would work?

18  **A.**   Right.  You would have to -- imagine it this way.  Like

19  dripped this way, and those are two legs, and on the inside

20  of the legs, there's the half balls in there, and then

21  there's the little connector which looks like a dog bone.

22  **Q.**   No disrespect intended, are you an engineer?

23  **A.**   No.

24  **Q.**   Okay.  Were you the one that was designing or going to

25  design the hip joints?

1    A.    Well, I had to.  You know, it had to be done.  And I

2    knew more than anybody there about how to make joints.

3    Q.    Do you recall ever asking Carter Bryant at that meeting

4    words to the effect, hey, can you help me out with these hip

5    joints or anything like that?

6    A.    Well, I asked what kind of joints they wanted.

7    Q.    And did you get a response?

8    A.    They said yeah, go ahead with that, because I think they

9    understood what the joints actually were.

10   Q.    And who said that to you?

11   A.    I don't remember.

12   Q.    Who was paying for your time during this period of time?

13   A.    MGA.

14            THE COURT:  Counsel, I'm going to take a brief

15   break.  There's a matter I need to take up in chambers.  It's

16   going to be no more than six or seven minutes.  So I'll ask

17   the jury to go back to the jury room.

18            (Recess taken.)

19            THE COURT:  Sorry about that, Counsel.  You may

20   proceed.

21            MR. NOLAN:  Thank you.

22   Q.    Just before the break, we were talking about the October

23   6th meeting at your house on Friday.

24            Do you recall that?

25   A.    Right.

1  **Q.**   And following that meeting on October 6th, what did you

2  next do?

3  **A.**   I made the changes they asked for, and then I took it to

4  Gentle Giant, which is a molding company, to pour a mold of

5  it.

6  **Q.**   Now, as of this time, and we're talking about October

7  6th; correct?

8  **A.**   Correct.

9  **Q.**   Are you aware, during this period of time, of the status

10 of Carter Bryant's negotiations with MGA?

11            MR. PRICE:  Objection.  Foundation.

12            THE COURT:  Sustained.  Well, it's a foundational

13 question.

14            MR. NOLAN:  That's right.  And she answered she

15 didn't know; correct?

16            THE WITNESS:  Correct.

17 **Q.**   BY MR. NOLAN:  You made reference to something called

18 Gentle Giant.  Tell me what Gentle Giant is.

19 **A.**   Gentle Giant started off as a sculpting and molding kind

20 of a sculpting house.  So they were considered a vendor.  I

21 met them through Mattel.  And they also made silicon molds,

22 which is where they pour silicon -- pretend this is the

23 piece.  They poured silicon around it to make a negative mold

24 so you could proceed with your sculpting.

25 **Q.**   Had you worked with Gentle Giant before?

1    A.    Yes.

2    Q.    And what was the purpose in making contact with Gentle

3    Giant?

4    A.    Well, I had gotten as far as I could go on this clay

5    sculpt.  So I needed to make a mold and proceed to wax.

6    Q.    Now, explain to me what you mean by a mold and proceed

7    to wax.  Tell us a little bit about that process.

8    A.    Well, the mold is silicon rubber.  It comes in two

9    pieces, and it's blue and very rubbery and kind of loose.  So

10   like I was saying, you would put a cup around the sculpt,

11   pour the mold in, and then overnight it hardens.  After that,

12   you put it out with a knife.  Take the piece out, and then

13   pour the hot wax in there.  And from there you can go into

14   any finishing and more finite nitty-gritty tech at part of

15   making the doll.

16   Q.    Did you select Gentle Giant yourself?

17   A.    Yes, I did.

18   Q.    Carter Bryant didn't assist or give you any references

19   to Gentle Giant, did he?

20   A.    I don't think he even knew about them.

21          MR. NOLAN: I'd like to show, your Honor, which is

22   admitted, Trial Exhibit 1136, which is the photograph.  The

23   photograph is 1136.

24          Aaron, can we have the photograph up?  And then I

25   think we actually have a tangible, Ms. Leahy.  If you'd just

1  wait.

2  Q.   Mrs. Leahy, directing your attention to the photo on the

3  screen, do you recognize that as a photograph of the tangible

4  object that I've just put in front of you?

5  A.   Yes, I do.

6  Q.   And what I want to do is focus your attention to 1136-A.

7  And you can take it out of the bag if you want.   I think the

8  parts are separated.

9  A.   Do you want me to put it together?

10 Q.   If you can, it would be great.

11 A.   I don't think I can put the one arm on, but I'll do the

12 best I can.

13 Q.   We assume that it has two arms, and both arms were

14 attached; correct?

15 A.   Correct.

16 Q.   What is 1136-A?

17 A.   This is the first sculpt that I was talking about at

18 those two meetings.

19 Q.   Is this the final --

20 A.   This is a copy of the clay sculpt that I did.

21 Q.   Okay.  And this you received from Gentle Giant what

22 date?  Do you recall?  You delivered it to Gentle Giant on

23 October 11th?  The clay sculpt?

24 A.   Somewhere around there.

25 Q.   And how long after that did you receive back what's

1   depicted in 1136-A?

2   **A.**   I don't remember when they got it back to me, but

3   usually in the molding process, it takes a few days,

4   depending on how busy they are.  It could take longer.

5   **Q.**   Now, you had delivered to Gentle Giant a clay sculpt;

6   correct?

7   **A.**   Correct.

8   **Q.**   Where is the clay sculpt?

9   **A.**   It got destroyed in the molding process.  When they pull

10  it out, they have to cut it out, and it gets all broken up.

11  **Q.**   Is that ordinary, or is that part of the process?

12  **A.**   That's part of the process.  That's the body.  The head

13  didn't get destroyed.  Just because of the nature.  It's just

14  a ball.  There's nothing to break.

15  **Q.**   So following the October 6th meeting and the delivery of

16  the clay sculpt to Gentle Giant, did Carter Bryant ever

17  provide any directions or specific instructions regarding

18  what changes he wanted to be made with respect to this

19  sculpt?

20          MR. PRICE:  Objection as to time.

21          THE COURT:  Sustained.

22  **Q.**   BY MR. NOLAN:  From October 6th, when you had the

23  meeting and you showed one of the iterations of the sculpt;

24  correct?

25  **A.**   Correct.

1    Q.    Following that, did you make changes to the sculpt?

2    A.    I made the changes they asked for.

3    Q.    And those changes included the comments made by Paula

4    Treantafelles Garcia?

5    A.    Yes.

6    Q.    And Victoria Marlow?

7    A.    Veronica.

8    Q.    Veronica.  I'm sorry.  And Carter Bryant, you recall,

9    had made a suggestion with respect to skinnier ankles?

10   A.    Correct.

11   Q.    Did you make the change that Carter had suggested,

12   making the ankles skinnier?

13   A.    Well, I didn't because they would have just broken

14   coming out of the mold.  So I just kept them thick at this

15   time.

16   Q.    So you didn't follow the suggestion that Carter Bryant

17   had made.

18   A.    Not at that time.

19   Q.    So the sculpt that's in front of you, the October 11

20   sculpt, is that the final Bratz sculpt?

21   A.    No, no, not at all.

22   Q.    So tell us what next happens after you receive this back

23   from Gentle Giant.  And let's do this chronologically.  You

24   believe you delivered this to Gentle Giant on October 11th;

25   correct?

4160

1   A.   Or maybe a day or two before that.

2   Q.   And do you recall the precise date that you received it

3   back from Gentle Giant?

4   A.   I don't know the exact date.  It would have been soon

5   after the 11th.

6   Q.   But in any event, it took the form that is represented

7   here in this sculpt; correct?

8   A.   Right.  Except the material was in wax.

9   Q.   Did Gentle Giant deliver the sculpt to you?

10  A.   No, I would pick everything up from them.

11  Q.   Now, what did you do with the wax sculpt that you got

12  back from Gentle Giant sometime after October 11th?

13  A.   Well, I took it and cut it up with a jeweler's saw,

14  which is like a hacksaw, and I had to go in and start making

15  up more realistic, feasible, producible doll.  This was just

16  a figurine at this point to see what it looked like.  And

17  from there I had to get down to the nitty-gritty of the

18  technical part of it.

19  Q.   By the way, when you went to Gentle Giant, did you

20  provide to Gentle Giant Carter Bryant's concept drawings?

21  A.   No.

22  Q.   Did you provide to Gentle Giant the Angel Devil ad from

23  Steve Madden?

24  A.   No, they wouldn't have needed that.

25  Q.   Was Carter Bryant with you at this meeting with Gentle

1   Giant where the instructions were given to develop the

2   sculpts?

3   A.   No, he wasn't.

4   Q.   So you were talking about what you started to do with

5   carving it up and cutting it up.  Would you explain more what

6   you did?

7   A.   Well, I took it, I cut the legs here.  I had to shorten

8   it to be 10 inches tall, which is a big thing.  And wax is

9   very time consuming and laborious.  You have to fix it pretty

10  much one drip at a time.  So I had to cut here and here and

11  cut as much out here and here to make it the right height in

12  the legs so they would be proportional.

13          I also had to put the joints in.  I had the joints

14  made by a machinist.  What it is, in the hips, there's a cup,

15  like a half cup like that.  And then the legs, as you saw in

16  that scribble drawing, they're a half ball, and then the

17  socket fits in there just like a regular bone socket, but

18  it's machine joints.  So that way you know exactly what

19  you're getting back from them.

20  Q.   And where were you doing this work that you just

21  described in 1136-A?

22  A.   At my house.

23  Q.   Was anybody else present with you?

24  A.   No.

25  Q.   Did Carter come over and give you specific directions or

1    suggestions as to what you should do?

2    **A.**    No, nobody came over at that point.

3    **Q.**    When was the next meeting that you had where you

4    presented the sculpt that is depicted in 1136-A?

5    **A.**    I'm pretty sure it was in late October.  I took it to

6    MGA and a lady named Mercedeh Ward, who is an engineer, was

7    present, and she looked at it and started making comments.

8    **Q.**    Do you recall if that meeting took place on October

9    25th?

10    **A.**    It would have been somewhere around there.  I could look

11    at my notes.

12    **Q.**    Can you take a look at your notes?

13    **A.**    It doesn't have the date, but that would have been the

14    meeting.

15    **Q.**    And what would the date of the meeting be?

16    **A.**    It just says October blank 2000.  So...

17    **Q.**    Do you have a specific recollection as to what day in

18    October you presented this mold -- this sculpt to Mercedeh

19    Ward?

20    **A.**    Um, it would have been around -- well, late October.  So

21    the 25th and '6th.

22    **Q.**    I want to show you Trial Exhibit 1140 and ask you if you

23    can identify it for us first.

24              And if I may approach, your Honor, with 1140-A

25    through -D.

1           THE COURT:  You may.

2    Q.     BY MR. NOLAN:  I've put some tangible items in front of

3    you.

4           Do you see them?

5    A.     Yes.

6    Q.     Do you recognize them?

7    A.     Yes, I do.

8    Q.     What are they?

9    A.     These are the silicon molds that I was talking about.

10   One is a liquid, and then they poured it into this

11   configuration.  They probably had some polystyrene around it,

12   and they cut it open, and you can see inside there's like

13   some legs.  It's like the negative space of some legs.

14   Q.     Okay.  What you're holding up, the larger piece we'll

15   mark as 1140-A.  And is there a date on that particular mold?

16   A.     Yeah.  These say 10/23.  These don't have dates.

17          MR. NOLAN:  The mold that's dated October 23 will

18   be marked as 1140-D; is that correct?

19          MS. AGUIAR:  The big one is A.

20          MR. NOLAN:  Thank you.

21   Q.     Now, I just want to focus for just a moment on 1140-A.

22          Do you recall  -- do you see the date on that as

23   being October 23?

24   A.     Yes, I do.

25   Q.     And who put the date on that?

1   A.   Gentle Giant.

2   Q.   And of what year?

3   A.   2000.

4   Q.   Do you know that Carter Bryant's last day of employment

5   at Mattel was October 19th, 2000?

6   A.   I didn't know what his last day was.

7   Q.   In any event, did you show -- first of all, when you

8   went to pick these up from Gentle Giant, were you alone?

9   A.   Yes, I was.

10   Q.   Did you bring them back and show them -- now I'm talking

11   about the mold itself -- to Carter Bryant?

12         MR. PRICE:  Objection, your Honor.  This is beyond

13   the time frame.

14         THE COURT:  Sustained.  I believe.  Unless you want

15   to bring this -- actually, I'm not clear what the time frame

16   is you're referring to in that question.  So why don't you

17   rephrase.

18         MR. NOLAN:  Thank you.

19   Q.   On October 23, when you picked this up from Gentle

20   Giant, do you know whether or not Carter Bryant had seen this

21   mold at Gentle Giant before October 23rd?

22   A.   No, Carter never saw these.

23   Q.   And the corresponding resin cast that's depicted in

24   photograph 1141, this is going to be in the white notebook.

25   Could you take a look at that for me.  1141.

1   A.   Right.

2   Q.   Do you recognize that photograph?

3   A.   Yeah, it's a cast of what these were molded out of.

4   It's a resin cast, not wax.

5            MR. NOLAN:  Your Honor, I'd offer the photograph of

6   the resin cast, which is depicted in 1141.

7            MR. PRICE:  Object.  It's beyond the time frame.

8            THE COURT:  Sustained.  Lay further foundation,

9   Counsel.

10           MR. NOLAN:  Your Honor, can I take one minute as a

11  sidebar real quick?

12           THE COURT:  All right.

13           **(SIDEBAR CONFERENCE HELD.)**

14           THE COURT:  Yes.

15           MR. NOLAN:  Your Honor, Mattel pushed the time

16  period beyond October 19th and asked numerous questions with

17  respect to the status of various matters with Paula Garcia

18  and pushed it well back into November.

19           THE COURT:  My standard has always been that I

20  would permit evidence past the October 19th date as long as

21  it's referencing back or is relevant to issues at or before

22  the October 19th date.  So that's why this last question that

23  you asked, even though it was October 23rd, the answer as

24  such was basically saying it was going backwards in time into

25  a relevant period.  And that's fine.  And that's the

1    demarcation.

2              MR. NOLAN:  I understand.  I'm sorry.

3              THE COURT:  Does that make sense?

4              MR. NOLAN:  Yes, it does.

5              THE COURT:  Okay.

6              **(CONCLUSION OF SIDEBAR CONFERENCE.)**

7              MR. NOLAN:  So there's an objection to 1114?

8              MR. PRICE:  Yes.

9    **Q.**   BY MR. NOLAN:  All right.  I want to just focus you back

10   to this mold that you picked up from Gentle Giant on October

11   23.

12   **A.**   Okay.

13   **Q.**   When you were designing the clay figure that you

14   delivered to Gentle Giant, were you looking at and making

15   reference to Carter Bryant's concept drawings?

16   **A.**   No, not at this point.

17   **Q.**   Going back in time, and now I want to try to break this

18   up into time periods, if I could, with you.

19              Your first phone call with Carter Bryant came

20   toward the end of September; correct?

21   **A.**   Yeah, towards the end.

22   **Q.**   Could you estimate for the jury how much time you spent

23   talking with Carter Bryant or meeting with Carter Bryant from

24   the first phone call that you had through October 19th of

25   2000?

4167

1    A.    Maybe an hour, hour and a half total.

2    Q.    Do you have any idea whether Carter Bryant was doing any

3    work on the Bratz line during the period of the time that he

4    spoke to you on the telephone in late September through

5    October 19th, 2000?

6              MR. PRICE:   Objection.   As to the characterization

7    of the phone call being late September.

8              THE COURT:   Rephrase, Counsel.

9    Q.    BY MR. NOLAN:   Just go back real quick.   You recall by

10   looking at your calendar, you said your first meeting with

11   Carter Bryant was on September 29th; correct?

12   A.    The first meeting was when he brought me the drawings,

13   which was a little before that.

14   Q.    Okay.   A little bit before that.   That's right.   And

15   just before that, you had received a phone call from

16   Mr. Bryant?

17             MR. PRICE:   Object.   Ambiguous, just before that.

18   That's not what she said.

19             MR. NOLAN:   Okay.

20             THE COURT:   Rephrase.   Thank you.

21   Q.    BY MR. NOLAN:   From the first phone call that you had

22   with Carter Bryant -- in fact, do you have a notation

23   anywhere in your calendar that might help us or assist us in

24   determining when you first received a phone call from Carter

25   Bryant?

1   **A.**   The date?

2   **Q.**   Yes.

3   **A.**   Let me look.  What was the number of my notebook?

4   **Q.**   It's 1137.

5   **A.**   It would have been somewhere around September 20th.

6   **Q.**   So my question, then, is, from the period --

7          MR. PRICE:  If I can object and have her identify,

8   your Honor, what just refreshed her recollection.

9          THE COURT:  Very well.  Counsel, ask the question.

10  **Q.**   BY MR. NOLAN:  What did you look at, if anything, to

11  refresh your recollection that allows you to estimate that

12  the first contact with Carter Bryant came around September

13  20th of the year 2000?

14  **A.**   Well, I was just trying to count backwards from

15  September 29th, and it took me two or three days to sculpt

16  after Carter gave me the drawings.  And then it was after

17  that call, it was like a week or less that he brought me the

18  drawings.  So I'm just guessing that it was somewhere around

19  the 18th, 19th, 20th.

20  **Q.**   Okay.  But in any event, from the first phone call from

21  Carter Bryant, which you estimate to be around September 20th

22  of the year 2000, through the date of October 19th, 2000, is

23  it your testimony that you spent possibly as much as an hour

24  and a half either discussing with Carter Bryant issues or

25  meeting with Carter Bryant?

1   A.   Correct.

2   Q.   During that same period of time, were you having

3   conversations with Paula Treantafelles Garcia?

4   A.   Well, there were several meetings, and she was at at

5   least one or more of the meetings.

6   Q.   And were you also having conversations with Veronica

7   Marlow?

8   A.   At the meetings, yes.

9   Q.   You have identified for us the large mold on the left,

10   and I want to now turn your attention to the three that are

11   on the -- to the left of that.

12        Do you see that?

13   A.   Yes.

14   Q.   And what are those three?

15   A.   These are -- this is the legs.  After I cut it up, you

16   have to start working on each individual part.  So in here

17   there are two legs.  And you can see here's the torso, which

18   would be, you know, the neck, the shoulders without the arms,

19   down to the hips.  This is the arms.  It would be two arms.

20   And this is the head.

21   Q.   Now, directing your attention to the head, can you just

22   tell us the sculpt -- the exhibit number that's on the sculpt

23   of the head?

24   A.   1140-D, like dog.

25   Q.   Okay.  The sculpt for the head, did you pick that up

1    from Gentle Giant in October of 2000?

2    A.    Yes.

3    Q.    Is it possible, Mrs. Leahy, that you ever did a sculpt

4    of the Bratz head in June of 2000?

5    A.    In June of 2000?

6    Q.    Yes.

7    A.    No.

8    Q.    Do you know a woman by the name of Anna Rhee?

9    A.    Yes, I know Anna.

10   Q.    And how do you know Anna?

11   A.    She's a face painter in the industry.

12   Q.    Is she employed by Mattel?

13   A.    No.  I know she was at some point in her career but not

14   when I was there.

15   Q.    Do you understand her to be a vendor?

16   A.    She's a free-lance, yeah, vendor.

17   Q.    Do you recall ever giving Anna Rhee a sculpt of a Bratz

18   doll head?

19   A.    No, I never gave her a sculpt of a doll head.

20   Q.    Prior to you picking up 1140-D, which is a sculpt of the

21   Bratz -- the mold of the Bratz head for Gentle Giant, had you

22   ever done another sculpt of a Bratz head?

23   A.    Other than this mold?

24   Q.    Other than that mold.

25   A.    No.

1  Q.   As of October 19th, 2000, was there a final Bratz

2  sculpt?

3  A.   No.

4          MR. PRICE:  Objection.  Irrelevant.

5          MR. NOLAN:  Time period, your Honor.

6          THE COURT:  Was there an objection?

7          MR. PRICE:  It's irrelevant.

8          MR. NOLAN:  Time period.

9          THE COURT:  Wait a second, Counsel.

10          It's not relevant.  Sustained.

11  Q.   BY MR. NOLAN:  The mold that you have there as 1140, you

12  said was presented at a meeting on October 25th at MGA; is

13  that correct?

14  A.   Well, the mold wasn't.  But a resin cast of what's

15  inside was.

16  Q.   The resin cast that was presented.

17          Was the resin cast that was contained in trial

18  Exhibit 1140, 1140-A through -D, ever presented to MGA prior

19  to October 25th of 2000?

20  A.   No.

21  Q.   After October 25th, 2000, were substantial changes made

22  to this particular mold?

23          MR. PRICE:  Objection.  Irrelevant.

24          THE COURT:  Sustained.

25  Q.   BY MR. NOLAN:  When you picked up this mold from Gentle

1    Giant and the clay resin that was contained in it, did you at

2    any time after -- well, let's keep it -- I'm sorry.  I always

3    get in trouble when I say at any time.  After you picked it

4    up and you brought it home, did you go back in any way to

5    check to see whether or not they were similar to Carter

6    Bryant's concept drawings?

7              MR. PRICE:  Objection.  Irrelevant, time period.

8              THE COURT:  We're not going to finish this today.

9    Why don't we take this up outside the presence of the jury,

10   Counsel.

11             I'll send the jury home tonight.  And we'll see the

12   jury tomorrow morning at 9:00.

13             **(WHEREUPON THE JURY WITHDRAWS.)**

14             THE COURT:  Please be seated.

15             Mr. Nolan, I'm not seeing the relevance of these

16   last series of questions, the changes to the mold on --

17             MR. NOLAN:  I just wanted to wait until Mrs. Leahy

18   left the courtroom.

19             THE COURT:  That's fine.  What's the relevance of

20   this?  The changes afterwards or whether they are similar to

21   the drawings?

22             MR. NOLAN:  Your Honor, just to show that the

23   concept drawings and the connection to the sculpt, that there

24   isn't a connection, and on their proposed verdict form, and I

25   understand that we're not trying to negotiate around what

1    their verdict form is going to be, but I want to make

2    absolutely clear that we have an opportunity to establish

3    that the sculpts were not tied to Carter Bryant's drawings

4    other than the initial interests operation and that Carter

5    Bryant did not have specific direction, because I just submit

6    to your Honor that one of the forms of the verdict form says

7    and any sculpt that Carter Bryant directed or gave directions

8    on.

9          That's why I was trying to go around this

10   particular date.  I'm mindful of the time limitations --

11         THE COURT:  I still don't get any changes in the

12   sculpt after.  Even if that's all true, I still don't see the

13   relevance of subsequent changes.

14         MR. NOLAN:  Well, I accept that, your Honor.  And I

15   understand that.  What I was trying to say is that one of my

16   questions, I thought related back in time.  I took this mold,

17   which is October 23rd, recognizing that I can't go out in the

18   future, but I did try to establish that when she picked up

19   this mold and the clay resin that was in it, the resin

20   sculpt, that she didn't go back and confirm that this resin

21   was similar to or that she used the concept drawings for any

22   purpose or that she took them back to Carter Bryant and said

23   is this consistent with what you told me to do.

24         Those kinds of lines of questions, which throws me

25   back into the relevant time period.  That's what I was trying

1    to do.

2              THE COURT:  Okay.  Just to that last question

3    there.

4              MR. PRICE:  It doesn't bring back to the relevant

5    time period because the question is what did you do after

6    October 23rd.  After October 23rd did you go look at a

7    drawing.  After October 23rd --

8              THE COURT:  The question is what was done up to

9    October 19th.

10             Anything further, Mr. Nolan?

11             MR. NOLAN:  No, I think I'll tighten that up

12    tomorrow.

13             THE COURT:  All right.  As phrased right now, the

14    relevancy objection is sustained.  We'll take it up in the

15    morning.

16             Anything further that we need to address at this

17    time, or are we good to go for tomorrow?

18             Mr. Zeller?

19             MR. ZELLER:  Thank you, your Honor.  Mattel would

20    asked for leave to file two motions.  Number one is a JMOL.

21             THE COURT:  Is a who?

22             MR. ZELLER:  Judgment as a Matter of Law.

23             THE COURT:  I suspect I'm going to hear in a few

24    moments about a motion from Mr. Nolan as well.

25             MR. ZELLER:  Yes, I suspect so.  And the next

1 | motion is a motion to compel client to testify in our

2 | rebuttal case.  We've been having some back and forth.  And

3 | we'll obviously attempt to resolve it, but there's not a lot

4 | of time.  So we would like the opportunity to file a motion.

5 | THE COURT:  What came up in the defense's case in

6 | chief that was not reasonably anticipated?

7 | MR. ZELLER:  Your Honor, in terms of the subject

8 | matter of what we would ask Mr. Bryant about, I would

9 | respectfully submit that this isn't necessarily the forum to

10 | be telling the other side what we intend to examine

11 | Mr. Bryant on.  I trust that we will make a showing to the

12 | Court as to the proprietary -- the propriety, rather, of

13 | rebuttal.  If that's going to be a ground that they are going

14 | to oppose on.

15 | As I understand, at least one of the principal

16 | issues would just simply be a jurisdictional one.  They seem

17 | to be taking the position that he simply can't be compelled

18 | regardless of whether or not the standard is met.

19 | Now, whether that's ultimately their position, I

20 | don't want to try and speak on their behalf, but certainly

21 | you know, to the extent that that is a basis that is raised

22 | as to why Mr. Bryant should not be ordered and come and

23 | testify in rebuttal, then we would address it there.

24 | But I would certainly say right now I think it

25 | would be a little unfair.

1          THE COURT:  The judgment as a matter of law is

2    directed towards what?

3          MR. ZELLER:  I think that the main event on that

4    really is ownership of certain works that Mr. Bryant

5    acknowledged or created when he was employed by Mattel.

6          THE COURT:  Mr. Nolan?

7          MR. NOLAN:  Your Honor, if I could address first

8    Carter Bryant and then come back to the judgment.

9          THE COURT:  Yes.

10          MR. NOLAN:  We certainly do have a right, a

11    standing to argue an issue with respect to whether or not

12    they should have the right to -- not the right to recall him,

13    yes, I guess I would describe it as the right to recall him

14    in the context of whether or not the subject matter that they

15    want to address could have been anticipated in advance.

16          Sometimes it's referred to as sandbagging.

17    Sometimes it's referred in other ways.  But I cannot imagine

18    that there was an issue that came up in the first hour of our

19    case, because that's when, as I understand it, your Honor, we

20    had played the Jacqueline Prince videotape.  That was the

21    only evidence that we had presented in our case, and it is

22    what we mentioned earlier in the week, that we were advised

23    on Monday night.  I think it was Monday night, for the first

24    time, on a scheduling issue, because Ms. Anderson was

25    advising that they were calling Carter in rebuttal.  And I

1    found out at that time, kind of curious and interesting that

2    they were able to after one video say they want Carter back.

3         So I do want an opportunity to argue whatever

4    suggestion that they are making, a surprise, oh, my gosh, out

5    of all of the witnesses in the world, that they would have to

6    bring Carter Bryant back.  I want to address that.

7         Let me turn to the judgment as a matter of law

8    motion.

9         Your Honor, Mattel well knows the evidence, the

10   record evidence in this case that there is a factual dispute

11   as to the drawings, the concept drawings as to when they were

12   done.  There is an issue, we've never contested it, with

13   respect to the color enhancement, whatever color is affixed

14   mechanically, the cranes -- I don't know how I did it.

15        But the drawings conceived and developed at Mattel,

16   while at Mattel, we went through laborious testimony,

17   factual, and I think the jury is going to be, as the trier of

18   fact, has to be making a decision as to whether or not those

19   were original concept drawings done while at Mattel or simply

20   a mechanical transfer process of tracing.

21        That was a lot of evidence in the case.  There's a

22   disputed record on it.  I do not believe that there is any

23   basis in the record to grant judgment as a matter of law on

24   that.

25        I will say, your Honor, for the record, that with

1   respect to the fashions, the evening wear fashions that are

2   drawn on the original concept drawings, I will represent to

3   the Court there is no evidence that they were ever used by

4   MGA, nor is MGA taking the position in this case that we have

5   control of the fashions.

6           Nor am I contending that we claim ownership to the

7   color or the various colors that appear on those outfits.

8   But that's not the issue in this case, your Honor.  I think

9   that the trier of fact will have to render a verdict based on

10  the evidence that came in and is hotly disputed whether or

11  not those drawings, the drawings were actually done while at

12  Mattel or whether or not it was merely a mechanical process

13  with no creativity involved.

14          THE COURT:  Very well.  And are you seeking leave

15  to file your own motion?

16          MR. NOLAN:  Yes, your Honor.  My best estimate is I

17  think we're going to file it tomorrow morning.  It won't be

18  lengthy, I promise you.  And I don't want to represent right

19  now what it is that we intend to file.  I want to, although

20  if I have to reserve right now, I can give you kind of a

21  broad scope.

22          THE COURT:  Well, just if you would for the record,

23  what -- would you specify the type of motion that you are

24  seeking to file?

25          MR. NOLAN:  Sure.  It will be a judgment as a

1   matter of law.  With respect to the Hong Kong entity.

2            THE COURT:  Very good.

3            MR. NOLAN:  And then one of the other points in

4   there will go to some of the contractual aiding and abetting,

5   and in particular, the inducement of the tortious

6   interference.

7            THE COURT:  Very good.

8            MR. NOLAN:  But I haven't seen the final draft.

9            THE COURT:  I understand.  All right.  I will give

10  leave -- all I'm doing is giving leave at this point in time

11  to both Mattel and to MGA to file their respective judgments

12  as a matter of law.  Motions for judgment as a matter of law.

13  I'm going to request both sides to keep those to five pages

14  as the Court has tried to do in motions during the trial.

15  And I'll also give leave for a motion to compel the testimony

16  of Carter Bryant.  I agree with Mr. Nolan.  I can't conceive

17  of what it is that was not reasonably anticipated, but since

18  I don't know what it is, I can't make that judgment.  And

19  I'll wait and see what is set forth in the motion.

20            You indicated that your motion -- MGA's motion can

21  be filed tomorrow.  When can I expect Mattel's motions to be

22  filed?

23            MR. ZELLER:  Our expectation is tomorrow as well.

24            THE COURT:  Very well.  Tomorrow is the 3rd.  And I

25  would then anticipate oppositions to the motions to be

1    filed -- I'm going to say by noon on Monday.  And actually,

2    they can be filed anytime on Monday.  But I'd like to receive

3    oppositions in chambers, copies of the oppositions on Monday

4    by noon.

5           So the Court can rule on these if necessary on

6    Monday afternoon.  I am planning to hold a hearing in this

7    case on Monday afternoon to go over the jury instructions and

8    the verdict form for Phase 1-A.  And what I'd like to be able

9    to do is be in a position to also hear any argument on these

10   three motions and hopefully decide these three motions on

11   Monday afternoon as well.  So if I can get the oppositions,

12   the Court is going to limit this to the motion and the

13   opposition, five pages each.

14          MR. NOLAN:  Do you have a time preference in the

15   afternoon?  Not for the filing of the motion but for the

16   hearing?

17          THE COURT:  For the hearing, let me get back to you

18   on that.  I got to take a look at my criminal calendar and

19   see.  Let me take a look at my criminal calendar, and I'll

20   get back to you on that tomorrow.

21          MR. NOLAN:  Can I raise two quick points?

22   Actually, two small points and two not too big issues.

23          On the time count, your Honor, the Janet Bryant --

24          THE COURT:  Oh, yes.

25          MR. NOLAN:  I've been told that MGA's time on it

1    was one hour and two minutes.  And Mattel's was 18 minutes.

2              THE COURT:  Very good.  So I've got to transfer 18

3    minutes from the defense to Mattel.

4              MR. NOLAN:  Correct.  And then we had raised the

5    issue of Rodney Palmer's video.

6              THE COURT:  Okay.  That's right.  I still have to

7    review Mr. Palmer's video deposition.  I haven't done that.

8    I'll have that ready for you tomorrow morning.

9              MR. NOLAN:  I add to it that we learned that

10   Mr. Palmer is not here.  That he's on vacation on the East

11   Coast.  I was advised of that by Mr. Quinn.  Because when I

12   saw the objections, I said can you have him here then

13   present.  And we'll just put his testimony on as a 30(b)(6)

14   witness.  And I've been advised that he's not in the

15   jurisdiction.

16             Last point, your Honor, is that much like what we

17   went through over the last couple days on Custodian of

18   Records subpoenas, we've issued a Custodian of Records

19   subpoena to Mattel trying to get in some documents, and we

20   were confronted with objections, and what we would really

21   like to do is get this custodian issue and the documents out

22   of the way tomorrow if we could.

23             THE COURT:  Who do you have?  How much longer do

24   you have with Ms. Leahy approximately?

25             MR. NOLAN:  Oh, I think maybe -- I've never wanted

```
1   to sound like Mattel.  I think more -- not more than 10
2   minutes.
3            THE COURT:  All right.
4            MR. NOLAN:  15 minutes.
5            THE COURT:  And you have Mr. Palmer.  You want a
6   Custodian of Records.  What other witnesses are you planning
7   to call?  I know you anticipated or hoped to rest tomorrow.
8   I don't know if that's possible.  But what rounds out your
9   case at this point?
10           MR. NOLAN:  It's going to be off the top of my
11   head.  One of the issues is Mr. Kilpin, which I believe we
12   submitted that e-mail to you about.
13           THE COURT:  I've got that here.  Is that the
14   primary purpose of calling Mr. Kilpin?
15           MR. NOLAN:  Yes.  Although what I'd like to do is
16   take a very, very brief but strong point of trying tomorrow
17   to show to you where Mattel categorically opened up the door
18   to allow us to get in the marketing plans.  Not all of them.
19   We would redact them down to the limited portions of what
20   Mr. Kilpin had reflected there based on some testimony that's
21   been offered in the case.
22           THE COURT:  All right.  As well as the e-mail
23   itself.
24           MR. NOLAN:  As well as the e-mail itself.
25           THE COURT:  All right.  Who else besides
```

1   Mr. Kilpin, the Custodian of Records, Mr. Palmer.

2            MR. NOLAN:  And then we have the video play of

3   Richard Irmen, Jeanne Galvano, which is the friend, both of

4   those videos, your Honor, run about an hour each.

5            THE COURT:  Right.

6            MR. NOLAN:  And then I have Mr. De Anda.  And right

7   now I'm sure I'll be getting a note.  But that's my best

8   estimate for tomorrow.

9            THE COURT:  Do you have any witnesses beyond that

10  before you rest?

11           MR. NOLAN:  I just -- I don't think so.  But I

12  want -- that's my best estimate right now, your Honor.  But I

13  want to go back and think about this and reflect on it to

14  make certain that we have everybody.  There may be somebody

15  else.  It's just not coming to mind right now.

16           THE COURT:  Well, assuming the Court doesn't have

17  any major interruptions tomorrow, it seems that we can get

18  through most of this tomorrow.  So what I'll hear in the

19  morning, then, is I'll rule on the Palmer transcript, and

20  I'll hear argument and make a decision on the Kilpin

21  testimony.  Was that right?  Kilpin?

22           MR. NOLAN:  Kilpin.  The one other witness, your

23  Honor, is Jill Thomas.  She's still on the witness list.

24  This is the argument that Mr. Quinn made about gee, she's,

25  you know, in charge of litigation.  She's got a lot of

1    privilege issues and stuff like that.  We recognize that, but

2    as I said earlier, tying it back to this custodian of record

3    subpoena issue and the documents, if any, that are going to

4    be produced, I mean, we have two of our general counsel on

5    the stand today testifying.

6              THE COURT:  I understand.  All right.

7              MR. NOLAN:  And then there was one other thing that

8    just slipped my mind.  I'll let somebody else talk.  If I can

9    remember what it was, I'll come back to it.

10             THE COURT:  Very well.  Counsel?

11             MR. QUINN:  Your Honor, every time my friend

12   Mr. Nolan talks about why he wants to get Jill Thomas on the

13   stand, we hear a different account.  When we raised this, was

14   it yesterday?  What day of the week is it?  Yesterday, it was

15   because of Rachel Harris, that she had had a meeting with

16   Rachel Harris and he wanted to ask her about that.

17             In the supplemental witness list that we got last

18   Friday, in the box for expected subject matter, it was

19   credibility of Carter Bryant.  And now we've heard in some

20   very vague fashion that it's relating to Custodian of

21   Records.

22             MR. NOLAN:  I apologize.  When I say the Custodian

23   of Records documents, your Honor, we've subpoenaed from the

24   Custodian of Records any documents that were produced to

25   Rachel Harris.  That's the reference I was making before.

```
 1              THE COURT:  It's the Custodian of Records of

 2   documents related to Rachel Harris to impeach Carter Bryant.

 3   Maybe it's all one.  It's a seamless --

 4              MR. QUINN:  It's a gestalt, clearly.

 5              MR. NOLAN:  No, it's a carom shot.

 6              THE COURT:  Be that as it may, Counsel.

 7              MR. QUINN:  The Court, I think, knows our view.

 8              THE COURT:  I do.

 9              MR. QUINN:  There needs to be a proffer.  I

10   suggest, given Ms. Thomas's involvement in this case, there

11   should be some specific proffer --

12              THE COURT:  What is your concern about Ms. Thomas?

13              MR. QUINN:  She wasn't -- I know this hasn't been a

14   terribly powerful argument up to this point, but she wasn't

15   on the witness list.  We got notice of her June 30th.  I

16   think that's last -- whenever that was.  Well, we got it last

17   Friday.

18              THE COURT:  Okay.

19              MR. QUINN:  She's not on the witness list.  She's

20   intimately involved, truly a member of our litigation team

21   from the inception in this case.  All I asked for -- my view

22   is given that, there ought to be some reason.  It's like

23   calling trial counsel to testify.  There ought to be some

24   articulated reason.  And MGA has now had at least three times

25   to say give us a reason, and they haven't given us one that I
```

 1  think has any force to it.

 2          I mean, she met with Rachel Harris, didn't give her

 3  any documents.  Harris didn't -- she didn't -- she didn't

 4  give Harris any documents.  Harris didn't give her any

 5  documents.  Why is that reason for invading our camp and

 6  putting the in-house lawyer responsible for this case who

 7  wasn't on the witness list on the stand?

 8          THE COURT:  Very well.  What about this Custodian

 9  of Records issue?

10          MR. QUINN:  Custodian of Records issue.  We got a

11  subpoena last Thursday for a Custodian of Records.  It

12  identifies 22 documents.  Actually, I think it only

13  identifies perhaps 21 documents and a category, all documents

14  that, you know, a Custodian of Records for any documents that

15  Ms. Thomas gave to Ms. Harris or Ms. Harris gave to

16  Ms. Thomas.  I forget which one it is.  And then on Monday we

17  got a supplement to that adding another dozen documents.

18          So we have a Custodian of Records subpoena, now 34

19  documents on it.  The return date was less than five days.

20  It was, you know, if we got last Thursday, I think a return

21  date was today for the subpoena.

22          Your Honor, there isn't any procedure under the

23  Federal Rules to do this.  This is like a -- I mean, the

24  Court's fully aware of the discovery procedures.  This is

25  like a 30(b)(6) Custodian of Records deposition.  Show up

1    with all the -- whatever documents Ms. Thomas gave to

2    Ms. Harris.

3                There is nothing in the Federal Rules that

4    authorizes this.  That authorizes subpoenaing, you know, some

5    identified person to authenticate documents in trial.  You

6    know, even as to the categories where they do list the

7    documents.

8                THE COURT:  Are there disputes as to the

9    authentication of these documents?

10               MR. QUINN:  Some of them there are.  Some of them

11   there are.  We did go through that procedure, pretrial

12   exhibit list, and some of them, there were questions as to

13   authenticity reserved, objections were preserved.

14               What this is, your Honor, 34 documents at this

15   point on a subpoena return date five days before it was

16   supplemented and then supplemented two days?  This is

17   discovery in the middle of trial.  We shouldn't have to deal

18   with this at this point.  There just is no authority in the

19   Federal Rules for doing it.

20               THE COURT:  Very well.  Let me hear from someone

21   from MGA on this.

22               Ms. Aguiar.

23               MS. AGUIAR:  Okay.  So I have in front of me a

24   subpoena to a Custodian of Records to MGA, and it's dated

25   June 12th, 2008.  The return date is June 17th, 2008.  This

1   is Mattel to us.   It has an attachment with a number of

2   exhibits listed.   Number 7 is not a specific document.

3   Number 7 says any other exhibits on the parties' trial

4   exhibit lists in your possession, custody, or control that

5   have not yet been authenticated.

6           As your Honor may recall, the trial exhibit lists

7   in this case are nothing less than gi-normous.

8           We served -- and let me back up.   We provided to

9   Mattel a Custodian of Records.   We made general objections.

10  But we didn't move to quash.   We said okay.   Tell us what

11  documents you want to ask them about.   We'll provide them to

12  you.   Craig Holden came here, took the stand, and they put

13  documents in front of him.

14          We served a similar Custodian of Records subpoena,

15  and I can personally tell you that when the associate who is

16  working on the case with me came to me and said should I use

17  similar language to the catchall category that Mattel used,

18  and said any trial exhibits, I said no.   You know what?

19  Because I don't think that's appropriate.

20          So we put a category.   We did put a residual

21  category that we said things in your possession that we tell

22  you about at least 24 hours before, because I didn't think

23  that it was fair to say any exhibit on the list.   So the --

24  if we want to talk about there being no procedure under

25  Federal Rules, then I think it should run both ways.   They

1    served one on us.  We complied with it.  We provided the

2    witness.  The witness showed up, and the witness testified to

3    the documents that they asked him about.

4              We did a similar thing -- if we want to quibble

5    about how many days there were between the time when we both

6    served it and when we asked for it to be returned, well, I

7    don't really think that's the point.  We have a fairly narrow

8    universe of documents.  If they would like, we can get back

9    to them either tonight or first thing in the morning and let

10   them know definitely which ones we would do with the

11   custodian.  But I think clearly it's a fair procedure, your

12   Honor.

13             THE COURT:  Thank you.

14             Mr. Quinn?

15             MR. QUINN:  Your Honor, they brought a document

16   custodian.  They agreed to do that.

17             THE COURT:  You did serve a subpoena on them in the

18   middle of trial.

19             MR. QUINN:  We did serve a subpoena on them.  They

20   brought a document custodian.  They didn't get up here like I

21   am and say I've been served with a list of 34 documents at

22   the end of the trial, and there's no authority for it.  And,

23   your Honor, you remember what happened when we were at

24   sidebar?  We were trying to get 1932 in, and counsel said you

25   can't do it with a Custodian of Records.

```
 1              Drolnick (phonetic) is coming up.  You can do it

 2   with her.  The Custodian of Records has no knowledge about

 3   that.  We didn't get in a single -- there was one document I

 4   put in front where there was a conditional admission.  That's

 5   what that all amounted to at the end of the day, one

 6   document.  And even that didn't come in until Mr. Marlow took

 7   the stand earlier today, I think it was.

 8              Now I'm dealing with a list of 34?

 9              THE COURT:  I understand.  And you know, I want to

10   treat both parties the same, though, Counsel.  So I do think

11   that you need to come up with a custodian just as they did.

12   I will certainly reserve for you the same rights to object as

13   MGA objected in terms of foundational objections to the

14   custodian not having knowledge.

15              I mean, it really does seem -- I want to treat both

16   sides the same here.  What's good for the goose is good for

17   the gander.  I know that it's not named in the Federal Rules

18   of Civil Procedure, but that's essentially what we're trying

19   to enforce here.  There is a voluminous number of documents.

20   And I'm sure Mr. Nolan could give us a recap in terms of the

21   actual numbers, but I think we've had to adopt certain unique

22   procedures in this case just to marshal this effectively

23   consistent with the time allotted by the Court.

24              So the Court has developed some procedures that are

25   not normally imposed, and one of them that makes sense to me
```

1   is having a kind of catchall custodian to get in those

2   documents that need to be -- that do need to be moved into

3   evidence that don't naturally line up with one of the

4   witnesses.

5           You have very forcefully argued that I should just

6   permit these documents in as long as there's a stipulation of

7   authenticity.  And the Court is satisfied with the relevance

8   of foundation without a witness.

9           I have insisted on a witness just to -- as part of

10  the case management here.  What I think we need to do tonight

11  is I do think the -- your request to have a definitive list

12  on the documents, a refined list of the documents is a

13  reasonable one.  I hate to rule in the abstract without

14  knowing what documents that we're talking about.  And just

15  what role those documents play in this case.

16          So I guess what I'm inclined to do is say get

17  together tonight.  Let's go over the exact documents that you

18  absolutely need.  Certainly if there's no dispute over

19  authenticity, I think that's an appropriate way to get them

20  in.  And if there is a dispute over authenticity, that's a

21  whole separate question.

22          And if Mattel has reserved their rights to

23  challenge, that puts it in a different category than the

24  documents that were in question with MGA.  And you have

25  preserved those rights, and you can exercise those objections

1  and it's incumbent, then, upon MGA to come up with a way of

2  authenticating that.

3           If they don't, then the document doesn't come in.

4  But if there's been a stipulation to authenticity, I can't

5  think of any documents that you so stipulated that Mattel

6  sought to introduce that have not been introduced at this

7  time.  Am I mistaken on this point?

8           MR. QUINN:  Frankly, I can't think of it.

9           THE COURT:  Well, if there are, let me know

10  tomorrow.  Because the Court by imposing this is not

11  attempting to preclude either side from getting in documents

12  that are essentially stipulated to and the Court does believe

13  is relevant, or are relevant to the proceedings.  I want

14  those documents to come in and go before the jury.

15           MR. QUINN:  What I'm hearing --

16           THE COURT:  And the other thing I want to say, the

17  other thing that needs to be done tonight is that Mr. Nolan

18  or whoever is responsible for Jill Thomas needs to sit down

19  with Mr. Quinn or whoever is responsible for responding to

20  that and lay out clearly what it is that she's being called

21  for.  She is counsel, and just as with when there was talk

22  about calling Ms. Glaser or other witnesses, the Court has

23  imposed a higher standard in terms of making the proffers,

24  which I haven't imposed on other witnesses.

25           I think that is a reasonable request in light of

4193

```
 1   the role that Ms. Thomas played in litigation here.
 2             MR. NOLAN:  It is reasonable, your Honor.  And
 3   we'll meet.
 4             My only point, to make this really clear, is that
 5   Jill Thomas, of course, the testimony is that she interviewed
 6   a third party witness that Mattel did not represent who then
 7   came in and testified and related that she had -- that's the
 8   only issue, and --
 9             THE COURT:  Here's what I'll do.  I'll take this up
10   tomorrow morning.  I'll want in terms of the Custodian of
11   Records issue, those documents identified for the Court.  Let
12   me take a look at them.  You know, this process may not work
13   with respect to ones where there's not a stipulation on
14   authenticity.  And that's going to have -- MGA is going to
15   have to find a way to get those documents in some other way.
16   But to the extent there's a stipulation, I think the
17   custodian of record is a reasonable way of doing that.
18             I'll expect Mattel to make that available, provided
19   that there's no other objections to it that can't be answered
20   by the custodian.  And I'll take that up in the morning.
21   Jill Thomas, I'll take that up in the morning.  The Palmer
22   transcript, I'll take that up in the morning.  And Kilpin,
23   I'll give leave to MGA to argue that.
24             So those four issues will be taken up in the
25   morning before the start of the trial at 9:00.
```

1    MR. NOLAN:  Your Honor, there was one name that I

2    left off.  And Cassidy Park.  And she's been on the list.  I

3    sent an e-mail to Mr. Quinn about this.  Mr. Quinn was

4    surprised because he said gee, I thought she was finished.

5    My distinct memory, and you may recall this, is that they

6    called her.  I was cross-examining her, and I believe the

7    Court asked me to stop in light of the third party schedules

8    that were going on.  And you said, you know, call her in your

9    case.

10    THE COURT:  Someone is going to have to show me a

11    transcript.  I just don't remember one way or the other.  I

12    know Cassidy Park was called as a witness, and we heard from

13    her.  I don't know if I excused her or not.  So if someone

14    could provide me a transcript.  And it's not that I'm

15    questioning you.  I take it that Mattel disputes that?

16    MR. QUINN:  I've looked at the transcript.  And

17    you'll see that Mr. Nolan gets into an issue.  There is a

18    sidebar.  There's a discussion.  We can do this by

19    stipulation.  The last words are Mr. Nolan says, "I'll deal

20    with this later."

21    I think pretty clearly dealing with the

22    stipulation, and she leaves the stand.  And I assumed that

23    was the end of it.  I was very surprised to hear he wanted to

24    call her back.

25    THE COURT:  Did I excuse her?  I know I tried to

1   make the practice of saying you're excused.

2        MR. NOLAN:  I don't believe so, your Honor.  And

3   Mr. Quinn will, if he looks earlier in the transcript, this

4   is where you were concerned about the third party witnesses,

5   and you said something about, you know, they have taken 10

6   minutes.  Can't you call her back.  At least that was my

7   understanding.

8        THE COURT:  Take a look at the transcript, and

9   we'll take this up tomorrow morning as well.

10       MR. NOLAN:  Can we have a time count, your Honor,

11  before we leave tonight, if that's possible?

12       THE COURT:  Very well.  Give me a second here.  All

13  right.  That's all that MGA has at this point?

14       MR. NOLAN:  Yes.

15       THE COURT:  All right.  Let me do the time count,

16  and then -- I've got MGA at 33 hours and 47 minutes.  And I

17  have Mattel right at 45 hours and 5 minutes.

18       All right.  For Mattel?

19       MR. PRICE:  On the Carter Bryant motion, could we

20  make our proffer as to the relevance of the rebuttal

21  testimony in camera?

22       THE COURT:  Given that it's rebuttal testimony,

23  that makes -- I suppose that makes sense.

24       MR. PRICE:  Quite frankly, it's kind -- we have to

25  give the plaintiff notice because of where he is.  And it's

1    dependent upon what witnesses say, obviously.

2              THE COURT:  Can do you it in a written submission

3    to be submitted in camera, and then the Court after reading

4    it will decide whether or not the in camera submission is

5    justified, and we'll go from there.  I'll give you leave to

6    file the declaration concerning the anticipated testimony in

7    camera.  And then the Court will decide from there.

8              MR. PRICE:  The other issue is in the practicality.

9    If the Court rules on this Monday afternoon, he will not be

10   able to get here by Tuesday probably, given the time

11   difference between here and Kickapoo.  So -- Springfield.

12             THE COURT:  What do you suggest?

13             MR. PRICE:  Well, if we had a ruling Monday

14   morning, perhaps he could get out here.  Or I don't know if

15   they are actually going to be able to rest tomorrow.  There's

16   always the possibility of doing it the first thing Monday

17   morning.  If you rule in our favor.

18             THE COURT:  You get your motion to MGA tonight.

19             MR. PRICE:  I think the person will be sweating on

20   that.  But we can do that.

21             THE COURT:  You've made that clear for the record.

22             All right.  You get the motion to MGA tonight, and

23   then that gives MGA tomorrow, and I don't want people having

24   to worm --

25             MR. ZELLER:  I assume we'll deliver the in camera

1   declaration in the morning since I'm not sure there's a way

2   of getting it to you tonight.

3           THE COURT:  Very good.  I presume it's going to be

4   a relatively short motion.

5           MR. ZELLER:  Yes, your Honor.

6           THE COURT:  All right.  Anything else?

7           MR. ZELLER:  Yes, your Honor.

8           MR. NOLAN:  You know, I apologize.  Before we get

9   off the rebuttal case, is that the only rebuttal witness that

10  they intend to call?

11          THE COURT:  I don't know.

12          MR. NOLAN:  Could we ask?

13          THE COURT:  At this point, Counsel, it would be

14  helpful to the Court to know.

15          MR. QUINN:  Yes.

16          THE COURT:  Very good.

17          MR. ZELLER:  Just as a reminder with respect to the

18  Palmer declarations and the issue, from our perspective, the

19  main issue is whether or not that evidence comes in at all

20  because of the standards for spoliation.

21          THE COURT:  I understand.  I got my clue there when

22  I saw the objection to him stating his name in the

23  deposition.  That was the first hint that you are objecting

24  to the whole thing categorically.  So I got that.

25          MR. ZELLER:  Fair enough.  And then as an

1    administrative issue, we assume that the Court plans to

2    instruct the jury after the closing argument?

3            THE COURT:  No.  I instruct before.  That's always

4    been my practice.  It goes back to when I was a prosecutor.

5    I always liked having the instructions out there so I could

6    argue them to the jury.

7            MR. ZELLER:  That's helpful.

8            And that's it, your Honor.

9            THE COURT:  And they will know the verdict form as

10   well.  They will have -- they will have received the Court's

11   oral statement of the instructions and the oral statement of

12   the verdict form, and then they will hear your closing

13   arguments and go back into the jury room and will have

14   physical copies of both.  And in a case like this, I will

15   have a copy of the instructions for each member of the jury.

16           We'll only have one verdict form going back,

17   though.  Because that's the last thing I need.

18           Very good.  We'll talk about the hearing Monday

19   tomorrow as well.

20           MR. NOLAN:  Your Honor, just 30 seconds.  Would it

21   be the Court's intention to instruct the jury and then

22   immediately proceed to closing arguments?

23           THE COURT:  Yes.

24           MR. NOLAN:  And then the Court's practice with

25   respect to --

1          THE COURT:  And just so you know, based on what you

2     are telling me, is that it looks like you'll be resting

3     tomorrow or Tuesday at the latest.  I can't imagine the

4     rebuttal witness, if the Court permits it, is going to last

5     all that long.  So I would expect that Wednesday morning,

6     Wednesday will be devoted to closing arguments.  The Court

7     will begin in the morning with the instructions, and I will

8     expect closing arguments to be completed on Wednesday.

9          MR. NOLAN:  All right.  And the last question is

10    with respect to closing arguments, your Honor, is it the

11    Court's practice, since this is a civil case, not to allow

12    the plaintiff to have a rebuttal closing argument?

13         THE COURT:  No, the Court has always allowed

14    rebuttal closing argument.

15         MR. NOLAN:  And will there be --

16         THE COURT:  When there is a burden -- when the

17    plaintiff bears the burden of proof, generally that's the

18    Court's practice, is to allow the party bearing the burden of

19    proof to have a rebuttal case.

20         MR. NOLAN:  And I guess there's no surrebuttal.

21         THE COURT:  No.

22         MR. NOLAN:  I assume that as part of that process,

23    we would have time estimates so that there's not a situation

24    where the opening statement is 15 minutes long and then the

25    rebuttal is three and a half hours.

4200

1          THE COURT:  No, that won't be permitted.  The Court

2    will ask for time estimates and impose time limitations if

3    necessary.

4          MR. NOLAN:  Thank you.

5          MR. PRICE:  With respect to that, your Honor, is it

6    okay with the Court if one attorney does the initial closing

7    and another does the rebuttal?

8          THE COURT:  The initial -- I'm sorry?

9          MR. PRICE:  The opening closing, for example, one

10   attorney would do the opening closing --

11         THE COURT:  You can split it up.  That's fine.

12   Just no tag teaming during the actual remarks themselves.

13         All right.  If there's nothing further at this

14   time, I will see you tomorrow morning.  Let's try to make it

15   8:15 because it sounds like we have quite a few things to get

16   through before 9:00.  We have a full day tomorrow.

17

18              (Proceedings concluded at 5:39 P.M.)

19

20

21

22

23

24

25

1
2
3
4
5
6                          C E R T I F I C A T E
7
8
9           I hereby certify that pursuant to Title 28,
10   Section 753 United States Code, the foregoing is a true and
11   correct transcript of the stenographically reported
12   proceedings in the above matter.
13           Certified on July 2, 2008.
14
15           _____
16           MARK SCHWEITZER, CSR, RPR, CRR
             Official Court Reporter
17           License No. 10514
18
19
20
21
22
23
24
25