1    but it was the group of the four girls is what I remember

2    seeing.

3    Q.   Is it fair to say that you can't be certain as to which

4    of those three drawings it was that you saw?

5    A.   No.  Whether it was this black and white drawing or that

6    one, I don't know which one it was.  It's four characters

7    standing there to me.

8    Q.   Well, let's see if we can be a little bit more precise

9    about some of this.

10   A.   Sure.

11   Q.   Exhibit 774 and 778, those are the black and white ones?

12   A.   779 is the black and white one.  777 and 779.

13   Q.   So let's focus on 778 for a second.

14   A.   778, yes.

15   Q.   That one is colored in?

16   A.   Yes.

17   Q.   And you're relatively confident that the drawing you

18   saw, the Bratz drawing that you saw there in Lancaster in

19   January of 1999, you testified to previously, was not in

20   color; right?

21   A.   No, it wasn't.

22   Q.   So you feel pretty confident that you could exclude

23   Exhibit 778 as being the actual drawing that you saw.

24   A.   Right.  It was -- it was just, this is the four

25   characters that I wanted to -- which specific one it is I

1    don't know.

2  Q.    Right.   I'm trying to, like I say, let's be a little bit

3  more precise just to see if we can narrow the candidates down

4  a little bit.

5  A.    Sure.

6  Q.    So you'll agree with me that at least, as it's shown

7  here, that Exhibit 778 is not one that you saw in Lancaster

8  in January of 1999; right?

9  A.    No, because it's colored in.

10  Q.    You would agree with my statement?

11  A.    Yes.

12  Q.    Directing your attention to -- since I can't see that

13  far.

14  A.    779.

15  Q.    779.   779 is the one that at least is, if not colored

16  in, at least is somewhat more finished than the other

17  exhibit; is that right?

18  A.    Yes.   There's more pencilling in.

19  Q.    Was the one that you saw there in Lancaster shaded in,

20  even if it was black and white?

21  A.    I don't recall.

22  Q.    So it might have been.   It might not have been.   You're

23  not sure?

24  A.    No, I'm not -- I -- I couldn't tell you.   I don't

25  remember.

1   Q.   Focusing first on 774, can you tell me under oath, you

2   know, where you're sworn to tell the truth, that that's the

3   drawing that you saw there in Lancaster in January of 1999?

4   A.   Under oath, I can tell you that these look very similar.

5   I don't know which one I've seen, but it was of the four

6   characters like they're presented here.   I don't know if it's

7   774 or 779 or one I missed, but this is -- this is what I

8   seen.

9   Q.   And what I'm now just following up to find out is about

10  something, and namely, do you know that the particular

11  drawing that's in front of you that we've marked as

12  Exhibit 774 is in fact the same drawing that you saw there in

13  Lancaster in January of 1999?

14  A.   No.

15  Q.   Focusing on the particular drawing that you have in

16  front of you as Exhibit 779, can you tell me that the

17  particular drawing that you saw there in Lancaster in January

18  of 1999 that you testified about earlier when Carter showed

19  you drawings is in fact the same drawing that you saw at that

20  time?

21  A.   Yes, it looks very much like the one that I remember

22  seeing.

23  Q.   And for the record, which one are we --

24  A.   779.

25  Q.   What was it, then, that you can remember happening next?

1    A.    Carter and I -- we were moving him into a studio, and he

2    had unpacked some of his -- well, his boxes of crap and the

3    Bratz were one of many that were in a box, and I remember

4    seeing then -- them then.

5    Q.    And when you say "them," are you talking about drawings?

6    A.    Yes.

7    Q.    And these were Bratz drawings?

8    A.    I believe it was something similar to this one, yes.

9    Q.    Well, they were additional Bratz drawings?

10   A.    They were Bratz drawings, yes.

11   Q.    You said that he was moving into a studio?

12   A.    Yes.

13   Q.    And this was in September of 2000?

14   A.    No, it was a little bit earlier than that.

15   Q.    When did that happen?

16   A.    Late August, early September of 2000.  Something like

17   that.

18   Q.    When you say he was moving into a studio, was this an

19   art studio?

20   A.    It was what we called his studio.  It was at the house

21   in Gardena that we had purchased.  We had fixed it up.  It

22   was an apartment out back that we had fixed up for him to set

23   up his drawing table and all that kind of stuff.

24   Q.    Oh, I see.  So this is where the tenant used to live but

25   apparently by that time was gone?

1   A.   Yes.

2   Q.   And so in that interim period, it got fixed up to be an

3   art studio for Carter to work in?

4   A.   Yes.

5   Q.   And so you said that in this late August, early

6   September 2000 time period you were unpacking boxes in that

7   studio?

8   A.   Yes.

9   Q.   And where had these boxes been?  Had they been in the

10  house?

11  A.   In the house, in the garage, in storage.

12  Q.   Was -- were some of them in a separate storage facility?

13  A.   No, I don't believe we had a storage facility.  I think

14  they were all in the garage or stacked up someplace.

15  Q.   But just when you said earlier that they were in

16  storage, what were you referring to?

17  A.   Storage in the garage or in a closet.

18  Q.   And so I take it, when you said you were unpacking the

19  boxes and then you saw those drawings, the Bratz drawings,

20  this was actually in the studio; right?

21  A.   Yes.

22  Q.   Because people were -- you and Carter were taking things

23  out of the boxes, and that's when you saw the Bratz boxes?

24  A.   No.  Cart was unpacking stuff.  I was moving it.

25  Q.   I see.  You got the good job.

1   A.   Yeah.

2   Q.   So just to be clear, then, you were moving the boxes

3   from the house into the studio.  Carter was in the studio,

4   and he was unpacking boxes?

5   A.   More or less.

6   Q.   Did you help unpack at all, or did you just move?

7   A.   I probably just moved.  He has a bad habit of unpacking

8   while we're moving and reminiscing, slowing the process down.

9   Q.   So I take it Carter was the one who actually unpacked

10  the Bratz drawings that he showed you?

11  A.   Yes.

12  Q.   And when he showed them to you, this was in the studio?

13  A.   Yes, as he was unpacking.

14  Q.   Anything else that you can remember?

15  A.   No, not -- no, I can't.

16  Q.   And just so it's clear, there's nothing else that you

17  can remember that he said to you or that you said to him

18  regarding these drawings?

19  A.   No, nothing regarding the drawings, no.

20  Q.   Anything else generally about Bratz as a concept?

21  A.   No.

22  Q.   Or just Bratz, period?

23  A.   No.

24  Q.   And then what is it you remember next happening with

25  respect to Bratz?

1   A.   I'm not really sure what happened next.  They were

2   unpacked, and that was -- I think the next thing was that he

3   had showed them to MGA.

4   Q.   Had Carter said to you specifically, back in the 2000

5   time period, that Veronica Marlow was the one who had

6   introduced him to MGA, or was that something that you first

7   learned later on?

8   A.   No.

9   Q.   Let me try it this way:  Do you remember learning that

10  more or less at the time that it first happened, or was that

11  sometime subsequent to it?

12  A.   What first happened?

13  Q.   When -- when Veronica Marlow had introduced Carter to

14  MGA.

15  A.   I believe I found out a little bit before they were

16  introduced.

17  Q.   And do you remember if that was something that occurred

18  before or after the move to the studio and when Carter

19  unpacked the drawings that you talked about?

20  A.   It was after the move into the studio.

21  Q.   On that day you described in which Carter unpacked the

22  Bratz drawings in his studio and he showed them to you, were

23  any of those drawings in color?

24  A.   I don't recall because it was more him looking at them.

25  I was moving boxes.

1    Q.   Can you give us an estimation of how many Bratz drawings

2    you saw on that day?

3    A.   I don't know.  I didn't really see that many -- I didn't

4    see -- he was going through them.  I was busy.

5    Q.   Is it fair to say that you wouldn't be able to identify

6    for us a particular drawing that you saw on that day?

7    A.   That would be fair to say.

8    Q.   I understand you have a clarification?

9         MS. ANDERSON:  Yes.

10        THE WITNESS:  I know that we kind of got confused

11   on which of these drawings, 774 to 779 earlier, and I just

12   wanted to clarify that I'm not sure which drawings I seen in

13   1999, but they were very similar, if not one of these, but

14   similar to it.

15   Q.   BY MR. ZELLER:  Similar to Exhibits 774 and 779?

16   A.   Yes.

17   Q.   But you can't be sure as to -- whether you saw those

18   exact drawings as they're depicted in Exhibit 774 and 779.

19   Is that true?

20   A.   Yes.

21   Q.   And as between those two, you can't be certain as to

22   which one you saw?

23   A.   Yes.

24   Q.   Does one of those two exhibits, 774 versus 779, look

25   closer to what you saw?

1    A.    I couldn't say either way.

2    Q.    Focusing on the time period of October of 2000.  At that

3    time Carter bought a new desktop computer; is that correct?

4    A.    Yes.

5    Q.    So it's the case that you didn't have a computer prior

6    to October of 2000 in that house?

7    A.    No, we did not.

8    Q.    Neither you nor Carter did?

9    A.    No, we didn't.

10   Q.    And we were talking about Carter bought a desktop

11   computer in October of 2000, but that was in the Gardena

12   house?

13   A.    Yes.

14   Q.    Did you use that computer?

15   A.    Yes.

16   Q.    Did Carter use that computer that you saw?

17   A.    Yes.

18   Q.    At some point on that desktop computer a program called

19   Evidence Eliminator was installed; is that correct?

20   A.    I believe so.

21   Q.    Was that something that you did or Carter did?

22   A.    I believe Carter did.

23   Q.    Were you involved in any way in the purchase of the

24   Evidence Eliminator program that was on the desktop computer?

25   A.    No, I wasn't.

1    Q.   Did you, yourself, ever run it?

2    A.   No.

3    Q.   At some time after Carter's purchase of the desktop

4    computer in October of 2000, did he buy a Compaq laptop?

5    A.   Yes.

6    Q.   And do you know when he bought that?

7    A.   I believe it was around February of 2002.

8    Q.   Did you install Evidence Eliminator on that laptop?

9    A.   No, I did not."

10            (End of deposition playing.)

11            MR. NOLAN:  We ran out of time today for witnesses,

12   your Honor.

13            THE COURT:  Thank you, Counsel.

14            Members of the jury, I will wish you all a happy

15   4th of July.  We will not have court tomorrow, but I'll see

16   you all at 9:00 on Tuesday morning.

17            **(WHEREUPON THE JURY WITHDRAWS.)**

18            THE COURT:  Please be seated.  Okay.  I'd like to

19   schedule a hearing for Monday afternoon.  We've got motions

20   on the criminal calendar taken care of.  There's a few

21   matters I need to take up at 2:00, which shouldn't last long.

22   So if everyone could be ready at 3:00, if that works for

23   everyone.  At that time I want to go through the jury

24   instructions and the verdict form.

25            Does everyone have in what the Court had asked from

1    each side in terms of the binders, the jury instructions, the

2    verdict forms?  I want to make sure I don't have any --

3    anything additional.

4         MR. ZELLER:  I believe that's the case.  But I can

5    double-check as soon as we are done here to make sure.  But

6    my last information is I thought we had done that.

7         THE COURT:  I'll be here for a while tonight.  So

8    before the Court leaves tonight, let me know that I have

9    everything.  Because when I leave tonight, I'm not coming

10   back to the courthouse until Monday.

11        MR. NOLAN:  Your Honor, I believe we have

12   everything.

13        THE COURT:  Very good.  So that's the jury

14   instruction issue, and the hearing on Monday at 3:00.

15        Mr. Nolan, where are we now on witnesses?  We've

16   gotten through Ms. Leahy.  The Court has to work out the

17   Palmer issue.  On the Custodian of Records --

18        MR. NOLAN:  We have the Custodian of Records and

19   Cassidy Park, your Honor.

20        THE COURT:  Is that it?

21        MR. NOLAN:  For the live witnesses.  We've got

22   Galvano.

23        THE COURT:  So Irmen is done, De Anda is done, and

24   Kilpin is done.

25        So Galvano, Cassidy Park.  What about Jill Thomas?

1        MR. NOLAN:  I had a meeting with Mr. Quinn.  And he

2   made a proffer, which I asked him to put on the record, and

3   based on that proffer, we would not call.

4        THE COURT:  Okay.  You need to put something on the

5   record?

6        MR. QUINN:  If you'd like to.

7        MR. NOLAN:  Just what you represented to me.

8        MR. QUINN:  That Ms. Thomas did meet with Rachel

9   Harris.  She had provided no documents to Ms. Harris.

10  Ms. Harris provided no documents to Ms. Thomas and did not

11  show any documents to her.  Neither showed any documents or

12  provided any documents to each other.

13       THE COURT:  Very good.  And you are accepting his

14  representation?

15       MR. NOLAN:  Yes.

16       THE COURT:  Very good.  Based on that, we won't be

17  calling Ms. Thomas.

18       All right.  So Jeanne Galvano, Cassidy Park, the

19  Custodian of Records, and Mr. Palmer.  Those are the four

20  that you have left; correct?

21       MR. NOLAN:  Correct, your Honor.

22       THE COURT:  All right.  As far as a rebuttal case,

23  we have --

24       MR. QUINN:  Your Honor, before we get to that,

25  Cassidy Park, we went back and looked at the transcript, and

1   she was excused.  We thought her testimony was concluded.

2   The transcript indicates that the Court did excuse her.  And

3   we don't think there's a basis for calling her again.  We can

4   provide the transcript citation.

5          THE COURT:  Okay.  I'll take up Cassidy Park and

6   Mr. Palmer, and we'll take up these matters in a moment.  But

7   I want to get a sense of at the outside, there are four

8   witnesses left for the defense; correct?

9          MR. NOLAN:  That's correct, your Honor.

10          THE COURT:  And from a rebuttal perspective, we

11   have Carter Bryant and then a motion from Mattel on that.

12   When should I anticipate an opposition from MGA to that

13   motion?

14          MS. AGUIAR:  I realize the timing is difficult

15   given the holiday.  And while I completely understand the

16   time pressures that Quinn Emanuel was under, I think we got

17   it like 2:30 in the morning.  So we essentially didn't have

18   it until this morning.  And obviously, I'm not being

19   critical.  But is there a way that we could get it to you

20   sometime between now and Monday?

21          THE COURT:  Yes.  Absolutely.  I'll be home

22   working.  I'm just not planning to be here.

23          MS. AGUIAR:  Of course.

24          THE COURT:  If the Court were to decide to permit

25   Carter Bryant to be recalled, how much lead time does he

1    reasonably need to get back out here?

2             MS. AGUIAR:  Mr. Nolan will address that.

3             MR. NOLAN:  Your Honor, obviously what's absent

4    here is Carter Bryant's counsel.  And we're not privy to the

5    communications between Quinn Emanuel and Ms. Anderson or

6    whomever is there.  I got an e-mail from Ms. Anderson during

7    the lunch break asking me when the matter was going to be

8    taken up.  And I said I didn't have any idea.  I believe they

9    are filing an opposition as well.

10            So the short answer is I have no idea.  We're not

11   in communication with Mr. Bryant.  And maybe counsel for

12   Quinn Emanuel can inform us on what the status of their

13   communications are with the Keker Van Nest firm because we

14   don't know that.

15            THE COURT:  Yes.

16            MR. QUINN:  We don't know exactly where he is.  One

17   of the things I was going to propose to your Honor is that,

18   at the end of the day today, we get in touch with his counsel

19   and just let his counsel know that this matter was set for

20   hearing, assuming that the Court is going to set it for

21   hearing sometime Monday morning.  And just alert them to the

22   possibility that depending upon the Court's ruling, he might

23   need to be here Tuesday morning.

24            THE COURT:  I'll take this in camera at sidebar if

25   you want.  But is there anything relevant to this in the

4484

1  settlement agreement?

2          MR. QUINN:  Nothing that isn't also in the public

3  document.

4          THE COURT:  Okay.  All right.  Then why don't you

5  discuss it.  Is there -- basically what I'm asking is is part

6  of the settlement agreement an agreement to be available?

7          MR. QUINN:  There is a statement in the public

8  document, the dismissal, that he agrees to appear in our case

9  in chief, and so they are taking the position that that

10  exhausts his obligations.

11          THE COURT:  Who is "they"?

12          MR. QUINN:  Mr. Bryant.  His counsel is.

13          THE COURT:  I see.

14          MR. QUINN:  That they have informed us of that.

15          THE COURT:  So I probably should hear from them as

16  well, then, on this motion.

17          MR. QUINN:  It would seem.

18          THE COURT:  All right.  I would like to get,

19  then -- today is Thursday.  Tomorrow is Friday.  Do they

20  deliver on Sunday?

21          MR. NOLAN:  Anytime you want.  Unfortunately, your

22  Honor.  I mean not by public mail but by messenger.

23          THE COURT:  There's somebody who is out there

24  around the clock?

25          MR. NOLAN:  For a price, it can be done.

1          THE COURT:  All right.  Why don't we have delivered

2     to -- I'll give leave to both MGA and counsel for Mr. Bryant

3     to file a response to the motion to order Mr. Bryant to

4     return, and that can be filed -- delivered to the Court at

5     the Court's residence by 3:00 on Sunday.

6          Mr. Nolan, I believe you have my home residence

7     address?

8          MR. NOLAN:  Somewhere I do, yes, your Honor.  I

9     think you've provided it before for special deliveries.

10         THE COURT:  So you could provide that to Mr. Keker

11    or Ms. Anderson.  And have it delivered by three o'clock on

12    Sunday.

13         MR. NOLAN:  We'll try to coordinate the delivery.

14         THE COURT:  If you could.  That would be great.

15    And then I'll take a look at it.  And then I think it's

16    probably better that we have a hearing on this Monday morning

17    as opposed to the Monday afternoon.  We have a lot of

18    scheduling conferences scheduled for 9:30, I believe.  With

19    you we don't have much at 10:00.  We have five scheduling

20    conferences scheduled for 9:30.  And we have four hearings at

21    10:00.  Why don't we simply add this to the 10:00 calendar.

22         MR. NOLAN:  This limited issue, your Honor?

23         THE COURT:  This limited issue.  Just provide

24    notice.  So we'll hear this at 10:00, and then we'll hear

25    everything else at 3:00.

1    MR. NOLAN:  Your Honor, I have no reason to ask

2  this other than anticipation since I've not talked to them,

3  Keker Van Nest, as to whether or not they have other

4  commitments at ten or eleven o'clock.  Is there any

5  possibility, if they were to ask, that they could attend by

6  phone?

7    THE COURT:  You know, given these circumstances,

8  that would be appropriate.

9    MR. NOLAN:  It would be appropriate?

10    THE COURT:  That's fine, yes.

11    MR. NOLAN:  And it may not be necessary.  I just --

12    THE COURT:  Well, yes, that's fine with the Court.

13    MR. NOLAN:  All right.  Thank you.

14    THE COURT:  And, in fact, I'm not going to order

15  them to attend at all.  If they want to submit on the written

16  opposition and have you represent their interests, that's

17  fine as well on this limited point.  Because, quite frankly,

18  this affects -- the only reason I'm offering them is simply

19  to protect Carter Bryant's interests, and to the extent they

20  want to waive appearance, that's fine.

21    MR. NOLAN:  Your Honor, I know that a declaration

22  was submitted in camera.

23    THE COURT:  I have that, yes.  I did review that.

24    MR. NOLAN:  And I just want to --

25    THE COURT:  It puts you in an awkward position.

1    MR. NOLAN:  In any other case, any other situation,

2  any other factual situation we would now be in a situation

3  where we would know exactly why they are calling someone for

4  rebuttal, what the justification is.  And it's very difficult

5  for us to be shooting in the dark.

6    THE COURT:  Let me hear a response to that,

7  Mr. Quinn.

8    MR. QUINN:  Your Honor, I think if we are down to

9  their playing a videotape and calling a Custodian of Records,

10 and that's all, there's not going to be any response, then,

11 to our proffered rebuttal, I don't mind their seeing the

12 declaration.

13    THE COURT:  I'm sorry?

14    MR. QUINN:  If the remainder of their case, if they

15 will represent it's going to consist solely of the videotape

16 that hasn't been played --

17    THE COURT:  Maybe two videotapes.

18    MR. QUINN:  Or two, and calling the Custodian of

19 Records, and we have to deal with the Cassidy Park issue, and

20 that's another separate issue.

21    THE COURT:  They have already represented that's

22 all that's left in their case.

23    MR. QUINN:  I know.  But my agreement to this would

24 really depend on the Court's ruling on Cassidy Park.  I

25 wouldn't want that -- if they are going to get another live

1   substantive witness up there, it would be my preference that

2   they not see the declaration.

3           So perhaps if the Court could take a look at the

4   Cassidy Park issue, and depending on how that's resolved, we

5   may not have an objection to their seeing that.  If we're

6   just looking at tape and a Custodian of Records deposition,

7   and that's the end of the case.  What I'm concerned about is

8   that they see it and that that somehow then shapes the

9   remainder of their case.

10          THE COURT:  Your remark, Mr. Nolan, when you say

11  ordinarily you would know what the rebuttal witness is going

12  to be testifying to, I don't think that's necessarily

13  accurate.  By definition, rebuttal witnesses are normally not

14  decided upon until the end of the defense case.

15          MR. NOLAN:  My point is that we're at the end of

16  the case.  I would assume that we're going to be through on

17  Tuesday, and Mr. Bryant, if he's going to testify, would be

18  right there afterwards.

19          THE COURT:  Mr. Quinn is saying you're not quite

20  there.  If you really are at the end of the case, okay, I

21  think we've resolved this by removing the Cassidy Park issue

22  and going forward on that.

23          Okay.  So no other rebuttal from Mattel, I take it,

24  unless the Court rules in a certain way on the Palmer case;

25  correct?

1          MR. QUINN:  The only other possible rebuttal that

2    we're considering is some other witness on this Jewel doll

3    issue.

4          THE COURT:  Well, you mean this?

5          MR. QUINN:  Not that one, no.  Not on that.

6          THE COURT:  The Jewel doll issue that you raised

7    in --

8          MR. QUINN:  Yes.

9          THE COURT:  Yes.  Well, it sounds like we're going

10   to be able to wrap this up on Tuesday, even if all of this

11   comes in because of the limited nature of these rebuttal

12   witnesses.

13         MR. NOLAN:  If I could just go back on the comment

14   with respect to Jewel Barbie.  Our case, we didn't -- I mean,

15   Jewel Barbie was put on in their case.  The only time that we

16   tried to do something with respect to Jewel Barbie was with

17   respect to getting an authentication of this copyright

18   application, and I didn't get it in.

19         Now, to say that they are going to use that now in

20   rebuttal, I mean, I always do the -- the test for rebuttal

21   has got to be that it's something that shouldn't have been

22   anticipated --

23         THE COURT:  I understand.  It's helpful that we

24   could have the in camera declaration provided.  So let's deal

25   with the Cassidy Park issue.  Who wants to lead off on that?

1   And someone has to refresh my recollection on what Cassidy

2   Park has to do with any of this.

3         MR. NOLAN:  She was called as a witness, and the

4   date of her testimony really doesn't matter, but it was

5   sometime at page 3530, whatever date that was.  But here was

6   the gist of it.  They took Cassidy Park for just a few

7   minutes.  She was the supervisor of Carter Bryant during

8   the -- the corporate supervisor during the period back in

9   Missouri.  And you'll recall we were backing up on third

10  party witnesses.

11        I had been taking -- I went a little bit long.

12  They went short.  And you said to me during a period of time,

13  Mr. Zeller -- reading from page 3530 -- "Mr. Zeller is going

14  to get beat up at the end of the day by a bunch of third

15  party lawyers who are not going to have their witnesses on.

16  A 25-minute witness has now taken an hour and 20 minutes.

17  And I understand she's on your witness list.  All that's

18  relevant to the Court is that the chess clock is going as we

19  speak."

20        And then it is true, your Honor, I -- you know, I

21  asked a few more questions, and then I sat down.  I confess I

22  fully understood that the message was we're burning up time

23  that needs to be used for third parties.  If you've got her

24  on your witness list, she'll come back.  That's how I

25  interpreted.

1        THE COURT:  You're saying the Court rushed you?

2        MR. NOLAN:  No, I made a decision based on trying

3   to please the Court, in trying to accommodate the third party

4   witnesses.  But I will admit, your Honor, that at the end,

5   you did excuse the witness.  And at that time I did not say

6   time out.  But I did give them notice --

7        THE COURT:  What do you want to bring her back to

8   say?

9        MR. NOLAN:  I'm always faced with these proffers

10   that I'm giving.  There's certain topics that I'm going to

11   look at carefully to see whether or not we need to cover

12   them.  There were areas that I did not cover with her, and in

13   light of the Court's comments and rulings, I want to take

14   that in consideration.  I can't make a proffer right now,

15   nor, frankly, your Honor, they have never had to do this on a

16   particular witness.

17        THE COURT:  You are asking them do it with regard

18   to Carter Bryant.

19        MR. NOLAN:  That's a totally different subject.

20        THE COURT:  Right.  That's a rebuttal witness.

21   This is your case in chief.  But the difference here,

22   Counsel, is you're asking the Court to set aside the fact

23   that I excused a witness and reopen testimony.  I think the

24   Court is not out of line to ask why is it that you are asking

25   the Court to take what is extraordinary relief and recall a

1    witness who has been excused to have them recalled not as a

2    rebuttal witness, but just to come again in the case in

3    chief?

4              MR. NOLAN:   I understand, your Honor.   One of the

5    areas that I wanted to explore with her had to do with when

6    she first learned about Carter Bryant's involvement in Bratz.

7    I wanted to get into her involvement.   She's on the

8    inventions committee at Mattel during the relevant period of

9    time here.   I want to explore really what her status is as an

10   employee of Mattel because there's conflicting testimony on

11   that.

12             But, your Honor, I need -- I mean, that's my

13   proffer right now.   But I need to go back.   I mean, I can

14   take a few minutes and think about it more, but it's been a

15   long day, and I'm trying to assess where we're at.

16             We want to end this case, but I do think that the

17   standards -- you know what?   I agree.   You excused her.   I

18   misunderstood something because she was on our witness list,

19   that we would have the right to call her back.   And I gave

20   notice to Mr. Quinn.   Mr. Quinn raised the issue about gee, I

21   thought she was through.   We all looked at the transcript.

22   It is what it is.

23             I could think more about it and make a definitive

24   decision in a few minutes, if I could just have leave to do

25   that.

1          THE COURT:  Very well.  Let me hear a response from

2   Mattel.

3          MR. QUINN:  Your Honor, the transcript reflects

4   that Mr. Nolan did do a recross-examination.  He asked a

5   question, and then said, "Nothing further."

6          The Court asked us, "Anything further?"

7          "No, your Honor."

8          "All right.  You're excused, ma'am."

9          The two subjects that counsel has identified, when

10  she first learned about Bratz, that sounds like a statute of

11  limitations or laches issue, and conceivably he's going to

12  have a chance to question her about that if there is another

13  phase to this.

14          And then the question about her status as an

15  employee, she's an employee.  The CEO of a company that's got

16  30,000 employees didn't think she was an employee now.

17  Although he acknowledges he wouldn't necessarily know if

18  she's a part-time employee.  That doesn't really sound like a

19  significant enough issue that we should do this very unusual

20  procedure of bringing back somebody.

21          MR. NOLAN:  I made this argument irrelevant.  I

22  apologize for taking up the time.  Your Honor, we will not

23  call Cassidy Park.

24          THE COURT:  All right.

25          MR. NOLAN:  So we will accept the deal that Mattel

1  offered about giving us the declaration of Carter Bryant so

2  we can use that to respond.

3          THE COURT:  Very well.

4          MR. QUINN:  And so there won't be any other

5  witnesses, as I understand it.  We're looking at two tapes

6  and the Custodian of Records.

7          THE COURT:  Two tapes, the Custodian of Records,

8  yes.  Okay.  That takes care of everything except the Palmer

9  issue.  I'd like to speak a little bit more about the Palmer

10  issue tonight.  But besides the Palmer issue, is there

11  anything else?

12          MR. ZELLER:  If I could just get a clarification

13  and make sure I correctly communicate to Carter Bryant's

14  counsel the Court's expectations.  I understood the 3:00 P.M.

15  Sunday deadline, which I'll obviously advise them of.  And

16  I'll send them this portion of the transcript as well.

17          THE COURT:  And a 10:00 A.M. hearing, and it's up

18  to them whether they want to be there for the hearing or not.

19  They can either have Mr. Nolan or counsel for MGA represent

20  their interests, or they can participate by telephone, or

21  they can -- they are always certainly welcome to attend in

22  person.

23          MR. ZELLER:  And also to anticipate potentially a

24  question.  Is it okay for them to send by e-mail to you any

25  opposition brief that they have by 3:00 P.M. on Sunday?

1          THE COURT:  I'll tell you the problem is that my --

2    we really don't have a printer that works all that well at

3    home.  And there's only so much I can read.  I really would

4    rather have a hard copy.  So maybe you can e-mail it to

5    someone else who can print it out and give it to MGA and get

6    it in.  I would prefer a hard copy.

7          MR. ZELLER:  Very well.

8          THE COURT:  And then if there's a Phase 2 of this

9    trial, if there's an extra printer around here that the Court

10   can borrow --

11         MS. AGUIAR:  We'll chip in.

12         MR. QUINN:  Done, your Honor.

13         THE COURT:  In any event, yes, what else?

14         MR. ZELLER:  Also we were interested in the time

15   count.

16         THE COURT:  I'll get back to you on that.  I have a

17   pretrial service officer waiting in chambers since 5:00.

18   Somebody wants to get out for the weekend.  So I'll come back

19   and deal with Palmer and the time count.  And we've got a

20   couple dolls.

21         MS. AGUIAR:  I understand that you want to cut this

22   short.  So we can do this on Tuesday.

23         THE COURT:  That's what I'm trying to do now.  I

24   really want to know if there's anything else.

25         MS. AGUIAR:  I did want to raise it, and you can

1   tell me when you want to deal with it.   There's a couple

2   dolls that were marked with different witnesses.   There was

3   testimony elicited on both the My Scene and the Flavas doll

4   throughout the course of the testimony in 1-A.   And neither

5   one of these came into evidence.   There was discussion at a

6   sidebar regarding My Scene, not about Flavas.   I think Flavas

7   was just an oversight of not moving it in.   We can deal with

8   it on Tuesday, but we do want to move both of them into

9   evidence.

10          THE COURT:   We'll talk about the dolls when I come

11   back out.   Anything else?

12          MS. AGUIAR:   And we would like leave to submit a

13   supplemental expert report.   I can walk through with you what

14   the basis for that is, and there's one other exhibit that

15   needs to be moved in.   But again, nothing that can't wait.

16          THE COURT:   Supplemental expert report on?

17          MS. AGUIAR:   Sure.   It is on damages.

18          THE COURT:   Okay.   This is for the next phase.

19          MS. AGUIAR:   Well, it's for 1-B, yes.   But I wanted

20   to raise it because we want leave to file a motion to submit

21   it.

22          THE COURT:   Very good.

23          MS. AGUIAR:   So there are those three things which

24   we can deal with whenever your Honor thinks it is

25   appropriate.

1          THE COURT:  Just give me a few minutes here.  It's

2     not going to take me long in chambers.

3          MS. AGUIAR:  And in the midst of your time count,

4     we have the Irmen video.

5          THE COURT:  Oh, yes, please.  What is that?

6          MS. AGUIAR:  MGA is 32 minutes, five seconds.  And

7     Mattel is 14 minutes, 25 seconds.

8          THE COURT:  Got it.  All right.  I'll take a brief

9     recess.  We'll resume around 5:30.

10          (Recess taken.)

11          THE COURT:  Okay.  Let's deal with the most

12     difficult issue first.  Why don't we take up the Palmer

13     matter.  And now that we've all settled down a little bit,

14     I'd like to take the Palmer argument from the top.  So

15     whoever would like to proceed on that first.

16          MR. NOLAN:  Palmer was designated as the person

17     most knowledgeable with respect to the phone records.  We

18     took the deposition.  We want to play the video.  We would

19     like to have it sponsored by the person most knowledgeable at

20     Mattel.  We're not asking the Court to instruct the jury.  We

21     don't believe a 403 argument is appropriate.  We're not

22     attaching an intentional aspect to it.

23          As the Court noted, there's been a lot of testimony

24     about things that are missing.  But I don't want the jury to

25     be sitting there wondering I wonder whatever happened to the

1    October phone records.  And what I'd like, because they are

2    going to have the September phone records in evidence, I'd

3    like to have those in evidence.  That one sheet of paper that

4    shows the phone calls.  And I just think that they need to

5    know that this document does not exist.

6            So from the absence of proof, they don't have to

7    draw any conclusions.  I'm not going to say that it was

8    intentional by Mattel.  I am going to say that had these

9    records been available, and they are not, they likely would

10   have confirmed what the story is here, and that is that there

11   were meetings, some Friday afternoons.  I mean, I think the

12   Court understands our position in that respect.

13           THE COURT:  No, no.  Please elaborate.  That's

14   actually what I was listening for.  So what do you believe,

15   if we would have had the phone records, what do you believe,

16   best case scenario for MGA, those phone records would have

17   shown?

18           MR. NOLAN:  Carter Bryant never called MGA during

19   this period of time after he signed the contract and gave

20   notice that --

21           THE COURT:  And, of course, they don't

22   necessarily -- what they would show, then, in that instance

23   is that there is no evidence that Carter Bryant ever used his

24   phone at Mattel to call MGA; correct?

25           MR. NOLAN:  Correct.  That's correct.

1          THE COURT:  Would Mattel be willing to stipulate to

2   that fact, that there is no evidence that Carter Bryant used

3   his phone at Mattel to call MGA?

4          MR. ZELLER:  In October of 2000.

5          THE COURT:  In October of 2000.

6          MR. ZELLER:  I think with some wordsmithing, the

7   answer to that is yes.

8          THE COURT:  The Devil is always in the details.

9   What possible wordsmithing would you like?

10          MR. ZELLER:  It's a matter of what we would

11   stipulate to and what is told to the jury.

12          THE COURT:  This is what I would tell the jury.

13   The parties have stipulated that there is no evidence that

14   Carter Bryant called MGA -- that Carter Bryant called MGA

15   using his Mattel phone during the month of October.  And

16   assume there would be a further stipulation to admit the

17   phone records from September and all the other months that

18   you want to get in.

19          MR. NOLAN:  Right, your Honor.  And I think I would

20   just include no phone calls to MGA or Margaret Leahy.

21          THE COURT:  This is essentially the same thing that

22   the Court organized when it was -- when the ball was on the

23   other side on the Menz expert witness when it gets down to

24   the mechanics of it.  Because that's all Palmer is.  He can't

25   offer any opinion.  There's no issue of culpability or intent

4500

1  with respect to Palmer.

2          Palmer is very much like Menz and the issue of the

3  Evidence Eliminator, and if there's no disagreement,

4  Mr. Nolan just told me that the best case scenario for MGA is

5  evidence that at the end of the day, there is no evidence of

6  these phone calls.  And if Mattel will stipulate to that, and

7  MGA is willing to stipulate to that, that not only saves

8  time, but it eliminates this issue.

9          MR. ZELLER:  I guess in a matter of preference, the

10  way the Court originally had it before the break, I think,

11  was really --

12          THE COURT:  I understand that.

13          MR. ZELLER:  Just a problem with the phrase there

14  is no evidence.  I mean, if something more specific --

15          THE COURT:  There is no evidence.  That's the

16  problem.  I think they are entitled to that.  Just like there

17  is no evidence of what the molds look like.  There's no

18  evidence that any number of things in this trial.

19          MR. ZELLER:  And that gets us into that very issue.

20  I mean, why are we talking about that?  We're just -- this

21  particular one, I mean, a stipulation or an instruction that

22  the October phone records do not exist, that seems

23  appropriate.

24          All I'm saying is in terms of, you know, the

25  particular wording used in front of the jury.  I mean, if the

1    Court is looking for, say, a stipulation in terms of what

2    will we argue or not argue, you know, I think we can

3    certainly say that in broader terms, we're not going to

4    argue, you know, that our case depends on or is based on or

5    rests on the fact that Carter Bryant was calling MGA from his

6    Mattel extension in October of 2000.  I mean, that's not an

7    issue that we have raised.

8              That's why I think it seems like a little bit of

9    overkill to be emphasizing to the jury well, there's a

10   missing piece.  You know, when it seems to emphasize

11   something where, you know, the same point could be made about

12   any number of other things that, as the parties have been

13   discussing and there is testimony about, that they are

14   missing.

15             THE COURT:  Like what?

16             MR. ZELLER:  Well, the missing molds.  I mean, we

17   could say, you know, there's --

18             THE COURT:  There's evidence.  There was a question

19   asked, where are the molds?  They are gone.  So that's out in

20   front of the jury.  And I'm basically trying to treat this in

21   the same way.  I haven't placed any limitation on any of the

22   questions that have been asked about evidence that -- or

23   items that are missing.  And I don't see any reason to do so

24   now.

25             I have some concerns, and this is what MGA needs to

1    be mindful of, of the -- of some of the testimony in the

2    Palmer deposition which I think goes beyond and gets into

3    this negative inference aspect of it.  And that's why I asked

4    the question that I did, and I'm satisfied with MGA's answer,

5    that all they are looking for is the statement of fact that

6    there are no phone records for October of 2000.  There's no

7    evidence of these communications, whereas there is evidence

8    for September.

9             And I agree with Mr. Nolan's point, that it does

10   seem odd that if there's going to be evidence introduced for

11   the September phone records, and I gather you have no

12   objection for the September records.

13            MR. ZELLER:  True.

14            THE COURT:  And if that comes in, there needs to be

15   an explanation.  I really think it is of moment at the end of

16   the -- frankly, it's a nonentity in my view at the end of the

17   day.  But it seems to be important to both sides.  So I'm

18   sure I'm missing something.

19            MR. ZELLER:  I would just point out, your Honor,

20   that the phraseology that the Court was suggesting most

21   recently, I mean, that could actually be consistent with the

22   idea that the phone records still exist but do not show that

23   there were calls.  That's part of, I guess, why, you know,

24   respectfully I would suggest that it's more, as the Court is

25   saying, the Devil is in the details.

1        I think conceptually we have absolutely no problem

2   with a stipulation, with the Court, you know, instructing the

3   jury and short-circuiting all of this.  But it is something

4   of a concern where it makes it sound, you know, not only a

5   matter of emphasis, but it makes it sound like, because this

6   jury is going to see the September records, they are not

7   going to have October records.

8        And then they are going to be told, you know,

9   there's no evidence suggesting that we have the records.  And

10  they show he did not call.  And I recognize this is a fine

11  line.  I mean, there's no question, but this is the

12  wordsmithing aspect of it.

13       THE COURT:  Let me suggest this:  The Court cannot

14  force anyone to stipulate.  So if I don't have both sides

15  agreeing, then I go back to the drawing board.  What if we

16  say the parties have stipulated that exhibit, whatever the

17  exhibit is that has the -- is it just the September -- well,

18  just the September records that you want to get in; is that

19  correct?

20       MR. NOLAN:  The September telephone records.

21       THE COURT:  So it's relatively short.  So that

22  exhibit, whatever it is that has the September records, is a

23  record of telephone calls from Carter Bryant's extension at

24  Mattel to MGA.  There are no records available for the month

25  of October.

1    So the Court's proposed stipulation would be the

2    parties have stipulated that exhibit, whatever it is, is a

3    record of telephone calls from Carter Bryant's extension at

4    Mattel to MGA for the month of September 2000.  There are no

5    records available for the month of October, 2000.

6    MR. PRICE:  We're not introducing the September

7    records.  I don't know if he wants them redacted to just

8    reflect Carter Bryant to MGA.

9    THE COURT:  I'm sure he can speak for his view on

10   that.

11   MR. PRICE:  I thought he said he didn't want that.

12   THE COURT:  Mr. Nolan, what are your thoughts?

13   MR. NOLAN:  Your Honor, this is a business record

14   of Mattel.  I don't want it to be redacted.  I think that it

15   should just come in in the form that it was presented to the

16   witnesses.

17   THE COURT:  Can I take a look at it?

18   MS. AGUIAR:  Sure.

19   THE COURT:  What about the Court's proposal,

20   though?  The parties have stipulated this is a record of

21   telephone calls from Carter Bryant's extension at Mattel to

22   MGA for the month of September 2000.  We can highlight the

23   ones that are going to MGA, and there are no records

24   available for the month of October 2000.  And that treats

25   this very much like all of the other missing stuff that's

1   come out during this trial.  There's no request for an

2   adverse inference to be made either in argument or

3   instruction, and we'll leave it at that.

4          MR. NOLAN:  The exhibit that's been handed up to

5   you is Exhibit 472.  The version you have may have all of the

6   months in it, and my intention would be only the month of

7   October.  We would take that out.  Your Honor, with respect

8   to the Court's proposal, I don't -- my concern is that the

9   Court is directing that these are the phone calls to MGA.  If

10  you -- if the stipulation was just saying that Exhibit 472

11  represents the phone calls made by Carter Bryant from his

12  extension at Mattel for September, there are no records

13  available for the period for October.

14         THE COURT:  Yes.  That's acceptable.

15         MR. NOLAN:  Yes.

16         THE COURT:  Acceptable?

17         MR. ZELLER:  It is, your Honor.

18         THE COURT:  Very well.

19         Regarding the dolls.

20         MS. AGUIAR:  The two exhibits, two tangible

21  exhibits, 18555, which is a Flavas doll.

22         THE COURT:  Yes.

23         MS. AGUIAR:  And 17378, which is a My Scene doll,

24  and I think in connection with a presentation that was made

25  earlier today to the Court, and as the Court is aware, as

1    you've been sitting here the whole time, there has been a lot

2    of evidence about Flavas and My Scene both in testimonial

3    evidence and also in documentary evidence.  So we would

4    move --

5            THE COURT:  Tell me what you think the relevance,

6    though, of actually seeing the dolls as to perhaps curiosity

7    or whatever.  The concern that Mr. Zeller expressed at

8    sidebar, or maybe it was Mr. Quinn, somebody expressed at

9    sidebar regarding the My Scene dolls is that we don't want to

10   get into a Phase 1-B type issue where the jury is comparing

11   the dolls to Bratz and wondering --

12           MS. AGUIAR:  Understood.  I think the jury,

13   though -- I don't really know or have any basis for saying

14   this other than observing them for the last six weeks.  I

15   think they have been paying attention and are savvy, and I

16   think they know what their task is going to be in this phase.

17   You have your instructions.

18           But specifically, your Honor, almost every time

19   there's been a doll mentioned specifically, there's been

20   testimony about it, it has come into evidence.  So for that

21   matter we could say that when -- and I think it is my memory

22   that Mattel actually was the one who offered a Bratz doll

23   into evidence, and so for that matter, we could say they are

24   going to be looking at the drawings and looking at the Bratz

25   doll.  So dolls have come into evidence that people have

1    testified about.

2           We've got Prayer Angel into evidence.   And I do

3    think that the jury is entitled to see these tangible items

4    about which there's been testimony.

5           THE COURT:   Again, the Court's question is for what

6    purpose?

7           MS. AGUIAR:   I think that -- I don't see that

8    there's any other -- to the extent that there was testimony

9    on the other dolls, and therefore, we wanted the jury to be

10   able to actually see the tangible item that people were

11   testifying about, presumably that was why a number of the

12   other dolls were introduced.   So I think it's for the same

13   reason --

14          THE COURT:   Well, the fact that the dolls were

15   passed around and there were particular reasons why they were

16   passed around.   There was no objection made, or if there was,

17   it was dealt with.   I can't remember them all at this point.

18   But there was a particularized reason.   What I'm asking you

19   for is let's do the same thing here.   What is the reason for

20   these dolls, outside of curiosity or completeness or

21   whatever?

22          MS. AGUIAR:   And I do think that -- both of these

23   dolls were introduced after Bratz, and there was testimony

24   elicited from witnesses that your Honor permitted on that

25   regarding the timing.   And that these would allow the jury to

1  know that and to see that because the dates on these boxes,

2  just like the dates on some of the other boxes, are what they

3  are, and the jury can see them.

4          THE COURT:  Don't the dates on these boxes render

5  them irrelevant for purposes of timing?

6          MS. AGUIAR:  I don't think this is a timing

7  question.

8          THE COURT:  I don't think so either.

9          MS. AGUIAR:  And I do think there are dolls that

10  have come into evidence, I don't think over objection that

11  have dates on there that have dates outside the time frame.

12  So that really is not a reason.  I really just think look,

13  the jury has seen dolls come into evidence when there's been

14  testimony about it.  So I just don't see any harm, and I

15  think it -- anyway.

16          THE COURT:  Okay.  Let me hear Mattel's thoughts.

17          MR. QUINN:  Your Honor, I think when other dolls

18  have come in, they have been for a particular reason because

19  they are relevant to issues in this case.

20          THE COURT:  Give me an example.

21          MR. QUINN:  Cabbage Patch dolls.  Would somebody

22  have been painting a Cabbage Patch head in the fall or summer

23  of 2000.  Is that an adequate explanation as to -- I mean,

24  Prayer Angel heads weren't available, and we had an invoice

25  which refers to Prayer Angel.  There was a whole question

1    about what is that.   There was testimony from Anna Rhee and

2    others.   I think there's a Cabbage Patch doll in evidence and

3    a Prayer Angel doll in evidence.   They were part of the story

4    about the development of Bratz, and there was testimony on

5    that.

6              These may be, you know, My Scene in particular is

7    going to be relevant to Phase 2.   I don't even think it's

8    relevant to Phase 1-B.   This one is a 2004 doll.   I mean,

9    that's what the date is on it.

10             It's not relevant to any issue in this case.   I

11   mean, what I'm hearing is there's really no harm.   There

12   should be a complete set of all the dolls that have ever been

13   referred to.

14             I think there is harm.

15             THE COURT:   Let me -- articulate that harm.   I'm

16   trying to get an articulated reason for either putting them

17   in or not putting them in.   Can you articulate a reason for

18   not putting them in?

19             MR. QUINN:   The Court knows that there are

20   contentions in this case and other claims which are not part

21   of this phase that My Scene is a knock-off of Bratz.   And

22   they point to certain features about the eyes in particular,

23   which are called out.   And you know, I think putting this

24   into evidence invites the jury to sort of speculate about

25   that and go off in directions which really aren't relevant to

1    this phase.   There has been no testimony about these

2    particular dolls.

3              THE COURT:   Anything else?

4              MR. QUINN:   Nothing, your Honor.

5              THE COURT:   Very well.   Okay.   I'll make a decision

6    on that on Monday when I'm not so tired.

7              And, Ms. Aguiar, if you're half as tired as I am,

8    you may need some sleep as well.   If you can come up with an

9    articulable reason as to why these dolls should come in, I'll

10   consider that on Monday.

11             MS. AGUIAR:   Fair enough.

12             THE COURT:   All right.   As it stands right now, I

13   don't see a justification at all for admitting them.   But if

14   there is a reason, I'll give you leave to bring that up.   The

15   expert reports, someone needs leave to file an expert report

16   for Phase 1-A?   Or 1-B?

17             MR. NOLAN:   Yes, I understand this has been the

18   subject of discussions with Mattel.   They know that we were

19   going to be -- we've had a supplemental report ready to go.

20   There were discussions.   We just need leave of the Court to

21   ask permission to file it.   It has to do with potential

22   damages in 1-B.

23             THE COURT:   Is there any objection to it being

24   filed?

25             MR. ZELLER:   No objection to them seeking leave.   I

1   don't know the details because I haven't been part of this

2   conversation, but I do understand we have some substantive

3   issues with what is being requested.

4           THE COURT:  Very good.

5           MR. ZELLER:  But the leave part is fine with us.

6           THE COURT:  If all you're seeking is permission to

7   seek leave to file, that's -- sure, and just to refresh,

8   Magistrate Infante had allowed a 30(b)(6) witness to be

9   taken.  It was actually taken either during the course of the

10  trial or immediately before, having to do with damages.  It

11  was a supplemental.  And that's why we had to add that

12  information out to the report.

13          THE COURT:  All right.

14          MR. NOLAN:  So we can file the motion for leave?

15          THE COURT:  Yes.  All right.  I think that wraps up

16  the list.  I know there's a few other exhibits.

17          And, Ms. Aguiar, I'll take those up on Monday after

18  we go through the jury instructions and the verdict form.

19  10:00 Monday, we will deal with the Carter Bryant issue.

20  Three o'clock we'll deal with jury instructions, verdict

21  form, and exhibits.  We will hear on Tuesday morning from --

22  not necessarily in this order -- Custodian of Records, Jeanne

23  Galvano, and the stipulation on Exhibit 472.

24          MS. AGUIAR:  Great.  I was just wondering, your

25  Honor, about one thing.  We are going to be filing our

1    judgment as a matter of law.  Were you hoping to take that

2    with you?  Did you want us to somehow --

3              THE COURT:  Do you have it done?

4              MS. AGUIAR:  Not right this minute, but we may have

5    it soon.  So not to get into your schedule too much, but how

6    long are you going to be here?

7              THE COURT:  I'll be here until 7:00.

8              MS. AGUIAR:  Okay.  And the same thing would be

9    true for the jury instructions.  We're making sure, and your

10   law clerk asked us to do that.

11             THE COURT:  I'm take all of those home with me this

12   evening.

13             MS. AGUIAR:  One last question regarding

14   scheduling.  Was your Honor anticipating that if everybody

15   rests on Tuesday, that we would run right Wednesday morning

16   into closing, or were you thinking -- or were you thinking a

17   day in between or what?

18             THE COURT:  We need to start on Wednesday.  I'm

19   pushing up against some commitments at the end of the month

20   of July.  I want this to move along here.  I don't know how

21   long the jury is going to take to deliberate.  So that's

22   something he can't say.  But we need to --

23             MR. NOLAN:  Your Honor, if we finish -- we'll have

24   the charging conference on Monday.  And if we finish Tuesday

25   morning, and let's assume, and now that we've seen the

1   declaration, we're going to have, I think, a vigorous

2   opposition as to why this wasn't dealt with in the case, in

3   their case in chief, because it's Jewel Barbie and Rainy Day

4   Rascals.  And I'm tired, but I think I remember hearing about

5   that in the case in chief.

6          But my question is this, your Honor.  If we finish

7   Tuesday morning, would it be the Court's intention to

8   instruct the jury Tuesday afternoon, and would we start --

9          THE COURT:  I don't think so.  What I'd like to do

10  is Wednesday, you know, fresh, give the instructions,

11  probably take an hour, hour and a half to get through the

12  instructions and the verdict form.  And counsel -- we are

13  going to get through closings all on one day.  So I say that

14  before I ask this, but what are your estimates on closing

15  arguments at this point?

16         MR. QUINN:  Can we give that on Monday, your Honor?

17         THE COURT:  You can.  But be mindful of the Court's

18  statement.  We will be getting through closings in one day.

19         MR. QUINN:  Right.  Understood.

20         THE COURT:  I'm not going to have --

21         MR. QUINN:  I assume one day meaning a day ending

22  at 5:00 P.M.

23         THE COURT:  Right.

24         MR. NOLAN:  And as sarcastic as this may sound,

25  it's the Irish and being tired, that's closing arguments from

1    both of them.

2             THE COURT:  Right.

3             MS. AGUIAR:  One thing I forgot, and I apologize.

4    With regard to the judgment as a matter of law, we are filing

5    it, obviously, before Mattel has its rebuttal.  And I think

6    this probably goes without saying, but whatever is in our

7    motion will not be the subject of testimony by Mattel in its

8    rebuttal case.  Because obviously, we're pretty much done.

9    They know what our case is now.  It's a video, and it doesn't

10   have to do with their motion.  So I --

11            THE COURT:  They have identified what they are

12   calling their rebuttal witness for.

13            MS. AGUIAR:  Right.

14            THE COURT:  And you have that.  So worst case

15   scenario from your perspective is that that subject matter

16   comes in, but nothing beyond that.  So given what you've

17   indicated that the JMOL is on, that should be fine.

18            The only thing is if you're getting Mr. Bryant out

19   here on Tuesday -- and I'm not saying if he is or if he is

20   not -- but if he is, we need to make sure he's out here early

21   Tuesday morning.  Because it doesn't sound like there's going

22   to be a lot to do Tuesday.  How long is Jeanne Galvano?

23            MR. NOLAN:  An hour and two minutes.

24            THE COURT:  Okay.  And then the Custodian of

25   Records, probably a half hour or so.

1          MR. NOLAN:  With as much knowledge as they probably

2     have, maybe two hours.  I don't know.  No, I think you're

3     right.  A half hour would be generous.

4          THE COURT:  All right.  So very good.  I'm just

5     starting to think, if we are -- if we did get through the

6     jury instructions on Monday afternoon and we finish up early

7     enough on Tuesday, maybe I might instruct on Tuesday

8     afternoon so that we can start with the closing argument

9     first thing Wednesday morning.  I wouldn't start with closing

10    arguments any earlier than Wednesday morning.  But maybe it

11    might make sense.

12          Let's just see how we do.  We may need some more

13    time on Tuesday afternoon to finish up our charging

14    instruction, but let's see how that plays out.  But in any

15    event, closing arguments for Wednesday.

16          I'm getting a note.  See, you guys get notes all

17    the time.  I get them, too.

18          Anything else?

19          MR. QUINN:  No, your Honor.

20          MR. NOLAN:  No, your Honor.

21          THE COURT:  Getting back to this issue that I'm

22    concerned about about Carter Bryant getting out here, what I

23    don't want to do is if the Court does find in favor of Mattel

24    on that point, I don't want this to be an issue of having to

25    put the trial off another day to get him out here.

1          So I think perhaps what Mattel should do is arrange

2     to have a ticket for Mr. Bryant to come out here so that that

3     does not become an issue.  So that on Monday, if the Court

4     were to find some Mattel's favor, that we're scrambling

5     around and not have to continue the matter to another day.

6          MR. QUINN:  We will do that, your Honor.

7          THE COURT:  I'm sorry?

8          MR. QUINN:  We will do that.

9          THE COURT:  Very well.  That's a good suggestion.

10         MR. NOLAN:  Your Honor, they have a plane.

11         THE COURT:  I'm sorry?

12         MR. NOLAN:  They have a plane.  I know that from

13    taking the deposition of --

14         THE COURT:  Very good.  The last point I want to

15    make is that I know we're all getting -- we've been in trial

16    now seven weeks, and I say this to no one in particular and

17    everyone in general, including myself.  We've got to be

18    mindful of our tone and respect for everyone involved.  So

19    let's keep that in mind, particularly as we head into next

20    week.  Let's all have a good weekend.

21         Get some rest -- some rest, anyway -- and a Happy

22    Independence Day to everyone, and I will see you on Monday at

23    10:00.

24         MR. QUINN:  I'm sorry.  Your Honor, the time count?

25         THE COURT:  MGA is right at 37 1/2 hours.  And

```
 1   Mattel is at 46 hours and 45 minutes.

 2             MR. QUINN:  Thank you, your Honor.

 3             THE COURT:  Approximately.

 4             MR. NOLAN:  Your Honor, have a great weekend.

 5             THE COURT:  You too.  Take care.

 6

 7             (Proceedings concluded at 6:10 P.M.)

 8

 9                   C E R T I F I C A T E

10

11

12        I hereby certify that pursuant to Title 28,

13   Section 753 United States Code, the foregoing is a true and

14   correct transcript of the stenographically reported

15   proceedings in the above matter.

16        Certified on July 3, 2008.

17

18        _____

19        MARK SCHWEITZER, CSR, RPR, CRR
          Official Court Reporter
20        License No. 10514

21

22

23

24

25
```