1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                            ---

4        **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                            ---

6    MATTEL, INC.,                 :  PAGES 4642 - 4763
                                   :
7              PLAINTIFF,          :
                                   :
8        VS.                       :  NO. ED CV04-09049-SGL
                                   :  [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,      :  CV04-9059 & CV05-2727]
     ET AL.,                       :
10                                 :
              DEFENDANTS.          :
11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17                TUESDAY, JULY 8, 2008

18                 JURY TRIAL - DAY 21

19                 AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23   CERTIFIED                   UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24   COPY                        255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                               (213) 663-3494

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
        By John B. Quinn, Esq.
5           B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
6           Harry Olivar, Esq.
            John Corey, Esq.
7           Diane Hutnyan, Esq.
            William Price, Esq.
8       855 South Figueroa Street
        10th Floor
9       Los Angeles, CA 90017
        (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

1                               **I N D E X**

2

3              MATTER:   JURY INSTRUCTION AND
                         VERDICT FORM CONFERENCE CONTINUED.
4

5                            **E X H I B I T S**

6

7     (Exhibit 1-B received.)................................ 4647

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| 1 | **Riverside, California; Tuesday, July 8, 2008** |
| 2 | **1:51 P.M.** |
| 3 | **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)** |

4    THE COURT:  All right.  We're back on the record

5  outside the presence of the jury to take up those matters I

6  indicated we needed to take up at the end of this morning's

7  session.

8         Where are we on The Wall Street Journal issue?

9         MR. NOLAN:  Your Honor, Mattel has proposed a

10  stipulation that imputes some factual information into the

11  stipulation about that the department didn't have knowledge.

12  And quite frankly, the way the stipulation is right now is

13  that there's a typographical error in The Wall Street

14  Journal.

15         I think the record is fair.  Mattel could have

16  produced information with respect to whether or not they

17  corrected it or not.  Rather than having a commentary within

18  a stipulation, I would just forego that stipulation, and

19  we'll argue it off the record in the court case now.

20         THE COURT:  So you don't wish to pursue this?

21         MR. NOLAN:  No, your Honor, because I think it's

22  going to prolong the case.  I don't want to burn my hours on

23  that point, your Honor.

24         THE COURT:  Very well.

25         MR. NOLAN:  We already have the stipulations in the

```
 1   record concerning the typographical error.
 2              THE COURT:  Wait a second.  Could you identify that
 3   for me just so that -- I don't want the jury to have a
 4   dispute.  I want to have what's going to be read to the jury
 5   clearly set forth right now.
 6              MR. NOLAN:  Your Honor, this appears at page 3541,
 7   line 21, it follows after the sidebar, and it says:
 8   "Mr. Nolan, it is stipulated between MGA and Mattel that The
 9   Wall Street Journal article which was published in July, on
10   July 18th of 2003, contained a statement that the Toon Teens
11   product had been scrapped by Mattel in 1998, and that was an
12   error in the article."
13              THE COURT:  And that's what you're going to go
14   with?
15              MR. NOLAN:  Yes.
16              THE COURT:  Very well.
17              MR. ZELLER:  Yes, your Honor.  That is what was
18   stipulated to.
19              THE COURT:  Very good.  What about Exhibit 472?
20   What is the language that's going to be read for that?
21              MS. AGUIAR:  I'm sorry.  The new Wall Street
22   Journal article, though, with the revised redaction, I'm not
23   sure that's in evidence, and I apologize if -- I'm not sure
24   that was just covered.  I want to make sure the exhibit
25   itself gets in, and I don't think it is actually in.
```

```
 1              THE COURT:  Isn't Exhibit 1-A already in evidence?
 2              MR. NOLAN:  It was, but then after, to accommodate
 3   the stipulation, they put in another redacted version that
 4   includes the typographical error.
 5              THE COURT:  Very good.  And that's what -- we're
 6   going to call that Exhibit 1-B?
 7              MR. NOLAN:  I think 1-B would be a proper
 8   denomination.
 9              THE COURT:  Do you stipulate that 1-B is admitted?
10              MR. ZELLER:  Yes.
11              THE COURT:  Very good.  Then it is admitted.
12              (Exhibit 1-B received.)
13              THE COURT:  Just make sure the clerk has a copy of
14   whatever line and paragraph number it is.
15              Okay.  Now with respect to Exhibit 472, what
16   language have we agreed to on that?
17              MR. NOLAN:  Is that the phone records?
18              THE COURT:  Yes, that's the phone records, exactly.
19              MR. NOLAN:  I thought that we had agreed on the
20   language that you had proposed.
21              THE COURT:  Okay.  The language that I have written
22   down here is the parties have stipulated that Exhibit 472 is
23   a record of telephone calls from Carter Bryant's extension at
24   Mattel from the month of September 2000.  There are no
25   telephone records available for the month of October 2000.
```

1             THE COURT:  That's correct.  So you'll be reading

2   that, Mr. Nolan?

3             MR. NOLAN:  Yes.

4             THE COURT:  All right.

5             MR. NOLAN:  Can I borrow your notes?

6             THE COURT:  Okay, sure.

7             MR. NOLAN:  I apologize.

8             THE COURT:  All right.  That leaves this difficult

9   question regarding Cassidy Park.  There's essentially two

10  questions, and the Court has spent a long time thinking about

11  this.  There's two questions.  One is the admissibility

12  evidence of the evidence itself, the authenticity question.

13            That's the easier of the two questions to answer,

14  because I think based on 10 -- or 901 (b)(2), and the cases

15  that have been referred to and a few others that I've taken a

16  look at during the lunch break, there's sufficient

17  authenticity based on the testimony of Cassidy Park coupled

18  with the fact that this was produced by Mr. Bryant, which was

19  further authenticity in the Court's eyes to this document.

20  It's not only the recognition of the signature and the

21  handwriting but also the handwriting within the drawing

22  itself.

23            Now, the more troubling question for the Court and

24  the closer call, as I indicated yesterday, just in the whole

25  notion of whether or not rebuttal evidence should be

 1  presented on this, the Court has allowed for the reasons that

 2  are repeated several times now, instead of the, I suppose,

 3  more traditional plaintiff's case in chief, defense case in

 4  chief, rebuttal, surrebuttal, for the sake of judicial

 5  efficiency and benefit of the jury, I essentially collapsed

 6  the two cases and allowed the defense to present their case

 7  in chief or make their direct examination questions for

 8  witnesses that were called by the plaintiff, and vice versa.

 9            So what I tried to do by looking at the testimony

10  is try to figure out whether or not -- I'm making a ruling,

11  Mr. Nolan.

12            MR. NOLAN:  I apologize.  There was one other

13  submission that was not made to you.

14            THE COURT:  Okay.  Let me hear it all before I

15  make a ruling.

16            MR. NOLAN:  I apologize, your Honor.  The question

17  that was posed to us had to do with when the subject of Rainy

18  Day Rascals was first raised, and I believe that the

19  transcript you have is from the date of June 17th, page 2902.

20  Your Honor, the question, the issue of greeting cards was

21  first raised by Mr. Price in his examination of Mr. Bryant

22  earlier in that day, and that appears at page 2666.  So the

23  greeting cards issue first was identified by Mr. Price --

24            THE COURT:  May I see that, the question and

25  answer?

```
 1              MR. NOLAN: And then the only other point I might
 2    add is that following the entry at 2902, which is the
 3    transcript you have on June 17th, Mr. Price took Mr. Bryant
 4    back on examination on the 6/18 date, had him all afternoon.
 5              And then on the 20th, Mr. Bryant was held over the
 6    weekend, Mr. Price continued the examination on the 20th.  So
 7    he had two different examinations.  We had two different
 8    examinations.  We were both going back and forth.
 9              THE COURT: Very good.
10              MR. ZELLER: If I may make a brief comment, your
11    Honor.  The testimony that you have, 2666 and 2668 and that
12    vicinity, it's talking about Exhibit 1313, which the Court
13    will recall, that was that second notebook, the one that
14    Carter Bryant said he did after he left Mattel.
15              THE COURT: Very good.  Are we all done now?
16              MR. NOLAN: Yes, your Honor.
17              THE COURT: All right.  Very good.  The Rainy Day
18    Rascals questioning comes up by Mr. Nolan in the context of
19    Exhibit 18494 and Exhibit 15393 and a few other exhibits.
20    And significantly, the exhibits have not only the greeting
21    card itself, but I'm looking at 18498 here, and it actually
22    has the date '98 here written on them.
23              In any event, it appears to the Court that that is
24    part of the -- very understandably part of the case in chief
25    of MGA.  That line of questioning concerning Rainy Day
```

1  Rascals, and I know that there are other questions being
2  raised about notebooks and about other greeting cards and
3  about other drawings and about other sketchings, but in terms
4  of when the series Rainy Day Rascals was done and where it
5  was done and how it was done, that was part of the case in
6  chief of the defense, MGA.

7          Certainly Mattel had an opportunity to respond to
8  that, and, as Mr. Nolan pointed out, they had an opportunity
9  to respond over several days. And for reasons that are not
10  clear, they did not introduce or put before Carter Bryant the
11  Rainy Day Rascals document that they now seek to introduce.

12          The argument before lunch that MGA was pressing and
13  where the Court's attention was focused was on the Cassidy
14  Park -- the fact that Cassidy Park came in after Cunningham,
15  because where the Court was on Monday, I was convinced by
16  Mattel that they did not have a full understanding of the
17  significance of Rainy Day Rascals until Mr. Cunningham's
18  deposition.

19          Notwithstanding that, I thought the burden on
20  calling Carter Bryant was too significant, and that's why I
21  ruled in favor of MGA on recalling Carter Bryant. But then,
22  of course, Cassidy Park comes after Mr. Cunningham.

23          But I'm convinced, based on what's before me and
24  the testimony I heard this morning that Mr. Zeller, and not
25  to mention anyone at Mattel, had any idea that Cassidy Park

1  could identify the signature until this morning.  So it would

2  not have made sense necessarily for them to have asked

3  Cassidy Park about that.

4          So I don't know if that goes anywhere.

5          So what I'm back to during the lunch break is going

6  back and forth in terms of whether or not this is appropriate

7  rebuttal evidence.  And it's clear that it was presented in

8  the defense case in chief.  This is not something which

9  Mattel raised.  I know they asked about greeting cards,

10  whether it was in the same notebook or another notebook, it

11  was a Hallmark card that was being shown by Mr. Price at the

12  time, not Rainy Day Rascals, and besides, the Hallmark card

13  would not have linked up with Cunningham's expert testimony

14  to make the point that MGA has very well made in their case

15  in chief.

16          When one party makes a point in the case in chief,

17  when the defense makes a point in the case in chief,

18  ordinarily, a rebuttal would seem to be an appropriate

19  response.

20          Another concern that I addressed was one raised, I

21  think, by Ms. Aguiar, and it's a serious allegation, and the

22  Court would not want to -- I don't know if it was Ms. Aguiar

23  or Mr. Nolan who made the point most forcefully, but both

24  alluded to it, was that somehow this was a grandstanding

25  opportunity for Mattel to end on this note.  And that

1  troubled the Court.

2  But again, based on what I've heard from both sets

3  of attorneys this morning as well as the testimony of the

4  witness who actually shed more light on this than I thought

5  she would have in terms her being contacted by telephone last

6  night, when she was contacted, and when she actually was able

7  to look at the document and everything, this does not strike

8  the Court as a grandstanding effort.

9  I have more concerns about that with bringing

10  Carter Bryant out, because -- and again, I think I mentioned

11  this on Monday, Carter Bryant would be basically called out

12  to impeach him on something, and I was concerned about ending

13  on that note.

14  That's not what's happening here. And I think at

15  the end of the day, any concern about that can be addressed

16  by the Court giving leave to MGA on this point anyway to

17  bring any surrebuttal.

18  The last concern of prejudice the Court had was the

19  issue raised by Ms. Aguiar this morning, and that being of

20  notice. Which, unfortunately, has been resolved by the -- a

21  juror taking ill, and so there's been clearly now plenty of

22  notice. And the concern about not being prepared is fully

23  addressed. Although, I must say for not being prepared,

24  Mr. Nolan, that was one of your better cross-examinations.

25  So perhaps you'd be better.

```
 1              I've always suspected that some of our best
 2    attorneys do better when they don't have a lot of time to
 3    think about it.
 4              MR. NOLAN:  It's these darn outlines I get that I
 5    have a problem with.
 6              THE COURT:  They get in the way of that raw talent.
 7    So I thought this was a fabulous cross-examination.
 8              In any event, but the points that you made during
 9    that cross-examination, just to circle back to that
10    authenticity issue, go to the weight of the evidence more
11    than it goes to the actual authenticity.  I do believe that
12    the authenticity is satisfied.
13              So for all of those reasons and trying to have a
14    considered and balanced and weighing of all the concerns, and
15    going back and forth on the issue several times, I am
16    convinced that this very limited area is proper for them, and
17    I'm going to exercise the Court's discretion to allow Cassidy
18    Park to speak and authenticate the document, and that will be
19    the extent of what she is permitted to get into.  Mr. Nolan
20    or whoever from MGA can cross-examine and is provided leave
21    to provide a surrebuttal on this point, on the dating of the
22    Rainy Day Rascals, and that will be the limited area of
23    rebuttal and surrebuttal in this case.
24              It's not particularly unusual for a case of this
25    complexity to have some rebuttal.  I've tried to look at
```

1    cases that give the Court a more clear direction in terms of

2    what is proper rebuttal and what is not proper rebuttal.

3    Most of the cases simply end in saying it's up to the sound

4    discretion of a trial court.  And balancing all the factors

5    here, I said this was a close case yesterday with respect to

6    Carter Bryant.

7              It's a close case again today.  But it's different

8    with Cassidy Park than it was with Carter Bryant.  And I

9    think it tips slightly in favor of Mattel on this issue.  But

10   it's a very limited, circumscribed rebuttal, and I trust that

11   if there is to be a surrebuttal, given that MGA knows the

12   content of the rebuttal, that by seven o'clock tonight, they

13   will let Mattel know who it is they plan to call.  And the

14   Court will leave it at that.  And that's the best I can do

15   with this particular issue.

16             MR. NOLAN:  I appreciate that.  I just say that, as

17   a witness, Cassidy Park comes -- when you say that it's

18   limited to this document, her credibility is an issue, of

19   course.

20             THE COURT:  With every witness.  I'm saying what

21   Mr. Zeller is limited to.  Your entitled to impeach.

22             MR. NOLAN:  Thank you.

23             THE COURT:  What I don't want to do is we're not

24   opening up a can of worms to go after other issues that are

25   collateral to this.

1           MR. NOLAN:  I understand.

2           THE COURT:  Very well.  Impeachment is fair game,

3  provided there's a foundation to impeach with the witness.

4  That's something the Court will take in the context of the

5  examination.

6           Let's go to the jury instructions.

7           MR. NOLAN:  Your Honor, I will also say that we

8  don't meet until seven o'clock.  Based on regarding the

9  surrebuttal, based on the record that I am aware of, which I

10 have no reason to dispute with respect to the condition of

11 Carter Bryant's father, the fact that he is still in

12 Missouri, the fact that his attorney is not sent, you know,

13 for any ability to present that evidence in any format, we

14 believe that Mr. Bryant is not available to us effectively.

15          So I can just say it's not our intent to offer a

16 surrebuttal.  But if I change that, I just want to do it for

17 timing purposes right now.

18          THE COURT:  I appreciate that.

19          MR. NOLAN:  But that's my best guess.

20          THE COURT:  As I indicated earlier, I think, I

21 would give you leave to do it by video, and the Court would

22 provide the technological -- I think that ability to do it by

23 video if you want to do it that way as opposed to bringing

24 him into court.  But that's entirely up to you.

25          All right.  Let's get on to jury instructions.

1           Apparently there's an e-mail regarding the juror.
2    Give me a second here.  Report from Juror No. 7.  "I just
3    spoke with Mrs. Dome.  Her doctor's diagnosis is food
4    poisoning.  He prescribed medication and recommended that she
5    stay home tomorrow.  Ms. Dome is now resting, but she'll
6    phone before 5:00 P.M. to give us an update."  That's from
7    Mr. Holmes.

8           I am hoping that she feels a lot better by five
9    o'clock.  I would hate to interfere with a doctor's diagnosis
10   or the remedy.  I'm reluctant to take a full day off at this
11   point.  The Court is really pushing up against its own
12   commitments towards the end of this month.  I've anxious to
13   get through this.

14          Now, I don't know how long the jury is going to
15   deliberate, and we could very well be into August regardless
16   of our best efforts, but I would like to do the closing
17   arguments tomorrow, if possible.  But I guess we'll just have
18   to wait until five o'clock and see how she's doing.

19          Any thoughts of counsel?

20          MR. NOLAN:  No, your Honor.  Although with any
21   luck, we won't be here at 5:00.  I was just wondering if
22   there is any further communication on the status.  Can
23   Mr. Holmes e-mail us that message?

24          THE COURT:  Right.  The only thing is that I may
25   inquire of counsel in terms of how they wish to proceed.  If

 1  she is unable to come in tomorrow --

 2          MR. NOLAN:  That's the issue.  For myself, I think

 3  for MGA, we talked about this during lunch.  This has been an

 4  incredibly dedicated jury.

 5          THE COURT:  It is.

 6          MR. NOLAN:  You know --

 7          THE COURT:  And she actually apparently expressed

 8  concern back there that she wasn't going to be with the trial

 9  when the paramedics were coming.

10          MR. NOLAN:  You know, when you give a service like

11  this, and I know the pressure on the schedule, but I just

12  think our view would be, your Honor, to give her the one more

13  day, as inconvenient as it is for everybody, but more as a

14  tribute to her dedication and also as a signal to all the

15  other jurors that their service is so immensely important and

16  relied on by counsel.

17          THE COURT:  Mr. Quinn?

18          MR. QUINN:  For a lot of reasons, we share the

19  Court's view that if at all possible, we do closings

20  tomorrow, but I'm also sympathetic to what Mr. Nolan has

21  said.  This juror, like all jurors, has been very dedicated,

22  and it would be a shame to lose her.

23          THE COURT:  Very good.  We'll cross this bridge

24  when we get to it at five o'clock.  In the interim, let's be

25  prepared to proceed tomorrow.

```
 1              So let's take the jury instructions, the verdict
 2   form, and then some closing argument related issues.
 3              I have the jury instructions before me.  So let's
 4   begin with that.
 5              Objections.
 6              MR. RUSSELL:  Your Honor -- well, you first.
 7              MR. PROCTOR:  We -- Mr. Russell and I did not
 8   confer about this in advance.  There are a couple of typos we
 9   both probably caught.  I do have a couple of substantive
10   concerns.  Should I just run through it?
11              MR. RUSSELL:  Do you mind if I say one thing first?
12              Your Honor, we took the liberty of preparing
13   written objections setting forth our position.  I thought it
14   might be helpful for your Honor and for Mattel if we handed
15   those up to your Honor and to Mattel now so that everyone
16   could actually see our position in writing.  It maybe would
17   facilitate the discussion if that would be useful.
18              THE COURT:  Are these extensive, Counsel?
19              MR. RUSSELL:  No, your Honor.  We really only
20   have -- the longest one we have is less than a page.  There
21   are very few -- they are word specific.  We'd like to file
22   them, but --
23              THE COURT:  I'd rather just hear these orally.  I
24   give you leave to file objections, then they are going to
25   want to seek leave to file written responses to it.  And
```

 1    let's just make these oral, Counsel.  I'm not going to cut

 2    you off.  You can say as much as you need to say.

 3                MR. RUSSELL:  Very well, your Honor.

 4                THE COURT:  Let's not do another round of filing on

 5    this.  But I am glad that you have those, because I'll have

 6    you make the changes, or somebody make the changes.

 7                Mr. Proctor, why don't we go through your

 8    objections first, both substantive and nits, and then I'll do

 9    the same thing for Mr. Russell.

10                MR. PROCTOR:  Very good, Judge.  The first one is

11    on page 3, there is an instruction on clear and convincing

12    evidence.  And I am not aware of any --

13                THE COURT:  The Court meant to take that out.  That

14    was an oversight.  I indicated yesterday that I was going to

15    take that out.  Thank you.

16                Next.

17                MR. PROCTOR:  Next one, page 13, the first sentence

18    says the parties have agreed to certain facts to be placed

19    in.  We should probably add the word evidence.  Placed in

20    evidence.

21                THE COURT:  Yes.

22                MR. PROCTOR:  The next one is on pages 22 and 23.

23    In the first paragraph, and then in the last two paragraphs

24    again, the Court uses the words conceived or reduced to

25    practice by Carter Bryant and explaining what works would be

1 | owned by Mattel.

2 | THE COURT: Right.

3 | MR. PROCTOR: The contract itself does use the

4 | words conceived or reduced to practice. And it also uses the

5 | words create and made, the past tense of make. All words

6 | were used, not in the same paragraph, but --

7 | THE COURT: That's what I'm looking for, a copy of

8 | that.

9 | MR. PROCTOR: I have a copy I can provide.

10 | THE COURT: I have it right here.

11 | MR. PROCTOR: Up at the top in the very first

12 | paragraph, the contract reads: "I acknowledge that Mattel

13 | operates in a competitive environment," et cetera, et cetera.

14 | "This agreement is designed to make clear," and if you look

15 | at little 3III, "inventions that I create will be owned by

16 | the company." And then down above the signature block,

17 | "Caution, this agreement creates important obligations of

18 | trust and affects the employee's rights to inventions the

19 | employee may make during his or her employment."

20 | And correctly, we would submit, the Court on

21 | summary judgment ruled that Mattel owns all Bratz works which

22 | Mr. Bryant, quote, creates while working at Mattel. That's

23 | the language of the Court's summary judgment order. And so I

24 | don't think it makes any sense to use the words conceived and

25 | reduced to practice in the jury instructions and not use the

1    perhaps more everyday words create and make, which are both

2    in the Court's summary judgment order, as a finding that we

3    own such works, where it's created while at Mattel and in the

4    agreement itself.

5              THE COURT:   I don't like make because that

6    conflates the issue of actually just doing.  And that seems

7    to be -- I think the point that is -- the distinction made in

8    the agreement, that this is conceived or reduced to practice

9    has import that goes beyond simply making, and Ms. Aguiar

10   spoke to this indirectly the other day.

11             Create certainly has a -- it is more narrow than

12   make and is closer to the notion of conceived or reduced to

13   practice.  I adopted that because that is simply the language

14   that is used in the actual paragraph.  That is on point to

15   this particular concern.  And I don't think it's that

16   difficult to grasp.  It's something that's conceived and is

17   reduced to practice.

18             MR. PROCTOR:   I agree, and I'm not saying that it

19   can't be understood.  I'm simply -- contract interpretation

20   is the job of the Court in most circumstances, and the Court

21   has interpreted this contract.

22             We got an extensive briefing on summary judgment

23   about what this contract means.  And the Court's

24   conclusion -- after all of that briefing and all that

25   argument and the Court gave us a day to argue this issue --

1  the Court's conclusion was inventions that Carter Bryant

2  created while working at Mattel are owned by Mattel.

3          THE COURT: Very good. Okay. I'm mindful of your

4  argument. I'll go back to that.

5          I want to hear from MGA before I make a change.

6          MR. PROCTOR: Okay. Should I go through the rest

7  of them?

8          THE COURT: Yes.

9          MR. PROCTOR: Okay. The same, actually in -- the

10  same instruction, the last two paragraphs. I would also

11  suggest adding language which was in the first paragraph, I

12  believe. In the first paragraph on page 22, the Court has in

13  whole or in part, which is correct, I believe.

14          THE COURT: Right. Which is it? Is it in whole or

15  in part? What does the contract say?

16          MR. PROCTOR: Let me confirm before I respond.

17          MS. AGUIAR: Solely or jointly.

18          MR. PROCTOR: Solely or jointly with others is the

19  language.

20          THE COURT: That's what I want to use. That's what

21  I meant to use. Solely or jointly.

22          MR. PROCTOR: All right. Page 25 is our next

23  concern or contains our next concern.

24          THE COURT: Yes.

25          MR. PROCTOR: After, in the middle paragraph, the

1    Court writes, the Court is reciting its findings as relevant

2    to intentional interference. And the Court recites that the

3    Court has found Mr. Bryant directly competed with Mattel.

4    After that sentence, I believe it makes sense to add another

5    finding which the Court did make on summary judgment, which

6    is that Mattel was harmed.

7         THE COURT: I intentionally took that out, Counsel,

8    based on the arguments yesterday. This cures the -- and I

9    went back through the motion for reconsideration, and

10   Mr. Russell was mistaken. He did not actually seek

11   reconsideration on that particular point; however, he was

12   correct about what was moved for, and just to avoid an error,

13   potential error, I took the precaution.

14        I think the harm is self-evident, and that's why I

15   found as I did on the motion for summary judgment. I don't

16   know how you could possibly get the other elements based on

17   that evidence and that evidence also not manifesting the harm

18   requisite, but I think the safer course is to not find on

19   that issue and let the jury --

20        MR. ZELLER: May I be heard on that, your Honor?

21        THE COURT: Yes.

22        MR. ZELLER: I did start to talk about that

23   yesterday. I am concerned that after all of this, we are

24   going to have a closing argument about harm. And we

25   certainly understood the Court's order to be providing

1   summary judgment on that element. There is a Ninth Circuit
2   case, I can get the cite. I had it yesterday. I probably
3   still have it with me.

4           But it's a Ninth Circuit case called Cool Fuels.
5   And what the case is that the Court, sua sponte, can enter
6   partial summary judgment on elements that are uncontested.
7   There's no question that for whatever reason, and I haven't
8   gone back to try and dig up the history, but we did not move
9   on that element with respect to tortious interference, but we
10  did on the other claims. Duty of loyalty --

11          THE COURT: I understand all of that. I checked,
12  and you didn't move for it on this claim.

13          MR. ZELLER: Right. And so for whatever reason
14  that was, the fact is that the Court then entered summary
15  judgment on that element. You know, there was no contested
16  evidence on it. And the Court affirmatively found it on the
17  other claims.

18          Then there was no motion for reconsideration.
19  We're now months down the road. We've gone through this
20  trial. I mean, I can tell you that certainly in how we've
21  evaluated what evidence we're going to put in and how we are
22  going to put it in, we were relying on that decision, and
23  we're relying on the Court's determination that that element
24  was satisfied.

25          So I am a little concerned about where this puts us

1   for of closing and then, you know, for jury deliberations.

2   It was -- it's something that would potentially require us,

3   tonight, I guess, to go back and make sure that we have put

4   in evidence, you know, that we otherwise would have on this

5   element.

6           I don't know as I stand here, you know, what

7   decisions we might have made differently, but it's of

8   concern.  And I do think based on this point, based on the

9   Cool Fuel's decision, based on the fact that there was no

10  objection or motion for reconsideration and no argument made

11  to the Court about that element until, you know, recently, I

12  think that the Court should still instruct the jury as to

13  that element.

14          THE COURT:  Provide the Court with this Cool Fuel

15  cite, if you would, Counsel.  Mr. Russell, I'm going to give

16  you a chance to respond to all of this and then some.

17          MR. RUSSELL:  Fair enough, your Honor.

18          THE COURT:  All right.  Mr. Proctor?

19          MR. PROCTOR:  Thank you, Judge.  Same page, page 25

20  at the bottom, the language that the Court uses here assumes

21  a fact.  The instruction reads the Court has also found that

22  the mere fact that Carter Bryant solicited employment from

23  MGA and Isaac Larian and MGA offered employment to Carter

24  Bryant is not sufficient to show intentional interference.

25          That is -- that fact is actually, I believe, or

1    that assumed fact is actually contradicted by the evidence.

2    Mr. Bryant did not seek employment at MGA. That's not what

3    this is about. So I mean his testimony was actually quite

4    clear. He wasn't looking for a job. He only worked there as

5    a free-lancer at all because Isaac Larian asked him to. He

6    just wanted to sell his drawings and idea and made royalties

7    without working on it.

8              THE COURT: What I want to get across, though, and

9    what I'm trying to come up with a balanced instruction, I

10   think the jury needs to be instructed that this is merely

11   seeking, soliciting, offering is not -- I understand your

12   objection and the way the Court phrased it.

13             MR. PROCTOR: I have a proposed alternative.

14             THE COURT: Please.

15             MR. PROCTOR: The Court has also found that Isaac

16   Larian's or MGA's mere offering of employment to Carter

17   Bryant would not be sufficient, and then the rest is the same

18   by itself, to establish intentional interference.

19             THE COURT: So your objection basically is to

20   whether Carter Bryant solicited employment from MGA.

21             MR. PROCTOR: And also the language in the Court's

22   instruction, you know, recites that the Court has found that

23   fact that Carter Bryant did this isn't sufficient. We

24   dispute that fact. I don't think that's a fact. I don't

25   even think there's actually any evidence of that fact.

```
 1              So the language that I'm proposing would be, you
 2   know, it's a different tense.  Isaac Larian's or MGA's mere
 3   offering of employment to Carter Bryant would not be
 4   sufficient by itself to establish an intentional
 5   interference.  Et cetera, et cetera.
 6              THE COURT:  Very well.  I understand your
 7   objection.
 8              MR. PROCTOR:  Thank you.  Page 28.  There is a
 9   typographical error in the word over.
10              THE COURT:  Line?
11              MR. PROCTOR:  Line 18.
12              THE COURT:  Thank you.
13              MR. PROCTOR:  Page 29, there's a typo in the word
14   loyalty on line 3.
15              THE COURT:  Thank you.
16              MR. PROCTOR:  Page 30, on line 9, there's a typo in
17   the word agreement.
18              THE COURT:  Thank you.
19              MR. PROCTOR:  And then after that, in the context
20   of the inventions agreement, what the Court did was discuss
21   the inventions agreement or refer to the inventions agreement
22   and then quote the language of the agreement.
23              THE COURT:  Right.
24              MR. PROCTOR:  And here the Court is again referring
25   to a paragraph of the agreement, you know, referring to the
```

1   obligation to keep proprietary information confidential.

2   What I would propose to add after that is language which

3   comes from the agreement, and my proposal would be to add a

4   sentence which says under the inventions agreement,

5   proprietary information includes information that Mr. Bryant

6   developed or discovered as a result --

7           THE COURT: I'll do it one way or the other. I'm

8   either going to leave it the way it is and the jury can look

9   at it, or I include the entire language. I'm not going to

10  parse and just include those provisions that are helpful to

11  Mattel.

12          MR. PROCTOR: That's fair enough. And I think the

13  language should be included, the definition of proprietary

14  information.

15          THE COURT: If I'm going to do that, then, and I

16  did think of that. I just thought that it would be -- that

17  we could just refer to the agreement. But to be consistent,

18  so it would just simply be section 1-B.

19          MR. PROCTOR: If I may, the definition of

20  proprietary information is in section 1-B. The language that

21  I'm actually referring to comes from section 1-A.

22          THE COURT: Okay.

23          MR. PROCTOR: But it is definitional language.

24          THE COURT: Section 1-A of the inventions

25  agreement.

1           MR. PROCTOR:  It's the second clause of the first

2     sentence in 1-A.  Where it says including information that I

3     may develop or discover as a result of my employment with the

4     company.

5           THE COURT:  Right.  Again, though, I'm either going

6     to include the entire paragraph or none of the paragraph.

7     I'm not going to parse.

8           MR. PROCTOR:  I understand.

9           THE COURT:  Very good.  I'll see what MGA has to

10    say about that.

11          MR. PROCTOR:  That's it for Mattel.

12          THE COURT:  That's it for Mattel.  Okay.

13          Now, Mr. Russell, the floor is yours.  You can

14    respond.  You can start with your own objections, and then

15    respond to Mattel's objections, reverse that order, or do

16    both at the same time.

17          MR. RUSSELL:  Thank you, your Honor.

18          THE COURT:  It's entirely up to you.

19          MR. RUSSELL:  First, I just want to note for the

20    record the MGA parties' objections to the Court's decision

21    not to provide certain instructions that Mattel had

22    proffered.  I believe we're probably on safe grounds, merely

23    that we proffered them and you didn't give them.  But out of

24    an abundance of caution, if your Honor please, I'd simply

25    like to list the instructions into the record, or if it

1   please, I could simply submit this.  This is just a listing

2   of what you didn't give and save time.  Either/or.

3             THE COURT:  Well, list your objections now,

4   Counsel.

5             MR. RUSSELL:  Yes, your Honor.  First, we would

6   object to the Court's decision not to provide the Copyright

7   Act section 204 California Civil Code section 988 instruction

8   for the reasons stated in tab 6 and our responses to the

9   objections.

10            Second, we object to the Court's decision not to

11  provide the instruction intentional interference with

12  contractual relations -- elements, and I'll give specific

13  comments on the instruction the Court did give, but we

14  believe our instruction as drafted would be the appropriate

15  one.

16            We also believe the Court should give the

17  instruction intentional interference with contractual

18  relations, inducement, for the reasons stated in the Court's

19  tab 6 of the binder.

20            We believe the Court should give the instruction

21  fiduciary duty -- burden of proving breach.  We believe for

22  the reasons stated in the binder provided to the Court.

23            We believe the instruction harm caused by breach of

24  fiduciary duty should be given.  We believe an instruction

25  the duty of loyalty defined should be given.

1           We believe the instruction breach of the duty of

2   loyalty should be given.

3           We believe consent to employee's actions should be

4   given.

5           Harm caused by the breach of duty of loyalty should

6   be given.

7           And that is the universe of instructions that the

8   Court did not give that we offered.

9           THE COURT:  And just for the record, the Court

10  believes that each of these nine concepts are either not

11  necessary or adequately covered by the instructions that are

12  given, which are based on the California model instructions.

13  Well, let me say actually, 1, I don't think, is necessary.

14  204 and 988, the Court has already interpreted the contract.

15  2 through 9, the Court believes are adequately covered by the

16  instructions that the Court has proposed to give.

17          MR. RUSSELL:  Yes, your Honor.  Just so we're

18  clear, the reason we offered 204, we understand your Honor's

19  rulings.  But just the issue of interpretation is something

20  that we'd like to at some point take up.

21          At this point I guess I'll just run through the MGA

22  parties' objections, and as I hit the comments made by

23  Mattel, I'll address those.

24          THE COURT:  Very well.

25          MR. RUSSELL:  Turning to the instruction at page --

1   I guess it's 22 and 23, which is the first substantive

2   instruction.

3           THE COURT: Yes.

4           MR. RUSSELL: The MGA parties would object to the

5   use of the word ideas in the instruction, which appears at

6   line 4 on page 22, on the grounds that the contract does not

7   provide or define the term ideas within it. So that would be

8   an objection that we have. We would ask that similarly and

9   for the same reasons that the phrase idea for the name Bratz

10  be stricken because the contract in the inventions agreement

11  does not cover ideas.

12          THE COURT: Give me a second.

13          MR. RUSSELL: Because the Court has included in the

14  first paragraph a summary of Mattel's contentions, we believe

15  that the MGA parties should be permitted to have a statement

16  of their contentions listed in the instruction, and we would

17  propose the following. After the conclusion of the first

18  paragraph.

19          THE COURT: One second. Okay.

20          MR. RUSSELL: The MGA parties deny Mattel's

21  contention. The MGA parties contend --

22          THE COURT: Wait a second, Counsel. I'm even

23  slower than this guy.

24          The MGA parties deny -- I got that.

25          MR. RUSSELL: Mattel's contention. And if it would

1  be helpful, since I wrote these down, I could hand it to you,

2  and you could simply read it.

3         THE COURT:  I prefer to do it this way.  I don't

4  want to open the floodgate.

5         The MGA parties deny Mattel's contentions --

6         MR. RUSSELL:  The MGA parties contend that even if

7  a Bratz-related work was physically made during the period of

8  Bryant's employment with Mattel, Mattel does not own any work

9  that is merely a copy or noncreative alteration --

10         THE COURT:  Counsel, aren't we careening right into

11  the issue yesterday with Ms. Aguiar, that it is a 1-B issue?

12         MR. RUSSELL:  It's our position that this should be

13  a 1-A issue.

14         THE COURT:  I really have ruled on that yesterday.

15  I agree with you, the MGA's parties deny contentions, we do

16  that in jury instructions all the time when we set forth the

17  claims.  I do it in just about every criminal case that I do.

18  The government has indicted, claims this, the defendant

19  denies the claims.  But to go into an issue, I mean, I'll

20  write this down, but I've exhaustively gone through this with

21  Ms. Aguiar yesterday.

22         MR. RUSSELL:  That's one of the reasons I was

23  trying to be mindful of your Honor's time.  Some of these

24  points you probably have disagreed with, and I am mindful of

25  that.  I don't want to waste your time.  But I do feel the

```
 1    need to preserve the record for potential appeal, to at least
 2    state the issues --
 3              THE COURT:  Very well.  Continue.
 4              MR. RUSSELL:  Noncreative alteration of a
 5    pre-Mattel invention.
 6              THE COURT:  Very well.  Thank you.
 7              MR. RUSSELL:  Also consistent with what we
 8    discussed yesterday, we object to the use of the phraseology
 9    the Court has found on the grounds that it's prejudicial and
10    may unduly bias the jury.
11              THE COURT:  That's on --
12              MR. RUSSELL:  This is on line 12, page 22.
13              THE COURT:  Yes.  And then it also appears --
14              MR. RUSSELL:  It appears repeatedly.  We would
15    submit --
16              THE COURT:  Let's be a little bit more specific --
17              MR. RUSSELL:  Absolutely.  I'll do it each time.
18              THE COURT:  I used it on page 22.  I used it on
19    page 25.  And I used it on page 30.
20              MR. RUSSELL:  That sounds right, your Honor.  So
21    with respect to this specific one, we would simply ask the
22    Court to delete the clause on line 12 so that the sentence
23    would simply read the inventions agreement is, and then we'll
24    note for the record obviously our objection now.
25              THE COURT:  I see.
```

```
 1              MR. RUSSELL:  But rather than giving any
 2   imprimatur, we'll simply have the jury be told that.
 3              THE COURT:  I see.  It's a little easier there than
 4   in the two other places.
 5              MR. RUSSELL:  And I have specific proposals as we
 6   get there.
 7              THE COURT:  Very good.  All right.
 8              MR. RUSSELL:  Before I forget, in this instruction,
 9   the language, page 22, line 5, in whole or in part, I believe
10   your Honor addressed that already.
11              THE COURT:  Yes, solely or jointly.
12              MR. RUSSELL:  Just so that I can be sure we caught
13   that.
14              Page 23, line 13, again, the word idea we submit
15   should be stricken.
16              THE COURT:  Okay.
17              MR. RUSSELL:  We can then turn to the next, which
18   is on page 24.  We would ask the Court to strike the
19   characterization of Mr. Larian as MGA's Chief Executive
20   Officer on the grounds that it's irrelevant and prejudicial
21   and does haven't anything to do --
22              THE COURT:  I thought I took that from your
23   proposed instructions.
24              MR. RUSSELL:  No.  I'll double-check that, but if I
25   did that, I withdraw my request.
```

```
 1              THE COURT:  I may very well be mistaken.  I thought
 2   I got that from one of yours.  I thought that was a good
 3   idea.
 4              MR. RUSSELL:  I don't believe so.  Our instruction
 5   is at page 52 of the binder.  And it says that Mattel claims
 6   that defendants Isaac Larian and MGA Entertainment
 7   intentionally interfered with a contract.  So I don't believe
 8   we had that language.
 9              THE COURT:  I picked it up someplace.  Okay.
10   You're right.  It was from Mattel's.  I see there's a second
11   that on page 24, line 5.  And I'll take that out as well.
12              MR. RUSSELL:  Okay.  We then, turning to lines 6 to
13   7 on page 24 object to the term certain contracts because
14   it's vague and ambiguous.  I think at this point the jury
15   should be told which contracts it is that the contention is
16   that --
17              THE COURT:  It's defined as the inventions
18   agreement.
19              MR. RUSSELL:  There's no reason we couldn't insert
20   instead, inventions agreement, if that's the preferred
21   approach.
22              THE COURT:  Okay.
23              MR. RUSSELL:  Turning to element 2, lines 14 to 15
24   on page 24.
25              THE COURT:  Right.
```

1          MR. RUSSELL:  We respectfully submit, your Honor,

2    that the instruction should instead be phrased as it was in

3    the MGA parties, and that is that MGA and/or Larian had

4    actual knowledge.

5          THE COURT:  Right.  I know you want the actual

6    knowledge, but for the same reason that I'm not giving the

7    willful blindness that Mattel has asked, I think that new

8    captures that.

9          MR. RUSSELL:  I understand that.  This is purely

10   for the record.  And the second portion that your Honor

11   actually ruled on yesterday, so this won't be a surprise, is

12   that we submit that it should be knowledge of the material

13   terms of the inventions agreement.

14         THE COURT:  Right.  And I reject that as well.

15         I do want to make a point.  I think if we're going

16   to change the contracts to inventions agreement, I don't want

17   there to be a confusion between the jury as to an agreement

18   and a contract.  I mean, we use those phrases interchangeably

19   here.  Just to make it clearer, going back to page 22, I'm

20   going to change on line 9 the word an agreement to a

21   contract.  Mattel's claim is based on a contract between

22   Carter Bryant and Mattel called the inventions agreement.  I

23   don't want there to be confusion that we referred to there as

24   an agreement and here as a contract.

25         MR. RUSSELL:  That would be fine with us, your

 1  Honor.

 2              THE COURT:  Very well.

 3              MR. RUSSELL:  Your Honor, with respect to the

 4  phrasing of the third and fourth elements, we would object

 5  for the reasons that we stated previously, that we don't

 6  think performance made more difficult should be given here.

 7  I mean, the contention in the case is simply that there was

 8  an actual breach.  I mean, this instruction doesn't fit the

 9  facts of this case.  We're not talking about someone who

10  continued to perform.

11              THE COURT:  Very good.

12              MR. RUSSELL:  Then I'd like to address the argument

13  that was made by Mr. Zeller with respect to their reliance on

14  your Honor's findings on summary judgment.

15              First, as your Honor noted, there is no question,

16  and the Court's order makes clear, if you look at your

17  May 21st order, that MGA was the moving party.  Looking

18  specifically at --

19              THE COURT:  One second.  May 21st order.  I'm

20  sorry.  Go ahead.

21              MR. RUSSELL:  Pages 9 and 10, the Court makes clear

22  that it was MGA that moved for summary judgment, and the

23  Court essentially says upon reflection, and it now appears to

24  set aside findings that it made previously.

25              And then in reliance upon that fact and in

1  furtherance of that fact, if your Honor looks at the pretrial
2  conference order that was filed in this case at page 5, where
3  the Court summarizes the rulings that were made, there are no
4  findings made by this Court in the pretrial conference order
5  with respect to intentional interference in favor of Mattel.
6  And it was on that basis, your Honor, that we felt
7  comfortable.

8       Both the language of the May 21st order and much
9  more particularly the language of the final pretrial
10 conference order, which was consistent with our view that
11 what your Honor had done was it was confused during the
12 initial argument. I believe I clarified during the second
13 argument that we, not Mattel, had moved, and I had said to
14 your Honor we had a difficult time understanding how your
15 Honor could have found against MGA for those reasons, and I
16 argued it was -- I was confused. We did not move for
17 reconsideration.

18      But it was merely the continuation of argument on
19 summary judgment where we addressed for the first time during
20 oral argument the intentional interference elements. And I
21 went through for your Honor both that Mattel didn't move and
22 that we did move, and based upon that, your Honor issued this
23 ruling, and I pointed out then and I point out again I don't
24 think the Court could make a finding as a matter of law on
25 harm because no party moved on that issue. There was no

 1  evidence for which the Court could have made such a finding.

 2          So the Court could not have made a sua sponte

 3  finding.  The Cool Fuel case that Mr. Zeller referred to, I'm

 4  familiar with this case.  This was a case where the issue was

 5  fully tendered and briefed by both parties, and then the

 6  Court is free, given that record, to say well, I have a fully

 7  submitted joined issue.  And even though technically one

 8  party didn't move, there's no surprise.  There's no unfair

 9  prejudice.

10          It's quite the contrary here.  We didn't move on

11  that element.  They didn't move on that element.  No one

12  briefed that issue.

13          THE COURT:  Well, there's no question with respect

14  to the first point.  There's a valid contract between Mattel

15  and Mr. Bryant.

16          MR. RUSSELL:  Your Honor found that.  We're not

17  contesting that for today's purposes.

18          THE COURT:  What about Mr. Bryant directly competed

19  with Mattel by entering into the contract with MGA?

20          MR. RUSSELL:  Well, again, your Honor, I'm not here

21  to reargue summary judgment with you.

22          THE COURT:  Very good.  I guess I'm not following,

23  Mr. Russell, what you are objecting to in the instruction

24  right now.

25          MR. RUSSELL:  I'm responding to the argument made

 1  by Mr. Zeller about harm.

 2          THE COURT:  So this is just limited to the harm

 3  issue.  Very good.

 4          MR. RUSSELL:  You had me confused.  Just in

 5  response to the harm issue.  That issue was never briefed --

 6          THE COURT:  So you agree with the Court, you're not

 7  objecting to the Court's instruction, you're agreeing that

 8  the harm should not be included.

 9          MR. RUSSELL:  Yes.  And then further, I just want

10  to point out to the Court, just to give the Court some

11  comfort, when this issue was raised, and it's in your binders

12  at page 6 of tab 6, and at page 56 of tab 6, we specifically

13  objected when Mattel attempted to rely upon purported

14  findings by your Honor.  So there's no question this issue

15  was preserved.

16          THE COURT:  Very well.

17          MR. RUSSELL:  Turning to your instruction at page

18  25, again, line 4, your Honor, the Court has already found as

19  a matter of law.  And again, we object to that language, that

20  it's prejudicial and unduly biased.

21          THE COURT:  What do you propose in this instance?

22          MR. RUSSELL:  I think again what you simply should

23  start with is just capitalize the word there.  There was a

24  valid agreement.  You don't even necessarily need it given as

25  a prior instruction on this point.  They have already been

1   told on page 22 that there is a valid agreement between the

2   parties.  I don't know why we need it at all.  I think it's

3   redundant, but if you strip the Court's finding from it, this

4   is surplusage.  So I submit it could be deleted entirely.

5         THE COURT:  And then I suppose you're suggesting

6   the same thing with line 8.  I could say Mr. Bryant directly

7   competed with Mattel.

8         MR. RUSSELL:  Absolutely.

9         THE COURT:  Your objection to this court finding,

10  court further finding.

11        MR. RUSSELL:  Correct.  I have an additional

12  objection to the extent that you want to keep the directly

13  competed language that's found at line 8 through line 11.  I

14  mean, I think it's confusing.  I think it's somewhat

15  ambiguous, and I think it's prejudicial because if you look

16  at the first sentence of paragraph 2 and then the second

17  sentence of paragraph 2, you would think that competition was

18  an element of their intentional interference claim because

19  you say in the second sentence whether the remaining

20  requirements, I just think it creates an element of the

21  confusion that doesn't need to be put in here.

22        THE COURT:  How would you phrase it?

23        MR. RUSSELL:  Well, I think you simply should say

24  nothing if you're going to say anything at all about the

25  elements.  Elements are what they are.

```
 1              THE COURT:  Well, no, the Court has found that
 2   element satisfied by that competing.  So that's got to be
 3   incorporated.  They won that on summary adjudication.

 4              MR. RUSSELL:  Well, okay, we object to that
 5   finding, but we'll live with it if we could simply say, you
 6   know, in this case, you are to find, something along those
 7   lines.  Or you should assume, something like that, as opposed
 8   to the Court --

 9              THE COURT:  I kind of liked your first suggestion
10   where I simply state it.

11              MR. RUSSELL:  Yes.

12              THE COURT:  Okay.  Let's move along.

13              MR. RUSSELL:  Then, your Honor, we believe to the
14   extent we're going to have findings of the Court listed, we
15   think there has to be some recognition here of your Honor's
16   preemption finding on the tortious interference claim.  The
17   Court found that the claim was preempted to the extent that
18   it is based on Mattel's rights to Bratz.  That's in your
19   April 25th order at page 2.

20              THE COURT:  But Mattel isn't arguing that.

21              MR. RUSSELL:  I think there's going to be a chance
22   the jury could be confused.  Mattel is not allowed, based on
23   your Honor's rulings, to seek or recover damages for a
24   transfer of rights to Bratz under their intentional
25   interference claim.  If I understand what you held.  And I
```

1    think there's a definite chance the jury will be confused.

2    They need to be told, and here's what I propose. I admit

3    this is difficult, and I struggled with it. Something along

4    the lines of it is not sufficient -- and if I could just read

5    it.

6              THE COURT: Okay.

7              MR. RUSSELL: It is not sufficient to establish

8    this claim that Carter Bryant transferred any rights to Bratz

9    that he had to MGA. Something along those lines.

10             THE COURT: Refresh my recollection on the evidence

11   of the transfer. Has that even come in?

12             MR. RUSSELL: I'm being told it's in the consulting

13   agreement. I think the concern is I don't want them to stand

14   up and say --

15             THE COURT: They are not going to -- if there was

16   evidence about this transfer of rights, I could see that

17   being an issue. But I don't think that came in. I don't

18   recall it coming in. If I'm mistaken, let me know. And

19   Mattel can't argue that. If they do, you certainly have

20   grounds to object.

21             MR. RUSSELL: I guess, then, if we're not sure, and

22   we can all go back and look. I'm not sure what the harm to

23   Mattel is. If they can't argue that, just to make clear this

24   is not fair game seems appropriate. We certainly relied on

25   this in framing our case and our defense.

1           THE COURT:  Very good.

2           MR. RUSSELL:  With respect to the next instruction,

3   your Honor, page 26.  On line 4 to 5, we would like to insert

4   the word actually before the word new.  You've already

5   addressed that.  But just for the record.

6           Your instruction at page 27, your Honor.  Again, I

7   think our threshold objection is that you've collapsed two

8   different claims into one.  I think that we're concerned that

9   this is going to be confusing to the jury.  It's going to

10  make it difficult for them to understand that these are two

11  legally distinct concepts, two legally distinct claims.

12          Particularly, given your Honor's findings that

13  there are as to one claim, a duty and a breach, and as to the

14  other, a duty, I think the risk that there's going to be

15  confusion and perhaps jury error is in our view difficult to

16  escape.  So we would --

17          THE COURT:  I understand your argument.  It's

18  confusing either way.  If we do it the structural way that

19  Mattel proposed or that you proposed, there's no easy way of

20  doing it.  I appreciate the argument.

21          MR. RUSSELL:  Okay, your Honor.  We also object,

22  your Honor, to the extent that we believe that the element of

23  harm is omitted from this instruction.

24          THE COURT:  How is the element of harm omitted?

25          MR. RUSSELL:  You've got three different elements.

1   You've got a constituted a breach, that we knew that they

2   constituted a breach, and we gave substantial assistance.

3          What's missing is there has to be harm from

4   something MGA did, and we have to have a substantial factor

5   test here.  Every tort in California requires a showing that

6   the defendant's conduct --

7          THE COURT:  That's present in both the predicate

8   tort, which are fully incorporated into that.  So the element

9   of harm has to be found.

10          MR. RUSSELL:  I guess maybe I'm just playing a

11   little bit of a semantic game, but yes, to the extent there

12   is a finding of the breach of loyalty --

13          THE COURT:  That harm, as a matter of law, is

14   sufficient to serve as the form or the elements of aiding and

15   abetting.

16          MR. RUSSELL:  I guess the question is when is the

17   MGA parties' conduct a substantial factor.  In other words,

18   the MGA parties could give substantial assistance to

19   Mr. Bryant, but their conduct may not constitute a

20   substantial factor we would submit, and it's appropriate to

21   have a jury make a determination or be told --

22          THE COURT:  I appreciate your argument.  I think

23   it's clear.  MGA and/or Mr. Larian have to give substantial

24   assistance or encouragement to Mr. Bryant to breach his duty

25   or duties, to breach the duty or duties, there has to be

1    harm.  So you can make your argument on harm.

2              MR. RUSSELL:  Thank you, your Honor.  Second

3    element, line 13, after the word Larian, we'd like to insert

4    the word actually.

5              THE COURT:  Very well.

6              MR. RUSSELL:  We also, your Honor, would

7    respectfully submit that language that was in our proposed

8    instructions at page 77 of tab 6 of your binder be included.

9    We had a lengthy paragraph.  I can just read it to your

10   Honor.

11             THE COURT:  I'm sorry.  Page 77?

12             MR. RUSSELL:  77 and 78.  I believe it's the bottom

13   of 77.  It picks up --

14             THE COURT:  I've already given you your substantial

15   assistance instruction, I believe.

16             MR. RUSSELL:  We have an additional point, your

17   Honor, which for the record we'd like to note, and if your

18   Honor chooses to reject it, that's certainly appropriate.

19   But we believe there's an inverse relationship between

20   substantial assistance and knowledge and that the cases

21   establish that.

22             THE COURT:  What does that mean?

23             MR. RUSSELL:  In other words, if you can show

24   minimal substantial assistance, you've got to show much more

25   knowledge.  That's what the cases --

```
1         THE COURT:  You think that's clear and apparent
2    from simply saying that the substantial assistance
3    requirement is inversely related to the knowledge factor, you
4    think there's a single juror who is going to understand that?
5         MR. RUSSELL:  Well, your Honor, if I've done a poor
6    job of drafting, I'm happy, if your Honor is willing to
7    entertain it, to submit clearer language.  But I think the
8    point we're trying to make --
9         THE COURT:  Telling these 10 jurors --
10        MR. RUSSELL:  I will take the hit for doing a poor
11   job of drafting, but I do think it important that the jury be
12   told if, for instance, you've got cases where the alleged
13   substance assistance is a routine business transaction, in
14   which case the Court said well, fair enough, that might
15   constitute assistance under the law.  But in that case I'm
16   going to hold you to a requirement that you've got to show --
17        THE COURT:  I think you did a really good job of
18   defining substantial assistance in your instruction on that
19   point, Counsel.
20        MR. RUSSELL:  Thank you, your Honor.
21        THE COURT:  You're welcome.
22        MR. RUSSELL:  Turning to the instruction at page
23   28, as to the first element, we believe, your Honor, that the
24   first element at line 7 should be rephrased as follows:  That
25   Mr. Bryant knowingly and expressly agreed to take on a
```

1  fiduciary duty. Because to say that they have to prove that

2  he owed a fiduciary duty in our view is insufficient under

3  City of Hope and the City Solutions case.

4          THE COURT: It really doesn't matter because I've

5  already found, as a matter of law, that he owed a fiduciary

6  duty.

7          MR. RUSSELL: And I understand that, your Honor,

8  but it is our position -- and we articulated this on the

9  reconsideration motion. Your Honor has rejected it, but I am

10 articulating it again for the record --

11         THE COURT: I would have made that finding.

12         MR. RUSSELL: And then we object with respect to

13 the second instruction, or second element where it says

14 Mr. Bryant failed to act in the best interests of Mattel, and

15 to the remainder, we would propose instead, it should simply

16 say that Mr. Bryant breached his fiduciary duty or the

17 fiduciary duty. There's no reason to paraphrase what is

18 designed below. And it would be clear.

19         THE COURT: Okay. Wait a second. CACI doesn't

20 have an elemental listing of breach of fiduciary duty, does

21 it?

22         MR. RUSSELL: No. I think that's why the parties

23 got themselves into difficulties.

24         THE COURT: What other objections do you have?

25         MR. RUSSELL: With respect to that instruction or

1    additional?

2              THE COURT:  28.

3              MR. RUSSELL:  That does it, your Honor.

4              THE COURT:  Okay.  What else?

5              MR. RUSSELL:  With respect to the instruction on

6    page 29, the duty of loyalty, I believe you caught already

7    the typo at line 3.

8              THE COURT:  Yes.

9              MR. RUSSELL:  We believe, your Honor, that this

10   instruction, like the fiduciary duty instruction, should

11   define the duty of loyalty.  We had proposed a duty of

12   loyalty definition in our instructions.

13             THE COURT:  Where did you -- what page is that on?

14             MR. RUSSELL:  I believe that's all the page 109 of

15   tab 6.

16             THE COURT:  Where is that taken from?  The

17   fiduciary duty instruction -- there was a stipulation on

18   that.

19             MR. RUSSELL:  Correct.

20             THE COURT:  Okay.

21             MR. RUSSELL:  I guess we just took that from

22   Williston as well as the -- I'll never pronounce it right,

23   Huong, H-U-O-N-G, Que, Q-U-E, case.

24             THE COURT:  I suspect the part from Williston is

25   the first two lines; correct?

1          MR. RUSSELL:  Yes.

2          THE COURT:  That sounds like the objective part of

3   it.  That sounds like a good thing to give, Counsel.

4          MR. RUSSELL:  Thank you, your Honor.

5          THE COURT:  All right.  Anything else?

6          MR. RUSSELL:  Yes, your Honor.  With respect to the

7   third element after informed consent, we believe for the

8   reasons we articulated in our responses and objections, pages

9   105 through 108, that the language or otherwise ratified by

10  its conduct should be added.

11         THE COURT:  What's the basis for that?

12         MR. RUSSELL:  Well, your Honor, simply that we

13  believe that the cases for the reasons we stated therein

14  provide not only that could you have in-advance consent, but

15  you could simply find out later and say that was acceptable.

16         And with respect to the fourth element, that there

17  should be the limitation that the harm occurred during the

18  term of Mr. Bryant's employment, because Mr. Bryant doesn't

19  know any duties once he leaves.

20         THE COURT:  Is that true as a matter of law?  If

21  you breach someone's duty of loyalty and skedaddle and the

22  duty of breach happens afterwards --

23         MR. RUSSELL:  I think I would submit yes, your

24  Honor, especially here, because the facts are in this case,

25  in particular, the allegation is that Mr. Bryant remained a

1  Mattel employee and was actively breaching his duties of

2  loyalty by signing a contract and working for someone else.

3          THE COURT:  I'm asking is there any authority that

4  the harm has to take place while he's still there?

5          MR. RUSSELL:  I apologize.  I wasn't prepared to

6  argue the cases extensively with you.  But let me look at the

7  cases we cited at 105 to 108 of our binder.

8          As I recall, most of the cases make clear that the

9  duty of loyalty terminates when the employee leaves, and so a

10  harm has to occur while the duty exists, that it may have

11  repercussions thereafter, I think --

12          THE COURT:  All these relate to damages.

13          MR. RUSSELL:  It seems hard to imagine, your Honor,

14  that someone could claim that there wasn't a harm that

15  occurred while he was an employee.  I mean, there may be --

16  we can all argue about what that means in terms of damages

17  later, but if he only owes a duty until he leaves and there's

18  no harm until after he leaves, that would be our position,

19  that that would be inappropriate.

20          THE COURT:  Very well, Counsel.

21          MR. RUSSELL:  Page 30, I believe Mr. Proctor noted

22  a typo at line 9 on agreement.  I would submit that the word

23  invention should be inventions.

24          THE COURT:  Yes.  What about adding section 1-A of

25  the inventions agreement to kind of conform this to the

1    pattern that I had before?

2            MR. RUSSELL:  We were thinking about this as well,

3    your Honor.  And I think if your Honor wants to add the

4    language of the contract, that's fine.  The definition of

5    proprietary information.  What we had proposed is to add

6    another sentence at the end.  You can add that language, if

7    you wish, something to the effect, and I'll just read it, the

8    parties disagree as to precisely what is covered by paragraph

9    1-A.  It's up to you to decide this issue.

10           Because given the arguments yesterday, they have an

11   interpretation that proprietary information covers something,

12   and we have a different interpretation, and I think it's fair

13   to have the jury understand that is a live question for them.

14           THE COURT:  Very good.

15           MR. RUSSELL:  Obviously we reserve and make --

16   continue our objection to the findings both of the existence

17   of a duty and a breach for the duty of loyalty and the

18   fiduciary duty, but I'm not going to reargue those today.

19           We also note that we believe it would have been

20   appropriate, and your Honor has rejected this, to have

21   instructions on preparation to compete, but in light of your

22   Honor's findings, we didn't submit any.

23           THE COURT:  I did add that line, though.

24           MR. RUSSELL:  I understand.

25           THE COURT:  To try to address that very concept.

1  Because I do think you're entitled to an instruction on that.

2           MR. RUSSELL: Yes, your Honor. And you've already

3  rejected this, but the point I'm trying to make is simply we

4  think it would be appropriate to perhaps be a little bit more

5  illustrative, but I think your Honor has concluded our

6  instruction was argumentative. I'm simply noting for the

7  record that we think it would be appropriate to have an

8  illustrative list of what would be a legitimate preparation

9  of competing and what would not. I don't want to belabor

10 that point.

11          THE COURT: Very good.

12          MR. RUSSELL: Your Honor, I also would like to

13 lodge an objection on line 14, page 30, to the word secretly.

14 I think that -- when he secretly entered into a contract with

15 MGA, we think it's --

16          THE COURT: That's a good point.

17          MR. RUSSELL: Your Honor, with respect to

18 conversion, we simply would ask that there be an additional

19 sentence added that can be found at our proposed instruction

20 at pages 27 and 28. And I'll read it: "A conversion claim

21 must relate" -- what I meant to pick up with was the second

22 sentence. "A conversion claim cannot be based upon property

23 that a party has discarded." Because there is evidence, if

24 the dummy doll makes it in past our objection, as a matter of

25 law, we think it was based on discarded materials.

```
 1              So we should be free to argue that trash cannot be
 2   the basis for a conversion claim.
 3              THE COURT:  The first part, the tangible property,
 4   is already covered in the --
 5              MR. RUSSELL:  That's why I stopped myself.  I
 6   inadvertently read too much from my notes.
 7              THE COURT:  Okay.
 8              MR. RUSSELL:  Anything else?
 9              MR. RUSSELL:  That is it, your Honor.
10              THE COURT:  All right.  Very good.
11              Let me hear from Mr. Proctor.  There's a few of
12   these I want you to address, some that you don't need to
13   address.
14              MR. PROCTOR:  All right.
15              THE COURT:  I'll let you know which ones those are.
16              MR. PROCTOR:  Okay.  Let's begin with page 20, the
17   ideas, idea.
18              MR. PROCTOR:  Page 22?
19              THE COURT:  Yes, page 22.  I'm sorry.
20              MR. PROCTOR:  Okay.  This is a straight rehash of
21   summary judgment.  The issue of both summary judgment and
22   post summary judgment arguments, arguments in the context of
23   the final pretrial conference order.  Mr. Russell is saying
24   the contract doesn't cover ideas.  You shouldn't use the word
25   idea because the contract doesn't cover ideas.
```

1           The Court expressly ruled, again, after, you know,

2   hundreds of pages of briefing and lots and lots of argument,

3   that the contract does cover ideas. Mr. Russell is saying we

4   shouldn't have a clause which says we claim we own the idea

5   for the name Bratz. And presumably MGA objects to the

6   inclusion of that clause on the verdict form.

7           MGA objected to the inclusion of the language about

8   the idea for the name Bratz in the final pretrial conference

9   order as well, and I believe there was briefing on that

10  subject as well, and the Court rejected it and included that

11  language in the final pretrial conference order. So it's a

12  live issue. And it's already decided by the Court's summary

13  judgment ruling again.

14          THE COURT: What about the language, the MGA

15  parties deny Mattel's contentions.

16          MR. PROCTOR: I think I'm aware of the Court --

17          THE COURT: I've already indicated my ruling on the

18  rest of that sentence. It's in the 1-B issue, but just

19  having a line in there that the MGA parties deny Mattel's

20  contentions.

21          MR. PROCTOR: I have no objection to that.

22          THE COURT: What about this objection that the

23  Court has found and simply state what the Court has found as

24  opposed to emphasizing that the Court has found.

25          MR. PROCTOR: This is a tough issue, I think. On

1   page 22 on line 12, I think the Court can take it out.  Where

2   it says, you know, the Court has found, as a matter of law,

3   that the inventions agreement is a valid and enforceable

4   agreement.  I think the Court can just say the inventions

5   agreement is a valid and enforceable agreement.

6           But I don't think that's true on page 25 or page

7   30, which is the other spot where that language appears, I

8   think.

9           THE COURT:  Well, 25 I don't have as much of a

10  problem because I am making findings that go both ways.  I

11  make findings that favor Mattel, and I make findings that

12  favor MGA.  The first paragraph can certainly be restated,

13  there was a valid contract between Mattel and MGA, Mattel and

14  Mr. Bryant.  But then the Court has found that Mr. Bryant

15  directly competed.

16          The Court also found that Isaac Larian -- I'm

17  thinking out loud right now, that where it's balanced like

18  that, where I'm making one finding one way and one finding

19  the other way, that the prejudicial impact that Mr. Russell

20  expressed is not as much in play.

21          MR. PROCTOR:  I agree with that.  I suppose I

22  disagree on the first statement, which was that the first

23  paragraph you can take out without it being a problem at all,

24  take out the language of finding this as a matter of law.

25          And the reason is the way this is going to hear,

1   the way this is going to sound to the jury.  This comes on

2   the heels of a jury instruction telling the jury, instructing

3   the jury what the elements of our claim is, and when it comes

4   later, that's the context in which it arises as well.  And

5   the Court is going to tell the jury well, the first element

6   is that there was a contract or contracts between Mattel and

7   Carter Bryant.  And the second element is et cetera,

8   et cetera.

9         Then immediately after that, I don't think we can

10  just take out all the prefatory language and say there was a

11  valid contract, because we need something, and I think the

12  language that the Court has chosen thus far captures it,

13  which says this element is off the table.  Something to

14  identify to the jury what the purpose of what the Court is

15  saying, the purpose of it, as everyone in this room knows, is

16  to say this he will cement off the table, and this element is

17  decided.

18        The Court conveys that to the jury as this is being

19  read aloud by using the words the Court has already found, as

20  a matter of law, that there was a valid contract.

21        THE COURT:  Instead of that Mr. Bryant failed to

22  act in the best interests of Mattel while he was employed by

23  Mattel, to put simply that Mr. Bryant breached his fiduciary

24  duty to Mattel.  Particularly given that we then down below

25  find fiduciary duty.

1        I kind of like the simpler approach that

2   Mr. Russell suggests.

3        MR. PROCTOR:  It is simpler.  I think it's -- I

4   think it's less clear.  It is certainly shorter.  There's no

5   question about that.  You know, he --

6        MR. RUSSELL:  Thank you for that concession,

7   Counsel.

8        MR. PROCTOR:  What are the elements of that he had

9   a duty and he breached it.  You could make an instruction

10  extremely simple.  What the Court has done thus far explains

11  to the jury what a breach is.  And the Court does explain it

12  again down below.

13        THE COURT:  I think I would agree with you if I

14  didn't explain it.  It needs to be explained one place, but

15  I'm afraid that we're emphasizing one particular aspect of

16  it.  Very well.  I understand your position.

17        And related to this -- and I also think Mr. Russell

18  makes a good point that just as we defined the fiduciary

19  duty, I think an objective definition of the duty of loyalty,

20  which the first two lines of the MGA definition provides,

21  it's simply an employee owes his or her employer a duty of

22  loyalty.  The scope of the employee's duty varies with the

23  nature of the employee's relationship with his or her

24  employer.

25        And of course, the jury has heard evidence about

1  the nature of that relationship.  They have the benefit of

2  the inventions agreement, et cetera.

3          I certainly want to give the remainder of that

4  instruction, which tilts heavily towards MGA.

5          MR. PROCTOR:  What you read is acceptable.

6          THE COURT:  Very well.  I think that gives light --

7  I think it's a good point to include that.

8          Skip to 31.  This request to add a line of

9  conversion claim cannot be based upon property that has been

10  discarded.  Is there any authority that you can cite to which

11  would suggest that that's not the case?

12          MR. PROCTOR:  Whatever the legal merits of that

13  position are, it's irrelevant.  And the reason is that the

14  discarded property at issue here, the allegedly discarded

15  property at issue, as Mr. Bryant testified, oh, I went to the

16  trash bins at Mattel and, you know, pulled out some Mattel

17  trash to make the, quote, unquote, dummy doll that I used for

18  the pitch to MGA, and MGA's position is oh, it's just trash.

19  You can't convert trash.  So no harm, no foul.

20          That is totally irrelevant because the, quote,

21  unquote, dummy doll, the prototype doll, whatever it was made

22  of, whatever its pieces were, whether it was trash at Mattel,

23  something that wasn't trash at Mattel, something that

24  Mr. Bryant bought at the store, whatever it is, Mattel owns

25  that prototype doll.  Mr. Bryant artistically created this

1  prototype doll, and the testimony -- there's been

2  testimony --

3           THE COURT:  I'll hear from Mr. Russell on that in a

4  moment.  I understand your argument.  It was basically

5  resurrected, and it was created into something else, and by

6  virtue of the inventions agreement, it was no longer trash.

7           MR. PROCTOR:  You got it.

8           THE COURT:  I'll hear from Mr. Russell on that in a

9  moment.

10          That's it.  Thank you, Counsel.

11          That last argument, Counsel, the argument is that

12  it wasn't that a piece of trash was taken out and then you

13  walked out the door with it, and you can't claim conversion

14  for that trash.  It's that the trash was taken out, and

15  because Mattel owns or at least they claim to own pursuant to

16  the inventions agreement anything that Carter develops,

17  designs, et cetera, he took this trash, he developed and

18  designed something; therefore, it became Mattel's property at

19  that point.

20          It was no longer trash.  The value implicitly well,

21  he thought well enough to take it over and show it to

22  Mr. Larian, who wasn't precisely impressed by it, but

23  nonetheless there was certainly some value to it.

24          MR. RUSSELL:  From trash it emanated, from trash it

25  returned.

```
 1              THE COURT:  This is almost starting to sound
 2   theological.
 3              MR. RUSSELL:  Exactly.  Lo, there once was trash.
 4   But given that it was trash, and given that Mattel is
 5   precluded from seeking any value from the exploitation of
 6   that doll, if it had any value, but rather, the physical
 7   value, if he could sell it on e-mail --
 8              THE COURT:  Where are those cases you cite on
 9   trash?
10              MR. RUSSELL:  Page 130 of tab 6, the --
11   specifically the leading case is Ananda, A-N-A-N-D-A, Church
12   of Self-Realization versus --
13              THE COURT:  See, there we go.  That's the one.
14              MR. RUSSELL:  That's a leading case.  There are
15   other cases as well.  But given that Mattel doesn't have the
16   right to exploit any rights that would flow from possession
17   of the dummy doll, given that the dummy doll was created from
18   trash and immediately discarded, and while he says --
19   purportedly the evidence in this record is undisputed that it
20   was created from trash and thrown back into the trash and
21   never used.
22              So we should be entitled to have the jury say
23   there's no value to that doll.  And when they stand up and
24   say you don't see a dummy doll here, we say yeah, because you
25   can't have a conversion claim based on trash --
```

1        THE COURT: I'll look at the case.

2        MR. RUSSELL: Sure, your Honor.

3        THE COURT: All right. Okay. I think I have the

4  arguments I need. After some further reflection to make the

5  final jury instructions, and I'll prepare those myself.

6  There's -- the changes aren't that substantive.

7        Mr. Zeller, is this to the jury instruction issue?

8        MR. ZELLER: These are the citations that I -- the

9  Court had asked for previously.

10        THE COURT: Yes.

11        MR. ZELLER: I had mentioned some of the cases.

12  And just on the last point, your Honor, I assume that if the

13  Court is going to be further considering or actually is

14  inclined to not instruct the jury on that dummy doll, that we

15  would have an opportunity to further discuss it. It's a very

16  important point to us.

17        THE COURT: If the Court were to put in the

18  trash --

19        MR. ZELLER: Right. Exactly.

20        THE COURT: Very well.

21        This is the Cool Fuel case?

22        MR. ZELLER: That's correct. The Cool Fuel versus

23  Connett, C-O-N-N-E-T-T.

24        THE COURT: Yes.

25        MR. ZELLER: It is found at 865 F.2nd 309, and this

1   is a 1982 Ninth Circuit case, and basically the discussion on

2   sua sponte action by the District Court on summary judgment

3   begins, it looks like page 311.

4           THE COURT:  Thank you.  All right.  I'll take a

5   look at these and have these ready for if you not by the end

6   of today, by first thing tomorrow morning.  But I think

7   counsel knows where the Court is going in terms of the vast

8   majority of the instructions.

9           Oh, it's 685, not 865.

10          MR. NOLAN:  Your Honor, we agree with the law

11  clerk.

12          MR. ZELLER:  I have 685 right here.

13          THE COURT:  Okay.  You must have misspoke.  I think

14  you said 865.

15          MR. ZELLER:  No problem.  It's a very, very small

16  matter.

17          THE COURT:  All right.  I want to give the court

18  reporter a break before we come back and do the verdict form.

19  But let me quickly finish up two other matters on the closing

20  argument.  This motion to preclude video testimony is one.

21  The length of the closing arguments is the other.  I'll start

22  with the latter first.

23          My inclination, given the time that we're going to

24  have tomorrow, is to -- I really want to get through the

25  closing arguments.  And that's to limit each side to two and

1   a half hours.  150 minutes.  And I'll hear from you on both

2   that.  And my thought, mindful of Mr. Nolan's earlier

3   concern, would be to require that Mattel spend no more than

4   one third of that time, namely, 50 minutes, in rebuttal.  But

5   that's -- I think we can get through the very brief limited

6   rebuttal case, surrebuttal, if there is any, instructions,

7   and five hours of closing argument.

8          I'll have the jury eat in.  We'll have them catered

9   lunch in the jury room.  Think we can get through that in an

10  entire day, unless there's some manifest injustice to

11  limiting you to two and a half hours.

12          MR. QUINN:  That's actually --

13          MR. NOLAN:  That's what we had discussed.

14          MR. QUINN:  And I think if we take -- I'm assuming

15  if we have a very brief rebuttal testimony, read the

16  instructions, if we start at 9:00, we should be ready to

17  start closing by 10:15.  If you do the arithmetic, if we only

18  take an hour for lunch, and we really do hold the breaks to

19  15 minutes, that leaves us two and a half hours each, and

20  we'd be done by 5:00.

21          THE COURT:  And so two and a half hours is

22  reasonable to you as well?

23          MR. QUINN:  Yes, your Honor.

24          MR. NOLAN:  And our understanding was that the

25  split was going to be two hours for the opening by Mr. Quinn

```
 1   and 30 minutes for Mr. Price.  That may adjust over time, but
 2   that was the estimate that Mr. Quinn and I talked before the
 3   Court --
 4            MR. QUINN:  That's my target.  But I would just as
 5   soon not be held to that.
 6            THE COURT:  Well, I am going to -- I am not going
 7   to permit any more than 50 minutes, the two third, one
 8   third --
 9            MR. QUINN:  I understand that, but I wouldn't want
10   to be held to two hours and --
11            THE COURT:  The only question I asked was is there
12   a manifest injustice in the Court's two and a half hours,
13   two-third, one-third split.
14            MR. NOLAN:  No problem.
15            THE COURT:  All right.  That takes care of that
16   issue.  And whether it's tomorrow or Thursday depends on the
17   health of the juror.
18            This motion to preclude video testimony in closing
19   argument.  Is this still a motion?
20            MR. QUINN:  It is a motion, your Honor.  I mean,
21   our pitch on that, your Honor, is that it gives undue
22   emphasis to one piece of evidence.  They have seen human
23   beings talking live mostly, and they have also seen some
24   videotape of human beings testifying.  And it gives undue
25   emphasis to the videotaped testimony to use that in closing.
```

1    It's unfair to the testimony that we'd like to rely
2    on for all of the other witnesses as to which there is not
3    videotape.

4    MR. NOLAN: Your Honor, very briefly, because I
5    think the opposition covered most of it, I just want to say
6    that the controlling authority in this case is U.S. versus
7    Guess, G-U-E-S-S.

8    The case that they rely on, your Honor, is a case
9    that I think is the accepted practice, and that is in opening
10   statements, hesitation of allowing using videotape in opening
11   statement. But that's the Hynix Semiconductor case versus
12   Rambus. But U.S./Guess is the controlling case here. It
13   talks about State Courts.

14   This is squarely within the practice of other
15   cases. I don't believe it gives any undue emphasis. In
16   fact, what the courts have said, and this is what was pointed
17   out in Guess, is that it ensures accuracy. And we intend to
18   use some of the videotape in this case to make some of the
19   points that we want to make, your Honor.

20   THE COURT: I think this is something which is
21   vested to the discretion of the Court. The Ninth Circuit
22   does seem to appear in Guess to have suggested that it is
23   a -- almost a preferred way of handling recounted testimony.
24   It certainly eliminates the objection of mischaracterizing
25   testimony because it goes to the heart of that testimony.

```
 1              So to the extent the exhibit is in, the testimony
 2    is in, counsel may use it as you see fit.
 3              MR. NOLAN:   Thank you, your Honor.
 4              THE COURT:   The motion is denied.
 5              Let's take a break, and we'll take up the verdict
 6    form.
 7              (Recess taken.)
 8              THE COURT:   Okay.   We're back on the record.   And I
 9    promised you a verdict form, but I have one more question for
10    Mr. Russell on this issue of harm.
11              Mr. Russell, if you would.
12              MR. RUSSELL:   Yes, your Honor.
13              THE COURT:   If, and it's a huge if, but if the
14    jury -- well, the jury must find there was a contract between
15    Mattel and Carter Bryant because the Court has found.
16              So if the jury finds that MGA and Mr. Larian knew
17    about the contract, and if the jury further finds that MGA
18    and Mr. Larian intended to disrupt the performance of the
19    contract, and if the conduct of MGA and Mr. Larian in fact
20    prevented performance of the contract or made it more
21    difficult and that the conduct of MGA and Mr. Larian was a
22    substantial factor in causing Mattel's harm, if all of those
23    things were true, how could we -- how could anyone possibly
24    argue that there was no harm to Mattel?
25              MR. RUSSELL:   Your Honor, it's difficult to answer
```

1  that question in the abstract, not knowing all the elements,

2  but I guess all I would say --

3            THE COURT:  I just listed all of the elements

4  except the harm.

5            MR. RUSSELL:  I understand that.

6            THE COURT:  And the circumstances of this

7  particular case, not in the abstract, but based on the

8  evidence in this case that you have available to argue in

9  closing, how could you possibly argue that there was no harm,

10  assuming the jury finds all of those factors?

11            I've tried to put myself back to where I was when I

12  made this finding on the motion for summary judgment.  And if

13  you find all of those elements, assume those to be true, how

14  could there not be harm?

15            MR. RUSSELL:  Well, given that you've assumed the

16  last element that follows --

17            THE COURT:  Put that aside.  Just take the first

18  four.

19            MR. RUSSELL:  So that you've got a contract.

20            THE COURT:  You have a contract.  You have

21  Mr. Larian and MGA knowing of the contract.  You have

22  Mr. Larian and MGA intending to disrupt the performance under

23  the contract.  And finally, you have the conduct of MGA and

24  Mr. Larian actually preventing performance under the

25  contract.  How could you possibly not have harm, at some

 1   measure, the measure of which is damages, and we'll reserve

 2   that for 1-B.

 3           So that's not relevant to establishing the tort

 4   itself.  But in terms of the element of having some harm or

 5   detriment or negative effect, how could you possibly argue

 6   that it's not --

 7           MR. RUSSELL:  Setting to the side the transfer of

 8   the ownership of Bratz, which has been preempted out, I guess

 9   what I would say is it could very well be the case that there

10   was no harm to Mattel from all of those things being true

11   because Mr. Mattel -- Mr. Bryant could leave at any time.

12   They didn't have any expectation that he was going to remain

13   an employee.

14           THE COURT:  That's that at-will issue, which is a

15   red herring.  The Court's already dispensed with that.

16           MR. RUSSELL:  I agree with you that --

17           THE COURT:  It's not about his employment.  It's

18   about the inventions agreement.  It's assuming that they

19   interfered in the inventions agreement, not intervening in

20   his employment contract.  If in fact Mr. Larian -- and I'll

21   just use him as a substitute for MGA -- knew about the

22   inventions agreement, interfered with the inventions

23   agreement, and actually interfered with it, because that's

24   what the element is, that he has to actually interfere with

25   it.  In other words, get Carter Bryant to violate the

1   inventions agreement.  Isn't there some inherent harm to

2   Mattel's interests by definition?

3          MR. RUSSELL:  No, your Honor, or at least I think I

4   can articulate a way that there wouldn't be.  The inventions

5   agreement is the contract we're talking about.  The

6   inventions agreement has three different buckets, the

7   preferred term today.  You've got the section 1 talking about

8   trade secrets, proprietary information, section 2 talking

9   about inventions, which is now off the table by virtue of

10  your Honor's summary judgment ruling, and section 3, which I

11  would characterize as giving rise to the duty of loyalty.

12  It's a codification in written form of the duty of loyalty.

13          It may be a technical violation.  Mr. Larian knows

14  that, for sake of argument, Mr. Larian knows that Mr. Bryant

15  has a contract, knows that under that contract the inventions

16  agreement, knows that Mr. Bryant owes a duty of loyalty to

17  Mattel, owes a duty not to compete, signs him up, that is a

18  technical breach of the contract, and then that same day

19  Mr. Larian intending to cause a literal breach, but

20  understanding he was going to immediately quit, which is the

21  record evidence in the case, there would be no harm to

22  Mattel.

23          Mr. Bryant has the right -- the at-will issue may

24  be a red herring for element purposes, by for harm purposes,

25  it's not.  Mr. Bryant had no obligation to remain at Mattel

1   for any period of time.  He could have quit and left the

2   office that day.

3           So it could be a technical violation of the

4   inventions agreement.

5           THE COURT:  Now let me put the question to Mr. --

6   given that that theoretical issue is not what you're going to

7   be arguing, it's not what you're seeking by this trial, that

8   it's all about the inventions clause, it's all about the

9   drawings, or not all about it, but a big portion of it, and

10  that has a clear manifest, I don't think there's anyone in

11  this room that would suggest that to the extent that an

12  invention or a design or a drawing or conception is in fact

13  induced or aided and abetted in violation of the inventions

14  agreement, is induced or aided and abetted by MGA, that there

15  would not be a manifest showing of harm, what's the concern

16  here?

17          MR. ZELLER:  Well, I think the concern is that we

18  have a situation where the jury is instructed here are the X

19  number of elements, and, you know, they, as presumably most

20  juries work, they go down these element by element and say

21  what's been satisfied here.  And then they get to the element

22  of harm, and then they say well, you know, there really

23  hasn't been anything on this.

24          THE COURT:  You are arguing conversion.  You are

25  arguing -- these inventions.  As far as they know, they

1    haven't gotten into the subtleties of the copyright law yet.

2    Your arguments, or a big portion of your argument is going to

3    be devoted to the fact that these drawings belong to Mattel.

4    And based on the instructions, like I say, we're not getting

5    into the subtleties of Phase 1-A concerning that even though

6    something might be owned by Mattel, it might not have

7    copyrightable value to Mattel.

8           They are certainly going to be under the impression

9    at this stage that that's as far as the analysis goes,

10   because that's all they are going to have.

11          MR. ZELLER:   And I think it's absolutely right for

12   the ownership claims.   But we do, of course, have the tort

13   claims, and we take those seriously.   Those are matters of

14   principle for the company.   We have a situation where we had

15   an employee who, you know, transferred his loyalty to a

16   competitor.   And those are real claims to us.

17          I think that the Court is right, that there is no

18   reasonable jury that could find that there was -- I mean, let

19   me start with this, actually.

20          Just the loss of undivided services while somebody

21   is drawing a salary, that's the part of the equation

22   Mr. Russell doesn't really talk about, is that he is being

23   paid.   He's being paid money, he's being given benefits by

24   the company, and yet the company has lost his undivided

25   services.   That is an inherent harm.

1        THE COURT: There you go once again articulating
2   the harm. I guess what I'm saying at the end of the day,
3   Mr. Zeller, Mr. Quinn, or Mr. Price are clearly going to be
4   able to articulate, and MGA is not really going to have a
5   rational basis to challenge, and I just want to avoid -- I
6   have some degree, notwithstanding Cool Fuel, and it's an
7   interesting case and one that the Court is going to utilize
8   in the future, no question, but I have some level of
9   discomfort with instructing on the harm issue.

10       Notwithstanding the fact that I still get back to
11  exactly where I was when I made the statement that I did in
12  my order on the Motion for Partial Summary Judgment, that it
13  just seems on the undisputed evidence here that no matter how
14  you slice this, that the harm is manifest.

15       MR. ZELLER: I would view it this way, your Honor.
16  Because I can understand, and I don't think there's a
17  disagreement in terms of the analysis here, but I think where
18  we may differ is that on the one hand, you know, the Court
19  looks at that and says well, why don't we give that to the
20  jury.

21       When I see it, and it's all undisputed and there's
22  no reasonable juror who could find anything other than the
23  fact that there is harm, that means that that element
24  shouldn't be going to the jury, lest it cause confusion, it
25  be one of those situations where, you know, all of this is

1   pretty obvious to us except for this one element, and an

2   element that in fairness, as I think the Court knows, we

3   haven't focused on.

4        THE COURT:  You haven't focused on it in terms of

5   damages, but there is certainly evidence in terms of harm to

6   Mattel.  I guess what I'm thinking out loud here is I want to

7   err on the side of caution on this point.  Mr. Russell has

8   raised a question in the Court's mind about how far I should

9   go with it this, notwithstanding I still can't get my mind

10  around how harm is not manifest.

11       MR. ZELLER:  And I agree with -- what I would then

12  sort of request, your Honor, because I think in some ways,

13  then, it may be a little bit more elaboration is going to

14  have to be given to the jury so that they understand that at

15  this point they are not trying to analyze the amount.

16       THE COURT:  Right.

17       MR. ZELLER:  All we have to do is show that there

18  was some harm, whether it was inherent in it or, you know,

19  whatever the case may be.  But just so that that distinction

20  is made to the jury so that they don't get confused and think

21  well, they haven't told us what the amount was.  I mean,

22  that's the sort of thing that causes me at least those

23  practical concerns.

24       Because in terms of the analysis, we're exactly on

25  the same page as the Court, but I think where does that leave

1  us and the jury at the end of the day? This is a very

2  practical matter, and I think maybe a little bit of guidance

3  on that would go a long way towards obviating that concern.

4        THE COURT: At the same time I don't want to go

5  down the road that was initially invited by MGA and have an

6  entire separate instruction on harm.

7        Any further thoughts, Mr. Russell, before I take

8  this under submission?

9        MR. RUSSELL: Yes, your Honor. I do think it

10 interesting that Mr. Zeller parrots the language of a Rule

11 50(a) motion to you. If it was so obvious to them in this

12 issue, they certainly were on notice, given the objections

13 and given your Honor's rulings, they could have moved for a

14 directed verdict on this issue.

15       THE COURT: They didn't need to because they

16 already have the ruling of the Court.

17       MR. RUSSELL: Well, given the objections and the

18 pretrial conference order --

19       THE COURT: Let the Court make no mistake about

20 this. There was no motion for reconsideration on this. The

21 Court's ruling is clear, and I'm not -- nothing that I'm

22 saying now should be interpreted in any way as the Court

23 falling back on that. This is just a concern in the context

24 of jury instructions and nothing more.

25       MR. RUSSELL: Well, then, your Honor, I would

1   simply go back to the concern I had before that I

2   articulated.  To the extent the jury is being told that the

3   Court found things as a matter of law, that is prejudicial to

4   us, particularly on an issue whereas we've raised, I think

5   there is at least a reasonable basis for us to have assumed

6   this was a live issue.

7           I understand your Honor's point, but in our mind,

8   looking at the pretrial conference order and the other

9   orders, and given the state of evidence, it would be highly

10  prejudicial to us to have the jury be told that this element

11  was satisfied.

12          THE COURT:  I'm going to try to find a way that

13  addresses your concern and the practical concern by

14  Mr. Zeller.  And I hope I can do it after some further

15  thought.  But thank you.  I think I understand the concerns.

16          All right.  So I will take care of the jury

17  instructions tonight and have these ready for when you come

18  in here at 8:30 tomorrow morning for a final look-see.  And

19  my rulings will be implicit in the final version of the jury

20  instructions.

21          But the Court certainly has considered, and you've

22  all been provided an opportunity to make your record in terms

23  of your objections.  And just for the record, the Court has

24  fully considered and will fully consider all of your

25  objections.

1         MR. PROCTOR: Your Honor, would it be possible -- I

2  don't know if practically the Court can do this, when the

3  Court provides the jury instructions in the morning, can we

4  get them electronically? Because Mattel likely will use some

5  of them in its closing.

6         THE COURT: Yes, I'll e-mail them to the same two

7  people I e-mailed to before.

8         MR. RUSSELL: Would it be acceptable if we e-mailed

9  them to Mr. Nolan or Ms. Aguiar? I'm going to be unavailable

10  tomorrow.

11         THE COURT: You're not going to be here tomorrow?

12         MR. RUSSELL: I will not be here tomorrow. I have

13  a pre-existing obligation, and I won't be here.

14         THE COURT: No problem.

15         Ms. Aguiar, if you'll provide your e-mail address.

16         MS. AGUIAR: Yes.

17         THE COURT: Very good. Okay. Verdict form?

18         MS. AGUIAR: Good news coming your way.

19         THE COURT: That's good news. That's a relief.

20  I'm really tired.

21         MS. AGUIAR: I think we all are. But here's where

22  we are. I spoke with Mr. Proctor over lunch. We are going

23  to go with the idea that we discussed yesterday and the

24  general concept of the three time periods of the list of

25  drawings. And also not just the time periods that we

1   discussed, but also combining, for the ease of the jury, the

2   same drawing that may have different notations on it or maybe

3   text or another one doesn't have text, those are going to be

4   all combined on the line.

5       Mr. Proctor did ask me to make, and he was right,

6   to make two changes to one of the lists. We did that. One

7   thing I think we need to work out with you, relatively minor,

8   but we need to agree on wording of the question that will

9   precede each of the lists.

10      THE COURT: Okay. What would you direct me to?

11      MS. AGUIAR: Sure. And by the way, in terms of the

12  lists, I'll provide them to you electronically.

13      THE COURT: I'm going to do the jury instructions.

14  I'm actually going to ask the parties if they would do the

15  verdict form in light of the Court's rulings this afternoon.

16  Just in terms of the actual work itself. Since you've

17  already -- pick a portion of the lists, I've already

18  indicated that I want general verdict questions on the other

19  four or five claims. So this should be pretty

20  straightforward.

21      MS. AGUIAR: Should be. With regard to the other

22  questions, I have a little trepidation as to whether we'll

23  have a meeting of the minds on what exactly you wanted. But

24  I'm absolutely happy to have us do that for the Court.

25      THE COURT: Let's start with the first one, the

1    ownership issue, and direct me someplace.  What shall I use

2    as my base?  I don't care if it's the MGA proposal or the

3    Mattel proposal.

4                MS. AGUIAR:  If you look at the MGA proposal, page

5    1.

6                THE COURT:  So this will be tab?

7                MS. AGUIAR:  This will be tab 7.

8                THE COURT:  Tab 7, the objections and responses.

9    Page 9 has question 1 on it.  Ownership of drawings.

10               MS. AGUIAR:  Right.

11               THE COURT:  Has Mattel proven by a preponderance of

12   the evidence that Carter Bryant conceived of the idea and

13   drew the initial master drawings of the Bratz characters

14   while Mr. Bryant was employed by Mattel?  Is that what you're

15   referring to?

16               MS. AGUIAR:  That is our proposal for the general

17   question, your Honor.  I think, you know, that they have it

18   worded a different way, I believe.  With regard to the -- to

19   what question precedes each of the lists, do you want to just

20   go through all of the questions?

21               THE COURT:  Can I have a copy of it?  Because

22   question No. 2 goes to intentional interference.  So it's

23   just one question here.

24               MS. AGUIAR:  I guess what I'm saying is because

25   we've been agreeing about this over the last couple of days

1    and you said don't file anything more --

2              THE COURT:  Now I do want something.  Not filed,

3    just give me something.  I need to see the language that

4    we're talking about now.

5              MS. AGUIAR:  The language that we're talking about

6    now for the question that would precede each of these lists,

7    we don't have.  What it would say is, and I'll tell it to you

8    right now what my proposal is, and Mr. Proctor has a slightly

9    different proposal.

10             THE COURT:  Let me hear yours first.

11             MS. AGUIAR:  For each of the drawings listed below,

12   was that drawing conceived or reduced to practice by Carter

13   Bryant.

14             Now, for each of the three sets of lists, you would

15   then insert a different ending to that question.

16             THE COURT:  Okay.

17             MS. AGUIAR:  So far the first one, it would be --

18   and I started -- I'm just thinking a little bit out loud.

19   For the first one, I started by saying prior to the period he

20   was employed by Mattel.  But the only -- because I was trying

21   to be neutral, in other words.  But I think the problem with

22   that is that he had a couple periods of employment.

23             THE COURT:  Right.

24             MS. AGUIAR:  And so as we discussed yesterday and

25   as you, I think, recognized, the jury is going to come out

1    one way or the other.  By the time they get to this question,

2    they will have already answered the basic question.  Did he

3    come up with this idea while he was employed by Mattel or

4    not.  So --

5            THE COURT:  And where is that?  That's where I

6    wanted to start with.

7            MS. AGUIAR:  The question that you just read.  It

8    was ownership of drawings, question one.

9            THE COURT:  Do you have that question?

10           MS. AGUIAR:  That's why I asked do you want to go

11   through all of the questions, or do you want to hear

12   Mr. Proctor's response to even the threshold sort of general

13   question.

14           THE COURT:  I guess I'm trying to come up with a

15   basis to structure this.  Let's carry on with your argument.

16           MS. AGUIAR:  So in other words, just to ground

17   this, you would have the general question that is in the

18   verdict form now.  Has Mattel proven by a preponderance of

19   the evidence, et cetera.  Then you would have as the next

20   presumably three questions --

21           THE COURT:  Got it.  2, 3, and 4.

22           MS. AGUIAR:  Exactly.  With the lists as agreed to

23   break them down.

24           THE COURT:  And aren't you asking the same

25   question, though, with respect to all three categories?  I

1   understand the groupings in the three different categories.

2           MS. AGUIAR:  Right.  So the second question would

3   be -- it would end with the phrase during the period he was

4   employed by Mattel, and then obviously the third question

5   would ask after the period he was employed by Mattel.

6           THE COURT:  I don't get this at all, Counsel.  The

7   same question -- the burden is always on Mattel to prove that

8   anything was done during the period of employment.  Whether

9   it's before or after doesn't matter.  All we need to know is

10  whether it was during that period.

11          The answer is yes, it's yes.  If it's no, it's no.

12  I agree with the groupings idea just for ease of closing

13  arguments on both sides, to say that, you know, the Court has

14  grouped in the verdict form --

15          MS. AGUIAR:  I gotcha.  I was thinking if you don't

16  give them some clue what these groupings are, they will kind

17  of be like --

18          THE COURT:  I will rely on Mr. Nolan and -- I just

19  want to have the logical groupings.  So I'm going to have to

20  rely on closing argument to a certain extent.

21          MS. AGUIAR:  Then I completely agree with you and

22  understand.  I was trying to build into the question an

23  explanation for why there were three groups.

24          THE COURT:  I don't think that's necessary.

25          MS. AGUIAR:  So let me take what you just said

 1  then.  Then I think the question in advance of each of the

 2  lists has to say has Mattel proven by a preponderance of the

 3  evidence that Carter Bryant conceived and reduced to

 4  practice --

 5          THE COURT:  Or reduced.

 6          MS. AGUIAR:  I'm sorry.  -- or reduced to practice

 7  each of the drawings listed below.

 8          THE COURT:  During the period of time that he was

 9  employed by Mattel.

10          MS. AGUIAR:  Exactly.

11          THE COURT:  Do we have an agreement in terms of the

12  time period?

13          MS. AGUIAR:  Yes, we do.  It's January 4th -- when

14  I say we do have an agreement, it's sort of been understood

15  throughout the trial, but certainly January 4th, 1999,

16  through October 19, 2000.

17          THE COURT:  At least I keep hearing the 19th all

18  throughout the trial.

19          That's what I've been using.  I'll have to go back

20  and reevaluate everything now if it's the 20th.

21          MR. ZELLER:  I don't know if that day is going to

22  matter.

23          THE COURT:  All right.  Very good.  And so if

24  you've got the three groupings down, that makes sense in

25  terms of ease of explaining this at closing argument.  So

```
 1  this is not a complete cluster to the jury.

 2              MS. AGUIAR:   Okay.  And I think you're absolutely

 3  right, and that's great.

 4              So then we skip all the way down to -- we jump over

 5  to Mattel's corrected fourth amended form.  And it was the

 6  question you and I were discussing the end of the session

 7  yesterday.

 8              THE COURT:   Yes.

 9              MS. AGUIAR:   Which is question 11, I believe.

10              THE COURT:   Hold on a second.  And these have the

11  general verdict.

12              MS. AGUIAR:   And if you're look at Mattel's fourth

13  amended, what we -- what we just discussed regarding

14  ownership of inventions, we would replace pages 3, 4 --

15  basically replace question 10.

16              THE COURT:   Yes.

17              MS. AGUIAR:   And then -- so then that brings us to

18  question 11 on their form.

19              THE COURT:   And this way there's not a need for

20  that general question on ownership.  All we need to have is

21  the question for each of the drawings listed below, has

22  Mattel proven by a preponderance of the evidence that the

23  drawing -- that the exhibit -- we can work on the word

24  there -- was conceived of or reduced to practice by Carter

25  Bryant during the period he was employed by Mattel from
```

 1   January 4, 1999, through October 19, 2000.

 2              MS. AGUIAR:   I would strongly request that the

 3   general question -- and this is going with your

 4   predisposition for the general verdict form -- I think there

 5   is a need for the general question so that the jury can

 6   articulate on the basic question of whether Mattel has proven

 7   that he conceived of the idea and drew the master drawings

 8   while he was employed by Mattel.

 9              THE COURT:   Your reference to master drawings is a

10   phrase that we all understand.  But it's not clear to me at

11   all that that's been brought out in the trial in any kind of

12   definitive way.

13              MS. AGUIAR:   If the word master is an issue or

14   conceived of the idea for and drew the whatever you want to

15   insert before drawings, initial drawings, concept drawings, I

16   think that is the basic question that not only MGA but Mattel

17   has sort of reiterated throughout the whole of Phase 1-A.

18   It's certainly the issue that you've pressed on.  See, that

19   gets wrapped up in a 1-B issue.

20              MS. AGUIAR:   I don't think so, your Honor.  I think

21   under the language of the contract, it's an invention.  And

22   the basic question is was it conceived or reduced to

23   practice.  And --

24              THE COURT:   All we're trying to decide in 1-A is

25   what was conceived or reduced to practice during the

1   particular time period.  And 1-B will decide whether or not
2   these were -- there was elements of originality or elements
3   of copyrightability such that this was actually the
4   ownership -- it's almost a misnomer to call this an
5   ownership, and I agree with you on that point.  Because we're
6   not deciding ownership in this phase.  All we're deciding is
7   the factual predicate of when these things came into
8   existence.

9           Then we'll figure out when we've figured out what
10  things did or did not come into existence during the
11  relevance time period, then we go to 1-B, and then the
12  question certainly becomes are these based on an original
13  drawing, are they based on a master drawing.  Is this a light
14  box sketch, or is it not.  I guess that's when I see it being
15  relevant.  But not to this phase here.

16          MS. AGUIAR:  I understand what you said yesterday,
17  and I won't reargue that point.  But when I came into this
18  case and read the phasing order and we were having
19  discussions before the trial started, it was my understanding
20  that your Honor had envisioned, at least right before the
21  trial started, that if one -- if the verdict form in 1-A came
22  out a certain way, and I think you even said this a couple
23  times, depending on the outcome of 1-A, there may not need to
24  be a 1-B.

25          THE COURT:  Absolutely.  If the jury finds that

1  none of these drawings were done during the time period, then

2  there's no question there's not a 1-B.

3         And even if -- there's only certain drawings that

4  were done, you intimated this yesterday, and I would

5  certainly consider this, there may be a grounds for to you

6  make a mention to, well, the jury only found the following 20

7  drawings to have been done during the time period, and these

8  drawings are so clearly connected to what we describe as the

9  master drawings, and they found that the master drawings were

10  all done in 1998, I may be able to decide as a matter of law

11  that there's no copyright issue here and decide the scope of

12  the copyright issue just as I did in the Superman case

13  recently.

14         I'll be able to make that without having the

15  benefit of the jury, or at least make certain findings.  It

16  all depends what they find.  And I need that finding

17  before -- I think you're trying to insert too much into this

18  at this point.

19         MS. AGUIAR:  I always understood that 1-B would be

20  the copyright case.

21         THE COURT:  Yes.

22         MS. AGUIAR:  And if 1-B is now going to be not just

23  compare the dolls to the drawings or the drawings to the

24  dolls for whatever the copyright test is, substantial

25  similarity or a different -- we would argue for a different

1    standard, what I understand you to be saying is that 1-B is
2    not only that, but 1-B is also compare these drawings to
3    these drawings.

4              THE COURT:  No, no, no.  What I'm suggesting is 1-B
5    might be short-circuited.  Based on what the jury comes back
6    with, and if they find that certain drawings were not
7    based -- were decided, were drawn -- were drawn in 1998, not
8    1999, it may very well be that you'll be able to stand up and
9    say your Honor, based on the jury's findings, it is clear
10   that the drawings that were done that the jury found Carter
11   Bryant to have done in 1999 are clearly based on what
12   happened in 1998.

13             You don't need to send this to the jury for 1-B.
14   Let us brief this issue, and, you know, it's something which
15   would have to be pretty compelling to me because I would be
16   sending the jury off.  And I don't want to necessarily do
17   that.

18             But that is -- that would be a legal issue for the
19   Court.

20             If this goes to the jury in 1-B, it will simply be
21   going to the jury on those drawings, sketches, whatever, that
22   they have identified as having been created by Carter Bryant
23   while he was at Mattel, that is what is captured by the
24   agreement, and you will be able to argue whether or not those
25   are copyrightable.  Certainly, I suppose, part of your

1   argument may very well be that these are not original.   These
2   are based on 1998 drawings.

3           MS. AGUIAR:   That's what I'm saying.

4           THE COURT:   That's all 1-B.   There's no basis for
5   that, though, at this point in 1-A.   We have not had any
6   evidence on the copyrightability.   There are no instructions
7   on that.

8           MS. AGUIAR:   I'm separating copyrightability from
9   the question of whether the 1998 drawings, let's call them
10  that just for now under our scenario that we're playing out
11  here, the relation between the 1998 drawings and any ones
12  that were done from those, then 1-B would necessarily have to
13  include, again, and I must say there was testimony from
14  Carter Bryant at length about 1998 versus what he did later,
15  how it was done, and adding color.

16          I really am making a distinction between that and
17  copyrightability.   I'm not talking about copyrightability.
18  I'm talking about that we would have to try in 1-B, and the
19  jury would have to be presented with questions on the 1-B
20  form on whether or not drawings that were made during the
21  period when he was employed by Mattel were simply traced from
22  or were they based on something that he did in 1998 and
23  therefore he owned.

24          THE COURT:   I don't know.   You're getting ahead of
25  me here.   I don't know if that would or would not be a part

1   of the 1-B verdict form.  I know it's not properly part of

2   the 1-A form.

3           MS. AGUIAR:  I guess what I'm saying, and I

4   appreciate that, but I'm saying if it's not part of the 1-A

5   form, by definition, it has to be a 1-B issue, and the reason

6   I'm concerned about this is because it's at the crux of our

7   argument and always has been, which is that if he did these

8   in 1998 and he's found to have done them in 1998, let's just

9   say he conceived of them and reduced them to practice under

10  the inventions agreement in 1998, that means he owns them.

11  That means that under the relevant and applicable --

12          THE COURT:  He owns them as a matter of copyright

13  law.

14          MS. AGUIAR:  He owns them, and then what he is able

15  to do with them going forward is subject to his ownership

16  that attached in 1998.

17          THE COURT:  I understand that.

18          MS. AGUIAR:  Is that's something that we would have

19  to deal with in 1-B, and the jury would have to make a

20  determination in 1-B as between -- they would have to address

21  that issue.

22          THE COURT:  I'm not disagreeing with you.  I'm not

23  going to agree to something that I'm not fully focused on

24  now, Counsel.

25          MS. AGUIAR:  We saw it as a 1-A issue, and I just

1   want to get on the record now that I think it necessarily

2   from our perspective has to be part of 1-B because of this --

3              THE COURT:  You may very well be right.

4              Mr. Zeller, let me hear you on this point before we

5   move on.

6              MR. ZELLER:  I don't know how much you want to

7   hear.  We talked about this at some length yesterday.  In

8   fact, much of the same argument was presented yesterday

9   verbatim about relationship between drawings, tracing, the

10  light box, everything else.  This phase.  And it's been clear

11  for some period of time.  This phase is to determine when

12  things were created.  When did he put pen to paper.  When

13  were these drawings or these sculpts made.

14             THE COURT:  As well as the other tortious claims

15  that you have.

16             MR. ZELLER:  Exactly.  And just focusing on the,

17  you know, we'll call them loosely the ownership issues.

18             Then whatever consequences flow from that --

19             THE COURT:  Well, you know, and that may be the

20  problem.  They probably shouldn't be referred to as the

21  ownership issues because right now all we're determining is

22  creation issues as opposed to ownership issues.  The

23  ownership issues are really the 1-B issue.

24             Ms. Aguiar is probably correct, that all of these

25  things are going to have to be explored.  I just don't know

1   the exact questions that are going to be asked of the jury in

2   1-B, if we get to 1-B, and I don't want to commit to that at

3   this point.

4           MR. ZELLER:  Right.  And --

5           THE COURT:  But I am interested in the questions

6   that we need to ask the jury in 1-A, and I do want to commit

7   to that at this point.

8           MR. ZELLER:  And I think the Court's questions,

9   ones that we were talking about, you know, were on track.

10  And just where we were yesterday, the Court will recall, is

11  that in general the Court thought that the verbiage we had in

12  our verdict form, proposed verdict form, was better.  They

13  had probably the better part of the groupings, the concept of

14  the groupings.

15          The Court will see from our verdict form, and we do

16  put it in terms of when were things made, when were they

17  created.  We can talk about exactly that language.  But just

18  in terms of conceptually, it is to say okay, when was this

19  group made, when was this group made, when was this group

20  made, and the main event was to try and reduce at least the

21  number.

22          THE COURT:  Working through this, I'm going to

23  expand a little bit beyond your question.  You say for each

24  of the works listed below, was that work created by Carter

25  Bryant during the period he was employed by Mattel.

1           MGA says or provides it actually in their third

2    revised proposed verdict form in the three different

3    questions.  But essentially I'm reducing it to this question

4    here, which is kind of an amalgam of both of yours.

5           For each of the -- I'm going to say drawings right

6    now, listed below, has Mattel proven by a preponderance of

7    the evidence that the drawing -- again, come back to that

8    word -- was conceived of or reduced to practice.  And I

9    understand that you want made or created.  And I'm probably

10   at this point going to go with the language in the contract,

11   notwithstanding the Court's use of the word created in the

12   summary judgment order.

13          But I'll get back to that as well, by Carter Bryant

14   during the period he was employed by Mattel from January 4,

15   1999, to October -- through October 19th, 2000.  That's

16   where -- and then using the groupings that you have agreed

17   to.

18          So what I'd like you to do at this point, Mr.

19   Zeller and Ms. Aguiar, is address that proposed language.

20          MR. ZELLER:  Yes, and obviously the term drawings

21   is a term we probably should discuss, and it may have to be

22   changed for at least some of the groups, because some of them

23   are three-dimensional, tangible items.

24          MS. AGUIAR:  But that's in a different question,

25   actually.  In the three groupings that we're talking about,

```
 1   there are no three-dimensional items.  They are all drawings.
 2             MR. ZELLER:  I haven't interrupted her point.  She
 3   talked at some length.
 4             THE COURT:  Fair enough.
 5             MS. AGUIAR:  I apologize.
 6             MR. ZELLER:  And it is a separate question.  I
 7   assume, however, that we are going to, when we have that
 8   separate question, we are going to still track the same
 9   language is my point.  I think they all ought to track when
10   we talk about the date of creation.
11             THE COURT:  Let me just stop you there.  The word
12   items, I kind of like the word items.  It covers drawings,
13   sketches, three-dimensional things, items.  I like item.  Is
14   there an objection to item?
15             MS. AGUIAR:  Item.  Let's go for it.
16             THE COURT:  Each of the items listed below.  That's
17   a great word.  Okay.  Moving right along.  For each of the
18   items listed below, has Mattel proven, by a preponderance of
19   the evidence, that the item was conceived of or reduced to
20   practice by Carter Bryant during the period he was employed
21   by Mattel from January 4, 1999, through October 19, 2000.
22             MR. ZELLER:  Another comment, and I suppose we can
23   talk about whether it's more suitable for the jury
24   instructions or also in the verdict form, but we did talk
25   yesterday about the phrase alone or jointly with others.  I
```

1   think that to the extent what we're talking about is, you

2   know, some language that would capture this, that's probably

3   less of an issue with items or drawings as opposed to the

4   sculpts.  And actually, isn't the language alone or jointly

5   with others in but in any event --

6          THE COURT:  Is it a contract -- alone or jointly by

7   others.  You're right.  Alone or jointly by others, solely or

8   jointly.  Alone, solely.  Solely or jointly just has a nice

9   symmetry and adverb -- all right.  So you want to have that

10  element.

11         Okay.  Any other objections?

12         MR. ZELLER:  And then I guess I would just raise

13  the question, and I don't profess to have a very strong

14  feeling about it, but putting the dates in there seems to

15  link them --

16         THE COURT:  It's to clarify that -- your proposal

17  just had them while he was employed by Mattel.  As Ms. Aguiar

18  points out, he was employed at two different periods.

19         MR. ZELLER:  And I'm not suggesting that --

20         THE COURT:  I know you're not suggesting that.

21         MR. ZELLER:  No, I understand.

22         THE COURT:  Very well.

23         MR. ZELLER:  It just seems to make the question

24  longer, and that's the main issue.

25         THE COURT:  Okay.  Now, I know this is question

 1  No. 10 in the verdict form proposed by Mattel. It's question

 2  No. 1 in the verdict form proposed by MGA. I think it should

 3  be question No. 1 just to coincide with the order that A is

 4  in the pretrial conference order, that was in the complaint,

 5  and is in, most importantly, in the instructions.

 6         I don't want to jump around. So what I will do is

 7  this will be the first question, then. And then we will have

 8  the categories that you've agreed to, and we will follow

 9  that.

10         Now, what have you done with the much disputed

11  question 11, namely, the prototype doll, Trial Exhibits 537,

12  1105, and 1136, those items?

13         MS. AGUIAR: That is a good word for these

14  purposes. The question then that would precede that short

15  list, I presume, would be the same question.

16         THE COURT: Same question.

17         MS. AGUIAR: And on the copy that I'm looking at --

18         THE COURT: You know, I think the thing to do is if

19  you've got these three buckets established, just to break it

20  down for ease of reading. Why don't we do that same question

21  for each of the categories.

22         MS. AGUIAR: I agree.

23         THE COURT: For each of the following items, it's

24  the same question, whether it's one bucket, a second bucket,

25  a third bucket, and then we get to this fourth bucket

1   essentially, which is these miscellaneous items.

2           MS. AGUIAR: Right. And I think the language

3   that's in Mattel's question 11, you indicated already

4   yesterday, that you would not include that Bryant testified

5   he presented to MGA.

6           THE COURT: I think it's just prototype doll, the

7   September 1st, 2000, prototype doll.

8           MS. AGUIAR: And I know we're getting into

9   wordsmithing here. But there was no testimony from anyone

10  talking about that doll calling it a prototype doll, and I

11  think it's a loaded word. A dummy doll or Frankenstein doll.

12  But prototype --

13          THE COURT: Prototype is loaded. It suggests -- I

14  agree. Dummy doll is kind of loaded, too.

15          MR. ZELLER: That's a loaded term, too.

16          THE COURT: So is prototype, Mr. Zeller. It serves

17  that it's the prototype for something else. Can we come up

18  with a more neutral word?

19          MS. AGUIAR: The word that people were using

20  actually in the record, I believe, was dummy doll. I

21  understand that that also has connotations. I guess you

22  could put doll in quotes.

23          THE COURT: How about this. September 1st, 2000,

24  composite doll. No?

25          MS. AGUIAR: How about doll in quotes? Because

 1   clearly the way it was described, it wasn't exactly --

 2          MR. PROCTOR:  What about simply factual, the doll

 3   Carter Bryant presented to MGA on or about September 1st.

 4          MS. AGUIAR:  But the way it was described in the

 5   record is not like, you know, a Barbie doll, a Bratz doll.

 6   It was this --

 7          MR. PROCTOR:  The figure.

 8          MR. ZELLER:  The other terms that have been used

 9   from time to time, model --

10          THE COURT:  No.

11          MR. ZELLER:  I mean, we could presumably --

12          MS. AGUIAR:  What's the issue with putting doll in

13   quotes?  I would rather the word that was used in the course

14   of the trial, which I believe was dummy doll, but I

15   understand that's --

16          MR. ZELLER:  To go back to the Court's word, how

17   about this.  The three-dimensional item.

18          THE COURT:  The three-dimensional item presented on

19   September 1st, 2000.

20          MS. AGUIAR:  Sure.  That's fine.  I think this

21   links in some way that the exchange on the jury instructions

22   regarding this doll, though.  Because we now have something

23   on the verdict form that they actually are checking yes or no

24   but doesn't exist and is not in evidence.

25          THE COURT:  I understand that objection.  I'm going

```
 1    to overrule that objection.  There's testimony to it.

 2              MS. AGUIAR:  Okay.

 3              THE COURT:  I am concerned about the date, though,

 4    as well.  Because I don't want to imply a date.

 5              MS. AGUIAR:  Do you want to just say at a pitch

 6    meeting?  Because everyone has been using that term.

 7              THE COURT:  Three-dimensional work presented at

 8    pitch meeting?

 9              MS. AGUIAR:  Can we keep with item?

10              THE COURT:  Item.

11              MR. ZELLER:  Either item or work is fine by us.

12              THE COURT:  I'm sorry?

13              MR. ZELLER:  Either item or work is fine by us.

14              THE COURT:  What about at the pitch meeting?

15              MR. ZELLER:  Yeah, that's fine, your Honor.

16              THE COURT:  Okay.  Very good.  As far as these

17    other three exhibits.

18              MS. AGUIAR:  Moving right along.  537 is not in

19    evidence.  There was a meeting between the two legal

20    assistants, as I understand, yesterday, and it's not in.

21              THE COURT:  Both legal assistants say it's not in

22    evidence, then it's not in evidence.  So that's out.

23              What about 1105?  That's the e-mail.

24              MS. AGUIAR:  Yeah, 1105, I think it's confusing

25    because it's -- I'm thinking of the jury looking at an
```

1   e-mail, and this is actually -- there were a couple different

2   e-mails.  This particular one, 1105, attaches a one-page

3   photo of the sculpt.  And I don't dispute that this document

4   is in evidence, but I think, you know, we're asking them a

5   question, was the following item created or reduced to

6   practice, and it's an e-mail.

7           To be honest, and I think we could probably

8   stipulate to this, although maybe I'm being too hopeful, I

9   believe this is a photograph of Exhibit 1136, which is the

10  very next thing on the list.

11          THE COURT:  Mr. Zeller?

12          MR. ZELLER:  Well, I think that the way it can be

13  dealt with is -- I mean, it may require additional verbiage

14  as to the item depicted on page --

15          THE COURT:  I would agree with you if it was a

16  different item, but is it the same as the item on 1136?

17          MR. ZELLER:  Well, I think we'll have to check on

18  that to reconcile those.  Certainly if it is, your Honor, we

19  wouldn't --

20          THE COURT:  My sense is that it is.  I think

21  Ms. Aguiar is correct.  If it's not, then I think I would go

22  with the language proposed by Mr. Zeller, the item depicted

23  in the photograph of --

24          MS. AGUIAR:  And then it would be 1105-2, so they

25  wouldn't be looking at the first page.

```
 1              THE COURT:  That's correct, for purposes of the
 2   jury instruction.  The whole exhibit is in; right?
 3              MS. AGUIAR:  Yes, but to avoid confusion for the
 4   jury looking at an e-mail --
 5              THE COURT:  You're right.
 6              MS. AGUIAR:  And I think I understand where your
 7   Honor's going.  If you look at the date that this e-mail was
 8   sent and the testimony about when that thing -- when 1136
 9   existed, and if you actually just look at the photograph --
10   so we can discuss that tonight.
11              THE COURT:  Work it out.  I'll make my ruling now.
12   If it's the same item, it comes in once if it's 1136.  If it
13   is a separate item --
14              MR. ZELLER:  Just so the confusion may arise
15   because I believe that at least one item is only depicted in
16   an attachment to an e-mail.  It may be another e-mail, and
17   that's maybe part of the confusion that's arisen, but we can
18   go with that language of saying depicted in.
19              THE COURT:  Very good.  All right.  The next two
20   questions, 12 and 13, I understand MGA's arguments on.  This
21   is the idea for the name Bratz and the line of dolls called
22   Bratz.  We crossed this bridge, I believe, at the pretrial
23   conference.  Unless there's specific objection to the form of
24   those questions, I am going to permit those questions to go
25   to the jury.
```

1     MS. AGUIAR: But if we're talking about -- I think

2   what you just -- what we were just discussing, though, is

3   that we were just talking about timing issues here. And what

4   was done when. So when I said well, we'd like the general

5   question of whether he conceived of the idea for Bratz and

6   drew the master drawings while he was employed by Mattel, you

7   said we shouldn't have that question.

8     THE COURT: No, no, the master drawings. Conceived

9   the idea for Bratz, I already denied sided. That part of

10   your question is coming in. You're going to be able to argue

11   based on the evidence that no, he conceived of this back in

12   1998, Kickapoo High School, Seventeen magazine, the mom, the

13   friend of the mom, everybody says that he conceived of it

14   back in 1998; so you'll have your evidence to say no.

15     So that issue, that conception of the name Bratz

16   and the idea for the line of the dolls, that issue, that's

17   not an ownership issue, and that's what I'm saying we're not

18   going to get into right now, the ownership of that. We're

19   simply saying when it was conceived of, what ideas were

20   conceived of, what drawings were reduced to writing during

21   this time period.

22     MS. AGUIAR: So my issue with the second question

23   is you are starting to talk about a line of dolls.

24     THE COURT: Okay. And that's a fair objection.

25     MS. AGUIAR: And we have gotten away, I believe,

1  from this idea and kept out testimony regarding anything that

2  was done after October 19th and the line of dolls didn't

3  exist until well after that.

4            THE COURT:  The line of dolls themselves.  But here

5  the question is focused on the -- and the idea for the line

6  of dolls.

7            MS. AGUIAR:  How about conceived the idea for --

8            THE COURT:  A line of dolls.

9            MS. AGUIAR:  Or conceived of the idea for Bratz.

10  Because I don't think that the idea is that he --

11            THE COURT:  You know, I kind of like that.

12            Mr. Zeller, if we just make this simpler.  Did

13  Bryant conceive the idea for Bratz while employed by Mattel.

14            MR. ZELLER:  I think we're generally amenable to

15  that.  The only hesitation I have is it follows on from the

16  question of the name Bratz.  And part of the reason we had

17  other language in there was simply to distinguish between the

18  two.  So the jury didn't think it was the same question posed

19  in a different way.

20            So that's why it had a line of dolls.  But I don't

21  have any objection to, you know, reducing it so we don't call

22  it for a line of dolls, that exact verbiage.  Other language

23  needs to go in.

24            THE COURT:  Suggestion?

25            MR. ZELLER:  I suppose we could just say the idea

```
 1  of four dolls called Bratz.  I don't know if that gets us
 2  very far.  But that would be an option.
 3              MS. AGUIAR:  I think that's a problem because there
 4  is some testimony that he didn't even know whether these
 5  would be dolls, and they were characters, but he never --
 6              THE COURT:  Characters.  The idea for the Bratz
 7  characters.
 8              MR. ZELLER:  I think that is workable.
 9              THE COURT:  The Bratz characters.  Whether they
10  manifested themselves as movies, all of that stuff is going
11  to be decided in 1-B, the copyright phase, in terms of how
12  far the idea goes and all of that.  That's great.  The Bratz
13  characters.
14              Okay.  So that will be question 1 -- question 1.
15  We'll just have -- this is good.  1 will have each of the
16  items listed below for the time period.  The three buckets,
17  the fourth bucket being the three-dimensional sculpts, and
18  we'll work out the wording on that.
19              Then we'll have these two additional questions
20  regarding the idea for the name Bratz, and the Bratz
21  characters, and then we will simply go down and have the
22  general verdict question form for intentional interference
23  with contractual relations, aiding and abetting breach of
24  fiduciary duty, aiding and abetting breach of fiduciary duty,
25  aiding and abetting breach of duty of loyalty, and then
```

```
 1   conversion.
 2           One question aimed at MGA, one question aimed at
 3   Isaac Larian, and I guess my big question on conversion, why
 4   are we putting MGA Hong Kong in there at this point?
 5           MR. PROCTOR:  The final pretrial conference
 6   order --
 7           THE COURT:  I know it said it there.
 8           MR. PROCTOR:  MGA Hong Kong is a live defendant to
 9   the conversion claim.  There is, I believe --
10           THE COURT:  Was there any evidence at all?
11           MR. PROCTOR:  I believe there's some.  It's
12   limited, I concede.  I believe there's some evidence that MGA
13   Hong Kong obtained possession of the drawing --
14           THE COURT:  Do these 10 jurors have any idea that
15   MGA Hong Kong is an entity in this case?
16           MR. PROCTOR:  I have suspected a motion for
17   judgment as a matter of law on this.  I didn't get it.  I
18   mean, if MGA wants to knock a claim out of the case, normally
19   they would make a motion on it, and I would have the benefit
20   of time to look at the record and file an opposition if
21   appropriate or concede if not appropriate.  But that motion
22   wasn't brought.
23           THE COURT:  What are MGA's thoughts on this?
24           MR. RUSSELL:  Well, your Honor, we did in fact move
25   to knock out MGA Hong Kong on the unfair competition claims.
```

1    I would submit that the same result should ensue with respect
2    to the conversion claim since the issue here is only
3    possession of originals, not copies. I don't think there's
4    any evidence that MGA Hong Kong possessed the originals, but
5    they can correct me if I'm wrong. I didn't see that in the
6    record.

7          And again, there's virtually no reference to MGA
8    Hong Kong anywhere in the record. I mean, there's more
9    references to Korea for some reason than to Hong Kong.

10         MR. ZELLER: I don't want to belabor the issue. I
11   have a practical solution or suggestion, perhaps. There is
12   actually some evidence that tangible items have been in the
13   possession of MGA Hong Kong. And it's shown in various
14   e-mails, transmittals, but be that as it may, I believe it
15   clutters up unnecessarily the verdict form.

16         I think if there is an understanding, a stipulation
17   among the parties that if MGA is found liable on this verdict
18   form for conversion, they aren't going to make some argument
19   that, well, they are technically sitting in Hong Kong under
20   the control of MGA Hong Kong, and therefore outside the reach
21   of the Court. I think, frankly, that's just the practical
22   issue that is -- that we are facing on this.

23         If that could otherwise be addressed, I don't think
24   it needs to be on the verdict form.

25         MR. RUSSELL: That's an easy answer, your Honor.

```
 1  No.   Since they didn't put any evidence in the record, if
 2  your Honor doesn't want to dispose of it now, it doesn't take
 3  30 seconds in closing argument to get rid of it.   The jury
 4  didn't hear anything.
 5           THE COURT:   I'll leave it on.   It stays on.
 6           Okay.   Does everyone -- have I given you enough
 7  information to draft up the verdict form for tomorrow
 8  morning?   Or do you need me to run through it one more time?
 9           MS. AGUIAR:   We're fine.
10           MR. PROCTOR:   For the sake of staving off potential
11  disputes down the line, Mattel's proposed language on the
12  state law claims is what the Court wants us to use?
13           THE COURT:   This is fine.   Is MGA liable for
14  intentional -- yeah, these are just general verdict
15  questions.
16           MR. PROCTOR:   And the one other pitch that I would
17  make -- well, two.   One pitch on the drafting of the creation
18  question, the Court has language in it, has Mattel proven by
19  a preponderance of the evidence that it was created at
20  such-and-such time.   And that's certainly the standard of
21  proof, but I don't think that that language needs to be
22  incorporated in a verdict form question, and I think it's
23  simpler.
24           I mean, it's obviously going to be in the jury
25  instructions, but I think it's simpler and correct to simply
```

1   say as we did in our proposal, when was the work created, for
2   each of the items listed below, was the item created by
3   Carter Bryant alone or jointly with others during the period
4   of his employment with Mattel between, you know, January 4,
5   '99, and October 19, 2000.

6           THE COURT:  You know, in all of the general verdict
7   form questions, there's this notion of liable, is MGA liable
8   to Mattel, and to be liable, that's defined in the
9   instructions by a preponderance of the evidence.  There's no
10  similar language in this.

11          So I think for that reason, that concept does need
12  to be imposed to indicate the burden of proof.  All the other
13  general verdict questions forms that you proposed have that
14  built into it by suggesting that the question is whether, you
15  know, MGA is liable for this.  Suggesting that the burden of
16  proof is on Mattel.  I think that needs to be in this
17  question as well.

18          So I appreciate your comment, but I think I'll go
19  with the language that I proposed.

20          MR. PROCTOR:  Okay.  And the second one, consider
21  this as an alternative argument regarding the jury
22  instruction where the jury is told what works Mattel owns.
23  The Court's language right now is conceived or reduced to
24  practice.  I believe that we should add in the word create.
25          If the Court is not inclined to add in the word

1   create, I would propose as an alternative that something be

2   said about what reduced to practice means in this context.

3   Because my concern is going to be -- my concern is MGA is

4   going to stand up in closing and say look, the only thing

5   that matters is when these works were conceived or reduced to

6   practice.

7           And this work, this is part of the line -- this

8   work which Mr. Bryant admits -- this part of it won't come

9   out, but this work which Mr. Bryant admits he created and put

10  pen to paper in 1999 or 2000, while working at Mattel, well,

11  he came up with that idea for that in 1998.

12          So conceived doesn't apply, and it wasn't reduced

13  to practice until after he left Mattel when MGA made dolls

14  out of this stuff, and so it doesn't matter when he actually

15  did it under the Court's instructions.  Because there's no

16  conception or reduction to practice while employed at Mattel,

17  and I don't think that's correct.  I don't think that's what

18  the Court intends.  And I think for that reason --

19          THE COURT:  Let me hear from MGA on that.  While

20  I'm doing that, I want to look at my summary judgment

21  finding.

22          MS. AGUIAR:  Your Honor, I think we're back --

23  we're rearguing at this point something that we not only just

24  discussed 20 minutes ago, but something we discussed

25  yesterday.  And your Honor went with the phrase conceived or

1  reduced to practice in the jury instructions, and that's the
2  way they are now. I think if you start to throw in
3  additional words in this verdict form, which we've tried to
4  streamline and make as user friendly as possible, you are
5  going to run into problems.

6          THE COURT: Well, you are certainly not going to
7  make the argument that Mr. Proctor just expressed, are you?
8          MS. AGUIAR: I think we're going to argue that --
9          THE COURT: Because I did find in interpreting the
10 contract, and reading from page 8 on my order of May 21st,
11 that it is uncontroverted that -- that's where I used the
12 word created.

13         MS. AGUIAR: I know.

14         THE COURT: I did use creation as the Court's
15 interpretation of that phrase, and I don't want to have my
16 decision -- my tentative decision to go with the language of
17 the contract as somehow getting subverted and reopen these
18 arguments that we went through at length during the motions
19 for summary judgment.

20         MS. AGUIAR: I understand that. But I think for
21 purposes of the legal instructions that are given to the jury
22 and the verdict form, we have to stick with the language of
23 the contract. And I think that we are certainly entitled to
24 refer to the language of the contract in closing.

25         THE COURT: Mattel is entitled to the Court's

1    interpretation of the contract, Counsel. You have raised a

2    real concern now on the Court's part, and I think you may

3    have just convinced me that I need to go with the creation

4    language in the jury instructions. Because now you're giving

5    life to what Mr. -- the concern Mr. Proctor just raised.

6              I ruled already months ago that this is creation.

7    I overruled every objection to the use of the word creation

8    during this trial on that basis.

9              MS. AGUIAR: I understand that, but I think that we

10   absolutely have to, if he wants the word creation in there as

11   well, then we certainly have to have conceived, reduced to

12   practice in there also. We're talking about the language of

13   the contract.

14             THE COURT: I agree with that.

15             MS. AGUIAR: And I think we have serious problems

16   down the road if the language of the contract was not

17   included in the jury instructions and in the verdict form.

18             THE COURT: Oh, it's going to be included. I'm

19   going to actually quote the language of the contract. On

20   both the fiduciary duty and on the inventions agreement.

21   That's going to be included in there.

22             It's just that when we're referring to this in a

23   shorthand way, I would rather have used the language of the

24   contract, but based on Mr. Proctor's concern and your

25   response to this, I'm concerned that you're going to suggest

1  that it's something other than simple creation.

2       MS. AGUIAR:  I think that in the question itself in

3  the verdict form, it also has to have the language of the

4  contract, because then I think you're going to end up with

5  the jury members being confused because if they are actually

6  reading this carefully, which I have every reason to believe

7  they are, they are going to look at the contract and look at

8  your instructions --

9       THE COURT:  We do all hope that's the case.

10      MS. AGUIAR:  Yes, and they are going to see

11 conceived or reduced to practice, and then all of a sudden

12 they are going to see another word in the verdict form.  And

13 I'm sorry, your Honor, but I think it has to have, whether or

14 not Mr. Proctor prevails on you to include create is another

15 thing, but I think it has to have conceived or reduced to

16 practice in the verdict form, or else we're going down a

17 dangerous road there.  I mean, that's the language of the

18 contract.

19      THE COURT:  Oh, we've just received word from the

20 juror.  Mrs. Dome says she feels about the same, not good,

21 and requests permission to stay home tomorrow.  The doctor

22 says usually it takes 36 hours for the illness to cycle

23 itself through this problem.  She came down with this

24 yesterday afternoon.  Please advise.

25      I will advise her to stay home tomorrow, and we'll

1   start this on Thursday morning.

2           MS. AGUIAR:   Okay.   Thank you, your Honor.

3           MR. RUSSELL:   Your Honor, I hate to tag team, but

4   if I could just explain something.   I think there's a little

5   confusion.   So one person takes the verdict form and one

6   person takes the jury instructions.   I think perhaps there

7   was a lack of clarity.   I'm not sure she meant to say in

8   response to what Mr. Proctor was talking about.   Your Honor

9   has cut off, I believe, for 1-A the ability to say drawings

10  versus dolls.   That's not a 1-A issue, which is why we can

11  stick with conceived and reduced to practice.

12          We're not going to make that argument because your

13  Honor has prevented us from making that argument.   That will

14  be a 1-B issue, and obviously we reserve our rights, but

15  there's no need to add create for the reasons we articulated

16  because we're not going to make the very argument that he's

17  talking about.   We don't have the evidence in the record to

18  make that argument.

19          THE COURT:   The finding on page 5 of the Court's

20  April 25th order, the Court grants summary judgment in favor

21  of Mattel on the issue of the enforceability of the

22  inventions agreement and the issue of applicability of the

23  inventions agreement to any Bratz related inventions,

24  including any designs, improvements, ideas, concepts, and

25  copyrightable subject matter that he is found to have created

 1   during the period of his employment with Mattel.

 2            MR. RUSSELL:  Yes.  But I think when you talk about

 3   this with respect to the jury instructions, and I think you

 4   look at the language of the contract and as Mr. Proctor

 5   indicates, at the very top of the contract it does use the

 6   word create, but when it wishes to be clear, it makes clear

 7   that the language is conceived and reduced to --

 8            THE COURT:  I understand.  But the Court has

 9   interpreted that to mean create.

10            MR. RUSSELL:  I understand, but I think it is

11   clearer, given the context, to use the language of the

12   contract, particularly when we get to 1-B.

13            THE COURT:  I understand your argument, Counsel.

14            MR. RUSSELL:  Thank you, your Honor.

15            THE COURT:  Thank you.

16            MR. PROCTOR:  Briefly, your Honor, and I know

17   you've heard a lot on this.  The Court hit it on the nose.

18   We are respectfully entitled to the benefit of the Court's

19   interpretation of the contract.  The Court's interpretation

20   of the contract uses the word create.  We are entitled to the

21   benefit of that.

22            I believe the simplest way to present it, I mean

23   the contract is what creates legal obligations.  The Court's

24   interpretation of it governs the scope of those obligations,

25   and the jury is governed by the Court's interpretation of

 1    that contract.  The jury is not governed by the contract.

 2              THE COURT:  I understand.

 3              MR. PROCTOR:  And the word create is the word that

 4    the Court has used.

 5              If the Court chooses to use conceived and reduced

 6    to practice as a supplemental term --

 7              THE COURT:  How would you propose on doing that?

 8    Because that's kind of where I'm going at this point.  I

 9    think you're entitled to the benefit of the Court's

10    interpretation of the contract.  I understand Ms. Aguiar's

11    point that it would be helpful to the jury to have the actual

12    language of the contract.

13              I suppose one way we could do this is has Mattel

14    proven by a preponderance of the evidence that the items were

15    conceived or reduced to practice, that is, created by Carter

16    Bryant during the period he was employed by Mattel or reverse

17    that, were created, that is, conceived of or reduced to

18    practice, and put that conceived or reduced to practice

19    within quotation marks to reference the fact that that's the

20    language from the contract.

21              MR. PROCTOR:  That would be acceptable.  The first

22    version of it is, I think, the one that makes more sense.

23              THE COURT:  Put in quotation marks the conceived or

24    reduced to practice.  Given the Court's ruling.

25              MR. PROCTOR:  Or an alternative which I would throw

1    out for the Court's consideration is simply use commas, that

2    the item was created, comma, conceived, comma, or reduced to

3    practice.

4            THE COURT:  I think that's confusing for the

5    reasons Ms. Aguiar pointed out.  Then they are seeing

6    something in the contract and seeing something else in the

7    jury instruction.  I think we need to highlight what's in the

8    contract, and we can do that by putting that in quotations,

9    and then at the same time you have the benefit of the Court's

10   ruling on summary adjudication by having the parenthetical

11   essentially.

12           MR. PROCTOR:  And just to be clear, I think this

13   issue applies both to the jury instruction on page 22 and the

14   verdict form.

15           THE COURT:  It's a way to solve the jury

16   instruction issue as well.

17           All right.  Well, now that we have all of tomorrow

18   before we're going to have this, I would still like the

19   parties to prepare a draft of this verdict form consistent

20   with the rulings that I've just made, provide it to the Court

21   by nine o'clock tomorrow morning.  And then I will take that.

22   I will take -- I've already got the jury instruction stuff on

23   a disk.  I will work on both during the morning, get them to

24   the point where I am satisfied, and then let's convene

25   tomorrow at 1:30.

```
 1              And I will have available for you by noon -- I'll
 2   try to have available for you by eleven o'clock the final
 3   versions, and then we'll have one last hearing on this at
 4   1:30 to see if there's any nits or anything else that the
 5   parties want to take issue with, then you'll have the benefit
 6   of the final version all tomorrow afternoon, and we'll get
 7   through all of this on Thursday.
 8              MR. PROCTOR:  Thank you, Judge.  And just for
 9   clarity, the language the Court wants is, quote, conceived or
10   reduced to practice, comma close quote, that is, created.
11              THE COURT:  Yes.
12              MR. PROCTOR:  Okay.
13              THE COURT:  And just for the record, the Court is
14   relying on its finding on page 5 of the April 25th order.
15              MS. AGUIAR:  And, your Honor, for the record, we do
16   believe that it should just be the language of the contract.
17   I understand that after hearing argument you've decided to go
18   with also inserting the word created in there, but we do
19   believe it would be the better course to go with solely the
20   language of the contract.
21              THE COURT:  I understand your position.
22              MS. AGUIAR:  Okay.  I just wanted to make that
23   clear.
24              THE COURT:  I appreciate that.
25              MS. AGUIAR:  The Galvano video, did we give you the
```

 1   time counts on that?

 2           THE COURT:  You did not.  Thank you.  How much of

 3   this was Mattel's?

 4           MS. AGUIAR:  It was -- you want Mattel first?

 5   Mattel was 27 minutes and 30 seconds.  MGA, 34 minutes, 19

 6   seconds.

 7           THE COURT:  Very good.

 8           MS. AGUIAR:  And would it be easy enough to get an

 9   updated time count from you?

10           THE COURT:  Sure.  You've all used 36 hours plus

11   another two hours and 32 minutes for MGA.  So that's 38 hours

12   and 32 minutes.  And Mattel has used 36 hours plus 11 hours

13   and 15 minutes.  So it's 47 hours and 15 minutes.

14           MS. AGUIAR:  You said Mattel has used 36 hours?

15           THE COURT:  You both have used 36 plus the time

16   here.  So Mattel has used 36 plus 11 hours and 17 minutes.

17   So Mattel has used 47 hours and 17 minutes.  You have used 36

18   hours plus two and a half, two hours and 32 minutes.  So you

19   have used a total of 38 hours and 32 minutes.

20           MS. AGUIAR:  Thank you, your Honor.

21           THE COURT:  Pretty close.  Plus or minus a few

22   minutes.

23           MR. PROCTOR:  One final point, and I apologize if

24   there was discussion about this yesterday.  I don't want to

25   revisit it if there was, and I'm not aware of it.  But the

```
 1    structure of the verdict form, the Court's view was that we
 2    should do the ownership before the state law claims.

 3              THE COURT:  Just to keep it consistent with the
 4    jury instructions, right.

 5              MR. PROCTOR:  The pitch that I would make to
 6    reverse it, and we in our proposed form did reverse it.  Is
 7    it simply -- going through the ownership aspects of it, you
 8    know, MGA, we've seen the wisdom of MGA's briefing.

 9              It's a very good grouping, but there's still, you
10    know, about 75 questions as to a lot of exhibits, a lot of
11    drawings that the jury is going to have to answer, and it's
12    going to take the jury a long time to get through that, and I
13    do think there's some fruitfulness to having the jury answer
14    the state law claims, which is a fairly typical case, jury
15    deliberations process, come to a unanimous conclusion as to
16    whether MGA, Mr. Larian are liable or not, and then gets into
17    this laborious process of going --

18              THE COURT:  I see your point, Mr. Proctor.  But if
19    the jury was not having the benefit of the Court reading and
20    explaining the verdict form to them during the instructions,
21    and they were just getting it cold and thinking they had to
22    start at page 1 before they could go to page 2, go to page 3,
23    they are going to be able to do this however they want.  They
24    are going to know that I'm not going to read every single
25    exhibit on the verdict form.  I'm going to explain to them
```

 1 | you start with one question about the timing, and I would
 2 | explain to them the different buckets, as it were, the
 3 | additional questions. And then they can approach it however
 4 | they want. Give some -- they will figure that out. I
 5 | appreciate the concern. I'd like to keep the order. I see
 6 | the tactical benefit of having them address these other
 7 | issues first, and I can I understand why you would want them
 8 | to do this.

 9 | But I think to keep this consistent with the way
10 | you've approached this in the pretrial conference order and
11 | the jury instructions, that I shouldn't deviate from that.

12 | MR. PROCTOR: Thank you.

13 | THE COURT: Okay. I think we're done for the day.
14 | I'll see you at -- I'll get those forms from you, the verdict
15 | form on a disk tomorrow morning at 9:00. I will do my best
16 | to have ready for you both the jury instruction and the
17 | verdict form at 11:00, and then I will see you here at 1:30,
18 | and we'll go from there.

19 | All right. Good evening.

20 |

21 | (Proceedings concluded at 4:55 P.M.)

22 |

23 |

24 |

25 |

1

2

3

4

5                    **C E R T I F I C A T E**

6

7

8            I hereby certify that pursuant to Title 28,

9    Section 753 United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings in the above matter.

12            Certified on July 8, 2008.

13

14

15   **MARK SCHWEITZER, CSR, RPR, CRR**
     Official Court Reporter
16   License No. 10514

17

18

19

20

21

22

23

24

25