1      YOU'RE NOT ALLOWED TO ARGUE WHEN YOU ARE EXAMINING

2  WITNESSES.  BUT I CAN ARGUE NOW.

3      WHAT WAS THE POINT OF THAT, EXCEPT TO CONFUSE YOU?

4  AND THERE'S NO ANSWER TO THAT.

5      AND MR. NOLAN SAYS, WHY DIDN'T WE BRING SOMEONE IN TO     04:31

6  SHOW YOU THAT THERE WAS AN ANGEL DOLL?

7      WE DIDN'T HAVE TO.  MR. BRYANT GAVE YOU -- IT'S HIS

8  TESTIMONY.  THIS IS 1999.

9      BUT WE HAVE TO FIND SOMETHING IN '98 HERE.

10     DO YOU REMEMBER, THEY DID THE JEWEL DRAWINGS.            04:31

11     AGAIN, MR. NOLAN SAYS, WHY DIDN'T YOU BRING IN

12  SOMEONE BESIDES CASSIDY PARK?

13     I'LL TELL YOU WHY WE BROUGHT HER IN.  BECAUSE

14  MR. BRYANT SAID CASSIDY PARK WAS HIS SUPERVISOR WHEN HE SAYS HE

15  DID JEWEL BARBIE DRAWINGS; THAT'S WHY.                      04:31

16     AND THEN MR. NOLAN SAID THAT MS. PARK SAID SHE WASN'T

17  FAMILIAR WITH HIS ASSIGNMENTS.

18     DO WE HAVE 3498?

19     THAT'S NOT WHAT SHE TESTIFIED.

20     WHAT SHE TESTIFIED TO WAS THAT EVERY ASSIGNMENT IN      04:32

21  '98 WENT THROUGH HER.

22     "ANY PROJECTS HE HAD BEEN WORKING WENT THROUGH ME

23  BETWEEN JANUARY AND APRIL OF 1998, AND HE DIDN'T GET ANY JEWEL

24  BARBIE PROJECTS."

25     AND YOU KNOW SOMETHING ELSE?                            04:3

1          AT HIS DEPOSITION, UNDER OATH, BEFORE HE REALIZED HE

2   HAD PUT SOMETHING IN HERE IN 1998, WE SAID 'WHAT WERE YOUR

3   PROJECTS?'

4          HE DIDN'T MENTION JEWEL BARBIE.

5          WE SHOWED YOU THAT IN THE CLOSING.  WE ASKED HIM,          04:32

6   'WHAT DID YOU DO WHEN YOU STARTED IN '99?

7          WELL, I DID JEWEL BARBIE THEN.

8          THAT'S WHAT HE SAID BEFORE HE REALIZED HOW IMPORTANT

9   THIS WAS.

10         AND THEN WE SHOWED YOU THE FEBRUARY '99 JEWEL BARBIE          04:32

11  DRAWING, WHICH COMES FROM HERE, FEBRUARY '99 AND ALL HE CAN SAY

12  IS, OH, LOOK, THERE'S SOME DATED JANUARY '98; EVEN THOUGH

13  PREVIOUSLY MR. BRYANT SAID HE DIDN'T DO THEM IN '98; EVEN

14  THOUGH MS. CASSIDY PARK SAID HE DIDN'T DO THEM IN '98.

15         AND, YES, THERE IS AN EXPLANATION.  YOU SAW IT ON HIS          04:32

16  CONFLICT OF INTEREST QUESTIONNAIRE; WHEN HE WAS SUPPOSED TO PUT

17  JANUARY '99, HE PUT JANUARY '98.  AND THEN THERE WERE OTHER

18  DRAWINGS IN FEBRUARY WHERE HE GOT IT RIGHT, WHERE IT'S

19  FEBRUARY '99; NOTHING IN '98 IN HERE THEY CAN IDENTIFY.

20         SO HE SAYS RAINY DAY RASCALS; THAT'S IT; IT'S RAINY          04:3:

21  DAY RASCALS.

22         AGAIN, SAYS WHO?

23         WHAT EVIDENCE DO YOU HAVE THAT RAINY DAY RASCALS WERE

24  DONE IN 1998?  ANYTHING BESIDES MR. BRYANT'S WORD?

25         NO.  YOU HAVE NOTHING.          04:3

```
 1          IN FACT, DO YOU RECALL, I ASKED MR. BRYANT HAS HE

 2   EVER SEEN A RAINY DAY RASCALS ANYWHERE DATED 1998?

 3          HIS RESPONSE WAS 'I MIGHT HAVE.  I DON'T KNOW.'

 4          SO THAT WAS A CHALLENGE TO THEM.  OKAY.  BRING IT ON.

 5   BRING IT ON.  SHOW US THIS GREETING CARD DONE IN '98.          04:3:

 6          NO ONE ELSE HAS EVER TESTIFIED, NO ONE ELSE

 7   TESTIFIED; MR. IRMEN, NO ONE SAID THEY SAY A RAINY DAY RASCALS

 8   GREETING CARD IN '98.  BUT WE LOOKED AND LOOKED AND LOOKED, AND

 9   WE FOUND ONE DATED 1999, AND THAT'S EXHIBIT 10624.  WE CAN SHOW

10   YOU THAT.  AND MR. NOLAN DOESN'T DISPUTE THAT'S HIS SIGNATURE.   04:3(

11   YOU HEARD HIM SAY THAT.  THIS IS PRODUCED BY MR. BRYANT FROM

12   HIS DOCUMENTS.  THIS IS THE ONLY RAINY DAY RASCALS DRAWING THAT

13   EXISTS THAT IS DATED.

14          AND ALTHOUGH MR. NOLAN REPEATED DOZENS OF TIMES,

15   RAINY DAY RASCALS 1998, RAINY DAY RASCALS 1998, HE REPEATS IT    04:3(

16   AGAIN AND AGAIN, THERE'S NO PROOF OF IT.  NONE AT ALL.

17          MORE LIKELY THAN NOT, WHAT'S THE DATE OF THIS

18   NOTEBOOK?

19          AND THEN WE HAVE, OF COURSE, THE 'WADE' NOTE.

20          WELL, AGAIN, MR. BRYANT, THIS WASN'T TESTIFIED TO AT     04:3(

21   HIS DEPOSITION, FOR THE FIRST TIME EVER, HE TAKES THE STAND AND

22   SAYS 'AH, THAT WAS 1998.'

23          IF WE COULD SHOW THAT NOTE; THAT'S 1155-C OF 87.

24          WHO DO WE HAVE TO TRUST WITH THAT?

25          WHAT PROOF IS THERE THAT WAS '98?                        04:3(
```

```
 1            WE HAVE MR. BRYANT'S WORD.  OF COURSE, THAT'S A LOT
 2   TO GO ON.
 3            DO YOU RECALL, WHEN I SAID, 'THIS NOTE IS
 4   INTERESTING.  IT SAYS WE'RE GOING TO BE BACK IN A FEW WEEKS.
 5   HOW LONG OF A DRIVE IS THAT?'                                    04:35
 6            I DIDN'T KNOW THE ANSWERS TO THIS STUFF, FOLKS.  IT'S
 7   THE FIRST TIME HE HAD EVER SAID THIS WAS '98, IN FRONT OF YOU.
 8   SO WHY WOULD YOU BE COMING BACK SO QUICKLY ON A 12-HOUR DRIVE?
 9   WHY WOULD YOU LOOK FORWARD TO COMING BACK AGAIN IN THE NEXT FEW
10   WEEKS?  COULD BE BECAUSE OF THANKSGIVING AND CHRISTMAS.  YEAH,   04:35
11   THAT'S A POSSIBILITY.  THEIR FAMILIES GOT TOGETHER THANKSGIVING
12   AND CHRISTMAS.
13            DIDN'T THAT HAPPEN IN '99?
14            HE SAYS IT'S POSSIBLE.  I DON'T KNOW.  IT'S POSSIBLE
15   THAT WE WERE THERE IN '99, AS WAS WADE AND HIS FAMILY.  AND     04:35
16   THEN WE SHOWED YOU THE RECORDS.
17            AND MR. NOLAN SAYS WE'VE GOT TO PROVE IT WAS 1999.
18            NO, WE DON'T.  WE'VE PROVEN TO YOU THAT THE IMPORTANT
19   INFORMATION IN HERE IS 1999.  EVERYTHING WE CAN DATE
20   POSITIVELY, THE BANK RECORDS, FOR EXAMPLE, 1999; ANGEL, 1999;   04:3
21   THE JEWEL DRAWING, 1999.
22            HE DOESN'T GET TO SAY 'AH HA, 1998, YOU CAN'T PROVE
23   ME WRONG.'
24            YOU'VE GOT TO WEIGH THE EVIDENCE AND SAY IS THAT TRUE
25   OR NOT?                                                         04:3
```

```
 1              THAT INSTRUCTION SAYING YOU SHOULD BRING IN THE BEST
 2   EVIDENCE WE CAN; THAT IS IF YOU CONTROL THAT EVIDENCE.
 3              MR. BRYANT DIDN'T SAY THIS WAS 1998 UNTIL HE TOOK
 4   THAT STAND.  AND WE COULDN'T GO OUT AND TAKE WADE'S DEPO OR
 5   LISA'S.  WE CERTAINLY COULDN'T HAVE DONE IT IN SPRINGFIELD,      04:36
 6   BECAUSE THEY WERE 12 HOURS AWAY.
 7              BUT WHO COULD HAVE BROUGHT THEM?
 8              YOU DIDN'T HEAR ANY TESTIMONY ABOUT THAT THIS IS A
 9   1999 NOTEBOOK, AND THIS ESTABLISHES THAT THE VERY FIRST BRATZ
10   DRAWINGS WERE DONE IN 1999.  AND IF YOU LOOK AT THE EVIDENCE,    04:36
11   YOU'VE GOT TO LOOK AND SEE WHAT'S MORE LIKELY THAN NOT.
12              YOU'VE GOT MR. BRYANT'S STORY ABOUT 1998; RIGHT?
13              HE HAS NO DOCUMENTS TO BACK THAT UP AT ALL.  BUT
14   HERE'S THE EVIDENCE THAT WE DO KNOW.  WE KNOW THAT IN 1998, HE
15   WAS WORKING ON SOMETHING CALLED SABRINA.  AT LEAST THAT'S WHAT   04:37
16   HE SAYS.  AND YOU SAW SOME EXHIBITS OF THAT.  AND WE KNOW THAT
17   IN '98 HE HAD AN AGENT.  MR. NOLAN TOLD YOU THAT HE HAD AN
18   ARTIST AGENT IN '98.  REMEMBER THAT?  IN FACT, REMEMBER IN
19   SEPTEMBER OF '98, HE SAID HE LEARNED FROM ASHTON DRAKE ABOUT
20   ALASKA MAMA.  HE KNEW ABOUT ALASKA MAMA.                        04:37
21              THEY DIDN'T BRING THOSE FOLKS IN TO SAY 'HEY, HE HAD
22   THIS EXCITING PROJECT CALLED BRATZ THAT HE TRIED TO SEND AROUND
23   IN 1999.'
24              NOT AT ALL.
25              WHAT WAS THIS AGENT DOING?                           04:37
```

```
 1          OTHER THINGS WHICH MR. BRYANT HAD CREATED AND WAS
 2   TRYING TO SELL.  HE DIDN'T WANT TO BE AN OLD NAVY EMPLOYEE.  HE
 3   WANTED TO BE A FREELANCER.  HIS TESTIMONY OF AUGUST OF '98:  'I
 4   CAME UP WITH THIS GREAT IDEA, I PUT IT IN A FOLDER, AND I NEVER
 5   SENT IT TO ANYONE UNTIL AUGUST OF '99.'
 6          DOES THAT MAKE SENSE, GIVEN THE POSITION HE WAS IN
 7   WERE HE WANTED TO BE A FREELANCER?  HE'S TRYING TO SELL THIS
 8   STUFF?
 9          NO.  IT DOESN'T MAKE SENSE AT ALL.
10          SO WE HAVE HIS '98 STORY.  LET'S COMPARE THAT WITH,
11   THEN, WHAT HAPPENED IN '99.
12          IF WE COULD PUT UP EXHIBIT 25-R.
13          I CREATED THIS DEMONSTRATIVE JUST TO SHOW YOU.
14          IN '99, HERE'S WHAT WAS HAPPENING:
15          FIRST YOU HAVE THE TOON TEENS DRAWINGS DISPLAYED IN
16   LILY'S CUBICLE; EXHIBIT 48.  MR. BRYANT DIDN'T DENY HE SAW
17   THEM; HE SAID, I DON'T REMEMBER.'  YOU HEARD MS. MARTINEZ'
18   TESTIMONY ABOUT ELISE BRINGING HIM BY.
19          THEN IN JULY WE HAVE THAT STEVE MADDEN AD, AUGUST
20   1999, SEVENTEEN MAGAZINE.  AND YOU'VE SEEN THAT OVER AND OVER
21   AGAIN.
22          MR. NOLAN'S ONLY RESPONSE IS, 'OH, THAT'S NOT EXACTLY
23   THE SAME ONE THAT MS. LEAHY GOT, BECAUSE IT HAS DIFFERENT
24   PRINTING AT THE BOTTOM.'
25          WELL, AGAIN, HE SAID HE READ SEVENTEEN.  WE BRING IN
```

1    THE SEVENTEEN MAGAZINE.  IT LOOKS VERY MUCH LIKE BRATZ, DOES IT

2    NOT?  EVEN THOUGH MR. BRYANT WOULDN'T ADMIT IT.  EVEN THOUGH

3    IT'S WHAT MR. BRYANT GAVE MS. LEAHY FOR HER INSPIRATION; SO

4    HE'S SEEN BOTH OF THESE IN THE JUNE/JULY TIME FRAME.

5            THE EVIDENCE IS RIGHT THERE.                          04:39

6            AND THEN IN THAT SAME TIME FRAME, WE'VE GOT THESE

7    INDENTATIONS IN THIS BLACK NOTEBOOK ABOUT THE BANKING

8    STATEMENTS, JULY '99; RIGHT HERE IN THE SAME NOTEBOOK THAT HE

9    HAS THOSE VERY FIRST DRAWINGS.

10           IN EARLY AUGUST, MS. GARCIA HAS DISPLAYED HER DOLLS    04:39

11   IN THAT DESIGN CENTER; IF YOU LOOK AT THE PICTURE, THE DATE OF

12   THAT IS AUGUST OF '99.

13           THEN AUGUST 26TH, HE HAS THESE DOCUMENTS NOTARIZED,

14   THESE DRAWINGS.  AND MR. NOLAN SAID WE HAVE TO PROVE THAT'S

15   FORGED TO PROVE OUR CASE?  TO THE CONTRARY, THAT PROVES OUR    04:40

16   CASE.  WE DON'T NEED TO SHOW THAT WAS FORGED.

17           YOU KNOW WHY YOU NOTARIZE DOCUMENTS IN '99?  TO PROVE

18   THE DOCUMENTS EXISTED IN EL SEGUNDO, CALIFORNIA, IN '99; THAT'S

19   THE REASON.  MARKING A DOCUMENT SHOWS THAT YOU HAD IT ON THE

20   DATE THAT YOU MARKED IT.                                      04:4

21           IF WE COULD PUT UP EXHIBIT 40-R.

22           FOR EXAMPLE, ONE OF THOSE COPYRIGHT WAYS OF DOING IT,

23   THE CHEAP WAY, IS TO SEND YOURSELF AN ENVELOPE SO IT WILL HAVE

24   A DATE ON IT, A STAMP ON IT; THAT'S ONE WAY OF SHOWING YOU DID

25   SOMETHING ON A CERTAIN DAY.                                   04:4

| | |
|---|---|
| 1 | IF THAT'S IN AUGUST OF '99, IT WOULDN'T HELP YOU TO |
| 2 | PUT '98 DOCUMENTS IN THERE, WOULD IT?  IT WOULDN'T PROVE TO |
| 3 | ANYONE THAT YOU DID IT IN '98.  IT WOULD PROVE THAT YOU DID IT |
| 4 | IN '99. |
| 5 | IT MAKES NO SENSE TO HAVE THAT STAMP PUT ON THERE TO |
| 6 | PROVE YOU DID IT IN '98.  YOU WOULDN'T DO THAT WITH ANY FORGED |
| 7 | DOCUMENT.  SAME THING WITH NOTARIES. |
| 8 | IF WE COULD PUT UP 39-R. |
| 9 | IT'S STAMPING A DOCUMENT ON THE DATE THE NOTARY SAW |
| 10 | IT.  THAT'S WHAT YOU SEE IN EXHIBIT 62; DRAWINGS THAT ARE |
| 11 | STAMPED AT THAT TIME.  AND ALL THAT SHOWS -- IN FACT, IT SHOWS |
| 12 | DEFINITIVELY, IT PROVES THOSE DOCUMENTS EXISTED IN AUGUST OF |
| 13 | 1999. |
| 14 | NOW, HE'S SENDING THEM TO ALASKA MAMA HERE AT THIS |
| 15 | TIME.  WHY HE DID HE CHOSE AUGUST '99?  I SUBMIT, BECAUSE |
| 16 | THAT'S WHEN HE DID THEM, AFTER ALL OF THE EVENTS I JUST SHOWED |
| 17 | YOU IN THE '99 TIME FRAME; THAT'S WHY HE SENT THEM. |
| 18 | SO HE WANTS TO NOTARIZE THEM AND SAY 'I HAD THEM |
| 19 | BEFORE ALASKA MAMA,' SO HE HAS THEM NOTARIZED.  THEN IF YOU |
| 20 | LOOK AT THE NOTARY BOOK -- AND MR. QUINN SHOWED IT TO YOU -- IF |
| 21 | THAT NOTARY BOOK STOPS AT THAT PERIOD WHERE -- IF IT STOPPED |
| 22 | THERE, THIS CASE WOULDN'T EVEN -- IT WOULD BE A SLAM DUNK.  IF |
| 23 | THIS STOPS HERE, THIS PERIOD, WE WOULD HAVE PROOF POSITIVE |
| 24 | THESE THINGS WERE DONE IN AUGUST OF '99. |
| 25 | AND MR. BRYANT IS NOT DUMB.  MR. BRYANT SAYS, "OH, MY |

1  GOSH, THIS PROVES IT'S IN '99. COULD YOU PUT IN ALSO 'MISSOURI

2  1998,' BECAUSE I'M WORKING AT MATTEL NOW AND THESE BELONG TO

3  MATTEL."

4       THIS PART FROM '98 IS, AGAIN, MR. BRYANT'S WORD.

5  IT'S NOTHING MORE THAN HIS WORD, AND IT'S USELESS. IN FACT, IT   04:42

6  SHOWS HIS KNOWLEDGE OF GUILT. BECAUSE, 'OH, MY GOSH, LOOK WHAT

7  I'VE JUST PROVEN.'

8       IF WE COULD GO BACK TO THE TIMELINE, 25-R.

9       HE HAS THESE DRAWINGS NOTARIZED AFTER ALL OF THIS

10  THAT'S GOING ON IN '99. AND THEN THE NEXT DAY, AUGUST 27TH, HE   04:43

11  DRAWS ANOTHER ONE AND HE DATES IT, HE DATES IT, AUGUST 27TH,

12  '99.

13       IF WE CAN SHOW EXHIBIT 777.

14       HE'S GOT THE GROUP THAT HE SENDS TO ALASKA MAMA,

15  AUGUST 26, '99. AND THEN HE MAKES A CHANGE THE NEXT DAY, THE   04:43

16  VERY NEXT DAY. AUGUST 27, 1999 HE DECIDES TO CHANGE LUPE, GIVE

17  HER A DIFFERENT HAIRSTYLE. ALL OF THIS CREATIVITY IS TAKING

18  PLACE IN 1999.

19       AND THEN SOME TIME AFTER THAT, HE SENDS THE BRATZ

20  DRAWINGS TO ALASKA MAMA, AND THEN THOSE DRAWINGS ARE DATED.   04:43

21  ALSO SHORTLY AFTER THAT, SEPTEMBER 19TH, IF YOU LOOK AT

22  EXHIBIT 1327 AND 1328; DATED 1999, BECAUSE THAT'S WHEN THE

23  CREATIVITY WAS TAKING PLACE.

24       AND I DON'T MEAN TO MINIMIZE THIS, BUT THEY COME BACK

25  WITH HIS MOTHER, WHO, MR. NOLAN SAID, 'WELL, WHAT DO YOU   04:44

```
 1   EXPECT; SHE'S THINKING OF WHAT HAPPENED TEN, NINE YEARS AGO.'
 2          WELL, THAT'S RIGHT. THAT'S THE POSITION MR. BRYANT
 3   PUT HER IN. HE KNOWS HOW TO PROVE DOCUMENTS ARE DONE ON A
 4   CERTAIN DATE. HE'S DONE COPYRIGHTS. HE KNOWS HOW TO SEND
 5   SOMETHING TO YOURSELF. HE KNOWS HOW TO GET THEM NOTARIZED. HE      04:44
 6   DIDN'T DO THAT, SO HE HAS TO GO TO MOM AND SAY 'DO YOU REMEMBER
 7   THIS WAS IN '98? DO YOU REMEMBER THAT, MOM?'
 8          AND IT'S LIKE, WHAT IS IT, THE STORY OF THE MOTHER
 9   WHO'S GOING TO A PARADE, HER SON IS IN THE PARADE, SHE'S
10   PROUDLY WATCHING JIMMY WALK BY AND SHE'S BEAMING WITH PRIDE.      04:44
11   AND SHE TURNS TO THE OTHER MOTHERS AND SAYS 'ISN'T IT
12   WONDERFUL, JIMMY IS IN STEP AND EVERYBODY ELSE IS OUT OF STEP.'
13   THAT'S HOW MOMS SEE THINGS; AND THAT'S WHAT HE PUT HER IN, AND
14   SHE WAS WRONG.
15          AND THEN WE HAVE MS. GALVANO, LADIES AND GENTLEMEN.       04:45
16   THEY BROUGHT IN MS. GALVANO, AND SHE COULDN'T SHOW YOU A SINGLE
17   DOCUMENT IN THE WORLD THAT SHE SAW IN AUGUST OF '98. SHE MAY
18   HAVE SEEN SOMETHING. SHE MAY HAVE SEEN SABRINA. BUT THAT'S
19   LIKE HAVING A LINEUP, YOU KNOW, YOU ARREST SOMEONE; THE COPS
20   HAVE LINEUPS. THEY SAY, MA'AM WHICH OF THOSE SIX WAS IT? SHE     04:45
21   GOES, WELL, IT COULD HAVE BEEN NUMBER THREE.
22          WAS IT NUMBER THREE?
23          OH, ABSOLUTELY NOT; BUT IT KIND OF LOOKED LIKE NUMBER
24   THREE, EXCEPT HE DOESN'T HAVE A FACE.
25          AND THEN YOU PROSECUTE NUMBER THREE.                      04:45
```

| 1 | THAT'S WHAT MS. GALVANO -- SHE WANTS TO HELP, SHE |
| 2 | REALLY DOES.  WE'RE NOT SAYING SHE'S LYING; WE'RE SAYING SHE |
| 3 | HAS NOTHING TO ADD. |
| 4 | THEN YOU HAVE HIS LIFE PARTNER -- I MEAN, THIS IS THE |
| 5 | BEST THEY COULD DO -- WHO TOLD YOU, YEAH, I SAW SOMETHING THAT |
| 6 | SAID BRATZ WHEN NO ONE ELSE HAS HEARD THE BRATZ NAME UNTIL IT'S |
| 7 | PRESENTED TO MGA OVER A YEAR LATER, OR MORE THAN THAT, |
| 8 | ACTUALLY. |

04:45

| 9 | THAT'S THE QUALITY OF EVIDENCE THAT YOU HAVE TO WEIGH |
| 10 | IN DECIDING THIS CASE.  AND YOU WAY THAT AGAINST JUST THE UTTER |
| 11 | DISHONESTY OF THE PEOPLE WHO REALLY GOT CARTER BRYANT ON THIS |
| 12 | PATH. |

04:46

| 13 | NOW, I WANT TO TALK TO YOU A LITTLE ABOUT THE VERDICT |
| 14 | FORM, IF I COULD FIND IT HERE:  ON THE VERDICT FORM, IT'S |
| 15 | DIVIDED INTO THESE SPECIFIC QUESTIONS, AND YOU REMEMBER |
| 16 | MR. NOLAN SAYING THE FIRST QUESTION HERE LISTS ALL OF THE |
| 17 | DOCUMENTS THAT CARTER BRYANT SAYS HE DID IN 1998.  AND THE |
| 18 | QUESTION IS SIMPLE:  WHAT DO YOU THINK IS MORE LIKELY, GIVEN |
| 19 | THE PHYSICAL EVIDENCE, GIVEN THE DOCUMENTARY EVIDENCE, GIVEN |
| 20 | HIS TESTIMONY? |

04:46

| 21 | WHAT DO YOU THINK IS MORE LIKELY? |
| 22 | IS HE TELLING THE TRUTH OR NOT? |
| 23 | YOU KNOW, MR. LARIAN SAID THAT HE WANTED TO DO AN |
| 24 | INVESTIGATION ABOUT WHETHER THESE WERE '98. |
| 25 | ASK YOURSELF THIS:  IF YOU WERE TO DO AN |

04:47

```
 1   INVESTIGATION OF THIS, MR. BRYANT IS THERE IN FRONT OF YOU,

 2   WOULD YOU SAY TO HIM, "DO YOU HAVE ANY DOCUMENTS THAT SAY IT?

 3   WHAT NOTEBOOK WAS IT THAT YOU PUT IT IN?"

 4           WOULD YOU SAY THOSE SORTS OF THINGS, OR WOULD YOU

 5   SAY, OKAY, SO WHAT'S THE NAME OF YOUR MOM?  HOW ABOUT YOUR        04:47

 6   LOVER?  HOW ABOUT YOUR MOM'S BEST FRIEND?

 7           YOU HAVE TO ASK YOURSELF, WHO DO YOU BELIEVE.

 8           I THINK THE ANSWER IS CLEAR.  YOU CAN'T BELIEVE

 9   MR. BRYANT IF ALL OF THE PHYSICAL EVIDENCE, THE SCIENTIFIC

10   EVIDENCE, TELLS YOU THIS WAS DONE IN 1999.  THE INSPIRATIONAL    04:47

11   EVIDENCE, THE MADMAN OF '99.

12           SO THEN WE HAVE THE SECOND QUESTION HERE.  THE SECOND

13   QUESTION IS, FOR EACH OF THE ITEMS LISTED BELOW, HAS MATTEL

14   PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT THESE WERE

15   CONCEIVED AND REDUCED TO PRACTICE.                               04:47

16           THESE ARE, AS MR. NOLAN SAID, THE COLORED-IN

17   DOCUMENTS.  AND MR. BRYANT TESTIFIED THAT ALL OF THESE, IF YOU

18   SEE A DOCUMENT WHERE IT'S COLORED IN, THAT WAS DONE WHILE I WAS

19   AT MATTEL.

20           THAT'S ACTUALLY AT PAGE 2466, IT'S LINES 9 TO 11.        04:4

21           "QUESTION:  THAT PROCESS, PROJECTING IT, TRACING IT,

22   COLORING IN, THAT PROCESS WAS DONE WHILE YOU WERE AT MATTEL?

23           ANSWER:  YES."

24           MR. PAGE:  IN FACT, MR. BRYANT TESTIFIED THAT, IF YOU

25   SEE A DRAWING WITH A HEAD AND A FACE THAT ARE TOGETHER, THAT     04:4
```

```
 1    THAT WAS DONE SOME TIME AFTER 1998.

 2          HE WAS ASKED -- AND THIS IS THE FOLLOWING PAGE, 3246,

 3    LINE 15-23 --

 4          "QUESTION:  THE DRAWING WITH A BODY AND A FACE

 5    TOGETHER DIDN'T EXIST IN 1998; CORRECT?                      04:48

 6          ANSWER:  I DON'T REMEMBER THAT IT DID.

 7          QUESTION:  AND THAT'S TRUE OF THE OTHER EXHIBITS I

 8    WAS SHOWING YOU WHICH HAD THE CHARACTERS, YOU KNOW, WITH THE

 9    BODY AND THE FACE.  AND YOU WOULD SAY, OH, BUT THERE WAS A

10    MASTER DRAWING.  THE MASTER DRAWINGS IN AUGUST 1998 DIDN'T HAVE  04:49

11    THE FASHIONS AND THE FACE AND THE BODY ALL TOGETHER; RIGHT?

12          ANSWER:  NO.  I DON'T THINK SO."

13          MR. PAGE:  IF YOU SEE A PICTURE WITH A HEAD AND A

14    BODY AND FASHIONS TOGETHER, THAT'S DONE AFTER 1999.

15          THAT'S THE SECOND QUESTION YOU HAVE IN THE VERDICT     04:49

16    FORM, WHICH IS THIS GROUP OF THE DOCUMENTS, WHICH, REALLY,

17    MR. BRYANT ADMITS HE DID WHILE HE WAS AT MATTEL.

18          SO YOU HAVE A THIRD GROUP OF DOCUMENTS HERE, AND

19    THESE ARE ONES THAT MR. BRYANT SAYS HE DID AFTER MATTEL.  AND

20    IF YOU LOOK AT EXHIBIT, FOR EXAMPLE, 323-32, THIS DRAWING HERE,  04:4

21    REMEMBER, THIS IS A SCULPTOR DRAWING.  MR. BRYANT SAYS IT WAS

22    DONE AFTER HE LEFT MATTEL IN OCTOBER 19.  OF COURSE, HE ALSO

23    SAID HE KNOWS THAT IF HE SAYS IT'S BEFORE THEN, WE OWN THAT.

24          HOWEVER, MS. GARCIA TOLD YOU THIS WAS DONE BETWEEN

25    OCTOBER 4TH AND OCTOBER 19TH, IF WE CAN PUT UP HER TESTIMONY; I  04:5
```

```
 1    BELIEVE THAT'S SLIDE 12-R.  MS. GARCIA WAS ASKED:
 2              "QUESTION:  WHAT INFORMATION DO YOU HAVE ON THAT
 3    SUBJECT?
 4              ANSWER:  I KNOW THIS WAS CREATED PRIOR TO
 5    OCTOBER 19TH OF 2000."
 6         MR. PRICE:  THE REASON SHE KNOWS THAT IS BECAUSE IT
 7    WAS HANDED TO THE SCULPTOR TO BE USED BY MS. LEAHY TO SCULPT.
 8    SO THE EVIDENCE IS THAT THAT WAS DONE NOT AFTER HE LEFT MATTEL
 9    BUT WHILE HE WAS AT MATTEL.
10              THE NEXT THREE DRAWINGS; 1107, 1108, 1109, AND 1110,
11    I'LL SHOW YOU THOSE, BECAUSE THESE WERE FASHION DRAWINGS THAT
12    WERE DONE.
13              MR. BRYANT SAYS, OH, THESE WERE DONE AFTER I LEFT
14    MATTEL.  BUT WHEN YOU LOOK AT WHAT WAS GOING ON IN OCTOBER,
15    THAT MAKES NO SENSE.
16              IF WE CAN PUT UP 26-R.
17              REMEMBER, CARTER BRYANT WAS INSTRUCTED TO WORK
18    FULL-TIME STARTING OCTOBER 6TH.  MR. NOLAN SHOWED YOU THAT.
19    YET, YOU DON'T START SEWING AND DOING PATTERN MAKING FOR THE
20    DOLLS UNTIL YOU HAVE THE FASHIONS DESIGNED.  THE WORKERS DON'T
21    JUST MAKE UP STUFF.  THEY DON'T GO BUY THEIR OWN FABRIC.  THEY
22    DON'T CREATE THEIR OWN DESIGNS.  THEY ARE GIVEN THE DESIGNS BY
23    THE DESIGNER; THAT'S HOW IT WORKS.
24              VERONICA MARLOW STARTED SEWING AND PATTERN MAKING
25    BEGINNING OCTOBER 13TH; THAT'S WHEN SHE STARTED DOING THE
```

04:50
04:50
04:51
04:51
04:51

```
 1   ACTUAL PATTERNS; AND THAT'S EXHIBIT 606-5; THOSE ARE HER BILLS
 2   WHICH SHOW THAT BETWEEN OCTOBER 13TH AND OCTOBER 20, BUT
 3   STARTING WITH OCTOBER 13, SHE'S DOING SEWING AND PATTERN
 4   MAKING; SEWING AND PATTERN MAKING; AND BILLING THAT, THAT'S A
 5   HECK OF A LOT OF HOURS, I MIGHT SAY.  THIS WAS A RUSH JOB.         04:52
 6   WE'RE TALKING 81 HOURS HERE OF SEWING AND PATTERN MAKING.
 7            SHE HAD A PRIOR BILL WHICH WAS ANOTHER 80 HOURS
 8   LEADING UP TO OCTOBER 13TH WHICH WAS JUST DOING THE RESEARCH.
 9   BUT THEY DON'T DO THIS UNLESS YOU HAVE THE DESIGNS DONE.
10            AND THEN YOU'VE GOT MS. GARCIA, IN 26-R, MS. GARCIA      04:52
11   SENDS THE FINAL FASHIONS TO HONG KONG OCTOBER 24.  THAT MEANS
12   THEY ARE DONE.  THAT'S EXHIBIT 1236.  THIS IS THE ONE WHERE
13   MS. GARCIA SAID I DON'T KNOW WHAT YOU ARE TALKING ABOUT.  I
14   DON'T EVEN KNOW WHAT FINAL FASHION DESIGN MEANS.  BUT SHE'S
15   SENDING THIS ON THE 23RD.  WE KNOW IT WAS DONE BEFORE THEN.       04:5:
16            AGAIN, WHAT'S MORE LIKELY?
17            IT WAS DONE BEFORE THEY ACTUALLY MADE THE FASHIONS.
18   YOU DON'T MAKE THE FASHIONS WITHOUT THE DESIGNS.
19            SO IF WE GO BACK TO 26-R.  SO MR. BRYANT HAD TO HAVE
20   COMPLETED THOSE DESIGNS IN ADVANCE OF THIS ACTIVITY TAKING        04:5:
21   PLACE.
22            THOSE DRAWINGS THAT WE JUST SHOWED YOU WERE THE
23   DRAWINGS THAT WERE SHOWN TO THE CUSTOMER IN EARLY NOVEMBER.
24   REMEMBER HOW THEY WENT TO K-MART; WE'VE GOT THIS HERE, THE
25   FASHIONS, AND ALL THAT STUFF.                                     04:5
```

| | |
|---|---|
| 1 | SO THOSE DRAWINGS, WE BELIEVE THAT THE EVIDENCE IS |
| 2 | MORE LIKELY THAN NOT CONSISTENT WITH THE DOCUMENTS THEY TRY TO |
| 3 | RUN AWAY FROM WERE DONE BEFORE HE LEFT MATTEL IN OCTOBER 19TH. |
| 4 | THE SAME IS TRUE, ACTUALLY, IF WE GO TO THE VERDICT |
| 5 | FORM, PAGE 4, IF YOU GO THROUGH THESE OTHER DRAWINGS, THEY ARE |
| 6 | THE SAME SORTS OF DRAWINGS AND FASHIONS, AND THEN YOU SEE 323, |
| 7 | 18, 19, AND 26.  323 IS THE PACKAGE OF DOCUMENTS WHICH |
| 8 | MR. LINKER SAID HE WAS GIVEN IN MID OCTOBER SO THAT HE COULD |
| 9 | START DOING THE PACKAGING.  THAT'S EXHIBIT 323.  THAT, AGAIN, |
| 10 | IS BEFORE CARTER BRYANT LEAVES MATTEL. |
| 11 | SO WE THEN GO TO NUMBER FOUR:  "FOR EACH OF THE ITEMS |
| 12 | BELOW, HAS MATTEL PROVEN BY A PREPONDERANCE OF THE EVIDENCE..." |
| 13 | THERE ARE TWO PHYSICAL ITEMS HERE.  ONE IS THIS |
| 14 | THREE-DIMENTIONAL ITEMS PURSUANT TO THE PITCH, THE ONE THAT |
| 15 | MR. GARCIA AND MR. LARIAN SAID WAS UGLY, AND THE ONE |
| 16 | MS. O'CONNOR SAID WAS BEAUTIFUL IN 11 OUT OF TEN. |
| 17 | NO QUESTION THAT WAS DONE WHILE CARTER BRYANT WORKED |
| 18 | AT MATTEL. |
| 19 | THEN YOU HAVE EXHIBIT 1136, THAT'S THE SCULPT THAT |
| 20 | MS. LEAHY DID.  AND DO YOU REMEMBER MS. LEAHY'S TESTIMONY?  IT |
| 21 | TOOK AWHILE TO GET OUT, BUT DO YOU RECALL WHAT HAPPENED? |
| 22 | SHE MEETS WITH MR. BRYANT.  HE GIVES HER THE DESIGNS. |
| 23 | HE GIVES HER THE STEVE MADDEN AD.  HE SAYS I WANT YOU TO MAKE |
| 24 | BRATZ FOR ME.  AND IN JUST A 2-DAY PERIOD, SHE COMES UP WITH A |
| 25 | SCULPT ON SEPTEMBER 29TH.  AND YOU SAW HER NOTES OF |

04:53
04:54
04:5
04:5
04:5

1   SEPTEMBER 29TH.  WHAT SHE DID WAS SHE WENT AND SHE MET WITH

2   MR. BRYANT; SHE SAID 'HERE'S THE SCULPT.'  AND HE SAID 'THAT'S

3   GREAT, BUT HERE ARE MY SPECIFIC COMMENTS...'"  AND YOU REMEMBER

4   HE LISTED ABOUT FOUR OR FIVE COMMENTS IN HER NOTES.

5        AND WHAT SHE TESTIFIED TO AT HER DEPOSITION WAS, YOU        04:55

6   KNOW, I TOOK HIS COMMENTS AND I INCORPORATED EACH AND EVERY ONE

7   OF THOSE COMMENTS.  AND SHE DOES A SCULPT, A SCULPT UNDER THE

8   ARTIST 'S GUIDANCE, MR. BRYANT'S GUIDANCE, TO BE A BRATZ DOLL,

9   TO BE A BRATZ SCULPT.

10        SO BECAUSE MR. BRYANT WAS THE DESIGNER OF THIS,           04:55

11  BECAUSE HE'S THE ONE WHO GAVE HER THE DRAWINGS, BECAUSE HE'S

12  THE ONE WHO GAVE HER THE COMMENTS, AS SHE ORIGINALLY SAID,

13  BECAUSE THIS WAS TO FULFILL HIS VISION; AND THIS IS DONE

14  BETWEEN -- SEPTEMBER 18TH WAS THE FIRST WAS WHEN HE FIRST

15  CONTACTED HER.  THIS ALSO WOULD BE MATTEL PROPERTY.           04:5

16        WHAT MS. LEAHY SAID SHE DID DO WAS SHE THEN TRIED TO

17  MAKE IT MANUFACTURABLE BECAUSE, YOU KNOW, YOU JUST HAVE TO DO

18  SOME THINGS TO MAKE IT MANUFACTURABLE.  BUT THAT'S

19  CARTER BRYANT'S DIRECTION, HIS VISION, HIS SCULPTOR FOR HIS

20  BRATZ.                                                        04:5

21        AND THEN YOU GET TO THE QUESTIONS WHICH DON'T HAVE

22  LONG NUMBERS AFTER THEM, LISTS AND LISTS AND LISTS, AND THAT IS

23  -- FIVE AND SIX IS WHETHER HE CONCEIVED THESE WHILE AT MATTEL;

24  AND, AGAIN, THAT'S THE '99 EVIDENCE.  AND THAT HE CONCEIVED THE

25  NAME BRATZ.  AND THAT'S, AGAIN, THE EVIDENCE YOU HEARD FROM,   04:5

1    FOR EXAMPLE, MS. RHEA, WHO SAID HE HADN'T EVEN COME UP WITH IT

2    BY JUNE, BUT HE DID COME UP BY THE SEPTEMBER 1ST MEETING WHEN

3    HE WAS AT MATTEL.

4         AND THEN WE HAVE INTENTIONAL INTERFERENCE AND THE

5    AIDING AND ABETTING AND THE DUTY OF LOYALTY.  REALLY, WHAT MORE

6    IS THERE TO SAY HERE ABOUT THIS?  IT'S REALLY UNDISPUTED WHAT

7    HAPPENED HERE.

8         DID MGA KNOW IT?

9         OH, COME ON, MS. GARCIA WAS IN THIS UP TO HER NECK.

10        IN FACT, THE BUILDER, I THINK MR. NOLAN SAID, 'WELL,

11   BUT HE PAID THIS MATTEL PAINTER, AND THERE'S NO EVIDENCE THAT

12   WE KNEW ANYTHING ABOUT THAT."

13        ACTUALLY, IF YOU LOOK AT THE EVIDENCE -- DO WE HAVE

14   THOSE EXHIBITS NUMBER -- THERE'S A CHECK WHICH MR. BRYANT WROTE

15   -- OH, LET'S TRY 1310, I THINK -- THERE'S A CHECK MR. BRYANT

16   WROTE FOR $150 TO SHEILA FOR HER FACE PAINTING.  I DON'T

17   REMEMBER THAT.  SHEILA WAS THE MATTEL EMPLOYEE.  AND YOU RECALL

18   TESTIMONY FROM MS. RHEA THAT THIS PROJECT HAD AN 'ANGEL' CODE

19   NAME.  DO YOU REMEMBER, I ASKED MR. BRYANT, DID ONE OF YOUR

20   DOLLS HAVE THE NICK NAME OF ANGEL?  HE SAID ABSOLUTELY NOT.

21   AND THEN WE SHOWED YOU HIS HANDWRITTEN DESCRIPTIONS OF THEM

22   WHERE, YES, ONE OF THEM'S NICK NAME WAS AKA ANGEL.

23        THIS IS MR. BRYANT'S CHECK.

24        AND THEN 593, THIS IS A COUPLE OF DAYS, A FEW DAYS

25   LATER.  WHAT DOES MR. BRYANT DO?  HE SENDS AN INVOICE TO

```
 1    MS. GARCIA FOR $150.  IT SAYS 'ANGEL FACE HAIR DESIGNS AND
 2    SKETCHES.'
 3            HEY, YOU KNOW, IT SAYS AUGUST 31ST FOR MR. BRYANT, BY
 4    THE WAY.  DO YOU SEE THIS?  HE'S A MATTEL'S EMPLOYEE.
 5            WHAT?  HE'S DOING WORK FOR MGA NOW IN AUGUST?         04:59
 6            DOES THAT MAKE ANY SENSE TO YOU?
 7            NO.
 8            MS. GARCIA:  THANKS, PAULA; A LITTLE SMILEY FACE
 9    THERE.  MS. GARCIA WAS IN ON THIS WITH MR. BRYANT AT THE TIME.
10    HE'S HELPING THEM CREATE A DOLL THAT WILL COMPETE WITH MATTEL.  04:59
11    HE'S HAVING FACES PAINTED FOR THE PITCH.  REMEMBER HIS INITIAL
12    PITCH, AUGUST 15TH, OR MID AUGUST; THAT'S WHAT MR. BRYANT SAYS;
13    THAT'S WHAT MRS. O'CONNOR SAYS; AND THEN THEY'RE GOING TO MEET
14    WITH MR. LARIAN.  AND IT'S DURING THAT TIME FRAME THAT
15    MR. BRYANT DOES THIS DOLL AND HAS IT PAINTED AND PAYS SHEILA.   04:59
16    BUT NOT BEFORE HE'S USING THE CODE NAME ASKING TO BE REIMBURSED
17    FOR IT.
18            AND THEN, OF COURSE, THE MOST COMPELLING EVIDENCE ON
19    THIS AIDING AND ABETTING IS THE DATE ON THE CONTRACT ITSELF.
20    AS OF SEPTEMBER 18, 2000, THAT'S WHEN MR. BRYANT WAS WORKING    05:00
21    FOR THEM.  EXHIBIT 30 IS THAT LETTER TO THE VENDOR, UNIVERSAL,
22    SEPTEMBER 18, 2000; THE FIRST CONTACT WITH MS. LEAHY
23    SEPTEMBER 17TH, SEPTEMBER 20TH OF 2000.
24            MGA RECOGNIZED WHAT IT WAS DOING AND INDUCING A
25    MATTEL EMPLOYEE WHO CREATED MATTEL DESIGNES TO BRING HIS        05:00
```

```
 1    DESIGNS TO MGA.  THEY DIDN'T GIVE A HOOT WHETHER THEY WERE DONE
 2    AT MATTEL OR NOT.  BUT THEY WANTED HIM TO MAKE SURE THEY COULD
 3    COMPETE AS QUICKLY AS POSSIBLE WITH MATTEL.
 4              YOU'RE MORE TIRED THAN I AM; YOU HAVE TO LISTEN TO
 5    ALL OF THIS.  BUT I WANT TO THANK YOU FOR YOUR PATIENCE.  AND     05:0C
 6    BOTH PARTIES HAVE PUT A LOT OF EFFORT INTO THIS.  OUR EFFORT
 7    HAS BEEN GEARED TOWARDS ONE THING:  IT'S UNFAIR IF A COMPANY
 8    COMPETES WITH YOU BY STEALING FROM YOU.  IT'S UNFAIR IF A
 9    COMPANY COMPETES WITH YOU BY TAKING ONE OF YOUR BEST DESIGNERS,
10    WHILE HE STILL WORKS FOR YOU, AND GIVES YOU IDEAS, EFFORT, AND    05:01
11    HELPS YOU GET INTO THE MARKET TO COMPETE.
12              MATTEL ISN'T ANTI-COMPETITIVE.  IT IS ANTI-FRAUD.  IT
13    DOES BELIEVE YOU SHOULD COMPETE FAIRLY; THAT BOTH SIDES SHOULD
14    PLAY FAIRLY.  AND THAT'S WHAT WE'RE ASKING YOU TO SAY TO THE
15    WORLD.  MR. NOLAN SAID 'PEOPLE FORGET WHAT I SAID HERE AND WHAT   05:01
16    HE SAID HERE.'  THAT'S A SAD TRUTH.  BUT WHAT THEY WON'T FORGET
17    IS YOU SAYING THERE'S A RIGHT WAY AND A WRONG WAY TO COMPETE,
18    AND WHAT YOU DID HERE CROSSED THAT LINE.  AND YOU HAVE A CHANCE
19    TO REMEDY IT.
20              WE THANK YOU.                                          05:01
21         THE COURT:  THANK YOU, COUNSEL.
22              JUST A COUPLE OF THINGS BEFORE I EXCUSE THE JURY AT
23    THIS TIME.
24              I UNDERSTAND THAT WE HAVE TWO MEMBERS OF THE JURY WHO
25    NEED TO TAKE SMOKE BREAKS.  WITHOUT COMMENTING ON THE HEALTH     05:02
```

1    EFFECTS OF SMOKING, I WILL LEAVE THAT UP TO YOU AT THIS POINT.

2         THAT'S PART OF THE SCHEDULE, THOUGH, THAT'S IN YOUR

3    HANDS AT THIS POINT.  IF YOU NEED TO TAKE A BREAK FOR WHATEVER

4    PURPOSE, THAT'S FOR YOU TO DECIDE.

5         HOWEVER, WHEN ONE OF YOU OR TWO OF YOU OR ANY OF YOU          05:02

6    ARE NOT PRESENT TOGETHER, WHEN YOU ARE NOT ALL TOGETHER, YOU

7    SHOULD NOT BE DISCUSSING THE CASE; SO IF ONE OR TWO PEOPLE NEED

8    TO TAKE A BREAK FOR WHATEVER PURPOSE, STOP DISCUSSING THE CASE,

9    LET THEM TAKE THEIR BREAK, AND WAIT FOR THEM TO COME BACK AND

10   THEN RESUME YOUR DELIBERATIONS.  BUT DO NOT BE DELIBERATING        05:02

11   UNLESS ALL TEN ARE TOGETHER AT A TIME; SO IN TERMS OF

12   SCHEDULING YOUR BREAKS, I'LL LEAVE THAT UP TO YOU.

13        I'M GOING TO BE GIVING YOU THREE ENVELOPES; THE FIRST

14   ENVELOPE IS LABELED "JURY VERDICT FORM"; IT HAS THE JURY

15   VERDICT FORM; ONE COPY; AND THAT'S THE ONE THAT YOUR PRECEDING     05:03

16   JUROR WILL FILL OUT, SIGN, DATE, AND RETURN ONCE YOU HAVE

17   REACHED A UNANIMOUS VERDICT.

18        THE SECOND FORM ARE THE JURY NOTES.  I HAVE CORRECTLY

19   LISTED THEM, ONE THROUGH 15.  I DON'T KNOW WHY THE LAST JURY I

20   HAD DID THIS, BUT, FOR WHATEVER REASON, THEY JUST PICKED THEM      05:03

21   RANDOMLY AND THEY WEREN'T IN ORDER.  IT HELPS US IF YOU COULD

22   PICK NUMBER ONE, MAKE YOUR FIRST NOTE BE JUROR NUMBER ONE, TWO,

23   THREE, FOUR, FIVE, JUST BE MINDFUL OF THAT.

24        THE ONE JURY NOTE WE'D LIKE TO GET BACK AS SOON AS

25   POSSIBLE -- I KNOW WE'RE AT THE END OF THE DAY TODAY, SO I         05:03

| | |
|---|---|
| 1 | DON'T EXPECT IT TODAY, BUT TOMORROW MORNING -- IS JUST AN |
| 2 | INDICATION OF YOUR SCHEDULE THAT YOU ARE GOING TO BE KEEPING |
| 3 | TOMORROW AND THEREAFTER, JUST SO THAT I CAN LET THE ATTORNEYS |
| 4 | KNOW. BECAUSE I'LL EXPECT LEAD COUNSEL FOR BOTH SIDES TO BE |
| 5 | PRESENT WHENEVER YOU ARE DELIBERATING. |
| 6 | AND THEN THERE ARE COPIES OF THE JURY INSTRUCTIONS |
| 7 | THAT I READ THIS MORNING. THERE ARE TEN COPIES, ONE FOR EACH |
| 8 | OF YOU, TO USE; SO THOSE ARE THE THREE FOLDERS THAT WILL BE |
| 9 | GOING BACK WITH YOU TO THE JURY ROOM. |
| 10 | AT THIS TIME, I'D ASK THE BAILIFF TO COME FORWARD AND |
| 11 | BE SWORN IN. |
| 12 | **THE CLERK:** PLEASE STATE YOUR NAME FOR THE RECORD. |
| 13 | **BAILIFF:** SCOTT EVANS. |
| 14 | (CLERK GIVES OATH TO BAILIFF. ) |
| 15 | **BAILIFF:** I DO. |
| 16 | **THE COURT:** VERY WELL. |
| 17 | LET'S EXCUSE THE JURY AT THIS TIME. |
| 18 | MR. HOLMES, IF YOU WOULD TAKE THESE THREE FOLDERS |
| 19 | WITH YOU. |
| 20 | ALL RISE FOR THE JURY. |
| 21 | (WHEREUPON JURORS DEPART COURTROOM.) |
| 22 | **THE COURT:** COUNSEL, I CONGRATULATE BOTH SIDES ON |
| 23 | OUTSTANDING CLOSING ARGUMENTS. IT WAS TRULY A PLEASURE. BOTH |
| 24 | SIDES MADE OBJECTIONS, THAT I OVERRULED. I THINK THAT THERE |
| 25 | MAY HAVE BEEN A NUMBER OF STATEMENTS MADE THROUGHOUT BOTH |

05:03

05:04

05:04

05:04

05:0

```
 1   CLOSINGS THAT CERTAINLY PUSHED THE LINE, PERHAPS, BUT I BELIEVE
 2   OVERALL THAT YOU STAYED WELL WITHIN THE DEFINED PARAMETERS AND
 3   REPRESENTED YOUR CLIENTS VERY ZEALOUSLY, BUT FAIRLY, AND ANY
 4   CONCERNS WERE FULLY ADDRESSED BY THE JURY INSTRUCTIONS AND THE
 5   REPEATED ADMONITIONS TO THE JURY ABOUT THE ROLE OF ARGUMENTS BY      05:06
 6   COUNSEL AND THE PRIMARY ROLE, OF COURSE, OF THE EVIDENCE AND
 7   THE COURT'S INSTRUCTIONS; SO I DID NOT INTERRUPT OR FURTHER
 8   INTERVENE.
 9        JUST FOR THE RECORD, PLAINTIFF USED ALL BUT ONE
10   MINUTE OF THEIR TWO AND A HALF HOURS, AND DEFENSE USED ALL BUT       05:06
11   FOUR MINUTES OF THEIR TWO AND A HALF HOURS, SO THEIR ESTIMATES
12   WERE PRETTY CLOSE.  I APPRECIATE YOUR EFFORTS.  I KNOW NOW THE
13   HARD PART BEGINS, THE WAITING AND THE PACING.
14        I DO EXPECT COUNSEL TO BE PRESENT WHILE THE JURY IS
15   DELIBERATING TO ANSWER ANY NOTES PROMPTLY, AND WE, OF COURSE,        05:07
16   WILL BE MAKING SURE THAT YOU'RE MADE AWARE OF ANY NOTES THAT
17   COME OUT AS SOON AS THEY COME OUT.
18        I WOULD WAIT AROUND TONIGHT, FOR THE NEXT 20 MINUTES.
19   I PRESUME THE JURY IS GOING TO DISBURSE WITHOUT SENDING ANY
20   NOTE IN; BUT, NOT KNOWING THAT, I'D ASK YOU TO WAIT AROUND FOR       05:07
21   ABOUT 20 MINUTES OR SO.
22        I THINK THAT'S ALL I HAVE.
23        IS THERE ANYTHING FROM PLAINTIFF?
24        MR. PRICE:  WONDERING IF IT'S OKAY -- WE'LL STAY HERE
25   TONIGHT, BUT, IF IT'S OKAY ON THE OTHER DAYS, OR DAY, THAT WE        05:07
```

1   BE WITHIN TEN MINUTES OF THE COURTHOUSE?

2           **THE COURT:**  THAT'S FINE.  JUST MAKE SURE MR. HOLMES

3   HAS A WAY OF CONTACTING YOU.

4           **THE COURT:**  MR. ZELLER?

5           **MR. ZELLER:**  NUMBER ONE, THE PEOPLE RESPONSIBLE FOR          05:07

6   THE TECHNICAL SIDE ARE INTERESTED IN KNOWING WHETHER THEY NEED

7   TO ALSO REMAIN IN CASE THERE'S A PLAYBACK OF VIDEO.

8           **THE COURT:**  FRANKLY, THEY ARE PROBABLY MORE IMPORTANT

9   THAN THE LAWYERS.

10          **MR. ZELLER:**  THAT'S WHAT I TRIED TO EXPLAIN.              05:08

11          **THE COURT:**  THE TECHNICAL PEOPLE HAVE BEEN ABSOLUTELY

12  OUTSTANDING AND CRITICAL IN THIS PRODUCTION AS IT WERE, AND I

13  APPRECIATE THEIR EFFORTS, AND I CERTAINLY WOULD APPRECIATE IF

14  THEY WERE AVAILABLE FOR ANYTHING LIKE THAT, IF WE NEED TO FIND

15  ANYTHING QUICKLY OR IF THE JURY NEEDS ANY PLAYBACK.               05:08

16          **MR. ZELLER:**  THANK YOU.

17          AND THEN THERE IS AN ISSUE CONCERNING WHAT GOES BACK

18  TO THE JURY WITH RESPECT TO ONE EXHIBIT, WHICH THE COURT MAY

19  RECALL IS THAT BINDER THAT I BELIEVE WAS SHOWN AND IT WAS

20  CONDITIONALLY ADMITTED IN CONNECTION WITH MS. GARCIA'S            05:08

21  TESTIMONY, I BELIEVE.  IT IS EXHIBIT 17770.

22          **THE COURT:**  THESE ARE THE FABRIC SWATCHES.

23          **MR. ZELLER:**  YES.

24          **THE COURT:**  THIS WAS BACK ON MAY 30.

25          YOU'D HAVE TO REFRESH MY RECOLLECTION IN TERMS OF THE         05:0

1    CONDITION UPON WHICH IT WAS ADMITTED.

2         **MR. ZELLER:**  THE COURT WILL RECALL -- AND THIS IS

3    REFLECTED IN THE TRANSCRIPT AS WELL -- IS THAT IT'S A FAIRLY

4    SIZABLE BINDER.  IT HAS FABRIC SWATCHES, OTHER KINDS OF

5    DOCUMENTS, I THINK, THAT ARE MOSTLY RELATED TO THE FASHIONS.          05:09

6    IT COVERS A FAIRLY LENGTHY TIME PERIOD.  SOME OF IT IS

7    CERTAINLY THE RELEVANT TIME PERIOD EARLY ON IN THIS BINDER, AND

8    THEN IT GOES ON WELL INTO THE SUBSEQUENT TIME PERIODS.

9         MR. PRICE MADE AN OBJECTION, PARTLY, IN LARGE PART,

10   BECAUSE AT THAT POINT WE HAD NOT HAD AN OPPORTUNITY TO GO            05:09

11   THROUGH EVERY SINGLE PAGE OF THAT BINDER.

12        AND AGAIN, THERE'S NO DISPUTE THAT AT LEAST SOME OF

13   THAT BINDER IS RELEVANT BY BOTH PARTIES' LIGHTS.  BUT THEN

14   THERE ARE LATER MATERIALS THAT WE DO HAVE AN ISSUE WITH AND IT

15   BEING AVAILABLE TO THE JURY AND GOING BACK, IF THE JURY --          05:09

16        **THE COURT:**  WHAT'S THE CONCERN?

17        **MR. ZELLER:**  I THINK THE CONCERN IS, YOUR HONOR, THAT

18   IT GETS US OUTSIDE OF THE TIME PERIOD.

19        MATTEL HAS CERTAINLY TRIED TO PUT ON EVIDENCE AFTER

20   THE TIME PERIOD.  THE COURT HAS --                                  05:1

21        **THE COURT:**  CAN I SEE THIS BINDER IN QUESTION?

22        WHILE WE'RE DOING THAT, I HAVE RECEIVED AN ADMITTED

23   EXHIBIT LIST, STAMPED TODAY, JULY 10TH, 2008, WHICH I

24   UNDERSTAND HAS BEEN REVIEWED BY BOTH THE PARTIES AND IT HAS

25   BEEN AGREED TO AS THE FINAL EXHIBIT LIST AS TO WHAT HAS BEEN        05:1

```
 1   ADMITTED.

 2             IS THAT CORRECT?

 3             MR. NOLAN:  THAT'S CORRECT.

 4             THE COURT:  MATTEL?

 5             MR. ZELLER:  I'M TOLD THAT THAT IS LIKELY THE ONE.      05:11

 6        IF IT REFLECTS THAT 17770, WHICH WE'RE DISCUSSING,

 7   WAS CONDITIONALLY ADMITTED, THAT WOULD APPEAR TO BE IT.

 8             THE COURT:  I NEED SOMETHING A LITTLE MORE

 9   UNEQUIVOCAL THAN THAT.

10             MR. ZELLER:  MR. GRANT HAS CONFIRMED TO ME THAT THIS    05:11

11   IS IT.

12             THE COURT:  VERY WELL.  THEN THIS WILL BE THE EXHIBIT

13   LIST.  AND MR. HOLMES, YOU'LL FILE THIS.

14             THIS IS THE BINDER HERE, 17770.

15             MS. AGUIAR:  MAY I BE HEARD?                            05:11

16             THE COURT:  THE STANDARD THAT I HAVE EMPLOYED

17   THROUGHOUT ALL OF THESE, WHERE THERE ARE MULTIPLE SHEETS,

18   MULTIPLE DATES OR ENTRIES, THOSE PORTIONS THAT ARE PUT BEFORE A

19   WITNESS AND ARE THE SUBJECT OF TESTIMONY IS WHAT GOES IN, AND

20   EVERYTHING ELSE HAS BEEN REDACTED.  THAT IS WHAT WE'VE DONE IN   05:11

21   THE ARTICLES; THAT'S WHAT WE HAVE DONE WITH BOOKS; THAT'S WHAT

22   WE'VE DONE WITH MAGAZINES.  AND THAT WHAT IS WHAT I'LL PROBABLY

23   DO WITH THIS.

24             DO WE HAVE A RECORD OF WHAT PAGES WERE ACTUALLY SHOWN

25   TO THE WITNESS?                                                  05:12
```

1    **MS. AGUIAR:** THE RELEVANT PAGES OF THE TRANSCRIPT ARE

2    PAGES 835 AND 836. THE EXCHANGE WAS THAT I OFFERED IT FOR

3    IDENTIFICATION, AND I EXPLAINED THAT IT CAN'T BE TAKEN APART

4    BECAUSE OF THE NATURE OF IT, AS YOU CAN SEE THERE. AND YOU

5    THEN SAID THAT YOU UNDERSTOOD THAT AND THAT YOU WERE GOING TO    05:12

6    ADMIT IT. AND YOU SAID, "MR. PRICE, I'LL GIVE YOU AN

7    OPPORTUNITY TO REVIEW THIS DURING THE BREAK. IF THERE'S

8    PARTICULAR PAGES THAT YOU OBJECT TO, I'LL GIVE YOU LEAVE TO

9    RENEW YOUR OBJECTION."

10           THAT'S NUMBER ONE.                                       05:12

11           MR. PRICE DID REVIEW IT AT THE BREAK AND NEVER

12    RENEWED THAT OBJECTION OR MADE ANY OTHER OBJECTION WHATSOEVER

13    ON THE RECORD AT ANY TIME AFTER THAT.

14           MR. ZELLER MADE A PASSING REFERENCE TO THE FACT THAT

15    MATTEL HAD NOT BEEN ABLE TO REVIEW THIS EXHIBIT. I'M SURE,      05:1

16    ACTUALLY, IF HE ASKS HIS PEOPLE WHO ARE ASSISTING IN THIS

17    PROCESS, THE ASSOCIATES WHO WORK WITH HIM, AND HIS SUPPORT

18    STAFF, THEY WILL TELL YOU THAT THEY HAD EVERY SINGLE PAGE OF

19    THIS. THEY ACTUALLY LOOKED AT THIS TANGIBLE EXHIBIT PRIOR TO

20    TRIAL; SO IT'S NOT THE CASE THAT THEY DIDN'T HAVE THIS EXHIBIT.  05:1

21           I WOULD ALSO SAY, YOUR HONOR, THAT I ASKED TO BE ABLE

22    TO PUBLISH IT TO THE JURY; AND SO I PASSED THIS EXHIBIT AROUND

23    TO THE JURY MEMBERS WHO ACTUALLY, AS I RECALL, TOOK A

24    SIGNIFICANT AMOUNT OF TIME LOOKING AT IT.

25           SO I THINK TO NOW, AFTER, ONE, THEY SAW THIS EXHIBIT     05:1

1    AND HAD PLENTY OF TIME TO OBJECT TO IT; AND TWO, YOU SAID ON

2    THE RECORD THAT YOU WERE GOING TO GIVE HIM LEAVE TO LOOK AT IT

3    ON THE BREAK AND RENEW ANY OBJECTION, AND HE DIDN'T; AND YOU

4    LET ME PUBLISH IT TO THE JURY.  NOW, IF THEY DON'T SEE THIS

5    EXHIBIT, I THINK IT'S PREJUDICIAL TO US THAT ALL OF A SUDDEN AN        05:1<

6    EXHIBIT THAT WASN'T JUST FLASHED UP ON THE SCREEN FOR A MOMENT

7    BUT THAT THEY PROBABLY SPENT BETWEEN FIVE AND TEN MINUTES

8    LOOKING AT, NOW DOES NOT GO BACK TO THE JURY.  SO I THINK THE

9    TIME TO OBJECT TO THIS EXHIBIT HAS PASSED.  AND THE NATURE OF

10   IT IS SUCH THAT IT SHOULD NOT BE TAKEN APART.                          05:1<

11            **THE COURT:**  MR. ZELLER?

12         **MR. ZELLER:**  YES.

13            IN TERMS OF WHAT I WAS REPRESENTING TO THE COURT IS

14   THAT THE REASON IT WAS CONDITIONALLY ADMITTED IS BECAUSE WE

15   DIDN'T HAVE THE OPPORTUNITY TO LOOK AT EVERY PAGE PRIOR TO THE         05:1<

16   TIME IT WAS SHOWN TO MS. GARCIA.

17            **THE COURT:**  SINCE MAY 30TH, I TRUST YOU HAVE.

18         **MR. ZELLER:**  YES.

19            AND THAT'S SPECIFICALLY --

20            **THE COURT:**  WHAT PAGES ARE YOU OBJECTING TO?              05:1<

21            THIS SEEMS LIKE A LOT OF FABRIC.

22            **MR. ZELLER:**  WHAT WE HAVE OFFERED TO DO, YOUR

23   HONOR -- AND I THINK THIS FAIRLY STATES WHAT OUR OBJECTION

24   WOULD BE AS WELL -- IS THAT ANYTHING AFTER A DATE CERTAIN -- WE

25   CAN BE SOMEWHAT FLEXIBLE ON THAT; IF IT WAS, SAY, AS OF OR            05:1<

```
 1   AFTER NOVEMBER 7TH, 2000, WE DON'T THINK SHOULD BE IN THERE.
 2   THERE'S CLEARLY STUFF FROM LATER TIME PERIODS.  IT WOULD SEEM
 3   LIKE THE MOST RATIONALE WAY OF DEFINING THIS EXHIBIT WOULD BE
 4   BY TIME PERIOD.
 5           THE COURT WILL ALSO RECALL, OF COURSE, THIS WAS         05:15
 6   SOMEWHAT MORE -- THIS WAS EARLY ON THAT THERE WAS PERHAPS SOME
 7   ADDITIONAL ISSUES ABOUT WHAT THE RELEVANT TIME PERIOD WAS
 8   ULTIMATELY GOING TO BE AT THAT TIME.  BUT CLEARLY AT VARIOUS
 9   TIMES, BOTH PARTIES, INCLUDING MATTEL, WERE PRECLUDED FROM
10   PUTTING ON EVIDENCE AS TO LATER TIME PERIODS.  AND I THINK      05:15
11   THAT'S THE STANDARD HERE.
12           I RESPECTFULLY DISAGREE WITH MGA'S POSITION THAT SOME
13   HOW IT WAS INCUMBENT ON US -- THIS WAS A CONDITIONALLY ADMITTED
14   EXHIBIT.  IT WAS INCUMBENT UPON THEM TO HAVE IT PROPERLY MOVED
15   INTO EVIDENCE.  AND I DON'T SEE HOW WE HAVE WAIVED IN ANY WAY   05:15
16   WHAT HAS BEEN CLEARLY STATED AS A RELEVANCE OBJECTION TO AT
17   LEAST PORTIONS OF THIS BINDER.
18           AND I'M SURE THAT LOGISTICALLY IT CAN BE WORKED OUT,
19   FOR PURPOSES OF WHAT GETS SHOWN TO THE JURY, AT A MINIMUM, JUST
20   SIMPLY BY PHOTOCOPYING THE RELEVANT PAGES, HAVING THAT MARKED   05:1
21   AS THE APPROPRIATE EXHIBIT, AND PROVIDING THAT TO THE JURY.
22           THE COURT:  THANK YOU, COUNSEL.
23           I HAD ASKED YESTERDAY FOR THERE TO BE A COMPREHENSIVE
24   REVIEW OF THE EXHIBITS COMPLETED YESTERDAY; AND THAT IF THERE
25   WERE ANY PROBLEMS WHATSOEVER, FOR THIS TO BE BROUGHT TO THE     05:1
```

```
 1   COURT'S ATTENTION AT 8:30 THIS MORNING.  NOT AT 5:15 TONIGHT.

 2           THE OBJECTION IS OVERRULED.  THE EXHIBIT IS ADMITTED.

 3           WE'RE DONE WITH THIS.

 4           THE JURY HAS RETURNED A NOTE.  APPARENTLY

 5   NOTWITHSTANDING MY REQUEST THEY USE NOTES IN ORDER, THE FIRST     05:16

 6   NOTE RECEIVED IS JURY NOTE NUMBER FOUR.

 7           (LAUGHTER.)

 8           THE COURT:  I ALSO RECEIVED JURY NOTE NUMBER ONE.

 9           THE ONLY GOOD NEWS IN THIS IS THAT THEY ARE

10   CONSISTENT.                                                       05:1'

11           BOTH NOTES INDICATE THAT THE JURY WILL BE WORKING

12   TUESDAY THROUGH FRIDAY FROM 9:15 TO 5:00, TAKING A LUNCH AT

13   12:30.

14           THEY ARE GONE FOR THE DAY.

15           MR. PRICE:  CAN WE ASK HOW LONG LUNCH WOULD BE?           05:1'

16           THE COURT:  THEY DIDN'T SAY THAT IN EITHER NOTE.

17           COUNSEL, THE PRACTICE OF THE COURT IS TO MAKE

18   PHOTOCOPIES OF THE NOTES AND PROVIDE THEM TO BOTH COUNSEL.

19           MR. HOLMES, IF YOU'LL DO THAT.

20           ANYTHING FURTHER FROM MATTEL?                            05:1

21           MR. ZELLER:  WE DO HAVE THE ORIGINAL OF THE NOTEBOOK,

22   1155-C, AND I'LL DELIVER THAT TO MR. HOMES.

23           THE COURT:  EXCELLENT.

24           ANYTHING FURTHER FROM MGA?

25           MS. AGUIAR:  WE ALSO NEED TO LODGE WITH YOUR HONOR        05:1
```

THURSDAY, JULY 10, 2008                    TRIAL DAY 23, AFTERNOON SESSION

```
 1   THE PORTFOLIOS THAT HAVE THE VERDICT FORM DRAWINGS IN THEM.

 2   HOWEVER YOU HONOR THINKS IT'S APPROPRIATE TO DO THIS, I WAS

 3   WONDERING IF THE JURY COULD BE INSTRUCTED THAT WITH REGARD TO

 4   THESE ORIGINALS, THESE DRAWINGS, THAT THEY HAVE BEEN PUT INTO

 5   THE PROTECTIVE SLIP SHEETS AND THAT THEY NOT REMOVE THEM,       05:18

 6   BECAUSE A LOT OF THEM ARE ON TRACING PAPER AND VERY THIN PAPER.

 7          THE COURT:  VERY WELL.

 8          MS. AGUIAR:  IF SOMEONE SPILLS THEIR LATTE ON LUPE,

 9   IT'S NOT GOING TO BE A GOOD SCENE.

10          THE COURT:  I'LL INSTRUCT MR. HOLMES, WHEN HE            05:1

11   DELIVERS THOSE TO THE JURY, TO SIMPLY INSTRUCT THEM TO NOT

12   REMOVE THEM WITHOUT COURT PERMISSION.  IF THEY NEED TO HAVE

13   THEM REMOVED FOR SOME PURPOSE, THAT WE WILL DO THAT HERE IN THE

14   COURTROOM.

15          MS. AGUIAR:  THANK YOU.  I APPRECIATE THAT.  WE'LL       05:1

16   LEAVE THESE WITH MR. HOLMES.

17          THE COURT:  VERY WELL.

18          ANYTHING FURTHER FROM MGA?

19          MR. NOLAN:  NOTHING FURTHER, YOUR HONOR.

20          THANK YOU.                                               05:1

21          THE COURT:  COURT IS ADJOURNED.

22          GOOD AFTERNOON.

23          (CONCLUSION OF AFTERNOON SESSION.)

24   / / /

25   / / /
```

1                              CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

6

7

8    THERESA A. LANZA, RPR, CSR          7-14-08
     OFFICIAL COURT REPORTER                  DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, JULY 10, 2008                 TRIAL DAY 23, AFTERNOON SESSION