1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -                    CERTIFIED

7    MATTEL, INC.,                    )                COPY
                                      )
8                    PLAINTIFF,       )
                                      )
9        VS.                          )    NO. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                   DEFENDANTS.      )    TRIAL DAY 29
                                      )    MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )    PAGES 5722-5814
                                      )

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17              TUESDAY, AUGUST 5, 2008

18                    8:41 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER
24            3470 12TH STREET, RM. 134
            RIVERSIDE, CALIFORNIA   92501
25                 951-274-0844
                WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     ON BEHALF OF MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        BY:   JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               WILLIAM PRICE
 6                        865 S. FIGUEROA STREET,
                          10TH FLOOR
 7                        LOS ANGELES, CALIFORNIA  90017

 8

 9
     ON BEHALF OF MGA ENTERTAINMENT:
10
                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11                        BY:   THOMAS J. NOLAN
                               RAOUL KENNEDY
12                             LAUREN AGUIAR
                               CARL ROTH
13                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
14                        213-687-5000

15

16

17

18

19

20

21

22

23

24

25
```

TUESDAY, AUGUST 5, 2008                     TRIAL DAY 29, MORNING SESSION

```
 1                              I N D E X

 2                                                        PAGE

 3      PHASE 1-B...................................      5722

 4

 5

 6      PLAINTIFF
        WITNESS         DIRECT      CROSS      REDIRECT      RECROSS
 7      NINETTE PEMBLETON

 8      BY MS. AUGIAR              5750                          5785
        BY MR. QUINN                         5776, 5789
 9

10

        PLAINTIFF
11      WITNESS         DIRECT      CROSS      REDIRECT      RECROSS
        MITCHELL KAMARCK
12
        BY MR. QUINN     5792
13

14

15

16             EXHIBITS           RECEIVED

17              18196              5774
                13705              5795
18              13707              5799
                13708              5807
19

20

21

22

23

24

25
```

```
 1          RIVERSIDE, CALIFORNIA; TUESDAY, AUGUST 5, 2008; 8:41 A.M.

 2                              -OOO-

 3          THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

 4   MATTEL, INC., V. MGA, INC., ET AL.

 5          MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

 6   THE RECORD.

 7          MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 8   MATTEL.

 9          MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, RAOUL KENNEDY,

10   DAVID HANSEN, AND CARL ROTH ON BEHALF OF MGA.

11          THE COURT:  WE TOOK CARE OF A NUMBER OF MATTERS IN

12   CHAMBERS.  THERE'S A FEW OTHER MOTIONS THAT WE HAVE HERE THAT

13   WE NEED TO RESOLVE.

14          WHAT I WANT TO RESOLVE IN THE FEW MINUTES WE HAVE

15   BEFORE 9:00 ARE THE JURY INSTRUCTION ISSUES RELATED TO OPENING

16   STATEMENT.

17          THERE'S A REQUEST TO INSTRUCT THE JURY CONCERNING

18   MR. NOLAN'S STATEMENT REGARDING THE MATTEL POSITION THAT THEIR

19   CASE IS ONLY WORTH $75,000; THERE IS THE REQUEST TO INSTRUCT

20   CONCERNING MR. PRICE'S STATEMENT, COMPARING THE RETURN OF

21   LIABILITY ON THE STATE TORT CLAIMS TO A CRIME; AND THEN THERE'S

22   THE ISSUE WITH RESPECT -- WHICH IS THE SUBJECT MATTER OF MGA'S

23   MOTION FOR SANCTIONS -- CONCERNING THE USE OF CERTAIN DOLLS IN

24   OPENING STATEMENT BY MR. PRICE THAT MGA ALLEGES WAS A

25   MISREPRESENTATION.  I JUST RECEIVED THE OPPOSITION AS I WAS
```

```
 1   WALKING OUT HERE ON THAT.

 2          THEN, OF COURSE, THERE'S THE COURT'S -- AS I

 3   INDICATED IN CHAMBERS -- THE COURT'S DESIRE TO INSTRUCT THE

 4   JURY JUST ON THE MISTRIAL, BASICALLY, THE MOTION FOR MISTRIAL,

 5   AND PUBLICATION AND VARIOUS OTHER ISSUES RELATED TO THE LAST

 6   WEEK.

 7          SO LET ME HEAR -- I DIDN'T GIVE MATTEL A CHANCE TO

 8   RESPOND TO MR. NOLAN'S REQUEST LAST TIME FOR THE INSTRUCTION

 9   CONCERNING HIS USE OF THE CRIME METAPHOR, AND THEN I'LL ALSO

10   HEAR FROM MR. PRICE, IF I COULD, ORALLY ANYWAY, ON THE DOLLS

11   THAT WERE USED DURING YOUR OPENING STATEMENT.

12          MR. PRICE:  YOUR HONOR, FIRST OFF, ON THE CRIME

13   METAPHOR, I THINK IT'S INAPPROPRIATE TO INSTRUCT THE JURY ON

14   ANYTHING SAID IN OPENING STATEMENTS UNLESS THE COURT BELIEVES

15   THEY WERE MISLED AND THAT THAT CANNOT BE CORRECTED WITH THE

16   EVIDENCE.

17          WITH MR. NOLAN'S STATEMENT, AS THE COURT POINTED OUT,

18   ABOUT THE $75,000 ASSESSMENT, THE EVIDENCE WOULD BE TOO

19   CONFUSING; IT WOULD NOT BE UNDERSTOOD BY THE JURY AS TO WHY

20   THAT IS INAPPROPRIATE; AND, THEREFORE, THE COURT CONCLUDED THAT

21   AN INSTRUCTION WAS NECESSARY, BECAUSE OBVIOUSLY, THAT INVOLVED

22   QUESTIONS OF WHETHER OR NOT THE CASE SHOULD BE IN FEDERAL

23   COURT, WHO HAD THE BURDEN, ET CETERA.

24          I THINK THE COURT SPECIFICALLY SAID THE JURY WOULD

25   NEVER UNDERSTAND THAT, ALTHOUGH A FIRST YEAR LAW STUDENT WOULD,
```

1 | AND, THEREFORE, A CURATIVE INSTRUCTION IS NECESSARY.

2 | TO TELL THEM THAT THE CRIME METAPHOR WAS SOMEHOW

3 | INAPPROPRIATE, I THINK, REALLY PREJUDICES US. IT IS AN

4 | APPROPRIATE METAPHOR. IT'S ONE I WOULD CONTINUE TO USE IN

5 | CLOSING ARGUMENT, WHICH IS THAT CRIME SHOULDN'T PAY.

6 | WHAT I SAID IN THE FIRST FEW MINUTES OF THE OPENING

7 | WAS THAT THE QUESTION THAT FACED THIS JURY WAS A VARIANCE OF

8 | THE QUESTION OF, SHOULD CRIME PAY, OR SHOULD MGA'S WRONGFUL

9 | CONDUCT PAY? AND THEN I THINK ONE OR TWO TIMES AFTERWARDS, I

10 | SAID THEIR EXPERT SAID IT SHOULD PAY 70 PERCENT, OR WHATEVER,

11 | OR 80 PERCENT.

12 | THE JURY WASN'T MISLED BY THAT. THIS JURY KNOWS THAT

13 | THEY DID NOT CONVICT MR. LARIAN OF A CRIME IN THE SENSE THAT HE

14 | IS NOT GOING TO BE PUT IN AN ORANGE JUMPSUIT AND SENT TO JAIL.

15 | THEY KNOW THAT. THEY WEREN'T CONFUSED BY THAT.

16 | IT IS, HOWEVER, AN APPROPRIATE ARGUMENT.

17 | WHAT THEY DID FIND -- THE ACTIONS THEY FOUND THAT HE

18 | UNDERTOOK ARE CRIMINAL. BUT THIS IS NOT A CRIMINAL PROCEEDING.

19 | AND SO IF THERE IS GOING TO BE AN INSTRUCTION TO THE JURY, YOUR

20 | HONOR, SO THAT WE'RE NOT PREJUDICED, I BELIEVE THAT INSTRUCTION

21 | SHOULD BE SOMETHING TO THE EFFECT, 'WELL, THIS IS NOT A

22 | CRIMINAL PROCEEDING, HE IS NOT GOING TO JAIL, BUT YOU DID MAKE

23 | A FINDING THAT WHAT HE DID WAS, FOR EXAMPLE, CONVERT MATTEL'S

24 | PROPERTY. AND THAT IS CRIMINAL. IT DOES NOT HAVE THE EFFECT

25 | OF SENDING HIM TO JAIL. THAT IS NOT THE PUNISHMENT. THE

1  PUNISHMENT SOUGHT HERE IS A CIVIL PUNISHMENT.'

2      THAT'S A FAIR INSTRUCTION.  BUT EVEN THAT'S

3  UNNECESSARY BECAUSE THIS JURY KNOWS THAT THEIR VERDICT DOES NOT

4  MEAN HE IS GOING TO JAIL.  AND IT WAS NOT SUGGESTED IN THE

5  OPENING STATEMENT.

6      SO TO MAKE THAT COMMENT -- I MEAN, TO DO A CORRECTIVE

7  INSTRUCTION TO THE JURY SUGGESTS THAT THERE WAS SOME MISCONDUCT

8  ON MY PART.  THERE WAS NO MISCONDUCT.  THIS JURY WAS NOT

9  MISLED.  AND QUITE FRANKLY, IT'S AN ATTEMPT TO BALANCE OUT THE

10  INSTRUCTIONS TO THE JURY.

11      MR. NOLAN MADE A STATEMENT WHICH THE COURT RECOGNIZED

12  THAT A FIRST YEAR LAW STUDENT WOULD KNOW WAS MISLEADING AND

13  INACCURATE AND INCAPABLE, THROUGH THE EVIDENCE, OF BEING

14  CORRECTED; SO THAT IS WHY THE COURT AGREED TO AN INSTRUCTION ON

15  THAT STATEMENT.

16      MY STATEMENT WAS A PROPER COMMENT ON THE EVIDENCE.

17  IT WAS NOT MISLEADING IN ANY WAY.  AND TO SUGGEST THAT IT WAS

18  SUGGESTS MISBEHAVIOR WHEN THERE WAS NONE.

19      **THE COURT:**  WITH RESPECT TO THE DOLLS?

20      **MR. PRICE:**  WITH RESPECT TO THE DOLLS, YOUR HONOR,

21  THE PREMISE IS THAT WE HAD NO GOOD FAITH BELIEF THAT THAT WAS

22  ONE OF THE DOLLS THAT WAS SUED IN DOUBLE GRAND.  AS OUR PAPERS

23  MAKE CLEAR, WE DID HAVE A GOOD FAITH BELIEF THAT WAS ONE OF THE

24  DOLLS.  THE DOLL ITSELF SAYS "TRENDY TEENS."  IT HAS THE HERO

25  POSE ON IT.  IT WAS A DOLL WHICH WAS SHOWN TO KAMARCK DURING

1　HIS DEPOSITION TO SAY, 'WAS THIS ONE OF THE DOLLS?' AND IT'S

2　QUOTED IN OUR PAPERS. HE HEMMED AND HAWED AND SAID, 'IT DOES

3　LOOK LIKE SOMETHING THAT CAME THROUGH HERE.'

4　　　　WE HAVE PICTURES WHICH ARE INCREDIBLY BLURRY, AND ONE

5　OF THE PROBLEMS WE HAVE, AND THE REASON WE'VE BEEN MAKING

6　MOTIONS TO GET GOOD COPIES AND THE ACTUAL DOLLS THAT WERE SUED

7　ON, IS BECAUSE IT'S DIFFICULT TO SEE JUST FROM THE PLEADINGS

8　WHAT THEY'RE TALKING ABOUT. BUT WE HAD A GOOD FAITH BELIEF

9　THAT WAS ONE OF THE DOLLS; OTHERWISE, I NEVER WOULD HAVE SHOWN

10　IT. AND THAT WAS BASED ON THE TITLE OF THE DOLL, THE HERO

11　SHOT, AND THE FACT THAT MR. KAMARCK, WHEN SHOWN IT AT HIS

12　DEPOSITION, SAID, 'YEAH, THAT'S SOMETHING THAT I KIND OF

13　RECOGNIZE AS SOMETHING THAT'S COME THROUGH HERE.'

14　　　　OBVIOUSLY, AGAIN, IF THE EVIDENCE SHOWS THAT WAS NOT

15　ONE OF THE DOLLS, THEN THAT'S SOMETHING I'LL HAVE TO DEAL WITH

16　IN CLOSING ARGUMENT. BUT IT'S IMPROPER TO MAKE ANY COMMENT TO

17　THE JURY, BECAUSE THERE'S ABSOLUTELY NO EVIDENCE THAT WOULD

18　SUPPORT THE CONCLUSION THAT MY STATEMENT WAS MADE IN BAD FAITH.

19　WHEN I MADE THAT STATEMENT, I THOUGHT IT WAS ONE OF THE DOLLS

20　THAT WAS SUED UPON.

21　　　　**THE COURT:** THANK YOU, COUNSEL.

22　　　　MR. NOLAN?

23　　　　**MR. NOLAN:** IF I MIGHT. NOT TO DO A TAG TEAM, BUT

24　I'D LIKE TO ADDRESS THE CRIME PORTION OF IT, AND THEN HAVE MY

25　COLLEAGUES ADDRESS THE OTHER.

1         YOUR HONOR, THIS IS A CIVIL CASE.  WE ALL KNOW THAT.

2    USING A REFERENCE TO CRIME AS A METAPHOR FOR WHAT THE JURY

3    FOUND HERE IS POTENTIALLY CONFUSING AND VERY PREJUDICIAL TO THE

4    JURY.  AND I HAVE NO BETTER EVIDENCE, NOR DO I THINK THERE

5    COULD BE ANY BETTER EVIDENCE, THAT IT WASN'T UNTIL AFTER THE

6    OPENING STATEMENT DELIVERED BY MR. PRICE IN THE NUMEROUS

7    REFERENCES TO CRIMINAL BEHAVIOR THAT JUROR 6'S NOTE CAME

8    FORWARD AND UNCOVERED A STATEMENT MADE BY JUROR NUMBER 8 TO THE

9    EFFECT THAT IRANIANS ARE THIEVES AND THEY STEAL OTHER PEOPLE'S

10   IDEAS.

11        WHAT I THINK, YOUR HONOR, IS THAT THERE IS A REAL

12   POTENTIAL THAT FOR EVERY TIME THAT MR. PRICE IN THIS CASE WANTS

13   TO REFER TO CRIMINAL ACTIVITY, OR THAT CRIME DOESN'T PAY, IT IS

14   GOING TO THE HEART OF AN ISSUE THAT WE SPENT A CONSIDERABLE

15   AMOUNT OF TIME TRYING TO DEAL WITH.

16        IN TRUTH, YOUR HONOR, THIS IS NOT A CRIMINAL CASE.

17   THERE WAS AN ALLEGATION OF CONVERSION.  I UNDERSTAND THE

18   ELEMENTS OF CONVERSION, BUT THIS IS NOT A CRIMINAL CASE, AND WE

19   IMPLORE THE COURT TO TAKE THAT INTO CONSIDERATION.

20        THIS IS NOT AN EFFORT TO BALANCE OUT THE OTHER

21   INSTRUCTION.  THIS IS SIMPLY ONE, YOUR HONOR -- AND I THINK THE

22   BEST PROOF OF THAT IS, THE FIRST TIME MR. PRICE USED THAT

23   REFERENCE IN HIS OPENING STATEMENT, WHICH I BELIEVE IS IN THE

24   FIRST TWO SENTENCES OF THE OPENING STATEMENT, I OBJECTED.  I

25   HAVE RARELY OBJECTED TO COUNSEL'S ARGUMENTS.  I JUST THINK THAT

1   IT'S HIGHLY PREJUDICIAL.

2           AND WE CERTAINLY NOW KNOW, WITH THE BACKDROP OF WHAT

3   OCCURRED AND THE EMOTIONS OF THIS CASE, THAT IT'S EVEN MORE

4   SIGNIFICANT THAT I THINK THAT MATTER BE CLEARED, AND, FRANKLY,

5   THAT MR. PRICE NOT BE ALLOWED TO CONTINUE TO MAKE REFERENCES TO

6   'CRIME DOESN'T PAY.'

7           THE JURY WILL BE INSTRUCTED ON THE MEASURE OF DAMAGES

8   AND THE APPROPRIATE STEPS THAT THEY SHOULD TAKE IN WEIGHING

9   THAT.

10          I'LL SUBMIT ON THAT.

11          **THE COURT:**  THANK YOU, COUNSEL.

12          MS. AGUIAR?

13          **MS. AGUIAR:**  REGARDING THE ISSUE OF THE DOLLS, I WAS

14  HANDED A COPY OF MATTEL'S OPPOSITION PROBABLY AROUND THE SAME

15  TIME THAT YOU WERE, AND I JUST WANT TO START BY SAYING, YOUR

16  HONOR, THAT WE FILED THE MOTION ON FRIDAY.  I WENT BACK AND

17  CHECKED WHAT THE BRIEFING SCHEDULES HAVE BEEN FOR MOTIONS THAT

18  HAVE BEEN FILED SINCE ABOUT THE MIDDLE OF JULY.  AND NO MATTER

19  WHOSE MOTION IT HAS BEEN, THE OTHER PARTY HAS PUT IN AN

20  OPPOSITION WITHIN NO MORE THAN 48 HOURS.

21          STARTING ON SUNDAY, WE ASKED MATTEL TO RESPOND TO

22  THIS AND WE STATED THAT WE THOUGHT IT WAS VERY SERIOUS AND THAT

23  WE THOUGHT THE EVIDENCE REGARDING ANY HONG KONG WITNESSES

24  SHOULD NOT PROCEED PRIOR TO YOUR HONOR BEING ABLE TO HEAR THIS

25  AND FULLY CONSIDER OUR MOTION.

```
 1          THE COURT NOR I DID NOT GET THIS UNTIL ABOUT FIVE
 2   MINUTES AGO.  THIS MOTION HAS BEEN ON FILE SINCE FRIDAY, AND
 3   WE'VE BEEN ASKING THEM SINCE EARLY SUNDAY AFTERNOON TO GET US
 4   THEIR OPPOSITION, GIVEN THE TIME EXIGENCIES INVOLVED.
 5          WE ARE NOT JUST ASKING FOR A CURATIVE INSTRUCTION.  I
 6   THINK THAT'S THE VERY LEAST OF WHAT SHOULD HAPPEN HERE.  I
 7   THINK THE COMBINATION OF THE FACT THAT THEY USED THE BLATANTLY
 8   WRONG DOLL IN OPENING AND THE FACT THAT IN OPENING, AS YOU'LL
 9   SEE FROM OUR MOTION, THEY ALSO MADE REFERENCE TO STATEMENTS
10   THAT WE SUPPOSEDLY MADE IN HONG KONG REGARDING COPYRIGHT, WHICH
11   WE DID NOT MAKE.  THEY ARE CONFLATING AND INTENTIONALLY
12   CONFUSING TWO SEPARATE BODIES OF HONG KONG LAW.
13          THE COURT:  BUT, COUNSEL, ISN'T THIS A TRIAL LAWYER'S
14   DREAM?
15          I MEAN, IF THIS IS TRUE -- AND I DON'T KNOW; I
16   HAVEN'T READ THE OPPOSITION; I RECEIVED IT THE SAME TIME YOU
17   DID -- BUT IF MATTEL HAS STOOD UP AND LIED TO THIS JURY, AND IF
18   MR. PRICE HAS USED WRONG DOCUMENTS AND MADE MISREPRESENTATIONS,
19   MR. NOLAN AND YOU, I TRUST, ARE GOING TO TAKE THAT AND
20   EMBARRASS THEM, HUMILIATE THEM, IN FRONT OF THIS JURY WITH
21   THOSE STATEMENTS IN YOUR CLOSING ARGUMENT AFTER YOU INTRODUCE
22   THE EVIDENCE SHOWING THIS.
23          I'M NOT SAYING THAT'S THE CASE, BUT HAVING BEEN A
24   TRIAL LAWYER ONCE MYSELF, I MEAN, THAT -- THIS JURY HAS BEEN
25   INSTRUCTED OVER AND OVER AND OVER AGAIN THAT STATEMENTS BY
```

1  LAWYERS ARE OF NO EVIDENTIARY VALUE.

2       HOWEVER, AS THIS COURT INDICATED AND ALLOWED IN THE

3  CLOSING ARGUMENTS FOR BOTH SIDES, YOU CAN CERTAINLY USE THOSE

4  OPENING STATEMENTS TO THOROUGHLY IMPEACH AND INDICT THE

5  OPPOSING SIDE IF THEY MADE A REPRESENTATION.

6       TO ME, THIS IS -- I DON'T SEE WHERE THIS IS SOMETHING

7  WHICH CAN -- IF TRUE -- AND I DON'T KNOW IF IT'S TRUE OR NOT; I

8  HAVEN'T READ THE OPPOSITION, SO I'M JUST GOING BASED ON YOUR

9  REPRESENTATION AT THIS POINT -- IF THIS IS TRUE, THIS MAY HAVE

10 BEEN THE BEST DEVELOPMENT IN THE OPENING STATEMENTS FOR MGA.  I

11 DON'T SEE HOW THIS IS NOT THE TYPE OF THING WHICH EVERY TRIAL

12 ATTORNEY IS MORE THAN CAPABLE OF CURING AND USING TO THEIR

13 TACTICAL AND STRATEGIC ADVANTAGE.

14      **MS. AGUIAR:**  I GUESS WHAT I WOULD SAY IN RESPONSE TO

15 THAT IS, WE CAN CERTAINLY DO THAT.  AND I HAVEN'T BEEN A TRIAL

16 LAWYER AS LONG AS MR. PRICE HAS, I'M SURE; BUT TO ME, THIS

17 SHOULDN'T TURN INTO 'LET'S SEE HOW ONE SIDE CAN TOTALLY USE

18 OPENING STATEMENT TO IMPUGN THE INTEGRITY OF MGA AND TO MAKE

19 STATEMENTS TO THIS JURY ABOUT WHAT MATTEL IS TRYING TO SUGGEST

20 ARE OUTRAGEOUS ARGUMENTS THAT WE MAY HAVE MADE IN OTHER

21 JURISDICTIONS AND COMPARISONS THAT MGA MAY HAVE MADE TO DOLLS

22 THAT LOOK NOTHING LIKE THE BRATZ DOLLS.'

23      AND TO PREJUDICE THIS JURY AGAINST US BEFORE WE'RE

24 EVEN OUT OF THE BOX IN PHASE 1-B -- I UNDERSTAND, YOUR HONOR;

25 I'M JUST SAYING, FOR US TO SPEND THE PRECIOUS FEW HOURS THAT WE

```
 1  HAVE IN 1-B BASICALLY TRYING TO SHOW THE JURY THAT WHAT
 2  MR. PRICE DID IN OPENING WAS WRONG AND WAS INCORRECT, I JUST
 3  DON'T THINK IS THE BEST USE OF OUR TIME.
 4       WE CAN CERTAINLY DO THAT.
 5       THE COURT:  IT MAY BE AMONGST THE MOST EFFECTIVE WORK
 6  THAT YOU DO IN 1-B.  IT WAS EXTRAORDINARILY EFFECTIVE IN 1-A
 7  WHEN MATTEL USED IT TO IMPEACH MGA WITNESSES.
 8       THIS TRIAL TURNS, IN LARGE MEASURE, ON CREDIBILITY,
 9  AND THE JURY HAS ALREADY WEIGHED IN ON CREDIBILITY IN LARGE
10  MEASURE.  AND LIKE I SAY, I DON'T KNOW WHAT THE TRUTH IS HERE.
11  I GIVE BOTH COUNSEL PRESUMPTION THAT WHAT THEY ARE DOING IN
12  THEIR OPENING STATEMENT IS HONEST, IS DONE IN GOOD FAITH, IS
13  REASONABLE.  IF THE EVIDENCE TURNS OUT THAT THEY WERE WRONG,
14  THERE'S A PRICE TO BE PAID WITH THE JURY, AND YOU HAVE CLOSING
15  ARGUMENT TO POINT THAT OUT.
16       AND, YES, IF I FIND THAT MR. PRICE INTENTIONALLY
17  INTRODUCED EVIDENCE -- IF WHAT YOU'RE SAYING IS TRUE, THAT HE
18  INTENTIONALLY -- THEN THAT'S AN EXTRAORDINARILY SERIOUS MEASURE
19  WHICH, QUITE FRANKLY, GOES BEYOND SIMPLY THIS TRIAL AND RAISES
20  AN ETHICAL CONCERN.
21       I WILL FULLY EXAMINE THAT BEFORE I MAKE A DECISION.
22  BUT THAT'S NOT SOMETHING I'M GOING TO DO ON THE FLY.  IT'S NOT
23  SOMETHING THAT I'M GOING TO DO WITH ONE OR TWO DAYS BRIEFING.
24  THAT'S AN EXTRAORDINARILY SERIOUS ALLEGATION THAT YOU'RE MAKING
25  ABOUT MR. PRICE AT THIS POINT.
```

```
 1              ONE OR TWO DAYS IS NOT -- THAT'S SOMETHING WHICH I
 2   WILL HAVE TO -- IF I COME TO THE CONCLUSION OR BELIEF THAT
 3   MR. PRICE DID WHAT YOU JUST SAID HE DID, THAT HE INTENTIONALLY
 4   LIED TO THIS JURY -- THAT IS AN EXTRAORDINARILY SERIOUS
 5   ALLEGATION, AND THE COURT WILL TREAT IT.  I'M NOT GOING TO
 6   TREAT IT IN SHORT SHRIFT OR DEAL WITH IT WITH A QUICK
 7   INSTRUCTION TO THE JURY AT THIS POINT.  THAT'S SOMETHING THAT
 8   WE WILL TAKE UP.
 9              I REALLY DON'T SEE THIS AS A HIGHLY PREJUDICIAL THING
10   AT THIS POINT THAT CANNOT BE FULLY CURED AND FULLY ADDRESSED IN
11   THE COURSE OF THIS TRIAL.
12              YOU HAVE LODGED A MAJOR ALLEGATION AGAINST MR. PRICE
13   PERSONALLY AT THIS POINT, AND I WILL FULLY EVALUATE THIS.
14         MS. AGUIAR:  I APPRECIATE YOU CONSIDERING THAT,
15   YOUR HONOR.
16              I WOULD SAY A COUPLE OF THINGS TO CLOSE OUT ON THIS,
17   THEN.
18              THEY CITE MR. KAMARCK'S TESTIMONY.
19              WHEN HE WAS SHOWN THAT DOCUMENT, HIS ANSWER WAS, 'I
20   HONESTLY CAN'T SAY ONE WAY OR THE OTHER.'  AND AS WE SAID IN
21   OUR PAPERS, WE ATTACHED IN OUR PAPERS -- ACTUALLY, WE INCLUDED
22   RIGHT IN OUR BRIEF THE TRENDY TEENS DOLL THAT WAS AT ISSUE IN
23   THAT CASE.  AND THEIR RESPONSE TO OUR MOTION SAYS NOWHERE THAT
24   THAT DOLL THAT HE SHOWED WAS THE RIGHT DOLL.
25              BUT SECONDLY, IT WAS NOT JUST THE USE OF THAT DOLL,
```

1   WHICH THEY HAVE NOT BEEN ABLE TO SAY TO YOUR HONOR WAS THE

2   CORRECT DOLL.  IT WAS THE WAY THAT THEY CHARACTERIZED THE

3   ARGUMENTS THAT WE MADE IN HONG KONG.  IT WAS WRONG.  THEY WERE

4   TAKING STATEMENTS THAT WE MADE UNDER THE HONG KONG DESIGN

5   REGISTRATION ORDINANCE AND CONFLATING IT WITH COPYRIGHT.  AND

6   THEY CAN SAY ALL THEY WANT THAT WE'RE TRYING TO REARGUE THE

7   ISSUE THAT WE BROUGHT TO YOUR HONOR'S ATTENTION BEFORE, BUT MY

8   POINT IS, WE DON'T EVEN HAVE THE FIRST WITNESS ON THE STAND IN

9   1-B AND THEY'VE ALREADY TAKEN THIS HONG KONG LITIGATION

10  MATERIAL AND COMPLETELY TWISTED IT.  AND WE DON'T EVEN HAVE A

11  WITNESS ON THE STAND YET.

12          SO WE HAVE BEEN IMPLORING YOUR HONOR TO UNDERSTAND

13  THAT THIS IS AN AREA THAT IS RIPE FOR CONFUSION OF THIS JURY

14  AND PREJUDICE TO MGA.  AND AS WE SET FORTH IN OUR PAPERS, THEY

15  MADE AN ALLEGATION THAT WE COMPARED SPECIFIC ELEMENTS OF THE

16  BRATZ DOLLS TO THE TRENDY TEENS DOLL.  WE DID THAT IN

17  CONNECTION WITH A CLAIM UNDER THE REGISTERED DESIGN ORDINANCE.

18  NOT UNDER COPYRIGHT.  AND WE CITED A CASE TO YOUR HONOR IN OUR

19  PAPERS.

20          **THE COURT:**  I'VE READ YOUR PAPERS, COUNSEL.

21          **MS. AGUIAR:**  THIS IS ONLY OPENING STATEMENT, AND

22  WE'RE ALREADY CONFUSING DIFFERENT BODIES OF LAW.  AND I

23  UNDERSTAND THAT YOUR HONOR HAS RULED THAT FACTUAL STATEMENTS

24  CAN COME IN.

25          **THE COURT:**  THREE TIMES, AS YOU POINT OUT IN YOUR

1    BRIEF.

2          **MS. AGUIAR:** I UNDERSTAND THAT. BUT YOU KNOW WHAT?

3    THEY HAVE TAKEN YOUR RULING AND ALREADY CREATED PREJUDICE WITH

4    IT.

5          **THE COURT:** LET'S SEE WHAT THE EVIDENCE SHOWS,

6    COUNSEL, AND WE WILL GET TO THE BOTTOM OF THIS.

7          MATTEL BROUGHT A MOTION TO DISQUALIFY YOUR FIRM FOR

8    ETHICAL MISCONDUCT. YOU HAVE NOW ACCUSED MR. PRICE OF ETHICAL

9    MISCONDUCT. I'M GOING TO TREAT YOUR ALLEGATION JUST AS

10   SERIOUSLY AS I TREATED MATTEL'S ALLEGATION. I'M NOT GOING TO

11   TREAT IT ANY LESS SERIOUSLY OR ANY MORE SERIOUSLY OR GIVE IT

12   ANY SHORTER OR LONGER SHRIFT. IT WILL BE ADDRESSED.

13         THE RULING ON THE FOREIGN LITIGATION REMAINS THE

14   SAME. I UNDERSTAND THE POTENTIAL FOR CONFUSION. I UNDERSTAND

15   THE POTENTIAL FOR PREJUDICE. THAT IS WHY I'M EXCLUDING ALL OF

16   THE LEGAL STATEMENTS, ALL OF THE LEGAL CONCLUSIONS, ALL OF THE

17   LEGAL OPINIONS, FROM THE FOREIGN LITIGATION.

18         THE FACTUAL STATEMENTS, THE FACTUAL AVERMENTS THAT

19   ARE MADE, ARE STATEMENTS -- ARE ADMISSIONS OF A PARTY OPPONENT,

20   WHICH YOU CANNOT HIDE FROM; YOUR CLIENT CANNOT HIDE FROM AT

21   THIS POINT. AND THAT'S THE DIVIDING LINE IN THIS. I'VE

22   ARTICULATED THAT, AS YOU POINT OUT, NOW THREE TIMES; AND THAT

23   IS GOING TO BE WHAT I'M GOING TO USE TO DETERMINE THE EVIDENCE.

24         **MS. AGUIAR:** I APPRECIATE THAT.

25         **THE COURT:** THAT'S WHAT THE JURY IS GOING TO DECIDE

1   THIS CASE ON. AND I'M ABOUT TO REMIND THEM IN 30 SECONDS THAT

2   THAT'S EXACTLY -- AND NOT THE OPENING STATEMENT AND NOT

3   STATEMENTS BY LAWYERS OR OBJECTIONS OR ANY OF THE OTHER

4   SHENANIGANS THAT GO ON. IT'S JUST THE EVIDENCE. AND I HAVE

5   CONFIDENCE THAT THAT'S WHAT THIS JURY IS DOING.

6              **MS. AGUIAR:** THANK YOU.

7              **THE COURT:** THANK YOU, COUNSEL.

8              **MR. PRICE:** IF I COULD RESPOND BRIEFLY TO THE THIEF

9   SECTION. AND I CERTAINLY WELCOME ANY INQUIRY AS TO WHETHER OR

10  NOT I BEHAVED ETHICALLY. BUT THE ONE THAT I GUESS WE STILL ARE

11  ADDRESSING IS THE 'CRIME DOESN'T PAY.'

12             MR. NOLAN CERTAINLY CAN'T DENY WHAT I SAID, WHICH IS

13  THAT IN THE FIRST FEW MOMENTS OF MY OPENING, I SAID 'THIS IS A

14  VARIANCE OF THE QUESTION, DOES CRIME PAY?'

15             NOW HE'S ARGUING THAT THE ARGUMENT IS INAPPROPRIATE.

16  AND AS THE COURT KNOWS -- YOU'VE READ PLENTY OF IP CASES. THEY

17  REFER TO THEFT.

18             **THE COURT:** I UNDERSTAND.

19             MR. PRICE, ALL I'M GOING TO DO IS MAKE REFERENCE TO

20  THE METAPHOR THAT YOU USED AND JUST REMIND THE JURY THAT THIS

21  IS A CIVIL CASE, NOT A CRIMINAL CASE; THE BURDEN OF PROOF IS

22  PREPONDERANCE OF THE EVIDENCE; NOT PROOF BEYOND A REASONABLE

23  DOUBT; NO ONE HAS BEEN ACCUSED OF A CRIMINAL OFFENSE; THESE ARE

24  STATE TORT CLAIMS. AND I'M GOING TO LEAVE IT AT THAT.

25             **MR. PRICE:** I THINK TO BE FAIR, YOU HAVE TO SAY THAT

```
 1   HE WAS ACCUSED OF COMMITTING AN ACT WHICH WOULD BE A CRIME AND
 2   THAT I'M PERMITTED TO CHARACTERIZE IT AS A THEFT, AS A CRIME.
 3   OTHERWISE, THEY ARE GOING TO THINK, WHENEVER I GET UP IN
 4   CLOSING, OR MR. QUINN DOES, AND SAY, 'LOOK, YOU FOUND THAT HE
 5   BASICALLY STOLE THESE MATERIALS; HE CONVERTED THEM; HE
 6   KNOWINGLY USED MATTEL'S PROPERTY.  THAT'S THEFT.'
 7           THERE ARE PLENTY OF CASES CHARACTERIZING THAT AS
 8   THEFT.
 9           THE COURT:  I'M NOT FAULTING YOUR ARGUMENT AT ALL,
10   PRECISELY FOR THE REASONS THAT YOU JUST STATED.  THE METAPHOR
11   IS APPROPRIATE.  THE ONLY VALID CONCERN THAT I AM CONCERNED
12   ABOUT IS THE CONFUSION ISSUE.  I DON'T WANT THIS JURY -- AND
13   I'VE ALREADY INSTRUCTED THEM ON THIS TO A CERTAIN EXTENT.  IT'S
14   SIMPLY REMINDING THEM THAT THE BURDEN OF PROOF HERE IS
15   PREPONDERANCE OF THE EVIDENCE.  NOT PROOF BEYOND A REASONABLE
16   DOUBT.  IT'S A CIVIL CASE; IT'S NOT A CRIMINAL CASE.
17           I JUST DON'T WANT THERE TO BE ANY CONFUSION ON THAT
18   POINT.
19           THE METAPHOR IS WHOLLY APPROPRIATE.
20           MR. PRICE:  I UNDERSTAND.
21           I WOULD REQUEST THE COURT TO SAY THAT THE METAPHOR IS
22   APPROPRIATE.  BECAUSE THE COURT KNOWS, AND MR. NOLAN KNOWS,
23   THAT THEY WERE NOT CONFUSED; THEY KNOW THEY DIDN'T CONVICT HIM
24   OF A CRIME; THEY KNOW THAT HE'S NOT GOING TO JAIL.
25           THE ONLY REASON THEY WANT THIS INSTRUCTION IS BECAUSE
```

```
 1   IT SUGGESTS THAT THE METAPHOR WAS INAPPROPRIATE.  AND I THINK,

 2   BECAUSE OF THAT SUGGESTION, IT'S INAPPROPRIATE FOR THE COURT TO

 3   GIVE THAT INSTRUCTION WHEN IT IS UNDISPUTED THEY ARE NOT

 4   CONFUSED.  THERE'S NO EVIDENCE THEY COULD HAVE BEEN CONFUSED BY

 5   THAT.

 6        SO THE COURT SAYING, 'MR. PRICE, IN THE OPENING, MADE

 7   A REFERENCE TO A CRIME.  I JUST WANT TO REMIND THE JURY

 8   THAT' -- IT SUGGESTS I DID SOMETHING WRONG WHEN I DIDN'T.

 9   THERE'S NO NEED TO GIVE THAT INSTRUCTION, BECAUSE THEY KNOW,

10   AND THEY HAVE BEEN TOLD NUMEROUS TIMES, WHAT THE BURDEN OF

11   PROOF IS.

12        THE COURT:  I DON'T BELIEVE YOU DID ANYTHING WRONG,

13   MR. PRICE, BY USING THAT METAPHOR, GIVEN THE CONTEXT OF THIS

14   CASE, GIVEN THE FINDINGS OF THE JURY IN PHASE 1-A.

15        I DO RECOGNIZE THE CONCERN RAISED BY MGA, SO I'LL TRY

16   TO WORD THIS IN SUCH A WAY AS TO MAKE BOTH OF THOSE THINGS

17   PERFECTLY CLEAR.

18        MR. PRICE:  VERY WELL.

19        THE COURT:  THANK YOU, COUNSEL.

20        MR. QUINN:  YOUR HONOR, WITH RESPECT TO THE TOY

21   STORE, WHICH, I GUESS, IS UPSTAIRS, AND HOW TO DEAL WITH THE

22   ADMISSION OF ALL OF THOSE PRODUCTS, THE PARTIES DO HAVE A

23   STIPULATION.

24        THE COURT:  WHY DON'T YOU STATE THAT ON THE RECORD,

25   COUNSEL.
```

```
 1              ACTUALLY, WHY DON'T YOU STATE THAT BEFORE THE JURY.
 2         MR. QUINN:  YES.  WE'VE STIPULATED.  AND I HAVE A
 3   COPY FOR THE COURT.
 4         THE COURT:  PROVIDE THAT TO THE COURT BEFORE I BRING
 5   THE JURY OUT.  THEN I'M GOING TO BRING THE JURY OUT AND TRY TO
 6   GET THROUGH THESE INSTRUCTIONS AND GET ON WITH THIS TRIAL.
 7         MR. QUINN:  ONE OTHER THING, THOUGH.  WE HAVE THIS
 8   CUSTODIAN OF RECORDS ON THE STAND, YOUR HONOR.  TO DO THIS, WE
 9   WERE REQUIRED TO PUT A LIVE BODY ON THE STAND.  WE'RE DONE NOW,
10   AND THESE WILL ALL COME IN.
11         THE COURT:  MGA HAS ALREADY ASKED FOR LEAVE TO RECALL
12   THAT WITNESS, TO CROSS-EXAMINE THEM.  I ALREADY PROVIDED THAT
13   TO THEM.
14         MR. QUINN:  IN THEIR CASE, AS I UNDERSTAND IT.
15         THE COURT:  WELL, IF THEY WANT TO CALL THEM AT THE
16   END OF THIS --
17         MR. QUINN:  YOUR HONOR, THE PROBLEM I HAVE WITH THIS
18   IS, WE DID NOT WANT TO START OUR CASE WITH A CUSTODIAN OF
19   RECORDS, BUT WE WERE REQUIRED TO PUT A LIVE BODY UP THERE.  WE
20   NOW HAVE A STIPULATION.  WHAT'S GOING TO HAPPEN IS, OUR
21   CASE-IN-CHIEF STARTS OUT WITH A SUBSTANTIVE -- THE ONLY
22   SUBSTANTIVE EXAMINATION IS NOW BY MGA.  THEY COULD HAVE CALLED
23   ANYBODY.  THEY'VE CALLED SOMEBODY WHO'S HEAD OF THEIR
24   OPERATIONS, AND THEY NOW WANT TO DO A SUBSTANTIVE EXAM AT THE
25   START OF OUR CASE ON APPORTIONMENT, ON INFRINGEMENT, ON OTHER
```

1   ISSUES. AND THAT JUST DOESN'T SEEM TO BE FAIR.

2         **THE COURT:** COUNSEL, THE COURT HAS, THROUGHOUT THIS

3   ENTIRE TRIAL, ALLOWED CROSS-EXAMINATION TO FOLLOW, AND I HAVE

4   ALLOWED CROSS-EXAMINATION TO INCLUDE SUBSTANTIVE DIRECT

5   EXAMINATION.

6         **MR. QUINN:** BUT HERE, THE DIRECT IS NOT SUBSTANTIVE

7   AT ALL. THEY COULD HAVE CHOSEN ANYBODY. WE SAID, 'YOU HAVE TO

8   PUT A LIVE BODY UP.' THEY REQUIRED US TO DO IT IN ORDER TO GET

9   IN THESE HUNDREDS AND HUNDREDS OF PRODUCTS. THEY COULD HAVE

10   PUT UP ANYBODY. THEY PUT SOMEBODY UP THERE NOW -- THIS IS, I

11   SUBMIT, A DIFFERENT CASE THAN ALL OF THE OTHERS THAT THE COURT

12   HAS FACED. WE HAVE NO SUBSTANTIVE EXAMINATION OF THIS WITNESS.

13   WE'RE DONE NOW. IN FACT, WE HAVE A STIPULATION NOW THAT

14   OBVIATED THE NEED TO CALL HER AT ALL. SO THEY WANT TO START

15   OUR CASE BY STARTING TO PUT IN THEIR CASE.

16         THIS IS KIND OF A DIFFERENT CIRCUMSTANCE.

17         IT JUST DOESN'T SEEM FAIR, YOUR HONOR.

18         **THE COURT:** MS. AGUIAR?

19         **MS. AGUIAR:** WE SEEM TO BE CAUGHT BETWEEN A ROCK AND

20   A HARD PLACE ALWAYS WITH MR. QUINN, BECAUSE IF WE HAD OFFERED A

21   WITNESS THAT WAS NOT SOMEONE WHO HAD SUBSTANTIVE KNOWLEDGE OF

22   THESE PRODUCTS, WE PROBABLY WOULD HAVE BEEN TAKEN TO TASK FOR

23   THAT.

24         WE HAVE OFFERED AS A CUSTODIAN OF THESE DOCUMENTS THE

25   PERSON THAT IS MOST LOGICAL TO DO THAT, THE DIRECTOR OF

```
 1   OPERATIONS AT MGA WHO'S FAMILIAR WITH ALL OF THESE PRODUCTS.
 2           I DON'T KNOW WHERE MR. QUINN GETS THE IDEA THAT I'M
 3   GOING TO DO AN EXTENSIVE EXAMINATION REGARDING INFRINGEMENT.
 4   BUT I DO PLAN TO ASK HER SEVERAL QUESTIONS.  WE'VE ADDRESSED
 5   THIS AT SIDE-BAR.
 6           THE COURT:  HOW LONG DO YOU THINK THOSE QUESTIONS
 7   WILL LAST?
 8           MS. AGUIAR:  10, 15 MINUTES.
 9           THE COURT:  VERY WELL.
10           WE'RE DONE WITH THIS.
11           DO I HAVE THAT STIPULATION?
12           MR. QUINN:  YES, YOUR HONOR.
13           THE COURT:  LET'S BRING THE JURY IN.
14           (WHEREUPON, A BRIEF RECESS WAS HELD.)
15           (WHEREUPON, JURORS ENTER COURTROOM.)
16           THE COURT:  WE'RE NOW BACK ON THE RECORD WITH THE
17   JURY PRESENT.  I WANT TO THANK ALL OF THE MEMBERS OF THE JURY
18   FOR BEING HERE PROMPTLY THIS MORNING.
19           THERE'S A FEW MATTERS I WANT TO ADDRESS WITH YOU.
20           FIRST, AND MOST SIGNIFICANTLY, OF COURSE, IS, WE'VE
21   LOST ONE OF THE JURORS.  THE COURT EXCUSED JUROR NUMBER 8.  I
22   KNOW THAT YOU ARE ALL FAMILIAR WITH THE CIRCUMSTANCES THAT LED
23   TO THE COURT'S EXCUSAL OF JUROR NUMBER 8.  CERTAIN EXTRANEOUS
24   AND VERY INAPPROPRIATE STATEMENTS WERE MADE BY THE JUROR.  IT
25   WAS BROUGHT TO THE COURT'S ATTENTION BY YOU.  I KNOW THAT YOU
```

```
 1   INSTRUCTED AND ADMONISHED THAT JUROR THAT IT HAD NO PLACE IN
 2   YOUR DELIBERATIONS.
 3          I WANT YOU TO KNOW THAT THE COURT, THE PARTIES,
 4   MATTEL, MGA, MR. LARIAN -- WE ALL HAVE COMPLETE CONFIDENCE IN
 5   NOT ONLY YOUR ABILITY BUT YOUR INTEGRITY AND YOUR COMMITMENT
 6   NOT TO LET ANY STATEMENT BY THAT JUROR AFFECT YOUR
 7   DELIBERATIONS.  WE'RE ALL VERY CONFIDENT THAT THEY DID NOT
 8   AFFECT YOUR DELIBERATIONS, BASED ON MY INTERVIEWS WITH EACH ONE
 9   OF YOU; SO WE ARE VERY CONFIDENT IN PROCEEDING FORWARD IN THIS
10   TRIAL.
11          IT'S ALWAYS UNFORTUNATE WHEN WE HAVE TO EXCUSE A
12   JUROR, AND I APOLOGIZE FOR THE PROCESS THAT WE HAD TO GO
13   THROUGH LAST FRIDAY; BUT I KNOW THAT YOU ALL APPRECIATE THE
14   SIGNIFICANCE AND THE IMPORTANCE OF MAKING SURE THAT THOSE TYPES
15   OF STATEMENTS HAVE NO ROLE IN THE DELIBERATION PROCESS.  I
16   APPRECIATE VERY MUCH YOUR DILIGENCE ON THAT MATTER.
17          AND, OF COURSE, GOING FORWARD, I ALSO AM CONVINCED OF
18   YOUR COMMITMENT TO NOT LET ANYTHING THAT HAPPENED LAST FRIDAY,
19   OR WITH RESPECT TO JUROR NUMBER 8, AFFECT HOW YOU VIEW EITHER
20   PARTY; THAT YOUR DECISION IN THIS PHASE OF THE TRIAL, THIS
21   SECOND AND FINAL PHASE OF THE TRIAL, WILL BE BASED STRICTLY ON
22   THE EVIDENCE, THE TESTIMONY THAT YOU HEAR, AND THE EXHIBITS
23   THAT ARE ENTERED INTO.  NOT ON THE LIKES OR DISLIKES OR ANY
24   OTHER EXTRANEOUS THOUGHTS OR PRECONCEIVED NOTIONS.  AND THAT
25   YOU WILL CONTINUE NOT TO READ ANYTHING ABOUT THIS CASE, NOT
```

```
 1   LISTEN TO OR HEAR ANYTHING ABOUT THIS CASE, NOT DISCUSS THIS
 2   CASE WITH ANYBODY, BUT THAT THE EVIDENCE THAT YOU HAVE BEFORE
 3   YOU AND NOTHING ELSE WILL DETERMINE YOUR DECISION.
 4              I ALSO WANT TO REEMPHASIZE THAT ANYTHING THAT THE
 5   LAWYERS STATED IN THEIR OPENING STATEMENTS SHOULD BE OF NO
 6   MOMENT TO YOU AT THIS POINT IN TERMS OF EVIDENCE.  THOSE WERE
 7   SIMPLY ROAD MAPS.  THOSE WERE STATEMENTS BY THE LAWYERS AS TO
 8   WHAT THEY THINK THE EVIDENCE MAY SHOW IN THIS PHASE OF THE
 9   TRIAL.  AS YOU LEARNED IN THE LAST PHASE, IT'S THE EVIDENCE
10   THAT ULTIMATELY CONCERNS AND YOUR UNDERSTANDING OF IT.
11              I DO WANT TO MAKE TWO BRIEF COMMENTS ON THE OPENING
12   STATEMENT.
13              SOMETIMES, AS YOU KNOW, THE COURT HAS GIVEN YOU
14   PARTICULAR INSTRUCTIONS.  THERE WAS A STATEMENT BY MGA, BY
15   MR. NOLAN, THAT MATTEL HAD VALUED THEIR TORT CLAIMS TO THE
16   COURT AS $75,000.  THAT WAS SIMPLY A MISTAKE.  THAT IS NOT THE
17   CASE, AND THAT SHOULD BE DISREGARDED BY YOU, THAT PARTICULAR
18   STATEMENT.
19              THERE WAS A METAPHOR THAT MR. PRICE USED ABOUT CRIME:
20   'CRIME DOESN'T PAY.'
21              IT'S ENTIRELY UP TO YOU AS TO WHETHER OR NOT A
22   METAPHOR WORKS OR DOESN'T WORK.  THE COURT IS NOT SUGGESTING
23   THAT IT'S INAPPROPRIATE.  THE COURT IS SIMPLY MAKING NOTE OF
24   THE FACT THAT THIS IS A CIVIL CASE, NOT A CRIMINAL CASE.  I
25   DIDN'T WANT YOU TO BE CONFUSED BY THAT AS TO SUGGEST THAT THIS
```

1    MIGHT BE A CRIMINAL CASE, WHERE THE STANDARD IS PROOF BEYOND A

2    REASONABLE DOUBT.  IN A CIVIL CASE, IT'S PROOF BY A

3    PREPONDERANCE OF THE EVIDENCE, AS I PREVIOUSLY INSTRUCTED TO

4    YOU.

5             AS FOR THE METAPHOR ITSELF, OR ANY OTHER METAPHORS OR

6    ALLEGORIES OR STORIES THAT ARE USED, THOSE ARE THINGS THAT

7    LAWYERS CAN PROPERLY USE TO TRY TO CONVEY TO YOU THEIR

8    POSITIONS, AND IT'S ENTIRELY UP TO YOU TO DETERMINE WHETHER THE

9    METAPHOR FITS OR DOESN'T FIT.

10            SO WITH THOSE COMMENTS IN MIND, WE'RE GOING TO RESUME

11   THE TRIAL.

12            THE FIRST THING THAT WE'RE GOING TO DO THIS MORNING

13   IS RATHER UNUSUAL.  WE'RE ACTUALLY GOING TO GO TO ANOTHER

14   COURTROOM TO OBSERVE CERTAIN EXHIBITS, ACTUALLY A LOT OF

15   EXHIBITS, THAT HAVE BEEN INTRODUCED BY STIPULATION.  I'M GOING

16   TO ENTERTAIN A STIPULATION FROM THE PARTIES IN JUST A MOMENT TO

17   INTRODUCE ALL OF THOSE PRODUCTS THAT WE STARTED TO INTRODUCE

18   LAST WEEK, A WEEK AGO.  INSTEAD OF BRINGING THE PRODUCTS TO

19   YOU, WE'VE SET THEM UP IN AN EMPTY COURTROOM.  WE'RE GOING TO

20   BRING YOU TO THE PRODUCTS.

21            I'M GOING TO BRING YOU UP IN A SECURED WAY.  YOU'RE

22   GOING TO ACCOMPANY ME UP TO THE COURTROOM THE BACK WAY, THROUGH

23   THE JUDGE'S ELEVATOR, UP TO THAT COURTROOM.  WHEN WE GET UP

24   THERE, THE LAWYERS WILL BE SEATED.  THE PRESS AND THE AUDIENCE

25   ARE WELCOME TO ATTEND AS WELL.  NOBODY IS GOING TO SAY

1   ANYTHING.  YOU'RE GOING TO BE FREE TO WALK AMONGST THE PRODUCTS
2   AND TAKE A LOOK.

3           THE ONE THING I'M GOING TO ADMONISH YOU, THOUGH, IS
4   TO NOT DISCUSS THE MATTERS WITH EACH OTHER.  AND THIS IS NOT
5   GOING TO BE AN EASY THING TO DO, BECAUSE YOU'RE GOING TO SEE A
6   LOT OF PRODUCTS; THERE'S GOING TO BE A LOT OF TOYS UP THERE;
7   AND IT MAY BE NATURAL TO POINT OUT SOMETHING, OR WHATEVER.
8   TAKE AS LONG AS YOU WANT.  IT'S ENTIRELY UP TO YOU.

9           AND JUST SO YOU KNOW GOING FORWARD, AT THE END OF
10  THIS PHASE OF THE TRIAL, WHICH I GUARANTEE YOU IT WILL BE DONE,
11  ABSENT SOME EXTRAORDINARY CIRCUMSTANCE, IN THE NEXT TWO
12  WEEKS -- YOUR DELIBERATIONS ARE GOING TO TAKE PLACE IN THE JURY
13  ROOM ATTACHED TO THAT COURTROOM UPSTAIRS, AND THOSE EXHIBITS
14  ARE GOING TO REMAIN ON DISPLAY IN THAT COURTROOM SO THAT IN THE
15  COURSE OF THE DELIBERATIONS, IF YOU NEED TO SEE ANY OF THOSE
16  PRODUCTS, YOU WILL BE ABLE TO GO, ESCORTED BY THE BAILIFF, INTO
17  THAT COURTROOM, WHERE YOU'LL BE ABLE TO LOOK AT THEM AGAIN.

18          SO THIS IS NOT GOING TO BE THE ONLY TIME YOU'RE GOING
19  TO BE ABLE TO SEE THEM.  LIKE ALL OTHER EXHIBITS, THEY ARE
20  GOING TO BE INTRODUCED PURSUANT TO STIPULATION; THEY'RE GOING
21  TO BE AVAILABLE FOR YOUR INSPECTION.  BUT, AGAIN, INSTEAD OF
22  TRYING TO FIT ALL OF THOSE TOYS INTO THE JURY DELIBERATION
23  ROOM, I'M GOING TO LEAVE THEM SET UP IN THAT COURTROOM.  WE'RE
24  GOING TO HAVE YOU DELIBERATE UP THERE BECAUSE THE COURT HAS TO
25  START ANOTHER TRIAL HERE AND THERE WILL BE ANOTHER JURY USING

1    YOUR DELIBERATION ROOM. THAT WAY, YOU CAN USE THEM, THEY'RE

2    CONVENIENT, THEY'RE CLOSE TO YOU, AND THEY WILL BE AVAILABLE TO

3    YOU.

4          SO THAT'S WHAT WE'RE GOING TO DO.

5          AT THIS TIME, I'M GOING TO ASK COUNSEL TO SET FORTH

6    ON THE RECORD THE STIPULATION CONCERNING THESE VARIOUS

7    EXHIBITS.

8          **MR. QUINN:** MGA ENTERTAINMENT, INC.; MGA HK LIMITED;

9    AND ISAAC LARIAN, THE MGA PARTIES, ON THE ONE HAND, AND MATTEL,

10   INC., ON THE OTHER HAND, BY AND THROUGH THEIR COUNSEL OF

11   RECORD, HEREBY STIPULATE AS FOLLOWS:

12         ONE:  MATTEL AND MGA OFFER THE BRATZ DOLLS AND OTHER

13   MGA PRODUCTS IDENTIFIED IN THE ATTACHED EXHIBIT A INTO

14   EVIDENCE.

15         AND, YOUR HONOR, THAT EXHIBIT A HAS BEEN PROVIDED TO

16   THE COURT.  IT'S THE LIST OF PRODUCTS AND EXHIBIT NUMBERS.

17         TWO:  THE BRATZ DOLLS AND OTHER MGA PRODUCTS

18   INTRODUCED AT TRIAL ARE A REPRESENTATIVE SAMPLE OF ALL BRATZ

19   DOLLS AND OTHER MGA PRODUCTS, INCLUDING LICENSED PRODUCTS.

20         THREE:  THE MGA PARTIES WILL NOT CONTEND THAT MATTEL

21   HAS FAILED TO MEET ITS BURDEN IN ANY RESPECT BY FAILING TO

22   INTRODUCE OTHER BRATZ DOLLS OR MGA PRODUCTS, INCLUDING LICENSED

23   PRODUCTS.

24         FOUR:  THESE STIPULATED FACTS SHALL BE READ TO THE

25   JURY.

```
 1              THE COURT:  VERY WELL.

 2          AND WITH RESPECT TO EXHIBIT A, WHICH HAS ALL OF THE

 3   EXHIBITS -- AS I UNDERSTAND IT, THOSE ARE ALL OF THE EXHIBITS

 4   THAT ARE IN COURTROOM NUMBER 4 OF THIS COURTHOUSE.  THE

 5   PARTIES, I KNOW, HAVE SPENT A LOT OF TIME REVIEWING THOSE

 6   PRODUCTS, AND BOTH PARTIES ARE REPRESENTING TO THE COURT THAT

 7   LIST AND THOSE PRODUCTS CORRESPOND.

 8          IS THAT CORRECT?

 9          MR. QUINN:  THAT'S CORRECT, YOUR HONOR.

10          THE COURT:  FROM MGA, YOU JOIN IN THE STIPULATION, AS

11   WELL AS THE REPRESENTATION CONCERNING THE PRODUCTS?

12          MS. AGUIAR:  WE DO.

13          THE COURT:  VERY WELL.

14          AT THIS TIME, COUNSEL ARE INVITED TO COME UP TO THE

15   COURTROOM.  THE VERY FIRST ROW, THE FIRST BENCH, IS FOR

16   COUNSEL, AND THEN EVERYTHING BEHIND THAT IS FOR EVERYBODY ELSE.

17   I KNOW IT'S GOING TO BE A LITTLE BIT CROWDED, BUT WE'RE GOING

18   TO GO UP.  YOU SHOULD USE THE ELEVATOR OUT HERE, THE PUBLIC

19   ELEVATORS.  GO TO THE FOURTH FLOOR.  AGAIN, THE FIRST ROW IS

20   FOR COUNSEL, AND THEN EVERYTHING BEHIND THAT WILL BE OPEN.

21          NOBODY IS TO SAY ANYTHING DURING THIS PROCESS,

22   INCLUDING THE JURORS.  AND WHEN THE JURORS ARE FINISHED

23   LOOKING, THEY CAN HAVE A SEAT IN THE JURY BOX IN THAT ROOM.

24   ONCE ALL OF THE JURORS HAVE SEATED DOWN, I'LL THEN ESCORT YOU

25   BACK DOWN HERE AND WE'LL RESUME WITH TESTIMONY.
```

1          WE'RE IN RECESS AS WE MOVE.

2          (WHEREUPON, A BRIEF RECESS WAS HELD.)

3          **THE COURT:**  WE'RE BACK IN OPEN COURT ON THE RECORD.

4  IS THERE ANY FURTHER EXAMINATION FROM MATTEL ON THIS PARTICULAR

5  WITNESS RELATED TO THE PRODUCTS?

6          **MR. QUINN:**  NO, YOUR HONOR.

7          **THE COURT:**  VERY WELL.

8          MGA MAY PROCEED WITH THE EXAMINATION.

9          **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

10  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

11  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

12  HELP YOU GOD.

13          **THE WITNESS:**  YES.

14          **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

15  YOUR LAST NAME FOR THE RECORD.

16          **THE WITNESS:**  NINETTE PEMBLETON

17          **THE COURT:**  YOU MAY PROCEED, COUNSEL.

18          **MS. AGUIAR:**  THANK YOU.

19                          **EXAMINATION**

20  **BY MS. AGUIAR:**

21  Q    GOOD MORNING.

22          CAN YOU REMIND THE JURY, CAN YOU STATE YOUR NAME FOR

23  THE RECORD, PLEASE.

24  A    YES.  MY NAME IS NINETTE PEMBLETON.

25  Q    AND YOU WERE LAST HERE ABOUT A WEEK AND A HALF AGO; SO IF

1   YOU COULD REMIND THE JURY, BY WHOM ARE YOU CURRENTLY EMPLOYED?

2   A    MGA.

3   Q    AND WHAT IS YOUR POSITION AT MGA?

4   A    MY POSITION IS VICE PRESIDENT OF OPERATIONS.

5   Q    YOU SAID YOU WERE THE VICE PRESIDENT OF OPERATIONS.

6   A    CORRECT.

7   Q    HOW LONG HAVE YOU HELD THAT POSITION?

8   A    I'VE HELD THAT POSITION FOR ALMOST THREE YEARS NOW.

9   Q    I DON'T KNOW IF YOU'RE AWARE, BUT THE JURY WAS JUST UP IN

10  THE COURTROOM LOOKING AT ALL OF THE PRODUCTS.

11        HAVE YOU HAD THE CHANCE TO GO UP AND LOOK AT THE

12  PRODUCTS IN THAT ROOM?

13  A    PREVIOUSLY, I DID.

14  Q    AND THOSE ARE PRODUCTS IN THE ROOM THAT ARE BRATZ DOLLS

15  AND OTHER PRODUCTS THAT HAVE BEEN DEVELOPED AND MANUFACTURED BY

16  MGA; IS THAT CORRECT?

17  A    THAT IS CORRECT.  THERE MAY HAVE BEEN A FEW THAT WERE

18  LICENSED PRODUCTS.

19  Q    CORRECT; AND WE'LL GET TO THAT; THANKS FOR THAT

20  CLARIFICATION.

21        SO WHAT I WANT TO DO THIS MORNING IS SPEND A FEW

22  MINUTES WALKING THROUGH THE DIFFERENT PRODUCTS TO EXPLAIN TO

23  THE JURY WHAT THEY JUST SAW IN THE ROOM.

24        AND YOUR HONOR, IS IT OKAY IF I USE THIS MICROPHONE

25  SO I'M MORE MOBILE?

```
 1              THE COURT:  YOU MAY.

 2              MS. AGUIAR:  I WANT TO START BY SHOWING YOU FOUR

 3    EXHIBITS THAT MOST OF THE FOLKS ON THE JURY HAVE SEEN BEFORE;

 4    IT'S EXHIBIT 17558, 12286, 17551, AND 17561.

 5    BY MS. AGUIAR:

 6    Q    CAN YOU DESCRIBE TO THE JURY WHAT WE'RE SEEING HERE IN

 7    THESE FOUR EXHIBITS I JUST PUT IN FRONT OF YOU?

 8    A    THESE ARE THE FIRST GENERATION BRATZ DOLLS THAT WERE

 9    INTRODUCED.

10    Q    AND IS THAT HOW THEY ARE REFERRED TO, JUST COLLOQUIALLY,

11    WITHIN MGA?

12    A    THE ORIGINAL DOLLS; THE FOUR GIRLS.

13    Q    AND WHEN DID THESE DOLLS FIRST COME TO THE MARKET?

14    A    THESE CAME TO MARKET IN THE LATTER PART OF 2001.

15    Q    AND JUST TO REMIND US ALL, WHAT ARE THE NAMES OF THE FOUR

16    DOLLS?

17    A    CLOE, JADE, YASMINE AND SASHA.

18    Q    IS IT CORRECT THAT MGA LATER CAME UP WITH DIFFERENT DOLLS

19    BY DIFFERENT NAMES?  IN OTHER WORDS, CREATED DIFFERENT

20    CHARACTERS?

21    A    YES; THAT'S CORRECT.

22    Q    WERE DOLLS INTRODUCED IN YEARS AFTER 2001?

23              IN OTHER WORDS, AFTER THE FIRST GENERATION DOLLS CAME

24    OUT?

25    A    YES.  DOLLS WERE INTRODUCED EACH YEAR, TWICE A YEAR, MAYBE
```

```
 1   MORE, AND STILL TO THIS DAY ARE BEING INTRODUCED.
 2   Q    SO IN WHAT PART OF THE YEAR ARE THOSE DOLLS TYPICALLY
 3   INTRODUCED?
 4   A    WELL, THE MARKET BASICALLY HAS TWO MAIN SEASONS, WHICH IS
 5   A STRING LAUNCH AND A FALL LAUNCH.  THE SPRING LAUNCH USUALLY
 6   HITS SHELVES BY JANUARY, BEGINNING OF THE YEAR.  THERE'S AN
 7   OPPORTUNITY THEN FOR WHAT THEY CALL A RESET OR AN OPPORTUNITY
 8   TO PUT NEW PRODUCTS ON THE SHELVES IN MARCH.
 9        BUT THE SECOND BIG INTRODUCTION, WHICH IS THE BIGGEST
10   ONE FOR THE TOY INDUSTRY, IS THE FALL AND THAT'S AUGUST 1ST ON
11   SHELF; AND THEN THERE'S A SUBSEQUENT OCTOBER RESET.
12   Q    GREAT.
13        HAS MGA, TO YOUR KNOWLEDGE, INTRODUCED DIFFERENT
14   BRATZ DOLLS TWICE A YEAR SINCE THE FIRST GENERATION DOLLS?
15   A    CONTINUALLY.
16   Q    I JUST WANT TO SHOW YOU A COUPLE OF EXAMPLES AND TALK
17   ABOUT THEM.  LET'S START WITH 17582.
18        WHAT ARE WE LOOKING AT HERE?
19   A    THIS IS A BRATZ WINTER WONDERLAND DOLL; IT WAS ONE OF THE
20   FIRST THINGS WE CAME OUT WITH AFTER WE JUMPED FROM THE 14.99
21   PRICE POINT INTO A HIGHER PRICE POINT.
22   Q    CAN YOU EXPLAIN TO ME WHAT YOU JUST SAID?  YOU WERE
23   JUMPING FROM --
24   A    THIS IS A WINTER WONDERLAND DOLL; IT WAS ONE OF THE
25   THEMES.  AND BY "THEMES" WHAT WE MEAN IS THAT WE COME OUT WITH
```

1  DIFFERENT PREMISES THAT WE BASE THE FASHION OR THE THOUGHT OF

2  THE DOLL AROUND.  THIS, AS YOU CAN SEE, IS WINTERTIME; IT'S

3  BASED AROUND SKIING, SNOW FUN, SKI LODGES.  AND THERE WAS AN

4  OPPORTUNITY TO DO DIFFERENT PRICE POINTS IN THE MARKETPLACE; SO

5  THIS HAS A LITTLE MORE ACCESSORIES THAN YOUR ORIGINAL DOLL

6  PACK, AND IT ALLOWS YOU TO -- ONE OF THE MAIN THINGS ABOUT

7  THESE DOLLS THAT WE TRIED TO DO IS CREATE SOMETHING IN THE

8  PACKAGE THAT WAS FOR THE CONSUMER AS WELL AS FOR THE DOLLS; SO

9  IN THIS EXAMPLE, I BELIEVE THERE'S A COLLECTIBLE KEY CHAIN; THE

10 THOUGHT IS 'SOMETHING FOR YOU, SOMETHING FOR THE DOLL. '

11 Q    OKAY.

12       AND I FORGET IF YOU JUST SAID WHEN WINTERTIME

13 WONDERLAND CAME OUT.

14 A    WINTERTIME WONDERLAND WAS 2003, I THINK.

15 Q    LET ME SHOW YOU ANOTHER DOLL; I THINK IT WAS 17369, IF I

16 COULD WHILE I'M UP HERE, JUST TO SAVE ANOTHER TRIP, I WAS GOING

17 TO HAVE YOU LOOK AT ONE MORE, WHICH IS 18676.

18       CAN YOU GIVE US THE NAME OF THE FIRST ONE AND

19 DESCRIBE TO US WHAT THAT IS.

20 A    THIS IS A BRATZ WORLD DOLL, IT'S CALLED "TOKYO A GO-GO."

21 ONE OF THE BRAINSTORMS WE HAD AT WORK, THE CREATIVE TEAMS

22 HAD --

23       **MR. QUINN:**  THIS IS BEYOND THE QUESTION NOW.

24       **THE COURT:**  SUSTAINED.

25 / / /

1   **BY MS. AGUIAR:**

2   Q    LET ME ASK YOU SPECIFICALLY.  LET'S LOOK AT TRIAL

3   EXHIBIT 17369.  WHAT IS THE NAME OF THAT PARTICULAR DOLL?

4   A    BRATZ WORLD TOKYO A GO-GO.

5   Q    WHAT WAS THE STRATEGY BEHIND THAT PARTICULAR DOLL?

6   A    THE STRATEGY WAS TO CREATE DOLLS FROM AROUND THE WORLD.

7   TOKYO A GO-GO WAS ONE BASED ON JAPAN; THERE WAS ALSO ONE CALLED

8   PRETTY AND PUNK, BASED ON LONDON; THERE WAS ONE FROM FRANCE.

9   Q    AND DO YOU RECALL WHEN TOKYO A GO-GO CAME TO THE MARKET,

10  ROUGHLY?

11  A    I BELIEVE THIS WAS 2004.

12  Q    YOU MENTIONED WITH REGARD TO THE WINTERTIME WONDERLAND

13  DOLL THAT THERE WAS SOMETHING IN THE PACKAGE FOR THE CONSUMER

14  AND SOMETHING FOR THE DOLL.  IS THAT A THEME THAT CARRIED

15  THROUGH TO THIS TOKYO A GO-GO DOLL AS WELL?

16  A    IT IS.  THIS ONE COMES WITH SOUVENIR STICKERS.

17  Q    GO BACK FOR A SECOND.  IN THE FIRST GENERATION DOLLS, THE

18  FIRST FOUR DOLLS THAT WERE RELEASED IN 2001, WAS THERE EVEN A

19  THEME INVOLVED IN THOSE PARTICULAR DOLLS?

20  A    NO.  THEY WERE JUST FASHION DOLLS.

21  Q    IF YOU WOULD NOW -- AND I'LL TAKE SOME OF THOSE DOWN OFF

22  YOUR SHELF IN A MOMENT, BUT IF YOU WOULD TURN TO THE NEXT ONE

23  THAT I GAVE YOU, WHICH IS 18676.  WHAT ARE WE LOOKING AT THERE?

24  AND IF YOU COULD SHOW IT TO THE JURY.

25  A    THIS IS A BRATZ ROCK ANGELZ DOLL.

```
 1    Q    COULD YOU DESCRIBE TO US AGAIN, WITH REGARD TO THIS DOLL,
 2    A LITTLE ABOUT THE THEME.
 3    A    THIS THEME WAS BASED ON CLASSIC ROCK AND ROLL.  IT WAS A
 4    HUGE PROMOTION FOR THE COMPANY.  IT WAS SUPPORTED BY A LOT OF
 5    OTHER PRODUCTS THAT WERE THEMED FOR THIS.  THIS ALSO CAME WITH
 6    A CD, A MUSIC CD, WHICH WAS A BIG STEP FORWARD FOR THE COMPANY.
 7    Q    WHAT WAS THE THOUGHT PROCESS WITH PUTTING A CD WITH THE
 8    DOLL?
 9    A    WELL, IT'S A ROCK THEME; IT MADE SENSE TO HAVE ROCK MUSIC.
10    AGAIN, SOMETHING FOR THE CONSUMER, SOMETHING FOR THE DOLL.
11    Q    THE ONE LAST ONE I WANTED TO ASK YOU ABOUT IN THE FASHION
12    DOLL LINE IS 17524, EXHIBIT 17524.
13         CAN YOU TELL US WHAT THAT IS?
14    A    THIS IS A BRATZ FASHION PIXIEZ DOLL.
15    Q    AND WHAT IS A FASHION PIXIE?
16    A    WELL, FAIRIES IS A VERY POPULAR THEME FOR LITTLE GIRLS AND
17    DOLLS AND TYPICAL TO BRATZ.  PIXIEZ WAS A VERSION OF FAIRIES.
18    Q    AND IS THIS A DOLL THAT MGA CREATED AND DEVELOPED ITSELF?
19    A    YES.  THIS IS A DOLL THAT MGA DESIGNED AND DEVELOPED AND
20    MANUFACTURED ITSELF.
21    Q    IS IT CONSIDERED PART OF THE BRATZ CORE FASHION DOLL LINE?
22    A    IT'S CONSIDERED A BRATZ THEME.
23    Q    WE'VE JUST GONE THROUGH THE FIRST GENERATION DOLLS AND
24    THEN A NUMBER OF OTHER DOLLS THAT WERE INTRODUCED IN LATER
25    YEARS.  IS THERE A WAY THAT WE CAN SORT OF CATEGORIZE THE
```

```
 1   PRODUCTS WE'VE LOOKED AT SO FAR, OR THAT YOU WOULD CATEGORIZE?
 2   A    WELL, THESE WE'VE LOOKED AT ARE ALL FASHION DOLLS.
 3   BASICALLY, THE POINT OF A FASHION DOLL IS FOR A GIRL TO BE ABLE
 4   TO DRESS IT UP, PLAY WITH IT, MAKE IT LOOK PRETTY.
 5   Q    OKAY.
 6            AT SOME POINT DID MGA BEGIN TO DEVELOP AND PRODUCE
 7   PRODUCTS THAT WERE BEYOND THE FASHION DOLL CATEGORY?
 8   A    YES.
 9   Q    I'D LIKE TO WALK THROUGH SOME OF THOSE.
10            LET'S LOOK AT 17578.
11            CAN YOU DESCRIBE FOR THE JURY WHAT WE SEE HERE.
12   A    THIS IS A BRATZ TALKING DOLL.
13   Q    WHAT WAS THE THOUGHT PROCESS HERE?
14   A    THE THOUGHT PROCESS IS THAT A LOT OF CONSUMERS WERE
15   REPEATEDLY SAYING 'WOULDN'T IT BE GREAT IF YOU COULD TALK TO
16   YOUR BRATZ DOLL?'  SO THE IDEA HERE WAS TO BUILD A BASE THAT
17   HAD A SPEAKER AND CONSUMER ELECTRONICS COMPONENTS IN IT THAT
18   ALLOWS YOU TO ASK A QUESTION AND THEN THE DOLL WILL RESPOND
19   WITH A CANNED ANSWER.
20   Q    I DON'T IF THAT ONE ACTUALLY WORKS.  IS IT POSSIBLE TO
21   SHOW THE JURY HOW IT WORKS?
22   A    YES.  YOU CAN PUSH A BUTTON.
23            (DOLL STARTS TALKING.)
24   A    SHE ASKED ME, 'DO I LIKE SCHOOL?'  AND I HAVE TWO OPTIONS
25   HERE:  ONE IS YES; TWO IS NO.
```

```
 1              IT'S BEEN A LONG TIME.

 2              (DOLL STARTS TALKING AGAIN.)

 3   BY MS. AGUIAR:

 4   Q    AND THIS TALKING BRATZ DOLL, IS THIS CONSIDERED A FASHION

 5   DOLL?

 6   A    THE DOLL ITSELF IS A FASHION DOLL, BUT IT WOULD NOT BE

 7   TYPICALLY THE SAME PLAY PATTERN AS YOU MIGHT USE ONE OF THESE

 8   DOLLS FOR.

 9   Q    YOU MENTIONED THE WORD PLAY PATTERN A COUPLE OF TIMES.  I

10   DIDN'T GET TO PLAY WITH DOLLS WHEN I WAS LITTLE.  CAN YOU

11   EXPLAIN TO THE JURY WHAT YOU MEAN WHEN YOU ARE USING THIS

12   PHRASE "PLAY PATTERN"?

13   A    YES.  IN THE DOLL CATEGORY, THERE ARE DIFFERENT DOLLS THAT

14   YOU COULD POSSIBLY BUY; THERE'S SMALL DOLLS; THERE'S FASHION

15   DOLLS; THERE'S LARGE DOLLS; THERE'S SPECIAL FEATURE DOLLS.  SO

16   WHEN YOU BUY A FASHION DOLL, THE IDEA IS FOR, YOU KNOW, YOUNGER

17   THAN A TWEEN MARKET; IT COMES WITH CLOTHES AND ACCESSORIES.  A

18   PLAY PATTERN WOULD BE THAT YOU DRESS IT; YOU MIGHT BRUSH ITS

19   HAIR; YOU MIGHT DO PRETEND PLAY WITH ACCESSORIES.

20              A PLAY PATTERN, FOR INSTANCE, FOR A LARGE DOLL WOULD

21   BE MORE LOVING AND NURTURING; A DOLL THAT YOU WOULD GIVE A

22   BOTTLE TO THAT --

23   Q    PLEASE SLOW DOWN.

24              I PUT ANOTHER DOLL IN FRONT OF YOU; 17523.  IT MIGHT

25   BE DIFFICULT TO PUT IT UP ON THE COUNTER, BUT I'M GOING TO TRY
```

```
 1   SO EVERYBODY CAN SEE IT.
 2           WHAT ARE WE LOOKING AT HERE, 17523
 3   A    THIS IS A COLLECTOR DOLL.  THIS IS A DOLL THAT'S REALLY
 4   MEANT MORE FOR DISPLAY; YOU MIGHT PUT IT IN YOUR ROOM OR ON A
 5   SHELF; IT'S NOT SOMETHING THAT YOU WOULD CONTINUALLY DRESS AND
 6   UNDRESS.
 7   Q    AND I NOTICE THIS DOLL ON THE BOX SAYS "MEYGAN."
 8           CAN YOU EXPLAIN, WHAT WAS "MEYGAN"?
 9   A    MEYGAN IS A BRATZ CHARACTER THAT WAS INTRODUCED SOME TIME
10   AFTER THE ORIGINAL FOUR CHARACTERS.
11   Q    DO YOU RECALL WHETHER THIS COLLECTOR DOLL CAME OUT WITH A
12   VERSION FOR MULTIPLE DIFFERENT CHARACTERS?
13   A    IT DID.  I BELIEVE THERE WERE THREE DIFFERENT CHARACTERS,
14   BUT NOT IN THE SAME YEAR.  IT'S A COLLECTIBLE DOLL, SO THEY
15   WERE LIMITED EDITION.  ONCE YOU SOLD THROUGH THAT NUMBER, THAT
16   WAS DONE.
17   Q    THE NEXT ONE I WANTED TO SHOW YOU WAS 17475.
18           CAN YOU TELL THE JURY, LOOKING AT 17475, IT APPEARS
19   TO BE A GUY.
20   A    IT'S A BOY'S.
21   Q    CAN YOU TELL US WHAT BRATZ BOYZ IS?
22   A    YES.  BRATZ BOYZ WAS A RESPONSE TO THE CONSUMERS ASKING
23   FOR THE BRATZ DOLLS TO ACTUALLY START HAVING BOY FRIENDS.
24   Q    WAS THERE MORE THAN ONE ORIGINAL BOY?
25   A    THERE WAS.  I THINK ORIGINALLY THERE WERE TWO BOYS.  I
```

```
 1    THINK IT WAS "CAMERON" AND "DYLAN."  AND THEN THERE WERE FOUR
 2    MORE BOYS INTRODUCED AFTER THAT.
 3    Q    WERE THE BRATZ BOYZ A SUCCESSFUL PRODUCT FOR MGA?
 4    A    YES.   THEY STILL ARE A SUCCESSFUL PRODUCT FOR MGA.
 5    Q    THEY ARE STILL BEING MANUFACTURED?
 6    A    THEY ARE.
 7    Q    AND DO YOU KNOW HOW MANY BOY CHARACTERS THERE ARE TODAY,
 8    ROUGHLY?
 9    A    ROUGHLY SIX.
10    Q    I THINK RELATED TO ONE OF THE COMMENTS YOU JUST MADE ABOUT
11    THE BRATZ DOLLS HAVING BOY FRIENDS, 17499, IF YOU COULD
12    DESCRIBE TO THE JURY WHAT WE'RE LOOKING AT HERE WITH 17499.
13    A    THIS IS BRATZ BLIND DATE.  AND ACTUALLY IT IS ABOUT BOY
14    FRIENDS, BUT IT WAS A VERY SMART MARKETING STRATEGY WHICH
15    ALLOWS THE GIRLS TO SEE WHICH CHARACTER THEY ARE BUYING FOR THE
16    GIRL DOLL, BUT THEY DON'T KNOW WHAT BOY THEY ARE GOING TO BE
17    GETTING UNTIL THEY OPEN THE PACKAGE.   THEN THERE WAS AN
18    OPPORTUNITY THAT ONE IN EVERY 24 CHARACTERS WOULD ACTUALLY COME
19    WITH A CHARACTER NAMED "BRYCE," A BOY'S CHARACTER.
20    Q    WHO WAS MORE COVETED THAN THE OTHER BOYS.
21    A    HE WAS THE SPECIAL ONE IN THIS SET.
22    Q    OKAY.
23    A    HE HAD A 6-PACK.
24    Q    HE HAD A 6-PACK?
25    A    I'M JUST...
```

1   Q    IF YOU WOULD HAVE TOLD ME I WOULD HAVE BEEN ASKING ABOUT A

2   6-PACK IN FEDERAL COURT DURING THIS CASE, I WOULD HAVE SAID NO.

3        THE JURY CAN'T SEE IT, BUT CAN YOU, JUST FOR CLARITY

4   SAKE, DESCRIBE HOW MANY DOLLS ARE INCLUDED IN THAT PACKAGE?

5   A    TWO DOLLS; A GIRL AND A BOY.

6   Q    AND THE IDEA WAS THAT THE BOY IS BEHIND THE COVERING AND

7   SO YOU CAN'T SEE WHO THE BOY IS THAT YOU'RE BUYING; IS THAT

8   RIGHT?

9   A    THAT'S RIGHT.  IT'S A BLIND DATE; SO YOU DON'T KNOW WHO HE

10  IS UNTIL YOU OPEN THE PACKAGE; UNTIL HE SHOWS UP.

11  Q    OKAY.

12       AND TELL ME, WHAT WAS THE THEORY BEHIND MGA WANTING

13  TO DEVELOP THIS PARTICULAR PRODUCT?

14  A    THE THEORY WAS THAT IT'S ALWAYS EXCITING FOR GIRLS AT THE

15  AGE THAT PLAY WITH THESE DOLLS TO FANTASIZE ABOUT SECRET BOY

16  FRIENDS AND BLIND DATES.

17  Q    THE NEXT ONE I WANT TO SHOW YOU, THE NEXT DIFFERENT

18  PRODUCT, IS 17493.

19       CAN YOU TELL US WHAT WE'RE LOOKING AT THERE?

20  A    THIS IS A MICRO BRATZ DIAMONDZ DOLL.  MICRO BRATZ, WHICH

21  IS THE SAME NOW AS LIL' BRATZ, ACTUALLY WE TALKED ABOUT THERE

22  BEING DIFFERENT CATEGORIES OF DOLLS.  THIS IS CONSIDERED A

23  SMALL DOLL.  IT'S A SLIGHTLY DIFFERENT PLAY PATTERN.  IT'S FOR

24  YOUNGER GIRLS.

25  Q    AND JUST FOR THE RECORD, HOW TALL WOULD YOU APPROXIMATE

1    THAT MICRO BRATZ IS?

2    A    THREE-AND-A-HALF INCHES.

3    Q    AND WHAT IS THE PLAY PATTERN ASSOCIATED WITH THIS SMALL

4    DOLL?

5    A    EVEN THOUGH FASHION DOLLS COME WITH PLAY SETS, MICRO DOLLS

6    ARE MUCH MORE -- YOU PRETEND PLAY.  YOU MOVE THEM AROUND AND

7    YOU PUT THEM IN ENVIRONMENTS AND YOU HAVE THEM TALK TO EACH

8    OTHER.

9    Q    WAS THE IDEA BEHIND THIS ONE ALSO THAT YOU WOULD CHANGE

10   ITS CLOTHES AND ITS FASHIONS, OR WAS THAT NOT PART OF IT?

11   A    YES.  IT IS A FASHION DOLL, BUT IN THE CATEGORIES WE CALL

12   IT, IT'S A SMALL FASHION DOLL.  IT'S A SMALL DOLL.

13   Q    LET'S GO ON TO THE NEXT BRAND.  I WANT TO SHOW YOU 17360.

14   WOULD YOU TELL US WHAT WE'RE LOOKING AT HERE, EXHIBIT 17360?

15   A    THIS IS A SUB BRAND OF BRATZ CALLED BRATZ BABYZ.

16   Q    WHAT IS BRATZ BABYZ?

17   A    BRATZ BABYZ IS A SMALLER DOLL THAT'S MEANT FOR THE SAME

18   TYPE OF PLAY PATTERN AS THE SMALL DOLLS.  IT WAS ALSO IN

19   RESPONSE TO CONSUMER REQUESTS THAT WE START DEVELOPING A FAMILY

20   AROUND THE BRATZ.

21   Q    CAN YOU TELL US MORE ABOUT THAT?  WHEN YOU SAY THAT IT WAS

22   IN RESPONSE TO CONSUMER REQUESTS, WHAT DO YOU MEAN BY THAT?

23   A    WELL, IN EVERY ONE OF OUR PRODUCTS, WE HAVE A WARRANTY

24   REGISTRATION CARD, AND IN THE REGISTRATION CARD THERE'S AN

25   OPPORTUNITY FOR THE CONSUMER TO SHARE THEIR THOUGHTS WITH YOU.

```
 1   AND THE IDEA IS THAT YOU WOULD SOLICIT THEIR OPINIONS ON
 2   PRODUCTS THEY WOULD LIKE TO SEE YOU MAKE; AND IT'S CONTINUAL
 3   THAT THEY WOULD ASK FOR BABIES.
 4   Q    WAS THIS BRATZ BABYZ DOLL BASED ON THE SAME DESIGN OR THE
 5   SAME SCULPT AS THE ORIGINAL BRATZ FASHION DOLL?
 6   A    NO.  THIS IS A COMPLETELY DIFFERENT SCULPT.
 7   Q    WAS THIS A SCULPT THAT WAS DEVELOPED BY MGA?
 8   A    YES, IT IS.
 9   Q    IF I ASKED YOU THE SAME QUESTION FOR, LET'S SAY, THE MICRO
10   BRATZ, WOULD YOUR ANSWER BE THE SAME, THAT IT WAS A DIFFERENT
11   SCULPT?
12   A    YES.
13   Q    AND HOW ABOUT THE COLLECTOR MEYGAN DOLL THAT WE LOOKED AT
14   EARLIER?  IS THAT ALSO BASED ON A DIFFERENT SCULPT?
15   A    YES.
16   Q    AND THOSE WERE ALL DEVELOPED BY MGA?
17   A    YES.
18   Q    LET'S LOOK AT 17583.  IF YOU COULD TELL THE JURY WHAT
19   WE'RE LOOKING AT HERE, THIS EXHIBIT.
20   A    THIS IS A BRATZ BABYZ SITTER DOLL PACK.  IT ACTUALLY IS
21   SOMETHING INTERNALLY WE WOULD CALL A MULTI-PACK.  WE STARTED
22   DOING A LOT OF DOLLS WHERE YOU GOT TWO DOLLS IN THE SAME BOX.
23   IN THIS CASE, IT'S A BRATZ DOLL WITH A BABYZ DOLL TOGETHER AND
24   IT'S THEMED BABYSITTER; AS IF THE BIG DOLL IS WATCHING THE
25   LITTLE DOLL.
```

```
 1    Q    DO YOU RECALL, ROUGHLY, WHEN THIS WAS INTRODUCED?

 2    A    I DON'T.

 3    Q    WAS THIS ALSO A REACTION TO CONSUMER REQUESTS?

 4    A    IT WAS.  BUT IT STARTED, REALLY, WITH CONSUMERS ASKING FOR

 5    TWINS, WHICH THEN STARTED AS A DOUBLE DOLL PACK AND THEN IT

 6    CARRIED FORWARD TO WHAT OTHER DOUBLE DOLL PACKS WE COULD

 7    ACTUALLY MAKE.

 8    Q    I'M NOT SHOWING IT TODAY BECAUSE THERE'S TOO MUCH TO GO

 9    THROUGH, BUT YOU MENTIONED TWINS.  CAN YOU EXPLAIN TO THE JURY

10    THE CONCEPT THERE BEHIND THE TWIN DOLLS.

11    A    THE CONCEPT OF TWINS IS THAT YOU GET TWO DOLLS THAT WOULD

12    BE SISTERS IN THE SAME BOX.  THEY SOMETIMES LOOKED IDENTICAL

13    AND SOMETIMES THEY DIDN'T LOOK IDENTICAL, JUST LIKE IN REAL

14    LIFE.

15    Q    THESE COMMENT CARDS THAT YOU SAY YOU GET BACK FROM

16    CONSUMERS, DO YOU HAPPEN TO KNOW WHO AT MGA READS THEM OR

17    REVIEWS THEM?

18    A    YES.  ISAAC LARIAN REVIEWS THEM CONSTANTLY, LIKE, EVERY

19    WEEK.  WE ALSO HAVE A WAY TO RESPOND ON THE INTERNET WITH THE

20    SAME QUESTIONS; SO THE CUSTOMER SERVICE TEAM AT OUR COMPANY IS

21    RESPONSIBLE FOR COPYING ALL OF THOSE CARDS AND MAKING SURE HE

22    GETS A SET TO READ THROUGH.  OUR PRODUCT DEVELOPMENT TEAMS GET

23    A SET SO THEY CAN GO THROUGH AND SEE WHAT CONSUMERS ARE ASKING

24    FOR AS WELL.

25    Q    LET ME SHOW YOU ANOTHER BRAND, 17467.
```

```
 1              CAN YOU TELL US WHAT THIS IS.
 2    A    THIS IS A BRATZ BIG BABYZ.  AND AGAIN, AS WE TALKED ABOUT
 3    THERE BEING DIFFERENT TYPES OF DOLL STYLES, DOLL TYPES IN THE
 4    DOLL CATEGORIES, THIS IS CONSIDERED A LARGE DOLL.
 5    Q    WOULD THIS BE CONSIDERED A STANDARD BABY DOLL?
 6    A    THIS ISN'T LIKE YOUR TYPICAL BABY DOLLS IN THE MARKET, BUT
 7    IT WAS TO ADDRESS THE SAME AUDIENCE.  THE PLAY PATTERN WOULD
 8    BE, OF COURSE, MOTHERING AND NURTURING.
 9    Q    WHEN YOU SAY IT WAS DIFFERENT THAN THE STANDARD BABY DOLL
10    IN THE MARKET, WHAT WERE YOU REFERRING TO?
11    A    WELL, I THINK SIMILAR TO BRATZ, YOU CAN SEE THEIR FASHIONS
12    ARE NOT TYPICAL OF A BABY DOLL; THEY ARE MORE EDGY, COOL.  IT'S
13    JUST A WAY TO APPROACH IT FROM A TRENDY PERSPECTIVE.
14    Q    IS THIS BIG BABYZ DOLL BASED ON THE SAME DESIGN OR THE
15    SAME BODY SCULPT AS THE BRATZ FASHION DOLL?
16    A    NO.  THIS IS AN ENTIRELY DIFFERENT SCULPT.
17    Q    LET'S LOOK AT 17479.  I THINK THIS IS ONE WE HAVE NOT SEEN
18    YET.  CAN YOU TELL US WHAT THIS LINE IS?
19    A    THIS IS ALSO A SUB BRAND OF BRATZ CALLED BRATZ KIDZ.
20    Q    WHY WAS THE BRATZ KIDZ LINE INTRODUCED?
21    A    AS WE'VE ALREADY BEEN TALKING ABOUT, THE CONSUMER CARDS
22    LARGELY ALWAYS TALK ABOUT A BRATZ FAMILY; MOTHERS, SISTERS,
23    SIBLINGS, BABIES.  BRATZ KIDZ WAS ALSO IN RESPONSE TO THAT
24    CONSUMER INQUIRY.
25    Q    IS BRATZ KIDZ STILL A PRODUCT THAT IS ON THE MARKET?
```

1  A     YES, IT IS.

2  Q     IS IT A LINE THAT'S DONE WELL FOR MGA?

3  A     YES.  IT DOES VERY WELL FOR MGA.

4  Q     LET ME SHOW YOU 17473.  WITH 17473, WHAT IS THIS?

5  A     THIS IS A BRATZ BABYZ' PONY.

6  Q     EXPLAIN TO ME, IS THIS A FASHION DOLL?

7  A     THIS IS NOT A FASHION DOLL, NO.

8  Q     WHAT WAS THE IDEA WITH MGA DEVELOPING THE PONYZ' LINE?

9  A     WELL, CHILDREN ALWAYS ASK FOR ANIMALS, ZOO CHARACTERS, BUT

10 HORSES SEEM TO BE EXTREMELY POPULAR.  THIS WAS A WAY TO MAKE A

11 HARD MOLDED -- IT WAS ACTUALLY SCULPTED AND INJECTION MOLDED

12 FOR --

13 Q     EXPLAIN TO ME WHAT YOU JUST SAID.  YOU MENTIONED SOMETHING

14 ABOUT INJECTION MOLDED.

15 A     IT'S JUST A WAY TO MANUFACTURE PRODUCTS; SO THIS ALSO HAD

16 TO BE SCULPTED SIMILAR TO THE DOLL BODIES.  IT'S JUST AN

17 ANIMAL.

18 Q     WAS THIS ALSO IN RESPONSE TO CONSUMER REQUESTS OR CONSUMER

19 COMMENTS?

20 A     YES; IN PART, IT WAS.

21 Q     I THINK I'LL GIVE YOU THE NEXT FEW TOGETHER SO WE CAN TALK

22 ABOUT SOME MORE OF THE LINES.

23        THE FIRST ONE SHOULD BE 17482, AND IF YOU COULD TELL

24 US WHAT THAT IS.

25 A     17482, THIS IS THE BRATZ ITSY BITSY LINE; THIS IS ALSO

1    DIFFERENT SCULPTS AND A FASHION DOLL; IT'S MUCH SMALLER.  THESE

2    DOLLS ALSO HAVE SOME FASHION PLAY.  YOU CAN BRUSH THEIR HAIR.

3    THEY USUALLY COME WITH ACCESSORIES AND PLAY SETS.  THEY ARE

4    COLLECTIBLE-TYPE DOLLS WHERE YOU WOULD BUY A BUNCH OF THEM TO

5    GET AS MANY STYLES AS YOU CAN.

6    Q    SO WE'VE LOOKED AT A BUNCH OF DIFFERENT SIZES OF THE

7    DOLLS.  DOES THIS GO TO A DIFFERENT AUDIENCE THAN DOLLS THAT

8    ARE LARGER THAN THAT?

9    A    WELL, IT DEPENDS WHAT THE PURCHASE REASON IS FOR.

10           IF YOU'RE BUYING IT TO PLAY WITH, LIKE A SMALL DOLL,

11   IT WOULD BE SIMILAR TO LIKE A LIL' BRATZ PLAY PATTERN.  BUT IF

12   YOU'RE BUYING IT FROM THE COLLECTOR'S ASPECT, YOU MAY BE A

13   LITTLE OLDER GIRL.

14   Q    IS THE BRATZ ITSY BITSY A LINE THAT WAS DEVELOPED AND

15   PRODUCED BY MGA?

16   A    YES, IT WAS.

17   Q    AND DO YOU RECALL WHEN THAT FIRST CAME OUT, ROUGHLY?

18   A    I THINK ITSY BITSY CAME OUT IN 2006.

19   Q    AND THE NEXT ONE I PUT IN FRONT OF YOU, I BELIEVE, SHOULD

20   BE 17486.

21           CAN YOU TELL US WHAT THAT IS?

22   A    BRATZ LIL' ANGELZ IS STILL A LINE THAT WE SELL TODAY.

23   THIS IS SOMETHING THAT WE MAKE MULTIPLE INTRODUCTIONS OF PER

24   YEAR.  WHAT I MEAN BY THAT IS THAT WE CONTINUALLY TRY TO KEEP

25   NEW STYLES OF THIS ON THE SHELF AT RETAIL, SO THERE IS A

```
 1   COLLECTABILITY ELEMENT TO IT.  IT ALWAYS COMES WITH ONE SMALL

 2   DOLL AND THEN PETS.  THE IDEA WOULD BE THAT IT WOULD CREATE A

 3   COLLECTIBLE FRENZY THAT YOU ALWAYS WANTED TO GET THE NEXT ONE

 4   THAT CAME OUT.

 5   Q    YOU SAID THIS ONE IS STILL ON THE MARKET?

 6   A    THIS, YES, THE LIL' ANGELZ IS.

 7   Q    DOES IT COME TO MARKET MULTIPLE TIMES PER YEAR?

 8   A    YES; SIX, EIGHT TIMES A YEAR.

 9   Q    I WANT TO MOVE INTO WHAT I THINK IS ANOTHER DOLL CATEGORY

10   AND SHOW YOU EXHIBIT 17602.

11        CAN YOU TELL US WHAT WE'RE LOOKING AT HERE?

12   A    THIS IS A BRATZ PETZ.

13   Q    DESCRIBE FOR US WHAT CATEGORY THIS WOULD FALL INTO.

14   A    THIS WOULD FALL INTO A CATEGORY WE CALL PLUSH, WHICH IS AN

15   OPPORTUNITY TO HAVE PRODUCTS MAYBE IN A DIFFERENT SECTION OF

16   THE STORE THAN YOU WOULD PUT FASHION DOLLS.

17   Q    AND OFF THE TOP OF YOUR HEAD, DO YOU KNOW WHAT ANIMALS THE

18   BRATZ PETZ HAVE BEEN MADE IN?

19   A    YES.  BRATZ PETZ HAVE BEEN MADE IN CATS, FOXES, EASTER

20   BUNNIES.  I THINK WE TRIED DOGS.

21   Q    AND WHAT AGE GROUP IS THE BRATZ PETZ LINE TARGETED TO?

22   A    SIX TO ELEVEN.

23   Q    SO WE'VE GONE THROUGH THE DIFFERENT LINES THAT MGA HAS

24   PRODUCED.  I WANT TO ASK YOU WHAT THE TERM IN YOUR INDUSTRY

25   "PLAY SETS" REFERS TO.
```

```
 1   A    PLAY SETS IS A WAY TO CREATE AN ENVIRONMENT THAT, IN OUR
 2   CASE, USUALLY IS A THEME THAT THE DOLLS ARE ALSO IN.  AND IT
 3   ALLOWS YOU TO ACTUALLY TAKE THE DOLLS AND PUT THEM INTO A PLAY
 4   ENVIRONMENT SIMILAR TO A DOLL HOUSE.
 5   Q    SO LET ME SHOW YOU, I THINK WE HAVE TWO HERE; THEY ARE
 6   PRETTY LARGE, SO I'M GOING TO LIMIT IT TO TWO OF THEM; WE'VE
 7   GOT 17574, AND THE SECOND ONE SHOULD BE 17528.
 8        WHY DON'T WE TAKE THE ONE THAT YOU HAVE, THE RUNWAY
 9   DISCO THERE, 17528.  CAN YOU DESCRIBE FOR THE JURY WHAT THEY
10   ARE LOOKING AT THERE?
11   A    WELL, THE BRATZ PRODUCTS IS PREDOMINANTLY KNOWN FOR
12   FASHION SENSE OR BEAUTY, AND THIS IS A FASHION RUNWAY WHICH
13   ALLOWS YOU TO SIMULATE A FASHION SHOW EXPERIENCE ON A PLAY SET
14   THAT HAD REAL WORKING SOUND AND LIGHTS WITH YOUR DOLLS.
15   Q    WAS THIS A PRODUCT THAT MGA THOUGHT OF AND DEVELOPED
16   ITSELF?
17   A    ABSOLUTELY.  THIS WAS DESIGNED AND DEVELOPED IN-HOUSE.
18   Q    AND THIS IS ONE OF THE PLAY SETS THAT HAS BEEN DEVELOPED.
19   A    YES.
20   Q    AND THE OTHER PLAY SET, IF YOU COULD DESCRIBE WHAT WE'RE
21   LOOKING AT WITH 17574.
22   A    THIS IS THE BRATZ STYLING SALON AND SPA.  AND JUST LIKE
23   YOU WOULD SIMULATE A FASHION SHOW, IN THIS CASE YOU WOULD
24   SIMULATE A BEAUTY SALON.
25   Q    LET'S START OVER WITH THE SALON.  TELL US WHAT THAT IS.
```

```
 1   A    THIS IS A BRATZ STYLING SALON AND SPA, AND WHAT THIS IS

 2   SIMILAR TO THE FASHION RUNWAY WHERE YOU WOULD SIMULATE A

 3   FASHION SHOW.  IN THIS CASE, YOU SIMULATE A BEAUTY SALON

 4   EXPERIENCE; SO YOU WOULD BRING THE DOLL INTO THE SALON AND BE

 5   ABLE TO WASH ITS HAIR, PUT ON ITS MAKEUP, PAMPER IT.

 6   Q    I SHOULD HAVE BEEN BORN IN THE 90'S INSTEAD OF IN 1968.

 7        IT'S PRETTY COOL.

 8        I WANT TO MOVE AWAY FROM PLAY SETS AND INTO THE LAST

 9   TWO CATEGORIES THAT I WAS GOING TO TALK WITH YOU ABOUT THIS

10   MORNING, AND THAT IS WHAT I'LL REFER TO AS BRANDED MERCHANDISE.

11        ARE YOU FAMILIAR WITH THAT TERM?

12   A    YES, I AM.

13   Q    WHAT DOES THE TERM "BRANDED MERCHANDISE" MEAN TO YOU?

14   A    BRANDED MERCHANDISE MEANS THAT THERE'S DIFFERENT PRODUCT

15   TYPES THAT YOU WOULD APPLY A SPECIFIC BRAND TO, SUCH AS BRATZ.

16   Q    I'M NOT GOING TO PUT THEM ALL UP ON THE COUNTER; MAYBE

17   I'LL JUST TRY TO SEPARATE THEM HERE ON THE TABLE TO MAKE THINGS

18   EASIER; 17773, 18801, 18802.  LET ME JUST DO THIS ONE.  WE HAVE

19   OTHERS HERE, BUT LET ME JUST LABEL IT AS THIS FOR NOW; THE LAST

20   ONE IS 18807.

21        SO WOULD IT BE EASIER -- WOULD YOU LIKE THESE UP

22   THERE OR CAN YOU SEE FROM WHERE YOU ARE?

23   A    THE FIRST ONE WAS...

24   Q    THE FIRST ONE IS 17773.

25   A    IS THAT A SEWING MACHINE?
```

 1   Q    YES.

 2        I'LL PUT THE SMALLER ONES UP WITH YOU AND I'LL LEAVE

 3   THE SEWING MACHINE THERE.

 4        SO JUST USING THESE AS AN EXAMPLE -- WE DO HAVE MORE,

 5   BUT IN THE INTEREST OF TIME, JUST TO USE THESE AS AN EXAMPLE --

 6   CAN YOU EXPLAIN TO US WHAT WE'RE LOOKING AT HERE.

 7   A    WELL, WHEN BRATZ WAS WELL RECEIVED IN THE MARKETPLACE,

 8   THERE WAS AN OPPORTUNITY TO EXPAND INTO DIFFERENT CATEGORIES OF

 9   BUSINESS.  THE BRAND REALLY BECAME A LIFE-STYLE BRAND MORE THAN

10   JUST A FASHION DOLL BRAND, WHICH GAVE US OPPORTUNITIES TO TAKE

11   THE BRAND, BRANDED MERCHANDISE, AND DO DIFFERENT GENRES OF

12   PRODUCT; SO ROOM DECOR PILLOWS WAS ONE; SPORTING GOODS; THERE

13   WAS SCOOTERS; BIKES; HELMETS; SAFETY GEAR.  AND THEN ACTIVITIES

14   SUCH AS DO-IT-YOURSELF SEWING MACHINE KITS

15   Q    ARE THERE PRODUCTS BEYOND THE PRODUCTS THAT I JUST SHOWED

16   YOU THAT ARE WHAT YOU WOULD CALL BRATZ BRANDED MERCHANDISE?

17   A    THERE'S HUNDREDS.

18   Q    AND THE LAST CATEGORY I WANTED TO TOUCH ON IS SOMETHING

19   CALLED LICENSED PRODUCTS.  CAN YOU EXPLAIN TO THE JURY WHAT IS

20   MEANT BY THAT TERM.

21   A    LICENSED PRODUCTS IS AN OPPORTUNITY FOR A COMPANY TO TAKE

22   A BRAND THAT'S SUCCESSFUL, SUCH AS BRATZ, AND ALLOW SOMEBODY

23   ELSE TO USE THAT BRAND IN MAKING PRODUCTS THAT YOU MAY NOT WANT

24   TO MANUFACTURE YOURSELF.  BEDDING MIGHT BE ONE.  IF YOU'RE NOT

25   ALREADY IN THE BEDDING MARKET, YOU MIGHT ALLOW SOMEBODY TO BUY

```
 1    YOUR BRATZ BRAND AND PUT IT ON BEDDING.  COSTUMES; JEWELRY.
 2    Q    JUST TO GIVE THE JURY AN EXAMPLE -- AND AGAIN, I WON'T USE
 3    ALL OF THESE IN THE INTEREST OF TIME -- 17698, 17450, AND
 4    17425.
 5         CAN YOU TELL US WHAT WE'RE LOOKING AT HERE.
 6    A    YES.  THIS IS AN EXAMPLE OF WHAT WE WERE JUST TALKING
 7    ABOUT.  RETAILERS HAVE PARTNERS THAT THEY BUY A LOT OF THEIR
 8    GOODS FROM.  FOR INSTANCE, IF YOU HAD A BEDDING SUPPLIER, SUCH
 9    AS THAT PRODUCT THERE, AND THEY WANTED TO BUY YOUR BRAND, THEY
10    WOULD HAVE A BETTER OPPORTUNITY OF GETTING THEIR PRODUCT PLACED
11    IN THE STORE BECAUSE THEY ALREADY HAVE A RELATIONSHIP IN THAT
12    CATEGORY WITH THE BUYERS; SO THAT WOULD BE AN EXAMPLE OF
13    BEDDING.  THIS IS AN EXAMPLE OF FOOTWEAR.  THIS WOULD BE AN
14    EXAMPLE OF BATH AND BEAUTY.
15    Q    AND THESE ARE PRODUCTS THAT MGA ITSELF DOES NOT
16    MANUFACTURE; IS THAT CORRECT?
17    A    THAT'S CORRECT; WE DO NOT.
18    Q    I WANT TO SHOW YOU A DOCUMENT, IT'S TRIAL EXHIBIT 18196 --
19    AND I JUST MIGHT NEED A MINUTE TO GET A FEW COPIES OF THAT.
20    WHILE BECKY IS DOING THAT, ALL OF THE PRODUCTS WE WENT THROUGH
21    TODAY, THE CORE FASHION DOLLS, THE FIRST GENERATION AND THEN
22    THE DIFFERENT DOLLS AFTER THAT AND THEN THE DIFFERENT LINES --
23    ARE ALL OF THOSE CURRENTLY ON THE MARKET TODAY?
24    A    NO.
25    Q    OKAY.  SO IS IT CORRECT THAT THERE ARE LINES THAT HAVE
```

1    BEEN INTRODUCED THAT FOR ONE REASON OR ANOTHER WERE NOT

2    CONTINUED?

3    A    YES; THAT IS TRUE.

4    Q    YOU HAVE IN FRONT OF YOU TRIAL EXHIBIT 18196.

5             CAN YOU TELL US WHAT THIS IS?

6    A    THIS IS A LISTING OF THE DIFFERENT PRODUCTS THAT MGA HAS

7    DESIGNED, DEVELOPED, AND MARKETED.

8             **MR. QUINN:**  MAY WE HAVE SOME FOUNDATION FIRST?

9             WE HAVE NOT SEEN THIS DOCUMENT.

10            **THE COURT:**  TAKE A LOOK AT IT, COUNSEL.

11            ACTUALLY, IT'S 10:30.  LET'S TAKE OUR BREAK.

12            **MS. AGUIAR:**  THIS WAS THE LAST DOCUMENT, ACTUALLY.

13            (WHEREUPON JURORS DEPART COURTROOM.)

14            **THE COURT:**  COUNSEL, YOUR 10 OR 15 MINUTES ARE JUST

15   ABOUT UP.

16            **MS. AGUIAR:**  THIS WAS IT, YOUR HONOR.

17            **THE COURT:**  ALL RIGHT.

18            COURT IS IN RECESS.

19            (WHEREUPON A BRIEF RECESS WAS HELD.)

20            (JURORS ENTER COURTROOM.)

21            **THE COURT:**  COUNSEL, YOU MAY PROCEED.

22   **BY MS. AGUIAR:**

23   Q    MS. PEMBLETON, DO YOU STILL HAVE THE DOCUMENT IN FRONT OF

24   YOU THAT IS MARKED AS TRIAL EXHIBIT 18196?

25   A    YES.

```
 1  Q    ARE YOU FAMILIAR WITH A COMPUTER DATABASE AT MGA CALLED
 2  "ITEM MASTER"?
 3  A    YES, I AM.
 4  Q    WHAT IS THE ITEM MASTER?
 5  A    THE ITEM MASTER IS THE COMPANY REPOSITORY FOR ALL OF THE
 6  PRODUCTS THAT WE MAKE AND SELL.
 7  Q    WHO AT MGA IS RESPONSIBLE FOR OVERSEEING THE MAINTENANCE
 8  OF THAT DATABASE OR WHO HAS THE RESPONSIBILITY FOR THAT
 9  DATABASE?
10  A    I DO.
11  Q    DOES IT CONTAIN INFORMATION THAT MGA RELIES ON IN THE
12  COURSE OF ITS BUSINESS?
13  A    ABSOLUTELY.
14  Q    AND DO YOU BELIEVE THAT THE INFORMATION IN THAT DATABASE
15  IS ACCURATE?
16  A    YES, I DO.
17  Q    DO YOU RECOGNIZE 18196 AS A DOWNLOAD FROM THAT DATABASE?
18  A    YES, I DO.
19            MS. AGUIAR:  YOUR HONOR, I MOVE 18196 INTO EVIDENCE.
20            THE COURT:  ANY OBJECTION?
21            MR. QUINN:  NO OBJECTION.
22            THE COURT:  IT'S ADMITTED.
23            MS. AGUIAR:  IT'S AN EXTREMELY LONG DOCUMENT, BUT I
24  JUST WANT YOU TO GIVE THE JURY AN EXAMPLE OF WHAT WE'RE LOOKING
25  AT HERE.
```

 1   **BY MS. AGUIAR:**

 2   Q    CAN YOU WALK US THROUGH THE COLUMNS AND DESCRIBE WHAT'S

 3   HERE IN THIS EXHIBIT.

 4   A    I CAN.

 5        THE BASE SKEW NUMBER, THE FIRST ON THE LEFT, IS

 6   ACTUALLY A SIX-DIGIT ITEM NUMBER THAT WE ASSIGN AT MGA THAT WE

 7   GIVE TO REPRESENT EACH INDIVIDUAL PRODUCT THAT WE SELL IN THE

 8   MARKET.  THE SECOND COLUMN IS THE SUB BRAND IS WHAT IT'S CALLED

 9   HERE, BUT THIS IS REALLY A CATEGORIZATION OF HOW TO TAKE THE

10   INDIVIDUAL PRODUCTS AND PUT THEM INTO GROUPS.  IF THAT MAKES

11   SENSE.

12   Q    SO, FOR INSTANCE, ONE IS BRATZ CORE; IS THAT RIGHT?

13   A    THAT'S RIGHT.

14   Q    AND ANOTHER ONE WOULD BE BRATZ BABYZ, FOR EXAMPLE?

15   A    YES.

16   Q    AND WHAT ARE WE LOOKING AT IN THE NEXT COLUMN?

17   A    IT'S CALLED THE PRODUCT TYPE, OR IT COULD ALSO BE

18   REFERENCED AS A CATEGORY OF BUSINESS.  IT WOULD BE -- LIKE WE

19   TALKED ABOUT HAVING MULTIPLE CATEGORIES OF DOLLS; THIS IS WHERE

20   THAT WOULD APPEAR; SMALL DOLLS; FASHION DOLLS; LARGE DOLLS;

21   LIFE-STYLE; SPORTING GOODS.

22   Q    AND LASTLY, THE COLUMN ON THE RIGHT.

23   A    IT'S ACTUALLY THE DESCRIPTION OF THE PRODUCT.

24        **MS. AGUIAR:**  YOUR HONOR, WITH THAT, I HAVE NOTHING

25   FURTHER.  THANK YOU.

| | |
|---|---|
| 1 | **THE COURT:**  FURTHER EXAMINATION BY THE PLAINTIFF? |
| 2 | **MR. QUINN:**  THANK YOU, YOUR HONOR. |
| 3 | **EXAMINATION** |
| 4 | BY MR. QUINN: |
| 5 | Q   GOOD MORNING, MS. PEMBLETON. |
| 6 | I WAS INTERESTED IN SOMETHING YOU SAID WHEN COUNSEL |
| 7 | WAS ASKING YOU SOME QUESTIONS ABOUT BRANDED PRODUCTS. |
| 8 | IF I JOTTED IT DOWN CORRECTLY, YOU SAID THAT BECAUSE |
| 9 | OF THE SUCCESS OF THE BRATZ DOLLS IN THE MARKETPLACE, MGA HAD |
| 10 | AN OPPORTUNITY TO SELL BRANDED PRODUCTS. |
| 11 | DO YOU RECALL THAT? |
| 12 | A   I DO. |
| 13 | Q   AND WHAT YOU MEANT BY THAT IS BECAUSE THE DOLLS WERE |
| 14 | SUCCESSFUL, YOU THEN HAD AN OPPORTUNITY TO GET INTO OTHER LINES |
| 15 | OF PRODUCTS, LIKE BICYCLE HELMETS; CORRECT? |
| 16 | **MS. AGUIAR:**  OBJECTION TO FORM, YOUR HONOR; THE LEAD |
| 17 | UP TO THAT QUESTION. |
| 18 | **THE COURT:**  OVERRULED. |
| 19 | **THE WITNESS:**  I WOULD SAY THAT BECAUSE THE BRAND |
| 20 | BECAME SO WELL KNOWN, THAT THERE WAS AN OPPORTUNITY TO EXPAND |
| 21 | INTO DIFFERENT CATEGORIES BASED ON THE BRAND. |
| 22 | BY MR. QUINN: |
| 23 | Q   AND WE'RE TALKING ABOUT THE BRATZ BRAND; RIGHT? |
| 24 | A   THE BRATZ BRAND. |
| 25 | Q   WHICH STARTED WITH A CORE BRATZ FASHION DOLL; CORRECT? |

```
 1   A    YES, IT DID.

 2   Q    AND ANOTHER ONE, YOU SAID YOU HAD AN OPPORTUNITY AT

 3   ANOTHER TYPE OF BRANDED PRODUCT WAS THE CHILD BEADS, THE BEADS

 4   GAME OR NECKLACES, OR WHATEVER THAT WAS?

 5   A    IT WAS AN ACTIVITY TOY.

 6   Q    SO THAT'S ANOTHER EXAMPLE OF SOMETHING YOU WERE ABLE TO DO

 7   BECAUSE OF THE SUCCESS OF THE BRATZ DOLLS IN THE MARKETPLACE;

 8   CORRECT?

 9   A    AS A RESULT OF THE SUCCESS OF THE BRAND ITSELF.

10   Q    WELL, AGAIN, THE BRAND STARTS WITH THOSE DOLLS; RIGHT?

11   A    THAT'S WHERE IT STARTED.

12   Q    THE FIRST GENERATION BRATZ FASHION DOLLS; THAT'S WHERE IT

13   STARTED; RIGHT?

14   A    YES; BEFORE IT EVOLVED INTO A LOT MORE THAN THAT.

15   Q    AND THEN ALSO YOU TALKED ABOUT LICENSE PRODUCTS.  BECAUSE

16   OF THIS SUCCESS OF THE DOLLS IN THE MARKETPLACE, YOU HAD AN

17   OPPORTUNITY TO LICENSE THINGS LIKE FLIP FLOPS, BATH AND BEAUTY

18   SUPPLIES, BEDDING, AND THINGS OF THAT NATURE; CORRECT?

19   A    I CAN'T COMPLETELY AGREE, BECAUSE I STILL DON'T THINK IT'S

20   BASED ON THE SUCCESS OF THE DOLLS THEMSELVES.  AFTER THE LINE

21   HAD EXPANDED INTERNALLY AND THE BRAND BECAME SO WELL KNOWN TO

22   WHAT IT IS, THAT'S WHEN THE LICENSEES STARTED WITH THE

23   OPPORTUNITIES TO MAKE THINGS OUT OF THE BRAND NAME.

24   Q    LET ME ASK YOU, THEN, HOW MANY BICYCLE HELMETS DID MGA

25   SELL BEFORE IT INTRODUCED THE FIRST BRATZ DOLLS?  ANY?
```

1  A    NONE.

2  Q    HOW MANY OF THESE BEADS, CHILD BEAD GAMES, NECKLACES, HOW

3  MANY OF THOSE DID MGA SELL BEFORE THE FIRST BRATZ DOLLS WERE

4  INTRODUCED ON THE MARKETPLACE?

5  A    NONE FOR BRATZ.

6  Q    AND HOW ABOUT FLIP FLOPS?  DID YOU LICENSE ANY FLIP FLOPS

7  BEFORE THE FIRST BRATZ DOLLS WERE INTRODUCED?

8  A    NO, WE DID NOT.

9  Q    DID YOU LICENSE ANY BEDDING OR ANY BATH AND BEAUTY

10  PRODUCTS BEFORE THE FIRST BRATZ DOLLS WERE INTRODUCED?

11  A    NO, WE DID NOT.

12  Q    SO IF MR. BRYANT HAD NOT SHOWN MR. LARIAN MATTEL'S

13  CONFIDENTIAL INFORMATION, THE DESIGN FOR THE BRATZ DOLLS, THERE

14  NEVER WOULD HAVE BEEN BRATZ BEDDING, BRATZ FLIP FLOPS, BRATZ

15  BATH AND BEAUTY SUPPLIES, OR ANY OF THOSE OTHER BRANDED OR

16  LICENSED PRODUCTS; ISN'T THAT TRUE?

17  A    I CAN'T SAY THAT'S ABSOLUTELY TRUE, BECAUSE PERHAPS IF IT

18  HAD NOT BEEN BRATZ IT MAY HAVE BEEN ANOTHER BRAND OF FASHION

19  DOLLS THAT SPAWNED ALL OF THE LICENSED PRODUCTS.

20  Q    AND THAT'S UTTER AND SHEER AND TOTAL SPECULATION ON YOUR

21  PART; CORRECT?

22  A    ABSOLUTELY.

23  Q    THE REALITY IS THAT MGA NEVER OUT-LICENSED ANY PRODUCT

24  BEFORE BRATZ; TRUE?  ANY PRODUCT, UNDER ANY BRAND NAME.

25  A    THAT SOUNDS TRUE, ALTHOUGH I CAN'T SAY FOR CERTAIN.

1    Q    THAT'S YOUR BELIEF.

2    A    THAT'S MY UNDERSTANDING.  I HAVEN'T BEEN THERE ALWAYS.

3    Q    THAT MGA HAD NEVER LICENSED ANYTHING TO ANYONE ELSE,

4    OUT-LICENSED, UNDER ANY BRAND NAME BEFORE BRATZ; CORRECT?

5    A    THAT'S MY UNDERSTANDING.  I DON'T KNOW IF THAT'S CORRECT.

6    Q    CAN YOU IDENTIFY ANY PRODUCT THAT MGA LICENSED OUT BEFORE

7    THE BRATZ DOLLS WERE INTRODUCED?

8    A    NOT BEFORE THE BRATZ DOLLS WERE INTRODUCED, BUT CERTAINLY

9    BRANDS AFTER THE BRATZ DOLLS WERE INTRODUCED.

10   Q    THEN YOU DESCRIBED FOR US -- WE LOOKED AT A NUMBER OF

11   DIFFERENT TYPES OF BRATZ DOLL PRODUCTS, FASHION PIXIEZ, THE

12   BRATZ TALKING DOLL, THE BRATZ BOYZ, THE MICRO BRATZ, THE BRATZ

13   BABYZ, THE BRATZ KIDZ, THE BRATZ PETZ, THE ITSY BITSY BRATZ,

14   ALL DIFFERENT TYPES OF BRATZ DOLLS.  IF MR. LARIAN HAD NOT

15   AIDED AND ABETTED MR. BRYANT'S BREACH OF FIDUCIARY DUTY, IF HE

16   HAD NOT ENGAGED IN CONVERSION OF MATTEL'S CONFIDENTIAL

17   INFORMATION REGARDING THE BRATZ DESIGNS, NONE OF THOSE BRATZ

18   TOYS, NONE OF THOSE OTHER BRATZ DOLLS EVER WOULD HAVE EXISTED;

19   CORRECT?

20   A    NOT UNDER THE NAME BRATZ.  BUT I BELIEVE THAT THE

21   CREATIVITY AND THE DESIGN THAT WENT INTO ALL THOSE OTHER THINGS

22   DID NOT NATURALLY JUST TRANSPIRE THEMSELVES OFF OF THAT INITIAL

23   LAUNCH.

24   Q    MA'AM, NONE OF THOSE WOULD HAVE EXISTED BUT FOR

25   MR. LARIAN'S AIDING AND ABETTING MR. BRYANT IN BREACHING HIS

1    FIDUCIARY DUTY AND GETTING THE CONFIDENTIAL BRATZ DESIGNS;

2    CORRECT?

3    A    I'M NOT SURE I AGREE WITH THAT.

4    Q    WELL, DID MGA HAVE ANY TYPE OF FASHION DOLL LINE, TO YOUR

5    KNOWLEDGE, BEFORE BRATZ WAS INTRODUCED?

6    A    NO.

7    Q    YOU IDENTIFIED A NUMBER OF THEMES AND DIFFERENT TYPES OF

8    DOLLS, LIKE THE WINTER WONDERLAND DOLL.  YOU'RE NOT SAYING THAT

9    MGA WAS THE FIRST COMPANY TO EVER COME OUT WITH A WINTER

10   WONDERLAND OR A WINTER THEMED DOLL, ARE YOU?

11   A    NO, I'M NOT.

12   Q    AND CERTAINLY ROCK AND ROLL AND MUSIC THEMED DOLLS, YOU'RE

13   NOT SAYING MGA WAS THE FIRST TO DO THAT.

14   A    NO.  BUT I DO BELIEVE MGA'S INTERPRETATION OF THOSE THEMES

15   WAS UNIQUE.

16   Q    BUT WHAT YOU WERE TALKING ABOUT IN DIRECT EXAMINATION, THE

17   IDEA OF A ROCK AND ROLL OR MUSIC THEMED DOLL, THAT HAD BEEN

18   DONE BEFORE.

19   A    YES.

20   Q    AND I THINK YOU SAID FAIRIES ARE COMMON AND POPULAR THEMES

21   FOR CHILDREN?  FAIRY DOLLS?

22   A    FAIRIES ARE.

23   Q    AND THEN TOKYO A GO-GO, THE THEME OF A FOREIGN COUNTRY,

24   YOU'RE NOT SAYING THAT MGA WAS THE FIRST DOLL COMPANY TO EVER

25   DO THAT, ARE YOU?

```
 1   A    NO, I'M NOT.

 2   Q    OR BABYSITTERS OR TWINS OR DISCOS OR TALKING DOLLS, YOU'RE

 3   NOT SAYING THAT MGA WAS THE FIRST TO DO ANY OF THOSE, ARE YOU?

 4   A    NO.  I SIMPLY WAS SAYING THAT MGA HAS A UNIQUE TAKE ON ALL

 5   THOSE DIFFERENT TYPES OF BASES.

 6   Q    AND AGAIN, THIS ALL RISES AND WHAT YOU'RE REFERRING TO IS

 7   THE BRATZ BRANDED TAKE; CORRECT?

 8   A    THE DESIGNERS' INTERPRETATION OF WHAT BRATZ IS MEANT TO BE

 9   TO THE MARKETPLACE.

10   Q    RIGHT.

11        AND NONE OF THAT EVER WOULD HAVE EXISTED IF

12   MR. BRYANT HAD NOT BROUGHT OVER TO MGA MATTEL'S CONFIDENTIAL

13   BRATZ DESIGNS; CORRECT?

14   A    AGAIN, I'M NOT CERTAIN I AGREE WITH THAT.

15   Q    YOU THINK IT MIGHT HAVE HAPPENED ANYWAY.

16   A    I DO.  I THINK THAT A FASHION DOLL LINE COULD HAVE SPAWNED

17   ITSELF AT MGA AT ANY TIME.

18   Q    COULD HAVE.  BUT THAT'S, AGAIN, SHEAR AND UTTER

19   SPECULATION ON YOUR PART; CORRECT?

20   A    WELL, ACTUALLY WE DID HAVE A FASHION DOLL BRAND POST-BRATZ

21   THAT WE LAUNCHED INTERNALLY; SO IT DID HAPPEN.

22   Q    DO YOU HAVE ANY EVIDENCE AT ALL THAT PRIOR TO MR. BRYANT

23   BRINGING OVER MATTEL'S CONFIDENTIAL DESIGNS, THAT MGA WAS

24   DEVELOPING SOME TYPE OF FASHION DOLL INTERNALLY?

25   A    I DO NOT.
```

```
 1   Q    NOW, ALL OF THE MGA PRODUCTS THAT YOU SAW IN THE COURTROOM
 2   UPSTAIRS AND THEN THAT THE JURY SAW WERE DESIGNED BY MGA HERE
 3   IN THE UNITED STATES; IS THAT CORRECT?
 4   A    THAT IS CORRECT, IN COLLABORATION WITH SOME OF OUR HONG
 5   KONG TEAM.
 6   Q    BUT AS I UNDERSTAND IT, PART OF THE DESIGN WORK IS DONE
 7   MOSTLY HERE IN THE U.S.
 8   A    THAT'S CORRECT.
 9   Q    AND THAT DESIGN WORK INCLUDES MAKING DRAWINGS AND OTHER
10   REPRODUCTIONS OF THE BRATZ DOLLS AND OTHER PRODUCTS?
11   A    CAN YOU SAY THAT AGAIN.
12   Q    YES.  THE DESIGN WORK WE'RE TALKING ABOUT THAT'S DONE HERE
13   IN THE U.S., WE'RE TALKING ABOUT CREATING DRAWINGS; CORRECT?
14   A    WELL, ONCE THERE'S BEEN SOME STUDY IN THE MARKETPLACE, YOU
15   KNOW, AND BRAINSTORMING, YES, THEN DRAWINGS ARE MANIFESTED FROM
16   THAT.
17   Q    AND YOU ALSO MAKE OTHER REPRODUCTIONS THAT ARE DEVELOPED
18   AND DESIGNED IN THE U.S. OF BRATZ DOLLS AS PART OF THAT
19   DEVELOPMENT PROCESS.
20   A    YES.  PART OF THE DEVELOPMENT PROCESS INCLUDES GOING INTO
21   DIFFERENT TYPES OF DEVELOPMENT.
22   Q    AND ONCE THAT DESIGN WORK IS COMPLETED AND SIGNED OFF ON
23   HERE IN THE UNITED STATES, THEN THE DESIGN IS SENT OVER TO THE
24   FAR EAST, TO HONG KONG, FOR PRODUCTION; CORRECT?
25   A    YES; THAT IS CORRECT.
```

```
 1   Q    NOW, MGA'S BRATZ RELATED SALES HAVE BEEN ABOUT THREE

 2   BILLION DOLLARS; IS THAT ROUGHLY CORRECT?

 3   A    I HAVE NO KNOWLEDGE OF EXACTLY WHAT THE SALES HAVE BEEN.

 4   Q    GIVE OR TAKE ONE BILLION DOLLARS.

 5   A    NO.  I CAN'T TELL YOU.

 6   Q    YOU CAN'T TELL US --

 7   A    I CANNOT.

 8   Q    YOU SAID THERE ARE OTHER BRANDS THAT MGA HAS.  CAN YOU

 9   TELL US WHAT THE SALES ARE OF ANY OF THOSE OTHER BRANDS?

10   A    I CAN'T TELL YOU WHAT THE ANNUAL SALES NUMBERS ARE.

11   Q    CAN YOU GIVE US ANY NUMBERS, IF NOT ANNUALLY, FOR ANY

12   PERIOD?

13   A    HOW ABOUT IF WE PUT IT IN VERBIAGE AND SAY VERY

14   SUCCESSFUL.  I DON'T KNOW THE DOLLAR VALUE.

15   Q    I UNDERSTAND YOU'RE TELLING US IT'S VERY SUCCESSFUL.  I'M

16   TRYING TO FIND OUT IF WE CAN QUANTIFY THAT AT ALL.

17        DO YOU HAVE ANY NUMBERS THAT YOU CAN GIVE US?

18   A    I DO NOT HAVE ANNUAL SALES FIGURES I CAN GIVE YOU THAT I'M

19   CONFIDENT ARE CORRECT ON ANYTHING.

20   Q    NOW, IT'S TRUE, YOU TOLD US ABOUT THIS, I THINK YOU USED

21   THE TERM OF A CORE FASHION DOLL LINE WHICH STARTED OUT WITH THE

22   ORIGINAL FOUR CHARACTERS?  IS THAT A TERM THAT YOU USED?

23   A    I DON'T RECALL.  I THINK WE CALLED IT THE FIRST GENERATION

24   OR THE ORIGINAL FOUR.

25   Q    ALL RIGHT.
```

```
 1              THOSE ORIGINAL FOUR, THEY ALL COME FROM THE SAME HEAD
 2   SCULPT; CORRECT?
 3   A     I BELIEVE THEY DO.
 4   Q     AND EVERY GENERATION AFTER THAT HAS COME FROM THE VERY
 5   SAME HEAD SCULPT; CORRECT?
 6   A     OKAY.  SCULPTS HAVE TO BE REDONE EVERY TIME; SO...
 7              THE SAME BASIS OF THE SCULPT?  YES.
 8   Q     YES.
 9              SO IF WE WERE TO LOOK AT IT SCIENTIFICALLY, WE'D SEE
10   THAT THE HEAD FOR EACH OF THOSE DOLLS FOR EVERY GENERATION,
11   IT'S ESSENTIALLY THE SAME.
12   A     ONLY FOR THAT ONE SIZE DOLL.
13   Q     AND THAT'S TRUE ALSO FOR THESE ADDITIONAL CHARACTERS THAT
14   WERE ADDED.  MEYGAN, RIGHT, USES THE SAME HEAD?
15   A     YOU KNOW, HONESTLY, I DON'T KNOW THE ANSWER TO THAT.  I
16   DON'T KNOW IF THE AUXILIARY CHARACTERS OF MEYGAN, DANA -- USE
17   THAT SAME --
18   Q     YOU JUST DON'T KNOW ONE WAY OR THE OTHER?
19   A     I DO NOT.
20   Q     THEY MIGHT ALWAYS HAVE USED THE SAME HEAD; THEY MIGHT HAVE
21   DIFFERENT HEADS; YOU JUST DON'T KNOW.
22   A     I DO NOT KNOW IF IT'S A DIFFERENT SCULPT.
23   Q     THEN HOW ABOUT THE BODY ITSELF FOR THE CORE FASHION DOLLS?
24   HAS THAT EVER CHANGED FROM GENERATION TO GENERATION?
25              WE'RE TALKING ABOUT THE CORE FASHION DOLL.
```

```
 1   A    I DON'T BELIEVE IT HAS, BUT I DON'T KNOW THAT FOR A FACT.
 2   Q    SO FAR AS YOU KNOW, THOSE OF THE HEAD AND THE DOLLS -- THE
 3   HEAD AND THE BODY FOR ALL THOSE FASHION DOLLS, ALL OF THE
 4   DIFFERENT GENERATIONS, THE NEW CHARACTERS, SO FAR AS YOU KNOW,
 5   IT'S ALL BEEN THE SAME AND HAS NEVER CHANGED FROM THE
 6   BEGINNING; TRUE?
 7   A    I DON'T KNOW OTHERWISE.  THAT WOULD JUST BE FOR THAT ONE
 8   SIZE DOLL.
 9   Q    DO YOU KNOW WHETHER SOME OF THE LARGER DOLLS, THEY TOOK
10   THE SAME CORE SCULPT AND JUST ENLARGED IT?
11        DO YOU KNOW WHETHER THAT HAPPENED?
12   A    I DON'T BELIEVE THAT HAPPENS PROPORTIONATELY.  I THINK IT
13   HAS TO BE REDESIGNED AND RATIOED.  I DON'T THINK YOU CAN BLOW
14   SOMETHING UP TEN PERCENT AND HAVE THE SAME, YOU KNOW, SHAPE
15   THAT YOU'RE DESIRING.
16   Q    YOU DON'T KNOW WHETHER THAT'S EVER BEEN DONE, OF YOUR OWN
17   KNOWLEDGE.
18   A    I DON'T KNOW, BUT IT DOESN'T SOUND LIKE A POSSIBILITY.
19            MR. QUINN:  NOTHING ELSE.
20            THANK YOU, YOUR HONOR.
21            THE COURT:  ANYTHING FURTHER, MS. AGUIAR?
22                      FURTHER EXAMINATION
23   BY MS. AGUIAR:
24   Q    BASED ON YOUR EXPERIENCE WORKING WITH THE COMPANY THROUGH
25   THE DEVELOPMENT OF THE DIFFERENT LINES OF PRODUCTS THAT WE
```

1    TALKED ABOUT THIS MORNING, DID THE IDEA FOR BRATZ BABYZ COME

2    FROM MR. BRYANT'S ORIGINAL CONCEPT DRAWINGS?

3    A    NO.  IT DID NOT.

4    Q    HOW ABOUT THE IDEA FOR THE SMALL DOLL LIL' ANGELZ?

5         DID THAT COME FROM MR. BRYANT'S CONCEPT DRAWINGS?

6    A    NO, IT DID NOT.

7    Q    AND I TAKE IT THERE WERE NO PONIES DEPICTED IN

8    MR. BRYANT'S ORIGINAL CONCEPT DRAWINGS; IS THAT RIGHT?

9    A    I HAVEN'T SEEN MR. BRYANT'S ORIGINAL DRAWINGS, BUT I DON'T

10   THINK SO.

11   Q    HAS ANYONE EVER TOLD YOU THAT THE IDEA FOR MGA'S PLUSH

12   LINE OF BRATZ PETZ CAME FROM MR. BRYANT'S ORIGINAL CONCEPT

13   DRAWINGS?

14   A    NO.

15   Q    MGA HAD DEVELOPED AND MARKETED DOLLS PRIOR TO THE TIME

16   THAT IT DEVELOPED AND MARKETED THE BRATZ DOLLS; CORRECT?

17   A    YES; QUITE SUCCESSFULLY.

18   Q    MGA KNEW HOW TO MAKE A DOLL.

19   A    YES, THEY DID.

20   Q    HAVE YOU EVER HEARD THAT MR. BRYANT'S CONCEPT DRAWINGS

21   INCLUDED IDEAS LIKE WINTERTIME WONDERLAND OR ROCK ANGELZ?

22   A    NO, I HAVE NOT.

23   Q    WE DISCUSSED BRANDING EARLIER.  CAN YOU DESCRIBE TO US THE

24   DIFFERENT DEPARTMENT OR THE DIFFERENT ASPECTS WITHIN THE

25   COMPANY THAT WERE INVOLVED IN BUILDING THE BRATZ BRAND.

```
 1  A    WELL, THE DEVELOPMENT ITSELF HAS MULTIPLE GROUPS OF PEOPLE

 2  THAT ARE INVOLVED IN I GUESS MANIFESTING THEIR INTERPRETATION

 3  OF WHAT THEY ARE TRYING TO MAKE IN 3-D FORM.

 4        THEY HAVE DESIGNERS, PRODUCT DESIGNERS.  YOU HAVE

 5  SCULPTORS.  YOU HAVE FACE PAINTERS.  YOU HAVE HAIR ROOTERS.

 6  YOU HAVE MODEL MAKERS.  AND THEN YOU HAVE THE TEAMS THAT

 7  SUPPORT THAT:  OPERATION TEAMS, PLANNING TEAMS, MARKETING,

 8  SALES, MEDIA, FULFILLMENT.

 9        IT'S A HUGE COLLABORATION TO DEVELOP A DOLL.  IT JUST

10  DOESN'T HAPPEN BY ITSELF.

11  Q    AND SPECIFICALLY WITH REGARD TO BUILDING THE BRAND, WHAT

12  IS YOUR UNDERSTANDING OF THE ROLE THAT MARKETING PLAYS IN

13  DEVELOPING THE BRATZ BRAND?

14  A    MARKETING'S ROLE IS EXTREMELY IMPORTANT.  THEY HAVE TO

15  UNDERSTAND WHAT THE CONSUMERS ARE LOOKING FOR; WHAT ELSE IS OUT

16  THERE THAT WE'RE COMPETING WITH; HOW TO TARGET OUR PRODUCTS SO

17  IT HAS THE BEST OPPORTUNITIES TO SUCCEED AGAINST ITS

18  COMPETITION.

19  Q    AND LET ME ASK YOU THE SAME QUESTION FOR ADVERTISING, FOR

20  EXAMPLE.  WHAT DOES ADVERTISING --

21        MR. QUINN:  BEYOND THE SCOPE, YOUR HONOR.

22        THE COURT:  SUSTAINED.

23  BY MS. AGUIAR:

24  Q    WE WERE DISCUSSING, AND I BELIEVE MR. QUINN ASKED YOU,

25  QUESTIONS ABOUT THE BRATZ BRAND.  DO YOU RECALL THAT?
```

```
 1   A    YES.
 2   Q    AND ARE THERE ELEMENTS OF DEVELOPING THE BRAND OTHER THAN
 3   DEVELOPING JUST THE DOLL ITSELF?
 4   A    YES.  ABSOLUTELY.
 5   Q    IS ONE OF THOSE ELEMENTS ADVERTISING?
 6   A    YES.
 7   Q    AND WHAT ROLE DOES ADVERTISING PLAY IN BUILDING THE BRAND?
 8        MR. QUINN:  I STILL THINK IT'S BEYOND THE SCOPE, YOUR
 9   HONOR.
10        THE COURT:  LET ME SEE YOU AT SIDE-BAR.
11        (SIDE-BAR PROCEEDINGS AS FOLLOWS:)
12        THE COURT:  COUNSEL, YOU TOLD ME YOU HAD 10 OR
13   15 MINUTES; THAT 10 OR 15 MINUTES HAS LASTED 55 MINUTES.  NOW
14   WE'RE GOING INTO ADVERTISING.  THIS IS EXACTLY WHAT YOU
15   REPRESENTED THAT YOU WERE NOT GOING TO BE DOING.
16        MS. AGUIAR:  WHEN I DID MY INITIAL EXAMINATION, IT
17   WAS STRICTLY RELATED TO PRODUCTS.  MR. QUINN ASKED HER, I
18   THINK, VERY BROAD QUESTIONS.  THIS IS MY LAST QUESTION.  I WAS
19   TRYING TO FOLLOW UP ON AN AREA THAT HE SPECIFICALLY RAISED.
20        THE COURT:  WELL, YOU DID GET INTO BRANDING AT
21   55 MINUTES; IT WAS NOT JUST ON PRODUCTS.
22        LET'S WRAP THIS UP.
23        MS. AGUIAR:  SO JUST THIS LAST QUESTION?
24        THE COURT:  YES, YOU MAY.
25        MS. AGUIAR:  THANK YOU.
```

```
 1              (SIDE-BAR PROCEEDINGS CONCLUDED.)
 2    BY MS. AGUIAR:
 3    Q    IF I RECALL THE QUESTION THAT I ASKED YOU BEFORE WE WENT
 4    TO SIDE-BAR, IT WAS WHAT IS YOUR UNDERSTANDING OF HOW
 5    ADVERTISING IS AN IMPORTANT ELEMENT OF BUILDING THE BRATZ
 6    BRAND?
 7    A    WELL, ADVERTISING'S RESPONSIBILITY IS TO MAKE SURE THAT
 8    THE PUBLIC IS PERCEIVING THE BRAND THE WAY WE WANT THEM TO SEE
 9    IT.
10              MS. AGUIAR:  THANK YOU, YOUR HONOR.
11              I HAVE NOTHING FURTHER.
12              THE COURT:  VERY WELL.
13                        FURTHER EXAMINATION
14    BY MR. QUINN:
15    Q    THOSE PEOPLE THAT YOU IDENTIFIED, MS. PEMBLETON, WHO WERE
16    RESPONSIBLE FOR BUILDING THE BRAND, THEY DIDN'T WORK AT MGA
17    BEFORE MR. BRYANT BROUGHT OVER MATTEL'S CONFIDENTIAL
18    INFORMATION, DID THEY?
19    A    I KNOW ONE KEY PERSON DID.
20    Q    MOST OF THOSE PEOPLE WERE HIRED AFTER HE BROUGHT OVER
21    MATTEL'S INFORMATION IN ORDER TO CAPITALIZE ON THE SUCCESS OF
22    THE DOLLS; ISN'T THAT TRUE?
23    A    NOT ORIGINALLY.  I DON'T BELIEVE THAT WE STAFFED UP
24    SIGNIFICANTLY TO SUPPORT THAT INITIAL LAUNCH.  I THINK THAT WAS
25    JUST SUBSEQUENT YEARS.
```

1   Q   SUBSEQUENT YEARS TO CAPITALIZE ON THE SUCCESS OF THE DOLLS

2   IN THE MARKETPLACE; CORRECT?

3   A   YES; YOU NEED PEOPLE TO DEVELOP PRODUCT.

4   Q   SO IN SUBSEQUENT YEARS THESE PEOPLE WERE HIRED IN ORDER TO

5   CAPITALIZED ON THAT SUCCESS AFTER MR. BRYANT AND MR. LARIAN DID

6   WHAT THEY DID; CORRECT?

7   A   THAT DOESN'T MEAN THAT THEY WERE JUST EXCLUSIVE TO THAT

8   BRAND.  THEY COULD HAVE WORKED ON -- DOLL PEOPLE WORK ON DOLLS.

9   Q   RIGHT.

10          BUT MGA IS KNOWN FOR THE BRATZ DOLLS; RIGHT?

11  A   WELL, I BELIEVE MGA WAS KNOWN FOR DOLLS BEFORE BRATZ.

12  Q   ONE OF THE THINGS THAT MGA ADVERTISES IS DOLLS; CORRECT?

13  A   MGA ADVERTISED DOLLS.

14  Q   BRATZ DOLLS.

15  A   PRIOR TO BRATZ, WE ADVERTISED DOLLS.

16  Q   THESE PEOPLE IN THE BRANDING DEPARTMENT THAT YOU ARE

17  TALKING ABOUT, THEY ARE RESPONSIBLE FOR OVERSEEING ADVERTISING

18  OF BRATZ DOLLS; CORRECT?

19  A   THEY ARE RESPONSIBLE FOR OVERSEEING ADVERTISEMENT OF THE

20  ENTIRE COMPANY'S LINE.

21  Q   AND THESE OTHER PRODUCTS THAT YOU REFERRED TO, BRATZ

22  BRANDED PRODUCTS, PONYZ, PETS, BABYZ, ANGEL DOLLZ, YOU'RE NOT

23  CLAIMING THAT ANY OF THOSE ARE UNIQUE, THAT YOU'RE THE FIRST

24  COMPANY TO COME OUT WITH DOLLS OF THOSE TYPES, ARE YOU?

25  A   NO.  BUT I THINK IT'S IMPORTANT THAT YOU UNDERSTAND THAT

```
 1   BRATZ LENT ITSELF TO THOSE PRODUCTS; THAT DOESN'T MEAN THOSE

 2   PRODUCTS WOULD NOT HAVE EXISTED IF IT WASN'T FOR BRATZ.

 3   THERE'S STILL ROOM IN THE MARKET FOR PONIES, FOR OTHER TYPES OF

 4   DOLLS, FOR PLAY SETS.  IT JUST IS NATURAL WHEN YOU HAVE A

 5   SUCCESSFUL BRAND TO APPLY A BRAND TO A PRODUCT YOU WOULD HAVE

 6   COME OUT WITH ANYWAY.

 7   Q    AND MGA HAS A SUCCESSFUL BRAND BECAUSE MR. BRYANT BROUGHT

 8   OVER TO MGA MATTEL'S CONFIDENTIAL DESIGNS FOR BRATZ; CORRECT?

 9   A    NO.  I DO NOT AGREE.  I BELIEVE THAT MGA HAS A SUCCESSFUL

10   BRAND BECAUSE IT WAS NURTURED INTERNALLY WITH CREATIVE PEOPLE

11   DEVELOPING IT.

12   Q    THE BRAND DID NOT EXIST BEFORE MR. BRYANT BROUGHT HIS

13   DESIGNS OVER; CORRECT?

14   A    THAT IS CORRECT.

15            MR. QUINN:  THANK YOU.

16            THE COURT:  ANYTHING FURTHER?

17            MS. AGUIAR:  NOTHING FURTHER, YOUR HONOR.

18            THE COURT:  VERY WELL.

19            YOU'RE EXCUSED MA'AM.  THANK YOU.

20            PLAINTIFF'S NEXT WITNESS?

21            MR. QUINN:  THE NEXT WITNESS IS MITCHELL KAMARCK, WHO

22   IS HERE; WE JUST NEED A MINUTE TO SORT OF MOVE THINGS AROUND,

23   GET BINDERS OUT, AND GET SOME PRODUCTS OFF THE TABLE.

24            THE COURT:  YOU MAY.

25            (BRIEF PAUSE. )
```

```
 1              THE CLERK:  FOR THE BENEFIT OF THE RECORD, MAY WE
 2    HAVE THE WITNESS STATE YOUR NAME FOR THE RECORD.
 3              THE WITNESS:  MITCHELL KAMARCK, K-A-M-A-R-C-K.
 4              THE CLERK:  HAVING BEEN PREVIOUSLY SWORN,
 5    MR. KAMARCK, I REMIND YOU THAT YOU'RE STILL UNDER OATH.
 6              THE WITNESS:  THANK YOU.
 7                        FURTHER EXAMINATION
 8    BY MR. QUINN:
 9    Q    YOU WERE HERE AND YOU TESTIFIED PREVIOUSLY A FEW WEEKS
10    AGO.  AND JUST TO REMIND US ALL, YOU BEGAN WITH MGA IN 2002 AS
11    ITS CHIEF LEGAL OFFICER.
12    A    TECHNICALLY, I'M NOT SURE WHETHER I STARTED OFF AS THE
13    CHIEF LEGAL OFFICER.  BUT I STARTED OFF IN 2002.
14    Q    WAS THAT IN SEPTEMBER OF 2002?
15    A    IT MAY HAVE BEEN; IT WAS IN THAT PERIOD.
16    Q    DO YOU RECALL WHEN IT WAS THAT YOU BECAME CHIEF LEGAL
17    OFFICER, IF IT WAS IN SEPTEMBER?
18    A    IT WOULD BE SHORTLY THEREAFTER.
19    Q    CERTAINLY BY THE END OF 2002, YOU THINK YOU WERE THE CHIEF
20    LAWYER AT MGA?
21    A    YES.
22    Q    AND WHEN YOU JOINED MGA AND WHEN YOU BECAME THE CHIEF
23    LEGAL OFFICER, THERE WERE SOME CASES, SOME LAWSUITS, THAT MGA
24    WAS INVOLVED IN THAT WERE THEN ALREADY PENDING; IS THAT FAIR TO
25    SAY?
```

```
 1  A    YES.

 2  Q    AND SOME OF THOSE CASE CONCERNED INTELLECTUAL PROPERTY

 3  RIGHTS OR ANTI-PIRACY CASES.

 4  A    CORRECT.

 5  Q    AND THOSE ARE CASES WHERE MGA WAS SAYING THAT THE

 6  DEFENDANTS WERE MAKING KNOCK-OFFS OR PRODUCTS THAT WERE TOO

 7  SIMILAR TO MGA'S PRODUCTS.

 8  A    THE PLEADINGS SPEAK FOR THEMSELVES.

 9  Q    THERE WERE SOME CASES OF THAT NATURE --

10  A    THERE WERE ANTI-PIRACY MATTERS, YES.

11  Q    ONE OF THOSE CASES THAT WAS PENDING THEN WAS A CASE CALLED

12  MGA VERSUS CITY WORLD, PENDING IN HONG KONG.

13       DO YOU RECALL THAT CASE?

14  A    NO.   NOT IN PARTICULAR.

15  Q    YOU SAY NOT IN PARTICULAR.  DO YOU RECALL THERE WAS AN

16  ANTI-PIRACY CASE PENDING IN HONG KONG WHEN YOU BECAME CHIEF

17  LEGAL OFFICER?

18  A    I BELIEVE THERE MIGHT HAVE BEEN A COUPLE.

19  Q    LET ME SHOW YOU -- WE'VE GOT THREE BINDERS UP THERE --

20  A    I DIDN'T REALIZE I WAS THAT VOLUMINOUS.

21  Q    IT HAPPENS TO LAWYERS; PAPER STICKS TO THEM.

22       IF WE COULD ASK YOU TO TURN TO VOLUME I AND LOOK AT

23  EXHIBIT 13705, IF YOU WOULD, PLEASE.

24       **THE COURT:**  ARE YOU SURE IT'S NOT IN VOLUME II?

25       IN THE COURT'S, IT'S IN VOLUME II.
```

```
 1              THE WITNESS:  IT'S NOT IN MY VOLUME.
 2              MR. QUINN:  IT MIGHT BE.  WE MIGHT HAVE MADE A
 3    MISTAKE, YOUR HONOR.  IF EVERYONE HAS FOUND IT, IT MIGHT BE AT
 4    THE BOTTOM END OF VOLUME I OR THE BEGINNING OF VOLUME --
 5              THE WITNESS:  13705.
 6              MR. QUINN:  13705.
 7              THE WITNESS:  I HAVE IT.
 8    BY MR. QUINN:
 9    Q    YOU SEE HERE THAT THIS IS A STATEMENT OF CLAIM RELATING TO
10    A CASE IN HONG KONG?
11    A    YES.
12    Q    AND YOU SEE THE TITLE OF THE PLAINTIFF THERE, IT'S "ABC
13    INTERNATIONAL TRADERS DOING BUSINESS AS MGA ENTERTAINMENT"?
14    A    YES.
15    Q    AND DOES THIS APPEAR TO YOU TO BE A COPY OF A STATEMENT OF
16    CLAIM THAT MGA FILED AS A PLAINTIFF IN A CASE IN HONG KONG?
17    A    I CAN'T SAY THAT I'M FAMILIAR WITH THIS PARTICULAR ONE.
18    Q    IF YOU LOOK AT THE BACK, YOU'LL SEE THE NAME OF SOME
19    LAWYERS.
20    A    YEAH; WILLIAM FAN.
21    Q    IS THAT A NAME THAT YOU RECOGNIZE AS BEING LAWYERS IN HONG
22    KONG WHO DID WORK FOR MGA?
23    A    ABSOLUTELY.
24    Q    DO YOU HAVE ANY REASON TO BELIEVE, LOOKING AT THIS, THAT
25    THIS IS NOT A COPY OF A COMPLAINT THAT MGA FILED IN HONG KONG?
```

```
 1 | A    I HAVE NO REASON TO BELIEVE OTHERWISE.
 2 |          MR. QUINN:  YOUR HONOR, WE'RE GOING TO OFFER THE
 3 | WHOLE DOCUMENT; BUT BECAUSE OF CERTAIN WORDS THAT APPEAR, WE'VE
 4 | BLANKED THEM OUT ON PAGES THAT WE PROPOSE TO DISPLAY.  AND
 5 | BEFORE IT GOES INTO EVIDENCE, OBVIOUSLY THAT'S GOING TO HAVE TO
 6 | BE DEALT WITH.
 7 |          THE COURT:  LET'S PROCEED AS WE HAVE WITH OTHER
 8 | DOCUMENTS, SUCH AS ARTICLES AND THE REST, WHERE THE COURT WILL
 9 | CONDITIONALLY ADMIT, AFTER I HEAR FROM ANY OBJECTIONS, AND THAT
10 | WHICH IS TESTIFIED TO WILL BE ADMITTED.  BECAUSE WE'VE HAD
11 | EXTENSIVE DISCUSSIONS ABOUT PORTIONS THAT WILL COME IN AND WILL
12 | NOT COME IN.
13 |          MR. QUINN:  VERY WELL, YOUR HONOR.
14 |          WE WOULD OFFER THEN EXHIBIT 13705, YOUR HONOR.
15 |          MR. NOLAN:  YOUR HONOR, SUBJECT TO CONDITIONALLY --
16 | WE HAVE NO OBJECTION.
17 |          THE COURT:  VERY WELL.
18 |          YOU MAY PROCEED.
19 | BY MR. QUINN:
20 | Q    IF YOU WOULD TURN, PLEASE, TO PAGE NUMBER 13705-3, IT
21 | ACTUALLY STARTS ON PARAGRAPH FOUR THAT BEGINS ON THE PRECEDING
22 | PAGE; IT MAKES CERTAIN ALLEGATIONS THAT DEFENDANTS ARE DOING
23 | SOME CERTAIN THINGS.
24 |          DO YOU SEE THAT?
25 | A    YEAH.  I SEE "ALLEGATION."
```

1   Q    ALL RIGHT.  AND THEN IF YOU WOULD TURN TO THE TOP OF

2   PAGE 3, JUST TO GIVE YOU SOME CONTEXT; AND PERHAPS WE COULD

3   ENLARGE THE TOP OF THAT PARAGRAPH UP AT THE TOP OF PAGE 3.  WE

4   WILL BE DISPLAYING B COPY IN WHICH -- DO WE HAVE THE B COPY?

5          (OFF THE RECORD DISCUSSION.)

6   BY MR. QUINN:

7   Q    LET ME JUST READ IT THEN.  WE WON'T DISPLAY.

8          DO YOU SEE WHERE IT SAYS THAT THE DEFENDANTS ARE --

9   AND I'M EDITING HERE -- "DISTRIBUTING FASHION DOLLS KNOWN AS

10  'FUNKY TWEENS,' WHICH ARE REPRODUCTIONS OF OR A REPRODUCTION OF

11  A SUBSTANTIAL PART OF THE SAID ARTISTIC WORKS."

12          DO YOU SEE WHAT I'M REFERRING TO THERE?

13  A    YES, I DO.

14  Q    ALLEGATIONS THAT THEY ARE REPRODUCING THE DEFENDANT'S

15  FUNKY TWEEN PRODUCTS; IT'S A REPRODUCTION OF WHAT'S REFERRED TO

16  AS AN ARTISTIC WORK.

17  A    I DO SEE THAT.

18  Q    ALL RIGHT.

19          NOW, LET ME SHOW YOU A STATEMENT THAT MR. NOLAN MADE

20  IN OPENING STATEMENT IN THIS PHASE OF THE TRIAL.  MR. NOLAN

21  SAID IN OPENING STATEMENT:  "WE DIDN'T RELY JUST SIMPLY ON

22  MR. BRYANT'S DRAWINGS TO STOP THE INFRINGEMENT OVER IN

23  HONG KONG OR ANY OTHER JURISDICTION.  IT'S A SERIES OF THINGS."

24          NOW, YOU KNOW THAT'S NOT AN ACCURATE STATEMENT WHEN

25  MR. NOLAN SAYS, "WE DIDN'T RELY JUST SIMPLY ON MR. BRYANT'S

```
 1   DRAWINGS."  YOU KNOW THAT'S INACCURATE, DON'T YOU, SIR?
 2   A    NO.  I WOULD SAY THAT'S AN ACCURATE STATEMENT.
 3   Q    BUT YOU KNOW THAT IN THE CITY WORLD CASE, AS ORIGINALLY
 4   FILED, CITY WORLD SUED SAYING THE DEFENDANT'S FUNKY TWEEN
 5   PRODUCTS WERE REPRODUCTIONS OF THE DRAWINGS AND THAT WAS THE
 6   ONLY ARTISTIC WORK THAT WAS SUED ON?  YOU KNOW THAT, DON'T YOU?
 7   A    I HONESTLY DON'T KNOW THAT.
 8   Q    WELL, LET'S TAKE A LOOK AT PARAGRAPH 3-A.  AND THERE'S A
 9   HEADING THERE AT THE TOP, "PARTICULARS OF ORIGINAL ARTISTIC
10   WORKS."  PARAGRAPH 3-A OF EXHIBIT 13705 APPEARS ON PAGE 2.
11   "THE ONLY ORIGINAL ARTISTIC WORKS IDENTIFIED WHICH ARE BEING
12   REPRODUCED ALLEGEDLY HERE ARE 17 DESIGN DRAWINGS OF VARIOUS
13   FASHION DOLLS MADE BETWEEN THE YEARS 1998 AND 2000."
14        DO YOU SEE THAT?
15   A    I DO SEE THAT.
16   Q    SO WHEN THIS CASE WAS FILED AND THESE ALLEGATIONS WERE
17   MADE ABOUT MGA'S ARTISTIC WORKS BEING REPRODUCED BY THE
18   DEFENDANT'S FUNKY TWEEN PRODUCTS, THE ONLY ARTISTIC WORK IT WAS
19   SUED ON ORIGINALLY WERE THE 17 DESIGN DRAWINGS; CORRECT?
20   A    AGAIN, THIS PREDATES ME.  THE DOCUMENT SAYS WHAT IT SAYS.
21   BUT, YOU KNOW, THAT'S NOT MY UNDERSTANDING OF HOW WILLIAM FAN
22   PROSECUTED THESE.
23   Q    WELL, THIS CASE WAS PENDING WHILE YOU WERE STILL THERE;
24   RIGHT?
25   A    YES.  IT PREDATES ME.  YES, I THINK IT WAS STILL PENDING
```

```
 1   WHEN I ARRIVED.
 2   Q    IT WAS FILED, I THINK, A COUPLE OF MONTHS BEFORE YOU
 3   STARTED.  I THINK YOU CAN CHECK.  IT WAS FILED IN JULY.
 4   A    OKAY.
 5   Q    ALL RIGHT.
 6   A    SO YES.
 7   Q    AND THEN IT CONTINUED TO BE PENDING DURING THE ENTIRE TIME
 8   THAT YOU WERE AT MGA; CORRECT?
 9   A    AGAIN, I BELIEVE IT WAS PENDING.  I DON'T KNOW WHETHER THE
10   COURT HAD RULED ON THIS PARTICULAR APPLICATION BEFORE, BUT I
11   THINK IT WAS PENDING.
12   Q    IT WAS NEVER DISMISSED WHILE YOU WERE THERE; YOU'RE CLEAR
13   ON THAT; YOU NEVER DISMISSED THE CASE.
14   A    I DON'T BELIEVE IT WAS DISMISSED.
15   Q    TO ELIMINATE ANY DOUBT ABOUT THE 17 DESIGN DRAWINGS THAT
16   ARE REFERRED TO HERE THAT MGA WAS SUED ON, TAKE A LOOK AT
17   EXHIBIT 13707, THE AFFIRMATION OF LEE SHIU CHEUNG.
18   A    13707-A?
19   Q    JUST 13707.
20   A    OKAY.
21   Q    DO YOU RECOGNIZE THE NAME OF LEE SHIU CHEUNG?
22   A    THAT'S NOT HOW I WOULD KNOW HIM, BUT I'VE BEEN TOLD THAT
23   THIS IS MR. LEE.
24   Q    FOR ENGLISH PURPOSES, HE USES A DIFFERENT NAME?
25   A    YES.
```

```
 1   Q    AND THE ENGLISH NAME THAT YOU KNOW HIM BY IS WHAT?

 2   A    I THINK IT'S WILLIAM LEE.

 3   Q    AND HE WAS THE MANAGING DIRECTOR OF MGA HONG KONG;

 4   CORRECT?

 5   A    I BELIEVE SO.

 6   Q    ALL RIGHT.

 7        AND THIS IS AN AFFIRMATION, WHICH YOU UNDERSTAND TO

 8   BE LIKE AN AFFIDAVIT OR A DECLARATION; THAT'S THE TERM THEY USE

 9   WHEN THEY CREATE THOSE THINGS OVER IN HONG KONG; CORRECT?

10   A    THAT WAS MY UNDERSTANDING.

11   Q    THIS IS AN AFFIRMATION OF MR. LEE THAT WAS FILED IN

12   CONNECTION WITH THIS CITY WORLD CASE; CORRECT?

13   A    I DON'T KNOW WHETHER IT WAS FILED IN THE CITY WORLD CASE.

14   I DIDN'T FILE IT.  THAT APPEARS TO BE WHAT IT IS.

15        MR. QUINN:  AND I WOULD OFFER EXHIBIT 13707,

16   YOUR HONOR.

17        MR. NOLAN:  NO OBJECTION, PURSUANT TO THE PROCEDURES

18   WE OUTLINED BEFORE.

19        THE COURT:  VERY WELL.

20        YOU MAY PROCEED.

21   BY MR. QUINN:

22   Q    AGAIN, JUST TO ELIMINATE DOUBT ABOUT WHAT THE 17 DESIGN

23   DRAWINGS ARE, IF YOU COULD TURN TO 13707-3 OF MR. LEE'S, OR

24   MR. CHEUNG'S, AFFIRMATION.  YOU CAN SEE IN PARAGRAPH 7 THAT HE

25   SAYS, AND I QUOTE, "NOW PRODUCED AND SHOWN TO ME MARKED LSC-3
```

```
 1   ARE COPIES OF 17 INITIAL CONCEPT AND DESIGN DRAWINGS OF THE

 2   BRATZ DOLLS MADE BY MR. BRYANT IN THE YEAR 2000 PURSUANT TO THE

 3   AGREEMENT."

 4           DO YOU SEE THAT?

 5   A    YES.

 6   Q    AND LSC-3, THAT'S HOW HE REFERS TO THE ATTACHMENT; LSC

 7   BEING HIS INITIALS, LEE SHIU CHEUNG; AND HE'S GOT AN

 8   ATTACHMENT 3, CORRECT, WHERE HE'S GOT THOSE COPIES?

 9   A    I'M NOT FOLLOWING YOU.

10   Q    WELL, HE INDICATES THAT HE'S ATTACHED TO HIS AFFIRMATION

11   THE 17 DESIGN DRAWINGS THAT HE'S REFERRING TO.

12           DO YOU SEE THAT?

13   A    I DO SEE WHERE HE REFERS TO THAT.

14   Q    AND IF YOU TURN NOW -- YOU'LL FIND THAT LSC-3, THE

15   ATTACHMENT, AT PAGE 15 TO 32, 13707-15 TO 32 --

16   A    I SEE WHERE IT REFERENCES LSC-3.

17   Q    YOU HAVE THAT?

18   A    YES.

19   Q    AND THEN I THINK IF YOU TURN TO PAGE 13707, BEGINNING AT

20   PAGE 15, YOU'LL SEE THE ATTACHMENT, LSC-3, AND THE 17 DESIGN

21   DRAWINGS HE REFERS TO.

22           DO YOU SEE THAT?  ARE YOU WITH ME?

23   A    I DO SEE THAT.

24   Q    THEN BEHIND THAT ARE SOME DRAWINGS THAT WE'RE ALL VERY

25   WELL FAMILIAR WITH AT THIS POINT.
```

```
 1              MR. QUINN:  PERHAPS WE COULD JUST PAGE THROUGH THOSE.
 2              (DRAWINGS ARE SHOWN ON SCREEN.)
 3    BY MR. QUINN:
 4    Q    WHEN THIS CASE WAS FILED AGAINST CITY WORLD IN HONG KONG,
 5    THESE ARE THE DRAWINGS THAT MGA SUED ON; CORRECT?
 6    A    YEAH.  IT APPEARS THAT'S THE REFERENCE TO WHAT THE
 7    COMPLAINT IS IN THIS ACTION.
 8    Q    RIGHT.
 9              AND, OF COURSE, THIS WAS BEFORE THIS LAWSUIT, THE
10    MATTEL/MGA LAWSUIT, WAS FILED; CORRECT?
11    A    YEAH.  I COULD SAY THAT'S CORRECT.
12    Q    SO WHILE YOU WERE THERE, WHILE YOU WERE AT MGA, THE ONLY
13    BASIS THAT WAS ASSERTED FOR THIS CLAIM AGAINST CITY WORLD WERE
14    THESE ORIGINAL DRAWINGS.
15              MR. NOLAN:  OBJECTION, YOUR HONOR.  VAGUE AND
16    AMBIGUOUS; LACK OF FOUNDATION; ALSO CALLS FOR A LEGAL
17    CONCLUSION.
18              THE COURT:  REPHRASE, COUNSEL.
19    BY MR. QUINN:
20    Q    WHILE YOU WERE THERE, DO YOU RECALL THAT THIS WAS EVER
21    AMENDED TO DELETE THE DRAWINGS OR TO ADD OTHER WORKS OR TO
22    CHANGE THIS?
23    A    I'M NOT AWARE.
24    Q    SO JUST LOOKING AT THIS NOW, BASED ON THE KNOWLEDGE YOU
25    PRESENTLY HAVE, WHEN THIS CASE WAS FILED AND WHILE YOU WERE
```

```
 1   THERE, THE ONLY ARTISTIC WORKS REFERRED TO IN THIS COMPLAINT
 2   AGAINST CITY WORLD WERE MR. BRYANT'S DRAWINGS; IS THAT CORRECT?
 3   A    AGAIN, THAT WAS NOT MY UNDERSTANDING OF HOW HE WAS
 4   PROSECUTING THESE MATTERS, BECAUSE HE HAD ORIGINAL DOLLS IN
 5   HONG KONG FOR THE PROSECUTION OF THESE MATTERS, SO...
 6   Q    FOCUSING ON THE COMPLAINT, WHAT WAS FILED WITH THE COURT,
 7   SO FAR AS YOU'RE AWARE, SITTING HERE NOW, THE ONLY ARTISTIC
 8   WORKS THAT FORM THE BASIS OF THIS CLAIM WHILE YOU WERE AT MGA
 9   WERE THOSE ORIGINAL DRAWINGS THAT MR. BRYANT DID.
10            MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION,
11   YOUR HONOR.
12            THE COURT:  YOU'RE ASKING BASED ON HIS KNOWLEDGE?
13            MR. QUINN:  YES.
14            THE COURT:  OVERRULED.
15            THE WITNESS:  BASED ON WHAT I JUST READ, IF THAT'S
16   THE ONLY REFERENCE, THEN THAT'S THE ONLY REFERENCE.
17   BY MR. QUINN:
18   Q    SKIPPING FORWARD SEVERAL YEARS NOW, DO YOU KNOW WHETHER OR
19   NOT IN 2007, AFTER THIS LAWSUIT WAS FILED, THIS CASE THAT
20   MATTEL AND MGA AND MR. LARIAN ARE INVOLVED IN, WHETHER AFTER
21   THIS LAWSUIT WAS FILED, THAT COMPLAINT IN HONG KONG WAS AMENDED
22   TO DELETE ALL REFERENCE TO THE DRAWINGS?
23   A    DO I KNOW --
24   Q    DO YOU KNOW WHETHER THAT'S TRUE OR NOT?
25   A    I HAVE NO KNOWLEDGE REGARDING ANYTHING AFTER I LEFT MGA.
```

1    Q    LET'S LOOK AT THESE FUNKY TWEEN DOLLS THAT MGA TOLD THE

2    COURT IN HONG KONG IN THE CITY WORLD CASE WERE A REPRODUCTION

3    OF MR. BRYANT'S DRAWINGS.

4              **MR. NOLAN:**  OBJECTION.  MISCHARACTERIZES THE LEGAL

5    DOCUMENT.

6              **THE COURT:**  REPHRASE, COUNSEL.

7              **MR. QUINN:**  ALL RIGHT.

8    **BY MR. QUINN:**

9    Q    YOU SAW THE COMPLAINT MAKES REFERENCE TO THESE FUNKY TWEEN

10   DOLLS?

11   A    YEAH.

12   Q    WE LOOKED AT THAT A MOMENT AGO?

13   A    YES.

14   Q    WE LOOKED AT THE LANGUAGE ABOUT HOW THEY ARE A

15   REPRODUCTION OF THE ARTISTIC WORKS?

16   A    YES.  THERE WAS SOME ALLEGATIONS IN THERE.

17   Q    LET'S TAKE A LOOK AT WHAT THESE FUNKY TWEEN DOLLS LOOK

18   LIKE THAT WERE ALLEGED TO BE A REPRODUCTION OF THE ARTISTIC

19   WORKS.  I'D ASK YOU TO TURN, PLEASE, TO EXHIBIT 13707; THAT'S

20   THE SAME AFFIDAVIT OF MR. CHEUNG THAT WE WERE JUST LOOKING AT.

21   A    RIGHT.

22   Q    AND IF YOU WOULD LOOK AT PARAGRAPH 24 OF MR. CHEUNG'S

23   AFFIRMATION THAT APPEARS ON PAGE 7, YOU'LL SEE THAT HE SAYS HE

24   IS ATTACHING COPIES OF DOWNLOADS OF IMAGES OF FUNKY TWEEN DOLLS

25   FROM A WEBSITE, AN EBAY® WEBSITE.

```
 1              DO YOU SEE THAT?

 2   A    YES.

 3   Q    AND HE SAYS HE ATTACHED THOSE AS LSC-17.  THAT'S HOW THEY

 4   DO THINGS; THE ATTACHMENT IS NUMBERED WITH HIS INITIALS.

 5              DO YOU SEE THAT, SIR?

 6   A    I SEE THE REFERENCE TO LSC-17.

 7   Q    AND I THINK IF YOU TURN NOW TO PAGE 113, YOU WILL SEE

 8   LSC-17; THAT'S ONE OF THE SCREEN SHOTS.

 9   A    I DO SEE 113.

10   Q    THAT'S AN IMAGE OF ONE OF THESE FUNKY TWEEN DOLLS THAT

11   APPARENTLY WAS ON EBAY®.

12   A    OKAY.

13   Q    AND THEN THERE'S ANOTHER AT PAGE 116.  IF YOU COULD TURN

14   FORWARD TO THAT, PLEASE, ANOTHER EBAY® SCREEN SHOT.

15              I APOLOGIZE, THESE AREN'T TERRIFIC COPIES.

16   A    OKAY.

17   Q    AND THEN ON PAGE 119 IS ANOTHER ONE.

18   A    OKAY.

19   Q    DO YOU SEE THAT?

20              AND THEN MR. CHEUNG ALSO ATTACHES SOME OTHER IMAGES,

21   WHICH HE GETS FROM THE DEFENDANT'S WEBSITE.  IF YOU GO BACK TO

22   HIS AFFIRMATION AT PARAGRAPH 18; AND THAT'S AT PAGE 6.

23   A    I SEE IT.

24   Q    AND HE SAYS THERE, "ATTACHED AS LSC-14 ARE SOME DOWNLOADS

25   OF SCREEN SHOTS FROM THIS WEBSITE," THE DEFENDANT'S WEBSITE.
```

```
 1              DO YOU SEE THAT THERE?

 2    A    I DO SEE THE REFERENCE.

 3    Q    AND THESE ARE A LITTLE BIT BETTER COPIES.  IF YOU GO,

 4    THEN, TO PAGE 91, YOU'LL GET BACK TO THE ATTACHMENT, 13707-91.

 5              THESE ARE OTHER IMAGES OF THESE FUNKY TWEEN DOLLS,

 6    WHICH ARE ALLEGED TO BE REPRODUCTIONS OF THE DRAWINGS.

 7              DO YOU SEE THAT?

 8    A    I SAW THE EXHIBIT.

 9    Q    I'D LIKE TO GO BACK TO THE FIRST EBAY® SCREEN SHOT WE

10    LOOKED AT, 13707-113.

11    A    I SEE IT.

12              MR. QUINN:  IF I COULD APPROACH THE WITNESS,

13    YOUR HONOR.

14              THE COURT:  YOU MAY.

15    BY MR. QUINN:

16    Q    I'M GOING TO BRING YOU, MR. KAMARCK, PLAINTIFF'S

17    EXHIBIT 13708.  THE QUESTION I HAVE FOR YOU IS, DOES THE DOLL

18    THAT YOU'RE HOLDING THERE IN THAT BOX -- IF YOU COMPARE THAT TO

19    THE DOLL OR THE IMAGE OF THE DOLL AT EXHIBIT 13707-113, DOES

20    THE LATTER, THE IMAGE, APPEAR TO BE A COPY OF THAT DOLL,

21    EXHIBIT 13708, WHICH YOU'RE HOLDING IN YOUR HAND?

22    A    IT'S SIMILAR.  I WOULDN'T BE 100 PERCENT BECAUSE OF THE

23    QUALITY OF THE PICTURE AND THE FACT THAT THINGS HAVE BEEN MOVED

24    AROUND WITHIN THE PACKAGING.  BUT THE CLOTHING LOOKS SIMILAR.

25    I CAN'T REALLY TELL FROM THE FACE.
```

```
 1   Q    IT SAYS "FUNKY TWEENS" ON THE OUTSIDE?

 2   A    YES, IT DOES.

 3   Q    AND DO YOU SEE ANY DIFFERENCES AS YOU COMPARE THE DOLL,

 4   EXHIBIT 13708, TO THE IMAGE THAT WE HAVE ON THE SCREEN?

 5   A    I MEAN, THE ISSUE I HAVE IS THE PACKAGING.  I MEAN, IT'S

 6   NOT THE SAME INTERIOR PACKAGING.  THE DOLL LOOKS LIKE SHE'S

 7   WEARING THE SAME CLOTHING.  I CAN'T TELL THE FACE PAINTING

 8   BECAUSE THE QUALITY IS NOT GOOD ENOUGH, BUT THE HAIR APPEARS TO

 9   BE SIMILAR.  IT JUST SEEMS -- THE PACKAGING SEEMS TO HAVE

10   BEEN -- SOMETHING HAS BEEN DONE TO THE PACKAGING, BECAUSE SHE'S

11   NOT POSITIONED IN THE SAME WAY -- THERE'S SOMETHING THAT'S

12   SUPPOSED TO BE HERE AND ON THE SIDE; THEY'RE GONE.  BUT, YOU

13   KNOW...

14   Q    JUST FOCUSING ON THE DOLL AND NOT THE BACKGROUND OR THE

15   ACCESSORIES, DOES THIS APPEAR -- 13707-113, WHICH WAS INCLUDED

16   IN THE PAPERS THAT MGA FILED WITH THE COURT IN HONG KONG, DOES

17   THAT APPEAR TO BE AN IMAGE OF THAT DOLL, EXHIBIT 13708, THAT

18   YOU'RE HOLDING IN YOUR HAND?

19   A    YEAH.  AGAIN, I CAN'T TELL WITH THE FACE BECAUSE IT'S

20   OBVIOUSLY NOT CLEAR ENOUGH TO SEE THE FACE PAINTING, BUT THE

21   HAIR APPEARS TO BE OF A SIMILAR MAKE, AND SHE'S WEARING A

22   SIMILAR OUTFIT.

23             MR. QUINN:  I'D OFFER EXHIBIT 13708, YOUR HONOR.

24             MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

25             THE COURT:  THIS IS THE DOLL ITSELF?
```

```
 1            MR. QUINN:  YES, YOUR HONOR.  I'M OFFERING THE DOLL,
 2   EXHIBIT 13708.
 3            THE COURT:  IT'S ADMITTED.
 4            MR. QUINN:  THEN IF I COULD SHOW EXHIBITS 13710,
 5   13712, 13714; AND IF I COULD APPROACH THE WITNESS WITH THESE,
 6   YOUR HONOR.
 7            THE COURT:  YOU MAY.
 8   BY MR. QUINN:
 9   Q    MY QUESTION FOR YOU, MR. KAMARCK, IS WHETHER THESE DOLLS
10   ARE OTHER FUNKY TWEEN DOLLS WHICH WERE THE SUBJECT OF THAT CASE
11   IN HONG KONG?
12   A    YOU KNOW, I HONESTLY DON'T KNOW.  WE'D HAVE TO GO THROUGH
13   THE SAME EXERCISE.
14   Q    YOU JUST DON'T FEEL COMFORTABLE CONFIRMING THAT ONE WAY OR
15   THE OTHER?
16   A    NO.  AGAIN, I WASN'T THERE AT THE TIME THIS WAS FILED, AND
17   I DON'T THINK I'VE EVER SEEN THESE BEFORE.
18   Q    BUT THE ALLEGATION IN THE CITY WORLD CASE WAS THAT THE ONE
19   DOLL THAT WE'VE NOW RECEIVED INTO EVIDENCE, 13708 --
20            MR. QUINN:  IF WE COULD PUT THAT BEFORE THE WITNESS
21   AGAIN; AND PERHAPS WE COULD REMOVE THE OTHER THREE, SO AS NOT
22   TO BLOCK THE JURY'S VIEW.
23   BY MR. QUINN:
24   Q    AS WE'VE SEEN, THE ALLEGATION IN THE CITY WORLD CASE WAS
25   THAT THE DOLL THAT YOU'RE HOLDING, 13708, WAS A REPRODUCTION OF
```

```
 1   MR. BRYANT'S ORIGINAL DRAWINGS; CORRECT?
 2   A    THAT APPEARS TO BE THE ALLEGATIONS AS YOU HAVE PRESENTED
 3   THEM TO ME.
 4   Q    AND AS YOU'VE SEEN IN LOOKING AT THE PLEADINGS HERE.
 5        AND IF WE COULD LOOK AT THOSE DRAWINGS.  AND THE
 6   BETTER COPIES ARE IN EVIDENCE AS EXHIBIT 10.  IF WE COULD LOOK
 7   AT PAGES 2, 4, 10, AND 11 OF EXHIBIT 10.
 8        THE QUESTION I HAVE FOR YOU IS WHETHER YOU CAN TELL
 9   US -- AND THESE ARE JUST ON THE SCREEN, SIR -- THERE ARE COPIES
10   THERE BEFORE YOU, BUT THERE ARE BETTER COPIES THAT WERE PUT ON
11   THE SCREEN.  FEEL FREE TO LOOK AT THOSE IF YOU WANT.
12        THE QUESTION I HAVE IS WHETHER YOU CAN TELL US WHICH
13   ONE OF THESE ORIGINAL CARTER BRYANT DRAWINGS WAS ALLEGEDLY
14   REPRODUCED BY THE DEFENDANT IN THE CITY WORLD CASE IN MAKING
15   THAT DOLL THERE, EXHIBIT 13708.
16        MR. NOLAN:  OBJECTION.  LACKS FOUNDATION; ALSO CALLS
17   FOR A LEGAL CONCLUSION.
18        THE COURT:  YOU'RE GOING TO HAVE TO LAY SOME FURTHER
19   FOUNDATIONAL QUESTIONS, COUNSEL.
20   BY MR. QUINN:
21   Q    BY LOOKING AT THE DRAWINGS, CAN YOU DETERMINE WHICH ONE OF
22   THE DRAWINGS THIS DOLL WAS ALLEGED TO BE A REPRODUCTION OF?
23   CAN YOU DO THAT?
24   A    I WOULD BE READING WILLIAM FAN'S MIND IN THAT INSTANCE,
25   TRYING TO GUESS WHAT HE WAS RELYING UPON.
```

```
 1   Q    DURING THE TIME YOU WERE CHIEF LEGAL OFFICER AT MGA, DID

 2   THIS CASE EVER COME TO YOUR ATTENTION?  DID YOU EVER HAVE

 3   OCCASION TO GET INVOLVED OR MAKE DECISIONS OR REVIEW PLEADINGS

 4   RELATING TO THIS CASE?

 5   A    YOU KNOW, IT DOESN'T REALLY RING A BELL.  THERE WERE A LOT

 6   OF MATTERS I WAS HANDLING.  THIS ONE DOESN'T STICK OUT.

 7   Q    YOU'RE NOT SAYING YOU NEVER HAD OCCASION TO LOOK INTO IT;

 8   YOU JUST DON'T RECALL ONE WAY OR THE OTHER; IS THAT TRUE?

 9   A    THAT'S TRUE.

10   Q    IN THE ALLEGATIONS THAT WERE MADE, THE DOLL, THE FUNKY

11   TWEEN DOLL, WAS A REPRODUCTION OF THE DRAWINGS.  CAN YOU

12   DESCRIBE FOR US IN WHAT SENSE IT WAS A REPRODUCTION?  IS THAT

13   SOMETHING YOU CAN DO?

14        MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION; CALLS FOR

15   A LEGAL CONCLUSION.

16        THE COURT:  BASED ON THE ANSWER TO THE LAST QUESTION,

17   COUNSEL, SUSTAINED.

18   BY MR. QUINN:

19   Q    LET ME JUST ASK WHETHER YOU KNOW OR IF YOU HEARD FROM ANY

20   SOURCE WHETHER ANY SCIENTIFIC ANALYSIS WAS EVER DONE TO COMPARE

21   THE DRAWINGS TO THE DOLLS THAT WERE THE SUBJECT OF THE LAWSUIT.

22        MR. NOLAN:  OBJECTION, YOUR HONOR.  ASSUMES FACTS NOT

23   IN EVIDENCE WITH RESPECT TO A LEGAL CONCLUSION AS TO HONG KONG

24   PROCEEDINGS.

25        THE COURT:  THAT'S FINE.  OVERRULED.
```

1        **THE WITNESS:**  I'M UNAWARE OF ANYTHING LIKE THAT.

2   **BY MR. QUINN:**

3   Q    DO YOU KNOW WHETHER ANYONE WAS EVER DIRECTED TO LOOK AT

4   THE SIZE AND SHAPE OF THE HEAD IN THE DRAWING AND COMPARE IT TO

5   THE DOLL THAT WAS THE SUBJECT OF THE LAWSUIT --

6   A    NO.

7   Q    -- TO SEE WHETHER IT WAS THE SAME SIZE OR NOT?

8   A    I'M NOT AWARE OF ANYTHING LIKE THAT.

9   Q    LET'S PUT ONE OF THOSE IMAGES BACK UP, ONE OF THE

10  DRAWINGS; AND YOU HAVE THE DOLL BEFORE YOU, EXHIBIT 13708.  IF

11  WE COMPARE THEM, WOULD YOU AGREE THAT THE DOLL AND -- WE'RE

12  JUST LOOKING NOW AT PAGE 2 OF EXHIBIT 10 -- YOU WOULD AGREE

13  THAT THERE ARE SOME SIMILARITIES BETWEEN THE DOLL AND THE

14  FIGURE DEPICTED IN THE DRAWING?

15       **MR. NOLAN:**  OBJECTION, YOUR HONOR, TO THE RELEVANCE

16  OF THIS BECAUSE OF THE FACT THAT THESE PROCEEDINGS IN HONG KONG

17  CALLS FOR A LEGAL CONCLUSION, AND THIS COMPARISON IS

18  IRRELEVANT.

19       **THE COURT:**  I TEND TO AGREE, COUNSEL.

20       HOW IS THIS RELEVANT?

21       **MR. QUINN:**  THE BASIS OF THE ALLEGATION THAT ONE IS A

22  REPRODUCTION OF THE OTHER.  HE'S TOLD ME THAT HE CAN'T REALLY

23  DO THAT, SO I'M ASKING HIM FIRST TO FOCUS ON SIMILARITIES.

24       **THE COURT:**  LET ME SEE YOU AT SIDE-BAR ON THIS.

25       (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

1  SIDE-BAR:)

2      **THE COURT:**  THE CONCERN I'M HAVING IS WITH THE WORD

3  "REPRODUCTION," WHETHER OR NOT IT HAS LEGAL IMPORT OR A COMMON

4  MEANING.  I WOULD BE IN AGREEMENT WITH YOU IF IT WAS SIMPLY A

5  COMMON MEANING OF REPRODUCTION, BECAUSE THAT WOULD BE EVEN MORE

6  SIMILAR THAN A SUBSTANTIALLY SIMILAR ITEM.

7      HOWEVER, THE CONCERN I HAVE IS -- AND I THINK YOUR

8  OBJECTION GOES TO THE ISSUE OF WHETHER OR NOT REPRODUCTION HAS

9  A PARTICULAR, MORE BROAD SENSE UNDER HONG KONG LAW.  BECAUSE IF

10  IT HAS A MORE NARROW SENSE, OR JUST AS NARROW, THEN IT'S FINE.

11  YOU DON'T GET TO ESCAPE THE LEGAL REASONING JUST BECAUSE IT'S A

12  LEGAL TERM IF THE LEGAL TERM IS EVEN MORE CONFINING.

13      SO I GUESS THAT'S MY QUESTION.

14      WHAT DOES IT MEAN TO SAY "REPRODUCE" IN THIS CONTEXT?

15  WHAT DOES THAT MEAN?

16      **MR. QUINN:**  MY ANSWER TO THE QUESTION IS NOT INFORMED

17  BY ANY KNOWLEDGE OF HONG KONG LAW, YOUR HONOR, BECAUSE I DON'T

18  HAVE ANY.

19      I ASSUME THAT THE ALLEGATION THAT THIS IS A

20  REPRODUCTION OF THAT CONNOTES ITS COMMON MEANING.  ELSEWHERE IN

21  THE COMPLAINT THERE ARE SPECIFIC LEGAL ALLEGATIONS ABOUT

22  "INFRINGEMENT."  WE'VE GONE AWAY FROM THAT AND MADE EFFORT TO

23  BLACK THAT OUT.

24      **THE COURT:**  RIGHT.  THAT'S WHAT I DON'T KNOW.

25  BECAUSE I GO BACK TO THIS DISTINCTION THAT I'VE BEEN TRYING TO

```
 1    MAKE.  I THINK IT'S UNFAIR TO MATTEL FOR MGA TO BE ABLE TO
 2    ESCAPE PRIOR FACTUAL REPRESENTATIONS THAT THEY MADE IN OTHER
 3    LITIGATION; WHETHER IT'S IN HONG KONG OR TIMBUKTU.
 4         AT THE SAME TIME, IT IS NOT FAIR TO MGA TO HAVE A
 5    STATEMENT THAT HAS A PARTICULAR LEGAL MEANING BE USED FOR
 6    ANOTHER PURPOSE.  THAT'S THE DIVIDING LINE.
 7         THAT'S WHERE I AM ON THIS.  I NEED TO BE EDUCATED, I
 8    SUPPOSE, ON THIS PARTICULAR STATEMENT.
 9         MR. NOLAN:  THAT'S THE BASIS OF OUR OBJECTION,
10    YOUR HONOR.
11         THE COURT:  IT'S A LEGITIMATE BASIS.  I JUST DON'T
12    KNOW THE ANSWER BECAUSE I DON'T KNOW WHAT THIS MEANS.
13         NOW, WE HAVE THE ATTORNEY ON HERE WHO OVERSAW THE
14    LITIGATION, AND I WOULD HAVE HOPED -- AND I THOUGHT THIS WAS
15    WHERE THIS WAS GOING -- THAT HE WOULD KNOW WHAT THIS MEANS.
16    BUT APPARENTLY HE DOESN'T HAVE THE FOUNDATION.
17         SO GIVEN THE CURRENT RECORD, I THINK I HAVE TO
18    SUSTAIN THE OBJECTION.
19         MR. QUINN:  I ASSUME I CAN FRAME THE QUESTION ABOUT
20    ASKING THE COMPARISON, SIMILARITIES OR DISSIMILARITIES, AND NOT
21    USE THE WORD "REPRODUCTION."
22         THE COURT:  WITHOUT THAT, THEN, THE RELEVANCY
23    OBJECTION KICKS IN, BECAUSE IT'S ONLY RELEVANT IF IT'S BEING
24    USED TO -- IT HAS TO BE BOOTSTRAPPED ON TO A FACTUAL AVERMENT
25    IN THE LITIGATION.  AND THAT NEXUS IS MISSING IF WE DON'T HAVE
```

1   THE REPRODUCTION.  UNLESS THERE'S SOMETHING ELSE THAT I'M

2   MISSING.

3            **MR. QUINN:**  YOUR HONOR, THIS ISSUE HAS BEEN ON THE

4   TABLE FOR SOME TIME.  WE'VE TALKED ABOUT INFRINGEMENT.  NOBODY

5   EVER RAISED AN ISSUE UNTIL THIS MOMENT THAT REPRODUCTION MIGHT

6   HAVE SOME SPECIAL MEANING.

7            **THE COURT:**  IT MAY HAVE BEEN ON THE TABLE BETWEEN

8   YOU.  IT WAS NOT ON THE TABLE IN FRONT OF ME.  I SAID I WOULD

9   CALL THEM DURING THE COURSE OF THE TRIAL BASED ON -- THIS IS

10  GOING TO CONTINUE TO BE THE ISSUE.  IF THERE'S A FOUNDATION FOR

11  IT BEING A CLEAR, COMMON VERNACULAR-TYPE WORD, THAT'S FINE.

12  "THESE 17 DRAWINGS MR. BRYANT DID IN 2000..."  THAT I CAN

13  INTERPRET HAS NO SPECIAL LEGAL IMPORT.  EVEN IF IT HAS A LEGAL

14  IMPORT, I'M NOT GOING TO ALLOW MGA TO ESCAPE IT IF IT HAS AN

15  EVEN MORE NARROW DEFINITION.

16           IF "REPRODUCED" MEANT IT HAD TO BE ABSOLUTELY THE

17  SAME, THAT'S CERTAINLY WITHIN THE UNIVERSE OF SUBSTANTIALLY

18  SIMILAR.  AND YOU DON'T GET TO SAY IN ONE LITIGATION 'THEY ARE

19  ABSOLUTELY THE SAME OR A REPRODUCTION OR A REPLICA' AND THEN IN

20  ANOTHER LITIGATION SAY 'THEY ARE NOT SUBSTANTIALLY SIMILAR.'

21           I'M NOT GOING TO LET THAT HAPPEN EITHER.

22           I DON'T KNOW WHAT THIS WORD "REPRODUCED" MEANS.

23           YOU CAN CIRCLE BACK AND LAY A FOUNDATION FOR IT WITH

24  THIS WITNESS OR ANOTHER WITNESS, BUT BASED ON WHAT WE HAVE

25  RIGHT NOW, THERE'S NO FOUNDATION FOR THE RELEVANCY.

1           **MR. QUINN:** ONE OTHER THING. AS THE PROPONENT OF THE

2   OBJECTION, WOULDN'T MGA HAVE THE RESPONSIBILITY TO COME FORWARD

3   AND SAY THIS HAS GOT SOME SPECIALIZED MEANING?

4           **THE COURT:** YOU'RE THE PROPONENT OF THE EVIDENCE, AND

5   I'VE ALREADY SET THE PARAMETERS ON THAT.

6           **MR. QUINN:** THANK YOU.

7           **THE COURT:** VERY WELL.

8           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

9           **THE COURT:** WE'RE JUST ABOUT AT THE LUNCH BREAK.

10  WE'LL TAKE OUR LUNCH BREAK NOW.

11          I'LL SEE THE JURY AT 1:30; I'LL SEE COUNSEL AT 1:15.

12          (WHEREUPON, MORNING SESSION CONCLUDES.)

13

14

15

16

17

18                          CERTIFICATE

19

20  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
21  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
    ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
22  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.
23

24  _____              _____
    THERESA A. LANZA, CSR, RPR                  DATE
25  FEDERAL OFFICIAL COURT REPORTER