1          MR. QUINN:  Your Honor, we have an objection to the

2    use of this document.  We haven't seen it before.

3          THE COURT:  You haven't seen it before?

4          MR. QUINN:  No.

5          THE COURT:  Counsel, was this produced in

6    discovery?

7          MR. HANSEN:  It's got a production number on it,

8    yes.  It was produced in discovery.

9          MR. QUINN:  Your Honor, that doesn't answer the

10   question.

11         THE COURT:  Let's go to sidebar.

12         **(SIDEBAR CONFERENCE HELD.)**

13         THE COURT:  Mr. Quinn?

14         MR. QUINN:  Your Honor, our concern is that this --

15   it's our recollection that this document was not produced in

16   discovery.  Bates numbers are added to documents that aren't

17   produced in the course of this trial.  The fact that there's

18   a Bates number here doesn't answer the question as to whether

19   it was timely produced in discovery.  And our recollection,

20   our team's recollection is we haven't seen this before.

21         THE COURT:  Was it on your exhibit list?

22         MR. HANSEN:  It's my understanding it was produced.

23   It was added to the exhibit list based on the questioning

24   today in terms of the timing.  This goes to the timing of the

25   addition of materials for artistic works other than the

1   drawings.

2           THE COURT:  It's just that we don't -- this is the

3   first time we've had this.  I assume that you have a way of

4   verifying that it was produced?

5           MR. HANSEN:  I can't say specifically.  I was

6   informed that it's been produced.

7           THE COURT:  I assume somebody on the Skadden Arps

8   team can somehow confirm that?

9           MR. HANSEN:  I can do something else for a minute.

10          THE COURT:  Could you?  We've only got 10 minutes

11  left.

12          MR. QUINN:  The question is when.  It's been

13  produced.  The question is when.

14          MS. AGUIAR:  With due respect, we have been

15  producing, throughout the trial, documents to each of you.

16  We get documents from you guys even a day before testimony.

17  So all I'm saying is we will absolutely go back right now and

18  confirm that it's been produced.  The timing of when it's

19  been produced, as we all know, the practice is that we've

20  been doing a rolling production.  So why don't we go check.

21          MR. HANSEN:  And I didn't know that this issue was

22  going to arise until today, which is also why it wasn't in

23  the binder.

24          THE COURT:  Why don't you finish up the next 10

25  minutes, and we can take this up after hours.

1              MR. HANSEN:  I'll finish her off without this.

2              MS. AGUIAR:  We might be able to confirm that right

3   now.

4              MR. ZELLER:  Then for the record, your Honor, this

5   would have been a document the Court would have compelled

6   them to produce within five days of the May order dealing

7   with the other infringement litigation.  So if it's after

8   that cutoff, then we have a problem with it.

9              THE COURT:  If there was a specific order requiring

10  it to be produced in a specific time frame, that puts it in a

11  different category.  I just don't know.

12             MS. AGUIAR:  We'll try to confirm that.

13             (CONCLUSION OF SIDEBAR CONFERENCE.)

14             MR. HANSEN:  We're working to confirm.

15             THE COURT:  Very well.  Why don't you proceed with

16  another question.

17  Q.   BY MR. HANSEN:  You were asked about the Multi Toy case?

18  A.   Yes.

19  Q.   Are you familiar with that case?

20  A.   Yes, I am.

21  Q.   Can you just generally --

22  A.   In general terms.

23  Q.   Can you generally describe for me what the case was

24  about?

25  A.   The case was brought against three or four stores, as I

1   recall, or entities that were selling knock-offs of the Bratz

2   dolls in downtown Los Angeles.  So Multi Toy, as I recall,

3   was one of the defendants.  And there were others there.  And

4   they were selling dolls in packaging that looked very similar

5   to the Bratz packaging, coloring that looked similar to the

6   Bratz packaging, copying some of the artwork on their

7   counterfeit or knock-off packaging that would also appear on

8   the Bratz packaging of the original dolls.

9   Q.  Did MGA have issues with what you're calling knock-offs?

10  A.  Yes, they did.

11  Q.  Why was that?

12  A.  Well, generally whenever there's a product that's

13  successful in the marketplace, there tend to be imitators,

14  especially in the toy arena.  And there were a number of

15  them -- most of the products were made in China, and, for

16  instance, some of the things that came up in Multi Toy we

17  actually saw in South Africa and the U.K.

18        So the same dolls would appear in different places

19  around the world.  So that they were essentially -- they

20  along with others sort of jumped on the bandwagon to put out

21  dolls in packaging that looked like ours, lettering that

22  looked like ours.  When I say ours, MGA's.  Logos that looked

23  similar in order to capitalize on the popularity of the Bratz

24  brand and the dolls that people were buying.

25  Q.  Could you look, please, Ms. Gronich, in the white binder

1   that is there on the corner.  And it's -- it's the second

2   tab.  It's Exhibit No. 10877.

3   A.    Yes.

4   Q.    Could you identify this document for me, please?

5   A.    It's a declaration that I signed in connection with

6   MGA's application for a temporary restraining order against

7   the defendants in the Multi Toy litigation, and it lists all

8   the defendants.

9           MR. QUINN:  Your Honor, move Exhibit 10877 into

10  evidence.

11          THE COURT:  Any objection to that?

12          MR. QUINN:  No objection, your Honor.

13          THE COURT:  It's admitted.  You may publish.

14          **(Exhibit 10877 received.)**

15  Q.    BY MR. HANSEN:  So could we look for a second -- if you

16  would flip to page 68 in that stack.  It's about a third of

17  the way in.  And it's actually pages 68 through 72.  And

18  would you please tell me what those pages are?

19  A.    It's a photocopy of the copyright registration

20  certificate for the Sasha doll configuration, accessories,

21  and packaging.

22  Q.    So this is a copyright registration for the Sasha doll

23  configuration, accessories, and packaging?

24  A.    Yes.

25  Q.    Could we have Exhibit 559 on the screen, please.  This

1   is already in evidence.  It's the -- this is the same

2   copyright registration for the Sasha doll packaging and

3   accessories?

4   **A.**   Yes.

5   **Q.**   And the -- I would like to use the -- the reason I'm

6   going to the registration is it has a better color picture.

7          If we could look at the -- just briefly, the page 5

8   of that.  Of the registration.  These are pictures of the

9   Sasha doll.

10  **A.**   Yes.

11  **Q.**   Okay.

12         And, Aaron, could we put up Exhibit 17558, which is

13  already admitted.

14         And can you identify this for me?

15  **A.**   The picture on the screen, on the left?

16  **Q.**   Yes.

17  **A.**   It's just a better picture of the picture on the right,

18  showing the Sasha packaging and artwork.

19  **Q.**   And so this is the Sasha doll that's in the copyright

20  registration?

21  **A.**   That is correct, yes.

22  **Q.**   Okay.

23  **A.**   It's the original doll.

24  **Q.**   Now, if we could look, please, at -- sorry for the

25  jumping around.  Exhibit 6.  Go back to your declaration for

```
 1   a second.  Exhibit 10877.  And if we could look at Exhibit 6,
 2   which starts at page 222 a little further in.
 3   A.   Yes.
 4   Q.   And if we could go to page 223.  Can you tell me what
 5   this is?  Identify this photo for us.
 6   A.   I don't recall.  I have to look at what my -- what
 7   specific entity sold this, but this is one of the dolls that
 8   was -- and packaging that was -- one of the products that was
 9   the subject of the litigation, the Multi Toy litigation.
10   Q.   So the Musical Trendy Teenies doll shown in this picture
11   was one of the dolls at issue, one of the packages that was
12   at issue in the litigation?
13   A.   Yes.
14   Q.   And if we go to the next page of this, which is page
15   224.  Do you see that?
16   A.   Yes.
17   Q.   And then if we jump to 225, we're basically zooming in
18   on the character art on the left.
19              Do you see that?
20   A.   Yes, I do.
21   Q.   And that is -- can you tell me what this is that's shown
22   in the screen that we're looking at now, page 225 of
23   Exhibit 10877?
24   A.   Right.  It's a closeup of the prior one, and it's the
25   actual character art that's taken directly from the Bratz
```

```
 1   packaging that you showed me earlier.  I don't know what the

 2   number was.  It was clear on the left, the new exhibit that

 3   you showed.  Exhibit 559.

 4           So the two-dimensional artwork which is on the

 5   bottom right of the Bratz Sasha doll was reproduced exactly

 6   on the Musical Trendy Teenies package.  And that shows the

 7   closeup of the four girls there.

 8   Q.   Could you put up Exhibit TX 18812, and if you could just

 9   look in your binder.  It's in the back.  Can you tell me what

10   these are?  Can you identify the three --

11   A.   It's actually a better color copy of Exhibit 6,

12   10877-223.  In slightly reverse order, they are essentially

13   the three pages that you showed me.  Second page is the third

14   page of the black and white, but it looks like from what I

15   can see, it says KMW.

16           So it would also be the lawyer who represented us

17   or the firm that represented us.  So the color pictures that

18   are depicted in this exhibit.

19   Q.   And the second page of Exhibit 18812 is the color

20   version of what's on the screen right now; is that right?

21   A.   Yes, that's correct.

22           MR. HANSEN:  Can we put up the second page of

23   18812, the color picture?  I'd like to move it into evidence.

24           THE COURT:  Any objection?

25           MR. QUINN:  No objection.
```

1           THE COURT:  It's admitted.

2              (Exhibit 18812 received.)

3  **Q.**  BY MR. HANSEN:  This is just a better color version of

4  what's attached to your declaration; right?

5  **A.**  Yes.

6  **Q.**  All right.  And if we could also just on the left, if we

7  could replace the black and white one with the picture that

8  we had before from the Sasha package, 17558.  Do you see any

9  relationship between the package art on the left and the

10  package art on the Mini Musical Teenies doll?

11  **A.**  Yes, that's what I referred to earlier, that they

12  essentially took that two-dimensional character art and just

13  copied it directly onto their product, which is the Musical

14  Trendy Teenies.

15  **Q.**  And were the other products at issue in that case, did

16  they similarly copy package art from the Bratz packaging?

17  **A.**  Package art or slogans, like the girls with a passion

18  for fashion, or the package shape and coloring.  Essentially

19  to varying degrees they included lots of different elements

20  from the MGA packaging or logos.

21           THE COURT:  Counsel, I'm going to stop you here.

22  We're past the hour.  We'll resume with this tomorrow morning

23  at 9:00.  Unless you have some further ground.

24           MR. HANSEN:  I have one question.

25           THE COURT:  I know you have further exam, but I'd

```
 1   like to let counsel --

 2            MR. QUINN:  I think I can finish in a minute and a

 3   half, your Honor.

 4            THE COURT:  A minute and a half?  The jury says go

 5   for it.

 6   Q.   BY MR. HANSEN:  Can you tell me how the Multi Toy

 7   litigation ultimately ended?

 8            THE COURT:  MGA prevailed.  Some of the defendants

 9   entered into a consent judgment early on, that they

10   acknowledged their liability.  And MGA ultimately obtained

11   summary judgment against the remaining defendant and

12   prevailed in the litigation as a result.

13            MR. HANSEN:  I have the letter.  The document's

14   already been produced.  May I?

15            THE COURT:  You may show it to counsel.  I assume

16   that obviates the objection.

17            MR. QUINN:  It does obviate the objection, your

18   Honor.

19            THE COURT:  Very well.

20            MR. QUINN:  But it means I can't finish in a minute

21   and a half, probably.

22            THE COURT:  We'll continue with this in the

23   morning.  Thank you, Counsel.

24            I'll see the jury tomorrow morning at 9:00.

25            **(WHEREUPON THE JURY WITHDRAWS.)**
```

1          THE COURT:  Counsel, I'd like a sense of how you

2   anticipate tomorrow playing out.

3          MR. QUINN:  If I could have one moment, your Honor.

4          THE COURT:  Yes.

5          MR. ZELLER:  What we intend to do is we have some

6   what we're hoping will be brief witnesses to discuss some of

7   these other cases in particular, the Double Grand case and

8   three other of the Hong Kong cases.  Without sounding

9   pejorative about it, obviously the Court has seen some of the

10  challenges we have in terms of trying to get clear, legible

11  copies, samples of the dolls that have been sued upon, and

12  really clear answers on what MGA itself did in some of this

13  litigation.

14         So what we did, because multiple roadblocks were

15  being thrown up within -- really after we had last met, we

16  contacted some of these litigants in Hong Kong and asked them

17  to come and testify briefly so that we can do things like get

18  the dolls admitted and the pleadings that we are unable to

19  get through MGA witnesses.

20         We've also subpoenaed MGA.  We have another

21  Custodian of Records subpoena, which MGA has moved to quash.

22  The topics, as far as we're concerned, are extremely

23  straightforward.  They are basically just saying bring the

24  originals of the dolls or photographs of the dolls that you

25  sued upon in these various cases that are at issue.  And so

1   there's still an issue outstanding on that.

2          It would be our intention to put on a combination

3   of those people to clear up really what is left in terms of

4   MGA's own litigation. Pleadings, the dolls that were sued

5   upon or photographs, clear legible photographs of the dolls

6   that were being alleged. And that's a combination of an

7   attorney named Edmond Yeung, Y-E-U-N-G, a representative from

8   Double Grand, which was one of the litigants. And the

9   Custodian of Records who I referenced.

10          So that would be the index, to put those three

11  people on, and then Mr. Larian. Unless, of course, we can

12  have something worked out or something stipulated to in terms

13  of what products were at issue in these other cases. And I

14  understand from e-mails that MGA is in all likelihood taking

15  the position that we can't put any of these Hong Kong people

16  on either.

17          I mean, it's really no exaggeration to say that

18  multiple roadblocks have been put up in terms of our ability

19  to put on very simple evidence about what did MGA do in this

20  prior case, in these prior cases. And I expect that's going

21  to be an additional issue that's going to have to be

22  resolved.

23          But those are the people we intend to put on. And

24  I would also say that the Court has seen now the legibility

25  problems that we have faced from some of MGA's production,

1   which was a production required by the Court's order back in

2   May.

3               As far as we're concerned, that's just simply a

4   violation of the Court's order.  We have asked repeatedly for

5   legible copies of photographs attached to MGA's own

6   pleadings, and we still don't have them.

7               MS. AGUIAR:  Can I just get clarification?  Is that

8   the whole day tomorrow?

9               THE COURT:  So Mr. Larian would take up the rest of

10  the day?

11              MR. ZELLER:  That really depends on MGA.  If

12  Mr. Larian is completed, we would expect to put Mr. Wagner

13  on, our damages expert.

14              THE COURT:  Very good.  There's also certainly a

15  number of -- when you say it depends on MGA, if depends on

16  how long MGA cross-examines or examines?

17              MR. ZELLER:  Correct.  And if that takes us to the

18  end of the day, that would be it.

19              MS. AGUIAR:  And it's definitely Mr. Wagner; right?

20  Because the order you've given us was quite different than

21  that.  Can I get clarification that you meant to say Wagner?

22  Because that's different from anything you told me last

23  night.

24              MR. ZELLER:  We're still caucusing a little bit.  I

25  apologize.  There's another witness, Mr. Keiser.  All these

```
 1   people are on our list that we've shared with MGA as to the
 2   potential witnesses for 1-B here.
 3             There is a Mr. Keiser who I know MGA has said that
 4   it has or intends to make some sort of motion over.  He is
 5   an expert who really is involved in digital scanning of
 6   three-dimensional items.  His testimony will be relatively
 7   brief, at least from our perspective.  But I know that MGA
 8   has raised some issues concerning his testimony.
 9             THE COURT:  And you intend to call him after
10   Mr. Larian?
11             MR. ZELLER:  I believe so, yes, your Honor.
12             THE COURT:  Very well.  Thank you, Counsel.
13             MR. ZELLER:  Thank you.
14             MS. AGUIAR:  Thank you, your Honor.  When
15   Mr. Zeller says, quote, it's no exaggeration to say that
16   roadblocks have been thrown up, it's not an exaggeration.
17   It's just false.  If we want to argue the motion to quash
18   now, I'm fully prepared to do that, and I'm wondering whether
19   you want to do that.
20             THE COURT:  Why don't we do that and get that
21   resolved now.
22             MS. AGUIAR:  I trust that your Honor has our motion
23   and the response by Mattel?
24             THE COURT:  I do.
25             MS. AGUIAR:  Here's the history.
```

1           THE COURT:  Let me just pull it up.  And I'm pretty
2   familiar with the history, Counsel.

3           MS. AGUIAR:  Okay.  I think if I could take 30
4   seconds to just give what I think are the very important
5   highlights, which are that Mattel served, as we all know,
6   both sides have served many document requests in this case.
7   And they served document requests that specifically asked for
8   samples of dolls.  This is in, your Honor, in the declaration
9   that we submitted in connection with our motion.  This is
10  Exhibit 1, page 12.  And these were requests that were
11  propounded back in October.

12          Requests 1 through 4 specifically relate to
13  tangible dolls and photographs of dolls.  We made objections,
14  and as your Honor is familiar with the history, Judge Infante
15  ruled on April 14th that those requests were grossly
16  overbroad and unduly burdensome.

17          Mattel appealed Judge Infante's order.  His order
18  addressed document requests 1 through 30.  They specifically
19  appealed only four of those.  They did not appeal the
20  requests that they made concerning dolls and tangibles and
21  photographs.

22          They appealed item number -- document request
23  Nos. 6, 15, 23, and 25.  That was a motion that they filed in
24  front of your Honor.  You overruled Judge Infante on two of
25  those.  And you ordered us, as we've discussed today, to

1    produce pleadings.  That was document request No. 15 and
2    court orders from the Bratz lawsuit.  That was request
3    No. 23.  And in May, we made an expedited search and
4    production of pleadings and court orders from Hong Kong.

5         There was no mention from the time they made --
6    from the time Judge Infante ruled in April regarding
7    tangibles, dolls, and photographs, until they served trial
8    subpoenas on us on the 24th and 25th of July.

9         In their papers, which they submitted in response
10   to our motion to quash, they don't even -- they don't even go
11   there.  They don't even contest that.  They, I think,
12   implicitly acknowledge, yes, that is what we did.  We didn't
13   appeal it.  Their argument now is well, this is different.
14   Because this is trial.  So now we're asking for stuff at
15   trial.

16        Let me cut right to the chase about whether or not
17   this is going to be practical or even possible.  Mattel says
18   in its papers, well, MGA says these are subject to
19   undertakings, and they make the allegation that they don't
20   know what we're talking about, and this has come out of the
21   blue.

22        I would point your Honor to the transcript of the
23   hearing from February 4th.  During that transcript, Mr. Nolan
24   and Mr. Corey were arguing to you an issue regarding
25   tangibles in Hong Kong.  Your Honor will probably recall

1   that. The issue of undertakings specifically came up at that

2   hearing. And Mr. Corey acknowledged that he was aware of

3   this issue at least as of that date.

4          Your Honor, I also have letters from a colleague of

5   mine with another one of the Quinn lawyers starting in

6   December. December 26th, January 10th, January 15th, and

7   February 7th, all discussing this issue that under Hong Kong

8   law, these items are subject to solicitors' undertakings.

9          So the allegation in Mattel's papers which were

10  filed several days ago, that they don't know from

11  undertakings and they think we're just pulling this out of

12  the blue, I can't quite fathom it.

13         But anyway, they know, and we all know that they

14  can't get this stuff out of Hong Kong. I provided Mr. Zeller

15  this morning with a declaration from our Hong Kong counsel,

16  which I have copies and I will provide to the Court. It is a

17  declaration from someone in William Fan's office. His name

18  is Dexter Lam, L-A-M.

19         And as your Honor will see from that declaration,

20  which is consistent with the representations that we've made

21  to the Court starting as early -- well, certainly

22  representations we made to Mattel starting as early as

23  December of '07 and to your Honor as early as February of

24  '08, that there are solicitors' undertakings that prevent

25  tangible items such as these dolls and photographs from being

 1  taken out of Hong Kong.

 2          If such a request was made, a hearing date could be

 3  obtained from the Court no earlier than September, given the

 4  current circumstances.

 5          So where that leaves us is that we have two

 6  subpoenas served on MGA U.S. and MGA Hong Kong.  July 24th

 7  and July 25th.  Those are in the declaration that we

 8  submitted with our motion to quash, Exhibit 6, and it's page

 9  165, thereabouts, in case you want to see them.  The

10  Exhibit A to both of those subpoenas is very specific.

11  Please produce originals of the following documents.  And

12  there's eight categories, and it says produce original dolls,

13  original tangibles, and original photographs.

14          It's not legally or practically possible for us to

15  do that at this point.  And so for Mr. Zeller to turn history

16  on its head and say that all of a sudden we are throwing up

17  roadblocks when, with all due respect, I feel like something

18  slipped through the cracks over there and they just didn't

19  ask for the stuff, to then hit us with subpoenas less than 10

20  days ago, when we know we can't get this stuff out of the

21  country, it just doesn't ring true.

22          So that's where we are.  We have since made, just

23  so you know, inquiries with both MGA in the U.S. and then MGA

24  Hong Kong to see if they have the dolls.  In other words,

25  separate and apart from what the solicitors have.  Does MGA

Case 2:04-cv-09049-DOC-RNB   Document 4705-33   Filed 01/19/09   Page 19 of 32   Page ID
#:137538

1   have any of those allegedly infringing dolls, and we have

2   confirmation from both of these entities that they do not.

3           So we have made strides to explore whether we can

4   comply with the subpoena since receiving them less than 10

5   days ago, and that's what I have to report to your Honor.  We

6   just don't have them.

7           THE COURT:  Very well.  Thank you, Counsel.

8           MR. ZELLER:  First of all, we certainly didn't

9   accuse them of stonewalling now, just now.  This has been

10  going on literally for months.  The Court ordered MGA to

11  produce all pleadings and other documents, a defined term,

12  filed, submitted, or served by you in the Bratz lawsuits,

13  which were identified.  And there was a list of them that

14  claim, allege, or assert that the appearance or features of

15  any doll or other product, whether in whole or in part,

16  infringes Bratz.  Infringe is a defined term as well.

17          As far as I can understand, the argument here

18  appears to be that they were not obligated to provide legible

19  copies, photos of the product that they were accusing and

20  that somehow that fell outside the scope of that request.  We

21  didn't move on other more narrow requests for the simple

22  reason we didn't have to.

23          That is the request that we thought best captured.

24  And for MGA to say that somehow they have no ability to

25  provide even legible copies of their own photographs that

```
 1  they filed in courts, I think it really belies the excuses
 2  that we're hearing here.  We've been asking for legible
 3  copies since the time we received these illegible ones.  The
 4  Court is aware that we have had to go to extraordinary
 5  lengths simply to try and find dolls that we think are the
 6  infringing ones and identify them and bring them to court.
 7             MGA does not say, and I have heard no
 8  representation from MGA that every single sample that they
 9  have of those infringing dolls from the other cases are
10  subject to any undertaking.  And, in fact, it's implausible
11  for them to say that that's the case.
12             THE COURT:  I'm of two minds on this issue.  With
13  respect to the dolls themselves, that was not before the
14  Court, as I understand it, in May, or when the Court
15  considered the appeal.
16             As far as -- and I agree with Ms. Aguiar there.  To
17  ask for the actual dolls at this point, to the extent that
18  Dexter Lam is saying that he has them, I have no reason to
19  question Ms. Aguiar's representation that she's inquired of
20  MGA USA and they don't have them.  We're not going to get
21  them.
22             Where I'm more sympathetic with Mattel's argument
23  is with respect to any pleadings, including certainly copies
24  of any exhibits, documents, photographs.  I mean, we talk
25  about a pleading.  We don't just talk about the complaint.
```

 1   It's all pleadings.  It was certainly my intention that, to
 2   the extent that MGA had in its possession or control any
 3   pleadings related to this, that they would get turned over so
 4   that we could avoid this particular problem.

 5        So I'm not sympathetic, Mr. Zeller, with respect to
 6   the dolls themselves.  I'm much more sympathetic with respect
 7   to the photographs.  And I'm hoping that we can work
 8   something out here.  Because quite frankly, I think it makes
 9   MGA look terrible what's going on right here this afternoon
10   before this jury, before lawyers from MGA, general counsel
11   from MGA stand up here and not recognize what it was that
12   they were supervising.

13        I think MGA has every incentive at this point just
14   to produce the legible copies, and let's move on off of this.
15   This is really -- I don't understand what's going on here.  I
16   don't understand why MGA is not just clearing this up and
17   moving this on.  I mean, they have got some -- I'm hearing in
18   the last half hour here some fairly good responses to this.
19   Let's get this resolved.  I don't get what's happening here,
20   Counsel.  Certainly photographs attached as exhibits to a
21   pleading is part of the pleadings.

22        MS. AGUIAR:  I don't disagree.  Two separate
23   things.  The motion to quash was directed at original dolls
24   and original photographs.

25        THE COURT:  I'm with you -- well, right.

1              MS. AGUIAR:   Original photographs.  So let me then
2   address --

3              THE COURT:   Unless and to the extent the original
4   photographs were submitted -- I don't want to mince words
5   here.  What was submitted to the Court is what should have
6   been produced to Quinn Emanuel in May.  Period.

7              MS. AGUIAR:   I understand.  And MGA in its May 22nd
8   production -- and there may have been supplements to that --
9   but I do know that there was a large production made on
10  May 22nd.  We did produce the pleadings, and we didn't just
11  produce the complaint, for example.  We produced attachments.
12  The photographs are not of great quality, but the photographs
13  that were up today that we kept seeing are from the
14  production that we made.  These were attachments --

15             THE COURT:   Let me stop you there.  Are they of the
16  same quality that was submitted in the litigation in
17  Hong Kong?

18             MS. AGUIAR:   I can't speak to whether the quality
19  is exactly the same.  What I can say is that we will
20  undertake to figure out if there is somewhere a better
21  quality of that photograph, but we have produced what we were
22  required to produce.

23             THE COURT:   And I'm not faulting you on that.  Like
24  I said, I think this is quite frankly in your interests.
25  Because this, for what it's worth, I think this looks facial

1    from MGA's perspective.  But who am I?

2         MS. AGUIAR:  I'm not saying it wouldn't be in our

3    best interests.  So we will endeavor to do it.  But there are

4    two very separate issues.

5         THE COURT:  And I've identified them as two

6    separate issues.  And I'm with you on the dolls because that

7    was not -- if Mattel really needed these dolls from their

8    perspective, that aspect of Judge Infante's discovery order

9    should have been appealed, and it wasn't.

10        MS. AGUIAR:  We will inquire -- there's a pager

11   time difference, but it may be the next day in Hong Kong

12   already now.  So that may work in our favor.  We will inquire

13   tonight regarding these photographs.  I believe we have in

14   the past, because we've got in the request, but we will do it

15   again.  And so with regard, just to be clear, the subpoenas

16   were directed at these original documents.  So there's

17   nothing for the custodian to --

18        THE COURT:  That's what you're telling me.  There's

19   no blood from a radish.  If you say there's nothing there, I

20   believe you.

21        MS. AGUIAR:  I just want to make sure we don't have

22   to bring the custodian here.

23        THE COURT:  The Court accepts your representation.

24        MR. ZELLER:  I'm certainly glad I made the better

25   argument about the photographs, of course.  And just to focus

1    on that for a moment.  I mean, we have been asking for these

2    for quite some time.  We have never received any

3    representation that, number one, those are the best quality

4    that are available.  Number two, it's not within MGA's

5    possession, custody, or control to provide those.  I mean,

6    the Court saw the quality that we were confronted with.  It

7    forced us to waste time, which frankly, to put it out

8    there --

9              THE COURT:  I'm mindful of that.

10             MR. ZELLER:  Exhibit 13725 was Exhibit A of this.

11   I mean, just look indecipherable.  Almost black.

12             THE COURT:  And in terms of the timing, the Court

13   will take that into account.

14             MR. ZELLER:  I appreciate that, your Honor.  Thank

15   you.

16             MR. QUINN:  I'm wondering if the original dolls

17   can't be moved, whether it's possible to take digital

18   pictures of the original dolls and e-mail them.

19             THE COURT:  I don't know.  And perhaps that's

20   something you can talk with MGA about tonight.  This should

21   have been resolved by the Court's order in May.  To the

22   extent that the pleadings included pictures, legible copies

23   of the pleadings, the most legible copies of the pleadings

24   should have been provided.  And so that aspect of the trial

25   subpoena the Court will insist upon.  I accept counsel's

1    representations.  I accept Dexter Lam's representation.  I

2    have no reason to question any of that, that the dolls

3    themselves are simply not available at this point in time.

4         MR. ZELLER:  I understand.  I wasn't pressing that

5    because I recognize the Court thought that that was the

6    weaker of the two arguments.  But at a bare minimum, we have

7    raised this photograph issue and the quality of these

8    exhibits over and over again.  We have actually on more than

9    one occasion sent specific lists to MGA saying these are

10   illegible.  We need these.

11        So it wasn't just a broad based request to MGA

12   saying oh, your entire production from May 22nd was defective

13   because it's illegible.  We went to the trouble of

14   identifying the very things that we put in front of the jury

15   today and had to slog through because of the quality in large

16   part, too.  And we specifically asked for those, and we never

17   got a response.

18        THE COURT:  All right.  Well, let's see what can be

19   done tonight, tomorrow in Hong Kong.  And we'll take this up

20   again in the morning.  But I do think it's in the interests

21   of everyone to try to resolve this.

22        The other issue, if we're going to get to

23   Mr. Larian's testimony tomorrow, there's the issue of the

24   financial documents.  And I think I may have spoken to

25   Mr. Nolan and Mr. Quinn this morning.  Or Mr. Price, when we

1   were in chambers, to this. And there's no question that the
2   Court had ordered the production of Mr. Larian's financial
3   documents quite some time ago.

4           To the extent that the documents were in the
5   control, custody, possession of MGA or MGA's agents, and they
6   were not turned over in a timely fashion, they are not coming
7   in. To the extent that they are documents that were created
8   and were produced contemporaneous with the trial, they come
9   in. MGA is certainly correct and Mr. Larian is certainly
10  correct that the relevant documents, the relevant time period
11  for his net worth is now. And that's correct.

12          And so the documents that reflect his net worth now
13  are relevant, and I would expect that they would be produced
14  somewhat contemporaneously with this trial; however, to the
15  extent there are documents that were created back in October
16  of 2007 or January of 2008 or February of 2008 that were not
17  turned over, those documents aren't coming in now. And
18  that's going to be how I'm going to evaluate that in the
19  context of the trial. I'll hear further. But that's my
20  general sense of it after reading the papers on this.

21          MR. PRICE: We would disagree that his net worth
22  after the verdict is relevant because in that situation,
23  whenever you bifurcate, for example, punitives and actual
24  damages, then the defendant can come in and say the trial has
25  had an effect on me. And basically that's what they are

1    saying here. They said because the jury ruled against us, I

2    am now impoverished. And I'm not aware of any case saying

3    that that's the time period you look at.

4            THE COURT: And perhaps I slightly misstated it.

5    I'm not saying that it's the post-verdict period. We're not

6    talking about the last week of July of 2008. When I say

7    contemporaneous with the trial, it's what Mr. Larian is worth

8    coming into trial, not what he was worth in 2006 or 2007. Or

9    even in early 2008. It's what he's worth at the time that

10   the trial is taking place.

11           MR. PRICE: My fear is that Mr. Larian will blurt

12   out or be asked well, what's happened in the last week. Or

13   he's going to say because of what this jury did, I'm a

14   pauper. I think that would be inappropriate.

15           THE COURT: I would actually like -- I don't think

16   there's any cases particularly on that point. But I would

17   invite both sides to submit authority to the Court on that

18   particular point, if a change in financial position in a

19   bifurcated trial is relevant to that second phase.

20           I know this is not the first court to bifurcate a

21   case along these lines. It's kind of an interesting point,

22   and that I don't think is addressed particularly, at least

23   not in any of the cases I took a look at.

24           But I'll invite both parties to provide something

25   to the Court tomorrow morning which addresses that particular

1     issue. Otherwise, the standard I intend to use is

2     contemporaneous with the trial. We're talking the May, June

3     period. I'll certainly give MGA and Mr. Larian leave to

4     introduce evidence of his net worth that has been produced at

5     that time, provided that it has actually been calculated and

6     produced at that time and not -- the allegation, the concern

7     of sandbagging some of these documents, I think, is very real

8     based on at least the allegation of when the dates are. I

9     don't have them before me.

10     I don't know what they are going to be relying on,

11     but I will exclude, my tentative is to exclude anything that

12     was created that should have been produced pursuant to this

13     Court's orders at a much earlier time period. So that's --

14     MR. ROTH: Your Honor, if I could address those two

15     issues. Certainly, we will submit authorities to your Honor.

16     The one thing I would point out is you'll recall the list of

17     assets that was placed before the jury. By far the largest

18     piece there is a value for the ownership of the company. And

19     that value is nothing more than the present value of future

20     expected earnings. That's the way those valuations are

21     created. That's the way Mattel's expert has determined value

22     in this case.

23     So obviously, as events change, as the future

24     expectations change, that value changes. That will affect

25     damage --

```
 1              THE COURT:  It's an interesting question, though.
 2   Because normally in a nonbifurcated trial, you wouldn't have
 3   the situation develop where there's full financial
 4   consequences of the verdict itself.  And, of course, the
 5   reality is there were financial consequences of the verdict.
 6   Mr. Nolan disclosed certain financial consequences in
 7   chambers.  There was reference made to stock prices.  There
 8   was -- I understand that there was an impact from the
 9   verdict, but I'd like to see some authority on that.
10              Is it that finely tuned to, you know, what does the
11   jury consider, particularly in the context of punitive
12   damages.  How finely tuned is that?  I'll look forward to
13   authority on that.
14              MR. ROTH:  If I could just forecast one bit more.
15   There was a verdict.  About a week later there was an opening
16   statement given by Mr. Price where he offered up an opinion
17   about the value of the company as of the time that he was
18   speaking.  Based on what he said Mr. Wagner would opine.
19              So he has said that there was a value of
20   approximately 605 million as of the time of that opening
21   statement.  So we believe, at least in that context, we have
22   the opportunity to test his expert, whether he agrees with
23   Mr. Price that that was the value as of that moment he was
24   speaking.
25              In the context of punitive damages, your Honor, we
```

 1   will provide the authority that the Court would like.

 2             In terms of --

 3             THE COURT:  Well, let me think about that.  I'm

 4   trying to recall exactly what Mr. Price said, and I don't

 5   recall exactly --

 6             MR. ROTH:  I can paraphrase.

 7             THE COURT:  Well, why don't you get the transcript

 8   in front of me.  In any event, I want to be governed here by

 9   what the law requires in terms of damages, compensatory

10   damages and punitive damages, and what do we do in a

11   bifurcated trial like this where the verdict has had an

12   impact.

13             And I'm not questioning that both sides should be

14   entitled to evaluate the impact of that verdict if in fact

15   that is a lawful consideration, or should the Court

16   alternatively just consider this as one trial and that we

17   take the start of the trial as the date.  I mean, I guess

18   that's what I -- we're going to need to come up with a date.

19   And it's an interesting question.

20             MR. ROTH:  Yes, your Honor.  Related to that, the

21   second point that your Honor raised in terms of the

22   timeliness of the production of financial information.  As

23   your Honor knows, the company, MGA, daily, weekly, quarterly

24   basis is ongoing.  We just passed June.  End of second

25   quarter.  We have very recently produced financial

1   information relating to the first two quarters of this year.

2          THE COURT:   And I'd expect you to have produced

3   that and to be able to use that at a trial like this.  I have

4   no issue with that.

5          What I have an issue with is there's allegations,

6   and I don't know how this is going to play out or exactly

7   what you're going to rely on.  There's allegations that there

8   were documents created as early as October of 2007 that were

9   not produced until the last seven weeks.  That's the type of

10  document that is not going to come in.

11         MR. ROTH:   Understood, and I think I know precisely

12  what you're referring to.  And frankly, at this point I think

13  that may not be so relevant, given the timing of the events.

14         THE COURT:   Let's take this other issue up tomorrow

15  morning.  I have work to do.  You have work to do.  And I'll

16  see you tomorrow morning at 8:00.  It doesn't sound like

17  we're going to get through any of these four.  Although I

18  have gone through and ruled on the objections of the

19  videotapes.

20         MR. QUINN:   Could we have a time count?

21         THE COURT:   I have you have remaining 9 hours and

22  17, 18 minutes and MGA having 19 hours and 20 minutes.

23         MR. QUINN:   Thank you, your Honor.

24         MR. NOLAN:   Your Honor, what time do we start

25  tomorrow?

```
 1              THE COURT:  Let's be here at 8:00.  This financial
 2    issue may take some time.  And I'd also like to hear what
 3    success you've had with Hong Kong.  So let's see you here
 4    tomorrow morning at 8:00.
 5
 6                   (Proceedings concluded at 5:37 P.M.)
 7
 8                        C E R T I F I C A T E
 9
10
11              I hereby certify that pursuant to Title 28,
12    Section 753 United States Code, the foregoing is a true and
13    correct transcript of the stenographically reported
14    proceedings in the above matter.
15              Certified on August 5, 2008.
16
17
18              MARK SCHWEITZER, CSR, RPR, CRR
                Official Court Reporter
19              License No. 10514
20
21
22
23
24
25
```