1   **A.**    I do.

 2   **Q.**    And you talk about ABC -- and that was the official

 3   name?   The company was doing business as MGA?

 4   **A.**    ABC International, right.

 5   **Q.**    -- can effectively leverage the Bratz brand by

 6   introducing not only apparel, but accessories such as

 7   handbags, book bags, footwear, eyewear, headwear, jewelry,

 8   watches, and luggage to name a few.

 9           Do you see that?

10   **A.**    Yes.

11   **Q.**    And this was your concept, again, before the Bratz dolls

12   were even being sold to the public; right?

13           MR. NOLAN:   Objection, your Honor.   Lack of

14   foundation.

15           THE COURT:   Lay a foundation for that, Counsel.

16   **Q.**    BY MR. PRICE:   If you look at the first page of this,

17   this is March of 2001?

18   **A.**    It is.

19   **Q.**    That's before any Bratz dolls were being sold to the

20   public; correct?

21   **A.**    That's correct.

22   **Q.**    And so getting back to page 16, then, this was part

23   of -- you remember back in September 2000, you said we're

24   going to develop a Bratz brand.

25           Do you recall that?

1  **A.**  I do.

2  **Q.**  And this was part of the idea, that you could leverage

3  that brand by putting out accessories, eyewear, headwear,

4  et cetera; correct?

5  **A.**  That's correct.

6  **Q.**  And you have here the cost to do that is minimal.  The

7  cost to begin licensing is minimal.

8          Do you see that?

9  **A.**  That's what the business plan says, yes.

10  **Q.**  And that's because basically someone is paying you to

11  use the brand; right?

12  **A.**  Somebody is paying us to use the brand; that's correct.

13  **Q.**  So you're not paying for their manufacturing costs or

14  anything.  They are just -- you're getting paid for the right

15  to use the Bratz brand; right?

16  **A.**  That's correct.

17  **Q.**  And you point out that the only risk involved is that

18  the Bratz dolls do not sell through at retail; correct?

19  **A.**  Yes.

20  **Q.**  So in other words, you're not going to be able to

21  license this very effectively unless the public goes for the

22  core of the brand Bratz dolls?

23  **A.**  The four Bratz dolls were originally what came out to

24  the market, and we spent a lot of money --

25          MR. PRICE:  Move to strike as nonresponsive.

```
 1                    THE COURT:  Sustained.  Stricken.

 2                    Mark, would you please read back the last question?

 3                    (Record read.)

 4                    THE WITNESS:  I'm not sure I can understand the

 5   question.  I can't answer it the way you phrased it.

 6   Q.   BY MR. PRICE:  Let me rephrase it, then.

 7                    You're not going to get the licensing revenue

 8   unless the public accepts the Bratz dolls.

 9   A.   No.  If the Bratz brand becomes successful, then we can

10   get licensing.

11   Q.   And the core, the core of the Bratz brand, what you are

12   leveraging off of here, is the dolls; right?

13   A.   No, we are leveraging the Bratz brand.  The Bratz brand

14   was launched with four dolls in 2001.

15   Q.   If you look at Exhibit 13858.  Do you recognize that as

16   an e-mail you sent in March 2002 to a Gariochi Dario Berte?

17   And I apologize for the pronunciation.

18   A.   Looks like an e-mail I send.

19                    MR. PRICE:  Move Exhibit 13858 into evidence.

20                    MR. NOLAN:  No objection.

21                    THE COURT:  It's admitted.

22                    (Exhibit 13858 received.)

23   Q.   BY MR. PRICE:  And you see.  E-mail is concerning

24   licensing products for Bratz.  Do you see it talks about we

25   will not over license this brand and make products that do
```

 1   not fit within the core consumer need and our marketing

 2   timing strategy.

 3          Do you see that?

 4   **A.**   Yes.

 5   **Q.**   And if you go to the third to the last paragraph, which

 6   again is at the same time:  "Please understand that we will

 7   not license every category.  This is for every territory, and

 8   not only Italy.  And every product right away.  The core of

 9   the brand are the dolls, and we do not want to harm the sales

10   of the dolls."

11          That's what you were telling Mr. Gariochi Dario in

12   March of 2002; correct?

13   **A.**   That's correct.

14   **Q.**   Let's go back to your 13520, your business plan, and we

15   were at page 16.  We were talking about the only risk

16   involved is that the Bratz dolls do not sell through at

17   retail.

18          Do you see that?

19   **A.**   I do.

20          MR. PRICE:  And if I may approach the well, your

21   Honor, to pick up an exhibit.

22   **Q.**   I have Exhibit 18801, which you may have seen yesterday,

23   a bicycle helmet.  The point is if the core of the brand, the

24   Bratz dolls, aren't selling through, you're not going to have

25   anyone interested in putting Bratz names or pictures on a

1   bicycle helmet; right?

2   **A.**   If the brand is not successful, yes, you cannot license

3   the Bratz brand.  That's correct.

4   **Q.**   My question is a little more specific.  If the Bratz

5   dolls aren't selling through at retail, no one is going to be

6   interested in licensing a bicycle helmet that has Bratz on

7   it; right?

8         MR. NOLAN:  Objection.  Lack of foundation as to

9   time.  At what point?

10         THE COURT:  As to time, overruled.

11         THE WITNESS:  Again, the Bratz brand started with

12  four dolls.  The four dolls had to sell with marketing and

13  advertising to establish the brand, and then once the brand

14  became successful, we were able to license it, and that's how

15  the licensing business works.

16  **Q.**   BY MR. PRICE:  And with respect to --- actually, let's do

17  this.  If you look at page 17.  And if we look at the last

18  paragraph of your business plan.  It says, "If the fashion

19  dolls to (Sic) not sell through at retail, this can cause a

20  backlash with licensees who have already spent moneys in

21  advances and product development."

22         Do you see that?

23  **A.**   I do.

24  **Q.**   You're tying this to the dolls; correct?

25  **A.**   That's what the business plan is saying, yes, that if

```
 1   the dolls that were -- basis of launching the Bratz brand
 2   were not successful, then the licenses will not be
 3   successful.
 4   Q.    And then if we look at page 18, it says:   "To be
 5   effective, other financial -- other licensed products depend
 6   on the presence of our Bratz."
 7         Do you see that?
 8   A.    Bratz trademark, Bratz brand, yes.
 9   Q.    And this is before a Bratz doll had ever been shown to
10   the retail public; correct?
11   A.    No, they were shown -- to the public.  They were not
12   shown to the public yet.  They were not in the market yet.
13   Q.    You wouldn't have gone down this road to develop a Bratz
14   brand with dolls that have oversized heads and prominent eyes
15   and prominent lips if Carter Bryant hadn't shown you Mattel's
16   confidential proprietary property in September of 2000;
17   right?
18   A.    I'm sorry.  Can you repeat the question?
19   Q.    You never would have gone down this road.  You never
20   would have been here trying to license Bratz, trying to sell
21   these dolls if Carter Bryant hadn't shown up at MGA and shown
22   you Mattel's confidential information, these designs, Bratz
23   designs, and the concept of these dolls with oversized heads
24   and prominent eyes and prominent lips?
25   A.    Again, as I said, Carter Bryant showed us some drawings
```

1   that became the inspiration and basis for Bratz.  The Bratz

2   dolls came to the market in many, many changes, and we

3   marketed it and built it.  And that's what became the brand.

4   So I don't know how else to answer your question.

5   Q.  Without that inspiration, you never would have done what

6   you did, which was create the Bratz dolls, license the Bratz

7   name, create the Bratz brand; correct?

8   A.  You ask so many questions all at the same time.  We

9   could have -- theoretically we could have had the name Bratz

10  because it was in existence since 1984 and put it on another

11  product.  And it belonged to somebody else, didn't belong to

12  Mattel or Carter Bryant or MGA.

13  Q.  It's certainly correct to say that after a two-year

14  search leading up to September of 2000, you had not, even

15  with all your efforts, found a fashion doll like Bratz.

16  A.  Which was Carter Bryant's drawings as an inspiration to

17  launch the Bratz dolls.

18  Q.  Your definition of inspiration is you wouldn't have

19  done anything if not for Carter Bryant showing you that

20  confidential information; right?

21  A.  That's not correct.  We would have found something else.

22  Q.  And getting back to this branding.  You recall, I think

23  there was a Bratz pet that was shown to Ms. Pembleton.

24          You recall that?

25  A.  I do.

```
 1   Q.   And when you are developing something like that, one of
 2   the things you're trying to do is connect that extension,
 3   line extension, to the Bratz dolls; right?
 4   A.   The execution of it, yes.  For all the brand to
 5   basically mesh together, yes.
 6   Q.   So, for example, if you look at Exhibit 13859, you
 7   recognize this as an e-mail you sent in 2002?
 8   A.   November of 2002, yes.
 9             MR. PRICE:  Move 13859 into evidence, your Honor.
10             MR. NOLAN:  No objection.
11             THE COURT:  It's admitted.
12             (Exhibit 13859 received.)
13   Q.   BY MR. PRICE:  And you say -- you see this is talking
14   about Bratz pets, and you say:  "We want the pets to look
15   like Bratz, big face, big eyes, fantasy, and not like the
16   plush in slumber party"; correct?
17   A.   Yes.
18   Q.   And this is an example of tying kind of an unrelated
19   product back to the core of the brand, which are the Bratz
20   dolls.
21   A.   Again, it has to all -- it's mixed together.  It's like
22   Nike.  When you buy the shoes, the shirt has -- they all -- a
23   shirt doesn't look like a shoe, but as a brand, they all mesh
24   together.
25   Q.   And if you look at 13871, do you recognize this as an
```

1   e-mail string between you and Karen Bonde?

2   **A.**   Yes, looks like it, yes.

3            MR. PRICE:   Move 13871 into evidence, your Honor.

4            MR. NOLAN:   No objection.

5            THE COURT:   It's admitted.

6            **(Exhibit 13871 received.)**

7   **Q.**   BY MR. PRICE:   And you see e-mails to you concerning the

8   Bratz pets:   "I think we've done a good job of that.   Now we

9   have to make the most of the Bratz connection.   At one point

10  we talked about creating a cross-sell piece to be included in

11  the Tokyo Bratz dolls.   Did that happen?   Can we do something

12  on the website that explains where these little pets came

13  from and their connection to the Bratz girls?"

14           Do you see that?

15  **A.**   I do.

16  **Q.**   And your response is:   "Thanks for being proactive on

17  this.   Please follow through."

18           Do you recall that?

19  **A.**   Yes.

20  **Q.**   And then the ideas for commercials included having the

21  Bratz dolls, for example, with one of the pets.

22           Do you recall that?

23  **A.**   I'm sorry?

24  **Q.**   Ideas for commercials for the Bratz pets was to --

25  **A.**   What are you referring to, sir?

```
 1   Q.   I'll refer you to a document if we need to.  I'm just
 2   asking if you recall this.  That one of the ideas, then, was
 3   to -- well, you understood kids kind of wanted the owners of
 4   each pet associated with a pet?
 5   A.   I'm having a tough time understanding you.
 6   Q.   Your marketing people told you that the way to sell this
 7   commercial is to have a Bratz character in a commercial with
 8   a Bratz pet.
 9   A.   How do you sell a commercial?  I'm not sure if I
10   understand your question.  I'm sorry.
11   Q.   Let me see if I can just go -- look at Exhibit 13872.
12   It's dated February 8, 2006, an e-mail that you are copied on
13   from Shoreh Larian?  I know I mispronounced that.  How is
14   that pronounced, sir?
15   A.   It's okay.  Go ahead.
16   Q.   Okay.  Do you have 13872 in front of you?
17   A.   I do.
18   Q.   And is that an e-mail that you received?
19   A.   It has my name on it, yes.
20        MR. PRICE:  Move that into evidence, your Honor.
21        MR. NOLAN:  No objection.
22        THE COURT:  It's admitted.  You may publish.
23        (Exhibit 13872 received.)
24   Q.   BY MR. PRICE:  And the subject is hot button research
25   for ad development results for Bratz pets?
```

1   **A.**     I see that.

2   **Q.**     And if we go to the third page, there's a section:

3   "Commercial to include most kids want the owners of each pet

4   associated with the pet itself in the commercial, i.e., Sasha

5   could be displayed with Bunny Boo."

6              And was Bunny Boo the icon that was put on some of

7   Sasha's accessories?

8   **A.**     I believe so, yes.

9   **Q.**     And it says:  "It will be good to have the owners

10  displayed with the pet so that people recognize them and buy

11  them together, so that people know who each pet belongs to,

12  so that if you have a specific doll, you know which pet to

13  buy for it."

14             Do you see that?

15  **A.**     I do.

16  **Q.**     The idea was to leverage the idea of the popularity of

17  the Bratz dolls so you can sell the Bratz dolls --

18  **A.**     To leverage the Bratz brand in order to sell Bratz pets

19  and other products.  It's all about branding, sir.

20  **Q.**     And specifically you're talking about Bratz dolls;

21  correct?

22  **A.**     Let me see that.

23  **Q.**     Sasha is a doll; right?

24  **A.**     Yes.  But Sasha is also a TV character.  Sasha is many

25  things.  But Sasha is one of the dolls.

```
 1   Q.   Now, again, Ms. Pembleton was talking about accessories

 2   and such.  You remember she mentioned something about -- she

 3   talked about doing Bratz twins.

 4            Do you recall that?

 5   A.   I'm sorry?

 6   Q.   Do you recall she was talking about doing Bratz twins as

 7   kind of an extension of the Bratz line?

 8   A.   I don't remember exactly.  But she might have, yes.

 9   Q.   And I'd like you to look, if you would, at

10   Exhibit 13918.

11   A.   Go ahead.

12   Q.   You found it?

13   A.   Yes.

14   Q.   There is an e-mail from you to Ms. Garcia?

15   A.   Yes.

16   Q.   This is an e-mail from you to Ms. Garcia?

17   A.   Yes, it is.

18   Q.   And Ms. Pembleton?

19   A.   Yes.

20            MR. PRICE:   Move 13918 into evidence.

21            MR. NOLAN:   No objection.

22            THE COURT:   Admitted.

23            (Exhibit 13918 received.)

24   Q.   BY MR. PRICE:  It says:  "Subject, Bratz twins," and an

25   attachment, "Olsen twins, TRST."
```

6178

```
1            Do you see that?

2   A.   Yes, I do.

3   Q.   And if we go all the way down, it says:  "Spreadsheet

4   attached.  I'll bring pictures to you."

5            Do you see that?

6   A.   Yes.

7   Q.   And do you know what TRST stands for?

8   A.   Toy retail sales tracking.

9   Q.   If we go to the attached spreadsheet, this is showing

10  you are tracking sales of a Mattel doll, the Olsen twins?

11  A.   TRST is toy retail sales tracking is a system that

12  tracks sales of not only Mattel products or MGA products.

13  All the toy products.

14  Q.   But when --

15  A.   And you can buy it, and we did buy.  So you can buy that

16  service.

17  Q.   But here what you're tracking is the Olsen twins, which

18  are manufactured by Mattel.

19  A.   They were licensed to Mattel.  Yes, Mattel was

20  manufacturing those; that's correct.

21  Q.   And if we go back to the first page of this, in addition

22  to getting these spreadsheets, what you wanted to get from

23  the Ninette in connection with this subject, Bratz twins, was

24  you wanted to get pictures of the Mattel product.

25  A.   They are available at retail.  You can get pictures of
```

```
 1   them.  You can go to Wal-Mart or Toys-R-Us and buy them and
 2   take pictures of them.
 3   Q.   And if you go to 13917, that's the same e-mail string,
 4   but Ms. Pembleton has sent you what you asked for, which are
 5   attachments which show pictures of the Olsen twins?
 6   A.   I'm sorry, I cannot find it.
 7   Q.   13917.  It's right before 13918.
 8   A.   I found it.  Go ahead.
 9   Q.   Is this the response from Ms. Pembleton to you, giving
10   you what you asked for?
11   A.   Looks like, yes, with a series of pictures attached
12   which she probably got from -- I don't know where she got it
13   from.
14            MR. PRICE:  Move Exhibit 13917 into evidence.
15            MR. NOLAN:  No objection.
16            THE COURT:  It's admitted.
17                 (Exhibit 13917 received.)
18   Q.   BY MR. PRICE:  And this is the response.  "Here's a
19   start."  And then has attachments, and if you look at them,
20   those are pictures of the Olsen twins dolls; correct?
21   A.   As of 2004, yes.
22   Q.   And this --
23   A.   Looks like it.  Again, I don't remember the Olsen twins
24   dolls.  These are black and white pictures.  But it looks
25   like them, yes.
```

```
 1   Q.   And this is something which you do with a brand.  You
 2   look at competitors' ideas, and you come up with your own
 3   ideas, and you compete; right?
 4   A.   That's correct.  We come up with our own execution.
 5   Q.   Another product you had was something called Bratz Big
 6   Head.
 7           Do you recall that?
 8   A.   I don't think we have a product called Bratz Big Head.
 9   Q.   Let me rephrase that.  Bratz Funky Fashion Makeover.
10           MR. NOLAN:  It's close but not --
11           MR. PRICE:  Yes.
12           THE WITNESS:  I hope it wasn't a southern
13   interpretation of a big head.  Go ahead.
14   Q.   BY MR. PRICE:  So Bratz Funky Fashion Makeover.  Let me
15   show you 17533, which is in evidence.  This is an example of
16   something else that MGA came out with to leverage the Bratz
17   brand; right?
18   A.   That's correct.
19   Q.   And in doing that --
20   A.   Hold on one second.  It says date of 2004, yes.
21   Q.   And doing that, one thing it did was sent to the
22   manufacturer enlarged Barbie heads; right?
23   A.   It's possible.  I don't know.
24   Q.   If you'd look at Exhibit 11179.
25   A.   Can you repeat that again?  119 --
```

```
 1    Q.    11179.

 2    A.    This is a series of e-mails.  You want me to read the

 3    whole thing?

 4    Q.    Well, if you'd turn 11179-0008 and -0010, you see there

 5    are some photographs there?

 6    A.    There is.

 7    Q.    One being of a large Barbie head?

 8    A.    Yes.

 9    Q.    And you see this is an e-mail from Elly Shinohara to

10    Paula Treantafelles concerning Bratz Big Head?

11    A.    Yes.

12    Q.    And were you aware of this communication concerning the

13    development of this large head Bratz doll?

14    A.    I was not.  I'll not on the e-mail.

15    Q.    You never talked to Ms. Garcia about sending Barbie

16    large heads to the manufacturing company to assist in

17    developing the Bratz head?

18    A.    I might have.  I don't remember.  This is dated 2001.  I

19    don't recall that far back.

20               MR. PRICE:   I'd move in 11179 into evidence.

21               MR. NOLAN:   Your Honor, lack of foundation.

22               THE COURT:   Counsel?

23               MR. PRICE:   Best I can do with it.  It's an MGA

24    document produced by MGA.  They are calling Ms. Garcia.  We

25    could put it in through her, if necessary --
```

1           MR. NOLAN:  Your Honor, I apologize.  We'll take a

2   look at the document.  Right now --

3           THE COURT:  It's past five o'clock.  Why don't we

4   take it up in the evening, and we'll take it up first thing

5   in the morning.

6           Members of the jury, I'll see you at nine o'clock

7   tomorrow morning.

8           **(WHEREUPON THE JURY WITHDRAWS.)**

9           THE COURT:  Please be seated.  The Court has a

10  conference call at 5:15 that I need to take up.  Is there

11  anything else that you need the Court to attend to this

12  evening that cannot wait until tomorrow morning at 8:00?

13  Mr. Proctor, are we all right?

14          MR. PROCTOR:  I think it can wait until tomorrow.

15          THE COURT:  There's another binder you were going

16  to get me for Brode, did you say?

17          MR. PROCTOR:  I believe it's in MGA's hands right

18  now.  I think we should have it, but it may not be here yet.

19          THE COURT:  Thank you.

20          MS. AGUIAR:  Very quickly, your Honor.  We reached

21  a stipulation with Mr. Quinn because during the exam of

22  Mr. Yeung, we meant to move in a couple of exhibits.  May I

23  read the numbers in?  13784 and 13785.

24          THE COURT:  Very well.  Those are admitted.

25          **(Exhibits 13784 and 13785 received.)**

```
 1              THE COURT:  You're still working on the other
 2  stipulation, though, concerning Ms. Gronich?
 3              MS. AGUIAR:  Yes, we'll read something in tomorrow.
 4              THE COURT:  Very good.
 5              MS. AGUIAR:  And two other things.  Just if we
 6  could get a time count, and I wanted to raise something
 7  regarding scheduling so that we could plan if your Honor had
 8  any indication of when you might want the parties in for the
 9  charging conference.  We wanted to make sure to start
10  thinking about that.
11              THE COURT:  I'm working on my Monday calendar on
12  that.  So I'll have information on that tomorrow.  It largely
13  depends on that.  Time count is 18:05 for MGA and 6:15 for
14  Mattel.
15              I assume the issue with respect to attorney
16  McFarland is resolved?
17              MR. QUINN:  Yes, it is, your Honor.
18              THE COURT:  We're past that?
19              MR. QUINN:  We are.
20              THE COURT:  Very well.  The Court is still waiting
21  for a proposed order on certain rulings I made pretrial in
22  this case from the parties.
23              MS. AGUIAR:  Oh, you know what?
24              THE COURT:  I see a lot of fingers going around.
25              MS. AGUIAR:  Pretrial, you mean pre 1-B?
```

```
 1              THE COURT:  The series of motions that I did
 2   telephonically.
 3              MS. AGUIAR:  We did give our comments to the Quinn
 4   firm about a week or so ago.  We're just waiting to hear
 5   back, I believe is the state of play.
 6              MR. ZELLER:  But I'll look into it, and we'll get
 7   it resolved.  We'll respond tonight.
 8              THE COURT:  Let's get those in tomorrow if we can.
 9              There are a few outstanding motions which I plan to
10   take up tomorrow morning at 8:00.  Do we have an opposition
11   at all?  Are there any additional briefs on any of the
12   motions that were submitted, the three motions submitted by
13   MGA and the ex parte?  I think I've ruled on most, except for
14   the motion for sanctions and the motion for clarification.
15              Is there anything further, any further briefing
16   that I should be expecting, or do I have everything that the
17   parties have submitted?
18              MR. ZELLER:  The second motion you mentioned was
19   the reconsideration motion?
20              THE COURT:  Reconsideration clarification.
21              MR. ZELLER:  One that MGA brought.
22              THE COURT:  Yes.
23              MR. ZELLER:  I know that there is the motion
24   concerning our expert, and I believe it's an oral motion.
25   I'm not aware of anything in writing.  But it's our expert,
```

1    Frank Keiser.

2            THE COURT:  It was referenced earlier today by

3    Mr. Quinn, I believe.

4            MR. ZELLER:  Right.  And that was something that

5    MGA was raising.  I believe it could probably be tabled for

6    the moment if only because we have decided we're not going to

7    call him in our case in chief.  We reserve to call him in

8    rebuttal, but at least the issue could be tabled at the

9    moment.

10           If the Court's question was have we filed an

11   opposition to the clarification/reconsideration motion, the

12   answer is that we have.  I know it was over at the court here

13   today, earlier today.

14           THE COURT:  If you'd provide a courtesy copy to the

15   courtroom deputy.

16           MR. ZELLER:  I believe we have.

17           THE COURT:  Maybe it was submitted outside?

18           MR. ZELLER:  I understand that it was provided to

19   Mr. Holmes earlier today.

20           THE COURT:  Very well.  So it should be sitting on

21   my desk, then.  I'll take up those two motions at least to

22   the extent that I'm going to take them up.  To a large

23   extent, as I already indicated, that clarification/

24   reconsideration motion is going to be largely decided in the

25   context of the jury instructions that Ms. Aguiar just

1   referred to.   But I will try to give some guidance for the

2   witnesses that you are calling.

3            As far as the motion for sanctions, I do want to

4   get that resolved tomorrow morning.   So we'll hear you on

5   that tomorrow morning at 8:00.   Because the Court has heard

6   testimony as well about the subject matter there.

7            MS. AGUIAR:   Okay, great.   We just, if we have time

8   to put in a short reply on the sanctions motion, we will try

9   to do that.   I didn't know when you were going to want to

10  rule on it.   So we have not had an opportunity, since I guess

11  we got the opposition yesterday morning.

12            THE COURT:   Okay.

13            MS. AGUIAR:   And so I --

14            THE COURT:   I haven't been having replies in these

15  motions during the trial.   I'll give you leave to make your

16  argument tomorrow morning.   I assume we're past all the

17  evidence on this point; is that correct?

18            MR. PRICE:   Yes, I think we're past the evidence on

19  that point.

20            THE COURT:   Yes, we are?

21            MR. PRICE:   Yes, we're past it.   And there is no

22  more evidence about the Hong Kong dolls.

23            THE COURT:   Very well.   I'll take that up tomorrow

24  morning and give both parties and opportunity to argue at

25  8:00.

 1              Anything else for Mattel?

 2              MR. QUINN:  No, your Honor.

 3              THE COURT:  Ms. Aguiar, Mr. Nolan, anything else

 4   from MGA?

 5              MS. AGUIAR:  Will your Honor be taking argument on

 6   the motion for clarification, or really at that point just

 7   telling us what your views are?

 8              THE COURT:  Right.

 9              MS. AGUIAR:  The latter?

10              THE COURT:  I'm going to -- I'll do that in the

11   morning.

12              MS. AGUIAR:  Right.  But I was just wondering

13   whether you were going to take argument on it or just say

14   look, this is what you plan to do.  Because Mr. Hansen, who

15   has been working with me on that, has a medical procedure in

16   the morning.  So I actually really do -- we obviously do want

17   to have resolution of it.  But I'm just trying to --

18              THE COURT:  I feel pretty comfortable at this point

19   explaining the Court's position without further argument.

20   But if you would rather me put it off until noon tomorrow, I

21   can.

22              MS. AGUIAR:  If you're comfortable with your

23   position, but certainly there are quite a few things, and I

24   just skimmed it at lunch today.  There are quite a few things

25   that Mattel says in its opposition which we really disagree

1   with.   But --

2              THE COURT:   We've had extensive argument on all of

3   these points up to this.   I think this is something that --

4   and ultimately, it's not going to be decided as much as I'm

5   going to give guidance on my previous order.   We will be

6   revisiting all of these issues in the context of the jury

7   instructions and the verdict form.

8              MS. AGUIAR:   That's what I thought.   So tomorrow

9   morning is fine.

10             THE COURT:   Very well.

11             MR. NOLAN:   Your Honor, real quick.   We may change

12  the procedure tomorrow in that I know that we have

13  historically taken our case and put it in through, let's say,

14  with Mr. Larian.   It may be that tomorrow, because of other

15  business commitments that he might have to attend to, that I

16  might just do the technical cross-exam to deal with the

17  issues that they raised but then reserve the right to call

18  him back in my case in chief, if that's okay.   And I just

19  wanted to alert the Court and Mattel for scheduling purposes.

20             THE COURT:   What time are Mr. Larian's business

21  commitments?

22             MR. NOLAN:   Later in the morning.   It won't

23  override the importance of what we're doing here.

24             THE COURT:   Very well.

25             MR. NOLAN:   There's other reasons why we may want

1   to do it in our case in chief rather than doing it at this

2   time.

3           THE COURT:  Okay.  We'll take that up in the

4   morning as well.

5           MR. PRICE:  When you said nothing further on the

6   doll, I assume you're talking about the doll we were talking

7   about in opening, the plush doll.

8           THE COURT:  Yes.

9           MR. PRICE:  Because there is still the issue about

10  photographs of other dolls and whether or not they are clear

11  enough.  You'll recall there's still that discussion going

12  on.

13          THE COURT:  I understand that.  But based on

14  Ms. Aguiar's statements this morning, that's been worked out.

15  We're making progress on that.

16          MR. PRICE:  I was trying to keep Mr. Zeller off the

17  podium.

18          MR. ZELLER:  That's substantially so.  There are

19  some issues.  I sent an e-mail.  Hopefully, we'll get that

20  issue resolved.

21          THE COURT:  Very good.  We'll revisit this in the

22  morning.  Okay.  If there's nothing further, I need to speak

23  very briefly with Mr. Nolan and Mr. Quinn off the record at

24  sidebar, and then we're done for the day, and then we'll see

25  the rest of you at 8:00 tomorrow morning.

1          Court is in recess.

2               (Proceedings concluded at 5:12 P.M.)

3

4

5               C E R T I F I C A T E

6

7

8          I hereby certify that pursuant to Title 28,

9   Section 753 United States Code, the foregoing is a true and

10  correct transcript of the stenographically reported

11  proceedings in the above matter.

12               Certified on August 6, 2008.

13

14

15          MARK SCHWEITZER, CSR, RPR, CRR
               Official Court Reporter
16             License No. 10514

17

18

19

20

21

22

23

24

25