1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                   - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7    MATTEL, INC.,                    )   **CERTIFIED COPY**

8              Plaintiff,             )

9        vs.                          )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)   Trial Day 33
                                      )   Morning Session
11              Defendants.           )   Pages 6745-6855
                                      )
12   AND CONSOLIDATED ACTIONS,        )
                                      )

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17           TUESDAY, AUGUST 12, 2008

18                 8:23 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
           Federal Official Court Reporter
24           3470 12th Street, Rm. 134
           Riverside, California  92501
25              951-274-0844
             WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2
      On Behalf of Mattel, INC.:
 3
                            QUINN EMANUEL
 4                          By:   JOHN QUINN
                                  JON COREY
 5                                MICHAEL T. ZELLER
                                  HARRY OLIVAR
 6                                TIMOTHY ALGER
                                  WILLIAM PRICE
 7                          865 S. FIGUEROA STREET,
                            10TH FLOOR
 8                          LOS ANGELES, CALIFORNIA  90017
                            213-624-7707
 9

10
      ON BEHALF OF MGA ENTERTAINMENT:
11
                            Skadden, ARPS, SLATE, MEAGHER & FLOM LLP
12                          BY:   THOMAS J. NOLAN
                                  JASON RUSSELL
13                                RAOUL KENNEDY
                                  DAVID HANSEN
14                                LAUREN AGUIAR
                                  CARL ROTH
15                          300 SOUTH GRAND AVENUE
                            LOS ANGELES, CALIFORNIA  90071-3144
16                          213-687-5000

17

18

19

20

21

22

23

24

25
```

```
1                              I N D E X

2

3                                              PAGE

4    PROCEEDINGS                               6748

5

6    DEFENSE
     WITNESS          DIRECT     CROSS    REDIRECT    RECROSS
7    Margaret Leahy (continued)

8    BY MR. Nolan     6778                 6848
     BY MR. Price               6832                  6852
9

10

11

12            EXHIBITS          RECEIVED

13              17733             6800

14

15

16

17

18

19

20

21

22

23

24

25
```

Tuesday, August 12, 2008                Trial Day 33, Morning Session

```
 1        RIVERSIDE, CALIFORNIA; TUESDAY, AUGUST 12, 2008; 8:23 A.M.
 2                              -oOo-
 3             (HEARING OUTSIDE THE PRESENCE OF THE JURY.)
 4        THE CLERK:  Calling case number CV04-09049-SGL,
 5   Mattel, Inc., v. MGA, Inc., et al.
 6             Counsel, please state your appearances for the
 7   record.
 8        MR. QUINN:  John Quinn, Mike Zeller, Bill Price for
 9   Mattel.
10        MR. NOLAN:  Tom Nolan, Lauren Aguiar, Carl Roth, and
11   David Hansen for MGA and Isaac Larian.
12        THE COURT:  There's a couple of matters the Court
13   wants to take up before we bring the jury in.
14             Let me start with the schedule for this week.  I know
15   both parties expressed a concern about the timing for this
16   week.  The Court shares that concern.
17             What we did yesterday was contact the jury and
18   indicate to them two things:  First of all, that we'll probably
19   be going through 5:30 for the next three days; and also that
20   they should bring their own lunch, that I'm only going to take
21   an hour for lunch instead of an hour and a half.  They're free
22   to go out to lunch if they want, but I just wanted to give them
23   a heads up that we're going to tighten up the schedule a bit to
24   make sure that we get through everyone's allotted time and wrap
25   up this case by the end of the day Thursday so that we can have
```

 1  closing arguments and instructions on Friday.  That seemed to
 2  be fairly well received by the jury, at least we had no one
 3  walk out on us.

 4          As far as a couple of matters to take up this
 5  morning, I did receive the two versions of the proposed orders
 6  regarding the July 18th and July 21st motions, and I'll want to
 7  hear from the parties on that.  I also want to hear on the
 8  motion of Mattel to quash the MGA trial subpoena regarding the
 9  custodian of records; and then the court just received last
10  night the opposition to the motion to quash; and anything else
11  that the parties think we need to take up before we start.

12          **MR. ZELLER:**  I'm not sure if the Court's had an
13  opportunity to look at them yet, but there has been some
14  briefing on the joint authorship issue regarding 1136.

15          **THE COURT:**  I have not.  All I received was the fax
16  from Skadden.  I have not received the fax from Mattel.  I was
17  looking for it this morning, but it had not come in.  If you
18  have another copy, if you could provide that to the Court.

19          **MR. ZELLER:**  We'll get you a copy right away, Your
20  Honor.

21          **THE COURT:**  Very well.

22          It could very well have been our fax machine.

23          Do you wish to take up any other issues besides the
24  ones the Court has identified?

25          **MR. ZELLER:**  One administrative matter, just so it

 1    doesn't slip through the cracks.  We now have an agreed-upon

 2    time for the videos that were played on Friday.

 3              **The COURT:**  Excellent.  And that is...

 4              **MR. ZELLER:**  19 minutes, 30 seconds for Mattel; and

 5    5 minutes and 30 seconds for MGA.

 6              **THE COURT:**  Very well.

 7              **MR. NOLAN:**  Your Honor, one matter.

 8              We're going to resume with the testimony of

 9    Margaret Leahy this morning to make it as efficient as

10    possible.  Just after we do some of the other arguments, I want

11    to raise a couple of issues that came up during the examination

12    of Ms. Leahy --

13              **THE COURT:**  Sure.

14              **MR. NOLAN:**  -- that we just need clarification on,

15    and then guidance on one other area that we want to get into in

16    light of a conversation we had at side-bar during 1-A while she

17    was testifying, just so there's no issues.

18              Do you want to do that now?

19              **THE COURT:**  Sure.

20              **MR. NOLAN:**  There were a number of objections that

21    were sustained with respect to changes that Ms. Leahy made and

22    the purposes behind those changes, or whether or not the

23    question was why or because --

24              **THE COURT:**  Right.  I sustained objections to why,

25    not to the changes themselves.  She had unlimited ability to

 1    testify as to the changes themselves.

 2            **MR. NOLAN:**  Correct, Your Honor.

 3            One of the things that I wanted to point out is that

 4    the argument seems to be, from Mattel, based on the arguments

 5    we had Friday morning, that the sweat-of-the-brow type of

 6    testimony would not be relevant under a copyright analysis; and

 7    that is really what the substance of the objections were going

 8    to.

 9            And yet, at the same time, Your Honor, Mattel has

10    state law claims here.  It just seems to us, upon reflection --

11    and it was apparent to me during the examination -- that Mattel

12    almost wants their cake and eat it too.

13            With respect to the copyright, I'm not going to

14    reargue what we spent a lot of time on on Friday morning, but

15    on the state law claims, it seems to me that we -- there's a

16    need to show a causal connection between the wrongdoing and the

17    profits, and it seems to me that it is relevant for

18    Margaret Leahy to be able to testify as to why those changes

19    were made, because I think they do go to the whole question of

20    proximate cause and how the profits were derived and whether or

21    not they were derived from the wrongful conduct.  It seems to

22    me that the more they restrict this line of questioning, the

23    more it is -- and I'm not arguing the preemption argument --

24    but the more it becomes apparent to all of us that there is no

25    difference between the positions that they're taking,

 1   respectfully, on the copyright side and the tort law claims,

 2   except when it comes to damages.  They think that they should

 3   be able to get all of the damages on the state law claims.  And

 4   I just think in the -- we did not discuss the difference

 5   between the state law claim elements of causation, proximate

 6   causation, and having them tie a causal connection to the

 7   alleged wrongdoing, that we should be allowed to introduce

 8   evidence.  And it's not sweat of the brow; it's exactly why she

 9   was doing this and the effects of these changes and the impact

10   that it had on the model that makes it relevant to the state

11   law claims.

12          **THE COURT:**  Let's separate those two, because I guess

13   I can ipse dixit understand the effects of those changes on the

14   sculpture itself, as opposed to why she was doing it, as having

15   a relationship to the proximate cause.  You're going to have to

16   explain the connection between why she was making a change and

17   the proximate causality on the state torts.  I have not seen

18   that.

19          **MR. NOLAN:**  I think I'll do it on just one element,

20   if I might, just to make the point.

21          Carter Bryant's idea for the doll was based on his

22   notion that older children -- in fact, his testimony is that he

23   used high school students as the model and wouldn't it be

24   interesting and fun if they were hip and they were just more

25   fashion-oriented and that type of thing.  In fact, what MGA did

1    was identify a market opportunity with respect to the tweens,

2    you know, this whole compression of age and making it from 8 to

3    12 or 13.

4         **THE COURT:** I remember that testimony. I thought

5    changing it to look from a high school to a tween was let in,

6    but maybe I'm mistaken.

7         **MR. NOLAN:** The point I'm making is that it did come

8    in, except when she said -- and would say, 'I did this to make

9    it appear younger, that this made it appear younger; the torso

10   was more of a teenager body.' My recollection, Your Honor, was

11   that that testimony was not allowed in.

12        **THE COURT:** Do we have a transcript on that, because

13   that's the type of thing I would -- that she's making it appear

14   younger, that she's changing either the doll itself, the sculpt

15   itself, or even the idea of the doll itself, again, all of

16   that, I understand, comes in. That would have been a mistake

17   if I would have kept out the change in the model to make it

18   appear younger.

19        The concern I have is confusion of the jury,

20   particularly when Margaret Leahy -- just the way she talks, the

21   way she gets into her explanations, her whys, her because. She

22   emphasizes, I think unduly overemphasizes, the

23   sweat-of-the-brown issue. To the extent she wants to explain

24   -- and she's very effective and efficient, I think, when she's

25   just explaining the changes that she made -- either from the

1  drawings, or to the extent that she takes the position that her
2  work had nothing to do with the drawings, all of that is fine.
3  And to address the state law claim on the idea, to the extent
4  that she changed the idea that this jury has found was
5  developed by Carter Bryant, that is all fine.

6        It's not always a clear-cut line to draw.  But I
7  agree with you on everything that you have said in terms of the
8  example.  You'd have to find another example of something that
9  I actually kept out that you believe should come in on
10 causality to the state tort claims.

11       **MR. NOLAN:**  Your Honor, this is just one example.
12       **THE COURT:**  Okay.

13       **MR. NOLAN:**  And I can find more later, but this helps
14 me with respect to shaping the examination.

15       At page 6716, starting at line 7, we're talking about
16 changes to the arms.

17       And I ask the question:  "What about -- did you make
18 any changes to the arms?"

19       ANSWER:  "Yes.  I made changes to the arms as well."

20       QUESTION:  "Describe just the changes you made to the
21 arms, {sic} or arms plural."

22       ANSWER:  "The arms had to get a lot smaller, whereas
23 on a tween body, you want the legs to be more muscular."

24            "Objection, your honor.  Again, the why."

25            "Sustained."

```
 1              THE COURT:  Read that again.
 2          That was the one where she said "because," and then
 3   she said -- and then she even asked, "where's my why?"
 4          Is that right?
 5              MR. NOLAN:  No, Your Honor.
 6              THE COURT:  I don't have it in front me, counsel, so
 7   I'm trying -- this is just based on my memory.
 8          First of all, before we move to this topic, is there
 9   anything in the transcript on the first example that you
10   brought up?
11              MR. NOLAN:  I'll go back, Your Honor, and find that.
12          I think the global clarification has helped me out in
13   terms of giving me guidance as we go forward this morning.
14   I'll look for other examples while we're going onto these other
15   motions.
16              THE COURT:  That's the balance I'm trying to strike,
17   and if I made a mistake on Friday, I'm happy to go back and
18   revisit that.  But that's the balance I'm trying to strike, as
19   opposed to her describing how hard it was to do this or why she
20   did this for some molding purpose or whatever.  What's relevant
21   is changes that she made.
22          And I agree with you, to differentiate between the
23   causality on the copyright to the state tort claims, she needs
24   to be able to get into changes on the idea itself.
25              MR. NOLAN:  Okay.
```

 1    **THE COURT:** Now, there comes a point where this bumps

 2  up against the originality issue and the authorship issue that

 3  we discussed at length on Friday as well; and that's another

 4  concern that the court has. There's more than one dynamic

 5  affecting the court's rulings on these evidentiary objections.

 6  I'm not saying it's an easy minefield to traverse, but I'm also

 7  not going to permit MGA to escape their own previous statements

 8  with respect to originality of the drawings and the works as

 9  related to the drawings and the jury's findings on that point.

10  That's another dynamic that's playing into this.

11    **MR. NOLAN:** Your Honor, I agree.

12    And there's briefs that have been filed on this

13  particular issue, and I know that you are waiting to look at

14  those.

15    **THE COURT:** I'll be reviewing those as we go through

16  this testimony this morning.

17    **MR. NOLAN:** Two other issues that arise from

18  Margaret Leahy.

19    In 1-A, we were asking her about the moonlighting and

20  what activities she did, and we had a side-bar, and the Court

21  excluded her testimony with respect to the moonlighting as it

22  relates to 1-A. And then you indicated, Your Honor, after that

23  side-bar, while we were at side-bar but at the conclusion of

24  the questioning, on page 4126 -- we're talking about -- you

25  say, "that's going to be different. We will revisit the issue

```
 1    in 1-B."

 2              And I said, "and she will clearly be a 1-B witness as

 3    well, if we get there, and that's probably a better place, so I

 4    would just ask the Court" --

 5              THE COURT:  "I can see this going to the issue of

 6    damages.  We're absolutely -- so for 1-A purposes, we're just

 7    focusing on the breach of contract.  I think, based on the

 8    answer to the Court's question, I'm going to sustain the

 9    objection."

10              So we would want to get into the moonlighting aspect,

11    as we highlighted and indicated we would want to.

12              THE COURT:  Well, let's revisit that.

13              What is the relevance of moonlighting to damages on

14    the state court claims?

15              MR. NOLAN:  Your Honor, I think it goes to the

16    affirmative defenses that we've asserted with respect to the

17    contract, whether or not it's waivable.

18              THE COURT:  I indicated, since that statement that I

19    made there, that we're doing the affirmative defenses outside

20    the presence of the jury, so that's not --

21              MR. NOLAN:  That's the clarification I wanted to

22    make, the intersection with respect to that.

23              And then the very last point is that the Court is

24    aware that on the jury verdict form, there is a drawing, a

25    controlled drawing.  I believe it's 1183, which is a drawing
```

1   that the jury found was done by Carter Bryant while he was
2   employed at Mattel, jointly or solely.

3       What we were not allowed to introduce at trial,
4   because Mattel objected to it, was the sculpt, the 1141 sculpt,
5   the one done on October 25th; that did not get into evidence.

6       Ms. Leahy would lay the foundation that the drawing
7   in issue is actually a drawing that is derived from the sculpt
8   that was done on 1125, that was presented for the first time on
9   1125.

10      I know the court has said that we're not going to
11  revisit the timing issues. You mentioned that before with
12  respect to 1136. But on this particular one, Your Honor, what
13  is most interesting, I think, and unfair -- we may have to deal
14  with it in a judgment as a matter of law, motion for new
15  trial -- is that Mattel specifically objected to introducing
16  into evidence the actual sculpt that would have established
17  that the drawing itself was not done until October 25th, when
18  it was presented to Mercedeh Ward. And I would like leave,
19  during this witness and only during this witness, to allow that
20  testimony to come in.

21      Your Honor, it's interesting; they allowed in the
22  molds, exhibits 1040-A through D, which have marked
23  October 23rd. When I went to the sculpt to try to introduce
24  that, they objected to it, and then took that off of the
25  verdict form.

```
 1              THE COURT:  On what basis?  Refresh my recollection.
 2              MR. NOLAN:  They objected to the basis that it was
 3    beyond the scope of phase 1-A.
 4              And then I pointed out, Your Honor, 'well, it's on
 5    the verdict form.'  It had been on the verdict form --
 6              THE COURT:  Did you indicate to the court at the time
 7    that it goes to the issue of timing?
 8              MR. NOLAN:  Your Honor, the whole line of questioning
 9    was on the line of timing.
10              THE COURT:  And in the discussion on the objection,
11    did you point out to the court that it went to the issue of
12    timing?
13              MR. NOLAN:  I'll go back and see if we did, but I
14    would say the overall argument that we were making, Your Honor,
15    was that that was made -- in fact, to this point, Your Honor --
16    and Paula Garcia was asked in her examination about that
17    particular document, and she identified the drawing as having
18    been done at a particular meeting where Mercedeh Ward was
19    present, which is the October 25th one.  It was at that time
20    when we got to Margaret Leahy to introduce the sculpt that they
21    objected.  So the entire trial up until that time was gearing
22    up towards that October 25th meeting.  But I'll go back and
23    look at that.
24              THE COURT:  Right.  But the timing is not the timing
25    of the sculpt, because there's evidence the timing of the
```

1    sculpt came in.  What should not come in is the sculpt for
2    purposes of establishing that the drawing was done after the
3    sculpt was created.

4              Was that ever brought to the Court's attention?
5         **MR. NOLAN:**  I'll double-check.

6              I think it is.  But then, if that was not, Your
7    Honor, then we think that Mattel should be -- because it was
8    unclear as to whether or not Mattel was taking the position
9    that that drawing related to 1136, the gray sculpt.

10        **THE COURT:**  That's what I'd like to see.  I'd like to
11   see that in the transcript, in terms of how that played out.

12             Let me hear from Mattel on these points.

13        **MR. PRICE:**  Your Honor, if you recall, there was
14   evidence --

15        **THE COURT:**  I don't.  That's why I'm asking.

16        **MR. PRICE:**  There was evidence that that drawing was
17   done before Mr. Bryant left Mattel.  It was part of the packet
18   given to Mr. Linker.  Ms. Garcia, at her deposition, said it
19   was done before October 19th.  I think she changed her
20   testimony on the stand, but, of course, that evidence was
21   presented to the jury so that they could decide.

22             Our objection on sculpts was simply that we weren't
23   claiming -- we made an objection that the sculpt was outside
24   the time frame, and there was never a suggestion that what they
25   wanted to put in evidence was when that drawing was done.

1          **THE COURT:** Right. That's the question that I have.
2     I'd like to see that in the transcript. I don't recall that
3     argument being made, but there's a number of things that are
4     hard to recall.

5          **MR. PRICE:** So our position is that the jury was
6     asked to decide when that drawing was done. It was clearly in
7     the first phase. And I guess they just didn't want to present
8     that evidence. There was no argument to the Court that what
9     they were trying to put in was relevant at all to that issue.

10         **THE COURT:** I'm happy to take a look at the
11    transcript to see if that argument was presented that way. If
12    not, it was waived, and we'll move forward. But I'll take a
13    look at the transcript on that.

14         Mr. Zeller?

15         **MR. ZELLER:** With respect to the state law claim
16    issue, I'm not sure that there's, at this stage anyway, based
17    upon the Court's prior guidance, that there's that much
18    disagreement about what should and should not come in. It is,
19    as the Court was pointing out, a line drawing problem.

20         The Court, of course, also pointed out that there are
21    the issues of potential jury confusion in allowing the kind of
22    evidence about sweat of the brow and why changes were made.

23         In addition, it does start running into the issues of
24    originality and protectability, which the Court is ruling upon
25    as a matter of law.

1        I would also say that there's one other constraint on

2   this; and this is also true with respect to the state law

3   claims.  Mr. Nolan is making the argument, and I think I

4   understand it, that -- he's saying, 'well, the reason why

5   Margaret Leahy, for example, made changes would have an impact

6   on the model, and presumably, then, on the benefit, whether the

7   benefit that MGA derived from the sale of the Bratz Dolls

8   really resulted from the misappropriation, from the aiding and

9   abetting of breach of fiduciary duty and the like.'

10        And I think I understand what that point is.

11        I think fundamentally, however, that in order to

12   really connect those things, they are going to have to have

13   some evidence saying "Margaret Leahy made particular change x,"

14   that that somehow contributed to the benefit of the success of

15   Bratz, we will call it, and it was outside the idea that Bryant

16   presented.  I mean, if they can establish those things, then

17   perhaps Mr. Nolan's argument --

18        **THE COURT:**  That's what they are trying to do, I

19   think, Mr. Zeller.  I think that's precisely what they are

20   trying to do.  They are having Margaret Leahy lay the

21   foundation that she threw away, put away, or shelved the

22   drawings that Carter Bryant did, and it's not clear what was

23   her muse, but it was something other than the drawings, and

24   that she made the carvings and did the changes that she's

25   testifying to at length.  And I imagine there will be another

1   witness that will come along and say that those are the changes
2   that account for the success of Bratz.

3           **MR. ZELLER:**  Well, the second part is exactly what
4   I'm addressing.  I'm unaware of such a witness who is going to
5   be able to come in and link those things up.

6           **THE COURT:**  If they can't do that, then that goes
7   nowhere.

8           **MR. ZELLER:**  But they still have then sewn the very
9   jury confusion that we are concerned about, and allowing the
10  jury to speculate, 'oh, well, she thought they were important.
11  She was allowed to explain why she made them.  Obviously, MGA
12  thinks that they're important.'

13          So my point is that at the end of the day, they have
14  to have evidence of that second aspect.  There's been no
15  proffer that there is sufficient evidence, and I'm unaware of
16  such evidence.

17          **THE COURT:**  I don't know how that's going to play
18  out, but that is precisely why I'm trying to avoid
19  Margaret Leahy, essentially, without foundation, supplying that
20  evidence through her "because" and "why" and that type of
21  testimony.  I think that adds -- it's not just an issue of jury
22  confusion.  I think ultimately it's an issue of foundation.
23  She is, I am convinced, certainly the best sculptor that I will
24  have a chance to meet in personal life.  She's a fabulous
25  sculptor.  There's no question about it.  Is she a marketing

1    expert?  Is she a branding expert?  Well, of course not.  I
2    don't know of any foundation that has been laid there.

3          So that's what I'm trying to regulate here as this
4    evidence comes in, is not to allow her to go beyond her
5    expertise in terms of describing what she did as an artist and
6    her source of what she did as an artist, as opposed to
7    explaining why she did that, for branding purposes or something
8    that goes beyond foundation.

9          I'm mindful of your point.  I think at the end of the
10   day, if there is no evidence on the latter element, then this
11   argument goes nowhere and that can be addressed with the jury.
12   But I think at this point it's relevant evidence.

13          MR. ZELLER:  There is another issue that's been sort
14   of lurking around a lot of the arguments that MGA has been
15   making with respect to copyright issues; and this isn't
16   necessarily just Margaret Leahy doing this; this has also been
17   said in various contexts.  I'm concerned that there is becoming
18   this overemphasis on the mere translation of 2-D to 3-D as
19   somehow being dispositive, or even relevant, frankly, to the
20   copyright infringement analysis under substantial similarity
21   standards.

22          We hear this in a couple of different variants.  Of
23   course, the whole notion of 2-D to 3-D is played up
24   extensively.  In fact, when Mr. Vilppu is put up to be examined
25   in the context of a Daubert hearing, his report makes it clear

1   he thinks that inherently changing something from 2-D to 3-D
2   makes it different, substantially different; so we have that
3   issue lurking around.

4          But also we have this manifested in another way by
5   MGA, which is -- these questions are being directed to
6   Ms. Leahy, which is basically, 'well, Carter Bryant's drawings
7   didn't give you instructions on how to sculpt it.'

8          That is also irrelevant.  I mean, whether a drawing
9   has sufficient detail to tell somebody how to copy it, or to
10  translate it into another medium, is not the standard.  And I'm
11  concerned that this is going to cause jury confusion in the way
12  that this is being presented, and this overemphasis of 'these
13  aren't engineering drawings; these aren't controlled drawings';
14  and if somehow those were not presented to MGA, that that
15  somehow is relevant to infringement.

16         **THE COURT:**  Again, the Court is trying to strike a
17  balance.  The Court kept out -- there was an engineering
18  drawing of some doll that was completely irrelevant to this
19  case, a turnaround drawing.  I'm keeping that out, because I
20  agree that would be an overemphasis on a point that has no
21  relevance or bearing.  I've permitted other testimony in terms
22  of -- because I do think MGA is entitled to submit evidence, to
23  the extent that they have relevant evidence, to show that it
24  wasn't the drawings that Margaret Leahy developed the Bratz
25  doll on.  Whether that's credible or not is an issue that the

 1   jury needs to decide.

 2           MR. ZELLER:  But I think that --

 3           THE COURT:  I think that is relevant.

 4           Or do you disagree?

 5           MR. ZELLER:  I probably do disagree, but I'm not sure

 6   that -- it just depends on how it's being framed specifically.

 7   In other words, sometimes I can see --

 8           THE COURT:  Explain how you disagree on that, how the

 9   evidence that -- for Margaret Leahy to say that 'I did not' --

10   particularly mindful of the state tort claims -- that 'it was

11   not Carter Bryant's drawings that I predicated my sculpt on, or

12   changes to my sculpt.'

13           MR. ZELLER:  And she's already said that.  I mean,

14   that evidence is already in; so I'm not disagreeing with that

15   point.

16           THE COURT:  Okay.

17           MR. ZELLER:  I'm saying that there are plenty of

18   other situations where, depending on how it's framed, I would

19   say it's irrelevant.  If she starts trying to put in -- and

20   really what I was responding to was more of this notion of

21   independent creation.  I mean, once it starts to shade into

22   that, then we have a problem there with that.  That, to us, is

23   a very serious issue.  So that, I think, is really where I'm

24   articulating a concern, once we get into that.

25           But I don't disagree with what the Court is saying,

1   because as the court has said before, that rebuts some of the

2   other evidence that's already in, or at least purports to rebut

3   other evidence in, such as we put in from the Hong Kong

4   pleadings saying that they referenced those drawings.

5           And the Court is right, that at the end of the day,

6   whether that was the case is going to be a matter for the jury

7   to determine as a factual matter.

8           Also, that said, sort of -- I think it's Mr. Nolan's

9   phrase -- too much mustard on the hot dog, when you get to that

10  point, starts to overemphasize and suggest to the jury that

11  that's really the important legal standard.  Obviously, at the

12  end of the day, it's substantial similarity that they are going

13  to be looking at; and that's going to be driving their

14  determination.  So whether we get into the issue of, 'well, did

15  you have Carter Bryant's drawings hanging up in your cubicle

16  when you designed a' -- again, maybe some of that would be

17  potentially fair game, but when all of this is emphasized over

18  and over again, I'm concerned that it starts to suggest to the

19  jury that somehow the determination they have to make at the

20  end of the day is, 'did someone have the drawings in front of

21  them, copy them, or make some conscious effort to, you know,

22  exactly reproduce Mr. Bryant's drawings?'  Because that's not

23  the standard.

24          **THE COURT:**  I'm mindful of your concern.  I do not

25  think that there has been the undue overemphasis up to this

```
 1   point.  I'll continue to try to draw this line, based on the
 2   very dynamics that I've indicated, and I'll entertain any
 3   objection or responses that counsel want to make going forward.
 4           I would like to get those authorship briefs, if you
 5   have those.
 6           MR. ZELLER:  I have those, Your Honor.
 7           THE COURT:  Mr. Nolan, anything further on this
 8   point?
 9           MR. NOLAN:  I did not want to go silent on
10   Mr. Zeller's apparent effort to switch the burden of causal
11   connection to MGA on this.
12           THE COURT:  No, it's not.  Mattel bears that burden.
13   I'm mindful of that.
14           We're going to start at 9:00 sharp.
15           I just received a note from Ms. Sassie from one of
16   the jurors.  "Mr. Nichols just informed me that if it's
17   possible, he would like to attend his friend's funeral on
18   Thursday.  He requested that, if possible, he be able to leave
19   at noon."
20           Such is life.
21           MR. NOLAN:  Let's try to do this.  We'll try to be as
22   efficient as possible.  We'll try to do our best to move
23   forward.  The hours have changed.  Things can happen by
24   Thursday -- and I guess, without saying one way or the other
25   right now, I think both parties will just commit to try to move
```

 1   this along as quickly as possible.  With these extra hours,
 2   maybe that will help.  And maybe the presentation of evidence
 3   could finish by noon on Thursday.  It looks difficult right
 4   now, but I would hate to automatically say it's not possible.
 5   And then still do the closing on Friday.

 6           **THE COURT:**  I suppose the other thing I could do is
 7   think about -- there's Monday.  And right now, I haven't had a
 8   lot of hearings set up, both civil and criminal, for Monday,
 9   but I suppose I could -- it wouldn't be the first time in
10   history that a federal judge has continued a hearing.

11           **MR. NOLAN:**  Never in this case, unfortunately.

12           **THE COURT:**  I suppose that's what we could do.  I
13   promised the jury that they'd have it by Friday.  We've come
14   close to it.  But this is obviously a juror request.  I can
15   explain to them that I'll grant that request but that may mean
16   that we have to have them come in on Monday.  And I know they
17   normally haven't come in on Monday.

18           Mattel, any thoughts?

19           **MR. QUINN:**  Sounds like it might be a solution, Your
20   Honor.  It's a difficult situation, obviously.

21           **THE COURT:**  You'll deal with the PR concerns for the
22   lawyers that have hearings planned on Monday --

23           **MR. QUINN:**  Just the way we've been dealing with all
24   of the PR concerns, Your Honor.

25           **THE COURT:**  Given how you all have dealt with PR

1    issues, perhaps I should rephrase that.

2         **MR. NOLAN:** Your Honor, it's a possibility, but what

3    about not raising that possibility until we decide whether or

4    not we can't get the job done?

5         **THE COURT:** I guess the only reason is that I think

6    some of the jurors have made -- because we've been taking every

7    Monday off from trial, I think they have made plans. And to

8    the extent that we're going to run through Monday, I want to

9    give them as much notice as possible; so I may raise it as a

10   possibility.

11        **MR. NOLAN:** Okay.

12        **THE COURT:** I'll say the Court has received a note,

13   and I'll explain that we have gotten to a point that we really

14   thought we could get this done but we needed literally every

15   hour this week, as evidenced by my phone calls to the jurors

16   yesterday asking them to plan to stay to 5:30 and bring their

17   own lunch. This puts a monkey wrench into it, but that's the

18   nature of life, and funerals are important to attend.

19        I remember number 6 works on Monday, and that's the

20   big issue, to take it up with number 6.

21        **MR. NOLAN:** Maybe just a few questions of the

22   individual jurors to see the impact.

23        But it's always refreshing to see that you get notes

24   too.

25        **THE COURT:** I do. Believe me, I get notes.

 1            Ms. Aguiar?

 2            **Ms. AGUIAR:**  These are clearly minor issues, in light

 3    of what we've been talking about, but I did want to raise a few

 4    things.

 5            Regarding the rulings on the Farr video, we do not

 6    need those this morning.  We are adjusting some of the

 7    designations, withdrawing a few.

 8            Would Your Honor want to do that at lunch?

 9            **THE COURT:**  I was planning to do that at lunch.

10            **Ms. AGUIAR:**  Thank you for that.

11            As you know, there was an issue on Friday regarding

12    the availability of Ms. Martinez.  Again, this is not something

13    we need to raise right at this moment, but I wanted to put it

14    on your radar screen.

15            **THE COURT:**  Oh, yes.  I'm sorry.

16            Where are we on that?  I see she's not here.

17            **Ms. AGUIAR:**  We have proposed a stipulation, because

18    we've been told that she's not going to be available this week.

19    So the stipulation that we proposed -- and I can provide a copy

20    to Your Honor -- is that we be permitted to play her deposition

21    testimony, obviously subject to counters and to Your Honor's

22    rulings, and that certain exhibits, which I've set forth in the

23    stipulation, would come into evidence, because we feel that we

24    would otherwise have been able to examine her and get those

25    exhibits into evidence.

```
 1              I can give you a copy of that stipulation.

 2         THE COURT:   Okay.

 3         Ms. AGUIAR:   In other words, it's been proposed, and

 4   we haven't heard back from Quinn Emanuel.  This is how we are

 5   proposing to resolve it.

 6         THE COURT:   Very well.

 7              Mr. Zeller, any thoughts on that?  We have four

 8   minutes before we start with the jury.

 9         MR. QUINN:   Your Honor, we advised MGA's counsel last

10   Thursday that we would not be in a position to deliver

11   Ms. Martinez this week.  We advised them that the last day for

12   sure she could be here was Friday.  They chose to call another

13   witness instead of her.

14              She is seeing doctors today and tomorrow, and without

15   going into any details on the symptoms, I doubt she's going to

16   be back.  We would like to have her back, but I don't think

17   it's going to happen.

18         THE COURT:   So she's unavailable.

19              Is there any reason why MGA can't simply play the

20   deposition transcript?

21         MR. QUINN:   I think she probably meets the test of

22   unavailability under the federal rules, and they can probably

23   play the transcript.

24              As to the rest of the stipulation, we don't agree to

25   it.
```

1    The documents, we think, are irrelevant.  They made a
2    decision not to put her on the stand.  We don't think they
3    would come in anyway; so we object to the documents.

4        There's also a statement in the stipulation,
5    something they want us to recite, and we don't agree with that
6    either.

7        **THE COURT:**  Do I have the stipulation in front of me?

8        **Ms. AGUIAR:**  Here it is.

9        **THE COURT:**  Thank you.

10       **MR. NOLAN:**  While you're looking at the stipulation,
11   the only thing I wanted to correct Mr. Quinn on, just to be
12   more precise, is that we had a discussion -- I got an e-mail
13   from Mr. Quinn where he did not categorically say that she was
14   not going to be available this week, that he was awaiting the
15   doctor's note that she wouldn't be in court.

16       Your Honor knows that on Friday we went late, in the
17   sense of losing a couple of hours.  We wanted to put Ms. Leahy
18   on the stand to get that evidence in.

19       My understanding at the time was that it was not
20   absolutely prohibitive to have Ms. Martinez come in for the
21   limited purposes of testifying, that it was awaiting on a note
22   from the doctor; so it's not as though we were told
23   categorically that she was not available.

24       I'm not blaming anyone.  This is just one of those
25   things about life.  In the sense, this is good news.

1        **THE COURT:** Births, funerals. We have it all.

2        Mr. Corey, briefly.

3        **MR. COREY:** The very last thing, Your Honor.

4        One of the questions the court asked was if there was

5   anything else that we should take up.

6        I do want to alert the court to the fact that we've

7   gone back and looked at some of the statements that were made

8   and comments that were made and rulings that the Court made in

9   connection with the discussions last Thursday and Friday about

10  apportionment.

11        In light of some of the positions that MGA has taken

12  and some of the rulings that the Court has made, that really

13  calls into question the validity and reliability of Mr. Meyer's

14  opinions related to apportionment. And I had hoped to raise

15  this in the context of the discussion of the --

16        **THE COURT:** In terms of what the apportionment really

17  is.

18        **MR. COREY:** And in terms of whether the approaches

19  that he has actually can meet the Daubert requirements, the

20  (unintelligible) requirements. And I had hoped to raise this

21  in some more context, but I think what we'd like to do is bring

22  a motion on that, at least to inform the court as to what those

23  issues are.

24        **THE COURT:** Let's hold off on bringing in a motion at

25  this point.

```
 1              When is Mr. Meyers scheduled to testify?
 2         MR. NOLAN:  Thursday.
 3         THE COURT:  We'll have a hearing before that
 4    testimony goes forward, either tomorrow or Thursday.
 5              He's an expert; right?
 6         MR. COREY:  Yes, Your Honor.
 7         THE COURT:  Okay.
 8         MR. ROTH:  As you'll recall, well before the trial,
 9    there was the issue, remember, of the sixteenth motion
10    in limine.  It was way back in may.  It was essentially -- we
11    were concerned, as a result of the process that the Court set
12    up, that that process not be expanded to permit continuing
13    Daubert motions.
14         THE COURT:  Right.
15         MR. ROTH:  Your Honor's choice of proceeding with
16    that was to not open the window to additional Daubert motions
17    that had not been made.  And Your Honor indicated that if the
18    Daubert motion hadn't been made as of that point, it was
19    waived.
20              Now, it is true that Your Honor has made certain
21    statements regarding the relevancy of certain types of issues;
22    and, perhaps, that's what Mattel is talking about; but a
23    Daubert motion which goes to your reliability and the
24    appropriate --
25         THE COURT:  I don't think that's the issue.
```

```
 1   Mr. Corey is talking about the methodology, but I think this is
 2   actually to MGA's benefit.
 3              The last thing that you want to have is to call a
 4   witness, lay the foundation, and have an objection sustaining
 5   it and have that witness turn around and be sent back out the
 6   door.  It's just to flesh out any evidentiary objections
 7   outside the presence of the jury.  It's not so much a Daubert
 8   hearing proffer as it is a relevancy foundational issue.
 9              MR. ROTH:  Perhaps if we could get some indication
10   from Mattel as to what the concerns are, I could better address
11   the issue.
12              THE COURT:  Why don't you discuss that amongst
13   yourselves, and then if you still have this concern, Mr. Roth,
14   I'll invite you to take it up during the break.
15              MR. ROTH:  Thank you, Your Honor.
16              THE COURT:  We're missing one juror.  As soon as this
17   one juror comes in, I'll be bringing the jury in, and we'll go
18   forward.
19              Court is in brief recess.
20              (Whereupon, a brief recess was held.)
21              (Whereupon, jurors enter courtroom.)
22              MR. NOLAN:  Your Honor, we have Margaret Leahy on the
23   stand.
24              THE COURT:  You may.
25              I just want to take up a very brief issue with the
```

1    jury.

2            Mr. Nichols, I've received word concerning the

3    funeral that you need to attend on Thursday; and that, of

4    course, is most important and we'll certainly take Thursday

5    afternoon off to attend to that.

6            That creates a bit of an issue in terms of

7    scheduling, in terms of my promise that we'd have things

8    wrapped up by Friday, because we were somewhat depending on

9    that Thursday afternoon to wrap the case up; so we're going to

10   need an extra half a day someplace.

11           One alternative is, the Court has Monday reserved for

12   its motions, but I understand that some of you work on Monday,

13   or have made commitments on Monday.

14           Does anybody have a commitment on Monday?

15           One option would be for the Court to continue its

16   calendar on Monday.

17           There's a criminal trial that I have to get underway

18   on Tuesday.  I have to pick a jury in that on Tuesday.

19           Another option is, I could pick that jury, send them

20   home for a day, and we could wrap up on Wednesday next.

21           So those are the two options the Court is

22   considering.  I want to accommodate things like a funeral,

23   certainly.

24           So we won't have court Thursday afternoon.  I believe

25   you were contacted yesterday that we are going to try to really

1     be industrious this week; go to 5:30 and only take an hour for

2     lunch.  We really need to wrap this up because of our schedule.

3     But then, certainly, if things come up that you need to bring

4     to the Court's attention, let me know, because life goes on as

5     well.

6                    All right.  Mr. Nolan, you may call Ms. Leahy.

7                    **MR. NOLAN:**  Your Honor, may I approach with

8     Exhibit 1136, the gray sculpt, and have it on the witness

9     stand?

10                   **THE COURT:**  You may.

11                   **DIRECT EXAMINATION (continued)**

12    **BY MR. NOLAN:**

13    Q    I want to go back to where we left off on Friday

14    afternoon.  I think some of the exhibits have been put in front

15    of you, and it might be easy for you to take them out of the

16    boxes as we talk about them.

17                   First of all, the gray sculpt, we've referred to that

18    as 1136.

19                   Would you mind taking that out of the exhibit bag.

20                   And this is the first exploratory sculpt, your first

21    sculpt; is that correct?

22                   **MR. PRICE:**  Object to the characterization of

23    "exploratory."

24                   **THE COURT:**  Rephrase, counsel.

25    / / /

1   **BY MR. NOLAN:**

2   Q    The exhibit that you have just now assembled with the head

3   sculpt, that's 1136, and that was the sculpt that was presented

4   around early October; is that correct?

5   A    Correct.

6   Q    Now, the second one is Exhibit 1141.

7           Do you have 1141 there?

8   A    Yes.

9   Q    And now, 1141, is that the first sculpt that you ever

10  presented at MGA?

11  A    Yes, this is the first sculpt that I showed at MGA.

12  Q    And what was the date of that meeting?

13  A    October 25th.

14  Q    Is that the first time you exhibited a sculpt to

15  Mercedeh Ward?

16  A    Yes, it is.

17  Q    And then the third sculpt that we were talking about was

18  Trial Exhibit 1234.

19          Is that also there?

20  A    Yes, it's right here.

21  Q    And you were the creator of Exhibit 1141 and 1234;

22  correct?

23          **MR. PRICE:**   Objection.  Calls for a legal conclusion.

24          **THE COURT:**   Yes.  Sustained.

25          You can rephrase the question, Counsel.

 1   BY MR. NOLAN:

 2   Q    Who made 1141?

 3   A    I did.

 4   Q    Who made 1234?

 5   A    I did.

 6   Q    Now, over the weekend -- and I know there was a lot of

 7   testimony about changes that you made to each of the sculpts.

 8        Just to more or less put this into context, did you

 9   assist in preparing a summary chart that reflects the various

10   changes that were made by you in the various three sculpts that

11   we have in front of you?

12   A    Yes, I did.

13        MR. NOLAN:  Your Honor, if I may approach the witness

14   for a moment?

15        THE COURT:  You may.

16   BY MR. NOLAN:

17   Q    I don't believe that we had completed all of the changes

18   to the 1234 sculpt, but just to put us back where we were on

19   Friday, the first graph that I have put in front of you, that

20   is a demonstrative which is a summary of Leahy's changes from

21   Trial Exhibit 1136 to 1141, the head.  Do you recognize this?

22   A    Yes.

23   Q    Is this an accurate summary of the points that you were

24   making on the changes that you made?

25   A    Yes, it's accurate.

```
 1   Q    Now, just briefly, what I'd like to do is -- again, on
 2   the left-hand side of the screen is Trial Exhibit 1136; and
 3   that is a photograph of the sculpt of 1136, the gray sculpt; is
 4   that correct?
 5   A    Correct.
 6   Q    And then 1141, of course, is the October 23rd sculpt, just
 7   the head; correct?
 8   A    Correct.
 9   Q    Now, can you just briefly go through the changes on 1136
10   that you made and then also walk us through the changes that
11   you made to 1141, the October 23rd sculpt.
12        MR. PRICE:  Objection.  It's cumulative; it's also
13   asked and answered.  It's just repeating the entire hour's
14   testimony.
15        THE COURT:  It does seem to be.
16        Are these all based on testimony from Friday?
17        MR. NOLAN:  Yes, Your Honor.  But my intent is to ask
18   a question of the effect these changes had on the appearance,
19   and the differences.
20        THE COURT:  Overruled.  It appears to be somewhat
21   cumulative, but proceed.
22   BY MR. NOLAN:
23   Q    So quickly, if you could, work through these.
24   A    Okay.
25        The gray head was too big and round and
```

1    mature-looking, so in the 1141 sculpt, I made it smaller and
2    younger.

3           The gray head didn't have any bone structure; it
4    looked like a superball with eyes stuck on it, dug in.

5           Going to the 1141 sculpt, the bone structure, I added
6    cheek bones, did the brow and the nose and the bridge and the
7    chin.

8           The eyelash definition, kind of the upper eyelid,
9    kind of leading back to the ear, I changed that and made it
10   less distinct, more neutral and softer; took the eyebrows off.

11          Again, on 1136, there's defined eyebrows.

12          I'll just keep on 1136, and then go to 1141.

13          The eye socket is stylized, meaning it's, like,
14   rounder, with the eyes actually dug in; and that started to get
15   softer in the right-hand side sculpt, the 1141 sculpt.

16          In 1131, the nose is a lot higher; it's a lot higher
17   above the upper lip; and so I lowered that and elongated it in
18   the 1141 sculpt; made the nose more defined on 1141, wider and
19   bigger.

20          Again, the 1136 has a rounder, flatter nose; and I
21   just started to give it more bone structure and cartilage
22   structure in 1141.

23          On 1136, you can't see the rear view, but the back of
24   the skull is very, very round; and 1141, I started to go in and
25   shape the nape of the neck; so you can see the skull bones back

1   there, or start to.

2          Her cheek bones on 1136 were too low, too saggy; so

3   to make it look younger, on 1141, I raised the cheekbones and

4   kind of narrowed her cheeks out a little.

5          The forehead is very round on 1136, so on 1141, I

6   flattened her forehead and made it a little longer.

7          There's barely any jaw, no jaw definition, on 1136,

8   and I started to give, on 1141, an indication of a jaw.

9          She had very big chunky lips that were just stuck on

10  her face, so on 1141, I started to smooth them in and shape

11  them more, and carve out, like, under the corners of the mouth

12  and below the lower lip.  There's no definition on 1136

13  underneath the lip, leading to the chin; so I put that

14  indention in there, and, you know, added to the chin, to make

15  it pop out more, as well as taking it back here.

16  Q   Now, just looking at the changes that you made, when you

17  look at -- and the reference to mature-looking and

18  younger-looking, were the changes made to distinguish -- or

19  make a difference in the age of the sculpt depicted in 1136 and

20  the sculpt depicted in 1141?

21          **MR. PRICE:**  Objection.  Leading.

22          **THE COURT:**  Sustained.

23          Rephrase, counsel.

24  **BY MR. NOLAN:**

25  Q   What were the effects of the changes that you made with

1    respect to 1136 and 1141, with respect to the age, if any?

2    A    Well, part of making all these changes was -- we say

3    massaging, but leading it into looking younger.  She was too

4    mature in the gray sculpt.

5    Q    Now, going to the second graphic in this package, this is

6    a summary of Leahy's changes from 1136 to 1141; and now we're

7    talking about the torso.

8         Again, could you walk us through those changes, and

9    then at the end, I'll ask you a follow-up question with respect

10   to the effect those changes had.

11   A    On 1136, the body became too mature, like an older body,

12   like a college student or late high school; so I had to shorten

13   her torso and narrow her shoulders to make her look younger,

14   more tween-like.

15        The shoulders were too developed and square and

16   brawny, so I narrowed them and gave her more slope at her neck.

17        The hips are lower on 1136; and on 1141, I raised the

18   hips to give the illusion of longer legs.

19        Again, the upper torso was too mature and broad and

20   developed; her bust was too developed, and rib cage and

21   everything like that; so on 1141, I just downplayed the whole

22   upper torso to make it look younger, like it's still

23   developing.

24        1136 has a thicker neck, so I thinned down the neck,

25   also adding to the younger effect.

1     On 1141, I made her chest higher, as all part of the

2  tween torso look, that underdeveloped upper torso, and kept the

3  baby fat, like around her breast area and in her armpit area.

4     1136 does not have any hip joints yet. It's just all

5  one big piece, which is what we call a figurine, or a maquette.

6  On 1141, I added the ball joints, so the legs would move.

7  Q    Could you explain to the jury what effect, if any, these

8  changes had with respect to the appearance of the 1141 sculpt

9  as compared to 1136.

10  A    The biggest effect was that I took a lot of inches out,

11  and also aesthetically, I had to make her look a lot younger

12  and more tween-like, rather than such a mature body.

13  Q    By the way, I think on Friday, I was asking you about hips

14  and other parts of the torso.  I asked you whether or not

15  Carter Bryant's drawings depicted any breasts.

16     Do you recall that testimony?

17  A    Yeah.  I remember, yeah.

18  Q    Did Carter Bryant's drawings provide any definition of the

19  breast size or shape or form of any breasts?

20  A    No, not at all.

21  Q    Now, the next summary page, these are changes from the

22  back view of 1136 to 1141.  Could you just briefly go through

23  that same exercise for us, pointing out the changes that you

24  made on 1136 and 1141.

25  A    Okay.

1            On 1136, the rear end, her bottom, was too wide and

2    mature and flat and low.  It was too voluptuous, yet being too

3    flat at the top part of it, where the lower back kind of leads

4    into the bottom part.

5            In 1141, in order to remedy that, I made it more

6    perky, like I raised the muscles up towards the lower back; and

7    it's just overall smaller and more childlike.

8    Q    By the way, in your background and education, do you have

9    experience in classes in anatomy?

10   A    I've never taken any official classes in anatomy.  We had

11   a lot of figure-drawing classes in college.

12   Q    Okay.

13           In the changes that were made between 1136 and 1141

14   from the back view, what effect did those changes have on the

15   appearance of the sculpt?

16   A    I had a few more changes that I needed to go through.

17           Was that enough?

18   Q    I'm sorry.  Go through those.

19   A    The upper back is just too wide; the rib cage was spread

20   too much; so I narrowed it; same with the front, to make it

21   look younger and more tween-like.

22           The back of the legs are getting straighter -- I

23   mean, the back of the legs in 1136 are straighter and they

24   don't have all of the muscles and definition; it almost gives

25   the appearance of fat.

1        And on 1141, I started to add muscles, as if there
2    were actual muscles under the skin, and tone as well.
3    Q    Looking at the next page in this, the changes to the legs,
4    do you see that?
5    A    Yes.
6    Q    Again, could you walk us through changes between Trial
7    Exhibit 1136, the gray sculpt, and 1141, your sculpt that was
8    presented to MGA on October 23rd.
9    A    Okay.
10        On 1136, the legs are much longer and thick and
11   fleshy, especially the upper thighs.  It's the same as from the
12   back view.  So in 1141, even though the thighs are still
13   fleshy, I'm starting to add that muscle tone, like straight up
14   through the hips and above the knee, and softening the knees
15   quite a bit and adding the muscles to the outer side of the
16   calves as well as the inner side of the calves.  The calf
17   muscles are lower on the outside and more defined, and the
18   inner begins to raise up.  And I think I got that wrong on the
19   1136 sculpt.
20        And I put the joints in, to start exploring the hip
21   sockets.
22   Q    What was the effect, if any, of the changes that you made
23   to the legs, between 1136 and 1141?
24   A    Well, it just made her look younger and took her down to
25   this size, you know, the significantly smaller size here.

1    Q    In the last summary chart I have, do you see changes to

2    the arms on 1136 to 1141?

3    A    Yes.

4    Q    Could you walk us through that.

5    A    On 1136, the arms are a lot bigger and longer.  On 1141,

6    they're shorter and thinner.  On 1136, they're more adult arms;

7    they're more muscular.  The tweens -- the one also, including

8    the upper torso, but the arms also develop later, so they have

9    tiny little arms.

10          On 1136, the hands are rough, with no definition at

11   all.  On 1141, I started to define them more.  But hands are so

12   difficult; I kind of save them until the absolute last part of

13   sculpting.

14          The wrist is -- it doesn't show it in the picture,

15   but the wrist on 1136 is more angled than the wrist on 1141, so

16   I started to just bring the wrist down.

17   Q    Do you have -- you're holding up, I see, a copy of one of

18   the arms.  Do you have that?  Maybe you could compare that for

19   the jury without looking at the screen, because the photograph

20   doesn't really depict that.  Or, if you want to, maybe

21   demonstrate with your hands, if that might be easier, to show

22   the difference between the angle of the wrist.

23   A    I'll show you this, if you can see.  The gray sculpt is

24   very, almost -- very animated like that; and this one is

25   starting to bring it a little bit straighter up, a little more

 1    realistic of a pose.

 2    Q    Now, I note here the reference on 1136.  You have "more

 3    adult muscular arms."  And then across that, "arms have a

 4    fleshy, baby-fat feel," on 1141, the October 23rd sculpt.

 5          Looking at the changes that you made between 1136 and

 6    1141 on the arms, did they have an effect on the appearance or

 7    the age of the sculpt?

 8    A    Yeah.  It made it look younger.

 9          **MR. NOLAN:**  Before I go through the summary charts on

10    changes that were made from 1141 to 1234, Your Honor, under

11    1006, we'd offer the summary charts that I've marked as

12    18882-A, a summary of the photographs and the sculpt itself

13    that depicts the numerous changes.

14          **THE COURT:**  Any objection?

15          **MR. PRICE:**  Yes, Your Honor.  It's not a 1006

16    summary.  This is just a demonstrative.

17          **THE COURT:**  We'll take this up later.

18          **MR. NOLAN:**  Okay.

19    **BY MR. NOLAN:**

20    Q    I want to turn briefly, if I might, now to the second

21    series of summaries; and that is the summary of changes now

22    made from the sculpt, 1141, that is, the sculpt that was

23    presented at the October 23rd meeting, and the sculpt marked in

24    evidence as 1234, which was done in December of 2000.

25          Do you see that?

1    A    Yes.

2    Q    Again, do you mind just going through the changes here

3    that you made in the sculpt 1234 from the 1141 sculpt.

4    A    Okay.

5         In 1141, there's a smaller, flatter forehead; so I

6    had to even make her look younger.  I had gone too far with the

7    flattened part.  This had more definition.  But I had gone too

8    far on this, so I added more to make this larger and more

9    childlike, on 1234.

10        On 1141, the jaw is still too round and the cheeks

11   are still a little too poofy and young.

12   Q    Did you say "poofy" or "goofy"?

13   A    Poofy.  They're not goofy.

14   Q    That's a sculptor term?

15   A    Yeah.

16        On 1141, the jaw is rounder and the cheeks are still

17   poofy; there's not enough definition in them yet; so I went in

18   and defined the cheekbones more on 1234 and started defining

19   the jaw line and the cheeks more, in the area below the cheeks.

20        There's this roundness in the temple area of 1141, so

21   I started to bring that out and give her more bone structure in

22   her temples.

23        In 1141, there's details in the eye and eyelids, so

24   in 1234, I did what I call a wash.  We just washed out the

25   eyes, or I just washed out the eyes.  They're completely flat;

Tuesday, August 12, 2008                    Trial Day 33, Morning Session

1   there's just nothing there.

2           In 1141, her nose is still very sharp and triangular,
3   and I rounded it quite a bit in 1234. The bridge of her nose,
4   if you see it in this profile, is sitting a lot higher in 1141
5   than it is in 1234. I brought it down lower in 1234, just that
6   part where it cuts in between the eyes.

7           In 1141, the lips are still separated from the face,
8   so I started to wash them out and join them with the cheeks and
9   the upper lip and the lower lip and the corners of the mouth.
10  The expression of the mouth on 1141 is very tightly closed, and
11  it's a very unnatural, kind of stagnant expression; so I opened
12  it a little to relax her and then defined the corners of the
13  mouth more and pushed them back a little bit more, to give the
14  illusion that she's smiling.

15          The ears were still sticking out too far on 1141, so
16  when I got to 1124, I pushed the ears back in.

17  Q   What effect, if any, did these changes have between 1141
18  and your 1234 sculpt presented on December of 2000?

19  A   Overall, it made it look younger, but the effect is that
20  it was more human and more defined, more believable, and more
21  of a finished product.

22  Q   By the way, before we move to the sculpt, again there's a
23  reference to nose bridge, both on 1141 and 1234. I asked you
24  on Friday with respect to Carter Bryant's drawings, and whether
25  or not they depicted a nose structure.

1      Do you recall that line of questioning?

2  A    Yes.

3  Q    And, again, to your knowledge or memory, did

4  Carter Bryant's concept drawings provide any bone structure for

5  the structure of the nose?

6          MR. PRICE:  Objection.  Asked and answered several

7  times.

8          THE COURT:  Sustained.

9  BY MR. NOLAN:

10 Q    Going to the next sheet, this is changes to the torso;

11 and, again, could you walk us through these changes.

12 A    Okay.

13          This is after Mercedeh came in, so I got --

14 Q    This is Mercedeh Ward?

15 A    Mercedeh Ward.

16          So from sculpt 1141 to 1234, she gave me exact

17 measurements for joints, so I had the joints made and put the

18 joints in, which -- on 1141, the narrow shoulders, they were a

19 little too narrow, so when I got the ball joints, I widened

20 them a little bit.  There's no collarbone in this one; there's

21 a lot of material in the upper chest area; so I started to give

22 the indication of a collarbone in 1234.  Her breasts were still

23 developing, should I say; so they were pretty undefined, so I

24 needed to add some definition in 1234.

25 Q    Were the changes that you made to 1234 to the breasts

1  consistent with the particular age group?

2  A    Well, yeah.  They're higher and they're consistent with

3  the tween group.

4  Q    Go on.  I'm sorry to interrupt.  Go ahead.

5  A    On 1141, the rib cage, if you can see from the side view

6  too, it's just kind of a '50s style; it's not really developed;

7  it's just like a big -- almost like an upside down triangle put

8  on the waist.

9  Q    What do you mean by a '50s style?

10  A    '50s style, where they have the big rib cages back there,

11  because they pinched their waists in so much.  Everything just

12  kind of either squeezed out the bottom or squeezed out the top

13  with that cinched waist.  It just gives the illusion that your

14  waist is smaller.

15       So with 1234, I started to just relax the waist a

16  little bit.  I added a little more definition and material

17  under the rib cage in 1234, to give a smoother transition into

18  the lower torso.

19       The pelvis, due to the nature of the joints in 1141,

20  they're in a V-shape; so the pelvis area is much thinner in

21  1141 than it is in 1234.  It got a lot wider.  It had the ball

22  sockets at the hip joints, and I decided, with Mercedeh, to put

23  in disc joints in the legs.

24       The area between the thighs, here, there's a lot

25  bigger of a gap than there is in this area.  I narrowed that

```
 1   gap as much as I could, still enabling her to sit down all the
 2   way.
 3            On 1141, she has a flatter tummy below her
 4   bellybutton.  On 1234, I just gave a little indication of a
 5   little flesh and muscle around her bellybutton.
 6   Q    And what was the overall effect of the changes that you
 7   made, that are embodied in the sculpt you did in December of
 8   2000, 1234?
 9   A    Well, the overall effect was just developing it so it
10   could be a believable doll and producible at the same time, and
11   keep that tween look to it.
12   Q    Now go to the next page, if you would; and this is the
13   changes that you made on the back view.  Let's just walk
14   through these briefly, if we could.
15   A    On 1141, like I was talking about that cinched waist, it
16   gave her a big sway to her back; so I added a little bit more
17   around the waist, just as I did in the front view, to make it a
18   smooth transition to the back.
19            The back of her legs and her rear end are still very
20   fleshy, so in 1234, I made them more muscular and took them
21   down on the inside and the outside, to make them a little
22   thinner and more toned; and I straightened both the legs and
23   gave her thinner, more toned calves still, and softened the
24   back of the knees as well.
25   Q    Now, the changes that you made with respect to the back
```

```
 1    view in 1234, were they consistent with the idea that you were
 2    trying to capture?
 3    A    Yes.
 4    Q    Were you getting directions from Carter Bryant at this
 5    time?
 6    A    No, not at all.
 7    Q    Let's go to the next page, briefly.  These are the changes
 8    between 1141 and 1234, the legs.
 9         Could you just walk us through these changes from the
10    October 23rd sculpt to the December 2000 sculpt.
11    A    Okay.  The legs.
12         As before, there were ball joints, so I added the
13    disc joints, which is that straight joint here, rather than
14    having a ball and socket.  The upper thighs were too curvy and
15    fleshy, so in 1234 I toned them down and made them thinner.  On
16    1141, there's more of a contrapposto pose.
17         And if you don't know what contrapposto is, it's from
18    Greek sculpture, where if you look at them all, like one
19    shoulder is kind of down and one knee is kind of bent.  It just
20    means off balance.  It's called, like, the relaxed
21    contrapposto.  It's an art term.
22         So I took that out so she would be just standing up
23    straight.  Like, this would be a contrapposto thing, where her
24    shoulder is down and she's more relaxed, whereas this is very
25    straight and symmetrical; so I took that gesture out, the
```

1    contrapposto gesture.

2           Her knees on 1141 are still rough.  You can even see

3    kind of a sharp shadow right here; so, on 1234, I made them

4    rounder and more defined and started putting that little thigh

5    muscle in there, as well as underneath the knees.

6    Q    And, again, did these changes have an effect?  Were you

7    trying to accomplish an effect in the appearance?

8    A    Yeah.  Still keeping it in the tween vein.

9    Q    The last graphic is now to the arms.

10          Again, now we're comparing 1141, the October 23rd

11   sculpt, to the 1234 sculpt in December that you did.

12          Could you walk us through those.

13   A    Well, again, on 1141, there's just that kind of flat

14   joint, it's not really even a joint, in the shoulder; so I

15   added, on 1234, the ball-and-socket joint.  On 1141, there's no

16   shoulder definition.  It's just kind of flat and almost an

17   amorphic shape.  It's not really a dedicated shoulder shape; so

18   I put that in 1234.

19          I lowered the elbow joints.  I think that's what the

20   straight lines and upper arm means, because that elbow joint

21   was too high in 1141; so I lowered it and smoothed it out.

22   There's just more flowing lines from 1234, compared to 1141.

23          As before, there's no details in the hands

24   whatsoever.  Like I said, because hands are so difficult and

25   fragile, I save them for last; so in 1234, I spent quite a good

```
 1   amount of time on the hands, getting the hands correct.
 2   Q     In getting the hands correct, did you go back to
 3   Carter Bryant's concept drawings?
 4   A     No.  He doesn't draw correct hands.
 5   Q     And were you attempting to go back to the gray sculpt,
 6   1136, to try to get the hands right, when you were doing 1141
 7   or 1234?
 8   A     No.  They don't have hands either.
 9   Q     What other changes did you make here?
10   A     I brought the thumb in.  It makes it easier to tool, so
11   the thumb doesn't rip off when they're pulling it out of the
12   tool; and it also makes it easier to dress for the little girl.
13   Q     What do you mean by it's easier to dress for the little
14   girl?
15   A     Because when you have a thumb that's sticking way out --
16   and the sleeves on all dolls tend to fit pretty tightly -- the
17   threads get stuck and it's very frustrating; so the closer you
18   can get that thumb in, the easier it is to dress for everybody.
19            MR. NOLAN:  Now, we've marked this group of summary
20   exhibits as 18882-B; and we'll just bring this up later on
21   Your Honor, subject to the same proffer.
22            THE COURT:  Unless there's no objection.
23            MR. PRICE:  There's an objection.
24            THE COURT:  We'll take these charts up later.
25            MR. NOLAN:  Thank you.
```

1    BY MR. NOLAN:

2    Q    Now, just to finish this off, there are areas that we did

3    not touch upon on Friday, and I just want to go through them

4    real quickly.  Now we're talking about changes from 1141 to

5    1234 that are not depicted on the summary sheets.

6              I just want to go to the back for a moment and ask

7    you to take a look at 1141.

8              I'm sorry.  I'm told that you just covered that.

9              On 1234, by the way, if I could ask you to look at

10   that, the December sculpt --

11   A    Yes.

12   Q    Do you have that in front of you?

13   A    Yes.

14   Q    Are there any feet depicted on that sculpt?

15   A    No, there are no feet.

16   Q    Now, in the white notebook, I'd ask you to go back to an

17   exhibit, 1139.

18              MR. NOLAN:  And I believe this is in evidence,

19   Your Honor.

20   BY MR. NOLAN:

21   Q    Now, do you recognize any portion of 1139 that has any of

22   your doodles or drawings?

23   A    Yeah.  The two funny ones on the right are mine.

24   Q    Now, the rest of the figures that are drawn here were

25   drawn by Carter Bryant.

1    A    Correct.

2    Q    And what reference, if any, did you make on 1139?  Or what

3    use did you make for 1139?

4    A    Well, I was just -- I had the head and I was measuring the

5    size it would be when it shrunk 6 percent, on my drawing; so I

6    was measuring from one of the heads that I had.  But I didn't

7    use Carter's drawings for anything.  I was just scribbling on

8    this paper.

9    Q    Did you use Mr. Bryant's drawings or the depiction of the

10   expressions on 1139 in doing any of the appearance sculpting on

11   your sculpts?

12   A    No, not at all.

13   Q    Now, Exhibit 1234, you testified on Friday -- that, again,

14   is the one that was done in December of 2000; correct?

15   A    Yes.

16   Q    That actually is not the final Bratz production sculpt; is

17   that correct?

18   A    Correct.

19   Q    Were you asked to make additional design changes on what

20   would eventually become the final sculpt?

21   A    Yes, I did.  I had to get it scanned and upsized.  This

22   happens a lot in the industry, because everybody gets used to

23   looking at something at one size.  And the heads shrink

24   8 percent from the original sculpt, just due to the nature of

25   the tooling process; so when it came back from China, it was

 1    just way too small, so I had to upsize it and make it the

 2    product size.

 3            MR. NOLAN:  Your Honor, I'd like to place in front of

 4    Ms. Leahy Exhibit 17733.

 5    BY MR. NOLAN:

 6    Q    Is that up there, Ms. Leahy?

 7            I don't believe it is.

 8    A    Yes.

 9    Q    Can you describe it for the jury.

10    A    This is the final plastic Bratz doll that eventually is

11    decorated and gets put in the package.

12            MR. NOLAN:  Your Honor, we'd offer 17733.

13            MR. PRICE:  No objection.

14            THE COURT:  It's admitted.

15            (Exhibit 17733 is admitted.)

16    BY MR. NOLAN:

17    Q    The last subject that I want to turn to, if I might, is --

18    I want to, for demonstrative purposes, place on the screen a

19    comparison of three exhibits; 302-6, 323-32, and Trial

20    Exhibit 1234.

21            MR. NOLAN:  Your Honor, these are depictions of the

22    head sculpts of the various exhibits.

23            THE COURT:  Any objection?

24            MR. PRICE:  No objection to displaying them.

25            THE COURT:  You may proceed.

1    BY MR. NOLAN:

2    Q    Ms. Leahy, you've seen this comparison?

3    A    Yes.

4    Q    And just to orient us, on the left-hand side is

5    Carter Bryant's concept drawings provided to you sometime in

6    September of 2000.

7    A    Correct.

8    Q    And do you recognize the character?

9    A    Yeah.  I can't remember her name, though.

10   Q    And then in the middle, I have Trial Exhibit 323, which is

11   Carter Bryant's body drawing.

12             Do you see that?

13   A    Right.

14   Q    Then on the far right-hand side is Trial Exhibit 1234,

15   which is your December 2000 sculpt.

16   A    Yes.

17   Q    Okay.

18             Now, looking at 1234, did you base your sculpt on

19   Carter Bryant's 302-6?

20   A    No, I didn't.

21   Q    Did you base your sculpt on Carter Bryant's drawing of

22   323-32?

23   A    No.  He actually based that drawing on my second sculpt.

24       MR. PRICE:  Objection.  Move to strike as

25   inconsistent with the jury's verdict.

1          **THE COURT:** Let me see you at side-bar, counsel.

2          (Whereupon, the following proceedings

3          Were held at side-bar:)

4          **THE COURT:** FIRST of ALL, counsel, don't make those

5     speaking objections to the jury. We talked about that the

6     other day.

7          **MR. PRICE:** What's a shorthand for that type of

8     objection? Because I didn't know that I was --

9          **MR. NOLAN:** "Objection; relevance."

10         **THE COURT:** Yeah. Just relevancy. It's not relevant

11    to this phase. I'll understand the concern that you have.

12         Let's hear the objection, first.

13         **MR. PRICE:** The objection is, in the first phase, she

14    actually testified that her sculpt was created October 25th or

15    thereafter.

16         **THE COURT:** And I trust you're going to hear

17    cross-examination and you're going to impeach her on that.

18         **MR. PRICE:** And that the drawing was done after that;

19    that Carter Bryant's drawing --

20         **THE COURT:** Right.

21         **MR. PRICE:** The jury found Carter Bryant's drawing

22    was done before October 19th, while he was at Mattel.

23         **THE COURT:** This gets back to the drawing on this

24    particular one.

25         **MR. NOLAN:** But, Your Honor, notwithstanding that,

 1    they played in their case in chief Carter Bryant's video

 2    deposition on this drawing; and Carter Bryant's testimony

 3    before this jury in this phase is that he did that drawing in

 4    November.  They introduced this issue contrary to what the jury

 5    verdict says -- I can point it out; I can get the transcript --

 6    the video portion that was played to the jury in this case had

 7    Carter Bryant testifying that he did the drawing --

 8              THE COURT:  I recall that; he referred to it as a

 9    November drawing.

10              MR. PRICE:  Actually, you struck -- they designated

11    in November --

12              THE COURT:  I did all but one.  You did play one, I

13    don't know why, but you did play it.  There was one; it struck

14    my eye when it came across.

15              MR. NOLAN:  Me, too.

16              MR. PRICE:  It was unintentional.  Clearly, we can't

17    impeach the verdict either.  We can't change Carter Bryant's

18    deposition testimony, taken four years ago; so, for example, he

19    also said there were 1998 drawings.

20              THE COURT:  I know.

21              MR. PRICE:  Those weren't introduced to impeach the

22    jury verdict.  It was just part of his answer.  This new

23    testimony is being admitted contrary to the verdict.  He did

24    this drawing before October 19th, before he left Mattel.

25              THE COURT:  I pressed you at the earlier argument,

```
 1   about the transcript.  I assume somebody has had time to look

 2   and see if there was a transcript in which this objection was

 3   made, of the timing issue; that you asked the court to allow

 4   this evidence in for purposes of the timing of this trial.

 5           Was that ever made?

 6           MR. NOLAN:  I haven't gotten the transcript report

 7   back, but my point is --

 8           THE COURT:  I just don't know.  I don't recall it

 9   being made; so I'm going to go with that until I'm shown

10   otherwise.

11           MR. PRICE:  I have a trial cite where she testified

12   in the first phase that this was created after her drawing, so

13   it had to be -- I think she said November -- it was around

14   October 25th; so the jury considered that testimony and decided

15   this drawing was done on approximately October 19th.

16           THE COURT:  The problem is, counsel, it's a very

17   weird situation where I've never been confronted with before,

18   when a witness believes that jury is wrong, and the legitimate

19   questions that are being posed to that witness, to say that the

20   witness can't testify as to what she believes, is kind of an

21   odd instruction to be asking for from the court.

22           MR. PRICE:  The instruction to the jury has to accept

23   as a fact and the witness has to accept as a fact -- I have

24   dealt with this in trials -- the witness has to accept as fact

25   what the jury found, so there cannot be testimony contradicting
```

1    what the jury found.  She can't try to convince them they were

2    wrong.

3            **THE COURT:**  But this question is not going to be

4    posed to the jury.

5            **MR. PRICE:**  Well, Mr. Nolan wants to argue that her

6    sculpt -- she didn't even -- that the drawing Carter Bryant did

7    -- he's comparing wasn't even created until after she did her

8    sculpt of October 25th.  That factual argument cannot be made.

9            **THE COURT:**  And I agree with that, based on the

10   jury's finding.  And, to the contrary, you can argue that the

11   jury has already found and this impeaches her testimony.  This

12   is the risk that the defense takes when they are trying to

13   introduce evidence that is contrary to a juror's finding;

14   because they are not going to be permitted to argue contrary to

15   the jury's finding.  And you are going to be permitted to

16   impeach their evidence with the jurors' finding.

17            I think that's the best resolution of this going

18   forward.

19            You're aware of that?

20            **MR. NOLAN:**  I'm aware of that.

21            **THE COURT:**  You're not going to be able to argue in

22   your closing the factual positions contrary to the jury's

23   finding.  Do you understand that?

24            **MR. NOLAN:**  I accept that, Your Honor.  I accept

25   that.

1       But the point I'm making is the point that you put

2   your finger on, which was that they played and introduced in

3   this phase Carter Bryant's testimony --

4       **THE COURT:** They are not going to be able to argue it

5   either. I don't care who introduced it, how it comes in, who

6   objects or who doesn't object. Nobody is going to argue

7   findings that are contrary to the jury's verdict, unless and

8   until I set aside the jury's verdict. Period.

9       **MR. NOLAN:** I understand that.

10      I don't know where we stand. Was there an objection?

11      **MR. PRICE:** I can't remember.

12      **THE COURT:** Relevance.

13      **MR. PRICE:** Yes. I think it was that she was

14  testifying that this drawing was created after she did the

15  sculpt.

16      **THE COURT:** If she wants to say that, I'm not going

17  to stop her at this point. You can impeach that. And you're

18  not going to be able to argue based on that.

19      **MR. NOLAN:** Right. That's what I thought the play

20  was.

21      **(Whereupon, side-bar proceedings were concluded.)**

22      **THE COURT:** Counsel, continue.

23  BY MR. NOLAN:

24  Q   Before we took the side-bar I was asking you whether or

25  not you based your December 2000 sculpt, Exhibit 1234, on

1    Mr. Bryant's 323-32 drawing.

2              And what was your answer?

3    A    Well, my answer was no, Carter based that drawing on my

4    previous sculpt; so by the time I got to 1234, I mean, I didn't

5    base it on any of Carter's drawings.

6    Q    And you didn't base your December 2000 head sculpt on

7    Mr. Bryant's concept drawings?

8    A    No, not at all.

9    Q    Just looking at and staying on this for a moment, the eyes

10   in your 1234, December 2000 sculpt, did you attempt to copy the

11   eyes in Carter Bryant's concept drawings?

12   A    No.  The 1234 sculpt doesn't even have eyes.

13   Q    Did you try to copy, in your December 2000 sculpt, the

14   eyes that are drawn in Exhibit 323?

15   A    No, I didn't.

16   Q    Did you attempt to copy the eyebrows depicted in

17   Carter Bryant's drawing, 302?

18   A    No.  She doesn't -- I didn't sculpt any eyebrows.  She

19   doesn't have eyebrows.

20   Q    So there's no eyebrows on 1234 that are based on either

21   Carter Bryant's body drawing, 323, or Exhibit 302; right?

22              **MR. PRICE:**  Objection.  Leading.  Move to strike.

23              **MR. NOLAN:**  I'll rephrase it.

24              **THE COURT:**  Very well.

25   / / /

1    BY MR. NOLAN:

2    Q    Did you base Trial Exhibit 1234, your December sculpt, on

3    any eyebrow depiction made by Carter Bryant?

4    A    No.  It doesn't have eyebrows.

5    Q    Did you base the nose structure on your sculpt,

6    Exhibit 1234, on any nose structure depicted by Carter Bryant

7    in 302, his concept drawing, or 323, his body drawing?

8    A    No.  Those drawings don't have nose structures, so I had

9    to make up my own.

10   Q    Did you base the lips on the sculpt of 1234 on any lip

11   drawn by Carter Bryant, either in his concept drawing, 302, or

12   his body drawing, 323?

13   A    No, I didn't.

14   Q    Are there any eye features that you copied from either

15   Carter Bryant's concept drawing or his body drawing in your

16   sculpt 1234?

17   A    No.  It doesn't -- 1234 doesn't have any eye features.  I

18   washed out the eyes and made them flat.

19   Q    Looking at Trial Exhibit 1234, your December sculpt, the

20   chin structure, did you rely and base the chin structure on the

21   sculpt that you did in December of 2000 on any chin structure

22   drawn by Carter Bryant in either 302 or 323?

23   A    No, I didn't.

24   Q    Or on any other drawing done by Carter Bryant?

25   A    No Carter drawings.

1    Q    Or on any input from Carter Bryant, while he was an

2    employee of Mattel?

3    A    No.

4    Q    Or at any time?

5    A    Carter would make -- in meetings, he would make a few

6    surficial comments, very minor comments; but for the overall

7    thing, not at all.

8    Q    Was this after he had left the employment of Mattel?

9    A    Right.  Well, he made a few comments at the October 6th

10   meeting, like making the skinnier ankles.

11   Q    But in the October meeting, did he provide you with the

12   chin structure?

13   A    No.

14   Q    Did he provide you the eye structure?

15   A    No.

16   Q    Did he provide you the nose structure?

17   A    No.  There is no nose structure.

18   Q    Did he provide you the shape of the head?

19   A    No, he didn't.

20   Q    Did you, in doing your 1234 sculpt, try to capture the

21   overall look and feel of the Carter Bryant drawings in 302 or

22   323?

23   A    No, I didn't.

24   Q    Is the age of the child depicted in your sculpt on 1234

25   the same age depicted in Carter Bryant's drawings on 302 or

1   323?

2   A   No.   I'd say she's younger.

3   Q   Who's younger?

4   A   1234 is younger than 302 or 323.

5   Q   I'd like to now put up a body depiction.  This has the

6   same exhibits, but now just a different perspective.  This is

7   the full body torso, head, for Exhibit 302 and 323 and 1234.

8        My question is this:  In doing the torso of your

9   sculpt on 1234 in December of 2000, did you copy the body torso

10  depicted in Carter Bryant's drawings, either 302 or 323?

11  A   Definitely not 302.  And then the drawing he did of 323

12  was after he saw this sculpt on October 25th.

13  Q   The body that's depicted on Carter Bryant's concept

14  drawings, do you see that?

15  A   302?

16  Q   302.

17       Is the body depicted in your sculpt 1234 younger or

18  older than the drawing marked Exhibit 302-6?

19  A   It's younger.

20       **MR. NOLAN:**  Your Honor, the last area is an area that

21  we were going to take up at side-bar, that we raised this

22  morning.  I don't know if you want to take a break now or just

23  take a quick moment at side-bar.

24       **THE COURT:**  Let's take a quick moment at side-bar,

25  Counsel.

1    Actually, lets just take a break.

2        (Whereupon, jurors depart courtroom.)

3        (Brief recess taken.)

4        **THE COURT:**  We're back on the record, outside the

5    presence of the jury.

6        Counsel, I'll hear on that issue you wanted at

7    side-bar.

8        **MR. NOLAN:**  I understand that moonlighting as an

9    affirmative defense can be tried outside the jury.

10       **THE COURT:**  Yes.

11       **MR. NOLAN:**  There's one other issue and that goes to

12   the issue of fraudulent concealment.  There was testimony in

13   the first phase of the trial as to conversations that Ms. Leahy

14   had with certain of the Mattel employees in the early summer of

15   2001, I believe, with respect to the project.  My understanding

16   was that testimony was restricted to what was said with respect

17   to Carter Bryant's involvement, because that goes to the time

18   of the drawings.

19       But the question now, I think, is that we should be

20   allowed to go back to those three conversations and have her

21   explain what she said about her own work she was doing in

22   concert with Carter Bryant to indicate when the work on Bratz

23   was being done.  Because it was clear that period of time was

24   during September of 2000.  It no longer goes to timing, it goes

25   to the concealment element.

1      **MR. PRICE:**  Your Honor, my understanding is that

2   there was no limitation on her examination on these topics in

3   the first phase.  In fact, I asked her whether or not she

4   mentioned that Carter Bryant had done any of this while he was

5   working at Mattel, and she said, no, the topic never came up;

6   so it was fully covered in 1-A.  Of course, the evidence in 1-A

7   amounts to 1-B; so I don't understand that.  And she never said

8   that she said anything about September before either; so we've

9   gone through these conversations with her, and now counsel

10   wants to reopen it.  It seems inappropriate.

11      **MR. NOLAN:**  Your Honor, at 4288 there's a series of

12   questions to Ms. Leahy about conversations that she had with

13   the employees and what she was talking about was what she said

14   with respect to specifically Carter Bryant.  In fact, Mr. Price

15   cross-examined her, "Did you mention Carter Bryant?"

16      **THE COURT:**  Where are the Court's -- you said the

17   Court limited or restricted -- do you have that?

18          I don't recall doing that.

19      **MR. NOLAN:**  At 4289, I asked the following question,

20   starting at 4288:

21          QUESTION:  "What did you say to Mr. Hebden?"

22          ANSWER:  "I think, you know, when I quit the

23   department, it was a hard decision.  I really felt proud of

24   myself because I was successful and I had the chance to work on

25   a very successful --

1        MR. PRICE: "Objection. Nonresponsive; too broad,
2    given the narrow relevance."

3        And Your Honor said "just what did you say to
4    Mr. Hebden?

5        And then she talks about the actual words, but she
6    doesn't -- I said: Can you recall in substance what you said
7    to Mr. Hebden about Carter Bryant's involvement in Bratz, and
8    she said I don't remember.

9        **THE COURT:** Again, where is the Court's restrictions?
10   Mr. Price's objections are not the Court's restrictions. I was
11   sustaining the nonresponsive part of that; that's why I asked
12   her, what did you actually say?

13       Where does the Court restrict you, is my question?

14       **MR. NOLAN:** This is just at Page 4287. There's an
15   objection. My question is "during the conversation, did you
16   tell Roxanna Powell about Carter Bryant's involvement in the
17   early concept of the Bratz?

18       **THE COURT:** "Counsel, the part I'm overruling is --
19   I'll allow you to explore the relative roles of any individuals
20   at the meetings with Mr. Bryant in the time period of September
21   and October of 2000; narrow the question to that."

22       **THE COURT:** So you were definitely focused on
23   September/October of 2000; you're correct on that.

24       **MR. NOLAN:** Right. So when we're asking the
25   questions about what Paula did and stuff like that, what she

1   did during September and October, during that period of time,

2   was not part of that because we were restricting it to what the

3   individuals did at those meetings; that was the understanding

4   of the narrow relevance.

5          So for instance, "the part I'm overruling, I'll allow

6   you to explore the relative roles of any individuals at the

7   meetings with Mr. Bryant and the time period of September

8   October of 2000; narrow the question to that."

9          Now what I think we should be entitled to do is ask

10  her whether or not she explained to these employees what work

11  she was doing that went not only in September and October, but

12  beyond the deadline that we had for October 19th.  Because that

13  goes --

14          **THE COURT:**  Explain to what employees?  Mattel?

15          **MR. NOLAN:**  Yes.  On the issue of concealment; what

16  the work that she was doing -- the last time we were focused on

17  the relevance was what was Paula Treantafelles doing?  What was

18  Carter Bryant doing during those meetings?  But since Paula was

19  not an employee at Mattel and was not involved in that timing

20  issue, that's what we were talking about during the first

21  phase.

22          **THE COURT:**  You want to ask Ms. Leahy what did she

23  tell Mattel employees about what she was doing?

24          **MR. NOLAN:**  Right, in connection with this assignment

25  with Carter Bryant, and not limit it to the work that was done

1   up to October 19th.

2               **THE COURT:**  Mr. Price?

3               **MR. PRICE:**  I'm a little confused.

4        If he's saying he wants her to testify what she told

5   Mattel employees as to what she was doing after October 19th,

6   that's irrelevant.

7        The issue of fraudulent concealment is concealing

8   that Carter Bryant was working on Bratz while he was a Mattel

9   employee.

10              **THE COURT:**  The fraudulent concealment period goes

11   after October 19th.

12              **MR. PRICE:**  Well, yes, concealment does, but her

13   testimony of what she told other employees after October 19th

14   concerning her sculpting -- concerning, "here's what I did; I

15   was really involved in the sculpt; it was very tough; I had to

16   do this, this, and this;" that's just hearsay to prove, I

17   assume, that she did what she said she's doing today.

18        On the issue of fraudulent concealment, I think

19   Mr. Nolan is suggesting that she is going to testify -- and

20   maybe we need a proffer -- that she told Mattel employees that

21   after October 19th, Carter Bryant was involved.

22        Of course, that would be irrelevant.

23        I specifically asked her, because there was really no

24   limitation on her questions with Mattel employees concerning

25   Carter Bryant.  It was, she couldn't repeat as hearsay, you

1  know, all of the efforts she undertook as a sculptor.

2  **THE COURT:** And you still have your hearsay objection

3  and your other foundational objection, counsel. But I don't

4  think -- you're probably right. I don't see this limitation

5  Mr. Nolan was referring to, but...

6  **MR. PRICE:** In fact, because there was no limitation

7  on cross, I pointed out, I said, "you know, isn't it true" --

8  well, that was sustained. It was first specifically with one

9  person, and that conversation, I think with Ms. Powell, I said

10  "it's true that in this conversation, at no time did you tell

11  her that Mr. Bryant was working on Bratz when he was employed

12  by Mattel; is that correct?"

13  This is at Page 4299.

14  She said "We didn't talk about that."

15  Then I said, 'Did you ever tell anyone at Mattel that

16  Carter Bryant was working on Bratz while he was employed at

17  Mattel?" And her answer was, 'It didn't come up in any

18  conversation, so I didn't think about it.'

19  So they had complete --

20  **THE COURT:** And now, Mr. Nolan, your position is she

21  did think about it and she did tell Mattel employees --

22  **MR. NOLAN:** No, Your Honor. I think the argument

23  that we're making is now in the context -- where we're putting

24  on evidence --

25  **THE COURT:** The testimony that is the same witness,

1    is she now going to say that she did think about it and that

2    she did tell Mattel employees?

3              **MR. NOLAN:**  No.  She's going to amplify on what she

4    did on the sculpt with Carter Bryant's concept drawings, where

5    the focus IN the first phase was --

6              **THE COURT:**  What's relevant is what she told Mattel

7    employees.  Is she going to change her testimony now and say

8    that she did tell Mattel employees that she was working with

9    Carter Bryant on the sculpt?

10             **MR. NOLAN:**  Your Honor, she testified to that at

11   trial in the first phase; that she was working with

12   Carter Bryant on the.

13             **THE COURT:**  This is a factual issue.  We're just

14   going to let this in.  And Mr. Price, you can impeach with that

15   testimony; and Mr. Nolan, you can ask.  This is all wrapped up

16   in the concealment issue.  What Ms. Leahy told Mattel employees

17   or didn't tell Mattel employees is relevant to the issue of

18   concealment.  Right?

19             **MR. PRICE:**  Absolutely.

20             **THE COURT:**  So if they are changing their testimony

21   or not changing their testimony, if she's changing her

22   testimony, I know you know how to deal with that.

23             Let's proceed.

24             This jury is a lot brighter, I think, than you give

25   them credit for.

1          **MR. PRICE:**  We fully explored this; so, yes, I will

2     have to deal with that.  And I don't have that much time.  So

3     it's unfair to go over this again in future efforts.

4          **THE COURT:**  There is a cumulative concern here.

5          I assume, Mr. Nolan, this is going to be very brief?

6          **MR. NOLAN:**  I would be surprised if it takes more

7     than three minutes.

8          **THE COURT:**  Very well.

9          Let's bring the jury in.

10          And you have preserved all of your other objections

11     on hearsay and the like.

12          **MR. PRICE:**  Thank you, Your Honor.

13          (JURORS ENTER COURTROOM.)

14          **THE COURT:**  Ms. Leahy may be recalled.

15     BY MR. NOLAN:

16     Q    Ms. Leahy, just a few more questions and then we'll wrap

17     up.   Thank you.

18          Can I have back up the last chart comparing

19     Carter Bryant's drawings to Leahy's sculpt body.

20          Now, we've made comparisons with trial Exhibit 302-6,

21     and that's one of the character drawings that you were provided

22     by Mr. Bryant in September of 2000; yes?

23     A    Yes.

24     Q    Okay.

25          Now, without going through the same chart with the

1  number of documents or drawings Mr. Bryant provided to you in

2  September of 2000, my question to you is, did you base your

3  Leahy December 2000 sculpt, Exhibit 1234, on any concept

4  drawing provided to you by Mr. Bryant?

5  A    No.  Not at all.

6  Q    And again, if we could go to the comparison of just the

7  drawings to the sculpt; this is just a tighter view.

8        Again, so the record is clear and the testimony is

9  clear, I was pointing you to a specific document, concept

10 drawing 302-6.  Do you see that?

11 A    Yes.

12 Q    Without any limitation now, did you base your sculpt,

13 1234, on any of the drawings, concept drawings, provided to you

14 BY Carter Bryant?

15 A    No.  Not at not; they are night and day.

16 Q    Are you familiar with the term "blueprints," like in an

17 architectural sense?

18 A    Yes.

19 Q    Ms. Leahy, did Carter Bryant's drawings, the concept

20 drawings that you saw in September of 2000, serve in any way as

21 blueprint drawings for your sculpt 1234?

22        **MR. PRICE:**  Objection.  Irrelevant.

23        **THE COURT:**  Sustained.

24        Counsel, define your term.  I understand she may have

25 an understanding, you may have an understanding, but the

```
 1   relevant fact is also a foundational issue.
 2            MR. NOLAN:  Thank you.
 3            MR. NOLAN:  May I be permitted to provide a better
 4   foundation?
 5            THE COURT:  Ask your next question, counsel.
 6   BY MR. NOLAN:
 7   Q    Blueprint drawings, can you give us some texture, some
 8   definition, as to what your understanding as a sculptor would
 9   be to blueprint drawings?
10   A    Blueprint drawings are specific views with measurements of
11   specific views.  Like, in architecture, you would have a front
12   view, a side-view, a back view, and a plan view, which is
13   looking from above in the industry we, for dolls, don't do a
14   plan view, which is looking from above.  But if you have a
15   controlled drawing which is like a blueprint drawing, it's
16   usually the back side and front views and they have specific
17   measurements depicting exactly where to put joints, exactly
18   what parts go where, how they are going to work, and what they
19   are going to look like.
20   Q    Now, did Carter Bryant provide you a blueprint drawing
21   upon which you based your sculpt?
22            MR. PRICE:  Objection.  Irrelevant, given the
23   definition.
24            MR. NOLAN:  If we need to --
25            THE COURT:  Let me see you at side-bar, counsel.
```

1     (Side-bar proceedings as follows:)

2         **MR. NOLAN:**  Your Honor, I'm sure, given your schedule

3     this morning, that you haven't --

4         **THE COURT:**  I have read it.

5         **MR. NOLAN:**  Turning to Page 2, the pleading that

6     Mattel has filed, entitled "trial brief for a joint authorship

7     and ownership, Exhibit 1136," reading from Page 2, lines 24

8     through 28, they say "and again, contrary to phase 1-A trial

9     evidence and verdict establishes that it was Bryant and Bryant

10    alone who designed and provided the blueprints upon which the

11    sculpt was based."

12        So it's in that context, Your Honor.  And I'm just

13    trying to draw out that those drawings were not the blueprints

14    upon which she based her sculpt on.

15        **Ms. AGUIAR:**  And can I just add to that, so he can

16    respond to everything that we wanted to lay out there?

17        In phase 1-A, Ivy Ross, who was a Mattel executive,

18    her testimony was elicited by Mr. Quinn on direct examination

19    regarding the role of a two-dimensional drawing and the process

20    of creating a doll; and Ms. Ross testified -- and this is on

21    Page 296 of the transcript -- that she "likens it to a

22    blueprint for building a house, and then you later determine

23    whether you execute against that blueprint drawing."

24        And on cross-examination, Mr. Nolan did ask her a

25    question about that, and she indicated that she wasn't saying

```
 1   that any particular drawings were blueprints, but there clearly
 2   has been testimony about this in both Mattel's witnesses; they
 3   are urging it in a belief, Your Honor, and we think it's
 4   absolutely relevant, not for only Ms. Leahy to talk about this,
 5   but specifically to give an example.
 6           This jury has heard five or six times now, terms
 7   like, "controlled drawing," "turn-around drawing," "engineered
 8   drawing"; and when Mr. Nolan tried to offer an example of such
 9   drawings that Ms. Leahy has herself used in the past, which she
10   can lay the foundation for and the authenticity for, we believe
11   it's relevant for this jury to understand that there's been an
12   allegation that we used these drawings, according to Mr. Price
13   in his opening statement, we used these drawings to basically
14   just create a doll directly from those drawings; so this issue
15   is relevant.  And frankly the turn-around drawings that we'd
16   like to go back to as exhibits, those too are relevant.
17           THE COURT:  Wait a second.
18           The turn-around drawings, you're talking about the
19   drawings from the Shrek case?
20           Ms. AGUIAR:  I'm saying Ms. Leahy used the
21   turn-around drawings from the Shrek princess to do a sculpt.
22           THE COURT:  Was there foundation for that in this
23   case?
24           MR. NOLAN:  No.
25           THE COURT:  All right.  Very good.
```

    1            No foundation was laid on that, so --

    2        **Ms. AGUIAR:**  No.  I'm saying that she could say that.

    3        **THE COURT:**  We're not going to put in what "could be"

    4    before me.  The record before me, the Shrek drawing, was not

    5    used in this case; correct?

    6        **Ms. AGUIAR:**  It was not used for the Bratz dolls in

    7    this case.

    8            **THE COURT:**  Very well.

    9        **Ms. AGUIAR:**  I was trying to give you an example that

   10    she often sculpts from drawings that are turn-around drawings.

   11        **THE COURT:**  I'm just trying to keep the record clear.

   12    There was nothing from the Shrek drawing that was involved in

   13    the creation of the Bratz sculpt.

   14        **Ms. AGUIAR:**  That's correct.

   15            **THE COURT:**  Very good.

   16            Mr. Price?

   17        **MR. PRICE:**  Our contention is that she based her

   18    sculpt on the drawings.  She has said "I didn't base them on

   19    the drawings; I took instruction, et cetera."

   20            Now what they are trying to suggest is that in order

   21    to prove she based them on the drawings, we have to teach her

   22    how to go from a drawing to the final product.  Case law is

   23    clear, drawings don't have to show you how; they don't have to

   24    be blueprint drawings in the manner she defined them.  Because

   25    Mr. Nolan asked her what her definition was --

 1          **THE COURT:**  You're speaking past each other in

 2   certain respects.  This is why I initially sustained the

 3   objection, whether it was just blueprint drawings thrown out

 4   there.

 5          As I understand it, you have concept drawings -- and

 6   clearly, MGA is not contending that the Bratz doll is divorced

 7   from the concept drawings entirely.

 8          **MR. NOLAN:**  No; we're not contending that at all.

 9          **THE COURT:**  So there's really a connection between

10   the concept drawings and the final product.

11          **MR. NOLAN:**  In fact, there's been lots of testimony

12   on that.

13          **THE COURT:**  The fact that when she's actually drawing

14   up her thing, she did design and developed blueprints, there

15   are ways to do that; that is much like the photocopy machine

16   issue; there's complications and there's layers of sculpting

17   that go on.

18          **MR. NOLAN:**  It's actually the absence of the

19   blueprint drawings.  She does not have blueprint drawings.  We

20   think that's relevant.

21          **THE COURT:**  So there are no blueprint drawings?

22          **MR. NOLAN:**  There are no blueprint drawings.

23          **THE COURT:**  Then what is she going to say?

24          **MR. NOLAN:**  She'll testify that she had no blueprint

25   drawings.

1            **THE COURT:** This is really of no moment, then.

2           **MR. PRICE:** It is, because in closing -- how could

3 this sculpt be a copy of this when she wasn't given the

4 blueprint drawings?

5           **THE COURT:** That's part of why I'm concerned about

6 the Shrek drawing, because if the Shrek drawing introduces --

7 it is potentially confusing that there's some other drawing,

8 there is some other blueprint OUT there. That's where I

9 thought this was going is an intermediary between concept

10 drawings and the ultimate Bratz doll.

11         If MGA wants to take the position to this jury that

12 somehow she's just made this all up, frankly, based on the

13 evidence I've seen, it's not very credible. But that's their

14 argument. The jury will make that fact-finding decision.

15         Mattel is taking the position that if she's

16 influenced by anything, she was influenced by Carter Bryant's

17 drawings. Whether that's credible or not is, again, for the

18 jury to decide. But they are not seeking to introduce some

19 other drawings.

20         As long as that is clear, what's your question, then?

21           **MR. NOLAN:** My question is that you did not have any

22 blueprint drawings for the creation of the Bratz dolls.

23 Because what I'm worried about, Your Honor -- not worried, I

24 mean -- is that their same argument they are making to you in

25 quotes and in the brief that I just quoted --

1       **THE COURT:** It basically turns on a question that's
2   already been asked about six or seven times, and that is were
3   the Bratz drawings, were Carter Bryant's drawings, the
4   blueprint drawings or something else. If you want to
5   characterize that one more time, it really is cumulative.
6       **MR. NOLAN:** I'm just trying to get off the stage.
7       It was really -- because of the argument --
8       **THE COURT:** I thought this was going in a different
9   direction. I thought it was going more in the direction
10  Ms. Aguiar was talking about in terms of blueprint drawings, or
11  something else.
12      Because if there are any out there, that changes this
13  landscape. There are no drawings related to Bratz that's not
14  been presented to this jury that I've excluded; correct?
15      **Ms. AGUIAR:** That is absolutely correct.
16      Just so I'm clear, though, Your Honor, because there
17  is so much testimony about the concept, generally, of turn-
18  around/controlled drawings, we wanted to be able --
19      **THE COURT:** Let me make it clear that there were no
20  such drawings.
21      **Ms. AGUIAR:** That's one thing; and two, for the jury
22  to see an example of what we have been talking about for so
23  long.
24      **THE COURT:** That, I think, is a 403 confusing issue.
25  I think, if anything -- if you want to go down this road,

1  that's fine. I think it bolsters Mattel's points; because then
2  the only drawings at the end of the day are Carter Bryant's
3  drawings. But that's up to you.

4      **MR. NOLAN:** There is one other Mercedeh Ward rough
5  engineered drawing with respect to the armature that she gets,
6  but it's not from Carter Bryant, and it's well after, while
7  she's in the sculpt process; that's the only other drawing that
8  I was going to go to.

9      **THE COURT:** Mr. Zeller?

10      **MR. ZELLER:** Two points: Number one, just so it's
11  clear, in terms of the purpose of why this evidence would be
12  admitted, this should not come in for any purpose of joint
13  authorship. This is pointing specifically to our brief on why
14  it is that should not come in for that purpose. But I don't
15  think the court is addressing that at this point.

16      **THE COURT:** I'm not.

17      **MR. ZELLER:** Number two, the drawing that is with
18  reference to Mercedeh Ward, I think this is 403, because this
19  is an engineering drawing; it's talking about 'how do you
20  connect the armature'; totally a functional consideration.
21  It's going to cause the jury to have to start figuring this
22  out.

23      **THE COURT:** If it affected some change on the
24  appearance of the doll --

25      **Ms. AGUIAR:** It did.

1         **MR. ZELLER:**  If they can lay that foundation --

2         **THE COURT:**  That's the relevance.  Not mechanical.

3    Because we're not interested in how the photocopy machine

4    works; we're interested in what it produces.  And if that

5    drawing produced some change, then I'll allow it.  But the

6    foundation needs to be laid.

7         Let's move beyond this as quickly as we can.  We all

8    understand where we are.  And on those briefs, the issue I

9    really need to hear, I guess reply from, is on this derivative

10   work.  Because I don't get where you leave derivative works at

11   all, based on your brief.  But I'll take that up during the

12   lunch hour.

13        **MR. NOLAN:**  Okay.

14        (Side-bar proceedings concluded.)

15   **BY MR. NOLAN:**

16   Q    Using the definition that you just articulated as

17   blueprint drawings, did Carter Bryant's concept drawings serve

18   as a blueprint for your sculpt?

19   A    No, they didn't.

20   Q    We asked questions to you about some conversations that

21   you had with Mattel employees concerning your work on the Bratz

22   sculpt.

23        Do you recall that earlier testimony?

24   A    Yes.

25   Q    And just for context purposes, could you just repeat for

```
 1   us the names of the Mattel employees that you had conversations
 2   with concerning your work on the Bratz sculpt?
 3   A    I spoke with Roxanna Powell; Michael Hebden, and
 4   Houssein Abbo.
 5   Q    Just quickly, Roxanna Powell, when was that conversation?
 6   A    In 2001.
 7   Q    And her position at Mattel is what?
 8   A    She was a designer; I don't know what her title was.
 9   Q    And Mr. Abbo, when did you have that conversation?
10   A    It would have been after the conversation with Roxanna but
11   soon after the Bratz came OUT.
12   Q    What was Mr. Abbo's role at Mattel?
13   A    He was the master sculptor.
14   Q    But even though it may not have been at the same time as
15   Roxanna Powell, do you know whether or not that conversation
16   still took place in 2001?
17   A    Yeah; roughly.
18   Q    And then who was the third individual, if any, that you
19   spoke to?
20   A    It was Michael Hebden.
21   Q    And again, Mr. Hebden, that's H-E-B-D-E-N; is that
22   correct?
23   A    Correct.
24   Q    And what was his role?
25   A    He was my manager when I worked at Mattel, my sculpting
```

1   manager.

2   Q    And when you had conversations with these three

3   individuals, were they still employed by Mattel?

4   A    Yes, they were.

5   Q    And directing you now just to Roxanna Powell, can you tell

6   the jury what you told Roxanna Powell about your involvement

7   and work on the Bratz sculpt?

8   A    She had asked what I had done on it; what Carter had done

9   on it, what Paula had done on it and I told her I sculpted it

10  and Paula was the project administrator and Carter had come up

11  with the drawings.

12  Q    And what did you say your role was?

13  A    The sculptor.

14  Q    And same questions with Mr. Abbo.  What did you say to

15  Mr. Abbo with respect to your involvement in the Bratz sculpt?

16  A    Well, I just talked about the fact that I sculpted it and

17  we talked about Carter because Abbo knew the Carter had done it

18  and just how, you know, he actually flew the nest and was able

19  to have that concept.

20  Q    And when you say "flew the nest," what do you mean by

21  that?

22  A    That he was successful.

23  Q    Who was successful?

24  A    Carter.

25  Q    Who's the he you're talking about?

1    A    Carter.

2    Q    And Mr. Abbo said that?

3    A    Well, we were talking about that.

4    Q    Did you tell Mr. Abbo the timing of when you were working

5    on the Bratz sculpt?

6            **MR. PRICE:**  Objection.  Leading.

7            Withdrawn.

8            **THE COURT:**  You're withdrawing the question and

9    you're withdrawing the objection?

10           **MR. NOLAN:**  No.  I renew.

11           **THE COURT:**  Rephrase the question.

12           **MR. NOLAN:**  It happens so infrequently.  I was

13   stunned for a moment.  I apologize.  So a tie goes to the

14   runner.

15   BY MR. NOLAN:

16   Q    Ms. Leahy, did you have any conversation with Mr. Abbo

17   concerning the timing of the work that you did on the Bratz

18   sculpt?

19   A    I was just really excited because it was my first job

20   right after I left Mattel.  I was worried when I left about not

21   getting work; so I was really excited to talk to Michael and

22   all of my peers that I was important and I got work.

23   Q    By the way, you had told Mr. Abbo when you left Mattel;

24   yes?

25   A    Yes.

```
 1    Q    And Roxanna Powell, she knew when you left Mattel too.

 2    A    Yes.

 3    Q    Michael Hebden, he's your supervisor, he was your

 4    supervisor at Mattel, what did you tell Mr. Hebden about the

 5    work that you did on Bratz, and did the subject of timing come

 6    up?

 7    A    I also told him it was the first job -- one of the first

 8    jobs I worked on, and that I was just excited to be getting

 9    work.

10    Q    And the work you were referring to is the work that you

11    were dealing with on the Bratz sculpt.

12    A    Correct.

13              MR. NOLAN:   Nothing further.   Thank you.

14              THE COURT:   Cross-examination.

15                       CROSS-EXAMINATION

16    BY MR. PRICE:

17    Q    Ms. Leahy, you recall when you here last time in July that

18    you testified about conversations with Ms. Powell and Mr. Abbo

19    concerning the fact that Carter Bryant had done the concept

20    drawings.  Do you remember that?

21    A    Correct.

22    Q    And today you've added the name Mr. Hebden.  Do you recall

23    that?  Is that right?

24              MR. NOLAN:   Objection, Your Honor.   That's

25    argumentative; lack of foundation; misstates her testimony.
```

1    **MR. PRICE:**  I'll rephrase.

2  **BY MR. PAGE:**

3  Q    Today you just talked about Mr. Hebden; correct?

4  A    Correct.

5         **MR. PRICE:**  Your Honor, if I could read from the

6  trial transcript of July 3, 2008, 4291, lines 14 through 18.

7         QUESTION:  "With respect to conversations with

8  Roxanna Powell and Houssein Abbo, can you recall any other

9  people that you spoke to where you discussed the fact that

10  Carter Bryant had done the concept diamonds for Bratz?"

11         ANSWER:  "That's all I remember."

12  **BY MR. PRICE:**

13  Q    Ms. Leahy, Mr. Nolan was just asking you questions about

14  when you spoke with these folks, did you talk about timing as

15  to your involvement.  Do you recall that?

16  A    Yeah.  I didn't speak to Michael Hebden about Carter, but

17  I did speak to him about the Bratz.

18  Q    And it's true, though, that you never told anyone at

19  Mattel that Carter Bryant was working on Bratz while he was

20  employed at Mattel; correct?

21  A    No.  I never said that.

22  Q    In fact, as you've testified, that never came up in any

23  conversation that you can recall; correct?

24  A    Correct.

25  Q    Now I'd like to put up, if we could, Exhibit 5-0089, and

```
 1    in your testimony you recall, the last time you were here, you
 2    testified that this drawing was done by Mr. Bryant after
 3    October 25; correct?
 4    A    Correct.
 5    Q    And you testified that Mr. Bryant drew this drawing after
 6    seeing your sculpt -- I think it's Exhibit 1141 -- that you had
 7    presented on October 25th; correct?
 8    A    Correct.
 9    Q    That Mr. Bryant was trying to draw that sculpt; that was
10    your testimony previously; correct?
11    A    Correct.
12    Q    And you understand that the jury has come back with a
13    verdict and ruled that this drawing was done before
14    October 19th, before Carter Bryant left Mattel.  Do you
15    understand that?
16    A    Well, I didn't know anything about the jury verdict.  I
17    just know that drawing came after the sculpt.
18    Q    You're aware, are you not, that drawing, this drawing, was
19    given to a Mr. Linker prior to October 19th?
20    A    I don't know anything about Steve and Linker and getting
21    the drawings.  I don't know about that.
22    Q    Let me show you, if I could, this is testimony that the
23    jury has heard in this phrase from Mr. Bryant; it's Page 350.
24    This is testimony that the jury has heard just a couple of days
25    ago, Your Honor.
```

1    Let's turn to 278, that's the Bates number of that
2  drawing.
3    "What are we looking at here?
4    This is a drawing of the actual finished doll that I
5  gave to -- this drawing I gave to Margaret to have her restart
6  the sculpt."
7  **BY MR. PRICE:**
8  Q    That's true, isn't it, that Mr. Bryant, prior to leaving
9  Mattel, gave you that drawing so you could do the sculpt?
10 A    No.    That's absolutely not true.    Because he specifically
11 did that drawing after this sculpt, and I remember him giving
12 it to me.
13 Q    And your testimony is that it was after October 19th.
14 A    After October 25th, because nobody saw this sculpt until
15 October 25th.
16 Q    How can you explain how Mr. Linker saw that drawing prior
17 to October 19th?
18 A    I can't explain Mr. Linker's actions.    I can only explain
19 that drawing came after this sculpt.
20 Q    What you will apparently concede, if we look at
21 Exhibit 5-89 again, is that that drawing, whether given to you
22 before or after, is supposed to be a representation of that
23 sculpt, Exhibit 1141.
24 A    I don't understand what you're asking me.
25 Q    What you have told the jury is that Mr. Bryant drew this,

```
 1   Exhibit 5-89, after seeing your sculpt --
 2   A    Correct.
 3   Q    -- to be a representation of that sculpt.
 4   A    No.  He didn't draw it to be a representation of the
 5   sculpt.  He was inspired by this sculpt to make that drawing.
 6   He didn't have this sculpt in front of him to make the drawing.
 7         Is that what you are asking?
 8   Q    Why would Mr. Bryant make that drawing and give it to you
 9   after you had made the sculpt, rather than, as he testified,
10   before you made the sculpt to assist you?
11         MR. NOLAN:  Objection.  Mischaracterizes testimony.
12         THE COURT:  The jury has heard the testimony.  They
13   can determine for themselves whether it was properly
14   characterized.
15         The WITNESS:  Can you ask that again?
16   BY MR. PRICE:
17   Q    Why would Mr. Bryant give you that drawing after you did
18   the sculpt, rather than before you did the sculpt to assist
19   you?
20   A    Well, he was a really nice guy.  He doesn't have any
21   understanding of 3-dimensional sculpts.  But I think he thought
22   he was being helpful by coming up with the drawing.
23   Q    If we could put up Exhibit 5-28, Bryant's testimony.
24         "With respect to this drawing, Mr. Bryant testified
25   that the sculpt that was created from this drawing, did that
```

```
 1   become the final sculpt?"

 2           ANSWER:  "To the best of my knowledge, yes."

 3           QUESTION:  It did?

 4           ANSWER:  Yes.

 5   By MR. PRICE:

 6   Q    You disagree with Mr. Bryant's testimony that the sculpt

 7   created from his drawings became the final sculpt?

 8   A    He probably understood that you were talking about this

 9   sculpt, the December sculpt; because that drawing came after

10   this sculpt.

11   Q    Do you disagree with Mr. Bryant that that final sculpt was

12   created from that drawing, Exhibit 5-89?

13   A    You know, I thought it was sweet that he brought the

14   drawing and he thought he was being helpful.  I didn't say,

15   'Carter, this drawing is useless, please go away.'  I took it

16   and said thank you and carried on with my work.

17   Q    You were shown some comparisons, and I want, if I could,

18   to compare Exhibit 13907, the doll, with the sculpt.

19           First of all, it's your understanding, I guess, that

20   the dolls -- you're not aware of the dolls being sold naked;

21   that is, without clothes; right?

22   A    I didn't understand that.

23   Q    You're not aware of these dolls being sold without clothes

24   on; right?

25   A    Right.  They had clothes.
```

1    Q    And you pointed out, you did some blowups and you pointed

2    out some differences between the sculpts; correct?

3    A    Correct.

4    Q    And I take it when these dolls are sold, they don't come

5    with a sculptor like you to point out differences or point out

6    little things?

7              **MR. NOLAN:**  Objection.  Argumentative.

8              **THE COURT:**  Rephrase, Counsel.

9    **BY MR. PRICE:**

10   Q    Being someone who's a professional sculptor, you can

11   probably look at two sculpts and fairly easily point out

12   differences; correct?

13   A    Yes.

14   Q    You have a slightly more critical eye than, say, a tween,

15   to use your phrase; correct?

16   A    Depends on the person.

17   Q    Well, here we've shown the final doll compared to the

18   sculpt.  Do you see that?

19   A    Yes.

20   Q    And I think your testimony is that to the average person a

21   tween -- to the tween, that this Exhibit 5-89 would be viewed

22   as substantially different than the final doll sculpt; that's

23   your testimony; correct?

24   A    I don't think I ever testified about somebody else looking

25   at it and thinking it would be different.  It was just my

```
 1   opinion on how they would be different; correct?
 2   Q    So you understand one of the issues here is whether or not
 3   the final dolls look substantially similar to Mr. Bryant's
 4   drawings.  Do you understand that?
 5   A    Yes, I do.
 6   Q    And you understand the question isn't whether a
 7   professional sculptor would think they look different; you
 8   understand that.
 9   A    I don't understand.  I'm so sorry.  I can't understand
10   what you are asking me.
11   Q    Let me try to give you an example, if I could.  This is a
12   demonstrative of some of Mr. Bryant's drawings and the final
13   doll.
14        You see at the far left this is one of the drawings
15   that you received from Mr. Bryant; correct?
16   A    I don't remember it specifically, but it looks like the
17   drawings in the packet that he gave me.
18   Q    And, in fact, prior to receiving Mr. Bryant's drawings,
19   you weren't on your own trying to sculpt the doll that would
20   eventually look like a Bratz doll, right, prior to seeing
21   Mr. Bryant's drawings?
22   A    No.
23   Q    And, in fact, my understanding is that prior to Mr. Bryant
24   giving you the drawings, at that stage in your career, you had
25   never actually sculpted a body from start to finish; is that
```

1   correct?

2   A     Correct.

3   Q     And, in fact, you testified, I think last week, when you

4   were pointing out some differences in the sculpts, that along

5   the way you might make some mistakes because you weren't as

6   experienced as you are now; correct?

7   A     Correct.

8   Q     So Mr. Bryant gave you the drawing on the far left, and I

9   guess it's your testimony that from this drawing that you

10  envisioned when you turned that into a three-dimensional

11  drawing, that her bottom should be flat and low; is that right?

12  A     Can you rephrase the question?

13  Q     Sure.

14        You're talking about the sculpts, and one of the

15  first sculpts, you said you see here, the bottom is flat and

16  low, as opposed to a -- I don't know if you used the word

17  perky, but as opposed to a younger bottom.

18        Do you recall that?

19  A     Yes.

20  Q     And so I guess my question is, here, this is Mr. Bryant's

21  drawing that you got -- and I'm just trying to understand --

22  was it your understanding that to create a sculpt that would

23  look like this drawing, that the rear would be something flat

24  and low?

25  A     Well, there's no bottom in that drawing; so I had to make

1  it up.

2  Q    What you saw from this drawing is that, "Well, what

3  Mr. Bryant wants me to do is create a figure which has a

4  mature, flat and low bottom"; is that your testimony?

5         MR. NOLAN:   Your Honor, objection; lacks foundation;

6  the reference to the drawing; also mischaracterizes.

7         THE COURT:   Overruled on that.

8         You may answer the question.

9         The WITNESS:   I apologize again, but I just -- I'm

10  confused.   I don't understand the question.

11  BY MR. PRICE:

12  Q    When Mr. Bryant gave you these drawings, I think you said

13  you then went to sculpt a mature sculpt with a flat, low rear.

14  And I'm just asking is that really what you thought this would

15  look like if depicted in three dimensions, that this character

16  would have a mature, flat, low rear?

17  A    No.   He gave me those drawings in the Steve Madden ad as

18  inspiration, and I came up with what I came up with on my own.

19  Q    You'll agree that as someone looking at this drawing, you

20  would not expect, if this person were turned around, that they

21  would look mature with a flat, low rear?

22  A    There's no -- I can't assume anything.   There's only that

23  front three/quarter view right there.

24  Q    Does this look like a mature woman to you, the drawing

25  Mr. Bryant gave you, that began this process?

```
 1   A    A mature woman, meaning what age bracket?
 2   Q    You were using the phrase "mature" throughout your
 3   testimony; so I'm asking you to use that word.
 4        Is this the mature -- does this drawing on the far
 5   left look like a mature woman?
 6   A    I believe I was talking about this gray sculpt looking too
 7   college age, and, yes, I think that these would be college
 8   girls.
 9   Q    Well, you recognize the second drawing here as another
10   drawing Mr. Bryant did; correct?
11   A    Yes.
12   Q    And were you involved in creating the dolls that were
13   presented to the Hong Kong Toy Fair?
14   A    I don't know what was presented at the Hong Kong Toy Fair.
15   Q    Were you involved in the December time frame of creating
16   prototype dolls?
17   A    I don't understand what you mean by prototype.
18        I sculpted this, this was done in December.
19   Q    The third picture here is a picture of a doll presented at
20   the Hong Kong Toy Fair.  I'm wondering, do you recognize that
21   as anything you were involved with?
22   A    I can't tell from the picture if it's plastic or resin.
23        Can you tell me?
24   Q    I can tell you that it was a prototype.
25   A    Well, it makes a difference, because this is my sculpt I
```

| | |
|---|---|
| 1 | did in December and this is what came out of Hong Kong, and |
| 2 | they are two different things; so unless I know if that's |
| 3 | plastic or resin, I can't tell you. |
| 4 | Q    Whether you were involved? |
| 5 | A    Right. |
| 6 | Q    Were there any discussions with anyone about presenting |
| 7 | something at the Hong Kong Toy fair? |
| 8 | A    No.  I was not aware of any toy fair. |
| 9 | Q    At the far right, we have one of the dolls; this is Cloe, |
| 10 | and the jury has seen this kind of panel for each one of the |
| 11 | dolls.  I take it your testimony is that looking at it as a |
| 12 | sculptor, your opinion is that this doll does not look |
| 13 | substantially similar to any of these drawings; is that right? |
| 14 | A    You're asking me to comment on the doll with clothes on |
| 15 | and the face paints and the hair? |
| 16 | Q    The way it's actually sold to the public, yes. |
| 17 | A    No.  From a professional standpoint, I don't. |
| 18 | Q    And you realize that because you come from looking at it |
| 19 | as a sculptor that you might be looking at comparisons |
| 20 | differently than, say, a tween. |
| 21 | **MR. NOLAN:**  Objection.  Lack of foundation; calls for |
| 22 | speculation. |
| 23 | **THE COURT:**  As phrased, overruled. |
| 24 | **The WITNESS:**  I'd have to talk to the individual |
| 25 | tween looking at it.  I mean, my six-year old can look at some |

1   things and tell the differences between some things and not; so

2   it depends on the individual.

3   **BY MR. PRICE:**

4   Q    So you can't speak for tweens?

5   A    Correct.

6   Q    So if the jury has to establish whether or not someone in

7   that age group would find the dolls to be substantially similar

8   to Carter Bryant's drawings, if that's the perspective, then

9   you cannot give an opinion on that because you can't speak for

10  tweens; right?

11  A    Correct.

12  Q    And, in fact, Mr. Bryant as a designer might like at that

13  a different way than you as a sculptor; correct?

14  A    Well, everybody might look at it a different way.

15  Q    Let me ask you, just looking at the face, as a sculptor,

16  you're telling us that the face of the final doll is not

17  substantially similar to Mr. Bryant's drawings; right?

18  A    That's what I'm telling you.

19  Q    And this refers to 1107 through 1108 and the Cloe drawing.

20          **MR. NOLAN:**   Your Honor, this is deposition testimony;

21  it's outside the record.

22          **MR. PRICE:**   It was played on Friday, Your Honor.

23          **MR. NOLAN:**   It's also --

24          **THE COURT:**   Take it down, to start with.

25          What is this?

1        **MR. PRICE:** This is what was played to the jury on

2   Friday.

3        **MR. NOLAN:** That's not the way it was described up

4   there.

5        **MR. PRICE:** Because we didn't have the transcript at

6   that time. This is what was played to the jury on Friday.

7        **THE COURT:** IF you played it to the jury on Friday,

8   you may publish it. If it's not, you may not.

9        Consult with counsel.

10       **MR. NOLAN:** I'll accept the representation, for

11  completeness purposes.

12       **THE COURT:** Very well.

13       **MR. PRICE:** May we display now, Your Honor?

14       **THE COURT:** You may.

15  BY MR. PRICE:

16  Q    I'll represent to you the drawing of Cloe, second from the

17  left, was 1109; and we're talking about 1107 through 1108.

18       "Look at these exhibits now, Mr. Bryant. Are these

19  the drawings that the original release Bratz dolls were based

20  on?"

21       ANSWER: "They reflect the fashions that were

22  released and the basic hair styles and the basic look of the

23  face."

24  BY MR. PRICE:

25  Q    Now, again, as a sculptor you may disagree with that;

```
 1   right?
 2   A    I'm not a painter or a hair designer or a fashion
 3   designer; so that would just be my opinion.
 4   Q    Okay.
 5        Back to Cloe, originally, back in phase 1-A and
 6   originally here, you testified that Carter Bryant's drawings
 7   had no nose.  Do you recall that?
 8   A    Yes, I do.
 9   Q    If we look at these drawings, you see, for example, Cloe,
10   on the far left, Cloe has a bridge and a small nose indicated
11   in the drawing; correct?
12   A    Well, there's a line there and a little dot, but it's not
13   enough information for me to say, okay, this is exactly
14   something he wants.  And I recall there's a drawing of Sasha
15   that does not have a nose at all.
16   Q    Well, if you look at -- you knew that what this drawing
17   shows was prominent lips, oversized eyes, and a diminished
18   nose; fair?
19   A    Yes; that was the trend at the time, is what a lot of
20   people were doing.
21   Q    In fact, did you agree with the following -- if we could
22   show Exhibit 4207; this is a pleading in the Hong Kong
23   proceedings.  It's in evidence, Your Honor.  If we could go to
24   4207, page eight of paragraph 17.
25        "One thing that is contributed to the success of
```

1  Bratz is the oversized eyes, and the protrusive mouth that are

2  capable of being decorated with makeup, and the diminished size

3  of the nose that serves no decorative purposes."

4       Do you see that?

5  A    I do see that.

6  Q    And you'll agree that -- I'll represent to you, this is

7  MGA talking under oath, so you'll agree with that, won't you,

8  that the dolls have that look:  Oversized eyes, protrusive

9  mouth, and a diminished size of the nose; correct?

10 A    Correct.

11 Q    And as you said, that's exactly what was conveyed in

12 Carter Bryant's drawings.  If we can put up the Cloe drawings

13 again.  That's what's conveyed in the drawings, right, as you

14 just said:  The protrusive mouth, oversized eyes, and a

15 diminished nose; correct?

16 A    Well, that was the trend at the time.  There were a lot of

17 drawings that looked exactly like that with oversized eyes and

18 lips and diminished noses.  For example, the Diva Stars

19            **MR. PRICE:**  Move to strike as nonresponsive.

20            **THE COURT:**  Sustained.  It is stricken.

21 **BY MR. PRICE:**

22 Q    You'll agree that Carter Bryant's drawings have the

23 factors that MGA say are unique to the dolls, which is the

24 oversized eyes, protrusive, lips, and the diminished nose;

25 you'll agree with that?

1    A    I can agree with that statement.

2         **MR. PRICE:**  No further questions.

3                    Re**DIRECT EXAMINATION**

4    **BY MR. NOLAN:**

5    Q    Ms. Leahy, Mr. Price showed you some testimony of

6    Carter Bryant played by videotape in this case.  I want to go

7    to a different portion, same testimony, played at the same

8    time, not shown to you.

9         Mr. Shorr, could I have from the transcript,

10   Page 351, video deposition.  This is from the video deposition

11   played at trial, starting at Page 351, lines 19 on 351, running

12   through line 20, on 352.

13        **THE COURT:**  You may proceed, counsel.

14        (Transcript is displayed.)

15   **BY MR. NOLAN:**

16   Q    So here's the testimony of Carter Bryant that's been

17   played to the jury.

18        "After Margaret had done a little bit of work on the

19   preliminary sculpt, and when Mercedeh came on board, we

20   realized that the work that Margaret had done was not going to

21   work; so Paula and Margaret -- or, I'm sorry, Paula and

22   Mercedeh, basically said that we needed to start the sculpt

23   again."

24        QUESTION BY MR. QUINN:  "So the answer to my question

25   is, yes, you did a new form of sculpt.

```
 1              Objection.  Objection.  Mischaracterizes the witness
 2    again.
 3              MR. QUINN:  Your turn.
 4              Answer:  Would you restate your question?
 5              So did you do a new form for the doll?
 6              Objection.  Mischaracterizes.  We basically started
 7    the sculpt over."
 8              "And that started with a new drawing?"
 9              ANSWER:  "Yes.  That depicted a different form for
10    the doll; depicted a different pose."
11              "A more neutral pose?"
12              "Yes."
13              QUESTION:  "Not just a pose but a different form of
14    body?"
15              ANSWER:  "Just a slimmed down body."
16              "Did you regard those as significant changes in the
17    body?"
18              ANSWER:  "Yes."
19    BY MR. NOLAN:
20    Q    Now, the reference is to Mercedeh Ward, do you see that?
21    A    Yes.
22    Q    When was the first time that a sculpt was presented to
23    Mercedeh Ward, the date?
24    A    It was this sculpt presented on October 25th.
25    Q    Now I'd liked to do the same comparison that Mr. Price was
```

1    using for a just a moment, the panel of dolls, the drawings.

2    This is the same comparison he was asking you about.

3              Looking at the drawing of Carter Bryant's concept

4    drawing, do you see that?

5    A     Yes.

6    Q     That's Cloe; right?

7    A     Yes.

8    Q     And then looking at the final panel, which is a depiction

9    of one of the Cloe dolls sold, in your opinion, is that Cloe

10   doll the same age as is characterized in Carter Bryant's

11   drawings?

12             **MR. PRICE:**  Your Honor, objection as irrelevant,

13   given her testimony about foundation.

14             **THE COURT:**  Sustained on foundation.

15   **BY MR. NOLAN:**

16   Q     The photographs that we showed you of the sculpted head

17   that you were shown earlier, your efforts in sculpting it was

18   to, what, make the sculpt look older than Carter Bryant's

19   concept drawings or younger?

20             **MR. PRICE:**  The question has been asked and answered.

21             **THE COURT:**  It has been.

22   **BY MR. NOLAN:**

23   Q     Mr. Price was asking you questions about, I think, whether

24   or not looking at the Cloe doll on the left -- the drawing,

25   rather, on the left -- whether or not you could depict that she

```
 1    was supposed to have a flat behind.  I think that's what he
 2    said.
 3              Do you recall that?
 4    A    I was confused on that.  If you could just rephrase it.
 5    Q    Here's my question:  Did Mr. Bryant's drawings provide you
 6    any guidance with respect to the dimensions of the body?
 7    A    No.
 8    Q    Whether or not you're a sculptor or a mother, is it your
 9    view that the sculpt of the doll, the naked doll itself, has no
10    influence at all on the appearance of the doll?
11              MR. PRICE:  Objection.  Vague; irrelevant.
12              THE COURT:  Overruled.
13              You may answer.
14              The WITNESS:  The naked sculpt --
15              THE COURT:  It was a yes or no question.
16              The WITNESS:  Can you ask again, then?
17    BY MR. NOLAN:
18    Q    Sure.  I'll start it differently.
19              Mr. Price asked you whether or not they sell dolls in
20    a naked form.
21              Do you recall that?
22    A    Yes.
23    Q    And what's your answer?
24    A    No.
25    Q    Let me ask you this.  In your experience, do young girls
```

```
 1    undress the dolls when they are playing with them?

 2    A     The second they get them out of the package.

 3    Q     And do you believe that they do that in the presence of

 4    their parents?

 5    A     Yes.

 6    Q     Is it your view that the sculpt or design of the body and

 7    the torso in its naked plastic form has no bearing on the look

 8    and feel of a doll?

 9    A     No.  It absolutely has a bearing.

10    Q     Or does it have no impact on whether or not a doll is

11    marketable at retail?

12    A     It absolutely has an impact.

13              MR. NOLAN:  Nothing further.

14              THE COURT:  Mr. Price?

15                          RECROSS-EXAMINATION

16    BY MR. PRICE:

17    Q     Ms. Leahy, between the time you met with Carter Bryant in

18    September and the time that you did the final sculpt, what

19    drawings did you have of Bratz dolls?

20    A     Could you tell me which sculpt is --

21    Q     What you described as the final sculpt; I guess that would

22    be -- I don't have a number -- 1234.

23    A     Can you please --

24    Q     Between the time Mr. Bryant presented his drawings to you,

25    the ones with the oversized eyes and lips and the diminished
```

1    nose, and the time that you did the final sculpt, is it true

2    that the only drawings you had of Bratz dolls were

3    Carter Bryant's?

4    A     Those are the only inspiration I had, besides the

5    Steve Madden ad and then the drawing from the 25th came after

6    this, the 25th sculpt, when you saw it.

7    Q     That's Exhibit 5-99, the drawing that the jury found was

8    done prior to October 19th?  Is that the one you're referring

9    to?

10   A     The drawing?

11   Q     5-89.

12         You're referring to this drawing, the drawing the

13   jury found was done while Carter Bryant was at Mattel; that's

14   the drawer you were referring to?

15   A     Correct.  Mercedeh also did a little controlled drawing

16   for the ball and socket of the arms.

17   Q     And that was just a drawing -- so other than Ms. Ward's

18   drawing of just the mechanics of the ball and joint with the

19   arm, the only aesthetic drawings you had for Bratz prior to

20   doing your final sculpts were Carter Bryant's drawings;

21   correct?

22   A     Correct.

23   Q     And are you aware that in a pleading under oath in Hong

24   Kong that MGA has represented that in doing your sculpts, that

25   you were referring to Carter Bryant's drawings?

1      **MR. NOLAN:** Objection to the term "referring;" the

2    actual term was "referred."

3          **THE COURT:** Rephrase, counsel.

4    **BY MR. PRICE:**

5    Q    Are you aware that under oath in Hong Kong that MGA

6    represented to the court that in doing your sculpts, that you

7    referred to Carter Bryant's drawings?

8    A    When Carter brought me the drawings, I looked at them.    I

9    didn't use them for my sculpting purposes.

10   Q    If we could put up the Cloe.

11         To the extent that these dolls look anything like

12   Carter Bryant's drawings then, that's purely coincidence?

13   A    I'm testifying as to my knowledge of what I do in this

14   field.    I don't know what's coincidence.    I can tell you what

15   the differences are, and I have done that over the past couple

16   of days.

17         **MR. PRICE:** Nothing further, Your Honor.

18   **By MR. NOLAN:**

19   Q    Ms. Leahy, you're not denying that you looked at

20   Carter Bryant's drawings in September of 2000, are you?

21   A    No.    Not at all.

22         **MR. NOLAN:** Nothing further.

23         **THE COURT:** We're done.

24         Ms. Leahy, you're excused.    Thank you.

25         (Morning session concluded.)

1

2

3                                        CERTIFICATE

4

5      I hereby certify that pursuant to section 753, title 28, united
       states code, the foregoing is a true and correct transcript of
6      the stenographically recorded proceedings held in the above-
       entitled matter and that the transcript page format is in
7      conformance with the regulations of the judicial conference of
       the united states.

8

9                                                            8-20-08
       ─────────────────────────                          ──────────────
       THERESA A. LANZA, CSR, RPR                              Date
10     FEDERAL Official COURT Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25