1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                       ---

4       **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                       ---

6   MATTEL, INC.,                :   PAGES 6856 - 7046

7          PLAINTIFF,        :

                                 :

8    VS.                      :   NO. ED CV04-09049-SGL

                                 :   [CONSOLIDATED WITH

9   MGA ENTERTAINMENT, INC.,    :   CV04-9059 & CV05-2727]

   ET AL.,                      :

10                             :

           DEFENDANTS.        :

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17           TUESDAY, AUGUST 12, 2008

18              JURY TRIAL - DAY 33

19              AFTERNOON SESSION

20

21

22             MARK SCHWEITZER, CSR, RPR, CRR

                   OFFICIAL COURT REPORTER

23   CERTIFIED     UNITED STATES DISTRICT COURT

                  181-H ROYBAL FEDERAL BUILDING

24            255 EAST TEMPLE STREET

    COPY        LOS ANGELES, CALIFORNIA 90012

25            (213) 663-3494

6857

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
        By John B. Quinn, Esq.
5         B. Dylan Proctor, Esq.
         Michael T. Zeller, Esq.
6         Harry Olivar, Esq.
         John Corey, Esq.
7         Diane Hutnyan, Esq.
         William Price, Esq.
8       855 South Figueroa Street
       10th Floor
9       Los Angeles, CA 90017
       (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13      Skadden, Arps, Slate, Meagher & Flom LLP
       By Thomas J. Nolan, Esq.
14        Carl Alan Roth, Esq.
        Jason Russell, Esq.
15        Lauren Aguiar, Esq.
        David Hansen, Esq.
16        Matthew Sloan, Esq.
        Robert Herrington, Esq.
17       300 South Grand Avenue
       Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

6858

1                          **I N D E X**

2

3      **PAULA DIANTHE GARCIA, SWORN....................... 6859**

4      DIRECT EXAMINATION BY MS. AGUIAR:...................... 6859

5

6                          **E X H I B I T S**

7

8      (Exhibit 16418-002 received.)......................... 6949

9      (Exhibit 951-B, Pages 002-007, received.).............. 6960

10     (Exhibits 17712-17715 received.)...................... 6961

11     (Exhibit 18633 received.)............................. 7021

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Riverside, California; Tuesday, August 12, 2008** |
| 2 | **11:30 A.M.** |
| 3 | THE COURT: All right, Counsel, we're ready for you |
| 4 | to call your next witness. |
| 5 | MS. AGUIAR: MGA calls Paula Garcia. |
| 6 | THE CLERK: Please raise your right hand. |
| 7 | **PAULA DIANTHE GARCIA, SWORN.** |
| 8 | THE CLERK: Please take the stand. Please state |
| 9 | your full name for the record, and spell your last name. |
| 10 | THE WITNESS: Paula Dianthe Garcia. |
| 11 | **DIRECT EXAMINATION** |
| 12 | BY MS. AGUIAR: |
| 13 | **Q.** Good morning, Ms. Garcia. |
| 14 | **A.** Good morning. |
| 15 | **Q.** Welcome back. |
| 16 | **A.** Thanks. |
| 17 | **Q.** Let's talk about Carter Bryant's pitch book drawings for |
| 18 | a moment. I've put a copy of them in front of you. You'll |
| 19 | see that on the front. |
| 20 | Do you have it? |
| 21 | **A.** Yes. |
| 22 | **Q.** And I also laid a copy of them on the table. It's |
| 23 | basically a package of about 14 or 15 drawings; is that |
| 24 | right? |
| 25 | **A.** Yes. |

1  Q.   Is it correct that Mr. Bryant was the one who approached

2  MGA with his concept drawings and pitched these drawings to

3  MGA?

4  A.   Yes.

5  Q.   Did MGA seek him out at Mattel and ask him to bring

6  those drawings to MGA?

7            MR. PRICE:   Object.   Irrelevant to this phase.

8            THE COURT:   Overruled.

9  Q.   BY MS. AGUIAR:   At the time Mr. Bryant brought those

10  drawings to MGA and showed them to you, pitched them to MGA,

11  did you believe those drawings belonged to Mr. Bryant?

12  A.   Yes, I did.

13  Q.   In other words, did you believe that MGA made those

14  drawings -- in other words, at the time did you believe that

15  he made those drawings, that he owned them, and he could

16  pitch them to MGA?

17            MR. PRICE:   Objection.   Irrelevant to this phase.

18            THE COURT:   It's the same question again.

19  Overruled again.  But it is cumulative.   Let's move along,

20  Counsel.

21  Q.   BY MS. AGUIAR:   When Mr. Bryant signed the consulting

22  contract with MGA -- and this is my last question on that

23  point -- when he signed the contract with MGA and MGA started

24  to explore the concept of whether his drawings could play

25  themselves out in any way in a three-dimensional doll, did

1  you have any reason to believe that you were working with the

2  property of MGA?

3            MR. PRICE: Objection. Irrelevant at this phase.

4            THE COURT: Counsel, what legal issue does it go

5  to? Don't make a speaking objection.

6            MS. AGUIAR: That was my last question.

7            THE COURT: What does it go to?

8            MS. AGUIAR: It goes to her state of mind and

9  damages, your Honor.

10           THE COURT: First, is it relevant. I'll see you at

11 sidebar, Counsel.

12           **(SIDEBAR CONFERENCE HELD.)**

13           THE COURT: Let me hear you.

14           MS. AGUIAR: I didn't want to say in front of the

15 jury, but I believe it goes to punitive damages and any

16 other --

17           THE COURT: So it goes to malice and -- right.

18           MS. AGUIAR: That was my last question.

19           THE COURT: Okay.

20           MR. PRICE: Well --

21           THE COURT: Unless you don't want to argue in

22 close --

23           MR. PRICE: That they knew? I think the jury has

24 already found that. That they knowingly converted --

25           THE COURT: Yeah, but -- yeah, you're right.

1        MR. PRICE: So that's my problem, is that we're

2  now --

3        THE COURT: That wasn't your objection. It was

4  relevance.

5        MR. PRICE: I know, because I couldn't say

6  inconsistent with the verdict.

7        THE COURT: Counsel, this is the difficulty in a

8  bifurcated trial like this. The issue of malice is fresh in

9  this phase. I understand there's evidence from before which

10  goes to that issue and there's an argument to be made, but

11  certainly the argument views that the level of intent

12  necessary to find the state tort claims is not sufficient by

13  itself to qualify for the punitive damage phase.

14        So I do think it's fair game for them. I'm going

15  to give them some leeway to ask these questions and for you

16  to cross. It's -- technically, you're correct, it's

17  cumulative, and let's not ask too many questions. I'll give

18  you some leeway. But I think counsel is correct.

19        MS. AGUIAR: And just to point out, your Honor,

20  they asked Mr. Larian similar questions on their direct exam.

21        THE COURT: They did.

22        MS. AGUIAR: So if I could ask the Court for an

23  indication --

24        THE COURT: All right. So the objection is

25  overruled.

1        **(CONCLUSION OF SIDEBAR CONFERENCE.)**

2  **Q.** BY MS. AGUIAR: Ms. Garcia, my last question was when

3  Mr. Bryant signed the agreement with MGA, and MGA began to

4  develop the three-dimensional doll that later became Bratz,

5  did you believe that you were using property at the time that

6  belonged to Mattel?

7              MR. PRICE: Objection. Assumes facts --

8              THE COURT: As phrased. Rephrase, Counsel.

9  **Q.** BY MS. AGUIAR: In September of 2000, when Mr. Bryant

10  brought these drawings to MGA and MGA began to explore

11  whether those drawings could form the basis of a

12  three-dimensional doll, did you believe you were working with

13  the property of Mattel?

14  **A.** No, I did not.

15  **Q.** Before Mr. Bryant came to you, so let's take it prior to

16  early September of 2000. Had you seen or were you aware of

17  any sort of trend or characteristics in the popular culture

18  or popular media that were consistent with the look that you

19  were already thinking about for a fashion doll?

20              MR. PRICE: Objection. Relevance.

21              THE COURT: Counsel, this goes to?

22              MS. AGUIAR: It goes to protectability, your Honor.

23  It goes to the state law claims and to protectability.

24              THE COURT: I'll permit this question. You may

25  answer.

1          MS. AGUIAR:  You need it back again?

2          THE WITNESS:  Yes, I'm sorry.

3    **Q.**  BY MS. AGUIAR:  Before Mr. Bryant brought his drawings

4    to MGA, had you already been aware of or personally seen a

5    trend or characteristic in the popular press or --

6          THE COURT:  I'm sorry, Counsel.  I'm going to have

7    to see you at sidebar.

8          **(SIDEBAR CONFERENCE HELD.)**

9          THE COURT:  What element of protectability is this

10   going to?

11         MS. AGUIAR:  Your Honor, Ms. Garcia will testify

12   that she saw several magazine ads which had the

13   characteristics of big head, oversized eyes, large feet, that

14   prior to Mr. Bryant bringing his drawings to MGA she had seen

15   and she had envisioned wanting in a doll.  So this goes to

16   the idea that a big head is not protectable.  Oversized eyes

17   are not protectable.  The particular eye that Mr. Bryant did

18   your Honor has found would be protectable if --

19         THE COURT:  The jury is going to be instructed on

20   that.

21         MS. AGUIAR:  And on the state law claims, if I

22   could just add, I think it goes to whether they can show, as

23   Mr. Price said in his opening, whether the profits that we

24   made were attributable to his drawings.  They are clearly

25   going to argue to this jury in closing that we shouldn't get

6865

```
 1   a penny of profits because we had his drawings.  And we need
 2   to be able to show that not only after he brought his
 3   drawings, but before he brought them, Ms. Garcia and others
 4   at MGA had an idea of what they would want to see in a doll.
 5              MR. ZELLER:  She's conflating at least three
 6   separate issues.  Number one, protectability, as the Court
 7   has already ruled, is a matter of law that the Court is going
 8   to instruct the jury on.  That's just not proper to be in
 9   front of a jury.  In fact, it's going to cause confusion.
10              THE COURT:  Goes to the State Court claims.
11              MR. ZELLER:  If I miss on the copyright, it's
12   shading to independent creation, which is an issue they are
13   not allowed to raise in front of the jury.  In terms of the
14   state tort claim, they are misunderstanding what it is that
15   their damages claims are based upon.
16              THE COURT:  Your damages --
17              MR. ZELLER:  I'm sorry.  That damages claim.  So we
18   will stick with that.
19              MS. AGUIAR:  I know you're trying to shift the
20   burden to us, but let's get real.
21              MR. ZELLER:  It is our burden.  But if I understand
22   what she's saying correctly, the notion seems to be that
23   because they could have obtained from some other source and
24   because those are publicly available elements, that somehow
25   that goes to apportionment.  And that's not what
```

 1   apportionment is at all.

 2          THE COURT:  Is that what you're saying?  Because

 3   I'm not getting it either.  How is this a damages defense?

 4          MS. AGUIAR:  I'm trying to show, your Honor, that

 5   for purposes of the state law claims -- and we will do more

 6   of this later in her testimony -- that there were ideas that

 7   MGA brought to the table, ideas that Paula Garcia had about

 8   what she wanted this doll to look like, the market she wanted

 9   it to appeal to, the overall look that she wanted it to have

10   but didn't all come from Mr. Bryant's drawings.

11          So if they are going to argue to the jury in

12   closing you should award a gazillion dollars because they

13   took the drawings and that was it, the drawings were the

14   inspiration for what ended up being the doll, we need to be

15   able to show that that's not right.

16          THE COURT:  This gets back to a list of five

17   elements on apportionment.  We've already gone through this,

18   two and a half hours arguing part of this.  If you're going

19   to ask questions about those five, and here you're going to

20   the heart of the drawings themselves, and I think the only

21   way -- my first question at sidebar is what element does it

22   go to, and it clearly goes to originality.  And that is

23   absolutely off the table at this point in time.

24          The Court has already found, as a matter of law,

25   based on judicial estoppel, not to mention a whole host of

1    other reasons, that you cannot get into that at this point.

2          So the only issues with respect to apportionment

3    are the ones that Mr. Nolan stood up and represented -- I

4    have them written down on a little yellow stick-it up there,

5    and those are the questions you can address, not the drawings

6    themselves.

7          MS. AGUIAR:   And by those elements of

8    apportionment, you're referring to accessories, fashions,

9    packaging, themes?  Is that --

10         THE COURT:   Right.  That's the list.

11         MS. AGUIAR:   I just want to make sure we're on the

12   same page.

13         THE COURT:   Those are the questions that Paula

14   Garcia certainly is qualified to talk about.  But what you're

15   doing right now is trying to revisit this issue, again, of

16   originality.  That's how it sounds anyway.

17         MS. AGUIAR:   I'll move on from this.  But we would

18   like an opportunity, not here and not while the jury is here,

19   to address the tentative list that you gave the parties

20   regarding what was protectable and not protectable and make

21   a --

22         THE COURT:   I've given you leave to do that at any

23   time.

24         MS. AGUIAR:   Of course, and we would like to do

25   that.

1        THE COURT: Absolutely. Objection is sustained.

2        **(CONCLUSION OF SIDEBAR CONFERENCE.)**

3  **Q.**  BY MS. AGUIAR: Ms. Garcia, we were talking about the

4  pitch book drawings-before. Let me ask you something. Did

5  the idea of hip, edgy characters in Mr. Bryant's drawings

6  provide a source of inspiration for the Bratz dolls?

7  **A.**  Yes.

8  **Q.**  Did it provide the only source?

9        MR. PRICE: Objection as phrased.

10       THE COURT: Sustained.

11  **Q.**  BY MS. AGUIAR: When MGA was creating and developing the

12  Bratz dolls, did others at MGA provide inspiration and

13  creativity for the creation of those dolls?

14  **A.**  Absolutely.

15  **Q.**  Give me some names of those people, and we'll go back in

16  detail in a moment and go through them.

17  **A.**  Veronica Marlow, Margaret Leahy, myself, just to name a

18  few.

19  **Q.**  There was also a face painter involved; is that right?

20  **A.**  Yes.

21  **Q.**  Who was that?

22  **A.**  Anna Rhee.

23  **Q.**  There was someone at MGA who had a lot of involvement in

24  packaging for the dolls that you developed; is that right?

25  **A.**  That's right.

1  Q.   Were there quite a few people involved in packaging?

2  A.   Yes.

3  Q.   Is there one in particular that had a prominent role?

4  A.   Yes.

5  Q.   And who is that?

6  A.   Aileen Storer.

7  Q.   So we'll come back to each of those folks.   You

8  mentioned Ms. Leahy, and since we have some of these sculpts

9  up on the stand, why don't we start there.   Where we left off

10  the last time you were here, when we were talking about

11  sculpting, I believe you had already given some testimony

12  regarding the gray casting that is standing in front of you

13  that's been marked as Exhibit 1136 A.

14          Do you recall that?

15  A.   Yes.

16  Q.   Do you recognize that as an early casting that Margaret

17  was working on in October of 2000?

18  A.   Yes.

19          THE COURT:   Excuse me, Counsel, one second.

20  Q.   BY MS. AGUIAR:   Were you aware that the jury's verdict

21  in Phase 1-A of this trial found that Mr. Bryant had created

22  that sculpt either solely or jointly with others?

23  A.   Yes.

24  Q.   Were you involved in the process of meeting about this

25  sculpt and commenting on it?

1  **A.**  Yes.

2           MR. PRICE:  Objection.  Irrelevant to this phase.

3           THE COURT:  It's foundation.  Overruled.

4  **Q.**  BY MS. AGUIAR:  Was this exhibit, 1136 A, something that

5  Mr. Bryant created solely on his own?

6           MR. PRICE:  Objection.  Irrelevant.

7           THE COURT:  Overruled.

8           THE WITNESS:  No.

9  **Q.**  BY MS. AGUIAR:  What's your basis for saying that?

10 **A.**  Because there were so many people who contributed to the

11 development of this sculpt.  I personally was involved.  I

12 had many comments and revisions.  You know, even Veronica

13 Marlow had her comments.  There were certainly people who

14 inputted into the sculpt development.  Excuse me.  I also --

15 later in later developments, Mercedeh Ward --

16 **Q.**  But that was limited just to this sculpt?  You mentioned

17 yourself and Veronica Marlow.  Were there any other MGA --

18 either MGA employees or vendors who specifically were

19 involved in the creation of this 1136 A?

20 **A.**  Certainly Margaret as a vendor personally created,

21 influenced the development of the sculpt.

22           THE COURT:  Just to make this consistent with

23 earlier testimony, you're not using creation in a legal

24 sense; correct?

25           MS. AGUIAR:  That's correct, your Honor.  Gave

```
 1   comments for how I was using it.
 2   Q.   So did you understand, when I said create, that had
 3   input into bringing this into being?
 4   A.   That's correct, yes.
 5   Q.   Who had ultimate control over whether this was the
 6   sculpt that was approved or that you moved forward on?
 7   A.   Me.
 8   Q.   And again, what's your basis for saying?
 9   A.   Well, it was my responsibility to ultimately make a
10   manufactured doll, a doll that I would be accountable for,
11   you know, for its hopeful success.  So absolutely if I had a
12   decision to make or if I was uncomfortable about a decision
13   that may have been suggested by others, I would feel very
14   comfortable, and I would overrule those decisions.
15   Q.   So let's move past 1136 and move past it in time.  Do
16   you recall a meeting at MGA around October 25th to review a
17   new sculpt?
18   A.   Yes, I do.
19   Q.   And do you recall who attended that meeting?
20   A.   I attended, Carter Bryant, Margaret Leahy, Veronica
21   Marlow was present, Mercedeh Ward.
22   Q.   And we've heard the name Mercedeh Ward.  Can you tell us
23   very briefly what -- who was Mercedeh Ward?
24   A.   Mercedeh Ward was an MGA employee.  She was hired to be
25   responsible and accountable for development and sort of the
```

1   counterpart in L.A. with Hong Kong for manufacturing.

2   Q.   Did Ms. Ward suggest some engineering or some structural

3   changes to the doll?

4   A.   Yes.

5   Q.   Do engineering changes and structural changes impact the

6   look and the aesthetic of the doll?

7   A.   Yes, they very much can.

8   Q.   If you take a look at one of the bags that's in front of

9   you there, and we have the little bodies in the bags.  One is

10  marked 1141.

11          Do you see that?

12  A.   Yes.

13  Q.   Okay.  And if you could take that out and tell me

14  whether you recognize it?

15  A.   Yes, I recognize it.

16  Q.   What is it?

17  A.   This is the -- a cast of the sculpt that Margaret

18  presented in the October 25th meeting.

19  Q.   Was this the next sculpt after 1136 A?

20  A.   Yes.

21  Q.   At this October 25th meeting, where you were looking at

22  this new sculpt, did you have Carter Bryant's drawings with

23  you there at the meeting?

24  A.   No.

25  Q.   Do you recall providing any comments at the October 25th

```
 1   meeting on the sculpt that's there in front of you?

 2   A.   Yes, I do.

 3   Q.   Let me ask you to look at --

 4             And, your Honor, this is in evidence.  It's trial

 5   Exhibit 1137-18.

 6             THE COURT:  You may proceed.

 7   Q.   BY MS. AGUIAR:  And I believe there should be a copy of

 8   it in your binder, Ms. Garcia, if you'd like to look at a

 9   hard copy.  And probably better for you to look at it in hard

10   copy because the one on the screen is extremely difficult to

11   read.

12             Do you recognize this?

13   A.   Yes, I do.

14   Q.   And whose handwriting do you recognize it to be?

15   A.   I recognize it to be Margaret Leahy's handwriting.

16   Q.   In this list of changes here that were indicated at the

17   October 25th meeting, do you recognize any of them as being

18   one specifically made by you?

19   A.   Yes.

20   Q.   And which ones are those that you recognize as being

21   comments that you suggested?

22             MR. PRICE:  Your Honor, objection.  It's irrelevant

23   to issues in this phase.

24             THE COURT:  I'm going to stop the trial for right

25   now and take a lunch break.  I'll see the jury back here at
```

 1   1:15.   We'll take this up outside the presence of the jury.

 2            **(WHEREUPON THE JURY WITHDRAWS.)**

 3            THE COURT:   Please be seated.   You may step down,

 4   Ms. Garcia.

 5            All right, Counsel, let me hear you on this.

 6            MS. AGUIAR:   May I actually understand the basis

 7   for the objection?   Because my understanding --

 8            THE COURT:   The basis is that it's not relevant,

 9   that this whole area of collaborative work essentially is not

10   relevant to this phase or to any issue before the court or

11   before the jury.

12            MS. AGUIAR:   I was moving on to a different point,

13   your Honor, which is that on this particular sculpt,

14   Ms. Garcia gave specific comments.   So there were changes

15   made.   I mean, this is testimony that's in evidence.

16   Margaret Leahy testified about these changes.   This is where

17   the change came from.   Ms. Garcia actually wanted these

18   changes made and suggested them to Ms. Leahy.   So it actually

19   doesn't go to collaboration, your Honor.   It goes to what you

20   have said we can get into, which is what changes were made.

21            THE COURT:   Let's back up for a moment and talk

22   about this collaboration evidence.   Is there going to be any

23   more of this evidence?

24            MS. AGUIAR:   Let me think about that for a moment.

25   I don't believe so.   I was just trying to think in my head

 1  who was at these meetings and whether or not they were going

 2  to be testifying.  I believe the answer is that there would

 3  not be other witnesses that would address this.

 4              THE COURT:  Very well.  All right.

 5              MS. AGUIAR:  But I do think I've moved on here

 6  specifically to talk about the changes in the sculpt rather

 7  than this going to a collaboration point.  And Ms. Garcia

 8  will testify that some of the specific -- she recognized some

 9  of these as comments that she made and changes that she

10  wanted made in the aesthetic look of the sculpt.

11              THE COURT:  Very well.

12              MR. ZELLER:  I think the Court knows, from looking

13  at the brief that we filed on the joint authorship issue,

14  that she's going right down the factors.  Control was a

15  question asked.  Who had control of this.

16              She's trying to parse the comments.  What's

17  relevant to be the changes that were well outside the scope

18  of this.  And as the Court knows, number one, this was

19  something that could have, should have been and must have

20  been raised in 1-A if they were going to make this assertion.

21  And in addition, it was not in the final pretrial conference

22  order.  So all of this is waived.

23              And it also just fails as a matter of law.  Now,

24  truth be told, I'm half tempted, your Honor, to simply ask

25  for a jury instruction, submit it to the jury with an

```
 1  instruction that says --

 2          THE COURT:  I think that might be the best -- the

 3  joint authorship issue is what you're talking about.

 4          MR. ZELLER:  With an instruction, your Honor, that

 5  makes it very clear that if they acted illegally in producing

 6  this sculpt, that it cannot be a work of joint authorship.  I

 7  mean, it is obviously -- there's only one result, and in

 8  fact, no other result could even survive a JMOL, given the

 9  findings already made in Phase 1-A about their illegal

10  conduct.

11          So, I mean, I know I'm not there yet, your Honor,

12  but honestly, that she has asked now a series of questions,

13  both now of Ms. Garcia as well as previously the questions

14  that were asked of Ms. Leahy that really just transparently

15  go only to joint authorship and this theory that they want to

16  espouse.  We've objected at every stage of this.  It was not

17  raised, hasn't been properly preserved.

18          And, you know, if the Court is going to entertain

19  relitigating additional ownership issues, then there are

20  probably some things that they are now saying that frankly we

21  would potentially want to put on the table and say that the

22  jury ought to determine whether Mattel owns those as well,

23  given the time period, given some of the differences we're

24  hearing between 1-A and 1-B.

25          THE COURT:  Let me ask you, are you seeking joint
```

```
 1   authorship?  I need a definitive answer to that.  Because
 2   there are a host of legal issues, including a very incomplete
 3   treatment of derivative law in MGA's brief, that need to be
 4   picked up if this is the route that we're going on.
 5            MS. AGUIAR:  And in terms of arguing that brief, if
 6   you'd like to do that now, Mr. Hansen is --
 7            THE COURT:  The first question is the question I
 8   have pending.  I want that question answered.  Are you
 9   seeking joint authorship of the works in question?
10            MS. AGUIAR:  I believe the answer is yes, and let
11   me explain where that comes from, which is that in the first
12   phase, I'm kind of -- I was kind of amazed by the brief that
13   Mattel filed because they said that Phase 1 established their
14   copyright ownership of that sculpt.  And I was really
15   surprised when I read that in their brief.
16            THE COURT:  I disagree with that assessment.
17   Obviously, copyright infringement issues were reserved
18   expressly for Phase 1-B.  Everybody knows that.
19            MS. AGUIAR:  Right.  So when they said that their
20   ownership of that sculpt had been established, we think
21   that's wrong.  We think that the jury verdict --
22            THE COURT:  Well, the issue -- and this is a
23   surprise to this Court in the sense that joint authorship
24   never saw the light of day that I can recall in summary
25   judgment practice.  This never saw the light of day in the
```

1    pretrial conference order. This is an entirely new one to
2    the Court. This takes me entirely aback.

3        There's a whole host of legal issues that we now
4    need to brief on joint authorship. I need to reconsider the
5    undisputed evidence. I think this certainly brings up a
6    number of the issues that Mr. Zeller just made allusion to.
7    But this really is a change in direction from just -- just
8    the Court was not prepared for it. The last thing I thought
9    you were going to be seeking is joint authorship based on the
10   facts of this case.

11       I've heard apportionment over and over again on
12   damages, and the focus has been on the damages and all of
13   that. And that was what came up with Mr. Nolan at sidebar
14   repeatedly throughout Phase 1-A. Not once did I hear -- we
15   can check the transcript. I'm sure someone did do it, if the
16   phrase joint authorship or joint author was ever used at any
17   point in time up until the last couple days.

18       MS. AGUIAR: And I think that this is largely a
19   function of the verdict form and the jury's verdict. The
20   verdict form merely establishes that he created it either by
21   himself or jointly with other people at a certain time. So
22   because we don't know whether the jury found for any
23   particular item whether he created it by himself, solely, or
24   whether he created it jointly, we don't have the question
25   established of the owner --

```
 1            THE COURT:  Yes, because it wasn't in dispute.
 2   Nobody in this courtroom thought that somehow anybody at MGA,
 3   from Mr. Larian on down, had any thought about Bratz or the
 4   Bratz drawings prior to Carter Bryant doing all of the Bratz
 5   drawings and bringing them to MGA; correct?
 6            MS. AGUIAR:  That's correct, but let's talk about
 7   the specific example that we're dealing with here.  We're
 8   dealing with a sculpt that was created and -- that's a loaded
 9   word.  A sculpt that was made by Margaret Leahy.
10            THE COURT:  Yes.
11            MS. AGUIAR:  So I have to say that --
12            THE COURT:  But there's no question that it was
13   made as a result of someone saying these drawings look great.
14   Namely, Paula Garcia saying these drawings look great.  Here,
15   make a sculpt.  They were trying to make a doll to reflect
16   the drawings; correct?
17            MS. AGUIAR:  They were trying to make a doll, and
18   they were trying to figure out whether -- and this sort of
19   goes to some of the evidence that's going to come out in this
20   phase, whether making a doll that looked just like those
21   drawings would make any sense.  Whether it would sell.
22   Whether it would be appropriate.  And so actually, I disagree
23   that the ultimate goal was to make a doll that looked exactly
24   like the drawings.  That's Mattel's argument, and I
25   understand that.  But --
```

```
 1              THE COURT:  Can you point to this argument being
 2   raised before the Court any time prior to this last few days?
 3              MS. AGUIAR:  We have always argued, your Honor,
 4   that we didn't copy those drawings, that we designed away
 5   from them.
 6              THE COURT:  Counsel, please answer my question.
 7              MS. AGUIAR:  I'm sorry.  I thought I was.
 8              THE COURT:  Joint authorship.  We all know the
 9   phrase joint authorship.  We're all familiar with copyright
10   law.  That has joint authorship been proffered as a defense
11   or argument at any point in time prior to the last few days?
12              MS. AGUIAR:  I think it was addressed in the jury
13   instructions.  I want to turn it over to Mr. Hansen because
14   we really are getting into arguing the motion, and I don't
15   want to step outside the bounds of where --
16              THE COURT:  Where in the jury instructions do we
17   mention joint authorship?
18              MR. HANSEN:  Your Honor, it's in our jury
19   instructions that were filed immediately following the 1-A
20   trial.
21              THE COURT:  Okay.  So prior to this point, though,
22   in the pretrial conference order, prior to trial, during
23   summary judgment, and during the entirety of Phase 1-A,
24   there's no mention of joint authorship; correct?
25              MR. HANSEN:  That's correct.  The sculpt that's at
```

1    issue, the blue sculpt, was not in the prior pretrial

2    conference order either.  So the issue only came up as a

3    result of the 1-A verdict.  It's not in the final pretrial

4    conference order.  So as a result of the verdict, once the

5    jury determined that, that raised the issue of joint

6    authorship, which was fully briefed in our papers.

7            THE COURT:  It's not fully briefed in your papers

8    because your papers on derivative works, you stop short of

9    the bottom line.  You indicate, correctly so, that a

10   derivative work, that the owner of the copyright or the

11   originator of the copyright cannot claim a copyright in that

12   work.  However, and this is the however that's missing in

13   that -- in your analysis on the derivative work, they still

14   can control those derivative works.  They still have the

15   right to control those derivative works.  That's the part you

16   leave out in your analysis.

17           MR. HANSEN:  I'm not sure what you're saying, your

18   Honor.  They don't have the right to own it, and therefore,

19   they would not have a right to sue based on it.

20           THE COURT:  But they have a right to control it.

21           MR. HANSEN:  I'm not sure what you mean by control.

22           THE COURT:  Why don't I provide you Patry.  Patry

23   does a much better job of explaining it --

24           MR. HANSEN:  We do cite to Patry in our brief.

25           THE COURT:  I know, but you pick and choose what

1    you cite. And that's my concern.

2           MR. HANSEN: I tried to cite to the parts that I

3    thought were relevant. I'd be happy to look at it.

4           THE COURT: I respectfully think that you omitted a

5    very important part of the citations to which you made,

6    Counsel.

7           MR. HANSEN: I apologize if that's true. I'd be

8    happy to look at it.

9           THE COURT: Please do. Let's regroup at -- well,

10   let me hear from Mr. Zeller.

11          MR. ZELLER: Because some of the factual issues

12   that were raised, if I could just maybe put this before the

13   Court and not so much argue it, but just some of the factual

14   statements that were made in 1-A about the relationship

15   between the drawings, which there could not even remotely be

16   an argument that those are jointly controlled or owned or

17   have any joint authorship. And the sculpt, 1136 that's now

18   at issue.

19          Paula Garcia testified in 1-A, and this is page

20   612, lines 6 through 20, out in this range: "So being that

21   those drawings don't belong to MGA, but interested in proving

22   out this 3D version of his sketches, I asked Margaret Leahy

23   to sculpt a rendition of his portfolio sketches."

24          There are very similar statements making it clear

25   that at best what was done was a derivative work.

1        Another place, page 792 of the transcript through
2  793:  "So one of the explorations was to prove out his
3  sketches into a 3D form with Margaret."

4        This is Bryant's testimony from Phase 1-A, pages
5  2747, lines 8 through 20 and thereabouts:  "But when you gave
6  her feedback, you were doing that to try to capture the look
7  that you had created; right?  That's the reason you gave her
8  feedback."  Obviously, talking about the feedback to Margaret
9  Leahy about the sculpt.

10        "Answer:  Well, yeah, I think so."

11        Now, one reason why this is important, your Honor,
12  and this is something that I think is very critical to the
13  derivative analysis.  Not only, of course, the issue that's
14  in the papers in terms of -- because the issue is not -- the
15  issue isn't their ownership.  The issue isn't our ownership,
16  I should say.

17        The issue is whether they can claim some sort of
18  joint authorship, and we think the cases preclude that, but
19  also the Court will recall we looked at the ERG case
20  recently.  The Court found very significant that the idea of
21  ERG could somehow have additional rights in the 3D costumes
22  it created, found very troubling because it meant that this
23  licensee basically would be permitted to stop or interfere
24  with the owner's ability to have others create three
25  dimensional costumes.

1          This is a very similar situation.  If MGA is

2    somehow allowed, and I actually think that there's no

3    authority to support this idea that having induced Carter

4    Bryant to secretly work on this project and to work on

5    preparing a derivative work, that somehow that could give

6    rise to any rights that MGA has, I --

7          THE COURT:  Patry makes it clear.  Certainly the

8    infringer does not have copyright in the work.  Neither does

9    the owner.  It's a derivative work, but they have control

10   over it.  And they have a right to preclude that use.  And

11   that's what Patry goes on to explain.

12         MR. ZELLER:  And there are some technical reasons I

13   would disagree with all of the analyses he makes, but the

14   bottom line is it renders all of this irrelevant.  They

15   cannot assert ownership.  Whether it means that there are no

16   rights in the sculpt, whether both Mattel and MGA, or whether

17   it means that Mattel still has rights in the sculpt but MGA

18   doesn't, the result is the same.  This is irrelevant.

19         THE COURT:  I see how all of this goes to the

20   ownership, the injunctive issues that the Court is going to

21   have to ultimately address.  I think Ms. Aguiar's response

22   would be that at least it goes to damages.

23         MR. ZELLER:  I don't think it goes to damages.

24   What one could potentially argue is that if no one had any

25   rights in that sculpt, that there would be no infringement

1    claim.  That would be the upshot of it.  Now, frankly, the
2    argument, the counter to this notion that somehow --

3                THE COURT:  Why doesn't it also diminish the amount
4    of damages, to the extent that damages can be attributed to
5    the noninfringing elements?

6                MR. ZELLER:  Well, you see, your Honor, I think
7    that gets us back into exactly the kind of quandary that ERG
8    says really you can't have happen, which is that somehow our
9    rights would be interfered with.  The upshot of their
10   argument is fine, Mattel has rights in the drawings, but
11   because we, MGA, procured an unauthorized derivative, we're
12   now able to cut off some aspect of Mattel's rights.  That
13   just cannot be the case.  And that's, I think, exactly the
14   kind of concern --

15               THE COURT:  That's what I circled back to Patry's
16   analysis.  That even the copyright holder has the right to
17   control the work, and obviously Mattel, in controlling that
18   work, would be affording MGA that right to make those -- use
19   it in that derivative fashion.

20               MR. ZELLER:  And what I would say --

21               THE COURT:  And, Mr. Hansen, I'll invite you, but
22   there's nothing in your brief in which you dispute that these
23   are derivative.  You don't even make an attempt to do that.
24   Is that a concession, or do you want to argue that further?
25               MR. HANSEN:  We, in fact, argued in the first part

1  that we owned the copyright.  The very first section is based

2  on the standard for being an author under the copyright law.

3  It's our view that we actually own the copyright.  We're not

4  conceding --

5            THE COURT:  I understand that.

6            MR. HANSEN:  I think the whole derivative work

7  thing is a red herring, because just the mere fact that it

8  may have started somewhere with her looking at the drawings,

9  it's only a derivative work if it infringes.  This is the

10  problem with the derivative work in this entire case.  A

11  derivative work isn't something that's just based on

12  something.  A derivative work is something that actually

13  infringes something else.  So we're not conceding the

14  infringement issue or derivative work at any stage.

15            THE COURT:  That's all linked to your argument on

16  joint authorship.

17            MR. HANSEN:  In this brief it is, yes.  And we have

18  the issue of derivative work in the jury instructions.

19  Derivative work is not a shorthand for infringement.

20  Derivative work is --

21            THE COURT:  I understand it's not a shorthand for

22  it.

23            MR. HANSEN:  I know you do.  Yes.

24            THE COURT:  But it's not the end of the analysis,

25  though, either.  I just want to get through this period of

1  the evidence.  When I say that, I mean there's certainly

2  serious issues.  This jury is going to be instructed

3  intensively on what they can and cannot find as a matter of

4  copyright law.  I just want to get through this evidence, and

5  I don't want to have evidence on the one hand that doesn't

6  come in, that MGA needs properly for its argument on damages

7  or copyright infringement.

8         On the other hand, I do not want to unduly confuse

9  a jury that's going to have a complicated task before it in

10 any event.  And that's what I'm trying to strike here.

11        MR. HANSEN:  And all we were trying to get at is to

12 the extent the blue sculpt is going to be used as a work that

13 is now being claimed as a basis for infringement, that's the

14 issue that we have, and the blue sculpt is not one of the

15 works that is part of the final pretrial conference order.

16 It is not -- I don't know whether --

17        THE COURT:  I do need you, Mr. Zeller, to address

18 that.  Because that's a point Mr. Hansen has raised several

19 times now, and it does somewhat rebut this concern the Court

20 has about the new nature of the argument.  Their authorship

21 is focused on the sculpt, and the sculpt itself was not part

22 of the pretrial conference order.

23        MR. ZELLER:  Well, I guess I mean they are the

24 proponents of this joint authorship issue.  I think they are

25 somewhat conflating the issues.  The way I view it -- and by

1  the way, I can cite --

2       THE COURT:  They are not claiming joint authorship

3  on any of the drawings that were at issue in Phase 1-A.  If

4  they were doing that, I would find that even more

5  disconcerting.  This joint authorship issue has arisen in the

6  context of this sculpt which Mattel convinced the Court to

7  include on the jury form, the jury verdict form, but that was

8  not part of the pretrial conference order.  The jury has made

9  the finding, it is a joint or solely created finding.  I

10  guess I am persuaded to a certain extent by the argument that

11  that has invited now the joint authorship analysis, which you

12  may be correct, that ultimately it needs to be instructed to

13  the jury on.

14       But my only question now is to how to navigate the

15  waters in terms of allowing sufficient evidence in that's

16  relevant to the issue.  An issue that's properly going to be

17  before the jury.

18       MR. ZELLER:  First of all, we don't agree that's

19  properly in front of the jury.  The real danger, of course,

20  in having to instruct them on all of this is that, of course,

21  it complicates things.  It may cause confusion.  It's going

22  to open up new areas of testimony in this case.  And I don't

23  agree that somehow, because the sculpt was not in the final

24  pretrial conference order, I actually think it was, but even

25  assuming it's not, I have to go back and look.  I don't

1   recall that part.

2           THE COURT:  I seem to remember the argument being

3   made.  Someone is going to have to take a look here during

4   the lunch break.  I trust Mr. Hansen, you'll correct the

5   Court's misimpression if the sculpt was part of the pretrial

6   conference order.

7           MR. HANSEN:  If it was, we'll correct it.  I

8   believe it's not, but we'll look.

9           MR. ZELLER:  I believe the Court was recalling that

10  the sculpt drawing, that we put a reference to a copyright

11  registration in for.  In fact, when we're talking about this,

12  I am fairly confident, and I'll find it, that we actually

13  said, in the final pretrial conference order, that it was all

14  the sculpts, all the drawings, any other matter, including

15  the name that Carter Bryant created while he was employed by

16  Mattel.

17          But I guess even apart from that, your Honor, I

18  guess I sort of view it this way.  I mean 1136 was on the

19  verdict form.  Clearly ownership, ownership was Phase 1-A.

20  And that's actually in the Court's phasing order.  To the

21  extent that they had --

22          THE COURT:  Ownership under the contract.  You're

23  correct.

24          MR. ZELLER:  And to the --

25          THE COURT:  Not necessarily ownership of copyright

1    rights.  Those are two different things.  That's not going to

2    be determined until the Court makes a decision on copyright.

3    That's actually phase 3.  That's beyond the trial.

4           MR. ZELLER:  Finally, if they had an issue and

5    thought that somehow going into the infringement phase, that

6    the ownership of that sculpt could somehow reside, whether in

7    part or in whole on MGA, I think that was the time for them

8    to raise it.

9           When it was on the verdict form, Exhibit 1136,

10   regardless of what happened with the final pretrial

11   conference order, the fact is once it was on there, it

12   conforms to proof.  It's Rule 15, I think it is.  But it's

13   the one that conforms to proof, and it's gone.

14          THE COURT:  All right.  Putting aside your waiver

15   argument, substantively, Counsel.

16          MR. ZELLER:  Sure.  What I would say is this, your

17   Honor.  And this is the further step, and this is really the

18   response to, I think, the next step in the analysis here.

19   Which is MGA tries to posit that because of their illegal

20   conduct, somehow that means that all the rights in the sculpt

21   were destroyed under derivative works law.

22          But, of course, and I'll set aside Patry for a

23   moment.  But the cases, of course, are involving a situation

24   where it was one person who created the unauthorized

25   derivative.  So, of course, when the Court speaks of there

1  being no rights in the derivative work, that the party

2  preparing it could avert cert, well, that's because they

3  didn't have a situation where there were joint authorship

4  claims being asserted.

5           So they weren't confronted with the situation of

6  where you had kind of a mixed situation here, which is Carter

7  Bryant -- I mean, obviously there's no dispute that if Carter

8  Bryant had by himself mechanically done all of the sculpting,

9  that that would fall within the scope of his contract.  It

10  would be solely owned by Mattel.  Exactly like the drawings.

11          So the issue here is whether or not the fact that

12  there was another party that was interjected into this,

13  Leahy/MGA, and then making a contribution to what was Carter

14  Bryant's work, even assuming that it's the joint authorship

15  situation, that somehow that destroyed Carter Bryant's

16  contributions.  And that, I don't think, is borne out by the

17  cases.

18          I think that the Patry analysis takes it a little

19  too far or overlooked one counter to this, which is that my

20  view would be that in the event that MGA did acquire any

21  rights to that sculpt as a result of some transfer by

22  Margaret Leahy, those rights were held in constructive trust,

23  and they should be ordered back as an equitable remedy to

24  Mattel.

25          THE COURT:  And that's something that we can cross,

1   Counsel, when we get to equitable remedies.  I'm not saying I

2   agree or disagree at this point.  My question is how could

3   the Court be in a position right now to preclude evidence of

4   joint authorship altogether?

5            MR. ZELLER:  Because I think fundamentally joint

6   authorship, on the substance of it, regardless of how you

7   carve it up, is irrelevant.  It is completely irrelevant.

8            THE COURT:  Even if the jury were to find joint

9   authorship at the end of the day, you're saying the Court

10  should award those rights back to Mattel.  But isn't that

11  putting the cart before the horse?

12           MR. ZELLER:  I don't think so, your Honor, because

13  the situation has been created here, because --

14           THE COURT:  You're asking me basically to rule on

15  it right now.

16           MR. ZELLER:  Well, it may have to to the extent

17  that MGA is going to argue that they could not have infringed

18  that sculpt because of their so-called joint authorship

19  issues.  Because what they are going to try and argue, I

20  think, at the end of the day, is that well, if the -- and I

21  think it is kind of the point they are trying to make in the

22  brief or are making in the brief, which is that if it's an

23  unauthorized derivative, there are no rights in it

24  whatsoever, no copyright interest to adhere in this sculpt.

25           Therefore, Mattel could not obtain damages based on

1   the infringement of that sculpt. My response is well, no,
2   all those rights are owned by us in any event because they
3   are being held in constructive trust. So it takes us back to
4   the infringement point. In other words, is this a
5   copyrightable work in which we could obtain copyright
6   infringement damages for.

7        So I hear what the Court is saying. I think in the
8   normal situation, it would be putting the cart before the
9   horse to make that determination, but we can't go to the
10  jury, at least under MGA's argument on whether or not there
11  could even be infringement of this work, because they are
12  going to claim that it's jointly authored. But --

13       THE COURT: This would be an entirely different
14  situation if there was a cognizable argument for independent
15  authorship, it would be severed, but based on the jury
16  findings, it's basically impossible.

17       MR. ZELLER: That's right. So that's what creates
18  the issue. And from my perspective, because regardless of
19  whether you apply what I would say is the more narrow
20  consequences of there being this unauthorized derivative
21  contribution, we'll call it, whatever the case may be,
22  whether it destroys MGA's rights in that sculpt, alleged
23  rights in that sculpt, or whether it destroys both MGA's and
24  Mattel's, that still renders it irrelevant. That's where I
25  guess I'm thinking that this whole issue of joint authorship,

 1  you know, is not really one that ultimately gets determined
 2  by the jury in any event.

 3         But because if -- and I think the facts bear this
 4  out -- if -- well, actually let me start with this.  I mean,
 5  there is no argument that they had Mattel's permission to
 6  make this derivative.

 7         THE COURT:  That's understood.

 8         Mr. Hansen, why don't you respond to this last
 9  point, that even at the end of the day, if you establish
10  joint authorship, that it goes nowhere in light of the
11  fundamental basis for all of this work, namely, Carter
12  Bryant's drawings, which your client has repeatedly in
13  litigation affirmed and reaffirmed.

14         MR. HANSEN:  The basic response is that we have
15  discussed the Carter Bryant drawings as being the inspiration
16  for the things that followed, including the Bratz doll.
17  There are multiple carts before the horse here, your Honor,
18  and we need to start at the beginning.  The first part is we
19  don't actually believe that the jury verdict in Phase 1-A
20  precludes a finding of sole authorship in the copyright by
21  Ms. Leahy.

22         The first portion of our brief is directed to the
23  issues that need to be determined to decide who is an author
24  of this sculpt.  And the evidence that we've cited in our
25  brief as to copyright ownership, authorship itself, goes to

1   the issue that Mr. Bryant's general comments, here's my

2   drawings, go take and do your magic with them, and then

3   Ms. Leahy has testified that she put the drawings away.

4            She testified that as to other contributions that

5   Mr. Bryant may have made to the sculpt, they arise to the

6   level of essentially one comment during a meeting potentially

7   where he says to make the ankles thinner, and she rejects

8   that for construction purposes.

9            In terms of copyright law, we don't concede,

10   putting aside what exactly the Phase 1 means, we don't

11   concede copyright ownership, and that is the first part of

12   our brief.  The fact that Mr. Bryant may have given some

13   generalized instructions or even the fact that he may have

14   given her the drawings originally, if it's believed, which we

15   think there's no counterevidence that she put those in the

16   drawer and basically started on her own, we don't believe

17   that Mr. Bryant, then, would be an author under the Copyright

18   Act regardless of what the created verdict in Phase 1 means.

19   So that's the first cart.

20            Then the second one, then, is --

21            THE COURT:  How would you ever reconcile a

22   finding -- because essentially this ownership is not a joint

23   authorship on those facts that you are suggesting, that it

24   was an independent creation.

25            MR. HANSEN:  I'm suggesting that she's the sole

1    author.

2              THE COURT:    Therefore, independent creation.

3              MR. HANSEN:    That's correct.

4              THE COURT:    How can that be reconciled with a jury

5    verdict which found that the work in question, namely, the

6    sculpt, was jointly or solely created by Carter Bryant while

7    he was working at Mattel?

8              MR. HANSEN:    Because the creation aspect, the jury

9    could have credited that Mr. Bryant in fact met with

10   Ms. Leahy and gave suggestions as to the sculpts themselves.

11   They could have believed the evidence that she saw the

12   drawings.    We don't know to what extent they felt that

13   Mr. Bryant's contributions to the blue sculpt rows to the

14   level of authorship under the Copyright Act because it was

15   specifically determined in Phase 1 that ownership of

16   copyright would not be resolved and would be reserved for

17   this phase.

18             That's the gist of our argument.    And whether or

19   not they can control something is a different issue as to

20   whether or not they have authorship.    We think at a minimum

21   there is evidence that would suggest that -- on the sculpt,

22   Mr. Bryant essentially had --

23             THE COURT:    You're not making this argument with

24   respect to any of the drawings or anything else.    Just the

25   sculpt; correct?

1              MR. HANSEN:  We haven't yet --

2              THE COURT:  No, now is the time, Counsel.  Pretrial

3     conference was the time.  But now is the time.

4              MR. HANSEN:  We are.  Absolutely.

5              THE COURT:  Which ones?

6              MR. HANSEN:  As to the vendor drawings, the four

7     drawings that were made that were consistently put up as to

8     these slides, our argument is that the contributions -- if

9     you look at the evolution of those drawings, and the evidence

10    will come in, that the participation in terms of authorship

11    as to the copyrightable content of those drawings was

12    participated in by MGA employees or contractors and that at a

13    minimum, there's a colorable argument or a fact question

14    whether or not there is joint authorship.

15             THE COURT:  Are you arguing independent creation --

16    you just told me that you're arguing independent or creation

17    on the sculpt.  Are you arguing independent creation on the

18    four drawings?

19             MR. HANSEN:  It's actually just a shade more

20    complicated than independent creation because it could be

21    found to be -- in order for it to be a derivative work, it

22    has to be infringing.  So Mr. Zeller and Mattel, we

23    understand their arguments are always jumping to its

24    unauthorized derivative work.

25             The question is that we're suggesting that our

```
 1   contribution -- our contribution to the sculpt is essentially
 2   all of it.  As to these other drawings, it may be a more
 3   difficult question, what we believe our contribution as to
 4   the vendor drawings, the ones that are second over from the
 5   concept drawings in the slides that they show, are eligible
 6   for an argument of joint authorship.  The contribution would
 7   be by the MGA people in terms of authorship of those specific
 8   drawings.  We're not arguing as to sole authorship as to
 9   those, but joint authorship.  And that's one of the reasons
10   we submitted the instructions as soon as the verdict came in.
11             THE COURT:  Very good.  All right.  Well, I need to
12   think about these -- any others, Mr. Hansen?
13             MR. HANSEN:  Any others?
14             THE COURT:  That's it.  The four drawings and the
15   sculpt.
16             MR. HANSEN:  I believe so.  The only qualification
17   is that --
18             MR. NOLAN:  May I?
19             THE COURT:  Please.
20             MR. HANSEN:  The control drawing, the one that is
21   the issue that arose this morning as to whether or not it was
22   based on the sculpt or vice versa are to the extent that it's
23   based on the sculpt.  You know, if the sculpt is not
24   infringing and it's based on the sculpt, then actually it
25   would be an unauthorized derivative work of a work that MGA
```

1   owns.  So all of this stuff can get a little bit complicated,
2   but this is the only other one.

3              THE COURT:  It would be a -- wait a second.  You're
4   saying that might be --

5              MR. HANSEN:  Im sorry.  It would be authorized.

6              THE COURT:  Carter Bryant was working for Isaac
7   Larian at that time.

8              MR. HANSEN:  We would own the right -- I'm sorry.
9   I apologize.  We would own the copyrights and also the rights
10  to control it.

11             THE COURT:  All right.

12             MR. ZELLER:  I think the Court can appreciate how
13  truly extraordinary this argument is.  So MGA, as found by
14  the jury, illegally induces, aids, and abets Carter Bryant in
15  breaching his fiduciary duty to create, in transferring and
16  disclosing to it what is certainly a group, we will call it,
17  of completely undisputed drawings.  Solely owned by Mattel.

18             So then in secret, still unbeknownst to Mattel,
19  they have other people involved in the process.  And that
20  gives them ownership rights.  I mean, I would defy MGA to
21  cite a single case that even remotely suggests that that is
22  even plausible.  And the Court knows that it's not.  From
23  looking at the ERG case, a point that they have not responded
24  to.

25             Taken to its conclusion, in fact, as part of this

1    argument, it essentially means that they are able to cut off

2    Mattel's rights, its copyright rights, and its solely owned

3    works, undisputedly solely owned works by their own illegal

4    conduct in preparing or having participation in creation of

5    other works that would post those works.

6            That is just not what copyright law even remotely

7    contemplates. And it's -- that is a policy argument the

8    Ninth Circuit has made perfectly clear in these situations.

9            THE COURT: Separating what goes to the ultimate

10   issues of ownership from navigating the evidentiary issues in

11   terms of what this jury must hear in order to determine

12   copyright infringement and any damages related thereto, any

13   copyright infringement and any damages related thereto, what

14   do you suggest?

15           MR. ZELLER: Honestly, your Honor, I think -- I

16   just think it's not an issue at the end of the day. I don't

17   think it's anything that could be or should be instructed to

18   the jury. I don't think that there's any point in any of

19   this evidence coming in. If they want to talk about changes,

20   we have discussed that.

21           But now, of course, they are trying to shove

22   through that loophole this idea that they can talk about who

23   made the contribution. And, well, Paula, those were your

24   comments, weren't they. Whether you want to call it joint

25   authorship or however they try and pigeonhole this, it again

1    gets back to the point of causing jury confusion, attempting

2    to appeal to the sympathy of the jury that somehow there was

3    work that was done by MGA that ought to be credited beyond

4    what the law allows.  And there's dispute that their costs

5    are going to be deducted.

6            THE COURT:  But at the end of the day, if the jury

7    believes that these works are not substantially similar,

8    based on all of the changes and all of the differences that

9    are pointed out between the dolls and the doll products and

10   the doll packaging and whatever else and the Carter Bryant

11   drawings and the sculpt -- and that is an awkward aspect of

12   the whole thing -- but if they find that there is a

13   dissimilarity, there is not sufficient evidence to establish

14   substantial similarity, the jury finds for MGA.

15            And this evidence of who did the work, whether it

16   was five people or twenty people or one person really is of

17   no moment one way or the other.

18            On the other hand, if the jury does find

19   substantial similarity between the dolls, the products, the

20   accessories and the drawings, whether one person worked on

21   creating the infringement or a hundred people worked on

22   creating the infringement, whether it took them a day or

23   whether they had to really work hard and spend three or four

24   months, that is of no moment.

25            MR. ZELLER:  Right.

```
 1              THE COURT:  What's at issue here is a comparison of

 2    the undisputed -- at least from the jury's findings, the

 3    undisputed drawings and various items that Carter Bryant

 4    created while he was at Mattel with what was done at MGA.

 5              The joint ownership issue, though, the joint

 6    authorship issue does throw a wrinkle into this if I am not

 7    able to resolve it at this point as a matter of law.

 8              MR. ZELLER:  Well, I would have to think about

 9    that.  I mean, as to what suggestions I --

10              THE COURT:  As do I.

11              MR. ZELLER:  Because I just think that interjecting

12    this issue to belatedly, and what the Court just saw live,

13    real time, them asserting now ownership of new works, joint

14    authorship of new works, we're all hearing about this for the

15    very first time in the last week of trial.  I mean, whatever

16    the rules are, timeliness must provide, the time to have

17    raised that has passed.

18              MR. NOLAN:  Your Honor, very briefly, if I could

19    just close this out.  I just want to point out that in the

20    pretrial conference order, and I think this is where the

21    difficulty has arisen, is that we started this trial on the

22    basis of claims on specific copyrighted works.  The Phase 1-A

23    was defined as simply being -- not simply, I apologize, but a

24    definition of the timing of various drawings, some of which

25    were never copyrighted.  Only 16 of which were ever focused
```

1    and framed for us in the pretrial conference order.   The

2    sculpt, I have it here.

3              THE COURT:   It's not there.

4              MR. NOLAN:   It's not there.   Now, the difficulty

5    then arises if Mattel now, based on the verdict in 1-A, now

6    takes the timing question and wants to make the argument that

7    the blue sculpt, 1136, which was awarded to them, now forms

8    the basis of copyright material that they can base their

9    infringement claim on because that was never framed in the

10   case as one of the issues.

11             We only get into these issues now by in effect

12   affording credit to the jury's verdict, and I'm not in any

13   way disparaging the jury's verdict, but that's where the real

14   difficulty comes in.

15             And the last point I wanted to make, just in terms

16   of the confusion here, is that I've heard so many times about

17   what this jury has found and what we stole, your Honor, over

18   our objection, Mattel wanted a general verdict form with

19   respect to conversion.   And it just says is MGA liable to

20   Mattel for conversion.   Is Isaac Larian liable for

21   conversion.   Is MGA liable for conversion.

22             THE COURT:   Right.   And by that implicit is the

23   finding that all of the elements of conversion were met.

24             MR. NOLAN:   Yes.   But there is no definition of

25   what the item or proprietary or confidential information was

1   that was converted.  It is entirely conceivable, your Honor,

2   that the issue that -- we don't know what the jury found was

3   converted.

4       THE COURT:  That wouldn't have been cured by your

5   proposed instruction either.  Your specific Interrogatories

6   did not go down and list all of the hundreds of items either.

7   You wanted to break out the elements, not all of the

8   different items and have them make a specific finding.  You

9   did ask for a breakout of the elements.

10      MR. NOLAN:  I may be wrong on this, and I probably

11  was, but I did think early on that we suggested -- I may be

12  wrong on this.  That was Mr. Russell's point at some point in

13  time, that actually to have symmetry and to avoid this issue,

14  that there should be a specific breakout on --

15      THE COURT:  Water under the bridge, Counsel.

16      MR. NOLAN:  I understand, but regardless of whether

17  or not we characterized it as water under the bridge, I don't

18  think it's appropriate for Mattel to naturally conclude other

19  than the elements under the conversion of what items were

20  actually converted.

21      THE COURT:  Well, we have the same jury,

22  fortunately, and the jury knows what they found on.

23      MR. NOLAN:  Well, and I think that's really the

24  issue here.  You know, as you said, you wanted to wade

25  through this evidence.  I understand that.  And I think a lot

1  of it can be dealt with at the time of the charging

2  conference when we have a better understanding --

3       THE COURT:  I think so as well.  I still have to

4  get to that point.  And I don't have a settled barometer of

5  what comes in or what doesn't.  And this joint authorship

6  issue, which really has been sprung on the Court in the last

7  couple days, really throws a monkey wrench into that.  As I

8  say, this is the first I've been hearing on joint authorship.

9  I don't recall you in your opening statement referring to

10  joint authorship.

11       MR. NOLAN:  I don't believe I framed the issue that

12  way in 1136.

13       THE COURT:  I don't think so.  As a term of art,

14  that is a whole -- that's a whole separate ball of wax.  And

15  that's --

16       MR. NOLAN:  And I'm going back, and it's not in

17  terms of blaming anybody.  I'm just trying to put a stake in

18  this, and that is when 1136, which was not previously in the

19  pretrial conference order, was added to the verdict form,

20  that's when the issue became framed only if and when the jury

21  then made a decision as to the timing of it, and then the

22  effect of the timing finding is what triggers these other

23  discussions.  That's the point I was raising, your Honor.

24       THE COURT:  Just to interject a housekeeping

25  matter, I did receive a couple notes from the jury as to

 1   timing.  Juror number -- which one is it?  Basically Juror
 2   No. 2 requested that we meet on Wednesday, not Monday of next
 3   week related to her teaching.  Juror No. 6 indicated that he
 4   had a prepaid vacation starting August 19th, but he's willing
 5   to forego that for the sake of this case.

 6         So what I think we'll do is we will have those
 7   closing arguments on the 13th -- on the 20th, on Wednesday.
 8   And that will give us Thursday afternoon while Juror No. 1 is
 9   at his friend's funeral, to have the charging instruction,
10   and then we will have Monday the 18th and the 19th.
11   Actually, I'll be picking a jury in the criminal case, but
12   we'll have time on both days to work out the final
13   instructions.

14         This is certainly going to be something that we
15   want to get absolutely correct for both sides.  But it still
16   leaves me somewhat uncertain as to how to proceed with some
17   of this evidence that MGA is trying to get in.

18         I need a few moments to think about it myself and
19   do some reading.

20         Mr. Zeller, anything further?

21         MR. ZELLER:  One thing I would ask, your Honor, is
22   that the upshot of MGA's argument appears to be that there
23   are no rights in the Bratz dolls, that those have been
24   destroyed, which, if that is the case, then we really should
25   have an opportunity to have our damages expert get back up

1   there and testify as to what the value of that destruction

2   was.  This is something that, you know, is obviously very

3   serious.  I mean, I can only assume that part of it is a

4   strategy because they think it's going to damage Mattel

5   further.

6          I hate to say that, but that appears to be the

7   implication here.  Which is, well, Mattel acquired nothing

8   because we, MGA, destroyed them as part of our wrongful

9   conduct.

10         THE COURT:  This has a lot of implications, and

11  that's why I need to think some about this myself.

12         Anything further from MGA before I take a recess?

13         MR. HANSEN:  We disagree with that, but nothing

14  else.

15         THE COURT:  All right.  I'll take a recess.

16

17         (Recess taken at 12:40 P.M.)

18                - - - - -

19                **1:40 P.M.**

20         THE COURT:  Okay.  I apologize for the delay, but

21  this is obviously an issue that we need to get right.

22         Is there anything further from the parties?

23         MR. NOLAN:  Nothing further from MGA.

24         THE COURT:  Okay.  The defense, and it's clearly a

25  defense of joint authorship, is something which should have

1    been presented to this Court a long time before Phase 1-B.

2    My sense is that this is something which MGA has come up with

3    after the verdict in 1-A in the middle of trial.  It wasn't

4    presented in the opening statement.  It wasn't presented

5    certainly in Phase 1-A.  It was not presented at the pretrial

6    conference or in the pretrial conference order.  And it was

7    not presented in the motions for summary judgment and

8    responses thereto.

9         At no time that I can find anywhere in this case

10   has MGA taken the position that the sculpt in question or any

11   of the drawings, the four drawings in question, or anything

12   else was a product of joint authorship, let alone independent

13   creation.

14        To interject that issue now completely muddles and

15   muddies the Phase 1-B, and on waiver alone, I can't find any

16   basis to allow this in at this point.

17        Moreover, the jury's finding with respect to

18   conversion in particular, but as well as the other torts,

19   seem to completely vitiate any basis to argue joint ownership

20   at this point -- or joint authorship at this point.  But that

21   aside, this is -- this was clearly waived.

22        This is a -- not an appropriate time to be

23   asserting this defense.  At a minimum, the jury's verdict

24   found that Carter Bryant created solely, or at a minimum, he

25   created the sculpt in question jointly and various other

1  drawings jointly. There's certainly no basis for independent
2  creation. All of this is further belied by the position that
3  MGA has taken time and time and time again in other
4  litigation.

5       So the Court is going to preclude at this point, as
6  a matter of law, the introduction of the joint authorship
7  defense at this late stage in the trial.

8       What that leaves, of course, is apportionment.
9  What that leaves, of course, is testimony, as I've already
10 permitted in, concerning changes and differences and other
11 evidence that relates to how the dolls and accessories and
12 products are not similar to or are dissimilar to the drawings
13 and the sculpt that the jury has already found that Carter
14 Bryant created while he was working for Mattel.

15      And it is through that prism going forward that the
16 Court will evaluate the objections made.

17      Are there any objections concerning the Court's
18 order?

19      MR. ZELLER: No, your Honor.

20      MS. AGUIAR: I understand your ruling, your Honor.
21 I need to get some guidance on how it may impact some
22 questions that I ask Ms. Garcia. There are some drawings,
23 1107 through 1110, which are the retailer drawings, that
24 there is some debate. There had been some debate about when
25 they were done. I understand we discussed yesterday that the

1  jury found they were done in October. There was some

2  testimony that was played from Carter Bryant's deposition

3  that he did those drawings in November.

4         The different point that I want to get to, though,

5  is to explain why those drawings look different than the

6  pitch book drawings and why those drawings in some ways look

7  more similar to the dolls and elicit that testimony from

8  Ms. Garcia.

9         Because the jury has not heard any testimony

10  regarding why those were made and under what circumstances

11  they were made.

12         Well, actually, what I would suggest is that they

13  play the video deposition of Carter Bryant where he describes

14  that he made changes to the look of the dolls, the look of

15  the drawings, 1107 through 1110, and I think we should be

16  able to elicit testimony from Ms. Garcia on the same subject

17  that Mattel elicited from Carter Bryant through his video

18  deposition regarding why those changes --

19         THE COURT: Was that their designation or your

20  designation?

21         MS. AGUIAR: I believe it was a Mattel designation.

22         THE COURT: I think you may be mistaken, Counsel.

23         MS. AGUIAR: I'm sorry. You're saying it was our

24  counter?

25         THE COURT: I think it was.

1          MS. AGUIAR:  It generated, though, and I appreciate

2    that -- I'm sorry -- from a designation that they made when

3    they wanted to raise the issue of these drawings again.  So

4    by definition, if it was a counter, then they raised the

5    issue in what they played.

6          And if your Honor ruled that it was a valid counter

7    and should come in, then clearly the questions that preceded

8    that pertained to these drawings.

9          And so the jury now has evidence in front of it in

10   this phase from Mr. Bryant regarding those drawings, and I

11   think that we're entitled to have not just Mr. Bryant's

12   testimony on it, because obviously, I don't believe that

13   would be fair.  I think we have to have Ms. Garcia's

14   testimony, and I will proffer to your Honor that --

15         THE COURT:  Do you understand how awkward this is?

16   These are drawings that the jury has already said -- and

17   there was no limitations placed on the timing in this phase.

18   And I'll check that.  They found that these drawings were

19   done by Carter Bryant while he was at Mattel.  You want to

20   describe similarities between those and the allegedly

21   infringing work, which proves their case.

22         MS. AGUIAR:  No.  Differences between the pitch

23   book drawings and the retailer drawings.  And I believe that

24   given the testimony --

25         THE COURT:  But what you are characterizing as

 1  those and the retailer drawings, the jury has already found

 2  were done by Carter Bryant while he was at Mattel.

 3          MS. AGUIAR: Right, but in Mattel's case in chief,

 4  video testimony was played of Mr. Bryant where these precise

 5  drawings were discussed.

 6          THE COURT: I understand that. That doesn't

 7  address the issue. I don't care which side is trying to do

 8  it. I'm not going to allow anybody to submit evidence that

 9  is inconsistent at this point to unsettle, to render an

10  inconsistent jury verdict.

11          MS. AGUIAR: I understand that, your Honor. But

12  that evidence already came in.

13          THE COURT: Maybe it should be stricken, then. It

14  was your evidence. It was your counterdesignation.

15          MS. AGUIAR: I understand that, your Honor, but it

16  was a counter to a designation that Mattel had affirmatively

17  offered. We didn't offer the designation in a vacuum. It

18  was -- we had designated testimony that had followed some

19  testimony that Mattel had designated regarding these

20  drawings.

21          THE COURT: You're not addressing the Court's major

22  concern. So you're saying that they have opened the door to

23  basically unsettling the verdict in the first phase.

24          MS. AGUIAR: No. They have clearly opened the door

25  to discussing what these drawings are. And why is it that

1    these drawings -- I mean, I don't understand how it would be

2    inconsistent with the verdict to explain, okay, you found

3    when he made them. But I'm not trying to introduce evidence

4    from her as to when they were done except to just say okay,

5    were these the drawings that were done in connection with the

6    retailer meetings just to identify them. It's testimony

7    regarding the drawings themselves, why did they look the way

8    they look. How did they come about. Not timing.

9            THE COURT: All right. Let me hear from Mr. Zeller

10   and Mr. Price.

11           MR. PRICE: We presented deposition testimony of

12   Carter Bryant that these drawings looked like the dolls.

13   That's one of the issues in this case. The

14   counterdesignation was these drawings don't look like --

15   there are differences between these drawings and the earlier

16   drugs which were played over our objection, but we didn't

17   open the door to anything except whether these drawings

18   looked like MGA's products, which is the issue in this case.

19           THE COURT: Right. And you certainly agree,

20   though, that evidence to the contrary, that evidence that

21   they don't look like the products is admissible.

22           MR. PRICE: Absolutely. But evidence that these

23   drawings were created jointly as a result of comments from

24   Ms. Garcia and there was a reason why these drawings --

25           THE COURT: Ms. Aguiar just committed to the Court

1  that there will be no testimony and no evidence as to when

2  they were done.  I'll accept that.

3        MR. PRICE:  Well, it's not just when they were

4  done.  I don't see how Ms. Garcia can toe that line since her

5  testimony is linked with this being done after October 25th.

6  But whether or not how these drawings came into being are

7  irrelevant to the issue in this case, which is whether or not

8  the products infringe the drawings.  Because a jury --

9        THE COURT:  This goes back to the same issue that

10  we had that you objected to with respect to Ms. Leahy.  I

11  understand the why.  Why changes are made are not relevant

12  and it's a danger for confusing.  But how they came into

13  being, how the permutations came about, I can see some

14  relevance to that in terms of underscoring differences.

15        The bigger problem that I have right now is

16  differences between the doll and the drawings are relevant.

17  Differences between drawings and drawings, that's the

18  question that I could never get an answer to from Ms. Aguiar,

19  as to how that's relevant to anything.

20        MR. PRICE:  That's what she's talking about, is

21  having Ms. Garcia --

22        THE COURT:  I understand that.  That's why I need

23  an answer from someone at MGA or the defendants to explain

24  how the drawing-to-drawing testimony is relevant unless

25  there's this element that these drawings were outside, and

 1  they are not based on the jury's findings.  That's what I'm
 2  looking for.

 3          If Ms. Garcia wants to talk all afternoon about how
 4  these drawings are not similar or substantially similar to
 5  the dolls, she can have at it.

 6          MS. AGUIAR:  I understand, your Honor, but I have
 7  in front of me the designations that were played already to
 8  the jury.  And the questions about these drawings were
 9  whether the drawings were used to create the Bratz model that
10  was shown to the Hong Kong toy fair, and in creating them,
11  who made the drawings, and then we played the counters to
12  that.

13          So the jury saw all of that testimony.  And so to
14  not be able to have testimony on the same drawings and
15  commenting on the same drawings as to why they were even
16  made, and there's changes, obviously, in those drawings.  Why
17  are those drawings -- why do those drawings look different?

18          THE COURT:  Why is that relevant?

19          MS. AGUIAR:  It's relevant, and I keep coming back
20  to this, but I think it's an absolutely critical point.  It
21  goes to the state law claims.  It goes to whether our process
22  of creating the doll was done merely from the drawings.  And
23  to go back to the opening statement and to go back to
24  Mattel's questioning of our witnesses and their case in
25  chief, it's Mattel should not -- I'm sorry.  MGA --

1       THE COURT:  I'm with you on that, Ms. Aguiar,
2   whether the dolls were created from the drawings.

3       Again, what this is getting to, you're trying to
4   make drawing-to-drawing comparison, not drawing to doll.  I
5   will let you -- I will let Ms. Garcia go all afternoon on
6   drawing to doll.

7       MS. AGUIAR:  Right.  But what Mattel is saying is
8   that these retailer drawings are so much like the dolls.

9       THE COURT:  Right.

10      MS. AGUIAR:  But there's a reason why those
11  retailer drawings are closer to the dolls.  And we should be
12  able to offer testimony that the reason those retailer
13  drawings are closer to the dolls was because of input from
14  MGA, and that absolutely goes to the state law claims.  We're
15  not contesting timing.  And I understand your Honor's ruling
16  regarding joint authorship.

17      But this goes to whether our development of the
18  doll, how much of it related to Carter Bryant's drawings
19  versus how much of it related to our vision of what the doll
20  should look like, what the fashions should be like, what the
21  audience would be that it would appeal to, the look of the
22  doll in those drawings is different, and the reason the look
23  of the doll in those drawings is different is because they
24  were directed by Paula Garcia.  And they were directed by
25  Paula Garcia because she wanted a different look.

1           So that's my direct answer to your question.

2           THE COURT:   This gets back to the conflation of the

3  apportionment issue.   You are conflating apportionment of

4  damages with the---

5           We've identified the elements, Counsel.   Mr. Nolan

6  provided that list to the Court.   The dolls themselves are

7  inextricably intertwined with the protectable elements of

8  copyright.

9           MS. AGUIAR:   But the fashions in those drawings are

10  different than the --

11           THE COURT:   She can speak to the fashions

12  absolutely.

13           MS. AGUIAR:   In the retailer drawings.

14           THE COURT:   She can speak to -- where is that list?

15  Here it is.   Packaging, noncopyrighted accessories, which is

16  fashions, promotional materials, themes, and additional

17  characters.   That's the apportionment.

18           MS. AGUIAR:   Okay.   So she can speak, then, to the

19  fashions that are depicted in the retailer drawings and how

20  those came about and why they look the way they look.

21           I will make sure she restricts her comments and

22  testimony to that.

23           MR. ZELLER:   Your Honor, I hate to quarrel with

24  what the Court has said, but what they represented were

25  noncopyrighted fashions under this heading of accessories.

1   What she is going to be commenting on are Mattel's drawings.

2   There's no question that those are part of what the Court has

3   found to be within the scope of copyright and part of what is

4   pro --

5              THE COURT:  I just stated the second is

6   noncopyrightable accessories.  So if it's a drawing that was

7   done by Carter Bryant, I'm not interested -- Court's not

8   going to -- we're not going to have evidence of that.

9              Ms. Aguiar, if that's your impression, then you are

10  mistaken.  It was noncopyrightable accessories, the second

11  point, not copyrightable accessories.

12             MS. AGUIAR:  Right.  And you are saying fashions

13  are, as I understood it, you said --

14             THE COURT:  Fashions are dresses, clothes.  I've

15  already ruled twice now in orders that they are

16  copyrightable.  Remember the teddy bear case.  We've been

17  through this a couple times.

18             MS. AGUIAR:  I'm not quarreling.  I just want to

19  make sure that we're clear.

20             THE COURT:  I don't know what precise drawings

21  you're referring to right now.

22             MS. AGUIAR:  The drawings 1107 through 1110.

23             THE COURT:  Are those drawings that the jury has

24  found were created by Carter Bryant?

25             MS. AGUIAR:  Yes, those were part of the jury

1   verdict.  But what I'm saying, your Honor, is --

2              THE COURT:  The fashions are copyrightable, if they

3   are copyrightable, they are owned by Mattel at this point in

4   time -- not owned, because the Court hasn't made any findings

5   on that, but the jury has found they were created under the

6   terms of the inventions agreement.  I've already ruled on the

7   inventions agreement transferring ownership.  That is

8   Mattel's.

9              MS. AGUIAR:  Okay.  So even though fashions is one

10  of the elements of apportionment, you're saying --

11             THE COURT:  I have said it, and the record will

12  testify to this.  Noncopyrightable accessories, not

13  copyrightable.  Here on the table and up in the room you've

14  got a lot of noncopyrightable accessories.  A tent.  We had a

15  two-and-a-half-hour hearing on this, and I tried to explain

16  the types of things that are clearly copyrightable

17  accessories.  The tent, the blanket, or whatever.

18             Now there's an issue with respect to drawings that

19  appear on that.  And that's something that we'll need to

20  grapple with probably in instructions.

21             MS. AGUIAR:  But let me raise an issue, then, with

22  regard to the later generation dolls.  After 2001.  After

23  2001, the elements that we are relying on for apportionment

24  and every time they take a totally blank sculpt, this doll

25  right here, it has no hair, no face decoration, no clothes,

1    no accessories.  It's not in a package.  They start from

2    scratch.

3            So that, your Honor, goes absolutely directly to --

4    it goes to so many things.

5            THE COURT:  Well, they don't start from scratch.

6    And that's the whole point of Mattel's case, is that it's not

7    from scratch.  That actually there's a marked, substantial

8    similarity between how the doll comes out and the generation

9    before and before.  Whether that's true or not I don't know.

10   That's going to be for the jury to decide whether there's

11   substantial similarity in all of these permutations and

12   generations of dolls.

13           MS. AGUIAR:  Right.  But this sculpt and what they

14   start with each time.  This blank sculpt.

15           THE COURT:  I'm not saying that I'm disagreeing

16   with you.  But I'm not going to repeat myself.  They start

17   with that, but they also start with the last generation.

18   Dollwise, this is what they start with.  And the look of the

19   doll, arguably, does not differ a whole lot or substantially

20   from this look.

21           It's not like they start with that doll and say

22   willy-nilly now let's come up with something entirely new and

23   different every time.

24           MS. AGUIAR:  Well, they do start with this blank

25   doll, your Honor, and they do decide from scratch let's

1   decide what new doll this is going to be, what theme. And

2   this is evidence that we were planning to elicit. We start

3   with a theme. There was no theme in Carter Bryant's

4   drawings. Zero.

5           We start with a theme. They then develop the

6   fashions. The face paint. Every time there will be

7   testimony from a face painter and from Ms. Garcia that the

8   face decoration is different. And the jury will have to make

9   that determination.

10          But in order to show, your Honor, apportionment

11  factors and the fact that we do create -- I mean, I

12  understand that Mattel's -- their theory is that they are the

13  same doll.

14          THE COURT:  Or that they are substantially similar.

15          MS. AGUIAR:  They have actually -- Mr. Quinn almost

16  used those same words, same doll. But okay, that they are

17  substantially similar. The test is not whether the doll in

18  2006 is substantially similar to the doll from 2002. We all

19  know that's not the test. It's whether the doll from 2006

20  that's in the Winter Wonderland package is substantially

21  similar to the drawings.

22          THE COURT:  That's right.

23          MS. AGUIAR:  So we need to be able --

24          THE COURT:  And that's the question for the jury.

25          MS. AGUIAR:  Right. And so their theory is --

1          THE COURT:  And I'm not going to allow MGA to

2     confuse the jury that by somehow, because we're starting from

3     scratch in actually physically building the doll, that

4     somehow the similarities or dissimilarities, however the jury

5     may perceive them, are somehow irrelevant and the focus is

6     on, again, how you go about copying it as opposed to the end

7     product and whether or not it's a copy or not.

8          MS. AGUIAR:  But how is it not relevant when they

9     are asking for billions of dollars, for not just the first

10    generation doll, which we've talked a lot about, but for

11    every generation after that, for us to not be able to explain

12    that that doll that came out in 2005 called Rock Angels with

13    different face paint, different clothes, different

14    accessories, different packaging --

15         THE COURT:  Additional characters and themes are on

16    the list here, Counsel, of apportionment.  I agree with you

17    in part.

18         MS. AGUIAR:  I just think with regard to all of

19    those, we need -- Mattel has their story, and we have ours.

20         THE COURT:  And you have your story.

21    Unfortunately, both stories are shaped by legal findings that

22    the Court has made throughout.  And I understand you want to

23    go further than the Court's permitting you to go.  You've

24    made your record of that.  And you've preserved that for

25    appeal.

6923

```
 1           I've got to enforce a line here that I believe is
 2   required by the law.  And this list of five is not
 3   necessarily exhaustive.  There may be something else that you
 4   identify.  And that's what I'm going to be working with.  The
 5   dolls themselves, though, the dolls themselves, the question
 6   is simply one of substantial similarity.
 7           MS. AGUIAR:  Back to the drawings.
 8           THE COURT:  Yes.
 9           MS. AGUIAR:  Right.  And I just think for the state
10   law claims, if they are asking for that much money, we need
11   to be able to show that the profit we made in 2005 on the
12   Rock Angels doll was not due --
13           THE COURT:  To the Rock Angel theme.  You can do
14   that.
15           MS. AGUIAR:  So you're saying I can talk about the
16   Rock Angel theme --
17           THE COURT:  You can talk about these five things
18   here, yes.
19           MS. AGUIAR:  Okay.  And the accessories that are in
20   the package.
21           THE COURT:  The noncopyrightable accessories.
22           MS. AGUIAR:  Okay.
23           MR. ZELLER:  First, let me apologize.  Apparently I
24   wasn't quarreling with the Court.  I was quarreling with MGA,
25   I guess, as usual.  Because I think it is quite clear that
```

1   those drawings that they want Ms. Garcia to compare really is

2   for the purpose of eliciting her contribution, they will

3   argue, to those particular drawings.

4           THE COURT:  After hearing further argument, that

5   clearly appears to be the case.

6           MR. ZELLER:  And I don't know if it is water under

7   the bridge at this point, but I do have for the Court our

8   designations, and the testimony that MGA has argued opened up

9   the door.  And he simply testifies about creating that range

10  of drawings, 1107, I think it begins, through 1110, 1111, and

11  says he created them for Hong Kong toy fair and for use of

12  the models for Hong Kong toy fair.

13          So it's hard to see how that opened up the door to

14  the kind of comparison that MGA was arguing about.

15          THE COURT:  Are there any questions concerning how

16  we proceed?

17          All right.  Let's take a very brief recess, and

18  then we'll bring the jury in in about five minutes.

19          (Recess taken.)

20          **(WHEREUPON THE JURY ENTERS.)**

21          THE COURT:  Counsel, you may proceed.

22          MS. AGUIAR:  Thank you.

23  Q.  Ms. Garcia, we were talking about the sculpt that was

24  done and presented to MGA on October 25th.  I just want to

25  bring you back to where we were before lunch, and that is

1   Exhibit 1141.

2           Looking at that sculpt, will you tell me what

3   changes were made in that sculpt that you specifically

4   recall?

5   A.   I remember making some specific references to the Bratz

6   and making sure that the breasts appeared more natural. And

7   I also made comments to the ears. I felt that the ears

8   looked a little Dumbo-like.

9   Q.   I'm sorry?

10  A.   Dumbo-like. I'm sorry. My best reference. And so it

11  was just to actually make the ears more flush, closer to the

12  head, closer to more of a human-like relation in the ear.

13  And finally, as it relates to the feet, I thought it was sort

14  of strange, the overall size of the feet and the indentations

15  of toenails.

16          So we, you know, one of the comments that I made

17  was to actually make the feet more generic.

18  Q.   Can you -- I believe in that bag that you pulled 1141

19  out of, are there feet, like loose feet in the bag?

20  A.   Yes.

21  Q.   Can you show those to the jury and maybe just sort of

22  stick them onto the bottom of the leg so you can show us what

23  you mean?

24  A.   They actually won't fit into one another, but well, I

25  love the disproportion of the big head, big feet idea, I felt

1    that this foot was a little too extreme in terms of size,

2    overall size.  And especially length from toe to the back of

3    the heel.  But also just the toenails themselves almost

4    suggested something too specific and too realistic.  So those

5    were things they wanted to flesh out.

6    Q.   Sticking with the feet for a moment, are those feet on

7    the sculpt, 1141, the same as the feet in the final Bratz

8    sculpt?

9    A.   Definitely not.

10   Q.   And take the head, for example, that was part of 1141.

11   Is the head the same shape and the same size as the head on

12   the final Bratz sculpt?

13   A.   No.

14   Q.   And just closing out on 1141, if you look at one of the

15   arms, I don't know if they are attached to the body, but did

16   that sculpt have real hands at this point?

17   A.   No.   In fact, they were very, very roughed out, meaning

18   that there was not any sculpting specifics or definition in

19   the hands at this point.

20   Q.   Look in your binder, if you would, at tab 17317.   Are

21   you with me?

22   A.   Yeah.

23   Q.   Do you recognize that document?

24   A.   Yes, I do.

25   Q.   What is it?

1 **A.** This was an e-mail that I sent to my counterparts in

2 Hong Kong, MGA Hong Kong, as well as Mercedeh, where I detail

3 some comments on the Bratz sculpt.

4 MS. AGUIAR: Your Honor, I move 17317 into

5 evidence.

6 THE COURT: Any objection?

7 MR. PRICE: Object on relevance.

8 THE COURT: I'm sorry, Counsel. The exhibit again

9 is?

10 MS. AGUIAR: 17317.

11 THE COURT: -317?

12 MS. AGUIAR: 17317.

13 THE COURT: I'm sorry. Objection sustained.

14 **Q.** BY MS. AGUIAR: Was the sculpt 1141 that we've been

15 looking at being sent to Hong Kong for purposes of final

16 manufacture?

17 **A.** No.

18 **Q.** Why were you sending this sculpt to Hong Kong at this

19 point?

20 MR. PRICE: Objection. Relevance.

21 THE COURT: Sustained, Counsel.

22 **Q.** BY MS. AGUIAR: Did MGA continue to make changes to the

23 sculpt after October 25th?

24 **A.** Absolutely.

25 **Q.** If you would look in front of you, another one -- you

```
 1   can close up your binder if you want to create a little bit

 2   more space up there.

 3           If you look at Exhibit 1234, and that should be

 4   another one of the sculpts in a bag.

 5           Do you recognize this sculpt?

 6   A.   I do.

 7   Q.   Okay.  And what do you recognize it as, if you could

 8   sort of place it in time for us.

 9   A.   This represents the cast of the final wax that we

10   released from L.A. to Hong Kong.

11   Q.   And when you say final wax, does final wax mean final

12   sculpt?

13   A.   Yes.  However, I just want to make note that though it

14   was final sculpt when released out of L.A., there were still

15   some changes that were even made further to the sculpt in

16   Hong Kong.

17   Q.   Okay.  So after 1234, did the teams from MGA in the U.S.

18   and in Hong Kong continue to make changes to the sculpt?

19   A.   Yes.

20   Q.   Do you consider the changes that were made to 1234 to be

21   changes that were creative changes?

22           MR. PRICE:  Objection.  Irrelevant.

23           THE COURT:  Sustained.

24   Q.   BY MS. AGUIAR:  Do you consider them to be changes that

25   impacted the look of the doll?
```

```
 1  A.    Yes.

 2  Q.    Were they changes that impacted the way kids would play

 3  with the doll?

 4             MR. PRICE:  Objection.  Speculation.

 5             THE COURT:  Foundation, Counsel.

 6  Q.    BY MS. AGUIAR:  Do you have a sense of how children play

 7  with Bratz dolls?

 8  A.    Yes, I do.

 9  Q.    And what is that based on?

10             MR. PRICE:  Object as to time frame.  The question

11  of time.

12             THE COURT:  Clarify the time frame as part of your

13  foundation.

14             MS. AGUIAR:  Let me ask it a different way.

15  Q.    What was your intent in making the changes to the sculpt

16  that were made after October 25th?

17             MR. PRICE:  Object.  That's irrelevant.

18             THE COURT:  Her intent in making the changes is

19  irrelevant.  Sustained.

20  Q.    BY MS. AGUIAR:  Were the changes being made to impact

21  the way the doll -- were the changes made by MGA after

22  October 25th to the sculpt made in order for the doll to be

23  more salable?

24  A.    Yes.

25             MR. PRICE:  Object to relevance.
```

```
 1              THE COURT: I think that's not relevant.
 2   Sustained.
 3              MR. PRICE: Move to strike.
 4              THE COURT: It is stricken.
 5   Q.   BY MS. AGUIAR: Did MGA have to adjust the look of the
 6   sculpt in order to incorporate the changes that were made in
 7   Hong Kong after October 25th?
 8   A.   Yes.
 9   Q.   During the time these changes were being made in
10   November and December of 2000, at any point did you or anyone
11   else to your knowledge refer back to Mr. Bryant's drawings?
12   A.   No.
13   Q.   At any point when you were discussing those changes that
14   were happening in the U.S. and in Hong Kong in November and
15   December, did anyone ever say to your knowledge, or did you
16   ever say well, if we need to figure that out, let's go get
17   Mr. Bryant's drawings, and we'll look to see how we do it.
18   A.   No.
19   Q.   Why is that?
20   A.   To be honest with you, Carter Bryant's portfolio
21   drawings did not give any reference, especially at this point
22   in the sculpt, for our guidance, for our manufacturing.
23   Frankly, Carter Bryant's portfolio drawings referenced a
24   concept for us. But Carter Bryant's portfolio drawings were
25   not a reference that we used to develop or to generate the
```

```
 1   sculpt.

 2   Q.   I want to pass up to you Exhibit 18845.  Can you

 3   identify for us what you're looking at there?

 4   A.   This is a Bratz manufactured body.

 5   Q.   And I am wondering if Mr. Bryant's drawings referenced

 6   anything about how to make the doll's leg work, for example.

 7             MR. PRICE:  Objection.  Irrelevant.

 8             THE COURT:  Overruled.

 9             THE WITNESS:  No.

10             THE COURT:  Maybe you could rephrase your question,

11   Counsel.  Can you rephrase your question?  I think I know

12   where you're going with this in a relevant way.  So why don't

13   you rephrase.  I don't want to sustain it outright.  Just

14   rephrase it.

15   Q.   BY MS. AGUIAR:  Was there anything in Mr. Bryant's

16   drawings that specifically showed MGA how to make the doll's

17   leg?

18   A.   No.

19   Q.   If you rip off the side of that leg there of that doll,

20   which I did by the little surgery the other day with an

21   Exacto knife, and you could show the jury the side of the leg

22   there.  That specific design there, was there anything in

23   Mr. Bryant's drawings that MGA specifically looked at and

24   referred to in making that?

25             MR. PRICE:  That's irrelevant.
```

```
 1              THE COURT:   Sustained.

 2   Q.    BY MS. AGUIAR:   Did the movement of the doll's legs

 3   factor into how kids would play with the doll?

 4              MR. PRICE:   Speculation.

 5              THE COURT:   Sustained.   Speculation.

 6   Q.    BY MS. AGUIAR:   When you were deciding how to create the

 7   leg on the doll, did you have conversations regarding the

 8   interaction between how the leg was built and how the kids

 9   would play with the doll?

10   A.    Yes.

11   Q.    And what was your understanding as to why you were --

12   why MGA made the leg the way it did?

13              MR. PRICE:   Objection.   That's irrelevant.

14   Q.    BY MS. AGUIAR:   As it relates to a child playing with

15   the doll.

16              THE COURT:   Overruled.

17              THE WITNESS:   It's very, very important.   Our

18   consumer is 7 to 10.   Our consumer is -- is considered to be

19   quite a savvy consumer even though they are little girls.   As

20   a 7- to 10-year-old little girl, you have to be able to

21   manipulate your fashion doll.   You have to be able to pose it

22   and stance it in a cool attitude.   Because that's what 7- to

23   10-year-old girls do with fashion dolls, especially Bratz.

24              It's also -- so if you were to play with a rock

25   star Bratz fashion doll, it would be important that you would
```

 1  be able to move or bend the legs in a rock star position so

 2  that you could represent what an attitude of a rock star to

 3  look like.  But further, it's very important to be functional

 4  as well, meaning that you had to allow for the girl to be

 5  comfortable with dressing and undressing the fashions.

 6          Our fashions were meant to be tight and fitted,

 7  which isn't because they are 7 to 10 year olds and the

 8  fashions had to look impeccable.  The truth with that is that

 9  if they are tight-fitted, sometimes it's hard to get on and

10  off.  So you needed to be able to move and bend the legs to

11  wiggle and try and jiggle the fashions off, if you will.

12          MS. AGUIAR:  Okay.  Thank you.

13  Q.    Let's move to the final Bratz sculpt.  I was actually

14  going to ask you if you feel comfortable coming up to the

15  screen, because I want to put on the screen, Aaron, a picture

16  of one of Mr. Bryant's concept drawings, which is

17  Exhibit 302-006, and take with you --

18          Actually, Ms. Garcia, if you could just take with

19  you one of the final production Bratz sculpts.  And I think

20  we might be able to get you a microphone that you can use.

21          Aaron, could we put on the screen 17733, which is a

22  photograph of the sculpt here that you have in your hand.

23          Okay.  Back through for us, and tell me -- do we

24  have a laser pointer?  We do.  Okay.  And on the left is

25  302-006.  So if you would describe in your own words the

1    differences between Mr. Bryant's pitch book drawing on the

2    left and the final Bratz manufactured sculpt on the right.

3    And maybe we can work -- if you want to work head down or

4    toes up, whatever you're comfortable with.

5    A.    Okay.  Well, first, one of the big differences is the

6    head size of Carter Bryant's 2D portfolio drawings.  His head

7    is quite a bit larger in proportion -- or quite a bit large

8    in proportion to the rest of the body.  And our Bratz final

9    manufactured doll, you'll see that certainly we went for a

10   large head, but we actually chose to reduce the size of the

11   head, especially relative to the overall size of the body.

12          Another important difference was the ears.  For me,

13   in reading this document or reading the portfolio drawing

14   from Carter Bryant, I felt that the ears were kind of low on

15   the side of the face, a little bit unnatural to what is more

16   human like and felt, again, that the ears were a little --

17          MR. PRICE:  Your Honor, object.  I think the

18   question is one of differences.

19          THE COURT:  Let's get back to how they are

20   different, not why or because.

21   Q.    BY MS. AGUIAR:  So try and restrict your answers to just

22   the changes rather than -- just discussing the changes, if

23   you would.  Thank you.

24   A.    I'll move on to the torso.  The torso in the drawing

25   appeared to be very short, especially in relation to the

1    overall size of the body. The difference in our manufactured

2    Bratz doll is actually much longer. Specially relative to

3    the entire body. So this torso may be more natural.

4        The upper thigh, very short, specially if you look

5    at it from the hip to the knee. And the manufactured Bratz

6    sculpt, you'll see that the length of the hip to the knee is

7    much longer, again, looking more like a human-like quality.

8    But if you look at the thickness of the upper thigh, the

9    thickness of the thigh was pretty thick. The adjustment in

10   the manufactured Bratz doll, you'll see the leg is thinner.

11       From Carter Bryant's 2D portfolio sketch, specially

12   from the knee to the ankle is actually quite long, specially

13   in relationship to its upper thigh. And the actual

14   manufactured Bratz doll, you'll see that the shin from the

15   knee to the ankles actually is more human like, especially

16   more natural in relationship to the upper thigh.

17       The feet, the perception, especially I read when

18   looking at the Carter Bryant 2D sketches, was the feet were

19   large, especially in relation to, again, the overall sketch.

20   Our feet, definitely we have big feet, but we -- our

21   manufactured Bratz sculpt actually has some smaller larger

22   foot, if that makes sense, specially in relationship to the

23   overall body proportion.

24   Q.   And in terms of doing a comparison between the drawing

25   and the sculpt, because the drawing gives -- was there

1   anything in his pitch book that gave you a side view of how

2   Mr. Bryant would have imagined a three-dimensional object

3   looking from the side?

4   **A.**   No.

5              MR. PRICE:   That's irrelevant, your Honor.

6              THE COURT:  Overruled.   You may answer.

7              THE WITNESS:   No.

8   **Q.**   BY MS. AGUIAR:   And were there any drawings in his

9   pitch book that showed what he would have imagined that a

10  three-dimensional doll would look like from the back?

11  **A.**   No.

12  **Q.**   Let me also just -- I notice that like the little hands

13  have like the thumbs sticking out.   Can you address that

14  change?

15  **A.**   In fact, I missed two points.   That's one of them.

16  Absolutely a very important revision or difference between

17  Carter Bryant's portfolio drawings and the manufactured

18  Bratz.   In the portfolio drawings, Carter Bryant created a

19  sort of hand gesture, especially with a protruded thumb.   And

20  the manufactured Bratz doll, we removed the protrusion of the

21  thumb, bringing to closer, sort of in the same plane as the

22  rest of the fingers.   That was actually -- our deliberate

23  reason to do that is to make sure that thumb, if you've

24  ever --

25              MR. PRICE:   Objection, your Honor.

```
 1              THE COURT:  Sustained.  As to reason.

 2    Q.   BY MS. AGUIAR:  Okay.  Is it easier for a child to take

 3    clothes on and off a fashion doll if the thumb is not

 4    sticking out?

 5              MR. PRICE:  Objection.  Foundation.  It's also

 6    irrelevant.

 7              THE COURT:  Overruled.

 8    Q.   BY MS. AGUIAR:  You may answer.

 9    A.   It is very difficult for a little girl to be able to

10    dress fashions on and off, especially on, if a thumb is

11    protruded.

12    Q.   Aaron, if you would flip to, still on Exhibit 302, but

13    page 4.  So if we -- the image on the left, I want to go to

14    302-004.  I see that in Mr. Bryant's drawings, that

15    contemplated a removable hair feature; is that correct?

16    A.   That's correct.

17    Q.   And the actual Bratz dolls that MGA created and released

18    don't have that feature, do they?

19    A.   No, they don't.

20    Q.   Would you agree that that represents a difference,

21    significant difference between the two-dimensional drawing

22    and the three-dimensional doll that MGA created?

23              MR. PRICE:  Objection.  It's improper opinion.

24              THE COURT:  Rephrase, Counsel.

25    Q.   BY MS. AGUIAR:  Do you believe that the drawing, which
```

1  shows a removable hair feature, is different from the doll

2  which does not show that feature?

3  **A.**    Yes.

4  **Q.**    Did you personally believe that the doll should have a

5  removable hair feature?

6           MR. PRICE:  Object.  Irrelevant.

7           THE COURT:  Sustained.  You can rephrase it,

8  Counsel.

9  **Q.**    BY MS. AGUIAR:  What effect -- did you take into

10  consideration the marketability in the target audience when

11  deciding whether the final doll that MGA created should have

12  a removable hair feature?

13           MR. PRICE:  Objection.  It's irrelevant.

14           THE COURT:  Sustained.

15  **Q.**    BY MS. AGUIAR:  Given your target audience, did you

16  think that the doll would be as marketable if it had a

17  removable hair feature?

18           MR. PRICE:  Same objection.  It's not one of the

19  five factors.

20           THE COURT:  Let me see you at sidebar, Counsel.

21           **(SIDEBAR CONFERENCE HELD.)**

22           THE COURT:  Why is this not a dissimilarity from

23  the drawings, I mean, particularly as she phrased it this

24  last time in terms of marketability.  There's a foundational

25  issue, but focusing on your relevancy objection.

1    MR. PRICE: The dissimilarity, she's testified ad

2  nauseam that it's not similar. It didn't have a pop-off

3  head.

4    THE COURT: Now she's going -- and that goes to the

5  substantial similarity issue. But on the marketability,

6  she's going one step further, and this strikes me as an

7  appropriate apportionment argument, that this change from the

8  drawing, or this aspect, which is not copyrightable, actually

9  had an effect on the amount of money or profits generated by

10  the sale of this doll. This would be one of the factors.

11  This kind of falls within, I don't know, noncopyrighted

12  accessory.

13    I did add a sixth one, functional mechanical

14  maneuverability. Something like that. But in any event, why

15  doesn't this go to apportionment?

16    MR. ZELLER: I don't think it falls within one of

17  the five factors, certainly not as I understood them.

18    THE COURT: Ever. But why not, Mr. Zeller?

19    MR. ZELLER: Well, are we talking about the

20  copyright claims, or are we talking about state law?

21    THE COURT: Let's start with the copyright.

22    MR. ZELLER: I think it's absolutely irrelevant.

23  And the reason is because it's a functional -- they are

24  talking about kind of a functional feature, and that just

25  doesn't have anything to do with, you know, because remember,

1   the Court talks about --

2            THE COURT:  You're right.  It has nothing to with

3   the copyright aspect, but why doesn't it go to apportionment

4   as a noncopyright feature that is responsible -- and I don't

5   know if you lay the foundation that this witness --

6            MR. ZELLER:  That's certainly part of the problem,

7   but what we're talking about is an absence of something.  I

8   mean, it would be -- it would be one thing to say that there

9   was some feature that they added that drove sales.

10           THE COURT:  Why doesn't a removal of a feature --

11  that's why I initially -- when you first made the objection,

12  I was with you on that line of analysis, but then when I

13  thought about it, why doesn't a removal of a feature of a

14  drawing have just as much of --

15           MR. ZELLER:  And whether that foundation has been

16  laid is part of the problem.

17           THE COURT:  That's a separate issue.  But I think

18  it is a legitimate question to ask.  Objection is overruled.

19           **(CONCLUSION OF SIDEBAR CONFERENCE.)**

20  **Q.**   BY MS. AGUIAR:  We were talking about the pop-off hair.

21           Ms. Garcia, had you -- did you have any information

22  from any source, when you were deciding whether or not the

23  final doll should have removable hair, that informed your

24  decision not to implement that element of the drawing?

25  **A.**   I certainly had input from -- well, my understanding is

1   my reception from our consumers certainly is that

2   especially --

3           MR. PRICE:   Objection.   This is beyond the scope of

4   the question.

5           THE COURT:   Nonresponsive.

6   Q.   BY MS. AGUIAR:   So you did have information regarding --

7   that informed your decision to not implement that feature;

8   correct?

9   A.   Yes.

10  Q.   And what was that information that you had that led you

11  to decide not to implement that feature in Mr. Bryant's

12  drawings?

13  A.   Feedback from little girls.

14  Q.   And what was that feedback?

15  A.   The feedback that I learned is that especially for our

16  consumers 7 to 10, aesthetic was absolutely important.   The 7

17  to 10 consumer doesn't necessarily buy a toy to play with.

18  They are a little older.   Certainly there are 7 to 10 year

19  olds who play.   But primarily our 7 to 10 consumer required a

20  doll that looked awesome, that looked like something they

21  would aspire to.   If we were to implement a play feature that

22  would impede the style or the look of the doll overall, then

23  it would not be worthy of including inside the product.

24  Q.   So based on that, did MGA affirmatively decide to create

25  and manufacture a doll that was different in that respect

1    from Mr. Bryant's drawings?

2    **A.**    Yes.

3    **Q.**    Now, if there's anything else you wanted to point out

4    about the differences between the drawing and the sculpt,

5    that's fine.  Otherwise, I was going to move on to a separate

6    area.

7    **A.**    Ready to move on.

8    **Q.**    All right.  So you can give back the microphone and head

9    on back.  I'm going to actually back up and give you Trial

10   Exhibit 17385.  Can you identify what you have there in front

11   of you as Trial Exhibit 17385?

12   **A.**    Yes.

13   **Q.**    What is it?

14   **A.**    This is a manufactured Barbie doll.

15   **Q.**    How tall is Barbie?

16   **A.**    I believe she's approximately 11 inches, 11 1/2.

17   **Q.**    And how tall is -- how tall are the Bratz dolls?

18             MR. PRICE:   Object.  Comparison is irrelevant.

19             MS. AGUIAR:   I'm not making a comparison between

20   Barbie and Bratz.

21             THE COURT:   Overruled.

22   **Q.**    BY MS. AGUIAR:  How tall is Bratz?

23   **A.**    Bratz is about nine inches.

24   **Q.**    Did MGA make a conscious decision as to the size to make

25   the Bratz doll?

1    A.    Yes.

2    Q.    Was there anything in Mr. Bryant's drawings, when he

3    originally brought them to MGA in September, that indicated

4    the size that an ultimate doll should be?

5    A.    No.

6    Q.    So was there anything in there that said this should --

7    I'm imagining that this would be an 8-inch doll, or I'm

8    imagining that this would be a 12-inch doll?

9    A.    No.

10   Q.    So that was a decision regarding the creation and

11   manufacture of the doll that was made separate and apart from

12   Mr. Bryant's drawings; is that correct?

13   A.    Objection.  Leading.

14         THE COURT:  Sustained.

15   Q.    BY MS. AGUIAR:  Was that a decision that was made

16   separate and apart from Mr. Bryant's drawings?

17   A.    Yes, absolutely.

18   Q.    Because of the size of the Bratz dolls being nine and a

19   half inches, were Bratz always considered for toy industry

20   purposes to be in the fashion doll category?

21   A.    No.

22   Q.    Okay.  Can you explain how that is, because obviously

23   we've been talking throughout the trial about Bratz as a

24   fashion doll.  So can you explain why it is that Bratz for

25   that purpose was not categorized as a fashion doll?

```
 1              MR. PRICE:  Object.  Irrelevant.

 2              MS. AGUIAR:  It goes to marketability and the state

 3   law claims, your Honor.

 4              THE COURT:  Okay.  I'll give you some background in

 5   this.  Overruled.

 6              THE WITNESS:  MGA consciously made a decision to go

 7   and to build the Bratz doll at approximately nine inches.  It

 8   was a conscious decision that we made because frankly, we

 9   wanted to be termed a small doll.  Let me back up.  Within

10   the toy industry, we're measured, especially through a system

11   called NPD, which is a POS tracking system.

12   Q.  BY MS. AGUIAR:  Hold on one second.  Too many acronyms.

13   I don't know how relevant it is to your answer, because I'm

14   not sure what the acronyms mean, but if it is relevant, can

15   you explain what you mean by the acronyms that you used?

16   A.  NPD?

17   Q.  Sure.  You used NPD, and I think you used another one?

18   And I want to make sure we all understand what they all mean.

19   A.  NPD.

20   Q.  Describe what that is.

21   A.  NPD is a point of sale tracking system, meaning it is a

22   system that is able to track how sales are performing within

23   a category.  So you're able to see how well within this

24   system you did, especially in relation to the competition

25   within that same category.
```

1          One of MGA's decisions to actually reduce the size

2     of the doll was to be sure that we, frankly, weren't being

3     tracked in NPD within the fashion doll category. We intended

4     to be tracked outside of the fashion doll category and in

5     another category, which is termed the small doll category.

6     Q.    So in other words, you have to be a certain height to be

7     a fashion doll.

8     A.    Yeah.  I mean, I think certainly Barbie sort of

9     identified and defined that height certainly, yes.

10    Q.    So it's like when you go on a ride at the amusement

11    park, you have to be a certain height in order to ride the

12    ride.  You have to be a certain height to be a fashion doll?

13    A.    Yes.

14    Q.    And when it says small doll, does that necessarily mean

15    like four inches high?  I mean, what is the small doll

16    category?

17    A.    It's funny, because the small doll category, though it

18    uses and implies the word small, in the category small doll,

19    it's kind of -- and I remember using this term with a buyer.

20    The small doll category is kind of a catchall for a lot of

21    alternative brands, especially within girls' toys.  So small

22    doll doesn't limit it to specifically a size and especially

23    such as four inches.  In this case, especially eight years

24    ago, it sort of references anything other than 11 inches or

25    Barbie.

1    **Q.**    Are the Bratz fashions and clothes interchangeable with

2    11 1/2-inch dolls?

3    **A.**    No.    And that's a second and very important decision

4    that we consciously made in reducing the size.    And when I

5    mean in height, but also in some of the proportions of the

6    doll as well, was to be sure that our Bratz fashions couldn't

7    be exchanged with Barbie fashions and alternatively.    That

8    they were meant to be built for a Bratz doll and not to be

9    exchanged.

10   **Q.**    Was that a conscious marketing decision that MGA made in

11   creating the doll?

12   **A.**    Absolutely.

13   **Q.**    Let's switch gears.    Is there somebody who works for MGA

14   named Judy Rich who maintains a document that shows the

15   different disciplines at MGA that are involved in creating

16   the Bratz dolls?

17   **A.**    Yes.    I used to work with her, yes.

18   **Q.**    If you could turn to Exhibit 16418 in your binder.

19          And, your Honor, before I forget, may I move into

20   evidence the doll that we discussed before, the blank sculpt?

21   I believe it was 18845.

22          THE COURT:    Any objection?

23          MR. PRICE:    No objection.

24          THE COURT:    It's admitted.

25          **(Exhibit 18845 received.)**

```
 1              MS. AGUIAR:  Thank you.
 2   Q.   So are you looking at 16418?
 3   A.   Yes, I am.
 4   Q.   Can you tell us what that is?
 5   A.   This is a development schedule that was prepared by Judy
 6   Rich, and the development schedule tracks the individual,
 7   what we call micromilestones, that ultimately drive you to a
 8   manufactured or production start date.
 9              MS. AGUIAR:  Your Honor, I move 16418.
10              MR. PRICE:  Object.  Hearsay.
11              THE COURT:  Counsel?
12              MS. AGUIAR:  I think it's a business record, your
13   Honor.
14              THE COURT:  Lay a foundation for it.
15   Q.   BY MS. AGUIAR:  Is this a document that was regularly
16   maintained by MGA in the course of its business?
17   A.   Yes, it was.
18   Q.   And is it a form that you recognize?
19   A.   Yes, I do.
20   Q.   And did you rely on this document in doing your work in
21   being the brand manager at Bratz?
22   A.   Yes.
23              MS. AGUIAR:  Again, I move 16418, your Honor.
24              MR. PRICE:  No foundation, hearsay within hearsay.
25              THE COURT:  What are you referring to, Counsel?
```

6948

1    The page number.

2            MR. PRICE:  First page is an e-mail.

3            THE COURT:  Very well.

4            MR. PRICE:  And the latter one is foundation as to

5    the source of the information, et cetera.

6            MS. AGUIAR:  I don't need the e-mail.

7    Q.   The questions I was asking you about the document,

8    Ms. Garcia, being used in business and whether it's a form

9    you recognize, let's look at -- let's just focus on page

10   16418-002.

11   A.   Okay.

12   Q.   Is that a document that MGA regularly maintained?

13   A.   Yes.

14   Q.   Do you recognize this form of document?

15   A.   Yes, I do.

16   Q.   And did you use it in connection with the work that you

17   did on Bratz?

18   A.   Yes.

19           MS. AGUIAR:  I think 16418, your Honor, dash 002.

20           MR. PRICE:  No foundation on the source of the

21   information.

22           THE COURT:  Let's identify where the information

23   came from, Counsel.

24   Q.   BY MS. AGUIAR:  The information in 16418, what is the

25   source of the information that was put into this document?

1  A.   I'm sorry.  Do you mean who provided the -- who provided

2  this information?

3  Q.   Yes.

4  A.   Judy Rich provided this information.  She was

5  responsible to input dates and update it.

6  Q.   And where did she get the information?

7  A.   It would have been from team members themselves who

8  would confirm their completion of one of their milestones.

9  It would be information confirmed by Hong Kong in the same

10  way.

11  Q.   And were those people who were all employed by MGA?

12  A.   That's right.

13        MS. AGUIAR:   Your Honor, I move 16418-002.

14        MR. PRICE:   Same objection, your Honor.

15        THE COURT:   Overruled.  It's admitted.

16        **(Exhibit 16418-002 received.)**

17        THE COURT:   Just -02 through -04.

18        MS. AGUIAR:   Thank you.

19  Q.   And without getting into the details, if you would just

20  describe how this shows the different --

21        And, Aaron, if we could just --

22        I know it's not going to be east to see, but if we

23  can leave most of the document on the screen, I'd just like

24  you to, without getting into line by line, just how this

25  shows some of the different disciplines that were involved in

1  creating the doll.

2  **A.**  Absolutely.  The -- each of the individual boxes

3  represent some function, some part of building the overall

4  manufactured Bratz doll.  For example, and I will say that

5  it's sort of -- there should be more boxes, or we should have

6  built -- there are more disciplines that are gathered within

7  one box.  So if I can break down each box, for example.

8  **Q.**  Or maybe just use one as an example?

9          MR. PRICE:  Your Honor, a general objection.

10  Relevance on disciplines used to create the doll.

11          THE COURT:  Sustained.

12          MS. AGUIAR:  I don't want to make a --

13          THE COURT:  Focuses on comparisons, Counsel.

14          MS. AGUIAR:  Let's move on to a different topic.

15  **Q.**  Let's talk about doll names.  In Mr. Bryant's drawings,

16  the characters that he drew had certain names; is that right?

17  **A.**  Yes.

18  **Q.**  Did MGA make a conscious decision to change the names of

19  the characters when they actually created the doll?

20  **A.**  Yes.

21  **Q.**  So, for example, Zoe was one of the characters.  Did Zoe

22  stay Zoe?

23  **A.**  No, she did not.

24  **Q.**  Explain the change that MGA decided to make.

25  **A.**  Zoe was not a name that MGA preferred.  We chose

 1   alternatively to use Cloe.  Other characters, such as Lupe,

 2   Lupe was a character that Carter Bryant used in his portfolio

 3   sketches.  And it was a decision by MGA not to use the name

 4   Lupe.  Lupe appeared, and that name was associated to the

 5   Hispanic character.  And it was in MGA's conscious decision

 6   not to use that name because the name felt a bit stereotyped,

 7   and for sort of the ethnic background of the Hispanic

 8   culture.

 9            So we chose Yasmin as an alternative name.

10            Hallidae, the same.  Hallidae appeared to be sort

11   of, again, sort of a stereotyped African-American name, and

12   you know, we were conscious not to -- we were conscious to

13   change that name, to find a name such as Sasha which still,

14   you know, still felt cool and funky and related, but not to

15   the extreme and not to the stereotype that Hallidae felt.

16   Q.   If you'd just tell me if you know the answer to this.

17   Did MGA then register for trademark purposes those names:

18   Cloe, Sasha, Yasmin, and Jade?

19            MR. PRICE:  Objection.  Irrelevant.

20            THE COURT:  Overruled.

21            THE WITNESS:  Yes.

22   Q.   BY MS. AGUIAR:  So those four names are names that for

23   trademark purposes are owned by MGA; is that correct?

24   A.   Yes.

25   Q.   Let's talk about other developments and changes in the

```
 1   doll.  When you were here testifying in the first phase, we
 2   had to talk about things but only up until a certain date, if
 3   I recall that.  And now if you'll recall that.  And now I
 4   want to go beyond that date in your development of the dolls.
 5              Did Mr. Bryant's drawings provide information --
 6   and let's talk about fashions first.  Did they provide
 7   information regarding what fabrics should be selected for
 8   purposes of the fashions?
 9              MR. PRICE:  Object.  Vague as to Mr. Bryant's
10   drawings, as to time.
11              MS. AGUIAR:  Okay.  Let me start again.
12              THE COURT:  Rephrase, Counsel.
13   Q.   BY MS. AGUIAR:  The pitch book drawings that he brought
14   to you, which were the ones that you had as you started to
15   develop the doll, did those drawings provide information
16   regarding what fabrics to use to make fashions?
17   A.   No, they did not.
18   Q.   Did the drawings provide information to MGA, these same
19   drawings, employed MGA information on how to construct the
20   patterns for the fashions?
21   A.   No, they did not.
22   Q.   Did you decide to get someone involved in developing the
23   fashions for the Bratz dolls?
24   A.   Yes.
25   Q.   And who was that?
```

1  **A.**    Veronica Marlow.

2  **Q.**    And did you consider her to have skills and have

3  creativity as it related to development of fashions?

4  **A.**    Absolutely.

5  **Q.**    As you and Ms. Marlow selected the fabrics for the

6  fashions for the first generation, for example, and made the

7  patterns, what effect did that have on the marketability of

8  the doll?

9              MR. PRICE:  Objection regarding the first

10  generation.  If we could do a sidebar, I'll explain.

11  Relevance would be the objection.

12             THE COURT:  It's more of a foundational issue.  Why

13  don't we take it up at sidebar.

14             **(SIDEBAR CONFERENCE HELD.)**

15             THE COURT:  I guess I'm not following your

16  relevancy objection.

17             MR. PRICE:  They are talking about the fashions.

18  The fashions in 1107 through 1110 on those drawings are

19  protected.

20             THE COURT:  Right.  It's the first generation but

21  not beyond that.  They can go into the -- all the fashions

22  and --

23             MR. PRICE:  And that's why I said I object as to

24  any testimony with respect to the first generation.  Because

25  they are trying to say oh --

1           THE COURT: To the extent that the first

2 generation, there is a substantial similarity with the

3 drawings, then they are protected.

4           MR. PRICE: And she's saying oh, but we selected

5 the fabric that looks like that drawing.

6           THE COURT: Just to be clear on this, I've ruled

7 that doll fashions can be protectable; however, it's Carter

8 Bryant's particularized expression of them. So it's only

9 those drawings to the extent that they are substantially

10 similar. And there's a whole bunch of dolls up there with

11 fashions that look nothing like Carter Bryant's drawings.

12 That's where apportionment comes in. To the extent that you

13 have the foundation to establish marketability, et cetera.

14 So I now understand Mr. Price's point. You have to

15 distinguish between the first generation and --

16           MS. AGUIAR: Okay. And since your Honor has ruled

17 that Mr. Bryant's particularized fashions that he drew would

18 be copyrightable, can you elicit -- would I be able to elicit

19 testimony from her as to why she thinks some of the fabric

20 choices and how they make the patterns were different from

21 what Mr. Bryant drew?

22           THE COURT: Oh, absolutely because that goes to

23 substantial similarity.

24           MR. PRICE: That looks terrible to say here's the

25 drawing. How is the first generation different?

```
 1              THE COURT:  She can ask the question how she wants,
 2    Counsel.  I'm sure she appreciates your input.
 3              You just need to be clear.  However you want to ask
 4    the question, that you are severing out the -- those that are
 5    potentially copyrightable from those that are clearly
 6    indisputably not.
 7              MS. AGUIAR:  Okay.  So in asking this particular
 8    question, I'm at the first generation.  Is there anything
 9    that you did to move away from, make the fashions different
10    from those in Mr. Bryant's drawings?
11              MR. NOLAN:  While we're here, your Honor, a
12    relevant question.  Move for a moment just to the state tort
13    claims.  The selection of the fabric, the quality of the
14    fabric, which affects the price point, which affects the
15    appearability, which affects the --
16              THE COURT:  As long as this is noncopyrightable
17    accessories, you're fine.
18              MR. NOLAN:  I guess what I was saying for the state
19    law claims, we're trying to see what added value they --
20              THE COURT:  I'm with you on that.
21              MR. NOLAN:  I just wanted to --
22              THE COURT:  I know this has been awkward and there
23    have been more objections than normal.  And you've seen
24    where --
25              MS. AGUIAR:  I'm definitely trying, your Honor, and
```

1   I'm not faulting him necessarily, but I'm getting a lot of

2   objections.

3         THE COURT:  But I hope both sides are understanding

4   that I'm trying to implement the ruling, and it's not an easy

5   thing do, and I'm not faulting either side either for making

6   objections or for running afoul, and if I can make any

7   further guidance, can I do so?  Do you kind of get it?

8         MS. AGUIAR:  I do.  I believe that with respect to

9   this first generation, I'm asking her about differences as

10  they relate to copyright.  As I understand it, you object to

11  our argument that even for first generation, choices that we

12  may have made relate to marketability, just for first

13  generation.

14        MR. NOLAN:  I didn't understand that.

15        THE COURT:  As long as it's noncopyrightable

16  accessories.  But, you know, I guess the gray matter would be

17  if you are taking a -- and this is where we become

18  inextricably intertwined.  If you took a fashion that is

19  substantially similar to one of the ones that Carter Bryant

20  drew and the mere fact that you did it in a special way or

21  used a special fabric, that would be very hard to divorce the

22  copyrightable elements of that from the noncopyrightable

23  elements.

24        So I would find, as a matter of law, that they are

25  inextricably intertwined, and I would sustain a relevancy

1    objection.  As to another fashion doll not based on Carter

2    Bryant's, there you have free rein.

3              MR. NOLAN:  That gives -- she got there quicker

4    than I did.

5              MR. PRICE:  So that we toe this line, that's why I

6    think it has to be linked to the drawings.  The witness

7    doesn't know.

8              THE COURT:  I think that's a cleaner way of doing

9    it, but again, I'm not going to micromanage the actual

10   questions.

11             MS. AGUIAR:  Thank you.

12             **(CONCLUSION OF SIDEBAR CONFERENCE.)**

13   **Q.**  BY MS. AGUIAR:  I'm sticking, for purposes of this

14   question, and in a few minutes we're going to move on to

15   dolls beyond the first generation, but specifically with

16   regard to the first generation, would you agree that there

17   are similarities between Mr. Bryant's pitch book drawings and

18   the fashions that are on the actual manufactured dolls?

19   **A.**  There are some similarities.  There are some important

20   differences, too.

21   **Q.**  Okay.  And so would you explain to me, as it relates to

22   the fashions, the choices or decisions that you believe were

23   made by MGA that show a difference in those first generation

24   fashions?

25             MR. PRICE:  Objection.  It's too vague unless we

1  know what we're talking about.

2          THE COURT:  Sustained.  Rephrase your question,

3  Counsel.

4  Q.   BY MS. AGUIAR:  For example, if you look at 302.  For

5  purposes of comparison, why don't you find a page on here

6  that you can explain, that you find useful for explaining to

7  me some of the decisions that were made to make alterations

8  for the fashions between the drawing and the manufactured

9  dolls.  Is there a particular page that you'd like to go to?

10 A.   I would go to page 6.

11 Q.   Okay.  And so if you could explain to us some of the

12 reasons -- some of the differences in the changes in the

13 fashions.

14 A.   As I mentioned earlier, not only did I find concern for

15 the use in the name Lupe as sort of a stereotyped name for a

16 specific type of Hispanic young girl, I was also very

17 concerned about the fashions as well.  I was concerned about

18 the fashions for two reasons.  One, primarily that I --

19          MR. PRICE:  Objection.  This is nonresponsive.

20          THE COURT:  Sustained.

21 Q.   BY MS. AGUIAR:  If you could specifically describe the

22 changes that you made to make differences in some of the

23 fashions.

24 A.   When comparing Yasmin and Lupe, Yasmin -- in comparing

25 the Lupe to Yasmin, Yasmin, we chose to use an earth tone

1    fabric for the pants in her -- the pants that she actually

2    wore.  We decided to use a soft velvet lavender corset for

3    her top as opposed to a small, tiny T-shirt and a hoodie.  In

4    exchange for the hoodie, we added a suede brown handkerchief,

5    and that was used as an accessory.

6    **Q.**   But again, certainly you wouldn't dispute that some of

7    the fashions in his drawings are similar to the fashions that

8    ended up on the first generation dolls.

9    **A.**   No, I don't dispute that.

10   **Q.**   All right.  Let's move on to another element.  Let's

11   move on to face paint.  On behalf of MGA, did you hire

12   someone to do the face painting for the first generation?

13   **A.**   Yes, I did.

14   **Q.**   And who was that?

15   **A.**   Anna Rhee.

16   **Q.**   Did you consider her to be a skilled face painter?

17   **A.**   Yes, I did.

18   **Q.**   Did you instruct her, when she was doing the face paint

19   for the first generation dolls, to simply copy what she saw

20   in Mr. Bryant's drawings?

21   **A.**   No, I did not.

22   **Q.**   Did you intend for her to bring her skills to bear and

23   her creativity to bear in creating the face paint for the

24   first generation dolls?

25   **A.**   Yes, I did.

1    Q.    Did you have involvement in overseeing the process or

2    the approval of what the face paint ended up looking like on

3    the dolls?

4    A.    Yes, I did.

5    Q.    If you could turn to Exhibit 951-B in your binder.    Have

6    you got that?

7    A.    Yes.

8    Q.    Do you recognize that?

9    A.    Yes, I do.

10    Q.    What is it?

11    A.    This is the hand-drawn eye artwork that was prepared by

12    Anna Rhee, which was included in our paint master release

13    from Los Angeles to the Hong Kong office.

14                 MS. AGUIAR:   And, your Honor, I would move 951-B,

15    pages 002 through 007.

16                 THE COURT:   Any objection?

17                 MR. PRICE:   No objection.

18                 THE COURT:   It's admitted.   You may publish.

19                 **(Exhibit 951-B, Pages 002-007, received.)**

20                 MS. AGUIAR:   And put up 951-B-007.

21    Q.    Ms. Garcia, if you could describe what we're looking at

22    here?

23    A.    This is a swatch card or swatch page that also was

24    included in the paint master release that we released from

25    Los Angeles to Hong Kong.   The swatches of color indicate the

1    colors we wanted Hong Kong to match in manufacturing the

2    Bratz doll in China.

3    Q.   And let me also have you look at -- I'm going to bring

4    you up a little box.  A box of heads.  And they are Trial

5    Exhibits 17712 through 17715.

6            Can you tell us what you are looking at there in

7    that box?

8    A.   These are the original paint master faces that were

9    painted by Anna and released to Hong Kong so that Hong Kong

10   could duplicate the same exact eye artwork in manufacturing.

11           MS. AGUIAR:  Your Honor, I want to move into

12   evidence the tangibles 17712 through 17715.

13           MR. PRICE:  No objection.

14           THE COURT:  Admitted.

15           **(Exhibits 17712-17715 received.)**

16           MS. AGUIAR:  I don't think we are going to be able

17   to put this on the screen.  Do we have a picture -- oh, okay.

18   That's weird.

19   Q.   Do you recognize these images here as photos of the sort

20   of half heads that are in those boxes there?

21   A.   Yes.

22   Q.   And so tell us, describe to us what we're looking at

23   here, then.

24   A.   So these are actually the head.  A roto cast head, which

25   would have been the actual correct manufactured size of a

1    Bratz head, and we released those heads to Anna Rhee.  And

2    Anna Rhee hand painted the eye artwork onto the roto cast

3    head.

4    Q.    Okay.  I'd like to go to some comparisons.  I want to --

5    I'm going to take you through and ask you to compare the

6    drawings from Mr. Bryant's pitch book of the dolls and

7    compare those to the actual painted face on the Bratz dolls

8    themselves.  Okay?

9              So we've made some graphics which will be a little

10   bit easier to do that, which are drawn from trial exhibits.

11             Aaron, I think the first one is No. 500.  That's

12   slide No. 500.  So for those people on the jury who wear

13   makeup, then you may actually dig the next five or ten

14   minutes.  And for those of you who don't, you know, this will

15   be like a trip from hell to the Nordstrom cosmetics counter,

16   but bear with me for a few minutes.

17             So let's not focus for the moment, because we're

18   going to get to that in a few minutes.  Don't talk for now

19   about the shape of the lip, the size of the lip, the size of

20   the eye.  This is all about makeup.

21             If you would compare for us the makeup on the eye

22   area and the lip area as between his drawings and the actual

23   doll for us.

24   A.    May I please have the --

25   Q.    You want the laser?