1  A.    It would help.

2  Q.    Sure.

3  A.    Thank you.  I guess the best place to start is from the

4  top.  So using and pointing to the Carter Bryant 2D portfolio

5  sketch, you'll see that Lupe's eyebrow color is actually -- I

6  also will have to say that this -- the images that they are

7  projected right now don't really represent, you know, the

8  greatest representation of the truest colors, but it's pretty

9  good to represent that Lupe's color in her eyebrows are very,

10  very dark brown.  Almost with some hints of black in them.

11        On the Yasmin manufactured Bratz doll, you'll see

12  that the eyebrows actually have -- certainly they are brown,

13  but it's a lighter brown, a softer brown.  Almost to have a

14  little bit of -- like a violet or a purple tone to it.

15        If you look at Lupe, Carter Bryant's portfolio

16  sketch, her eye shadow color, the color indicated in his

17  drawing was a very, very dark brown.

18        If you look at the manufactured Yasmin doll, you'll

19  see actually that the eye shadow color was adjusted to a

20  lavender or purple brown, softer color.

21        Going into her eye color, Lupe, in Carter Bryant's

22  portfolio sketch, had almost a green eye color.

23        In the manufactured Bratz Yasmin doll, you'll see

24  that the -- while that eye color is dual toned, meaning it

25  has two colors, the primary color in Yasmin's eye is brown.

1   A light brown.

2         Even the lips.  The lipliner on Lupe's drawing in

3   Carter Bryant's portfolio sketches had a very, very dark

4   brown, very dark brown.  And you look on the Yasmin        -

5   manufactured doll, she has a -- almost like a red tone, a red

6   lipliner.

7         And then further, the lip color of Lupe in the

8   Carter Bryant's 2D portfolio has a -- again, a dark brown, a

9   very, very dark brown as opposed to the manufactured Yasmin

10  doll that has almost a pink tone to it.  All of these

11  revisions were very important to, you know, set the right

12  tone and the right personality about the Bratz to our

13  consumer.

14  Q.   Help me out for a second.  As someone who doesn't wear

15  lipstick, and there's a lot of people in the room who don't,

16  help us out here.  You know someone could be -- thank God;

17  right?

18        I'm just trying to, you know, appeal to everyone in

19  the room.  You are walking down the aisle.  I may walk down

20  the aisle and go to those lipsticks, they kind of look

21  somewhat the same color to me; is that right?  Tell me if I'm

22  wrong.

23  A.   No, you're wrong.

24  Q.   Okay.

25  A.   Those lip colors are very, very different.  And those

```
 1   lip colors, I believe they strongly mean something very, very
 2   different to our consumer.  Lip color is a reflection of a
 3   mood or a personality in a female.  So you can speak a lot in
 4   the color of your lipliner or your lip color.  And that makes
 5   a difference.  Absolutely.
 6   Q.   In your view, was the face decoration on the Bratz doll
 7   copied from the colors of the -- of face colors in
 8   Mr. Bryant's drawing?
 9   A.   Absolutely not.
10        MR. PRICE:  Object.  That's her understanding.
11        THE COURT:  Rephrase the question.
12   Q.   BY MS. AGUIAR:  In making the manufactured Bratz dolls,
13   in your view the colors used for the face decoration are
14   different?
15   A.   Yes.
16   Q.   Let's go to the next one.  And we have four of these.
17   So we'll try to move through them so this makeup tutorial
18   doesn't last the whole afternoon.
19        So if you could just go through the next three of
20   these and do sort of the major areas of comparison for us.
21   A.   Without getting through so much detail, Hallidae in
22   Carter Bryant's portfolio drawings, the eye shadow here
23   referenced in Hallidae was almost like a burnt orange, kind
24   of a mustardy color.  In the manufactured Bratz doll, you'll
25   see that we adjusted the eye shadow to a more natural brown
```

1  tone.  The eye color of Hallidae seems to be dual tone, but
2  there's like an orange and also kind a very bright yellow in
3  the highlight of her eye.

4  In the Bratz manufactured Sasha-doll, you'll see
5  that the eye color for Sasha is also dual toned.  It was
6  primarily a brown color with an accent of a lighter green.

7  The lip color on Hallidae, if you look at the
8  lipliner, it's a very, very dark brown color.  And then the
9  color within the liner is also a kind of dark reddish sort of
10  burnt orange color.

11  In Bratz manufactured Sasha dolls, certainly we
12  chose a color.  The color is orange, but not in the same
13  value that the Hallidae doll is.  It's softer.  All of these
14  things, you know, intentionally creates a softer, younger,
15  more appropriate character to the consumer.

16  Q.  Why don't we do Jade next.

17  A.  I'll definitely say that there are probably some more
18  similarities in the Jade Carter Bryant portfolio drawing to
19  the Jade manufactured doll; however, there are still some
20  differences.  This image doesn't do it well.  But actually,
21  the eyebrow color used on Carter Bryant's portfolio drawings
22  is actually a little bit darker than the actual manufactured
23  Jade eyebrow.

24  The eye color of Jade in Carter Bryant's portfolio
25  sketch is kind of an olive greenish brownish color.  MGA's

1  Jade color is also dual tones, but we used primarily a

2  lighter brown color. And even in the lip color, they are

3  similar. We chose to take a softer pink approach.

4  Q.  And why did you do that?

5  A.  Again, also just doing everything we can to make sure

6  that the characters don't appear harsh or just relevant,

7  appropriate, soft. Still edgy, though, of course.

8  Q.  And the last one.

9  A.  This is Carter Bryant's Zoe sketch that represents, if

10  you look at the eyebrows, again, in a 2D image, you'll

11  probably see more clearly that the eyebrow color used in the

12  Carter Bryant Zoe drawings is a dark brown color. Cloe, the

13  manufactured Bratz doll, has a much lighter brown color. And

14  Zoe's drawing in Carter Bryant's portfolio sketch, you'll see

15  that he used a lot of purple and violet eye shadow, almost

16  like she was made up with a lot of eye shadow. If you look

17  at the manufactured Cloe doll, you'll see that we removed a

18  lot of the eye shadow. Actually, the shadows that we used

19  are very mute or natural tone, very deliberate to soften up

20  the face.

21  You'll see the eye color of Zoe is actually a

22  purple, a very violet, intense color. It almost appeared

23  that she was wearing a contact, like a false eye color. So

24  we deliberately in the Jade manufactured doll created a light

25  blue color, a more natural blue tone.

1          Carter Bryant added a little makeup addition
2   underneath the eye.  We opted not to include that in the
3   manufactured Bratz doll.

4   Q.   You mean that purple butterfly looking thing?

5   A.   Half butterfly sort of.

6   Q.   Okay.

7   A.   And in terms of the lip colors, our colors are pretty
8   similar.  And the closer view of that image, Zoe on Carter
9   Bryant's sketch has a -- kind of a more pink, more intense
10  pink color.  Where our manufactured doll, we actually used a
11  lot of pearlescent paint, to soften up the paint to make it
12  appear a little more natural, a little less made up.

13          One also really important sort of reference that
14  Carter made in all of the characters was if you can see this
15  really strong reference to blush on the face.  It's a
16  reference that starts almost above the ear and almost to the
17  ends of her -- the tips of her lips.  And also kind of
18  indicates that only that big space, but some strength from
19  the color, some intensity to the color.

20          MR. PRICE:  I'm going to object.  Color is
21  irrelevant.  Unprotectable.

22          THE COURT:  Color?

23          MR. PRICE:  What she's described is an
24  unprotectable element.

25          THE COURT:  As is being incorporated into the look,

```
 1   overruled.

 2            THE WITNESS:  I'll also point out that the Cloe

 3   manufactured doll, we close to use a very, very little amount

 4   of blush on the face.  Using a very small area on the face

 5   and also to reduce the amount of blush.  Again, doing

 6   everything we can to just soften and sweeten up the

 7   characters from the portfolio drawings.

 8            THE COURT:  Counsel --

 9            MS. AGUIAR:  That includes the presentation on

10   makeup for this afternoon.  I was going to move on to another

11   area.

12            THE COURT:  Let's take our afternoon break at this

13   time, Counsel.

14            (WHEREUPON THE JURY WITHDRAWS.)

15            THE COURT:  Please be seated.  Just on that last

16   objection, I agree, Counsel, that color by itself is not

17   relevant, not protectable, but as it's being used in the

18   particularized expression, I think it's fair game.

19            MR. ZELLER:  I'll take responsibility for this one.

20   As I understood the Court's ruling, in fact, it was really at

21   MGA's insistence where they said things like the complexion,

22   the blush, that kind of coloration.

23            THE COURT:  You're talking -- I'm sorry.  Mr. Price

24   just said color is irrelevant.  You're talking about it on

25   the cheeks itself?
```

1          MR. ZELLER:  Correct.  And the complexion, that's

2   how I understood Ms. Garcia's testimony to be going.

3          THE COURT:  Yes, that's not one of the protectable

4   elements that the Court has identified in its tentative order

5   on that point.  I'm not saying at the end of the day that

6   that's the final.  So the jury will be instructed on that.

7          MR. ZELLER:  Fair enough.

8          THE COURT:  But you're not saying that color is

9   irrelevant.

10         MR. ZELLER:  We'll certainly quote Mr. Nolan as

11  saying that color is irrelevant.

12         THE COURT:  Very well.  I understand.  But the

13  particularized expression in a protectable element --

14         MR. ZELLER:  Right.  And it was specifically

15  because she was talking about blush.  And frankly, I thought

16  MGA was the proponent of saying that that kind of element --

17  complexion, blush, the makeup -- I think Mr. Nolan was using

18  the term, was unprotectable.  Obviously, I recognize there's

19  the distinction if you're talking about, say, the particular

20  face paint for the eyes or the particularized expression.

21         THE COURT:  One thing I left off my order was the

22  mole.  And I haven't really decided on the mole yet.  And

23  that's probably between the two, whether that's part of the

24  eye expression or whether that's not.  But we can cover

25  this --

```
 1              MR. ZELLER:  If I can have leave to submit a
 2    10-page brief --
 3              THE COURT:  On the mole.  Yeah.  Mr. Zeller, I'm
 4    sure you could fill it out.
 5              MR. ZELLER:  Thank you.
 6              THE COURT:  I have every confidence.
 7              MR. NOLAN:  The mole is worth $3 billion.
 8              THE COURT:  At a minimum.
 9              The Court received an order from the Ninth Circuit
10    moments ago.  It reads as follows:  "Petitioner's motion to
11    file portions of the emergency motion and the petition for
12    writ of mandamus under seal is granted.  The motion to exceed
13    the page limitation on the petition is granted.
14              "The emergency motion for an order suspending the
15    trial is denied.
16              "Petitioners have not demonstrated that this case
17    warrants the intervention of this court by means of the
18    extraordinary remedy of mandamus.  Citing Bauman versus U.S.
19    District Court.  Accordingly, the petition is denied."
20              We'll take a 10-minute break, and then we'll resume
21    with the trial.
22              (Recess taken.)
23              (WHEREUPON THE JURY ENTERS.)
24              MS. AGUIAR:  Your Honor, while we wait for the
25    witness, I neglected to move in 18874.
```

1          MR. PRICE:   That's demonstrative.   I'd object.

2          THE COURT:   I'm sorry, Counsel.   What was that?

3          MS. AGUIAR:   I neglected, while we are waiting for

4    the witness, to move in 18874.

5          THE COURT:   No objection?

6          MR. PRICE:   That's a demonstrative.

7          THE COURT:   Was that the -- which one is that?

8          MS. AGUIAR:   It's the ones you -- she was just

9    using for the comparisons.   They are comprised of trial

10   exhibits that are in evidence.   And so I think it would

11   assist the jury in making the comparisons, your Honor.

12         THE COURT:   I'm going to take these up at the end

13   of trial, all of these various demonstratives that have been

14   assembled by both sides.   We'll take them up at that time.

15         MS. AGUIAR:   Okay.

16         THE COURT:   Keep a list of any of these that you

17   want to have brought in.

18         MS. AGUIAR:   We'll do that.

19         And, Aaron, can you put back up the Yasmin one that

20   we were looking at.

21   Q.   Before we close out on this, I just wanted to make sure

22   to ask you, looking at these comparisons, when MGA made the

23   manufactured Bratz doll, did you make the eye, for example,

24   different than the particular eye color and eye makeup color

25   in Mr. Bryant's drawings?

1    A.    Yes.

2    Q.    And in choosing and manufacturing the facial colors for

3    the manufactured dolls, did you use different colors than

4    what are depicted, the particular colors that are depicted in

5    Mr. Bryant's drawings?

6    A.    Yes.

7    Q.    All right.  So now we're going to move away from --

8                And you can take that down, Aaron.

9                We're going to move away from makeup.  Now I want

10   to talk about the facial features themselves.

11               And, Aaron, if you could put up -- I think your

12   reference is probably CR 14 or 15.

13               I want to talk about the facial characteristics and

14   ask you a question about whether the eye -- and not the color

15   now -- I'm talking about the other characteristics of the eye

16   in the manufactured doll, are different from the particular

17   eye that Mr. Bryant drew.  Okay?  And you can tell me whether

18   you would prefer to do that from where you are or if you want

19   to go up to the screen.

20   A.    I'd prefer to come to the screen.

21   Q.    Okay.

22               THE COURT:  Yes, absolutely.

23   Q.    BY MS. AGUIAR:  While you're walking, my question for

24   you is going to be let's start with the proposition that

25   we're looking at these two eyes.  We're looking at the

1   particular eye that Mr. Bryant drew on the left, and we're

2   looking at the particular eye that MGA manufactured on its

3   dolls. And I need you to explain to me, if you believe those

4   are different, what the differences are. Because there may

5   be people in the room who are thinking to themselves, you

6   know, lady, you got to be kidding me. It's a big, oversized

7   eye.

8           So could you point out --

9           THE COURT: Counsel, is there a question there?

10          MS. AGUIAR: Yes.

11          MR. PRICE: I object to the question as phrased to

12  suggest that that's an appropriate way of looking at it.

13          THE COURT: It is, Counsel. Let's avoid that in

14  the future.

15          MS. AGUIAR: I will.

16  **Q.** Do you want the pointer again?

17  **A.** I'm fine.

18  **Q.** I think -- actually, let's drop down the line

19  extractions, and maybe you can also point to that as you go.

20  **A.** Okay. Again, I guess the best is to start from the top

21  and work our way down. In particular, in the reference

22  between Carter Bryant's portfolio 2D sketches as it relates

23  to the Bratz manufactured doll, one very, very specific

24  difference is in the shape of the eyebrow. MGA's deliberate

25  decision as to actually make certainly an arching eyebrow,

1  but not to the same degree, not to the same severe slope

2  coming to a top and coming down.

3          THE COURT:  Can I interject here for a second,

4  Counsel?  Could you describe for the record what you've done

5  here?

6          MS. AGUIAR:  Oh, sure.

7  Q.  Ms. Garcia, can you explain what we're looking at here?

8  A.  Sure.  This -- the images on the bottom represent sort

9  of a black and white, an outline of the characteristics and

10  the facial features of both the 2D Carter Bryant portfolio

11  drawings and the manufactured Bratz doll.

12          MR. PRICE:  My objection is they are not in

13  evidence, obviously.  And this witness didn't prepare them.

14  It's an improper demonstrative.

15          THE COURT:  I'm sorry.  What's not in evidence?

16          MR. PRICE:  What they have done here in the bottom.

17  It's an improper demonstrative for a fact witness.

18          THE COURT:  Just lay a foundation for what we're

19  seeing, Counsel.

20  Q.  BY MS. AGUIAR:  Okay.  Can you explain what the two

21  images are on the top and how the lines -- and how we arrived

22  at what you're looking at on the bottom?  Just explain what

23  the images are on the top.

24  A.  Okay.  So the images on the touch, the first is on the

25  left is the Carter Bryant 2D portfolio sketch of Lupe.

1    Focusing in on her head and face.  And then this is the Bratz

2    manufactured Yasmin doll.  Again, cropped into her face.

3  Q.    And on the right-hand side, the Yasmin, is that a first

4    generation doll?

5  A.    Yes, it is.

6  Q.    And then what are we -- just explain, if you would once

7    again, what are we looking at on the bottom, and how did that

8    come about?

9  A.    So the images on the bottom represent outlines as if you

10   were to trace some of the facial features, the structure of

11   the facial features within the two references in the above.

12   So they represent sort of -- removed of the color, since we

13   already went through color -- just kind of the actual

14   structure and dimension and that respect.

15  Q.    So would you go through with us --

16         MR. PRICE:  My objection is the ones on the bottom

17   don't represent the works of anything at issue.

18         MS. AGUIAR:  I don't want to make a speaking

19   objection --

20         THE COURT:  No, let's go to sidebar.

21         **(SIDEBAR CONFERENCE HELD.)**

22         THE COURT:  The Court said it would do the

23   filtering analysis.  And the Court has filtered out the

24   protectable and nonprotectable elements.  This seems to go

25   one step beyond the Court's filtering by divorcing the

1 outlines of, for example, the protectable particularized

2 expression of the eyes from the context, the color, shading,

3 et cetera. You're taking it one step beyond what the

4 Court -- I'm assuming that's your objection.

5 MR. PRICE: Yes.

6 MS. AGUIAR: Let me explain why I think that's not

7 the case. We are trying to do exactly what your Honor

8 suggested, which is make a direct comparison from the drawing

9 to the doll. We made it with regard to the particularized

10 colors that he chose, and now we're trying to demonstrate the

11 shape differences in the eye. And I think it's -- when MGA

12 was developing the doll, they didn't do the color and the

13 shape together. They did them separately. They designed it.

14 And then it was separately drawn by Anna Rhee. So there's

15 been no suggestion that these outlines are not exact outlines

16 of the shape of the eye or the shape of the lip.

17 THE COURT: The concern is a 403 concern with

18 respect to these particular depictions, that because these

19 depictions, and I'm referring to the outline drawings for the

20 record, on the bottom part of the page, are being divorced or

21 separated from the context in which they appear. You're

22 taking the filtering analysis one step beyond the filtering

23 that the Court did. You can certainly point out -- ask every

24 question that you want to ask, but it's just the submission

25 of the creation of these two outline sketches that I have

1    concerns about.

2           MS. AGUIAR:  We are trying to show, your Honor --

3    and I think it is a valid comparison -- we're trying to show

4    shape.  And I think for the jury's benefit, this very clearly

5    shows the shape which I think we would be entitled to do.

6           THE COURT:  Right.

7           MS. AGUIAR:  So if they were suggesting that these

8    outlines did not follow the outlines of the eye --

9           THE COURT:  That's not the issue.

10          MR. NOLAN:  Your Honor, I just would add, I think

11   the next step is going to be just take a look, let's say, at

12   the size and shape of the eyes and making a comparison --

13          THE COURT:  And if you wanted to pull out, you

14   know, this and put the -- lay on top of each other.  The

15   problem with the black and white sketching is that it

16   divorces it from what has been found to be all wrapped up.

17   You can narrow in as much as you want, even on one eye or as

18   much as you want, as long as you're still comparing the

19   drawing with the doll.  Not a sketch of a drawing and a

20   sketch of the doll.  No matter how accurate the sketch might

21   be.

22          MR. NOLAN:  Because I'll represent to the Court

23   that I did this in my opening statement without any

24   objection.  In fact, I was doing the lip comparison.  Because

25   see, what would happen --

1          THE COURT:   I'm sure you probably did, Counsel.

2    I'm really not focusing in on this until now.   I didn't issue

3    my ruling on the filtering until a few days ago.

4          MR. NOLAN:   But we did one other thing.   And that

5    is -- because this would be the next step in the process, is

6    just take this lip and overlay it to that lip.   Okay?

7          THE COURT:   If you want to do that with these, you

8    can.   But not with the drawings.   The more I'm looking at

9    this, -- and really the cases that I did on filtering, I

10   think that is something which is particularly not appropriate

11   to do.

12          MR. NOLAN:   But we could highlight the lips, the

13   lines, and the eyes next to each other?

14          THE COURT:   You can manipulate all of that all you

15   want.   And if you want to take a break --

16          MS. AGUIAR:   No, that's fine.

17          MR. NOLAN:   And the last point, for about the fifth

18   time today, these speaking objections are really in front of

19   the jury, it suggests that we're doing something wrong --

20          THE COURT:   Hold on a second.

21          That was a speaking objection, Mr. Price.   You've

22   got to use not relevant.   This is another one that would be

23   not relevant.

24          MR. PRICE:   I apologize.   I'm doing my best.   I'm

25   trying to make eye contact and seeing if my shortcut works.

1    THE COURT: That's not appropriate. And I try to
2  avoid that as well. I don't want eye contact going on
3  between the Court and counsel.

4    MR. PRICE: I'm just trying to see if there's a
5  puzzled look on your face.

6    THE COURT: Don't try to read that. Because
7  oftentimes, if I'm giving an expression, oftentimes it may be
8  something that I'm reading on my screen that has absolutely
9  nothing to do with this case.

10    MS. AGUIAR: If he looks happy, it's not because of
11  us.

12    MR. NOLAN: It's more than that. There's a pattern
13  now that's developing where they are suggesting that what
14  we're doing or attempting to do is wrong. And that's the
15  problem. And I think this is about the fifth time this --

16    THE COURT: I understand. There have been speaking
17  objections made by both sides throughout this trial. And I
18  have cautioned both sides. But I have mentioned this to you,
19  Mr. Price, several times today. So next time it happens, I'm
20  going to say something to you in front of the jury. Thank
21  you, Counsel.

22        **(CONCLUSION OF SIDEBAR CONFERENCE.)**

23    MS. AGUIAR: Aaron, if you could put back up the 14
24  graphic.

25  Q.  Okay. So if you want to use the pointer or you want to

1   use your finger, let's -- I think you already commented on

2   the eyebrow.  So if you would move on to the eye and focus

3   your comments on the differences, if any, that were

4   implemented in the doll versus the drawing.

5   **A.**   Okay.  In referencing the Carter Bryant 2D portfolio

6   sketch, you'll notice that the eye shape is actually quite

7   round.

8          If you look at the actual manufactured MGA Bratz

9   doll, the eye actually takes a wider, more almond, a longer

10  shape, specially in a distance from the tear duct to the edge

11  of the eye.

12         In the pupil area, you'll see that the pupil in

13  Carter Bryant's Lupe portfolio drawings is actually quite

14  small and kind of sort of beady-like.  In the manufactured

15  Bratz Yasmin doll, the pupil is actually opened bigger,

16  wider.  And I'll stop to say that I've been part of the

17  development of dolls now for --

18         MR. PRICE:  Objection, your Honor.

19         THE COURT:  Next question, Counsel.

20  **Q.**   BY MS. AGUIAR:  Describe for me the effect of the change

21  that was made.

22         MR. PRICE:  Objection.  Irrelevant.

23         THE COURT:  Sustained.  Unless you're asking -- why

24  don't you rephrase your question.

25  **Q.**   BY MS. AGUIAR:  Was a decision made to change the pupil

```
 1   size, an affirmative decision by MGA?

 2   A.    It was a very conscious decision by MGA to change the

 3   size of the pupil.  The pupil size --

 4              MR. PRICE:  Objection.  Beyond the scope.

 5              THE COURT:  Next question.

 6   Q.    BY MS. AGUIAR:  And what was the reason for the

 7   decision?

 8              MR. PRICE:  Objection.  Relevance.

 9              THE COURT:  Sustained.

10   Q.    BY MS. AGUIAR:  Was that decision based on your view of

11   the marketability of the doll?

12              MR. PRICE:  Objection.  Leading.

13              THE COURT:  Sustained.

14   Q.    BY MS. AGUIAR:  What was the decision based on?

15              MR. PRICE:  Objection.  Irrelevant.

16              THE COURT:  Well, with respect to marketability,

17   Counsel.  I wish I could do this -- a very quick sidebar.

18              (SIDEBAR CONFERENCE HELD.)

19              THE COURT:  I'm going to sustain or overrule

20   objections going forward at this point.  Reasons why they

21   make a change is not relevant.  That a change was made is

22   relevant.  What change was made is relevant.  And ultimately

23   how that affected marketability or the profits is relevant

24   with respect to apportionment of damages.  Presuming that the

25   change is not related to a protectable -- that's part of the
```

1   apportionment analysis.

2          MS. AGUIAR:  But, your Honor, so, for example, just

3   speaking here at sidebar, if they made that change because

4   they knew from their experience and from research and from

5   feedback that making a doll with a beady eye and a small

6   pupil would not sell as well, that is absolutely relevant.

7   It was a decision they made to make a change, and it probably

8   ended up in a more successful doll that sold more, and as

9   your Honor put it, captured the imagination of a kid rather

10  than a doll that looked different.

11         MR. PRICE:  If that's what she's going to, there's

12  no foundation at all.

13         THE COURT:  I understand the foundational

14  objection.  But we are all on the board that that's relevant.

15         MR. PRICE:  If there's a foundation.

16         THE COURT:  But the best way to do that is

17  accomplish the -- establish the change.  What is the change.

18  And then if you want to get into the impact of that change in

19  terms of profitability, marketability, assuming that you can

20  lay a foundation for it, that's fine.

21         MS. AGUIAR:  Because I did establish the change.

22  She said it was a smaller pupil and they made it larger.  So

23  I established that the change was made, and now I was trying

24  to go into and what was the effect of that?

25         THE COURT:  The way that the questions were coming

1    out, and it's just a -- kind of a form issue as it is, is to

2    get away from the why, the result of the change. There was a

3    change, and there was an effect on marketability. And lay

4    the foundation.

5         MR. PRICE: The problem is there's no way that this

6    witness would have the foundation to testify --

7         THE COURT: That's why I'm asking you to ask it in

8    that order, because that way you get in the change, and then

9    if there's a question of foundation, it doesn't cut you off

10   at the pass. You may have to bring up somebody else to deal

11   with the marketability or the impact on damages in the

12   apportionment. But it's a way of doing the evidence in a way

13   that makes sense.

14        MR. NOLAN: Real quickly, your Honor, for

15   clarification. So if I change that she makes, for instance,

16   in the pupil is made to make her appear younger or to appeal

17   to a different audience or idea, that's fair game, as I

18   understand what we've been going through today.

19        THE COURT: Why she did it is not relevant unless

20   it can be expressed in terms of marketability.

21   Profitability. She has to lay the foundation. We have not

22   heard that. I have not heard that.

23        MR. NOLAN: I appreciate that. I guess I'm doing a

24   different point. If the change was made to make it different

25   than the idea that Carter Bryant had for the expression of

```
 1   the eye, for instance, Carter Bryant's eye express was --
 2              THE COURT:  To show that the particularized
 3   expression in the doll is different than the particularized
 4   expression in the drawing, that goes both to the issue of
 5   copyright and to damages, yes.
 6              MR. NOLAN:  Okay.
 7              MS. AGUIAR:  He's just saying the change goes to
 8   both.
 9              THE COURT:  Right.  And you have to lay a
10   foundation for that.
11              (CONCLUSION OF SIDEBAR CONFERENCE.)
12   Q.  BY MS. AGUIAR:  Okay.  So let's just go back to the eye
13   and summarize, if you would, for me.
14              What is the difference, if any, between the shape
15   of the eye in the drawing and the shape of the eye that MGA
16   opted to create in the doll?
17              MR. PRICE:  This is asked and answered.
18              THE COURT:  Reorientation.  You may answer.
19   Q.  BY MS. AGUIAR:  You can answer.
20   A.  In the Carter Bryant Lupe 2D portfolio drawing, the eye
21   is quite round and short from the tear duct to the end of the
22   eye.
23              In the Bratz manufactured Yasmin doll, the eye is
24   actually much longer, more almond in shape.
25   Q.  Was there a change made by MGA in the size of the pupil
```

1    between the drawing and the actual doll?

2    **A.**    Yes, absolutely.

3    **Q.**    And what was that change?

4    **A.**    We chose to make a bigger sized pupil in the Bratz

5    manufactured Yasmin doll.

6    **Q.**    Does the change in the pupil size make the eye look

7    different?

8    **A.**    Yes, it does.

9    **Q.**    In what way?

10   **A.**    Well, the eye overall, the tone that you receive from an

11   eye with a bigger pupil suggests a character --

12           MR. PRICE:   Your Honor, characterization.

13   Relevance.

14           THE COURT:   Rephrase your question, Counsel.

15   **Q.**    BY MS. AGUIAR:   Due to the size of the pupil, is the eye

16   on the right that you created in the Bratz dolls different

17   from the eye on the left?

18   **A.**    Yes.   The pupil on the right is larger in size than the

19   pupil on the left side.   And the larger pupil suggests a

20   sweeter --

21           MR. PRICE:   Objection.   Beyond the scope.

22           THE COURT:   Next question.

23   **Q.**    BY MS. AGUIAR:   Based on your experience, did you have

24   an understanding that changes such as the one you've just

25   described have an impact --

```
 1               THE COURT:  I'm sorry.  I'm going to retract that
 2    ruling.  It's part of the difference.
 3               MS. AGUIAR:  Mark, will you please read back the
 4    last question and answer?
 5               (Record read.)
 6               THE WITNESS:  A sweeter, younger, more
 7    approachable, more appropriate character.
 8    Q.   BY MS. AGUIAR:  Do you have an understanding based on
 9    your experience in doll development, that there is a
10    connection between the size of the pupil and the look of the
11    doll generally?
12    A.   Yes, absolutely.  The size of the pupil --
13               MR. PRICE:  Objection.
14               THE COURT:  It was a yes or no question.  Next
15    question.
16    Q.   BY MS. AGUIAR:  And what is that understanding based on?
17    A.   It's based on my experience in developing dolls, and it
18    is my understanding that the size --
19               MR. PRICE:  Objection.  Beyond the scope.
20    Q.   BY MS. AGUIAR:  And what is -- and what is your
21    understanding about that connection?
22               THE COURT:  I'll sustain the foundational
23    objection.  Further foundation, Counsel.
24               MS. AGUIAR:  Okay.
25    Q.   Describe to us how you know what it is you know about
```

1    the size of the pupil on the eye of a doll?

2                THE COURT:  And its effect.

3    Q.   BY MS. AGUIAR:  Yes.  And its effect on how kids

4    interpret or perceive a doll.

5    A.   It's based on my experience, almost now collective of 10

6    years of doll development, you know, in the past 10 years of

7    my doll development experience.

8    Q.   Have you received results of focus groups on subjects

9    like this?

10               MR. PRICE:  Objection as to time frame.

11               MS. AGUIAR:  I'm asking a general question now,

12   your Honor.

13               THE COURT:  Very well.

14               THE WITNESS:  Not specific focus groups based on

15   the size of a pupil.  It has been through my learning and

16   developing and also then my receiving, my own perception of

17   studying dolls and the size of the pupil.

18   Q.   And what is your understanding regarding the connection

19   between the size and how a child reacts to a doll?

20               MR. PRICE:  Objection.  Lack of foundation.

21               THE COURT:  Insufficient foundation, Counsel.

22               MS. AGUIAR:  I'll move along.

23   Q.   Okay.  So we've talked about the eye.  Is there anything

24   else that you'd like to point out in the way of differences

25   between the drawing and the doll?  Sticking with the eye just

1  for a moment.

2  **A.**  No, that's it.

3  **Q.**  And are there any differences that you see moving on to

4  the eyelashes, let's say.  Are there differences between the

5  particular way that Mr. Bryant drew them and the particular

6  way that MGA created them?

7  **A.**  Yes, in Carter Bryant's 2D portfolio sketch, you'll see

8  that he creates eyelashes, three of them at the end of the

9  eye.  In the Bratz manufactured Yasmin doll, we actually

10  created four eyelashes, and the eyelashes actually span from

11  the center of the pupil all the way to the end of the eye.

12  And I make reference only to the eyelashes on the top lid.

13  **Q.**  Do you believe that in creating the Bratz dolls, that

14  the particular way that MGA did it is different than the

15  particular way that Mr. Bryant drew them in his pitch book?

16  **A.**  Yes.

17  **Q.**  Let's do another facial feature.

18       And, Aaron, maybe we can use number 47 for that

19  one.

20       Let's talk about the lips.

21       Do you see differences between the way that

22  Mr. Bryant drew the lips and the particular way that MGA

23  manufactured the lips on the doll?

24  **A.**  Yes, absolutely.

25  **Q.**  And we're looking here, by the way, at the drawing of

1    Hallidae on the left and a photograph of the actual first

2    generation Sasha doll on the right; correct?

3    A.    That's correct.

4    Q.    Sorry.  Go ahead.

5    A.    In looking at Carter Bryant's 2D portfolio sketch of

6    Hallidae, you'll notice the shape of the upper lip.  The

7    shape of the upper lip is actually a continuous kind of

8    curving line as opposed to the manufactured Sasha doll where,

9    in fact, we actually created or implemented peaks in the

10   shape of the top of the lip, suggesting a more natural lip

11   shape.

12        If you look at the size of the Hallidae Carter

13   Bryant 2D portfolio sketch and you look at the size from the

14   top of the upper lip to the bottom of the upper lip, it was

15   my personal perception that this was a pretty solid and full

16   lip as opposed to the Bratz manufactured Sasha lip.  The top

17   of the upper lip to the bottom of the upper lip actually is

18   much shorter in distance, meaning the top lip is much smaller

19   in relation to the top lip of Hallidae.

20        You'll see that in Carter Bryant's Hallidae

21   drawing, there is the really strong -- it's not as super

22   clear here, but there's a really strong sort of flip that

23   happens at the ends of the top lip.  And in the Bratz

24   manufactured Sasha, you'll see that the flips were minimized,

25   if not almost completely reduced.

1          And you'll also see in the Hallidae drawing that

2    there's a big sort of crease in the top upper lip which Bratz

3    manufactured Sasha did not include at all.

4          Those were some deliberate revisions to -- let me

5    back up.  I was concerned in reviewing the Hallidae drawing

6    that --

7          MR. PRICE:  Objection.  Beyond the scope.

8          THE COURT:  Next question, Counsel.

9    Q.   BY MS. AGUIAR:  Did the changes that you made to the lip

10   that you've described so far result in a different look, an

11   overall look and feel of the lip on the right?

12   A.   Yes.

13   Q.   And what is that different look and feel of the lip on

14   the right?

15   A.   The look on the right represents a more natural lip, a

16   more modest lip, a more human-like lip.  And frankly, in my

17   opinion, a more appropriate lip.

18   Q.   Is there anything else you want to point out about the

19   lip before we move on?

20   A.   I'd like, if it's acceptable, to point out in the

21   Hallidae drawing.  Is that acceptable?

22   Q.   Sure.  Again, if it's a difference between the drawing

23   and the doll, yeah.

24   A.   Actually, I've actually spoken to the differences.

25   That's enough.

1  Q.  Great.  So with regard to the lips that we're looking at

2  here, did --

3  A.  Actually, I apologize.  I don't mean to interrupt, but I

4  did think of a few more differences, if it's acceptable to

5  speak to them.

6  Q.  All right.  Point out, if there are other differences,

7  what they are.

8  A.  I apologize.  I've sort of been focused on the bottom.

9  But in the Carter Bryant 2D portfolio sketch, you'll notice

10  that the Hallidae's bottom lip is more square in shape, if

11  you will.  And if you look at the manufactured Sasha bottom

12  lip, you'll see that it's actually more like oval or round in

13  shape.  It doesn't create so much of the square.

14         And finally, in the Hallidae Carter Bryant 2D

15  portfolio sketch, you'll see a really, really strong sort of

16  crease in the bottom lip which was -- there's certainly a

17  sculpt relief of sort of material removed from the bottom

18  lip.  But not to the same degree and not to the same

19  intensity.  And not for the same purpose that I believe the

20  Hallidae line was indicated for.

21  Q.  So do you think the lip in the doll that MGA created is

22  different from the particular lip that Mr. Bryant drew?

23  A.  Yes.

24  Q.  Okay.  I was going to -- unless there's anything else

25  about the facial features that you want to point out, then I

1   was going to move on.

2   **A.**   I'm done.

3   **Q.**   Okay.  You can go back up to the witness stand.

4           I'm going to move past the first generation dolls

5   now.  So the next series of questions that I want to ask you

6   this afternoon, I'm going to be referring to the different

7   Bratz dolls that came out spring 2002 and forward.  Okay?

8   **A.**   Okay.

9   **Q.**   After the first generation, when was the next line of

10  dolls released?

11  **A.**   In spring 2002.

12  **Q.**   And starting in spring 2002, did the new dolls have

13  themes that went along with them?

14  **A.**   Yes, they did.

15  **Q.**   And the jury's heard a bit about themes and maybe if

16  Aaron can put up some of the slides that we showed the jury

17  in the opening statement, and those slides show some of the

18  themes that have been implemented starting 2002.

19          Aaron, maybe you can flip through them.

20          These show 2002 up through the present.  If you can

21  explain to the jury what is meant by theme.

22  **A.**   A theme is actually another way to term a collection.

23  It's very, very important to create themes.  As themes

24  provide reasons for collectability, another reason for a

25  consumer to purchase another Bratz doll.  A consumer of 7 to

1  10, she's a really fickle girl.

2          MR. PRICE:  This goes beyond the scope.

3          THE COURT:  Sustained.  Next question.

4  Q.  BY MS. AGUIAR:  How does the use of a theme relate to

5  your target consumer?  Why is that important?

6  A.  The themes relate because --

7          MR. PRICE:  Objection.  Foundation.

8          THE COURT:  Sustained.  Lay a foundation, Counsel.

9  Q.  BY MS. AGUIAR:  Do you have an understanding of why

10 themes are important to your consumers?

11 A.  Yes, I do.

12 Q.  What is that based on?

13 A.  Based on focus groups.  Based on bounce-backs of our

14 consumers, based on fan club feedback.

15 Q.  And what is your understanding of the importance of

16 themes to your particular target audience for the Bratz

17 fashion dolls?

18         MR. PRICE:  Objection.  Lack of foundation and

19 relevant time period.

20         THE COURT:  Lay some more foundation.

21 Q.  BY MS. AGUIAR:  We're talking about the time period when

22 MGA was producing lines of dolls with different themes from

23 2002 through 2007.

24         Do you now, as you sit here today, have an

25 understanding of the relevance of themes to your particular

1  target audience?

2       MR. PRICE:  I'll object.  It's irrelevant as to

3  today.  And lack of foundation as to the time frame.

4       THE COURT:  Let's ask a series of questions

5  establishing the time frame, Counsel.

6  **Q.**  BY MS. AGUIAR:  At some point in time, did you develop

7  an understanding that themes are important to your consumer?

8  **A.**  Yes.

9  **Q.**  When did you come to understand that?

10 **A.**  I came to understand that from spring 2002.  Frankly, in

11 the development of our spring 2002 line and, you know,

12 through the many, I guess the seven or eight years up until

13 today.

14 **Q.**  Okay.  And what is your understanding as to the

15 importance and relevance of themes to the Bratz target

16 audience?

17      MR. PRICE:  Lack of foundation for 2002.  That's

18 where she doesn't have the foundation.

19      THE COURT:  Just confirm that her previous

20 foundation is connected up to the time frame that you've

21 identified.

22 **Q.**  BY MS. AGUIAR:  As of 2002, did you already have the

23 understanding of the importance of themes to your consumer

24 that you were targeting?

25 **A.**  Yes.

1  Q.   And what was that understanding that you had regarding

2  the importance of themes to that consumer?

3  A.   My understanding is through communication or focus group

4  with our consumer type.  It was in studying and reviewing

5  documents like, as I mentioned before, NPV, which is, you

6  know -- recognizes how products or themes may or may not

7  perform.

8  Q.   So how is a theme -- or why, rather, is a theme

9  important to this age range of girls that you were targeting?

10 A.   This age group is -- I have learned through my

11 experience and through research and tons of communication and

12 interaction with these girls.  These girls are starting to

13 find in their life interests even beyond and outside of toys.

14 It can range as much as, you know, magazines, iPods, music.

15 They find interests very much outside of toys.  It is through

16 the theme that we can reinvent ourselves.

17        So we can keep them interested and through the

18 theme that we can reach them emotionally to, you know, to

19 touch sort of some of those interests that they are even

20 finding, you know, beyond and outside of being even seven to

21 ten years old.

22 Q.   Did MGA use or rely on in any way Mr. Bryant's original

23 concept drawings when you were developing themes, any of the

24 themes for the new Bratz dolls?

25 A.   No.

1   Q.   Did Mr. Bryant's drawings even have a theme in them?

2   A.   No, they did not.

3   Q.   Do the different Bratz dolls with different themes

4   usually sell at the same rate or the same popularity?

5   A.   No, they do not.

6   Q.   I want to go through one or two that may not have done

7   so well.  I want to first go to Exhibit 17565.

8          So let's start with 17565.  Can you tell the jury

9   what that doll is?

10  A.   This is a Bratz Pretty and Punk doll.

11  Q.   Did that doll sell well?

12  A.   No, this doll did not sell well.

13  Q.   And do you have an understanding as to why that -- why

14  it did not sell well?

15  A.   Yeah.

16  Q.   And why did it not sell well?

17         MR. PRICE:  Objection.  Lack of foundation.

18         THE COURT:  Sustained.

19  Q.   BY MS. AGUIAR:  What's your understanding based on?

20  A.   My understanding is based on interaction and

21  communication with core girls of our consumer set.  We also

22  got feedback from, you know, our fan club, bounce-backs, the

23  like.

24  Q.   And what is your understanding as to why that particular

25  doll did not sell well?

1           MR. PRICE:  Objection.  Foundation and hearsay.

2           THE COURT:  Sustained.  Further foundation,

3    Counsel.

4    Q.   BY MS. AGUIAR:  Did the communication with consumers and

5    bounce-back comments from girls and fan club websites provide

6    you an understanding as to why this doll was not successful,

7    this particular doll?

8    A.   Yes.

9    Q.   And is that the typical way in which you would learn

10   whether a particular doll was or was not successful?

11   A.   Yes.

12   Q.   And is this something you do in the course of being a

13   brand manager for Bratz, is to get feedback like that and

14   gain an understanding as to the reasons a doll is successful?

15   A.   It is a huge responsibility as a brand manager.

16   Q.   And what is your understanding as to why this particular

17   doll did not do as well?

18          MR. PRICE:  Same objections.  Foundation and

19   hearsay.  Also, your Honor, relevance as to her

20   understanding.

21          THE COURT:  Is it being offered for the truth of

22   the matter asserted, Counsel?

23          MS. AGUIAR:  No.  It's to get at her understanding

24   of why it didn't sell as well as another Bratz doll.

25          THE COURT:  Then it becomes -- it runs into the

1  relevance dilemma. It doesn't matter why she thinks --

2     MS. AGUIAR: Okay.

3  **Q.** Let me ask can you this: Do you know for a fact that

4  this Bratz doll did not sell as many dolls as other Bratz

5  dolls?

6  **A.** Yes, I do.

7  **Q.** And turn to the next one. 18690. Can you tell the jury

8  what we're looking at there?

9  **A.** This is -- it's called Fabulous Bratz.

10 **Q.** Fabulous Bratz. And is that the one with the Las Vegas

11 theme?

12 **A.** Yes, it is.

13 **Q.** Is this a doll that did not do as well as other Bratz

14 dolls?

15 **A.** Yes.

16 **Q.** And do you know that for a fact?

17 **A.** Yes.

18 **Q.** Is it your understanding that the theme of these two

19 dolls is one of the reasons that the doll did not sell well?

20    MR. PRICE: Objection. Lack of foundation.

21 Hearsay.

22    THE COURT: Sustained.

23 **Q.** BY MS. AGUIAR: Let's talk about dolls that did sell

24 well. I'm going to show you two of them.

25    Can you tell the jury what we're look at there?

1   There's two. 18680. What is that?

2   **A.**   That's a Bratz Slumber Party.

3   **Q.**   And 17529.

4   **A.**   This is a Bratz Formal Funk.

5   **Q.**   And did these two dolls that we're looking at here,

6   Slumber Party and Formal Funk, sell very well in comparison

7   to other Bratz dolls?

8   **A.**   Yes, they did.

9   **Q.**   So what do you say in response to the argument that all

10   the dolls that -- let's say just the four that I've shown you

11   just now within the last five minutes, that those are all

12   basically just the same doll.

13                MR. PRICE: Objection. Vague.

14                THE COURT: Rephrase.

15   **Q.**   BY MS. AGUIAR: Are the four exhibits that I just showed

16   you -- 17529, 18680, 18690, and 17565 -- are those the same

17   doll?

18                MR. PRICE: Objection. Vague.

19                THE COURT: You're referring to the body, Counsel?

20                MS. AGUIAR: I'm referring to the whole thing, the

21   doll as a whole.

22   **Q.**   In those packages, just as you're looking at them now,

23   are those the same doll?

24                MR. PRICE: Objection. Vague.

25                THE COURT: I'm sorry, Counsel. You're asking if

1   they are the same?  The exact same?

2           MS. AGUIAR:  Yeah.  Are those the same doll.

3           THE COURT:  Overruled.

4           THE WITNESS:  No, they are not the same doll.

5   Q.   BY MS. AGUIAR:  And why in your view are the dolls that

6   we're looking at in front of us not the same doll?

7   A.   They are not the same doll because they represent

8   different themes, the themes requiring different fashions,

9   accessories, packaging, et cetera.

10          MR. PRICE:  Objection.  Move to strike the opinion.

11  That's irrelevant.

12          THE COURT:  Sidebar, Counsel.

13          MS. AGUIAR:  You want me to just ask a different

14  question?

15          THE COURT:  I want to see you at sidebar.

16          **(SIDEBAR CONFERENCE HELD.)**

17          THE COURT:  My concern is this.  And that's why I

18  questioned.  I -- I should have sustained the vagueness

19  objection.  What you've done is told the jury basically, I

20  don't really understand how this played out.  You asked her

21  are they the same.  She said no.  Why are they not the same?

22  Because they have different themes.  Ergo, if you have

23  different themes, they are not the same doll, not to mention

24  not being substantially similar.  This is totally irrelevant,

25  and I'm considering an instruction to the jury.  That's why I

1    called for the sidebar. I'll hear argument from both sides.

2              MS. AGUIAR: She's testified that they develop

3    different themes for the dolls.

4              THE COURT: That's clear. But that doesn't make

5    them necessarily different, not the same doll. There's a

6    conflating of issues. I should have sustained the vagueness

7    objection. I made a mistake.

8              MR. NOLAN: Your Honor, isn't that ultimately the

9    question --

10             THE COURT: Do you understand the concern the Court

11   has?

12             MR. NOLAN: I do, your Honor. Isn't that

13   ultimately the question of fact that this jury will have to

14   make the determination on? And that is whether or not the

15   facial, the look --

16             THE COURT: She's not asking about any protectable

17   element. She is asking about a clearly nonprotectable

18   element and using that as a basis to say that --

19             MS. AGUIAR: Your Honor, Mr. Quinn in his opening,

20   he basically also, I believe -- and I'd have to go back to

21   the transcript -- asked at least one witness whether these

22   aren't -- and he used that phraseology. These are just the

23   same doll. And I believe we're entitled to elicit testimony

24   as to why she believes certain things make the dolls

25   different.

         1              THE COURT:  You may be right.  I can't remember

         2     exactly what he said or didn't say.  I can only rule on

         3     objections that are before me.  But the objection was well

         4     taken, and I blew it.

         5              Counsel?

         6              MR. PRICE:  I believe there should be an

         7     instruction.  She's able to testify about differences between

         8     the dolls.  That's the infringement element.  Now they are

         9     trying to conflate that with apportionment somehow.  Because

        10     it's in a box and has accessories, now there's testimony that

        11     that makes them not the same doll.  So I think that the jury

        12     needs to be instructed.

        13              THE COURT:  This is not -- I don't want to give an

        14     instruction like this.  Counsel, can you cure this with some

        15     questions?

        16              MS. AGUIAR:  Yes, I believe I can.

        17              THE COURT:  For me to have confidence that you can

        18     cure it with a question, I need to have confidence that you

        19     understand what went wrong here.

        20              MS. AGUIAR:  What if I ask her specifically do the

        21     two dolls you're looking at have different themes.  Do the

        22     two dolls you're looking at -- are they wearing different

        23     fashions.  The two dolls you're looking at, are the

        24     accessories in the box different.

        25              THE COURT:  That's fine.  All of that is fine.  The

1  problem was the predicate you used to say are these -- it was

2  clever, but it was not proper.

3          MR. PRICE:  We need to strike the answer that's in

4  the evidence.

5          THE COURT:  I will strike that.  I'm not going to

6  give that instruction.

7          MR. PRICE:  And I think we also need a question so

8  there's no confusion.  I want to be clear.  The dolls

9  themselves, those are the same.  Because we need them to know

10  that that's not what they are saying.

11         MS. AGUIAR:  But the dolls themselves are not the

12  same.

13         MR. PRICE:  As a follow-up -- this is a follow-up

14  that the jury just heard.  They are going to think this is

15  just breaking down the differences --

16         THE COURT:  I know.  No, I --

17         MS. AGUIAR:  I will ask about each of the elements

18  that I just set out.  I do believe I understand what you're

19  saying, and I will ask about the fashions, the theme, the

20  packaging, the accessories, and ask if --

21         THE COURT:  And that all goes to apportionment.  It

22  doesn't go to substantial similarity.  These two just got

23  conflated.

24         MS. AGUIAR:  But as we all know, the question on

25  substantial similarity is not from doll to doll.  You've said

1  that. They have agreed with that.

2  THE COURT: I understand that.

3  MS. AGUIAR: So the fact that I asked if these two

4  dolls are the same doll doesn't even go to substantial

5  similarity.

6  THE COURT: Counsel, Counsel, if you can establish

7  in this jury's mind that two dolls are not substantially

8  similar or the same based on different themes, you have made

9  your task on establishing from drawing to doll that much

10 easier. I'm convinced you understand the argument. Don't

11 unconvince me. I think you understand where you run afoul.

12 MS. AGUIAR: So I will ask the questions.

13 THE COURT: You do. I'm going to strike the

14 answer. I'm not going to instruct at this point. But I'll

15 be mindful of this.

16 **(CONCLUSION OF SIDEBAR CONFERENCE.)**

17 THE COURT: Ladies and gentlemen, just backing up a

18 bit, you are to disregard, and the Court is going to strike

19 the answer with respect to the dolls, whether they are the

20 same or not. The two dolls in question. Just completely

21 disregard that.

22 Counsel, next question.

23 **Q.** BY MS. AGUIAR: Sure, the two dolls that you have in

24 front of you, do those two dolls have different themes?

25 **A.** Yes, they do.

1   **Q.**   The two dolls in front of you, are they wearing

2   different fashions?

3   **A.**   Yes, they are.

4   **Q.**   The two dolls that you have in front of you, are there

5   different accessories in each of the two boxes?

6   **A.**   Yes.

7   **Q.**   And the two dolls that you have in front of you, are

8   they both in a different package?

9   **A.**   Yes, they are.

10  **Q.**   What are the characters that are depicted in each of the

11  dolls?  Can you tell the jury, for example, in the Slumber

12  Party?

13  **A.**   In Slumber Party, Yasmin is included in the package.

14  And in Formal Funk, Dana is included in the package.

15  **Q.**   So the two dolls in front of you, are the characters

16  different?

17  **A.**   Yes.

18  **Q.**   And if you look specifically at the face decoration, or

19  what we've been calling the face paint, is the face paint

20  different in the Formal Funk doll versus the Slumber Party

21  doll?

22  **A.**   Yes, they are very different.

23  **Q.**   The hair on the two dolls, on Yasmin and on -- did you

24  call her Dana?

25  **A.**   Dana.

1  Q.   Is the hair different?

2  A.   Yes, they are very different.

3  Q.   So other than the underlying naked sculpt, which you had

4  up there before, are the different elements of the dolls that

5  we just discussed different from one to the next?

6  A.   Yes.

7  Q.   Let's talk about fashions for a moment.

8          For the Bratz dolls -- going past first generation

9  into 2002 and forward.  Did you use Mr. Bryant's pitch book

10 drawings to design the fashions for the other generations of

11 dolls?

12 A.   No, we did not.

13 Q.   Are the fashions in the later dolls the same as the

14 fashions that were drawn by Mr. Bryant in his concept

15 drawings?

16 A.   No, they are not.

17 Q.   Does MGA track information about whether the fashions on

18 different dolls are successful or not?

19 A.   Yes.

20 Q.   Are fashions one of the reasons why the Bratz consumers

21 buy the dolls?

22          MR. PRICE:   Objection.   Lack of foundation.

23          THE COURT:   Sustained.

24 Q.   BY MS. AGUIAR:   Before we get on to that, let me give

25 you -- I would like to have you walk us through an example of

1 how you develop some fashions. Trial Exhibit 14624.

2             Can you tell us what we're looking at here?

3 **A.** This is a Bratz Girls Really Rock Sasha doll.

4 **Q.** And are the fashions on this Girls Really Rock Bratz

5 doll the same as the fashions that were depicted in

6 Mr. Bryant's concept drawings?

7 **A.** No, they are not.

8 **Q.** Can you describe for us, using this -- and is this, by

9 the way, one of the Bratz dolls that hit the shelves about a

10 month or so ago?

11 **A.** Yes, they are.

12 **Q.** So this is one of the newest ones?

13 **A.** Yes.

14 **Q.** Can you describe for us how, then, the fashions in this

15 particular doll are different from the fashions in

16 Mr. Bryant's drawings -- concept drawings?

17 **A.** In concept, the fashions for Girls Really Rock are

18 expected to look like a hip-hop rock star. And so the

19 fashions were deliberately designed to represent what a

20 hip-hop star might be wearing. So we referenced some

21 inspiration, some celebrities. We reference fashion and

22 fashion trends. And so we create fashions. We arrived at

23 the decision to sketch a fashion that looked like this. From

24 sketch, we actually will pull fabrics and fabric material

25 types and sew the fashion so that they become a 3D form, and

 1   make adjustments, of course, along the way and through the

 2   process to make sure that we got it just right.

 3   **Q.**   Beyond the first generation of Bratz dolls, including

 4   the ones we've been looking at this afternoon up there, did

 5   you base the fashions on Mr. Bryant's concept drawings in any

 6   of the fashions beyond the first generation?

 7   **A.**   No.

 8   **Q.**   Let's take a look in your binder at Exhibit 4568.

 9            Do you recognize 4568?

10   **A.**   Yes, I do.

11   **Q.**   Can you tell us what it is?

12   **A.**   This is a research.  It is a writeup of the results of a

13   research that took place in the U.S., U.K., and Canada on

14   Bratz.

15   **Q.**   Have you seen this document before?

16   **A.**   Yes.

17   **Q.**   So you recognize it?

18   **A.**   Yes.

19            MS. AGUIAR:  I'd like to move into evidence, your

20   Honor, 4568.

21            MR. PRICE:  Hearsay.

22            THE COURT:  Are you offering it for the truth of

23   the matter asserted?

24            MS. AGUIAR:  I believe it's a business record, your

25   Honor.

1           THE COURT: Then lay a foundation for it as such.

2  **Q.**  BY MS. AGUIAR: Does MGA from time to time engage

3  outside research services to do this type of report for MGA?

4  **A.**  Absolutely.

5  **Q.**  And in the course of developing new lines of Bratz

6  dolls, does MGA rely on the information in reports such as

7  these?

8  **A.**  Yes.

9  **Q.**  And do you have an understanding of the source of the

10  information that's contained in Exhibit 4568?

11  **A.**  I'm sorry. I don't know what you mean.

12  **Q.**  In other words, where did the information come from

13  that's included in the exhibit?

14  **A.**  There is a group called CNR Research who developed this

15  report. They acted as a separate party of MGA to develop the

16  report.

17  **Q.**  And do you have any reason to believe that the results

18  and the information that they are reporting in here are

19  inaccurate in any way?

20  **A.**  No.

21  **Q.**  And did you rely on this document in doing various -- in

22  carrying out your responsibilities as the brand manager for

23  Bratz?

24  **A.**  Yes.

25          MS. AGUIAR: Your Honor, I move 4568.

1              MR. PRICE:   Objection.   It's hearsay.

2              THE COURT:   Is CNR Research services part of MGA?

3              THE WITNESS:   No, they are not.

4              THE COURT:   Sustained.   Based on business records.

5              MS. AGUIAR:   It was created by -- prepared at the

6   request of MGA.

7              THE COURT:   I understand.

8   Q.    BY MS. AGUIAR:   Through quantitative focus groups,

9   prepared for MGA over the years, have you gained any

10  understanding regarding the importance of specifically the

11  fashions element of the Bratz doll to the consumer?

12  A.    Yes.

13  Q.    And what is the understanding that you have gained in

14  that regard?

15             MR. PRICE:   Objection.   Foundation.   Calls for

16  hearsay.   And irrelevant.

17             THE COURT:   Lay a foundation, Counsel.   I'll

18  consider relevancy after.

19  Q.    BY MS. AGUIAR:   What are the sources of information that

20  you have, as you sit here today, regarding the importance of

21  fashions or the relevance of fashions to the development of

22  the Bratz dolls and to their success?

23  A.    It was through my learning direct from girls and their

24  feedback through bounce-backs, fan club, qualitative

25  research, quantitative research, and even some retailer, like

1  Amazon dot com.  Consumers can actually write up and give

2  their comments and critique, both positive and negative,

3  about the brand.

4  **Q.**  And is that the typical way someone in your position

5  would gather information in order to determine the importance

6  of an element like fashions to the success of your product?

7  **A.**  Yes.

8  **Q.**  And was this knowledge gained over the course of a

9  number of years as the Bratz brand manager?

10  **A.**  Yes.

11  **Q.**  And what is your understanding as to the importance of

12  fashions in the sale of the doll?

13          MR. PRICE:  Object.  Hearsay, lack of foundation,

14  and her understanding is irrelevant.  For the truth.

15          THE COURT:  Counsel, is there another area we can

16  get into in that last 10 minutes?

17          MS. AGUIAR:  I'm sorry.  I thought we were going to

18  5:30.

19          THE COURT:  That's right.  We were going to go to

20  5:30.  Sustained on the same basis as before.

21          MS. AGUIAR:  Okay.

22  **Q.**  Does MGA change the fashions on each of the different

23  Bratz doll lines that it creates and sells?

24  **A.**  Yes.

25  **Q.**  Why do you do that?

1            MR. PRICE: Objection. Irrelevant.

2            THE COURT: Overruled. You may answer.

3            THE WITNESS: We change the fashions through every

4 Bratz doll and through every theme because it encourages

5 fashions. The change in fashion. Encourages the reason for

6 another purchase of a doll. It also -- fashion is incredibly

7 important because it represents a style, an attitude, and a

8 theme.

9            So it is important to create varieties of themes,

10 create varieties of different fashions to encourage the

11 consumer to want to bite deep into the brand, to aspire deep

12 into the brand.

13 **Q.** BY MS. AGUIAR: And why not just --

14            MR. PRICE: Your Honor, I would object and move to

15 strike if that's for the truth of the matter.

16            THE COURT: Is that, Counsel?

17            MS. AGUIAR: I asked them why they changed

18 fashions. I think it's relevant -- a relevant question, your

19 Honor, with regard to later generations.

20            THE COURT: I'll permit it for the state of mind,

21 not necessarily for the truth of the matter.

22 **Q.** BY MS. AGUIAR: If every different doll line that you

23 issued twice a year, if the dolls were wearing the exact same

24 clothes that they were wearing six months before that, would

25 all of those dolls continue to sell?

1              MR. PRICE: Objection. Lack of foundation.

2              THE COURT: This is clearly going for the truth of

3    the matter. Lay a foundation, Counsel.

4    Q.   BY MS. AGUIAR: Why doesn't MGA just use the fashions

5    that were depicted in Mr. Bryant's concept drawings over and

6    over and over again with each different doll it issues?

7    Surprise?

8              MR. PRICE: I'll object unless it's just state of

9    mind. And I'll object to that as to relevance.

10             THE COURT: If you're going for -- it's a

11   repackaging of the same question, Counsel. If you're going

12   for the truth of the matter asserted, you have to lay a

13   foundation. If you're going to state of mind, it's already

14   come in to a limited extent. What is it relevant to? The

15   state of mind.

16             MS. AGUIAR: I think it certainly goes to her state

17   of mind.

18             THE COURT: Okay. What is that relevant to?

19             MS. AGUIAR: The decisions that are made by

20   Ms. Garcia and others at MGA as to why to create different

21   fashions.

22             THE COURT: Very well. For that purpose.

23   Q.   BY MS. AGUIAR: So the question is why not just use the

24   same old fashions that were depicted in Mr. Bryant's concept

25   drawings over and over and over again?

1          THE COURT:  Let me instruct the jury.  We've been
2    going back and forth on state of mind versus truth of the
3    matter asserted.  A hearsay statement cannot be introduced in
4    this fashion for the truth of the matter asserted.  You
5    cannot consider these facts as being true.  This is just an
6    explanation as to why MGA does a certain thing.  Their
7    perceptions or their beliefs, their state of mind, as it
8    were.

9          You may proceed, Counsel.

10          THE WITNESS:  MGA would not choose to release the
11   same fashions every season, season after season, as it would
12   be a detriment to the brand.  The consumer would not find
13   interest after purchasing the first release of doll to
14   therefore find it and purchase it yet a second or third or
15   fourth time.  It would also ruin sort of the reinvention, the
16   relevance, the -- the fresh that comes in with every unique
17   collection and collections theme.

18   Q.   BY MS. AGUIAR:  Let's move off fashions for a moment and
19   talk about accessories.

20   A.   Okay.

21   Q.   In the doll world, just very briefly for the jury, what
22   is meant by accessories?  What can be encompassed within that
23   term?

24   A.   An accessory is something that's sold within the doll
25   package independent of the doll and the fashions she's

1    wearing.  So, for example, in this case, in Girls Really

2    Rock, the accessories would be the guitar, the electric

3    piano, to name two.  Those accessories are important.

4    Q.    Why are they important?

5                 MR. PRICE:  Objection.  It's offered for the truth.

6                 MS. AGUIAR:  Same, your Honor, why they developed

7    different accessories.

8                 THE COURT:  Why are they important to MGA?

9    Q.    BY MS. AGUIAR:  Why are the accessories with each new

10   doll line important to MGA?

11   A.    The accessories are important because they provide

12   pieces to help express or to extend the theme or the

13   experience.  A rock star is -- in this case, a hip-hop star

14   seems to be sort of removed as some of the most important

15   things and kind of defining a hip-hop or a rock star.  They

16   have to have some instruments or at least a microphone at a

17   minimum to express the experience of being a hip-hop star or

18   a rock star.

19   Q.    Remind me what you said.  You said there was a

20   microphone and what else?

21   A.    A guitar and electronic piano.

22   Q.    Were there any guitars or electronic pianos in

23   Mr. Bryant's concept drawings?

24   A.    No.

25   Q.    Other than backpacks or purses that were with the dolls

1   in the original concept drawings; is that correct?

2   A.   That's right.

3   Q.   Other than that, has MGA ever referenced for any

4   generation -- has MGA referenced those drawings in developing

5   accessories for the different doll lines?

6   A.   No.

7   Q.   Did you ever get any ideas from Mr. Bryant's concept

8   drawings for any of the accessories for any of the dolls

9   after the first generation?

10  A.   No.

11  Q.   I want to show you just one or two more that have

12  accessories in them.  One of them is the Magic Hair doll,

13  which is Exhibit 17543.

14          So can you tell the jury what we're looking at with

15  the Magic Hair Bratz doll, which is 17543?

16  A.   This was a Bratz Magic Hair doll.

17  Q.   Can you explain the accessories that are included in

18  that package?

19  A.   Sure.  The accessories include two hair creams, one hair

20  glitter, one curling iron, one hair crimper, and one hair

21  brush.

22  Q.   And is it MGA's practice, whenever it issues a new line

23  of Bratz dolls, that accessories are always included with the

24  doll?

25  A.   Yes.

1   **Q.**   And if we could just go quickly, then, to the Genie

2   Magic, which is 17536. And if you could describe what we're

3   seeing there in terms of the accessories.

4   **A.**   In this case, the accessory includes a Magic Genie

5   bottle. It includes a crystal ball as an accessory, and also

6   a Magic Genie, what we called an 8 Ball, which is in the

7   consumer's size, magic fortunes.

8   **Q.**   Clarify for me what you meant what you said it was a

9   consumer size?

10   **A.**   An accessory can be scaled to be in the right size for

11   the doll and for the doll to experience, or it can be

12   enlarged so that it can be an accessory for the consumer to

13   experience. And in this case, the magic -- excuse me --

14   crystal ball was in size for doll, and the genie bottle was

15   in size for the consumer to experience.

16   **Q.**   What do you say to the argument that there may have

17   been -- I don't know. Has there ever been a fashion doll

18   with a genie theme before MGA came out with it?

19   **A.**   Sure.

20   **Q.**   Is that possible that -- I don't know. I won't say

21   particular fashion dolls, but any fashion doll out there in

22   the world had done a genie theme before?

23   **A.**   Sure.

24   **Q.**   Okay. So why, then, is this any different from a prior

25   fashion doll genie theme?

1    **A.**    Well, in the way -- I guess the difference would be in

2    the way that Bratz approached the design and the concept.

3    And the way that we show to, you know, represent the

4    fashions, the way that we included or what accessory we chose

5    to include, the packaging, the handles, the handle that

6    became a necklace for the consumer.

7           So the genie as a theme may not have been unique to

8    market.    It's the way that MGA approached the concept of that

9    genie theme in particular.

10   **Q.**    Let's talk for a few minutes -- and you can put that

11   away.    I want to talk about -- I want to talk about

12   characters.    Since 2001, since the issuance of the first

13   generation dolls, has MGA created other core fashion doll

14   characters?

15   **A.**    Yes, we have.

16   **Q.**    And look in your binder, if you will, at 18633.    Are you

17   there?

18   **A.**    Yes.

19   **Q.**    And can you identify the document that you're looking

20   at?

21   **A.**    This is a list of all of the character names that have

22   been developed within the Bratz brand.

23          MS. AGUIAR:    Your Honor, I move 18633 into

24   evidence.

25          THE COURT:    Any objection?

1          MR. PRICE: I'll object. It's hearsay. Lack of

2  foundation.

3          THE COURT: Counsel, why don't you lay further

4  foundation.

5          MS. AGUIAR: Sure.

6  Q.  Do you recognize this form of document?

7  A.  Yes, I do.

8  Q.  And is it maintained by an MGA employee at your

9  direction?

10  A.  Yes, it is.

11  Q.  And have you seen it before?

12  A.  Yes, I have.

13  Q.  In what department is this document maintained?

14  A.  It is maintained within the -- currently within the

15  packaging group.

16  Q.  And do you have an understanding as to whether it's

17  updated from time to time?

18  A.  Yes, it is updated.

19  Q.  And if you need to know information in order to perform

20  your functions and you need to know whether you have a

21  particular character's name that's already been used or been

22  out there, would you consult this document?

23  A.  Yes, I would.

24  Q.  And is it your understanding that the information in

25  this document is pulled from the files of the company?

1   **A.**   That's correct.

2         MS. AGUIAR: Your Honor, I move the exhibit.

3         MR. PRICE: No objection.

4         THE COURT: It's admitted.

5         **(Exhibit 18633 received.)**

6         MS. AGUIAR: Whew. I'm getting tired.

7         Let's put that up on the screen, if we could.

8         Oh, my God, after all of that, Aaron doesn't have

9   it. That's okay. It's still in evidence.

10         You know what? Mr. Price was nice enough to remind

11   me I can put this on the Elmo so you guys can see it.

12         THE COURT: And to think that's the old-fashioned

13   way to do it.

14   **Q.**   BY MS. AGUIAR: Can your tell us what we're looking at

15   here?

16   **A.**   This is the document that MGA prepares and updates and

17   includes all Bratz character names, a collection of all the

18   Bratz branded character names.

19   **Q.**   And do you know roughly how many there are, if you can

20   give us a range?

21   **A.**   I think there's approximately 40 characters developed to

22   date.

23   **Q.**   Are some characters more popular than others?

24   **A.**   Yes.

25   **Q.**   And in developing these characters, did MGA rely in any

1  way on Carter Bryant's concept drawings?

2  **A.**  No, he did not.

3  **Q.**  Did Mr. Bryant concept any characters other than what he

4  called Lupe, Hallidae, Jade, and Zoe?

5  **A.**  No.

6  **Q.**  So all of the characters beyond those four which you

7  then created different names for, those were all concepted by

8  MGA; is that correct?

9  **A.**  That's correct.

10  **Q.**  Can you describe for us how the different characters are

11  developed?

12  **A.**  Actually, a character is developed from a personality.

13  So we look at all the different varieties of personalities.

14  Personalities because we want to create dimension and depth

15  within our brand.  We also want to create -- we don't want to

16  be sort of identified as one kind of personality, but to

17  reach multiple personalities, in an effort that we might

18  reach multiple different girls in the marketplace.  So we

19  start with a personality.

20  **Q.**  Help me out here.  Because a doll is an inanimate

21  object.  Can we agree on that?

22  **A.**  Yes.

23  **Q.**  In other words, it can't talk.

24  **A.**  That's right.

25  **Q.**  And it can't express its personality verbally; right?

1   A.    That's right.

2   Q.    So how do you give an inanimate object, like a doll, a

3   Bratz doll, how do you give it a personality?

4   A.    It's so involved.  A personality is defined by the

5   character's fashion, the pallet or the colors that we use on

6   our personality.  The soft tones or pink or lavender or light

7   browns indicate a different character as opposed to somebody

8   who wears black and red and like a deep navy or midnight

9   blue.

10          So it can be in the fashions that they wear, the

11   styles of fashion.  So if they are wearing black leather or

12   leather as opposed to a knit cotton can totally separate the

13   personality types.  The way they wear their hair, the way the

14   hair is styled, the accessories that they wear, the jewelry

15   and/or jewelry fashion, those are just to name a few.  It

16   could go on forever.

17   Q.    Tell me if the selection of the name for the character

18   has anything to do with the personality?

19   A.    Absolutely.  We try to line up the character name.  If a

20   character -- if a name has a personality just listening to

21   it, if it has a sound or a tone, like -- well, if a character

22   name has a softer sounding name, than sometimes we'll try to

23   associate that softer sounding name to a softer sounding

24   character.

25   Q.    Have you ever developed after the first generation a

```
 1  character that just didn't -- just kind of flopped and you
 2  didn't pursue it after it was released?
 3  A.    Yes.
 4  Q.    And can you think of one or --
 5  A.    Yes.  There's a character named -- I believe her name
 6  was Dee Dee.
 7  Q.    That's a bad name.  Just kidding.  What is your
 8  understanding about what happened to Dee Dee?
 9            MR. PRICE:  Object.  Lack of foundation unless
10  she's talking about sales figures.
11            THE COURT:  Lay a further foundation, Counsel.
12  Q.    BY MS. AGUIAR:  Let's put it this way:  Did you guys
13  create Dee Dee at one point?
14  A.    Yes, we did.
15  Q.    Do you remember anything about how you created her
16  personality?
17  A.    Yes.
18  Q.    And what was she like?
19  A.    She was meant to be sort of a dark kind of -- kind of
20  angry or aggressive character.
21  Q.    And Dee Dee's no longer with us; is that right?
22  A.    I don't expect that we will manufacture Dee Dee again.
23  Q.    I want to use as an example two other characters so that
24  you can explain this whole character personality idea.  So
25  that's 18689.  Can you tell us what we're looking at here,
```

1  Trial Exhibit 18689?

2  **A.**  This is the first release of Bratz twins.  You actually

3  get identical twin sisters.

4  **Q.**  And are the two Bratz dolls in that box different

5  characters?

6  **A.**  Yes, they are.

7  **Q.**  Describe for us, if you would, what the two characters

8  are in the box.

9  **A.**  The character on the left, her name is Phoebe.  And the

10  character on the right is -- her name is Roxxi.

11  **Q.**  And how is it, using these two as an example, that you

12  can explain to the jury how these two dolls have -- they are

13  different characters with different personalities.  Can you

14  explain that?

15  **A.**  Sure.  It's the combination of -- okay.  Let me back up.

16  Phoebe is intended to be sort of a -- they are identical, but

17  they are totally different.  So Phoebe is intended to be

18  sugar, as we referenced it as her nickname.  And Roxxi was

19  meant to be spice, which is the nickname we referenced in the

20  package.

21  **Q.**  And by the way -- sorry to interject here.  But do most

22  of the dolls, when you give them a name, do they also have a

23  nickname?

24  **A.**  Most characters have a nickname as well to help define

25  their personalities.

1   Q.   Sorry to interrupt.

2        You were just describing the nicknames.

3   A.   So we've started with nicknames.  We also used pallets

4   of color.  So Phoebe uses like a baby pink.  Roxxi uses, you

5   know, a brighter red.  And if you look at their jackets they

6   wear, even though they both wear jackets, Phoebe wears kind

7   of a fuzzy light pink fur jacket, and Roxxi wears a black

8   leather jacket with zippers and studs.  Even down to their

9   accessories, you'll notice that Phoebe has a little angel key

10  chain meant for the consumer.

11  Q.   You're talking about the things sort of on the left in

12  the middle?

13  A.   Yes.  And you'll notice that Roxxi is sold with a cute

14  little Devil key chain.

15  Q.   And the key chain is not meant for the doll to use.  The

16  consumer is meant to use it?

17  A.   Yes.

18  Q.   I want to talk for a few minutes about packaging.  And

19  so you can put those guys away.

20       And again, in developing the characters after the

21  first generation of Bratz dolls, did you use any idea or any

22  information from Mr. Bryant's concept drawings?

23  A.   No, I did not.

24  Q.   Is it your understanding -- do you have an understanding

25  that consumers who buy Bratz dolls tend to own more than one

1   Bratz doll?

2            MR. PRICE:  Objection.  Lack of foundation.

3            THE COURT:  Sustained.  Lay a foundation.

4   Q.  BY MS. AGUIAR:  Have you ever received information, in

5   the course of your duties as brand manager, that would

6   suggest to you that consumers buy more than one Bratz doll?

7            MR. PRICE:  Object.  Calls for hearsay, lack of

8   foundation.

9            THE COURT:  Sustained.

10  Q.  BY MS. AGUIAR:  Have you ever received information,

11  either way, as to the number of dolls that kids buy?

12            THE COURT:  It's a yes or no question.

13            THE WITNESS:  Yes.

14  Q.  BY MS. AGUIAR:  And what's the source of that

15  information?

16  A.    The source of information includes personal

17  communications with potential core consumers or consumer

18  types.  Direct communication from the consumer direct to MGA

19  through our either fan club and fan club communications,

20  through their writeup and responses to their product likes

21  and dislikes.  You know, websites such as Amazon dot com.

22  And even through some qualitative or quantitative research.

23  Q.  And do you use the information that you get from these

24  different sources in making decisions about how to develop

25  different dolls?

1  **A.**  Yes.

2  **Q.**  And how does it affect your decision in that regard?

3  **A.**  I'm sorry.  Can you rephrase it?

4  **Q.**  How does the information that you get from consumers

5  regarding the different dolls impact how you then develop

6  different dolls?

7  **A.**  The feedback is -- the consumer is very vocal in

8  communication.  They are very expressive.  So I'm able to

9  differentiate between their likes and appreciations and their

10  dislikes.  And with those learnings, I learn to not recreate

11  their dislikes in the future.  And I do everything I can to

12  recreate their likes in the future.

13  **Q.**  While we have a couple of the Bratz dolls up there,

14  let's talk for a few minutes about packaging.

15  **A.**  Okay.

16  **Q.**  Do you also oversee the development of the packaging for

17  the Bratz dolls?

18  **A.**  Yes.

19  **Q.**  What's your involvement in that?

20  **A.**  My responsibility in packaging is that I communicate

21  with the packaging team, to educate them on the concept, the

22  purpose, the intent of the theme and the inspiration.  I'll

23  give them references of inspiration that inspired me.  I'll

24  give them references of sketches that were provided or

25  developed by my fashion designers so they have a sense of

1  what the product looks like. Once given that information,

2  they will then go into concepting.

3       So they will give me varieties of different

4  concepts that can kind of similarly approach the same theme.

5  And I will lead them down or give comments on which ones I

6  like or dislike for various reasons. And I'll work with them

7  all the way through what is called a mechanical stage.

8       The mechanical stage is actually getting down into

9  the intricacies of writing the copies and the language and

10  the copy, the tone, the way we use our words is accurate.

11  The character art in making sure the character art represents

12  the right attitude expression. And I'll oversee all that

13  have until it is perfect, frankly, and then it's released to

14  Hong Kong for manufacturing.

15  Q.   Let's go back to -- and I'm sorry for this, but I'm

16  going to flip back for the next couple of questions to the

17  first generation dolls. And I put them here on the table.

18       In Mr. Bryant's concept drawings, did he envision

19  any sort of packaging that would go along with whatever doll

20  was eventually developed?

21  A.   No.

22  Q.   So was there anything that MGA used from Mr. Bryant's

23  drawings to develop the Bratz packaging?

24  A.   No.

25  Q.   Was there any idea or concept anywhere in what

1    Mr. Bryant brought to you in September of 2000 regarding the
2    packaging?

3    **A.**    No.

4    **Q.**    So I'm going to just hand one of them up to you so you
5    can have one in front of you.

6              How would you describe the physical shape of the
7    package that MGA developed for the Bratz dolls starting with
8    the first generation?

9    **A.**    I would describe them as a trapezoid shape.

10   **Q.**    Can you expand on that a little bit?

11   **A.**    Yeah.  The true intention of the trapezoid shape
12   actually was -- came from a concept of a spotlight.  The idea
13   was we wanted to actually put the characters under a
14   spotlight to sort of highlight them, make them almost like
15   celebrities.  Unfortunately, we couldn't afford the spotlight
16   inside the package.  But you know, a spotlight, if you look
17   at the light, sort of disseminates or brings down or creates
18   sort of a triangle or trapezoid as it reaches the floor.  So
19   that's actually where the trapezoid shape came from.

20             And ultimately, the spotlight molded piece never
21   made it in the package.  The trapezoid became an indication
22   of strength, a specific unique package to separate from the
23   competition.

24   **Q.**    Was the Bratz packaging developed in house by MGA
25   employees or by someone outside?

1   **A.**   By MGA employees.

2   **Q.**   And to your knowledge, were there any other fashion

3   dolls that were sold as of 2001, when the Bratz dolls were

4   issued, in packaging of that shape?

5   **A.**   Not to my knowledge or my memory, no.

6   **Q.**   So we've talked about the physical shape. We've talked

7   about the structure of it, that it was a trapezoid. Now can

8   you tell the jury a little bit about how that -- how you

9   believe that was unique from the beginning, how the actual --

10   the package as a whole, stepping away from just the shape,

11   how that was unique?

12   **A.**   May I also refer past the first generation package?

13   **Q.**   You could, but maybe we could just talk about stuff

14   like, for example, could you see the doll from just the

15   front, or what was the impact of the material that you used

16   for the packaging?

17   **A.**   I understand. It was important to MGA to be able to

18   create a really special presentation at retail, especially,

19   again, in the interest of, you know, reaching the seven- to

20   ten-year-old consumer. We wanted to create a quality package

21   because we know that in some cases, in many cases this

22   consumer will want to collect or to display their dolls.

23           It's like the way that they would express

24   themselves by tearing magazines and sticking them all over

25   their walls or putting them on their folder. It's an

1  expression, something reaches them emotionally, and they

2  start to express it around them.

3        This package was important because we wanted to

4  sort of -- we wanted to open the sides, not only obviously

5  the front, but the other side and top of the package sort of

6  to represent a display case, a really special place that the

7  doll can be posed in as opposed to the traditional toy

8  package which we term as a coffin box, where all the package

9  is covered with packaging or hard material and only the front

10  is exposed.

11        Other unique qualities to the package was the

12  special -- I'll start by saying the logo itself.  The logo

13  and the designing of our logo and the way that we design each

14  one of those letters in the quirky, kind of the crazy way we

15  shape the letters, like the hook on the R, are very specific

16  details that we created to identify this really unique logo.

17        And while the Bratz logo or the word Bratz had a

18  specific meaning we expected for moms, we added very

19  specifically a halo over the R with stars to suggest that,

20  the guys know the term for Bratz, we're actually not so bad.

21  We're kind of angels.

22        The character art and the way we used our character

23  art, very important.  Our dolls cannot communicate or speak.

24  So character art was so important to us to create that stance

25  of four girls, but also their stance, their posture, the way

1    they looked at you, the way they carried themselves, the way

2    they wore their fashion helped us to communicate an attitude

3    and expression that was going to be meaningful to the seven-

4    to ten-year-old consumer.

5    Q.   And just making up on one of the things that you said

6    about character art or package art, the character art on the

7    first generation box, am I right that it's showing sort of

8    the four shot -- the drawing of the four girls together; is

9    that correct?

10   A.   That's right.

11   Q.   And has the character art developed from that first

12   generation character art since that time?

13   A.   Yes.

14   Q.   So in other words, from -- moving on from the first

15   generation, is the character art on Bratz doll packages

16   different from the character art that's on that box there?

17   A.   Absolutely.

18   Q.   And would that carry over for the character art that

19   appears on other Bratz products?

20   A.   Definitely.

21   Q.   In other words, that it's different from the first

22   generation?

23   A.   Correct.

24   Q.   I interrupted you.  Sorry.  Had you already -- have we

25   addressed the handle on the package?

1  A.   No, not yet.

2  Q.   Can you maybe just talk for a moment?  The question is

3  was there anything in MGA's development of the packaging that

4  was special about the handle.

5  A.   It's funny, because as a consumer, the handle is kind of

6  usually the last thing you pay attention to.  It's just that

7  functional thing that helps you take it off the shelf and on

8  to the cash register or to home.  But we wanted to even

9  manipulate the handle to be something meaningful or at least

10  an aesthetic quality to the package and presentation.  We

11  felt the consumer appreciated that.

12       So in Genie, actually it's a handle so you can

13  carry it away from the chain, but actually this became a

14  necklace for the consumer when you open the package.

15       Frankly, what we understand is that there are fan

16  club members who actually collect all of the different

17  varieties of handles because they felt it to be collectible.

18  Or just sometimes we'll add handles -- we'll just add a

19  texture, like a fuzzy little piece of fabric on the top of

20  the Slumber Party just to, you know, denote something unique,

21  just adding some embellishment is super important.

22  Q.   How much -- and there might be a range.  So you can give

23  me a range.  But how much per doll expressed as a percentage

24  of a hundred percent, how much does MGA spend on the

25  packaging?

```
 1              MR. PRICE:  Objection.  It's irrelevant.

 2              THE COURT:  As a percentage?

 3              MS. AGUIAR:  It goes to the importance of the

 4   element, your Honor.

 5              THE COURT:  Overruled.

 6   Q.   BY MS. AGUIAR:  You can answer.

 7   A.   In some cases, like for a package for something like

 8   this, it's often that the package could almost represent like

 9   40 percent of the total product cost.

10   Q.   And that would be on the high side?

11   A.   Yeah.

12   Q.   And what is the thought at MGA as to why so much is

13   spent?  I mean, why up to 40 percent of the cost of the doll

14   is spent on packaging?  Why is that?

15              MR. PRICE:  Object.  Irrelevant.

16              MS. AGUIAR:  Again, your Honor, it goes to their

17   thought process of why.

18              THE COURT:  Overruled.  You may answer.

19              THE WITNESS:  You know, I'll just go back to the

20   consumer.  This is sort of what I believe to be a savvy

21   consumer, seven to ten.  It's really important to the way

22   that you represent your product.  It has to be special.  It

23   has to be unique.  It has to look expensive.  It has to look

24   special.

25              So we're willing to spend this kind of money in the
```

```
 1    package so that we can send an essence or a pledge to the
 2    consumer that she'll feel comfortable about picking this up
 3    off the shelf irregardless or separate from the fact that
 4    it's a toy.
 5    Q.   BY MS. AGUIAR:  Do you know if -- does MGA believe that
 6    the consumer has a different reaction -- in determining how
 7    you do your packaging and how much you spend on your
 8    packaging, do you take into consideration that the consumer
 9    has a different reaction to the product inside the box when
10    the box looks different?
11              MR. PRICE:  Objection.  Understanding is
12    irrelevant.
13              THE COURT:  Sustained.
14    Q.   BY MS. AGUIAR:  In deciding how much to spend on
15    packaging and how much emphasis to put on packaging, do you
16    take into consideration, in doing that, the impact that the
17    package has on the consumer?
18    A.   Yes.
19    Q.   And how do you take that into account?
20              MR. PRICE:  Object, if offered for the truth again,
21    your Honor.
22              THE COURT:  There needs to be foundation for this,
23    Counsel.
24              MS. AGUIAR:  I don't think I asked her
25    understanding.  I just asked whether it informs the state of
```

1  mind at MGA in terms of whether to continue to spend that

2  much on packaging.

3        THE COURT:  Right.  And I understand that.  That's

4  why I indicated to lay a foundation for it.

5  Q.   BY MS. AGUIAR:  Does that type of thing -- does the

6  reaction to the consumer impact MGA's decision as to how much

7  to spend on packaging and how to develop your packaging?

8  A.   Yes.

9  Q.   And how does it do that?

10        MR. PRICE:  Objection.  That's irrelevant.

11  Q.   BY MS. AGUIAR:  What is the impact it has on the

12  decision-making process?

13        It's sort of the same question I was asking, your

14  Honor, for fashions and accessories?

15        THE COURT:  I understand.  I'll overrule on that

16  objection.  The concern I have is foundation, Counsel.

17  That's what I just indicated a moment ago.  How she knows

18  about the impact on the consumers.

19        MS. AGUIAR:  Okay.

20  Q.   Do you have an understanding of the impact on the

21  consumer of the package?

22  A.   Yes, I do.

23  Q.   And what's that based on?

24  A.   Through the same, you know, the same references such as,

25  you know, communicating personally with the consumers,

1   listening to their specific feedback and their critique,

2   through fan club, their critique through websites such as

3   Amazon dot com where they can judge or make criticisms or

4   hopefully some thumbs up on some of our aspects.  And those

5   comments are not only specific to the doll product itself but

6   can also relate to the package as well.

7   Q.   One last question on the packaging.  Do you know whether

8   MGA has a design patent for the trapezoidal packaging that

9   MGA developed?

10          MR. PRICE:  Objection.  Irrelevant.

11          THE COURT:  A design?

12          MS. AGUIAR:  A design patent.  It goes to the state

13   law claims, your Honor.

14          THE COURT:  Overruled.  You may answer.

15          THE WITNESS:  Yes, I believe so.

16   Q.   BY MS. AGUIAR:  So it's your understanding that MGA owns

17   a design patent on the trapezoidal shape of its packaging?

18   A.   I'm not a hundred percent sure, but I believe so.

19          MS. AGUIAR:  Your Honor, I was going to move on to

20   my last couple of topics.  Should we do that in the morning?

21          THE COURT:  We'll end for the day now and pick up

22   at 9:00 in the morning.

23          **(WHEREUPON THE JURY WITHDRAWS.)**

24          THE COURT:  Please be seated.

25          Counsel, is there anything we need to take up at

1   this time?

2         MR. NOLAN:  Your Honor, very briefly.  The Court

3   had indicated, and while it's still today, I wanted to touch

4   real quickly on the summaries that we had prepared for

5   Margaret Leahy that she testified to and that I had moved in

6   under 1006.  For the record, it was 18882-A and -B.  And they

7   are the summary of various changes.

8         Your Honor, I would cite to the Federal Rules of

9   Evidence 1006, which makes specific reference to photographs

10  and allowing, you know, summaries of voluminous points that

11  are raised with the photographs, and I would cite to a case.

12  Actually, if I could read something here, your Honor.

13         THE COURT:  Sure.

14         MR. NOLAN:  This is from Mueller and Kirkpatrick

15  Federal Evidence section 1034.  It says:  "Summary proof

16  offered under Federal Rule Evidence 1006 may include

17  conclusions or interpretations suggested by a competent

18  witness that in effect sums up evidence in effect was already

19  presented to the jury in the case of United States versus

20  Gold."

21         And again, United States versus Robbins, they talk

22  about summaries where not only is it accurate and supported

23  by the competent testimony of a witness, but that the items

24  that are being summarized are rather voluminous.  The example

25  of a photograph that's cited -- the reference to photographs

1   in 1006 talks about numerous changes that could have been

2   depicted in a photograph. For instance, we might have been

3   able to show specific photographs on the cheekbone or the

4   chin or the ear or the nose. And if we had done that and we

5   had a series of 35, 45 photographs, I would submit that the

6   summaries would be appropriate.

7           And on that analogy, we would ask for the Court to

8   admit those summaries as evidence.

9           THE COURT: Thank you, Counsel.

10          MR. PRICE: Your Honor, obviously I haven't looked

11  at those authorities. We can, and I can respond with

12  authorities tomorrow morning. But all this does is summarize

13  a couple hours of testimony. He went through all of -- he

14  said tell me about the changes. She told him about the

15  changes. And then today they showed a demonstrative which

16  summarized her testimony.

17          Now, if she can testify about it in that short a

18  period of time is not voluminous, and that would be like me

19  putting in a chart of all the testimony I elicited from

20  Mr. Bryant or Mr. Larian about specific topics as summaries

21  of the points that I made.

22          This is not what 1006 is about. But if you'd like

23  briefing, we could --

24          THE COURT: I definitely don't want briefing. I'll

25  take a look at the case and let you know in the morning.

1          We still have that motion to quash the subpoena for
2     the Custodian of Records.

3          MR. NOLAN:  Right.

4          THE COURT:  My sense in reading that is that I
5     assume that the custodian is going to be one of the last
6     people you call, Counsel?

7          MR. NOLAN:  I believe that it would be sometime
8     tomorrow afternoon.  Mr. Roth was actually going to handle
9     that, your Honor.  And maybe he'll give you a better
10    indication, and then the only thing I wanted to add so I
11    don't have to get back up, your Honor, is not that any of us
12    are against working Wednesday, Wednesday evening, but in
13    light of the change in --

14         THE COURT:  In light of the change, we're not going
15    to be working Wednesday evening.  It will be Thursday
16    afternoon.  The way I figure we'll do this is today is
17    Tuesday.  So tomorrow we'll have a full day.  We only have --
18    you have eight hours left.  Mattel has three hours and 15
19    minutes -- 14 minutes.  So that's 11 -- let's say 12 hours.
20    And we'll definitely get through that between Wednesday and
21    half a day Thursday, Friday morning.  So I'm really no longer
22    concerned about time since we're not going to do the closing
23    arguments until next Wednesday.

24         We should have plenty of time to do everything.
25    We'll have Thursday afternoon to do the instructions, and

```
 1   we'll have the case wrapped up at least from an evidentiary

 2   standpoint by end of the day on Friday, and we'll have

 3   closing arguments on Wednesday.

 4          So we can do our first cut through the jury

 5   instructions on Thursday afternoon.  And I assume it will

 6   take most of the afternoon to do that.  And then undoubtedly

 7   there will be another cut, I take it, probably on Monday or,

 8   if necessary, Tuesday.

 9          MR. ZELLER:  And on the subject of scheduling, your

10   Honor, I know offhand of at least one Daubert hearing that's

11   going to have to be had based on the witnesses who MGA

12   currently has in its lineup.  Mr. Vilppu is the one who comes

13   to mind.

14          I know there are certain issues concerning

15   Mr. Meyer.  Whether they will be dealt with in a Daubert

16   hearing is a different issue perhaps.

17          THE COURT:  Why is Mr. Vilppu going to be called?

18          MR. ZELLER:  We'll call him a design expert.  He --

19   his background is actually in animation.

20          THE COURT:  When is he going to be called?

21          MR. ZELLER:  I'm sorry.  When?

22          THE COURT:  I'm familiar with what Mr. Vilppu

23   intends to testify about.  Just when.

24          MR. ZELLER:  In terms of when he's going to be in

25   the lineup, that's somewhat within MGA's control.  I don't
```

1    know at this point. He was further into the line. But where
2    we are, given that we've only had two witnesses today, hard
3    to say.

4              - MR. NOLAN: Your Honor, we had intended to do
5    Mr. Vilppu tomorrow. But in light of this, I think we will
6    get to it Thursday. And we'll make decisions as we go along.
7    Obviously everything is in flux as we move forward.

8              THE COURT: I understand. All right.

9              MR. ROTH: Your Honor, to answer your timing
10   question. The custodian -- and perhaps this will resolve the
11   issue. There are some witnesses, now given the way the day
12   went, who we think many of the documents that are the subject
13   of the custodian will be a vehicle for getting those
14   documents in.

15             THE COURT: That's how I read the motion as well.
16   That's why I was hoping that we were going to save the
17   custodian for the end to see what we'll really still have in
18   dispute.

19             MR. ROTH: If that had come up today, that might be
20   a different question. But there are some witnesses for
21   form --

22             THE COURT: Very good. Let's take that up at that
23   time.

24             MR. ROTH: One other thing, your Honor. Just in
25   terms of your workload, which I'm sure is considerable.

1  There's the Farr deposition transcript.  We've been taking a

2  look at that, and we think we can make further withdrawals.

3  And frankly, it would end up being rather smaller than it is

4  now.

5          THE COURT:  Why don't do you that.

6          MR. ROTH:  Why don't we do that and handle that

7  that way.

8          THE COURT:  Excellent.  If there's nothing else, I

9  just want to get this order regarding the previous motions

10 resolved.  I received two different versions.  I want to have

11 one version submitted to the Court that reflects the

12 following.  I'll take No. 1 from -- someone needs to take

13 notes of this.

14         THE REPORTER:  I will.

15         THE COURT:  Thank you, Mark.

16         Number 1 from Mattel.

17         Number 2 from MGA.

18         Number 3 from Mattel.

19         4 and 5, as best I can tell, are identical, except

20 in 5, Mattel refers to the defendants, and MGA refers to MGA.

21 It doesn't include Mr. Larian.  I can't believe that that's

22 actually what you are disputing between the two of you.  But

23 if it is --

24         MS. AGUIAR:  No, no, we weren't disputing that.

25         THE COURT:  Very good.  Number 6 in Mattel needs to

1    go in.   There's no corollary in MGA's.

2              Number 7 in Mattel looks to be identical with No. 6

3    in MGA.   So that's the same.

4              Number 8 is the same as No. 7 in MGA.

5              Mattel's 9 is the same as MGA's No. 8.   So that's

6    fine.

7              Mattel's 10 is the same as MGA's 9.

8              And No. 11 is the same as MGA's 10.

9              And No. 12 is the same as MGA's 11.

10             Number 13 is the same as MGA's 12.

11             14 is the same as the 13.

12             And 15 is the same as the 14.

13             So I really don't see why I got two of these except

14   for there is -- the Mattel 6 was nowhere to be found.   And if

15   words in dispute on the first few.   But let's get those

16   resolved and get a consolidated order for the Court's

17   signature tomorrow morning.

18             And that's all I have.

19             MR. NOLAN:   Thank you, your Honor.

20             THE COURT:   All right.   See you tomorrow morning

21   around 8:30.

22                       (Proceedings concluded at 5:39 P.M.)

23

24

25

7046

1

2

3

4                    C E R T I F I C A T E

5

6

7          I hereby certify that pursuant to Title 28,

8    Section 753 United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings in the above matter.

11          Certified on August 12, 2008.

12

13

14   MARK SCHWEITZER, CSR, RPR, CRR
     Official Court Reporter
15   License No. 10514

16

17

18

19

20

21

22

23

24

25