1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    ---

6    MATTEL, INC.,              :   PAGES 7163 - 7323
                               :
7              PLAINTIFF,      :
                               :
8       VS.                    :   NO. ED CV04-09049-SGL
                               :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,  :   CV04-9059 & CV05-2727]
     ET AL.,                   :
10                             :
               DEFENDANTS.     :
     _____  :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17            WEDNESDAY, AUGUST 13, 2008

18              JURY TRIAL - DAY 34

19              AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23                              UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24                              255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

1    **Appearances of Counsel:**

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

1
# I N D E X

2
**DEBORA MIDDLETON, SWORN.** .............................. 7187

3
DIRECT EXAMINATION BY MR. NOLAN: ..................... 7187
CROSS-EXAMINATION BY MR. PRICE:...................... 7199

4
**LEON DJIGUERIAN, SWORN.** .............................. 7200

5
DIRECT EXAMINATION BY MS. AGUIAR ..................... 7201

6
CROSS-EXAMINATION BY MR. PRICE:...................... 7218

7

8
**LUI DOMINGO, SWORN.** .................................. 7222

9
DIRECT EXAMINATION BY MS. AGUIAR:..................... 7223

10
CROSS-EXAMINATION BY MR. PRICE: ..................... 7267

11
**TIMOTHY KILPIN, SWORN.** .............................. 7273

12
DIRECT EXAMINATION BY MR. NOLAN: ..................... 7273

13
# E X H I B I T S

14
 (Exhibit 18320-003 received.)........................ 7195

15
 (Exhibit 18320-005 received.)........................ 7196

16
(Exhibits 18870, 18869, 18863, 18862, 18865,
18866, 18860, 18861, 18864, 18868, 18867, 18857,
17
18858, 18859, 18871-73 received.)..................... 7218

18
(Exhibit 18929 received.)............................ 7226

19
(Exhibit 18921 received.)............................ 7233

20

21

22

23

24

25

1      <u>**Riverside, California; Wednesday, August 13, 2008**</u>

2                          **1:10 P.M.**

3      **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4           THE COURT:  I want to take up the issue of Kevin

5      Farr first.

6           As they are coming in, is there an issue you want

7      to take up?

8           MR. NOLAN:  I'd like a sidebar on Jury Note 6, if I

9      might.

10          THE COURT:  All right.

11          **(SIDEBAR CONFERENCE HELD.)**

12          THE COURT:  Yes.

13          MR. NOLAN:  I had a thought about Juror No. 6.

14     This happened in another case I had.  It involves a little

15     bit of deception.  So I just wanted to warn you ahead of

16     time.

17          THE COURT:  All right.  I spent 10 years in the

18     U.S. Attorney's Office.  I understand deception is sometimes

19     used for a good purpose.

20          MR. NOLAN:  I don't know if it was Judge Walter who

21     suggested this one time, but there was a juror who had a

22     financial issue.  And what happened was that parties, without

23     the jury knowing it, contributed money to the fund and the

24     Court --

25          THE COURT:  I've heard of this before.  I don't

 1   know if it was this case.

 2          MR. NOLAN:  And the Court more or less said to the

 3   jury, listen, I'll write a letter saying we have a special

 4   fund so you would not lose any money.  And then we would, if

 5   Mattel would agree, would contribute money anonymously, and

 6   they would never know the parties did it.

 7          THE COURT:  That's a good idea, actually.  But you

 8   know, I don't want to create any -- a run on the fund.  So

 9   perhaps this might be something I'll take up with Juror No. 6

10   separately.  And just indicate -- well, let me see what he

11   does.  Because if it's no moment to him and he doesn't ask

12   for a letter, but if he asks for a letter, at that time what

13   I might do is I'll let you know that I'm doing this, but I'll

14   pull him aside and indicate to him that --

15          MR. QUINN:  In principle, we have no problem with

16   that.  That's fine.

17          THE COURT:  All right.  That's a good idea.

18          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

19          MR. NOLAN:  Your Honor, the right person is here.

20          THE COURT:  Let me talk about this a little bit

21   before I make these rulings.  This has been yet another river

22   to navigate.  I'm mindful of Motion in Limine No. 9.  And I'm

23   also mindful of the apportionment arguments.  On the one

24   hand, what these rulings reflect is the Court's attempt to

25   balance relevant evidence as to the significance of

1    packaging, of themes, of certain of the elements that MGA

2    wants to apportion.  And I certainly thinking having someone

3    from Mattel as the leading toy company talking about those

4    elements is relevant evidence in that regard.

5            .  On the other hand, a lot of this evidence is of a

6    nature that gets into the type of 403 issues upon which the

7    Court ruled in its motion in limine.  So I've tried to go

8    through this and let the evidence in that is most probative

9    of the issue of the importance of branding and themes and the

10   like to Mattel or any other responsible toy manufacturer,

11   while at the same time preclude evidence that runs afoul of

12   the 403 ruling.

13           So just with that overview in mind, that's what the

14   Court is attempting to accomplish here in balancing this.

15   Let me get into the specifics.  And then after I've gone

16   through these rulings, if there's any particular rulings that

17   the Court has made that the parties feel don't strike that

18   right balance, I think it's best to wait until after the

19   Court has ruled on all of it and you see everything that's

20   coming in and everything that's not coming in before you make

21   your comments as opposed to hearing argument on each

22   individual one.  Because I think a lot of this has to be

23   taken as a whole.

24           All right.  And again, also, if I skip over any

25   objections, please let me know.  I think I caught them all.

1          All right.  Beginning on page 20 and 21, the

2    objections are overruled.

3          I think we now next go to 83.  And I'll sustain the

4    602 objection which is right in the middle of a page.  Lines

5    11 through 13.  It's fair enough to ask this witness what he

6    means by the word fashionable and his explanation.  There's

7    certainly a 602 problem, given how he responds to the

8    question on line 11.  So I'm going to strike that particular

9    sentence.

10          Turning to page 109, I'm going to overrule the

11    objections on 109, 110, and 111.  With respect to

12    Exhibit 2502, however, the only part that comes in, and it's

13    basically for reference by the witness, is the line that's

14    identified for the witness here in this transcript.  This is

15    not bringing in the entire exhibit.

16          So our tech people are going to have to work on

17    that.

18          So everything is overruled up to page 113, and then

19    I'm going to sustain the objection starting on line 21 of 113

20    through line 6 of 114.

21          I'll overrule the objections beginning on line 7 of

22    114 through line 8 of 115.

23          I'll then sustain the objections beginning on line

24    12 of page 115 through line 7 of 116.  Because there we get

25    into the whole Mattel is a struggling brand, et cetera,

1   et cetera.

2           Turning to page 138, I'll overrule the objections

3   to lines 21 through 25.  Again, Exhibit 2504 just comes in to

4   have reference to the line on page 7 which provides context

5   to the questions, not for the substance of the document

6   itself.

7           Overrule the objections on 139, lines 15 through

8   20, but sustain the objections starting on page 139, line 23,

9   through 140, line 21.

10          We then move, I believe, to page 229.  Oh, no.  I'm

11  skipping something here.  214 I think it is.  Turning to page

12  214.  Okay.  I'll again overrule the objections on pages 214

13  and 215, but the only portion of this 10K that's coming in is

14  the line that talks about the worlds of strategy within the

15  Barbie brand.  This lays foundation for some of the questions

16  that I'm going to permit coming up.

17          And the objections are overruled through page 218.

18          Then when we get to page 229, I'm going to sustain

19  the objections on 229, on 230, through line 1 of 231.

20          I'll overrule the objections on 231 beginning at

21  line 2, through 232, line 15.

22          I'll sustain the objection on page 233.  It doesn't

23  make any sense to me.  The question doesn't make any sense.

24          Turning to page 275, I will sustain the objections.

25          On 276, I'll sustain the objections on lines 1

1   through 6, overrule the objections on lines 22 through 25 of

2   page 276, and lines 1 through 17 of 277.

3          Sustain all objections on 278 and 279.

4          Sustain the objections on 285.

5          Sustain the objections on 281 from lines 1 through

6   13.

7          Overrule the objections from line 14 through the

8   bottom of the page.

9          Overrule the objections on 282 through the top of

10  283, line 1.

11         And I think that takes us to the end.  So those are

12  the Court's tentative rulings where I've tried to strike this

13  balance as I indicate.  I've tried to keep out any irrelevant

14  evidence about the Barbie brand or Mattel or what's going on

15  at Mattel, while at the same time permit evidence in

16  concerning the importance of themes and packaging and various

17  things that go to the apportionment.

18         I'll hear from either, both, or neither sides.

19         MR. COREY:  One question first, your Honor.

20         THE COURT:  Yes.

21         MR. COREY:  Going back to page 139.

22         THE COURT:  Very well.

23         MR. COREY:  The Court sustained the objection to

24  139 starting at line 23.

25         THE COURT:  That's correct.

1          MR. COREY:  And there's a reference there to

2    Exhibit 2505.  I just want to make sure that the Court is not

3    admitting that.

4          THE COURT:  That is not being admitted.  That's

5    correct.  And the only -- I mean, the only extent -- because

6    I think these exhibits are largely irrelevant, but they are

7    intertwined into the question.  And it's going to be hard to

8    ask the question without that reference in the exhibit, and

9    that's the only portion that's going to be shown or published

10   to the jury, is just that portion to give context to the

11   questions that follow.

12         MR. COREY:  And I appreciate that, your Honor.  I

13   just wanted to make sure that we were clear on that.  I think

14   with respect to -- and this may be unfortunately a little bit

15   late.  With respect to Mr. Farr, Mr. Farr is the Chief

16   Financial Officer.  I think there's kind of a fundamental

17   foundational problem with respect to any of his testimony

18   relating to these things because he's a financial person.

19   He's not a product design, marketing, or planning person, and

20   I think we are going to have to people on stand, including

21   this afternoon, who are going to be more well versed and more

22   qualified to speak to these particular issues than Mr. Farr

23   in his particular position as the Chief Financial Officer.

24         THE COURT:  And you know, you may be right in terms

25   of him being a financial officer, and he may not be the most

1    qualified, but as the Chief Financial Officer of a company,

2    and given the interconnectedness of understanding the

3    importance of the themes and accessories and packaging to the

4    bottom line, that's particularly the context of which this is

5    relevant.   Because this is the impact that these elements

6    have on damages that makes it relevant to MGA's defense in

7    this case.

8            So I think the CFO, even though he is in the

9    financial aspect of the company, he's at a high enough level,

10   and he's got to understand the relationship between these

11   elements and the impact that they have on the financial

12   success of the product in question.   And that's ultimately

13   the relevance of this, it goes to damages.

14           MR. COREY:   And I think the Court would be exactly

15   right if that were the question or that were the type of

16   question that Mr. Farr was asked.   But he was not asked these

17   questions.   He was asked design and marketing questions.   I

18   think -- and I can find this in a minute.   I think what he

19   said was that Mattel does not quantify.

20           THE COURT:   As a general objection I'm going to

21   overrule it.   If there's a particular question that you think

22   that you want to focus on, Counsel, I will consider it.   When

23   I say that objection, I'm not going to use that objection

24   basically to strike all of his testimony.   If there's

25   particular questions that you think that he lacks foundation

1   on in -- questions where I've overruled your foundational

2   objection, I'll consider it at this time.

3         MR. COREY:  I don't have the specific question in

4   front of me, your Honor.

5         THE COURT:  Very well.

6         MR. HERRINGTON:  Your Honor, Robert Herrington on

7   behalf of MGA.  Just one note.  Pages 115 and 116.

8         THE COURT:  Yes.

9         MR. HERRINGTON:  You sustained the objection

10  beginning at line 12 on page 115.

11        THE COURT:  Right.  Through line 7 on 116.

12        MR. HERRINGTON:  I would ask your Honor, if you

13  could take a look starting at 25 of page 115 through line 7

14  of 116.  And if we could have that portion entered.  It

15  doesn't go to the 402.

16        THE COURT:  The problem I have with this, and it

17  really wasn't fleshed out or designated, I don't understand

18  the answer from lines 4 through 7.  I think it's the

19  execution of an individual SKU basis.  I know what a SKU is,

20  but what does that mean?

21        MR. HERRINGTON:  The point of this section is

22  differentiating again between the product.

23        THE COURT:  I understand the point.  But what does

24  that answer mean?

25        MR. HERRINGTON:  As I understand what he is

1    basically saying is that you can have a product that itself

2    is not a good product, but the brand is doing well and can

3    still carry the product along.  It's the differentiation

4    between the product and the brand that we're trying to have

5    the CFO of Mattel actually acknowledge here.

6              THE COURT:  You know, I'll give you line 25 and

7    lines 1 and 2, but this answer just doesn't make any sense to

8    me.  So line 25 on page 115 and lines 1 and 2, the question,

9    "Is it possible to have a strong brand and a weak product at

10   the same time?"  "Yes."  But as far as this answer, it

11   doesn't make any sense.  And the rest of what I sustained

12   there is designed towards talking about Mattel's -- it's so

13   intertwined with this whole notion of Mattel struggling, and

14   it runs into that 403 issue I described.

15             MR. HERRINGTON:  I understand.

16             MR. COREY:  And this is the kind of foundational

17   commentary I was talking about.  There's not an

18   identification of the brand.  They are really just asking him

19   to speculate about whether this is possible.  It's not in the

20   context of his experience.

21             THE COURT:  It's not the most convincing evidence.

22   I assume it's based on his experience, Counsel --

23             MR. COREY:  He is the CFO of Mattel.  And I didn't

24   finish my sentence.

25             THE COURT:  I'm sorry.

1          MR. COREY:  His experience with respect to specific

2    products at Mattel.  You can speculate about anything.  Is it

3    possible?  Of course, anything is possible.  But it's not

4    tethered to anything specific in his experience.

5          THE COURT:  Well, actually we know, based on what

6    the Court has kept out, exactly what he's talking about.  So

7    you are correct.  He's talking about the Mattel brand.  If

8    you look at the lines preceding this, and I'm striking that

9    because of the 403 issues, but I'm not concerned that this is

10   just a speculative statement.  He's actually talking about

11   the Mattel brand.  In context.  But I'm not allowing that in,

12   and this is part of the balancing that goes on.

13         MR. COREY:  Thank you, your Honor.

14         THE COURT:  Anything else on this?  Any other

15   questions?

16         Very well.  And please be careful on those

17   documents.  Only that portion that is referenced in the

18   statement here.

19         Okay.  You said I don't need to deal with Nordquist

20   now?

21         MS. AGUIAR:  Well, actually, your Honor, when you

22   had asked, at the beginning of the lunch break, if we had a

23   response, I had said if you wouldn't mind taking up at the

24   end of the lunch break, because Mr. Sloan is here, and if he

25   could address that.

```
 1                THE COURT:  Mr. Sloan.

 2                MR. SLOAN:  Do you want me to address the

 3   objections now?

 4                THE COURT:  I received the objections to the MGA

 5   parties Phase 1-B designations of Jill Nordquist.  Before I

 6   get into ruling on the individuals, I want to get an answer

 7   to the general objection.

 8                MR. SLOAN:  Your Honor, two general objections.

 9   First is the 403 objection with respect to the issue that we

10   dealt with before, which is they are claiming that unless we

11   show a direct nexus between the knowledge of Ms. Nordquist

12   that Carter Bryant actually was working for MGA or drawing

13   the Bratz drawings while he was still at Mattel, that this

14   whole thing should be precluded on 403 grounds.  And our

15   argument is simply that that's -- that the inclusion of that

16   information is consistent with your Honor's July 24th order.

17                We understand the 403 considerations, but we

18   believe that this is appropriate.  It goes to Mattel's state

19   of knowledge as to the fact that Carter Bryant, they learned

20   fairly early on that Carter Bryant was working at MGA, and

21   that should have caused them to begin investigating.

22                THE COURT:  Are we ever going to get -- we're

23   further along now, of course, than we were when I ruled

24   previously about this in the trial.  And we're not quite done

25   yet, and I understand there's more we're -- we're going to
```

7178

1   hear from more witnesses.  Are we going to get to the point

2   where we hear any evidence at all that Mattel had any

3   knowledge or reason to believe that Carter Bryant did in fact

4   do any of these drawings while he was at Mattel prior to

5   2003?

6               MR. SLOAN:  Well, your Honor, to some extent it's

7   circumstantial evidence.  It's a number of building blocks.

8   I think one of the main building blocks -- and I confess I

9   wasn't here for Margaret Leahy's testimony yesterday -- but

10  my understanding of what she said, although I haven't read

11  it, is that one of the things that she spoke to certain

12  Mattel employees just after Bratz was released in the summer

13  of 2001.  Those employees knew, for instance, that she had

14  left Mattel in approximately September of 2000.

15              THE COURT:  I know you're expecting to get that in,

16  but that never came in, did it?

17              MR. NOLAN:  Your Honor, I -- I'll go back to the

18  transcript.

19              THE COURT:  Would you?  I'd like to see that.

20  You're right about the building blocks, and I understand the

21  circumstantial case, but I just don't want to continue down

22  this road if the building blocks -- if the circle is never

23  going to be completed.  And I don't recall that testimony.

24              MR. NOLAN:  Your Honor, we'll go back to the

25  testimony.  But my recollection is that she -- in the

7179

1   conversations that she was having, she was talking about how

2   each of them knew that she had left in September of 2000, her

3   employment at Mattel, that the Bratz was the first free-lance

4   project while at Mattel.  And so that combined indicates that

5   the work that she was doing --

6           THE COURT:  Mr. Sloan just said that there was a

7   communication made.  Maybe I misunderstood you.

8           MR. SLOAN:  Your Honor, my understanding is that

9   she had communications with -- I think there was two or three

10  employees from Mattel who at that time weren't Mattel

11  employees, who were friends of hers.  They knew that she had

12  left Mattel in approximately September of 2001.  She told

13  them that she was working on Bratz.  I believe she told them

14  that Carter Bryant was working on Bratz and that this was the

15  first project she had worked on afterwards.

16          THE COURT:  Submit that testimony to the Court.

17  Let me take a look at that when you get a chance.

18          Moving on to the second issue.  Basically they are

19  saying it exceeds the scope of her 30(b)(6) designation and

20  that she's a local witness here.  So just call her as a

21  witness.

22          MR. SLOAN:  Your Honor, our response to that is

23  first of all, I think under the rule she does qualify as a

24  managing agent of the company under Rule 32.  She has -- the

25  standards that the courts look at, it's a fairly flexible

1   standard.

2          But they look at whether she has the employee's

3   rank or title, whether she has supervisory powers.   She

4   testified that if she were Carter Bryant's supervisor in this

5   particular situation, she would have asked him to leave

6   immediately when he refused to disclose where he was going.

7          The extent of the corporate employee's power to

8   exercise judgment and discretion in dealing with corporate

9   matters.   I think the fact that they put her up as a 30(b)(6)

10  witness on very closely related issues suggests that they

11  felt she had the ability to bond the corporation.

12         THE COURT:   But you do concede some of the

13  testimony that you've designated here does go beyond the

14  scope of those designations?

15         MR. SLOAN:   Your Honor, if you're going to read

16  them very strictly, I think it does.   I think there's an

17  argument to be made that they are very closely connected.

18  For instance, topic 55, all acts, omissions, circumstances,

19  and/or evidence showing or tending to show that Bryant made

20  affirmative misrepresentations to Mattel employees upon his

21  departure.

22         There are two elements of affirmative

23  misrepresentation.   The first is what Mattel is actually

24  trying to introduce, which we didn't designate, which was the

25  fact that Mr. Bryant refused to disclose where he was going.

1   But part of the -- you know, when they are claiming that it's

2   a misrepresentation, it's only a misrepresentation if in fact

3   they find out at some point that he has in fact lied.  And

4   they found that out in part when they found out he had gone

5   over to MGA to work on Bratz.

6           So it goes to Mattel's knowledge that in fact this

7   statement, which they had suspected might not be accurate,

8   was a misrepresentation.  At some later point, Jill Nordquist

9   found out that it was in fact inaccurate, that he had gone

10  over to MGA.  So I think it's closely related.  I won't

11  claim, your Honor, that it's on all fours --

12          THE COURT:  That other question.  The fraudulent

13  concealment is on MGA's part allegedly.

14          MR. SLOAN:  Correct, your Honor.

15          THE COURT:  That Mattel figured out.  An element of

16  concealment isn't that the other person necessarily bought

17  off on the concealment; right?  You're guilty of lying to

18  someone even if the other person doesn't believe --

19          MR. SLOAN:  Actually, with respect to fraudulent

20  concealment, that's not the case.  If you in fact know, and

21  that's sort of what we're arguing on.  If Mattel knew in fact

22  that he was, assuming was lying about something, if they knew

23  in fact that he was working on Bratz drawings or he was going

24  over to MGA, that would defeat their fraudulent concealment

25  claim.  They have to prove both that there was an affirmative

 1  concealment on behalf of MGA and that it succeeded actually.

 2  And this goes directly to the fact that, you know, when she

 3  was put on notice that perhaps --

 4          THE COURT:  Assuming that MGA was lying or

 5  concealing that Mattel had figured out.  Okay.  Well, find

 6  that stuff from Margaret Leahy's transcript.

 7          MR. NOLAN:  I have it.  And as a courtesy to

 8  Mr. Price, let me show it to him.

 9          THE COURT:  Show it to Mattel and hand it up.

10          MR. NOLAN:  Your Honor, let me say for the record

11  I've shown it to Mr. Price, and we're going to be directing

12  your attention to pages 6828, starting at line 20, through

13  6832, ending at line 12.  And then Mr. Price in his

14  cross-examination would point to page 6833, lines 18 through

15  24, and for the Court's convenience, I'm going to bring up a

16  little bit of a tab.

17          THE COURT:  Thank you.

18          2001; right?

19          MR. NOLAN:  Summer of 2001 she's having the

20  conversation.

21          MR. PRICE:  Your Honor, the first time Ms. Leahy

22  testified, she testified that when she left Mattel, she told

23  Mattel that she was leaving to become a mom, not to work.  So

24  that attenuates it even further.

25          THE COURT:  That's what she testified she said when

7183

```
 1    she was leaving Mattel, not what she said in the summer of

 2    2001.

 3              MR. PRICE:  Summer of 2001, she said, "One of the

 4    first projects I worked on when I started working again was

 5    Bratz."

 6              THE COURT:  So what Mr. Sloan suggests is to

 7    connect the dots in order to -- someone at Mattel would have

 8    had to have been thinking back essentially, well, wait a

 9    second, she left Mattel in September.  The first project she

10    worked on was Bratz.  Carter Bryant was still working for

11    Mattel in September.  Ergo, he could have been involved.

12              MR. PRICE:  And that she was not being honest when

13    she said she was quitting Mattel just to be a mom, not to

14    work.

15              MR. NOLAN:  We'll go back, and it's --

16              THE COURT:  This is a great factual issue for the

17    jury to figure out.

18              MR. NOLAN:  Right.  My only point, your Honor, is

19    the record is going to speak for itself.  I don't believe

20    that her testimony was anything other than she was leaving

21    full-time employment to be able to spend more time at home

22    and do free-lancing work, that she had discussions that she

23    could not work at Mattel as a free-lancer and she was

24    free-lancing out there.

25              THE COURT:  This reaffirms my conviction that this
```

1    is a good factual issue for the jury to decide.

2         Very well.  That will help me in deciding the

3    Nordquist.  Does Mattel need to say anything further to the

4    general objection?  Response to Mr. Sloan, or are we done

5    with that?

6         MR. COREY:  Just very quickly with respect to the

7    second objection, with regard to the scope of the testimony.

8    The real thrust of the objection is to put the topics in

9    front of the Court so the Court can make a proper ruling on

10   that.  And with respect to the issue of whether she's an

11   officer, director, or managing agent.  She's an employee in

12   the licensing department.  She's not the person or the kind

13   of caliber of person that the Court considers -- that the

14   rules consider binding.

15        THE COURT:  Is Ms. Nordquist available?

16        MR. COREY:  Yes.

17        MR. SLOAN:  Just one thing, your Honor.

18   Ms. Nordquist has been an employee of Mattel for 11 years.

19   She's now a director of the consumer brands division.  I

20   believe at the time that Carter Bryant was working in the

21   second shift at Mattel, she was, I believe, also a director

22   position in the Barbie Collectibles unit where he was

23   working.  She does have some seniority.

24        They obviously felt that she has some experience

25   and ability to bind the company by the fact that they put her

1    up as their 30(b)(6) witness on a lot of these topics, which

2    are very closely related to the topics that we're introducing

3    evidence on.  And if you look at the flexible standards that

4    the courts have employed, I think that she appropriately fits

5    as a managing agent.

6            THE COURT:  Okay.  Very good.  If there was any

7    concern at all that she was not available, I think I probably

8    would go with Mr. Sloan's flexible interpretation and allow

9    in the deposition.  But since she's available, let's have her

10   come in.  Make her available.  You can use the deposition in

11   examining her.  And you can ask her whatever questions you

12   want.

13           MR. NOLAN:  Your Honor, is she available for

14   tomorrow morning?

15           THE COURT:  Mr. Corey gave me an unqualified

16   available.  So she's available whenever you want her,

17   Mr. Nolan.

18           MR. NOLAN:  Thank you, your Honor.

19           MR. ZELLER:  We're happy to have Ms. Nordquist here

20   at a reasonable time.  It's not a question of her

21   availability.  We already have two witnesses.  Mr. Eckert,

22   Mr. Kilpin, who have been waiting around to be called.  We

23   were given an order in which these witnesses with going to be

24   called.  Mr. Kilpin was supposed to be up next and then

25   Mr. Eckert.  In the late morning and over lunch, we were then

```
 1    told there was going to be like three or four MGA employees

 2    put on the stand instead.  So I mean --

 3              THE COURT:  Mr. Zeller, I'm very sympathetic to

 4    this, but this sounds very reminiscent of exactly what I

 5    heard of MGA attorneys in Phase 1-A on behalf of

 6    Mr. McFarland and on behalf of a number of other attorneys.

 7              So I don't want to give short shrift to these

 8    individuals because I know they are very busy, and this is a

 9    tremendous burden and imposition on them, any more than I

10    wanted to give short shrift to MGA's witnesses and

11    Mr. Larian's witnesses.  But as I think you pointed out, it's

12    the nature of trial.

13              MR. ZELLER:  And I recognize that, your Honor, and

14    I'm not complaining about that.  What I am raising is that

15    there's a suggestion now that we need to have Ms. Nordquist

16    come out here and wait indefinitely.

17              THE COURT:  I am ruling essentially in Mattel's

18    favor in granting that, Counsel.  I mean, the alternative is

19    doing what Mr. Corey has been trying to stop, and that is

20    have the video deposition played.

21              MR. ZELLER:  Right.  I understand, your Honor.  But

22    again, the point is that what is being suggested is that

23    Mr. Nolan just said we want her here tomorrow.  And that

24    means -- we've already had Mr. Kilpin waiting for three days,

25    Mr. Eckert waiting for a period of time, and now we're going
```

7187

1    to stack up another witness.  I'm just asking for some

2    actual, real reasonable estimate.  We can have her here, but

3    to have her then come tomorrow, not go on, you know, I mean,

4    that's --

5              THE COURT:  The worst case scenario would be that

6    she would have to come back on Friday.  We're done on Friday.

7              MR. ZELLER:  Thank you.

8              THE COURT:  Let's bring the jury in.  Quickly.

9              MR. NOLAN:  Your Honor, our next witness is Debbie

10   Middleton.  Can we have her take the stand?

11             **(WHEREUPON THE JURY ENTERS.)**

12             THE CLERK:  Please stand and raise your right hand.

13             **DEBORA MIDDLETON, SWORN.**

14             THE CLERK:  Please have a seat.

15             THE COURT:  Go ahead and state your name, and spell

16   your last name for the record, please.

17             THE WITNESS:  My name is Debora Middleton,

18   M-I-D-D-L-E-T-O-N.

19                      **DIRECT EXAMINATION**

20   BY MR. NOLAN:

21   **Q.**   Ms. Middleton, how are you employed?

22   **A.**   I work for MGA.

23   **Q.**   And how long have you worked for MGA?

24   **A.**   I've worked there since July of 2003.

25   **Q.**   What is your current position or title?

1  **A.**   It's director of creative development.

2  **Q.**   If you could just please explain for the jury's sake

3  what your educational background is, and for those of us who

4  have been here for several months or a lot of weeks, could

5  you speak into the microphone.  It's easier for everybody to

6  hear.  Thank you.

7  **A.**   I worked in animation for 15 years prior to starting at

8  MGA.  I worked for various companies, starting in, I guess,

9  the biggest company was -- well, the first big company was

10  Don Bluth.  I worked for them for two years in Ireland and

11  then moved to L.A., working for another two years with them.

12  Also did some work for Warner Brothers on a couple of their

13  features.

14         I worked for a company called Rich and Nation on a

15  feature film.  Did a little work for Disney, a little work

16  for Dream Works before going to Klasky-Csupo.  I worked there

17  for two years before starting at MGA.

18  **Q.**   And briefly explain to us your educational background.

19  **A.**   I went to Champlain College for a year studying fine

20  arts.  And then I went to Sheridan College in Toronto for

21  three years, studying animation.

22  **Q.**   Now, you testified that your current position is

23  director of creative development at MGA; correct?

24  **A.**   Yes.

25  **Q.**   What was your title when you first started at MGA?

7189

1    A.    It was character art manager.

2    Q.    And do you recall approximately the date of your first

3    employment with MGA?

4    A.    It was July 2003.

5    Q.    Now, when you say you were the character art manager,

6    first of all, what is character art?

7    A.    It's the artwork that we create to go on packages or use

8    in style guides.

9    Q.    Before you arrived at MGA in July of 2003, did MGA have

10   an in-house art department?

11   A.    No, they did not.

12   Q.    So after you joined, how many members were in your

13   department?

14   A.    I was the only person.

15   Q.    Prior to the time that you joined, had any character art

16   been created in by MGA?

17   A.    No, not to my knowledge.

18   Q.    And how long did you serve as character art manager for

19   MGA?

20   A.    For roughly two years.

21   Q.    And then what happened in 2005?

22   A.    I was promoted to director of character art.

23   Q.    And what were your responsibilities as the director of

24   character art at MGA?

25   A.    I was overseeing the character art team in creating all

7190

1    the character art that we used at MGA for packaging, style

2    guides, and at that point we were also into the website.

3    **Q.**    And what was the date that you assumed your current

4    position as director of creative development?

5    **A.**    That was the summer of 2007.

6    **Q.**    And explain to the jury what your -- what are your

7    responsibilities as the director of creative development at

8    MGA?

9    **A.**    I work on our entertainment properties, our DVD's from

10   the beginning idea to the film is actually delivered to MGA.

11   I also work on our website creating the artwork that's used

12   on our various websites, and I work with our licensing team

13   on approvals for licensed product that get submitted to MGA.

14   **Q.**    Now, for the period of July 2003 through July 2007, were

15   you the person within MGA in charge of character art for the

16   MGA products?

17   **A.**    Yes.

18   **Q.**    And did you work on the Bratz line?

19   **A.**    Yes.

20   **Q.**    Did you work on other lines?

21   **A.**    Yes.

22   **Q.**    Could you give the jury a little bit of background when

23   we talk about -- first of all, is there a difference between

24   character art and package art for a doll?

25   **A.**    No.

1   Q.   So could you just very briefly explain to the jury what

2   the purposes of character art or package art on a product?

3   A.   The children can relate to the drawings in the character

4   art.  So -- I'm sorry.  Can you repeat the question?

5   Q.   Sure.  Can you just explain to the jury what the

6   purposes of character art or package art are.

7   A.   So it's something that the children can relate to to see

8   a cartoon character.  It's also a way that we can bring some

9   life to the character, because a doll is very plastic and

10  isn't in a pose, but character art can actually be posed and,

11  you know, in a situation.  It gives it some life and some --

12  I think giving it life is really what it does.

13  Q.   Now, in developing the character art for a particular

14  doll package, do you try to make the character art look like

15  the doll in the box?

16  A.   It looks similar to the doll in the box, yes.

17  Q.   Is it identical?

18  A.   No.

19  Q.   Could you describe for us briefly the steps in

20  developing character art?

21  A.   While --

22  Q.   While at MGA.

23  A.   Paula comes up with a theme that she'd like to create,

24  and that theme is then given to Aileen, who is -- who works

25  on the packaging, and she comes up with the look that she'd

1    like to create for a packaging for that certain theme.

2          Then we're given some information on what the theme

3    idea is.  We're also given usually a tear sheet which has a

4    pose that they'd like us to reproduce.  We're also given a

5    sketch from the fashion designer that shows the fashion that

6    we're supposed to draw onto the character.  And those are the

7    elements we're given to start the process of drawing.

8    **Q.**   You used a term that we've heard before.  And I want to

9    make certain.  You said tear sheet.  Could you give me an

10   example or definition of a tear sheet?

11   **A.**   A lot of times it's just a sheet that is torn out of a

12   magazine that is a live action, a person in a certain pose,

13   that they'd like to us draw something similar to that pose.

14   **Q.**   I think we have in front of you a white notebook.  I'd

15   ask you to look at Trial Exhibit 18320-004.

16         Can you identify that for us?

17   **A.**   That's a tear sheet.

18   **Q.**   So this is a sample of a tear sheet used at MGA?

19   **A.**   Yes.

20         MR. NOLAN:  Your Honor, we'd offer 18320-004.

21         MR. PRICE:  Objection.  Relevance.

22         THE COURT:  Counsel, what is this going to?

23         MR. NOLAN:  It goes to the differentiation and

24   changes and the process of how changes are made with respect

25   to the character art from package to package.  It's

1   foundational.

2            THE COURT:   Lay a further foundation for this,

3   Counsel.

4            MR. NOLAN:   Okay.

5   **Q.**   The particular tear sheet that you have in front of you,

6   18320, do you see that?

7   **A.**   Yes.

8   **Q.**   Are you familiar with this tear sheet?

9   **A.**   Yes.

10  **Q.**   And could you explain to us how you are familiar with

11  it?

12  **A.**   It's one of the pieces of information that I helped

13  gather.

14  **Q.**   And what was the purpose in gathering the tear sheet?

15  **A.**   To explain the process of how we create character art.

16  **Q.**   Was this tear sheet used at MGA to create character art?

17  **A.**   It was.

18  **Q.**   And was that character art created -- developed under

19  your supervision?

20  **A.**   Yes.

21           MR. NOLAN:   Your Honor, with that foundation...

22           THE COURT:   Counsel, may I see you at sidebar?

23           MR. NOLAN:   Sure.

24           **(SIDEBAR CONFERENCE HELD.)**

25           THE COURT:   I guess I'm struggling on the relevance

 1    of this, how this is not kind of like the Shrek thing.

 2              MR. NOLAN:  Because one of the components of

 3    apportionment, as we've identified it, is marketing,

 4    packaging.  This is actually something affixed to the

 5    package, and what we want to do is demonstrate that for each

 6    of the boxes on the characters that come out, that there is

 7    different --

 8              THE COURT:  Okay.

 9              MR. NOLAN:  And this was only simply, your Honor,

10    to lay -- you know, how artwork is created.  Frankly, I could

11    skip over it, but I thought it would be interesting for the

12    jury to understand the tear sheet process.

13              THE COURT:  Okay.  This is different than the Shrek

14    thing.  Okay.  Counsel?

15              MR. NOLAN:  I'm sorry.  It's completely different.

16              THE COURT:  No, I just wasn't -- yes.  I'll hear

17    your argument.

18              MR. PRICE:  My understanding is that they are

19    saying that the art on the packaging entitles them to certain

20    reduction of damages.  The process for doing that --

21              THE COURT:  I don't have the 403 concerns that I

22    had about Shrek because that was getting into actually how

23    the doll was created.  If he wants to use his time this way,

24    that's fine.  Overruled.

25              **(CONCLUSION OF SIDEBAR CONFERENCE.)**

7195

1           THE COURT:  The objection is overruled, Counsel.

2           MR. NOLAN:  Thank you.  I'd like to just place it

3    on the screen.

4    Q.   You identified this as a tear sheet coming from a

5    magazine; is that correct?

6    A.   Yes.

7    Q.   And for the jury's benefit, could you walk us through,

8    describe quickly what use is made of the tear sheet and take

9    us through to the development of the artwork.

10   A.   Well, the tear sheet just lets us know that they want us

11   to create a standing pose.  It's more of a profile pose with

12   the head turned towards camera.

13   Q.   And was this tear sheet used for a particular piece of

14   character art?

15   A.   It was.  It was used for the Sweetz line.

16   Q.   You have trial 18320-003 in front of you?

17   A.   Yes.

18   Q.   And what do you recognize that as?

19   A.   That was a -- the rough drawing that was done based on

20   this tear sheet reference.

21          MR. NOLAN:  Your Honor, we'd offer this exhibit.

22          MR. PRICE:  No objection.

23          THE COURT:  It's admitted.

24          **(Exhibit 18320-003 received.)**

25   Q.   BY MR. NOLAN:  Now asking you to -- what is the next

7196

1   step in terms of developing particular character art?  And

2   let's use this Sweetz line as an example.

3   **A.**   Based on the first rough sketch, we sometimes have

4   overlays that need to be done if something isn't drawn quite

5   right.  So sometimes an overlay is done on top of this.

6   **Q.**   Directing your attention to 18320-005.  Can you

7   recognize that for us.

8          What is 18320-005?

9   **A.**   That's -- I believe that's the color.  The number is cut

10  off a little bit.  But I believe that's the color, the final

11  artwork that was created.

12         MR. NOLAN:  Your Honor, we'd offer this exhibit.

13  Just for my reference, I apologize, what is the number on the

14  bottom of that page?

15         THE WITNESS:  I have 18320-00, and the last number

16  is somewhat cut off.

17         MR. NOLAN:  Okay.  I believe it's 5, your Honor.

18         THE COURT:  Very well.  Admitted.

19         **(Exhibit 18320-005 received.)**

20  **Q.**   BY MR. NOLAN:  So that's the third step, adding color;

21  correct?

22  **A.**   Yes, we do the rough pencil, and then we do a tight

23  pencil line over the rough after any revisions are done, and

24  then the center shot shows the artwork once the line art has

25  been taken into the illustrator program in the computer and

1   created into an illustrator file like this with flat color

2   inside.

3   Q.   Now, for the sweet lines, was the actual doll packaging

4   and character art use in the sweet lines actually made and

5   fully developed before you started doing the rendering?

6   A.   No.

7   Q.   Do you refer to the doll at any point while you're

8   drawing the character art?

9   A.   No.

10  Q.   How many different character art drawings have you been

11  involved in while employed at MGA?

12       MR. PRICE:  Objection.

13  Q.   BY MR. NOLAN:  With respect to Bratz.

14  A.   Hundreds.

15  Q.   Is that hundreds total, or is that on an annual basis?

16  A.   That would be on an annual basis.

17  Q.   Can you explain to the jury very quickly why there are

18  so many character art pieces that you are involved in?

19  A.   In each line there's four dolls or sometimes six dolls

20  with the main four characters and sometimes other characters.

21  So we do one piece of character art for each character.  In

22  our style guides there's often two poses for each character.

23  So there could be eight pieces of character art for one theme

24  or as many as 12 pieces of character art for one theme that

25  we create.  And there are many themes that are done every

 1 season, between five and I'd say ten.  So you just multiply

 2 it.  It becomes a lot of different poses and pieces of

 3 artwork that we create.

 4 **Q.**   So the character art is driven by the various themes?

 5 **A.**   Yes.

 6 **Q.**   Ms. Middleton, so hundreds of character art drawings

 7 each year you've been there; correct?

 8 **A.**   Yes.

 9 **Q.**   So there's -- you've been there for approximately five

10 years?

11 **A.**   Yes.

12 **Q.**   So is it safe to say that somewhere in the neighborhood

13 of 500 to whatever are the number of character art drawings

14 that you've been involved in and supervised?

15 **A.**   Yes.

16 **Q.**   For any one of those character art drawings, did you

17 ever make reference to the concept drawings of Carter Bryant?

18 **A.**   No, I did not.

19 **Q.**   Did you ever, in the five years you've been employed at

20 MGA, ever direct one of your employees to go back and look at

21 the concept drawings of Carter Bryant?

22 **A.**   No.

23 **Q.**   Do you know Carter Bryant?

24 **A.**   I've never met him, no.

25 **Q.**   Have you ever spoken with him?

1   A.   No.

2   Q.   Have you ever seen, in the five years that you've been

3   at MGA, Carter Bryant's concept drawings from 2000?

4   A.   No.

5        MR. NOLAN:   Nothing further.

6                    **CROSS-EXAMINATION**

7   BY MR. PRICE:

8   Q.   Ms. Middleton, I understand you began working in July of

9   2003?

10  A.   Yes.

11  Q.   By that time there had been some Bratz dolls in the

12  market; right?

13  A.   Yes.

14  Q.   Were you familiar with the Bratz dolls?

15  A.   Somewhat familiar.  I'd seen them in stores.

16  Q.   Did you become familiar with them once you worked at MGA

17  in July of 2003?

18  A.   I saw them.  I was in contact with them.

19  Q.   And in what context did you see these dolls or were you

20  in contact with them?

21  A.   I didn't actually have to use the dolls to do my job.

22  So you know, as you walk through MGA, there's all different

23  stages of production going on.  So we see the dolls around,

24  and oftentimes prototypes of the packaging because our

25  character art was used on packaging.  So I would see the

7200

1    packages occasionally once they were being created with the

2    character art on them.

3    **Q.**    And I think you said, I wrote it down, that the

4    character art looks similar but not identical to the doll in

5    the box; is that right?

6    **A.**    That's right.

7            MR. PRICE:  No further questions.

8            THE COURT:  Anything further?

9            MR. NOLAN:  Nothing further, your Honor.

10           You are excused, ma'am.  Thank you.

11           Your next witness.

12           MS. AGUIAR:  That was quite unexpectedly short, but

13   we're going to be ready in a moment.  We need to set up a

14   table.

15           THE CLERK:  Please stand and raise your right hand.

16                    **LEON DJIGUERIAN, SWORN.**

17           THE CLERK:  Please be seated.

18           Please state your full name, and spell your last

19   name for the record.

20           THE WITNESS:  Leon Djiguerian, D-J-I-G-U-E-R-I-A-N.

21           MS. AGUIAR:  Your Honor, I can certainly wait until

22   we're done, or if it wouldn't be too distracting, we can

23   finish setting up the table --

24           THE COURT:  I don't want to --

25           MS. AGUIAR:  I don't want to distract the jury.

7201

1          THE COURT:  Right.  So we can just wait a moment.

2    That's all right.

3          While we're doing this, Counsel, is there a binder

4    on this?

5          MS. AGUIAR:  There's not.

6          THE COURT:  There's not.  All right.

7                    **DIRECT EXAMINATION**

8    BY MS. AGUIAR:

9    **Q.**   Good afternoon.

10   **A.**   Good afternoon.

11   **Q.**   Mr. Djiguerian, would you tell us where you work,

12   please?

13   **A.**   I work at MGA Entertainment.

14   **Q.**   Okay.  And if you want, you can either move your --

15   scoot your chair up or -- this thing moves, so you can pull

16   it towards you if you want to be more comfortable.

17          Sorry.  You said you work at MGA?

18   **A.**   Yes.

19   **Q.**   What is your position?

20   **A.**   Currently Bratz brand manager.

21   **Q.**   And how long have you been with the company?

22   **A.**   Almost eight years.

23   **Q.**   Without going into each of the specific jobs or years,

24   can you tell us just generally in what areas you have worked

25   over the last seven to eight years?

7202

1   A.   I started off as a graphic designer, and I moved on to

2   structural engineering, production management, project

3   planning, design manager, and now Bratz brand manager.

4   Q.   Through the course of those different areas where you've

5   worked at MGA, have you become familiar with the various

6   Bratz products?

7   A.   Yes.

8   Q.   And do you also have familiarity specifically with the

9   sculpts that were developed at MGA for each of those

10  products?

11  A.   Yes.

12  Q.   Okay.   I'd actually like to go through those with you.

13          And, your Honor, with your permission, it might

14  just be easier, I have the microphone, and instead of going

15  back and forth, may I --

16          THE COURT:   Absolutely.

17          MS. AGUIAR:   Thank you.

18  Q.   Are you familiar with the Bratz Boyz product?

19  A.   Yes.

20  Q.   Okay.   And just for the record, what we've done is we've

21  put one of each of the products -- can you tell us, these

22  are, the things in the back, Bratz subbrands in their

23  packaging; is that correct?

24  A.   That's correct.

25  Q.   Okay.   And then for each of these, we have a sculpt that

1    corresponds to the doll in the box; correct?

2    A.    Yes.

3    Q.    And the sculpt -- can you describe -- in other words,

4    are we seeing sculpts fully decorated and clothed?

5    A.    No, you're seeing the naked sculpt, the raw sculpt.

6    Q.    Okay.  Let's start first with the Bratz boys, then.  Let

7    me hand you --

8         And your Honor, can I just move all of these in at

9    the end?

10        THE COURT:  You may.  I trust you've reviewed

11   these, Counsel?

12        MR. PRICE:  I have not seen the sculpts.  I think

13   everything else is in evidence.

14        MS. AGUIAR:  The products in the boxes are in

15   evidence, and the sculpts, they were given the opportunity to

16   inspect.

17        THE COURT:  Very well.  Why don't we do this.  If

18   you'd do this for the Court, Mr. Price, just take a quick

19   look at those, and let me know if you have any objections,

20   and this way we can get that out of the way and resolve that,

21   and then counsel can operate freely.

22        (Pause.)

23        MR. PRICE:  Your Honor, I don't know if they are

24   the sculpts to those products, but if that's what he's going

25   to testify to, I have no objection.

7204

```
 1          THE COURT:  Very well.  Conditionally, then, I will
 2    admit them, and you'll renew your objection if you have any
 3    concerns about foundation based on the testimony.
 4          You may proceed, Counsel.
 5          MS. AGUIAR:   Thank you.
 6    Q.   So the first product, do you recognize this as a Bratz
 7    Boyz product?
 8    A.   Yes, I do.
 9    Q.   And this is for the record Trial Exhibit 17477.
10          I'm going to hand you Trial Exhibit 18870.  And
11    when you are talking about these, it would be great if you
12    could hold them up in a way that the jury can see them.
13    Thanks.
14          Can you identify the Trial Exhibit 18870?
15    A.   Yeah, this is the Bratz Boyz body sculpt.  Head sculpt.
16    It's in raw form, not painted or rooted.
17    Q.   Was it a sculpt that was developed by MGA?
18    A.   Yes.
19    Q.   And I'll ask you the same questions for all of these
20    sculpts.  I'm sorry if it becomes a slight bit repetitive.
21    So I'm going to ask you some of the same questions for all of
22    these sculpts.  So is this sculpt the same as the sculpt for
23    the Bratz core fashion doll?
24    A.   No, it's different.
25    Q.   Can you tell us in what ways it's different?
```

7205

1    **A.**   Well, first thing is there's a lot of muscular mass on

2    the body defining it as a male figure.   There's muscle

3    definition on the legs, the torso, the shoulders are broader,

4    larger arms, has a six-pack, different head sculpt than the

5    girls' doll.

6    **Q.**   Let me ask you this threshold question before we go any

7    further.   In the years that you've been working at MGA, have

8    you ever seen before today, have you ever seen Mr. Bryant's

9    original concept drawings for Bratz that were presented to

10   MGA in September of 2000?

11   **A.**   No, I have not.

12   **Q.**   To the best of your knowledge, is that sculpt that

13   you're holding in your hand, the Bratz Boyz sculpt, were the

14   drawings used to create that sculpt?   Were the drawings from

15   the pitch book drawings from September 2000 used to create

16   that sculpt?

17   **A.**   I don't believe so, no.

18   **Q.**   So you can just leave that one.   And we'll go on to the

19   next one.   The next one is Lil Bratz.   Do you recognize this

20   as a Lil Bratz product?

21   **A.**   Yes.

22   **Q.**   And this is Trial Exhibit 17491.   And I'm going to hand

23   you Trial Exhibit 18869.   And can you tell us what we're

24   looking at there?

25   **A.**   This is a Lil Bratz doll.   In its raw form, the sculpt.

1    **Q.**    I'm trying to think how to get out of the way so you

2    guys can see the screen.

3              Okay.  And is this the -- I mean, this is a

4    fairly -- this may be an obvious question, but is this the

5    same sculpt as the core fashion doll sculpt?

6    **A.**    No, it's not.

7    **Q.**    What are the primary differences?

8    **A.**    The first thing is the size.  This is a miniature

9    microdoll.  The body sculpt is different.  The head size is

10   different.  The head sculpt is different.  Overall it's a

11   completely different doll.

12   **Q.**    Were Carter Bryant's drawings from September of 2000

13   used to create that sculpt?

14   **A.**    No.

15   **Q.**    The next product I wanted to talk about is Babyz.  And

16   can you explain to the jury, I'm going to show you two

17   different Babyz product.  One you'll see here is Trial

18   Exhibit 17775.  And the next one is 17471.  And can you

19   explain the difference between the two Bratz Babyz products

20   that we just looked at?

21   **A.**    Well, the first one you showed was the first launch of

22   the Babyz with the molded hair.  It has plastic hair.  And

23   the second one you showed has actual rooted hair.

24   **Q.**    And when you say rooted hair, I think we probably have

25   heard this already, but what do you mean by that?

7207

1   **A.**   Actual hair that you can brush and style.

2   **Q.**   So let me hand you 1863 and 18862.  Can you tell us what

3   we're looking at with 1863?

4   **A.**   This is the first Babyz sculpt, it's all molded hair.

5   There's no rooted hair.

6   **Q.**   Is this a sculpt that was created and by MGA?

7   **A.**   Yes, it was.

8   **Q.**   To your knowledge was it based in any way on Carter

9   Bryant's drawings from September of 2000?

10  **A.**   No, it's not.

11  **Q.**   Can you tell us the ways in which it's different, if at

12  all, from the core fashion doll sculpt?

13  **A.**   Well, this baby here is much smaller than the Bratz core

14  doll.  It has different proportions of the body, the legs,

15  the torso.  It has a different size head in relation to the

16  Boyz.  It's a completely different sculpt.

17  **Q.**   And then moving on to the next one in front of you,

18  which should be 18862.  And if you could tell the jury what

19  we're looking at there.

20  **A.**   And this is another generation of the Bratz Babyz.  And

21  this one here you can actually move the hair and have real

22  hair to style and brush.  Versus this one where it was molded

23  hair.

24  **Q.**   And so other than the molded versus the rooted hair, is

25  the sculpt the same?

7208

1    **A.**    The body sculpt is the same.   The only difference is the

2    head.

3    **Q.**    So it's a different head sculpt?

4    **A.**    Correct.

5    **Q.**    Next one.   I'm holding up Trial Exhibit 17466.   Do you

6    recognize this?

7    **A.**    Yes.

8    **Q.**    As a Bratz Big Babyz?

9    **A.**    Yes.

10   **Q.**    I've just handed you two trial exhibits.   One is 18865

11   and 18866.   Can you tell us what we're looking at with 18865?

12   **A.**    -65 is this one here.   This is the Big Babyz with the

13   molded hair once again, the plastic hair.   You cannot you

14   brush it or style it.   It's plastic.   And the next one here

15   is the version with the rooted hair where you can actually

16   brush and style the hair that's being applied to the head.

17   **Q.**    Were both of these sculpts that were developed and

18   manufactured by MGA?

19   **A.**    Yes.

20   **Q.**    And to the best of your knowledge, were these sculpts

21   based on Mr. Bryant's drawings from September of 2000?

22   **A.**    No.

23   **Q.**    Can you walk us through the nature of these sculpts and

24   how they differ from the core fashion doll sculpts?

25   **A.**    Well, these are large dolls.   They are large babies.

7209

1     The scale is much different than from the Bratz core.   Once

2     again, the body proportions are different, the legs, the

3     torso, the arms, and the head size is larger.

4     **Q.**    Okay.   Great.

5     **A.**    Completely different sculpt.

6     **Q.**    Thank you.   The next product I'm going to hold up for

7     you is Trial Exhibit No. 17478.   Do you recognize that as a

8     Bratz Kidz product?

9     **A.**    Yes.

10    **Q.**    And this particular one is a girl?

11    **A.**    Yes.

12    **Q.**    So I'm handing you two more exhibits.   Those are 18860

13    and 18861.   Can you tell us what we're looking at?

14    **A.**    The 18860 is the Bratz Kidz girls' doll.   And -861 is

15    the Bratz Kidz boys' doll.

16    **Q.**    And are these two sculpts that were developed and

17    manufactured by MGA?

18    **A.**    Yes.

19    **Q.**    To the best of your knowledge, were they based on

20    Mr. Bryant's concept drawings for Bratz pitched to MGA in

21    September of 2000?

22    **A.**    No.

23    **Q.**    Can you walk us through the differences between the

24    sculpts that we're looking at here and the Bratz fashion doll

25    sculpt?

7210

1    **A.**    Well, these dolls are also smaller than the Bratz core

2    fashion doll.  They have skinnier legs, skinnier torso,

3    different head sculpt.  Once again, the proportions are

4    different between the legs, the torso, the arms.  And the

5    boys sculpt is actually different than the girls sculpt.

6    **Q.**    Are there some ways in which you can tell that it's a

7    boy's body?

8    **A.**    The boy has little bit broader shoulders and also the

9    head sculpt is different.

10   **Q.**    Let's move on to -- do you recognize Trial Exhibit 18877

11   as a Bratz Big Kidz?

12   **A.**    Yes.

13   **Q.**    And I'm handing you 18864, and if you could tell the

14   jury what that is.

15   **A.**    That is a large scale of a Bratz Kidz.

16   **Q.**    And is this a sculpt that was developed by MGA?

17   **A.**    Yes, it was.

18   **Q.**    And was it developed based on Mr. Bryant's concept

19   drawings?

20   **A.**    No, it wasn't.

21   **Q.**    Can you tell us the differences between this sculpt,

22   18864, and the fashion doll sculpt?

23   **A.**    This sculpt is much taller than the Bratz fashion doll,

24   and the proportions are different between the legs, the arms,

25   the torso, the head sculpt is completely different.  It's a

7211

```
 1    much larger doll.
 2    Q.    Okay.  Let's keep moving here.  Okay.  I'm going to show
 3    you two products here.  17486 and 18878.  And do you
 4    recognize those as Bratz Lil Angelz?
 5    A.    Yes.
 6    Q.    Can you tell us the difference between the two Lil
 7    Angelz products that I just held up?
 8    A.    Well, one has molded hair and the other one has rooted
 9    hair where it can actually be styled and brushed.  And they
10    also have different body poses.  Each one is in a different
11    stance.
12    Q.    So it's sort of the rooted versus plastic hair that we
13    you talked about before?
14    A.    Correct.
15    Q.    And let's identify these, then.  The first Trial Exhibit
16    is 18867 and 18868.  And if you could tell us what those two
17    are that you're holding.
18    A.    These are the Bratz Lil Angelz dolls.  This one here,
19    she's sitting in a stance like a little newborn would sit.
20    And it has -- it will have rooted hair.  This is the version
21    where you can actually apply hair to it and brush it and
22    style it.  And the other version here is a different --
23    different stance that the baby sitting in, a different body
24    pose.  And this one here actually has molded hair, plastic
25    hair.
```

7212

1  **Q.**   And were these sculpts that were developed and created

2  by MGA?

3  **A.**   Yes, they were.

4  **Q.**   And as far as you know, were Mr. Bryant's concept

5  drawings for Bratz referenced in creating these sculpts?

6  **A.**   No.

7  **Q.**   This is Trial Exhibit 18875.  Do you recognize that as a

8  Bratz Star Singerz?

9  **A.**   Yes.

10 **Q.**   And now I'm bringing you Trial Exhibit 18857.  And if

11 you could explain to the jury what 18857 is.

12 **A.**   This is a different Bratz body sculpt used for the Bratz

13 Star Singerz.  She's actually a taller doll than our normal

14 Bratz core.  She has more articulation in the knees where you

15 can actually bend her knees and pose her in different ways.

16 Her arms actually raise up when you lift the leg to put her

17 in some dancing features.  And it has pointy feet.

18 **Q.**   And is the torso the same as the fashion doll sculpt?

19 **A.**   No, it's completely different.  This is a much taller

20 doll than the Bratz core doll.

21 **Q.**   Okay.  And the arms themselves, do you know if the arms

22 are different or the same than the core fashion doll?

23 **A.**   No, the arms are different sculpts, different posture.

24 **Q.**   And is this a sculpt that was developed by MGA?

25 **A.**   Yes.

7213

1   Q.   And to the best of your knowledge, were Mr. Bryant's

2   concept drawings used to create this particular sculpt?

3   A.   No.  It wasn't.

4   Q.   I'm holding up -- this is Trial Exhibit 17731.  And do

5   you recognize it as a Bratz -- the movie star doll?

6   A.   Yes, I do.

7   Q.   And I'm going to hand you Trial Exhibit No. 18858.  And

8   if you could describe for the jury that one you have in your

9   hand right now, what is that?

10  A.   This is the Bratz moving body.  And it's in raw form,

11  the sculpt, and the differences between this and the core is

12  the articulation in the torso.  The arms are completely

13  posable.  You have elbow joints, wrist joints, forearm joints

14  and so forth to put her in different stances.  And the torso

15  is also articulated so you can actually move her left and

16  right also in the upper body.

17  Q.   And what about sort of the legs?

18  A.   The legs are similar to the Bratz.

19  Q.   And is this a sculpt that was developed by MGA?

20  A.   Yes, it was.

21  Q.   Were Mr. Bryant's concept drawings for Bratz used to

22  create this particular sculpt?

23  A.   No, it wasn't.

24  Q.   Trial Exhibit No. 17524.  Do you recognize that as a

25  Fashion Pixiez product?

7214

1    A.    Yes.

2    Q.    I'm going to hand you Trial Exhibit No. 18859, and if

3    you can tell us, is this -- tell us what's in your hands.

4    A.    This is the sculpt for the Bratz Pixiez line.  She is a

5    taller sculpt than the Bratz core.  She has different kinds

6    of arm posture where she's actually folding her arms.  In

7    this sculpt she has a different head sculpt, a different

8    face, completely different than the Bratz core.

9    Q.    Do her arms move as well?

10   A.    Yeah, her arms move and her legs also move.  It has

11   articulation in the hip joints and the shoulders.

12   Q.    Okay.  And is this a sculpt that was developed at MGA?

13   A.    Yes.

14   Q.    And to the best of your knowledge, were Mr. Bryant's

15   drawings referenced in order to make this particular sculpt?

16   A.    No.

17   Q.    This one is going to be -- I'm going to leave the fun

18   one for last.  Let's do the -- I'm holding up 17577 and

19   14188.  And do you recognize those as two versions of the

20   talking Bratz?

21   A.    Yes.

22   Q.    And I'm going to hand you two more trial exhibits, 18872

23   and 18876.  And why don't you do 18872 first.  And describe

24   what we're looking at there.

25   A.    This is one of the body sculpts for Bratz talking.

1   She's in a completely unique stance with one arm on the hip

2   and one arm straight down.  They don't have articulated hip

3   joints.  The lower half of the body is fixed.  You can't move

4   it.  They only have articulated shoulder joints.

5   **Q.**   And why don't we move to the next exhibit.

6   **A.**   And the next one is a completely different body sculpt.

7   Once again, she's standing in a different pose.  And on this

8   one also, you cannot move her legs.  The hip joints are not

9   articulated, but her arms are, the shoulders.

10  **Q.**   And are these two sculpts that you have in front of you,

11  18872 and -73, sculpts that were developed at MGA?

12  **A.**   Yes, they were.

13  **Q.**   And based on your knowledge working at the company, were

14  these sculpts -- were Mr. Bryant's drawings used to create

15  these sculpts?

16  **A.**   No.

17  **Q.**   And last but not least, Trial Exhibit No. 18879.  Do you

18  recognize that as a walking Bratz product?

19  **A.**   Yes.

20  **Q.**   And Trial Exhibit 18871, can you tell us what we're

21  looking at there?

22  **A.**   This is the sculpt for the walking Bratz doll.  She's

23  connected to a walking dog.  And the sculpt is much

24  different.  She has much larger feet here to fit the

25  mechanism inside the shoes to make her walk.  And she has an

1  articulated torso in the top to make her torso move also.

2  Her legs are not as articulated as the Bratz core doll, given

3  that there's mechanism inside.  And the knees, you cannot

4  bend them at the knees.

5  Q.   And I probably should have asked you this at the very

6  beginning, although I suspect that the jury already knows.

7  When you have been using the term articulated or

8  articulation, can you tell us, you know, in your world what

9  that means specifically?

10  A.   Sure.  It's the ability to move a joint or a part of the

11  body.  For instance, this is what we call a shoulder

12  articulation, where you can actually move the arm at the

13  shoulder, and then when we refer to the hip at the joint, the

14  joint at the hip where you can actually make the legs move

15  back and forth.

16  Q.   And is this a sculpt that was developed at MGA?

17  A.   Yes.

18  Q.   And were Mr. Bryant's drawings from September 2000

19  specifically referenced in creating this sculpt?

20  A.   No.

21  Q.   And just because I think it's a little bit funny, can

22  you make it walk?

23  A.   Sure.

24  Q.   I think it has a battery in it.

25  A.   Yes.

1   **Q.**   Just a little lightheartedness for the afternoon.   Okay.

2   Thank you.

3          Your Honor, I would move into evidence -- shall I

4   read the exhibit numbers?

5          THE COURT:   Please do.

6          MS. AGUIAR:   Okay.   Well, before I do that -- well,

7   should I do that first, or should we find out if there's any

8   objection?

9          MR. PRICE:   There's no objection.

10         THE COURT:   Very well.

11         MS. AGUIAR:   18870.

12         18869.

13         18863.

14         18862.

15         18865.

16         18866.

17         18860.

18         And 18861.

19         18864.

20         18868.

21         18867.

22         18857.

23         18858.

24         18859.

25         18871 through 73.   And I would move all of those

7218

 1    into evidence.

 2              THE COURT:  Very well.  They are all admitted.

 3              **(Exhibits 18870, 18869, 18863, 18862, 18865,**

 4              **18866, 18860, 18861, 18864, 18868, 18867, 18857,**

 5              **18858, 18859, 18871-73 received.)**

 6              MS. AGUIAR:  Thank you.  That's all I have.

 7                        **CROSS-EXAMINATION**

 8    BY MR. PRICE:

 9    **Q.**   Mr. Djiguerian?

10    **A.**   "Djiguerian."

11    **Q.**   Sir, you mentioned the phrase core information doll

12    sculpt.

13              Do you remember that?

14    **A.**   Yes.

15    **Q.**   And how many dolls have been created using that core

16    fashion doll sculpt?

17    **A.**   Please specify.  I don't understand what you mean by how

18    many dolls.

19    **Q.**   Well, let's just say how many dolls -- the sculpts used

20    to create dolls which are sold, that core fashion doll

21    sculpt, how many dolls have been created using that sculpt?

22    **A.**   I don't know.

23    **Q.**   A lot?

24    **A.**   I don't know.

25    **Q.**   Okay.  You referred to the sculpt that was used to

7219

1  create the original Bratz dolls; correct?  The core fashion

2  doll sculpt?

3  **A.**   As relating to the first -- the first Bratz sculpt.

4  **Q.**   Yes.

5  **A.**   Yes.

6  **Q.**   And that sculpt, other than the movie Bratz has been

7  used for the subsequent generations as well; correct?

8  **A.**   No.  Each one of these is a completely different sculpt.

9  **Q.**   I'm not talking about these sculpts.  I'm talking about

10  the core Bratz dolls.  Do you understand?

11  **A.**   Well, how do you define Bratz core dolls?

12  **Q.**   The dolls which are, if you look at Cloe, Jade, Yasmin,

13  that Bratz type doll.  There have been subsequent generations

14  of those; correct?

15  **A.**   Of the sculpt or the dolls?

16  **Q.**   Of the dolls.

17  **A.**   Yes.

18  **Q.**   It's what you referred to as the fashion dolls; right?

19  **A.**   Correct.

20  **Q.**   Okay.  And those dolls, except for the movie one, have

21  used that same, what you referred to as core fashion doll

22  sculpt; correct?

23  **A.**   No, not even the movie.

24  **Q.**   Pardon?

25  **A.**   Not even the movie doll.

7220

1    Q.    I know the movie doll.  I'm saying excluding that.

2    A.    I don't quite understand the question.

3    Q.    See behind you where they have these Bratz dolls?

4    A.    Yes.

5    Q.    Okay.  They were created with what you call the core

6    fashion doll sculpt; right?

7    A.    Yes, the sculpt, yes.

8    Q.    And, for example, I'll show you Exhibit 18729, which is

9    Sasha.  That's the core fashion doll sculpt; right?

10   A.    Correct.

11   Q.    So you know the names of these core fashion dolls?

12   A.    The names of the characters or the themes?

13   Q.    The names of the characters.  There are a number of

14   names associated with these core fashion dolls; correct?

15   A.    Correct.

16   Q.    Not just Sasha, Yasmin, Cloe.  And I missed one, but

17   Meegan and other names; correct?

18   A.    Yes.

19   Q.    And they are made all with the same sculpt?

20   A.    Yes.

21   Q.    And you also said you were a brand manager.  So you know

22   something about building a brand; right?

23   A.    Yes.

24   Q.    And the first thing you do is you build your core

25   product.  In this case, the Bratz dolls; right?

7221

1   **A.**   Well, depends on the brand.  I mean, in this case, the

2   dolls were built first.

3   **Q.**   And they were called Bratz?

4   **A.**   Correct.

5   **Q.**   And you said you worked there for eight years.  Did you

6   work there in September of 2000?

7   **A.**   No.

8   **Q.**   In any event, none of these dolls which we're looking at

9   now, which Ms. Aguiar showed you, none of these existed

10  before Carter Bryant went to MGA and shared with MGA Mattel's

11  confidential information about Bratz; correct?

12  **A.**   Correct.

13  **Q.**   And certainly, for example, the Bratz boy, there

14  wouldn't have been a Bratz boy if there hadn't been initially

15  the core of the brand which was the Bratz girls; right?

16          MS. AGUIAR:  Objection.  Assumes facts, your Honor.

17          THE COURT:  Rephrase, Counsel.

18          MR. PRICE:  Sure.

19  **Q.**   Is it correct, your understanding, that the Bratz Boyz

20  was created because it was to be sold to girls who like the

21  Bratz girls, the Bratz dolls?

22  **A.**   I don't know why it was created back then.

23  **Q.**   Well, you are in charge, as the brand manager, of

24  strategy for the brand?

25  **A.**   No, not the strategy.

```
 1   Q.   So you don't decide what is going to be produced by MGA

 2   or the types of things that might be associated with the

 3   brand; is that right?

 4   A.   Well, I mean, I'm aware of what's being done, and I'm

 5   asked what I think about things.

 6   Q.   Well, let's put it this way.  You have no reason to

 7   think that there would have been a Bratz boy or a baby Bratz

 8   or a movie Bratz without those Bratz dolls that are the core

 9   of the brand; right?

10   A.   I don't agree with that, no.

11            MS. AGUIAR:  I'm sorry.  Objection.  Assumes facts.

12   We can go to sidebar if you'd like.

13            THE COURT:  You may.

14            MR. PRICE:  Your Honor, I'll withdraw the question.

15   I don't have time for a sidebar.

16            THE COURT:  Are you finished?

17            MR. PRICE:  I'm finished.

18            THE COURT:  Very well.  Anything further?

19            MS. AGUIAR:  Nothing further.  Thank you.

20            THE COURT:  You are excused, sir.

21            MS. AGUIAR:  We're getting our next witness, your

22   Honor, who is Lui Domingo.

23            THE CLERK:  Please raise your right hand.

24                      LUI DOMINGO, SWORN.

25            THE CLERK:  Please take the stand.
```

7223

1          Please state your full name, and spell your last

2     name for the record.

3          THE WITNESS:  Lui Domingo, D-O-M-I-N-G-O.

4                        **DIRECT EXAMINATION**

5     BY MS. AGUIAR:

6     **Q.**   Mr. Domingo, are you employed by MGA?

7     **A.**   Yes.

8     **Q.**   And before we go any further, I'm going to give you one

9     of the rules of the road to try to speak into the microphone.

10    **A.**   Okay.

11    **Q.**   What's your position at MGA?

12    **A.**   I'm a senior designer at MGA.

13    **Q.**   How long have you been with the company?

14    **A.**   Five years.

15    **Q.**   Are there other doll designers who have your same

16    position at MGA?

17    **A.**   Yes.

18    **Q.**   How many?

19    **A.**   There's --

20         MR. PRICE:  Objection.  That's irrelevant.

21         THE COURT:  I'm sorry, Counsel?

22         MR. PRICE:  That's irrelevant.

23         MS. AGUIAR:  I'll withdraw it.  It was just

24    foundational.  That's fine.

25         THE COURT:  Very well.

7224

1  **Q.**   BY MS. AGUIAR:   Do you work on dolls other than the

2  Bratz fashion dolls?

3  **A.**   Currently I do.

4  **Q.**   Okay.   So what different dolls do you work on?

5  **A.**   I work on baby dolls for Zaph.   I work on licensed

6  products for top model, and Bratz.

7  **Q.**   You said you're a doll -- I think you said your position

8  was doll designer.   Senior doll designer.

9  **A.**   Yes.

10  **Q.**   Can you explain to the jury what that entails?

11  **A.**   Um, that's a concept person that generates preliminary

12  ideas and themes for dolls for every season.   So for spring

13  or fall, I come up with the look of the doll, the design of

14  the paint, the design of the hair, the colors that are used

15  for paint and hair, the fashions which I guess we call soft

16  goods in the industry.   Everything that has to do with the

17  product.   Accessories as well, and I even provide some input

18  or suggestions for how the packaging might look like in order

19  to interpret the concept.

20  **Q.**   So before we get into specific examples, let me just ask

21  you another background question.   Did you ever work at

22  Mattel?

23  **A.**   Yes, I did.

24  **Q.**   And for how long did you work there?

25  **A.**   I worked for five years.

7225

1    **Q.**   Why did you leave?

2             MR. PRICE:  Objection.  Irrelevant.

3             THE COURT:  Sustained.

4    **Q.**   BY MS. AGUIAR:  After you left Mattel, did you leave

5    Mattel voluntarily?

6    **A.**   No.

7    **Q.**   Where did you go after you left Mattel?

8    **A.**   I went to a small company that does children's consumer

9    products called Home Inspirations.

10   **Q.**   And how long did you work at Home Inspirations?

11   **A.**   I worked at Home Inspirations for two years.

12   **Q.**   Two years?

13   **A.**   Yes.

14   **Q.**   And where did you go after Home Inspirations?

15   **A.**   I worked for MGA.

16   **Q.**   And then that takes us to the present; is that correct?

17   **A.**   Yes, correct.

18   **Q.**   I've placed in front of you a couple of trial exhibits.

19   The first one, which should be on the top of the pile, is --

20   well, actually, you know what?  Before we do that, I'm sorry.

21   Let me ask a foundational question.

22            Have you designed a number of Bratz fashion dolls

23   over the years?

24   **A.**   Yes, quite a few.

25   **Q.**   How many would you say that you have designed in the

7226

1    years that you've been with MGA?

2    **A.**    Just whole segment.    Each segment might contain four or

3    five dolls.    I must have designed at least about 50 over the

4    course of five years.

5    **Q.**    Okay.    So when you're saying 50, that's 50 dolls total?

6    **A.**    No, 50 themes.    And each theme might have three or four

7    dolls of different designs.

8    **Q.**    So now getting back to Trial Exhibit 18920.    And if you

9    could look through that exhibit and tell us if you recognize

10    what that is.

11    **A.**    Yes, I do.

12    **Q.**    And what are the -- what is in Trial Exhibit 18920?

13    **A.**    This is my original concept sketch for a Bratz segment

14    called Tokyo a Go-Go which I did when I first came to MGA.

15    That was in 2000.    And this is a 2004 product.

16    **Q.**    Did you create the drawings that are contained within

17    18920?

18    **A.**    Yes, I did.

19            MS. AGUIAR:    Your Honor, I move 18920 into

20    evidence.

21            THE COURT:    Any objection?

22            MR. PRICE:    No objection.

23            THE COURT:    It's admitted.    You may publish.

24            **(Exhibit 18929 received.)**

25    **Q.**    BY MS. AGUIAR:    If we could look at pages 9 and 10 of

7227

```
 1    that exhibit.

 2              And, Aaron, if you could place 18920 on the screen.

 3              THE COURT:  Counsel, do you have a copy of that by

 4    chance?

 5              MS. AGUIAR:  Oh, I'm sorry.  I thought I did.

 6    Q.    So, Mr. Domingo, can you tell us what we're looking at

 7    here on these two pages?

 8    A.    Yes.  Those are two of my original concept sketches for

 9    a Bratz segment, meaning a group of dolls that I did for MGA,

10    when I first came to work for them in 2003, called Tokyo a

11    Go-Go.  And those are the Bratz dolls wearing, I guess what

12    is called Tokyo funk.  You know, basically fashions that

13    are -- where the Tokyo teenagers or kids in Japan wear

14    T-shirts over another T-shirt.  They wear skirts over pants.

15    They wear leggings.  They kind of wear the whole kitchen

16    sink, so to speak.  And I thought it might be a good idea to

17    do it for Bratz.

18    Q.    So where did the initial idea to do a Tokyo-themed doll

19    come from?

20    A.    Isaac Larian was throwing the idea that probably we

21    should do something related to Tokyo.  And I actually agreed,

22    and I was looking at some pictures of, you know, streets of

23    Tokyo, and I saw some fashions that I thought would be very,

24    very interesting for -- to do for the Bratz dolls.

25    Q.    Were you looking at any other company's product when you
```

1  started to develop these concept sketches for the Tokyo doll?

2  **A.**   No.

3  **Q.**   How would you characterize the look of the doll that you

4  were designing here?

5  **A.**   It is trendy, it's young, it's funky, but it's also very

6  different from what we're accustomed to looking at in

7  America.   It's a bit more international.   The hair is

8  colored.   And the inspiration, the graphics, the design that

9  I used for the T-shirt is inspired by Japanese animation.

10  **Q.**   And you're talking about the two T-shirts that the

11  characters are wearing in the drawing?

12  **A.**   Yes, correct.

13  **Q.**   And can you just describe them for us?

14  **A.**   Yes.   These are -- Japanese animation has become very

15  popular in this country, especially for a very specific age

16  group.   And I just used graphics that sort of emulate that

17  look.

18  **Q.**   So what was the next step in your process of designing

19  this particular doll after the concept drawings?

20  **A.**   Well, I present my ideas to Paula Garcia and Isaac

21  Larian.   And when they like the idea, I then proceed to

22  building the 3D model.   And I mean by that constructing the

23  little fashions, the garments.   I work with pattern makers,

24  seamstresses.   I work with a face painter, and I give them

25  specific directions by giving them drawings and pictures on

7229

1  how the face should be to correspond with the fashions, and I

2  also work with a hair designer, and I give specific

3  directions on how the hair should look like.

4          So I buy the fabric.  I go out and shop.  I buy the

5  fabric.  I bring it to the sample makers, and we start

6  through a lengthy process.  They first make preliminary

7  samples for me.  And I look at it.  Say that doesn't look

8  quite right.  The sleeves are too long or the pants too big.

9  They make corrections and do it again, and we do this process

10 over and over again until finally we capture the exact look

11 that I was going for.

12 **Q.**  And when you're talking about developing a look of the

13 face paint, for example, for the doll, and this one

14 specifically, did you have any sources that you looked to for

15 what you wanted the face decoration to look like?

16 **A.**  Yes, a bunch of things.  One of them, as I mentioned,

17 Japanese animation.  So I even watch cartoons sometimes to

18 look at Japanese animation.  I look at Japanese magazines,

19 among other things.

20 **Q.**  So we've talked about the fashions, the face paint, and

21 the hair.  Do you also have a role in designing the

22 accessories that go with the doll?

23 **A.**  Yes, definitely.  And for this particular product, it's

24 not on the sketch, but I wanted them to have electronic pets.

25 So they would have dogs and cats, but they are more robots.

7230

1    And little things that we traditionally associate with Japan

2    as a very technological country.  So little laptops, digital

3    camera, cell phone.  You know, that sort of thing that's kind

4    of very Japanese.

5    Q.    As of the time that you designed this doll, the Tokyo

6    doll, had you been shown Carter Bryant's pitch book drawings

7    for Bratz?

8    A.    No.

9    Q.    I'm going to show you the actual doll.

10   A.    Okay.

11   Q.    This is Trial Exhibit 14018.  Can you tell us what we're

12   looking at here?

13   A.    Yes.  This is one of the finished products of Tokyo a

14   Go-Go.  This particular character is Sasha, I believe.  And

15   so she's wearing Tokyo fashions.  She's wearing a skirt over

16   pants.  She's wearing fur.  She has a little plush animal

17   with her.  She's got a robotic dog.  She comes with extra

18   shoes and extra outfits that are similar to what the Tokyo

19   teenagers wear.  And she has a suitcase.  So she can travel

20   to Tokyo.

21   Q.    That's definitely an important element.

22         So what I wanted to do is maybe flash to another

23   one of the pages back to your drawings.  I was noticing she

24   has this kind of fur thing going on on the top, but that

25   wasn't shown in one of the drawings that we saw before.

7231

1          So if we flip, Aaron, back to 18920, am I right

2   that -- page 5?

3   **A.**    Yes.

4   **Q.**    So if we look at page 5, do you sometimes mix and match?

5   **A.**    Yes, I do.  In fact, this was a preliminary concept.  I

6   then decided that she should wear pants and the skirt should

7   be changed and be made an extra skirt instead.  So the skirt

8   she's wearing on the sketch is actually the one that's packed

9   out to the side of the doll over here.  And I gave her

10  something else to wear.  Sometimes -- certain things work

11  well in a two-dimensional drawing, but when you actually look

12  at it in 3D, it doesn't really work well.  So, you know,

13  drawings are great, but you know, it doesn't always translate

14  well.  So then I make my changes.

15  **Q.**    So what I'm going to ask Aaron to try to do is

16  Exhibit 302, Trial Exhibit 302, let's leave the one here on

17  the left, if you can, Aaron, the 14018, and then I was going

18  to ask you to look through now Mr. Bryant's pitch book

19  drawings that were presented to MGA in September and then I'm

20  going to ask you a few questions.

21          So if you can maybe put the pitch book on the

22  right-hand side -- if you just want to look at them, and

23  Aaron will flip through them for you.

24          Incidentally, before today or before about an hour

25  ago, had you ever seen the series of drawings that's on the

7232

1   right-hand side there, the Carter Bryant pitch book drawings?

2   **A.**   No.

3   **Q.**   So let me ask you, are the fashions that you created for

4   the Tokyo a Go-Go Bratz doll different than the fashions that

5   are depicted in Mr. Bryant's drawings?

6   **A.**   Yeah, they are very different.

7   **Q.**   And let me ask you the same question for the face

8   decoration.   The face decoration that you concepted for the

9   Bratz doll, is that the same as what's depicted in

10  Mr. Bryant's drawings?

11  **A.**   They are not.   They are different.   They are not the

12  same at all.

13  **Q.**   And the accessories that you designed and created here

14  for the Tokyo a Go-Go doll, well, I guess are there even

15  accessories that you saw other than I guess they were

16  knapsacks or purses?

17  **A.**   Typically as designers, we are encouraged to use

18  existing molds, existing tools, because the molding process

19  is very costly.   But in the case of this product, Tokyo a

20  Go-Go, I decided to do something very different.   So I

21  sculpted the original items.   We created new molds, even

22  though it was costly.   And I don't know if you're familiar

23  with the process of painting the doll in production, you

24  create masks to mask maybe the lips and then you paint the

25  eyes.

1          So there's a series of metal masks that go on the

2     plastic.  Because of the cost of these masks, we are actually

3     encouraged to use the same mask, but in the case of Tokyo a

4     Go-Go, I went radically different.  I used new masks to make

5     it different than what had been done in the past, in the

6     previous seasons.

7     **Q.**   All right.  I want to do one other doll with you before

8     I let you go.  If you could look down at the drawings that

9     are Trial Exhibit 18291 and tell us what that is?

10    **A.**   It's another original concept sketch item done for Bratz

11    when I came in 2003.  It's called Nighty-Nite.  But the

12    working name back then was Bratz Intimates.

13             MS. AGUIAR:  Your Honor, I move 18921.

14             MR. PRICE:  No objection.

15             THE COURT:  It's admitted.  You may publish.

16             **(Exhibit 18921 received.)**

17             MS. AGUIAR:  Aaron, if we could look at pages 4 and

18    6.

19    **Q.**   Can you tell us what we're looking at here?

20    **A.**   Yes, that's actually Cloe and Yasmin, and they are my

21    original concept sketches for a sleep wear set.  We had

22    had -- we had a Bratz segment in the past where the theme was

23    about sleep.  But we wanted to do another sleep theme, but

24    different from the previous one.  And so I did something a

25    little bit more grown up.

7234

1          The previous one was about bunny slippers and bath

2     robes.   And this one was a little bit more like -- like a

3     teenager who is trying to grow up.   So it's, you know, like

4     little camisoles and pajamas that are cargo pants.   A little

5     bit younger ad trendier.

6     **Q.**   So what happened in your process with creating -- did

7     you say that the final name of the doll was --

8     **A.**     Nighty-Nite.

9     **Q.**   Nighty-Nite.   What was the next step in your process?

10    **A.**    It's the same thing.   At the time that I had come to

11    MGA, the existing face paints were not exactly ones that I

12    thought were appropriate to use.   And so I had brought in my

13    own painter.   And I had asked Paula's permission if I could

14    use my own face painter, and she allowed me, and ultimately

15    they actually hired the painter, and she now works for MGA.

16    But I decided to make the face paint a little bit more

17    delicate, a lot less made up.

18          You know, smaller eye liners, a little bit more

19    expressive, sleepy looking.   And then for the fashions, I

20    actually went out and shopped for fabric, and the difficulty

21    is in that scale of a doll, sometimes a regular print doesn't

22    really work.   It's too big.   You only get two flowers on one

23    top.   So I actually had to look for prints that would be

24    appropriate --

25          MR. PRICE:   Objection.   At this point it's beyond

1    the scope of the question.

2          THE COURT:  It is.

3          MS. AGUIAR:  I can direct a specific question.

4    **Q.**  With regard to the fashions in particular, what was the

5    process you undertook?

6    **A.**  I built a 3D.  I worked with the seamstress.  I buy the

7    fabric.  We start with pattern making.  I correct the

8    samples.  We do it over and over again until it's done right.

9    And the same is true for face paint and hair.

10   **Q.**  When you were concepting this doll and drawing the

11   fashions and developing the other aspects of the doll, were

12   you looking at any other company's product as a specific

13   reference?

14   **A.**  No.  I was looking at our own products as a reference of

15   departure.

16   **Q.**  Let me ask you something.  There's been some testimony

17   today about companies sometimes looking to other companies'

18   products, looking to their competition.  Is that consistent

19   with your experience at MGA and at Mattel?

20   **A.**  Only as a process of research.

21   **Q.**  Explain what you mean by that.

22   **A.**  Um, when we're looking to put out a certain doll, we

23   are --

24          MR. PRICE:  Object to lack of foundation for all of

25   MGA.

1          THE COURT:  Further foundation.

2          MS. AGUIAR:  I think I said is it consistent with

3    his experience.

4          THE COURT:  Let's lay a foundation, Counsel.

5    Q.   BY MS. AGUIAR:  You were a doll designer at Mattel;

6    correct?

7    A.   I was, yes.

8    Q.   You were.  You were a doll designer at Mattel, and you

9    have been a doll designer at MGA; correct?

10   A.   Yes.

11   Q.   And you testified that looking at competitors' products

12   is a -- you said is something that you are familiar with,

13   something done at both of those companies; correct?

14   A.   Correct.

15         MR. PRICE:  Objection.  Irrelevant.

16         THE COURT:  Sustained.

17         MR. PRICE:  Move to strike.

18         THE COURT:  Let's get back to the question and the

19   foundation for that question, Counsel.

20         MS. AGUIAR:  If we need to go to sidebar, can I get

21   clarification on the relevance part of that question?

22         THE COURT:  Sure.

23         **(SIDEBAR CONFERENCE HELD.)**

24         THE COURT:  Counsel.

25         MR. PRICE:  The relevance part is that what Mattel

7237

```
 1   does isn't relevant.  What MGA did is relevant because they
 2   are saying unique, it should go to apportionment.
 3          Now, we've already told the jury there's nothing
 4   wrong with it.  The question is is what MGA is doing unique.
 5   So the only relevant question is at MGA what was done.  My
 6   objection on foundation is that he can't speak for all of
 7   MGA.
 8          THE COURT:  I thought it was further than that.  I
 9   thought you were saying that all this witness could testify
10   to is what his experience was.
11          MR. PRICE:  Well, absolutely.  But he also worked
12   at Mattel, which is why she's asking about Mattel.
13          THE COURT:  Where this started, Counsel, is you
14   asked him for all of MGA.
15          MS. AGUIAR:  I thought -- I'll correct that, your
16   Honor.  I thought I then said his particular experience based
17   on what he did.  But I will clarify that.
18          THE COURT:  Based on his experience, what did all
19   of MGA do?
20          MS. AGUIAR:  No, just what he did.
21          THE COURT:  Okay.  That's particular aspect.
22          MS. AGUIAR:  Now, with regard to the Mattel
23   argument, that I can't understand.  Because Mr. Price stood
24   before you an hour ago and said that it's relevant that this
25   is something that companies do.  That they -- the competition
```

1    looks at each other's products, and why do they do that, and

2    he claims there's nothing wrong with it, then it should be

3    relevant.   This particular witness has specific experience

4    having done that at Mattel.

5          The fact that MGA does this, this is a fact that

6    the jury should know through direct -- his direct experience

7    at Mattel specifically having done this particular thing,

8    namely, looking at competitors' products --

9          THE COURT:   But there's no indication that anything

10   is improper here.

11         MS. AGUIAR:   Respectfully, your Honor --

12         THE COURT:   I'm sorry?   I'll give an instruction to

13   the jury, if you want, on that.   I think it was made clear.

14   You asked a series of questions of the witness, of

15   Ms. Garcia.   Was this public information.   There's been no

16   allegation that there's anything improper here.   And I'll

17   give an instruction, if you want, on that.

18         MS. AGUIAR:   I think the implication that Mattel is

19   trying to draw here is fairly clear that this was not

20   something that was okay to do, that we were looking at their

21   products to copy their ideas.

22         THE COURT:   But if that's true, then what you're

23   trying to do is throw that back on Mattel instead of

24   clarifying the record and making it clear to the jury.   I'll

25   give an instruction, but I'm not going to go down a road if

1    you believe, as you're telling me, that somehow -- which I

2    don't see on this record, that there's an allegation that MGA

3    has done something improper.

4            The way to cure that is by telling the jury that

5    they did not do anything improper, not to turn it around and

6    say well, Mattel is doing it too.

7            MS. AGUIAR:  Again, there was no value judgment in

8    the evidence.  I was trying to --

9            THE COURT:  I agree.  There's no value judgment in

10   the evidence.  I agree with that last statement.

11           Mr. Nolan.

12           MR. NOLAN:  Quickly.  I guess my point is that it's

13   one thing for Mattel to say that there's nothing wrong and

14   they are not contending that there's anything wrong, and then

15   they ask a series of questions to Mr. Larian or to Paula

16   Garcia.  And it's something that the Court could instruct

17   saying that there's no allegation of any wrongdoing here.

18   It's another thing, though, for this jury to understand an

19   industry practice without turning this into 403.  I mean,

20   just to show --

21           THE COURT:  It's relevant, and that's why I started

22   this whole thing by asking counsel what was it relevant to.

23   It's relevant for Mattel to introduce evidence that MGA did

24   not originate or come up with this unique particularized

25   expression of whatever we're talking about, the packaging,

 1    the themes, or what have you.  It's relevant to the issue of

 2    apportionment damages.  It's not relevant just to have

 3    testimony about industry practices in general.

 4              MR. NOLAN:  Right.

 5              THE COURT:  If there is a negative inference -- I

 6    agree with Ms. Aguiar, that there's no value suggestion in

 7    that testimony.  If you believe there is, I'm willing to

 8    clear it up with an instruction.

 9              MS. AGUIAR:  Since I said that last, can I?  I'm

10    sorry.  We're the ones being accused here, your Honor, of

11    everything in this phase.  So frankly, I think that when

12    Mattel brings out this evidence, after having asked an hour's

13    worth of questions about stealing information and stealing

14    confidential stuff and then asks questions and shows

15    documents about us having looked at their products, when they

16    do that, your Honor, because of the nature of where we are

17    and that we're the defendants and what they have alleged in

18    their opening and how they have tried this 1-B case, I think

19    there absolutely is when that evidence comes out.  So if it's

20    an instruction --

21              THE COURT:  That's why I offered previously and I

22    offer again to give a clarifying instruction.

23              MR. NOLAN:  What would the Court's instruction be?

24              THE COURT:  That there was nothing illegal,

25    unlawful, unethical about copying elements, designs, themes,

 1   that are out in noncopyrighted in the market.  And we can

 2   work on some language, but that's the instruction I offered

 3   to give earlier, and I'm willing to give it.

 4        I would ask counsel to submit some joint language

 5   if you can.  If you can't, do what we've done before, and

 6   I'll give the instruction.  That's the way to cure a problem

 7   you've identified.  It's not to say you, too, and then leave

 8   it hanging out there.  Because all that does is ratchet up

 9   the concern that somehow there's something wrong about this,

10   and there's nothing wrong about it.  I don't think there's

11   any suggestion that any of this, Mr. Price in his

12   questioning, suggests that they stole the idea from Mattel or

13   anything of that nature.  If there's a concern, though, I'll

14   address it.

15        MR. NOLAN:  Your Honor, just while we're here, and

16   this is the point that I wanted to make, is that perhaps with

17   this witness, it's not particularly relevant, but another

18   witness, when we're going to go to Mr. Kilpin, for instance,

19   on the question of perception of the importance of Bratz

20   branding and packaging, the observations that have been made,

21   the foundation is that they did competitive shopping of Bratz

22   products.

23        We're not going to allege that there's anything

24   wrong with that, but that's going to be the foundation as to

25   how they knew to make the observations and do the research

```
 1   that they were doing.
 2            So you know, in that sense I think I'm going to
 3   make a proffer that I think in that limited sense,
 4   competitive shopping that Mattel engaged in as the foundation
 5   for what they were claiming or asserting with respect to the
 6   importance of certain attributes of the Bratz product is
 7   going to be --
 8            THE COURT:  I'm sorry.  I'm not following this.
 9   You're talking about competitive shopping by Mattel is
10   relevant to what?
11            MR. NOLAN:  They go out and buy a Bratz product.
12   They buy all the Bratz products.  They bring it into the
13   design center.
14            THE COURT:  I assume MGA does the same thing.
15            MR. NOLAN:  And Hasbro probably does, too.
16            THE COURT:  So what is this relevant to?
17            MR. NOLAN:  It's the basis upon which they then
18   make assessments.
19            THE COURT:  "They" being?
20            MR. NOLAN:  Mattel.
21            THE COURT:  Mattel makes assessments.
22            MR. NOLAN:  With respect to the factors that are
23   making Bratz successful.  Whether or not it's themes,
24   packaging.  It's our apportionment.  It goes back to my
25   argument earlier that if Mattel --
```

```
 1          THE COURT:  Wait, wait.  Okay.  I'm going to have

 2   to see this in context.  I don't understand where this is

 3   going.  I don't see how -- this case is not about what Mattel

 4   did.  This phase of the case is not about what Mattel did to

 5   MGA.  This phase is about what MGA did to Mattel.  You are on

 6   the defense side.  They are on the plaintiff's side.  I know

 7   that kind of creates a certain landscape.

 8          MR. NOLAN:  Let me come back to this when we're not

 9   on our time during a break.

10          MR. PRICE:  Your Honor, before, you said you would

11   give an instruction depending upon how I handled it.  And I

12   actually asked Ms. Garcia when I had the documents, I said

13   there's nothing wrong with this.  You're dealing with public

14   information, and you're competing.

15          THE COURT:  I thought it was handled well, and I

16   thought her responses to it made it clear that there was

17   nothing wrong.  I don't see the allegation.  But if there's

18   some confusion at the end of the day, I'll consider an

19   instruction.  I'm not going to make a big deal out of it.  I

20   don't see anything nefarious about this.  You talk about

21   stealing.  Stealing the Bratz drawings?  That's what the jury

22   found in Phase 1-A.  You are painting with a broad brush on

23   this.

24          MS. AGUIAR:  Well, frankly, I can pull out the

25   sections from the opening statement and from the questioning
```

1    of our witnesses, they don't limit it just to the drawings.

2    I wish I had a dollar at this point for every time Mr. Quinn

3    or Mr. Price said, and when you had Mattel's confidential

4    information and when you stole the confidential information.

5             And frankly, I am not trying to paint with a broad

6    brush.  I know that that is not an appropriate thing to do.

7    I'm going by the questions that they have asked and the

8    allegations that they have made that they are putting in

9    their case in chief.

10             THE COURT:  That reference, and I understand

11    it's -- I mean, it's what former prosecutors do.  I'm sure,

12    Mr. Nolan, you did it yourself when you were a U.S. Attorney.

13             MR. NOLAN:  Never.

14             THE COURT:  Of course not.

15             MR. NOLAN:  I think this goes back to an earlier

16    issue that we raised with the Court with respect to the broad

17    scope of describing this confidential information and how

18    broad it is, and we talked about the effectiveness, and

19    Mr. Price almost wore that out.  And our only problem is the

20    confusion issue here, as Ms. Aguiar points out.  If there's

21    no issue here.

22             THE COURT:  The jury knows what they found and what

23    they didn't find.  At the end of the day, we all do it.  And

24    I'm probably more guilty than anybody.  We all put more stock

25    in what we say than what the evidence says, and we should be

1   mindful that the jury understands what they found and what

2   they didn't find.  And I think I indicated previously that

3   there's a point where that kind of language becomes

4   unproductive if the jury thinks it's being over used.

5         The jury knows whether Mr. Price is or is not

6   accurately conveying what they found or whether you are

7   accurately conveying what they found.  And I trust the jury

8   on this.  My offer regarding the instruction stands.  I will

9   consider what you submit.  If it's appropriate, I'll give it;

10  if I don't think it's appropriate, I won't give it, and we'll

11  move on.

12        MS. AGUIAR:  Fair enough.

13        **(CONCLUSION OF SIDEBAR CONFERENCE.)**

14        THE COURT:  Counsel, you may proceed.

15        MS. AGUIAR:  Thank you.

16  **Q.**   I'm trying to get my thought process back.

17        Aaron, can we have back up on the screen, then, the

18  two images that we were looking at?  And I may have asked you

19  this, and I apologize, because I got turned around.

20        In designing this doll, were you looking

21  specifically at another company's product in referencing it?

22  **A.**   No.

23  **Q.**   And were you referencing Mr. Bryant's pitch book

24  drawings from September of 2000 when you designed this doll?

25  **A.**   No.

7246

1   Q.   I'm going to ask Aaron to do the same thing he did

2   before.   Oh, actually, you know what?   Sorry.   First things

3   first.   I got to show you the actual doll.   I'm going to

4   bring up to you Trial Exhibit 18665.

5            Can you tell us what we're look at here?

6   A.   This is the final product of a concept I had done for

7   MGA when I worked for them in 2003.   Or when I first came to

8   work for them in 2003.   It's called Nighty-Nite.   And this is

9   one of the characters.   I believe this is Fianna.   This is

10  one of the characters.

11           She's wearing a pajama and a camisole, and she

12  comes with an extra sleep outfit and bathrobe and sleep

13  accessories like powder puff, hair brush, an extra pillow.

14  Q.   Did you design the fashions that we're looking at for

15  the Nighty-Nite doll?

16  A.   I designed the concept.   So that would include the

17  fashions, the face paint, the hair, the accessories.   And

18  some input and direction on -- or suggestions on packaging.

19  Q.   And we've talked about how you designed the Tokyo a

20  Go-Go doll and designed the Nighty-Nite doll.   When you

21  designed that doll, is it correct that you're working with a

22  sculpt that is the core Bratz fashion doll sculpt?

23  A.   Correct.

24  Q.   And what is your intent in creating the different

25  fashions and the different accessories for each one of those

7247

1    blank sculpts?

2         MR. PRICE:  Object.  It's irrelevant.

3         THE COURT:  Intention.  Yes, rephrase, Counsel.

4    Q.  BY MS. AGUIAR:  When you design different fashions,

5    different face paint, different accessories to create a doll,

6    does that result in a different look?

7    A.  Yes, very much so.

8    Q.  And let me ask you something, too.  When you say that --

9    you mentioned that you are a doll designer.

10   A.  Yes.

11   Q.  And let me go back to that for a second.  Do you

12   actually design the actual three dimensional sculpt?

13   A.  Occasionally.

14   Q.  But is the majority of your responsibility at MGA to

15   design the fashions, the face paint, the accessories, to help

16   with the packaging?

17   A.  Yes.

18   Q.  Okay.  In other words, are you a sculptor?

19   A.  I'm not a sculptor.

20   Q.  And are you a person who works in engineering or

21   manufacturing to actually make the sculpt?

22   A.  No.

23   Q.  Okay.  Thanks.  I just wanted to clarify that.

24        So if we could, Aaron, put up Trial Exhibit 302

25   again.  I think having now seen it once, we won't flip

7248

 1    through all of the pages again, but if we could just put up

 2    the first page of Exhibit 302.

 3              Are the fashions that you designed for the

 4    Nighty-Nite doll different from the fashions in Mr. Bryant's

 5    drawings?

 6    **A.**   Very much so.

 7    **Q.**   And is the face paint that you designed for the

 8    Nighty-Nite doll different from the face paint in

 9    Mr. Bryant's drawings?

10              MR. PRICE:  Object as ambiguous.

11              THE COURT:  Rephrase, Counsel.

12    **Q.**   BY MS. AGUIAR:  Is the face paint that you designed

13    different from the face paint in Trial Exhibit -- face paint

14    depicted on the dolls in Trial Exhibit 302?

15    **A.**   Yes, very much so.

16    **Q.**   And were any of the specific accessories that you

17    designed and developed for the Nighty-Nite doll taken from

18    Mr. Bryant's concept drawings?

19    **A.**   I have never seen the drawing on the right until about

20    an hour ago.  So I actually designed my own plastic parts for

21    the product.

22    **Q.**   Just a couple more questions.  You have mentioned that

23    you designed a number of dolls over the years at MGA; is that

24    correct?

25    **A.**   Yes.

1   Q.   Having now looked at the -- Mr. Bryant's pitch book

2   drawings, are any of the fashions that you have designed for

3   the different lines of Bratz dolls the same fashions that are

4   depicted in Mr. Bryant's drawings?

5   A.   No.

6   Q.   And in any of the face paint on any of the Bratz fashion

7   dolls that you have designed, were you referring to

8   Mr. Bryant's drawings in designing that face paint?

9   A.   No.

10  Q.   And, for example, you are setting down to concept what

11  you want the face decoration to look like, that what you want

12  the eye, let's say, on the Nighty-Nite doll to look like.

13  Were you looking at Mr. Bryant's drawings when you did that?

14  A.   No.

15  Q.   Did you have a specific idea in your mind of the

16  particular eye that you wanted to express in the Nighty-Nite

17  doll?

18  A.   Yes, I did.

19  Q.   And how would you describe what that eye was or the look

20  of the eye that you were going for in the Nighty-Nite doll?

21  A.   I wanted the eyes to be more expressive, to look a

22  little bit sleepier, and I also didn't want a lot of makeup

23  on the eye because she was going to bed.  And I wanted it

24  basically clean and youthful and just sort of healthy

25  looking.  That is what I wanted.

1   **Q.**   And for any of the accessories that you've designed for

2   any of the Bratz fashion dolls, did you reference

3   Mr. Bryant's concept drawings in designing those accessories?

4   **A.**   No.

5   **Q.**   And these same questions that I've asked you about the

6   fashions, the face paint, and the accessories, versus

7   Mr. Bryant's drawings, would that be true for all of the

8   dolls, the Bratz fashion dolls that you have designed for

9   MGA?

10   **A.**   Yes.

11          MS. AGUIAR:   Your Honor, I don't have anything

12   further.

13          THE COURT:   Very well.

14          MR. PRICE:   Your Honor, would this be a good time

15   for break?

16          THE COURT:   Oh, yes, actually it is.   Thank you,

17   Counsel.

18          All rise for the jury.

19          (Recess taken.)

20          THE COURT:   Okay.   We're on the record outside the

21   presence of the jury.   And, Mr. Nolan, you have something you

22   wanted to take up.   I want the record to clearly reflect that

23   when Mr. Nolan gave the answer "never" at sidebar, he had an

24   enormous smile on his face.

25          You may proceed, Counsel.

1           MR. NOLAN:  It's only because, rest his soul,

2    Judge Byrne is not here anymore.  He would disagree with me.

3           A couple of practical problems that will add to the

4    efficiency of this afternoon.  And we're off the clock.  So

5    it's helpful.

6           First of all, we have our branding expert tomorrow

7    morning.  He has to testify because of a scheduling conflict.

8    And so one of the building blocks, if you would, that we

9    wanted to put in that we attempted to stipulate, but they

10   wouldn't agree to it.

11          So we asked Heather Polk, P-O-L-K, be on our

12   witness list and be available to put in a series of documents

13   simply almost as a custodian, if you would, because she's in

14   a department known as the worldwide consumer research

15   department at Mattel.  And these are internal consumer

16   research reports maintained by Mattel in the ordinary course

17   of business.  And they track attributes of Bratz and, you

18   know, make statistical analysis and track and whatever.

19   Mr. Quinn advised me that she's not here.

20          Now, I'm not casting any aspersions on why she's

21   not here.  That's not where I'm going with this, your Honor,

22   but I needed to raise it with the Court.  One of the thoughts

23   is to talk to them about a potential stipulation to try to

24   get the documents in.  I could raise a potential issue that

25   they are going to have, and that is that these internal

1  research reports, your Honor, they come out on a seasonal

2  basis.  We have about 12 of them.  And what they do is they

3  measure through their own consumer research various scores

4  that they attribute to various products.  Some internal, some

5  external.  But certainly Bratz.  They track Bratz.  And we

6  would attempt to offer them into evidence if Ms. Polk was

7  here from the department.

8       I don't know whether or not there is an objection

9  to the use of these documents.  It would be easier, and then

10  we wouldn't have to call the witness.  But it's a predicament

11  that we have now.  Because we wanted to make reference to

12  them with the expert.  And she was --

13            THE COURT:  Tomorrow morning.

14            MR. NOLAN:  Yes.

15            MR. ZELLER:  Well, your Honor, last night, 8:38

16  P.M., and I can provide the Court with my Blackberry with my

17  e-mail on it providing me with the witness list, the very

18  thing I was complaining about earlier today, or at least

19  raising.  The list I was given was Garcia, Kilpin.

20            THE COURT:  Wait a second.  I want to get this

21  pinned down.  Because we're now down to -- Mattel is down to

22  two hours.  MGA is down to less than six hours.  We're down

23  to less an eight hours to go here.  So we should know how

24  this all -- we have tomorrow morning and Friday.  So

25  basically we're just going to play out tomorrow morning and

1   Friday.  I'd like to get a sense of exactly the lineup at

2   this point.  We're at the very end of the trial.  So everyone

3   should know exactly what's happening at this point.

4           MR. ZELLER:  I actually have a printout now of the

5   e-mail.

6           THE COURT:  Why don't you provide that to the

7   Court.

8           MR. ZELLER:  And this was supposed to be in the

9   order in which people were going to be called.  As the Court

10  can see from this, I mean, there are three more witnesses who

11  are in this order who have not even been called yet:

12  Mr. Eckert, Mr. Kilpin, and Aileen Storer.

13          So we did not -- we sent Ms. Polk home.  She had

14  been waiting, just as Mr. Kilpin and Mr. Eckert had been

15  waiting.  We sent her home for the day.  She can be here

16  tomorrow morning.  But that's kind of the -- where we are on

17  this situation.  And we were --

18          THE COURT:  So you sent Ms. Polk home.

19          MR. ZELLER:  I'm sorry?

20          THE COURT:  You sent Ms. Polk home?

21          MR. ZELLER:  In Los Angeles.

22          THE COURT:  And, Mr. Nolan, this is for Mr. Vilppu?

23          MR. NOLAN:  For Joachimsthaler.

24          THE COURT:  And he has something tomorrow morning?

25          MR. NOLAN:  He's going to testify tomorrow morning.

7254

 1    He can't be here on Friday.  That's why we're going to have

 2    him testify tomorrow.

 3              THE COURT:  All right.  So we could have Polk go

 4    first tomorrow morning.  And how long is Mr. Joachimsthaler

 5    going to go?

 6              MR. NOLAN:  Possibly an hour, hour and a half, your

 7    Honor.

 8              THE COURT:  And Ms. Polk will take how long?

 9              MR. NOLAN:  It shouldn't take very long.  These are

10    just documents.

11              THE COURT:  Why don't we take care of that tomorrow

12    morning?

13              MR. NOLAN:  Well, your Honor --

14              THE COURT:  You have about an hour and half left.

15    Who are you calling this afternoon?

16              MR. NOLAN:  I want to check with respect to a

17    ruling that you made on Mr. Farr, which I think eliminates

18    the need to call Mr. Eckert.  I just need to confirm that,

19    and it would be Mr. Kilpin.  But I wanted to raise with the

20    Court a couple of issues with respect to Mr. Kilpin ahead of

21    time so we had some guidance.  And the next in order, your

22    Honor, would be -- we want to try to put Mr. Larian on --

23              THE COURT:  Not Ms. Storer?

24              MR. NOLAN:  Based on the testimony that came in

25    today, we're not going to put her on.

7255

```
 1            THE COURT:  So Storer is gone.  Eckert, you say,
 2    Mr. Eckert is not going to be called, depending on your
 3    assessment?
 4            MR. NOLAN:  I've just got to confirm that.
 5            THE COURT:  And Mr. Kilpin is going to go for a
 6    while?
 7            MR. NOLAN:  He could, your Honor.
 8            THE COURT:  So if we get through Mr. Kilpin today,
 9    pick up tomorrow morning Joachimsthaler.  What about Kerner
10    and Mr. Larian?
11            MR. NOLAN:  We need Mr. Kerner for financial
12    documents related to the expert, Mr. Meyer, who will testify
13    on Friday.
14            THE COURT:  Okay.
15            MR. NOLAN:  And, your Honor, on Mr. Kerner, if I
16    could raise one point.  You know, there is a dispute between
17    the way the experts approach how you should make a comparison
18    between companies.  Their expert --
19            THE COURT:  I'm familiar with that.
20            MR. NOLAN:  We contend it should be addressed --
21    the profitability comparison should be made to rather than
22    Mattel as a whole, and all of its product line should be
23    limited to a particular fashion doll line.  So the financial
24    documents that we would be putting in, your Honor, are the
25    profitability numbers with respect to doll lines within
```

```
 1   Mattel.  But I would submit it's not in any way a violation
 2   of the motion in limine because it goes to a core issue on
 3   damages.
 4             THE COURT:  We'll take that up when we get to
 5   Mr. Kerner.
 6             Mr. Larian -- how long do you anticipate calling
 7   him for?
 8             MR. NOLAN:  Probably a half hour.
 9             THE COURT:  Okay.  And then you have Mr. Vilppu on
10   Friday?
11             MR. NOLAN:  Yes, your Honor.
12             THE COURT:  And we'll have that hearing early
13   Friday morning.  And how long do you anticipate for
14   Mr. Vilppu?
15             MR. NOLAN:  My best estimate is about a half hour,
16   your Honor.
17             THE COURT:  Mr. Arons?
18             MR. NOLAN:  And Mr. -- it's Ms. Arons.
19             THE COURT:  Ms. Arons.  Okay.  And I believe that
20   would be a short witness.
21             MR. NOLAN:  And then we have a survey expert and
22   Mr. Meyer.  And both of those would be longer.  So I think
23   that we're talking about -- I think last night I was
24   estimating for the expert testimony somewhere in the range of
25   about three hours total.
```

1    THE COURT:  Okay.

2    MR. NOLAN:  And we have some videos to play.

3    THE COURT:  All right.  Let's have Ms. Polk here

4 first thing tomorrow morning.  She's not here.  She's in

5 Los Angeles.  Obviously, she can't testify.  Let's have her

6 here first thing tomorrow morning.  And you'll have her go

7 before Mr. Joachimsthaler, and I'm going to release the jury

8 at noon tomorrow.  And then we'll have all day Friday to wrap

9 up.

10    MR. NOLAN:  Right.  And may I turn to Mr. Kilpin

11 for a moment?

12    THE COURT:  That's who you're going to be calling

13 next?

14    MR. NOLAN:  But Mr. Price isn't finished with this

15 witness.  But rather than going to sidebar --

16    THE COURT:  How much longer do you have with this

17 witness?

18    MR. PRICE:  I haven't started yet.  But I've got to

19 make it short.

20    THE COURT:  Very well.  Yeah.  I understand.

21    MR. NOLAN:  Why don't we raise the issue at

22 sidebar, then, and let's just get on with the evidence.

23    THE COURT:  No, we can do this now.  What is the

24 issue with respect to Mr. --

25    MR. NOLAN:  Your Honor, I just was a little bit

 1   confused by our last sidebar, and I'm sure it's just me,

 2   because earlier in the day I thought that we had established

 3   that within reason, being able to look to Mattel's comments

 4   and observations with respect to Bratz would be relevant with

 5   respect to some of the components of apportionment would be

 6   relevant.  And what Mr. Kilpin and his department --

 7          THE COURT:  What I ruled -- I'm not saying that I'm

 8   not going to get there, but let's be careful about what I

 9   ruled earlier.  You're talking about my decision on Farr?

10          MR. NOLAN:  My understanding about what the issue

11   would be that we would need to address when we got to

12   Mr. Kilpin, that his testimony would be relevant to the

13   apportionment issues.

14          THE COURT:  Yes.

15          MR. NOLAN:  And that Mattel's statements, if you

16   would, or beliefs or observations with respect to certain of

17   those components of apportionment would be relevant.

18          THE COURT:  Yes, depending on what the statements

19   are, right.

20          MR. NOLAN:  And what I was going to propose with

21   Mr. Kilpin, it's almost like going to Hong Kong for a moment,

22   if you would, and that is that what I would propose is that

23   we would try to be careful in what documents we put up and

24   that only those pages of a particular document that we

25   believe has a relevant statement with respect to Bratz would

```
 1   come in, and then we would later redact and put into

 2   evidence.   And I wanted to give the Court a heads up.

 3            THE COURT:   Right.   I did that earlier with the

 4   Farr deposition because there's really no way of doing the

 5   videotaped deposition which has language quoted from a

 6   document without having that document language quoted.

 7            If the document itself has no relevance other than

 8   it has introductory language, then I'm not likely to allow

 9   the document in.   If you can ask these questions without

10   reference to the documents that are only coming in to provide

11   a context or a basis to ask the question, kind of your good

12   faith basis to explore the area, that's not going to be a

13   sufficient basis to get the documents in.   I would --

14            MR. NOLAN:   I believe I understand that.

15            THE COURT:   I'm thinking in the abstract of the

16   Farr deposition.   All of those questions that were asked of

17   Mr. Farr could have been asked without a single reference to

18   those 10-K documents or anything else.   And they probably

19   should have been.   But because we're dealing with a video

20   deposition, there's nothing I can do.   Here it's live

21   testimony.   So I'm much less likely to allow documents in

22   that are not relevant.

23            MR. NOLAN:   Right.   Here is the proffer I'll make.

24   Mr. Kilpin is the author of marketing reports within Mattel

25   and that at various times, one purpose for offering this
```

1    evidence is to show that Mattel at some point in time was

2    recognizing that their brand was in a state of decline

3    similar to what Mr. Eckert was --

4            THE COURT:  It's not coming in.  I can tell you

5    that right now.  If that's what the document says, it's not

6    coming in.

7            MR. NOLAN:  Okay.  Let me just round it off --

8            THE COURT:  What I'm trying to say, it's not

9    relevant what's going on over at Mattel.  Certainly a Mattel

10   employee who is on record or a senior Mattel employee who is

11   on record saying that themes or branding or packaging is

12   important cannot now hide from that statement.  You have a

13   right to bring that out.

14           But in doing so, that doesn't give you a right to

15   bring out documents that go and comment on the state or the

16   condition of Mattel.  That's where we cross that 403 boundary

17   into something that is both confusing and prejudicial.

18           MR. NOLAN:  I understand that.  Your Honor, just so

19   I can make this record and make it in two sentences, I think.

20   One is that we believe that those kinds of comments, and the

21   Court is well aware of those documents because we've referred

22   to them before, are relevant to the weight, if you would, to

23   be given to packaging and promotional efforts and marketing

24   and all of that when Mattel was faced with difficulties in

25   the market concerning their sales.

1          It shows the importance of doing the, what I would

2    describe the apportionment side of the analysis.  And for

3    instance, Mr. Kilpin, and I took his deposition, I believe

4    his testimony would be that at no time while they were trying

5    to address the declining market share did they ever make any

6    changes in the physical appearance of the doll or the face.

7          So my proffer would be that in addressing the

8    issues that they were faced, Mattel did not make any changes

9    to the facial expressions of either Barbie or My Scene or

10   Flavas.

11         THE COURT:  Counsel, I understand your position.

12   You've been urging this on the Court for months now and have

13   made every effort to get this evidence in.  The importance of

14   what you describe as the apportionment side of the analysis

15   can be completely explored with Mr. Kilpin and any number of

16   other witnesses without getting into the underlying Mattel is

17   in crisis.  Mattel is on fire.  Barbie is on fire.  Barbie is

18   a disaster.

19         All of that stuff is irrelevant and prejudicial.

20   You can get into this fully and have them explain what's

21   important and what's not important, why they think it's

22   important, all of that, how it affects the bottom line, how

23   it affects sales, how it affects marketability.  You can get

24   into all of that without getting into what you've been trying

25   to get in since your opening statement in Phase 1-A.

1        And I can't explain how that's not going to come in

2   any more than I have.

3        MR. NOLAN:  No, but this is the last --

4        THE COURT:  This is your last effort.  Okay.

5        MR. NOLAN:  I mean, I just wanted to make

6   absolutely clear.

7        THE COURT:  It's not coming in still.

8        MR. NOLAN:  I understand.  But he would also be

9   available -- I mean, he'd be able to testify to the

10  observations that he made with respect to the success of the

11  Bratz.

12       THE COURT:  I'm not really sure what those are, but

13  I'll consider those in context.

14       MR. NOLAN:  Would the Court entertain possibly a

15  redaction of everything out of the marketing reports,

16  everything out of the marketing reports except what is

17  referenced to Bratz and only Bratz?

18       THE COURT:  I'll have to take a look at that,

19  Counsel, but I think it would be the easier thing to do.

20       Mr. Zeller?

21       MR. ZELLER:  Briefly on the issue of Mr. Kilpin.

22  One thing that was said at sidebar is getting into all of

23  these other things about competitive shopping and that sort

24  of thing, that's obviously from our perspective, that's just

25  403 material.  If they want to ask the kinds of questions

```
 1    that I think the Court has already made clear can be asked, I
 2    mean, there's no need to go into that sort of thing.  And it
 3    just leads us right back to the same problem of what we were
 4    discussing at sidebar.  It's no answer to any of this.
 5              THE COURT:  Well, again, it's something that the
 6    Court is going to balance.  Part of the relevancy of this
 7    might be in terms of foundation.  So the more you stipulate
 8    to in terms of foundation, or the less you object to in terms
 9    of foundation, the less likely we're going to have to go down
10    this particular road.
11              But you can't have your cake and eat it too, as
12    Mr. Nolan has stated before, and object on foundation,
13    because foundation could rip the covers off of this
14    basically, and then we'd have to get into, well, how do you
15    know this?  Well, we've had experience with Bratz and, you
16    know, et cetera, et cetera.
17              I'm trying to balance these things because I do see
18    the prejudice.  I do see the confusing nature of getting into
19    too much of this statement.  I believe these witnesses are
20    very competent based on precisely their experience with
21    Barbie, based on their experience with all of these other
22    things, to testify on these issues of apportionment which are
23    properly before the jury.  So that's the balancing.  Make
24    your objections, no speaking objections, I will rule on them,
25    and we will move forward.
```

1          MR. ZELLER:  And what I would say, your Honor, is

2    that Mr. Nolan isn't quite correct when he says that somehow

3    that's based on, you know, looking at the products.  And even

4    if it is, that I do wonder to what degree there is any basis

5    for introducing such evidence, even with an experienced

6    business person.  Saying well, I looked at a product, and I

7    thought that it was successful for X, Y, and Z.  That is, I

8    think, not only 403, it is itself a foundational problem.

9          So I mean the issue wouldn't be so much, gee, you

10   know, you looked at Bratz products.  I mean, that presumably

11   is going to be a question, presumably would be something that

12   as part of the foundation may or may not be discussed.  But I

13   somewhat -- part of my concern is that if that's really the

14   proffer for foundation, I'm highly skeptical that that is

15   really admissible evidence.

16         THE COURT:  No, the foundation goes well beyond

17   that, Mr. Zeller.  It gets into precisely these issues that

18   the Court has found is prejudicial to bring in.  But if we

19   need to have the jury educated on precisely how Mr. Kilpin

20   arrived at his conclusions, I think that would necessarily

21   involve him getting into issues of the various downturns in

22   Mattel and the problems that they have had.  And I think it

23   should be avoided for the 403 grounds, but the conclusion of

24   that is not to keep it out entirely because I think that

25   would be unfair to MGA.

```
 1           MR. ZELLER:  And the other aspect --

 2           THE COURT:  You understand the balance I'm trying

 3    to strike here?

 4           MR. ZELLER:  I absolutely do, your Honor.  I

 5    absolutely see it.  And the other issue, your Honor, and if I

 6    could have the Court's guidance on this, is the Court is

 7    aware that they have determined that they are going down this

 8    path that is going to necessarily lead to the jury hearing

 9    about MGA's trade secret theft.  They are going to put

10    Mr. Kilpin on, and the questions that they are going to ask

11    him, based on everything that Mr. Nolan has said, is going to

12    put this in front of the jury.

13           So I would like some guidance as to whether, you

14    know, when this happens, you know, should we have a sidebar,

15    should we have further discussion about it, that they are

16    going to ask him questions that are going to elicit this.

17           THE COURT:  I don't know if he is or he's not.

18    Certainly the issue is out there.  You've fronted it.

19    There's not going to be any surprises.  We'll see how the

20    testimony plays out.

21           MR. ZELLER:  It was actually what Mr. Price had

22    explained earlier today, which is when they ask him this

23    question about the document that Mr. Nolan has repeatedly

24    referred to about, you know, out executed and out thought,

25    the phrase that Mr. Nolan uses over and over, that is exactly
```

7266

```
 1    what's going to lead to it.  And Mr. Price had explained that
 2    earlier.  So --
 3              THE COURT:  I understand.
 4              MR. ZELLER:  I know obviously the Court wouldn't be
 5    surprised.
 6              THE COURT:  It's on the record.  And I hope we
 7    don't go down that road.  I've done everything I can to keep
 8    the -- to respect the boundaries of Phase 1 and Phase 2.  And
 9    it's up to counsel.
10              MR. ZELLER:  Thank you, your Honor.
11              The last point would I make, and this if it's an
12    administrative matter.  We're certainly hoping that we will
13    save some time for a very short rebuttal case.  We would
14    potentially put our damages expert back up as well as
15    Mr. Hollander.  The Court had made a ruling about
16    Mr. Hollander for purposes of our case in chief.  We think
17    that they have put at issue exactly what it is that that
18    survey goes to.
19              That's all I have.
20              MS. AGUIAR:  Then we need to schedule a time for a
21    hearing on Mr. Hollander because we have a motion in limine.
22              THE COURT:  We're not getting to it today.  We are
23    now eating jury time.  Please, let me bring in the jury.
24    Mr. Proctor, the same to you unless you've got something that
25    has to come up right now.
```

7267

1    MR. PROCTOR:  There's one objection to Mr. Farr's

2    deposition which I believe may have been overlooked.

3    THE COURT:  Are we playing Mr. Farr's deposition?

4    MR. PROCTOR:  That's up to MGA.

5    MR. NOLAN:  Not this afternoon.

6    THE COURT:  Okay.  Not this afternoon.  So please,

7    let's bring the jury in.  I'll take up all of this at the end

8    of the day.

9    **(WHEREUPON THE JURY ENTERS.)**

10   THE COURT:  Counsel, you may proceed.

11   **CROSS-EXAMINATION**

12   BY MR. PRICE:

13   **Q.**   Mr. Domingo, when did you start working for MGA?

14   **A.**   That would be July 2003.

15   **Q.**   So that was a number of years after Mr. Bryant gave to

16   MGA these drawings; right?

17   **A.**   I'm not sure exactly when Mr. Bryant started.  I would

18   say a couple of years at the least.

19   **Q.**   And you told us that you didn't see his drawings, but

20   you were familiar with the dolls that MGA had, the Bratz

21   dolls; correct?

22   **A.**   From having been at the stores, correct.

23   **Q.**   And then once you started working there, you became

24   familiar with the dolls as well; right?

25   **A.**   Yes.

7268

1   **Q.**   And in your designs of the dolls, one thing you had to

2   do is make sure that whatever design you did, it still looked

3   like a Bratz doll; right?

4   **A.**   That it still fitted the 10-inch doll with the existing

5   sculpt, correct.

6   **Q.**   Well, and that it didn't look that much different from

7   the other Bratz dolls so that people would say that's not

8   even a Bratz doll.

9   **A.**   I wouldn't say that's accurate, sir.

10  **Q.**   For example, you couldn't do -- if you look at

11  Exhibit 13721, that's that big one there.  If we could put up

12  13722.  Assume that was the same size as a Bratz doll, the

13  same height.  If we can put up the photograph.

14          For example, you wouldn't do a face like that for a

15  Bratz doll; right?

16  **A.**   Well, this is not a pretty face.  So no, I wouldn't,

17  sir.

18  **Q.**   Well, luckily dolls can't speak.  Let's go to another

19  one.  We'll see if you think that's pretty.  Look at 13695.

20  That Mini Trendy Teens doll.  If we can put up 13696.

21  Assuming this were the same size as a Bratz doll, this is

22  still not something that you would consider doing, pretty or

23  ugly, as a Bratz concept; correct?

24  **A.**   Not this execution, sir, no.

25  **Q.**   And, in fact, if we look at your execution, and if we

1    could put up Exhibit 14018, the Tokyo doll.  Do you see that?

2    And you said you drew some concept drawings for that doll;

3    correct?

4    **A.**    Correct.

5    **Q.**    And the concept drawings have a much more extreme look

6    than the doll; right?

7    **A.**    Yes.

8    **Q.**    So, for example, if we can split this into two, we have

9    14018.  If we can put up 18920, which are your drawings.  We

10   can start with the second page, I think.  Let's start with

11   the fourth page.

12          And if we could flip through here, Ken.

13          I mean, it's fair to say that none of these

14   drawings look substantially similar to the doll that was

15   created by MGA; is that right?

16   **A.**    Well, let me just explain something.  We use two

17   sketches in the industry.  One is called a conceptual sketch,

18   and one is called a developmental sketch.  My sketches are

19   concept sketches in that it does not contain enough

20   information to be able to execute it exactly like this.  It

21   is not a control drawing, sir.

22   **Q.**    Let's look at this.  You see how you have these eyes and

23   the very, very large lips here?

24   **A.**    Yes.

25   **Q.**    Okay.  I mean, that wasn't the way it was translated to

1  the actual doll; correct?

2  **A.**   Again, it is a concept sketch, not intended to be inch

3  by inch or quarter inch by quarter inch the exact translation

4  of the 3D.

5  **Q.**   So the answer to my question is I'm correct.  That none

6  of these drawings here that we have in 18920, which you

7  presented to us, look substantially similar to the Bratz

8  product; correct?

9  **A.**   It was not intended to be.

10  **Q.**   You've not answered my question.  They don't look

11  substantially similar, do they?

12  **A.**   No.

13  **Q.**   And if you look at the shape of the eyes, the lips, the

14  head, those aren't the eyes and lips and head that are going

15  to go on a Mainline Bratz doll; correct?

16  **A.**   That's not even the hairstyle.

17  **Q.**   But I asked you about the others.  That is, you could --

18  you wouldn't put those eyes and that size lips proportionally

19  on a Mainline Bratz doll.

20  **A.**   It's hard to say, sir.  Because until I actually see

21  what that looks like in 3D, then I can say I wouldn't do it

22  or would do it.  The control point is the process, as you go

23  along.  It's sort of evolutionary.

24  **Q.**   Well, it's fair to say you didn't do it.  That is, you

25  did not -- when you were doing your designs, you didn't put

1    this look that we have in 18920 on the doll.

2    **A.**   That's not the outcome.  Correct.  You're right.

3    **Q.**   And, in fact, I put in front of you up there, I think

4    it's Exhibit 17558.  It's one of the original Sasha dolls.

5    Do you see that?

6    **A.**   Yes.

7    **Q.**   And maybe we can put up a picture of that that MGA used

8    this morning.  And then if you would hold up the dolls to the

9    jury.  Maybe they can see the dolls for themselves.  And then

10   put your Tokyo a Go-Go doll up.  And you'll agree that those

11   two dolls look more similar to each other than the Tokyo a

12   Go-Go doll looks to the drawings in 18920.

13   **A.**   Can I see the drawings of 18920?

14   **Q.**   I think you have them in front of you.  Those are the

15   ones you did which were the concept drawings.

16   **A.**   18920 is a boy doll.

17   **Q.**   You see your concept drawings which your counsel took

18   you through?

19   **A.**   Okay.  Let me look for that.  I'm sorry, sir.  Could you

20   repeat the question?

21   **Q.**   You'll agree that those two dolls look much more similar

22   to each other than your Tokyo a Go-Go doll looks to the

23   drawings that you said it was based on.

24   **A.**   I beg to differ, sir.  Conceptually this is far more

25   similar.  But I can see your point in that as a doll, they

1    are both 10 inches in this size of package.  Yes, they are

2    similar.  They are 3D to 3D.

3    Q.   Just so we have your testimony since you do disagree on

4    some level.  The way you look at it, the doll on the right

5    here is less similar to the Tokyo a Go-Go doll than -- if we

6    can put up 18920 -- than your sketches were, which are 18920;

7    is that right?  Just from your viewpoint?

8    A.   Correct.  In terms of general look and colors and the

9    general feel that when you look at the doll, the sketch is

10   far more similar to the Tokyo a Go-Go doll than this exhibit.

11   Q.   You said that you had designed a lot of dolls at MGA;

12   correct?

13   A.   Yes, sir.

14   Q.   Now, for all of that work to date, have you been paid in

15   the neighborhood of, say, $30 million?

16   A.   No, sir.

17   Q.   More than a million?

18   A.   No, sir.

19           MR. PRICE:  I won't get any further.  Thank you.

20           MS. AGUIAR:  Nothing further, your Honor.  Thank

21   you.

22           THE COURT:  Very well.  You are excused.

23           THE WITNESS:  Thank you.

24           THE COURT:  Next witness.

25           MR. NOLAN:  MGA calls Timothy Kilpin.

1          THE CLERK:  Please remain standing.  Raise your

2     right hand.

3                    **TIMOTHY KILPIN, SWORN.**

4          THE CLERK:  Please be seated.  Please state your

5     full name, and spell your last name for the record.

6          THE WITNESS:  Tim Kilpin, K-I-L-P-I-N.

7                      **DIRECT EXAMINATION**

8     BY MR. NOLAN:

9     **Q.**   Good afternoon, Mr. Kilpin.

10    **A.**   Hello.

11    **Q.**   You testified in Phase 1-A, when we went over your

12    background.  I just want to touch upon a couple of things to

13    put this back in perspective for us.  You are currently

14    employed by Mattel?

15    **A.**   Yes.

16    **Q.**   And you are currently involved with the boys division;

17    correct?

18    **A.**   That's right.

19    **Q.**   But prior to being assigned to the boys division, you

20    were involved in the girls division?

21    **A.**   That's correct.

22    **Q.**   And, in fact, your title was senior vice-president,

23    girls marketing and design; is that correct?

24    **A.**   Yes.

25    **Q.**   And could you tell the jury during what period of time

7274

1   you served as the senior vice-president, girls marketing and

2   design?

3   **A.**   That was from October of 2003 to October of '05.

4   **Q.**   Is it fair to say that before you had the title of

5   senior vice-president of girls marketing design, most of your

6   career has been focused on marketing of various consumer

7   products?

8   **A.**   Well, I ran for a number of years the Disney business at

9   Mattel, which included marketing, design, engineering, all of

10   those aspects.   And then when I was at Disney, I ran the

11   category management for all of the toy business there.

12   **Q.**   And you also worked for a period of time for Tonka Toys?

13   **A.**   Yeah.   For about three years back in the late 80's.

14   **Q.**   And you were a product manager at Tonka Toys?

15   **A.**   Yes.

16   **Q.**   And was one of your areas of responsibility there

17   marketing?

18   **A.**   Yes.

19   **Q.**   Now, in total how many years have you worked for Mattel

20   off and on?

21   **A.**   About 17 years in total.

22   **Q.**   And would it be fair to say that for those entire seven

23   years, your area of focus has always been marketing?

24   **A.**   You said seven years?

25   **Q.**   17.

7275

1   **A.**   17 years.  Well, actually, from '95 to '99 it was as a

2   general manager.  So that included marketing, design,

3   engineering.  And then from the time that I came back in 2003

4   until today, that's been the same thing, now marketing and

5   design.

6   **Q.**   One of your responsibilities as senior vice-president

7   girls marketing and design was to oversee the marketing for

8   Barbie?

9   **A.**   Yes.

10  **Q.**   And also overseeing the marketing for the doll line My

11  Scene?

12  **A.**   Yes.

13  **Q.**   And also overseeing the marketing for a line called

14  Flavas?

15  **A.**   No.  As a matter of fact, I did not work on that.

16  **Q.**   Okay.  So that was either before your time or after your

17  time in the girls division?

18  **A.**   I was not there when that was being done.

19  **Q.**   Do you know when Flavas was entered into the market?

20  **A.**   I think it was before my time.

21  **Q.**   You think it was before 2003?

22  **A.**   I don't know.

23  **Q.**   But in any event, to your knowledge it wasn't being

24  sold -- Flavas was not being sold by Mattel during the period

25  of time you served as the senior vice-president of the girls

1  marketing and design; is that correct?

2  **A.**   Not during my time.

3  **Q.**   And I assume at various times in your capacity as senior

4  vice-president in charge of girls marketing and design at

5  Mattel, you would prepare marketing reports?

6  **A.**   Well, usually I didn't prepare marketing reports.  My

7  teams did.

8  **Q.**   And you would review those?

9  **A.**   Yes.

10  **Q.**   And can you just give us some general background on

11  marketing 101 maybe?  And that is why does a company prepare

12  marketing reports or do analysis of marketing plans?

13         MR. ZELLER:  The question is vague.

14         THE COURT:  Overruled.  You may answer.

15         THE WITNESS:  Well, it is a pretty broad question.

16  Generally speaking a company is providing -- supporting a

17  product line with marketing to help sell that product to the

18  customers, the trade, the retailers, and then to sell it

19  through to consumers.

20  **Q.**   BY MR. NOLAN:  How often would Mattel prepare marketing

21  reports?

22  **A.**   When I was running that particular group, we didn't have

23  a set process for that.  We probably did it a couple of times

24  a year.

25  **Q.**   And how many people would be involved in the preparation

1    of the marketing reports?

2    A.    Well, I had a group -- what time frame are we talking

3    about?

4    Q.    During the time that you were the senior vice-president

5    in charge of girls marketing and design for such things as

6    Barbie and My Scene?

7    A.    At that time I had a group that was probably about 10 or

8    12 people that were responsible for marketing.  So they would

9    be the ones working on those plans.

10   Q.    And when did you leave the girls division?

11   A.    October of 2005.

12   Q.    And what were the circumstances by which you were moved

13   out of the girls division?

14            MR. ZELLER:  Relevance.

15            THE COURT:  Sustained.

16   Q.    BY MR. NOLAN:  During the period of time that you were

17   overseeing the marketing for Barbie and My Scene, did you

18   engage in any competitive analysis?  In other words, what

19   your competitors' products were doing?

20   A.    Well, yes.  Typically we would look at the competitive

21   set on a regular basis.

22   Q.    And the competitive set during the period of time that

23   you were there in the girls division, 203 and 2005, included

24   Bratz; correct?

25   A.    Yes, it did.

7278

1   **Q.**   And when was the first time you heard or learned of the

2   Bratz doll line?

3   **A.**   Well, I guess that would have been sometime in 2001.

4   That was when I was at Disney.

5   **Q.**   And what were the circumstances by which you became

6   aware of the Bratz line?

7   **A.**   I don't remember that specifically in terms of when I

8   first saw it.

9   **Q.**   When you saw it, where were you?

10   **A.**   I honestly don't remember.

11   **Q.**   Do you remember whether or not you visited one of the

12   New York toy shows?

13   **A.**   Well, yes, I used to go there pretty regularly.

14   **Q.**   Do you recall seeing the Bratz line for the first time

15   at the New York Toy Fair?

16   **A.**   I remember visiting the MGA showroom at New York Toy

17   Fair one year.  I don't know if that was the first time I saw

18   it or not.

19   **Q.**   Okay.  And who were you employed with at that time?

20   **A.**   Disney.

21   **Q.**   What was your overall impression of the Bratz line when

22   you first saw it in 2001?

23   **A.**   I thought the product looked fresh.

24   **Q.**   What do you mean by the word "fresh"?

25   **A.**   I thought it looked different.