1     UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3        ---

4  **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5        ---

6 MATTEL, INC.,     : PAGES 7446 - 7547
           :

7    PLAINTIFF,  :
           :

8  VS.       : NO. ED CV04-09049-SGL
           : [CONSOLIDATED WITH

9 MGA ENTERTAINMENT, INC., : CV04-9059 & CV05-2727]
 ET AL.,       :

10         :
    DEFENDANTS.   :

11

12

13

14

15   REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    RIVERSIDE, CALIFORNIA

17   THURSDAY, AUGUST 14, 2008

18    JURY TRIAL - DAY 35

19    AFTERNOON SESSION

20

21

22       MARK SCHWEITZER, CSR, RPR, CRR
        OFFICIAL COURT REPORTER

23       UNITED STATES DISTRICT COURT
        181-H ROYBAL FEDERAL BUILDING

24       255 EAST TEMPLE STREET
        LOS ANGELES, CALIFORNIA 90012

25       (213) 663-3494

CERTIFIED COPY

1   **Appearances of Counsel:**

2

3   On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
5            B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
6            Harry Olivar, Esq.
             John Corey, Esq.
7            Diane Hutnyan, Esq.
             William Price, Esq.
8        855 South Figueroa Street
         10th Floor
9        Los Angeles, CA 90017
         (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20

21

22

23

24

25

1

## I N D E X

2

3          MATTER:    JURY CHARGE CONFERENCE.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **Riverside, California; Thursday, August 14, 2008**

2                              **3:10 P.M.**

3          **(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)**

4              THE COURT:  Okay.  We're on the record and outside

5      the presence of the jury.  I've split this up into two

6      different categories.  Damages instructions and copyright

7      instructions.  I'm going to give the copyright instructions

8      first and the damages instructions when the time comes.  But

9      just for purposes of the day, I'd like to start with damages

10     instructions.

11             Okay.  I can make some tentative findings as to the

12     intentions of the Court.  The Devil is always in the detail.

13     But basically this is what I'm going to give.  I'm going to

14     start with an Instruction 5.1 out of the Ninth Circuit Model

15     Jury Instructions, but I'm only going to use the first,

16     third, and fourth paragraph, just kind of as an introduction

17     to the issue of dodges.

18             So that is to say I'm going to have an instruction

19     which basically tells the jury it's the duty for the Court to

20     instruct you about the measure of damages.  By instructing

21     you on damages, the Court does not mean to suggest for which

22     party your verdict should be rendered.  It is for you to

23     determine what damages, if any, have been proved.  Your award

24     must be based upon evidence and not upon speculation,

25     guesswork, or conjecture.

1    So we'll start out with that very basic

2  instruction.

3    I will then give an instruction for each of the

4  three state tort claims, for the interference with

5  contractual relations and for the aiding and abetting breach

6  of fiduciary duty, duty of loyalty.  Both parties essentially

7  agree that I should give an iteration or variation of CACI

8  3901.  There also seems to be an agreement that I need to

9  give a disgorgement of profits instruction in the context of

10  3901.  There's disagreement on language in that.  That seems

11  to be agreed to as well.

12    And then with respect to conversion of damages, I

13  need to give a CACI 2021.  So at a minimum, that will be

14  given on the State Court claims.

15    On the copyright damages, I intend to give a

16  version of or essentially the 17.22 copyright damages, the

17  actual damages.  17.24, copyright damages, defendants'

18  profits, an instruction on indirect damages, and an

19  instruction on willful infringement.

20    Although I have some questions about it, both sides

21  have submitted a duty to mitigate.  If I give it, I'll be

22  giving the 5.3 version from the Ninth Circuit, and then both

23  sides agree that a version of CACI 3947 on punitive damages

24  needs to be given.

25    What that leaves and what I'd like to hear argument

1    on are some particular particularized instructions proposed

2    by both sides.   In particular, two by Mattel.   One --

3    actually, both related to the issue of apportionment.   One

4    instruction basically suggests a tie goes to Mattel basically

5    on the issue of apportionment if there's confusion and a

6    presumption for Mattel.   And somewhat related, if the

7    apportioned elements are inextricably intertwined with the

8    protectable elements, that there's no apportionment.

9           MGA, there are six instructions actually that I

10   want to take up with them.   The first three relate to a

11   limitation instruction based on the Court's April 25th, 2008,

12   order related to preemption issues and the like.   There's an

13   instruction regarding indirect -- no, no.   Indirect damages I

14   indicated was already going to go in.   There's an instruction

15   on alternative methods of the plaintiff's damages.   Somewhat

16   related to that, there's an instruction on duplicative

17   damages, and then there's the proposal to use the 5.6 nominal

18   damages.

19          So those are the -- I've kind of now -- I've

20   separated out the damages.   I've divided out those which I'm

21   going to give some version of.   And quite frankly, I think

22   the Court, based on the arguments that have already been

23   submitted, I could work out language that I feel comfortable

24   with based on the model instruction.   But I'd really

25   appreciate further argument on the special instructions that

1    I've just identified, the two for Mattel and the six for MGA.

2            So let me afford you that opportunity at this time.

3    Whoever wants to go first may go first.

4            MR. PROCTOR:  Good afternoon, your Honor.  If I

5    may, I would start with one comment on what the Court said it

6    did not want to hear argument on.

7            THE COURT:  Please.

8            MR. PROCTOR:  Only one, and that is the duty to

9    mitigate.  We submitted a duty to mitigate instruction as an

10   alternative.  We do not think such an instruction is

11   appropriate in this case where we're seeking disgorgement as

12   a remedy.  It's not clear to me how one can mitigate the

13   other side's profits.  And so we don't think it's an

14   appropriate instruction.

15           Apportionment, the language -- I mean, there's

16   really two issues.  One is the statute is obviously oblique,

17   shall we say.  It's a single sentence, which is interpreted

18   by courts in various ways, and the instructions which we have

19   proposed, with the exception of the last sentence in the

20   instruction on page 33, it's an amended one.  The second

21   apportionment instruction.

22           THE COURT:  Hold on a second.

23           MR. PROCTOR:  Sure.

24           THE COURT:  All right.

25           MR. PROCTOR:  With the exception of that sentence,

1   the language we had proposed is basically straight out of

2   cases.   The first one, benefit of the doubt should be given

3   to Mattel.   You know, the cases are clear that in cases of

4   apportionment, where you're trying to determine whether to

5   carve out profits from noninfringing work, the benefit of the

6   doubt is given to the plaintiff.

7           The only way, you know, where the fact-finder is a

8   jury and where the jury is going to be deciding apportionment

9   as is the case in this case, the only way to apply that law

10   is to include it in a jury instruction.   And it's undisputed

11   law.   I don't think MGA has proffered any law suggesting

12   that's incorrect, that the benefit of the doubt goes to the

13   infringer.

14           THE COURT:   This is the problem that I have with

15   it.   It somewhat muddles the issue of burden of proof.   When

16   you say that, when you say that one side bears the burden of

17   proof on an issue by a preponderance of the evidence, but

18   then you're saying that if there's a -- that the benefit of

19   the doubt should also be afforded to that same side on an

20   apportionment issue, it gets a little confusing, and that's

21   the concern that the Court has.

22           MR. PROCTOR:   I potentially see the concern, and

23   maybe one way to potentially obviate it is to merge the two

24   apportionment instructions which we have proposed.   Because

25   the benefit of the doubt language in the cases makes sense in

```
 1   the context of the second apportionment instruction we had

 2   proposed.

 3            THE COURT:  Why is the first one even necessary if

 4   I give the inextricably intertwined?

 5            MR. PROCTOR:  I don't mean this -- I hope this

 6   doesn't sound flip in any way, but it's necessary because of

 7   the law.  The law is -- Ninth Circuit law is that in cases of

 8   apportionment, when a jury is trying to assess whether it can

 9   apportion damages and how it should apportion damages and

10   under the law whether the infringing and noninfringing

11   elements are inextricably intertwined, the benefit of the

12   doubt goes to Mattel.  And that is separate and apart from

13   the fact that this is an issue on which MGA bears the burden.

14            There's the basic instruction in 17.24, which says

15   MGA bears the burden.  And then this is obviously from case

16   law.  But the inextricably intertwined, that point, I think,

17   is fairly undisputed.  And the benefit of the doubt makes

18   sense in that context.  And again, given that the jury is the

19   fact-finder, I don't know how that law would -- that law

20   would be rendered meaningless if the jury were not to be

21   instructed on it.

22            THE COURT:  Very well.  Why don't you address --

23   actually, before we move on to MGA's, why don't we hear from

24   MGA on these two.  I think that might be the easiest way to

25   do it.
```

1        MR. ROTH:  Good afternoon, your Honor.  I agree, it

2    seems like that's the way to go.  First, with respect to --

3    I'm looking at Mattel's page 32.  There's not a number, but

4    it's the first of the two that I think your Honor was

5    addressing.

6        THE COURT:  Right.

7        MR. ROTH:  The fact of the matter is you will see

8    from time to time in cases sort of a two-part statement or

9    dicta in cases dealing with apportionment.  You do see

10   cases -- language similar to what you have here from Mattel.

11   And then that is generally followed up with language,

12   something to the effect, for instance, from Sheldon.  What is

13   required is not mathematical exactness but only a reasonable

14   approximation.

15       Courts cannot be -- this is from Abend, which is a

16   Ninth Circuit case.  Courts cannot being expected to

17   determine with mathematical exactness an apportionment of

18   profits; we only require a reasonable adjusted portion.

19       THE COURT:  But that doesn't really undermine the

20   concept that to the extent there is a blurring, that the

21   doubts go to Mattel.

22       MR. ROTH:  The burden is on MGA with respect to

23   apportionment.

24       THE COURT:  With respect to apportionment.

25       MR. ROTH:  That is the case.

7456

```
 1            THE COURT:  And you think that's sufficient there
 2   to capture this idea?
 3            MR. ROTH:  Yes, I do.  I think so long as we
 4   include the other language which I've just suggested, which
 5   is in our proposed instruction.  Where we have real problems
 6   with the second of the two instructions, which says if you
 7   cannot readily separate the infringing and noninfringing
 8   elements of the work that you find infringes Mattel's
 9   copyright, then you should not apportion defendant's
10   properties --
11            THE COURT:  The only -- you only cite me to one
12   case, and that's the Cream Records case, and in that case,
13   the language you cited says where it is clear that not all of
14   the profits are attributable to the infringing material, the
15   copyright owner is not entitled to recover all of those
16   profits.  That's kind of just the point.  Of course, if it's
17   clear, and there is clear apportionment, then you are
18   absolutely correct, and that which is not attributable to the
19   infringement should be separate and apart.
20            But what this instruction suggests, and the law
21   that supports it seems to indicate that when it's all
22   inextricably intertwined, when it's not clear, for example,
23   to use the language of Cream Records, then you don't
24   apportion.
25            MR. ROTH:  If we could look at the authorities
```

 1   cited by Mattel, for instance.  There's the Nintendo case,

 2   which we've seen from them a number of times.  That was a

 3   case that arose both under copyright and trademark.  And in

 4   that case, there was a cartridge with a variety of games on

 5   it, as I recall, all sold under the infringing name of

 6   Nintendo.

 7        The Court said in that context that you couldn't

 8   distinguish because under trademark law, you couldn't

 9   apportion because the entire thing was sold under the name of

10   Nintendo.  But under the copyright laws, actually the Court

11   would have permitted apportionment.  Because you could have

12   divided the games up.

13        THE COURT:  Well, what about the Sheldon case?

14   When the copyrighted portions are so intermingled with the

15   rest of the work that they cannot well be distinguished, the

16   entire profits realized by the defendants will be given to

17   the plaintiff.

18        MR. ROTH:  Yes, your Honor, and in that case, it's

19   an instruction to follow the facts of that case.  As you'll

20   recall, that was a case that we discussed last week.

21        THE COURT:  Right.

22        MR. ROTH:  Where a copyrighted play, just basically

23   taken from the plaintiff, that is the story.  That story is

24   transferred from one medium to another, from a play to a

25   movie.  The Court holds in that case, notwithstanding the

1    fact that the story is obviously intermingled with the movie,

2    that you could apportion.  And in fact, apportions 20 percent

3    to the plaintiff, 80 percent to the defendant.  Because it

4    found that the additional creative elements in this second

5    medium, in the movie as opposed to the play, that the jury

6    could determine the value contributed by the defendants in

7    connection with that movie.

8            THE COURT:  But does that defeat the principle --

9    assuming, and again, if you can apportion, then you should

10   apportion, no question.  And the jury needs to be instructed

11   on that.  But to the extent that they are inextricably

12   intertwined, then it goes to the copyright holder.  I don't

13   see how that's -- the Court is not making a finding.  This is

14   not a summary judgment decision.  This is a jury instruction.

15           We're telling the jury if you can apportion in the

16   first instance, absolutely, by all means, apportion.  And I

17   think that there's been a lot of evidence this week about

18   apportionment and percentages and ways for the jury to make

19   that calculation.

20           But there are also elements and evidence where the

21   apportioned elements are arguably wrapped up.  And it strikes

22   me as appropriate.  To instruct the jury just on those

23   points, that A, yes, if you can apportion, and if MGA proves

24   by the preponderance of the evidence that elements should be

25   apportioned out, do it.  But if not, if they are inextricably

1    intertwined, then you don't.  It's like the reverse side of

2    the same coin.

3           I agree with your assessment of <u>Sheldon</u> in that

4    particular case, that was probably the correct result, but

5    here we have evidence of apportioned elements, and we have

6    evidence, I think, also that could reasonably be inferred by

7    the jury to be inextricably intertwined.

8           MR. ROTH:  Your Honor, I think that it may be a

9    matter of the presentation because in the way that we're

10   seeing here, essentially what we're seeing from Mattel is the

11   same point made basically three separate times.  The way the

12   Court articulated is quite close, I think, to the law.

13   That's not what we're seeing here.  They actually -- we state

14   three times the burden that's on MGA.  The burden is on MGA

15   to establish that elements -- that noninfringing factors

16   contributed to the profitability of the Bratz dolls and the

17   related products.

18          We think, your Honor, that satisfies the

19   instruction requirement to the jury.

20          THE COURT:  You're referring to the language in

21   17.24, lines 19 to 23.  This is on page 31 of the brief.

22   Assuming the Court gives the language unless you find that a

23   portion of the product from the sale of a product containing

24   or using the copyrighted work is attributable to factors

25   other than use of the copyrighted work, all of the profit is

1    to be attributed to the infringement.

2            So you're suggesting that that captures the

3    element?

4            MR. ROTH:  I think that captures it, and I think by

5    pulling this out, we're reiterating it over and over and over

6    again three or four times the burden being placed on MGA.  I

7    think that that language that the Court has just repeated

8    does capture the law.

9            THE COURT:  I understand your argument.  Thanks,

10   Counsel.

11           All right.  Mr. Zeller?

12           MR. ZELLER:  The points that Mr. Roth raised

13   briefly.  I'm not sure that it's much of an argument,

14   particularly at this stage, to say that the burden of proof

15   is repeated.  As the Court will recall from 1-A, whenever it

16   was our burden, it was repeated over and over, and, of

17   course, it was all over the verdict form, and I don't recall

18   MGA saying that it was unfair at that time.

19           The one thing I do want to say about the special

20   apportionment instruction, why I think it is important to

21   really get this point across to the jury about inextricably

22   intertwined is that it is a limiting principle of

23   apportionment.  And I'm concerned that they may think it's an

24   all or nothing thing, and it's not.  Obviously, there can be

25   gradations or certain kinds of apportionment that are done,

1   and we don't want the jury to simply think that either they

2   apportion or they don't.

3         And without that instruction, I think it leaves

4   that kind of potential danger, and I think the Court put it

5   right, exactly right, when it says to the extent.  I mean,

6   that's exactly what this kind of instruction is.

7         THE COURT:  Mr. Roth, let me ask you about that

8   last sentence of the second apportionment instruction.

9   Mattel wants an instruction that it's undisputed between the

10  parties that the infringing and noninfringing elements of the

11  Bratz dolls cannot be separated and cannot be apportioned.

12        MR. ROTH:  That -- obviously we don't agree with

13  that.  I think we'll see when we present our case, it's

14  really a matter of how you -- what do you mean by the word

15  doll.  It's a piece of plastic in a box.

16        THE COURT:  As Mr. Nolan would say, that's the

17  naked mold.

18        MR. ROTH:  Yes.  So there's the naked mold that

19  has -- that's in the box.  That basically doesn't change.  We

20  are not going to say well, you know, we think it's our leg.

21  Agree it's their arm, but the leg contributed 82 percent and

22  the arm only 17 percent.  Therefore, give us 82.

23        We are going to say, however, when we look at a

24  package, a doll package, that -- and you look at what someone

25  is actually buying, they are paying a price for this, there

 1  are a variety of elements within this.  So if you're calling

 2  this whole thing the doll --

 3          THE COURT:  No, I don't think we are, and what

 4  we're talking about is just if you were to take the doll

 5  package and take the doll that's inside the package out of

 6  it, that's what cannot be apportioned.  That seems to be the

 7  position that everyone is taking, but maybe not.

 8          MR. ROTH:  Well, I think the one place we may be in

 9  disagreement, and this is an issue that has arisen since I

10  was last up here, and that is if you were to take the doll

11  out and say -- I'm just looking at something that has a

12  purse.  Not holding the purse, just take the doll out wearing

13  clothes.

14          It would be our view that the clothes are not

15  infringing.  Because as I recall the Court's holding

16  regarding protectable elements, what the Court held was that

17  the particularized expression of the clothes in Carter

18  Bryant's drawings are protectable.

19          THE COURT:  Right.  It's the particularized

20  expression in the drawings.  Now, there's a question for the

21  jury as to whether or not those drawings are substantially

22  similar to any, all, some, or none of the clothes that are in

23  any of the products.  That's -- I'm not deciding that one way

24  or the other.

25          You could be right.  The jury might find that

 1   there's only the clothes on four dolls are in fact

 2   substantially similar.  They might find that none of the

 3   dolls' fashions are substantially similar, or because of the

 4   look or because of the way it appears, they might find that

 5   all of the fashions are substantially similar.  That's a

 6   factual decision for the jury to decide.  I'm not finding

 7   that as a matter of law.

 8          So that's kind of wide open.  But in terms of the

 9   dolls themselves, although I suppose maybe I've answered my

10   own question on that, because the clothing, that might be,

11   depending on how the jury finds on the issue of substantial

12   similarity between the drawings, the fashion drawings and the

13   clothes.  That's going to be up to the jury.

14          So I suppose that element can be separated out and

15   apportioned depending on what the jury finds.

16          MR. ROTH:  Yes, your Honor.  So again, the

17   statement -- I mean, there is a way you could interpret that,

18   and we would be in agreement.  But I think as written, that

19   would be quite confusing to the jury.  I think the jury would

20   think we mean the box, everything in there.

21          THE COURT:  Anything more from Mattel on these two?

22          MR. ZELLER:  I mean, I thought what we were

23   reflecting here in that sentence was what Mr. Roth conceded

24   the other day, that they are not going do make arguments

25   about apportioning the doll, and they thought that was

1    important so that the jury doesn't get confused about it.

2         THE COURT:  All I'm hearing is with respect to the

3    clothes.  Because in talking about what the doll is, there is

4    a scenario, Mr. Zeller, where the jury could find that the

5    clothes are not substantially similar yet the look of the

6    doll, of the other protectable elements that I've identified,

7    are.  And arguably, then, part of what we're referring to

8    here as the doll would be apportioned out.

9         MR. ZELLER:  I guess it comes down to your

10   definition of doll.  Certainly we did not intend to put into

11   this instruction some sort of suggestion that fashion as a

12   matter of law could not be apportioned if the jury thought

13   that it somehow met the burden of proof and didn't believe it

14   was inextricably intertwined.

15        THE COURT:  So your definition of the doll would be

16   something less than the naked mold and something less than

17   the doll with the fashions on.

18        MR. ZELLER:  I thought the word doll neutrally

19   communicated that.  It's a more loaded term than I ever

20   thought it was, but that is exactly right.  I mean, it's

21   the -- in however we can best express that, I'm not opposed

22   to it because we are not trying to suggest that the Court,

23   you know, do that as a matter of law, as to the fashions or

24   anything else.  But, you know, obviously we're going to take

25   the position that this stuff is all intertwined and there

7465

```
 1    shouldn't be any apportionment for that reason.  But that's a
 2    dispute for the jury to figure out.
 3              THE COURT:  Right.
 4              MR. ZELLER:  But we do think it's important that
 5    they don't start off down that road of dividing up the doll
 6    in some way.  And this at least gives them a good starting
 7    point, and it -- we thought it got the point across simply.
 8              THE COURT:  Okay.  Do you want to turn now to the
 9    MGA -- let's -- I've heard enough on those two.  Let's go on
10    to the additional instructions proposed by MGA.  And I'm not
11    suggesting that there's not significant disputes on even the
12    ones that we agree on, but at least the Court has enough of a
13    basis to work out a 3901 instruction or a 2021 instruction,
14    and what I plan to do is basically write that out and give
15    counsel, someone the ability to finalize that, but I think
16    you have enough on that.
17              But where I would like additional argument, I think
18    I owe it to have counsel to have argument on is on these
19    instructions where you're literally two ships passing in the
20    night.  And let's start with limitations based on the April
21    25th, 2008, order, and the series of instructions that MGA is
22    submitting on that.
23              Again, whoever wishes to lead off may do so.  I
24    assume you understand the ones I'm referring to.
25              MR. PROCTOR:  I think I do, your Honor.
```

          1          THE COURT:   Beginning on MGA's instruction page 8,

          2   limitations on damages for intentional interference with

          3   contractual relations.

          4          MR. PROCTOR:   Yes, thank you.   I mean, there are a

          5   couple of issues here.   And they are -- the instructions that

          6   MGA proposes are similar, but they are dissimilar issues.   As

          7   to the aiding and abetting claims, this is, as far as I can

          8   tell, simply a rehash of the 1-A motion for judgment as a

          9   matter of law.   The argument being the claims are preempted.

         10   Disgorgement is a remedy under the Copyright Act.

         11   Disgorgement of the defendant's properties.   That's the same

         12   remedy Mattel is seeking for the state law claims, ergo, the

         13   state law claims are preempted and you couldn't get that

         14   remedy.

         15          As to -- the question is a little different as to

         16   the intentional interference claim because the Court did hold

         17   that claim preempted in part in summary judgment ruling.

         18          Where the rubber -- I don't like that expression.

         19   The issue on this is the Court's rulings said the intentional

         20   interference claim is preempted as to Bratz but not as to

         21   fiduciary duty.   So the intentional interference claim is

         22   viable as to -- and alive as to breach of fiduciary duty,

         23   insofar as it's predicated on breach of fiduciary duty.

         24   That's the language of the Court's order.

         25          Breach of fiduciary duty is exactly what gives rise

1    to disgorgement in this case.

2            MGA's response to this is, well, you know, Bratz is

3    an invention under one clause of the inventions agreement,

4    and therefore, it can't be proprietary information under

5    another clause of the inventions agreement, which is a

6    refrain we've heard many times and doesn't follow.

7            THE COURT:  And the Court has previously rejected

8    that.

9            MR. PROCTOR:  Correct.  The intentional

10   interference claim is live as to proprietary information and

11   to fiduciary duty under the Court's summary judgment ruling.

12   The mere fact that we are seeking a remedy which parallels

13   remedies under the Copyright Act doesn't mean the claim is

14   preempted or that the remedy is not available.

15           THE COURT:  Let me hear from MGA on this.  And part

16   of the problem, Mr. Roth, is imagine a jury hearing the

17   follow two sentences.  In measuring damages under Mattel's

18   claims of intentional interference, you are to consider only

19   those monetary losses that Mattel suffered as a result of MGA

20   and Mr. Larian's interference with the contract.  You may not

21   consider the MGA's interference with Mattel's rights to Bratz

22   or any of the revenues.

23           MR. ROTH:  Your Honor --

24           THE COURT:  Do you see?  How is a jury supposed to

25   make sense of that?

1        MR. ROTH:  I think, your Honor, that the confusion

2   that we have here is put in stark relief now that we're in

3   the damages phase of the case.  Because I think that what

4   Mattel wants to proceed here in this phase of the case is on

5   damages that result from MGA's sales of allegedly infringing

6   products and indirect profits theories based upon that.  That

7   is a harm that doesn't flow from interference with anyone's

8   contractual rights.  That's not a harm that flows from the

9   violation of any fiduciary duties.

10       THE COURT:  You're saying that, but they are in

11  fact claiming that that's exactly the harm that flows from

12  those interferences with the contractual rights and the

13  interference with the fiduciary duties.  I mean, it's -- I

14  understand the frustration because it in many respects are

15  the same dollars being counted.  And this is not unusual.  I

16  mean unfortunately -- I say unfortunately because it creates

17  these kind of headaches at jury instruction time.

18       That's not unusual that we have multiple different

19  legal claims that the damages flowing from which involve some

20  of the same dollars.  But that doesn't mean that the claims

21  get excluded.

22       You know, at the end of the day, the Court may very

23  well have to take measures to ensure that we don't have

24  double awarding of the same dollars in damages.  There might

25  even be an argument, although I think it's probably safer for

 1    the Court to do it, and we'll get to this.  You have

 2    submitted an instruction basically telling the jury not to

 3    double award for the same types of damages.

 4            We'll cross that bridge when we get to it.  But

 5    there's no question that however we do it, your principle is

 6    correct, that we can't give the same money damages, but to

 7    say that because disgorgement is a remedy for copyright, it

 8    cannot ipse dixit be a remedy for the intentional

 9    interference with contractual relations or the breach of the

10    fiduciary duty.  I'm not following that.

11            MR. ROTH:  Let me try it a different way.  There

12    was a number of witnesses, evidence that came on regarding

13    the relationship between Carter Bryant and Mattel which, you

14    know, for instance, the disclosure of information regarding

15    vendors, working for two companies at one time, the use of

16    Mattel employees for services, all of which could potentially

17    have led to theories of harm.  We could have had damages

18    theories premised upon that.

19            They haven't presented that.  And indeed, based

20    upon the disclosure of confidential information, if you

21    assume that the drawings are confidential information --

22            THE COURT:  Just for the record I'm willing to

23    accept that.  I think that's a fair -- we had that discussion

24    at sidebar.

25            MR. ROTH:  If you accept that proposition, there

7470

```
 1    could have been a theory that could have explained the harm
 2    to Mattel resulting from the disclosure of that information.
 3    That's not a theory that we --
 4              THE COURT:  Why isn't the harm to Mattel the lost
 5    profits or the disgorgement of profits that resulted from --
 6              MR. ROTH:  That's not a theory of harm.  That's a
 7    theory of disgorgement.  That's a theory of what -- of the
 8    measure of our benefit.  Their theory of harm could have been
 9    based upon a showing that we would have -- we would have made
10    those profits but for.  Something would have happened, some
11    different economic situation would have pertained --
12              THE COURT:  And they did not pursue that.
13              MR. ROTH:  They did not.
14              THE COURT:  That's correct.  And I kept out
15    evidence that they wouldn't have done that because they were
16    not pursuing that.  So that is off the table.  I agree with
17    that.
18              MR. ROTH:  Okay.  So since they are not proceeding
19    on a damage theory based upon the harm caused by breach of
20    fiduciary duty or intentional interference, all they are
21    doing is replicating the copyright damages.  There is nothing
22    additional added, when you focus on --
23              THE COURT:  You're saying that not because of the
24    elements that needed to be proven in order to establish the
25    liability, but you're saying that because of the nature of
```

1    the damages that they are pursuing; is that correct?

2         MR. ROTH:  That's right.  So, for instance, 2005,

3    there's a Bratz doll sold.  There's a profit made.  The

4    theory is you shouldn't have produced a product that is

5    identical to something that we own.  If Mattel had wanted to,

6    they could have taken Carter Bryant's drawings and put them

7    on the Empire State Building and said these are our drawings.

8    We own them.  Anyone who tries to sell a doll that looks like

9    this we will sue.  That's an infringement theory.  That's the

10   value that those drawings give to Mattel.

11        Now, there's a different theory.  There's another

12   theory, which is we have a great idea about a market

13   opportunity.  We see a market opportunity out there.  We've

14   got a great idea.  We have decided for whatever reasons, it

15   serves Mattel's interests not to market that idea.  For

16   whatever reason.  Whatever judgment they make.  And for some

17   reason, for some reason that information gets out, and they

18   are harmed as a result of disclosure of that idea, whatever

19   that theory of harm might be.

20        That is a road they could have taken.  They didn't

21   take that road.  The road they took here was a copyright

22   road.  Infringement not based on disclosure of confidential

23   information, but based upon their theory that a product was

24   sold that infringes something they own.

25        So that kind of theory should proceed under the

1    copyright laws.   The copyright laws have a very specific

2    detailed framework within which those sorts of damages are

3    supposed to be analyzed.   And frankly, your Honor, it's led

4    to a lot of confusion here because we have been getting, as

5    we attempt to present our evidence regarding apportionment,

6    we've been getting objections based upon concepts found in

7    copyright law.   You know, in terms of sweat of the brow is

8    the perfect example.

9          Okay.   Fine in the copyright context.   That concept

10   isn't found in the context of state law claims.   We don't

11   have the sort of framework within -- that the courts and,

12   frankly, Congress has worked out about how you measure

13   damages in that context.   Led to a lot of confusion, and

14   frankly a lot of our evidence has not been able to come in

15   because of that.

16         So we think --

17         THE COURT:   Right.   But that would be evidence

18   related to these other types of damages that you're talking

19   about that they are not pursuing.   They are only pursuing,

20   and let's just use the phrase copyright-like damages on

21   their state tort claims; right?   So the Court has put

22   copyright-like limitations on the evidence that comes in for

23   those damages, which is what you're complaining about right

24   now; right?

25         MR. ROTH:   Correct.

1    THE COURT:  It still gets back to the question that

2  just because you limit yourself to copyright-like damages

3  predicated on State Court claims that have a different

4  element than the copyright claims, does that equal

5  preemption?  The Court previously ruled that it did not.

6    MR. ROTH:  Understood.

7    THE COURT:  To clarify the entire picture in terms

8  of the Court's rulings on evidence as well as the issue here

9  in the jury instructions.

10    MR. ROTH:  Understood.  And the point that I am

11  making here is now that we're talking about damages, the

12  other element is irrelevant.  That's why we're in --

13    THE COURT:  It does not appear to be factoring into

14  the damages, but does that eliminate, does that require

15  preemption?  And I think the law on that says no.

16    MR. ROTH:  I think the law, with all due respect,

17  says yes, under Del Madera.

18    THE COURT:  What's the authority for that?  For

19  that principle, the fact that the damages do not seize upon

20  the different element, because that I never saw, or I don't

21  recall seeing.  Maybe it was there.

22    MR. ROTH:  Your Honor, the case I have is Del

23  Madera in which you had an unfair competition claim premised

24  upon breach of fiduciary duty.  The damage theory, it's very

25  similar.  The idea is taken and is exploited.  The damage

1    theory becomes nothing more than a copyright damage theory,

2    and the Court says that nothing additional is being added in

3    the context of --

4              THE COURT:   I'm sorry.   The case?

5              MR. ROTH:   The Del Madera case.

6              THE COURT:   What's the cite on that?   It's not

7    coming to mind.

8              MR. ROTH:   820 F.2nd 973.   The pin cite is 977.

9              THE COURT:   I have it here.   Very good.   We'll look

10   at that.

11             All right.   Anything further on that?

12             MR. ROTH:   No, your Honor.

13             THE COURT:   Very well.   Mr. Zeller?

14             MR. ZELLER:   At the outset, of course, this is a

15   rerun of the argument that was made on the JMOL.   You know,

16   specifically with respect to the Del Madera case.

17             THE COURT:   I just want to make sure I'm right,

18   Counsel.

19             MR. ZELLER:   You absolutely are right.

20             The other thing is that MGA's argument really is

21   conflating several different principles.   Number one, it's

22   conflating harm with damages.   And then it goes on to

23   basically conflate remedies with preemption.   And the Court

24   is absolutely right.   There is no case, certainly that we're

25   aware of, and none that has been cited by MGA that basically

1    says well, if you're seeking, quote, these sorts of damages,

2    end quote, that that is what drives preemption.  I mean, the

3    test is extremely well established.

4         Obviously people can debate how it applies in a

5    given case, and courts, of course, have rendered any number

6    of opinions on this.  But the test is always is there a

7    qualitative difference in the elements in the nature of the

8    rights.

9         THE COURT:  What's your recollection of the Del

10   Madera case?

11        MR. ZELLER:  Well, truthfully, your Honor, I'd have

12   to reread it.  I know I've reread it for the JMOL hearing.  I

13   had not reread it again for purposes of today.  I know that

14   there is, number one, the Court will see that it has been

15   since limited in certain respects.  I know there's subsequent

16   authority that makes it very clear that in the kind of

17   situation we're dealing with, it is not preempted.  And I

18   know that there are also -- but I'll have to refresh myself

19   on all those nuances because it has been a little while since

20   the JMOL.

21        I know we discussed that case specifically in our

22   opposition to the MGA party's motion for partial judgment as

23   a matter of law.  And we cite some of those other authorities

24   that really make it clear that this Del Madera case does not

25   stand for the proposition that there should be preemption

 1    with respect to our claims here.   And this is a brief we

 2    filed on July 7, 2008, in opposition to the JMOL that the

 3    Court previously ruled on.

 4             THE COURT:  Very well.  Okay.  Let's move on to the

 5    next -- alternative methods of plaintiff's damages and

 6    somewhat related to that is the requested instructions for

 7    duplicative damages.

 8             MR. ZELLER:  Would it be helpful if we gave the

 9    Court our copy of the JMOL that discusses the case?

10             THE COURT:  Sure.  You can send that up.  That's

11    fine.

12             All right.  The -- yes, let's take those up next.

13    Page 23 of the proposed instructions.

14             MR. PROCTOR:  Thank you, Judge.  Alternative

15    methods doesn't fit the case.  We have one damages theory as

16    to the state law claims, as to the aiding and abetting claim,

17    as to the intentional interference claim.  Conversion permits

18    a different remedy.  So that's a different claim, but there's

19    going to be a different damages instruction on that claim.

20             This case here, I mean this instruction, select the

21    method that has the lowest damages, doesn't fit a case where

22    there's one damage theory and also isn't even the law.

23             I'm trying to refresh my memory on it, but if I

24    recall, it's a case about damages from delay in a

25    construction delay context, and there were two damages

7477

1    theories, and the Court said well, pick the one that's lower.

2         Here we're seeking disgorgement of their profits.

3    That's what we're seeking.  Instructing the jury to pick the

4    one that has the low -- the damages theory that has the

5    lowest damages number would make no sense.  It's not as

6    though we're seeking, for example, our own profits and also

7    disgorgement of MGA's profits where there's some alternatives

8    from which one could possibly choose.

9         So this instruction just doesn't fit the case.

10        THE COURT:  Duplicative damages, your argument is

11   essentially that this is something the Court can do?

12        MR. PROCTOR:  It's not a jury instruction issue.

13   If an instruction were given and the jury actually followed

14   the instruction, they would put down a damages number,

15   whatever it is on the first claim, and write zero on every

16   other claim, which is not an appropriate thing for a whole

17   variety of reasons.  We're entitled to get a jury finding as

18   to damages to each claim.  We're not seeking double damages.

19   The Court can figure out what's double afterwards.

20        THE COURT:  And on the nominal damages?

21        MR. PROCTOR:  Nominal damages, number one, is not a

22   remedy that's available under copyright law.  It is a

23   remedy -- you can get nominal damages under tort claims.  I

24   don't particularly think the instruction fits the case.  I

25   don't think there's -- I don't think MGA is going to argue

1    that our damages were nominal.  I think the instruction would

2    confuse the jury.

3         MGA's damages expert doesn't say that we're

4    entitled to one dollar.  Nobody really thinks that in this

5    case.  So I don't think it fits.  And under 403 I would say

6    it shouldn't be given.  There certainly shouldn't be any

7    suggestion that it applies to copyright because there are

8    cases that say nominal damages is not an available remedy

9    under copyright law.

10        THE COURT:  Thank you, Counsel.  Beginning with

11   that last point first, Mr. Roth, do you agree that nominal

12   damages do not apply to copyright, but only for the tort

13   claims?

14        MR. ROTH:  Just to make this simpler, we would

15   withdraw nominal damages and the alternative methods of

16   damages instructions.

17        THE COURT:  Focus on duplicative, then.  The cases

18   that you cite, a good number of them talk about the District

19   Court or the trial court actually doing the reduction.  In

20   fact, one of the Ninth Circuit cases talks about the case

21   being remanded to the District Court to reduce the damages.

22        So this is certainly something that the

23   Ninth Circuit has viewed as something that the District Court

24   can do.  None of these that I saw anyway stand for the

25   proposition that it's only the District Courts that can do

1    it.  My sense is that's a safer way of doing it as opposed to

2    turning that over to the jury.  I have more confidence in my

3    ability to parse through this and make sure that there's not

4    double damages being awarded than frankly turning that task

5    over to the jury.

6          MR. ROTH:  Your Honor, our concern is that, in

7    essence, a confusing and really inaccurate number is being

8    presented to the jury.  Because the number -- since you have

9    dollars here that are indisputably also over here, it looks

10   like the overall number is larger than --

11         THE COURT:  You're talking about, for example, the

12   fact that money made by -- profits made by MGA and then are

13   distributed to Isaac Larian, it sounds like there's not just

14   the hundreds of millions of dollars that went to MGA, but the

15   hundreds of millions of dollars that went to Isaac Larian are

16   the same hundreds of millions of dollars, and you're

17   concerned that the jury is going to add those two to come up

18   with a number.

19         MR. ROTH:  That's right, your Honor.  And it's

20   going to lead to a result which we think is unfair, because

21   what you've got here is the jury being presented with a

22   number that at its core is wrong.  It's the same dollars.

23   And so understood that the Court can fix that later, but

24   we're going to have to deal with a verdict that could have

25   been influenced by the fact that the dollars have been

```
 1    inflated because they have been added to one another
 2    effectively.
 3              THE COURT:  I'd like to hear Mattel respond to that
 4    particular point, because that is, I think, a legitimate
 5    concern.  Here the issue is, it's not so much, Mr. Proctor,
 6    that we can't do the adjustments, but that just the jury is
 7    going to get confused, and perhaps the solution is not the
 8    duplicative damage instruction that's given, but just
 9    something which makes clear to the jury, for example, that --
10    and frankly, this can cut both ways.  It can be just as
11    confusing to the jury to -- I can see this cutting both ways.
12              How do you suggest we deal with this potential
13    confusion issue?
14              MR. PROCTOR:  I think I understand the issue.  The
15    problem is, as MGA, you know, was pointing out, and as is
16    clearly the case, we're seeking disgorgement of benefits for
17    the copyright claim as well as the tort claims.  And in the
18    copyright context, the benefits -- and there are three
19    defendants in the copyright claim.
20              There's MGA.  There's Isaac Larian.  There's MGA
21    Hong Kong.  MGA's benefits from the infringing activity are
22    measured separately, and this is how the evidence came in.
23    MGA's benefits from the infringing activity are measured
24    separately from Isaac Larian's benefits.
25              THE COURT:  Legally you're correct, Mr. Proctor.  I
```

1    get that.  I understand that.  That's not the issue of the

2    confusion that that's going to create in the jury when there

3    are all of these hundreds of millions of dollars floating

4    around.

5         MR. PROCTOR:  Sure, but in terms of confusion, I

6    think it would be confusing to do anything but let the jury

7    come in with its numbers.  I mean, the evidence, the damages

8    evidence, our damages evidence, we will be calling

9    Mr. Wagner, and we intend to call Mr. Wagner in rebuttal.

10        But our damages evidence has already come in.  He

11   has put up numbers showing what Mr. Larian's benefits are and

12   what MGA's benefits are.  And to not permit the jury -- I

13   mean, the jury has to be permitted to fill in numbers, if it

14   accepts our theory of the case and accepts our evidence, and

15   it has to be permitted to put in a number on the verdict form

16   that lines up with the benefits to Mr. Larian and the

17   benefits to MGA.  To the extent they are duplicative, we

18   won't recover both.

19        Again, we are not seeking double damages.  We've

20   never been seeking double damages, but the way the case has

21   been tried and under the law, given you have to measure the

22   benefits separately, or individually, you have to look at

23   each defendant's benefits in this particular context, there's

24   no way not to give -- there's no way to instruct the jury --

25   I mean, we certainly can't instruct the jury to disregard

7482

1   duplicative damages and only put it once.  We have to on the

2   copyright claim, we have to have separate entries in the

3   verdict form for Mr. Larian and MGA.  So I don't know how

4   else to deal with it.  It's the way the evidence has come in.

5       I suggest the jury be permitted to make its award

6   based on the profit it sees Larian as having received and MGA

7   as having received, and if they are duplicative, the Court

8   will fix it later.

9       THE COURT:  All right.  I'll think about this one.

10  Does anyone have any suggestion on, short of this duplication

11  instruction, any thoughts on how to make it clearer in the

12  context of the damages instruction, how to avoid this

13  confusion?

14      MR. ROTH:  I don't presently, your Honor.  I'd like

15  to think about it.  Perhaps this is one that we could get

16  back to the Court on.

17      THE COURT:  Please.

18      MR. ROTH:  I understand the tension here, but

19  perhaps we could circulate a proposed instruction on this

20  issue.

21      THE COURT:  All right.  I've heard what I need to

22  hear on damages.  I have some work to do on that.  My

23  intention to do it is tomorrow during lunch, I'm hoping that

24  we don't have too much else to take up, that I can kind of

25  announce the Court's decisions on this.  But that will give

1    me some time to go through the various issues and be able to

2    provide you guidance and direction on these instructions, at

3    least the damage phase of it.

4         Anything more on the damage instructions before I

5    turn to copyright instructions?

6         MR. PROCTOR:  If I could briefly revisit the

7    apportionment issue that we addressed a few minutes ago.

8         Mr. Roth remarked or argued that, you know, that

9    the language on the bottom of Model Instruction 17.24

10   captures the inextricably --

11        THE COURT:  What about that do you think does not

12   capture, and what danger is that?

13        MR. PROCTOR:  This certainly captures the burden of

14   proof.  This makes clear that the defendants bear the burden

15   of proof, and it also makes clear that unless the jury finds

16   that a portion of the profit is attributable to some factor,

17   it all goes to Mattel.  It makes those two points.

18        But the point that it does not make is that if a

19   noninfringing factor -- if an indisputably noninfringing

20   factor is inextricably intertwined with the infringing factor

21   in the eyes of the jury, then the profits from that, if there

22   are any, go to Mattel.  That is a separate point.  That is

23   the law.

24        You know, in that second apportionment instruction

25   we proposed, maybe there is a dispute about whether you can

1   apportion the doll, but there's no dispute that if there

2   is -- if the infringing and noninfringing factors are

3   inextricably intertwined, they cannot be apportioned.   And

4   that's obviously a heated dispute in this case.

5          THE COURT:  All right.  I'm going to take a look at

6   the Sheldon case again and Mr. Patry's comments and look that

7   up.

8          MR. ROTH:  If you would, your Honor, in both those

9   contexts, as I indicated, they also have the additional

10  language.  The apportionment is not an exact mathematical

11  science here.  And we think -- that's some Sheldon and Patry,

12  and if that language is going to be added, we think the

13  additional comment from Sheldon, from Patry, if necessary.

14         THE COURT:  Okay.  Well, you certainly, both sides

15  certainly are aware from the first phase, 1-A, that the Court

16  believes less is more when it comes to jury instructions.

17  And to the extent that something is covered once, I'm not

18  going to highlight it.  So what I'll be looking for is to see

19  if there's some element that is not captured by this, and I

20  will look at Sheldon and Patry on that.

21         MR. ROTH:  The language I'm looking at in Patry

22  reads because infringing and noninfringing elements are

23  frequently intertwined, it is error to require defendant to

24  demonstrate the profits not attributable to infringement are

25  completely free of infringing material.

```
 1              THE COURT:  Right.

 2              MR. ROTH:  It also notes --

 3              THE COURT:  And that's the balance.  It's not that

 4    they are completely free.  But what Mr. Proctor suggests is

 5    when they are inextricably intertwined.  And you have kind of

 6    the two ends of the spectrum.  And that's -- okay.  What

 7    section are you quoting there?

 8              MR. ROTH:  22.147.

 9              THE COURT:  Very good.  That's the same section.

10    I'll take a look at that.

11              MR. ROTH:  Thank you, your Honor.  And in addition,

12    on the Del Madera point, we also have our JMOL brief if you'd

13    like to take a look at that.

14              THE COURT:  Please.  All right.  Let me turn to

15    copyright now, and I'm going to treat it the same way

16    essentially.  Okay.

17              There's a preliminary issue here which I think

18    is -- I agree with MGA's assessment that it would be helpful

19    to specify the infringing works in a preliminary instruction.

20    It's not at all clear that we are limited in this case,

21    though, to the 16 original drawings.  So I'd like to hear

22    both counsels' positions on that.

23              MR. HANSEN:  Good afternoon, your Honor.

24              THE COURT:  Mr. Hansen.

25              MR. HANSEN:  Our position is that it's limited to
```

1    the 16 works.

2            THE COURT:  What about -- since the return of the

3    verdict, there's been a few more copyright registrations.

4            MR. HANSEN:  We addressed this issue.  I wasn't

5    actually present, but before the final pretrial conference

6    order was entered back on May 23rd, this exact issue was

7    presented in connection with one of the -- Mattel had

8    attempted at that time to add an additional drawing to the

9    16, the control drawing which you've seen is one of the

10   drawings that Bryant made of a sculpt.

11           At that time, your Honor determined that it was

12   just simply too late to be adding additional registrations to

13   the trial.  There is no reason -- the same reason that that

14   drawing should have been registered previously is present

15   with respect to all of the other works that Mattel is

16   attempting to enter in this case.

17           As to -- I mean, I just saw today all of the

18   registrations.  And it's a stack --

19           THE COURT:  How many are there, Mr. Zeller, at this

20   point?

21           MR. ZELLER:  With respect to the -- a total, I'll

22   have to get the Court a number.  It's probably in the

23   ballpark of 30, if we include prelawsuit registrations.  I

24   would say it's approximately 12 since the verdict.  And

25   those, of course, are the additional works that the jury

1    found were created during the term of Carter Bryant's

2    employment by Mattel.

3                THE COURT:  So a total of 28.

4                MR. ZELLER:  In that ballpark.  I can get an exact

5    number, but it's approximately that number.

6                MR. HANSEN:  And on that point first, I don't

7    believe we're talking about, if you'll recall, a lot of the

8    registrations are single drawing, single drawing.  I believe

9    that the 28 -- and I haven't had a chance to go through

10   them -- have, you know, dozens of pages with respect to any

11   particular registration.  So we're not talking about a couple

12   of dozen drawings.  We're talking about basically all of the

13   drawings that were on the verdict for Phase 1-A.

14                One of the issues I think that needs to be

15   addressed, putting aside the timeliness of the registration,

16   there's no reason in the world that these works, the sculpt

17   and the various drawings could not have been registered, you

18   know, months and years ago.  Actually, before the control

19   drawing that was rejected in May.  And in essence what Mattel

20   is attempting to do is benefit improperly, we think, by the

21   bifurcation of the Phase 1-A and 1-B trials.  Had the

22   Court -- had this not been bifurcated, there would be

23   absolutely no question that these drawings would not be

24   subject to --

25                THE COURT:  Well, that's actually part of my

7488

```
 1    analysis.  That's part of what I was thinking.  If it was not
 2    bifurcated, what the Court would have had to have done, not
 3    knowing what the jury was going to find and not knowing what
 4    really was going to be the copyrighted work, because that
 5    would have been part of the process of a nonbifurcated trial,
 6    the Court would have had to give a more general instruction
 7    as currently is being proposed by Mattel, that there are
 8    copyrighted works.  This is how you determine what has been
 9    copyrighted.  Your argument would be that they weren't even
10    registered.
11           MR. HANSEN:  It's the registration issue.  I think
12    we all agree that when the pen goes to paper, that copyright
13    exists at that point.  It's the registration point, and it's
14    the delay in the time of registering these drawings which
15    raise, frankly, a whole host of issues, including our
16    favorite, authorship issue.
17           THE COURT:  All right.  So we've got the
18    registration issue and the delay.  What else do we have?
19           MR. HANSEN:  Because there's nothing different
20    about these drawings.  These are drawings that they have had
21    knowledge of.  There's nothing different between the 16 and
22    these.  Just like the problem before the Phase 1-A part of
23    the trial, that they have had knowledge of this.  In that
24    instance, if you recall the argument was it was an attorney
25    only document, and that was the excuse.
```

1    There's no excuse in the world that if they really

2    wanted to bring these to trial, they could have registered

3    them sooner, and they were not registered until July 25th or

4    later.  And the discovery issues in the case proceeded along

5    the 16 that have been registered and have serious issues as

6    to prejudice and ownership and damages and relation fact, and

7    it raises a whole host of issues, and the prejudice of adding

8    in at this point the many dozens of issues that these

9    drawings would create, we think, is just unfair.

10        THE COURT:  I need more than that, Counsel.  You

11   need to explain.  You used a big broad brush here.  I'm not

12   following.  Those aren't objections.

13        MR. HANSEN:  I'll be specific, then.

14        THE COURT:  Please.

15        MR. HANSEN:  And I don't know.  There's so many

16   things in those drawings, that honestly I have no idea what

17   exactly Mattel plans to use of those drawings.  We've seen

18   some of them.  Take, for example, the sculpt that we're

19   familiar with.  Okay?  The one that Ms. Leahy did that the

20   jury determined that Mr. Bryant had some involvement with,

21   and therefore, fell under the Phase 1 verdict.

22        It's always been our position, and it is our

23   position today, that the copyright in that work, because of

24   the mastermind of that work being Ms. Leahy, is Ms. Leahy.

25   And so to the extent that putting aside whether or not it

1    somehow gets caught up in the contract, the copyright issue

2    has not changed.   It was -- we were not -- we were

3    specifically at Mr. Zeller's urging in part, and not to place

4    blame, but it was a simple up or down in terms of timing, and

5    we attempted in the first phase of the trial to bring

6    copyright ownership issues in and have more meaning.   And

7    that issue was rebuffed.

8          Our last discussion on this was not joint

9    authorship.   I think your Honor's point was that joint

10   authorship was waived and that we can't prove joint

11   authorship.   We are not trying to prove joint authorship.   In

12   fact, we believe we have sole authorship in the copyright,

13   and if anything, it is for Mattel to prove that Mr. Bryant's

14   contribution to that sculpt rises to the level of a joint

15   authorship, which is their burden.   We raised authorship in

16   our additional jury instructions going all the way back to

17   the first submission.

18         We have in the pleading, that is, in reference in

19   the pretrial order not only authorship, but joint authorship

20   raised.   So we think at this point to have those issues --

21         THE COURT:   Wait a second.   You said in the

22   pretrial?   Counsel misspoke, I think.   Are you saying you

23   raised joint authorship as a defense in the pretrial

24   conference order?

25         MR. HANSEN:   No.   I'm sorry, authorship is in

1    the --

2              THE COURT:  Let's be careful.  Because that was one

3    of the grounds.  If I'm mistaken on that, I want to know

4    about it because that was one of the bases that I'm keeping

5    out joint authorship.

6              MR. HANSEN:  It's in our operative pleading that is

7    referenced in the final pretrial conference order, and as to

8    the issues now --

9              THE COURT:  What is?  Authorship or joint

10   authorship?

11             MR. HANSEN:  Authorship has always been.

12   Authorship, there's never been a contention by us on that.

13   The joint authorship issue, these works were not at issue in

14   the case.

15             So there was no particular reason to take them from

16   the affirmative defense in our pleading and specifically put

17   them in the case.  Until now, these works are attempting to

18   be brought into the case in addition to the 16 that we have

19   fully addressed with all of our affirmative defenses.

20             THE COURT:  Joint authorship has never been pled?

21             MR. HANSEN:  It's an affirmative defense in MGA's

22   pleading.  It was not raised specifically with respect to

23   these works in the final pretrial conference order because

24   these works were not part of the final pretrial conference

25   order.  But even before then --

```
 1              THE COURT:  What pleading are you referring to?

 2              MR. HANSEN:  It is the MGA pleading that's -- it's

 3    referenced in the final pretrial conference order.  The name,

 4    I forget whether it's -- I have it.  Second amended answer

 5    and counterclaim.  I think this is it.  No.  This is theirs

 6    that lists the 16.  I apologize.

 7              THE COURT:  I'm sorry, Counsel.  I turned away.

 8              MR. HANSEN:  The answer and affirmative defenses of

 9    MGA Entertainment to Mattel's second amended answer and

10    counterclaims, and its joint authorship is the 20th

11    affirmative defense.

12              THE COURT:  Okay.  So this goes back to your

13    initial answer.  This was never presented in any of your

14    pleadings submitted in advance of the pretrial conference; is

15    that correct?

16              MR. HANSEN:  This -- yes.  I'm not arguing that.

17    My argument in that respect is that it's an affirmative

18    defense --

19              THE COURT:  I just wanted to clarify for the

20    record.

21              MR. HANSEN:  Yes, I didn't mean to confuse that.

22    It is not in that.

23              THE COURT:  And I just want to make sure I wasn't

24    confused.  Because the Court truncated the pretrial

25    conference order dramatically.  And I would certainly have
```

7493

1    considered anything that had been submitted as part of the

2    pleadings to the pretrial conference from MGA or from Mattel.

3    It's not in that universe of documents.

4            MR. HANSEN:  No, because the 16 that was in that

5    larger version that was truncated, the 16 works were at issue

6    that led, I believe, to your Honor's original ruling that the

7    additional drawing that they registered as of May 15th was

8    not going to be added because it was simply too late.  And

9    we're in exactly the same position as to the registration of

10   all the other ones.

11           Frankly, you would think, if nothing else, that the

12   shadow of the bow in May would suggest that the other works

13   that they were attempting to bring in the case, they should

14   probably hurry up and do so.

15           THE COURT:  Very good.  So your argument is that

16   they could have been, should have been, were not brought in

17   May.

18           MR. HANSEN:  Absolutely.

19           THE COURT:  All right.  Anything else?

20           MR. HANSEN:  Relation fact issues.  There may be --

21   there was additional briefing on this issue on May 23rd.  And

22   if you're seriously planning on going beyond at this point

23   and effectively changing your ruling from May, we would

24   appreciate the opportunity to at least submit that the

25   relation fact now, it's too late to get damages.

```
 1              THE COURT:  Thank you, Counsel.

 2              MR. ZELLER:  Obviously, there are a number of

 3    issues that are sort of being put on the table, these

 4    arguments.  Number one, the sculpt that MGA is, you know,

 5    again urging that there should be some sort of joint

 6    authorship theory that they can assert, that's quite

 7    different from the drawing.  The idea that that was not

 8    included, joint authorship period, at all, in the parties'

 9    final pretrial conference order, I mean, that excuse really

10    just doesn't add up.

11              In particular, the portions that we submitted, we

12    made very clear, sculpts, prototypes, drawings, those things

13    that Carter Bryant created while he was employed by Mattel

14    are owned by Mattel.  I mean, that was made crystal clear,

15    and we specifically called out sculpts.  The Court recalled

16    there was a dispute about whether we could include the names

17    in there as well.

18              So we did include those things.  There was no

19    response that said well, you cannot pursue your copyright

20    infringement claims because there's some theory of joint

21    authorship.  That is just not in the final pretrial

22    conference order, and Mr. Hansen, when we argued this point

23    last, acknowledged that it's not in there.  And I think he's

24    acknowledging today it's not in there.

25              THE COURT:  The Court affirms that.
```



 1          MR. ZELLER:  So we start with this premise that

 2   somehow they are being prejudiced as a result of the

 3   introduction of registrations, the prejudice they are trying

 4   to argue has been waived.  That simply cannot amount to

 5   prejudice.  That's the only thing that he identifies as

 6   somehow causing prejudice to MGA.

 7          Now, the Court will also recall that when we

 8   introduced those registrations at trial, there was only one

 9   objection that was made.  It wasn't that they were too late.

10   It wasn't that they weren't in the final pretrial conference

11   order.  It was simply that allowing the jury to see them

12   would be confusing.  That was it.  That was the entirety of

13   the argument.  All other ones have been waived.  And there

14   are certainly lots of ways short of excluding these

15   registrations to deal with any, you know, purported confusion

16   that can arise from them.

17          Look, the jury is going to see registrations by MGA

18   that are introduced into evidence that claim ownership to all

19   manner of works that the jury has now determined were really

20   made when Carter Bryant was employed by Mattel.  Frankly, the

21   way dealing with these registrations on both sides is simply

22   to tell the jury look, you know, you don't apply presumptions

23   to these.  They are not going to be taken as evidence of

24   anything.

25          The only thing that really matters for purposes of

 1   registration is can a copyright infringement claim be

 2   predicated on it.  That's simply a matter of law.  And

 3   there's no dispute that they have been registered.  And the

 4   Court is, I'm sure, aware of cases where even before the

 5   registration actually issues, the courts will allow an

 6   infringement claim to proceed.

 7           So I mean that is something that is frankly just a

 8   formality under section 411 of the Copyright Act.  And it's

 9   now been satisfied.

10           But I think these other objections that he's making

11   have been waived because they were not raised.  The only

12   issue is whether it would be confusing.  And that's just not

13   the same kind of argument that he's making here.

14           THE COURT:  Let's get back to the issue of the

15   instruction itself, which is what prompted this.  Whether the

16   Court goes with the 16 drawings or the -- 16 registrations or

17   the 28 registrations, I guess as an initial matter, I'm

18   convinced that that's a cleaner way of presenting this to the

19   jury so that we're not simply referring to certain

20   copyrighted works, that the jury has some sense that for

21   closing argument, both sides have some sense of what it is

22   the basis of, the copyright claim.  Not that there's any

23   presumption created by that registration, and I agree that

24   some instruction or some line to the jury that this carries

25   no weight in that regard is appropriate.

1   But just it seems a way of making it clear on the

2   record and for the jury what is at issue here.

3   MR. ZELLER:  You know, perhaps there's one way of

4   doing it, your Honor, is giving the jury a copy of the

5   verdict form in Phase 1-A and saying these are the works.  I

6   mean, those are the works that are at issue.  And those are

7   the works that any claim is being based on.

8   So we give them a copy of the verdict.  I suppose

9   we could put in the instruction and maybe not read or give

10   them an appendix or whatever is mechanically the easiest

11   thing just to give them the list.  They are going to, of

12   course, remember well, I'm sure, those drawings, having seen

13   them, and they will be made available to them again as well.

14   So I think it's -- frankly, to refresh them on here

15   is the universe of works that you decided upon in 1-A.  And

16   I, the Court, am instructing you that because they were

17   created while Carter Bryant was a Mattel employee, Mattel

18   owns them.  And proceeding from there.

19   THE COURT:  All right.  I appreciate your arguments

20   on that.  I'll try to figure out what's the best way to craft

21   that preliminary or introductory introduction, instruction.

22   MR. HANSEN:  Could I, just last on that?

23   THE COURT:  Sure.

24   MR. HANSEN:  I have to strongly disagree with the

25   notion that this is a mere formality.  Because what's

1   happening here is that, as your Honor said back in the May --

2   I think it was May 23rd hearing, that in not allowing the

3   single extra drawing, the 17th drawing, that it would be

4   unfair in the equitable sense, not the ethical sense, to at

5   that late date allow that additional drawing to be added.

6         The unfairness here is, first of all, compounded

7   tenfold by the fact that had that happened with these at the

8   time, the issue regarding the authorship and the joint

9   authorship would have been clearly raised.  And we would have

10  had the opportunity at that time not to be even having these

11  waiver arguments right now.  Putting aside the fact that we

12  have never waived sole authorship of the sculpt.

13        What's happening is that we're in essence being

14  sued, if the sculpt comes in, on something that we own the

15  copyright on.  I personally believe that, having registered a

16  sculpt that Mr. Bryant has no argument to be an author for is

17  an improper registration with the copyright office.  But

18  that's another issue.  At this point we're not talking about

19  adding a couple of drawings.  This is a stack of --

20        THE COURT:  But this is what's changed.  And I know

21  this is frustrating.  I'm sure this accounts for a lot of

22  frustration that's been expressed by MGA and Mr. Larian since

23  the return of the verdict.  The landscape changes when the

24  jury finds, as they did, that contrary to the presumptive

25  position that we were in at the pretrial conference where the

1    burden of proof for all of this rested on Mattel, we're no

2    longer there.

3            We're now in a world in which it's been

4    established, at least from a legal perspective, that all of

5    these drawings were done at a different time than what's

6    being alleged, that acts of fraud and conversion were

7    perpetrated to essentially steal these drawings.  And that's

8    the change.  That puts us in a different position, and they

9    have now actually been registered in the copyright office.

10           And to say that notwithstanding the fraud and the

11   conversion and the misrepresentations with respect to the

12   timing of the drawings, now that the jury is considering

13   copyright infringement, they must put blinders on and ignore

14   all of that and just look at the 16 drawings that were

15   undisputedly registered as of the time of the pretrial

16   conference, that seems to be fundamentally unfair.

17           MR. HANSEN:  The issue that I go to is

18   fundamentally unfair is that if you look at the transcript

19   from the 1-A trial, we attempted to put copyright ownership

20   at issue, and Mr. Zeller said he understood -- everyone

21   understood the straight up and down issue --

22           THE COURT:  We're not going back to that decision,

23   Counsel.  That water has left and gone down river and stream

24   a long time ago.

25           MR. HANSEN:  You understand our position, I think,

 1   that adding this at the end --

 2          THE COURT:  I do, and this all inured to your

 3   benefit up through and including the pretrial conference.

 4   But things have changed dramatically as of the return of the

 5   verdict.  In terms of -- and you are asking me to place

 6   blinders on the jury and say, you know, ignore the fraud.

 7   Ignore the conversion.  Ignore the finding with respect to

 8   literally hundreds of drawings.  The only issue of copyright

 9   at this point are the 16 drawings that were registered

10   pretrial.

11          MR. HANSEN:  And what it comes down to, frankly, is

12   let's put aside all but a few.  There are only actually a few

13   of the drawings -- if you look at what the drawings are, you

14   haven't seen them during the trial --

15          THE COURT:  If it's not of moment, what's the

16   issue?

17          MR. HANSEN:  We're talking about the ones that are

18   of moment.  The ones of moment are the ones where the issue

19   of ownership is not being allowed to be asserted by us.  And

20   we think that's the prejudice.  That's the interference.

21          THE COURT:  And besides the sculpt, what are you

22   referring to?

23          MR. HANSEN:  It would be the vendor drawings.  I

24   think, if you recall, it was yesterday morning that

25   Ms. Garcia was -- tried to get into the notion that the one

7501

```
 1   that's just before the model, it was the reason it looks

 2   different is because she was giving artistic direction as to

 3   what the drawing should look like.  There's a clear evolution

 4   from the pitch book drawing to the drawing that was done

 5   right before.  We think it was done after he left Mattel, but

 6   the jury has found otherwise, but --

 7            THE COURT:  This runs right up against that

 8   argument that you've been pressing me throughout this phase

 9   to basically undo the jury's verdict on timing.  There were

10   no limitations on timing evidence that this Court imposed on

11   MGA or Mr. Larian in Phase 1-A.

12            MR. HANSEN:  And I'm not trying to undo the timing.

13            THE COURT:  And if there is, let me know.  I can't

14   think of a single piece of timing evidence that was excluded.

15   The jury made a finding.  And I understand Ms. Leahy

16   vehemently disagrees with it.  I understand Mr. Larian

17   vehemently disagrees with it.  For all I know, counsel

18   vehemently disagrees with it.  But that cannot be of any

19   moment to the Court at this point.

20            MR. HANSEN:  And I'm not arguing the timing.  I

21   would not do that.  I'm not here to re-argue that.

22            THE COURT:  And so when we talk about what I'm not

23   allowing you to present, all I'm not allowing you to present

24   is presenting evidence that is flatly contradictory and

25   inconsistent with the jury's finding.  Now, notwithstanding
```

```
 1   that, some of that evidence has come in.  It's seeped around

 2   the edges and corners.  That's just the nature of trial.

 3   It's not a perfect game.  But by and large, that's the

 4   evidence that I've tried to keep out.  And I can understand

 5   why it offends your clients to keep that out.  But I can't

 6   help that.

 7            MR. HANSEN:  And I'm not taking offense --

 8            THE COURT:  I don't mean you personally.

 9            MR. HANSEN:  But what we're trying to say is that

10   the mere fact that Mr. Bryant may have been at a meeting when

11   the sculpt was discussed does not make him a, quote, author.

12   We're into copyright issues now.  And it is an ownership

13   issue that Ms. Leahy, if you read the Aal Mohammed case, it's

14   the question of the mere fact that you are there with me and

15   saying hey, good job.  Do this and that.

16            That isn't -- that could be just under the contract

17   to have implicated the contract issue.  But the copyright

18   issue, the item in the -- the copyright ownership are two

19   separate things.  And the ownership, we believe Ms. Leahy,

20   based on all of the factors that go into it, it's not a joint

21   author.  She's the sole author of that.

22            The facts are so minuscule in terms of Mr. Bryant,

23   could they have found that it fell within the contract?

24   Sure.  We think that the copyright ownership issue is an

25   entirely different can of worms and that frankly, if you look
```

1    at the evidence even in the light most favorable to Mattel,

2    the ownership of the sculpt which they are now using against

3    us as to the copyright is MGA's.  That's what I'm saying.

4            THE COURT:  Very good.

5            Mr. Zeller, if you would restrict your remarks.

6    Because this really is an area that is -- that I'd like to

7    have addressed, the sole ownership of the sculpt issue.  And

8    I want to make sure that I'm not improperly conflating timing

9    issues with ownership issues in terms of the sculpt.

10           MR. ZELLER:  And you are not.  And what I would

11   start with is this proposition, because Mr. Hansen has relied

12   on it on more than one occasion, which was the last charging

13   conference, and that somehow ownership issues were off the

14   table.  That's not correct.

15           The Court will recall that the discussion started

16   because MGA was espousing the position that because the 1999

17   drawings, the drawings that were in color that Carter Bryant

18   admitted that he made when he was employed by Mattel were

19   nothing but tracings from the 1998 drawings.  So-called back

20   then.

21           And so they were saying no copyright rights could

22   adhere in those drawings.  That was an issue of

23   copyrightability, not of ownership.

24           The Court -- excuse me.  The jury, of course, has

25   returned a verdict that said all of those things were created

1    at the time he was employed by Mattel.  So their

2    copyrightability issue there is gone.  To the extent that

3    they were really saying that somehow -- because the Court had

4    already by that time ruled naturally that created works that

5    Carter Bryant created at the time of his Mattel employment

6    are owned by Mattel.

7            I mean, those were the issues in Phase 1.  If they

8    were going to have Garcia get up there, like they did the

9    other day, and load her up to start saying oh, that was --

10           THE COURT:  Counsel, load her up?  Let's be

11   careful.

12           MR. ZELLER:  Your Honor, I have to disagree.  I do

13   choose those words carefully because after the Court's ruling

14   on that, she interjected and volunteered on more than one

15   occasion that somehow she gave the art direction.  Something

16   we never heard at all.

17           I mean, the Court will recall in 1-A, they were

18   saying Carter Bryant created these.  No one else is mentioned

19   on those drawings.  But he did it after he left Mattel.  They

20   lose 1-A, and now we hear, well, yeah, I guess they really

21   were done at the time, but it was Paula Garcia who did them.

22           I mean, I don't think -- I'm not cynical when I

23   point this out to the Court.  And I don't think I'm

24   stretching this is what they said.  And they did this after

25   the Court's ruling on joint authorship.  They did it anyway.

```
 1          So in any event, your Honor, I apologize for
 2   perhaps the digression, but the fact is that we were the
 3   verdict winners in 1-A.  The factual doubts, the factual
 4   issues are resolved in our favor.
 5          THE COURT:  What about the -- get back to the sole
 6   ownership.  Putting aside whether it was loaded up or not
 7   loaded up, we have evidence before this jury from Margaret
 8   Leahy saying, "I took the drawings.  I put them in the
 9   drawer."  Regardless of how credible that might be, given the
10   outcome of what she did, that she did not look at or did not
11   consider or did not attempt to make this consistent with the
12   design drawings, putting aside credibility issues on that,
13   it's evidence that's before the jury.
14          Mr. Hansen presses that they should be able to --
15   they should actually have an instruction on independent
16   ownership on that basis.
17          MR. ZELLER:  Again, I think we start with the
18   waiver point again.  I mean, that just is not something that
19   they had asserted, whether one talks about 1-A, 1-B, whatever
20   the case may be, they did not put it in the final pretrial
21   conference order.  So it's not a theory that they are
22   entitled to a jury instruction on, period.
23          Number two, with respect to the -- I'll set
24   aside --
25          THE COURT:  So the Court's analysis on joint
```

1   authorship having been waived applies to independent

2   creation.

3            MR. ZELLER:  Correct, absolutely, your Honor.  And

4   I think that is the import of the Court's ruling the other

5   day.

6            The second point I would say is on the merits.  And

7   I won't get into the derivative issues or anything else at

8   this point because I think it's actually quite simple.  There

9   is testimony from 1-A.  In fact, it came from Carter Bryant,

10  and it also came from Margaret Leahy.  They have somewhat

11  changed their story now in 1-B, but setting that aside for

12  the moment, in 1-A there's evidence that the sculpt was based

13  on the drawings.  Flatly stated by Carter Bryant.  I will get

14  the Court the citations where this evidence came in more than

15  once.

16           Number two, that Carter Bryant was the one who had

17  control and direction over the sculpt.  There is testimony to

18  that effect.

19           Number three, that he is the one that gave

20  comments -- and this is based on Leahy's deposition.  Her

21  deposition established that Carter Bryant gave comments and

22  direction and that she implemented them.

23           And then I would also say that there is further

24  more evidence, your Honor, and this was on cross-examination

25  of Ms. Leahy during Phase 1-A, when Mr. Price asked her,

1   well, changes you were making, slicing off the arms and all

2   that sort of stuff, that was to make it manufacturable.  And

3   she acknowledged that it was.

4            THE COURT:  Let's assume this is great evidence and

5   you make a convincing argument, and that argument can be made

6   to the jury.  Does it make it an indisputable fact?

7            MR. ZELLER:  It makes it -- I'm not suggesting it

8   makes an indisputable fact, your Honor.  What I'm saying is

9   that the evidence that was presented in 1-A, at a bare

10  minimum when this issue should have been and could have been

11  raised by MGA, that evidence is sufficient to support the

12  verdict and support our position.

13           Now, what they are really trying to do -- and I

14  think the Court is absolutely right.  This is an attack on

15  the verdict -- to the extent they were going to make those

16  arguments, it should have been 1-A.  And I think the Court

17  legitimately was quite surprised when you were hearing about

18  this literally days before the end of 1-B.

19           I mean, we certainly were very surprised, and the

20  Court will recall that when it was raised at sidebar by

21  Ms. Aguiar, I mean, I said it at the time and said I would

22  really like an opportunity to brief this kind of issue.  And

23  that's what we did.

24           So I think given where we are in the stream of this

25  case, I mean, we're now one day away from the end of evidence

```
 1   in this case.  And for them to somehow basically circumvent
 2   what was fought over for six weeks really does seem, you
 3   know, quite unfair, and it's really not right.  And we also
 4   don't think it's proper under the law.
 5          THE COURT:  Mr. Hansen, I'll give you the last
 6   word.
 7          MR. HANSEN:  Very briefly.  A couple points.  If
 8   the jury, as Mr. Zeller said, found that Carter Bryant had
 9   created the sculpt, we wouldn't be having this discussion.
10          THE COURT:  They did find that he created it solely
11   or jointly.
12          MR. HANSEN:  That's the issue.
13          THE COURT:  That excludes independent creation,
14   does it not?
15          MR. HANSEN:  No.
16          THE COURT:  If it was solely, then she had nothing
17   to do with it.  If it's jointly, that means that he and her
18   together created it.
19          MR. HANSEN:  Well --
20          THE COURT:  How do we get to the third possibility?
21          MR. HANSEN:  That would mean, yes, that Carter
22   Bryant had input, and there's no question that there is in
23   the record -- it's not quite the evidence that Mr. -- I would
24   suggest that Mr. Zeller is talking about, that Mr. -- for
25   example, the specific input that Ms. --
```

 1           THE COURT:  You're suggesting it was

 2    inconsequential input.  And if it was inconsequential input,

 3    then there was no basis for the jury to find, as they did,

 4    that it was a joint work.

 5           MR. HANSEN:  I'm saying from a copyright ownership

 6    standpoint, it was not addressed.  It has nothing to do with

 7    what people may think sitting around and we noodle things.

 8    We cited the cases, and if you look back, your Honor, I

 9    apologize.  We put this in our brief.  If you look at what

10    shouldn't be actually quite surprising, because if you look

11    at how the verdict came about, Mattel argued that what the

12    verdict should say is that the works at issue were created by

13    Mr. Bryant or at the direction of Mr. Bryant.  And that was

14    rejected in favor of going with the language in the contract.

15           So if it had been what Mr. Zeller is now arguing

16    the evidence shows, that it was a direction of the mastermind

17    Carter Bryant, then we would probably not be having this

18    discussion either.  But what we have is a -- all of the

19    testimony shows that the sculptor is Margaret Leahy.  There

20    is no question that Carter Bryant had no skills in this

21    regard.  The evidence, Carter Bryant's testimony in the

22    record is that "I gave it to Margaret and said do your

23    magic."  That's both from him and from Ms. Leahy.  And you've

24    seen Ms. Leahy talk about doing the sculpting.  The only

25    direct evidence, and I would like to see more --

1          THE COURT:  Carter Bryant didn't do the sculpting.

2          MR. HANSEN:  The evidence from Ms. Leahy is she put

3    them in a drawer.  Carter Bryant was at a meeting, the quiet

4    guy in the corner.  He suggested that he wanted the ankles

5    thinner, and she basically disregarded that because she does

6    the sculpting, and that that doesn't work from a

7    manufacturing standpoint.

8          All I'm saying is that the evidence in terms of

9    whether or not he was involved -- he was there.  There's no

10   question he was there.  But that doesn't mean that it's

11   sufficient under Aal Mohammed and the other case that we cite

12   to make him -- to make him a joint author.

13          This is not making us a joint author.  He's the one

14   that's trying to get -- he's not.  Mattel, now that they have

15   this sole or jointly, are trying to wedge themselves into

16   copyright ownership.  This is not us trying to do it.  It's

17   them trying to do it.  And frankly, right now, the evidence

18   is to the contrary.

19          THE COURT:  Thank you, Counsel.  You've done a good

20   job of framing this issue.

21          MS. AGUIAR:  Would your Honor entertain just a few

22   moments?  Because I feel as though I was implicated in some

23   of Mr. -- some of Mattel's comments.

24          THE COURT:  I will hear briefly, and then I have to

25   move on to the instructions issue.

```
 1              MS. AGUIAR:  Absolutely.  But I really want to

 2    address, just back to the question of whether we should be

 3    telling the jury that we have 16 copyrighted drawings here or

 4    we have 95 copyrighted drawings.  And I think we need to go

 5    back to the beginning.

 6              Mattel registered certain of the drawings in this

 7    case.  Drawings were produced during the litigation.  And

 8    Mattel registered them.  So we had -- we, MGA, we did

 9    copyright registrations on the drawings.  Mattel also did.

10    Mattel did their own registrations on certain of the drawings

11    that were produced.

12              THE COURT:  I understand.

13              MS. AGUIAR:  All of the drawings that are on the

14    verdict form, and specifically the retailer drawings that

15    have been very much the focus of their 1-B case, those were

16    not registered.  They chose not to register those drawings.

17              THE COURT:  You're saying before the trial.

18              MS. AGUIAR:  Before the trial.  I believe -- when

19    did the original, January of 2007.

20              THE COURT:  They are registered now.

21              MS. AGUIAR:  I understand that.  But they chose not

22    to register them then.  And I want to address that point.

23              THE COURT:  Okay.

24              MS. AGUIAR:  Of those retailer drawings.  Juries

25    taking those as an example, had been registered by Mattel,
```



1    along with the other drawings that they chose to register,

2    the 16 or 17 drawings, your Honor, I would submit that

3    discovery on those drawings would have been different in this

4    case.

5         If those had been alleged to have been registered

6    by Mattel and claimed copyright on those drawings, I can

7    absolutely envision a situation where Interrogatories would

8    have been propounded on those in a different way.

9    Depositions would have been taken in a different way.  And

10   questions would have been asked on those drawings.

11        This case would have been litigated not in a

12   fundamentally different way, but certainly with regard to

13   that evidence, your Honor, and I'm -- I'm not painting with a

14   broad brush.  You asked for specifics.

15        THE COURT:  So perhaps the better course for the

16   Court to take is not to reference these actual registered

17   drawings at all.

18        MS. AGUIAR:  I think the point though, is we are

19   dealing with copyright claims.  And so we are not trying to

20   say that all of what the jury found in the first phase should

21   be disregarded.  We're not saying those shouldn't be part of

22   what they consider, for example, in deciding damages on the

23   state law claims, that those were done while they were at

24   Mattel.

25        But we're dealing with a legal claim of copyright.

1   And we litigated this case based on which drawings did Mattel

2   claim copyright over.

3            And now those 16 drawings are the drawings, your

4   Honor.  And I think that --

5            THE COURT:  Well, maybe your point is well taken.

6   And the better course is simply not to specify.

7            MS. AGUIAR:  But then let's say the jury is

8   deliberating for three hours next Thursday.  And the first

9   note that comes up says --

10           THE COURT:  Note No. 8.

11           MS. AGUIAR:  It would be note No. 14, given our

12  luck.  And it says what are the copyrighted works?  And I

13  think that this case was litigated that these drawings were

14  the drawings that Mattel claimed were copyrighted.

15           Now, we're not saying all of the -- and I don't

16  know what the total number is.

17           THE COURT:  Do you have anything further to say in

18  response to the changing landscape argument?

19           MS. AGUIAR:  I think, your Honor, your Honor made

20  a --

21           THE COURT:  You know what I mean by that?

22           MS. AGUIAR:  Yes, I do.  But that's not really what

23  we're saying.  We're not saying these drawings all of a

24  sudden, because the 1-A verdict went against us, should not

25  be part of the case.  They still have their state law claims.

 1   They are asking for damages attributable to those state law

 2   claims.

 3           But we're saying with regard to the first part of

 4   the verdict form that's going to ask the jury do you find

 5   that MGA is liable for copyright infringement and not damages

 6   related to state law, that these are the drawings that were

 7   registered.  And that --

 8           THE COURT:  But the changing landscape argument

 9   gets back to the issue of notice and prejudice.  There's no

10   secret that you knew that Mattel was seeking everything.  I

11   mean, in fact, that was one of the complaints that I heard

12   through discovery many times, was that Mattel was seeking

13   everything.

14           MS. AGUIAR:  What I would say to that, then, is it

15   goes both ways.  There was no secret that if Mattel wanted to

16   seek these drawings, they could have registered them.  And

17   then we would have litigated this case differently.

18           And, your Honor, just for example, the other day,

19   and I'm used to using this as an analogy, found that we had

20   waived joint authorship.  And you said well, you may have

21   alleged it way back when in a pleading, but you did not raise

22   it again, and I find that it's waived.  We accept your

23   decision.

24           Why isn't it that Mattel waived a copyright claim

25   on those specific drawings because Mattel in 2007 or whenever

```
 1    they registered the other drawings, did not register these
 2    drawings?  There was nothing stopping them from doing that.
 3            And when we argued in front of your Honor at the
 4    pretrial conference that just one single drawing shouldn't
 5    come in, you said I see that.  I see that Mattel, you could
 6    have raised this issue earlier, and these are in the same
 7    vein.  They could have done the same thing with these
 8    drawings, your Honor.
 9            THE COURT:  I think I understand the argument,
10    Counsel.
11            MS. AGUIAR:  Thank you.
12            MR. ZELLER:  I think one thing that needs to be
13    cleared up in this whole discussion is that registration is
14    not copyright protectability or copyright ownership.
15    Registration is simply a prerequisite under section --
16            THE COURT:  I do understand that.
17            MR. ZELLER:  Yeah.  And so they are grossly --
18    well, they are substantially overstating what is the effect
19    of this.  Those drawings have been at issue throughout the
20    case.  They were on the verdict form.  I mean, to whatever
21    degree they can claim surprise up to that point has certainly
22    been waived because they were on the verdict form.
23            Those are specifically what the jury considered,
24    and we're just now looking at okay, is there going to be
25    copyright infringement that will be considered over those
```

```
 1   additional drawings.  And I would submit, your Honor, not
 2   only was that waived when -- by failing to include some of
 3   the stuff, but particularly when we introduced them, that the
 4   only objection is that it was somehow confusing, but also,
 5   your Honor, think of the efficiency concerns.  If they are
 6   now registered, which means that we can tomorrow morning walk
 7   back into this courthouse, file another complaint --
 8            THE COURT:  I am mindful of that.  That's part of
 9   the changing landscape.
10            MR. ZELLER:  And look, both parties have had their
11   oxes gored now over the changing landscape.  When we talked
12   about damages and the changes that occurred because of the
13   financial condition and because of bifurcation when it
14   benefited --
15            THE COURT:  Mr. Zeller, I'm going to stop you here.
16   We've spent an hour now on the preliminary instructions.  We
17   have a lot of other instructions to get to.  So I really
18   understand both sides' position, and we'll go from there.
19            All right.  Moving on to the next instruction.
20   Actually, what I'm going to do is the same thing I did
21   before.  There's essential agreement that the following
22   standard instructions need to be given.  There is, of course,
23   permutations or iterations between the two versions which the
24   Court will work out.  I have the benefit of your respective
25   positions.  But 17.1, copyright defined.
```

1          17.4, ownership and copying.  And I do understand

2    that Mattel has conceded some of the objections that were

3    made by MGA and submitted modified versions even in their

4    most recent submission.

5          17.15, direct copying and access.

6          I'm going to call it 17.17, although there is some

7    such instruction.  It's simply commentary from the

8    Ninth Circuit suggesting that an individual substantial

9    similarity instruction or an individualized substantial

10   similarity instruction needs to be developed.  Both sides

11   have submitted such.  And the Court will be able to reconcile

12   that.

13         A 3D comparison to the 2D instruction has been

14   submitted by both sides.  Neither are standard, but between

15   the two, the Court can fashion one that I think is

16   appropriate.  Actually, Mattel has submitted two.  One

17   talking about 3D -- comparing -- a three-dimensional

18   item can infringe a two-dimensional drawing, and also that

19   three-dimensional drawings are not necessary in order to have

20   the infringement.

21         And then MGA has an instruction describing how to

22   compare two dimensional with three dimensional.  I will

23   create an instruction based on that.

24         17.20, derivative liability with respect to

25   Mr. Larian.

1          17.21, contributory infringement.  And then

2   fraudulent concealment.

3          So those are instructions that the Court will take

4   your respective modifications and come up with instructions.

5          What I need to hear on is what remains.  I'm going

6   to sever out affirmative defense instructions right now.

7   Affirmative defense instructions on abandonment, good faith,

8   and consent.  And I'd like to get an indication from MGA on

9   that.

10          Basically what I need is on the day before the

11   close of evidence, I need an affirmative representation as to

12   what affirmative defenses you are pursuing and what

13   affirmative defenses you are not pursuing.

14          MR. HANSEN:  The ones that are listed, we would

15   submit the bona fide purchaser registration as a matter of

16   law.

17          THE COURT:  The good faith 205(d)?

18          MR. HANSEN:  Yes.

19          THE COURT:  All right.

20          MR. HANSEN:  And the other ones we're withdrawing.

21          THE COURT:  I really don't want there to be any

22   further -- I'm going to go down the list here, and I want

23   someone from MGA who can give me a yes or a no to the

24   following affirmative defenses.  Abandonment.

25          MR. RUSSELL:  That's abandoned.

1          THE COURT:  That's gone.  Agents or omissions of

2    others.

3          MR. RUSSELL:  That's also gone.

4          THE COURT:  Acquiescence.

5          MR. RUSSELL:  That's also gone.

6          THE COURT:  Consent.

7          MR. RUSSELL:  That's gone.

8          THE COURT:  Estoppel.

9          MR. RUSSELL:  It's not for the jury.

10         THE COURT:  That will be something the Court will

11   decide.  Failure to mitigate, you're seeking that.  Mattel is

12   opposing that.  As a matter of law, that will be part of the

13   Court's decision.

14         Laches.

15         MR. RUSSELL:  Same analysis.  That will be

16   deferred.

17         THE COURT:  Unclean hands?

18         MR. RUSSELL:  Actually, I take that back.  Unclean

19   hands MGA had withdrawn before the case even started.  That

20   is a Carter Bryant remnant.

21         THE COURT:  That's right.

22         Waiver?

23         MR. RUSSELL:  That would again be post trial for

24   your Honor.

25         THE COURT:  Very good.  Good faith?

1        MR. RUSSELL:  That, as Mr. Hansen alluded to, would

2   be a legal issue that we would submit briefing on.  But we

3   don't believe the jury needs to be instructed on that.

4        THE COURT:  Okay.  And then fraudulent concealment,

5   of course, that's the issue still left for the jury.

6        All right.  That's it; right?  There's nothing

7   else?

8        MR. RUSSELL:  That's it, your Honor.

9        THE COURT:  Okay.  So I'll start with Mattel.  That

10  leaves one, two, three, four, five, six, seven, eight, eight

11  instructions that you are seeking that I will hear from.  I

12  have two that you've submitted in writing, but I'll give you

13  an opportunity to address these.  The first one is 17.10.

14  Copyright interest assignee.

15       MR. ZELLER:  Yes, your Honor.  And Mr. Proctor can

16  address those.  The one thing, before we move on past it, is

17  fraudulent concealment.  I did want to raise an issue about

18  that, which is, of course, the Court will recall that today

19  there was evidence that was submitted.  The Court struck it.

20       THE COURT:  Some evidence was submitted; some

21  evidence was removed.  Yes.

22       MR. ZELLER:  And so what I would request, your

23  Honor, and we can provide this to the Court tomorrow, is that

24  there be an additional instruction on that which tells the

25  jury point-blank that these other issues whether Mattel could

```
 1    have, should have, would have sued over Toon Teens or Diva
 2    Starz or that sort of thing is of no moment to fraudulent
 3    concealment.  Because I am very concerned at this point about
 4    the impression that was made on the jury with that evidence.
 5              THE COURT:  I want to wait until I've heard all of
 6    the evidence on fraudulent concealment.  And the Court will
 7    take up the issue of fraudulent concealment at that time.
 8              MR. ZELLER:  Fair enough.  Thank you.
 9              THE COURT:  All right.  Mr. Proctor.  17.10.
10              MR. PROCTOR:  17.10, I don't know if there is any
11    such thing, but it's a foundational instruction.  It's basic
12    and explanatory.  17.1 explains at -- at least our version of
13    17.1, and I believe MGA's as well.  And I don't have it in
14    front of me, explains, you know, it is the owner of a
15    copyright who may exercise the exclusive rights to reproduce,
16    prepare derivative works.  The term owner includes an
17    assignee.
18              So the natural follow-on instruction is a
19    Ninth Circuit model.  It's who is an assignee.
20              So we just need to explain in some way that Mattel
21    has the rights to these copyrights because Bryant assigned
22    them to Mattel.  As long as that gets explained, if the Court
23    prefers to, you know, build that into 17.1 instead of having
24    a stand alone, I think that's fine.
25              Both sides have submitted instructions to the jury
```

1    that Mattel owns and can sue for infringement of those

2    drawings.  We obviously, as the past 45 minutes show,

3    disagree as to what the drawings are.  But at least as to

4    these 16, MGA agrees the jury should be instructed that

5    Mattel owns them and can sue for infringement of them.

6              THE COURT:  17.13, the derivative works.  The

7    particular concern I have is with the use of the word dolls

8    on line 7.

9              MR. PROCTOR:  I think the clause such as drawings

10   or dolls can be taken out.  This instruction I do think

11   matters.  I think we need this.  Obviously, it's the nature

12   of derivative works and whether derivative work is at issue

13   in this case.  But taking out that clause is fine.  Fine by

14   us.

15             THE COURT:  The inverse ratio rule.  That's part of

16   the substantial similarity issue.

17             MR. PROCTOR:  It is -- I mean, MGA cites, I think,

18   it's a -- they cite a couple treatises suggesting the inverse

19   ratio rule is misguided and the Ninth Circuit has it wrong.

20   But, I mean, it is just clear Ninth Circuit law.  There are a

21   number of Ninth Circuit cases.  I think we cite four or five.

22   I believe there are others which say we apply an inverse

23   ratio rule where the greater the access is, the lower the

24   burden of showing substantial similarity.

25             THE COURT:  Copyrightability of characters.  Why is

1    this necessary?

2         MR. PROCTOR:   Because Mr. Bryant's characters are

3    protectable.   I mean, there's no dispute that Mr. Bryant

4    conceived, and, to use MGA's term, sketched, drew characters.

5    MGA and MGA's witnesses have used that term consistently.

6    Under Ninth Circuit law, characters are protectable, and you

7    know, they are precisely analogous.   It's well-known,

8    identifiable characters.   Superman, Mickey Mouse, Godzilla.

9         The Bratz dolls, the characters that Mr. Bryant

10   created, conceived while at Mattel, are well-known and

11   identifiable characters to a particular segment of the

12   population.

13        But the characters themselves, separate and apart

14   from their visual depictions and the specific protectable

15   elements of those visual depictions, the characters are

16   protectable.

17        THE COURT:   My last question, and then if there's

18   anything further you want to say before I invite Mr. Hansen

19   or Mr. Russell up, the no intent for copying, that's tied up

20   to the good faith defense; correct?

21        MR. PROCTOR:   Correct.   And there were three

22   instructions basically on this issue, or potentially four, I

23   guess.   I mean, there's no intent for copying on our side,

24   and MGA then has an instruction which hasn't yet been

25   withdrawn to my knowledge, which is a good faith instruction.

```
 1              THE COURT:  Right.

 2              MR. PROCTOR:  They have withdrawn the 205 defense,

 3   but they haven't withdrawn the instruction that says -- I

 4   don't have it in front of me, but roughly you can consider

 5   MGA's good faith or something to that effect.  Certainly for

 6   civil infringement, intent is not a requirement.  That needs

 7   to be made clear to the jury, I think.  It's indisputable

 8   law.  Then there's the separate willful infringement aspects.

 9   MGA said we're seeking a finding of willful infringement as

10   to willful infringement; that is a mens rea requirement --

11              THE COURT:  And you agree that there's a

12   requirement for a willful infringement instruction.

13              MR. PROCTOR:  Oh, absolutely.

14              THE COURT:  Okay.  I understand your position.

15   Before I turn to the MGA instructions, I'll give MGA a chance

16   to respond to any of these.  You've laid out your objections

17   in your papers.  If there's anything further?

18              MR. HANSEN:  I'll be brief.  The first one on the

19   assignee, we just don't think it's necessary, and our

20   objection is also as to the works and the registration issue

21   that we just discussed.  So that's pretty straightforward.

22   Unless you have other questions.

23              The derivative work, one of our issues was the

24   dolls in question.

25              THE COURT:  I certainly see your point there.  That
```

7525

 1   word should not come in.

 2          MR. HANSEN:   The other issue that we have with it

 3   is that throughout the case, the derivative issue has been

 4   sort of short-circuited and attempted to be used as a

 5   different way to get around the substantial similarity test,

 6   which is not the law, and we cite Litchfield versus Spielberg

 7   and the other decisions that -- the fact that something may

 8   be called a derivative work doesn't avoid the need that the

 9   work be substantially similar to the underlying work.

10          So whether you call the dolls derivative works or

11   not, it's the same test of substantial similarity --

12          THE COURT:   Copyright protection, you obviously

13   need the substantial similarity.

14          MR. HANSEN:   In order for the dolls to infringe,

15   whatever you call them, testify to be substantially similar.

16   And one of the issues with the derivative work, there's

17   actually two issues.   One, it assumes that it's based on

18   preexisting material, which we think is inappropriate.   It's

19   already assuming getting --

20          THE COURT:   Is that disputed at all?

21          MR. HANSEN:   Yes.

22          THE COURT:   By whom?

23          MR. HANSEN:   By me.   I mean, by MGA.   We don't

24   dispute --

25          THE COURT:   What evidence disputes that, Counsel,

1    in this trial?

2              MR. HANSEN:   That the --

3              THE COURT:   That the -- that all of this is at

4    least at some point, the starting point for all of this was

5    Carter Bryant's drawings.  Mr. Larian says that.

6              MR. HANSEN:   It's what gets into the dolls that's

7    important.  And if you look at the dolls versus the drawings,

8    whether -- the lips, whether those are preexisting works, in

9    the drawings, the protectable elements that have made their

10   way in, this sort of starts the ball rolling.  It's

11   unnecessary to call it a derivative work and potentially

12   confusing.

13             THE COURT:   All right.

14             MR. HANSEN:   But the bigger concern is that the

15   jury has to understand that the fact that it's not just being

16   based on something, it has to go further than that.  And it

17   still has to be infringing.  That's our point.

18             THE COURT:   Very well.

19             MR. HANSEN:   The inverse ratio rule.  Would you

20   take Patry on that one?

21             THE COURT:   Unfortunately, as much as I wish -- I'm

22   not going to say that.  I have to abide by the Ninth Circuit,

23   Counsel.

24             MR. HANSEN:   And all I would say is that here it's

25   particularly important to look at what the Ninth Circuit has

1    stated in that regard very closely.  I mean, I wish we could

2    go with Professor Patry and toss it out, but I understand.

3    Nimmer and everyone is moving towards the direction of

4    getting away from it, as is the Ben's Bargain case that I

5    think was alluded to.

6         The bottom line issue is that if that type of

7    instruction is going to be given, which we suggest is

8    inappropriate, I think that what happens to be made clear at

9    a minimum is that the inverse relationship, inverse ratio

10   rule only applies to the issue of actual copying.  It does

11   not change the burden with respect to wrongful appropriation.

12        And that's the problem, because in this case, where

13   it's admitted that there is access to the drawings, to

14   suggest, as they have by putting it after the substantial

15   similarity instruction, which is also wrong, it suggests

16   essentially a directed verdict here.  In terms of how low

17   does the -- that we had access, there's no dispute that we

18   had access to the works here.  And what's actually

19   happened --

20        THE COURT:  But as a result of that access, that it

21   does lower the showing necessary on similarity.

22        MR. HANSEN:  In terms of factual copying.  This one

23   has to be parsed out thinly, because what we're talking about

24   is copying as an element and then wrongful appropriation as a

25   separate element.  And the inverse ratio rule, if properly

1   applied and used in the probative similarity sense of like

2   the second circuit, it goes to whether or not did we get the

3   mold from Jade's drawing versus the ultimate burden of

4   wrongful appropriation, and there has not been, I would

5   suggest to your Honor, there has not been a single case in

6   the Ninth Circuit that has held -- that has found

7   infringement based on a lower standard than substantial

8   similarity.

9        And what I would direct you, if to anything else,

10  then the Sid and Marty Kroft case, where the inverse ratio

11  rule is discussed essentially in dicta after the Court has

12  already determined that Mayor McCheese is substantially

13  similar to H.R. Puff 'N Stuff.

14       But if you look at the cases closely, there is no

15  decision in the Ninth Circuit, and I'd have to say 2340, but

16  I'm not aware of any decision in the Ninth Circuit,

17  Ninth Circuit itself or any court within the Ninth Circuit

18  that has actually determined that the burden on wrongful

19  appropriation is lowered for purposes of substantial

20  similarity.

21       THE COURT:  Anything else you want to comment

22  that's not contained in your papers on these, Counsel?  The

23  rest of these are pretty straightforward.

24       MR. HANSEN:  I have Patry, but you have that.  I

25  have another article, but you understand the law on that one.

```
 1   I have additional authority, but I don't think it would

 2   matter at this point on that.

 3            Intent is in here multiple places.  I think the --

 4   this is the -- your point on less is more.  We don't need --

 5   it brings intent out where it doesn't need to be because the

 6   pattern jury instructions themselves in this instance address

 7   that.  The willfulness addresses it in the flip side.

 8   There's nothing that says that they have to show intent.  And

 9   I think pointing that out is unduly prejudicial.

10            THE COURT:  All right.  Let me keep you up there,

11   Counsel --

12            MR. HANSEN:  I'm sorry.  Characters.

13            THE COURT:  Okay.

14            MR. HANSEN:  Did you want to talk about characters?

15            THE COURT:  You've made your argument in your

16   papers.

17            MR. HANSEN:  And it's Siegel.  You've got it

18   quoted.  I like it, obviously.  But here I think that what's

19   happening, what Mr. Proctor is conflating inappropriately is

20   you can't look at the fact that the Bratz characters are

21   successful today.  They have the visual works.  The

22   characters, the development of the characters themselves, if

23   you actually look at the pitch book drawings, it's talking

24   about, you know, Lupe is the Hispanic one is what it says,

25   and things of that nature, which I would suggest to you is
```

1    not sufficiently developed characterization to warrant a

2    character instruction.

3              The Queen of Cool is not something that rises to

4    the level of the descriptions of the Man of Steel.

5              THE COURT:  And that's an argument you'll be able

6    to make to the jury.

7              MR. HANSEN:  I would suggest that, as a matter of

8    law, the character instruction is inappropriate.  It really

9    goes more like to the Rice case, where you have some

10   ill-defined cloaked magician.  But our view is that it

11   doesn't rise to the level, as a matter of law, having

12   sufficiently distinctive features based on Carter Bryant's

13   one-sentence descriptions of these characters, to rise to the

14   level of a separate character instruction.

15             THE COURT:  Very good.

16             Turning to your proposed instructions.  We've dealt

17   with the preliminary instructions.  There's a number of other

18   instructions you have in here.  17.2, copyright subject

19   matter.

20             17.3, idea and expression.

21             MR. HANSEN:  Your Honor, one other thing before we

22   move on.  Mr. Nolan reminds me, and I apologize, that at the

23   1-A charging conference, the issue was raised by Mr. Proctor

24   that the jury verdict form concerning characters only relates

25   to the state law claims.  So it would be inappropriate for

1    that reason as well.

2          THE COURT:  Okay.

3          MR. HANSEN:  I apologize.  And we'll pull the

4    transcript cites.  We don't have them right now.

5          THE COURT:  Okay.  Turning to your instructions.

6    Is there anything further you want to argue here?

7          MR. HANSEN:  Any particular instruction?  I think

8    independent creation is appropriate.

9          THE COURT:  Okay.  I've got that circled.  And I'll

10   take a look at that.

11         MR. HANSEN:  If nothing else, we have issues beyond

12   just the beginning.

13         THE COURT:  And assume the independent creation

14   just applies to the sculpt and the four retailer drawings.

15         MR. HANSEN:  And all of this.  Everything that is

16   accused infringed that had nothing to do with the drawings.

17   It's fairly broad.

18         THE COURT:  I see.  All right.  Does the jury

19   really need to be instructed on originality?

20         MR. HANSEN:  Originality is not in dispute.  So

21   which instruction?

22         THE COURT:  17.12.  There's just a couple here

23   which I don't know -- I just don't know if they are

24   necessary.  Copyright subject matter, 17.2 and 17.3.  I think

25   what's in dispute is what they need to be instructed on.

1    MR. HANSEN:  I think in terms of the first point

2    with the originality requires things that -- that it not

3    include things that he takes from another work, our view is

4    that that would actually be more involved in the extrinsic

5    portion of the substantial similarity test.

6        THE COURT:  That's my point on a number of these.

7    Reading through, for example, your 17.2, 17.3, 17.6, and then

8    17.12, originality.  A lot of these themes are -- I don't

9    think they, the Ninth Circuit, would suggest that we adopt

10   all of these.  I just don't think -- it almost becomes more

11   confusing when you add in more of these instructions.  We've

12   got a lot to instruct the jury on that is in dispute.

13       MR. HANSEN:  Which ones other than 17.12?

14       THE COURT:  17.2 and 17.3, copyright subject

15   matter.  There's two of them.  I just don't --

16       MR. HANSEN:  I think given your Honor's -- assuming

17   that there would be something within the substantial

18   similarity about not protecting ideas and facts and concepts,

19   then I think that that would probably be appropriate.

20       THE COURT:  That's my point.  To the extent they

21   are covered in one of these other instructions, I'm just

22   going to not repeat it.

23       MR. HANSEN:  Which would be fine.  As long as they

24   are covered in another instruction, we have no objection to

25   that.  Okay.  So there anything else?

1          THE COURT:  Not in particular.  What I think I'm

2    going to do is you would probably be better served at this

3    point if the Court, preparing its instructions now, based on

4    this, making the decisions on the ones in dispute, of course,

5    whether they come in at all or not, and then trying to put

6    together language that works for the ones that you are at

7    least agreed on in principle that there should be an

8    instruction on, I'll try to have that for you at noon

9    tomorrow.  If not at noon, certainly by the end of the day.

10   Depends on how many objections you make during the day.

11         MR. RUSSELL:  Your Honor, just a point of

12   clarification, since Mr. Proctor raised it.

13         First, he referenced the good faith instruction.

14   We didn't withdraw that, but when you asked me the question

15   about defenses, of course, our view, that's not a defense.

16   It's simply evidence that a jury may consider, and indeed,

17   that's how the instruction is framed.

18         So when you were asking me were there any other

19   defenses, I just want to be clear, our view is good faith is

20   not a defense.  But it is an instruction that's properly

21   given.

22         Second, Mr. Proctor referenced that we are

23   withdrawing the good faith bona fide purchaser for value

24   defense.  That's not correct.  We're simply saying we think

25   your Honor could address that.  There are no disputed facts.

1      THE COURT:  Right.  I think he meant that,

2  withdrawing it from the jury instructions.

3      MR. RUSSELL:  Okay.  I just wanted to be clear.

4      THE COURT:  I can understand why you're all

5  sensitive to the whole waiver issue at this point, but that's

6  understandable.

7      MR. ROTH:  Your Honor, if I might, and I apologize

8  we're going a bit out of order here, because you did go back

9  to the willful infringement issue.  It's something you had

10  mentioned during the damages phase.  I think the difficulty

11  with the instruction we see from Mattel is in the way --

12  where it gets the definition of what willful is.  It sort of

13  pulls from the statutory damages part of the statute and

14  actually the cases they find, and willful infringement is

15  really a case law based thing -- instruction.

16      Excuse me, your Honor.  The cases where you find

17  that, the two most relevant are Sheldon, which we've

18  discussed a number of times, defines willfulness for the

19  context of this instruction as deliberate plagiarism.  So

20  we'd ask that that be in the definition.

21      THE COURT:  You have that in your proposed?

22      MR. ROTH:  That, we don't.

23      THE COURT:  Deliberate plagiarism?

24      MR. ROTH:  Yes, your Honor.  And we can submit an

25  additional instruction if your Honor would like.

 1           THE COURT:  Ultimately, you all are going to be

 2   typing these up.

 3           MR. ROTH:  And I do apologize going back to

 4   damages.  One thing your Honor noted at the outset of the

 5   discussion is the punitive damages instruction.  There is

 6   some dispute.  It's not an issue that you --

 7           THE COURT:  When I say that you both have

 8   identified, I understand there's a dispute, and I'm willing

 9   to consider those disputes, and I'm going to try to meld

10   something that makes sense that takes into account as many of

11   the respective objections as possible.

12           So I'm not just saying there's going to be -- I

13   understand that on all of those, almost, that where you --

14   you're not stipulating to the same version of a particular

15   model instruction.  But you agree that that's the model

16   instruction is the basis that should be given.

17           MR. ROTH:  In the context of the punitive damages

18   instruction, we believe that the model instruction really is

19   one that ought to apply.  And the key case here is the

20   Campbell case, U.S. Supreme Court case, and that's an

21   economic damages case, but in that case, they distinguish for

22   purposes of defining malice, et cetera, they distinguish

23   between personal injury, and I could just read.

24           "We have instructed courts to determine the

25   reprehensibility of a defendant by considering whether the

1   harm caused was physical as opposed to economic.  The

2   tortious conduct evinced an indifference to or reckless

3   disregard of the health or safety of others.  The target of

4   the conduct had financial vulnerability.  The conduct

5   involved repeated actions or was an isolated incident, and

6   the harm was the result of intentional malice, trickery,

7   deceit or mere accident."

8           And again, that was a -- an insurance defense case.

9   Economic harm.  But still in that context, the Supreme Court

10  felt that that was the sort of distinction that should be

11  drawn in the instructions for the jury.  And that's why

12  that's in the model form instructions for punitive damages.

13  And we think it is appropriate here.

14          THE COURT:  Thank you, Counsel.

15          MR. NOLAN:  Your Honor, I apologize.  Before you

16  move on, may I give a quick cite?

17          THE COURT:  Sure.

18          MR. NOLAN:  This way my frustration will be

19  lessened tonight.  Mr. Zeller made a statement that we

20  waived, because we only suggested it would lead to confusion

21  with respect to the damages.  It's quite to the contrary.

22  And I'd ask the Court, if you are inclined, to look at this

23  issue.

24          It's page 6470, lines 12 through 18, where after I

25  raised the confusion issue, I further point out the very

1   point that we're saying here, that we started this trial with
2   certain 16 drawings.  And then later on, the Court's ruling
3   on 6471, I specifically, from lines 4 through 8, and you say:
4   "I'm going to overrule the objection; however, I will give
5   you leave.  I'm not seeking any legal objection; however,
6   since there's no moment and it's not going to the jury, it's
7   in.  In you want to revisit the objection with legal
8   authority, I will entertain it."
9           That was at a sidebar conference, your Honor.  We
10  certainly raised it, probably raised it more than you ever
11  wanted to.  But the suggestion that we waived it at sidebar
12  is unfounded.  Thank you.
13          THE COURT:  Mr. Zeller?
14          MR. ZELLER:  It was the only legal objection that
15  was made.  And that's perfectly clear.  The Court can see it
16  from the transcript, the only legal objection that was raised
17  to that evidence coming in was articulated that way.  And I
18  think that's the basis on which objections have to be
19  considered and determined as to whether or not something has
20  been properly preserved.
21          THE COURT:  Mr. Proctor, briefly.
22          MR. PROCTOR:  Two quick points.  If you look at
23  MGA's good faith instruction, I think this shows precisely
24  why our instruction, that intent is not required for a
25  copyright claim, should be given.  Their proposed good faith

1   instruction reads, of course, the tort claims, there's no

2   liability for tort claims being decided in this phase of the

3   case.

4           "The good faith of Larian, MGA, and MGA Hong Kong

5   is a factor that should be considered when assessing any

6   claim by Mattel that they acted in bad faith or with bad

7   intent.  To the extent Mattel's claims implicate defendant's

8   intent or mental state, good faith is a relevant inquiry for

9   which Mattel bears the burden of proof."

10          Whether or not the Court gives this instruction --

11  and, of course, I would urge the Court not to -- MGA is going

12  to make arguments about their good faith presumably, and I

13  think it needs to be made clear that copyright claim doesn't

14  have that as an element.

15          The second point is an instruction which hadn't

16  been mentioned.  I don't know if the Court wants to hear

17  anything on it.  If not, that's fine.  But the proposed

18  multiple copyright registrations instruction.

19          If you look at the Castle Rock case -- and there's

20  some other cases cited in there which is in our papers --

21  it's pretty clear in this context to say that they are

22  entitled to take, you know, pieces of one doll, pieces of one

23  drawing and another drawing and another drawing, and unless

24  they take the whole -- or a huge amount of one individual

25  drawing, if they pick and choose between three of them, it's

1    okay, is just not the law.  And that's what that instruction

2    suggests.

3           THE COURT:  Everyone should be assured this is not

4    the final opportunity to argue these.  Let's move the ball

5    forward.  I have enough to move forward and come up with some

6    draft -- a draft working document that you will create

7    hopefully tomorrow afternoon or over the weekend.  And then

8    we'll undoubtedly be visiting this on Monday.  And it will be

9    better probably to have particular objections after the Court

10   makes some threshold determinations.

11          So this has been extraordinarily helpful.  I

12   appreciate everybody's argument.  Everyone is obviously well

13   prepared for this afternoon.  I greatly appreciate that.

14          MR. HANSEN:  In that argument, we had -- I think

15   the Court had put in additional information relative to the

16   extrinsic part.  This just has a couple points that may be

17   useful for determining filtering.  It's just additional

18   material.

19          THE COURT:  Very well.  I'll take it.

20          MS. AGUIAR:  And I only wanted to hand up the

21   section of the transcript, your Honor, from the first

22   charging conference, where Mr. Proctor indicated that the

23   question regarding the conception of the Bratz characters --

24          THE COURT:  I recall that, actually.

25          MS. AGUIAR:  Pertaining only to the state law

```
 1    claims.

 2            THE COURT:  I do recall that.

 3            MS. AGUIAR:  So you don't need this?

 4            THE COURT:  No.  Thank you, though.  Okay.  I think

 5    I have what I need.

 6            MR. ROTH:  Your Honor, if we could, and I do

 7    apologize.  If moving off of jury instructions completely,

 8    this was an issue that was raised toward the end --

 9            THE COURT:  I'll accept that invitation.

10            MR. ROTH:  You'll recall there was some discussion

11    regarding Mr. Kerner and his testimony, and Mr. Nolan

12    suggested that we think -- just to give you some background

13    here -- Mr. Wagner put in an analysis, an apportionment

14    analysis which looked at a -- looked at a variety of toy

15    companies, including Mattel.

16            Certain statements were made by Mattel about -- by

17    Mr. Wagner about its EBIT margin and its financial

18    performance.  And then a comparison was made for purposes of

19    that apportionment analysis between the Bratz line and Mattel

20    and other companies.

21            THE COURT:  Right.

22            MR. ROTH:  As you'll recall, we had a lengthy

23    debate earlier on in the case about a supplemental report

24    that Mr. Meyer was permitted to put in this response to that

25    which focused on -- more narrowly on the Barbie and the
```

```
 1   Mattel girls' performance and made that comparison.   And
 2   Mr. Kerner, it was his deposition at which this information
 3   was obtained.   We got a few documents and testimony regarding
 4   those documents.
 5          We would like to present that -- the Court allowed
 6   us to submit that report.   And we'd like to present that
 7   opinion.   Mr. Meyer's been deposed about that opinion.   We've
 8   heard from Mr. Wagner.   So we'd like to present that opinion.
 9          Mr. Kerner is a witness simply to get in the
10   predicate facts regarding, you know, the documents that are
11   the basis for Mr. Meyer's testimony.   We're not interested in
12   showing the jury the underlying Mattel financials.   We're
13   simply -- we simply want Mr. Meyer to have the opportunity to
14   make -- to present the expert testimony.   And so we think --
15          THE COURT:   You don't generally introduce the
16   reports that your experts base their analysis on.
17          MR. ROTH:   No.   We'd like simply to submit into
18   evidence -- we're not even proposing to show the jury.
19   Submit into evidence the underlying document which is the
20   financial reports so that -- that is the basis --
21          THE COURT:   I guess I'm not following.   If it gets
22   introduced into evidence, then it goes to the jury.   So how
23   can you say that you want to introduce it into evidence and
24   not show it to the jury?   It is 5:30.   I'm just not
25   following.
```



1           MR. ROTH:  I think, your Honor, the concern that

2    we're hearing from Mattel is that there's some sort of

3    confusion or 403 possibility.  We're going to examine

4    Mr. Kerner about the financial performance of Barbie or

5    Mattel girls based upon this document.  And we're not

6    intending to do that.  We simply want it to be a predicate

7    for Mr. Meyer's report.

8           THE COURT:  It doesn't sound like you need it to be

9    introduced into evidence for it to be a predicate.  For

10   example, we had an expert this morning who made reference to

11   all kinds of books and research and work that he did, and

12   that was not introduced into evidence.  So I don't understand

13   why you want to introduce into evidence the predicate report

14   that the expert relied upon coming up with his opinion.

15          MR. ROTH:  If Mattel will stipulate that we don't

16   need to admit that into evidence as a predicate to that

17   opinion, then we will not put Mr. Kerner on and will not

18   attempt to admit that document into evidence.

19          THE COURT:  Okay.  Let me hear from Mattel on this.

20          Mr. Zeller, you understand the Court's point, that

21   certainly -- I'm not asking to you waive any objections that

22   you might have to an expert witness or not to an expert

23   witness, but an expert witness can certainly rely upon

24   documents that are not being admitted into evidence; correct?

25          MR. ZELLER:  Well, that is true in many

```
 1   circumstances.  I mean, whether it's true in this particular
 2   circumstance is a different issue.  And we haven't heard his
 3   testimony.  We haven't heard how it's going to be relied
 4   upon.
 5           But we're really at first principles on this.  They
 6   want to call Mr. Kerner in order to introduce what we think
 7   we've identified as the documents.  And they are internal
 8   Barbie, My Scene, Flavas financial documents.  I mean,
 9   there's no other way of interpreting them.  And that's what
10   they are.
11           So their ultimate use is, you know, and how they
12   intend to have their expert rely on it, introduce them,
13   whatever the case may be, that's a different issue.  What
14   we're talking about right now is Mr. Kerner and that they
15   want to try and admit what we consider to be inadmissible and
16   confusing documents into evidence.
17           You know, where it goes from there, I mean, I would
18   simply say that with respect to their expert, I mean, we
19   aren't going to know that until we see it.
20           THE COURT:  Why don't you do this.  Why don't you
21   call your expert, and if this becomes an issue, I'll give you
22   leave to call Mr. Kerner to lay a foundation if that's
23   necessary.  I just -- I understand the concern.  I understand
24   the evidence.  I think the more efficient way is to proceed
25   as you would with any expert.  And if it becomes a problem,
```

1    we'll address it.

2              Mr. Kerner will be here all day tomorrow.

3              MR. NOLAN:  Your Honor, that's what we were trying

4    to avoid.  That was the vacation issue.

5              THE COURT:  Oh, right.  This is the gentleman that

6    has the family vacation issue.

7              MR. NOLAN:  That's why we tried to make the offer,

8    to try to avoid the issue.

9              THE COURT:  I'm sorry.  I forgot about the

10   vacation.  I don't know.  I haven't heard the expert

11   testimony myself.  I don't know.  You guys are going to have

12   to work that out yourselves.  I can't rule in a vacuum.

13             MR. ROTH:  Your Honor, we'll proceed in good faith.

14   We will put the expert on.  He will proffer his opinion.  His

15   opinion is not a mystery.  The documents are not a mystery.

16   There's a report that is the subject of that opinion.  And

17   then --

18             THE COURT:  How did your expert get these

19   documents?  I assume they were produced in discovery.

20             MR. ROTH:  Yes.

21             THE COURT:  And what kind of documents are they?

22             MR. ZELLER:  I can give the Court an example.  If I

23   can make sure I'm looking at the right thing.  I can give

24   this as an example.  I have an extra copy of it.

25             THE COURT:  Mr. Roth is giving me the whole binder.

1   Mr. Zeller, there's no dispute that these are all authentic

2   documents?

3            MR. ZELLER:  That's correct.

4            THE COURT:  So the question becomes whether or not

5   they are relevant and they were produced to the expert.  Just

6   call your expert and have Mr. Kerner go on vacation.  I'm not

7   going to rule whether the evidence comes in or the documents

8   come in, but there's no dispute as to authenticity.

9            MR. ZELLER:  We're objecting on relevance and 403.

10           MR. ROTH:  And I think frankly that objection is

11   really more directed at the opinion, not the underlying

12   documents, and if they are not going to take the position

13   that the failure to introduce the documents is somehow a

14   predicate --

15           THE COURT:  I know I have insisted up through this

16   trial to have a person here to do that, but I don't want to

17   ruin someone's vacation over something which is not really --

18   the relevancy and the 403 issue can be taken up in the

19   context of the expert's testimony, does not need to be taken

20   with respect to Mr. Kerner's.  Tell Mr. Kerner to take his

21   vacation.

22           MR. ROTH:  Finally, there is tomorrow a series of

23   hearings, I believe, in the morning with respect to a series

24   of experts, one of which is Mr. Meyer.  We've been trying to

25   get from Mattel sort of the basis for their concerns about

```
 1   Mr. Meyer.  Something that I raised earlier on.
 2            I actually asked Mattel for a list of the
 3   paragraphs in his report that they were taking issue with.  I
 4   haven't gotten that.  There is a process, obviously, for
 5   raising issues about experts that's done pretrial.  There's a
 6   briefing process.  The parties are given an opportunity to
 7   consider and file papers on that.  I think if there's going
 8   to be a challenge made based upon, you know, rulings from
 9   this Court, I think it's only fair for us at this point to
10   know the basis for those challenges.
11            THE COURT:  We'll take that up at 8:30 tomorrow
12   morning.  You'll discuss those concerns.
13            MR. ZELLER:  I assume that there have been
14   discussions on that.  I am not personally familiar with them.
15            THE COURT:  Whoever it is.
16            MR. ZELLER:  But I can certainly ensure that
17   there's a dialogue.
18            THE COURT:  All right.
19            Mr. Proctor, this is your last chance at the
20   lectern tonight.
21            MR. PROCTOR:  It is.  We have some waiver issues.
22   I've heard twice now that I said at the 1-A charge conference
23   with the characters issue only relates to the state law
24   claims.  That's just not right.  What -- you'll recall the
25   verdict form question was when Carter Bryant conceived the
```

1    idea for the characters.  That question related to the state

2    law claims.  The jury instruction that we are proposing

3    relates to the characters as depicted in the drawings, which

4    is a separate copyright issue.

5              THE COURT:  I do understand that distinction,

6    Counsel.

7              MR. PROCTOR:  Thank you.

8              THE COURT:  All right.  Court is in recess.

9

10

11

12

13                    C E R T I F I C A T E

14

15

16         I hereby certify that pursuant to Title 28,

17    Section 753 United States Code, the foregoing is a true and

18    correct transcript of the stenographically reported

19    proceedings in the above matter.

20              Certified on August 14, 2008.

21

22

23    **MARK SCHWEITZER, CSR, RPR, CRR**
      Official Court Reporter
24    License No. 10514

25