1              UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                 - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                - - -

**CERTIFIED COPY**

7  MATTEL, INC.,              )
                        )

8             Plaintiff,  )
                        )

9       vs.            )  No. CV 04-09049
                        )

10  MGA ENTERTAINMENT, inc., et. Al.,  )
                        )

11            Defendants.  )
         _____)  MOTION HEARING

12  AND CONSOLIDATED ACTIONS,    )
                        )
        _____)

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            Riverside, California

17          Monday, November 10, 2008

18               1:05 P.M.

19

20

21

22

23         THERESA A. LANZA, RPR, CSR
        Federal Official Court Reporter

24         3470 12th Street, Rm. 134
        Riverside, California  92501

25            951-274-0844
         WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2

 3    On behalf of Mattel, Inc.:

 4                        QUINN EMANUEL
                          By:  JOHN QUINN
                               MICHAEL T. ZELLER
 5                        865 S. FIGUEROA STREET,
                          10TH FLOOR
 6                        LOS ANGELES, California  90017
                          213-624-7707
 7

 8

 9    On behalf of MGA Entertainment:

10                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
11                             JASON RUSSELL
                               LAUREN AGUIAR
12                             RAOUL KENNEDY
                          300 SOUTH GRAND AVENUE
13                        LOS ANGELES, CALIFORNIA  90071-3144
                          213-687-5000
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2                                               Page

 3    MOTION HEARING................................    4

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     RIVERSIDE, CALIFORNIA; MONDAY, NOVEMBER 10, 2008; 1:05 P.M.

2                              -oOo-

3              **THE CLERK:**  Calling calendar item number 13,

4     Mattel, Inc., versus MGA Entertainment, Inc., Case Number

5     ED CV 04-9049-SGL.

6              Counsel, please state your appearances for the

7     record.

8              **MR. QUINN:**  John Quinn, Mike Zeller, Dylan Proctor

9     for Mattel.

10             **MR. NOLAN:**  Tom Nolan, Raoul Kennedy, Lauren Aguiar,

11    and Jason Russell on behalf of MGA and Isaac Larian.

12             **THE COURT:**  Good afternoon to you all.

13             We're on calendar this afternoon for a variety of

14    motions that have been filed, which the Court has received and

15    reviewed.  The Court is going to go through these in the

16    following order:  I'd like to begin with the affirmative

17    defenses motion, then go to the declaratory relief motion, the

18    constructive trust motion, and then the permanent injunction

19    motion.

20             So I'd like to start with those four motions; and

21    then, of course, there's some other issues that need to be

22    taken up as well as we go through this.  There's motions to

23    strike that the Court has received and reviewed.  There's

24    auxiliary motions, for lack of a better phrase, which we'll

25    take care of as we go through this.

1          The Court has certainly reached certain tentative

2   thoughts in reviewing the motions, although nothing is final;

3   and what I plan on doing over the course of the next week is

4   hopefully issuing an omnibus order which will basically provide

5   a road map in terms of how the Court's findings are going to

6   take place; and then by reference, perhaps, include certain

7   other orders as well.  But a lot of that will depend on how

8   events play out this afternoon.

9          Let's begin with the motion regarding the affirmative

10  defenses.

11          **MR. NOLAN:**  Your Honor, as has been the practice in

12  the past, we divided responsibilities for specific motions.  If

13  you don't mind, we're not going to be jumping up and down; but

14  Mr. Russell will be addressing the first two matters, I'll be

15  addressing the constructive trust matter, and Mr. Kennedy will

16  be arguing the preliminary injunction, as well as myself on

17  certain portions.

18          **THE COURT:**  Very well.  Since we're not before a

19  jury, I'm not really concerned about that; however you want to

20  handle that.

21          On the affirmative defenses motion, I'll invite the

22  defense to proceed first.

23          **MR. RUSSELL:**  Thank you, your Honor.

24          As I believe we've laid out in our papers, there are

25  three defenses that we're talking about today.

1     **THE COURT:**  Laches, waiver, and estoppel.

2     **MR. RUSSELL:**  Correct.  And we're really only talking

3   about those claims as they effect the claims that are pending

4   today.  That's the declaratory relief, copyright, and unfair

5   competition claims.  And I think the key point to be made --

6   I'd like to start off with laches -- is simply that we are now

7   in a different place than we were with respect to statute of

8   limitations.  This is a defense that applies without respect to

9   the relation-back tolling doctrines that obviously were so

10  critical to the statute of limitations analysis.

11          And so, perhaps just to start with, the easiest

12  claim, if you look at the claim for constructive trust that is

13  before the Court, that has a two-year limitations period,

14  because it's based off of the state law aiding and abetting

15  claims.  If you take as a given, as I think we should, that the

16  Court has found notice as early as July of 2003, from The Wall

17  Street Journal article -- but I'll take an even later date, the

18  date that Carter Bryant was deposed in November of 2004.  The

19  claims here weren't filed until November of 2006, more than two

20  years later.  There is no tolling by virtue of the fact that

21  the action was filed against Carter Bryant or by virtue of the

22  fact that MGA intervened, and accordingly, under Jarrow

23  Formulas, the constructive trust form of relief is

24  presumptively barred.  So it would be up to Mattel to show some

25  sort of justifiable reason why it delayed in seeking the relief

1   that it does.  And I don't think that there's any way that it

2   can, for many of the reasons that we showed in our papers, not

3   the least of which is that they have repeatedly eschewed much

4   of the relief that they seek now.

5          In fact, as we lay out in our constructive trust

6   brief, they told this Court and told MGA to their detriment

7   that they were not seeking ownership over trademarks and the

8   like, weren't seeking rights, proprietary rights, over the name

9   "Bratz."  And so I don't think there can be much question but

10  that there was a conscious delay, mindful of the effect that it

11  would have on MGA.  And I think equally obvious -- -

12          **THE COURT:**  Not seeking a trademark is not the same

13  as not seeking a constructive trust over the name or the

14  benefits derived from the name.

15          **MR. RUSSELL:**  I think the difficulty is that there is

16  no right separate and apart, in our view, from the trademark.

17  You can't protect a copyright -- there's no copyright in a

18  name.  And so the only protection that one can have -- what

19  right that one can have over the name "Bratz" is if there's a

20  trademark.  And as we cite, and I believe that Your Honor's

21  decision in Conversive makes clear, the value in a trademark is

22  by virtue of use.  It doesn't matter who invented it.  It

23  doesn't matter -- anything else.  It's simply, who puts the

24  value into it here?

25          The evidence, I think, would be undisputed that if

1    there was any value in Bratz, and certainly there is, that was

2    all created by MGA at the time that Mr. Bryant came up with the

3    name "Bratz" -- and there's a parenthetical there -- but at the

4    time he came up with the name "Bratz," it had no value to

5    anyone.  Indeed, the only person who might argue it had value

6    was Lovins, for whom MGA purchased rights to utilize the

7    trademark name.

8           **THE COURT:**  We can take this up, of course, when we

9    get into the constructive trust motion itself.  That kind of

10   begs the question of whether or not, assuming, as the Court

11   does, frankly, at this point, that Bryant did come up with the

12   name "Bratz" while he was at Mattel, and that Mattel,

13   therefore, owns that name.

14          And I'm also accepting the fact that the value to

15   Bratz was certainly developed while MGA used and marketed

16   Bratz.  That fits somewhat well into this constructive trust

17   theory, that the benefit that was developed is held in trust

18   for Mattel.

19          **MR. RUSSELL:**  The problem we have with that is that

20   there was no value at the time.  It would be one thing --

21          **THE COURT:**  Why is that a prerequisite?

22          **MR. RUSSELL:**  Because to the extent that there were

23   damages associated with the taking of any trade secrets and the

24   like, any value in trade secrets, that was covered by the

25   damages award by the jury.  That's already been dealt with.  So

1  now we're talking about the right to use the name "Bratz," and

2  more importantly, to exclude others from using the name

3  "Bratz."

4           THE COURT:  Exactly.

5           MR. RUSSELL:  Here, at the time that the name was

6  developed -- and, again, we can quarrel.  Even though the jury

7  found Mr. Bryant came up with the name "Bratz" while at Mattel,

8  the evidence in the record is undisputed that that name "Bratz"

9  was already in the public domain, because Lovins was using it

10 many, many years before Mr. Bryant ever even went to Mattel.

11          THE COURT:  In a different context, though; correct?

12          MR. RUSSELL:  He was using it for children's

13 clothing.

14          THE COURT:  As opposed to dolls, right.

15          MR. RUSSELL:  Now, there's additional evidence that

16 we could put forth for your Honor that internationally, the

17 name was also used and MGA purchased it for international

18 purposes from preexisting rights holders.

19          But for purposes of the analysis of the constructive

20 trust, the key fact is -- and you have to look at the cases

21 that talk about this -- because there was no value and because

22 the only way that you can have value in a name is by transfer

23 of the trademark, you have to look at the use.  And since it's

24 true that based on the jury's findings, Mattel could have, at

25 that time, put into use the name "Bratz," the evidence actually

Monday, November 10, 2008                    CV 04-09049

1   shows that they considered it and decided affirmatively not to

2   use it, for whatever reason.

3        **THE COURT:**  And I understand how that's detrimental

4   from a trademark perspective, not necessarily from a

5   constructive trust perspective.

6        **MR. RUSSELL:**  If what you're saying is, they have the

7   right to name "Bratz," that doesn't answer any questions, I

8   think, as far as all of the parties are concerned.  Having the

9   name "Bratz" without any rights to exploit it, or to prevent

10  MGA from exploiting it, doesn't answer any questions.

11       And that's why Mattel, in its papers, is asking for a

12  constructive trust, not of just the name "Bratz," but more

13  importantly, of the trademarks to the name "Bratz."

14       **THE COURT:**  Let me get you back to your argument on

15  the affirmative defenses, though, vis-à-vis the constructive

16  trust.  You got a little off course, but this is important, and

17  I'm sure we'll revisit it.

18       **MR. RUSSELL:**  Because that is the starting point,

19  your Honor.  The constructive trust is, I believe, most

20  susceptible to the laches argument.  So I've laid out for you

21  the delay.  And we are presumptively in the land where there is

22  inexcusable delay, because we are more than the limitations

23  period for the constructive trust claim.

24       I would say you are many years more, but taking the

25  most pessimistic view, the date that Carter Bryant was deposed,

1    the date that even Mattel in its own papers argues it had

2    perfect knowledge of all of its claims, that was on November 4,

3    2004.  They didn't file claims with respect to the name, ever.

4    In fact, I would argue they still have yet to file those

5    claims.  But they never even made an argument for your Honor to

6    impose a constructive trust until this fall.  So almost six

7    years, almost twice the limitations period, almost three times

8    the limitations period.

9            So then the only question left is, was there any

10   prejudice to MGA?

11           And, again, we can show both forms of prejudice.  The

12   first evidentiary prejudice -- your Honor sat through the

13   trial.  I hardly need to remind you, and I think it's a point

14   that can't be disputed, that much of a passage of time affected

15   witnesses's recollections.  Many witnesses -- in fact,

16   virtually every witness had difficulty recalling something that

17   happened that long ago.

18           We also have an additional form of evidentiary

19   prejudice; and that is that Mattel, for reasons that the Court

20   has already found were not intentional -- but Mattel failed to

21   preserve e-mails that would have been relevant, in our view,

22   dispositive of some of these points.  Those were not preserved.

23   And had their claims been filed earlier, it is likely that MGA

24   would have had access to those e-mails; so that's an additional

25   form of evidentiary prejudice.

```
 1          We can also show the economic prejudice, because the
 2   facts are, again, undisputed, in reliance on the fact that
 3   Mattel, at every step, refused to take any steps, not only to
 4   enforce whatever rights it might have as to "Bratz," but even
 5   to assert that it had rights to the name "Bratz."  In reliance
 6   on that, MGA has poured tens, and even hundreds of millions of
 7   dollars into building the name "Bratz" into an extremely
 8   valuable trademark and brand, one that is known worldwide.  And
 9   at this point -- and we cite many cases that say this,
10   your Honor -- having built up that value and having had Mattel
11   sit on its right and effectively speculate on the value would
12   be inequitable.  This is the perfect case to apply a laches.
13   It couldn't be more hand-in-glove than that.
14          Now, turning to the copyright claim, as your Honor
15   would recall, based on Your Honor's rulings, Mattel's copyright
16   claims were timely by three days.
17          Now, it is true that under Jarrow Formulas, that
18   would give them a presumption that laches shouldn't apply.  I
19   would argue, your Honor, that unlike the statute of limitations
20   analysis for copyright infringement, the analysis for laches is
21   slightly different.  They should be on a slightly -- there's a
22   slightly more relaxed standard for MGA to establish the
23   beginning of the notice period.  And I would argue, your Honor,
24   that based on the July 2003 article, which said that Mr. Bryant
25   was showing works in 1999 to MGA, that should have placed
```

```
 1   Mattel on notice of potential infringement of ideas that they
 2   would own.  And they didn't do so.
 3              But even if I'm stuck with the later date, the one
 4   that misses by three days, in light of the fact that there can
 5   be no dispute that Mattel was on notice and chose to sit back
 6   for almost a full three years while MGA poured an undisputed
 7   hundreds and hundreds of millions of dollars into developing
 8   the Bratz line, the Bratz dolls, again it would be inequitable
 9   for them to prevail on their copyright claim.
10              And that same analysis would apply with respect to
11   the declaratory relief claim, because it is essentially a
12   mirror image of their copyright claim.  I would argue, there is
13   no distinction, and that's one of the reasons we argue that
14   it's preempted.
15              THE COURT:  Very well, Counsel.
16              Anything further on waiver?
17              MR. RUSSELL:  Your Honor, I think on the waiver
18   points, we fairly well set it forth -- I don't know that I can
19   add much to our papers.
20              THE COURT:  Fair enough.
21              And estoppel?
22              MR. RUSSELL:  Your Honor, again, estoppel is
23   essentially just the mirror image of our laches argument.  I
24   think the only difference is that you take a little bit more
25   look at the conduct of Mattel than you would with laches.
```

Monday, November 10, 2008                          CV 04-09049

1      Laches just looks at delay.  Estoppel looks somewhat to the

2      reasoning behind the actions of Mattel.  But I think, again, we

3      would meet the standards for estoppel quite easily.

4                    **THE COURT:**  Very well.

5                    Let me hear from Mattel on the affirmative defenses.

6                    Mr. Zeller?

7                    **MR. ZELLER:**  Good afternoon, your Honor.

8                    Obviously, if there are any particular questions -- I

9      think we have addressed a lot of these arguments in our briefs.

10                   I would, I think, remind the Court on a couple of

11     points that MGA has just now raised, which is -- I mean, we,

12     frankly, have a whole series of conflicting statements about

13     how long we supposedly delayed.

14                   At one point, I think we were even accused of waiting

15     six years, which is just inconceivable based on this record.

16     In fact, it is precluded by the jury verdict, which says that

17     there was fraudulent concealment at least up to 2002.  And

18     that's even setting aside the rulings that the Court has

19     already made about when it was that we were, in fact, on

20     notice, and when, really, that laches clock would have started.

21                   I don't think there's any dispute at this point that

22     what we're talking about is a situation that we were within the

23     limitations period, even setting aside relation-back; and that,

24     therefore, we're into this standard formulation that we are

25     presumed to be timely.

Monday, November 10, 2008                          CV 04-09049

1          **THE COURT:**  Fair enough.

2          The one point that Mr. Russell emphasizes is with

3    respect to the constructive relief that you're seeking, and

4    when, if ever, that constructive relief was expressly sought.

5          **MR. ZELLER:**  Yes, your Honor.  That was actually one

6    point I did want to address.

7          The Court will recall that during the course of

8    trial, this was actually raised with respect to the name.  And

9    what the Court ruled was -- specifically, it says, quote, "With

10   respect to the "Bratz" name, the Court is inclined to overrule

11   MGA's objection as to the Court finds no surprise or prejudice

12   to MGA.  The naming of "Bratz" is properly within the scope of

13   Mattel's breach of contract claims and was fully explored in

14   discovery," end quote.

15         And, in particular, the constructive trust remedy was

16   sought from the very beginning.  That was actually in the

17   Bryant complaint, where we asked that our property be returned

18   to us.  And we asked for all manner of equitable relief for

19   anything that was created.

20         **THE COURT:**  You talk about property being returned.

21   It would appear -- the way that MGA has taken that is, you're

22   seeking the return of physical property, not the name.  The

23   name is somewhat different.  And the argument, as I understand

24   it, is that nowhere do you specifically come out and say that

25   you're seeking, on some theory, the name itself, "Bratz."

1     **MR. ZELLER:**  That I don't think is correct.  In fact,
2  I think what we also refer to -- and I will find the exact
3  language that we had; I believe we cited it in our papers -- I
4  believe we actually directed the Court to particular provisions
5  of our prayer, where we asked for things like benefits.  I
6  mean, it was very broad.

7     **THE COURT:**  It was very broad.  The argument is that
8  it wasn't very specific.

9     **MR. ZELLER:**  Sure.

10     I would, first of all, respectfully, your Honor,
11  suggest that certainly if one is looking to the complaint as to
12  whether or not it encompasses relief -- I mean, breadth is an
13  advantage to us, not something that they can claim, Well, we
14  were surprised.  I mean, we were seeking everything that we
15  were legally entitled to.

16     But second, your Honor, the Court will recall, of
17  course, the general rule that the pretrial conference order is
18  a pleading that supersedes the operative pleadings.  And
19  there's no question that the Court has already ruled that we
20  properly raised that in connection with the pretrial order; so
21  I think there's no question that it's in play, and there's no
22  question that we have been asking for the return of all of the
23  benefits.

24     And I understand the Court's point about property and
25  that sort of distinction, but the fact is that the use that

1  they were allowed to make of the name that indisputably, per

2  the jury's verdict, belongs to Mattel was a benefit to MGA and

3  that that use (unintelligible) to our benefit under the

4  constructive trust theory.

5          So I think that it is something that's been fairly at

6  issue in the case.  And the kinds of statements that MGA has

7  pointed to in its briefs, and what it's saying here today about

8  Mattel supposedly waiving ownership of trademark and everything

9  else, that's just not what we said.  We were very clear that we

10  were saying -- and, certainly, the Court will recall, we were

11  talking about, Is an infringement claim being made?  That, we

12  have not been making here.  That is not part of this case.

13          But, certainly, we have said, over and over and over

14  in this case, anything that Carter Bryant created while he was

15  employed by Mattel, ideas, concepts, names, designs, and so on,

16  belonged to Mattel.

17          And the Court will recall that was even an issue on

18  summary judgment, when MGA tried to argue that under the

19  inventions agreement, it was only very narrowly-defined types

20  of inventions.  And the Court, of course, rejected that on

21  summary judgment.

22          **THE COURT:**  Thank you, Counsel.

23          **MR. ZELLER:**  If I may just make one additional point,

24  your Honor, which is, this whole -- it's really -- I think,

25  really, all they have -- or the only argument they make would

```
 1   be on prejudice.  And I don't think that there's, first of all,

 2   any evidence connecting the expenditures that they made to any

 3   kind of reliance.

 4           If the Court looks at their brief, there is no

 5   citation whatsoever to evidence of that.  And they didn't

 6   submit any here, either.  They didn't say Mattel's inaction is

 7   what actually drove these expenditures and why they were doing

 8   it.

 9           THE COURT:  Their argument is, obviously, if Mattel

10   had asserted these rights, that would have caused them to

11   pause, perhaps to stop and pursue, in their pursuit of this

12   development.

13           MR. ZELLER:  Well, I would say, first of all, it's

14   their obligation to prove it, which they have not done.

15   There's absolutely no evidence in the record saying what it is

16   that they would have done.

17           And, number two, the only evidence that does exist

18   shows the opposite.  The Court will recall that when MGA

19   intervened in this case in December of 2004, they explicitly

20   said it was because they were going to defend their rights to

21   Bratz, that the rights to Bratz were at stake.

22           What did they do the following year?  They actually

23   increased their expenditures to Bratz.  So even if one looks at

24   what it is that MGA did -- just even looking solely at the

25   expenditures that they made, it shows that there's no causal
```

1    connection between the times that they were fully aware, even

2    indisputably aware, that Mattel was asserting this.  You'll see

3    that there's no correlation even between what they're claiming

4    they knew, when they knew it, and when they first understood

5    it, and their expenditures.  And I would submit, particularly

6    in the absence of any evidence from MGA, which clearly is

7    within their control, that that kind of argument just simply

8    fails.

9            **THE COURT:**  Mr. Russell?

10           **MR. RUSSELL:**  Thank you, your Honor.

11           Let me try to take the points Mr. Zeller raised, in

12   their order.

13           First, with respect to the vacillating time period,

14   or whatever it is that he was talking about, I think our briefs

15   are fairly clear.  The difference we're talking about is

16   starting in July of 2003 to as late as November of 2003; so

17   that's the time period we're talking about.  We do lay out

18   history leading up to that, which is relevant to statute of

19   limitations, because we think that puts context -- since this

20   is, in effect, an equitable trial on those defenses, it puts

21   into context the knowledge that Mattel had.  It isn't as if

22   they woke up on July --

23           **THE COURT:**  I think Mr. Zeller's point was that

24   what's changed is, how long did they wait from that time

25   period, say, November of 2003 until --

1      MR. RUSSELL:  Again, your Honor, I would argue it's

2  July of 2003, because I didn't hear Mr. Zeller take issue with

3  me, and I think that's because he can't with respect to the

4  fact that notice for laches is more liberal for MGA.  And so I

5  would argue, when you put the context of the knowledge that

6  Mattel had -- that is to say, they had to be on notice of

7  potential possible actions by MGA affecting their intellectual

8  property -- we've got that.  They knew in March of 2002.  They

9  were investigating Mr. Larian and MGA for allegedly pilfering

10  employees and taking Mattel designs; so they certainly

11  suspected well before The Wall Street Journal article that

12  that's what was going on.

13      THE COURT:  Right.  And I do have this jury finding,

14  though, with respect to fraudulent concealment.

15      MR. RUSSELL:  And let me address that, because that's

16  easily swept aside.  That would matter if we were arguing that

17  they were on notice in 2002.  I didn't argue that to

18  your Honor, and our papers don't argue that.

19      The jury's finding of fraudulent concealment ended

20  April of 2002.  Now, I don't know why they chose that date, but

21  they chose that date; but I get to take the benefit of the

22  knowledge that Mattel had from that point forward.  And when

23  you get to July of 2003, given their investigation --

24      THE COURT:  Forward to what point?  Address

25  Mr. Zeller's argument that at least in their initial complaint

```
 1    that it is -- the relief sought is broad enough to certainly

 2    encompass the notion of constructive trust.

 3              MR. RUSSELL:  I think I'll just take Mr. Zeller at

 4    his word.  On May 23rd of this year, Mr. Zeller said, We have

 5    not -- this is with respect to this exact argument.  We were

 6    asking, Are you trying to argue for the rights to exclude with

 7    respect to the name "Bratz"?  And Mr. Zeller said, and I quote,

 8    "We have not said that the name "Bratz" is, quote,

 9    'proprietary'," end quote, to Mattel.  That is not the basis of

10    our theory.

11              That's May 23, 2008, Page 79, Lines 20 to 22.

12              Now, Mr. Nolan, the very next Monday, came back and

13    said, I think that at the last hearing, and a few hearings

14    back, what they were saying is that they are not dealing with

15    the trademark of "Bratz"; they are dealing with the idea of

16    Bratz, the name itself, just to be clear again for the record.

17              And then the Court noted, 'Yes, and I understand the

18    distinction; it's not a trademark claim, because it was never

19    put into use by Mattel during the time period.'

20              That's at Page 39, 20 through 43.

21              So it is true that we had knowledge that they were

22    arguing that the name was relevant to their claims, much like

23    Diva Starz was relevant to their claims.  It put timing on

24    their claims to the extent that they had rights to damages from

25    those claims.  Those were put to the jury; and in my view, the
```

1    jury awarded whatever it is that they attributed a value to

2    using the name.  But Mattel has specifically and repeatedly

3    said, We are not seeking to have proprietary -- that's

4    Mr. Zeller's word -- proprietary right to the name "Bratz."

5              **THE COURT:**  But go back to my question.

6              You concede, I trust, that much earlier than May of

7    2008, going back to the initial complaint, that the relief

8    sought is broad enough to encompass this notion of constructive

9    trust.

10             **MR. RUSSELL:**  It would be broad enough to capture the

11   notion of the right to the name "Bratz," but not the right to

12   exclude others from the name "Bratz."

13             I would argue, your Honor, that if they had wanted to

14   exclude MGA from using the name "Bratz," or to take the value

15   of the trademark -- and that is what we are talking about --

16   they were obligated to file a trademark claim.

17             You don't get to take someone's trademark --

18   your Honor wrote in Conversive -- and I think Brookline also

19   had the same language -- it doesn't matter who invented a name;

20   that's not relevant at all.  So I will give them that

21   Mr. Bryant invented it, for want of a better term, while at

22   Mattel.  But in the language of trademark, so what?  The facts

23   are, it is use and the value that is created through that use

24   that is at issue now.

25             **THE COURT:**  So it's not relevant who invented the

1   name.

2           MR. RUSSELL:  It's not relevant to excluding others

3   from the right to the name "Bratz."

4           THE COURT:  That's assuming that there's not an

5   intervening contract which awards proprietaryship ownership.

6   That's a distinguishing feature, Counsel.

7           MR. RUSSELL:  Even if it were the case -- and I don't

8   think it is the case -- but even if it were the case that one

9   could argue, they have the name, they have it, they could have

10  developed it, they didn't.  There are many cases out there

11  where someone takes a name invented by someone else and puts

12  value to it and then the original inventor comes forth and

13  says, I'd like the name, please; and the courts say "no."

14          THE COURT:  Right.  But, again, what you just

15  described there is different than the situation that we have

16  here, because Mattel's argument, the critical difference is, is

17  that there was that employment inventorship agreement which

18  gave the rights to Mattel.

19          MR. RUSSELL:  I don't actually think that's a

20  distinction with any difference, because as the cases cite --

21  and I think Brookline deals with this issue, though I'm not

22  100% sure -- but the cases talk about the fact, you can't

23  assign a right to a name unless there's value in the name.

24  That is to say, there is no value in the word "Bratz," because

25  you can't copyright it, you can't protect it; it has no

1    protectable value until it's put into use.

2         So even if we assume that the fact that Mr. Bryant

3    invented it while at Mattel had some relevance, okay, they

4    would have had the right at the time to exploit it.  By virtue

5    of the fact that they did not, they gave up the right to

6    exclude others from it, because Mr. Bryant has no right to

7    assign to them a valueless asset under trademark law.  And I

8    would argue this would also be true with respect to the state

9    law constructive trust theories.  It's valueless.

10        I mean, your Honor dealt with the Disney case.  We

11   talked about that awhile ago.  California does give a

12   contractual right to protect things.  That is true.  But it can

13   be given up.  And here, it was given up explicitly.  They chose

14   not to use it, and they chose at every turn not to seek the

15   monetary value of the name "Bratz."

16        They certainly know how to seek trademarks.  They're

17   doing it now.  Where were they for all of these years?  It's

18   not like they woke up yesterday and discovered there's this new

19   thing called a trademark.  They knew what a trademark was.

20   They knew what a copyright was.  They certainly knew in 2004

21   that Bratz was developed while he was at Mattel.  That's why

22   they say they filed.  It's more than two years ago.  I think

23   I'm in good shape there.  Again, we're talking about laches for

24   the current purposes.

25        **THE COURT:**  Thank you, Counsel.

1         Is there anything further?

2         **MR. RUSSELL:**  That's really the point.  I just wanted

3    to make one other point, which is, they say that we didn't put

4    forth for you any nexus between our prejudice and the delay;

5    and I think that is really a tough argument for them to make.

6         The fact is, your Honor heard ample evidence from

7    Mr. Larian and others that MGA was keenly concerned about

8    Mattel filing suit against them and pursuing them.  And when

9    they intervened, what did Mattel do for an additional two and a

10   half years?  Nothing.  They didn't file any affirmative claims

11   against MGA.

12        **THE COURT:**  But Mr. Zeller's point is, what did MGA

13   do?  And I think the evidence indicates, actually --

14        **MR. RUSSELL:**  Danjaq, which is the leading Black's

15   case in the Ninth Circuit, says that's okay.  In fact, Danjaq

16   was the case where they got sued on the rights, and they

17   continued to pour money into the James Bond franchise, even

18   after being sued; and the court looked at that very prejudice

19   and said that's good enough.

20        Here, we're in a stronger position.  We intervened,

21   expecting, Okay, we've said we have the right.  The natural

22   reaction is, Mattel is going to come back and say, We're going

23   to sue you; we own it.  They certainly knew all of the facts

24   they know now.  They didn't.  They waited two and a half years

25   with no explanation whatsoever.

1        And I think it's certainly a fair inference, if not

2   an outright indisputable fact, that MGA had the right to rely

3   upon the failure of Mattel to file claims to further develop

4   its product.   And I think that's what Danjaq would say.

5        I actually think that's what Jarrow Formulas said.

6   Jarrow Formulas was a case where you had somebody told seven

7   years earlier, I'm going to sue you; I'm going to sue you;

8   don't continue to make those claims with respect to your

9   probiotic product.   They poured money in.   That's sufficient

10  nexus.

11          **THE COURT:**   Thank you, Counsel.

12          Mr. Zeller, I'm going to limit you to the argument

13  that Mr. Russell made concerning whether or not Mr. Bryant

14  could ever have even assigned anything that did not have value

15  to Mattel.

16          **MR. ZELLER:**   Yes, your Honor.

17          If I may say for the record, obviously, he's made a

18  number of arguments that have led into the merits of

19  constructive trust and the like that I have not addressed, and

20  I assume that we'll have an opportunity at some point.   I was

21  focusing more on, of course, the equitable defenses at this

22  point.

23          With respect to the argument about a valueless asset,

24  number one, that's not supported by any authority.   There's

25  nothing that says it has to be valued -- it has value in the

```
 1   way that it appears MGA is talking about.
 2          Number two, the fact is that there is evidence that
 3   it had value.  MGA paid for it.  MGA entered into a contract
 4   with Bryant to acquire those rights.
 5          THE COURT:  But not specifically the name "Bratz."
 6          MR. ZELLER:  It included everything.
 7          THE COURT:  It included it, but was there ever a
 8   value placed on the name "Bratz" at that point in time?
 9          MR. ZELLER:  I would have to double-check,
10   your Honor.  Nothing occurs to me as to whether --
11          THE COURT:  Was there any value to the name "Bratz"
12   at that particular time?
13          MR. ZELLER:  I think there was.
14          THE COURT:  What was the value?
15          MR. ZELLER:  Well, number one --
16          THE COURT:  In its undeveloped state.
17          MR. ZELLER:  I'm not sure I can give you a
18   quantification of it, but what I can say is this:  That, number
19   one, MGA entered into an agreement where it paid money to
20   Bryant for intellectual property that included the name.
21   Number two, the fact is, MGA, soon after that, filed intent to
22   use applications.  That shows MGA itself understood and
23   believed that it had value.
24          THE COURT:  Or that it would have value.
25          MR. ZELLER:  No.  That the name had value.
```

1       **THE COURT:**   The name would have value.   They wanted

2  to protect what they were about to invest in.

3       **MR. ZELLER:**   Well, your Honor, yes.   But that proves

4  my point, that the use was going to acquire -- I mean, that was

5  going to be an investment that would potentially lead to -- or

6  actions that would lead to trademark rights.   The name itself

7  had value, because it was part of the bundle of proprietary

8  information that Carter Bryant took from Mattel and sold to

9  MGA.   The name itself had value.   And it also has value because

10  Bryant had breached his duty, aided and abetted by MGA, not

11  disclosing it to Mattel.

12       And the one thing that he is conflating, MGA is

13  conflating in its argument, is this notion that the name

14  "Brats," B-R-A-T-S, is what we are claiming we derive rights

15  from.   That is not correct.   Brats, B-R-A-T-S, as used in the

16  context or considered as part of the Diva Starz project, that

17  was an issue of timing, like the Toon Teens evidence.

18       **THE COURT:**   I understand that.

19       **MR. ZELLER:**   It's not the basis of our rights.

20       But I don't think that MGA has cited any authority

21  that said somehow, because the full value of the name had not

22  been realized at the time that Bryant wrongfully assigned it,

23  sold it, gave MGA some permission to use it, that that somehow

24  means that there could be no constructive trust over it.

25       In fact, what Mr. Russell has pointed out that I

1  think is quite significant here is that he concedes that absent

2  a constructive trust remedy, they continue to have the right to

3  exclude others from using that name; and that's Mattel

4  included.

5          So what, essentially, MGA is saying is that if this

6  Court does not grant a constructive trust remedy, they can

7  continue to use the wrongfully-acquired property, the name.

8  And we couldn't, and we were never given that opportunity to

9  use it.

10          The last point I would make, your Honor, is just

11  simply that Mr. Russell concedes that they understood a

12  constructive trust was at least a remedy encompassed within our

13  first complaint.  But the constructive trust remedy necessarily

14  implies the right to exclude others.  He's trying to make this

15  distinction that somehow they didn't know that we would be

16  asking to exclude them, in some respect, through a constructive

17  trust or other kinds of remedies.  But inherently, when you're

18  asking for a constructive trust, or an injunction, which we

19  also asked for, that is the right to exclude.

20          **THE COURT:**  Thank you, Counsel.

21          Let's move on to the declaratory relief motion.

22          I also want to begin with MGA on this motion, even

23  though it's not their motion, because I want clarification on a

24  couple of other points.

25          **MR. RUSSELL:**  Yes, your Honor.

1       THE COURT:  On the one hand, you seem to be arguing

2   in your opposition to the motion that the verdict, the

3   decision, is self-evident; there's no need for declaratory

4   relief.  But then on the other hand, you argue that the verdict

5   is confused, essentially, and that it doesn't render or lead to

6   the relief being sought by Mattel.

7       Do you understand --

8       MR. RUSSELL:  I understand the argument.

9       THE COURT:  There appears to be an internal

10   inconsistency, taking your briefs in whole on this and other

11   issues; and I'm going to give you an opportunity to make that

12   clear for the record.

13       MR. RUSSELL:  Thank you, your Honor.

14       This is the argument that Mattel was making in their

15   briefs, and I think there's a little bit of -- to borrow a word

16   from Mr. Zeller -- conflation here.  There are four distinct

17   points I would argue within the declaratory relief motion.

18       The first two are the drawings and the sculpts.  With

19   respect to those, our point was, the verdict is clear, there is

20   no argument, and what they're seeking is moot.

21       THE COURT:  And to be clear, the verdict clearly

22   found that the drawings and the sculpts, at least the sculpts

23   referred to on the verdict form, were created by Carter Bryant

24   while he worked for Mattel.

25       MR. RUSSELL:  Correct.

1      **THE COURT:**  At least in part, solely or jointly.

2      **MR. RUSSELL:**  Correct.

3      So given that, and given Your Honor's prior rulings

4  with respect to the legal import, there is nothing left with

5  respect to the first half.

6      **THE COURT:**  Okay.

7      **MR. RUSSELL:**  Now, there are two other components:

8  The name, which, obviously, we hotly contest.  And I would

9  argue the failure by Mattel to put that in play before the jury

10  is dispositive there.  But, yes, we argue that; but that has

11  nothing to do with this.

12      **THE COURT:**  The same verdict form rendered a decision

13  on that issue as well.

14      What's not clear about that?

15      **MR. RUSSELL:**  The only thing that it rendered was the

16  timing of the name.  But that's distinct, because with the

17  drawings and the sculpts, the jury was specifically asked, What

18  is the value?  $31,500, if memory serves.  But they chose not

19  to do that for the name, because they had specifically eschewed

20  taking the value of the name.  We said that repeatedly.

21  Mr. Zeller -- I quoted him to you -- it's in the discourse that

22  you had with Mr. Nolan.  They chose not to put that in front of

23  the jury.  That was their tactical decision.  And we pressed

24  them at every point to make that clear.

25      So that is totally distinct from the drawings and the

1    sculpts.  They could have put that on there, and we could have

2    fought about that, and the jury might or might not have awarded

3    them something on that and we would have had a different

4    discussion.  But we don't have that discussion.  They didn't

5    file trademark claims, and they didn't ask the jury to assess,

6    under state law theories -- although I think it would be

7    inappropriate -- but they didn't ask the jury, under state law

8    theories, to assess a value in the name "Bratz."  That was

9    their choice.

10            So "yes" with respect to that.  So I don't see any

11    inconsistency there.

12            And with respect to the last category, the

13    characters, I think what's happening here is, there's a little

14    bit of an argument behind the argument.  If what we're talking

15    about is the ideas for the characters, which is literally what

16    their motion asks for, the jury did find that the ideas for the

17    characters were conceived while Mr. Bryant was at Mattel.  That

18    is what the verdict form says.  But I think we all know that's

19    not what we're talking about.

20            What Mattel is trying to do is take it a step further

21    and get the value of those characters.  And what we're saying

22    is, the jury has spoken on that issue.  Again, you don't need

23    to go there.  They asked for the full value of the exploitation

24    of Bratz in every possible formulation.  They asked for

25    $1.47 billion.  If that didn't capture it -- and what did they

1  get?  $10 million.  So they asked for that relief, and they

2  didn't get it.

3         Nothing your Honor could do by way of declaratory

4  relief would add anything permissibly; and I would argue would

5  very much undercut and infringe on our Seventh Amendment right,

6  and put into dispute and lack of clarity what happened.

7  There's no reason for that relief to be granted here.

8         So the only thing, in our view, that really is at

9  issue here is the name.  The rest of it is moot, and your Honor

10  should simply not take up their invitation to go down that

11  road.

12         **THE COURT:**  What about the affect of this on the

13  assignment of rights by Carter Bryant?

14         **MR. RUSSELL:**  I'm not sure I understand that

15  question.

16         **THE COURT:**  Well, Carter Bryant purported to assign

17  any rights that he had to MGA.

18         **MR. RUSSELL:**  Correct.

19         **THE COURT:**  The jury finding in the first phase

20  arguably indicates that those rights were properly with Mattel

21  and that efforts to transfer that were fraudulent, were

22  interference in contractual relations, et cetera.

23         Is it self-evident, then, all of those rights rest

24  with Mattel?

25         **MR. RUSSELL:**  I'd say "no" is the answer to that,

1   your Honor.  I mean, the rights that they have are the rights

2   that the jury awarded.  The jury found infringement and awarded

3   them $10 million.

4          **THE COURT:**  Those are two separate things.  We'll be

5   discussing this, I'm sure, later in terms of what the jury

6   awarded and not.  They awarded the value, the damages, that

7   they believed were associated with what they found to have been

8   copyrighted, something to that effect.  That's not an awarding

9   of rights.

10          You have a position to argue that arguably on the

11  jury award that the lion's share of the value related to the

12  Bratz dolls was not the characters, it was not the dolls

13  themselves, but rather, all of the other things that were

14  lumped into it.

15         **MR. RUSSELL:**  Correct.

16         **THE COURT:**  What Mattel is seeking now is just those,

17  from the jury's perspective, relatively nonvaluable dolls

18  themselves.

19         **MR. RUSSELL:**  They're not even seeking that,

20  your Honor.  I think that's part of the mischief here.

21         If you look at what they're seeking, they're seeking

22  declarations they own, the ideas for the characters, which is,

23  I think we can agree under any formulation, not protectable.

24  There are no rights in the ideas for the characters.  We don't

25  even know what that is.  It's not as if we're talking about 70

1   specific drawings, two specific sculpts.  We're talking about

2   this amorphus ideas for characters.

3           I suggest, respectfully, they're inviting you to a

4   place you shouldn't go, by, if you were to do so, granting

5   declaratory relief on essentially something meaningless.

6           **THE COURT:**  So it's not self-evident, then, that it's

7   anything, to you, more than the ideas?

8           **MR. RUSSELL:**  That's what they asked for in their

9   motion.

10          **THE COURT:**  Not what they asked for.  In terms of

11  your argument as to what he is -- you're saying that

12  declaratory relief is not required because certain things are

13  self-evident.  I want a clear understanding, from your

14  perspective, of what is self-evident.

15          **MR. RUSSELL:**  I will just take them at their word.

16  What they asked for was a declaration from you that they own

17  all of the rights to the ideas for characters found on the

18  verdict form.  The verdict form has a question saying, Did he

19  conceive the ideas for the characters while at Mattel?

20          Yes, that happened.

21          But ideas for characters, unlike specific drawings or

22  unlike sculpts, that does not have -- there's nothing that we

23  can wrap our hands around and say, We're talking about 'X'.

24  Ideas for characters -- I think the reason that was put on the

25  form, respectfully, was, it allowed them, again for timing

1  purposes -- they're trying to tie things for timing purposes.

2  But now they're trying to turn it into something else and say,

3  This is essentially an asset, a valuable property, that they

4  own.  And I think, again, because it's so nebulous, they got

5  what they were entitled to on the verdict form; they got the

6  benefit they wanted.

7        But for you to go further and try to guess what the

8  jury intended by that, and try to guess what that means, is

9  going to result in a series of bad things, not the least of

10 which is, we're going to be fighting again, I assure you, about

11 what that means in the future.  And there's no reason to do

12 that.  They got the value that the ideas embodied by virtue of

13 the copyright damages and by virtue of the state law damages

14 claims.

15        **THE COURT:**  Let me hear from Mattel.

16        **MR. ZELLER:**  Respectfully, I would submit that the

17 argument, just like MGA's papers, actually shows why we needed

18 declaratory relief here.  It's anything far from clear.

19        We're asking the Court simply to connect the dots as

20 to its rulings, the jury's findings.  This was always what was

21 anticipated that would be done under declaratory relief.  And

22 MGA, on the one hand, wants to basically say, Well, we lost the

23 trial, so now it's moot.

24        That's just not the law.  It's quite the contrary.

25        In order to make a declaratory relief claim moot,

1   once there's been a live controversy, once there was ever one,

2   which is undisputed here, they have to stand up here, in a

3   binding way, and say, We agree, Mattel owns these.

4        **THE COURT:**   That's what I was attempting to do there

5   a moment ago, Counsel, though unsuccessfully.   Because I think

6   there's still a dispute over the characterization of what it is

7   that you're seeking.   So let me do the same thing with you.

8            Clearly, what is it that you're seeking?

9        **MR. ZELLER:**   Your Honor, we do lay that out, I hope

10  with sufficient precision, in the papers.   I will attempt to

11  summarize it in a way, but obviously, we were very careful in

12  exactly what we set forth in our papers.

13           Let me first address the characters issue, since

14  Mr. Russell appeared to be struggling with that one.

15           The character issue is Mattel --

16       **THE COURT:**   The Court is struggling as much as

17  Mr. Russell, so let's --

18       **MR. ZELLER:**   Fair enough, your Honor.

19           The character issue is, in fact, with the copyright.

20  The Court will recall that in Phase B, the Court instructed the

21  jury that, in fact, copyright in a character can be infringed.

22  That's what we're asking for, is the copyright ownership in the

23  characters, the distinctive attributes of characters that are

24  protectable under the Court's prior rulings.

25           So it's not this -- ironically enough, when

1    Mr. Russell says it's all nebulous, of course that just

2    confirms the crying need for declaratory relief.  But as to the

3    merits of our request, we are asking for the Court to connect

4    the dots, whether it's the drawings, the sculpt, the

5    characters, and the other works that Mattel owns, and putting

6    it forth in a single order that makes very clear, This is what

7    Mattel owns.  Because, otherwise, we're going to be reduced to

8    piecing together, in front of some foreign court, in

9    particular -- here was the verdict, here was the Court's

10   summary judgment ruling; and, of course, then having MGA

11   dispute in those jurisdictions what we think is already settled

12   here.

13           But with respect to the mootness point, your Honor,

14   which is really their main argument, that mootness argument

15   simply fails under any standard.  The courts have been very

16   clear that once there is a live controversy, they have to say,

17   in a binding way, that they are no longer disputing what is

18   actually at issue.

19           **THE COURT:**  Counsel, I'm with you on the need for a

20   declaratory relief order.  I'm going to issue one.  But I want

21   to make sure -- what I'm really concerned about is the point

22   that Mr. Russell made about -- I don't want to be sitting here

23   six months from now having another debate or disputation over

24   what is meant by the terms.

25           Take, for example, number three on your proposed

1  order, under the inventions agreement, "Mattel owns the rights

2  to all inventions in Mattel's line of business that Mr. Bryant

3  conceived or reduced to practice while employed at Mattel."

4          What do you mean by that?

5          **MR. ZELLER:**  I think, your Honor, that that is

6  preparatory language to help explain the basis for the Court's

7  ruling.  It is to our -- and, honestly, your Honor, the reason

8  we have done this is the reason I was just alluding to, that if

9  we have to go into foreign courts and seek relief based upon

10 our ownership rights, we want to have an order that we can

11 present to a court that will be sufficiently self-contained

12 that it explains what the basis is.

13         **THE COURT:**  To say "the rights," are we talking --

14 obviously, we're not talking about trademark rights.

15         **MR. ZELLER:**  Not at that particular point, no.

16         But, your Honor, that is not intended to say that

17 that would be the delineation of the rights; those are

18 elsewhere as well.

19         What we're saying is, that's an explanation; that's

20 the rationale for the judgment, for the ruling itself.  It's

21 not meant to be that.  And we can certainly clarify that,

22 your Honor, if you want.  It's not intended to be, you know,

23 some other open-ended invitation for us to guess about a whole

24 variety of other things that may have been created.

25         **THE COURT:**  That's the concern I have.  I think it's

1    legitimate.

2         MR. ZELLER:  And that's not its purpose.  Its purpose

3    is to explain -- whether it's the copyright office, the

4    trademark office, foreign courts, third parties, whoever else

5    is out there in the world -- the explanation.

6         THE COURT:  If this is simply a matter of connecting

7    the dots between the Court's pretrial rulings and the verdict

8    findings of the jury, that's one thing.  It's another thing if

9    this is being used as a platform to expand upon the rights.

10        And you're disavowing the latter?

11        MR. ZELLER:  That is correct.  Absolutely,

12   your Honor.

13        There are, obviously -- some of the implications of

14   the Court's rulings will -- and I think they're probably one

15   area where --

16        THE COURT:  I know that I want to be aware; I love

17   knowing the implications --

18        MR. ZELLER:  The implication, I would say, really

19   goes to, of course, the validity, or invalidity, from our

20   perspective, of the assignment that MGA purportedly received.

21        But that's also spelled out.  There's no hidden

22   implication in that respect, your Honor.  It's all there.

23   We're not asking for some open-ended invitation.

24        THE COURT:  It's all there, and then some.

25        All right.  Very well.

1          Is there anything further on this, from your

2     perspective?

3          **MR. ZELLER:**  The one thing I do want to say,

4     your Honor, on this particular issue, too, is that -- and, of

5     course, this whole issue about the name has come up again.

6     And, again, I'm hoping that we'll have an opportunity to fully

7     address the various things that have come up in the context of

8     the motions that we've made, where that's at issue, which is

9     the constructive trust and the UCL injunction.

10         **THE COURT:**  You have until 5:00, Counsel.

11         **MR. ZELLER:**  Thank you.

12         **THE COURT:**  Just briefly.

13         **MR. RUSSELL:**  First, I just can't help but note to

14    myself -- I mean, Mr. Zeller now wants to connect the dots that

15    we asked your Honor and they fought so hard against connecting

16    awhile ago.  I mean, it seems pretty clear to me, if they had

17    wanted this to be even clearer, they could have had a specific

18    verdict form for these things; they could have put on their

19    order what they're talking about.

20         We're not -- the first category, there could be no

21    question that it's moot, the 70 drawings and the two sculpts.

22    Your Honor's order is how many sentences long there?  The

23    verdict form is one question with a hundred subparts.

24         I don't know that that requires you to do much, and I

25    do think it's fraught with peril.  I do think it invades our

1    constitutional rights under the Seventh Amendment.  There's no

2    reason to go there for the first two.  I don't even hear

3    Mr. Zeller really arguing that.  There's no dispute.  We've

4    said in our briefs, the verdict form says what it says, they

5    have whatever rights that conveys.

6              To come back and ask your Honor to put more gloss on

7    this, it doesn't seem like there's any reason for it.

8              And with respect to the characters, he's certainly

9    not elucidating what he's talking about.  Again, he can't tell

10   you what he's talking about.  He can't put precision on it.

11   And it's because he doesn't know what he wants.  What he wants

12   is an order that gives him the right to do mischief in the

13   future.  I think there's little question of that.  And I think

14   that's one of the reasons why -- and we cite your Honor to

15   these cases.  I think (unintelligible) is a noted authority on

16   this.  This is one of the reasons why declaratory relief

17   actions are frequently held preempted.  You don't want to have

18   courts ruling in a declaratory fashion.  We already had a jury,

19   asked these very questions; render a fairly detailed -- maybe

20   not detailed enough -- but a fairly detailed verdict form; and

21   now they want to come back for a second bite, and say, You

22   know, gosh, I wish I could tweak this, I wish I could tweak

23   that.  It's not needed for the first part.  And for the second

24   part, they didn't ask for it.  They had their shot at it.  And

25   all they want to do now is expand the rights that they were

1    never given.

2           So I would submit that this claim, with respect to

3    ownership over the ideas, is preempted.  There's no need for a

4    declaration from the Court.

5           **THE COURT:**  Thank you, Counsel.

6           I want to move on to the constructive trust motion.

7    I know we've already delved into this to some extent, but I

8    think the merits of the constructive trust need to be developed

9    as well.  I'll permit Mattel to proceed first on this.

10          **MR. ZELLER:**  I think the Court is familiar with our

11   basic theory here, which, as briefly put, is that, as the jury

12   found, Carter Bryant created the name "Bratz," B-R-A-T-Z, so

13   that there's no ambiguity here, the name "Bratz" itself that

14   was used by MGA subsequently while he was employed by Mattel;

15   that was part of this bundle of proprietary information,

16   because Bryant created it, that was improperly transferred and

17   then used by MGA.

18          The constructive trust that we are asking for goes to

19   the uses that they made of that name that subsequently gave

20   rise to trademark rights and trademark registrations.  And

21   that, under our point, is part and parcel of the wrongdoing.

22   And the point I was making earlier is that absent this kind of

23   relief, literally MGA will be allowed to continue to use, for

24   its benefit, something that the jury found Bryant created when

25   he was employed by Mattel, and continue to exclude Mattel from

1    the right to use it.

2           And that, we think, is exactly the kind of situation

3    that the constructive trust, as well as the UCL injunction,

4    remedies were designed to cure and to avoid, as this kind of

5    situation.

6           The one thing that MGA just never really comes to

7    dispute -- and I don't think they can, in light of the jury

8    verdict, as well as the Court's rulings -- is that

9    Carter Bryant created the name "Bratz," B-R-A-T-Z, while he was

10   a Mattel employee and that he wrongfully gave it, disclosed it,

11   to MGA.

12          The Court is familiar with the authorities, including

13   under the restatement, that makes it very clear that the scope

14   of relief that we're entitled to as a result of that also goes

15   to the benefits of what it is that MGA obtained.  And from our

16   perspective, all of those uses -- and there's no question that,

17   of course, it took the use by MGA of the name for trademark

18   rights to arise, at least in the United States.  Foreign

19   jurisdictions are different.  But our perspective is, just like

20   in the licensor-licensee situation, the fact is that it

21   (unintelligible) to our benefit, and those are the rights that

22   we should have had and that we should have been given.

23          Mr. Russell, on more than one occasion, has said,

24   basically, Mattel knew and just basically decided not to use

25   the name "Bratz."  But he is again conflating the different

1    names and the different evidence that's here in this case.

2    There is no evidence that Mattel knew about Bryant's creation

3    of the name "Bratz," B-R-A-T-Z, before his deposition in

4    November of 2004.  What is certainly the case is that what he's

5    talking about, Mr. Russell is citing to, are instances about

6    the name Brats, B-R-A-T-S, within Diva Starz.  That's neither

7    here nor there.  It doesn't have anything to do with our theory

8    here.

9              **THE COURT:**  I understand that, Counsel.

10             **MR. ZELLER:**  Yes.

11             Now, one thing that MGA really does not come to grips

12   with either is, even with their whole use argument, which we

13   actually think supports our constructive trust theory -- but

14   even apart from that, in foreign jurisdictions, the

15   registration is what gave rise to the rights.

16             So, I mean, it was simply the act of MGA taking the

17   "Bratz" name from Bryant that belonged to Mattel and then doing

18   a foreign registration, and blocking Mattel right then and

19   there before it even knew that it had the rights to that name.

20   So even these kind of use arguments that they make to try and

21   escape the consequences of the constructive trust just have no

22   application in that situation.

23             The one thing that Mr. Russell has also alluded to

24   more than once was the Lovins registration.

25             In many respects, it's not really an argument that I

1   think gets them very far, if anywhere.  I mean, first of all,

2   as the Court has pointed out, and the Court knows, Lovins was

3   for a very particular use.  It wasn't even for dolls.  It

4   wasn't for toys.  So whatever implication or impact that

5   particular situation has, it's extremely narrow and doesn't

6   really go to the heart of what it is that we're asking for

7   here.

8            Number two, the fact is that the tort had already

9   been done.  They were already beginning to use the trademark

10  when the Lovins situation came in.  This is pure happenstance

11  that they then had to acquire rights from Lovins.  Whatever

12  rights they acquired also falls under the same theory of

13  constructive trust.  I mean, the fact is, they never had the

14  right to use the "Bratz" name, because Bryant created it when

15  employed by Mattel, MGA aided and abetted in his breach of

16  fiduciary duty, tortuously interfered with his contract in

17  taking that name and proceeding to use it.

18           **THE COURT:**  Let me ask you a question.

19           These arguments are flushed out in the briefs.

20  There's one argument that's not as flushed out.  I'd like to

21  hear your response in greater detail.  And I certainly want to

22  give Mr. Russell, or MGA, a chance.

23           It's the basis of the Court to actually extend

24  injunctive relief to these intellectual property cases.

25  There's that last footnote in the opposition from MGA,

```
 1    Footnote 11 on Page 17, which attempts to distinguish Mattel's
 2    cases about the Court's authority to do this.  I'm somewhat
 3    concerned about this lurking issue about the underlying basis
 4    to even extend a constructive trust.
 5              Can you address that?
 6         MR. ZELLER:  The footnote the Court is referring to
 7    is the one --
 8         THE COURT:  On Page 17 of the opposition.
 9         MR. ZELLER:  And that's talking about an injunction?
10         THE COURT:  Right.  "Mattel's cases are not to the
11    contrary, since none of them extend injunctive relief under the
12    UCL to lawful activities related to the UCL violations at
13    issue."
14         MR. ZELLER:  I don't think that is a correct
15    statement of our cases, your Honor, and let me find the
16    authority.
17         THE COURT:  Page 17 of the opposition.
18         MR. ZELLER:  This is -- for example, Hewlett was a
19    case -- I believe we cited this in our papers, but just in
20    case, for the record, it's 54 Cal. App. 4th 499, specifically
21    Pages 538 through 542; and that was a situation where the Court
22    'affirmed an injunction that was prohibiting otherwise lawful
23    activities, following a finding of liability under the UCL.'
24              Now, from our perspective, of course, that's an even
25    further situation out than what we have here.  This was a
```

1    direct consequence of the wrongdoing; and so they continue to

2    benefit and they continue to be able to exclude us.

3            **THE COURT:**  It was wrongdoing followed by lawful

4    activity.

5            **MR. ZELLER:**  Arguably, that always happens in this

6    kind of situation.  Even in the more very traditional,

7    straightforward situations --

8            **THE COURT:**  And the question was whether or not the

9    constructive trust can be used to basically hold in trust the

10   lawful activity in an intellectual property situation.

11           **MR. ZELLER:**  Right.  Exactly.

12           And so I don't think it's a distinction that's really

13   supported by the cases, first and foremost.  But to me, in some

14   respects, the argument is proof far too much.  I mean, that

15   would basically be saying, Well, you don't really get all of

16   the benefits of the initially illegal conduct; it all has to be

17   illegal.

18           I'm unaware of anything in the cases that suggest

19   that.  And, in fact, it would run counter to really the

20   equitable principles that underline both constructive trusts as

21   well as UCL injunctions.  I mean, it's to put a stop to illegal

22   activity.

23           And as a matter of fact, I would hazard to say that

24   in many doctrines, that kind of equitable relief can still be

25   granted, even if it includes and sweeps within it something

```
 1   that someone could arguably say is lawful behavior or something
 2   that arose later and was lawful.  I mean, this is part and
 3   parcel.
 4            THE COURT:  And your best authority for that would be
 5   what?
 6            MR. ZELLER:  I believe, for example, there's the
 7   Hewlett case that I was referring to in the injunction context.
 8            THE COURT:  Right.
 9            MR. ZELLER:  And then with respect to constructive
10   trust -- let me just find this here, your Honor.  I believe
11   that among our best cases would be the Haskell Engineering
12   case, where what we're talking about is that there was
13   initially illegal activity and embezzling of funds, but then,
14   of course, those were applied to basically acquire other
15   property.
16            And, obviously, even the enhanced value of the
17   property was something that was recoverable.  No one argued
18   that that in itself was illegal.  It's obviously the root
19   cause; it's the underlying part of it.  And anything that's
20   traceable -- also in terms of the authority for this
21   proposition, your Honor, I mean, it's commonly stated as the
22   rule that basically any benefits that are traceable to that
23   wrongdoing are what we can obtain.  It's not whatever is
24   traceable and was in itself independently tortious and
25   actionable.
```

1    **THE COURT:**  From your perspective, the basis for the

2    17200 claim is Mr. Larian's interference in the contractual --

3    his tortious interference?

4    **MR. ZELLER:**  That's one aspect of it, yes.  There's

5    also aiding and abetting breach of fiduciary duty.  In fact, in

6    some respects, I think that's the most straightforward one, is

7    the aiding and abetting claim, because as the Court will

8    recall, under section one of Carter Bryant's agreement, things

9    that he created while employed by Mattel were Mattel's

10   proprietary information.  The Court already ruled he had a

11   fiduciary obligation to protect that information.  MGA acquired

12   it wrongfully, as the jury verdict confirms, and took that name

13   and then subsequently put it to use.

14        And that is, I think, the most direct basis for

15   finding, basically, part of a course of wrongful conduct by

16   MGA.  And that was really the genesis of it.  I mean, there's

17   no question, and I don't think there's any dispute, that MGA

18   acquired that name from Bryant.  There's just no evidence, and

19   I don't even hear any argument from MGA, that that name came

20   from anywhere other than Bryant, which pursuant to the jury's

21   verdict is Mattel's property.

22        **THE COURT:**  Very well.

23        Mr. Russell?

24   **MR. RUSSELL:**  Your Honor, if we're going to talk

25   about the unfair competition claim, I think the best place to

1   start with is the fact that Mattel lacks standing to even

2   assert rights under this claim.   They have repeatedly and

3   undeniably -- I think every member at the table to my right has

4   said they are not seeking damages for any harm to Mattel; they

5   simply seek to force MGA to disgorge ill-gotten benefits.   We

6   cite your Honor to the <u>Madrid v. Perot Systems Corp.</u> case, and

7   there are many other cases that so hold.   That's not going to

8   give them standing.

9           **THE COURT:**   This is an issue that appears in several

10  of these briefs, this question of whether there was sufficient

11  evidence of any damages to Mattel during the trial, or up to

12  this point.

13          There seems to be some.

14          **MR. RUSSELL:**   I struggle with that only because,

15  your Honor, if we hadn't heard from Mattel that they were not

16  seeking to put in evidence, and, indeed, forcing the exclusion

17  of evidence about the harm to them, the exclusion of

18  evidence -- then we would be in a very different place right

19  now.

20          **THE COURT:**   I say "some" only because notwithstanding

21  their best efforts to keep that evidence out, some made its way

22  into the trial.   And in any event, it was kept out on 403

23  grounds, basically, not to confuse the jury for what they were

24  deciding in those phases.   It's hard for the Court not to

25  consider why I should not -- and this is wrapped up in the

1    motion to strike -- why I should not consider that evidence at

2    this point.

3              MR. RUSSELL:  I think you should consider it because

4    they told you that they weren't going to put in any evidence

5    and they weren't going to rely on that as a theory for

6    recovery.  We were estopped in taking discovery that we wanted;

7    expert reports were cut back.  I mean, a lot of our efforts to

8    craft our case, jury instructions, verdict forms, their entire

9    theory --

10             THE COURT:  We're mixing a lot together here.  It's

11   one thing to talk about jury forms or instruction during the

12   earlier phases of the trial.

13             MR. RUSSELL:  I think at the end of the day --

14             THE COURT:  Were you precluded in the discovery phase

15   from ever --

16             MR. RUSSELL:  I think the answer is "no" in the early

17   phases.  I mean, there was some discovery at the end when there

18   was still some expert discovery, but I don't want to tarry

19   there long.  I think the more important point is at trial and

20   in the verdict and jury instructions.  There's no question that

21   that was their repeated position.  And if some evidence of harm

22   to Mattel inadvertently spilled in, it was certainly made clear

23   by Your Honor's rulings and by the arguments that that was not

24   something the jury should properly consider.

25             THE COURT:  Sure.  But why should I not consider that

1    evidence at this point?

2         **MR. RUSSELL:**  Why would they not be bound by their

3    own judicial admissions at various stages?  They have taken the

4    position and prevailed upon it.  Their specifically saying,

5    We're not seeking damages; we're not putting in evidence of

6    harm, precluded us from doing so, and prevailed.  So all of the

7    elements for judicial estoppel are met, for judicial

8    statements --

9         **THE COURT:**  But they were not seeking a constructive

10   trust in Phase 1-A or 1-B.

11        **MR. RUSSELL:**  Well, what they were doing was, they

12   were trying to prevail on claims on which constructive trust is

13   a form of relief.  Perhaps, they would not have prevailed had

14   we had a trial on what the harm to Mattel was.  If we had been

15   allowed to try the harm to Mattel case, maybe the jury would

16   have concluded that there were no damages.

17           I mean, it's tough for me to speculate in the

18   abstract, but what I can do is say, they made a tactical

19   decision that has been consistent -- I think this is

20   Mr. Proctor's word -- consistent from day one.

21        **THE COURT:**  At this point, this is only a standing

22   argument you're making; correct?

23        **MR. RUSSELL:**  That's the first place, I think, we

24   have to start on an unfair competition claim.

25        **THE COURT:**  So the question is whether or not there

1    is standing for them to bring this?

2           **MR. RUSSELL:**   Correct.   And we've already cited

3    your Honor -- this is -- yes, Prop 64 in California -- I mean,

4    this is not an idle issue.   17200, California courts, in

5    particular -- and that is the <u>Madrid v. Perot Systems</u> case.

6    It's not enough, as <u>Madrid</u> says, to talk about ill-gotten gain.

7    You've got to talk about harm to the plaintiff.   And they have

8    said there was none.   So we don't even need to get to the fine

9    distinctions that Mr. Zeller was trying to get to.   They can't

10   come to grips with their own admissions.   There's no standing,

11   so the UCL claim should just go right out the window.

12          But even if that weren't the case -- and this is why

13   I think -- tied up with the arguments in Footnote 11 -- the

14   facts are, they can't show a nexus for purposes of unfair

15   competition.

16          **THE COURT:**   The theory in Footnote 11, am I right in

17   reading more into that?

18          **MR. RUSSELL:**   Yes.

19          **THE COURT:**   I thought that just kind of jumped out at

20   me as being a little bit more than Footnote 11.

21          **MR. RUSSELL:**   Sometimes there are space constraints

22   and the like.   But I think the point to be made is that they

23   have to show a nexus between the unlawful conduct and the

24   remedy.   And they can't do that.   It's not simply enough to

25   say, Mr. Bryant conceived the name while at Mattel; and,

```
 1   therefore, we have rights.  Because under your Honor's decision
 2   in Conversive, Mr. Bryant had no right to transfer to the name
 3   "Bratz" at that time.  There was no valuable property.  A
 4   constructive trust cannot exist in a vacuum.  Property must
 5   have value.  It didn't.  And Mr. Zeller stood here, in response
 6   to your question, and basically conceded that there was no
 7   value at the time.  It's farcical to suggest otherwise.
 8            THE COURT:  Prospective value.
 9            MR. RUSSELL:  Correct.  If Mattel had been told,
10   Would you like $5 for the name "Bratz" back in 2000, I think
11   they would have said, I'll take the $5.
12            THE COURT:  They probably would have asked you, What
13   are you going to do with the name "Bratz"?
14            MR. RUSSELL:  That's probably true.  But in any
15   event, there is little question that there wasn't much going
16   on.
17            THE COURT:  That conversation may have avoided this
18   whole thing.
19            MR. RUSSELL:  Perhaps.  But in any event, there was
20   no value, certainly none that can be quantified by Mattel; so
21   there was no rest for a constructive trust to even exist over.
22   The only time value was created was through lawful activities.
23   Mr. Zeller conceded that.  There's no argument -- value in the
24   name "Bratz" was created through lawful activity.  That's one
25   of the reasons why the cases we're talking about in that
```

1    footnote are so critical.  Most of the time, you're enjoining

2    the unlawful conduct.  Here, what they want to enjoin is

3    something that happened that's irrelevant.

4          Mr. Bryant invented the name.  Again, we dispute

5    that.  The name "Bratz" was in the public domain.  I don't

6    think they have any rights, protectable rights, at all.  I

7    think to the extent they argue that there's some --

8          THE COURT:  Address the argument that Mr. Zeller

9    makes.  When something has -- it's kind of like the fruit of

10   the poisonous tree, as it were.  I mean, this was a house.  The

11   house of Bratz, so the argument goes, was built on a foundation

12   that a jury has found was unlawful.

13         MR. RUSSELL:  It's more like we came across a tree,

14   cut it down, made it into boards and built a house, and now

15   they want my house.  That's, I think, more analogous.  We're

16   not talking about something where there was a house and now I

17   want to paint it -- I painted it blue, and I want the value.

18   That's the problem they have here, is you can't divorce the

19   name "Bratz" from its value right now.  That's one of the

20   reasons we cited your Honor to the Tillamook case.

21         Tillamook Country Smoker is a Ninth Circuit case that

22   talks about how inequitable it is for a plaintiff -- it's 311

23   F.Supp.2d 1023 -- it talks about the fact that it would be

24   inequitable to divest a defendant of a trademark name after

25   years of investment.  And that really, I think, bottom line,

1     sort of implicates the policy we're talking about.

2           And that's where your Honor's decision in Conversive

3     really dovetails.  If there had been value at the time and they

4     had pursued it, this would be a different case.  There was no

5     value, so there was nothing that could be transferred, and,

6     hence, nothing over which a constructive trust at that time

7     could have been rendered.

8           Now the only thing that has value is the trademark,

9     and they're precluded either because they needed to seek a

10    trademark claim, or if they are contending that the name

11    "Bratz" had some proprietary value, something Mr. Zeller

12    specifically said they're not seeking, then they should have

13    gone for a trade secret claim on that.  So it would be

14    preempted as a matter of trade secret preemption; and we

15    briefed that as well.

16          The problem here is, the value was created lawfully.

17    There was no value when it was taken.  The value was all

18    created by MGA.  And it would certainly -- since this is an

19    equitable remedy, I think you have to look at the equity.  What

20    would the equity be when they were certainly aware of this name

21    very early on and sat on their hands forever, to letting them

22    speculate on MGA's investment?

23          MGA should have the right to exclude them.  It

24    developed the "Bratz" name.  It developed the marks.  It's the

25    one that spent the money.  They knew as early as 2001 that the

1    "Bratz" name was out there.  They certainly knew by 2004, when

2    they deposed Mr. Bryant, everything; and yet, here we are four

3    years later, for the first time, hearing, Give us the

4    trademarks.

5            And that's exactly the reason why the UCL claim is

6    limited to unlawful activity.  If we were talking about the

7    unlawful expansion of the mark -- it's hard to imagine that

8    would happen, but if that were the case, this might be

9    different.  But every single thing done by MGA since it got the

10   name is lawful.  There's no dispute about that.  And that's

11   what distinguishes all of their cases.

12           **THE COURT:**  Very well.

13           Anything further, Mr. Zeller?

14           **MR. ZELLER:**  Yes.

15           Mr. Russell continues to basically mix together

16   different concepts, but in particular, one thing that he said

17   to the Court just now was that MGA developed the name "Bratz."

18   That is just demonstratively inconsistent.

19           **THE COURT:**  What I understand him to mean by that is,

20   there's no question that Carter Bryant came up with the idea

21   for the name "Bratz" while he was at Mattel; and, therefore, it

22   is owned by Mattel.

23           What Mr. Russell is saying is, starting with that

24   which Mr. Russell puts no value on, MGA took that name and gave

25   it value.  It cut down the tree, to use his analogy, and ran it

Monday, November 10, 2008                           CV 04-09049

```
 1   through the lumber mill and built a house.
 2              Before, it was just a tree; now it's a house.
 3              Before, it was a name; now it's a brand.
 4        MR. ZELLER:  But the fundamental point, your Honor,
 5   is that they do not contest that brand came only as a result of
 6   taking the name from Mattel.
 7        THE COURT:  But the value for the brand did not come
 8   from taking it from Mattel.
 9        MR. ZELLER:  That's where I disagree, your Honor.
10   Mr. Russell is incorrect when he says that I conceded there was
11   no value.  Quite to the contrary.  I said that we couldn't
12   quantify it.  But there's no requirement under the law that
13   somehow there has to be a particular value to something.
14        THE COURT:  If you can't quantify, can you give me a
15   qualitative -- how could we -- what value is there or was
16   there?
17        MR. ZELLER:  Your Honor, we can --
18        THE COURT:  I know what the value there is.  What
19   value was there?  Back up to 2000, 1999, when Carter Bryant
20   came up with this name "Bratz."  What value was there?  Don't
21   put a dollar number on it.  What's the value of the name?
22        MR. ZELLER:  The value of the name -- and we can get
23   deposition testimony from -- in fact, I believe Mr. Larian, to
24   support this -- is that in the toy industry, having a project,
25   having a great toy idea with a great name is critical.  And, in
```

1   fact, it's something that you protect.  It's something that MGA

2   has protected prior to the time it is put on the market.

3          Bear in mind what it is that Carter Bryant did.  He

4   took a bundle of rights over to MGA, that he did not own, and

5   that Mattel, in fact, owns.  Part of that bundle, this project,

6   was these doll designs, along with the name that, in fact --

7   and there's evidence in the record -- that MGA liked, that

8   girls liked.  And this is all before it was developed into a

9   trademark.

10          In fact, MGA, during the time right after Bryant

11   brought the name over to MGA, did internal focus groups, and

12   the girls said, 'Oh, yeah we love the name.'  That was not a

13   mark at that point.  That was a name.  Because they weren't

14   even using it in commerce.  And, in fact, these things were

15   before December of 2000, before they even started.

16          **THE COURT:**  That was a name for a doll; right?  It

17   was in that context that it was being described?

18          I don't want to get ahead of myself, because this is

19   going to come up again in the permanent injunction motion.  But

20   we might as well start addressing this now, because this is one

21   of the tough things that I'm -- you know, the Court is sitting

22   in equity at this point, to a large extent.  And this is the

23   struggle that I have with this case fundamentally, is that the

24   measurable value, the measurable value to Bratz, the brand

25   Bratz, to the dolls Bratz, to everything that came of it, is so

1   much a function of what Isaac Larian and his team at MGA put

2   into it.

3            At the same time, I recognize and respect the jury's

4   finding that the idea for Bratz, the name "Bratz," the concept

5   drawings for Bratz, were improperly obtained, based on the

6   tortious interference claims.

7            That creates a struggle, Counsel.

8            **MR. ZELLER:**  And I will say, your Honor -- and I

9   think that is, in many respects, certainly going to be the

10  heart of the issue here.

11           **THE COURT:**  And to take everything that is of value

12  and to, from your perspective, return it to its rightful owner,

13  that's quite a leap.

14           **MR. ZELLER:**  Well, I wouldn't call it a leap,

15  your Honor.  What I would suggest is that, certainly, it's

16  going to -- it is applying the law, is what I would suggest,

17  your Honor.  The fact is, the enormity of the wrong here really

18  shouldn't be a reason the Court should shirk from ordering the

19  property back.

20           **THE COURT:**  Just how you responded to me there, it's

21  applying the law.  I understand.  That's why I prefaced this by

22  saying we're sitting in equity.  And I understand that even in

23  equity, of course, I'm required to follow the law.

24           **MR. ZELLER:**  Yes.

25           **THE COURT:**  But I need you to address the equities of

1   this.

2           MR. ZELLER:  I will, your Honor.  And I also think

3   that --

4           THE COURT:  I'll certainly want to hear from MGA in

5   the same regard, but it's something that I -- in reviewing

6   these papers, that has been kind of in the back of my mind

7   throughout these last several weeks.  I've had any number of

8   people come up to me in the last month or so and say, Aren't

9   you glad to have that Bratz case all over with?  Now we're at

10  the critical point.

11          MR. ZELLER:  I would say this, your Honor:  The Court

12  has, of course, seen the evidence during the course of trial;

13  and, certainly, there is a base line, obviously, on this

14  particular issue that the Court needs to be consistent with, of

15  course, with the jury verdict; the timing of the name; the fact

16  that there was, in fact, intentional torts that were committed

17  by MGA here; that there was fraudulent concealment.  And I

18  think, frankly, when you start looking at those issues, I mean,

19  that helps, I think, really set the equities.

20          The fact is, MGA is not going to be walking out empty

21  handed.  The fact is, they have been given -- and unfortunately

22  had the right to exploit these things when Mattel was unaware

23  of its rights.

24          Now Mattel is aware of its rights.  It's here in

25  court to protect the rights that it, in fact, owns.  To allow

1    MGA, going forward -- that's really the issue here, is what are

2    we going to allow MGA to continue to do into the future?

3            These are Mattel rights.  MGA is excluding Mattel, as

4    we speak, from any right to use the name "Bratz" in connection

5    with dolls, even though those were Mattel's rights.  You can

6    rest assured, when Mr. Russell poses his hypothetical about,

7    why wasn't Mattel using it, well, obviously, once we knew about

8    our claims here with respect to the name from Carter Bryant's

9    deposition -- I mean, I don't know what it is that MGA

10   realistically thought we were supposed to do.  Produce dolls

11   with the name "Bratz" so we could be sued for trademark

12   infringement?

13           It's really the equities that they're talking about,

14   your Honor.  I think fairness, fairness to talk about equity

15   that way really is to put us back to where we should have been,

16   absent Carter Bryant, with MGA and Mr. Larian's participation

17   in breaching his obligations to Mattel.  That's what caused all

18   of this, your Honor.  And the fact is that MGA -- there's no

19   question -- and I don't think that they can argue -- that they

20   have not already gained some benefit from doing this; so I

21   don't think that it is a matter of equity.

22           The other thing to bear in mind, your Honor -- and

23   this is why it's also critically so important.  And it's not a

24   matter of just saying, Well, am I going to deny Mattel what it

25   should get?  MGA has sued us.  MGA has claims against us going

 1    forward.   So for the Court to allow them to walk out of this

 2    courtroom still asserting these rights will not only deprive

 3    Mattel of the rights that it should have had, allow MGA to

 4    benefit from its tortious conduct, but it will allow MGA to

 5    continue to pursue claims against Mattel.   And that's just not

 6    right.

 7          Any way that you look at fairness, or equity, the

 8    equities here are to put everybody back where we belong, and

 9    where we should have been in the first instance.

10          The fact is, they claim that we're the ones who

11    ripped off all of this stuff.   And that's not what the jury

12    found.   That's not what the facts are.   And to allow MGA to

13    pursue those kinds of claims, that in itself is an injury.

14          I would also say, your Honor, with respect to this

15    whole issue about the value, I will find the testimony where

16    Mr. Larian said the effect of what I was talking about earlier.

17    It was some other MGA executive that, in fact, having -- you

18    know, developing internally, within a toy company, a project

19    like doll designs with a great name to go with it, that's

20    valuable; that's proprietary.

21          **THE COURT:**   And that's your argument with respect to

22    the standing issue as well?

23          **MR. ZELLER:**   That's correct.

24          And also on that point, your Honor, with respect to

25    the standing, there's a judicial admission here that Bratz has

1    taken away market share from Mattel.   That is something that's

2    in MGA's own papers.   That's even in their 1-C opening brief,

3    where they make quite clear that there's been damage and harm

4    and everything else.

5           So, I mean, to sort of suggest that somehow because

6    Mattel did not seek damages, its own quantifiable damages from

7    the jury, somehow precludes us now, that just does not really

8    add up.

9           Then, of course, finally, on that point of harm,

10   your Honor, the Court will recall that I stood here and I

11   basically asked the Court not to even instruct the jury on the

12   element of harm for those torts.   And in particular -- because

13   our understanding was, it was something that had been resolved

14   on summary judgment.   And, of course, I think it was even

15   Mr. Russell who convinced the Court that that element should go

16   into each of our claims.   The jury found in our favor on those

17   claims.   They necessarily found that MGA's conduct caused us

18   harm.

19          So I would respectfully submit that with respect to

20   the standing issue, the jury's findings on that are

21   dispositive.   There's no question that we have been harmed.

22   And that's embedded in the jury findings, along with the

23   evidence of market loss.

24          And then just briefly, your Honor, on the point that

25   we tried to exclude that kind of evidence about market loss,

1    certainly we tried to do that in front of the jury.  But that

2    was because it's an equitable issue.  It goes to equitable

3    issues here.  But that has nothing to do with whether or not

4    this Court should consider this evidence.  And there is, in

5    fact, at a bare minimum, a judicial admission of it in MGA's

6    own brief.

7            **THE COURT:**  Very well.

8            I'm going to hear briefly from Mr. Russell, and then

9    we're going to take a 15-minute break.

10           **MR. RUSSELL:**  Thank you, your Honor.

11           It's difficult to know where to start with that

12   lengthy list with him, but I guess what I would say is, if we

13   took ourselves back to the question -- he's saying to return

14   ourselves to where we were.  There can be no denial that the

15   jury was asked to assess sort of the measure of the

16   wrongfulness.  This is an argument that Mr. Kennedy is going to

17   make at --

18           **THE COURT:**  I know that we're going to be hearing

19   this --

20           **MR. RUSSELL:**  I don't want to take his math from him,

21   but I'm going to do it for a second.  The jury found, under

22   claim damages, that they were going to award less than one

23   percent to wrongful conduct.  I'll let him explain how that

24   comes down.  But the fact is, the jury's findings are

25   completely consonant with what I'm asking you to do today.

1    That is to say, the equities are all in MGA's favor, especially

2    with respect to the name.  There's no argument that the name

3    was built up by MGA.  They didn't have any rights at the time.

4    I've said to you that they had no copyright in a name; there

5    was no trademark in the name.

6              **THE COURT:**  You mean that it wasn't built up by

7    Mattel.

8              **MR. RUSSELL:**  Yes.  Because if there's no value in

9    the name, there's no rest.  Mr. Zeller cannot respond with any

10   value, other than to say there is, without pointing to

11   anything.  There was no value.  There was nothing for

12   Mr. Bryant to transfer to Mattel at the time he came up with

13   that name.  MGA lawfully and appropriately built up the name

14   "Bratz," and everything it did from the time it took possession

15   of that name forward was lawful and was a result of its hard

16   work, its investment, and its business acumen.  And it would be

17   completely unfair, in the grossest possible sense, and I

18   believe unprecedented, if your Honor were to hold that MGA

19   could be stripped of that trademark and all of the value that

20   was created in it, simply because the jury awarded less than

21   one half of one percent.  That's what it's finding was of the

22   claim damages.  That's the wrongfulness here.  This miniscule

23   vanishing puff in the area on the copyright claim, it's

24   nothing.  And what they're asking you to do is to take away

25   marks and brand rights that are worth billions of dollars.

1  They had their day in court on a billion-dollar claim.  They

2  lost it.

3          The facts are, under straightforward law, MGA

4  developed this mark, developed the value; and now, having sat

5  back on their rights, they want to take it.  They ask, What

6  could they have done?  It's such a simple answer.

7          The day that they deposed Carter Bryant, they should

8  have run into court, slapped an injunction motion in front of

9  your Honor, or whoever the court was, and said, Stop using our

10  property.

11          Did they do that?  No.

12          Why?  Because they recognized they had no right in

13  the value to the name "Bratz."  Instead, they sat back, and

14  even after they filed affirmative claims for the dolls and the

15  drawings, they sat back and let that brand continue to grow,

16  continue to become more valuable, every day.  They even

17  eschewed the rights to the name "Bratz" before trial, during

18  trial, and after trial.

19          As we point out in our briefs, even on the judgments

20  as a matter of law, we challenged them and said, Are you taking

21  the position you're seeking the rights to the value in the name

22  "Bratz"?  And they have no answer.

23          So what could they have done?

24          They could have done a lot.  But they didn't do

25  anything.  And to say that for them to have the equities, with

1  respect to this issue, is just simply out of line with all

2  reason, I would submit, your Honor.  MGA clearly has the rights

3  to the name.  I think your Honor sitting in equity must give

4  the name to where it belongs, the rightful owner, the one who

5  put the work in, the one who had the vision and the foresight

6  to build it into the brand that it is.  And that is MGA.

7          **THE COURT:**  Thank you, Counsel.

8          We're going to take a recess for 15 minutes, and then

9  we'll resume with the motion for permanent injunction.

10         (Whereupon, a brief recess was held.)

11         **THE COURT:**  We're back on the record.

12         The Court at this point would like to take up the

13 Mattel motion for a permanent injunction.

14         **MR. QUINN:**  Thank you, your Honor.  Good afternoon.

15         **THE COURT:**  Good afternoon.

16         **MR. QUINN:**  Your Honor, I take it from the briefing

17 that there is no dispute that the Court is, in this proceeding

18 at this point, bound by factual findings that the jury

19 necessarily and actually made in reaching its verdict.

20         We submit, your Honor, it's also the law, and we

21 think MGA has not been able to find a case to the contrary;

22 that the Court is only bound by findings that were actually and

23 necessarily made.  And for that, your Honor, we would cite the

24 Court to the Roberts decision, as well as the Burton decision.

25 In those instances, there were general verdicts, and the Court

1    addressed the question, Well, what was necessarily and actually

2    made?  A court, sitting in equity, addressing potential

3    equitable relief following a jury verdict is only bound as to

4    those things that are actually and necessarily -- were decided

5    or inherent in the verdict.

6         MGA relies on cases arguing that while the Court has

7    an obligation to reconcile the verdict, but those cases all

8    arise in the context of new trial motions, where we submit, the

9    Court's task is really very different.  At that point, the

10   Court is faced with a task of, Is there any reasonable

11   interpretation that can be placed on these verdicts in order to

12   preserve the result rather than grant a new trial?  Is there

13   any rational explanation?

14        At this point, your Honor, sitting as the court in

15   equity after a jury verdict, the Court really -- it's more like

16   a collateral estoppel analysis.  The Court is not charged with

17   the duty of trying to reconcile it and come up with a result

18   that's consistent.

19        **THE COURT:**  The Court should try to infer what it

20   reasonably can from the jury's verdict, should it not?

21        **MR. QUINN:**  I don't think so, your Honor.  And that's

22   what those cases indicate; that it's only -- it's a collateral

23   estoppel-like test:  What did the jury necessarily and actually

24   find?

25        And that's what those cases that we've cited to the

```
 1   Court say.
 2            THE COURT:  But the findings can be implicit as well
 3   as explicit, can they not?
 4            MR. QUINN:  I suppose.  Findings are certainly
 5   subject to interpretation.
 6            THE COURT:  Right.
 7            MR. QUINN:  And MGA has offered four different
 8   interpretations concerning the jury's verdict on the
 9   infringement damages.
10            They have suggested that, 'Well, this must have been
11   just for the first generation dolls.'  They've suggested that
12   -- Mr. Meyer says, 'Well, they may have found some small amount
13   of ongoing infringement; the number of infringing products
14   might have been small'; that's the third.  And, finally, that
15   the contribution of the drawings, the copyrighted drawings, was
16   small.
17            These are all efforts to try to understand how the
18   jury reached the decision that it did.
19            There are other possible explanations, your Honor.
20   The jury may have been influenced by the testimony that the
21   Phase 1-A verdict was devastating; that it was now impossible
22   to place any value on Mr. Larian's stock.  And Mr. Kennedy,
23   bless his heart, even blurted out the possibility of an
24   injunction and that he would be shut down.  I'm sure we all
25   remember that.
```

1          I think it's an equally-plausible interpretation that

2   that kind of testimony, your Honor, struck home with the jury.

3   It's equally plausible to think they thought, 'These folks have

4   been punished enough.  Mr. Larian's stock may now be worth

5   nothing.  The Court may shut them down; there may be an

6   injunction.'

7          The point is, we don't know.  We simply don't know.

8          **THE COURT:**  This was a general verdict, but it wasn't

9   a wholly general verdict.  It wasn't simply like, 'If you find

10  liability, fill in this dollar amount.'  The jury was asked

11  specific questions, and the dollar amounts they came up with

12  were reflected -- they essentially answered those questions in

13  dollars and cents.  And, certainly, the Court is bound by

14  whatever explicit or implicit logical conclusions are to be

15  reached by those answers.

16         **MR. QUINN:**  Your Honor, if the Court goes down that

17  road, I submit the Court would be speculating as to how they

18  got to that.  I mean, it was a general verdict in terms of what

19  was infringing.  The dollar amount, how they got there, from

20  one to the other, we'll never know.

21         And there's a case that tells us that the dollar

22  amount can't constrain the Court in terms of implicit findings

23  in framing subsequent equitable relief, unless it can tell to a

24  mathematical certainty that in reaching that dollar amount,

25  they must have made the implicit conclusion.  And that's the

1   Ohio-Sealy case, your Honor.

2          So one thing is clear at this point.  We're

3   speculating, we're all speculating, about how they got from

4   here to there.  And once we're speculating, we're outside the

5   realm of the Court being bound as to findings, in terms of

6   jury's findings, antecedent findings; as to what was infringing

7   or what wasn't infringing, or how they got there.

8          So we're at a stage which I think the Court

9   anticipated at the time we talked about the verdict form.  The

10  Court recognized at the time -- the Court may remember going

11  back and forth on this -- the Court said, 'At the end of the

12  day, the Court recognizes there's no way I'm going to ever

13  avoid the situation, or, going through this exercise that we're

14  going through right now of determining what is infringing and

15  what the infringement was, in framing the proper scope of

16  equitable relief.'  The Court recognized that at the time,

17  because it didn't have all of the dolls in front of it.

18         Now, MGA seeks to trivialize the award.  We hear

19  1 percent; we hear 1/2 of 1 percent.  Your Honor, today,

20  $10 million, I think, is still a substantial amount of money.

21  If you look at what the profits after tax on the dolls were,

22  the Bratz dolls, cumulatively -- their Exhibit 13931 said that

23  they were $200 million after taxes on the core Bratz dolls; so

24  $10 million is not a trivial amount in comparison to that.

25  It's 1/20th.  It's not nominal.  It's not $1.  It's not

 1   nothing.  It's a substantial award.

 2          Moreover, your Honor, there's a case in the

 3   Ninth Circuit that says that in trying to understand what the

 4   jury intended, the Court can look at the award on other causes

 5   of action.  That's the Banes case.  And in that case, there was

 6   an award on a 1983 claim, and the jury found no damages, no

 7   economic damages, but awarded punitive damages.  And then on

 8   another cause of action, breach of contract, the jury found

 9   $50,000 damages.  It went up to the Ninth Circuit; the Ninth

10   Circuit said the trial court appropriately looked at the award

11   on the other causes of action in trying to determine the jury's

12   intent and that it was proper to uphold the award of the

13   punitive damages.

14          Interestingly, your Honor, it occurred to us, in that

15   case, was the jury instructed, like ours, that on each cause of

16   action, they should make a determination as if that cause of

17   action was standing alone, and enter an award that they thought

18   was appropriate for that cause of action?  And it was.  In that

19   case, the jury was instructed the same way.  Yet, the Ninth

20   Circuit said it was entirely appropriate for the Court

21   post-trial to try to understand the jury's intention, framing

22   equitable relief, to look at all of the awards on all of the

23   claims.

24          Of course, if you do that here, your Honor, you have

25   a $100 million total amount under all of the awards, if you

1    look at the other claims.  So this is a substantial award,

2    however you look at it.

3              Moreover, I think there's an idea that somehow got

4    into the briefs, or has gotten into the discussion here, that

5    if there was a comparatively low infringement award, damages

6    award, in relation to what was sought by the plaintiff, that

7    that somehow argues for no injunction.

8              Your Honor, there's no case that supports that

9    proposition.  There is no case that says if the damages are

10   low -- the damages awarded are low; therefore, you don't get an

11   injunction.

12             **THE COURT:**  That's not the argument.  That's an over

13   simplification of what MGA is saying.  As I read what they are

14   saying it's that what we don't have is a clear delineation by

15   the jury of what they found to actually be an infringement.

16   And the best measure of that is, from MGA's perspective, the

17   damages that were awarded, suggesting that what they found to

18   infringe was a relatively small portion.

19             And then that impacts what should be subject to the

20   permanent injunction, suggesting that it should be just the

21   original four dolls, or what have you.  There are different

22   permutations.

23             **MR. QUINN:**  If I've oversimplified it, the argument,

24   and that's not really an argument they're making, fine.

25             **THE COURT:**  I think you need to address the argument

1   that they are making, which is a little more sophisticated than

2   simply saying just because it's a low damages award, there is

3   not much of a grounds for injunctive relief.

4           What they are suggesting is that that is a measure of

5   the copyright infringement.

6           **MR. QUINN:**  Your Honor, I would submit, there's no

7   case law to support that; and implicit in that is a conclusion

8   as to how much copyright infringement the jury found.  And we

9   get back to something that we can't tell from the jury verdict.

10  That's going to be your Honor's privilege to resolve.

11          If you look at the Dr. Seuss case, just because it's

12  a relatively small infringement in the work does not mean you

13  don't get an injunction.  In the Seuss case, it was just the

14  back cover that was infringing; yet the Court enjoined the

15  entire book.

16          In the Kaden case coming out of the Ninth Circuit,

17  your Honor, a software case, the determination was that only

18  5 percent of the software was infringing.  The Ninth Circuit

19  said it was error not to grant an injunction reverse.

20          So first off, I don't think it's a trivial award.  I

21  think it's a significant award.  $10 million is a significant

22  amount.  Banes tells us we can look at the entire amount of the

23  verdict in assessing what the jury intended in their assessment

24  of the economic damages.  That's $100 million.

25          But in any event, even if it's a small amount,

```
 1   there's ample authority that an injunction should still issue.
 2   So we get to the point now, what's the Court's role when you've
 3   got a jury verdict which is kind of a black box.  I mean, we're
 4   not going to know how they got there.  And there's ample
 5   authority that it's the Court's task now, as this Court
 6   anticipated at the time of the conference when the jury verdict
 7   was settled, that this Court is going to have to make a
 8   determination, based upon its own view of the evidence, as to
 9   the proper scope of injunctive relief.  That's what happened in
10   the Burton case and the Roberts case and the L.A. Protective
11   League case, where the Court afterwards, after the verdict,
12   made an assessment.
13          Now, let me just talk briefly before I begin
14   discussing the infringement issues -- your Honor, if I may
15   discuss the election of remedies.
16          THE COURT:  Yes.
17          MR. QUINN:  MGA raised -- it was actually their first
18   point in their brief.  The argument is that we decided to
19   pursue damages for future infringement.
20          THE COURT:  And that substitutes for the --
21          MR. QUINN:  And that substitutes and, therefore, we
22   made an election there.
23          They first say that the argument, as framed, only
24   applies to Mr. Larian and not MGA or Hong Kong, because what
25   they are referring to is the analysis that was done by Mattel's
```

 1    damages expert, trying to arrive at a present value for the

 2    benefit that Mr. Larian has received from infringing activity.

 3            So there is no even argument that can be made as to

 4    MGA or MGA Hong Kong.  We tried to deduce evidence concerning

 5    future damages.  But even as to Mr. Larian, we didn't seek

 6    future damages.  We were trying to assess -- the expert was

 7    trying to assess as of the point in time that he did his

 8    analysis --

 9            **THE COURT:**  The present value.  I understand that,

10    Counsel.

11            **MR. QUINN:**  Okay.

12            In any event, you'll recall Mr. Meyer's testimony,

13    your Honor, that you can't value it.  They make much about the

14    fact that the value the jury assigned to Mr. Larian's benefit

15    was zero.  Apparently, they agreed; they accepted Mr. Meyer's

16    testimony that you simply couldn't value it, given the 1-A

17    verdict, and given what happened.

18            So I turn now, your Honor, to infringement.

19            The Court identified for the jury, as it was required

20    to, the protectable elements in Mattel's copyrighted works in

21    Exhibit 26.  And I think you don't have to look any further

22    than the sculpt that Mattel owns.  That's Exhibit 1136.

23            **THE COURT:**  Yes.  But some of what you're seeking

24    goes well beyond the sculpt, Counsel.

25            **MR. QUINN:**  Yes.  But I'm starting with the sculpt.

1          **THE COURT:**  All right.

2          **MR. QUINN:**  The sculpt, your Honor, the question is

3    whether the dolls that are on sale today, and that they say

4    they are going to continue to sell, incorporate those

5    protectable elements which the Court identified, such that

6    there is substantial similarity.

7          And the Court has to do this analysis, bearing in

8    mind the rule in the Ninth Circuit that our burden in proving

9    substantial similarity is lowered by the fact that MGA had

10   unfettered access to Mattel's copyrighted works.

11         The Court also has to, I suggest, bear in mind -- and

12   I won't walk through the extrinsic test and the intrinsic test.

13   I know the Court is very familiar with that.  But just one

14   special application rule here which is important in the

15   intrinsic test in assessing substantial similarity from the

16   overall look and feel of the alleged infringing work.  The

17   Court has to look at it from the standpoint of the intended

18   audience, 7 to 12-year-olds.  And we submitted some evidence on

19   that.

20         The Court has seen the evidence as it played out in

21   the trial, and when you consider the fact that the test of

22   substantial similarity is lowered in this case and that the

23   audience is 7 to 12-year-olds, I think it's very difficult to

24   reach any conclusion other than the fact, other than the

25   conclusion, that all of these works are infringing.  They are

1    substantially similar.  It's undisputed that the sculpt was

2    always the same.  Virtually, there are a couple of instances,

3    but for the core Bratz dolls -- and MGA does not dispute

4    this -- the sculpt never changed, to this day.  Even in the

5    couple of instances where they used a different body, they used

6    the same head, the same features.

7         Ms. Leahy took the sculpt that Mattel owns and she

8    made some changes, and she testified about the changes that she

9    made at length.  To do that, she had to blow it up on an

10   eight-foot screen.  She, as a professional sculptress, had to

11   explain it.  Most of the changes, the Court will recall, or at

12   least many of them, were to make the doll more manufacturable.

13   But at the end, it is substantially similar, that sculpt, the

14   body, the face, the head.  That sculpt is used to this day.

15   That production sculpt is substantially similar to the sculpt

16   that Mattel owns.  And that sculpt embodies the elements and

17   the particular style which the Court identified as being

18   protectable.

19        I submit, your Honor -- what does MGA say in response

20   to this?  They don't really address the sculpt issue.  They

21   talk in terms of, 'Well, the face paint.'

22        Your Honor, the appearance of the doll is driven by

23   the sculpt, the spacing of the eyes, the features that are

24   there, that are accented or not accented.  You can't paint it

25   to make it look like Shrek or Superman.  Or maybe you could,

1   but they didn't try.

2          We've got a slideshow and we can walk through the

3   papers we've submitted.  If you compare the facial images of

4   the Bratz dolls, including right down to the ones that are sold

5   today, with Mr. Bryant's drawings, they are substantially

6   similar.  Those unique forms of expression that the Court

7   identified, the accentuation of some features, the

8   deaccentuation of others.  They're there.  They have not

9   changed.  The painted sculpt infringes.  The fact that they

10  paint it doesn't change the result, that it is our sculpt, it

11  is substantially similar to our sculpt.

12         Just in terms of fairness, the question the Court

13  raised, to permit them to use a sculpt which is substantially

14  similar to ours, going forward into the future, I submit -- and

15  to sue us for allegedly having knocked it off with My Scene,

16  just simply is not fair.

17         They talk about the skill of their designers in face

18  painting and in coming up with fashions and clothes for dolls.

19  Fine.  Let them put those on some other sculpt.  Let them do it

20  on some other image, where the eyes aren't the way those eyes

21  are, the nose isn't the way that nose is, and that

22  configuration isn't the way it is.  That's fine.  If they say,

23  'We've got some unique things that we did here and we do here,'

24  that's fine.  Let them do that on some other sculpt.

25         The characters, your Honor -- character and copyright

```
 1    is protectable.  These characters -- and we're talking here
 2    just about the original four characters -- they have certain
 3    attributes; they have mascots; they have symbols.  Those have
 4    not changed.  Those characters are identifiable; they were
 5    created by Carter Bryant while he worked for Mattel; they are
 6    owned now by Mattel; they should not be able to continue to use
 7    those characters.
 8            Your Honor, the order has got more exhibits attached
 9    to it than any order I've ever seen.
10            THE COURT:  I could say the same thing.
11            MR. QUINN:  The problem here, from our standpoint,
12    the challenge here, was that an injunction can't cross
13    reference any other documents.  It's all got to be
14    self-contained.  So the effort there, your Honor, was to try to
15    eliminate doubt, to identify the sculpts, to give images of all
16    of the different Bratz dolls, the four main characters, as well
17    as those which have come since, which use the same sculpt.
18            The two-dimensional images which we own, the
19    packaging art -- it includes screen shots of television ads
20    which we contend are infringing.  It also uses those same
21    two-dimensional images.  Print ads as well.  Registrations of
22    the works that we own.  And, basically, it was an effort to try
23    to eliminate doubt and to be as clear as we could about what
24    would be covered by this injunction.
25            So I apologize for the length of it, your Honor, but
```

 1   we had a hard time coming up with a different way, some way

 2   that would not just invite another lawsuit about whether this

 3   next product is being sold in contempt of a court order or

 4   whether it infringes rights or not.

 5           I submit, your Honor, there's no question that these

 6   products infringe.

 7           So now we get to the question of, is it appropriate

 8   under the other tests, under the tests for permanent

 9   injunction, for an injunction to issue here?

10           Most of the discussion in the briefing on this

11   subject has focused on the element of irreparable harm,

12   including, in particular, the potential impact of the eBay

13   decision.

14           The eBay decision has not been with us all that long,

15   and different courts have interpreted it in different ways.

16           **THE COURT:**  Just so you understand, that will, of

17   course, govern this Court's decision in this case.

18           **MR. QUINN:**  Of course, your Honor.

19           What we understand eBay to mean is that it is no

20   longer a per se rule that if there's an infringement, an

21   injunction should automatically issue.  The Court is required,

22   post-eBay, to do an analysis.  It's not enough to have found

23   infringement.

24           But since eBay, in the vast majority of cases, courts

25   continue to enter injunctions when you have past and ongoing

```
 1   infringement, like we have here.
 2            At the end of the day, it's an equitable remedy, of
 3   course, and the Court must do equity.  And I think it's
 4   important to focus on one of the attributes or elements or
 5   rights of copyright; that is, the right to exclude others.
 6            In their concurring opinion in the eBay decision,
 7   Justices Roberts, Ginsburg, and Scalia noted the continuing
 8   importance of the right to exclude.
 9            We have not been able to find any case where there
10   has been past infringement, a threat of ongoing infringement,
11   and an impact on the right to exclude, where a court has denied
12   an injunction.  In the Grokster case, which MGA relies on,
13   Judge Wilson was careful to note that where the right to
14   exclude others would be impaired, that weighs heavily in favor
15   of granting an injunction.
16            It's hard to imagine a case where the right to
17   exclude is not impacted more than this case, your Honor.  It's
18   not just impacted.  It's annihilated if an injunction does not
19   issue here.
20            We were not told about this history for years.  It
21   was hidden from us about the existence of our rights.  And we
22   are being sued today for marketing a product which they contend
23   infringes their rights in Bratz.  It's kind of a reverse right
24   to exclude.  They want to exclude us.  The world believes that
25   Bratz is MGA's copyrighted work.  It's impossible for us to
```

1    control that work, to exclude others.  This is like the end of

2    the continuum in terms of the right to exclude.  There is no

3    relief for us; there is no way for Mattel to exercise its

4    rights or to protect its rights without an injunction here.

5         **THE COURT:**  Counsel, I understand your arguments on

6    the first three elements.  The one I'd like you to focus on,

7    the one I have the biggest difficulty with, is the fourth, the

8    public interest, and how that would be impacted by a permanent

9    injunction.  MGA contends that not only would consumers be

10    denied an important product, but that Mattel would end up with

11    essentially a monopoly on the fashion doll market; the chilling

12    effect on competition and the other various arguments they

13    make; and particularly the timing of this.  You're asking me to

14    do this -- it's now November.

15         **MR. QUINN:**  I think we made an ex-parte application

16    to move this up, your Honor, for the precise reason that that's

17    mostly history.  The material is shipped, by and large -- my

18    understanding of the way the industry works, by November, the

19    stuff is either in the stores or on the way to the stores.

20         **THE COURT:**  It still would have -- even if we would

21    have moved it up to October, it would still have destroyed the

22    Bratz sales for the Christmas season.  That's largely why I

23    denied your ex-parte application to move it up.  And then we're

24    still here -- the timing of this does not necessarily seem

25    appropriate.

1          That, of course, is a secondary issue to these larger

2     arguments about the chilling effect that this would have on

3     competition, competition in the fashion doll industry and the

4     rest.  These are pretty significant public interest arguments

5     that MGA makes.

6          **MR. QUINN:**  Right.

7          In terms of this Christmas, your Honor, there are

8     certain major retailers in this industry, Toys-R-Us -- and

9     there's some other obvious candidates.  Mattel needs to have

10    good relations with those folks.  And I think if I had a moment

11    to confer with counsel, I could confirm my understanding that

12    Mattel would not do something that might damage its relations

13    with those retailers who have already made commitments for this

14    Christmas, if the Court understands what I'm saying.  Mattel

15    would be shooting itself in the foot to try to disrupt things

16    that could happen in that near-term time frame.

17         Again, I would want to confirm that with my client,

18    but that's my understanding of my client's position,

19    your Honor, in terms of this Christmas.

20         **THE COURT:**  Going forward, we have these larger

21    issues of competition.

22         **MR. QUINN:**  Your Honor, we submitted a declaration --

23    there are a number of fashion dolls out there.  Mr. Larian

24    identified a bunch of them on the stand when he testified.

25    We've submitted a declaration of Ms. Koda, where she identifies

1    the other fashion dolls that are out there; so it's not as if

2    there aren't any alternatives.

3            And this is not a situation where --

4            **THE COURT:**  How many other dolls have entire aisles

5    of a Toys-R-Us or a Wal-Mart devoted to them?

6            **MR. QUINN:**  The reality, Hannah Montana is eating

7    some folks' lunch, including folks present here in the

8    courtroom.  Hannah Montana, High School Musical, there are new

9    things that come up.  Bratz, whoever owns it, probably isn't

10   forever.  Barbie, Barbie may not be forever.  But you have new

11   ideas and new dolls that come to market.

12           Mr. Larian -- you'll recall Mr. Larian's testimony,

13   your Honor:  'If we hadn't done Bratz, we would have done

14   something else.  We would have been successful.  What

15   Carter Bryant brought wasn't that important.  We were

16   determined to do a fashion doll.  We would have done a fashion

17   doll.  We have all of these talented people.  We have these

18   unique octagonal shaped boxes.'  Put some other doll in there.

19   Put your face painters to work, painting some other sculpt.  Do

20   something else.

21           But I think it would give the folks here in this

22   courtroom too much credit to conclude that the innovation that

23   another doll, another Hannah Montana, isn't just around the

24   corner next year.

25           And I think we also have to bear in mind and assess

```
 1   this public interest.  Is it relevant -- I think we have to ask

 2   ourselves, is it relevant that this brand that we're talking

 3   about protecting as a competitor began with a theft?  That was

 4   the genesis of it.

 5            In terms of the public interest, is that not

 6   something that factors in?

 7            I submit that it is something that does factor in.

 8            There's a discussion of the Abend case concerning the

 9   great Hitchcock movie "Rear Window."  They rely on that as a

10   case to indicate that even though there was infringement, the

11   Court said an injunction shouldn't issue.  I think that's

12   readily distinguishable.  The Court said in that case that was

13   a special case; the movie maker had done nothing wrong; they

14   were the victim of what the court characterized as a legal

15   technicality; that it was based on a short story; the author of

16   the short story passed away, and the rights under the old

17   copyright act reverted to the heirs, and they were able to hold

18   up a classic motion picture.

19            The two times the Ninth Circuit has been asked to

20   apply Abend and declined to give an injunction since then, both

21   times it declined to do so -- the two published cases, I should

22   say -- that's the A&M case and the Kaden case.  The case we're

23   talking about now is not a case where -- you can't say, as you

24   could say of the motion picture company in Abend, that the

25   defendant did nothing wrong.
```

Monday, November 10, 2008                     CV 04-09049

```
1              We own the drawings.  We own the sculpt.  The Court

2    has seen the evidence.  We have submitted additional evidence,

3    which we understood all along that the Court was going to

4    entertain at this stage of the proceeding, as, indeed, the

5    courts in the cases I cited also entertained.

6              I'd point out, your Honor, if we were here -- and

7    they raise an issue about whether it's appropriate for the

8    Court to consider this additional evidence -- if we were here

9    just on an injunction proceeding, if Mattel had only sought

10   injunction, there would be no jury trial.  I can provide the

11   Court with authority.  That's true in patent cases, and it's

12   true in copyright cases.  The Court is entitled to consider

13   this additional evidence.

14             I'd be happy to address any other questions the Court

15   has.

16             THE COURT:  You made allusion to evidence that you

17   wanted to present to the Court, or you may want to present to

18   the Court, or you had available for the Court.  This afternoon

19   is the time to present anything further.

20             I want to hear from Mr. Kennedy before you get into

21   that, but if there is anything that you need to present to the

22   Court, now would be the time to do it.

23             MR. QUINN:  Is your Honor referring to what I

24   mentioned about conferring with my client?  Because of the

25   other evidence, we have submitted everything, your Honor.
```

```
 1              THE COURT:  You mentioned some slideshow or
 2      something.
 3              MR. QUINN:  Oh.  Those are copies of things that the
 4      Court already has.
 5              THE COURT:  They're already before the Court?
 6              MR. QUINN:  Yes, your Honor.
 7              THE COURT:  Thank you, Mr. Quinn.
 8              Mr. Nolan?
 9              MR. NOLAN:  Before Mr. Kennedy addresses what will be
10      the affect and the scope of the relief Mattel is seeking, the
11      one point I wanted to touch on first is last -- and maybe the
12      reason I'm jumping ahead is, I gave Jason Russell part of my
13      argument and he took the whole thing.  I was fully prepared on
14      Footnote 11, at Page 17.  That was my idea.
15              THE COURT:  You're relegated to a footnote,
16      Mr. Nolan.
17              MR. NOLAN:  It happens, even at the house.
18              Here's the point, your Honor.
19              I know time is short and Mr. Kennedy is the primary
20      word.  I was struck by Mr. Quinn's arguments, though, in
21      inviting you, in a sense, to sit now, under equity, to, in
22      effect, have a redo of a very lengthy trial that we had in
23      front of the jury with respect to the substantial similarities
24      of products.
25              THE COURT:  So you don't think I should be conducting
```

```
 1   the extrinsic/intrinsic copyright analysis of each of these
 2   dolls that I have up in courtroom four?
 3            MR. NOLAN:  Respectfully not, your Honor.  The reason
 4   for that is quite clear; and the record, I think, is also clear
 5   on this.  This was an unusual jury deliberation setting, and I
 6   think it best presents why you should, frankly, avoid the
 7   invitation.
 8            This Court set up the courtroom upstairs as a doll
 9   room.  There are stipulations that were read to the jury to the
10   effect by Mr. Quinn -- because it was their stipulation that we
11   agreed to -- that the dolls that were contained in that
12   courtroom were representative samples of the entire breadth of
13   the Bratz brand; there were core dolls, there were licensed
14   products, and so on and so forth.
15            The jury physically deliberated in a jury room which
16   was directly outside of the jury room.  We were, not
17   surprisingly, not allowed to go up to the fourth floor and peer
18   through the window of the courtroom to see whether or not they
19   were, in fact, looking at all of these dolls.  But I did not
20   hear from Mr. Quinn one single argument that differed from the
21   same impassioned argument that Mattel made to this jury.   In
22   fact, to the point, when Mr. Quinn says, 'While you're looking
23   at this, your Honor, remember you should be looking at it
24   through the eyes of a 7- to 10-year-old,' that was the
25   standard.
```

1      **THE COURT:**  A girl.

2      **MR. NOLAN:**  A girl.

3      **THE COURT:**  That makes it even more --

4      **MR. NOLAN:**  I think that all of us who have daughters

5   still can kind of look through that prism.

6          And the Court noted at the time that, you know, as an

7   adult you look at this and you might walk away with one

8   impression; but through the prism of the eyes and the

9   wonderment of a young girl, it is different.

10     **THE COURT:**  It's different and it's difficult; and

11  you make a good point.  What I want you to address, though,

12  Mr. Nolan is this:  And you're right, I'm hearing the same

13  arguments, to a certain extent, now for several times.

14  Mr. Quinn made those arguments to the jury.  The jury did have

15  this unique access that you described.  They assessed, based on

16  the Court's instructions, conducting the extrinsic and the

17  intrinsic analysis in terms of substantial similarity; and they

18  reached the conclusion that there was infringement; and then

19  they placed a dollar value, also pursuant to the Court's

20  instructions, on that.

21         At this point, what the Court has to do is determine

22  whether or not, based on their finding of infringement --

23  whether there should be any injunctive relief imposed, above

24  and apart from the dollar value of that.

25     **MR. NOLAN:**  I understand.

1    **THE COURT:**   In order for me to decide about that --

2    I've got two binders full of exhibits that are the actual

3    photographs of the merchandise that Mattel is seeking the

4    injunction to.   I can't tell from the verdict form which of

5    these the jury found infringement on.

6    How else can I decide whether or not there should be

7    an injunction without going and conducting that same extrinsic

8    and intrinsic analysis that we presume that the jury did?

9    **MR. NOLAN:**   Correct.

10   And I'm not going to lateral, but I'm getting the

11   high sign that I should lateral to Mr. Kennedy, because he'll

12   address how I think the Court can, consistent with the jury's

13   finding, address that particular issue.

14   The point that I want to make, though, before I sit

15   down, your Honor, is this:   That in making that determination

16   in the first instance, why should you go through the exercise

17   that Mr. Quinn invited the jury to do, that a jury deliberated

18   and must, by its very verdict and its answer, have rejected the

19   argument that he wants to make that the scope --

20   **THE COURT:**   Wait a second.

21   How did they reject that?

22   **MR. NOLAN:**   With respect to the breadth.

23   **THE COURT:**   With the breadth.

24   **MR. NOLAN:**   That's the only point.   So all I want to

25   do is address the sweeping comment that Mr. Quinn makes that

1   everything is the same, they're substantially similar.  Because

2   I think the overwhelming record of evidence is that they are

3   dissimilar, and, in fact, that was the success of why young

4   girls saw or perceived a difference between one version of the

5   doll versus another.  There are differences.

6           **THE COURT:**  Let me ask you this:  You're able to make

7   this argument now because we had a general verdict form.  If I

8   would have accepted your invitation to have a more specific

9   jury verdict form, where we would have listed some -- although,

10  I guess, we would never have all of the exhibits at the time,

11  or all of the permutations of the dolls; we had the

12  representative --

13          **MR. NOLAN:**  Representative samples.

14          **THE COURT:**  Yes.

15          -- and the jury would have found substantial

16  similarity with respect to most or all of those representative

17  samples and still come back with the damage award that they

18  did, you wouldn't be able to make this argument; correct?

19          **MR. NOLAN:**  No.  I disagree, your Honor, because I

20  think that we would be informed by the amount of money that

21  they found.  And then you would also be able to -- and, again,

22  I'm stealing some thunder here.

23          **THE COURT:**  Do you understand the question, though?

24  Let's say they find a particular doll -- just pick any one of

25  these at random, Exhibit 3, Page 216 -- if they were to find

```
 1    that this was an infringement, along with, perhaps, hundreds of

 2    other dolls that they were to find substantially similar to

 3    this, but yet only award -- and I say "only" loosely, because

 4    it is a lot of money; ten million or one hundred million,

 5    however we want to characterize the verdict in this case -- how

 6    is it that you could have argued then that I should not impose

 7    an injunction on the infringed products?

 8              MR. NOLAN:  If the verdict form had been filled out

 9    that way and the jury had answered it that way, we could not be

10    making that argument.

11              THE COURT:  Okay.

12              MR. NOLAN:  But the argument that we are allowed to

13    make -- and I don't know which picture you're holding up.

14              THE COURT:  It's just a random picture of a doll.

15              MR. NOLAN:  Right.

16              So, your Honor, I agree with that point.  But let me

17    ask Mr. Kennedy to address the other issues.

18              THE COURT:  Let's bring Mr. Kennedy in.

19              MR. KENNEDY:  Good afternoon, your Honor.

20              Like Mr. Quinn, back at my desk, I have a long and,

21    perhaps, eloquent argument that I wrote out.  In light of the

22    Court's questions, it's still back where I was sitting; so what

23    I lose in eloquence during the next few minutes, hopefully I

24    will make up for in helpfulness.

25              THE COURT:  Very well.
```

1        **MR. KENNEDY:**  If I could, your Honor, we prepared

2    three graphs that I think visually depict some of the concerns

3    that you have been expressing here.  And those two got

4    shortened down dramatically.

5            Aaron, can we go to the first one.

6            Your Honor, you'll recall this was one of Mattel's

7    exhibits -- I think it came up first in connection with

8    Mr. Wagner's testimony, and then we saw it again during final

9    argument, that in terms of the total Bratz profits, MGA had

10   $778 million, Mr. Larian had $696 million.  Combine those

11   together, it's something just south of $1.5 billion.  Against

12   that background, if we go to the next chart, we get to

13   Question 11 from the jury verdict, where the jury was asked

14   what amount of damages were to be awarded.

15           And just to digress for a moment, in arriving at

16   that, the jury, of course, was instructed that they were to

17   give full amounts and not be concerned about duplication.

18   Mr. Quinn referred to the Banes case from the Ninth Circuit,

19   said there was a similar instruction in that case.  We at least

20   cannot find it in our copy of Banes.  I'm sure the Court will

21   be able to determine whether, in fact, any of the other cases

22   deal with a "don't worry about awarding duplicative damages

23   instructions."  And, of course, the jury was also told to

24   disregard any possible injunction.

25           Now, against those two, let's go to graph three -- as

1   your Honor has said, there's no way, looking at the answer to

2   Question 11, we can tell exactly how the jury got to the

3   $6 million or $7 million or $10 million figure.  However, it

4   had to be in some combination of the following:  Either the

5   jury found that some very small subset of Bratz products, such

6   as, for example, the first generation dolls, infringed, or the

7   jury concluded that some larger subset of products, perhaps

8   every Bratz product, infringed.

9           The difficulty is, you've only got $10 million worth

10  of yellow, and you can either allocate that back to some small

11  subset of products, in which case the Court, doing equity,

12  says, 'Well, just a second, the infringement stops way over on

13  the left, and you're asking me to enjoin all of the blue space

14  up above,' or, alternatively, if you went through the exercise

15  and looked at all of those dolls up in the room and actually

16  concluded that every one infringed, we then have to take,

17  whether it's Mattel's $1.5 billion, or even coming all of the

18  way down to Mr. Meyer's $405 million in profits -- as

19  your Honor will recall, that's the lowest profit figure this

20  jury was ever given for the entire Bratz line.  So $10 million

21  of that -- and, of course, only $6 million is what they found

22  for MGA -- we're talking about 3 percent.

23          So the more widespread you might find the

24  infringement to be, the more vanishingly small would become the

25  contribution that's being made by Mattel's intellectual

```
 1   property.
 2            THE COURT:  What about factoring in apportionment?
 3   Let's say you have a product; pick any exhibit, and we'll call
 4   it product X; and it's found to be an infringing product.
 5   However, the dollar value -- let's say that's worth $100;
 6   that's a product value of $100.  But the jury finds that, under
 7   the apportionment instruction, only 10 percent or 5 percent of
 8   that is attributable to the infringing elements of that doll
 9   and 95 percent of it is to noninfringing.
10            Can't that account for a lot of the blue space you're
11   talking about?
12            MR. KENNEDY:  It could very well, your Honor.
13            THE COURT:  You don't know?
14            MR. KENNEDY:  We don't.  But my point is this:  For
15   purposes of an injunction, I submit it would be totally
16   pointless for your Honor to go through that exercise since, of
17   necessity, either -- you aren't going to be able to identify
18   it, but let's assume you are able to do it.  You're either
19   going to find there's some small subset of these products that
20   generated four hundred or six hundred million or a billion
21   dollars in profits that have 5 or 10 or 20 percent
22   infringement, or 1 or 2 percent infringement.  What you're
23   going to come out at the end is with either a small subset,
24   because you've only got $10 million to play with.  I use that
25   phrase advisedly.
```

```
 1              So regardless of whether you find --

 2         THE COURT:  I'm sorry.  I'm not following you on that

 3    response.  Because if I find that there is a portion of

 4    infringement on each of the products that, for example, Mattel

 5    has submitted in their proposed order, a product infringes or

 6    it does not infringe, and if you have a portion of your product

 7    infringing, it's subject to an injunction.

 8         MR. KENNEDY:  It would have been if we were here in

 9    2005, your Honor; but the eBay case, we submit, put another

10    knob, another choice, on the dial.  Just because there's

11    infringement, you're no longer --

12         THE COURT:  I'm not suggesting that by itself is

13    sufficient.  I'm saying there are other factors as well.  I've

14    read eBay several times now, and it's certainly going to guide

15    my analysis in terms of deciding whether to enjoin.  But in

16    terms of the question of whether or not --

17              You're trying to use the copyright damages to

18    convince the Court that the jury really didn't find a copyright

19    infringement to a lot of these products.

20         MR. KENNEDY:  Not at all, your Honor.  The jury, as

21    we point out on this graph, could have found that every single

22    Bratz product infringes.

23         THE COURT:  If that's the case, why should at least

24    that factor in eBay weigh in favor of the injunction?

25         MR. KENNEDY:  For this reason, your Honor:  The jury,
```

1      if they found all of the products, then they found at least

2      $405 million in total sales, or if they believed Mattel, $800

3      million, a billion four of those, the contributing factor in

4      the profitability of the infringing products totaled $10

5      million.  So if it's for every single product, even using the

6      $405 million, best case for them, that says they found

7      2.5 percent of the reason for the success for the profitability

8      of the product was the use of the intellectual property, which

9      says the other 97.5 percent came from Mr. Larian or his staff.

10            **THE COURT:**  Okay.

11            **MR. KENNEDY:**  My point is that would -- perhaps,

12     pre-eBay, it would have been a different world.  But in the

13     eBay world, where you're now allowed to truly do traditional,

14     old-fashioned equity, is it really appropriate to set out and

15     bar the sale of a product, 97.5 percent of which was in no way

16     Mattel's doing?

17            **THE COURT:**  Under that, what I have to ask are the

18     four questions, or the four factors, that eBay sets out.

19            **MR. KENNEDY:**  Correct, your Honor.  Starting with --

20     assuming we have 2.5 percent of every product, that every

21     product infringes and you divide the $10 million up, and --

22            When I first got married, we had a rug that was too

23     small, and we kept trying to move it around, and there wasn't

24     any way -- the damn thing would not cover the floor.  And you

25     have the same thing here with the $10 million.  The rug is too

1  small for an injunction, regardless of how you allocate that

2  money.  You either come up with a vanishingly small subset of

3  infringing products, or you come up with a vanishingly small

4  percentage of infringement by all of the products.  And the

5  jury has put that cap for us.

6         I submit, this is a classic case for looking for

7  another remedy under eBay, which gets to your dilemma, because

8  I can't make the yellow go away.  That's still there.  The jury

9  found it.  Maybe we get it down to $6 million, you could talk

10 about a remittitur.  But there still clearly is infringement,

11 and our clients are profiting from that infringement, which is

12 why, when we came time to write our opposition to the

13 injunction in this case, we toyed with whether we ought to say

14 injunction -- excuse me.  Mattel hasn't mentioned the word

15 "royalty"; so, therefore, it's a gotcha; they've waived it for

16 all time, and on further thought, we said no, we ought to talk

17 about all of the remedies, and that's why we broached the idea

18 of a royalty, particularly in this case, where Mattel has never

19 commercialized the product; Mattel has never claimed that they

20 are trying to conduct other licensed negotiations and that

21 we're somehow holding down what they can charge.

22         The only harm -- and I put "harm" in quotes -- they

23 claim they suffered during trial was that they did not get

24 their cut of our profits.  And the royalty -- the jury has

25 given it to them retroactively -- the royalty provides a way to

1    do it prospectively.  And they, of course, came back and said,

2    Don't even mention royalties; we don't want to talk about that.

3            My own theory is, that's because this is not a case

4    that they have pursued on principled economic reasons all

5    along.  As your Honor pointed out the day after the verdict

6    came in, we can all agree, we have a profitable product that's

7    in everybody's interest.

8            What Mattel should be doing, if you're looking at it

9    from economics, is saying, We want to get as much of that

10   2.5 percent as we can; go sell Bratz.  The last thing they

11   should be wanting to do is cut it off.  But we submit, the

12   reason is, they have never been here for the economics; they've

13   been here to destroy a competitor.

14           There's no reason why your Honor has to agree with me

15   on that one.  The point is --

16           **THE COURT:**  The royalty you propose, if I'm reading

17   your expert correctly, is 3/10ths of 1 percent.

18           **MR. KENNEDY:**  In that range, your Honor.

19           **THE COURT:**  Plus or minus a 10th of a percent.

20           **MR. KENNEDY:**  Correct, your Honor.  Even if we go and

21   apply the Georgia Pacific factors -- and, interestingly, the

22   district court in Georgia Pacific's analysis went to pains to

23   make sure that the infringer would still make a profit after

24   paying the royalty in that case, saying nobody would ever

25   license technology unless they were going to make money off of

1    it.

2             So here, even if you use the $405 million, there's a

3    max of 2.5 percent in benefit that we're getting.  So under

4    Georgia Pacific, rational people sitting down across the table

5    are going to be talking about something south of 2.5 percent.

6             Interestingly, the judge in Georgia Pacific got

7    reversed because the court of appeal found he had not allowed

8    for enough of a profit and concluded what you really needed to

9    do was have a royalty that would guarantee the infringer their

10   average profit from other lines of business.

11            That's all, obviously, vested in your Honor's

12   discretion.  And the 2.5 percent, that's a best case.  That's

13   assuming you find they use Mr. Meyer's numbers.  If you use

14   that $1.4 million, you come out with an intellectual property

15   contribution of something like .67 percent, according to

16   Mattel's figures; and then the royalty has to be some portion

17   of the .67 percent.

18            So I know your Honor is chuckling when you mention

19   the .3 percent, but there's no secret, any Georgia Pacific

20   royalty here will be incredibly small, because Mattel's

21   contribution to the profitability is incredibly small.  And I

22   think I understand why they don't want to talk about a royalty

23   and why they don't want you to exercise your discretion in that

24   regard.

25            But in terms of the dilemma you described, that

```
 1    Larian and MGA should not get a freebie, you have a tool

 2    available to keep that from happening.  I guess Mattel can

 3    refuse to cash the royalty checks when we send them and feel

 4    good about it.  But you do have an alternative.

 5            I believe -- it has not been asked for yet, but at

 6    least for today, the only thing that's before you, by Mattel's

 7    choice, is, are we going to have an injunction, or shouldn't

 8    we?

 9            And I would be glad if the Court wants to talk about

10    the other factors, but I don't think we need to go very far

11    beyond just this one to say that that's not the stuff that

12    injunctions are made of.

13        THE COURT:  I'll certainly hear your arguments with

14    respect to the other factors, Counsel.

15        MR. KENNEDY:  We heard about -- I've already alluded

16    briefly to the fact that this is somewhat of an unusual case,

17    in that unlike Kaden, the case cited by Mr. Quinn, we don't

18    have two competitors in the same software business going head

19    to head for competition and the sale by one is a loss by the

20    other.  This is not that kind of a case.  In fact, it wasn't

21    even until post-trial that Mattel first suggested that somehow

22    Barbie might be losing market share on the basis of Bratz.

23    This gets into our challenges to some of their declarations.

24            I think just going to the Pittway v. Black & Decker

25    case that they place heavy reliance on, there, the parties
```

```
 1   seeking the injunction documented they had a 30 percent decline

 2   in market share.  Hardware stores that used to stock just their

 3   flashlight were now giving equal shelf space to Black & Decker.

 4             You've been presented nothing of that sort to suggest

 5   that's happening here; and if you were, there would be the

 6   further question, is that loss of market share due to the

 7   2.5 percent that Mattel has contributed to Bratz, or is it due

 8   to the other 97.5 percent that other people have contributed,

 9   and maybe that's the reason Barbie is losing market share?

10             In any event, this is not that kind of a case.  You

11   have not been offered any evidence there.  I've already said,

12   this isn't even like the University of California that could

13   say, 'We don't commercialize, but we do license on a

14   nonexclusive basis and somehow we're prejudicing your rights in

15   that regard.'

16             That isn't the case here.

17             THE COURT:  The courts have certainly held that the

18   loss of the ability to market your own property, or protect

19   your own property, is an injury, sufficient for eBay purposes.

20             MR. KENNEDY:  No question about it.  But that's why I

21   said I think we need to go further beyond that and say, what is

22   really the harm here from Mattel's, as you say --

23             THE COURT:  But that is the harm, is it not?

24             MR. KENNEDY:  Conceptually only in this case, because

25   there is no exhibit showing:  Here's how Mattel would have
```

Monday, November 10, 2008                          CV 04-09049

```
 1    commercialize and marketed Bratz.
 2              THE COURT:  Isn't that conceptual harm sufficient for
 3    purposes of the irreparable harm factor?
 4              MR. KENNEDY:  I don't believe so in these facts,
 5    your Honor; and this is one of those where I don't have a case,
 6    particularly since eBay, that I can point you to.  They don't
 7    have a case since eBay going the other way.  But when you talk
 8    about the combination of a very, very minor contribution to the
 9    products -- one of the things Justice Kennedy focused in on his
10    concurring opinion in eBay as to whether injunctive relief is
11    appropriate -- but to take the combination of a miniscule
12    contribution and a copyright holder who has not commercialized
13    and is not licensing otherwise and whose sole identified harm
14    so far has been that they aren't getting the cut of certain
15    profits, I'm not even sure there's a balancing there.  As
16    your Honor pointed out the day after the verdict, both sides
17    are really on the same side of the equation.  They are arguing
18    over how to divide up the Golden Goose, why either one would
19    want to kill the Golden Goose.
20              Going beyond that, also in this case, your Honor has
21    alluded to the public interest angle that's going on here.
22              And then, finally, as the 3M v. Pribyl case, among
23    others, makes clear, an injunction is not a punitive tool, but
24    the goal is not to try to do Old Testament justice by smiting
25    somebody with an injunction; it's supposed to try to prevent
```

1   future harm that can't be prevented in some less onerous way.

2          And, yes, the satisfaction that Mattel can go home

3   each night knowing they have the right to market Bratz might

4   warm the cockles of their heart, but I submit, balanced against

5   everything else in this case, a royalty clearly emerges as what

6   the remedy should be, assuming anybody wanted one.

7          **THE COURT:**  A linchpin of your argument -- and I

8   certainly understand it -- is the damages award, and the

9   relatively small amount of the damages award, vis-à-vis the

10  profits that were brought in.  Mr. Quinn suggests that there

11  are other explanations for that, other than the one that you

12  suggest the Court must infer, as illustrated in your chart.

13         **MR. KENNEDY:**  Well, he has.  I don't think his other

14  suggested alternatives, though, are consistent first with the

15  fact that we are bound by both the explicit and implicit

16  findings; and that's Gates --

17         **THE COURT:**  That case is what the Court is going to

18  be relying on, the L.A. Police Department Protective; it does a

19  very good job of explaining what the Court needs to consider.

20         But what Mr. Quinn is suggesting is that there are

21  other implicit findings, that there's ambiguity there in terms

22  of what is implicit by the damages award.

23         **MR. KENNEDY:**  And there certainly is uncertainty as

24  to how they arrived -- there's uncertainty as to the precise

25  components of the $10 million.  And as we've talked about,

1    there are a lot of different allocations that could be done

2    there.  I don't believe Mr. Quinn -- I'm sure you'll remind me

3    if I missed any -- identified anything -- any other explanation

4    for the gross $10 million or the gross $6 million that is

5    consistent with the jury following its instructions.  He said

6    maybe they just thought they piled on enough and they had done

7    enough damage to MGA.

8            **THE COURT:**  Aaron, can I impose upon you to bring

9    back -- I think it was the verdict form that you had up there.

10           I frequently look to Aaron in other trials, wishing

11   that he was here.  Unfortunately, he's not.  But I do have him

12   now.

13           So 11-B, copyright infringement by Mr. Larian, the

14   distributions Mr. Larian received from MGA attributable to

15   Bratz-related works:  $3 million.

16           I'm not sure how they came up with that figure, and

17   that was not a figure that was being urged by anyone, that I

18   recall.

19           Then the value of Mr. Larian's ownership percentage

20   of MGA attributable to Bratz-related works:  Zero.

21           **MR. KENNEDY:**  Yes, your Honor.

22           **THE COURT:**  What was that work for them to come to

23   that conclusion?

24           **MR. KENNEDY:**  I have to be honest, I think there were

25   two things going on.  One was a finding on their part that

1    there really aren't any future infringing products out there.

2    Because remember all of Mr. Wagner's --

3              THE COURT:  That's not what I mean.

4              "The value of Mr. Larian's present ownership

5    attributable to Bratz-related works now."  That's not talking

6    about the future.  It's zero.

7              MR. KENNEDY:  But, your Honor, two things.  One, I

8    assume the jury read that -- I think they are required to

9    grammatically -- they went to the first sentence that said "as

10   a result of defendant's copyright infringement," and that they

11   didn't interpret B, the second paragraph, as just being what's

12   the appraised value of his interest.  It's, what's the value of

13   his interest that's due to defendant's copyright infringement?

14   If that was not the case, I think we have a real question of,

15   why was it on the verdict form?  Who would care about a

16   question like that?

17             As your Honor will recall, though, plaintiff's

18   attempts to establish his ownership interests were all based on

19   discounted future cash flows, based on the assumption that

20   everything MGA does infringes and that --

21             THE COURT:  Just about any number would make more

22   sense, though, than zero.

23             MR. KENNEDY:  Unless this jury concluded that the

24   only thing that infringed, for example, were the original first

25   generation dolls, and that by time of trial, MGA isn't making

1    anything that infringes any longer, which is why they came up

2    with all of those small numbers.

3            If I might, your Honor, the only evidence that was

4    ever presented in this case, suggesting that those total

5    hundreds and hundreds of millions of dollars of profits could

6    be gotten down to a single digit, a million dollar number, was

7    by focusing in on the first generation dolls.

8            **THE COURT:**  Right.  That number, if I recall, was

9    about $4 million.  Again, none of the numbers that either side

10   were advocating are reflected on the jury's verdict; so

11   something else -- their own calculus was engaged in this.  And

12   I'm not suggesting that there was anything wrong with their

13   calculus or anything right about their calculus.  But it is

14   what it is.  But trying to make implicit findings per Gates is

15   a bit of a challenge.

16           **MR. KENNEDY:**  Well, on the zero, it seems to me, if

17   you come to the conclusion, 'I'm just mystified by that,' that

18   sort of cuts in Mattel's favor.  I don't see any way that

19   identifying the source of the zero is going to help Mattel.  It

20   seems to me it's either a total neutral that the jury just

21   bought Meyer's statement that you can't value this at this

22   point in time and this is just uncertain, or the jury went

23   through an analysis and concluded that there were no longer any

24   products that were infringing and, therefore, there weren't any

25   future profits that fit in there.  Two alternative

```
 1    explanations.  I don't see any way, though, that the zero can
 2    be tortured into something that helps Mattel and militates in
 3    favor of the issuance of an injunction.
 4           THE COURT:  Or they just thought you did a brilliant
 5    closing argument.
 6           MR. KENNEDY:  We can pretty well eliminate that one;
 7    that's totally farfetched.
 8           I would like to place more -- I'd love to place more
 9    emphasis on the zero and say that's dispositive, that shows
10    they found there were no currently infringing products.  And
11    that is certainly an explanation.  However, I think we've got
12    good enough grounds here, I don't have to take a risk like that
13    with you and have you laugh at that particular argument.
14    Because the $10 million, your Honor, that cap, given the
15    totality of the profits that were involved, just cuts across
16    any equitable enjoining of the entire line.
17           THE COURT:  Thank you, Counsel.
18           Mr. Quinn, I'll give you a chance to reply.
19           MR. QUINN:  Thank you, your Honor.
20           THE COURT:  And particularly in terms of this
21    financial argument.
22           MR. QUINN:  Yes, your Honor.
23           If I could just briefly respond to Mr. Nolan's
24    remarks about the additional dolls.
25           The Court may remember, we didn't have all of the
```

 1    dolls at the time.

 2            **THE COURT:**  I do.

 3            **MR. QUINN:**  And MGA had been ordered to provide them.

 4    We didn't have them, so we went with a representative sample.

 5    But there was never any stipulation or agreement that we would

 6    not bring additional dolls in.  The additional dolls we brought

 7    in are dolls that are on sale now.

 8            The key -- the whole crux of Mr. Kennedy's argument

 9    here proceeds -- he assumes -- he connects -- we talk about

10    connecting the dots -- he connects the dots between the damages

11    number and what must have been Mattel's small contribution to

12    the product.

13            I'm telling you, your Honor, that flies in the face

14    of the authorities.  That's not an assumption this Court can

15    make.  That is not something that the jury necessarily decided,

16    that Mattel only made a small contribution to the product.

17            It simply does not follow.

18            The jury may have been struck by sympathy.  They may

19    have been struck by the evidence they heard in that regard.  I

20    think that's the most logical explanation for why

21    Mr. Larian's -- the value of what he had was -- why they gave

22    him a goose egg.  We simply do not know.  We're in the realm of

23    speculating here.  And that's what the courts say we cannot do.

24            The Court simply cannot speculate and defer to a

25    jury's decision based on speculation about how they must have

1    gotten there.

2            We're asking the Court to decide.  We believe the

3    Court must decide, must make its own judgment on these things,

4    as it anticipated that it would.  But the Court is not

5    constrained, except by things that the jury necessarily

6    decided.  We have that Sealy Mattress case that says -- the

7    words are "mathematical certainty."  In a subsequent equitable

8    proceeding, "The judge's discretion is not constrained by the

9    amount of the award, unless it can be determined to a

10   mathematical certainty that the jury must necessarily have

11   reached that conclusion."

12           So that's the premise of their argument, and it flies

13   in the face of the authorities that we've cited to the Court.

14   They have cited no contrary authority.  The only thing they

15   rely on are these new trial cases, which I think we can all

16   agree at this point, I hope, are a different circumstance,

17   where the court is trying to reconcile verdicts to see if it

18   can preserve a verdict and not have to do a new trial.

19           **THE COURT:**  You do understand the challenge the Court

20   faces, though, with the damages award; the rug, to use

21   Mr. Kennedy's analogy, and the space that you're trying to

22   cover with that rug?

23           **MR. QUINN:**  Your Honor, we're confident in this

24   Court.  This Court has heard the evidence.  It sounds like I'm

25   trying to -- let me withdraw.

1        We're asking the Court to exercise its judgment.  MGA

2   is telling you it must be a small contribution.  The Court has

3   heard the evidence.  It's the sculpt.  That's not a small

4   contribution.  The Court can make that judgment.  The Court has

5   seen the evidence.  That's the Court's job.

6        **THE COURT:**  But it's not the Court's job to

7   substitute its judgment for the jury on findings of fact,

8   explicit or implicit.

9        **MR. QUINN:**  I agree with that.  But absent a

10  necessary finding, something that the jury actually and

11  necessarily had to have found, this Court is free to exercise

12  its judgment.  And that, your Honor, is what we're asking the

13  Court to do.

14        We come back to, again, they trivialize the amount of

15  the award.  The evidence was that they put in that the profits

16  on the core Bratz dolls was $200 million; that $400 million was

17  Meyer's number for all profits, for all products.  We have a

18  $10 million award of infringement.  If you haven't followed the

19  numbers, it's $100 million; it's one quarter of the total.

20  They say that they don't -- we actually have a copy of the

21  Westlaw printout of the jury instruction in that Banes case, if

22  I could provide a copy of that to the Court.

23        **THE COURT:**  You may.

24        **MR. QUINN:**  It's Instruction Number 20.

25        In that case, the jury was instructed -- not in the

```
 1   same words, but conceptually the same as the jury was in this

 2   case -- that you're to make damage determinations with respect

 3   to each of the claims individually and separately as if there

 4   weren't any other claims.  Nonetheless, the Ninth Circuit said,

 5   in trying to understand what the jury did, the trial court

 6   properly took into account the total damages award on all

 7   claims.

 8           If we do that here, we're looking at a $100 million

 9   award.  It's not a trivial amount.  This Court is not bound to

10   any conclusion that Mattel's contribution was small or minor.

11   We submit, the Court has evidence before it that that simply

12   was not true.

13           THE COURT:  Your argument, then, is that the rug is

14   larger?

15           MR. QUINN:  I'm sorry.

16           THE COURT:  If the jury adopted MGA's damage figures,

17   then the rug is larger.

18           Mr. Kennedy suggests that this small 2.5 percent area

19   is small, using the $1.4 billion that you suggest.

20           MR. QUINN:  We're saying the rug is larger and the

21   room is smaller, perhaps; but yes.  There's ample room, to the

22   extent we're going to get into analysis.

23           THE COURT:  And I understand your argument that the

24   Court should not engage in that.  I can't ignore that finding,

25   because it is pretty compelling.
```

1    **MR. QUINN:**  The law is absolutely clear that unless a

2    jury finding is explicit or necessary to the decision, the

3    Court is not bound by it.  And what we're saying, your Honor --

4    I probably made this clear already -- we're asking this

5    Court -- we're telling this Court that the Court has the

6    ability and discretion to exercise its judgment.  That's what

7    we're asking the Court to do.

8         **THE COURT:**  Thank you, Counsel.

9         **MR. QUINN:**  Your Honor, I had a couple more points I

10   had hoped to make.

11        **THE COURT:**  Very well.

12        **MR. QUINN:**  I laid down a challenge for them to

13   identify a single copyright case post-eBay where there was

14   ongoing infringement and the court did not issue an injunction,

15   and we have not been cited such a case.

16        **THE COURT:**  That argument suggests that I should just

17   have this presumption which eBay basically rejected.  I need to

18   evaluate this.  This may be that first case.  I don't know.  I

19   don't know if that's --

20        **MR. QUINN:**  If you take into account --

21        **THE COURT:**  That argument seems to suggest that there

22   should be a presumption.

23        **MR. QUINN:**  Well, my argument is just based on what

24   the state of the law is now, what courts have done post-eBay.

25   If you focus in on the language and the concurring opinion, the

```
 1   cases they cited, Grokster, about the importance of the right
 2   to exclude -- this, I submit, your Honor, on the present record
 3   would be the first case where an injunction was not entered.
 4   We don't know -- no case has been cited.
 5            If the contribution is so small, if it were true that
 6   Mattel had contributed something very, very minor to this, it
 7   would be an easy thing for them to change, and they would be
 8   free to go their way and come out with a new doll that was not
 9   infringing.
10            On the issue of damages, your Honor, loss of market
11   share, loss of sales, the Court knows the reasons we thought
12   that was not appropriate to come before the jury.  We never
13   took the position that there were no lost sales or there was no
14   lost market share.
15            The Court has MGA's admissions.  They stated in their
16   brief, on affirmative defenses, their pretrial brief -- this is
17   at Page 7, Footnote 5 -- that Bratz has taken market share from
18   Barbie.  That's what the Court has before it on that.
19            You asked the question of Mr. Kennedy, Isn't it harm
20   not to be able to market your own copyrighted product?  And
21   Mr. Kennedy said, Well, conceptually, theoretically, that might
22   be harm.
23            We're being sued right now over My Scene's theory,
24   that it infringes Bratz.  That's not conceptual.  We're
25   defending that case.  That's all part of Phase 2 in this case.
```

```
 1   It's not conceptual.  It's not theoretical.  We not only can't
 2   market Bratz, we can't market our own products without being
 3   sued and being charged with infringing Bratz.
 4            With respect to monopoly, the public interest of
 5   monopoly, there's a case, the Mortgage Market Guide case, 2008,
 6   Westlaw 299, where the court said that courts recognize no
 7   monopoly -- there is not a monopoly if MGA can continue to
 8   compete just with noninfringing products.  I'm substituting
 9   "MGA" in there for the language in the opinion.  But they are
10   not unable to compete.  They are still free to, as Mr. Larian
11   said he would, come out with a new fashion doll.
12            With respect to royalty, there's a motion with
13   respect to Mr. Meyer's declaration, your Honor, that there is
14   no evidence before the Court from which the Court could derive
15   what a market royalty would be, what would be the result of a
16   negotiation between these two parties.  And it's all
17   hypothetical, and it's premised on an assumption about what the
18   jury must have decided.  No evidence about what prevailing
19   royalties are.  No evidence on what arrangements MGA or Mattel
20   have entered into.
21            We've submitted a declaration of Ms. Willis about how
22   she said, If there were hypothetical negotiations between these
23   parties, for a lot of different reasons, it would not make any
24   sense to license MGA.
25            And then, just on a very practical level, in terms of
```

1    royalty, your Honor, the Court has a very good sense of these

2    parties and the individuals involved.  That would put these

3    parties in an ongoing relationship, with royalty payments to be

4    made, to be questioned, to be audited.  The trust that would be

5    required whenever you have a licensing arrangement with a

6    royalty, I submit, this is not an appropriate case for that.

7              Thank you, your Honor.

8              **THE COURT:**  Mr. Quinn, Mr. Kennedy, is there anything

9    further?

10             **MR. KENNEDY:**  Just one minute, your Honor.

11             In addition to all of the other jury instructions

12   we've talked about, the Court gave Instruction Number 42, which

13   read, in part, "However, in determining what portion of the

14   defendant's profits are attributable to copyright infringement,

15   the benefit of the doubt should be given to Mattel and not

16   defendants.  If the copyrighted portions are so intermingled

17   with the rest of the infringing work that they cannot well be

18   distinguished from it, the entire profits realized by the

19   defendants are to be given to the plaintiff."

20             And against that, and all of the other jury

21   instructions, these folks came up with $10 million for

22   everybody and $6 million for MGA; so we have both explicit and

23   implicit findings that they were accepting only some very, very

24   small portion of total profits.

25             Against that, obviously, your Honor has a very

Monday, November 10, 2008                    CV 04-09049

1  weighty decision; and this probably is going to be new law

2  whichever way you go.  As Mr. Quinn correctly pointed out,

3  eBay hasn't been with us that long.  But I've got a

4  responsibility for something like 800 people's jobs.  If

5  there's any question I have not answered today that you think I

6  might be able to answer, I'd really appreciate the opportunity,

7  if there's something further that's on your Honor's mind that I

8  just have not been able to cover.

9         **THE COURT:**  I appreciate that, Counsel.  I appreciate

10  your argument and the outstanding argument of everyone this

11  afternoon.  The briefs are of the standard that I have come to

12  expect in this case, as are the oral arguments; so I thank you.

13         Those were the four motions I wanted to cover.  I

14  know there are three motions to strike.  There are a number of

15  additional issues which the Court will address, based on the

16  well-written papers.

17         Mr. Zeller, is there something further?

18         **MR. ZELLER:**  Yes, your Honor.  I wanted to direct the

19  Court's attention to a couple of pieces of evidence

20  particularly concerning this issue that was raised during oral

21  argument about the value of the name.  In particular,

22  Rachel Harris testified -- this is actually in the trial

23  transcript, Page 4208 through Page 4209.  And she was asked

24  about the circumstances about the Bratz name, and she said,

25  basically, that Bratz, B-R-A-T-Z, was one of about 20 that MGA

1    considered, and that they ultimately went with Bratz.  And the

2    following question was asked:

3            Question:  "And do you know why the name "Bratz" was

4    ultimately selected?"

5            We're talking about the name here.  This is October

6    of 2000, before any use was made of this, in commerce, or any

7    kind of trademark rights could have attached under U.S. law.

8            Answer:  "It was the most edgy.  It was just a cool

9    name."

10           Question:  "That was the consensus of the MGA

11   committee?"

12           Answer:  "Yes."

13           Question:  "Of which you were a member?"

14           Answer:  "Yes."

15   **MR. ZELLER:**  So MGA itself recognized that there was

16   an inherent value in this name, because it was edgy, it was

17   cool.

18           And also, as Paula Garcia testified at deposition,

19   this coalesced -- it basically matched up, it fit, with the

20   concept of the dolls.

21           So this is a name in itself that people perceived as

22   having value.  And actually, the decision was made to go

23   forward with it, for that very reason, because MGA itself

24   perceived and understood that the very name that Carter Bryant

25   came up with and that MGA took had value.

1        **THE COURT:**  Thank you, Counsel.

2        Anything further from Mattel?

3        **MR. QUINN:**  No, your Honor.

4        **THE COURT:**  Very well.

5        Anything further from MGA?

6        **MR. RUSSELL:**  I think all I would point out is the

7    obvious, which is, it's true that at that time, the evidence he

8    just showed showed MGA had a vision.  There's no evidence that

9    there was any value to it, other than it sounded good to MGA,

10   they devoted their resources to it, and they created something

11   that was valueless at the time.  He's now had a chance; he's

12   scoured the record; and he came up with nothing.  So that

13   property was worthless at the time.

14       **THE COURT:**  Gentlemen, that's enough.  Everyone sit

15   down.  The Court has before it enough; the Court has the entire

16   record before it.  I appreciate everyone's good efforts.

17       The Court has already spent a lot of time on these

18   various motions, and I think with the benefit of today's oral

19   argument, I should be able to issue an order later this week, I

20   hope, certainly within the next two weeks.  That will, of

21   course, pursuant to the September 2nd order, trigger the

22   ten-day filing for renewed JMOLS, motions for new trial, and

23   any other motions; 14 days after that, oppositions; seven days

24   after that, replies.  The Court will thereafter set a hearing.

25   This will probably put us into the middle to the end of

Monday, November 10, 2008                    CV 04-09049

1    December; so what I will do is set a hearing most likely in

2    early January, the first, second or third Monday in January.

3    That will then be the final hearing, from the Court's

4    perspective, on Phase 1 collectively.

5         In addition to whatever motions are submitted after

6    the Court has issued its orders as a result of this hearing,

7    and after it addresses those motions, the Court will also want

8    to take up issues of whether or not to enter judgment at the

9    end of Phase 1 for purposes of appeal or whether or not the

10   judgment should be held in abeyance until the second phase, and

11   I'll expect counsel to be prepared to argue to that effect.

12        I also intend to appoint a Discovery Master for

13   Phase 2 and lift the stay on Phase 2 discovery at that time.

14   In the order that I issue shortly, I will indicate three

15   potential Discovery Masters that the Court has confidence in,

16   and I'll be expecting you, come January, or whenever we have

17   this hearing, to be in the position to indicate to the Court if

18   you have any objection to one or all of those proposed Masters.

19   And then also, at the January hearing, I will have further

20   scheduling for Phase 2; so bring your calendars and be prepared

21   to conduct a scheduling conference at that time as well.

22        Regardless of what the Court orders after today, any

23   order related to declaratory relief or injunction will be

24   stayed pending that hearing in January.  I want retailers to

25   understand -- they have had a bad enough year -- that there's

```
 1   nothing that is going to happen with respect to this between
 2   now and that January hearing; that any order the Court issues
 3   in the next week or two will go into effect come January, after
 4   the holiday season has been completed.
 5           That is all I have for right now.
 6           Are there any questions on how we're proceeding at
 7   this point?  From Mattel?
 8           MR. QUINN:  No, your Honor.
 9           THE COURT:  From MGA?
10           MR. NOLAN:  No, your Honor.
11           THE COURT:  Very well.  Court is in recess.
12
13
14
15
16                        CERTIFICATE
17
18   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the Judicial Conference of
     the United States.
21
22   _____      _11-26-08_____
     THERESA A. LANZA, CSR, RPR                   Date
23   Federal Official Court Reporter
24
25
```