1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6    MATTEL, INC.,              : PAGES 200 - 342

                                :

7          PLAINTIFFS,       :

                                :

8     VS.              :  NO. ED CV04-09049-SGL

                     : [Consolidated with

9    MGA INC., ET AL.,        :  CV04-9059 & CV05-2727]

                                :

10          DEFENDANTS.       :

11

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15               RIVERSIDE, CALIFORNIA

16               TUESDAY, MAY 20, 2008

17                JURY TRIAL - DAY 1

18               AFTERNOON SESSION

19

20

21

22               MARK SCHWEITZER, CSR, RPR, CRR

                 OFFICIAL COURT REPORTER

23               UNITED STATES DISTRICT COURT

                 181-H ROYBAL FEDERAL BUILDING

24               255 EAST TEMPLE STREET

                 LOS ANGELES, CALIFORNIA 90012

25               (213) 663-3494

1   Appearances of Counsel:

2   On Behalf of Mattel:

3       Quinn Emanuel

        By John B. Quinn, Esq.

4       By B. Dylan Proctor, Esq.

        By Michael T. Zeller, Esq.

5       855 South Figueroa Street

        10th Floor

6       Los Angeles, CA 90017

        (213) 624-7707

7

8   On Behalf of MGA Entertainment:

9       Skadden, Arps, Slate, Meagher & Flom LLP

        By Thomas J. Nolan, Esq.

10      By Carl Alan Roth, Esq.

        By Jason Russell, Esq.

11      300 South Grand Avenue

        Los Angeles, CA 90071-3144

12      (213) 687-5000

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     I N D E X

2

3     JURY VOIR DIRE (CONTINUED)............................203

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Riverside, California; Tuesday, May 20, 2008

2                   1:12 P.M.

3          THE COURT:  Okay.  Let's continue with our

4     questioning of Mr. Bullard.

5          PROSPECTIVE JUROR BULLARD:  My name is John

6     Bullard.  I'm a granite and marble fabricator and installer.

7     The answer is no for 3, 4, and 5.  High school diploma.  I

8     live in San Jacinto.  I'm not married, don't have any

9     children.  I'm the only one currently living at my residence.

10    I have not been on a jury prior to this.  I am familiar with

11    Mattel.  I'm not familiar with MGA.  And I hold no opinions

12    to either.  No to 14, and there is no reason why I cannot be

13    fair if I sit on this jury.

14         THE COURT:  Thank you, sir.

15         Ms. Casper.

16         PROSPECTIVE JUROR CASPER:  I'm Marlene Casper.  I'm

17    an R.N. at Kaiser Permanente Riverside.  I've been a nurse

18    for 25 years.  I've been 10 years at Kaiser.  No to 3, 4, and

19    5.  I have a nursing degree.  I live in Rancho Cucamonga.

20    I'm a divorced lady, and I live by myself.  And I have four

21    children.  I have a daughter 43, she owns an antique shop in

22    Indiana.  A son, 41, he works for Schindler elevator in

23    El Segundo.  And a daughter that's 29, and she is a professor

24    at the University of Judaism in Beverly Hills.

25         I have heard of Mattel.  I've seen a few of the

1    toys, but I don't have an opinion on Mattel.  And I don't

2    know about the Bratz dolls.

3         THE COURT:  Have you ever been sued or involved in

4    a lawsuit?

5         PROSPECTIVE JUROR CASPER:  No.  And there's no

6    reason why I can't be a fair and impartial juror.

7         THE COURT:  Thank you, ma'am.

8         I'm going to skip to the back part of the

9    courtroom.  We'll begin with Juror 17.  Mr. Stuart Weiner.

10        PROSPECTIVE JUROR WEINER:  My name is Stuart

11   Weiner.  I have been in the electrical lighting field since I

12   finished school.  I'm presently in that field as a lighting

13   specialist involving working with contractors and

14   subcontractors.  I'm also presently working for a major

15   manufacturer and retailer in that field.

16        I've had no serious dispute with any employer.  I

17   have signed employment contracts working for people, nothing

18   with inventions of that sort in answer to No. 4.  I've had

19   no -- and No. 5.  Have no close experience with patents,

20   trademarks, or copyrights.  Number 6, my educational

21   background, I've done postgraduate work in accounting.  My

22   major field has been economics and political science, and I

23   have a degree in that.

24        The city I live in is Indian Wells.  I am single.

25   I have three children.  Number 9, their ages are 34, 32, and

1    22, three daughters.  The first is a school teacher.  The

2    second is working for me in real estate.  And the third one

3    is a paralegal in a law office here in the valley.

4         Number 10, there are no adults in my household.  I

5    have not had any prior jury experience, No. 11.  In answer to

6    No. 12, I am quite familiar with Mattel.  From my early

7    work -- one of my early jobs, when I finished schooling, was

8    working for a manufacturer that sold parts to Mattel Company

9    that they completed in their products and sold out, and I

10   have found in the contracts that they issued to us in our

11   working relationship with us that they have the highest

12   standards in carrying out those contracts.

13        I say this without any prejudice one way or

14   another.  I only make mention of this because I think of my

15   association with them tells me from the past there's nothing

16   unfavorable to say about what went on with our company

17   working with them.

18        THE COURT:  Let me ask you this, Mr. Weiner.  Would

19   you think that past experience, that was a positive one --

20        PROSPECTIVE JUROR WEINER:  I can't hear you.

21   Pardon.

22        THE COURT:  I'm sorry.  With your previous

23   experience you described working with Mattel, would you

24   describe it as a positive experience?  Would that in any way

25   cause you to favor Mattel or disfavor someone who was

1    involved in litigation with Mattel?

2         PROSPECTIVE JUROR WEINER:  When you said working

3    with them, I myself, it was a big company.  I was not working

4    with them.  I was in another division.  What I heard from the

5    other division in their working with Mattel, was that they

6    had favorable experiences in carrying out the contract.  I

7    felt that I should relate that I knew of that at the time

8    that I was working for them.  But I had no contact with the

9    division that was working with Mattel.

10        THE COURT:  Very good.  I appreciate that

11   distinction.  But as a follow-up to that, do you believe that

12   that impression that you received indirectly, would that have

13   any bearing on how you might view the parties in this case?

14        PROSPECTIVE JUROR WEINER:  Well, I hope not.  I

15   think just because they had high ethics, that was the general

16   mood and content of how our whole country conducted their

17   business when I first started out, as I finished schooling.

18   Things do change with ethics, but I think as I look back, I

19   look favorably at my business contact at that time of which

20   there was a reflection on Mattel, General Electric, and other

21   companies like that, how they conducted themselves.

22        THE COURT:  Very well.  What about MGA

23   Entertainment?  Any experience or opinions with respect to

24   MGA Entertainment?

25        PROSPECTIVE JUROR WEINER:  I know a lot about the

1    Barbie doll with Mattel, but I know absolutely nothing about

2    this company, the one that you are mentioning.

3          THE COURT:  Have you ever sued or been sued in a

4    lawsuit?

5          PROSPECTIVE JUROR WEINER:  I have sued.

6          THE COURT:  What was the nature of the lawsuit?

7          PROSPECTIVE JUROR WEINER:  One was a fraud for

8    antique objects and art.  But I was plaintiff.

9          THE COURT:  Anything about that experience that

10   might affect how you view the litigation if you sat as a

11   juror in this matter?

12         PROSPECTIVE JUROR WEINER:  Well, I think that's a

13   pretty general question for me to reflect on it right now.  I

14   can only think that I conducted myself in the highest

15   standards possible, and I think justice was well told to me

16   in the long case that went to the California Supreme Court.

17   And I thought everything about our court system and the way

18   this was handled through the different appeals and everything

19   else, and everything that I could say, I have the highest

20   respect for our judicial system, and I still do.

21         I was grateful that I was a plaintiff, and I'm

22   feeling honor bound to be here today for the first time if

23   I'm selected for jury duty.  It's a way of saying thank you

24   to my country for providing for this.

25         THE COURT:  Very good.  And the last question, you

1    said one was a fraud.  Was there another case that you were

2    involved in?

3            PROSPECTIVE JUROR WEINER:  Yes, there was another

4    case.  It concerned buying a large parcel of real estate for

5    a retirement home for myself.  And it turned out that what

6    was done was fraudulent, completely.  I went to court for

7    that and was plaintiff for it and saw that through

8    completely.

9            THE COURT:  And the same positive experience with

10   respect to the justice system in that case as well?

11           PROSPECTIVE JUROR WEINER:  Very much so.

12           THE COURT:  Is there any reason that you can think

13   of that you would not be fair or impartial in this case?

14           PROSPECTIVE JUROR WEINER:  Particularly with the

15   requests that you asked me, I think I would lean more because

16   of experience to fairness in this case.

17           THE COURT:  To fairness.

18           PROSPECTIVE JUROR WEINER:  Yes.

19           THE COURT:  Well, if there's any -- like I said at

20   the outset, if there's any question that I haven't asked you,

21   and I really need to depend upon you, all the members of the

22   panel here, to let me know if there's anything about the

23   case, anything you may have seen in the courtroom, anything

24   about the opening statements that you heard at all that might

25   cause you to question whether you could be fair and

1    impartial.

2         PROSPECTIVE JUROR WEINER:  Well, I've already said

3    one thing, which I saw was an irregularity when I came in

4    here, and you've already corrected it.  So I'm very grateful

5    for that.

6         THE COURT:  Thank you, Mr. Weiner.

7         Mr. Dehart.

8         PROSPECTIVE JUROR DEHART:  My name is Troy Lee

9    Dehart.  I am presently employed in Eisenhower Medical

10   Center.  I am an EGT tech at the ICU and cardiac surgery

11   units.  Before that, I worked several jobs for the water

12   company, for advertisement and other things.  Before that, I

13   was a retired United States Marine for 23 years, where I

14   served as a rifleman, a firefighter, crash rescue, audio

15   visual, combat photographer, trainer, electronic warfare,

16   lots of jobs that I can and can't mention.  Mostly boring.

17        Have I ever signed an employment agreement?  We've

18   just recently done that at the hospitals.  I have no idea

19   why.

20        THE COURT:  Anything about having to sign the

21   agreement that gives you any pause?

22        PROSPECTIVE JUROR DEHART:  It gives me pause

23   because we work in a hospital, and we're not creating

24   anything.  I have no idea why all hospitals in our area have

25   instituted these.  I think it has to do with some --

1          THE COURT:  Would anything about that experience

2    affect how you might view --

3          PROSPECTIVE JUROR DEHART:  Boring, waste of time,

4    waste of energy.

5          Any experience with trademarks or copyrights?  My

6    brother-in-law has several patents, which he's worked for a

7    company.  I've had several cartoons, photographs that were

8    placed and taken.

9          THE COURT:  Any challenges involving those

10   copyrights or patents, your copyrights or your

11   brother-in-law's patents?

12         PROSPECTIVE JUROR DEHART:  His, no.  His company

13   actually won a prize for one of their patents.  Nobel Prize,

14   I think.  That was a while ago.  I'm poor; so it doesn't work

15   that way.

16         THE COURT:  What do you mean by that?

17         PROSPECTIVE JUROR DEHART:  I've been a cartoonist,

18   artist, painter, photographer, stringer for the Marine Corps

19   for Stars and Stripes magazine, for all kinds of things.  If

20   you have a picture or a cartoon, and it may be copyrighted,

21   someone can take it, if they have greater need, greater use,

22   and if you don't, there's very little recourse.  There is no

23   recourse in the military, of course.  But there's very little

24   recourse unless you have the money to sue.  It's just a

25   matter of time.

1    THE COURT:  Very good.  If copyright were to become

2    an issue in this case, would you be willing to follow the

3    Court's instructions on whatever law might apply to that

4    issue or any other issue?

5    PROSPECTIVE JUROR DEHART:  I took an oath to uphold

6    and defend the Constitution.  I take that oath very

7    seriously.  And this is my first time as a juror of any kind,

8    a civilian matter, and I take that very seriously.

9    THE COURT:  Going back to the questions, your

10    educational background.

11    PROSPECTIVE JUROR DEHART:  Graduated high school.

12    I started college several times.  My last college experience

13    was going into the nursing program.  My wife is a nurse,

14    talked me into it.  Nurses work too hard.  I dropped out.

15    They work harder than Marines.  So that was the end of it.

16    My married status, I am married.  This is my second

17    wife.  She's a surgical nurse.  She's one of the top surgical

18    nurses in the state of California.  She's one of the few

19    people that can do certain types of sedation and other

20    things, which I don't understand and don't want to.

21    How many children?  I have a daughter and a son.

22    My daughter is celebrating her 28th birthday again and again.

23    My wife has a son.  He is presently going to be just hired by

24    Halliburton.  He's going back to Iraq.  He served two tours

25    in the Army in Iraq, and now he's going back there.

1         And is there any adults living with you?  Yes, I

2    have a recluse, a guy who lost everything.  So I took him in

3    to help bring him back.  He's an ex-KGB from Romania, if you

4    believe his story.  He drinks a lot.

5         But we are getting him a job.  We are getting him

6    his household and putting him back on the -- I kind of

7    inherited him out of the Sawtooth fires.

8         THE COURT:  Where do you live?

9         PROSPECTIVE JUROR DEHART:  I live in Pioneertown.

10   It's one of those places where they tell you go to the end of

11   the street and turn right at the big tree.  That's exactly

12   where I live.  Literally.

13        THE COURT:  You already indicated you have no prior

14   jury experience.  Are you familiar with Mattel or any of

15   their products?

16        PROSPECTIVE JUROR DEHART:  I probably know

17   everything there is about Barbie.  My daughter had every

18   Barbie.  I put together every Barbie thing.  My sister had

19   the very first Barbie.  My dad was not mechanical.  So I put

20   every Barbie thing together for him for Christmas.  I even

21   had a cousin that had a pre-Barbie doll from France.  That

22   was -- it wasn't a Barbie, but it was a pre-Barbie thing.  If

23   it has to do with Barbies, I have very much experience.

24        THE COURT:  Any opinions about Mattel or their

25   products?

1           PROSPECTIVE JUROR DEHART:  As long as they stay in

2   toys, it's fine.  I fired an M-1, 16-A-1 Matty, Mattel, and

3   it fell apart in my hands.  The plastics were built by Mattel

4   in the Vietnam era.  I still carry a scar for it.  As long as

5   they carry toys, it's okay.

6           THE COURT:  Will that affect how you evaluate

7   Mattel in this case?

8           PROSPECTIVE JUROR DEHART:  Not for toys.  For

9   weapons, yes.

10          THE COURT:  This is not a weapons case.

11          PROSPECTIVE JUROR DEHART:  As long as the company

12  stays within its expertise, I think that's great.

13          THE COURT:  What about MGA Entertainment?

14          PROSPECTIVE JUROR DEHART:  MGA, the only thing I

15  know about that is from working with nurses.  I have several

16  nurse friends who have called their husbands and said they

17  will buy this toy immediately before it sells out, and then

18  they complain about it all day, which has happened several

19  times over the last two months.

20          I don't know what it is, but I know the nurses are

21  complaining to their husbands.

22          I have no idea of any of this other -- I have been

23  involved with lawsuits.  I've had two lawsuits myself where I

24  sued.  One was a simple property dispute.  I wanted a guy to

25  move a fence.  He didn't want to.  He had lawyers and money.

1    I had time.  I won.  The fence was on my property.  The next

2    was a lawsuit against an insurance company.  I was hit, run

3    over by a car.  The insurance company thought that I was dead

4    along with a lot of other people.  So they didn't pay the

5    bills until after we proved that I wasn't dead, and they had

6    to pay the bills.

7            THE COURT:  Anything about those cases that might

8    affect how you view civil trials?

9            PROSPECTIVE JUROR DEHART:  It took so long.  Each

10   case took a ridiculous amount of time.  People continued to

11   talk beyond what they should have.  It was as if the lawyers

12   in my cases really enjoyed listening to themselves speak.

13   And I'm talking about four years to move a fence a hundred

14   feet, and I think I can prove that I have a life.  And it

15   took two years to do that.

16           My wife was involved with a lawsuit with

17   Medtronics.  We went to arbitration, and everything was

18   sealed after that.

19           THE COURT:  Any reason that you cannot be fair and

20   impartial in this case?

21           PROSPECTIVE JUROR DEHART:  I don't think there is

22   any reason.

23           THE COURT:  Very good.  Thank you, sir.

24           Mr. Bishaw.

25           PROSPECTIVE JUROR BISHAW:  My name is Alex Bishaw.

1    I got out of the military at 21.  Worked for a construction

2    company for 19 years, 15 in the field and 4 in estimating.  I

3    had a dispute with them as far as pay.  I was offered a

4    position at a much smaller company that I work with.  And now

5    I own about 30 percent of it.

6         Patent, trademarks, no.  Education, high school.  I

7    did some semesters in business.  I currently reside in

8    Riverside.  I'm a divorced father with three girls.  31,

9    works at a bank.  The 26 is a mother of one.  And my youngest

10   one, which moved out about a year ago, she's 25.  I have no

11   adults, and I enjoy living by myself.

12        I served in the past four years.  I did two jury

13   cases, criminal cases that we came to a verdict.  I am

14   familiar with Mattel, not because I owned any, but with the

15   girls, I've bought several Barbies.  And I know Bratz because

16   I've helped my daughter help my granddaughter decorate her

17   room with Bratz dolls.

18        Never been sued or a lawsuit.

19        As far as being fair and impartial, I compare this

20   with the other two jury duties that I served.  And I just

21   don't feel right here.

22        THE COURT:  What do you mean?

23        PROSPECTIVE JUROR BISHAW:  It's just not my kind of

24   case.  I just don't care if it's MGA or Mattel.

25        THE COURT:  That's not necessarily a bad thing.  We

1    don't want anyone to care about one party or another.  It's

2    kind of the point, to find people who are --

3           PROSPECTIVE JUROR BISHAW:  I was proud to serve on

4    the criminal cases, and it was a burden on me and my

5    daughters when I did serve, you know.  But this I just have a

6    problem with.  With this case.

7           THE COURT:  Okay.  Do you think that you would --

8    that your lack of interest in the subject matter might affect

9    how you would view one party or the other?

10          PROSPECTIVE JUROR BISHAW:  I'm afraid it might.  I

11   can't say until I start hearing it.  But right now, I'm not

12   even interested in it.  If they get the Bratz or they get the

13   Bratz, I really don't care.  Nothing personal.

14          THE COURT:  Very good.  Thank you, Mr. Bishaw.

15          Kevin Staff.

16          PROSPECTIVE JUROR STAFF:  My name is Kevin Staff.

17   Within the last 60 days, I've become an insurance agent for

18   Farmers Insurance.  I'm a captive agent.  Previously I've

19   worked as a chef, food and beverage manager, also a memorial

20   counselor at a cemetery and funeral establishment.  I've

21   never had a serious dispute with an employer.  I have signed

22   an employment agreement in accordance with restaurant dot

23   com.  I had a noncompete clause when I worked with them as a

24   restaurant consultant.  And currently with Farmers I do have

25   a captive agent clause with them for property and casualty

1   and life insurance.

2          No experience with patents, trademarks, or

3   copyrights.  Educational background, I have two years of

4   general education and college.  Also I have two years general

5   education in college, and I have a grand diploma from the

6   Cordon Bleu in Paris, France.

7          The name of the city I live in is Loma Linda.  I am

8   married 22 years.  My wife works for Loma Linda School of

9   Dentistry.  She's a senior administrative assistant to the

10  dean of dentistry, Dr. Richardson.  We have no children.  No

11  other adults living in our household.  Never been involved in

12  a jury.

13         I am familiar with Mattel, loved Hot Wheels when I

14  was a kid.  That's basically it.

15         Not familiar with MGA Entertainment.  No lawsuit,

16  and 15 is no.

17         THE COURT:  Thank you, sir.

18         Mr. Blazer.

19         PROSPECTIVE JUROR BLAZER:  Good afternoon.  My name

20  is Christopher Blazer.  Currently I'm to be employed for

21  another five weeks with Fontana School District as a

22  custodian.  That will be my final farewell to them.

23         I worked 14 years for Kaiser Steel prior to that.

24         During all those years, I've been a local union

25  president, financial secretary, previous representative.

1    That's basically a union advocate for employees.

2         I personally have never had a serious dispute.  I

3    have represented people probably, I would guess, 25 to 30

4    occasions in employment-related matters.  I have signed some

5    last chance agreements, things of that nature.

6         I have no experience with patents.

7         My educational background, high school graduate

8    with some labor relations college units.

9         I live in the City of Fontana.

10        I am single.  I have no children.

11        I live alone.

12        I have served on a criminal jury.  We were a hung

13    jury, two counts, hung on both counts.

14        I am familiar with Mattel just in that it's a major

15    company.  And I'm not familiar with MGA, Bratz.

16        Yes, I've never been sued or sued anyone.  And I

17    believe I can be fair and impartial.

18        THE COURT:  Your representation as a union advocate

19    for employees, has that -- would any of those disputes affect

20    how you might view another employee dispute?

21        PROSPECTIVE JUROR BLAZER:  No, sir.

22        THE COURT:  You'd be able to separate everything

23    you've learned in those prior experiences with the current

24    case?

25        PROSPECTIVE JUROR BLAZER:  Yes, sir.

1        THE COURT:  Very well.  Thank you, sir.

2        Ms. Hayes.

3        PROSPECTIVE JUROR HAYES:  My name is Linda Hayes.

4    I've been retired for the last 18 years, but prior to that, I

5    worked as a court clerk in the civil division of

6    Orange County Superior Court.  Mainly what I did was the

7    intake of documents, filing various complaints, both for

8    civil and for family law.

9        Before that, I worked for the Placentia School

10   District and the offices.  And for the Orange County road

11   department, again, in offices.

12       There has never been any kind of dispute with any

13   of my employers.  Nor have I had to sign any kind of special

14   agreements or had any experience with patents or trademarks.

15       Education would be high school and a variety of

16   college courses that were mainly for entertainment, child

17   development, English reading classes, those kinds of things.

18       I live in the city of Hemet.

19       I have been married for 44 years, and my husband is

20   also retired.  He was a land surveyor in the County of

21   Orange.

22       We have two children.  My son is 42 years old.

23   He's an electrician.

24       My daughter is 38 years old, and she is a

25   housewife.

1          There are no other adults living in our household.

2          I have about 15 years ago been on a criminal case.

3     It did come to verdict.

4          Yes, I'm familiar with a variety of Mattel toys,

5     including the Barbie doll, having a daughter and four

6     different granddaughters.

7          I was unfamiliar with the company called MGA, but I

8     do know about Bratz dolls.  In fact, for my youngest

9     granddaughter, who is 11, I refused to buy them for her

10    because I didn't particularly care for the styling that the

11    little girls wore.

12         That was just, you know, I don't care who made it.

13    I wouldn't have bought it.

14         I've never been sued, nor have I sued anyone, and I

15    think I could probably be pretty fair and impartial.  That's

16    it.

17         THE COURT:  Very well.  Ma'am, you said you worked

18    as a court clerk down in Orange?

19         PROSPECTIVE JUROR HAYES:  Orange County Superior

20    Court, civil division.

21         THE COURT:  You've seen a lot of cases come and go

22    in your time.

23         PROSPECTIVE JUROR HAYES:  Absolutely.

24         THE COURT:  And I trust that you can divorce

25    anything that you may have learned or picked up in the

1    clerk's office in Orange County Superior Court in any

2    instructions that this Court gives you or anything that

3    happens in this case.

4          PROSPECTIVE JUROR HAYES:  Right.  Basically,

5    anything I dealt with was procedure as far as processing

6    paperwork.  That doesn't have anything to do with the

7    evidence as presented on an individual trial.

8          THE COURT:  Very good.  Now, your views about the

9    Bratz dolls themselves, do you think that those views might

10   affect how you might view the parties in this case?

11         PROSPECTIVE JUROR HAYES:  Well, the problem in that

12   situation is both parties are claiming that doll.  So that

13   wouldn't have anything to do with how I would --

14         THE COURT:  So whatever negative feelings you have

15   about the doll would be transposed on --

16         PROSPECTIVE JUROR HAYES:  There are a lot of toys

17   out there that I choose not to buy for my grandchildren, and

18   just the fact that they were giving those out, I think, as a

19   McDonald's Happy Meal thing and so forth, and all of the

20   children were "We want one of those," and I said let your

21   other grandma buy it.

22         THE COURT:  Very good.  Thank you, ma'am.

23         Mr. Costello.

24         PROSPECTIVE JUROR COSTELLO:  My name is Joe

25   Costello.  I work for the City of Victorville, 17 years.  I

1      work in public works.  I'm a street super.

2           No to 3, 4, and 5.  High school diploma.  Some

3      classes relating to public works.  I live in Hesperia.  I'm

4      single.  I have a 32-year-old son.  He works for a company,

5      asphalt and concrete company here in Riverside.  He's an

6      assistant superintendent.

7           I live by myself.  I was on one criminal -- I was

8      an alternate on a criminal case.

9           I know Mattel since I was a kid.  I never heard of

10     MGA.  I have no opinion either way of both companies.  And no

11     to 14 and no to 15.

12          THE COURT:  Very well.  Thank you, sir.

13          Ms. Clark.

14          PROSPECTIVE JUROR CLARK:  My name is Linda Clark.

15     I have just retired from owning our own concrete cutting

16     business.  Briefly before that, I worked at the Broadway

17     store in Tyler mall.  3, 4, and 5 are no.  I have a high

18     school diploma and some college classes.  I live in Ridge

19     Canyon, which is in Riverside County.  I've been married for

20     52 years.

21          My husband worked for Kaiser Steel for 29 years,

22     and then he ran our business, concrete cutting.

23          I have three daughters.  One works at the school

24     district.  One is a medical transcriptionist for Kaiser, and

25     the other is a veterinary tech out in Apple Valley.  I have

1    one -- I guess he's 19 -- a grandson that lives in our home.

2         No to 11.  Of course, I know Mattel by Barbie.  I

3    have three girls.

4         I didn't realize MGA was a company that owned

5    Bratz.  I have bought a Bratz for my great-granddaughter, who

6    is seven.  No to 14, and I've never served, and I think I

7    could be fair.

8         THE COURT:  You don't have any particular opinions

9    about either company?

10        PROSPECTIVE JUROR CLARK:  No.

11        THE COURT:  Okay.  Very good.  Thank you, ma'am.

12        PROSPECTIVE JUROR ASENCIO:  My name is Anthony

13   Asencio.  I am currently unemployed.  Past occupation, I

14   worked for Home Depot for 11 years.  I did the DMV paperwork.

15   I was a trainer for Home Depot.  And I did have a dispute

16   with them.  I caught another employee stealing, and he

17   verbally attacked me, and he said some bad things, and I said

18   something back, and they have a zero tolerance.  So I was

19   dismissed.

20        But we're still on good terms with Home Depot.

21        THE COURT:  Was the other employee dismissed as

22   well?

23        PROSPECTIVE JUROR ASENCIO:  Yes, he was.  I felt

24   bad about that, but I caught him stealing, and then he said

25   something bad about my mother.  So that's just -- anyway.

1          THE COURT:  Very well.

2          PROSPECTIVE JUROR ASENCIO:  But I'm still on good

3     terms with them.  I go there and see everybody.  They let me

4     in.  Because normally you can't go back.  Yeah.

5          And I have signed agreements with Home Depot

6     because we have advertisement and stuff, and you don't want

7     to let it out because of my competitors, which I was okay

8     with.

9          THE COURT:  Okay.

10          PROSPECTIVE JUROR ASENCIO:  And I've owned my own

11     business before that.  I've had five retail stores in Vegas

12     and around Southern California.  And I've had to let

13     employees go because they were like stealing from us and then

14     going to other companies, trying to steal our -- we did

15     service for other companies.

16          THE COURT:  What kind of retail stores?

17          PROSPECTIVE JUROR ASENCIO:  Stereo stores.  We did

18     all the installations and other things.  And we had employees

19     try to steal our accounts.  So I had problems with them.

20          I am a high school graduate.  I did go to Ford

21     air-conditioning graduate school.  I went there, and then I

22     was a manager for train air-conditioning.  I currently live

23     in Murrieta with my 83-year-old mother, and I have a disabled

24     brother that I take care of.

25          I'm divorced.  Do you want to know anything about

1    my ex-wives?

2            THE COURT:  Not a lot.  Just what was her

3    occupation?

4            PROSPECTIVE JUROR ASENCIO:  When?

5            THE COURT:  Did she work?  What was her occupation

6    or business?

7            PROSPECTIVE JUROR ASENCIO:  Mine?

8            THE COURT:  No, your ex-wives'.

9            PROSPECTIVE JUROR ASENCIO:  One was a highway

10   patrol.  She was in the Rodney King trial.  We had to go to

11   that.  So you know the verdict on that.

12           And then my other wife, we owned a business.

13           I have two boys, one is Anthony.  He's 44.  He's

14   installation, installer for electronics.  And I have another

15   son, he's 38.  He's a chef.  He owns his own business.

16           And every year I'm called for jury duty, but I've

17   never been on it.  Every year.  In fact, I just finished last

18   week.

19           I'm familiar with Mattel, of course, with Hot

20   Wheels and everything.  And Barbie dolls for grandchildren.

21           I've been to the City of Industry store because

22   they have big sales there.  You can go there.

23           And that's the only way I'm familiar with them.

24   They are a very good company.

25           And the other company I don't know.  Because my

1    grandsons are older.  So I don't know anything about the

2    Bratz doll.  And I have been sued.  I was sued by my family.

3    My mother.  Because I was an executor of a will.  So we had

4    to go to court twice on that, by I won in both cases.

5              And then, of course, being in business, retail

6    stores, we were sued several times.  I only lost once.

7              THE COURT:  Anything about any of those experiences

8    that might affect how you view the parties in this case?

9              PROSPECTIVE JUROR ASENCIO:  No.  Because it's just,

10   you know, you have to go through it.  It's just most of it

11   was just small trials.  We usually settled out of court.  And

12   I think I could be fair.  I've never been picked.  We'll see.

13             THE COURT:  But you think you could make a verdict

14   based on the evidence and testimony here?

15             PROSPECTIVE JUROR ASENCIO:  Yes, it will have to be

16   on the evidence.  I'll have to weigh everything, listen to

17   both sides because I have no -- it doesn't matter.  I don't

18   have to go either way.  Just whatever I think is fair.

19             THE COURT:  Thank you, sir.

20             Mr. Nguyen.

21             PROSPECTIVE JUROR NGUYEN:  My name is Michael

22   Nguyen, and I am an engineer for Northrup Grumman.  And I

23   have been a software engineer for more than 10 years.  No for

24   3.  Yes for 4.  The company I work for, I have to sign

25   employment agreement --

1          THE COURT:  Mr. Nguyen, pull the microphone a

2    little bit further away.  There's a little too much feedback.

3          PROSPECTIVE JUROR NGUYEN:  Okay.  I have to sign an

4    employment agreement and invention agreement with all the

5    company I work for.

6          THE COURT:  Do you have any strong feelings about

7    having to sign those agreements?

8          PROSPECTIVE JUROR NGUYEN:  Because they want the

9    product belong to the company after I leave the company.

10          THE COURT:  Do you have a problem with that?

11          PROSPECTIVE JUROR NGUYEN:  No.

12          And no for 5.

13          I have a Bachelor's degree from Cal Poly Pomona.

14    Major in computer science.

15          I live in Montclair.  I'm single.  I have no

16    children.

17          I'm living with my mom, my brother, and my sister.

18    My brother is a software engineer.  And my sister is a

19    software engineer, too.

20          I have no prior jury experience.  I know Mattel,

21    but I don't know much about their product.

22          I'm not familiar with MGA and their product.

23          I have been sued in a lawsuit once.  It's a car

24    accident.  And then the lawyers took care for us, and it was

25    settled outside the court.

1    I believe I can be fair and impartial in this case.

2    THE COURT:  All right.  Thank you, sir.

3    Ms. Burnham at the other end, next row.

4    MR. NOLAN:  Your Honor, do you mind, if it would be

5    possible if they stood while they are talking?  I apologize,

6    it just would be helpful to see.

7    THE COURT:  I hate to put everybody on the spot, I

8    just want all counsel to see.  If everybody would do that in

9    the back rows, that would be great.

10    Thank you, ma'am.

11    PROSPECTIVE JUROR BURNHAM:  My name is Sharon

12    Burnham.  I have done quite a bit in my life.  I worked as a

13    part-time bookkeeper while the children were young, and when

14    they were teens, I opened up my own children's clothing store

15    for a couple of years until my husband got transferred.

16    And then I came here from Colorado and worked for a

17    company that developed geospatial software and was in charge

18    of their computer database for 11 years.

19    I retired early, but got a little antsy.  So I went

20    back to work at Joanne's.  I am a big-spirited seamstress,

21    and I work part time at Joanne's fabric stores currently.  I

22    have not had any disputes with an employer.

23    I have had to sign the employment agreement with

24    the geospatial company because they develop the software.

25    And I was not in the development department.  So I was not

1    involved, but we had to state that we would not, you know,

2    pass on any of the information even when we left the company.

3    And I have not really experienced anything with trademarks or

4    copyrights.

5           My education is I have an Associate degree in

6    management and marketing from a junior college.

7           I live in Riverside.

8           I am married for 48 years.

9           My spouse is also -- he's permanently retired.  And

10   he was senior corporate auditor for a very large company for

11   his nearly entire career.

12          I have three children, the youngest being 41 and

13   was a bank operation manager, but is currently staying at

14   home.

15          I have a son that is 44, and he works for American

16   Tire in the warehouse.  He is an assistant manager.  And then

17   I have a 47-year-old daughter who has her Ph.D. and is

18   currently a V.P. for a relatively small pharmaceutical

19   development company.  And she works right with the doctors

20   and things to promote the products.

21          I do have a son who is living with us in our

22   household, who hopefully will be moving soon.  But let's see,

23   I do not have any prior jury experience.

24          I am very familiar with Mattel and its products,

25   having both girls and boys, we have had several products

1    while they were being raised.

2         We were always very pleased with the products.  I

3    mean, you know, we always -- the kids just loved them, and,

4    of course, Barbie dolls was a very big thing in our

5    household.

6         I am familiar with the Bratz doll but very, very

7    little because my kids were already grown.  It's just one of

8    my granddaughters who had a fetish for it.  And she lives out

9    of state.  But I did not know that they were the MGA

10   Entertainment Company.  I just knew the Bratz doll.

11        I was involved in a lawsuit when we first moved

12   here.  At the airport I slipped on ice.  So it was negotiated

13   out of court.  So there wasn't any big deal with that.

14        I do feel that I could be fair and impartial.

15        THE COURT:  Thank you very much, ma'am.

16        Mr. Smith.

17        PROSPECTIVE JUROR SMITH:  My name is Phillip Smith.

18   As to my present occupation, I am a pastor/missionary on a

19   bit of a hiatus.  Presently a primary caregiver for my two

20   elderly parents.  My mother 85 and my father 84.  As for

21   previous occupations, the list is large.  Mostly related to

22   agricultural construction.  Although I have been involved in

23   a certain significant amount of training of youth and

24   different areas of that.  I did alcohol and drug

25   rehabilitation counseling for 16 years as well as other

1    things.

2         Have I ever had any serious dispute with an

3    employer?  Other than being fired once and quitting once, no.

4    The circumstances around those were minimal as I would

5    estimate them.

6         I've never signed an agreement other than with

7    Metropolitan Water District, who I worked for from 1986 to

8    1991.  Just an employment agreement.  I'm -- quite frankly, I

9    have no idea what was in it.  I just signed it.  It was a

10   paycheck.

11        Have I ever been involved in patents, trademarks,

12   or copyrights?  No, sir, I have not.

13        My educational background is in 1991 I was put out

14   on medical disability from the Metropolitan Water District.

15   I went to Azusa Pacific University.  I got a Bachelor's

16   degree in global studies with an emphasis on world missions.

17        And I graduate in '95, December of '95.

18        I live in Nuevo, which is a beautiful little bird.

19   I hope none of you know where it's at.  My marital status,

20   I've been married 38 years to the same woman.  And she is the

21   executive office administrator for her family's custom

22   harvesting and farming venture.

23        I have two children.  One is 36.  He has a

24   Bachelor's and Master's degree in structural engineering.  He

25   also has an MBA, and he works for the third largest

1    manufacturer of irrigation products in the world.  In product

2    development and engineering.  R & D development.

3         There are no other adults living in my household

4    other than my wife.  I have never been on a jury.

5         Mattel is obviously famous for a variety of reasons

6    in my life, whether being a kid, a child, a father of

7    children, or a grandfather of children, I've been familiar

8    with them.  Barbie is a little removed as I can be from them.

9    I guess it's another one that I'm familiar with.  I have no

10   real opinion regarding that company, MGA.  I have no previous

11   knowledge of.  Nor the Bratz dolls.  Although with

12   granddaughters I probably should have.

13        Other than that, I have no opinion of them.

14        I've never been in a lawsuit.  My brother was sued

15   once briefly in 1973, which lasted about two hours in court,

16   and I cannot remember the outcome.  And it was immaterial to

17   me.

18        And I believe that I can be fair and impartial in

19   dealing with this issue.

20        THE COURT:  Mr. Smith, I did receive a note from

21   you indicating a potential hardship.  Would you like to --

22   are you able to discuss that openly, or would you like to

23   discuss it at sidebar?

24        PROSPECTIVE JUROR SMITH:  I can briefly describe to

25   you what the problem is.  My mother has advanced Alzheimer's.

1    And my father is the primary caregiver for her.  I'm

2    secondary.  Two weeks ago, Thursday -- a week ago last

3    Thursday, my father passed out and had some serious physical

4    problems.  We have not determined what they are.  He's

5    still -- I guess it moved me to a primary care position.

6        If you need more information on that, I would

7    prefer to give it to you in private.  But my particular

8    position right now is one that I have assumed significant

9    conflicts with my being here for an extended period of time.

10        THE COURT:  I know this developed after you had

11    submitted answers to the questionnaire.

12        PROSPECTIVE JUROR SMITH:  Yes, sir.

13        THE COURT:  All right.  But you believe because of

14    this, that it would be difficult for you to -- to at this

15    point to sit for the trial for the two months?

16        PROSPECTIVE JUROR SMITH:  I think -- I would hate

17    to use the word impossible, but it may become that way.

18        THE COURT:  Thank you, sir.

19        PROSPECTIVE JUROR SMITH:  It is -- is this

20    something that I may be excused with, or would you prefer me

21    to wait?

22        THE COURT:  I'll take that up with the attorneys

23    momentarily.

24        Thank you, sir.

25        Mr. Russell.

1          PROSPECTIVE JUROR RUSSELL:  I'm Paul Russell.

2     Currently I work for Northrup Grumman.  I am a wind tunnel

3     model machinist.  I've been in the machinist field most of my

4     life.  My father had a machine shop when I was a kid.  I was

5     on staff at a church for two years.  Kind of took a break

6     from that field.

7          I have never had a serious dispute with an employer

8     except my dad.  He didn't give me a raise.  So I quit.

9          I have -- let's see, 3.  That was 3.  4, I have

10    signed employment agreements in the past.  I currently am

11    under one.

12         THE COURT:  Do you have any strong feelings one way

13    or another about such agreements?

14         PROSPECTIVE JUROR RUSSELL:  No strong feelings.  I

15    think it's fair.

16         Number 5, no.

17         My educational background, I am currently enrolled

18    in the CBU working on my degree in Christian studies.

19         I live in Corona.  I'm married.  My wife works for

20    CBU.  She's an administrative assistant.

21         I have three kids.  Lindsey is 21, a student.  And

22    she is a real estate appraiser apprentice.  Josh is a

23    student, 19, works at In and Out.  And Jesse is a freshman.

24    No other adults in my household.

25         No prior jury experience.

1          I'm familiar with Mattel.  In fact, I grew up with

2      a kid whose dad was an engineer at Mattel.  So he was like

3      the luckiest kid in the world because he brought home all the

4      prototype toys that never made it to market.  So he happened

5      to be my best friend.

6          And I was brought to Mattel to go through those

7      focus groups, which at the time I didn't know that they were

8      focus groups, but you played with toys and evaluated them.

9          Let's see --

10         THE COURT:  Would any of that have an impact on how

11     you view the parties in this case?

12         PROSPECTIVE JUROR RUSSELL:  I was sitting here

13     thinking about that.  I think I can still be objective about

14     it.  It was a good experience, if that's -- I mean, what kid

15     wouldn't like that?  But yeah, I think I could be impartial.

16         MGA, I don't know of the company.  But I know of

17     the product, Bratz.  My daughter has wanted one.  I've never

18     been sued, nor have I sued.  And like I said, I think I can

19     be impartial.

20         THE COURT:  Thank you, sir.

21         Ms. Dome.

22         PROSPECTIVE JUROR DOME:  My name is Lisa Marie

23     Dome.  I am currently a midwife student, and I have some

24     experience in real estate until the market fell.  I've been

25     involved in childbirth studies.  I've been an educator for

1    childbirth classes.

2         Let's see, no to 3, 4, and 5.  High school diploma.

3    I'm currently enrolled at a midwifery college.  I live in

4    Moreno Valley.  I am married, and my husband is a tile

5    setter.

6         I have two children, 17, grown, girls, never was

7    into dolls.  So I never had to deal with Barbies or the Bratz

8    dolls, which I'm fine with, actually.

9         She's more of a tomboy type.

10        No other adults in my household.  No jury

11   experience prior to this.

12        I did not know Mattel made Barbie.  So that shows

13   you my knowledge of Mattel.  I have heard of them.  I've also

14   heard of MGA, but I have no opinion about them.  I don't know

15   enough to have an opinion.

16        Let's see, lawsuit.  I did have to take my

17   orthodontist to a small claims court because I took my braces

18   off and there was a gap that he didn't want to fix.  So I

19   won.  I'm happy about that.

20        And I think I could be very impartial since I have

21   no opinion.

22        THE COURT:  Thank you, ma'am.

23        Ms. Steingraber.

24        PROSPECTIVE JUROR STEINGRABER:  My name is Annette

25   Steingraber.  I've been mostly a stay-at-home mom.  I have

1     been a school bus driver for a private school.

2             I was an apartment manager and also was a secret

3     shopper.

4             I have never -- no to Nos. 3, 4, and 5.

5             Some college courses.

6             I live in Corona.

7             I'm married, married for 46 years.

8             My husband is an attorney.  Business law.

9             I have four children.  The oldest is deceased.

10            THE COURT:  I'm sorry.

11            PROSPECTIVE JUROR STEINGRABER:  A daughter that's

12    42, a son that's 41.  And my daughter works for an attorney

13    in a law office.  And my son works for Orange Police

14    Department, but not as a sworn officer.

15            And my son that lives at home, he's 27, and he's

16    graduating from UCR next month.  He works for CVS as a

17    pharmacy -- pharmacy technician.

18            I have been on a civil jury, and it was -- we came

19    to a verdict.

20            I am familiar with Mattel.  My kids had Mattel toys

21    when they were little growing up.  They had Barbie dolls.  I

22    also have Barbie dolls.  I'm a doll collector.

23            I am not familiar with the company MGA, but I have

24    heard of the Bratz dolls.  I have given them as a gift to my

25    granddaughters and also Barbie dolls.

1       I have never been sued, but I have sued somebody.

2   And yes, I can be a fair and impartial juror.

3       THE COURT:  You said you were an apartment manager

4   and what kind of shopper?

5       PROSPECTIVE JUROR STEINGRABER:  When we first got

6   married.  Oh, secret shopper.

7       THE COURT:  What is that?

8       PROSPECTIVE JUROR STEINGRABER:  You go to the

9   department stores, and you don't -- the people that work

10  there, the employees, they don't know that you are kind of

11  scrutinizing them, see how well they do.

12      THE COURT:  I see.

13      PROSPECTIVE JUROR STEINGRABER:  Towards the public.

14      THE COURT:  And you are a doll collector yourself?

15      PROSPECTIVE JUROR STEINGRABER:  Yes.  I don't have

16  any Bratz dolls, but I do have a few Barbies.

17      THE COURT:  Okay.  Given your familiarity with

18  dolls and from a professional --

19      PROSPECTIVE JUROR STEINGRABER:  No, not really.  I

20  just like to collect them.

21      THE COURT:  Okay.  So you don't have any particular

22  feelings about one company or the other?

23      PROSPECTIVE JUROR STEINGRABER:  No.

24      THE COURT:  All right.  Thank you, ma'am.

25      Ms. Tulipani.

1          PROSPECTIVE JUROR TULIPANI:  My name is Lynn

2    Tulipani.  I'm currently a supervisor with Riverside County

3    child support.  I've been there for about 15 years.

4          3, 4, and 5 is no.

5          6, I'm currently completing my Bachelor's degree.

6    So I need to leave at 4:00.

7          I live in Palm Desert.  I am divorced.  I have two

8    children, both living with me.  One is 21, college student.

9    Works out at Trilogy golf course, and an 18 year old that is

10   graduating next week, who also works at Trilogy.  There are

11   no other adults living in the home.

12          I've been on one jury, a criminal jury, and we did

13   have a verdict.

14          Obviously, I'm familiar with Mattel and Barbie.  I

15   have no opinion either way.

16          I'm not familiar with MGA Entertainment.

17          I have purchased Bratz dolls for my niece.

18          I have been involved in lawsuits as a rental

19   property owner.

20          And I do believe I can be fair and impartial.

21          THE COURT:  Your ex-husband, what does he do, or

22   what did he do?

23          PROSPECTIVE JUROR TULIPANI:  He's a foreman for a

24   union construction company.

25          THE COURT:  Thank you very much, ma'am.

Transcript of Proceedings- PM (Voir Dire)  5/20/2008  12:00:00 PM

1          Ms. Dualan.

2          PROSPECTIVE JUROR DUALAN:  My name is Lisa Dualan.

3     I currently work for Harrah's casino, and I am a pit

4     boss/dealer.  Previously to that -- I worked there six years.

5     Previous to that, I worked in retail businesses.  No to 3, 4,

6     and 5.  My educational background, college program, 20 years,

7     keep going.

8          My last degree was majoring in interpreting for the

9     deaf.

10          I live in Menifee.  I am married.  My husband works

11    for the Postal Service as a carrier.  I have three children,

12    two boys, ten and five.  And my daughter, seven.  My

13    mother-in-law lives with me on and off.

14          I have been on a criminal case, and we came to a

15    verdict.  I am familiar with Mattel and the Barbies, and all

16    the other toys.

17          As far as MGA, I'm not familiar with their company.

18    I am familiar with the Bratz dolls.  I don't particularly

19    agree with the doll itself and the age group that it targets.

20          I don't purchase it myself.

21          Never been in a lawsuit, and I think I can be fair.

22          THE COURT:  When you say you don't agree with the

23    age group that it targets, would those views about the doll

24    and the target age of the doll affect how you might view --

25          PROSPECTIVE JUROR DUALAN:  No, it's just a personal

1    preference that I don't particularly want to purchase the

2    doll.

3         THE COURT:  You think you could be fair in this

4    trial?

5         PROSPECTIVE JUROR DUALAN:  Yeah.

6         THE COURT:  Thank you, ma'am.

7         Ms. Hairston.

8         PROSPECTIVE JUROR HAIRSTON:  Do I have to stand?

9         THE COURT:  I'm sorry.

10        PROSPECTIVE JUROR HAIRSTON:  My name is Celestine

11   Hairston.  I am retired from San Diego Superior Court.

12        I went back as a retiree and worked in juvenile

13   dependency.  And prior to retirement, I -- my last position

14   was as adoption clerk.

15        No to 3, 4, and 5.

16        I live in Lake Elsinore.  I am married.  My husband

17   was just promoted to director of psychiatry for Kaiser

18   Permanente.

19        I have two sons.  One is 38.  He just retired from

20   the Army.  And he works as a computer instructor for the

21   Army.

22        My oldest is 40.  And he is a systems analyst.

23        No other adults.  A sassy little Shih Tzu.  I have

24   been an alternate on a jury.

25        And I am familiar with Mattel.  I've had Barbie

1    dolls, and my husband has Hot Wheels as we speak.

2         I do know about Bratz dolls.  I don't know about

3    MGA Entertainment.

4         I've never been sued, and I've never sued anyone.

5         And yes, I can be fair and impartial.

6         THE COURT:  Thank you, ma'am.  You may sit down.

7         PROSPECTIVE JUROR MCEACHERN:  Hello, my name is

8    Nivea Mceachern.  I am a licensed psychiatric technician at

9    Metropolitan State Hospital.

10        No, I have not signed an -- 3, 4, and 5 is no.

11        Educational background is high school grad, some

12   college.  I live in Ontario.  I am married.  My husband works

13   for a utility management company auditing bills and also for

14   merchants management.

15        I have two children, ages 30 and 26.  My daughter

16   is a stay-at-home mom.  My son is in construction, which is

17   very slow right now.

18        No adults living in my household.

19        I have served on two juries, one criminal, one

20   civil, each where a verdict was rendered.

21        I am familiar with Mattel.  Who is not?  I mean,

22   they have been around forever.

23        I don't have any opinion on Mattel.

24        I am not familiar with MGA Entertainment, but I am

25   familiar with the Bratz dolls.

1          My granddaughters have Bratz and Barbies.

2          I don't have an opinion.

3          I've never been sued.  I've never sued anybody.

4          I feel I can be fair.

5          THE COURT:  Thank you, ma'am.

6          Mr. Garrett.

7          PROSPECTIVE JUROR GARRETT:  My name is Nathan

8   Garrett.  And I currently work at Century I Theaters in

9   Palm Desert.  And my past occupations, I've worked

10  construction.  My dad is a construction worker.  So I've

11  worked construction as long as I can remember.  I just

12  recently started working at a theater because construction

13  has slowed down so much.  No to 3, 4, 5.  Not so much, but my

14  dad always has these little inventions.  So he's always

15  looking into patents.  Pretty good ideas.  He's never

16  patented anything yet.  But everybody tells him he should.

17         And just high school diploma.  I live in Morongo

18  valley.  Single.  And no children.

19         But I do live in the house with several adults.  I

20  have my sister.  She's 22, and she works at Chevron gas

21  station.  I have both my parents -- my mom doesn't work, and

22  my dad is a construction worker, and then a brother who

23  doesn't work right now.

24         No, I don't have any jury experience.  And I am

25  somewhat familiar with Mattel, but only because of the Hot

1    Wheels.  I didn't actually know they made Barbies until just

2    today.

3          I have sisters.  They have Barbies, of course, and

4    Bratz.  But I do not know that either company made either of

5    those.

6          And I have never been sued or sued anyone, and

7    there is no reason that I can't be fair for this.

8          THE COURT:  What kind of inventions did your dad --

9          PROSPECTIVE JUROR GARRETT:  Well, in construction

10   work, anybody who knows construction work, we do concrete,

11   and when you're out in the hot sun all day and you have

12   stakes at the end of the day, you always have to pull your

13   stakes out of the ground that keep your forms in.  And he

14   came out with a stake puller, because pulling stakes is bad

15   on your back, and with the stake puller, it doesn't put any

16   stress on your back at all.

17         And then he used to work on windmills as well, and

18   him and another dude came out on how to -- because for the

19   windmills, they were always buying new gears, and they came

20   out with a way to repair the old gears.  So he was going to

21   patent that, but someone took it from him first.

22         THE COURT:  Very well.  Thank you.

23         We're going to go down to Juror No. 37.

24   Ms. Schroyar.  And aside from the answers you've already

25   given us at sidebar.

1          PROSPECTIVE JUROR SCHROYAR:  My name is Carolyn

2    Schroyar.  Presently 21 years with Southern California

3    Edison.  Before that, I worked for Georgia Pacific, plastics

4    division.

5          Serious dispute, only if you consider unionizing

6    the Georgia Pacific and becoming the shop steward.

7          I have an employment agreement with Edison.  We all

8    do, confidentiality and conflict of interest.

9          No on 5.  I have an A.A. in administrative justice.

10   I have a certificate in medical assistance.  I live in

11   Rialto.  I'm single.  I have one son who is 40, a computer

12   technician in Illinois.

13         No other adults in my home.  Never been on a jury.

14   I am familiar with Mattel and Barbie, never having bought nor

15   owned one.  Familiar with MGA and Bratz only through

16   advertisement and articles.  And I did sue over a dog bite.

17   Never been sued myself.

18         THE COURT:  Thinking about the litigation with the

19   dog bite case, that might affect how you view the litigation

20   in this case?

21         PROSPECTIVE JUROR SCHROYAR:  It was a completely

22   different thing.  It was job related, and I won.

23         THE COURT:  Very good.  Thank you, ma'am.

24         Mr. Chan.

25         PROSPECTIVE JUROR CHAN:  My name is Tsuen Chan.

1    Friends call me George.

2         I'm retired right now.  Before that, I was a

3    pathologist for Kaiser Permanente in Portland, Oregon.  And

4    before that, I worked for the Oregon Health Science

5    University.

6         Never any dispute with employer or employee.

7         I have -- I had signed some agreements with my two

8    previous employers concerning patient privacy issues.

9    Anything that I developed or invented would belong to the

10   company or university.

11        And any speaking fees, they take that, too.

12        THE COURT:  Do you have any strong feelings one way

13   or the other about those agreements?

14        PROSPECTIVE JUROR CHAN:  No, because I went in

15   knowing that when I signed the agreement.

16        No experience with patents, trademarks, or

17   copyrights.

18        I have medical degree.  And I'm board certified in

19   pathology.

20        I now live in a place called Ivy Glen down south of

21   Corona.  I think somebody mentioned Trilogy.  That's where it

22   was.

23        I'm married.  My wife has been a homemaker.  Never

24   worked before outside of the home.

25        One daughter, 36 years old.  And she is a supply

1    manager for a multinational company in Los Angeles.

2        No adults -- no other adults living with us right

3    now.

4        No prior jury experience.

5        I'm familiar with Mattel.  Number one, through my

6    daughter.  Number two, I have friend, not close one, who was

7    a toy designer for Mattel more than 10 years ago.  He left

8    the company, went to Hong Kong as a free-lance designer.  But

9    he never said anything bad about the company.

10       THE COURT:  Anything about that friendship or that

11   relationship that might affect how you view the case?

12       PROSPECTIVE JUROR CHAN:  He is the husband of a

13   friend of my wife.  So it's not a very close friend.

14       THE COURT:  Very good.

15       PROSPECTIVE JUROR CHAN:  And I also heard something

16   on the news and read something about the dispute between

17   Mattel and the Chinese toymakers.  And I wasn't too sure what

18   was going on.  I believe it was the Chinese claimed that it

19   was a design flaw.  But there's something about paint and

20   lead, too.  But I watch Chinese television quite a bit, and

21   one of the statements I heard that Mattel company actually

22   apologized to the toymakers in China.  So at that time I

23   thought well, that's pretty classy of them to do that.

24       I don't know anything about the other company, MGA.

25       I am -- I was named in a lawsuit.  A patient sued

1    my previous company, Kaiser Permanente, in Portland, and as

2    one of the doctors who took care of this patient, I looked at

3    some specimens taken from his body.  So I was named as part

4    of it.  And I think they call it throwing a net and putting

5    everybody in.  But the lawsuit was dropped.  I didn't know

6    why it was dropped.  I just got a letter from the company

7    lawyer saying it was no longer going on.  But I was deposed

8    by it.

9         THE COURT:  Do you think you could be fair in this

10   case?

11        PROSPECTIVE JUROR CHAN:  Beg your pardon?

12        THE COURT:  Do you think you could be fair in this

13   case?

14        PROSPECTIVE JUROR CHAN:  The case that I was

15   involved in?

16        THE COURT:  No, this case.

17        PROSPECTIVE JUROR CHAN:  Oh, this case.  I was

18   going to say I need some guidance on No. 15.

19        THE COURT:  Well, what we're asking for there is if

20   there's anything at all that you can think of, and I really

21   have to depend upon your own just thinking about this.

22   Several jurors have mentioned thinking about this, as we go

23   through this process, and maybe something somebody else said

24   may have set off something in your mind.

25        Is there any reason, as you stand here in this

1    courtroom, that you think you might favor one side or the

2    other based on what you know so far?

3          PROSPECTIVE JUROR CHAN:  After hearing the opening

4    statements by both sides, unfortunately, I develop some kind

5    of bias, and I don't know whether I should say it openly, but

6    I'm glad to tell you what it is.

7          THE COURT:  No, I'd rather you not, actually.  Why

8    don't you approach sidebar for a moment.

9          (SIDEBAR CONFERENCE HELD.)

10         THE COURT:  Go ahead and speak freely.

11         PROSPECTIVE JUROR CHAN:  This is no reflection on

12   any of you, but when this gentleman made his opening

13   statement, he --

14         THE COURT:  You are indicating Mr. Nolan.

15         PROSPECTIVE JUROR CHAN:  He went into quite detail

16   to the background of the -- went into some detail to the

17   company owner, and the person, Mr. Bryant, who was involved.

18   And I know I shouldn't do that, but I felt, you know, this

19   seems to be some weakness in the case, that you have to go

20   into the background because if it's a dispute between patent

21   or whatever, it actually caught me in the discussion.  Well,

22   maybe it's not important, but this gentleman, and I'm

23   sorry --

24         THE COURT:  Mr. Quinn.

25         PROSPECTIVE JUROR CHAN:  -- Quinn in his statement,

1    he already said something like the opposition is going to go

2    into something like, you know, something like that.  So I

3    kind of -- I don't want to think that what bothers me is if I

4    didn't hear it incorrectly, Mr. Bryant developed his, or have

5    the design in 1998, and he joined the company, Mattel, and I

6    was wondering why, if it's such a good design, why did he

7    present to Mattel.  So I know I was going way ahead.

8         THE COURT:  You're raising some interesting

9    questions, but the -- and the concern that the Court has is

10   that you are allowing the statements by the attorneys to

11   shape your opinion of the case and not waiting to hear the

12   evidence as to what the evidence is going to say.

13        My question is do you think you could put aside

14   what the attorneys have said and just wait until you hear the

15   evidence and make your decision based on the evidence, the

16   testimony from the witnesses, and the exhibits?  Or do you

17   think you would be unduly influenced by the attorneys'

18   statements?

19        PROSPECTIVE JUROR CHAN:  In my previous line of

20   work, that's how we come to diagnosis.  We look at it, and

21   then we go down one track because we think this is the

22   correct track.  And it's hard to go back to the other one.

23   It's possible if we run into a dead end.  We say okay, let's

24   go back.  But I'm sorry.  It's no reflection on you.

25        THE COURT:  Counsel, any questions?

1        MR. NOLAN:  I appreciate your candor.  Do I

2    understand that --

3        PROSPECTIVE JUROR CHAN:  I didn't want to say it in

4    public because I don't want to contaminate them.

5        MR. NOLAN:  I appreciate that.  I guess one of the

6    questions I have is if you were on trial in a case like this,

7    would you feel comfortable having the jury with your previous

8    position judging your case?

9        PROSPECTIVE JUROR CHAN:  Probably not because

10   unfortunately, the first impression, one is hard to overcome

11   the first impression.  Just like in my line of work, when I

12   say well, this is probably what it is, it takes a lot for me

13   to take it the other way.

14       THE COURT:  Mr. Quinn?

15       PROSPECTIVE JUROR CHAN:  That's what my worry is.

16   It may not be fair.  I mean, it's not fair.

17       MR. QUINN:  Doctor Chan, do you sometimes have the

18   experience in your work that what you initially thought was

19   the case turned out not to be the problem at all?

20       PROSPECTIVE JUROR CHAN:  Rarely.

21       MR. QUINN:  Well --

22       PROSPECTIVE JUROR CHAN:  Usually the first

23   impression is correct.

24       MR. QUINN:  In your work, do you have to keep your

25   mind alert --

1     PROSPECTIVE JUROR CHAN:  I do.

2     MR. QUINN:  Now, in this type of procedure that

3 we're involved in here, the judge will instruct the jury, if

4 he hasn't already, that the people on the jury must make

5 their decisions based only on what the evidence is that's

6 presented at trial.

7     PROSPECTIVE JUROR CHAN:  Yes.

8     MR. QUINN:  And to work to keep an open mind until

9 all of the evidence is in.

10     Do you think that that is something that you can

11 do?  If you were chosen and you were so instructed by the

12 Court, that you could work to try to keep an open mind until

13 you heard all of the evidence?

14     PROSPECTIVE JUROR CHAN:  Yes, I think I can.  You

15 know, especially after the discussions.  I'll try to just

16 dampen that instinct to go down.

17     MR. NOLAN:  One follow-up.

18     THE COURT:  You may.

19     MR. NOLAN:  I appreciate, doctor, that you say you

20 would try to dampen it.  Would it be fair, though, as we

21 start the trial, if you were on the jury, that MGA and Bratz

22 would start a little bit behind, and we would have to

23 overcome your initial impression and bias -- not bias, but

24 initial impression in the case?  Is that a fair assessment as

25 to how you would start the trial?

1          PROSPECTIVE JUROR CHAN:  Unfortunately, I already

2     put you at -- it's a bias, I have to admit.  But just

3     listening, and it's not for me -- it's my fault, you know.

4     My way, that I always jump to conclusions.

5          THE COURT:  I understand.  Go ahead and have a

6     seat.

7          Counsel, if you'd stay here for one second.

8          Referring to Juror No. 28, Mr. Phillip Smith, I did

9     receive a note that detailed a little bit of what he talked

10    about?

11         MR. NOLAN:  There's no issue there.

12         MR. QUINN:  No issue.  We should let him go.

13         THE COURT:  All right.  I'm going to go ahead and

14    do that.  I think we're far enough into this where I feel

15    comfortable we'll have enough jurors.

16         MR. NOLAN:  Your Honor, what time are we going to

17    take a break?

18         THE COURT:  Let's go to 2:45.  And then we'll take

19    a break until 3:00.

20         Mr. Holmes indicated that you would like to take  a

21    break now.  So why don't we go ahead and take our break now

22    from 2:30 to 2:45.  But let's be back right here at 2:45.

23    And, Mr. Smith, if you'd remain in the courtroom for a few

24    moments.

25         (WHEREUPON THE JURY WITHDRAWS.)

1          THE COURT:  Mr. Smith, I have spoken with both

2    counsel, and we are going to excuse you at this time.  We

3    appreciate your service.  Good luck with your parents.

4          All right.  We're in recess until 2:45.

5          (Recess taken.)

6          (WHEREUPON THE JURY ENTERS.)

7          THE COURT:  Mr. Robert Nulph.

8          PROSPECTIVE JUROR NULPH:  My name is Robert Nulph.

9    I currently am an information services supervisor at Loma

10   Linda University Medical Center.  I've been there for about

11   10 years.  3, 4, and 5 are all no.

12         High school graduate with fair amount of continuing

13   education in the computer world and so forth.  I live in

14   Hemet, California.

15         I'm married.  My wife was previously an HR

16   assistant, and she's currently an office sup- -- an office

17   manager at an insurance company.

18         I've got two boys, both not adults yet.

19         There are no other adults in our household.

20         Previously I was on a criminal jury.  Yes, we did

21   have a verdict.

22         I am familiar with Mattel by having three younger

23   brothers and raising two boys.

24         I don't have any, you know, opinions, you know, for

25   or against them.

1          I know of the Bratz dolls from seeing them on the

2    display shelves and so forth.

3          I've never been sued or part of a lawsuit.

4          And yes, I could be a fair and impartial juror.

5          THE COURT:  Thank you, sir.

6          Mr. Martinez.

7          PROSPECTIVE JUROR MARTINEZ:  My name is Lupe

8    Martinez.  I'm retired from Metropolitan Water District.  No

9    to 3.  No to 4.  No to 5.

10          I attended high school.  I've had some classes at

11    Mount San Antonio.  I live in the City of Beaumont.

12          Been married the second time.  I have four kids of

13    my own, and she has four.

14          And my son works for the State of California,

15    HAZMAT.

16          And I have a daughter that's now a grandma,

17    housekeeper, homekeeper, whatever you call it, and two that

18    work for Costco.  And one is in Seattle from my second

19    marriage.

20          They have a daycare center.

21          I have nobody living at home except two puppies.

22          Jury experience, I've had criminal and civil.  And

23    we came to a verdict on all of them except for one which was

24    dismissed, the jury, because one of the jurors had

25    Alzheimer's.  That happened on the second day.  So we were

1    all sent home.

2         Mattel, I bought a couple of toys years ago.  I go

3    to Petco now.

4         And I'm not familiar with 13, 14.

5         And I would be a fair juror.  And impartial.

6         THE COURT:  Very good.

7         So you're not familiar with the Bratz dolls

8    themselves?

9         PROSPECTIVE JUROR MARTINEZ:  No.

10        THE COURT:  Are you familiar with the Bratz dolls?

11        PROSPECTIVE JUROR MARTINEZ:  With none of them.

12        THE COURT:  Okay.  Very good.  Thank you, sir.

13        Ms. Thomas.

14        PROSPECTIVE JUROR THOMAS:  My name is Felicia

15   Thomas.  I am a coach operator, previously a psychiatric

16   technician.

17        No to 3, 4, and 5.

18        I am a high school graduate and a psych tech.

19        I live in Redlands.

20        I'm married.  My husband is an auto mechanic.

21        I don't have any children.

22        No other adults living in the household.  I've

23   never served as a juror.

24        I have no opinion about Mattel.

25        I am familiar with them, but no opinion.

1          And I am not familiar with MGA, but I am familiar

2     with the Bratz dolls.

3          THE COURT:  Do you have any strong opinions one way

4     or the other?

5          PROSPECTIVE JUROR THOMAS:  No.

6          And I have sued my present company for a

7     work-related injury.

8          THE COURT:  Is that the coach company?

9          PROSPECTIVE JUROR THOMAS:  Yes.

10         THE COURT:  What company is that?

11         PROSPECTIVE JUROR THOMAS:  And I feel that I can be

12    fair.

13         THE COURT:  You are a coach operator?

14         PROSPECTIVE JUROR THOMAS:  No.  I drive public

15    transportation.

16         THE COURT:  Very good.  I understand.  Thank you,

17    ma'am.

18         PROSPECTIVE JUROR JOHNSON:  I'm Charlotte Johnson.

19    I mostly have been a wife and mother to two boys.  And my

20    past occupations, I did go to work after they were in

21    college, and I worked as an office manager for Martin

22    Murrieta.  We were in Denver at the time.

23         I've never had a dispute with any of my employers.

24         I've signed two employment agreements, one with

25    Martin Murrieta and the other one with -- I worked recently

1    for a marketing firm in Los Angeles.  And I signed an

2    agreement with a rug weaver because sometimes we would design

3    patterns for them, and they didn't want us selling them to

4    anyone else.

5         I have no experience with patents.

6         I am -- I've been in college for about 20 years,

7    just keep taking things I like.  No degree.

8         I live in Riverside.  I'm married.  My spouse is a

9    retired Air Force colonel, pilot.  He retired about 15 years

10   ago.  He's now an administrator for the county office of

11   education, for their budget.  As you know, they are all in

12   trouble with that now.

13        We have two boys.  They are 42 and 38.  The oldest

14   boy has his own business in Seattle, Washington, where he's

15   an insurance adjuster.  Our youngest son is a manager at

16   Nordstrom.

17        We have the manager at Nordstrom living with us

18   right now.  Kind of a boomerang.

19        I've had two jury experiences, both criminal

20   trials.  We arrived at a verdict at both of them.

21        I'm familiar with Mattel.  I guess, if you produce

22   GI Joe, then I'm familiar, you know, with that.  Was that

23   Hasbro?  Anyway.  We didn't buy Barbies.  I don't even know

24   what a Bratz doll is.  I have heard of MGA.

25        I've never been sued, though I've been tempted to

1    sue some people, but I've not done it.

2        I can't see any reason why I couldn't be fair and

3    impartial.

4        THE COURT:  Thank you very much, ma'am.

5        Ms. Easterling.

6        PROSPECTIVE JUROR EASTERLING:  My name is Alice

7    Easterling.  I have worked for the Veterans Hospital at Loma

8    Linda for the past 20 years.  I'm a Registered Nurse.

9        It's no to 3, 4, and 5.

10        My educational background, B.S. in nursing.

11        I live in Ontario.

12        I've divorced and currently live alone.

13        I have two children, a boy and girl, 45 and 39.  My

14    son is self-employed.  By daughter is a nurse.

15        There's no other adults in the household.  I've

16    been on two trials.  Both criminal.  And both reached

17    verdicts.

18        I am familiar with Mattel, but not with MGA.

19        And I have no opinion about either one.

20        I haven't been sued or sued.

21        And I would be a fair and impartial juror.

22        THE COURT:  Thank you very much, ma'am.

23        Mr. Victor.

24        PROSPECTIVE JUROR VICTOR:  My name is Henry Victor.

25    For the last 20 years I've been working with composite

1    materials.

2        I'm also a shop steward.  So it would be yes to

3    No. 3.  I represent people with a lot of different problems.

4        Yes, I have signed an agreement for employment.

5        No on the trademarks.

6        I have a high school diploma with some college.

7        I live in Riverside.

8        I'm married.  My wife doesn't work.

9        I have two children, 34 and 29, and they both work

10   at a warehouse.

11       There's no other adults living in my home.  I have

12   no prior jury experience.

13       I'm familiar with Mattel, but I have no opinions.

14       MGA, I'm familiar with the Bratz dolls, but I also

15   have no opinion.

16       I've never had a lawsuit, and I think I could be

17   fair and impartial.

18       THE COURT:  You said you have had experience with

19   an employment agreement?

20       PROSPECTIVE JUROR VICTOR:  Yes.

21       THE COURT:  What was the nature of that employment

22   agreement?

23       PROSPECTIVE JUROR VICTOR:  For secrets on chemicals

24   that we use, different formulas that they come up with and

25   stuff like that that we can't reveal.

1          THE COURT:  Any strong feelings about having to

2     sign the employment agreement?

3          PROSPECTIVE JUROR VICTOR:  No.

4          THE COURT:  Very good.  Thank you.

5          Jade Beasley.

6          PROSPECTIVE JUROR BEASLEY:  My name is Jade

7     Beasley.  I work for the Riverside Unified School District.

8     Previous to that, I worked at a flower shop.

9          No to 3, 4, and 5.

10          I am a continual college student.  One day I'll

11     have my degree.

12          I live in Riverside.

13          I've been married for 14 years.  My husband is a

14     merchandiser.  I have two boys, a teenager and a seven year

15     old.  No other adults living in my home.  I have not served

16     as a juror in a case.  I am familiar with Mattel and Barbie,

17     Hot Wheels.  Hot Wheels are big at my house.  My husband has

18     Hot Wheels.  He thinks it's our nest egg.

19          I am not familiar with the name MGA Entertainment,

20     but I, however, am familiar with the Bratz dolls with my

21     younger nieces and seeing them in the store.  I think there's

22     one actually named after me, too.

23          I have not been involved in a lawsuit, and there's

24     no reason why I could not be fair.

25          THE COURT:  Thank you, ma'am.

Transcript of Proceedings- PM (Voir Dire)  5/20/2008  12:00:00 PM

1        Ms. Guerrero.

2        PROSPECTIVE JUROR GUERRERO:  My name is Charla

3    Guerrero.  My current occupation is in mortgage collections.

4    Previous to that was credit card collections.  Previous to

5    that was fast food.

6        I have signed an employment agreement with my

7    current company.  Never anything with any copyrights or

8    trademarks.  Educational background is just from high school,

9    and I went to travel industry school.  I also worked with the

10   airlines previous, too.

11       I live in Colton.  I am married.  My husband, he

12   works business-to-business sales with a website company,

13   jobbing dot com.

14       I have a daughter, five years old.

15       There's no other adults living in the household.

16       Never been on a jury service.

17       I am familiar with Mattel as far as Barbies and

18   stuff.

19       Never heard of MGA, but I am familiar with the

20   Bratz dolls.

21       I've never sued or been sued.

22       And I would be able to be fair.

23       THE COURT:  Thank you, ma'am.

24       Any strong feelings about the employment agreement

25   that you signed?

1          PROSPECTIVE JUROR GUERRERO:  No.

2          THE COURT:  Very good.  Thank you.

3          Let's now skip down to the back of the courtroom,

4     Juror No. 47.  Mr. Young.

5          PROSPECTIVE JUROR YOUNG:  My name is James Young.

6     I work as a maintenance mechanic at a distribution center.

7     No to 3, 4, and 5.  6, high school graduate.  I live in

8     Fontana.  I'm married.  My wife is a sales representative for

9     an aircraft product company.  I have three children.  Twins

10    that are eight and a five year old.

11         I have a 19-year-old stepson living in the house.

12         No prior jury experience.

13         I am familiar with Mattel.  I collect Hot Wheels.

14    It's my nest egg.

15         MGA, never heard of them.  I've seen Bratz dolls

16    going through trying to find my Hot Wheels.

17         I've been in a Workman's Comp lawsuit before, and

18    there's no reason why I can't be fair.

19         THE COURT:  Thank you, Mr. Young.

20         Mr. Powell.

21         PROSPECTIVE JUROR POWELL:  My name is William

22    Powell.  I manage a meat and seafood department for a grocery

23    chain, have done that for the last 33 years.  Before that, I

24    was a lab technician for Minnesota Mining.

25         I've never had a serious dispute with an employer.

1       I have signed employment agreements.  Mostly just

2    confidentiality, pricing and that type of thing.

3       THE COURT:  Any concerns about -- feelings about

4    that one or another?

5       PROSPECTIVE JUROR POWELL:  No.

6       4 and 5 are no.

7       Back in the early 70's, I had three years of

8    college at San Diego State.  Education, I was going to be a

9    teacher.  But I dropped out.

10      I live in Riverside.  I'm married.  My wife works

11   for the County of Riverside, and she also has one more

12   semester at La Sierra University, social work.  Social

13   worker.

14      I have three children, two daughters, 37 and 29,

15   who previously worked, both of them, in the -- in the

16   computer graphic design.  But they are now stay-at-home

17   mothers.

18      My son is 33, and he's a buyer for a construction

19   company.

20      My daughter-in-law lives with us, my wife and I.

21   My four grandchildren, temporarily.  Hopefully.

22      I have never been on a trial before.

23      I am familiar with Mattel, Barbie products.  Other

24   Mattel products.  I have no opinion one way or the other

25   about them.

1       I did not know that MGA Entertainment owned Bratz

2    dolls or made Bratz dolls.  I have heard of Bratz dolls.

3    I've never seen one.

4       I have neither sued nor been sued, and I would be a

5    fair and impartial juror.

6       THE COURT:  Thank you, sir.

7       Mr. Leija.

8       PROSPECTIVE JUROR LEIJA:  My name is Dom Leija.  I

9    am currently a small business owner.  I own an auto detailing

10   business, and I recently created a clothing company.  I have

11   not been involved in any serious disputes.  I have signed an

12   employment agreement in the past.  I have worked for a

13   pharmaceutical company prior to my auto detailing business.

14   Did that for several years.  And I am involved in a

15   trademark.  I'm working on a trademark for the clothing

16   company I just treated, having a logo and trademark.

17      THE COURT:  Let me stop you for a second.  Anything

18   about that experience that might affect how you view this

19   case?

20      PROSPECTIVE JUROR LEIJA:  No, not at all.

21      THE COURT:  You could separate all of that from

22   what you hear in this courtroom?

23      PROSPECTIVE JUROR LEIJA:  Absolutely.

24   Educationwise, I attended UC Riverside and graduated with a

25   B.A. in poly sci.  I live in Indio, living with my

1    significant other, and she works at the Esmeralda Hotel.  I

2    have one child, six years old, and his occupation is giving

3    me a hard time, basically, every day.

4         No other adults living in the home.  I have prior

5    jury experience in the criminal case about three years ago.

6    We did have a verdict.  I am familiar with Mattel since I did

7    have a collection of Hot Wheels when I was a kid, and I still

8    have some of those.

9         MGA I'm not familiar with.  And I haven't been

10   involved in a lawsuit, and I can be fair and impartial.

11        THE COURT:  Very good.  Thank you, sir.

12        Mr. Breaux.

13        PROSPECTIVE JUROR BREAUX:  My name is Eric Breaux.

14   I work for the Burlington Northern Railroad, and no to 3.

15   Yes to 4.  And no to 5.

16        High school graduate.

17        I live in a small town called Needles, California.

18   I'm married with two young daughters.

19        No, there's no other -- nobody else living in my

20   home.

21        I have served twice as a juror, and criminal.

22        And my daughters do have Bratz and Barbies.

23        And I've never been sued or sued anybody else.  And

24   I don't see why I can't be fair.

25        THE COURT:  Thank you, Mr. Breaux.

1        Ms. Tassin.

2        PROSPECTIVE JUROR TASSIN:  My name is Teri Tassin.

3    I am a nurse at Ontario Christian Schools.

4        No to 3, 4, and 5.

5        I am a college graduate with a nursing degree.  I

6    live in the City of Fontana.  I am married 20 years.  My

7    husband is a critical systems engineer.

8        I have three children, ages 13, 17, and 19.

9        My 19 year old is a student in college.  There are

10   no other adults living in our household.

11       No prior jury experience.

12       I am familiar with Mattel and Barbies.

13       I'm not familiar with the company MGA, but I am

14   familiar with the Bratz dolls.

15       No, I've never been sued, or I've never sued

16   anybody.  And there's no reason why I couldn't be fair and

17   impartial.

18       THE COURT:  Thank you, ma'am.

19       Ms. Fath.

20       PROSPECTIVE JUROR FATH:  My name is Sylvia Fath.  I

21   am currently the senior vice-president of business services

22   for the California-Nevada Credit Union Leagues.  I have

23   worked in the credit union industry for 30-some-odd years.

24       Did I ever have a dispute with an employer?  No to

25   3.  No to 4 and 5.  And my educational background is I have a

1    Master's in global management.  And I live in Apple Valley.

2    I am married.  My spouse is semiretired.

3         He used to work -- he had his own business in a

4    telecommunication company.  I have three children.  The ages

5    are 35, 34, and 28.  35 is the foreman technician,

6    electrician for 20th Century Fox.  The middle daughter is

7    working for Mercury Casualty as a claims adjuster, and my son

8    is self-employed, running a small business, telecom systems.

9         There are no children living in our household,

10   thank goodness, and I have served in jury duty on a criminal

11   case, and we did reach a verdict.

12        I am familiar with Mattel, Barbies.  I didn't

13   really ever care to play with Barbies or any dolls, nor my

14   children.  We were pretty much all outdoors people.  And I

15   have no opinion of either company, and, of course, I've heard

16   of Mattel.

17        I have never been sued or been in a lawsuit, and I

18   can be a fair and impartial juror.

19        THE COURT:  Thank you.

20        Ms. Fedrick.

21        PROSPECTIVE JUROR FEDRICK:  My name is Sheila

22   Fedrick.  I am a flight attendant for Alaska Airlines.

23   Before that, I worked for the federal government, and before

24   that, I was a Registered Nurse.

25        THE COURT:  What did you do for the federal

1   government?

2        PROSPECTIVE JUROR FEDRICK:  I worked with the

3   Department of Homeland Security.  I was an inspector.

4        No to 3 and 4.

5        5, my son has done some copyrights because he is in

6   the music industry.

7        My educational background, I have a nursing degree

8   from Spellman College in Atlanta, Georgia.  I live in

9   Moreno Valley.  I am married, and my husband is in the Air

10  Force.

11        I have one child, just turned 18, will be

12  graduating next week.

13        No other adults live in my house.

14        I do have prior jury experience.  I was on a civil

15  case in another state, and we did reach a verdict.

16        I am familiar with Mattel, but I have not bought

17  any dolls.

18        I am not familiar with MGA or the Bratz dolls.  No

19  to 14.  And yes, I can be fair and impartial in this case.

20        THE COURT:  Thank you, ma'am.

21        Ms. Briscoe.

22        PROSPECTIVE JUROR BRISCOE:  My name is Janice

23  Briscoe.  I currently work as a teacher.  I've been teaching

24  for 25 years.  Before that I worked for the L.A. Times for 12

25  years.  Has anyone been close to you?  No, I've never had a

1    serious dispute with an employer.  I have signed employment

2    agreements as part of education.  Just basically not to

3    divulge information or to use the Internet correctly.

4          No one that I know of has been involved with

5    patents or trademarks or copyright agreements.

6          Educational background.  I have a Bachelor's degree

7    and a Master's degree.  I have a teaching credential.

8          I currently live in Montclair.

9          I'm not married.

10         I have three children, three adult children.  My

11   oldest son lives in Fontana.  He works for Tap

12   Pharmaceuticals.

13         My middle son is self-employed as a barber.

14         My daughter is also in the education field.  She's

15   a substitute teacher at Pomona Unified School District.

16         There are -- right now my middle son still lives at

17   home.

18         No prior jury experience.

19         I am familiar with Mattel and its products.

20         My children love toys and as they were growing up,

21   we bought everything we could buy.  Christmas was always fun

22   at our house.

23         MGA, I don't know that company at all.  I am

24   familiar with the Bratz dolls because my students -- I teach

25   first grade, and little girls have every doll and bring it to

1      Show and Tell.

2          I have been sued before in a car accident.  My

3      attorneys handled it through the insurance company.

4          THE COURT:  Anything about that experience that

5      might affect how you view this case?

6          PROSPECTIVE JUROR BRISCOE:  No.

7          Also, I can be a fair and impartial juror.

8          THE COURT:  Thank you very much, ma'am.

9          Ms. Kokesh.

10         We're down to the end.

11         PROSPECTIVE JUROR KOKESH:  Okay.  My name is Edna

12     Kokesh.  I work at the Veterans Hospital in Loma Linda.  I've

13     been there for 28 1/2 years.  I work as a therapy assistant

14     at this time.  3, 4, and 5 are no.

15         Educational background, I do have a high school

16     education, some college.  I did attend the Redlands adult

17     school years ago.

18         I live in Highland.

19         I am a widow.  I have three children.  Or actually,

20     three boys.

21         By oldest son is 44, and he works as a maintenance

22     attendant.

23         The middle boy is on disability right now.  He had

24     a major heart attack.  He's 41.

25         My youngest son is 38, and he works for a tire

1    accessories company.

2        Let's see, my oldest son does live at home with me

3    at this time to help me out.

4        I have been on a jury before.  I have had a civil

5    one and a criminal.  We reached verdicts on both of those.

6        I am familiar with Mattel because of my boys.  They

7    love their Hot Wheel cars.  We did have those quite a bit.

8        The MGA Entertainment, I am not aware of this

9    company.

10        The Bratz dolls, I've heard co-workers talking

11    about that for their children.  I have never seen them.  I

12    don't know what they even look like.

13        I don't have an opinion about either one of these

14    companies.

15        Number 14 is no, never had a lawsuit.

16        And I can be a fair and impartial juror.

17        THE COURT:  Thank you very much, ma'am.

18        Mr.  Holmes, if you'd bring the microphone back up

19    to Juror 21, Christopher Blazer.  I received a note from you

20    during the break.  Perhaps you could elaborate on this note

21    for the sake of the jurors.

22        PROSPECTIVE JUROR BLAZER:  Just recently we signed

23    agreements with Fontana Unified School District.  United

24    Steelworkers is the union representing the employees.  I am

25    the chief negotiator.  We are going to be meeting with

1    employees who put in a request to retire on June 30th.  And

2    so far we have about 38, I believe.  And between the 3rd and

3    the 10th, we'll be scheduling meetings, and I'll be one of

4    the people to meet with those employees to go over their

5    benefits and the whole thing.

6         My concern is I don't know if we're going to be

7    scheduling them during the daytime, the nighttime, the

8    weekends or not.  At this time I'm up in the air myself

9    because it's still about two weeks away.  I am concerned that

10   I may have a rush of people wanting to meet me early in the

11   afternoon or in the morning, whatever.  I'm not certain.

12        THE COURT:  Will you have any ability to suggest

13   that perhaps you could do the counseling in the evening?

14        PROSPECTIVE JUROR BLAZER:  Well, that's going to

15   depend on the number, your Honor, at this point.  That's

16   where I'm up in the air.

17        THE COURT:  Thanks for bringing that to our

18   attention.

19        Is there anybody else?  Now is the time to let us

20   know of any concerns, any problems.  I guess Juror No. 32 has

21   thought of something as well.  Could you raise your hand.

22   Ms. Lynn Tulipani.  Yes.

23        PROSPECTIVE JUROR TULIPANI:  Because of my travel

24   distance, I have school three nights a week.  So I'm going to

25   need to leave by 4:00.

1        THE COURT:  Very good.  That's something that we

2    can accommodate.

3        Anybody else?  You may have thought of something as

4    we go through this.  Please do not assume, because you are

5    seated someplace that, gee, there's no way I'm going to get

6    on the jury.  The last two trials I've had, as soon as we get

7    the jury, someone raises their hand and says I was seated so

8    far back so I never thought I was going to get picked, and

9    they come up with a big problem.  So everybody in this room

10   could actually be on the jury in the next hour and a half.

11       So now is the time to raise your hand if you have a

12   concern.

13       Let's do this in order.  Juror No. 3, Mr. -- oh,

14   you have the microphone.  I'm sorry.  Please stand up and say

15   your name.

16       PROSPECTIVE JUROR EASTERLING:  Alice Easterling.

17       THE COURT:  Yes.

18       PROSPECTIVE JUROR EASTERLING:  And what I did was I

19   made vacation plans for July the 1st through the 5th.  And I

20   have already purchased the tickets.  So that's my problem.

21       THE COURT:  Very good.  Thank you very much.

22       Let's go up here to the -- well, maybe not.

23       PROSPECTIVE JUROR JOHNSON:  Charlotte Johnson.  We

24   have a wedding going on in our family, but not until August.

25   And I sent in, I wrote this little thing up when I submitted

1    my paperwork.  But both of our granddaughters are getting

2    married on the 29th of August, and I'd like to be out of the

3    trial by then.

4         THE COURT:  So would I.

5         PROSPECTIVE JUROR JOHNSON:  Will you put that in

6    writing?

7         THE COURT:  Don't worry about August.

8         PROSPECTIVE JUROR JOHNSON:  Okay.

9         PROSPECTIVE JUROR MARTINEZ:  I'm Lupe Martinez.  I

10   have, between the questionnaire and all of that, I made a

11   vacation from June 4th through June 9th.  And it's already

12   paid for and everything.

13        PROSPECTIVE JUROR NGUYEN:   My name is Michael

14   Nguyen.  And because -- I think the company will not pay me.

15   It will take like two months.  And also I will be on vacation

16   next Monday.

17        THE COURT:  The company does not pay you for the

18   two months?

19        PROSPECTIVE JUROR NGUYEN:  Yeah.

20        THE COURT:  So --

21        PROSPECTIVE JUROR NGUYEN:  Only two weeks.

22        THE COURT:  Only for two weeks?

23        PROSPECTIVE JUROR NGUYEN:  Yes.

24        THE COURT:  Would that create a financial hardship

25   for you to be off more than two weeks?

1        PROSPECTIVE JUROR NGUYEN:  Yes.

2        THE COURT:  Anybody else out in the --

3        PROSPECTIVE JUROR RUSSELL:  My name is Paul

4    Russell.  A wedding in August and vacation also, tickets

5    bought.

6        THE COURT:  In August?

7        PROSPECTIVE JUROR RUSSELL:  Yes.

8        THE COURT:  Thank you.  All right.  Finally, up

9    here to Juror No. 3.  Mr. Bagalso.

10       PROSPECTIVE JUROR BAGALSO:  My name is Reynaldo

11   Bagalso.  And I'm a caregiver who has Downs syndrome, but my

12   problem is I have too much business right now.  And my

13   relatives, about nine people, as I speak, they have been in

14   my house since last month, and I've been gaining weight like

15   crazy.  But I didn't think that they would be coming.  And

16   they will be staying here until June 15.  And they have some

17   plans.

18       I'm with them, but I -- I guess with this thing, I

19   don't know if I could do it.  But they could take care of my

20   brother-in-law with Downs, but the rest of them, they are

21   staying in my house for about a month and a half now, and

22   some have plans that might come up.  Like we have some

23   christening last week, and that's it.

24       THE COURT:  Anybody else?  Front row here.  Mr. --

25   Ms. --

1          PROSPECTIVE JUROR FUENTES:  My name is Lorena

2    Fuentes.  I also have a hardship, I guess, because I'm a

3    rental teacher, substitute.  If I don't work, I don't get

4    paid.

5          PROSPECTIVE JUROR WAGES:  David Wages.  I just --

6    June 10th my son is graduating, and I just want to be there

7    for that.  From high school.  But I'm not sure if it's in the

8    evening.  So...

9          THE COURT:  And finally, in the back row there.  We

10   have Ms. --

11         PROSPECTIVE JUROR BRISCOE:  I'm Janice Briscoe, and

12   I volunteered to teach summer school.  And it starts, I

13   believe, the 1st of July.

14         THE COURT:  Anybody else?

15         All right.  At this time I'm going to be inviting

16   counsel for both parties to ask you questions, and I want to

17   give each side no more than 30 minutes.  Please be mindful

18   that anything that counsel says, any assumption that might be

19   in their question is not evidence.  It's not to be taken any

20   way.  It's simply a question.  I'd ask counsel to be mindful

21   to keep the questions as such.  And I'll give 30 minutes to

22   each side.

23         MR. QUINN:  May I have a minute first, your Honor,

24   before we start?

25         THE COURT:  Yes.

1          MR. QUINN:  Your Honor, I hate to do this, but can

2     we approach sidebar?

3          THE COURT:  Yes.

4          (SIDEBAR CONFERENCE HELD.)

5          MR. QUINN:  Your Honor, damages are Phase 1-B

6     issues.  But, of course, the core thing that one would

7     inquire into in jury selection is jurors' attitudes towards

8     damages.

9          THE COURT:  I have no problem with you going into

10    that.  That was just in the opening statement that you could

11    not go into 1-B.

12         MR. QUINN:  I just wanted to make sure that that

13    wasn't going to be a problem.

14         THE COURT:  Provided, Counsel, please, just

15    questions.

16         MR. QUINN:  I just want, you know, like is there a

17    limit.

18         THE COURT:  No instructions to the jury.  No

19    telling them what the law is or the theory of the case.

20         MR. QUINN:  I'll try not to be.

21         THE COURT:  Just general questions, if you have any

22    problems about awarding damages or things of that have

23    nature.  I don't want to have to interrupt.

24         MR. QUINN:  Understood.

25         THE COURT:  Mr. Nolan?

1       MR. NOLAN:  Okay.

2       THE COURT:  You know what's proper and not.

3       MR. QUINN:  I hope so, your Honor.

4       THE COURT:  This is not your first trial.

5       (CONCLUSION OF SIDEBAR CONFERENCE.)

6       THE COURT:  You may proceed.

7       MR. QUINN:  Folks, we really appreciate your

8    participation in this process.  It's an important process for

9    all sides that we try to get jurors that to the extent

10   possible don't come to the trial with biases or

11   preconceptions.  We all have different life experiences.  So

12   to some extent I suppose that can't be helped to some degree,

13   but the effort here is to try to do the best we can to kind

14   of ferret those out and see if we can get the best possible

15   group of people that can come and hear the evidence in this

16   case without prejudgment.

17       I'd just like to ask some.  There's no way in the

18   half hour I've got that I can ask you all questions.  That

19   will be a relief, I'm sure, to all of you.  So I'm just going

20   to follow up on some of the answers that some of you gave.

21   In fact, if I ask somebody a question and don't ask the

22   person sitting next do you, please don't read anything into

23   that.  We appreciate all of your service, and we appreciate

24   all of you being here, and we're very interested in what you

25   have to say.  But it doesn't mean anything if I don't get

1    around to asking you a question in the time that I've got.

2         But let me begin by asking Ms. Voegele.  You

3    indicated you once worked for a time for a company that made

4    baby strollers.

5         PROSPECTIVE JUROR VOEGELE:  Yes, I did.

6         MR. QUINN:  And you said something to the effect

7    that you could not go to work for a rival company.

8         PROSPECTIVE JUROR VOEGELE:  That's the agreement

9    that I signed, that I was not allowed to go to a rival

10   company, another company that did similar products, like

11   strollers and --

12        MR. QUINN:  And you said something about, if I

13   heard you right, you said something about because you had

14   information about trade secrets?

15        PROSPECTIVE JUROR VOEGELE:  Yes.

16        MR. QUINN:  And it would be unethical?

17        PROSPECTIVE JUROR VOEGELE:  Yes.  I know -- I think

18   they were afraid that we would give away secrets about the

19   strollers or the high chairs that other companies might gain

20   from it.

21        MR. QUINN:  Okay.  And do I recall correctly you

22   used the word ethical, that it would be unethical to do that?

23   Or that there was an ethical issue?

24        PROSPECTIVE JUROR VOEGELE:  I believe that's the

25   term I used, yes.

1          MR. QUINN:  And I thought that was interesting

2     because the concept of business ethics, what does that mean

3     to you?  Is that a contradiction in terms?

4          PROSPECTIVE JUROR VOEGELE:  No, ethics was my own

5     personal opinion, that if I went to work for any company --

6     and I did that once years ago.  I worked for two different

7     paint companies, and I never ever discussed the companies.

8     The first company I worked for, when I went to the second

9     company, I never once told them anything about clients or

10    products.  That was my own personal ethics.

11         MR. QUINN:  Maybe I could just ask the panel as a

12    whole, does anyone else here have some feeling about business

13    ethics?  Is that something that means something?

14         And you are?

15         PROSPECTIVE JUROR HAYES:  My name is Linda Hayes.

16    And yes, business ethics and ethics in all forms in life.

17    It's just how can you not have a feeling about that?

18         MR. QUINN:  How about in the business world?

19         PROSPECTIVE JUROR HAYES:  Yes.

20         MR. QUINN:  And what role do you think ethics has

21    to play in the business world?

22         PROSPECTIVE JUROR HAYES:  Ethics in life and in the

23    business world, if something is going to succeed, it needs to

24    succeed on its own value, on its own merit.

25         MR. QUINN:  Mr. -- is it Weiner?  "Weiner"?  I know

1    that you two moved over here.

2         PROSPECTIVE JUROR WEINER:  You're nice to ask the

3    question.  It's really Weiner.  MR. QUINN:  Thank you for

4    being there.

5         THE COURT:  And just for the record, he's now Juror

6    No. 18.

7         MR. QUINN:  You made a remark relating to ethics.

8    You said at one point at a time in the past the whole country

9    had high ethics, that companies had ethics.  Do you recall

10   saying something like that?

11        PROSPECTIVE JUROR WEINER:  Yes, when I first

12   graduated college, that was the idealism that was taught in

13   economic classes.  And many years since then, I've seen an

14   involvement many times go the other way.  So I've made the

15   comparison to tell the judge that I had a high sense of

16   ethical regard for the company I was working for and in their

17   dealings with Mattel, how ethical they were to the company

18   that I was working with, manufacturing good products for

19   their toys and so forth.  So that was my early experience.

20        And it wasn't prejudicial to say that I felt that

21   was the norm at that time.  I've seen some sliding going

22   downward since then.  I've read a lot, as has been brought

23   out in trade with China and other things.  There's a lot of

24   ethical issues that are coming up in this country today that

25   did not come up before.  And that's one reason I feel

1    privileged that I have that high standard, and I still do,

2    and I look to this case with the high standard of succeeding.

3         MR. QUINN:  Is there anyone else that sort of has a

4    sense that maybe there's been a change in the world in the

5    terms of business ethics and the ethics that companies employ

6    in competing?  Is that something that resonates with anyone

7    else here in this group?

8         PROSPECTIVE JUROR POWELL:  I think that you can

9    have ethics in the 50's, the 60's, the 70's.  That's an

10   individual, personal thing.  It doesn't have to do with the

11   time that -- the times that you are in.  It's a decision made

12   by the company, that they are going to set standards and

13   follow those standards regardless of the outcome monetarily.

14   You know, you can succeed unethically and be as unsuccessful

15   as a business that doesn't succeed monetarily.  It's still

16   unsuccessful.

17        MR. QUINN:  It comes down to the individuals?

18        PROSPECTIVE JUROR POWELL:  The individuals that

19   make up the company, I believe.

20        MR. QUINN:  Now, I know listening to those that

21   have experience in industries and companies and markets which

22   are highly competitive.  Assume that the baby stroller market

23   is highly competitive.  And I know some of you have worked

24   with Northrup, and you know the aerospace industry.  It's

25   highly competitive.

1          And I guess what I'm wondering about is is there

2     such a thing as fair competition and unfair competition?  Is

3     that something that -- do you think there's limits on how

4     companies that are going at it in the marketplace, how they

5     can -- how they should compete with each other?  Does anybody

6     have any reaction to that idea in today's society?

7          PROSPECTIVE JUROR DEHART: My name is Troy Dehart.

8     1980.  In 1980 I saw a very important -- or I was involved or

9     sat through a very important lecture where we became the

10    company or country of greed.  I was in the United States

11    Marine Corps, and the lecture was given by our president.

12         MR. QUINN:  And does the concept of --

13         PROSPECTIVE JUROR DEHART: The country went to hell

14    after that.  I lost a dozen good friends in helicopter

15    crashes because of shoddy equipment that was placed in

16    equipment here in California, in helicopters here in

17    California that we were ordered to accept and place in our

18    vehicles.  I lost friends in Desert Storm because of the

19    shoddy equipment.  And we actually shot each other.

20         So as for ethics, I lost people in Vietnam.  We

21    shot, too.  But that's a different story.  We were just

22    stupid.  But as for the equipment and the companies, I

23    understand you guys are suing each other for a matter of

24    financial gain.  Ethical responsibility to your companies.

25    But to say that America should return to ethical

1    responsibilities is absolute.

2         MR. QUINN:  Thank you.

3         PROSPECTIVE JUROR DEHART:  Do we have ethical

4    responsibilities?  I can cite a dozen -- no, I can't.  I can

5    infer on some issues in the Marine Corps and maybe -- that

6    maybe.  And the ethics went out the window.  And the

7    president at that time wrote an executive order saying that

8    we will use that equipment to fight despite the strong

9    objections.

10        MR. QUINN:  I'm sure we can all agree that that

11   shouldn't happen.

12        Has anyone had any experience in your work with

13   competition that you thought was unfair?  You thought a

14   competitor was just -- they were competing too hard, using

15   tactics that they shouldn't employ?  Has anyone ever kind of

16   encountered that?

17        PROSPECTIVE JUROR WEINER:  Of course.

18        MR. QUINN:  And is that Mr. Weiner?

19        PROSPECTIVE JUROR WEINER:  I don't want to

20   monopolize about this, you know.  But --

21        MR. QUINN:  Well, let me try to -- I appreciate

22   your comments.  Let me try to get to some other folks to give

23   them an opportunity.

24        PROSPECTIVE JUROR WEINER:  I think that would be

25   fair, others to participate.

1          MR. QUINN:  Thank you.

2          Mr. Ehlers, have you had some experience like that

3   with competition that you thought just went over the line?

4          PROSPECTIVE JUROR EHLERS:  I used to work in inside

5   sales, which manufactured motors and pricing.  And very, very

6   shoddy at times with other competition.

7          MR. QUINN:  In terms of information would be leaked

8   or how --

9          PROSPECTIVE JUROR EHLERS:  Most of the competition

10  knows -- they pretty much know your pricing.  Most industries

11  do.  And they know what your capacity is, and they know how

12  far they can go to take you out.

13         MR. QUINN:  You've gone from what you heard about

14  their case already that involves an agreement which includes,

15  as one of its terms, and I think the evidence will be, that

16  certain things created in the course of an employee's

17  employment with a company, the employee agrees that they are

18  owned by the company.

19         And I'd like to try to find out whether, you know,

20  some of you have indicated you have experience with

21  agreements like that.  But does anyone have any kind of

22  reaction to that kind of an agreement?  If you think about

23  it, in a way it's kind of extraordinary.  You're going to go

24  to work for somebody.  You sign an agreement.  Anything that

25  you create that's in that employer's line of work, the

1     employer owns.

2            It's like they own your mind.  That's what the

3     agreement is.  If it's in the employer's line of work, the

4     employer owns it.

5            THE COURT:  A question, Mr. Quinn.

6            MR. QUINN:  I'm sorry?

7            THE COURT:  A question.

8            MR. QUINN:  My question is does anybody have a

9     reaction to that?  Does that seem unfair to anybody?  Is it

10    Ms. Johnson?

11           PROSPECTIVE JUROR JOHNSON:  I'm Charlotte Johnson.

12    I signed an agreement with a rug weaver that I was repping.

13    And we designed many of the styles that they wove.  But we

14    had an agreement.  It was Rug Barn, and they make throws.

15    You may be familiar with them.  Many of our reps, some of us

16    had a little artistic talent and would create little designs.

17    And I did one for a museum.  But I had to sell it through Rug

18    Barn.  And, of course, other than that initial sale, I never

19    made a commission off of it.

20           I resented that a little bit; however, I do

21    understand that when you sign an agreement like that, you are

22    working for that company.  I would never have had the

23    opportunity, probably, to create and sell that design without

24    my marketing firm behind me.

25           MR. QUINN:  So taking it all into account, how did

1    you feel, balancing the commitment you made in the agreement

2    and --

3          PROSPECTIVE JUROR JOHNSON:  I never designed

4    another one.  I never did another one.

5          MR. QUINN:  Is this a situation where you were

6    actually on the payroll of the company?

7          PROSPECTIVE JUROR JOHNSON:  No, we were all

8    independent contractors.

9          MR. QUINN:  All right.  Thank you very much.

10         Does anyone else have experience with inventions

11   agreement like that?  If I'm not mistaken, Mr. Nguyen, you

12   work in the software area?

13         PROSPECTIVE JUROR NGUYEN:  I work in the software

14   area.  And I write -- my name is Michael Nguyen.  And I work

15   in the software area.  And every line of code I wrote for the

16   company belongs to the company.  So as I leave the company, I

17   cannot take anything with me.

18         Also like work over there, like it is involved with

19   national security.  I cannot discuss any work out side the

20   company at all.

21         MR. QUINN:  How do you feel about that?  They are

22   saying everything that you do, all the code that you write is

23   owned by the company.  You are free to go get another job,

24   but the code stays behind.  How do you feel about that?

25         PROSPECTIVE JUROR NGUYEN:  I think it's okay.  I

1    think it's fair because they pay me.  So whatever I wrote for

2    them and then when I leave, I just -- it just belongs to

3    them, you know.

4        MR. QUINN:  Is it Mr. Casas over here?  You said

5    something about an agreement relating to tattoos or working

6    at Blockbuster.

7        PROSPECTIVE JUROR CASAS:  Well, for Blockbuster if

8    you came up with any new ideas like for campaigning and stuff

9    like that, for selling like rewards cards and selling on

10   line, which they are trying to go against Netflix.  Like they

11   had a special way of doing it, or if you had a way of talking

12   to the customers, like a salesperson, you know.  Try to sell

13   something to someone that they don't necessarily need it, but

14   just the way that they do it, you couldn't discuss it with

15   anybody else.

16       But the whole tattooing thing, it's so that when

17   they steal your designs and stuff like that, because some

18   people will see your design, and they will take it and erase

19   whatever name you put on there and try to market it

20   themselves.

21       MR. QUINN:  Did that happen to you?

22       PROSPECTIVE JUROR CASAS:  It happened to me twice.

23       MR. QUINN:  How did you feel about that?

24       PROSPECTIVE JUROR CASAS:  It hurt.  Because I

25   worked my butt off to do that, to create that.  My mind is

1    the one that like compiled that design together.  And someone

2    just came up and swept it up and took all the rewards.

3          MR. QUINN:  Somebody else indicated -- thank you --

4    had a similar experience with cartoons.  And I think I might

5    be back to Mr. Dehart.  You indicated you had a similar type

6    of experience with cartoons being taken?

7          PROSPECTIVE JUROR DEHART:  I've been drawing ever

8    since I was a little kid.  I've had specific cartoons,

9    designs for tattoos, which I'll never have a tattoo.  I'm a

10   coward.

11          I've had several pieces of art that were -- we

12   copyrighted by putting -- taking it to a notary.  We mailed

13   it to ourselves.  We do all kinds of things to try to protect

14   us.  But there's something called similar art, which I've

15   learned about.  Someone can draw or redraw whatever you have

16   and simply say it was similar even though they were -- you

17   were doing it right in front of them, and they can take it.

18   Because it's -- I don't understand the law on that, but it

19   doesn't matter if it's notarized or you send it off to a

20   copyrighter.  It's not absolute.  It's not Charley Brown, is

21   it?

22          MR. QUINN:  And how did that make you feel?

23          PROSPECTIVE JUROR DEHART:  We had discussions.  But

24   I wasn't going to sue them over it because they made money,

25   and that's good.  Unfortunately, I wish I could be making

1    that money.

2         MR. QUINN:  Thank you.

3         PROSPECTIVE JUROR DEHART:  But nothing I could do

4    about it.

5         MR. QUINN:  Thank you.

6         Ms. Burnham.  I didn't mean to surprise you.

7         PROSPECTIVE JUROR BURNHAM:  Okay.

8         MR. QUINN:  You indicated you work in the software

9    area as well?

10        PROSPECTIVE JUROR BURNHAM:  Yes.

11        MR. QUINN:  And what is it exactly that you do?

12        PROSPECTIVE JUROR BURNHAM:  Well, I don't now.  But

13   I did for 11 years.  I just did their database, but it's ESRI

14   at Redlands, and they are one of the largest geospatial

15   softwares in the country here.  But I wasn't really involved

16   in the actual software, I just set up accounts.  But I think

17   that's why I had to -- we all had to sign it because we did

18   hear things.  And I was in on some of their -- just the

19   computer part, not on the actual software.

20        MR. QUINN:  Even though you weren't, I guess,

21   actually involved in writing the code like Mr. Nguyen was,

22   did you have any problem with the idea that software is --

23   that there's such a thing as intellectual property that can

24   have value, things like software, designs, and things like

25   that?  Is that something that makes sense to you?

1         PROSPECTIVE JUROR BURNHAM:  Well, yes.  I mean, I

2    believe that, you know, that if the person that is putting

3    the work in it is the company, and they are paying you, and

4    they have said okay, you have to sign a contract, you know,

5    that I go ahead and, you know, I do what I am told, I guess.

6    Because I believe that if you're there and they are paying

7    you, you wouldn't have had the opportunity to even know

8    unless, you know, you were at work.  And so I -- yeah,

9    that's, I believe it, yes.

10        MR. QUINN:  Thanks very much, Ms. Burnham.

11            Is there anyone here who has any difficulty with

12    the idea that an intangible thing or just an idea or a

13    design, that that might be valuable property?  Is that

14    something that seems strange to anyone?

15            There's been a lot of -- all of you have been asked

16    about inventions, agreements, and whether you've had these

17    kinds of employment agreements.  Let me just ask you whether

18    anyone has a family member or a close personal friend,

19    someone who you're close to, who has had an experience with

20    an inventions agreement?  Has anybody or anyone close to you

21    had experiences with one of these agreements?

22            I don't see any hands.

23            Let me change subjects now to ask about the subject

24    of damages.

25            And when folks come to court for different reasons

1    at different times, at the end of the day, if you are

2    selected to be on the jury in this case, there will be

3    evidence presented concerning the subject of damages.  And

4    the jury, if it gets that far, will have to decide whether to

5    award damages, and if so, how much.

6         Is there anyone here who has in their mind some

7    concept that, without knowing anything more about this case,

8    that there's some upward limit on the amount that they could

9    award in damages?  Without knowing anything more, that

10   there's a ceiling on it?

11        Is there anyone who feels that damage awards these

12   days have just gotten crazy?  They are just too high, there's

13   too many of them.  You read about them in the newspaper, and

14   it's just nuts what's coming out of courtrooms?  I see a lot

15   of nodding of heads.

16        The gentleman -- is it Mr. Nulph?

17        PROSPECTIVE JUROR NULPH:  It was just the typical

18   damages.  You hear about these tobacco verdicts.  $25 billion

19   awards for two guys who started smoking in the 60's.

20   Something you hear like that is comical.  You always hear

21   excessive damages, and, of course, hopefully cooler heads

22   prevail.  But there are some astronomical things that people

23   can't fathom.  How can you come up with a remarkable number

24   with someone who chose to do something?

25        MR. QUINN:  How about the Starbucks hot coffee?  We

1    always hear about that.  I think that's the best known

2    lawsuit in the world.  McDonald's.  I blew my own story.

3    That's the one we always hear when we talk to jurors.  But

4    you know, the evidence in that case was, and you know, I

5    don't work in that industry at all.  And I know just what I

6    read.

7         But I actually assumed that there was evidence that

8    McDonald's superheats its coffee and that there had been 80

9    reports of burns, and that they knew it was dangerous, and

10   there have been multiple incidents like that.  Facts like

11   that which you don't necessarily hear or see in the newspaper

12   article.  Do you understand what I'm saying?

13        PROSPECTIVE JUROR VOEGELE:  My name is Cecelia

14   Voegele.  My husband and I have had a running argument about

15   McDonald's, that dumb old lady with the coffee in her lap;

16   however, my side of the story is that she was very badly

17   burned, and she did have to have plastic surgery to repair

18   the damage done by the hot coffee.

19        On the other hand, she was trying to fix her coffee

20   getting in the vehicle.  So there was stupidity on her part.

21   So there's a lot of stories.

22        MR. QUINN:  Thank you very much.  And I'm not

23   involved in that case.  So all of you know.  My only point in

24   bringing it up is to ask you folks whether you can give me

25   your commitment that if you're on the jury in this case and

1    we get to the point where we're talking about a damages

2    award, that you can base that based on the evidence that's

3    been presented in this case and not based on some generalized

4    view, which is shared by a lot of Americans, that lawsuits

5    have gotten out of hand and verdicts are too high.

6         Is there anyone, and I'd ask you to raise your hand

7    if the answer is yes, is there anyone here who thinks that if

8    they got on the jury and they got to the issue of damages,

9    they could not do that?  In other words, they could not base

10   their decision just on the evidence that's presented in this

11   case?

12        I'm not seeing any hands.

13        PROSPECTIVE JUROR CASAS:  Mr. Casas.  The whole art

14   thing is a touchy subject.  And I think he knows it.

15        MR. QUINN:  I'm sorry?

16        PROSPECTIVE JUROR CASAS:  The art subject.  The

17   artistic aspect of creating the whole process.  It's a touchy

18   subject because it's based on potential.  It's not

19   accomplished yet.  It hasn't proven itself yet.  So that's

20   like really hard to put a figure on it.  Because the same

21   thing happens with like athletes.  Athletes, when they first

22   get drafted, they haven't accomplished anything yet.  But

23   they get paid gobs of money just based on potential.  So

24   that's why it's such a touchy subject when it comes down to

25   this whole art thing.  But the prices, hey, it's your guys'

1    money.

2          MR. QUINN:  Mr. Asencio.  What are your feelings

3    about lawsuits?

4          PROSPECTIVE JUROR ASENCIO:  Anthony Asencio.  What

5    are my feelings on lawsuits?

6          MR. QUINN:  Yes, lawsuits and settlements and

7    people complaining and whether people should be coming to

8    court.

9          PROSPECTIVE JUROR ASENCIO:  Well, I think if you

10   have a product and somebody takes it, or if you have

11   something that is yours, sure.

12         MR. QUINN:  Did you indicate that you were involved

13   in a lawsuit yourself?

14         PROSPECTIVE JUROR ASENCIO:  Yes.

15         MR. QUINN:  And could you tell us a little bit more

16   about that?

17         PROSPECTIVE JUROR ASENCIO:  Several lawsuits.

18   Because I own a business, and I have five retail stores.  And

19   one car caught on fire, and they blamed us, and it turned out

20   that the fire department had investigated it, and after we

21   installed the product, the gentleman went in there and redid

22   the wiring, and he didn't put a fuse in it, and the car

23   caught on fire on the freeway.  They saw the wiring.  And so

24   we were -- we were -- we weren't sued.  So we were --

25         MR. QUINN:  All right.  So you were satisfied with

1    the way that came out?

2         PROSPECTIVE JUROR ASENCIO:  Yes.  With that.  And I

3    was sued by my family.  Because I was a -- it was my

4    grandmother that passed away, and my cousin and I were the

5    executors of the will.  And it was a lot of money, and my

6    mother sued me, and my uncles.  But we won both cases.  But

7    it was real fair because we are allowed to tell what's going

8    on and stuff.  And it was fine.

9         MR. QUINN:  You were satisfied?

10        PROSPECTIVE JUROR ASENCIO:  Very satisfied.

11        MR. QUINN:  Ms. Steingraber.  If I could ask you,

12   you indicated that your husband practices business law?

13        PROSPECTIVE JUROR STEINGRABER:  Correct.

14        MR. QUINN:  And does that mean he does deals, or

15   does he do the kind of work that Mr. Nolan and I are doing

16   here?

17        PROSPECTIVE JUROR STEINGRABER:  Yes.

18        MR. QUINN:  So he does all kinds of business law?

19   Complete litigation work?

20        PROSPECTIVE JUROR STEINGRABER:  Plus bankruptcies

21   and trusts and wills also.

22        MR. QUINN:  Does he tend to represent more

23   plaintiffs or more defendants or usually a mix?

24        PROSPECTIVE JUROR STEINGRABER:  Usually breach of

25   contract.

1        MR. QUINN:  Is he with a law firm?

2        PROSPECTIVE JUROR STEINGRABER:  No.

3        MR. QUINN:  You indicated that your daughter works

4   for an attorney?

5        PROSPECTIVE JUROR STEINGRABER:  Yes.  Bankruptcy.

6        MR. QUINN:  Okay.  Is she a lawyer?

7        PROSPECTIVE JUROR STEINGRABER:  No.

8        MR. QUINN:  And you indicated that you are a doll

9   collector.

10       PROSPECTIVE JUROR STEINGRABER:  I am.

11       MR. QUINN:  What do you look for in the dolls?

12       PROSPECTIVE JUROR STEINGRABER:  Chubby legs and

13   chubby arms.  Usually babies.  No stick dolls.

14       MR. QUINN:  How long have you been doing that?

15       PROSPECTIVE JUROR STEINGRABER:  40-plus years.  Can

16   I say something about the lawsuits?

17       MR. QUINN:  I'm sorry?

18       PROSPECTIVE JUROR STEINGRABER:  You answer into a

19   lawsuit.  I've sued two different companies.  Only because

20   when you -- when you do something like take Fen-Phen, the

21   doctor says it's safe to take, and then you find out it's

22   not.  So I didn't do that on purpose.  You just find out

23   later that they are unsafe.  So then you sue the company.  So

24   sometimes you do -- you know, you do it willingly, but you

25   don't know the ramifications of that.

1          MR. QUINN:  Were you involved in one of those

2    suits?

3          PROSPECTIVE JUROR STEINGRABER:  I was.

4          MR. QUINN:  Were you satisfied with how it was

5    resolved?

6          PROSPECTIVE JUROR STEINGRABER:  Sure.

7          MR. QUINN:  Thanks very much.

8          THE COURT:  You have five minutes.

9          MR. QUINN:  Five minutes.

10         Mr. Juarez.  You've done -- you've had a career at

11   Union Pacific.

12         PROSPECTIVE JUROR JUAREZ:  That's correct.

13         MR. QUINN:  And you've been a hearing officer.  Is

14   that just for EEO claims, or have you gotten involved in

15   different kinds of issues?

16         PROSPECTIVE JUROR JUAREZ:  Altercations, theft,

17   discrimination, EEO.

18         MR. QUINN:  Like this one individual that settled

19   things.  They went outside and resolved the issue?

20         PROSPECTIVE JUROR JUAREZ:  No, because then I'd

21   have to investigate them for altercation.

22         MR. QUINN:  Okay.  So it's just sort of any kind of

23   problem involving employee conduct?

24         PROSPECTIVE JUROR JUAREZ:  Anything that would be

25   under discipline.

1          MR. QUINN:  Okay.  Do you have issues that come up

2    in terms of employee loyalty?  Is that a concept that comes

3    up or means anything to you?

4          PROSPECTIVE JUROR JUAREZ:  You're talking ethics?

5          MR. QUINN:  I'm sorry?

6          PROSPECTIVE JUROR JUAREZ:  You're talking ethics?

7          MR. QUINN:  Maybe it's ethics.  But the idea that

8    an employee owes some duty of loyalty to his employer, is

9    that something that in your work has come up or something

10    you've had occasion to reflect on?

11          PROSPECTIVE JUROR JUAREZ:  Not that I can remember.

12    Not loyalty.

13          MR. QUINN:  Okay.  Do you think that an employee

14    has any duty of loyalty to an employer in performing his job

15    duties?  Is that something that --

16          PROSPECTIVE JUROR JUAREZ:  We hire them to do a

17    job.  You know, for pay.  So in that regard, yes.

18          MR. QUINN:  There's a number of -- thank you very

19    much.  There's a number of jurors who have some experience in

20    the union environment.

21          Mr. -- is it Blazer?

22          PROSPECTIVE JUROR BLAZER:  Yes.

23          MR. QUINN:  You told us you're a local union

24    president, and you have these negotiations coming up.

25          PROSPECTIVE JUROR BLAZER:  Currently I'm a trustee

1      and negotiating chairman.  I'm a past president of our local

2      union.

3              MR. QUINN:  You are involved in representing union

4      members, employees, and dealings with the employer.

5              PROSPECTIVE JUROR BLAZER:  That's correct.  I'm

6      also the M and O, maintenance and operations grievance

7      person.  And when problems arise, everything from discipline

8      to employee conflicts, I get involved with them.

9              MR. QUINN:  All right.  Does the idea of employee

10     loyalty to the employer mean anything to you in your

11     environment?

12             PROSPECTIVE JUROR BLAZER:  That's a big point in

13     our environment.  That's one thing we preach to our people.

14     As a union, I preach that.  That you have a good job here.

15     The union negotiates for your terms of wages, conditions of

16     employment.  And in exchange for that, you are expected to

17     give a good day's job and carry on from there.  Maintain and

18     keep to the rules, too.

19             MR. QUINN:  Thank you, sir.

20             Thanks very much for your attention.  I have

21     nothing further.

22             THE COURT:  Thank you, Counsel.

23             Mr. Nolan.

24             MR. NOLAN:  Thank you.

25             Good afternoon.  As you can see, there's a pattern

1    that's forming.  And that is that I always get to go second.

2    There's some advantages, and there's some disadvantages,

3    especially when they are at 4:00.  So let's try to do it this

4    way.  First of all, what we're doing now is asking the

5    questions.  And you might be saying, you know, all day

6    everybody has been asking questions.  You probably have some

7    questions that you'd like to ask of either Mr. Quinn or

8    myself.  But this process we're going through is referred to

9    and comes from the French verb voir dire.  And it means to

10   tell the truth.

11        So let me tell you first something about me as I

12   start this process.  Number one, it's really difficult to ask

13   questions to 56 people you've never met before.

14        Number two is none of the questions are designed to

15   invade your privacy.  All of them are designed to make

16   certain, as we start this case, we start with a level playing

17   field.  And I want to go immediately to the question of

18   employment contracts and business ethics.  I assume that if I

19   asked all of you, do you all agree that businesses even today

20   and maybe more importantly today act in an ethical way, you'd

21   all agree; correct?  That's undisputed.

22        Both sides in this case agree.

23        Does anyone here, however, believe that it's

24   ethical for one company to make a claim on something that

25   they don't own?  Would that be ethical?  If you think so,

1       please raise your hand.

2              A number of you have raised your hand with respect

3       to employment agreements, and then some of you have raised

4       your hands and described them as confidentiality or

5       inventions agreements.

6              How many, and please raise your hand, believe that

7       it is ethical for a company to claim that an employee, by

8       signing an inventions agreement, signs away rights that he

9       had even before he went to work at the company?  Would that

10      be ethical?

11             Ms. Voegele, let me go to you for a moment.  Baby

12      carriages.  You've worked for a number of years with this

13      company.  And apparently your agreement prohibits you from

14      going to work for a competitor.

15             Is that clearly spelled out in your contract?

16             PROSPECTIVE JUROR VOEGELE:  Yes.

17             MR. NOLAN:  So when you signed your contract, was

18      it absolutely clear to you every day, when you went to work,

19      that you could never seek employment with a competitor?

20             PROSPECTIVE JUROR VOEGELE:  Yes.

21             MR. NOLAN:  Before going to work for your employer,

22      did you ever have an idea about something that you wanted to

23      pursue on your own?

24             PROSPECTIVE JUROR VOEGELE:  Yes.

25             MR. NOLAN:  How long had you had that idea?

1          PROSPECTIVE JUROR VOEGELE:  Years.

2          MR. NOLAN:  How did you come upon the idea in the

3    first instance?

4          PROSPECTIVE JUROR VOEGELE:  I have children of my

5    own.  And having children, you think of goofy things and make

6    things easier.

7          MR. NOLAN:  When you signed your employment

8    agreement with your employer, did you believe you were giving

9    that idea to your employer?

10          PROSPECTIVE JUROR VOEGELE:  No.

11          MR. NOLAN:  Did your employer ever tell you, I want

12    your idea even if you came up with it before you crossed our

13    door?

14          PROSPECTIVE JUROR VOEGELE:  It was never discussed.

15          MR. NOLAN:  How many have an employment contract

16    for an inventions agreement, or ever signed one, whereby you

17    agree to transfer any right that you may have had to an idea

18    that you had even before you went to the company?  Has

19    anybody signed such an agreement?

20          Mr. Nguyen, let me ask you a question.  You work

21    for a software company?

22          PROSPECTIVE JUROR NGUYEN:  Yes.

23          MR. NOLAN:  And is that Northrop Grumman?

24          PROSPECTIVE JUROR NGUYEN:  Yes.

25          MR. NOLAN:  And you signed an agreement.  Do all

1    the employees sign the agreement?

2         PROSPECTIVE JUROR NGUYEN:  Yes.

3         MR. NOLAN:  How long have you worked there?

4         PROSPECTIVE JUROR NGUYEN:  Almost seven years.

5         MR. NOLAN:  During those seven years, how many

6    versions of the employment contract have there been?

7         PROSPECTIVE JUROR NGUYEN:  Only one.

8         MR. NOLAN:  Did all the employees sign it?

9         PROSPECTIVE JUROR NGUYEN:  Yes.

10        MR. NOLAN:  Do you know of any employees that have

11   ever violated that agreement?

12        PROSPECTIVE JUROR NGUYEN:  I don't know.

13        MR. NOLAN:  Do you know of any employees who were

14   fired for violating that agreement?

15        PROSPECTIVE JUROR NGUYEN:  I don't think I know

16   anyone.

17        MR. NOLAN:  At Northrup Grumman do you know of

18   any -- and I'm going very far beyond my expertise in about a

19   nanosecond -- do you and other employees get to bring in your

20   own ideas for software that's not being used at

21   Northrop Grumman?

22        PROSPECTIVE JUROR NGUYEN:  You mean bring in the

23   knowledge for the company?

24        MR. NOLAN:  Yes.

25        PROSPECTIVE JUROR NGUYEN:  Yes.

1          MR. NOLAN:  And why do you do that?  Just to show

2     your ideas to other employees?

3          PROSPECTIVE JUROR NGUYEN:  Yes.

4          MR. NOLAN:  And are these ideas that you know would

5     never have been pursued by Northrop Grumman?

6          PROSPECTIVE JUROR NGUYEN:  Yes.

7          MR. NOLAN:  Are you prohibited by signing your

8     agreement to go to work for a competitor?

9          PROSPECTIVE JUROR NGUYEN:  No.

10          MR. NOLAN:  One thing that Mr. Quinn and I can

11     agree on is that this case after today, you'll never hear

12     about Hot Wheels.  They are not involved in the case.  Nor,

13     frankly, is Barbie.

14          But I have to be honest with you.  I was thinking

15     last night of all right, if I'm going to ask all these people

16     these questions, I better be prepared to share something

17     about me.  I mean, my wife still has the Barbies that she had

18     when she grew up.  She's not a collector.

19          But our daughters don't play with Barbie.  Do you

20     think it's okay that even though Barbie is an icon and has

21     been around forever, that sometimes competition is good for

22     the marketplace and the consumer?  Does anybody disagree with

23     the notion that competition is good?

24          Do you think it's ethical to compete?  Does anybody

25     disagree with this proposition?  If a product has been around

1    for 40 years and enjoys a significant status, that that

2    product is hands off and doesn't have to face competition?

3              PROSPECTIVE JUROR WEINER:  What if that product has

4    trademarks on it going on and there's a similar product that

5    comes along that you're talking about that's better -- Stuart

6    Weiner.  Excuse me.  That product you're talking about, as

7    you give it out to us, has been around for so many years, but

8    there are pending copyrights or patents or things of that

9    nature.  Does that become part of the equation, where you

10   have no right to improve upon it?  No other idea to bring to

11   it?

12             MR. NOLAN:  Well, I guess that's my question.

13             PROSPECTIVE JUROR WEINER:  That's my question to

14   you.

15             MR. NOLAN:  Can I answer that, your Honor?

16   Absolutely fair.  My view is the competition and the United

17   States Constitution would allow competition as long as it was

18   not a direct copy of Barbie.

19             PROSPECTIVE JUROR WEINER:  Right.

20             MR. NOLAN:  Or violated the copyright.

21             PROSPECTIVE JUROR WEINER:  But there is an ethical

22   issue, a direct copy.  And there's other issues that might

23   water this or color this one way or another.  And I think

24   those factors are what you're asking us to give you an

25   ethical answer on.  And I think you are posing ethical

1    questions to us, and ethics are clearly right and wrong.  And

2    I think if it's a specific, there's always an ethical answer

3    of goodness that should be answered to that.

4         So I think you really are asking us to agree with

5    the ethics of good press and principle of ideas.  But they

6    shouldn't be colored where something is a standard, like the

7    Barbie that has been so acceptable out there.  Even I know

8    about that with my daughters.  With my granddaughters, I

9    don't have to get involved with that because I'm not raising

10   them.  I don't know this new doll that's come along.  But I

11   heard about it.

12        And I think these are serious issues of ethics that

13   have to be worked out, and you are asking us to give you a

14   direct answer.

15        MR. NOLAN:  And I appreciate that.  But let's just

16   stay talking together for a moment on this point.  Do you

17   think, then, that just because Barbie has been around for 40

18   years that it would be ethical for her to stomp out any

19   competition even if it doesn't even look like it?

20        PROSPECTIVE JUROR WEINER:  Of course not, it

21   wouldn't.

22        MR. NOLAN:  We talked about duty of loyalty,

23   Mr. Quinn did.  How many believe that it is a two-way street

24   between an employer and an employee?  I see a number of you

25   nodding your head.

1          Does anybody disagree that an employer owes a duty

2     to its employees as much as they expect from the employees

3     back to the company?  Does anybody disagree with that

4     proposition?

5          Mr. Powell, you were nodding your head.

6          PROSPECTIVE JUROR POWELL:  I think it's a

7     reciprocal thing.  William Powell.

8          The employee is there for monetary gain, I assume,

9     just as the company is.  And so if the employee has the

10    employer's best interests at heart and vice versa, it's a

11    working relationship.  There's lots of trust involved.

12    People are happy to come to work.  It's a good environment,

13    you know.  I think that's what -- good working relationships

14    from both sides create.  Whereas if you have distrust, it can

15    make a bad working area.

16         MR. NOLAN:  Thank you.

17         Mr. Nulph is it?

18         I know that you were shaking your head and nodding

19    as well.  How do you feel about that?

20         PROSPECTIVE JUROR NULPH:  An employer is there to

21    succeed in business.  And without quality employees, the

22    employer does not succeed.

23         So the employee/employer relationship is a two-way

24    street.  You've got to treat the employees fair, and in turn,

25    you get a fair employment from the employee.  He comes to

1    work every day to put in his eight, ten, twelve-hour shift or

2    whatever.  And if you don't treat the employees fair, your

3    job as the employer, or your business as the employer won't

4    succeed because you don't have quality people, you know, that

5    are there moving you forward and stuff.

6        MR. NOLAN:  Ms. Dome?

7        PROSPECTIVE JUROR DOME:  Are you asking if ethics

8    is relative?

9        MR. NOLAN:  Yes.

10       PROSPECTIVE JUROR DOME:  I don't think it would be

11   relative.  If I have a commitment as an employee, I'm going

12   to uphold that even if my employer somehow -- I don't think

13   it negates the commitment that I make.  I didn't know if

14   that's what you were asking.  If the employer holds up their

15   end.  It's not --

16       MR. NOLAN:  Both sides of an agreement have to act

17   ethically.  Does everybody agree with that?

18       Nobody really would disagree with this in this

19   world.

20       How many, though, would agree that large powerful

21   corporations are in a far more superior position than an

22   individual employee is with respect to enforcing the terms of

23   employment agreements?

24       Miss Beasley?

25       PROSPECTIVE JUROR BEASLEY:  You are spinning this

1    as Mattel is like a monopoly, this big, bad corporation, and

2    that you somehow are, you know, the little guy trying to

3    scrape by when in essence, it is about ethics.  No one forces

4    anyone to sign a contract.  But what you need to uphold is

5    the legality of that contract that these fancy lawyers draw

6    up.  I don't understand where you're going with it is what

7    I'm saying to you.

8         MR. NOLAN:  Okay.  Let's just follow up on this.

9    And I wasn't trying to paint Mattel as an evil monopoly other

10   than to say that they actually have been in the market of

11   fashion dolls for 40 years.

12         But my question to you as a prospective employee

13   going to Mattel, do you think that if you had your own idea

14   many years back that was not part of the work that you did at

15   Mattel, by simply going to work at Mattel, that Mattel had

16   the right to take that idea from you?

17         PROSPECTIVE JUROR BEASLEY:  I would probably think

18   mighty heavily before I free-lanced with another company and

19   looked at the contract.  That's what I would do.

20         MR. NOLAN:  Would you expect that a company like

21   Mattel would have clear enforcement guidelines with respect

22   to that contract?

23         PROSPECTIVE JUROR BEASLEY:  Like I said, I would

24   expect a company like Mattel to have, you know, educated

25   lawyers draw up the appropriate binding agreements to protect

1    their vested interests in employees who are essentially being

2    paid to do a job.  And if I were that employee,

3    hypothetically I wouldn't be spilling my hopes and dreams and

4    ideas on a gold mine to someone else when I was under a

5    contract.

6         MR. NOLAN:  Would it matter to you that your gold

7    mine was not something that was being done at Mattel?

8         PROSPECTIVE JUROR BEASLEY:  Legally, apparently

9    what you're saying, what both sides are saying is that

10   legally it was binding.  So, you know, I would have to look

11   at the evidence, you know.  I -- if it were me, I would make

12   sure that I wasn't under a contract with Mattel, that I was

13   in essence a free agent and had every legal right to pursue

14   that venture.

15        MR. NOLAN:  Let's just carry this out for a moment.

16   Let's just say that you had an idea, and that you go out, and

17   you produce the idea.  And then Mattel waits five years to

18   file a lawsuit against you.

19        MR. QUINN:  Your Honor, there's a pending motion.

20        THE COURT:  Let's move on to another question,

21   Counsel.

22        MR. NOLAN:  All right.  I'll end it this way.

23   Would you expect an employer to enforce this contract in a

24   timely fashion?

25        PROSPECTIVE JUROR BEASLEY:  I would expect that

1    because we're here, that the parameters of the law have been

2    followed and that because this wasn't dismissed and it was

3    actually being brought to trial, that it was done so legally.

4         MR. NOLAN:  Okay.

5         Mr. Dehart, when did you first realize you liked to

6    draw?

7         PROSPECTIVE JUROR DEHART:  The day I was told I

8    started drawing was at one year old when my dad punished me

9    as a child, stuck me in the corner.  And I had a cartoon or a

10   crayon.  My mother says they couldn't get me out of the

11   corner for an hour.  And she put me into art schools as soon

12   as I could.  And from age 5 until I left the house at 18, she

13   had me enrolled in some kind of an art school or going to

14   something like that.  And I continue that to today, where I

15   draw political cartoons and sneak them to other people.

16        MR. NOLAN:  Do you copyright your drawings?

17        PROSPECTIVE JUROR DEHART: I stopped.  There's no

18   reason for me to.  For one reason, I am the world's greatest

19   artist.  So it's a privilege to be copied.

20        And after having a couple cartoons and I don't know

21   how many other little projects borrowed from me, as I'll say,

22   in those days in Virginia and the Carolinas and overseas, I

23   could simply tap the guy on the shoulder, and we could go

24   outside.  This is California.  I use a bigger weapon, a

25   lawyer.  And I have had to use them a couple times.  It

1    became that because I'm such a small cartoonist and artist,

2    more problematic to follow it up.

3          The only good news on that is I did go to an art

4    show, and I've bid on one of my own paintings, and the

5    curator turned me down, said I couldn't afford it.  He didn't

6    know I had painted it.  But it was stolen.

7          The idea, though, you mentioned about ethics for

8    companies.  I'm an amateur historian, and I'm very nervous

9    talking in front of people.  But isn't this something new in

10   our country that just came up in the 50's, the ethics of the

11   corporation to the person or the individual?  Is this

12   something that's brand new?

13         MR. NOLAN:  For purposes of this case, I think both

14   sides are agreeing that ethics are important flowing both

15   ways.

16         PROSPECTIVE JUROR DEHART: In that case, we just

17   have to see what, when, and where.

18         MR. NOLAN:  And is it your view that you can sit

19   back, listen to all of the evidence, evaluate it as it comes

20   in, and render a fair verdict based on the evidence?

21         PROSPECTIVE JUROR DEHART: I think I can.  But like

22   I say, my Constitution, I feel this is a privilege to be

23   allowed here.  This is my first time in any jury.  Between

24   the two companies, that's something that I don't even know

25   what it is.  I'd ask to see the thing.  I understand

1    similarities in art, as I've been told about that.  But is

2    there any resemblance?

3         MR. NOLAN:  I think there will be a trial where

4    that evidence will come in.  It's a wild guess on my part,

5    but I believe that will be part of the case.

6         PROSPECTIVE JUROR WEINER:  Might I ask a question?

7         MR. NOLAN:  Of course.

8         PROSPECTIVE JUROR WEINER:  Might ethics be as

9    important to the individual as it is to the company?

10        MR. NOLAN:  It should be.

11        PROSPECTIVE JUROR WEINER:  Thank you.

12        MR. NOLAN:  We talked about damages.  Mr. Quinn

13   asked you a question about damages.  I want to turn back to

14   that for just a few moments.

15        You know, we start off this case, it's no secret,

16   many of you have never heard of MGA.  Some of you have heard

17   about Bratz.  And all of you have heard about Mattel.  It's a

18   little bit lopsided in terms of knowledge of the companies.

19   First of all, just to ask you this question.  How many, just

20   simply because it's Mattel against a company that you don't

21   know anything about, that you start with a leaning towards

22   Mattel's position in this case because you think they're so

23   big, they must be getting it right?

24        Does anybody feel that way?  Because, you know,

25   there's a point about sharing feelings with you and, you

1    know, you asking me questions, which I enjoy and I

2    appreciate.  It's a privilege to answer those, sir.  It is

3    that this whole process has to be fair.  And fair doesn't

4    matter about how big you are or how long you've been in

5    business.  Does everybody agree with that proposition?

6         On the question of damages, do any of you believe

7    that plaintiffs oftentimes ask for more than they are

8    actually entitled to in a lawsuit?  Does anybody feel that

9    way?

10        Yes, sir.

11        PROSPECTIVE JUROR EHLERS:  I do.  I have no basis

12   for it.  I just believe that they ask for more because they

13   know that it's going to probably come down.  I don't think

14   it's right or wrong.

15        MR. NOLAN:  It's just part of the -- our jury

16   system?

17        PROSPECTIVE JUROR EHLERS:  Part of the process.

18        MR. NOLAN:  Is there anybody, based on everything

19   that you've heard today, who now, as they reflect back and

20   think, you know, I don't think if I was one of the parties in

21   this lawsuit that I would like this case to proceed having a

22   juror with my state of mind right now sitting on this jury?

23   Is there anybody that feels that way?  In other words, fair

24   and impartial.

25        For those of you that have signed inventions

1    agreements and confidentiality agreements, do each of you

2    agree that what your agreement provides may not be the same

3    as will be in evidence in this case?  Does anybody believe

4    that it's just a form agreement that's signed and used by

5    every company in every industry?

6        Ms. Voegele, would you accept the evidence in this

7    case that there is not a prohibition from going to work for a

8    competitor, and in fact the evidence in the case would be

9    that in the toy industry, people are moving back and forth

10   between the companies, would you be willing not to apply the

11   terms of your contract to the facts of this case?

12       PROSPECTIVE JUROR VOEGELE:  The contract that I

13   signed was very specific and written by the lawyers for that

14   company.  And they had specific reasons for their ideas and

15   for their rules.  And that's what I would abide by.

16       If you guys had different contracts and different

17   rules, then it would be a very individual thing.

18       MR. NOLAN:  The last subject that I want to get to,

19   which is probably in many ways the most difficult, but I need

20   to ask this question.  I asked you two different ways.  I

21   asked you with respect to sides, Mattel versus MGA.  My

22   client was not born in the United States.  And as you heard

23   in my opening statement, my client left at an early age, the

24   Middle East, came here, worked hard.  He become a United

25   States citizen and is a successful businessman.

1      I believe I described it as almost the American

2    dream.  Does anybody here believe, still believe in that

3    American dream?  Does anybody not believe in the American

4    dream, that if you work hard enough, you can be a success?

5          PROSPECTIVE JUROR DEHART:  I think we all should

6    regardless of corporate companies or bad experiences.  We all

7    have our right.  We all have an obligation to believe in

8    that.  It is in our Constitution.  We have the obligation to

9    pursue our own happiness.

10          MR. NOLAN:  Does anybody disagree with what

11    Mr. Dehart said?

12          PROSPECTIVE JUROR CASAS:  Well, okay, like in my

13    case, ability is one thing, and opportunity is another thing.

14    Any man can dream, but their ability is nothing if they don't

15    have an opportunity to like exploit that ability, to reach

16    that dream.  And there's a lot of people that don't have that

17    chance or have that opportunity to even come across a moment

18    like that.  And some people it gets passed by them, you know.

19    Not a lot of people have that opportunity for the American

20    dream, you know, quote, unquote.

21          So like to say that, you know, like everybody can

22    do it, no, not everybody can do it.  Because not everybody

23    has the necessary equipment or opportunities available to

24    them to accomplish that dream.

25          MR. NOLAN:  Do you think, though, that if the

1     opportunity arises and a person is willing to take the risk

2     and reach for that opportunity, that the mere fact that he's

3     not born in the United States should disqualify him from ever

4     pursuing that dream?

5         PROSPECTIVE JUROR CASAS:  No, because if you just

6     look at it, like okay, who hasn't seen that one, that movie,

7     "Pursuit of Happyness."  That guy had nothing, and he made

8     something of himself.  He made it an overdrive in his life to

9     pursue that dream.  If you sacrifice so much and if you offer

10    yourself to that dream and if you feel like -- fulfill it,

11    stick your head in it and keep on going and never stop, and

12    you finally do accomplish that, who is to say that somebody

13    else can't come by and take it away from you, you know?

14    You're the one that busted your butt for it.

15        MR. NOLAN:  Is it unethical for someone to come in

16    and try to take away what that person worked so hard to do?

17        PROSPECTIVE JUROR CASAS:  You guys keep using

18    ethics.  But the businesses do that to protect themselves.

19    But if the employee, you know, going up to the employer

20    doesn't like the terms of, you know, of the contract, then

21    they have to debate it, and they have to like come to an

22    accord with that employer to make it possible for him to do

23    other things.

24        Like I have my contract.  But I still have the

25    ability to like do side jobs and stuff like that.  They tried

1    to do that whole little like anything do you, like we're

2    going to own it, and I said no, I'm not going to do that.  I

3    sign another contract, bring it up or whatever, and we'll

4    talk about it and see if it accords more to my life and my

5    style and things that I want to accomplish, then I went ahead

6    and do it, but not if it conflicted against me, you know?

7         MR. NOLAN:  And were you able to change the

8    contract?

9         PROSPECTIVE JUROR CASAS:  Yes, I did.

10        THE COURT:  Mr. Nolan, thank you.

11        All right.  Ladies and gentlemen, we're going to

12   take a very brief recess now.  I want to give the counsel an

13   opportunity to discuss this matter among themselves and the

14   clients.  And when we come back at a quarter to 5:00, we'll

15   begin with the actual selection of the jury.

16        So again, remember exactly where you are seated.

17   Go ahead and take about a 10, 12-minute break outside, and

18   we'll resume promptly at 4:45.

19        (WHEREUPON THE JURY WITHDRAWS.)

20        THE COURT:  Okay, Counsel.  I do want to give you

21   10 minutes here to discuss this amongst yourselves and your

22   clients.  When I come bac at 4:45, first of all, let's go

23   back around to the backside of the tables.  After I seat the

24   jury, I'll bring you to sidebar to make your motions for

25   cause.  All I'm looking for is the motion.  Identify the

1    number and name of the juror and the legal basis for your

2    motion for cause.  Once I hear them, I'll rule on them.  I

3    will then send you back, and you'll exercise your peremptory

4    in front of the jury.  When you exercise the peremptory,

5    simply rise, thank and excuse the juror, and we will go to

6    the next one.  No one is going to move.

7            So be taking notes and crossing out the jurors as

8    you go through it, and at the end I'll remove the jurors that

9    have been removed, and we'll fill up the box, and we should

10   have our jury by 5:00 or shortly thereafter.

11           All right.  So about 10 minutes, and let's be ready

12   to go at 4:45.

13           Court is in recess.

14           (Recess taken.)

15           THE COURT:  On the record.  Why don't I start with

16   my judicial assistant, Kathy Pimentel.  If you would place on

17   the record what it is that you saw and observed and did.

18           MS. PIMENTEL:  A few moments ago, I walked up to

19   retrieve some courtesy copies from our box, and there was a

20   juror standing outside reading a document.  I pulled it away

21   from his hands, and I said to him, "Excuse me, sir, these are

22   copies for the Court," and I walked away, and I reported it

23   to the judge.

24           THE COURT:  Thank you.  The document in question is

25   a document entitled Mattel Inc.'s reply in support of motion

1    objecting to Discovery Master's May 8, 2008, order denying

2    Mattel's motion for reconsideration of February 26, 2008,

3    order denying motion to compel deposition of Christopher

4    Palmeri.

5           Not seeing that there's anybody on this planet

6    including this court that could actually figure out what that

7    means, there is a concern.  Obviously the juror in question

8    picked it out of the courtesy box and was apparently reading

9    through it.

10          MR. NOLAN:  He didn't rule on it, though.

11          THE COURT:  Not withstanding the admonition of the

12   Court not to read anything about the case, certainly not

13   official court papers, we've secured the juror so he's not

14   talking with any other members of the panel.  So I'm

15   confident that those prophylactic matters have been taken,

16   I'll look to the counsel for their opinion.

17          MR. NOLAN:  We would move to excuse the juror.

18          THE COURT:  Mr. Quinn?

19          MR. QUINN:  May I have a moment?  I'm not familiar

20   with the document.

21          MR. NOLAN:  Your Honor, that description is

22   actually my favorite in this case.  I will take that to my

23   grave with me because I think it says so much about the case.

24          MR. QUINN:  Do we know whether he read it, how long

25   he was holding it?

1          THE COURT:  We don't.  He's in the witness room

2     right now.  I could bring him in and question him if that's

3     your preference.

4          MR. QUINN:  I think it would be our preference to

5     find out if he actually read the document.  If he just picked

6     it up and was stumbling through the caption, who cares?  If

7     he read the document, that might mean a different result.

8          THE COURT:  Mr. Nolan?

9          MR. NOLAN:  Your Honor, the Court can proceed to

10    ask questions; however, I can't imagine, even if he said he

11    didn't read it, why anybody on jury duty coming in on the

12    first day would pick up what is obviously a legal pleading

13    that's not readily available to other members of the jury and

14    believe that he could do that.  I think that given the oath

15    that they took here, it's just a bad sign.  I would not even

16    exercise any further inquiry into this, your Honor.

17         THE COURT:  I don't know what's in this document.

18         MR. NOLAN:  And I'm saying this, your Honor.  I

19    don't even know -- I haven't even looked at my score.  I

20    didn't even consult with anybody.  I just don't think that is

21    the right way to go.  That motion, your Honor, does talk

22    about statements that Mr. Larian made in the press with

23    respect to, and I think they are going after so far, because

24    of the claim in there that Mr. Larian's deposition testimony

25    was inconsistent.  But nevertheless, it's a court pleading,

1    and he shouldn't be reading it.

2        THE COURT:  Thank you, Mr. Nolan.

3        I tend to agree with Mr. Nolan.  If this was a

4    situation where we really were down to our last juror or

5    something, I would be more inclined to see if we could cure

6    the problem here, but we have plenty of jurors.  This was

7    pretty irresponsible for someone to pick something like this

8    up and start reading it.  And I think the safest thing to do

9    is simply excuse this juror.

10        So, Mr. Holmes, why don't we bring the juror in.

11        Mr. Wages, if you'd approach the lectern.

12    Apparently you picked up a document in this case.

13        PROSPECTIVE JUROR WAGES:  I turned around and saw

14    it said courtesy copy.  And I was bored and put it down when

15    the lady came out.  I didn't look at it, though, didn't get a

16    chance.

17        THE COURT:  The courtesy being for me.

18        PROSPECTIVE JUROR WAGES:  I'm sorry, sir.  I saw a

19    box out there and didn't think anything would be important

20    stuck out in the hall.  That's all.

21        THE COURT:  I'm going to excuse you from jury

22    service.  In the future, don't do something like that.

23    Because that's --

24        PROSPECTIVE JUROR WAGES:  I'm sorry, sir.  Like I

25    said, it was out in the middle, and I didn't think anything

1    valuable out there right by the elevator.

2        THE COURT:  I accept that as your explanation, and

3    I'm not impugning your integrity by suggesting that you've

4    done something wrong.  You've done something which raises an

5    appearance of impropriety, which the Court has concerns

6    about, given the nature of the document that you had in your

7    hands.  And there's no way of the Court guaranteeing that

8    that appearance can be corrected.  So you are excused for the

9    day, sir.  Thank you.

10       Let's bring the rest of the panel in.

11       MR. NOLAN:  Your Honor, before do you that, may I

12   inquire?  Will we do hardship?  There were a couple of

13   questions that came up with respect to hardship.

14       THE COURT:  I'll take your motions for cause

15   including hardship at sidebar, Counsel.

16       Mr. Quinn and Mr. Nolan, why don't you approach

17   sidebar, and we'll get set up.

18       Ladies and gentlemen, unfortunately, I had to

19   excuse a juror for doing something that he was not supposed

20   to.  And on the way out -- that was Mr. Wages, Juror No. 13.

21   On the way out, he was seen talking to one of you, but we're

22   not really sure who.  Did anyone speak to Mr. Wages, or did

23   he say anything to any of you on the way out?

24       It was the gentleman who was sitting here in the

25   front row who is no longer with us.  And perhaps he may have

1    said something, and you didn't even hear it.  So I'm just

2    asking for the record did anybody hear anything from the

3    gentleman who was there on the way out?

4         Very good.  I see no hands.  I'm going to be with

5    counsel for a few minutes at sidebar.  And then we'll

6    proceed.

7         (SIDEBAR CONFERENCE HELD.)

8         THE COURT:  My law clerk thought she saw him

9    talking to someone on the way out.  I'm sorry.

10        All right.  Let's take motions for cause.  Number,

11   name, ground.

12        Mr. Quinn, I'll start with you.

13        MR. QUINN:  Number 19, Juror 19, Mr. Bishaw.  On

14   the grounds that he says he doesn't care about the case.

15   "Not my kind of case."  He isn't interested in the case.

16        THE COURT:  Your response?

17        MR. NOLAN:  We would join.

18        THE COURT:  That motion is easily granted, then.

19        Anyone else?

20        MR. QUINN:  Not for cause, your Honor.

21        THE COURT:  Mr. Nolan?

22        MR. NOLAN:  Juror No. 37.

23        THE COURT:  She's the one that indicated she could

24   not be fair based on publicity.

25        MR. QUINN:  Right.

1        THE COURT:  Very well.  That motion is granted for

2    cause.  37 is excused.

3        MR. NOLAN:  Your Honor, Juror No. 38.

4        THE COURT:  Doctor Chan.

5        MR. NOLAN:  Same issue.  He came in and said he was

6    completely biased, couldn't overcome it, even after trying to

7    be rehabilitated by Mr. Quinn.

8        THE COURT:  Despite Mr. Quinn's valuable efforts to

9    rehabilitate him.

10       MR. QUINN:  Your Honor, this one is different.  He

11   didn't see anything before the start of the trial.  He said

12   he had an impression.  We all have impressions.  When I asked

13   him whether he thought he could wait to make up his mind, he

14   ultimately said he could wait.

15       THE COURT:  Very well.  Your objection is noted.

16   Your next, Mr. Nolan?

17       MR. NOLAN:  Mr. Weiner, formerly known as 17, now

18   18.  Your Honor, I represent a Persian Jewish man.  I have a

19   juror who writes a note saying that a person sitting in the

20   audience who is a rabbi and wearing a yarmulke, he refers to

21   it as to take the skull cap off, that's inappropriate.  Your

22   Honor, on that basis alone, it tells us so much about his

23   bias.

24       THE COURT:  I understand your objection.

25       Mr. Quinn, your response?

1          MR. QUINN:  No one knows that Mr. Larian is Jewish.

2    No one knows that associating the skull cap with being Jewish

3    is a basis.

4          THE COURT:  Any other objections for cause?

5          MR. NOLAN:  No.

6          THE COURT:  There are two that the Court would

7    raise with counsel.  Both are financial hardships.  Number 2,

8    Lorena Fuentes, indicated that she doesn't get paid if she

9    doesn't work.  And No. 26, Mr. Michael Nguyen, who said he

10   only gets paid for two weeks, after which it will be a

11   financial hardship.  I'm more concerned about No. 26 because

12   he actually indicated it would be a financial hardship.

13   Ms. Fuentes has simply indicated that she would not get paid.

14   She doesn't like it, but she didn't indicate that it would be

15   a particular hardship.

16          I'd like your responses with respect to No. 2,

17   Ms. Fuentes, we have no problem with letting her go.

18          Mr. Nguyen said he works for Northrup.  And it's my

19   impression, based on prior juries I've picked, that Northrup

20   has unlimited jury service.  So I'm surprised to hear him say

21   that he only gets paid two weeks.

22          MR. NOLAN:  He was under oath.

23          THE COURT:  He's under oath.

24          MR. QUINN:  And I'm not.

25          THE COURT:  Well, not that you're not.  And I know

1    that you have experience in that, but it's the record I have

2    before me right now.  What are your thoughts on Mr. Nguyen?

3         MR. NOLAN:  That we would join in making the motion

4    to have him stricken for hardship purposes, your Honor.  And,

5    your Honor, with respect to No. 2, if I would go back to

6    Juror No. 2, your Honor, I think what she did say was that as

7    a substitute teacher, she would not get any money.  Now, I

8    think maybe it was my mistake or Mr. Quinn's mistake in not

9    following up as to whether or not that would actually cause a

10   hardship.

11        THE COURT:  I don't have that evidence before me.

12        MR. NOLAN:  That's a concern that I would have.

13        THE COURT:  I'm going to go ahead and -- Mr. Quinn,

14   you're probably right with respect to Mr. Nguyen, but he

15   indicated the financial hardship.  He doesn't have the two

16   weeks.  And we have excused basically, based on the

17   questionnaire, everybody else who made that same argument.

18   So I feel that I'm going to excuse Mr. Nguyen.

19        Mr. Weiner poses an interesting case because I do

20   not know if his statement reflects bigotry, as you suggest,

21   or if it's just complete ignorance.  He has -- he's a strange

22   bird, to use the legal term by any stretch.  I wouldn't be

23   surprised if either or both of you would exercise a

24   peremptory.  I don't know if there's enough there to

25   establish the bigotry.  Is the request to remove --

1          If it was based on this purported respect for the

2    court, and he goes on poetically about his respect for the

3    court and it being a privilege and all of that.  I suspect

4    it's motivated more by just a sense of decorum.  There's no

5    question that he's, like I say, strange, but I don't know if

6    there's really cause to remove him.  That was not explored by

7    either side in the follow-up.  So I don't know if I really

8    have a basis.

9          On Dr. Chan, however, I do agree with Mr. Nolan.

10   Although you're correct, Mr. Quinn, in your follow-up, but

11   then Mr. Nolan followed up, and he seems to be somewhat

12   loose.  I'm surprised he has a Ph.D.  But I'm going to excuse

13   him.  The motions that have been excused for cause, No. 13,

14   Mr. David Wages.  Number 26, Michael Nguyen.  And No. 19,

15   Alexander Bishaw.  And No. 28, Phillip Smith.  Number 37,

16   Carolyn Schroyar.  Number 38, Dr. Chan.  And No. 49,

17   Frederick Michael Jelley from earlier this morning.

18   Everybody else is in play.

19         We have -- you'll have 10 peremptories.  You will

20   have 10 peremptories.  And we're going to seat 10.  So

21   mathematically, the only 30 -- if you exercise all your

22   peremptories and we seat 10, the furthest we'll seat is 30.

23   So counting 30, we have mathematically the last juror that we

24   could choose would be 34, Celestine Hairston.

25         You are welcome to strike people beyond that, but

1    mathematically they cannot be seated on this jury.  So if you

2    do so, it would be for whatever reason.

3           MR. QUINN:  Your Honor, how about Ms. Fuentes?  Did

4    we resolve that?

5           THE COURT:  I did not remove her.

6           MR. QUINN:  I had a couple of others on hardship,

7    your Honor.  Mr. Martinez says he has a vacation June 4 to 9,

8    Juror No. 40.

9           THE COURT:  Well, he's so far out, Mr. Martinez,

10   we're never going to get to him.

11          MR. QUINN:  So Chan and Bishaw are the ones we've

12   let go.

13          THE COURT:  And Nguyen.

14          MR. NOLAN:  Your Honor, juror --

15          THE COURT:  Everyone else -- and Smith.  We

16   dismissed Phillip Smith.  That was earlier.  Up through 34.

17   So we're going to go back and forth here, and we'll get our

18   jury.

19          MR. NOLAN:  And number 32 indicated that she had to

20   leave every day at four o'clock.  And the Court said you

21   would accommodate that.

22          THE COURT:  That's more a hardship on the Court's

23   calendar than it is anything else.  Counsel?

24          MR. QUINN:  We vote to let her go.

25          THE COURT:  All right.  Then let's do that.  So

1    that way we can go to 5:00.  So that pushes it back.

2         MR. NOLAN:  I didn't know that would make the day

3    longer.  I'm teasing.

4         THE COURT:  So that puts us up to 35.

5         MR. QUINN:  There's no way mathematically we can go

6    past 35.

7         THE COURT:  Not by my count.

8         Now, do keep in mind that Mr. Blazer has these

9    negotiations.  But he could schedule that.

10        MR. NOLAN:  And the other one was No. 3.  He's the

11   one that's taking care of the --

12        THE COURT:  He can work his plans around.  We all

13   have various plans.

14        Okay.  Ladies and gentlemen, we are now ready.

15        (CONCLUSION OF SIDEBAR CONFERENCE.)

16        THE COURT:  Okay.  Ladies and gentlemen, we are now

17   ready to pick our jury.  Counsel will be standing and

18   thanking and excusing different jurors.  Do not take anything

19   personally.  I'm going to ask you to stay seated where you

20   are until we get through this process, and then we'll be

21   playing a bit of musical chairs.  And I know it's a few

22   minutes past five o'clock.  I was hoping to have this wrapped

23   up by 5:00, but instead of bringing you all back tomorrow

24   morning, we're going to push through and get this done in the

25   next five or ten minutes.

1          So each side has 10 peremptory challenges.

2     Plaintiff has the first challenge.

3          Mr. Quinn?

4          MR. QUINN:  Plaintiff would like to thank and

5     excuse Juror No. 5, Mr. Juarez.

6          THE COURT:  Number 5, Mr. Juarez.

7          Defense?

8          MR. NOLAN:  We'd like -- defense would thank and

9     excuse Juror No. 18, Mr. Weiner.

10         THE COURT:  Juror No. 18, Mr. Weiner.

11         Mr. Quinn.

12         MR. QUINN:  Your Honor, the plaintiff would like to

13    thank and excuse Juror No. 16, Ms. Casper.

14         THE COURT:  Juror No. 16, Ms. Casper.

15         Mr. Nolan.

16         MR. NOLAN:  We'd like to thank and excuse Juror

17    No. 4, Mr. Rede.

18         THE COURT:  Juror No. 4, Mr. Rede.

19         Mr. Quinn.

20         MR. QUINN:  The plaintiff would like to thank and

21    excuse Juror No. 14, Mr. Ehlers.

22         THE COURT:  Juror No. 14, Mr. Ehlers.

23         Your third peremptory, Mr. Nolan.

24         MR. NOLAN:  Thank and excuse Juror No. 9, Voegele.

25         THE COURT:  Juror No. 9, Ms. Voegele.

1          Your fourth peremptory, Mr. Quinn.

2          MR. QUINN:  The plaintiff would like to thank and

3   excuse Juror No. 20, Mr. Staff.

4          THE COURT:  Juror No. 20, Mr. Staff.

5          Mr. Nolan.

6          MR. NOLAN:  I'd like to thank and excuse Juror

7   No. 27, Ms. Burnham.

8          THE COURT:  Ms. Burnham, No. 27.

9          Back to you, Mr. Quinn.

10         MR. QUINN:  The plaintiff would like to thank and

11  excuse Juror No. 25, Mr. Asencio.

12         THE COURT:  Juror No. 25, Mr. Asencio.

13         Mr. Nolan.

14         MR. NOLAN:  I'd like to thank and excuse Juror

15  No. 22, Linda Hayes.

16         THE COURT:  Ms. Hayes, No. 22.

17         To you, Mr. Quinn.

18         MR. QUINN:  The plaintiff would like to thank and

19  excuse Juror No. 2, Ms. Fuentes.

20         THE COURT:  Juror No. 2, Ms. Fuentes.

21         It's to you, Mr. Nolan.

22         MR. NOLAN:  Thank and excuse Juror No. 10,

23  Mr. Olson.

24         THE COURT:  Number 10, Mr. Olson.

25         To you, Mr. Quinn.

1       MR. QUINN:  I'd like to thank and excuse Juror

2   No. 11, Mr. Casas.

3       THE COURT:  Juror No. 11, Mr. Casas.

4       It's to you, Mr. Nolan.

5       MR. NOLAN:  One moment, your Honor.  Juror

6   Number -- I think it's now 17, Mr. Dehart.

7       THE COURT:  Juror No. 17, Mr. Dehart.

8       To you, Mr. Quinn.

9       MR. QUINN:  Thank and excuse Juror No. 8,

10  Mr. Stephenson.

11      THE COURT:  Number 8, Mr. Stephenson.

12      Mr. Nolan.

13      MR. NOLAN:  Thank and excuse Juror No. 6,

14  Ms. Kunkle.

15      THE COURT:  Juror No. 6, Ms. Kunkle.

16      Back to you, Mr. Quinn.  This is your ninth

17  peremptory.

18      MR. QUINN:  Juror No. 15, Mr. Bullard.

19      THE COURT:  Juror No. 15, Mr. Bullard.

20      Mr. Nolan, your ninth peremptory.

21      MR. NOLAN:  Juror No. 33.

22      THE COURT:  Ms. Dualan.

23      Mr. Quinn, this is your last peremptory.

24      MR. QUINN:  I'd like to thank Juror No. 23,

25  Mr. Costello.

1          THE COURT:  Number 23, Mr. Costello.  That ends the

2    plaintiff's peremptories.

3          Mr. Nolan?

4          MR. NOLAN:  Your Honor, the defense would thank and

5    excuse Juror No. 3.

6          THE COURT:  Mr. Bagalso.

7          All right.  Now comes the musical chair part.

8          Ms. Fuentes, Mr. Bagalso, Mr. Rede, Mr. Juarez,

9    Ms. Kunkle, and Mr. Stephenson, if you'd stand in the back of

10   the courtroom for just a few moments.

11         And Mr. Nichols, if you'll just move over two

12   seats, please.  And Ms. Appleton, if you'd sit next to

13   Mr. Nichols.  And, Ms. Johnston, if you'd sit next to

14   Ms. Appleton in the back row.

15         Everyone else in this front row may go and stand in

16   the back of the courtroom, please.

17         Ms. Clark, if you'd please have a seat next to

18   Ms. Appleton.

19         PROSPECTIVE JUROR JOHNSON:  It's Ms. Johnson, not

20   Appleton.

21         THE COURT:  I'm sorry.  Thank you.

22         Mr. Blazer, would you please have a seat next to

23   Ms. Clark.

24         Mr. Russell, would you please come forward and sit

25   here in front of Mr. Nichols.

1          Ms. Dome, will you please sit next to Mr. Russell.

2          Ms. Steingraber, if you'd sit next to Ms. Dome.

3          Ms. Hairston, if you'd please come forward and sit

4     next to Ms. Steingraber.

5          And Ms. McEachern, if you'd come forward and sit

6     next to Ms. Hairston.

7          Counsel, I believe this is the jury that you have

8     selected for this trial.

9          Is that correct, Mr. Quinn?

10         MR. QUINN:  Yes, your Honor.

11         THE COURT:  Mr. Nolan?

12         MR. NOLAN:  Yes, your Honor.

13         THE COURT:  Very well.  I want to thank all of the

14    other members on the panel that have participated in these

15    proceedings.  We greatly appreciate your service and could

16    not have done this without you.  You are now excused from

17    jury service.  Good evening.

18         All right.  Please be seated.

19         Mr.  Holmes, at this time, would you swear in the

20    jury panel.

21         THE CLERK:  Ladies and gentlemen, would you please

22    stand for the oath and raise your right hand.

23         (Jury panel sworn.)

24         THE CLERK:  Thank you.  Please be seated.

25         THE COURT:  Members of the jury, given the lateness

1    of the day, I'm only going to read one instruction to you,

2    and then I will excuse you.  After I excuse you, Mr. Holmes

3    is going to take you out through this door and show you the

4    jury room.  That will be where you'll be convening each day

5    when you come here to court.  The trial is actually not going

6    to get underway until next Tuesday, a week from today.

7           So there will be nothing tomorrow, Thursday, or

8    Friday for you to tend to, but we will resume Tuesday,

9    May 27, at 9:00 A.M. sharp, and we'll be going from 9:00 A.M.

10   to 5:00 P.M. each day.  Before starting with the full opening

11   statements next Tuesday, I will have some further

12   instructions, but I do want to say a few words about your

13   conduct as jurors that apply from this point forward.

14          First, you are not to discuss this case with

15   anyone, and that includes members of your family, people

16   involved in the trial, or anyone else.

17          This includes discussing the case in Internet chat

18   rooms or through Internet blogs, Internet bulletin boards, or

19   e-mails.  Nor are you allowed to permit others to discuss the

20   case with you.  If anyone approaches you and tries to talk to

21   you about the case, please let me know about it immediately.

22          Second, do not read or listen to any news stories,

23   articles, radio, television, or on-line reports about the

24   case or about anyone who has anything to do with the case.

25          Third, do not do any research, such as consulting

1   dictionaries, searching the Internet, or using other

2   reference materials, and do not make any investigation about

3   the case on your own.

4        Fourth, if you need to communicate with me, simply

5   give a signed note to my courtroom deputy, Mr. Holmes, to

6   give to me.

7        Fifth, do not make up your mind about what the

8   verdict should be until after you have gone to the jury room

9   to decide the case and you and your fellow jurors have

10  discussed the evidence.  Keep an open mind until then.  At

11  this point you have no evidence before you.  You should

12  forget basically everything that you heard today.  The mini

13  opening statements are of absolutely no relevance whatsoever

14  at this point.  We'll be starting fresh on Tuesday with the

15  opening statements that will lead to the trial, and we will

16  go from there.

17       Finally, until this case is given to you for your

18  deliberation and verdict, you are not to discuss the case

19  with your fellow jurors.  So even amongst yourselves, do not

20  discuss the case.  Find something else to discuss.

21       So I'm going to excuse the jury at this time.

22       Mr. Holmes, take them back to the jury room and

23  provide them further instructions on reporting, and I'll have

24  a few words with counsel.

25       (WHEREUPON THE JURY WITHDRAWS.)

1          THE COURT:  Please be seated.

2          All right.  That takes care of jury selection.  We

3   now have our jury.  We're going to begin with the motions

4   tomorrow.  What I'd like counsel to do is report at noon.  I

5   need about two or three hours in the morning in addition to

6   what time I have tonight to fully prepare myself.  I'm just

7   not ready to start at nine o'clock.  So I'm going to ask

8   counsel to be here promptly at noon, and I'll devote all of

9   tomorrow afternoon to hearing as many motions as we can get

10   through.  If we can't get through them all tomorrow, we'll

11   pick up again on Thursday.

12          I'll expect the opposition to be -- or the response

13   to the statute of limitations issue, the evidence, the

14   supplemental filing by Mr. Nolan by noon tomorrow.  I will

15   also ask counsel for your positions as soon as possible on

16   this subpoena, what the Court is taking as a motion to quash

17   the subpoena of Amy Myers, and we'll start tomorrow afternoon

18   with basically a review of where we are in terms of all the

19   various motions.

20          I know there was a request for the Court to give

21   some structure, but I'll be developing that myself tonight

22   and tomorrow morning.  But we'll take those up as best we can

23   tomorrow afternoon.  And then as is necessary on Thursday.

24          And then by week's end, the Court is hoping to have

25   its rulings on yesterday's motions for partial summary

1    judgment and motions in limine such that we can structure the

2    final pretrial conference order and then prepare to make the

3    opening statements on Tuesday.

4        Anything else from counsel at this time?

5        MR. COREY:  I think we can minimize and take some

6    of the paper off the Court's desk.  We've today reached

7    resolution on an ex parte application to shorten time on a

8    motion to quash a subpoena to Wachovia and so that ex parte

9    and the motion I believe have been withdrawn.

10       THE COURT:  Have been withdrawn?

11       MR. COREY:  Or they will be withdrawn.

12       THE COURT:  That's the motion on?

13       MR. COREY:  I believe it's styled as a motion to

14   quash or in the alternate it is a motion for protective order

15   with respect to a subpoena to Wachovia.

16       THE COURT:  I appreciate the heads up on that,

17   Mr. Corey.

18       Thank you.  Anything else at this time?

19       MR. NOLAN:  No, your Honor.  Thank you.

20       THE COURT:  Good evening.

21       (Proceedings concluded at 5:21 P.M.)

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12                    C E R T I F I C A T E

13

14

15        I hereby certify that pursuant to Title 28,

16   Section 753 United States Code, the foregoing is a true and

17   correct transcript of the stenographically reported

18   proceedings in the above matter.

19        Certified on May 20, 2008.

20

21

         _____

22        MARK SCHWEITZER, CSR, RPR, CRR

          Official Court Reporter

23        License No. 10514

24

25