1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                    - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7    MATTEL, INC.,            )

                             )

8            PLAINTIFF,   )  NO. CV 04-09049

                             )

9        VS.            )  TRIAL DAY 5

                             )

10   MGA ENTERTAINMENT, INC., ET. AL.,  )  MORNING SESSION

                             )

11           DEFENDANTS.  )  PAGES 823-882

    _____)

12   AND CONSOLIDATED ACTIONS,       )

                             )

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17              FRIDAY, MAY 30, 2008

18                 9:09 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR

            FEDERAL OFFICIAL COURT REPORTER

24          3470 12TH STREET, RM. 134

            RIVERSIDE, CALIFORNIA  92501

25             951-274-0844

            WWW.THERESALANZA.COM

1    APPEARANCES:

2

ON BEHALF OF MATTEL, INC.:

3

QUINN EMANUEL

4        BY:  JOHN QUINN

JON COREY

5            MICHAEL T. ZELLER

HARRY OLIVAR

6            TIMOTHY ALGER

865 S. FIGUEROA STREET,

7        10TH FLOOR

LOS ANGELES, CALIFORNIA  90017

8        213-624-7707

9

10   ON BEHALF OF MGA ENTERTAINMENT:

11       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

BY:  THOMAS J. NOLAN

12           JASON RUSSELL

RAOUL KENNEDY

13           LAUREN AGUIAR

CARL ROTH

14       300 SOUTH GRAND AVENUE

LOS ANGELES, CALIFORNIA  90071-3144

15       213-687-5000

16

17

18

19

20

21

22

23

24

25

1                       I N D E X

2                                   PAGE

3     PLAINTIFF'S CASE (CONT'D).....................     826

4

5

6

7     PLAINTIFF

      WITNESS        DIRECT    CROSS    REDIRECT    RECROSS

8     PAULA DIANTHE GARCIA (CONT'D)

9     BY MS. AGUIAR              826

10

11

12

            EXHIBITS        RECEIVED

13

            201-2           828

14          16441-2          829

            16441-3          829

15          17770           836

            551             839

16

17

18

19

20

21

22

23

24

25

1      RIVERSIDE, CALIFORNIA; FRIDAY, MAY 30, 2008; 9:09 A.M.

2                    -OOO-

3      (WHEREUPON, THE CASE HAVING BEEN CALLED AND

4       APPEARANCES GIVEN, THE FOLLOWING PROCEEDINGS

5       WERE HAD:)

6       THE COURT:  GOOD MORNING TO YOU ALL.

7       GOOD MORNING TO THE MEMBERS OF THE JURY.

8       I RECEIVED A NOTE FROM JUROR NUMBER FOUR THIS

9   MORNING.  IT'S A QUESTION ASKING IF IT WAS ALL RIGHT IF THE

10   JURORS STAND AND STRETCH DURING SIDEBARS.

11      WITHOUT CONSULTING THE ATTORNEYS, I'M ABSOLUTELY SURE

12   THAT, YES, IT IS.  STRETCH, JUMPING JACKS, WHATEVER IT IS TO

13   HELP YOU THROUGH THE DAY IS FINE WITH THE COURT.

14      JUST SO YOU KNOW, WE'RE GOING TO HAVE A SHORT SESSION

15   THIS MORNING.  WE'LL GO FOR AN HOUR; WE'LL TAKE A SHORT BREAK,

16   AND THEN ANOTHER HOUR.  THE COURT HAS A CRIMINAL MATTER AT

17   11:00.  WE'LL HAVE A BIT LONGER LUNCHTIME TODAY, BECAUSE I HAVE

18   TO DO THAT MATTER UNTIL NOON, AND THEN WE'LL TAKE OUR LUNCH.

19      COUNSEL, YOU MAY PROCEED.

20      CROSS-EXAMINATION(CONTINUED)

21   BY MS. AGUIAR:

22   Q   IN ANTICIPATION OF A QUESTION YOU MAY BE ASKED LATER THIS

23   MORNING, DID YOU AND I MEET LAST NIGHT TO DISCUSS YOUR

24   TESTIMONY AT ALL?

25   A   NO.  I WENT HOME TO SEE MY DAUGHTER.

1    Q    AND DID WE DISCUSS IT AT ALL THIS MORNING?

2    A    NO.

3    Q    I JUST WANT TO WRAP UP AN AREA THAT WE WERE TALKING ABOUT

4    YESTERDAY WHEN WE FINISHED.  WE WERE TALKING ABOUT PRAYER

5    ANGELS, IF YOU RECALL.

6         IF YOU WOULD LOOK IN YOUR WHITE BINDER, EXHIBIT 201,

7    PAGE 2 OF THAT DOCUMENT.

8         MS. AGUIAR:  I BELIEVE THIS IS IN EVIDENCE.  I THINK

9    IT IS IN EVIDENCE.

10   BY MS. AGUIAR:

11   Q    IT'S NOT, SO IF YOU WOULD LOOK AT 201-2 AND TELL ME IF YOU

12   RECOGNIZE THAT DOCUMENT.

13   A    I DO.

14   Q    CAN YOU TELL ME WHAT IT IS.

15   A    THIS IS AN INVOICE FROM ANNA RHEE REGARDING THE ANGEL BABY

16   FACES.

17   Q    AND CAN YOU TELL US THE DATE OF THE INVOICE.

18   A    8-29-2000.

19   Q    AND TO YOUR RECOLLECTION, WAS ANNA RHEE DOING FACE

20   PAINTING FOR PRAYER ANGELS IN THIS TIME FRAME?

21   A    YES.

22   Q    IS THIS A REQUEST THAT YOU MADE OF HER?

23   A    YES.

24   Q    AND HAVE YOU SEEN EXHIBIT 201-2 BEFORE?

25   A    YES.

1     MS. AGUIAR:  YOUR HONOR, I'D MOVE 201-2.

2     THE COURT:  ANY OBJECTION?

3     MR. PRICE:  NO OBJECTION.

4     THE COURT:  IT'S ADMITTED.

5     YOU MAY PUBLISH.

6   BY MS. AGUIAR:

7   Q    IS THIS CONSISTENT WITH YOUR RECOLLECTION THAT ANNA RHEE

8   WAS DOING WORK REGARDING FACE PAINTING ON PRAYER ANGELS AS OF

9   THE END OF AUGUST OF 2000?

10  A   YES.

11  Q    AND WE DID HAVE THE TANGIBLE EXHIBIT UP THERE BEFORE, THE

12  PRAYER ANGEL DOLL.

13     IS IT STILL THERE?

14     GO AHEAD AND PULL THAT UP.

15     THE EYES THAT ARE DEPICTED ON THAT FINAL PRAYER ANGEL

16  DOLL, ARE THOSE EYES THAT ANNA RHEE PAINTED?

17  A   YES.  THEY ARE THE MANUFACTURED VERSION OF ANNA RHEE'S

18  PAINTED EYES.

19  Q    AND JUST TO TIE THIS UP, IF YOU WOULD LOOK IN YOUR BINDER

20  AT EXHIBIT 16441.  I'M GOING TO DIRECT YOU TO THE SECOND AND

21  THIRD PAGE.  IF YOU WOULD LOOK AT 16441-2.

22     DO YOU RECOGNIZE THAT DOCUMENT?

23  A   YES.

24  Q    CAN YOU DESCRIBE IT, PLEASE.

25  A   IT'S THE INVOICE FOR PRAYER ANGEL BABY FACES, PER

1    ANNA RHEE.

2    Q   DO YOU RECOGNIZE IT AS THE SAME DOCUMENT AS THE ONE WE

3    HAVE UP ON THE SCREEN, JUST A DIFFERENT VERSION OF IT?

4    A   YES.

5    Q   AND IF YOU LOOK AT THE VERY NEXT PAGE, 16441-03, COULD YOU

6    DESCRIBE WHAT THAT IS, PLEASE.

7    A   YES.

8        I BELIEVE THIS IS THE MGA PURCHASE ORDER FORM THAT

9    RELATES TO THE INVOICE THAT PRECEDES IT IN MY BINDER.

10       MS. AGUIAR:  YOUR HONOR, MOVE 16441-2 AND 3.

11       MR. PRICE:  NO OBJECTION.

12       THE COURT:  ADMITTED.

13       YOU MAY PUBLISH.

14   BY MS. AGUIAR:

15   Q   SO THE DOCUMENT ON THE RIGHT, NOW THAT WE HAVE THEM UP ON

16   THE SCREEN, WILL YOU JUST DESCRIBE FOR THE JURY WHAT THAT IS

17   AND WHAT IT CORRESPONDS TO.

18   A   THIS IS THE MGA PURCHASE ORDER FORM.  AND ON THE PURCHASE

19   ORDER FORM, YOU'LL SEE THAT THERE ARE SIMILARITIES TO THE

20   INVOICE.  THE FIRST AND FOREMOST IS THE SUBTOTAL, OR THE TOTAL,

21   ROUNDING TO $866.  I GUESS THE NAME ANNA RHEE, RELATING TO THE

22   INVOICE ANNA RHEE.  THE REFERENCE TO PRAYER ANGELS IN THE (R),

23   REFERENCE, COLUMN, RELATING BACK TO THE ANGEL FACES ON

24   ANNA RHEE'S INVOICE.

25   Q   THANK YOU.

1      I WANT TO MOVE BACK TO TALK ABOUT A SUBJECT WE WERE

2   DISCUSSING YESTERDAY, WHICH IS THE TIME PERIOD AFTER

3   SEPTEMBER 1ST OF 2001, AFTER YOU HAD MET WITH MR. BRYANT FOR

4   THE FIRST TIME AND SEEN HIS PITCH BOOK DRAWINGS.

5      DO YOU KNOW A GUY BY THE NAME OF ANDREAS KOCH?

6   A   YES.

7   Q   WHO'S ANDREAS KOCH?

8   A   AT THE TIME THAT'S MENTIONED, ANDREAS WAS A PRODUCT

9   MANAGER, A COLLEAGUE OF MINE, IN THE DEPARTMENT OF PRODUCT

10  MANAGEMENT.

11  Q   I PROMISE NOT TO SHOW YOU A FLOOR PLAN, BUT CAN YOU JUST

12  TELL ME, GENERALLY SPEAKING, WHERE HE SAT IN RELATION TO YOU AT

13  THAT TIME IN MGA'S OFFICES.

14  A   I BELIEVE THAT HE LITERALLY SAT ACROSS FROM ME, YOU KNOW,

15  JUST PARALLEL TO ME.

16  Q   DID MR. KOCH ATTEND THE PITCH MEETING ON SEPTEMBER 1ST

17  WHEN CARTER BRYANT CAME INTO MGA?

18  A   NO.

19  Q   HAVE YOU EVER HEARD ANYONE WHO ATTENDED THAT MEETING SAY

20  THAT MR. KOCH WAS AT THAT MEETING?

21  A   NO.

22  Q   WAS HE INVOLVED IN THE DECISION TO MOVE AHEAD WITH

23  EXPLORING THE BRATZ CONCEPT?

24  A   NO, NOT AT ALL.

25  Q   AT ANY POINT, IS IT POSSIBLE YOU SHOWED MR. KOCH THE PITCH

1    BOOK DRAWINGS?

2    A    ABSOLUTELY.  WE SHARED -- AS WE WERE COLLEAGUES, WE ALWAYS

3    BOUNCED IDEAS OFF OF EACH OTHER.  HE WORKED IN A VERY DIFFERENT

4    DEPARTMENT.  LIKE, HE WORKED IN, IF I REMEMBER, MALE ACTION OR

5    BOY-RELATED PRODUCTS; AND I WAS VERY MUCH RELATED TO THE GIRL

6    PRODUCTS; SO IT WAS OFTEN THAT I WOULD SAY, 'HEY, CHECK IT OUT;

7    WHAT DO YOU THINK?'  SO, YES.

8    Q    DO YOU HAVE A SPECIFIC RECOLLECTION OF HAVING DONE THAT

9    WITH HIM, OR DO YOU JUST THINK IT'S POSSIBLE THAT YOU MAY HAVE?

10   A    I BELIEVE IT'S POSSIBLE.

11   Q    IF THAT WERE THE CASE, DO YOU HAVE ANY IDEA WHEN THAT MAY

12   HAVE BEEN IN 2000?

13   A    I DON'T REMEMBER EXACTLY, BUT IT WOULD HAVE FOR SURE HAD

14   TO HAVE BEEN AFTER THE SEPTEMBER 1ST MEETING.

15   Q    AND JUST A TIMING QUESTION, BECAUSE THERE WAS TESTIMONY ON

16   THIS YESTERDAY, BUT THERE'S A LOT OF DATES FLYING AROUND, AND I

17   JUST WANT TO MAKE SURE WE GET THIS POINT OUT.

18        WHEN WAS THE FIRST INTERNAL MEETING AT MGA WHERE THE

19   MGA SALES FORCE WOULD HAVE BEEN INTRODUCED TO THE IDEA OF

20   BRATZ, IF YOU RECALL?

21   A    I DON'T REMEMBER THE EXACT DATE, BUT I BELIEVE THE FIRST

22   TIME WE ACTUALLY SHOWED SOME MENTION OF BRATZ WOULD HAVE BEEN

23   IN ABOUT MID OCTOBER TO OUR INTERNAL SALES TEAM.

24   Q    IS THERE A REASON WHY YOU THINK YOU KNOW THAT WAS THE TIME

25   FRAME WHEN THE FIRST SALES MEETING WOULD HAVE TAKEN PLACE?

1    A   I REMEMBER IT BEING VERY, VERY CLOSELY RELATED TO THE

2    RELEASE OF MY PDF.

3    Q   SO IF SOMEONE SAID THAT THE FIRST INTERNAL SALES MEETING

4    WHERE BRATZ WAS INTRODUCED TO THE MGA SALES FORCE WAS IN

5    SEPTEMBER OF 2000, WOULD THAT BE RIGHT?

6    A   NO.

7    Q   WERE YOU THE PERSON AT MGA RESPONSIBLE FOR OVERSEEING

8    DEVELOPMENT OF THE FASHIONS FOR A NEW DOLL LINE?

9    A   YES.

10   Q   AND DID YOU RETAIN ANYONE TO ASSIST YOU WITH THE FASHIONS?

11   A   CAN YOU BE MORE --

12   Q   SURE.  IT WAS AN OVERLY COMPLICATED QUESTION FOR WHAT I

13   MEANT TO ASK.

14       DID YOU WORK WITH AN OUTSIDE VENDOR ON FASHIONS?

15   A   YES.

16   Q   WHO WAS THAT?

17   A   VERONICA MARLOW.

18   Q   WHEN YOU HIRED MS. MARLOW, WAS SHE A MATTEL EMPLOYEE?

19   A   NO.

20   Q   AND DO YOU KNOW WHEN MS. MARLOW WORKED AT MATTEL?

21   A   NO.

22   Q   WHY WAS IT NECESSARY TO GET VERONICA MARLOW INVOLVED IN

23   THIS PROJECT IF YOU ALREADY HAD MR. BRYANT AROUND?

24   A   VERONICA MARLOW CONTRIBUTED SOMETHING VERY DIFFERENT TO

25   THE PROCESS.  I THINK EVERYBODY WAS INCREDIBLY SPECIAL AND

1    VERY, VERY POWERFUL FOR THEIR OWN ABILITY IN THE PROCESS.

2    CARTER BRYANT IS A VERY GOOD FASHION DESIGNER.  HE'S AN AWESOME

3    FASHION DESIGNER.  BUT HE HAD NO ABILITY TO ACTUALLY SEW THE

4    FASHIONS.  HE'S NOT A SEAMSTRESS.  HE DIDN'T KNOW HOW TO

5    TRANSLATE HIS SKETCHES INTO SOMETHING THAT HE COULD SEW AND

6    MAKE 3-D, SO VERONICA WAS INTEGRAL TO ACTUALLY PULL IT

7    TOGETHER, LITERALLY, YOU KNOW, MAKE IT POSSIBLE TO BE PUT INTO

8    A 3-D FORM, IN A SEWING FORM FOR HIM.

9    Q   DID MR. BRYANT, TO YOUR KNOWLEDGE, HAVE ANY EXPERIENCE IN

10   PATTERN MAKING?

11   A   NO.

12   Q   AND TO YOUR KNOWLEDGE, WAS MR. BRYANT A SEAMSTRESS?

13   A   NO.

14   Q   HAD HE EVER, TO YOUR KNOWLEDGE, MADE ACTUAL CLOTHES FOR

15   HUMANS OR FOR DOLLS?

16   A   NOT TO MY KNOWLEDGE, NO.

17   Q   YOU WERE SHOWN A NUMBER OF E-MAILS YESTERDAY BY MR. PRICE,

18   WHERE, IN ONE OF THEM, FOR EXAMPLE, YOU HAD CHARACTERIZED, IN

19   AN E-MAIL TO HONG KONG, THE FASHIONS AS BEING FINAL IN LATE

20   OCTOBER.

21      DO YOU REMEMBER THAT?

22   A   YES.

23   Q   CAN YOU DESCRIBE FOR ME, IN YOUR OWN WORDS, WHY YOU KNOW

24   THAT AS OF LATE OCTOBER, THE FASHIONS FOR BRATZ WERE NOT

25   FINALIZED.

1    A   I KNOW, BECAUSE MY MEMORY IS THAT WE WERE WORKING ON THE

2    FASHIONS FOR BRATZ ALL OF THE WAY THROUGH NOVEMBER, AND EVEN

3    INTO DECEMBER.  AND, FRANKLY, I REMEMBER WORKING ALL OF THE WAY

4    UP TO THINKING I WASN'T GOING TO SEE MY CHRISTMAS ON

5    DECEMBER 25TH, TRYING TO GET ALL OF THE SEWING PATTERNS DONE.

6    I REMEMBER THAT WE DIDN'T RELEASE OUR OFFICIAL SWATCH PACKAGES,

7    WHICH IS THE FORMS THAT INCLUDE THE FINAL FABRICS WE WANTED

8    HONG KONG TO FIND IN CHINA; SO I'M GOING TO GUESS LATE

9    NOVEMBER, EARLY DECEMBER, AND THEN SEWING PATTERNS LATE INTO

10   DECEMBER, CLOSE TO CHRISTMAS.

11        MS. AGUIAR:  YOUR HONOR, I'D LIKE TO, WITH YOUR

12   PERMISSION, SHOW COUNSEL AND THEN SHOW THE WITNESS ANOTHER

13   TANGIBLE EXHIBIT.  IT'S 17770.

14        THE COURT:  YOU MAY, COUNSEL.

15   BY MS. AGUIAR:

16   Q   WOULD YOU DESCRIBE FOR ME WHAT I'VE PLACED THERE, WHICH IS

17   EXHIBIT 17770.

18   A   THIS IS A HUGE PART OF THE HISTORY, BECAUSE THIS ACTUALLY

19   IS THE BINDER THAT INCLUDES ALL OF THE ORIGINAL SWATCHES THAT

20   WE RELEASED.  AND, AGAIN, WHEN I SAY SWATCH, THAT MEANS A CUT

21   OF FABRIC THAT IDENTIFIED WHAT WE INTENDED TO USE IN THE FINAL

22   FASHIONS FOR THE MANUFACTURED PRODUCT.  SO THESE ARE THE

23   ORIGINAL SWATCH SHEETS THAT INCLUDED ALL OF THE FINAL FABRICS,

24   AS WELL AS THE PAGES THAT HONG KONG RESUBMITTED BACK TO ME WITH

25   FABRICS THEY FOUND IN CHINA; THIS IS THEIR ATTEMPT TO MATCH THE

1    ORIGINAL FABRICS WE SENT TO THEM.

2        IF THAT'S NOT TOO CONFUSING.

3    Q   NO.  IT'S NOT TOO COMPLICATED.

4        IS THAT A BINDER THAT YOU HAVE SEEN BEFORE?

5    A   YEAH; IT WAS A PART OF ME FOR THAT PERIOD OF TIME.

6    Q   IS IT A BINDER THAT YOU HAD SOME INVOLVEMENT IN PUTTING

7    TOGETHER?

8    A   YEAH.  I BELIEVE THIS IS MY BINDER.

9        MS. AGUIAR:  YOUR HONOR, MOVE INTO EVIDENCE

10   EXHIBIT 17770.

11       THE COURT:  ANY OBJECTION?

12       MR. PRICE:  I HAVEN'T HAD TIME TO LOOK AT EACH PAGE,

13   BUT FOR RIGHT NOW --

14       THE COURT:  LET'S DO THAT.

15       AS YOU REFER TO THE PAGES, WE'LL ADMIT THE PAGES.

16       MS. AGUIAR:  I ACTUALLY DON'T KNOW THAT THEY CAN BE

17   TAKEN APART.

18       THE COURT:  CAN I TAKE A LOOK AT THAT.

19       MS. AGUIAR:  OH, ABSOLUTELY.  IT'S JUST A DIFFICULT

20   THING TO TAKE APART.

21       THE COURT:  OH, I SEE.

22       THE COURT IS GOING TO ADMIT THIS.

23       MR. PRICE, I'LL GIVE YOU AN OPPORTUNITY TO REVIEW

24   THIS DURING THE BREAK.  IF THERE'S PARTICULAR PAGES THAT YOU

25   OBJECT TO, I'LL GIVE YOU LEAVE TO RENEW YOUR OBJECTION.

Transcript of Proceedings - AM (Garcia Cross)  5/30/2008  12:00:00 PM

1      17770 IS INITIALLY ADMITTED.

2      YOU MAY PUBLISH.

3      MS. AGUIAR:  THANK YOU.

4   BY MS. AGUIAR:

5   Q   THIS DOESN'T REALLY SHOW MUCH, BUT THIS IS THE PHOTO OF

6   THE BINDER.

7      MS. AGUIAR:  IF I COULD SHOW IT TO THE JURY SO THEY

8   COULD LOOK AT THE PAGES.

9      THE COURT:  YOU MAY, COUNSEL.

10   BY MS. AGUIAR:

11   Q   MS. GARCIA, ARE THERE DOCUMENTS IN THIS FABRIC BINDER THAT

12   HELP YOU REMEMBER THE DATES ON WHICH THE FASHIONS FOR BRATZ

13   WERE FINALIZED?

14   A   YES.

15   Q   CAN YOU POINT US TO SOME OF THOSE PAGES.  AND I DON'T KNOW

16   THAT WE'LL BE ABLE TO LOOK AT THEM, BECAUSE WE DON'T HAVE

17   IMAGES OF THEM, BUT IF YOU WOULD JUST DESCRIBE WHAT YOU'RE

18   LOOKING AT AND TELL US THE DATES.

19   A   THIS WAS THE SWATCH PACKAGE FOR WHAT WE ORIGINALLY HAD

20   CALLED KADISHA, WHO LATER BECAME SASHA.  BUT ON HER SWATCH

21   PACKAGE RELEASE FORM -- EXCUSE ME.  LET ME BACK UP.  IT'S BEEN

22   A LONG TIME.

23      KADISHA'S SWATCH PACKAGE, THE FINAL FABRICS THAT WERE

24   RELEASED TO HONG KONG, THE DATE ON HER RELEASE PACKAGE WAS

25   12-4-2000; THAT LEADS ME TO BELIEVE, IN THIS CASE AND FOR

1    KADISHA, THAT HER FASHIONS WERE NOT FINALIZED UNTIL 12-4-2000.

2    Q    JUST TO BE CLEAR, IS IT POSSIBLE THAT DRAWINGS OR

3    RENDERINGS OF THE FASHIONS WERE DONE PRIOR TO THIS TIME?

4    A    YEAH.  I MEAN, YOU HAVE TO HAVE A SKETCH FIRST.  IT ALL

5    STARTS FROM THE SKETCH, AND THE SKETCH WORKS ITSELF INTO THE

6    SWATCH PACKAGES.  BEFORE THE SWATCH PACKAGES, YOU HAVE TO --

7    WELL, ACTUALLY, FRANKLY, YOU HAVE TO SEW IT EVENTUALLY TOO.  SO

8    ANYWAY, THERE'S A PROGRESSION.

9    Q    OKAY.

10         SO THERE MAY HAVE BEEN SKETCHES OF WHAT THE FASHIONS

11    WOULD LOOK LIKE.  BUT THE FASHIONS, FROM YOUR PERSPECTIVE, WERE

12    NOT FINALIZED UNTIL WHEN?

13         LET ME START AGAIN.

14         ALTHOUGH THERE MAY HAVE BEEN DRAWINGS OF WHAT THE

15    FASHIONS WERE MEANT TO LOOK LIKE PRIOR TO THIS TIME, BASED ON

16    THE DATES IN THE BINDER, WHAT DATE WERE THE FASHIONS FINALIZED?

17    A    I CANNOT IDENTIFY A PARTICULAR DATE FOR THE FASHIONS,

18    OTHER THAN BEING ABLE TO DEFINE THE FINAL DESIGN TO BE AT THE

19    TIME WE RELEASED THE SWATCHES.  BUT I CAN SAY THAT SKETCHES AND

20    DESIGNS WERE BEING ADJUSTED A LOT.  THERE WERE, LIKE, QUITE A

21    FEW FASHIONS, AND THOSE FASHIONS WERE QUITE FLUID IN DESIGN.

22    THEY WERE BEING REVISED AND CHANGED; SO IT'S VERY HARD TO PIN

23    DOWN.

24    Q    YOU CAN PUT THAT ASIDE.

25         WERE YOU THE PERSON AT MGA RESPONSIBLE FOR OVERSEEING

1  THE FACE PAINTING ON THE BRATZ PROJECT?

2  A   YES.

3  Q   AND DID CARTER BRYANT DO ANY OF THE FACE PAINTING ON THE

4  BRATZ PROJECT?

5  A   NO.

6  Q   IN FACT, WAS ANYTHING DONE WITH REGARD TO FACE PAINTING

7  PRIOR TO OCTOBER 20TH OF 2000?

8  A   NO.

9  Q   I'M GOING TO USE ONE OF THE BINDERS THAT MR. PRICE GAVE

10  YOU THE OTHER DAY.  IT'S TAB 551.  I'M SORRY, I CAN'T TELL YOU

11  WHAT VOLUME THAT IS.  I WOULD GUESS IT'S ONE.

12      MR. PRICE:  YES.

13  BY MS. AGUIAR:

14  Q   CAN YOU IDENTIFY THE DOCUMENT THAT'S MARKED AS

15  EXHIBIT 551.

16  A   IT SEEMS THAT IT'S AN E-MAIL FROM NANA ASHONG TO MYSELF,

17  MARTIN HITCH, AND VICTORIA O'CONNOR.

18  Q   AND THAT'S N-A-N-A, A-S-H-O-N-G; IS THAT RIGHT?

19  A   THAT'S RIGHT.

20  Q   WHO WAS NANA ASHONG?

21  A   SHE WAS AN ASSOCIATE PRODUCT MANAGER THAT REPORTED TO ME

22  AT THE TIME.

23  Q   AND DO YOU HAVE ANY REASON TO BELIEVE YOU DIDN'T RECEIVE

24  THE E-MAIL FROM MS. ASHONG?

25  A   NO.

1      MS. AGUIAR:  YOUR HONOR, MOVE 551 INTO EVIDENCE.

2      THE COURT:  ANY OBJECTION?

3      MR. PRICE:  NO.

4      THE COURT:  ADMITTED.

5          YOU MAY PUBLISH.

6   BY MS. AGUIAR:

7   Q   SO NOW THAT WE HAVE THIS UP ON THE SCREEN, DOES THIS

8   APPEAR TO BE AN E-MAIL THAT YOU RECEIVED FROM MS. ASHONG ON

9   SEPTEMBER 6, 2001?

10   A   COULD YOU REPEAT.

11   Q   DOES THIS APPEAR TO BE AN E-MAIL YOU RECEIVED FROM HER ON

12   SEPTEMBER 6, 2001?

13   A   YES.

14   Q   WERE YOU THE PERSON AT MGA WHO REGULARLY RECEIVED E-MAILS

15   REGARDING LEGAL ISSUES PERTAINING TO BRATZ?

16   A   NO.

17   Q   I DON'T THINK ANYONE HAS ASKED YOU THIS QUESTION, BUT ARE

18   YOU A LAWYER?

19   A   NO WAY.

20          NO OFFENSE.  SORRY.

21   Q   NONE TAKEN.

22          I WANT TO FOCUS ON THE FIRST ENTRY THERE, "DATE OF

23   CREATION."

24          DO YOU HAVE ANY IDEA LEGALLY WHAT "DATE OF CREATION"

25   MEANS?

1    A   NO.

2    Q   SO LET'S JUST FOCUS ON THIS FROM YOUR PERSPECTIVE, THEN,

3    AS A DEVELOPMENT PERSON, OR SOMEONE ON THE PRODUCTION SIDE.

4        ARE YOU AWARE OF ANYTHING SIGNIFICANT THAT HAPPENED

5    IN RELATION TO THE BRATZ PROJECT AS OF 9-18-00?

6    A   NO.

7    Q   FROM THE PERSPECTIVE OF DEVELOPMENT PRODUCTION OF THE

8    DOLL, WAS ANYTHING, QUOTE, "CREATED" IN RELATION TO THE BRATZ

9    AS OF SEPTEMBER 18, 2000?

10   A   NO.

11   Q   HAD YOU EVEN CIRCULATED YOUR INTERNAL PRODUCT DEVELOPMENT

12   FORM AS OF SEPTEMBER 18, 2000?

13   A   NO.

14   Q   HAD MR. LARIAN OR ANYONE AT MGA GIVEN THEIR SIGN-OFF FOR

15   PURSUIT OF THIS PROJECT AS OF SEPTEMBER 18, 2000?

16   A   NO.

17   Q   BASED ON YOUR INVOLVEMENT IN THE PROJECT AND YOUR

18   KNOWLEDGE OF THE TIME FRAME, DOES THE DATE SEPTEMBER 18, 2000

19   BEAR ANY RELATIONSHIP TO THE CREATION OF BRATZ, IN YOUR VIEW?

20   A   NO.  IT WOULD BE IMPOSSIBLE, IN MY OPINION, TO ASSIGN A

21   SINGLE DATE OF CREATION AS IT RELATES TO BRATZ.

22       I WOULDN'T KNOW WHAT IT MEANT LEGALLY, BUT NO.

23   Q   STICKING WITH ONE OTHER LEGALLY-RELATED SUBJECT, DO YOU

24   KNOW WHAT THE TERM, THE LEGAL TERM, "FIRST USE" MEANS?

25   A   NO.

1   Q    DO YOU RECALL EVER TELLING ANYONE THAT THE FIRST USE DATE

2   FOR BRATZ WAS JUNE OF 2000?

3        MR. PRICE:  OBJECTION.  I THINK THAT'S IRRELEVANT.

4        THE COURT:  SUSTAINED.

5        MS. AGUIAR:  COULD WE HAVE A SIDE-BAR?

6        MR. PRICE:  I'LL WITHDRAW MY OBJECTION.

7        THE COURT:  I THINK WE NEED TO HAVE A SIDE-BAR,

8   BECAUSE IT ACTUALLY TIES RIGHT INTO SOMETHING I'M LOOKING AT

9   FOR THE NEXT WITNESS.

10       (WHEREUPON, THE FOLLOWING PROCEEDINGS

11       WERE HELD AT SIDE-BAR:)

12       THE COURT:  I'M JUST GOING THROUGH THE NANA ASHONG

13  DEPOSITION, AND I'M AT THE POINT WHERE MATTEL WANTED TO

14  INTRODUCE EVIDENCE FROM THE SPRING OF 2001, WHAT WAS INCLUDED

15  IN THE COPYRIGHTS, DATES, ETC.  AND MGA IS OBJECTING ON THE

16  GROUNDS IT'S NOT RELEVANT TO PHASE 1-A; SO WE HAVE TO GET THIS

17  STRAIGHT HERE, COUNSEL.

18       HOW IS THIS POSSIBLY RELEVANT, GIVEN THE OBJECTIONS

19  YOU HAVE BEEN MAKING?

20       MR. PRICE:  YOU RECALL THE DOCUMENT WE TRIED TO --

21  WHICH DID NOT GET INTO EVIDENCE BECAUSE SHE SAID 'I DIDN'T SEE

22  IT,' EVEN THOUGH IT'S FAXED TO HER -- IT CONFIRMS THE

23  CONVERSATION WITH HER WHEN SHE SAYS THE FIRST TIME SHE USED THE

24  NAME BRATZ WAS JUNE OF 2000.  NOW, THAT'S RELEVANT IN THIS

25  PHASE BECAUSE WE'RE SAYING WE OWN THAT NAME.  AND SHE IS SAYING

1    THERE'S VARIOUS --

2         THE COURT:  YOU CAN CERTAINLY INTRODUCE EVIDENCE THAT

3    YOU CAME UP WITH THE NAME BRATZ WHILE CARTER BRYANT WAS WORKING

4    AT MATTEL.  BUT ONCE YOU START TALKING ABOUT WHAT MGA DID OR

5    DIDN'T DO, THEN WE'RE INTO PHASE ONE.  THAT'S KIND OF THE

6    DIVIDING LINE.  IT'S NOT RELEVANT WHAT MGA DID OR DIDN'T DO BUT

7    WHAT, ACCORDING TO YOU, THEY ALLEGEDLY TOOK FROM MATTEL.  WE'RE

8    TRYING TO ESTABLISH WHAT THEY ALLEGEDLY TOOK FROM OR DIDN'T

9    TAKE FROM MATTEL.

10        MR. PRICE:  THEY PUT THAT INTO ISSUE.  THEY SAID THEY

11   CAME UP WITH THE NAME.  BUT WHAT SHOWS -- THE DOCUMENT WHICH

12   SAYS MGA, THE DOCUMENT SAYS THEY ARE USING JUNE 15TH IS

13   CORROBORATION.  AND IN JUNE, WHEN THEY ARE TALKING WITH

14   MR. CARTER, SHOWING --

15        THE COURT:  JUNE 15TH OF WHAT YEAR?

16        MR. PRICE:  2000.

17        THE COURT:  THAT'S FINE.

18        I'M SORRY, COUNSEL.

19        MR. PRICE:  THAT'S WHAT THIS IS ABOUT.

20        MS. AGUIAR:  JUNE 2000.

21        THE COURT:  LET ME SEE THE DOCUMENT.

22        JUNE 15TH OF 2000 IS WELL BEFORE --

23        MS. AGUIAR:  THE QUESTION I ASKED HER -- I'LL CHECK

24   TO MAKE SURE I DIDN'T MISSPEAK -- I THINK I DID SAY JUNE OF

25   2000.

1        THE COURT:  OKAY.  THAT'S FINE.

2        MR. PRICE:  THAT'S WHY I WITHDREW THAT, BECAUSE I

3    REALIZED --

4        MR. NOLAN:  YOUR HONOR, HERE'S THE ISSUE.  IT'S DATED

5    2001.

6        MS. AGUIAR:  BUT I MOVED ON FROM THIS; THIS IS WHERE

7    I'M --

8        MR. PRICE:  SHE PUT THAT INTO EVIDENCE.  NOT ME.

9        MS. AGUIAR:  THIS IS A DIFFERENT DOCUMENT.  THE ONE

10   WE'RE TALKING ABOUT NOW IS THE ONE THEY SHOWED IN OPENING.

11       THE COURT:  FRANKLY, THE PART THAT I THOUGHT WAS

12   RELEVANT IN THIS DOCUMENT IS THE DATE OF CREATION,

13   SEPTEMBER 18, 2000.

14       I'M GOING TO SUSTAIN MGA'S OBJECTIONS TO MATTEL'S

15   SUBMISSION DEPOSITION ABOUT COPYRIGHT APPLICATIONS IN 2001.

16       MR. QUINN:  I'M NOT FAMILIAR WITH THAT ISSUE.  EXCEPT

17   I THOUGHT THAT IN THOSE COPYRIGHT APPLICATIONS, THEY WERE

18   CLAIMS MADE WITH RESPECT TO DATES OF CREATION IN 2000.

19       THE COURT:  AND I'M GOING TO OVERRULE THE OBJECTION

20   WHEN THEY TALK ABOUT JOS, OR THINGS ABOUT EVENTS IN 2000.  BUT

21   NOT WHEN THEY ARE TALKING ABOUT THINGS IN 2001.  I'M TRYING TO

22   USING THAT AS THE DEMARCATION TO COME UP WITH THE WAY TO DIVIDE

23   IT, REGARDLESS OF WHO PUTS EVIDENCE IN.

24       MR. PRICE:  IF I MAY, MY OBJECTION TO THIS LINE OF

25   QUESTIONING ON JUNE 2000 IS THAT WHEN I SHOWED HER THAT

1    DOCUMENT WHICH SAYS THAT -- IN LAWYERS' WRITING -- SAYING IT'S

2    CONFIRMED, YOU WERE USING BRATZ IN JUNE 15, 2000.

3         THE COURT:  THAT'S FINE.

4         MR. PRICE:  I WASN'T ALLOWED TO, NOW SHE WANTS TO; SO

5    IT'S BEYOND THE SCOPE OF MY CROSS BECAUSE I NEVER ASKED HER

6    QUESTIONS ABOUT THAT.

7         MS. AGUIAR:  ACTUALLY, YOU DID.

8         THE COURT:  I'M GOING TO GIVE YOU SOME LEEWAY BECAUSE

9    THIS IS THEIR DIRECT; SO FOR EFFICIENCY, I'M GOING TO LET THEM

10   NOT BE LIMITED BY YOUR AREA OF CROSS.  YOU CAN GET INTO IT.

11        I'M SORRY.  MY RULING WAS BASED ON AN ASSUMPTION THAT

12   YOU WERE STILL TALKING ABOUT 2001, AND THIS IS JUNE 2000;

13   THAT'S FAIR GAME.

14        MS. AGUIAR:  TO CLARIFY, MR. PRICE DID ASK THE

15   WITNESS QUESTIONS ABOUT THAT DOCUMENT.  SHE JUST SAID SHE HAD

16   NEVER SEEN THE DOCUMENT AND DIDN'T RECALL THE DOCUMENT.  SO THE

17   DOCUMENT ITSELF DID NOT GET INTO EVIDENCE.  BUT HE DID ASK HER

18   ABOUT THE SUBSTANCE OF IT, WHICH IS WHAT I'M TRYING TO DO.

19        THE COURT:  THIS IS A LEGITIMATE AREA OF INQUIRY.

20   YOU CAN FOLLOW UP WITH THE DOCUMENT IF YOU WANT.

21        (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

22   BY MS. AGUIAR:

23   Q   I ACTUALLY FORGOT THE QUESTION BEFORE THE BREAK.

24        DO YOU RECALL EVER TELLING ANYONE THAT THE FIRST USE

25   OF BRATZ WAS JUNE OF 2000?

Transcript of Proceedings - AM (Garcia Cross)  5/30/2008  12:00:00 PM

1    A    NO.

2    Q    HOW DO YOU KNOW THAT YOU WOULD NOT HAVE SAID THAT TO

3    SOMEONE?

4    A    I DON'T EVEN KNOW WHAT "FIRST USE" IS.

5    Q    LET'S SAY YOU WERE JUST INTERPRETING "FIRST USE" IN THE

6    LAY PERSON WAY.

7        WOULD YOU HAVE EVER SAID THAT MGA FIRST USED THE NAME

8    BRATZ OR THE BRATZ CONCEPT IN JUNE OF 2000?

9    A    NO.

10   Q    EXPLAIN TO US WHY YOU BELIEVE IT WOULDN'T BE POSSIBLE FOR

11   YOU TO HAVE SAID THAT.

12   A    CAN YOU REPEAT THE DATE AGAIN.

13   Q    SURE.

14       JUNE OF 2000.

15   A    YEAH.

16       IT WOULD JUST BE IMPOSSIBLE FOR ME TO HAVE MADE ANY

17   REFERENCE TO BRATZ IN JUNE OF 2000, WHEN I DON'T EVEN REMEMBER

18   MEETING CARTER BRYANT OR BEING EXPOSED TO THE BRATZ CONCEPT

19   UNTIL SEPTEMBER OF 2000; SO THAT DATE HAS NO RELEVANCE TO

20   BRATZ.

21   Q    DO YOU HAVE A GENERAL RECOLLECTION OF WHEN THE BRATZ

22   PRODUCT WAS ACTUALLY ON THE SHELVES IN THE U.S.?

23   A    I HAVE A GENERAL IDEA.

24   Q    WHAT IS THAT GENERAL IDEA?

25   A    WELL, WE WENT TO PRODUCTION, I THINK, ABOUT MID MAY OF

1    2001; SO I BELIEVE BY THE TIME IT GETS FROM CHINA'S

2    MANUFACTURING PLANTS TO THE BOATS, AND DA DA DA, IT PROBABLY

3    LANDED UP SOMEWHERE AROUND JUNE 15TH, ABOUT FOUR WEEKS FROM TH

4    CHINA PLANT TO WHEREVER IT MIGHT HAVE LANDED IN THE WORLD.

5    Q   SO BASED ON YOUR INVOLVEMENT IN THE PROJECT AND YOUR

6    KNOWLEDGE OF THE TIMELINE, DOES JUNE 2001 HAVE SIGNIFICANCE FOR

7    YOU IN TERMS OF THE BRATZ PROJECT?

8        MR. PRICE:  OBJECTION.  RELEVANCE.  NOW WE'RE IN

9    2001.

10       THE COURT:  SUSTAINED.

11   BY MS. AGUIAR:

12   Q   I WANT TO GO BACK TO ANOTHER SUBJECT THAT WAS DISCUSSED

13   YESTERDAY.

14       WE'VE THROWN AROUND THE ACRONYM "PDF," AND YOU

15   EXPLAINED IT STANDS FOR "PRODUCT DEVELOPMENT FORM"; IS THAT

16   RIGHT?

17   A   THAT'S RIGHT.

18   Q   BUT OTHER THAN WHAT IT STANDS FOR, CAN YOU ACTUALLY

19   EXPLAIN WHAT A PRODUCT DEVELOPMENT FORM IS.

20   A   FOR ME, THE PRODUCT DEVELOPMENT FORM WAS A FORM THAT WE

21   PULLED TOGETHER AS PRODUCT MANAGERS.  IT WAS A WAY TO, YOU

22   KNOW, ON A TOP-LINE LEVEL, DROP IN SOME INFORMATION THAT WE

23   COULD SEND TO HONG KONG, BECAUSE THE HONG KONG TEAM IS, LIKE --

24   IT'S LIKE THE RIGHT AND LEFT HAND, AND WE HAVE TO WORK

25   TOGETHER, AND IT'S SOMETIMES INSANE TO THINK WHAT WE GET DONE,

1    KNOWING THAT WE'RE IN DIFFERENT PARTS OF THE WORLD.

2         WHEN WE LAUNCH A PRODUCT, WHEN WE KICK SOMETHING OFF,

3    WHAT WE DID THEN WAS, WE WOULD PREPARE THIS PDF FORM; AND THE

4    FORM WOULD BE JUST SOME BASIC INFORMATION TO KIND OF SAY,

5    'OKAY, HONG KONG, THIS IS WHAT IT IS; IT'S A DOLL, AND WE'RE

6    TERMING IT THIS; AND WE WANT TO TRY TO GET IT INTO PRODUCTION

7    BY THIS DATE.'

8    Q   I JUST NOTICED THAT THE COURT REPORTER'S HEAD IS ABOUT TO

9    EXPLODE.  YOU NEED TO SLOW DOWN.

10   A   SO THE FORM IS BASIC INFORMATION TO HONG KONG, JUST TO

11   KICK IT OFF WITH THEM, IDENTIFYING THE PROJECT WORKING NAME.

12   IT WILL SAY WHEN THE PRODUCTION STARTS, WHEN WE'RE HOPING TO

13   GET IT INTO PRODUCTION, WHAT WE HOPE THE RETAIL PRICE IS GOING

14   TO BE; KIND OF GIVES THEM A GENERAL IDEA OF WHAT THE PRODUCT IS

15   OR HOW YOU PLAY WITH IT, HOW WE HOPE YOU WOULD PLAY WITH THE

16   DOLL.  JUST SOME BASIC INFORMATION TO GET THEM STARTED.

17   Q   SO ONCE A PDF IS ISSUED, IS IT SOMETHING THAT GETS

18   REISSUED OR CHANGED OVER TIME?

19   A   IT IS SUPPOSED TO BE UPDATED THROUGH TIME, THOUGH I ADMIT

20   THAT I WAS NOT GOOD AT THAT.

21   Q   SO FOR BRATZ, WHAT IS YOUR RECOLLECTION?  WAS THERE

22   BASICALLY ONE PDF, OR WERE THERE MULTIPLE VERSIONS OF IT?

23   A   I BELIEVE I ONLY PREPARED ONE PDF FORM.

24   Q   AND REMIND US ALL OF WHAT THE PRODUCT DEVELOPMENT FORM

25   DATE WAS.

1    A   OCTOBER 16, 2000.

2    Q   AND DID THAT DATE EVER CHANGE?

3    A   NO.

4    Q   I WANT TO MAKE SURE EVERYONE UNDERSTANDS SOME OF THE

5    DOCUMENTS WE'VE BEEN LOOKING AT OVER THE LAST FEW DAYS.

6        IS THERE A DIFFERENCE BETWEEN THE PRODUCT DEVELOPMENT

7    FORM AND SOME OF THE BRATZ SCHEDULES THAT WE'VE SEEN ON THE

8    SCREEN IN THE LAST COUPLE OF DAYS?

9    A   YES.

10   Q   WHAT IS THE DIFFERENCE BETWEEN THOSE TWO DOCUMENTS?

11   A   THEY HAVE NO RELATIONSHIP TO ONE ANOTHER.  THEY ARE

12   SEPARATE DOCUMENTS.

13   Q   BUT IS THE PDF DATE REFERENCED IN THE SCHEDULE?

14   A   I BELIEVE, YES.  I BELIEVE SO, YES.

15   Q   SO THE ONLY CONNECTION, THEN, BETWEEN THE PDF AND THE

16   SCHEDULE IS THAT THE SCHEDULE WILL LIST SOMEWHERE ON IT WHAT

17   THE PDF DATE IS.

18   A   YES.

19   Q   SO LET'S FOCUS ON THE SCHEDULE, THEN.

20       IS THIS SCHEDULE SOMETHING THAT YOU CREATED FOR THE

21   BRATZ PROJECT?

22   A   WHEN WE HAD LAUNCHED THE BRATZ PROJECT, THERE WAS NO

23   PLANNER; THE WAY THAT I WAS A PLANNER AT MATTEL, THERE WAS NO

24   FORMAL PLANNER AT MGA AT THE TIME.  SO I HAD SORT OF TAKEN THE

25   RESPONSIBILITY, THOUGH IT WAS NOT MY RESPONSIBILITY AS A

1    PRODUCT MANAGER, TO CREATE A RUDIMENTARY SCHEDULE FOR BRATZ.

2    Q   WITHOUT GETTING INTO THE GORY DETAIL, DID YOU USE A

3    SOFTWARE PACKAGE OR COMPUTER PROGRAM TO KEEP YOUR SCHEDULE?

4    A   IT WAS AN EXCEL SPREADSHEET THAT I TRIED TO BUILD TOGETHER

5    TO CREATE THE SCHEDULE.

6    Q   WAS THIS A FORM THAT ALREADY EXISTED AT MGA AS OF THE TIME

7    YOU STARTED, OR DID YOU CREATE IT?

8    A   I CREATED IT.

9    Q   WAS THE SCHEDULE SOMETHING THAT WAS UPDATED AS YOU WENT

10   ALONG?

11   A   I'M NOT SURE I UNDERSTAND.

12   Q   LET ME TRY TO ASK YOU A BETTER QUESTION.

13        WERE THE DATES IN THE SCHEDULE UPDATED AS TIME WENT

14   BY?

15   A   I DON'T REMEMBER.  I WILL TELL YOU THAT A SCHEDULE IS

16   SUPPOSED TO BE UPDATED.  A WORKING SCHEDULE LIKE THAT SHOULD BE

17   UPDATED EVERY SINGLE DAY, MAYBE EVEN A COUPLE OF TIMES A DAY.

18   I DON'T REMEMBER IF I REVISED THAT FIRST SCHEDULE OR NOT.

19   Q   DO YOU RECALL THAT BETWEEN THE TIME YOU MADE THE FIRST

20   SCHEDULE AND WHENEVER YOU STOPPED HAVING TO DO THE SCHEDULE

21   THAT IT WAS UPDATED ON MULTIPLE OCCASIONS?

22   A   I BELIEVE SO, BUT I'M NOT SURE.

23        MS. AGUIAR:  I'LL ASK AARON TO PUT ON THE SCREEN A

24   DOCUMENT THAT'S ALREADY IN EVIDENCE; EXHIBIT 1103.

25   BY MS. AGUIAR:

1   Q   WE LOOKED AT THIS YESTERDAY.

2        DO YOU REMEMBER THAT?

3   A   YES.

4   Q   AND THIS IS A DOCUMENT THAT WE DISCUSSED FOR A WHILE, THAT

5   YOU DISCUSSED FOR A WHILE, AND I UNDERSTAND THAT THERE ARE

6   DATES IN HERE THAT ARE NOT CORRECT; IS THAT RIGHT?

7   A   VERY MUCH SO, YEAH.

8   Q   YOU MADE MISTAKES IN THIS SCHEDULE.

9   A   YES.

10  Q   WAS THIS THE ONLY SCHEDULE YOU EVER MADE A MISTAKE ON OR

11  PUT IN THE WRONG DATE?

12  A   I'M SURE I'VE MADE QUITE A FEW MISTAKES ON MY SCHEDULES.

13  Q   THIS VERSION OF THE SCHEDULE, DO YOU KNOW HOW LONG THIS

14  WAS, THE ONE YOU GUYS WERE OPERATING UNDER?

15  A   IT COULD NOT HAVE BEEN VERY LONG.

16  Q   WHY IS THAT?

17  A   BECAUSE JUDY RICH, WHO WAS AN MGA EMPLOYEE WHO WAS HIRED

18  TO BE THE PLANNER -- I DON'T REMEMBER EXACTLY WHEN SHE WAS

19  HIRED, BUT I DO REMEMBER THAT SHE WAS PRETTY ACTIVE AROUND,

20  LIKE -- I DON'T KNOW -- THE THIRD WEEK OF OCTOBER.  SO IF I

21  LAUNCHED THIS ON OCTOBER 16TH, POTENTIALLY WITH MY PDF, IT MAY

22  HAVE ONLY BEEN USED FOR A WEEK BEFORE JUDY RICH TOOK IT OVER

23  AND BUILT A PROPER SCHEDULE.

24  Q   ARE THERE OTHER DATES ON THIS SCHEDULE THAT ARE WRONG?

25  A   YES.

1    Q   LET'S JUST GET IT ALL OVER WITH NOW.

2        CAN YOU WALK THE JURY THROUGH WHICH ONES THAT YOU

3    KNOW TO BE INCORRECT ON THIS SCHEDULE.

4    A   IF WE START ON THE LEFT SIDE OF THE PAGE AND YOU LOOK AT

5    THE SECOND BOX, WHERE IT SAYS "FEP, PP, AND PS," THE PS DATE IS

6    INCORRECT.  I NOTED 5-1-2000, AND WHAT IS FACTUAL IS THAT WE

7    DIDN'T GO INTO PRODUCTION UNTIL 5-15 OF 2001, SO I WAS TOTALLY

8    OFF BY A YEAR THERE.

9    Q   AND "PS" STANDS FOR WHAT, IN YOUR WORLD?

10   A   "PS" STAND FOR "PRODUCTION START," THE DATE WE START

11   PRODUCTION.

12   Q   SO YOU DID NOT START PRODUCTION ON THE BRATZ DOLL PACKS AS

13   OF MAY 1ST OF 2000.

14   A   NO WAY.

15   Q   SO THAT DATE IS WRONG.

16   A   RIGHT.

17   Q   ANYTHING ELSE?

18       WHAT'S "PP"?

19   A   "PP" IS "PREPRODUCTION."  IT IS A KIND OF RUDIMENTARY RUN

20   OF THE PRODUCTION LINE BEFORE YOU WENT INTO PRODUCTION START.

21       PRODUCTION START, YOU'RE AT FULL CAPACITY AND THE

22   PRODUCT IS LOOKING GOOD AND YOU'RE RUNNING EFFICIENTLY.

23       SO THAT DATE IS ALSO WRONG.

24       I AM NOT SURE, BUT IT'S POSSIBLE THAT A LOT OF WHY

25   THESE DATES WERE WRONG IS BECAUSE IN PLANNING, YOU SOMETIMES

1    SET A SCHEDULE BY STARTING IT FROM THE PRODUCTION START DATE

2    AND YOU CAN BACKWARDS PASS YOUR SCHEDULE FROM THERE.  ONCE YOU

3    GET STARTED, YOU START TO SAY, 'OKAY, THIS IS WHEN I NEED TO

4    GET THIS THING PRODUCED, ON THIS DATE.'  AND THERE'S WAYS TO

5    LINK THE DATES SO THAT -- WITH DURATION, SO THAT IT

6    NATURALLY -- IN THE EXCEL SPREADSHEET, WITHOUT YOU DOING

7    ANYTHING, IT BACKWARDS PASSES IT FROM THERE.  SO IF THAT DATE

8    IS WRONG, THERE'S REALLY A GOOD CHANCE THAT A LOT OF THE OTHER

9    DATES IN THERE ARE AFFECTED BY THAT MISTAKE.  LIKE, THE

10   PACKAGING, WHERE YOU SEE "FMA" --

11   Q   HOLD ON.

12       WE'RE FOCUSING NOW ON THE RIGHT-HAND SIDE.

13   A   THE PACKAGING BOX.  AND YOU LOOK AT THE MILESTONE "FMA."

14   Q   WHAT DOES "FMA" STANDS FOR?

15   A   "FMA" IS "FINAL MECHANICAL ART."  IT MEANS -- THAT'S A

16   FANCY WORD FOR JUST -- THE PACKAGE IS DESIGNED IN L.A.; IT'S

17   FINISHED, DESIGNED, AND BEEN RELEASED FORMALLY TO HONG KONG.

18       THAT DATE NOTES MARCH 4, 2000.  AND, AGAIN, I KNOW

19   THAT NOT TO BE TRUE.  WE DIDN'T ACTUALLY RELEASE THE FMA UNTIL

20   2001.  SO, AGAIN, I THINK THAT DATE MIGHT HAVE BEEN AFFECTED BY

21   THAT PS DATE OR I JUST WROTE THE WRONG DATE.

22   Q   REMIND US WHEN YOU ARRIVED AT MGA, THE MONTH AND THE YEAR.

23   A   APRIL OF 2000.

24   Q   AND I'M NOTICING -- ARE THERE DATES ON HERE THAT ARE EVEN

25   PRIOR?  I MEAN, THERE'S DATES ON HERE THAT ARE EVEN PRIOR TO

1   APRIL OF 2000?

2   A   RIGHT.  LIKE, THAT FMA DATE COULDN'T HAVE HAPPENED,

3   BECAUSE I HADN'T EVEN ARRIVED AT MGA THEN AT THAT TIME.

4   Q   SO WOULD YOU AGREE THAT THIS PARTICULAR VERSION OF THE

5   EARLY SCHEDULE IS JUST COMPLETELY MESSED UP, JUST WRONG?

6   A   YES.

7   Q   DO YOU RECALL OPERATING OFF SCHEDULES DURING YOUR

8   DEVELOPMENT OF BRATZ THAT WERE UPDATES OF THIS SCHEDULE WITH

9   CORRECT DATES?

10   A   I REMEMBER WORKING OFF OF SCHEDULES, BUT IT WOULDN'T HAVE

11   BEEN THIS ONE.  I BELIEVE JUDY RICH CAME IN AND CREATED HERS

12   ALL OVER FROM THE BEGINNING, STARTED OVER.

13       MS. AGUIAR:  YOUR HONOR, YOU MENTIONED WANTING TO

14   BREAK AT 10:00.

15       DO YOU WANT ME TO KEEP GOING FOR A WHILE?

16       THE COURT:  IF YOU'RE DONE WITH THIS HERE.

17       FINISH UP WITH THIS DOCUMENT.

18   BY MS. AGUIAR:

19   Q   OVER ON THE LEFT, BACK WHERE WE WERE, "FEP," WHAT DOES

20   THAT STAND FOR?

21   A   THAT'S A PRODUCTION TERM.  THE FORMAL TERM, AS I

22   UNDERSTAND IT, IS "FIRST ENGINEERING PILOT."

23       THE FIRST ENGINEERING PILOT IS EVEN A MORE

24   RUDIMENTARY PRODUCTION MILESTONE.  WHEN THE CHINA PLANT IS

25   TRYING TO TRAIN THE GUYS ON THE LINE TO KNOW THE PRODUCT, HOW

1    TO ASSEMBLE IT, BUILD IT, MOVE IT ON TO WHERE THE NEXT GUY

2    PICKS IT UP, IT TAKES SOME TIME TO LEARN HOW TO PUT A PRODUCT

3    TOGETHER AND MAKE SURE IT WORKS WELL AND WORKS GOOD.

4         SO FEP WOULD BE THE FIRST TIME THAT THEY'RE GOING TO

5    TRY TO BE EFFICIENT AND PUT THESE PRODUCTS TOGETHER, AND THEN

6    FROM THERE -- FEP WOULD HAVE BEEN THE FIRST RUDIMENTARY RUN OF

7    THE PRODUCTION LINE, TO TRAIN THE GUYS ON THE PRODUCTION LINE.

8    WHEN THEY BECAME COMFORTABLE, IT MOVES INTO A PP MILESTONE,

9    WHERE IT'S A LITTLE MORE EFFICIENT AND IT'S A LITTLE MORE --

10   IT'S LOOKING BETTER.  AND THEN YOU'RE IN FULL CAPACITY; YOU'RE

11   RUNNING AT THE RIGHT SPEED, PRODUCT IS LOOKING REALLY GOOD, AND

12   IT'S ACTUALLY A SELLABLE PRODUCT AT PRODUCTION START.

13        MS. AGUIAR:  YOUR HONOR, I'M GOING TO MOVE ON TO

14   ANOTHER DOCUMENT AFTER THE BREAK.

15        THE COURT:  VERY WELL.

16        LET'S TAKE A BRIEF BREAK.  WE ONLY HAVE AN HOUR LEFT

17   THIS MORNING.

18        (WHEREUPON A BRIEF RECESS WAS HELD.)

19        THE COURT:  WE ARE BACK ON THE RECORD OUTSIDE OF THE

20   PRESENCE OF THE JURY.

21        COUNSEL, I RECEIVED A NOTE FROM A JUROR.  WE'RE GOING

22   TO BRING THAT JUROR OUT AT THIS POINT.  IT SAID:  "GOOD

23   MORNING, JUDGE LARSON.  I WAS WONDERING IF I COULD GET A WORD

24   WITH YOU AT A BREAK.  IT CONCERNS MY JOB.  THANKS SO MUCH.

25   PAUL RUSSEL, JUROR NUMBER SIX."

1     I'M GOING TO BRING HIM OUT.  I DON'T WANT TO SPEAK TO

2     HIM MYSELF.

3         THERE WAS ANOTHER JUROR WHO ASKED A QUESTION, IN MY

4     DIRECTION, ABOUT THE LAST EXHIBIT.  I DID NOT ANSWER HER.  I

5     ASKED HER TO GO AHEAD AND SHE CAN ASK THAT QUESTION.  I'LL GIVE

6     YOU LEAVE TO ASK THAT QUESTION IN THE EXAMINATION.  I'LL GIVE

7     COUNSEL LEAVE TO ASK HER ABOUT THAT ON THE RECORD.

8         (JUROR RUSSEL ENTERS. )

9         THE COURT:  WE'RE BACK ON THE RECORD IN THE PRESENCE

10    OF JUROR NUMBER SIX, PAUL RUSSELL.

11        MR. RUSSELL, I RECEIVED A NOTE FROM YOU INDICATING

12    YOU WANT TO SPEAK TO THE COURT ABOUT YOUR JOB.  WE NEED TO HAVE

13    THAT DISCUSSION IN FRONT OF OTHER COUNSEL, SO FEEL FREE.

14        JUROR:  THIS MORNING WHEN I WAS GETTING READY FOR

15    JURY DUTY, I GOT A CALL FROM MY BOSS.  ON THE DAYS WE'RE NOT IN

16    SESSION, I'M GOING TO BE WORKING; SATURDAYS, SUNDAYS, MONDAYS.

17        BUT ANYWAY, I'M GOING TO SAY AS MINIMAL AS I CAN.  I

18    WORK FOR AN AIRCRAFT COMPANY WITH SECURITY CLEARANCES, AND SO I

19    WAS TOLD TODAY THAT I'M GOING TO BE GIVEN A LETTER TOMORROW

20    WHEN I GO TO WORK TO GIVE TO YOU TUESDAY, FROM MY COMPANY.  I

21    DON'T KNOW THE CONTENTS OF THE LETTER, BUT THE GIST OF IT IS

22    THEY WANT TO ATTEMPT TO GET ME OFF THE CASE.

23        THE COURT:  DID YOU EXPLAIN THE -- YOU RECEIVED THE

24    QUESTIONNAIRE IN ADVANCE OF THE TRIAL, RIGHT, WHETHER OR NOT

25    YOU WOULD BE AVAILABLE FOR TWO MONTHS?

1        DID YOU PROVIDE THAT TO YOUR EMPLOYER?

2        JUROR:  YES.  I TOLD MY BOSS TWO MONTHS.  VERBALLY HE

3    SAID, OH, THAT'S NOT GOOD, BUT -- THEY DIDN'T MAKE ANY ATTEMPTS

4    BEFORE THAT, AND THEY DIDN'T SAY -- THEY DIDN'T MAKE ANY

5    ATTEMPTS BEFORE THAT.

6        THE COURT:  VERY GOOD.

7        JUROR:  I WENT TO THE JURY SUMMONS, AND I THINK THEY

8    THOUGHT THE ODDS OF ME GETTING ON THE CASE WERE GOING TO BE

9    MINIMAL.  AND THEY ARE, YOU KNOW; TEN OUT OF 56.

10        AND THEN WHEN I CAME BACK THE NEXT DAY, I THINK THEY

11    WERE, LIKE, OH, NO, THIS, THAT, AND THE OTHER.

12        AND I TOLD THEM, I SAID, THERE'S NO ALTERNATES IN

13    THIS CASE.

14        I DON'T KNOW IF I SHOULD HAVE SAID THAT OR NOT, BUT.

15        THE COURT:  YOU DO NOT WANT TO DISCUSS THE CONTENTS

16    AND THE SUBJECT MATTER OF THIS CASE.  YOU ARE ORDERED NOT TO DO

17    THAT.

18        JUROR:  ABSOLUTELY NOT.

19        THE COURT:  THE COURT WILL BE HAPPY TO RECEIVE

20    WHATEVER LETTER YOU WANT TO PROVIDE TOMORROW.  I'LL SHARE THAT

21    WITH COUNSEL, AND WE'LL PROCEED FROM THERE.

22        JUROR:  THAT'S WHY I GAVE YOU THE NOTE.

23        I WAS, LIKE, HIT THIS MORNING A LITTLE BIT.  AND I

24    DON'T WANT TO BLINDSIDE YOU WITH THIS LETTER.  I WANT TO GIVE

25    YOU SOME HEADS UP.

1       THE COURT:  I GET BLINDSIDED ALL OF THE TIME.  I'M

2  USED TO IT.

3       (LAUGHTER).

4       THE COURT:  WE'RE GOING TO GO AHEAD NOW -- IF YOU

5  WOULD GO BACK IN WITH THE REST OF THE JURY.  WE'LL BE CALLING

6  YOU ALL IN IN JUST A MOMENT.

7       (JUROR NUMBER SIX EXITS COURTROOM. )

8       THE COURT:  COUNSEL, BASED ON WHAT I'VE HEARD SO FAR,

9  I'M DISINCLINED TO ALLOW THE JUROR TO BE EXCUSED AT THIS POINT.

10  I'LL RECEIVE THE LETTER AND SHARE THE LETTER, IF IT COMES, WITH

11  YOU.  AND THEN THE COURT WILL PREPARE AN APPROPRIATE RESPONSE

12  AFTER CONSULTING WITH YOU.

13       MR. PRICE:  YES, YOUR HONOR.

14       THE COURT:  DO YOU HAVE ANY OTHER THOUGHTS?

15       MR. PRICE:  THAT'S FINE, YOUR HONOR.

16       THE QUESTION, IS IT JUST YOUR INTENT TO HAVE THE

17  JUROR ASK THE QUESTION?

18       THE COURT:  I'M GOING TO HAVE HER PLACE ON THE RECORD

19  WHAT SHE SAID TO ME, AND I'M GOING TO THEN EXPLAIN TO THE

20  JURORS NOT TO DO THAT AGAIN, AND THEN I'LL ALLOW COUNSEL TO

21  PROCEED.  THE QUESTION IS MORE TOWARDS COUNSEL THAN IT IS

22  TOWARDS A WITNESS.  SHE JUST WANTS TO HAVE SOMETHING BETTER

23  EXPLAINED.

24       I DON'T HAVE A PROHIBITION AGAINST JURORS ASKING

25  QUESTIONS.  THERE'S NO LEGAL PROHIBITION AGAINST THAT.  I DON'T

1    WANT TO ENCOURAGE IT.  I'M GOING TO PERMIT IT, SINCE THE JUROR

2    DID IT SUA SPONTE.  BUT I'M GOING TO ADMONISH THEM NOT TO TALK

3    TO ME.  AS I PREVIOUSLY INDICATED, DON'T SPEAK TO ME ABOUT THE

4    CASE IN THE HALL, BECAUSE IT PUTS THE COURT IN AN AWKWARD

5    POSITION.

6        MR. PRICE:  I JUST THOUGHT OF HER ASKING THE

7    QUESTION, AND ME OBJECTING.

8        THE COURT:  YOU'RE NOT GOING TO OBJECT.  IT'S PURELY

9    AN INFORMATIONAL TYPE QUESTION.

10       IF YOU WISH TO BE HEARD AT SIDE-BAR AND LODGE AN

11   OBJECTION AT SIDE-BAR, I'LL GIVE YOU LEAVE TO DO THAT.

12       MR. PRICE:  THANK YOU.

13       THE COURT:  LET'S BRING THE ENTIRE JURY IN.

14       (JURORS ENTER COURTROOM.)

15       THE COURT:  WELCOME BACK TO THE MEMBERS OF THE JURY.

16       ONE OF THE MEMBERS OF THE JURY ASKED THE COURT A

17   QUESTION CONCERNING THE CASE AS WE WERE WALKING OUT THE DOOR.

18   I'M GOING TO ASK THE JUROR JUST TO ADDRESS THAT TO COUNSEL.

19       I ALSO WANT TO REMIND ALL THE JURORS NOT TO

20   COMMUNICATE WITH ME OR ANYBODY ELSE ABOUT THIS CASE, EVEN TO A

21   QUESTION.  IF YOU HAVE SOMETHING, PUT IT IN A NOTE SO I CAN

22   SHARE THAT WITH COUNSEL, AND WE CAN DO IT HERE IN OPEN COURT.

23   IT'S JUST IMPORTANT THAT ANY DISCUSSION ABOUT THIS CASE TAKES

24   PLACE ON THE RECORD IN FRONT OF COUNSEL AND THE PARTIES.

25       IF YOU WOULD JUST REPEAT, AS VERBATIM AS YOU CAN, THE

1    QUESTION THAT YOU ASKED ME RIGHT OUTSIDE OF THE DOOR HERE, AS

2    WE WERE LEAVING.

3         STATE YOUR NAME FOR THE RECORD, IF YOU WOULD.

4         JUROR:  NIVEA MCEAHERN.

5         THE DOCUMENT THAT WAS UP ON THE SCREEN, OVER TO THE

6    LEFT YOU WERE SHOWING US THESE DATES THAT WERE INCORRECT, OR

7    SOMETHING LIKE THAT.  BUT RIGHT ON THE SIDE, THERE WERE SOME

8    TARGET DATES.  WHAT WERE THOSE TARGET DATES?  WERE THEY

9    PERTAINING TO THE DATES THAT WERE ON THE LEFT OR TO THE RIGHT?

10        MS. AGUIAR:  WOULD IT HELP TO HAVE THE DOCUMENT UP ON

11   THE SCREEN?

12        THE COURT:  THAT'S A QUESTION TO YOU, COUNSEL, BUT,

13   OF COURSE, YOU'RE NOT TO GIVE THE ANSWER; THAT WOULD BE FROM

14   THE WITNESS.

15        MS. AGUIAR:  OF COURSE.  I WAS ASKING IF WE COULD PUT

16   THE DOCUMENT UP.

17        THE COURT:  LET'S PUT IT ON THE SCREEN AND YOU CAN

18   ASK THE WITNESS THE QUESTION.

19        MR. PRICE:  AND IT'S ON HER TIME.

20        THE COURT:  YES.  IT IS NOW ON THE DEFENSE TIME.

21        MS. AGUIAR:  YES.  IT'S ON MY TIME.

22        YOU CAN DOUBLE DEDUCT ME FROM THIS ONE.  I LIKE

23   QUESTIONS.  IT'S NOT A PROBLEM AT ALL.

24        OH, I SEE WHAT YOU'RE SAYING.

25        SO I'LL ASK THE WITNESS -- JUST TO MAKE SURE WE'RE IN

1  THE SAME PLACE.

2      SO RIGHT BETWEEN THESE TWO BOXES WHERE IT SAYS TARGET

3  AND OTHER DATES?  RIGHT THERE?

4      JUROR:  YES.

5  BY MS. AGUIAR:

6  Q   SO, MS. GARCIA, IF YOU COULD EXPLAIN FOR ALL OF US,

7  THERE'S A BOX THAT HAS THE ACRONYMS "FEP," "PP," AND THEN "PS,"

8  AND TO THE RIGHT OF THAT, IT SAYS TARGET.  AND THEN THERE ARE

9  DIFFERENT DATES.

10      COULD YOU EXPLAIN WHAT THAT MEANS?

11  A   YES.  ACTUALLY THAT COLUMN, TARGET, AND THOSE DATES BELOW

12  IT, RELATE DIRECTLY TO THE DATES TO ITS LEFT.  AND TO BE CLEAR,

13  THOSE DATES ARE -- WE'RE ALWAYS SORT OF TAUGHT THAT GENERALLY

14  THERE'S THESE TARGET DATES, THE OPTIMAL, THE BEST PRODUCTION

15  START DATE YOU CAN KIND OF NAIL, AND THOSE ALWAYS -- THE MANTRA

16  IS LIKE THE BEST PRODUCTION START TO GET TO IS APRIL 1ST.

17  PERIOD.  DEPENDING ON THE YEAR YOU'RE IN.

18  Q   YOU MEAN APRIL 1ST OF ANY YEAR?

19  A   YES.

20  Q   WHY?

21  A   BECAUSE YOU PRODUCE TWICE A YEAR, AND WITHIN THE TWO TIME

22  PERIODS, ONE OF THEM IS WHAT YOU LAUNCH -- I HOPE I'M BEING

23  CLEAR -- OF THE TWO LAUNCH PERIODS, ONE OF THE LAUNCH PERIODS

24  OPTIMALLY WOULD LOVE TO BE, SHOULD BE, IN A PERFECT WORLD, IF A

25  SCHEDULE WENT PERFECTLY, SHOULD "PS," PRODUCTION START, ON

1    APRIL 1ST.  BUT THAT'S GENERALLY NOT THE REALITY.

2    Q    I THINK I'M INFERRING THIS FROM THE JUROR'S QUESTION, BUT,

3    WHY DO YOU HAVE TARGET DATES BEFORE YOU EVEN CAME TO MGA?

4         ARE THOSE DATES THE CORRECT DATES?

5    A    THEY ARE STILL TOTALLY INCORRECT BECAUSE OF THE YEAR 2000.

6    BUT, I DON'T KNOW, I WAS ALWAYS TAUGHT THAT YOU'RE SUPPOSED TO

7    MEASURE THOSE THREE DATES UP; LIKE, WHAT YOU BELIEVE IS

8    REALISTIC TO DELIVER AGAINST WHAT YOU WOULD HAVE OPTIMALLY OR

9    SHOULD BE DELIVERING ON.

10        DOES THAT MAKE SENSE?

11   Q    YEAH.  BUT I WANT TO FOCUS ON THE FACT THAT THESE TARGET

12   DATES ARE IN THE YEAR 2000 ON THIS PARTICULAR VERSION OF THE

13   SCHEDULE.

14        WAS THERE EVER A TARGET PRODUCT SHIP DATE OF APRIL 1,

15   2000?

16   A    FOR THIS BRATZ PROJECT?

17   Q    YES.

18   A    NO.

19   Q    WAS THERE EVER A -- AND "PP" IS WHAT AGAIN?

20   A    PRODUCTION PILOT.

21   Q    WAS THERE EVER A PRODUCTION PILOT TARGET DATE OF MARCH 4

22   OF 2000 FOR THE BRATZ PROJECT?

23   A    NO.

24   Q    AND WAS THERE EVER A FINAL ENGINEERING PILOT TARGET DATE

25   OF FEBRUARY 19TH OF 2000 ON THE BRATZ PROJECT?

1      A    NO.

2      Q    SO ARE THESE TARGET DATES WRONG?

3      A    YES.

4      Q    DID YOU EVENTUALLY COME UP WITH CORRECT TARGET DATES FOR

5      THE PURPOSES OF DEVELOPMENT OF YOUR PROJECT?

6      A    I DIDN'T, BECAUSE THIS WAS -- I BELIEVE, AND I'M NOT SURE,

7      BUT I BELIEVE THIS WAS PROBABLY THE FIRST AND ONLY RENDITION OF

8      SCHEDULE THAT I CREATED AND THAT JUDY RICH TOOK IT OVER FROM

9      THERE.

10     Q    WAS THERE EVER A DISCUSSION INTERNALLY AT MGA OF

11     APRIL 1ST, 2001, AS BEING THE PRODUCT SHIP DATE?

12     A    THAT WOULD HAVE BEEN MORE ACCURATE.

13     Q    WAS THERE EVER A DISCUSSION ABOUT A "PP" DATE OF MARCH 4

14     OF 2001?

15     A    THAT WOULD HAVE, AGAIN, BEEN MORE ACCURATE.

16     Q    WOULD YOUR ANSWER BE THE SAME IF I ASKED YOU ABOUT THE

17     FINAL ENGINEERING PILOT BEING IN FEBRUARY, LATE FEBRUARY OF

18     2001?

19     A    YES, THAT'S RIGHT.

20     Q    SO AGAIN, THIS IS JUST CONTINUING WITH THE THEME OF JUST

21     THAT THIS DOCUMENT WAS AN INCORRECT VERSION OF THE SCHEDULE.

22     A    THAT'S RIGHT.

23          MS. AGUIAR:  YOUR HONOR, IS IT APPROPRIATE TO ASK

24     WHETHER THE QUESTION HAS BEEN ADEQUATELY ANSWERED?

25          THE COURT:  YOU MAY PROCEED, YES.

1        MS. AGUIAR:  SHOULD I ASK IF THE JUROR WANTS MORE

2    INFORMATION?

3        THE COURT:  DOES THAT COVER IT?

4        JUROR:  YES.

5        THE COURT:  VERY GOOD.  MOVE ALONG.

6    BY MS. AGUIAR:

7    Q   LET'S GO IN YOUR BINDER TO TAB 11301.

8        LET ME KNOW WHEN YOU'VE HAD A CHANCE TO LOOK AT IT.

9    IT'S A 4-PAGE DOCUMENT.

10   A   OKAY.

11   Q   DO YOU RECOGNIZE EXHIBIT 11301?

12   A   YES.

13   Q   WHAT IS IT?

14   A   THIS IS A BRATZ DEVELOPMENT SCHEDULE PREPARED BY JUDY

15   RICH.

16   Q   AND WHAT IS THE FIRST PAGE OF EXHIBIT 11301?

17   A   IT APPEARS TO BE AN E-MAIL THAT JUDY RICH SENT TO

18   SAMUEL WONG IN HONG KONG, MYSELF, CECELIA KWOK, AND

19   MERCEDEH WARD.

20   Q   DO YOU HAVE ANY REASON TO BELIEVE YOU DIDN'T RECEIVE THIS

21   E-MAIL FROM MS. RICH ATTACHING THE SCHEDULE?

22   A   NO.

23       MS. AGUIAR:  MOVE TO ADMIT.

24       MR. PRICE:  OBJECTION ON RELEVANCE; DATE.

25       THE COURT:  COUNSEL, WHERE IS THIS GOING?

1          MS. AGUIAR:  THERE WAS A LOT OF QUESTIONING YESTERDAY

2     ABOUT THE INITIAL SCHEDULE AND WHETHER IT WAS RIGHT OR WRONG,

3     WHETHER THOSE DATES SHOWED THE ACTUAL PRODUCTION DATES, AND ALI

4     THIS IS IS JUST TO SHOW THIS WAS THE FINAL BRATZ SCHEDULE AND

5     TO SHOW --

6          THE COURT:  LAY A FOUNDATION, COUNSEL.

7     BY MS. AGUIAR:

8     Q   YOU MENTIONED THIS E-MAIL IS FROM JUDY RICH.

9     A   YES.

10    Q   WHO'S JUDY RICH?

11    A   JUDY RICH WAS THE PRODUCT PLANNER AT MGA AT THE TIME.

12    Q   WAS ONE OF HER RESPONSIBILITIES TO UPDATE AND CIRCULATE

13    THE BRATZ PRODUCTION SCHEDULE?

14    A   YES.

15    Q   DO YOU RECALL RECEIVING SCHEDULES FROM MS. RICH AND

16    RELYING ON THEM IN PERFORMING YOUR JOB IN DEVELOPING THE BRATZ

17    PROJECT?

18    A   YES.

19    Q   IF YOU TURN TO THE SECOND PAGE OF THE EXHIBIT, WOULD YOU

20    IDENTIFY FOR US WHAT THAT SECOND PAGE IS.

21    A   THIS IS ACTUALLY HER VERSION OF THE EXCEL SPREADSHEET THAT

22    REPRESENTS THE PRODUCTION MILESTONES FOR BRATZ.

23    Q   DO YOU HAVE AN UNDERSTANDING WHETHER THIS WAS THE FINAL

24    BRATZ SCHEDULE THAT YOU OPERATED PURSUANT TO?

25    A   I BELIEVE SO, YES.

Transcript of Proceedings - AM (Garcia Cross)  5/30/2008  12:00:00 PM

1    Q   IF YOU LOOK AT THE THIRD PAGE OF THE EXHIBIT, CAN YOU TELL

2    US WHAT THE THIRD PAGE IS?

3    A   THAT WOULD BE THE DEVELOPMENT SCHEDULE FOR THE FASHION

4    PACKS; WE CREATED NOT ONLY DOLLS IN THE FIRST SEASON BUT SOME

5    FASHION PACKS, EXTRA FASHIONS FOR THE DOLLS.

6    Q   JUST WRAPPING UP, THEN, ON THE LAST PAGE, DO YOU RECOGNIZE

7    WHAT THAT IS?

8    A   IT APPEARS TO BE ANOTHER EXCEL DOCUMENT WITH SOME COMMENTS

9    BY L.A. AND THEN A COLUMN NEXT TO IT WITH SOME RESPONDING HONG

10   KONG COMMENTS.

11   Q   SO FOCUSING ON THE SECOND PAGE, WHERE IT SAYS "BRATZ DOLL

12   PACKS," WILL YOU LOOK AT THE DATES IN THAT CHART AND TELL ME

13   WHETHER THEY ARE CONSISTENT WITH YOUR KNOWLEDGE REGARDING THE

14   FINAL BRATZ SCHEDULE?

15   A   YES.  THEY ARE.

16        MS. AGUIAR:  YOUR HONOR, I'D MOVE THE EXHIBIT INTO

17   EVIDENCE.

18        MR. PRICE:  SAME OBJECTION.  RELEVANCE.  WE'RE NOT

19   SAYING THERE WEREN'T OTHER SCHEDULES.

20        THE COURT:  I'M GOING TO NEED TO SEE YOU AT SIDE-BAR,

21   COUNSEL.

22        (WHEREUPON, THE FOLLOWING PROCEEDINGS

23        WERE HELD AT SIDEBAR:)

24        THE COURT:  THE CONCERN THAT I AM HAVING IS THAT SOME

25   OF THE DATES IN HERE ARE THE SAME DATES THAT WERE ON THE

1    EARLIER SCHEDULE, WHICH HAVE BEEN IMPEACHED, ESSENTIALLY, BY

2    YOU.

3         MS. AGUIAR:  UH-HUH.

4         THE COURT:  I'M NOT GOING TO ADMIT ANOTHER SCHEDULE

5    WHICH HAS ADDITIONAL WRONG DATES; I THINK WE'RE JUST CONFUSING

6    THE JURY AT THIS POINT.

7         IF YOU HAVE A CORRECTED STATEMENT OF DATES AND YOU

8    WANT TO INTRODUCE THAT AND CAN LAY THE FOUNDATION THAT THESE

9    ARE THE CORRECT DATES ACROSS THE BOARD, THEN...

10        BUT THESE HAVE THE SAME DATES THAT SHE'S JUST SPENT

11   TIME SAYING ARE NOT THE DATES AND ARE MISTAKES.

12        I'VE GIVEN YOU WIDE LEEWAY TO IMPEACH HER ON THAT.

13   BUT THE THOUGHT OF INTRODUCING ANOTHER CALENDAR THAT IS EQUALLY

14   FRAUGHT WITH ERROR, I THINK, ONLY CONFUSES THE ISSUE; SO IT'S

15   NOT SO MUCH THAT IT'S NOT RELEVANT, BECAUSE THERE ARE CERTAIN

16   DATES HERE THAT ARE RELEVANT; THERE ARE ALSO CERTAIN DATES THAT

17   ARE NOT, THAT'S TRUE, BUT THE DOCUMENT THAT YOU INTRODUCED HAS

18   THE --

19        MR. PRICE:  BUT WE DIDN'T INQUIRE INTO FUTURE DATES;

20   THAT'S NOT AN ISSUE IN THE CASE.

21        THE COURT:  FAIR ENOUGH.

22        AGAIN, THERE ARE DATES IN THIS DOCUMENT IN THIS TIME

23   PERIOD THAT ARE RELEVANT WITH THAT SAME ANALYSIS, THE

24   OCTOBER 16, 2000 DATES.  BUT I ASSUME SHE'LL TAKE THE POSITION

25   THAT THOSE DATES ARE WRONG.

1    MS. AGUIAR:  I WILL CLEAR THIS UP AND RESOLVE IT BY

2    ASKING THE WITNESS A FEW QUESTIONS REGARDING HER UNDERSTANDING

3    OF THE --

4    THE COURT:  BUT THEN THIS IS SIMPLY CUMULATIVE.  THE

5    ONLY RELEVANT DATES ARE THE DATES THAT HAVE ALREADY BEEN

6    TESTIFIED BY THE WITNESS TO BE ERRONEOUS.

7    MS. AGUIAR:  NO.  ALL I WAS GOING TO DO WAS ACTUALLY

8    ASK HER HER BEST RECOLLECTION OF THE FINAL CORRECT PRODUCT SHIP

9    DATE, FOR EXAMPLE, OR THE FINAL CORRECT PP DATE; JUST ASK HER A

10    COUPLE OF QUESTIONS ABOUT THE --

11    THE COURT:  BUT THOSE DATES AREN'T RELEVANT.

12    THE DATES THAT ARE RELEVANT ARE THE ONES BACK IN

13    OCTOBER; AND THOSE DATES ARE THE SAME DATES, FROM WHAT I'M

14    SEEING, UNLESS I'M MISTAKEN -- THOSE ARE THE SAME DATES ON THE

15    OTHER DOCUMENT; SO UNLESS YOU'RE GOING TO GO ANOTHER ROUND WITH

16    MR. PRICE AND THEN YOU'RE GOING TO GET UP AND SAY THOSE DATES

17    ARE MISTAKES --

18    MS. AGUIAR:  I TAKE YOUR POINT.

19    THE COURT:  LET'S MOVE ON.

20    I WILL SUSTAIN THE OBJECTION.

21    (SIDE-BAR PROCEEDINGS CONCLUDED. )

22    BY MS. AGUIAR:

23    Q   MS. GARCIA, I'M GOING TO GO BACK TO THE SUBJECT OF WHAT

24    WAS DONE WITH RESPECT TO PACKAGING ON THE BRATZ PROJECT.  I'M

25    GOING TO ASK AARON TO PUT UP ON THE SCREEN AN EXHIBIT ADMITTED

1    INTO EVIDENCE YESTERDAY, OR MAYBE THE DAY BEFORE, EXHIBIT 320

2    THAT YOU LOOKED AT.

3         WE'VE ALL SEEN THIS A NUMBER OF TIMES BEFORE.

4         WHAT DO YOU RECOGNIZE THIS TO BE?

5         I KNOW YOU TESTIFIED THAT YOU DON'T RECALL IT, BUT

6    LET'S JUST SEE IF YOU COULD BRING US BACK TO THIS.

7    A   I BELIEVE THIS WAS AN E-MAIL FROM LIZ HOGAN TO MYSELF

8    REGARDING PACKAGING RELATED TO BRATZ.

9    Q   AND I BELIEVE YOU TESTIFIED THAT IT'S POSSIBLE THAT YOU

10   HAD THIS MEETING, BUT YOU DON'T RECALL IT; IS THAT CORRECT?

11   A   RIGHT.

12   Q   AND MR. PRICE SHOWED YOU A NUMBER OF OTHER DOCUMENTS,

13   E-MAILS AND WHATNOT, THAT WERE EXCHANGED BETWEEN YOU AND

14   MR. LINKER AND HIS COLLEAGUE REGARDING MEETINGS REGARDING

15   PACKAGING IN THIS TIME FRAME.

16        WHY DO YOU THINK THAT YOU DON'T RECALL THOSE MEETINGS

17   THAT ARE REFERENCED IN THE DOCUMENTS?

18        DO YOU KNOW WHY YOU DON'T RECALL THEM?

19   A   OTHER THAN IT WAS A VERY LONG TIME AGO, I DON'T KNOW.

20   Q   DID YOU HAVE APPROVAL TO MOVE FORWARD AS OF THIS TIME,

21   OCTOBER OF 2000?  DID YOU HAVE APPROVAL TO MOVE FORWARD WITH

22   PACKAGING WORK AS OF THAT TIME?

23   A   NO.

24   Q   LET'S PUT UP 325-001, ALSO IN EVIDENCE.

25        MS. GARCIA, I NOTE YOU'RE CC'D ON THIS E-MAIL.

1          DO YOU SEE THAT?

2     A   YES.

3     Q   FOCUSING YOU DOWN ON THE SECOND-TO-THE-LAST PARAGRAPH,

4     WHERE IT SAYS "WE HAVE RECEIVED YOUR QUOTE FOR THE PACKAGING OF

5     OUR BRATZ LINE.  HOWEVER, IT HAS NOT BEEN ACCEPTED AS WE FEEL

6     IT IS HIGH.  PLEASE DO NOT PROCEED WITH ANY WORK ON THIS

7     PROJECT UNTIL YOU RECEIVE A PURCHASE ORDER FROM ME.  AT THAT

8     TIME YOU WILL KNOW THAT WE HAVE ACCEPTED YOUR PROPOSED COSTING.

9     PLEASE LOOK AT YOUR QUOTE TO SEE WHERE YOU CAN LOWER YOUR PRICE

10    AND FORWARD A NEW QUOTE TO PAULA AND MYSELF AS SOON AS

11    POSSIBLE."

12         IS THAT CONSISTENT WITH YOUR RECOLLECTION ABOUT WHERE

13    YOU STOOD WITH PACKAGING AS OF OCTOBER OF 2000?

14         LET ME BE MORE SPECIFIC?

15         HAD YOU RECEIVED APPROVAL TO MOVE FORWARD WITH THE

16    PACKAGING PROPOSAL FROM MR. LINKER AND MS. HOGAN IN 2000?

17    A   NO.  AND TO BE CLEAR, I BELIEVE JUST THE WORD 'PROPOSAL,'

18    I'D PREFER TO REFER TO IT AS A 'QUOTE' INSTEAD.  'PROPOSAL'

19    MIGHT SUGGEST -- ANYWAY.

20         SO THE FARTHEST WE GOT HERE, IT SEEMS, WAS A

21    SUBMISSION BY STEVE LINKER'S TEAM ON A QUOTE FOR THE

22    POSSIBILITY OF DOING THE WORK.

23    Q   DID STEVE LINKER AND LIZ HOGAN EVER SUBMIT TO MGA A

24    CREATIVE PROPOSAL ON PACKAGING?

25    A   NO.

1    Q    SO YOU GOT A QUOTE FROM THEM, BUT YOU NEVER ACTUALLY GOT A

2    PROPOSAL SAYING THIS WAS ACTUALLY WHAT WE CAN DO FOR YOU.

3    A    NO.  NOT THAT I REMEMBER, NO.

4    Q    WERE ANY DECISIONS MADE WITH REGARD TO PACKAGING FOR THE

5    BRATZ PROJECT PRIOR TO OCTOBER 20, 2000?

6    A    NO.

7    Q    LATER IN TIME, DID YOU WORK WITH OUTSIDE VENDORS ON

8    PACKAGING?

9    A    YES.  WELL, JUST TO BE CLEAR, WE DIDN'T OFFICIALLY WORK

10   WITH THEM, BUT WE EXCHANGED WITH POSSIBLE ALTERNATIVE VENDORS

11   FOR PACKAGING, TO BE CLEAR.

12   Q    DO YOU RECALL ANY OF THE VENDORS THAT YOU DID RECEIVE

13   PACKAGING PROPOSALS FROM?

14        MR. PRICE:  RELEVANCE, PAST OCTOBER 2000.

15        THE COURT:  SUSTAINED.

16   BY MS. AGUIAR:

17   Q    DO YOU RECALL WHEN, IN THE TIMELINE, WERE YOU HAVING

18   DISCUSSIONS INTERNALLY AT MGA REGARDING PACKAGING?

19        THE COURT:  COUNSEL, GOING BACK TO THAT OBJECTION FOR

20   A MOMENT.  YOU CAN ASK THAT QUESTION DEPENDING ON THE TIME

21   FRAME, BECAUSE THE TIME FRAME WAS NOT CLEAR.  IT WAS

22   OPEN-ENDED.  IF YOU'RE ASKING FOR OCTOBER OF 2000, THAT WOULD

23   BE ADMISSIBLE.

24   BY MS. AGUIAR:

25   Q    FOCUSING ON OUR TIME FRAME UP TO OCTOBER 20TH, DO YOU

1    REMEMBER HAVING CONVERSATIONS WITH ANY OTHER OUTSIDE VENDORS

2    REGARDING PACKAGING PROPOSALS IN THAT TIME PERIOD?

3    A   IT'S POSSIBLE.

4    Q   AND WERE ANY CREATIVE PROPOSALS RECEIVED FROM OUTSIDE

5    VENDORS FOR PACKAGING IN THAT TIME PERIOD?

6    A   I DON'T REMEMBER.

7    Q   HAD YOU MADE ANY DECISION TO RETAIN AN OUTSIDE VENDOR TO

8    WORK WITH YOU ON PACKAGING PRIOR TO OCTOBER 20, 2000?

9    A   NO.

10   Q   AND DO YOU RECALL WHEN IN THE TIMELINE YOU WERE DISCUSSING

11   STRATEGIES ABOUT PACKAGING AT MGA?

12       MR. PRICE:  OBJECTION.  POTENTIALLY IRRELEVANT; NO

13   TIME FRAME.

14       THE COURT:  SUSTAINED.  REPHRASE.

15   BY MS. AGUIAR:

16   Q   DID YOU DISCUSS PACKAGING AT MGA FOR THE BRATZ PROJECT

17   AFTER OCTOBER 20, 2000?

18   A   YES.

19   Q   DID CARTER BRYANT PROVIDE ANY IDEAS OR ANY INPUT AT ALL ON

20   THE STRUCTURAL DESIGN OF THE BRATZ PACKAGING?

21   A   NO.

22   Q   WAS HE INVOLVED IN THAT PROCESS AT ALL?

23   A   NO.

24   Q   IN THE TOY INDUSTRY, WHAT'S MEANT BY THE TERM "PACKAGE

25   ART"?

1    A    PACKAGE ART, AS I UNDERSTAND IT, IS ACTUALLY THE 2-D

2    GRAPHICS THAT ARE PRINTED ON THE STRUCTURE OF THE PACKAGE.

3    Q    SO THE DRAWINGS OR THE DEPICTIONS OF THE DOLLS ON THE

4    OUTSIDE OF THE PACKAGE?

5    A    COULD BE.

6    Q    COULD IT BE OTHER STUFF?

7    A    SURE.  LIKE THE BACKGROUND, THE ICONOGRAPHIES; IT COULD BE

8    MAYBE LOGO; ANYTHING THAT'S A PIECE OF ART, FRANKLY; ANYTHING

9    THAT'S 2-D THAT GETS PRINTED ON THE PACKAGE.

10   Q    WERE YOU THE PERSON AT MGA WHO WAS RESPONSIBLE FOR

11   OVERSEEING PACKAGE ART FOR BRATZ?

12   A    I WAS RESPONSIBLE FOR OVERSEEING THE APPROVAL OF THE

13   PACKAGE.

14   Q    WAS ANY OF THE PACKAGE ART FOR THE BRATZ DOLL LINE STARTED

15   BEFORE OCTOBER 20, 2000?

16   A    NO.

17   Q    HOW DO YOU KNOW THAT?

18   A    I KNOW -- I'M NOT SURE.

19        I'LL JUST ANSWER IT AND THEN YOU GUYS TELL ME.

20        I KNOW THAT WE HAD NOT FORMALLY STARTED PACKAGING

21   UNTIL, I THINK, PROBABLY AS LATE AS NOVEMBER, EARLY DECEMBER,

22   AND WE CARRIED INTO AS LATE AS MARCH.  OFFICIALLY, THE

23   PACKAGING WAS RELEASED MUCH LATER IN MARCH.

24   Q    I WANT TO GO ON TO THE SUBJECT THAT MR. PRICE ASKED YOU

25   ABOUT, AND I DON'T THINK IT WAS YESTERDAY BUT THE DAY BEFORE

1    THAT, AND THE AREA OF TESTIMONY IS WHO CAME UP WITH THE NAME

2    BRATZ.

3        DO YOU RECALL THAT AREA OF TESTIMONY?

4    A   YES.

5    Q   CERTAINLY, MR. BRYANT HAD GIVEN HIS CHARACTERS

6    COLLECTIVELY THE NAME BRATZ WHEN HE CAME TO THE PITCH MEETING;

7    CORRECT?

8        MR. PRICE:  OBJECTION.  LEADING.

9    BY MS. AGUIAR:

10   Q   HAD MR. BRYANT GIVEN HIS CHARACTER A NAME AS OF THE PITCH

11   MEETING ON SEPTEMBER 1ST?

12   A   YES.

13   Q   AND WHAT WAS THAT NAME?

14   A   BRATZ.

15   Q   AND I THINK YOU TESTIFIED YESTERDAY, THOUGH, THAT YOU HAD

16   SOME HESITATION INTERNALLY AT MGA ABOUT THE NAME BRATZ; IS THAT

17   CORRECT?

18       MR. PRICE:  OBJECTION.  LEADING.

19   BY MS. AGUIAR:

20   Q   DO YOU HAVE ANY HESITATION ABOUT THE NAME BRATZ?

21   A   YES.

22   Q   CAN YOU EXPLAIN WHAT THAT WAS.

23   A   MY CONCERN WAS, FIRST OF ALL, I'LL ESTABLISH I LOVED THE

24   NAME BRATZ PERSONALLY BUT I WAS A LITTLE WORRIED THAT THE TERM

25   BRATZ MIGHT SEEM INAPPROPRIATE OR TOO NEGATIVE FOR MOMS; THAT

1   MAYBE THEY WERE GOING TO MISUNDERSTAND OUR POSITION ON WHAT

2   BRATZ THE BRAND STANDS FOR GENERALLY.

3   Q   SO AFTER MR. BRYANT HAD COME TO MGA WITH HIS CHARACTERS

4   AND HIS CONCEPT OF BRATZ, DID MGA CONSIDER OTHER NAMES?

5   A   MGA CONSIDERED MANY NAMES ALTERNATIVE TO BRATZ.

6   Q   WHAT WERE SOME OF THOSE NAMES?

7   A   STYLE SQUAD; BABEZ, WHICH I'M NOT SURE IS MUCH BETTER.

8   Q   B-A-B-Z?

9   A   B-A-B-E-Z, YEAH.

10      FASHION FRENZIES.

11      THERE WERE QUITE A FEW.

12   Q   CAN YOU DESCRIBE FOR US THE PROCESS THAT YOU WENT THROUGH

13   AT MGA WHEN YOU WERE CONSIDERING THE NAMES.

14   A   YEAH.  IT WAS QUITE FLUID, AS MOST THINGS WERE CREATIVELY

15   AT MGA.  PEOPLE WERE EXCHANGING AND SUGGESTING ALL DAY LONG,

16   ALL OF THE TIME, IN MANY NUMBER OF DAYS.  ISAAC SUGGESTED SOME.

17   I HAD SOME SUGGESTIONS.  CHARLES O'CONNOR, THE COPYRIGHTER, HAD

18   SOME IDEAS.  I THINK EVEN, LIKE, BECKY HARRIS WHO IS AN

19   EMPLOYEE TODAY EVEN AT MGA HAD A DAUGHTER AT THE TIME WHO HAD

20   SOME SUGGESTIONS.  THERE WERE JUST A LOT OF DIFFERENT FUN IDEAS

21   FROM MANY PEOPLE.

22   Q   AND I THINK YOU SAID THIS, BUT WAS MR. LARIAN INVOLVED IN

23   THE PROCESS OF PROPOSING NAMES?

24   A   YEAH.  ACTUALLY, IT WAS HIS SUGGESTION FOR BABEZ.  THAT

25   WAS HIS.

1    Q   DID YOU LIKE THAT IDEA?

2    A   NO.

3    Q   HOW DID YOU REACH THE FINAL DECISION TO GO WITH THE BRAND

4    NAME BRATZ FOR THE MANUFACTURED PRODUCT?

5    A   AFTER KEEPING AN OPEN HEART AND LISTENING TO EVERYBODY'S

6    ALTERNATIVE SUGGESTIONS, MY INSTINCT WAS TO GO FOR IT AND TO

7    CALL IT BRATZ.  BECAUSE FROM THE BRANDING PERSPECTIVE -- I

8    REALLY KEPT THINGS VERY CLOSE TO MY HEART -- THERE WERE VERY

9    SPECIFIC INTENTIONS FOR THIS BRAND TO TARGET THAT SEVEN TO

10   TEN-YEAR OLD CONSUMER.  AND ONE OF THOSE WAS -- WELL, NOT ONE

11   OF THOSE, BUT THE OVERALL CONCEPT OF BRATZ WAS TO MAKE SURE IT

12   WAS COOL ENOUGH AND SUAVE ENOUGH AND KIND OF UNEXPECTED ENOUGH

13   SO THAT ANY -- AND MAYBE EVEN JUST A TINY BIT REBELLIOUS ENOUGH

14   -- SO THAT THOSE SEVEN TO TEN-YEAR OLD GIRLS UNDERSTOOD IT AND

15   APPROVED IT.  BRATZ SEEMED LIKE THE RIGHT TERM, SO WE WENT FOR

16   IT.

17   Q   AND IN THE SAME VEIN, MR. BRYANT HAD ALSO SORT OF ASSIGNED

18   SPECIFIC NAMES TO THE FOUR CHARACTERS IN HIS BOOK; CORRECT?

19   A   YES.

20   Q   SIMILARLY, WITH BRATZ, DID YOU CONSIDER CHANGING THE NAMES

21   OF THE CHARACTERS?

22   A   YES, ABSOLUTELY.

23   Q   CAN YOU EXPLAIN THAT.

24   A   YES.

25       AS I MENTIONED A LITTLE BIT YESTERDAY AS WELL, I

1    THOUGHT THERE WAS SOME AMAZING -- THE TONE AND STYLE AND SOME

2    AMAZING STUFF IN CARTER'S PORTFOLIO; BUT ALSO THERE WAS STUFF

3    IN THAT PORTFOLIO THAT MADE ME REALLY NERVOUS, AND ONE OF THAT

4    WAS, WHILE I LOVED THE ETHNIC DIVERSITY, I ALSO WAS CAUTIOUS

5    NOT TO OVER STEREOTYPE, AND I PERSONALLY FELT HIS SUGGESTION

6    FOR THE NAME LUPE FOR THE HISPANIC CHARACTER, OR, I BELIEVE HE

7    NAMED IT KADISHA OR HALLIDAE FOR THE AFRICAN AMERICAN

8    CHARACTER, I FELT THAT MIGHT HAVE BEEN JUST A LITTLE

9    STEREOTYPED; SO CERTAINLY WE LOOKED FOR ALTERNATIVE NAMES.

10    Q   AND DID YOU, IN FACT, END UP CHANGING THE NAMES?

11        MR. PRICE:  OBJECTION.  THE NAMES ARE IRRELEVANT.

12        MS. AGUIAR:  I'LL WITHDRAW THE QUESTION.

13        THE COURT:  VERY WELL.

14    BY MS. AGUIAR:

15    Q   HAD ANY FINAL DECISION BEEN MADE PRIOR TO OCTOBER 20TH

16    REGARDING WHAT NAMES TO USE FOR THE CHARACTERS?

17        MR. PRICE:  OBJECTION.  THAT'S NOT AT ISSUE.

18        THE COURT:  OVERRULED.

19    BY MS. AGUIAR:

20    Q   HAD ANY FINAL DECISION BEEN MADE REGARDING THE NAMES TO

21    USE FOR THE FOUR GIRLS PRIOR TO OCTOBER 20TH?

22    A   NO.

23    Q   WAS A FINAL DECISION MADE REGARDING WHETHER TO USE THE

24    NAME BRATZ AS THE BRAND NAME FOR THE MANUFACTURED PRODUCT PRIOR

25    TO OCTOBER 20TH?

1    A   NO.

2    Q   AND WHO HAD THE FINAL SAY OR THE FINAL VETO POWER OVER

3    WHETHER TO USE THE NAME BRATZ?

4    A   ISAAC.

5    Q   MR. LARIAN?

6    A   YES.  SORRY.

7    Q   SO YOU GUYS ENDED UP FULL CIRCLE, BACK AT THE NAME

8    MR. BRYANT HAD SUGGESTED.

9    A   THAT'S RIGHT.

10   Q   AND THAT FINAL APPROVAL TO USE THE NAME BRATZ, IN FACT,

11   CAME FROM WHO?

12   A   ISAAC.

13   Q   DID YOU ALSO OVERSEE THE BRANDING ASPECTS OF THE BRATZ

14   PROJECT?

15   A   VERY MUCH SO, YES.

16   Q   CAN YOU JUST EXPLAIN FOR THE JURY IN YOUR INDUSTRY WHAT

17   THE TERM "BRANDING" MEANS.

18   A   BRANDING CAN BE SO MUCH.

19       BRANDING IS ALL OF THOSE VERY, VERY CRITICAL ELEMENTS

20   THAT YOU USE, WHETHER ON THE DESIGN OF A PHYSICAL PRODUCT

21   WITHIN THE PACKAGE; IN A COMMERCIAL; ANYTHING THAT RELATES TO

22   THE BRAND BRATZ.  BRANDING HELPS TO REALLY BE CLEAR TO YOUR

23   CONSUMER WHAT YOUR PRODUCT TRULY STANDS FOR.  IT CAN BE THINGS

24   THAT DENOTE AN EMOTION.  IT COULD BE, LIKE, 2-D GRAPHICAL

25   THINGS, LIKE A LOGO.  ALL OF THE ASSETS ARE MEANT TO PULL

1    TOGETHER TO SEND A COMMON AND CONSISTENT, VERY CLEAR MESSAGE

2    ABOUT YOUR PURPOSE FOR YOUR PRODUCT TO THE CONSUMER.

3    Q    WAS MR. BRYANT INVOLVED IN DEVELOPING THE STRATEGIES FOR

4    THE BRANDING OF BRATZ?

5    A    NO.

6    Q    DO YOU RECALL THAT YOU GAVE YOUR DEPOSITION IN CONNECTION

7    WITH THIS LITIGATION?

8    A    YES.

9    Q    AND DO YOU RECALL HOW MANY DAYS YOU SAT FOR YOUR

10   DEPOSITION?

11   A    I KNOW THAT I SAT THROUGH TWO DAYS OF DEPOSITION.

12        MR. PRICE:  OBJECTION I THINK THERE'S AN IN LIMINE

13   MOTION, OR SO I'VE BEEN TOLD.

14        COULD WE APPROACH SIDE-BAR?

15        THE COURT:  YES.

16        (WHEREUPON, THE FOLLOWING PROCEEDINGS

17        WERE HELD AT SIDEBAR:)

18        THE COURT:  WHERE ARE WE GOING RIGHT NOW?

19        MS. AGUIAR:  MR. PRICE IMPEACHED HER WITH A COUPLE OF

20   QUESTIONS FROM HER DEPOSITION YESTERDAY, AND I WANTED TO

21   ESTABLISH THAT SHE GAVE OVER 1,300 PAGES OF DEPOSITION

22   TESTIMONY AND 'DID SHE REMEMBER THOSE QUESTIONS.'  I THINK IT'S

23   A FAIR CONTEXT TO SET FOR THE JURY, BECAUSE HE WAS IMPEACHING

24   HER WITH A COUPLE OF QUESTIONS OUT OF FOUR DAYS WORTH OF

25   TESTIMONY.

1    THE COURT:  THERE WAS A MOTION IN LIMINE THAT THE

2    COURT RULED ON THAT WE'RE NOT GOING TO MAKE ANY REFERENCES TO

3    THE AMOUNT OF DISCOVERY IN THIS CASE, AND WE'RE NOT GOING TO

4    IDENTIFY HOW MUCH DISCOVERY WAS PRODUCED OR NOT.  IT'S A DOOR I

5    REALLY DON'T WANT OPENED UNLESS THERE'S A COMPELLING REASON TO

6    DO SO, BECAUSE IT'S ONE THAT'S GOING TO COME BACK AND BITE BOTH

7    SIDES IN THE COURSE OF THIS TRIAL.

8    MS. AGUIAR:  I DIDN'T MEAN TO BE IN VIOLATION.  I HAD

9    UNDERSTOOD THAT TO MEAN THAT COLLECTIVELY WE COULDN'T SAY THERE

10   WERE TEN MILLION DOCUMENTS AND 60 DEPOSITIONS.

11   THE COURT:  I THINK YOUR POINT MAY HAVE BEEN MADE

12   ALREADY, BECAUSE WHEN MR. PRICE ASKED YESTERDAY ABOUT THE

13   DEPOSITION, HE DID ASK THE WITNESS TO TURN TO PAGE 1,302 OF HER

14   DEPOSITION.  THAT IS ALREADY IN EVIDENCE, AND THAT PAGE NUMBER

15   IS A CLEAR INDICATION OF JUST HOW LONG THIS DEPOSITION WAS.

16   BUT BEYOND THAT, I DON'T WANT TO GO DOWN THIS ROAD.

17   MR. NOLAN:  NOT TO BE CUTE, BUT I DON'T THINK 1,392

18   WAS THE LAST PAGE.  COULD WE JUST ALLOW HER TO SAY WHAT THE

19   LAST PAGE WAS?

20   THE COURT:  NO.

21   MR. NOLAN:  I UNDERSTAND.

22   THE COURT:  THE OBJECTION IS SUSTAINED.

23   MS. AGUIAR:  YOU HAVE TO TRY.

24   (SIDE-BAR PROCEEDINGS CONCLUDED.)

25   BY MS. AGUIAR:

1    Q   DO YOU REMEMBER WHEN YOU GAVE YOUR DEPOSITION, THE ROUGH

2    DATES WHEN YOU GAVE YOUR DEPOSITION IN THIS CASE?

3    A   I KNOW THAT I EXCHANGED AT LEAST TWO DAYS --

4    Q   WITHOUT TALKING, I JUST DON'T WANT TO GET TO HOW MANY

5    DAYS.  I JUST WANT THE TIME FRAME OF ABOUT WHEN YOU GAVE IT, IF

6    YOU REMEMBER.

7    A   ABOUT A YEAR AGO.

8    Q   AS YOU SIT HERE TODAY, DO YOU REMEMBER ALL OF THE

9    QUESTIONS THAT YOU WERE ASKED IN YOUR DEPOSITION?

10   A   NO.  IMPOSSIBLE.

11   Q   I WANT TO PUT UP SOME EXHIBITS, AND THERE WERE FOUR OF

12   THEM, ADMITTED YESTERDAY; 1107-B THROUGH 1110-B.

13        DO YOU RECALL SEEING THESE FROM YESTERDAY?

14   A   YES, I DO.

15   Q   THIS IS 1107.  DO YOU RECALL THERE WERE THREE OTHERS, OF

16   THE THREE OTHER GIRLS?

17   A   YES.

18   Q   WHAT DO YOU RECOGNIZE THEM TO BE?

19   A   I RECOGNIZE THEM TO BE DRAWINGS THAT WERE PREPARED BY

20   CARTER.

21   Q   AND MR. PRICE TOOK YOU THROUGH AND ASKED YOU WHAT YOU

22   REMEMBERED ABOUT THESE AND WHEN THEY WERE DONE AND TO WHOM TH

23   WERE SHOWN, AND THEN HE SHOWED YOU PORTIONS OF YOUR DEPOSITION

24   TESTIMONY THAT -- I GUESS THE POINT WAS THAT IT WAS

25   INCONSISTENT.

1       CAN YOU EXPLAIN FOR THE JURY, THEN, WHAT --

2       MR. PRICE:  I OBJECT TO THAT PREFACE, BECAUSE I DON'T

3   THINK THAT'S WHAT HAPPENED.

4       THE COURT:  REPHRASE, COUNSEL.

5   BY MS. AGUIAR:

6   Q   CAN YOU EXPLAIN TO THE JURY NOW WHAT YOU RECALL ABOUT

7   THESE DRAWINGS, WHAT YOU RECALL ABOUT THEM?

8   A   I DON'T REMEMBER EXACTLY, I AM NOT 100-PERCENT SURE, BUT I

9   BELIEVE THAT THESE DRAWINGS WERE PREPARED FOR A RETAILER

10  MEETING.

11  Q   DO YOU RECALL WHEN THAT RETAILER MEETING WAS?

12  A   I BELIEVE IT WAS EARLY NOVEMBER OF 2000.

13  Q   AND DID YOU ASK CARTER TO DO THE DRAWINGS?

14  A   I BELIEVE SO, YES.

15  Q   DO YOU RECALL WHEN YOU ASKED HIM TO DO THE DRAWINGS FOR

16  THE RETAILER PRESENTATIONS?

17  A   I DON'T REMEMBER EXACTLY.

18  Q   IS IT POSSIBLE THEY WERE DONE IN THE WEEK OR TWO BEFORE

19  THE MEETINGS?

20  A   YES.

21      THE COURT:  LET'S TAKE OUR BREAK RIGHT NOW.  I'M

22  GOING TO ASK COUNSEL TO STAND BY, BECAUSE I DON'T KNOW HOW LONG

23  THIS WILL TAKE.  I WANT TO RESUME BEFORE LUNCH.

24      I'M GOING TO EXCUSE THE JURY TO THE JURY ROOM AT THIS

25  TIME.  YOU'LL BE INFORMED IF YOU'RE EXCUSED FOR THE LUNCH

Transcript of Proceedings - AM (Garcia Cross)  5/30/2008  12:00:00 PM

1    PERIOD OR NOT.

2         I'LL CALL THE CRIMINAL MATTER AND SEE HOW LONG IT'S

3    GOING TO TAKE.

4         (CONCLUSION OF MORNING SESSION.)

5

6

7

8

9

10

11

12

13

14

15

16

17              CERTIFICATE

18

19   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

20   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-

     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

21   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

     THE UNITED STATES.

22

23   _____        _____

     THERESA A. LANZA, CSR, RPR             DATE

24   FEDERAL OFFICIAL COURT REPORTER

25