Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      ---

4        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                      ---

6    MATTEL, INC.,            : PAGES 883 - 1006

                              :

7          PLAINTIFF,         :

                              :

8        VS.              : NO. ED CV04-09049-SGL

                          : [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,     : CV04-9059 & CV05-2727]

     ET AL.,                :

10                          :

     DEFENDANTS.        :

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                RIVERSIDE, CALIFORNIA

17                FRIDAY, MAY 30, 2008

18                JURY TRIAL - DAY 5

19                AFTERNOON SESSION

20

21

22               MARK SCHWEITZER, CSR, RPR, CRR

                 OFFICIAL COURT REPORTER

23               UNITED STATES DISTRICT COURT

                 181-H ROYBAL FEDERAL BUILDING

24               255 EAST TEMPLE STREET

                 LOS ANGELES, CALIFORNIA 90012

25               (213) 663-3494

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

```
 1     Appearances of Counsel:
 2
 3     On Behalf of Mattel:
 4        Quinn Emanuel
          By John B. Quinn, Esq.
 5           B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
 6           Harry Olivar, Esq.
             John Corey, Esq.
 7           Diane Hutnyan, Esq.
             William Price, Esq.
 8        855 South Figueroa Street
          10th Floor
 9        Los Angeles, CA 90017
          (213) 624-7707
10
11
12     On Behalf of MGA Entertainment:
13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
          300 South Grand Avenue
17        Los Angeles, CA 90071-3144
          (213) 687-5000
18
19
20
21
22
23
24
25
```

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1                        I N D E X

2

3      PAULA GARCIA, PREVIOUSLY SWORN.......................... 886

4      CROSS-EXAMINATION (CONTINUED) BY MS. AGUIAR:............ 886

5      REDIRECT EXAMINATION BY MR. PRICE: .................... 902

6      RECROSS-EXAMINATION BY MS. AGUIAR: .................... 983

7      FURTHER REDIRECT EXAMINATION  BY MR. PRICE:............. 996

8

9                    E X H I B I T S

10

11     (Exhibit 13592 received.)............................. 909

12     (Exhibit 4501 received.).............................. 991

13     (Exhibit 4502 received.).............................. 993

14     (Exhibit 4505 received.).............................. 993

15

16

17

18

19

20

21

22

23

24

25

1           Riverside, California; Friday, May 30, 2008

2                        1:30 P.M.

3                  (WHEREUPON THE JURY ENTERS.)

4           WHEREUPON THE CASE HAVING BEEN CALLED

5           AND APPEARANCES GIVEN, THE FOLLOWING

6           PROCEEDINGS WERE HELD:

7           THE COURT:  Good afternoon, Counsel.

8           Counsel may continue.

9                  PAULA GARCIA, PREVIOUSLY SWORN.

10                 CROSS-EXAMINATION (CONTINUED)

11   BY MS. AGUIAR:

12   Q.   Ms. Garcia, before we move off the topic totally of the

13   retailer meeting in, I believe you said, November of '07,

14   that's what we were talking about before the break, to bring

15   us back to where we were.  Can you look in your white binder

16   at tab 13586.  And why don't you take a minute to familiarize

17   yourself with the document.

18   A.   Okay.

19   Q.   I want to direct your attention to the top e-mail, and

20   the document is not in evidence.  So I won't say what the

21   substance of it says, but directing your attention to the top

22   e-mail, does this do anything to refresh your recollection

23   that you attended the retailer meeting in early November

24   2007?

25   A.   In reading this e-mail, it does suggest that there was a

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    possibility that I would have attended this Kmart meeting.

2    Q.   Now, do you have a specific recollection of having

3    attended the meeting?

4    A.   No.

5    Q.   Do you think it's possible that you were there?

6    A.   It's possible.  I don't remember.

7    Q.   You can put that aside.

8         If there was testimony during this trial by a

9    colleague of yours at MGA that indicated that you once told

10   her to keep Carter Bryant a secret and to not discuss him

11   outside of the company, what would your response be to that

12   testimony?

13   A.   I would respond that that was untrue.

14   Q.   Was there ever a time when you told people at MGA not to

15   speak about Carter Bryant?

16   A.   No.

17   Q.   Was there ever a time when you heard anyone else at MGA

18   tell people -- and I want to -- we looked at an e-mail

19   yesterday where Mr. Larian had mentioned that there should be

20   no references on the website.

21        Do you recall that?

22   A.   Yes.

23   Q.   Excepting that from my question, do you recall anyone at

24   MGA ever telling people not to speak about Carter Bryant

25   outside of the company?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.  No.

2    Q.  And did you ever tell Carter himself not to tell anyone

3    that his drawings were presented to MGA?

4    A.  No.

5    Q.  And how about did you ever suggest to him that he should

6    say that he was involved in the Bratz project?

7    A.  No.

8    Q.  Moving on to a different subject.  In your position at

9    MGA, do you review sketches or concept drawings that are

10   submitted to you by doll designers and artists?

11   A.  Yes.

12   Q.  Did you do that at all in your position at Mattel?

13   A.  No.

14   Q.  So over the years that you've done this at MGA, just

15   ballpark, how many would you say you've seen, how many

16   sketches and drawings and concepts that you have seen?

17   A.  Hundreds.

18   Q.  I'd like to ask Aaron to put up -- it's already in

19   evidence, 263-3.

20        Do you recognize what's on the screen?

21   A.  Yes.

22   Q.  What do you recognize it to be?

23   A.  I recognize it to be a sketch of a Toon Teens drawing.

24        MR. PRICE:  I would object and move to strike

25   unless there's some foundation that she saw this before

1    trial.

2         THE COURT:  Overruled for now.

3    Q.   BY MS. AGUIAR:  Do you see the arm and the hand pose

4    that's depicted in this drawing?

5    A.   Yes.

6    Q.   Based on your experience reviewing concept drawings in

7    your position at MGA, in your view is this arm and hand pose

8    a unique one?

9         MR. PRICE:  Objection.  Improper opinion.  Beyond

10   the scope.

11        THE COURT:  Foundation, Counsel.  I'll sustain it.

12   Q.   BY MS. AGUIAR:  In the course of doing what you do at

13   MGA, do you often review sketches like this from artists and

14   doll designers?

15   A.   Yes.

16   Q.   And do you think that you are familiar with the style

17   and -- with the style of artists when they are drawing,

18   making drawings like this?

19   A.   Yes.

20   Q.   And looking at the drawing that's on the screen right

21   now, does that arm and the hand pose, have you ever seen that

22   before in the drawings that you have viewed?

23        MR. PRICE:  Same objection.

24        THE COURT:  Overruled.  You may answer.

25        THE WITNESS:  Is the question have I seen arm poses

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1      like this?

2      Q.   BY MS. AGUIAR:  Yes, have you seen hand and arm poses

3      like this --

4           THE COURT:  Other than on a Toon Teen?

5           MS. AGUIAR:  Sorry.  Thank you for that.

6      Q.   Other than the other drawings of Toon Teens that you've

7      seen here in court in the last week or so, have you seen an

8      arm and hand posed like this in drawings that you've reviewed

9      in your work with MGA?

10     A.   Yes.

11     Q.   Can you -- are there either specific examples, or can

12     you tell us what you recall about having seen this before?

13     A.   It's -- in the experience that I've had, in the nine

14     years at MGA, it is common for, you know, for artists or for

15     designers, especially in my experience fashion designers, to

16     draw their artwork with hands built out in this posture.  I

17     have a designer right now who designs and drawings hand

18     positions in that very way, even up to today.

19     Q.   Do the arms and the hand pose in this drawing that you

20     are looking at here resemble the arm and the hand poses in

21     Mr. Bryant's pitch book drawings?

22          MR. PRICE:  Objection.  Beyond the scope.  It's

23     improper opinion.  It's not this phase.

24          THE COURT:  Sidebar, please.

25          (SIDEBAR CONFERENCE HELD.)

1          THE COURT:  Mr. Quinn elicited from his witness a

2     witness of similar qualifications testimony about this pose

3     and the uniqueness of this pose, and this is rebuttal to

4     that.  So I'm not following your objection.

5          MR. PRICE:  Well, you're right.  We didn't say this

6     was unique.  We explained he was exposed to this while he was

7     at -- while he was at Mattel.  But this witness, my direct

8     had nothing to do with this at all.  I know you're talking

9     about for efficiency --

10          THE COURT:  There was more to being exposed to

11     this.  The witness actually described it as being unique and

12     went into some explanation as to why it was unique, and this

13     is a response to that, that it's not unique.

14          Now, they're a temporal issue.  The critical

15     question is whether or not she had seen this prior to Toon

16     Teens, and that's one of the reasons I called you over here.

17     Because if it was something after Toon Teens, it could be

18     another artist copying Toon Teens.  So for it to have

19     relevance, it would have to be before.  So that's a further

20     foundation that you're going to have to double back on.

21          MR. PRICE:  If she asks that, she shouldn't be

22     leading.  When is the first time.  But my objection is I know

23     we're trying to be efficient here, but, you know, we've had a

24     long, quote, direct examination.  This has nothing to do with

25     what she was asked on her, quote, cross.

1          THE COURT:  And you're correct on that.  I'm

2     permitting this to rebut an earlier witness.

3          MR. QUINN:  I don't think I ever actually elicited

4     testimony that it was unique.  I don't think I did, your

5     Honor.  I mean, what we did was we went through the story

6     about the roller skates.

7          THE COURT:  I can't say that the word unique was

8     used, but the testimony, to the best of my recollection, was

9     that it was something which was different, unusual, struck

10    the witness as something special.  And I think that goes to

11    your case.  I think that's strong evidence for you in terms

12    of seeing those things manifest.  So I think that's a

13    legitimate basis to rebut.

14          But I'm concerned about the temporal issue.  If

15    that temporal issue is not established, I want to go back and

16    strike it, and you guys have the benefit of having the

17    testimony.  If you can identify for me, but that's my

18    recollection.

19          MR. NOLAN:  That's my recollection.

20          MS. AGUIAR:  May I have a word?  I specifically

21    remember more than one witness saying that it was unique.  In

22    fact, I can remember almost the words of one witness saying I

23    recognize Lily Martinez's drawings because Lily has a unique

24    style.

25          THE COURT:  If I'm mistaken, you can bring it up.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1          MR. QUINN:  I agree with what counsel just said.

2     Ms. Ross did say she would recognize Lily's style because it

3     looks like Lily.  And she talked about the lips and the --

4          THE COURT:  No, she specifically talked about the

5     hands because it's all tied up.  If I'm mistaken, you point

6     it out to me, Counsel.

7          (CONCLUSION OF SIDEBAR CONFERENCE.)

8          THE COURT:  Go ahead and lay that foundation we

9     discussed at sidebar.

10    Q.   BY MS. AGUIAR:  Do you recall when was the very first

11    time that you have seen an arm or a hand pose similar to the

12    one that's depicted on the screen right now?

13    A.   It could have been -- do you mean in the -- at all in

14    general?

15    Q.   At all in general.  I'm just trying to place your

16    experience or your memory of seeing similar arm poses, place

17    it in time, and the earliest one you remember.

18    A.   The only reason I can't put a particular date is that,

19    you know, it's possible that these hands could have been on

20    dolls that I have seen and, you know, even prior to my coming

21    to MGA.  It's just a really common position to illustrate --

22         MR. PRICE:  I'm going to move to strike.

23         THE COURT:  That last answer is stricken.  Let's

24    lay a foundation on the time.

25         MS. AGUIAR:  Okay.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1      Q.   Do you recall having seen an arm pose like this even

2      prior to the time that you came to MGA?

3      A.   It is possible, yes.

4      Q.   Do you -- and again, I'm going to ask --

5           MR. PRICE:  Your Honor, I'm going to move to strike

6      that for substantive --

7           THE COURT:  I'm not going to strike the answer, but

8      we're not quite done with this.

9      Q.   BY MS. AGUIAR:  If we can put up one of the drawings

10     from Mr. Bryant's pitch book.

11          Do you think the arms and the hands in the Toon

12     Teens drawing resemble the arms and the hands in Mr. Bryant's

13     pitch book depicted on the right?

14          MR. PRICE:  Objection.  Irrelevant.  She's not

15     testifying --

16          THE COURT:  Counsel, do you have anything further

17     on the temporal foundation?

18          MS. AGUIAR:  Should we go to the side again?

19          THE COURT:  Do you have anything further on the

20     temporal issue?

21          MS. AGUIAR:  May I have a moment?

22          THE COURT:  You may.

23     Q.   BY MS. AGUIAR:  I'm trying to get a little more into

24     time frames here.  Prior to September 1st, 2000, had you seen

25     drawings with arm and hand poses like the one on the left?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.   You know, I can't recall any in particular right now,

2    but it's very possible.

3    Q.   Do you believe that you saw drawings or sketches with a

4    similar arm and hand pose prior to 1999?

5         MR. PRICE:  It's calling for speculation.

6         THE COURT:  Overruled.  You may answer.

7         THE WITNESS:  Prior to 1999.

8    Q.   BY MS. AGUIAR:  Let me give you another question,

9    because I want to broaden it.  Not just -- have you also seen

10   this arm and a hand pose in any other media, popular media,

11   magazines, fashion books or anything like that?  And again,

12   I'll narrow it down to time, but have you ever seen this arm

13   and hand pose in other media?

14        MR. PRICE:  Objection.  Assumes facts not in

15   evidence.  And it is leading.

16        THE COURT:  I'm going to sustain the objection at

17   this point.  I -- let's move on, Counsel.  Go to another

18   area.

19        MS. AGUIAR:  May I ask a specific question about

20   time?  Because I hadn't let her answer the last question.

21        THE COURT:  Let's move on to another area.

22        MS. AGUIAR:  Okay.  Can I ask about the comparison

23   here?

24        THE COURT:  I'm sorry, Counsel.  I'm going to have

25   to see you at sidebar.

1          (SIDEBAR CONFERENCE HELD.)

2          THE COURT:  What I don't like about this is you

3    asked basically the same question prior to coming to MGA and

4    before 1999 and the first time she says it's possible.  The

5    next time -- and all of a sudden she remembers something.  I

6    just think we're getting --

7          MS. AGUIAR:  May I break it down, though?  I think

8    there are two separate issues.  One is whether or not in her

9    view that hand pose is unique.  And I understand the

10   objection about time.  In other words, that if she had not

11   seen an arm and a hand pose --

12         THE COURT:  Let's deal with that issue first.

13   We'll get to the comparisons in a second.

14         MS. AGUIAR:  I'll let it go.

15         THE COURT:  I think I need to instruct the jury to

16   disregard the prior testimony because I overruled the

17   objection and allowed the testimony in.  And then I thought

18   better of it at sidebar, because of the lack of the temporal

19   foundation, and I, like I say, I don't understand how this

20   witness can testify one moment that it's only possible that

21   she saw this before going to MGA, and then you asked the

22   question a different way, and now all of a sudden she knows

23   for sure that she saw it prior to 1999.

24         MS. AGUIAR:  She didn't give an answer.

25         THE COURT:  I heard and the court reporter both

1    recorded that her answer was prior to 1999.

2         MR. NOLAN:  Your Honor, with respect to the

3    temporal aspect of it, can I just be clear about something?

4    Because when -- is the foundation -- the witness is not here.

5         THE COURT:  It's not relevant that she saw somebody

6    else do it after Toon Teens came out.  It only impeaches if

7    it was done before Toon Teens was designed or developed.

8         MS. AGUIAR:  But Toon Teens never came out.

9         MR. QUINN:  It's actually the decal that comes out

10   in 1999.

11        THE COURT:  The decal on the Barbie doll.  That's

12   the -- when was that?

13        MR. QUINN:  1999.

14        THE COURT:  That was 1999.  The question was right,

15   but I am sorry.  You just don't find this at all -- I think

16   there's almost a leading issue here.  When someone answers a

17   question "It's possible," and then turns around when the

18   question is framed slightly differently, I'm going to sustain

19   the objection and just have the jury disregard this

20   particular testimony.

21        MR. NOLAN:  Your Honor, in 1-A, though, we may

22   later have to deal with this through an expert.

23        THE COURT:  And that's fine.  We can work it out

24   later.  Let's not be dealing with it here.

25        MS. AGUIAR:  So then the second question, which has

1    nothing to do with when she first saw it, which is as a

2    design person, which their witnesses have testified to, same

3    type of experience, Lily Martinez, Ivy Ross, do these two

4    look similar to you, that has nothing to do with time.  That

5    has nothing to do with when she first saw the pose.  That

6    just has to do with look at this one and look at this one.

7        THE COURT:  I agree with you, if you can convince

8    me that it's relevant.  What is it relevant to?

9        MS. AGUIAR:  Mr. Quinn in his opening and has

10   elicited testimony from the first two fact witnesses that

11   Mr. Bryant was influenced specifically by Toon Teens and by

12   the arm and the hand pose in Toon Teens in doing his

13   drawings.  If that were the case, she'd think they look

14   similar.

15       THE COURT:  Fair enough.

16       MR. PRICE:  Actually, that's wrong.  The witnesses

17   weren't asked to make the comparison.  The witnesses weren't

18   asked to give an expert opinion on similarity.  We have

19   experts on that in another phase, the Bratz dolls and the

20   drawings.  That's why you have experts.  The witnesses just

21   lay the foundation that these drawings existed and he saw

22   them.  Therefore, the jury, a layperson can determine whether

23   it's --

24       THE COURT:  My recollection is they testified a

25   little bit more than they saw them.  They indicated that they

1    thought they were inspired by them.

2        MR. QUINN:  Your Honor, I think what folks are

3    remembering is my opening statement.  I never had either Ivy

4    Ross or Lily Martinez say that.

5        MS. AGUIAR:  There was extensive testimony about

6    how she looked unique because she looked like she was roller

7    blading and trying to catch her balance --

8        THE COURT:  Stop.  I'm going to give the

9    instruction to strike.  I'm going to grant your objection on

10   foundational grounds and permit very limited testimony on

11   observations, from a layperson's perspective, and then we'll

12   move along.

13       (CONCLUSION OF SIDEBAR CONFERENCE.)

14       THE COURT:  Members of the jury, I am going to

15   sustain the foundational objection by Mr. Price and instruct

16   you to disregard this witness's answer with respect to

17   whether or not she has seen other drawings similar to the

18   Toon Teens drawing on the left with respect to the arm

19   position.  That is stricken from the record.

20       Counsel, you may proceed.

21       MS. AGUIAR:  Thank you.

22   Q.  Ms. Garcia, I'd like to ask you whether you believe that

23   the arm and the hand pose in Toon Teens drawing on the left

24   of the screen, which is Exhibit 263-3, resembles in your view

25   the arm and the hand poses in the photographs on the --

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1     sorry, of the drawings on the right that come from

2     Mr. Bryant's pitch book.

3     A.   I do not find similarities.

4     Q.   Would you tell me why you think they are not similar?

5     A.   If you look at the drawings on the right, which

6     represent the Bratz drawings, you'll see that both characters

7     have a wrist that's cocked very, very strong and hard.  And

8     especially, I guess, the characters -- the character's right

9     hand drawn on the left-hand side.

10    Q.   I want to make sure I'm following you.  Can you give

11    that to me again?  I want to make sure which drawing you're

12    referring to.

13    A.   Okay.  In the drawings to the right, which represent the

14    2000 portfolio drawings, you'll see that the wrist in the

15    character's right hand would be drawn on the left side of the

16    drawing is cocked really, really strong at the wrist.  It's

17    bent down in a more extreme position.  And the arm on that

18    character that is opposite, which would be her left or drawn

19    on the right, her arm is actually placed, you know, down

20    lower.

21    Q.   So you're talking still about the drawings on the

22    right-hand side, and you're talking about the character's

23    left arm?

24    A.   Right.  I'd also like to just say because again, in

25    terms of branding, I talk a lot about branding --

1      MR. PRICE:  Objection.

2      THE COURT:  Stricken.  Next question, Counsel.

3  Q.  BY MS. AGUIAR:  You just need to stick to the question I

4  ask you.

5      So you described something about the right arm

6  wrist and then the left arm.  Is there any other reason why

7  you think that the Toon Teen arm and hand pose is not similar

8  to the arm and hand pose in Mr. Bryant's drawings?

9  A.  I would say that the arm poses that are in Mr. Bryant's

10  drawings represent a tone and a mood that's very, very

11  different from that of the Toon Teen drawings next to it.

12  Q.  What do you mean by that?

13  A.  In the Toon Teen drawing, it's to me -- I receive it

14  that, you know, she is very sweet, that maybe she's off

15  balance --

16      THE COURT:  Counsel, I think we may be beyond the

17  arms.

18  Q.  BY MS. AGUIAR:  Let me just clarify.  When you're

19  speaking in giving your answer right now, are you talking

20  about the arms?

21  A.  Yes.  The arms denote this tone or mood.  They help to

22  express.

23  Q.  You are dealing with probably most people in the room

24  that are not creative people and who have never referred to

25  arms as expressing a tone.  I would think that would be fair

1   to say.  So can you explain to us why an arm or a hand pose

2   in a drawing can convey a tone to you?

3   A.   You know, drawings obviously, they can't speak.  So as

4   drawings, you -- it is the way that you draw your characters

5   that help you to express an attitude or a mood or a tone.

6   And I believe that the way that Mr. Bryant's arms are drawn

7   set the tone that they are sassy, that they have attitude,

8   that they are, you know, that they are confident.

9          However, the arms drawn in the drawing in Toon

10  Teens represent a different attitude, not necessarily sassy,

11  not necessarily with attitude.  They seem to exude an

12  attitude of, to me, sweet or delicate or, you know, I don't

13  know.  I just -- I think that they represent two different

14  things when looking at them.

15  Q.   Had you ever been exposed to the Toon Teen drawings

16  prior to this litigation?

17  A.   No.

18          MS. AGUIAR:  I have nothing further, your Honor.

19  Thank you.

20          THE COURT:  Further direct examination by

21  plaintiff?

22          MR. PRICE:  Thank you, your Honor.

23                REDIRECT EXAMINATION

24  BY MR. PRICE:

25  Q.   Ms. Garcia, I want to take you back to the beginning of

1    your examination by counsel.  When you were talking about at

2    the time you left Mattel and joined MGA, the question was

3    that you had this new doll idea in April 2000.

4          Do you remember that testimony?

5    A.  Yes.

6    Q.  And you told the jury that you had identified a market,

7    the seven- to ten-year-old market.

8          Do you recall that?

9    A.  Yes.

10   Q.  That Barbie tended to be more of a younger girl's doll,

11   and you thought that there was this gap in this market.  You

12   remember that?

13   A.  Yes, I do.

14   Q.  And this was your idea back in April 2000; correct?

15   A.  That's right.

16   Q.  But that wasn't your idea.  You knew that idea at

17   Mattel, didn't you?

18   A.  First of all, it wasn't an idea.  It was an

19   understanding that there is -- that there was not a market,

20   that there was not a doll that appealed to those girls seven

21   to ten.  I don't know what you mean by idea.

22   Q.  Well, what I mean is when you were at Mattel, you knew

23   that that was the concern of the people at Mattel, that they

24   had done research and that they had had feedback and that

25   they identified that they needed to somehow appeal to this

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    market, this seven- to ten-year-old market.  You knew that at

2    Mattel.

3    A.   No, I did not know that.  I wasn't privy to any of that

4    kind of information.  That was something that I received that

5    I perceived in studying the market.

6    Q.   Okay.  So since you weren't privy to that information,

7    you certainly can't tell the jury that this was some unique

8    idea of yours; correct?

9    A.   No.

10   Q.   That this was an idea that might have been actually

11   well-known in the doll industry, and, in fact, at Mattel by

12   April of 2000.

13   A.   I don't know what you mean by idea.  It was -- I

14   believe, if you're a consumer of any kind, that if you're a

15   close consumer to the girls' market, you would have

16   recognized that there were no dolls at that time that were

17   appropriate to girls seven to ten.

18   Q.   Okay.  So I think you just said if you were a consumer,

19   you'd recognize that.  You don't deny that folks at Mattel

20   recognized that gap in the market.  You don't deny that?

21        MS. AGUIAR:  Objection.  Calls for speculation.

22   She's already said she doesn't know what people at Mattel

23   knew.

24        THE COURT:  Overruled.  You may answer.

25        THE WITNESS:  Because that I was not part of any

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    group that would have done this sort of research and to have

2    arrived at this kind of information, I had no idea that

3    Mattel would have identified that to be a problem.

4    Q.   BY MR. PRICE:  Well, you just said that any consumer

5    would understand that.  I mean, so don't you think people at

6    Mattel would?

7    A.   You were specific to speak of research that Mattel had

8    collected and that I might have been privy to that notion.

9    Q.   At any of these job interviews at Mattel with various

10   divisions, where you were interviewing for the four marketing

11   divisions; right?

12   A.   Yes.

13   Q.   And that was sort of a marketing issue, that as you

14   tried to find out what the consumer wants, whether there's a

15   gap that needs to be fulfilled sort of; right?

16   A.   I don't understand your question.

17   Q.   Well, let me ask you, when you were interviewing for any

18   of these four jobs within Mattel, the ones that you didn't

19   get, did you say hey, I've got -- I've noticed there's this

20   gap in the market.  We need to try to focus on seven to ten

21   year olds?

22   A.   I was not approaching in my individual interviews with

23   the recognition that there's a gap in the market related to

24   fashion dolls, no.

25   Q.   Let me go to the other aspect of your testimony, which

1    is you did testify that you had this new doll idea in about

2    April of 2000, this doll that would appeal to the seven year

3    old market and be sassy and have attitude; correct?

4    A.   Yes, but let me just, if I might, maybe the word idea

5    was the incorrect word to use.  I simply want to be able to

6    say that I recognized a void in the market for girls seven to

7    ten, and I recognized that there needed to be a fashion doll

8    appropriate to that consumer.  And if you call recognizing

9    that -- if you call recognizing that we needed to create a

10   fashion doll with attitude and urban and sassy and all of

11   those appropriate things to a seven to ten year old, then I

12   guess that's an idea.

13   Q.   So let's examine that.  First, did you talk about how

14   Mattel -- let me rephrase it.

15        You did talk about how you wanted to have different

16   ethnicities of that doll.  That was part of your idea;

17   correct?

18   A.   That's right.

19   Q.   And, of course, when you were at Mattel, you knew they

20   had dolls with different ethnicities; correct?

21   A.   That's right.

22   Q.   Such as Diva Starz?

23   A.   If I might just finish.

24   Q.   You may go beyond the scope of the question.

25        MR. NOLAN:  Objection.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   BY MR. PRICE:  Go ahead.

2         THE COURT:  Is there anything further?

3         THE WITNESS:  Yes, sir.

4         THE COURT:  Please.

5         THE WITNESS:  You mentioned that there were other

6    dolls that had other -- that a doll might have had other

7    ethnicities such as Diva Starz or such as Barbie.  I don't

8    mean to deny that those brands, especially Barbie, didn't

9    have other ethnicities, it's just that in the case of

10   Barbie's dress, she was sort of the hero.  The brand is

11   called Barbie, and she's the blonde-haired, blue-eyed

12   character.

13        I don't mean to suggest that there weren't other

14   characters with different ethnicities.  I just wanted to make

15   sure that in my brand, those other characters were equally as

16   important as the blonde-haired, blue-eyed character.

17   Q.   BY MR. PRICE:  Let's go to different ethnicities.  Was

18   Diva Starz, was that a Barbie product?

19   A.   No.

20   Q.   And Diva Starz had Alexis, who was a blonde?

21   A.   Yes.

22   Q.   And Tia, who was African-American; correct?

23   A.   I don't know for sure.

24   Q.   Well, do you remember they had an African-American and a

25   Latin, that this is a non-Barbie doll?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.  Okay.

2    Q.  Do you recall that at all?

3    A.  Yes.

4    Q.  And I think you mentioned that Barbie herself had

5    different ethnicities, although the lead was a blonde;

6    correct?

7    A.  Yes.

8    Q.  And that's true in the marketplace, that, for example,

9    Bratz has a blonde, Chloe?

10   A.  Yes.

11   Q.  And it has dolls of different ethnicities; correct?

12   A.  That's right.

13   Q.  And what you've discovered in the marketplace, just

14   consumer choice, is that Chloe, the blonde, outsells the

15   others by two to one almost?

16   A.  That's not true.

17   Q.  Does the blonde -- is that by far the biggest seller?

18   A.  That is not true.

19   Q.  Do you know of a company called Consumer Quest?

20   A.  Yes.

21   Q.  And they do research for MGA for Bratz?

22   A.  Correct.

23   Q.  And I'll hand you what's been marked as 13592 for

24   identification.

25        May I approach?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1          THE COURT:  You may.

2     Q.  BY MR. PRICE:  Have you had a chance to look at

3     Exhibit 13592?

4     A.  Not completely.

5     Q.  Go ahead.

6     A.  Okay.

7     Q.  And this you recognize as a market research report

8     prepared for MGA on about January 29 of 2002?

9     A.  That's right.

10         MR. PRICE:  Your Honor, I move this in evidence.

11         THE COURT:  Any objection?

12         MS. AGUIAR:  No objection.

13         THE COURT:  It's admitted.

14         (Exhibit 13592 received.)

15     Q.  BY MR. PRICE:  And if you look at the fifth page of the

16     document, the third paragraph there, do you see they talk

17     about -- display that.  Chloe is the blonde of the Bratz

18     dolls?

19     A.  That's right.

20     Q.  And in your report of 2002, Chloe is clearly the top

21     character with roughly twice the appeal of each Yasmin and

22     Jade.  Sasha has far less appeal.  This is a report that you

23     received as the product manager of Bratz?

24     A.  Yes.

25     Q.  And clearly you did want different ethnicities.  You

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    thought that was important; right?

2    A.  Yes, very much.

3    Q.  And you said you had this, we'll call, as did you in

4    your examination, new idea which you were excited about about

5    the time you joined MGA, April of 2000; correct?

6    A.  Yes.

7    Q.  And you then told the jury, though, about the dolls that

8    MGA had at the time, including Toddler Tabitha?

9    A.  Yes.

10   Q.  And Bathtime Bouncy Baby?

11   A.  Yes.

12   Q.  And Singing Bouncy Baby?

13   A.  Yes.

14   Q.  And My Dream Baby?

15   A.  Yes.

16   Q.  Hopscotch Heather?

17   A.  Yes.

18   Q.  Prayer Angel?

19   A.  Yes.

20   Q.  None of these dolls fulfilled your vision.  They didn't

21   encompass your new idea of an urban, sassy, multi-ethnic

22   doll; correct?

23   A.  Well, to be clear, all of those had at least two

24   ethnicities, and some had as many as four.

25   Q.  So these dolls, this is what you're talking about.  MGA

1   already had on the market this fashion doll, this idea that

2   you had.  Is that what you're saying?

3   A.   MGA had diverse ethnicities within their large dolls.

4   And as established at that time, MGA had not established a

5   fashion doll as of yet.  That's the difference.  I wanted to

6   establish different ethnicities within a fashion doll

7   concept.

8   Q.   But you wanted to be urban and sassy as well.

9   A.   Sure.

10   Q.   None of these dolls meet that description obviously; is

11   that right?

12   A.   They weren't meant to.

13   Q.   So there was this gap at MGA which you recognized in

14   April of 2000 as well.  MGA did not have a fashion doll which

15   was urban and sassy and multi-ethnic?

16   A.   That's right.

17   Q.   So you had this new idea in April 2000, but the first

18   time you ever mentioned it was in mid-August of 2000 to

19   Veronica Marlow.  Is that your testimony?

20   A.   That's exactly my testimony.

21   Q.   So even though this was your idea and you were excited

22   about it, you didn't tell anybody at MGA about it in April of

23   2000; correct?

24   A.   That's correct, because to keep in mind, I had started

25   MGA in mid-April.  I had been assigned, when coming to MGA,

1    to be responsible for the doll division.  When I started at

2    MGA, I had already had dolls waiting for me that I needed to

3    get started.  That was my first responsibility.

4         So, you know, I took at least, you know, three and

5    a half months to get those dolls going, as promised and as

6    assigned to my responsibility, which is Prayer Angels,

7    Hoppity Bouncy Baby and the like.  And it was three months

8    later that I felt I had those under control so much so that I

9    would be able to start really focusing on this fashion doll

10   idea.

11   Q.   So you didn't mention it in April, May, June, or July to

12   anyone, not a soul at MGA; correct?

13   A.   That's right.  I was busy on my large dolls.

14   Q.   So you were too busy, for example, to say to Mr. Larian

15   or to a co-worker, you know, I have this idea that really

16   excites me about a fashion doll that's urban and sassy and

17   hip.  You didn't have time during those months to even

18   mention it once to anyone before mentioning it to Veronica

19   Marlow; is that right?

20   A.   That's right.  My focus was doing the responsibility I

21   was hired for, which is to focus on an established designs

22   for large dolls first.

23   Q.   And there's certainly nothing in writing during any of

24   those months concerning this new idea you believe you had as

25   of April 2000; correct?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.  No.

2    Q.  I'm sorry.  Is that correct?

3    A.  That's correct.

4    Q.  And then you didn't talk to Mr. Larian about your idea

5    until after you had had a conversation with Veronica Marlow

6    where she had mentioned Mr. Bryant; correct?

7    A.  Yes, that's right.

8    Q.  And, in fact, you didn't tell Mr. Larian about the idea

9    until after you had actually seen Mr. Bryant's drawings in

10   August along with Mr. Bryant and Veronica Marlow and Victoria

11   O'Connor; right?

12   A.  No, that's not true.

13   Q.  Well, in any event, let's talk about the conversation

14   you had with Ms. Marlow.  And you have a good relationship

15   with Ms. Marlow?

16   A.  Yes, I do.

17   Q.  Are you friends?

18   A.  Yes.

19   Q.  And you actually have, for example, financial dealings

20   outside of work?

21   A.  I don't know what you mean.

22   Q.  Well, if you look in your binder at Exhibit 1317?

23   A.  Okay.

24   Q.  And this appears to be a check from either Peter or

25   Maria Marlow to you?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1      A.  Yes.

2      Q.  And is this -- does this have to do with MGA, or is this

3      a personal matter?

4      A.  This is a personal matter.  It was a present, a wedding

5      present that they extended to my husband and I.

6      Q.  And this is a check for $8,000?

7      A.  That's right.

8          MR. PRICE:  Your Honor, move Exhibit 13172 into

9      evidence.

10         MS. AGUIAR:  No objection.

11         THE COURT:  It's admitted.  You may publish.

12         (Exhibit 13172 received.)

13     Q.  BY MR. PRICE:  And just so I understand, at this point,

14     when you received an $8,000 wedding present, Ms. Marlow was a

15     vendor of MGA; correct?

16     A.  Yes.

17     Q.  Someone that you would give business to?

18     A.  She was a free-lancer, if that's what you mean.

19     Q.  What I mean is you would be the one who would decide who

20     to give that sort of work to; correct?

21     A.  Yes.

22     Q.  And you would give free-lance work to Ms. Marlow;

23     correct?

24     A.  Yes.

25     Q.  Now, Ms. Marlow, focusing on your conversation with her

1    in mid-August, isn't it the case that Ms. Marlow is the one

2    who brought up fashion dolls and not you?

3    A.  I'm sorry.  I didn't understand the question.

4    Q.  Sure.  In this August meeting that you had with

5    Ms. Marlow, isn't it a fact that she's the one who brought up

6    to you fashion dolls, not the other way around?

7    A.  That is not how I remember it.

8    Q.  Well, let me ask you if that's possible.  Is it possible

9    that it was Ms. Marlow who is the one who brought up fashion

10   dolls to you and not the other way around?

11   A.  I don't believe that's possible.

12   Q.  And so she would be wrong if that was her testimony?

13   A.  I would think that she was wrong, according to my

14   memory.

15   Q.  Well, do you recall that during that testimony, you were

16   talking about Prayer Angels because you were asking her to

17   work on Prayer Angels?

18   A.  I'm sorry.  Could you --

19   Q.  Sure.  Let me.  During the conversation, it began, did

20   it not, because you and Ms. Marlow were talking about the

21   project she was then working on, Prayer Angels?

22   A.  No, that is not the way it went.

23   Q.  Did you talk about Prayer Angels in this conversation?

24   A.  We may have been talking about our Hoppity Bouncy Baby.

25   Are you speaking about the August 15th meeting?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   I am.  And in that meeting, did you not talk about --

2    you're talking about the first meeting where you two

3    discussed fashion dolls; correct?

4    A.   I'm just trying to establish that Veronica Marlow and I

5    spoke for the first time about a fashion doll walking out of

6    the lobby of MGA on our way to a Hoppity Bouncy Baby shoot on

7    August 15th, the day of the Virgin Mary day in my church.

8    Q.   Did you around this time frame have a discussion with

9    Ms. Marlow about Prayer Angels where she was saying that she

10   had an idea, so it would be a traditional angel, but she was

11   telling you how to make it trendy and cute and more sexy?

12        Do you recall that?

13   A.   No, I don't.

14   Q.   And you don't recall saying that you liked that concept

15   and wanted to talk about it?

16   A.   No.

17   Q.   So if Ms. Marlow testified to that, she would be wrong?

18   A.   I don't believe she would be correct.

19   Q.   Isn't it true that when Ms. Marlow suggested a fashion

20   doll, your response was that -- initially, it was you weren't

21   interested in a fashion doll at that time?

22   A.   I do not remember Ms. Veronica Marlow suggesting a

23   fashion doll to me.

24   Q.   Well, let me ask this, then.  You did have a -- some

25   testimony about Prayer Angels and Mr. Carter Bryant,

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1      Mr. Bryant doing some Prayer Angel drawings for you.

2           Do you recall that?

3      A.   Yes.

4      Q.   And Ms. Marlow was the one who suggested he do those

5      drawings; correct?

6      A.   That's right.

7      Q.   And you in fact received drawings from him?

8      A.   That's right.

9      Q.   Did he fax them to you, or how did you get those?

10     A.   I believe that he e-mailed them to me.

11     Q.   So Mr. Bryant knew that he was doing this work for

12     someone from MGA; correct?

13     A.   Yes.

14     Q.   And this Prayer Angels project, this was a project which

15     had a green light; correct?

16     A.   I don't know what you mean.  Can you be more specific?

17     Q.   Sure.  I mean we were talking earlier about Bratz and

18     when you kind of had a green light approval to go forward.

19     And you had done your PDF.

20          Do you recall that?

21     A.   Yes.

22     Q.   Now, Prayer Angels was at that stage?

23     A.   It was in development, yes.

24     Q.   So MGA had a doll in development for which you asked

25     Carter Bryant to do some drawings; correct?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.   Yes.

2    Q.   And the idea, I think what you testified was that you

3    weren't satisfied with the faces that you were getting, and

4    you wanted other ideas that you might use on this project,

5    which was actually in development at MGA; correct?

6    A.   Yes.

7    Q.   And I believe you testified that you never would have

8    given such an assignment to someone that you knew was a

9    Mattel employee because it would have been confidential

10   information and Mattel was a competitor.

11        That's what you testified; correct?

12   A.   That's right.

13   Q.   Okay.  And so Carter Bryant then, to your understanding,

14   withheld critical information from you such that you never

15   would have asked him to do those drawings if you had known he

16   was a Mattel employee; right?

17   A.   I don't know what you mean.

18   Q.   Well, didn't you testify in your examination that, if

19   you had known Carter Bryant was a Mattel employee, you never

20   would have asked him to draw those faces that you might use

21   on your product?

22   A.   Yes.

23   Q.   And so my question is, then, Mr. Carter, who knew he was

24   a Mattel employee, apparently withheld from you critical

25   information that would have led you not to use him; correct?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.   I do not know if Carter deliberately withheld

2    information.  I'm not sure what Carter's understanding was.

3    I'm not sure what Carter understood.  I understood to be in

4    his way of employment, but I wouldn't suggest that he

5    deliberately withheld information.

6    Q.   I'm trying to understand this.  Because you, as someone

7    who works in the toy industry, knew that it would have been

8    inappropriate for a Mattel employee to provide drawings to

9    you at MGA that would be considered to be used on a product

10   competitive with Mattel.

11        You knew that; right?

12   A.   I'm sorry.  Could you repeat that, please?

13   Q.   Yes.  At the time you knew it would have been improper

14   for an employee at a competitive company such as Mattel to be

15   doing drawings for you at MGA for consideration to be used on

16   an MGA doll in production, you knew that that would be

17   inappropriate?

18   A.   Yes.

19   Q.   And that's why you would never have asked Mr. Bryant to

20   do that if you had known he was a Mattel employee; right?

21   A.   That's right.

22   Q.   And certainly it's your understanding that Mr. Bryant

23   knew he was supplying you at MGA faces to be considered for

24   this baby angel or angel baby; correct?

25   A.   I'm sorry.  I'm getting a little tired.  Can you please

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    repeat the question?

2    Q.   Sure.  Your understanding is Mr. Carter knew that he was

3    drawing designs of faces that you wanted to consider for your

4    doll at MGA, Prayer Angels.

5    A.   I don't know what Carter knew he was submitting those

6    designs for, if in fact they were intended to be used for

7    production, or maybe he thought he was submitting those

8    drawings as a test to see -- for me to see his abilities

9    before the September 1st meeting.  I don't know what his

10   intentions were in sending me those drawings.

11   Q.   Well, I take it that since you've learned that he was a

12   Mattel employee at that time, that you haven't asked him what

13   his view was.  Why was he giving you these drawings when he

14   was a Mattel employee, and you had this competitive product,

15   Prayer Angels?

16   A.   I haven't had a conversation like that with him.

17   Q.   Certainly, we talked about this with respect to the

18   Bratz drawings, but certainly that would affect your

19   evaluation -- or Carter Bryant's honesty and ethics if he

20   was, while a Mattel employee, doing designs for a competitive

21   product at MGA.

22   A.   That would not adjust my assessment of Carter Bryant.

23   Q.   It's your view that MGA did not do a test product of

24   Prayer Angels with Carter Bryant?

25   A.   From MGA's perspective, that's correct.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   Now, I'm going to call your attention to my artwork,

2    which your counsel added to here.  It's not pretty, but you

3    can see this sort of; is that right?  So in your counsel

4    examination, she went through this time line, and first she

5    went to June, and she talked about, you know, if Ms. Maurus

6    said that there was a meeting concerning Bratz, that she was

7    wrong and you were correct, that there was not one; correct?

8    A.   Yes, that's correct.

9    Q.   And then she said that Ms. Rhee was painting a Bratz

10   head, then she's wrong and you were correct, that there was

11   no such painting; correct?

12   A.   That's right.

13   Q.   And then moving forward, in August, early August, that

14   if Ms. O'Connor testified that there was a meeting before

15   September 1st where you saw the Bratz drawing, that she's

16   wrong, and you're correct?

17   A.   As I mentioned before, I'm not sure that there was a

18   meeting prior to September 1st in August.  I don't remember

19   it, but I can't suggest that it's absolutely impossible that

20   it took place.

21   Q.   Well, if that did take place, you recall in your

22   testimony in your original examination was that the reason

23   you might not have heard on September 1st what everybody else

24   heard, which is that Carter Bryant was then an employee of

25   Mattel, that the reason was you were so excited about these

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1   drawings you were seeing for the first time.

2        Do you recall that testimony?

3   A.   Yes, I do.

4   Q.   Well, that excuse wouldn't really apply if you had seen

5   those drawings earlier in mid-August in a meeting with

6   Ms. O'Connor and Mr. Bryant; right?

7   A.   I'm sorry.  I don't understand your question.

8   Q.   That is, you were saying that the reason you might not

9   have heard Mr. Carter Bryant say he was a Mattel employee was

10  because you were so excited by these drawings you were seeing

11  for the first time.

12       Well, that would not be the reason you didn't hear

13  him say that if in fact you had seen those drawings for the

14  first time in a prior meeting with Ms. O'Connor and

15  Mr. Bryant; right?

16  A.   That's exactly why I believe in fact in my heart that

17  the first time I saw those drawings was on September 1st of

18  2000.

19  Q.   I've gone through the time line and points where you say

20  other people are wrong and you're right.  Now I'd like to

21  show you some documents and try to go through these to make

22  sure I'm clear on this.

23       You remember Exhibit 305 which I showed you?

24  A.   No, I don't.

25  Q.   I'll have this gentleman put it up.  We actually

1    remember the numbers.

2         Now, in this case, your testimony is that October

3    10th, that in this case, you were wrong, that is, that saying

4    that Mr. Carter Bryant had worked four hours a day since the

5    1st of September, that in this case you're wrong on that;

6    right?

7    A.   I believe I told you that I believe I wrote this

8    incorrectly.

9    Q.   By the way, just to clarify, though, when you say

10   working on this line, what you're referring to there is

11   working, and this is your e-mail of October 10th, on the

12   Bratz line.

13   A.   As I mentioned earlier, the term working, I'd like to

14   clarify.  He was not working on designs for Bratz at this

15   time.  He was accompanying me through exploration exercises

16   such as the sculpt.  You know, sort of the exploration

17   period.  He was not designing during this time.

18   Q.   My question is different.  Where it says this line, what

19   you are referring to is the Bratz line?

20   A.   The potential for the Bratz line, that's right.

21   Q.   No, no.  What you're referring to is the Bratz line.

22   A.   Yeah.

23   Q.   And then if we have -- could you show Exhibit 1103.  And

24   I'll come back to this, but I believe your testimony on this

25   is that every single date on this is wrong?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.   No.

2    Q.   But your testimony, and we'll come back to it, though,

3    is that that second date, which is highlighted in gray,

4    control drawings to L.A. designer, that that date is wrong?

5    A.   As I mentioned earlier, the October 2nd date could have

6    been the date in fact that I -- that the portfolio drawings

7    were passed to Ms. Leahy for the exploration sculpt; however,

8    that sculpt did not become the manufactured Bratz product.

9    Q.   So, ma'am, remember, we went through this, and you said

10   that -- your initial testimony was that that date was wrong.

11   It was a typographical error.

12        Do you remember that?

13   A.   No, I don't.

14   Q.   Well, I'll move on, then.  And we'll get back to this at

15   some point.

16        But if you look at Exhibit 1236.  And if we can

17   highlight the part of this.  I think your testimony is that

18   in this October 24th e-mail that you wrote, where you said we

19   have finalized the fashion designs, and I am releasing the

20   following final design packages, is it your testimony that

21   you were wrong in saying you had finalized the fashion

22   designs?

23   A.   I believe what I said is -- I'm not sure what I meant by

24   the finalized fashions.  Today we showed when the fashions

25   were finalized, which would have been identified in the

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1   swatch packages which were marked November and some early

2   December.

3   Q.   Well, actually, what you were referring to in those,

4   finalizing the fashion designs, you remember you said it all

5   starts with the sketch?  Do you remember saying that in your

6   examination?

7   A.   Yes, I do.

8   Q.   That you have a designer.  They do a design sketch;

9   right?

10   A.   Yep.

11   Q.   And then it's sort of like Giorgio Armani doesn't always

12   sell his own clothes?

13   A.   That's right.

14   Q.   So once you get the design, the sketch, you then work

15   with someone with fabrics?

16   A.   Sure.

17   Q.   And someone actually has to do sewing; right?

18   A.   Right.

19   Q.   And then someone has to do the sculpting; right?

20   A.   That's right.

21   Q.   And in doing all of this, what you're trying to do is

22   stay true to that vision of that designer, who is assisting

23   you in working with these people; right?

24   A.   I don't understand what you mean.  Do you mean that the

25   sketches, that everybody matches exactly to the sketches?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   That everyone uses the fashion designer's designs as

2    their guide to try to realize that fashion designer's vision?

3    A.   Sure.  So long as the fashion designer's sketches don't

4    revise.

5    Q.   In fact, you've testified that that is what you did on

6    the Bratz line.  Whatever happened, your goal was to stay

7    true to Carter Bryant's designs.

8    A.   Can you please be more specific?  I don't understand.

9    Q.   Well, let me help you.  If you'd look at Exhibit 10001.

10   A.   Would that be in volume 1 or 2?

11   Q.   2.  10001.

12   A.   My book seems to start at --

13   Q.   It's 10001, not 1001.  One zero zero zero one.

14   A.   Okay.

15   Q.   Do you recognize this as an e-mail exchange between you

16   and a gentleman named Robert Haynes Peterson in about May of

17   2001?

18   A.   Yes.

19   Q.   And what he did was he e-mailed questions to you, and

20   then you went to his e-mail and wrote out the answers?

21          MS. AGUIAR:  Objection.  Relevance.

22          THE COURT:  Overruled for the time being.  You are

23   laying the foundation, Counsel?

24          MR. PRICE:  Yes.

25   Q.   So instead of being a normal interview process where a

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    reporter talks to you and takes notes and writes up what he

2    thinks you said, in this case, Mr. Haynes Peterson sent you

3    an e-mail with questions, and then you went into that e-mail

4    and typed out the answers to the questions?

5    A.   It seems so.

6    Q.   And what this e-mail reflects is those questions and

7    those answers; right?

8    A.   That's right.

9    Q.   And you remember I was asking you, you testified in your

10   examination that you had, for example, Ms. Leahy do the

11   sculpting, and you had Veronica Marlow assist with the

12   fabrics, and there were people who actually sewed the dolls,

13   and you said, "I think Carter Bryant didn't do the actual

14   sewing."

15        Do you recall that?

16   A.   Yes, I do.

17   Q.   And then you said, however, "It all starts with the

18   sketch"; right?

19   A.   Sure.

20   Q.   And my question to you is with respect to Bratz, that's

21   what happened.  That is, you, as the product manager, thought

22   that Mr. Carter Bryant's sketches were terrific, and you

23   tried to stay true to Carter Bryant's, the creator's, the

24   designer's vision?

25   A.   Could you please point me to where that might be?

1    Q.  Sure.  Look at the second page.  And would you like me

2    to read the question to you?

3    A.  Sure.

4    Q.  How did MGA --

5         THE COURT:  Wait a second.

6         MS. AGUIAR:  I have a continuing objection.

7         THE COURT:  Before you read the question, Counsel,

8    you have to move this in evidence.

9         MR. PRICE:  I move Exhibit 10001 into evidence.

10        MS. AGUIAR:  I have a relevancy objection, your

11   Honor.

12        THE COURT:  I'll sustain the objection to all but

13   the seventh paragraph of the second page.  So just that.  I

14   assume that's the paragraph you're after, Counsel.

15        MR. PRICE:  I counted six, but you --

16        THE COURT:  I think you know which one you're

17   after.  Just that paragraph.

18   Q.  BY MR. PRICE:  The question was:

19        "How did MGA design the four different girls?

20        Both inspiration for the overall design and the

21        look of each girl?

22        "ANSWER:  The four girls were already

23        concepted when presented by the inventor during our

24        first meeting.  I thought they were incredible, and

25        I tried to stay true to this inventor/creator's

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1      vision."

2          That was the answer you wrote; correct?

3      A.   But I believe -- I'd like to explain if I may.

4      Q.   I want to focus on September through October 20th with

5      respect to Mr. Bryant.  Okay?  Focusing on that.

6          And you testified, for example, that there were

7      meetings with the sculptor.  Do you recall testifying to that

8      in your direct or your cross-examination by your counsel;

9      yes?

10     A.   Yes.

11     Q.   And Mr. Bryant, Carter Bryant was there in the meeting

12     you were in; correct?

13     A.   That's right.

14     Q.   And, in fact, he was in previous meetings with that same

15     sculptor without you; correct?  Without you being present.

16     A.   As mentioned earlier, I remember being present at the

17     sculpt meetings both with Carter Bryant and Margaret.  It's

18     possible that I may not have been part of one.  I don't

19     remember personally.

20     Q.   But in any event, he didn't do the actual sculpting;

21     right?

22     A.   No, he didn't.

23     Q.   I mean, that's what you have a sculptor for.

24     A.   Sure.

25     Q.   And he worked with Veronica Marlow on the fashions;

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    correct?

2    A.  How do you mean?

3    Q.  Well, he talked to her about his ideas.  He provided her

4    with sketches.  He approved some of her swatches.

5        MS. AGUIAR:  Objection on foundation grounds, your

6    Honor.

7        THE COURT:  Sustained.

8    Q.  BY MR. PRICE:  Let me ask you this, then.  In September

9    and October, do you know the interaction that Carter Bryant

10   had with Ms. Marlow, who introduced you to him?

11   A.  I believe I do, yes.

12   Q.  And how do you know that?

13   A.  I mean, I knew what we were working on in September and

14   October of 2000, if that's what you mean.

15   Q.  And you remember we showed you all of those invoices of

16   the 160 hours prior to October 20th that Ms. Marlow billed;

17   correct?

18   A.  That's right.

19   Q.  And you know that Mr. Bryant, as the visionary, the

20   creator, worked with her during that time frame?

21   A.  I don't know that, no.

22   Q.  If you would look at Exhibit 1765 -- which I believe is

23   in evidence, your Honor.

24       THE COURT:  I believe so.

25   Q.  BY MR. PRICE:  Now, this is October 23.  See just the

1    first paragraph there.  Going down there.  That's correct.

2    That's from Mr. Carter Bryant to you; correct?

3    A.   Yes.

4    Q.   And you see down here, where it says:  "So here's a

5    rundown of what we plan to have for you by Friday."

6         Do you see that?

7    A.   Yes.

8    Q.   You can tell who he's talking about when he says "we";

9    correct?

10   A.   No, not necessarily.

11   Q.   Who is doing the doll fashions and the swatching?

12   A.   Okay.  Veronica.

13   Q.   And the fashion pack designs and swatching there?

14   A.   Veronica.

15   Q.   And this was, I believe -- is it Tuesday?  Monday.  This

16   was -- I'll represent to you this was a Monday because that's

17   what I've been told.

18        And it says:  "We're going to have all of these

19   things for you by Friday."  And you see that?

20   A.   Yes.

21   Q.   And obviously, being familiar with how this industry

22   works, they didn't start working on these on Monday; right?

23   A.   I'm not sure what they were working on during this time

24   in reference to this e-mail.

25   Q.   Well, you had the bill dated October 20th -- the bills

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    of 160 hours doing design and the swatching; right?

2    A.   Mr. Price, I believe that yesterday I testified that I'm

3    not sure what Ms. Veronica was doing, but if she was doing

4    anything in regards to that invoice, that was more likely to

5    be exploratory stuff, especially related to the exploratory

6    sculpt.

7    Q.   She was doing swatching and designs right there in those

8    invoices; right?

9    A.   Um, I'm not sure what she was swatching, because in fact

10   the final fashion designs were not released until, you know,

11   close to early December, and, in fact, the sculpt wasn't even

12   complete at that time.

13   Q.   I'm trying to focus on what Mr. Carter Bryant did during

14   this time frame and who you worked with.  You paid for 160

15   hours worth of work for Ms. Marlow for designing and

16   swatching with respect to the Bratz project; right?  You,

17   meaning MGA.

18   A.   I do not believe that the hours attributed that I did

19   pay for were in relation to actually the manufactured

20   fashions that I released to production.

21   Q.   And I'm not asking you that.  I'm asking you, focusing

22   on what Carter Bryant did in September and October on what

23   you say is the final or interim or the third variation, I'm

24   not focusing on that.  I'm just trying to get you to agree

25   that the creator, the designer, who does the sketches for

1    which this follows, was working with Ms. Marlow in September

2    and October on these designs.

3    A.   On which designs, Mr. Price?

4    Q.   The designs you paid for, the 160 hours you paid for in

5    September and October?

6    A.   I just want to be clear, that I may have paid for

7    those -- for the work that Veronica had rendered, but I'm not

8    sure what work they were.  But I'm certain that they were not

9    the product that we actually manufactured.  They could have

10   been exploratory fashions.  I'm not sure what they were.

11        MR. PRICE:  Move to strike the latter part of the

12   answer.

13        THE COURT:  Which part?

14        MR. PRICE:  The part "I don't know if they were

15   exploratory or whatever."  It's irrelevant to this phase.

16        THE COURT:  The part that I think you are objecting

17   to, Counsel, is the reference to the final product.

18        MR. PRICE:  Yes.

19        THE COURT:  Everything else is not stricken.  The

20   reference to the final product is stricken.

21   Q.   BY MR. PRICE:  Let's try to wrap this up.  You do agree

22   that Mr. Bryant, September and October, while he was still an

23   employee at Mattel, was working with Veronica Marlow on some

24   sort of designs and fashions relating to Bratz?

25   A.   What I remember within this time period is that I

1    believe that Mr. Carter Bryant, as it related to fashions,

2    had a shopping experience, as I confirmed earlier, a shopping

3    spree with Ms. Veronica Marlow around the middle of October.

4    That's what I understand him to have been doing around this

5    time period as it related to fashions.

6    Q.   And if we can go to the Exhibit 1236, where it talks

7    about these final fashion -- your October 24th e-mail.

8         MS. AGUIAR:  I didn't object before, but can we get

9    the whole document on the screen?  Because I think the

10   sentence at the bottom is also relevant.  It's the whole

11   bottom e-mail.

12        MR. PRICE:  Blow up the whole thing.

13        THE COURT:  Very well.  Is that sufficient,

14   Counsel?

15        MS. AGUIAR:  Thank you.

16        THE COURT:  Yes.

17   Q.   BY MR. PRICE:  Now, when it talks about the finalized

18   fashion designs, in your examination from your counsel, you

19   recall that she asked you about these Exhibits 1107 to 1110?

20        Do you recall that?

21   A.   I'm sorry.  I was just reviewing the document.

22   Q.   Sure.  Do you recall that, in your examination with your

23   counsel, she showed you these drawings, 1107 to 1110.

24        Do you recall those sketches?

25   A.   No, I don't.

1    Q.   Okay.  I can understand.  Let's put 1107 up.  This might

2    help refresh your memory.

3         Does this help you remember?  You had 1107, 1108,

4    1109, 1110, which are these drawings by Carter Bryant?

5    A.   Yes.

6    Q.   And it's true, is it not -- I'm trying to find your depo

7    transcript.

8         THE COURT:  Counsel, why don't we go ahead and take

9    our break at this time.

10        (WHEREUPON THE JURY WITHDRAWS.)

11        THE COURT:  Counsel, I want to take up an issue.

12   I'm going to ask the witness to step outside for this

13   discussion.

14        (WHEREUPON THE WITNESS WITHDRAWS.)

15        THE COURT:  I'd like to hear from both sides on

16   this issue of this distinction the witness is making

17   regarding the final product and the exploration.  Because I'm

18   afraid that it's infecting a legal issue in this first phase

19   that is potentially opening up the apportionment issue in the

20   second phase.  And at the same time I want this witness to be

21   able to answer based on her understanding of what was

22   happening.  But I would like to hear from both sides on it.

23        MR. PRICE:  My perspective.  First, your Honor, I

24   will ask her didn't Mr. Bryant work with the sculptor in this

25   time frame.  And her answer will almost always be yes, but

1    let me be clear, it wasn't the final sculpt.  Did she work

2    with the fashion designer?  Yes, but let me be clear, this

3    wasn't the final fashions.

4          THE COURT:  I'm hearing that as well, Counsel.  And

5    I --

6          MR. PRICE:  And actually --

7          THE COURT:  I should begin with Ms. Aguiar.

8          MR. PRICE:  And if I can tell, my remedy, I'm not

9    asking about that.  I'm asking what did the designer who was

10   guiding this do in that time frame.  That's how I'm trying to

11   limit it.

12         THE COURT:  I think you are entitled to the answer

13   to that question, and then at the same time I think

14   Ms. Garcia is entitled to answer it as best she can.  But,

15   Counsel, she does seem to be sticking in this -- I don't want

16   to call it a legal defense, but it definitely seems to be a

17   distinction that she has in her mind that frankly is not

18   relevant to this phase of the trial.  And I'm getting to the

19   point where I'm going to call for an instruction to the jury

20   on this.  So I'd like to hear your thoughts on this.

21         MS. AGUIAR:  I think that she has a very -- keep in

22   mind, this is the person who developed the Bratz line.  And

23   she has a very specific idea of what is Bratz.  And she has

24   been trying to explain that during this early time period,

25   for example, if they were buying fabrics or making clothes,

1    they were doing it to see what some of his ideas might look

2    like.  She even testified that if they did make something,

3    she thinks they might have been making them off of this very

4    large --

5              THE COURT:  Is the defense taking the position in

6    this case that what was going on in, say, October, November,

7    December of 2000 was not a development of the Bratz doll?  Is

8    that MGA's position?

9              MS. AGUIAR:  I don't believe so, your Honor.  I

10   think --

11             THE COURT:  Because this is the person most

12   knowledgeable about MGA's position or MGA's company.  So I

13   really don't think that you can take the position and

14   introduce evidence through your witness, through your person

15   most knowledgeable that's contrary to the position that you

16   as a company are taking.  So something's got to give here.

17             MS. AGUIAR:  I think that she is not intending to,

18   and I will represent to the Court that she has not been

19   prepared to support any legal defense.

20             THE COURT:  I'm not suggesting anything, but I

21   think it may be incumbent upon counsel, and if you don't do

22   it, the Court may have to do it in terms of an instruction,

23   because I think what we're doing is we're creating a

24   distinction that is confusing the issue that's being

25   litigated here, and I'd like to hear from you on that point.

1          I'm not suggesting coaching or anything else.

2     She's a very intelligent woman, and she's certainly capable

3     of coming up with whatever theories.  I'm not suggesting that

4     she needs to be coached on anything.  I'm simply saying that

5     I understand the objection that Mattel is making on this

6     point.

7          And it's conflicting -- her testimony is

8     conflicting with what we all understand to be undisputed.

9     It's not -- and unless I'm mistaken, and if I am, let me hear

10    it now, because I may have to revisit some other decisions

11    that I've made in terms of phasing here.

12          MS. AGUIAR:  As I said yesterday, and I think we

13    talked about this yesterday morning preliminarily before the

14    jury came in, and what I was also trying to explain is that I

15    think Mr. Price, I think he may be bringing on some of the

16    answers by putting in his question Bratz, the Bratz sculpt,

17    or the Bratz fashions.

18          I understand that that may seem like slicing it

19    thin, but for her it's not because the manufactured Bratz

20    doll and what they may have been doing early on to figure out

21    whether this was something they even could do are two

22    different things.  So can I make a suggestion?

23          THE COURT:  Please.

24          MS. AGUIAR:  That we do two things here.  One, I

25    can't control, and one I can.  The one I can't control is the

1   suggestion that when the questions are asked, they are asked

2   in a way that are not loaded up with this concept of Bratz.

3   Because I think that's what's tripping her answer.

4        THE COURT:  Counsel, there's got to be a reference

5   to Bratz here.  That's what this is about.  The question is

6   whether or not -- you're asking me to tell Mattel that they

7   are to exclude Bratz from their questions?

8        MS. AGUIAR:  Not at all.  But I'm just saying when

9   he says the Bratz sculpt, I think that that is what's causing

10   some of the problem.  And if he just says the sculpt or

11   whatever.  Again, I can't control that.  I'm just trying to

12   explain why I think she's answering the way she is.

13        The thing I can control is that we can mention to

14   her what this issue is.  I mean, if you think it's

15   appropriate, we can address it with her.  And if she can

16   answer in a way that does not keep making the reference to

17   the final product, I'm happy to do that.  Because clearly we

18   don't want to go down the road of having the instruction.  I

19   don't think it's necessary at this point.  I think it would

20   be prejudicial to us to have such an instruction.

21        So I'm just trying to point out that I think it's

22   a -- the problem is coming from two ends, and so I can

23   speak -- we can speak to her about the issue, but I do think

24   it's the wording of the question.  And, of course, I'm not

25   suggesting we never mention the word Bratz.  I've been using

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    it.  Everyone's been using it.

2        THE COURT:  And that's just the point.  When you

3    have used it, there hasn't been a problem.  And that's the

4    concern that I have, and that's why I've asked the witness to

5    step out and the jury to step out.  I've been following along

6    here and taking notes where many times that you will use the

7    same phraseology that Mr. Price uses it, when you use it, she

8    is not making this elaboration.  When Mr. Price uses it, she

9    is.  And that's the concern I have.  She seems to fully

10   understand it when you use it.  She doesn't seem to

11   understand it when Mr. Price uses it.

12       MS. AGUIAR:  You know, I'm not disputing what

13   you're saying.  I just don't -- I haven't looked at the

14   transcript of what my questions are and whether I've been

15   asking her the questions worded in the same way.  I believe

16   what you're saying.  I just -- so as I said, I don't think we

17   should go down or need to go down the road of an instruction.

18   I think it would be prejudicial.

19       We can address it with the witness.  And we can

20   explain to her that if she can answer her question without

21   drawing this distinction, we can try to do that.  But I think

22   it's --

23       THE COURT:  I feel uncomfortable about ever telling

24   a witness what they can and cannot say.  I think there's a

25   bigger issue.

1       Mr. Nolan, you seem anxious to say something.

2       MR. NOLAN:  Your Honor, I'll just represent to you

3   without waiving any privileges, I explained the Court's

4   phasing order in terms of do not get into this final project,

5   okay?

6       THE COURT:  Do you understand, Mr. Nolan, the

7   Court's concern?

8       MR. NOLAN:  No, no, I understand the Court's

9   concern, your Honor, and I do respectfully, though, disagree

10  with the difference in the types of questions.  I think

11  here's the issue.

12      Mr. Price, and I understand why he's doing it, has

13  a document on the screen that says we're sending the final

14  fashions.  He's always talking about the final fashions with

15  respect to Bratz.  It's always tied that way.

16      I believe, if you go through the transcript, you

17  will never hear a question from Ms. Aguiar that is loaded in

18  the beginning with such things -- I don't mean it in a

19  pejorative way, that he's pointing to a document that refers

20  to a final fashion --

21      THE COURT:  I understand that.  And I'm not talking

22  about the final fashion.  I'm just saying when you use simply

23  the word Bratz, it appears that it's triggering a different

24  response, depending on who it's coming from.

25      MR. NOLAN:  Well, your Honor, I think we pointed

1    out pretty early on that if there was a distinction between

2    the Bratz drawings and the Bratz doll, because the Bratz doll

3    is Phase 1-B.  We've always understood that.  The difference,

4    though, your Honor, here is when we're talking and asking

5    questions, with all due respect, I believe Bratz is related

6    to the drawing.  That's the concern I have.

7            THE COURT:  You're correct.  We're talking about

8    the Bratz drawings at this phase.  And whatever else

9    Mr. Bryant did or didn't do while he was still working at

10   Mattel.  You're correct.

11           But what this witness is doing through these

12   repeated insertions is suggesting that the Bratz drawings, or

13   whatever it is that was going on here, has nothing to do at

14   all with the final product.  And she is repeatedly putting

15   this wedge in there and referencing the final product, making

16   comparisons with the final product.  And that seems to be

17   decidedly Phase 1-B.

18           I just went through this deposition this morning,

19   and you make this very same objection, and I think -- I have

20   tentatives in your favor across the board on this issue on

21   objecting to Phase 1-B issues in infecting Phase 1-A.  But

22   that's precisely what is happening here.

23           MR. NOLAN:  Well, your Honor, I respectfully

24   disagree because I'll give you one last example.  Mr. Price

25   showed a document.  You sustained the objection as to all

1    paragraphs other than paragraph 7; however, that document and

2    that interview was conducted well beyond October 20th of

3    1999, the relevant date.  For some reason Mr. Price decided

4    to go over to an interview well beyond the October 19th date.

5           THE COURT:  Well, let me stop you there.  He did,

6    but the one paragraph that I permitted in was making

7    reference to a meeting that took place at the time that we're

8    talking about.  It talks about our first meeting, and I

9    gather, based on the foundation, that that was a reference to

10   the time period.  Are you suggesting it's not?

11          MR. NOLAN:  I do not believe it is.  When she's

12   saying that we try to stay true to the vision of, at least

13   that's how I understood the document.

14          THE COURT:  Wait a second.  The line says -- if I'm

15   mistaken on that, then I should reverse my ruling.  But the

16   paragraph states the four girls, which I assume everyone

17   agrees are the Bratz dolls, in context here, were already

18   concepted when presented by the inventor during our first

19   meeting.

20          Are you saying that that's not the meeting?

21          MR. NOLAN:  No, your Honor.  I -- that is the

22   September 1st meeting.  But may I just explain to you --

23          THE COURT:  That's why it's in.

24          MR. NOLAN:  I'm sorry.  What is happening, though,

25   is when she says, "I tried to stay true to his vision as

1    expressed in the drawings," they are drawing the inference

2    that back at that point in time, and that's why they use the

3    document to impeach her on what she's trying to say was the

4    interpretation.  To allow her to just have to say we tried to

5    stay true to his vision, the vision and the doll are

6    different.  That's the point.  And I think that's the

7    confusion that's coming in.

8           THE COURT:  The vision and the doll are different,

9    but they are not unconnected.  And she appears to be

10   suggesting that they are unconnected.

11          MR. NOLAN:  Your Honor, we are not taking that

12   position.  That's not --

13          THE COURT:  I wouldn't think so.

14          MR. NOLAN:  Of course not.  Your Honor, that's not

15   what is happening.  And that's not -- I mean, I can't get

16   into her head.  I mean, if -- she can testify in 1-B, too,

17   your Honor.  But I understand the Court's concern.

18          THE COURT:  You understand the concern.

19          MR. NOLAN:  And we'll talk.  We'll both talk about

20   it again and make certain that she is mindful of that

21   distinction.  But I would urge Mr. Price to maybe, when

22   you're looking at final fashions and pointing to a document

23   in October, and your Honor, he even went to an October 23

24   date when Carter Bryant is working for us.

25          THE COURT:  Right.  But the October 23 date, I mean

1    to the extent that there is a -- I'm allowing some, and I've

2    overruled a couple of the objections that you've made that

3    have been slightly past the October 19th date simply because

4    it appeared to the Court that the document relates back to

5    information or work or developments that predated October

6    19th.  I think there was a fair inference, and you both can

7    argue that.

8        MR. NOLAN:  Right.

9        THE COURT:  And you know, when I limit -- when I

10   indicated on the record that Mr. Price is entitled to the

11   answer, you're certainly free to fully examine and bring out

12   whatever additional explanations you want.  It's just that

13   I'm really concerned about this one explanation that keeps

14   coming up in the context, and I guess I'm still not satisfied

15   as to how we address T perhaps part of the solution is what

16   you're suggesting is to remind her of the Phase 1-A, 1-B

17   distinction.

18       Mr. Price, anything further from Mattel's

19   perspective.

20       MR. PRICE:  I believe -- it has been confusing.

21   And I think an instruction is proper, and not which suggests

22   she's doing anything wrong.  But an instruction that says

23   something to the effect that, you know, that in this part of

24   the trial, we're trying to determine, you know, what Mr. --

25   what Carter Bryant did while he was still employed at Mattel

1    and who owns the drawings.  And the final product is not an

2    issue at this point.  And it's not for you to worry about.

3           THE COURT:  I think I understand this.  But what do

4    you want me to do, Counsel?

5           MR. PRICE:  I think they should be told that,

6    because I think right now they are having to decide that,

7    because it is every other answer.  At least 20 times where

8    she said but the final product, blah, blah.  But the final

9    product, et cetera.

10          And I think you need to tell the jury that they

11   don't have to worry about that right now because they are

12   working hard on this.  And they have got to try to categorize

13   this.  And I think just telling them something which all

14   sides agree to.

15          THE COURT:  Well, Mr. Price, I'm close to doing

16   that, but I'm not there yet.  I think that would be -- I

17   think Mr. Nolan and Ms. Aguiar are correct, that that would

18   be unfair at this point.  It's going to be part of the

19   instructions at the end of this phase, no question, and I'm

20   hoping that this can perhaps be corrected during the break,

21   and I'll give you leave to recover some of this ground if you

22   want.

23          MR. PRICE:  Thank you.

24          THE COURT:  I'm in mind of the concern.

25          Mr. Nolan, Mr. Quinn, can I see you in chambers for

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    a second on an unrelated matter.

2        (Recess taken.)

3        THE COURT:  Yes, Counsel.

4        MR. QUINN:  One issue I wanted to alert the Court

5    to.  The next witness we would call is Victoria O'Connor, who

6    has been waiting around for two days.  I asked counsel

7    whether we could interrupt to try to get her on and off.  I

8    think my direct examination would be maybe 20 minutes with

9    her.

10       My concern is that we may finish up with this

11    witness, and then we would only have time to do our direct

12    with Ms. O'Connor.  Her mother is having surgery on Tuesday.

13    She cannot come back Tuesday.  She might be able to come back

14    next Wednesday afternoon.  That's the earliest she could come

15    back.  She's got a trip out of state Thursday and Friday.  So

16    I think -- what I fear, our choice may be either to interrupt

17    this witness and try to get Ms. O'Connor on or off, or we may

18    be in an situation where we do our direct, and they don't

19    have a chance to cross her until next Wednesday afternoon at

20    the earliest.  And that's only a maybe.  So I'm alerting the

21    Court to this situation.

22        THE COURT:  Thank you, Mr. Quinn.

23        Mr. Nolan?

24        MR. NOLAN:  My suggestion to Mr. Quinn or what I

25    told Mr. Quinn was that we at times would be willing to

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    accommodate such situations.  Ms. Garcia has this week put

2    off all of the buyer meetings for the spring line, and they

3    are set for next week, and I am hoping that we're going to be

4    able to finish her today.  I'm worried that if Victoria

5    O'Connor comes on, that we'll have to bring back Ms. Garcia,

6    and I don't know whether she's going to be available.  What

7    I'm suggesting is that we can put Victoria O'Connor on

8    Wednesday afternoon and finish her off then.

9          I don't want to interrupt with the surgery, but I

10   think we should try to get Ms. Garcia finished and do that.

11   I don't -- I think it would be tough to interrupt

12   Ms. Garcia's testimony right now.  She's been on the stand

13   for quite a while.  I probably don't want to put this on the

14   public record.  I apologize.  She's pregnant, and she gets

15   tired.  But we've pushed off all of her work for next week

16   and asked her to commit to this week.

17          So I would ask not to have her interrupted right

18   now.  I'd like to get this witness finished up today.

19          MS. AGUIAR:  If it would help with regard to

20   planning, I have at this point extremely limited redirect.

21          THE COURT:  Why don't we just proceed, and I think

22   everybody is aware of the situation.

23          Thank you, Counsel.

24          Mr. Price, let's bring in the jury.  We should

25   bring the jury in before Mr. Price resumes questioning.  A

1    minor detail.

2         (WHEREUPON THE JURY ENTERS.)

3         THE COURT:  Counsel, you may proceed.

4         MR. PRICE:  Thank you, your Honor.

5         1236 again.

6    Q.  Ms. Garcia, I'm going to try to focus on what you may

7    have meant in this memo and ask you questions about this

8    phrase here about having finalized the fashion designs,

9    because I'm trying to get a handle on what Mr. Carter Bryant

10   did before he left Mattel.

11        You recall I showed you Exhibit 1107.  Do you have

12   1107 in front of you?  That would be in the first volume --

13   no, second volume.  I'm going to show you those and 1108,

14   1109 so we can show the jury what we're talking about here.

15   And it's correct that the fashions shown on Exhibit 1107,

16   we'll go to that first, those are fashions that -- 1107 --

17   that ultimately ended up being sold with dolls; correct?

18   A.  Yes, it appears so.

19   Q.  And Exhibit 1108, that's -- the same is true?

20        MS. AGUIAR:  Objection.  Relevance.

21        MR. PRICE:  What drawing she's referring to when

22   she says final fashion designs, and it's our contention that

23   she's referring to these --

24        THE COURT:  Let's ask that question, Counsel.

25        MR. PRICE:  Okay.

1   Q.   There were drawings that Carter Bryant did separate and

2   apart from 1107 through 1110 that were provided for the

3   development, the fashions as part of the dolls; correct?

4   A.   I don't understand.  Can you please rephrase your

5   question?

6   Q.   Sure.  We've got this 1107, 1108, 1109, 1110.  And these

7   are drawings, actually, which you've testified were shown to

8   Kmart in November; correct?

9   A.   Yes, I believe so.

10  Q.   And you said you don't know exactly when these

11  particular drawings were created, whether it was a couple

12  weeks before or prior to that; correct?  You don't recall.

13  A.   I don't recall exactly.

14  Q.   Okay.  And you've got the phrase in that e-mail which

15  talks about the final fashion designs.  The phrase which you

16  don't really recall what you meant; correct?

17  A.   Do you mean in this document?

18  Q.   No.  Remember the other document we had up?  1236, where

19  you talked about final fashion designs, and you don't recall

20  what you meant by that.

21  A.   That's right.

22  Q.   So let's look at what was happening then.  These 1107,

23  1108, 1109, 1110, the fashions in those pictures prior to

24  those pictures being drawn, Carter Bryant drew designs for

25  those fashions.  That's what you expect to be true; correct?

1    A.   That I -- I don't understand.  I'm sorry.  I really

2    don't understand the question.

3    Q.   It's okay.  It's late, and I'm not terribly articulate.

4    So let's go to 1107 and give a specific example.

5          Now, you told us these ended up actually being on a

6    doll.  So what I'm saying is these fashions here; all right?

7    This shirt and these drawings here, the drawings for those

8    were done by Carter Bryant before this full drawing was done,

9    that is, the designs that he drew -- Carter Bryant drew

10   designs for these fashions before he did Exhibit 1107.

11   That's what you expect; correct?

12   A.   No, not necessarily.

13         MR. PRICE:  Your Honor, if I could read from her

14   deposition transcript.  This is on October 10, 2007.

15         THE COURT:  Which volume, Counsel?

16         MR. PRICE:  4.  October 10, 2007.

17         THE COURT:  Page?

18         MR. PRICE:  Page 1031, line 17 to line 25.

19         THE COURT:  Any objection?

20         MS. AGUIAR:  Just a relevance objection.

21         THE COURT:  Overruled.  And the objection within

22   the context is overruled as well.

23         MR. PRICE:  (Reading.)

24         "QUESTION:  And if I understand your testimony

25         correctly, there were drawings that Carter Bryant

1      did separate and apart from what we've marked here

2      as Exhibits 1107 through 1110 that were provided

3      for the development of the fashions as part of the

4      dolls; is that correct?

5          "ANSWER:  I expect so, yes."

6      Q.  And it's true, ma'am, that those design drawings that

7      Carter Bryant did for fashions that are shown on Exhibit 1107

8      were provided to MGA prior to the time that Exhibit 1107 was

9      provided?

10     A.  No.

11         MR. PRICE:  Your Honor, if I could read from page

12     1032, line 22, through 1033, line 5.

13         THE COURT:  Any objection?

14         MS. AGUIAR:  No.

15         THE COURT:  The objection is overruled.  You may

16     read it.

17         MR. PRICE:  (Reading.)

18         "QUESTION:  Is it true that those design

19     drawings that Carter Bryant did for the fashions

20     that are shown in Exhibit 1107 --

21         "ANSWER:  Um-hm.

22         "QUESTION:  Were provided to MGA prior to the

23     time that Exhibit 1107 was provided?

24         "ANSWER:  Yes."

25         Actually, your Honor, if I could just continue

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    reading down to line 20.

2             THE COURT:  Down to line -- I'm sorry?

3             MR. PRICE:  On page 1033.

4             THE COURT:  Any objection?

5             MS. AGUIAR:  No objection.

6             THE COURT:  Through line 20?

7             MR. PRICE:  Yes, your Honor.

8             "QUESTION:  And is the same true for the

9    fashions in Exhibit 1108?

10            "ANSWER:  Yes.

11            "QUESTION:  Is the same true for the fashions

12   shown in Exhibit 1109?

13            "ANSWER:  Yes.

14            "QUESTION:  Is the same true for the fashions

15   shown in Exhibit 1110?

16            "ANSWER:  Yes."

17   Q.  So, Ms. Garcia, having seen this testimony and seeing

18   these drawings and having testified that the fashion designs

19   for those drawings were created before you got those

20   drawings, I'd like to go back now to 1236, where you inform

21   Korea that "we finalized the fashion designs."

22            Do you see that?  Is it possible that what you're

23   referring to there are the drawings Carter Bryant did before

24   he did Exhibits 1107 through 1110 but which were designs of

25   the fashions on Exhibit 1107 through 1110?  You follow me?

1    A.   Yes.  And I don't believe so.

2    Q.   But you do agree, after looking at this, obviously MGA

3    had from Carter Bryant some time prior to getting

4    Exhibits 1107 through 1110, that MGA had these design

5    drawings from Mr. Bryant that had those fashions on them.

6    You now believe that; correct?

7    A.   It is possible that prior to receiving the final

8    drawings, the drawings that you referenced as 1107 through

9    1110, it's possible that there were some drawings a few days

10   prior to receiving the final drawings.  That is possible.

11   Q.   And would you have at that time referred to those as

12   finalized fashion designs if in fact those were fashions that

13   ended up being sold with the dolls?  Would that have led you

14   to use this language here?

15   A.   I'm sorry.  I'm just -- give me time.

16   Q.   I'm trying to figure what you meant here by this.

17   Because you can't remember when you say finalized the fashion

18   designs.

19          Would you have used that phrase because the designs

20   in 1107 to 1110 actually ended up being sold with the dolls?

21   A.   I don't believe the drawings that 1107 to 1110 was

22   necessarily in reference to this particular e-mail.

23   Q.   And so focus on this question, then.  Would you have

24   used that phrase, though, "finalized the fashion designs," if

25   you were thinking here I have these sketches of designs that

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    actually were used on the dolls?  Would that have been

2    something that might have been referred to?

3    A.  I'm sorry.  I just don't understand your question.

4    Q.   Okay.  I'll try it one more time, and then I'll move on

5    to something else, because it's late, and perhaps you just

6    don't remember what this means.

7             Assume the following.  Assume that you had 1107

8    through 1110, those drawings.  And assume that the fashions

9    on those drawings, you know, ended up on the dolls.  Okay?

10   And assume that you had the design sketches for those before

11   October 24th.  Are you with me so far?  I haven't asked a

12   question yet.

13            MS. AGUIAR:  I have a relevance objection.

14            THE COURT:  I'm sorry?

15            MS. AGUIAR:  A relevance objection.

16            THE COURT:  Overruled.  I'll give you some

17   latitude.

18   Q.   BY MR. PRICE:  If you were with me, you may not be now.

19   A.   Can you start over for me?

20   Q.   Sure.  Assume 1107 through 1110 -- that those drawings

21   showed fashions that ultimately ended up being sold with the

22   dolls.  Okay?  Assume that.  And assume that prior to getting

23   those drawings, you got, as you testified to, design drawings

24   from Carter Bryant for those specific fashions.

25   A.   To be clear, rougher versions of the versions 1107 to

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    1110.

2    Q.   What I'm talking about is just design drawings that he

3    did for the fashions that are in those pictures as you've

4    testified to.

5    A.   I'd just like to clear my testimony to say that if I had

6    gotten sketches prior to the sketches referenced as 1107 to

7    1110, it may have been rougher versions of those very

8    drawings.  Just being clear.

9    Q.   So those drawings that he did, if you knew at the time

10    you did this that those drawings, those designs were going to

11    be the designs that ended up on the dolls, might you have

12    referred to those October 24th, using the loose language, we

13    have finalized the fashion designs, could that be what you're

14    referring to?

15    A.   Mr. Price, I don't believe that those drawings have any

16    relationship to this particular e-mail.

17    Q.   So sitting here today, you have no idea really what you

18    are referring to in this e-mail when you say we have

19    finalized the fashion designs?

20    A.   As mentioned, I do not know what I could have meant by

21    final fashion designs as today I confirmed in my testimony

22    that the designs were not finalized until the swatch packages

23    were released in early December.

24        MR. PRICE:  I move to strike everything after --

25        THE COURT:  In context, I'm going to deny the

1    request.

2    Q.  BY MR. PRICE:  So having said when you believe final

3    fashion designs were done, I'm just asking a very simple

4    question.  I'm not asking what this doesn't refer to, I'm

5    asking what it does refer to, okay?  Do you have any idea

6    what this does refer to when you tell Korea --

7    A.  Hong Kong.

8    Q.  Hong Kong.  Thank you.  Do you have any idea what you

9    did refer to when you told Hong Kong in October 2000 that you

10   had finalized the fashion designs?

11   A.  As I mentioned, I am not sure what I meant.  It was like

12   eight years ago.  I am not sure.

13   Q.  Let me then switch topics because I think we've gotten

14   your memory on this as best we can.

15        You remember in examination, I believe you were

16   asked about the September 1st meeting, and your counsel

17   showed you pictures of the removable feet and the removable

18   hair.  Exhibit 302, I think.

19        Do you recall that?

20   A.  Yes, I believe so.

21   Q.  And you testified that when you saw these drawings, you

22   were excited, but that you really didn't think much about

23   this removable hair part.

24   A.  I believe that I mentioned that I wasn't certain of that

25   feature.

1    Q.   Well, and you explained that it kind of bothered you at

2    the time.  You had reservations.

3         MS. AGUIAR:  Objection.  Mischaracterizes her

4    testimony.

5         THE COURT:  Why don't you rephrase your question,

6    Counsel.

7    Q.   BY MR. PRICE:  Did you say you had reservations about

8    this part, that is, the removable hair?

9    A.   I don't remember my exact words.  I believe I was just

10   unsure of its execution.  I wanted to prove that out.

11   Q.   Because, actually, what happened is MGA tried to be able

12   to do that, and had problems with its production in doing

13   that; correct?

14   A.   I believe the way that it went was that we tried, and

15   Hong Kong was absolutely able to produce it, but the way I

16   remember it is that I didn't like the way it looked in the

17   version that Hong Kong was able to manufacture.

18   Q.   Well, as late as December, you recall that you had done

19   some informal kind of focus groups with girls who weren't

20   crazy about the idea of a bald-headed doll.

21   A.   I don't remember that.

22   Q.   You remember suggesting to Mr. Larian, though, that you

23   were going to try to do this removable head feature to see if

24   it would in fact physically work?

25   A.   I don't remember exactly.

1    Q.   Do you remember telling Mr. Larian that you wanted this

2    hair feature to be the big news for year two?

3         MS. AGUIAR:  Relevance.

4         MR. PRICE:  She said she didn't like it.

5         THE COURT:  Overruled.

6         THE WITNESS:  I'm sorry.  Could you please repeat

7    the question?

8    Q.   BY MR. PRICE:  Yes.  For from not liking this feature,

9    you told Mr. Larian in December of 2000 that you wanted this

10   feature to be the big plus for year two?

11   A.   I believe in context, and this has been a while.  So I

12   hope I -- I'll represent what I remember.  I believe what I

13   meant in that was that it really wasn't working the way that

14   I really hoped it to look.  And I wanted to make sure that

15   those dolls looked perfect to market as we launched them.

16   And because they weren't looking so great, because they

17   weren't looking the way that I had hoped them to or I was

18   worried that the way Hong Kong was able at that time to be

19   able to execute the feature, the decision was at that time to

20   not incorporate it in the first release of the Bratz dolls

21   and try again in the second release, give it more time to

22   make sure that we can finesse it.

23        I wanted to still try and make it happen if, and

24   only if, it didn't impose on the aesthetics.  It wasn't

25   happening in the first release.  So my thought was let's put

1    it off, leave it alone, and try and implement it in the

2    second.

3    Q.   But you never sent Mr. Larian, who was your boss, an

4    e-mail saying I don't like this feature.  I think it's a bad

5    idea to pursue this.  You never did that?

6    A.   I'm not sure.  I might have.  I'm not -- you know, I

7    don't know if it was a verbal conversation or if there were

8    e-mail exchanges.

9    Q.   It's true that in December of 2000, what you told

10   Mr. Larian was this -- let's see if this looks and works

11   great, and we'll surprise them with this as an added bonus.

12        Do you remember saying that?

13   A.   Do you have a particular e-mail you could show me?

14   Q.   Let me show you what we have identified as Exhibit 1110

15   for identification.

16        Do you recognize this, Ms. Garcia, as an e-mail you

17   sent to Mr. Larian and others around December 13, 2000?

18   A.   Yes.

19        MR. PRICE:  Move it into evidence, your Honor.

20        MS. AGUIAR:  No objection.

21        THE COURT:  Admitted.  You may publish.

22        (Exhibit 1110 received.)

23   Q.   BY MR. PRICE:  And this is concerning that hair

24   mechanism; correct?

25   A.   It seems so, yes.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.  Because Mr. Larian thought it was a good idea?

2    A.  I don't know if he did generally or not.

3    Q.  Okay.  What's an MDB situation?

4    A.  That referred to My Dream Baby situation.

5    Q.  I won't get into My Dream Baby.  Apparently somebody

6    within MGA.  But Mr. Larian, you say, until we receive a

7    sample with a hair mechanism, I will continue to sell Bratz

8    without this feature.  If we find that it looks/works great,

9    we will surprise them with this added bonus.

10         Do you see that?

11   A.  Yes.

12   Q.  So as of this time, you hadn't received yet a sample

13   from Hong Kong of the hair mechanism.

14   A.  I actually believe that we had received a sample of the

15   mechanism at this time, but I'm not exactly sure.  I might

16   have actually seen images or photos from Hong Kong.  I'm not

17   sure.  I don't remember.

18   Q.  Well, you have no reason to believe that what you stated

19   here was incorrect when you were talking to your boss, that

20   you hadn't received a sample of the mechanism yet?

21   A.  May I have a chance to read further into the document?

22   Q.  Sure.

23   A.  Okay.

24   Q.  To put it in context, let's look at the first e-mail

25   from Isaac Larian.  It starts here telling you who it's from,

1    but you don't actually see the e-mail.  All you see in this

2    page is from Isaac to Samuel Wong.  And then go to the page

3    where Mr. Larian is saying, "If the savings to do only one

4    hair set is 32 cents, then I want to have both hair sets.

5    This is what makes our product different.  If it can't be

6    done, I want to know why, in detail."

7          Do you see that?

8    A.  Yes, I do.

9    Q.  By the hair sets, he's talking about the ones that you

10   can plug into the head.  That's talking about that removable

11   hair feature?

12   A.  Yes.

13   Q.  So that's the context of the string.  And then back to

14   the next page.  Where Mr. Wong says the savings is 32 cents

15   only if we take away one hair set.

16          And then what is sent to you is Mr. Larian's

17   e-mail, "Put back and do both hair.  The product must look

18   great."

19          That's the one that you received that you are

20   referring to, I'm sorry, that you responded to; correct?

21   This e-mail here?

22   A.  Yes.

23   Q.  And so you understood Mr. Larian really wanted to do

24   this feature that Mr. Bryant had shown in his original

25   drawings.

1    A.   I think that Isaac really wanted to give that feature a

2    shot.  It was, you know, pretty neat.

3    Q.   So did you respond by saying, you know, ever since

4    September 1st, I've never really thought much about this

5    feature and had reservations about it.

6         Did you respond like that?

7    A.   No.

8    Q.   So if we can see your response to Mr. Larian.  And this

9    is your response where you say until we receive a sample,

10   you'll continue to sell without the feature.  It's true, you

11   didn't want to delay the product launch because the earlier

12   marketing a great product, the better.

13   A.   I didn't understand the last part.

14   Q.   I didn't say this that well.  You didn't want to delay

15   the launching of these dolls because there was some

16   difficulty in Hong Kong in giving you a sample of the hair

17   mechanism; right?

18   A.   No, that's not the case at all, no.

19   Q.   Well, you were going to continue to sell Bratz without

20   the feature until you got from Hong Kong a sample of the hair

21   mechanism.  That's correct; right?

22   A.   Until I got a mechanism?

23   Q.   A sample of the hair mechanism.

24   A.   You know, I have to be clear.  As mentioned, I actually

25   think that I was at least seeing images from Hong Kong of the

1    mechanism that they were executing in Hong Kong with this

2    hair feature.  I may not have received an actual sample.  I

3    may have.  I'm not sure.

4    Q.   Okay.  Is the reason you put things in e-mails so that,

5    you know, eight years later you might be able to determine

6    what actually happened, because your memory might not be so

7    good?

8    A.   I don't believe that I write e-mails expecting to go

9    reflect on them eight years later, if that's what you mean,

10   sir.

11   Q.   That's fair enough.

12        Do you like to have some record, though, of the

13   development of the product, and when something was done and

14   what time?

15   A.   I use e-mail to correspond, you know, within that --

16   within that situation at that time.

17   Q.   Okay.  And you are certainly trying to be accurate in

18   your e-mails at that time when you're talking to your boss.

19   A.   Sure.

20   Q.   Okay.  And then at the end, it says, "Please, let's not

21   make this a MDB situation where we give it all to consumers

22   at one time.  I want this hair feature to be the big news for

23   year two."  What you refer to as year two, what's that refer

24   to?

25   A.   I believe that to be launch two, like the second

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    release.

2    Q.   Okay.  And just to define it, I don't want to get into

3    what was launched, but just to define it, what time frame is

4    that talking about, when you wanted that snapping hair

5    feature to be the big news?  What time period are we talking

6    about?

7    A.   That would have been for the coming season.  I guess

8    that would have been the spring launch, the following product

9    launch.

10   Q.   Had the first product launch occurred as of December

11   2000?

12   A.   No.

13   Q.   I didn't think so.  So that's why I want to make sure no

14   one is confused.  What year, then, would year two have been?

15   A.   What year would year two have been?  Let's see, I went

16   to production on May 15th of 2001.  So the following season

17   would have been six months later.  So that would have been

18   the spring.  It would have been the spring of 2002.

19   Q.   So in December of 2000, you're talking about that hair

20   feature being the big news for spring of 2002.  That's the

21   time frame we're talking about?

22   A.   The launch, product availability.

23   Q.   You're talking about calculating launches, et cetera.

24   At Mattel you were a product manager.  That's what you did

25   for a couple years?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.  Yes.

2    Q.  And you spoke, in your examination with your, counsel

3    about Exhibit 1103, which is this Excel spreadsheet.

4        Do you recall that?

5    A.  Yes.

6    Q.  And if we can put that up.  I know that's hard to read,

7    so we might get individual entries in a second.  But this is

8    the format that you used as a product planner at Mattel, that

9    you had been trained to do those two or three years at

10   Mattel; correct?

11   A.  Yes.

12   Q.  And when you were telling the jury about how -- and you

13   have, for example, the spring date, and you're taught to kind

14   of work backward from the launch date and there's actually

15   software packages that help you do that, you learned all of

16   that as a product planner at Mattel?

17   A.  Yes.

18   Q.  And when we look at this document, Exhibit 1103, you

19   mentioned that there's some software which, if you put in one

20   date, it then backs in other dates using obviously some sort

21   of formula.

22   A.  It's -- the Excel program is what I meant, yes.

23   Q.  And that's, for example, if you have an FEP, can you

24   remind us what that means?

25   A.  First engineering pilot.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.  And then PP?

2    A.  Production pilot.

3    Q.  And PS?

4    A.  Production start.

5    Q.   So the way do you it as a planner is you said these are

6    kind of industry goals that you are trying for a certain

7    season in the April, May time frame?

8    A.  Which ones?

9    Q.  The PP and PS?

10   A.  Those are production milestones.  Every product has to

11   set this.

12   Q.   And I believe you testified that April is sort of

13   typical in the industry because that's kind of seasonal, the

14   time when you do these production starts?

15   A.  That's the optimum.  That would be the ideal production

16   start during a season.

17   Q.   And there are software programs so that if you have a

18   target of April 1st as a production start, that then that

19   would fill in other dates to lead up to that; correct?

20   A.   Not in this particular case.  This is a -- like a hand

21   built -- I shouldn't say hand built, but I personally built

22   this Excel document.  It's like an Excel program that

23   probably most are pretty common with.  So I literally, every

24   square -- the letters, the words, and literally the date

25   durations, the week, number of weeks, the single numbers that

1    are in the column that just precede the actual dates, I

2    physically built that document with all of those and then

3    linked all of that information together that when you enter

4    that first PS date, all the durations are linked

5    themselves --

6    Q.   So you created the program?

7    A.   I created the document.

8    Q.   So that if you put in an April 1, 2000, as the

9    production start, then that would link to then six months

10   prior to that you were going to have to do something else,

11   and two months prior to that, something else?  Is that what

12   you mean by linked?

13   A.   I would have an -- in the Excel document, in the program

14   I would have linked like, for example, 4/1/2000 date to a

15   duration.  Like, for example, the number 4.  I would have

16   manually built that formula in my Excel document so that when

17   I in fact then put a date there, it would calculate based on

18   my durations.

19   Q.   Okay.  However, if your production starts in April 2000,

20   then obviously you have to do the development before then.

21   A.   Right.  But the production didn't start in April.

22   Q.   Exactly.  So, for example, if this were done through

23   some computer program where you were trying to link them and

24   say if production starts April 2000, nine months before that,

25   we're going to have to have fabric approval, for example,

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    then the fabric approval date would obviously be before April

2    of 2000; right?  If it was done automatically.  You can't

3    have fabric approval after the production started; right?

4    A.   No, you can't.

5    Q.   Right.  So if this was done through some sort of link,

6    then if you put in April 1, 2000, then the steps leading up

7    to that would have to be prior to April 1, 2000; right?

8    A.   I'm sorry.  Can you please repeat the question?

9    Q.   Sure.  If there's some link where you're using a time

10   difference so that you start with the production date and

11   work backwards, then obviously, if you're using a link so

12   that that's done automatically, if you put in April 1, 2000,

13   then, for example, fabric approval would have to be before

14   the April 1, 2000, date; right?

15   A.   Can we find a different -- I just want to make sure that

16   we're not basing anything on the incorrect date of April

17   2000.

18   Q.   I know that date is incorrect.  I'm just saying that if

19   it were linked mathematically, the way you would do that is

20   you would make sure that the dates leading up to April 1,

21   2000, were before April 1, 2000.

22   A.   Right.

23   Q.   Okay.  However, if you look at these dates here, the

24   ones other than the gray dates.  Let's look at the ones other

25   than the gray dates, they are kind of going in ascending

1    order.  October 30th, and then November 27th, and on forward.

2         Do you see that?

3    A.  Is it possible to enlarge this?

4    Q.  Yes, let's enlarge this.  As you see, for sculpting, for

5    example, you've got control drawings, wax, resubmit,

6    resubmit, up to production mold.

7         Do you see that?

8    A.  Yes.

9    Q.  And you'd expect those to be maybe not those exact

10   dates, but this step is going to be before this step, which

11   is going to be before this step, which is going to be before

12   this step; correct?

13   A.  Correct.

14   Q.  And doing that, you're projecting at least after this

15   gray area, you're projecting forward.  You're, I wouldn't say

16   guessing, but you're trying to set goals, milestones to reach

17   in the future; correct?

18   A.  Yes.

19   Q.  And obviously on this document, those goals, milestones,

20   aren't linked to -- if we can go back to the left, Ken.  They

21   aren't linked to these dates here, which are obviously

22   incorrect; right?  Because if you're going to have a start

23   date of April 1, 2000, you're not going to start with a wax

24   six months after that; right?

25   A.  I don't believe, and I wouldn't say that the dates in

1    the squares or in the boxes are linked to the target column

2    that you have here.

3    Q.   Right.  So putting this aside, these here that you did,

4    I think what you testified to is you actually did them by

5    hand from scratch.

6    A.   I inputted -- what I meant by inputting, I input the

7    dates, a date, for example.  I'd have to look at the, you

8    know, the program or how I linked to identify which are links

9    and which are actually inputted dates.

10   Q.   Okay.  So if we look at this, though -- and Ken, let's

11   go back to the full document.  And blow this up just so we

12   can see the overall document.

13          Now, what you have here, though, you have both

14   dates which are a record of what has already happened, and

15   then milestones, goals in the future; correct?

16   A.   Can you be more specific, please?  Do you mean --

17   Q.   Well, you recall that you said that there are areas

18   where you, on the computer, both inputted the date and then

19   grayed it to indicate this is not a date in the future.  This

20   is something that happened in the past.

21   A.   Yes, and I -- just to be clear, the October 2nd of 2000

22   date, and if I might, I might clarify again --

23   Q.   Well, I move to strike as nonresponsive.  My question is

24   simply whether you gray --

25          THE COURT:  Sustained.

1    Q.   BY MR. PRICE:  We'll get to that.  But that is, the

2    process was let's start -- you wanted to gray the dates that

3    you thought had already occurred; right?

4    A.   Yes.

5    Q.   Okay.  And you didn't gray these dates here.  You see

6    the April 20, 2000, the March, and the May 2000?  You didn't

7    gray those, even though, if you look at them, technically

8    they are in the past; right?

9    A.   I didn't actualized them because in fact I expected that

10   should have said April 1st of 2001.

11   Q.   Exactly.  Because you knew that these dates wouldn't be

12   past dates.  They couldn't be; right?  So you didn't gray it.

13   A.   I don't understand your question.  I'm sorry.

14   Q.   When you look at this chart and you decide I'm going to

15   take the additional steps of graying the dates, that I am

16   recording things that have already happened, you did not gray

17   these incorrect numbers because it wouldn't have made sense

18   that these dates already happened.

19   A.   That's right.

20   Q.   So what you did is you went through and took this

21   additional step of graying the dates that you knew had

22   happened in the past; correct?

23   A.   Yes.

24   Q.   And so, for example, you got the PDF date, October 16,

25   2000.  That had happened on October 16.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.  Yes.

2    Q.  In fact, we saw the documents that show that, that that

3    had happened on October 16th.

4    A.  That's right.

5    Q.  And then you specifically grayed this date, control

6    drawings to L.A. designer.  And you grayed that date as

7    October 2nd, 2007, correct?

8    A.  Yes.

9    Q.  And that was a date, obviously, that had happened in the

10   past, prior to your doing this schedule; correct?

11   A.  Yes.

12   Q.  And whatever you define as these control drawings,

13   whatever they are in your mind, they are drawings done by

14   Carter Bryant.

15   A.  Yes, I believe they are the portfolio drawings.

16   Q.  Now, you also testified in your examination earlier, you

17   were asked questions about who came up with Bratz.  You

18   remember being asked by your counsel about that?

19   A.  Bratz, the term Bratz, the word Bratz?

20   Q.  The word Bratz as being associated with this project

21   we've been talking about, yes.

22   A.  Yes.

23   Q.  And if we could put up 302, I believe you testified

24   that, well, the name Bratz wasn't approved until much later.

25        Do you recall that?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1   A.   Yes.

2   Q.   And I think you said it was -- did you have a time frame

3   as to when it was approved?

4   A.   I don't remember exactly.

5   Q.   But what you do agree with is that when Mr. Bryant came

6   into MGA, you're saying on September 1st, with these

7   drawings, if we can go to the second page, that he was

8   calling this doll line Bratz.

9   A.   That's right.

10   Q.   And, you know, we've gone through a number of e-mails

11   over the last few days.

12   A.   We sure have.

13   Q.   Yeah.  And you notice that on almost all of those

14   e-mails in September and October, the word that is associated

15   with this project is in fact Bratz.

16   A.   Actually, there are other e-mails that you may not have

17   shown me where in fact we use a different term other than

18   Bratz in referring to the project.

19   Q.   Well, for example, let's look at that early one,

20   March -- Exhibit 305.  Let me ask you about this.  Your

21   testimony under oath is that this is what you're referring

22   to, you're referring to as the Bratz line; correct?

23   A.   What document is this?  Where can I refer to this?

24   Q.   This is Exhibit 305.  This doesn't say Bratz on it, but

25   you recall you testified what line you were referring to

1    here.  And you already said that the line you were referring

2    to is the Bratz line; correct?

3    A.   The brand we're talking about right now today, yes.

4    Q.   And it's true, is it not, that at that point and October

5    within MGA this was referred to as Bratz?

6    A.   It was, and it's possible that it may be in October,

7    could have been referred to as other things, such as Fashion

8    Frenzies.  I'm not sure.

9    Q.   Let me show you Exhibit 18.  This is September 27, when

10   you were sending the materials to Hong Kong; right?

11        The subject, how you titled this, the subject you

12   referred to was Bratz; correct?

13   A.   At this time, yes.

14   Q.   And, of course, that's the name that stuck, Bratz.

15   A.   I don't understand what you mean.

16   Q.   That is the name that has been used ever since the line

17   has been public to refer to that line, is Bratz.  It's Bratz?

18   A.   What do you mean by public?

19   Q.   Well, let's say those four dolls that you sell, they are

20   called Bratz.

21   A.   Mr. Price, I don't mean to be difficult.  I mean only to

22   say that there was certainly e-mails where in fact we

23   referred to them as Bratz, and there's a period of time, in

24   fact, where we referred to them as something other than

25   Bratz.  I'm not going to suggest that we didn't at any time

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    even in development sometimes refer to them as Bratz.

2    Q.   The name you settled on was the same name that Carter

3    Bryant brought to you, you're saying in September of 2000,

4    which is Bratz.  That's the name that was settled on.

5    A.   We settled on the name Bratz.

6    Q.   By settled, I don't mean to mean you made compromises.

7    That's the name that actually went to the public?

8    A.   We produced our line as Bratz.

9    Q.   So it would be accurate to say that it was a group of

10   MGA folks getting around and talking that came up with the

11   name Bratz.  That's not true, is it?  It was Carter Bryant

12   who came up with that name, and MGA approved it.

13   A.   I think that there were -- and I testified to this

14   earlier -- that there were a group of people at MGA who made

15   the decision to go forward with the term Bratz.

16   Q.   But those people, when they got together to come up with

17   this decision, they knew that one of the possibilities, as

18   suggested by Carter Bryant, was Bratz.

19   A.   It was definitely a consideration among others,

20   definitely.

21   Q.   And all I'm asking is it's not true that these MGA folks

22   are the ones who came up with the name.  That was Carter

23   Bryant; right?  They simply said yeah, we agree to that.

24   A.   That would be correct.

25   Q.   Thank you.  You also testified briefly that, when you

1    went to MGA, you were talking about a friendly -- you talked

2    about how it was your opinion, your view, that it was a

3    friendly family atmosphere.  Do you recall that?

4    A.  Yes, I do.

5    Q.   But you are aware that other people at MGA don't share

6    your view of that being a family atmosphere?

7          MS. AGUIAR:  Relevance.

8          MR. PRICE:  I didn't bring it up.  She did in her

9    examination.

10         THE COURT:  Let's lay a foundation for it, Counsel.

11         MR. PRICE:  Sure.

12   Q.   First of all, you recall you were examined by your

13   counsel; correct?

14   A.  I didn't hear you.

15   Q.   You recall you were examined by your counsel?

16   A.  Yes.

17   Q.   And that she asked you what you liked about MGA?

18   A.  Yes.

19   Q.   And you said that it had a family atmosphere, a friendly

20   atmosphere, conducive to creativity.

21   A.  That was absolutely my perception.

22   Q.   And what I want to make clear to the jury is, although

23   that's your perception, you know that that is not everyone's

24   perception at MGA.

25         THE COURT:  I'm going to sustain the relevance

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    objection.  Move along, Counsel.

2    Q.   BY MR. PRICE:  One of the questions you were asked, I

3    believe, by your counsel was concerning Ms. Leahy, the woman

4    who did the sculpts.

5    A.   Yes.

6    Q.   And I think you were asked, did you tell Ms. Leahy not

7    to talk to anyone about Carter Bryant.

8        Do you remember that?

9    A.   Yes.

10   Q.   Let me ask you.  When MGA uses a vendor, is that vendor

11   free to talk to people about the project that MGA is working

12   on?

13   A.   Are they free to talk?  I'm not sure what you mean.

14   Q.   Well, you consider these things confidential, don't you?

15   I mean, you consider these swatches and these sculpts and the

16   direction you're going and what you're doing as confidential.

17   You don't want your competitors to know about that; right?

18   A.   Sure.

19   Q.   So you've got Ms. Leahy, and you give her an assignment;

20   correct?

21   A.   Yes.

22   Q.   And let's say that you say I want you to work with

23   Carter Bryant on this assignment for Bratz.

24   A.   Yes.

25   Q.   Okay.  She actually has to sign an agreement, a

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    confidentiality agreement, not to talk to anybody except

2    people at MGA or people you approve of about anything to do

3    with that project; isn't that right?

4    A.  I sign confidentiality agreements with my free-lancers

5    because that's part of our MGA practice.  But it is not the

6    reason that I was trying to necessarily conceal Carter

7    Bryant.

8    Q.  I'm not suggesting that, ma'am.  I'm not suggesting that

9    that's the reason you have them sign the agreement.

10   A.  I'm sorry.  I must have misunderstood your question.

11   Q.  You were asked by your counsel whether you were

12   specifically told, when you specifically told Ms. Leahy, a

13   vendor, not to talk about Carter Bryant.  You recall that

14   question?

15   A.  Oh, yes.

16   Q.  And you didn't have to tell her that, because she was

17   under an obligation to MGA not to talk to anyone about having

18   anything to do with the Bratz project; right?

19   A.  Yeah, I mean I was asking her not to, you know, if she

20   signed a confidentiality agreement, I expected that any work

21   she did for me would not be something that she would share

22   with anyone else.

23   Q.  Exactly.  She's not even supposed to tell anybody else

24   that she's doing work for you.

25   A.  That's not necessarily true.

1    Q.   Let me rephrase that.  She's not supposed to tell anyone

2    else that she's working on a particular sculpt, with a

3    particular person, a particular project; correct?

4    A.   She's not supposed -- it's my understanding that she is

5    not supposed to divulge necessarily what she is -- what I've

6    asked her to create.

7    Q.   You didn't want anyone in the world other than folks

8    within MGA to know that she was working on Bratz.

9    A.   Mr. Price, I don't understand your question.  I give

10   her, like every single vendor that I work with, even up to

11   today, a confidentiality agreement for them to sign to

12   protect the creative -- that that person, who I'm paying, to

13   keep safe, to keep confidential.

14   Q.   And because you give that agreement to everyone and they

15   sign it, do you have conversations with Ms. Leahy every time

16   you give her a project to do something, to say hey, you've

17   got to keep this quiet?  You don't have to do that, do you?

18   A.   I'm just not understanding.  What do you mean?

19   Q.   Because you have this -- these signed contracts with

20   Ms. Leahy, the confidentiality contracts, you don't have to

21   specifically go and tell her every time you give her a

22   project, Margaret, this is on the, you know, hush-hush.

23   Don't tell anybody about it.  That's just standard operating

24   practice that it's confidential; right?

25   A.   Yeah, I mean I would expect, if a vendor is going to do

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    work with me and on my group on any designs, that they would

2    not divulge any kind of information on the aesthetics that

3    they are working on, on the designs that they are working on,

4    if that's what you mean.

5    Q.   A final thing.  On control drawings, remember the

6    exhibit that refers to control drawings?  I think you told

7    the jury that what you're referring to there are -- when you

8    use control drawings, you mean engineering runs.

9         Do you recall telling them that?

10   A.   I understand the term control drawings to be -- yeah,

11   more like engineering drawings containing information like

12   dimensions, specific information like dimensions.

13   Q.   And actually, ma'am, control drawing can mean one of two

14   things.  It can be either an engineering drawing, or it can

15   be a drawing on a conceptual level, an aesthetic level and

16   how to approach the actual creative part of the concept.

17   A.   I don't understand.

18   Q.   Pardon?

19   A.   Can you please repeat or rephrase the question.

20   Q.   Control drawing, as used in that exhibit, where you say

21   control drawing, object second, in that reference it can be

22   either an engineering drawing or a conceptual level aesthetic

23   level drawing and how to approach the actual creative part of

24   the concept?

25   A.   I would say it's careful to, you know -- it's careful.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    That particular word can be termed loosely in the -- in a

2    creative environment, but I recognize more that a control

3    drawing is more likely to be a drawing that includes very

4    specific information.  Engineering information, dimensional

5    information, that kind of thing.

6        MR. PRICE:  Your Honor, if I could read from

7    Ms. Garcia's deposition transcript.  This is volume 3.  The

8    date is October 9, 2007.

9        THE WITNESS:  Which volume would that be?

10        MR. PRICE:  That's 3, ma'am.  And it's going to be

11    page 778, line 11, to 779, line 4.

12        "QUESTION:  What is a" --

13        THE COURT:  Wait, Counsel.

14        MS. AGUIAR:  No objection.

15        THE COURT:  Very well.  You may proceed.

16        MR. PRICE:  (Reading.)

17        "QUESTION:  What is a control drawing as used

18    in Exhibit 1103?

19        "ANSWER:  Control drawing is a reference.

20    It's a drawing that is released to the sculptor for

21    a few things.  It could be a control drawing from

22    an engineering perspective considering armatures

23    and whatnot.  It can also be a control drawing from

24    a conceptual level, an aesthetic level, and how to

25    approach the actual creative part of the concept.

1  "QUESTION:  Were you the one who put in this

2  entry indicating that the control drawings to the

3  L.A. designer occurred on October 2, 2000?

4   "ANSWER:  I'm not sure, but I believe so.

5   "QUESTION:  What particular control drawings

6  for Bratz were being referred to here?

7  Exhibit 1103?

8   "ANSWER:  I can't be sure.  It is -- as

9  mentioned by definition, it's either the

10  engineering control drawing or an aesthetic control

11  drawing.  I don't remember."

12   No further questions, your Honor.

13   THE COURT:  Anything further?

14     RECROSS-EXAMINATION

15  BY MS. AGUIAR:

16  Q.   Let's go back to one of the exhibits Mr. Price showed

17  you this afternoon, 13592.  I believe he handed it to you

18  separately.  It was not in your binder.  If we can have it on

19  the screen.

20   And my recollection is he pointed you to one single

21  page.  We don't have it because it was a new exhibit.

22   THE COURT:  You can use the Elmo.  It's page 5, I

23  believe.

24  Q.   BY MS. AGUIAR:  Because the jury doesn't have this in

25  front of them on the screen, can you let us know how many

1   pages are in this document?  Do you have a copy of?

2   A.  I'm so sorry.  I don't have the document.

3   Q.  It's not in the binders.  It was handed up to you.

4   Actually, let's look at this so we understand what it is.

5   Can you look at the first page and tell us what it is?

6   A.  It's titled 2002 Bratz Commercial Test and Product

7   Appeal Study.  It seems to be a focus group conducted by

8   Consumer Quest.

9   Q.  So Mr. Price brought you directly to page 5 regarding

10  one line of this document.  But can you tell us how many

11  pages total are in this document?

12  A.  29 pages.

13  Q.  It's a 29-page document.  And can you tell us what this

14  29-page document is, what it summarizes?

15  A.  This document represents the result of a focus group

16  that apparently took place on January 29th of 2002.  A

17  general research study is a study where you poll a small set

18  of girls, in this case, to get their general opinion about

19  appeal to the particular product.

20  Q.  Do you remember that Mr. Price showed you this document

21  as evidence that Chloe was the blonde character, and

22  therefore, she sold the most?

23       Do you recall that?

24  A.  Yes.

25  Q.  So the information that he showed you in this document,

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    is this actual sales information?

2    A.  No, absolutely not.

3    Q.  Is this actual data that demonstrates how many dolls

4    have been sold to the public?

5    A.  No.

6    Q.  So tell us, if you would, based on your knowledge of

7    actual sales of the Bratz line, whether Chloe, the blonde

8    character, in fact outsells all the other characters.

9         MR. PRICE:  Object to vague.  Combined?  Or each

10   character?

11        MS. AGUIAR:  I'll clarify my question.

12        THE COURT:  Thank you, Counsel.

13   Q.  BY MS. AGUIAR:  Is Chloe the hottest selling of the four

14   dolls?

15        MR. PRICE:  Objection as to time.

16   Q.  BY MS. AGUIAR:  Over all of the life of the Bratz line,

17   is Chloe the hottest selling of the four lines?

18        THE COURT:  Very well.  You may answer.

19        THE WITNESS:  No, she's not.

20   Q.  BY MS. AGUIAR:  Why don't you tell me generally speaking

21   what is your understanding of which one is the one that flies

22   off the shelves more than the others.

23   A.  It's my understanding that Yasmin, the Hispanic

24   character, is the best-selling character of the Bratz

25   collection.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   And Yasmin is not blonde?

2    A.   No.

3    Q.   And she's not meant to look white?

4    A.   No.

5    Q.   Let's look at another document.  This one is about the

6    hair feature that Mr. Price was referring you to.  It's

7    Exhibit 1100, and I think we can put that one up on the

8    screen.

9         Do you recall your testimony about your view of the

10   pop-off hair feature?

11   A.   Yes.

12   Q.   And looking not just at the first sentence of this

13   e-mail, and looking just at the last sentence of this e-mail

14   that you were directed to during your cross-examination, but

15   looking at the whole response that you wrote to Mr. Larian,

16   can you tell me whether you believe that's consistent with

17   the view that you've always held about the pop-off hair

18   feature?

19   A.   Yes, it is.

20   Q.   And can you tell us -- explain in the second paragraph

21   there what you wrote and how it's consistent with the view

22   you've always held about the hair feature, the second

23   paragraph that starts the product is excellent as it is?

24   A.   The product -- should I just read it?

25   Q.   Yes, or you can read it or whatever portions of it you

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    think are relevant.

2    A.  It says this was definitely -- okay.  The product is

3    excellent as it is.

4    Q.  And when you say the product is excellent as it is, as

5    is means what?

6    A.  Means as the fashion doll, as a fashion doll or without

7    the hair feature.  This was definitely the feature that

8    caused the girls to feel a bit uncomfortable.  And as I

9    mentioned earlier, if that -- if this feature, the inclusion

10   of this feature should make little girls not necessarily love

11   our fashion doll or should impede on its style or its

12   asthetic quality, then I was not comfortable to include it in

13   the product.

14   Q.  And was this a view that you consistently held over

15   time?

16   A.  Absolutely.

17   Q.  So if you want to keep going in the paragraph.

18   A.  They were also concerned that their doll will always be

19   bald if they happen to lose one of their hairs.

20   Q.  What do you mean by that?

21   A.  Given that the doll -- an effort to include this hair

22   feature, it requires that you always have to have a hair to

23   snap onto the head to ensure that the doll has hair.  Should

24   you lose those snap hair pieces, should you lose them, then

25   your doll won't have anything to have on her head, which

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    would leave the doll bald.

2        And again, that goes back to my concern that, you

3    know, this fashion doll was meant to be appropriate to the

4    seven- to ten-year-old consumer, were very savvy, and this

5    doll always had to look impeccable and beautiful because they

6    would expect as such.  And this feature would have impeded --

7    would impede on, you know, on its aesthetic should a consumer

8    have lost that hair.

9    Q.   When you say in the last sentence of that paragraph, "I

10   am confident that the consumer will be satisfied with

11   traditional hair play, long and pretty," what do you mean by

12   traditional hair play?

13   A.   Traditional hair play is -- I meant the traditional way

14   a girl would play with hair on a doll, which is traditionally

15   about brushing and combing the hair.  It's fixed and rooted

16   in the head permanently.

17   Q.   Was this another way you're saying that you were

18   confident that the consumer would be satisfied with the doll

19   as MGA was already producing it?

20   A.   No.  Was in production?

21   Q.   Yes.  In other words, as of this time -- I'm sorry.

22   That was a bad question.

23       Are you saying here that you are confident the

24   consumer will be satisfied with a doll that does not have

25   pop-off hair?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.  That's right.

2    Q.  And in the third paragraph, if you'd just comment on

3    that.  As soon as the hair mechanism is done, I want to put

4    it in front of girls to see how they react.

5    A.  I meant it that as soon as Hong Kong was, you know, had

6    refined and finished the hair mechanism in a way that I felt

7    was appropriate or looked aesthetically, you know, perfect,

8    it would be then that I would get that sample from Hong Kong

9    and put that in front of girls to see, you know, what their

10   general opinion was.

11   Q.  And this e-mail was December 13th of 2000.  This was --

12   at this time Mr. Bryant was under contract with MGA and

13   working for MGA; correct?

14   A.  Yes.

15   Q.  We're in the home stretch.  Two other short things.

16       Mr. Price asked you whether you had learned your

17   scheduling or your planning system through your time at

18   Mattel.  Do you recall that?

19   A.  Yes.

20   Q.  And does Mattel use, based on your years there and from

21   what you remember back when you worked there for a few years,

22   did they use a particular name of a software in order to do

23   their planning?

24   A.  Yes.

25   Q.  And what was the name of that software package?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    A.   It's called Tracks.

2    Q.   T-R-A-C-K-S?

3    A.   Yes.

4    Q.   And did you at MGA ever use the Tracks system?

5    A.   No.

6    Q.   So you were not using the same planning system that you

7    were using at Mattel?

8    A.   No.

9    Q.   Is it your understanding that the dates required in a

10   doll production process are fairly standard in the industry?

11   A.   I don't know what you mean.

12   Q.   Sure.  In other words, the times that are required

13   between each step, is that something that was unique to what

14   you learned at Mattel, or was that something -- those were

15   dates that were standard in the industry?

16   A.   Standard in the industry.

17   Q.   Lastly, we were talking about the name Bratz, where it

18   came from and how you ended up there.

19        Do you remember that?

20   A.   Yes.

21   Q.   And you're not contending, are you, that the name

22   didn't -- let me take out all the negatives.  Mr. Bryant came

23   to MGA and presented the characters with the name Bratz;

24   right?

25   A.   That's right.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   But over time, MGA considered changing the brand name to

2    another name; correct?

3    A.   Yes.

4    Q.   And Mr. Price showed you some e-mails where the name

5    Bratz was used internally, yes?

6    A.   Yes.

7    Q.   Let me ask you to turn in your binder to Exhibit 4501.

8    Can you tell us what Exhibit 4501 is?

9    A.   Yes.

10   Q.   What is it?

11   A.   It's an e-mail from me to Rachel Harris, Aileen Storer,

12   Carter Bryant, Peter Marlow.

13   Q.   Do you recognize this as an e-mail that you authored and

14   sent to those people?

15   A.   Yes.

16        MS. AGUIAR:  Your Honor, I offer 4501.

17        THE COURT:  Any objection?

18        MR. PRICE:  Objection to the date because it's

19   outside the time frame.

20        THE COURT:  Overruled in light of the examination.

21   It's admitted.  You may publish.

22        (Exhibit 4501 received.)

23   Q.   BY MS. AGUIAR:  Can you tell us what the Re line of this

24   is?

25   A.   Girlfrenz packaging meeting.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Q.   What does the reference to Girlfrenz packaging meeting

2    refer to?

3    A.   Girlfrenz was one of the alternative names that we

4    considered for the Bratz line.

5    Q.   So you know, when you use the term Girlfrenz here in

6    December of 2000, it's not some other doll that you were

7    thinking of developing.  This was a reference to the project

8    that eventually was produced as Bratz?

9    A.   Yes.

10   Q.   And let me ask you to turn to the next exhibit in your

11   binder, which is 4502.

12   A.   I've got it.

13   Q.   Can you describe to us what that document is?

14   A.   This is a document produced by a free-lance house,

15   packaging free-lance house called -- who is referred to as

16   Ayzenberg.

17   Q.   And that's -- can you spell it?

18   A.   A-Y-Z-E-N-B-E-R-G.

19   Q.   And is this a document that you referred on or about

20   November 13th, 2000?

21   A.   Yes.

22        MS. AGUIAR:  Move 4502, your Honor.

23        THE COURT:  Any objection?

24        MR. PRICE:  No objection.

25        THE COURT:  Admitted.

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1          (Exhibit 4502 received.)

2     Q.   BY MS. AGUIAR:  So I see on the front of this document

3     it says Ayzenberg, which is the name of the vendor, and it

4     says MGA entertainment style squad pitch.  Can you tell us

5     what Style Squad is a reference to?

6     A.   Style Squad was even another one of the many alternative

7     names we were considering for Bratz.

8     Q.   And was this the name that you were referring -- that

9     you were using to refer to the project in your dealings with

10    Ayzenberg?

11          Your Honor, I have one last exhibit.  May I have

12    someone bring up copies?

13          THE COURT:  Please.

14    Q.   BY MS. AGUIAR:  Can you tell us what Exhibit 4505 is,

15    please?

16    A.   This is an e-mail from Jessica McConnell to myself, CC

17    Rachel Harris.

18          MR. PRICE:  No objection to this coming into

19    evidence, if it helps.

20          THE COURT:  It's admitted.

21          (Exhibit 4505 received.)

22    Q.   BY MS. AGUIAR:  And now that we have it on the screen,

23    can you describe what we're looking at?

24    A.   There is an e-mail submitted from Jessica McConnell, and

25    it's titled further name exploration.  And this was

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    Ayzenberg's list of alternative names for Bratz.

2    Q.   And are these names that were considered internally at

3    MGA in this November 2000 time frame as a potential brand

4    name for the product that was eventually manufactured?

5    A.   Yes.

6        MS. AGUIAR:  May I have a moment?

7        THE COURT:  You may.

8        MS. AGUIAR:  One more question.  I have to find the

9    exhibit.

10       Your Honor, I wanted to go to the exhibit where

11   they admitted just the one paragraph.

12       THE COURT:  Yes.  What exhibit number is that?

13       MS. AGUIAR:  I'm not sure when it went in.  It was

14   admitted as an exhibit number.

15       THE COURT:  Here it is.  It was Exhibit 10001.

16   Page 2, paragraph -- well, Mr. Price thinks it's paragraph 6,

17   I think it's paragraph 7.

18       MS. AGUIAR:  It's the loan paragraph.  It's the

19   mystery floating paragraph.

20   Q.   Okay.  In this paragraph here, where you say, "I thought

21   they were incredible and I tried to stay true to this

22   inventor/creator's vision," can you tell us what you meant

23   there?

24   A.   I was referring to the four characters, and I wanted to

25   stay -- this was in reference to Carter Bryant's characters

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    in the portfolio drawings.  I wanted -- because certainly

2    there were things in that portfolio that I loved very much,

3    and we talked about that there were some that I was concerned

4    about.  And it was, you know, it was for me to say I tried to

5    stay true to this inventor's vision.  Meaning, you know, I

6    tried to do -- wherever it felt comfortable without me

7    feeling that it was going to impose on the success of Bratz,

8    I tried to stay true to his vision.

9    Q.   And were there ways in which you were not able to do

10   that?

11   A.   Yes.

12   Q.   Can you tell us what those were?

13   A.   I'm sorry?

14        MR. PRICE:  Objection at this point.

15        THE COURT:  Sustained.

16        MS. AGUIAR:  That's for another time.

17        Thank you, I have nothing further.

18

19

20

21

22

23

24

25

1          FURTHER REDIRECT EXAMINATION

2     BY MR. PRICE:

3     Q.   You were asked questions about Bratz again.  It's not as

4     though someone at MGA came up with the name Bratz, though, is

5     it?  That's not true?

6     A.   It is not -- you know, we will attest for sure that

7     Bratz was included in Carter Bryant's September 1st, 2000,

8     portfolio.  It was MGA employees who made the decision to in

9     fact use Bratz in production.

10    Q.   But it would be false to say that MGA came up with it

11    because one of their employees looked at these drawings and

12    said hey, those look like Bratz.  That was my idea.

13          That would be a false statement; right?

14    A.   We agreed to use the term Bratz because in fact,

15    ultimately, that name very closely represented the concept of

16    Bratz, if that's what you mean.

17    Q.   No, I mean that no one with a fresh slate came up with

18    the name Bratz.  It was a name that was given to them by

19    Carter Bryant, and they agreed on it; right?

20    A.   Yes.

21    Q.   And with respect to Exhibit 4502, the Ayzenberg document

22    that was shown to you, it was a list of other names

23    considered.  Does that document reflect a back and forth that

24    this is where we are now as to possible names?  Or are all of

25    these names Ayzenberg's suggestions?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1          Do you understand what I mean?

2     A.  No, I don't.

3     Q.   You hire these outside companies to help in certain

4     areas.  Is the list that you were shown on Exhibit 4502, is

5     that a list that just they came up with, or is it a list

6     which they are developing with joint back and forth with MGA?

7     A.   I believe that that e-mail was a response to a request

8     from MGA to have them and in their own internal team arrive

9     at, you know, their varieties or their suggestions as

10    alternative names to Bratz.  So that's an Ayzenberg list of

11    names.

12          MR. PRICE:  Nothing further.

13          THE COURT:  Anything further?

14          MS. AGUIAR:  Nothing further.

15          THE COURT:  Very well.

16          Ms. Garcia, you are excused.  Have a nice weekend.

17          MR. QUINN:  Your Honor, could we --

18          THE COURT:  Sure.  Well, Counsel, we have literally

19    four minutes left.

20          MR. QUINN:  I was going to ask you.

21          THE COURT:  Fair enough.

22          (SIDEBAR CONFERENCE HELD.)

23          MR. QUINN:  Your Honor, the next witness has been

24    waiting two days.  I'll throw boatloads of proposed

25    examination overboard.  I'll do it in 10 minutes.  But it's a

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    real problem for her to come back.  If we could just do it, I

2    will race right through it.

3         THE COURT:  If there's no objection from Mr. Nolan,

4    I'll ask the jury if they are willing to stay.

5         MR. NOLAN:  Your Honor, I strongly object because I

6    know the content of what they are going to try to bring out

7    and elicit, which is going to take -- not substantial, but I

8    can't do cross-examination within three minutes or five

9    minutes.  I think it would be grossly unfair in three minutes

10   after this to just drop something in where she's going to

11   have to come back anyway on Wednesday or Thursday afternoon

12   or whenever.  Not for three minutes, your Honor.  It's just

13   not fair.

14        MR. QUINN:  Your Honor, we've had this lady waiting

15   around based on estimates we've been given as to how long the

16   examinations will take.

17        THE COURT:  I understand.

18        MR. QUINN:  These things happen.

19        THE COURT:  They do.

20        MR. QUINN:  I'm not happy with rushing it myself,

21   but this woman, her mother is having surgery.  It's only a

22   maybe about whether she'll come back.  It's been a real

23   sacrifice to her.  She's real unhappy.

24        MR. NOLAN:  We have a full deposition.

25        THE COURT:  Who is the witness?

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1          MR. QUINN:  Victoria O'Connor, former MGA.

2          THE COURT:  Wow.  This is --

3          MR. NOLAN:  Your Honor, if she can't come back for

4     whatever reason, I mean, there is a full deposition, and I

5     think it has already been designated that we can play it in

6     the absence of her live testimony.  But to just do this and

7     drop two minutes on a Friday after a very long week, what

8     they want is a prejudicial piece like this to leave with the

9     jury for the weekend, which I think will be very prejudicial

10    for us under the circumstances.

11         THE COURT:  How long do you feel a full-fledged

12    cross-examination would take?

13         MR. NOLAN:  I believe my examination is 20, 25

14    minutes, your Honor.

15         THE COURT:  And how long is your direct

16    examination?

17         MR. QUINN:  I've offered to get it inside 10

18    minutes.

19         THE COURT:  If the jury were able to stay for

20    another 35 or 40 minutes -- and believe me, I'm the last one

21    that wants to stay.  I've got 12 motions to work on.  And I

22    can't wait to get home and work on those.  But would that be,

23    assuming that you got -- and I wouldn't -- I wouldn't

24    indicate who is going to take how much time.

25         I'd simply ask the jury are you able to stay for 45

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    minutes for someone who has a medical situation next week.  I

2    understand your argument and I'm reluctant, but does that

3    sound -- these professional requests are going to come around

4    on both sides during the course of the trial.

5         MR. NOLAN:  I accommodate.  But when I first talked

6    to Mr. Quinn, her mother is having the surgery on Tuesday.

7    It's not her medical condition.

8         THE COURT:  This may be moot.  Because if any

9    member of the jury says they have a commitment, I'm going to

10   protect the jury before I protect the witness.  So the

11   question is whether I ask the jury if they are able to stay

12   for 45 minutes, which would afford you your cross-examination

13   uninterrupted, unabridged.  We'll get the witness on.  May I

14   ask the jury?

15        MR. NOLAN:  I feel -- I'm so -- I feel like calling

16   my wife because it's my daughter's graduation this weekend,

17   but your Honor, if the jury will stay, we can do it.

18        THE COURT:  I'll ask if there's any member of the

19   jury that cannot stay for another 45 minutes.

20        You're a brave man.

21        Members of the jury, ordinarily we would be

22   breaking at this time, and we can if we need to.  We have a

23   witness who has a family medical matter to attend to next

24   week.  She's been waiting here today to testify.  It looks

25   like we will need 45 minutes.  I have told counsel if there

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    is any juror who cannot stay for another 45 minutes, we're

2    going to end it today and find another time to bring the

3    witness in.  But if, and I know this is Friday afternoon, and

4    we all want to get home, but if all the members of the jury

5    can stay for another 45 minutes, I've told the lawyers that

6    the Court would accommodate this one witness.

7          Is there a juror that has an issue?

8          I see a couple of hands.  I'm sorry.  We're going

9    to have to conclude for the day, and we'll resume tomorrow.

10         MR. PRICE:  Tomorrow?

11         THE COURT:  A Freudian slip.

12         We'll see you on Tuesday at 9:00.

13         All rise for the jury.

14         (WHEREUPON THE JURY WITHDRAWS.)

15         THE COURT:  Please be seated.  Mr. Quinn, I will

16   give you leave to bring that witness out of order whenever

17   it's appropriate to do so.

18         MR. QUINN:  Thank you.

19         THE COURT:  Very well.  I think he indicated

20   earlier that I'll see whoever is arguing the motions at 1:30

21   on Monday.  I'll see you at 1:30 on Monday.  Is there

22   anything else we need to take up?

23         MR. NOLAN:  Just on your local rules, you normally

24   require lead trial counsel to be here.  There is a

25   possibility, because of a commitment on 1:30 on Monday, that

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1     I will not be here.  And I think Jason Russell and --

2             THE COURT:  I'd rather see the attorneys that

3     actually wrote the motions.

4             MR. NOLAN:  I thought.  So no offense taken.

5             THE COURT:  So Mr. Russell and Mr. Zeller, I

6     presume.

7             MR. NOLAN:  Pardon me?

8             THE COURT:  And Mr. Zeller, I presume?

9             MR. NOLAN:  I assume so.

10            THE COURT:  And a few other supporting cast.

11            MR. ZELLER:  Your Honor, I have not read it, but

12    there is an opposition to the Fifth Amendment motion we had

13    filed, and I didn't know if this came within the parameters

14    of what the Court had already ordered, but I'd request an

15    opportunity to file some sort of reply.

16            THE COURT:  You don't think you've sufficiently

17    addressed the issue in your motion?

18            MR. ZELLER:  I would hope so, and I do caveat it by

19    saying I have not read the opposition.  I know it was filed.

20            THE COURT:  Let me take a look at the opposition

21    this weekend, and take it up with me on Monday if you are

22    here, or Tuesday morning, and we'll see if the Court needs

23    further briefing on this.  Given that I'm treating these as

24    trial briefs and not as a motion per se, I may dispense with

25    the optional reply.

1          Are there any other deposition transcripts besides

2     the Nana Ashong deposition?  I'll rule on that at 1:30 as

3     well.

4          MR. ZELLER:  There is another transcript.  I do not

5     know if the Court has received it yet, but it should be

6     imminent, which is deposition testimony from a Steve Linker,

7     L-I-N-K-E-R.

8          THE COURT:  Will that be on Tuesday or Wednesday?

9          MR. ZELLER:  I think that the current plan is that

10    it will probably be someday other than Tuesday, with the

11    caveat that because things have run long, and a number of the

12    next witnesses who we planned on calling were in a position

13    of Ms. O'Connor in the sense that they are third party

14    witnesses, and some are difficult to control their schedule,

15    our plan is to try and put as many of those people as

16    possible on Tuesday, and then if we have additional time left

17    over, we would probably play some video either of Nana Ashong

18    or Steve Linker.

19         THE COURT:  Very well.  I just wanted to make sure

20    I don't have to go through that this weekend.

21         MR. ZELLER:  We will certainly have it before you

22    on Monday morning.

23         THE COURT:  And speaking of time, plaintiffs have

24    used ten hours and one minute, and I've got the defense

25    having used seven hours and 45 or 44 minutes.  That's where

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1    we're at at present.

2          Anything else?

3          MR. NOLAN:  Your Honor, I just want to be clear.

4    So there are no new witnesses for Tuesday other than what

5    we've already --

6          MR. ZELLER:  Let me clarify something that we

7    talked about earlier.  I am informed that the Court should

8    already have the Prince designations as well as Steve Linker.

9          THE COURT:  Do we have those, Gina?  Here they are.

10   Here's Linker, and here is Prince.  Yes, Counsel, I have both

11   of them.  So nothing else for Mattel?

12         MR. PROCTOR:  Two things.  Number one, for

13   clarification on Monday, are you intending to hear arguments

14   on statutes of limitations briefs?

15         THE COURT:  I have received them, and we'll be

16   working on that as well.  I don't think I -- I am not going

17   to hear any more argument on statute of limitations, and I

18   want to compliment whoever did the briefs, I guess it was

19   Mr. Zeller and Mr. Russell, for addressing the issues that

20   the Court asked to be addressed and only the issues that the

21   Court asked to be addressed.

22         So they were very helpful, and I think the Court

23   should be prepared to make its final ruling on the statute of

24   limitations on Monday, but there will be no argument.  We've

25   heard enough of that.

1        MR. PROCTOR:  And we could use a little

2   clarification on the motion -- discovery motion No. 4, the

3   privilege log motion.  I understand that the Court wanted the

4   motion narrowed in some way, but there's a lack of clarity on

5   our side as to exactly what the Court's directions are.

6        THE COURT:  To be honest, I haven't really looked

7   at it other than what is set forth in the index.  So I may

8   not be able to give that to you until Monday.  But thank you.

9        Anything further from MGA?

10       MR. NOLAN:  No, your Honor.

11       THE COURT:  All right.  Everyone try to have a good

12   weekend and get some rest, and we'll see you on Monday.

13

14            (Proceedings concluded at 5:10 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Transcript of Proceedings - PM (Garcia Cross/Redirect/Recross/Redirect)  5/30/2008  1:00:00 PM

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on May 30, 2008.

15

16

_____

17          MARK SCHWEITZER, CSR, RPR, CRR

            Official Court Reporter

18          License No. 10514

19

20

21

22

23

24

25