of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                       ---

4        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                       ---

6    MATTEL, INC.,            : PAGES 1110 - 1254

                              :

7           PLAINTIFF,        :

                              :

8        VS.             : NO. ED CV04-09049-SGL

                         : [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

     ET AL.,                 :

10                          :

     DEFENDANTS.        :

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17               TUESDAY, JUNE 3, 2008

18                JURY TRIAL - DAY 6

19               AFTERNOON SESSION

20

21

22               MARK SCHWEITZER, CSR, RPR, CRR

                 OFFICIAL COURT REPORTER

23               UNITED STATES DISTRICT COURT

                 181-H ROYBAL FEDERAL BUILDING

24               255 EAST TEMPLE STREET

                 LOS ANGELES, CALIFORNIA 90012

25               (213) 663-3494

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      Appearances of Counsel:

2

3      On Behalf of Mattel:

4          Quinn Emanuel
            By John B. Quinn, Esq.

5              B. Dylan Proctor, Esq.
                Michael T. Zeller, Esq.

6              Harry Olivar, Esq.
                John Corey, Esq.

7              Diane Hutnyan, Esq.
                William Price, Esq.

8          855 South Figueroa Street
            10th Floor

9          Los Angeles, CA 90017
            (213) 624-7707

10

11

12     On Behalf of MGA Entertainment:

13         Skadden, Arps, Slate, Meagher & Flom LLP
            By Thomas J. Nolan, Esq.

14             Carl Alan Roth, Esq.
                Jason Russell, Esq.

15             Lauren Aguiar, Esq.
                David Hansen, Esq.

16             Matthew Sloan, Esq.
            300 South Grand Avenue

17         Los Angeles, CA 90071-3144
            (213) 687-5000

18

19

20

21

22

23

24

25

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1                         I N D E X

2

3      STEVEN LINKER, VIA VIDEOTAPED DEPOSITION.............. 1118

4      ANNA RHEE, SWORN...................................... 1177

5      DIRECT EXAMINATION BY MR. QUINN: ..................... 1178

6      CROSS-EXAMINATION BY MS. AGUIAR:...................... 1204

7      REDIRECT EXAMINATION BY MR. QUINN: ................... 1244

8      RECROSS-EXAMINATION BY MS. AGUIAR:................... 1249

9      FURTHER REDIRECT EXAMINATION BY MR. QUINN: ........... 1251

10                    E X H I B I T S

11     (Exhibits 319, 323, and 326 received.)................ 1118

12     (Exhibits 203 and 204 received.)..................... 1218

13     (Exhibit 17405 received.)............................ 1219

14     (Exhibit 201-8 received.)............................ 1225

15     (Exhibit 12822-B received.).......................... 1228

16     (Exhibit 12822-B received.).......................... 1232

17     (Exhibit 10228 received.)............................ 1239

18     (Exhibit 10229 received.)............................ 1240

19

20

21

22

23

24

25

1        Riverside, California; Tuesday, June 3, 2008

2                    1:15 P.M.

3        (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4        THE COURT:  We're back on the record.  I understand

5    there's a few issues outside the presence of the jury that we

6    need to take up.

7        Mr. Corey?

8        MR. COREY:  Yes, your Honor.  With respect to the

9    exhibits that are going to be associated with Mr. Linker's

10   presentation of testimony by video, I think the first issue

11   is I think the parties can offer by stipulation Exhibits 319

12   and 326, and all of 323 with the exception of page 3, and

13   page 3, I think, as well we'd like to take up with the Court.

14       THE COURT:  323, page 3?

15       MR. COREY:  Yes, your Honor.

16       THE COURT:  The first page is the envelope.  Second

17   page is the back of the envelope.  And the third page is

18   this?

19       MR. COREY:  That's correct, your Honor.

20       THE COURT:  All right.  Who wants it in and who

21   wants it out?

22       MR. COREY:  Matter is not offering it.  What 323 is

23   is a package of materials that were provided to Mr. Linker at

24   an October 19th meeting.  His testimony, and I think this

25   appears on page 77 of his deposition transcript, is at page

1    3, is a poster that acquired some time after the Bratz dolls

2    were in production, and he placed it in the envelope.  It's

3    not part of the package that he received at the time of the

4    Starbucks meeting.  Matter's position is it doesn't have

5    anything to do with Phase 1-A.

6         THE COURT:  He says, "Well, there is a combination

7    of stuff, but for the most part, this was the package that

8    was provided to me at the October 19th meeting at MGA,

9    excluding SL 00015.  That is a poster from the final product

10   that I had put into the envelope just for cross-reference

11   when I bought the toy.  So that is a poster that wasn't

12   anywhere near or part of the package that was at MGA when I

13   went there on October 19th."

14        MR. NOLAN:  Your Honor, our point is that the

15   testimony makes clear that that document was not part of the

16   package at the time, but to take that out places it out of

17   context completely for the jury.  It's not misleading.  It's

18   explained by the testimony in the deposition that the jury

19   will be viewing anyway.

20        THE COURT:  That makes sense, Mr. Corey.

21        MR. COREY:  Your Honor, I have no problem taking

22   out any of the testimony relating to that page.  I think that

23   entire -- we take out anything between lines 9 and 18, I that

24   that solves the problem.

25        THE COURT:  What is your concern about having this

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    in here?

2         MR. COREY:  It doesn't have anything to do with

3    Phase 1-A.  I don't know when it was created.  I don't know

4    when he acquired it.  It affects the integrity of the package

5    that he was given at the October 19 the meeting.

6         If they want to use that as a separate exhibit, I

7    would we'd have the same objection.  But I think it has to do

8    with the integrity of the package that was provided to

9    Mr. Linker at that meeting.

10        MR. NOLAN:  Your Honor, if you have the original

11   transcript --

12        THE COURT:  You're going to have to excise more

13   than just the line through 18.  Actually, what you'll have to

14   do is excise lines 9 through 24 on page 77 and then on page

15   78, lines 1 through 5 Matter.

16        MR. COREY:  That's fine with Matter.

17        MR. NOLAN:  The only point is this was designated

18   by Matter.

19        THE COURT:  I understand that, but it's not -- it's

20   not relevant, and it is confusing.  And the testimony is

21   clear that this was not part of the package.

22        MR. NOLAN:  Right.  We weren't going to argue --

23        THE COURT:  So we're to strike lines 9 through 24.

24   So the question will simply be do you recognize what's been

25   marked as Exhibit 323 or any portion of it.  Answer, yes.

1    And then we go to the next question, which will be on page

2    78.  Did you receive a package at the October 19th meeting.

3    I did.  And we'll just go from there.

4         MR. NOLAN:  All right.  And that takes out this

5    irrelevant stuff.

6         MR. COREY:  And one other question.  How would the

7    Court prefer us to handle the instruction provided in

8    connection with the testimony on page 186 to provide the

9    context for the testimony that it all relates to the object

10   19th meeting?

11        THE COURT:  Well, I thought you were going to work

12   that out during the break or something.

13        MR. COREY:  I'm more than happy to provide that

14   instruction to the jury unless the Court preferred to do it.

15   I think that's the question.

16        MR. NOLAN:  Your Honor, I apologize.  I had

17   understood that they were going to propose how to do it in

18   testimony, not --

19        THE COURT:  Right.  Your recollection is correct,

20   Mr. Nolan.  Why don't we just back it up and include -- it

21   really doesn't move the ball forward other than to insert a

22   time frame.  The question before, and you don't recollect

23   anything he showed that you was not included in the envelope

24   and you got after the October 19th meeting; right?  I don't

25   recollect.  You never saw any three dimensional -- it kind of

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008 7:44:00 AM

1      provides a context and provides a date.  I think that's

2      sufficient.  Why don't we just expand it to include lines 16

3      through 19 on page 186.

4            MR. COREY:  That's fine, your Honor.  I obviously

5      misunderstood the Court.

6            THE COURT:  That's all right.  I probably wasn't

7      clear.

8            Anything else, Mr. Corey?

9            MR. COREY:  No, your Honor.

10           THE COURT:  Mr. Nolan?

11           MR. NOLAN:  No, your Honor.

12           THE COURT:  Let's bring the jury in.

13           Counsel, do you have a time?

14           MR. QUINN:  I think MGA is just double-checking.

15           MR. NOLAN:  We're okay with it.

16           MR. QUINN:  Your Honor, for the witness Ashong, it

17     was MGA, 8 minutes 20 seconds, Matter, 18 minutes, 5 seconds.

18           THE COURT:  Thanks.

19           (WHEREUPON THE JURY ENTERS.)

20           THE COURT:  Counsel may call your next witness.  I

21     know it's a videotape.  State the name of the witness and

22     indicate any stipulation concerning the exhibits.

23           MR. QUINN:  The witness is a Steve Linker, your

24     Honor.  And I am not sure if there are any stipulations

25     regarding exhibits for this witness.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1          MR. NOLAN:  There is.

2          MR. COREY:  The parties would offer by stipulation

3     Exhibits 319, 323 with the exception of page 3, and 326.

4          MR. NOLAN:  That's correct, your Honor.  So

5     stipulated.

6          THE COURT:  Very well.  They are admitted.

7          (Exhibits 319, 323, and 326 received.)

8          THE COURT:  You pay publish, and you may proceed

9     with the video deposition.)

10          WHEREUPON THE VIDEOTAPED DEPOSITION

11          EXCERPTS OF STEVEN LINKER, AS PROVIDED

12          BY COUNSEL, WERE NOT REPORTED BUT ARE

13          INCORPORATED HEREIN BELOW AS FOLLOWS:

14           STEVEN LINKER, VIA VIDEOTAPED DEPOSITION

15          THE REPORTER:  Raise your right hand, please.

16          (WHEREUPON, THE WITNESS WAS DULY

17          SWORN.)

18     Q.  On that note, good morning, Mr. Linker.

19     A.  Good morning.

20     Q.  If you could please tell us your full

21     name for the record.

22     A.  Steven Linker.

23     Q.  Are you currently employed by a company?

24     A.  Yes.

25     Q.  And what's the name of that company?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   Penny Arcade.

2    Q.    And generally speaking, what line of

3    business is Penny Arcade in?

4    A.   It's a design service company that

5    services primarily toy companies, children's

6    entertainment properties, children's market

7    industry.

8    Q.    Do you have a title or a position with

9    Penny Arcade?

10   A.   Yeah.  I own it.  It's my small

11   business, which is pretty much self-employed

12   through them.

13   Q.   And about how long have you done

14   business under the name Penny Arcade?

15   A.   How long?  Since 2000 is when we were

16   incorporated, when I started it, so six years.

17   Q.   If you could please tell us again just

18   briefly your employment history or background prior

19   to the time that you started working as Penny

20   Arcade?

21   A.    What was my employment --

22   Q.    Yes.

23   A.    -- background, history?

24   Q.    Yes.

25   A.    After school I worked at Mattel for two

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    years between 1994 and 1996, and from Mattel I went

2    to a company called Equity Marketing in Los Angeles

3    from '96 to the end of '98 or '99; and in 1999 I

4    started free-lancing and started my business, Penny

5    Arcade, in 2000 until present.

6    Q.   And when you were at Mattel, what was

7    your position there just generally speaking?

8    A.   A designer; designer of toys.

9    Q.   And did you work out of the design

10   center there in El Segundo?

11   A.   Yes, I did.

12   Q.   As a free-lancer starting in

13   approximately the 1999 time period, did you do work

14   for Mattel?

15   A.   Yes.

16   Q.   And what projects do you recall working

17   on in that 1999 time period?  I take it from your

18   response there were many?

19   A.   There were many projects, yeah.

20   Q.   Why don't you just tell me what were the

21   ones that I guess took up most of your time.

22   A.   In 1999?

23   Q.   Yes.

24   A.   By far, Diva Starz.

25   Q.   During what approximate time period from

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    1999 until when on the Diva Starz project?

2    A.   2002, maybe end of 2002, until the

3    project kind of faded out.  We might even have done

4    some stuff in 2003 early but...

5    Q.   Did you work directly with people at

6    Mattel in connection with the Diva Starz project?

7    A.   Yes.

8    Q.   And who were the people you recall

9    principally working with?

10   A.   Principal, Maureen Mullen, Barb Miller,

11   Rene Pasko, Joni Pratte.  Those were the primary

12   players that I worked with, but there is Sue Davis;

13   Joe Frankie; Alison Eisenberg; Kip -- Kip Long -- I

14   can't pronounce his last -- Kip Ongchangco or

15   something like that.  Good guy.  But those were the

16   primary people that I worked with on Diva Starz.

17        MR. ZELLER:  Please mark as Exhibit 314 a

18   three-page document consisting of an e-mail dated

19   January 7, 2000, from Liz Hogan to Joni Pratte,

20   that's P-r-a-t-t-e, and Sue Davis with a CC to

21   Steve Linker, and it bears Bates numbers M0016585

22   through 86.001.

23   Q.   All right.  Do you recognize this?

24   A.   Yes.

25   Q.   What is Exhibit 314?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   This is an e-mail that my partner and I

2    provided to Mattel for names for the, at the time,

3    Chat Girls brand, which they were looking to change

4    the name, and these are our suggestions, a list of

5    our concepts and ideas.

6    Q.   Was this provided to Mattel in

7    connection with what became known as Diva Starz?

8    A.   Yes, it is.

9    Q.   And when was this e-mail sent to Mattel?

10   A.   It was early 2000, January 7th, 2000.

11   Q.   Is that something that you worked on

12   with Liz Hogan?

13   A.   Yes.

14   Q.   Do you recall discussing with Liz Hogan

15   potential names for Diva Starz dolls that included

16   Brats, B-r-a-t-s?

17   A.   Do I recall that?

18   Q.   Yes.

19   A.   Yes.  That was part of our whole -- I

20   mean, we would have brainstorms on it.

21   Q.   And do you recall those brainstorms

22   being in or before January of 2000?

23   A.   Yes.

24   Q.   Did you ever create any logos or

25   illustrations or artwork that pertained to Brats,

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    B-r-a-t-s?

2    A.  Yes.

3    Q.  If you could tell me just generally

4    speaking what you recall creating on that.

5    A.  I recall doing a bunch of different

6    types of logos and ideas for a line extension, I

7    guess, of the Diva Starz brand, the younger Brats,

8    I guess, is what the direction was given to me; and

9    so I worked on a couple logos for that, Chat Brats,

10   Brats, other strange names, Chat Room, stuff like

11   that, but Brats was one of the names of the logos,

12   I suppose.

13   Q.  And this was for Mattel?

14   A.  For Mattel.

15   Q.  Directing your attention to the second

16   page of Exhibit 316 --

17   A.  Yes.

18   Q.  -- do you recognize what's depicted

19   here?

20   A.  Yes.

21   Q.  What are these?

22   A.  These are my files of creating color

23   pallets and Chat Brats logo and Chat Room, Chat

24   Girls logo concepts and branding and color ideas.

25   Q.  And is the same true for the last page,

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    which is 16811?

2    A.   Yes.  These are my designs provided to

3    Mattel regarding the Brats concept line for the

4    Diva Starz brand at the time.

5    Q.   Did you create these for Mattel, these

6    two pages, 809 and 811?

7    A.   809 and 811?

8    Q.   Right.

9    A.   Yes.

10    Q.   Approximately when did you create these

11    logo designs that had Brats as part of them?

12    A.   These are --

13    Q.   Brats with an "S."

14    A.   Yeah.  These were earlier in the

15    process, so probably in 1999, because we were still

16    working with the Chat name.

17    Q.   When you say -- you say probably in your

18    answer as to date?

19    A.   It was early in the process of building

20    the identity or the brand of Diva Starz, but it was

21    before the name Diva Starz, so that's why you see

22    the word "chat," because it was originally based on

23    Chat Girls.  So any line that I -- any designs that

24    I did or for these designs in particular, it was

25    considered, instead of Chat Girls, it was their

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    little sisters, the Chat Brats, and that's why you

2    see the little girl designs.  So this was somewhere

3    towards the end of 1999, maybe early 2000, but

4    definitely early in the process, I would say, '99.

5    Q.   Directing your attention to the third

6    page of Exhibit 315, which is M16810, do you

7    recognize anything here?

8    A.   Yes.

9    Q.   Are these illustrations or other

10   drawings that you made?

11   A.   I created all these illustrations.

12   Q.   And then how about the part that says

13   "Chat Brats"?  Is that one you created too?

14   A.   I created that.

15   Q.   And maybe if you can tell us what is

16   depicted here, these character drawings.

17   A.   What's depicted here is the tall girl in

18   the middle was based on the final design of the

19   doll, the first line of the Diva Starz doll, and

20   then her -- I was to create her little sister as a

21   toddler and also as like a little brat or middle

22   age and give them variety as what she would look

23   like at different ages, and the black and white is

24   just the line art for the small one in the middle.

25   Q.   Is everything that's depicted here on

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Page 16810 of Exhibit 315 work you created for

2    Mattel?

3    A.   Yes.

4    Q.   And approximately when did you create

5    this page that we are discussing?

6    A.   During the same time frame as the logos,

7    so it would have been towards the 1999 -- towards

8    the end of 1999.

9    Q.   Directing your attention to Exhibit 316,

10   do you recognize these pages?

11   A.   Yes.

12   Q.   And what generally do these depict?

13   A.   The same files as before, just it's a

14   file that had a combination of all the elements

15   that I used for this particular project.

16   Q.   When were these logos and illustrations

17   that are shown here on Exhibit 316 created?

18   A.   Created in 1999.

19   Q.   This was for Mattel as well?

20   A.   Yes.

21   Q.   Directing your attention to the second

22   page of Exhibit 316, you will see there is Brats,

23   B-r-a-t-s, at the top, and then you can correct me

24   if I am wrong about this, it looks like below that

25   there is one that's kind of a double pose or an

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    image?

2    A.   Yeah.

3    Q.   Is that also supposed to be or was,

4    rather, B-r-a-t-s?

5    A.   Yes.

6    Q.   Is this part of what you created for

7    Mattel and then sent to Mattel?

8    A.   Yes.

9    Q.   Now I really am moving on to a new

10   subject.  At some point did you have contact with

11   anyone at MGA?

12   A.   Yes.

13   Q.   What was your first contact with anyone

14   at MGA?

15   A.   I received a call from Paula

16   Treantafelles regarding she had called and

17   introduced herself, and she told me she knew who I

18   was from work that she has seen that I worked on

19   the Diva Starz at Mattel and through Maureen

20   Mullen, said she referred me, and she asked me if I

21   was available for free-lance work.  She said she was

22   fond of my work and she said, "Could you come in to

23   do some packaging, graphics and logo design."

24   Q.   Was this a face-to-face meeting or a

25   phone call?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   This was a phone call.

2    Q.   And Ms. Treantafelles called you?

3    A.   Yes.

4    Q.   Approximately when was this?

5    A.   Approximately probably the summer of

6    2000, early like before summer, early summer,

7    somewhere in there.

8    One page.  Strike that.  Let's please mark as

9    Exhibit 318 a one-page document bearing Bates

10   number SL 00063.

11   Q.   Mr. Linker, have you had a chance to

12   take a look at Exhibit 318?

13   A.   Yes.

14   Q.   Please tell us what it is.

15   A.   It's an invoice that I sent to Paula

16   Treantafelles for work rendered for her and her

17   company.

18   Q.   You say her company?

19   A.   MGA.

20   Q.   I take it that you received this phone

21   call from Paula Treantafelles prior to the August

22   12th date, which reflects here your first work?

23   A.   Right, so it was probably within a week

24   or so before August 12th.

25   Q.   -- that's why I am asking.  So when you

1    say probably, I just want to make sure is this

2    something --

3    A.   Right.

4    Q.    -- that's your best recollection.

5    A.   Well, my best recollection is, yes,

6    that my first meeting with her was based on this

7    project.  So seeing that on this invoice with the

8    project start date for me on my sketches was

9    August 12th, then that's the time when I met her.

10   Q.   What project does Exhibit 318 relate to?

11   A.   A logo design for one of their toys

12   called Hoppity.

13   Q.   Was that the first project you ever

14   worked on for MGA?

15   A.   Yes, it is.

16   Q.   And if you could please tell us just

17   generally speaking what was Hoppity?

18   A.   Hoppity was a doll that bounced on a

19   ball, and they needed a -- she needed or they

20   needed, I don't know how to refer it, but MGA

21   needed a better logo design that showed more action

22   and graphic elements.

23   Q.   Prior to the time that

24   Miss Treantafelles made that first phone call to

25   you in the summer of 2000, did you know

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Miss Treantafelles?

2    A.  No.

3    Q.  Had you ever heard of her before then?

4    A.  No.

5    Q.  Did you do any work on Hoppity after

6    August 25th, 2000?

7    A.  No.

8    Q.  After you did work on Hoppity, did you have any

9    conversations with anyone at MGA about

10   further work or potential work for MGA?

11   A.  Yes.

12   Q.  What happened next then in that regard?

13   A.  Paula contacted me about a couple of

14   jobs that she had in line for packaging, one that

15   could start and the other one was a rush or a new

16   concept that they wanted to get started on.

17   Q.  What were these two projects?

18   A.  The first one was Samantha Scooter, and

19   the other one at the time wasn't given a name, so I

20   didn't know what it was, but eventually, I mean, it

21   was the Bratz.

22   Q.  This was a phone call that she made to

23   you?

24   A.  Yes.

25   Q.  And approximately when was that phone

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    call made?

2    A.   It was after this invoice and it was

3    before October 3rd, so somewhere in the middle of

4    September.

5    Q.   Of 2000?

6    A.   Of 2000, or late September.

7         MR. ZELLER:  Let's please mark as Exhibit 319

8    a one-page document which appears to be from a

9    planner or diary with the dates of October 2nd,

10    2000, and October 3rd, 2000, and bearing Bates

11    number SL 0002.

12         (WHEREUPON, a certain document was

13         marked Deposition Exhibit No. 319,

14         for identification, as of 9/13/06.)

15         MS. CENDALI:  This is 319?

16         MR. ZELLER:  Yes, 319.

17    BY MR. ZELLER:

18    Q.   Do you recognize what's been marked as

19    Exhibit 319?

20    A.   Yes.

21    Q.   What is this?

22    A.   These are some notes in one of my daily

23    planners.

24    Q.   Is all this your handwriting?

25    A.   Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1  Q.  I see that there is writing for

2  October 3rd, 2000?

3  A.  Yes.

4  Q.  These are all entries that you made on

5  or about October 3rd, 2000?

6  A.  Yes.

7  Q.  And if you could please tell us, what do

8  these entries relate to?

9  A.  These relate to taking on a packaging

10  project and getting the breakdown of what they

11  wanted for Scooter Samantha from MGA.

12  Q.  Directing your attention to Exhibit 319,

13  does this reflect a meeting that you had with MGA?

14  A.  Yes.

15  Q.  And was that with Paula in particular?

16  A.  Yes.

17  Q.  Where was that meeting?

18  A.  Held at MGA offices.

19  Q.  That was a October 3rd, 2000 meeting?

20  A.  Yes.

21  Q.  What happened then with respect to

22  the -- not the Scooter Samantha project but the

23  other one that Paula had mentioned that she wanted

24  you to potentially work on?  What happened after

25  she mentioned it in the phone call?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  She set up a meeting to meet with her

2    to see if we would want to work on this other

3    packaging project that was to be expedited as far

4    as like she was really excited about it, and she

5    set up a meeting for us to come and meet her to see

6    if we wanted to take on the project.

7    Q.  Do you recognize what we have marked as

8    Exhibit 320?

9    A.  Yes.

10    Q.  Maybe we should break it out a little

11    bit.  Just focusing on the typewritten e-mail

12    portion, do you recognize this e-mail?

13    A.  Yes.

14    Q.  Please tell us what this e-mail is.

15    A.  This e-mail is an e-mail addressed to

16    Paula Treantafelles and Carter Bryant regarding

17    packaging direction and questions that we had for

18    this new project called the Brats.

19    Q.  Was this e-mail sent on or about

20    October 12, 2000?

21    A.  Yes, it was.

22    Q.  What was your role in creating the

23    e-mail portion of Exhibit 320?

24    A.  My partner and I, Liz Hogan, went over a

25    bunch of questions that we needed to ask to get

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    prepared to send a quote and to get started on this

2    rush project, so we needed all this information.

3    So we conversed, and these were the questions we

4    had.

5    Q.   You just mentioned the rush project.

6    What project is this you are referring to in your

7    answer?

8    A.   Oh, what's the project?

9    Q.   Yes.

10   A.   The Bratz packaging.

11   Q.   You had referred to this exhibit, 320,

12   as being an e-mail to Carter Bryant?

13   A.   It was addressed to him.

14   Q.   And why was this e-mail addressed to

15   Paula Treantafelles and Carter Bryant?

16   A.   They were the two people that we were

17   told to contact regarding this project and they

18   were the two we met at the meeting when we first

19   saw the concept, so we were -- they were our

20   contact person.  Paula was our contact person at

21   MGA and Carter was, from our knowledge, was the

22   creator of the concept.

23   Q.   And what project are you referring to?

24   A.   Bratz packaging project.

25   Q.   Add you met with Paula and Carter Bryant

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      prior to October 12th, 2000, prior to this e-mail?

2      A.   Yes.

3      Q.   And where did you meet them?

4      A.   We met them at a Starbucks coffee shop

5      on Rosecrans Avenue in Manhattan Beach or El

6      Segundo, on the border.

7      Q.   When did this meeting took place?

8      A.   It took place that week, either that

9      Tuesday or Wednesday before the October 12th

10     e-mail.

11     Q.   So what days would that be?

12     A.   Tuesday the 10th, Wednesday the 11th in

13     the a.m.

14     Q.   The meeting was in the morning?

15     A.   Yes.

16     Q.   And who was present for that meeting at

17     Starbucks on October 10th or 11th, 2000?

18     A.   It was myself; my partner, business

19     partner, Liz Hogan; Paula Treantafelles; Carter

20     Bryant; and a fifth party, a woman whose name I

21     don't recall that was associated with Mr. Bryant.

22     Q.   I am sorry.  Associated with Mr. Bryant?

23     A.   Well, came with Mr. Bryant, yeah.

24     Q.   You saw them walk in together?

25     A.   Yeah, they were together.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      Q.   I would like to ask you a few questions

2      about this meeting that you had at Starbucks on or

3      about October 10th or 11, 2000.  Was this meeting

4      about Bratz?

5      A.   Yes.

6      Q.   Please tell me what it is that you can

7      recall being discussed at this meeting about Bratz?

8      A.   We discussed packaging direction and --

9      well, we mostly talked with Paula.  She expressed

10     what she was looking for as far as direction and

11     piece count as far as what she would like to see us

12     do for packaging and gave us kind of like rough

13     time lines on when she needed stuff done, but

14     before all that, she presented the concept to us or

15     they presented it to us.

16     Q.   I am sorry.  You say before that she

17     presented the concept?

18     A.   Before telling us what she wanted, she

19     presented the concept.  We needed to see the

20     concept first before we could talk about packaging.

21     Q.   Please tell me what you mean when you

22     say that she presented it to you.

23     A.   At this meeting we were shown the

24     concept of Bratz, the dolls.

25     Q.   What were you shown?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   A.  We were shown artboards, illustrations

2   of dolls and their features as far as what the

3   dolls do and what they represent.

4   Q.  At this meeting on or about October 10th

5   or 11th, 2000, did anyone refer to this project as

6   being Bratz by name?

7   A.  Yes.

8   Q.  Was that the first time that you heard

9   the term "Bratz" in connection with the MGA

10  project?

11  A.  Yes, yes.

12  Q.  Did Mr. Bryant say or do anything at

13  this meeting?

14  A.  Not much.

15  Q.  Well --

16  A.  He presented -- it was his -- he brought

17  the portfolio with the images.

18  Q.  When you say "the images," you are

19  referring to the artboards and the illustrations

20  and the things you mentioned earlier?

21  A.  Yes.

22  Q.  Did you know Mr. Bryant before this

23  meeting?

24  A.  Yes.

25  Q.  How did you know him?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   We worked at Mattel at the same time in

2    1996 before I left, so I knew him from there.

3    Q.   Did you and Mr. Bryant talk about Mattel

4    at all during the meeting?

5    A.   Briefly.  I think I asked him when he

6    left or, you know, because I was no longer there,

7    so I assumed he was no longer there, and he said he

8    had just quit, so that was about it.

9    Q.   Mr. Bryant said he had quit?

10    A.   Yes.

11    Q.   Was there anything that happened in

12    between the meeting that you had that you described

13    at Starbucks on or about October 10th or 11th,

14    2000, and then the time that the October 12th, 2000

15    e-mail was sent, which we marked as Exhibit 320, as

16    it pertains to Bratz, or was the next thing that

17    happened that you sent the e-mail or Liz sent the

18    e-mail with your participation?

19    A.   When we left, I know that we prepared

20    this e-mail, because we had a lot of questions, and

21    also, we were starting to work on quotes for the

22    job because that's typically what we do and we knew

23    this was a big job, so we started bouncing back

24    ideas, but primarily we left there with these

25    questions and wanted to set up a secondary meeting

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    to go over these and to get more information.

2    Q.   Do you recognize what's been marked as

3    Exhibit 321?

4    A.   Yes.

5    Q.   What's this?

6    A.   This is a packaging estimate that Liz

7    and I provided to Paula Treantafelles regarding the

8    Bratz packaging project.

9    Q.   And what was your participation in the

10   creation of this e-mail, 321?

11   A.   Liz and I worked together on estimating

12   based on their notes and what they -- their

13   requests.  We came up with this as an initial quote

14   and phases to meet their deadlines.  So I worked on

15   it with her as far as how much things cost, what's

16   our lead time, who is going to do what on the

17   projects.  We were figuring that out, how many

18   resources we could use, stuff like that, logo

19   design.

20   Q.   Do you recognize Exhibit 322?

21   A.   Yes.

22   Q.   What is Exhibit 322?

23   A.    Notes from one of my daily planners

24   dated October 18th, Wednesday, of 2000 and

25   Thursday, October 19th of 2000.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   Okay.  Then turning to the right side of

2    Exhibit 322, which is for October 19, 2000 --

3    A.   Yes.

4    Q.   -- the second entry says "MGA - Bratz 10

5    to 11"?

6    A.   Correct.

7    Q.   What does that refer to?

8    A.   Those are the times of our meetings, so

9    I was going to MGA.  I was going to meet and talk

10   about the Bratz packaging project between 12:00 and then --

11   sorry.

12   Q.   Was this a meeting that actually took

13   place?

14   A.   Yes.

15   Q.   Did this meeting take place on

16   October 19, 2000?

17   A.   Yes.

18   Q.   Who was -- well, let me ask this first:

19   Where was this meeting?

20   A.   At MGA offices in the Valley.

21   Q.   And who was there for the meeting?

22   A.   It was myself, Paula Treantafelles, a

23   woman who represented the packaging.  I believe her

24   name was Rachel Harris, and Kerri Legg.  Those are

25   the principals that I recall at the meeting.

1    Q.   And if you could please just tell me

2    generally speaking what happened at that meeting as

3    it pertained to Bratz?

4    A.   We discussed packaging with a little

5    more detail as to what they wanted.  They provided

6    me with the pitch that we saw, the artboards.  They

7    provided me with some sample references of color

8    swatches, some graphic references, and we went

9    over -- they gave me some spec sheets and we went

10   over what they would like to see as far as the idea

11   of the shape of the box.  We kind of like

12   brainstormed it.  It was sort of a brainstorm

13   pretty much for packaging.

14   Q.   You mentioned spec sheets?

15   A.   Yes.

16   Q.   What are those?

17   A.   Spec sheets are like -- it could be a

18   couple of things, but the specs are like calling

19   out sizes and dimensions, what are the accessories

20   that come with each pack, you know, how many pieces

21   are in there so we know where to place it in the

22   packaging and stuff like that.

23   Q.   Do you recognize what's been marked as

24   Exhibit 323 or any portion of it?

25   A.   Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   Did you receive a package at the

2    October 19, 2000 meeting?

3    A.   I did.

4    Q.   And who did you get that from?

5    A.   I got it from MGA, Paula or the group

6    that was working on this, but pretty much Paula and

7    her design team as far as --

8    Q.   And you received those materials while

9    you were actually at MGA's offices?

10    A.   While I was in the meeting, they gave me

11    this yellow envelope.

12    Q.   So then just so the record is clear on

13    this, what you received from MGA was pages starting

14    SL 16 through SL 63 on October 19th, 2000?

15    A.   Yes.  This is all stuff that was put in

16    there.

17    Q.   Well, I guess one thing I am trying to

18    ask is, were you given this, these materials that

19    we were discussing in an envelope from MGA?

20    A.   Yes.

21    Q.   In other words, MGA provided the

22    envelope?

23    A.   Yes, and it was addressed on the second

24    page, SL 00014, to Steve and Liz from Bratz or with

25    the "Bratz" in quotes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   Well, maybe if we could walk through a

2    few of these pages here that are part of 323,

3    starting with SL 16.

4    A.   Yeah.

5    Q.   This was one of the pages you received

6    on October 19, 2000, from MGA?

7    A.   Yes.

8    Q.   Had you seen this particular drawing

9    prior to that time?

10   A.   Yes.

11   Q.   When did you see this drawing?

12   A.   At the meeting at Starbucks with Paula

13   and Carter.

14   Q.   The one that was on October 10th or

15   11th?

16   A.   Yes.

17   Q.   Turning your attention to the next page,

18   SL 17.

19   A.   Yes.

20   Q.   This is one of the pages you received

21   from MGA on October 19th, 2000?

22   A.   Yes.

23   Q.   Had you seen this one before that time?

24   A.   Yeah.

25   Q.   When did you see this drawing previous

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1     to that?

2     A.   At the meeting at Starbucks on either

3     October 11th or 10th, 10th or 11th, 2000.

4     Q.   And directing your attention to SL 18,

5     this was one of the pages you received in that

6     package you are referring to at the October 19th

7     meeting?

8     A.   Yes.

9     Q.   And had you seen this one before the

10    October 19th meeting?

11    A.   Yes.

12    Q.   When did you see this one before?

13    A.   I saw this at the Starbucks meetings on

14    October 10th or October 11th of 2000.

15    Q.   SL 19, this was part of the

16    October 19th, 2000 package?

17    A.   Yes.

18    Q.   And had you seen this particular drawing

19    before that time?

20    A.   Yes.

21    Q.   When did you see that one?

22    A.   I saw this at that same meeting, the

23    Starbucks meeting, October 10th or October 11th.

24    Q.   Directing your attention to SL 20, this

25    was part of the October 19th meeting package?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   A.   Correct.

2   Q.   And had you seen this drawing prior to

3   that October 19th, 2000 meeting?

4   A.   Yes.

5   Q.   When did you first see this drawing?

6   A.   I saw this at the Starbucks meeting

7   October 10th or October 11th of 2000.

8   Q.   Well, maybe I can cut through some of

9   these then.  Is it true that SL 21, 22, 23, 24, 25,

10  26, 27, 28 and 29 are materials that you saw at the

11  Starbucks meeting on or about October 10th or 11th

12  2000?

13  A.   Yes.

14  Q.   And these were -- all these pages were

15  part of the October 19th, 2000 meeting packet?

16  A.   Correct.

17  Q.   And are these what you are referring to

18  as the artboards that you talked earlier?

19  A.   Yes, these were the artboards that we

20  saw.

21  Q.   Were these the materials that Carter

22  Bryant had as part of that portfolio you are

23  referring to?

24  A.   Yes.

25  Q.   And so the record is clear, we are

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    talking about SL 16 through SL 29?

2    A.   Yeah.  Let me just make sure.  What did

3    you say was the first one?  16.  Yep.

4    Q.   Directing your attention then to SL 30,

5    which is part of Exhibit 323, this was among the

6    October 19, 2000 meeting packet?

7    A.   Yes.

8    Q.   Had you seen that prior to the

9    October 19 meeting?

10   A.   I don't recall seeing these before that

11   date.

12   Q.   What's your understanding of what this

13   depicts?

14   A.   Just different hairstyles that were

15   going to be part of the toy.  Part of the concept

16   was that she came with different hairpieces that

17   fit on the back of her head, and these were some of

18   the styles that they were looking at or that they

19   were sketching up.

20   Q.   This was for Bratz?

21   A.   For Bratz.

22   Q.   Directing your attention to SL 31 and

23   then 32, 33 and 34, these all look identical?

24   A.   Yeah.

25   Q.   Well, let me ask you then about SL 31

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1     through SL 34.

2     A.   Yes.

3     Q.   Is this drawing something you received

4     as part of the October 19, 2000 packet from MGA?

5     A.   Yes, it is.

6     Q.   Had you seen this illustration prior to

7     October 19th?

8     A.   No, I hadn't.

9     Q.   And generally speaking, what's your

10    understanding of what this illustration depicts?

11    A.   This depicts all the accessories and all

12    the items that were going to be packed out for each

13    toy or each SKU.  So we knew there was going to be

14    a doll, a CD-ROM, a second set of shoes, a purse,

15    and a second outfit, a backpack.  They were calling

16    out the piece count of the toy, what was included

17    with the toy.

18    Q.   And when you say "the toy," you are

19    referring to Bratz?

20    A.   Bratz, the doll.

21    Q.   Okay.  Let me ask about them together

22    then.  Was this page or pages, SL 36 and 37, among

23    the materials that you received from MGA on

24    October 19, 2000?

25    A.   Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1  Q.  What's your understanding of what 4.99

2  refers to on this?

3  A.  That was the retail price of the fashion

4  pack or the "A" price.  I don't know what was

5  called out there.  I believe it was the retail

6  price, so just an accessory kit, I guess, to the

7  dolls.  So it was part of the packaging brief or

8  the specs that they wanted to give us.

9  Q.  Directing your attention to Page SL 38

10  of Exhibit 323 --

11  A.  Yes.

12  Q.  -- is this something that you received

13  from MGA on October 19th, 2000?

14  A.  Yes.

15  Q.  Directing your attention to SL 42 of

16  Exhibit 323, is this page something that you

17  received from MGA on October 19, 2000?

18  A.  Yes, it is.

19  Q.  Had you seen this page prior to the

20  October 19 meeting?

21  A.  No.

22  Q.  Please tell us generally what's your

23  understanding of what this page depicts?

24  A.  This was for the actual Bratz doll.

25  This was a call-out of all the pieces and items

1      that were going to be provided in the packaging

2      along with the doll.  It calls out the outfits.

3      There was going to be an outfit dressed on the

4      girl.  It comes with her own hairstyle.  It comes

5      with her shoes, the necklace, the backpack.  It

6      calls out all the items as far as what else is in

7      the packaging, and it gives you the price point

8      that they are looking to meet.

9      Q.   Directing your attention to SL 44, was

10     this something that MGA provided to you on

11     October 19, 2000?

12     A.   Yes.

13     Q.   And what does this generally depict?

14     A.   This is just I guess like an engineering

15     drawing or a call-out of what the doll size is, the

16     size of the doll, basically, and sort of like specs

17     on what the body was going to be made of -- or not

18     made of but how it was going to look.  So it was

19     the actual size reference, so it gave us an idea

20     how to build around this size with all the fashions

21     and everything and the packaging size.

22            Again, we were doing packaging, so we

23     needed to know the actual size of the doll, and

24     this was a good call-out on that size reference.

25     Q.   Had you seen this particular drawing

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    prior to October 19, 2000?

2    A.  No, I hadn't.

3    Q.   Directing your attention to Exhibit 320,

4    that's the October 12, 2000 e-mail printout that we

5    had discussed earlier, and we talked earlier about

6    the printed text, or at least some of the printed

7    text here, and I wanted to ask you about the

8    handwriting.  This is all your handwriting, is that

9    correct?

10    A.  Yes.

11    Q.   I would like to ask you a few questions

12    about the handwriting on this document, Exhibit

13    320.  Did you make this handwriting on Exhibit 320

14    on October 12, 2000, or at some other time?

15    A.   At some other time.

16    Q.   When did you make your handwritten

17    notations here?

18    A.   These were made on the 19th of October

19    during the meeting with MGA.

20    Q.   The October 19th meeting you were

21    referring to earlier?

22    A.  Yes.

23    Q.   Under entry No. 1 the typewritten

24    portion says, "We need some spec sheets calling out

25    sizes and dimensions on the dolls and the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    accessories," end quote, then in handwriting it

2    says "copies - today."  What's the "copies - today"

3    referring to?

4    A.  It means I received copies that day, and

5    I even put a check next to the one saying that was

6    completed.

7    Q.  So the record is clear on this, when you

8    are referring to spec sheets, you are referring to

9    those pages that are SL 30 --

10    A.  Yes.

11    Q.  -- through SL 47?

12    A.  Through 47?  Yes.

13    Q.  For the record, this is part of

14    Exhibit 323.  And then Item 2, where it talks about

15    the artboards and the typewritten portion and then

16    it says "copies" in handwriting next to it --

17    A.  Yes.

18    Q.  Did you have an understanding that the

19    dolls had individual names prior to the time that

20    you had that October 19th, 2000 meeting?

21    A.  Yes, yes.  And they had working names.

22    You know, at that point they were working names, of

23    which I don't know which were confirmed in-house or

24    not.

25    Q.  Then item No. 4, the typewritten portion

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    on Exhibit 320 says, "Do you have photo/JPEGs of

2    the sculpts," question mark, and then looks like a

3    handwritten notation that says "casts," c-a-s-t-s?

4    A.   C-a-s-t-s.

5    Q.   "By next week for ref," r-e-f, period?

6    A.   Yes.

7    Q.   What's that referring to?

8    A.   The question is, do they have photos or

9    JPEGs of sculpts of the dolls that they were

10   making, and the answer was we can see casts by next

11   week for reference.  So casts are like casts of the

12   sculpts.  They are just like copies of the final

13   sculpts or work-in-progress at that point.  So they

14   said they would provide it by the following week

15   for reference.

16   Q.   And "they" being MGA at this

17   October 19th meeting?

18   A.   Yes, yes.

19   Q.   And those are the outfits that you had

20   originally seen at the Starbucks meeting on

21   October 10th or October 11th, 2000?

22   A.   Yes.

23   Q.   Directing your attention to the bottom

24   portion of Exhibit 320, the handwriting there --

25   A.   Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   -- first it says "deadlines" and it has

2    two references there, "12/15 for Wal-Mart," it

3    looks like "meeting," MTG?

4    A.   Um-hmm.

5    Q.   That's a yes?

6    A.   Yes.

7    Q.   And then the next one is "11/20" with a

8    question mark and then references Target?

9    A.   Yes.

10   Q.   Was that something that was discussed at

11   the October 19, 2000 meeting?

12   A.   Yes, it was.

13   Q.   And what was discussed on that subject?

14   A.   They had sales meetings set up, so they

15   wanted -- I wrote these notes down as to when are

16   these sales meetings and who are they with and what

17   they needed for each one, so I was roughly given

18   around 11:20 they were setting up a meeting with

19   Target, which they needed white boxes, which was

20   just an outline of the shape of the box and the

21   floor plan of the box for planograms, and I wrote

22   it twice.  So I wrote "box whites for planograms,"

23   which is the same thing as "white box for

24   planograms."  So I just doubled my notes because I

25   do that sometimes.  And the 12:15 was for the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Wal-Mart meeting, and by that meeting I wrote

2    "trade dress meeting," to have the colors and the

3    look and the style and the illustrations, whatever

4    it's going to be, have that kind of narrowed down

5    by that meeting.

6    Q.   Was it your understanding that as of the

7    October 19, 2000 meeting that the meeting that was

8    set up for Target subsequently on or about November

9    20th was to be over the planograms for Bratz?

10   A.   Yes, it was.

11   Q.   Directing your attention to Exhibit 324,

12   have you seen this e-mail previously?

13   A.   Yes.

14   Q.   Is this an e-mail that you saw on or

15   about October 19th, 2000?

16   A.   Yes.

17   Q.   Did you participate in the creation of

18   this e-mail that's marked as Exhibit 324?

19   A.   Yes.

20   Q.   And please tell me generally speaking

21   what your involvement was?

22   A.   In coming up with prices, what goes with

23   each phase, consulting with Liz Hogan on how to

24   outline or best approach this project based on the

25   packaging requests from MGA on the Bratz line.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   I take it that the retail prices there

2    that are in the first paragraph, was that

3    information that was provided by MGA?

4    A.   Yes.

5    Q.   And that was provided to you on

6    October 19th, 2000, at that meeting or at some time

7    prior to that?

8    A.   It might have been prior through an

9    e-mail.

10   Q.   Was it no later than October 19, 2000?

11   A.   No later than October 19th.  It was

12   either that day or prior to that day.

13   Q.   Was this something that was discussed

14   then at the meeting?

15   A.   This stuff was discussed at the meeting?

16   Q.   Yeah.  Well, this particular e-mail,

17   Exhibit 324.

18   A.   Yeah.  Well, they gave us all -- then

19   they gave us all the specs and everything for it,

20   so I received all the stuff at the meeting, but we

21   had an idea of what they wanted because they gave

22   us -- basically they gave us four SKUs, four SKUs,

23   one SKU, one SKU.  So we knew to base our quote off

24   of that, but we didn't have specifics of what was

25   in the product.  You know what I mean?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   If you could turn back to Exhibit 321

2    for a moment, which is your October 14, 2000

3    e-mail.

4    A.   321, yep.

5    Q.   You will see there it has some retail

6    prices that are listed as of October 14, 2000?

7    A.   Right, right.

8    Q.   My question is, did you receive those

9    particular retail prices that are listed here from

10   MGA on or before October 14, 2000?

11   A.   Yes, we did.

12        MR. ZELLER:  Let me try it this way:  I think

13   I have made it too complicated.  Let's just mark as

14   Exhibit 326 a two-page document bearing Bates

15   numbers SL 8 through 9.  This appears to be an

16   e-mail from Liz Hogan to Liz Hogan dated

17   October 12, 2000, subject, EST.

18   Q.   Do you recognize what we have marked as

19   Exhibit 326?

20   A.   Yes.

21   Q.   Q.   First let me ask you this:  Is this

22   something that you were involved with the creation

23   of?

24   A.   Yes.

25   Q.   And how were you involved with the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    creation of this?

2    A.   Verbally with Liz Hogan after the

3    meeting, we sat and went over what -- off of the

4    specs they gave us, four SKUs, two SKUs, one SKU,

5    these were a breakdown.  We were talking how are we

6    going to break down our estimate for this project,

7    and again, we go back and forth a lot as far as

8    setting up estimates on big projects, so this was

9    probably one of the initial estimates.

10   Q.   Was this a draft in some way?

11   A.   This is a draft.

12   Q.   I see that this e-mail is dated

13   October 12, 2000.  Is it fair to say that the

14   information regarding the number of SKUs for Bratz

15   and the retail price for Bratz listed here in the

16   first paragraph of Exhibit 326 was information that

17   was provided to you by MGA?

18   A.   It's pretty apparent that, yes, it was

19   given to us during that day at that meeting.  Or

20   not that day, but it was given to us so we had the

21   information by this day.

22   BY MR. ZELLER:

23   Q.   That was no later than October 12th,

24   2000?

25   A.   It was no later than October 12th, no.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect) 6/3/2008 7:44:00 AM

1    Q.   Returning for a moment to Exhibit 324,

2    which was the October 19, 2000 e-mail, this was

3    something that was actually sent to MGA?

4    A.   Yes.

5    Q.   I am going to show you a series of

6    drawings that were previously marked as Deposition

7    Exhibit 10.  For the record, the first page is a

8    affirmation in connection with some MGA litigation

9    in Hong Kong made by a Lee Shiu, S-h-i-u, Cheung,

10   C-h-e-u-n-g, dated June 18th, 2002, that describes,

11   quote, "Copies of 17 initial concept and design

12   drawings of the Bratz dolls made by Mr. Bryant in

13   the year 2000," end quote.

14   Q.   So if you would let me know when you

15   have had a chance to take a look at those drawings

16   and the other pages marked as Exhibit 10.

17   A.   Okay.

18   Q.   So with respect to Exhibit 10, you can

19   ignore the first page for purposes of my questions.

20   First, just focusing on the figures, setting aside

21   the handwriting and that sort of thing on these

22   drawings, are these -- do you recognize these as

23   copies of any of the artboards that you saw at the

24   Starbucks meeting on or about October 10th or 11th,

25   2000?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Yes.

2    Q.   Those were the artboards that Mr. Bryant

3    showed you of Bratz dolls?

4    A.  Yes.

5    Q.   Directing your attention to the second

6    page of Exhibit 10, which is the one that's M1489?

7    A.  1489?

8    Q.   Right.

9    A.  Yes.

10    Q.   At the bottom it says, "All rights

11    assigned to ABC International Traders," and then it

12    continues on.  It has a signature, a date and then

13    a contract date.  Do you see that material there in

14    the lower right-hand corner?

15    A.  Correct, yes.

16    Q.   Was any of that on the artboards that

17    you saw at the Starbucks meeting in October of

18    2000?

19    A.  No.

20    Q.   Was this information on any of the

21    artboard artwork that you saw, whether it was the

22    original or the copies, back in October of 2000?

23    A.  No, I did not see that stuff on those

24    boards.

25    Q.   Was it on there?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   It wasn't on there.

2    Q.   Directing your attention to the next

3    page, M1490, you will see that there is a

4    handwritten notation that looks like a circle "C"

5    and then 8/1998.  Do you see that?

6    A.   Yes.

7    Q.   Was that handwritten notation on any of

8    the artboards that you saw from Mr. Bryant or MGA

9    in October of 2000?

10   A.   No.

11   Q.   You will see the typewritten portion,

12   "all rights assigned to ABC International Traders"?

13   A.   Yes.

14   Q.   And then it ends with "contract date"

15   and then some additional handwriting there; it

16   looks like a date of some kind, perhaps?

17   A.   Correct.

18   Q.   Was any of that information on any of

19   the artboards that you saw from Mr. Bryant or MGA

20   in October of 2000?

21   A.   No.

22   90?  Let me ask that question then as to M1491.

23   You will see the information in the lower

24   right-hand corner, it says "all rights assigned,"

25   and then it continues on and ends with a

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    handwritten notation that starts off "contract

2    date."

3    A.  Yes.

4    Q.  Was that information on any of the

5    artboards that either Mr. Bryant or MGA showed to

6    you in October of 2000?

7    A.  No, it wasn't.

8    Q.  Directing your attention to the next

9    page, M1492, you will see that this drawing has a

10   circle C/1998.

11   A.  Um-hmm.

12   Q.  Was that handwritten notation or date

13   written on any of the artboards that you saw from

14   Carter Bryant or MGA in October of 2000 --

15   A.  No.

16   Q.  -- or at any other time?

17   A.  No, I have not seen that.

18   Q.  Was the same true of the rest of the

19   printed information and the other handwriting that

20   continues on on 1492?

21   A.  The same is true.

22   Q.  Was the same true for 1493?

23   A.  Yes.

24   Q.  Is the same true for M1494?

25   A.  Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1     Q.   Directing your attention to Page M1495

2     of Deposition Exhibit 10, you will see that there

3     is a handwritten circle "C" with 8/1998 on it?

4     A.   Yes.

5     Q.   Was that on the artboards that

6     Mr. Bryant or MGA showed to you in October of 2000?

7     A.   No.

8     Q.   Is the same true for the rest of the

9     information that's there on M1495 that begins "all

10    rights assigned" and then continues on to that

11    handwritten notation contract date?

12    A.   The same is true.

13    Q.   Is the same true for the next page,

14    M1496?

15    A.   The same is true.

16    Q.   Directing your attention to M1497, you

17    will see that that has a handwritten notation,

18    8/11 -- excuse me -- 8/1998.  Was that handwritten

19    notation or that date on the artboards or artwork

20    that Carter Bryant and MGA showed you in October of

21    2000?

22    A.   No.

23    Q.   Is the same true of the additional

24    written information on this page beginning with

25    "all rights assigned to" and then ending with that

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    handwritten notation "contract date" and then with

2    a date?

3    A.   The same is true.

4    Q.   Is the same true for 1498?

5    A.   The same is true.

6    Q.   Is the same true for 1499?

7    A.   The same is true.

8    Q.   Is the same true for the next page,

9    M1500?

10    A.   In regards to this written stuff on the

11    bottom?

12    Q.   Yes.

13    A.   Yes, the same is true.

14    Q.   Is the same true for the next page,

15    M501?

16    A.   It's upside-down.  The same is true.

17    Q.   Who at Mattel did you submit your work

18    on Diva Starz to?

19    A.   I submitted Diva Starz work to a

20    numerous amount of people.  Maureen Mullen, Rene

21    Pasko, Barbara Miller, Joni Pratte, Alison

22    Eisenberg, Kislap Ongchangco.

23          MR. BERMAN:  That guy.

24    BY THE WITNESS:

25    A.   That guy.  Sue Davis.  Those were the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   primary names I could recall working on the

2   majority of the stuff, but there were probably

3   another five to ten people, who knows, maybe.

4   BY MS. CENDALI:

5   Q.   What made you decide to depict the dolls

6   with these oversized feet?

7   A.   That was part of the design of the Diva

8   Starz.  That was just -- that's my style and that's

9   what I like to draw and that's what they wanted.

10   They wanted big feet, big head, because they have

11   to stand on the feet, the dolls.

12   Q.   And why did you depict the eyes large?

13   A.   That was part of the Diva Starz.  They

14   had big eyes.  That was the direction of the doll

15   and the brand, and it also was proportionally --

16   looked good at the time, you know.

17   Q.   Now, I believe you also testified that

18   at one point Chat Girls was considered as a

19   possible name for the Diva Starz line, is that

20   right?

21   A.   Yes.

22   Q.   What other names were considered other

23   than Diva Starz, to your knowledge?

24   A.   Chat Girls was the main working name,

25   work-in-progress name.  At one time I believe Gab

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Girls was considered, but I believe there was about

2    500 names that were explored.  I mean, there was a

3    list of names that were explored.

4    Q.   I believe you said that at the time when

5    Chat Girl was considered for the name of Diva

6    Starz, there was some consideration of Chat Brats

7    for the child --

8    A.   Right.

9    Q.   -- Diva Starz, right?

10          And in your mind as the artist, how old

11   were the --

12   A.   It was like the younger sister or the --

13   that's the way I interpreted it.

14   Q.   A child supposed to be around seven or

15   eight or nine?

16   A.   I don't know the age, but just a younger

17   version of the chat girl or the Diva Star.

18   Q.   Then in terms of 316, who did you

19   provide 316 to?

20   A.   Who did I provide this to?

21   Q.   Yeah.  Which particular person at

22   Mattel, if anyone, did you provide it to?

23   A.   Maureen Mullen, I believe, was the

24   contact on this, on the Chat Brats.

25   Q.   Then in Exhibit 317, do you know who you

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    provided -- who at Mattel, if anyone, you provided

2    that to?

3    A.   What's 317?  I don't know if I have

4    that.  I am sorry.  Did I lose that?

5    Q.   As far as you know, Carter Bryant never

6    worked on Diva Starz, right?

7    A.   Correct.

8    Q.   I believe you testified that when you

9    got the initial call from Ms. Treantafelles she

10   said something to you to the effect of wanting you

11   to work on Hoppity Baby and that she told you what

12   in general MGA was working on.  Is that roughly

13   what you said?

14   A.   She said -- no.  She said that she was

15   aware of my work, for work I did with Mattel on

16   Diva Starz and through Maureen Mullen, and she

17   wanted me to come in and do a logo for her and she

18   wanted to see my work.

19   Q.   Let me try one more time just to

20   expedite, otherwise we'll look for it.

21       Mr. Linker, do you remember

22   Miss Treantafelles telling you in the early

23   conversation that she had with you, you know, the

24   projects that MGA was working on?

25   A.   She showed me some of the projects,

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    yeah.

2    Q.   And am I correct that none of those

3    projects were Bratz?

4    A.   Yes, correct.

5    Q.   Other than that one meeting, did you

6    have any other contacts with Carter Bryant

7    concerning Bratz?

8    A.   No.

9    Q.   You never saw anything three-dimensional

10   at any time from anyone at MGA regarding Bratz,

11   correct?

12   A.   Correct.

13   Q.   And you never saw any face paints at any

14   time regarding Bratz, is that correct?

15   A.   Correct.

16   Q.   Did you ever have any communications

17   with Anna Re regarding Bratz?

18   A.   Anna Re, no.

19   Q.   Do you even know her?

20   A.   I know of her, yes, I know her.

21   Q.   How do you know her?

22   A.   I've worked with her on a project way

23   past this time.

24   Q.   And you submitted a proposal to do the

25   packaging for Bratz, is that correct?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   Correct.

2    Q.   And am I correct that MGA thought that

3    the proposal was too high?

4    A.   To our understanding, yes.

5    BY MS. CENDALI:

6    Q.   Did they tell you that the proposal was

7    too high?

8    A.   Not in so many words, but we needed to

9    revise it, so yes.

10   Q.   Let's look at what has been marked as

11   exhibit --

12         MR. BERMAN:  Are you looking for 325?

13         THE WITNESS:  325.

14         MS. CENDALI:  325.  Thank you, counsel.

15         MR. BERMAN:  No problem.

16   BY MS. CENDALI:

17   Q.   Which is an e-mail from Kerri Legg to

18   you and Liz Hogan dated October 20th, 2000.  Do you

19   see that?

20   A.   Yes.

21   Q.   And do you see it says, "Steve, the information outlined

22   in this letter is the new purchasing policy for MGA

23   Entertainment.  This policy will help ensure prompt payment

24   of invoices.  Please use the following as a guideline

25   when accepting jobs from employees of MGA Entertainment,"

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008 7:44:00 AM

1    and then there is a list of four items.  Do you see

2    that?

3    A.   Yes.

4    Q.   And then it says, "We have received your quote for

5    the packaging of our Bratz line.  However, it has not been

6    accepted as we feel it is high."

7         Do you see that?

8    A.   Yes.

9    Q.   And it goes on to say, "Please do not proceed with any

10   work on this project until you receive a purchase order from

11   me.  At that time you will know that we have accepted your

12   proposed costing."

13        Do you see that?

14   A.   Yes.

15   Q.   Does that help refresh your recollection

16   as to whether MGA explicitly told you that they

17   thought that your proposal was too high?

18   A.   We weren't told it, but the e-mail

19   suggested it.

20   BY MS. CENDALI:

21   Q.   Well, you received this e-mail that

22   stated that "your proposal has not been accepted as

23   we feel it is high," correct?  You remember receiving that,

24   right?

25   A.   Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   Q.   And as a result of that, you tried to redo your proposal

2   to make it less expensive, correct?

3   A.   Correct.

4   Q.   And is that revised, somewhat cheaper

5   proposal reflected in one of the exhibits before

6   you?

7   A.   Yes, it is.

8   Q.   Which exhibit is that, please?

9   A.   I believe it is the Exhibit 327.

10   Q.   And that proposal, though, was not

11   accepted, correct?

12   A.   It wasn't -- it wasn't accepted.

13       MR. BERMAN:  You said 321?

14       MS. CENDALI:  321.

15   Q.   At the top of the page it says from Liz

16   Hogan to Paula Treantafelles copying you, Steve

17   Linker?

18   A.   Yes.

19   Q.   And then there is a line, and then

20   underneath it, it says, "Paula, the following is the estimate

21   for the Bratz trade dress and packaging design project.  It

22   looks like a lot, but it covers every possible area we could

23   think of that might come up during the next couple of

24   months."

25       Do you see that?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Yes.

2    Q.  And then at the bottom it says, "We look

3    forward to getting starting.  Thanks, Steve Linker,

4    Penny Arcade."

5         So I am trying to figure out, did you

6    write --

7    A.  The top portion?

8    Q.  Yes.

9    A.  Yes.

10   Q.  Okay.  And when you wrote "we look

11   forward to getting started, thanks," I take it at

12   the time you wrote that you hadn't yet actually

13   done any substantive work?

14   A.  Correct.

15   Q.  And is it fair to say that while you

16   attended that pitch meeting with or interview on

17   October 19th with Ms. Treantafelles and some

18   others, you didn't actually do any substantive work

19   that you submitted to MGA on Bratz?

20   A.  We didn't do work at that meeting, no.

21   BY MS. CENDALI:

22   Q.  Okay.  And you never did any work on

23   Bratz packaging, right?

24   A.  No, but I did have that meeting on the

25   19th.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   Did you say anything to the people at

2    Mattel regarding your contacts with MGA as they

3    pertained to the Bratz project?  Was that something

4    you shared with Mattel?

5    A.   No.

6    BY MR. ZELLER:

7    Q.   Was there a particular reason why?

8    A.   I signed an NDA with MGA, so -- on the

9    Bratz, so I didn't share it with anybody.

10   Q.   And what do you mean by an NDA?

11   A.   Nondisclosure agreement.

12   Q.   Is that something to protect

13   confidentiality?

14   A.   Yes.

15   Q.   When was the last time you did some work

16   for MGA?

17   A.   I believe last year or towards the end

18   of last year, like summer.

19        MR. QUINN:  That's the end of the videotape.  At

20   this time we move into evidence Exhibit 10, which was that

21   Hong Kong affirmation.

22        THE COURT:  Any objection, Mr. Nolan?

23        MR. NOLAN:  Your Honor, I believe that's subject to

24   an earlier ruling.

25        THE COURT:  Why don't we take that up during the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    break.  We'll take a brief break at this time.

2            (WHEREUPON THE JURY WITHDRAWS.)

3            THE COURT:  Please be seated.  I'm sorry, Counsel.

4    What's the objection?

5            MR. NOLAN:  Your Honor, there was no foundation

6    laid in that deposition for the admission of that particular

7    document.  That's why it was played, there was no stipulation

8    amongst counsel that that document should be offered into

9    evidence.  That's why we have this procedure.

10           THE COURT:  I'm sorry.  The exhibit is exhibit

11   number?

12           MR. QUINN:  10, your Honor.

13           THE COURT:  Okay.  You have Exhibit 10?

14           What from this, Counsel, do you want to admit?

15           MR. QUINN:  I'm sorry, your Honor, I apologize.

16           THE COURT:  What from this do you want to admit?

17           MR. QUINN:  The drawings, your Honor.

18           THE COURT:  These were shown to the witness,

19   Counsel; right?

20           MR. QUINN:  Yes, your Honor.

21           MR. NOLAN:  They were shown, your Honor, but

22   there's a procedure we go through where we work out whether

23   or not there's any issue with respect to the exhibits ahead

24   of time.  We stipulate, because that's what the Court asked

25   us to do; otherwise, we would have raised it earlier.

1     THE COURT:  I'm assuming, pursuant to the procedure

2     I stipulated, that anything shown to the jury has been

3     stipulated in evidence.  And if it hasn't been, you shouldn't

4     be showing it to the jury.  So in was not part of the

5     stipulation?

6     MR. NOLAN:  No, your Honor, it was not.

7     MR. QUINN:  I'm not sure that it was shown to the

8     jury.

9     MR. NOLAN:  That's the other reason.  It was -- the

10    drawings, a few of the drawings came up.  I did not object to

11    it because they were not admitting them into evidence, and

12    they are drawings that were done earlier.  But, your Honor,

13    there's been no foundation for that document and frankly no

14    discussion.  This was a document filed in Hong Kong, your

15    Honor, and I think the Court said you were going to be

16    dealing with that on a piecemeal basis, certainly not in a

17    deposition.

18    THE COURT:  Why did this not come up before the

19    testimony was played, Mr. Corey?

20    MR. COREY:  Your Honor, I had -- this was my

21    mistake.  I thought it had previously been admitted.  When I

22    recognized that it was not, it was taken down from the jury,

23    and it wasn't shown.  The instant that they popped up, they

24    were taken down.

25    THE COURT:  Is there another witness with whom you

1    can introduce this document?

2        MR. COREY:  I think the document itself is

3    self-authenticating.  It comes in as part of the court

4    record.

5        THE COURT:  That ties into this earlier motion we

6    have about these foreign documents.  First of all, answer my

7    question.  Is there another witness through whom you can

8    introduce this document?  Mr. Zeller?

9        MR. ZELLER:  I can address that.  Number one, these

10   particular pages are attached to an affirmation by the former

11   managing director of MGA, Hong Kong, a defendant, Stephen Lee

12   is his name.  He was the managing director at the time.  It

13   was submitted in the City World litigation.  We can put it in

14   through at least a couple different witnesses.  Number one

15   would be that I'm pretty confident, and I would have to

16   double-check, but we did take the Rule 30(b)(6) deposition of

17   both MGA and MGA Hong Kong on these prior sworn statements.

18       THE COURT:  Let me stop you there.  I'll accept

19   your representation.  And I also accept that it was a

20   mistake.  I will give you leave to introduce it through

21   another witness.  If you can stipulate to this and avoid that

22   time-consuming process, that will be fine.  Let me give you a

23   chance to talk about it during the break, and we'll go from

24   there.  I will sustain the objection as it stands right now

25   because Mr. Nolan is correct.  I accept that it was a

1   mistake, and I'll give you leave to introduce it through

2   another witness.  And we'll go from there.

3        MR. NOLAN:  And it's not a question of saving time.

4   There's procedural issues that need to be addressed with

5   respect to this document.  So we're not going to stipulate

6   that it comes in through this deposition.

7        MR. ZELLER:  If I may, a more global issue, your

8   Honor.  Recently the defendants were compelled, and they did

9   produce some additional pleadings that they had submitted in

10   other court cases.  Some of these are declarations, some of

11   them are regular court pleadings and the like.  We have sent

12   them repeated e-mails asking them if they will stipulate to

13   their admissibility so we don't have to call sponsoring

14   witnesses, particularly given that we will decide the

15   opportunity as to those documents to take depositions on

16   them.  We have sent at least two or three e-mails.  We have

17   not received a -- an actual answer as to whether or not those

18   would be stipulated to.

19        THE COURT:  Why don't you talk to counsel during

20   the break and see if there's an issue.

21        How much time should I credit towards MGA for that

22   last?

23        MR. QUINN:  We have some numbers, but I'm not sure

24   if they have been agreed to.

25        Matter is one hour, three minutes.  MGA is 10

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      minutes, 10 seconds.

2          THE COURT:  Very well.  I'll deduct 10 hours from

3      Matter and move it over to MGA.

4          MR. NOLAN:  I'm sorry, your Honor.  The

5      transcript -- maybe I'm wrong.  The transcript reads I'll

6      deduct -- I'm sorry.  You're right.  Never mind.

7          THE COURT:  All right.  We're in recess.

8          (Recess taken.)

9          (WHEREUPON THE JURY ENTERS.)

10          THE COURT:  Counsel, you may call your next

11      witness.

12          MR. QUINN:  Your Honor, Matter calls Anna Rhee.

13          THE CLERK:  May we have the witness please come

14      forward.

15          Ms. Rhee, please come forward.  Good afternoon,

16      ma'am.  Would you please take the witness stand.

17          Would you please remain standing, and you may put

18      down your materials.  Raise your right hand, please.

19              ANNA RHEE, SWORN.

20          THE CLERK:  Thank you, ma'am.  Would you please be

21      seated.  Please state your full name for the record, and

22      spell the last name.

23          THE WITNESS:  Anna Rhee, R-H-E-E.

24          THE CLERK:  Thank you.

25      ///

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1              DIRECT EXAMINATION

2      BY MR. QUINN:

3      Q.   Good afternoon, Ms. Rhee.  My name is John Quinn, and I

4      represent Matter.

5      A.   Hi.

6      Q.   Hi.  You are here pursuant to a subpoena?

7      A.   Yes.

8      Q.   What do you do for a living?

9      A.   I'm a face painter and designer.

10     Q.   Face painter, human beings, dolls, or both?

11     A.   Dolls.

12     Q.   And how long have you been a face painter?

13     A.   About 13 years.

14     Q.   Before we get into that, could you give the jury just a

15     rundown on your educational and employment background?

16     A.   Well, I went to school at Otis Parsons School of Design,

17     and then a little later I got a job at Matter toys as a face

18     designer.  And then a few years went by, and then I became a

19     full-time independent contractor.

20     Q.   And did you get a degree out of the Otis Parsons School

21     of Design?

22     A.   Yes, I did.

23     Q.   What year was that?

24     A.   '92.

25     Q.   And was Matter your first employment after that?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   At a large corporation, yes.

2    Q.   And how long were you at Matter?

3    A.   Would that be as a vendor or as an employee, temporary

4    employee?

5    Q.   As an employee, how long did you work for Matter as an

6    employee?

7    A.   I think it was three and a half years.

8    Q.   And when did you cease to be an employee at Matter?

9    A.   I don't remember what year that was.  Three years later.

10   Q.   I'm sorry?

11   A.   About three years later.

12   Q.   So would it be roughly 1995, 1996 that you left Matter,

13   just best estimate?

14   A.   Yes.

15   Q.   And what have you been doing -- have you been

16   self-employed since then?

17   A.   Yes, I have.

18   Q.   And you said you were a face painter and designer.

19   Could you give the jury an idea of how your work breaks down

20   versus face painting versus other kind of design work?

21   A.   Face designing is where you get a photo or an idea of

22   what you want the doll to look like.  A client will tell you

23   I want it to look like this person, and then you just paint

24   that onto a prototype.  So that's what face painting is.

25   Q.   Do you do work for -- as a doll face painter, do you do

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   work for more than one toy company?

2   A.  Yes, I do.

3   Q.  Since you left Matter, have you done work for Matter

4   painting doll faces?

5   A.  Yes.

6   Q.  Have you done work for MGA painting doll faces?

7   A.  Yes.

8   Q.  Have you done work for other toy companies painting doll

9   faces?

10  A.  Yes.

11  Q.  Can you give the jury an approximation maybe of how many

12  different companies you have painted doll faces for?

13  A.  About 10, maybe.

14  Q.  Are you pretty well known in the doll business as being

15  a face painter?

16  A.  I think I am.

17  Q.  What do you base that on?

18  A.  Well, because people call me from companies I never even

19  heard of, and I say well, how did you get my number?  Oh,

20  well, somebody, somebody told me, and I don't remember how

21  they got my name.  I never give out my number.  They just

22  seem to know.  I don't know exactly how.

23  Q.  Do you do advertising?

24  A.  I've never done any advertising.

25  Q.  So word of mouth?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   Yes.

2    Q.   Do you know Carter Bryant?

3    A.   Yes, I do.

4    Q.   When did you first meet Mr. Bryant?

5    A.   That would be in the design center of Matter in the temp

6    room.

7    Q.   I'm sorry?

8    A.   In the temp room, where the temp employees work.

9    Q.   Were you and Mr. Bryant both working at Matter at the

10    time?

11    A.   I think so.

12    Q.   Do you recall you --

13    A.   I was.

14    Q.   Do you recall if you were working there at the time?

15    A.   Oh, definitely, definitely.

16    Q.   And you say -- did you say temp room?

17    A.   Yes.

18    Q.   What is the temp room?

19    A.   That's what they called it.  It's just a big, huge room

20    where all the temp employees were staffed in there.

21    Q.   In addition to yourself, was Mr. Bryant also working in

22    that room at the time when you first met him?

23    A.   Yes, he was.

24    Q.   And this was during the time you were both employed by

25    Matter?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Yep.

2    Q.  Can you tell us whether you became friends with

3    Mr. Bryant?

4    A.  Yes, we did.

5    Q.  Would you socialize, see each other outside of work?

6    A.  Yes, we did.

7    Q.  Would you go to his house and he come to your house?

8    A.  Yes.

9    Q.  Can you tell us approximately, during the time that you

10   had this relationship with him, how many times a year the two

11   of you might socialize together, see each other outside of

12   work?

13   A.  Probably once a week, maybe.  And sometimes we would

14   skip a week, and then it might be twice in one week.  It

15   depends.  Different all the time.

16   Q.  Right.  And over how long a period of time did this

17   relationship exist?  One year, two years, three years?  What

18   would you guess or approximate?

19   A.  You know what?  I really can't say.  But it was several

20   years.  Several.

21   Q.  Did you do work with Mr. Bryant at Matter, while he was

22   at Matter and you were at Matter?

23   A.  I think I did.

24   Q.  Did you ever do any face painting on any project that

25   Mr. Bryant was involved in?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   I think I did, but it wasn't through him.  It was -- it

2    was his department.

3    Q.   Okay.  Do you know whether or not he was familiar with

4    your work at Matter?

5    A.   Yes.

6    Q.   And how was it that he was familiar with your work at

7    Matter?

8    A.   Okay.  Well, I know that he seemed to like my work, and

9    I think a lot of my work was used for his projects.

10   Q.   Can you think of any names of any particular projects

11   that he was working on where you know your work was used?

12   A.   No.  I didn't keep track of the names.

13   Q.   Okay.  Did Mr. Bryant, while you were working at Matter

14   and he was also working at Matter, did he ever ask you to

15   work on a non-Matter project?

16   A.   Yes, but not -- not in the company or anything.  Not

17   while we were there.

18   Q.   All right.  This is a conversation that took place off

19   company premises?

20   A.   Yes.

21   Q.   Where did the conversation take place?

22   A.   At his house.

23   Q.   And what did he ask you to do at that time?

24   A.   He asked me to paint -- if I was interested in doing a

25   face for him.  He didn't say what it was.  But it was a doll.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    And he said it was a really huge secret and a really big

2    project, and he made me promise not to tell anyone.  And I

3    didn't.  I didn't tell anyone.

4    Q.   You didn't tell anyone?

5    A.   No, absolutely not.

6    Q.   At that time, when he asked you about whether you were

7    interested in working on this secret project, did he say

8    anything else?

9    A.   There was another friend of ours who they were

10   originally supposed to do it together, but then he said that

11   he changed his mind and decided to do it on his own instead.

12   Q.   Who changed his mind and decided to do it on his own?

13   A.   Carter did.

14   Q.   Do you recall anything else that he said in that first

15   conversation about the project?

16   A.   He said -- he said especially not only to keep it a

17   secret, but especially don't tell Elise, who is our friend.

18   Q.   What is Elise's name?

19   A.   Elise Cloonan.

20   Q.   Do you recall anything else that he said about this

21   secret project at the time?

22   A.   At that time that's it.

23   Q.   Did he say anything about any compensation he expected

24   to get for this project?

25   A.   I think I was curious.  I asked him oh, how much does

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1     this kind of thing pay, and what's the process of doing it,

2     and he had mentioned that he had talked to a corporate

3     attorney, I think, and he said that he would get a

4     percentage, but I don't remember what it was.

5     Q.   A percentage of?

6     A.   Of royalties.

7     Q.   And what was your response to him when he asked you

8     whether you would be interested in working on this secret

9     project?

10    A.   Well, I thought it was really cool, and I thought

11    someday I wanted to do it.  I never did, but I wanted to.  It

12    was a great idea.

13    Q.   You said that you never did.  Someday you wanted to do

14    what?

15    A.   Like where you get royalties.

16    Q.   Okay.  Did you indicate to him one way or another as to

17    whether you'd be willing to do the face painting for him on

18    this secret project?

19    A.   Right then and there I said of course, I'd be

20    interested.  I was totally interested.

21    Q.   After that, what was the next conversation you had with

22    Mr. Bryant on the subject?

23    A.   I think at one point, at one point in time, he called me

24    and said that it was ready and do you want to -- can he come

25    and bring it to me, and I said sure, and so he did.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   And roughly how much time went by between the initial

2    conversation, when he told you about the secret project, and

3    the time he -- when he told you that it's ready?

4    A.   I don't know.  Maybe a month.

5    Q.   Okay.  And then you say he did?  He brought it --

6    A.   He brought it to my house.

7    Q.   And where were you living at the time?

8    A.   In North Redondo Beach.  I think the address is 1613

9    Ford Avenue, if I'm thinking correctly.  That's my old

10   avenue.  1613 Ford Avenue.

11   Q.   And what was it that he brought to you at your home?

12   A.   He brought a couple of drawings and two casted heads,

13   molded heads.

14   Q.   When you say molded heads, what do you mean?

15   A.   Think it's called roto cast.  It's like the mold before

16   it goes into production.  It's like the initial mold.  It's

17   solid and hard all the way through.  So a doll you would see

18   in the store is vinyl and empty inside.  This thing is really

19   a lot heavier and solid.

20   Q.   Have you seen those types of roto cast doll heads

21   before?

22   A.   Many times.

23   Q.   And what are they made out of?

24   A.   I think it's resin.

25   Q.   Can you tell the jury what the approximate size of these

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    two doll heads was?

2    A.   The size of a small lemon or a small lime.  About like

3    that.

4    Q.   And did you indicate he had some sketches with him as

5    well?

6    A.   I think there was two of them.

7    Q.   Can you describe the sketches for the jury?

8    A.   Sure.  It was in colored pencil.  And they had heads

9    but no bodies.  Just drawings of heads.  And they had -- it

10   was really cute, had slanted, you know, cat-like eyes,

11   almond-shaped eyes and big perky lips, really cute.

12   Q.   Were the eyes and the lips larger, sort of exaggerated

13   in size?

14   A.   For the head size, it would be very large, yeah.

15   Q.   When he brought these to you, did he give you any

16   directions as to what he wanted?

17   A.   He said to go by the drawing and to make sure it was

18   really edgy with attitude but still sweet.

19   Q.   Still?

20   A.   Still sweet looking at the same time.

21   Q.   Anything else that you can recall that he said in terms

22   of a direction to you?

23   A.   Well, one was supposed to be a Caucasian version, and

24   the other one I don't remember, but it was a variation of the

25   same thing.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   One was Caucasian, and the other was to be of some other

2    ethnicity?

3    A.   I think.  So I don't remember what race, but it was

4    supposed to be a different version.

5    Q.   And did you agree to do this face painting on these two

6    doll heads?

7    A.   Yes, I did.

8    Q.   And did you do it?

9    A.   Yes, I did.

10    Q.   And did you prepare a statement for the work that you

11    did?

12    A.   Oh, yes.

13    Q.   If we could take a look, please, at Exhibit 201.  In

14    front of you, Ms. Rhee, there's a binder with some tabs.  And

15    you'll see a 201 tab.

16         This is in evidence, your Honor, Exhibit 201.  If

17    we could look at the first page, 201-1.  And, your Honor, we

18    put this on the screen.

19    A.   I see it.

20         THE COURT:  Yes, previously admitted.

21    Q.   BY MR. QUINN:  Ms. Rhee, whose handwriting is this that

22    appears on this?

23    A.   Mine.

24    Q.   And what date is it?

25    A.   6/12/2000.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.  Can you tell us whether that's the date that you

2    prepared this invoice?

3    A.  Yes.

4    Q.  And is this the invoice that you prepared for the work

5    that you did painting these two doll heads that Mr. Bryant

6    brought to you?

7    A.  Yes.

8    Q.  And did you prepare this invoice after you had actually

9    painted the doll heads?

10   A.  Yes.

11   Q.  Can you tell us approximately how long it took you to

12   paint the two doll heads?

13   A.  Oh, I put a lot of time into it because it was a pretty

14   special doll.  So I think five hours, maybe.

15   Q.  Did you -- you put five hours into it.  My question is

16   how long after Mr. Bryant gave you the two doll heads did

17   it -- how long did it take you to actually do the painting?

18   How much time went by?

19   A.  Oh, I don't remember.  Maybe -- maybe two days,

20   possibly.

21   Q.  So would your best estimate be that Mr. Bryant brought

22   you these doll heads maybe a couple of days before June 12th?

23   Would that be your best estimate?

24   A.  Yes.

25   Q.  And working backwards in time, what would be your best

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1     estimate about when he first spoke to you about this secret

2     project where he's going to get these royalties?

3     A.  Are you asking me how long between the time he asked me

4     if I'd do this project to the time I finished the doll?

5     Q.  The time he first mentioned the project to you, which I

6     assume is before June 12th.

7     A.  Right.

8     Q.  I'm trying to find out how much time went by between the

9     time he first mentioned the project to you and the time you

10    had it all done and you gave him the invoice.  Approximately.

11    A.  Approximately a month.

12    Q.  Now, you've written up there at the top MGA

13    Entertainment.  Why did you write MGA Entertainment?

14    A.  Because he said it's for MGA Entertainment.

15    Q.  And is that -- is this the first assignment that you

16    ever did for MGA Entertainment?

17    A.  Yes.

18    Q.  And after this date, did it turn out that you did more

19    work for MGA?

20    A.  Yes.

21    Q.  Can you tell the jury maybe how many different

22    assignments that you got for MGA after this in the years

23    following?

24    A.  No, because it was a lot.

25    Q.  And it indicates here Angel Baby doll heads.  Why did

1    you write that, Angel Baby doll heads?

2    A.   Because I asked him what do I put on the invoice, and he

3    said Angel Baby doll heads.

4    Q.   During this conversation with him, by the way, when he

5    gave you this assignment, did he ever use the name Bratz?

6    Did he ever use that word?  That name?

7    A.   I don't recall.

8    Q.   And then it says at the bottom, request by Kerri Legg.

9    Why did you write Kerri Legg?

10   A.   I don't know who she is.  But he told me to put it down.

11   So I did.

12   Q.   And what did you do with this invoice?  Did you mail it

13   to MGA or give it to Carter Bryant?  What did you do with it?

14   A.   I gave it to Carter Bryant with the project.

15   Q.   With the completed doll heads?

16   A.   Yes.

17   Q.   And was your bill paid for $433?

18   A.   Yes.

19   Q.   And who paid it?

20   A.   MGA.

21   Q.   So is it true that Carter Bryant is the person who

22   introduced you to MGA?

23   A.   Yes.

24   Q.   Let me show you a doll that's already in evidence,

25   Exhibit 17403, a Prayer Angel.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      If I may approach the witness, your Honor.

2      THE COURT:  You may.

3      MR. QUINN:  It's in evidence.

4    Q.   It's Exhibit 17403, Prayer Angel.  If I could show you

5    this doll.  And my question to you is the doll that you

6    paint, the doll heads that you painted, was it one of those,

7    a Prayer Angel doll head?

8    A.   Not this one.  Not this invoice.  This was later.

9    Q.   When you say this was later, what do you mean by that?

10   A.   This was like way later, like one or two years later

11   that came along.  And I did this for -- I think I did this

12   for some girl that was working there.

13   Q.   At some point did you paint some Angel Baby doll heads?

14   A.   Yes.

15   Q.   But if we could go back and put that invoice up,

16   Exhibit 201, these Angel Baby heads referred to in this

17   invoice, were they that doll?

18   A.   No.

19   Q.   Did you end up painting the Bratz heads that were used

20   by MGA at the Hong Kong toy fair in January of 2001?

21   A.   Yes.

22   Q.   And if you'd take a look, please, at exhibits in your

23   book there, Exhibits 912 and 912-B.  Exhibit 912 --

24   A.   I see 912-B.

25   Q.   And just before it is 912.  And really 912-B is just

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    better copies of 912.

2    A.   Okay.  I'm ready.

3    Q.   I think you'll see that 912 and 912-B are the same.

4    912-B are just better copies.  My question to you is can you

5    identify those photographs, what those are?

6    A.   They are all Bratz.

7    Q.   And are these pictures of Bratz that you -- where you

8    painted the faces that were used for the Hong Kong toy fair?

9    A.   Yes.

10        MR. QUINN:  We'd offer those in evidence, your

11   Honor, 912 and 912-B.

12        THE COURT:  Any objection?

13        MS. AGUIAR:  No objection.

14        THE COURT:  They are admitted.

15        (Exhibit 912 and 912-B received.)

16   Q.   BY MR. QUINN:  If we could start with 912.  And if we

17   could go through the pictures behind 912.  Are these the doll

18   heads that we see here the ones that you painted?

19   A.   Yes.

20   Q.   Were the two doll heads that you painted for Mr. Bryant

21   back in June of 2000, were they similar to what we're looking

22   at here?

23   A.   Yes, they are.

24   Q.   That were used for the Hong Kong toy fair?  Did they

25   look like those?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Yes.

2         MR. QUINN:  If I may approach the witness, your

3    Honor, with plaintiff's Exhibit 13564, which is in evidence.

4         THE COURT:  You may.

5         MR. QUINN:  Cabbage Patch doll.

6    Q.  Have you seen these before, Cabbage Patch dolls?

7    A.  Have I seen them before?

8    Q.  Yes.

9    A.  Yes, I have.

10   Q.  In the summer of 2000, did you paint the faces of any

11   Cabbage Patch dolls?

12   A.  No.

13   Q.  In the summer of 2000, did you paint a Cabbage Patch

14   doll head -- I'm sorry.  Did you paint a Cabbage Patch doll

15   head that had been put on a Prayer Angel body?

16   A.  No.

17   Q.  If you'd take a look, please, at Exhibit 400 and 400-B,

18   which are in evidence.

19        Do you see up here what looks like a Prayer Angel

20   with the head of a Cabbage Patch doll on it?

21   A.  Yes, I do.

22   Q.  And you'll see that the lips are a little bit redder,

23   and there's a mark or something on the cheek that's a little

24   bit brighter than the Cabbage Patch doll you have in front of

25   you?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1          Do you see that?

2     A.   Yes.

3     Q.   Did you paint lips on this Cabbage Patch doll head and

4     put a mark on the cheek in the summer of 2000?  Do you recall

5     doing that?

6     A.   No, no.

7     Q.   I mean, is that something that you would charge $400 for

8     just to repaint the lips and to make brighter this mark on

9     the cheek?

10    A.   No.

11    Q.   How much would you charge to do something like that?

12    A.   You said just the lips and the little mark on the cheek?

13    Q.   Yes.

14    A.   At the most 50 bucks.

15    Q.   Do you know whether any Prayer Angel doll heads were

16    even available in the summer of 2000?  Do you know?

17    A.   I think it came along later because -- because I worked

18    on it.

19    Q.   Eventually you did some work on face painting for an MGA

20    doll called Prayer Angel?

21    A.   I did way later.

22    Q.   And did you work on other MGA projects as well?

23    A.   Yes.

24    Q.   How many different -- if you had to estimate and

25    focusing just on MGA dolls, how many different MGA doll heads

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    do you think you painted over the years since Mr. Bryant

2    introduced you in June of 2000?

3    A.   Do you mean how many different designs or how many dolls

4    period?

5    Q.   Different designs.

6    A.   Oh.  20 or 30, maybe.

7    Q.   And is your memory really good about exactly when you

8    did which one?

9    A.   No.  It's not perfect.

10   Q.   So how is it that, if we could go back to the original

11   June invoice?

12   A.   What number was that?

13   Q.   That is Exhibit 201-1.

14   A.   201-1.  Okay, hold on.  Got it.

15   Q.   How is it that you are certain that this was for --

16   these first two heads that Mr. Bryant brought you for the

17   secret project, how is it that you are certain those were for

18   Bratz?

19   A.   Well, it's the first job I ever did for MGA and for

20   Carter, for one thing.  And this was Carter's really special

21   project, and I knew it, and he was a friend of mine.  And so

22   I was going to put extra effort into it.  Something a little

23   extra, more than, you know, maybe some other doll.  It was

24   special to me, too.

25   Q.   Were you proud of your work on this project?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  I was very proud of it.

2    Q.  And the doll became a big success?

3    A.  Yes, very.

4    Q.  Do you know, by the way, whether there is a Bratz doll

5    which has the nickname Angel?  Do you know?

6    A.  Can you repeat that?

7    Q.  Do you know whether one of the Bratz dolls has the

8    nickname Angel?

9    A.  I don't think so, not that I'd ever heard of.

10        MR. QUINN:  Your Honor, we request to be marked as

11   Exhibit 12286 a Chloe doll, and request permission to

12   approach the witness.

13        THE COURT:  Any objection?

14        MS. AGUIAR:  I object to the relevance, given the

15   Court's prior rulings.

16        THE COURT:  Counsel, why don't you lay a foundation

17   for this first.  Well, you may present it in front of the

18   witness.

19        MR. QUINN:  All right.  Thank you.

20   Q.  I brought you this doll, Ms. Rhee, and my first question

21   is whether you can identify that as a Bratz doll which has

22   face paint.  You did the original face paint for it?

23   A.  I did this one, and it's definitely a Bratz head.  Sure.

24        MR. QUINN:  We'd offer that in evidence, your

25   Honor.

1        MS. AGUIAR:  Again, relevance objection, your

2   Honor.

3        THE COURT:  Sustained at this point, Counsel.

4        MR. QUINN:  All right.  Well, I'd offer it in

5   evidence.

6        THE COURT:  And I'll sustain it at this point.

7   Q.   BY MR. QUINN:  Did you later on enter into an agreement

8   with MGA where you assigned to MGA all the rights for work

9   you had done on Bratz, the face painting that you had done?

10  A.   I might have, but maybe that was way later.

11  Q.   Let's take a look, if you would, in your binder there.

12  Towards the back there's Exhibit 11843.  11843.

13  A.   Okay.

14  Q.   And if you go in, four pages into the exhibit, you'll

15  see some signature pages.  It's four pages in.

16  A.   I see the first one.

17  Q.   All right.  And does that have your signature on it?

18  A.   Yes, it does.

19  Q.   And does this appear to be a copy of an agreement that

20  you entered into with MGA?

21  A.   Yes.

22       MR. QUINN:  We'd offer Exhibit 11843, your Honor.

23       MS. AGUIAR:  No objection.

24       THE COURT:  It's admitted.  You may publish.

25       (Exhibit 11843 received.)

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      Q.   BY MR. QUINN:  And if we put on the fourth page, the

2      signature line, the signatures.  And that is -- that's what

3      you identified as your signature, Ms. Rhee?

4      A.   Yes.

5      Q.   And if we can go back to the first page and just

6      enlarge, say, the top quarter of it.  And this is not a great

7      copy, but it says:  "The parties to this agreement confirm

8      that on the 1st day of December, 1999, the effective date,

9      the agreement set out below was entered into between MGA

10     Entertainment," having an office, and the address, "and Anna

11     Rhee," and it identifies your address, Guadalupe?

12     A.   That's my other house, like later.

13     Q.   Okay.  And then it goes on in the recitals and says:

14     "Whereas MGA is the owner of all intellectual property rights

15     worldwide pertaining to the Bratz property, whereas MGA has

16     retained and continues to retain Anna Rhee to perform

17     services on one or more projects relating to the Bratz

18     property," and then it goes on to say:  "And whereas Anna

19     Rhee has performed and continues to perform services on one

20     or more projects for MGA."

21          Do you see that?

22     A.   Yes.

23     Q.   What this agreement does is that you assign to MGA the

24     rights to the work that you did effective December 1, 1999?

25          MS. AGUIAR:  Objection.  Leading, foundation.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      THE COURT:  I'm sorry.  What was the objection,

2  Counsel?

3      MS. AGUIAR:  Leading and foundation.

4      THE COURT:  Sustained.  Rephrase, Counsel.

5  Q.  BY MR. QUINN:  Do you recall entering into this

6  agreement with MGA?

7  A.  I remember signing something, but honestly, I never read

8  these.  I just sign them.

9  Q.  Do you recall now what your understanding was when you

10  signed it as to what you were -- what you were agreeing to?

11  A.  I knew.  Even though I don't read it, I know.

12  Q.  All right.

13  A.  It's all the same.

14  Q.  What is it that you know?

15  A.  That when you do something for a company, they keep all

16  the rights, and you're just doing the work for them and

17  that's all.

18  Q.  Who first spoke to you about this case, this case that

19  you are here -- that brought you here to court today?

20  A.  MGA lawyers did.

21  Q.  And do you recall who it was who first spoke to you?

22  A.  I don't know his name.  It was a man.  But a woman came,

23  too.  There was two men and one woman came along.

24  Q.  And where was it that they came?  Where was it that they

25  met you?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   To my house on Guadalupe.

2    Q.   And what was it that they said to you?  Did you know

3    they were coming?  Did they call you up and make an

4    appointment?

5    A.   They called and said can we talk to you, and I said

6    sure, and they came over, and we talked for a really long

7    time.

8    Q.   And do you recall when this was that these two men and

9    the woman came to speak to you?

10   A.   It was sometime I was living in the Guadalupe house, but

11   I don't know what year that was.  I lived there for, I think,

12   three years.

13   Q.   Do you recall what they said to you when they met with

14   you?

15   A.   It was about -- well, it was definitely about Bratz and

16   how there was going to be a lawsuit and that I would be

17   subpoenaed.  And I don't recall a whole lot.

18   Q.   Did they say anything one way or another about whether

19   you should tell people what you knew?

20   A.   What do you mean tell people what I knew?

21   Q.   Did they say anything to you on the subject of your

22   talking about your history or your involvement?

23   A.   Well, they just wanted to know that I did it and that

24   really I wasn't that into it.

25   Q.   I'm sorry?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   I wasn't that into what they were saying.

2    Q.   Okay.  Did you tell them at that time what you told the

3    jury here today?

4    A.   What I recall.

5    Q.   And at some point did you get a subpoena to have your

6    deposition taken?

7    A.   Yes.

8    Q.   And what did you do when you got the subpoena?

9    A.   I ignored it, and I lost it.

10   Q.   Eventually your deposition was taken?

11   A.   Right.

12   Q.   Did you feel the need for having an attorney to

13   represent you?

14   A.   I did.  I kind of freaked out because I didn't know -- I

15   didn't want to get involved in this whole thing.

16   Q.   Did you do something to try to find an attorney?

17   A.   Yes.

18   Q.   What did you do?

19   A.   Well, okay, this is what happened.  First MGA lawyers

20   got me.  And then eventually at one time or another Matter

21   lawyers -- someone from Matter called me.  So then I didn't

22   know what to do.  I freaked out.  So I tried to call the

23   lawyers back.

24   Q.   Which lawyers did you try to call back?

25   A.   They gave me the card, but I don't remember who it was.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    It was -- it was the guy.

2    Q.   From the MGA lawyers?

3    A.   Yeah, I tried to call him back.  I tried to call another

4    person that was working at MGA, Paula.  I tried to call her

5    back like tons of times that same evening.

6    Q.   Did they call you back?

7    A.   No.

8    Q.   What was your purpose in trying to reach the MGA

9    lawyers?

10   A.   To see what do I do.  I just really freaked out.  I

11   didn't have a purpose.  But I wanted someone to help me

12   because I didn't know what to do.

13   Q.   When you say you wanted someone to help you, did you

14   want a lawyer?

15   A.   Yeah, I did.

16   Q.   And after the folks from MGA didn't call you back, did

17   you call somebody else?

18   A.   No, I ignored the whole thing and thought it would just

19   go away.  But then eventually the manager and the face

20   department at Matter said Michael Moore, the lawyer from

21   Matter, wants to talk to you right now, and I was pretty

22   freaked out, but I said okay, and I just went down there, and

23   that was it.

24   Q.   Did you indicate to the folks at Matter that you would

25   like a lawyer?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   I did.  Well, I said I would like someone to represent

2    me because I don't know what it's about.

3    Q.   Again, you're an artist.

4    A.   Right.

5    Q.   And did Matter give you some choices of potential

6    lawyers who you might retain to represent you?

7    A.   Well, they gave me one, and he said well, you could

8    change if you don't like him and whatever.  And I said that's

9    fine.  I like him.

10   Q.   And is that individual here in court today, your lawyer?

11   A.   Yes.

12   Q.   Sitting in the back there?

13   A.   Yes.

14   Q.   And have you paid the lawyer, or has somebody paid that

15   lawyer for you?

16   A.   Somebody paid the lawyer for me.

17   Q.   What's your understanding as to who has paid the lawyer

18   to represent you?

19   A.   I assume Matter is paying.

20        MR. QUINN:  Nothing further.  Thank you.

21        THE COURT:  Cross-examination.

22              CROSS-EXAMINATION

23   BY MS. AGUIAR:

24   Q.   Hi, Ms. Rhee, my name is Lauren Aguiar.  I'm one of the

25   lawyers for MGA.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1          You just testified that the MGA lawyers came to see

2     you at some point about this litigation.

3          Do you recall that?

4     A.   I do recall.

5     Q.   Was one of the people me?

6     A.   What's your name?

7     Q.   My name is Lauren Aguiar.

8     A.   No, it wasn't, I don't think.

9     Q.   And it also wasn't my colleague Tom Nolan; is that

10    correct?

11    A.   Correct.

12    Q.   And it was no one from the firm where we work.  Do you

13    see any of the lawyers in the courtroom today who came and

14    spoke to you that day?

15          MR. QUINN:  Objection, your Honor.  How would she

16    know?

17          THE COURT:  Sustained.  Rephrase your question,

18    Counsel.

19    Q.   BY MS. AGUIAR:  You mentioned two men and a woman who

20    came to visit you that day.  Do you see any of them in the

21    courtroom today?

22    A.   No.

23    Q.   When you were preparing for your testimony today, were

24    any of the lawyers from Mr. Quinn's firm participating in

25    those phone calls or those meetings?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  I don't think so.

2    Q.   So it's just you and your lawyer who you identified

3    earlier?

4    A.  Yes.

5    Q.   So you are self-employed as a face painter; correct?

6    A.  Correct.

7    Q.   And you said you've done free-lance work for a number of

8    toy companies; is that correct?

9    A.  Correct.

10   Q.   And in 2000, in the year 2000, you were acting as a

11   free-lance face painter; right?

12   A.  Right.

13   Q.   And during that time, you weren't doing work exclusively

14   for Matter.  Am I right?

15   A.  Right.

16   Q.   You considered yourself someone who could work for not

17   just Matter, but for other companies as well?

18   A.  Right.

19   Q.   When Mr. Quinn was asking you questions, I believe that

20   he said at one point that you were employed by Matter.

21       Do you remember that?

22   A.  No.

23   Q.   He said were you an employee of Matter --

24   A.  I meant temp employee.

25   Q.   Right.  At your deposition you made it a point to very

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    specifically say that you were actually not an employee, you

2    were a temp; is that right?

3    A.  Correct.

4    Q.  Okay.  And during that time when you were a temp working

5    at Matter, you were laid off at least several times during

6    that period; is that right?

7    A.  Correct.

8    Q.  And then you were an outside vendor for Matter for a

9    time; right?

10    A.  Right.

11    Q.  And since you've been a free-lancer, you have not worked

12    inside the Matter design center during that time; right?

13    A.  Right.

14    Q.  So starting in June of 2000, you started working on face

15    painting projects for MGA; correct?

16    A.  Correct.

17    Q.  And your work for MGA has been exclusively in the area

18    of face painting and design; right?

19    A.  Correct.

20    Q.  You didn't participate in the development of the dolls

21    at MGA; right?

22    A.  No, I didn't.

23    Q.  And you didn't attend internal development meetings at

24    MGA; correct?

25    A.  Correct.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.  So you don't really have any firsthand knowledge of

2    MGA's doll development process, do you?

3    A.  No.

4    Q.  So you don't have any personal knowledge regarding the

5    dates when specific dolls were in phases of production at

6    MGA, do you?

7    A.  No.

8    Q.  So I think we can agree that you did face painting --

9    I'm going to start with Prayer Angels just to get you in the

10   right time frame.  We can agree that you did do face painting

11   on the MGA project called Prayer Angels; correct?

12   A.  Correct.

13   Q.  Where we probably don't have agreement is when you did

14   that face painting; correct?

15   A.  Correct.

16   Q.  So let me back up.  Am I right that your primary contact

17   at MGA, when you were working on Prayer Angels, was Paula

18   Garcia, she was at the time known by her maiden name, Paula

19   Treantafelles; is that right?

20   A.  Yes.

21   Q.  And Ms. Garcia was the person at MGA who was sort of the

22   project manager for Prayer Angels; correct?

23   A.  Correct.

24   Q.  And so based on what you just told me, you're not sure,

25   or you don't have any firsthand knowledge of when Prayer

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Angels was in development at MGA; right?

2    A.  They asked me to paint it while I was living in the

3    Guadalupe house.  But when it's in development, no.

4    Q.  Are you aware that Paula Garcia -- and is it all right,

5    when I refer to Paula Garcia, you'll know who I'm talking

6    about?

7    A.  Yes.

8    Q.  Are you aware that Ms. Garcia first asked you to do face

9    painting on Prayer Angels during the year 2000?

10   A.  No.

11   Q.  Do you know a woman named Veronica Marlow?

12   A.  Vaguely.

13   Q.  Do you understand her to be an outside vendor in the toy

14   industry?

15   A.  Yes.

16   Q.  Are you aware that Veronica Marlow testified that she

17   and you were both working on the Prayer Angels project as

18   outside vendors in the year 2000?

19        MR. QUINN:  This assumes facts not in evidence.

20        THE WITNESS:  No.

21        MR. QUINN:  Request the answer be stricken.

22        THE COURT:  It's stricken.  Rephrase your question,

23   Counsel.

24   Q.  BY MS. AGUIAR:  Would you have any basis to dispute some

25   testimony by Veronica Marlow that she was working on Prayer

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Angels in the year 2000?

2           MR. QUINN:  Again, as framed, assumes facts not in

3    evidence.

4           THE COURT:  Sustained.  Rephrase, Counsel.

5    Q.  BY MS. AGUIAR:  Would you have any basis to dispute a

6    statement that Veronica Marlow was doing work on Prayer

7    Angels during the year 2000?

8    A.  I don't know what she was doing in the year 2000.

9    Q.   And would you have any basis to dispute a statement that

10   you were working on the Prayer Angels project with her or you

11   were working on the same Prayer Angels project in the year

12   2000?

13   A.  I didn't work on Prayer Angels in the year 2000.

14   Q.   So your testimony -- I actually think in your

15   deposition, you said it's --

16          MR. QUINN:  Your Honor, I object.

17          THE COURT:  Rephrase.

18   Q.  BY MS. AGUIAR:  Is it true that you have stated that it

19   was impossible that you were working on Prayer Angels in the

20   year 2000?

21   A.   If I used the word impossible, I don't remember word for

22   word.  All I know is that I worked on Prayer Angels in my

23   other house, which is a couple years later.

24   Q.   Right.  So it's your best testimony that you didn't work

25   on Prayer Angels until 2003 or 2004; is that right?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Something like that, yes.

2    Q.  Let me ask you to look in your binder, and this is the

3    white binder in front of you, tab 396.

4    A.  Got it.

5    Q.  Are you at 396?

6    A.  Excuse me?

7    Q.  Are you at 396?

8    A.  Yes, I am.

9    Q.  Would you take a look -- and do you see that that's an

10    e-mail dated April 28th, 2000?

11    A.  Yes.

12    Q.  Would you take a look at the photographs that are

13    attached to the e-mail.  For example, if you look at any of

14    them, page 3 or 4 after that, do you see those photographs?

15    A.  Yes, I do.

16    Q.  Do you recognize those photographs that are attached to

17    the April 28th, 2000, e-mail as versions of the Prayer Angel

18    doll that MGA developed?

19    A.  I don't recognize the face.

20    Q.  Do you recognize the body of the doll as being the

21    Prayer Angel body?

22    A.  Yes.

23    Q.  Let me ask you to then now turn to in your binder, same

24    binder, tab 4417.

25    A.  Okay.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   And do you see that this document is dated June 13th,

2    2000?

3    A.   Maybe I'm looking at the wrong one.

4    Q.   This is tab 4417?

5    A.   4417, yes.

6    Q.   And do you see the date on that document is June 13th,

7    2000?

8    A.   Maybe I'm looking in the wrong place because this says

9    February 22.

10    Q.   Oh, that's in the -- sorry.  That's the exhibit sticker

11    from the deposition.  If you look in the actual body of

12    the --

13    A.   Oh, June 13th.  Okay.

14    Q.   Okay.  So you see that it's a June 13th, 2000, document.

15    Did you have any contact with a designer named Amy Myers

16    while you were working on Prayer Angels?

17    A.   I don't recall.

18    Q.   Do you have any basis to dispute that an Amy Myers

19    bought things like wings and halos as of June 2000?

20        MR. QUINN:  Assumes facts, your Honor.

21        THE COURT:  Rephrase.  It does assume facts as

22    phrased, Counsel.

23    Q.   BY MS. AGUIAR:  Does this refresh your recollection that

24    the Prayer Angel project was in development at MGA in the

25    year 2000?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1        MR. QUINN:  No foundation that the recollection

2    needs to be refreshed.

3        THE COURT:  Sustained.

4    Q.   BY MS. AGUIAR:  You're saying you have no recollection

5    of when the Prayer Angel doll was in development; is that

6    right?

7    A.   Right.

8    Q.   And this does not refresh your recollection as to

9    whether it was in development?

10   A.   This page?

11   Q.   Yes.

12   A.   No.

13   Q.   Turn, if you would, in your binder to tab 16543.

14   A.   Can you say that number again?

15   Q.   Sure.  16543.

16   A.   Okay.

17   Q.   Are you there?

18   A.   Yes.

19   Q.   Okay.  Did you note the date of this document, 16543?

20   A.   The date, yes.

21   Q.   And --

22       MR. QUINN:  Your Honor, she shouldn't be referring

23   to the date of the document.

24       MS. AGUIAR:  I'm sorry.  I specifically didn't.  I

25   just asked her if she noted the date.  That's why I didn't

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    mention the date itself.

2         THE COURT:  Very well.

3    Q.   BY MS. AGUIAR:  Does this document refresh your

4    recollection that in this time period you were working on a

5    doll for MGA that had legs sewn straight with bendable legs?

6         MR. QUINN:  Lacks foundation that she didn't have a

7    sufficient --

8         THE COURT:  Sustained.  Lay a foundation, Counsel.

9    Q.   BY MS. AGUIAR:  Do you recall working on a doll for MGA

10   in the year 2000 that when you press its hands together in a

11   prayer position, it activated prayers?

12   A.   No.

13   Q.   And this document does not refresh your recollection

14   about that fact?

15        MR. QUINN:  Same objection.

16        THE WITNESS:  No.

17        THE COURT:  She hasn't indicated that she -- lay a

18   foundation for the recollection, Counsel.  You have to ask if

19   there's anything that would refresh her recollection.

20   Q.   BY MS. AGUIAR:  Do you think that there's anything else

21   that I could show you that would refresh your recollection

22   that you were working on this project and you were working on

23   it?

24        MR. QUINN:  Foundation.  There's no indication that

25   she has a recollection that she lost, that there's a failure

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    of recollection.

2         THE COURT:  Sustained.

3    Q.  BY MS. AGUIAR:  At some point, when you were working on

4    Prayer Angels, did you know that you were working on it?

5    A.  Yes.

6    Q.  And you now don't remember when that was; is that right?

7    A.  I don't remember the exact dates.

8    Q.  Okay.  So is there anything that I could show you,

9    anything further I could show you that would help you

10   remember when that was?

11   A.  I can't think of anything.

12   Q.  So this document that you are looking at in front of

13   you, 16543, that does not help refresh your recollection that

14   you were working on that Prayer Angel project in this time

15   frame?

16   A.  I've never seen this before.

17   Q.  Let's look at a document that's already in evidence.

18   It's 402-B.  Do you have 402 B in your binder?

19   A.  Yes.

20   Q.  This was a document admitted into evidence during a

21   previous witness.  Do you see the conferring e-mail that says

22   August 4th, 2000?

23        MR. QUINN:  Again, your Honor, I object to

24   mentioning the date before there's any foundation laid.

25        THE COURT:  Counsel, the exhibit is in evidence.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1            MR. QUINN:  Oh, I'm sorry.  I apologize.

2       Q.  BY MS. AGUIAR:  Do you see the date on the cover of the

3    e-mail where it says August 4, 2000?

4       A.  Yes, I do.

5       Q.  Why don't we look at the attachment to the exhibit.

6            Do you recognize that?

7       A.  No.

8       Q.  Is it possible that this was a doll head for the Prayer

9    Angel project?

10      A.  It's possible.

11      Q.  It is possible?

12      A.  Yes.

13      Q.  Does this look like the general shape of the Prayer

14   Angel doll head that you worked on?

15      A.  Possible.

16      Q.  If you -- would it help you to look at the actual doll

17   that's in front of you?

18      A.  Yes.  Looks pretty exact.

19      Q.  Looks pretty exact?

20      A.  Yes.

21      Q.  So would you agree with me that this photograph of the

22   doll head that was circulated in August of 2000 is the Prayer

23   Angel -- a Prayer Angel doll head without face paint?

24      A.  It does, only the nose on this one is a little wider,

25   but basically yeah.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   Basically yeah.  Okay.  So does this document now help

2    you place in time when the Prayer Angel project was in

3    development at MGA?

4         MR. QUINN:  Lacks foundation that she would know

5    the answer to that, your Honor.

6         MS. AGUIAR:  Let me rephrase it.

7         THE COURT:  Very well.

8    Q.  BY MS. AGUIAR:  Does this help you place in time when

9    there were Prayer Angel doll heads available to be painted?

10   A.  Yes.

11   Q.   Okay.  And so does it help you place in time that there

12   were doll angel heads available to be painted as of August of

13   2000?

14   A.  I think so.

15   Q.   So would it make sense, then, that if there was a doll

16   angel head that was available to be painted in August of

17   2000, that that is the general time frame when you would have

18   started to do the face painting?

19   A.  I am positive that I painted it at my other house on

20   Guadalupe, which is not the year 2000, but I don't know the

21   dates.

22   Q.   Okay.  So putting aside -- because I'm trying to refresh

23   your memory with actual documents.  And so is it possible

24   that you were getting ready to paint at least this version of

25   the Prayer Angel doll head in August of 2000?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   No.  In the beginning I only did Bratz.  I didn't do

2    anything else for a long time.

3    Q.   Okay.  So you're saying it's not possible that you did

4    painting on the angel doll head in this time frame in 2000?

5    A.   I'm positive, yeah.

6    Q.   If you'd look at tab 203 and 204 in your binder.

7    A.   203?

8    Q.   Yes, please.

9    A.   Okay.

10   Q.   And why don't we do both at the same time.  If you would

11   look at 204 as well.  Do you recognize 203 and 204?

12   A.   Yes.

13   Q.   And what are they?

14   A.   Prayer Angels.

15       MS. AGUIAR:  Your Honor, I move 203 and 204.

16       MR. QUINN:  No objection.

17       THE COURT:  They are admitted.  You may publish.

18       (Exhibits 203 and 204 received.)

19   Q.   BY MS. AGUIAR:  And you recognize these photos as the

20   Prayer Angel doll that MGA developed; correct?

21   A.   Correct.

22   Q.   And I think you've already established this, but the

23   doll that's actually in front of you in the box, which is

24   Exhibit 17403, that is also the Prayer Angel doll that MGA

25   developed that went to market; correct?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   Correct.

2    Q.   I'm going to give you --

3         I'll show it to counsel, and then, your Honor, I'd

4    like to bring to the witness 17405.

5         THE COURT:  You may.

6    Q.   BY MS. AGUIAR:  Do you recognize 17405?

7    A.   Yes, I do.

8    Q.   What do you recognize it as?

9    A.   Prayer Angels.

10   Q.   And that's just another version of the Prayer Angel doll

11   that went to market; right?

12   A.   Right.

13   Q.   Do you see a date on bottom of the box?

14   A.   An exhibit?

15   Q.   Sorry.  Let me be more specific.

16        And before we do that, sorry, your Honor, then I'll

17   move into evidence 17405.

18        MR. QUINN:  No objection.

19        THE COURT:  Very well, Counsel.

20        (Exhibit 17405 received.)

21   Q.   BY MS. AGUIAR:  Not the blue exhibit sticker.  If you

22   look at the actual bottom part of the box, if you flip it up,

23   do you see a date on that box?

24   A.   Yes.

25   Q.   And what does the date say?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  It says copyright 2000 MGA Entertainment.

2    Q.  And does seeing that date on the bottom of the Prayer

3    Angel box help you to place into context when the Prayer

4    Angel doll was on the market?

5    A.  Well, it says 2000.

6    Q.  And is that consistent with the Prayer Angel doll head

7    that we saw that was attached to the August 2000 e-mail?

8         MR. QUINN:  Objection.  Ambiguous, your Honor.

9         THE COURT:  Overruled.

10         THE WITNESS:  But, you know, I never saw that

11    e-mail.  It doesn't mean anything to me.

12    Q.  BY MS. AGUIAR:  Let me rephrase the question.

13         We saw the Prayer Angel doll head that was attached

14    to an August 2000 e-mail.

15         Do you recall that?

16    A.  Yes.

17    Q.  And you agreed with me that that was a Prayer Angel doll

18    head that had not yet received face paint; correct?

19    A.  Correct, correct.

20    Q.  And that existed as of August 2000; correct?

21    A.  Yes.

22    Q.  And you just read on the bottom of the Prayer Angel box

23    the year 2000; correct?

24    A.  Correct.

25    Q.  And do those two things help you place into context when

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    the Prayer Angel doll project was going on?

2    A.   Yes.

3    Q.   Okay.  And how does that help you place into context the

4    timing?

5    A.   Well, it says that it was done here in the year of 2000,

6    but it wasn't me.  I didn't do it in the year 2000.  I'm

7    positive.

8    Q.   The faces on the Prayer Angel dolls were painted by you;

9    correct?

10   A.   Definitely by me.

11   Q.   Definitely by you?

12   A.   Yes.

13   Q.   So this may sound like an obvious question, but you

14   would have had to have painted the faces on the Prayer Angel

15   dolls before they hit the shelves; right?

16   A.   I know what you're trying to say, but I still didn't

17   paint them in 2000.  Maybe someone else did.

18   Q.   Take a look at rather than 17405, if you take a look at

19   Exhibits 203 and 204 in your binder.

20        Do you recall being shown these photographs at your

21   deposition?

22   A.   I think I saw hand drawings, not these ones.  From what

23   I recall.

24   Q.   And you did paint the faces on the Prayer Angel dolls.

25   Am I right?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      A.   Right.

2      Q.   There's no question in your mind about that?

3      A.   Right, no question.

4      Q.   And looking at the actual doll, 17403, if you'd actually

5      look at the physical doll that's right in front of you, the

6      one in the box.

7      A.   This one.

8      Q.   Take a look at the face on that.  Did you paint -- is

9      that an Anna Rhee face?  Is that the production version of an

10     Anna Rhee face?

11     A.   Yes.

12     Q.   So if that doll was produced and out on the market

13     sometime in the 2000 or early 2001, you would have had to

14     have painted that face before that time.  Am I right?

15     A.   Well, that's really weird, because I didn't.  I see what

16     you're trying to say.  But I didn't do it until later.  So it

17     doesn't make any sense.

18     Q.   So tell me how it could be that -- we've established

19     that you definitely painted the face; right?

20     A.   Right.

21     Q.   And we've established that you would have had to have

22     painted the face before the doll went to market.

23     A.   Right.

24     Q.   So can you explain to me how it is that you didn't paint

25     the face until 2003 or 2004?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   A.  No.  I can't.

2   Q.  So is it possible, now that I've shown you things to

3   help you place things in context, is it possible that you

4   painted the face sometime in 2000?  Is it possible?

5   A.  I don't think so.

6   Q.  Okay.  So now that you've seen -- I didn't mean to cut

7   you off.

8   A.  I'm sorry.

9   Q.  And why is it that you think it's not possible?

10   A.  Because in the beginning, I remember in the first house

11   I lived in, it was exclusively Bratz.  That's why it doesn't

12   make any sense.

13   Q.  Let me put up on the screen Trial Exhibit 16440, pages 2

14   and 3.  And if you want to see them in your binder, it's the

15   same number, 16440.  Do you see that?

16   A.  Hold on.

17   Q.  Sorry.  If you go to the second page of tab 16440, do

18   you see your invoice?

19   A.  Yes.

20   Q.  And if you turn the next page over, do you see the

21   document titled purchase order?

22   A.  Yes.

23   Q.  And do you see in that document where it says our

24   reference, do you see that column?

25         MR. QUINN:  No foundation for questioning the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    witness.

2         THE COURT:  Sustained.  Lay a foundation, Counsel.

3         MR. QUINN:  I think it should be taken down.

4         THE COURT:  It's in evidence.

5    Q.   BY MS. AGUIAR:  Do you have an understanding as to what

6    project MGA thought you were working on in June of 2000 when

7    you were doing face painting for them?

8    A.   Can you repeat that?

9    Q.   Sure.  Do you have any understanding of what project MGA

10   thought that you were working on in June of 2000 for them?

11   A.   Bratz.

12   Q.   And do you have an understanding as to why their

13   internal documents would preference Prayer Angels and not

14   Bratz?

15   A.   I have no idea.

16   Q.   If you'd turn in your book to your invoices, which are

17   behind tab 201, it's the first tab in your binder, and you

18   turn to page 201-8.

19   A.   Okay.

20   Q.   Do you recognize that document?

21   A.   Yes.

22   Q.   And is this your handwriting?

23   A.   Yes.

24   Q.   And can you just briefly describe to us what the

25   document is?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   Well, it says detailed sketch of angel's face and one

2    touch-up and -- two sets of color swatches and

3    specifications.

4    Q.   And is this an invoice that you prepared?

5    A.   Yes.

6         MS. AGUIAR:  Your Honor, I move 201-8.

7         MR. QUINN:  No objection.

8         THE COURT:  It's admitted.  You may publish.

9         (Exhibit 201-8 received.)

10   Q.   BY MS. AGUIAR:  Where it says detailed sketch of angel's

11   face, do you see that?

12   A.   Yes.

13   Q.   Do you have an understanding of what that means?  In

14   other words, what would that be describing?

15   A.   I'm not sure.

16   Q.   Do you sometimes do sketches of the face when you're

17   getting ready to do the face painting?

18   A.   No.  Once in a while, but rarely.  Rarely.

19   Q.   In other words, if you were trying to show what colors

20   you were going to use on an eye or on a lip, would you

21   sometimes draw the eye and then indicate what colors are to

22   be used on the eye?

23   A.   Never.

24   Q.   You never -- you've never done that?

25   A.   No.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   And when it says set of color -- I'm sorry.  So if

2    you've never done that, why would you write on the -- do you

3    know why you would have written on the invoice sketch of

4    angel's face?

5    A.   Sometimes -- that's not before I paint it.  That's after

6    I paint it.  And they want me to get it ready for production.

7    And then I'll just draw a real quick sketch with the color

8    swatches.

9    Q.   That was my fault.  I was limiting it in time.  So

10   sometimes you do sketch the eye at some point in your

11   process; is that right?

12   A.   Only if they ask me to.

13   Q.   But if they do ask you to, you sometimes sketch parts of

14   the face?

15   A.   Yes, I do.

16   Q.   The line that says set of color swatches and

17   specification, do you see that?

18   A.   Yes.

19   Q.   What would that be referring to?

20   A.   Color swatches, like these one-by-two inch usually,

21   one-by-two-inch pieces of board that I paint each color

22   that's going to be used, I just kind of slap it onto the

23   swatch, and I just give it to them.

24   Q.   And am I right that this was for work that you performed

25   for MGA in October of 2000; is that correct?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Yes.

2    Q.  Would you turn in your binder to tab 12822.  And it's

3    12822-B.

4    A.  I don't see the B part.

5    Q.  It should be the tab right behind 12822.  It should have

6    a B.

7         You know what?  I'm sorry.  I realize that I have

8    it, but I needed to pass it up to you.  I'm sorry.

9         Your Honor, can I bring up copies?

10        THE COURT:  Yes, please.

11   Q.  BY MS. AGUIAR:  Do you have that?

12   A.  Yes.

13   Q.  Would you make note of the date on the covering e-mail?

14   And you don't have to say it.  I just want to make sure

15   you're focused in on the date.

16        Do you see that?

17   A.  Yes.

18   Q.  And if you would turn to the second page of the exhibit.

19   A.  Okay.

20   Q.  And do you see that the covering e-mail says that it's

21   attaching certain things to the e-mail?

22        Do you see that?

23   A.  Yes.

24   Q.  And now do you recognize the first attachment here on

25   the first page there?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1          Do you recognize that?

2     A.   The first --

3     Q.   The first attachment.

4     A.   Oh, yes, I do.

5     Q.   Okay.  And what do you recognize that to be?

6     A.   You know what?  This is really weird.  It looks like

7     mine, but the writing is not my writing.

8     Q.   Was this -- does this appear to be a sketch that you

9     did?

10    A.   It does appear to be a sketch that I did.

11    Q.   And does it appear to be a sketch of an eye from a

12    Prayer Angel doll?

13    A.   It looks like it's definitely a Prayer Angel doll.

14         MS. AGUIAR:  Your Honor, I move --

15         THE COURT:  I'm sorry, Counsel.

16         MS. AGUIAR:  I move 12822-B.

17         THE COURT:  Any objection?

18         MR. QUINN:  No objection.

19         THE COURT:  It's admitted.  You may publish.

20         (Exhibit 12822-B received.)

21    Q.   BY MS. AGUIAR:  So now that we have it on the screen,

22    you recognize that as a sketch that you did; correct?

23    A.   Correct.

24    Q.   And you recognize that as a sketch of the eye of the

25    Prayer Angel doll?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Correct.

2    Q.  And do you recognize that as the lips of the Prayer

3    Angel doll?

4    A.  Correct.

5    Q.  And this would have been a sketch that you would have

6    done of the Prayer Angel doll eye prior to the date that the

7    e-mail was sent; right?

8    A.  Right.

9    Q.  So this would have been a sketch that you did of the

10   Prayer Angel eye before October of 2000; right?

11   A.  Right.  Oh, I wasn't even listening.

12   Q.  That's okay.  I'll give it to you again.  This is a

13   sketch of the Prayer Angel eye that you would have done prior

14   to the time that the e-mail was sent; correct?

15   A.  Correct.

16   Q.  And then, therefore, you would have had to have done the

17   sketch of this eye prior to October of 2000, which is when

18   the e-mail was sent; correct?

19   A.  Correct.

20   Q.  And let's look at the next page of 12822.  Do you

21   recognize -- actually, I think it's not in evidence yet.

22   That next page is not in play by the rules here.  We need

23   to -- look at the last page and tell me if you recognize

24   what's on that page there, page 3 of the exhibit.

25   A.  Yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008 7:44:00 AM

1    Q.   Okay.  What do you recognize that to be?

2    A.   Swatches.

3    Q.   Swatches of what?

4    A.   Color.

5    Q.   And can you be a little bit more specific?  Are these --

6    well, let me ask you, are these color swatches and

7    specifications?

8    A.   Yes.

9    Q.   Along the lines of what you were writing to me a few

10   minutes ago?

11   A.   Yes.

12       MS. AGUIAR:  Your Honor, I move 12822-B.

13       MR. QUINN:  I still don't think there's enough

14   foundation.

15       MS. AGUIAR:  Is this a page --

16       THE COURT:  Very well.  I'll sustain the objection.

17   Q.   BY MS. AGUIAR:  I'll just try it a different way,

18   because I think we know where this is going.  Is this a --

19       THE COURT:  Counsel, you should still wait for the

20   Court to rule on the objections.  Don't anticipate where the

21   Court is going.

22       MS. AGUIAR:  I'm sorry.

23   Q.   Is this a page that you prepared?

24   A.   Yes.

25   Q.   And is this a page you usually prepare in your process

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    of face painting on projects?  In other words, a page like

2    this, is this something you do from time to time?

3    A.   It's hard to say, because I don't do it this way.  And

4    if I did, I might have done it a long time ago, but I don't

5    remember.

6    Q.   So this is a set of color swatches; correct?

7    A.   Yes.

8    Q.   And is this a set of color swatches that as of the time

9    we're talking about, which is 2000, you prepared this;

10   correct?

11   A.   It looks like it.

12   Q.   Is that your writing on 12822-B?

13   A.   Yes, but you know what's weird?  The part that says

14   yellow in parentheses, that's not my writing.  That part's

15   not my writing.  Maybe somebody added it in.

16   Q.   So let me just get your testimony.  Do you believe that

17   you prepared the page that we're looking at here, which is

18   12822-B?

19   A.   Yes, I do.  But I wish you had the original -- I wish

20   they would have the original one, because it's really hard to

21   tell on this really not so good xerox.

22   Q.   I wish I did, too.  This is the best we've got.

23        Your Honor, I would move 12822-B?

24        MR. QUINN:  No objection.

25        THE COURT:  I'm sorry?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008 7:44:00 AM

1          MR. QUINN:  No objection.

2          THE COURT:  It's admitted.  You may publish.

3          (Exhibit 12822-B received.)

4     Q.   BY MS. AGUIAR:  Do you see on the first page of the

5     document that it was -- do you see the documents that are

6     described as being attached?  If you look at the first page

7     of the e-mail.  Do you see where those -- the JPEG files, do

8     you see that?

9     A.   Yes.

10    Q.   And do you see in the e-mail that it's attaching two

11    JPEG files?

12    A.   Yes.

13    Q.   Do you know the title of the first JPEG file?

14    A.   Black eye.

15    Q.   And so now looking at the doll in front of you, the

16    Prayer Angel doll, the version that I handed you there, do

17    you recognize the colors on this third page as corresponding

18    to the eye colors in the doll that I handed you there?

19    A.   Honestly, I can't tell because colors come in so many

20    variations.  This page, it could be for any doll.  I mean,

21    just because it's a color xerox, it all looks like black

22    except for the red and the brown and the yellow.  It all

23    looks like it's just plain black to me.

24    Q.   Do you see where it says the iris is brown?

25          Do you see that?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  Yes.

2    Q.  On the doll in front of you, that Prayer Angel doll,

3    does it have a brown iris?

4    A.  It does.

5    Q.  And do you see where it says tiny single highlight on

6    iris, light brown?

7        Do you see that?

8    A.  Yes.

9    Q.  Does the doll in front of you has a highlight in its

10   iris of light brown?

11   A.  It looks like there's only one color of brown in here.

12   Although it could be a mistake, but it looks like only one

13   brown.

14   Q.  And do you see the yellow iris highlight in the actual

15   doll?

16   A.  Yes.

17   Q.  So to be clear, the page with the color swatches, do you

18   understand that to correspond to the sketch that you have

19   there on the left?  In other words, those color

20   specifications are for the eye that you drew on the previous

21   page; correct?

22   A.  It's possible.  I can't guarantee it.  It's possible.

23   Q.  And this is a sketch that you -- so I think you said

24   this is a sketch that you did prior to October 26, 2000;

25   correct?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   That is marked that it is.

2    Q.   No.  We're looking up at the document again, and it's an

3    e-mail from October of 2000.

4    A.   Okay.

5    Q.   And so if you did this sketch, I think you've testified

6    that you did this sketch prior to October of 2000.  Does this

7    document with your sketch and your color specifications now

8    help you place in time when you were doing face painting on

9    the Prayer Angel project?

10   A.   I suppose that it should.  But I just remember I did it

11   at the other house.  So it's -- it doesn't make sense to me.

12   Q.   This is not a sketch of a Bratz doll face, is it?

13   A.   No, it's not.

14   Q.   It's not even close.

15   A.   No.

16   Q.   So the work that you were doing -- and this is work that

17   you were doing for MGA; correct?

18   A.   Correct.

19   Q.   And so this is not work that pertains to Bratz.

20   A.   No, absolutely not.

21   Q.   Right.  And it was work that you were doing in the year

22   2000 that's not pertaining to Bratz; correct?

23   A.   Correct.

24   Q.   Can I --

25   A.   I have a question.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   I'm sorry.  I need to ask you questions for now.

2         THE COURT:  Counsel, your next question.

3    Q.   BY MS. AGUIAR:  When you were preparing to come and

4    testify here today, did anyone show you these last four or

5    five documents that I've shown you today to help you place

6    events in time?

7    A.   No.

8    Q.   So when you testified earlier that there was absolutely

9    no way that you worked on Prayer Angels in 2000, is it

10   possible that you just had your dates mixed up?

11   A.   I don't think so.

12   Q.   Okay.  So given what we've seen here today, you still

13   think that --

14   A.   I remember doing it, actually working on it, but it was

15   at the other house.

16   Q.   Do you know when Carter Bryant -- I'm going to move on

17   to a different area.

18        Do you know when Carter Bryant first drew his Bratz

19   drawings and came up with the concept of Bratz?

20   A.   I don't know exactly when.  But for sure it was the year

21   2000.

22   Q.   You think it was the year 2000?

23   A.   Because why would he do a drawing and give it to me to

24   do it one or two years later?  So --

25   Q.   Do you have any direct information about when he first

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    did those drawings?

2    A.   No.

3    Q.   And you don't know when Carter Bryant first presented

4    his drawings to MGA, do you?

5    A.   No.

6    Q.   Would you have any basis to dispute the testimony -- do

7    you have any basis to dispute that the date that those were

8    first presented to MGA was in August or September of 2000?

9    A.   Repeat that.

10   Q.   Sure.  Do you have any basis to dispute that Carter

11   Bryant first presented his drawings to MGA after June of

12   2000?

13   A.   No.

14   Q.   You've never seen the internal documents at MGA which

15   set forth when the Bratz project began, have you?

16   A.   Can you repeat that?

17   Q.   Sure.  You've never seen any internal documents from MGA

18   which set forth when the Bratz project began at MGA, have

19   you?

20   A.   No.

21   Q.   So you don't have any firsthand knowledge of when MGA

22   actually started its development of the Bratz dolls, do you?

23   A.   No.

24   Q.   You were not involved in the sculpting process for the

25   Bratz dolls, were you?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  No.

2    Q.  And you testified that you think the heads that you

3    first painted for Bratz, the ones that Mr. Bryant brought to

4    you, you said that those were like a resin casting; correct?

5    A.  Yes.

6    Q.  And you remember that the sculptor for the Bratz project

7    was a woman named Margaret; correct?

8    A.  Correct.

9    Q.  And you didn't work with Margaret on the sculpting of

10   the Bratz sculpts, did you?

11   A.  No.

12   Q.  So would you have any basis -- do you have any basis to

13   dispute when -- testimony that those resin heads for Bratz

14   were actually not available until after June of 2000?

15       MR. QUINN:  Objection.  Assumes facts.

16       THE COURT:  Rephrase your question.

17   Q.  BY MS. AGUIAR:  Do you have any information regarding

18   when those resin heads were first available in terms of the

19   date?

20   A.  No.

21   Q.  Would you take a look at the doll that counsel showed

22   you before, the one that toppled onto the floor, the Bratz

23   doll, is there a date on that box?

24   A.  Yes.

25   Q.  What does it say?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   2001, MGA.

2    Q.   Does that help you place in time that the Bratz project

3    actually came after the Prayer Angel project?

4    A.   No, I'm positive Bratz was the first thing I ever did,

5    ever.

6         MS. AGUIAR:  Your Honor, can I pass the Prayer

7    Angels doll and the Bratz doll packages to the jury, please?

8         THE COURT:  Are they admitted?  They are, pursuant

9    to stipulation.  Very well, you may pass them to the jury.

10        Thank you, Counsel.

11   Q.   BY MS. AGUIAR:  If you'd turn to one of your invoices.

12   So it's tab 201.  And if you'd go to the 13th page.

13        Do you see that?

14   A.   Yes.

15   Q.   And I think actually 13 is in evidence.  So if we could

16   put 201-13 up on the screen.

17        Do you recognize what's depicted here?

18   A.   Yes.

19   Q.   And this is an invoice for face painting on the Bratz

20   project; correct?

21   A.   Correct.

22   Q.   So as of December of 2000, you were doing face painting

23   on Bratz; correct?

24   A.   Correct.

25   Q.   And if you'd turn in your binder to tab 15228.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.   Okay.

2    Q.   Do you recognize what you see there on 15228?

3    A.   Yes.

4    Q.   Are those your sketches of two sets of eyes?

5    A.   Yes.

6    Q.   And these are Bratz eyes; correct?

7    A.   Correct.

8    Q.   And you did them?

9    A.   Yes.

10        MS. AGUIAR:  I move 10228.

11        MR. QUINN:  No objection.

12        THE COURT:  Very well.

13        (Exhibit 10228 received.)

14   Q.   BY MS. AGUIAR:  And do you notice that -- we can take

15   down the invoice, and we'll just do -- because we're going to

16   do some other drawings here.

17        Do you notice the date in the bottom right-hand

18   corner of this document?  Do you see where it says January

19   17th, '01?

20   A.   No.

21   Q.   Right above where it says MGA Entertainment.

22        Do you see that date there?

23   A.   Oh.

24   Q.   Do you see that?

25   A.   Yeah, it was the writing on the -- yeah.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008 7:44:00 AM

1    Q.   Do you see where it says January 17th, '01?

2    A.   Yes.

3    Q.   And was that the date on or about the time when you did

4    the drawings here?

5    A.   Yes.

6    Q.   And these are Bratz eyes; correct?

7    A.   Yes.

8    Q.   If you'd turn to the very next tab in the binder, which

9    is 15229.  Do you recognize these as two other sets of eyes

10   that you drew?

11   A.   Yes.

12        MS. AGUIAR:  Move 10229.

13        MR. QUINN:  No objection.

14        THE COURT:  It's admitted.  You may publish.

15        (Exhibit 10229 received.)

16   Q.   BY MS. AGUIAR:  And these are two other sets of eyes for

17   the four Bratz characters; correct?

18   A.   Correct.

19   Q.   And this is the Asian eye and the -- what you're calling

20   here the black eye.  Do you see that?

21   A.   Yes.

22   Q.   And you see the date on this one, also January 17th of

23   '01?

24   A.   Yes.

25   Q.   And these are sketches that you did of the Bratz eyes as

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1      of January 17th, 2001; correct?

2      A.  Correct.

3      Q.  And if you'd turn to the next page.

4          And maybe for efficiency's sake, your Honor, I'm

5      going to ask you to look at the next few exhibits.  It's

6      15229-A, 15230, 15231, -32, those four.

7      A.  Okay.  15229-A?

8      Q.  Yes, and the next three after that.

9      A.  Okay.

10     Q.  Do you recognize the four documents that I've just asked

11     you to look at?

12     A.  Yes.  Well, no, I don't.  I recognize the drawing, but I

13     don't recognize the writing.

14     Q.  Okay.  Let's take the first one first.

15         THE COURT:  Counsel, if there is going to be a

16     dispute on this, I'm missing these.  All I have is 15229-A.

17     It goes from 15229-A, and the next one is 16434.

18         MS. AGUIAR:  I apologize.  It's an error on our

19     part.

20         THE COURT:  That's all right.  Is there another

21     binder?

22         MS. AGUIAR:  Does counsel have them?

23         MR. QUINN:  I have them.

24         MS. AGUIAR:  You can have mine.

25         MR. NOLAN:  We can share.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1        THE COURT:  Thank you, Counsel.

2    Q.  BY MS. AGUIAR:  If you'd look at 15229-A.  Do you see

3    that?  It's the first one.

4    A.  Okay.

5    Q.  Do you recognize what's on page 15229-A as a drawing of

6    eyes and color specifications?

7    A.  Yes.

8    Q.  And is this a document that you prepared?

9    A.  Only the drawing.

10   Q.  So you did not prepare the color swatches that are

11   underneath?

12   A.  No.

13   Q.  Do you see that the date of this document is February

14   2nd, 2001?

15   A.  Yes.

16   Q.  Is it right that you were working on the Bratz eye face

17   painting in or around February 2nd, 2001?

18   A.  It's hard to say because I drew these kind of

19   drawings -- I did it so many times that it could be any time.

20   I mean, this is not a good one.  I can't really tell.

21   Q.  Okay.  Would the date on the document suggest that that

22   was around the time that you were working on it, though?

23   A.  Yes.

24   Q.  One other question.  And I want to turn back to a

25   document that is actually in your black binder.  And if you'd

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1   turn in the black binder to tab 11843.  And this is in

2   evidence.  So if we could have it up.

3         And you already identified this as a contract -- an

4   agreement you signed with MGA; correct?

5   A.  I suppose so.

6   Q.  This was a document that Mr. Quinn went over with you.

7         Do you recall?

8   A.  Oh, yes, yes, yes.  I can't find the page, but I know

9   it's the same one.

10  Q.  If you want to find it in your binder, that's okay.

11  A.  I can tell it's the same.

12  Q.   And we'll zoom it in for you, on the very first

13  paragraph, as Mr. Quinn pointed out, it says effective date,

14  December 1, 1999.

15        Do you see that there?

16  A.  I see it.  I see it.

17  Q.   It says the first day of December 1999.

18  A.  Yes.

19  Q.   You were not doing work for MGA as of December 1st,

20  1999, were you?

21  A.  I don't think so.

22  Q.   And in fact you've testified that your very first

23  project for MGA was in June of 2000?

24  A.  Yes.

25  Q.   So you did not do any work for MGA between December 1st,

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    '99, and June of 2000; correct?

2    A.   Correct.

3         MS. AGUIAR:  Nothing further.

4              REDIRECT EXAMINATION

5    BY MR. QUINN:

6    Q.   Ms. Rhee, counsel showed you a number of different

7    drawings of eyes there towards the end of her examination,

8    Exhibit 1529-A, -30, -31, -32.  And you said at one point, "I

9    did these drawings so many times."

10        Do you recall saying that?

11   A.   Yes.

12   Q.   Would you explain what you mean by that?

13   A.   Well, I would do drawings and swatches all the time.

14   After I'm done with the -- with the drawing, I would

15   automatically do it, and it all looks pretty much the same.

16   Q.   Did you do drawings of Bratz eyes and swatches more than

17   once?

18   A.   Yes.

19   Q.   After the first assignment that you received from

20   Mr. Bryant in June of 2000, after that did you have a number

21   of assignments from MGA relating to Bratz?

22   A.   Yes.

23   Q.   As you sit here now, do you recall how many different

24   times you were asked to draw eyes or to do face painting on

25   Bratz during the second half of 2006, from June through the

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    end of 2000?  Do you remember how many different times?

2    A.   How many times that I -- can you repeat that again?

3    Q.   How many times, during the second half of 2000, you were

4    given assignments to do drawings of Bratz eyes or to paint

5    Bratz faces?

6    A.   I don't remember how many Bratz I did.  But it was every

7    single one.  Every single time.

8    Q.   In your line of work, when you paint doll faces, is that

9    something that typically for a new product you will do more

10   than once?

11   A.   Depends on what company.  Some companies do it, and some

12   companies don't.  When they do do it, it's all the time.

13   Q.   And how about MGA?  What was the practice at MGA?

14   A.   I would do it all the time.

15   Q.   Counsel showed you a number of different documents with

16   Prayer Angels or angels on it.  You told us, when I was

17   asking you questions, that Mr. Bryant had told you to put

18   that first invoice in June, and told you to put angel heads

19   on it.

20        Do you recall that?

21   A.   Yes.

22   Q.   Was that the only time that Mr. Bryant or

23   Ms. Treantafelles told you to put angel on an invoice for a

24   Bratz project?

25   A.   From what I recall, yes.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1          THE COURT:  Is there an objection?

2          MS. AGUIAR:  I think it mischaracterizes the

3    testimony.

4          THE COURT:  Why don't you rephrase the question,

5    Counsel.  I'll strike the answer.

6    Q.   BY MR. QUINN:  Let me put it this way.  Did Mr. Bryant

7    ever tell you he had a secret Prayer Angels project, an angel

8    or a doll that prayed?  Did he ever tell you he had a secret

9    Prayer Angel project?

10   A.   No.

11   Q.   If Ms. Garcia testified that angel heads were not even

12   available until August of 2000, and that's why she had a

13   Bratz head doll painted in its place -- I'm sorry.  A

14   cabbage --

15         THE COURT:  Is there a question?

16         MR. QUINN:  Let me start over.

17         THE COURT:  Thank you.

18   Q.   BY MR. QUINN:  Do you know whether or not angel --

19   Prayer Angel heads were available in June, July, and August

20   of 2000?

21   A.   No, it wasn't.

22         THE COURT:  I'm sorry.  What did you mean by

23   available?

24   Q.   BY MR. QUINN:  The question is did they exist?

25   A.   I don't know.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    Q.   Would you have any basis to dispute the testimony of

2    Paula Garcia that Prayer Angel heads were not available until

3    August of 2000?

4    A.   I don't understand the question.

5    Q.   Would you have any basis to dispute the testimony of

6    Paula Garcia that Prayer Angel heads were not available for

7    painting until August of 2000?

8    A.   I don't know.

9    Q.   Again, I know dates can be confusing.  But did you ever

10   repaint a Cabbage Patch doll face?  Do you recall ever being

11   asked to do that?

12   A.   No.

13   Q.   Do you know whether or not there was more than one wave

14   of Prayer Angel dolls?

15        MS. AGUIAR:  Objection.  Lack of foundation.

16        THE WITNESS:  I don't know.

17        THE COURT:  Sustained.

18   Q.   BY MR. QUINN:  In your experience in working with toy

19   companies, does it sometimes happen that there will be

20   different releases over time of a doll?

21   A.   Oh, yes.

22   Q.   And what are those called?  I said wave.  But what do

23   you call them in the business?

24   A.   I don't know.  I don't know either.

25   Q.   If I use release, different releases, is that something

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    that makes sense to you?

2    A.   Yes.  Release or re-release.  I don't know what you

3    would call it.

4    Q.   Do you know whether or not there was more than one

5    release of the Prayer Angel doll?

6    A.   If there was, I didn't do it.

7    Q.   When you met with the MGA counsel, the two lawyers and

8    the woman who came to your house, did you tell them in that

9    meeting that the June 2000 invoice was for painting Bratz

10   heads?

11   A.   I don't remember.  I don't remember what we talked

12   about.

13   Q.   So you just don't recall one way or the other?

14   A.   No.

15   Q.   Dates are confusing.  But what is the --

16          THE COURT:  Is there an objection, Counsel?

17          MS. AGUIAR:  Objection.  I think counsel is

18   testifying.

19          THE COURT:  Sustained, Counsel.  Let's not do that

20   again.

21   Q.   BY MR. QUINN:  What is the very first project you worked

22   on for MGA?

23   A.   Bratz.

24   Q.   And when was that?

25   A.   The year 2000.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1     Q.   What month?

2     A.   Might have been June or so.  June.

3     Q.   And was that the secret project that Mr. Bryant had told

4     you about?

5     A.   Yes.  Yes.

6          MR. QUINN:  Nothing further.

7                    RECROSS-EXAMINATION

8     BY MS. AGUIAR:

9     Q.   Do you recall that I showed you sketches that you had

10    done of Bratz eyes in January of 2001?

11    A.   Can you show it to me again?

12    Q.   Sure.  They had a date on them of January 17, 2001.

13         Do you recall that?

14    A.   Oh, yes.

15    Q.   Are you aware of any sketches or color specifications,

16    any documents that show that you were working on Bratz face

17    painting as of June of 2000?

18    A.   Can you repeat that one more time?

19    Q.   Sure.  These documents show that you were working on

20    Bratz face painting in January of 2001; correct?

21    A.   Correct.

22    Q.   Are you aware of any documents in your possession or

23    anywhere that show that you were working on Bratz face

24    painting, sketching eyes, or doing color specs back in June

25    of 2000?

MGA v. Mattel-Trial Transcripts (FINAL)          Unsigned                    Page  1249

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    A.  No.

2    Q.  Let me show you the sketch that you did of the Prayer

3    Angel eye sometime before October of 2000.  Let me ask you,

4    do you think it's a coincidence that you were doing sketches

5    of Prayer Angel eyes and at the same time you were writing

6    angels on your invoices that you were giving to MGA?  Do you

7    think that that's just a coincidence?

8        MR. QUINN:  Objection.  Argumentative.

9        THE COURT:  It is.  Sustained.

10   Q.  BY MS. AGUIAR:  Do you have an explanation as to why you

11   would have been writing angels on your invoices to MGA at the

12   same time you were actually sketching angels -- Prayer Angel

13   eyes?

14   A.  The first invoice was because Carter asked me to put

15   that down.

16       MS. AGUIAR:  Move to strike that as nonresponsive,

17   your Honor.

18       THE COURT:  It's her explanation.  Overruled.

19   Q.  BY MS. AGUIAR:  Do you understand that you were

20   submitting invoices to MGA in October of 2000 that said angel

21   faces on them?

22   A.  Can you repeat that?

23   Q.  Sure.  Do you understand that you were submitting

24   invoices to MGA in October of 2000 that said it was for work

25   on angel heads?

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008 7:44:00 AM

1    A.   Oh, yes.

2    Q.   And would that be because during that time period you

3    were actually sketching Prayer Angel eyes and working on

4    color specs for Prayer Angel eyes?

5    A.   No, because I did that at the other house.

6         MS. AGUIAR:  Okay.  Nothing further.

7              FURTHER REDIRECT EXAMINATION

8    BY MR. QUINN:

9    Q.   Ms. Rhee, counsel just asked you about whether you are

10   aware of any internal MGA documents showing planning for

11   colors and Bratz eyes dated in June of 2000.

12        MS. AGUIAR:  Objection.  Misstates my question.

13   That's not what I asked her.

14        THE COURT:  Rephrase the question, Counsel.

15   Q.   BY MR. QUINN:  Counsel has shown you various documents

16   dated from January of 2001 and asked you whether you had any

17   similar documents from June of 2000.

18        Do you recall being asked that?

19   A.   Yes.

20   Q.   Did you have any of those documents in your files that

21   counsel showed you?

22   A.   I don't know.

23   Q.   Are those the kinds of documents that you keep, or would

24   MGA have all of those documents?

25        MS. AGUIAR:  Objection.  Calls for speculation.

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1          MR. QUINN:  I'm talking about the sketches.

2          THE COURT:  Very good.  Sustain the objection.

3          Rephrase the question.

4     Q.   BY MR. QUINN:  The sketches that you would do for Bratz,

5     what would you do with them?

6     A.   I would turn them in to the designer who asked me to do

7     it.

8     Q.   Do you keep copies of all those?

9     A.   None.

10         MR. QUINN:  Nothing further.

11         THE COURT:  Anything further?

12         MR. NOLAN:  Nothing further.

13         THE COURT:  You are excused, ma'am.  And I'll

14    excuse the jury at this time.  Remember 8:30 tomorrow

15    morning.  We're just doing a half day tomorrow.

16         (WHEREUPON THE JURY WITHDRAWS.)

17         THE COURT:  Please be seated.  I trust at 8:30,

18    then, we'll begin with Ms. Brode.

19         MR. QUINN:  There was a witness, Victoria O'Connor,

20    who had waited a couple of days.  Her mother is having

21    surgery today.  We're going to contact her tonight, and if

22    the surgery went okay, she may be able to come tomorrow.  The

23    Court had indicated it may be acceptable to call her when

24    she's available, and we're hopeful that she will be

25    available.  If so, we would propose to call her tomorrow

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1    morning.

2         THE COURT:  Very well, and then we'll be back to

3    Kerri Brode, Denise O'Neal, and Tkacik.  And what I'll do is

4    meet with counsel at 8:15.  I will rule on the objections,

5    but I really don't have time right now.  But we'll do those

6    at 8:15 in the morning and start trial at 8:30.

7         I'm going to return the exhibit book.  I had to rip

8    out the tab number 10 because I have this penchant for

9    writing my notes on it, and I forgot that it was to be

10   returned to you.  So I stuck a little green tab there to

11   indicate No. 10.

12        If there's nothing else, I'll see you at 8:15

13   tomorrow morning.

14        Oh, we have a note from Juror No. 10.  Juror No. 10

15   asks is the address on the invoice 1613 Ford Avenue, Redondo

16   Beach, Anna Rhee's address, and is the Lupe house different?

17   That's the question that's been asked by the jury.

18        See you tomorrow at 8:15.

19

20        (Proceedings concluded at 5:00 P.M.)

21

22

23

24

25

of Proceedings - PM (Lanker depo; Rhee/direct/cross/redirect/recross/more redirect)  6/3/2008  7:44:00 AM

1

2

3

4

5                    C E R T I F I C A T E

6

7

8         I hereby certify that pursuant to Title 28,

9    Section 753 United States Code, the foregoing is a true and

10   correct transcript of the stenographically reported

11   proceedings in the above matter.

12         Certified on June 3, 2008.

13

14

          _____

15        MARK SCHWEITZER, CSR, RPR, CRR

          Official Court Reporter

16        License No. 10514

17

18

19

20

21

22

23

24

25