1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              EASTERN DIVISION

4                  - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    MATTEL, INC.,              )

                                )

8            PLAINTIFF,   )

                                )

9        VS.              )  NO. CV 04-09049

                                )

10   MGA ENTERTAINMENT, INC., ET. AL.,  )

                                )

11           DEFENDANTS.  )  TRIAL DAY 9

     _____)  MORNING SESSION

12   AND CONSOLIDATED ACTIONS,      )  PAGES 1669-1756

                                )

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17           FRIDAY, JUNE 6, 2008

18              9:27 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR

         FEDERAL OFFICIAL COURT REPORTER

24        3470 12TH STREET, RM. 134

         RIVERSIDE, CALIFORNIA  92501

25            951-274-0844

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                  QUINN EMANUEL
 4                BY:  JOHN QUINN
                      JON COREY
 5                    MICHAEL T. ZELLER
                      HARRY OLIVAR
 6                    TIMOTHY ALGER
                  865 S. FIGUEROA STREET,
 7                10TH FLOOR
                  LOS ANGELES, CALIFORNIA  90017
 8

 9

10    ON BEHALF OF MGA ENTERTAINMENT:

11                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                  BY:  THOMAS J. NOLAN
12                    JASON RUSSELL
                      RAOUL KENNEDY
13                    LAUREN AGUIAR
                      CARL ROTH
14                300 SOUTH GRAND AVENUE
                  LOS ANGELES, CALIFORNIA  90071-3144
15                213-687-5000

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2                                     PAGE

3      PLAINTIFF CASE (CONTINUED)...................... 1673

4

5

6      PLAINTIFF

       WITNESS        DIRECT     CROSS     REDIRECT     RECROSS

7      ISAAC LARIAN (CONT'D)

8      BY MR. PRICE    1673

9

10

11

               EXHIBITS        RECEIVED

12

               13621          1708

13     17252          1733

               4942           1739

14     500            1753

               1701           1754

15

16

17

18

19

20

21

22

23

24

25

1    RIVERSIDE, CALIFORNIA; FRIDAY, JUNE 6, 2008; 9:27 A.M.

2            -OOO-

3    THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

4    MATTEL, INC., V. MGA, INC., ET AL.

5        MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

6    THE RECORD.

7        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8    MATTEL.

9        MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, CARL ROTH ON

10   BEHALF OF MGA AND ISAAC LARIAN.

11       MR. QUINN:  YOUR HONOR, WE HAVE THE TIME ALLOCATIONS

12   FOR THE TKACIK VIDEO; AND THIS IS AGREED BETWEEN THE PARTIES.

13   MGA'S PORTION WAS EIGHT MINUTES, 28 SECONDS; AND MATTEL'S IS

14   NINE MINUTES, 46 SECONDS.

15       THE COURT:  EIGHT MINUTES AND 28 SECONDS; I'LL THROW

16   IN THE 30-SOME SECONDS FROM THE OTHER ONE, AND LET'S JUST CALL

17   IT NINE.

18       MR. NOLAN:  THAT'S GREAT.

19       THE COURT:  THANK YOU, COUNSEL.

20       I'VE DISCUSSED THIS WITH LEAD COUNSEL IN CHAMBERS,

21   BUT JUST FOR THE RECORD, AN ORDER GRANTING MATTEL'S MOTION FOR

22   AN ORDER FINDING THAT CERTAIN DOCUMENTS ARE AUTHENTIC, GRANTING

23   ADVERSE INFERENCE JURY INSTRUCTIONS AND PRECLUDING CERTAIN

24   TESTIMONY -- THE PROPOSED ORDER WAS MISTAKENLY DOCKETED

25   YESTERDAY.  THE COURT HAS NEITHER CONSIDERED NOR RULED ON THAT

1    MOTION.

2          AN ORDER WILL BE ISSUED SHORTLY VACATING THAT ORDER.

3          ARE WE READY TO PROCEED, OR ARE THERE ANY OTHER

4    ISSUES WE NEED TO TAKE UP AT THIS TIME?

5          MR. QUINN:  WE'RE READY.

6          MR. NOLAN:  YES, YOUR HONOR.

7          THE COURT:  VERY WELL.

8          MR. LARIAN, IF YOU WOULD COME BACK TO THE WITNESS

9    STAND; AND I THINK MR. HOLMES IS GETTING THE JURY.

10         (WHEREUPON, JURORS ENTER COURTROOM.)

11         THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.

12         MR. PRICE, YOU MAY PROCEED.

13              DIRECT EXAMINATION

14   BY MR. PRICE:

15   Q   MR. LARIAN, I WANT TO CONTINUE WITH SOME QUESTIONS ABOUT

16   THIS SEPTEMBER 1ST MEETING THAT YOU HAD WITH MR. BRYANT AND

17   VICTORIA O'CONNOR AND PAULA TREANTEFELLAS -- PAULA GARCIA.

18         YOU WERE HERE WHEN MS. O'CONNOR TESTIFIED?

19   A   YES, I WAS.

20   Q   AND DO YOU RECALL HER TESTIFYING THAT ON THAT VERY DAY

21   THAT YOU HAD THIS MEETING, THE DECISION WAS MADE BETWEEN YOU

22   AND PAULA AND HERSELF THAT MGA WAS GOING TO MAKE THIS DOLL

23   NAMED "BRATZ"?

24   A   I HEARD THAT TESTIMONY.

25   Q   AND THAT'S ACCURATE, ISN'T IT?

1    A   IT IS NOT.

2    Q   SO MS. O'CONNOR WAS, IN YOUR VIEW AGAIN, MISTAKEN ON THIS

3    MATTER AS WELL?

4    A   MAYBE SHE HAD THE WRONG RECOLLECTION.  I'M VERY CLEAR IN

5    MY MIND THAT FOR A FEW WEEKS, WE HAD NOT DECIDED TO DO THIS,

6    BECAUSE WE DIDN'T KNOW IF IT COULD EVEN BE MADE INTO A DOLL OR

7    NOT.

8    Q   LET ME ASK YOU ABOUT YOUR RECOLLECTION.

9        DO YOU RECALL YESTERDAY WE PUT UP ON THE OVERHEAD --

10   I THINK IT'S 12842.  DO YOU REMEMBER THAT E-MAIL CONCERNING

11   WHEN BRATZ WAS INTRODUCED?

12   A   WHEN DOES IT SAY IT WAS INTRODUCED?

13   Q   WHERE IT SAYS "...CONCERNED YOU CHANGED BRATZ, ENTER DATE

14   TO OCTOBER WHERE IT SAID TWO HUNDRED, AND YOU SAID OCTOBER 2000

15   FOR LEGAL PURPOSES."

16   A   YES.

17   Q   AND DO YOU RECALL YOUR TESTIMONY THAT YOU BARELY RECALL

18   THIS E-MAIL BECAUSE IT WAS SO LONG AGO?

19   A   I'M SORRY?

20   Q   DO YOU RECALL YOUR TESTIMONY THAT YOU BARELY RECALL THIS

21   E-MAIL BECAUSE IT WAS SO LONG AGO?

22   A   I DON'T REMEMBER THE EXACT E-MAIL.

23   Q   AND DO YOU REMEMBER I WAS ASKING QUESTIONS ABOUT WHETHER

24   YOU HAD A MEETING WITH PAT WILLIAMS AND MARTIN HITCH IN

25   FEBRUARY OF 2001?  DO YOU RECALL THOSE QUESTIONS?

Transcript of Proceedings - AM (I. Larian Direct)  6/6/2008  9:00:00 AM

1    A   YES, I DO.

2    Q   AND YOU SAID, AGAIN, IT'S POSSIBLE YOU DON'T REMEMBER

3    BECAUSE THAT WAS SO LONG AGO.

4    A   I DID.

5    Q   SO WE'RE TALKING ABOUT EVENTS THAT HAPPENED SEVEN, EIGHT

6    YEARS AGO; AND IT'S SOMETIMES DIFFICULT TO REMEMBER THOSE

7    THINGS; CORRECT?

8    A   THAT'S CORRECT.

9    Q   SO LET'S FOCUS, THEN, ON THIS SEPTEMBER 2000 MEETING.

10       YOU DO REMEMBER THAT MR. BRYANT WAS THERE.

11   A   YES.

12   Q   YOU DO REMEMBER THAT HE SHOWED YOU THESE DRAWINGS AND

13   CALLED THEM "BRATZ."

14   A   YES.

15   Q   AND IF YOU GO BACK AND THINK ABOUT IT, YOU REALLY DON'T

16   RECALL ONE WAY OR ANOTHER -- IT'S POSSIBLE HE DID; IT'S

17   POSSIBLE HE DIDN'T -- WHETHER HE SAID THAT HE WORKED ON THESE

18   DRAWINGS AT NIGHTS AND ON WEEKENDS?

19   A   I'M SORRY.  CAN YOU REPEAT THAT.

20   Q   YOU DON'T REALLY RECALL WHETHER IN THIS MEETING, WHEN

21   MR. BRYANT PRESENTED THESE DRAWINGS TO YOU, WHETHER HE SAID

22   THAT HE WORKED ON THESE DRAWINGS AT NIGHTS OR ON THE WEEKENDS?

23   A   HE TOLD ME HE DID THEM IN 1998, WHEN HE WAS IN MISSOURI,

24   ON NIGHTS AND WEEKENDS.

25   Q   SO SITTING BACK EIGHT YEARS AGO, YOU HAVE A SPECIFIC

1  RECOLLECTION THAT MR. BRYANT TOLD YOU THAT HE WORKED ON THESE

2  IN 1998; IS THAT RIGHT?

3  A   YES, I DO.

4  Q   AND DID HE TELL YOU THAT HE HAD WORKED AT MATTEL BETWEEN

5  APRIL '95 AND APRIL 1998?

6  A   NO, NOT TO THAT DETAIL.  HE TOLD ME HE WORKED AT MATTEL

7  RIGHT NOW.

8  Q   HE TOLD YOU AT THAT TIME HE WORKED AT MATTEL?

9  A   CORRECT; IN SEPTEMBER OF 2000.

10  Q   AND IF MS. O'CONNOR TESTIFIED SHE HAS NO RECOLLECTION OF

11  THERE BEING ANY DISCUSSION AS TO WHEN MR. BRYANT CREATED THESE

12  DRAWINGS, SHE WOULD BE, AGAIN, INCORRECT.

13  A   HER RECOLLECTION WOULD BE WRONG AGAIN.  I HEARD HER SAY

14  THAT THE CONTRACT WAS SIGNED ON SEPTEMBER 18TH, AND WHEN YOU

15  SHOWED HER, OR MR. NOLAN SHOWED HER, THE CONTRACT, THE TIME

16  STAMP ON THE BOTTOM, WHERE IT SAYS OCTOBER 4TH, SHE SAID,

17  'OKAY, MAYBE IT WAS DONE ON OCTOBER 4, 2000.'

18  Q   LET ME ASK YOU THIS, SIR:  IT'S TRUE, IS IT NOT, THAT,

19  SITTING THERE IN SEPTEMBER, YOU NEVER TOLD MR. BRYANT AT THAT

20  MEETING THAT IF HE CREATED THESE DOLLS WHILE THEY WERE AT

21  MATTEL, THAT THAT WASN'T SOMETHING YOU WERE INTERESTED IN?

22  A   THERE WERE NO DOLLS THAT HE WAS SHOWING US IN SEPTEMBER 1,

23  2000, WITH THE DRAWINGS.

24      ARE YOU REFERRING TO THE DRAWINGS?

25  Q   LET ME REPHRASE IT SO THAT WE'RE NOT BICKERING ABOUT

1    DEFINITIONS HERE.

2        IT'S TRUE, IS IT NOT, THAT IN THAT MEETING, YOU HAVE

3    NO RECOLLECTION OF SAYING TO MR. BRYANT THAT IF HE HAD MADE ANY

4    OF THESE DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

5    WAS AT MATTEL, YOU DIDN'T WANT THEM?  YOU DON'T RECALL SAYING

6    ANYTHING LIKE THAT?

7    A    NO.  I RECALL SAYING TO HIM THAT IF THIS WAS SOMETHING

8    THAT WAS DONE AT MATTEL, I WAS -- I HAD NO INTEREST IN IT.

9        MR. PRICE:  IF WE COULD PLAY FROM PAGE 439,

10   VOLUME II.

11       THE WITNESS:  WHICH VOLUME IS THAT, SIR?

12       MR. PRICE:  PAGE 439, LINE 7 TO LINE 14.

13       THE WITNESS:  WHICH VOLUME IS THAT, PLEASE?

14       MR. PRICE:  SECOND VOLUME.  IT'S MARCH 26, 2008;

15   439, LINE 7 THROUGH LINE 14.

16       MR. NOLAN:  NO OBJECTION, YOUR HONOR.

17       THE COURT:  YOU MAY READ, OR PLAY IT.

18       (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

19       (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL.)

20       "Q.  NOW, DURING THAT MEETING DID YOU TELL

21   CARTER BRYANT THAT IF HE HAD MADE ANY OF THOSE

22   DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

23   WAS A MATTEL EMPLOYEE THAT M.G.A. DID NOT WANT THEM?

24   A.  I DON'T RECALL HAVING THAT -- HAVING SAID

25       THAT.

1      Q.  WAS THAT EVER CONVEYED TO HIM?

2      A.  I DON'T KNOW.  I DON'T THINK SO."

3      (END OF EXERPT PROVIDED.)

4        MR. NOLAN:  YOUR HONOR, IT'S NOT FROM THE SAME

5    DEPOSITION.  IT'S FROM THE FIRST VOLUME, JULY 18TH OF 2006.

6    THIS WAS JUST HANDED UP TO ME FOR COMPLETION PURPOSES.  OR I

7    COULD DO IT IN MY DIRECT.

8        MR. PRICE:  I THOUGHT THE COMPLETENESS APPLIES -- WE

9    WERE TALKING ABOUT IT EARLIER --

10       THE COURT:  CLARIFY FOR THE RECORD, COUNSEL, THE DATE

11   OF THE DEPOSITION.

12       MR. PRICE:  THE DATE OF THE DEPOSITION I PLAYED WAS

13   MARCH 26, 2008.  THE DATE MR. NOLAN WANTS TO PLAY IS JULY 18,

14   2006.

15       MR. NOLAN:  CORRECT, YOUR HONOR.  AND I'LL PLAY IT

16   DURING MY EXAMINATION.

17       THE COURT:  VERY WELL.

18       YOU MAY PROCEED.

19   BY MR. PRICE:

20   Q   IN FACT, MR. LARIAN, SITTING THERE IN THAT MEETING, YOUR

21   VIEW WAS -- IT WOULDN'T HAVE BEEN A PROBLEM TO YOU IF

22   CARTER BRYANT HAD CREATED OR MADE ANY OF THESE DRAWINGS WHEN HI

23   WAS EMPLOYED AT MATTEL; THAT WOULDN'T HAVE BOTHERED YOU AT ALL?

24   A   THAT IS NOT CORRECT.  IF HE HAD MADE THESE DRAWINGS OR HAD

25   DONE ANYTHING WITH THEM AT MATTEL, I WAS NOT -- OR ANYWHERE

1    ELSE, ANY OTHER TOY COMPANY -- I WAS NOT INTERESTED.

2        MR. PRICE:  I'D LIKE TO PLAY FROM MARCH 26, 2008,

3    PAGE 450, LINES 10 THROUGH 17.

4        THE COURT:  ANY OBJECTION?

5        MR. NOLAN:  NO OBJECTION.

6        THE COURT:  YOU MAY PLAY.

7        (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

8        (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

9        "Q.  WOULD IT HAVE BEEN A PROBLEM IF CARTER.

10    BRYANT HAD CREATED OR MADE ANY OF HIS DRAWINGS WHEN

11    HE WAS EMPLOYED BY MATTEL IN YOUR VIEW?

12    A.  NO.

13    Q.  WHY NOT?

14    A.  BECAUSE I DON'T THINK, WHETHER IT'S M.G.A.

15    OR MATTEL, WE OWN THE PEOPLE, ESPECIALLY THE

16    CREATIVE PEOPLE, FOREVER."

17        (END OF EXERPT PROVIDED.)

18    BY MR. PRICE:

19    Q    MR. LARIAN, YOU BELIEVE IN THE GOLDEN RULE; RIGHT?

20    A    WHAT'S THE GOLDEN RULE?

21    Q    THE SAME RULES SHOULD APPLY TO YOU AS TO EVERYBODY ELSE.

22    A    YES.

23    Q    IF WE CAN LOOK AT EXHIBIT 1117, WHICH IS ALREADY IN

24    EVIDENCE, THE THIRD PAGE.

25        NOW, YOU SEE EXHIBIT 1117 WE SPOKE ABOUT YESTERDAY.

1       THIS IS THE AGREEMENT THAT MS. GARCIA SIGNED WITH MGA

2   IN APRIL OF 2000; IS THAT CORRECT?

3   A   CORRECT.

4   Q   AND AS WE DISCUSSED YESTERDAY, YOU UNDERSTAND THAT UNDER

5   HER CONTRACT WITH MGA, IF SHE CAME UP WITH ANYTHING THAT

6   RELATED TO THE COMPANY'S WORK WHILE SHE WAS AT MGA, THAT

7   BELONGED TO MGA; RIGHT?

8   A   THAT'S WHAT THE CONTRACT SAID, YES.

9   Q   YET, YOUR TESTIMONY UNDER OATH WAS THAT IT WOULD NOT HAVE

10  BEEN A PROBLEM FOR YOU IF CARTER BRYANT HAD CREATED OR MADE ANY

11  OF HIS DRAWINGS WHEN HE WAS EMPLOYED BY MATTEL; THAT WAS YOUR

12  TESTIMONY UNDER OATH; CORRECT?

13  A   I DID NOT SAY ANY OF HIS DRAWINGS.  HE HAD DONE HIS

14  INITIAL DRAWINGS IN 1998 IN MISSOURI, AND AFTER -- WHEN HE WAS

15  NOT WORKING AT MATTEL -- AND AFTERWARD, IF HE WAS WORKING ON

16  THEM AND REFINING THEM WHILE HE WAS STILL WORKING AT MATTEL, I

17  WOULDN'T SEE ANY PROBLEM WITH THAT.

18  Q   MR. LARIAN, YOU DON'T RECALL ANY STORY ON SEPTEMBER 1,

19  2000, ABOUT MR. BRYANT CREATING THESE DRAWINGS BETWEEN A SMALL

20  EIGHT-MONTH WINDOW, BETWEEN TWO STINTS AT MATTEL, DO YOU?

21  A   I'M NOT TELLING STORIES.  I'M TELLING THE TRUTH HERE.

22  Q   YOU SAID THAT YOU WERE NOT REFERRING TO -- YOU DIDN'T SAY

23  THAT IT WOULDN'T BOTHER YOU IF ANY OF HIS DRAWINGS --

24      LET'S PUT UP THE TRANSCRIPT OF WHAT WE JUST LOOKED

25  AT, THEN; PAGE 450, LINE 10 THROUGH 17.

1         THE QUESTION WAS, "WOULD IT HAVE BEEN A PROBLEM IF

2    CARTER BRYANT HAD CREATED OR MADE ANY OF HIS DRAWINGS WHEN HE

3    WAS EMPLOYED BY MATTEL, IN YOUR VIEW?"

4         "NO."

5         AND THEN IT GOES ON.

6    BY MR. PRICE:

7    Q    THIS IS ONE OF THOSE TRANSCRIPTS THAT YOU ACTUALLY

8    REVIEWED; CORRECT?

9    A    YES.  AND MAYBE AT THE TIME, WHEN MR. ZELLER WAS ASKING ME

10   THOSE QUESTIONS, I DID NOT PAY ATTENTION TO THE WORD "ANY."

11   AND I APOLOGIZE FOR THAT.

12   Q    MY QUESTION IS DIFFERENT.

13        THIS IS ONE OF THOSE TRANSCRIPTS THAT YOU ACTUALLY,

14   AFTERWARDS, READ AND MADE CORRECTIONS ON; CORRECT?

15   A    I BELIEVE I DID, YES.

16   Q    IN FACT, YOU MADE CORRECTIONS TO THE TRANSCRIPT.

17   A    I BELIEVE I DID, YES.

18   Q    THEN YOU SIGNED AT THE LAST PAGE WHERE IT SAYS, "I DECLARE

19   UNDER PENALTY OF PERJURY THAT THIS IS AN ACCURATE TRANSCRIPT."

20   A    I DID.

21   Q    YOU DID NOT CORRECT THE ANSWER THAT WE PLAYED UNDER OATH,

22   WHICH IS THAT IT WOULDN'T HAVE BEEN A PROBLEM IF MR. BRYANT HAD

23   CREATED OR MADE ANY OF HIS DRAWINGS WHEN HE WAS EMPLOYED BY

24   MATTEL?  YOU DIDN'T CORRECT THAT, DID YOU?

25   A    NO.  I MISSED THAT ONE.  I'M SORRY.  I APOLOGIZE.

1    Q   NOW, IT'S YOUR TESTIMONY THAT YOU ASKED

2    VICTORIA O'CONNOR --

3    A   YES.

4    Q   -- TO LOOK INTO WHETHER OR NOT CARTER BRYANT ACTUALLY

5    OWNED THE DRAWINGS.

6    A   I TOLD VICTORIA O'CONNOR, TO THE BEST OF MY RECOLLECTION,

7    TO MAKE SURE THAT THE STORY HE WAS TELLING US IS TRUE, THAT HE

8    DID THESE IN 1998, WHEN HE WAS IN MISSOURI.  AND I BELIEVE HE

9    DID THAT -- I MEAN, SHE DID THAT.  I'M SORRY.

10   Q   ACTUALLY, SIR, ISN'T IT TRUE THAT YOU ASKED

11   VICTORIA O'CONNOR TO MAKE SURE THAT HIS DRAWINGS DIDN'T BELONG

12   TO ANOTHER DESIGNER OR ANOTHER PERSON, BECAUSE YOU HAD NO

13   CONCERNS, REALLY, ABOUT WHETHER THEY BELONGED TO MATTEL?

14   A   I'M SORRY.  I DON'T UNDERSTAND YOUR QUESTION.

15   Q   SURE.

16       ISN'T IT TRUE THAT BECAUSE YOU WOULDN'T HAVE HAD ANY

17   PROBLEM IF HE HAD DRAWN THESE WHEN HE WAS AT MATTEL, WHAT YOU

18   ASKED VICTORIA O'CONNOR TO LOOK INTO WAS, ACCORDING TO YOU,

19   WHETHER OR NOT THESE DRAWINGS BELONGED TO ANOTHER DESIGNER?

20   A   THAT'S NOT CORRECT.  I WANTED TO MAKE SURE THAT IF HE WAS

21   TELLING US THAT HE HAD DONE THESE IN 1998, WHEN HE WAS LIVING

22   WITH HIS PARENTS IN MISSOURI, IF THAT'S WHAT HE IS SAYING, TO

23   MAKE SURE THAT STORY IS TRUE.  AND SHE DID VERIFY THAT IT WAS

24   TRUE.

25       MR. PRICE:  YOUR HONOR, IF WE COULD PLAY FROM

1   MR. LARIAN'S DEPOSITION TRANSCRIPT, VOLUME II, MARCH 26, 2008,

2   457.

3        THE COURT:  YOU SAID LINE 2 THROUGH --

4        MR. PRICE:  LINE 15 THROUGH 23, PAGE 457.

5        THE COURT:  VERY WELL.

6        ANY OBJECTION, MR. NOLAN?

7        MR. NOLAN:  I WOULD JUST ASK UP TO PAGE 458, LINE 16,

8   FOR COMPLETENESS.

9        MR. PRICE:  NO OBJECTION TO THAT AT ALL.

10       THE COURT:  VERY WELL.

11       (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

12       (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

13        "Q.   WHAT IS IT YOU ASKED VICTORIA O'CONNOR TO

14   CONFIRM?

15    A.   TO GO AHEAD AND MAKE SURE THAT IF HE SAYS

16   THESE DRAWINGS BELONG TO HIM, THAT IN FACT THESE

17   DRAWINGS BELONG TO HIM AND -- AND NOT -- AND NOT --

18   THAT'S -- THAT'S ALL I'M GOING TO ANSWER.

19    Q.   AND -- AND NOT TO WHOM?

20    A.   NOT, FOR EXAMPLE, ANOTHER DESIGNER, ANOTHER

21   ARTIST.

22    Q.   WERE YOU CONCERNED THAT CARTER BRYANT'S

23   DRAWINGS MIGHT BELONG TO ANOTHER DESIGNER OR ARTIST?

24    A.   NO.  I BELIEVED WHAT HE SAID; I JUST -- AS

25   A PRUDENT BUSINESSMAN, I JUST WANTED TO MAKE SURE

1    THAT WHAT HE WAS SAYING WAS RIGHT BEFORE WE GO AHEAD

2    AND INVEST A LOT OF MONEY IN SOMETHING.

3    Q.  DID YOU ASK VICTORIA O'CONNOR TO CONFIRM

4    THAT CARTER BRYANT HAD MADE THE DRAWINGS THAT HE

5    SHOWED YOU IN 1998?

6    A.  NOT AS SPECIFIC LIKE THAT.  I JUST TOLD --

7    TOLD HER WHAT I JUST TOLD YOU EARLIER.

8    Q.  DID VICTORIA O'CONNOR EVER COME BACK AND

9    TELL YOU WHETHER OR NOT SHE HAD CONFIRMED WHEN

10   CARTER BRYANT HAD MADE THE DRAWINGS?

11   A.  DIRECTLY TO ME?

12   Q.  YES.

13   A.  I DON'T RECALL.  SHE MIGHT HAVE.  I DON'T

14   RECALL IT WITHOUT LOOKING AT DOCUMENTS."

15   (END OF EXERPT PROVIDED.)

16   BY MR. PRICE:

17   Q   NOW, YOUR TESTIMONY, MR. LARIAN, IS THAT SOMEONE CAME BACK

18   AND SAID, YES, MR. BRYANT MADE THESE DRAWINGS IN 1998.

19   A   SPECIFICALLY, HIS ATTORNEY, ANNE WANG; AND I HAVE SEEN AN

20   E-MAIL TO THAT EFFECT.

21       MR. PRICE:  YOUR HONOR, MOVE TO STRIKE THE ANSWER.

22       THE COURT:  IT'S NONRESPONSIVE.

23       JUST ANSWER THE QUESTION.

24   BY MR. PRICE:

25   Q   IT'S A YES OR NO QUESTION.

1       YOUR TESTIMONY IS THAT -- AND THIS IS, I THINK, A YES

2    OR NO QUESTION -- IS THAT, ESSENTIALLY, AT SOME POINT, SOMEONE

3    CAME TO YOU AND SAID, 'I CONFIRM CARTER BRYANT DID THIS IN

4    1998'?

5    A    THAT IS CORRECT.

6    Q    AND ACCORDING TO YOUR TESTIMONY, ACCORDING TO YOU, WHETHER

7    CARTER BRYANT DID IT IN 1998 HAD NO SIGNIFICANCE AT ALL AS TO

8    WHETHER OR NOT MATTEL MIGHT HAVE RIGHTS TO THOSE DRAWINGS.

9        IS THAT YOUR TESTIMONY?

10   A    MY TESTIMONY IS THAT IF HE DID THESE IN 1998, WHEN HE WAS

11   NOT WORKING AT MATTEL, THEN THERE WAS NO QUESTION THAT THOSE

12   BELONGED TO HIM AND HE COULD DO WHATEVER HE WANTED TO DO WITH

13   THEM.

14   Q    ISN'T THE TRUTH OF THE MATTER, SIR, THAT IN THIS TIME

15   FRAME, IT DIDN'T MATTER TO YOU WHETHER MATTEL HAD RIGHTS TO

16   THESE DRAWINGS?

17   A    THAT'S NOT CORRECT.  AT THAT TIME, I WANTED TO KNOW IF --

18   TWO THINGS WERE IN MY MIND:  A, DID THEY BELONG TO HIM; AND, B,

19   CAN THEY BE MADE INTO A DOLL; CAN WE MAKE A DOLL FROM THIS?

20       MR. PRICE:  YOUR HONOR, IF I COULD PLAY FROM 459,

21   LINE 12, THROUGH 460, LINE 3.

22       MR. NOLAN:  WE WOULD ASK THAT WE CONTINUE THROUGH TO

23   PAGE 460, LINE 20.

24       MR. PRICE:  ABSOLUTELY.

25       THE COURT:  VERY WELL.

1          (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

2           (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

3           "Q.   WAS THE FACT THAT CARTER BRYANT'S LAWYER

4          REPRESENTED TO M.G.A. THAT CARTER BRYANT HAD DONE

5          THE DRAWINGS IN 1998 IN MISSOURI WHEN HE WAS NOT A

6          MATTEL EMPLOYEE HAVE ANY SIGNIFICANCE TO YOU AT THAT

7          TIME?

8          A.   IT -- HE CONFIRMED WHAT CARTER BRYANT HAD

9          TOLD US.

10         Q.   AND DID YOU FIND SOME COMFORT IN THIS?

11         A.   OF COURSE.

12         Q.   AND WHY WAS THAT?

13         A.   BECAUSE, YOU KNOW, I HOPED THE LAWYERS IN

14         COURT -- YOUR PROFESSION TELL THE TRUTH.

15         Q.   WELL, YOU THOUGHT THAT IT WOULD HAVE SOME

16         SIGNIFICANCE TO WHETHER OR NOT MATTEL MIGHT HAVE

17         RIGHTS TO THOSE DRAWINGS; IS THAT TRUE?

18         A.   NO.

19         Q.   WELL, THEN, PLEASE TELL ME WHAT COMFORT YOU

20         DERIVED FROM THE FACT THAT THIS, AS YOU DESCRIBE IT,

21         CONFIRMED WHAT CARTER BRYANT HAD TOLD YOU ABOUT

22         CREATING THESE DRAWINGS IN 1998 IN MISSOURI WHEN HE

23         WAS NOT EMPLOYED BY MATTEL.

24         A.   BESIDE WHAT I JUST TESTIFIED, I HAVE

25         NOTHING ELSE TO ADD.

1    Q.  SO YOU WERE JUST COMFORTED BY THE FACT THAT

2    HE HAD TOLD YOU THE TRUTH?

3    A.  AND HIS LAWYER CONFIRMED IT.

4    Q.  AND BEYOND THAT IT HAD NO SIGNIFICANCE TO

5    YOU; IS THAT TRUE?

6    A.  THAT'S TRUE."

7    (END OF EXERPT PROVIDED.)

8  BY MR. PRICE:

9  Q   THIS, AGAIN, IS TESTIMONY THAT YOU DID NOT CORRECT.

10    I'M GOING TO GET A DOUBLE NEGATIVE HERE.  I'LL REASK

11  IT.

12    WHEN YOU WERE ASKED, "WELL, YOU THOUGHT IT WOULD HAVE

13  SOME SIGNIFICANCE TO WHETHER OR NOT MATTEL MIGHT HAVE RIGHTS TO

14  THOSE DRAWINGS; IS THAT TRUE?"  AND YOU ANSWERED "NO," THIS IS

15  NOT AN ANSWER UNDER OATH THAT YOU CORRECTED WHEN YOU WENT

16  THROUGH THE TRANSCRIPT.

17  A   NO.  THERE WAS NOTHING TO CORRECT.  WHAT I SAID WAS THAT

18  HIS LAWYER HAD CONFIRMED THAT HE HAD DONE THIS IN 1998, AND HE

19  HAD SAID THE SAME THING; SO THERE WAS NOTHING TO CORRECT.  THEY

20  DIDN'T BELONG TO MATTEL.

21  Q   MY QUESTION WAS DIFFERENT, SIR.

22    FIRST, THE QUESTION WAS WHETHER OR NOT THAT WOULD

23  HAVE ANY SIGNIFICANCE TO YOU WITH RESPECT TO WHETHER OR NOT

24  MATTEL HAD RIGHTS TO THE DRAWINGS.

25    YOUR ANSWER WAS, 'IT HAD NOTHING TO DO -- NO, IT HAD

1    NOTHING TO DO WITH THAT.'

2        DID YOU CORRECT YOUR ANSWER OF 'NO' IN THAT

3    TRANSCRIPT?

4    A   I DID NOT, BECAUSE, AGAIN, HIS LAWYER HAD CONFIRMED THAT

5    HE HAD DONE THIS IN 1998 IN MISSOURI, AS HE HAD SAID, AND THERE

6    WAS NOTHING FOR ME TO CORRECT.

7    Q   THE QUESTION YOU WERE ASKED, IF THAT, IN FACT, HAPPENED,

8    WHETHER THAT WOULD HAVE SOME SIGNIFICANCE TO YOU AS TO WHETHER

9    OR NOT MATTEL MIGHT HAVE RIGHTS TO THOSE DRAWINGS.

10   A   TO ME, THAT WAS A HYPOTHETICAL QUESTION, THAT WAS NOT THE

11   FACT.  THE FACT WAS, AND IS, THAT HE DID THESE DRAWINGS IN 1998

12   WHEN HE WAS IN MISSOURI LIVING WITH HIS PARENTS.  AND HE COULD

13   PROVE THAT.

14   Q   BY THE WAY, YOU WERE HERE WHEN MS. O'CONNOR DENIED THAT

15   YOU EVER DIRECTED HER TO FIND OUT WHEN THE DRAWINGS WERE

16   CREATED.

17   A   YES.  BUT THERE ARE E-MAILS IN HERE THAT I GUESS YOU DID

18   NOT WANT TO SHOW HER.

19        MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE AFTER

20   "YES."

21        THE COURT:  STRIKE AFTER "YES."  "YES" IS THE ANSWER.

22   BY MR. PRICE:

23   Q   I TAKE IT YOU'RE SAYING HER TESTIMONY THAT YOU DID NOT

24   DIRECT HER TO DO THIS IS MISTAKEN?

25   A   HER TESTIMONY IS A MISTAKE.  AND I HAVE SEEN E-MAILS TO

1    THAT EFFECT.

2        MR. PRICE:  MOVE TO STRIKE, YOUR HONOR.

3        THE COURT:  JUST TRY TO ANSWER THE QUESTION,

4    MR. LARIAN.

5        THAT LAST PORTION IS STRICKEN.

6    BY MR. PRICE:

7    Q    AND YOU SAID YOU WANTED TO CONFIRM A STORY ABOUT 1998.

8        I BELIEVE YOU SAID THAT EVEN IF IT HAD NO

9    SIGNIFICANCE AS TO WHETHER MATTEL OWNED THE DRAWINGS, YOU DID

10   WANT TO CONFIRM THAT CARTER BRYANT WAS TRUTHFUL.

11   A    YES.

12   Q    NOW, OBVIOUSLY, IF YOU WANT TO INVESTIGATE SOMEONE'S

13   WORD --

14   A    CAN YOU REPEAT THAT QUESTION AGAIN, BECAUSE I THINK IT WAS

15   A LITTLE BIT CONVOLUTED.  CAN YOU REPEAT THAT FIRST QUESTION

16   ONE MORE TIME.

17   Q    YOU WANTED TO CONFIRM CARTER BRYANT WAS TRUTHFUL.

18   A    YES, I WANTED TO MAKE SURE WHAT HE WAS TELLING US WAS THE

19   TRUTH.

20   Q    NOW, OBVIOUSLY, IF YOU WANT TO INVESTIGATE SOMEONE'S WORD,

21   YOU HAVE TO GO BEHIND HIS WORD; RIGHT?

22   A    THAT'S WHAT WE DID.  YES.

23   Q    IF YOU REALLY WANT TO DO AN INVESTIGATION, YOU HAVE TO GO

24   BEHIND HIS WORD; YOU CAN'T JUST TAKE HIS WORD FOR IT AGAIN;

25   RIGHT?

1  A   I TOOK HIS WORD.  BUT AS A PRUDENT BUSINESSMAN, I ALSO

2  DIRECTED OUR HEAD OF LICENSING TO CHECK WITH OUR ATTORNEY AND

3  HIS ATTORNEY TO MAKE SURE WHAT HE WAS TELLING ME WAS TRUE.  AND

4  THEY DID.  AND HE CAME BACK AND SAID IT IS TRUE.  HIS ATTORNEY

5  CAME BACK IN WRITING SAYING THAT HE DID THIS IN 1998.

6  Q   NOW, LET'S SEE IF WE CAN LISTEN TO MY QUESTION.

7      WHAT YOU WANTED TO DO, ACCORDING TO YOU, WAS TO SEE

8  WHETHER OR NOT MR. BRYANT'S WORD WAS TRUE; CORRECT?

9  A   YES; THAT HE HAD DONE THIS IN 1998, IN MISSOURI; I WANTED

10  TO MAKE SURE THAT'S TRUE.  AND THAT CAME BACK TO BE TRUE.

11  Q   AND, OBVIOUSLY, IF YOU REALLY WANTED TO DETERMINE THAT,

12  YOU WOULDN'T JUST GO ASK MR. BRYANT AGAIN, 'HEY, DO THESE

13  BELONG TO YOU?'  YOU WOULDN'T TRUST HIS WORD TO TEST HIS WORD.

14  A   I DON'T THINK I UNDERSTAND YOUR QUESTION, SIR.

15  Q   YOU'RE SAYING MR. BRYANT TOLD YOU SOMETHING; CORRECT?

16  A   CORRECT.

17  Q   YOU WANTED TO SEE WHETHER OR NOT WHAT HE TOLD YOU WAS

18  TRUE, ACCORDING TO YOU.

19  A   CORRECT.

20  Q   AND YOU WANTED TO DO A REAL INVESTIGATION, NOT JUST

21  SOMETHING YOU COULD SHOW LATER AND SAY, 'SEE, I LOOKED INTO

22  IT.'

23  A   BESIDES THAT INVESTIGATION, I DIDN'T KNOW WHAT ELSE YOU

24  WANTED ME TO DO.  HIRE PRIVATE DETECTIVES?

25  Q   BY THE WAY, WAS IT YOUR TESTIMONY THAT MR. BRYANT'S

1    ATTORNEY CAME BACK IN WRITING WITH SOMETHING?

2        THAT'S A YES OR NO QUESTION.

3    A   CAN YOU ASK THE QUESTION AGAIN.

4    Q   ARE YOU TESTIFYING MR. BRYANT'S ATTORNEY PROVIDED YOU

5    SOMETHING IN WRITING?

6    A   OUR ATTORNEY --

7    Q   NO, NO.  MY QUESTION IS, DID MR. BRYANT'S ATTORNEY PROVIDE

8    YOU SOMETHING IN WRITING?

9    A   TO ME PERSONALLY?  NO.

10   Q   NOW, MY QUESTION IS THIS:  IF YOU WERE TO FIND OUT WHETHER

11   SOMEONE'S WORD IS ACCURATE, AND YOU WANTED TO DO A REAL

12   INVESTIGATION AND NOT JUST A SHOW, WOULDN'T YOU DO SOMETHING

13   BESIDES JUST ASK THEM, 'HEY, DID YOU REALLY MEAN THAT'?

14   A   WHAT I DID IS -- NO.  THAT'S NOT HOW I -- MAYBE LAWYERS DO

15   IT LIKE THAT, BUT I DON'T.  I DID NOT.

16   Q   SO YOUR TESTIMONY IS THAT MR. BRYANT TOLD YOU SOMETHING;

17   RIGHT?

18   A   RIGHT.

19   Q   YOU WANTED TO SEE WHETHER OR NOT WHAT MR. BRYANT TOLD YOU

20   WAS TRUE; CORRECT?

21   A   RIGHT.

22   Q   AND SO THEN YOU HAD MR. BRYANT'S LAWYER GO AND ASK HIM,

23   'WILL YOU TELL ME THE SAME THING?'

24   A   NO.  THAT'S NOT WHAT HAPPENED.

25   Q   WELL, SIR, ISN'T THAT EXACTLY WHAT YOU'RE SAYING HAPPENED,

1    THAT MR. BRYANT'S LAWYER -- AND YOU SAID YOU ASKED HIM THE SAME

2    QUESTION AND GOT THE SAME ANSWER AND SAID, 'I GOT THE SAME

3    ANSWER.'

4    A    NO.  THIS IS NOT EXACTLY THE SEQUENCE OF EVENTS THAT

5    HAPPENED.

6        I DIRECTED VICTORIA O'CONNOR TO MAKE SURE, TO FIND

7    OUT, THAT IF HE SAID HE HAD DONE THIS IN 1998 IN MISSOURI, THAT

8    HE HAD.

9        SHE WENT TO OUR ATTORNEY, DAVID ROSENBAUM, WHO WENT

10   TO CARTER BRYANT'S ATTORNEY AND ASKED THIS.  CARTER BRYANT'S

11   ATTORNEY CAME BACK LATER ON -- AND I HAVE SEEN AN E-MAIL TO

12   THAT EFFECT -- AND SAID SHE HAD INVESTIGATED AND THAT HIS STORY

13   WAS TRUE, THAT HE HAD DONE THIS IN 1998 WHEN HE WAS IN

14   MISSOURI.

15       MR. PRICE:  MOVE TO STRIKE A REFERENCE TO ANY

16   E-MAILS, GIVEN THE COURT'S ORDER.

17       THE COURT:  OVERRULED.

18   BY MR. PRICE:

19   Q    SIR, ISN'T IT TRUE THAT THE ONLY THING THAT HAPPENED WAS,

20   YOUR ATTORNEY WENT TO MR. BRYANT'S ATTORNEY AND SAID, 'SEE IF

21   HE'LL TELL YOU THE SAME THING THAT HE'S TOLD US'?

22       MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

23   FOUNDATION WITH RESPECT TO CONVERSATIONS THAT WERE GOING ON,

24   WHETHER MR. LARIAN WAS PRESENT OR NOT.

25       THE COURT:  SUSTAINED.

1          JUST FOUNDATION, COUNSEL.

2     BY MR. PRICE:

3     Q   SO SITTING HERE TODAY, YOU HAVE ABSOLUTELY NO IDEA WHAT

4     MR. BRYANT'S ATTORNEY SAID TO YOUR ATTORNEY.  THERE'S NO

5     FOUNDATION FOR THAT.

6          MR. NOLAN:  OBJECTION.  MR. PRICE IS POINTING TO ME.

7     I WAS NOT --

8          THE COURT:  COUNSEL, REPHRASE YOUR QUESTION.

9          PLEASE, NO SPEAKING OBJECTIONS, COUNSEL.

10    BY MR. PRICE:

11    Q   IS IT CORRECT THAT YOU HAVE NO IDEA WHAT MR. BRYANT'S

12    ATTORNEY -- WELL, LET'S TAKE IT IN STEPS.

13         YOU HAVE NO IDEA WHAT MR. BRYANT'S ATTORNEY DID AS

14    PART OF THIS INVESTIGATION; CORRECT?

15    A   I PERSONALLY HAVE NO DIRECT KNOWLEDGE OF THAT, NO.

16    Q   AND YOU HAVE NO DIRECT KNOWLEDGE AS TO WHAT MR. BRYANT'S

17    ATTORNEY AND YOUR ATTORNEY TALKED ABOUT; YOU HAVE NO DIRECT

18    KNOWLEDGE.

19    A   YES, I DO.  I HAVE SEEN AN E-MAIL TO THE EFFECT.

20    Q   BY "DIRECT KNOWLEDGE," I THINK THE QUESTION IS, WERE YOU

21    THERE?  WERE YOU PART OF THE CONVERSATION?  DID YOU HEAR IT?

22    A   NO, I WAS NOT PART OF THE CONVERSATION OR -- I WAS NOT

23    PART OF THE CONVERSATION TO HEAR SOMETHING.

24    Q   CERTAINLY, IT'S FAIR TO SAY THAT YOU WOULD NOT BE

25    SATISFIED -- IF YOU WERE TRYING TO FIND OUT WHETHER MR. BRYANT

1    WAS TRUTHFUL, YOU WOULDN'T BE SATISFIED WITH AN INVESTIGATION

2    THAT CONSISTED MERELY OF GOING TO MR. BRYANT AND SAYING, 'WILL

3    YOU TELL ME THAT YOU CREATED THIS WHEN YOU WEREN'T WITH

4    MATTEL'?

5    A    I WAS SATISFIED WHEN WE GOT CONFIRMATION BACK FROM

6    VICTORIA O'CONNOR THAT HIS LAWYER, CARTER BRYANT'S LAWYER,

7    AFTER INVESTIGATION, HAD TESTIFIED -- HAD SENT CONFIRMATION

8    THAT HE HAD DONE THIS.

9        FURTHERMORE, IF YOU LOOK AT CARTER BRYANT'S CONTRACT

10   WITH US --

11       MR. PRICE:  YOUR HONOR, MOVE TO STRIKE NOW AS

12   NONRESPONSIVE.

13       THE COURT:  I'LL STRIKE THAT.

14       RESTATE THE QUESTION -- LET THE COURT REPORTER REREAD

15   THE QUESTION.

16       MR. PRICE:  YES.

17       (WHEREUPON, THE LAST QUESTION WAS READ

18        BACK BY THE COURT REPORTER.)

19       THE COURT:  COUNSEL, REPHRASE THE QUESTION.

20       PERHAPS THE CONFUSION WAS IN THE LENGTH OF THE --

21   IT'S A COMPLICATED QUESTION.

22       THE WITNESS:  I WAS GOING TO ASK THAT.  THANKS.

23       THE COURT:  FAIR ENOUGH.

24       REPHRASE.

25   / / /

1    BY MR. PRICE:

2    Q   MR. LARIAN, AS CEO, TRYING TO INVESTIGATE WHETHER SOMEONE

3    SAID THE TRUTH --

4    A   YES.

5    Q   -- WOULD YOU BE SATISFIED WITH AN INVESTIGATION THAT

6    CONSISTED OF NO MORE THAN SOMEONE ELSE GOING TO THAT PERSON AND

7    SAYING, 'DID YOU SAY THE TRUTH?'

8        MR. NOLAN:  OBJECTION.  ASSUMES FACTS NOT IN

9    EVIDENCE.  IT'S ALSO ARGUMENTATIVE.

10       THE COURT:  REPHRASE THAT QUESTION.

11       SUSTAINED.

12   BY MR. PRICE:

13   Q   MR. LARIAN, YOU TOLD US THAT YOU WERE SEEKING THE TRUTH;

14   CORRECT?

15   A   YES, I DID.

16   Q   SEEKING THE TRUTH ABOUT WHETHER OR NOT MR. BRYANT TOLD YOU

17   SOMETHING WAS TRUE; CORRECT?

18   A   I WANTED TO MAKE SURE THAT IF CARTER BRYANT SAID HE DID DO

19   THE ORIGINAL DRAWINGS IN 1998 IN MISSOURI, THAT THAT WAS A TRUE

20   STORY.  THAT'S WHAT I WANTED TO KNOW, AND I GOT SATISFACTION

21   FOR THAT.

22   Q   AND IT'S FAIR TO SAY YOU WOULD NOT HAVE BEEN SATISFIED

23   WITH AN INVESTIGATION THAT CONSISTED OF SOMEONE ELSE GOING TO

24   MR. BRYANT AND SAYING, 'WILL YOU TELL ME THE STORY?'

25       MR. NOLAN:  OBJECTION, YOUR HONOR.  ASSUMES FACTS NOT

1    IN EVIDENCE; ARGUMENTATIVE.

2          THE COURT:  IT'S A HYPOTHETICAL.

3          OVERRULED.

4          THE WITNESS:  I DON'T KNOW HOW TO ANSWER THAT

5    QUESTION.

6          I ASKED VICTORIA O'CONNOR TO MAKE SURE THAT --

7          MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

8          THE COURT:  IT'S STRICKEN.

9          MAKE IT CLEAR THAT IT'S A HYPOTHETICAL, COUNSEL.

10   BY MR. PRICE:

11   Q    WE HAVEN'T HAD YOUR ATTORNEY HERE YET TO TESTIFY, SO I

12   NEED TO ASK YOU TO ASSUME THE FOLLOWING, WHETHER YOU WOULD BE

13   SATISFIED WITH THE FOLLOWING TYPE OF INVESTIGATION:

14          WOULD YOU BE SATISFIED WITH AN INVESTIGATION FROM

15   MR. BRYANT'S ATTORNEY SIMPLY REPORTING BACK TO YOUR ATTORNEY,

16   'HE TOLD ME THE SAME THING'?

17   A    AGAIN, I WAS NOT PART OF THAT CONVERSATION.

18          IF MY ATTORNEY AND HIS ATTORNEY, AS OFFICERS OF THE

19   COURT, CAME BACK IN WRITING AND SAID THAT THEY HAD

20   INVESTIGATED -- HIS ATTORNEY HAS INVESTIGATED AND HIS STORY IS

21   TRUE, I BELIEVE THAT.

22   Q    THAT WASN'T MY QUESTION.

23          I'M TALKING ABOUT THE TYPE OF INVESTIGATION.

24          YOU WERE TRYING TO GET TO THE TRUTH; RIGHT?

25   A    I DID.

1   Q   SO IN TRYING TO GET TO THE TRUTH, WOULD YOU BE SATISFIED

2   WITH SIMPLY A REPRESENTATION FROM MR. BRYANT'S ATTORNEY THAT

3   SHE ASKED MR. BRYANT AND HE TOLD HER THE SAME THING?  WOULD YOU

4   BE SATISFIED WITH THAT INVESTIGATION, TO TRY TO FIND THE TRUTH?

5   A   I DON'T KNOW IF -- I WASN'T THERE, SO I DON'T KNOW IF SHE

6   JUST CALLED HIM AND ASKED HIM, 'IS THIS TRUE OR NOT,' OR SHE

7   WENT BEYOND THAT.  I DON'T KNOW.  I THINK YOU SHOULD GET HER ON

8   THE STAND AND ASK HER.

9        THE COURT:  MR. LARIAN, HE'S NOT ASKING YOU ABOUT

10   WHAT ACTUALLY HAPPENED, BUT JUST HYPOTHETICALLY, TRYING TO FIND

11   OUT WHAT TYPE OF INVESTIGATION YOU WOULD BE SATISFIED WITH.

12        THE WITNESS:  IF I WAS HIS ATTORNEY, CARTER BRYANT'S

13   ATTORNEY?  IS THAT WHAT YOU'RE ASKING?

14   BY MR. PRICE:

15   Q   NO.  I'M ASKING YOU WHAT WOULD SATISFY YOU.  IF YOU WERE

16   REALLY LOOKING FOR THE TRUTH, WOULD YOU BE SATISFIED IF ALL

17   THAT THE INVESTIGATION CONSISTED OF WAS JUST MR. BRYANT'S

18   ATTORNEY ASKING HIM THE SAME QUESTION AND GETTING THE SAME

19   ANSWER?

20   A   BEING THROUGH THIS CASE NOW, I HOPE I ASSUME THAT HE WOULD

21   ASK, 'DID YOU DO THIS IN 1998?'  AND HE WOULD SAY 'YES.'  'DO

22   YOU HAVE PROOF OF IT?'  HE WOULD SAY 'YES.  LOOK AT THE

23   SEVENTEEN MAGAZINE.  LOOK AT THE PICTURES OF PARIS BLUE.  THIS

24   WAS IN AUGUST 1998, AND THOSE WERE INSPIRATIONS FOR MY

25   DRAWINGS.'

1        AND THEN I WOULD TAKE IT A STEP FURTHER.

2        IF THEY CAME BACK WITH THAT CONFIRMATION, AND HE HAD

3   A CONTRACT, JUST TO MAKE SURE, WE ASKED CARTER BRYANT --

4        MR. PRICE:  IT'S BEYOND THE SCOPE AT THIS POINT.

5        THE COURT:  IT IS BEYOND THE SCOPE.

6        NEXT QUESTION, COUNSEL.

7        MR. NOLAN:  IT'S A HYPOTHETICAL AS TO WHAT HE WOULD

8   EXPECT AN INVESTIGATION TO DO, AND MR. LARIAN IS EXPLAINING

9   WHAT THE REASONABLE --

10        THE COURT:  AND IT WAS GOING BEYOND THE INVESTIGATIVE

11   STAGE INTO THE CONTRACT STAGE.

12        MR. NOLAN:  EXCEPT THAT -- I DON'T WANT TO MAKE A

13   SPEAKING OBJECTION.  I JUST THINK THAT HE WAS IN THE MIDDLE OF

14   COMPLETING THE ANSWER TO A HYPOTHETICAL OF WHAT HE WOULD DO TO

15   MAKE CERTAIN THAT THE REPRESENTATIONS WERE TRUTHFUL, IN HIS

16   PURSUIT OF THE TRUTH.

17        THE COURT:  THANK YOU, COUNSEL.

18        ACTUALLY, IT WAS A YES OR NO QUESTION THE WAY IT WAS

19   POSED; SO THE OBJECTION IS SUSTAINED.

20        NEXT QUESTION.

21        MR. NOLAN, YOU'LL HAVE AN OPPORTUNITY TO FULLY

22   EXAMINE THIS ON YOUR REDIRECT.

23        MR. NOLAN:  I'M LOOKING FORWARD TO THAT.

24   BY MR. PRICE:

25   Q   MR. LARIAN, IN YOUR ANSWER, WHICH WENT BEYOND YES OR NO,

1   YOU MENTIONED FACTS ABOUT MAGAZINES AND OTHER FACTS WHICH YOU

2   WOULD HAVE WANTED TO UNCOVER IN AN INVESTIGATION; CORRECT?

3   A   NO.  YOU ASKED ME A HYPOTHETICAL QUESTION, AND I WAS

4   TRYING TO GIVE YOU A HYPOTHETICAL ANSWER; IF I WAS DOING IT,

5   WHAT I WOULD DO.

6   Q   EXACTLY.

7       SO WHAT YOU WOULD DO TO SATISFY WHETHER SOMEONE WAS

8   TELLING THE TRUTH, IF THAT'S WHAT YOU WERE TRYING TO DO, WOULD

9   BE TO GO BEYOND JUST SAYING, 'TELL ME THE STORY AGAIN'?  YOU'D

10  GO BEYOND THAT?

11  A   AND I THINK WE DID GO BEYOND THAT.

12  Q   I THOUGHT YOUR TESTIMONY WAS THAT YOU HAD ABSOLUTELY NO

13  FIRST-HAND KNOWLEDGE AS TO WHAT MR. BRYANT'S ATTORNEY DID; IS

14  THAT RIGHT?

15  A   THAT IS CORRECT, I HAVE NO PERSONAL KNOWLEDGE WHAT

16  CARTER BRYANT'S ATTORNEY DIRECTLY DID.

17  Q   SO WHAT YOU WOULD DO AS AN INVESTIGATOR --

18  A   I'M NOT AN INVESTIGATOR.

19  Q   LET ME FINISH THE QUESTION.

20      WHAT YOU WOULD DO AS AN INVESTIGATOR IS SAY, 'PROVE

21  IT TO ME.  I'M NOT GOING TO TAKE YOUR WORD FOR IT.  PROVE IT TO

22  ME'; RIGHT?

23  A   SIR, I'M NOT AN INVESTIGATOR; I'M A TOY MAKER.  SO I DON'T

24  KNOW.  I DON'T KNOW HOW TO ANSWER YOUR QUESTION.  YOU DON'T

25  LIKE MY ANSWER, BUT I DON'T KNOW HOW TO ANSWER IT ANY BETTER

Transcript of Proceedings - AM (I. Larian Direct)  6/6/2008  9:00:00 AM

1    THAN I DID.

2    Q    AS A TOY MAKER AND THE CEO OF MGA, YOU KNEW THAT IT WAS AN

3    IMPORTANT, CRITICAL QUESTION AS TO WHO OWNED THESE DRAWINGS;

4    RIGHT?

5    A    YES.

6    Q    AND, AS YOU SAID, YOU WEREN'T WILLING JUST TO TAKE THE

7    WORD OF SOMEONE YOU HAD NEVER MET BEFORE; CORRECT?

8    A    I MET HIM FOR THE FIRST TIME.

9    Q    AND YOU WEREN'T WILLING TO JUST TAKE THE WORD OF A MATTEL

10   EMPLOYEE, CURRENTLY EMPLOYED BY MATTEL, WHOSE JOB WAS TO MAKE

11   DRAWINGS -- YOU WEREN'T WILLING TO TAKE HIS WORD THAT, 'OH, I

12   DID THESE DRAWINGS AT SOME OTHER TIME'?

13   A    YOU JUST PUT A LOT OF THINGS IN THAT QUESTION.

14       HIS JOB WAS NOT TO DO DRAWINGS AT MATTEL.  AS MUCH AS

15   I KNOW, HE WAS JUST A FASHION DESIGNER AT MATTEL, NOT SOMEBODY

16   WHO JUST DOES THE DRAWINGS.

17       SO PLEASE REPHRASE YOUR QUESTION SO I CAN ANSWER.

18   Q    BE GLAD TO.

19       MR. BRYANT CAME TO YOU ON SEPTEMBER 1ST AND PRESENTED

20   YOU WITH DRAWINGS OF DOLLS CALLED "BRATZ"; RIGHT?

21   A    HE DID NOT COME WITH DRAWINGS OF A DOLL CALLED "BRATZ."

22   THERE WERE NO DOLLS ON SEPTEMBER 1, 2000, WHEN HE CAME TO US.

23   HE CAME UP WITH SOME DRAWINGS THAT BECAME THE INSPIRATION FOR

24   THE BRATZ DOLLS LATER ON, WHICH MGA CREATED.

25   Q    I DON'T WANT TO NITPICK WITH YOU.  LET'S LOOK AT

1    EXHIBIT 302.

2        YOU SAID YOU SAW THIS ON SEPTEMBER 1ST; RIGHT?

3    A   I'M SORRY?

4    Q   THIS IS WHAT YOU SAW ON SEPTEMBER 1ST:  "MEET THE BRATZ,

5    THE TOTALLY TRANSFORMABLE TEENAGE DOLLS.  THEY ARE FOUR BEST

6    FRIENDS FROM HIGH SCHOOL WHO LOVE TO TRADE CLOTHES, SHOES, AND

7    HAIRDOS, ET CETERA."

8        THAT'S AMONG THE THINGS HE PRESENTED TO YOU IN

9    SEPTEMBER OF 2000; CORRECT?

10   A   TO THE BEST OF MY RECOLLECTION, YES.

11   Q   THEN HE GAVE YOU DRAWINGS OF THESE TOTALLY TRANSFORMABLE

12   TEENAGE DOLLS NAMED "BRATZ."

13   A   YOU CHANGED THE PAGE.

14       WHERE DOES IT SAY "TEENAGE DOLLS"?

15   Q   LET'S GO BACK TO WHAT WE JUST WENT THROUGH.

16       "MEET THE BRATZ, THE TOTALLY TRANSFORMABLE TEENAGE

17   DOLLS."

18   A   I SEE THAT, YES.

19   Q   IN FACT, HE HAD A PROTOTYPE WITH HIM TO GIVE YOU AN IDEA

20   OF WHAT THIS WOULD LOOK LIKE IN THREE DIMENSIONS, AS OPPOSED TO

21   TWO DIMENSIONS; CORRECT?

22   A   HE DID HAVE A ROUGH PROTOTYPE, THAT'S CORRECT.

23   Q   LET'S GO TO THE NEXT PAGE AGAIN.

24       HE PRESENTED YOU WITH A SERIES OF DRAWINGS OF THESE

25   TOTALLY TRANSFORMABLE TEENAGE DOLLS, THE BRATZ.

1   A   THOSE WERE THE DRAWINGS THAT HE SHOWED US.  THE BRATZ

2   DOLLS DID NOT LOOK LIKE THEM.

3       MR. PRICE:  MOVE TO STRIKE EVERYTHING AFTER "THOSE

4   WERE THE DRAWINGS HE SHOWED US."

5       THE COURT:  OVERRULED.

6   BY MR. PRICE:

7   Q   AND YOU KNEW AT THAT POINT HE WAS A MATTEL EMPLOYEE.

8   A   YES, I DID KNOW.  WHEN HE CAME TO US -- WHEN HE CAME TO MY

9   OFFICE ON SEPTEMBER 1ST, HE TOLD ME THAT HE WAS A MATTEL

10  EMPLOYEE AT THE TIME, THAT'S CORRECT.

11  Q   SO SITTING THERE, YOU KNEW THAT THIS MATTEL EMPLOYEE WAS

12  SITTING THERE PITCHING YOU A DOLL IDEA?

13  A   YES, HE WAS PITCHING DRAWINGS FOR A DOLL IDEA, THAT'S

14  CORRECT.

15  Q   AND YOU KNEW THAT IF HE HAD COME UP WITH THESE DRAWINGS AT

16  THE TIME HE WAS A MATTEL EMPLOYEE, THEY BELONGED TO MATTEL.

17  A   THESE DRAWINGS, AGAIN, IF HE HAD DONE THEM IN 1998 AND

18  THEN LATER ON HAD WORKED ON THEM, DIDN'T BELONG TO MATTEL.

19      MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

20      THE COURT:  IT'S STRICKEN.

21      ANSWER THE QUESTION.

22      MR. PRICE:  DO YOU WANT ME TO REPEAT THE QUESTION?

23      THE COURT:  LET THE COURT REPORTER DO SO.

24      (WHEREUPON, THE LAST QUESTION WAS READ

25      BACK BY THE COURT REPORTER.)

1          THE WITNESS:  YES.  I WAS NOT INTERESTED IN THEM IF

2     HE HAD DONE THEM WHEN HE WAS WORKING AT MATTEL.  THAT'S

3     CORRECT.

4          MR. PRICE:  MOVE TO STRIKE EVERYTHING AFTER "YES,"

5     YOUR HONOR.

6          THE COURT:  OVERRULED.

7     BY MR. PRICE:

8     Q   SO YOU KNEW THAT ONE OF THE CRITICAL QUESTIONS WAS, DID

9     MATTEL OWN THESE DRAWINGS?

10    A   YES.

11    Q   ASSUMING THAT MR. BRYANT AT THAT MEETING TOLD YOU, 'OH, I

12    DID THEM IN 1998, IN THIS TIME FRAME WHEN I WASN'T AT MATTEL,'

13    YOU WOULD WANT TO INVESTIGATE THAT CRITICAL QUESTION; CORRECT?

14    A   FIRST OF ALL, IT WASN'T AN ASSUMPTION.  HE DID SAY THAT HE

15    DID THEM IN 1998 WHEN HE WAS IN MISSOURI.  AND, YES, WE DID

16    WANT TO INVESTIGATE THAT.  AND WE DID THAT.

17    Q   AND WHAT YOU'D WANT TO DO IS SAY, BASICALLY, 'PROVE IT TO

18    ME'?

19    A   TELL HIM TO PROVE IT TO ME, DIRECTLY TO ME?  NO, I DID NOT

20    ASK THAT, TO PROVE IT TO ME.  I GAVE DIRECTION TO MY HEAD OF

21    LICENSING TO MAKE SURE THAT WHAT HE WAS SAYING WAS THE TRUTH.

22    Q   WHOEVER YOU TOLD TO LOOK INTO IT, THE GOAL WAS TO TRY TO

23    PROVE TO YOU, THE CEO OF MGA, THAT THESE DRAWINGS DIDN'T BELONG

24    TO MATTEL; CORRECT?

25    A   CORRECT.

1    Q   AND IT'S FAIR TO SAY THAT YOU WOULDN'T BE SATISFIED IF THE

2    ONLY PROOF WAS THAT MR. BRYANT TOLD HIS LAWYER THE SAME THING

3    HE TOLD YOU; CORRECT?

4         MR. NOLAN:  OBJECTION.  ASKED AND ANSWERED.

5         THE COURT:  IT HAS BEEN ASKED AND ANSWERED, COUNSEL.

6    BY MR. PRICE:

7    Q   SO YOU TOLD US ABOUT WHAT, THEN, THE CERTAIN INVESTIGATION

8    YOU MIGHT DO IF YOU HAD BEEN IN MR. BRYANT'S LAWYER'S SHOES;

9    CORRECT.

10   A   I'M NOT A LAWYER.  BUT YOU'RE ASKING FOR A HYPOTHETICAL

11   QUESTION, AND I ANSWERED IT.  AND I DON'T LIKE TO BE A LAWYER.

12   Q   IT'S TRUE, IS IT NOT, THAT IN TRYING TO FIND THE ANSWER TO

13   THIS CRITICAL QUESTION, YOU HAVE NO FIRST-HAND KNOWLEDGE WHAT

14   MR. BRYANT'S LAWYER DID TO TRY TO, QUOTE, "PROVE THE STATEMENT

15   OF MR. BRYANT THAT THESE DIDN'T BELONG TO MATTEL"?

16        MR. NOLAN:  AGAIN, YOUR HONOR, ASKED AND ANSWERED.

17        THE COURT:  OVERRULED.

18        YOU MAY ANSWER.

19        THE WITNESS:  THAT IS TRUE.  I DON'T HAVE FIRST-HAND

20   KNOWLEDGE OF WHAT HIS LAWYER DID TO MAKE SURE THAT WHAT HE WAS

21   SAYING IS TRUE OR NOT.

22   BY MR. PRICE:

23   Q   YOU LEFT YOURSELF INTENTIONALLY IN THE DARK, DIDN'T YOU?

24   A   NO, I DID NOT.

25   Q   WELL, DID YOU GO TO EITHER MR. ROSENBAUM OR MS. O'CONNOR,

1   OR EVEN MR. BRYANT'S LAWYER, AND SAY, 'I WANT YOU TO TELL ME,

2   TO PROVE TO ME, THAT THESE DON'T BELONG TO MATTEL'?

3   A   I PERSONALLY DID NOT DO THAT.  I DELEGATED THAT -- WE HAD

4   EMPLOYEES.  I DELEGATED THAT TO AN EMPLOYEE WHOSE JOB WAS TO DO

5   THIS.  AND SHE DID.

6   Q   SO YOU'RE SAYING THAT MS. O'CONNOR WAS GIVEN PROOF OF A

7   STORY THAT THESE DRAWINGS WERE NOT DONE WHILE MR. BRYANT WAS AT

8   MATTEL?

9   A   MS. O'CONNOR WENT TO DAVID ROSENBAUM, WHO WENT TO

10  ANNE WANG, WHO WAS CARTER BRYANT'S LAWYER; AND ACCORDING TO AN

11  E-MAIL THAT I HAVE SEEN, HIS LAWYER CAME BACK AND SAID THAT SHE

12  HAS PROOF, SHE KNOWS IT WAS DONE IN 1998 WHEN CARTER SAID THAT,

13  THE INITIAL DRAWINGS.

14  Q   SO, OF COURSE, SINCE THIS IS A CRITICAL QUESTION AS TO

15  WHETHER OR NOT THESE DRAWINGS BELONGED TO MATTEL, YOUR RESPONS

16  WAS, 'WHAT PROOF ARE YOU TALKING ABOUT BESIDES MR. BRYANT'S

17  WORD?'  THAT WAS YOUR RESPONSE; CORRECT?

18  A   I DID NOT ASK THAT SPECIFIC QUESTION THAT YOU JUST ASKED.

19  I DID NOT.

20  Q   INSTEAD, YOU WENT FORWARD TO CREATE DOLLS BASED ON THESE

21  DRAWINGS THAT A MATTEL EMPLOYEE PRESENTED TO YOU IN SEPTEMBER

22  OF 2000.

23  A   FIRST WHAT WE DID IS, WE ENTERED INTO A CONTRACT WITH

24  CARTER BRYANT ON OCTOBER 4, 2000, AND THEN WE PROCEEDED TO

25  START DEVELOPMENT OF THE BRATZ DOLLS, WHAT BECAME BRATZ DOLLS

1    LATER ON.

2    Q   IT'S FAIR TO SAY, WITHOUT GETTING INTO NUMBERS, THE BRATZ

3    DOLLS, THE BRATZ MERCHANDISE, ARE A SIGNIFICANT PERCENTAGE OF

4    MGA'S BUSINESS?

5    A   YES.  OVER THE YEARS, THEY HAVE BECOME SIGNIFICANT.  THEY

6    WERE NOT SIGNIFICANT IN 2001 WHEN THEY WERE LAUNCHED, BUT THEY

7    HAVE BEEN OUT NOW FOR SEVEN YEARS, AND THEY HAVE BECOME

8    SIGNIFICANT.

9    Q   IN FACT, YOU, EVEN AS EARLY AS OCTOBER OF 2000, PREDICTED

10   THAT JUST FOR THE FIRST YEAR, YOU WERE GOING TO SELL 25 MILLION

11   OF THESE DOLLS?

12   A   YES, I DID PREDICT THAT, AS I DID WITH A LOT OF OTHER TOYS

13   THAT WERE NOT SUCCESSFUL.

14   Q   BUT SOMETIMES YOU'RE RIGHT; SOMETIMES YOU'RE WRONG.

15   A   IN THE TOY BUSINESS, THAT'S A FACT.

16   Q   WHEN YOU MAKE A PREDICTION, THOUGH, YOU'RE DOING THE BEST

17   YOU CAN; RIGHT?

18   A   I'M SORRY?

19   Q   WHEN YOU MAKE THESE PREDICTIONS, YOU'RE DOING THE BEST YOU

20   CAN.

21   A   YES.

22   Q   AND YOU PUT RESOURCES INTO CERTAIN DOLL LINES BASED UPON

23   YOUR PREDICTIONS.

24   A   WE SURE DID PUT A LOT OF RESOURCES IN MAKING BRATZ DOLLS,

25   WHAT THEY BECAME, BY NOW.

1    Q   OKAY.

2    A   BY "NOW," I MEAN BY 2008.

3    Q   AND SO IN OCTOBER OF 2000, PREDICTING THAT THESE DOLLS

4    WERE GOING TO SELL AROUND 25 MILLION FOR THE FIRST YEAR ALONE

5    --

6    A   YES.

7    Q   -- BEFORE PUTTING THE RESOURCES INTO MAKING THAT HAPPEN,

8    DID YOU ASK ANYONE WHAT WAS BEHIND THIS INVESTIGATION, WHAT WAS

9    DONE TO PROVE THAT MATTEL DOESN'T OWN THESE?

10   A   BESIDES WHAT I TOLD YOU, I HAVE NOTHING ELSE TO ADD.

11   Q   WELL, LET'S TALK ABOUT THE CONTRACT, THEN, THAT YOU

12   ENTERED INTO WITH MR. BRYANT.

13       I'D LIKE YOU TO LOOK AT, IF YOU WOULD, EXHIBIT 13621.

14       DO YOU RECOGNIZE EXHIBIT 13621 AS A CONTRACT BETWEEN

15   MGA AND CARTER BRYANT?

16   A   I DO.

17       I WANT TO READ THE WHOLE CONTRACT.

18   Q   IF YOU RECOGNIZE THIS AS THE CONTRACT RIGHT NOW, THAT'S

19   ENOUGH.

20   A   I DO.

21       MR. PRICE:  YOUR HONOR, I'D MOVE 13621 INTO EVIDENCE.

22       MR. NOLAN:  NO OBJECTION, YOUR HONOR, ALTHOUGH THIS

23   IS ALREADY IN EVIDENCE.

24       MR. PRICE:  I DON'T BELIEVE IT IS.  THEY ARE

25   DIFFERENT, ACTUALLY, SOMEWHAT.

1          MR. NOLAN:  WE HAVE NO OBJECTION TO THIS ONE.

2          THE COURT:  IS IT THE SAME DOCUMENT, THOUGH?

3          MR. PRICE:  SOMEWHAT.

4          MR. NOLAN:  WE HAVE NO OBJECTION TO THIS DOCUMENT.

5          THE COURT:  VERY WELL.

6          IT'S ADMITTED.

7          ONE THING I WANT TO AVOID, COUNSEL, IS ANY DUPLICATES

8    OF DOCUMENTS, PARTICULARLY KEY DOCUMENTS LIKE THIS; SO THIS IS

9    SOMETHING WE CAN REVISIT.

10          MR. PRICE:  I UNDERSTAND.  IN EXAMINATION, IT WILL

11   BECOME CLEAR.

12          THE COURT:  VERY WELL.

13   BY MR. PRICE:

14   Q   THERE'S SOME HANDWRITING HERE THAT SAYS "FINAL."

15          DO YOU KNOW WHOSE HANDWRITING THAT IS?

16   A   I DO NOT.

17   Q   IF YOU'D LOOK AT THE LAST PAGE OF THIS, IS THIS YOUR

18   SIGNATURE HERE?

19   A   IT IS.

20   Q   AND YOU RECOGNIZE THIS AS CARTER BRYANT'S SIGNATURE?

21   A   I DON'T RECOGNIZE HIS SIGNATURE, BUT THAT'S MY SIGNATURE.

22   Q   LET'S GO BACK TO THE FIRST PAGE.

23          THIS DOCUMENT, YOU RECEIVED THIS FROM YOUR ATTORNEY;

24   CORRECT?

25   A   I RECEIVED THIS FROM MY ATTORNEY?

1       I DON'T KNOW IF I RECEIVED IT FROM MY ATTORNEY OR IF

2   I RECEIVED IT FROM VICTORIA O'CONNOR.  I DON'T RECALL WHO I

3   RECEIVED IT FROM.

4   Q   IN ANY EVENT, MGA HAD AN ATTORNEY INVOLVED IN DRAFTING

5   THIS DOCUMENT.

6   A   YES, WE DID.

7   Q   AND THAT WAS MR. ROSENBAUM.

8   A   DAVID ROSENBAUM, YES.

9   Q   YOU UNDERSTOOD THERE WERE SOME NEGOTIATIONS THAT TOOK

10  PLACE THAT LED TO THIS DOCUMENT.

11  A   YES.  THERE WERE NEGOTIATIONS BETWEEN DAVID ROSENBAUM AND

12  CARTER BRYANT'S LAWYER, ANNE WANG.

13  Q   AND IT'S CORRECT THAT WHEN YOU RECEIVED THIS CONTRACT, YOU

14  LOOKED THROUGH IT TO MAKE SURE IT REFLECTED THE TERMS OF THE

15  CONTRACT THAT YOU WANTED TO AGREE TO.

16  A   I DON'T REMEMBER IF I READ THE WHOLE CONTRACT OR NOT.  I

17  KNOW THERE WAS LENGTHY NEGOTIATIONS GOING BACK AND FORTH, AND I

18  REMEMBER ONE E-MAIL ON OCTOBER 3RD -- OCTOBER 4TH, IN THE

19  MORNING, THAT THEY HAD FINALLY REACHED AN AGREEMENT BETWEEN

20  DAVID ROSENBAUM AND ANNE WANG, AND THEY GAVE ME A SIGNATURE

21  PAGE TO SIGN, WHICH I DID.

22  Q   SO I GUESS MY QUESTION IS, BEFORE SIGNING THIS, DID YOU

23  CHECK IT TO MAKE SURE THAT, FOR EXAMPLE, THE AMOUNT YOU

24  INTENDED TO PAY MR. BRYANT WAS IN HERE AND THAT HE WAS GRANTING

25  CERTAIN RIGHTS TO YOU?

1   A   I DON'T RECALL IF I -- NOW, SITTING HERE, I DON'T RECALL

2   IF I DID THAT AT THAT TIME OR NOT.  I DON'T KNOW.

3   Q   THAT WOULD BE YOUR PRACTICE, IF YOU WERE GOING TO ENTER

4   INTO A CONTRACT WITH SOMEONE -- THAT WOULD BE YOUR PRACTICE, IF

5   YOU'RE GOING TO BIND MGA TO PAY SOMEONE MONEY AND YOU WERE

6   TRYING TO GET SOMETHING IN RETURN, IT WOULD PROBABLY BE YOUR

7   PRACTICE TO READ THE OFFICIAL LEGAL CONTRACT SO YOU'D KNOW YOUR

8   OBLIGATIONS?

9   A   NO, THAT'S NOT PROBABLY MY PRACTICE.  I GET A LOT OF

10   THINGS TO DO.

11       MOST OF MY CONTRACTS AND EVERYTHING ELSE, I DELEGATE

12   TO MY LAWYERS AND OTHER PEOPLE IN THE COMPANY TO NEGOTIATE AND

13   LOOK AT, MAKING SURE THE BASIC TERMS ARE IN THERE.  THEN I'LL

14   SIGN IT.

15   Q   WELL, LOOK AT THE FIRST PAGE.  THERE'S A LINE HERE DATED

16   AS OF SEPTEMBER 18, 2000.

17       DO YOU SEE THAT?

18   A   I DO.

19   Q   SIR, DO YOU RECALL YESTERDAY THAT WE SHOWED SOME DOCUMENTS

20   WHERE YOU SAID THAT BRATZ WAS BORN IN SEPTEMBER OF 2000, A

21   DOCUMENT THAT BRATZ WAS CREATED ON SEPTEMBER 18, 2000?

22   A   I DIDN'T SEE A DOCUMENT THAT SAYS BRATZ WERE BORN ON

23   SEPTEMBER 18, 2000.

24   Q   NO, NO.

25   A   THAT'S WHAT YOU JUST SAID.

1    Q    TWO DOCUMENTS.  I DIDN'T MEANT TO CONFUSE YOU.

2         REMEMBER THERE WAS A DOCUMENT THAT SAID 'BRATZ WAS

3    BORN IN SEPTEMBER OF 2000,' AND THEN ANOTHER DOCUMENT SAYING

4    'THE DATE OF CREATION OF BRATZ WAS SEPTEMBER 18, 2000'?

5         DO YOU RECALL THAT?

6    A    I DON'T REMEMBER HER SAYING SEPTEMBER 18, 2000.  MAYBE SHE

7    DID.  I DON'T RECALL IT.

8    Q    LET'S REFRESH YOUR RECOLLECTION, THEN, IF WE CAN.

9         IF WE CAN GO TO EXHIBIT 551.  I MIGHT BE SLIGHTLY OFF

10   ON THE DATE, BUT I DON'T THINK SO.

11        DO YOU SEE THIS?  DO YOU REMEMBER WE SHOWED YOU THIS

12   YESTERDAY, SIR, THIS E-MAIL WITH NANA ASHONG, WHERE IT TALKED

13   ABOUT DATE OF CREATION, SEPTEMBER 18, 2000?

14   A    YES.  AND I RECALL TELLING YOU THAT I'M NOT COPIED ON THIS

15   E-MAIL AND I HAVE NEVER SEEN THAT BEFORE.

16   Q    ALL THESE FOLKS WORK FOR YOU.

17   A    YES.  EXCEPT I DON'T REMEMBER WHO JACKIE -- I DON'T KNOW

18   HOW TO PRONOUNCE HER LAST NAME.  I APOLOGIZE.

19   Q    CERTAINLY, IT'S FAIR TO SAY THAT WHEN YOU SIGNED THIS

20   AGREEMENT, WHICH OBLIGATED MGA TO DO CERTAIN THINGS AND

21   MR. BRYANT TO DO CERTAIN THINGS, THAT ONE OF THE THINGS YOU

22   TOOK NOTE OF WAS THAT THE CONTRACT PROVIDED TO YOU,

23   REPRESENTED, DATED AS OF SEPTEMBER 18, 2000?

24   A    I DON'T RECALL MY STATE OF MIND AT THAT TIME, EIGHT YEARS

25   AGO, WHEN THIS WAS SIGNED.

1   Q   WHAT YOU DO RECALL IS THAT ON SEPTEMBER 18, 2000,

2   CARTER BRYANT WAS STILL AN EMPLOYEE OF MATTEL.

3   A   YES.  ON SEPTEMBER 18, 2000, HE WAS STILL AN EMPLOYEE OF

4   MATTEL.

5   Q   NOW, IF YOU WOULD LOOK AT -- YOU SEE THE BOTTOM OF THESE

6   DOCUMENTS THERE, THESE NUMBERS, MGA 001, 002, ET CETERA?

7   A   YES.

8   Q   IF YOU WOULD LOOK AT THIS COPY OF THE CONTRACT, DO YOU SEE

9   ANY FAX HEADERS AT ALL ON THIS CONTRACT, ANYTHING SAYING THIS

10  WAS FAXED TO MR. BRYANT OR THAT MR. BRYANT FAXED IT BACK?

11  A   I DON'T SEE ANY FAX HEADER ON THIS DOCUMENT.

12  Q   LET ME SHOW YOU, THEN, WHAT'S BEEN ADMITTED AS EXHIBIT 15.

13      DO YOU SEE EXHIBIT 15?

14  A   I DO.

15  Q   DO YOU SEE AT THE BOTTOM, EXHIBIT 15, YOU NOTICE AT THE

16  BOTTOM, THERE ARE THESE DESIGNATIONS THAT SAY "BRYANT'S," AND

17  IT HAS CERTAIN PAGE NUMBERS.

18      DO YOU SEE THAT?

19  A   YES.

20  Q   DO YOU HAVE ANY IDEA WHAT THE SIGNIFICANCE IS OF THAT?

21  A   YES.

22  Q   WHAT'S THAT?

23  A   THOSE ARE PROBABLY DOCUMENTS THAT CARTER BRYANT PRODUCED,

24  AND THAT'S FROM, I LEARNED TO UNDERSTAND DURING THIS LEGAL

25  MATTER, IS WHAT LAWYERS PUT; LIKE THIS DOCUMENT CAME FROM

1    CARTER BRYANT AND THOSE ARE HIS BATES NUMBERS, AS YOU GUYS

2    IDENTIFY IT.

3    Q   AND THE PREVIOUS ONE, 13621, THAT HAD MGA ON IT, WHAT'S

4    YOUR UNDERSTANDING OF WHAT THAT MEANS?

5    A   THOSE ARE DOCUMENTS THAT MGA PRODUCED.

6    Q   SO THE CONTRACT WHICH MGA PRODUCED, TO YOUR UNDERSTANDING,

7    HAS NO FAX HEADLINERS ON IT AT ALL; CORRECT?

8    A   THAT'S CORRECT.

9    Q   IF WE LOOK AT THIS --

10   A   THAT DOCUMENT YOU SHOWED ME DID NOT HAVE FAX HEADERS,

11   THAT'S CORRECT.

12   Q   LOOK AT EXHIBIT 15, AND GO TO THE LAST PAGE.

13       YOU NOTICE THAT THIS HAS A FAX HEADER WHICH INDICATES

14   SOMETHING WAS SENT FROM MGA.

15       DO YOU SEE THAT?

16   A   I DO.

17   Q   AND IT'S YOUR UNDERSTANDING THAT THE CONTRACT WHICH WAS

18   FAXED TO MR. BRYANT WAS FAXED BACK TO MGA?

19   A   WELL, LET ME EXPLAIN THIS TO YOU, FIRST OF ALL.

20       THIS IS A SIGNATURE PAGE.

21   Q   ANSWER MY QUESTION.

22   A   OKAY.  GO AHEAD.

23   Q   IT'S YOUR UNDERSTANDING THAT MGA FAXED A CONTRACT TO

24   MR. BRYANT; CORRECT?

25   A   YES.

1   Q   AND IT'S YOUR UNDERSTANDING THAT MR. BRYANT FAXED THAT

2   CONTRACT BACK, SIGNED; CORRECT?

3   A   I HOPE SO.  I ASSUME SO, YES.

4   Q   AND SO YOUR UNDERSTANDING IS THAT THIS DOCUMENT THAT YOU

5   BELIEVE WAS PRODUCED BY MR. BRYANT HAS THE FAX HEADER

6   INDICATING WHEN MGA SENT IT TO HIM; CORRECT?

7   A   YES.  AT 4:36 P.M., ON OCTOBER 4TH.

8   Q   YOU THEN RETAINED IN YOUR POSSESSION 13621; THAT IS, THE

9   ONE WE LOOKED AT EARLIER WITHOUT ANY FAX HEADERS ON IT AT ALL;

10  CORRECT?

11  A   I PERSONALLY DID NOT RETAIN IT.  I THINK IT WENT TO

12  VICTORIA O'CONNOR OR THE LEGAL DEPARTMENT.

13  Q   SO MGA.

14  A   WELL, I DON'T KNOW WHICH ONE -- WHAT WAS THE OTHER ONE,

15  PLEASE?  13 --

16  Q   13621.

17      MR. PRICE:  WE HAVE AN EXTRA COPY.

18      THE COURT:  VERY WELL.

19  BY MR. PRICE:

20  Q   YOU WANT THAT OUTSIDE OF THE BINDER; CORRECT?

21  A   YES, I DO.

22  Q   YOU NOW HAVE BOTH 13621, MGA, AND EXHIBIT 15,

23  CARTER BRYANT; CORRECT?

24  A   YES.

25  Q   SO MY QUESTION, SIR, ON 13621 --

1    A    YES.

2    Q    -- WHAT HAPPENED TO THE FAX HEADER THAT SHOWED MGA SENT

3    THE FAX TO CARTER BRYANT?

4    A    MY UNDERSTANDING IS, WHEN SOMEBODY SENDS A FAX TO SOMEBODY

5    ELSE, IT STAMPS THAT SENDER'S NAME AND TIME, ET CETERA; SO

6    COULD THAT BE KNOWN ON HIS RECEIVING IT, BUT NOT ON THE SENDING

7    SIDE.

8    Q    BUT THE WAY YOU GOT THE CONTRACT BACK WAS, HE FAXED IT

9    BACK TO YOU.

10    A    YES.

11    Q    IT WOULD HAVE BOTH FAX HEADERS ON IT.

12    A    I DON'T KNOW, BECAUSE I HAVE SEEN FAX MACHINES THAT -- AS

13    A MATTER OF FACT, I HAVE ONE AT HOME, BECAUSE I DON'T WANT

14    PEOPLE TO HAVE MY HOME NUMBER -- THAT YOU CAN BLOCK, THAT

15    DOESN'T SHOW THE FAX THAT IT WAS SENT FROM, THE SENDER.

16         SO I DON'T KNOW IF MATTEL'S, OR ANYBODY ELSE'S THING,

17    WOULD HAVE A TIME STAMP, AS THEY SAY IN THE TERMINOLOGY.

18    Q    IS IT YOUR UNDERSTANDING THAT FEDERAL LAW REQUIRES A FAX

19    HEADER ON FAXES?

20    A    I HAVE NO IDEA ABOUT THAT.  I'M NOT A LAWYER.

21    Q    AS FOR YOUR PERSONAL USE, YOU MIGHT NOT.  BUT, PERHAPS,

22    MGA'S LAWYERS, YOU WOULD EXPECT TO BE AWARE OF WHAT SUCH LAWS

23    REQUIRED.

24         MR. NOLAN:  YOUR HONOR, OBJECTION.  LACK OF

25    FOUNDATION.

1     I DON'T EVEN KNOW THAT LAW.

2     THE COURT:  WE DON'T HAVE ANY EVIDENCE OF THE FEDERAL

3     LAW CONCERNING THAT, SO...

4     MOVE ON TO THE NEXT QUESTION.

5     BY MR. PRICE:

6     Q   YOU WERE HERE WHEN MS. O'CONNOR SAID THAT WHEN SHE

7     RECEIVED THE FAX FROM CARTER BRYANT, IT HAD A FAX HEADER THAT

8     SAID "BARBIE COLLECTIBLES."

9     A   I HEARD THAT TESTIMONY.

10    Q   YOU HAVE NO REASON TO DOUBT THAT THE CONTRACT YOU GOT FROM

11    CARTER BRYANT HAD THE FAX HEADER "BARBIE COLLECTIBLES."

12    A   I DON'T KNOW IF IT DID OR NOT.

13    Q   LET ME SHOW YOU WHAT'S ALREADY BEEN MARKED AS

14    EXHIBIT 13383.  IT'S ALREADY IN EVIDENCE, AND I'M GOING TO HAND

15    YOU A COPY.

16    DO YOU HAVE THAT?

17    A   YES.

18    Q   IF YOU WOULD TURN TO THE NEXT PAGE, THE SECOND PAGE ON

19    THAT.  THIS IS IDENTICAL TO EXHIBIT 15, ON THE FIRST PAGE, AND

20    EXHIBIT 13621, EXCEPT THE "DATED AS OF SEPTEMBER 18, 2000" IS

21    NOT THERE.

22    MR. NOLAN:  OBJECTION AS TO THE CHARACTERIZATION.

23    THE COURT:  REPHRASE, COUNSEL.

24    BY MR. PRICE:

25    Q   IF YOU LOOK AT EXHIBIT 15, THE FRONT PAGE, AND

1    EXHIBIT 1333 HERE, YOU NOTICE THAT ONE HAS A DATE ON IT, THE

2    OTHER DOESN'T; CORRECT?

3    A   I DO.

4    Q   AND THE SAME THING IS TRUE OF 13621?  THAT ALSO HAS A

5    DATED AS OF --

6    A   NOW YOU'RE CONFUSING ME.

7    Q   EXHIBIT 15, EXHIBIT 13621, ALL SAY "DATED AS OF

8    SEPTEMBER 18, 2000"; CORRECT?

9    A   EXHIBIT 15?  YES, THEY DO.

10   Q   AND IT'S TRUE THAT YOU DIDN'T WANT ANYONE TO KNOW THAT YOU

11   HAD A CONTRACT WITH CARTER BRYANT DATED AS OF SEPTEMBER 18,

12   2000, BECAUSE HE WORKED AT MATTEL THEN.

13   A   ABSOLUTELY NOT.  YOUR TESTIMONY IS NOT CORRECT.

14   Q   ACTUALLY, I ASKED A QUESTION.

15   A   BUT IT CAME TO ME AS TESTIMONY.  I APOLOGIZE.

16   Q   AGAIN, YOU WERE HERE WHEN MS. O'CONNOR TESTIFIED.

17   A   YES.

18   Q   IT'S TRUE, IS IT NOT, THAT THE FAX THAT CARTER BRYANT SENT

19   OF HIS CONTRACT HAD THAT HEADER ON IT, "BARBIE COLLECTIBLES,"

20   AND YOU TOLD MS. O'CONNOR, 'I WANT YOU TO WHITE THAT OUT'?

21   A   THAT IS NOT TRUE.

22   Q   SO YOUR TESTIMONY IS, MS. O'CONNOR WAS COMMITTING PERJURY?

23   A   NO.  I DON'T KNOW WHAT SHE WAS SAYING.  I HEARD THAT.

24   THERE WAS NO REASON FOR ME TO DO THAT.  SHE WAS FAXING THIS TO

25   PATTI GLASER, WHO'S MY ATTORNEY, WHO IS A PERSONAL FRIEND OF MY

1    FAMILY FOR THE PAST 15 YEARS.  THERE WAS NOTHING I WAS GOING TO

2    HIDE FROM HER OR ANYBODY ELSE.

3        AT THE BOTTOM OF EACH ONE OF THOSE PAGES, IF YOU LOOK

4    ON THE BOTTOM -- I DON'T HAVE YOUR LASER POINTER --

5    Q   I HAVE IT RIGHT HERE.

6    A   NO.  A LITTLE BIT TO THE LEFT.

7        THE TIME STAMP OF THE CONTRACT, CAN SOMEBODY

8    HIGHLIGHT THAT.

9    Q   OKAY.

10   A   OCTOBER 4, 2000, AT 3:05 P.M., WHEN THE CONTRACT WAS

11   FINALLY DRAFTED.

12       AND THERE IS NO QUESTION ABOUT THAT.  AND THAT DATE

13   IS ON EVERY PAGE OF THESE THREE DOCUMENTS THAT YOU SHOWED ME.

14   Q   BUT MY QUESTION WAS ABOUT THE FAX HEADER.

15       YOU DIDN'T WANT PEOPLE TO KNOW THAT WHEN

16   CARTER BRYANT SENT THE FAX TO YOU OF HIS CONTRACT, WHEN HE

17   SIGNED IT, HE WAS STANDING AT MATTEL AT THE TIME AND WAS A

18   MATTEL EMPLOYEE.

19   A   HE WAS A MATTEL EMPLOYEE, AND I WAS NOT HAPPY IF HE WAS

20   DOING ANYTHING FROM MATTEL, INCLUDING SENDING A CONTRACT, A

21   SIGNED CONTRACT, TO US.  BUT I GUESS YOU GUYS FIGURED THAT OUT

22   AND SETTLED WITH HIM.

23       MR. PRICE:  MOVE TO STRIKE THE LAST PART.

24       THE COURT:  THAT LAST PART IS STRICKEN.  IT WAS

25   NONRESPONSIVE, THE LAST SENTENCE.

Transcript of Proceedings - AM (I. Larian Direct)  6/6/2008  9:00:00 AM

1    BY MR. PRICE:

2    Q   SO, AS YOU JUST SAID, CERTAINLY YOU WOULD HAVE BEEN

3    UNHAPPY IF MR. BRYANT SIGNED THE CONTRACT WITH MGA AND ACTUALLY

4    FAXED IT FROM MATTEL?  THAT'S WHAT YOU JUST SAID; CORRECT?

5    A   IF HE WAS USING MATTEL MATERIALS OR FAX MACHINE TO SEND

6    THIS, YES, I WAS NOT HAPPY ABOUT THAT.

7    Q   THAT'S WHY YOU TOLD MS. O'CONNOR TO GET RID OF THE FAX

8    HEADER.

9    A   SIR, I NEVER TOLD HER TO GET RID OF THE FAX HEADER.  THERE

10   WAS NO REASON TO DO THAT.

11   Q   WELL, THEN, PERHAPS YOU CAN TELL US WHY THERE'S NO FAX

12   HEADER FOR MATTEL AND WHY THERE'S NO DATE HERE AS OF

13   SEPTEMBER 18, 2000.

14   A   I HAVE NO IDEA.

15   Q   SO SITTING HERE TODAY, YOU HAVE NO EXPLANATION AS TO WHY

16   THOSE TWO THINGS ARE MISSING FROM THIS DOCUMENT; IS THAT RIGHT?

17   A   I HAVE NO IDEA WHY THEY'RE MISSING, NO.

18        THE COURT:  LET'S TAKE OUR MORNING BREAK AT THIS

19   TIME.

20        (WHEREUPON, JURORS DEPART COURTROOM.)

21        THE COURT:  COUNSEL, THE COURT HAS JUST ISSUED THE

22   FOLLOWING ORDER:

23        "ORDER VACATING THE COURT'S JUNE 5, 2008 ORDER

24   GRANTING MATTEL'S MOTION REGARDING ADVERSE JURY INSTRUCTION.

25        "ON JUNE 5, 2008, THE COURT ISSUED AN ORDER CAPTIONED

Transcript of Proceedings - AM (I. Larian Direct)  6/6/2008  9:00:00 AM

1    "ORDER GRANTING MATTEL, INCORPORATED'S MOTION FOR AN ORDER,

2    FINDING THAT CERTAIN DOCUMENTS ARE AUTHENTIC, GRANTING ADVERSE

3    INFERENCE JURY INSTRUCTIONS, AND PRECLUDING CERTAIN TESTIMONY.

4    SEE 049049, DOCKET NUMBER 3922.

5        "THE ORDER GRANTING MATTEL'S MOTION WAS MISTAKENLY

6    PROCESSED BY THE CLERK'S OFFICE.  THE COURT HAS NOT CONSIDERED

7    MATTEL'S MOTION AND HAS EXPLICITLY STATED ON THE RECORD THAT IT

8    HAS DEFERRED RULING ON THIS MATTER.

9        "THE COURT WILL CONSIDER AND RULE ON MATTEL'S MOTION

10   AT A LATER POINT IN THE ONGOING TRIAL AFTER THE RELEVANT

11   WITNESSES HAVE BEEN CALLED TO TESTIFY BUT BEFORE THE JURY IS

12   INSTRUCTED.

13       "THIS ORDER, WHICH THE COURT NOW VACATES, SHOULD NOT

14   BE TAKEN AS ANY INDICATION OF HOW THE COURT WILL ULTIMATELY

15   RULE ON THIS ISSUE.  ACCORDINGLY, THE COURT VACATES THE ORDER

16   GRANTING MATTEL'S MOTION REGARDING ADVERSE JURY INSTRUCTION,

17   DOCKET 3922.  IT IS SO ORDERED."

18       THE COURT WILL TAKE A 15-MINUTE RECESS.

19       (WHEREUPON, A BRIEF RECESS WAS HELD.)

20       (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY:)

21       THE COURT:  I UNDERSTAND THERE'S A MATTER YOU WANT TO

22   TAKE UP BEFORE THE JURY COMES IN.

23       MR. PRICE:  YES, YOUR HONOR.

24       MR. NOLAN AGREED WITH THIS, BUT I WANTED TO PUT IT ON

25   THE RECORD.  WE WOULD ASK THAT THE WITNESS BE INSTRUCTED NOT TO

1    ADD "THIS E-MAIL" WHEN HE ANSWERS EVERY QUESTION CONCERNING HIS

2    COMMUNICATIONS.

3          THE COURT:  THERE WAS ONE ANSWER HE MADE REFERENCE TO

4    THE E-MAIL THAT I OVERRULED THE OBJECTION, WHERE I COULD SEE

5    WHERE THE ANSWER ARGUABLY CALLED FOR THAT EXPLANATION; SO THERE

6    WAS ONE.  BUT OTHERWISE--

7          MR. PRICE:  I'M NOT SUGGESTING HE WAS LOADED UP FOR

8    IT, BUT WITNESSES DO THEIR OWN THING, OBVIOUSLY.  BUT THERE WAS

9    A FEW TIMES WHEN IT SHOULDN'T HAVE BEEN.  AND CLEARLY, IT'S AN

10   E-MAIL WHICH HAS BEEN IN THE PRIVILEGE LOG, AND YOU KNOW THE

11   ENTIRE HISTORY OF THAT.

12         THE COURT:  YES.

13         MR. PRICE:  BUT I BELIEVE THE WITNESS HAS BEEN SO

14   ADVISED.

15         MR. NOLAN:  YOUR HONOR, I TALKED TO MR. LARIAN.  HE

16   WASN'T PRELOADED TO DO THAT.  I THINK THAT THE QUESTIONS, THE

17   WAY THEY WERE ASKED, SOMETIMES CALLED FOR IT.  I KNOW ONE OF

18   THEM WAS OVERRULED.  BUT I TALKED TO MR. LARIAN AND I ASKED HIM

19   TO BE VERY CAREFUL ABOUT THAT, AND HOPEFULLY WE WON'T HAVE A

20   RECURRENCE OF THAT.

21         THE COURT:  VERY GOOD.

22         ANYTHING FURTHER OR CAN WE BRING THE JURY IN?

23         MR. NOLAN:  HAS THERE BEEN A DETERMINATION ABOUT

24   WHETHER OR NOT THE HEARING ON MONDAY IS GOING TO GO FORWARD?

25         THE COURT:  NO.  THANK YOU FOR BRINGING THAT UP.

1        THE HEARING IS GOING TO GO FORWARD ON TUESDAY MORNING

2    AT 8:00 A.M.  I WANT TO DO THIS ALTOGETHER.  WE HAVE THE TWO

3    MOTIONS PENDING BEFORE THE COURT.  THE ONE MOTION IS THE MOTION

4    FOR ORDER ENFORCING THE JANUARY 25, 2007 ORDER DIRECTED TO

5    CARTER BRYANT, AND I'M GOING TO BE FINISHING UP MY MINUTE ORDER

6    ON THE PRELIMINARY ISSUE INVOLVED IN THAT, AND I'LL LET YOU

7    KNOW WHEN THE ORDER GOES OUT.

8        THE OTHER MOTION IS THE MOTION TO COMPEL THE

9    DEPOSITION OF LITTLER MENDELSON.  I ANTICIPATE GETTING THAT

10   BACK.  AND THEN WE HAVE THE UNDERLYING MOTION CONCERNING THE

11   EVIDENCE ELIMINATOR AT ISSUE.  I WANT ALL THREE OF THOSE

12   HANDLED AT THE SAME TIME.  I DON'T WANT TO BREAK THIS UP OVER

13   THE TWO DAYS, SINCE I FELT COMPELLED, OUT OF DUE PROCESS

14   CONCERNS.  TO GIVE THE ATTORNEYS SOME TIME, WE'LL DO THIS

15   ALTOGETHER AT 8:00 ON TUESDAY; SO THERE WILL NOT BE A HEARING

16   AT 1:30.

17       I UNDERSTAND THAT CAUSES POTENTIAL PROBLEMS FOR AN

18   EXPERT.  THE COURT WILL GRANT LEAVE TO SUBMIT THOSE BY WAY OF

19   THE EXPERT DEPOSITION OR THE REPORTS, OR HOWEVER YOU WANT TO,

20   AND I APOLOGIZE FOR THAT, BUT I THINK IT'S MORE IMPORTANT THAT

21   ALL THESE MATTERS BE CONSIDERED, FOR THE COURT'S BENEFIT, AT

22   THE SAME TIME.

23       MR. ZELLER:  THANK YOU, YOUR HONOR.

24       WE'LL STILL HAVE THE HEARING THEN ON THE EVIDENTIARY

25   MATTERS MONDAY AFTERNOON AS WELL?

1          THE COURT:  THE EVIDENTIARY MATTERS ON THE --

2          MR. ZELLER:  I THOUGHT WE WERE HAVING THE HEARING ON

3    SOME OF THE EVIDENCE ELIMINATOR EVIDENTIARY QUESTIONS MONDAY

4    AFTERNOON.

5          THE COURT:  I'D LIKE TO HEAR THAT ALL AT ONCE ON

6    TUESDAY MORNING; THAT WILL BE CONSOLIDATED.

7          MR. ZELLER:  I SEE.

8          THE COURT:  LARGELY FOR THE COURT'S BENEFIT.

9          SO I MAY END UP INSTRUCTING THE JURY TO COME IN AT

10   10:00 ON TUESDAY MORNING INSTEAD OF 9:00 TO GIVE US TWO HOURS

11   TO DO IT.  BUT I'D RATHER DO THIS ALL AT ONCE AND THE COURT BE

12   ABLE TO ISSUE A CONSOLIDATED ORDER ON THAT.

13         MR. ZELLER:  FAIR ENOUGH.

14         WE WANT TO MAKE SURE THERE WILL BE ENOUGH TIME.  I

15   THINK IT'S CONTEMPLATED THERE WILL BE AT LEAST SOME LIVE

16   TESTIMONY TO THE COURT.  AND IT'S PROBABLY GOING TO BE MORE

17   THAN AN HOUR, I WOULD IMAGINE, TO GO THROUGH ALL THOSE ISSUES.

18         THE COURT:  I'M MAKING THIS DECISION HAVING TAKEN

19   ANOTHER LOOK AT THE MOTIONS AND WITH SOME THOUGHTS IN MIND.  I

20   FEEL THAT TWO HOURS WILL BE SUFFICIENT.

21         MR. ZELLER:  THANK YOU.

22         THE COURT:  ANYTHING FURTHER?

23         MR. NOLAN:  NO, YOUR HONOR.

24         MR. PRICE:  NO, YOUR HONOR.

25         THE COURT:  LET'S BRING THE JURY IN.

1          (JURORS ENTER COURTROOM.)

2          THE COURT:  COUNSEL, YOU MAY PROCEED.

3          MR. PRICE:  THANK YOU, YOUR HONOR.

4     BY MR. PRICE:

5     Q    MR. LARIAN, WE WERE LOOKING AT 13383; PERHAPS WE CAN PUT

6     THAT BACK UP, THE SECOND PAGE.

7          THIS IS THE CONTRACT THAT WAS FAXED TO MS. GLASER.

8          YOU RECALL THAT I WAS ASKING YOU ABOUT THE DATE NOT

9     BEING HERE, AS OF SEPTEMBER 18, 2000, AND FAX HEADER.

10         LET ME ASK YOU THIS:  I TAKE IT YOUR TESTIMONY IS

11    THAT YOU DIDN'T ASK FOR THIS TO BE DONE BECAUSE YOU HAVE

12    NOTHING TO HIDE.

13    A    THAT'S CORRECT.

14    Q    THAT IS, THERE WAS NO REASON TO HIDE FROM MS. GLASER OR

15    ANYONE THAT MR. BRYANT WORKED FOR MGA; IS THAT RIGHT?

16    A    I'M SORRY.  MR. BRYANT NEVER WORKED FOR MGA.  MR. BRYANT

17    WAS A CONTRACTOR WITH MGA.

18    Q    AND THERE WAS NO REASON TO HIDE THAT FROM ANYONE.

19    A    YES.  THERE'S NEVER BEEN A REASON TO HIDE THAT, NO.

20    Q    NEVER BEEN A REASON TO HIDE FROM ANYONE THAT MR. BRYANT

21    WAS INVOLVED IN BRATZ.

22    A    NO REASON TO HIDE THAT HE WAS INVOLVED WITH BRATZ.

23    Q    WELL, YOU KNOW THERE WAS A WOMAN WHO WORKED FOR YOU NAMED

24    RACHEL HARRIS; SHE WAS THE DIRECTOR OF THE CREATIVE SERVICES AT

25    MGA.

1    A   THAT'S CORRECT.

2    Q   IT'S TRUE, SIR, THAT YOU CANNOT DENY THAT YOU TOLD

3    MS. HARRIS THAT YOU DID NOT WANT BRYANT TO BE PUBLICALLY

4    ASSOCIATED WITH BRATZ?

5    A   I NEVER TOLD HER OR ANYBODY ELSE THAT I DON'T WANT TO HIDE

6    CARTER BRYANT'S NAME OR ASSOCIATION WITH THE BRATZ.

7    Q   SO SITTING HERE TODAY, YOU'RE DENYING YOU EVER SAID

8    ANYTHING LIKE THAT TO HER; CORRECT?

9    A   I DO.

10        MR. PRICE:  YOUR HONOR, IF WE COULD PLAY FROM

11   MR. LARIAN'S DEPOSITION TRANSCRIPT, MARCH 26, 2008, PAGE 278,

12   LINE 23, TO 279, LINE 15.

13        THE COURT:  ANY OBJECTION?

14        MR. NOLAN:  JUST ONE.

15        FOR COMPLETENESS, COULD WE GO DOWN TO LINE 15.

16        MR. PRICE:  15 IS WHERE I'M GOING.

17        MR. NOLAN:  NO OBJECTION.

18        THE COURT:  VERY WELL.

19        (VIDEO DEPOSITION PLAYS;

20        EXCERPTS AS PROVIDED BY COUNSEL:)

21        "Q.  DID YOU EVER TELL RACHEL HARRIS IN WORDS OR

22        SUBSTANCE THAT SHE SHOULDN'T TALK ABOUT CARTER

23        BRYANT BEING INVOLVED WITH BRATZ?

24        A.  I DON'T RECALL IF I HAVE OR NOT.

25        Q.  YOU'RE NOT SURE IF YOU DID?

1     A.  I DON'T EVEN RECALL HER.

2     Q.  WELL, SO IS -- ARE YOU SAYING THAT IT'S --

3     YOU DON'T RECALL ONE WAY OR ANOTHER?

4     A.  I JUST DON'T RECALL.

5     Q.  WELL, ARE YOU DENYING YOU TOLD HER THAT?

6     THE WITNESS:  I JUST DON'T RECALL IT.

7     BY MR. ZELLER:

8     Q.  SO YOU MIGHT HAVE SAID IT TO HER, MIGHT

9     NOT; YOU'RE NOT SURE?

10    A.  NO.  I JUST DON'T RECALL IT."

11    (END OF EXERPT PROVIDED.)

12    BY MR. PRICE:

13    Q   SITTING HERE TODAY THOUGH, SIR, YOU CAN EMPHATICALLY STATE

14    UNDER OATH THAT IF MS. HARRIS SAYS YOU TOLD HER THAT YOU DIDN'T

15    WANT BRYANT TO BE PUBLICLY ASSOCIATED WITH BRATZ, THAT SHE IS

16    MISTAKEN.

17    A   I DON'T KNOW WHAT SHE HAD SAID OR NOT SAID.  I JUST DON'T

18    RECALL EVER SAYING THAT TO HER OR ANYBODY ELSE.

19    Q   AGAIN WE'RE GETTING INTO THE 'I DON'T RECALL.'

20        MY QUESTION IS, IF SHE SAYS UNDER OATH THAT'S WHAT

21    YOU TOLD HER, CAN YOU DENY THAT YOU TOLD HER THAT?

22    A   I DON'T RECALL IF I EVER SAID THAT.  THERE'S NO REASON FOR

23    ME TO DO THAT.

24    Q   CAN YOU DENY THAT YOU TOLD MS. HARRIS THAT IF ANYONE ASKS,

25    THAT YOU WERE GOING TO SAY THAT EITHER YOU OR YOUR DAUGHTER

1    WERE THE ONE THAT CREATED BRATZ?

2    A   MGA CREATED BRATZ.  THERE'S NO QUESTION ABOUT THAT.

3    Q   MY QUESTION IS DIFFERENT.

4        CAN YOU DENY THAT YOU TOLD MS. HARRIS THAT IF ANYONE

5    ASKS, THAT YOU WERE GOING TO SAY YOU OR YOUR DAUGHTER CREATED

6    BRATZ AND NOT MR. BRYANT?

7    A   HER RECOLLECTION, THE TESTIMONY, IF THAT'S EXACTLY WHAT

8    SHE SAID, WOULD BE WRONG.

9    Q   AGAIN, THAT'S BECAUSE YOU HAVE NOTHING TO HIDE WITH

10   RESPECT TO MR. BRYANT'S INVOLVEMENT WITH BRATZ; IS THAT RIGHT?

11       MR. NOLAN:  OBJECTION, YOUR HONOR.  ASKED AND

12   ANSWERED.

13       THE COURT:  OVERRULED.

14       THE WITNESS:  I HAVE NOTHING TO HIDE, AND SHE WAS A

15   DISGRUNTLED EMPLOYEE.

16   BY MR. PRICE:

17   Q   SO NOW YOU'RE SAYING YOU BELIEVE MS. HARRIS IS NOT TELLING

18   THE TRUTH -- POTENTIALLY NOT TELLING THE TRUTH ABOUT IT.

19   A   NO, I'M NOT SAYING THAT.

20   Q   MS. O'CONNOR WHO TESTIFIED, SHE'S ALSO A DISGRUNTLED

21   EMPLOYEE?

22   A   I DON'T WANT TO GET INTO THAT, IF SHE WAS OR NOT, FOR

23   CONFIDENTIALITY REASONS.

24   Q   I'LL TAKE THAT UP LATER.

25       LET ME ASK YOU THEN, SIR, IF YOU WOULD LOOK AT

1    EXHIBIT 4507.  DO YOU RECOGNIZE 4507 AS AN E-MAIL STRING WHICH

2    INCLUDES AN E-MAIL FROM YOU TO VICTORIA O'CONNOR AND OTHERS?

3    A    THAT'S CORRECT.

4    Q    AND THIS IS DATED MARCH 12, 2002.  DO YOU SEE THAT?

5    A    YES.

6    Q    IF YOU GO INTO WHAT'S ATTACHED HERE, THE BOTTOM HALF OF

7    THIS E-MAIL, YOU SEE WHAT'S ATTACHED IS AN E-MAIL FROM A

8    DAVID DEES TO CARTER BRYANT, DATED MARCH 29, 2002.

9        DO YOU SEE THAT?

10   A    YES.

11   Q    AND MR. DEES ACTUALLY ATTACHED -- IF WE GO TO THE NEXT

12   PAGE -- AN E-MAIL FROM A FAN TO HIM -- IT STARTS HERE,

13   ACTUALLY, AND GOES DOWN -- FROM A FAN TO HIM AND THEN HIS

14   RESPONSE.

15       DO YOU SEE THAT?

16   A    I'M NOT SURE WHERE THE FAN IS.

17   Q    YOU SEE WHERE IT SAYS "HELLO, MY NAME IS CHRISTIAN.  I'M A

18   GIRL..."

19   A    YES.

20   Q    AND THEN YOU SEE THE "HI, CHRISTIAN"?

21   A    YES, I DO.

22   Q    DOWN HERE, IN THIS PARAGRAPH, YOU SEE --

23       BY THE WAY, DAVID DEES WAS AN ILLUSTRATOR?

24   A    I DON'T RECALL HIM.

25   Q    IT SAYS "HOWEVER, I CAN'T TAKE CREDIT FOR CREATING THE

1    BRATZ DOLLS OR EVEN THE FIRST BRATZ ILLUSTRATIONS, FOR THAT

2    HONOR SHOULD GO TO A FELLOW NAMED CARTER BRYANT WHO'S TRULY A

3    GENIUS OF FASHION AND THE SOLE AND ONLY PERSON WHO FIRST DREW

4    THOSE GREAT POUTY LIPS AND THAT EXTREME LOOK THAT ONLY OUR

5    HEROES SHARE."

6        THIS IS PART OF THAT E-MAIL THAT YOU READ AND THEN

7    RESPONDED TO?

8    A   YES.

9    Q   GO TO THE FIRST PAGE.  WE'LL HIGHLIGHT THIS.  THIS IS YOUR

10   RESPONSE ASKING "WHO GAVE DAVID DEES INFO TO WHAT HE DOES FOR

11   US TO THIS YAHOO LADY, AND WHY?"

12   A   YES, SIR, I DO.

13   Q   AND THERE'S A SECTION HERE, "JULIE, BETH, ABE, THERE MUST

14   BE NO MENTION ABOUT MATTEL OR ANY OF THEIR PROPERTIES, CARTER,

15   OR ANY MGA BRATZ PARTS, ET CETERA."  DO YOU SEE THAT?

16   A   I DO.

17   Q   SO HERE AT THIS POINT YOU'RE SAYING "DON'T MENTION CARTER

18   BRYANT"; CORRECT?

19   A   OR MGA OR BRATZ OR ANY OTHER PROPERTIES.

20   Q   WHAT YOU'RE UPSET ABOUT IS HE'S TALKING ABOUT CARTER

21   BRYANT.

22   A   NO.  I'M UPSET THAT HE'S -- TWO THINGS I'M UPSET ABOUT.

23   WOULD YOU LIKE ME TO EXPLAIN WHY I AM UPSET?

24   Q   THAT WAS MY QUESTION.  YOU CAN ANSWER IT FULLY.

25       YOU'RE UPSET BECAUSE HE MENTIONED CARTER BRYANT AS

Transcript of Proceedings - AM (I. Larian Direct)  6/6/2008  9:00:00 AM

1    BEING THE CREATOR AND GENIUS BEHIND BRATZ/?

2    A   NO.  IF YOU READ THIS WHOLE DOCUMENT COMPLETELY, GO TO THE

3    PAGES, MGA 3801821, AND 801822, HE'S TALKING ABOUT EVERYTHING

4    ABOUT MGA, WHAT DO WE DO, BUSINESS, WHERE IS THE OFFICES; A LOT

5    OF INFORMATION ABOUT THE COMPANY THAT I DID NOT WANT TO HAVE ON

6    PUBLIC YAHOO WEB SITE.

7         SECONDLY, I HAD RECEIVED A LETTER, TO THE BEST OF MY

8    RECOLLECTION, FROM YOUR LAW FIRM, A CEASE AND DESIST LETTER,

9    REGARDING YAHOO TELLING ME THAT 'IF YOU DON'T PUT THIS WEB SITE

10   DOWN, WE ARE GOING TO SUE YOU,' AND I DIDN'T WANT TO BE

11   INVOLVED WITH MATTEL WITH ANY TYPE OF A LAWSUIT.

12   Q   THAT'S NOT WHAT THAT LETTER SAID, IS IT?

13        THE LETTER YOU GOT FROM OUR LAW FIRM HAD NOTHING TO

14   DO WITH SHUTTING DOWN A WEB SITE, DID IT?

15   A   I DON'T RECALL THE EXACT CONTENTS, BUT I'M SURE IT'S IN

16   THE EVIDENCE AND SOMEBODY WILL SHOW IT TO YOU.

17   Q   THAT'S EXHIBIT 17252.

18   A   I DON'T FIND 17252.

19   Q   I'VE BEEN TOLD IT'S THE LAST TAB.

20   A   YES, I HAVE IT NOW.

21   Q   IS THAT THE E-MAIL THAT YOU WERE REFERRING TO, DATED

22   FEBRUARY 7, 2002?

23   A   E-MAIL?

24   Q   IS THIS THE LETTER YOU WERE TALKING ABOUT, DATED

25   FEBRUARY 7, 2002?

1    A   THAT'S ONE OF THE LETTERS THAT I RECEIVED -- ONE OF THE

2    LETTERS THAT I RECEIVED FROM YOUR LAW FIRM.

3    Q   WELL, YOU RECALL YOU PREVIOUSLY TESTIFIED UNDER OATH, THIS

4    LETTER IS THE REASON IN EXHIBIT 4507 HERE, THAT YOU SAID

5    'YOU'RE NOT TO MENTION MATTEL OR OTHER PROPERTIES, CARTER, MGA

6    BRATZ, ARTS, ET CETERA.'

7    A   THESE, TOGETHER WITH, THERE WERE RUMORS IN THE MARKET THAT

8    WE WERE GETTING FROM RETAILERS THAT MATTEL WAS JUST ABOUT TO

9    SUE US BECAUSE OF BRATZ, AND I DIDN'T WANT TO HAVE ANY ISSUES,

10   LEGAL BATTLE, WITH MATTEL.

11   Q   ACTUALLY, YOU PREVIOUSLY TESTIFY UNDER OATH THAT THE ONLY

12   THING YOU REMEMBER THAT CAUSED YOU TO BE UPSET WAS GETTING THIS

13   LETTER, EXHIBIT 17252.

14   A   MAYBE I, AT MY DEPOSITION, THAT'S WHAT I RECALLED.  BUT

15   GOING BACK AND LOOKING, THERE ARE OTHER DOCUMENTS THAT IT

16   SHOWS, AND THOSE ARE IN WRITING, THAT WE WERE HEARING FROM THE

17   RETAILERS THAT MATTEL WANTS TO SUE US BECAUSE BRATZ WAS

18   SUCCESSFUL.  AND THAT'S WHAT MATTEL DOES, FRANKLY, IN THE TOY

19   BUSINESS.

20       MR. PRICE:  YOUR HONOR, MOVE TO STRIKE THE LATTER

21   PART AS NONRESPONSIVE, AND REQUEST AN INSTRUCTION THAT ANYTHING

22   HE SAYS IS NOT OFFERED FOR THE TRUTH CONCERNING WHAT ANYONE

23   ELSE SAID.

24       THE COURT:  IS THERE ANY OBJECTION TO THAT

25   INSTRUCTION?

1        MR. NOLAN:  YES, YOUR HONOR.  WE WOULD HAVE AN

2    OBJECTION, YOUR HONOR.  THERE'S GOING TO BE --

3        THE COURT:  ARE YOU SUGGESTING THAT IT IS BEING

4    OFFERED FOR THE TRUTH?

5        MR. NOLAN:  WITH RESPECT TO THAT IT'S NOT BEING

6    OFFERED FOR THE TRUTH OF THE MATTER, BUT WHAT HIS STATE OF MIND

7    WAS.

8        MR. PRICE:  RIGHT.  THAT'S WHY I ASKED FOR THE

9    INSTRUCTION.

10       THE COURT:  VERY WELL.  THE LAST PORTION IS STRICKEN,

11   AND THE OUT-OF-COURT STATEMENT ESSENTIALLY IS NOT BEING OFFERED

12   FOR THE TRUTH OF THE MATTER ASSERTED.

13       COUNSEL.

14   BY MR. PRICE:

15   Q   SO SINCE YOU TELL US THAT'S YOUR STATE OF MIND AND WHY YOU

16   WROTE THIS, I'D LIKE TO PLAY, IF I COULD, YOUR HONOR, FROM THE

17   MARCH 26, 2008 DEPOSITION TRANSCRIPT, PAGE 279, LINE 16 TO PAGE

18   280, LINE ONE.

19       MR. NOLAN:  NO OBJECTION, YOUR HONOR.

20       THE COURT:  YOU MAY PROCEED.

21       (VIDEO DEPOSITION PLAYS; EXCERPTS

22       PROVIDED BY COUNSEL AS FOLLOWS: )

23       "Q.  DO YOU RECALL THAT THERE WAS A TIME WHEN AN

24       OUTSIDE DESIGNER NAMED DAVID DEES SENT AN EMAIL TO A

25       BRATZ FAN WEBSITE?

1      A.  I DON'T RECALL DAVID DEES.

2      Q.  DO YOU RECALL ANY OUTSIDE DESIGNER SENDING

3      AN EMAIL TO A BRATZ FAN WEBSITE THAT CAUSED YOU SOME

4      CONCERN OR -- OR UPSET?

5      A.  THE ONLY THING I REMEMBER THAT CAUSED ME

6      UPSET WAS GETTING A LETTER FROM YOUR LAW FIRM ABOUT

7      SOMEBODY'S -- SOMEBODY'S YAHOO WEBSITE.  THAT'S THE

8      ONLY THING I REMEMBER."

9      (END OF EXERPTS PROVIDED.)

10     BY MR. PRICE:

11     Q   NOW TURNING TO THAT LETTER, MR. LARIAN, EXHIBIT 17252 IS

12     THE LETTER YOU WERE REFERRING TO; CORRECT?

13     A   AGAIN, I DON'T RECALL, BECAUSE, AS I SAID, WE RECEIVED

14     SEVERAL LETTERS FRO YOUR LAW FIRM; SO I'M NOT SURE IF THIS IS

15     THE ONE OR ANOTHER ONE.

16     Q   YOU SEE THAT THIS IS A LETTER YOU RECEIVED FEBRUARY 7,

17     2002, FROM QUINN EMANUEL; CORRECT?

18     A   YES.

19        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 17252 INTO

20     EVIDENCE.

21        MR. NOLAN:  NO OBJECTION.

22        THE COURT:  ADMITTED.  YOU MAY PUBLISH.

23     BY MR. PRICE:

24     Q   JUST SO WE'RE CLEAR, THE DATE OF EXHIBIT 4507 WAS MARCH

25     2002; CORRECT?

1   A   CORRECT.

2   Q   SO THIS IS THE LETTER YOU RECEIVED -- IF WE COULD BLOW IT

3   UP HERE -- AND YOU SEE IT TALKS ABOUT THE 'MATTEL MARKS, BARBIE

4   AND DIVA STARZ TRADEMARKS, ARE BEING INFRINGED BY THE BRATZ

5   YAHOO DISCUSSION GROUP'?

6   A   I DO SEE THAT.

7   Q   AND A COPY OF THE HOME PAGE WAS ATTACHED TO THAT LETTER.

8       DO YOU SEE THAT?

9   A   SORRY?

10   Q   IT SAYS "ENCLOSED IS A COPY OF THE HOME PAGE."

11   A   I SEE THIS LETTER SAYS THAT.

12   Q   IT SAYS "THE KEY WORDS DESIGNATED BY MGA INCLUDE BARBIE

13   AND DIVA STAR."

14       DO YOU SEE THAT?

15   A   YES.

16   Q   AND THE WAY THAT WORKS IS THAT IF SOMEONE IS DOING AN

17   INTERNET SEARCH, SAY, FOR BARBIE OR DIVA STAR, IF THAT'S A KEY

18   WORD, THAT MEANS THAT THE SEARCH RESULTS WILL INCLUDE A

19   WEB SITE ABOUT BRATZ.

20   A   I WOULD HAVE NO IDEA.  YOU GUYS WROTE THE LETTER.  I HAVE

21   NO IDEA.

22   Q   WELL, YOU CERTAINLY DIDN'T WRITE BACK AND SAY THIS IS

23   INCORRECT.

24   A   NO.  I TURNED THIS LETTER OVER TO MY ATTORNEY PATTY

25   GLASER.

1   Q   SO WHEN INTERNET USERS SEARCH YAHOO FOR DISCUSSION GROUPS

2   RELATED TO MATTEL'S BARBIE AND DIVA STAR DOLLS, THE BRATZ

3   DISCUSSION GROUPS ARE IDENTIFIED.  DO YOU SEE THAT?

4   A   YES.

5   Q   AND THEN IT TALKS ABOUT 'THE COURTS HAVEN'T HESITATED TO

6   ENJOIN THE USE OF A COMPETITOR'S MARK TO DIVERT INTERNET USER

7   FROM FINDING A COMPETITOR'S WEB SITE OR TO DRIVE TRAFFIC TO THE

8   INFRINGER YOU CITE.'

9   A   I SEE WHAT THE LETTER SAYS.

10   Q   IF WE COULD GO TO THE SECOND PAGE.  AND AFTER HAVING SOME

11   OTHER CASES DISCUSSED, IT SAYS "MATTEL MUST REQUEST MGA

12   ENTERTAINMENT PROVIDE WRITTEN CONFIRMATION WITHIN ONE WEEK THAT

13   ALL KEY WORDS ON BRATZ SITES THAT CONSIST OF TERMS IDENTICAL OR

14   CONFUSINGLY SIMILAR TO MATTEL MARKS HAVE BEEN REMOVED AND THAT

15   MGA ENTERTAINMENT WILL NOT AGAIN USE MATTEL'S MARKS IN SUCH A

16   MANNER.'  DO YOU SEE THAT?

17   A   YES.

18   Q   AND THE MARKS THAT THEY WERE REFERRING TO -- WELL, YOU

19   WOULD AGREE THAT IF THA'S WHAT'S HAPPENING, THAT SHOULDN'T BE

20   HAPPENING; THAT IS, THAT MGA SHOULDN'T HAVE BEEN USING MATTEL'S

21   MARKS INTENTIONALLY TO DIVERT TRAFFIC TO THEIR WEB SITE.

22   A   SIR, MGA WAS NOT USING MATTEL'S MARKS.  THIS IS A FAN WHO

23   HAD COME UP WITH THE PUBLIC WEB SITE CALLED YAHOO ON HIS OWN,

24   WHAT HE WAS PUTTING DIVA STARZ AND BRATZ, AND YOU GUYS WERE

25   TRYING TO SUE ME BECAUSE SOMEBODY OUTSIDE -- LIKE A MEMBER OF

1    JURY COULD HAVE A WEB SITE AND PUT BARBIE AND BRATZ ON IT AND

2    DIVA STARZ, SAYING THAT, OKAY, IF YOU DON'T DO THIS, WE GOING

3    TO COME AND TAKE YOUR CHILDREN.

4    Q    SO SHOW ME WHERE THAT IS HERE.  I MUST HAVE MISSED THAT.

5    WHERE IS THAT?

6    A    READ THE WHOLE LETTER.  IF YOU DON'T TAKE THIS OFF WITHIN

7    ONE WEEK -- I'M GOING TO READ IT COMPLETELY.

8    Q    SURE.  LET'S GO AND SEE WHERE THE KIDS ARE MENTIONED HERE.

9    A    NO, THEY ARE NOT MENTIONED.  I WAS BEING SARCASTIC.

10         MR. NOLAN:  WE'LL STIPULATE THAT THE CHILDREN ARE NOT

11   IN THIS LETTER.

12         THE COURT:  MOVE ALONG, COUNSEL.

13   BY MR. PRICE:

14   Q    IF WE GO HERE, WHAT IT'S TALKING ABOUT IS ENJOINING THE

15   USE OF A COMPETITOR'S MARK.

16         YOU KNOW WHAT THAT MEANS; RIGHT?

17   A    NO.  I'M NOT A LAWYER.  YOU WROTE THIS.  I HAVE NO IDEA

18   WHAT THAT MEANS.

19   Q    ARE YOU SAYING MGA HASN'T TOLD PEOPLE WHO ARE INFRINGING

20   ITS MARKS THAT IT WILL SEEK TO ENJOIN THEM FROM DOING THAT?

21   A    I AM SURE WE HAVE AND OUR LAWYERS HAVE DONE THAT.  I'M NOT

22   A LAWYER.

23   Q    IN FACT, YOU'VE HAD DOZENS OF CASES WHERE MGA HAS FILED

24   LAWSUITS TO PROTECT ITS INTELLECTUAL PROPERTY.

25   A    I BELIEVE WE HAVE.  I DON'T KNOW IF THERE ARE DOZENS, BUT

1    I BELIEVE WE HAVE FILED TO STOP PEOPLE IN USING OUR

2    INTELLECTUAL PROPERTY.

3    Q   SO, FOR EXAMPLE, YOU DON'T WANT A COMPETITOR USING THE

4    NAME BRATZ ON THEIR DOLLS; RIGHT?

5    A   NO, I DON'T.  WITHOUT OUR PERMISSION, I DON'T.

6    Q   SO YOU UNDERSTAND WHAT AN INJUNCTION IS AN ORDER SAYING

7    YOU CAN'T DO THAT.

8    A   CORRECT.

9    Q   AND I GUESS WHAT YOU'RE TELLING US IS THIS SITE WASN'T

10   EVEN MGA'S SITE, SO YOU DIDN'T REALLY CARE IF IT WAS SHUT DOWN

11   OR NOT.

12   A   NO.  ALL I'M SAYING IS THAT THIS WAS NOT AN MGA SITE.  WE

13   HAD NOT PUT THAT UP.  SOMEBODY ELSE HAD PUT THAT UP.  YET, YOU

14   WROTE US A LETTER TELLING US TO -- I DON'T KNOW, WHATEVER YOUR

15   LETTER SAYS TO DO.

16   Q   BUT I GUESS YOU'RE TELLING US IS THAT YOU DIDN'T CARE IF

17   THE SITE WAS ENJOINED OR NOT BECAUSE IT WASN'T YOURS.

18   A   I HAVE NO IDEA.  I DON'T HAVE A RECOLLECTION.  ALL I

19   REMEMBER IS THAT WHEN I GET THIS LETTER, I WAS VERY UPSET.  AND

20   KNOWING MATTEL, THAT THEY SUE EVERYBODY, I SENT THIS TO MY

21   LAWYER.

22       MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE, THOUGH

23   NOT UNEXPECTED.

24       THE COURT:  EVERYTHING AFTER "I HAVE NO IDEA AND I

25   DON'T HAVE ANY RECOLLECTION AT ALL"; AFTER THAT, THE ANSWER IS

1    STRICKEN.

2    BY MR. PRICE:

3    Q   YOU'LL AGREE, THOUGH, THAT WHAT THIS LETTER IS TALKING

4    ABOUT ARE THESE MATTEL MARKS, BARBIE AND DIVA STARZ; IS THAT

5    CORRECT?

6    A   THIS IS BARBIE AND DIVA STAR; IT DOESN'T HAVE THE Z AT THE

7    END.

8    Q   BUT THAT'S WHAT IT'S TALKING ABOUT.

9    A   YES.

10   Q   SO LET'S GO BACK TO EXHIBIT 4507.

11       CARTER IS NOT A MATTEL TRADEMARK, AS FAR AS YOU KNOW;

12   CORRECT?

13   A   HE'S NOT.

14   Q   AND THE LETTER YOU GOT FROM MATTEL HAD NOTHING TO DO WITH

15   NOT MENTIONING CARTER BRYANT, DID IT?

16   A   NO.  BUT THAT YAHOO WEB SITE HAD CARTER BRYANT'S NAME AND

17   OTHER THINGS IN THERE, AND I JUST DIDN'T WANT TO HAVE A LAWSUIT

18   BASICALLY BROUGHT FROM MATTEL REGARDING ANY MATTER THAT WILL

19   UPSET YOU.

20   Q   SO AT THIS POINT, THEN, YOU'RE SAYING IT WASN'T YOUR

21   INTENTION TO KEEP CARTER BRYANT UNDER WRAPS?

22   A   HE WAS NOT UNDER WRAPS.  HE WAS ALREADY IN THE NEWS.

23   Q   I'M TALKING ABOUT YOUR INTENTION -- IN THIS TIME FRAME,

24   SPRING 2002, IT WAS NOT YOUR INTENTION TO KEEP CARTER BRYANT

25   UNDER WRAPS BECAUSE YOU'RE TRYING TO HIDE SOMETHING; IS THAT

1   CORRECT?

2   A   THAT IS TRUE.  WE'VE NEVER TRIED TO HIDE CARTER BRYANT'S

3   NAME.

4   Q   IN THAT CASE, LOOK AT EXHIBIT 4942 THEN IN FRONT OF YOU.

5       DO YOU RECOGNIZE THAT AS AN E-MAIL STRING WHICH AT

6   THE TOP HAS AN E-MAIL BETWEEN YOU AND DEEDEE VALENCIA?

7   A   YES.

8   Q   AND COULD YOU TELL US WHO DEEDEE VALENCIA IS?

9   A   I DON'T RECOLLECT WHO SHE WAS.  I THINK SHE WAS A PRODUCT

10  MANAGER, BUT I DO NOT REMEMBER EXACTLY.

11  Q   AND BY A PRODUCT MANAGER, WHAT WOULD THE DUTIES OF A

12  PRODUCT MANAGER BE?

13  A   PRODUCT MANAGERS MANAGE PRODUCTS; THEY COME UP WITH

14  PRODUCT IDEAS, ET CETERA.

15  Q   NO RELATION TO DAVID DEES, AS FAR AS YOU KNOW?

16  A   WHO?

17  Q   DEEDEE VALENCIA.

18  A   I DON'T UNDERSTAND YOUR QUESTION.  WAS IT A JOKE?

19  Q   YOU DO RECOGNIZE THE EXHIBIT; CORRECT?

20  A   I DO.

21      MR. PRICE:  MOVE EXHIBIT 4942 INTO EVIDENCE, YOUR

22  HONOR.

23      MR. NOLAN:  NO OBJECTION.

24      THE COURT:  IT'S ADMITTED YOU MAY PUBLISH.

25  / / /

1    BY MR. PRICE:

2    Q   AND IT BEGINS WITH AN E-MAIL SENT BY DEEDEE VALENCIA TO

3    YOU.

4        DO YOU SEE THAT?

5    A   YES.

6    Q   THIS IS IN FEBRUARY OF 2003; RIGHT?

7    A   CORRECT.

8    Q   HER IDEA IS "LET'S DO A LIMITED EDITION COLLECTIBLE."

9    A   I SEE THAT.

10   Q   WHAT OFTEN HAPPENS ON THESE LIMITED EDITION COLLECTIBLES,

11   THERE'S A SIGNATURE OF SOME SORT OF A CREATOR OR SOMEONE

12   ASSOCIATED WITH THE PRODUCT.

13   A   ALL I CAN DO IS TALK ABOUT MGA, AND WE HAVE DONE

14   COLLECTIBLE DOLLS AND THEY DON'T HAVE A SIGNATURE OR ANYTHING

15   ELSE ON IT.

16   Q   WELL, ACTUALLY, IN THIS E-MAIL, MS. DEES FIRST TALKS ABOUT

17   HOW ONE WOULD SELL AND DISTRIBUTE THIS COLLECTIBLE DOLL;

18   CORRECT?

19   A   WHERE ARE YOU LOOKING AT?

20   Q   LIMITED EDITION COLLECTIBLE, SELLING/DISTRIBUTION, THERE'S

21   A PARAGRAPH HERE ON WHAT THE DISTRIBUTION WOULD BE OF THE DOLL;

22   CORRECT?

23   A   IT SAYS 'SELLING AND DISTRIBUTION.'

24   Q   AND THEN THERE'S A THING HERE, WHAT WERE THE FEATURES OF

25   THIS COLLECTIBLE DOLL.

1    A   THAT'S CORRECT; THAT'S WHAT SHE'S SAYING.

2    Q   SO WHEN YOU READ THIS, YOU WERE LOOKING AT HER IDEAS AS TO

3    WHAT KINDS OF FEATURES YOU MIGHT WANT TO PUT ON A COLLECTIBLE

4    DOLL; CORRECT?

5    A   SHE HAD A WHOLE BUNCH OF IDEAS ABOUT PRODUCTS HERE, AND I

6    REPLIED IN THE TOP SAYING "GOOD IDEAS, LET'S DISCUSS IN

7    NEW YORK."

8    Q   AND THE FIRST THING IS "SIGNED BY ?  I KNOW WE WANT TO

9    KEEP CARTER UNDER WRAPS."

10        THAT'S ONE OF THE THINGS YOU READ WHEN YOU READ THIS

11   E-MAIL IN FEBRUARY 2003, YOU READ MS. DEES SAYING TO YOU, WE

12   WANT TO KEEP CARTER UNDER WRAPS, SO WHO'S GOING TO SIGN THIS.

13   A   I DON'T RECALL PAYING ATTENTION TO THAT PORTION OF THE

14   E-MAIL.  I COULD HAVE, BUT I DON'T RECALL IT.  THERE WAS NO

15   REASON TO HIDE CARTER BRYANT'S NAME.

16   Q   WELL, THEN IF THERE'S NO REASON TO HIDE CARTER BRYANT'S

17   NAME, THIS MUST HAVE REALLY SURPRISED YOU OR UPSET YOU, WHERE

18   ONE OF YOUR PRODUCT MANAGERS SAYS TO YOU "I KNOW WE WANT TO

19   KEEP HIM UNDER WRAPS."

20   A   NO, IT DID NOT.

21   Q   SO IT WOULDN'T SURPRISE YOU IF ONE OF YOUR PRODUCT

22   MANAGERS SAID TO YOU "I KNOW THAT WE WANT TO KEEP CARTER BRYANT

23   UNDER WRAPS."

24   A   THERE WAS NO NEED TO KEEP CARTER BRYANT'S NAME UNDER

25   WRAPS; SO I DON'T KNOW WHAT YOU'RE GETTING AT.

1    Q   SO YOU WOULDN'T WANT YOUR PEOPLE TO HAVE THE IMPRESSION

2    THAT IT WAS YOUR DESIRE TO KEEP CARTER BRYANT UNDER WRAPS.  YOU

3    WOULDN'T WANT THAT.

4    A   ALL I CAN REMEMBER IS THAT WE HAD NO IDEA TO HIDE

5    CARTER BRYANT'S NAME.  AS A MATTER OF FACT, WE HAD NOT.  IT WAS

6    ALL OVER.

7    Q   MY QUESTION IS DIFFERENT.

8        IT'S THAT CERTAINLY YOU WOULDN'T WANT YOUR EMPLOYEES,

9    LIKE YOUR PRODUCT MANAGERS, TO BE UNDER THE MISIMPRESSION THAT

10   THEY ARE TO KEEP CARTER BRYANT UNDER WRAPS.  YOU WOULDN'T WANT

11   THEM TO HAVE THAT IMPRESSION IF IT WEREN'T TRUE.

12   A   I HAVE NO RECOLLECTION OF HAVING ANYBODY WANTING TO KEEP

13   HIS NAME UNDER WRAPS.

14       I DON'T THINK I UNDERSTAND YOUR QUESTION.

15   Q   I THINK YOU SAID THAT YOU DIDN'T WANT TO KEEP CARTER

16   BRYANT UNDER WRAPS; RIGHT?

17   A   WE HAD NO REASON TO KEEP CARTER BRYANT OR ANYBODY ELSE

18   UNDER WRAPS.

19   Q   SO IF THAT'S CORRECT, THEN CERTAINLY YOU WOULDN'T WANT THE

20   PEOPLE WORKING FOR YOU TO THINK THAT; YOU WOULDN'T WANT THEM TO

21   THINK THAT THEY HAD TO HIDE CARTER BRYANT; RIGHT?

22   A   I WAS NOT IN THEIR HEAD.  I DON'T KNOW WHAT THEY WERE

23   THINKING OR NOT THINKING.

24   Q   SURE YOU KNOW WHAT THEY WERE THINKING.  DEEDEE VALENCIA

25   JUST WROTE TO YOU AND SAID "I KNOW WE WANT TO KEEP CARTER UNDER

1    WRAPS."

2    A   I SEE WHAT SHE WROTE.

3    Q   YOU'RE TELLING US THAT IS UNTRUE AND YOU WOULDN'T WANT

4    PEOPLE TO THINK THAT; RIGHT?

5    A   WE HAD NO REASON TO HIDE CARTER BRYANT'S NAME UNDER WRAPS.

6    Q   SO IF THAT'S TRUE, THEN CLEARLY WHAT YOU WOULD SAY IN YOUR

7    RESPONSE IS, "I DON'T KNOW WHERE YOU'RE GETTING THIS, BUT

8    PLEASE, YOU GUYS, QUIT KEEPING CARTER BRYANT UNDER WRAPS."

9    A   NO.  NOT NECESSARILY.  I WAS LOOKING AT HER PRODUCT IDEAS,

10   I'M A PRODUCT PERSON, AND I SAID 'YOU HAVE GOOD IDEAS.'

11   Q   YOU'RE CORRECT.  IN YOUR RESPONSE, YOU DIDN'T SAY ANYTHING

12   LIKE 'YOU'RE MISTAKEN, MS. VALENCIA.  I DON'T KNOW WHERE THIS

13   IS COMING FROM.'

14   A   I DID NOT.

15   Q   SO BASED UPON YOUR RESPONSE, YOUR BELIEF IS MS. VALENCIA

16   KEPT THINKING THAT YOU WANTED HER TO KEEP CARTER BRYANT UNDER

17   WRAPS.

18   A   I DON'T KNOW WHAT SHE WAS THINKING.  ALL I CAN TELL YOU IS

19   I THOUGHT SHE HAD GOOD PRODUCT IDEAS, AND I REPLIED TO THAT.

20   Q   DO YOU HAVE ANY IDEA HOW MS. VALENCIA CAME TO THE

21   CONCLUSION THAT YOU WANTED TO KEEP CARTER BRYANT UNDER WRAPS?

22   A   I HAVE NO IDEA.  YOU SHOULD CALL HER IN AND ASK HER.

23   Q   WELL, DID YOU ASK HER WHEN SHE TOLD YOU THAT IN FEBRUARY

24   OF 2003?

25   A   NOT BESIDE THE E-MAIL THAT I SENT, NO.

1   Q   WAS THIS ONE OF HER GOOD IDEAS:  "I KNOW WE WANT TO KEEP

2   CARTER BRYANT UNDER WRAPS"?

3   A   NO.  THE PRODUCT WAS A GOOD IDEA; TO DO A DOLL WITH PLUSH

4   BODY WITH A PLASTIC HEAD WAS A GOOD IDEA, AND MAKE IT A

5   COLLECTIBLE.

6   Q   IF YOU LOOK AT EXHIBIT 1932, DO YOU RECOGNIZE THIS AS A

7   LIST OF FORMER MATTEL EMPLOYEES WORKING AT MGA THAT WAS CREATED

8   BY MGA?

9   A   I DO NOT.  I'VE NEVER SEEN THIS DOCUMENT BEFORE.

10   Q   YOU DON'T RECOGNIZE THIS AT ALL?

11   A   I DO NOT.

12   Q   DID YOU EVER TELL ANYONE AT MGA THAT WITH RESPECT TO

13   CARTER BRYANT'S DATES OF WORKING FOR MATTEL, THAT THEY WERE NOT

14   TO ASK THAT QUESTION?

15   A   I DID NOT.

16   Q   WERE YOU HERE A COUPLE OF DAYS AGO WHEN MR. NOLAN WAS

17   EXAMINING MS. O'CONNOR ABOUT THE -- THERE WAS A TOY OF THE YEAR

18   AWARDS IN 2002.  DO YOU RECALL THAT?

19   A   NO.

20   Q   DID YOU ATTEND A TOY OF THE YEAR AWARDS IN 2002?

21   A   I BELIEVE I DID.

22   Q   AND DO YOU RECALL MR. NOLAN ASKING MS. O'CONNOR WHETHER OR

23   NOT AT THAT AWARDS CEREMONY YOU, IN FACT, IDENTIFIED

24   MS. O'CONNOR AS SOMEONE WHO HAD CONTRIBUTED TO BRATZ?

25   A   I THINK YOU'RE MAKING A MISTAKE OF THE TWO SHOWS.  THERE

1    WAS A LICENSING SHOW, AND I DON'T REMEMBER THE EXACT DATE OF

2    IT, WHERE BRATZ WAS NAMED PROPERTY OF THE YEAR, AND WE WON, AND

3    AT THAT SHOW I STOOD UP IN FRONT OF A THOUSAND PEOPLE AND I

4    SAID VICTORIA O'CONNOR WAS ONE OF THE PEOPLE WHO WAS

5    INSTRUMENTAL IN MAKING A LICENSING PROGRAM FOR MGA, FOR

6    STARTING THE LICENSING DEPARTMENT AT MGA; SO YOU'RE MISTAKING

7    THE TWO SHOWS.

8    Q   I'M BASING THAT ON THE TRANSCRIPT.

9        SO IF MS. O'CONNOR TESTIFIED IN RESPONSE TO

10   MR. NOLAN'S QUESTIONS, OR AGREED THAT YOU HAD SINGLED HER OUT

11   AT SOME TOY OF THE YEAR AWARD CEREMONY, THAT WOULD BE MISTAKEN

12   AS TO WHICH ONE IT WAS?

13   A   MAYBE MR. NOLAN MADE A MISTAKE.  HE'S A LAWYER.

14       IT WAS DEFINITELY A LICENSING SHOW IN 2002 OR 2003, I

15   DON'T REMEMBER THE EXACT DATE, WHERE BRATZ WAS NAMED PROPERTY

16   OF THE YEAR; AND, AGAIN, I GOT UP AND I ACKNOWLEDGED

17   VICTORIA O'CONNOR AS BEING THE PERSON WHO STARTED THE LICENSING

18   DEPARTMENT AT MGA.

19   Q   WELL, THERE WAS A TOY OF THE YEAR AWARD IN 2002.

20   A   I THINK THERE WAS, YES.

21   Q   AND BRATZ WAS RECOGNIZED.

22   A   YES, AS TOY OF THE YEAR.

23   Q   AND AT THE TIME BRATZ WAS RECOGNIZED, I TAKE IT YOU MADE

24   SOME REMARKS.

25   A   I DID.

1    Q   AND WHEN YOU MADE THE REMARKS ABOUT BRATZ, IT'S TRUE, IS

2    IT NOT, THAT YOU DIDN'T MENTION CARTER BRYANT?

3    A   NO, I DID NOT.

4    Q   IN FACT, AT THAT CEREMONY, AND PERHAPS IT WAS AFTER, THERE

5    WAS SOMEONE INTERVIEWING YOU AND ASKED YOU WHO CAME UP WITH THE

6    NAME BRATZ.  DO YOU RECALL THAT?

7    A   I DO NOT RECALL THAT.

8        MR. PRICE:  YOUR HONOR, WE'VE SUPPLIED TO MR. NOLAN A

9    VIDEO CLIP MARKED EXHIBIT 13182-B, STATEMENTS BY MR. LARIAN.

10       I WONDER IF WE COULD PLAY THAT.

11       THE COURT:  ANY OBJECTION?

12       MR. NOLAN:  WE HAVE IT.  THERE'S A PORTION --

13       MAY I JUST TALK TO MR. PRICE FOR JUST ONE MOMENT.

14       THE COURT:  YOU MAY.

15       (SOTTO VOCE DISCUSSION BETWEEN COUNSEL. )

16       MR. PRICE:  IT'S A FULL CLIP.  IT SHOWS MR. LARIAN'S

17   ACCEPTANCE SPEECH.  THE PART WE'RE PLAYING IS THE INTERVIEW.

18       THE COURT:  VERY WELL.

19       ANY OBJECTION?

20       MR. NOLAN:  NO, YOUR HONOR.  WE'LL PLAY THE

21   ACCEPTANCE SPEECH IN OUR PORTION OF THE CASE.

22       MR. PRICE:  I MAY OBJECT TO HEARSAY, BUT I'LL LOOK AT

23   IT.

24       THE COURT:  WE'LL DEAL WITH THAT AT THE TIME.

25       GO AHEAD AND PLAY WHAT'S NOT OBJECTED TO.

1     (MEDIA CLIP PLAYED; EXCERPT NOT PROVIDED.)

2    BY MR. PRICE:

3    Q   SIR, THIS WAS THE INTERVIEW AFTER YOUR ACCEPTANCE SPEECH;

4    CORRECT?

5    A   I DON'T KNOW IF IT WAS BEFORE OR AFTER.

6    Q   AND IN YOUR SPEECH ITSELF, YOU DID SINGLE OUT SOME MGA

7    FOLKS.

8    A   I'M NOT SURE IF I DID.  I DON'T REMEMBER.  I THANK ALL OF

9    THE MGA EMPLOYEES.  I DIDN'T KNOW IF I SINGLED OUT PEOPLE.

10   MAYBE I HAVE.  I DON'T RECALL.

11   Q   I THINK YOU TOLD US YOU DIDN'T CONSIDER CARTER BRYANT TO

12   BE AN EMPLOYEE; IS THAT RIGHT?

13   A   HE WAS NEVER AN EMPLOYEE OF MGA.

14   Q   IT'S FAIR TO SAY THAT IN THE SPEECH YOU GAVE, YOU MADE NO

15   MENTION OF CARTER BRYANT; CORRECT?

16   A   I DON'T THINK I DID.  I DON'T RECALL IF I DID OR NOT.

17   Q   AND YOU WERE ASKED HOW DID YOU COME UP WITH THIS NAME

18   BRATZ; THAT WAS SOMETHING YOU WERE ASKED AFTERWARDS; CORRECT?

19   A   CORRECT.

20   Q   AND IF WE GO TO EXHIBIT 302, I THINK YOU'VE AGREED THAT

21   THE PERSON WHO CAME UP WITH THE NAME BRATZ -- IF WE CAN SHOW

22   THAT -- WAS CARTER BRYANT; THAT WAS PRESENTED TO YOU IN

23   SEPTEMBER.

24   A   ABSOLUTELY.  CARTER BRYANT CAME UP WITH THE NAME BRATZ.

25   WE CONSIDERED MANY NAMES, AND AT THE END WE SETTLED ON THE NAME

1    THAT CARTER BRYANT HAD COME UP WITH.

2    Q   SO IF YOU WEREN'T TRYING TO KEEP CARTER BRYANT UNDER

3    WRAPS, THEN WHEN YOU WERE ASKED 'HOW DID YOU COME UP WITH THE

4    NAME BRATZ,' WHY DIDN'T YOU TELL THE REPORTER THE INDIVIDUAL

5    WHO FIRST GAVE YOU THE NAME BRATZ TO ATTACH TO THESE DOLLS?

6    A   BECAUSE WE CONSIDERED MANY NAMES -- ONE OF THEM WAS

7    FASHION FRIENDS, ANOTHER ONE WAS BABEZ, THOSE ARE THE ONES THAT

8    I REMEMBER -- AND I RECALL SITTING IN THE ROOM LOOKING AT THE

9    DOLLS AND CONSIDERING THE NAMES.  ORIGINALLY I HAD CONCERNS

10   WITH NAMING THESE 'BRATZ' BECAUSE IT HAD KIND OF NEGATIVE

11   CONNOTATION.  BUT ONE OF THE PEOPLE IN THE MEETING SAID THEY

12   LOOK LIKE LITTLE BRATZ; SO THAT'S WHAT I SAID, LET'S CALL IT

13   BRATZ.  AND THAT'S WHAT THAT CLIP IS REFERRING TO.

14   Q   YOU SAID YOU HAD A LIST OF NAMES YOU WERE LOOKING AT.

15   A   YES.

16   Q   AND VARIOUS PEOPLE PROVIDED VARIOUS NAMES TO CONSIDER.

17   A   CORRECT.

18   Q   AND DID YOU HAVE AN OUTSIDE COMPANY WHO ACTUALLY SAID

19   'HERE'S SOME NAMES YOU MIGHT CONSIDER'?

20   A   IT MIGHT BE.  I DON'T RECALL.  I REMEMBER TWO OF THE

21   NAMES, BECAUSE ONE CAME FROM ME AND IT WASN'T GOOD ENOUGH.

22   Q   AND ONE OF THE NAMES ON THAT LIST WAS BRATZ WITH A "Z"?

23   A   BRATZ WITH A "Z" CAME FROM CARTER BRYANT.

24   Q   THAT WAS ONE OF THE NAMES ON LIST.

25   A   CORRECT.

1    Q    AS YOU SAID, THAT NAME ON THAT LIST CAME FROM

2    CARTER BRYANT.

3    A    CORRECT.

4    Q    I THINK YOU JUST SAID YOU WERE IN A ROOM LOOKING AT THE

5    DOLLS.

6    A    LOOKING AT PICTURES OF THE DRAWINGS.

7    Q    BUT I THOUGHT YOU SAID YOU WERE IN A ROOM LOOKING AT THE

8    DOLLS.

9    A    MAYBE I MISSPOKE.  WE WERE LOOKING AT THE DRAWINGS.

10    Q    SO YOU AGREE WITH MS. GARCIA THAT IT ALL STARTS WITH THE

11    DRAWING; IT ALL STARTS WITH THAT SKETCH.

12    A    THE DRAWINGS WERE THE INSPIRATION FOR THE BRATZ.  THE

13    DRAWINGS THAT CARTER BRYANT SHOWED US ARE ABSOLUTELY THE

14    INSPIRATION FOR THE BRATZ.

15    Q    SO IT'S NOT UNEXPECTED THAT YOU MIGHT SAY, WITHOUT GREAT

16    PRECISION, 'WE WERE LOOKING AT THE DOLLS,' WHEN ACTUALLY YOU

17    WERE LOOKING AT THE DRAWINGS?

18    A    I DON'T UNDERSTAND YOUR QUESTION.

19    Q    IT'S AN UNDERSTANDABLE MISTAKE TO MAKE THAT YOU JUST MADE,

20    SAYING WHEN YOU ARE LOOKING AT THE DRAWINGS, SAYING WE'RE

21    LOOKING AT THE DOLLS?

22    A    EIGHT YEARS LATER, NOW THAT WE HAVE THE DOLLS, WE REALLY

23    ARE FOCUSING ON THE DOLLS AND NOT THE DRAWINGS.  BUT AT THE

24    TIME THERE WERE NO DOLLS, THERE WERE JUST DRAWINGS; SO YOU HAVE

25    TO PUT THAT IN CONTEXT.

1    Q   SO THEN IF, IN FACT, IT WAS MR. BRYANT WHO WAS RESPONSIBLE

2    FOR THAT NAME BRATZ BEING ON THAT LIST, WHEN YOU WERE ASKED

3    'HOW DID YOU COME UP WITH THE NAME?'  WHY DIDN'T YOU SAY,

4    'WELL, THAT WAS THE NAME THE CREATOR GAVE US WHEN HE FIRST GAVE

5    US THE DRAWINGS; THEY WERE CALLED BRATZ'?

6    A   BECAUSE.  YOU SAW THE CLIP.  THAT'S WHAT I SAID.  THAT'S

7    WHAT I SAID IN THERE, IS THAT WE WERE SITTING AROUND THE ROOM

8    LOOKING AT -- I WILL CORRECT MYSELF, THE DRAWINGS, AND SOMEBODY

9    SAID THEY LOOK LIKE LITTLE BRATZ, LET'S CALL THEM BRATZ.  AND I

10   SAID LET'S JUST CALL THEM BRATZ.

11   Q   IF YOU WEREN'T TRYING TO KEEP CARTER BRYANT UNDER WRAPS,

12   AS MS. VALENCIA THOUGHT YOU WERE TRYING TO DO, IF YOU WEREN'T

13   TRYING TO DO THAT, WHY DIDN'T YOU SAY, WHEN YOU WERE ASKED 'HOW

14   DID YOU COME UP WITH THIS?'  'THE CREATOR CAME UP WITH IT;

15   CARTER BRYANT.  GOOD JOB.'

16   A   BECAUSE THERE WAS NO REASON TO BRING CARTER BRYANT INTO IT

17   OR NOT TO BRING INTO IT.  I WASN'T THINKING.  I WAS VERY

18   EXCITED.  WE HAD JUST WON TOY OF THE YEAR AWARD.  IT WAS RIGHT

19   AFTER THE AWARD CEREMONY.  FRANKLY, IT WAS A BIG SURPRISE THAT

20   WE HAD WON.  AND I JUST RECALL THAT MEETING, AND THAT'S WHAT I

21   SAID.

22   Q   WELL, AT THE CEREMONY ITSELF, WHY DIDN'T YOU SAY "I

23   PARTICULARLY WANT TO GIVE THANKS TO CARTER BRYANT, THE MAN WHO

24   CREATED THIS'?

25   A   MGA CREATED BRATZ.  MGA TOOK CARTER BRYANT'S DRAWINGS AS

1    INSPIRATION.  MGA INVESTED MILLIONS OF DOLLARS, TIME AND

2    EFFORT, TO MAKE BRATZ HAPPEN.  MGA EMPLOYEES DID.  AND I

3    THANKED ALL OF THEM TO THE BEST OF MY RECOLLECTION.  I DID NOT

4    THINK OF NAMES.  THAT'S THE BEST OF MY RECOLLECTION.

5    Q   I THINK EARLIER WHEN WE WERE TALKING ABOUT MS. VALENCIA

6    SAYING 'WE WANT TO CAN KEEP CARTER BRYANT UNDER WRAPS,' YOU

7    SAID THAT THERE WAS NO NEED TO IN THAT TIME FRAME, SPRING OF

8    2002, BECAUSE IT WAS IN THE NEWS AND PEOPLE KNEW ABOUT

9    MR. BRYANT CREATING BRATZ.

10        MR. NOLAN:  OBJECTION.  MISSTATES HIS TESTIMONY.

11        THE COURT:  IT'S A QUESTION.

12        IS THAT ACCURATE?

13        THE WITNESS:  CAN YOU PLEASE REPEAT THE QUESTION.

14        THE COURT:  REPHRASE THE QUESTION, COUNSEL.

15    BY MR. PRICE:

16    Q   WE WERE TALKING ABOUT MS. VALENCIA'S E-MAIL, WHERE SHE

17    SAID 'WE WERE TRYING TO KEEP CARTER BRYANT UNDER WRAPS.'

18    DIDN'T YOU SAY THERE WAS NO REASON TO, BECAUSE HIS NAME IS OUT

19    THERE IN THE PRESS?

20    A   NO.  I TOLD YOU, WE HAVE NEVER TRIED TO HIDE

21    CARTER BRYANT'S NAME.  AS A MATTER OF FACT, I RECALL -- YOU

22    KNOW WHAT, I JUST DON'T WANT TO --

23        MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

24        THE COURT:  IT IS.

25        ASK YOUR QUESTION AGAIN, COUNSEL.

1    BY MR. PRICE:

2    Q    I'M ASKING, MR. LARIAN, PREVIOUSLY DIDN'T YOU SAY THAT ONE

3    OF THE REASONS YOU HAD NO DESIRE TO KEEP CARTER BRYANT'S NAME

4    UNDER WRAPS WAS BECAUSE HIS NAME WAS ALREADY OUT THERE IN

5    CONNECTION WITH BRATZ IN THE 2002 TIME FRAME?

6    A    IT WAS ALREADY OUT THERE.

7    Q    THAT IT WAS ALREADY OUT THERE IN THE PRESS.

8    A    IT WAS IN YAHOO FOR SURE.  YAHOO IS PUBLIC.  EVERYONE CAN

9    GO ON YAHOO.COM; SO, TO ME, THAT'S PUBLIC.  THAT'S ALREADY IN

10   THE PUBLIC.  IT'S LIKE TODAY'S INTERNET; IT'S PRESS.

11   Q    BUT THAT'S THE ONE WHERE YOU SAID 'GET THE NAME OUT OF

12   THERE.'

13   A    I DID NOT SAY 'GET THE NAME OUT OF THERE.'  I SAID I DON'T

14   WANT TO HAVE ANY ISSUES.  YOU SAW MY E-MAIL.

15   Q    YOU'LL AGREE THAT MGA IS NOT AWARE OF ANY PRESS REPORT OR

16   PUBLICATION THAT IDENTIFIED BRYANT AS THE CREATOR OF BRATZ

17   PRIOR TO JULY 15, 2003?

18   A    WHAT DO YOU CALL THAT YAHOO WEB SITE?  PRESS OR DO YOU NOT

19   CALL IT THE PRESS?

20   Q    I'M ASKING IF YOU AGREE THAT YOU ADMIT THAT MGA IS NOT

21   AWARE OF ANY PRESS REPORT OR PUBLICATION THAT IDENTIFIED BRYANT

22   AS THE CREATOR OF BRATZ PRIOR TO JULY 15, 2003?

23   A    I GUESS I AGREE WITH THAT STATEMENT, BECAUSE I ASSUME THEY

24   ARE NOT PUTTING YAHOO AS PART OF THAT.

25   Q    AND YOU ALSO AGREE THAT THE FIRST PRESS REPORT OR

1   PUBLICATION THAT MGA'S AWARE OF THAT IDENTIFIED BRYANT AS THE

2   CREATOR OF BRATZ WAS THAT WALL STREET JOURNAL ARTICLE PUBLISHED

3   JULY 18, 2003.

4   A   IF YOU CHARACTERIZE PRESS AS THAT, YES.

5   Q   AND WITH RESPECT TO CARTER BRYANT'S NAME, DO YOU RECALL AT

6   SOME POINT YOU ACTUALLY FILED A PATENT APPLICATION FOR REMOVING

7   THE FOOT FROM THE DOLL.  DO YOU RECALL THAT?

8   A   I DID.

9   Q   IF YOU WOULD LOOK AT EXHIBIT 500.

10   A   I HAVE IT.

11   Q   DO YOU RECOGNIZE THAT AS THE PATENT APPLICATION?

12   A   YES.

13       MR. PRICE:  YOUR HONOR, WE WOULD MOVE EXHIBIT 500

14   INTO EVIDENCE.

15       THE COURT:  ANY OBJECTION?

16       MR. NOLAN:  NO OBJECTION TO 500, YOUR HONOR.

17       THE COURT:  VERY WELL.  IT'S ADMITTED.

18       YOU MAY PUBLISH.

19   BY MR. PRICE:

20   Q   THIS IS AN APPLICATION DONE FOR "DOLL AESTHETIC WITH

21   CHANGEABLE FOOTWEAR."

22       DO YOU SEE THAT?

23   A   YES.

24   Q   WHERE IT SAYS "THE INVENTOR IS ISAAC LARIAN"; CORRECT?

25   A   THAT DOCUMENT SAYS THAT, YES.

1    Q    AND IN CONNECTION WITH THIS DOCUMENT, YOU FILED A

2    DECLARATION UNDER OATH.  DO YOU RECALL THAT?

3    A    I DID.

4    Q    AND IF YOU COULD LOOK AT 1701, DO YOU RECOGNIZE THAT AS

5    THE DECLARATION YOU FILED UNDER PENALTY OF PERJURY IN

6    CONNECTION WITH MAKING THAT PATENT APPLICATION?

7    A    CORRECT.

8         MR. PRICE:  MOVE EXHIBIT 1701 INTO EVIDENCE.

9         MR. NOLAN:  NO OBJECTION, YOUR HONOR.

10        THE COURT:  VERY WELL.  IT IS ADMITTED; YOU MAY

11   PUBLISH.

12   BY MR. PRICE:

13   Q    AND IT SAYS "AS A BELOW-NAMED INVENTOR, I HEREBY DECLARE

14   THAT..."

15   A    YES.

16   Q    AND YOU SAY "I BELIEVE I AM THE ORIGINAL, FIRST, AND SOLE

17   INVENTOR, IF ONLY ONE NAME IS LISTED BELOW," AND ONLY ONE NAME

18   IS LISTED BELOW:  YOURS.

19   A    YES.

20   Q    SO YOU'RE SAYING THAT YOU'RE THE ORIGINAL, FIRST, AND SOLE

21   INVENTOR OF THIS DOLL WITH AESTHETIC, CHANGEABLE FOOTWEAR;

22   CORRECT?

23   A    THAT VERSION WHICH IS USING THE PATENT, YES, I AM.

24   Q    IF WE CAN SHOW EXHIBIT 302.

25         THIS IS ONE OF THE DRAWINGS WHICH CARTER BRYANT

1    SHOWED YOU IN SEPTEMBER OF 2000; CORRECT?

2    A   HE DID.

3    Q   IT'S CORRECT, IS IT NOT, THAT PRIOR TO CARTER BRYANT

4    TELLING YOU ABOUT THE CONCEPT OF CHANGEABLE FOOTWEAR, YOU DON'T

5    RECALL PREVIOUSLY HAVING EVER HEARD THE IDEA; THAT'S CORRECT,

6    IS IT NOT?

7    A   THAT'S CORRECT.

8    Q   AND MR. BRYANT ALSO HERE, I GUESS, TALKED ABOUT CHANGEABLE

9    HEADWEAR AS WELL.

10   A   HE DID.

11   Q   IN FACT, DO YOU RECALL THAT LATER IN THAT YEAR, YOU WERE

12   SUGGESTING TO THE FOLKS WHO WORKED FOR YOU THAT YOU REALLY

13   WANTED THAT FEATURE ON YOUR DOLL?  DO YOU RECALL THAT?

14   A   WHAT FEATURE?

15   Q   THE CHANGEABLE HEADWEAR.

16   A   I DID.

17       MR. PRICE:  WOULD THIS BE A GOOD TIME FOR A BREAK?

18       THE COURT:  WE'LL TAKE OUR LUNCH BREAK NOW.  THE JURY

19   WILL RECONVENE AT 1:30.

20       COURT IS IN RECESS.

21       (CONCLUSION OF MORNING SESSION.)

22

23   / / /

24   / / /

25   / / /

1                  CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED

     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE

     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

     THE UNITED STATES.

6

7

     _____        _____

8    THERESA A. LANZA, RPR, CSR                  DATE

     OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25