Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                        - - -

5         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7    MATTEL, INC.,              )

                                )

8              PLAINTIFF,   )

                                )

9         VS.              )  NO. CV 04-09049

                                )

10   MGA ENTERTAINMENT, INC., ET. AL.,  )

                                )

11             DEFENDANTS.  )  TRIAL DAY 11

     _____)  MORNING SESSION

12   AND CONSOLIDATED ACTIONS,       )  PAGES 2118-2225

                                )

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17           WEDNESDAY, JUNE 11, 2008

18                  9:02 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR

          FEDERAL OFFICIAL COURT REPORTER

24        3470 12TH STREET, RM. 134

          RIVERSIDE, CALIFORNIA  92501

25             951-274-0844

```
 1     APPEARANCES:
 2
       ON BEHALF OF MATTEL, INC.:
 3
                   QUINN EMANUEL
 4              BY:  JOHN QUINN
                   JON COREY
 5                 MICHAEL T. ZELLER
                   HARRY OLIVAR
 6                 TIMOTHY ALGER
                865 S. FIGUEROA STREET,
 7              10TH FLOOR
                LOS ANGELES, CALIFORNIA  90017
 8
 9
10     ON BEHALF OF MGA ENTERTAINMENT:
11                 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                BY:  THOMAS J. NOLAN
12                 JASON RUSSELL
                   RAOUL KENNEDY
13                 LAUREN AGUIAR
                   CARL ROTH
14              300 SOUTH GRAND AVENUE
                LOS ANGELES, CALIFORNIA  90071-3144
15              213-687-5000
16
17
18
19
20
21
22
23
24
25
```

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1                    I N D E X

2                              PAGE

3     PLAINTIFF CASE (CONTINUED)........................  2133

4

5

6

      WITNESS        DIRECT      CROSS     REDIRECT     RECROSS

7     JEFFREY WEISS

8     BY MR. NOLAN    2123                 2132

      BY MR. QUINN             2131

9

10    PLAINTIFF

      WITNESS        DIRECT      CROSS     REDIRECT     RECROSS

11    ISAAC LARIAN (CONTINUED)

12    BY MR. NOLAN            2133

      BY MR. PRICE                   2165

13

14

15        EXHIBITS       RECEIVED

16        16914       2142

          18508       2156

17        11036       2199

18

19

20

21

22

23

24

25

1      RIVERSIDE, CALIFORNIA; WEDNESDAY, JUNE 11TH, 2008; 9:02 A.M.

2            -OOO-

3      THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

4   MATTEL, INC., V. MGA, INC., ET AL.

5      MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

6   THE RECORD.

7      MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8   MATTEL.

9      MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, CARL ROTH ON

10   BEHALF OF MGA.

11      THE COURT:  GOOD MORNING.

12      WE'RE GOING TO CALL A WITNESS OUT OF ORDER THIS

13   MORNING, I BELIEVE.

14      MR. PRICE:  COULD WE TALK AT SIDE-BAR ON THIS

15   QUICKLY.

16      THE COURT:  VERY WELL.

17      (WHEREUPON, THE FOLLOWING PROCEEDINGS

18      WERE HELD AT SIDE-BAR:)

19      MR. PRICE:  YOUR HONOR, BECAUSE THE ARTICLE GOT INTO

20   EVIDENCE, WE'VE DECIDED NOT TO CALL MR. WEISS.  HOWEVER, HE'S

21   HERE, AND MR. NOLAN WANTS TO CALL HIM BECAUSE HE'S HERE.

22      I HAVE NO PROBLEM WITH INTERRUPTING OUR CASE TO PUT

23   HIM ON.

24      THE COURT:  VERY GOOD.

25      MR. PRICE:  I WOULD REQUEST THAT THE JURY NOT BE TOLD

1    THAT WE WERE ORIGINALLY INTENDING TO CALL HIM AND DECIDED NOT

2    TO; THAT WOULD BE INAPPROPRIATE.  AND I'M AFRAID THE

3    EXAMINATION WILL BE "YOU'RE HERE BECAUSE MATTEL WANTED YOU

4    HERE."

5            MR. NOLAN:  I WOULDN'T ASK THAT.

6            THE COURT:  IS THERE A REASON FOR ME TO TELL THE JURY

7    THAT THIS IS MR. NOLAN CALLING THIS WITNESS?

8            MR. NOLAN:  NO.

9            MR. PRICE:  IT'S OUR CASE, SO I THINK --

10           THE COURT:  WE'RE INTERRUPTING MR. LARIAN'S

11   CROSS-EXAMINATION.  I'LL TELL THE JURY THAT IN ORDER TO

12   ACCOMMODATE MR. WEISS' SCHEDULE, WE'RE GOING TO INTERRUPT THIS

13   WITNESS AND THAT MR. NOLAN HAS SOME QUESTIONS OF MR. WEISS.

14           MR. PRICE:  SOUNDS GREAT.

15           MR. NOLAN:  MAYBE IF YOU COULD SAY MR. WEISS HAD TO

16   COME BACK TODAY AT THIS SPECIFIC TIME BECAUSE YOU DID ORDER HIM

17   TO BE BACK HERE AT 9:00 ON WEDNESDAY.

18           THE COURT:  THAT I ORDERED HIM TO BE BACK?

19           YEAH.  I'LL TAKE THE FALL.

20           IS THAT FINE, MR. PRICE?

21           MR. PRICE:  YOU CAN TAKE THE FALL ANYTIME YOU WANT.

22           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

23           THE COURT:  MEMBERS OF THE JURY, WE'RE GOING TO BE

24   TAKING A WITNESS OUT OF ORDER, JUST TO ACCOMMODATE A WITNESS'S

25   CALENDAR.  SO WE'RE GOING TO INTERRUPT MR. LARIAN'S

1    EXAMINATION.  A WITNESS IS GOING TO COME IN, WILL BE EXAMINED,

2    AND THEN WE'LL RESUME WITH THAT.

3         VERY WELL.

4         MR. NOLAN, I BELIEVE YOU WISH TO CALL THIS WITNESS?

5         MR. NOLAN:  YES, YOUR HONOR.

6         WE WOULD CALL MR. JEFFREY WEISS.

7         THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

8    YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

9    BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

10   HELP YOU GOD?

11        THE WITNESS:  YES, I DO.

12        THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

13   YOUR LAST NAME FOR THE RECORD.

14        THE WITNESS:  JEFFREY NEIL WEISS, W-E-I-S-S.

15             DIRECT EXAMINATION

16   BY MR. NOLAN:

17   Q   GOOD MORNING, MR. WEISS.  MY NAME IS TOM NOLAN.

18        WE'VE NEVER MET, HAVE WE?

19   A   I DON'T BELIEVE SO.

20   Q   HAVE YOU EVER PERSONALLY MET A GENTLEMAN NAMED

21   ISAAC LARIAN?

22   A   YES.

23   Q   APPROXIMATELY, WHEN DID YOU FIRST MEET HIM?

24   A   I BELIEVE I ACTUALLY ONLY MET HIM ONCE, AT A DINNER WHERE,

25   I BELIEVE, WE GAVE HIM AN AWARD, AT THE VALLEY BUSINESS

1    JOURNAL.

2    Q   DID YOU HAVE ANY CONNECTION WITH THE VALLEY BUSINESS

3    JOURNAL?

4    A   YEAH.  I WAS A STAFF WRITER THERE, STAFF REPORTER THERE.

5    Q   DO YOU RECALL THE DATE OF THAT DINNER MEETING?

6    A   I DON'T.

7    Q   DO YOU RECALL GENERALLY THE YEAR?

8    A   I'D SAY 2004, 2005.

9    Q   WAS THE DINNER MEETING AT WHICH YOU MET MR. LARIAN BEFORE

10   OR AFTER YOU WROTE AN ARTICLE ABOUT ISAAC LARIAN?

11   A   I WROTE SEVERAL ARTICLES ABOUT ISAAC LARIAN.

12   Q   I'D LIKE TO PLACE IN FRONT OF YOU -- THERE'S A NOTEBOOK IN

13   FRONT OF YOU.  IF YOU COULD TURN TO A DOCUMENT MARKED AS

14   EXHIBIT NUMBER 6000.

15        DO YOU SEE THAT?

16   A   THE TX-6000?

17   Q   YES.

18        DO YOU RECOGNIZE THAT?

19   A   YEAH.

20   Q   WHAT IS IT?

21   A   IT'S A STORY THAT I WROTE IN MARCH OF 2004 FOR THE

22   BUSINESS JOURNAL.

23        MR. NOLAN:  YOUR HONOR, THIS IS ALREADY IN EVIDENCE.

24   CAN I PUT IT ON THE SCREEN?

25        THE COURT:  YOU MAY.

1        MR. PRICE:  IT'S IN EVIDENCE IN REDACTED FORM, I

2    BELIEVE, YOUR HONOR.

3        THE COURT:  IT IS.

4        MR. NOLAN:  10258 IS THE REDACTED FORM, SO THAT'S THE

5    VERSION THAT WILL BE PUBLISHED, YOUR HONOR.

6        THE COURT:  VERY WELL.

7        YOU MAY.

8    BY MR. NOLAN:

9    Q    MR. WEISS, I JUST WANT TO ASK YOU A COUPLE QUICK QUESTIONS

10   ABOUT THIS ARTICLE.

11       FIRST OF ALL, COULD YOU INTRODUCE TO THE JURY MAYBE

12   AN EXPLANATION AS TO THE SAN FERNANDO BUSINESS JOURNAL, WHAT IT

13   IS.

14   A    IT'S A BUSINESS NEWSPAPER, A SISTER PUBLICATION OF THE

15   L.A. BUSINESS JOURNAL AND THE ORANGE COUNTY BUSINESS JOURNAL

16   AND THE SAN DIEGO BUSINESS JOURNAL.  IT'S A BIWEEKLY NEWS

17   PUBLICATION THAT FOCUSES ON THE SAN FERNANDO VALLEY.

18   Q    TO YOUR KNOWLEDGE, IS MGA LOCATED IN THE SAN FERNANDO

19   VALLEY?

20   A    YES.

21   Q    WAS THIS YOUR FIRST JOB AFTER COLLEGE?

22   A    YEAH.

23   Q    AND YOU GRADUATED FROM OCCIDENTAL COLLEGE IN 2003?

24   A    UH-HUH.

25   Q    DID YOU HAVE A JOURNALISM DEGREE?

1   A   NO.  THERE'S NO JOURNALISM DEGREE AT OCCIDENTAL, JUST A

2   HISTORY AND ENGLISH DEGREE.

3   Q   PRIOR TO WRITING THIS ARTICLE, DID YOU CONDUCT A TELEPHONE

4   INTERVIEW WITH MR. LARIAN?

5   A   YES.

6   Q   DID YOU EVER CONDUCT AN IN-PERSON INTERVIEW WITH

7   MR. LARIAN?

8   A   NO.

9   Q   PRIOR TO THE TELEPHONIC INTERVIEW OF MR. LARIAN, DO YOU

10   RECALL WHETHER OR NOT YOU HAD RESEARCHED OR CONDUCTED ANY

11   REVIEW OF OTHER MEDIA ARTICLES CONCERNING MGA AND ISAAC LARIAN

12   BEFORE YOU WROTE IT?

13   A   YES.  I HAD REVIEWED THE BUSINESS JOURNAL ARCHIVES AND

14   WHATEVER I COULD COME UP WITH IN A CURSORY GOOGLE SEARCH.

15   Q   IN YOUR BINDER, I'D ASK YOU TO TAKE A LOOK AT EXHIBIT 11.

16   THIS IS AN ARTICLE BY THE WALL STREET JOURNAL, PUBLISHED ON

17   JULY 18, 2003.  I'D ASK YOU TO TAKE A LOOK AT IT.

18        DO YOU HAVE A MEMORY OF WHETHER OR NOT YOU REVIEWED

19   THIS BEFORE YOU INTERVIEWED MR. LARIAN?

20   A   I DON'T BELIEVE SO.

21   Q   THIS ARTICLE THAT YOU WROTE IS DATED MARCH 29, 2004;

22   CORRECT?

23   A   YES.

24   Q   DID YOU TAKE ANY NOTES DURING YOUR INTERVIEW OF

25   MR. LARIAN?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   YES.  TYPED NOTES.

2    Q   WAS THE PURPOSE OF THIS ARTICLE THAT YOU WERE WRITING AN

3    INVESTIGATIVE PIECE ON MGA?

4    A   NO.  WE WERE GIVING HIM A LARGE BUSINESS AWARD.

5    Q   AND WHAT WAS THE ATTRIBUTES FOR THE LARGE BUSINESS AWARD

6    AT MGA ENTERTAINMENT?

7    A   THEY'RE A SUCCESSFUL PRIVATE COMPANY IN THE SAN FERNANDO

8    VALLEY.  A LARGE BUSINESS WAS ANY COMPANY WITH EMPLOYEES OVER

9    250 PEOPLE.

10   Q   WAS IT THE INTENT OR YOUR GOAL IN THIS ARTICLE TO

11   DETERMINE WHO DID THE ORIGINAL DRAWINGS THAT LED TO THE

12   CONCEPTION OF THE BRATZ DOLL?

13   A   NO, NOT AT ALL.

14   Q   DID THAT SUBJECT EVEN COME UP DURING THE COURSE OF YOUR

15   INTERVIEW WITH MR. LARIAN?

16   A   NO.

17   Q   I WANT TO TURN TO A PORTION OF THE ARTICLE THAT TALKS

18   ABOUT -- AND YOU'LL SEE IT RIGHT THERE.  I BELIEVE IT'S ON THE

19   SECOND PAGE OF YOUR EXHIBIT.  IT SAYS, "'MY OLDEST SON,

20   17-YEAR-OLD JASON, IS VERY CREATIVE AND A MUSIC WRITER.  HE HAS

21   COME UP WITH SOME OF OUR POPULAR TOYS,' LARIAN SAID.  'HE CAME

22   UP WITH COMMANDOBOT, A ROBOT THAT WAS THE FIRST EVER ROBOT TOY

23   TO WORK ON VOICE RECOGNITION.  IT WAS A FANTASTIC SELLER THAT

24   WAS FEATURED IN WIRED MAGAZINE.'"

25        DID YOU EVER LOOK AT COMMANDOBOT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    NO.

2    Q    DID YOU KNOW ANY OF THE FEATURES OF COMMANDOBOT?

3    A    NO.

4    Q    DID YOU, AS PART OF THIS STORY, MAKE ANY EFFORT TO

5    INTERVIEW JASON LARIAN, MR. LARIAN'S SON?

6    A    NO.

7    Q    AND THEN YOU GO ON TO SAY, "'IT WAS JASON'S IDEA FOR

8    BRATZ.'"  AND THAT'S IN QUOTES.

9        DO YOU SEE THAT?

10   A    YES.

11   Q    DO YOU HAVE A SPECIFIC RECOLLECTION OF MR. LARIAN TELLING

12   YOU THAT IT WAS JASON'S IDEA FOR BRATZ?

13   A    NO.  I MEAN, I WRITE LOTS OF STORIES, AND THIS IS OVER

14   FOUR YEARS OLD; SO I DEFINITELY DON'T REMEMBER.  I MEAN, I KNOW

15   THE STORY, OBVIOUSLY -- OBVIOUSLY, THE STORY DOESN'T EXIST IN

16   THE ABSTRACT, BECAUSE IT'S RIGHT IN FRONT OF ME; BUT I DON'T

17   REALLY -- I'VE PROBABLY WRITTEN WELL INTO THE HUNDREDS OF

18   STORIES IN THE LAST FOUR AND A HALF YEARS; SO I CAN'T REALLY

19   REMEMBER A PARTICULAR QUOTE.  YOU KNOW, I CAN'T SPEAK TO THE

20   VORACITY.  I ASSUME HE SAID THAT; IT'S THERE.  BUT I DON'T

21   REMEMBER HIM SAYING THAT.

22   Q    AND THEN YOU GO ON TO THE SECOND PARAGRAPH THAT SAYS,

23   "'YASMIN, MY 15-YEAR-OLD DAUGHTER, IS INVOLVED IN THE BUSINESS

24   AS WELL.  SHE'S PARTICULARLY INTERESTED IN FASHION AND FOCUS

25   GROUPS.  ONE OF THE BRATZ IS NAMED AFTER HER,' LARIAN SAID."

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1        DO YOU SEE THAT?

2    A    YES.

3    Q    DID YOU EVER ASK FOR PERMISSION TO INTERVIEW YASMIN?

4    A    NO.

5    Q    DO YOU RECALL -- THE SECOND PARAGRAPH THAT YOU'RE

6    ATTRIBUTING, HE SAYS, "YASMIN, HIS DAUGHTER, IS INVOLVED IN THE

7    BUSINESS AND IS INVOLVED IN THE FASHION."

8        AT THE TIME, DID YOU THINK IT WAS A LITTLE BIT ODD

9    FOR A 17-YEAR-OLD BOY TO HAVE BEEN COMING UP WITH THE IDEA FOR

10   A DOLL?

11   A    NO.  BECAUSE, I MEAN, LOGICALLY SPEAKING, YOU KNOW, KIDS

12   ARE GOING TO BE MORE IN TUNE WITH STUFF FOR THEIR OWN

13   GENERATION.  I MEAN, I WOULD THINK LOGICALLY IT WOULD BE EASIER

14   FOR A KID, ACTUALLY, TO COME UP WITH A TOY.  AND ALSO, I DON'T

15   THINK IT'S THAT UNUSUAL FOR ME TO BE INCLUDING HIS FAMILY IN

16   THE STORY, BECAUSE MGA WAS -- WE HAD THEM RANKED -- LISTED AS A

17   FAMILY BUSINESS.  AND I WAS A FAMILY BUSINESS REPORTER.  IT WAS

18   ONE OF THE HATS THAT I WORE AT THE BUSINESS JOURNAL.  AND SO A

19   LOT OF THE STORIES THAT I HAD WITH FAMILY BUSINESSES HAD FAMILY

20   EMPHASIS, AND I WOULD SPEAK TO -- YOU KNOW, A LOT OF THE

21   BUSINESS OWNERS WOULD BE MORE FORTHRIGHT IN TERMS OF THEIR

22   FAMILY BECAUSE THEY WERE CATEGORIZED AS A FAMILY BUSINESS.  I

23   BELIEVE, OFF THE TOP OF MY HEAD, THAT EITHER MGA WAS NOMINATED

24   FOR A FAMILY BUSINESS AWARD OR WON ONE AT SOME POINT; SO IT

25   WOULDN'T BE THAT UNUSUAL FOR THE FAMILY ASPECT TO BE THERE.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    DO YOU HAVE ANY RECOLLECTION, MR. WEISS, OF, BEFORE YOU

2    PUBLISHED THE ARTICLE, SENDING A DRAFT OF THE ARTICLE TO

3    MR. LARIAN FOR HIS APPROVAL?

4    A    NO.  THAT'S NOT OUR POLICY.

5    Q    SO YOU NEVER, BEFORE THIS ARTICLE WAS PUBLISHED, ASKED

6    MR. LARIAN TO CONFIRM A QUOTE THAT YOU WERE ATTRIBUTING TO HIM

7    WITH RESPECT TO JASON HAVING THE IDEA FOR BRATZ?

8    A    NO.

9    Q    IN THE COURSE OF THE INTERVIEW WITH MR. LARIAN, DID YOU

10   ASK HIM ANY QUESTIONS THAT HE REFUSED TO ANSWER?

11   A    NO.

12   Q    DID YOU HAVE A SENSE, IN INTERVIEWING HIM, THAT HE WAS

13   TRYING TO CONCEAL ANYTHING FROM YOU?

14   A    NO.  HE WAS ALWAYS VERY FORTHRIGHT AND ALWAYS VERY

15   ENGAGING; A VERY GOOD INTERVIEW.

16   Q    ARE YOU FAMILIAR WITH THE PUBLICATION CALLED THE WALL

17   STREET JOURNAL?

18   A    YES.

19   Q    BASED ON YOUR EXPERIENCE IN THE INDUSTRY AT THAT TIME, IS

20   IT YOUR VIEW THAT THE WALL STREET JOURNAL HAD A WIDER

21   CIRCULATION THAN THE VALLEY BUSINESS JOURNAL?

22   A    YEAH.  JUST A LITTLE.

23   Q    NO CRITICISM INTENDED OF THE VALLEY BUSINESS JOURNAL.

24        WHERE ARE YOU CURRENTLY EMPLOYED?

25   A    I WORK AT THE L.A. TIMES AND L.A. WEEKLY, FREELANCE STUFF.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    HOW MANY ARTICLES HAVE YOU WRITTEN AS A FREELANCER, DO YOU

2    THINK, OVER YOUR CAREER?

3    A    ARE WE INCLUDING WHEN I WAS A STAFF REPORTER?

4    Q    YES.

5    A    I'D SAY IT'S GOT TO BE IN THE HIGH -- IT'S GOT TO BE CLOSE

6    TO 1,000, PROBABLY, AT THIS POINT.  I MEAN, I'VE ALSO BLOGGED;

7    SO IF YOU COUNT THOSE, SEVERAL THOUSAND.

8    Q    I ASSUME YOU TRY TO GET YOUR STORIES RIGHT WHEN YOU WRITE

9    THEM; CORRECT?

10   A    YES.

11   Q    DO YOU THINK YOU'VE EVER MADE A MISTAKE IN ANY OF THE

12   THOUSAND ARTICLES?

13   A    OF COURSE.

14        MR. NOLAN:  NOTHING FURTHER.

15        THE COURT:  CROSS-EXAMINATION.

16             CROSS-EXAMINATION

17   BY MR. QUINN:

18   Q    I'M JOHN QUINN, AND I REPRESENT MATTEL.

19        WOULD IT BE FAIR TO SAY THAT YOU DON'T RECALL

20   SPECIFICALLY ANY OF THE THINGS THAT MR. LARIAN SAID IN THAT

21   INTERVIEW?

22   A    YEAH.  I DON'T REMEMBER ANY OF THEM SPECIFICALLY, NO.

23   Q    SO EVEN THOUGH YOU DON'T RECALL SPECIFICALLY ANY OF THE

24   THINGS THAT HE SAID, IS IT YOUR PRACTICE, AS A PROFESSIONAL

25   JOURNALIST, THAT IF YOU ATTRIBUTE QUOTATIONS TO SOMEBODY, YOU

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    TRY TO MAKE IT AS ACCURATE AS POSSIBLE?

2    A   YES.  BUT, YOU KNOW, PHONE INTERVIEWS AREN'T AN EXACT

3    SCIENCE, AND SOMETIMES YOU DON'T HEAR -- SOMETIMES PEOPLE -- I

4    MEAN, OBVIOUSLY, I TALK TOO FAST AND IT'S HARD TO GET EVERY

5    WORD; SO SOMETIMES THAT HAPPENS AND SOMETIMES YOU CAN'T

6    UNDERSTAND.  THAT'S THE PROBLEMS WITH PHONE INTERVIEWS.

7    THEY'RE NOT AN EXACT SCIENCE.  IT'S NOT LIKE YOU'RE SEEING THE

8    PERSON SAY SOMETHING AND YOU HAVE A RECORDER IN FRONT OF THEM

9    THAT YOU CAN GO BACK AND TRANSCRIBE IT.  YOU'RE RELYING ON

10   TYPING AS FAST AS YOU CAN AND HOPING THAT YOU CAN DECIPHER WHAT

11   THEY'RE SAYING.

12   Q   SO YOU TRY TO DO THE BEST YOU CAN, IN TERMS OF YOUR

13   QUOTATIONS.

14   A   OF COURSE.

15   Q   DID YOU EVER RECEIVE A REQUEST FROM MR. LARIAN OR MGA FOR

16   A CORRECTION?

17   A   NO.  NOT TO MY KNOWLEDGE.

18   Q   DO YOU RECALL MR. LARIAN MENTIONING THE NAME

19   CARTER BRYANT?

20   A   NO.

21        MR. QUINN:  NOTHING FURTHER.

22        THE COURT:  ANYTHING FURTHER, MR. NOLAN?

23            FURTHER DIRECT EXAMINATION

24   BY MR. NOLAN:

25   Q   DID YOU EVER ASK MR. LARIAN WHO DID THE ORIGINAL CONCEPT

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1      DRAWINGS FOR BRATZ?

2    A    NO.

3         MR. NOLAN:  NOTHING FURTHER.

4         THANKS FOR YOUR TIME.

5         THE COURT:  YOU'RE EXCUSED, SIR.  THANK YOU VERY

6    MUCH.

7         MR. NOLAN:  YOUR HONOR, MAY MR. LARIAN NOW RESUME?

8         THE COURT:  PLEASE.

9            CROSS-EXAMINATION(CONTINUED)

10   BY MR. NOLAN:

11   Q    GOOD MORNING.

12   A    GOOD MORNING.

13   Q    I'LL TRY TO WRAP THIS UP.  I JUST WANT TO COVER A COUPLE

14   OF POINTS THAT I DIDN'T GET TO BEFORE THE BREAK YESTERDAY.

15        WHEN WE BROKE LAST NIGHT, WE WERE TALKING ABOUT THE

16   SEPTEMBER, OCTOBER 2000 TIME PERIOD, SO I JUST WANT TO REORIENT

17   YOU IN TERMS OF TIME AND TAKE YOU BACK TO THE SEPTEMBER 1ST

18   MEETING WITH CARTER BRYANT.  ALL RIGHT?

19   A    YES.

20   Q    NOW, PHYSICALLY, WHERE WAS THAT MEETING CONDUCTED?

21   A    IN MY OFFICE.

22   Q    IN ADDITION TO THE DRAWINGS THAT YOU SAW ON THAT DAY, DID

23   MR. BRYANT BRING ANYTHING ELSE WITH HIM?

24   A    TO THE BEST OF MY RECOLLECTION, HE HAD A ROUGH DUMMY TO

25   SHOW HOW THE DOLLS -- IF THEY WERE MANUFACTURED, HOW WOULD THEY

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1      LOOK LIKE.

2      Q   IF I RECALL YESTERDAY, YOUR IMPRESSION OF CARTER'S CONCEPT

3      DRAWINGS WERE THAT THEY WERE A LITTLE BIT WEIRD, MAYBE LOOKED

4      LIKE AN ALIEN; CORRECT?

5      A   THEY DID.

6      Q   DID YOU HAVE A REACTION OR A VIEW OR AN IMPRESSION OF THE

7      OTHER THING THAT MR. BRYANT BROUGHT TO THE MEETING?

8      A   BESIDES THE DRAWINGS AND THAT ROUGH DUMMY?

9      Q   I'M JUST FOCUSED NOW ON THE DUMMY ITSELF.

10         DID YOU HAVE A REACTION TO THE DUMMY?

11     A   I DIDN'T LIKE IT.  I DIDN'T THINK IT LOOKED GOOD.  IT WAS

12     ABOUT -- IT WAS LIKE A ROBOT, ABOUT 18 INCHES TALL.  THAT'S ALL

13     I REMEMBER.

14     Q   FOLLOWING THAT MEETING, DID MR. BRYANT LEAVE THE DUMMY

15     DOLL AT MGA?

16     A   NOT TO THE BEST OF MY RECOLLECTION, NO.

17     Q   HAVE YOU, AT ANYTIME AFTER THAT INITIAL MEETING, EVER

18     LOOKED AT THE DUMMY DOLL?

19     A   NO.

20     Q   DO YOU RECALL, AT ANYTIME LEADING UP TO THE CONTRACT

21     EXECUTION ON OCTOBER 4TH OF 2000, EVER ASKING ANYBODY WORDS TO

22     THE EFFECT, 'YOU KNOW, I WANT TO SEE THAT DUMMY DOLL THAT

23     CARTER BRYANT BROUGHT IN'?

24     A   NO.  THAT DUMMY DOLL WAS IRRELEVANT IN MY MIND.

25     Q   WE WERE FOCUSED ON THE CONTRACT THAT YOU EXECUTED WITH

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    CARTER BRYANT, THE CONSULTING AGREEMENT.

2    A   YES.

3    Q   AND MR. PRICE ASKED YOU A COUPLE OF QUESTIONS WITH RESPECT

4    TO THIS, AND I WANT TO TURN TO --

5         MR. NOLAN:  IF I COULD HAVE EXHIBIT 15 ON THE SCREEN.

6         THIS IS ALREADY IN EVIDENCE, YOUR HONOR.

7         THE COURT:  VERY WELL.

8         MR. NOLAN:  AND I ALSO WOULD LIKE TO HAVE PLACED ON

9    THE SCREEN FOR THE JURY EXHIBIT 13621, WHICH IS THE MGA

10   PRODUCTION NUMBER.

11   BY MR. NOLAN:

12   Q   SO, MR. LARIAN, IS THE SCREEN IN FRONT OF YOU WORKING?

13   A   YES.  IT'S MY EYES THAT ARE NOT WORKING.

14   Q   EXHIBIT 15 MIGHT BE IN THE BLACK BOOK, AND THEN

15   EXHIBIT 13621 MAY BE IN THE WHITE BOOK.  AND I APOLOGIZE FOR

16   YOU HAVING TO DO THIS BALANCING ACT.

17   A   EXHIBIT 15 IS IN THE WHITE BOOK.

18   Q   THEN DON'T WORRY ABOUT THE BLACK BOOK.

19        LOOK AT EXHIBIT 15.  IT'S ON THE SCREEN.

20        THESE ARE COPIES OF THE ACTUAL CONSULTING AGREEMENT;

21   CORRECT?

22   A   THEY ARE.

23        CAN YOU TELL ME WHAT'S THE OTHER EXHIBIT.

24   Q   IT'S 13621.

25        YOU RECALL MR. PRICE ASKING YOU A QUESTION ABOUT THE

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    CONSULTING AGREEMENT THAT YOU SIGNED WITH CARTER BRYANT?

2    A   YES, I DID.

3    Q   OKAY.  AND DO YOU RECALL THAT MR. PRICE WAS COMPARING THE

4    CONTRACTS AND TELLING YOU THAT THESE ARE IDENTICAL COPIES?

5    A   YES, HE DID.

6    Q   WHAT I WANT TO DO NOW IS TURN TO THE LAST PAGE OF BOTH OF

7    THESE CONTRACTS.

8        MR. NOLAN:  AND, YOUR HONOR, I SHOULD ALERT THE COURT

9    THAT THE REDACTION -- A CHANGE HAS BEEN MADE IN THE REDACTION.

10   THE SOCIAL SECURITY NUMBER HAS STILL BEEN REDACTED, BUT THE

11   LAST FOUR NUMBERS HAVE NOT BEEN REDACTED, FOR PURPOSES OF THIS

12   EXAMINATION.

13       THE COURT:  VERY WELL.

14   BY MR. NOLAN:

15   Q   DO YOU HAVE BOTH PAGES IN FRONT OF YOU, MR. LARIAN?

16   A   EXCEPT 13621, EVERYTHING IS REDACTED.

17   Q   OKAY.

18       (BRIEF PAUSE.)

19       LET'S SEE IF WE CAN DO THIS FROM THE SCREEN,

20   MR. LARIAN.  WE'LL TRY TO BLOW THIS UP.

21       MR. NOLAN:  FIRST OF ALL, AARON, DO YOU MIND BLOWING

22   UP, ON THE EXHIBIT NUMBER 15, WHICH IS A BRYANT PRODUCTION, THE

23   SIGNATURE BLOCKS ONLY.

24       AND COULD YOU ALSO DO THE SIGNATURE BLOCKS NOW ON

25   EXHIBIT 13621.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir) 6/11/2008 9:02:00 AM

1    BY MR. NOLAN:

2    Q   MR. LARIAN, DO YOU SEE THE EXHIBIT ON THE LEFT-HAND SIDE,

3    THE NUMBERS 6324?

4    A   YES, I DO.

5    Q   AND CARTER BRYANT'S SIGNATURE?

6    A   YES, I DO.

7    Q   SIR, DOES IT APPEAR TO YOU THAT THOSE ARE IDENTICAL

8    SIGNATURES AND NUMBERS?

9    A   WELL, THE SIX ON THE ONE ON THE RIGHT IS TOUCHING THE LINE

10   ON THE BOTTOM.  632 ON THE FOUR, THE LINE FOUR, IS GOING

11   THROUGH THE LINE, THE HORIZONTAL LINE, WHERE IT SAYS "SOCIAL

12   SECURITY NUMBER."

13   Q   NOW, LET'S GO TO YOUR SIGNATURE BLOCK ON THESE DOCUMENTS.

14        AND I THINK I'M GIVING YOU A COMPLIMENT BY SAYING

15   THIS IS YOUR SIGNATURE.

16        THIS SCRIBBLE, THAT IS YOUR NAME; RIGHT?

17   A   THAT IS MY SIGNATURE.

18   Q   MINE'S NOT MUCH BETTER, AND NO OFFENSE IS INTENDED.

19        BUT WHAT I DO WANT YOU TO FOCUS ON IS THAT SIGNATURE

20   ON THE LEFT-HAND SIDE, WHICH IS THE SIGNATURE FROM THE BRYANT

21   EXHIBIT.  DO YOU SEE YOUR NAME AND THE LINE?

22   A   YES, I DO.

23   Q   AND IF YOU LOOK AT THE MGA COPY OF THE EXHIBIT, IS THAT

24   SIGNATURE IDENTICAL TO THE ONE THAT'S SHOWN ON THE BRYANT

25   EXHIBIT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1   A   NO.  BECAUSE ON THE ONE ON THE RIGHT, IT JUST KEEPS

2   CONTINUING, AND THE "E" IS NOT THE SAME, NO.

3   Q   BY THE WAY, DID YOU EVER ASK ANYBODY TO WHITE OUT THE LAST

4   TAIL OF YOUR SIGNATURE?

5   A   I DID NOT.

6   Q   SIR, DO YOU HAVE A RECOLLECTION OF WHETHER OR NOT YOU

7   REEXECUTED THE CONSULTING AGREEMENT BETWEEN CARTER BRYANT AND

8   AFFIXED YOUR ORIGINAL SIGNATURE ON A DOCUMENT?

9   A   YES, WE DID.

10  Q   GO TO PARAGRAPH 5, PAGE 5 OF THE DOCUMENT -- PARAGRAPH 5.

11      THIS IS IN THE CONTRACT THAT WAS EXECUTED ON

12  OCTOBER 4TH.

13      YOU SEE "WARRANTIES AND INDEMNITIES"?

14  A   YES, I DO.

15  Q   AND YOU SEE WHERE IT SAYS, "BRYANT REPRESENTS, WARRANTS,

16  AND AGREES THAT, A, HE HAS THE RIGHT AND IS FREE TO EXECUTE

17  THIS AGREEMENT, TO GRANT THE RIGHTS GRANTED BY HIM TO MGA

18  HEREUNDER AND TO PERFORM EACH AND EVERY TERM AND PROVISION

19  HEREOF; B) NEITHER THE EXECUTION AND DELIVERY OF THIS

20  AGREEMENT, NOR THE PERFORMANCE BY BRYANT OF ANY OF HIS

21  OBLIGATIONS HEREUNDER WILL CONSTITUTE A VIOLATION, BREACH, OR

22  DEFAULT UNDER ANY AGREEMENT, ARRANGEMENT, OR UNDERSTANDING, OR

23  ANY OTHER RESTRICTION OF ANY KIND TO WHICH BRYANT IS A PARTY OR

24  BY WHICH BRYANT IS BOUND; C) THE BRYANT WORK PRODUCT SHALL BE

25  FREE OF ALL LIENS..."

1        BY THE WAY, THE "BRYANT WORK PRODUCT," DO YOU KNOW

2    WHAT IT REFERS TO?

3    A    THE DRAWINGS.

4    Q    "...SHALL BE FREE OF ALL LIENS AND ENCUMBRANCES, AND THERE

5    WILL BE NO CLAIMS, DEMANDS, OR ACTIONS PENDING OR THREATENED

6    WITH RESPECT THERETO, AND THAT THE BRYANT WORK PRODUCT IS

7    ORIGINAL AND NO PART THEREOF INFRINGES OR SHALL INFRINGE UPON

8    ANY COMMON LAW OR STATUTORY RIGHTS OR INTELLECTUAL PROPERTY

9    RIGHTS OF ANY THIRD PARTY, INCLUDING, WITHOUT LIMITATION,

10   CONTRACTUAL RIGHTS, PATENTS, COPYRIGHTS, MASS WORK RIGHTS,

11   TRADE SECRETS, RIGHTS OF PRIVACY, AND OTHER INTELLECTUAL

12   PROPERTY RIGHTS; D) HE..."

13        IS THAT REFERRING TO CARTER BRYANT?

14   A    YES, SIR.

15   Q    "HE SHALL COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS

16   IN FORCE DURING THE TERM OF THIS AGREEMENT WITH RESPECT TO THE

17   SERVICES TO BE RENDERED HEREUNDER; AND E) HE SHALL INDEMNIFY

18   AND HOLD MGA HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS,

19   LOSSES, COSTS, JUDGMENTS, SETTLEMENTS, DAMAGES, AND EXPENSES,

20   INCLUDING REASONABLE COUNSEL FEES, ARISING FROM ANY BREACH BY

21   HIM OF ANY OF THE WARRANTIES, REPRESENTATIONS, AND AGREEMENTS

22   MADE BY HIM HEREUNDER."

23        WERE THOSE PROVISIONS IN THE CONSULTING AGREEMENT IN

24   THE AGREEMENT AT THE TIME YOU SIGNED THEM ON OCTOBER 4TH?

25   A    YES.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q   I WANT TO MOVE TO ANOTHER SUBJECT.

2         DURING THE EXAMINATION WITH MR. PRICE, HE PUT IN

3    FRONT OF YOU EXHIBIT 12892 [SIC].  THIS MAY BE IN THE BLACK

4    BINDER.

5         MR. NOLAN:  THIS IS IN EVIDENCE, YOUR HONOR.

6         THE COURT:  VERY WELL.

7         YOU MAY PUBLISH IT.

8         THE WITNESS:  CAN YOU GIVE ME THAT NUMBER AGAIN.

9    BY MR. NOLAN:

10   Q   12892 [SIC].

11        I APOLOGIZE.  IT'S 12842.

12        DO YOU HAVE THAT?

13   A   YES, I DO.

14   Q   NOW, DO YOU RECALL MR. PRICE DIRECTING YOUR ATTENTION TO

15   THE OCTOBER 2000, FOR LEGAL PURPOSES, STATEMENTS?

16   A   I DO.

17   Q   THOSE ARE YOUR WORDS; YES?

18   A   YES, THEY ARE.

19   Q   AND YOU WERE RESPONDING TO CAYMOHR@AOL.COM?

20   A   YES.

21   Q   I WANT TO FOCUS YOUR ATTENTION FOR A MOMENT TO THE BOTTOM

22   PARAGRAPH.  IT SAYS, "HI, ISAAC.  HERE'S THE PRESENTATION FOR

23   FOX."

24        JUST REMIND US; "FOX" WAS THE FOX PRODUCTION COMPANY?

25   A   THE 20TH CENTURY FOX.

1    Q    THEY WERE GOING TO DO A COMMERCIAL OR A MOVIE?

2    A    THEY WERE CONSIDERING TO DO A MOVIE FOR BRATZ, YES.

3    Q    AND I FINISHED IT FROM HERE:  "ISAAC, I'M CONCERNED YOU

4    CHANGED THE BRATZ INTRO DATE TO OCTOBER 2000" -- I ASSUME IT'S

5    2000, NOT 200 -- "DO YOU WANT TO KEEP THAT OR NOT?"

6         AND YOUR RESPONSE WAS, "OCTOBER 2000, FOR LEGAL

7    PURPOSES."

8    A    THAT'S CORRECT.

9    Q    I WANT TO SHOW YOU A DOCUMENT THAT MR. PRICE DID NOT SHOW

10   YOU, WHICH IS THE FOX PRESENTATION THAT'S BEING REFERENCED

11   HERE.

12        IF YOU COULD TURN IN THE WHITE BOOK TO 16914.

13   A    I HAVE IT.

14   Q    DO YOU HAVE 16914 IN FRONT OF YOU?

15   A    YES.

16   Q    DO YOU SEE THAT THIS IS AN E-MAIL?

17        DO YOU HAVE THAT IN FRONT OF YOU?

18   A    I DO.

19   Q    AND DO YOU RECOGNIZE THIS DOCUMENT?

20   A    YES.

21   Q    THIS IS AN E-MAIL SENT FROM YOU TO WHOM ELSE?

22   A    FABIENNE -- AND I DON'T KNOW HOW TO PRONOUNCE THE LAST

23   NAME.  AND RICARDO CRUZ.

24   Q    CHONAVEL, C-H-O-N-A-V-E-L.

25        AND RICARDO CRUZ?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    YES.

2    Q    YOU SEE IT SAYS, "ATTACHMENTS:  BRATZ FACTS DOCUMENT"?

3    A    YES.

4    Q    WILL YOU TURN TO THE ATTACHMENT THAT SAYS, "BRATZ FACTS."

5         DO YOU RECOGNIZE THAT?

6    A    YES.

7         MR. NOLAN:  YOUR HONOR, WE WOULD OFFER EXHIBIT 16914.

8         MR. PRICE:  OBJECTION.  HEARSAY AND IRRELEVANT.

9         PERHAPS MR. NOLAN CAN POINT US TO A PARTICULAR --

10        THE COURT:  COUNSEL, WHY DON'T YOU CONSULT.

11        MR. NOLAN:  YOUR HONOR, WE'RE GOING TO REDACT, BY

12   AGREEMENT, EVERYTHING THAT IS ON THIS DOCUMENT, "BRATZ FACTS,"

13   STARTING WITH, "WHO ARE THE BRATZ?"  BUT WE'LL KEEP IN THE

14   FIRST PARAGRAPH.

15        THE COURT:  MR. PRICE, IS THAT ACCEPTABLE?

16        MR. PRICE:  YES.

17        THE COURT:  BY STIPULATION, THE DOCUMENT IS ADMITTED

18   AS REDACTED.  THIS IS 16914.

19   BY MR. NOLAN:

20   Q    SO THIS IS THE E-MAIL THAT YOU SENT; CORRECT?

21   A    YES.

22   Q    JUST TO PUT IT IN PERSPECTIVE, LOOK AT 12842.  THIS IS THE

23   EXHIBIT THAT MR. PRICE SHOWED YOU.

24        YOU SEE THE PROXIMITY OF THE DATES?

25   A    YES.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    DO YOU ALSO SEE THAT RICARDO CRUZ IS COPIED ON BOTH OF

2    THESE E-MAILS, AS WELL AS FABIENNE CHONAVEL?

3    A    YES.

4    Q    NOW, LET'S JUST GO TO THE SECOND PAGE ON THE EXHIBIT THAT

5    WAS NOT SHOWN TO YOU BEFORE.  THIS IS WHAT YOU WERE

6    REFERRING TO.

7         DO YOU SEE THIS, SIR?

8    A    I DO.

9    Q    NOW, THIS DOCUMENT SAYS, "TAKING THE TOY WORLD BY SURPRISE

10   (LIKE, TOTALLY), FOUR BRATZ DOLLS, CLOE, SASHA, JADE, AND

11   YASMIN, ALSO KNOWN AS THE BRATZ PACK, WERE LAUNCHED AT TOY FAIR

12   2001."

13        DO YOU SEE THAT?

14   A    I DO.

15   Q    NOW, YOU MADE A CHANGE TO THAT DATE; CORRECT?

16   A    I DID.

17   Q    CAN YOU TELL THE JURY WHETHER OR NOT YOU EXTENDED THE DATE

18   INTO THE FUTURE BY YOUR CORRECTION, OR DID YOU ACTUALLY BRING

19   THE DATE TO AN EARLIER DATE?

20   A    I BROUGHT IT TO OCTOBER 2000.  THAT'S WHEN WE SIGNED THE

21   CONTRACT WITH CARTER BRYANT.

22   Q    DO YOU HAVE ANY REASON, MR. LARIAN, TO -- I MEAN, IF YOU

23   WERE TRYING TO CONCEAL THE DATE OF THE INTRODUCTION OF BRATZ,

24   DO YOU HAVE ANY EXPLANATION AS TO WHY YOU WOULD HAVE MOVED THE

25   DATE TO AN EARLIER DATE, IN OCTOBER OF 2000?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    I NEVER --

2         MR. PRICE:  ARGUMENTATIVE AS PHRASED.

3         MR. NOLAN:  I'LL WITHDRAW IT.

4         THE COURT:  OVERRULED.

5         YOU MAY ANSWER.

6         THE WITNESS:  I NEVER WANTED TO CONCEAL THE DRAWINGS

7    OF CARTER BRYANT AND WHO HAS DONE IT.  NEVER.

8    BY MR. NOLAN:

9    Q    BY THE WAY, BY MOVING THE DATE BACK TO OCTOBER OF 2000,

10   THAT'S THE DATE OF THE EMPLOYMENT CONTRACT WITH CARTER BRYANT;

11   CORRECT?

12   A    THERE WAS NO EMPLOYMENT CONTRACT WITH CARTER BRYANT.

13   Q    I APOLOGIZE.  THE CONSULTING AGREEMENT.

14   A    THAT'S THE DATE -- OCTOBER 4, 2000 IS WHEN WE SIGNED THE

15   CONSULTING CONTRACT WITH CARTER BRYANT.

16   Q    A COUPLE OF OTHER CLEANING-UP POINTS, JUST TO MAKE CERTAIN

17   IT'S IN THE RECORD.

18        MR. LARIAN, WHEN DID YOU FIRST OFFER FOR SALE, EITHER

19   IN THE UNITED STATES OR IN EUROPE, THE BRATZ DOLLS?

20   A    I'M NOT SURE IF I UNDERSTAND YOUR QUESTION.

21   Q    WHEN WERE THEY FIRST SOLD AT RETAIL?

22   A    THE BRATZ DOLLS WERE SOLD IN SPAIN ABOUT MAY, JUNE OF 2001

23   FIRST; AND IN THE U.S.A., TO THE BEST OF MY RECOLLECTION,

24   AUGUST OF 2001.

25   Q    WHY SPAIN?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1      A    BECAUSE BANDAI WAS OUR DISTRIBUTOR FOR SPAIN, AND THEY

2      WERE THE FIRST ONES TO PLACE AN ORDER FOR THE PRODUCT; SO THEY

3      WERE SHIPPED FIRST.

4      Q    I'D LIKE TO PLACE IN FRONT OF YOU --

5            MR. NOLAN:  I THINK THAT THE CLOE DOLL, YOUR HONOR,

6      IS IN EVIDENCE, THE FIRST GENERATION.  I'D LIKE TO INTRODUCE

7      THE OTHER THREE.

8            YOUR HONOR, MAY I APPROACH?

9            THE COURT:  YOU MAY.

10           MR. NOLAN:  I'M PLACING IN FRONT OF MR. LARIAN

11     EXHIBIT 1369, WHICH IS A BRATZ CLOE; EXHIBIT NUMBER 17558,

12     WHICH IS SASHA; EXHIBIT NUMBER 17551, WHICH IS JADE; AND

13     EXHIBIT 17561, YASMIN.

14           WE'RE GOING TO MARK THIS, AS FOR CLOE, AS

15     EXHIBIT 12286.  THAT'S ALREADY IN EVIDENCE.

16           THE COURT:  VERY WELL.

17           MR. NOLAN:  SO CLOE WILL BE 12286.

18     BY MR. NOLAN:

19     Q    NOW, MR. LARIAN, CAN YOU PLEASE IDENTIFY FOR THE JURY WHAT

20     THESE EXHIBITS ARE.

21     A    THESE ARE THE ACTUAL FIRST GENERATION BRATZ DOLLS, THE

22     FIRST FOUR THAT CAME TO THE MARKET IN 2001.

23           THIS IS YASMIN; THIS IS CLOE; THIS IS JADE; AND THIS

24     IS SASHA.

25     Q    ARE THOSE FOUR DOLLS THE FIRST GENERATION BRATZ OFFERED

1    FOR RETAIL SALE IN JUNE OF 2001?

2    A   YES, THEY ARE.

3    Q   AND HOW CAN YOU TELL THAT, SIR?

4    A   BECAUSE WHEN YOU MAKE A TOY AND YOU BRING IT TO THE

5    MARKET, YOU PUT THE DATE, THE COPYRIGHT OF THAT DATE, ON THE

6    BOTTOM.  THAT'S THE FIRST DATE THAT THEY CAME TO THE MARKET.

7         WHEN WE COME UP WITH THE NEXT ONE, IN 2002, ON THE

8    COPYRIGHT, IT SAYS "2002."

9         WE COME UP WITH ANOTHER ONE IN 2003.  THE COPYRIGHT

10   SAYS "2003."

11        THAT'S HOW YOU CAN TRACK WHEN THE TOY FIRST CAME TO

12   THE MARKET.

13        MR. NOLAN:  YOUR HONOR, I'M SHOWING TO MR. PRICE -- I

14   WANT TO, WITH THE COURT'S PERMISSION, APPROACH THE WITNESS WITH

15   RESPECT TO TWO OTHER BRATZ DOLLS, EXHIBIT 18512, WHICH IS A

16   CLOE MODEL, AS WELL AS EXHIBIT 18513, WHICH IS ALSO A CLOE

17   MODEL.

18        THE COURT:  YOU MAY.

19        MR. NOLAN:  WITH THE COURT'S PERMISSION, MAY WE

20   PUBLISH THIS?

21        THE COURT:  YES.

22        MR. NOLAN:  FOR THE RECORD, I'VE PUBLISHED TO THE

23   JURY THE FOUR FIRST GENERATION BRATZ DOLLS.

24        THE COURT:  VERY WELL.

25        (BRIEF PAUSE.)

1        THE WITNESS:  I'M READY IF YOU'RE READY.

2     BY MR. NOLAN:

3     Q   MR. LARIAN, I'VE PLACED IN FRONT OF YOU TWO OTHER DOLLS,

4     ALL CLOE DOLLS.  THE FIRST ONE IS EXHIBIT 18512.

5        DO YOU SEE THAT?

6     A   YES, I DO.

7     Q   AND CAN YOU TELL THE JURY WHAT GENERATION BRATZ DOLL THIS

8     IS OF CLOE.

9     A   THIS MUST BE SECOND GENERATION, BECAUSE, AGAIN, ON THE

10    BOTTOM, IT SAYS "COPYRIGHT 2002."

11       MR. PRICE:  OBJECTION AS IRRELEVANT AT THIS TIME.

12    MOVE TO STRIKE.

13       MR. NOLAN:  IT'S JUST WITH RESPECT TO THE BOTTOM OF

14    THE BOXES, YOUR HONOR.

15       THE COURT:  JUST FOR PURPOSES OF IDENTIFICATION, I'LL

16    ADMIT IT.

17       WE'RE NOT GOING TO GO MUCH BEYOND THIS, MR. NOLAN.

18       MR. NOLAN:  NO, NO.  YOU'RE RIGHT.

19       THE COURT:  OVERRULED.

20    BY MR. NOLAN:

21    Q   AND THEN WITH RESPECT TO 18513, THAT'S ANOTHER VERSION OF

22    CLOE?

23    A   YES.  THIS IS COPYRIGHT 2004; SO THIS MUST HAVE COME TO

24    THE MARKET IN THE YEAR 2004.

25    Q   THANK YOU.

1          YOU CAN MOVE THE DOLLS ASIDE FOR A MOMENT.

2          I WANT TO GO TO THE NAME "BRATZ" FOR A SECOND.

3      THERE'S BEEN A LOT OF DISCUSSION ABOUT THAT.

4          MY QUESTION IS THIS, SIR:  THERE'S BEEN A LOT OF

5      TESTIMONY IN THIS CASE WITH RESPECT TO THE ORIGIN OF THE NAME

6      "BRATZ."

7      A    YES.

8      Q    DO YOU DISPUTE IN ANY WAY THAT CARTER BRYANT HAD THE IDEA

9      OF BRATZ WHEN HE PRESENTED THE DRAWINGS TO YOU?

10     A    I DO NOT.

11     Q    AND IS IT TRUE THAT FOR SOME TIME, THE TEAM AT MGA WAS

12     CONSIDERING OTHER NAMES OTHER THAN "BRATZ"?

13     A    YES, WE WERE.

14     Q    MY QUESTION TO YOU SIR, IS, WERE YOU CONSIDERING OTHER

15     NAMES OTHER THAN "BRATZ" BECAUSE YOU WERE CONCERNED THAT

16     "BRATZ" WAS PROPRIETARY TO MATTEL?

17     A    NO.

18     Q    CAN YOU EXPLAIN TO THE JURY WHY YOU WERE CONSIDERING OTHER

19     NAMES OTHER THAN "BRATZ."

20     A    ONE OF THE CONCERNS THAT WE HAD WAS, JUST NAMING A DOLL

21     "BRATZ" AT THAT TIME WOULD HAVE A NEGATIVE CONNOTATION.  LIKE,

22     I COULD CALL MY KIDS LITTLE BRATS WHEN THEY DO SOMETHING WRONG;

23     SO THAT WAS ONE OF THE CONCERNS THAT WE HAD.

24     Q    IN ANY EVENT, AFTER CONSIDERING A HOST OF OTHER NAMES, YOU

25     DID SETTLE ON "BRATZ"; CORRECT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   WE DID.

2    Q   NOW, CAN YOU TELL THE JURY WHAT STEPS YOU HAD TO TAKE TO

3    SECURE THE RIGHTS TO "BRATZ," THE NAME ITSELF.

4    A   WE HAD -- WE CONSIDERED OTHER NAMES SUCH AS "BABEZ

5    FASHION," ANOTHER NAME, BUT AT THE END, WE SETTLED ON "BRATZ."

6    WHEN WE CAME UP WITH THE PRODUCT TO THE MARKET, NAMING THEM

7    "BRATZ," WE WERE SUED BY A COMPANY CALLED LOVIN.  AND HE SHOWED

8    US A TRADEMARK REGISTRATION THAT I BELIEVE HE OWNED THE NAME

9    "BRATZ," TO THE BEST OF MY RECOLLECTION -- I DON'T REMEMBER THE

10   EXACT DATE -- GOING BACK TO '84 OR '94, WHERE HE HAD REGISTERED

11   AND USED THE NAME "BRATZ."

12        SO WE SETTLED WITH HIM AND WE BOUGHT THE NAME "BRATZ"

13   FROM HIM.

14   Q   NOW, AFTER YOU PURCHASED THE MARK AS A RESULT OF THE

15   LAWSUIT, DID YOU ALSO HAVE ANY ISSUES IN EUROPE WITH RESPECT TO

16   A CLAIM THAT SOMEONE ELSE HAD A RIGHT TO THE NAME "BRATZ"?

17        MR. PRICE:  IRRELEVANT; ANY CLAIM.

18        THE COURT:  SUSTAINED.

19   BY MR. NOLAN:

20   Q   MR. LARIAN, CAN YOU PLEASE TELL THE JURY WHEN IS THE FIRST

21   TIME YOU EVER HEARD THAT MATTEL WAS MAKING A CLAIM THAT THE

22   "BRATZ" NAME WAS PROPRIETARY TO MATTEL.

23        MR. PRICE:  OBJECTION.  THAT MISSTATES OUR CLAIMS.

24        THE COURT:  REPHRASE, COUNSEL.

25   / / /

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir) 6/11/2008 9:02:00 AM

1    BY MR. NOLAN:

2    Q    MR. LARIAN, WHEN IS THE FIRST TIME YOU EVER LEARNED THAT

3    MATTEL WAS CONSIDERING NAMING ONE OF ITS DOLLS "BRATS"?

4    A    WHEN MR. QUINN MADE HIS OPENING STATEMENT HERE; THAT WAS

5    THE FIRST TIME.  AND WE HAD BEEN NOW IN THE BUSINESS FROM 2001

6    TO 2007, ALREADY SEVEN YEARS.  AND FOR THE FIRST TIME IN THIS

7    COURT, I HEARD THAT AT ONE TIME THEY WERE CONSIDERING NAMING A

8    PRODUCT "BRATS," WITH AN "S."

9    Q    SO I ASSUME THAT NOBODY FROM MATTEL'S LEGAL TEAM EVER

10   WROTE YOU A LETTER, YOU OR MGA, SAYING, 'HEY, HOW DID YOU COME

11   UP WITH THE NAME "BRATZ"?  WE WERE CONSIDERING IT INTERNALLY

12   FOR ONE OF OUR DOLLS.'

13        DID YOU EVER GET A LETTER LIKE THAT?

14        MR. PRICE:  OBJECTION.  IRRELEVANT.

15        THE COURT:  OVERRULED.

16        THE WITNESS:  WE NEVER GOT A LETTER FROM THEM, NO.

17        AND WE HAD ADVERTISED THE NAME "BRATZ" IN THE

18   TOY MARKET --

19        THE COURT:  YOU'VE ANSWERED THE QUESTION.

20        NEXT QUESTION.

21   BY MR. NOLAN:

22   Q    MR. LARIAN, THERE WAS TESTIMONY WITH RESPECT TO TOON TEENS

23   INTRODUCED IN THE BEGINNING OF THIS CASE, AND MY QUESTION TO

24   YOU IS, PRIOR TO THIS LITIGATION, HAD YOU EVER HEARD OF

25   TOON TEENS?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    NO, I HAVE NOT.  THE ONLY TIME I HEARD ABOUT SOMETHING

2    CALLED "TOON TEENS" WAS WHEN I READ THE WALL STREET JOURNAL

3    ARTICLE IN 2003.

4    Q    NOW, MY QUESTION TO YOU, SIR, IS, WHEN WAS THE FIRST TIME

5    YOU HEARD A CLAIM THAT THE POSE FOR CLOE IN THE DRAWINGS OF

6    CARTER BRYANT WERE SIMILAR TO THE POSES FOR THE TOON TEEN

7    DOLLS?

8         MR. PRICE:  OBJECTION.  THAT'S IRRELEVANT.

9         MR. NOLAN:  YOUR HONOR, MAY WE APPROACH AND HAVE A

10   QUICK SIDE-BAR?

11        THE COURT:  YOU MAY.

12        (WHEREUPON, THE FOLLOWING PROCEEDINGS

13        WERE HELD AT SIDE-BAR:)

14        THE COURT:  COUNSEL, I TEND TO AGREE, BUT I'LL HEAR

15   YOUR EXPLANATION.

16        YESTERDAY THERE WAS A SIMILAR OBJECTION MADE, AND IT

17   WAS SUSTAINED.

18        MR. NOLAN:  I'M JUST CONFUSED BY THIS, BECAUSE I WANT

19   TO MAKE CERTAIN.  I UNDERSTOOD THE RECORD TO BE THAT THEY

20   INTRODUCED EVIDENCE, AS WEAK AS IT MAY BE, THAT THE POSE

21   BETWEEN LILY MARTINEZ'S TOON TEENS AND THE HAND POSES -- AND

22   THEY ELICITED TESTIMONY FROM IVY ROSS AND LILY MARTINEZ.  AND

23   MY POINT --

24        THE COURT:  BUT THE BASIS FOR LETTING THAT IN -- THE

25   ONLY REASON THAT COMES IN WAS FOR THE TIMING ISSUE, IN TERMS OF

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    WHEN CARTER BRYANT GOT THE IDEA FOR BRATZ.  AND MATTEL, AS WEAK

2    AS IT MAY BE, IS ARGUING THAT THAT WAS THE INSPIRATION.  JUST

3    LIKE YOU HAVE THE SEVENTEEN MAGAZINE, THEY HAVE TOON TEENS.

4        WHETHER OR NOT THERE'S A COPYRIGHT CLAIM, WHETHER OR

5    NOT MR. LARIAN MAY HAVE KNOWN OF IT, THAT REALLY IS IRRELEVANT.

6        I'LL GIVE YOU SOME LEEWAY ON THE "BRATZ" NAME, JUST

7    BECAUSE OF THE WAY IT'S PLAYING OUT.  BUT ON THIS, I DON'T SEE

8    THE RELEVANCE OF THIS AT ALL.  I AGREE WITH MR. PRICE.

9        MR. NOLAN:  I DO BELIEVE, YOUR HONOR, IT GOES TO THE

10   STATUTE OF LIMITATIONS ISSUE, BECAUSE THEY KNEW ABOUT THE

11   "BRATZ" NAME.

12       THE COURT:  THAT'S NOT THE CLAIM IN THIS CASE, THOUGH

13   THIS GETS BACK TO THIS WHOLE ISSUE I'VE ALREADY REJECTED.

14       MR. NOLAN:  I'M NOT REARGUING, BUT I JUST WANT TO

15   MAKE A POINT THAT AS I UNDERSTAND THE COURT'S RULING WITH

16   RESPECT TO THE CONTRACT CLAIMS, WHICH IS PART OF THIS CASE,

17   OBVIOUSLY TORTIOUS INTERFERENCE WITH THE CONTRACT, AND

18   MISAPPROPRIATION.

19       THE COURT:  WHAT DOES HIS KNOWLEDGE OF THIS HAVE TO

20   DO --

21       MR. NOLAN:  MY POINT IS, I WANT TO ESTABLISH THAT

22   MATTEL NEVER REACTED BY A LETTER SAYING BRATZ OR --

23       MR. PRICE:  THE POSE LOOKS JUST LIKE TOON TEENS.

24   THEY NEVER BOUGHT THAT.  AND THE COURT HAS RULED THOSE CLAIMS

25   ARE TIME-BARRED, UNLESS CONCEALED.  AND, AGAIN, THAT'S WHAT I'M

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    TRYING TO --

2          THE COURT:  THOSE CLAIMS AREN'T BEING BROUGHT.  THE

3    TOON TEENS CLAIMS IS NOT BEING BROUGHT.

4          MR. NOLAN:  BUT IT IS, YOUR HONOR, BEING BROUGHT,

5    BECAUSE YOU'LL REMEMBER, THEY ARE CONTENDING WE TOOK

6    PROPRIETARY INFORMATION FROM MATTEL.  THAT'S PART OF THE CLAIM.

7          THE COURT:  YES.

8          MR. NOLAN:  THAT'S WHY TOON TEENS --

9          THE COURT:  BUT THEN THIS ISN'T PROPRIETARY

10   INFORMATION.  THEY ARE PRODUCING IT ONLY RELEVANT OF TOON TEENS

11   EVER SINCE MR. QUINN FAMOUSLY STOOD UP IN MY COURTROOM STATING

12   THE TIMING OF THE DEVELOPMENT OF BRATZ BY CARTER BRYANT.

13         MR. NOLAN:  I, FRANKLY, DO NOT BELIEVE THAT'S HOW THE

14   JURY UNDERSTANDS THAT ISSUE, YOUR HONOR, BECAUSE -- AND THE

15   TESTIMONIAL ABOUT THE POSES AND HOW UNIQUE IT WAS, THAT'S --

16         THE COURT:  JUST LIKE HER TESTIMONY ABOUT THE

17   SIMILARITIES IN THOSE ADS IN SEVENTEEN MAGAZINE AND THE POSES.

18   I'VE LET ALL OF THAT IN ON BOTH SIDES, AND I'LL CONTINUE TO LET

19   THAT IN.  I THINK THAT'S ALL RELEVANT, BECAUSE IT GOES TO THE

20   CIRCUMSTANTIAL EVIDENCE OF WHEN CARTER BRYANT DEVELOPED THESE

21   DRAWINGS OR THE IDEA OR THE NAME.

22         MR. NOLAN:  THE CONTRACT CLAIM THAT IS ALIVE IN THIS

23   CASE IS THAT CARTER BRYANT BREACHED DUTY OF LOYALTY, NOT ONLY

24   IN MEETING --

25         THE COURT:  BOTH IN HIS DUTY OF LOYALTY AND IN

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    FIDUCIARY DUTY.

2        MR. NOLAN:  BUT ALSO THEIR CLAIM, THE CHART, THE

3    RECEIVING CHART, TO SHOW -- AND THEY ELICITED TESTIMONY ABOUT

4    HOW CARTER BRYANT COULD HAVE COME OVER AND LOOKED AT THE TOON

5    TEENS DRAWINGS AND THEN HE SAID, 'WOW, THAT'S COOL.'  THEY COME

6    OUT.  AND THEN WE HAVE THE TESTIMONY THAT --

7        MR. PRICE:  THE EYES LOOK JUST LIKE THE EYES.

8        THE COURT:  RIGHT.

9        MR. NOLAN:  THAT IS ALL ABOUT PROPRIETARY INFORMATION

10   THAT THEY CONTEND THAT CARTER BRYANT VIOLATED.

11       THE COURT:  THE PROPRIETARY INFORMATION, AS I

12   UNDERSTAND IT -- WHAT HE THEN ARGUES IS THAT HE WAS INSPIRED BY

13   THIS.  I TEND TO AGREE, IT'S NOT THE STRONGEST EVIDENCE IN THE

14   WORLD, BUT IT'S EVIDENCE, AND -- BUT THIS WITNESS'S KNOWLEDGE

15   OF THAT, I CAN'T SEE THE RELEVANCE.  BUT I APPRECIATE THE

16   ARGUMENT.

17       MS. AGUIAR:  I THINK WITH THAT CLARIFICATION THAT THE

18   PROPRIETARY INFORMATION THEY ARE (UNINTELLIGIBLE) WAS TAKEN

19   DOES NOT INCLUDE THE TOON TEENS DRAWINGS, THEN I THINK WE'RE

20   FINE.

21       IS THAT WHAT YOU'RE SAYING?

22       MR. QUINN:  WE'VE NEVER MAINTAINED --

23       THE COURT:  THAT'S NEVER BEEN --

24       MR. QUINN:  WE'VE NEVER MAINTAINED THAT.

25       THE COURT:  THAT'S THE BASIS OF MY UNDERSTANDING OF

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1     THE RULE.

2         MS. AGUIAR:  SO AS LONG AS WE'RE ALL CLEAR ON THAT,

3     THEN WE ARE FINE.

4         THE COURT:  YOU SHOULD LET HER SPEAK FIRST.

5         MR. NOLAN:  I NEEDED THAT.

6         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

7         THE COURT:  YOU MAY PROCEED.

8     BY MR. NOLAN:

9     Q   MR. PRICE ASKED YOU QUESTIONS WITH RESPECT TO THE HISTORY

10    OF MGA, ITS EARLY HISTORY; AND YESTERDAY YOU TESTIFIED WITH

11    RESPECT TO ITS EARLY ORIGINS.  I JUST WANT TO GO BACK TO THAT

12    FOR A MOMENT.

13        CAN YOU EXPLAIN TO THE JURY WHETHER OR NOT MGA WAS

14    EVER A LICENSEE OF MATTEL PRODUCTS?

15        MR. PRICE:  OBJECTION.  IT'S IRRELEVANT.

16        MR. NOLAN:  IT GOES TO --

17        THE COURT:  MGA WAS A LICENSEE...

18        MR. NOLAN:  OF MATTEL, WITH RESPECT TO ELECTRONIC

19    PRODUCTS.

20        THE COURT:  WHY DON'T YOU REPHRASE.

21        IS THERE A PARTICULAR PRODUCT IN MIND, COUNSEL?

22        MR. NOLAN:  YES.

23        THE COURT:  ASK YOUR NEXT QUESTION.

24    BY MR. NOLAN:

25    Q   YOU'RE FAMILIAR WITH A HAND-HELD ELECTRONIC GAME FOR

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1     BARBIE?

2     A    YES.

3     Q    WHO MANUFACTURED THAT GAME?

4     A    MGA DID, IN '96, '97.  WE WERE A LICENSEE OF MATTEL.

5           MR. PRICE:  MOVE TO STRIKE.  IT'S IRRELEVANT.

6           THE COURT:  BRIEFLY.

7           MR. NOLAN:  OPENING STATEMENT, WHETHER OR NOT THEY

8     WERE A SOPHISTICATED COMPANY IN WHAT THEY WERE DOING.

9           THE COURT:  OVERRULED.

10          BRIEFLY, COUNSEL.

11    BY MR. NOLAN:

12    Q    I'D LIKE TO SHOW YOU EXHIBIT 18508.

13          DO YOU RECOGNIZE EXHIBIT 18508?

14    A    YES, I DO.

15    Q    WHAT IS IT?

16    A    IT'S A BARBIE HAND-HELD GAME THAT MGA MADE UNDER LICENSE

17    FROM MATTEL IN 1997 BECAUSE THEY DIDN'T WANT TO DO IT

18    THEMSELVES.

19          MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 18508.

20          THE COURT:  OBJECTION?

21          MR. PRICE:  403, RELEVANT.

22          THE COURT:  OVERRULED.

23          IT'S ADMITTED.

24          THE COURT:  AT THE END OF THIS TRIAL, I ASSUME ALL OF

25    THIS CAN GO TO TOYS-FOR-TOTS?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1       THE WITNESS:  TO CHARITY.

2       MR. NOLAN:  MOST DEFINITELY.

3    BY MR. NOLAN:

4    Q   WITHOUT GOING INTO ALL THE -- IS EXHIBIT 18508, THE BARBIE

5    HAND-HELD, THE ONLY ELECTRONIC GAME THAT YOU MANUFACTURED UNDER

6    LICENSE AGREEMENT WITH MATTEL?

7    A   NO.  WE MADE --

8    Q   NO FURTHER.

9       SO YOU MADE OTHERS; RIGHT?

10   A   WE MADE TOYS FOR MATTEL, YES.

11   Q   THANK YOU.

12   A   NOT FOR MATTEL.  UNDER LICENSE FOR MATTEL.

13   Q   BUT MGA MANUFACTURED IT.

14   A   THAT'S RIGHT.  BECAUSE THEY WOULD NOT DO IT THEMSELVES.

15   Q   SO YOU HAD MANUFACTURING CAPABILITIES IN HONG KONG; IS

16   THAT RIGHT?

17   A   IN HONG KONG AND CHINA.

18   Q   MR. PRICE ASKED YOU QUESTIONS WITH RESPECT TO THE FILING

19   OF A BANKRUPTCY CLAIM BY MGA IN THE LATE 1990'S.  I JUST WANT

20   TO ASK YOU A QUESTION ABOUT THAT.

21       CAN YOU EXPLAIN, FIRST OF ALL, WHEN THE BANKRUPTCY

22   PETITION WAS FILED.

23   A   IT WAS ON MARCH 19, 1997.

24   Q   WHERE WAS THE BANKRUPTCY PETITION FILED?

25   A   IN THE BANKRUPTCY COURT IN SAN FERNANDO VALLEY,

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    CALIFORNIA.  I DON'T REMEMBER THE EXACT NAME OF THE COURT.

2    Q   AS BRIEFLY AS POSSIBLE, WITHOUT GETTING INTO THE DETAILS,

3    CAN YOU PUT INTO CONTEXT THE CIRCUMSTANCES WHICH LED TO THE

4    FILING OF THE BANKRUPTCY AND WHAT HAPPENED.

5    A   WE WERE SET UP FOR AN INSURANCE SCAM IN TEXAS, MCALLEN,

6    TEXAS, WHERE SOMEBODY HAD CLAIMED THAT, BELIEVE IT OR NOT, MY

7    BROTHER HAD SPIT ON THE FLOOR AND HAD DEFAMED HIM; SO THEY HAD

8    FILED A LAWSUIT.  AND WE WERE NEVER GIVEN NOTICE OF GOING TO

9    COURT FOR THE -- I THINK A HEARING OR SOMETHING.  AND THEN,

10   THEY -- ONE DAY WE GOT A JUDGMENT FOR $6.7 MILLION FOR

11   DEFAMATION.

12        AND FOR MEDIATION, WE WENT TO AUSTIN, TEXAS, WHERE

13   OUR INSURANCE COMPANY WAS THERE, THE LAWYERS FOR THE OTHER

14   GENTLEMAN WERE THERE, AND I WAS THERE; AND THEY ASKED FOR A

15   SETTLEMENT OF $985,000 INSTEAD OF $6.7 MILLION.

16        MR. PRICE:  THIS APPEARS TO BE BEYOND THE SCOPE; LACK

17   OF FOUNDATION.

18        THE COURT:  SUSTAINED.

19        LET'S ASK ANOTHER QUESTION, COUNSEL.

20   BY MR. NOLAN:

21   Q   MR. PRICE ASKED YOU QUESTIONS ABOUT WHETHER OR NOT YOU

22   MADE DISTRIBUTIONS TO FAMILY MEMBERS FROM MGA.

23        DO YOU RECALL THAT?

24   A   YES.

25   Q   YESTERDAY WE TALKED ABOUT YOUR PARENTS.

1        DO YOU RECALL THAT?

2    A   YES.

3    Q   NOW, IT IS TRUE THAT YOU HAVE MADE DISTRIBUTIONS TO BOTH

4    YOUR MOTHER AND YOUR FATHER; CORRECT?

5    A   I MADE DISTRIBUTION TO MY MOTHER.  MY FATHER WAS GETTING

6    OLDER IN AGE, AND THEY LIVE TOGETHER.  I MADE DISTRIBUTION TO

7    MY MOTHER.

8    Q   AND IT'S TRUE THAT YOU'VE MADE DISTRIBUTIONS ALSO TO OTHER

9    FAMILY MEMBERS; CORRECT?

10   A   YES.

11   Q   I WANT TO TURN TO THE LAST SUBJECT OF THE WALL STREET

12   JOURNAL ARTICLE THAT WAS PUBLISHED IN 2003.  AND I THINK THAT

13   THE REDACTED VERSION IS EXHIBIT 1-A.  WE'VE SEEN THIS A COUPLE

14   OF TIMES, MR. LARIAN.  I FORGOT TO ASK YOU A QUICK QUESTION ON

15   THAT.

16       THERE'S A QUOTE IN HERE WITH RESPECT TO THE SORT-OF

17   DOLL CONTEST, AND I JUST WANT TO SHOW IT AGAIN SO WE KNOW WHAT

18   WE'RE TALKING ABOUT HERE.

19       IT SAYS THAT MR. BRYANT -- HE SAYS HE CHOSE

20   "MR. BRYANT'S IDEA FOR THE BRATZ OVER SEVERAL OTHERS AFTER

21   HOLDING A SORT-OF DOLL FASHION DESIGN CONTEST IN LATE 1999."

22       DO YOU SEE THAT?

23   A   I DO.

24   Q   WHEN DID YOU ACCEPT OR WHEN DID YOU CHOOSE MR. BRYANT'S

25   IDEA FOR A NEW LINE OF DOLLS?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    IN 2000.

2    Q    WHY DID YOU TELL THE WALL STREET JOURNAL THAT YOU WERE

3    HOLDING A SORT-OF FASHION DOLL DESIGN CONTEST IN LATE 1999?

4    A    THERE WAS NO SUCH A THING IN 1999.  EITHER I MISQUOTED,

5    BECAUSE I'M KIND OF DYSLEXIC IN MY MIND, MIXING YEARS, OR SHE

6    MADE A MISTAKE; EITHER ONE OF THOSE TWO.

7    Q    DID YOU HOLD A DOLL CONTEST IN 1999?

8    A    NOT TO THE BEST OF MY RECOLLECTION, NO.

9    Q    WAS VICTORIA O'CONNOR EVEN WORKING AT MGA IN 1999?

10   A    I DON'T KNOW.  I DON'T THINK SO, BUT I DON'T KNOW EXACTLY

11   WHEN SHE STARTED WORKING AT MGA.

12   Q    WHAT ABOUT PAULA GARCIA?  WAS SHE EVEN WORKING IN 1999?

13   A    NO.  PAULA GARCIA STARTED IN APRIL OF 2000.

14   Q    DID YOU EVER MEET CARTER BRYANT IN 1999?

15   A    I DID NOT MEET CARTER BRYANT UNTIL SEPTEMBER 1, 2000, IN

16   MY OFFICE.

17   Q    YOU WERE INTERVIEWED BY TELEPHONE FOR THIS ARTICLE?

18   A    I DON'T RECALL IF IT WAS BY PHONE OR IN PERSON.

19   Q    YOU DON'T HAVE ANY RECOLLECTION OF WHETHER OR NOT YOU WERE

20   IN THE UNITED STATES OR ANYWHERE ELSE WHEN YOU WERE BEING

21   INTERVIEWED.

22   A    FOR SURE, I HAD A PORTION OF THIS INTERVIEW, OR MAYBE ALL

23   OF IT, WHEN I WAS IN HONG KONG.

24   Q    WHEN DID YOU FIRST LEARN THAT CARTER BRYANT DID NOT RESIGN

25   AND WALK OUT THE DOOR OF MATTEL ON OCTOBER 4, 2000, AFTER

1   SIGNING HIS AGREEMENT?

2   A   I THINK THE DAY, THE EVENING -- LET'S PUT IT THIS WAY; I

3   REMEMBER IT VERY CLEARLY:  THE EVENING BEFORE MATTEL SUED

4   CARTER BRYANT IN 2004.  THAT'S WHEN I WAS OUT TO DINNER WITH A

5   GENTLEMAN NAMED MICHAEL BLOCK.  I RECEIVED A CALL FROM A WALL

6   STREET JOURNAL REPORTER ON MY CELL PHONE BY THE NAME OF

7   QUEENA KIM, AND SHE TOLD ME THAT MATTEL HAD JUST LEAKED TO HER

8   A LAWSUIT THAT THEY HAD FILED AGAINST CARTER BRYANT.  AND I

9   ASKED HER, 'WHAT IS THE BASIS OF THE LAWSUIT?'  AND SHE SAID,

10   TO ME, THAT CARTER BRYANT -- THEY CLAIMED CARTER BRYANT

11   WORKED --

12        MR. PRICE:  YOUR HONOR, OBJECTION.

13        THE COURT:  SUSTAINED.

14        THE QUESTION WAS, WHEN DID YOU FIRST LEARN?

15        IT WAS A TEMPORAL QUESTION.

16        MR. PRICE:  MOVE TO STRIKE THE ANSWER.

17        THE COURT:  THE ANSWER IS STRICKEN.

18   BY MR. NOLAN:

19   Q   WHEN DID YOU FIRST LEARN THAT CARTER BRYANT HAD NOT EXITED

20   MATTEL WHEN HE SIGNED THE CONTRACT ON OCTOBER 4TH?

21   A   THE DAY BEFORE MATTEL FILED THE LAWSUIT IN 2004 AGAINST

22   CARTER BRYANT.

23   Q   THANK YOU.

24        WHAT DID YOU DO, IF ANYTHING, AFTER YOU LEARNED OF

25   THAT LAWSUIT?

1   A   I PICKED UP THE PHONE AND CALLED CARTER BRYANT.

2   Q   AND WHY DID YOU DO THAT?

3   A   I WANTED TO KNOW IF WHAT THE WALL STREET JOURNAL REPORTER

4   WAS TELLING ME IS TRUE; THAT HE HAD NOT LEFT MATTEL ON

5   OCTOBER 4TH, AS HE WAS SUPPOSED TO.

6   Q   AND WHAT DID MR. BRYANT TELL YOU?

7   A   HE TOLD ME THAT HE GAVE MATTEL A TWO-WEEKS NOTICE.

8   Q   MR. LARIAN, DO YOU RECALL EVER SEEING CARTER BRYANT IN THE

9   MGA OFFICES BETWEEN OCTOBER 4TH AND OCTOBER 19TH?

10      THE COURT:  OF WHAT YEAR, COUNSEL?

11      MR. NOLAN:  OF 2000.

12      THE WITNESS:  I DO NOT.

13   BY MR. NOLAN:

14   Q   DO YOU HAVE ANY KNOWLEDGE OF WHAT MR. BRYANT WAS DOING

15   BETWEEN OCTOBER 4TH AND OCTOBER 19TH OF THE YEAR 2000?

16   A   I DO NOT.  NOT MUCH OF ANYTHING, IF I CAN THINK ABOUT IT.

17   Q   MR. LARIAN, WHEN YOU OFFERED A CONSULTING AGREEMENT WITH

18   CARTER BRYANT, WERE YOU ATTEMPTING TO BRIBE HIM TO LEAVE

19   MATTEL?

20   A   WAS I -- I'M SORRY.  CAN YOU ASK THAT QUESTION AGAIN.

21   Q   WHEN YOU OFFERED CARTER BRYANT A CONSULTING AGREEMENT WITH

22   MGA IN OCTOBER OF 2000, WERE YOU BRIBING CARTER BRYANT TO LEAVE

23   MATTEL WITH MATTEL DESIGNS?

24   A   ABSOLUTELY NOT.  HE WAS MAKING $5,000 A MONTH, OR --

25   SORRY -- $55,000 A YEAR AT MATTEL, AND WE OFFERED HIM --

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1         MR. PRICE:  OBJECTION.  FOUNDATION.

2         THE COURT:  LAY A FOUNDATION, COUNSEL.

3    BY MR. NOLAN:

4    Q   SO THE ANSWER TO MY QUESTION IS, NO, YOU WERE NOT

5    ATTEMPTING TO BRIBE HIM?

6    A   THE ANSWER TO YOUR QUESTION IS ABSOLUTELY NOT.

7    Q   DO YOU KNOW HOW MUCH CARTER BRYANT WAS BEING PAID AT

8    MATTEL?

9    A   YES.

10   Q   HOW DO YOU KNOW THAT?

11   A   HE TOLD ME.

12   Q   WHAT DID HE TELL YOU HE WAS MAKING AT MATTEL?

13        MR. PRICE:  HEARSAY.  OBJECTION.

14        MR. NOLAN:  GOES TO HIS STATE OF MIND.

15        THE COURT:  ONLY FOR THE STATE OF MIND, NOT

16   NECESSARILY FOR WHAT HE ACTUALLY MADE AT MATTEL, BUT FOR WHAT

17   MR. LARIAN UNDERSTOOD HE MADE AT MATTEL.

18        THE WITNESS:  TO THE BEST OF MY RECOLLECTION, HE SAID

19   HE WAS MAKING $55,000 A YEAR, EITHER $50,000 OR $55,000 A YEAR.

20   I DON'T REMEMBER THE EXACT AMOUNT.

21   BY MR. NOLAN:

22   Q   AND THE AMOUNT THAT YOU WERE OFFERING AGAINST ROYALTIES TO

23   BE EARNED ON THE BRATZ LINE WAS HOW MUCH A MONTH FOR

24   MR. BRYANT?

25   A   TO THE BEST OF MY RECOLLECTION, IT WAS $5,500 A MONTH FOR

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    THE FIRST THREE MONTHS, AND IT WENT DOWN TO $5,000 AFTER THE

2    SECOND THREE MONTHS; AND IT WAS FOR SIX MONTHS.

3    Q   SO THE SMALL DIFFERENCE BETWEEN WHAT CARTER BRYANT WAS

4    MAKING AS AN EMPLOYEE AT MATTEL AND WHAT HE WOULD BE PAID AS A

5    FREELANCE CONSULTANT FOR MGA, THAT LITTLE DIFFERENCE, IN YOUR

6    MIND, WERE YOU OFFERING HIM A LITTLE BIT MORE TO BRIBE HIM?

7          MR. PRICE:  OBJECTION.  IT'S ARGUMENTATIVE AS

8    PHRASED.

9          THE COURT:  REPHRASE YOUR QUESTION.

10   BY MR. NOLAN:

11   Q   YOU WERE OFFERING MR. BRYANT A LITTLE BIT MORE MONEY THAN

12   HE WAS MAKING AT MATTEL; RIGHT?

13   A   WE DID.

14   Q   AT THE TIME THAT YOU OFFERED MR. BRYANT THE FREELANCING

15   AGREEMENT WITH MGA, DID YOU KNOW FOR CERTAIN WHETHER OR NOT YOU

16   WOULD, IN FACT, EVEN MANUFACTURE A BRATZ DOLL?

17   A   NO.  WE DID NOT KNOW IF THOSE DRAWINGS CAN BE MANUFACTURED

18   TO A DOLL.

19   Q   DID YOU KNOW, AS OF OCTOBER 4, 2000, WHETHER OR NOT IT WAS

20   EVEN FEASIBLE TO MANUFACTURE A BRATZ DOLL?

21   A   IT WAS NOT -- AT THAT TIME, WE DIDN'T THINK IT WAS

22   FEASIBLE.  AND IT WENT THROUGH -- IN FACT, IT WENT THROUGH

23   MANY, MANY RENDITIONS BEFORE THEY BECAME THESE DOLLS.

24   Q   MR. LARIAN, DID YOU EVER INTEND TO INTERFERE WITH ANY

25   CONTRACT THAT CARTER BRYANT HAD WITH MATTEL?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   I DID NOT.

2    Q   DID YOU EVEN KNOW WHAT THE TERMS OF CARTER BRYANT'S

3    CONTRACT WAS AT MATTEL?

4    A   I DID NOT.

5    Q   DID YOU STEAL THE BRATZ IDEA FROM MATTEL?

6    A   I DID NOT.

7        MR. NOLAN:  NOTHING FURTHER.

8        THE COURT:  FURTHER EXAMINATION BY MR. PRICE?

9        MR. PRICE:  YES, YOUR HONOR.

10          FURTHER DIRECT EXAMINATION

11   BY MR. PRICE:

12   Q   MR. LARIAN, LET ME START WITH SOME OF YOUR MOST RECENT

13   ANSWERS.  I BELIEVE MR. NOLAN ASKED YOU WHETHER YOU KNEW WHAT

14   CARTER BRYANT WAS MAKING AT MATTEL.

15       DO YOU RECALL THAT?

16   A   I DO.

17   Q   AND THEN HE ASKED THE AMOUNT YOU HAD AGREED TO PAY

18   MR. BRYANT PER MONTH.

19       DO YOU RECALL THAT?

20   A   I DO.

21   Q   IF WE LOOK AT THE CONTRACT, THOUGH, I BELIEVE -- LET'S

22   LOOK AT -- THERE'S SEVERAL VERSIONS -- I THINK IT'S 15.

23       DOES EXHIBIT 15 CONTAIN ALL OF THE PROMISES THAT MGA

24   MADE TO CARTER BRYANT IN TRYING TO ATTEMPT TO CONVINCE HIM TO

25   BECOME A CONSULTANT WITH MGA?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    THIS CONTRACT, MUTUAL CONTRACT, THE PROMISES THAT MGA MADE

2    TO HIM AND THE PROMISES THAT MR. BRYANT MADE TO MGA.

3    Q    AND IF YOU LOOK AT THE SECOND PAGE HERE, THERE'S A SECTION

4    THERE THAT SAYS, "COMPENSATION COSTS."  THAT'S SECTION FOUR.

5        DO YOU REMEMBER THAT?

6    A    YES.

7    Q    AND IT TALKED ABOUT THIS $5,500 PER MONTH, AND THEN THE

8    $5,000 PER MONTH.

9        DO YOU SEE THAT?

10   A    CORRECT.

11   Q    AND AS YOU TOLD US, THOSE WERE ADVANCES AGAINST ROYALTY;

12   CORRECT?

13   A    CORRECT.

14   Q    AND PARAGRAPH B THERE IS WHERE IT SAYS HE'S GETTING HIS

15   3 PERCENT ROYALTY; CORRECT?

16   A    THAT'S CORRECT.

17   Q    AND HE INSISTED ON A ROYALTY; CORRECT?

18   A    CORRECT.

19   Q    AND IN SEPTEMBER, YOUR INITIAL REACTION WAS, 'I DON'T WANT

20   TO GIVE YOU A ROYALTY'; RIGHT?

21   A    NO, THAT'S NOT -- YOUR QUESTION IS NOT CORRECT.

22   Q    WERE THERE EVER ANY DISCUSSIONS IN SEPTEMBER WHERE YOU

23   WERE TAKING THE POSITION WITHIN MGA THAT IT WOULD BE

24   INAPPROPRIATE TO GIVE MR. BRYANT ROYALTY?

25   A    NO.  WE DID NOT WANT TO GIVE HIM ROYALTY ON LICENSING

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    REVENUE THAT WE WOULD GET FOR BRATZ.

2    Q    IN ANY EVENT, IN THESE CONVERSATIONS THAT YOU HAD WITH

3    MR. BRYANT, ONE OF THE THINGS YOU SAID TO HIM WAS, 'THINK ABOUT

4    ALL OF THE MONEY YOU'RE GOING TO MAKE BECAUSE YOU'RE GOING TO

5    GET A ROYALTY OF 3 PERCENT'; CORRECT?

6    A    I TOLD HIM, 'THINK ABOUT ALL OF THE MONEY YOU'RE GOING TO

7    GET,' THAT'S RIGHT.  'AND YOU'RE GOING TO GET A 3 PERCENT

8    ROYALTY.'

9    Q    SO IN HAVING THE DISCUSSIONS, IN TRYING TO GET HIM TO SIGN

10   WITH MGA AND LEAVE MATTEL, YOU TOLD HIM, ONE, 'YOU'RE GOING TO

11   GET AN ADVANCE ON ROYALTY'; CORRECT?

12   A    THAT'S RIGHT.

13   Q    AND, TWO, 'YOU SHOULD THINK ABOUT ALL OF THE ROYALTY

14   YOU'RE GOING TO MAKE ON THIS'; CORRECT?

15   A    I DID.

16   Q    AND, IN FACT, AROUND THAT TIME FRAME, YOUR ESTIMATE AS TO

17   THE REVENUES FOR BRATZ IN JUST THE FIRST YEAR WAS ABOUT

18   $25 MILLION; RIGHT?

19   A    THAT'S CORRECT.

20   Q    SO FOR THAT FIRST YEAR ALONE, MR. BRYANT'S ROYALTY WOULD

21   BE ABOUT -- EXPECTED, NOT ACTUAL -- WOULD BE ABOUT 3 PERCENT OF

22   $25 MILLION; CORRECT?

23   A    THAT'S CORRECT.  EXPECTED.

24   Q    YOU'RE PROBABLY AS BAD AT MATH AS I AM.

25        DO YOU KNOW WHAT 3 PERCENT OF $25 MILLION WOULD BE?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   I'M NOT AS BAD AS YOU ARE.  I THINK IT'S $750,000.

2    Q   SO IN TRYING TO CONVINCE MR. BRYANT TO SIGN WITH MGA AND

3    LEAVE MATTEL, IN YOUR DISCUSSIONS WITH HIM, YOU SAID HE SHOULD

4    EXPECT TO GET SOMEWHERE AROUND $750,000 FOR THE YEAR 2001.

5    A   NO.  I EXPECTED HIM TO GET A 3 PERCENT ROYALTY ON THE

6    PRODUCT THAT WE BRING TO THE MARKET AND SELL.  AND THAT'S WHAT

7    HE GOT, AGAINST THE ADVANCES HE WAS RECEIVING.

8    Q   BUT AS YOU SAID, YOU EXPECTED THAT TO BE ABOUT $25

9    MILLION.

10   A   THAT WAS MY FORECAST, AND NOT ALL OF MY FORECASTS HAVE

11   COME TRUE.

12   Q   BUT I'M JUST TALKING ABOUT TRYING TO CONVINCE MR. BRYANT

13   TO LEAVE MATTEL AND JOIN MGA.

14        ONE OF THE THINGS YOU SAID TO HIM WAS, 'WE FORECAST

15   $25 MILLION, OR A LOT OF SALES, AND YOU SHOULD THINK ABOUT ALL

16   OF THE MONEY YOU'RE GOING TO MAKE FROM THOSE SALES.'

17   A   WE DID NOT.  TO THE BEST OF MY RECOLLECTION, WE NEVER TOLD

18   HIM THAT WE'RE GOING TO FORECAST $25 MILLION.  THIS WAS AN

19   INTERNAL FORECAST THAT WE DO FOR OUR SALES REPORT, TO HAVE A

20   BUDGETED PLAN.  BUT I DID TELL HIM THAT HE SHOULD THINK ABOUT

21   THE ROYALTIES HE WILL MAKE ON THIS LINE IF IT BECOMES

22   SUCCESSFUL.

23   Q   AND THAT'S BECAUSE, IN YOUR VIEW, THE ROYALTIES ON THE

24   LINE WERE GOING TO DWARF THESE ADVANCES OF $5,500 PER MONTH, OR

25   $5,000 PER MONTH; CORRECT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   I DEFINITELY HOPED THAT THE BRATZ LINE WILL BE SUCCESSFUL

2    FOR MGA, WHICH LATER ON, THEY BECAME SUCCESSFUL, AND THE

3    ROYALTIES THAT HE WILL MAKE WILL BE MORE THAN THE SALARY HE WAS

4    MAKING AT MATTEL.

5    Q   AND AS IT TURNED OUT, I BELIEVE YOU SAID THAT THE

6    ROYALTIES HE HAS MADE AS A RESULT OF MOVING FROM MATTEL ARE

7    SOMEWHERE IN EXCESS OF $30 MILLION?

8    A   FROM 2001 TO 2007, YES, I BELIEVE THE ROYALTIES HE HAS

9    MADE IS IN EXCESS OF $30 MILLION.

10   Q   I WANT TO ASK YOU SOME QUESTIONS -- NEXT TO THE LAST TOPIC

11   YOU TALKED ABOUT WAS ABOUT THIS FASHION DOLL CONTEST.

12       DO YOU RECALL MR. NOLAN ASKED YOU ABOUT THAT?

13   A   YES.

14   Q   AND HE SHOWED YOU EXHIBIT 1-A, AND MAYBE WE CAN PUT THAT

15   UP.  AND IF WE COULD, GO TO THE LAST PARAGRAPH.

16       MR. NOLAN ASKED YOU ABOUT THIS STATEMENT THAT YOU

17   CHOSE MR. BRYANT'S IDEA FOR THE BRATZ OVER SEVERAL OTHERS AFTER

18   HOLDING A SORT-OF FASHION DOLL CONTEST IN LATE 1999.

19       DO YOU RECALL BEING ASKED QUESTIONS ABOUT THAT?

20   A   I DO.

21   Q   AND, IN FACT, YESTERDAY YOU TESTIFIED THAT YOU HAD THIS

22   SORT-OF FASHION DOLL CONTEST BECAUSE RON STOVER, THE BUYER AT

23   WAL-MART, HAD CHALLENGED YOU TO COME UP WITH A TOY THAT COULD

24   COMPETE WITH BARBIE AND THEN HE WOULD BUY IT.

25   A   THAT'S CORRECT.

1          MR. PRICE:  YOUR HONOR, I'D LIKE TO PLAY FROM

2     MR. LARIAN'S DEPOSITION, PAGE 58, LINE 16, TO 60, LINE 15.

3     IT'S THE FIRST VOLUME.

4          THE COURT:  ANY OBJECTION, MR. NOLAN?

5          MR. NOLAN:  NO OBJECTION.

6          THE COURT:  VERY WELL.

7          THE OBJECTIONS SET FORTH IN THE TRANSCRIPT ARE

8     OVERRULED.

9          YOU MAY PLAY IT.

10          (WHEREUPON, VIDEO DEPOSITION PLAYS;

11          EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS: )

12

           Q   ALL RIGHT.  SO CAN YOU TELL ME WHEN

13

     APPROXIMATELY IT WAS YOU HAD THIS CONVERSATION WITH

14

     STOVER, WHEN HE SAID BRING ME SOMETHING TO COMPETE.

15

     WITH BARBIE.

16

           A   I CAN'T.

17

           Q   CAN YOU TELL ME WHAT YEAR?

18

           A   I CAN'T.

19

           Q   WAS IT BEFORE PAULA JOINED MGA?

20

           A   MOST LIKELY.

21

           Q   DO YOU THINK IT WAS WITHIN A YEAR OF HER

22

     JOINING?

23

           A   I CAN'T TELL YOU.  I DON'T KNOW.

24

           Q   WAS IT MORE -- WAS IT FIVE YEARS BEFORE SHE

25

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1
        A   I CAN'T ESTIMATE THAT.
2
        Q   ALL RIGHT.  IT MIGHT HAVE BEEN FIVE YEARS?
3
        IT MIGHT HAVE BEEN MORE THAN FIVE YEARS?  YOU'RE NOT
4
        SURE?
5
        THE WITNESS:  I DON'T THINK IT WAS MORE THAN
6
        FIVE YEARS, BUT I CAN'T REMEMBER.
7
        BY MR. QUINN:
8
        Q   ALL RIGHT.  CAN YOU NARROW DOWN THE TIMEFRAME
9
        AT ALL FOR ME?
10
        A   BESIDES WHAT I JUST TOLD YOU, I CAN'T.
11
        Q   ALL RIGHT.  WELL, WHAT YOU'VE TOLD ME DIDN'T
12
        NARROW IT DOWN VERY MUCH.
13
        A   RIGHT.
14
        Q   ALL RIGHT.  SO DID YOU DO ANYTHING AS A
15
        RESULT OF MR. STOVER'S COMMENT TO YOU?
16
        A   LEFT THE WAL-MART BEING UPSET THAT I DIDN'T
17
        GET AN ORDER YET.
18
        Q   ALL RIGHT.
19
        A   STILL DIDN'T GET AN ORDER.
20
        Q   DID YOU -- DID YOU PROCEED TO LOOK FOR A
21
        FASHION DOLL IDEA AS A RESULT OF HIS COMMENT,
22      SOMETHING
23       TO COMPETE WITH BARBIE?
24      A   I DON'T RECALL THAT.  PROBABLY WE WERE
25      LOOKING A LOT OF DIFFERENT IDEAS, A LOT OF DIFFERENT

1       PRODUCTS ALL THE TIME.  COULD HAVE SEE A FASHION

        DOLL.

2

        NOTHING THAT PROBABLY GOT MY INTEREST.  I DON'T

3       RECALL.

4          Q    UH-HUH.  SO YOU MIGHT HAVE -- AS A RESULT OF

5       MR. STOVER'S COMMENTS, YOU MIGHT HAVE GONE TO LOOK

        FOR SOMETHING TO COMPETE WITH BARBIE OR YOU MIGHT NOT

6       HAVE, YOU'RE JUST NOT SURE; IS THAT TRUE?

7       THE WITNESS:  I DON'T RECALL THAT I DID,

8       ACTUALLY, BESIDES GOT PISSED OFF THAT, YET AGAIN, HE

9       DIDN'T GIVE ME AN ORDER.

10      (CONCLUSION OF EXCERPTS.)

11   BY MR. PRICE:

12   Q   LET'S TALK ABOUT THE FASHION DOLL CONTEST YOU WERE

13   ACTUALLY REFERRING TO IN THE WALL STREET JOURNAL.

14   A   GO AHEAD.

15   Q   YOU TOLD THE JURY YESTERDAY THAT THIS FASHION DOLL

16   CONTEST, TO YOUR BEST RECOLLECTION, OCCURRED -- YOU DON'T

17   BELIEVE PAULA GARCIA WAS PART OF THE DISCUSSION ABOUT THAT

18   CONTEST; IS THAT RIGHT?

19   A   AS TO THE BEST OF MY RECOLLECTION.

20   Q   SO WHAT YOU TOLD THE JURY WAS, THERE WAS A FASHION DOLL

21   CONTEST THAT CAME OUT AS A RESULT OF WHAT MR. STOVER SAID;

22   CORRECT?

23   A   NO.  WHAT I TOLD THE JURY WAS I GOT THE FIRST IDEA ABOUT

24   DOING A FASHION DOLL WHEN RON STOVER WOULD STILL NOT GIVE ME AN

25   ORDER AFTER BEING DOWN THERE SO MANY TIMES.  AND WHEN I ASKED

1    HIM, 'WHEN ARE YOU GOING TO GIVE ME AN ORDER," HE SAID, 'COME

2    UP WITH SOMETHING THAT WILL COMPETE WITH BARBIE, AND I'LL GIVE

3    YOU AN ORDER.'

4    Q   AND YOU SAID THAT AS A RESULT OF THAT, YOU DID A FASHION

5    DOLL CONTEST AND TALKED WITH VICTORIA O'CONNOR; RIGHT?

6    A   NO.  I SAID THAT I KEPT THAT IN MY MIND AND I TOLD

7    VICTORIA O'CONNOR, 'LOOK FOR IDEAS FOR FASHION DOLLS WHICH ARE

8    DIFFERENT THAN BARBIE.'

9    Q   AND THE DISCUSSIONS YOU HAD WITH VICTORIA O'CONNOR, YOU

10   DON'T THINK PAULA GARCIA WAS PART OF THAT DISCUSSION; CORRECT?

11   A   NO.  I DON'T RECALL IF SHE WAS OR NOT.

12   Q   WELL, DO YOU RECALL TESTIFYING WHEN MR. NOLAN ASKED YOU,

13   "WHEN YOU WERE MEETING AND CONSIDERING OTHER IDEAS FOR FASHION

14   DOLLS, BEFORE YOU MET WITH CARTER BRYANT, WAS PAULA GARCIA PART

15   OF THOSE DISCUSSIONS, OR WAS IT YOU AND VICTORIA O'CONNOR?"

16        ANSWER:  "VICTORIA O'CONNOR IS IN CHARGE OF

17   LICENSING, TALKING TO OTHER DESIGNERS; SO I DON'T THINK

18   PAULA GARCIA WAS PART OF THAT DISCUSSION, NO.'

19   BY MR. PRICE:

20   Q   DO YOU RECALL TELLING THE JURY THAT YESTERDAY?

21   A   AND I STAY WITH THAT.  I DON'T RECALL IF PAULA GARCIA WAS

22   PART OF THAT DISCUSSION OR NOT.

23   Q   AND THIS IS ALL PART OF THE FASHION DOLL CONTEST, WHICH

24   YOU WERE REFERRING TO IN THAT WALL STREET JOURNAL ARTICLE;

25   CORRECT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   THAT'S CORRECT.

2    Q   BUT YOU RECALL, SIR, THAT YOU WERE ASKED ABOUT WHAT YOU

3    MEANT BY A "FASHION DOLL CONTEST" IN YOUR DEPOSITION?  DO YOU

4    REMEMBER THAT?

5    A   I BELIEVE I WAS.  I DON'T REMEMBER EXACTLY WHEN IT WAS,

6    BUT, YES, I BELIEVE I WAS ASKED QUESTIONS, NOW FOR THE FIFTIETH

7    TIME, ON THE SORT-OF FASHION DOLL CONTEST.

8    Q   ACTUALLY, THESE WERE QUESTIONS YOU WERE ASKED ON THE VERY

9    FIRST DAY OF YOUR DEPOSITION.

10       DO YOU RECALL THAT?

11   A   I DON'T RECALL IF IT WAS MY FIRST DAY OF DEPOSITION OR THE

12   LAST TIME.  I DON'T.

13   Q   WE'VE ALREADY PLAYED THIS, SO I'M JUST GOING TO ASK YOU

14   WHETHER OR NOT THIS ANSWER IS TRUE.

15       MR. PRICE:  IF WE CAN PUT UP 15, LINE 10, TO 16,

16   LINE 25.

17       THE COURT:  ANY OBJECTION?

18       MR. NOLAN:  NO OBJECTION, YOUR HONOR.

19       THE COURT:  YOU MAY PUBLISH.

20   BY MR. PRICE:

21   Q   DO YOU REMEMBER YOU WERE ASKED TO TELL US UNDER OATH ABOUT

22   THIS CONTEST?  DO YOU REMEMBER THAT?

23   A   YES.

24   Q   AND YOU SAID THAT YOU HAD IT SOMETIME IN 2000.

25       DO YOU RECALL THAT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   I'M SORRY?  LET ME READ THAT AGAIN.

2         CAN I JUST READ IT IN CONTEXT?

3    Q   PLEASE, READ IT.

4    A   GO AHEAD.  YES.

5    Q   SO YOUR TESTIMONY UNDER OATH THEN WAS THAT THE FASHION

6    CONTEST YOU WERE REFERRING TO WAS SOMETIME IN 2000.

7         DO YOU RECALL THAT?

8    A   YES.

9         MR. PRICE:  AND IF WE COULD PUT UP PAGE 17, LINE 4,

10   TO PAGE 18, LINE 1, WHICH HAS BEEN PREVIOUSLY PLAYED.

11        THE COURT:  ANY OBJECTION, MR. NOLAN?

12        MR. NOLAN:  NO OBJECTION.

13        THE WITNESS:  CAN YOU GIVE ME THE LINES AGAIN,

14   PLEASE.

15   BY MR. PRICE:

16   Q   SURE.

17        17, LINE 4, TO 18, LINE 1.

18        I BELIEVE YOU MAY HAVE THE TRANSCRIPT IN FRONT OF

19   YOU, SO YOU CAN READ WHATEVER YOU WOULD LIKE.

20   A   I'D LIKE TO READ IT, SO I DON'T WASTE TIME.

21   Q   DO YOU RECALL THIS TESTIMONY?

22   A   I DO.

23   Q   AND WHEN YOU FIRST TESTIFIED ABOUT THIS SORT-OF FASHION

24   DOLL CONTEST, THE ORIGINAL TESTIMONY WAS THAT THIS CONTEST TOOK

25   PLACE AFTER PAULA GARCIA JOINED MGA; CORRECT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    NO.

2         PLEASE GO AHEAD AND READ MY TESTIMONY.

3    Q    "HOW ABOUT SEPTEMBER?  I THINK YOU'VE ALREADY TOLD ME YOU

4    KNOW IT TOOK PLACE BEFORE SEPTEMBER."

5         ANSWER:  "BETWEEN APRIL AND SEPTEMBER."

6         THE WITNESS:  GO UP, PLEASE.  I WANT TO READ THAT

7    WHOLE THING TO THE JURY, IF YOU DON'T MIND, THE WHOLE --

8         NO?

9         MR. NOLAN:  I RULED ON THAT REQUEST, YOUR HONOR.  I

10   APOLOGIZE.

11        THE COURT:  THANK YOU, COUNSEL.

12   BY MR. PRICE:

13   Q    THE REASON YOU CHOSE APRIL IS BECAUSE YOU SAID IT WAS

14   "PROBABLY AFTER APRIL, BECAUSE THAT'S WHEN PAULA STARTED";

15   CORRECT?

16   A    AT FIRST, I SAY, "I CAN'T TELL YOU.  PROBABLY AFTER APRIL,

17   BECAUSE THAT'S WHEN PAULA STARTED."

18   Q    RIGHT.  YOU LINKED IT TO AN EVENT; WHEN YOU FIRST TOLD

19   THIS STORY, YOU SAID THIS CONTEST TOOK PLACE AFTER PAULA

20   STARTED; RIGHT?

21        MR. NOLAN:  OBJECTION.  ARGUMENTATIVE AS TO THE

22   REFERENCE OF "STORY."

23        THE COURT:  REPHRASE.

24   BY MR. PRICE:

25   Q    WHEN YOU GAVE YOUR VERSION OF EVENTS AT YOUR DEPOSITION --

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1          MR. NOLAN:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

2     IT'S TESTIMONY.

3          THE COURT:  IT IS.

4          COUNSEL, LET'S JUST ASK THE QUESTION.

5     BY MR. PRICE:

6     Q   WHEN YOU TESTIFIED AT YOUR DEPOSITION, YOU SAID THIS

7     CONTEST TOOK PLACE -- YOU LINKED IT WHEN PAULA STARTED; RIGHT?

8     A   I SAID, "I CAN'T TELL YOU.  PROBABLY AFTER APRIL, BECAUSE

9     THAT'S WHEN PAULA STARTED. "

10         AND THAT'S WHAT I RECALLED AT MY DEPOSITION, WHEN I

11    WAS SITTING THERE AND GIVING TESTIMONY.

12    Q   AND THE REASON YOU SAID THAT IS BECAUSE AT THAT TIME, AT

13    YOUR DEPOSITION, UNDER OATH, YOU SAID YOU TOLD TWO PEOPLE ABOUT

14    THIS CONTEST, PAULA GARCIA AND KAMI GILLMORE.

15    A   AGAIN, I DON'T REMEMBER EXACTLY WHAT I SAID THERE.

16         MY BEST RECOLLECTION, WHEN I WAS GIVING THIS

17    DEPOSITION, GOING BACK, SETTING UP IN MY MIND -- NOW WE'RE

18    2006, I BELIEVE YOU WERE TAKING MY DEPOSITION AS TO WHAT HAD

19    HAPPENED, AND I TRIED TO LINK IT IN MY HEAD THAT IT MOST LIKELY

20    MUST HAVE BEEN WHEN PAULA WAS THERE AND KAMI GILLMORE.

21    Q   IF WE COULD LOOK AT -- AGAIN, THIS HAS BEEN PLAYED.  WE

22    HAD IT UP FOR A SECOND THERE; 16, 4, TO 25.

23         DO YOU RECALL YOU WERE ASKED AT YOUR DEPOSITION, "WHO

24    PARTICIPATED IN THIS CONTEST, THIS FASHION DOLL CONTEST?"  DO

25    YOU RECALL?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    YES.

2    Q    AND THEN YOU SAID, "WE ASKED OUR PEOPLE TO LOOK FOR

3    FASHION DOLLS," ET CETERA.

4         DO YOU SEE THAT?

5    A    IT DOESN'T SAY "ET CETERA."

6         MR. NOLAN:  YOUR HONOR, MR. PRICE IS NOT READING FROM

7    THE START OF THE TESTIMONY, THE FIRST QUESTION AND ANSWER.

8         THE COURT:  HE ASKED FOR LINE 4; AND FOR SOME REASON,

9    WE HAVE LINES 1 THROUGH 3.

10        MR. NOLAN:  I APOLOGIZE.  I DIDN'T REALIZE THAT.

11        THE COURT:  YOU DID SKIP A SENTENCE ON LINE 7.  WHY

12   DON'T YOU INCLUDE THAT.

13   BY MR. PRICE:

14   Q    "WHO PARTICIPATED IN THIS CONTEST?"

15        ANSWER:  "IT WAS SORT-OF A CONTEST I MENTIONED TO

16   YOU.  WE ASKED OUR PEOPLE TO LOOK FOR FASHION DOLLS, OUR

17   DESIGNERS, OUR MARKETING PEOPLE, THE EMPLOYEES."

18        QUESTION:  "WHEN YOU SAY 'WE,' SIR, ARE YOU REFERRING

19   TO YOURSELF?"

20        ANSWER:  "YES."

21        QUESTION:  "ISAAC LARIAN, YOU'RE THE ONE THAT ASKED

22   PEOPLE TO LOOK FOR IDEAS; IS THAT TRUE?"

23        ANSWER:  "I DO.  THAT'S TRUE."

24        QUESTION:  "AND WHO WAS IT THAT YOU ASKED TO LOOK FOR

25   IDEAS FOR FASHION DOLLS?"

1          ANSWER:  "I ASKED PAULA TREANTAFELLES AND I BELIEVE

2     KAMI GILLMORE."

3          QUESTION:  "IS THERE ANYONE ELSE THAT YOU ASKED TO

4     LOOK FOR THIS AS PART OF THIS SORT-OF CONTEST?"

5          ANSWER:  "I DON'T REMEMBER."

6     BY MR. PRICE:

7     Q    THAT WAS YOUR TESTIMONY UNDER OATH ON JULY 18, 2006;

8     CORRECT?

9     A    YES, SIR.

10    Q    AND YOU SUBSEQUENTLY LEARNED THAT BOTH MS. TREANTAFELLES,

11    MS. GARCIA, AND MS. GILLMORE DENIED THAT THEY HAD EVER

12    PARTICIPATED IN ANY SORT-OF CONTEST.

13    A    I HAVE NOT LEARNED IF THEY HAVE DENIED OR AGREED THAT THEY

14    PARTICIPATED OR NOT.  I DID NOT.

15    Q    IN ANY EVENT, IN YOUR EXAMINATION --

16    A    NOT IN ANY EVENT.  I DID NOT REMEMBER THAT.

17    Q    IN THE EXAMINATION THAT MR. RYAN {SIC} MADE OF YOU IN

18    FRONT OF THE JURY YESTERDAY, YOUR TESTIMONY WAS THAT IT WAS

19    VICTORIA O'CONNOR WHO WAS PART OF THE FASHION DOLL CONTEST, AND

20    NOT PAULA GARCIA; CORRECT?

21         MR. NOLAN:  YOUR HONOR, I ASSUME HE'S --

22         THE COURT:  WHAT'S YOUR OBJECTION, COUNSEL?

23         MR. NOLAN:  WRONG NAME.  THAT'S ANOTHER IRISHMAN.

24         MR. PRICE:  YOU'RE RIGHT.

25         THE COURT:  FAIR ENOUGH.

1       MR. PRICE:  I'LL JUST POINT.

2       MR. NOLAN:  I'M MR. NOLAN.

3   BY MR. PRICE:

4   Q   IN RESPONSE TO QUESTIONS FROM YOUR ATTORNEY, WHAT YOU TOLD

5   THE JURY UNDER OATH WAS THAT THE CONTEST INVOLVED

6   VICTORIA O'CONNOR, AND NOT PAULA TREANTAFELLES.

7   A   SINCE MY DEPOSITION, I HAVE GONE AND LOOKED AT PAPERWORK

8   AND OTHER THINGS AND REFRESHED MY MEMORY.  I STILL BELIEVE THAT

9   I MIGHT HAVE ASKED PAULA GARCIA AND KAMI GILLMORE FOR THAT, BUT

10  FOR SURE, VICTORIA O'CONNOR WAS IN CHARGE OF LICENSING, TO LOOK

11  FOR NEW FASHION DOLL IDEAS.

12  Q   OKAY.

13      SO YOU FOUND PAPERWORK SINCE THEN THAT TALKS ABOUT A

14  FASHION DOLL CONTEST?

15  A   NO.  I'M SORRY.  IF I SAID "PAPERWORK," I MISSPOKE.  I

16  HAVE TALKED TO OTHER PEOPLE.

17  Q   WELL, YOU'LL AGREE WITH THIS:  YOU'VE CHANGED YOUR STORY

18  SINCE YOUR DEPOSITION.

19  A   I HAVE NOT CHANGED MY STORY.  I HAVE JUST REFRESHED MY

20  RECOLLECTION.

21  Q   WELL, LET ME ASK YOU, IS THIS STATEMENT THAT YOU MADE

22  UNDER OATH STILL TRUE?  DO YOU STILL BELIEVE IT'S TRUE, THAT

23  YOU HAD A FASHION DOLL CONTEST AND THAT YOU ASKED

24  PAULA TREANTAFELLES AND KAMI GILLMORE TO LOOK FOR IDEAS FOR

25  FASHION DOLLS?

1    A    I BELIEVE AT THAT TIME, WHEN I WAS GIVING MY TESTIMONY, I

2    STILL BELIEVED THAT I MIGHT HAVE ASKED THEM THAT, YES.

3         THE COURT:  COUNSEL, ARE WE READY TO MOVE ON TO

4    ANOTHER AREA?

5         MR. PRICE:  WE CAN TAKE OUR BREAK NOW.

6         THE COURT:  MEMBERS OF THE JURY -- AND I'LL ADDRESS

7    THIS TO EVERYBODY -- CURIOSITY HAS GOTTEN THE BETTER PART OF

8    MRS. LARSON, SO SHE SHOWED UP TODAY.  I JUST WANTED TO IDENTIFY

9    FOR YOU THAT SHE'S IN THE COURTROOM TODAY.

10         OBVIOUSLY, YOU'RE NOT TO DISCUSS THE CASE OR THE

11   JUDGE WITH MRS. LARSON.

12         (LAUGHTER.)

13         WE'LL SEE THE JURY IN 15 MINUTES.

14         (WHEREUPON, JURORS DEPART COURTROOM.)

15         THE COURT:  COUNSEL, I'LL COME OUT BEFORE THE JURY TO

16   DO THE SARAH HOLDEN OBJECTIONS.

17         (BRIEF RECESS.)

18         (HEARING OUTSIDE THE PRESENCE OF THE JURY.)

19         THE COURT:  WE'RE BACK ON THE RECORD OUTSIDE OF THE

20   PRESENCE OF THE JURY.

21         I WANT TO GO THROUGH THE SARAH ODOM OBJECTIONS.

22         BUT BEFORE I DO, I HAVE RECEIVED A NEW PAGE 9 WITH A

23   NOTE FROM MY COURTROOM DEPUTY SAYING "PLAINTIFF SUBMITTED THIS

24   AS SUBSTITUTE FOR PREVIOUS VERSION."

25         BUT IT DIDN'T HAVE THE PAGE 10 ON BACK, AND I CAN'T

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    TELL A SINGLE DIFFERENCE BETWEEN THE NEW PAGE 9 AND THE OLD

2    PAGE 9.

3         MR. COREY:  THE NEW PAGE 9 HAS DESIGNATIONS OR

4    COMMENTS FROM OPPOSING COUNSEL; THAT'S WHAT WE RECEIVED, AND WE

5    PROVIDED IT TO THE COURT.  I'M NOT SURE THAT I CAN ADDRESS WHAT

6    DIFFERENCES THEY WERE TRYING TO ADDRESS ON THAT OR NOT, YOUR

7    HONOR.

8         THE COURT:  VERY GOOD.  I JUST NOTICED THE ADDITION;

9    THE OBJECTION EXTENDS TO PAGE 9, LINES 22 THROUGH PAGE 10,

10   LINE 1.  I DID NOTICE A DIFFERENCE; IT'S ONE OF THOSE THINGS

11   WHERE YOU HAVE THE TWO DIFFERENCES BETWEEN THE TWO PICTURES.  I

12   JUST FOUND IT.

13        LET'S GO THROUGH THIS, AS I DID BEFORE.

14        BEGINNING ON PAGE 6, THE OBJECTION IS SUSTAINED TO

15   LINES 7 THROUGH 20; THAT'S NOT AN ANSWER.

16        TURNING TO PAGES NINE AND TEN, THE OBJECTIONS ARE

17   SUSTAINED.

18        ON PAGE 12 I'M A LITTLE CONFUSED BECAUSE THE

19   OBJECTION SEEMED TO EXTEND BEYOND THE AREA OF DESIGNATION.

20   MGA'S OBJECTION APPEARS TO GO BEYOND THE AREA THE DESIGNATION.

21   I AGREE WE'RE NOT GOING TO LET IN THE NOTICE OF DEPOSITION, AND

22   ALL THE OTHER STUFF.

23        ON PAGE 15, AGAIN, IT'S AN OBJECTION TO AN AREA THAT

24   HAS NOT BEEN DESIGNATED; NAMELY, THE EXHIBIT B, THE ANNUAL

25   REPORT.  THAT'S NOT COMING IN.  ALL THAT'S COMING IN IS THE

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    YEARBOOK ITSELF.

2        MR. COREY:  CORRECT.  MATTEL IS NOT OFFERING THE

3    REPORT, YOUR HONOR.

4        THE COURT:  ALL RIGHT.

5        THE NEXT OBJECTION APPEARS ON PAGE 22, AND THAT IS

6    SUSTAINED.  AS ARE THE OBJECTIONS BY BOTH MATTEL AND MGA ON

7    PAGE 23.  THE OBJECTIONS ON PAGES 24 AND 25 ARE SUSTAINED.  THE

8    OBJECTION ON PAGE 26 IS SUSTAINED.

9        MR. COREY:  ALL OF THE OBJECTIONS ON PAGE 25, YOUR

10   HONOR?

11       THE COURT:  YES.

12       MR. COREY:  THANK YOU.

13       THE COURT:  THIS IS JUST OPINION OF A TEACHER, IN

14   TERMS OF THE PURPOSE OF THE YEARBOOKS AND ALL THAT.  TO THE

15   EXTENT IT'S NOT SELF EVIDENT, I WOULD ASSUME EVERYONE ON THE

16   JURY UNDERSTANDS WHAT A YEARBOOK IS FOR.

17       MR. COREY:  I WOULD HOPE SO, YOUR HONOR.

18       THE COURT:  ONE PERSON'S OPINION IS NO BETTER THAN

19   ANYONE ELSE'S; NO FOUNDATION.

20       PAGE 26, I ALREADY SUSTAINED THE OBJECTION.

21       I'M GOING TO OVERRULE THE OBJECTION ON 27, AT THE

22   BOTTOM OF PAGE 27, TOP OF PAGE 28.  I THINK THERE'S SUFFICIENT

23   FOUNDATION THERE.  I'M GOING TO SUSTAIN THE OBJECTION ON BOTTOM

24   OF PAGE 28, AS WELL AS THE OBJECTIONS AT BOTTOM OF PAGE 29;

25   INSUFFICIENT FOUNDATION FOR STANDARD OF INCLUSIVITY, ET CETERA.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1         PAGE 33, I WILL OVERRULE THE OBJECTION.  THESE ARE

2    ANSWERS BASED ON OBSERVATIONS, WHAT THE PERSON ON CAMPUS SAW.

3         ON PAGE 34, I'M GOING TO SUSTAIN THE OBJECTION TO THE

4    FIRST BRACKET ON LINES TWO -- I HAVE A QUESTION ON TWO THROUGH

5    SIX.

6         YOU SAY PAGES ONE THROUGH THREE OF THE YEARBOOK.

7         I'M LOOKING AT THE YEARBOOK, AND I LOOK AT PAGES ONE

8    THROUGH THREE, THEY DON'T SEEM TO BE FAIRLY REPRESENTATIVE

9    PICTURES OR EXCERPTS OF THE YEARBOOK.  PAGE 1 OF THE YEARBOOK

10   APPEARS TO BE A GROUP OF HIGH SCHOOL BOYS WITHOUT SHIRTS ON;

11   PAGE 2 HAS THREE MEMBERS OF THE FOOTBALL TEAM.  I GUESS THERE

12   IS A GATHERING OF STUDENTS IN THE LOWER LEFT; PAGE 3 HAS MORE

13   MEMBERS OF THE FOOTBALL TEAM.

14        I DON'T KNOW WHY THOSE PAGES WERE SELECTED OR WHAT

15   THEY --

16        MR. COREY:  WE'LL WITHDRAW TWO THROUGH SIX, YOUR

17   HONOR.

18        THE COURT:  TWO THROUGH SIX IS OUT.

19        I OVERRULE THE OBJECTION TO LINES 9 THROUGH 14.

20   AGAIN, THAT'S JUST IN REFERENCE TO THE GENERAL -- THAT'S BASED

21   ON THE TEACHER'S OBSERVATION.  BUT I'LL SUSTAIN THE OBJECTION

22   FOR LACK OF FOUNDATION ON 15 THROUGH 20.  I'LL OVERRULE THE

23   OBJECTIONS FROM LINES 21 THROUGH 25 ON PAGE 34.  I'LL OVERRULE

24   THE OBJECTIONS ON PAGE 35 FROM LINE 1 TO LINE 14.  I'LL SUSTAIN

25   THE OBJECTION ON LINES 15 THROUGH 19; THE OBJECTION IS HEARSAY,

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    BUT IT'S REALLY A FOUNDATIONAL ISSUE.  I DON'T KNOW HOW A

2    PERSON TESTIFYING HERE WOULD KNOW WHETHER OR NOT THE TEXTUAL

3    NARRATIVES WERE ACTUALLY PREPARED BY THE PEOPLE WITH KNOWLEDGE

4    OF THE EVENTS DESCRIBED THEREIN.  I SUPPOSE THE ONLY WAY THEY

5    COULD HAVE KNOWN THAT WOULD BE HEARSAY, AND THAT'S WHERE THE

6    HEARSAY OBJECTION COMES FROM.  BUT, IN ANY EVENT, IT'S

7    SUSTAINED.

8         LINES 22 THROUGH 25 ON PAGE 35, IT IS SUSTAINED.

9    LINE 1 ON PAGE 36 IS SUSTAINED.

10        LINES 2 THROUGH 9, IT'S OVERRULED.  IT'S

11   SELF-EVIDENT.  AGAIN, I ASSUME THE ANSWER TO THE PARTICULAR

12   QUESTIONS ON LINES 5 THROUGH 9 IS BASED ON OBSERVATION,

13   PERSONAL EXPERIENCE OF THE WITNESS.

14        I WILL OVERRULE THE OBJECTION ON LINES 19 THROUGH 25

15   AND ON THE NEXT TWO PAGES.  THE RELEVANCE IS NOT PARTICULARLY

16   STRONG, BUT IT'S BASED ON THIS WITNESS'S EXPERIENCE OF WORKING

17   WITH THE BOOKS.

18        SIMILARLY, I'LL OVERRULE MATTEL'S OBJECTIONS ON

19   PAGE 39.  I'M GOING TO PERMIT THAT ENTIRE DISCUSSION,

20   ESSENTIALLY, OF THE YEARBOOK PREPARATION PROCESS.

21        TURNING TO PAGE 42, I'LL SUSTAIN THE OBJECTION.  AND

22   THAT'S IT.

23        QUESTIONS?

24        MR. COREY:  BEFORE YOU MOVE ON, I JUST WANT TO MAKE

25   SURE --

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1          THE COURT:  WHAT I'LL ADMIT IS ONLY THE YEARBOOK

2    EXHIBIT ITSELF; NOTHING ELSE COMES IN.

3          MR. COREY:  CAN YOU GO BACK TO PAGE 34, JUST TO MAKE

4    SURE I HAVE THE COURT'S RULINGS PROPERLY.

5          I HAVE THAT THE COURT IS OVERRULING OBJECTIONS ON

6    PAGE 34, LINES 8 THROUGH 20 AND LINES 21 THROUGH 25.

7          IS THAT CORRECT?

8          THE COURT:  NO.  I'M SUSTAINING THE OBJECTIONS ON

9    LINES 15 THROUGH 20.  I'M ALLOWING HIM TO SAY 'DO THE

10   PHOTOGRAPHS ACTUALLY DEPICT WHAT THEY LOOKED LIKE?  YES.  AND

11   WHAT THEY WERE WEARING?  YES.

12         I ASSUME HE COULD DO THAT FROM OBSERVATION.

13         BUT WHEN YOU GET INTO WHAT ACTIVITIES THEY GENERALLY

14   ENGAGED IN ON CAMPUS AND WHAT THEIR INTERESTS WERE ON CAMPUS, I

15   THINK YOU'RE GETTING INTO THE STUDENTS' MINDS ON A LEVEL THAT

16   IS NOT SUFFICIENT FOUNDATION.  IT'S ALSO NOT AS RELEVANT.

17         THE ISSUE AS I UNDERSTAND IT, IS WHAT DO THESE KIDS

18   LOOK LIKE AT KICKAPUU HIGH SCHOOL AT THE TIME FRAME IN GENERAL?

19         MR. COREY:  THANK YOU, YOUR HONOR.

20         LINES 1 THROUGH 8 ON THAT PAGE HAVE BEEN WITHDRAWN.

21         THE COURT:  I THROUGH 8, I THINK, WAS WITHDRAWN BY

22   MR. COREY; SO THAT'S OUT.

23         MR. COREY:  YES, YOUR HONOR.

24         THE COURT:  THAT'S THE REFERENCE TO PAGES 1 THROUGH

25   3; THAT'S OUT BY STIPULATION.

1        MR. NOLAN:  WE DID REVIEW THE PROPOSED LETTER WITH

2    RESPECT TO THE JUROR, AND WE THINK IT'S FINE.  WE THINK IT'S

3    FINE.

4        MR. QUINN:  YES, IT'S FINE, YOUR HONOR.

5        THE COURT:  I'LL SIGN THIS AND SEND THIS OUT, THEN.

6        MR. NOLAN:  THE LAST THING IS, YOU RAISED YESTERDAY

7    AFTERNOON ABOUT FILING AN OPPOSITION, WERE WE GOING TO FILE A

8    REPLY.  WE WILL ABSOLUTELY FILE A RESPONSE TO THAT MOTION, YOUR

9    HONOR.

10        THE COURT:  I WOULD EXPECT YOU WOULD WANT TO FILE A

11    RESPONSE AND NOT JUST LEAVE THAT HANGING OUT THERE.

12        MR. NOLAN:  I APOLOGIZE THAT I DID NOT PICK UP ON

13    THAT EARLIER.  FRANKLY, I HAD NOT READ IT.

14        THE COURT:  YOU DON'T NEED TO APOLOGIZE.

15        MR. NOLAN:  WE WILL FILE A RESPONSE.

16        COULD WE HAVE UNTIL FRIDAY TO DO THAT, YOUR HONOR?

17        THE COURT:  I'M ASKING THAT IT BE FILED BY FRIDAY,

18    YES.

19        MR. NOLAN:  THEN WE HAVE AGREED THAT BEFORE ANY OF

20    THAT TESTIMONY IS PRESENTED, THAT THERE WOULD ACTUALLY BE A

21    HEARING, BECAUSE WE'RE GOING TO BE PRESENTING OUR EXPERT'S

22    REPORT IN RESPONSE TO THEIR EXPERT'S REPORT.

23        THE COURT:  WELL, AS I UNDERSTAND WHAT'S GOING ON,

24    MR. ROTH INDICATED TO ME YESTERDAY THAT THERE WAS GOING TO BE A

25    STIPULATION, HOPEFULLY, WORKED OUT BETWEEN THEMSELVES AND

1    MR. ZELLER IN TERMS OF THE DESIGNATION, IN TERMS OF THE

2    DEPOSITION, IN TERMS OF THE REBUTTAL REPORT.  AND THAT'S ALL

3    FINE.

4        MR. ROTH INDICATED THERE WASN'T GOING TO BE A

5    RESPONSE.  I ENCOURAGE YOU TO MAKE A RESPONSE JUST BECAUSE OF

6    THE NATURE OF THE ALLEGATIONS SET FORTH IN THAT MOTION.

7        MR. NOLAN:  THAT'S ALL MY COMMENTS WERE --

8        THE COURT:  I APPRECIATE THE WAY THAT MOTION CAME IN.

9    BECAUSE I KNOW IT HAD TO HAVE BEEN TYPED BEFORE MY REMARKS

10   YESTERDAY MORNING, BUT IT WAS A VERY FACT, AT LEAST FROM

11   MATTEL'S PERSPECTIVE, A FACT-BASED MOTION, AND IT DID NOT

12   INCLUDE ANY LANGUAGE BEYOND JUST SIMPLY WHAT THEIR

13   UNDERSTANDING OF THE FACTS WERE.  AND I'LL EXPECT THE

14   OPPOSITION OR RESPONSE TO BE OF THAT SAME NATURE.

15       I JUST REALLY WANT TO FOCUS ON THE FACTS HERE.

16       MR. NOLAN:  THAT'S ALL I WANT TOO, YOUR HONOR.

17       WE WILL BE RESPONDING.

18       THE COURT:  VERY WELL.

19       MR. COREY:  BEFORE WE LEAVE MS. ODOM, SO THE COURT IS

20   ADMITTING EXHIBIT A.

21       THE COURT:  THE YEARBOOK ITSELF IS ADMITTED, BASED ON

22   FOUNDATION, RIGHT.

23       ANYTHING ELSE ON ODOM?

24       THE LETTER IS IN.  I'LL GET THE RESPONSE ON FRIDAY.

25       IN THE MEANTIME, I WILL EXPECT, PURSUANT TO

1    MR. ROTH'S REPRESENTATION, THAT THERE WILL BE A STIPULATION IN

2    TERMS OF HOW THIS IS GOING TO PLAY OUT.  BECAUSE I HAVE ALREADY

3    TENTATIVELY RULED THAT THE EXPERT REPORT IS PROPER,

4    NOTWITHSTANDING THE SCHEDULING ORDER.

5         MR. ZELLER HAS SAT BACK DOWN, SO APPARENTLY THERE WAS

6    A FALSE ALARM ON HIS PART.

7         MR. ZELLER:  I THINK THE COURT CERTAINLY HIT IT ON

8    THAT.

9         THE COURT:  MR. LARIAN IS BACK UP HERE ON THE WITNESS

10   STAND.

11        THERESA, WHAT TIME DID WE BREAK?

12        COURT REPORTER:  10:42.

13        THE COURT:  WE'LL BRING THE JURY IN.  WE'LL BREAK

14   AGAIN AT NOONTIME.

15        MR. PRICE, AFTER MR. LARIAN -- HOW MUCH LONGER DO YOU

16   BELIEVE YOU HAVE WITH MR. LARIAN?

17        MR. PRICE:  PROBABLY 45 MINUTES TO AN HOUR.

18        THE COURT:  SO YOU'RE GOING TO TRY AND WRAP UP BEFORE

19   NOON; 46 MINUTES.

20        MR. PRICE:  I'D SAY AN HOUR TO AN HOUR AND A HALF.

21        THE COURT:  LET'S DO WHAT WE CAN TO WRAP THIS UP AT

22   NOON.

23        (JURORS ENTER COURTROOM.)

24   BY MR. PRICE:

25   Q   MR. LARIAN, WE WERE TALKING ABOUT YOUR TESTIMONY AT YOUR

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    DEPOSITION IN 2006 ABOUT THIS FASHION DOLL CONTEST WHERE YOU

2    ASKED MS. TREANTAFELLES AND KAMI GILLMORE TO PARTICIPATE IN

3    THAT.

4         IN FACT, YOUR TESTIMONY AT THAT TIME WAS THAT THE

5    REASON PAULA GARCIA, PAULA TREANTAFELLES, CAME TO YOU WITH

6    CARTER BRYANT WAS BECAUSE OF THIS CONTEST YOU HAD INVOLVED HER

7    IN.

8    A   I DON'T RECALL THAT.  BUT AT THE END SHE CAME TO ME WITH

9    THE DRAWINGS THAT BECAME THE FASHION DOLL FOR MGA.

10   Q   BUT I'M TALKING ABOUT THIS FASHION CONTEST YOU'RE

11   TESTIFYING ABOUT.  YOUR TESTIMONY THEN WAS THAT YOU NOT ONLY

12   TOLD MS. GARCIA ABOUT IT, BUT THAT'S THE REASON SHE BROUGHT

13   CARTER BRYANT TO YOU.

14        THAT WAS YOUR TESTIMONY UNDER OATH THEN; CORRECT?

15   A   I BELIEVE MY TESTIMONY WAS THAT AT THE END, WHAT CAME OUT

16   OF THE WHOLE THING WAS CARTER BRYANT'S DRAWINGS BECAME THE

17   BASIS FOR BRATZ.

18   Q   IN YOUR EXAMINATION, WHEN WE PLAYED, I THINK, PAGE 26,

19   LINES 10 THROUGH 25; SO LET ME ASK YOU ABOUT THAT, THEN, IF I

20   MAY.

21        THE COURT:  YOU MAY PUBLISH.  THIS HAS BEEN

22   PREVIOUSLY DISPLAYED.

23        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

24        MR. PRICE:  (READING) "AFTER YOU TALKED WITH THE

25   FOLKS ABOUT THIS SORT OF FASHION DOLL CONTEST, DID

1    KAMI GILLMORE COME BACK TO YOU WITH ANY IDEAS?

2         ANSWER:  NOT THAT I RECALL.

3         QUESTION:  DID PAULA TREANTAFELLES COME BACK TO YOU

4    WITH ANY IDEAS?

5         ANSWER:  SHE BROUGHT BRATZ; WHAT WAS -- IS THE IDEA

6    THAT LATER ON BECAME BRATZ.

7         QUESTION:  MR. LARIAN, DID ANYONE ELSE COME BACK TO

8    YOU WITH AN IDEA FOR A FASHION DOLL AS A RESULT OF YOUR

9    SPEAKING TO PEOPLE ABOUT THIS SORT-OF CONTEST.

10        ANSWER:  NOT THAT I RECALL.

11        QUESTION:  SO THE ONLY ONE THAT RESPONDED WAS PAULA,

12   AND SHE CAME UP WITH THE CONCEPT FOR BRATZ; IS THAT RIGHT?

13        ANSWER:  SHE SHOWED ME SOMETHING THAT BECAME THE IDEA

14   FOR BRATZ."

15   BY MR. PRICE:

16   Q   THAT WAS YOUR TESTIMONY UNDER OATH AS OF 2006; CORRECT?

17   A   AND AS OF TODAY, YES.

18   Q   WELL, SIR, I THOUGHT YOU TOLD THE JURY YESTERDAY, YOU

19   DON'T EVEN KNOW THAT PAULA GARCIA WAS TOLD ABOUT THIS CONTEST?

20   ISN'T THAT WHAT YOU TOLD THE JURY JUST YESTERDAY?

21   A   I SAID I DON'T RECALL IF SHE WAS PART OF THE CONTEST OR

22   NOT, AND THAT'S NOT CONTRARY TO WHAT I SAID HERE.

23   Q   YOUR TESTIMONY AT YOUR DEPOSITION THAT YOU TOLD MS. GARCIA

24   AND KAMI GILLMORE ABOUT A CONTEST AND THAT MS. GARCIA CAME TO

25   YOU WITH AN IDEA AS A RESULT OF THAT CONTEST, THAT'S SIMPLY NOT

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    TRUE, IS IT?

2    A   EXCUSE ME.  CAN YOU TELL ME WHERE I SAY HERE THAT AS A

3    RESULT OF THE CONTEST, SHE CAME UP WITH BRATZ?

4    Q   THE ONLY ONE THAT RESPONDED.

5        YOU UNDERSTOOD THAT YOU WERE BEING ASKED WHETHER

6    ANYBODY RESPONDED TO THIS SORT-OF FASHION DOLL CONTEST;

7    CORRECT?

8    A   I SAID THE ONLY ONE THAT RESPONDED WAS PAULA, AND SHE CAME

9    UP WITH THE CONCEPT FOR BRATZ.

10       THAT WAS THE QUESTION YOU WERE ASKING.  MY ANSWER IS

11   BELOW:  SHE SHOWED ME SOMETHING THAT BECAME THE IDEA FOR BRATZ.

12       THAT'S YOU ASKING.  I DON'T KNOW IF MR. ZELLER OR

13   MR. QUINN WAS ASKING.

14   Q   LET ME PUT IT THIS WAY SO WE CAN BE CLEAR.

15       IT IS SIMPLY NOT TRUE THAT YOU HAD A FASHION DOLL

16   CONTEST IN WHICH YOU INVOLVED MS. GILLMORE AND

17   MS. TREANTAFELLES; CORRECT?

18   A   I BELIEVE, TO THE BEST OF MY RECOLLECTION, THAT THEY COULD

19   HAVE BEEN INVOLVED IN IT.  I CANNOT TELL YOU FOR SURE.  I KNOW

20   VICTORIA O'CONNOR WAS LOOKING FOR FASHION DOLLS TO COME TO THE

21   COMPANY.

22   Q   ARE YOU SAYING THAT YOU CAN'T BE SURE TODAY AT YOUR

23   DEPOSITION UNDER OATH, YOU SAID THOSE WERE THE ONLY TWO PEOPLE

24   YOU REMEMBER BEING INVOLVED IN THIS CONTEST, RIGHT,

25   MS. GILLMORE AND MS. TREANTAFELLES; CORRECT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    THOSE WERE THE NAMES THAT I RECALL AT THAT TIME, YES, AT

2    THE TIME OF DEPOSITION.

3    Q    DO YOU HAVE ANY EXPLANATION AS TO WHY NEITHER MS. GILLMORE

4    NOR MS. GARCIA-TREANTAFELLES OR ANYONE ELSE RECALLS A FASHION

5    DOLL CONTEST?

6    A    I CANNOT SPECULATE.  MAYBE THEY DON'T HAVE -- MAYBE THEIR

7    RECOLLECTION FOR SO MANY YEARS BACK IS NOT THE SAME AS MINE; OR

8    THE SAME AS VICTORIA O'CONNOR, YOUR WITNESS.

9    Q    I'M SORRY.  DO YOU BELIEVE VICTORIA O'CONNOR TESTIFIED

10   THERE WAS A FASHION DOLL CONTEST?

11   A    I BELIEVE SHE TESTIFIED THAT WE WERE LOOKING.  I HAD TOLD

12   HER TO LOOK FOR FASHION DOLL IDEAS.

13   Q    IS IT YOUR RECOLLECTION THAT YOUR ATTORNEY ASKED

14   MS. O'CONNOR WHETHER THERE WAS A FASHION DOLL CONTEST?

15   A    NO, IT'S NOT.

16   Q    IN FACT, YOU KNOW HE DID NOT ASK HER THAT QUESTION;

17   CORRECT?

18   A    I DON'T KNOW WHAT HE ASKED HER OR NOT; SO MUCH GOING ON IN

19   THIS CASE.

20   Q    WELL, LETS TALK ABOUT SOMETHING ELSE GOING ON IN THIS

21   CASE.

22       MR. NOLAN ASKED YOU, WHEN HE FIRST STARTED HIS

23   EXAMINATION OF YOU, EARLY ON ABOUT WHETHER YOU RECALL ME ASKING

24   YOU ABOUT MGA HIRING MATTEL EMPLOYEES.

25       DO YOU RECALL THAT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   I DON'T RECALL ALL OF THE QUESTIONS THAT HAVE BEEN ASKED,

2    BUT MAYBE YOU DID.

3    Q   WELL, YOU RECALL MR. NOLAN SAID 'DO YOU RECALL MR. PRICE

4    ASKING YOU ABOUT MGA HIRING MATTEL EMPLOYEES?'  AND YOU SAID

5    YES AT THAT TIME.

6        YOU DO RECALL ME ASKING ABOUT IT; RIGHT?

7    A   YES.

8    Q   AND I BELIEVE YOU TESTIFIED THAT OBVIOUSLY THERE'S NOTHING

9    WRONG WITH MGA HIRING MATTEL EMPLOYEES OR MATTEL HIRING MGA

10   EMPLOYEES; CORRECT?

11   A   THERE'S NOTHING WRONG.

12   Q   NOW, DO YOU REMEMBER, THOUGH, THE CONTEXT IN WHICH I ASKED

13   YOU THAT QUESTION?

14   A   NO, I DON'T.

15   Q   LET ME TRY AND REFRESH YOU.

16       IF YOU WOULD LOOK AT EXHIBIT 13532.

17   A   WHAT BOOK?

18   Q   IT'S THE BLACK BOOK.

19       THE COURT:  NOW WE HAVE TWO BLACK BOOKS, I

20   UNDERSTAND.

21       MR. PRICE:  THE LARGER BLACK BOOK; IT'S IN THE

22   SMALLER ONE AS WELL.

23       THE WITNESS:  REPEAT THE NUMBER.

24   BY MR. PRICE:

25   Q   13532.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1        DO YOU RECALL I WAS ASKING YOU ABOUT THIS PROPOSED

2    AGREEMENT WITH YOUR EMPLOYEES, DATED AUGUST 10, 2000?

3    A    YES.

4    Q    AND I HAD CALLED YOUR ATTENTION TO PAGE 6.

5    A    GO AHEAD.

6    Q    IN PARTICULAR, THE CLAUSE WHICH SAID THAT FOR A YEAR AFTER

7    LEAVING THE COMPANY, THAT YOUR EMPLOYEES COULD NOT WORK WITH

8    ANOTHER COMPANY WITHOUT YOUR PERMISSION.

9        DO YOU RECALL THAT?

10   A    YES.

11   Q    AND YOU RECALL AT THAT POINT I ASKED 'WASN'T IT YOUR

12   BUSINESS PRACTICE TO HAVE YOUR FORMER MATTEL EMPLOYEES CONTACT

13   EMPLOYEES AT MATTEL TO TRY AND SOLICIT THEM TO JOIN MGA?

14   A    CAN YOU REPEAT THAT QUESTION.

15   Q    YOU RECALL AT THAT POINT I SAID "DIDN'T YOU HAVE YOUR

16   EMPLOYEES AT MGA, WHO USED TO WORK FOR MATTEL, WEREN'T YOU

17   TELLING THEM TO CONTACT THE MATTEL EMPLOYEES YOU KNOW AND SEE

18   IF THEY WILL JOIN MGA"?

19   A    YES.

20   Q    AND THERE'S NOTHING WRONG WITH THAT, YOU THINK.

21   A    THERE'S NOTHING WRONG WITH THAT.

22   Q    BUT YOU PROHIBITED YOUR EMPLOYEES FROM DOING THAT IF THEY

23   LEFT MGA.

24   A    I DID NOT PROHIBIT THEM.  AND IF WE DID, IT'S ILLEGAL.

25   YOU CANNOT STOP EMPLOYEES GOING FROM ONE COMPANY TO ANOTHER, A

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    LEAST IN THE UNITED STATES OF AMERICA.

2    Q   LET ME REPHRASE THE QUESTION.

3        ISN'T IT TRUE -- DO YOU RECALL WE SHOWED YOU

4    EXHIBIT 5715, WHICH IS IN THERE; THAT SMALL BINDER?

5        I'M CROSSING MY FINGERS AND HOPING.

6    A   YES.

7    Q   IF WE COULD SHOW THAT, PLEASE; IT'S IN EVIDENCE.

8        IN AUGUST OF 1999 YOU WERE ASKING TRACY AND KAMI IF

9    THEY KNEW GOOD PEOPLE OUT OF MATTEL THAT COULD BE HIRED AS

10   ENGINEERS.

11       DO YOU RECALL THAT?

12   A   YES.  I RECALL THAT -- YOU'RE GOING TOO FAST --

13       I RECALL THAT I MIGHT HAVE SENT THAT E-MAIL.

14   Q   AND BOTH TRACY AND KAMI WERE FORMER MATTEL EMPLOYEES.

15   A   I DON'T RECALL TRACY.  I REMEMBER KAMI BEING.  I DON'T

16   RECALL TRACY.

17   Q   AND AGAIN, YOUR VIEW IS THERE'S NOTHING WRONG WITH THAT;

18   RIGHT?

19   A   NOTHING WRONG, NO, NOTHING WRONG WITH THAT.

20   Q   BUT IN YOUR AGREEMENT WITH YOUR EMPLOYEES, YOU PROHIBITED

21   THEM, IF THEY LEFT MGA, FROM CONTACTING ANYONE AT MGA AND

22   TRYING TO HIRE THEM.

23   A   ARE YOU TALKING ABOUT THE PROPOSED AGREEMENT THAT I SAID

24   WE WITHDREW BECAUSE IT WAS NOT LEGAL?

25       IS THAT THE ONE YOU'RE REFERRING TO, SIR?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q   LET'S LOOK AT EXHIBIT 13620, WHICH IS ONE OF THE SIGNED

2    AGREEMENTS THAT YOU HAD, IN FACT, I BELIEVE IT'S WITH KAMI

3    GILLMORE.

4    A   IS THAT IN THE SMALL BOOK?

5    Q   IT'S 13620; I BELIEVE THAT'S IN THE BIG BOOK.

6    A   GO AHEAD.

7    Q   THIS YOU RECOGNIZE AS AN AGREEMENT YOU HAD WITH

8    MS. GILLMORE.

9    A   YES.

10   Q   IF YOU LOOK AT THE SECOND PAGE -- BY THE WAY, WAS THIS ONE

11   OF YOUR STANDARD FORMS AT THIS TIME, THIS CONFIDENTIALITY AND

12   INVENTIONS ASSIGNMENT AGREEMENT, WHICH IS EXECUTED APPARENTLY

13   SOMETIME IN 1999, IF YOU LOOK AT THE LAST PAGE?

14   A   WHAT WAS THE QUESTION?

15   Q   THIS IS THE FORM THAT YOU REQUIRED YOUR EMPLOYEES TO SIGN

16   IN THIS TIME FRAME; RIGHT?

17   A   IT LOOKS LIKE IT, YES.  AT LEAST THAT'S THE ONE

18   KAMI GILLMORE SIGNED.

19   Q   ONE OF THE PROVISIONS YOU HAD HERE IN THE SECOND PAGE IS

20   THAT THEY WILL PRESERVE THE COMPANY'S TRADE SECRETS.

21       DO YOU RECALL THAT?

22   A   CAN YOU POINT ME, PLEASE.

23   Q   SURE.  IT'S THESE TWO PARAGRAPHS HERE.

24       DO YOU SEE THAT?

25   A   YES.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    AND, IN FACT, YOU'VE GOT A PROVISION HERE THAT "EMPLOYEE

2    AGREES TO MAINTAIN THE SAME LEVEL OF CONFIDENTIALITY REGARDING

3    CO-WORKERS."

4         DO YOU SEE THAT?

5    A    YES.

6    Q    AND YOUR COMPANY TOOK THE POSITION THAT BECAUSE OF THIS

7    CONTRACT, IF SOMEONE LEFT MGA, THEY COULD NOT THEN APPROACH MGA

8    TO TRY AND HIRE SOMEONE FOR THEIR COMPANY.

9    A    I DON'T RECALL IF WE DID THAT OR NOT.  BUT IF WE DID, IT'S

10   ILLEGAL, IT'S NOT ENFORCEABLE.

11   Q    WELL, YOU SAID IT'S OKAY TO DO THAT; RIGHT?  IT'S OKAY FOR

12   AN EMPLOYEE TO LEAVE A COMPANY AND THEN TRY AND HIRE EMPLOYEES

13   FROM THE COMPANY THAT THEY LEFT; RIGHT?

14   A    THAT'S MY BELIEF; THAT IN CALIFORNIA, OR IN THE UNITED

15   STATES, YOU CAN HIRE EMPLOYEES FROM ONE COMPANY TO ANOTHER.

16   Q    BUT YOU ACTUALLY WOULD SEND OUT LETTERS TO FORMER

17   EMPLOYEES WHO TRIED TO DO THAT AND SAY 'THAT'S ILLEGAL, WE'LL

18   SUE YOU IF YOU DO IT.'

19   A    WE MIGHT HAVE SAID THAT, YES, BUT THAT'S NOT LEGAL, AND WE

20   HAVE NOT SUED ANYBODY OVER THAT.

21   Q    IF YOU WOULD LOOK AT EXHIBIT 10036, THAT'S IN THE SMALLER

22   BINDER, YOU SEE ON THE FIRST PAGE, THERE IS A LETTER ON MGA

23   LETTERHEAD, WRITTEN BY YOU.

24   A    GO AHEAD.

25   Q    DO YOU RECOGNIZE THAT?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    I DO.

2    Q    THAT'S YOUR SIGNATURE?

3    A    IT IS.

4    Q    IT'S A LETTER SENT TO KAMI GILLMORE; CORRECT?

5    A    IT IS.

6    Q    AFTER SHE LEFT MGA.

7    A    I DON'T KNOW.  IT MUST BE AFTER SHE LEFT MGA; RIGHT.

8    Q    AND IT'S SENT TO HER TO TELL HER YOU CANNOT RECRUIT

9    EMPLOYEES AT MGA.

10   A    HOLD ON ONE SECOND.

11        IT SAYS SOMETHING TO THAT EFFECT IN PARAGRAPH TWO,

12   YES.

13        MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 11036 INTO

14   EVIDENCE.

15        THE COURT:  ANY OBJECTION?

16        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

17        THE COURT:  ADMITTED.  YOU MAY PUBLISH.

18        MR. PRICE:  JUST ADMITTING THE FIRST PAGE AT THIS

19   POINT.

20   BY MR. PRICE:

21   Q    SO THIS IS NOVEMBER 10, 2000; CORRECT?

22   A    YES.

23   Q    AND LOOK AT THE SECOND PARAGRAPH:  "I WAS TOLD BY

24   MATT HEDRICK THAT YOU SUGGESTED THAT HE HAD ATTEMPT TO RECRUIT

25   COLLEEN O'HIGGINS TO WORK FOR PLAY HUT."

1          DO YOU SEE THAT?

2     A   YES.

3     Q   "ANY SUCH ATTEMPT TO SOLICIT THE COMPANY'S PERSONNEL

4     REPRESENTS SERIOUS INTERFERENCE WITH THE COMPANY'S BUSINESS AND

5     FINANCIAL INTERESTS AND, IF TRUE, WOULD VIOLATE THAT PART OF

6     THE AGREEMENT IN WHICH YOU AGREED TO, QUOTE, 'MAINTAIN THE SAME

7     LEVEL OF CONFIDENTIALITY' REGARDING CO-WORKERS, EMPLOYEE

8     RELATION MATTERS, AND COMPANY OPERATIONS AS REGARDS TO TRADE

9     SECRETS AND CONFIDENTIAL INFORMATION."

10         THAT'S WHAT YOU WROTE TO HER.

11    A   I DID.

12    Q   WERE YOU TRYING TO SCARE HER?

13    A   I DON'T RECALL WHAT I WAS TRYING TO DO.  ALL I KNOW IS

14    THAT WE GOT A LETTER FROM HER ATTORNEY AFTERWARD SAYING THAT

15    THIS IS ILLEGAL, AND WE DROPPED THE WHOLE THING.  WE NEVER SUED

16    OR TOOK ACTION AGAINST KAMI GILLMORE.

17    Q   WELL, HERE YOU TOLD HER ON NOVEMBER 2000, "PLEASE BE AWARE

18    THAT I WILL TAKE ANY APPROPRIATE ACTION WITH REGARD TO SAFE-

19    GUARDING THE COMPANY'S CONFIDENTIAL INFORMATION AND IMPROPER

20    ATTEMPTS TO SOLICIT CURRENT EMPLOYEES."

21         THAT'S WHAT YOU TOLD HER IN NOVEMBER OF 2000;

22    CORRECT?

23    A   IT APPEARS SO, YES.

24    Q   SO THEN, YOUR BELIEF, THEN, PRIOR TO THIS, OBVIOUSLY, IN

25    1999, WAS -- THIS IS NOVEMBER 2000 -- AS OF NOVEMBER 2000, MGA

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1      TOOK THE POSITION, YOU KNOW, IF YOU LEAVE MGA, YOU CAN'T

2      SOLICIT ANY EMPLOYEES FOR MGA; RIGHT?

3      A   WE TOOK THAT POSITION.  THAT POSITION IS WRONG.  YOU

4      CANNOT STOP EMPLOYEES TO MOVE FROM ONE COMPANY TO ANOTHER IN

5      CALIFORNIA.

6      Q   I UNDERSTAND THAT YOU NOW SAY THAT WAS WRONG.

7          BUT MY QUESTION IS, IN 1999 AND AT LEAST AS OF UP TO

8      NOVEMBER 10, 2000, THAT'S THE POSITION YOU TOOK; RIGHT?

9      A   YES.

10     Q   AND AT THE SAME TIME YOU TOOK THAT POSITION, AS IN

11     EXHIBIT 5715, YOU WERE ENCOURAGING FORMER MATTEL EMPLOYEES TO

12     RECRUIT EMPLOYEES FROM MATTEL; CORRECT?

13     A   WE WERE ENCOURAGING EX-MATTEL EMPLOYEES WHO WERE AT MGA TO

14     LOOK FOR OTHER PEOPLE, AND WE WERE ALSO ASKING MATTEL HUMAN

15     RESOURCES IF THEY HAD PEOPLE TO COME TO US.

16     Q   AND FOCUSING ON NOW HAVING FORMER MATTEL EMPLOYEES CONTACT

17     CURRENT MATTEL EMPLOYEES TO RECRUIT THEM, IN THIS AREA YOU

18     WEREN'T APPLYING THE SAME RULES TO BOTH COMPANIES; RIGHT?  YOU

19     WERE SAYING 'MY FORMER EMPLOYEES CAN'T DO THAT, BUT I'M GOING

20     TO ASK MATTEL EMPLOYEES TO DO THAT.'

21     A   I DON'T UNDERSTAND YOUR QUESTION.  CAN YOU CLARIFY?

22     Q   I'LL TRY TO CLARIFY.  THIS IS 5715.

23         WHERE YOU'RE ASKING KAMI, WHO YOU KNOW AS A FORMER

24     MATTEL EMPLOYEE, TO COME UP WITH NAMES OF PEOPLE WHO WORK AT

25     MATTEL.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A    RIGHT.

2    Q    FOR RECRUITING; CORRECT?

3    A    YES.

4    Q    DO YOU SEE ANYTHING INCONSISTENT WITH TELLING YOUR OWN

5    EMPLOYEES IN THIS TIME FRAME, 'IF YOU LEAVE, YOU CAN'T RECRUIT

6    MGA EMPLOYEES.'  BUT, AT THE SAME TIME, TELLING THE FORMER

7    MATTEL EMPLOYEES WHO WERE WORKING WITH YOU, 'GO GET 'UM AT

8    MATTEL.'

9    A    I DO SEE AN INCONSISTENCY IN THAT.

10   Q    YOU MENTIONED PEOPLE WHO WERE LAID OFF; CORRECT?

11        YOU ALSO RECRUITED PEOPLE WHO WERE LAID OFF; CORRECT?

12   A    CORRECT.

13   Q    AND WE LOOKED AT I THINK IT WAS EXHIBIT 16911, WHICH IS A

14   LETTER THAT YOU ACTUALLY WROTE TO SOMEONE AT MATTEL CONCERNING

15   LAYOFFS.  DO YOU RECALL THAT?

16   A    CAN YOU PLEASE REPEAT.

17   Q    16911 WHICH IS ALSO --

18   A    I HAVE IT.

19   Q    DO YOU RECALL THIS IN JUNE OF 2000, WHERE YOU'RE WRITING

20   TO MR. HANDY AT MATTEL, SAYING "WITH THE LAYOFFS, LET ME KNOW

21   IF YOU KNOW SOME GOOD PEOPLE WE CAN CONSIDER."

22        DO YOU SEE THAT?

23   A    YOU MEAN MARCH OF 2000?

24   Q    YOU'RE RIGHT.  MARCH OF 2000.

25        AND JOHN HANDY, AGAIN, WAS WHO?

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    A   TO THE BEST OF MY RECOLLECTION, HE WAS A SENIOR VICE

2    PRESIDENT OF DESIGN AT MATTEL.

3    Q   DOES YOUR COMPANY HAVE POLICIES AS TO THE SORT OF BENEFITS

4    IT GIVES TO ITS EMPLOYEES WHEN IT HAS LAYOFFS?

5    A   I'M NOT SURE IF WE DO.  I THINK WE DO.  I'M NOT FAMILIAR

6    WITH IT.

7    Q   WELL, IT'S TRUE, IS IT NOT, YOUR UNDERSTANDING, THAT MOST

8    COMPANIES, PARTICULARLY THE SIZE OF MATTEL, HAVE BENEFITS THEY

9    GIVE TO THE EMPLOYEES THAT THEY HAVE TO LAYOFF?

10   A   I HAVE NO IDEA WHAT POLICIES MATTEL HAS ONE WAY OR

11   ANOTHER.

12   Q   WOULD IT SURPRISE YOU THAT IF WHEN MATTEL LAYS OFF

13   EMPLOYEES, IT TRIES TO GIVE THEM ASSISTANCE TO FIND JOBS?

14        MR. NOLAN:  OBJECTION.  LACKS FOUNDATION, YOUR HONOR;

15   ALSO CALLS FOR SPECULATION.

16        THE COURT:  REPHRASE YOUR QUESTION OR LAY THE

17   FOUNDATION.

18   BY MR. PRICE:

19   Q   IS IT YOUR UNDERSTANDING THAT IT IS GOOD CORPORATE POLICY,

20   GOOD CORPORATE CITIZENSHIP, FOR A COMPANY WHO LAYS OFF

21   EMPLOYEES TO TRY TO HELP ITS EMPLOYEES FIND JOBS?

22   A   IT IS.

23   Q   AND HERE IN MARCH OF 2000 YOU'RE ASKING MR. HANDY ABOUT

24   EMPLOYEES THAT MATTEL HAS LAID OFF; CORRECT?

25        I'LL CALL YOUR ATTENTION TO THIS:

1         "WITH ALL THAT IS HAPPENING AT MATTEL, ALL THE

2     LAYOFFS, ET CETERA, PLEASE LET ME KNOW IF YOU KNOW GOOD PEOPLE

3     WE CAN CONSIDER."

4         AND THEN YOU ACTUALLY LIST SOME POSITIONS; CORRECT?

5     A   YES.

6     Q   AND OF COURSE YOU THOUGHT THERE'S NOTHING WRONG WITH

7     ASKING MATTEL, IF THEY HAVE SOME GOOD PEOPLE WHO THEY ARE

8     LAYING OFF, THAT THEY MIGHT BE ABLE TO WORK WITH US.

9     A   ET CETERA.

10    Q   ET CETERA?  YOU THOUGHT NOTHING WRONG WITH THAT?

11    A   NOTHING WRONG.

12    Q   AND YOU AGREE IT'S GOOD CORPORATE CITIZENSHIP, EVEN IF YOU

13    DON'T KNOW MATTEL'S POLICIES, FOR A COMPANY WHO'S LAYING OFF

14    ITS EMPLOYEES, TO TRY AND HELP THEM FIND JOBS; RIGHT?

15    A   IT IS GOOD CITIZENSHIP, YES.

16    Q   THAT'S A DIFFERENT SITUATION, THAN, FOR EXAMPLE,

17    KAMI GILLMORE LEAVING MGA AND CONTACTING CURRENT MGA EMPLOYEES.

18    A   WHAT IS THE DIFFERENCE?

19        I DON'T UNDERSTAND YOUR QUESTION.

20    Q   WELL, DO YOU BELIEVE IT'S GOOD CORPORATE CITIZENSHIP THAT

21    A COMPANY SHOULD BE HAPPY WHEN ITS COMPETITORS TRY TO POACH

22    THEIR EMPLOYEES?

23    A   SHOULD NOT BE HAPPY.  BUT IT'S NOT ILLEGAL.  IT'S DONE ALL

24    OF THE TIME.  YOU DID IT.

25    Q   AND MR. HANDY'S RESPONSE WAS "RAIME IS OUR HUMAN RESOURCE

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir) 6/11/2008 9:02:00 AM

1   PERSON" -- AND YOU UNDERSTAND HUMAN RESOURCE PEOPLE DEAL WITH

2   LAYOFFS AND EMPLOYEE MATTERS?

3   A   AND RECRUITMENT, YES.

4   Q   "WE AREN'T CURRENTLY LAYING OFF ANYONE IN MY DIVISION. IN

5   FACT, WE'RE LOOKING FOR GOOD PEOPLE OURSELVES. BUT I KNOW THE

6   LEARNING COMPANY IS HAVING LAYOFFS, AND IF ANYONE THERE IS A

7   FIT FOR YOUR NEEDS, RAIME, LET ME KNOW."

8   A   YES.

9   Q   YOU THOUGHT THIS IS GOOD CORPORATE CITIZENSHIP THAT IF

10  SOMEONE IS LAYING OFF PEOPLE, THAT THEY SHOULD BE WILLING TO

11  HELP THOSE FOLKS FIND JOBS.

12  A   I KNOW IT'S A GOOD CORPORATE CITIZENSHIP TO DO THAT, YES,

13  SIR.

14  Q   I ASKED YOU EARLIER, I TAKE IT YOU DON'T KNOW IF YOU HAVE

15  POLICIES, IF MGA HAS POLICIES, WHERE THEY TRY AND DO THAT.

16  A   I TOLD YOU I DON'T KNOW IF WE HAVE A POLICY SIMILAR TO

17  YOURS OR NOT. I'M NOT AWARE COMPLETELY OF THE POLICY.

18      IF YOU WOULD LIKE, I CAN FIND OUT AND COME BACK TO

19  YOU.

20  Q   LET'S MOVE TO ANOTHER TOPIC NOW.

21      AT THE END OF YOUR EXAMINATION, I BELIEVE YOU SAID,

22  RATHER EMPHATICALLY, "WE HAVE HAD NO REASON TO HIDE CARTER

23  BRYANT."

24  A   THAT'S ABSOLUTELY TRUE.

25  Q   NOW, HERE'S MY QUESTION:

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1        DO YOU REMEMBER MR. NOLAN ASKED YOU WHETHER YOU WERE

2    HERE DURING MR. QUINN'S OPENING STATEMENT?

3    A   I WAS.

4    Q    WERE YOU HERE DURING MR. NOLAN'S OPENING STATEMENTS?

5    A   YES, SIR, I WAS.

6    Q    AND DO YOU RECALL DURING THAT OPENING STATEMENT THAT

7    MR. NOLAN SAID TO THE JURY THAT "ISAAC LARIAN WILL EXPLAIN WHY

8    HE DID MAKE EFFORTS AT SOME TIMES TO CONCEAL WHO THE DESIGNER

9    WAS ON BRATZ FOR A VERY GOOD REASON.  ISAAC LARIAN WILL EXPLAIN

10   TO YOU THIS IS A VERY, VERY COMPETITIVE MARKET.  HE DID NOT

11   WANT THE IDENTITY OF CARTER BRYANT OR ANY OF HIS EMPLOYEES OUT

12   THERE."

13       DID YOU HEAR YOUR ATTORNEY SAY THAT?

14   A   I DID.

15   Q   SO ON THE ONE HAND, YOU'RE SAYING TO THE JURY 'THERE IS NO

16   REASON THAT WE EVER HAD TO HIDE CARTER BRYANT.'

17   A   THAT'S ABSOLUTELY TRUE.  WE HAVE NEVER HAD THE REASON TO

18   HIDE THE IDENTITY OF CARTER BRYANT.

19   Q   BUT ON THE OTHER HAND, YOU'RE SAYING YOU DID HAVE A REASON

20   AND YOU DID HIDE HIM AT SOME TIMES BECAUSE YOU DON'T WANT YOUR

21   EMPLOYEES -- YOU'RE TAKING THE POSITION THAT YOU DID CONCEAL

22   CARTER BRYANT ON SOME OCCASIONS, BECAUSE YOU DIDN'T WANT HIS

23   IDENTITY OR ANY OF YOUR EMPLOYEES' IDENTITIES OUT THERE.

24   A   WE DON'T WANT OUR COMPANY'S EMPLOYEES IDENTITIES OUT THERE

25   BECAUSE NO OTHER TOY COMPANY DOES, FRANKLY.

1    Q    WELL, WE'LL GET TO THAT, BECAUSE YOU'RE TALKING ABOUT

2    COLLECTIBLES.

3          SO WHICH ONE IS IT?  IS IT THAT AT NO TIME YOU HAD

4    ANY REASON TO HIDE CARTER BRYANT?  OR IS IT THAT AT SOME TIMES

5    YOU TRIED TO CONCEAL CARTER BRYANT BECAUSE YOU DIDN'T WANT

6    OTHER PEOPLE TO KNOW WHO YOUR EMPLOYEES WERE?

7    A    WE ABSOLUTELY NEVER INTENTIONALLY WENT OUT OF OUR WAY TO

8    CONCEAL CARTER BRYANT'S NAME FROM ANYBODY.  NEVER.

9    Q    LET ME ASK YOU THIS:  WE TALKED ABOUT THAT WALL STREET

10   JOURNAL ARTICLE ON JULY 18, 2003.  DO YOU REMEMBER THAT?

11   A    YES.

12   Q    AND DO YOU RECALL, I READ THE ADMISSIONS INTO EVIDENCE

13   THAT MGA HAD MADE ABOUT THAT ARTICLE.

14   A    I RECALL A LOT OF THINGS.  I'M NOT SURE IF I RECALL EVERY

15   WORD YOU SAID, SIR.

16   Q    I CAN'T BLAME YOU.

17          NOW, JULY 18, 2003, THAT'S ALMOST THREE YEARS, ABOUT

18   TWO AND A HALF YEARS, TEN AND A HALF MONTHS, FROM THE TIME YOU

19   BEGAN MEETING WITH CARTER BRYANT IN SEPTEMBER OF 2000; CORRECT?

20   A    YES.

21   Q    AND IT'S FAIR TO SAY THAT IF YOU HAD NO REASON TO HIDE

22   CARTER BRYANT, YOU CERTAINLY WOULD NOT HAVE BEEN TELLING ANY

23   EMPLOYEES THAT YOU WANTED CARTER BRYANT'S NAME TO BE KEPT UNDER

24   WRAPS.

25   A    I NEVER, TO THE BEST OF MY RECOLLECTION, EVER TOLD ANY

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    EMPLOYEE THAT I WANT CARTER BRYANT'S NAME UNDER WRAP.

2    Q    AND YOU CAN DENY THAT EMPHATICALLY, BECAUSE YOU HAD NO

3    REASON TO HIDE CARTER BRYANT; RIGHT?

4    A    I HAD NO REASON, THEN OR NOW, TO HIDE CARTER BRYANT'S

5    NAME.

6    Q    AND BECAUSE YOU'RE SO EMPHATICALLY SURE OF THAT, IF YOU

7    HAD EVER BEEN ASKED UNDER OATH, 'HEY, DID YOU TELL EMPLOYEES

8    THEY SHOULD HIDE CARTER BRYANT'S NAME,' YOUR ANSWER WOULD BE

9    'NO, I NEVER DID THAT.'

10   A    NO.  I WOULD SAY, BECAUSE I COULD NEVER SAY I NEVER DID

11   THAT, MY ANSWER WOULD BE 'I DON'T RECALL EVER DOING THAT.'

12   Q    OR WOULD IT BE 'I DON'T RECALL ONE WAY OR THE OTHER'?

13   A    OR IT COULD BE 'I DON'T RECALL ONE WAY OR THE OTHER.'

14   Q    YOU UNDERSTAND THE DIFFERENCE BETWEEN THOSE TWO ANSWERS?

15   IF YOU SAY 'I DON'T RECALL ONE WAY OR THE OTHER,' THAT SUGGESTS

16   THAT SOMETHING THAT MIGHT HAVE HAPPENED.

17   A    I JUST KNOW I DON'T RECALL DOING IT ONE WAY OR ANOTHER, OR

18   IF I'M EVER ASKED THAT.

19       I DON'T KNOW HOW ELSE TO ANSWER THAT.

20   Q    WE PLAYED THIS DURING YOUR INITIAL EXAMINATION; IT'S YOUR

21   SECOND VOLUME, PAGE 278, LINE 2, TO 270, LINE 15.

22       QUESTION:  "DID YOU EVER TELL RACHEL HARRIS,

23       IN WORDS OR SUBSTANCE, THAT SHE SHOULDN'T TALK

24       ABOUT CARTER BRYANT BEING INVOLVED WITH BRATZ?

25       ANSWER:  I DON'T RECALL IF I HAVE OR NOT."

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    BY MR. PRICE:

2    Q   DO YOU SEE THAT?

3    A   I DO.

4    Q   TODAY AND YESTERDAY YOU WERE EMPHATIC THAT YOU WOULD NEVER

5    HAVE SAID THAT TO ANYONE BECAUSE YOU WEREN'T TRYING TO HIDE

6    CARTER BRYANT.

7    A   NO.  TODAY AND YESTERDAY AND TOMORROW, I EMPHATICALLY WILL

8    TELL YOU, LADIES AND GENTLEMEN OF THE JURY, THERE WAS NO REASON

9    FOR US TO HIDE CARTER BRYANT'S NAME.  AND WE NEVER DID.

10   Q   SO THEREFORE, IF THAT'S TRUE, IF YOU WERE GOING TO ANSWER

11   THIS TRUTHFULLY, THE ANSWER WOULD BE, NO.

12        "DID YOU EVER TELL RACHEL HARRIS, IN WORDS OR IN

13   SUBSTANCE, THAT SHE SHOULDN'T TALK ABOUT CARTER BRYANT BEING

14   INVOLVED WITH BRATZ?

15        IF WHAT YOU'RE SAYING IS TRUE, YOU NEVER HAD THE

16   INTENTION OF DOING THAT, YOU NEVER DID THAT, THE TRUTHFUL

17   ANSWER WOULD BE NO; RIGHT?

18   A   MY ANSWER WAS 'I DON'T RECALL IF I HAVE OR NOT.'

19   Q   SO AT THAT TIME, AS OF JULY 2006, YOU WEREN'T WILLING TO

20   DENY AT THAT TIME THAT YOU HAD TOLD EMPLOYEE RACHEL HARRIS THAT

21   SHE SHOULDN'T TALK ABOUT CARTER BRYANT BEING INVOLVED WITH

22   BRATZ.  YOU WERE NOT WILLING TO DENY THAT, WERE YOU?

23   A   I DID NOT RECALL, AND I STILL DO NOT RECALL, IF I HAVE

24   EVER DONE THAT.  THAT'S THE ANSWER.

25   Q   SO IF RACHEL HARRIS CAME IN HERE AND SAID "I SPOKE WITH

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    MR. LARIAN AND HE TOLD ME THAT MGA DID NOT WANT CARTER BRYANT'S

2    NAME ASSOCIATED WITH BRATZ," IF SHE CAME IN HERE AND SAID THAT,

3    YOU CANNOT DENY SHE SAID THAT -- THAT YOU SAID THAT.

4    A   I'M SORRY?

5    Q   I BLEW IT AT THE END, DIDN'T I.

6        IF RACHEL HARRIS CAME IN HERE AND SAID "ISAAC LARIAN

7    TOLD ME HE DID NOT WANT CARTER BRYANT'S NAME ASSOCIATED WITH

8    BRATZ," IF SHE TESTIFIED TO THAT, YOU COULD NOT DENY THAT YOU

9    SAID THAT TO HER.

10   A   I STILL DON'T UNDERSTAND YOUR QUESTION.

11       I DON'T KNOW WHAT SHE SAYS OR HASN'T SAID.

12       I KNOW WHAT I AM SAYING, AND I HAVE SAID THAT FROM

13   THE BEGINNING AND I HAVE SAID THAT TO YOU TODAY.  I HAD NO

14   REASON EVER TO HIDE CARTER BRYANT'S NAME.  CARTER BRYANT'S NAME

15   WAS GIVEN IN JANUARY OF 2001 -- DECEMBER OF 2000 TO WAL-MART,

16   THE BIGGEST CUSTOMER IN THE WORLD.

17   Q   YOU CAN'T DENY THAT YOU TOLD RACHEL HARRIS THAT YOU DON'T

18   WANT CARTER BRYANT'S NAME BEING INVOLVED IN BRATZ.  YOU CAN'T

19   DENY THAT, CAN YOU?

20   A   MY ANSWER IS, I DON'T RECALL IF I HAVE SAID THAT TO HER OR

21   NOT.  I DON'T RECALL THAT.  MY ANSWER IS I DO NOT RECALL.

22   Q   AND IT'S CERTAINLY TRUE THAT WHEN CARTER BRYANT FAXED HIS

23   CONTRACT BACK TO MGA, IT'S TRUE THAT IF YOU WEREN'T TRYING TO

24   HIDE CARTER BRYANT'S NAME, THERE WOULD BE NO REASON FOR YOU, OR

25   ANYONE, TO WHITE OUT A FAX HEADER FROM BARBIE COLLECTIBLES;

1    RIGHT?

2    A    THERE WAS NO REASON FOR ME OR ANYONE TO HIDE THE BARBIE

3    COLLECTIBLES FAX LETTER WHEN I WAS SENDING THAT FAX TO MY

4    ATTORNEY PATRICIA GLASER, WHO'S BEEN A FAMILY FRIEND OF MINE

5    FOR THE PAST 15 YEARS.

6    Q    BUT, IN FACT, THAT'S WHAT YOU DID.

7    A    I DID NOT.

8    Q    YOU JUST SAID THAT YOU TOLD YOUR BIGGEST CUSTOMER,

9    WAL-MART, ABOUT CARTER BRYANT.  DO YOU RECALL THAT?

10   A    I DID.

11   Q    IS THAT REFERRING TO EXHIBIT 17281?

12   A    THE BIG BOOK OR THE SMALL BOOK?

13   Q    IT'S IN BOTH THE SMALL BOOK AND IN YOUR ATTORNEY'S SMALL

14   BOOK; IT'S SOMETHING YOU TALKED ABOUT YESTERDAY.

15   A    YES; THAT'S WHAT I AM REFERRING TO.

16        MR. PRICE:  MAY WE PUT THIS UP?  IT'S IN EVIDENCE.

17        THE COURT:  YOU MAY.

18   BY MR. PRICE:

19   Q    FIRST OF ALL, THIS IS AN E-MAIL WITHIN MGA; RIGHT?

20   A    IT IS FROM ERIC YIP, WHO WORKED FOR MGA, AND ELING POON,

21   WHO WORKED FOR WAL-MART -- WAS THE AGENT FOR WAL-MART.  PREL

22   WAS THE AGENT, THE BUYING AGENT, FOR WAL-MART IN HONG KONG.

23   Q    SO ELING POON WAS NOT AN EMPLOYEE OR A CONTRACTOR FOR MGA;

24   IS THAT RIGHT?

25   A    NO.  SHE WORKED FOR A COMPANY CALLED PREL, WHICH I BELIEVE

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    STANDS FOR PACIFIC RESOURCE, I DON'T REMEMBER.  THEY WERE A BIG

2    AGENT FOR WAL-MART IN HONG KONG AND CHINA.

3    Q   AND YOU'RE SAYING THAT YOU REVIEWED --

4        DO YOU SEE WHERE IT SAYS J-PEG?

5    A   YES.

6    Q   YOU'RE SAYING YOU INTERVIEWED EACH AND EVERY ONE BEFORE IT

7    WAS SENT OUT.

8    A   NO.  I INSTRUCTED ERIC YIP TO SEND THESE DRAWINGS, THIS

9    J-PEG, TO WAL-MART TO GET RON STOVER TO COME OVER TO VISIT,

10   BECAUSE HE DIDN'T WANT TO COME AND VISIT US.

11   Q   AND YOU SELECTED THE PRECISE ONES TO SEND, YOU'RE SAYING.

12   A   NO.  I JUST SAID SEND THOSE DRAWINGS TO HER.

13   Q   SO ALL YOU TOLD MR. YIP WAS 'I WANT YOU TO SEND THESE

14   DRAWINGS OF THE BRATZ DOLLS SO THE CUSTOMER WILL KNOW WHAT THEY

15   LOOK LIKE.'

16   A   THEY WERE NOT DOLLS; THESE WERE THE DRAWINGS THAT WERE

17   GOING TO BECOME THE BASIS FOR BRATZ.  AND I DID ASK ERIC YIP TO

18   SEND THAT TO ELING POON OF PREL.  I DID.

19   Q   AND YOU DID NOT SAY, 'I WANT TO SEE EACH AND EVERY ONE OF

20   THOSE BEFORE YOU SEND IT'; CORRECT?

21   A   I DON'T RECALL SAYING THAT ONE WAY OR ANOTHER.  I DO NOT

22   RECALL THAT.

23   Q   AND IF WE LOOK AT WHAT WAS ATTACHED, THE VERY FIRST ONE

24   MENTIONS CARTER BRYANT'S NAME; CORRECT?

25   A   YES.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    BUT YOU CAN'T TELL US THAT YOU REVIEWED THAT BEFORE IT WAS

2    SENT; CORRECT?

3    A    I DON'T RECALL ONE WAY OR ANOTHER IF I REVIEWED EVERY ONE

4    OF THESE, NO.

5    Q    IN FACT, MGA OFTEN WILL TALK WITH POTENTIAL CUSTOMERS,

6    SUCH AS K-MART OR WAL-MART, ABOUT WHAT IT'S GOING TO BE DOING

7    IN THE NEXT SEASON; CORRECT?

8    A    WE TALK TO THEM, WE SHOW THEM OUR IDEAS FOR THE NEXT

9    SEASON; THAT'S CORRECT.

10   Q    AND YOU MENTIONED THAT AT THE TOY FAIR HOW, FOR EXAMPLE,

11   WHEN YOU ARE SHOWING THINGS, EVEN AT THE TOY FAIR, THERE'S SOME

12   SORT OF SECURITY INVOLVED.

13   A    IN OUR PRIVATE SHOWS, YES.  NOT IN THE OPEN SHOWS.

14   Q    IN YOUR PRIVATE SHOWS.

15   A    RIGHT.

16   Q    IN YOUR PRIVATE SHOWS, WHAT ARE YOU SHOWING IN YOUR

17   PRIVATE SHOWS, NORMALLY?

18   A    PRODUCT IDEA CONCEPTS THAT ARE GOING TO COME OUT FOR NEXT

19   SEASON, AS WELL AS SOME PRODUCTS THAT HAVE BEEN IN THE MARKET

20   BEFORE THAT THEY ARE GOING TO CARRY FORWARD TO THE FUTURE.

21   Q    SO WHY DO YOU HAVE THE SECURITY FOR YOUR PRIVATE SHOWS

22   WHERE YOU'RE GOING TO BE SHOWING PRODUCTS COMING OUT NEXT

23   SEASON?

24   A    WHY DO WE HAVE --

25   Q    SECURITY ON THESE PRIVATE SHOWS WHEN YOU ARE TALKING ABOUT

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    PRODUCTS COMING OUT NEXT SEASON?

2    A   TO STOP THE COMPETITORS WHO COME TO OUR SHOWROOM AND FIND

3    OUT WHAT THOSE PRODUCTS ARE AND GO KNOCK THEM OFF.

4    Q   SO WHEN YOU'RE TALKING TO YOUR CUSTOMERS LIKE K-MART AND

5    WAL-MART ABOUT THINGS THAT ARE GOING TO HAPPEN IN THE FUTURE,

6    LIKE NEXT SEASON, YOU WANT THEM TO BE QUIET ABOUT IT; RIGHT?

7    A   WE WANT THE RETAILERS TO BE QUIET ABOUT IT?

8    Q   WHEN YOU'RE SHOWING THINGS YOU'RE GOING TO HAVE IN THE

9    NEXT SEASON, YOU DON'T WANT THEM GOING TO HASBRO OR MATTEL AND

10   SAYING 'HEY, MGA HAS THIS GREAT IDEA?'

11   A   LET ME PUT IT THIS WAY:  WE EXPECT THEM NOT TO DO THAT.

12   BUT I'M NOT SURE IF THAT HAPPENS IN REALITY.

13   Q   WELL, NOT ONLY DO YOU EXPECT THEM NOT TO DO THAT; BUT,

14   THEY ALSO SIGN CONFIDENTIALITY AGREEMENTS AS YOUR VENDORS WHERE

15   THEY SAY THEY ARE NOT GOING TO DO THAT.

16   A   I AM NOT AWARE OF IF THEY DO THAT OR NOT.  IT'S POSSIBLE

17   THEY DO SIGN.  I DON'T REMEMBER.

18   Q   AND WHEN YOU'RE COMMUNICATING TO SOMEONE SUCH AS -- THIS

19   IS K-MART, I BELIEVE, IF WE GO TO EXHIBIT 17281 -- THIS IS

20   DECEMBER OF 2000?

21   A   WAL-MART, YOU MEAN?

22   Q   WAL-MART.  OKAY.

23      IF YOU LOOK HERE, THIS IS DECEMBER 14, 2000.  YOU HAD

24   NOT EVEN HAD YOUR SHOW IN HONG KONG AT THAT POINT, HAD YOU?

25   A   WE HAD NOT.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    AND YOU HAD NOT HAD YOUR NEW YORK SHOW WHEN YOU SENT THIS

2    OUT; CORRECT?

3    A    NO.

4    Q    AND IT'S TRUE, IS IT NOT --

5    A    EXCUSE ME.  YOU MEAN THE COMING SHOW, IN 2001; RIGHT?

6    Q    THE ONE YOU TESTIFIED ON YOUR DIRECT EXAMINATION.

7    A    YES.

8    Q    SO THIS IS BEFORE YOU EVEN HAVE YOUR PRIVATE SHOW, WHERE

9    YOU'RE SHOWING THESE MOCK-UPS OF THE BRATZ DOLLS; CORRECT?

10   A    SORRY?

11       THERE WERE NO MOCK-UPS OF BRATZ DOLLS AS OF

12   DECEMBER 14, 2000, IF THAT'S WHAT YOU ARE ASKING ME.

13   Q    SO IT'S FAIR TO SAY THAT YOU EXPECTED THIS COMMUNICATION

14   WITH WAL-MART TO BE CONFIDENTIAL.

15   A    I DON'T REMEMBER MY EXPECTATION AT THE TIME.  I THINK, AS

16   A MATTER OF FACT, MATTEL WAS A CATEGORY MANAGER FOR WAL-MART AT

17   THE TIME, AND I'M PRETTY SURE THEY SAW ALL OF THE COMPETITOR

18   INFORMATION FROM EVERYBODY.

19   Q    LET ME ASK YOU AGAIN.

20       I THINK YOU SAID YOU DON'T RECALL WHETHER YOU

21   EXPECTED THIS TO BE CONFIDENTIAL IN DECEMBER OF 2000.

22   A    I DON'T RECALL MY STATE OF MIND.

23       LET'S PUT IT THIS WAY:  I HOPED THAT THE WAL-MART

24   BUYER -- AGAIN, MY EXPECTATION IS THAT THEY WOULD KEEP THINGS

25   CONFIDENTIAL, WHAT'S GOING TO COME IN THE FUTURE.

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    Q    YOU ALSO TESTIFIED, THOUGH, IN YOUR EXAMINATION FROM

2    MR. NOLAN, THAT AT SOME POINT YOU DID HAVE A REASON TO HIDE

3    MR. BRYANT'S NAME BECAUSE YOU THOUGHT THERE MIGHT BE

4    LITIGATION.  DO YOU RECALL THAT?

5    A    I DON'T RECALL SAYING THAT I WANTED TO HIDE

6    CARTER BRYANT'S NAME BECAUSE THERE'S GOING TO BE LITIGATION.  I

7    DID NOT WANT TO HAVE -- CAN I EXPLAIN?

8         WE GOT A LETTER FROM YOUR LAW FIRM, I DON'T KNOW IF

9    IT WAS MR. QUINN HIMSELF OR SOMEONE WORKING FOR HIM, TELLING US

10   THAT THE PUBLIC FAN, THE BRATZ FAN WHO'S PULLED UP A YAHOO

11   WEB SITE, WAS SOMEHOW INFRINGING MATTEL'S TRADEMARKS.  AND

12   KNOWING MATTEL AND THAT THEY WOULD FIND ANY EXCUSE TO SUE ANY

13   COMPETITOR WHO COMPETES WITH THEM, ESPECIALLY IN THE FASHION

14   DOLL, I DIDN'T WANT TO HAVE A LAWSUIT.

15   Q    LET ME ASK YOU ABOUT THIS STATEMENT YOU JUST MADE.

16        IN YOUR DIRECT EXAMINATION, YOU MENTIONED FOUR

17   LAWSUITS YOU WERE AWARE OF; CORRECT?

18   A    IN REGARDS TO FASHION DOLLS ONLY.  I KNOW MORE, IF YOU

19   WOULD LIKE TO KNOW.

20   Q    YOU MENTIONED THE FOUR CASES.  CAN I FOLLOW UP ON THAT?

21   A    ON THE FASHION DOLLS, YES.

22   Q    OF COURSE, YOU KNOW THAT THOSE ARE LAWSUITS WHERE MATTEL

23   IS SAYING SOMEONE IS USING OUR INTELLECTUAL PROPERTY; CORRECT?

24   THOSE FOUR CASES?

25   A    EITHER INTELLECTUAL PROPERTY OR -- YOU GUYS COME UP WITH A

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    LOT OF DIFFERENT EXCUSES TO SUE PEOPLE.

2    Q    IN FACT, MATTEL PREVAILED IN EVERY ONE OF THOSE CASES;

3    CORRECT?

4    A    I DON'T THINK YOU DID.

5    Q    DID YOU KNOW WHAT THE ALLEGATIONS WERE?  DO YOU KNOW WHAT

6    WAS BEING SAID IN THOSE CASES?

7    A    I THINK ON THE GROBURGER CASE, YES, YOUR ALLEGATION WAS

8    THAT THE RADIO CITY DOLL LOOKED LIKE BARBIE, AND I BELIEVE YOU

9    LOST THAT CASE AND YOU APPEALED THAT AND YOU SETTLED.  AND I

10   REMEMBER THAT EITHER THE FEDERAL COURT JUDGE IN THAT CASE OR

11   ANOTHER CASE SPECIFICALLY SAID -- IT'S PUBLISHED -- THAT

12   ANYBODY WHO DECIDES IN THE TOY BUSINESS TO GET INTO THE FASHION

13   DOLL BUSINESS, THEY HAVE A TARGET PAINTED ON THEIR BACK BY

14   MATTEL.

15   Q    LET'S TALK ABOUT THE TARGETS THAT YOU HAVE GONE AFTER.

16        MGA HAS FILED DOZENS OF LAWSUITS --

17   A    WE HAVE.

18   Q    -- SAYING PEOPLE HAVE INFRINGED BRATZ.

19   A    WE HAVE.

20   Q    YOU SUED ABC, BRIAN DUBINSKY, MANLEY TOY QUEST.

21   A    HE HAD NOTHING TO DO WITH BRATZ.

22   Q    IT WAS A LAWSUIT FOR MISAPPROPRIATION OF TRADE SECRETS,

23   UNFAIR COMPETITION.

24   A    I DON'T REMEMBER THE SPECIFICS OF THAT LAWSUIT.

25   Q    IN FACT, YOU HAD A SUIT AGAINST ABC INTERNATIONAL TRADERS

1    IN BRAZIL.  DO YOU RECALL THAT?

2    A   WE DID SUE ESTRELA IN BRAZIL, YES.

3    Q   YOU SUED MATSUSHITA ELECTRIC.

4    A   HAD NOTHING TO DO WITH BRATZ.

5    Q   BUT IT WAS A CASE ABOUT UNFAIR COMPETITION.

6    A   NO IT WAS NOT.

7    Q   WASN'T IT A CALIFORNIA SUPREME COURT CASE CONSTRUING THE

8    CALIFORNIA UNFAIR PRACTICES ACT?

9    A   I DON'T REMEMBER THAT CASE AND WHEN IT WAS.

10   Q   YOU SUED DYSCOM CORPORATION.

11   A   I DON'T RECALL.

12   Q   BARRY MANUFACTURING COMPANY.

13   A   NO; THAT DOESN'T RING A BELL TO ME.

14   Q   HOW ABOUT CRUM & FORSTER SPECIALTY INSURANCE?

15   A   I DON'T REMEMBER IF IT WAS THEM OR NOT; THAT WAS PROBABLY

16   IN RELATION TO THE TEXAS MATTER THAT I WAS TELLING YOU ABOUT.

17   Q   THE FASHION ACCESSORIES BAZAAR.

18   A   YES, WE DID.  AND IT WAS NOT REGARDING BRATZ.

19   Q   ONE OF THE CASES YOU SAID THAT MATTEL SUED WAS HASBRO.

20       DO YOU RECALL THAT?

21   A   YES.

22   Q   YOU SUED HASBRO.

23   A   NOT OVER BRATZ.

24   Q   YOU SUED THEM FOR MERCHANDISE LICENSING AGREEMENT, BREACH

25   OF CONTRACT; RIGHT?

1    A   I DID.

2    Q   YOU SUED A COMPANY CALLED MULTITOY, WHICH WAS CONCERNING

3    BRATZ DOLLS.

4    A   I DON'T RECALL.

5    Q   SEIZURE OF COUNTERFEIT, INFRINGING BRATZ DOLLS IN FOUR

6    L.A. RAIDS.

7    A   THERE WERE A LOT OF COUNTERFEIT BRATZ DOLLS IN DIFFERENT

8    PARTS OF THE WORLD.

9    Q   IN FACT, IF WE EXPAND IT, AS YOU SAID, WE'VE TALKED ABOUT

10   SOME CASES WHERE YOU SUED IN HONG KONG.

11   A   YES.

12   Q   AND IN THE U.K.

13   A   YES.

14   Q   YOU TRY TO PROTECT WHAT YOU BELIEVE ARE YOUR RIGHTS;

15   CORRECT?

16   A   YES.  BUT I DON'T SAY ANYBODY WHO COMES IN TO THE FASHION

17   DOLL; I DON'T PAINT A TARGET ON THEIR BACK, AS MATTEL DOES.

18   Q   AND CERTAINLY YOU DON'T KNOW ANY DETAILS ABOUT -- OR MAYBE

19   YOU'RE SAYING YOU DO KNOW DETAILS ABOUT ONE OF THE FOUR CASES

20   YOU'RE TESTIFYING ABOUT; RIGHT?

21   A   I HAVE DETAILS.  IF YOU WOULD LIKE TO ASK ME QUESTIONS, I

22   WILL GIVE YOU THE DETAILS.

23   Q   DID YOU FOLLOW THOSE FOUR CASES?

24   A   WHICH ONE?

25   Q   YOU MENTIONED FOUR TO THE JURY.  I'M JUST WONDERING

1    WHETHER OR NOT YOU TOOK IT UPON YOURSELF TO FOLLOW THOSE CASES.

2    A   I BELIEVE JUDGE LARSON -- OR YOU ASKED ME TO ONLY TALK

3    ABOUT THE ONES ON FASHION DOLLS, AND I HAVE.  I BELIEVE THAT

4    WAS THE CASE.

5    Q   MY QUESTION WAS, I'VE ASKED YOU ABOUT A NUMBER OF YOUR OWN

6    CASES, AND YOU DON'T EVEN REMEMBER SOME OF YOUR OWN CASES.

7    A   SOME OF THEM I DO, SOME I DON'T.

8    Q   BUT IT'S YOUR TESTIMONY THAT YOU DO TRACK CASES THAT

9    MATTEL FILES.

10   A   I TRACKED THOSE FOUR CASES.

11   Q   AND GETTING BACK TO, THEN, YOUR MINDSET IN 2000, WHEN YOU

12   RECEIVED -- I'M GOING TO SHOW IT TO YOU -- EXHIBIT 17252 --

13   A   YES, SIR.

14   Q   -- THIS IS WHAT YOU RECEIVED IN FEBRUARY OF 2002; IS THAT

15   CORRECT?

16   A   YES.

17   Q   IT TALKED ABOUT USING BARBIE AND DIVA STARZ, THOSE NAMES;

18   CORRECT?

19   A   HE TALKED ABOUT BEING INFRINGED BY A BRATZ YAHOO

20   DISCUSSION GROUP WEB SITE.  YES.  THAT'S WHAT YOU WERE

21   CLAIMING.

22   Q   AND THE TWO TRADEMARKS THAT WERE BEING DISCUSSED WERE

23   BARBIE AND DIVA STARZ; CORRECT?

24   A   YES.

25   Q   AND THEN IF WE LOOK AT EXHIBIT 4507.

1    A    GO AHEAD.

2    Q    AND THIS IS THE E-MAIL WHERE IT INCLUDES THE DAVID DEES

3    LETTER; CORRECT?

4    A    I'M SORRY?

5         YEAH, THAT INCLUDES THE DAVID DEES LETTER.

6         I'M NOT SURE.  I THINK CHRISTIAN'S LETTER, SOMEBODY

7    NAMED CHRISTIAN -- BRATZ.

8    Q    AND THEN DAVID DEES' RESPONSE.

9    A    I'M CONFUSED.

10   Q    LET'S FOCUS ON WHAT YOU SAY HERE.

11        IN MARCH OF 2002 AFTER SEEING WHAT'S ATTACHED TO THIS

12   E-MAIL, YOU DIRECT THERE'S TO BE NO MENTION ABOUT MATTEL.

13        YOU UNDERSTAND MATTEL IS A TRADEMARK OF MATTEL;

14   CORRECT?

15   A    YES.

16   Q    OR ANY OF THEIR PROPERTIES.

17   A    YES.

18   Q    THAT WOULD INCLUDE BARBIE OR DIVA STARZ; RIGHT?

19   A    YES.

20   Q    NOW, HERE WE HAVE CARTER.  YOU'RE TALKING ABOUT CARTER

21   BRYANT HERE.

22   A    YES, I AM.

23   Q    AND OBVIOUSLY THAT LETTER YOU GOT FROM OUR LAW FIRM

24   CONCERNED BARBIE AND DIVA STARZ; RIGHT?

25   A    YES.

1   Q   BUT YOUR FEAR HERE WAS IF CARTER WAS MENTIONED PUBLICALLY

2   AS BEING ASSOCIATED WITH BRATZ, MGA MIGHT BE SUED.

3   A   SORRY?

4   Q   YOUR CONCERN HERE IS THAT IF CARTER IS MENTIONED PUBLICLY

5   IN ASSOCIATION WITH BRATZ, THEN MGA MIGHT BE SUED BY MATTEL.

6   A   NO.  THIS LETTER, AS I TESTIFIED EARLIER, WAS, ONE, I

7   DIDN'T WANT TO HAVE A TARGET PAINTED ON MY BACK, AGAIN, AS I

8   SAID, A FEDERAL JUDGE FOUND AGAINST MATTEL --

9       MR. PRICE:  MOVE TO STRIKE.

10      THE COURT:  OVERRULED.  YOU MAY PROCEED.

11      THE WITNESS:  SECONDLY, I DIDN'T WANT THIS GENTLEMAN,

12  MR. DAVID DEES, TALKING ABOUT ALL OF THE THINGS IN MY COMPANY

13  THAT WHERE MY OFFICES WERE, WHERE THE TOY DEPARTMENT IS, WHAT

14  FLOOR IS THE DESIGN CENTER THAT WE HAVE THERE; THAT'S THE

15  REASON.

16  BY MR. PRICE:

17  Q   BUT I'M FOCUSING ON CARTER, WHICH REFERS TO CARTER BRYANT.

18  A   YES.

19  Q   DIDN'T YOU SAY THAT AS A RESULT OF THE CEASE AND DESIST

20  LETTER YOU GOT FROM MATTEL, THAT YOU WERE AFRAID MGA MIGHT BE

21  SUED.

22      DO YOU RECALL SAYING THAT?

23  A   I RECALL IT, YES.  BECAUSE, IN FACT, IN YOUR LETTER YOU

24  SAID 'IF YOU DON'T RESPOND IN A WEEK, WE WILL SUE YOU.'

25  Q   AND AS OF CERTAINLY MARCH OF 2002, THE BRATZ DOLLS HAD

1    BEEN OUT IN THE MARKET FOR SOME TIME.

2    A   THEY HAD.

3    Q   SO I THINK YOU PROBABLY THINK THAT MATTEL KNEW THAT YOU

4    MADE BRATZ DOLLS AT THAT TIME.

5    A   THEY KNEW FROM AT LEAST JANUARY 2001 THAT MGA MADE BRATZ

6    DOLLS.

7    Q   SO CERTAINLY AT THIS POINT YOU'RE NOT SAYING 'I DON'T WANT

8    MATTEL TO KNOW THAT WE DON'T HAVE BRATZ DOLLS,' BECAUSE

9    OBVIOUSLY THE WHOLE WORLD KNOWS THAT IN MARCH OF 2002; RIGHT?

10   A   YES.

11   Q   BUT, WHAT YOU'RE SAYING NOT TO MENTION IS CARTER BRYANT;

12   RIGHT?

13   A   IT'S VERY CLEAR WHAT I SAID:  "THERE MUST BE NO MENTION

14   ABOUT MATTEL OR ANY OF THEIR PROPERTIES, CARTER, ANY MGA BRATZ

15   ARTS, ET CETERA."  THAT'S WHAT I SAID.

16   Q   THIS E-MAIL IS THE E-MAIL IN WHICH DAVID DEES SAID

17   CARTER BRYANT WAS THE PERSON RESPONSIBLE FOR THOSE WONDERFUL

18   BRATZ DOLLS; RIGHT?

19   A   AMONG OTHER THINGS, YES.

20        THE COURT:  COUNSEL, WE'RE AT THE NOONTIME HOUR.

21        MR. PRICE:  WE CAN BREAK NOW.

22        (WHEREUPON JURORS DEPART COURTROOM.)

23        THE COURT:  THERE WAS NO OBJECTION OR MOTION TO

24   STRIKE THE FIRST TIME THE REFERENCE WAS MADE TO THE ALLEGED

25   STATEMENT BY THE FEDERAL JUDGE IN THE OTHER CASE, SO I WASN'T

1    GOING TO SUSTAIN AN OBJECTION WHEN IT WAS RAISED AGAIN.

2         BUT, MR. NOLAN, YOU MAY WANT TO THINK ABOUT THAT.

3         IF IT CONTINUES TO BE AN ISSUE, THERE MAY BE A

4    REQUEST FOR AN INSTRUCTION THAT THE COURT MIGHT BE INCLINED TO

5    GIVE.

6         MR. PRICE:  OBVIOUSLY IN FRONT OF A JURY, I DON'T

7    WANT TO BE MOVING TO STRIKE EVERY TIME MR. LARIAN BLURTS OUT --

8    CLEARLY, IT'S NOT A WAIVER, THOUGH.  BECAUSE HE BLURTS OUT

9    SOMETHING -- MR. NOLAN HAS BEEN TAKING THE POSITION, NOW I GET

10   TO CHASE THAT.

11        I WANT IT CLEAR THAT JUST BECAUSE I DON'T MOVE TO

12   STRIKE, THAT DOESN'T MEAN I THINK IT'S RELEVANT.

13        THE COURT:  YOU DIDN'T MOVE TO STRIKE AND YOU DIDN'T

14   OBJECT IN ANY WAY WHEN IT CAME OUT BEFORE.

15        HAVING SAID THAT, IT'S GOT TO STOP.

16        DO YOU UNDERSTAND, MR. NOLAN?

17        MR. NOLAN:  OF COURSE, YOUR HONOR.

18        THE COURT:  LET'S TAKE OUR LUNCH BREAK.  I'LL SEE YOU

19   BACK HERE AT 1:15.

20        MR. NOLAN:  MY ONLY LAST POINT ON THAT IS THAT

21   MR. PRICE SPECIFICALLY ASKED HIM ABOUT THE OUTCOME OF THOSE

22   CASES.

23        THE COURT:  I UNDERSTAND.

24        MR. NOLAN:  BUT I WILL TALK TO MR. LARIAN.

25        THE COURT:  BUT WE'RE JUST NOT GOING TO GO ANY

Transcript of Proceedings - AM (Weiss Dir/Cross/ReDir; I. Larian Cross/ReDir)  6/11/2008  9:02:00 AM

1    FURTHER INTO THAT.

2          MR. NOLAN:  I UNDERSTAND.

3          THE CLERK:  COURT STANDS IN RECESS.

4

5

6

7

8

9

10

11

12                    CERTIFICATE

13

14    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
      STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF

15    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
      ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

16    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
      THE UNITED STATES.

17

18
      _____        _____

19    THERESA A. LANZA, RPR, CSR                    DATE
      OFFICIAL COURT REPORTER

20

21

22

23

24

25