1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                             ---

4            HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                             ---

6     MATTEL, INC.,              : PAGES 2428 - 2524

                                 :

7            PLAINTIFF,          :

                                 :

8        VS.               :  NO. ED CV04-09049-SGL

                           : [CONSOLIDATED WITH

9     MGA ENTERTAINMENT, INC.,     :  CV04-9059 & CV05-2727]

      ET AL.,                :

10                          :

      DEFENDANTS.         :

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                  RIVERSIDE, CALIFORNIA

17               THURSDAY, JUNE 12, 2008

18                  JURY TRIAL - DAY 12

19                    AFTERNOON SESSION

20

21

22                   MARK SCHWEITZER, CSR, RPR, CRR

                     OFFICIAL COURT REPORTER

23                   UNITED STATES DISTRICT COURT

                     181-H ROYBAL FEDERAL BUILDING

24                   255 EAST TEMPLE STREET

                     LOS ANGELES, CALIFORNIA 90012

25                   (213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.

5        B. Dylan Proctor, Esq.
         Michael T. Zeller, Esq.

6        Harry Olivar, Esq.
         John Corey, Esq.

7        Diane Hutnyan, Esq.
         William Price, Esq.

8        855 South Figueroa Street
         10th Floor

9        Los Angeles, CA 90017
         (213) 624-7707

10

11   On Behalf of MGA Entertainment:

12       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.

13       Carl Alan Roth, Esq.
         Jason Russell, Esq.

14       Lauren Aguiar, Esq.
         David Hansen, Esq.

15       Matthew Sloan, Esq.
         300 South Grand Avenue

16       Los Angeles, CA 90071-3144
         (213) 687-5000

17

18   For Carter Bryant:

19       Keker & Van Nest
         By Christa Anderson, Esq.

20       Michael H. Page, Esq.
         710 Sansome Street

21       San Francisco, CA 94111-1704
         (415) 391-5400

22

23

24

25

1                    I N D E X

2

3    CARTER BRYANT, PREVIOUSLY SWORN........................ 2433

4    DIRECT EXAMINATION (CONTINUED) BY MR. PRICE............ 2433

5

6

7                    E X H I B I T S

8

     (Exhibit 2201 received.).............................. 2518

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      Riverside, California; Thursday, June 12, 2008

2                2:00 P.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4          THE COURT:  I understand there's an issue outside

5      the presence of the jury?

6          MR. PROCTOR:  Yes, your Honor.  Largely for the

7      purpose of expediting the examination of Mr. Bryant, the

8      parties have agreed to move into evidence by stipulation a

9      large number of his drawings.  There's many hundreds of them.

10         THE COURT:  Very well.

11         MR. PROCTOR:  Rather than have to go through the

12     mechanics of that during the examination.  The parties were

13     working on this last night, late into the night.  Because

14     there's a large number of the drawings, we've agreed to make

15     this, with the Court's permission, basically a -- to admit

16     them provisionally and reserving the rights until 1:30 P.M.

17     tomorrow, if there is an objection, simply because the

18     parties haven't had enough time to fully review each of the

19     documents just in case there is something going on that

20     neither of us expect the other side to be doing, to belatedly

21     object up until 1:30 tomorrow to any of these individual

22     documents with the court's permission.

23         THE COURT:  And then at that point I suppose if

24     there was an objection and it was sustained, the Court would

25     explain to the jury that the exhibit has been withdrawn?

1          MR. PROCTOR:  I think that would be the mechanics

2     of it, and presumably if there's going to be an objection --

3     presumably, anything that's going to be objected to is not

4     going to be something that's actually shown to the jury today

5     or tomorrow morning.  If it's being shown to the jury,

6     then --

7          THE COURT:  It's not objected to.

8          MR. PROCTOR:  Well, if it's being shown to the

9     jury, then presumably counsel om either side will pop up and

10    say hey, we didn't know this was in the stipulation, and

11    we're objecting to this at that time.  All right, that would

12    be in principle the way we would propose to do this.

13         THE COURT:  Do you have the exhibit numbers?

14         MR. PROCTOR:  It's being messengered over.

15         THE COURT:  All right.  I'll take it up during the

16    afternoon break, and then I'll inform the jury and put it on

17    the record at the end of the -- of that break.

18         And I trust all of that is consistent with MGA's

19    understanding?

20         MR. HARRINGTON:  Yes.

21         Very well.  Let's go ahead and bring the jury in

22    and proceed with Mr. Bryant.

23         MR. PRICE:  Your Honor, could we have Mr. Bryant's

24    binders?  Mr. Grant can help, put back up in front of him?

25         THE COURT:  Sure.  Thank you.

1        (WHEREUPON THE JURY ENTERS.)

2        THE COURT:  Good afternoon, members of the jury.

3        Mr. Bryant, Counsel, you may proceed.

4        MR. PRICE: Can we put up Exhibit 25.

5            CARTER BRYANT, PREVIOUSLY SWORN.

6            DIRECT EXAMINATION (CONTINUED)

7   BY MR. PRICE:

8   Q.   Mr. Bryant, when we broke last time, I was talking to

9   you about the agreements you signed when you started with

10  your second stint at Mattel.

11       Do you recall that?

12  A.   Yes.

13  Q.   And one of the agreements was this employee confidential

14  information agreement; correct?

15  A.   Yes.

16  Q.   If we could blow it up so we can see what it says.  And

17  I want to ask you about this section here, 2-A.  "I agree to

18  communicate to the company as promptly and fully as

19  practicable all inventions as defined below, conceived or

20  reduced to practice by me, alone or jointly by others, at any

21  time during my employment by the company."

22       Do you see that?

23  A.   Yes.

24  Q.   And inventions included designs.  Do you see that?  "As

25  used in this agreement, the term investigations includes but

1    is not limited to all discoveries, improvements, processes,

2    developments, designs, et cetera."

3           Do you see that?

4    A.  Yes.

5    Q.   And do you recall also the provision here concerning

6    that the agreement does not apply to an invention which

7    qualifies under the provision of section -- I think it's 2870

8    of the California Labor Code?

9           Do you see that?

10   A.  Yes, I see it.

11   Q.   Does that section provide that the requirement to assign

12   shall not apply to an invention that the employee developed

13   entirely on his or her own time without using the employer's

14   equipment, supplies, facilities, or trade secret information

15   except for those inventions that either, one, relate at the

16   time of conception or reduction to practice of the invention

17   to the employer's business, or actually or demonstrably

18   anticipated research of development of the employer?

19          Do you see that?

20   A.  Yes.

21   Q.   And you understand Mattel's business was the toy

22   business?

23   A.  Yes.

24   Q.   And so that under this agreement, if you came up with a

25   design or something that related to the toy business while

1    you were at Mattel, that that was to be assigned and belonged

2    to Mattel under your agreement.

3    A.   Are you asking me if I understood that?

4    Q.   Yes.

5    A.   No.

6    Q.   Let me ask you this:  You mentioned that you had heard

7    about moonlighting.

8         Do you remember that?

9    A.   Yes.

10   Q.   It's true, is it not, that while you were at Mattel --

11   well, let me ask you, while you were at Mattel, did you know

12   of any Mattel employees who worked for any Mattel competitors

13   while they were simultaneously employed by Mattel?

14   A.   Not anybody specifically.  I had just heard about it.

15   Q.   While you were at Mattel, did you know of any Mattel

16   employees who worked for other toy companies while they were

17   employed at Mattel?

18   A.   Again, not anybody specifically.

19   Q.   Did you have any information, at the time you were at

20   Mattel, that indicated to you that Mattel permitted Mattel

21   employees to work for other toy companies while they were

22   employed by Mattel?

23   A.   It was just kind of a general sort of rumor.

24        MR. PRICE:  Your Honor, I'd like to play from

25   Mr. Bryant's deposition, January 23, 2008, page 833, line 4

1    to line 24.

2         THE COURT:  Counsel, I have the witness exam and

3    direct exam binders.  I'm looking for the -- never mind.

4    Here they are.  I'm sorry.  What was the volume?

5         MR. PRICE:  It's volume 4, January 23, 2008.

6         THE COURT:  Got it.

7         MR. PRICE:  Page 833, your Honor, line 4 to line

8    24.

9         THE COURT:  Got it.  Thank you.

10        Any objection, Mr. Nolan?

11        MR. NOLAN:  No, your Honor.

12        THE COURT:  You may play.

13        WHEREUPON THE VIDEOTAPED DEPOSITION

14        EXCERPTS OF CARTER BRYANT, AS PROVIDED

15        BY COUNSEL, ARE INCORPORATED HEREIN.

16        "QUESTION:  While you were at Mattel, did you know

17   of any Mattel employees who worked for any Mattel

18   competitors while they were simultaneously employed

19   by Mattel?

20        "ANSWER:  No.

21        "QUESTION:  Or worked for other toy companies

22   while they were employed by Mattel?

23        "ANSWER:  No.

24        "QUESTION:  Do you have any information that

25   indicates to you that committed Mattel employees to

1    work for other toy companies while they were

2    employed by Mattel?

3         "ANSWER:  No."

4    Q.   BY MR. PRICE:  Mr. Bryant, do you recall giving that

5    testimony under oath?

6    A.   Yes.

7    Q.   And do you recall in your deposition there came a time

8    when there was a break of the proceedings, that is, where

9    everyone kind of got up and took a 15-minute break?

10   A.   Okay.

11   Q.   Do you recall that?

12   A.   Well --

13   Q.   There were a number of breaks --

14   A.   We took a lot of breaks.

15   Q.   You were told that if you needed a break, you just had

16   to ask, and you could go and stretch your legs; right?

17   A.   Right.

18   Q.   And do you recall there came a time when you did that

19   and then came back, and your counsel announced that you

20   wanted to amend an answer.

21        Do you remember that?

22   A.   Yes.

23   Q.   And this was after you had had a break and had time to

24   consult with your attorney at the time; correct?

25   A.   I believe so, yes.

1    Q.  And at the time you wanted to change your answer with

2    respect to the topic of moonlighting.

3         Do you remember that?

4    A.  Yes.

5    Q.  And you came and said that you wanted to add that you

6    had knowledge about moonlighting at Mattel.

7         Do you recall that?

8    A.  I remember something to that effect, yes.

9    Q.  And, of course, prior to that time in the deposition, no

10   one had actually used the word "moonlighting"; correct?

11   A.  I don't remember.

12   Q.  And you were then asked questions about moonlighting.

13        Do you recall that?

14   A.  Vaguely.

15   Q.  Let me ask you the following:  It's true that you don't

16   know anybody by name who actually moonlighted while at

17   Mattel; correct?

18   A.  I couldn't give any specific names, no.

19   Q.  You just heard rumors; correct?

20   A.  Right.

21   Q.  And you can't recall any names; correct?

22   A.  No, not at this time.

23   Q.  And you can't recall any products?

24   A.  No.

25   Q.  You can't recall any companies in particular that Mattel

1  employees were supposedly moonlighting for?

2  A.  You know, I think I had just heard that they were --

3  some employees worked for -- did other things for other toy

4  companies.

5  Q.  But you didn't hear anything about names of employees or

6  names of companies or names of product.  This is just general

7  rumors that you say you heard about; correct?

8  A.  That's right.

9  Q.  And so let me ask you this:  Was it your understanding

10  that as far as Mattel was concerned, it was perfectly okay to

11  do that, that is, to be a Mattel employee and also work for

12  another toy company or to create toys to benefit some other

13  company.  Was it your understanding that that was perfectly

14  okay?

15  A.  Well, um, no.  I don't think that was my understanding.

16  Q.  So in fact you said at your deposition, did you not,

17  that you had no opinion yourself at all as to whether it was

18  okay for a Mattel employee to do competitive work for another

19  toy company while they were employed by Mattel.  Your

20  testimony was you didn't have any opinion about that one way

21  or another; is that right?

22  A.  That's right.

23  Q.  By the way, when your deposition was taken, you were

24  prepared for your deposition by your counsel; correct?

25  A.  Yes, I spent some time with my counsel.

1   Q.  In fact, you recall there were three days of your

2   deposition close to each other in 2004 when you met with your

3   counsel prior to those three days of deposition.

4   A.  Yes.

5   Q.  And you met with them for over two days; correct?

6   A.  I don't recall the exact number of days.  But it was

7   more than one.

8   Q.  And as part of training you for your deposition, one

9   thing they did is they actually had you sit down and be

10  videotaped.

11       MR. NOLAN:  Objection, your Honor, with respect to

12  the characterization of training.  It's argumentative.

13       MR. PRICE:  I'll rephrase.

14       THE COURT:  Thank you, Counsel.

15  Q.  BY MR. PRICE:  In preparing you for your deposition, one

16  of the things that your attorneys did was they actually

17  videotaped you.

18  A.  Yes.

19  Q.  And did they do that before the first deposition?

20  A.  I believe so, yes.

21  Q.  And when they videotaped you, they actually sat you down

22  and asked you questions and had you give answers while being

23  videotaped; correct?

24  A.  Yes.

25  Q.  And this went on for a number of hours; correct?

1    A.  I don't remember exactly how long it went on.

2    Q.  And do you have any idea where those videos are now?

3    A.  Do I have any idea?

4    Q.  Yes.

5    A.  I have absolutely no idea.

6    Q.  So that was done before the first day of your

7    deposition, which I'll represent to you was November 4, 2004;

8    correct?

9    A.  Yes.

10   Q.  Now, if we could --

11       Your Honor, I would like to play from the November

12   5, 2004, videotaped deposition of Carter Bryant, page 269 --

13   actually, page 268, line 22, to 269, line 13.

14       THE COURT:  Any objection?

15       MR. NOLAN:  Objection.  Mr. Bryant is not a party.

16   I don't know for what purpose.  There is no question pending.

17   Is this for impeachment?

18       MR. PRICE:  Absolutely.

19       THE COURT:  Any objection?

20       MR. NOLAN:  No objection.

21       THE COURT:  Very well.  You may play.

22       WHEREUPON THE VIDEOTAPED DEPOSITION

23       EXCERPTS OF CARTER BRYANT, AS PROVIDED

24       BY COUNSEL, ARE INCORPORATED HEREIN.

25       "QUESTION:  You indicated that you met with your

1    counsel the day before yesterday to prepare for

2    your deposition.

3        "ANSWER:  Yes.

4        "QUESTION:  And how much time did you meet

5    with your counsel?

6        "ANSWER:  We spent a good part of the day.

7        "QUESTION:  Is that eight hours, six hours,

8    four hours?

9        "ANSWER:  I don't remember exactly.  I think

10   maybe it was about -- maybe about six hours.

11       "QUESTION:  And had you met with your counsel

12   to prepare for your deposition last week as well?

13       "ANSWER:  Yes.

14       "QUESTION:  And how much time did you spend

15   last week?

16       "ANSWER:  We spent two full days.

17       "QUESTION:  Last week?

18       "ANSWER:  Yes.

19       "QUESTION:  Did they videotape you?

20       "ANSWER:  No."

21   Q.   BY MR. PRICE:  In fact, Mr. Bryant, it wasn't until

22   almost four years later that you finally admitted that, prior

23   to your depositions, that your counsel had in fact videotaped

24   you and asked you questions and gotten answers from you

25   under -- while being videotaped; is that right?

1   A.   Well, I'm a little bit confused.  Are you talking about

2   the prep sessions that were videotaped?  Or are you talking

3   about being videotaped during the deposition?

4   Q.   I'm talking about the prep sessions where you met with

5   your counsel and those being videotaped and your being asked

6   questions and answering questions while being prepared by

7   your attorneys.

8   A.   Well, I mean, I -- what I remember right now is that

9   yes, I was videotaped.  If I didn't remember it at that time,

10   then, you know, I made a mistake.

11   Q.   Well, at that time, we're talking about in 2004, the

12   deposition we just played was November 5, 2004.  You were

13   also taken the day before, November 4, 2004, and you're being

14   asked about events that took place just a week prior to that;

15   is that right?

16   A.   Yes.

17   Q.   And the week prior to that, you met with your attorneys

18   for two days and six hours, and you were in fact videotaped

19   while preparing; correct?

20   A.   Well, again, I think I was.  I could be wrong.

21   Q.   In any event, at the time within just a week of

22   preparing for the deposition at that time, you denied that

23   that took place; correct?

24   A.   Well, apparently I did.  But, you know, my memory is not

25   clear now.  It might not have been clear back then either.

1    Q.   That's kind of something you'd remember, wouldn't you?

2    If you go to your attorney's office and they say we're going

3    to videotape you so we can ask you questions and get answers

4    and see how you look on tape?

5    A.   I don't know.  You know, there were a lot of things

6    going through my mind at that time.  So I may not have

7    remembered it.

8    Q.   So while you may not have remembered it the week after

9    it happened, you did remember it in 2008, some four years

10   after it happened; is that right?

11   A.   You know, I suppose so.

12   Q.   At the time your depositions were taken, it was your

13   testimony at that time that you had no idea whether Mattel

14   would object to you doing work for another toy company on the

15   side; is that right?

16   A.   I'm sorry.  What was the question?

17   Q.   Sure.  At the time your depositions were taken, it was

18   your testimony under oath that you had no idea whether Mattel

19   would object to your doing work for another toy company on

20   the side while working for Mattel.

21   A.   I don't remember exactly what I said in my deposition.

22   If I could be shown that document.

23   Q.   Well, let me ask it in general, then, and see whether or

24   not that's true.  Is it true that while you were at Mattel,

25   you had no idea whether Mattel would object to you doing work

1   for another toy company on the side while being employed by

2   Mattel?

3   A.  I don't know.

4   Q.  You don't know whether you had any idea one way or

5   another whether it was okay to be working for Mattel and

6   taking a paycheck, and yet on the side, unbeknownst to them,

7   working for another toy company?  You didn't have an idea one

8   way or another as to whether or not that was wrong?

9   A.  Well, I mean, I think I had a general idea that, you

10  know -- that you know -- that that might not be acceptable.

11  Q.  Well, did you have any idea that Mattel would have an

12  objection to you doing work on the side for another toy

13  company?

14  A.  I mean, maybe in general, but, you know, I don't think

15  that was anything that was ever really specifically told to

16  me.

17  Q.  Whether specifically told to you or not, I'm asking you

18  your understanding when you're a Mattel employee.  Did you

19  have any idea whether or not Mattel would have any objection

20  for you doing work on the side for another toy company?

21  A.  Are you just talking about me personally or anybody?

22  Q.  Let's talk about you.  Did you have any idea, while you

23  were working for Mattel that they might have an objection to

24  you working at Mattel and on the side working for another toy

25  company?

1    A.   You know, I don't think I really had all that much of an

2    opinion one way or the other.  I mean, I think maybe I had

3    some general understanding that they might object.

4    Q.   You later joined MGA and signed a consulting agreement;

5    correct?

6    A.   Yes.

7    Q.   If you look at Exhibit 15, which is already in evidence,

8    and if we could display that.

9         Do you see this is a copy of an agreement dated as

10   of September 18, 2000, between you and MGA?  Do you recognize

11   that agreement?

12   A.   Yes.

13   Q.   And if we could go to the second paragraph.  Do you see

14   it says:  "The term shall commence on the date of this

15   agreement.  MGA shall have the right to terminate this

16   agreement on not less than 45 days prior written notice to

17   Bryant.  During the term of this agreement, Bryant will not

18   provide consulting services to any person, firm, or

19   corporation engaged in the design, development, and

20   manufacture and sale of dolls or similar products."

21        That's agreement you signed with MGA; correct?

22   A.   Yes, on October 4th.

23   Q.   And your understanding with MGA is that they would have

24   a problem if you were consulting with them and also

25   consulting for another toy company; correct?

1    A.   Yes, because I had independent counsel who explained

2    this contract to me.

3    Q.   Okay.  So what you're saying is that if you had not had

4    independent counsel, you would not have been able to

5    understand the words in the contract with MGA which said, you

6    know, during the term of this agreement, Bryant will not

7    provide consulting services to any person, firm, or

8    corporation engaged in the design, development, and

9    manufacture and sale of dolls or similar products.

10        That would have been beyond your ability to

11   comprehend without having an attorney?

12   A.   Well, no.

13   Q.   So just reading this, you knew that MGA would have a

14   problem with you working for them and consulting for another

15   company at the same time; correct?

16   A.   I mean, again, I think I had a general understanding,

17   which was explained to me later more specifically.

18   Q.   Well, is there some reason in your mind where you --

19   where you can explain to me why you have an understanding

20   that while at MGA, MGA wouldn't want you working for another

21   toy company, but you don't have any opinion or idea as to

22   whether or not Mattel would have an objection to that?  Can

23   you explain the distinction for me?

24   A.   Well, again, when I was at Mattel, you know, the

25   contracts that were given to us to sign were, you know,

1    nobody ever went over the specific paragraphs.  You know,

2    they were not explained.  They were given to us and said to

3    commence work, you have to sign this packet.  You know, no

4    opportunity to consult with a lawyer or anybody about the

5    terms of the agreement.

6    Q.  So that's how you can explain why you would understand

7    MGA's objection, but you didn't have any idea Mattel might

8    have an objection; correct?

9    A.  Yes.

10   Q.  Would you like to add anything else to that explanation?

11   Any other reasons?

12   A.  No.

13        MR. PRICE:  Your Honor, if I can play from

14   Mr. Bryant's deposition, volume 4, dated January 23, 2008,

15   page 787, line 24, to 788, line 10.

16        THE COURT:  Any objection?

17        MR. NOLAN:  No objection.

18        THE COURT:  You may play it.

19        WHEREUPON THE VIDEOTAPED DEPOSITION

20        EXCERPTS OF CARTER BRYANT, AS PROVIDED

21        BY COUNSEL, ARE INCORPORATED HEREIN.

22        "QUESTION:  Is there some reason in your own

23   mind why you can explain to me why it is that you

24   have an understanding why MGA, while you were

25   working for MGA, would not want you working for

1    another toy company, but you just have no idea

2    whether or not Mattel would have an objection to

3    that?  Can you explain the distinction for me?

4       "ANSWER:  No."

5    Q.   BY MR. PRICE:  You knew, Mr. Bryant, of course, that

6    after your deposition was taken, that a transcript would be

7    made of your statements under oath; correct?

8    A.   Yes.

9    Q.   And you knew that you'd have an opportunity to review

10   that transcript at your leisure and make any corrections to

11   any answers that you gave; correct?

12   A.   Yes.

13   Q.   And you actually had done that for some other

14   transcripts previously, where you've actually reviewed the

15   transcript and signed that you had read it and reviewed it,

16   and everything was great; right?

17   A.   To the best of my recollection, yes.

18   Q.   And you had the same opportunity with respect to this

19   transcript and that answer; correct?

20   A.   Yes.

21   Q.   And it's correct to say that when you sat there -- by

22   the way, when you reviewed your deposition transcript, to

23   review to see if you wanted to change any answers, did you

24   have the opportunity to actually talk to your counsel in that

25   process?

1   A.  Yes.

2   Q.  And did you do that with respect to your deposition on

3   January 23, 2008?

4   A.  I don't remember.

5   Q.  It's fair to say, however, that you do remember you had

6   the opportunity?

7   A.  Yes.

8   Q.  And as far as you are aware, you did not change your

9   answer at this deposition on the transcript from no to

10   anything else.

11   A.  No, not that I remember.

12   Q.  So it's fair to say that at the beginning of this year,

13   January 23rd, 2008, when you were asked under oath to explain

14   why you thought MGA would object to you working for another

15   toy company, but you had no idea Mattel would have such an

16   objection, your answer, when you were asked to give a full

17   explanation, was no, I can't explain the distinction;

18   correct?

19   A.  Well, at that time, you know, no, I really couldn't.

20   Q.  So the answer you gave the jury as to why there was this

21   distinction is something that you've come up with sometime

22   between January 23, 2008, when you testified under oath, and

23   today; correct?

24   A.  I've just had more opportunity since then to review the

25   contracts.

1    Q.  Well, having done that, since you had more opportunity

2    to review the contracts, that means you've actually had an

3    opportunity to look at the Mattel contract, the

4    confidentiality agreement; correct?

5    A.  Yes.

6    Q.  And you understood the words in that agreement; correct?

7    A.  Well, I understood some of it, sure.

8    Q.  Well, let's go back to Exhibit 25, and first let's look

9    at -- I'm sorry.  Let's look at the next paragraph.

10   Paragraph 3:  "My employment with the company requires my

11   undivided attention and effort.  Therefore, during my

12   employment with the company, I willfully comply with the

13   company's conflict of interest policy as it may be amended

14   from time to time.  I shall not, without the company's

15   express written consent, engage in any employment or business

16   other than for the company, or invest in or assist in any

17   manner any business competitive with the business or future

18   business plans of the company."

19        And I think you said that from the time you gave

20   your answer no in your deposition, that you couldn't explain

21   why you had different understandings between MGA and Mattel,

22   that you've had the opportunity to look at these contracts

23   and understand them; correct?

24   A.  Yes.

25   Q.  Okay.  So let's see, if we look at these words, you

1    understand what those words say, don't you?

2    A.   I have a fairly good understanding, I guess.

3    Q.   And you understand that what that says is that you can't

4    work for Mattel and get a paycheck and work with or assist in

5    any manner any business that's competitive with the business

6    of Mattel; correct?

7    A.   Yes, but again, this was a contract that I had signed a

8    long time ago.

9    Q.   Well, I understand you said that, but I'm looking at

10   your statement where you said that between the time you

11   testified on January 23, 2008, when you said you couldn't

12   explain why you thought MGA would prohibit it, you had no

13   idea why Mattel would prohibit it working for competitors,

14   when you said you had no explanation to today, when you gave

15   the jury the explanation, I think said you came up with that

16   explanation because you looked at the contracts; right?

17   A.   Right.

18   Q.   And I'm trying to understand how looking at this

19   contract and looking at that language led you to come up with

20   the answer you gave the jury, which was that you had an

21   attorney who could explain the language of the MGA contract,

22   but you didn't have an attorney who could help you understand

23   this language.

24   A.   I'm not sure exactly what you're asking me.

25   Q.   Well, let me put it this way:  It's fair to say that you

1    don't need an attorney to explain to you what this language

2    means.

3          MR. NOLAN:  Your Honor, objection.  Relevancy and

4    could I have a minute at sidebar with respect to this?

5          THE COURT:  It's impeachment.  Overruled.

6          THE WITNESS:  I'm sorry.  Please ask me the

7    question one more time.

8    Q.  BY MR. PRICE:  Would you agree with me that you don't

9    need an attorney to explain to you what this language means?

10   A.  Well, I think since reviewing these documents in this

11   case, working with attorneys has helped me to understand, you

12   know, what these terms meant.

13   Q.  Wasn't my question you don't need an attorney to

14   understand what the language in paragraph 3 means, do you?

15   A.  Well, not necessarily, but again, when I signed this,

16   you know, these paragraphs were never explained to me.

17   Q.  Well, you don't need someone to explain them to you if

18   you read them, do you?  You can understand without the

19   benefit of an attorney or anybody else, you can understand

20   what this language means.

21   A.  I think that having an attorney helped me understand it.

22   You know, would definitely have helped me understood it

23   better than I did at the time that I signed it.

24         MR. PRICE:  Move to strike as nonresponsive.

25         THE COURT:  Why don't you rephrase your question,

1    Counsel, because that is a statement in a question.

2    Rephrase.

3    Q.   BY MR. PRICE:  You don't need an attorney to explain to

4    you what this paragraph means.  You can tell by just reading

5    it, can't you?

6    A.   Well, you know, I mean, it's a legal contract.  I'm not

7    a lawyer.  It would definitely be a benefit for an attorney

8    to help me understand these terms.

9         MR. PRICE:  Same motion, your Honor.

10        THE COURT:  That is his answer, Counsel.

11   Q.   BY MR. PRICE:  Let me ask you this way:  Without getting

12   legal advice, do you think that you, Mr. Bryant, could read

13   these words and understand what it means when it says my

14   employment with the company requires my undivided attention

15   and effort?

16        MR. NOLAN:  Asked and answered and also foundation

17   as to what time.

18        THE COURT:  It really hasn't been answered, but

19   it's a foundational question as to time, I think that's

20   implied by the document.

21        Counsel, why don't you clarify.

22        MR. NOLAN:  I just want to make sure that's what is

23   being asked.

24        THE COURT:  Very well.

25   Q.   BY MR. PRICE:  First I'll ask you the time period when

1    you signed the document.  And, of course, you signed the

2    document with this paragraph in it previously when you joined

3    Mattel back in '95; right?

4    A.  Yes.

5    Q.   So now we're talking about '99, when you are signing

6    basically the same document again.  Okay?

7    A.  Yes.

8    Q.   And so if we go to this, could you understand just as a

9    layperson, someone not trained in the law, what it meant when

10   it said my employment with the company requires my undivided

11   attention and effort?

12          MR. NOLAN:  Objection as to foundation, whether or

13   not he even read this at the time.

14          THE COURT:  Clarify, Counsel.

15   Q.  BY MR. PRICE:  Did you read this document before you

16   signed it?

17   A.  Um, you know, I remember looking at it, reading it the

18   best I could, understanding it the best I could.  But I

19   didn't understand everything about it.

20   Q.   All right.  So having read it and understood it the best

21   you could, my question is where it says my employment with

22   the company requires my undivided attention and effort, did

23   you understand that as just a layperson, someone who hasn't

24   had the horror of being in law school --

25   A.  I mean --

1          MR. NOLAN:  Your Honor, I'm going to object to the

2     gratuitous comments.  Can we just be asking questions?  It's

3     argumentative.

4          MR. PRICE:  I'll take out "horrible."

5          THE COURT:  That's a good point, Mr. Nolan.

6     Q.   BY MR. PRICE:  My employment with the company requires

7     my undivided attention and effort.

8          Did you understand that as someone who had not been

9     to law school or had a legal degree?

10    A.   Well, yes.

11    Q.   And you understood that it meant you were to use your

12    undivided attention and effort for the company?

13    A.   Well, I'm not sure that I understood what undivided

14    attention meant.

15    Q.   Okay.  Well, so let's try this some more here.  During

16    my employment with the company, I willfully comply with the

17    company's conflict of interest policy as it may be amended

18    from time to time.

19          Did you understand what that meant?

20    A.   I don't remember having any understanding of that.

21    Q.   Well, you actually signed on the same day the company's

22    conflict of interest policy; correct?

23    A.   I don't remember.

24    Q.   If you look at it, I think it's in front of you there,

25    Exhibit 26.  Do you see there's a conflict of interest

1    questionnaire that you filled out that you reviewed

2    yesterday?

3    A.  Yes.

4    Q.  And you filled that out on the same day that you read

5    this document; correct?

6    A.  Yes.

7    Q.  And did you know that you were agreeing to comply with

8    the company's conflict of interest policy?  Did you

9    understand that?

10   A.  I don't know that I did.

11   Q.  Well, when it says "I willfully comply with the

12   company's conflict of interest policy," which of those words

13   did you not understand to mean that you would fully comply

14   with the conflict of interest policy?

15   A.  Well, at the time of signing this document, I really

16   don't recall this phrase at all.

17   Q.  Okay.  Let's go to the next sentence, then.  It says:

18   "I shall not, without the company's express written consent."

19        Now, you know what that means, express written

20   consent; right?

21   A.  Yes.

22   Q.  I shall not, without the company's express written

23   consent, engage in any employment or business other than for

24   the company."

25        You understood what that meant.  That pretty plain

1    language; right?

2    A.  Yes, sure.

3    Q.  And you understood that, without the company's express

4    written consent, you were not to work for another company or

5    engage in any business other than for the company.

6    A.  Well, yeah, I think I pretty much generally understood

7    that.

8    Q.  So you knew you weren't supposed to work for Mattel and

9    at the same time work for another toy company; right?

10   A.  Right.

11   Q.  And then it says:  "Or invest or assist in any manner

12   any business competitive with the business or future business

13   plans of the company."

14        Do you see that?

15   A.  Yes.

16   Q.  Now, when you saw that, you saw assist in any manner,

17   you knew that was a fairly broad statement; correct?

18   A.  I really don't remember this part of the paragraph.

19   Q.  Well, you did read the entire paragraph, but this part

20   you just don't remember; correct?

21   A.  That's correct.

22   Q.  Well, reading it now, then, since you've told us you

23   read it at the time, do you see anything vague about this,

24   that you can't assist in any manner any business competitive

25   with the business or future business plans of the company?

1   A.   No, I mean, that's pretty clear.

2   Q.   And so if you read this at the time, then you would have

3   clearly understood that, as an employee of Mattel, you

4   weren't to assist in any manner any business that was

5   competitive with Mattel; correct?

6   A.   Well, you know, again, I don't remember every -- I

7   didn't remember every little detail about this contract.  You

8   know, after I signed it.  I don't remember every single

9   provision.

10   Q.   Fair to say, though, that if you had read this at the

11   time, you would have understood that you were not supposed

12   to, as a Mattel employee, assist a competitor company in any

13   way; correct?

14   A.   More than likely.

15   Q.   And you knew that in '95 and '96 and '97 and '99 and

16   2000; right?

17   A.   I think I had a general understanding of it.

18   Q.   And yet during that time frame, you tried to assist a

19   competitor company, MGA, in developing a line of dolls called

20   Bratz.

21   A.   Well, I wouldn't really say that's true.

22   Q.   Well, let's talk about your last stint at Mattel.  To

23   begin with, it's not just MGA.  You understood that while you

24   were a Mattel employee, you weren't supposed to do anything

25   to assist any company that would be competitive with Mattel;

1    correct?

2    A.  I think so, yes.

3    Q.   And I believe we had a chart showing that you started at

4    Mattel for the second time in January of '99; correct?

5    A.  That's right.

6    Q.   And then do you recall at the end of August of '99,

7    around that time frame, you sent designs to a company called

8    Alaska Mama; correct?

9    A.  Yes.

10   Q.   And maybe I can show you the drawings I'm talking about.

11   This is Exhibit 62.  It's in, I think, the drawings binder in

12   front of you.  I'm going to cross my fingers and hope we have

13   the original.  Have you found Exhibit 62?

14   A.  Yes.

15   Q.   And if you'd look -- first, flip through these.  Do you

16   recognize these as drawings, or all or some of these, and

17   perhaps you can tell us which, which you sent to this company

18   Alaska Mama?

19   A.  Yes.

20   Q.   So the first page, is that one that you sent?

21   A.  I'm not sure if I sent this page or not.

22   Q.   Do you see it appears to have a notarization date of

23   August 25, '99?

24   A.  Yes.

25   Q.   And that's a date, again, that this was about eight

1    months -- well, almost nine months after you started working

2    at Mattel that second time; correct?

3    A.   Yes.

4    Q.   And although we'll get back to this in some detail

5    later, one of the reasons you notarized this was so you could

6    establish that you had this drawing before you sent it to

7    Alaska Mama?

8    A.   Yes.

9    Q.   So that Alaska Mama couldn't later say -- later use the

10   drawing and say they came up with it; right?

11   A.   Right.

12   Q.   This would show, as of August 25, '99, you had done

13   this; correct?

14   A.   Yes.

15   Q.   So with that in mind, since you notarized this, do you

16   think this is one of the drawings you sent to Alaska Mama?

17   A.   I don't recall that I sent this to Alaska Mama.

18   Q.   It is fair to say it's a drawing that you had notarized

19   in August of '99?

20   A.   Yes.

21        MR. PRICE:  Your Honor, if I could approach with

22   the original of that.

23        THE COURT:  You may.

24        MR. PRICE:  I am going to approach, your Honor,

25   with a stack of originals, and maybe we can go through them.

1   Q.   Let's do it this way.  And perhaps I can move these in

2   all at one time.  If we could display to the jury the first

3   page of Exhibit 62.  So this is the first drawing, 62, that

4   you were talking about; correct?

5   A.   Yes.

6   Q.   And you see these faces have names on them -- Jade,

7   Lupe, Zoe, and Hallidae -- correct?

8   A.   Yes.

9   Q.   And these are the characters that you termed the Bratz?

10  A.   Yes.

11  Q.   In fact, if you look at the second page of Exhibit 62,

12  it should say Bryant 00194.

13      Do you see it?

14  A.   Okay.

15  Q.   This is one of the drawings which you sent to Alaska

16  Mama?

17  A.   No.  I don't think I sent black and white drawings to

18  Alaska Mama.

19  Q.   Well, let me ask it this way:  You had this notarized so

20  you could prove you had this drawing before something was

21  sent to Alaska Mama; correct?

22  A.   Yes.

23  Q.   So what you're saying is you might have sent them a

24  color version of this?

25  A.   Yes.

1    Q.   Is it your best recollection you sent them a color

2    version of this second page of Exhibit 62?

3    A.   I believe so, yeah.

4    Q.   And was that one of the originals which you handed over

5    during discovery or does that not exist anymore?

6    A.   I don't know.

7    Q.   When was it that you colorized this, the second page of

8    Exhibit 62?

9    A.   Sometime in '99.

10   Q.   And so you said Alaska Mama was a colorized drawing.

11   When you say color, let's talk about the mechanics of doing

12   that.  My understanding is you have a black and white drawing

13   you can use.  Is it a light box?

14   A.   Yes.

15   Q.   That you will kind of project that on a poster board or

16   something; correct?

17   A.   Right.

18   Q.   And then you can trace the drawing again; correct?

19   A.   Yes.

20   Q.   And then you can color in what you just did; correct?

21   A.   Right.

22   Q.   Okay.  So that process of creating that drawing, which

23   is projecting it, doing the drawing, coloring it, all of that

24   you did while you were at Mattel?

25   A.   Well, I didn't do the drawing while I was at Mattel.

1    Q.  I'll get back to that.  My question was different.  What

2    you sent to Alaska Mama, you said, was where you projected a

3    drawing onto a poster board; is that right?

4    A.  Um-hm.

5    Q.  I'm asking you about this process where you then did it

6    on a poster board; right?

7    A.  Yes.

8    Q.  The physical activity of going through that drawing;

9    right?

10   A.  Right.

11   Q.  Is that an easy thing to do for you?

12        MR. NOLAN:  I apologize, your Honor.  Vague and

13   ambiguous, "that thing you do."

14        THE COURT:  Rephrase.

15   Q.  BY MR. PRICE:  Is that an easy process, that is, to go

16   and trace the detail of one drawing which you were projecting

17   through this light box?

18   A.  Yes, it's a very mechanical process.

19   Q.  Is it easier than the original free hand?

20   A.  Yes.

21   Q.  Okay.  So that process that I'm talking about, which is

22   tracing the drawing and then coloring the drawing in, that

23   process to create a poster board you sent to Alaska Mama,

24   that was done while you were at Mattel; right?

25   A.  Yes.

1   Q.   And the first page we looked at, did you send a color

2   copy of that to Alaska Mama?

3   A.   I don't believe so.

4   Q.   Let's go to the third page.  Did you send either a color

5   copy or black and white copy of that to Alaska Mama?

6   A.   I don't think so.

7   Q.   Let's go to the fourth page.  In August '99, did you

8   send a black and white or color version of this page to

9   Alaska Mama?

10   A.   Not that page exactly as it appears.

11   Q.   Was it altered?

12   A.   No, it wasn't altered.  I just added the face.

13   Q.   Was this something that you started out with a light box

14   to project the image?

15   A.   Right.

16   Q.   You said added the face.

17   A.   I took the drawing that had this drawing, and I put it

18   on to the light box along with this drawing to make a

19   complete figure.

20   Q.   And you're holding up the first page of Exhibit 62.

21   Let's go to that.  Is that right?

22   A.   Yes.

23   Q.   So that process that you just talked about, did you do

24   that while you were at Mattel?

25   A.   Yes.

1    Q.   Let's go to the fifth page.  Is this something which you

2    sent to Alaska Mama?

3    A.   I don't think so.

4    Q.   Any version of this, colored?

5    A.   No, I don't think so.

6    Q.   The next page, page 6.  Did you send a colorized version

7    of this with a face?

8    A.   Yes.

9    Q.   And that process of projecting it, tracing it, coloring

10   in, that process was done while you were at Mattel?

11   A.   Yes.

12   Q.   Page 7.  Did you send this?

13   A.   No.

14   Q.   Page 8?  Did you send page 8 here, again, with the face

15   and colorized?

16   A.   Yes.

17   Q.   And that process was done while you were at Mattel?

18   A.   Yes.

19   Q.   Page 9.  Was any portion of page 9 sent to Alaska Mama?

20   A.   I don't believe so.

21   Q.   How about page 10?

22   A.   I don't think so.

23   Q.   Page 11?

24   A.   I don't think so.

25   Q.   Or 12?

1   A.  No, I don't think so.

2   Q.  13?

3   A.  No, I don't recognize the little drawings on the side.

4   Q.  You don't recognize these?

5   A.  No.

6   Q.  Not your work?

7   A.  No.

8   Q.  If you look at the original there, that might help you.

9   Do you have in front of you, it would say, I think, Bryant

10   00301.  Should be the 13th one in the stack.  Looking at the

11   original.

12   A.  Yes.

13   Q.  Does looking at the original help you determine whether

14   or not this was something you sent to Alaska Mama?

15   A.  I don't think it was.

16   Q.  Does looking at the original give you some clue as to

17   what this is on the side?

18   A.  No, I don't know.

19   Q.  And could you hold up the original so we can kind of see

20   what that looks like?  That's the original?

21   A.  This here is a copy.

22   Q.  Okay.

23   A.  This also appears to be a copy with some pencil drawings

24   of some small faces on the right.

25   Q.  Look at the next page, Exhibit 62.  Is this something

1    you would have sent to Alaska Mama?

2    A.   Possibly.

3    Q.   And what's the purpose of this particular drawing?

4    A.   I think those were just showing, you know -- I think

5    those were showing some sort of measurements of, you know,

6    how large the head might be.

7    Q.   The reason you wanted to tell -- by the way, tell us

8    what Alaska Mama is.

9    A.   Alaska Mama is an artist representative agency.  And

10   they represent artists to help them find work.

11   Q.   Now, did you ever apply for work and bring with you a

12   portfolio of your past work so that people would have an idea

13   of how talented you are?

14        MR. NOLAN:  Objection.  Temporal foundation.

15        THE COURT:  Lay a further foundation.

16   Q.   BY MR. PRICE:  Prior to sending these out to Alaska

17   Mama, were you ever in a situation where you applied for work

18   and showed them a portfolio of what you'd done previously to

19   show them how talented you were?

20   A.   Sure.

21   Q.   That wasn't what you were doing with Alaska Mama,

22   though, was it?

23   A.   Well, no, not really.

24   Q.   With Alaska Mama, you were showing them a project you

25   were working on and saying I want to sell this project;

1    correct?

2         MR. NOLAN:  Objection, your Honor.  Ambiguous as to

3    "a project you were working on."

4         THE COURT:  Clarify, Counsel.

5    Q.   BY MR. PRICE:  Alaska Mama, you were sending them these

6    drawings to pitch this Bratz concept; correct?

7    A.   I don't know that I was trying to pitch it so much as

8    just see if, you know, that was anything that they would be

9    interested in working on.

10   Q.   You said anything they would be interested in what, sir?

11   A.   That there's a project that they would be interested in

12   working on as far as taking it and showing it to, you know,

13   various companies or something like that.

14   Q.   The idea is you wanted Alaska Mama to help you pitch

15   Bratz.

16   A.   Think that was my thinking at the time, yes.

17   Q.   And so the idea was they would represent you and go to

18   doll companies, and -- or toy companies, and pitch the Bratz

19   concept; right?

20   A.   I mean, I didn't even know if they would go to toy

21   companies, you know, or if they would go to somebody like,

22   you know, a greeting card company or a company that made

23   figurines.

24   Q.   Well, you actually sent them documents, for example, to

25   give them the idea of the size; correct?

1    A.   Yes.

2    Q.   One of the things you had in mind is that these would be

3    pitched to a company to make dolls?

4    A.   Yeah, that was one thing I was thinking.

5    Q.   So while you were at Mattel, you sent these drawings to

6    Alaska Mama with the purpose of getting them to represent you

7    and pitch Bratz dolls to another company; correct?

8    A.   Well, you know, yeah, I didn't think there was anything

9    wrong with that.

10   Q.   Well, we just looked at -- let's go back to Exhibit 25.

11   I assume you thought that if a company agreed to make these

12   dolls because you pitched it to them, they would be doing it

13   because they thought they would make some money out of it;

14   right?

15   A.   Well, I imagine.

16   Q.   I mean, do you understand that's usually why companies

17   take on these sorts of projects?  They think they will make

18   money out of it; correct?

19   A.   Sure.

20   Q.   And you would agree, when you joined the company, that

21   you would not do anything to assist in any way any business

22   competitive with the business of Mattel; correct?

23   A.   Yes, but what I was thinking with pitching these

24   materials was not that I was going to, you know, continue

25   working at Mattel if something came about with this.  I mean,

1    I -- my idea was that if something came about with this, you

2    know, I would leave Mattel's employment and go work on this.

3    Q.   Sure.  But while you were at Mattel, you went through

4    the process with respect to the drawings that we identified;

5    correct?  That is, tracing them, coloring them in; correct?

6    A.   Yes.

7    Q.   And while you were at Mattel, you sent the drawings out

8    to an agency that you hoped would represent you.  Yes?

9    A.   Yes.

10   Q.   So that they would be pitched to a company that would

11   make a doll; correct?

12   A.   That would make some kind of a product.

13   Q.   You thought a doll was one of the things you were going

14   for; right?

15   A.   Right.

16   Q.   And you knew that Mattel was in the doll business;

17   right?

18   A.   Yes.

19   Q.   And it's your testimony that you saw nothing wrong with

20   that; is that right?

21   A.   I didn't see anything wrong with it because I didn't

22   know if anything would ever come about of, you know, just

23   sending these -- sending these drawings off.

24   Q.   You certainly hoped it would; right?

25   A.   I'm sorry.  What?

1    Q.   You hoped something would come about from this.  You

2    hoped that by sending these drawings, which you had colorized

3    and sent out to Alaska mama, you hoped that something would

4    come of it?

5    A.  Well, sure.

6    Q.   So it was your intent to create a doll line that would

7    be competitive with Mattel.

8    A.   No, absolutely not.  I mean, when I created these

9    characters, I didn't have the foggiest idea of what they

10   would become.  I had no idea that they would ever compete

11   with anything Mattel did.

12   Q.   To clarify something, it's true, is it not, that you

13   never brought the Bratz idea to the attention of the people

14   at Mattel.  That's true?

15   A.   That is true.

16   Q.   Well, let's talk about what happened after you sent

17   these drawings to Alaska Mama with the hope that some company

18   would turn them into dolls.  Let's talk about your next step.

19        You continued to work on drawings that would give

20   you an idea of how to create these dolls; correct?

21   A.   I don't remember.  I don't remember if I did any

22   additional drawings at that time.

23   Q.   Let me show you what is marked as Exhibit -- by the way,

24   sir, it's certainly your testimony that by August of '99,

25   that you had created these four characters with developed

1    fashions, that you had this full concept for the Bratz dolls;

2    correct?

3    A.   Yeah, I thought it was fairly finished.

4    Q.   So if you look at Exhibit 1327, I'll hand you the

5    original of this.

6         Do you have that in front of you now, sir?

7    A.   Yes.

8    Q.   And this is a drawing that you did; correct?

9    A.   Yes.

10   Q.   And what's the purpose of this drawing?

11   A.   I think I had just added some measurements on to my old

12   drawings just to get an idea of what the size of the

13   character might be.

14   Q.   Do you see it says sculptural body drawing to be used

15   for all dolls.

16        Do you see that?

17   A.   Yes.

18   Q.   And if we blow it up here, it has actual size, nine

19   inches.

20        Do you see that?

21   A.   Yes.

22   Q.   I take it on the drawing you have, that the idea is that

23   that is actually the actual size on the piece of paper?

24   A.   Yes.

25   Q.   And is this your handwriting where you put 9/19/99?

1    A.  Yes.

2    Q.  And if you'll look at Exhibit 1928.

3         MR. NOLAN:  On the last exhibit, we will reserve an

4    objection to the temporal --

5         THE COURT:  Very well.  Can you lay a foundation as

6    to the --

7    Q.  BY MR. PRICE:  Let's go back to the last one.  1327.  Do

8    you have the original, Mr. Bryant?

9    A.  Yes.

10   Q.  You are in fact the person that wrote this date on it,

11   September 19, 1999; correct?

12   A.  Yes.  I think that's the date that I added the

13   measurements onto the drawing.

14   Q.  So this finished drawing that we have here is a drawing

15   which you did, a sculptural body drawing as of September 19,

16   1999; correct?

17   A.  Well, this was an old drawing from '98, and I believe

18   that the measurements were added on the 19th of September,

19   '99.

20   Q.  Let me ask you this:  Is there a drawing such as this

21   without measurements that has a date on it of 1998 that was

22   put on the drawing in 1998?

23   A.  I'm not sure.

24   Q.  The only drawing you're aware of which has a date on it

25   that has this form is -- and that's dated is this one, right?

1    Exhibit 1327.

2    A.   That's the only one I can think of right now.

3    Q.   Now --

4         THE COURT:  Very well.  With respect to this

5    exhibit, the temporal foundation objection is overruled.

6    Q.   BY MR. PRICE:  Did I make it up there with the other

7    exhibit and hand it to you?

8    A.   Yes.

9    Q.   So let's look at Exhibit 1328.  And do you see this says

10   sculptural drawing heads, September 19, 1999?

11   A.   Yes.

12   Q.   And that is in your writing?

13   A.   Yes.

14   Q.   And this again gives dimensions for the head of Lupe and

15   Zoe; correct?

16   A.   Yes.

17   Q.   And it's true that September 19, 1999, you were working

18   at Mattel; correct?

19   A.   Yes.

20   Q.   If you'd now look at Exhibit 777.

21        MR. NOLAN:  Your Honor, I apologize.  We have an

22   objection to the temporal foundation for this document.

23        THE COURT:  I'm sorry.  Very well.

24        Counsel, connect the date.

25   Q.   BY MR. PRICE:  It's correct, sir, that you put this

1    date, September 19, '99, on this drawing at the time on

2    September 19, '99; correct?

3    A.  To the best of my recollection.

4        THE COURT:  Objection is overruled.

5    Q.  BY MR. PRICE:  I'm going to show you Exhibit 777, the

6    original.  And is Exhibit 777 a drawing you did?

7    A.  Yes.

8    Q.  And could you actually hold that up so the jury can see

9    what that looks like?

10   A.  Yes.

11   Q.  And this drawing, I take it everything that's on this,

12   the lines, the date, it's your handwriting; right?  Or

13   drawing?

14   A.  Yes.

15   Q.  Or both.

16       And this date here, August 27, 1999, that was put

17   on by your hand; correct?

18   A.  Yes.

19   Q.  And it was put on on August 27, '99; correct?

20   A.  Yes.

21   Q.  And this character, it says Lupe.  Do you see that?

22   A.  Yes.

23   Q.  Now if we look at Exhibit 62 and the second page of that

24   Exhibit 62, which is in front of you.

25   A.  Okay.

1    Q.   Do you see we have this figure here.  Do you see that?

2    A.   Yes.

3    Q.   And is that supposed to be Lupe?

4    A.   Yes.

5    Q.   Okay.  Now, maybe we can put these side by side.  I

6    don't know if it's possible.  But we have Exhibit 777, and

7    maybe we can -- can you blow up Lupe here and blow up Lupe

8    here.

9         This is an evolution in Lupe; is that right?

10        MR. NOLAN:  Objection, your Honor, to the term

11   evolution.  Ambiguous.

12        THE COURT:  I'm sorry, Counsel?

13        MR. NOLAN:  Objection.  Ambiguous.

14        THE WITNESS:  Well, it wasn't really an

15   evolution --

16        THE COURT:  Wait a minute.  Do you understand the

17   question?

18        THE WITNESS:  Yes.

19        THE COURT:  Very well.  Overruled.

20        MR. NOLAN:  Withdrawn.

21        THE WITNESS:  No, I wouldn't characterize it as an

22   evolution.  The only thing was that I decided that I wanted a

23   new hairstyle on that particular character.  Not a new

24   hairstyle, because I had actually come up with the sort of

25   ponytailed one at the same time that I came up with the

1    braided hairstyle.  I just decided to -- that I liked the

2    ponytail better.

3    Q.  BY MR. PRICE:  So which came first?  This one here,

4    which you have dated August 27, '99, or this on the left,

5    which is from Exhibit 62, which is notarized August 26?

6    A.  The drawing on the left was -- was the first one.  But I

7    mean the drawing on the right is simply a tracing of the

8    drawing on the left with the changed hairstyle.

9    Q.  And this, actually, the drawing on the right that has

10   the August 27, '99 date, that is the drawing that -- the

11   drawing that you used for the pitch to MGA; is that right?

12   A.  Yes.

13   Q.  So if you look at Exhibit 302 in your binder.  And maybe

14   we can put up 302.  First page.  And maybe we can compare it

15   to that with Exhibit 777.

16   A.  I have a 302-B.  Is that the one you're talking about?

17   Q.  Yes.  302-B, which is a better copy of 302.

18        So just to be clear, then, this Exhibit 777 is what

19   you then used this character for your presentation that you

20   gave to MGA; correct?

21   A.  Yes.

22   Q.  Now, in addition to the drawings we've just showed

23   you -- 1327, 1328, and 777 -- with the '99 dates on them, in

24   addition to those, you did a number of drawings while at

25   Mattel where what you did was use a light box, project a

1    sketch onto a poster board or something, sketch it, trace it,

2    and color it; right?

3         MR. NOLAN:  Objection, your Honor.  Argumentative.

4         THE COURT:  Rephrase, Counsel.  I'll sustain.

5    Q.  BY MR. PRICE:  While you were at Mattel, you also did a

6    number of drawings of Bratz characters where you took a

7    drawing, projected it, traced over it, colorized it; right?

8         MR. NOLAN:  Same objection, your Honor.  It's also

9    compound.

10        THE COURT:  I'll overrule the first objection, but

11   let's break it up.

12   Q.  BY MR. PRICE:  Well, remember we talked about this

13   process where you used a light box and you'd project it and

14   colorize it?

15   A.  Yes.

16   Q.  And you did a number of drawings at Mattel where you did

17   that?

18        MR. NOLAN:  I'm going to object as to the term

19   number of drawings.  Ambiguous.

20        THE COURT:  Let's rephrase.

21   Q.  BY MR. PRICE:  You did drawings where you used that

22   process while you were at Mattel, Bratz drawings?

23   A.  What I did was I took the master drawings that I had

24   done before and transferred the drawing onto a piece of

25   illustration board.

1    Q.   When you say transferred, I'm talking about the process

2    we were talking about earlier where you would trace it and

3    then colorize it; correct?

4    A.   Well, not even colorize it so much.  Transferring the

5    drawing is, I guess, sort of an artistic term where you do

6    just what you said, where you take the paper and you put it

7    on the light box, and then you just trace exactly what's

8    there onto your piece of illustration board.

9    Q.   And in addition, while you were at Mattel, you would do

10   that process, would you sometimes color the drawings?

11   A.   Yes.

12   Q.   And one of the reasons you did that was so that you

13   could come up with a pitch book to go to a company and try to

14   sell the idea of a Bratz doll.

15   A.   I mean, I don't -- I don't know that that's exactly what

16   I had in my mind, but, you know, I did want to add color to

17   them.

18   Q.   You ended up using those poster boards that you created

19   at Mattel as part of your pitch to MGA?

20   A.   Well, I didn't create them at Mattel.

21   Q.   I'm talking about creating that poster board where you

22   projected it, traced it, colored it in.  That you did at

23   Mattel; correct?

24        MR. NOLAN:  Same objection as to the term creation,

25   your Honor.  Ambiguous.

1          THE COURT:  Sustained.

2     Q.  BY MR. PRICE:  Let me show you Exhibit 3.

3          You found it in your book?

4     A.  Yes.

5     Q.  Let me show you.

6          THE COURT:  You've seen this, Counsel?

7          MR. NOLAN:  Yes, I was just trying to look to see

8     which one it was.

9          THE COURT:  Very well.

10    Q.  BY MR. PRICE:  Let's look at the first page there, and

11    if you'd hold up for the jury that poster board.  Do you see

12    it?

13         Now, at one time that poster board was blank;

14    right?

15    A.  Yes.

16    Q.  When did you make it not blank?

17    A.  Well, in 1999.

18    Q.  So you started with a blank poster board, and then you

19    created, through the process we talked about, what we have as

20    the first page of Exhibit 3; correct?

21         MR. NOLAN:  Objection.  Ambiguous.

22         THE COURT:  I don't think so at this point.

23         THE WITNESS:  Yeah, again, I took my drawing that I

24    had done previously, transferred it, and added color, yes.

25    Q.  BY MR. PRICE:  So was that poster board something which

1    was used in a pitch?

2    A.   Yes.

3    Q.   And a pitch to whom?

4    A.   Well, I think I sent color copies of this to Alaska Mama

5    and also when I showed them to MGA.

6    Q.   So again, when the -- when you turned this blank poster

7    board into what we have up here, and if you hold it up,

8    because I think the jury can see it a little better where

9    it's in color, you did that about what time in -- while you

10   were at Mattel?

11   A.   I think it was sometime late summer.  I think it was in

12   the summer.  I'm not sure if it was late summer.

13   Q.   Of '99?

14   A.   Yes.

15   Q.   And then when you first did that in '99, turned that

16   blank poster board into what the jury can now see, at the

17   time you did that, did you add this date of August '98 to it?

18   A.   I don't think so.

19   Q.   And it's true that you don't recall for what purpose you

20   added this 8/98; correct?

21   A.   Well, no, I think I have a little bit of a recollection.

22   I think at some point I was asked to turn over the original

23   drawings to MGA.  And I think what I was just trying to

24   signify was that, you know, the concept, you know, the master

25   drawings were done in 1998.

1          MR. PRICE:  Your Honor, I'd like to play from

2    Mr. Carter's deposition -- I'm sorry.  I've done this so

3    much -- Mr. Bryant's deposition.

4          THE WITNESS:  That's all right, Mr. Bill.

5          MR. PRICE:  That was good.  If we could play from

6    November 5, 2004, page 299, line 13 to line 25.

7          THE COURT:  Any objection?

8          MR. NOLAN:  No objection.

9          THE COURT:  You may, Counsel.

10         MR. NOLAN:  Your Honor, I apologize.  Can we play

11   through page 300, line 19 ?

12         MR. PRICE:  I object, your Honor.  The question is

13   why did he do it.

14         THE COURT:  One second.  I'm going to sustain

15   Mr. Price's objection.  You can explore this, Counsel, in

16   your cross-examination.

17             WHEREUPON THE VIDEOTAPED DEPOSITION

18             EXCERPTS OF CARTER BRYANT, AS PROVIDED

19             BY COUNSEL, ARE INCORPORATED HEREIN.

20         "QUESTION:  And my question to you is,

21     looking at this black and white version, what is it

22     that makes you think that this is a photocopy of

23     the color version?

24         "ANSWER:  Because of the shading and, you

25     know, there's obvious mid-tones in there.

1       "QUESTION:  You do not recall -- or you did

2   add this 8/1998?

3       "ANSWER:  Yes.

4       "QUESTION:  You just don't recall when you

5   added that?

6       "ANSWER:  I don't recall.

7       "QUESTION:  Do you recall for what purpose you

8   added that?

9       "ANSWER:  No, I don't."

10  Q.   BY MR. PRICE:  Getting back to the first page there,

11  Mr. Bryant, one thing we can say for certain is that this

12  8/98 was added sometime in 1999.

13  A.   I couldn't say that for certain, no.

14  Q.   Let me rephrase.

15      One thing we can say for certain is this 8/98 was

16  added sometime after you began working at Mattel.

17  A.   I'm still not exactly sure what you're asking me.

18  Q.   You began working for Mattel again in January of 1999;

19  right?

20  A.   Right.

21  Q.   At that time that poster board, wherever it existed, was

22  blank.

23  A.   Yes.

24  Q.   So my question is you added this date 8/1998 at some

25  time after January of 1999; correct?

1    A.  I think I added it after I left Mattel.

2    Q.  So it could have been in 2000 or 2001?

3    A.  Yes.

4    Q.  Could have been 2004?

5    A.  Possibly.  I don't remember it being that late.

6    Q.  Are you aware of a single one of your Bratz drawings

7    which has a 1998 date on it which was actually put there,

8    where the date was put there in 1998?

9    A.  I'm not sure.

10   Q.  Sitting here today, you can't think of a single drawing

11   that has a 1998 date on it that was put there by you in 1998;

12   correct?

13   A.  No, I can't really.  Generally, you know, I don't

14   usually put a date on like a master drawing, line drawing.  I

15   typically don't necessarily date those.

16   Q.  So the answer is you can't identify a specific one today

17   where you put a '98 date on it in 1998; correct?

18   A.  No, I can't.

19   Q.  You can identify, however, at least three drawings where

20   you put a 1999 date on them in 1999.

21   A.  Yes.

22   Q.  And those are the ones we looked at earlier.  The 1327,

23   the 1328, and the Exhibit 777; correct?

24   A.  If you could show those to me again.

25   Q.  Sure.  1327, September 19, '99.  That was put there in

1    '99; right?

2    A.   Yes.

3    Q.   And then 1328, September 19, 1999, that was put there in

4    '99; right?  In fact, September 19, 1999?

5    A.   I'm assuming so, yes.

6    Q.   And then Exhibit 777, where you have August 27, '99,

7    which was put there about August 27, '99; correct?

8    A.   Yes.

9    Q.   If you look at the originals in front of you, you'll see

10   that there are some other poster boards which have Bratz

11   dolls on them.  And there are these dates of '98 on them.

12       Do you see that?

13   A.   Yes.

14   Q.   And maybe you could pull up one of those.  And which

15   character is that?

16   A.   This is Sasha.  I think she was originally called

17   Hallidae.

18   Q.   Let's put up Exhibit 3, page 5.  And I think Mr. Bryant

19   was holding up the original.  Is that the original that you

20   are looking at that you are holding up?

21   A.   Yes.

22   Q.   And you'll notice that again, this has this August 1998

23   date on it; right?

24   A.   Yes.

25   Q.   And if there's any date in these exhibits or in these

1   originals that say '98 to your knowledge, those dates were

2   put in there sometime after 1999; correct?

3   A.   Yes.

4   Q.   And possibly as late as 2000, 2001; right?

5   A.   It's possible, yes.

6   Q.   Were those dates put on those drawings after April of

7   2004?

8   A.   No.

9   Q.   So they were put on there before the actual -- this

10   lawsuit began?

11   A.   Yes, to the best of my recollection.

12   Q.   Do you have anything that can help you demonstrate when

13   after 1999 those dates are put on?  For example, a note in

14   one of your note pads or anything like that?

15   A.   Well, the only thing that I can really remember is that

16   it seems at some point I was asked through MGA to turn in

17   those original drawings.

18   Q.   To what, sir?

19   A.   To turn in those original drawings to them.

20   Q.   Okay.  Are we talking about --

21   A.   Yeah, like these.

22   Q.   And also with respect to these colorized poster boards

23   that are part of Exhibit 3, those were created the same way

24   that we've discussed where you started with a blank poster

25   board and projected something on and traced a drawing, and

1    then colored it in?

2    A.   Right.

3    Q.   And that activity of changing that from a blank poster

4    board to a -- what we have in front of us, that activity,

5    took place sometime after you started working for Mattel;

6    correct?

7    A.   Yes.

8    Q.   And by the way, much MGA asked you to turn over

9    originals, was that in connection with this case that they

10   asked you to turn over the originals?

11   A.   No, I don't think so.

12   Q.   Did they tell you why they wanted you to turn over the

13   originals?

14   A.   No, I don't remember why.

15   Q.   So at some point you actually asked other people at

16   Mattel to help you, assist you in creating materials for a

17   pitch; correct?

18   A.   Yes.

19   Q.   There is a woman who was your roommate, one of your

20   roommates, Elise Cloonan; is that right?

21   A.   Yes.

22   Q.   She was a very good friend of yours?

23   A.   Yes.

24   Q.   A graphic artist who worked at Mattel?

25   A.   Yes.

1    Q.  She wasn't in management, was she?

2    A.  No.

3    Q.  How would you describe how close your friendship was?

4    A.  Well, we were pretty good friends.

5    Q.  And at some point you used her computer to do some work

6    to help you with -- to prepare a pitch book; right?

7         MR. NOLAN:  Objection.  Foundation to the computer,

8    the location.

9         THE COURT:  Sustained.

10   Q.  BY MR. PRICE:  At some point you asked -- well,

11   Ms. Cloonan had a computer; right?

12   A.  Yes.

13   Q.  And where was that computer located?

14   A.  Um, that was in our home.

15   Q.  And I believe your testimony is that you asked her to

16   assist you on her computer to help create this pitch book.

17   A.  All I really remember asking her to help me with was to

18   make a little logo that said Bratz.

19   Q.  And did you tell her why you were asking her to do this?

20   A.  I don't remember.

21   Q.  Did she also help you type some text?

22   A.  No, I don't think so.  I think I typed that.

23   Q.  So when I say type text, if we look at Exhibit 302-B,

24   for example.  And there's been some testimony this is a copy

25   of materials that were given to Mr. Larian.

1      Do you see if -- by the way, is this the logo

2    you're talking about, the B-R-A-T-Z?

3    A.   Yes.

4    Q.   And if we go to the second page, you see there's some

5    text, Meet the Bratz, et cetera?

6    A.   Yes.

7    Q.   And then, if we go into the next page, you'll see

8    there's text as well?

9    A.   Yes.

10   Q.   So is it your testimony that you were the one who typed

11   the text?

12   A.   To the best of my recollection, yes.

13   Q.   When this happened, when you asked your roommate to help

14   you with the logo, at that time were you employed by Mattel?

15   A.   Yes.

16   Q.   At the time you typed the text so you could use that for

17   a pitch you worked at Mattel?

18   A.   Yeah, the text was based on something that I had written

19   quite a while ago, back when I had the original idea.

20   Q.   And Ms. Cloonan at the time you asked her to assist you,

21   she was also employed by Mattel at that time?

22   A.   Yes.

23   Q.   And can you give us the year that this took place where

24   you asked your roommate to help you with a logo?

25   A.   I think it was in 2000, but I'm not absolutely positive.

1    Q.  It was before September of 2000; right?

2    A.  Yes.

3    Q.  And years later, it's true, is it not, that you told

4    Ms. Cloonan that you didn't tell her why you were asking her

5    to help you because you wanted to protect her in case there

6    was a dispute?

7    A.  I don't -- I don't remember saying that.

8    Q.  Can you deny that you told Ms. Cloonan that, that is,

9    that you didn't tell her why you were asking for her help

10   because you wanted to protect her?

11   A.  I can't deny it, but I don't remember telling her that.

12   Q.  You didn't want to get her in any trouble, did you?

13   A.  Of course not.  I wouldn't want to get anyone in

14   trouble.

15   Q.  Now, there's another woman you were friends with

16   named --

17        THE COURT:  Counsel, I'm going to stop you here,

18   and we'll take a little bit of a break.

19        (WHEREUPON THE JURY WITHDRAWS.)

20        THE COURT:  Counsel, just for your planning

21   purposes, we're just going to go through 4:45 today.  We'll

22   stop 15 minutes before the hour.

23        MR. NOLAN:  Your Honor, just for planning purposes,

24   we expect at 4:45 or 5:00 to have the responses from Jason

25   Russell and Marcus Mumford on file with you.

1          MR. NOLAN:  Can we file those under seal, your

2    Honor?

3          THE COURT:  I'm sorry?

4          MR. NOLAN:  May we file those under seal?

5          THE COURT:  Yes.

6          MR. NOLAN:  Without an ex parte application?

7          THE COURT:  Just provide them to Mr. Holmes.  I

8    think the instruction that's going out and the order that

9    Mr. Holmes is passing out to you now is to provide them

10   directly to the Court, not to place them in the courtesy box.

11   The Court has set forth parameters in the order that I just

12   typed up.

13         MR. PRICE:  One issue I'd like to raise.  You

14   recall an issue yesterday with Mr. Larian saying that a

15   Federal Court had concluded that if --

16         THE COURT:  Yes.

17         MR. PRICE:  What we'd like to do, we found the case

18   we think he's talking about.  It does not say that.

19         THE COURT:  Why don't you meet and confer with

20   counsel and see if it is the same case and work on that.

21         MR. PRICE:  That's great.

22         THE COURT:  And, Mr. Page, do you have anything to

23   add on those confidential documents?

24         MR. PAGE:  Yes, we do not require anything to be

25   sealed that has not already been requested sealed by one of

1    the parties.

2        THE COURT:  Thank you very much.  We'll see you in

3    about five or ten minutes.

4        (Recess.)

5        (WHEREUPON THE JURY ENTERS.)

6        THE COURT:  Ladies and gentlemen, the parties have

7    stipulated to the admission of a number of exhibits that are

8    being used with this witness just to try to more efficiently

9    get through the testimony.  And so, Counsel, the Court is

10   going to approve the stipulation.  When you get to an exhibit

11   that has been admitted through stipulation, or through this

12   stipulation, just make reference to that, and you may then

13   publish.

14       So, for example, Trial Exhibit, the first one,

15   1.001, admitted through stipulation, and then proceed.

16       MR. PRICE:  Yes.

17       THE COURT:  And if there's an objection to that for

18   some reason, if MGA disputes that it has been admitted

19   through stipulation, you can state the objection.  Otherwise,

20   you may proceed.

21       MR. PRICE:  Thank you.

22       THE COURT:  Very well.

23   Q.  BY MR. PRICE:  Mr. Bryant, your counsel is in the room;

24   correct?

25   A.  Yes.

1    Q.  Mr. Page?

2    A.  Yes.

3    Q.  Could you point him out?

4    A.  He's over there.

5    Q.  With the red necktie?

6    A.  Yes.

7    Q.  Blue polka-dots.  And, of course, you know MGA's

8    counsel?

9    A.  Yes.

10    Q.  Have you noticed during my questioning whether or not

11    Mr. Page, for example, has been shaking his head up and down

12    or sideways?

13    A.  No, not at all.

14    Q.  You haven't been looking in that direction?

15    A.  I may have glanced over in that direction, but I don't

16    remember looking at Mr. Page, no.

17    Q.  Or Mr. Nolan?

18    A.  No, not really.

19    Q.  Well, let me get back to my questioning, then.  We were

20    talking about Ms. Cloonan, your roommate.

21         Was her computer the only computer you had access

22    to outside of work in the '99, 2000 time frame?

23    A.  Yes.

24    Q.  So if you were doing any work on Bratz at home using a

25    computer, it would have been Ms. Cloonan's computer?

1   A.   Yes.

2   Q.   Did you do any work to try to put together this Bratz

3   pitch on Ms. Cloonan's computer other than typing in text?

4   A.   No.

5   Q.   Now, I was about to ask you, before we broke, about Anna

6   Rhee.

7        Do you know Ms. Rhee?

8   A.   Yes.

9   Q.   Was she at your home frequently?

10  A.   Yes, she had been to my home a few times.

11  Q.   Much you say a few times, would you characterize your

12  relationship as being good friends?

13  A.   Yes.

14  Q.   And you knew she was an excellent face painter as well?

15  A.   Yes.

16  Q.   Now, in trying to get together something to partnership

17  Bratz, in addition to doing these poster boards, you also

18  tried to put together a prototype; correct?

19  A.   Well, I mean, I don't even know that I'd call it a

20  prototype.  It was just sort of a cobbled together sort of

21  dummy.

22  Q.   Well, you did the dummy for a reason; right?

23  A.   You know, I thought it would help to have some kind of

24  three dimensional, you know, something or other to look at.

25  Q.   And in putting together this, shall we call it a figure,

1    in putting together this three-dimensional figure for your

2    pitch, you asked some folks who were connected with Mattel to

3    help you out; correct?

4    A.   Yes.

5    Q.   So these folks that you asked to help were your

6    co-workers; right?

7    A.   Yes.

8    Q.   So, for example, you wanted to have this

9    three-dimensional figure to have hair; right?

10   A.   Yes.

11   Q.   And there's a process called hair rooting?

12   A.   Yes.

13   Q.   Could you explain to the jury what that is?

14   A.   That's a process where a -- it's kind of like a sewing

15   machine.  It's threaded with this hair where they can take

16   the plastic head and run it through this machine, and it

17   will -- the needle will, you know, insert the hair.  That's

18   the best way I can explain it.

19   Q.   And there's a woman at Mattel named Carmen Monteagudo?

20   A.   Yes.

21   Q.   Could you tell us what her position was at Mattel?

22   A.   She was a hair rooter.

23   Q.   So you went to her and gave her a head that you wanted

24   to have hair rooted on; right?

25   A.   Yes.

1    Q.  And you kept her in the dark as to why, didn't you?

2    A.  I don't know what you mean by kept her in the dark.

3    Q.  Well, did you say I want to do this because I'm going to

4    make a pitch for this project Bratz to another toy company?

5    A.  Well, no, I don't think I did.

6    Q.  Did it occur to you that your co-workers might not be

7    happy contributing to a potentially competitive product if

8    they knew the truth about what you were doing?

9    A.  I guess I didn't really think it was that big of a deal.

10   Q.  Did you think it was none of their business that you

11   were asking them to, for example, Ms. Monteagudo, to do hair

12   rooting so you could take this product and show it to a

13   competitor of Mattel to try to pitch your Bratz project?

14   A.  Well, I don't really know at the time that I understood

15   that MGA was a competitor of Mattel.  You know, I knew they

16   were a toy company.  I didn't know how big they were or

17   anything like that.

18   Q.  You understood that the company you were going to, MGA,

19   sold toys; right?

20   A.  Yes.

21   Q.  You understood Mattel was in the toy business; correct?

22   A.  Yes.

23   Q.  Sitting here today, do you kind of see it as somewhat of

24   a betrayal of your co-worker, Ms. Monteagudo, that you didn't

25   tell her that you were asking her to root hair for a

1    three-dimensional figure that would be used to try to

2    convince another toy company to make a doll?

3    A.  I don't think I thought of it that way.

4    Q.  And she's not the only Mattel employee that you asked to

5    help you in the Bratz project and kept in the dark.

6    A.  Well, again, I don't feel like I kept her in the dark.

7    I don't remember her really asking too many questions about

8    it.

9    Q.  Well, her job was to take assignments from people at

10   Mattel to root hair; correct?

11   A.  Yes.

12   Q.  And so you are saying because she didn't ask you what

13   you were doing it for, she should have assumed it was for

14   another toy company?

15   A.  No, I'm not trying to say that.

16   Q.  You thought you had the expectation that she assumed it

17   was for something to do with Mattel; right?

18   A.  Well, I'm not sure that I had that assumption, no.

19   Q.  She worked at the Mattel design center?

20   A.  Yes.

21   Q.  You went to her with a head?

22   A.  Yes.

23   Q.  You said I'd like you to root some hair for this head?

24   A.  Yes.

25   Q.  That was her job, to root hair for heads for dolls for

1   Mattel?

2   A.  Yes.

3   Q.  And she said sure, she'd do it; correct?

4   A.  Yes, I think so.

5   Q.  And you're telling this jury that you didn't assume that

6   she thought she was doing work for Mattel?

7   A.  You know, I don't know what she thought.  I mean, I'm

8   not sure what she thought.

9   Q.  Well, I know you can't actually read her mind, but did

10  you expect that, when you went to a head rooter, a woman who

11  rooted heads at the Mattel design center and gave her a doll

12  head to root, did you expect that she thought that she was

13  doing work for Mattel?

14  A.  Again, you know, I'm not sure exactly what I thought or

15  what I expected that she thought.

16  Q.  She trusted you, didn't she?

17  A.  Um, yes.

18  Q.  And you betrayed that trust, betrayed that trust by

19  getting her involved in creating a prototype for a doll which

20  you were going to pitch to another toy company.

21  A.  I didn't feel that way at the time.

22  Q.  How about right now?  Do you feel that way?

23  A.  Well, you know, no.  I mean, I didn't really think it

24  was any big deal to, you know, to try and create some kind of

25  pitch material.

1    Q.   Talking about being a big deal, you have received

2    royalties for Bratz dolls, have you not?

3    A.   Yes.

4    Q.   Something in excess of $30 million in royalties?

5    A.   I'm not sure of the exact amount, but it's been -- it's

6    been several million dollars, yes.

7    Q.   Fair to say that the Bratz dolls have been a big deal to

8    you?

9    A.   Sure.

10   Q.   So in addition to having the hair rooted, you also

11   wanted the head painted; correct?

12   A.   Yes.

13   Q.   And one of your better friends, Anna Rhee, was one of

14   the best face painters out there; correct?

15   A.   Yes.

16   Q.   And isn't it true that you asked her to paint a face?

17   A.   No.

18   Q.   One of the nicknames for one of the Bratz dolls that you

19   created was Angel; correct?

20   A.   No.

21   Q.   If you'd look at Exhibit 5.  I'd like you to turn to

22   page 43.  And you see this is a handwriting, Meet the Bratz.

23   I think it says they are the cool girls from your school.

24        Do you see that?

25   A.   Yes.

1    Q.   And I'm going to hand you the original, which is -- how

2    are we referring to this now?  It's TX 0005.043.  It is fair

3    to say this came before the typewritten version?

4    A.   Yes.

5    Q.   And this is your handwriting where you say meet Zoe, aka

6    Angel.

7    A.   Yes.

8    Q.   And aka is short for also known as; correct?

9    A.   Right.

10   Q.   Now, I asked you some questions about Anna Rhee.  Mattel

11   also had face painters; correct?

12   A.   Yes.

13   Q.   And there was a woman named Sheila who worked at the

14   design center who painted faces?

15   A.   Yes.

16   Q.   You think she was as talented as Ms. Rhee?

17   A.   Yes.

18   Q.   She was another of your co-workers in the design center?

19   A.   Yes.

20   Q.   Do you remember Sheila's last name, by the way?

21   A.   No, I don't.

22   Q.   You went to Sheila at the design center, and you showed

23   her a doll head; correct?

24   A.   Yes.

25   Q.   And you asked her to paint a face on it; correct?

1    A.  Yes.

2    Q.  Gave her some kind of idea of what you wanted?

3    A.  I think I gave her one of my old drawings, yes.

4    Q.  And her job was to paint faces on dolls when designers

5    would ask her to; correct?

6    A.  Yes.

7    Q.  You were a designer at Mattel?

8    A.  Yes.

9    Q.  And she did what you asked.  She took your drawing, and

10   she painted a face that you were thinking of using for your

11   pitch with MGA.

12   A.  Yes.

13   Q.  And again, you didn't tell her that this was for MGA?

14   A.  I don't recall if I told her anything about it or not.

15   Q.  She trusted you as well?

16   A.  Yes.

17   Q.  This three-dimensional doll, you also took some parts

18   from various bins at Mattel to put the doll together; right?

19   A.  Yes, I believe I used some Ken boots, and that's the

20   only thing I can think of right now.

21   Q.  By the way, this woman, was her last name Kyaw?

22   A.  That sounds familiar.

23   Q.  So in addition to this three dimensional -- let me step

24   back.

25       You thought the most important part of this

1    representation you were going to give to MGA was the face;

2    correct?

3    A.   No, not really.

4    Q.   Well, didn't you say you used the body?  For what?

5    A.   I'm sorry.  What, now?

6    Q.   For the body of this three-dimensional doll you were

7    going to give to MGA, what did you use for the body?

8    A.   I think it was like a Barbie body.

9    Q.   And was that the kind of body you had in mind for Bratz?

10   A.   No.

11   Q.   However, for the face painting, you actually gave at

12   least Sheila Kyaw a drawing of how you wanted the Bratz face

13   to look; correct?

14   A.   Well, I gave her a drawing of what I had created in

15   hopes she could do something with the head that I had.

16   Q.   So although you knew that the body was not going to look

17   like the Bratz that you had in mind and had conceived, you

18   did hope that the head that would be presented, the face

19   would look like the Bratz character you had created; right?

20   A.   Well, I mean, I knew it wasn't going to look exactly

21   like it, because, you know, that just wouldn't have been

22   possible.  But I did give her instructions to paint it as

23   close to my drawing as she could and give me what she had.

24   Q.   And that's because you knew that you wanted the face to

25   have a certain look and attitude, the one that you had

1    thought of?

2    A.  Sure.

3    Q.  But you knew the body wasn't going to have the body you

4    thought of; right?

5    A.  No.  I -- I'm sorry.  Yes.

6    Q.  So there came a time when you presented this at a

7    meeting at MGA; correct?

8    A.  Yes.

9    Q.  And during that meeting and discussions, you even

10   mentioned that this face is sort of generally my idea of how

11   generally the Bratz dolls will look.

12   A.  I don't know if I said that or not.

13   Q.  Well, you certainly didn't say that about the body.

14   A.  I don't remember what I said about the body either.

15   Q.  So in addition to working on this three-dimensional doll

16   to present at a pitch, you also put together your drawings

17   for the pitch book; correct?

18   A.  Yes.

19   Q.  And your testimony is the first meeting you had was

20   sometime in August; correct?

21   A.  Yes.

22   Q.  And this meeting you were present at, correct?

23   A.  Yes.

24   Q.  Paula Treantafelles?

25   A.  Yes.

1   Q.   Victoria O'Connor?

2   A.   Yes.

3   Q.   Was Isaac Larian there?

4   A.   No, not at the first meeting.

5   Q.   And at this first meeting, did you bring this doll you

6   created?

7   A.   No.

8   Q.   Is that because it wasn't complete?

9   A.   Um, I don't remember.

10   Q.   You did bring drawings?

11   A.   Yes.

12   Q.   And if we look at Exhibit 302.  And if you'll page

13   through there.  Is 302, are these the drawings you presented

14   at this first meeting that you tell us you had with

15   Ms. Treantafelles, Ms. O'Connor?

16   A.   Yes.  I'm not sure -- I can't remember if I had the

17   notebook at that time or if I just showed my portfolio.

18   Q.   If you had what?

19   A.   I said I can't remember if I had the notebook, the

20   little binder notebook at the time, or if I just had my

21   portfolio.

22   Q.   Let me try to clarify that.  First, one other thing.

23   Ms. Veronica Marlow was also at this meeting?

24   A.   Yes.

25   Q.   And you say you're not sure you had your notebook.  What

1    do you mean by your notebook?

2    A.   With, I put together a little pitch book that had color

3    copies of my drawings.

4    Q.   So at the first meeting, you think you just showed your

5    poster boards?

6    A.   Well, I know that's what I showed first.  I can't

7    remember if I left them with this notebook or not.

8    Q.   So when you say that you were showing your poster

9    boards, do you have any in front of you in those originals?

10   A.   Yeah, I'm talking about like, you know, these drawings.

11   Q.   And you are holding up the one we saw earlier that had

12   that -- the date on it that you put on sometime after '99;

13   correct?

14   A.   I'm sorry?

15   Q.   You are holding up one of those poster boards which has

16   that date on it in '98 that you put on it sometime after '99.

17   A.   Yes.

18   Q.   So these poster boards that you showed them in this

19   meeting, again, as of the time you joined Mattel, those

20   poster boards, wherever they were, were blank.

21   A.   Well, yes.

22   Q.   And then you changed them from a blank poster board to

23   the sorts of drawings you have shown us.  You did that

24   process while you were at Mattel; correct?

25   A.   If you mean transferring the drawing from my original

1    tracing paper drawings and putting it onto the board?  Is

2    that what you mean?

3    Q.   I mean what I said.  Changing that from a blank poster

4    board to what you presented, that process you did while you

5    were employed at Mattel; right?

6    A.   Well, yes.

7    Q.   Every one of the poster boards you showed them were

8    changed from a blank poster board to those characters while

9    you were at Mattel; right?

10   A.   Yes, but using the drawings that I had created quite a

11   bit earlier.

12   Q.   And we'll get to that.  I'm talking about what you did,

13   what you agree you did while you were employed at Mattel to

14   try to pitch your concept to a competitor.  Okay?

15   A.   Okay.

16   Q.   And you agree that while you were at Mattel, you changed

17   those blank poster boards to the characters you presented to

18   MGA in what you're describing as this meeting in August;

19   correct?

20   A.   Well, yeah, I mean obviously, they went from blank

21   pieces of paper to, you know, drawings.

22   Q.   And before you actually had your meeting with

23   Mr. Larian, actually created from scratch, that is, not just,

24   you know, projecting, for new poster boards.  For new

25   drawings.

1    A.   Well, not from scratch.  I used the old head drawings,

2    and I used one of the old poses, and then the other pose I

3    used was just kind of a standard fashion pose.

4    Q.   Let me see if I can show you, and we can see if we're

5    talking about the same thing.

6    A.   Okay.

7    Q.   If we look at Exhibit -- I have here 716.  Well, there's

8    an Exhibit 5 there.  And it's page 83.

9         What we have up is not what I handed you.  So let

10   me check.  5-84.  I'm sorry.  5-00084.  That's one of the

11   drawings you did sometime between your meeting in August and

12   your meeting with Mr. Larian?

13   A.   To the best I can recall, yes.

14   Q.   And if you can just show it to the jury.

15        And there are at least -- there are other drawings

16   that you also did between your meeting, which you say

17   happened in August and your meeting with Mr. Larian?

18   A.   I believe there were three others.

19   Q.   If you'll look at -- I think the original one of my

20   associates put on top for you during the break for easy

21   access.  It's Exhibit 719.  This is one of the drawings you

22   did, you believe, sometime between August and your meeting

23   with Mr. Larian?

24   A.   Yes, using, you know, an older face and an old pose.

25   Q.   And then you added a new -- the clothes?

1    A.   Right.  Yeah.  Those fashions I don't believe were ever

2    used, though.

3    Q.   It's something you created before you saw Mr. Larian?

4        MR. NOLAN:  Objection, your Honor, to the term

5    creation.  Ambiguous.

6        THE COURT:  I'll sustain the objection, Counsel.

7    Why don't we go ahead and specify what you mean.

8        MR. PRICE:  Sure.

9    Q.   Prior to meeting with these folks in August, what we see

10   here as Exhibit 719 did not exist in this form; correct?

11   A.   What do you mean in this form?  The drawing itself?

12   Q.   There we go.  Right there.  Beautiful red lips, green

13   eyes, nice dress.  This did not exist?

14   A.   Actually, the head and the pose, that was all old --

15   those were all old drawings.

16   Q.   Did you have a picture like this where a nice green

17   dress with a purse, these shoes, did you have a picture like

18   this before you met -- before that meeting you said you had

19   in August?

20   A.   I didn't have a drawing that had that dress and those

21   shoes, no.

22   Q.   Or the purse?

23   A.   The purse I'm not sure about.

24   Q.   The bracelets?  Did you have those?

25   A.   Well, I'm not exactly sure.

1    Q.  You changed this blank poster to this sometime between

2    the August meeting and when you met with Mr. Larian; right?

3    A.  Yes.

4    Q.  And then if you look at Exhibit 722.  And I'll approach,

5    if I may, with the original.  Which character is this?

6    A.  This is -- at the time I think we were calling her

7    Hallidae.

8    Q.  And these designs, dress, et cetera, you did sometime

9    between the meeting you say happened in August and the

10   meeting with Mr. Larian; correct?

11   A.  Yes.

12   Q.  And again, this blank poster board was changed to this

13   drawing sometime between that first meeting you say you had

14   in August and the meeting with Mr. Larian; right?

15   A.  Well, yes.

16   Q.  If you'd look at Exhibit 725.  And I'll approach with

17   the original.  Your testimony is that this -- could you hold

18   that up?  And is that -- we're talking about poster board.

19   This obviously isn't poster board.

20   A.  Right.

21   Q.  How would you describe that paper?

22   A.  This paper?

23   Q.  Yeah, how would you describe --

24   A.  This is just regular like copier paper.

25   Q.  Is that what you presented as the original at the

1    meeting with Mr. Larian?

2    A.  I don't believe so, no.

3    Q.   Did you create Exhibit 725 and then do something with it

4    to present to Mr. Larian?

5    A.  No.  I mean, I know I created it on the same kind of

6    illustration board.  But I don't recall doing anything

7    special with it.

8    Q.   The designs, shoes, dress, et cetera, were done sometime

9    between this August meeting you talked about and the meeting

10   with Mr. Larian?

11   A.  Yes.

12   Q.   And you said that actually the original of this is on a

13   poster board?

14   A.  Right.

15   Q.   And that again was changed from a blank poster board to

16   what we're seeing now sometime in that time frame between

17   mid-August and early September?

18   A.  Well, yes.

19   Q.   Now let's talk about the meeting you had with

20   Mr. Larian.  And let me step back.  In the meeting you had

21   with Ms. Treantafelles and Ms. Marlow, Ms. O'Connor, did you

22   say you worked for Mattel?

23   A.  Um, I think I did.

24   Q.   Between the meeting you had with Ms. Treantafelles,

25   Ms. O'Connor, Ms. Marlow, and Mr. Larian, between that time,

1    did you have communications with anyone at MGA?

2    A.   Well, I think I may have spoken to Victoria O'Connor.

3    Q.   Did you talk with Ms. Garcia?

4    A.   I don't remember.

5    Q.   So when you had your meeting on September 1st -- let me

6    step back.  Your testimony is you had a meeting on September

7    1st; right?

8    A.   Yes, we did have a meeting September 1st.

9    Q.   And let's talk about the location of that meeting.  Was

10   it at MGA?

11   A.   Yes.

12   Q.   And September 1st, you're still an employee at Mattel;

13   correct?

14   A.   Yes.

15   Q.   And you go to MGA's offices.  Where are they located?

16   A.   Van Nuys.

17   Q.   Was there any security?  Did you have to check in with

18   someone?

19   A.   I don't remember.

20   Q.   Do you remember having to go and sign in and getting a

21   sort of a temporary tag to be escorted somewhere?

22   A.   No, I don't remember.

23   Q.   Was the meeting in Mr. Larian's office?

24   A.   I believe so, yes.

25   Q.   You understood that he was the Chief Executive Officer

1    of another toy company, a company other than Mattel, which is

2    MGA?

3    A.  Yes.

4    Q.  And you were bringing to him these designs for Bratz as

5    well as a three-dimensional creation to pitch your Bratz

6    concept; correct?

7    A.  Yes.

8    Q.  And your hope was that the CEO of MGA would agree to

9    produce the Bratz dolls; correct?

10   A.  Well, yes, sure.

11   Q.  Tell us who was at this meeting that was on September

12   1st.

13   A.  Well, it was myself, Mr. Larian, pretty sure his

14   daughter Yasmin was there, and Paula Treantafelles-Garcia,

15   Victoria O'Connor, and I think Veronica Marlow might have

16   been present.

17   Q.  Now, when you had presented your drawings to Ms. Garcia

18   and Ms. O'Connor in August, was Ms. Garcia excited about

19   them?

20   A.  Um, she seemed like it, yeah.

21   Q.  You got positive feedback; right?

22   A.  Um, yeah, I got a good vibe.

23   Q.  Who was it that suggested that you bring your designs to

24   Mr. Larian, CEO?

25   A.  Well, what I recall at that first meeting, I think that

1    Victoria had told me that Mr. Larian was out of town, but she

2    thought he would like to see them.

3    Q.   In this meeting September 1st, one of the things you

4    told Mr. Larian was that you were at that time employed by

5    Mattel; right?

6    A.   I'm quite sure that I did.

7    Q.   And when you told Mr. Larian that you were then employed

8    by Mattel, you don't recall him saying anything in response

9    to that, do you?

10   A.   I think we talked.  You know, I think he asked me maybe

11   something about, you know, are these something that you came

12   up with on your own and, you know, on your own time.  And you

13   know, I told him that yes, they were.

14       MR. PRICE:  Your Honor, I'd like to play from

15   Mr. Bryant's deposition page 91, lines 3 through --

16       THE COURT:  Help me out.  Direct me to the volume.

17       MR. PRICE:  It is volume 1.  It is dated November

18   4, 2004.  And it's lines 3 through 7.

19       THE COURT:  Any objection?

20       MR. NOLAN:  No objection.

21       THE COURT:  You may play it.

22       MR. PRICE:  Thank you.

23       WHEREUPON THE VIDEOTAPED DEPOSITION

24       EXCERPTS OF CARTER BRYANT, AS PROVIDED

25       BY COUNSEL, ARE INCORPORATED HEREIN.

1          "QUESTION:  When you told Mr. Larian that you

2     were then employed by Mattel, what did he say?

3          "ANSWER:  I really don't recall what he said

4     exactly.

5          "QUESTION:  Well, generally.

6          "ANSWER:  I don't even remember generally what

7     he said."

8     Q.   Now, you told Mr. Larian that you were employed by

9     Mattel because you thought it was important for him to know

10    that; right?

11    A.   Um, well, I suppose so.

12    Q.   Well, I'm asking you to more than suppose.  I'm asking

13    for your testimony now.  Isn't a reason you told Mr. Larian

14    that you were employed by Mattel is that you felt it was

15    important for him to know that?

16    A.   Well, to the best of my recollection, yes, I think so.

17    Q.   After the September 1st meeting, when you showed the

18    Bratz drawings and this doll that you created to Mr. Larian

19    and others, at that point do you think you had a good

20    reception?

21    A.   Um, you know, I thought it went fairly well.  I kind of

22    got the feeling from Mr. Larian that he kind of thought they

23    were very odd-looking characters.  But, I mean, I thought it

24    went pretty well.

25    Q.   You said you got the impression from Mr. Larian, you

1    actually used the words odd-looking characters.

2         When is the last time that you heard that phrase?

3    A.   That I heard that phrase?

4    Q.   Let me ask it this way:  Do you recall Mr. Larian saying

5    they are odd-looking characters?

6    A.   No, not specifically.  I guess I'm just paraphrasing.

7    Q.   And after that meeting, you began having discussions

8    with MGA about becoming a consultant to MGA to make Bratz a

9    reality; right?

10   A.   Yes.

11   Q.   How soon after this meeting did you get -- did someone

12   from MGA communicate with you to say, you know, we want this

13   to happen?

14   A.   Well, I don't remember the exact amount of time that

15   passed, but I think it was, you know -- it was at least

16   several days.

17   Q.   And you were contacted by an attorney from MGA?

18        MR. NOLAN:  Objection as to foundation.  Time.

19        THE COURT:  Wait a second.  Sustained.

20   Q.   BY MR. PRICE:  Within two weeks of September 1st, you

21   began engaging in negotiations with an attorney at MGA;

22   right?

23   A.   Well, I don't remember exactly who I talked to first.

24   It seemed like I talked to Isaac first after that initial

25   meeting.

1    Q.   Mr. Larian?

2    A.   Yes.  Sorry.

3    Q.   And Mr. Larian was excited?

4    A.   He seemed to be.

5    Q.   He mentioned, when he talked to you, how successful he

6    thought this might be; correct?

7    A.   Are we talking about this first conversation that we

8    had?

9    Q.   Let's say -- well, let me ask you, how many

10   conversations did you have with Mr. Larian in September?

11   A.   Oh, I don't recall.  More than one.

12   Q.   And those discussions, you talked about, for example,

13   how you might be paid?

14   A.   Yes.

15   Q.   You talked about the fact that you wanted a royalty?

16   A.   Yes, I think so.

17   Q.   You talked about how fiscally and successfully you could

18   become rich?

19   A.   I don't remember ever saying that.  That's not something

20   I really recall.

21   Q.   I'm not talking about you saying that.  I'm talking

22   about during these conversations, didn't Mr. Larian say

23   something to the effect of, with the deal we're talking

24   about, you could be rich?

25   A.   Yeah, he might have said something like that.

1    Q.   And that was kind of -- because he was kind of excited

2    about this, and he was getting you excited about it; right?

3    A.   Well, sure.

4    Q.   Because he wanted you to become a consultant at MGA to

5    make this Bratz a reality; right?

6    A.   Yes.

7    Q.   And in doing that, you had to have some discussions with

8    MGA's counsel; right?

9    A.   Yes.

10   Q.   If you'd look at Exhibit 2201.  And this is not in the

11   drawings book.  It would be in the other black book.

12   A.   Okay.

13   Q.   Do you recognize 2201 as a communication you had with a

14   Mr. Rosembaum sometime around September 14 of 2000?

15   A.   Yes.

16        MR. PRICE:  Your Honor, move Exhibit 2201 in

17   evidence.

18        MR. NOLAN:  No objection, your Honor.

19        THE COURT:  It's admitted.  You may publish.

20        (Exhibit 2201 received.)

21   Q.   BY MR. PRICE:  You see this is the first page?

22   A.   Yes.

23   Q.   Was this something -- how did you send this to

24   Mr. Rosembaum?

25   A.   I don't remember exactly.

1    Q.  Did you send a letter in the mail?

2    A.  I don't -- I don't remember.

3    Q.  You weren't communicating by mail in September with MGA,

4    were you?

5    A.  It's possible.  I don't remember.

6    Q.  Do you recall using a messenger service?

7    A.  Well, again, it's possible.  But no, I don't remember

8    that.

9    Q.  Do you know if you faxed it from Mattel?

10   A.  Again, it's possible.  But I don't remember.  There's no

11   fax heading or anything like that.  So I don't know.

12   Q.  Did you fax documents from Mattel to MGA between

13   September 1st and the time that you left Mattel October 19th?

14   A.  Yes.

15   Q.  What documents do you specifically remember faxing?

16   A.  Well, I think the only thing that I can remember faxing

17   was the final page of the contract agreement.

18   Q.  Where did you fax it from?

19   A.  One of the fax machines at Mattel.

20   Q.  Is that when you were in Barbie collectibles?

21   A.  Yes.

22   Q.  Do you know that it was just the last page?

23   A.  No, I'm not sure.

24   Q.  Let's look at the next page on this document.  September

25   14.  "Enclosed is a copy of my original offer of employment

1   with Mattel.  To the best of my knowledge, other than an

2   agreement of confidentiality, there are no other expressed

3   contracts that have been signed.  I am unable to look into

4   this too much further with our Human Resources director

5   without risking suspicion, but I am quite certain that this

6   should suffice."

7           Who was the Human Resources director that you were

8   referring to then?

9   A.  I don't remember that person's name.

10  Q.  It's just four days after this that you actually begin

11  representing that you are working for MGA; correct?

12  A.  I'm not sure.

13  Q.  If you look at Exhibit 30, which is in evidence.  Do you

14  recognize this as a letter you sent September 18, 2000, to a

15  Mr. Kinuyo representing that you are working with MGA

16  Entertainment, that we are located in Los Angeles,

17  California, and that sample cards should be sent to MGA

18  Entertainment, attention Carter Bryant, 1319 West 160th

19  Street, Gardena, California 90247, USA.

20          This is something you sent out around September 18,

21  2000; correct?

22  A.  Yes.

23  Q.  And you intended to give the impression to the recipient

24  of this letter, you intended to give them the impression that

25  you worked with MGA; correct?

1   A.  You know, I don't really remember exactly what I was

2   thinking when I wrote this, but I guess I was sort of

3   anticipating working with MGA.

4   Q.  And the impression you wanted to give to the recipient

5   of this letter was that you were working for MGA and that

6   they were actually to address their response to MGA to your

7   attention; correct?

8   A.  Yes, but again, I don't remember exactly, you know,

9   trying to represent that I was MGA.

10  Q.  So your testimony under oath is that you did not expect

11  that the recipient of this letter would believe that you were

12  with MGA?

13  A.  I guess I didn't really have an understanding of what

14  they would think.  You know, I guess maybe I did think that

15  the recipient thought that I worked with MGA.

16      THE COURT:  Counsel, we're going to continue with

17  this tomorrow morning.

18      The witness will return at 9:00, as will the jury.

19  You are excused for the evening.

20      (WHEREUPON THE JURY WITHDRAWS.)

21      THE COURT:  Counsel, please be seated.  Just a

22  couple housekeeping things.  The Court did receive and sign

23  the joint order regarding MGA's Joint Motion in Limine

24  No. 13, and that was fine.  It was granted in part and denied

25  in part.

1          I also asked counsel to provide a proposed order on

2     the two other motions I ruled on at the same time.  The

3     denial of Mattel's motion to take a deposition of Littler

4     Mendelson and the granting in part and denying in part the

5     motion to enforce the January 2007 order regarding the

6     computer hard drive production.

7          So I'd like to get that tomorrow morning, if

8     possible, from counsel.

9          If you have a response to the OSC, Mr. Nolan, make

10    sure you give those to Mr. Holmes.  And I also will need from

11    MGA tomorrow their opposition or response to the motion

12    regarding the expert reports related to 42 LLC.

13         MR. NOLAN:  Your Honor, I'm lodging with the Court

14    a declaration of Marcus Mumford and Jason Russell, and I ask

15    for leave of Court to submit mine tomorrow, as I've been in

16    court, and I did not understand I was part of the OSC until I

17    saw the order.  So I will submit my declaration in the

18    morning.

19         THE COURT:  That's fine, Counsel.

20         MR. NOLAN:  And you want --

21         THE COURT:  Provide those to Mr. Holmes.  He'll

22    provide them to me, and they will stay in my custody.

23         MR. NOLAN:  And, your Honor, I'm also supplying a

24    copy to counsel.

25         THE COURT:  Very well.  All right.  I will see

1    those proposed orders and responses tomorrow at 8:30.  We'll

2    begin with the hearing on the OSC, and I hope to have that

3    done by 9:00 so we can resume with Mr. Bryant's testimony.

4          Anything else from Mattel?

5          MR. PRICE:  Your Honor, we provided to MGA a copy

6    of the case that we believe --

7          THE COURT:  Yes.

8          MR. PRICE:  I -- initial response was I think

9    that's the case, but I haven't had an office allege --

10         THE COURT:  Let's take that up tomorrow.

11         Anything else?

12         MR. QUINN:  Just to give the Court a heads up,

13   depending upon how Mr. Bryant's testimony goes, we're going

14   to have Mr. Menz on standby on the Evidence Eliminator issue,

15   depending on how the testimony goes.  He'll take the stand

16   after Mr. Bryant.

17         THE COURT:  Anything from MGA at this time?

18         MR. NOLAN:  No, your Honor.

19         THE COURT:  Very well.  Good evening.

20

21         (Proceedings concluded at 4:50 P.M.)

22

23

24

25

1

2

3

4

5

6                    C E R T I F I C A T E

7

8

9          I hereby certify that pursuant to Title 28,

10    Section 753 United States Code, the foregoing is a true and

11    correct transcript of the stenographically reported

12    proceedings in the above matter.

13          Certified on June 12, 2008.

14

15

_____

16          MARK SCHWEITZER, CSR, RPR, CRR

            Official Court Reporter

17          License No. 10514

18

19

20

21

22

23

24

25