Transcript of Proceeding - AM (Bryant Dir/Cross)   6/17/2008 10:36:00 AM

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                 - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                 - - -

7   MATTEL, INC.,            )
                             )
8           PLAINTIFF,   )
                             )
9       VS.             )  NO. CV 04-09049
                             )
10  MGA ENTERTAINMENT, INC., ET. AL.,  )
                             )
11          DEFENDANTS.  )  TRIAL DAY 14
    _____)  MORNING SESSION
12  AND CONSOLIDATED ACTIONS,      )  PAGES 2708-2817

13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            TUESDAY, JUNE 17, 2008

18               8:47 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
            FEDERAL OFFICIAL COURT REPORTER
24          3470 12TH STREET, RM. 134
            RIVERSIDE, CALIFORNIA  92501
25          951-274-0844
            WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2
      ON BEHALF OF MATTEL, INC.:
 3
                  QUINN EMANUEL
 4                BY:  JOHN QUINN
                    JON COREY
 5                  MICHAEL T. ZELLER
                    HARRY OLIVAR
 6                  TIMOTHY ALGER
                  865 S. FIGUEROA STREET,
 7                10TH FLOOR
                  LOS ANGELES, CALIFORNIA  90017
 8

 9

10    ON BEHALF OF MGA ENTERTAINMENT:

11                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                  BY:  THOMAS J. NOLAN
12                  JASON RUSSELL
                    RAOUL KENNEDY
13                  LAUREN AGUIAR
                    CARL ROTH
14                300 SOUTH GRAND AVENUE
                  LOS ANGELES, CALIFORNIA  90071-3144
15                213-687-5000

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2                             PAGE

3    PLAINTIFF CASE (CONTINUED)........................ 2727

4

5

6    PLAINTIFF
     WITNESS       DIRECT    CROSS    REDIRECT    RECROSS
7    CARTER BRYANT (CONTINUED)

8    BY MR. PRICE   2727
     BY MR. NOLAN              2779
9

10

11
           EXHIBITS         RECEIVED
12
              20           2759
13        10480            2763
           1326            2766
14          27             2767
           593             2769
15

16

17

18

19

20

21

22

23

24

25

1      RIVERSIDE, CALIFORNIA; TUESDAY, JUNE 17, 2008; 8:47 A.M.

2            -OOO-

3      (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY. )

4        THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

5  MATTEL, INC., V. MGA, INC., ET AL.

6        MAY WE HAVE COUNSEL STATE YOUR APPEARANCES FOR THE

7  RECORD.

8        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

9  MATTEL.

10       MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, MATTHEW SLOAN

11  FOR MGA AND ISAAC LARIAN.

12       THE COURT:  GOOD MORNING, COUNSEL.

13       WE'RE ON THE RECORD OUTSIDE THE PRESENCE OF THE JURY.

14       ARE THERE ANY MATTERS THAT WE NEED TO TAKE UP BEFORE

15  WE BRING THE JURY IN?

16       MR. QUINN:  A COUPLE, I THINK, YOUR HONOR.

17       THERE WAS THAT LINGERING ISSUE ABOUT WHAT A FEDERAL

18  JUDGE DID OR DID NOT SAY REGARDING THE TARGET ON THE BACK.

19       THE COURT:  RIGHT.

20       MR. QUINN:  NOTWITHSTANDING OUR BEST EFFORTS, WE WERE

21  NOT ABLE TO AGREE ON LANGUAGE ABOUT HOW TO CHARACTERIZE THAT

22  DECISION; SO, YOUR HONOR, AS THE COURT SUGGESTED, WE'VE

23  PREPARED A DOCUMENT THAT HAS EACH SIDE'S PROPOSED INSTRUCTION

24  TO THE JURY.

25       THE COURT:  COULD YOU PROVIDE THAT TO MR. HOLMES,

1    PLEASE.

2        MR. QUINN:  THE ONLY COMMENT I WOULD MAKE ON THIS IS

3    THAT MGA'S PROPOSED VERSION INCLUDES THE LANGUAGE THAT A COURT

4    FOUND AS TO BE "SUBSTANTIALLY TRUE THAT...".  AND I THINK THAT

5    INVITES THE POTENTIAL FOR COMPOUNDING THE CONFUSION.  THE

6    UNDERLYING CASE WAS A QUESTION, OF COURSE, OF WHETHER IT WAS A

7    DEFAMATION CLAIM, AND "SUBSTANTIALLY TRUE" IN THAT CONTEXT HAS

8    A PARTICULAR MEANING.

9        THE COURT:  MS. AGUIAR, I'LL HEAR FROM MGA.

10       MS. AGUIAR:  MY POINT IN INCLUDING THAT, YOUR HONOR,

11   IS JUST TO MAKE CLEAR THAT WHEN MR. LARIAN WAS MAKING THIS

12   STATEMENT, HE WASN'T JUST GETTING IT FROM OUT OF NOWHERE.  AND

13   IN THAT CASE, MR. QUINN IS RIGHT; AND YOU WERE OBVIOUSLY RIGHT

14   THE OTHER DAY WHEN YOU POINTED OUT THAT THE COURT DID NOT FIND

15   THAT IT IS TRUE THAT MATTEL PUTS A TARGET ON YOUR BACK.  BUT

16   THE COURT DID FIND THAT IT WAS SUBSTANTIALLY TRUE THAT THE

17   WITNESS DID, IN FACT, GIVE THAT TESTIMONY.  SO THAT WAS MY ONLY

18   POINT.

19       I DON'T WANT TO LEAVE THE JURY WITH THE IMPRESSION

20   THAT MR. LARIAN WAS WAY OFF BASE IN TESTIFYING WHAT HE

21   TESTIFIED TO, AND I JUST THINK WE HAVEN'T HAD A SITUATION IN

22   THIS CASE WHERE YOU HAVE GIVEN THE JURY AN INSTRUCTION

23   REGARDING SOMEONE'S TESTIMONY.  SO I JUST THINK IT'S IMPORTANT

24   THAT WE NOT LEAVE THE JURY WITH THE IMPRESSION THAT HE WAS

25   TOTALLY WRONG.

1        MR. QUINN:  HE WAS TOTALLY WRONG, YOUR HONOR.  AND

2    THERE WAS NO FINDING BY ANY COURT.  AND THAT'S WHAT HE SAID.

3    THAT'S TOTALLY WRONG.  THERE'S A HUGE DIFFERENCE BETWEEN SAYING

4    THERE WAS SUCH A FINDING BY A COURT, AND A FORMER EMPLOYEE

5    TESTIFIED TO THAT FACT.

6        THE COURT:  THERE IS A HUGE DIFFERENCE, AND I AGREE

7    WITH YOU ON THAT.  I ALSO UNDERSTAND MS. AGUIAR'S POINT.

8        MY CONCERN ABOUT THE MATTEL PROPOSED INSTRUCTION IS

9    THAT IT SEEMS TO ALMOST BE A DIRECTIVE FROM THIS COURT THAT

10   MR. LARIAN GAVE FALSE TESTIMONY, AND I DON'T WANT TO GIVE THAT

11   IMPRESSION.  WHILE, AT THE SAME TIME, BY CALLING FOR THIS

12   INSTRUCTION, I CERTAINLY WANT TO MAKE SURE MATTEL IS NOT

13   MALIGNED, FOR LACK OF A BETTER PHRASE, BY TESTIMONY THAT IS NOT

14   WHOLLY ACCURATE.

15       I THINK THIS IS ONE OF THOSE INSTANCES WHERE IT WAS

16   UNFORTUNATE THAT MR. LARIAN SAID WHAT HE SAID.  BUT AT THE SAME

17   TIME, I UNDERSTAND WHERE IT CAME FROM, I THINK.

18       MR. QUINN:  WE CERTAINLY DON'T HAVE TO SAY HE GAVE

19   FALSE TESTIMONY.

20       THE COURT:  LET ME SUGGEST THIS, BECAUSE I ALSO

21   AGREE -- I TEND TO PREFER MGA'S PROPOSED INSTRUCTION, BUT I

22   DON'T WANT TO LEAVE IT AT -- THE LINE THAT SAYS, "THE COURT IN

23   THAT CASE FOUND THAT IT WAS SUBSTANTIALLY TRUE THAT THE WITNESS

24   HAD GIVEN THAT TESTIMONY," I'M AFRAID YOU'RE CORRECT THAT THAT

25   LEADS IT RIGHT BACK TO WHERE WE WERE.  I THINK I NEED TO ADD

1    THE PHRASE "BUT NOT THAT THE ALLEGATION ITSELF WAS TRUE," TO

2    MAKE IT CLEAR TO THE JURY THAT WHAT THE COURT FOUND WAS THAT

3    SOMEBODY HAD SAID THIS BUT NOT THAT IT WAS TRUE.

4        I ALSO LIKE THE CLARIFICATION IN THE MGA INSTRUCTION

5    THAT THIS WAS A CALIFORNIA STATE COURT CASE AND NOT A FEDERAL

6    COURT CASE, BECAUSE MY BIG CONCERN IS DISTANCING THIS JURY'S

7    SENSE THAT THIS HAS ANYTHING AT ALL TO DO WITH THE INSTRUCTIONS

8    THAT THIS COURT HAS GIVEN.

9        AND THEN I'LL ALSO ADD TO THAT LAST LINE THAT WAS

10   PROPOSED BY MGA, WHERE MGA WRITES, "I AM ALSO INSTRUCTING YOU

11   THAT IN THIS CASE, YOU ARE TO FOLLOW THE INSTRUCTIONS AND

12   DIRECTIONS OF THIS COURT AND NO OTHER" -- I'M GOING TO ADD

13   THAT, JUST TO REINFORCE THE FACT THAT ONLY WHAT THIS COURT SAYS

14   GOES IN THIS CASE AND NOT ANY OTHER CASE.

15       I THINK THAT CAPTURES IT.

16       MR. QUINN:  YOUR HONOR, I'M WONDERING WHETHER NOW

17   THAT THE JURY IS BEING TOLD THAT A WITNESS SO TESTIFIED -- I

18   MEAN, THAT IS HEARSAY, AND I'M WONDERING WHETHER THEY DON'T

19   ALSO NEED TO BE TOLD THEY CAN'T CONSIDER THAT FOR THE TRUTH OF

20   THE MATTER.  BECAUSE THEY CAN'T.

21       THE COURT:  I COULD ADD A LINE, AND IT DOES MAKE

22   SENSE, PERHAPS, AFTER I SAY "BUT NOT THAT THE ALLEGATION WAS

23   TRUE," "BECAUSE THIS TESTIMONY IS AN OUT-OF-COURT STATEMENT

24   THAT IS NOT BEFORE YOU, NONE OF THIS IS TO BE CONSIDERED AS

25   EVIDENCE IN THIS TRIAL."

1        IS THAT SOMETHING THAT MGA --

2        MS. AGUIAR:  THANK YOU, YOUR HONOR.  THAT'S FINE.

3        THE COURT:  "BECAUSE ALL OF THIS IS AN OUT-OF-COURT

4    STATEMENT THAT HAS NOT BEEN INTRODUCED IN THIS TRIAL, YOU ARE

5    INSTRUCTED NOT TO CONSIDER IT."

6        AND HOPEFULLY, THAT NEUTRALIZES THIS ENTIRE LINE, AND

7    WE'LL LEAVE IT AT THAT.  THEN THEY UNDERSTAND WHAT IT IS;

8    MR. LARIAN IS NOT HELD OUT TO BE UNDULY PREJUDICED, NEITHER IS

9    MATTEL; AND WE MOVE ALONG.

10       MR. QUINN:  I APPRECIATE THAT, YOUR HONOR.

11       THE COURT:  OKAY.

12       ANYTHING FURTHER ON THIS POINT?

13       MR. QUINN:  NO, YOUR HONOR.

14       THE COURT:  VERY WELL.

15       ANY OTHER ISSUES THAT YOU WANT TO RAISE BEFORE WE

16   BRING THE JURY OUT, FROM MATTEL'S PERSPECTIVE?

17       MR. QUINN:  YES, YOUR HONOR.

18       HOPE BLOOMS ETERNAL.  WE'RE TRYING TO GET TO THE

19   POINT WHERE WE CAN REST OUR CASE TOMORROW.

20       THE COURT:  THAT WOULD BE GREAT.

21       MR. QUINN:  MY COLLEAGUES OVER HERE HAVE POINTED OUT

22   IT MAY BE EXTREME WISHFUL THINKING, BUT THAT'S OUR GOAL.

23       THE COURT:  I UNDERSTAND MR. NOLAN HAS NO FURTHER

24   EXAMINATION OF MR. BRYANT, SO WE SHOULD BE ABLE --

25       (LAUGHTER.)

1        MR. QUINN:  THAT WOULD CERTAINLY SPEED THINGS UP, IF

2    HE WOULD WAIVE THAT.

3        AS OFTEN HAPPENS AS YOU GET INTO THE END OF YOUR

4    CASE, YOU CONFRONT THE ISSUE OF SOME STRAY DOCUMENTS, AND 'HOW

5    ARE WE GOING TO GET SOME DOCUMENTS INTO EVIDENCE?'  AND WE HAVE

6    SUBPOENAS OUT TO DOCUMENT CUSTODIANS AND LAWYERS AND FORMER

7    LAWYERS AT MGA.  WE'RE ALSO IN DISCUSSIONS ABOUT PURSUING

8    STIPULATIONS, AND WE'LL DEAL WITH THAT ONE WAY OR ANOTHER.

9        I WAS WONDERING IF I COULD PERSUADE THE COURT TO

10   REVISIT SOME COMMENTS THAT THE COURT MADE LAST WEEK ABOUT

11   GETTING DOCUMENTS INTO EVIDENCE.

12       THE COURT HAD SAID THAT THE ONLY WAY A DOCUMENT IS

13   GOING TO COME IN AS EVIDENCE IS EITHER A STIPULATION OR THROUGH

14   A WITNESS.  WE WERE SCRATCHING OUR HEADS ABOUT WHAT THAT MEANT

15   THIS WEEKEND IN A SITUATION WHERE THERE IS A STIPULATION TO THE

16   AUTHENTICITY OF A DOCUMENT.  IT IS WHAT IT PURPORTS TO BE.  AND

17   BY HYPOTHESIS, SINCE THE COURT DETERMINES RELEVANCE, IT'S

18   RELEVANT.

19       IT STILL SEEMS TO US THAT WE SHOULD -- IN THAT

20   SITUATION, WE'RE NOT SURE WHAT ADDITIONAL FOUNDATION WOULD BE

21   NECESSARY FROM A WITNESS ON THE STAND.  I'M NOT CLEAR EXACTLY

22   EVEN WHAT QUESTION WE WOULD ASK.  IF WE HAVE A DOCUMENT WHICH

23   IS STIPULATED TO BE AUTHENTIC, THE COURT FINDS IT'S RELEVANT,

24   IT SEEMS TO US WE SHOULD SIMPLY BE ABLE TO MOVE IT INTO

25   EVIDENCE.  IT DOESN'T HAVE TO BE DONE BEFORE THE JURY, OR IT

1    COULD BE, BUT IT SEEMS CLUMSY, PERHAPS, TO ALSO CALL A WITNESS,

2    ESPECIALLY SINCE WE'RE SCRAMBLING TO GET SOME OF THESE PEOPLE

3    IN HERE.

4         THE COURT:  SO THERE ARE DOCUMENTS THAT THE ONLY

5    REASON, AS YOU UNDERSTAND, THAT MGA WILL NOT AGREE TO THEM IS

6    BECAUSE OF RELEVANCE?  IS THAT IT?

7         MR. QUINN:  YES, YOUR HONOR.  THERE ARE A CLASS OF

8    DOCUMENTS AS TO WHICH MGA HAS AGREED THEY ARE AUTHENTIC.

9         THE COURT:  AND THERE'S NO FOUNDATIONAL OBJECTION?

10   ANY OTHER OBJECTIONS?  JUST RELEVANCE?

11        MR. QUINN:  AS TO SUM CLASS OF DOCUMENTS, YES,

12   YOUR HONOR.

13        THE COURT:  I UNDERSTAND YOUR POINT WITH RESPECT TO

14   THAT SUM CLASS OF DOCUMENTS, BUT I'LL HEAR FROM MGA FIRST,

15   BECAUSE I'M RELUCTANT TO CHANGE THE GUIDELINES IN THE MIDDLE OF

16   THE GAME.

17        MR. NOLAN:  THAT WAS GOING TO BE MY OBVIOUS POINT,

18   YOUR HONOR.  I CAN COMMIT TO THE COURT THAT WE HAVE DESIGNATED

19   REPRESENTATIVES FROM EACH TEAM THAT ARE STILL TALKING TO EACH

20   OTHER, TO MEET.  WE HAD TO GO PRETTY FAR INTO THE TEAM TO FIND

21   THAT OUT SO THAT THERE WOULD BE NO SIDE ISSUES OR COLLATERAL

22   ISSUES.  MY UNDERSTANDING IS THAT THE GROUP MET LAST EVENING, A

23   PROPOSAL WAS MADE, THERE WERE EXCHANGES BACK AND FORTH.  AND I

24   CERTAINLY UNDERSTAND MR. QUINN'S ISSUE.  WE'RE GOING TO HAVE

25   SIMILAR ISSUES DOWN THE ROAD.

1      MY ONLY CONCERN, YOUR HONOR, IS THIS -- AND I'VE MADE

2    THIS POINT BEFORE.  I'M NOT SUGGESTING THAT THERE'S A CHANGE IN

3    THE RULES MIDSTREAM.  I DON'T HAVE TO, BECAUSE THAT, IN FACT,

4    IS WHAT IS GOING TO HAPPEN, BECAUSE I WOULD HAVE LOVED TO HAVE

5    HAD, WHEN IVY ROSS WAS ON THE STAND AND LILY MARTINEZ WAS ON

6    THE STAND -- TO BE ABLE TO IMPEACH BOTH OF THEIR TESTIMONY WITH

7    DOCUMENTS FOR WHICH THERE IS NO DOUBT THEY ARE AUTHENTIC, THEY

8    ARE BUSINESS RECORDS OF MATTEL.  AND I THINK THE COURT MAY

9    RECALL SOME OF THAT TESTIMONY.  AND MY SCENE 360 IS THE CLASSIC

10   ONE.  THERE WAS AN OBJECTION TO THAT.

11      UNDER THIS PROPOSAL NOW, OF COURSE, NOW THAT THEY'RE

12   AT THE END OF THE CASE, THOSE RULES CHANGE.

13      I'LL COMMIT TO YOU THAT WE'RE GOING TO WORK TOWARDS

14   WORKING OUT A PROCESS SO THAT YOU'RE NOT GOING TO BE BOTHERED;

15   WE'RE NOT GOING TO TAKE UP UNNECESSARY COURT TIME.  THE DEVIL

16   IS IN THE DETAILS.  IT'S BEING WORKED ON.  THAT'S ALL I WOULD

17   SAY.  I DON'T BELIEVE ANY OF THIS WILL COME UP WITH

18   CARTER BRYANT TODAY.

19      THE COURT:  IF IT'S REALLY ONLY A MATTER OF

20   RELEVANCE, JUST TO KIND OF PRESERVE -- BECAUSE MR. NOLAN IS

21   CORRECT.  I MEAN, THERE WERE DOCUMENTS THAT JUST HADN'T COME IN

22   YET.  AND THIS HAS WORKED TO YOUR BENEFIT WITH SOME WITNESSES.

23      MR. QUINN:  THIS SHOULD WORK BOTH WAYS.  IF WE'VE

24   STIPULATED TO THE AUTHENTICITY OF A DOCUMENT -- BY HYPOTHESIS,

25   I'M ONLY TALKING ABOUT DOCUMENTS WHERE THERE'S A STIPULATION TO

1   AUTHENTICITY.  IT SEEMS TO ME, THEN, THE ONLY ISSUE BEFORE THE

2   COURT IS WHETHER IT'S RELEVANT.

3        NOW, THERE'S A SEPARATE ISSUE ABOUT WHETHER A

4   PARTICULAR WITNESS CAN BE QUESTIONED ABOUT THAT DOCUMENT IF

5   THEY'VE NEVER SEEN IT BEFORE OR THEY DON'T KNOW WHAT IT IS.

6   WHAT I'M SUGGESTING, I DON'T THINK, IS -- IT'S NOT ONE-SIDED.

7   WE'VE STIPULATED TO THE AUTHENTICITY --

8        THE COURT:  IF IT'S NOT ONE-SIDED, IT'S THE TYPE OF

9   THING THAT YOU SHOULD ALL AGREE ON AND MOVE FORWARD.  BUT IF

10  YOU'RE NOT ABLE TO AGREE ON IT -- QUITE FRANKLY, YOU CAN PUT UP

11  JUST ABOUT ANYBODY.  IF THERE'S NO ARGUMENT ON AUTHENTICITY,

12  YOU CAN PUT UP ANY --

13       MR. QUINN:  98.6 TEMPERATURE HUMAN BEING?

14       THE COURT:  JUST ABOUT.  BECAUSE THERE'S NO ISSUE ON

15  AUTHENTICITY AND IT'S JUST A MATTER OF RELEVANCE.  YOU KNOW,

16  BRING SOMEBODY FROM MATTEL AND PUT THEM UP THERE AND MOVE THE

17  DOCUMENTS IN.

18       BUT THAT WAY, WE'RE NOT GETTING INTO THIS -- BECAUSE

19  WHAT I DON'T WANT TO DO -- I SEE THE DOWNSIDE OF CARVING OUT

20  EXCEPTIONS ON THIS.  I SEE THE DOWNSIDE.

21       MR. QUINN:  THE COURT HAS GIVEN US SOME USEFUL

22  GUIDANCE, YOUR HONOR.

23       THE COURT:  VERY WELL.

24       MR. QUINN:  THERE'S ANOTHER ISSUE I'D LIKE TO RAISE,

25  YOUR HONOR.

1        WE MADE A MOTION BEFORE TRIAL DIRECTED TO CERTAIN

2    ASSERTED PRIVILEGE DOCUMENTS, INCLUDING ONE IN PARTICULAR WHICH

3    HAD BEEN CLAWED BACK BY MGA.  THIS WAS AN E-MAIL FROM

4    MR. LARIAN TO PATTIE GLASER, I BELIEVE IN MAY OR JUNE OF 2001,

5    WHERE HE STATES THAT -- I THINK IT'S ALREADY IN THE RECORD WHAT

6    HE STATES.

7        MR. NOLAN:  YOUR HONOR, SUBJECT TO A CLAWBACK MOTION,

8    I BELIEVE THAT WE HAVE ASSERTED IT AS A PRIVILEGED STATEMENT,

9    AND I DON'T THINK MR. QUINN SHOULD ON THE RECORD BE STATING

10   WHAT'S IN THE ADMISSION.

11       THE COURT:  FAIR ENOUGH.

12       MR. QUINN:  I THINK IT HAS BEEN ON THE RECORD.  I

13   WON'T SAY ANYTHING RIGHT NOW.  IT'S ON THE RECORD BEFORE.  THE

14   COURT DENIED THAT MOTION SUBJECT TO IT BEING RENEWED.  AND

15   BEFORE WE REST, YOUR HONOR, WE WOULD RENEW THAT MOTION.

16       I WOULD JUST REMIND THE COURT, AS WE'VE SAID BEFORE,

17   THIS IS SIMPLY A FACTUAL STATEMENT ABOUT WHEN THESE DRAWINGS

18   WERE CREATED.  THAT'S ALL IT IS.  AND THE COURT HAS RECOGNIZED,

19   IN ANOTHER CONTEXT, THAT IF IT'S SIMPLY A FACTUAL

20   COMMUNICATION, IT'S NOT PRIVILEGED.

21       THE COURT:  YOU WANT TO BRING THIS EVIDENCE IN PRIOR

22   TO THE CLOSE OF YOUR CASE?

23       MR. QUINN:  YES, YOUR HONOR.

24       THE COURT:  REFRESH MY RECOLLECTION.

25       WHAT MOTION IN LIMINE NUMBER WAS THAT?

1          MR. QUINN:  IT WASN'T A MOTION IN LIMINE.  IT WAS A

2     MOTION TO BASICALLY DETERMINE THAT CERTAIN DOCUMENTS WERE NOT

3     PRIVILEGED BASED ON A CRIME FRAUD EXCEPTION.

4          BUT DURING THE COURSE OF THE TRIAL, I THINK THE COURT

5     HAS ANOTHER BASIS IN WHICH TO LOOK BEYOND THE CLAIM OF

6     PRIVILEGE.  AND THAT IS WAIVER.  THEY HAVE NOW, BY PRODUCING

7     DOCUMENTS AFTER THAT, IN THE MIDDLE OF A TRIAL, SOME

8     COMMUNICATIONS WITH MR. ROSENBAUM, ON THAT VERY SUBJECT.

9          THE COURT:  THE COURT HAS BEEN VERY RESTRICTIVE.

10    MR. QUINN, BE CAREFUL HERE.

11         MR. QUINN:  I UNDERSTAND.

12         THE COURT:  OKAY.

13         MR. QUINN:  IT'S A TRADE WE'D TAKE.

14         THE COURT:  WELL, THEN, IF THAT'S A TRADE YOU'LL

15    TAKE, MAYBE YOU SHOULD TALK WITH THE PEOPLE YOU'RE TRYING TO

16    BARGAIN WITH.

17         MR. QUINN:  I WAS JUST ANTICIPATING WHERE THE COURT

18    WAS GOING.

19         THE COURT:  BECAUSE I SUSPECT THERE'S A NUMBER OF

20    DOCUMENTS THAT THEY WOULD LIKE TO GET IN UNDER THE SAME THEORY;

21    THAT THESE ARE JUST COMMUNICATIONS OF A FACT-BASED NATURE.

22         MR. QUINN:  WELL, YOUR HONOR, THERE IS THAT BASIS.

23    THERE'S A CRIME FRAUD ISSUE, WHICH WE'D LIKE THE COURT TO

24    ADDRESS.  SECOND, THE COURT HAS ATTACHED SIGNIFICANCE TO THE

25    FACT THAT A COMMUNICATION WITH A LAWYER IS PURELY FACTUAL.  AND

1    I WOULD POINT OUT, THAT'S WHAT THIS IS.  AND THIRD, IN THE

2    MIDDLE OF THE TRIAL, WE HAVE A SUBJECT MATTER WAIVER ON THIS

3    SUBJECT, I.E., COMMUNICATIONS WITH LAWYERS ABOUT WHEN THESE

4    DRAWINGS WERE CREATED; SO WE THINK THAT'S A WAIVER.

5        THE COURT:  LET ME HEAR FROM MGA IN RESPONSE.

6        MR. NOLAN:  I LIKE WORKING WITH MR. QUINN IN TRIAL,

7    BECAUSE AFTER THE FACT, WE GET THESE OFFERS AND THEY SEEM

8    GREAT.  I JUST WONDER WHY WE'RE GETTING THE TRADE-OFF NOW AT

9    THE END OF THE CASE, WHEN I WANTED TO GET THESE DOCUMENTS IN A

10   LITTLE BIT EARLIER.  BUT I'LL SET THAT ASIDE FOR A MOMENT, YOUR

11   HONOR.

12       THIS WAS JUST OFFERED TO US.  LET ME THINK ABOUT IT,

13   IF I MIGHT.

14       THE COURT:  VERY WELL.

15       MR. NOLAN:  I'VE GOT SOME COLLEAGUES I SHOULD CONSULT

16   WITH, BUT I UNDERSTAND THE PROPOSAL.

17       IF I COULD JUST RAISE A COUPLE OF QUICK POINTS, JUST

18   TO ALERT THE COURT OF A COUPLE OF THINGS TODAY, FOR AN AGENDA

19   TO DISCUSS LATER AT A BREAK.

20       FIRST OF ALL, WE'D LIKE, BEFORE WE START TODAY,

21   YOUR HONOR, IF YOU COULD GIVE US AN UPDATE ON THE COUNT, THE

22   TIME COUNT.  I THINK THAT WOULD BE HELPFUL.

23       THE COURT:  YES.  AND WE'VE RECONSTRUCTED THAT

24   MISSING TIME THAT I HAVE FROM THURSDAY; SO I'LL BE GETTING THAT

25   FROM MY COURT REPORTER SHORTLY, AND AS SOON AS I HAVE THAT,

1    I'LL GIVE YOU THE TIME COUNT.

2         YOURS, I DO KNOW, THOUGH.  YOURS IS RIGHT AT

3    17 HOURS.

4         MR. NOLAN:  ALL RIGHT.

5         YOUR HONOR, THEN IMMEDIATELY AFTER CARTER BRYANT

6    FINISHES -- AND HOPE SPRINGS ETERNAL -- MAYBE WE'LL GET THROUGH

7    IT TODAY.  I DON'T KNOW HOW MUCH LONGER MR. PRICE HAS.

8         THEY DO WANT TO CALL, I BELIEVE, THE COMPUTER EXPERT,

9    MR. MENZ.  AND I WOULD JUST LIKE THE OPPORTUNITY TO RAISE THAT,

10   YOUR HONOR, ON THE 403 ISSUES THAT WE HAD DISCUSSED BEFORE, AS

11   TO WHETHER OR NOT WE'RE GOING TO GET INTO THAT VERY QUICKLY.

12        THE COURT:  I'LL BE INTERESTED TO HEAR HOW THIS ALL

13   PLAYS OUT.  WE'LL WAIT UNTIL AFTER MR. BRYANT'S TESTIMONY, AND

14   THEN I'M SURE WE'LL HAVE SOME OPPORTUNITY TO FURTHER ADDRESS

15   THAT.  I'M NOT GOING TO MAKE A DECISION ON THAT UNTIL I'VE

16   HEARD ALL OF MR. BRYANT'S TESTIMONY.

17        MR. QUINN:  FINALLY, YOUR HONOR -- I HAD FORGOTTEN

18   THIS -- THERE ARE SOME WITNESSES THAT WE WANT TO CALL,

19   MS. GRONICH, FORMER GENERAL COUNSEL OF MGA.  THIS IS A DOCUMENT

20   ISSUES, SO MAYBE WE'RE GOING TO WORK THAT OUT.

21        THE COURT:  LET'S TRY TO WORK IT OUT.  WE'VE GOT THE

22   JURY READY.  LET'S BRING THEM IN.

23        MR. QUINN:  AND MS. GLASER AS WELL, BOTH OF WHOM ARE

24   NOT AVAILABLE, WE'RE BEING TOLD.  AND FARHAD LARIAN.  SO WE MAY

25   NEED TO REST, SUBJECT TO CALLING FARHAD LARIAN IN THE DEFENSE

1      CASE.

2           THE COURT:  VERY GOOD.

3           COUNSEL?

4           MR. WERDEGAR:  I JUST WANTED TO ALERT THE COURT THAT

5      I WAS HERE TODAY ON BEHALF OF THE WITNESS AND NOT MY COLLEAGUE.

6      MS. ANDERSON HAD A SCHEDULING CONFLICT; SO THAT THE COURT

7      WOULDN'T BE SURPRISED.

8           THE COURT:  VERY WELL.

9           I BELIEVE IT WAS INTRODUCED MR. PAGE AND MS. ANDERSON

10     TO THE JURY.  I'M HAPPY TO DO THE SAME FOR YOU, IF YOU WISH TO

11     BE INTRODUCED AS MR. BRYANT'S ATTORNEY.

12          MR. WERDEGAR:  IF IT'S BEEN DONE BEFORE, JUST TO BE

13     CONSISTENT, YOUR HONOR.

14          THE COURT:  VERY WELL.

15          AND ALSO, MR. HOLMES WILL PROVIDE YOU WITH A

16     MICROPHONE.  I KNOW YOU'RE SITTING OUT THERE, BUT IN CASE YOU

17     DO HAVE AN OBJECTION TO MAKE, I ASK THAT YOU USE THE

18     MICROPHONE, FOR THE BENEFIT OF THE COURT REPORTER.

19          MR. WERDEGAR:  VERY GOOD, YOUR HONOR.

20          THE COURT:  JUST TO RECAP, THEN, IT SOUNDS LIKE

21     MATTEL AND MGA COUNSEL WILL DISCUSS THESE VARIOUS DOCUMENT

22     ISSUES, THE ONES WHICH ARE SUBJECT TO STIPULATION OR PARTIAL

23     STIPULATION, THE ONES THAT MR. QUINN SUGGESTS ARE SUBJECT TO

24     THE CRIME FRAUD EXCEPTION OR SUBJECT MATTER WAIVER ON THE

25     ATTORNEY-CLIENT PRIVILEGE, AND ANY OTHER DOCUMENTS.  LET'S

1   EXPLORE THOSE BEFORE THE COURT HAS TO MAKE A RULING ON THEM.

2       MS. AGUIAR:  SO THAT WE CAN GO AHEAD AND BRING IN THE

3   JURY NOW, IF I CAN JUST RAISE ONE OR TWO OTHER THINGS AT THE

4   MORNING BREAK.  THEY'RE NOT INCREDIBLY TIME SENSITIVE, BUT I

5   DID WANT TO RAISE THEM TODAY.

6       THE COURT:  VERY GOOD.

7       IF THE JURY IS READY, LET'S BRING THEM IN.  IT'S MY

8   UNDERSTANDING THAT THEY ARE.

9       (WHEREUPON, JURORS ENTER COURTROOM.)

10      THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.

11      A COUPLE OF THINGS BEFORE WE RESUME WITH THE

12  TESTIMONY OF MR. BRYANT.

13      FIRST OF ALL, THE COURT NEEDS TO PROVIDE AN

14  INSTRUCTION TO YOU CONCERNING SOME TESTIMONY FROM MR. LARIAN.

15      EARLIER IN THE TRIAL, YOU HEARD TESTIMONY FROM

16  ISAAC LARIAN.  LAST WEDNESDAY, YOU HEARD MR. LARIAN TESTIFY

17  THAT A FEDERAL JUDGE HAD, QUOTE, "SPECIFICALLY SAID IT'S

18  PUBLISHED THAT ANYBODY WHO DECIDED IN THE TOY BUSINESS TO GET

19  INTO THE FASHION DOLL BUSINESS, THEY HAVE A TARGET PAINTED ON

20  THEIR BACK BY MATTEL," CLOSED QUOTE.

21      I'M INSTRUCTING YOU THAT IT WAS A CALIFORNIA STATE

22  COURT CASE.  NOT A FEDERAL CASE.  THE JUDGE IN THAT CASE DID

23  NOT MAKE THE RULING THAT MR. LARIAN REFERENCED.  RATHER, IN

24  THAT CASE, QUOTE, "MATTEL'S FORMER EMPLOYEE TESTIFIED THAT

25  MATTEL AGGRESSIVELY DEFENDS AGAINST ANY ENTRIES IN THE FASHION

1    DOLL BUSINESS, AND ANYONE WHO MAKES AN ELEVEN-AND-ONE-HALF-INCH

2    FASHION DOLL PAINTS A TARGET ON THEIR BACK," CLOSED QUOTE.

3         THE COURT IN THAT CASE FOUND THAT IT WAS

4    SUBSTANTIALLY TRUE THAT THE WITNESS HAD GIVEN THE TESTIMONY,

5    BUT NOT THAT THE ALLEGATION ITSELF WAS TRUE.

6         BECAUSE ALL OF THIS IS AN OUT-OF-COURT STATEMENT OR

7    OUT-OF-COURT STATEMENTS THAT HAVE NOT BEEN INTRODUCED INTO THIS

8    TRIAL, YOU ARE INSTRUCTED NOT TO CONSIDER ANY OF THIS.  I'M

9    ALSO INSTRUCTING YOU THAT IN THIS CASE, YOU ARE TO FOLLOW THE

10   INSTRUCTIONS AND DIRECTIONS OF THIS COURT AND NO OTHER COURT.

11        I ALSO, AT THIS POINT, WANT TO INTRODUCE

12   MR. WERDEGAR.

13        IF YOU WOULD STAND UP.

14        MR. WERDEGAR IS MR. BRYANT'S ATTORNEY FOR TODAY.  YOU

15   HAD PREVIOUSLY MET MR. PAGE AND MS. ANDERSON, BUT MR. WERDEGAR

16   IS HERE TODAY.  HE'S BEEN GIVEN LEAVE TO MAKE OBJECTIONS TO

17   ANYTHING ON BEHALF OF MR. BRYANT THAT HE WISHES.

18        MR. PRICE, I BELIEVE THAT YOU'RE --

19        MR. NOLAN:  MY ONLY POINT WOULD BE, DOES THE COURT

20   MIND POINTING OUT THAT MR. WERDEGAR IS PART OF THE SAME LAW

21   FIRM AS THE OTHER TWO?

22        THE COURT:  VERY WELL.

23        MR. WERDEGAR IS A PARTNER, I BELIEVE, OF MR. PAGE AND

24   MS. ANDERSON.

25        MR. WERDEGAR:  THAT'S CORRECT, YOUR HONOR.

1          THE COURT:  AND HE IS NOT ASSOCIATED WITH THE LAW

2     FIRM OF SKADDEN ARPS, MR. NOLAN AND HIS COLLEAGUES.

3          MR. NOLAN:  THANK YOU, YOUR HONOR.

4          THE COURT:  ANYTHING FURTHER, MR. NOLAN?

5          MR. NOLAN:  NO.  THANK YOU VERY MUCH.

6          THE COURT:  MR. PRICE, YOU MAY RESUME YOUR

7     EXAMINATION.

8               DIRECT EXAMINATION (CONTINUED)

9     BY MR. PRICE:

10    Q   MR. BRYANT, THIS MORNING I NEED TO GO OVER SOME DRAWINGS

11    WITH YOU, JUST TO GET YOUR TESTIMONY ABOUT THEIR CREATION, SO

12    THAT WE'LL KNOW WHAT THE TESTIMONY IS.

13         IN FRONT OF YOU, THERE'S THE BINDER WHICH IS THE

14    DRAWINGS BINDER.

15         ON THE FIRST ONE, I'M GOING TO BE ASKING YOU ABOUT

16    THE DRAWINGS THAT ARE EXHIBIT 5.

17    A   OKAY.

18    Q   WE'VE BEEN USING TWO NUMBERS TO HELP YOU FIND THESE.

19    THERE'S A BATES NUMBER, AND THERE'S AN EXHIBIT NUMBER AT THE

20    BOTTOM.  IT WILL SAY, LIKE, 5-40 OR SOMETHING LIKE THAT.

21         DO YOU SEE THOSE NUMBERS?

22    A   YES.

23    Q   THERE'S ALSO A BRYANT BATES NUMBER.

24         DO YOU SEE THOSE AS WELL?

25    A   YES.

1    Q    AND WHEN I DO THESE, I'LL TRY TO STATE IN THE RECORD BOTH

2    NUMBERS, SINCE THE JURY WILL HAVE BOTH THE EXHIBIT, WHICH IS A

3    COPY, AND THE BATES NUMBER, WHICH IS THE ORIGINAL.

4    A    ALL RIGHT.

5    Q    AND JUST TO ORIENT US, THE LAST TIME WE HAD TALKED ABOUT

6    NUMBER 539, WHICH IS CARTER BRYANT NUMBER 500179; 540, WHICH IS

7    CARTER BRYANT 500180; 541, WHICH IS BRYANT NUMBER 00181; AND

8    542, WHICH IS BRYANT NUMBER 00182.

9        MR. PRICE:  IF WE COULD PUT UP 539.

10   BY MR. PRICE:

11   Q    SO WHAT WE'RE TALKING ABOUT HERE IS -- YOU SEE THERE --

12   THIS IS SORT OF CUT OFF.  YOU SEE AT THE BOTTOM RIGHT, IT WILL

13   HAVE EXHIBIT 5-39.

14       DO YOU SEE THAT?

15   A    YES.

16   Q    AND THEN IT ALSO HAS THIS BRYANT BATES NUMBER ON IT.

17       YOU SEE BRYANT 00179?

18   A    YES.

19       MR. PRICE:  AND IF I MAY APPROACH WITH AN ORIGINAL,

20   YOUR HONOR.

21   BY MR. PRICE:

22   Q    AS AN EXAMPLE, IF YOU CAN SHOW THAT TO THE JURY, THAT'S

23   THE ORIGINAL, THEN, OF THIS BRYANT 00179, WHICH IS

24   EXHIBIT 5-39; CORRECT?

25   A    YES.

1    Q    DO YOU REMEMBER THAT WE WENT OVER THOSE YESTERDAY WITH THE

2    ONES THAT ARE TORN OUT FROM A NOTEBOOK?

3    A    YES.

4    Q    NOW, WHAT I WANT TO FOCUS ON -- I KNOW YOUR TESTIMONY IS

5    THAT YOU DID THAT IN '98.  I WANT TO FOCUS ON THE OTHER

6    EXHIBITS IN EXHIBIT 5, WHICH YOU SAY WERE DONE AFTER YOU HAD

7    DONE THOSE INITIAL NOTEBOOK DRAWINGS.  OKAY?

8    A    OKAY.

9    Q    SO THESE ARE DRAWINGS THAT ARE SOME TIME AFTER EXHIBITS

10   5-39 TO 5-42; OKAY?

11   A    ALL RIGHT.

12   Q    IF YOU WOULD FIRST GO TO 5-0035, WHICH IS BRYANT 00175 --

13   AND WE CAN DO THE NEXT IN A GROUP, I THINK; 5-36, WHICH IS

14   BRYANT 00176; 5-37, WHICH IS BRYANT 00177; AND 5-38, WHICH IS

15   BRYANT 00178.

16         HAVE YOU LOOKED AT THOSE?

17   A    YES.

18   Q    THOSE ARE DRAWINGS WHICH YOU SAY WERE DONE IN 1998, AFTER

19   THOSE ORIGINAL NOTEBOOK DRAWINGS; CORRECT?

20   A    YES.

21         MR. PRICE:  IF I MAY APPROACH, YOUR HONOR, WITH THE

22   ORIGINALS.

23         THE COURT:  YOU MAY.

24   BY MR. PRICE:

25   Q    WHAT YOU HAVE IN FRONT OF YOU NOW ARE THE ORIGINALS OF

1   THOSE DRAWINGS, CORRECT, ALONG WITH A COPY?

2   A   YES.

3   Q   COULD YOU HOLD UP JUST ONE OF THE ORIGINALS SO WE CAN SEE

4   WHAT IT LOOKS LIKE.

5   A   (WITNESS COMPLIES.)

6   Q   ARE THESE DONE IN PENCIL?

7   A   YES.

8   Q   THE ORIGINALS ARE ON JUST TRACING PAPER OR REGULAR PAPER?

9   A   THIS IS JUST REGULAR, UNLINED PAPER.

10   Q   LET ME GO THROUGH HERE SO WE HAVE A COMPLETE

11   IDENTIFICATION OF THE DRAWINGS.

12        IF YOU WOULD LOOK AT 5-46, WHICH IS BRYANT 00186.

13        THAT'S ALSO A DRAWING YOU DID AFTER THESE NOTEBOOK

14   DRAWINGS, AND YOU CLAIMED THEY WERE DONE IN '98; CORRECT?

15   A   YES.

16   Q   AND IF WOULD YOU LOOK AT 5-49, 5-50, WHICH ARE BRYANT

17   00189 AND BRYANT 00190.

18        THESE ARE OTHER DRAWINGS, AGAIN, WHICH WERE AFTER

19   THESE NOTEBOOK DRAWINGS, AND YOU CLAIM WERE DONE IN '98;

20   CORRECT?

21   A   YES.

22   Q   I'LL BRING YOU WHAT APPEAR TO BE THE ORIGINALS OF THOSE,

23   OF BRYANT 189 AND BRYANT 190.

24        AND THOSE APPEAR TO BE THE ORIGINALS?

25   A   YES.

1    Q    AND THOSE ARE, AGAIN, PENCILED DRAWINGS ON BLANK PAPER;

2    CORRECT?

3    A    YES.

4    Q    IF YOU WOULD LOOK AT EXHIBIT 5-63, BRYANT 00203.

5    A    YES.

6    Q    THIS IS ANOTHER DRAWING YOU CLAIM YOU DID IN '98, AFTER

7    THOSE INITIAL NOTEBOOK DRAWINGS; RIGHT?

8    A    RIGHT.

9    Q    IF YOU WOULD LOOK AT 5-65, WHICH IS BRYANT 00205, ANOTHER

10   DRAWING YOU DID, YOU CLAIM IN 1998, AFTER THOSE ORIGINAL

11   NOTEBOOK DRAWINGS; RIGHT?

12   A    YES.

13   Q    AND THE SAME IS TRUE OF 5-66, WHICH IS BRYANT 00206?

14   A    YES.

15   Q    GO TO 5-69, WHICH IS BRYANT 00209.

16        ANOTHER DRAWING AFTER THESE ORIGINAL NOTEBOOK

17   DRAWINGS YOU SAY WERE DONE IN '98; RIGHT?

18   A    YES.

19   Q    GO TO 5-72, BRYANT 00212; AND 5-73, BRYANT 00213.

20        THESE ARE ALSO DRAWINGS AFTER THE NOTEBOOK DRAWINGS

21   WHICH YOU CLAIM WERE DONE IN '98; RIGHT?

22   A    YES.

23   Q    LOOK AT 5-76, WHICH IS BRYANT 00216; 5-77, WHICH IS BRYANT

24   00217; 5-78, WHICH IS BRYANT 0218.

25        THESE ALSO ARE DRAWINGS YOU CLAIM WERE DONE AFTER THE

1    ORIGINAL NOTEBOOK DRAWINGS AND SOMETIME IN 1998; IS THAT RIGHT?

2    A   YES.

3    Q   EXHIBIT 5-100, WHICH IS BRYANT 00290.

4        IS THIS ANOTHER EXAMPLE OF A DRAWING WHICH YOU CLAIM

5    WAS DONE IN 1998, AFTER THOSE ORIGINAL NOTEBOOK DRAWINGS?

6    A   NO, I WOULDN'T AGREE WITH YOU ON THAT.

7    Q   OKAY.

8        WHEN WAS THIS ONE DONE?

9    A   THIS, I BELIEVE, WAS DRAWN IN 2000.

10   Q   AND WHEN IN 2000?

11   A   I THINK IT WAS LATE NOVEMBER OF 2000.

12   Q   SO YOU'RE SAYING THIS ONE WAS DONE AFTER YOU LEFT MATTEL;

13   IS THAT RIGHT?

14   A   YES.

15   Q   LET'S LOOK AT 5-101.

16       IS THIS A DOCUMENT WHICH YOU CLAIM WAS DRAWN AFTER

17   THOSE ORIGINAL DRAWINGS BUT SOMETIME IN 1998?

18   A   WHAT WAS THE NUMBER ON IT, AGAIN?

19   Q   IT'S BRYANT 290 AND IT'S 5-101.

20   A   OKAY.

21   Q   IS THIS THE DRAWING WHICH YOU CLAIM WAS DONE IN 1998,

22   AFTER THOSE ORIGINAL DRAWINGS IN THE BLACK NOTEBOOK?

23   A   YES.

24   Q   BY THE WAY, IT IS YOUR UNDERSTANDING, IS IT NOT, THAT

25   THOSE ORIGINAL DRAWINGS THAT WE'RE LOOKING AT WITH THE TORN

1    SHEETS OF PAPER --

2    A   YES.

3    Q   -- THOSE CAME OUT OF THE BLACK NOTEBOOK?

4    A   I AM NOT COMPLETELY CERTAIN WHICH NOTEBOOK THOSE CAME

5    OUT OF.

6    Q   YOU WERE LOOKING AT THEM FRIDAY WITH THE BLACK NOTEBOOK.

7        WOULD YOU LIKE TO SEE IT AGAIN?

8    A   SURE.

9    Q   THIS IS THE ORIGINAL OF 1155-C.

10       IS IT YOUR UNDERSTANDING THAT THOSE ORIGINAL DRAWINGS

11   THAT YOU MADE, WHICH WERE 5-39, 5-40, 5-41, AND 5-42, CAME OUT

12   OF THAT NOTEBOOK?

13   A   I BELIEVE SO, YES.

14   Q   I'M GOING TO SWITCH YOU NOW TO A DIFFERENT EXHIBIT.  IF

15   YOU WOULD LOOK AT EXHIBIT 1.

16       IS EXHIBIT 1 A COLLECTION OF SOME OF THE PITCH

17   MATERIALS THAT YOU INTENDED TO SHOW MGA IN 2000?

18   A   YES, BASED ON THE OLD '98 DRAWINGS.

19   Q   AND JUST TO BE CLEAR, EVERY ONE OF THESE PAGES -- LET ME

20   DEFINE IT THIS WAY.  I'M GOING TO ASK YOU WHETHER THEY WERE

21   CREATED AFTER 1998.  AND BY THAT I MEAN, YOU PUT PENCIL TO

22   PAPER TO CREATE THESE PARTICULAR DRAWINGS WHILE YOU WORKED AT

23   MATTEL; CORRECT?

24       MR. NOLAN:  OBJECTION, YOUR HONOR.  VAGUE AND

25   AMBIGUOUS AS TO THE PROCESS.

1      THE COURT:  REPHRASE.

2      I'M A LITTLE CONFUSED MYSELF.

3   BY MR. PRICE:

4   Q   ALL I MEAN BY 'THESE WERE CREATED WHEN YOU WORKED FOR

5   MATTEL,' I MEAN THAT ORIGINALLY THEY WERE BLANK PAGES AND WHILE

6   YOU WERE AT MATTEL TO CREATE THESE, YOU FIRST PUT PEN OR PENCIL

7   OR A MAGIC MARKER OR A PASTEL MARKER, WHATEVER, TO PAPER.

8   A   YES.  USING THE DRAWINGS FROM 1998.

9   Q   SO WHAT YOU'RE SAYING IS THAT YOU -- AGAIN, THE PROCESS OF

10  USING A LIGHT BOX AND YOU PUT THAT ON A BLANK POSTER BOARD, AND

11  THEN YOU TOOK PEN, PENCIL, WHATEVER, AND DREW THESE DRAWINGS IN

12  EXHIBIT 1 IN 1999; CORRECT?

13  A   YES.

14  Q   WHILE WORKING AT MATTEL?

15  A   NOT WHILE PHYSICALLY AT MATTEL; BUT OFF HOURS, YES.

16  Q   WHILE EMPLOYED BY MATTEL?

17  A   WHILE EMPLOYED BY MATTEL, YES.

18  Q   WOULD YOU LOOK AT EXHIBIT 2.

19      COULD YOU TELL US, WERE THESE DOCUMENTS IN EXHIBIT 2

20  DONE ALSO IN PREPARATION FOR THE PITCH THAT YOU MADE TO MGA IN

21  2000?

22  A   WELL, THEY LOOK LIKE THE SAME DRAWINGS THAT WE JUST LOOKED

23  AT.

24  Q   WITHOUT TEXT.

25  A   RIGHT, WITHOUT TEXT.

1   Q   TO GIVE AN EXAMPLE, IF WE LOOK AT -- FOR EXAMPLE, IF YOU

2   WOULD GO TO EXHIBIT 2-2002.

3        DO YOU SEE THAT DRAWING?

4   A   EXHIBIT 2 -- WHAT WAS IT?

5   Q   2-2002 -- 2-0002.  I APOLOGIZE.

6   A   YES.

7   Q   SO YOU'RE SAYING EXHIBIT 2 LOOKS LIKE THIS; CORRECT?

8   A   YES.

9   Q   AND IF YOU LOOK AT EXHIBIT 1, AT 1-008, IT'S THE SAME

10  POSTER BOARD, BUT YOU'VE ADDED TEXT; CORRECT?

11  A   YES.

12  Q   AND THE TEXT WE'RE TALKING ABOUT WAS ENTERED INTO THE

13  COMPUTER IN '99; IS THAT RIGHT?

14  A   YEAH.  I THINK I DID SOME SORT OF A WRITE-UP WHEN I WAS

15  FIRST DRAWING OUT THE CHARACTERS; BUT, YES, THIS TYPING WAS

16  DONE IN '99.

17  Q   AND EXHIBIT 1 IS A COMPILATION YOU PUT TOGETHER IN 2000;

18  CORRECT?

19  A   YES.

20  Q   BEFORE YOU LEFT MATTEL'S EMPLOYMENT; RIGHT?

21  A   YES.

22  Q   IF WE COULD LOOK AT THE FIRST PAGE OF EXHIBIT 1.

23       WHEN DID YOU WRITE OUT IN HANDWRITING "ALL MATERIALS

24  COPYRIGHT 2000, CARTER BRYANT"?

25  A   I THINK THAT WAS BEFORE THE MEETING WITH MGA, BEFORE THE

1    FIRST MEETING.

2    Q   MR. BRYANT, AGAIN, I'M GOING TO BE CONCENTRATING ON THE

3    CATEGORY OF DOCUMENTS WHICH WERE CREATED IN THE SENSE THAT IT

4    WAS A BLANK PIECE OF PAPER AND THEN YOU DREW AND PUT THIS ON

5    THE PAPER WHILE YOU WORKED FOR MATTEL.  AND I'D LIKE TO CALL

6    YOUR ATTENTION -- GO BACK TO EXHIBIT 5 NOW, AND LOOK AT 5-26,

7    WHICH IS BRYANT 00163.

8        MR. NOLAN:  CONTINUING OBJECTION.  VAGUE AND

9    AMBIGUOUS.  IT'S THE PREMISE OF THE QUESTION AS TO HOW THEY

10   WERE CREATED.

11       THE COURT:  OVERRULED.  I THINK IT'S CLEAR AT THIS

12   POINT.

13   BY MR. PRICE:

14   Q   DO YOU HAVE THAT IN FRONT OF YOU?

15   A   YES.

16   Q   AND THIS IS ONE OF THOSE DRAWINGS WHERE YOU PUT THE PEN TO

17   THE PAPER SOMETIME BETWEEN JANUARY '99 AND SEPTEMBER OF 2000;

18   CORRECT?

19   A   YES.

20   Q   WHILE YOU WERE EMPLOYED AT MATTEL?

21   A   YES.

22   Q   LOOK AT EXHIBIT 5-27, WHICH IS BRYANT 00164.

23       SAME QUESTION:  PUT PEN TO PAPER AND CREATED IT THAT

24   WAY, WHILE YOU WERE EMPLOYED BY MATTEL.

25       MR. NOLAN:  AGAIN, YOUR HONOR, OBJECTION TO "PEN TO

1    PAPER CREATION."

2        THE COURT:  OVERRULED.

3        THE WITNESS:  YES.  THESE WERE SKETCHES THAT I DID IN

4    2000.

5    BY MR. PRICE:

6    Q   IF YOU LOOK AT 5-80, BRYANT 00221 -- ACTUALLY, BEFORE

7    THAT, GO BACK TO 5-26, 00163, AND 5-27.  IS IT YOUR BEST

8    RECOLLECTION THAT THESE WERE CREATED IN THE MANNER I DESCRIBED,

9    SOMETIME IN JULY OF 2000?

10   A   I'M NOT REALLY SURE OF THE MONTH.

11   Q   LET ME SEE IF I CAN REFRESH YOUR MEMORY.

12       DO YOU HAVE YOUR DEPOSITION TRANSCRIPTS THERE?

13   A   YES.

14       MR. PRICE:  YOUR HONOR, IT WOULD BE EASIER TO PLAY AT

15   315 -- THIS IS VOLUME II, NOVEMBER 5, 2004, 315, LINE 19, TO

16   316, LINE 6 -- 317, LINE 2.

17       IT'S 315, LINE 19, TO 317, LINE 2.

18       THE COURT:  ANY OBJECTION?

19       MR. NOLAN:  NO OBJECTION, YOUR HONOR.

20       THE COURT:  YOU MAY PLAY.

21       (WHEREUPON, VIDEO DEPOSITION PLAYS;

22        EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS:)

23       Q   163?

24       A   THESE I THINK WERE ACTUALLY A LITTLE BIT EARLIER.

25        THESE WERE ROUGH SKETCHES THAT I HAD DONE FOR THE

1    EVENING OUTFITS FROM 2000.

2    Q  SO YOU DID THESE WHILE YOU WERE STILL EMPLOYED BY

3       MATTEL?

4    A  YES.

5    Q  CAN YOU PLACE IN TIME WHEN IT WAS THAT YOU CREATED

6       THESE?

7    A  I THINK MAYBE IN JULY 2000.

8    Q  IS THERE SOMETHING THAT CAUSED YOU TO CREATE THESE

9       IN JULY?

10   A  I KNEW THAT THE PITCH MEETING WAS COMING UP, AND I

11      THOUGHT IT MIGHT BE GOOD TO HAVE SOME EVENINGWEAR

12      OUTFITS TO SHOW IN THE GROUP OF DRAWINGS.

13   Q  AS OF THE TIME THAT YOU WROTE THESE DRAWINGS -- I

14      MEAN, HOW LONG BEFORE THE TIME THAT YOU CREATED

15      THESE DRAWINGS WAS THE PITCH MEETING SET UP?

16   A  I DON'T RECALL.

17   Q  CAN YOU GIVE ME AN ESTIMATE?

18   A  A COUPLE OF WEEKS, MAYBE.

19   Q  SO THE PITCH MEETING WAS SET UP PERHAPS -- YOUR

20      BEST RECOLLECTION IS A COUPLE OF WEEKS BEFORE YOU

21      CREATED THESE DRAWINGS?

22   A  YES, POSSIBLY.

23   Q  AND BY "THESE DRAWINGS," WE'RE REFERRING TO PAGE

24      163?

25   A  YES.

1    Q   DID THE BRATZ DOLLS END UP HAVING EVENINGWEAR?

2    A   NO, THEY DID NOT.

3    Q   DIDN'T DO AN EVENING FASHION VERSION?

4    A   NO.

5    Q   164?

6    A   THAT'S KIND OF THE SAME THING AS THE PREVIOUS

7        PAGE.  IT'S ROUGH SKETCHES FOR THOSE EVENINGWEAR

8        OUTFITS.

9    Q   CREATED AT THE SAME TIME?

10   A   YES.

11       (END OF EXCERPT PROVIDED.)

12   BY MR. PRICE:

13   Q   MR. BRYANT, THE PITCH MEETING YOU'RE REFERRING TO THAT YOU

14   WERE PREPARING FOR IN JULY, THAT'S YOUR INITIAL MEETING WITH

15   MGA, ACCORDING TO YOUR TESTIMONY; CORRECT?

16   A   YES.  BUT, AGAIN, I'M NOT SURE ABOUT THE JULY DATE.

17   Q   WELL, YOU TESTIFIED ABOUT JULY IN YOUR VIDEO TESTIMONY.

18       YOU HAD A CHANCE TO LOOK AT YOUR TRANSCRIPT AND MAKE

19   ANY CHANGES IF YOU HAD ANY DOUBTS ABOUT YOUR TESTIMONY;

20   CORRECT?

21   A   YES.

22   Q   AND WHEN YOU WENT THROUGH YOUR TRANSCRIPT AND YOU MADE

23   CORRECTIONS -- DID YOU MAKE SOME CORRECTIONS?

24   A   I DON'T BELIEVE SO, NO.

25   Q   DID YOU CORRECT THAT TESTIMONY ABOUT THESE BEING CREATED

1    IN JULY, BEFORE YOUR PITCH TO MGA?

2    A   NO.

3    Q   NOW, LET'S SEE IF WE CAN FINISH UP EXHIBIT 5 HERE ON

4    DRAWINGS THAT WERE CREATED WHILE YOU WERE EMPLOYED BY MATTEL,

5    IN THE SENSE THAT THAT'S WHEN YOU PUT THE PEN TO THE PIECE OF

6    PAPER, WHICH IS THAT EXHIBIT.

7         MR. NOLAN:  I'M GOING TO OBJECT TO THE BELATED

8    ARGUMENT --

9         THE COURT:  REPHRASE YOUR QUESTION, COUNSEL.

10   BY MR. PRICE:

11   Q   LET ME FOCUS ON SOME OTHER DOCUMENTS, AND I'LL ASK YOU

12   WHETHER OR NOT THESE WERE DRAWINGS THAT WERE CREATED WHILE YOU

13   WERE EMPLOYED BY MATTEL.  AND BY CREATED, I MEAN WHEN YOU PUT

14   PEN OR PENCIL TO THAT PAPER THAT CREATED THE DRAWING; OKAY?

15   A   ALL RIGHT.

16   Q   LOOK AT 5-80, WHICH IS BRYANT 0021.

17        THIS WAS PUT ON THIS PIECE OF PAPER WHILE YOU WERE

18   EMPLOYED AT MATTEL; CORRECT?

19   A   USING THE HEAD, THE '98 HEAD; BUT, YES.

20   Q   IF YOU WOULD LOOK AT 5-81, WHICH IS BRYANT 00235.

21        SAME QUESTION:  DONE WHILE YOU WERE EMPLOYED AT

22   MATTEL.

23   A   YES.

24   Q   AND 5-82, BRYANT 00236, DONE WHILE YOU WERE EMPLOYED AT

25   MATTEL.

1    A   YES.

2    Q   5-83, BRYANT 00237, ALSO DONE WHILE EMPLOYED AT MATTEL.

3    A   YES.

4    Q   5-84, BRYANT 00273, DONE WHILE YOU WERE EMPLOYED AT

5    MATTEL.

6    A   YES.  AGAIN, USING ONE OF THE OLD HEADS FROM '98, YES.

7    Q   BUT, AGAIN, A BLANK PIECE OF PAPER, AND THEN IT BECAME

8    UNBLANK WHILE YOU WERE EMPLOYED AT MATTEL; RIGHT?

9    A   YES.

10   Q   5-85, BRYANT 00274, DONE WHILE YOU WERE EMPLOYED AT

11   MATTEL.

12   A   YES.

13   Q   5-86, BRYANT 00275, DONE WHILE YOU WERE EMPLOYED AT

14   MATTEL.

15   A   YEAH.

16       DIDN'T WE JUST LOOK AT THIS ONE?

17   Q   IT LOOKS SIMILAR.

18   A   IT LOOKS LIKE THE SAME DRAWING AS NUMBER 80.

19   Q   LET ME SHOW YOU THE ORIGINALS OF THESE.

20       ALL WE HAVE ARE PHOTOCOPIES OF FIVE.  THEY APPEAR TO

21   BE THE SAME DRAWINGS, BUT IN DIFFERENT SCALES AND SIZES.

22   A   YES.

23   Q   5-87, WHICH IS BRYANT 276, DONE WHILE YOU WERE EMPLOYED AT

24   MATTEL.

25   A   YES.  AGAIN, THIS ONE WAS USING AN OLD '98 POSE AND HEAD.

1    Q    AGAIN, IT WAS A BLANK PIECE OF PAPER, WHICH YOU THEN

2    CHANGED TO THIS 5-87 WHILE YOU WERE AT MATTEL; CORRECT?

3    A    YES.

4    Q    LOOK AT 5-108, WHICH IS BRYANT 00297, DONE WHILE YOU WERE

5    EMPLOYED AT MATTEL.

6    A    THIS JUST LOOKED LIKE ANOTHER COPY OF THIS SAME ONE WE

7    JUST LOOKED AT, 87.

8    Q    DONE WHILE YOU WERE AT MATTEL.

9    A    YES.

10   Q    AND IF I COULD CHANGE YOU TO A DIFFERENT EXHIBIT NOW.  IF

11   YOU WOULD LOOK AT EXHIBIT 10.  I'VE PLACED BEFORE YOU

12   EXHIBIT 10.  I'D LIKE YOU TO LOOK AT PAGE 2, 10-2, WHICH IS --

13   THIS TIME IT'S BATES M-0001489.

14        DO YOU RECOGNIZE THIS AS A DRAWING YOU DID WHILE AT

15   MATTEL?

16   A    AGAIN, THESE ARE USING THE OLD 1998 DRAWINGS; BUT, YES.

17   Q    LET ME DRAW YOUR ATTENTION TO SOME OTHER DOCUMENTS, IF I

18   COULD; STILL IN EXHIBIT 5.

19        LET ME ASK YOU THIS, BEFORE GOING INTO THESE

20   DOCUMENTS:  IN OCTOBER OF 2000, PRIOR TO YOUR LEAVING MATTEL,

21   DO YOU RECALL THAT MS. MARLOW ACTUALLY HAD BOUGHT SWATCHES TO

22   MAKE SOME OF THE CLOTHING FOR THE BRATZ DOLLS?

23   A    I'M NOT SURE EXACTLY WHEN SHE BOUGHT THOSE.

24   Q    IGNORING THE TIME, THOUGH, IS IT FAIR TO SAY THAT YOU

25   WORKED WITH MS. MARLOW SO SHE WOULD KNOW WHAT SWATCHES TO GET

1         MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

2    FOUNDATION; TEMPORAL.

3         THE COURT:  LAY A FOUNDATION, COUNSEL.

4    BY MR. PRICE:

5    Q   WAS THERE A TIME WHEN YOU WORKED WITH MS. MARLOW SO THAT

6    SHE WOULD KNOW WHAT SWATCHES TO GET FOR THE BRATZ PRESENTATION

7    OR DOLLS?

8    A   I DON'T RECALL.

9    Q   MS. MARLOW HAD DRAWINGS FROM YOU SO SHE WOULD KNOW WHAT

10   SWATCHES TO GET TO APPROXIMATE THE DRAWINGS; RIGHT?

11        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACKS FOUNDATION;

12   CALLS FOR SPECULATION.

13        THE COURT:  SUSTAINED.

14   BY MR. PRICE:

15   Q   DID YOU SHARE YOUR DRAWINGS WITH MS. MARLOW?

16   A   YES.

17   Q   AND ONE OF HER JOBS WAS TO ACTUALLY GET MATERIAL SWATCHES

18   TO CREATE FOR THE DOLLS; CORRECT?

19   A   WELL, EVENTUALLY, YES.

20   Q   AND ONE OF HER JOBS, HER ROLES, WAS TO ACTUALLY HAVE FOLKS

21   SEW THE FASHIONS; RIGHT?

22   A   YES, EVENTUALLY.

23   Q   AND DID YOU WORK WITH HER SO SHE WOULD -- YOU DESIGNED THE

24   CLOTHES FOR THE BRATZ DOLLS; RIGHT?

25        MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

1    TEMPORAL TIME.

2        THE COURT:  LAY A FOUNDATION FOR THIS, COUNSEL.

3    BY MR. PRICE:

4    Q   SOMETIME IN 2000, AT ANY TIME IN 2000, DID YOU DESIGN

5    CLOTHES FOR THE BRATZ DOLLS?

6    A   YES.

7    Q   AND WAS IT MS. MARLOW'S JOB TO LOOK AT THOSE DESIGNS AND

8    TRY TO GET SWATCHES THAT WOULD MATCH THEM?

9    A   I BELIEVE SHE DID THAT, YES.

10   Q   AND WHAT KIND OF DIRECTIVE DID YOU GIVE TO MS. MARLOW SO

11   SHE WOULD GET SWATCHES THAT WOULD MATCH THE DESIGNS YOU HAD

12   CREATED?

13       MR. NOLAN:  YOUR HONOR, FOUNDATION; TIME.

14       MR. PRICE.  IN 2000.

15       THE COURT:  VERY WELL.

16       THE WITNESS:  I'M SORRY.  WHAT WAS YOUR QUESTION,

17   AGAIN?

18   BY MR. PRICE:

19   Q   WHAT DIRECTIVE WOULD YOU GIVE TO MS. MARLOW SO THAT SHE

20   WOULD GET SWATCHES TO MATCH THE DESIGNS YOU HAD CREATED?

21   A   WELL, I DON'T REMEMBER EXACTLY WHAT I WOULD TELL HER, BUT

22   I WOULD SAY THINGS LIKE, YOU KNOW, 'I KIND OF IMAGINED THIS

23   OUTFIT BEING IN THIS KIND OF A FABRIC OR THIS ARTICLE OF

24   CLOTHING BEING IN, YOU KNOW, THAT KIND OF FABRIC.'

25   Q   IF WE COULD GO TO 1765; THAT WOULD BE IN THE EXHIBIT BOOK,

1    NOT THE DRAWING BOOK.  THIS IS AN E-MAIL WHICH YOU WROTE TO

2    PAULA GARCIA, OR PAULA TREANTAFELLES, AROUND OCTOBER 23, 2000.

3        DO YOU SEE THAT?

4    A   YES.

5    Q   AND THIS WAS JUST A COUPLE OF DAYS, LIKE FOUR DAYS, AFTER

6    YOUR LAST DAY AT MATTEL; RIGHT?

7    A   YES.

8    Q   AND HERE YOU'RE STATING, 'I AM WORKING FAST AND FURIOUSLY

9    ON FABRICS AND EVERYTHING FOR THE PACKAGES.'

10       DO YOU SEE THAT?

11   A   YES.

12   Q   AND BY SAYING THAT YOU'RE WORKING ON THE FABRICS, YOU'RE

13   REFERRING TO YOU AND MS. MARLOW; RIGHT?

14   A   WELL, I DON'T REMEMBER EXACTLY WHAT I MEANT BACK THEN.

15   Q   WELL, WHO WAS ACTUALLY DOING THE ACTUAL WORK ON THE

16   FABRICS?  WHO WAS ACTUALLY GETTING THE SWATCHES?

17   A   WELL, I THINK IT WAS A LITTLE BIT OF BOTH OF US.

18   Q   BOTH OF US, MEANING YOU AND MS. MARLOW?

19   A   YES.

20   Q   AND WHEN YOU WOULD GIVE HER DIRECTION AS TO WHAT KIND OF

21   SWATCHES TO GET, YOU WERE TRYING TO CAPTURE -- TRYING TO GET

22   THE SWATCHES TO REFLECT THE LOOK THAT YOU HAD DESIGNED; RIGHT?

23       MR. NOLAN:  OBJECTION, YOUR HONOR.  ASSUMES FACTS NOT

24   IN EVIDENCE; ALSO LACK OF FOUNDATION.

25       THE COURT:  IT'S A QUESTION.

1        YOU MAY ANSWER.

2        THE WITNESS:  I'M SORRY.  WHAT WAS THE QUESTION,

3    AGAIN?

4    BY MR. PRICE:

5    Q   EARLIER YOU SAID THAT YOU WOULD GIVE HER DIRECTION AND

6    WHEN YOU WERE GIVING HER DIRECTION, YOU WERE TRYING TO GIVE HER

7    DIRECTION SO SHE WOULD GET FABRICS TO CAPTURE THE LOOK THAT YOU

8    HAD DESIGNED; RIGHT?

9        MR. NOLAN:  YOUR HONOR, MISSTATES HIS TESTIMONY.

10       THE COURT:  IT'S A QUESTION.

11       IS IT TRUE OR NOT, SIR?

12       THE WITNESS:  YES.  I THINK THAT WAS PART OF THE

13   IDEA.

14   BY MR. PRICE:

15   Q   AND THAT'S WHAT YOU WERE DOING WHEN YOU TALKED TO OTHER

16   PEOPLE ABOUT -- FOR EXAMPLE, MS. LEAHY, SHE WAS THE SCULPTOR WE

17   TALKED ABOUT.

18       DO YOU RECALL THAT?

19   A   YES.

20   Q   AND WHEN YOU TALKED TO HER AND GAVE HER SUGGESTIONS, YOU

21   WERE GIVING THOSE SUGGESTIONS TO TRY TO CAPTURE THE LOOK WHICH

22   YOU HAD ENVISIONED; CORRECT?

23   A   WELL, LESS SO WITH MARGARET, BECAUSE, YOU KNOW, I AM NOT A

24   SCULPTOR, YOU KNOW.  I'M AN ARTIST.  AND I LEFT A LOT OF THAT

25   UP TO HER.

1   Q   WELL, YOU TOLD US THAT WHEN SHE DID SCULPTS, YOU GAVE HER

2   FEEDBACK; CORRECT?

3   A   YES.

4   Q   AND OBVIOUSLY, YOU'RE NOT A SCULPTOR, SO YOU DON'T KNOW

5   THE LIMITATIONS OF CLAY OR WHAT CAN BE ACTUALLY DONE AS WELL AS

6   SHE DOES; CORRECT?

7   A   RIGHT.

8   Q   BUT WHEN YOU GAVE HER FEEDBACK, YOU WERE DOING THAT TO TRY

9   TO CAPTURE THE LOOK THAT YOU HAD CREATED; RIGHT?  THAT'S THE

10  REASON YOU GAVE HER FEEDBACK?

11  A   WELL, YEAH, I THINK SO.

12  Q   BECAUSE YOU WERE FAIRLY PROUD OF THE LOOK YOU HAD CREATED

13  WITH YOUR BRATZ DRAWINGS; RIGHT?

14  A   WELL, SURE.

15  Q   AND, IN FACT, MS. LEAHY -- DO YOU REMEMBER YOU GAVE HER --

16  WE LOOKED AT A DRAWING EARLIER ON FRIDAY WHICH YOU HAD GIVEN

17  HER FOR THE SCULPT.

18       DO YOU RECALL YOU GAVE HER A RESTART DRAWING FOR THE

19  SCULPT?  DO YOU RECALL THAT?

20  A   YES.

21  Q   IF YOU WOULD LOOK AT EXHIBIT 5 AT 278; THAT IS IN THE

22  DRAWINGS BOOK.  ACTUALLY, IT'S 5-89.

23       THE COURT:  YOU WERE SAYING BRYANT 278?

24       MR. PRICE:  RIGHT.  SO IT'S 5-89, BRYANT 278.

25       THE WITNESS:  WHAT WAS THE NUMBER, AGAIN?  EXHIBIT

Transcript of Proceeding - AM (Bryant Dir/Cross)   6/17/2008  10:36:00 AM

1    WHAT?

2    BY MR. PRICE:

3    Q    5-0089.

4        THIS IS A DRAWING WHICH YOU GAVE TO MS. LEAHY TO

5    RESTART HER SCULPT AT ONE POINT; CORRECT?

6        MR. NOLAN:  OBJECTION.  FOUNDATION AS TO TIME.

7        THE COURT:  COUNSEL?

8        MR. PRICE:  SOMETIME IN 2000.

9        MR. NOLAN:  BETTER TIME.  IF WE CAN LAY A BETTER

10   FOUNDATION THAN SOMETIME IN 2000.

11       THE COURT:  FAIR ENOUGH.

12   BY MR. PRICE:

13   Q   FIRST, LET ME ASK YOU THIS:  IS THIS ONE OF YOUR DRAWINGS?

14   A   YES.

15   Q   AND IN OCTOBER OR NOVEMBER OF 2000, DID YOU GIVE THIS

16   DRAWING TO MS. LEAHY?

17   A   I THINK SOMETIME IN NOVEMBER.

18   Q   AND, OF COURSE -- ARE YOU SAYING NOVEMBER BECAUSE YOU LEFT

19   MATTEL ON OCTOBER 19TH?

20   A   NO.  I'M JUST SAYING THAT BECAUSE THAT SEEMS TO BE WHAT I

21   REMEMBER.

22   Q   AND WOULD YOU DISAGREE, THEN, WITH MS. GARCIA IF SHE

23   TESTIFIED YOU DID THIS BETWEEN OCTOBER 4TH AND OCTOBER 19TH?

24   A   YOU KNOW, I CAN'T VOUCH FOR WHAT MS. GARCIA SAID, BUT MY

25   MEMORY IS THAT I DID THIS SOMETIME IN NOVEMBER.

1   Q   DO YOU RECALL THAT IN OCTOBER, YOU MET WITH A GENTLEMAN

2   NAMED STEVE LINKER?

3   A   YES.

4   Q   AND THAT WAS BEFORE YOU LEFT MATTEL; CORRECT?

5   A   YES.

6   Q   AND IN THAT MEETING, YOU SHOWED MR. LINKER SOME DRAWINGS

7   AND SKETCHES; CORRECT?

8   A   YES.

9   Q   BECAUSE HE WAS DOING THE IDEA -- HE WAS GOING TO DO A

10  PROPOSAL FOR PACKAGING; RIGHT?

11  A   RIGHT.

12  Q   AND EVENTUALLY, THERE WAS A MEETING WITH MR. LINKER WHERE

13  YOU GAVE HIM SOME DRAWINGS; CORRECT?

14  A   I BELIEVE SO, YES.

15  Q   THAT WAS BEFORE YOU LEFT MATTEL; RIGHT?

16  A   I DON'T KNOW WHEN I GAVE HIM THE DRAWINGS.  I DON'T

17  REMEMBER EXACTLY.

18  Q   WELL, IF MR. LINKER TESTIFIED THAT IT WAS BEFORE

19  OCTOBER 19TH, THEN WOULD YOU HAVE ANY REASON TO DISPUTE THAT?

20  A   NO.  I'M JUST NOT REALLY RECALLING EXACTLY WHEN IT WAS

21  THAT I GAVE HIM THE DRAWINGS.

22  Q   IT WAS A NUMBER OF YEARS AGO; RIGHT?

23  A   YES.

24  Q   IF YOU WOULD LOOK AT EXHIBIT 323.  IN PARTICULAR, IF YOU

25  WOULD LOOK AT -- THERE ARE BATES NUMBERS AT THE BOTTOM AS WELL

1    AS OTHER NUMBERS -- 323-0032, WHICH IS BATES NUMBER SL-00044.

2       DO YOU SEE THAT?

3    A   YES.

4    Q   THIS IS THE SAME DRAWING THAT WE WERE LOOKING AT, THAT YOU

5    GAVE MS. LEAHY FOR THE RESCULPT; RIGHT?

6    A   YES.

7    Q   IF MR. LINKER TESTIFIED YOU GAVE THIS TO HIM ON OR BEFORE

8    OCTOBER 19TH, YOU REALLY WOULD HAVE NO REASON TO DISPUTE THAT,

9    WOULD YOU?

10   A   WELL, I GUESS I CAN'T REALLY DISPUTE IT, BUT I DON'T

11   REMEMBER GIVING HIM THIS PARTICULAR DRAWING BEFORE SOMETIME IN

12   NOVEMBER.

13   Q   WELL, IS IT YOUR UNDERSTANDING THAT IN NOVEMBER,

14   MR. LINKER WAS EVEN STILL IN THE RUNNING TO DO THE PACKAGING?

15   A   I DON'T REMEMBER.

16   Q   WASN'T HE REJECTED AS SOMEONE WHO COULD DO THE PACKAGING

17   BY THE END OF OCTOBER?

18   A   I DON'T REMEMBER.

19   Q   IN ANY EVENT, IT'S FAIR TO SAY, FOR MS. MARLOW AS WELL AS

20   MS. LEAHY, THAT THESE WERE PEOPLE WHO WERE TRYING TO HELP

21   CAPTURE THE LOOK YOU HAD CREATED BECAUSE YOU WERE PROUD OF THAT

22   LOOK?

23   A   WELL, YES.

24   Q   AND SO IF WE COULD GO BACK TO EXHIBIT 1765, THEN, THAT

25   FIRST PARAGRAPH.

1        NOW, IT'S FAIR TO SAY THAT YOU AND MS. MARLOW HADN'T

2    STARTED WORKING --

3        THE COURT:  COUNSEL, 1765?

4        MR. PRICE:  EXHIBIT 1765.  WE'RE AWAY FROM THE

5    DRAWINGS NOW.

6        THE WITNESS:  OKAY.

7    BY MR. PRICE:

8    Q   DO YOU SEE WHERE YOU'RE SAYING, "I'M WORKING FAST AND

9    FURIOUSLY ON FABRICS AND EVERYTHING FOR THE PACKAGES"?

10       DO YOU SEE THAT?

11   A   YES.

12   Q   NOW, YOU DIDN'T BEGIN WORKING FAST AND FURIOUSLY FOR THE

13   FABRICS AFTER OCTOBER 19TH; CORRECT?  YOU HAD DONE SOME OF THAT

14   BEFORE THEN.

15   A   I DON'T REALLY REMEMBER DOING MUCH OF ANYTHING LIKE THAT,

16   NO.

17   Q   HOW ABOUT MS. MARLOW?

18   A   I THINK SHE MAY HAVE DONE A COUPLE OF EXPLORATORY THINGS,

19   BUT...

20   Q   WELL, YOU DON'T LOOK FOR THE FABRICS UNTIL YOU'VE GOT THE

21   DESIGN IN YOUR MIND AS TO WHAT YOU'RE LOOKING FOR; RIGHT?

22   A   IT CAN WORK EITHER WAY.

23   Q   WELL, IN THIS CASE, YOU CAME UP WITH THE DESIGN FIRST;

24   RIGHT?

25   A   YES.  HOWEVER, THE DESIGNS THAT, YOU KNOW, I HAD PUT IN

1    THAT PITCH BOOK WERE NEVER USED.

2    Q   WELL, EXACTLY.  IN OCTOBER -- OCTOBER, NOVEMBER TIME

3    FRAME, WHEN YOU WERE LOOKING FOR SWATCHES, YOU HAD SOME FURTHE

4    DESIGNS THAT YOU HAD DONE; CORRECT?

5    A   I DON'T EXACTLY REMEMBER.

6    Q   HERE, WHERE YOU SAID, "HERE'S A RUNDOWN OF WHAT WE PLAN TO

7    HAVE FOR YOU BY FRIDAY," DO YOU SEE THAT?

8    A   YES.

9    Q   BY "WE," YOU'RE REFERRING TO YOU AND MS. MARLOW; RIGHT?

10   A   I THINK SO, YES.

11   Q   LOOK AT EXHIBIT 1236.  THIS IS DATED OCTOBER 24TH.

12       IS IT TRUE, SIR, THAT YOU WERE ABLE TO GO AND LOOK AT

13   THESE SWATCHES TO HAVE READY THE WEEK AFTER YOU LEFT MATTEL

14   BECAUSE YOU HAD ALREADY DONE -- FINALIZED THE DESIGNS AS OF

15   THAT DATE, SO YOU COULD GO BUY THE SWATCHES?

16   A   I DON'T REMEMBER IT THAT WAY, NO.

17   Q   CAN YOU DENY THAT'S WHAT HAPPENED?

18   A   WELL, ALL I CAN REALLY REMEMBER IS THAT, YOU KNOW, WE

19   EVENTUALLY THREW OUT THE DESIGNS THAT WERE DONE, YOU KNOW, BACK

20   IN THOSE OLD DRAWINGS, '98 DRAWINGS.  WE DIDN'T GO WITH THOSE

21   FASHIONS.  WE BASICALLY STARTED OVER.  SO I DON'T REALLY KNOW

22   TOO MUCH ABOUT THIS DOCUMENT.

23   Q   WELL, MY QUESTION IS, CAN YOU DENY THAT BY OCTOBER 4TH,

24   YOU HAD DONE NEW DESIGNS, FASHION DESIGNS, WHICH PERMITTED

25   MS. MARLOW TO THEN GO AND GET THE SWATCHES?

1    A   I DON'T BELIEVE THAT'S TRUE, NO.

2    Q   SO YOU CAN'T DENY THAT UNDER OATH.

3    A   TO THE BEST OF MY RECOLLECTION, THAT IS NOT TRUE.

4    Q   LET'S LOOK AT SOME DRAWINGS, THEN, THAT MIGHT RELATE TO

5    THAT.

6         IF YOU WOULD LOOK AT EXHIBIT 5.  NOW WE'RE GOING TO

7    BE IN THE DRAWINGS.  I'M GOING TO ASK YOU TO LOOK AT 5-14,

8    WHICH IS BRYANT 00151.

9         DO YOU SEE THIS DRAWING WHICH SAYS "FINAL DESIGN"?

10   A   YES.

11   Q   IT'S YOUR TESTIMONY THAT YOU DID THIS SOMETIME AFTER YOU

12   LEFT MATTEL; CORRECT?

13   A   YES.

14   Q   THIS WAS NOT THE FINAL DESIGN THAT MS. GARCIA WAS

15   REFERRING TO IN HER OCTOBER 24TH E-MAIL.

16   A   NO.  THIS WAS THE FINAL DESIGN THAT WENT OUT FOR THE FIRST

17   ROUND OF DOLLS.

18   Q   LET'S LOOK AT EXHIBIT 5-18, BRYANT 00155.

19        YOUR TESTIMONY IS, THIS WAS AFTER YOU LEFT MATTEL; IS

20   THAT RIGHT?

21   A   YES.

22   Q   EXHIBIT 5-19, 00156, YOUR TESTIMONY IS, THIS IS AFTER YOU

23   LEFT MATTEL.

24   A   YES.

25   Q   EXHIBIT 5-28, BRYANT 00165, THIS WAS AFTER YOU LEFT MATTEL

1    ALSO.  THAT'S YOUR TESTIMONY?

2    A   YES.

3    Q   MOVE TO EXHIBIT 5-30, BRYANT 00167.

4        THIS IS, YOU CLAIM, ALSO SOMETHING YOU DID AFTER YOU

5    LEFT MATTEL; CORRECT?

6    A   YES.

7    Q   MOVE TO EXHIBIT 5-95, 00284.

8        THESE FINAL FASHION DESIGNS, YOU CLAIM, WERE AFTER

9    MATTEL; CORRECT?

10   A   YES.

11   Q   AND 5-96, BRYANT 285?

12   A   YES.

13   Q   5-99, BRYANT 288?

14   A   WHAT WAS THE NUMBER?

15   Q   5-99, BRYANT 288.

16   A   OKAY.  YES.

17   Q   NOW I'D LIKED YOU TO LOOK AT --

18       MR. NOLAN:  JUST SO THE RECORD IS CLEAR, THE ANSWER

19   "YES" WAS THAT HE DID IT AFTER.

20       MR. PRICE:  THAT HE CLAIMS HE DID IT AFTER MATTEL,

21   THESE FINAL FASHION DESIGNS.

22       THE COURT:  THANK YOU, COUNSEL.

23   BY MR. PRICE:

24   Q   SO YOUR TESTIMONY IS THAT THESE FINAL DESIGNS WERE NOT THE

25   ONES REFERRED TO IN MS. GARCIA'S OCTOBER 24TH E-MAIL.

1   A   AGAIN, I NEED TO LOOK AT THAT E-MAIL AGAIN.

2   Q   SURE.

3       IF YOU WOULD LIKE TO, IT'S EXHIBIT 1236.

4       SO YOUR TESTIMONY IS THAT THOSE MARKED "FINAL FASHION

5   DESIGNS" ARE DIFFERENT THAN THE ONES MS. GARCIA WAS REFERRING

6   TO IN OCTOBER 24, 2000?

7   A   I'M NOT REALLY SURE.

8   Q   LET ME SHOW YOU SOME ADDITIONAL DRAWINGS TO SEE IF THIS

9   WILL HELP YOU DECIDE WHETHER OR NOT YOU'RE SURE WHETHER OR NOT

10  THAT'S WHAT MS. GARCIA IS REFERRING TO OR NOT.

11      IF YOU'D LOOK AT -- THIS SHOULD BE IN THE DRAWINGS

12  SECTION -- EXHIBIT 1107.  ACTUALLY, I'M GOING TO ASK YOU TO

13  LOOK AT 1107, 1108, 1109, AND 1110, AND I'M GOING TO HAND UP

14  THE ORIGINALS TO YOU, IF I MAY.

15      HAVE YOU HAD A CHANCE TO GLANCE AT 1107 THROUGH 1110?

16  A   YES.

17  Q   THESE WERE DRAWINGS THAT HAD TO HAVE BEEN COMPLETED PRIOR

18  TO A PRESENTATION TO K-MART IN NOVEMBER OF 2000; RIGHT?

19  A   I DON'T EXACTLY REMEMBER WHAT THE GOAL WAS WITH THESE.

20  Q   SO YOU DON'T RECALL WHETHER OR NOT THESE EXHIBITS -- FLIP

21  THROUGH THEM -- WERE TO REFLECT TO K-MART WHAT THE DESIGNS

22  WOULD BE ON THE FIRST PRODUCT?

23  A   WELL, AGAIN, I'M NOT REALLY SURE WHO THESE WERE BEING

24  SHOWN TO.

25  Q   IF I TAKE OUT K-MART, OR WAL-MART OR TOYS-R-US OR

1    WHATEVER, DO YOU RECALL THAT THESE DRAWINGS HAD TO BE DONE BY

2    EARLY NOVEMBER SO THERE COULD BE A PRESENTATION TO A POTENTIAL

3    CUSTOMER?

4    A   YEAH.  I DON'T REMEMBER EXACTLY WHEN THESE NEEDED TO BE

5    DONE BY.  AND, AGAIN, I DON'T REALLY RECALL WHO THEY WERE BEING

6    SHOWN TO.

7    Q   I'M GOING TO HAND YOU A COPY OF WHAT'S BEEN MARKED AS

8    EXHIBIT 325.  I THINK IT'S ALREADY IN EVIDENCE.

9        DO YOU RECALL I WAS ASKING YOU ABOUT WHEN YOU WOULD

10   HAVE GIVEN MS. LEAHY THE DRAWINGS, THE SCULPT DRAWINGS, WHICH

11   WAS EXHIBIT 323, SL-0044?  DO YOU RECALL THAT?

12   A   I BELIEVE SO, YES.

13   Q   AND WE WERE TALKING ABOUT MR. LINKER, WHEN YOU WOULD HAVE

14   GIVEN SUCH A DRAWING TO MR. LINKER.

15       DO YOU RECALL THAT?

16   A   YES.

17   Q   AND I'M SHOWING YOU EXHIBIT 325, WHICH IS AN OCTOBER 20TH

18   E-MAIL TO MR. LINKER, REJECTING HIS QUOTE FOR THE BRATZ LINE.

19       MR. NOLAN:  YOUR HONOR, OBJECTION AS TO FOUNDATION AS

20   TO WHETHER OR NOT HE'S EVER SEEN THIS EXHIBIT.

21       THE COURT:  SUSTAINED.

22   BY MR. PRICE:

23   Q   MY QUESTION IS, DOES THIS REFRESH YOUR MEMORY THAT IT WAS

24   BEFORE YOU LEFT MATTEL THAT YOU HAD GIVEN MR. LINKER THE

25   DRAWINGS IN EXHIBIT 323 SO THAT HE COULD DO A PROPOSAL?

1    A    WHAT WAS IT, AGAIN?  323?

2    Q    323, SL-0044.

3    A    I'M NOT FINDING IT IN THE BOOK.

4         I DON'T RECALL GIVING HIM THIS DRAWING.  I RECALL

5    GIVING HIM OTHER DRAWINGS.  BUT I DON'T RECALL THIS ONE AS

6    BEING PART OF THE DRAWINGS THAT I GAVE TO HIM.

7    Q    SO THEN, YOU WOULD HAVE NO EXPLANATION HOW MR. LINKER,

8    PRIOR TO OCTOBER 19TH, WOULD HAVE IN HIS POSSESSION THIS

9    DRAWING.

10        MR. NOLAN:  YOUR HONOR, LACK OF FOUNDATION; ALSO

11   CALLS FOR SPECULATION.

12        THE COURT:  YOU'RE ASKING IF HE HAS ANY IDEA --

13        MR. PRICE:  YES.

14        THE COURT:  -- TO HIS KNOWLEDGE?

15        OVERRULED.

16        THE WITNESS:  NO, I DON'T.

17   BY MR. PRICE:

18   Q    YOU'LL AGREE THE ONLY WAY HE COULD HAVE IT IN HIS

19   POSSESSION IS IF, IN FACT, IT HAD BEEN CREATED.

20   A    ARE YOU ASKING -- WELL, I'M NOT SURE WHAT YOU'RE ASKING

21   ME.

22        CREATED BY WHEN?

23   Q    BY THE TIME IT WAS GIVEN TO HIM.

24   A    WELL, I MEAN, YEAH, I SUPPOSE IT WAS GIVEN TO HIM AT SOME

25   POINT.  BUT I JUST DON'T REMEMBER WHEN.

1    Q   BECAUSE YOU DON'T REMEMBER, YOU CANNOT DENY THAT THIS

2    DRAWING, WHICH YOU GAVE MS. LEAHY TO RESTART HER SCULPT, WAS

3    GIVEN TO HIM PRIOR TO THE TIME YOU LEFT MATTEL BECAUSE YOU JUST

4    DON'T RECALL.

5    A   WELL, I DON'T RECALL, BUT I DON'T REMEMBER IT HAPPENING

6    THAT WAY.

7    Q   DO YOU HAVE EXHIBIT 20 IN YOUR BOOK?

8    A   IN THE DRAWINGS BOOK?

9    Q   NO.  GOOD POINT.  IN THE DOCUMENTS BOOK.  WE'RE GOING TO

10   SWITCH NOW TO SOME LAST FEW DOCUMENTS.

11       IF YOU DON'T HAVE IT, I'LL BE GLAD TO BRING IT UP TO

12   YOU.

13   A   I DON'T SEE ONE.

14   Q   LET ME HAND YOU A COPY.  THIS IS EXHIBIT 20.

15       DO YOU RECOGNIZE EXHIBIT 20 AS A RESUMÉ THAT YOU

16   CREATED SOMETIME AROUND NOVEMBER OF 1998?

17   A   WELL, YEAH, IT LOOKS LIKE MY RESUMÉ.  I'M NOT EXACTLY SURE

18   WHEN I CREATED IT.

19   Q   YOU SEE THERE'S A FAX HEADER AT THE TOP?

20   A   YES.

21   Q   DOES THAT GIVE YOU AN IDEA OF AT LEAST WHEN YOU WERE

22   SENDING IT OUT?

23   A   WELL, AS FAR AS I KNOW, IF THE FAX MACHINE WAS SET RIGHT,

24   THEN, YEAH, IT PROBABLY WAS.

25   Q   ABOUT NOVEMBER OF '98.

1    A   IT COULD HAVE BEEN, YES.

2         MR. PRICE:  MOVE EXHIBIT 20 INTO EVIDENCE,

3    YOUR HONOR.

4         MR. NOLAN:  NO OBJECTION.

5         THE COURT:  IT'S ADMITTED.

6         YOU MAY PUBLISH.

7         (EXHIBIT 20 RECEIVED.)

8    BY MR. PRICE:

9    Q   IN THIS RESUMÉ IN '98, ONE OF THE THINGS YOU SAID YOU HAD

10   DONE, MR. BRYANT, WAS THAT YOU HAD ACTUALLY DEVELOPED DOLL TOY

11   CONCEPTS FROM INITIAL IDEA TO THE PRE-PRODUCTION DEVELOPMENT

12   STAGE; CORRECT?

13   A   YES.

14   Q   AND YOUR EXPERIENCE WAS, YOUR CONCEPTS WERE PRESENTED

15   "FIRST IN ILLUSTRATION FORM, USING SKETCHES, ILLUSTRATIONS, AND

16   CONCEPT BOARDS, AND THEN, UPON APPROVAL, TRANSLATED TO THE

17   THREE-DIMENSIONAL PROTOTYPE STAGE."

18        DO YOU SEE THAT?

19   A   YES.

20   Q   AND WHAT YOU'RE SAYING HERE IS THAT YOU HAD EXPERIENCE IN

21   TRANSLATING OR HELPING OTHERS TRANSLATE YOUR IDEAS, YOUR

22   SKETCHES, ET CETERA, TO THREE-DIMENSIONAL PROTOTYPE DOLLS;

23   CORRECT?

24   A   YES.

25   Q   DOWN HERE, IT SAYS YOU'RE A DESIGNER OF THE TEEN SKIPPER

1    DOLL, MARKETED IN 1997.

2        DO YOU SEE THAT?

3    A   YES.

4    Q   AND ALSO, THERE WAS AN ARTICLE WRITTEN ABOUT YOU AS BEING

5    THE DESIGNER OF THE TEEN SKIPPER DOLL; CORRECT?

6    A   YES.

7    Q   AND THAT WAS SOMETHING WHICH MATTEL HELPED ARRANGE.

8    A   YES.

9    Q   SO IT WAS NO SECRET TO THE INDUSTRY THAT YOU WERE THE ONE,

10   IN FACT, THAT HAD DESIGNED THE TEEN SKIPPER DOLL; RIGHT?

11   A   RIGHT.

12   Q   AND THERE ARE ALSO DOLLS CALLED "COLLECTIBLES"; RIGHT?

13   A   YES.

14   Q   IN FACT, I THINK YOU WORKED IN BARBIE COLLECTIBLES.

15   A   YES.

16   Q   AND SOMETIMES THERE ARE THESE LIMITED EDITION COLLECTOR

17   DOLLS WHERE THE DESIGNER ACTUALLY SIGNS THE PACKAGING; IS THAT

18   RIGHT?

19   A   THERE WAS A SERIES LIKE THAT, YES.

20   Q   YOU WERE INVOLVED IN THAT AT MATTEL.

21   A   YES.

22   Q   IF WE COULD SHOW YOU WHAT WE'VE MARKED FOR IDENTIFICATION

23   AS EXHIBIT 13627.

24        IS THIS ONE OF THE BARBIE COLLECTOR'S LIMITED EDITION

25   DOLLS THAT YOU WORKED ON?

1    A   YES.

2    Q   IS THERE A WAY WE CAN TELL FROM THE PACKAGING THAT YOU

3    WERE, IN FACT, THE ONE WHO WORKED ON THAT?

4    A   THAT'S ME RIGHT THERE, 30 POUNDS LIGHTER.

5    Q   AND A LITTLE YOUNGER?

6    A   AND A LITTLE YOUNGER.

7    Q   SO ON THE BACK, THERE'S A PICTURE OF YOU; LOOKS LIKE

8    THERE'S A SIGNATURE THERE.

9        WHO'S SIGNATURE IS THAT?

10   A   THAT'S MINE.

11   Q   AND IF WE LOOK AT THIS SECTION HERE, THAT'S ACTUALLY SORT

12   OF A LETTER YOU WERE WRITING TO THE COLLECTOR ABOUT YOURSELF;

13   CORRECT?

14   A   YES.  BUT I DON'T REALLY BELIEVE THAT I AUTHORED THAT

15   LETTER.  JUST PARTS OF IT.

16   Q   SO YOU WROTE SOME OF IT, AND PROBABLY SOMEBODY IN

17   PACKAGING OR MARKETING WROTE ANOTHER PART; RIGHT?

18   A   DEFINITELY MARKETING.

19   Q   I'LL ALSO HAND YOU A DOCUMENT MARKED 10480 FOR

20   IDENTIFICATION.

21       BEFORE I ASK YOU ABOUT THAT, I WANT TO GO BACK TO

22   YOUR RESUMÉ.  ONE OF THE THINGS YOU WERE SAYING IN YOUR RESUMÉ

23   THAT YOU HAD DONE BY 1998 WAS ALSO, "DESIGNED A NEW BARBIE BODY

24   WHICH WAS TO BE INTRODUCED."

25       DO YOU SEE THAT?

1    A    YES.

2    Q    AND WHEN YOU WERE SAYING YOU WERE THE DESIGNER OF THE NEW

3    BARBIE BODY, I TAKE IT YOU DIDN'T ACTUALLY SCULPT IT.

4    A    NO.

5    Q    THAT WAS A SITUATION WHERE THERE WAS SOMEONE ELSE WHO

6    SCULPTED IT; RIGHT?

7    A    NO.  NOBODY REALLY SCULPTED IT.  IT WAS JUST -- WELL, I

8    USED TO USE THE TERM "IT WAS FRANKENSTEINED TOGETHER" FROM

9    VARIOUS EXISTING DOLL BODY PARTS.

10   Q    SO SOMEONE PUT STUFF TOGETHER THROUGH EXISTING PARTS UNDER

11   YOUR DESIGN DIRECTION TO CREATE A NEW BARBIE BODY; RIGHT?

12   A    YES.  BUT I DON'T THINK WE EVER USED IT.

13   Q    AS OF THIS TIME, YOU WERE TELLING FOLKS IT WAS GOING TO BE

14   INTRODUCED.

15   A    I THOUGHT IT WAS GOING TO BE, YES.

16   Q    AND IN ORDER TO CREATE THIS NEW BODY TO A

17   THREE-DIMENSIONAL BODY, DID YOU WORK WITH THE PEOPLE WHO WERE

18   FRANKENSTEINING THIS, AS YOU PUT IT?

19   A    WELL, YES.

20   Q    AND YOU, AT LEAST AS OF '98, HAD SEEN WHAT YOU THOUGHT WAS

21   THE FINAL RESULT OF THAT; CORRECT?

22   A    YES.

23   Q    AND YOU WERE TELLING WHOEVER LOOKED AT YOUR RESUMÉ THAT

24   YOU WERE THE PERSON RESPONSIBLE FOR THAT DESIGN; THAT IS, THAT

25   THREE-DIMENSIONAL LOOK THAT WAS, TO YOUR UNDERSTANDING, THE

1   FINAL RESULT?

2   A   YES.

3   Q   IF YOU WOULD LOOK AT EXHIBIT 10480.

4        IS THIS AN EXAMPLE OF, SAY, A LETTER YOU WERE SENDING

5   OUT TO SOLICIT EMPLOYMENT SOMETIME IN 1998?

6   A   YES.  I DON'T REALLY REMEMBER IT, BUT THAT'S WHAT IT LOOKS

7   LIKE.

8        MR. PRICE:  I'D MOVE EXHIBIT 10480 INTO EVIDENCE.

9        MR. NOLAN:  NO OBJECTION.

10        THE COURT:  IT'S ADMITTED.

11        YOU MAY PUBLISH.

12        (EXHIBIT 10480 RECEIVED.)

13   BY MR. PRICE:

14   Q   JUST SO WE CAN UNDERSTAND YOUR EXPERIENCE, YOU SEE HERE IT

15   SAYS, "MY EXPERIENCE AT MATTEL INCLUDED ALL ASPECTS OF 2-D AND

16   3-D DESIGN AND ILLUSTRATION, AND GAVE ME VERY SOLID EXPERIENCE

17   IN WORKING IN A HIGHLY CREATIVE FIELD OF TIGHT DEADLINES,

18   BASICALLY WORKING UNDER MY OWN DIRECTION AFTER GETTING GENERAL

19   DIRECTIVES FROM DESIGN MANAGEMENT."

20        DO YOU SEE THAT?

21   A   YES.

22   Q   NOW, WHEN YOU'RE TALKING ABOUT 3-D DESIGN, YOU'RE TALKING

23   ABOUT SOMETHING OTHER THAN THE DRAWINGS WE'VE BEEN LOOKING AT;

24   RIGHT?

25   A   YEAH.  I WAS MAINLY REFERRING TO, YOU KNOW, CREATING

1    FASHIONS AND THINGS LIKE THAT.

2    Q   BUT YOU'RE NOT TALKING ABOUT JUST THE DRAWINGS THERE;

3    YOU'RE ACTUALLY TALKING ABOUT TRANSLATING YOUR DRAWINGS INTO A

4    THREE-DIMENSIONAL OBJECT; CORRECT?

5    A   RIGHT.

6    Q   WE HAD EARLIER BEEN TALKING ABOUT THE TEEN SKIPPER BARBIE

7    WHICH YOU DESIGNED.

8    A   YES.

9    Q   IF YOU WOULD LOOK AT EXHIBIT 11245, THE SECOND PAGE.

10       I GUESS MY QUESTION IS THIS:  ARE YOU AWARE -- THIS

11   IS DATED OCTOBER 31ST.  IT'S ALREADY IN EVIDENCE.  I DON'T KNOW

12   IF YOU RECEIVED THIS E-MAIL, BUT I'M WONDERING -- WERE YOU

13   AWARE THAT MGA HAD SENT TO HONG KONG, IN AN ATTEMPT TO HELP

14   THEM COME UP WITH THE BRATZ DESIGN, A SKIPPER DOLL?

15       MR. NOLAN:  YOUR HONOR, OBJECTION.  LACK OF

16   FOUNDATION WHETHER OR NOT HE'S EVER SEEN THIS.

17       THE COURT:  SUSTAINED.

18   BY MR. PRICE:

19   Q   I'M JUST ASKING IN GENERAL, ARE YOU AWARE THAT IN THE

20   OCTOBER 2000 TIME FRAME, THAT MGA HAD SENT TO HONG KONG, MGA'S

21   FACILITY, A SKIPPER DOLL?

22   A   I DON'T REMEMBER THAT.

23   Q   DID YOU ASSIST IN ACTUALLY GOING OUT AND GETTING THE

24   SKIPPER DOLL THAT WAS THEN SENT TO HONG KONG?

25   A   I DON'T REMEMBER DOING THAT, NO.

1    Q   WHAT DOES "THE SKIPPER DOLL" REFER TO?  WHAT DOES THAT

2    MEAN TO YOU WHEN YOU SEE "THE SKIPPER DOLL"?

3    A   WELL, I'M ASSUMING THAT THEY WERE TALKING ABOUT THE NEW

4    ONE, THE NEW SKIPPER DOLL.

5    Q   AND THAT'S BARBIE'S LITTLE SISTER; IS THAT RIGHT?

6    A   SOMETHING LIKE THAT, YES.

7    Q   LET ME SHOW YOU WHAT'S MARKED AS EXHIBIT 1326 FOR

8    IDENTIFICATION.

9        DO YOU HAVE THAT, MR. BRYANT?

10   A   YES.

11   Q   DO YOU RECALL EXHIBIT 1326 IS SORT OF A SEATING DIAGRAM AT

12   MATTEL THAT YOU WERE SHOWN AT YOUR DEPOSITION?

13   A   YES.

14   Q   AND YOU WERE ASKED TO LOOK AT IT AND IDENTIFY WHERE IT WAS

15   THAT YOU SAT WHEN YOU STARTED WORKING FOR MATTEL AGAIN IN

16   JANUARY OF '99.

17   A   YES.

18   Q   AND THIS IS A DRAWING WHERE YOU HAD INDICATED WHERE, IN

19   FACT, YOU SAT; CORRECT?

20   A   YES.

21       MR. PRICE:  YOUR HONOR, I'LL MOVE EXHIBIT 1326 INTO

22   EVIDENCE.

23       MR. NOLAN:  NO OBJECTION.

24       THE COURT:  ADMITTED.

25       YOU MAY PUBLISH.

1       (EXHIBIT 1326 RECEIVED.)

2    BY MR. PRICE:

3    Q   IF YOU CAN SEE THE FIRST PAGE, THIS AREA HERE, YOU SEE

4    THERE'S AN AREA THERE THAT HAS YOUR NAME ON IT; CORRECT?

5    A   RIGHT.

6    Q   AND THE NAMES NEAR YOU HAVE BEEN BLANKED OUT; CORRECT?

7    A   I SUPPOSE SO.

8    Q   SO THAT DIDN'T INFLUENCE YOUR SHOWING US WHERE IT WAS THAT

9    YOU SAT; CORRECT?

10   A   NO.

11   Q   IS MY STATEMENT CORRECT?

12   A   YES, YOUR STATEMENT IS CORRECT.

13   Q   AND WHEN YOU SAW THIS, YOU IDENTIFIED THAT YOU WERE SEATED

14   HERE, WHERE IT SAYS "4".

15       DO YOU SEE THAT?

16   A   RIGHT.

17   Q   AND IS IT TRUE THAT YOUR TESTIMONY WAS THAT YOU DIDN'T

18   HAVE ANY RECOLLECTION AS TO WHO SAT ON EITHER SIDE OF YOU?

19   A   NO.  I MEAN, NOT A DEFINITE RECOLLECTION.

20   Q   PARDON?

21   A   NOT A DEFINITE RECOLLECTION, NO.

22   Q   I'LL SHOW YOU WHAT'S BEEN MARKED AS EXHIBIT 27 FOR

23   IDENTIFICATION.

24       MR. PRICE:  AND I HAVE A COPY FOR THE COURT AS WELL.

25       THE COURT:  VERY WELL.

1    BY MR. PRICE:

2    Q   IS EXHIBIT 27 THE PROPRIETARY INFORMATION CHECKOUT FORM

3    WHICH YOU EXECUTED AROUND OCTOBER 19TH OF 2000; THAT IS, THE

4    LAST DAY YOU WERE AT MATTEL?

5    A   YES, I BELIEVE SO.

6        MR. PRICE:  MOVE EXHIBIT 27 INTO EVIDENCE.

7        MR. NOLAN:  NO OBJECTION.

8        THE COURT:  IT'S ADMITTED.

9        YOU MAY PUBLISH.

10       (EXHIBIT 27 RECEIVED.)

11   BY MR. PRICE:

12   Q   THIS IS YOUR SIGNATURE AT THE BOTTOM; CORRECT?

13   A   YES.

14   Q   AND, IN FACT, YOU FILLED THIS OUT ON OCTOBER 19, 2000?

15   A   TO THE BEST OF MY RECOLLECTION, YES.

16   Q   AND YOU KNOW THAT THIS PARAGRAPH THAT "MY INTEREST IN,

17   (A), ANY AND ALL INVENTIONS, IMPROVEMENTS, AND IDEAS, WHETHER

18   OR NOT PATENTABLE, WHICH I HAVE MADE OR CONCEIVED OR MAY MAKE

19   OR CONCEIVE AT ANY TIME DURING THE PERIOD OF MY EMPLOYMENT WITH

20   THE COMPANY, EITHER SOLELY OR JOINTLY WITH OTHERS, AND IN, (B)

21   ANY SUGGESTIONS, DESIGNS, TRADEMARKS, COPYRIGHT SUBJECT MATTER,

22   LITERARY OR ARTISTIC WORKS, WHICH I HAVE MADE OR CONCEIVED, OR

23   MAY MAKE OR CONCEIVE, AT ANY TIME DURING THE PERIOD OF MY

24   EMPLOYMENT, WHICH RELATE OR ARE APPLICABLE DIRECTLY OR

25   INDIRECTLY TO ANY PHASE OF THE COMPANY'S BUSINESS, SHALL BE THE

1    EXCLUSIVE PROPERTY OF THE COMPANY, ITS SUCCESSORS, ASSIGNEES,

2    OR NOMINEES."

3        YOU NOTED THAT WHEN YOU SIGNED THE DOCUMENT?

4    A   I DON'T REMEMBER EXACTLY READING THAT OR WHAT MY

5    UNDERSTANDING OF THAT WAS AT THE TIME.

6    Q   OKAY.

7        BUT BY THAT TIME, BY THE LAST DAY AT MATTEL, YOU KNEW

8    THAT; THAT WAS YOUR UNDERSTANDING; THAT IF YOU CREATED

9    SOMETHING THAT RELATED TO MATTEL'S BUSINESS, THE TOY BUSINESS,

10   WHILE YOU WERE AN EMPLOYEE OF MATTEL, THAT THAT BELONGED TO

11   MATTEL; RIGHT?

12   A   I THINK MY UNDERSTANDING OF IT WAS, YOU KNOW, ANYTHING

13   THAT RELATED TO BARBIE OR THE BARBIE GROUP.

14   Q   OR TOYS; RIGHT?

15   A   I'M NOT SURE THAT I HAD THAT UNDERSTANDING.

16   Q   YOU UNDERSTOOD THAT THE COMPANY'S BUSINESS WAS NOT JUST

17   BARBIE OR BARBIE GROUP; RIGHT?

18   A   WELL, YES.

19   Q   YOU UNDERSTOOD, FOR EXAMPLE, WHEN YOU WERE THERE, THEY

20   ALSO RELEASED DIVA STARZ?

21   A   I DIDN'T BECOME AWARE OF DIVA STARZ UNTIL AFTER I LEFT.

22   Q   HOPEFULLY, THIS IS THE LAST DOCUMENT I'LL SHOW YOU.

23   A   OKAY.  THAT'S GOOD.

24   Q   THAT'S EXHIBIT 593 FOR IDENTIFICATION.

25        DO YOU HAVE THAT, MR. BRYANT?

1    A   YES.

2    Q   DO YOU RECOGNIZE THIS AS AN INVOICE THAT YOU SENT TO

3    PAULA GARCIA AROUND AUGUST 31ST OF 2000?

4    A   YES.

5        MR. PRICE:  MOVE THIS INTO EVIDENCE, YOUR HONOR.

6        MR. NOLAN:  NO OBJECTION.

7        THE COURT:  IT'S ADMITTED.

8        (EXHIBIT 593 RECEIVED.)

9    BY MR. PRICE:

10   Q   YOU SENT THIS TO PAULA GARCIA AT MGA; RIGHT?

11   A   YES.

12   Q   YOU'RE DATING THIS AT THE END OF AUGUST; CORRECT?

13   A   YES.

14   Q   AND IT SAYS HERE, "THREE HOURS, ANGEL FACE HAIR DESIGNS

15   AND SKETCHES."

16       DO YOU SEE THAT?

17   A   YES.

18   Q   IS THIS WORK THAT YOU DID?

19   A   YES.

20   Q   SO YOU WERE BILLING MGA FOR WORK YOU DID ON DRAWING

21   ANGEL FACES; CORRECT?

22   A   YES.

23   Q   WHILE YOU WERE STILL EMPLOYED AT MATTEL?

24   A   YES.

25   Q   AND THE AMOUNT WE HAVE HERE IS $150.

1        DO YOU SEE THAT?

2    A   YES.

3    Q   WERE YOU PAID FOR THIS?

4    A   I DON'T RECALL.

5    Q   IS IT FAIR TO SAY YOU DON'T RECALL NOT BEING PAID; YOU

6    DON'T RECALL HAVING THIS FEELING, 'THEY GIPPED ME'?

7    A   I DON'T REMEMBER ONE WAY OR THE OTHER.

8    Q   YOU ACTUALLY DID SOME SKETCHES; CORRECT?

9    A   YES.

10   Q   YOU UNDERSTOOD THAT MGA AT THAT TIME HAD A PROJECT THAT

11   INVOLVED ANGELS, OR BABY ANGELS.

12   A   I HAD A PRETTY VAGUE IDEA OF WHAT THE PROJECT WAS.

13   Q   AND MS. GARCIA SAID THAT THEY WERE HAVING TROUBLE COMING

14   UP WITH THE WAY THE FACE OF THEIR DOLL SHOULD LOOK, AND THEY

15   WANTED TO GET SOME IDEAS FROM YOU.

16   A   WELL, I DON'T RECALL PAULA SAYING THAT.

17        I DO REMEMBER BEING ASKED BY VERONICA MARLOW IF I

18   COULD DO A FEW SKETCHES FOR HER.

19   Q   WHICH YOU KNEW WERE GOING TO BE GIVEN TO MGA.

20   A   YES.

21   Q   ON A DOLL PROJECT MGA WAS WORKING ON; RIGHT?

22   A   YES.

23   Q   JUST SO I'M SURE OF YOUR UNDERSTANDING, THEN, AS TO WHAT

24   YOUR OBLIGATIONS WERE AS A MATTEL EMPLOYEE, IS IT YOUR

25   UNDERSTANDING THAT YOU COULD ASSIST ANOTHER TOY COMPANY IN

1    CREATING A TOY THAT WOULD COMPETE WITH MATTEL'S TOYS?

2    A   I MEAN, I GUESS I DIDN'T REALLY THINK OF IT IN THOSE TERMS

3    OF COMPETING.  ALL I KNEW ABOUT MGA WAS THAT THEY WERE A VERY

4    SMALL COMPANY.  YOU KNOW, I CAN'T SAY IN MY MIND THAT I REALLY

5    THOUGHT THAT THEY WERE MATTEL COMPETITORS.

6    Q   LET ME ASK YOU JUST GENERALLY, THEN.

7        DID YOU BELIEVE, AS OF AUGUST OR SEPTEMBER OF 2000,

8    THAT IT WAS COMPLETELY OKAY FOR YOU TO TRY TO CREATE A DOLL

9    THAT WOULD THEN BE PUT INTO THE TOY MARKET BY A COMPANY OTHER

10   THAN MATTEL?

11   A   WELL, I WASN'T TRYING TO CREATE A DOLL.  I WAS JUST DOING

12   SOME IDEAS FOR SOME FACES.

13   Q   WELL, WITH BRATZ, YOU WERE TRYING TO GET MGA TO CREATE

14   YOUR DOLL; RIGHT?

15   A   YES.

16   Q   YOUR TESTIMONY WAS THAT IT WAS COMPLETELY OKAY FOR YOU,

17   WHILE YOU WERE WORKING AT MATTEL, TO TRY TO GET ANOTHER

18   COMPANY, WHETHER LARGE OR SMALL OR MEDIUM SIZE, TO PRODUCE A

19   DOLL OTHER THAN BARBIE THAT WOULD BE PUT INTO THE MARKETPLACE.

20   A   YEAH, THAT WAS MY UNDERSTANDING.

21   Q   SO YOUR UNDERSTANDING IS, SO LONG AS IT WASN'T BARBIE, SO

22   LONG AS YOU WEREN'T CREATING A BARBIE DOLL, IT WAS OKAY FOR YOU

23   TO GO TO ANOTHER TOY COMPANY AND TRY TO GET THEM TO PUT A DOLL

24   INTO THE MARKETPLACE.

25   A   I THINK THAT WAS MY UNDERSTANDING.

1          THE COURT:  MR. PRICE, I'M GOING TO GO AHEAD AND TAKE

2     A BRIEF BREAK.

3          (WHEREUPON, JURORS DEPART COURTROOM.)

4          THE COURT:  MR. PRICE, HOW MUCH LONGER?

5          MR. PRICE:  THAT MAY HAVE BEEN MY LAST QUESTION, BUT

6     I'M GOING TO HAVE 20 PEOPLE TELL ME OTHERWISE, PROBABLY.

7          THE COURT:  VERY WELL.

8          MR. NOLAN, YOU'LL BE PREPARED TO PROCEED?

9          MR. NOLAN:  SURE.

10         JUST CURIOUS, DOES THE COURT HAVE A CALCULATION ON

11    THE TIME?

12         I KNOW WHAT MY TIME IS.

13         THE COURT:  YES, I DO HAVE THAT AT THIS POINT.

14         34 HOURS AND 51 MINUTES FOR MATTEL AND 17 HOURS FOR

15    MGA.

16         MR. NOLAN:  AND THAT'S INCLUDING THIS MORNING?

17         THE COURT:  AS OF RIGHT NOW, YES.

18         MR. NOLAN:  THANK YOU VERY MUCH.

19         (WHEREUPON, A BRIEF RECESS WAS HELD.)

20         (JURORS ENTER COURTROOM.)

21         MR. PRICE:  YOUR HONOR, FOR THE RECORD, WE HAD

22    IDENTIFIED THE BARBIE DOLL AS 13627.  IT ACTUALLY NEEDS TO BE

23    13656.

24         THE COURT:  VERY GOOD.  THANK YOU FOR THAT

25    CLARIFICATION.

1      MR. PRICE:  I DON'T KNOW IF I MOVED THIS INTO

2   EVIDENCE OR NOT.  I THOUGHT I DID.

3      THE COURT:  I BELIEVE SO.  THERE WAS NO OBJECTION.

4      MR. NOLAN:  NO OBJECTIONS.

5      THE COURT:  PROVIDE THAT TO THE COURTROOM DEPUTY.

6   BY MR. PRICE:

7   Q   MR. BRYANT, PRIOR TO TESTIFYING IN THIS TRIAL, DID YOU

8   HAVE AN OPPORTUNITY TO MEET WITH COUNSEL OTHER THAN YOUR OWN TO

9   DISCUSS YOUR TESTIMONY?

10   A   YES, I DID.

11   Q   WHO DID YOU MEET WITH TO DISCUSS YOUR TESTIMONY, OTHER

12   THAN YOUR OWN ATTORNEY?

13   A   I MET WITH THE LAWYERS FROM SKADDEN.

14   Q   WHEN YOU SAY 'LAWYERS FROM SKADDEN,' THERE ARE A FEW.

15      DO YOU HAVE ANY NAMES?

16   A   I DON'T HAVE ANY LAST NAMES, BUT I'VE GOT A COUPLE OF

17   FIRST NAMES, I GUESS.

18   Q   TELL US WHAT THOSE ARE.

19   A   A MAN NAMED ROB AND A MAN NAMED ALAN.

20   Q   ANY OTHER ATTORNEYS THAT YOU MET WITH PRIOR TO GETTING ON

21   THE STAND LAST WEEK AND TESTIFYING IN THIS CASE?

22   A   MR. NOLAN; MR. TOM NOLAN.

23   Q   ANY OTHERS?

24   A   LET'S SEE.  A LADY NAMED CLAUDE, AND A LADY NAMED LAUREN.

25   Q   THESE, YOUR UNDERSTANDING, ARE ALL LAWYERS WITH THE

1    SKADDEN FIRM.

2    A   YES.

3    Q   INCLUDING MR. NOLAN; YOU UNDERSTAND HE'S WITH SKADDEN.

4    A   YES.

5    Q   ANY OTHERS THAT YOU MET WITH PRIOR TO TAKING THE STAND

6    LAST WEEK TO TESTIFY?

7    A   NOT THAT I REMEMBER.

8    Q   OVER WHAT PERIOD OF TIME DID YOU MEET WITH THESE LAWYERS?

9    A   TWO, MAYBE THREE DAYS.

10   Q   WAS YOUR LAWYER PRESENT WHEN YOU WERE MEETING WITH THE

11   SKADDEN LAWYERS TO DISCUSS YOUR TESTIMONY?

12   A   YES.

13   Q   AND I TAKE IT YOU DIDN'T MEET WITH US BEFORE WE PUT YOU ON

14   THE STAND TO DISCUSS YOUR TESTIMONY; CORRECT?

15   A   CORRECT.

16   Q   WHEN YOU SAY IT WAS TWO OR THREE DAYS, WAS IT ACTUALLY

17   OVER A TWO- OR THREE-DAY TIME FRAME?

18   A   I BELIEVE SO.

19   Q   AND DURING THAT TIME, DID THE LAWYERS, OTHER THAN YOUR OWN

20   LAWYER, DID THEY SHOW YOU DOCUMENTS AND ASK YOU QUESTIONS?

21   A   YES.

22   Q   DID THEY DISCUSS WHAT THEY WERE GOING TO ASK YOU WHEN THEY

23   GOT THEIR OPPORTUNITIES TO ASK YOU QUESTIONS?

24   A   NO.  I DON'T RECALL THAT.

25   Q   SO THEY WOULD JUST SHOW YOU DOCUMENTS AND ASK YOU

1    QUESTIONS ABOUT THEM.

2    A   YES.

3    Q   AND DID THEY DISCUSS HOW YOU SHOULD PHRASE CERTAIN

4    ANSWERS?

5    A   I MEAN, I SUPPOSE THEY MADE SUGGESTIONS.

6    Q   AND WHEN THEY WERE MAKING SUGGESTIONS AS TO HOW YOU SHOULD

7    PHRASE CERTAIN ANSWERS, WAS ANY OF THIS VIDEOTAPED?

8    A   NOT THAT I REMEMBER.

9    Q   YOU MENTIONED LAWYERS OTHER THAN YOUR OWN.  WAS THERE

10   ANYONE THAT YOU MET WITH WHO WAS REPRESENTED AS BEING A JURY

11   CONSULTANT?

12   A   NO.

13   Q   DO YOU KNOW HOW MANY TIMES THE SKADDEN LAWYERS SUGGESTED

14   THAT YOU PHRASE AN ANSWER A CERTAIN WAY, AS OPPOSED TO THE WAY

15   YOU HAD PHRASED IT?

16   A   OH, I HAVE NO IDEA.

17   Q   LIKE, MORE THAN A DOZEN TIMES, PERHAPS?

18   A   I COULDN'T SAY ONE WAY OR THE OTHER.

19   Q   IN THE TESTIMONY YOU GAVE IN RESPONSE TO MY QUESTIONS, DID

20   YOU USE THEIR SUGGESTIONS IN PHRASING YOUR ANSWERS?

21   A   WELL, I CAN ONLY REMEMBER SO MUCH, BUT, YOU KNOW, I'M JUST

22   UP HERE TRYING TO DO THE BEST I CAN.

23   Q   DID THEY EVER, WHEN THEY MET WITH YOU, DID THEY CAUTION

24   YOU NOT TO SAY CERTAIN THINGS A CERTAIN WAY OR TO SAY CERTAIN

25   THINGS?

1   A   NOT THAT I REMEMBER.

2   Q   NOW, SINCE THAT TWO- OR THREE-DAY PREPARATION PRIOR TO

3   TAKING THE STAND, AND SINCE THE TIME YOU'VE TAKEN THE STAND,

4   HAVE YOU HAD ANY DISCUSSIONS WITH ANY LAWYERS OTHER THAN YOUR

5   OWN ABOUT YOUR TESTIMONY?

6   A   NOT THAT I CAN REMEMBER, NO.

7   Q   IN THAT SENSE -- WAS IT WEDNESDAY -- SINCE LAST WEDNESDAY

8   HAVE YOU TALKED TO ANYONE ABOUT THE TESTIMONY YOU'VE GIVEN

9   BEFORE THE JURY?

10   A   I'VE SPOKEN WITH MY ATTORNEYS.

11   Q   ANYBODY ELSE?

12   A   NOT THAT I CAN REMEMBER.

13   Q   AND OVER WHAT PERIOD OF TIME -- LET ME REPHRASE THAT.

14       GIVE ME AN ESTIMATE IN TERMS OF THE NUMBER OF HOURS

15   THAT YOU TALKED WITH YOUR ATTORNEY SINCE LAST WEDNESDAY ABOUT

16   THE TESTIMONY YOU'VE BEEN GIVING ON THE STAND.

17   A   MAYBE HALF AN HOUR.

18   Q   WHEN WAS THAT?

19   A   I SPOKE WITH HIM LAST NIGHT.

20   Q   LAST NIGHT?

21   A   UH-HUH.

22   Q   AND SINCE FRIDAY, SINCE YOU TOOK THE STAND AND LEFT THE

23   STAND ON FRIDAY, THE ONLY CONVERSATIONS YOU HAD WITH ANY

24   ATTORNEYS SINCE THEN WERE LAST NIGHT FOR HALF AN HOUR?

25   A   YES.

1    Q   HOW ABOUT DURING THE DAY ON FRIDAY?

2        FOR EXAMPLE, WE HAD A LUNCH BREAK ON FRIDAY.  DID YOU

3    HAVE ANY DISCUSSIONS WITH ANYBODY DURING THAT LUNCH BREAK ABOUT

4    YOUR TESTIMONY?

5    A   OTHER THAN MY ATTORNEY, NO.

6    Q   NOW, YOU UNDERSTOOD, THOUGH, THAT YOUR ATTORNEY IS

7    ASSISTING THE SKADDEN ATTORNEYS; CORRECT?

8        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

9    FOUNDATION.

10       THE COURT:  SUSTAINED.

11   BY MR. PRICE:

12   Q   DO YOU HAVE AN UNDERSTANDING AS TO WHETHER OR NOT YOUR

13   COUNSEL IS ASSISTING THE SKADDEN ATTORNEYS?

14       MR. WERDEGAR:  YOUR HONOR, I JUST WANT TO OBJECT.

15   THAT CALLS FOR ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS.

16       IF HE HAS AN UNDERSTANDING THAT COMES FROM HIS

17   COMMUNICATION WITH HIS COUNSEL, I WOULD OBJECT ON THAT BASIS.

18       THE COURT:  I'LL OVERRULE THE OBJECTION AS PHRASED.

19   HOWEVER, IF WE GET INTO THE CONTENT, I'M GOING TO SUSTAIN THE

20   OBJECTION.

21       DON'T DISCLOSE THE UNDERSTANDING, JUST YES OR NO

22   WHETHER YOU HAVE AN UNDERSTANDING OR NOT.

23       THE WITNESS:  WHAT WAS THE QUESTION?

24   BY MR. PRICE:

25   Q   DO YOU HAVE AN UNDERSTANDING AS TO WHETHER OR NOT YOUR

1    COUNSEL IS ASSISTING THE SKADDEN ATTORNEYS?

2    A   NO.

3    Q   WELL, DURING THIS TWO OR THREE DAYS THAT YOU WERE WITH THE

4    SKADDEN ATTORNEYS AND YOUR ATTORNEY, DID YOU OBSERVE WHETHER O

5    NOT YOUR ATTORNEY WAS ASSISTING THE SKADDEN ATTORNEYS?

6    A   I'M NOT SURE WHAT YOU MEAN BY ASSISTING.

7    Q   OH, ASKING QUESTIONS, FOLLOW UPS; SUGGESTING CHANGES IN

8    ANSWERS IN RESPONSE TO WHAT THE SKADDEN ATTORNEYS WERE

9    SUGGESTING; THINGS LIKE THAT.

10   A   WELL, I MEAN, YEAH, I THINK SO.

11   Q   AND YOUR ATTORNEY, IN FACT, IS BEING PAID BY MGA; RIGHT?

12   A   PARTIALLY.

13   Q   PARTIALLY MEANING 97 PERCENT?

14   A   NO.

15   Q   THERE WAS A PERIOD OF TIME WHEN YOUR ATTORNEY WAS BEING

16   PAID BY MGA AT ABOUT A 97-PERCENT RATE?

17   A   I'M NOT EXACTLY SURE IF THAT WAS EVER THE CASE.

18   Q   YOU KNOW THERE'S SOME SORT OF DOCUMENT WHICH STATES THAT;

19   RIGHT?  YOU'VE SEEN SOME DOCUMENTS.

20   A   I MAY HAVE.  I DON'T REMEMBER THEM.

21   Q   WELL, WHAT'S YOUR UNDERSTANDING AS TO HOW MUCH OF YOUR

22   ATTORNEY'S FEES ARE BEING PAID BY MGA, WHAT PERCENTAGE?

23   A   I DON'T KNOW THE PERCENTAGE, BUT I KNOW THAT I AM PAYING A

24   LOT OF ATTORNEYS' FEES.

25   Q   THERE WERE, DURING THE COURSE OF THIS LITIGATION, TWO

1    FIRMS THAT REPRESENTED YOU; IS THAT RIGHT?

2    A   WELL, NO.  THE ONLY OTHER FIRM THAT I CAN THINK OF WAS

3    LITTLER MENDELSON.

4    Q   CORRECT.  THEN THERE'S A FIRM, KEKER.

5    A   YES; KEKER.

6    Q   SO THAT WAS TWO SEPARATE LAW FIRMS AT DIFFERENT TIMES.

7    A   YES.

8        MR. PRICE:  NO FURTHER QUESTIONS AT THIS TIME.

9        THE COURT:  VERY WELL.

10       EXAMINATION BY MR. NOLAN.

11       MR. NOLAN:  THANK YOU.

12               CROSS-EXAMINATION

13   BY MR. NOLAN:

14   Q   GOOD MORNING.

15   A   GOOD MORNING.

16   Q   WE'VE MET BEFORE; CORRECT?

17   A   YES.

18   Q   AND SO I DON'T REPEAT A MISTAKE, WHAT I'D LIKE TO DO, IF

19   YOU DON'T MIND, IS OCCASIONALLY I MAY REFER TO YOU AS CARTER;

20   ALL RIGHT?

21   A   THAT'S FINE.

22   Q   YOU SHOULD PROBABLY REFER TO ME AS MR. NOLAN, THOUGH.

23       I WANT TO GO BACK TO THIS LAST LINE OF QUESTIONS THAT

24   MR. PRICE ASKED YOU, AND THAT IS PREPARING FOR YOUR TESTIMONY

25   TODAY.

1      IT'S TRUE THAT YOU WERE A PARTY IN THIS LITIGATION

2    FOR WELL OVER FOUR YEARS; CORRECT?

3    A   YES.

4    Q   AND YOU WERE REPRESENTED BY SEPARATE COUNSEL THROUGHOUT

5    THAT TIME; CORRECT?

6    A   YES.

7    Q   NOW, IT'S TRUE THAT SINCE YOU TOOK THE STAND ON WEDNESDAY,

8    YOU'VE NEVER HAD ANY CONVERSATIONS ABOUT YOUR TESTIMONY WITH

9    ANY OF THE LAWYERS ON THE TEAM FROM SKADDEN ARPS; IS THAT

10   CORRECT?

11   A   NO.  NOT THAT I REMEMBER.

12   Q   CARTER, AT ANY TIME, HAS ANY LAWYER, EITHER FROM KEKER VAN

13   NEST, LITTLER, OR SKADDEN ARPS, EVER SUGGESTED THAT YOU SAY

14   ANYTHING BUT THE TRUTH IN THIS CASE?

15   A   NO.  NEVER.

16      THE COURT:  COUNSEL, ON THE COURT'S INSISTENCE, LET'S

17   KEEP IT MR. BRYANT.

18      MR. NOLAN:  I UNDERSTAND.

19   BY MR. NOLAN:

20   Q   MR. BRYANT, YOU'VE BEEN ON THE STAND SINCE WEDNESDAY

21   AFTERNOON.  I DON'T THINK IT'S GOING TO COME TO YOU AS A SHOCK

22   THAT I'M GOING TO WANT TO ASK YOU SOME QUESTIONS, BUT I WANT TO

23   START OFF BY ASKING YOU A FUNDAMENTAL QUESTION.

24      MR. BRYANT, YOU UNDERSTAND THAT MATTEL CONTENDS THAT

25   YOU'RE LYING IN YOUR TESTIMONY IN THIS TRIAL.  DO YOU

1    UNDERSTAND THAT?

2    A   YES.

3    Q   THEY ARE CONTENDING THAT YOU'RE LYING WITH RESPECT TO THE

4    DATE WHERE YOU CONCEIVED OF AND REDUCED TO DRAWINGS THE IDEA OF

5    BRATZ.  DO YOU UNDERSTAND THAT?

6        MR. PRICE:  ARGUMENTATIVE AS PHRASED; CHARACTERIZING

7    OUR POSITION.

8        THE COURT:  REPHRASE, COUNSEL.

9    BY MR. NOLAN:

10   Q   DO YOU UNDERSTAND THAT YOUR CREDIBILITY IS UNDER ATTACK BY

11   MATTEL IN THIS CASE?

12   A   YES.

13   Q   HAVE YOU TESTIFIED TRUTHFULLY AT TRIAL?

14   A   YES.

15   Q   YOU'VE HAD YOUR DEPOSITIONS TAKEN IN THIS CASE ON FOUR

16   DIFFERENT SESSIONS; RIGHT?

17   A   FIVE.

18   Q   SORRY.

19       DID YOU TESTIFY TRUTHFULLY, TO THE BEST OF YOUR

20   ABILITY, IN THOSE DEPOSITIONS?

21   A   YES.

22   Q   AND MR. BRYANT, WHEN DID YOU CONCEIVE OF THE IDEA OF BRATZ

23   AND REDUCE IT TO MASTER DRAWINGS?

24   A   THAT WAS IN 1998.

25   Q   WHERE WERE YOU LIVING?

1   A   I WAS LIVING IN KIMBERLING CITY, MISSOURI.

2   Q   WHO WERE YOU LIVING WITH?

3   A   I WAS LIVING WITH MY PARENTS.

4   Q   WERE YOU EMPLOYED BY MATTEL AT THE TIME?

5   A   NO.

6   Q   WERE YOU UNDER CONTRACT WITH MATTEL AT THE TIME?

7   A   I WAS UNDER CONTRACT WITH MATTEL UP UNTIL SOME TIME IN

8   APRIL OF 1998.

9   Q   I'M GOING TO TRY TO TOUCH UPON A LOT OF THESE SUBJECTS,

10   BUT I WANT TO JUST, UP FRONT, ASK YOU A COUPLE OF QUICK

11   QUESTIONS.

12       MR. PRICE, I THINK ON FRIDAY AFTERNOON OR JUST BEFORE

13   THE LUNCH BREAK, SHOWED YOU A DECLARATION THAT YOU HAD SIGNED

14   THAT WAS SUBMITTED TO THE UNITED STATES PATENT OFFICE.

15       DO YOU RECALL THAT LINE OF TESTIMONY?

16   A   YES.

17   Q   AND HE SHOWED YOU A DECLARATION THAT YOU HAD SIGNED UNDER

18   PENALTY OF PERJURY.

19       DO YOU RECALL THAT?

20   A   YES.

21   Q   MR. BRYANT, AT ANY TIME, HAVE YOU EVER SIGNED A

22   DECLARATION UNDER THE PENALTY OF PERJURY THAT YOU BELIEVED TO

23   BE FALSE?

24   A   NO.

25   Q   HAS ANY LAWYER EVER ASKED YOU TO SIGN A DECLARATION UNDER

1    OATH TO GIVE MGA RIGHTS THAT IT DID NOT DESERVE?

2    A   NO.

3    Q   WE DON'T KNOW MUCH ABOUT YOUR BACKGROUND, I'M GOING TO GET

4    INTO THAT, BUT I WANT TO ASK YOU A QUESTION.

5        IS THERE ANYTHING ABOUT YOUR BACKGROUND AND THE WAY

6    YOU WERE RAISED THAT WOULD ALLOW YOU TO SIGN A FALSE

7    DECLARATION?

8        MR. PRICE:  OBJECTION.  ARGUMENTATIVE; CALLS FOR

9    NARRATIVE.

10       THE COURT:  SUSTAINED.  REPHRASE COUNSEL.

11   BY MR. NOLAN:

12   Q   HAVE YOU EVER SIGNED A FALSE DECLARATION?

13   A   NO.

14   Q   I COUNTED IT UP OVER THE WEEKEND, AND I BELIEVE FRIDAY

15   AFTERNOON YOU WERE ASKED QUESTIONS THAT CONCERNED THE PHRASE

16   "EVIDENCE ELIMINATOR" 37 TIMES.

17       DO YOU RECALL BEING ASKED QUESTIONS ABOUT A SOFTWARE

18   PROGRAM KNOWN AS EVIDENCE ELIMINATOR?

19       MR. PRICE:  ASSUMES FACTS NOT IN EVIDENCE.  IT COULD

20   BE TRUE, BUT..

21       THE COURT:  IT'S PRETTY CLOSE TO 37.  I STOPPED

22   COUNTING AFTER A GOOD NUMBER.

23       I'M GOING TO OVERRULE THE OBJECTION.

24       THE WITNESS:  I DO REMEMBER BEING ASKED ABOUT THAT,

25   YES.

Transcript of Proceeding - AM (Bryant Dir/Cross)   6/17/2008  10:36:00 AM

1    BY MR. NOLAN:

2    Q   DO YOU RECALL THAT?

3    A   YES.

4    Q   MR. BRYANT, DID YOU EVER PURCHASE OR USE THE SOFTWARE

5    PACKAGE KNOWN AS EVIDENCE ELIMINATOR TO CONCEAL INFORMATION

6    FROM MATTEL IN THIS CASE?

7    A   NO.

8    Q   I SUPPOSE IN THE COURSE OF THE TRIAL CERTAIN ASPECTS OF

9    ONE'S LIFE ARE EXPOSED TO THE PUBLIC, SO I APOLOGIZE FOR ASKING

10   THIS QUESTION, BUT IT'S RAISED.

11        WERE YOU CONCERNED THAT PEOPLE CLOSE TO YOU MAY HAVE

12   HAD THE OPPORTUNITY TO LOOK AT VARIOUS INTERNET SITES THAT YOU

13   HAD VISITED IN THE PRIVACY OF YOUR HOME?

14        MR. PRICE:  OBJECTION.  LEADING AS PHRASED, YOUR

15   HONOR.

16        THE COURT:  AS PHRASED.

17   BY MR. NOLAN:

18   Q   DID YOU HAVE ANY CONCERNS WITH RESPECT TO ACCESS TO YOUR

19   COMPUTER WHILE YOU WERE LIVING BACK IN MISSOURI IN THE 2001

20   TIME PERIOD?

21   A   WELL, ACTUALLY I DIDN'T MOVE BACK TO MISSOURI UNTIL 2002,

22   BUT, YES.

23   Q   THIS CASE DEALS WITH --

24        MR. NOLAN:  IN FACT, IF I MIGHT, YOUR HONOR, I'D LIKE

25   TO PUT THE GRAPHIC BACK UP THAT MATTEL HAS USED WITH RESPECT TO

1    THE TIME OF HIS EMPLOYMENT.  LET'S DO THE TIMELINE.

2         I JUST WANT TO TURN TO THIS EVIDENCE ELIMINATOR ISSUE

3    ONE MORE TIME.  AND WE'D OFFER THIS UP AS A GRAPHIC.

4    BY MR. NOLAN:

5    Q   NOW, DURING YOUR EXAMINATION, MR. PRICE, ON BEHALF OF

6    MATTEL, WAS FOCUSING ON THIS FIRST PERIOD OF TIME, WHICH IS

7    SEPTEMBER 1995 THROUGH APRIL 29, 1998; THAT WAS DESCRIBED AS

8    YOUR FIRST SEGMENT OF EMPLOYMENT AT MATTEL; CORRECT?

9    A   RIGHT.

10   Q   AND THEN THE SECOND PART IS JANUARY 4, 1999 THROUGH

11   OCTOBER 19, 2000.

12        DO YOU SEE THAT?

13   A   YES.

14   Q   AND THAT IS WHAT WE'VE BEEN REFERRING TO AS THE SECOND

15   PERIOD OF EMPLOYMENT AT MATTEL; CORRECT?

16   A   YES.

17   Q   THEN THERE'S THE MIDDLE SECTION IN 1998 WHICH WE'RE GOING

18   TO BE TALKING ABOUT WHERE YOU WERE NOT UNDER CONTRACT WITH

19   MATTEL; CORRECT?

20   A   YES.

21   Q   AND YOU WERE NOT WORKING FOR MATTEL; CORRECT?

22   A   THAT'S RIGHT.

23   Q   NOW, IF I UNDERSTAND YOUR TESTIMONY, YOU DIDN'T PURCHASE

24   YOUR DESKTOP COMPUTER UNTIL OCTOBER 21, 2000; CORRECT?

25   A   THAT'S RIGHT.

1    Q   AND THEN ON NOVEMBER 1ST, 2000, YOU PURCHASED THE LAPTOP

2    COMPUTER.  DO YOU SEE THAT?

3    A   YES.

4    Q   AND THEN ON SEPTEMBER 10, 2002, THE SOFTWARE PACKAGE

5    EVIDENCE ELIMINATOR WAS INSTALLED ON THE LAPTOP.

6        DO YOU SEE THAT?

7    A   YES.

8    Q   ON OCTOBER 2003, YOU GAVE YOUR DESKTOP COMPUTER TO YOUR

9    NIECE; CORRECT?

10   A   YES.

11   Q   WHEN YOU BOUGHT THE COMPUTER IN OCTOBER OF 2000, HAD YOU

12   TRANSFERRED ANY INFORMATION TO THAT COMPUTER FROM YOUR FIRST

13   PERIOD OF EMPLOYMENT AT MATTEL?

14   A   NO.

15   Q   DID YOU TRANSFER ANY INFORMATION FROM YOUR SECOND PERIOD

16   OF EMPLOYMENT AT MATTEL?

17   A   NO.

18   Q   WHEN YOU PURCHASED YOUR DESKTOP AND THEN YOUR LAPTOP

19   COMPUTER, DID YOU TAKE ANY OF THE EARLY 1998 DRAWINGS OR

20   ANYTHING ELSE LIKE THAT AND THEN LOAD THEM INTO THE COMPUTER?

21   A   NOT THAT I REMEMBER, NO.

22   Q   IN FACT, PRIOR TO OCTOBER 21, 2000, HAD YOU EVEN OWNED A

23   COMPUTER?

24   A   NO.

25   Q   PRIOR TO NOVEMBER 1ST, 2001, HAD YOU EVER OWNED A LAPTOP

1    COMPUTER?

2    A   NO.

3    Q   BUT IT IS TRUE, IS IT NOT, THAT DURING OCTOBER OF 2000

4    THROUGH WHEN THE HARD DRIVE WAS IMAGED IN THIS CASE, YOU, ON

5    OCCASION, WOULD VISIT VARIOUS ADULT SITES ON THE INTERNET;

6    CORRECT?

7         MR. PRICE:  OBJECTION.  LEADING AS PHRASED.

8         THE COURT:  SUSTAINED.

9    BY MR. NOLAN:

10   Q   DURING THE PERIOD OF TIME OF OCTOBER 21ST THROUGH THE TIME

11   THAT THE DESKTOP OR THE HARD DRIVES WERE IMAGED, DID YOU VISIT

12   ANY INTERNET SITES?

13        MR. PRICE:  OBJECT AS TO VAGUE.  WE'RE TALKING ABOUT

14   DESKTOPS, AND I WAS LIMITING IT TO LAPTOPS.

15        THE COURT:  VERY WELL.

16        MR. NOLAN:  I'LL LIMIT IT TO LAPTOP COMPUTERS.

17        THE COURT:  VERY WELL.

18   BY MR. NOLAN:

19   Q   DURING OCTOBER 2000 THROUGH THE TIME OF THE IMAGING OF

20   YOUR HARD DRIVES ON YOUR LAPTOP COMPUTER, HAD YOU USED YOUR

21   LAPTOP COMPUTER TO ACCESS INTERNET ADDRESSES?

22   A   YES.

23   Q   WERE ANY OF THOSE INTERNET ADDRESSES OF AN ADULT CONTENT

24   TYPE?

25   A   YES.

1    Q   DID YOU HAVE, DURING THE SAME PERIOD OF TIME, ANY CONCERNS

2    THAT OTHERS WOULD HAVE ACCESS TO THAT IF THEY LOOKED AT YOUR

3    LAPTOP COMPUTER?

4    A   YES.

5    Q   I WANT TO GO KIND OF IN REVERSE ORDER FOR JUST A MOMENT.

6    IF YOU DON'T MIND, I WANT TO GO TO A DIAGRAM THAT MR. PRICE

7    SHOWED ON THE SCREEN JUST SHORTLY BEFORE HE RESTED, AND IT'S

8    EXHIBIT 1326.  THIS IS A SEATING CHART.

9         DO YOU REMEMBER THIS?

10   A   YES.

11   Q   THIS WAS A SEATING CHART THAT WAS SHOWN AT YOUR

12   DEPOSITION; IS THAT CORRECT?

13   A   YES, I BELIEVE SO.

14   Q   AND REMEMBER THAT MR. PRICE POINTED OUT TO YOU THAT IN

15   CERTAIN AREAS, THE NAMES OF EMPLOYEES ASSIGNED TO THOSE

16   CUBICLES HAD BEEN REMOVED; CORRECT?

17   A   YES.

18   Q   NOW, YOU DIDN'T REMOVE THOSE NAMES, DID YOU?

19   A   NO.

20   Q   SO MR. PRICE ASKED YOU TO LOOK WHERE YOUR NAME IS, "CARTER

21   BRYANT"; DO YOU SEE THAT?

22   A   YES.

23        MR. PRICE:  OBJECTION.  THAT'S NOT WHAT I ASKED.

24        THE COURT:  OVERRULED.

25   / / /

Transcript of Proceeding - AM (Bryant Dir/Cross)   6/17/2008  10:36:00 AM

1    BY MR. NOLAN:

2    Q   DO YOU SEE WHERE I'VE CIRCLED NUMBER FOUR?

3    A   YES.

4    Q   I GUESS MY QUESTION IS, DID YOU PUT NUMBER FOUR THERE, AT

5    YOUR DEPOSITION?

6    A   I DON'T REMEMBER.

7    Q   OKAY.  BUT DO YOU SEE THERE'S A CB-1, A CB-2, A CB-3, AND

8    A CB-4?

9    A   YES.

10   Q   AND DO YOU REMEMBER THAT AT YOUR DEPOSITION, YOU MARKED

11   EACH ONE OF THOSE AS PLACES THAT YOU HAD SAT AT VARIOUS TIMES

12   OF YOUR EMPLOYMENT AT MATTEL?

13   A   I THINK SO, YES.

14   Q   OKAY.

15       AND DO YOU RECALL THAT WITH RESPECT TO NUMBER FOUR,

16   WHERE IT'S THE ONLY CUBICLE WITH YOUR NAME ON IT, DO YOU SEE

17   THAT?

18   A   YES.

19   Q   DO YOU RECALL TESTIFYING THAT YOU BELIEVED THAT YOU SAT AT

20   THAT LOCATION FOR ONLY ABOUT TWO MONTHS?

21   A   YES.

22   Q   DO YOU EVER RECALL WHILE EMPLOYED AT MATTEL EVER SITTING

23   NEXT TO A WOMAN NAMED PAULA TREANTAFELLES GARCIA?

24   A   ABSOLUTELY NOT.

25   Q   DID YOU EVEN KNOW A WOMAN BY THE NAME OF

1    PAULA TREANTAFELLES GARCIA WHILE YOU WERE EMPLOYED AT MATTEL?

2    A   NO.

3    Q   I WANT TO GO TO THE CONTRACT THAT'S AT ISSUE IN THIS CASE,

4    AND THAT'S THE ONE THAT YOU SIGNED IN 1999.

5         COULD I HAVE EXHIBIT NUMBER 25 ON THE SCREEN.

6         THIS IS IN EVIDENCE, YOUR HONOR.

7         THE COURT:  VERY WELL.

8    BY MR. NOLAN:

9    Q   YOU WERE ASKED A SERIES OF QUESTIONS BY MR. PRICE DURING

10   HIS EXAMINATION.  DO YOU RECALL THAT?

11   A   YES.

12   Q   AND JUST TO ORIENT ALL OF US, WE HAVE THE SIGNATURE ON THE

13   BOTTOM OF THAT CONTRACT, AND IT'S DATED 01/04/1999; CORRECT?

14   A   YES.

15   Q   AND THAT'S THE CONTRACT THAT YOU SIGNED WHEN YOU CAME BACK

16   TO MATTEL THE SECOND TIME; YES?

17   A   YES.

18   Q   RIGHT.

19       MR. PRICE ASKED YOU TO TAKE A LOOK AT I THINK IT WAS

20   PARAGRAPH TWO; THIS IS OWNERSHIP OF INVENTIONS.

21       DO YOU SEE THAT?

22   A   YES.

23   Q   SO IF I COULD READ THIS FOR YOU, IT SAYS "I AGREE TO

24   COMMUNICATE TO THE COMPANY AS PROMPTLY AND FULLY AS PRACTICABLE

25   ALL INVENTIONS AS DEFINED BELOW, CONCEIVED OR REDUCED TO

1    PRACTICE BY ME, ALONE OR JOINTLY BY OTHERS, AND AT ANY TIME

2    DURING MY EMPLOYMENT BY THE COMPANY."

3        DO YOU SEE THAT?

4    A   YES.

5    Q   DID I READ THAT CORRECTLY?

6    A   YES.

7    Q   AND THE COMPANY IS CAPITALIZED WITH A CAPITAL 'C'; YES?

8    A   YES.

9    Q   THAT REFERS TO MATTEL.

10   A   TO THE BEST OF MY KNOWLEDGE, YES.

11   Q   MY QUESTION TO YOU, SIR, IS DID YOU CONCEIVE AND DRAW THE

12   MASTER DRAWINGS FOR BRATZ AT ANY TIME DURING YOUR EMPLOYMENT BY

13   MATTEL?

14   A   NO.

15   Q   LET'S GO TO EXHIBIT NUMBER 26.

16       DO YOU KNOW AN INDIVIDUAL NAMED IVY ROSS?

17   A   YES.

18   Q   WHO'S IVY ROSS?

19   A   SHE WAS -- I THINK SHE WAS, LIKE, THE SENIOR VP OF GIRLS

20   TOYS AT MATTEL FOR A WHILE.

21   Q   SO DID SHE HAVE A POSITION THAT WAS MORE SENIOR TO YOU IN

22   THE ORGANIZATION AT MATTEL?

23   A   OH, YEAH, DEFINITELY.

24   Q   DID YOU KNOW IVY ROSS TESTIFIED IN THIS CASE?

25   A   YES.

1    Q    MATTEL CALLED HER AS ITS FIRST WITNESS.

2    A    I WASN'T AWARE OF THAT, BUT...

3         MR. NOLAN:  YOUR HONOR, I'D LIKE TO POST JUST THE

4    TRANSCRIPT OF PAGE 353, LINES 14 THROUGH 22, OF IVY ROSS'S

5    SWORN TESTIMONY IN THIS CASE.

6         MR. PRICE:  OBJECT.  THAT'S INAPPROPRIATE.  IT'S

7    LEADING.  IT'S A DIFFERENT WITNESS.  IT'S INAPPROPRIATE.

8         THE COURT:  FOR WHAT PURPOSE?

9         MR. NOLAN:  TO ASK MR. BRYANT IF HE AGREES --

10        THE COURT:  THIS IS TESTIMONY THAT'S ALREADY BEEN

11   INTRODUCED IN THIS TRIAL.

12        MR. PRICE:  YES.

13        THE COURT:  THE COURT WILL CONSIDER THE QUESTION.

14   YOU MAY PUT IT UP.

15   BY MR. NOLAN:

16   Q    THIS IS A QUESTION THAT I ASKED IVY ROSS, AND SO IT SAYS

17   "SO I SAID, SO THAT IF CARTER BRYANT DEVELOPED THE IDEA AND

18   CONCEPT FOR BRATZ BEFORE HE WAS EMPLOYED BY MATTEL ON

19   JANUARY 4, 1999, BY SIGNING HIS EMPLOYMENT AGREEMENT AT MATTEL,

20   HE DID NOT AUTOMATICALLY TRANSFER THAT IDEA AND CONCEPT TO

21   MATTEL; CORRECT?

22        MS. ROSS'S ANSWER WAS "CORRECT.  I GUESS I WOULD HAVE

23   TO UNDERSTAND WHAT 'STARTED THAT CONCEPT' REALLY MEANS.  BUT IF

24   HE CREATED IT PRIOR TO COMING TO MATTEL, MY UNDERSTANDING IS

25   THAT MATTEL DOESN'T OWN IT.

1        MY QUESTION TO YOU, MR. BRYANT, IS, DO YOU HAVE THE

2    SAME UNDERSTANDING AS THE SENIOR VICE PRESIDENT IN THE GIRLS

3    DIVISION AT MATTEL?  THAT IS, IF YOUR IDEA FOR BRATZ WAS

4    CONCEIVED AND DRAWN IN MASTER DRAWINGS PRIOR TO GOING TO WORK

5    AT MATTEL, THEN MATTEL DOESN'T OWN THAT?

6        MR. PRICE:  OBJECTION.  HE'S JUST ADDED THINGS.

7        THE COURT:  SUSTAINED.

8        YOUR INITIAL QUESTION, COUNSEL -- IT'S A COMPOUND

9    QUESTION, COUNSEL.

10        MR. NOLAN:  IT WAS TOO BIG.

11        THE COURT:  RIGHT.

12    BY MR. NOLAN:

13    Q   DO YOU AGREE WITH MS. ROSS'S UNDERSTANDING OF THE SAME

14    INVENTIONS AGREEMENT THAT YOU SIGNED?

15    A   YES.

16    Q   I WANT TO TURN TO ANOTHER DOCUMENT THAT MR. PRICE ASKED

17    YOU ABOUT, AND THAT WAS THE CONFLICT OF INTEREST QUESTIONNAIRE

18    THAT YOU SIGNED AT ABOUT THE SAME TIME.  IN FACT, I THINK IT

19    WAS ON THE SAME DAY WHEN YOU WENT BACK TO WORK AT MATTEL.  THIS

20    IS EXHIBIT 26.

21        DO YOU SEE THIS CONFLICT OF INTEREST QUESTIONNAIRE?

22    A   YES.

23    Q   AND THIS ONE, JUST FOR REFERENCE PURPOSES, IS SIGNED BY

24    YOU, AND IT'S DATED JANUARY 4, 1998.  BUT I THINK IT'S AGREED

25    BY BOTH SIDES THAT YOU MISDATED IT AND IT WAS SUPPOSED TO BE

1    1999; RIGHT?

2    A   YES.

3    Q   YOU DIDN'T SIGN THIS DOCUMENT WHILE YOU WERE BACK IN

4    MISSOURI, DID YOU?

5    A   NO.

6    Q   SO THIS IS ONE OF THE DOCUMENTS THAT YOU SIGNED WHEN YOU

7    SHOWED UP FOR MATTEL FOR YOUR SECOND STINT OF EMPLOYMENT;

8    CORRECT?

9    A   RIGHT.

10   Q   NOW, YOUR TITLE IS THERE, YOU'RE A PROJECT DESIGNER, AND

11   THAT'S CARTER BRYANT.  AND THEN IT SAYS "INSTRUCTIONS:  THE

12   PURPOSE OF THIS QUESTIONNAIRE IS TO CONFIRM THE PROPRIETY OF

13   RELATION BETWEEN OUR KEY EMPLOYEES AND OUR SUPPLIERS AND

14   COMPETITORS."

15        DO YOU SEE THAT?

16   A   YES.

17   Q   "PLACE READ THE DEFINITIONS BELOW AND MATTEL'S POLICIES

18   CONCERNING CONFLICTS OF INTEREST.  THEN ANSWER THE QUESTIONS BY

19   CHECKING THE CORRECT ANSWER.  BASE YOUR ANSWERS ON PERSONAL

20   KNOWLEDGE.  THERE IS NO NEED TO MAKE INQUIRIES OR SEEK

21   ADDITIONAL INFORMATION SINCE LACK OF KNOWLEDGE OF A SITUATION

22   INDICATES THERE'S NO CONFLICT OF INTEREST."

23        DO YOU SEE THAT?

24   A   YES.

25   Q   NOW, THERE ARE TWO DEFINITIONS PROVIDED, MATTEL'S

1   SUPPLIER.  DO YOU SEE THAT?

2   A   YES.

3   Q   NOW, THE DOCUMENT THAT YOU SIGNED IDENTIFIES A MATTEL

4   SUPPLIER AS BEING SOMEONE -- IT'S INTERPRETED BROADLY FOR

5   PURPOSES OF THIS QUESTIONNAIRE -- "A MATTEL'S SUPPLIER IS ANY

6   PERSON, PARTNERSHIP, TRUST, CORPORATION, OR OTHER ENTERPRISE

7   WHICH DURING THE PAST 12 MONTHS HAS DONE BUSINESS OR CURRENTLY

8   CONTEMPLATES DOING BUSINESS WITH MATTEL OR ANY MATTEL

9   SUBSIDIARY."

10      DO YOU SEE THAT?

11   A   YES.

12   Q   SO THAT'S THE DEFINITION OF A SUPPLIER.

13      NOW LET'S LOOK AT MATTEL'S COMPETITORS.

14      "FOR PURPOSES OF THE QUESTIONNAIRE, MATTEL'S

15   COMPETITOR IS INTERPRETED BROADLY FOR PURPOSES OF THIS

16   QUESTIONNAIRE.  A MATTEL COMPETITOR IS ANY PERSON, PARTNERSHIP,

17   TRUST, CORPORATION OR OTHER ENTERPRISE WHICH HAS DONE BUSINESS

18   OR CONTEMPLATES DOING BUSINESS IN ANY FIELD THAT IS IN

19   COMPETITION WITH MATTEL OR ANY MATTEL SUBSIDIARY."

20      DO YOU SEE THAT?

21   A   YES.

22   Q   YOU ANSWERED THIS QUESTION YOUR ON FIRST DAY OF YOUR

23   EMPLOYMENT; RIGHT?

24   A   YES.

25   Q   AND YOU ANSWERED MOST OF THEM NO, BUT YOU ANSWERED TWO OF

1    THEM YES.  QUESTION NUMBER FOUR:  "HAVE YOU BEEN THE RECIPIENT

2    OF ANY COMMISSION, FEE, LOAN, TRIP, GIFT, BENEFIT, OR ANYTHING

3    ELSE OF VALUE THAT IS DEFINED IN ANY WAY FROM THE MATTEL

4    COMPETITOR?"  AND YOU ANSWERED YES.

5         AND THEN NUMBER FIVE, WAS "HAVE YOU OR ANY RELATIVE

6    OF YOURS, BY BLOOD OR MARRIAGE, BEEN A DIRECTOR, OFFICER,

7    CONSULTANT, AGENT, EMPLOYEE, OR REPRESENTATIVE OF, OR AGREED

8    FOR ANY MATTEL'S SUPPLIER IN ANY CAPACITY?"

9         DO YOU SEE THAT?

10   A   YES.

11   Q   NOW COULD YOU READ TO THE JURY YOUR ANSWERS TO FOUR AND

12   FIVE.

13   A   "FREELANCE DESIGN AND ART WORK IN 1998, FROM APPROXIMATELY

14   5-98 THROUGH 11-98, FOR THE ASHTON DRAKE GALLERIES."

15   Q   AND AT THIS TIME, THAT IS JANUARY 4TH OF 1999, HAD YOU

16   EVER EXHIBITED YOUR BRATZ CONCEPT OR THE MASTER DRAWINGS TO ANY

17   MATTEL SUPPLIER?

18   A   NO.

19   Q   HAD YOU EXHIBITED OR SHOWN YOUR BRATZ DRAWS OR CONCEPT

20   MASTER DRAWINGS TO ANY MATTEL COMPETITOR?

21   A   NO.

22   Q   YOU REFER THERE TO THE ASHTON DRAKE GALLERIES.  FIRST OF

23   ALL, WHO'S ASHTON DRAKE GALLERIES?

24   A   ASHTON DRAKE GALLERIES IS A COMPANY WHO PRODUCES

25   COLLECTIBLE DOLLS FOR, I GUESS, MORE OF THE ADULT MARKET.

1    Q   WHEN YOU SAY THE ADULT MARKET, ARE YOU TALKING ABOUT A

2    DOLL MARKET?

3    A   YES.

4    Q   DESCRIBE GENERALLY, IF YOU COULD, WHEN YOU SAY 'MORE OF

5    THE ADULT MARKET FOR DOLLS,' WHAT DOES THAT TRANSLATE TO?

6    A   ADULT DOLL COLLECTORS.

7    Q   WAS THERE A PARTICULAR LINE OF DOLLS THAT ASHTON DRAKE WAS

8    DISTRIBUTING AT RETAIL TO COLLECTIBLES AT THAT TIME?

9    A   YES.

10   Q   DID YOU SUBMIT FREELANCE WORK TO ASHTON DRAKE DURING THIS

11   PERIOD OF TIME?

12   A   YES.

13   Q   AND SOME OF YOUR WORK, WAS IT ACCEPTED?

14   A   YES.

15   Q   CAN YOU ESTIMATE FOR US HOW MUCH YOU WERE PAID IN EXCHANGE

16   FOR YOUR FREELANCE WORK AT ASHTON DRAKE?

17   A   I THINK I MADE AROUND $800.

18   Q   IN TOTAL?

19   A   I THINK SO, YES.

20   Q   WOULD IT BE FAIR TO SAY, NO DISRESPECT INTENDED, THAT YOU

21   HAD MORE REJECTIONS ON YOUR FREELANCE WORK THAN ACCEPTIONS

22   DURING THIS PERIOD OF TIME?

23   A   DEFINITELY.

24   Q   ONE OTHER AREA BEFORE WE GO INTO DETAIL IN TERMS OF YOUR

25   BACKGROUND IS THIS KICKAPOO HIGH SCHOOL, WHICH HAS RECEIVED

1    PROBABLY MORE ATTENTION THAN KICKAPOO HIGH SCHOOL HAS EVER

2    RECEIVED BEFORE.

3        DO YOU RECALL THAT YOU WERE ASKED QUESTIONS ABOUT

4    KICKAPOO HIGH SCHOOL?

5    A   YES.

6    Q   AND DO YOU RECALL THAT MR. PRICE PUT ON THE SCREEN FROM

7    YOUR DEPOSITION AT PAGE 140, LINES NINE THROUGH 14?

8        DO YOU RECALL BEING DIRECTED TO CERTAIN LINES IN YOUR

9    DEPOSITION?

10   A   COULD YOU ASK ME THAT AGAIN?

11   Q   SURE.

12       DO YOU RECALL THAT DURING YOUR EXAMINATION IN THIS

13   TRIAL BY MR. PRICE THAT HE PUT ON THE SCREEN LINES FROM AN

14   ANSWER THAT YOU HAD PROVIDED IN YOUR DEPOSITION?

15   A   OH.  YES.

16   Q   I'D LIKE TO PLACE ON THE SCREEN WHAT MR. PRICE PUT UP

17   THERE, WHICH IS FROM PAGE 140 OF YOUR DEPOSITION, LINES NINE

18   THROUGH 14.  AND MR. BRYANT, DO YOU HAVE YOUR TRANSCRIPTS IN

19   FRONT OF YOU?

20   A   YES.

21   Q   YOUR DEPOSITION TRANSCRIPTS?

22   A   YES.

23   Q   I BELIEVE IT'S GOING TO BE IN VOLUME I, AND I'D LIKE YOU

24   TO OPEN UP PAGE 140.

25       THIS IS WHAT WAS PUT UP.

1        MR. PRICE:  OBJECTION.  I DID NOT PUT THIS UP, YOUR

2    HONOR.  I ASKED HIM QUESTIONS ABOUT IT, BUT IT WAS NOT PUT UP.

3        THE COURT:  VERY WELL.  IT WAS NOT PLACED ON THE

4    SCREEN.

5    BY MR. NOLAN:

6    Q   DO YOU HAVE PAGE 140, LINES NINE THROUGH 14?

7    A   YES, I THINK SO.

8    Q   I'D LIKE TO ASK YOU, MR. BRYANT, WHETHER OR NOT LINE 14 IS

9    THE LAST SENTENCE OF YOUR ANSWER TO THE QUESTION THAT YOU WERE

10   ASKED?

11   A   THE QUESTION THAT I WAS ASKED...

12   Q   AT YOUR DEPOSITION.

13   A   AT MY DEPOSITION.

14       I'M NOT REALLY SURE WHAT YOU MEAN.

15   Q   I APOLOGIZE.

16       MR. NOLAN:  YOUR HONOR, FOR PERMISSION, CAN I PUBLISH

17   PAGE 140, STARTING AT LINES NINE THROUGH 14, AND RUN IT THROUGH

18   TO THE COMPLETE ANSWER THAT WAS PROVIDED?

19       THE COURT:  JUST IDENTIFY WHAT YOU WANT.  PAGE 140,

20   BEGINNING WITH LINE NINE, THROUGH WHAT?

21       MR. NOLAN:  THROUGH LINE 141 ON LINE NINE.

22       THE COURT:  LINE NINE OR LINE SIX?

23       MR. NOLAN:  SORRY.  LINE SIX.  THANK YOU.

24       MR. PRICE:  NO OBJECTION.

25       THE COURT:  VERY WELL.

1        MR. NOLAN:  JUST SO THE RECORD IT'S CLEAR, I'M GOING

2    TO BE POSTING PAGE 140 FROM YOUR DEPOSITION, STARTING AT LINE

3    NINE, AND RUNNING OVER TO THE END OF YOUR ANSWER WHICH APPEARS

4    ON PAGE 141, LINE SIX.

5        DO YOU SEE THAT?

6    A   YES.

7    Q   NOW, MR. PRICE ASKED YOU TO LOOK AT LINES NINE THROUGH 14.

8    AND THAT WAS:  "CAN YOU TELL ME, AS BEST AS YOU CAN RECALL,

9    WHEN IT WAS THAT YOU CREATED BRATZ?

10       ANSWER:  LET'S SEE.  I WAS DRIVING BY A HIGH SCHOOL.

11   I BELIEVE IT WAS ON MY WAY HOME FROM WORK.  AND THERE WERE --

12   THE KIDS WERE GETTING OUT OF SCHOOL AND I WAS JUST KIND OF

13   STRUCK BY THE WAY THEY LOOKED."

14       DO YOU SEE THAT?

15   A   YES.

16   Q   "THEY WERE WEARING KIND OF, YOU KNOW, OVERSIZED CLOTHES,

17   BIG BAGGY JEANS."

18       DO YOU SEE THAT?

19   A   YES.

20   Q   MR. PRICE ASKED YOU TO LOOK AT LINES NINE THROUGH 14.  AND

21   MY QUESTION TO YOU, MR. BRYANT, IS, THAT WAS NOT THE END OF

22   YOUR ANSWER, WAS IT?

23   A   NO.

24       MR. NOLAN:  YOUR HONOR, FOR THE JURY, MAY I PLAY THE

25   VIDEO FROM PAGE 140, STARTING AT LINE NINE, RUNNING THROUGH

1      PAGE 141, LINE SIX?

2           THE COURT:  ANY OBJECTION?

3           MR. PRICE:  NO OBJECTION.

4           THE COURT:  YOU MAY.

5           (VIDEO DEPOSITION PLAYED;

6           EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS: )

7           "Q  CAN YOU TELL ME AS BEST YOU CAN RECALL WHEN IT

8       WAS THAT YOU CREATED THE BRATZ? A YES. LET'S SEE. I

9       WAS DRIVING BY A HIGH SCHOOL. I BELIEVE IT WAS

10      ON MY WAY HOME FROM WORK, AND THERE WERE -- THE KIDS

11      WERE GETTING OUT OF SCHOOL AND I WAS JUST KIND OF

12      STRUCK BY THE WAY THEY LOOKED. THEY WERE WEARING

13      KIND OF, YOU KNOW, OVERSIZED CLOTHES, BIG, BAGGY

14      JEANS. THEY HAD ON BACKPACKS AND -- I DON'T KNOW.

15      THERE WAS JUST SOMETHING VERY INTERESTING AND

16      EXCITING ABOUT THEIR ENERGY AND JUST GOT ME TO KIND

17      OF THINKING, YOU KNOW, WOULDN'T IT BE COOL IF THERE

18      WERE SOME CHARACTERS THAT KIND OF ACCURATELY

19      REPRESENTED TODAY'S TEENAGER. AND SO WHEN I GOT HOME

20      I STARTED DOING A LITTLE BIT OF SKETCHING AND

21      SKETCHED SOME CHARACTERS FAIRLY QUICKLY. I HAD ALSO

22      KIND OF BEEN LOOKING AT MAGAZINES AND THINGS LIKE

23      THAT. THERE WERE SOME ADVERTISING THINGS THAT WERE

24      GOING ON AT THE SAME TIME THAT KIND OF ALL MELDED

25      TOGETHER AND KIND OF GAVE ME THE IDEA. THERE WAS A

1      PARIS BLUES AD. THERE WAS -- 17 MAGAZINE HAD A STEVE

2      MADDEN AD. THERE WAS AN AD FOR THE DIXIE CHICKS'

3      ALBUM AND IT SAID "CHICKS WITH ATTITUDE" ON IT, AND

4      IT ALL JUST KIND OF CAME TOGETHER AND IT ALL JUST

5      KIND OF REALLY STRUCK ME WHEN I DROVE BY THAT HIGH

6      SCHOOL. Q CAN YOU PLACE THIS IN A MONTH IN 1998? A

7      IT WAS IN LATE AUGUST."

8       (EXCERPTS CONCLUDED. )

9    BY MR. NOLAN:

10   Q   MR. BRYANT, I WANTED TO READ, IF I MIGHT, FROM THE

11   TRANSCRIPT OF MATTEL'S OPENING STATEMENT TO THE JURY IN THIS

12   TRIAL.  IT SAYS "HE" -- AND THEY ARE REFERRING TO YOU, "SAYS

13   THAT THERE AT THE KICKAPOO HIGH SCHOOL, AND HE'S DRIVING BY, HE

14   SEES THESE KIND OF ER URBAN-LOOKING, ETHNIC, HIP HOP KIDS WITH

15   ATTITUDES HANGING AROUND THE SCHOOL."

16      MR. BRYANT, IN THE FOUR YEARS OF LITIGATION, FIVE

17   DEPOSITIONS, AND ALMOST THREE DAYS OF TESTIMONY, HAVE YOU EVER

18   DESCRIBED THE HIGH SCHOOL STUDENTS AT KICKAPOO HIGH AS BEING

19   KIND OF URBAN LOOKING, ETHNIC, HIP HOP KIDS WITH ATTITUDES

20   HANGING AROUND THE SCHOOL?

21   A   NO.  NEVER.

22   Q   NOT TO DISPARAGE KICKAPOO HIGH SCHOOL, IN FACT, DO YOU

23   HAVE KNOWLEDGE AS TO WHO ONE OF THE MOST FAMOUS ALUMNI OF

24   KICKAPOO HIGH SCHOOL IS?

25      MR. PRICE:  OBJECTION.  INTERESTING, PERHAPS, BUT NOT

1   RELEVANT.

2       MR. NOLAN:  IT WILL BE CHARGED AGAINST ME, YOUR

3   HONOR.  IT'S REALLY COOL.

4       THE COURT:  IF IT'S THAT IMPORTANT, MR. NOLAN.

5   BY MR. NOLAN:

6   Q   DID YOU KNOW THAT BRAD PIT WENT TO KICKAPOO HIGH SCHOOL?

7   A   YES, SIR.  OF COURSE.

8       MR. PRICE:  HE'S ACTUALLY IN THE YEARBOOK, IF YOU

9   WANT TO SEE IT.

10      MR. NOLAN:  I'M SORRY FOR THAT MOMENT OF LEVITY.

11      THE COURT:  YOUR NEXT QUESTION, COUNSEL.

12  BY MR. NOLAN:

13  Q   YOU WERE ASKED A LOT OF QUESTIONS ABOUT HOW YOU DRIVE HOME

14  FROM THE OLD NAVY TO YOUR PARENTS' HOUSE.

15      DO YOU RECALL THAT LINE OF QUESTIONING?

16  A   YES.

17  Q   I WANT TO SHOW YOU A GRAPHIC THAT WAS DISPLAYED IN

18  MATTEL'S OPENING STATEMENT AT THE BEGINNING OF THIS CASE.  YOU

19  SEE THE TOP OF THIS, IT SAYS 'BRYANT'S ROUTE.'  AND JUST TO

20  ORIENT YOU, IT SAYS 'BATTLEFIELD MALL,' AND THEN THERE'S A BLUE

21  LINE AROUND KICKAPOO HIGH SCHOOL, AND THEN IT COMES BACK DOWN

22  AND THEN IT SAYS 'ROUTE TO PARENTS' HOUSE.'

23      DO YOU SEE THAT?

24  A   YES.

25  Q   NOW, IS THIS GRAPHIC AN ACCURATE DEPICTION OF HOW YOU

1   WOULD DRIVE FROM OLD NAVY IN THE BATTLEFIELD MALL TO YOUR

2   PARENTS' HOME?

3   A   NO.

4   Q   WHY NOT?  WHAT'S WRONG WITH THIS GRAPHIC, MR. BRYANT?

5   A   WELL, IT SHOWS -- THE RED LINE SHOWS THAT I WAS GOING A

6   WAY THAT I DIDN'T EVER GO.  I DON'T EVEN KNOW THAT AT THE TIME,

7   I KNEW THAT ROUTE EXISTED.

8   Q   YOU SEE WHERE IT SAYS 'ROUTE TO PARENTS' HOUSE' AND THE

9   LINE GOING DOWN?

10   A   YES.

11   Q   IS THAT A ROUTE THAT YOU KNOW GOES TO YOUR PARENTS' HOUSE?

12   A   I SUPPOSE THERE'S A WAY THAT YOU COULD GET THERE FROM THAT

13   WAY, BUT THAT'S NOT THE WAY THAT I TOOK.

14   Q   NOW, I WANT TO, IF I MIGHT, I'D LIKE TO PUT ON THE SCREEN

15   A GOOGLE GRAPHIC, IF I MIGHT.  IT'S 18507.

16        I'M GOING TO COME BACK TO THIS.

17        LET ME TURN TO THE SECOND PART OF YOUR ANSWER WHERE

18   YOU REFERRED TO A MAGAZINE CALLED SEVENTEEN.

19        DO YOU RECALL THAT?

20   A   YES.

21   Q   WHAT IS SEVENTEEN MAGAZINE, MR. BRYANT?

22   A   IT'S A FASHION MAGAZINE.  IT'S, I GUESS, GEARED TOWARD THE

23   I GUESS YOU'D CALL IT THE 'TWEEN MARKET.

24   Q   THAT'S A TERM THAT WE'VE USED BEFORE.  COULD YOU IDENTIFY

25   WHAT YOU MEAN BY THE 'TWEEN MARKET?

1    A   IT KIND OF REFERS TO AN AGE OF GIRLS, YOU KNOW, THAT COULD

2    BE ANYWHERE FROM, LIKE, 12 TO 16; SOMEWHERE AROUND THERE.

3    Q   AND DID YOU EVER LOOK AT A SEVENTEEN MAGAZINE IN 1998?

4    A   YES.

5    Q   DO YOU RECALL APPROXIMATELY WHEN?

6    A   I THINK IT WAS AROUND AUGUST.

7    Q   DO YOU HAVE IN FRONT OF YOU TRIAL EXHIBIT NUMBER 17246?

8        IN YOUR ANSWER IN THE QUESTION THAT MR. JOHN QUINN

9    HAD ASKED YOU IN YOUR DEPOSITION, YOU REFERRED TO A SEVENTEEN

10   MAGAZINE.

11       DO YOU RECOGNIZE THE SEVENTEEN MAGAZINE IDENTIFIED

12   FOR EXHIBIT PURPOSES AS 17246?

13   A   YES.

14   Q   HOW DO YOU RECOGNIZE IT?

15   A   I JUST REMEMBER THAT DREW BARRYMORE WAS ON THE COVER.

16   Q   AND WHEN DO YOU RECALL SEEING THE SEVENTEEN MAGAZINE,

17   MARKED AS EXHIBIT 17246?

18   A   I BELIEVE THAT WAS AROUND AUGUST.

19   Q   WHICH YEAR?

20   A   1998.

21       MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 17246 INTO

22   EVIDENCE.  IT'S NOT IN EVIDENCE YET.

23       THE COURT:  I THOUGHT WE ALREADY INTRODUCED THIS?

24       THOSE CERTAIN PAGES ARE IN EVIDENCE.  I THINK THERE

25   WERE FOUR PAGES WITH THE FOUR ADS.

1      MR. NOLAN:  I APOLOGIZE, YOUR HONOR.

2      THE COURT:  VERY WELL.

3      YOU MAY.

4      MR. NOLAN:  AND, YOUR HONOR, MAY I PUT THE COVER

5   SHEET OF THE SEVENTEEN MAGAZINE UP?

6      THE COURT:  YOU MAY.

7   BY MR. NOLAN:

8   Q   SO THAT'S DREW BARRYMORE ON THE COVER; CORRECT?

9   A   YES.

10   Q   AND WHAT IS THE DATE OF THE EDITION?

11   A   IT'S AUGUST 1998.

12   Q   CAN YOU EXPLAIN TO THE JURY HOW, FROM AN INSPIRATION POINT

13   OF VIEW, THAT YOU USE FASHION MAGAZINES TO COME UP WITH IDEAS

14   OR CONCEPTS.

15   A   WELL, YOU KNOW, IT'S PART OF MY PROFESSION, I GUESS.  I

16   LOOK THROUGH THESE MAGAZINES TO GET IDEAS FOR CLOTHES OR, YOU

17   KNOW, TRENDS, AND YOU KNOW, JUST KIND OF THE NEW LOOKS; JUST

18   KIND OF THINGS LIKE THAT.

19   Q   WERE THERE PARTICULAR ADS IN THIS MAGAZINE THAT CAUGHT

20   YOUR EYE?

21   A   YEAH.

22   Q   I'D ASK YOU TO TAKE A LOOK AT PAGE 126.

23      WHAT IS DEPICTED THERE?

24   A   THIS IS A PICTURE OF THE DIXIE CHICKS, MAYBE A COVER FOR

25   THEIR ALBUM.

1   Q   WAS THERE SOMETHING ABOUT THIS PARTICULAR AD THAT CAUGHT

2   YOUR IMAGINATION?

3   A   YEAH.  I LIKED THE 'CHICKS WITH ATTITUDE.'

4        MR. NOLAN:  THIS IS IN EVIDENCE, YOUR HONOR.  CAN WE

5   PUBLISH THIS?

6        THE COURT:  YOU MAY.

7   BY MR. NOLAN:

8   Q   SO, AGAIN, YOU SAW THIS IN AUGUST OF 1998.

9   A   YES.

10  Q   AND COULD YOU SAY THAT THIS WAS IN PROXIMITY TO THE TIME

11  THAT YOU CREATED THE CONCEPT OF BRATZ AND DID THE DRAWINGS?

12  A   YEAH, I THINK IT WAS AROUND THAT SAME TIME.

13  Q   SO DIXIE CHICKS, IT SAYS "CHICKS WITH ATTITUDE."

14       DO YOU SEE THAT?

15  A   UH-HUH.

16  Q   AND IN ADDITION TO THAT AD, DO YOU RECALL SEEING THE AD

17  THAT IS SHOWN ON PAGE 115 OF THIS EXHIBIT?

18  A   YES.

19  Q   WHAT AD IS THAT?

20  A   THAT IS A STEVE MADDEN AD.

21       MR. NOLAN:  YOUR HONOR, THIS IS IN EVIDENCE.

22       MAY WE PUBLISH IT?

23       THE COURT:  YOU MAY.

24  BY MR. NOLAN:

25  Q   THIS IS ANOTHER AD THAT YOU SAW IN AUGUST OF 1998.

1    A    RIGHT.

2    Q    WHAT STRUCK YOU ABOUT THIS AD?

3    A    I JUST THOUGHT IT WAS JUST REALLY KIND OF AMAZING, YOU

4    KNOW, HER POSE, AND HER SORT OF DISPROPORTIONATE FEET AND BODY,

5    I JUST THOUGHT THAT WAS REALLY COOL.  AND I JUST REALLY LIKED,

6    YOU KNOW, SHE LOOKED REALLY POWERFUL.

7    Q    AND WHAT WAS IT ABOUT THE POSE THAT YOU THOUGHT WAS

8    AMAZING?

9    A    I THINK IT WAS THE FEET WIDE APART, YOU KNOW; THE ONE ARM

10   THAT'S KIND OF CLINCHED IN A FIST, AND, YOU KNOW, IT'S JUST SO

11   EXTREMELY EXAGGERATED.  I THOUGHT IT WAS REALLY COOL.

12   Q    NOW, I'M GOING TO ASK YOU TO TAKE A LOOK AT THE AD SHOWN

13   ON PAGE 193 OF THE SAME MAGAZINE.

14       DO YOU RECOGNIZE THAT AD?

15   A    YES.

16   Q    DO YOU RECALL SEEING THAT AD IN AUGUST OF 1998?

17   A    YES.

18       MR. NOLAN:  YOUR HONOR, REQUEST TO PUBLISH THIS; IT'S

19   IN EVIDENCE.

20       THE COURT:  YOU MAY.

21   BY MR. NOLAN:

22   Q    WHAT ABOUT THIS AD, MR. BRYANT, THAT YOU WERE STRUCK BY?

23   A    I KIND OF LIKED JUST THE SORT OF GENERAL KIND OF, YOU

24   KNOW, FINGER WAVING.  I LIKED THE SORT OF DISPROPORTIONATE

25   LIPS, AND I LIKED THE WAY THE FIGURE WAS KIND OF OUTLINED.

1    Q    COULD YOU ALSO TURN TO PAGE 127.  IS THAT AN AD THAT YOU

2    REMEMBER SEEING IN AUGUST OF 1998?

3    A    YES.

4    Q    AND THAT IS AN AD THAT IS FOR PARIS BLUES.

5    A    RIGHT.

6         MR. NOLAN:  YOUR HONOR, THIS IS IN EVIDENCE.

7         CAN WE SHOW THIS?

8         THE COURT:  YES.

9    BY MR. NOLAN:

10   Q    YOU SAW THIS AD IN AUGUST OF 1998.

11        CAN YOU TELL US WHAT STRUCK YOU WITH THIS PARTICULAR

12   AD?

13   A    I JUST KIND OF REALLY LIKED EVERYTHING ABOUT IT.  I LIKED

14   HER POSE.  I LIKED THE BIG HEAD AND THE BIG FEET.  I LIKED THE,

15   YOU KNOW, THE SPARKLES ON THE DISCO BALL AND, YOU KNOW, THE

16   ANIMATED FACE, AND I LIKED HOW SHE WAS LEANING BACK ON THIS

17   DISCO BALL AND, YOU KNOW, SHE LOOKED LIKE SHE OWNED THE WORLD.

18   I THOUGHT THAT WAS COOL.

19   Q    I'D ASK YOU TO TURN TO PAGE 104 OF THE AUGUST SEVENTEEN

20   MAGAZINE AND ASK YOU IF YOU RECALL SEEING THIS AD IN AUGUST OF

21   1998?

22        MR. NOLAN:  THIS IS ALSO IN EVIDENCE, YOUR HONOR.

23        THE COURT:  I DON'T KNOW IF THIS PARTICULAR ONE WAS,

24   BUT IS THERE ANY OBJECTION?

25        MR. PRICE:  I THINK IT'S IRRELEVANT, BUT PERHAPS HE

1   CAN LAY FOUNDATION THAT IT IS.

2       THE COURT:  VERY WELL.  SINCE WE INDICATED THERE'S NO

3   OBJECTION TO IDENTIFYING THE PAGES WITHIN THIS MAGAZINE, I'LL

4   PERMIT YOU TO PUBLISH IT.  BUT DO LAY THE FOUNDATION.

5   BY MR. NOLAN:

6   Q   DID YOU REMEMBER SEEING THIS PARTICULAR AD IN THE

7   SEVENTEEN MAGAZINE, MR. BRYANT?

8   A   WHAT PAGE?

9   Q   IT'S PAGE 104.

10  A   I DON'T REMEMBER SEEING THIS PAGE RIGHT NOW.

11  Q   THEN WE'LL TAKE THAT DOWN.

12      TAKE A LOOK AT PAGES 016 AND 017 OF THIS AD.  THIS IS

13  NOT IN EVIDENCE.  I JUST WANTED TO ASK YOU WHETHER OR NOT YOU

14  REMEMBER LOOKING AT THIS.

15  A   NO.  THEY ARE NOT REALLY RINGING A BILL.

16  Q   MR. BRYANT, WHAT I'D LIKE TO DO IS ASK YOU -- THIS MAY BE

17  THE FIRST TIME YOU'VE BEEN ALLOWED TO EXPLAIN IT -- CAN YOU

18  EXPLAIN BRATZ, YOUR CONCEPT FOR BRATZ, TO THE JURY; WITHOUT A

19  REFERENCE TO DOCUMENTS, JUST TELL THEM WHAT YOUR CONCEPT WAS.

20  A   WELL, I GUESS MY CONCEPT WAS JUST, YOU KNOW, I ENVISIONED

21  THIS GROUP OF FRIENDS WHO ARE VERY, YOU KNOW, COOL, MAYBE KIND

22  OF POPULAR, KIND OF YOUNG, MAYBE 14, 15, WHO WORE, YOU KNOW,

23  JUST CLOTHING THAT WAS TRENDY BUT NOT NECESSARILY FANCY OR

24  ANYTHING LIKE THAT, AND THEY ALL JUST HAD THIS KIND OF, YOU

25  KNOW, 'WE'RE BEST FRIENDS, WE CAN DO ANYTHING, WE'VE GOT A LOT

1    OF POWER, WE BELIEVE IN OURSELVES.'

2        I THINK THAT'S KIND OF HOW I PICTURED BRATZ.

3    Q   DID YOU HAVE NAMES FOR THESE CHARACTERS?

4    A   YES.

5    Q   FIRST OF ALL, IN YOUR MIND, COLLECTIVELY, DID YOU HAVE A

6    NAME IN MIND FOR THIS COLLECTION OF CHARACTERS?

7    A   AFTER I STARTED DOING SOME ROUGH SKETCHES, YEAH, THE NAME

8    JUST KIND OF CAME TO ME.

9    Q   AND WHAT WAS THE NAME?

10   A   BRATZ.

11   Q   WITH AN 'S' OR A 'Z'?

12   A   WITH A 'Z'.

13   Q   HOW DID YOU COME UP WITH THAT NAME?

14   A   IT JUST KIND OF POPPED IN MY HEAD AS I SAT THERE KIND OF

15   DRAWING; TO ME, I JUST KIND OF THOUGHT, OH, YOU KNOW, THEY LOOK

16   LIKE BRATZ.

17   Q   WHAT WERE THE NAMES OF THE CHARACTERS THAT YOU CONCEIVED

18   OF IN AUGUST OF 1998?

19   A   THERE WAS JADE, HALLIDAE, ZOE, AND LUPE.

20   Q   DID EACH OF THEM HAVE THE SAME PERSONALITY IN YOUR

21   CONCEPT?  HOW DID THEY DIFFER?

22   A   I WANTED THEM EACH TO HAVE, YOU KNOW, KIND OF A

23   DISTINCTIVE PERSONALITY; HAVE DISTINCTIVE, YOU KNOW, INTERESTS;

24   DISTINCTIVE FASHION STYLES.

25   Q   WAS ZOE THE SAME CHARACTER AS JADE?

1    A   NO.

2    Q   WHAT ABOUT HALLIDAE AND ZOE?  WERE THEY THE SAME IN YOUR

3    CONCEPT?

4    A   NO.

5    Q   WHAT ABOUT LUPE?  WAS LUPE THE SAME AS ZOE?

6    A   NO.

7    Q   DID YOU HAVE AN IDEA AS TO WHETHER OR NOT THESE FOUR BEST

8    FRIENDS COULD EXCHANGE FASHIONS, DRESSES, STYLES?

9    A   YEAH.  I MEAN, I THINK THAT WAS PART OF THE IDEA.  I THINK

10   THAT'S PROBABLY SOMETHING THAT, YOU KNOW, GIRLS DO.

11        THE COURT:  WE'LL TAKE OUR LUNCH BREAK AT THIS TIME.

12        (WHEREUPON JURORS DEPART COURTROOM.)

13        THE COURT:  COUNSEL, I UNDERSTAND THERE ARE A FEW

14   MATTERS YOU WANTED TO TAKE UP ONCE THE JURY LEFT.

15        MS. AGUIAR?

16        MS. AGUIAR:  A COUPLE OF THINGS, YOUR HONOR.

17        ONE RELATES TO SOME VIDEOS THAT WE ANTICIPATE PLAYING

18   AS PART OF OUR CASE; SO WE'RE TRYING TO GET THAT STUFF LINED

19   UP.

20        I BELIEVE THAT YOUR HONOR ALREADY HAS THE

21   DESIGNATIONS FOR A VIDEO THAT MATTEL WAS GOING TO PLAY IN ITS

22   CASE, BUT I THINK NOW THEY ARE NOT GOING TO SO WE'RE GOING TO

23   PLAY IT IN OUR CASE; THAT'S JACQUELINE PRINCE.

24        THE COURT:  YES.

25        MS. AGUIAR:  AND I DON'T KNOW WHETHER YOUR HONOR HAS

1    HAD AN OPPORTUNITY TO GO THROUGH THAT YET.

2        THE COURT:  I DO HAVE IT HERE.  I'M NOT COMPLETELY

3    THROUGH IT, BUT I WILL.

4        WHEN DO YOU PLAN ON PLAYING THIS?

5        MS. AGUIAR:  IT WOULD BE ONE OF THE FIRST ONES THAT

6    WE WOULD PLAY, AND SO I JUST WANTED TO TEE THAT UP.

7        THE COURT:  I'LL MAKE SURE WE HAVE THAT READY BY THE

8    END OF THE DAY TODAY OR TOMORROW MORNING.

9        MS. AGUIAR:  THEN THERE'S A PAGE, YOU MAY NOT HAVE

10   GOTTEN TO IT YET, THAT WE'RE GOING TO GIVE YOU AND MATTEL'S

11   COUNSEL TO REPLACE IN THE PRINCE BINDER BECAUSE THERE'S BEEN AN

12   AMENDMENT TO --

13       THE COURT:  WHAT PAGE IS THAT?

14       MR. HERRINGTON:  258.

15       MS. AGUIAR:  MR. HERRINGTON IS TELLING ME 258, BUT

16   WE'LL PROVIDE IT TO YOU.

17       THE COURT:  WAIT A SECOND.

18       IT ONLY GOES TO PAGE 190.

19       THIS IS JACQUELINE PRINCE?

20       MS. AGUIAR:  RIGHT.  WE'LL GIVE YOU THE PAGE THAT

21   NEEDS TO BE REPLACED.  I'M TOLD BY BOTH SIDES NOW THAT IT'S

22   GOING TO BE HERE.

23       WE ALSO HAVE ANOTHER BINDER TO GIVE TO YOU, IT'S

24   JANINE GALVANO, AND WE'LL PASS THAT UP.

25       THE COURT:  PLEASE.

1        MS. AGUIAR:  AND THERE WILL BE TWO OTHERS COMING BY

2    THE END OF THE DAY, SO I JUST WANTED TO LET YOU KNOW THAT; ONE

3    BY THE END OF THE DAY AND --

4        THE COURT:  MS. PRINCE WILL BE THE FIRST ONE?

5        MS. AGUIAR:  WE THINK SO, YOUR HONOR.

6        THE COURT:  VERY WELL.

7        MS. AGUIAR:  AND THEN I CAN GIVE YOU SOME MORE

8    GUIDANCE IN TERMS OF WHO MIGHT BE AFTER MS. PRINCE SHORTLY.

9        THE COURT:  VERY GOOD.

10        MS. AGUIAR:  THE OTHER ISSUE I WANTED TO RAISE WAS AN

11    ISSUE THAT WE STARTED TALKING ABOUT AT THE END OF LAST WEEK,

12    AND THAT'S ONE OF THE WITNESSES THAT MATTEL HAS ON ITS BOOKS,

13    PETER MARLOW.  AND I UNDERSTAND THAT MR. MARLOW, HIS DEPOSITION

14    DID, IN FACT, GO FORWARD YESTERDAY.

15        AT THIS POINT, I WAS GOING TO ASK IF WE COULD GET A

16    PROFFER FROM MATTEL, AND ALSO SOME GUIDANCE FROM THE COURT, ON

17    THE SCOPE OR THE RELEVANCE OF MR. MARLOW'S TESTIMONY TO THIS

18    PHASE OF THE TRIAL.  BECAUSE WE'VE NOW HAD THE OPPORTUNITY TO

19    REVIEW THAT, AND I'D LIKE TO KNOW WHERE WE'RE GOING AND THEN

20    ADDRESS WHY WE THINK THAT, IN LARGE PART, HIS TESTIMONY DOES

21    NOT PERTAIN AT THIS PHASE.

22        THE COURT:  LET ME HEAR FROM MATTEL AT THIS POINT IN

23    TERMS OF WHO THEY ANTICIPATE TO BE THE ORDER OF WITNESSES AND

24    WHERE MR. MARLOW FIGURES INTO THAT.

25        MR. ZELLER:  I THINK, IN FAIRNESS, YOUR HONOR, WE

1    ONLY RECEIVED THE TRANSCRIPT THIS MORNING; SO, I GUESS, TO

2    FORCE US TO GIVE A PROFFER AT THIS MOMENT SEEMS PREMATURE.

3        THE COURT:  FAIR ENOUGH.

4        MR. ZELLER:  I WOULD CERTAINLY -- I OBVIOUSLY CAN

5    PREPARE TO ADDRESS IT, BUT I DON'T THINK WE EVEN HAVE THE

6    TRANSCRIPT IN FINAL FORM, I THINK WE ONLY HAVE IT IN ROUGH; THE

7    DEPOSITION WENT INTO THE EVENING LAST NIGHT.  I DO UNDERSTAND

8    THAT WE DID AT LEAST RECEIVE SOME ADDITIONAL INFORMATION.  I

9    DON'T WANT TO REPRESENT AND SOMEHOW LEAVE THE COURT WITH THE

10   IMPRESSION THAT ALL OF OUR QUESTIONS WERE ANSWERED.  AND I KNOW

11   THERE WILL BE ISSUES CONCERNING WHAT OCCURRED.

12       THE COURT:  WE HAVE MR. BRYANT THIS AFTERNOON, AND

13   MR. MENZ, DEPENDING ON THAT HOW THAT PLAYS OUT.  WHO ELSE AFTER

14   THAT DOES MATTEL PLAN TO CALL?

15       MR. ZELLER:  WE HAVE ONE OF OUR EXPERTS,

16   MR. CUNNINGHAM; HE IS A QUESTION DOCUMENT EXAMINER.  AND THEN

17   WE START GETTING INTO SOME OF THE WITNESSES WHO MR. QUINN

18   MENTIONED.  THEY ARE SOMEWHAT UP IN THE AIR IN TERMS OF

19   SCHEDULING.  WE HAVE FARHAD LARIAN WHO WE DO INTEND TO CALL

20   PRIOR TO THE CONCLUSION OF OUR CASE, OR, ALTERNATIVELY, WE'LL

21   HAVE TO ASK FOR LEAVE TO REST, AT LEAST CONDITIONED OR SUBJECT

22   TO CALLING THESE ADDITIONAL WITNESSES AFTERWARDS, BECAUSE WE'VE

23   BEEN TRYING GET THEM IN HERE TO TESTIFY TOMORROW BUT HAVE BEEN

24   TOLD FOR A VARIETY OF REASONS THAT SOME OF THESE PEOPLE ARE

25   UNAVAILABLE OR CANNOT BE HERE.

1      WE ALSO ANTICIPATE CALLING MARGARET LEAHY VERY

2   BRIEFLY.  THEN WE HAVE SOME ADDITIONAL WITNESSES WHO MR. QUINN

3   DESCRIBED EARLIER AS KIND OF THE DOCUMENT WITNESSES.  THAT'S

4   NOT TO SAY THAT'S ALL THEIR TESTIMONY WOULD RELATE TO, BUT

5   CERTAINLY A PRINCIPAL REASON THEY WOULD BE CALLED WOULD BE TO

6   GET DOCUMENTS INTO EVIDENCE; THAT CONSISTS OF MS. GRONICH,

7   MR. KAMARCK, AND MS. GLASER.

8      THE COURT:  VERY GOOD.

9      AS SOON AS YOU HAVE HAD A CHANCE TO REVIEW THE

10  PETER MARLOW DEPOSITION, MEET WITH MS. AGUIAR AND DISCLOSE WHAT

11  IT IS THAT YOU INTEND TO CALL HIM FOR SO HOPEFULLY YOU CAN

12  RESOLVE ANY CONCERNS THAT SHE MIGHT HAVE.  IF NOT WE'LL TAKE

13  THAT UP AT AN APPROPRIATE TIME.

14     MR. ZELLER:  THANK YOU.

15     THE COURT:  ANYTHING ELSE FROM MGA?

16     MS. AGUIAR:  JUST SOME ISSUES WITH THE WITNESSES THAT

17  THEY DID MENTION.  WE DON'T HAVE TO TAKE IT UP NOW.  WHY DON'T

18  WE TRY TO DISCUSS IT AMONG COUNSEL, AND IF WE COULD PRESERVE

19  AND COME BACK TO YOU LATER TODAY, BECAUSE THERE ARE ISSUES WITH

20  SOME OF THEM.

21     THE COURT:  ALL RIGHT.

22     ANYTHING FURTHER FROM MATTEL?

23     I'LL SEE YOU AT 1:30.

24     COURT STANDS IN RECESS.

25     (WHEREUPON, THE MORNING SESSION WAS CONCLUDED.)

1

2

3                    CERTIFICATE

4

5    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

8

9

     _____        _____
10   THERESA A. LANZA, RPR, CSR              DATE
     OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25