```
1                UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
3                        ---
4          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING
5                        ---
6    MATTEL, INC.,          : PAGES 4022- 4201
                            :
7          PLAINTIFF,       :
                            :
8      VS.            : NO. ED CV04-09049-SGL
                      : [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]
     ET AL.,               :
10                          :
          DEFENDANTS.       :
11
12
13
14
15         REPORTER'S TRANSCRIPT OF PROCEEDINGS
16              RIVERSIDE, CALIFORNIA
17             WEDNESDAY, JULY 2, 2008
18               JURY TRIAL - DAY 19
19                AFTERNOON SESSION
20
21
22              MARK SCHWEITZER, CSR, RPR, CRR
                OFFICIAL COURT REPORTER
23              UNITED STATES DISTRICT COURT
                181-H ROYBAL FEDERAL BUILDING
24              255 EAST TEMPLE STREET
                LOS ANGELES, CALIFORNIA 90012
25              (213) 663-3494
```

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

```
 1      Appearances of Counsel:
 2
 3      On Behalf of Mattel:
 4          Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
            By John B. Quinn, Esq.
 5            B. Dylan Proctor, Esq.
              Michael T. Zeller, Esq.
 6            Harry Olivar, Esq.
              John Corey, Esq.
 7            Diane Hutnyan, Esq.
              William Price, Esq.
 8          855 South Figueroa Street
            10th Floor
 9          Los Angeles, CA 90017
            (213) 624-7707
10
11
12      On Behalf of MGA Entertainment:
13          Skadden, Arps, Slate, Meagher & Flom LLP
            By Thomas J. Nolan, Esq.
14            Carl Alan Roth, Esq.
              Jason Russell, Esq.
15            Lauren Aguiar, Esq.
              David Hansen, Esq.
16            Matthew Sloan, Esq.
              Robert Herrington, Esq.
17          300 South Grand Avenue
            Los Angeles, CA 90071-3144
18          (213) 687-5000
19
20
21
22
23
24
25
```

1                          I N D E X

2

3       ROBERT TONNER, SWORN.................................. 4027

4       EXAMINATION BY MS. AGUIAR:............................. 4027

5       EXAMINATION BY MR. COREY:............................. 4036

6       FURTHER EXAMINATION BY MS. AGUIAR:.................... 4047

7       FURTHER EXAMINATIONBY MR. COREY:....................... 4059

8       ROBERT A. ECKERT, PREVIOUSLY SWORN.................... 4070

9       DIRECT EXAMINATION (CONTINUED) BY MR. NOLAN:  ......... 4070

10      CROSS-EXAMINATION BY MR. QUINN: ...................... 4071

11      REDIRECT EXAMINATION BY MR. NOLAN: ................... 4075

12      RECROSS-EXAMINATION BY MR. QUINN: .................... 4077

13      DAPHNE GRONICH, SWORN................................. 4079

14      DIRECT EXAMINATION BY MR. QUINN: ..................... 4079

15      CROSS-EXAMINATION BY MR. ROTH:........................ 4092

16      REDIRECT EXAMINATION BY MR. QUINN: ................... 4096

17      MITCHELL KAMARCK, SWORN............................... 4099

18      DIRECT EXAMINATION BY MR. QUINN:  .................... 4103

19      MARGARET ANN LEAHY, SWORN............................. 4113

20      DIRECT EXAMINATION BY MR. NOLAN: ..................... 4114

21

22

23

24

25

1                    E X H I B I T S

2

3       (Exhibit 13614 received.)............................ 4074

4       (Exhibit 1932 received.)............................. 4080

5       (Exhibit 5561 received.)............................. 4086

6       (Exhibit 10234-39 through -53 received.).............. 4106

7       (Exhibit 1137-14 received.).......................... 4142

8       (Exhibit 1137-15 received.).......................... 4149

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     Riverside, California; Wednesday, July 2, 2008

2          12:40 P.M.

3     (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4        THE COURT:  Very well.  Counsel?

5        MS. AGUIAR:  Your Honor, if it would make sense,

6    shall we start by having Mr. Tonner -- would you like him to

7    take the stand, and then we'll walk him through some of the

8    areas of his anticipated testimony?

9        THE COURT:  That sounds good.  Thank you.

10        MR. COREY:  Ms. Aguiar has said that she was going

11    to have the witness testify about the 2-D to 3-D conversion

12    from the drawings to the dolls.  And I reminded the Court

13    that that was an issue that would remain pending, and then I

14    went back and looked at the hearing transcript dealing with

15    that particular motion, and there was an agreement among

16    parties that that issue would be reserved for 1-B, something

17    that the court recognized.  And that was something that the

18    Court recognized.  I can read that if the Court would like.

19        THE COURT:  Ms. Aguiar?

20        MS. AGUIAR:  Sure.  I actually think, and I

21    appreciate why Mr. Corey is trying to pitch this as a 2-D to

22    3-D issue.  I think that the way the testimony has come out

23    in the trial, and I think that Mattel's verdict form, the

24    witnesses who have testified and the evidence that has come

25    in concerning sculpting and the sculpts, I don't think that

1    is the quick answer to it.

2         THE COURT:  Well, let me hear what it is.  Maybe

3    this would be better served, and Mr. Corey can make the

4    argument once I've heard exactly what this witness is going

5    to discuss along those lines.  So let's begin with the

6    swearing in of the witness.

7         THE CLERK:  Please raise your right hand.

8         ROBERT TONNER, SWORN.

9         THE CLERK:  Could you please state your name for

10   the record, and spell your last name.

11        THE WITNESS:  Robert Tonner, T-O-N-N-E-R.

12        THE COURT:  Very well.  Counsel, why don't you go

13   ahead and lead the witness through.

14                   EXAMINATION

15   BY MS. AGUIAR:

16   Q.  Mr. Tonner, you were here this morning at the hearing,

17   and if you'll recall, the judge identified four areas --

18   well, actually we all identified four areas of potential

19   testimony.

20        Do you recall that?

21   A.  Yes.

22   Q.  Okay.  And what I'd like to do is to walk you through

23   them one by one and ask you generally speaking what the

24   substance of your testimony that you -- what is the substance

25   of the testimony that you anticipate giving.  I will ask you

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    some questions as we go along, but I'd really like you to

2    explain to the judge what it would be.  Then Mr. Corey is

3    going to have the opportunity to do some follow-up questions.

4         MR. COREY:  So we're just asking the witness to

5    elicit --

6         THE COURT:  Let's give him a little bit more

7    direction than that.

8         MS. AGUIAR:  I will give him some direction, but I

9    would like him to explain what he would offer tomorrow on the

10   stand.

11   Q.   As a preliminary matter, before we get into the four

12   areas, I just want to confirm, you are not here to tell the

13   Court, to tell the jury that Mr. Bryant is telling the truth,

14   are you?

15   A.   No.

16   Q.   And you are not anticipating telling the jury that you

17   believe what Carter Bryant says and that he is a credible

18   witness.

19   A.   No, I in no way am doing that.

20   Q.   The first subject matter that we articulated today is

21   the inspiration process, the creative inspiration process.

22   Could you tell us on that particular issue what experience

23   you bring to the table and what you would add in giving

24   testimony in that area?

25   A.   Well, I've been in the design world for 35 years,

1     whether it's fashion design or doll design.  I've worked

2     with, you know, literally probably hundreds of different

3     designers, whether it's in doll design or in fashion design,

4     whether it's students or professionals.  I have a staff of

5     designers who are creative people with me and personal

6     experience, and 35 long years of personal experience.  Also,

7     you know, I've studied doll history, contemporary doll

8     history, and I certainly have an idea of how people came up

9     with ideas as general knowledge in the doll world also.

10    Q.   So can you give us an example of personal experience

11    that you have that would demonstrate to the jury the creative

12    inspiration process?

13    A.   Sure.  I did this doll in 1999.  It's a doll that I kind

14    of started my company to do.  I'm a fashion designer.  So I

15    wanted a fashion doll to put out on the market.  So I named

16    her Tyler Wentworth.  Now, these days you put stories with

17    the dolls.  So what I wanted to do was come up with a story

18    line for this doll that was unique and not out there.

19         Now, it's not going to sound too unique.  It

20    doesn't sound so much like genius, but I go through this -- I

21    go through a process that's kind of very linear.  I have the

22    doll.  And I have this idea and this idea.  I put them

23    together.  I needed to come up with what this doll's

24    profession would be.  And it had to be in fashion.

25         Well, everyone's done models and people have done,

1    you know, fashion editors, and I used to be a designer.  I'm

2    looking through Vogue magazine.  And bingo, it hits me, she's

3    a fashion designer.  So, you know, it's this line of going

4    from one idea to another idea to another idea.

5    Q.  So that's in your personal experience.  Do you also see

6    the design inspiration process at work in people that you

7    work with and people who work for you?

8    A.  Yes, all the time.  I have a designer who works for me

9    now.  He was hired as a clothing designer, but he wanted to

10   pitch to me a doll -- his own idea.  So in his presentation,

11   he takes, you know, and, believe it or not, it happened to be

12   Barbara Streisand and the Munsters.

13       MS. AGUIAR:  Okay.  Nothing will surprise me in

14   this case.

15       THE COURT:  You took the words right out of my

16   mouth.

17       THE WITNESS:  So he brings me this, and he brought

18   a sketch.  And you know what?  I kind of had the same

19   response you did.  But I thought it's worth a try.  So we did

20   it.  But he explained to me the process and how he went about

21   it and how he got this idea.

22   Q.  BY MS. AGUIAR:  And then you also have been in the

23   industry for quite some time.  Based on that, do you have

24   industry knowledge regarding design inspiration stories and

25   that so-called "ah-ha moment" with regard to others in the

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    industry generally?

2    A.   Well, there's a very, very famous one where Ruth Handler

3    from Mattel, coming up with Barbie, it was generally accepted

4    that she -- well, let me do this another way.

5        The story is that Ruth Handler was looking to put a

6    doll on Mattel.  And she wanted -- she kind of wanted a

7    fashion doll because she's looking at her daughter playing

8    with these very sophisticated paper dolls.

9    Q.   Sophisticated what?

10   A.   Paper dolls, very popular in the 50's.  And they were

11   done by very accomplished artists, and the clothes were very

12   sophisticated.  But what was out on the market was baby-like

13   fashion dolls, if you could find them.  I mean, you know,

14   babylike.  So she wanted to come up with her own doll.

15   Traveling in Europe, she comes across a doll called Bild

16   Lily.  So this, according to what I've read about this, it

17   was kind of a doll that was in men's tobacco shops.  It was

18   more of an adult kind of novelty rather than a doll, but she

19   likes the proportion because it was much more adultlike.  So

20   she -- I -- and in reading her excerpt of that in her

21   autobiography, that was kind of her ah-ha moment where she,

22   you know, put all the pieces together, and that's Barbie.

23   Q.   Do you have an understanding, based on reading testimony

24   and depositions, as to what Carter Bryant's testimony is

25   about these sources of his inspiration?

1    A.   Yes, I do.

2    Q.   What do you understand those to be?

3    A.   Well, my understanding is there's two main ones.  And

4    for any designer there's a lot more, but two main ones.  He

5    had picked up a copy of August 1998 Seventeen magazine.  And

6    he also -- there's a high school near to him.  I believe it

7    was Kickapoo High School.  And he saw some kids out in front

8    of the high school, whatever, he liked their energy.  He

9    liked kind of their style, and those two things kind of

10   jelled for him, and that was his ah-ha moment.

11   Q.   Now, are you here to tell the jury that what Carter says

12   was his design inspiration is in fact a true story?

13   A.   I have no way of knowing that, no.

14   Q.   Do you think that what he cites as the particular

15   sources of his inspiration are consistent with your personal

16   experience of the people who work for you and with the

17   industry stories that you are aware of?

18   A.   I think it's totally consistent in that it is specific.

19   I mean, it's a really specific sort of thing.

20        I mean, you know, it's very easy to see from my

21   point of view the magazine inspirations.  And then the high

22   school thing is one of those things where you're driving by,

23   and it hits you.  So that's -- that's where -- it is

24   consistent with the way these things happen.

25        THE COURT:  Let me, if I may, Counsel.

1          MS. AGUIAR:  Absolutely.  Thank you.

2          THE COURT:  I have a few questions on this.  You've

3   related your experience about how you developed a particular

4   doll or designed a particular doll.  You made reference to

5   this individual that pitched a doll to you, the Barbara

6   Streisand doll.  What was that individual's name?

7          THE WITNESS:  Joe.

8          THE COURT:  And Ms. Handler of Mattel.  I've got to

9   play this gate-keeping function of determining whether or not

10  the testimony that's called for here and whether or not it's

11  got a sufficient enough empirical base to support it.

12          When we're dealing with something artistic like the

13  design of a doll, as opposed to something which is, say, by

14  nature scientific, like a chemical experiment that there's

15  only one way of reaching that chemical experiment -- and

16  scientists may argue about it -- but there's ways of

17  demonstrating through hypothesis testing or whatever how to

18  develop that.  My sense is -- and it's only a sense at this

19  point -- is that different artists, whether we're talking

20  about actors or painters or designers, artists of various

21  sorts have different methods.

22          I mean, we've read a lot about that in the context

23  of acting performers, that there's different methods for

24  acting.  Some people, you know, adopt a particular school of

25  acting.  Others have different ways of going about it.  And

1    it's only speculation, but I'd be curious as to your thoughts

2    on this.  Is it possible that the same thing can be said for

3    creative designers in the doll business, that they might have

4    different methods for the creative process?  Or is it your

5    testimony or is it your opinion that everyone essentially has

6    the same creative process or goes through the same creative

7    process?

8         THE WITNESS:  You know, of course, everybody is

9    different.  And the way they see the world and all that and

10   the way they take in information is very different.

11        But, you know, in 35 years, I've never seen an

12   artist or designer come to something without taking those

13   steps.

14        Now, you know, there can be simpler steps.  For

15   instance, if a, you know, if somebody is doing a dress and

16   you have parameters already, then the inspiration may just be

17   the color.  It may be a very simple thing you don't even

18   think of as inspiration.  You look around and see a post-it,

19   and that's the green you want to use.

20        THE COURT:  So it's your sense that everyone has

21   these ah-ha moments to the extent they are doing something --

22   we all sit on the shoulders of other people, in other words,

23   we all have these inspiring moments.

24        THE WITNESS:  Yes.

25        THE COURT:  Can you tell, can you identify --

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      there's a dispute in the evidence here.  MGA takes the

2      position that the ah-ha moment for Mr. Bryant was the

3      Seventeen magazine and the Kickapoo High School, as you

4      identified.  Mattel takes the position that the ah-ha moment

5      may have been when he was exposed to certain dolls that he

6      saw over at Mattel.

7              Are you able to, in any kind of scientific way or

8      any kind of reliable way, discern which really was the ah-ha

9      moment for Mr. Bryant?

10             THE WITNESS:  Well, you know, I can't know that.

11     But what I can take you through is the sketches -- I believe

12     it's the Toon Teen sketches that Mattel says was inspiration.

13     And I can take you through what Mr. Bryant says.

14             Now, in my opinion, after looking at what makes

15     sense from A to B to C, Toon Teens doesn't look as -- that's

16     not a strong enough case, and I don't want to do anybody's

17     job here, but that's not as strong a thing for me as what he

18     described.

19             THE COURT:  That does not make as strong a case.

20             THE WITNESS:  Right.

21             THE COURT:  Could it be that that was the

22     inspiration?

23             THE WITNESS:  My opinion is that that's highly

24     unlikely.  But it could be the case.

25             THE COURT:  Why?

1          THE WITNESS:  Well, um, the dolls are -- to me they

2     are like night and day.  And Carter Bryant, he's an

3     accomplished artist.  So he doesn't put a line down -- you

4     know, he knows what he's doing when he's putting lines down

5     and when he's doing what he needs to do.  So he's going to --

6     he's going to look at something and be able to ascertain the

7     pros and cons of what he's looking at.  I don't know if

8     that's clear.  But he's going to know what he's looking at

9     when he looks at something.

10          So, you know, for instance, there's a Paris Blue

11     ad, and there's the Toon Teens.  And I can easily show where

12     the Bratz sketches are much more -- seem to be much more

13     based on the Paris Blue.  The Toon Teens, it's a totally

14     different doll, totally different concept.

15          MS. AGUIAR:  And that sort of takes us, your Honor,

16     into the second piece.

17          THE COURT:  And before we go any further,

18     Mr. Corey, I'll give him a chance to ask any questions that

19     he might have at this point.

20                    EXAMINATION

21     BY MR. COREY:

22     Q.  Good afternoon, Mr. Tonner.

23     A.  Afternoon.

24     Q.  When the Court was asking a question, you acknowledged

25     that it's entirely possible that Mr. Bryant was inspired by

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      the Toon Teens drawings; correct?

2      A.   Yes.

3      Q.   You can't preclude that possibility.

4      A.   Exactly.

5      Q.   And you are basing your -- you said that -- let's see, I

6      wrote it down.  You said you have an idea of how people come

7      up with ideas in the doll world; is that right?

8      A.   Well, my firsthand knowledge of how people come up with

9      ideas in the doll world.

10     Q.   Sure.  You talk to people, and you related a number of

11     anecdotes for us; right?

12     A.   Right.

13     Q.   And you said these people have kind of these ah-ha

14     moments.

15     A.   Right.

16     Q.   And I think what you said was that Carter Bryant's

17     story, at least as it was related to you, is another one of

18     these ah-ha moments.

19     A.   Correct.

20     Q.   But you can't say when that ah-ha moment occurred;

21     right?

22     A.   No.  I have no knowledge of that.

23     Q.   As a matter of fact, somebody has to decide whether they

24     believe Mr. Bryant or not as to when that ah-ha moment

25     occurred; correct?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     A.   Correct.

2     Q.   And you were talking to the judge when he was asking you

3     some questions.  You said that you find Mr. Bryant's story to

4     be credible because you see more similarities between what he

5     identified as being his inspiration, the Seventeen magazine

6     ads, and the Toon Teens drawings.  Is that fair?

7          MS. AGUIAR:  I have been trying not to object

8     because I don't think it's really the proper venue, but I

9     don't really think he said he found the story credible.

10         THE COURT:  Why don't you clarify.

11    Q.   BY MR. COREY:  You found Mr. Bryant's story to be more

12    consistent with the Seventeen magazine drawings than the Toon

13    Teen --

14    A.   I'm sorry.  Do that again.

15    Q.   Sure.  I apologize.

16         You said that you found Mr. Bryant's ah-ha story to

17    be more consistent in the context of viewing the Seventeen

18    magazine ads than in seeing the Toon Teens drawings or the

19    Toon Teens dolls.

20    A.   Yes.

21    Q.   And that was because the -- you found the Seventeen

22    magazine ads from the August '98 magazine to be more similar

23    to the Bratz drawings than the Toon Teens drawings and the

24    Toon Teens dolls.

25    A.   Well, it wasn't just -- it -- there were multiple things

1    in that Seventeen magazine that I believe he spoke about.

2    And the high school thing, that makes sense to me because

3    that's kind of out of the norm.  If you were going to pull

4    from the air or something like that, you'd probably pick

5    something that was more substantial or something that you

6    could really document, I would think.

7           But anyway, when I look at Toon Teens and I look at

8    the illustrations and what was in Seventeen magazine and

9    everything he said about it, it just -- it makes artistic --

10    it's logical artistically, if that's a phrase, that he would

11    go from A to B to C that way.

12    Q.   It sounds credible to you?

13    A.   Well, it sounds consistent.  It sounds consistent with

14    what my knowledge is and my experience and all that.

15    Q.   And that really is what we're going to, is consistent

16    with what?  Is there some empirical -- are there 12 steps

17    that artists have to follow to come up with an idea that

18    meets some set of standards?

19    A.   You know, there's no book.  There's no society or

20    whatever that sets aside laws of how a creative person has to

21    work.  So in that way, it's going to be very difficult to get

22    a measurement if that's what you're all looking for.  You

23    just can't get a measurement.

24           But what I do offer is hundreds and hundreds of

25    designers, sketchers, you know, clothing designers, doll

1    designers, concepts, all this kind of stuff, and it usually

2    works the same way.  And I've heard so many of the stories

3    that I feel like -- well, in my opinion, his is a good one.

4          THE COURT:  Have you ever been surprised at the

5    ah-ha moment?  Like wow, that's unusual that that was your

6    inspiration?  Or does it always -- does it always make sense

7    like, okay, that's consistent, as you would say?

8          THE WITNESS:  Yeah, I'm surprised myself when I

9    have an ah-ha moment.  Because I can be, you know, shopping

10    in the grocery store and I see a color or a character on the

11    cereal box, and you're not going to copy it, but you go, you

12    know what?  I mean, there's something about --

13          THE COURT:  This is my problem.  To testify to the

14    jury that it's more likely that it was the Paris Blues ad as

15    opposed to the Toon Teens, you're going to be objectively, or

16    you seek to objectively compare the Paris Blues ads to Bratz

17    versus the Toon Teens, but maybe it was just something that

18    you wouldn't pick up, that everyone in this room wouldn't

19    pick up, but the artistic genius of Carter Bryant picked up

20    on Toon Teens that was his ah-ha moment as opposed to what

21    might be the obvious or logical connection.

22          Do you see --

23          THE WITNESS:  I totally see what you're saying.

24    Yes, it is possible.

25          THE COURT:  Okay.  And that's what I'm struggling

1    with.  Without that scientific measurement, how do we --

2    we're talking about art.  Artists.

3            THE WITNESS:  That is a control.  And with all of

4    these years and these people, it usually makes some sort of

5    sense.  And right offhand, I don't think of a whacky example

6    where, you know, you're doing a doll design and you use a

7    whale for, I don't know, it's usually closer to that.

8    Q.  BY MR. COREY:  I'll provide you with a real world

9    example.  You know who Salvador Dali is; correct?

10   A.  Yes.

11   Q.  You are familiar with his paintings?

12   A.  Yes.

13   Q.  Have you read any books or a biography of him?

14   A.  No.

15   Q.  Do you know what his inspiration was?

16   A.  Well, knowing the pictures, I couldn't even imagine.

17   Q.  I'll represent it's memories of his birthing process.

18   That's what he claims his inspiration to be.  Does that sound

19   consistent, to be consistent with an ah-ha moment for an

20   artist?

21   A.  For him.

22   Q.  But it's entirely plausible; correct?

23   A.  Yes.

24   Q.  Now, I want you to -- have you ever been to Mattel

25   design center?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    A.   No.

2    Q.   But you know that Carter Bryant worked there?

3    A.   Yes.

4    Q.   And I want you to assume that he saw the Toon Teens

5    drawings in Lily Martinez's cubicle.  And you've seen the

6    Steve Madden ad from 1999.

7    A.   Angel Devil, yes.

8    Q.   And you've seen this ad before; correct?

9    A.   Yes.

10   Q.   Okay.  And if Carter Bryant after in the design center

11   saw Toon Teens and then saw this ad from the Seventeen

12   magazine in 1999 and then came up with the idea for Bratz,

13   that's also a consistent ah-ha story; correct?

14   A.   Yes.

15   Q.   And in your opinion you believe that the images in this

16   ad are closer to the Bratz drawings than the images from the

17   1998 Seventeen magazine in the Steve Madden ad?

18        MS. AGUIAR:  Your Honor, I believe what Mr. Corey

19   is referring to is an answer from his deposition where he was

20   talking about the Bratz dolls.

21        THE COURT:  Why don't we put those two ads up.  Can

22   we put the two ads?  The one from -- because I do know what

23   we're talking about.  I think this is an interesting point.

24   And I would appreciate your opinion on this.

25        MS. AGUIAR:  Your Honor, if we're getting into the

1    second area, I know Mr. Corey has asked him about the first

2    area.  Could I actually then take him through the second?

3    Because I think we're already --

4              THE COURT:  We really need to get on to the other

5    areas.

6              MS. AGUIAR:  We do.  But if we can get these two

7    up, I'm happy to walk him through it.  And then if Mr. Corey

8    has -- so can I take him through these?

9              MR. COREY:  I'm not sure what the Court wants to

10   do.

11             MS. AGUIAR:  I mean, is this what you were

12   referring to?

13             THE COURT:  Yes.

14             MR. COREY:  And I think the Court had a question

15   for the witness, if I recall.

16             THE COURT:  Any question on these, you are familiar

17   with the Bratz doll, of course.

18             THE WITNESS:  Yes.

19             THE COURT:  As between these two, are you able to

20   say that one is more or less likely to have been the

21   inspiration or is a more plausible inspiration than the

22   other?

23             THE WITNESS:  No.  And I'll tell you why.

24   Everything designed and everything that was going on at that

25   time was headed this way.  And you know, what was in that

1    August '98 magazine was a bunch of images that were not like

2    Steve Madden.  They had big feet, but they also had big heads

3    and this and that.  So to say that it's more likely that it

4    was that one, I don't -- I don't necessarily buy that.  I

5    mean, it could have been, but I don't.

6        THE COURT:  You couldn't say one way or another.

7        THE WITNESS:  No.

8        THE COURT:  Anything further, Mr. Corey?

9        MR. COREY:  No, your Honor.

10       THE COURT:  Let's go to the next area, Counsel.

11   You can take this down.

12       MS. AGUIAR:  With regard to the comparison, though,

13   of Toon Teens versus the sketches, yu know, Mr. Tonner would

14   offer very specific, based on his experience, artistic

15   observations of the differences between the Toon Teens

16   drawings and the Bratz sketches.  And I think Aaron may have

17   a graphic.

18       THE COURT:  Why don't we do that.

19       MS. AGUIAR:  That has the Toon Teens and the Bratz.

20       THE COURT:  Very good.

21       MS. AGUIAR:  So if Mr. Tonner could maybe explain

22   to the Court what he sees and why perhaps you are looking at

23   it with an experienced eye that would assist the jury in

24   understanding the differences.

25       THE WITNESS:  There are surface similarities for

1    example, they are both standing upright.  They are both semi

2    turned to the side just like a three-quarter view, and they

3    both have their arms out.

4           But that's kind of where it stops for me.  Because

5    the proportions are totally different.  Although they had the

6    same, you know, relatively the same size head and feet,

7    everything going on in between is totally different.  And

8    that says something different to a dollmaker.

9           For instance, the Toon Teen doll has -- she has a

10   large set of feet, but, I mean, between the neck and the

11   feet, she's got a little girl's body.  She does not have a

12   teenager's body, whereas the Bratz drawing is very shapely,

13   thin ankles, delicate hands, and there's a triangular thing

14   going on with the Toon Teens that is just not there with the

15   Bratz drawing.

16   Q.   When you say a triangular thing --

17         MR. COREY:  Your Honor, excuse me.  While this is

18   fascinating, I do want to note an objection that this is not

19   in his report, nor is that Toon Teens image in his report.

20         THE COURT:  Please continue.

21         THE WITNESS:  A triangular shape.  The Toon Teen

22   figure has very narrow shoulders.  She has a thin little

23   neck, and she just gets bigger as she goes down.  There's no

24   ankles per se.  Her ankle is probably wider than her thigh.

25   Same with the hands and the upper shoulder.  And the point

1    here is that, you know, I think it's an adorable sketch, the

2    Toon Teens.  I think it's adorable.  But it's apples and

3    oranges as far as doll design goes.

4         THE COURT:  Okay.  Could we do the same thing now

5    with one of the sources that he --

6         MS. AGUIAR:  You mean with one of the magazine ones

7    from '98?  Is that what you were thinking?

8         THE COURT:  Yes, exactly.

9         MS. AGUIAR:  Which one would you like?  There are a

10   few.  There's the Paris Blues.  There's the -- I think what

11   the judge --

12        THE COURT:  Well, I've had enough of Toon Teens.

13   We need to have the Bratz doll --

14        MS. AGUIAR:  Lupe or Zoe or one of the Bratz.  And

15   which one?

16        THE WITNESS:  Well, Paris Blues is the easiest one,

17   but you can also do Coke.

18            Now, from top to bottom, there are a lot of

19   similarities here.  And yes, there are a lot of differences,

20   but you have, forgetting the hair thing, but you have eyes

21   that are kind of sultry.  They both have -- they are lidded,

22   or she has a lot of eyelashes, the Paris Blues one.  They

23   definitely have a teenage body, and the proportion is more

24   Bratzlike.

25            Now, the Paris Blues does a little bit more with

1    hair, but the proportion is similar.

2              FURTHER EXAMINATION

3    BY MS. AGUIAR:

4    Q.   Can you talk about specifics with us when you talk about

5    proportion?  Because there is terminology that is in your

6    everyday lexicon and is not in that of the jury.  So if you

7    could break that down.

8    A.   The Paris Blues ad has this natural teenage body.  So

9    between the head, which is stylized, and the feet, which are

10   clunky oversized, she has a more natural body, as does the

11   Bratz doll.

12             MS. AGUIAR:  So we also have other graphics, which

13   I won't go into now in the interests of time, which do some

14   comparisons like this, your Honor, and measure sort of the

15   proportions of the body, like going back to the Toon Teens

16   one.  Mr. Tonner has worked with us on a graphic that, you

17   know, compares the proportions of the body that on first

18   blush, this jury looks at these two things and says oh, well,

19   yeah, boy, these look really similar, but if you look at the

20   shape of the hand on the left and the length of the hand on

21   the right, the arm, the waist --

22             THE COURT:  I see those differences.  I guess my

23   question is is that what's dispositive to the creative vision

24   of the design artist?

25             THE WITNESS:  Well, I would say he may -- had he

1    seen it, I have no way of knowing that, but had he seen it, I

2    would think that he would do what I did.  Oh, that's very

3    cute.

4         THE COURT:  Have you done the same thing, the

5    measurements with, let's say, the Steve Madden ad or the --

6         MS. AGUIAR:  In fact, with the Angel Devil ad, as

7    compared to -- we have one that compares the Angel Devil ad

8    to Zoe, and again, this is stuff that Mr. Tonner was asked

9    about in his deposition.  And he mentions --

10        THE COURT:  You've done that with the sources for

11   Mattel.  But what about your own sources, the Paris Blues

12   ads?  Have you compared the hand size, the waist size?

13        MS. AGUIAR:  We certainly could do that.

14        THE COURT:  Because those differences seem to exist

15   on the ads from the Seventeen magazine, at least visually.

16   Is that accurate?

17        THE WITNESS:  I'd have to look at it again.

18        THE COURT:  Well, there's a difference between the

19   size of the hand, the size of the feet, the size of the waist

20   in the Seventeen magazine from '98 and the Bratz doll, at

21   least what was up there.

22        THE WITNESS:  Right.  They are not the same.  He

23   didn't try to copy that.  But --

24        MS. AGUIAR:  I mean, if you look at the hands and

25   the arms, the waist, the size of the ankles, they are

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1        actually pretty much the same.

2               THE WITNESS:  If you measured them, they would be

3        different.

4               THE COURT:  That's my point.

5               THE WITNESS:  There are these slight differences.

6        But the proportion of differences --

7               THE COURT:  You haven't done those measurements.

8               THE WITNESS:  No.

9               THE COURT:  Very good.

10              MS. AGUIAR:  And then the posing is what Mr. Quinn

11       mentioned in his opening.  Sorry to ask Aaron to keep popping

12       back and forth, but the posing of the Toon Teens versus the

13       Bratz, again, looks to Mattel's argument, is similar, but

14       Mr. Tonner's view, which he can maybe explain to you, is that

15       they are quite different.  So I don't know whether you wanted

16       to address the differences in the posing.

17              THE COURT:  Well, again, if you would address the

18       posing of this, but also the '99 Steve Madden ad.  Is the

19       posing different there as well with the Devil?

20              MS. AGUIAR:  Yes, and the Angel Devil ad.

21       Q.   So, Mr. Tonner, if you can discuss the differences in

22       the posing of the Bratz and the Toon Teens.

23       A.   Well, the first one I've seen, when I looked at these

24       things, is that Mr. Bryant's sketch of Bratz looks grounded

25       whereas the Toon Teen looks a little off balance.  Both hands

1    are up, and they are both -- I mean, there will similarities,

2    such as both hands are up.  The arms are out to the side.

3    They are both looking -- they are both facing the same way.

4         But there's a knock-kneed thing on the Bratz

5    drawing.  She's pigeon-toed.  The Toon Teens is a little bit

6    more cartoony, but it looks to me like there's a V-shape

7    going, which is consistent with how this is drawn.

8         So she's standing with these big feet wide apart.

9    So there's a V there.

10        A little -- we're in the pose.  The Bratz has a

11   little bit of a hip thrust, and she's turned a bit more

12   toward the camera, if you would.  And the head sits -- the

13   head and the neck sit more forward on the body, which gives

14   her that grounded sort of look, as opposed to the Toon Teen,

15   which looks like she could fall backwards.

16   Q.   And I know your Honor wants to move --

17        THE COURT:  Why don't you put up the Seventeen and

18   Angel ad.

19        MS. AGUIAR:  We have that, your Honor.  And it

20   shows the two.  And if you could address the differences in

21   terms of proportion and then if you could go and then address

22   the --

23        THE COURT:  Actually, why don't you go through the

24   very same standards that you just did a moment ago of stance

25   and pose.

1          THE WITNESS:  Again, Bratz.  I mean, I understand

2     that he used a croqui, or what he calls a master sketch to

3     draw his drawing.  So they are all about the same.  So the

4     same things apply here.  The feet are kind of turned in kind

5     of pigeon-toed.  He has a knock-kneed sort of thing going on.

6     You can't see under the skirt, but the thighs should --

7          THE COURT:  So you're saying these are similar.

8          MS. AGUIAR:  No, I think he was saying the two

9     Bratz are similar.

10          THE COURT:  That's not what I'm asking.  Compare

11     these two before you.  Are they similar or dissimilar?

12          THE WITNESS:  Dissimilar.  Her feet are apart, and

13     they are facing forward.  They are not turned in.  The knees

14     are apart.  The arms are in different positions.  And the

15     proportion is different.  She's also squatting.

16          THE COURT:  Wait a second.  In the Paris Blues ad,

17     the person was sitting and not standing.

18          THE WITNESS:  Well, yes.  But we're not

19     comparing --

20          THE COURT:  Counsel, I'm starting to get a sense

21     that this is extraordinarily anecdotal.  I'm hearing this is

22     a mix master.  You just said it's significant that her arms

23     are different, in different --

24          THE WITNESS:  Yes, they are in different --

25          THE COURT:  But in the Paris Blues ad, her arms are

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    different.

2         THE WITNESS:  Well, Paris Blues was for proportion.

3    This was for a pose.

4         THE COURT:  This is a mix master.

5         MS. AGUIAR:  What we're trying to address is

6    Mattel's argument that this is the same, that the poses are

7    the same in Toon Teens or that this is the same.  And from an

8    artistic perspective, he's just trying to point out that

9    there are differences.

10        THE COURT:  There are differences, and there are

11   similarities.  I think that is clear to everybody in the

12   courtroom.

13        MS. AGUIAR:  And both of Mattel's witnesses who

14   were fact witnesses, Ivy Ross and Lily Martinez, were not

15   presented as experts, but they design dolls.  They are head

16   of the girls division and are artistic people.  And they were

17   up on the stand talking about Toon Teens.  And so you have

18   evidence in the record.

19        I appreciate why your Honor is starting to get the

20   sense well, you know, you look at everything, and you can see

21   similarities and differences.  I don't -- but the problem is

22   that we've had testimony from Mattel witnesses in this case

23   about these precise issues.  And so to say, all of a sudden

24   at this point in the trial, well, we can see similarities and

25   differences in everything --

1          THE COURT:  Counsel, I can only deal with the

2      objection that's before me.  And I'm not saying that there

3      aren't other witnesses yet to be called that can't address

4      these issues.  I'm simply saying from an expert standpoint,

5      bringing somebody unrelated to the facts of this case, what

6      I've heard now is there is no basis under Daubert to permit

7      this line of questioning.  And perhaps there may be something

8      different in the color or the sculpting.

9          MS. AGUIAR:  Okay.  So why don't we go to the last

10     two.

11     Q.  Mr. Tonner, with regard to color -- I'll do the last

12     two, and then Mr. Corey can follow up.

13          The last two are the colorization and the evening

14     wear from the pitch book and then the sculpting issue.

15          Do you have an understanding that Mr. Bryant did

16     the original sketches in black and white and then added color

17     at a later time?

18     A.  Yes.

19     Q.  Can you explain to the Court, based on your experience,

20     what you believe the -- what was the impact of the color?

21     A.  The impact of the color would be a pleasing

22     presentation.  As far as -- the interesting thing about the

23     Bratz thing was the idea about it was the concept and the

24     idea.  And if he -- however he got that across.  It's very

25     easy to do a beautiful black and white illustration that

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      would get the same point across.  The color -- you get the

2      same point across.

3           The Bratz -- and on to the fashions, the Bratz were

4      fashion dolls.  I mean, from the beginning they were fashion

5      dolls.  So by adding fashion doesn't change anything.  You

6      know, so I -- I see those as not necessarily important

7      points.

8      Q.  In your experience, though, have you seen people come up

9      with doll concepts and express those in a black and white

10     drawing and then seen them later in a colorized version?

11     A.  Well, yes.

12     Q.  And in your experience, does the addition of color in

13     something like this -- and let's put aside for the moment

14     color concept dolls.  So let's put that aside because we'll

15     talk about that in a moment.

16           Does a color change the original idea or the

17     concept for the doll that you originally saw, whether you saw

18     it in black and white?

19     A.  No, unless there was some reason to insert color into

20     the concept, color doesn't necessarily add anything.  In

21     fact, when he's doing his illustrations --

22           THE COURT:  I'm sorry.  Color doesn't add anything

23     to what?

24           THE WITNESS:  To a concept.

25           THE COURT:  Color does not add anything to a

1    concept from an artistic perspective?

2        THE WITNESS:  Well, to put -- okay.  I have to go

3    back here.  If you're presenting a doll idea and you do it in

4    black and white, you can do it just as effectively in black

5    and white as color.  I mean, people use color a lot because

6    it's an easier way to make somebody pop.  So it would add

7    excitement.  It would add interest to the sketches.

8        But I have seen very, you know, very detailed

9    beautiful black and white renderings also that get the point

10   across.  I mean, that's really the -- doing the illustrations

11   is to show somebody else, the point of that is to get the

12   idea across.

13       THE COURT:  What do you base that opinion on?

14       THE WITNESS:  35 years of experience.  If I want to

15   try to explain something to somebody, the easiest way,

16   instead of like talking it through, would be to show them a

17   sketch.

18       THE COURT:  And color doesn't add anything to that?

19       THE WITNESS:  It's not necessary.  And it

20   depends -- you know, again, it's like black and white, again,

21   could be very dramatic and very dynamic.  Color could do the

22   same thing.  Or if it's badly colored, you could hurt a

23   concept.

24   Q.   BY MS. AGUIAR:  In other words, in this particular case,

25   have you looked at the sketches in black and white and looked

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    at them in color?

2    A.   Yes.

3    Q.   And is it -- do you believe that the addition of the

4    color changed anything about Mr. Bryant's idea for Bratz?

5    A.   No.

6    Q.   Can you give the Court some examples of a doll where the

7    color in the doll or in the drawing was much more a part of

8    the concept?  Can you explain the whole idea of a color

9    concept doll?

10   A.   Well, personally I did a group of play dolls about 10

11   years ago, and in developing their personalities and the

12   style of the dolls, we gave them a favorite color.  So the

13   dolls came dressed in that color.  And the girly doll was in

14   pink, and the tomboy was in blue and all of that commercial,

15   I would say something like Strawberry Shortcake would come in

16   red and green.  That's where color is important to a concept.

17        But if I may, the -- when Carter was coloring

18   these, I've read nothing or seen nothing of what he said or

19   anything that I've looked at that says the color was

20   important.  For all I know, he ran out of red over here.  So

21   he colored it yellow.

22   Q.   In other words, do you understand Bratz to be a doll

23   idea where color plays a central role?

24   A.   No.

25   Q.   The clothes and what have you?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      A.   No.

2            THE COURT:  And again, why do you hold that opinion

3      with respect to Bratz besides your 35 years of experience?

4            THE WITNESS:  They have -- it's even hair color.

5      If they are trying to design a personality, like Cloe always

6      has blonde.  She doesn't always have blonde.  She has

7      multiple hair colors.  So color is not specific to a

8      character.  And it doesn't enhance it or whatever.  I think

9      what they do, I mean, you know, I'm not there.  But I would

10     think what they would do is they'd do a great design and

11     match the hair and stuff like that to work with a great

12     design.

13           Mr. Bryant, showing the sketches to a talented

14     staff, they would understand that there would be color and

15     fabrics and all of this.

16           THE COURT:  Anything further on this, Counsel?

17           MS. AGUIAR:  I'll just go to the last area, the

18     sculpting.

19     Q.   Can you tell the judge briefly what your experience is

20     with sculpting?

21     A.   I've been sculpting since I was 29, which is a long time

22     ago.  And I used to do all the sculpting for a company, and I

23     probably do about half of it now.

24     Q.   Can you discuss the importance in your opinion of the

25     sculptor to the process of doll design?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    A.   Well, it's crucial.  I think it's crucial.  You have to

2    get somebody who -- and that's why people hire good

3    sculptors.  They see somebody with talent whose dolls

4    consistently come out well.  If somebody is a talented doll

5    designer, you know, they are sought after.

6    Q.   Can you explain, when a sculptor is working from a

7    drawing, what kind of drawing that would need to be in order

8    for the sculptor to simply be executing on the vision that is

9    in the drawing?  In other words, what would that drawing need

10   to look like or include?

11   A.   Well, when we do projects that are, say, Disney or when

12   we try to do a portrait or whatever, we get actual

13   turnarounds.

14   Q.   Can you explain to the judge what that means?

15   A.   Yes, it's a side view, front view, back view.  So that

16   you get a whole sense of how every angle looks.  You have

17   three-quarter view.  Same with a portrait.  You want to nail

18   it.

19   Q.   And you obviously don't know specifically what

20   Mr. Bryant's involvement was in the sculpting process in this

21   case.

22   A.   No.

23   Q.   But you've had experience with sculpting things from

24   drawings such as the ones in this case.

25   A.   You mean one without turnarounds?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    Q.   Yes.

2    A.   Yes.

3    Q.   And what does that result in?  In other words, what's

4    the result when you have an illustration like this that

5    doesn't have all of that information in it?

6    A.   Well, you leave a lot up to the sculptor then.

7         MS. AGUIAR:  Anyway, your Honor, I know we're

8    running short on time.  So I'll wrap up.

9         THE COURT:  Very well.

10        Mr. Corey, do you have anything further?

11        MR. COREY:  Yes, unless the Court tells me that I

12   don't need anything further.

13        THE COURT:  Well, if you'd address the sculpting

14   issue.

15        MR. COREY:  Sure.  Do you want me to address it by

16   argument or by questioning the witness?  I'm just not clear.

17        THE COURT:  I'm sorry?

18        MR. COREY:  Do you want me to address it with the

19   Court?

20        THE COURT:  No, to the witness.  I'll give you both

21   a chance to argue as soon as we finish the questioning.

22             FURTHER EXAMINATION

23   BY MR. COREY:

24   Q.   Mr. Tonner, did you ever talk to -- you understand that

25   Ms. Leahy did some sculpts for the Bratz dolls?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    A.   Yes.

2    Q.   Did you ever talk to her about the sculpts?

3    A.   Not about the sculpts, no.

4    Q.   You talked to her, you just didn't talk to her about the

5    sculpts?

6    A.   Correct.

7    Q.   And isn't it also fair to say that you have no idea what

8    the stage of the sculpting process was as of October 19,

9    2000?

10   A.   I have no idea.

11   Q.   So you can't differentiate between what was done before

12   or after October 19, 2000?

13   A.   Correct.

14   Q.   Did anyone at MGA or Ms. Leahy's counsel ever identify

15   for you which sculpts were done, may have been done prior to

16   October 19th, 2000?

17   A.   I saw sculpts in various stages.  And it was spelled out

18   to me which came first.  I don't remember, you know, if they

19   said exactly what date anything was done.

20   Q.   And you testified that you are a sculptor.

21   A.   Yes.

22   Q.   And you've prepared sculpts both from drawings -- you've

23   prepared sculpts from drawings; right?

24   A.   Both.  And with vague reference.

25   Q.   You've actually started sculpting without the benefit of

1    drawings.

2    A.   Yes.

3    Q.   And you've started sculpting using sketches as a

4    guideline?

5    A.   Yes.

6    Q.   And using engineering drawings as a guideline?

7    A.   Yes.

8    Q.   And you actually don't have any factual basis to make an

9    assessment as to what happened in this case.

10   A.   No, no factual, no.

11   Q.   So what you are opining on is you look at the sculpt,

12   and the sculpt looks pretty good to you.

13   A.   No.  What I'm talking about is what I've been told that

14   was shown to Margaret as far as -- or given to Margaret and

15   what she came up with.  I compared the two.

16   Q.   So what exactly is your opinion that you are giving with

17   respect to the sculpts?

18   A.   I think that the sculpt is very professional.  And I

19   think that it's -- there's similarities to the sketch, but

20   she had a lot of latitude.

21   Q.   And you don't know if she had that latitude before or

22   after October 19, 2000?

23   A.   No, I don't.

24        MR. COREY:  Nothing further.

25        THE COURT:  Very well.  You may step down.

1          Any further argument at this time?

2          MR. COREY:  Addressing both the colorization issue,

3     if the Court thinks I need to, the jury, as far as I'm aware

4     is not colorblind.  They are fully capable of assessing what

5     drawings have color and what drawings don't have color.  It's

6     not really even an issue in 1-A.  The issue in 1-A is when

7     the drawings were created regardless of whether they have

8     color or not.

9          I mean, I think the way Mr. Price put it is when

10    the paper went from being blank to not blank.  And I think

11    the fact that you want to put somebody up to talk about when

12    color was or was not added doesn't add or subtract from any

13    of the claims --

14         THE COURT:  Let me ask you this.  To what extent is

15    Mattel going to be relying on the color drawings or the

16    colorization as a basis for its breach of contract claims?

17         MR. COREY:  Mattel is going to be claiming any

18    works that Mr. Bryant did while he was employed at Mattel.

19    So I don't know that I can parse it any more finely than

20    that.  But, I mean, it's entirely possible that in 1-B, when

21    we start talking about what is and is not protectable in the

22    Copyright Act, this may be something that we need to revisit

23    again.

24         With respect to the -- to whether the witness

25    should be called to testify or permitted to testify about the

1    sculpts, he doesn't have a basis to draw a distinction as to

2    what belongs in this phase and what doesn't belong in this

3    phase.  And I think the parties recognize that, and I'll read

4    very quickly from page 72 of the transcript of May 22nd,

5    2008.  Starting at line 25.  This is Mr. Nolan:

6         "To now say that based on that, your Honor, we

7         should be further punished by not being able to

8         make an argument, it's out in the public domain and

9         cited in copyright cases, cited by experts and kind

10        of common in the industry as to the difficulty

11        between going from 2-D to 3-D, I think, would be a

12        breath-taking punitive sanction that is not

13        supported by the record, and I'll submit on that.

14        "THE COURT:  This would be a 1-B issue, I

15        presume.

16        "MR. NOLAN:  Yes.

17        "MR. QUINN:  It would be 1-B."

18        And then skipping to the bottom at line 23, this is

19    what the Court says:

20        "I'm going to defer a ruling on this one until

21        before the 1-B trial."

22        And I think the Court has heard that that's exactly

23    what this witness is being proffered for.

24        THE COURT:  Thank you, Counsel.

25        Ms. Aguiar.

1        MS. AGUIAR:  I'll address the colorization and the

2    sculpting points.  I think that's sort of what we're down to.

3    On colorization, you put your finger on it by asking that

4    question of Mr. Corey.  What is the implication of the color

5    for their breach of contract claim?  And it's absolutely an

6    issue for this phase.  Because if they are going to claim all

7    drawings that he did while he was at Mattel, we all know, and

8    frankly, the record at this point is undisputed, he did the

9    color when he was -- after 1998.  But they were the same

10   drawings.

11       I think the record is also very clear that each one

12   of those drawings was originally created in 1998.  And so

13   this is very much an issue.  I appreciate Mr. Corey starting

14   off his answer to your question by saying it's not a 1-A

15   issue.  But then his answer to your next question was, well,

16   of course, it is.

17       THE COURT:  I don't disagree with you on that

18   point.

19       MS. AGUIAR:  Okay.

20       THE COURT:  I agree with you on that point.

21       MS. AGUIAR:  And I think that's an issue, your

22   Honor, respectfully, that we will have to discuss at issue in

23   the charging conference because it's going to relate very

24   much to what this jury finds they own.  Because if the idea

25   and the drawings were done in '98, and all he did was color

1    them in '99, then it's relevant to have an expert testify on

2    that, and it's relevant if the jury is going to be asked

3    about that, which they are.  It's in the verdict forms.

4        If there's no implication, and they find that the

5    drawings are essentially the same drawings, except that they

6    are colored in, then that doesn't translate to ownership.

7        THE COURT:  Right.

8        MS. AGUIAR:  Okay.  And then with regard to

9    sculpting, I think yes, it's true that this witness doesn't

10   know what happened between certain dates, but again, getting

11   back to the verdict form, just because we're almost getting

12   to that point and the parties have been amending it to

13   reflect how this case has been tried, they are asking this

14   jury whether Mr. Bryant created or directed someone else to

15   create these 3-D things.

16       So if the jury is going to have to decide, well,

17   was it him that did it or was it the sculptor, I think it's

18   pertinent to have a sculpting expert talk about the fact that

19   it's critical for the process, and what Mr. Bryant provided

20   could have resulted in 16 different sculpts, but it resulted

21   in this one because of the sculptor, not because of

22   Mr. Bryant.  What Mr. Corey read from a hearing that happened

23   before we had our first day of trial, as your Honor observed

24   earlier today, things change.

25       THE COURT:  Things change.  And no one should

1    presume that any particular question is going to be asked of

2    the jury.  The Court will make that determination.

3         MS. AGUIAR:  Of course.  I just mean that both

4    sides --

5         THE COURT:  I just don't want Mattel to think they

6    have already figured out the verdict form.

7         MS. AGUIAR:  Thank you, your Honor.

8         THE COURT:  All right.  If there's nothing further,

9    the Court is prepared to rule on this motion and the motion

10   for waiver.

11        Okay.  Let me begin with the earlier motion that we

12   discussed, the motion regarding waiver.  The Court is going

13   to deny that motion.  I do believe that there was a waiver of

14   the privilege; however, I do not believe the scope extends as

15   far as Mattel is seeking.  However, having said that, if MGA

16   goes any further down this road at all, the Court will

17   revisit this ruling.

18        Regarding the motion to preclude the expert

19   witness, Mr. Robert Tonner, the Court grants that motion.

20   Putting aside the issue of the relevance of any of this, the

21   Court has a much more fundamental problem, after considering

22   the testimony of Mr. Robert Tonner.  And I will only --

23   certainly not to embarrass anybody, but I simply don't find

24   Mr. Tonner credible.  I find his testimony lacking in

25   credibility.  And I find it to be tailored testimony and not

1    suitable for an expert witness.  And exercising its Daubert

2    required function, the Court precludes the testimony of

3    Mr. Tonner.

4         If parties would seek a further elaboration of the

5    Court's reasoning on this, the Court is happy to provide it.

6    I'm always reluctant to do so when one requires the Court to

7    comment on the character and credibility of the witness.

8    Based on the Court's assessments of the testimony that was

9    given here in response not only to counsel's questions but

10   the Court's questions, I simply don't find this witness to be

11   credible as an expert or in any other way.

12        So motion in limine to exclude Mr. Tonner's

13   testimony is granted.

14        MS. AGUIAR:  Just one clarification, your Honor.  I

15   don't know that it will become an issue, but Mattel has an

16   expert who essentially is very much along the same lines as

17   Mr. Tonner in terms of his -- I don't want to say they have

18   the same background, but they have similar comparisons that

19   they are drawing, very similar graphics, and the bar graphics

20   were drawn from their expert.  We tried to make the points we

21   were -- we think needed to be made.

22        So I don't think this is what you are saying, but

23   if we could have some guidance on whether this area of

24   testimony -- you seem to be saying apart from commenting on

25   Mr. Tonner himself, that this area of testimony is just

1    not -- you used the word scientific.

2         THE COURT:  That's not what I'm saying.  I'm

3    putting aside the issue of relevancy on this.  I'm simply

4    commenting on Mr. Tonner.  It's a fundamental issue.  I don't

5    find him credible.  He was making differences and pointing

6    out differences and trying to make observations that I think

7    were internally inconsistent.  And the clear impression that

8    he left the Court with is that he is tailoring his testimony.

9    And I don't make that conclusion lightly.  But that is the

10   Court's assessment after having heard the testimony.

11        There's a whole series of proposed experts, and the

12   Court will submit every expert proffered that's not

13   stipulated to to the same evaluation, at least those I

14   identified during the motions in limine.  And I'm not going

15   to advise on a future witness at this time.

16        MS. AGUIAR:  Okay.  No, I appreciate that.

17        THE COURT:  And that's not to say that I don't have

18   concerns as I've already expressed about the relevancy.  So

19   I'm not suggesting the other.  But I'm making this decision,

20   quite frankly, based strictly on a credibility finding.

21        MS. AGUIAR:  Thank you.

22        MR. NOLAN:  Your Honor, briefly on that.  Your

23   Honor, with respect to the topics that were proposed for 1-A

24   for Mr. Tonner, which was what we went through --

25        THE COURT:  We're done with Mr. Tonner, Counsel.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008  12:00:00

1          MR. NOLAN:  Okay.

2          THE COURT:  Court is in recess while we bring the

3     jury in.

4          MS. AGUIAR:  Your Honor, I'm sorry.

5          THE COURT:  Yes.

6          MS. AGUIAR:  There's one witness who may go right

7     after Mr. Eckert.  And there's an issue with regard to a

8     document that pertains to that witness.  Do you want to

9     assume that we're going to have another break before we get

10    to him?

11         THE COURT:  What document is that?

12         MS. AGUIAR:  The witness is Mitch Kamarck.  And one

13    of the documents that has been put on the list to get in

14    through him is the document that's the subject of the Raymond

15    Black declaration.  And I'm happy to take this up whenever

16    your Honor would like.

17         THE COURT:  Yes, this is the English --

18         MS. AGUIAR:  Exactly.  And we can do that later,

19    but it is an issue.

20         THE COURT:  Mr. Quinn --

21         MR. QUINN:  We're not offering the document she's

22    concerned about.

23         THE COURT:  Very good.  That takes care of that.

24    Very good.

25         Brief recess, and we'll bring the jury in.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1          (Recess taken.)

2          (WHEREUPON THE JURY ENTERS.)

3          THE COURT:  Mr. Eckert, members of the jury.

4          Counsel, you may continue.

5              ROBERT A. ECKERT, PREVIOUSLY SWORN.

6              DIRECT EXAMINATION (CONTINUED)

7    BY MR. NOLAN:

8    Q.  Mr. Eckert, just before the break, I asked you about

9    Mr. De Anda.  And I was just curious as to whether or not,

10   following your deposition in this case, you took any steps to

11   determine whether or not Mr. De Anda had approval to conduct

12   a separate business on the side.

13   A.  Yes, I did.  That afternoon I clarified it.

14   Q.   And what did you do in that regard?

15   A.   I asked Alan Kaye, who is the head of Mattel Human

16   Resources, and I believe Mr. De Anda's direct supervisor, if

17   what you told me at the deposition was true.  He said it was,

18   and that he had approved it.

19   Q.   Okay.  Great.  Thank you.  And during the lunch break,

20   did you have an opportunity to meet with your lawyers again?

21   A.   I had lunch with my lawyers.  I don't know if I'd call

22   it a meeting.

23   Q.   Okay.  Is Mattel's general counsel in the audience?

24   A.   Yes, he is.

25   Q.   And could you point him out to us?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    A.  That man.

2    Q.  Mr. Norma.

3    A.  Mr. Norma.

4    Q.  During the lunch did you go over any of the topics that

5    would be asked of you under cross-examination?

6    A.  No.

7          MR. NOLAN:  Thank you.  Nothing further.

8          THE COURT:  Thank you.

9          Mr. Quinn.

10                    CROSS-EXAMINATION

11   BY MR. QUINN:

12   Q.  Good afternoon, Mr. Eckert.

13   A.  Good afternoon, Mr. Quinn.

14   Q.  Yesterday afternoon, Mr. Nolan made a comment to you

15   about how you haven't been here during the trial since the

16   opening statement.

17          Do you recall being asked that?

18   A.  Yes, I do.

19   Q.  And do you have an understanding that there is an order

20   that the court has entered that folks who are on the witness

21   list who are going to be witnesses cannot attend the trial

22   until after they have testified?

23   A.  I don't know about an order, but I know I've been told I

24   cannot attend the trial until I've testified.

25   Q.  You've asked if you could attend?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     A.   Repeatedly, as you know.

2     Q.   As I know.  Indeed, you were asked some questions about

3     Mr. Kilpin and your interview of Mr. Kilpin.

4          Did you indicate that he had worked for Mattel

5     before?

6     A.   I believe he may have.

7     Q.   Now, when you interviewed with Mr. Kilpin for a

8     potential job at Mattel, did he bring with him a project that

9     he had been working on at Disney and offer it to Mattel?

10    A.   No, not that I'm aware of.

11    Q.   Did you assign some work to Mr. Kilpin and pay him to do

12    work for Mattel while he was still employed by Disney?

13    A.   No.

14    Q.   Did he work with Mattel on a project while he was still

15    employed by Disney?

16    A.   He may have, as a licensor, worked on projects, on dolls

17    or something that Mattel created.

18    Q.   Can you explain that to the jury, what you are referring

19    to there?

20    A.   Well, as an example, the Kung Fu Panda movie is produced

21    by DreamWorks, and under license, we make the toys that go

22    with the Kung Fu Panda movie.  So in that relationship,

23    Disney and Mattel are actually partners in the toy business.

24    Q.   So if he worked on something like that where Disney was

25    a licensor, did you say?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    A.   Yes.

2    Q.   That is the sort of thing that you have in mind?

3    A.   If he did anything, yes.

4    Q.   But you didn't have some Mattel project that he was

5    working with Mattel on for Mattel's account while you were

6    interviewing him.

7    A.   No, that's correct.

8    Q.   You were asked some questions about Cassidy Park and

9    whether she was a Mattel employee yesterday.  Is it possible

10   that Ms. Park could today be a part-time Mattel employee and

11   you wouldn't necessarily know it?

12        MR. NOLAN:  Objection.  Lack of foundation.  Calls

13   for speculation.

14        THE COURT:  It's foundational.  Well, actually, why

15   don't ask you it in a more foundational way without specific

16   reference to Ms. Park.

17   Q.   BY MR. QUINN:  How many folks are employed by Mattel

18   today?

19   A.   Approximately 35,000.

20   Q.   And you don't know them all?

21   A.   No, I don't.

22   Q.   And do you know how many part-time employees there are?

23   A.   No, I don't.

24   Q.   And would you know if somebody like Cassidy Park was a

25   part-time employee necessarily?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      A.   Not necessarily.

2      Q.   Is there a binder up there with your name on it, sir, a

3      black binder, Mr. Eckert?

4      A.   There is.

5      Q.   If you'd turn, please, to Exhibit 13614.

6      A.   I have it.

7      Q.   Can you identify that document for us?

8      A.   Yes.

9      Q.   And what is it?

10     A.   It says employee confidential, and it appears to be the

11     Word inventions agreement.

12     Q.   And that's signed by whom?

13     A.   It's signed by me, Robert A. Eckert, and it is signed by

14     Alan Kaye.

15          MR. QUINN:  We'd offer that in evidence, your

16     Honor.

17          MR. NOLAN:  No objection.

18          THE COURT:  It's admitted, and you may publish.

19          (Exhibit 13614 received.)

20     Q.   BY MR. QUINN:  Is it your understanding, Mr. Eckert,

21     that you signed the same inventions agreement that Mr. Bryant

22     signed?

23          MR. NOLAN:  Objection.  Lack of foundation.

24          THE COURT:  Lay a foundation, Counsel.

25     Q.   BY MR. QUINN:  Have you seen Mr. Brian's inventions

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1   agreement?

2   A.   Yes, I have.

3   Q.   Do you have an understanding as to whether or not the

4   inventions agreement that you signed is substantially the

5   same as the inventions agreement that Mr. Bryant signed?

6   A.   It's been a while since I read them both word for word,

7   but I believe they are the same.

8   Q.   All right.  Can you tell the jury how many toys, how

9   many different toy products Mattel sells?

10   A.   Well, in any given year, it's in the neighborhood of 8-

11   to 9,000 different toys.

12   Q.   And of those 8- to 9,000 toys, approximately how many

13   are new each year?

14   A.   About 80 percent.

15        MR. QUINN:  Nothing further.

16        THE COURT:  Mr. Nolan?

17        MR. NOLAN:  Very, very brief.

18             REDIRECT EXAMINATION

19   BY MR. NOLAN:

20   Q.   We just had up there your inventions agreement?

21   A.   Yes.

22   Q.   And it's similar to Carter Bryant's?

23   A.   I believe so.

24   Q.   Were you represented by counsel when you were

25   negotiating your employment contract with Mattel?

1           MR. QUINN:  Ambiguous whether it means the

2     inventions agreement or some other agreement.

3           THE COURT:  Clarify, Counsel.

4           MR. NOLAN:  I was referring to the --

5     Q.   Do you have an employment agreement with Mattel?

6     A.   I do.  Separate from this.

7     Q.   Separate and apart from this document?

8     A.   Yes.

9     Q.   Were you represented by counsel while you were

10    negotiating your employment agreement with Mattel?

11    A.   That is the one separate from this one?

12    Q.   Separate from this one.

13    A.   Yes, I was.

14    Q.   Okay.  You signed the inventions agreement as part of

15    your initiation as an employee at Mattel; correct?

16    A.   It appears I signed it perhaps the day after I joined

17    the company.

18    Q.   And isn't it true that, at all times leading up to the

19    decision as to whether or not you would execute your

20    employment agreement and accept employment at Mattel, you

21    were represented by counsel?

22    A.   At the time I accepted my employment agreement, I was

23    represented by counsel, yes.

24    Q.   Sir, do you have any knowledge as to whether or not

25    Carter Bryant was represented by counsel when he signed the

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      inventions agreement?

2      A.   The inventions agreement or an employment agreement?

3      I'm --

4      Q.   Well, let me --

5      A.   You're talking about both of them.  I've just trying to

6      clarify which one you're talking about.

7      Q.   Let me ask you this:  Did Carter Bryant have an

8      employment agreement with Mattel?

9      A.   I don't know.

10     Q.   With respect to the inventions agreement and

11     confidentiality agreement, the one that you just saw on the

12     screen.

13     A.   Yes.

14     Q.   Do you have any knowledge of whether or not Carter

15     Bryant had an employee -- had an attorney?

16     A.   No, I don't have any knowledge of that.

17           MR. NOLAN:  Nothing further.  Thank you.

18                  RECROSS-EXAMINATION

19     BY MR. QUINN:

20     Q.   Mr. Eckert, did you have an attorney advise you with

21     respect to that inventions agreement?

22     A.   No, I did not.

23           MR. QUINN:  Nothing further.

24           THE COURT:  Did you move 13614 into evidence?

25           MR. QUINN:  I thought I did, your Honor.

1        THE COURT:  And there was no objection; correct?

2        MR. NOLAN:  No objection.

3        THE COURT:  Very well.  It was received.

4        Nothing further, Mr. Nolan?

5        MR. NOLAN:  Nothing further.

6        THE COURT:  Mr. Eckert, you are excused.  And now

7   you may sit in the court.

8        THE WITNESS: I'll look forward to it, but I don't

9   have to sit here?

10       THE COURT:  No.  That seat is going to be occupied.

11       Mr. Nolan, your next witness.

12       MS. AGUIAR:  We're flip-flopping again.  We're back

13  into Mattel's case because there were witnesses that weren't

14  available last week.  So we've agreed to let them take them

15  out of order.  So another one of the witnesses they would

16  like to call is Daphne Gronich.

17       THE COURT:  Very well.  Thank you, Counsel.

18       Mr. Quinn, if you'd call your witness for the

19  record.

20       MR. QUINN:  Yes.  Mattel calls Daphne Gronich.  And

21  if I may approach the witness stand to put some documents up

22  here, your Honor.

23       THE COURT:  Very well.

24       THE CLERK:  Please raise your right hand.

25            DAPHNE GRONICH, SWORN.

1          THE CLERK:  Thank you.  Please be seated.  Please

2     state your full name for the record and spell the last name.

3          THE WITNESS:  Daphne Gronich, G-R-O-N-I-C-H.

4          THE CLERK:  Thank you.

5               DIRECT EXAMINATION

6     BY MR. QUINN:

7     Q.  Good afternoon, Ms. Gronich.  My name is John Quinn.  I

8     represent Mattel.  Did I say your name right, "Gronich"?

9     A.  No, it's "Gronich."

10    Q.  Thank you.  You were previously employed by MGA?

11    A.  Yes, I was.

12    Q.  Was your position general counsel, as I understand it?

13    A.  That is correct.

14    Q.  That means you were the top lawyer in house at MGA?

15    A.  That is correct.

16    Q.  And during what period of time were you the general

17    counsel of MGA?

18    A.  From December of 2003 through November of 2007.

19    Q.  So that would be roughly three years, four years

20    approximately?

21    A.  Yes.

22    Q.  Okay.  There's a couple -- this is going to be real

23    quick.  There's just a couple of documents that we've put in

24    front of you there.  And I'll first ask you to take a look at

25    the document that's marked Exhibit 1932.

1           Do you see that?

2     A.   Yes.

3     Q.   In the lower right-hand corner.

4           And do you recognize this -- you see the Bates

5     number there at the bottom.  It says MGA, and then there's a

6     number?

7     A.   Yes.

8     Q.   All right.  And you recognize this as a document that

9     was prepared at MGA and produced by MGA during this case.

10    A.   It appears to have been produced by MGA.  And I don't

11    know that I recognize this specific document, but I have seen

12    it.

13    Q.   You know that that is something that was created at MGA?

14    A.   I believe that it was, yes.

15          MR. QUINN:  Your Honor, we offer Exhibit 1932.

16          THE COURT:  Any objection?

17          MR. ROTH:  No objection.

18          THE COURT:  It's admitted.

19          (Exhibit 1932 received.)

20          MR. QUINN:  Permission to publish.

21          THE COURT:  You may.

22    Q.   BY MR. QUINN:  If we do look at the first page of 1932.

23    This is actually a multi-page document with several columns

24    on it; correct?

25    A.   Not all the columns appear on the same pages, but yes,

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    that is correct.

2    Q.   Just to give the jury an idea, because I don't intend to

3    display every page, it's got -- there are columns on each of

4    the pages, and it's about eight pages in length; correct?

5    A.   Well, the first columns -- A, B, C, D -- are on the

6    first pages.  It appears to be seven pages in length.  And

7    then there's the E, F, and G on the last three or four pages.

8    Q.   Right.  It goes from page Nos. 1 through 8 in the

9    exhibit numbers.  I think you'll see that.

10   A.   Yes.

11   Q.   Okay.  We're looking at the first page now, and this is

12   a list -- the title at the top on the first page is Former

13   Mattel Employees, April 20, 2006.

14        Do you see that?

15   A.   Yes.

16   Q.   And there's a list there of active employees in the

17   first column.  Then an identification of their position at

18   MGA.  Then a list of their dates of employment at MGA --

19   correct? -- on the first page?

20   A.   Yes.

21   Q.   And then on column D, if we can pull that up, it lists

22   the Mattel dates of employment of each of those persons;

23   correct?

24   A.   That's correct.

25   Q.   So you understand that this document lists folks

1    employed by MGA, at least as of the time this document was

2    prepared, who were then employed by MGA.  I'm sorry.  Folks

3    previously employed by Mattel who were then employed by MGA

4    and what their positions were; correct?

5    A.   That's what the document appears to be.  I don't know

6    for a fact that they were all -- the people listed as active

7    employees were then all actually active.

8    Q.   Okay.  But it at least appears to be an effort to

9    identify those MGA employees who used to work at Mattel.

10   Would you agree with that?

11   A.   Yes.

12   Q.   And column C is MGA dates of employment, and column D is

13   Mattel dates of employment; correct?

14   A.   That's what the columns say, yes.

15   Q.   And --

16   A.   I can't speak to the accuracy of the information, but

17   that's what the columns state.

18   Q.   All right.  But this was a document which, as you've

19   indicated, you know was prepared at MGA; correct?

20   A.   Well, it was prepared in the context of this litigation,

21   for this litigation.

22   Q.   My question really is it is a document that you know was

23   prepared at MGA; correct?

24   A.   As far as I know, yes.

25   Q.   All right.  And if you turn to page 1932-4, you will see

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    Carter Bryant's name there; correct?

2    A.   Yes.

3    Q.   And in column -- under column C, MGA dates, it says

4    question mark, question mark, question mark, question mark to

5    present.

6         Do you see that?

7    A.   Yes.

8    Q.   And then for Mattel dates, it says don't ask; correct?

9    A.   That's what it says.

10   Q.   And then if you'd take a look at the other exhibit,

11   Exhibit 5561, which is before you there.  Now, you are

12   familiar with some people by the name of Peter and Veronica

13   Marlow?

14   A.   I'm not personally familiar with them, no.

15   Q.   You know who they are.

16   A.   I believe so, yes.

17   Q.   And while you were employed at MGA, you had some

18   involvement in connection with this case; correct?

19   A.   That is correct.

20   Q.   And you knew that they were witnesses or potential

21   witnesses in this case; correct?

22   A.   I don't know that I knew that Peter Marlow was a

23   potential witness.

24   Q.   He is now, I can --

25        THE COURT:  Wait a second.  Counsel, that's

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    testifying.

2            MR. ROTH:  Your Honor, counsel is moving quite

3    closely here to attorney-client privilege questions.

4            THE COURT:  Are you making an objection, Counsel?

5            MR. ROTH:  Attorney-client privilege.

6            THE COURT:  I want to strike the last question and

7    answer.  Let's take it from the top, Counsel.

8            MR. QUINN:  All right.

9    Q.  Let me just -- I think you indicated -- is it true that

10   you knew that Veronica Marlow was a witness or a potential

11   witness in this case?

12   A.  Well, anything I know about that comes from my role as

13   general counsel and my involvement in this litigation.  So I

14   have no personal knowledge of her knowledge about issues in

15   this litigation apart from my role as general counsel and

16   counsel involved in the conduct of this litigation.

17   Q.  So you are --

18   A.  So anything I could tell you would only result from what

19   I know in my role as counsel.

20   Q.  All right.  So whatever you know on the issue of whether

21   or not they are witnesses, that's information you would have

22   acquired acting as a lawyer.  That's what you're telling us.

23   A.  That is correct.

24   Q.  Okay.  You do know, though, that MGA agreed to provide

25   an attorney for Veronica Marlow; correct?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    A.  I don't believe that's correct.

2    Q.  Do you know whether -- you see this letter here?

3    A.  Yes.

4    Q.  MGA was previously represented by the law firm of

5    O'Melveny & Myers?

6    A.  That is correct.

7    Q.  And have you seen this letter before?

8    A.  I'm not copied on it, and I did not see it at the time

9    it was sent.

10   Q.  All right.

11   A.  So I see what it says, but --

12   Q.  All right.  But you've seen correspondence from the firm

13   of O'Melveny & Myers during this time period when O'Melveny

14   was representing MGA; correct?

15   A.  Only in my role as counsel for MGA, that is correct.

16   Q.  And does this appear to you to be a copy of a letter

17   from MGA's counsel to another lawyer?

18   A.  It appears to be a copy, yes.

19   Q.  Written by MGA's counsel during the time they were

20   representing MGA; correct?

21   A.  That is factually correct, yes.

22        MR. QUINN:  We'd offer this exhibit, your Honor,

23   Exhibit 5561.

24        THE COURT:  Counsel?

25        MR. ROTH:  Your Honor, objection.  Foundation.  No

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    connection with this witness.

2         THE COURT:  What's the foundational issue?

3         MR. ROTH:  The witness has not seen this document,

4    is not copied on it.

5         THE COURT:  I understand that.  But what's the

6    foundational concern?

7         MR. ROTH:  She has no knowledge regarding this

8    document.  Therefore, she has no basis upon which to sponsor

9    it.

10        THE COURT:  Anything else?

11        MR. ROTH:  No.

12        THE COURT:  Very well.

13        MR. QUINN:  She's indicated it appears to be a copy

14   of a letter from a counsel.

15        THE WITNESS:  Your Honor, I had said --

16        THE COURT:  Please.

17        THE WITNESS:  I'm sorry.  I had said I hadn't --

18        THE COURT:  Please.  Thank you.

19        Very well.  The document is admitted.  You may

20   publish.

21        (Exhibit 5561 received.)

22   Q.  BY MR. QUINN:  If we could just enlarge that.  This is a

23   letter from MGA's counsel to a lawyer at another law firm on

24   the subject of the representation of Veronica and Peter

25   Marlow.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1        Do you see that?

2    A.   I do see that, yes.

3    Q.   And it says this is to confirm that, because of her work

4    for MGA Entertainment, Inc., MGA has agreed to be responsible

5    for the fees and costs incurred in your representation of

6    Veronica Marlow, and for her husband, Peter Marlow, in

7    connection with the Mattel versus Bryant lawsuit.  You may

8    direct your invoices to, and then there's your name; correct?

9    A.   That's correct.

10   Q.   The date of this is March 18, 2005.  You were the

11   general counsel of MGA, that is, the top in-house lawyer at

12   MGA as of that date?

13   A.   Yes, I was.

14   Q.   And your job at that time included approving and

15   arranging for the retention of outside counsel to represent

16   people who were witnesses or might be witnesses in this case.

17   Isn't that true?

18        THE WITNESS:  Could I have the question read back,

19   please?

20        THE COURT:  Yes, you may.

21        (Record read.)

22        THE WITNESS:  In general terms, it was true.  But I

23   was not always aware of all of the facts.

24   Q.   BY MR. QUINN:  There were a lot of different lawyers who

25   were retained for a lot of different potential witnesses by

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     MGA; correct?

2     A.   I think that's overstating it.

3     Q.   Do you know how many different witnesses MGA hired

4     lawyers to represent?

5     A.   No, I do not.

6     Q.   Can you give us an estimate of how many?

7     A.   I really can't.

8     Q.   Was it more than 20?

9     A.   I don't believe so.

10    Q.   Was it more than 10?

11    A.   I really don't know.

12    Q.   Did you -- did MGA enter into something called a joint

13    defense, joint defense agreement with Veronica and Peter

14    Marlow?

15    A.   I honestly don't know.

16    Q.   Do you know what a joint defense agreement is?

17    A.   Yes, I believe so.

18    Q.   That's an agreement where two parties can have lawyers

19    that represent them and the lawyers can have privileged

20    communications between them that others can't ask about?

21         MR. ROTH:  Your Honor, counsel --

22    Q.   BY MR. QUINN:  Isn't that true?

23         MR. ROTH:  Counsel is testifying about the content

24    of what he understands --

25         THE COURT:  I'm going to sustain the objection.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    Q.  BY MR. QUINN:  What is your understanding of a joint

2    defense agreement?

3         MR. ROTH:  Your Honor, relevance.

4         THE COURT:  It's foundational.  Overruled.

5         THE WITNESS:  Is that the parties involved in a

6    joint defense agreement share certain issues in common as to

7    which their attorneys can have discussions which would be

8    deemed privileged.

9    Q.  BY MR. QUINN:  In other words, they are privileged and

10   cannot be inquired into.  That's your understanding; correct?

11   A.  That is correct.

12   Q.  So that if MGA had a joint defense agreement with

13   Veronica and Peter Marlow and had retained counsel to

14   represent Veronica and Peter Marlow, MGA's lawyers could talk

15   to the Marlows' lawyers and have discussions, and those

16   discussions could not be inquired into; correct?

17        MR. ROTH:  Your Honor, I'm going to object to any

18   questions of counsel with regard to whether or not a joint

19   defense existed here or was appropriate here.

20        THE COURT:  On what grounds, Counsel?

21        MR. ROTH:  Attorney-client privilege.

22        MR. QUINN:  Mere existence.

23        THE COURT:  Existence is permitted.  Overruled.

24   Q.  BY MR. QUINN:  Do you need the question again, ma'am?

25   A.  Yes, please.

1   Q.   So if there were a joint defense agreement between MGA

2   and the Marlows, that would mean that MGA's lawyers could

3   have these confidential privileged communications with the

4   lawyers that they hired for the Marlows, and those

5   communications could not be inquired into.  That's your

6   understanding; correct?

7   A.   Well, I think it's -- I'm having difficulty answering it

8   as a hypothetical because my understanding is we were not --

9   MGA at the time was not retaining counsel for the Marlows,

10   notwithstanding this document and that the Marlows' defense

11   was going to be paid for and undertaken by Carter Bryant, not

12   MGA.  So this is at odds with my understanding of what the

13   situation was.

14        THE COURT:  Further question is going to require

15   further foundation, Counsel.

16        MR. QUINN:  I understand, your Honor.

17   Q.   I will represent to you that there was testimony that a

18   joint defense privilege -- if it is in evidence, that a joint

19   defense privilege was asserted in Mr. Marlow's deposition.

20   Are you aware of that?

21   A.   No, I'm not.

22        MR. NOLAN:  Your Honor, I apologize.  I'm going to

23   object to that last question.  It's not a fair representation

24   of the testimony.

25        MR. QUINN:  I'm being double-teamed, your Honor.

1          THE COURT:  You are.

2          MR. QUINN:  She's very well represented by any one

3     of these fine lawyers.

4          THE COURT:  Mr. Roth?

5          MR. ROTH:  I understand that does not comport with

6     the facts.  I believe that --

7          THE COURT:  Let me see you at sidebar, Counsel.

8          (SIDEBAR CONFERENCE HELD.)

9          THE COURT:  Okay.  What's the deal on joint defense

10    agreement?

11         MR. QUINN:  It was asserted, and then in the

12    deposition it was asserted, joint defense privilege,

13    objection made, instructed not to answer.  Then later on in

14    the deposition, it was withdrawn.

15         MR. NOLAN:  Your Honor --

16         THE COURT:  Okay.  The fundamental problem, before

17    we even get to that, is this witness has no clue apparently

18    of the existence and the extent to which a joint defense

19    agreement -- that's what I was suggesting there was a

20    foundational issue here.  I don't think there's a basis to --

21         MR. QUINN:  Ask her any more about it?

22         THE COURT:  Right.

23         MR. QUINN:  Understood.

24         MR. NOLAN:  Your Honor, we'd ask that the question

25    be stricken.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1          MR. QUINN:  The question be stricken?

2          THE COURT:  What's going to be stricken is your

3    representation.  That's going to be disregarded.

4          MR. QUINN:  All right.

5          THE COURT:  We'll move along.

6          (CONCLUSION OF SIDEBAR CONFERENCE.)

7          THE COURT:  The jury will disregard the last

8    preamble to the question, and counsel may ask your next

9    question.

10          MR. QUINN:  I have no other questions at this time,

11   your Honor.

12          THE COURT:  Very well.  Then Mr. Roth may ask his

13   next question.

14                   CROSS-EXAMINATION

15   BY MR. ROTH:

16   Q.   Good afternoon, Ms. Gronich.  Very quickly.  I'd like

17   you to refer back to Exhibit 1932.  Do you have it there in

18   front of you?

19   A.   Yes, I do.

20   Q.   Good.  And I'm going to take you, again very quickly,

21   four pages back into the document that has the very small box

22   on it.

23          Do you see that?

24   A.   With the four columns?

25   Q.   Yes.  And that was the page that counsel referred you

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    to.

2         Do you recall that?

3    A.  Yes.

4    Q.  Okay.  And there are line numbers in the far left

5    starting at 121 going down to 128.

6         Do you see that?

7    A.  Yes, I do.

8    Q.  And there was reference to line 123 in the far

9    right-hand columns that "don't ask"; is that right?

10   A.  That is correct.

11   Q.  We can put that up.  And you'll see Bryant, comma,

12   Carter, far right-hand column, it says:  "Don't ask."

13        Do you see that?

14   A.  Yes, I do.

15   Q.  And then 126, Rhee, Anna, don't ask.  Do you see that?

16   A.  Yes.

17   Q.  Do you have an understanding as to why it says don't ask

18   in the far right-hand column next to Carter Bryant's name?

19   A.  Yes, I do.

20   Q.  What is that understanding?

21        MR. QUINN:  Excuse me.  Foundation.

22        THE COURT:  Sustained.

23   Q.  BY MR. ROTH:  Ms. Gronich, were you involved in the

24   preparation of what is before you, Exhibit 1932?

25   A.  Yes, as far as I know, yes.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    Q.   Can you explain to the Court what that involvement was?

2    A.   In the context of the litigation with Mattel, and as

3    parts of conducting discovery and preparing to review the

4    documents and records at the company, I asked that a list be

5    put together of people at MGA.  I'm trying to say this in a

6    way that doesn't reveal privileged information.  But a list

7    was created that listed then MGA employees that had

8    previously been employed by Mattel, and therefore, it listed

9    active employees and the page that I was asked about earlier

10   listed temps, and those particular people were part-time

11   employees.

12   Q.   Okay.  So you are familiar with the creation of this

13   document?

14   A.   Yes, I am.

15   Q.   Okay.  And given that understanding now, do you have an

16   understanding as to why it says don't ask opposite Carter

17   Bryant's name?

18   A.   Yes.  Because the people that were preparing this

19   document were told not to contact either Mr. Bryant or

20   Ms. Rhee because they were then represented by counsel.  And

21   we did not want to have any of our employees contacting them

22   directly.

23   Q.   Why is it important that individuals who are represented

24   by counsel not be contacted directly?

25   A.   Well, when parties are represented by counsel in

1    litigation, individuals at a party are not allowed to contact

2    witnesses or other parties who are represented by counsel

3    because that would be improper.

4    Q.   Okay.  Focusing specifically on Anna Rhee, did you know

5    whether Mattel was paying Anna Rhee's lawyers under a joint

6    defense agreement?

7         MR. QUINN:  Lacks any foundation.

8         THE COURT:  Sustained.

9    Q.  BY MR. ROTH:  Do you have an understanding one way or

10   the other as to the arrangements between Anna Rhee and her

11   counsel?

12        MR. QUINN:  Same objection.

13        THE COURT:  This is a foundational question.  It's

14   a yes or no question.

15        THE WITNESS:  Could you repeat it?

16   Q.  BY MR. ROTH:  Do you have an understanding one way or

17   the other as to the arrangements between Anna Rhee and her

18   counsel?

19   A.  No.

20        MR. ROTH:  No further questions.

21        THE COURT:  Mr. Quinn, anything further?

22   ///

23   ///

24             REDIRECT EXAMINATION

25   BY MR. QUINN:

1    Q.   You don't have any information at all, do you, that

2    there's any kind of a joint defense agreement between Mattel

3    and Anna Rhee, do you?

4    A.   I have no information, but that's separate and apart

5    from the fact that she was represented by counsel.

6    Q.   But you simply don't have any information at all in that

7    regard that there's any type of joint defense.

8    A.   I personally do not.

9    Q.   Has anybody asserted any types of claims, to your

10   knowledge, against Anna Rhee or suggested that Anna Rhee has

11   some liability so far as you know?

12   A.   I don't see the question being relevant to my answer,

13   and I'm sorry if I'm being a little obtuse.  Anna Rhee, at

14   this point in time, in April of '06, had been deposed, and

15   her counsel would not allow anybody from MGA to be present or

16   to communicate with her and had made that very clear.

17        As to who may or may not have been paying her fees,

18   I don't know, but we clearly were in a position and were told

19   not to contact her even before that.

20   Q.   My question related to a need for a joint defense.  My

21   question is do you have any information that anybody has ever

22   asserted any claims against Anna Rhee?

23   A.   I have no personal information.

24   Q.   Or that she has any personal liability at all.

25   A.   I'm not familiar with that.

1   Q.   Now, in answer to counsel's questions about

2   Exhibit 1932, you shared with us some information that you

3   know about the preparation of that document; correct?

4   A.   I'm not sure I shared information.  I said I was

5   familiar with the preparation of the document.

6   Q.   Well, you explained to us, you gave us -- you gave us

7   a -- an account of what don't ask means, didn't you?

8   A.   Yes.

9   Q.   Didn't you just do that?

10   A.   Yes.

11   Q.   All right.  And you learned -- I guess what you know

12   about that is information that was acquired while you were

13   acting as a lawyer for MGA; correct?

14   A.   I'm afraid I'm having difficulty answering it because

15   what I learned about this, I had a role in this document and

16   in the discovery and in the litigation.  So I'm having

17   difficulty answering your question without disclosing

18   privileged communications.

19   Q.   Well, you didn't have any problem answering MGA's

20   counsel's question and explaining what you learned in

21   creating that document in your role as a lawyer; right?  You

22   were the general counsel of MGA; right?

23   A.   That is correct.

24   Q.   And when I asked you earlier about whether Peter Marlow

25   and Veronica Marlow were witnesses or potential witnesses,

1    you told us you couldn't answer that question because even to

2    answer that question would invade the attorney-client

3    privilege.  Isn't that what you told us?

4    A.  I don't think that's entirely what I said, but

5    essentially yes.

6    Q.  So you have no trouble lifting the veil on the privilege

7    when you are asked questions by MGA's counsel.  It's only

8    when I asked you a question about whether somebody is a

9    potential witness, you decide you can't answer because you

10    were acting as an attorney.

11    A.  No, that's not entirely accurate because in this

12    particular case, I have personal knowledge.  And in the

13    other, I actually didn't.

14    Q.  You said it was privileged.  When I asked you, you said,

15    "Anything I know about whether Peter Marlow and Veronica

16    Marlow are witnesses or potential witnesses is privileged."

17    That's what your testimony was; correct?

18    A.  I have to stand by the answer I just gave.  I have

19    personal knowledge as to this.

20          MR. QUINN:  Nothing further.

21          MR. ROTH:  Nothing further, your Honor.

22          THE COURT:  Very well.  You are excused, ma'am.

23    Thank you.

24          We're back to MGA now.

25          MS. AGUIAR:  Well, actually, one might think.  But

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      we also are accommodating Mattel on another witness.

2            THE COURT:  Very well.

3            MS. AGUIAR:  Mitch Kamarck is another witness that

4      Mattel wanted.  So we're also agreeing to let them take him

5      now.

6            MR. QUINN:  I should say, your Honor, this was the

7      subject of agreement between both parties with the Court's

8      endorsement.

9            THE COURT:  Understand, yes, duly noted.

10           THE CLERK:  Good afternoon.  Please raise your

11     right hand.

12                  MITCHELL KAMARCK, SWORN.

13           THE CLERK:  Thank you, sir.  Please be seated.

14     Please state your full name for the record, and spell the

15     last name.

16           THE WITNESS:  Yes, it's Mitchell Kamarck,

17     K-A-M-A-R-C-K.

18           THE CLERK:  Thank you.

19           MR. QUINN:  Your Honor, may we approach to deliver

20     some volumes?

21           THE COURT:  Yes.

22           MS. AGUIAR:  Your Honor, can we do -- I'm sorry to

23     do this, but a quick sidebar?

24           THE COURT:  Yes.

25           (SIDEBAR CONFERENCE HELD.)

1      THE COURT:  Counsel?

2      MS. AGUIAR:  I -- Mr. Zeller and I have had ongoing

3  discussions regarding these document witnesses.  And he has

4  provided us a universe of documents that might be the subject

5  of questioning for each witness.  And so with regard to

6  Mr. Kamarck, we had extensive e-mail communications, a copy

7  of which I have here, and he identified when Mr. Kamarck was

8  first going to testify, which I think was a couple of weeks

9  ago, the documents that they would go over with him.

10      The exhibits are -- and they listed four exhibits.

11  When I then realized that one of them was 1932, which was

12  Ms. Gronich's, I said per my earlier e-mails, she's the

13  witness for that one.  And then recently, a couple of days

14  ago, I've confirmed or wrote to him to confirm that the

15  documents from Mr. Kamarck would be the ones that they

16  previously told, and they say the documents are among the

17  ones we've previously listed.

18      He was just handed a gigantic binder, and we've

19  been trying to work together on this to prepare witnesses

20  according to what they have told us.  We've had notice on

21  four documents, one of which is already in through

22  Ms. Gronich, and from the size of the binder they just handed

23  him, this does not comport.

24      MR. QUINN:  There will be no surprises, I promise.

25      THE COURT:  Someone's phone just went off.  I'm

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    going to have to make an announcement on the electronic

2    devices.  I've tried not to instill the rule that district

3    judges have.  I know it's a tremendous inconvenience to the

4    parties.  At the same time, we've got to put these things on

5    vibrate mode, because it's getting annoying.

6          In any event, Mr. Zeller?

7          MR. ZELLER:  What I would say is this.  First of

8    all, the earlier e-mail that's being referenced are not those

9    four exhibits.  It was an earlier e-mail which in fact had

10   many exhibits set forth.  It was one sent by Tammy Gih.  I

11   don't have that e-mail with me; however, she had in the prior

12   days sent a rather extensive list of exhibits that were still

13   up in the air that we were seeking to get into evidence one

14   way or another, whether it was through Mr. Kamarck,

15   Ms. Gronich, whether the Custodian of Records and so on.

16         So there is, yes, it refers to my earlier e-mail,

17   but then there's also a chain that refers to Tammy Gih's

18   earlier e-mails, whether it's part of this chain or a

19   different chain, that I cannot say because we're sandbagged

20   by this.

21         I will also say, your Honor, that we have

22   repeatedly objected with Mr. Eckert in particular to --

23         THE COURT:  I know you have.

24         MR. ZELLER:  About documents --

25         THE COURT:  That you received as of last night.

1         MR. ZELLER:  That were not produced in discovery in

2    the case.

3         THE COURT:  And I've overruled the objections.

4         MR. ZELLER:  And these were identified previously

5    as trial exhibits.  What we were trying to do as a courtesy

6    that's being turned against us, I think under those

7    circumstances is particularly unfair, but those documents

8    that are part of this binder have been trial exhibits for

9    some period of time.  They were produced in discovery and

10   were MGA documents.

11        THE COURT:  It's her turn.

12        MR. QUINN:  I was just trying to be helpful.  I

13   thought I could say something.  Every once in a while --

14        MS. AGUIAR:  If I want to say something helpful,

15   why don't you go ahead.

16        MR. QUINN:  I'm confident there will be no

17   surprises, this will be really short, and you'll see this was

18   a waste of trees to put this binder together.  And if it's

19   not, I'll buy you dinner.

20        MS. AGUIAR:  I'm not trying to misrepresent

21   anything.  So that's why I brought the e-mail chain.  I just

22   try to prepare the witnesses so that when they get up, that

23   they will be able to testify.  The reason I asked for these

24   is that this witness would be able to testify and not say

25   well, I'm --

1    THE COURT:  Why don't we trust Mr. Quinn's

2    representation.  I do see your list here.  I also understand

3    that -- I mean, I have overruled a number of objections to

4    apparently exhibits that have come up at the last minute.

5    MS. AGUIAR:  Absolutely, and I'm not complaining

6    that these exhibits have not been produced.  I'm just saying

7    we're trying to prepare witnesses for, you know --

8    THE COURT:  I appreciate that.  And if this becomes

9    an issue during -- I'll accept Mr. Quinn's representation.

10   If this becomes an issue, we'll revisit this.

11   (CONCLUSION OF SIDEBAR CONFERENCE.)

12   THE COURT:  I see we have six exhibits in the

13   binder.  Is that correct?

14   MR. QUINN:  I don't have the same binder.

15   THE COURT:  Very well.  Let's proceed.

16            DIRECT EXAMINATION

17   BY MR. QUINN:

18   Q.  Good afternoon, Mr. Kamarck.

19   A.  Good afternoon.

20   Q.  My name is John Quinn.  I represent Mattel.  We just had

21   a lady on the stand, Daphne Gronich, who was a general

22   counsel at one point of MGA, and you were a general counsel

23   of MGA at one point, as I understand it; is that correct?

24   A.  That's correct.

25   Q.  And Ms. Gronich was after you, or you were before her?

1    A.   Yeah, I mean there was an overlap, but yes.

2    Q.   Okay.  And when you were general counsel, you were the

3    top legal officer in house at MGA?

4    A.   When I was general counsel, I was top legal officer.

5    Q.   And you were in charge, when you were general counsel,

6    of MGA's legal affairs?

7    A.   When I was general counsel.

8    Q.   And one of the kinds of legal affairs that MGA had was

9    various kinds of litigation relating to intellectual

10   property, knockoffs, piracy, things like that?

11   A.   Correct.

12   Q.   Including litigation over in Hong Kong?

13   A.   Correct.

14   Q.   That you had some oversight responsibility for?

15   A.   Um, when I was general counsel.

16        MR. QUINN:  At this point, your Honor, I would like

17   to read from a Request for Admission.  It's a Request for

18   Admission 79.  And it's been marked as Exhibit 10277.  And

19   the particular request for admission No. 79 appears on

20   10277-101.

21        THE WITNESS:  May I look at it, or do you want me

22   to wait?

23        MR. QUINN:  Of course.

24        THE COURT:  Any objection?

25        MS. AGUIAR:  No objection, your Honor.

1          THE COURT:  Very well.  You may read the request,

2     Counsel.

3          MR. QUINN:  "Request for Admission 79.  Admit that

4     the document attached hereto as Exhibit 2 is an authentic and

5     genuine copy of a statement of claim you" -- meaning MGA --

6     "filed on or about October 16th, 2003."

7          And the answer to that request for admission is

8     Admit.

9     Q.  Do you see that, sir?

10    A.  I do see that.

11    Q.  And --

12         THE COURT:  And just for the jury's reference, the

13    jury may treat answers to requests for admissions as -- treat

14    that as evidence in this case.

15         MR. QUINN:  And the referenced statement of claim,

16    your Honor, appears at Exhibit 10234-39 through 53.  And we

17    would offer that in evidence, your Honor.

18         THE COURT:  Any objection?

19         MS. AGUIAR:  Your Honor, is Mr. Quinn wanting to

20    admit just that portion of 10234?

21         MR. QUINN:  Yes, 10234-39 through -53.

22         MS. AGUIAR:  No objection.

23         THE COURT:  Very well.  It's admitted.  You may

24    publish.

25         (Exhibit 10234-39 through -53 received.)

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)   7/2/2008  12:00:00

1    Q.   BY MR. QUINN:  And if we could put that up on the

2    screen, and perhaps just enlarge the caption at the top.

3    This is a -- in relates to a case in Hong Kong that MGA

4    Entertainment brought against Uni-Fortune Industrial Limited

5    and Fu Wei Toys Company Limited?

6         Do you see that, sir?

7    A.   Yes, I do.

8    Q.   And this is one of these anti-piracy cases, these

9    intellectual property cases?

10   A.   That would be my guess.

11   Q.   And if you'd take a look at -- and this relates to

12   Bratz, doesn't it?  I think you can see on the statement of

13   claim there on page --

14   A.   I see the Bratz.  I'm sorry.  I see the Bratz reference.

15   Q.   So in other words, MGA is bringing a case against

16   somebody who they think is knocking off Bratz in Hong Kong;

17   correct?

18   A.   That appears to be what this document says.

19   Q.   And what is alleged here, what MGA alleges on page

20   10234-42, if we could go to that page.  And blow up that

21   subparagraph G at the bottom, what it says there is -- what

22   MGA says in its statement of claim, which that's like a

23   complaint over there.  That's something you file to start a

24   case?

25   A.   I assume so.

1    Q.   It says:  Carter Bryant hereinafter referred to as

2    Mr. Bryant, was commissioned by the plaintiff to make the

3    design drawings referred to in subparagraphs A and E hereof.

4    At all material times, it was the understanding and agreement

5    between the plaintiff and Mr. Bryant that copyright

6    subsisting in the artistic works should vest in plaintiff.

7    Pursuant thereto, a confirmatory assignment was made between

8    the plaintiff and Mr. Bryant in September of 2000."

9         Do you see that?

10   A.   I do see that.

11   Q.   And it refers to here subparagraphs A above, the design

12   drawings in subparagraphs A through E above.

13        Do you see that?

14   A.   Yes.

15   Q.   And if we could go up to A on the previous page, 0041.

16   We can see what's referred to there.  A refers to 18 design

17   drawings of various Bratz fashion dolls made between the

18   years 1998 and 2000.

19        Do you see that?

20   A.   I do see that reference.

21        MR. QUINN:  And now I'd like to read Request for

22   Admission 83, your Honor.  And the response, which appears at

23   Exhibit 10277-103 to 104.

24        THE COURT:  Any objection?

25        MS. AGUIAR:  No objection, your Honor.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1          THE COURT:  You may proceed.

2          MR. QUINN:  "Request for Admission 83.  Admit that

3     the set of 18 Bratz design drawings referenced in paragraph

4     3-A in the document attached hereto to as Exhibit 2 includes

5     at least one of the Bratz pitch materials."

6          That's a defined term.  The Bratz pitch materials

7     means each and every Bratz work which was displayed, shown,

8     provided, or offered to you on or before the date on which

9     you executed the Bryant MGA agreement.

10          So going back to Request for Admission 83, admit

11     that the set of 18 Bratz design drawings referenced in

12     paragraph 3-A in the document attached hereto to as Exhibit 2

13     includes at least one of the Bratz pitch materials.

14          The response is:  "Subject to and without waiving

15     the foregoing objections, MGA responds, MGA admits that the

16     18 design drawings referenced in Exhibit 2 include the

17     designs drawn by Mr. Bryant and shown to MGA at pitch

18     meetings, though these 18 design drawings also may contain

19     handwritten notations made at some point after Mr. Bryant's

20     pitch meetings with MGA."

21          Do you see that, sir.

22     A.  I do.

23     Q.  Okay.  So if we can go back to that statement of claims,

24     page 10234-42, what MGA is saying in this paragraph here --

25     let me just back up for a second.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1          Now, as a lawyer having responsibility for

2    supervising litigation in Hong Kong and elsewhere, you know

3    that what is said in one of these statements of claims that's

4    filed with the court, that that's important.

5    A.  I do.

6    Q.   And it's important that what you say is accurate;

7    correct?

8    A.   Correct.

9    Q.   And MGA is filing this case because it's trying to get

10   the court to do something essentially; correct?

11   A.   I believe so.

12   Q.   And in order to get the court to act and to do

13   something, MGA presents this statement of claim and files it

14   with the court; correct?

15   A.   I believe that's how it works in Hong Kong.

16   Q.   Representing what the facts are.  Or representing to the

17   court what the facts are that are the basis for its claim;

18   correct?

19   A.   That's my understanding of Hong Kong.

20   Q.   All right.  And in this case in Hong Kong, what MGA

21   represented, when it was trying to get the court to act, was

22   that these original Bratz pitch materials were commissioned,

23   that Carter Bryant was commissioned to create these original

24   Bratz pitch materials; correct?

25          MS. AGUIAR:  Objection.  Foundation and

1    mischaracterizing the document.

2         THE COURT:  I'll sustain the foundation.

3    Q.   BY MR. QUINN:  Sir, this is one of the cases you had

4    responsibility for supervising?

5    A.   No.

6    Q.   Were you familiar with this case?

7    A.   Generally familiar that there was cases being handled

8    out of Hong Kong.  This case, as I looked at it, doesn't ring

9    a bell with me.

10   Q.   You might have had some responsibility for it.  You

11   might not.  As you sit here now, you just don't recall?

12   A.   No, I believe another person probably was handling this.

13   Q.   Somebody who worked for you?

14   A.   Yes.

15   Q.   One of the other lawyers in the department?

16   A.   It would have been, yes.

17   Q.   Who reported to you?

18   A.   Who reported to me.

19   Q.   All right.  Well, that person who reported to you -- and

20   by the way, you'd hire obviously a lawyer in Hong Kong to

21   prosecute this case for you; correct?

22   A.   William Fan had been hired prior to me starting to

23   prosecute the matters in Hong Kong.  He wasn't my choice.

24   But yes.

25   Q.   Fan is the name of the barristers or foreign or however

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     they call them in Hong Kong who was representing this matter?

2     A.   Correct.

3     Q.   And when he needed information about the history of the

4     Bratz and the Bratz drawings in order to make representations

5     to a court, he would have to go to MGA to get that

6     information; correct?

7     A.   Well, he had done matters before I started on the Bratz

8     dolls.  So I'm not sure where he got the information from,

9     but I assume it would be from MGA.

10    Q.   From MGA.  It makes sense.  He had never worked at MGA's

11    offices in Van Nuys.

12    A.   Not that I'm aware of.

13    Q.   Right.  So the information that he got that he put in

14    this statement of claim which became a representation to the

15    Court when MGA was trying to get the Court to do something

16    for it, that's information ultimately he would have gotten

17    from MGA; correct?

18    A.   I would assume so, yes.

19    Q.   And in this case, the information that he got from MGA

20    and that he put in the statement of claim was that these

21    original design drawings, which were part of the Bratz pitch

22    materials were commissioned by MGA; correct?

23    A.   I'm sorry.  What is the question?

24    Q.   The information that he got and that he put in the

25    statement of claim was that the original Bratz -- these

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      drawings back at the Bratz pitch materials were commissioned

2      by MGA; correct?

3      A.   I honestly don't have a basis for saying where he got

4      that information from.

5      Q.   That's what he said.

6      A.   I'm sorry?

7      Q.   That's what he represented.

8      A.   Mr. Fan said he received this information from MGA?

9      Q.   No.  The representation he made was that these drawings

10     were commissioned by MGA.

11     A.   Yes.

12     Q.   And he said that acting as the attorney for MGA, saying

13     that on behalf of MGA; correct?

14     A.   Yeah, represented MGA, and this is his writing.

15     Q.   And he said that this agreement that MGA entered into

16     with Mr. Bryant in September of 2000 was merely confirmatory.

17     That's the word he used?

18     A.   That's the word he used.

19          MR. QUINN:  Nothing further.

20          THE COURT:  Cross-examination.

21          MS. AGUIAR:  I have no questions, your Honor.

22          THE COURT:  Very well.  Let's take our afternoon

23     break.

24          (Recess taken.)

25          THE COURT:  Counsel?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1          MR. NOLAN:  Thank you, your Honor.

2          MR. NOLAN:  I believe that that last interruption

3    of witnesses is the last of the reserved group of witnesses

4    that Mattel listed.

5          THE COURT:  Very well.

6          Is that true, Mr. Quinn?

7          MR. QUINN:  I believe so.

8          THE COURT:  So now you are formally resting?

9          MR. QUINN:  Yes.

10          MR. NOLAN:  In that regard, your Honor, can we take

11    one minute at sidebar?

12          THE COURT:  I understand what that's for, and I'll

13    give you leave to raise that at the end of the day.

14          MR. NOLAN:  All right.  MGA will call as its next

15    witness Margaret Leahy.

16          THE CLERK:  Good afternoon.  Would you please take

17    the witness stand, ma'am.

18          Thank you.  Please raise your right hand.

19               MARGARET ANN LEAHY, SWORN.

20          THE CLERK:  Thank you.  Please state your full name

21    for the record, and spell the last name.

22          THE WITNESS:  Margaret Ann Leahy, L-E-A-H-Y.

23          THE CLERK:  Thank you.

24               DIRECT EXAMINATION

25    BY MR. NOLAN:

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    Q.   Good afternoon, Mrs. Leahy.

2         It would help, during the course of the day, if you

3    would adjust the microphone.  Thanks.

4         Mrs. Leahy, I was wondering if you could tell us

5    how you are currently employed?

6    A.   I work for the Disney Stores.

7    Q.   What do you do for the Disney Stores?

8    A.   I'm a sculptor.

9    Q.   We've heard a lot about sculptors.  I think you're the

10   first we've met.  Can you tell us what a sculptor does?

11   A.   I make the very first prototype for the toys.  And then

12   they ship it to Asia and mass produce it.  So usually we

13   start in a clay or a wax and proceed to -- eventually, we end

14   up with the toy and send it for tooling in Asia.

15   Q.   When you say that you do the first prototype of toys, is

16   there a certain type of toy that you sculpt?

17   A.   I sculpt mainly girls' toys.  That's been my strength

18   over the past 13 years.

19   Q.   Let's go back and just set your background.

20        Where did you attend college?

21   A.   I went to Virginia Commonwealth University.

22   Q.   And when did you graduate?

23   A.   I graduated in 1988.

24   Q.   And what, if anything, did you do next?

25   A.   Next I moved to California from Virginia, I worked at a

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    frame store, and then I got a job at the natural history

2    museum making permanent exhibits.

3    Q.   And tell us about any training that you've had with

4    respect to sculpting and art generally.

5    A.   I have a Bachelor's of Fine Arts degree in sculpting

6    with painting and print-making minor, as well as art history.

7    All of my jobs after college have been some kind of

8    sculpting, whether it's very, very big sculptures or very,

9    very tiny sculptures.

10   Q.   And is that what your degree was in?

11   A.   Sculpting, yeah, it's a Fine Arts degree.

12   Q.   Did there come a time when you went to work for Mattel?

13   A.   I started in '94, I think, or early '95.

14   Q.   And what was your level entry position at Mattel?

15   A.   I think the title was just sculptor.

16   Q.   Did you have a job before going to Mattel, or was Mattel

17   your first job?

18   A.   I worked in the set business.  So we moved from job to

19   job.  Once the job was finished, we'd have to go look for new

20   work.

21   Q.   Now, how long did you work for Mattel?

22   A.   Five or six years.

23   Q.   Was that work for an uninterrupted period of time?

24   A.   Yes.

25   Q.   So that would have been from approximately 1994 through

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1      1999, 2000?

2      A.   Correct, 2000.

3      Q.   When did you leave Mattel employment?

4      A.   I left Mattel in mid-September of 2000.

5      Q.   At the time that you left Mattel, that is, mid-September

6      of 2000, what was your position at Mattel?

7      A.   I was a manager.

8      Q.   Of what particular department?

9      A.   Of the Disney group.

10     Q.   And what was the Disney group?

11     A.   The Disney group was the group Mattel devoted to

12     specifically developing all of their Disney dolls as well as

13     any Disney property.  It went through one group.

14     Q.   During the approximate six years that you've worked at

15     Mattel, were you always doing sculpting?

16     A.   Sculpting and managing.

17     Q.   Were you always assigned to the Disney group during

18     those six years?

19     A.   No.  Sometimes I would do other work for other groups.

20     When I started, I did work for Nickelodeon.  It was mainly

21     the licensed groups.  I did a little bit of work for Barbie,

22     but not much.

23     Q.   Are you married?

24     A.   Yes.

25     Q.   And who is your husband?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    A.   My husband is Dan Leahy.

2    Q.   And where does Mr. Leahy work?

3    A.   He works at Mattel as well.

4    Q.   Does he currently work at Mattel?

5    A.   Yes, he does.

6    Q.   In what department does Mr. Leahy work?

7    A.   He works in the sound department.

8    Q.   What does he do at Mattel?

9    A.   He's the manager of the sound department.  I don't know

10   exactly what he does.  We don't talk about it too much.  Two

11   kids.  We don't finish a lot of sentences.

12   Q.   Let's round out your family.  Do you have children?

13   A.   Yes.

14   Q.   And what are their ages?

15   A.   Ages four and eight.

16   Q.   How long has your husband been working at Mattel?

17   A.   Maybe seven or eight years.  He started right about when

18   I left.

19   Q.   To your knowledge, when you left Mattel in mid-September

20   of 2000, did you leave on good terms with Mattel?

21   A.   Yes.

22   Q.   And since leaving Mattel in mid-September of 2000, have

23   you done any work for Mattel?

24   A.   I did a handful of work for Mattel, maybe two or three

25   jobs.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    Q.   After leaving Mattel in mid-September of 2000, did you

2    stay at home, or did you establish a business?

3    A.   Well, I worked from home as a sole proprietor.  And then

4    I eventually incorporated.

5    Q.   When you say sole proprietor, did you have your own

6    business?

7    A.   I had my own business name, fictitious business name.

8    Q.   What was that name?

9    A.   Then was Leahy 3-D Design.

10   Q.   When you were employed at Mattel, did you sign an

11   inventions agreement, confidentiality agreement?

12   A.   I remember signing an agreement.

13   Q.   And was that when you first started working at Mattel?

14   A.   You start as a temp there.  So I don't know if I signed

15   it when I started as a temp or when I started on full time.

16   Q.   When you resigned from Mattel in mid-September of 2000,

17   did you have an understanding, one way or the other, as to

18   whether you could do free-lance work for Mattel immediately?

19   A.   Can you repeat the question?

20   Q.   Sure.  Do you have a date certain in your mind as to

21   when you resigned from Mattel in 2000?

22   A.   I know I gave two weeks' notice.  So it would have been

23   early September.

24   Q.   Are you aware of a policy at Mattel that after you

25   resign, you're not allowed to do free-lance work for Mattel

1    for a particular period of time?

2    A.  Oh, so after you quit.

3    Q.   After you quit.

4    A.  Yeah, I was aware of that policy.  It changed all the

5    time, the amount of time.  And it wasn't always honored, I

6    guess.  People would do work right away.  Some people

7    wouldn't do work right away.

8    Q.   Did you do work for Mattel right away after leaving in

9    September of 2000?

10    A.  No, I didn't.

11    Q.   I want to concentrate a little bit more during the six

12    years you were working at Mattel.

13           Did you ever, while you were employed at Mattel, do

14    work on the side?

15           MR. PRICE:  Objection, your Honor.  If we could

16    have a sidebar on this.

17           THE COURT:  You may.

18           (SIDEBAR CONFERENCE HELD.)

19           THE COURT:  Yes, Mr. Price.

20           MR. PRICE:  This is one of those apples to apples

21    issues.  Ms. Leahy testified in her deposition that she knew

22    her agreement prevented her from working but that her

23    supervisor told her that it was okay for her to do so because

24    she needed the money.  So therefore, because her supervisor

25    said it was okay, even though her agreement said it wasn't,

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1       she thought it was okay, and she did.

2              It has no relevance to this case.

3              MR. NOLAN:  Your Honor, I would represent that I

4       believe her testimony will be that although she asked her

5       supervisor with respect to one or I don't know how many jobs,

6       but she did do moonlighting side jobs without the permission

7       of Mattel and that the practice was well known, and she will

8       identify people that were doing it.

9              MR. PRICE:  Well, two things.  One, that would be

10      surprising because at her deposition she couldn't give a

11      single name when asked about moonlighting, but two, it's

12      irrelevant as to Carter Bryant's understanding of his

13      obligations.  The only reason we were able to get to his

14      understanding was for his understanding of his agreement.

15      This is a side show because we're going to have to be

16      bringing in witnesses now from her department saying no, this

17      wasn't --

18             THE COURT:  Well, I've already tried to set

19      parameters on this.  You raised the apples to apples.  If

20      there are other employees at Mattel who did what you allege

21      Carter Bryant worked on and there was acquiescence by Mattel

22      in doing so, that may be evidence of a practice, a custom

23      that might be relevant to determining whether or not a duty

24      of loyalty was in fact -- or whether a contract was breached.

25             MR. PRICE:  I think actually, your Honor, the

1   position was that if they got permission from Mattel, that

2   doesn't mean that there's a wholesale -- everybody can do

3   this.  Her testimony, and I'll show it to you in the

4   deposition, is her supervisor is the one who told her to do

5   it.

6          THE COURT:  Right.  And if that's the case, and

7   there's nothing more than that, then I agree with you.  It's

8   a different case, but what Mr. Nolan is suggesting is that

9   that's not the case, that there was other work that she did.

10  I do agree we're not going to start bringing that through

11  hearsay what other people did.  But in terms of what she

12  actually did, if she understood her agreement to permit her

13  to do this work without authorization, that argue -- that's

14  the apple to apple comparison.

15         MR. PRICE:  I think we need a proffer because it's

16  inconsistent with the deposition testimony.

17         THE COURT:  Then you can cross-examine her.

18         MR. PRICE:  But what if -- if Mr. Nolan is wrong,

19  then it's going to get in front of the jury, and we're going

20  to have to move to strike.  Does he have a good faith basis

21  that she's going to say I'm telling you at her deposition she

22  said her supervisor said it's okay for you to do outside

23  work.

24         THE COURT:  You're saying that that's not the case?

25         MR. NOLAN:  Yes, that's my understanding.  But your

1    Honor, let me just do it this way, and I'll be fair about it.

2    I'll ask her, as I did, did she ever do work outside.  Did

3    you ever do such work without the knowledge or permission of

4    your supervisor.

5          THE COURT:  Let's do this.

6          Ms. Leahy, would you come around over here?  We

7    need to ask you a question outside the presence of the jury.

8          All right.  I'm first going to allow Mr. Nolan to

9    ask you, and then Mr. Price can ask you questions.  You're

10   still under oath.  We just can't let the jury hear this yet.

11         THE WITNESS:  Okay.

12   Q.   BY MR. QUINN:  During the period of time that you were

13   employed at Mattel, did you do side projects outside of

14   Mattel?

15   A.   Yes, I did.

16   Q.   For which you were paid?

17   A.   Correct.

18   Q.   On approximately how many occasions did you do such

19   projects?

20   A.   Maybe about seven or eight.

21   Q.   Did you, in connection with those seven or eight

22   projects, always have the permission of your supervisor at

23   Mattel?

24   A.   I didn't necessarily have the permission of him.  But he

25   told me how to do it.  There was a time when my husband

1    wasn't working, and we didn't have a lot of money.  And he

2    said well, he felt badly for me.  So he said here's a way you

3    can make extra money.

4    Q.   And did that apply for each of the jobs that you did?

5    A.   No, it didn't.  I didn't tell him about any of the jobs

6    that I was doing at the time.  He just told me how to do it.

7    Q.   Did you ask him for written permission to do these

8    outside jobs?

9    A.   No, I did not.

10   Q.   My understanding is that your supervisor was Michael

11   Hebden?

12   A.   Yes.

13   Q.   And my understanding is you told him about your

14   financial situation?

15   A.   Well, we were very close.  He knew about it.

16   Q.   And he was your supervisor?

17   A.   Yes.

18   Q.   And he said that one way you can make money is to

19   contact vendors, other vendors for extra work; right?

20   A.   That's what he told me, yes.

21   Q.   And he didn't tell you a specific vendor to contact?

22   A.   No, he didn't tell me a specific vendor.  He said check

23   with the vendors you are working with and see if they have

24   any extra runoff work.

25   Q.   He said as far as he was concerned, that's okay if you

1    did that?

2    A.   Well, I don't know if he said that verbatim.

3    Q.   He's the one who said here's what you should do.

4    Contact these vendors and get some extra work.

5    A.   Correct.

6    Q.   And your understanding was that your written employment

7    agreement, under that agreement, that would have been

8    prohibited?

9    A.   I knew it was considered a conflict of interest in the

10   employment agreement.  But it was a very common thing for

11   people to do in the toy business as well as Mattel.

12   Q.   But your supervisor is the one who suggested that you do

13   it to help make ends meet; correct?

14   A.   He said this is a way you can do it.  He didn't --

15   Q.   Right.  And you didn't feel it was necessary to tell him

16   you were doing what he said to do.

17   A.   Yeah, I didn't want to tell him.

18        THE COURT:  Let me ask and try to cut to the chase.

19        Did you understand -- you mentioned a conflict of

20   interest.  Did you understand what you were doing, the

21   moonlighting, the working for the other vendors, to be in

22   conflict with your agreement with Mattel?

23        THE WITNESS:  I knew I could lose my job over it,

24   but it was such a common thing, that everybody did it, and at

25   that point I was going to lose my car.

1          THE COURT:  Again, I'm not asking for whatever

2     rationalization you may have imposed on it.  And I'm not

3     trying to make a moral judgment here.  Just in terms of your

4     understanding with your contract with Mattel, did you or did

5     you not believe that your contract authorized you to do that?

6          THE WITNESS:  I didn't believe that my contract

7     authorized me to do that.

8          THE COURT:  Thank you, ma'am.  You may return to

9     the witness stand.

10         (Whereupon the witness withdraws.)

11         THE COURT:  To me, that's the issue.  It's not what

12    was going on or what wasn't going on.  It's whether or not --

13    and I think to the extent that there are people, and I have

14    allowed both sides to get into asking questions about

15    understandings of the contract.  And I'll certainly allow you

16    to do that with this witness.  I've allowed that on both

17    sides by any number of Mattel, and even MGA employees.

18    Although I'm still pressed with, I'm not so sure about the

19    relevance with the MGA employees.

20         But in any event, both sides have done that.  But I

21    think to get now into evidence of moonlighting where it's

22    acknowledged that it's in conflict with the contract, not

23    withstanding that it may be common, I think it gets outside

24    the field.

25         MR. NOLAN:  Your Honor, I'm not going to argue the

1    point at this time.  If there's a 1-B case --

2         THE COURT:  That's going to be different.  We will

3    revisit the issue in 1-B.

4         MR. NOLAN:  And she will clearly be a 1-B witness

5    as well if we get there, and that's probably a better place.

6    So I would just ask the Court --

7         THE COURT:  I can see this going to the issue of

8    damages.  We're -- absolutely.  So for 1-A purposes, we're

9    just focusing on the breach of contract.  I think based on

10   the answer to the Court's question, I'm going do sustain the

11   objection.

12        MR. NOLAN:  Okay.  Thank you.

13        (CONCLUSION OF SIDEBAR CONFERENCE.)

14        MR. NOLAN:  May I proceed, your Honor?

15        THE COURT:  You may.  Thank you, Counsel.

16   Q.   BY MR. NOLAN:  Do you know -- had you heard of MGA

17   prior to your resignation from Mattel in mid-2000?  In

18   mid-September of 2000?

19   A.   No, I never heard of them.

20   Q.   Did you know a woman by the name of Paula Treantafelles

21   Garcia before you resigned from Mattel in September of 2000?

22   A.   No, I didn't know Paula then.

23   Q.   Did you know an individual by the name of Carter Bryant

24   prior to resigning from Mattel in mid-September of 2000?

25   A.   I knew who he was.  And we had met on one -- briefly

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     right before he left on a project he was working on at

2     Mattel.

3     Q.   And how did you know who Carter Bryant was?

4     A.   Well, the way it worked there is we have the sculpting

5     department.

6     Q.   You're talking about at Mattel?

7     A.   At Mattel.  And when a designer had a project to do,

8     he'd bring it to the sculpting department.  And as the

9     manager, I would put all of that together.  Say okay, what do

10    you have to do?  And this sculptor, you know, this is Carter,

11    would go off and do what he wants you to do.

12    Q.   And was there a time while you were at Mattel and

13    manager of the sculpting department that Carter Bryant

14    brought in a project to have sculpted at Mattel?

15    A.   It was a project called Spring Fawn, F-A-W-N, or

16    something like that.  And he just needed like a little fawn

17    sculpted for his doll.  It wasn't a big job.

18    Q.   Did you personally do that sculpt for him?

19    A.   No, I didn't.

20    Q.   Did you know Carter Bryant socially while you were

21    working at Mattel?

22    A.   No, I didn't.

23    Q.   In fact, could you estimate for us the amount of time

24    that you had actually spent talking to Carter Bryant prior to

25    your resignation in mid-September of 2000?

1   A.   Well, it was only that one meeting, and it was probably

2   about 10 minutes at the most.

3   Q.   Did you have an intent, when you resigned from Mattel,

4   with respect to whether or not you'd go into the free-lance

5   business?

6   A.   Well, it was a tough decision to leave Mattel because it

7   was a good salary job.  But we had just adopted our daughter.

8   And I didn't want to drive that far and be gone for 12 hours

9   a day.  So I made the decision to go free-lance.

10   Q.   Before leaving Mattel, did you tell people at Mattel of

11   your intent to free-lance in sculpting?

12   A.   I don't remember if I told anybody I was going to

13   free-lance.

14   Q.   At some point in time, did you receive a phone call from

15   Carter Bryant?

16   A.   I did after I was -- after I left Mattel.

17   Q.   And do you recall where you were when you received that

18   phone call?

19   A.   I was in my studio, my previous house, which was in the

20   garage.

21   Q.   And can you give the jury the best estimate of when you

22   received a phone call from Carter Bryant?

23   A.   It was in mid-September after I left.  Somewhere around

24   there.

25   Q.   And can you recount for us what Carter Bryant said to

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    you during the phone call?

2    A.  He said he had a project to sculpt, and I asked who it

3    was for.  And he said MGA Entertainment, and they were in

4    North Hills at the time.

5    Q.   Now, prior to this phone call with Carter Bryant, had

6    you heard of MGA Entertainment before?

7    A.  No, I had never heard of them.

8    Q.   How long did this phone call take place with Carter?

9    A.  It was maybe five minutes.

10   Q.   Did you ask Mr. Bryant how he obtained your telephone

11   number?

12   A.  I didn't ask how he got my number.

13   Q.   In any event, sometime after that phone call, did you

14   have an occasion to meet with Mr. Bryant?

15   A.  Yeah, he came over to my house and brought some drawings

16   over.

17   Q.   Do you recall the date of the first meeting with Carter

18   Bryant?

19   A.  I don't know the exact date.

20   Q.   Can you estimate how many days after your phone call

21   with Carter Bryant did you meet with him?

22   A.  It was probably -- maybe a week, week and a half.

23   Q.   And where did this meeting take place?

24   A.  It was at my house.

25   Q.   To the best of your recollection, was anybody else

1   present other than you and Mr. Bryant?

2   A.   Just my new daughter.

3   Q.   And can you recount for us, first of all, how long did

4   that meeting take place at your house?

5   A.   Maybe 20 minutes.

6   Q.   Now, during that meeting did Mr. Bryant show you

7   anything?

8   A.   He showed me a binder with his drawings in it.

9   Q.   When you say a binder of his drawings, was there

10   anything else that he showed you other than a binder?

11   A.   He had a Steve Madden ad that he had taken out of a

12   magazine.

13   Q.   What did Mr. Bryant ask you to do at that meeting, if

14   anything?

15   A.   Well, he came over, showed me his concept and showed me

16   the Steve Madden ad, and said this is the basic trend we're

17   going for, and he asked me to just come up with a model of

18   what I thought it would be.

19   Q.   Focusing for a moment on what you described as the

20   concept drawings, had you seen the concept drawings before

21   you had a meeting with Mr. Bryant at your house in late

22   September?

23   A.   No, I hadn't.

24   Q.   Do you recall how many drawings, how many concept

25   drawings Mr. Bryant showed you at that first meeting?

1    A.  I don't know how many.

2    Q.  Could you describe for us the concept drawings that you

3    saw at the first meeting?

4    A.  They were very basic drawings.  Some of them had color

5    on them.  Some of them were just lines with black and white.

6    It was of four different girls with big heads and big feet.

7    Q.  What did Mr. Bryant ask you, if anything, to do at that

8    meeting?

9    A.  He said, "Here's my idea.  Just take it and run with it.

10   Let me know when you've sculpted something."

11   Q.  Did Mr. Bryant provide to you on that day any -- well,

12   let me ask you this:  Are you -- have you ever worked with

13   engineering drawings?

14   A.  Yes, I have.

15   Q.  Did Mr. Bryant have in his notebook at the first meeting

16   any engineering drawings?

17   A.  No, none whatsoever.  They were just really rough

18   sketches.

19   Q.  I want to move just aside for just a second.

20       Do you know a woman by the name of Ivy Ross?

21   A.  Yes, I do.

22   Q.  And how do you know Ivy Ross?

23   A.  Ivy Ross was my boss at the Disney Store.

24   Q.  Does she still work at the Disney Store?

25   A.  No, she doesn't.

1     Q.   But you do?

2     A.   Yeah, I still work there.

3     Q.   Okay.  I represent to you that Ivy Ross appeared as a

4     witness in this case for Mattel.  And she talked about your

5     sculpting.

6     A.   Right.

7     Q.   And I believe that she referenced a presentation that

8     you made as an employee of the Disney stores with respect to

9     how a sculptor stays true to the designs of the designer.

10    Did you make that presentation?

11         MR. PRICE:  Objection.  Misstates the testimony.

12         MR. NOLAN:  I'll rephrase it.

13         THE COURT:  Thank you, Counsel.

14    Q.   BY MR. NOLAN:  While at the Disney Store, have you ever

15    made a presentation either in a training format or in any

16    format, with respect to sculptors following the drawings of

17    designers?

18    A.   No, I've never given a presentation there.

19    Q.   Going back to this first meeting that you had with

20    Carter Bryant, other than giving you the concept drawings and

21    telling you to do your magic, did Carter Bryant give you

22    specific directions about what he wanted the sculpt to

23    include?

24         MR. PRICE:  Object to the preface as misstating her

25    testimony.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1          THE COURT:  Rephrase it again, Counsel.

2      Q.  BY MR. NOLAN:  During this first meeting, did Carter

3      Bryant give you any directions with respect to how he wanted

4      the sculpt to look?

5      A.  Well, not really.  I mean, I was really excited about

6      this job because for the first time after working at Mattel

7      for six years --

8          MR. PRICE:  Objection.  Beyond the scope of the

9      question.

10          MR. NOLAN:  I can try to break it down.

11          THE COURT:  Very well.

12      Q.  BY MR. NOLAN:  Set aside for a moment the excitement,

13      and we'll get to that in just a moment.  I want to ask you,

14      at this first meeting did Carter Bryant tell you with certain

15      direction as to how he wanted you to sculpt the project he

16      asked you to sculpt?

17      A.  No, he didn't give me any direction.

18      Q.  Have you worked in the past at any time with designers

19      who, when they give you a project to do a sculpt, include

20      specific directions to follow?

21      A.  Yeah.  I've had designers give me very specific control

22      drawings.

23      Q.  And tell us, since we're not sculptors, what information

24      designers provide to you when they want you to follow their

25      concept drawings exactly.

1    A.   Well, there's a lady at MGA named Christine Nedahoshian

2    (phonetic), who had very set ideas in her mind of what she

3    wanted.  She would do turnarounds, we call them, where you

4    have a front view, a side view, and a back view with the

5    joints included, measurements of the joints, and what kind of

6    joints they would be in the doll.  And she's very specific

7    about it.

8    Q.   You used some terms I want to make certain we're all

9    clear about.  And you referenced turnaround drawings.  What

10   do you mean by a turnaround drawing?

11   A.   A turnaround drawing in our industry as well as the

12   animation industry is when you have multiple views of your

13   subject.

14   Q.   Then you also made reference to joints.  And how do you

15   use that term in the context of sculpting?

16   A.   Well, a doll is called articulation, and if you'll

17   notice on a doll, they usually have joints so you can move

18   the arms and move the legs, sometimes the knees, sometimes

19   the hands.  It depends on how much money you want to put into

20   the doll, but that's what a joint is.  And there's very

21   specific ways to do joints just within the laws of physics.

22   So you need pretty specific measurements and direction as far

23   as the joints go.

24   Q.   At any time that you were doing sculpts for MGA, did you

25   ever receive from Carter Bryant turnaround drawings?

1          MR. PRICE:  Objection as to time frame.

2          MR. NOLAN:  I'll narrow it.

3     Q.   At the first meeting at the end of September of 2000,

4     did Carter Bryant provide to you any turnaround drawings?

5     A.   No, he didn't.

6     Q.   At that first meeting did Carter Bryant provide to you

7     any engineering drawings?

8     A.   No, not at all.  It was just the one view, the one

9     concept sketch.

10    Q.   It was just simply two dimensional?

11    A.   Just a two-dimensional kind of a three-quarter view.

12    Q.   Did Carter Bryant at that first meeting provide to you

13    any directions or instructions with respect to how you should

14    deal with joints on the sculpt that you were going to be

15    making?

16    A.   No, not at that time, he didn't.

17    Q.   After this 20-minute meeting, what did you do next?

18    A.   Well, I was very excited about the project.

19    Q.   Let's stop there.  Why were you excited?

20    A.   I was excited because it was a new project that I

21    actually had artistic license on, like in Mattel it's a very

22    structured environment, and the designers are in control of

23    everything.

24          So this was pretty fun to me because number one, it

25    was my first job, one of my first jobs out of the free-lance

1    gate, and I wanted to do a good job, and I had so much

2    artistic license to put in, it was like a treat.

3    Q.   And did you in fact prepare a sculpt following that

4    first meeting?

5    A.   Yes, I did.

6    Q.   And how did you make that first sculpt?  What was it

7    made out of?

8    A.   I made it out of clay.  I just roughed it out really

9    quick.  We have these really hard blocks of change, and I put

10   them under a light so it melts, and then you just kind of

11   mold it together real quick to come up with the figure.

12   Q.   And approximately how long did it take for you to do

13   this first sculpt?

14   A.   A couple days.  Two or three days.

15   Q.   And during those two or three days, was Carter Bryant at

16   your side?

17   A.   No, he wasn't there.

18   Q.   Now, during this two- or three-day period of time, did

19   you ever call Carter Bryant and ask him for any directions or

20   instructions?

21   A.   I don't remember calling him.

22   Q.   Do you recall having a next meeting with Mr. Bryant?

23   A.   Yeah, I remember meeting with him to show him that clay

24   sculpt.

25   Q.   And do you still have that clay sculpt?

1    A.   No, the clay sculpt was destroyed during the molding

2    process.  It doesn't exist anymore.

3    Q.   Is that a typical result of the molding process, that

4    the original clay gets destroyed?

5    A.   Most of the time with clay, because it's soft, it gets

6    kind of mushed coming out.

7    Q.   And when you next met with Mr. Bryant, did you show him

8    this first clay sculpt?

9    A.   Yes, I did.

10   Q.   And where was this meeting at?

11   A.   This meeting was at my house.

12   Q.   And was anybody else present at this meeting?

13   A.   I'm not sure if anybody was there or not.  There were

14   several meetings with Paula and Veronica and Carter and some

15   meetings with just Carter.

16   Q.   In any event, at this meeting at your house, do you

17   recall the date of that meeting?

18   A.   I think it was on September 29th.

19   Q.   Now, by recalling the date of the meeting as being

20   September 29th, are you able to estimate for us when the

21   first contact with Carter Bryant occurred?  How many days

22   before that meeting?

23   A.   You mean the first phone call?

24   Q.   Yes.

25   A.   Well, it would have been a week and a half, two weeks.

1    Q.   And what about the first initial meeting that you had

2    with Carter Bryant, where you saw the conflict drawings for

3    the first time?

4    A.   Well, it took me a couple days to do the sculpt.  So you

5    know, it would be three, four days.

6    Q.   So around September 26 or September 27?

7    A.   Something like that.

8    Q.   All right.  So let's turn to the September 29th meeting.

9    And you are working with a clay sculpt.  Is this right?

10   A.   Right.

11   Q.   And can you describe for us how long the September 29th

12   meeting took?

13   A.   It was probably around the same, around 20 minutes.

14   Q.   Now, is it possible that Paula Treantafelles Garcia was

15   also present at that meeting?

16   A.   It's possible.  Like I said, there were several meetings

17   then.  You know, I had a newborn.  So I didn't have a lot of

18   sleep.  And I don't remember everything.

19   Q.   Now, the sculpt that you showed on September 29th, was

20   that a final sculpt?

21   A.   No, not at all.

22   Q.   Did you receive any comments from anyone with respect to

23   that sculpt?

24   A.   There were -- yeah, there were comments made.

25   Q.   And can you describe generally for us what those

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    comments were?

2    A.   Well, generally I remember Paula thinking it was too

3    big.  It was too tall.  It was about this tall, and the Bratz

4    ended up being about 10 inches.  And Paula thought it looked

5    too old for what they were trying to achieve.

6    Q.   When you say too old, what do you mean?

7    A.   Too old, too mature.  I had her very fleshed out with

8    hips and thighs and arms and, you know.

9    Q.   Can you recall any other comments or feedback that you

10   received in connection with that first initial sculpt?

11   A.   They wanted the waist thinner, the legs thinner, minor

12   things like that.

13   Q.   Now, did you have a practice, Mrs. Leahy, of maintaining

14   a calendar or some book where you could record your daily

15   schedules and any comments that were being made with respect

16   to work you were doing?

17   A.   I had a notebook that I'd write comments in.

18   Q.   I'd ask you to look in the white notebook that's before

19   you at Exhibit 1137.

20      Do you have that in front of you?

21   A.   Yes, I do.

22   Q.   And can you identify that for us?

23   A.   It's Wonder Woman.

24   Q.   I'm sorry.  I can't see it.  I'm sure it is Wonder

25   Woman?

1          THE COURT:  The Court will take judicial notice

2     that that appears to be Wonder Woman.

3          MR. NOLAN:  I don't know why I always get the

4     levity moments.

5          THE COURT:  It's a requirement.

6     Q.  BY MR. NOLAN:  Other than it being Wonder Woman, does it

7     serve any other purpose?

8     A.  It was my notebook.

9     Q.  I'd like you to turn your attention to page 14 of the

10    document.  Do you see what's set forth on September 29th?

11    A.  Yes.

12    Q.  And, in fact, is that a calendar that you used in the

13    year 2000 for a notebook?

14    A.  Yeah, this is the notebook I used when I first started.

15    Q.  And does it contain your handwritten notations?

16    A.  Yes, it does.

17    Q.  And did you make notations on this page, page 14,

18    concerning the comments made in response to your first clay

19    sculpt?

20    A.  Yes, that's here.

21          MR. NOLAN:  Your Honor, we'd offer 1137-14.

22          THE COURT:  Any objection?

23          MR. PRICE:  At this point it's still hearsay, your

24    Honor.

25          THE COURT:  Counsel?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    Q.   BY MR. NOLAN:  Well, you were in business at the time;

2    correct?

3    A.   Yes.

4    Q.   You were a sole proprietor?

5    A.   Yes.

6    Q.   And you were working in connection with a matter that

7    you had been retained by MGA; correct?

8    A.   Correct.

9    Q.   And was it your practice to make notes in connection

10   with a project that you were asked to perform for MGA?

11   A.   Yes, it was.

12   Q.   And when you would make these notes, were they

13   contemporaneous to situations or comments that were being

14   made in your presence?

15   A.   Yeah, usually with a lot of people there, the comments

16   are going so fast, I just kind of jot them down and translate

17   them so I'll remember to make the changes after they leave.

18   Q.   And would one of the purposes for making these

19   handwritten notations be to be able to go back and make

20   certain that you captured the comments that were being made?

21   A.   Correct.

22   Q.   And you did that in the ordinary course of your business

23   as a sculptor; correct?

24   A.   Most of the time.

25        MR. NOLAN:  Your Honor, again I'd offer 1137-14 as

1    a business record maintained by Mrs. Leahy and containing

2    business records pertinent to the job that she was hired to

3    do for MGA.

4         MR. PRICE:  I'm not going to object at this time.

5         THE COURT:  Very well.  Then it's admitted.

6         (Exhibit 1137-14 received.)

7         THE COURT:  You may publish.

8    Q.  BY MR. NOLAN:  And why don't we go to the front page, if

9    we could, just so that everybody could share the joke.

10        Okay.  That's the front page of your calendar;

11   correct?

12   A.  Correct.

13   Q.   Now let's turn to page 14.  All right.  And I know the

14   lighting and the coloring is not very strong, but I'll ask

15   Aaron to highlight here.  And ask you, do you recognize this?

16   A.  Yes, I do.

17   Q.   And first of all, whose handwriting is that?

18   A.  That's mine.

19   Q.   And do you see a date on the upper right-hand corner?

20   A.  Yes.

21   Q.   And that's September 29, 2000?

22   A.  Yes.

23   Q.   And next to it is the name Fiona.

24        Do you see that?

25   A.  Yes.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    Q.   Who is Fiona?

2    A.   Fiona's the name of my daughter, and we were originally

3    calling the sculpt Fiona.

4    Q.   When you were saying we were naming it Fiona, who were

5    you referring to?

6    A.   Carter.  He liked the name, but we couldn't use it in

7    the end.

8    Q.   In any event, could you read for the jury what you've

9    written down on this notation?

10   A.   It says:  "September 29, 2000, Fiona, head bigger, 2.575

11   inches, a smaller waist, smaller hips, thighs, and ankles,

12   the neck longer, thickness okay, feet, bulkier on top."

13   Q.   And do you have a specific recollection, as you are

14   sitting here today, as to who made these comments to you on

15   September 29th?

16   A.   I don't have a specific recollection of who made what

17   comments.

18   Q.   Can you explain whether or not Carter Bryant's concept

19   drawings were used in any fashion by you in making -- I'm

20   sorry, in receiving these comments from people at the

21   meeting?

22        MR. PRICE:  Objection.  Assumes facts not in

23   evidence, people at the meeting.

24        THE COURT:  Sustained.

25   Q.   BY MR. NOLAN:  The comments that you received at the

1    meeting, Mrs. Leahy, were these comments directed to trying

2    to make the sculpt look exactly like the concept drawings?

3    A.   No, not at all.

4    Q.   Do you know whether or not you even had the concept

5    drawings at this meeting?

6    A.   I don't remember.

7    Q.   Do you have a recollection that the concept drawings

8    were being used as a reference point at this meeting?

9    A.   Well, Carter gave me two things.  The concept drawings

10   as well as the Steve Madden ad.  And the concept drawings

11   were really basic and not very practical as far as the

12   sculpting standpoint.  So I went more by the Steve Madden ad

13   because it was a photo implying three dimensions.  So it was

14   a little easier to come up with something from that than from

15   his sketches.

16   Q.   Now, you said that the concept drawings were not very

17   practical from a sculpting point of view.  Can you express

18   that in layman's language as to what you mean?

19   A.   They were very basic drawings.  They didn't have any

20   measurements on them.  They didn't have any indication of

21   where the joints would be or what the play value of the doll

22   would be, meaning the articulation.

23        I couldn't really use them to come up with

24   something in the three-dimensional world.

25   Q.   Now, you made reference to a Steve Madden ad.  Do you

1    know whether or not the Steve Madden ad was present at the

2    September 29th meeting?

3          MR. PRICE:  Object.  It's ambiguous as to which

4    Steve Madden ad.

5          THE COURT:  Sustained.  You can lay a foundation

6    for which, Counsel.

7          MR. NOLAN:  Yes.

8    Q.  First, why don't you ask you to take a look at

9    Exhibit 302.  And do you recognize 302?

10   A.  Yes, I do.

11   Q.  And do you recognize 302?

12   A.  Me?

13   Q.  Yes.

14   A.  Yes.

15   Q.  What is 302?

16   A.  It was one of the drawings in the binder he gave me.

17         MR. NOLAN:  Your Honor, this is in evidence.  May I

18   publish it?

19         THE COURT:  You may proceed.

20   Q.  BY MR. NOLAN:  Now, 302 is an exhibit that contains a

21   number of pages and number of drawings.

22         Do you remember whether or not all of these

23   drawings were presented to you by Carter Bryant at that first

24   meeting?

25   A.  I know he gave me a binder full of drawings.  I can't

1    say for sure each individual specific drawing that was in

2    there.

3    Q.   But do you recall the drawing that's depicted as the

4    first page of Exhibit 302?

5    A.   Yes, I do.

6    Q.   And when you were saying earlier that Carter's concept

7    drawings were two dimensional and not very practical from a

8    sculpting point of view, were you referring to these

9    drawings?

10    A.   Yes, I was.

11    Q.   Now, we made reference to a Steve Madden ad.  I want to

12    just ask if you can look at 1127.  And do you recognize 1127?

13    A.   Yes, I do.

14    Q.   And how -- what is it?

15    A.   That was the tear sheet he gave me of the Steve Madden

16    ad.

17        MR. NOLAN:  Your Honor, this is also in evidence.

18    May I have this on the screen?

19        THE COURT:  You may.

20    Q.   BY MR. NOLAN:  What instructions, if any, did Carter

21    Bryant give you with respect to why he was giving you this

22    particular tear sheet?

23    A.   Well, he didn't necessarily give me any instructions.

24    He just said, "Here's some inspiration."

25    Q.   Did he ask you to copy specifically the Steve Madden ad?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     A.   No, not at all.

2     Q.   Did you use the Steve Madden ad as a reference at all in

3     any of your sculpting?

4     A.   I did.

5     Q.   Now, the Steve Madden ad appears to be a photograph;

6     correct?

7     A.   It's an altered photograph.

8     Q.   I'm sorry.  Actually, it's like two models that are

9     morphed down?

10    A.   Right.

11    Q.   And what use, if any, did you make of this ad?

12    A.   Well, like I said, this ad has three dimensions to it.

13    So I used a lot of the upper body of the girl on the right

14    because I can see more of her actual body.  A lot of the

15    lower body on the left for the same reason.

16    Q.   Was it your understanding that Carter Bryant had

17    designed the figures depicted in the Steve Madden ad?

18    A.   That he designed the --

19    Q.   The Devil and Angel drawing?

20    A.   No.

21    Q.   Following the meeting on September 29th, what next

22    happened?  And by the way, do you have the September 29th

23    sculpt?

24    A.   No.  I have a cast of it.

25    Q.   What next happens?

1   A.   Well, I made the changes they asked for.  And then I had

2   that cast made.

3   Q.   And after your meeting on September 29th, you continued

4   to work on doing the sculpt; correct?

5   A.   Correct.

6   Q.   And over what period of time are we now talking about?

7   A.   We got into October.  So maybe a week or two.

8   Q.   So we're into early October of 2000; is that correct?

9   A.   Correct.

10  Q.   Now, was Carter Bryant with you from September 29th,

11  2000, through the time that you did the next iteration of the

12  sculpt?

13  A.   Was he with me at my house?

14  Q.   Yes.

15  A.   No.

16  Q.   Did he come and give you any directions about the sculpt

17  from -- after the September 29th meeting to the next meeting

18  that you had?

19  A.   No, he didn't.

20  Q.   Do you recall Carter ever calling you and saying by the

21  way, you know, I want specifically you to do this, this, and

22  this during this period of time of September through --

23  September 29th through the date that you come up with the

24  next sculpt?

25  A.   No.  Carter never gave me any specifics on anything.

1    Q.   Did you -- do you recall when the next meeting was that

2    you had with respect to the sculpt?

3    A.   It was in early October.

4    Q.   And where was this meeting at?

5    A.   At my house.

6    Q.   And by looking at your notebook, Exhibit 1137, is there

7    a way that you can fix the date of this meeting?

8    A.   It's October 6th.

9    Q.   And is that depicted on page 15 of Exhibit 1137?

10   A.   Yes, it is.

11   Q.   And are the notations on the 15th page your handwriting?

12   A.   Yes, they are.

13   Q.   And they were done at or about the time of the events

14   that are recorded there?

15   A.   Correct.

16        MR. NOLAN:  Your Honor, we'd offer 1137-15.

17        MR. PRICE:  No objection.

18        THE COURT:  It's admitted.

19        (Exhibit 1137-15 received.)

20   Q.   BY MR. NOLAN:  Now, this is the very next page.  I'd

21   like to have this blown up, Aaron, if you don't mind.

22        And again, there is all in your handwriting?

23   A.   Yes, it is.

24   Q.   And you see this is Fiona, October 6th; correct?

25   A.   Correct.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    Q.   And can you now tell us who you -- first of all, this

2    meeting is where?  At your house?

3    A.   Yes, it's at my house.

4    Q.   And is it true that October 6th is a Friday?

5    A.   I'd have to look at the calendar.

6    Q.   Okay.  In any event, as a long-time employee of Mattel,

7    do you know what the hours of work are at Mattel on Fridays?

8    A.   You work until 1:00.

9    Q.   So do you recall, if I told you that October 6th is a

10   Friday, do you have a recollection of, first of all, where

11   the meeting took place and approximately what time?

12   A.   I know the meeting was at my house.  And I couldn't tell

13   you the time.

14   Q.   Was anybody else present other than yourself?

15   A.   Well, like I said, I had a few meetings with Carter

16   alone and some with Paula and Veronica.  So it was either

17   just Carter or Veronica and Paula.

18   Q.   Okay.  And directing your attention now to the notations

19   here, did you have another sculpt -- another iteration of the

20   sculpt available at this meeting?

21   A.   Yes.

22   Q.   And did you receive comments back regarding that sculpt?

23   A.   Yes, I did.

24   Q.   And can you just read for us your notations here and

25   what they mean to you?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    A.   It says Fiona, October 6th.  Invoice.  Which would mean

2    they wanted me to send an invoice.  Ankles, skin, yes, legs

3    skinnier from the inside, the bust, more definition.  Carve

4    chest in more for perky, meaning more perky, the body

5    smaller, the head bigger by 2 percent, bigger lips, and cheek

6    bones.

7          MR. NOLAN:  Your Honor, through the magic of

8    technology, I think we can establish that October 6th is in

9    fact a Friday, and I believe that Mr. Price will stipulate to

10   the fact that October 6, 2000, was on a Friday.

11         MR. PRICE:  I will stipulate.

12         THE COURT:  Very well.

13   Q.   BY MR. NOLAN:  Now, again, at the October 6th meeting,

14   did you have Carter Bryant's concept drawings there as your

15   guide?

16   A.   I think it was just the sculpt at this point.

17   Q.   What about the Steve Madden ad?  Was the Steve Madden ad

18   there?

19   A.   I don't remember.  I think it was just the sculpt at

20   this point.

21   Q.   Do you recall who it was that gave the specific comments

22   with respect to making the ankles skinnier or the bust have

23   more definition?

24   A.   Well, looking at this now, I can remember Carter wanted

25   the ankles skinnier, which is hard to do in production.

1    Veronica wanted the legs skinnier from the inside so you can

2    dress the doll and pull the pants up.  If the legs are too

3    close together, there's not enough room for the fabric

4    inside.  Paula made the perky breast comment.  And I think

5    Paula wanted the head bigger and body smaller.

6    Q.   Do you have a recollection amongst the three of them --

7    Carter Bryant, Paula Treantafelles Garcia, or Veronica

8    Marlow -- as to whether or not it was Carter that was

9    directing this meeting?

10       MR. PRICE:  Objection.  Assumes facts not in

11   evidence about the other attendees.

12       THE COURT:  Lay further foundation, Counsel.

13   Q.   BY MR. NOLAN:  Do you have a recollection at this

14   October 6th meeting as to who was present with you at the

15   meeting?

16   A.   Well, I do now after looking at the comments.

17   Q.   And what is it about the comments that refreshes your

18   recollection as to who was there?

19   A.   Well, I remember Paula making the perky breast comment

20   specifically, and like I said, I remember Veronica making the

21   comment about the space in between the legs so the fabric

22   would fit over when you're putting pants on.  And I remember

23   Paula wanting the body smaller and the head bigger as well.

24   Q.   Do you recall whether or not you had an impression at

25   this time as to whether or not Carter Bryant was in control

1    of the meeting and giving everybody the directions?

2           MR. PRICE:  Objection.  Calls for a

3    characterization.

4           MR. NOLAN:  Just her observation.

5           THE COURT:  Just based on your physical

6    observations, sense of the meeting.  Overruled.

7    Q.   BY MR. NOLAN:  You can answer.

8    A.   Carter is a very quiet guy.  So most of the time he

9    would just sit back, and I remember Paula making the gist of

10   the comments.

11   Q.   Now, by the October 6th meeting, had you started to

12   focus on any of the hip joints on your sculpt?

13   A.   I brought it up to them.  I asked what kind of joints

14   they wanted.  At the top of this page, there's a scribble of

15   my drawing to explain to them what a ball joint is.

16   Q.   And is this your effort to try to show how the hip joint

17   would work?

18   A.   Right.  You would have to -- imagine it this way.  Like

19   dripped this way, and those are two legs, and on the inside

20   of the legs, there's the half balls in there, and then

21   there's the little connector which looks like a dog bone.

22   Q.   No disrespect intended, are you an engineer?

23   A.   No.

24   Q.   Okay.  Were you the one that was designing or going to

25   design the hip joints?

1    A.   Well, I had to.  You know, it had to be done.  And I

2    knew more than anybody there about how to make joints.

3    Q.   Do you recall ever asking Carter Bryant at that meeting

4    words to the effect, hey, can you help me out with these hip

5    joints or anything like that?

6    A.   Well, I asked what kind of joints they wanted.

7    Q.   And did you get a response?

8    A.   They said yeah, go ahead with that, because I think they

9    understood what the joints actually were.

10   Q.   And who said that to you?

11   A.   I don't remember.

12   Q.   Who was paying for your time during this period of time?

13   A.   MGA.

14        THE COURT:  Counsel, I'm going to take a brief

15   break.  There's a matter I need to take up in chambers.  It's

16   going to be no more than six or seven minutes.  So I'll ask

17   the jury to go back to the jury room.

18        (Recess taken.)

19        THE COURT:  Sorry about that, Counsel.  You may

20   proceed.

21        MR. NOLAN:  Thank you.

22   Q.   Just before the break, we were talking about the October

23   6th meeting at your house on Friday.

24        Do you recall that?

25   A.   Right.

1   Q.   And following that meeting on October 6th, what did you

2   next do?

3   A.   I made the changes they asked for, and then I took it to

4   Gentle Giant, which is a molding company, to pour a mold of

5   it.

6   Q.   Now, as of this time, and we're talking about October

7   6th; correct?

8   A.   Correct.

9   Q.   Are you aware, during this period of time, of the status

10   of Carter Bryant's negotiations with MGA?

11       MR. PRICE:  Objection.  Foundation.

12       THE COURT:  Sustained.  Well, it's a foundational

13   question.

14       MR. NOLAN:  That's right.  And she answered she

15   didn't know; correct?

16       THE WITNESS:  Correct.

17   Q.   BY MR. NOLAN:  You made reference to something called

18   Gentle Giant.  Tell me what Gentle Giant is.

19   A.   Gentle Giant started off as a sculpting and molding kind

20   of a sculpting house.  So they were considered a vendor.  I

21   met them through Mattel.  And they also made silicon molds,

22   which is where they pour silicon -- pretend this is the

23   piece.  They poured silicon around it to make a negative mold

24   so you could proceed with your sculpting.

25   Q.   Had you worked with Gentle Giant before?

1    A.   Yes.

2    Q.   And what was the purpose in making contact with Gentle

3    Giant?

4    A.   Well, I had gotten as far as I could go on this clay

5    sculpt.  So I needed to make a mold and proceed to wax.

6    Q.   Now, explain to me what you mean by a mold and proceed

7    to wax.  Tell us a little bit about that process.

8    A.   Well, the mold is silicon rubber.  It comes in two

9    pieces, and it's blue and very rubbery and kind of loose.  So

10   like I was saying, you would put a cup around the sculpt,

11   pour the mold in, and then overnight it hardens.  After that,

12   you put it out with a knife.  Take the piece out, and then

13   pour the hot wax in there.  And from there you can go into

14   any finishing and more finite nitty-gritty tech at part of

15   making the doll.

16   Q.   Did you select Gentle Giant yourself?

17   A.   Yes, I did.

18   Q.   Carter Bryant didn't assist or give you any references

19   to Gentle Giant, did he?

20   A.   I don't think he even knew about them.

21        MR. NOLAN: I'd like to show, your Honor, which is

22   admitted, Trial Exhibit 1136, which is the photograph.  The

23   photograph is 1136.

24        Aaron, can we have the photograph up?  And then I

25   think we actually have a tangible, Ms. Leahy.  If you'd just

1    wait.

2    Q.   Mrs. Leahy, directing your attention to the photo on the

3    screen, do you recognize that as a photograph of the tangible

4    object that I've just put in front of you?

5    A.   Yes, I do.

6    Q.   And what I want to do is focus your attention to 1136-A.

7    And you can take it out of the bag if you want.  I think the

8    parts are separated.

9    A.   Do you want me to put it together?

10   Q.   If you can, it would be great.

11   A.   I don't think I can put the one arm on, but I'll do the

12   best I can.

13   Q.   We assume that it has two arms, and both arms were

14   attached; correct?

15   A.   Correct.

16   Q.   What is 1136-A?

17   A.   This is the first sculpt that I was talking about at

18   those two meetings.

19   Q.   Is this the final --

20   A.   This is a copy of the clay sculpt that I did.

21   Q.   Okay.  And this you received from Gentle Giant what

22   date?  Do you recall?  You delivered it to Gentle Giant on

23   October 11th?  The clay sculpt?

24   A.   Somewhere around there.

25   Q.   And how long after that did you receive back what's

1    depicted in 1136-A?

2    A.   I don't remember when they got it back to me, but

3    usually in the molding process, it takes a few days,

4    depending on how busy they are.  It could take longer.

5    Q.   Now, you had delivered to Gentle Giant a clay sculpt;

6    correct?

7    A.   Correct.

8    Q.   Where is the clay sculpt?

9    A.   It got destroyed in the molding process.  When they pull

10   it out, they have to cut it out, and it gets all broken up.

11   Q.   Is that ordinary, or is that part of the process?

12   A.   That's part of the process.  That's the body.  The head

13   didn't get destroyed.  Just because of the nature.  It's just

14   a ball.  There's nothing to break.

15   Q.   So following the October 6th meeting and the delivery of

16   the clay sculpt to Gentle Giant, did Carter Bryant ever

17   provide any directions or specific instructions regarding

18   what changes he wanted to be made with respect to this

19   sculpt?

20        MR. PRICE:  Objection as to time.

21        THE COURT:  Sustained.

22   Q.   BY MR. NOLAN:  From October 6th, when you had the

23   meeting and you showed one of the iterations of the sculpt;

24   correct?

25   A.   Correct.

1    Q.   Following that, did you make changes to the sculpt?

2    A.   I made the changes they asked for.

3    Q.   And those changes included the comments made by Paula

4    Treantafelles Garcia?

5    A.   Yes.

6    Q.   And Victoria Marlow?

7    A.   Veronica.

8    Q.   Veronica.  I'm sorry.  And Carter Bryant, you recall,

9    had made a suggestion with respect to skinnier ankles?

10   A.   Correct.

11   Q.   Did you make the change that Carter had suggested,

12   making the ankles skinnier?

13   A.   Well, I didn't because they would have just broken

14   coming out of the mold.  So I just kept them thick at this

15   time.

16   Q.   So you didn't follow the suggestion that Carter Bryant

17   had made.

18   A.   Not at that time.

19   Q.   So the sculpt that's in front of you, the October 11

20   sculpt, is that the final Bratz sculpt?

21   A.   No, no, not at all.

22   Q.   So tell us what next happens after you receive this back

23   from Gentle Giant.  And let's do this chronologically.  You

24   believe you delivered this to Gentle Giant on October 11th;

25   correct?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1   A.   Or maybe a day or two before that.

2   Q.   And do you recall the precise date that you received it

3   back from Gentle Giant?

4   A.   I don't know the exact date.  It would have been soon

5   after the 11th.

6   Q.   But in any event, it took the form that is represented

7   here in this sculpt; correct?

8   A.   Right.  Except the material was in wax.

9   Q.   Did Gentle Giant deliver the sculpt to you?

10   A.   No, I would pick everything up from them.

11   Q.   Now, what did you do with the wax sculpt that you got

12   back from Gentle Giant sometime after October 11th?

13   A.   Well, I took it and cut it up with a jeweler's saw,

14   which is like a hacksaw, and I had to go in and start making

15   up more realistic, feasible, producible doll.  This was just

16   a figurine at this point to see what it looked like.  And

17   from there I had to get down to the nitty-gritty of the

18   technical part of it.

19   Q.   By the way, when you went to Gentle Giant, did you

20   provide to Gentle Giant Carter Bryant's concept drawings?

21   A.   No.

22   Q.   Did you provide to Gentle Giant the Angel Devil ad from

23   Steve Madden?

24   A.   No, they wouldn't have needed that.

25   Q.   Was Carter Bryant with you at this meeting with Gentle

1    Giant where the instructions were given to develop the

2    sculpts?

3    A.  No, he wasn't.

4    Q.  So you were talking about what you started to do with

5    carving it up and cutting it up.  Would you explain more what

6    you did?

7    A.  Well, I took it, I cut the legs here.  I had to shorten

8    it to be 10 inches tall, which is a big thing.  And wax is

9    very time consuming and laborious.  You have to fix it pretty

10    much one drip at a time.  So I had to cut here and here and

11    cut as much out here and here to make it the right height in

12    the legs so they would be proportional.

13        I also had to put the joints in.  I had the joints

14    made by a machinist.  What it is, in the hips, there's a cup,

15    like a half cup like that.  And then the legs, as you saw in

16    that scribble drawing, they're a half ball, and then the

17    socket fits in there just like a regular bone socket, but

18    it's machine joints.  So that way you know exactly what

19    you're getting back from them.

20    Q.  And where were you doing this work that you just

21    described in 1136-A?

22    A.  At my house.

23    Q.  Was anybody else present with you?

24    A.  No.

25    Q.  Did Carter come over and give you specific directions or

1    suggestions as to what you should do?

2    A.   No, nobody came over at that point.

3    Q.   When was the next meeting that you had where you

4    presented the sculpt that is depicted in 1136-A?

5    A.   I'm pretty sure it was in late October.  I took it to

6    MGA and a lady named Mercedeh Ward, who is an engineer, was

7    present, and she looked at it and started making comments.

8    Q.   Do you recall if that meeting took place on October

9    25th?

10   A.   It would have been somewhere around there.  I could look

11   at my notes.

12   Q.   Can you take a look at your notes?

13   A.   It doesn't have the date, but that would have been the

14   meeting.

15   Q.   And what would the date of the meeting be?

16   A.   It just says October blank 2000.  So...

17   Q.   Do you have a specific recollection as to what day in

18   October you presented this mold -- this sculpt to Mercedeh

19   Ward?

20   A.   Um, it would have been around -- well, late October.  So

21   the 25th and '6th.

22   Q.   I want to show you Trial Exhibit 1140 and ask you if you

23   can identify it for us first.

24        And if I may approach, your Honor, with 1140-A

25   through -D.

1        THE COURT:  You may.

2    Q.  BY MR. NOLAN:  I've put some tangible items in front of

3    you.

4        Do you see them?

5    A.  Yes.

6    Q.  Do you recognize them?

7    A.  Yes, I do.

8    Q.  What are they?

9    A.  These are the silicon molds that I was talking about.

10   One is a liquid, and then they poured it into this

11   configuration.  They probably had some polystyrene around it,

12   and they cut it open, and you can see inside there's like

13   some legs.  It's like the negative space of some legs.

14   Q.  Okay.  What you're holding up, the larger piece we'll

15   mark as 1140-A.  And is there a date on that particular mold?

16   A.  Yeah.  These say 10/23.  These don't have dates.

17       MR. NOLAN:  The mold that's dated October 23 will

18   be marked as 1140-D; is that correct?

19       MS. AGUIAR:  The big one is A.

20       MR. NOLAN:  Thank you.

21   Q.  Now, I just want to focus for just a moment on 1140-A.

22       Do you recall  -- do you see the date on that as

23   being October 23?

24   A.  Yes, I do.

25   Q.  And who put the date on that?

1    A.  Gentle Giant.

2    Q.  And of what year?

3    A.  2000.

4    Q.  Do you know that Carter Bryant's last day of employment

5    at Mattel was October 19th, 2000?

6    A.  I didn't know what his last day was.

7    Q.  In any event, did you show -- first of all, when you

8    went to pick these up from Gentle Giant, were you alone?

9    A.  Yes, I was.

10   Q.  Did you bring them back and show them -- now I'm talking

11   about the mold itself -- to Carter Bryant?

12       MR. PRICE:  Objection, your Honor.  This is beyond

13   the time frame.

14       THE COURT:  Sustained.  I believe.  Unless you want

15   to bring this -- actually, I'm not clear what the time frame

16   is you're referring to in that question.  So why don't you

17   rephrase.

18       MR. NOLAN:  Thank you.

19   Q.  On October 23, when you picked this up from Gentle

20   Giant, do you know whether or not Carter Bryant had seen this

21   mold at Gentle Giant before October 23rd?

22   A.  No, Carter never saw these.

23   Q.  And the corresponding resin cast that's depicted in

24   photograph 1141, this is going to be in the white notebook.

25   Could you take a look at that for me.  1141.

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1     A.   Right.

2     Q.   Do you recognize that photograph?

3     A.   Yeah, it's a cast of what these were molded out of.

4     It's a resin cast, not wax.

5          MR. NOLAN:  Your Honor, I'd offer the photograph of

6     the resin cast, which is depicted in 1141.

7          MR. PRICE:  Object.  It's beyond the time frame.

8          THE COURT:  Sustained.  Lay further foundation,

9     Counsel.

10         MR. NOLAN:  Your Honor, can I take one minute as a

11    sidebar real quick?

12         THE COURT:  All right.

13         (SIDEBAR CONFERENCE HELD.)

14         THE COURT:  Yes.

15         MR. NOLAN:  Your Honor, Mattel pushed the time

16    period beyond October 19th and asked numerous questions with

17    respect to the status of various matters with Paula Garcia

18    and pushed it well back into November.

19         THE COURT:  My standard has always been that I

20    would permit evidence past the October 19th date as long as

21    it's referencing back or is relevant to issues at or before

22    the October 19th date.  So that's why this last question that

23    you asked, even though it was October 23rd, the answer as

24    such was basically saying it was going backwards in time into

25    a relevant period.  And that's fine.  And that's the

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

1    demarcation.

2            MR. NOLAN:  I understand.  I'm sorry.

3            THE COURT:  Does that make sense?

4            MR. NOLAN:  Yes, it does.

5            THE COURT:  Okay.

6            (CONCLUSION OF SIDEBAR CONFERENCE.)

7            MR. NOLAN:  So there's an objection to 1114?

8            MR. PRICE:  Yes.

9    Q.  BY MR. NOLAN:  All right.  I want to just focus you back

10   to this mold that you picked up from Gentle Giant on October

11   23.

12   A.  Okay.

13   Q.  When you were designing the clay figure that you

14   delivered to Gentle Giant, were you looking at and making

15   reference to Carter Bryant's concept drawings?

16   A.  No, not at this point.

17   Q.  Going back in time, and now I want to try to break this

18   up into time periods, if I could, with you.

19           Your first phone call with Carter Bryant came

20   toward the end of September; correct?

21   A.  Yeah, towards the end.

22   Q.  Could you estimate for the jury how much time you spent

23   talking with Carter Bryant or meeting with Carter Bryant from

24   the first phone call that you had through October 19th of

25   2000?

1    A.   Maybe an hour, hour and a half total.

2    Q.   Do you have any idea whether Carter Bryant was doing any

3    work on the Bratz line during the period of the time that he

4    spoke to you on the telephone in late September through

5    October 19th, 2000?

6         MR. PRICE:  Objection.  As to the characterization

7    of the phone call being late September.

8         THE COURT:  Rephrase, Counsel.

9    Q.   BY MR. NOLAN:  Just go back real quick.  You recall by

10   looking at your calendar, you said your first meeting with

11   Carter Bryant was on September 29th; correct?

12   A.   The first meeting was when he brought me the drawings,

13   which was a little before that.

14   Q.   Okay.  A little bit before that.  That's right.  And

15   just before that, you had received a phone call from

16   Mr. Bryant?

17        MR. PRICE:  Object.  Ambiguous, just before that.

18   That's not what she said.

19        MR. NOLAN:  Okay.

20        THE COURT:  Rephrase.  Thank you.

21   Q.   BY MR. NOLAN:  From the first phone call that you had

22   with Carter Bryant -- in fact, do you have a notation

23   anywhere in your calendar that might help us or assist us in

24   determining when you first received a phone call from Carter

25   Bryant?

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1    A.   The date?

2    Q.   Yes.

3    A.   Let me look.  What was the number of my notebook?

4    Q.   It's 1137.

5    A.   It would have been somewhere around September 20th.

6    Q.   So my question, then, is, from the period --

7         MR. PRICE:  If I can object and have her identify,

8    your Honor, what just refreshed her recollection.

9         THE COURT:  Very well.  Counsel, ask the question.

10   Q.   BY MR. NOLAN:  What did you look at, if anything, to

11   refresh your recollection that allows you to estimate that

12   the first contact with Carter Bryant came around September

13   20th of the year 2000?

14   A.   Well, I was just trying to count backwards from

15   September 29th, and it took me two or three days to sculpt

16   after Carter gave me the drawings.  And then it was after

17   that call, it was like a week or less that he brought me the

18   drawings.  So I'm just guessing that it was somewhere around

19   the 18th, 19th, 20th.

20   Q.   Okay.  But in any event, from the first phone call from

21   Carter Bryant, which you estimate to be around September 20th

22   of the year 2000, through the date of October 19th, 2000, is

23   it your testimony that you spent possibly as much as an hour

24   and a half either discussing with Carter Bryant issues or

25   meeting with Carter Bryant?

1    A.   Correct.

2    Q.   During that same period of time, were you having

3    conversations with Paula Treantafelles Garcia?

4    A.   Well, there were several meetings, and she was at at

5    least one or more of the meetings.

6    Q.   And were you also having conversations with Veronica

7    Marlow?

8    A.   At the meetings, yes.

9    Q.   You have identified for us the large mold on the left,

10   and I want to now turn your attention to the three that are

11   on the -- to the left of that.

12        Do you see that?

13   A.   Yes.

14   Q.   And what are those three?

15   A.   These are -- this is the legs.  After I cut it up, you

16   have to start working on each individual part.  So in here

17   there are two legs.  And you can see here's the torso, which

18   would be, you know, the neck, the shoulders without the arms,

19   down to the hips.  This is the arms.  It would be two arms.

20   And this is the head.

21   Q.   Now, directing your attention to the head, can you just

22   tell us the sculpt -- the exhibit number that's on the sculpt

23   of the head?

24   A.   1140-D, like dog.

25   Q.   Okay.  The sculpt for the head, did you pick that up

1    from Gentle Giant in October of 2000?

2    A.   Yes.

3    Q.   Is it possible, Mrs. Leahy, that you ever did a sculpt

4    of the Bratz head in June of 2000?

5    A.   In June of 2000?

6    Q.   Yes.

7    A.   No.

8    Q.   Do you know a woman by the name of Anna Rhee?

9    A.   Yes, I know Anna.

10    Q.   And how do you know Anna?

11    A.   She's a face painter in the industry.

12    Q.   Is she employed by Mattel?

13    A.   No.  I know she was at some point in her career but not

14    when I was there.

15    Q.   Do you understand her to be a vendor?

16    A.   She's a free-lance, yeah, vendor.

17    Q.   Do you recall ever giving Anna Rhee a sculpt of a Bratz

18    doll head?

19    A.   No, I never gave her a sculpt of a doll head.

20    Q.   Prior to you picking up 1140-D, which is a sculpt of the

21    Bratz -- the mold of the Bratz head for Gentle Giant, had you

22    ever done another sculpt of a Bratz head?

23    A.   Other than this mold?

24    Q.   Other than that mold.

25    A.   No.

1  Q.  As of October 19th, 2000, was there a final Bratz

2  sculpt?

3  A.  No.

4       MR. PRICE:  Objection.  Irrelevant.

5       MR. NOLAN:  Time period, your Honor.

6       THE COURT:  Was there an objection?

7       MR. PRICE:  It's irrelevant.

8       MR. NOLAN:  Time period.

9       THE COURT:  Wait a second, Counsel.

10       It's not relevant.  Sustained.

11  Q.  BY MR. NOLAN:  The mold that you have there as 1140, you

12  said was presented at a meeting on October 25th at MGA; is

13  that correct?

14  A.  Well, the mold wasn't.  But a resin cast of what's

15  inside was.

16  Q.  The resin cast that was presented.

17       Was the resin cast that was contained in trial

18  Exhibit 1140, 1140-A through -D, ever presented to MGA prior

19  to October 25th of 2000?

20  A.  No.

21  Q.  After October 25th, 2000, were substantial changes made

22  to this particular mold?

23       MR. PRICE:  Objection.  Irrelevant.

24       THE COURT:  Sustained.

25  Q.  BY MR. NOLAN:  When you picked up this mold from Gentle

1    Giant and the clay resin that was contained in it, did you at

2    any time after -- well, let's keep it -- I'm sorry.  I always

3    get in trouble when I say at any time.  After you picked it

4    up and you brought it home, did you go back in any way to

5    check to see whether or not they were similar to Carter

6    Bryant's concept drawings?

7        MR. PRICE:  Objection.  Irrelevant, time period.

8        THE COURT:  We're not going to finish this today.

9    Why don't we take this up outside the presence of the jury,

10   Counsel.

11       I'll send the jury home tonight.  And we'll see the

12   jury tomorrow morning at 9:00.

13       (WHEREUPON THE JURY WITHDRAWS.)

14       THE COURT:  Please be seated.

15       Mr. Nolan, I'm not seeing the relevance of these

16   last series of questions, the changes to the mold on --

17       MR. NOLAN:  I just wanted to wait until Mrs. Leahy

18   left the courtroom.

19       THE COURT:  That's fine.  What's the relevance of

20   this?  The changes afterwards or whether they are similar to

21   the drawings?

22       MR. NOLAN:  Your Honor, just to show that the

23   concept drawings and the connection to the sculpt, that there

24   isn't a connection, and on their proposed verdict form, and I

25   understand that we're not trying to negotiate around what

1       their verdict form is going to be, but I want to make

2       absolutely clear that we have an opportunity to establish

3       that the sculpts were not tied to Carter Bryant's drawings

4       other than the initial interests operation and that Carter

5       Bryant did not have specific direction, because I just submit

6       to your Honor that one of the forms of the verdict form says

7       and any sculpt that Carter Bryant directed or gave directions

8       on.

9              That's why I was trying to go around this

10      particular date.  I'm mindful of the time limitations --

11             THE COURT:  I still don't get any changes in the

12      sculpt after.  Even if that's all true, I still don't see the

13      relevance of subsequent changes.

14             MR. NOLAN:  Well, I accept that, your Honor.  And I

15      understand that.  What I was trying to say is that one of my

16      questions, I thought related back in time.  I took this mold,

17      which is October 23rd, recognizing that I can't go out in the

18      future, but I did try to establish that when she picked up

19      this mold and the clay resin that was in it, the resin

20      sculpt, that she didn't go back and confirm that this resin

21      was similar to or that she used the concept drawings for any

22      purpose or that she took them back to Carter Bryant and said

23      is this consistent with what you told me to do.

24             Those kinds of lines of questions, which throws me

25      back into the relevant time period.  That's what I was trying

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir) 7/2/2008 12:00:00

1      to do.

2              THE COURT:  Okay.  Just to that last question

3      there.

4              MR. PRICE:  It doesn't bring back to the relevant

5      time period because the question is what did you do after

6      October 23rd.  After October 23rd did you go look at a

7      drawing.  After October 23rd --

8              THE COURT:  The question is what was done up to

9      October 19th.

10             Anything further, Mr. Nolan?

11             MR. NOLAN:  No, I think I'll tighten that up

12     tomorrow.

13             THE COURT:  All right.  As phrased right now, the

14     relevancy objection is sustained.  We'll take it up in the

15     morning.

16             Anything further that we need to address at this

17     time, or are we good to go for tomorrow?

18             Mr. Zeller?

19             MR. ZELLER:  Thank you, your Honor.  Mattel would

20     asked for leave to file two motions.  Number one is a JMOL.

21             THE COURT:  Is a who?

22             MR. ZELLER:  Judgment as a Matter of Law.

23             THE COURT:  I suspect I'm going to hear in a few

24     moments about a motion from Mr. Nolan as well.

25             MR. ZELLER:  Yes, I suspect so.  And the next

1    motion is a motion to compel client to testify in our

2    rebuttal case.  We've been having some back and forth.  And

3    we'll obviously attempt to resolve it, but there's not a lot

4    of time.  So we would like the opportunity to file a motion.

5        THE COURT:  What came up in the defense's case in

6    chief that was not reasonably anticipated?

7        MR. ZELLER:  Your Honor, in terms of the subject

8    matter of what we would ask Mr. Bryant about, I would

9    respectfully submit that this isn't necessarily the forum to

10   be telling the other side what we intend to examine

11   Mr. Bryant on.  I trust that we will make a showing to the

12   Court as to the proprietary -- the propriety, rather, of

13   rebuttal.  If that's going to be a ground that they are going

14   to oppose on.

15       As I understand, at least one of the principal

16   issues would just simply be a jurisdictional one.  They seem

17   to be taking the position that he simply can't be compelled

18   regardless of whether or not the standard is met.

19       Now, whether that's ultimately their position, I

20   don't want to try and speak on their behalf, but certainly

21   you know, to the extent that that is a basis that is raised

22   as to why Mr. Bryant should not be ordered and come and

23   testify in rebuttal, then we would address it there.

24       But I would certainly say right now I think it

25   would be a little unfair.

1          THE COURT:  The judgment as a matter of law is

2     directed towards what?

3          MR. ZELLER:  I think that the main event on that

4     really is ownership of certain works that Mr. Bryant

5     acknowledged or created when he was employed by Mattel.

6          THE COURT:  Mr. Nolan?

7          MR. NOLAN:  Your Honor, if I could address first

8     Carter Bryant and then come back to the judgment.

9          THE COURT:  Yes.

10          MR. NOLAN:  We certainly do have a right, a

11     standing to argue an issue with respect to whether or not

12     they should have the right to -- not the right to recall him,

13     yes, I guess I would describe it as the right to recall him

14     in the context of whether or not the subject matter that they

15     want to address could have been anticipated in advance.

16          Sometimes it's referred to as sandbagging.

17     Sometimes it's referred in other ways.  But I cannot imagine

18     that there was an issue that came up in the first hour of our

19     case, because that's when, as I understand it, your Honor, we

20     had played the Jacqueline Prince videotape.  That was the

21     only evidence that we had presented in our case, and it is

22     what we mentioned earlier in the week, that we were advised

23     on Monday night.  I think it was Monday night, for the first

24     time, on a scheduling issue, because Ms. Anderson was

25     advising that they were calling Carter in rebuttal.  And I

1    found out at that time, kind of curious and interesting that

2    they were able to after one video say they want Carter back.

3           So I do want an opportunity to argue whatever

4    suggestion that they are making, a surprise, oh, my gosh, out

5    of all of the witnesses in the world, that they would have to

6    bring Carter Bryant back.  I want to address that.

7           Let me turn to the judgment as a matter of law

8    motion.

9           Your Honor, Mattel well knows the evidence, the

10   record evidence in this case that there is a factual dispute

11   as to the drawings, the concept drawings as to when they were

12   done.  There is an issue, we've never contested it, with

13   respect to the color enhancement, whatever color is affixed

14   mechanically, the cranes -- I don't know how I did it.

15          But the drawings conceived and developed at Mattel,

16   while at Mattel, we went through laborious testimony,

17   factual, and I think the jury is going to be, as the trier of

18   fact, has to be making a decision as to whether or not those

19   were original concept drawings done while at Mattel or simply

20   a mechanical transfer process of tracing.

21          That was a lot of evidence in the case.  There's a

22   disputed record on it.  I do not believe that there is any

23   basis in the record to grant judgment as a matter of law on

24   that.

25          I will say, your Honor, for the record, that with

1     respect to the fashions, the evening wear fashions that are

2     drawn on the original concept drawings, I will represent to

3     the Court there is no evidence that they were ever used by

4     MGA, nor is MGA taking the position in this case that we have

5     control of the fashions.

6          Nor am I contending that we claim ownership to the

7     color or the various colors that appear on those outfits.

8     But that's not the issue in this case, your Honor.  I think

9     that the trier of fact will have to render a verdict based on

10    the evidence that came in and is hotly disputed whether or

11    not those drawings, the drawings were actually done while at

12    Mattel or whether or not it was merely a mechanical process

13    with no creativity involved.

14         THE COURT:  Very well.  And are you seeking leave

15    to file your own motion?

16         MR. NOLAN:  Yes, your Honor.  My best estimate is I

17    think we're going to file it tomorrow morning.  It won't be

18    lengthy, I promise you.  And I don't want to represent right

19    now what it is that we intend to file.  I want to, although

20    if I have to reserve right now, I can give you kind of a

21    broad scope.

22         THE COURT:  Well, just if you would for the record,

23    what -- would you specify the type of motion that you are

24    seeking to file?

25         MR. NOLAN:  Sure.  It will be a judgment as a

1    matter of law.  With respect to the Hong Kong entity.

2         THE COURT:  Very good.

3         MR. NOLAN:  And then one of the other points in

4    there will go to some of the contractual aiding and abetting,

5    and in particular, the inducement of the tortious

6    interference.

7         THE COURT:  Very good.

8         MR. NOLAN:  But I haven't seen the final draft.

9         THE COURT:  I understand.  All right.  I will give

10   leave -- all I'm doing is giving leave at this point in time

11   to both Mattel and to MGA to file their respective judgments

12   as a matter of law.  Motions for judgment as a matter of law.

13   I'm going to request both sides to keep those to five pages

14   as the Court has tried to do in motions during the trial.

15   And I'll also give leave for a motion to compel the testimony

16   of Carter Bryant.  I agree with Mr. Nolan.  I can't conceive

17   of what it is that was not reasonably anticipated, but since

18   I don't know what it is, I can't make that judgment.  And

19   I'll wait and see what is set forth in the motion.

20        You indicated that your motion -- MGA's motion can

21   be filed tomorrow.  When can I expect Mattel's motions to be

22   filed?

23        MR. ZELLER:  Our expectation is tomorrow as well.

24        THE COURT:  Very well.  Tomorrow is the 3rd.  And I

25   would then anticipate oppositions to the motions to be

1      filed -- I'm going to say by noon on Monday.  And actually,

2      they can be filed anytime on Monday.  But I'd like to receive

3      oppositions in chambers, copies of the oppositions on Monday

4      by noon.

5          So the Court can rule on these if necessary on

6      Monday afternoon.  I am planning to hold a hearing in this

7      case on Monday afternoon to go over the jury instructions and

8      the verdict form for Phase 1-A.  And what I'd like to be able

9      to do is be in a position to also hear any argument on these

10     three motions and hopefully decide these three motions on

11     Monday afternoon as well.  So if I can get the oppositions,

12     the Court is going to limit this to the motion and the

13     opposition, five pages each.

14         MR. NOLAN:  Do you have a time preference in the

15     afternoon?  Not for the filing of the motion but for the

16     hearing?

17         THE COURT:  For the hearing, let me get back to you

18     on that.  I got to take a look at my criminal calendar and

19     see.  Let me take a look at my criminal calendar, and I'll

20     get back to you on that tomorrow.

21         MR. NOLAN:  Can I raise two quick points?

22     Actually, two small points and two not too big issues.

23         On the time count, your Honor, the Janet Bryant --

24         THE COURT:  Oh, yes.

25         MR. NOLAN:  I've been told that MGA's time on it

1    was one hour and two minutes.  And Mattel's was 18 minutes.

2         THE COURT:  Very good.  So I've got to transfer 18

3    minutes from the defense to Mattel.

4         MR. NOLAN:  Correct.  And then we had raised the

5    issue of Rodney Palmer's video.

6         THE COURT:  Okay.  That's right.  I still have to

7    review Mr. Palmer's video deposition.  I haven't done that.

8    I'll have that ready for you tomorrow morning.

9         MR. NOLAN:  I add to it that we learned that

10   Mr. Palmer is not here.  That he's on vacation on the East

11   Coast.  I was advised of that by Mr. Quinn.  Because when I

12   saw the objections, I said can you have him here then

13   present.  And we'll just put his testimony on as a 30(b)(6)

14   witness.  And I've been advised that he's not in the

15   jurisdiction.

16        Last point, your Honor, is that much like what we

17   went through over the last couple days on Custodian of

18   Records subpoenas, we've issued a Custodian of Records

19   subpoena to Mattel trying to get in some documents, and we

20   were confronted with objections, and what we would really

21   like to do is get this custodian issue and the documents out

22   of the way tomorrow if we could.

23        THE COURT:  Who do you have?  How much longer do

24   you have with Ms. Leahy approximately?

25        MR. NOLAN:  Oh, I think maybe -- I've never wanted

1    to sound like Mattel.  I think more -- not more than 10

2    minutes.

3         THE COURT:  All right.

4         MR. NOLAN:  15 minutes.

5         THE COURT:  And you have Mr. Palmer.  You want a

6    Custodian of Records.  What other witnesses are you planning

7    to call?  I know you anticipated or hoped to rest tomorrow.

8    I don't know if that's possible.  But what rounds out your

9    case at this point?

10        MR. NOLAN:  It's going to be off the top of my

11   head.  One of the issues is Mr. Kilpin, which I believe we

12   submitted that e-mail to you about.

13        THE COURT:  I've got that here.  Is that the

14   primary purpose of calling Mr. Kilpin?

15        MR. NOLAN:  Yes.  Although what I'd like to do is

16   take a very, very brief but strong point of trying tomorrow

17   to show to you where Mattel categorically opened up the door

18   to allow us to get in the marketing plans.  Not all of them.

19   We would redact them down to the limited portions of what

20   Mr. Kilpin had reflected there based on some testimony that's

21   been offered in the case.

22        THE COURT:  All right.  As well as the e-mail

23   itself.

24        MR. NOLAN:  As well as the e-mail itself.

25        THE COURT:  All right.  Who else besides

1    Mr. Kilpin, the Custodian of Records, Mr. Palmer.

2         MR. NOLAN:  And then we have the video play of

3    Richard Irmen, Jeanne Galvano, which is the friend, both of

4    those videos, your Honor, run about an hour each.

5         THE COURT:  Right.

6         MR. NOLAN:  And then I have Mr. De Anda.  And right

7    now I'm sure I'll be getting a note.  But that's my best

8    estimate for tomorrow.

9         THE COURT:  Do you have any witnesses beyond that

10   before you rest?

11        MR. NOLAN:  I just -- I don't think so.  But I

12   want -- that's my best estimate right now, your Honor.  But I

13   want to go back and think about this and reflect on it to

14   make certain that we have everybody.  There may be somebody

15   else.  It's just not coming to mind right now.

16        THE COURT:  Well, assuming the Court doesn't have

17   any major interruptions tomorrow, it seems that we can get

18   through most of this tomorrow.  So what I'll hear in the

19   morning, then, is I'll rule on the Palmer transcript, and

20   I'll hear argument and make a decision on the Kilpin

21   testimony.  Was that right?  Kilpin?

22        MR. NOLAN:  Kilpin.  The one other witness, your

23   Honor, is Jill Thomas.  She's still on the witness list.

24   This is the argument that Mr. Quinn made about gee, she's,

25   you know, in charge of litigation.  She's got a lot of

1    privilege issues and stuff like that.  We recognize that, but

2    as I said earlier, tying it back to this custodian of record

3    subpoena issue and the documents, if any, that are going to

4    be produced, I mean, we have two of our general counsel on

5    the stand today testifying.

6          THE COURT:  I understand.  All right.

7          MR. NOLAN:  And then there was one other thing that

8    just slipped my mind.  I'll let somebody else talk.  If I can

9    remember what it was, I'll come back to it.

10         THE COURT:  Very well.  Counsel?

11         MR. QUINN:  Your Honor, every time my friend

12   Mr. Nolan talks about why he wants to get Jill Thomas on the

13   stand, we hear a different account.  When we raised this, was

14   it yesterday?  What day of the week is it?  Yesterday, it was

15   because of Rachel Harris, that she had had a meeting with

16   Rachel Harris and he wanted to ask her about that.

17         In the supplemental witness list that we got last

18   Friday, in the box for expected subject matter, it was

19   credibility of Carter Bryant.  And now we've heard in some

20   very vague fashion that it's relating to Custodian of

21   Records.

22         MR. NOLAN:  I apologize.  When I say the Custodian

23   of Records documents, your Honor, we've subpoenaed from the

24   Custodian of Records any documents that were produced to

25   Rachel Harris.  That's the reference I was making before.

1          THE COURT:  It's the Custodian of Records of

2     documents related to Rachel Harris to impeach Carter Bryant.

3     Maybe it's all one.  It's a seamless --

4          MR. QUINN:  It's a gestalt, clearly.

5          MR. NOLAN:  No, it's a carom shot.

6          THE COURT:  Be that as it may, Counsel.

7          MR. QUINN:  The Court, I think, knows our view.

8          THE COURT:  I do.

9          MR. QUINN:  There needs to be a proffer.  I

10    suggest, given Ms. Thomas's involvement in this case, there

11    should be some specific proffer --

12         THE COURT:  What is your concern about Ms. Thomas?

13         MR. QUINN:  She wasn't -- I know this hasn't been a

14    terribly powerful argument up to this point, but she wasn't

15    on the witness list.  We got notice of her June 30th.  I

16    think that's last -- whenever that was.  Well, we got it last

17    Friday.

18         THE COURT:  Okay.

19         MR. QUINN:  She's not on the witness list.  She's

20    intimately involved, truly a member of our litigation team

21    from the inception in this case.  All I asked for -- my view

22    is given that, there ought to be some reason.  It's like

23    calling trial counsel to testify.  There ought to be some

24    articulated reason.  And MGA has now had at least three times

25    to say give us a reason, and they haven't given us one that I

1    think has any force to it.

2        I mean, she met with Rachel Harris, didn't give her

3    any documents.  Harris didn't -- she didn't -- she didn't

4    give Harris any documents.  Harris didn't give her any

5    documents.  Why is that reason for invading our camp and

6    putting the in-house lawyer responsible for this case who

7    wasn't on the witness list on the stand?

8        THE COURT:  Very well.  What about this Custodian

9    of Records issue?

10       MR. QUINN:  Custodian of Records issue.  We got a

11   subpoena last Thursday for a Custodian of Records.  It

12   identifies 22 documents.  Actually, I think it only

13   identifies perhaps 21 documents and a category, all documents

14   that, you know, a Custodian of Records for any documents that

15   Ms. Thomas gave to Ms. Harris or Ms. Harris gave to

16   Ms. Thomas.  I forget which one it is.  And then on Monday we

17   got a supplement to that adding another dozen documents.

18       So we have a Custodian of Records subpoena, now 34

19   documents on it.  The return date was less than five days.

20   It was, you know, if we got last Thursday, I think a return

21   date was today for the subpoena.

22       Your Honor, there isn't any procedure under the

23   Federal Rules to do this.  This is like a -- I mean, the

24   Court's fully aware of the discovery procedures.  This is

25   like a 30(b)(6) Custodian of Records deposition.  Show up

1    with all the -- whatever documents Ms. Thomas gave to

2    Ms. Harris.

3         There is nothing in the Federal Rules that

4    authorizes this.  That authorizes subpoenaing, you know, some

5    identified person to authenticate documents in trial.  You

6    know, even as to the categories where they do list the

7    documents.

8         THE COURT:  Are there disputes as to the

9    authentication of these documents?

10        MR. QUINN:  Some of them there are.  Some of them

11   there are.  We did go through that procedure, pretrial

12   exhibit list, and some of them, there were questions as to

13   authenticity reserved, objections were preserved.

14        What this is, your Honor, 34 documents at this

15   point on a subpoena return date five days before it was

16   supplemented and then supplemented two days?  This is

17   discovery in the middle of trial.  We shouldn't have to deal

18   with this at this point.  There just is no authority in the

19   Federal Rules for doing it.

20        THE COURT:  Very well.  Let me hear from someone

21   from MGA on this.

22        Ms. Aguiar.

23        MS. AGUIAR:  Okay.  So I have in front of me a

24   subpoena to a Custodian of Records to MGA, and it's dated

25   June 12th, 2008.  The return date is June 17th, 2008.  This

1    is Mattel to us.  It has an attachment with a number of

2    exhibits listed.  Number 7 is not a specific document.

3    Number 7 says any other exhibits on the parties' trial

4    exhibit lists in your possession, custody, or control that

5    have not yet been authenticated.

6          As your Honor may recall, the trial exhibit lists

7    in this case are nothing less than gi-normous.

8          We served -- and let me back up.  We provided to

9    Mattel a Custodian of Records.  We made general objections.

10   But we didn't move to quash.  We said okay.  Tell us what

11   documents you want to ask them about.  We'll provide them to

12   you.  Craig Holden came here, took the stand, and they put

13   documents in front of him.

14         We served a similar Custodian of Records subpoena,

15   and I can personally tell you that when the associate who is

16   working on the case with me came to me and said should I use

17   similar language to the catchall category that Mattel used,

18   and said any trial exhibits, I said no.  You know what?

19   Because I don't think that's appropriate.

20         So we put a category.  We did put a residual

21   category that we said things in your possession that we tell

22   you about at least 24 hours before, because I didn't think

23   that it was fair to say any exhibit on the list.  So the --

24   if we want to talk about there being no procedure under

25   Federal Rules, then I think it should run both ways.  They

1    served one on us.  We complied with it.  We provided the

2    witness.  The witness showed up, and the witness testified to

3    the documents that they asked him about.

4         We did a similar thing -- if we want to quibble

5    about how many days there were between the time when we both

6    served it and when we asked for it to be returned, well, I

7    don't really think that's the point.  We have a fairly narrow

8    universe of documents.  If they would like, we can get back

9    to them either tonight or first thing in the morning and let

10   them know definitely which ones we would do with the

11   custodian.  But I think clearly it's a fair procedure, your

12   Honor.

13        THE COURT:  Thank you.

14        Mr. Quinn?

15        MR. QUINN:  Your Honor, they brought a document

16   custodian.  They agreed to do that.

17        THE COURT:  You did serve a subpoena on them in the

18   middle of trial.

19        MR. QUINN:  We did serve a subpoena on them.  They

20   brought a document custodian.  They didn't get up here like I

21   am and say I've been served with a list of 34 documents at

22   the end of the trial, and there's no authority for it.  And,

23   your Honor, you remember what happened when we were at

24   sidebar?  We were trying to get 1932 in, and counsel said you

25   can't do it with a Custodian of Records.

1          Drolnick (phonetic) is coming up.  You can do it

2     with her.  The Custodian of Records has no knowledge about

3     that.  We didn't get in a single -- there was one document I

4     put in front where there was a conditional admission.  That's

5     what that all amounted to at the end of the day, one

6     document.  And even that didn't come in until Mr. Marlow took

7     the stand earlier today, I think it was.

8          Now I'm dealing with a list of 34?

9          THE COURT:  I understand.  And you know, I want to

10    treat both parties the same, though, Counsel.  So I do think

11    that you need to come up with a custodian just as they did.

12    I will certainly reserve for you the same rights to object as

13    MGA objected in terms of foundational objections to the

14    custodian not having knowledge.

15         I mean, it really does seem -- I want to treat both

16    sides the same here.  What's good for the goose is good for

17    the gander.  I know that it's not named in the Federal Rules

18    of Civil Procedure, but that's essentially what we're trying

19    to enforce here.  There is a voluminous number of documents.

20    And I'm sure Mr. Nolan could give us a recap in terms of the

21    actual numbers, but I think we've had to adopt certain unique

22    procedures in this case just to marshal this effectively

23    consistent with the time allotted by the Court.

24         So the Court has developed some procedures that are

25    not normally imposed, and one of them that makes sense to me

1     is having a kind of catchall custodian to get in those

2     documents that need to be -- that do need to be moved into

3     evidence that don't naturally line up with one of the

4     witnesses.

5            You have very forcefully argued that I should just

6     permit these documents in as long as there's a stipulation of

7     authenticity.  And the Court is satisfied with the relevance

8     of foundation without a witness.

9            I have insisted on a witness just to -- as part of

10    the case management here.  What I think we need to do tonight

11    is I do think the -- your request to have a definitive list

12    on the documents, a refined list of the documents is a

13    reasonable one.  I hate to rule in the abstract without

14    knowing what documents that we're talking about.  And just

15    what role those documents play in this case.

16           So I guess what I'm inclined to do is say get

17    together tonight.  Let's go over the exact documents that you

18    absolutely need.  Certainly if there's no dispute over

19    authenticity, I think that's an appropriate way to get them

20    in.  And if there is a dispute over authenticity, that's a

21    whole separate question.

22           And if Mattel has reserved their rights to

23    challenge, that puts it in a different category than the

24    documents that were in question with MGA.  And you have

25    preserved those rights, and you can exercise those objections

1    and it's incumbent, then, upon MGA to come up with a way of

2    authenticating that.

3         If they don't, then the document doesn't come in.

4    But if there's been a stipulation to authenticity, I can't

5    think of any documents that you so stipulated that Mattel

6    sought to introduce that have not been introduced at this

7    time.  Am I mistaken on this point?

8         MR. QUINN:  Frankly, I can't think of it.

9         THE COURT:  Well, if there are, let me know

10   tomorrow.  Because the Court by imposing this is not

11   attempting to preclude either side from getting in documents

12   that are essentially stipulated to and the Court does believe

13   is relevant, or are relevant to the proceedings.  I want

14   those documents to come in and go before the jury.

15        MR. QUINN:  What I'm hearing --

16        THE COURT:  And the other thing I want to say, the

17   other thing that needs to be done tonight is that Mr. Nolan

18   or whoever is responsible for Jill Thomas needs to sit down

19   with Mr. Quinn or whoever is responsible for responding to

20   that and lay out clearly what it is that she's being called

21   for.  She is counsel, and just as with when there was talk

22   about calling Ms. Glaser or other witnesses, the Court has

23   imposed a higher standard in terms of making the proffers,

24   which I haven't imposed on other witnesses.

25        I think that is a reasonable request in light of

1     the role that Ms. Thomas played in litigation here.

2         MR. NOLAN:  It is reasonable, your Honor.  And

3     we'll meet.

4         My only point, to make this really clear, is that

5     Jill Thomas, of course, the testimony is that she interviewed

6     a third party witness that Mattel did not represent who then

7     came in and testified and related that she had -- that's the

8     only issue, and --

9         THE COURT:  Here's what I'll do.  I'll take this up

10    tomorrow morning.  I'll want in terms of the Custodian of

11    Records issue, those documents identified for the Court.  Let

12    me take a look at them.  You know, this process may not work

13    with respect to ones where there's not a stipulation on

14    authenticity.  And that's going to have -- MGA is going to

15    have to find a way to get those documents in some other way.

16    But to the extent there's a stipulation, I think the

17    custodian of record is a reasonable way of doing that.

18        I'll expect Mattel to make that available, provided

19    that there's no other objections to it that can't be answered

20    by the custodian.  And I'll take that up in the morning.

21    Jill Thomas, I'll take that up in the morning.  The Palmer

22    transcript, I'll take that up in the morning.  And Kilpin,

23    I'll give leave to MGA to argue that.

24        So those four issues will be taken up in the

25    morning before the start of the trial at 9:00.

1      MR. NOLAN:  Your Honor, there was one name that I

2      left off.  And Cassidy Park.  And she's been on the list.  I

3      sent an e-mail to Mr. Quinn about this.  Mr. Quinn was

4      surprised because he said gee, I thought she was finished.

5      My distinct memory, and you may recall this, is that they

6      called her.  I was cross-examining her, and I believe the

7      Court asked me to stop in light of the third party schedules

8      that were going on.  And you said, you know, call her in your

9      case.

10      THE COURT:  Someone is going to have to show me a

11      transcript.  I just don't remember one way or the other.  I

12      know Cassidy Park was called as a witness, and we heard from

13      her.  I don't know if I excused her or not.  So if someone

14      could provide me a transcript.  And it's not that I'm

15      questioning you.  I take it that Mattel disputes that?

16      MR. QUINN:  I've looked at the transcript.  And

17      you'll see that Mr. Nolan gets into an issue.  There is a

18      sidebar.  There's a discussion.  We can do this by

19      stipulation.  The last words are Mr. Nolan says, "I'll deal

20      with this later."

21      I think pretty clearly dealing with the

22      stipulation, and she leaves the stand.  And I assumed that

23      was the end of it.  I was very surprised to hear he wanted to

24      call her back.

25      THE COURT:  Did I excuse her?  I know I tried to

1    make the practice of saying you're excused.

2          MR. NOLAN:  I don't believe so, your Honor.  And

3    Mr. Quinn will, if he looks earlier in the transcript, this

4    is where you were concerned about the third party witnesses,

5    and you said something about, you know, they have taken 10

6    minutes.  Can't you call her back.  At least that was my

7    understanding.

8          THE COURT:  Take a look at the transcript, and

9    we'll take this up tomorrow morning as well.

10          MR. NOLAN:  Can we have a time count, your Honor,

11    before we leave tonight, if that's possible?

12          THE COURT:  Very well.  Give me a second here.  All

13    right.  That's all that MGA has at this point?

14          MR. NOLAN:  Yes.

15          THE COURT:  All right.  Let me do the time count,

16    and then -- I've got MGA at 33 hours and 47 minutes.  And I

17    have Mattel right at 45 hours and 5 minutes.

18          All right.  For Mattel?

19          MR. PRICE:  On the Carter Bryant motion, could we

20    make our proffer as to the relevance of the rebuttal

21    testimony in camera?

22          THE COURT:  Given that it's rebuttal testimony,

23    that makes -- I suppose that makes sense.

24          MR. PRICE:  Quite frankly, it's kind -- we have to

25    give the plaintiff notice because of where he is.  And it's

1      dependent upon what witnesses say, obviously.

2          THE COURT:  Can do you it in a written submission

3      to be submitted in camera, and then the Court after reading

4      it will decide whether or not the in camera submission is

5      justified, and we'll go from there.  I'll give you leave to

6      file the declaration concerning the anticipated testimony in

7      camera.  And then the Court will decide from there.

8          MR. PRICE:  The other issue is in the practicality.

9      If the Court rules on this Monday afternoon, he will not be

10     able to get here by Tuesday probably, given the time

11     difference between here and Kickapoo.  So -- Springfield.

12         THE COURT:  What do you suggest?

13         MR. PRICE:  Well, if we had a ruling Monday

14     morning, perhaps he could get out here.  Or I don't know if

15     they are actually going to be able to rest tomorrow.  There's

16     always the possibility of doing it the first thing Monday

17     morning.  If you rule in our favor.

18         THE COURT:  You get your motion to MGA tonight.

19         MR. PRICE:  I think the person will be sweating on

20     that.  But we can do that.

21         THE COURT:  You've made that clear for the record.

22         All right.  You get the motion to MGA tonight, and

23     then that gives MGA tomorrow, and I don't want people having

24     to worm --

25         MR. ZELLER:  I assume we'll deliver the in camera

1      declaration in the morning since I'm not sure there's a way

2      of getting it to you tonight.

3              THE COURT:  Very good.  I presume it's going to be

4      a relatively short motion.

5              MR. ZELLER:  Yes, your Honor.

6              THE COURT:  All right.  Anything else?

7              MR. ZELLER:  Yes, your Honor.

8              MR. NOLAN:  You know, I apologize.  Before we get

9      off the rebuttal case, is that the only rebuttal witness that

10     they intend to call?

11             THE COURT:  I don't know.

12             MR. NOLAN:  Could we ask?

13             THE COURT:  At this point, Counsel, it would be

14     helpful to the Court to know.

15             MR. QUINN:  Yes.

16             THE COURT:  Very good.

17             MR. ZELLER:  Just as a reminder with respect to the

18     Palmer declarations and the issue, from our perspective, the

19     main issue is whether or not that evidence comes in at all

20     because of the standards for spoliation.

21             THE COURT:  I understand.  I got my clue there when

22     I saw the objection to him stating his name in the

23     deposition.  That was the first hint that you are objecting

24     to the whole thing categorically.  So I got that.

25             MR. ZELLER:  Fair enough.  And then as an

1    administrative issue, we assume that the Court plans to

2    instruct the jury after the closing argument?

3            THE COURT:  No.  I instruct before.  That's always

4    been my practice.  It goes back to when I was a prosecutor.

5    I always liked having the instructions out there so I could

6    argue them to the jury.

7            MR. ZELLER:  That's helpful.

8            And that's it, your Honor.

9            THE COURT:  And they will know the verdict form as

10   well.  They will have -- they will have received the Court's

11   oral statement of the instructions and the oral statement of

12   the verdict form, and then they will hear your closing

13   arguments and go back into the jury room and will have

14   physical copies of both.  And in a case like this, I will

15   have a copy of the instructions for each member of the jury.

16           We'll only have one verdict form going back,

17   though.  Because that's the last thing I need.

18           Very good.  We'll talk about the hearing Monday

19   tomorrow as well.

20           MR. NOLAN:  Your Honor, just 30 seconds.  Would it

21   be the Court's intention to instruct the jury and then

22   immediately proceed to closing arguments?

23           THE COURT:  Yes.

24           MR. NOLAN:  And then the Court's practice with

25   respect to --

1          THE COURT:  And just so you know, based on what you

2      are telling me, is that it looks like you'll be resting

3      tomorrow or Tuesday at the latest.  I can't imagine the

4      rebuttal witness, if the Court permits it, is going to last

5      all that long.  So I would expect that Wednesday morning,

6      Wednesday will be devoted to closing arguments.  The Court

7      will begin in the morning with the instructions, and I will

8      expect closing arguments to be completed on Wednesday.

9          MR. NOLAN:  All right.  And the last question is

10     with respect to closing arguments, your Honor, is it the

11     Court's practice, since this is a civil case, not to allow

12     the plaintiff to have a rebuttal closing argument?

13         THE COURT:  No, the Court has always allowed

14     rebuttal closing argument.

15         MR. NOLAN:  And will there be --

16         THE COURT:  When there is a burden -- when the

17     plaintiff bears the burden of proof, generally that's the

18     Court's practice, is to allow the party bearing the burden of

19     proof to have a rebuttal case.

20         MR. NOLAN:  And I guess there's no surrebuttal.

21         THE COURT:  No.

22         MR. NOLAN:  I assume that as part of that process,

23     we would have time estimates so that there's not a situation

24     where the opening statement is 15 minutes long and then the

25     rebuttal is three and a half hours.

1          THE COURT:  No, that won't be permitted.  The Court

2     will ask for time estimates and impose time limitations if

3     necessary.

4          MR. NOLAN:  Thank you.

5          MR. PRICE:  With respect to that, your Honor, is it

6     okay with the Court if one attorney does the initial closing

7     and another does the rebuttal?

8          THE COURT:  The initial -- I'm sorry?

9          MR. PRICE:  The opening closing, for example, one

10    attorney would do the opening closing --

11         THE COURT:  You can split it up.  That's fine.

12    Just no tag teaming during the actual remarks themselves.

13         All right.  If there's nothing further at this

14    time, I will see you tomorrow morning.  Let's try to make it

15    8:15 because it sounds like we have quite a few things to get

16    through before 9:00.  We have a full day tomorrow.

17

18              (Proceedings concluded at 5:39 P.M.)

19

20

21

22

23

24

25

am; Eckert Dir/Cross/ReDir/ReCross; Gronich Dir/Cross/ReDir; Kamarck Dir; Leahy Dir)  7/2/2008  12:00:00

```
 1
 2
 3
 4
 5
 6                C E R T I F I C A T E
 7
 8
 9          I hereby certify that pursuant to Title 28,
10    Section 753 United States Code, the foregoing is a true and
11    correct transcript of the stenographically reported
12    proceedings in the above matter.
13          Certified on July 2, 2008.
14
15

16          _____

            MARK SCHWEITZER, CSR, RPR, CRR
            Official Court Reporter
17          License No. 10514
18
19
20
21
22
23
24
25
```