t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3                            ---

 4          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 5                            ---

 6     MATTEL, INC.,            : PAGES 4764 - 4889

                                :

 7            PLAINTIFF,        :

                                :

 8      VS.              : NO. ED CV04-09049-SGL

                         : [CONSOLIDATED WITH

 9     MGA ENTERTAINMENT, INC.,    : CV04-9059 & CV05-2727]

       ET AL.,              :

10                        :

       DEFENDANTS.        :

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17            THURSDAY, JULY 10, 2008

18            JURY TRIAL - DAY 22

19              MORNING SESSION

20

21

22            MARK SCHWEITZER, CSR, RPR, CRR

              OFFICIAL COURT REPORTER

23            UNITED STATES DISTRICT COURT

              181-H ROYBAL FEDERAL BUILDING

24            255 EAST TEMPLE STREET

              LOS ANGELES, CALIFORNIA 90012

25            (213) 663-3494
```

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      Appearances of Counsel:

2

3      On Behalf of Mattel:

4          Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
           By John B. Quinn, Esq.

5          B. Dylan Proctor, Esq.
           Michael T. Zeller, Esq.

6          Harry Olivar, Esq.
           John Corey, Esq.

7          Diane Hutnyan, Esq.
           William Price, Esq.

8          855 South Figueroa Street
           10th Floor

9          Los Angeles, CA 90017
           (213) 624-7707

10

11

12     On Behalf of MGA Entertainment:

13         Skadden, Arps, Slate, Meagher & Flom LLP
           By Thomas J. Nolan, Esq.

14         Carl Alan Roth, Esq.
           Jason Russell, Esq.

15         Lauren Aguiar, Esq.
           David Hansen, Esq.

16         Matthew Sloan, Esq.
           Robert Herrington, Esq.

17         300 South Grand Avenue
           Los Angeles, CA 90071-3144

18         (213) 687-5000

19

20

21

22

23

24

25

1                          I N D E X

2

3     CASSIDY PARK, PREVIOUSLY SWORN......................... 4770

4     DIRECT EXAMINATION BY MR. ZELLER: .................... 4770

      CROSS-EXAMINATION BY MR. NOLAN:  ..................... 4774

5     REDIRECT EXAMINATION BY MR. ZELLER: .................. 4792

      RECROSS-EXAMINATION BY MR. NOLAN: .................... 4793

6

      CLOSING ARGUMENT BY COUNSEL FOR THE PLAINTIFF.......... 4823

7

8                        E X H I B I T S

9

10    (Exhibit 10624 received.)............................. 4773

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          Riverside, California; Thursday, July 10, 2008

2                    9:00 A.M.

3          (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4            WHEREUPON THE CASE HAVING BEEN CALLED AND

5            APPEARANCES GIVEN, THE FOLLOWING PROCEEDINGS

6          WERE HELD:

7            THE COURT:  Good morning, Counsel.  We're still

8    with the MGA case.  You're prepared to proceed at this time?

9    Are there any matters that you need to take up?

10           MR. NOLAN:  We are prepared to proceed with the

11   final act being reading of the declaration regarding

12   Mr. Palmer, which, I believe, the Court has.

13           THE COURT:  Right.  But you'll be doing the reading

14   of that.  That's a stipulation --

15           MR. NOLAN:  The missing October phone records.

16           THE COURT:  Very well.  And then you're prepared to

17   proceed with your rebuttal case?

18           MR. QUINN:  Yes, your Honor.  And then there's a

19   couple stipulations, I understand, to be read.

20           THE COURT:  Very well.  Why don't we go ahead and

21   bring the jury in and get through this.  And after we bring

22   the jury in and wrap this up, at that time I'm going to read

23   the jury instructions, once everyone's rested, and the

24   verdict form.  We'll then take a brief break.

25           The jury is going to order lunch at that time, come

1      back, we'll start with the opening closing statement, go

2      through lunch.  They will then have a 45-minute lunch, and

3      then it will be the defendant's closing argument and then the

4      rebuttal closing argument for the plaintiff.

5           And both sides will be limited to two and a half

6      hours.

7           MR. QUINN:  Your Honor, in my opening closing, I

8      might want to take a break an hour in, if that's acceptable.

9           THE COURT:  A brief one.

10          MR. QUINN:  Brief one.

11          THE COURT:  Right.

12          MR. PRICE:  We handed you a copy of the verdict

13     form.  We actually have one that's changed.  The form we gave

14     you has the phase on the title.  It just occurred to us that

15     that was something we probably wouldn't --

16          THE COURT:  I think it's going to be pretty clear

17     to the jury at this point in time that this is not the end of

18     the trial.

19          MR. PRICE:  In any event, if you prefer not to have

20     that, we have copies without the phase on it.

21          THE COURT:  I'll think about that before I give it

22     to the jury.

23          Mr. Nolan, do you have any thoughts on that?  This

24     is something which has been on there throughout.

25          MR. NOLAN:  It's been on there throughout.  I do

1    agree that they understand that they were cleared for some

2    period of time.  Maybe we'll go home.  Maybe we won't.  It's

3    also on the jury instruction form.  So --

4            THE COURT:  Very well.  I'll consider that.

5            (WHEREUPON THE JURY ENTERS.)

6            THE COURT:  Good morning, members of the jury.

7            Mr. Nolan, you may proceed.

8            MR. NOLAN:  Good morning.  Your Honor, the last

9    piece of business for MGA in its case is that we have a

10   stipulation to read having to do with the admission of

11   certain phone records.

12           THE COURT:  You may proceed.

13           MR. NOLAN:  Your Honor, the parties stipulate that

14   Exhibit 472 represents the phone calls made by Carter Bryant

15   from his extension at Mattel for the month of September 2000.

16   There are no records available for telephone calls from

17   Carter Bryant's extension for the period of October 2000.

18           THE COURT:  Is that stipulated to by Mattel?

19           MR. PRICE:  So stipulated, your Honor.

20           THE COURT:  Very well.

21           MR. NOLAN:  And on that note, MGA rests.

22           THE COURT:  Very well.

23           Any rebuttal?

24           MR. QUINN:  Yes, your Honor.  Mattel calls Cassidy

25   Park.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          THE COURT:  You may.

2          THE CLERK:  Please come forward.  Good morning,

3     ma'am.  Would you please take the witness stand.

4          Be seated.  Please state your full name for the

5     record, and spell your last name.

6          THE WITNESS:  Cassidy Park, P-A-R-K.

7          THE COURT:  Ms. Cassidy, you were previously sworn

8     in this matter; correct?

9          THE WITNESS:  Correct.

10         THE CLERK:  You are reminded you are still under

11    oath.

12          CASSIDY PARK, PREVIOUSLY SWORN.

13         MR. ZELLER:  Your Honor, if I may proceed?

14         THE COURT:  You may.

15         MR. ZELLER:  Thank you.

16          DIRECT EXAMINATION

17    BY MR. ZELLER:

18    Q.  Good morning, Ms. Park.

19    A.  Good morning.

20    Q.  Are you familiar with Carter Bryant's handwriting?

21    A.  Yes.

22    Q.  And how is it that you are familiar with his

23    handwriting?

24    A.  We worked together for several years.

25    Q.  And during the time period that you worked with Carter

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      Bryant there at Mattel, how often did you have occasion to

2      see his handwriting?

3      A.   Daily.

4      Q.   If you'd please take a look at -- there should be a

5      document there.  It's Exhibit 10624 for identification.

6      A.   Yes.

7      Q.   Do you have that there?

8      A.   Yes.

9      Q.   Let me ask you first, do you recall ever seeing this

10     specific document before this week?

11     A.   No.

12     Q.   Do you recognize any of the handwriting on this

13     document?

14     A.   I do.

15     Q.   Whose handwriting do you recognize on that document?

16     A.   Carter Bryant's.

17          MR. ZELLER:  Your Honor, I would move Exhibit 10624

18     into evidence.

19          MR. NOLAN:  Objection.  Lack of foundation and also

20     calls for hearsay.

21          THE COURT:  I'm going to sustain the foundation.

22     Let's lay some further foundation in terms of the specific

23     handwriting identified, Counsel.

24          MR. ZELLER:  Thank you, your Honor.

25     Q.   Directing your attention, and I don't want to you talk

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      about what exactly the document shows.  But let's just kind

2      of break down portions of it.

3             Do you see a signature there in the lower

4      right-hand corner?

5      A.   Yes.

6      Q.   Do you recall the handwriting of the signature?

7      A.   I do.

8      Q.   Whose handwriting is that?

9      A.   Carter Bryant's.

10     Q.   Do you recognize the handwriting of the date that's on

11     this document?

12     A.   I do.

13     Q.   Whose handwriting do you recognize of that?

14            MR. NOLAN:  Objection.  Lack of foundation, your

15     Honor.

16            THE COURT:  Overruled.

17            THE WITNESS:  Carter Bryant's.

18     Q.   BY MR. ZELLER:  And then there's a box there, some

19     written material inside of it on this Exhibit.

20            Do you recognize the handwriting in that side of

21     that box?

22     A.   I do.

23     Q.   Whose handwriting do you recognize it as?

24     A.   Carter Bryant's.

25            MR. ZELLER:  I would move Exhibit 10624 into

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      evidence, your Honor.

2            MR. NOLAN:  Same objection.

3            THE COURT:  Very well.  Overruled.  It's admitted.

4      You may publish.

5            (Exhibit 10624 received.)

6      Q.  BY MR. ZELLER:  And for the record, this document was

7      produced by Carter Bryant as Bryant 01727.

8            And I'd just like to ask you a couple questions,

9      Ms. Park, about this.  If we could blow up the bottom

10     portion.  Is that the handwritten signature of Carter Bryant

11     that you recognize?

12     A.  Yes.

13     Q.  And then this is a date of April 4th, 1999?

14     A.  Yes.

15     Q.  Is that the handwriting of Carter Bryant that you

16     recognize?

17     A.  Yes.

18     Q.  And then if we could look at the top portion.  And is

19     this material inside the box including with the banner and

20     then those initials there in the lower right-hand corner, is

21     that handwriting of Carter Bryant that you recognize?

22     A.  Yes.

23           MR. ZELLER:  I have nothing further, your Honor.

24           THE COURT:  Cross-examination.

25     ///

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1                               CROSS-EXAMINATION

2        BY MR. NOLAN:

3        Q.   Good morning, Ms. Park.

4        A.   Good morning.

5        Q.   I want to go back.  You appeared before, I guess a

6        couple weeks ago now, and you said that you were a part-time

7        employee at Mattel; is that correct?

8        A.   Correct.

9        Q.   And how long have you been a part-time employee?

10            MR. ZELLER:  This is asked and answered.

11            THE COURT:  Overruled.  You may answer.

12            THE WITNESS:  Since last April.

13       Q.   BY MR. NOLAN:  April of 2007?

14       A.   Correct.

15       Q.   And do you have an official title as a part-time

16       employee?

17       A.   Vice-president of product design.

18       Q.   And how many -- are you required to work a particular

19       number of hours a week?

20       A.   No, not necessarily.

21       Q.   Now, you are also in a real estate investment business?

22       A.   No.

23       Q.   Do you have any other employment when you aren't working

24       part time for Mattel?

25       A.   No.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Q.   So within the last two months, how many hours have you

2    spent at an office in Mattel?

3    A.   I haven't been to Mattel within the last two months.

4    Q.   So let's go back.  How about in the last six months?

5    How many hours have you spent at Mattel?

6    A.   Probably, oh, I don't know, maybe an hour, maybe a

7    little bit more than that.

8    Q.   So since you went to part-time status on April 4th of

9    2007, let's go all the way back there, how many hours have

10   you spent at Mattel in your part-time work?

11   A.   At Mattel, probably less than 10.

12   Q.   Prior to transitioning over to part time, you were a

13   full-time employee at Mattel, yes?

14   A.   Yes.

15   Q.   And what was your title?

16   A.   Vice-president of product design.

17   Q.   And how long have you been in that position full time?

18   A.   Seven plus years.  Seven, eight years.

19   Q.   Now, when you were transitioned to a part-time status,

20   you were paid a severance pay by Mattel; correct?

21   A.   No.

22   Q.   Did you receive any compensation from Mattel since April

23   of last year?

24   A.   I'm a paid employee.

25   Q.   Okay.  So can you tell us for the 10 hours that you have

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    spent at Mattel since leaving Mattel, how much you've been

2    paid?

3         MR. ZELLER:  Mischaracterizes the testimony.

4    Assumes facts.

5         THE COURT:  Rephrase.

6    Q.   BY MR. NOLAN:  During the period of time that you have

7    been a part-time employee at Mattel, I understand that from

8    April 4th of 2007 through today, how much compensation have

9    you received from Mattel?

10   A.   I get a salary.  Are you asking my salary amount?

11   Q.   Sure.  If that's how you're paid, that's what I'm

12   asking.

13        MR. ZELLER:  This is not relevant.

14        THE COURT:  Credibility.  Overruled.

15        THE WITNESS:  It's approximately $210,000 a year.

16   Q.   BY MR. NOLAN:  As a part-time employee -- and how long

17   do you intend to be a part-time employee for Mattel?

18   A.   As long as I have a job, as long as it's mutually

19   agreeable.

20   Q.   Well, have you been promised a certain term as a

21   full-time employee?

22   A.   I'm not a full-time employee.

23   Q.   Have you been promised a part-time term?

24   A.   No.

25   Q.   Have you been told that as soon as this litigation is

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    over, that you would lose your part-time status?

2         MR. ZELLER:  Argumentative.  Assumes facts.

3         THE WITNESS:  No.

4         THE COURT:  Wait a second.  As phrased, Counsel.

5    Rephrase that.

6         MR. ZELLER:  She answered.  I'll withdraw the

7    objection, your Honor.

8         THE COURT:  Wait a second.  A little too late,

9    counsel.  The answer is stricken.  The question is stricken.

10        Counsel, ask your next question.

11   Q.   BY MR. NOLAN:  Is one of your duties as a part-time

12   employee at Mattel to cooperate with litigation?

13   A.   No.

14   Q.   You were asked to come in today to testify about

15   Exhibit 10624.

16        Aaron, can I have that published.

17        Now, Ms. Park, please tell the jury when you first

18   received a phone call from anybody asking you to offer

19   testimony concerning this exhibit, 10624.

20   A.   It was about 10:00 o'clock, 10:20, on this past Monday

21   evening.

22   Q.   And at the time of the phone call, did you have a copy

23   of Exhibit 10624 in front of you?

24   A.   No.

25   Q.   At the time of that phone call, had you ever seen

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Exhibit 10624 before?

2    A.   No.

3    Q.   At the time of the phone call, approximately how many

4    years had transpired?  So we're talking about a phone call

5    you received Monday night of this year at 10:20; correct?

6    A.   Yes.

7    Q.   When was the last time you had supervised Carter Bryant?

8    A.   1998.

9    Q.   When was the last time you had physically seen Carter

10   Bryant?

11   A.   He was at my deposition approximately four or five years

12   ago.

13   Q.   Other than at your deposition, when is the last time you

14   saw Carter Bryant in a business setting?

15   A.   1998, probably.

16   Q.   Was it a lawyer from Mattel that called you at 10:20 on

17   Monday night?

18   A.   Yes.

19   Q.   And when you received the phone call, did you have

20   samples of Carter Bryant's signature at your home?

21   A.   No.

22   Q.   When did you next meet with employers for Mattel?

23   A.   Tuesday.

24   Q.   That's Tuesday of this week?

25   A.   Correct.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Q.   And which lawyers did you meet?

2    A.   Tammy and a little bit with Mr. Zeller, but Tammy

3    primarily.

4    Q.   And did they show you Exhibit 10624?

5    A.   Yes.

6    Q.   Did they show you any other documents?

7    A.   No.

8    Q.   Did they show you any other signatures of Carter Bryant?

9    A.   No.

10   Q.   So now we're here on Monday morning, and you're meeting

11   with Mr. Zeller and Tammy, and you're shown for the first

12   time an Exhibit that you had never seen before.  Did you tell

13   them right away that you could recognize Carter's signature?

14          MR. ZELLER:  Argumentative.

15          THE COURT:  Rephrase.

16          MR. ZELLER:  And privileged, too.

17          THE COURT:  Objection is sustained.

18          MR. NOLAN:  I'll approach it in a different way.

19   Q.   So from the time you left Carter Bryant as a supervisor,

20   through the morning you met with Mr. Zeller, had you done

21   anything to review Carter Bryant's signature?

22   A.   No.

23   Q.   This morning, in response to a question that Mr. Zeller

24   asked, you answered that you recognized April 4th, 1999, as

25   being Carter's handwriting; is that correct?

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    A.  Yes.

2         MR. NOLAN:  Aaron, do you mind redacting this

3    document out and just leaving the April 4th date on it.

4         Now, for the record, what I've done with this

5    exhibit is I've removed everything else other than April 4,

6    1999.

7    Q.  Do you see that?

8    A.  Yes.

9    Q.  Do you recall me asking you questions on Tuesday of this

10   week?

11   A.  Yes.

12   Q.  And do you recall at that time when I asked you could

13   you recognize April 4th, 1999, as Carter Bryant's signature.

14   Your answer was no, you could not.

15        MR. ZELLER:  Misstates the question.

16        THE COURT:  Sustained.

17   Q.  BY MR. NOLAN:  Do you remember answering that you didn't

18   know -- looking at April 4, 1999, if you didn't know the name

19   Carter Bryant beforehand was on that document, you wouldn't

20   say the April 4th, 1999, is Carter Bryant's handwriting?

21        MR. ZELLER:  Object to the characterization of the

22   testimony.

23        MR. NOLAN:  Your Honor, I'll read it.

24        THE COURT:  Why don't you do that.

25        MR. NOLAN:  Do you mind?

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          THE COURT:  That's the best approach, Counsel.

2          MR. NOLAN:  It's page 4623, lines 20 through 25.

3     This was a hearing conducted on Tuesday outside of the

4     presence of the jury.  I'm sorry, lines 18 through 22.

5          I'm asking the questions, Mrs. Park.  You're under

6     oath.  I asked you:  "Is it your testimony that after nearly

7     10 years, looking at April 4, 1999, if you didn't know the

8     name Carter Bryant beforehand, you would say the April 4,

9     1999, is Carter Bryant's handwriting?  Answer:  No."

10    Q.   What has happened since Tuesday, when you gave this

11    testimony under oath, to today when you answered the question

12    differently for Mr. Zeller?

13         MR. ZELLER:  Assumes facts, argumentative.

14         THE COURT:  Sustained.  Ask a different question.

15    Q.   BY MR. NOLAN:  Well, since Tuesday, have you looked at

16    other handwriting samples of Mr. Bryant?

17    A.   No.

18    Q.   How many employees were you supervising in September,

19    let's just say, of 1998?

20    A.   September of 1998.  Probably 15, around about there.

21    Q.   And is it your testimony that you saw the handwriting of

22    each of those employees on a daily basis?

23    A.   Yes.

24    Q.   And since 1998, approximately how many other employees

25    have you supervised?

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    A.   Up to 200.

2    Q.   And is it your view that you could recognize the

3    handwriting of each of those 200 employees that you

4    supervised?

5    A.   No.

6    Q.   So it's just Carter Bryant's signature that you could

7    identify; correct?

8    A.   No, that's not what I said.

9    Q.   Well, out of the 200, how many do you think you could

10   recognize their handwriting?

11   A.   I don't know.

12   Q.   You work with Lily Martinez?

13   A.   I do.

14   Q.   And how many years have you worked with Lily Martinez?

15   A.   Probably 10, 11.

16   Q.   And do you get a chance to see her handwriting?

17   A.   I've seen it on occasion.

18   Q.   Do you think you could recognize her handwriting?

19   A.   I think I probably could.

20   Q.   I'd like to pass up to you your deposition transcript.

21        Could I ask you to turn to page 275, lines 9

22   through 11.

23        Your Honor, we'd offer to play lines 9 through 11

24   of Mrs. Park's sworn deposition.

25        THE COURT:  One second, Counsel.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      I'm sorry, Counsel.  275, lines 9 through 11?

2      MR. NOLAN:  Yes.

3      THE COURT:  Any objection?

4      MR. ZELLER:  Your Honor, I think there needs to be

5    additional lines.  I think it needs to start at line 6

6    through line 11.

7      THE COURT:  Very well.

8      MR. NOLAN:  No problem.

9      THE COURT:  You may proceed.

10      WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

11      OF CASSIDY PARK, AS PROVIDED BY COUNSEL, ARE

12      INCORPORATED HEREIN:

13      "QUESTION:  Okay.  Do you recognize the

14    handwriting on M0012579 on the photograph?

15      "ANSWER:  No.

16      "QUESTION:  Okay.  If you saw Lily Martinez'

17    handwriting, would you recognize it?

18      "ANSWER:  I don't know."

19    Q.  BY MR. NOLAN:  All right.  Let's go back to the actual

20    exhibit you testified to this morning.

21      Could we have that on the screen.

22      Mrs. Park, you have no personal knowledge, do you,

23    as to when Carter Bryant affixed his signature to this

24    exhibit?

25    A.  No.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Q.   And you have no personal knowledge as to the import or

2    the significance of the date April 4, 1999, do you?  Personal

3    knowledge.

4    A.   It appears to be the date the drawing was made.

5    Q.   And what personal knowledge do you have that that

6    drawing was created on April 4, 1999?

7    A.   I don't.

8    Q.   If you look at the actual drawing, which is contained in

9    the smaller rectangle, do you see that?

10   A.   The what?

11   Q.   The drawing.

12   A.   Okay.

13   Q.   Okay.  You see that drawing?

14   A.   Yes.

15   Q.   And this is a drawing you've never seen before; correct?

16   Other than by Mr. Zeller and other lawyers; correct?

17   A.   Correct.

18   Q.   All right.  I just want --

19        Aaron, can you blow up for the jury the lower

20   right-hand corner of the actual drawing.

21        And do you recognize that as being CB?

22   A.   Looks like CHB to me.

23   Q.   And can you recognize Carter Bryant's signature or

24   initials?

25   A.   As his initials, yes.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Q.   And can you see a date anywhere there?

2    A.   No.

3    Q.   Do you have any personal knowledge as to why Carter

4    Bryant didn't put a date in the circle where he puts CHB?

5    A.   No.

6    Q.   I want to go back to -- do you have a white notebook in

7    front of you?

8    A.   No, I don't.

9    Q.   We'll bring up a white notebook, if you don't mind.  And

10   as we're bringing up the white notebook, let me ask you about

11   your background.

12        Are you a handwriting analyst?

13   A.   No.

14   Q.   Are you taking courses?

15   A.   No.

16   Q.   Do you hold yourself out as an expert in handwriting?

17   A.   No.

18   Q.   Or signature recognition?

19   A.   No.

20   Q.   Okay.  Do you have the white notebook now in front of

21   you?

22   A.   I do.

23   Q.   Would you look up to trial Exhibit 15601.

24        This is already in evidence, your Honor.

25        THE COURT:  Very well.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument) 7/10/2008 12:00:00 PM

1          MR. NOLAN:  Thank you.

2          And, Aaron, can we publish 15601.  And in looking

3    at 15601, you'll see a signature on the right-hand side of

4    that document.

5    A.  Yes.

6    Q.  Last time you visited us, I asked you if you recognized

7    the picture.  You said no.

8          Now I want to ask you another question based on

9    your testimony this morning.  Do you recognize the testimony

10   of Carter Bryant and the date 1/28/98?

11   A.  Yes.

12   Q.  And that's Carter Bryant's signature and date, isn't it?

13   A.  Appears to be.

14   Q.  Okay.  Now I'd like to ask you to look at 15603.  And

15   again, you see on the right-hand side there's a signature?

16   A.  Yes.

17   Q.  And whose signature do you recognize there and the date?

18   A.  Carter Bryant's.

19   Q.  And the date, ma'am?

20   A.  Are you asking me what the date is or if I --

21   Q.  Yes, the date, please.

22   A.  1/28/98.

23   Q.  And if you'd turn to Exhibit 15604, do you recognize the

24   signature?

25   A.  Yes.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Q.   And whose signature is that?

2    A.   Appears to be Carter Bryant's.

3    Q.   And the date?

4    A.   1/28/98.

5    Q.   Turn to Exhibit 15605.  Do you recognize the signature?

6    A.   Appears to be Carter Bryant's.

7    Q.   And the date that it's signed?

8    A.   1/28/98.

9    Q.   Let's go back to -- I just have two very brief questions

10   for you, ma'am.  Let's go back to -- well, why don't we go

11   back to your compensation.  $210,000 a year?

12   A.   I believe I actually misstated that.  I think it's

13   probably in the 170 -- high 170's.  It was a partial of my

14   salary.  Off the top of my head, I don't have that -- I don't

15   know that.

16   Q.   So just to be clear, you don't know what your salary is

17   today?

18   A.   I don't know the exact figure is what I'm telling you.

19   Q.   What I was going to ask you to assume, though, just

20   because I did the math in my head of what your estimate was

21   of 210,000, if that had been your -- if that is your salary,

22   for the 10 years that you've devoted since you've left

23   Mattel, that's about $21,000 an hour.  My question is can you

24   tell me any other part-time employees at Mattel that make

25   $21,000 an hour?

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    A.   My employment was --

2        MR. ZELLER:  Objection.  Assumes facts.

3    Mischaracterizes the testimony.

4        THE COURT:  Sustained.

5    Q.   BY MR. NOLAN:  Going back to 10624.  This is the drawing

6    that you've identified for us this morning?

7    A.   Yes.

8    Q.   Do you see that?

9    A.   Yes.

10   Q.   Does Mattel own this?

11       MR. ZELLER:  Objection.  Assumes facts.  Outside

12   the scope, certainly, at this point.

13       THE COURT:  Sustained on the first ground.

14       MR. ZELLER:  And lacks foundation.

15       THE COURT:  On that ground as well.

16   Q.   BY MR. NOLAN:  You are a part-time -- although part

17   time, you're an executive at Mattel; right?

18   A.   Yes.

19   Q.   And you're assigned to Mainline Barbie; correct?

20   A.   No.

21   Q.   Where are you assigned?

22   A.   I don't understand what you're asking me.

23   Q.   I'm asking you where are you assigned as a part-time

24   employee at Mattel?  What division?

25   A.   I'm in the girls division.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Q.   Okay.  And I thought your position there in the girls

2    division was executive vice-president.

3    A.   I never stated that.

4    Q.   Okay.  So what's your title?

5    A.   Vice-president, product design.

6    Q.   All right.  So in your capacity as vice-president

7    product design in the girls division at Mattel, is this

8    exhibit that's on the screen owned by your employer, Mattel?

9         MR. ZELLER:  Still assumes facts, lacks foundation,

10   and calls for a legal conclusion.

11        THE COURT:  That's the problem, Counsel.

12   Sustained.

13   Q.   BY MR. NOLAN:  Do you know if Carter Bryant was working

14   at Mattel on April 4th of 1999?

15   A.   Carter was not working for me on April 4th of 1999.

16   Q.   Carter Bryant was working at Mattel on April 4th, 1999;

17   correct?

18        MR. ZELLER:  Foundation.

19        THE COURT:  Do you know?

20        THE WITNESS:  I don't know the exact dates that he

21   came back.  I don't really know that for sure.

22   Q.   BY MR. NOLAN:  Do you know whether or not Carter Bryant

23   was working at Mattel in 1999?

24   A.   I believe he was working at Mattel in 1999.

25   Q.   Do you have any reason to believe that he wasn't working

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      at Mattel in April of 1999?

2      A.   I don't know the exact dates.

3      Q.   Do you have a belief that he was working at Mattel in

4      April of 1999?  Yes?

5      A.   No, I didn't say that.

6      Q.   In 1999, yes?

7      A.   I believe 1999 is when he came back, but I'm not sure of

8      that date.

9      Q.   Okay.  With that foundation, can you tell us whether or

10     not Mattel owns that drawing?

11         MR. ZELLER:  Still lacks foundation.  Assumes

12     facts.

13         THE COURT:  Sustained, Counsel.  I'll hear at

14     sidebar, if you want to, on this.

15         MR. NOLAN:  Just for a quick minute.

16         (SIDEBAR CONFERENCE HELD.)

17         THE COURT:  How does this witness have a possible

18     foundation to make a determination that we lawyers are

19     struggling with?

20         MR. NOLAN:  I think that's the very point.  That

21     here you have executives at Mattel.

22         THE COURT:  Are you talking about copyright

23     ownership, or ownership for conversion purposes?  What are

24     you asking?  Are you asking pursuant to the inventions

25     agreement?  Is it the ownership of Mattel, her understanding

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    of the inventions agreement?  I just don't get what you're

2    asking.  It's a legally conclusory question.  And that is

3    fraught with peril.

4         So I'm going to sustain the objection to the

5    question.  And you're going to have to rephrase it.

6         MR. ZELLER:  And just for the record, we're well

7    outside the scope.

8         THE COURT:  We are.  As long as we stay within

9    impeachment, we're fine.

10        (CONCLUSION OF SIDEBAR CONFERENCE.)

11        THE COURT:  You may proceed, Counsel.

12        MR. NOLAN:  Thank you.

13   Q.  You have no personal knowledge as to the date of when

14   Carter Bryant drew this drawing; correct?

15        MR. ZELLER:  Asked and answered.

16        MR. NOLAN:  It's just foundational for this set of

17   questions.

18        THE COURT:  Fair enough.

19        THE WITNESS:  Correct.

20   Q.  BY MR. NOLAN:  If Carter Bryant had done the drawing,

21   let me ask you, in your position at Mattel and the number of

22   years you've been at Mattel, you're familiar with the

23   employee inventions and confidentiality agreement; correct?

24   A.  Correct.

25   Q.  Okay.  So what I want to do is ask you a hypothetical.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    If Mr. Bryant had drawn this fashion design drawing in 1998

2    and merely placed the date April 4, 1999, on it while

3    employed at Mattel, would Mattel have a claim of ownership

4    under this?

5         MR. ZELLER:  Incomplete hypothetical.  Hypothetical

6    as well as lacks foundation, legal conclusion.

7         THE COURT:  Sustained.

8    Q.  BY MR. NOLAN:  So sitting here today, Ms. Park, other

9    than there appears to be a date on this document, you have no

10   idea when Carter Bryant created it; correct?

11   A.  Correct.  Only from the date.

12        MR. NOLAN:  Thank you.

13        THE COURT:  Redirect?

14              REDIRECT EXAMINATION

15   BY MR. ZELLER:

16   Q.  In your responsibilities as a part-time Mattel employee,

17   do your duties require you to go to the office?

18   A.  No, not really.

19   Q.  If you'd please tell us briefly and generally what kinds

20   of things do you do for Mattel as a part-time employee.

21   A.  My current role is really to act as an ambassador for

22   the local design schools.  Otis College of Art and Design,

23   FIDM, which is the Fashion Institute of Design and

24   Merchandising, Art Center in Pasadena, and to help source

25   talent, work with the design schools to connect them to

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      Mattel in some way.

2      Q.   And these are duties that are outside the office,

3      outside of Mattel?

4      A.   Yes.

5      Q.   Now, during the time when you worked with Carter Bryant

6      over the course of those years, how many drawings and other

7      handwritten materials would you estimate you saw of Carter

8      Bryant's?

9      A.   Hundreds.

10          MR. ZELLER:  Nothing further, your Honor.

11          MR. NOLAN:  One last question

12               RECROSS-EXAMINATION

13     BY MR. NOLAN:

14     Q.   Over the period of time you've been working with Lily

15     Martinez, how many drawings have you seen of hers?  Hundreds?

16     A.   Probably -- excuse me.  Probably hundreds.

17          MR. NOLAN:  Thanks.  No further questions.

18          MR. ZELLER:  Nothing further.

19          THE COURT:  You are excused, ma'am, thank you.

20          Anything further?

21          MR. QUINN:  Yes, your Honor.  There are just some

22     stipulated facts.

23          THE COURT:  You may.

24          MR. QUINN:  Your Honor, the parties have stipulated

25     that the photograph depicted in Exhibit 1105-2 is a picture

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      of Trial Exhibit 1136.

2              THE COURT:  Very well.  So stipulated?

3              MR. NOLAN:  So stipulated, your Honor.

4              THE COURT:  Very well.

5              MR. QUINN:  And then, your Honor, the following

6      facts are also stipulated.

7              THE COURT:  Please.

8              MR. QUINN:  Carter Bryant first worked for Mattel

9      in the Mainline Barbie group from September 1995 to April

10     1998.

11             In late December 1998, Mattel offered Bryant a

12     position in the Barbie Collectibles group.  Bryant accepted

13     Mattel's offer, moved back to California, and started work at

14     Mattel on January 4, 1999.

15             THE COURT:  So stipulated?

16             MR. NOLAN:  So stipulated.

17             THE COURT:  Very well.  Anything further from

18     Mattel?

19             MR. QUINN:  No, your Honor.

20             THE COURT:  Anything further from MGA?

21             MR. NOLAN:  No, your Honor.

22             THE COURT:  Very well.

23             Members of the jury, I am now going to instruct you

24     on the law that will govern your deliberations.  I will then

25     review with you the verdict form, and we will take a break.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    During the break, I'm going to ask you to order lunch.  We're

2    going to have lunch served in today.  Mr. Holmes will have a

3    menu for you to select from, because we're going to take a

4    rather short lunch instead of our usual hour, hour and a

5    half, it will be more like 45 minutes.

6         So we want that devoted to eating and resting as

7    opposed to walking off and trying to find a place to eat.  So

8    this afternoon -- this morning and this afternoon we'll have

9    the closing arguments.

10        I am limiting both sides to two and a half hours of

11   closing argument.  I'll have my chess clock going.  So at two

12   and a half hours, I will thank them if they are still

13   speaking, and they will sit down, and that will be the end of

14   it.  So we will get through the closing argument today, at

15   the end of which the case will be in your hands to decide and

16   deliberate.

17        I'll circle back and mention this again, but after

18   today, the decision in terms of what days to deliberate,

19   times of deliberation is in your hands.  The courtroom will

20   be open as early as 8:30 in the morning, and you can stay

21   here until 5:00, but if you want to modify those hours or

22   change those hours, that is up to you.

23        We will also make the courtroom available on

24   Mondays for deliberations.  All we'll be asking you to do is

25   let us know when you will be deliberating so I can make sure

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1   to have the attorneys here present in case any questions or

2   issues come up, and, of course, when you return your verdict.

3          At this time I'm going to read the instructions.

4   You will have copies of these instructions.  So instead of

5   taking notes, I want you to listen to my reading.  But each

6   of you will have a physical copy of the instructions to refer

7   to to help you refresh your recollection of the instructions.

8          Members of the jury, now that you have heard all of

9   the evidence and the arguments -- well, actually, you will

10  have heard the arguments of the attorneys -- it is my duty to

11  instruct you as to the law of the case.

12         A copy of these instructions will be sent with you

13  to the jury room when you deliberate.

14         You must not infer from these instructions or from

15  anything I may say or do as indicated that I have an opinion

16  regarding the evidence or what your verdict should be.

17         It is your duty to find the facts from all the

18  evidence in the case.  To those facts you will apply the law

19  as I give it to you.  You must follow the law, as I give it

20  to you, whether you agree with it or not.  And you must not

21  be influenced by any personal likes or dislikes, opinions,

22  prejudices, or sympathy.  That means that you must decide the

23  case solely on the evidence before you.  You will recall that

24  you took an oath to do so.

25         In following my instructions, you must follow all

1      of them and not single out some and ignore others.  They are

2      all important.

3              When a party has the burden of proof on any claim

4      by a preponderance of the evidence, it means you must be

5      persuaded by the evidence that the claim is more probably

6      true than not true.

7              You should base your decision on all of the

8      evidence, regardless of which party presented it.

9              In criminal trials, the prosecution must prove that

10     the defendant is guilty beyond a reasonable doubt.  But in

11     civil trials, such as this one, the party who is required to

12     prove something by a preponderance of the evidence need prove

13     only that it is more likely to be true than not true.

14             The law defines cause in its own particular way.  A

15     cause of injury, damage, loss, or harm is something that is a

16     substantial factor in bringing about an injury, damage, loss,

17     or harm.

18             A substantial factor is something which is more

19     than a slight, trivial, negligible, or theoretical factor in

20     producing a particular result.

21             You should decide the case as to each defendant

22     separately.  Unless otherwise stated, the instructions apply

23     to all parties.

24             The evidence you are to consider in deciding what

25     the facts are consists of:

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          1.  The sworn testimony of any witness.

2          2.  The exhibits which are received into evidence.

3          3.  Any facts to which the lawyers have agreed.

4          In reaching your verdict, you may consider only the

5     testimony and exhibits received into evidence.  Certain

6     things are not evidence, and you may not consider them in

7     deciding what the facts are.  I will list them for you.

8          1.  Arguments and statements by lawyers are not

9     evidence.  The lawyers are not witnesses.  What they have

10    said in their opening statements, closing arguments, and at

11    other times is intended to help you interpret the evidence,

12    but it is not evidence.  If the facts, as you remember them,

13    differ from the way the lawyers have stated them, your memory

14    of them controls.

15         2.  Questions and objections by lawyers are not

16    evidence.  Attorneys have a duty to their clients to object

17    when they believe a question is improper under the rules of

18    evidence.  You should not be influenced by the objection or

19    by the Court's ruling on it.

20         3.  Testimony that has been excluded or stricken or

21    that you have been instructed to disregard is not evidence

22    and must not be considered.  In addition, sometimes testimony

23    and exhibits are received only for a limited purpose.  When I

24    have given a limiting instruction, you must follow it.

25         4.  Anything you may have seen or heard when the

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    court was not in session is not evidence.  You are to decide

2    the case solely on the evidence received at the trial.

3         Some evidence may be admitted for a limited purpose

4    only.

5         When I instruct you that an item of evidence has

6    been admitted for a limited purpose, you must consider it

7    only for that limited purpose and for no other.

8         Evidence may be direct or circumstantial.  Direct

9    evidence is direct proof of a fact, such as testimony by a

10   witness about what that witness personally saw or heard or

11   did.  Circumstantial evidence is proof of one or more facts

12   from which you could find another fact.  You should consider

13   both kinds of evidence.  The law makes no distinction between

14   the weight to be given to either direct or circumstantial

15   evidence.  It is for you to decide how much weight to give to

16   any evidence.

17        If weaker and less satisfactory evidence is offered

18   by a party, when it was within that party's ability to

19   produce stronger and more satisfactory evidence, the evidence

20   offered should be viewed with distrust.

21        In deciding the facts in this case, you may have to

22   decide which testimony to believe and which testimony not to

23   believe.  You may believe everything a witness says, or part

24   of it, or none of it.  Proof of a fact does not necessarily

25   depend on the number of witnesses who testify about it.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          In considering the testimony of any witness, you

2    may take into account:

3              1.  The opportunity and ability of the witness to

4    see or hear or know the things testified to.

5              2.  The witness's memory.

6              3.  The witness's manner while testifying.

7              4.  The witness's interest in the outcome of the

8    case and any bias or prejudice.

9              5.  Whether other evidence contradicted the

10   witness's testimony.

11             6.  The reasonableness of the witness's testimony

12   in light of all the evidence.  And,

13             7.  Any other factors that bear on believability.

14          The weight of the evidence as to a fact does not

15   necessarily depend on the number of witnesses who testify

16   about it.

17          From time to time during the trial, it became

18   necessary for me to talk with the attorneys out of the

19   hearing of the jury, either by having a conference at the

20   bench, when the jury was present in the courtroom, or by

21   calling a recess.  Please understand that while you were

22   waiting, we were working.

23          The purpose of these conferences is not to keep

24   relevant information from you but to decide how certain

25   evidence is to be treated under the rules of evidence and to

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      avoid confusion and error.

2           Of course, we have done what we could to keep the

3      number and length of these conferences to a minimum.  I did

4      not always grant an attorney's request for a conference.  Do

5      not consider my granting or denying a request for a

6      conference as any indication of my opinion of the case or of

7      what your verdict should be.

8           The parties have agreed to certain facts to be

9      placed in evidence.  You should therefore treat these facts

10     as having been proved.

11          A deposition is the sworn testimony of a witness

12     taken before trial.  The witness is placed under oath to tell

13     the truth, and lawyers for each party may ask questions.  The

14     questions and answers are recorded.  When a person is

15     unavailable to testify at trial, the deposition of that

16     person may be used at the trial.

17          The deposition of a number of witnesses were taken

18     in this case.  You should consider deposition testimony,

19     presented to you in court in lieu of live testimony, insofar

20     as possible, in the same way as if the witness had been

21     present to testify.

22          The evidence that a witness has lied under oath on

23     a prior occasion or given inconsistent testimony under oath

24     may be considered, along with all other evidence, in deciding

25     whether or not to believe the witness and how much weight to

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      give to the testimony of the witness and for no other

2      purpose.

3              Evidence has been presented to you in the form of

4      answers of one of the parties to written Interrogatories

5      submitted by the other side.  These answers have been given

6      in writing and under oath, before the actual trial, in

7      response to questions that were submitted in writing under

8      established court procedures.  You should consider the

9      answers, insofar as possible, in the same way as if they were

10     made from the witness stand by the party that responded to

11     the written Interrogatories.

12             Evidence has been presented to you in the form of

13     admissions of one of the parties to written requests

14     submitted by the other side.  These answers have been given

15     in writing and under oath, before the actual trial, in

16     response to requests that were submitted in writing under

17     established court procedures.  The matters admitted are

18     deemed conclusively established as to the party that made the

19     admission.

20             Some witnesses, because of education or experience,

21     are permitted to state opinions and the reasons for those

22     opinions.

23             Opinion testimony should be judged just like any

24     other testimony.  You may accept it or reject it, and give it

25     as much weight as you think it deserves, considering the

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    witness's education and experience, the reasons given for the

2    opinion, and all the other evidence in the case.

3         Certain charts and summaries not received in

4    evidence have been shown to you in order to help explain the

5    contents of books or records, documents, or other evidence in

6    the case.  They are not themselves evidence or proof of any

7    facts.  If they do not correctly reflect the facts or figures

8    shown by the evidence in the case, you should disregard these

9    charts and summaries and determine the facts from the

10   underlying evidence.

11        Certain other charts and summaries have been

12   received into evidence to illustrate information brought out

13   in the trial.  Charts and summaries are only as good as the

14   underlying evidence that supports them.  You should,

15   therefore, give them only such weight as you think the

16   underlying evidence deserves.

17        All parties are equal before the law, and a

18   corporation is entitled to the same fair and conscientious

19   consideration by you as any party.

20        Under the law, a corporation is considered to be a

21   person.  It can only act through its employees, agents,

22   directors, or officers.  Therefore, a corporation is

23   responsible for the acts of its employees, agents, directors,

24   and officers performed within the scope of authority.

25        In its first claim, Mattel contends that it has

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    certain rights to all Bratz-related ideas, concepts,

2    drawings, designs, and other works conceived or reduced to

3    practice, that is, created, by Carter Bryant, alone or

4    jointly with others, while he was employed by Mattel,

5    including Bratz drawings and the idea for the name Bratz.

6         MGA and Isaac Larian deny Mattel's contention.

7         Mattel's claim is based on a contract between

8    Carter Bryant and Mattel called the employee confidential

9    information and inventions agreement, or simply, the

10   inventions agreement.  As a matter of law, the inventions

11   agreement is a valid and enforceable agreement.

12        Section 2 A of the inventions agreement provides:

13   Quote, I agree to communicate to the company as promptly and

14   fully as practicable all inventions as defined below

15   conceived or reduced to practice by me, alone or jointly with

16   others, at any time during my employment by the company.  I

17   hereby assign to the company and/or its nominees all my

18   right, title, and interest in such inventions and all my

19   right, title, and interest in any patents, copyrights, patent

20   applications, or copyright applications based thereon.  I

21   will assist the company and/or its nominees without charge

22   but at no expense to me at any time in every proper way to

23   obtain for its and/or their own benefit, patents and

24   copyrights for all such inventions anywhere in the world and

25   to enforce its and/or their rights in legal proceedings.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          The inventions agreement defines the term

2     inventions as follows:

3          The term inventions includes, but is not limited

4     to, all discoveries, improvements, processes, developments,

5     designs, know-how, data, computer programs, and formulae,

6     whether patentable or unpatentable.

7          To prevail on its first claim, Mattel must show, by

8     a preponderance of the evidence, that any particular

9     Bratz-related ideas, concept, drawing, design, or work was

10    conceived or reduced to practice, that is, created, by

11    Mr. Bryant, alone or jointly with others, while employed by

12    Mattel.

13         It is for you to decide what, if any, Bratz-related

14    works were created by Mr. Bryant alone or jointly with others

15    while he was employed by Mattel.

16         In its second claim, Mattel contends that MGA and

17    Isaac Larian intentionally interfered with the inventions

18    agreement between Mattel and Carter Bryant.  To establish

19    this claim, Mattel must prove the following by a

20    preponderance of the evidence:

21         1.  That there was a contract or contracts between

22    Mattel and Carter Bryant.

23         2.  That MGA and/or Mr. Larian knew of the

24    contract.

25         3.  That MGA and/or Mr. Larian intended to disrupt

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1       the performance this contract.

2               4.  That the conduct of MGA and/or Mr. Larian

3       prevented performance or made performance more difficult.

4               5.  That Mattel was harmed in some way.  And,

5               6.  That the conduct of MGA and/or Mr. Larian was a

6       substantial factor in causing Mattel's harm.

7               As a matter of law, there was a valid contract

8       between Mattel and Mr. Bryant, namely, the inventions

9       agreement.

10              As a matter of law, Mr. Bryant directly competed

11      with Mattel by entering into a contract with MGA, Mattel's

12      competitor, to produce a competing product while he was still

13      employed by Mattel.  Whether the remaining requirements of

14      Mattel's claim for intentional interference with contractual

15      relations have been satisfied or not is for you to decide.

16              It is also a matter of law that MGA and/or Isaac

17      Larian's mere offering of employment to Carter Bryant would

18      not be sufficient, by itself, to establish an intentional

19      interference with the contract between Mattel and Mr. Bryant.

20              In deciding whether MGA or Isaac Larian acted

21      intentionally, you may consider whether they knew that a

22      disruption in the performance of a contract or contracts was

23      substantially certain to result from their conduct.

24              In its third and fourth claims, Mattel contends

25      that MGA and Isaac Larian aided and abetted Carter Bryant's

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    breaches of, one, his fiduciary duty to Mattel, and, two, his

2    duty of loyalty to Mattel.  To establish that MGA and/or

3    Mr. Larian are liable for aiding and abetting breaches of

4    fiduciary duty or breach of the duty of loyalty, Mattel must

5    prove the following by a preponderance of the evidence:

6         1.  Mr. Bryant's conduct constituted a breach of

7    such duty or duties.

8         2.  MGA and/or Mr. Larian knew that Mr. Bryant's

9    conduct constituted a breach of duty or duties.  And,

10        3.  MGA and/or Mr. Larian gave substantial

11   assistance or encouragement to Mr. Bryant to breach his duty

12   or duties.

13        Now, I'll define each of those two duties.

14        To establish that Mr. Bryant breached his fiduciary

15   duty to Mattel, Mattel must prove the following by a

16   preponderance of the evidence:

17        1.  That Mr. Bryant owed a fiduciary duty to

18   Mattel.

19        2.  That Mr. Bryant breached his fiduciary duty to

20   Mattel.

21        3.  That Mattel did not give informed consent to

22   Mr. Bryant's conduct.

23        4.  That Mattel was harmed in some way.  And,

24        5.  That Mr. Bryant's conduct was a substantial

25   factor in causing Mattel's harm.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          Once a party assumes a fiduciary duty to another,

2     that party is obligated to act on behalf of the other party,

3     to hold the interest of the other paramount over his own

4     interests, and to take no action that would further his

5     interests over the other person's interest.

6          Now, to establish that Mr. Bryant breached his duty

7     of loyalty to Mattel, Mattel must prove the following by a

8     preponderance of the evidence:

9          1.  That Mr. Bryant was Mattel's employee.

10         2.  That Mr. Bryant knowingly acted against

11    Mattel's interests while he was employed by Mattel.

12         3.  That Mattel did not give informed consent to

13    Mr. Bryant's conduct.

14         4.  That Mattel was harmed in some way.  And,

15         5.  That Mr. Bryant's conduct was a substantial

16    factor in causing Mattel's harm.

17         An employee owes his or her employer a duty of

18    loyalty.  The scope of the employee's duty varies with the

19    nature of the employee's relationship with his employer.

20         As a matter of law, Carter Bryant owed both a

21    fiduciary duty and duty of loyalty to Mattel.

22         Mr. Bryant's fiduciary duty to Mattel is predicated

23    upon paragraph 1 A of the inventions agreement and is related

24    to Mr. Bryant's obligations to keep proprietary information

25    confidential.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          Section 1 A of the inventions agreement provides:

2          Quote, I acknowledge that the company possesses and

3    will continue to develop and acquire valuable proprietary

4    information, as defined below, including information that I

5    may develop or discover as a result of my employment with the

6    company.  The value of that proprietary information depends

7    on it remaining confidential.  The company depends on me to

8    maintain that confidentiality, and I accept that position of

9    trust.

10          The inventions agreement defines the term

11    proprietary information as follows:

12          Proprietary information means any information,

13    including formula, pattern, compilation, device, method,

14    technique, or process, that derives independent economic

15    value, actual or potential, from not being generally known to

16    the public or to other persons who can obtain economic value

17    from its disclosure or use, and includes information on the

18    company, its customers, suppliers, joint ventures, licensors,

19    licensees, distribution, and other persons and entities with

20    whom the company does business.

21          As a matter of law, Mr. Bryant breached his duty of

22    loyalty to Mattel when he entered into a contract with MGA,

23    Mattel's competitor while still employed by Mattel, to

24    produce a line of fashion dolls to be marketed in direct

25    competition with Mattel's products.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          At the same time, merely seeking employment from a

2     competitor and a failure to notify an employer of a decision

3     to seek new employment until a decision is final, does not

4     constitute a breach of duty of loyalty.

5          In its final claim, Mattel contends that MGA, MGA

6     Entertainment (HK) Limited, and Isaac Larian wrongly

7     exercised control over Mattel's property, including tangible

8     Bratz-related works such as Mr. Bryant's drawings.  To

9     establish this claim, Mattel must prove the following by a

10    preponderance of the evidence:

11          1.  That tangible property was conceived or reduced

12    to practice, that is, created, by Carter Bryant, alone or

13    jointly with others, during the period in which he was

14    employed by Mattel, January 4, 1999, to October 19, 2000.

15          2.  That any of the defendants intentionally took

16    possession of such property for a significant period of time.

17          3.  That Mattel did not consent.

18          4.  That Mattel was harmed.  And,

19          5.  That any one of the defendants' conduct was a

20    substantial factor in causing Mattel's harm.

21          Now, when you begin your deliberations, you should

22    elect one member of the jury as your presiding juror.  That

23    person will preside over the deliberations and speak for you

24    here in court.

25          You will then discuss the case with your fellow

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    jurors to reach agreement if you can do so.  Your verdict

2    must be unanimous.

3          Each of you must decide the case for yourself, but

4    you should only do so after you have considered all of the

5    evidence, discussed it fully with the other jurors, and

6    listened to the views of your fellow jurors.

7          Do not hesitate to change your opinion if the

8    discussion persuades you that you should.  Do not come to a

9    decision simply because other jurors think it is right.

10         It is important that you attempt to reach a

11    unanimous verdict but, of course, only if each of you can do

12    so after having made your own conscientious decision.  Do not

13    change an honest belief about the weight and effect of the

14    evidence simply to reach a verdict.

15         If it becomes necessary during your deliberations

16    to communicate with me, you may send a note through the

17    bailiff, signed by your presiding juror or by one or more

18    members of the jury.  No member of the jury should ever

19    attempt to communicate with me except by a signed writing.  I

20    will communicate with any member of the jury on anything

21    concerning the case only in writing or here in open court.

22         If you send out a question, I will consult with the

23    parties before answering it, which may take some time.  You

24    may continue your deliberations while waiting for the answer

25    to any question.  Remember that you are not to tell anyone,

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    including me, how the jury stands, numerically or otherwise,

2    until after you have reached a unanimous verdict or have been

3    discharged.  Do not disclose any vote count in any note to

4    the Court.

5         A verdict form has been prepared for you.  After

6    you have reached unanimous agreement on a verdict, your

7    presiding juror will fill in the form that has been given to

8    you, sign and date it, and advise the Court that you are

9    ready to return to the courtroom.

10        You will have a verdict form, the form that I have

11   here.  The verdict form is seven pages long.  It states:  "We

12   answer the questions submitted to us as follows."

13        The first group of questions relate to timing of

14   tangible items.

15        Question 1, for each of the items listed below, has

16   Mattel proven by a preponderance of the evidence that the

17   item was conceived or reduced to practice, that is, created,

18   by Carter Bryant alone or jointly with others during the

19   period in which he was employed by Mattel, January 4, 1999,

20   to October 19, 2000.

21        And then there's a list of exhibits.  TX stands for

22   trial exhibit, and the number follows.  There's a box for you

23   to check yes, and there's a box for you to check no.

24        Question No. 2 is the exact same question.  For

25   each of the items listed below, has Mattel proven by a

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    preponderance of the evidence that the item was conceived and

2    reduced to practice, that is, created by Carter Bryant alone

3    or jointly with others during the period in which he was

4    employed by Mattel, January 4, 1999, to October 19, 2000.

5          And then there is a list of exhibit numbers and yes

6    or no check boxes.

7          And then finally, question No. 3.  Again, for each

8    of the items listed below question No. 3, has Mattel proven

9    by a preponderance of the evidence that the item was

10   conceived or reduced to practice, that is, created, by Carter

11   Bryant, alone or jointly with others, during the period in

12   which he was employed by Mattel, January 4, 1999, to October

13   19, 2000.

14         And there's a list of exhibits.

15         Question No. 4.  Again, the same question.  For

16   each of the items listed below, has Mattel proven by a

17   preponderance of the evidence that the item was conceived or

18   reduced to practice, that is, created by Carter Bryant, alone

19   or jointly with others, during the period in which he was

20   employed by Mattel, January 4, 1999, to October 19, 2000.

21         There are two trial exhibit numbers.  One is the

22   three-dimensional item presented at pitch meeting, and then

23   there's a line this time instead of a box, yes or no.  And

24   then trial Exhibit 1136 A, a line for yes or no.

25         The second group is timing of ideas.  Question 5

1    states:  Has Mattel proven by a preponderance of the evidence

2    that Carter Bryant conceived the Bratz characters while

3    employed by Mattel.

4         Yes, no.

5         Number 6, has Mattel proven by a preponderance of

6    the evidence that Carter Bryant conceived the name Bratz

7    while employed by Mattel.  Again, yes or no.

8         Then there are the various other claims.

9    Intentional interference with contractual relations.

10        Question 7 asks:  Is MGA Entertainment, MGA, liable

11   to Mattel for intentional interference with contractual

12   relations?  Yes or no.

13        Question 8:  Is Isaac Larian liable to Mattel for

14   intentional interference with contractual relations.  Yes or

15   no.

16        And then there's the questions on aiding and

17   abetting breach of fiduciary duty.

18        Question 9.  Is MGA liable to Mattel for aiding and

19   abetting breach of fiduciary duty.  Yes or no.

20        Question 10.  Is Isaac Larian liable to Mattel for

21   aiding and abetting breach of fiduciary duty.  Yes or no.

22        Questions 11 and 12 relate to aiding and abetting

23   breach of duty of loyalty.

24        Question 11.  Is MGA liable to Mattel for aiding

25   and abetting breach of the duty of loyalty.  Yes or no.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          Question 12.  Is Isaac Larian liable to Mattel for

2    aiding and abetting breach of the duty of loyalty.  Yes or

3    no.

4          And the final three questions relate to the

5    conversion claim.

6          13.  Is MGA liable to Mattel for conversion?  Yes

7    or no.

8          14.  Is Isaac Larian liable to Mattel for

9    conversion.  Yes or no.  And,

10         15.  Is MGA Entertainment (HK) Limited liable to

11   Mattel for conversion.  Yes or no.

12         Once this verdict is completed, the foreperson of

13   the jury should sign and date on the lines below.  There's a

14   place for the date and a place for the presiding juror.  You

15   are to answer all 15 questions, and, as I indicated, your

16   verdict as to all 15 questions must be unanimous.

17         Those are the instructions and the verdict form.  I

18   caught a few typographical errors, which I'm going to change,

19   and then you'll receive a copy of the corrected version.

20         We're going to take a break now, and it's going to

21   be a brief break.  And I'm going to ask you to select your

22   lunch during the break.

23         When you return, you will hear the opening closing

24   argument.  Mattel, as you know, bears the burden of proof.

25   They go first.  They give their closing argument.  MGA then

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      gives their closing argument.  Because Mattel bears the

2      burden of proof, they are entitled to give a rebuttal.  After

3      the rebuttal, the case is then in your hands.  Until the case

4      is in your hands, do not discuss the case.  Do not discuss

5      the jury instructions that I just read or the verdict form.

6      The only thing you should be discussing right now is your

7      lunch preferences.

8              I'll see you in a few minutes.

9              (WHEREUPON THE JURY WITHDRAWS.)

10             THE COURT:  Please be seated.  I'm going to make

11     the following changes on the jury instructions and the

12     verdict form to conform with what I read to the jury.

13     Beginning with the cover sheet, I'm going to add the word

14     final just to differentiate this from the copies that are in

15     circulation at present.

16             On page 1, on line 3, now that you have heard all

17     of the evidence and will soon hear the arguments of the

18     attorneys.  So I'll be adding the words will soon hear.

19             On page 2, I will delete on line 4 and 5 or

20     affirmative defense.  I did not read that, and we intended to

21     take that out.

22             On page 26, line 18, I'll add the word Bryant after

23     Carter.

24             On page 29, line 3, I'll add Mr. before Bryant.

25             On page 30, line 3, I will add Mr. before Bryant.

1          On line -- on page 33, line 11, I'll correct the

2    spelling of Bryant.

3          And then on the verdict form, page 3, line 1, I

4    will add the word "a" between by and preponderance.

5          First of all, are there any objections to those

6    changes?

7          Mr. Price?

8          MR. PRICE:  No, your Honor.

9          MR. NOLAN:  No, your Honor.

10         THE COURT:  Very well.  Are there any other changes

11   that counsel picked up and the Court did not pick up that the

12   Court should make?

13         MR. ZELLER:  One thing we realized, your Honor,

14   with respect to Jury Instruction 29, it doesn't actually use

15   the word conversion.  And the jury verdict form does.  It may

16   be easily fixed by just inserting something on line 7, where

17   the sentence starts to establish this claim, maybe we just

18   can insert something which is legally called or the law calls

19   conversion, comma, Mattel must prove.

20         THE COURT:  Mr. Nolan?

21         MR. NOLAN:  Your Honor, why don't we just say to

22   establish this claim of conversion.

23         THE COURT:  To establish this claim for conversion.

24         MR. NOLAN:  For conversion.

25         THE COURT:  Is that agreed to by both parties?

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          MR. ZELLER:  Yes, your Honor.

2          THE COURT:  Very well.  Anything else, Mr. Zeller?

3          MR. ZELLER:  Yes, your Honor.  I think in light of

4     Mr. Nolan's examination of Cassidy Park, I think a 901

5     instruction would be appropriate so the jury understands what

6     she was here to testify about.  And in particular, I think

7     it's important for the jury to know that they can compare

8     handwriting on their own.  They don't have to rely on

9     testimony at that point as well.

10          I think that that's part of what's part and parcel

11     of the lay opinion that is allowed.  Because Mr. Nolan was

12     making a point about her not being an expert.  And I think

13     the jury has to be told that lay witnesses, those that are

14     not experts, are entitled to testify as to their opinion

15     about the genuineness of handwriting and that, you know,

16     familiarity is sufficient.

17          And then finally, that the jury itself can make its

18     own evaluation as to the genuineness of handwriting by

19     comparing examples that are in evidence.

20          THE COURT:  Mr. Nolan?

21          MR. NOLAN:  Your Honor, this matter has been before

22     the Court since Tuesday.  I conducted primarily the same

23     cross-examination I did today in front of the jury in the

24     proceedings conducted on Tuesday.  We've had jury

25     conferences.  They knew this issue was going to come up.  I

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1   submit it's too late to do.

2        So I also submit it would be highly prejudicial for

3   you to single out now and give an additional instruction.  It

4   would appear as though you, the Court, were commenting on the

5   weight of her testimony, and I believe it would be

6   inappropriate.

7        THE COURT:  I tend to agree with Mr. Nolan on this,

8   Mr. Zeller.  I think the time to raise this would have been

9   before the Court started reading the instructions, not now.

10       MR. ZELLER:  In fairness, your Honor, we weren't

11  given the opportunity to bring it --

12       THE COURT:  Counsel, throughout the last seven

13  weeks, people stood up and stopped the Court from doing

14  something it was about to do and requesting a sidebar.  You

15  certainly knew about that.

16       MR. ZELLER:  I thought we would have an opportunity

17  to comment.  Normally, that's when it's often done.  But

18  the --

19       THE COURT:  The time to have raised it, Counsel,

20  was before.  I agree with the point that giving that

21  instruction now, separate and apart from the rest of the

22  instructions, would be placing undue weight on that

23  instruction.  You are free to argue this, Counsel.  The Court

24  admitted the exhibit over the objections on foundation.  It's

25  clearly in.

1          There was also testimony that this document was

2     produced by Mr. Bryant that was unobjected to.  That is in.

3     At the end of the day, I think you can make whatever

4     arguments you need to make.

5          MR. ZELLER:  And just for the record, too, your

6     Honor, in terms of Mr. Nolan saying the cross-examination was

7     done previously, the Court --

8          THE COURT:  It was different.  And I understand,

9     Counsel.

10          MR. ZELLER:  Thank you.

11          THE COURT:  My point is on the timing of that.  The

12     time to have asked was for a sidebar before I started reading

13     the instructions.  Now I agree with Mr. Nolan.

14          MR. ZELLER:  Thank you.

15          MR. NOLAN:  Your Honor, the last point real quick

16     is that yesterday we asked the Court to consider reading

17     again the instruction with respect to the settlement of

18     Carter Bryant.

19          THE COURT:  I declined to do that, yes.

20          MR. NOLAN:  That's what I figured.

21          THE COURT:  That was conscious.

22          Anything further?

23          Very well.  I'm going to make these changes while

24     we're getting the menu.  And I will provide copies to both --

25     as to Mr. Price's concern, I do think that the jury knows

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    that there are different phases.  Phase 1-A suggests that

2    there are multiple phases.  And I understand the concern

3    there.  What I'm simply -- we know Phase 1 and 2 relate to

4    two entirely different trials with two entirely different

5    juries.  What I've decided to do is refer to this as phase A.

6    We know it's Phase 1-A.

7         I don't think there is any harm, as Mr. Nolan

8    mentioned, that at this point they clearly know there's

9    another phase coming.  1-A perhaps does suggest that there's

10   a Phase 1-A, 1-B, and a Phase 2 that they are responsible

11   for.  And I just think that phase A is sufficient to capture

12   the fact that there is phasing and they are aware of it.

13        Frankly, I want them to be -- I don't think there's

14   a need to hide that fact because that's out there.  Both

15   parties have made reference to it in statements to the Court

16   before the jury.  I think phase A is sufficient.  I'll hear

17   comments.  I'm not completely wedded to that.

18        MR. NOLAN:  Well, your Honor, my only comment is

19   it's always the constant refrain that I add is that there may

20   be a 1-B.  We don't know.

21        THE COURT:  Would you rather there not be a -- I

22   mean, they want it out altogether.  If you want it out, I'm

23   happy -- if we stipulate to taking it out, it's fine.

24        MR. NOLAN:  To me it doesn't matter.  I would

25   rather not have the Court instruct the jury, I don't think it

1    would or was suggesting that it would, that there was going

2    to be --

3            THE COURT:  Oh, my gosh, no.  This is being -- this

4    has been front and center.  It was typed by the parties

5    themselves onto these briefs.  So you have no one to blame

6    but yourselves for this.  Both of you did it in your briefs.

7    I left it on there because no one asked to have it removed

8    until this morning when Mr. Price did.  If you both want it

9    gone, that's fine with the Court.

10           MR. NOLAN:  I don't think there's a tactical

11    advantage or disadvantage.  If Mattel has an objection to it,

12    I'm not going to prevent the edit from being made.  I don't

13    think it's prejudicial either way.

14           THE COURT:  All right.  Very well.  Final jury

15    instructions as given.  If there's no objection, then it's

16    gone.

17           All right.  Anything further?  We're in recess

18    until the Court's done retyping these things and we have a

19    menu, and then we'll start with closing argument.

20           Who is giving the first closing?

21           MR. QUINN:  I am, your Honor.

22           THE COURT:  Very well.

23           (Recess taken.)

24           (WHEREUPON THE JURY ENTERS.)

25           THE COURT:  Counsel, if you could move that

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      slightly.  I'm having difficulty seeing the jurors.

2          THE COURT:  Counsel, you may proceed.

3          MR. QUINN:  Thank you, your Honor.

4        CLOSING ARGUMENT BY COUNSEL FOR THE PLAINTIFF

5          MR. QUINN:  Good morning, ladies and gentlemen.

6      When I last stood up here and spoke to you in opening

7      statement, I promised you that we would prove to you certain

8      things.  And although there are some pieces of evidence that

9      we didn't have time to put in, as you know, the judge has

10     told you we're on a clock, have been on a clock this whole

11     time, the evidence that we did put in proved to you what I

12     promised.

13         In general, I said the evidence would show that

14     Carter Bryant created Bratz while he was working at Mattel,

15     that Mattel owns the Bratz drawings, and that MGA -- that

16     with MGA's assistance, Mr. Bryant violated legal duties that

17     he owed to Mattel.

18         Now, having heard all the evidence, it's your job

19     to weigh the evidence.  And you've heard a lot of stories in

20     this case.  But if you focus on the evidence that cannot

21     change its story, if you focus on the unbias, the

22     disinterested evidence, the evidence that was created at the

23     time of the events, the documents and the physical evidence,

24     that evidence proves that Carter Bryant first put pen to

25     paper to create Bratz in this black notebook, Exhibit 1155,

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    in 1999.

2         Now, Mr. Bryant tore those first Bratz drawings out

3    of that notebook.  And he said before trial, as we'll see and

4    as you saw, that he no longer had the notebook that those

5    drawings came from.  He said it was gone.  He didn't know

6    what had come of it.  When he said that, he did not know that

7    through scientific analysis, through indentation analysis, we

8    could put those pages back into the notebook, that we could

9    show that they came from the notebook that we did have.

10        And before he knew, before Mr. Bryant knew that we

11   could put those pages back into the notebook containing those

12   original Bratz dolls on a drawing, before he knew we could

13   put them back, he was perfectly willing to admit that

14   everything in this notebook dated from 1999.

15        Once he learned we could do that through the

16   indentation analysis, he has to dispute.  He had to dispute

17   what was in that notebook and when it was created.

18        But we have shown you that what's in that notebook,

19   the Jewel drawings, the notes, the angel drawings, the notes

20   from Wade, the bank entries all in fact do date from 1999.

21   And having heard and seen the evidence, you know that MGA and

22   Mr. Isaac Larian used Carter Bryant, persuaded Carter Bryant,

23   induced Carter Bryant to work for MGA while he was employed

24   at Mattel.

25        Now, MGA's own internal documents and e-mails show

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    how deep Mr. Bryant's betrayal ran and how MGA was with him

2    every step of the way.  What MGA supplies in the absence of

3    documents and physical evidence, and sometimes in the face of

4    documents and physical evidence, are words.  Words of people

5    who want you to believe that Mr. Bryant did not violate his

6    duties to Mattel; that Bratz had nothing to do with Mattel;

7    that Carter Bryant did not breach his duty of loyalty, which

8    the Court has now instructed you he did; that Carter Bryant

9    did not breach his contract with Mattel by working with MGA

10   as the Court has now instructed you that he in fact did.

11        The chief factors who supply those words -- Paula

12   Garcia, Isaac Larian, and Carter Bryant -- took the witness

13   stand and showed time and again that they are not truthful,

14   that they did not tell you the truth.

15        Their words, the words they gave you, are not

16   better than documents.  They are in fact worst than no

17   evidence because their words portray an utter dishonesty and

18   lack of regard to the truth.

19        The people who support MGA's story are people who

20   make stories up.  The evidence and documents tell a different

21   story than the words that they utter.

22        I'd like to just start with a couple of -- a few

23   examples to remind you of some of the evidence that you

24   heard.  And I'm going to give you one example for each of

25   these three individuals, of an untruth, an important untruth

1    which they told you and which I submit is character defining

2    and tells you all you need to know about them.  And in doing

3    that, I don't mean to minimize all the other untruths that I

4    believe you heard.  Just one example to start out with each.

5           And let's begin with Paula Garcia.  You remember

6    her.  She's the vice-president of MGA.  She's in charge of

7    girls' toys.  She's the Ivy Ross of MGA, if you will.  She's

8    the product manager for Bratz, the key executive who was in

9    charge of this product that's the subject of this case.

10          When she took the stand, she knew that a key issue

11   in this case was whether or not MGA knew in the September and

12   October time frame that Carter Bryant was then employed by

13   Mattel.

14          The key questions were did she and MGA create an

15   alliance with Mr. Bryant to compete with Mattel while he was

16   still employed with Mattel?  And did MGA know that that

17   alliance was in violation of obligations that he had to

18   Mattel?  In short, did MGA aid and abet his wrongdoing?

19          Now, others at MGA can pretend that they had no

20   idea whether or not Carter Bryant had any obligations to

21   Mattel, even if he worked there.  You remember Mr. Larian

22   took the stand, and he claimed to have no idea what Mattel's

23   agreements with its employees might provide.  He said that

24   even though under MGA's contracts, MGA employees could not

25   compete with MGA.  Even under MGA's agreements, anything that

1   those employees created while they were working for MGA would

2   belong to MGA.  Even though these things are true, he took

3   the stand and told you he had no idea what Mattel might

4   require of its employees.

5          Perhaps it's okay if a Mattel employee comes up

6   with something, develops something in the course of their

7   Mattel employment and calls up another toy company and says

8   hey, I have developed this on my job here at Mattel.  I'd

9   like to offer it to you.  Who knows?

10          That was his -- he had no idea whether that would

11   be okay or not.  Pretended not to know what Mattel required

12   its employees and what the employees' obligations to Mattel

13   were.

14          But Paula Garcia could not pretend about that.  She

15   couldn't pretend because she had formerly worked at Mattel.

16   She had signed the same agreement that Mr. Bryant had signed.

17   She knew, and she testified that while she was a Mattel

18   employee, she knew that she could not assist a competitor.

19   Let's take a look at her testimony.

20          This was her testimony.  One of the things it said,

21   going back to that first page in looking at her contract, she

22   understood the inventions, anything she came up with would be

23   owned by Mattel, and what she also knew was that you were

24   supposed to devote your efforts to Mattel and not work for

25   another company at the same time.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          "I generally understood that, yes."

2          She knew, and she testified on the stand that she

3    knew what those obligations were.  She knew it would be

4    wrong.  She knew it would be a breach of Mattel employee

5    contracts for Carter Bryant to assist MGA or share design

6    ideas with MGA.

7          So what is Ms. Garcia's essential big lie to get

8    you to conclude that MGA did not aid and abet Carter Bryant

9    in violating his Mattel contract?  Knowing about these

10   obligations not being able to pretend ignorance about his

11   contract, she testified that she didn't even know that

12   Mr. Bryant was employed by Mattel until 2004, some four years

13   after she began working with him on Bratz.  After this

14   lawsuit was filed.

15         So although she knew that a Mattel employee

16   shouldn't have been doing what Mr. Bryant was doing, she

17   claimed she did not know that he was a Mattel employee.

18   Here's her precise testimony.

19         "Question:  You didn't know he was a Mattel

20   employee as of September 1st, and you didn't know that until

21   sometime in 2004; is that right?

22         "Answer:  Correct."

23         So folks, that wasn't her first answer.  At her

24   deposition, when she was under oath before, she first gave a

25   truthful answer and was coached by an attorney to take it

1    back.  You saw this video testimony in the trial.  I want to

2    show it to you again.  And watch Paula Garcia.  Watch her

3    eyes.  Watch what's happening.

4         WHEREUPON THE VIDEOTAPED DEPOSITION EXCERPTS

5         OF PAULA GARCIA, AS PROVIDED BY COUNSEL, ARE

6         INCORPORATED HEREIN:

7         "QUESTION:  Mr. Bryant at that time, as you

8    understood it, was a designer at Mattel.  Isn't

9    that true?

10        "MS. TORRES:  Objection, misstates the

11   witness's testimony.

12        "THE WITNESS:  Yes.

13        "QUESTION:  When is it you first became aware

14   that Mr. Bryant was working at Mattel?

15        "ATTORNEY TONE:  Objection.  Misstates the

16   witness's testimony, and vague.

17        "THE WITNESS:  Can you please repeat the

18   question?

19        "QUESTION:  Sure.  Isn't it true that when you

20   had this meeting you had been discussing, which you

21   reference as being the September 1st, 2000,

22   meeting, that by the time the meeting was over,

23   you, yourself, were aware that Mr. Bryant was

24   employed as a designer at Mattel?

25        "MS. TORRES:  Similar objections.

1       "THE WITNESS:  I don't mean to be difficult.

2    I would ask, please, if you could please rephrase

3    your question.

4       "QUESTION:  What's unclear about my question?

5       "THE WITNESS:  I'm not sure how to answer the

6    question without it being rephrased.

7       "QUESTION:  At that point did you become aware

8    that Carter Bryant was, as of September 1st, 2000,

9    when you had this meeting, at that point employed

10   by Mattel?

11      "ANSWER:  Yes.

12      "QUESTION:  When did you first become aware of

13   that?

14      "ANSWER:  My memory is three years ago.

15      "QUESTION:  Sometime in 2004?

16      "Answer:  Approximately, yes.

17      "QUESTION:  Was this after Mattel brought this

18   lawsuit?

19      "ANSWER:  I'm not sure when Mattel brought the

20   lawsuit."

21      You just saw that story, how it was crafted, right

22   in front of you.

23      Let's look at the transcript.  First, she answers

24   the question.  At the time when she was meeting with him, she

25   knew that he was employed by Mattel.  Answer, yes.  Then

1    there's an objection by the lawyer.  Misstates the testimony.

2    Misstates the testimony.  And had she previously given a

3    different answer in her deposition?  Mr. Price asked that

4    question.

5           She was asked on the stand whether she had

6    previously been asked in deposition whether she knew that

7    Mr. Bryant was employed by Mattel and had given a different

8    answer.  That was a challenge laid down by Mr. Price to MGA,

9    to come forward and show you if there had ever been a time

10   where she gave a different answer in that deposition.

11          And, of course, they had nothing.  They couldn't

12   point to anything in the transcript previously where she had

13   given a different answer.  That objection which you just saw

14   was nothing more than the attorney telling her you gave an

15   answer we don't like.  You need to change it.  That's what

16   that meant.  And after the objection, she hemmed and hawed.

17   You saw it.  She struggled and finally said, "I didn't know

18   he was employed by Mattel until 2004."

19          By the way, that wasn't the only instance of

20   coaching of witnesses that you saw.  I know some of you saw

21   when Mr. Bryant was on the stand, his lawyer, Michael Page,

22   sitting over here, who was shaking his head and nodding while

23   Mr. Bryant was testifying.

24          Paula Garcia absolutely knew.  No question she knew

25   that the person she was dealing with was a Mattel employee.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      The head of product development, a senior executive of MGA

2      knew in September and October that when she was -- when

3      Mr. Bryant was working with MGA on Bratz, she knew that he

4      worked for Mattel.  She knew even before that September 1

5      meeting.  How do we know that?  She had met with Carter

6      Bryant along with others before September 1.  Both Carter

7      Bryant and Victoria O'Connor told you about that previous

8      meeting in mid-August.

9          Ms. O'Connor was asked, well, by that August

10     meeting, did you know that Carter Bryant worked for Mattel,

11     and her answer was yes.  Because Paula Garcia had told her

12     that.

13         Carter Bryant also, he repeated at the September 1

14     meeting with Mr. Larian and Ms. O'Connor that yes, he worked

15     for Mattel.  You heard that testimony from Mr. Bryant in the

16     September 1 meeting.

17         "One of the things you told Mr. Larian was that you

18     were at that time employed by Mattel; right?"

19         "Answer:  I'm quite sure that I did."

20         Mr. Larian also said he heard that at that meeting.

21     You saw Mr. Larian's testimony.

22         "He told you at that meeting he worked at Mattel?

23         "Answer:  He did.

24         "Question:  And he said that in front of

25     Ms. O'Connor and Ms. Garcia?

1          "Answer:  To the best of my recollection, yes, he

2     did."

3          What was Ms. Garcia's excuse, her explanation for

4     why she didn't hear that?  Do you recall that?  She said she

5     was so dazzled, excited by these designs that Mr. Bryant had,

6     designs, by the way, that she also claimed they didn't use,

7     she said she was so dazzled by these designs that she didn't

8     hear it.  Well, apparently that deafening excitement caused

9     by those designs lasted for four years, because she claimed

10    she didn't know until 2004.

11         Another problem with the excuse is that the

12    September 1 date wasn't the first time she saw those

13    drawings.  As we learn later, when Mr. Bryant and

14    Ms. O'Connor took the stand, she saw them.  They both

15    testified.  Ms. Garcia had seen those designs before, at

16    least at a meeting in August.  You also heard the testimony

17    of Jennifer Maurus, MGA's general sales manager, that even

18    before that, Ms. Garcia had introduced Carter Bryant to her,

19    not only as being from Mattel, but as a friend she had worked

20    with at Mattel.

21         Ms. Morris's testimony:  Said she had worked with

22    him at Mattel.  And then you heard the testimony of Rachel

23    Harris, MGA's director of creative services.  And you recall

24    that she said she was told by Paula Garcia that Mr. Bryant's

25    going to be coming over on the lunch hour from his work at

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Mattel, and we should try to keep it quiet.  But there was no

2    question that she had been told by Ms. Garcia that he was a

3    Mattel employee at the time.

4        Ms. Garcia's sworn testimony to you from that

5    chair, that she did not know Carter Bryant was a Mattel

6    employee, is contradicted by every single piece of evidence

7    you have seen in this case.

8        But the testimony that she gave that she didn't

9    know for four years that he had been a Mattel employee is

10   just simply an insult to your intelligence.

11       Why would she lie about something like that?  She

12   did it because she had to.  Because if she, as a senior

13   executive of MGA, knew that Carter Bryant was a Mattel

14   employee in September and October of 2000, when she was

15   working with him hand in hand to develop a new doll line,

16   then MGA was knowingly interfering with Mr. Bryant's contract

17   with Mattel and aiding and abetting Mr. Bryant in breaching

18   his duties of loyalty and his fiduciary duties to Mattel.

19       So she and Mr. Larian had to perpetrate a fraud on

20   you, or try to.  Mr. Larian chose to lie about knowing that

21   Mattel would require the same duties of its employees that

22   MGA requires of its, MGA's, employees.  Ms. Garcia couldn't

23   do that.  She couldn't tell that lie.  So she chose the other

24   one.  She chose the lie that "I didn't know that he was a

25   Mattel employee."

1          That's Paula Garcia.

2          Now, let me talk about Mr. Larian.  Again, I'm

3    giving you one untruth for each of these key witnesses.

4          Mr. Larian's character defining untruth that he

5    told you, when he took the stand, he testified to you under

6    oath that there was no reason, no reason for MGA to keep

7    Mr. Bryant under wraps.  You recall that testimony.  No

8    reason to, you know, try to keep it quiet, that Mr. Bryant

9    had a role in Bratz.

10         Now, of course, this is contradicted.  Let's look

11   at the evidence that can't change.  It is contradicted by the

12   documents you have seen in this case.

13         First we have the e-mail from Dee Dee Valencia to

14   Mr. Larian.  Let's have a Bratz collector doll, a designer

15   signature doll.  But you know, who would sign it?  I know we

16   want to keep Carter under wraps.

17         Second, there's that unfortunate vendor, David

18   Dees, who drew the ire of Mr. Larian.  His offense was that

19   he had put on a Yahoo website that Carter Bryant was a genius

20   of fashion and the sole and only person who first created the

21   Bratz look.  And after seeing this, Mr. Larian sent an e-mail

22   to all MGA employees, you'll recall this, saying make no

23   mention of Carter Bryant.

24         And then you remember this document, the don't ask

25   document.  List of former employees.  We introduced this when

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Daphne Gronich was on the witness stand a few days ago.  And

2    you saw for Carter Bryant, the MGA dates of employment and

3    Mattel dates, it says question mark to the present, don't

4    ask.  And Ms. Gronich's explanation of that is, well, we knew

5    that Mr. Bryant had his own lawyer.  So we didn't want to ask

6    him his dates of MGA employment.

7         Does that make any sense?  They know when he worked

8    with MGA.  Not as an employee, but they know those dates.

9    That explanation makes no sense at all.

10        You also heard the testimony of Rachel Harris, who

11   told you she was instructed to never mention Mr. Bryant's

12   name outside of MGA.  She said that instruction came directly

13   from Mr. Larian, who in fact told her to say that he was the

14   person, he was the person who created Bratz.

15        In fact, in his testimony, Mr. Larian apparently is

16   in disagreement with his own counsel, Mr. Nolan.  You

17   remember in his opening statement, Mr. Nolan said there was a

18   reason to keep Mr. Bryant under wraps.  This is from

19   Mr. Nolan's opening statement.

20         He said there's a good reason to do it.

21   Mr. Larian will explain this.  Didn't want the identity of

22   Carter Bryant or of any of his employees out there.

23        So under oath, Mr. Larian tells you, "There's

24   absolutely no reason to hide Carter Bryant."  We ask him, but

25   wait a minute.  What about what your attorney said at the

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    opening statement, that there was a good reason.  And you

2    know this was his testimony.  He said, "Well, we don't want

3    our company's employees' identities out there because no

4    other toy company does, frankly, it's not just Carter Bryant.

5    It's anybody.  Any of our employees.  We don't want anybody

6    to know about who they are."

7            Well, that flatly contradicts Rachel Harris's

8    testimony.  She testified, you'll recall, that the only

9    person she was told to keep under wraps and not talk about

10   was Mr. Bryant.

11           Even when Mr. Larian finally conceded apparently in

12   speaking to a Wall Street Journal reporter in 2003 that

13   Mr. Bryant had something to do with Bratz, he still couldn't

14   bring himself to tell the truth.  Remember, he said well, it

15   was done as part of a fashion doll design contest.

16           Kind of unusual contest.  No announcement, no

17   prizes, no participants in this contest, other than

18   apparently Carter Bryant and Paula Garcia.

19           Now, I'm just giving you one example for each of

20   these key witnesses.  There are other untruths that I'm going

21   to talk about, and I don't mean to minimize those.

22           Now, for Carter Bryant.  And for Carter Bryant

23   there's just such a wealth of material one could choose from,

24   but I've chosen an example which Mr. Bryant himself said you

25   could use to evaluate all his testimony.

1          You'll recall that Mr. Price was asking Mr. Bryant

2     about the September 18th letter he sent to Universal, the

3     hair vendor.  And Mr. Price asked whether Mr. Bryant meant to

4     imply to Universal that he was working with MGA when he wrote

5     that sentence.  The company I'm working with is called MGA

6     Entertainment.  And Mr. Price says:

7          "So what you just said under oath is that you

8     didn't mean to imply necessarily that you were working with

9     MGA; right?

10          "Answer:  Right.

11          "Question:  And that's as truthful an answer as any

12     that you've given since you've been on the stand; right?

13          "Answer: Yes."

14          He agreed under oath that this answer here was as

15     truthful as any he had given on the stand.  But then when

16     Mr. Price questioned him further, he flip-flopped.  He

17     realized his dishonesty was exposed.  He was asked:

18          "So examining that answer, since you didn't mean to

19     create the impression, then why did you put on the address,

20     your address here as MGA Entertainment?  Perhaps it was

21     because you were trying to give this impression that you

22     worked with MGA?

23          "Answer:  It's possible, but, you know, I don't

24     really -- I don't really -- excuse me, remember."

25          It was apparent to everybody in the courtroom at

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    that point that Mr. Bryant was not telling the truth.  He

2    changed his answer to say that okay, you got me.  It's

3    possible that I was trying to give the impression that I was

4    working with MGA.

5           But Mr. Bryant told the truth about one thing.

6    That answer, that testimony was as honest as anything else

7    that he said on the stand.

8           And the Court's given you a jury instruction which

9    I think is useful in evaluating the truthfulness of

10   Mr. Bryant's testimony and the testimony of others, and

11   that's Jury Instruction No. 14.  The evidence that a witness

12   has lied under oath on a prior occasion or given inconsistent

13   testimony under oath may be considered, along with all other

14   evidence, in deciding whether or not to believe the witness

15   and how much weight to give to the testimony of the witness

16   and for no other purpose.

17          In other words, if he didn't tell the truth, you

18   can take that into account in evaluating all the testimony

19   that he gave.

20          You've now heard the jury instructions about

21   Mattel's claims in this case.  You know that it's Mattel's

22   contention that MGA and Mr. Larian interfered with Carter

23   Bryant's contract with Mattel, that MGA and Mr. Larian aided

24   and abetted Mr. Bryant in breaching his duties of loyalty and

25   fiduciary duties to Mattel.  As you've heard, the Court has

1   already found that Mr. Bryant did in fact breach his contract

2   and breached his duty of loyalty.

3          And I submit that under the evidence you've heard,

4   there was no doubt that he was helped in that, he was aided

5   and abetted in that by MGA.  They helped him because they

6   needed a successful product.  This is a company that in the

7   recent past not too long before had gone through a

8   bankruptcy.  They ended up losing millions of dollars in the

9   year 2000.  They had never had a fashion doll.  This was a

10  perfect marriage of an individual who was willing to betray

11  his employer and a company that needed him to do exactly

12  that.

13         Now, I'd like to talk about that marriage and the

14  events, and we'll get some help from Mr. Price to turn around

15  a chart we've prepared.  And this chart summarizes what you

16  heard about what Mr. Bryant and MGA did during the time that

17  Mr. Bryant was still a Mattel employee so he could get MGA in

18  the position and MGA would be in the position to compete with

19  Mattel.

20         Now, first I'd like to focus on a couple of things

21  Mr. Bryant did before September 2000.  In the year 2000, but

22  before September 2000.  While at Mattel, he goes to one of

23  his co-workers, a face painter by the name of Sheila Kyaw.

24  Why is he doing this?  He wants to create a Bratz doll that

25  he can take with him to pitch to MGA.  He didn't tell her

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    this was for MGA.  He didn't tell her it was for a

2    competitor.  She trusted him, and she painted the face.

3            He went to another co-worker, Ms. Carmen

4    Monteagudo, a woman who rooted hair for dolls.  Again, this

5    is a trusted co-worker.  He didn't tell her that she was

6    helping him create a prototype doll to take to a competitor.

7            The purpose of this activity, the reason he was

8    doing this was to create this prototype he could go and pitch

9    and try to get MGA on board for his idea.

10           Now, the three core MGA witnesses who took the

11   stand and testified about this prototype -- Mr. Bryant,

12   Ms. Garcia, and Mr. Larian -- all tell you that this doll

13   that he brought to the pitch meeting was horrible, was ugly.

14   It was a Frankenstein doll, something the neighbor kid in Toy

15   Story might have put together.

16           They say that Carter Bryant, a well respected

17   designer, who is trying to pitch something, would show up

18   with something hideous.

19           But you heard from Victoria O'Connor, who was also

20   at that meeting, and she said it was beautiful.  You recall

21   that testimony.  On a scale of 1 to 10, it was maybe an 11.

22   And then Mr. Nolan was questioning her.  If you look at the

23   next slide here.  And she described it.  She said it had a

24   big head.  It was beautifully painted.  She was a blonde,

25   long hair, small body, big feet.

1          You recall that testimony?  Ms. O'Connor, when she

2     gave her testimony, did not have any motive to be dishonest

3     in her testimony.

4          It's true that MGA fired her brother, but she gave

5     the same testimony on the stand that she had given in her

6     deposition clear back on December 6, 2004, and at the time of

7     her deposition, her brother had not been fired from MGA.  He

8     was still working there.

9          Her testimony was not created or shaped by her

10    brother's being fired.  Rather, her brother's firing was a

11    result of her testimony at her deposition.

12         Now, let's focus on what happened during the months

13    of September and October 2000, and specifically, between

14    September 1st and October 19th of 2000.

15         Mr. Larian told you that prior to October 4, when

16    Carter Bryant signed his MGA contract, Carter Bryant did

17    nothing.  And he said that after October 4, until Mr. Bryant

18    left Mattel on October 19th, there was nothing to be done.

19    He wasn't doing anything, he says.

20         And remember, Ms. Garcia downplayed what was being

21    done by saying this was all just exploratory.

22         The testimony of the only disinterested person who

23    was at that September 1 meeting, Victoria O'Connor, was that

24    MGA internally decided to go forward with the Bratz doll

25    right after that meeting.  How soon after that first meeting

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    was such a decision made?  That very day.

2         And after that, Mr. Bryant was an integral part of

3    a rush project to create a new doll line, new fashion doll

4    line for MGA, and MGA was helping Carter Bryant breach his

5    duties to Mattel so that MGA would be in a position to

6    compete with Mattel as soon as possible.

7         All this had to be done at breakneck speed.  You

8    saw the evidence.  So that MGA would be in a position to

9    present it to its major retailers, Kmart, Target, in the very

10   first week of November, as they did.  And to present it at

11   the Hong Kong toy fair in January, and the New York toy fair

12   as well.

13        And this is a document from Universal confirming --

14   it's in evidence, confirming that as per telephone

15   conversation, Universal, the hair vendor in Hong Kong, "I

16   learned that you're going to make dolls in Hong Kong."  They

17   have already decided that.  And this is dated September 21,

18   by the way.  "And as per your information, you are going to

19   exhibit new dolls to Toy Fair in New York next year."  That's

20   February.

21        They already know, as of this date, September 21,

22   they are already committed and they are acting fast to try to

23   meet those deadlines.

24        In September Mr. Bryant makes lots of calls to MGA

25   from his Mattel phone.  The phone records are in evidence if

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1      you want to look at them.  It's Exhibit 472.  The phone calls

2      aren't very long.  You don't have to have long phone calls

3      when you are talking to your boss.  But what was he doing

4      during this time period where these phone calls were being

5      made?

6           Well, we know he was lining up the hair vendor.  We

7      also know he was working with Margaret Leahy, a sculptor.

8      She met with Mr. Bryant on September 29 to get comments on

9      her sculpt.  She also met with him just two days earlier on

10     September 27th.  And that was a week to 10 days, she said,

11     after Carter Bryant had first called her to begin a sculpt

12     on September 18th.

13          In fact, if you look at the contract which

14     Mr. Bryant signed with MGA, which they, MGA, claims he

15     actually signed on October 4, that's Exhibit 15, if you look

16     at the contract, you'll see that it says it's dated as of

17     September 18.

18          That date was put there by an attorney from MGA.

19     There was a reason that that particular date was chosen.  By

20     that date, on that date, Carter Bryant was already working

21     for MGA to create Bratz and compete with Mattel.

22          Putting that date on the contract is MGA's official

23     recognition of that fact.

24          The point is that MGA, even MGA in their own

25     documents in the evidence that cannot change, recognizes that

1    Carter Bryant with MGA's assistance and encouragement was

2    working to Mattel's detriment to compete with Mattel by

3    mid-September of 2000.

4        In fact, as Ms. Garcia noted in September, he had

5    been working about four hours a day on MGA's behalf.  This

6    evidence, this date evidence, the contract is so damning,

7    that MGA and Mr. Larian even lied, withheld this information

8    from their original lawyers as to when he signed the

9    contract.

10        You heard from Ms. O'Connor, who received this

11    contract, it was faxed, it had a Barbie Collectibles header

12    on it.  And Mr. Larian asked to have a copy of it sent to

13    Ms. Glaser, but not before first whiting out the Mattel

14    header.

15        You recall that testimony, that he instructed her

16    to white that out.

17        And another thing that was whited out on the copy

18    that we got from the lawyer, Ms. Glaser, who was the original

19    lawyer representing MGA, was that date, September 18th.  So

20    we have missing fax header, a copy produced by Ms. Glaser,

21    what she received was also missing -- was also missing the

22    date.

23        All these acts in September and October, if you

24    focus only on all of these acts, folks, this is a completed

25    illegal scheme.  It's been consummated.  It's done.  If you

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1        look no further than this, it's a completed illegal scheme.

2              Mr. Bryant and MGA worked together, worked hand in

3        glove.  MGA helped Carter Bryant as Carter Bryant helped MGA.

4        Together they created a competing doll line called Bratz, in

5        violation of Mr. Bryant's contractual duties to Mattel.

6              Now, MGA's response to most of this documentary

7        evidence?  All these documents have typographical errors and

8        mistakes.  They don't mean what they say.

9              You recall Ms. Garcia's testimony, that the term

10       four hours was incorrect.  She didn't mean that.  That was a

11       typo.  And then, you know, when it talks about fashions,

12       finalized.  So it's true that as of Tuesday, October 24th,

13       you had finalized the fashion designs; correct?  No, that's

14       not correct.  Even though the contemporaneous document refers

15       to finalized fashion designs.

16             Then you recall control drawings.  Did they exist

17       as of October 2?  Control drawings were sent to an L.A.

18       designer.

19             And Ms. Garcia's testimony is, "You know, I believe

20       this date, October 2 of 2000, is incorrect."

21             That's another typo.  You know, poor MGA seems to

22       be beset with lots of typographical errors, but even in

23       things more formal than internal e-mails and memoranda and

24       planning documents, MGA can't seem to get the dates right

25       they would have us believe.  You recall how MGA told its

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    trademark lawyer, Ms. Arant, who Mr. Zeller questioned, who

2    was applying for trademarks on the Bratz, that the date of

3    first use for the Bratz names, you recall that document?

4    June 15, 2000.  And her testimony, well, that was a mistake.

5         And then their copyright applications also contain

6    mistakes, if you recall that.  And those were fixed.  They

7    amended them.  They went back and amended them after this

8    lawsuit was filed.

9         So MGA's first line of defense, that Mr. Bryant did

10   nothing while he was still employed by Mattel, is just --

11   can't be believed.  It's just patently false.

12        But they have a fall-back position, and it's this.

13   Well, none of this really matters, because if Carter Bryant

14   was assisting MGA while he was a Mattel employee, the designs

15   he created were created during this gap in his employment,

16   you know, during a short time frame in 1998 when he wasn't

17   working for Mattel.  And that's really important.  You know,

18   this gap in employment was created back then, wasn't working

19   for Mattel, and that's our fall-back position.

20        But the evidence, folks, contradicts this theory as

21   well.  In the first place, Mr. Larian didn't care when the

22   Bratz design was created by Mr. Bryant.  To be sure, he

23   claimed on the witness stand that it was absolutely, he said

24   it was absolutely critical to him that these designs were not

25   created while Mr. Bryant was at Mattel.  He said he made this

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    clear at that September 1st meeting.  But no one else was at

2    that meeting recalls Mr. Larian saying this.  Ms. O'Connor

3    was there.  She said nothing was said about Mr. Larian asking

4    at this meeting when this was created.

5         Carter Bryant was also at that meeting.  At trial

6    he said oh, yes, something like that was said.  But in

7    previous sworn testimony in his deposition, he says he didn't

8    remember what was said after he said that he was from Mattel.

9    You recall that testimony.  I don't recall what he said

10   exactly.

11        And, of course, Mr. Larian's sworn trial testimony

12   was inconsistent with his deposition testimony.

13        At deposition, he had said he did not think that he

14   told Mr. Bryant that he was not interested in drawings if

15   they were made while he was a Mattel employee.  This was

16   Mr. Larian's deposition testimony.  Remember, he's asked:

17        "During that meeting, did you tell Carter Bryant

18   that if he had made any of those drawings that he was showing

19   you during the time he was a Mattel employee, that MGA did

20   not want them?

21        "Answer:  I don't recall having that -- having said

22   that.

23        "Question:  Was that ever conveyed to him?

24        "Answer:  I don't know.  I don't think so."

25        In truth, Mr. Larian simply didn't care whether

1    those drawings were created while Mr. Bryant was a Mattel

2    employee or not.  It simply didn't matter to him.  That's

3    what he testified to at deposition.

4         "Would it have been a problem if Carter Bryant had

5    created or made any of his drawings when he was employed by

6    Mattel in your view?

7         "Answer:  No."

8         That's sworn testimony.  Well, this is consistent,

9    I submit, with how Mr. Larian and MGA do business.  You

10   recall the testimony of the Marlows, that they were using

11   Mattel employees to actually make Bratz fashions for MGA even

12   before Mr. Bryant left Mattel.

13        Exhibit 5223-1 is one of their time sheets here.

14   It's one of the time sheets from October 2000 for these

15   sample makers.  5223.  I'm sorry.  5723 is the Exhibit.  From

16   October 2000.  Now, these sample makers were at the time

17   Mattel employees, working for a competitor, even though they

18   had full-time jobs at the time from Mattel.  They are

19   actually creating clothes that were competing with Mattel

20   dolls.

21        And you recall that Mr. Marlow sent an e-mail.

22   This is Exhibit 13223 to Ms. Garcia.  And Mr. Larian admitted

23   that he saw this e-mail.  He was copied on it.  And in it,

24   Mr. Marlow said that these workers had secure jobs with the

25   outlook for many more years of stability, which they were

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    risking to work on Bratz.  If continued, if they were ever

2    discovered, they'd certainly be painfully humiliated and

3    fired.  He also said the women have more than 100 years total

4    of doll-making experience between them.

5        So it's secure jobs.  They are moonlighting.  They

6    are fired if they are discovered.  They have more than 100

7    years of doll-making experience between them.

8        Just knowing that, you know these women work for a

9    competitor.  They are being told that.

10       Now, if you actually know the industry, if you put

11   it together, you have a pretty good idea it's Mattel that

12   they are working for, but you don't have to conclude that.

13   You don't have to go that far.  It certainly communicates the

14   idea that these women worked for another toy company, and

15   that if it was discovered what they were doing, they would be

16   fired.

17       And in front of you, Mr. Larian said, "Well, it's a

18   long e-mail.  I don't believe I read this."  But he said

19   something even more telling.  My question:

20       "You said that you don't recall reading this e-mail

21   on which you are copied?

22       "Answer:  That's correct.

23       "My question is sitting here today reading it, you

24   still wouldn't do anything about it?

25       "Answer:  Probably I wouldn't."

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          Wouldn't do anything about it.  What's this tell

2     you?  It's clear these women are working for a competitor.

3     That's communicating.  He simply doesn't care.

4          So that's the first point about this 1998 gap in

5     Mr. Bryant's Mattel employment.  They haven't shown that that

6     is something that -- the evidence is that that is not

7     something they would have cared about.  They didn't care

8     whether these designs were created while Mr. Bryant was

9     employed by Mattel.

10          The second thing about this 1998 gap fall-back

11     story is that these -- you can tell how much it mattered to

12     them, whether they are saying the truth to this or when they

13     were created by the investigation that they did.

14          Here's one thing they knew, one thing they knew

15     about Carter Bryant in September of 2000, is that he could

16     not be trusted.  You remember what Paula Garcia said when

17     Mr. Price asked her about whether you could trust someone who

18     was working for one company while at the same time being

19     employed by competitor?  You know, if you knew that about

20     somebody, it would mean perhaps you shouldn't trust that

21     person; correct?  Yes.

22          She agreed to that.  And they knew that.

23     Ms. Garcia wouldn't admit it, but this the evidence is

24     overwhelming, and certainly Mr. Larian knew.

25          So what did MGA do to investigate whether in fact

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1   Mr. Bryant owned these designs and whether they were done

2   during some gap period back in 1998?  The only evidence of an

3   investigation presented to you was that they asked Carter

4   Bryant, and that MGA also -- Mr. Larian said well, they might

5   have had an attorney ask Mr. Bryant's attorney what

6   Mr. Bryant had said about when it was created.  And no

7   investigation at all.  Because we know Mr. Bryant's dishonest

8   and can't be trusted.

9         And interestingly, although you heard some

10   reference to lawyers, you didn't hear from those lawyers.

11   You didn't hear from MGA's counsel, the counsel that

12   supposedly did an investigation.  You recall Mr. Larian, on

13   the stand, he said I'm not a lawyer.  I'm a toy maker.  The

14   lawyers were the experts.  They know where to investigate.

15   They knew what to ask.

16         And you remember back on the very first day of

17   trial, Mr. Nolan in his opening statement talked about two

18   lawyers, Carter Bryant's attorney at the time, Ms. Wang, and

19   MGA's attorney, Mr. Rosembaum.  But MGA never called either

20   witness.  These are the people that supposedly know about the

21   investigation.

22         Without them, there's no evidence of an

23   investigation at all.

24         Mr. Larian said he didn't know what investigation

25   was done.  He said talk to the lawyers.

1          Ms. O'Connor said nothing was done.  This was her

2    testimony.  If Mr. Larian testified that he instructed you to

3    make sure this was something Mr. Bryant created outside of

4    his employment, she would dispute that she was ever asked to

5    do that.

6          MGA never called the two witnesses who could

7    substantiate the story that there was any type of

8    investigation to try to confirm this 1998 gap theory.

9          And again, you've got a jury instruction on this

10   which is helpful.  Jury Instruction No. 9.  If weaker and

11   less satisfactory evidence is offered by a party, when it was

12   within that party's ability to produce stronger and more

13   satisfactory evidence, i.e., if it was in their power to

14   bring those attorneys in here, the evidence offered should be

15   viewed with distrust.

16         There's no evidence of any investigation to find

17   the truth.  You only have window dressing, MGA sort of going

18   through the motions.

19         Now, before I get into the details about this 1998

20   gap creation story, there is something else I would like to

21   ask you to remember.  You have seen that Carter Bryant is

22   willing to commit perjury to lie about dates in order to get

23   property rights, intellectual property rights for MGA.  You

24   remember Mr. Price asking Mr. Bryant about a declaration

25   under penalty of perjury concerning certain Bratz features,

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1     when those features were first in the marketplace.  And that

2     declaration was submitted to him by an MGA attorney, and

3     there was a cover letter, and the cover letter explains our

4     patent application was filed on this date.  So a release date

5     back in 2001 would be anticipatory, while a release in the

6     fall of 2002 would be within the one-year grace period.

7           This is Exhibit 11898.  That kind of gives you an

8     idea that the attorney is telling you, you know, we really

9     need this -- we need -- these dolls need to first be in the

10    marketplace in 2002.  We need the grace period.

11          Of course, Mr. Bryant wouldn't acknowledge that.

12    He says I don't know what it means.  I don't know what a

13    grace period is.  He says I just don't know.

14          But then there's the declaration that Mr. Bryant

15    signed.  The signed declaration is Exhibit 502, and you see

16    in the third paragraph, here it talks about the features of

17    the Bratz dolls, and we asked Mr. Bryant about those

18    features.  And he explained that every -- and we actually

19    gave him a doll, and he pointed it out, went through each one

20    of these features, and he agreed that every single one of

21    those features identified in paragraph 3 of his declaration

22    were in the Bratz dolls released in 2001.

23          And then we went to the next paragraph on that next

24    page, the fourth paragraph, and Mr. Bryant -- or Mr. Price

25    asked Mr. Bryant, that statement that you made there, where

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    you said under oath that those things appeared for the first

2    time in 2002, that's false; right?  Your statement is that's

3    false.  And he says well, I mean, it seems like it, yes.

4         Mr. Bryant's first defense to this admittedly false

5    statement made about MGA, made about Bratz so that MGA could

6    get these property rights, it was, well, I didn't realize it

7    was going to the Patent Office.  You recall that?  He says --

8    he was asked, you knew you were lying to the Patent Office.

9    He says, "Well, I didn't know it was going to the Patent

10   Office."  And then we pointed out the very address, the title

11   on the document, the Patent Office.

12        So you knew this was going to the Patent Office.

13   He says, "Well, I don't really recall."

14        And his next defense after that was, "Well, I

15   didn't know this was under oath."  As if it's okay to lie to

16   the government in something you're submitting to the

17   government as long as it's not under oath.

18        Mr. Bryant will say whatever MGA wants him to say,

19   needs him to say in order to secure rights, in order to

20   obtain rights.

21        That was absolutely clear from Mr. Bryant's

22   testimony.

23        And Mr. Bryant is not just willing to say anything

24   to help MGA win.  He's willing to do anything as well.  And

25   that's why he ran a program called Evidence Eliminator on his

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1   laptop two days before technicians were coming to Missouri to

2   his house to image his computer to gather evidence in this

3   case to be presented to you.

4        Now, imaging a computer, that means you make an

5   exact copy of everything that's on a hard drive.  And this

6   program Evidence Eliminator is, as the name implies, is

7   something that destroys evidence.  It renders evidence

8   unrecoverable.  This is Exhibit 13629, which are the website

9   pages.  It's in evidence, although it wasn't actually shown

10  to you on the screen during the trial.

11       You can look at it, and it makes it absolutely

12  clear that, you know, this is something that even law

13  enforcement personnel, after this has been run, it makes the

14  information on there absolutely unrecoverable, even by

15  forensic experts, but this doesn't work automatically.  You

16  have to make a conscious decision to run it.  You must push a

17  button.  You must select safe shutdown.  And to do what he

18  did --

19       MR. NOLAN:  Objection, your Honor.  That's contrary

20  to the stipulation.

21       THE COURT:  Overruled.  Proceed.

22       MR. QUINN:  You must push a button.  You must

23  actually select safe shutdown.  It's deliberate and has to be

24  made.  You heard a stipulation that in this case, it has to

25  be run about a half hour to work.  And two days before the

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    technicians were coming to image the computer, someone did

2    that, made that decision and ran the program.

3        Now, Mr. Bryant does not deny that someone did it.

4    And he admitted that he's the one that bought the program.

5    He's the one that bought it and installed it, about the time

6    that there was some rumors that there might be a lawsuit

7    between Mattel and MGA.

8        But he denied that he was necessarily the one who

9    ran the program.  Mr. Irmen, his partner, certainly denied

10   it.  He said, "It wasn't me."  But Mr. Bryant said, you know,

11   it could have been other people who had access to the

12   computer, and we asked, you know, did the butler do it?

13   Well, he doesn't have a butler.  So the housekeeper.  He said

14   the housekeeper might have done it.

15       Now, let's stop for a second.  Does anyone here

16   believe for a minute the housekeeper would have stopped doing

17   her work, sat down at his computer for some unknown reason,

18   typed in a password -- it was password protected.  So you

19   also have to assume that she had the password.  And of all

20   the programs on the computer, she would choose to run

21   Evidence Eliminator and shuts his computer down using this

22   safe shutdown protocol to destroy evidence.

23       Well, Mr. Bryant must have realized that nobody

24   would have believed that story.  So again, he had a

25   fall-back, a back-up story.  He says he doesn't remember

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    doing it, but if he did it, he had a good reason, and the

2    reason was, the first one he gave, when he was asked about

3    this, it was to block pop-up ads and to make his computer run

4    faster.

5         Well, first, you have to ask yourself why are you

6    so concerned about blocking pop-ups and making your computer

7    run faster two days before the technicians are going to come

8    and image your computer.

9         But it also turns out he already had a pop-up

10   blocker.  This was in the stipulation you heard, installed on

11   the computer.  It was a program called Spy Hunter.

12        So he had to come up with yet another excuse.  This

13   is his third line of defense, and finally he says the reason

14   he ran it was to erase adult content.  He says, "I don't

15   remember doing it, but if I did, it was to erase adult

16   content.  That was my legitimate reason."

17        Does anyone believe the first part of that, that he

18   doesn't remember doing it?  Because if you don't believe the

19   first part, I submit you can't and shouldn't believe the

20   second part about why he did it.  You wouldn't remember it?

21        Imagine yourself in Mr. Bryant's position.  You're

22   a defendant at the time in a lawsuit concerning a product

23   where -- from which you made in excess of $30 million.  Your

24   attorney tells you we're flying out technicians to come to

25   your house in Missouri and image your computer.  And two days

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    before that happens, you sit down at your computer.  You pull

2    up the Evidence Eliminator program, and you select the safe

3    shutdown option.  You are about to destroy evidence in a

4    federal lawsuit.  Not exactly an everyday occurrence.  It's

5    something you might remember.

6          Do you think you would forget this?  Don't you

7    think as you press safe shutdown and saw bite after bite of

8    data being deleted, maybe your heart rate would go up a

9    little bit?  Maybe your palms would sweat a little bit?

10   Maybe you'd ask yourself can anybody ever figure out I did

11   this?  Is this the right thing to do?  Would you ask yourself

12   is this illegal?  Is it criminal?

13         Folks, if you did this, if somebody did this, they

14   would remember it.  It's not something that you would forget.

15   It's willful destruction of evidence.

16         That's not the only evidence of evidence

17   destruction you heard about in this case.  Mr. Isaac Larian's

18   brother Farhad Larian contended under oath, you heard, that

19   he had been defrauded by his brother, that, you know, he had

20   bought out his interest in MGA and at the time had concealed

21   from him the fact that he had been secretly working much

22   earlier in 2000 with Mr. Bryant to develop Bratz.

23         And he, Mr. Farhad Larian, had collected electronic

24   documents relevant to this case, which were on a USB drive,

25   and boxes and boxes of paper documents, and after that case

1    ended between the Larians, while Mattel's case was pending,

2    Mr. Farhad Larian intentionally destroyed everything on the

3    USB drive and destroyed boxes of documents.

4         He says it was not done at Isaac Larian's

5    direction.  But as you saw, Mr. Larian -- this is

6    Exhibit 13380 -- Mr. Farhad Larian had previously accused his

7    brother of instructing him to hide evidence.  Isaac Larian

8    denied that he had.  They had this exchange of e-mails about

9    whether that had in fact taken place.  And with a million

10   dollar attorneys' fees judgment hanging over his head, Farhad

11   Larian took the stand and supported his brother when he came

12   and testified here.

13        So we have a sham investigation.  We have Carter

14   Bryant lying to the Patent Office.  We have wiping of

15   computer data.  And now we come to Mr. Bryant's creation

16   story.  And again, let's not look at the self-serving

17   testimony.  Let's look at the evidence that doesn't change.

18        First, the dates on the drawings.  You'll recall

19   that Mr. Irmen, Mr. Bryant's partner, testified that

20   Mr. Bryant usually dates his drawings.  But not here.  Why

21   not?  Because contemporaneous dates for the original Bratz

22   drawings would not help him.  He had to backdate them.  And

23   Mr. Bryant admits that there is not a single Bratz drawing

24   bearing a 1998 date that was actually dated in 1998.  That

25   was his testimony.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1        "If there's any date in these exhibits or in these

2    originals that say '98, to your knowledge, those dates were

3    put in there sometime after 1999; correct?

4        "Answer:  Yes."

5        These dates on these documents, if we can go to the

6    next slide, all those dates were added after the fact.  He

7    admitted it.  They were added for the Court.  They were dated

8    8/1998 in order to get legal rights for MGA.  You can see the

9    exhibit numbers down there, 10-3, 10-5, 10-6, 10-8, 10-9, and

10   10-10.

11        The few contemporaneous dated Bratz drawings show

12   that they were created in 1999.  And these are Exhibits 1327,

13   1328, and 777.  The ones that were actually dated the date

14   they were created are all dated in 1999.

15        The next piece of physical evidence that doesn't

16   change, the notary book.  Now, remember that Mr. Bryant told

17   you he went to a notary in 1999 to notarize the drawings

18   before he sent them to an artist representative firm, Alaska

19   Mama.  But he realized, of course, that while a 1999 date

20   would protect him against Alaska Mama, it also would mean the

21   documents are Mattel's if they are created in 1999.

22        Remember he told his mother that if he did drawings

23   while he was at Mattel, he was not allowed to sell them.

24   That was his testimony.  He admitted that.  So after that

25   entry in the notary book was complete, he added the words, he

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    had to add the words from 1998 Missouri.  He had the notary

2    add them.  And you know, you only heard one expert, Mr. Lloyd

3    Cunningham, testify about the notary book.  And you heard him

4    say, the only expert who testified on this, that based on the

5    speed, the spacing of the works the way they were written,

6    those words must have been added later.

7         You can see this for yourself.  Look at the entry

8    on the right-hand side without those words on the bottom.

9    The person who originally wrote this clearly thought they

10   were done with males.  It goes over.  There's a period after

11   it.  You have the commas going down to the bottom.  This is

12   somebody who, as they are writing this, is making space for

13   what they think they have left.

14        At the time that was written, and they wrote males

15   and went into the next column, I submit the only natural way

16   to see this is that that person thought they were done, and

17   then this was added afterwards.

18        So we think those words from Missouri 1998 were an

19   afterthought.  But really it doesn't matter.  The notary book

20   certainly does not prove that Mr. Bryant did anything on

21   Bratz in 1998.

22        It only proves that Mr. Bryant knew about his

23   obligations to Mattel and was consciously violating them.  It

24   proves that the Bratz drawings existed in El Segundo,

25   California, when these were notarized in August of 1999 smack

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    in the middle of his Mattel employment.  It proves that

2    Mr. Bryant knew how to date documents, prove that they

3    existed, and didn't do it in 1998.  He had to add that last

4    line to the notebook.  Without the last line, the notary book

5    is proof positive that this was done in 1999 while he was

6    employed by Mattel.

7         Now, it's important to remember that Mr. Bryant was

8    not a novice about these matters, about protecting himself

9    and protecting his intellectual property rights.  He knew how

10   to do this.  He took that songwriting class where he learned

11   about intellectual property, he learned about copyrights.  He

12   copyrighted numerous songs:  Teach Me How to Love You; Big

13   Dreamer; Slow Down, Baby; Hands of Love.  You recall those

14   titles.

15        He also knew about something called a poor man's

16   copyright.  You heard about that, where you want to prove

17   something exists as of a certain point in time, you can put

18   it in an envelope, put postage on it, drop it in the mail,

19   and mail it to yourself.  You've then got a postage stamp

20   that proves that it existed then.

21        Although he had this knowledge, he never

22   copyrighted in any fashion the Bratz dolls.  He didn't

23   copyright the Bratz drawings.

24        He understood that creating these drawings while he

25   was employed by Mattel meant that Mattel would own them.  So

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    why not protect himself by copyrighting them?  He knew how.

2         The copy was they didn't exist before 1999.

3    Mailing them to himself in 1999 was not an option.

4    Copyrighting them was not an option.  Because copyrights and

5    postmarks don't lie.  The best he could do would be to put

6    backdates on the drawings and include that phrase from

7    Missouri 1998 in the notary book.

8         Other physical evidence, evidence that doesn't lie.

9    We have drawings which MGA does not dispute.  There's a

10   certain class of Bratz drawings that there's no dispute were

11   created in 1999 while Mr. Bryant was employed by Mattel.  You

12   heard himself that he created color drawings in 1999 when, as

13   Mr. Price put it, the paper went from being blank to unblank,

14   or when Mr. Bryant put pen to paper to create drawings.  MGA

15   does not dispute that he did those color drawings in 1999.

16        He also admitted that he created a packet of

17   materials for his pitch to MGA while he was still working at

18   Mattel.  He explained that he wrote copyright underneath

19   Bratz where it says -- this is Exhibit 302 -- copyright 2000

20   on that packet because that is when he assembled these pitch

21   materials.  He created the Bratz logo.  He asked his

22   roommate, fellow Mattel employee Elise Cloonan, to create the

23   Bratz logo on her computer.  Didn't tell her what he was

24   doing it for.  Didn't tell her it was for a pitch for a

25   competing product.

MGA v. Mattel-Trial Transcripts (FINAL)        Unsigned                Page  4864

1          And you heard Mr. Bryant testify that he drew

2     various evening gown exhibits for formal underwear in

3     anticipation of his pitch to MGA.  These are Exhibits 5-84,

4     722, 719, 5-26, and 5-27.

5          No one disputes -- to this class of drawings, no

6     one disputes that these were all created during the time of

7     his Mattel employment in 1999.

8          So now let's talk about Mr. Bryant's inspiration

9     story.  Mr. Bryant admitted to you that you can take almost

10    any drawings and look back to find things that are similar.

11    Things that you could claim in retrospect after the fact

12    inspired it, and he's done just that in the case of Kickapoo

13    High School kids and the Seventeen magazine.

14         What do the documents and the common sense tell us

15    about Mr. Bryant's inspiration story?  Let's talk first about

16    Kickapoo High.  Set aside the question of why Mr. Bryant was

17    so far from the interstate driving by a school zone at the

18    time school was getting out.

19         You've seen Mr. Bryant's drawings.  The Bratz are

20    urban.  They are hip.  They are multi-ethnic.  They are

21    trendy.  That's how Mr. Bryant originally conceived them.

22    Look how he described them at the time in his original

23    write-up.

24         This is Exhibit 5-403.  Lupe is the Hispanic girl

25    with lots of 'tude.

1          Hallidae, aka Hip Hop, is also ultra trendy, street

2     wear 'n' braids.

3          Jade has got the lock on far-out fashion.

4          The kids at Kickapoo?  Folks, they are none of

5     these.  They are not urban, hip, or trendy.  They are not

6     multi-ethnic.  They are more Ozzie and Harriot and Little

7     Kim.  Kickapoo is not a credible source of inspiration.

8          Ask yourself, does Mr. Bryant's story here ring

9     true?  Which is more likely?  That Mr. Bryant was inspired to

10    create a line of hip, urban, multi-ethnic, trendy dolls by

11    kids at Kickapoo High School in Springfield, Missouri, or

12    that he was inspired by Lily Martinez's Toon Teens and the

13    hip, urban, multi-ethnic kids of Los Angeles?  Which is more

14    likely?

15         Folks, the Bratz are not from Springfield,

16    Missouri.  The Bratz are from Southern California.  Why would

17    he say that he was inspired by the Kickapoo High School kids

18    who are none of these things?  He has to.  He has to place

19    them in 1998.  That's where he was in 1998.  So that's why he

20    has to tell that story.

21         Then the Seventeen magazine.  We have the August

22    '98 Seventeen magazine.  They argue well, this must be what

23    inspired him.  But if you look at the images in the August

24    1998 Seventeen magazine, they are not similar at all.

25         First, there's the Dixie Chicks ad.  Even

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument) 7/10/2008 12:00:00 PM

1    Ms. Galvano told you, well, that's a stretch to say it's

2    similar to Bratz.  I guess the idea is well, they have

3    attitude.  Maybe that's the point.

4          Then there's the Coca-Cola and the Paris Blues ads.

5    You have to ask yourself about these.  Are these so similar

6    that their existence is independent evidence that they were

7    the inspiration for the Bratz?  I submit they are not.  It

8    tells you nothing about the timing of the Bratz creation.

9          And finally, we come to the Steve Madden add.  MGA

10   relies most heavily on this.  Remember Mr. Nolan spent a fair

11   amount of time talking about this ad in his opening

12   statement.  It's true this ad did appear in August 1998

13   magazines, and there were big feet, but it isn't close to the

14   Bratz.

15         Kickapoo High and the August 1998 Seventeen

16   magazine were not the inspiration for Bratz.  The real

17   inspiration came in 1999 when Mr. Bryant saw Lily Martinez's

18   Toon Teens drawings, drawings with large head, eyes, and

19   feet, and the 1999 Steve Madden ad, the very ad he gave to

20   the sculptor, Ms. Leahy, for inspiration.

21         Remember Lily Martinez came up with Toon Teens in

22   1999.  She was proud of her Toon Teens drawings and had them

23   displayed in her cubicle where Carter Bryant or anyone else

24   could see them.  Remember Mr. Bryant's roommate, Elise

25   Cloonan, sat right next to Lily, and she brought Mr. Bryant

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1        by to show him the Toon Teens.

2              And she described -- you heard the testimony that

3        Ms. Martinez described each of the characters to Mr. Bryant,

4        and Mr. Bryant told her he really liked them.  He said they

5        were great.  He said that Mattel would be crazy if they don't

6        make these.  And when he told her this, you can remember

7        Ms. Martinez told you how proud she was that he liked them.

8              He saw the position of the fingers, saw the blue

9        hair.  He saw that awkward pose.  This is no ordinary pose.

10       You recall the genesis of this.  It came from a decal that

11       Ms. Martinez had done for a t-shirt on Cool Skating Barbie.

12       The figure in the decal was on roller states.  And that's the

13       inspiration for that pose.

14             Now let's look at the August 1999 Seventeen

15       magazine.  And as you know, magazines tend to come out

16       earlier than the dates that they bear.  The August magazine

17       would have been out a month before, in July.  That's the same

18       month that Mr. Bryant is having his drawings notarized.  Look

19       at this ad from the summer of 1999, Exhibit 10179-133.  This

20       looks far more like Bratz than the 1998 ad.  If we could show

21       them side by side.  Look at them.  The 1999 ad on the right

22       side is far more similar.  Look at the shoes.  In 1998, the

23       shoes are pointed out.  In 1999, they are angled in, just

24       like the Bratz drawing.

25             Look at the knees.  In 1998 it's a powerful stance

1    with the legs bowed out.  In 1999, they are awkwardly turned

2    in like the Bratz drawings.  The arms are far more similar in

3    the 1999 drawing.  The 1998 head is tiny.  The 1999 head is

4    oversized.  In 1998 the eyes are almost nonexistence.  In

5    1999, the eyes are oversized.

6         Anyone can see this.  Anyone but Carter Bryant, who

7    denied this.  Remember his testimony, he said the 1999 Steve

8    Madden ad looks no more like his Bratz drawings than the 1998

9    ad.  That's how terrified he is of this ad.  But you recall

10   MGA's own witness that they called.  Margaret Leahy testified

11   that Mr. Bryant gave her this image right here, that Bates

12   number there, Sidley, Austin, Brown and Wood.

13        Those were her attorneys.  They produced it.  And

14   he gave this to her as inspiration when she produced the

15   sculpts in 2000.  She produced it from her own notes.  That's

16   the ad that he chose to give to the sculptor.  I would go on,

17   but by this point you know the truth.

18        Mr. Bryant's inspiration for Bratz was Lily's Toon

19   Teens and the August 1999 Steve Madden ad, which he gave to

20   the sculptor.  Neither of these existed in 1998.

21        Your Honor, may we take five minutes?

22        THE COURT:  Five-minute break, but strictly five

23   minutes.

24        Members of the jury, Barbara, would you please take

25   the jury out.  We'll be in recess for five minutes.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          All rise.

2          (Recess taken.)

3          THE COURT:  You may proceed, Counsel.

4          MR. QUINN:  Thank you, your Honor.

5          Now we come to the surprise documentary evidence

6    that MGA and Carter Bryant never thought we would have.

7    Exhibit 1155, the black notebook.  You'll have it with you in

8    the jury room.  In July or August of 1999, Mr. Bryant started

9    drawing in the notebook that he was using at the time.

10   That's this black notebook.  As he admitted to you, his very

11   first, his very first Bratz sketches are Exhibits 5-39, 5-40,

12   5-41, and 5-42 that you see there on the screen.

13          That is his testimony.  And we asked him about

14   these.  And he confirmed that these were -- these exhibits,

15   he did that very day when he came home from Kickapoo High.

16   He drew these drawings.  These were the first ones.  You're

17   going to see a lot of Bratz drawings back in the jury room,

18   but everybody agrees that those are the first ones.

19          So dating them is very, very important.

20          It's undisputed now that the first drawings of

21   Bratz were down on these pages, those exhibits, 5-39, -40,

22   -41, and -42.  And these pages were torn out of this black

23   notebook, Exhibit 1155.  Based on forensic testing, the

24   indentation analysis done by Lloyd Cunningham, he positively

25   concluded that two of those first Bratz drawings, 5-39 and

1   5-42, were torn out of that notebook, and MGA did not dispute

2   that.  It didn't call their expert to contest that.

3       That analysis changed this case.  Before

4   Mr. Cunningham reached this conclusion Mr. Bryant testified.

5   He testified that he no longer had the notebook, that the

6   drawings came from a notebook that he didn't have.  Here it

7   is again.  Do you still have the original notebook?  No, I

8   don't.  Do you know where it is?  No idea.  You tossed it?

9   More than likely.

10      He did that because he tore out more than half the

11  pages of the notebook to conceal what was in them.  Only 54

12  of the original 120 sheets remain in Exhibit 1155.

13      Now, if you've ever torn pages out of one of these

14  notebooks with a spiral binder, it's something you got to do

15  with care.  You can't do a whole clump of them.  It's hard.

16  These wires hold the pages pretty tight.  You have to

17  deliberately pull them out one at a time.  And when

18  Mr. Bryant tore out those pages, that was a deliberate act of

19  physically separating the original Bratz drawings from the

20  1999 notebook where they came from that placed them in time.

21  He knew that that notebook, what remained in it, the Jewel

22  drawings, his 1999 bank records, would betray his lies.

23      By ripping those pages free, he believed that he

24  could make his Bratz drawings timeless.  He was destroying

25  the only record that existed of their birth at Mattel.  Once

1    he got them out of that notebook and the 1999 dated contents,

2    he was then free to tell any story he wanted about when he

3    had created those separated pages.  By pulling them out, he

4    was obliterating evidence that existed just as he did when he

5    ran Evidence Eliminator on his computer.

6         Except for his deceit, there was no reason for

7    Mr. Bryant to tear those Bratz pages out of his notebook.

8    Compare it to his 2000 notebook.  You have that in evidence.

9    That's Exhibit 1313.  It has basically all the pages in

10   there.

11        But faced, then -- he said Mr. Cunningham's work

12   changed this case.  Faced with Mr. Cunningham's work,

13   Mr. Bryant admitted for the first time at trial that these

14   very first Bratz sketches were torn out of Exhibit 1155.  And

15   that was his testimony.

16        This alone, ladies and gentlemen, proves that he

17   created Bratz at Mattel.  Why?  Because every single datable

18   entry in 1155 dates from 1999.

19        So MGA then came up with another strategy, and that

20   is that this notebook covers two different years, 1998 and

21   1999.  They want to convince you of that.  I'm going to

22   explain to you how every single page remaining in there,

23   everything in there dates from 1999.

24        Until MGA and Mr. Bryant realized that Mattel could

25   prove through this indentation analysis that the very first

1    Bratz drawings appeared in that notebook, Mr. Bryant had no

2    problem admitting that the remaining contents in there came

3    from 1999.

4         But now that Mattel has proved that the very first

5    Bratz drawings were done inside this notebook, and

6    Mr. Cunningham was able to put those pages back in, he now

7    has to say he was using that notebook in 1998.  And

8    therefore, he does say, he says, "I was using it in both

9    years."

10        But before, before he had to say the notebook was

11   from 1998, he said the things in the notebook were from 1999.

12   Let me show what you I'm talking about.

13        First, Jewel Barbie.  There are Jewel Barbie

14   drawings in the Exhibit 1155.  At deposition, in 2004,

15   Mr. Bryant was asked what he worked on during his first stint

16   with Mattel from September of '95 to April 1998.  And in that

17   testimony, he didn't mention Jewel Barbie.  That's because he

18   did not work on a Jewel project when he was employed in

19   Mainline Barbie through April of 1998.  He admitted at his

20   deposition that his work on Jewel Barbie was after he

21   rejoined Mattel in 1999.

22        And that's the testimony, January 1999 to October

23   of 2000, were you working on the Jewel collectible doll?  I

24   don't recall the exact time frame.  I think it was -- he

25   thinks it was in '99.

1          At that same deposition, we showed him a copy of

2     this page here.  This is from -- this is Exhibit 5 CB-128.

3     Headed at the top it says large angel.  We showed him a copy

4     of the page which was from the notebook, but we showed it to

5     him so he had no idea.  We made a photocopy of it and showed

6     it to him so he had no idea it came from the notebook.  He

7     admitted that this related to a Barbie large angel doll in

8     1999.  Here's his testimony on that.

9          "Project I worked on at Mattel, large angel, yes.

10         "Do you recall when you made these notes?

11         "I don't.  I believe it was in 1999."

12         Then, of course, there are the bank notations in

13    the notebook, which Mr. Bryant agreed were from a July 1999

14    bank statement.  You can compare those numbers for yourself,

15    if you want to, compare page 57 of Exhibit 1155, which are

16    the bank notations in 1155 with the bank statement, which is

17    Exhibit 13649.

18         At this point they realize they are trapped.  They

19    are desperate to prove that something, anything in the

20    remaining pages in the notebook came from 1998.

21         So what do they do?  They revisit that large angel

22    page that we just looked at.  Remember, they showed you this

23    correspondence here from Ashton Drake.  This is

24    Exhibit 15364-002, which refers to angels in 1998.  Why did

25    they do that?  To fool you.  It refers to angels.  Maybe

1      you'll get confused and think it says angels.  Maybe that

2      notebook entry which says large angel, maybe there's some

3      relation between the two.

4           That was a cynical effort to deceive you.  Because

5      you just saw that Mr. Bryant said, when Mr. Price asked him

6      about it, that these notebook pages didn't refer to the

7      Ashton Drake angel.  They referred to the 1999 Barbie

8      project.  You just saw that.

9           Let's look at exactly what he said again.  240.

10     This is testimony, he testified, referred to a large sidebar

11     an angel project he did in 1999.  And then your counsel

12     showed you Exhibit 15364, which was a project for Ashton

13     Drake from '98.

14           "That's a different project than the large size

15     angel project in 1999?

16           "Yes."

17           That's something from 1998, used the word angels,

18     and they tried to confuse you.

19           There's no question what those notes referred to.

20     He admitted that the Ashton Drake letter has nothing to do

21     with the notebook 1155.

22           So then Mr. Bryant changed his testimony about

23     Jewel Barbie.  Now he said oh, yeah, that was in 1998, and

24     Mr. Nolan showed you some misdated 1998 drawings as proof,

25     like this one here, Exhibit 15601.  All of them had that same

1     date.

2          Mr. Bryant said he had dated these because he had

3     mailed them from his home, but as you saw, in January 1999,

4     he was doing what a lot of folks do after the new year.  He

5     was putting the old year, 1999, as the date.  He did that in

6     his conflict of interest questionnaire, filled out in January

7     of 1999.  That's Exhibit 26.  He mistakenly used 1998 there.

8     By February he got it right, and we showed you his Jewel

9     Barbie drawings dated February 1999.  And this is

10    Exhibit 13657.  Those weren't mailed, and yet, they are

11    dated, too.

12         So another excuse bites the dust.  And as you can

13    see here, we've compared now Exhibit 1155 C-27,

14    Exhibit 10756, and Exhibit 13657.  As you can see, one of the

15    Jewel sketches in the notebook, the sketch on the left, is a

16    preliminary sketch of the final Jewel drawing dated in

17    February 1999.

18         Mr. Bryant testified that his supervisor was

19    Cassidy Park during the time of his employment with Mainline

20    Barbie in his first stint at Mattel, ending in April 1998.

21    She said it was impossible for Mr. Bryant to have worked on

22    Jewel in 1998.  Because in 1998 Jewel was not a mainline

23    project where he was working.  Mainline, according to

24    Ms. Park, did not begin a Jewel Barbie project until

25    September of 1998.  And by then, he was gone.  Ms. Park

1    testified that there was no way that Mr. Bryant was working

2    on a project in 1998.  That was her testimony.

3          The Mainline Jewel Barbie, by the way, looks

4    nothing like any drawing in the notebook identified as Jewel.

5    As Ms. Park testified, the key features of the Mainline

6    Barbie was the doll's twist waist, and the fashions were

7    designed to expose the midriff so the child could move the

8    waist.  All of Mr. Bryant's drawings that he identified as

9    Jewel show sketches of elaborate evening dresses like you

10   saw, nothing like the project that was being done in Mainline

11   Barbie.

12         So even more desperate, what else did you hear?

13   Well, they pointed to that note from his brother Wade.  And

14   this is Exhibit 115 C-87, which is in the notebook.  And you

15   recall, Mr. Price questioning Mr. Bryant.  And the suggestion

16   was well, this must have been in -- this at least must have

17   been in 1998.  And then you recall a question by Mr. Bryant,

18   well, where did they live?  It was about 12 hours away.  They

19   say they will be back in a few weeks.  Doesn't it sound like

20   maybe they are visiting at Thanksgiving and then come back at

21   Christmas?  Did your family get together at Thanksgiving and

22   Christmas, like in 1999?  And he acknowledged that Mr. --

23   Mr. Bryant acknowledged in his testimony, at the bottom

24   there, for example, Thanksgiving in 1999?  It's possible.  I

25   don't remember.

1          And then we proved, remember, with the ATM bank

2    records, that he in fact was in the Springfield, Missouri,

3    area in Thanksgiving and Christmastime of 1999.  So you saw

4    that.

5          MGA, what did they do?  They called his mom.

6    Called Wade.  Called anybody to say no, that note related to

7    a family get-together in 1998?  They can do that, you know.

8    They didn't do that.  There was no response made to that.

9          Now we come to MGA's final attempt to show the

10   notebook contained 1998 material.  And that's the greeting

11   card impression.  You've heard no testimony that prior to

12   this trial Mr. Bryant ever claimed that he created Rainy Day

13   Rascals greeting cards in 1998.  You never heard that before

14   this trial.

15         Mr. Bryant testified that he's done greeting cards

16   every year, and he continues to do them to this day.  That

17   was his testimony.

18          "You've been dabbling with greeting cards right up

19   to the present?

20          "Yes."

21         And you'll see that Exhibit 1153, that's

22   Mr. Bryant's 2000 notebook, contains greeting card drawings.

23         The indentations that Mr. Cunningham found showed a

24   greeting card sketch had been in the black notebook.

25   Remember that?  Rainy Day Rascals.  So guess what?

1    Mr. Bryant says Rainy Day Rascals, that was in 1998 for sure.

2        There's no proof that those impressions, those

3    drawings that you saw were from 1998, no proof that any Rainy

4    Day Rascals greeting card was done in 1998, least of all the

5    ones that are the impressions in the notebook.  The only

6    Rainy Day Rascal greeting card that is dated, Exhibit 10624,

7    dated, signed by Mr. Bryant, April 4, 1999.

8        And you'll note that this is a document that

9    Mr. Bryant produced, came from Mr. Bryant's own files.

10       So in conclusion, on the notebook, they have done

11   everything possible to distract you from the truth.  This

12   notebook was used in 1999.  Everything in it dates from 1999.

13   The Jewel Barbie sketches, the notes about large angel, the

14   bank statement, and yes, the Wade note.  And, of course,

15   those very first Bratz drawings, which it's undisputed came

16   out of there, 1999, smack during Mr. Bryant's employment with

17   Mattel.

18       Now I want to talk about the witnesses MGA called

19   to address or talk about the 1998 gap.  And let me just say

20   you cannot find people who are more trusting and accepting of

21   someone than their own family and friends.  And in

22   Mr. Bryant's case, that's all that MGA could find.  Family

23   and friends.

24       Let's talk about his mom.  Mr. Bryant's mom sees

25   him through the filter of the greatest love you can have for

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    someone.  She wants him to do well.  She is very proud of

2    him.  She knows it would be unethical for him to work for

3    a -- to work for someone else while he sells sketches or work

4    for someone else while he's employed at Mattel.  That was her

5    testimony.

6         He told her that.  I can't sell sketches because

7    that would interfere with my contract with Mattel.  She knows

8    that that would be unethical.  And she doesn't believe that

9    he's capable of that.  She doesn't believe that her son is

10   unethical.

11        But the Court has already found and instructed you

12   that her son worked for a Mattel competitor while he was

13   employed at Mattel, that he breached his contract, that he

14   breached his duty of loyalty.

15        And Mrs. Bryant, Mr. Nolan called a witness who

16   thinks Mr. Bryant is incapable of doing what he did here.

17   We're not suggesting that she should change her mind.  We are

18   saying that her testimony should not change yours or change

19   what you saw in this trial.

20        You can see what happens when she looks at

21   Mr. Bryant's pictures with a mother's eyes.  She identified

22   in her deposition several drawings she said she saw in 1998,

23   drawings that Mr. Bryant said didn't exist in 1998, that

24   Mr. Bryant said existed not until 1999 or later.

25        Let me show you some examples.  This is Exhibit 712

1    on the left-hand side.  And this is what Mrs. Bryant said

2    about the drawing.  She was definitive, no hesitation.  She

3    believes she's being accurate.  But this is what her son said

4    about the same drawing.  She was certain she saw it in 1998.

5            And if we could look at slide 67.1.

6            Mr. Bryant's testimony was that same exhibit,

7    Exhibit 712, didn't exist in 1998.  This didn't exist until

8    sometime around July of 2000; right?  Right.

9            According to her son, she was simply mistaken.

10   Another exhibit is Trial Exhibit 713.  Here's the testimony.

11   She was shown this.  Exhibit 713.  She says she can't say for

12   certain.  She thinks she saw it in 1998.  Here's Mr. Bryant's

13   testimony on the right-hand side.  Exhibit -- slide 788.

14           "This is also one of the exhibits you said were

15   done in July of 2000?

16           "I believe so, yes.

17           "And if your mom testified that she saw this in

18   August of 1998, she would be mistaken on this one?

19           "Yes."

20           You have another example, Trial Exhibit 35-2, which

21   again, Mr. Bryant produced these drawings.  And trial

22   Exhibit 35-2, which has Bates number 273.  Here's what she

23   said about this drawing.

24           Best recollection, she saw that in 1998?

25           "I would say yes.

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1          "Kimberling City?

2          "Yes, yes."

3          What was her son's testimony about this?  It was

4    done in November of 2000.  His testimony was this was done

5    sometime in November of 2000.

6          These are just a few examples.  There are at least

7    10 instances, 10 times where Mrs. Bryant testified she had

8    seen a drawing in 1998 while Carter was living with her in

9    Kimberling City, yet where Mr. Bryant himself admitted the

10   drawings were created later.

11         And the exhibits are there:  35-7, 712, 713, 733,

12   735, 737, 743, 779, 791, 792, and 793.

13         In other instances, she was equivocal, giving

14   identifications such as probably, not definitely, I can't say

15   absolutely, or I think.  In opening statement, Mr. Nolan made

16   a big point about, you know, moms can tell the truth.  And of

17   course, moms can tell the truth, and he's absolutely right

18   about that.  But they can also be honestly wrong.

19         Mrs. Bryant's deposition was taken in 2007, three

20   years after the suit was filed, and nine years after the

21   events that we're talking about.  It would be easy to be

22   mistaken about whether and when precisely she saw each

23   drawing.  There's no dispute she was wrong.  It doesn't

24   matter why.  And, of course, if you believe Carter Bryant's

25   testimony, if you do not believe Carter Bryant's testimony,

1      and we just saw overwhelming evidence that you shouldn't

2      believe his testimony, Mrs. Bryant's testimony about the

3      drawings she thinks she saw in 1998 absolutely must be

4      mistaken.

5            Then we come to January Galvano, an unusual

6      witness, a family friend.  It's unusual to call a witness to

7      drawings who cannot identify a single drawing in this case as

8      one she has seen.  We showed her dozens of drawings.  This is

9      just a list.  Dozens of drawings that Mr. Zeller showed her

10     at her deposition.  And she was sure she hadn't seen any of

11     them.

12           MGA couldn't show her drawings.  They had every

13     incentive to do so.  They had every drawing in the case at

14     their disposal, but they did not show her a single drawing.

15     Her memory of what she saw, no heads, big feet, very little,

16     if any, detail.  It didn't seem to have heads, big feet, not

17     a lot of detail, not faces.  Maybe eyes, just figures and

18     poses.

19           She could barely tell if they were female.  "They

20     had a female sense to them, but I don't know."

21           Very vague.  And by the way, we all have seen in

22     this case headless or faceless drawings.  We know there are

23     some like these:  701, 705, 710.  But she was shown these,

24     and she said no, it wasn't these.

25           What made her think -- whatever she saw, what made

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    her think that these faceless, barely formed sketches that

2    she describes that are lacking in detail, what made her think

3    they had anything to do with Bratz?  Is it because they

4    looked like --

5            I'm sorry.  Could we go to slides 1301 -- that's

6    it.  Okay.

7            These are the ones we showed you.  You've seen

8    these in the course of this trial.  She was shown them and

9    says no, it's not these.  And so we asked her, you know, you

10   have to ask yourselves, what made her think that these

11   faceless sketches lacking in detail had anything to do with

12   Bratz.  Is it because they look like Bratz dolls?  No.  It's

13   because Mrs. Bryant said what she saw were Bratz dolls.  Do

14   you recall that testimony?

15           It's absolutely clear that Mrs. Bryant was the only

16   source of her belief that these vague drawings that she saw

17   she couldn't identify were Bratz.  Here was her testimony.

18           "At some point you eventually realized these

19   drawings that you had seen that Janet Bryant had shown you

20   were part of Bratz?

21           "Yes.

22           "How is it that you figured that out?

23           "Janet told me."

24           Next:

25           "And when you say at the time that you saw them

1      that there was no name for them, you are saying that the

2      Bratz name was not being used for those drawings at the time

3      that you saw them?

4           "Yes, that's correct."

5           Next:

6           "Was it Janet who told you at some point those

7      drawings that I had shown you back in 1998 were for Bratz?

8           "Answer:  Yes.

9           "Question:  Other than Janet telling you, was there

10     any other source of information that you had for you -- for

11     you to figure out that those you had seen back in 1998, those

12     simple line drawings without a name in fact related to Bratz?

13          "Answer:  No."

14          We all know what she saw.  Maybe it was these

15     Sabrina drawings that Mr. Nolan referred to, he showed you

16     drawings where you could take off a detachable head that

17     Mr. Bryant also had done.  We will never know what it was she

18     saw.  But she was willing to accept Mrs. Bryant telling her

19     remember what you saw way back years ago?  That was Bratz.

20     She's willing to accept that because of how she feels about

21     Mr. Bryant and her son.

22          She visits them almost every year.  Mrs. Bryant

23     befriended her at a time in her life when she was very

24     depressed.  Ms. Galvano's very vague recollections of

25     unidentified drawings, seen nine years earlier, that no one

1    can find now and that you cannot examine for yourselves is

2    not proof of anything.

3        So finally we come to Mr. Bryant's partner,

4    Mr. Irmen.  Obviously, like Mr. Bryant's mother, Mr. Irmen is

5    hardly an unbiased witness.  He and Mr. Bryant share a life

6    together.  They have also shared $30 million.

7        While Mrs. Galvano's testimony suffers from

8    uncertainty about what it was that she saw, Mr. Irmen's

9    testimony suffers from the opposite problem.  Certainty about

10   something we know must be untrue.

11       What is that?  Mr. Irmen said that in January of

12   1999, Carter Bryant showed him one drawing for a doll concept

13   he called Bratz.  Just one drawing.  Not the many that Carter

14   Bryant claims to have created.  Apparently by the time that

15   Mattel deposed Mr. Irmen, MGA learned it was much safer not

16   to have claimed to have seen more than one drawing, much less

17   chance for a mistake.  But Mr. Irmen made a different

18   mistake.

19       He testified that Mr. Bryant called his concept

20   Bratz January 1, 1999.  But as we have seen, there is no

21   credible evidence Mr. Bryant used the Bratz name until much,

22   much later after he heard that Mattel had considered using

23   the name Bratz later in that year.

24       Anna Rhee testified that when Carter came and saw

25   her and gave her an assignment, he did not use the name Bratz

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    in June of 2000.  Not a single other witness has testified

2    that they heard Carter Bryant mention the name Bratz until

3    his pitch meeting in September.  When Carter Bryant went to

4    the notary, Ms. Prince, and had her make the notary book

5    entry in August of 1999, he included the names of each of the

6    characters.  You see those names there:  Lupe, Hallidae,

7    Jade, Zoe.  Absent from that entry, the name Bratz.

8         Ms. Prince testified that the word Bratz was not on

9    any document when she notarized it.  That was her testimony.

10   Do you see it on the drawings?  No.

11        Mr. Irmen is mistaken about when Mr. Bryant first

12   used the name.  If he is mistaken about that, then he's

13   mistaken about when he saw the drawing or he's not being

14   truthful at all.

15        Well, I've come to the conclusion of my remarks.  I

16   really want -- you've been a fabulous jury.  We've all

17   noticed how you've paid attention.  This has been a long

18   trial.  It's involved a significant sacrifice on all your

19   parts.  This will be my last chance to speak to you before

20   the trial is over.  I just want to give you our appreciation

21   for your service and the attention that you've paid to us.

22        But before I sit down, I'd like to remind you what

23   Mr. Nolan told you in his opening statement.  Mr. Nolan, and

24   this is a quotation from his opening statement.  He told you

25   that he had an obligation, meaning Mr. Bryant, talking about

t of Proceedings - AM (Park Dir/Cross/ReDir/Re-Cross; Plaintiff Closing Argument)  7/10/2008  12:00:00 PM

1    Mr. Bryant here, had an obligation under his employment

2    agreement the first time he worked and the second time he

3    worked at Mattel.  And we will prove to you, ladies and

4    gentlemen, that at all times Carter Bryant abided by his

5    obligations in that contract.

6         You now know that's not true.  It doesn't matter

7    how loud you say it.  You've seen the evidence.  You don't --

8    you have no doubt, and the Court has instructed you that

9    that's not true.

10        Thank you very much.

11        THE COURT:  Thank you, Counsel.

12        We're going to take our lunch break at this time.

13    A couple words about the lunch break.  Your food, if it's not

14    back there already, will be back there shortly.  I'm going to

15    ask you to eat together but not to discuss anything about

16    this case, about the closing arguments, about the

17    instructions or the verdict form the Court has given you.

18    Just simply enjoy your lunch.  It's 12:30 right now.  We'll

19    resume at 1:30 with Mr. Nolan's closing argument at that

20    time.

21        We are in recess.

22

23            (Lunch recess taken at 12:30 P.M.)

24

25

1

2

3

4

5

6

7          C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on July 10, 2008.

15

16

_____

17          MARK SCHWEITZER, CSR, RPR, CRR

Official Court Reporter

18    License No. 10514

19

20

21

22

23

24

25