1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3             EASTERN DIVISION

4                - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                - - -

7  MATTEL, INC.,        )
                      )

8          PLAINTIFF,  )
                      )

9      VS.        ) NO. CV 04-09049
                      )

10  MGA ENTERTAINMENT, INC., ET. AL.,  )  TRIAL DAY 32
                 ) MORNING SESSION

11        DEFENDANTS.  ) PAGES 6494-6622
  _____)

12  AND CONSOLIDATED ACTIONS,    )
                      )

13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16           RIVERSIDE, CALIFORNIA

17           FRIDAY, AUGUST 8, 2008

18             8:45 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
         FEDERAL OFFICIAL COURT REPORTER

24         3470 12TH STREET, RM. 134
         RIVERSIDE, CALIFORNIA  92501

25           951-274-0844

```
 1     APPEARANCES:

 2

       ON BEHALF OF MATTEL, INC.:
 3
                   QUINN EMANUEL
 4                 BY:  JOHN QUINN
                     JON COREY
 5                    MICHAEL T. ZELLER
                     HARRY OLIVAR
 6                   TIMOTHY ALGER
                     WILLIAM PRICE
 7                 865 S. FIGUEROA STREET,
                   10TH FLOOR
 8                 LOS ANGELES, CALIFORNIA  90017
                   213-624-7707
 9

10
       ON BEHALF OF MGA ENTERTAINMENT:
11
                   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                 BY:  THOMAS J. NOLAN
                     JASON RUSSELL
13                   RAOUL KENNEDY
                     LAUREN AGUIAR
14                   CARL ROTH
                   300 SOUTH GRAND AVENUE
15                 LOS ANGELES, CALIFORNIA  90071-3144
                   213-687-5000
16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3

 4    PLAINTIFF
      WITNESS        DIRECT     CROSS     REDIRECT     RECROSS
 5    MICHAEL MOORE

 6    BY MR. SLOAN      6578

 7

 8

 9

10         EXHIBITS        RECEIVED
11
           1195         6603
12         4434         6615

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    RIVERSIDE, CALIFORNIA; FRIDAY, AUGUST 8, 2008; 8:45 A.M.

2              -OOO-

3    THE CLERK:  CALLING ITEM NUMBER ONE ON CALENDAR, CASE

4    NUMBER CV04-09049-SGL, MATTEL, INC., V. MGA, INC., ET AL.

5    COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

6    RECORD.

7    MR. ZELLER:  MIKE ZELLER AND BILL PRICE FOR MATTEL.

8    MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, JORDAN FEIRMAN,

9    PATRICK HAMMON, AND CARL ROTH.

10    WE'RE TRYING TO GET SOME FACE TIME FOR SOME OF THE

11    YOUNG ASSOCIATES THAT HAVE WORKED SO HARD ON THIS CASE.

12    THE COURT:  WE DISCUSSED THAT ISSUE AT THE NINTH

13    CIRCUIT CONFERENCE, THE IMPORTANCE OF FIRMS MAKING SURE THAT

14    THE YOUNGER ASSOCIATES ARE GETTING THE TRAINING AND THE

15    COURT-TIME EXPERIENCE; SO I APPRECIATE THAT.

16    MR. NOLAN:  I THOUGHT YOU MIGHT SAY THAT MAYBE IT'S

17    THE YOUNG ASSOCIATES WHO WROTE THE BRIEFS THAT SHOULD ARGUE.

18    THE COURT:  BELIEVE ME, THAT WAS DISCUSSED AS WELL.

19    MS. AGUIAR:  I ACTUALLY VOLUNTEERED.

20    THE COURT:  THERE'S ACTUALLY ONE JUDGE -- AND I CAN'T

21    QUITE GO THIS FAR -- UP IN THE NORTHERN DISTRICT WHO'S TAKING

22    THE POSITION THAT HE WILL GIVE ORAL ARGUMENTS AT HIS STANDARD

23    MOTION CALENDAR IF AN ASSOCIATE WITH LESS THAN THREE YEARS

24    EXPERIENCE COMES AND ARGUES IT.  OTHERWISE, HE WON'T HEAR ORAL

25    ARGUMENT.  I LIKE ORAL ARGUMENT, AND I WANT TO HEAR THE BEST

1    THAT I CAN, BUT IT JUST SHOWS HOW FAR SOME JUDGES ARE GOING TO

2    TRY TO GET YOUNGER ASSOCIATES INTO THE COURTROOM.

3         MR. NOLAN:  CAN WE STOP THIS DISCUSSION NOW, BECAUSE

4    I DON'T WANT THIS REFLECTED ON THE AMERICAN LAWYER SURVEY?

5         THE COURT:  ALL RIGHT.  VERY GOOD.

6         I KNOW I ASKED YOU TO BE HERE AT 8:00.  I WANT TO

7    ASSURE YOU THAT THE COURT HAS BEEN HERE SINCE BEFORE THEN.

8    I'VE BEEN READING YOUR BRIEFS AND LOOKING AT THE CASES.  BOTH

9    BRIEFS ARE VERY WELL DONE.  I'VE GOT SOME QUESTIONS, THOUGH.

10        MR. ZELLER, I'D LIKE TO START WITH YOU, IF YOU WOULD.

11        WHAT ABOUT NON DOLL PRODUCTS THAT THE COURT CANNOT

12   FIND ARE INEXTRICABLY INTERTWINED?  I'M THINKING, FOR EXAMPLE,

13   SOFA, THE TENT.

14        MR. ZELLER:  I THINK THAT'S A DIFFERENT STANDARD.

15   AND I DON'T KNOW THAT THERE'S MUCH OF A DISPUTE OVER THAT.  I

16   MEAN, OBVIOUSLY, IF WHAT WE'RE TALKING ABOUT IS, SAY, WHAT'S

17   CLEARLY A NON DOLL PRODUCT, SAY A TENT, AND IT HAS A BRATZ

18   IMAGE ON IT, THE PRODUCT IS -- CERTAINLY, THERE'S AN

19   INFRINGEMENT.  IT REPRODUCES IN TWO-DIMENSIONAL FORM THE --

20        THE COURT:  THERE WOULD CLEARLY BE A TRADEMARK

21   INFRINGEMENT.  BUT I KNOW WE'RE NOT ANYWHERE NEITHER THERE.

22   AND I COULD ALSO SEE A DERIVATIVE INFRINGEMENT.  AND I KNOW

23   WE'RE NOT ANYWHERE NEITHER THERE.  I'M HAVING TROUBLE GETTING

24   TO -- AND I CAN SEE A CERTAIN COPYRIGHT INFRINGEMENT WITH

25   RESPECT TO THE PICTURE ON THE TENT, OR WHATEVER.

1       MR. ZELLER:  RIGHT.

2       THE COURT:  BUT UNLIKE THE DOLLS, WHICH I UNDERSTAND

3   YOUR INEXTRICABLY INTERTWINED ARGUMENT, I DON'T SEE HOW THE

4   TENT ITSELF -- I MEAN, ARGUABLY, THAT TENT WOULD HAVE SOLD

5   WHETHER OR NOT IT HAD ON THERE -- PERHAPS NOT AS WELL, BUT IT'S

6   A TENT, AND IT HAS A FUNCTION THAT'S COMPLETELY DIVORCED FROM

7   THE DOLL; AND ARGUABLY, A LOT OF CREATIVE PROCESS, OR SOME

8   CREATIVE PROCESS, WENT INTO MAKING THAT TENT SEPARATE AND

9   APART.  I CAN SEVER OUT THE ELEMENTS.

10      MR. ZELLER:  I THINK I UNDERSTAND WHERE THE COURT IS

11  COMING FROM ON THIS.

12       I ACTUALLY THINK IF WE START GETTING INTO WHAT WE'LL

13  CALL THE CREATIVE DIMENSIONS OF WHAT ARE CLEARLY NON DOLL

14  PRODUCTS, SAY, A TENT -- I MEAN, THAT CLEARLY SEEMS LIKE 403 --

15  WE'LL BE HERE FOREVER.  I DON'T THINK IT'S PERTINENT.  MAYBE IF

16  WE TAKE SORT OF AN EXTREME CASE -- AND I'M NOT EVEN SURE TO

17  WHAT DEGREE THIS ACTUALLY EXISTS, BUT I'LL HYPOTHESIZE ONE.

18  SAY, FOR EXAMPLE, THE TENT HAS NO ART WORK ON IT; DOES NOT

19  REPRODUCE THE ACTUAL CHARACTERS; IT SIMPLY SAYS "BRATZ" ON IT.

20  NOW, MAYBE THE PACKAGING IS INFRINGING; MAYBE THE CHARACTERS

21  ARE ON THERE.  BUT LET'S SET ALL OF THAT ASIDE.  THERE'S A

22  DOCTRINE THAT ALLOWS US TO BASICALLY GET THESE KIND OF

23  CONFLATED SALES.

24       AS MR. LARIAN WAS TESTIFYING TO ON THE STAND -- AND I

25  DON'T KNOW THAT THERE'S A LOT OF DISPUTE CONCEPTUALLY BETWEEN

1    THE PARTIES OVER THIS POINT -- YOU HAVE A BRAND.  AT THAT CORE

2    ARE THE DOLLS.  AND, OF COURSE, THAT ALLOWS FOR ACCESSORIES,

3    CERTAIN THINGS THAT ARE SOLD -- AND IN MANY INSTANCES, AND

4    PERHAPS IN ALL, THOSE ACCESSORIES DON'T REALLY NECESSARILY HAVE

5    AN EXISTENCE THAT'S INDEPENDENT OF THE DOLLS THEMSELVES.

6    FASHIONS WOULD BE A VERY SIMPLE EXAMPLE OF THAT.  I MEAN, THE

7    FASHIONS WOULD BE WORTHLESS WITHOUT THE DOLL.  THE DOLL IS

8    INFRINGING.  AND THAT WOULD GET US INTO EXACTLY THE SITUATION

9    OF THE KINDS OF CASES THAT I'M CITING.

10       THE COURT:  BUT THE TENT IS NOT WORTHLESS WITHOUT THE

11   DOLLS.

12       MR. ZELLER:  CORRECT.  THAT'S WHY I'M CREATING THIS

13   DISTINCTION.

14       SO ONCE WE GET TO, WE'LL CALL THEM THE LICENSED

15   PRODUCTS, THEN THERE ARE LICENSED PRODUCTS WITH IMAGES.  THOSE

16   ARE INFRINGING; THOSE WOULD BE DETERMINED BY THAT STANDARD.

17   BUT WHAT MGA IS OBTAINING FROM THE LICENSED PRODUCTS IS A

18   LICENSING FEE, WHICH THEY DON'T EVEN HAVE CREATIVE INPUT, OTHER

19   THAN REQUIRING THE LICENSEE TO USE THE ART WORK THAT IT

20   PROVIDES, WHICH IS BASED ON THE DOLL.

21       SO WE HAVE A STRAIGHT LINE THROUGH THIS.

22       THE COURT:  OKAY.  THIS GOES BACK TO MAYBE A SOLUTION

23   TO THIS THING THAT I WAS -- I'M TRYING TO EXPLORE.  I'VE BEEN

24   READING NIMMER ON INDEPENDENT CREATION.  IT'S NOT CLEAR AT ALL

25   TO THE COURT THAT AT THIS POINT THAT I HAVE EVIDENCE OF

1   INDEPENDENT CREATION.  AND THERE'S A DISTINCTION, OF COURSE,

2   BETWEEN CREATIVE ASPECT, SWEAT AND BROW TOWARDS CREATING THE

3   DOLL THAT IS ALLEGED TO BE COPYING AND INDEPENDENT CREATION.

4        AND CERTAINLY, INDEPENDENT CREATION COULD BE USED TO

5   REBUT AND DEFEAT YOUR CLAIMS OF SUBSTANTIAL SIMILARITY IF THERE

6   WAS SUFFICIENT EVIDENCE OF INDEPENDENT CREATION.

7        THE COURT CAN CERTAINLY TAKE THAT UP OUTSIDE THE

8   PRESENCE OF THE JURY, TO DETERMINE, AS A THRESHOLD MATTER,

9   WHETHER THERE IS SUFFICIENT EVIDENCE OF INDEPENDENT CREATION,

10  AND THEN WE CAN DETERMINE WHETHER OR NOT IT COMES IN OR IT

11  DOESN'T COME IN.

12       I SUPPOSE WITH RESPECT TO THE LICENSED PRODUCT -- AND

13  I'M THINKING OUT LOUD HERE -- AGAIN, IF THIS WAS INDEPENDENTLY

14  CREATED BY MGA, AS OPPOSED TO SOMEBODY ELSE, THEN MGA MIGHT

15  HAVE A CLAIM TO THAT.  BUT IF THE INDEPENDENT CREATIVE PROCESS

16  WAS SOMEBODY ELSE, WOULD THEY AS WELL IF IT WAS THEIR LICENSEE?

17       MR. ZELLER:  WELL, THAT GETS INTO A VERY INTERESTING

18  QUESTION, BUT I'M NOT SO SURE WE HAVE TO NECESSARILY RESOLVE

19  THAT, BECAUSE ULTIMATELY WHAT OUR THEORY IS, FOR PURPOSES OF

20  THAT EXTREME CASE I WAS TALKING ABOUT, WHERE YOU HAVE A TENT,

21  JUST HAS THE BRATZ NAME ON IT, NO ART WORK, NOTHING THAT YOU

22  COULD POINT TO THAT WOULD SAY IT'S DIRECTLY INFRINGING BECAUSE

23  THERE'S NO VISUAL WORK ON IT -- WE'RE SEEKING INDIRECT PROFITS.

24  THAT'S OUR THEORY.  THE FACT IS THAT THERE IS A CAUSAL

25  CONNECTION BETWEEN THE TWO.

1          THE COURT:  I UNDERSTAND YOUR CONNECTION TO IT, BUT

2     I'M TRYING TO EVALUATE THEIR ABILITY TO DEFEND AGAINST THAT

3     THEORY.

4          MR. ZELLER:  I THINK FOR PURPOSES OF INDIRECT

5     PROFITS, IT'S JUST A DIFFERENT DOCTRINE.  I DON'T THINK THE

6     COURT NEEDS TO RESOLVE WHETHER CREATIVITY WENT INTO CREATING

7     THE TENT, FOR EXAMPLE, BECAUSE WE'RE LOOKING FOR THE INDIRECT

8     PROFITS THAT MGA OBTAINED AS A BENEFIT BECAUSE OF THE

9     INFRINGEMENT.

10          EVEN IF THERE'S NOT AN INFRINGEMENT, PER SE, THAT,

11     SAY, THE LICENSEE ENGAGED IN -- BECAUSE ALL OF THIS EXISTS

12     BECAUSE OF THE SUCCESS OF OUR WORKS WHICH WE SAY HAVE BEEN

13     INFRINGED.  SO WE'RE KIND OF INTO A DIFFERENT -- AND MAYBE THE

14     BEST KIND OF ILLUSTRATION --

15          THE COURT:  UNLESS MGA CAN SHOW THAT THEY

16     INDEPENDENTLY CREATED THIS APART FROM THOSE WORKS.

17          MR. ZELLER:  EVEN IF THAT'S THE CASE, THE LICENSEE

18     HERE IS KEEPING THE REVENUE.

19          THE COURT:  RIGHT.

20          MR. ZELLER:  I MEAN, WE'RE NOT EVEN -- IT'S NOT LIKE

21     WE'RE SAYING --

22          THE COURT:  YOU'RE NOT GOING AFTER THE LICENSEES AT

23     THIS POINT.

24          MR. ZELLER:  CORRECT.

25          THE COURT:  AT THIS POINT.

1        MR. ZELLER:  EXACTLY.  AND WE'RE NOT SAYING, 'MGA PAY

2   US THE EQUIVALENT OF DAMAGES OF WHAT THE LICENSEE EARNED.'

3        THE COURT:  RIGHT.  THAT'S CLEARLY NOT PART OF THIS

4   CASE.

5        MR. ZELLER:  CORRECT.

6        AND KIND OF THE BEST ANALOGY IN THAT SITUATION IS

7   LIKE THAT CASINO CASE THE COURT MAY BE FAMILIAR WITH, WHERE

8   THEY WERE PIPING IN INFRINGING MUSIC AND THEY BASICALLY SAID,

9   'WELL, WE'LL TAKE FIVE PERCENT OF THE REVENUES.'  THAT

10  SOMETIMES IS APPLIED IN ADVERTISING CASES AND THAT SORT OF

11  THING.  THAT'S REALLY THE DOCTRINE WE'RE GOING UNDER FOR THOSE

12  KINDS OF --

13       THE COURT:  NONE OF THIS -- I MEAN, YOU SAY MAY OR

14  MAY NOT BE PERMITTED, BUT CLEARLY, YOU RECOGNIZE THAT THEY ARE

15  PERMITTED TO HAVE THEIR EMPLOYEES, OR ANYBODY ELSE, POINT

16  OUT -- FOR WHICH SUFFICIENT FOUNDATION IS LAID, POINT OUT THE

17  DIFFERENCES BETWEEN THE PROTECTABLE ELEMENTS, AS I'VE SET

18  FORTH -- AND I'M JUST ABOUT DONE WITH THAT ORDER AS WELL.  I DO

19  PROMISE, COME CLOSE TO PROMISING, THAT BOTH ORDERS WILL BE OUT

20  TODAY, THE ONE ON PROTECTABLE ELEMENTS AND THE ONE ON THE

21  MISTRIAL.  I'M JUST ABOUT DONE.  I'VE TURNED IN LAST REVISIONS.

22       SO, HOPEFULLY, WE'LL HAVE THAT VERY SHORTLY.

23       MR. ZELLER:  IF I MAY INTERRUPT, YOUR HONOR.

24       THE COURT:  -- PERMITTED TO POINT OUT DIFFERENCES

25  BETWEEN THE DRAWINGS AND THE -- THE PROTECTABLE ELEMENTS ON THE

1    DRAWINGS AND THE INFRINGING WORKS.  THAT SEEMS TO BE FAIR GAME.

2        MR. ZELLER:  I AGREE, YOUR HONOR.  JUST TO CLARIFY

3    WHAT WE'RE SAYING IN THE BRIEF -- I MEAN, IT'S EXACTLY THE

4    POINT THE COURT WAS MAKING; ASSUMING FOUNDATION, ASSUMING

5    RELEVANCE, ASSUMING ANY NUMBER OF OTHER KINDS --

6        THE COURT:  ASSUMING FOUNDATION.  THE QUESTION IS, IS

7    IT RELEVANT?  AND I THINK IT IS RELEVANT.

8        MR. ZELLER:  THERE'S NO DISAGREEMENT THAT, YOU KNOW,

9    HAVING SOMEBODY -- PROPER WITNESS, PROPER TIME, DOING THE

10   PROPER QUESTIONING, IF THEY ARE ASKED QUESTIONS ABOUT POINTING

11   OUT DIFFERENCES IN THE RELEVANT PRODUCTS, THEN I THINK THAT'S

12   ACCEPTABLE.

13       THE COURT:  AND IT'S ALSO CLEAR THAT MGA NEEDS TO BE

14   ABLE TO REBUT EVIDENCE THAT YOU HAVE INTRODUCED TO ESTABLISH

15   THE SCOPE OF YOUR INDIRECT CAUSATION.  FOR EXAMPLE, YOU

16   INTRODUCE EVIDENCE SAYING MARGARET LEAHY BASED HER SCULPTING ON

17   THE DRAWINGS.  MARGARET LEAHY CAN STAND UP HERE AND SAY,

18   'IXNAY, I DID NOT BASE MY SCULPT ON THE DRAWINGS.'

19       THAT ALL COMES IN; RIGHT?

20       MR. ZELLER:  WELL, I THINK THAT SOMEWHAT DEPENDS.

21   AND THIS IS ANOTHER WAY OF CARVING THIS OUT, BECAUSE THERE'S

22   TWO DIMENSIONS TO THIS.

23       YOU KNOW, ARE WE TALKING ABOUT --

24       THE COURT:  SO TO SPEAK.

25       MR. ZELLER:  YEAH.

1       I THINK THERE'S SORT OF THE NONCREATIVE ASPECT, WE'LL

2   CALL IT LOOSELY, AND THEN THE CREATIVE ASPECT, WE'LL CALL IT

3   LOOSELY.  SO IF WE HAVE SOMEBODY LIKE MARGARET LEAHY ON THE

4   STAND -- NOW, IF SHE'S TALKING ABOUT THE NONCREATIVE WORK, I

5   DON'T KNOW THAT THERE COULD BE A SERIOUS DISPUTE, BUT THAT

6   STUFF IS JUST IRRELEVANT.  THE DETAIL THAT GOES INTO THE

7   MANUFACTURING, 'WE DID X, Y, Z IN ORDER TO MAKE IT

8   MANUFACTURABLE,' THAT JUST SEEMS AWFULLY DIFFICULT TO

9   UNDERSTAND HOW THAT WOULD BE RELEVANT.

10       THE COURT:  THAT'S THE SWEAT AND BROW STUFF.

11       MR. ZELLER:  CORRECT.  SO I THINK THAT STUFF IS THE

12   EASIER CASE AND THAT THAT'S OUT.

13       IN TERMS OF WHAT WE'LL CALL THE CREATIVITY THAT GOES

14   INTO IT --

15       THE COURT:  INSPIRATION.

16       MR. ZELLER:  CORRECT.  INSPIRATION, CREATIVITY, OR

17   WHATEVER.

18       I THINK THERE'S A HUGE DIFFERENCE BETWEEN

19   MARGARET LEAHY SITTING UP THERE AND SAYING, 'LET ME POINT TO

20   YOU THE DIFFERENCES BETWEEN THIS DRAWING AND THE SCULPT THAT I

21   WORKED ON' --

22       THE COURT:  BUT SHE SHOULD BE ABLE TO GO FURTHER THAN

23   THAT AND SAY, 'LISTEN, I WAS NOT INSPIRED.  DRAWINGS?  WHAT

24   DRAWINGS?  I DON'T KNOW WHAT DRAWINGS YOU'RE TALKING ABOUT.'

25       I MEAN, YOU MAY BE ABLE TO IMPEACH HER.  THAT'S A

1    FACTUAL ISSUE FOR THE JURY TO DECIDE.  AND IF SHE TAKES THE

2    POSITION THAT, 'YEAH, I SAW THE DRAWINGS.  I TOSSED THEM IN THE

3    TRASH.  I CAME UP WITH THE DOLL ON MY OWN' -- WHETHER THAT'S

4    TRUE OR NOT, I DON'T KNOW, BUT THAT'S THE TYPE OF EVIDENCE THAT

5    WOULD BE ADMISSIBLE.

6         MR. ZELLER:  YOU SEE, THAT'S WHERE--  I DON'T THINK

7    IT'S ADMISSIBLE.

8         THE COURT:  EXPLAIN.

9         MR. ZELLER:  HERE'S WHY, YOUR HONOR:

10         EVEN ASSUMING THAT WHAT SHE IS TESTIFYING TO IS,

11    'THIS IS MY OWN CREATIVE INPUT; THIS IS WHAT I, MARGARET LEAHY

12    MYSELF, CAME UP WITH,' THE FACT IS, IT'S STILL NOT LEGALLY

13    RELEVANT.

14         THE COURT:  WE'RE ALMOST TALKING TWO SIDES OF THE

15    SAME COIN.

16         SHE CERTAINLY CAN SAY, 'I DID NOT RELY ON THE

17    DRAWINGS.'

18         MR. ZELLER:  THAT'S FAIR GAME.

19         THE COURT:  HOW DO YOU SAY, 'I DID NOT RELY ON THE

20    DRAWINGS' -- ISN'T SAYING 'I RELIED ON SOMETHING ELSE' JUST

21    ANOTHER WAY OF SAYING 'I DID NOT RELY ON THE DRAWINGS'?

22         I THINK I'M WITH YOU IN TERMS OF GOING BEYOND THAT

23    AND GETTING INTO THE WHOLE PRODUCTION PROCESS, BUT IN TERMS OF

24    WHAT INSPIRED HER MOLD --

25         MR. ZELLER:  AND I DON'T KNOW THAT THERE'S

1    NECESSARILY -- AT THAT LEVEL, THAT THERE'S THAT MUCH AGREEMENT.

2    IF THE COURT IS ASKING -- CLEARLY, IF SHE'S THERE TO REBUT AND

3    SHE SAYS, 'I DIDN'T RELY ON THE DRAWINGS; I MYSELF DID IT,'

4    THAT'S ONE THING.  AND CLEARLY, IF IT BECOMES AN ISSUE AS TO

5    HOW WAS SHE ACTUALLY INSPIRED, THEN THAT OPENS THAT DOOR.  BUT

6    WHAT I DON'T THINK IS PROPER -- I DON'T THINK IT'S PROPER FOR

7    THEM TO PUT ANYONE UP ON THE STAND AND SAY, 'LET ME WALK YOU

8    THROUGH THE THOUSAND CREATIVE CHOICES I MADE TO GET FROM THE

9    BEGINNING OF THE PROCESS TO THE END.'  AND THE REASON IS

10   BECAUSE ULTIMATELY, NO MATTER HOW MUCH -- EVEN IF IT'S ALL

11   TRUE, EVEN IF THEY PUT CREATIVE PROCESS INTO IT, IT IS LEGALLY

12   IRRELEVANT, BECAUSE AT THE END OF THE DAY --

13        THE COURT:  I UNDERSTAND YOUR ARGUMENT ON THAT.

14        MR. ZELLER:  IT'S AN UNAUTHORIZED DERIVATIVE WORK AT

15   THE END OF THE DAY, AT BEST, BUT IT'S STILL AN INFRINGEMENT.

16        THE COURT:  I THINK THAT'S ALL OF THE QUESTIONS I

17   HAVE FOR YOU, MR. ZELLER.  THANK YOU.

18        MR. ZELLER:  THANK YOU.

19        THE COURT:  LET ME HEAR FROM MGA.  I HAVE SOME

20   QUESTIONS FOR MGA AS WELL.

21        THE FIRST ARGUMENT ON OBJECTIONS, YOU'RE CERTAINLY

22   NOT TAKING THE POSITION THAT A FAILURE TO OBJECT TO A STATEMENT

23   IN OPENING, OR A FAILURE TO OBJECT TO EXHIBITS PRIOR TO TRIAL,

24   WAIVES OBJECTIONS DURING TRIAL.

25        MS. AGUIAR:  I THINK THERE ARE SEVERAL ASPECTS TO

1    THAT FIRST ARGUMENT IN OUR BRIEF, YOUR HONOR.

2        IT ALL RELATES TO ONE PRIMARY POINT, WHICH IS THAT

3    THIS IS THE FIRST TIME IN THE COURSE OF THIS LITIGATION THAT

4    WE'RE HEARING THIS ARGUMENT FROM MATTEL.  IT IS ON THE EVE,

5    LITERALLY ON THE EVE, OF WHEN WE'RE ABOUT TO START OUR

6    CASE-IN-CHIEF.

7        IN THE SUMMARY JUDGMENT BRIEFS, WE MADE IT CLEAR THAT

8    WE WERE GOING TO ARGUE THIS.  MATTEL DID NOT RAISE ANY ISSUE IN

9    THE SUMMARY JUDGMENT BRIEFING TO SAY, 'WELL, YOU CAN'T MENTION

10   THAT KIND OF STUFF; IT'S IRRELEVANT; AND, THEREFORE, YOU CAN'T

11   RAISE THOSE ISSUES TO REBUT SUMMARY JUDGMENT.'

12       THE COURT:  ARE THEY UNDER AN OBLIGATION TO DO SO?

13       MS. AGUIAR:  I WOULD THINK IF WE WERE RAISING IT IN

14   OPPOSITION TO SUMMARY JUDGMENT AND SAYING, 'WE ARE GOING TO

15   SHOW THIS AND SHOW THE DEVELOPMENT AND SHOW THE DIFFERENT STEPS

16   AND SHOW THE INDEPENDENT CREATION,' I WOULD THINK, YES,

17   ABSOLUTELY.  IF THEY THOUGHT THAT THIS WAS NOT AN ARGUMENT THAT

18   COULD LEGALLY BE MADE, OR AS MR. ZELLER IS NOW URGING, THAT IT

19   WAS TOTALLY IRRELEVANT, I FEEL PRETTY SURE THAT GIVEN THE

20   CALIBER OF ATTORNEYS IN THIS CASE, THEY WOULD HAVE SAID AT THE

21   TIME THAT THAT WAS NOT RELEVANT.

22       THE COURT:  I THINK THE CALIBER OF THE ATTORNEYS IN

23   THIS CASE SPEAKS TO WHY THEY DIDN'T SHAPE THE OPPONENT'S

24   LITIGATION STRATEGY.

25       MS. AGUIAR:  YOUR HONOR, THIS WAS LAID OUT IN THE

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1     JURY INSTRUCTIONS.

2         THE COURT:  I UNDERSTAND THAT.  WE HAVEN'T GOTTEN TO

3     JURY INSTRUCTIONS YET.

4         CAN YOU GIVE ME ANY AUTHORITY THAT SUGGESTS THAT ONE

5     PARTY IS OBLIGED TO OBJECT, IN ADVANCE OF TRIAL, ON RELEVANCY

6     GROUNDS, TO ARGUMENTS THAT THEY KNOW ARE GOING TO BE MADE AT

7     TRIAL?

8         MS. AGUIAR:  LET ME JUMP TO YOUR QUESTION ABOUT

9     OPENING STATEMENT.

10        BOTH MR. NOLAN AND MR. PRICE AND MR. QUINN -- WHEN

11    THEY WERE MAKING THEIR OPENINGS, THERE WERE OBJECTIONS BASED ON

12    RELEVANCE, ABSOLUTELY.  I SPECIFICALLY RECALL MR. PRICE

13    OBJECTING AT LEAST ONCE WHEN MR. NOLAN WAS MAKING ARGUMENTS;

14    OBJECTION RELEVANCE.

15        THE COURT:  BUT THERE WERE OTHER STATEMENTS MADE IN

16    OPENING TO WHICH OBJECTIONS WERE NOT MADE THAT BOTH SIDES HAVE

17    SUBSEQUENTLY OBJECTED, AND THE COURT HAS SUSTAINED THOSE

18    OBJECTIONS.  MR. PRICE, FOR EXAMPLE, MADE STATEMENTS IN OPENING

19    THAT MR. NOLAN AND YOU AND OTHERS HAVE OBJECTED TO.  WHEN WE

20    GOT AROUND TO IT, THE COURT HAS SUSTAINED THOSE OBJECTIONS.

21        JUST BECAUSE -- I GUESS I'M TRYING TO -- WHEN I READ

22    THIS, I COULDN'T THINK OF ANY AUTHORITY -- I'VE NEVER BEEN

23    PRESENTED WITH A SITUATION WHERE ONE SIDE HAS ARGUED THAT

24    BECAUSE AN OBJECTION WAS NOT MADE DURING AN OPENING STATEMENT

25    TO EVIDENCE THAT SOMEHOW NOW THAT OBJECTION IS WAIVED, LET

1    ALONE AN ARGUMENT THAT BECAUSE A MOTION IN LIMINE WAS NOT

2    BROUGHT OR A REPLY WAS NOT FILED TO A MOTION FOR SUMMARY

3    JUDGMENT THAT SOMEHOW NOW THE OBJECTION IS WAIVED.  I'VE NEVER

4    SEEN THAT IN MY CAREER, BUT...

5         MS. AGUIAR:  THE POINT I'M MAKING, THOUGH, YOUR

6    HONOR, IS THAT WE HAVE MADE IT PERFECTLY CLEAR THROUGHOUT THAT

7    THIS WAS AN ARGUMENT THAT WE WERE GOING TO BE MAKING.  WE MADE

8    THAT STATEMENT IN OPENING.  HAVING DRAWN NO OBJECTION, WE WOULD

9    BE PREJUDICED IF WE WERE PUT IN THE POSITION OF NOT BEING ABLE

10   TO MAKE GOOD ON THE STATEMENTS THAT MR. NOLAN MADE IN OPENING

11   REGARDING 'THE EVIDENCE WILL SHOW THIS' OR 'THE EVIDENCE WILL

12   SHOW THAT.'

13        THAT, TO ME, IS WHY THERE'S A PROCESS OF BEING ABLE

14   TO OBJECT TO STATEMENTS THAT ARE MADE IN OPENING.  BUT THAT'S

15   NOT MY PRIMARY ARGUMENT.

16        THE COURT:  I DON'T THINK IT'S OF ANY MOMENT AT ALL,

17   ACTUALLY, BECAUSE I -- IT'S THE FIRST ARGUMENT YOU PUT UP, SO

18   THAT'S WHY I'M ADDRESSING IT FIRST.  BUT THE PROCESS REQUIRES

19   DISCLOSURE OF EVIDENCE SO THAT THERE'S NOT TRIAL BY AMBUSH IN

20   TERMS OF DISCOVERY.  AND THE COURT WILL DO ITS BEST TO ADDRESS

21   THAT, WHILE AT THE SAME TIME, I'VE GIVEN BOTH SIDES LEAVE TO

22   PRODUCE DISCOVERY IN THE MIDDLE OF TRIAL BECAUSE OF THE UNUSUAL

23   CIRCUMSTANCES OF THIS TRIAL.  I'M PERMITTING MGA AND MR. LARIAN

24   TO PRODUCE UPDATED FINANCIAL INFORMATION IN THE MIDDLE OF

25   TRIAL.  I'VE ALLOWED MATTEL TO PROVIDE CERTAIN UPDATED AND NEW

1   EVIDENCE IN THE MIDDLE OF TRIAL.  THAT'S GENERALLY DISFAVORED,

2   AND I UNDERSTAND BOTH THE RULE AND STATUTORY AND CASE LAW BASIS

3   FOR LIMITING THAT.  I'VE JUST NEVER HEARD -- AND MAYBE IT'S MY

4   OWN INEXPERIENCE, BUT IN 18 YEARS, I'VE NEVER HEARD OF A

5   POSITION THAT SOMEHOW AN OBJECTION IS WAIVED TO A LEGAL

6   ARGUMENT OR TO EVIDENCE BECAUSE IT HAS NOT BEEN RAISED IN A

7   MOTION IN LIMINE OR IN A REPLY TO A MOTION FOR SUMMARY

8   JUDGMENT.  THAT, TO ME, IS JUST -- YOU CAN CALL IT STRATEGY,

9   BUT, I MEAN, I JUST DON'T THINK A SIDE IS REQUIRED TO DO THAT.

10      MS. AGUIAR:  I UNDERSTAND.  LET ME CLARIFY THE FIRST

11   POINT AND SECOND POINT IN THE BRIEF, YOUR HONOR.

12      THE FIRST POINT WAS THAT THIS ISSUE HAS BEEN CLEARLY

13   RAISED ALL ALONG AND NEVER OBJECTED TO.

14      THE SECOND ONE WAS THAT MATTEL'S CASE-IN-CHIEF IN

15   1-B -- QUESTIONING STARTING WITH THE VERY FIRST WITNESS,

16   NINETTE PEMBLETON, AS WELL AS MR. LARIAN -- THE FOCUS CLEARLY

17   WAS, 'ALL YOU HAD WAS THESE DRAWINGS.'  THE QUESTIONS WERE,

18   'YOUR SOLE INSPIRATION' --

19      THE COURT:  I'M WITH YOU ON THAT.  I HAVE "FAIR GAME"

20   WRITTEN NEXT TO THAT ARGUMENT.  YOU CAN ABSOLUTELY REBUT THAT.

21   THAT'S FAIR GAME.  SO YOU'VE CONVINCED ME ON THAT.  THAT PART

22   OF THE FIRST SECTION, I'M WITH YOU.

23      MS. AGUIAR:  OKAY.  AND THE PURPOSE OF THAT FIRST

24   SECTION WAS TO SAY, BEFORE WE EVEN GET TO THE REASONS WHY THIS

25   IS LEGALLY RELEVANT, AS AN EQUITABLE MATTER, THIS ARGUMENT HAS

1    BEEN PRESSED BY MGA THROUGHOUT; AND FRANKLY, I THINK, BASED ON

2    THAT, MATTEL RECOGNIZED THAT THAT'S WHAT WE WERE GOING TO

3    ARGUE; SO THIS IS THEIR STRATEGY IN THEIR 1-B CASE, WHICH

4    THEY'RE ABOUT TO REST WITHIN THE HOUR, I SUSPECT.

5         SO THEIR STRATEGY, WE NOW KNOW, BECAUSE THEY'RE ABOUT

6    TO FINISH THEIR 1-B CASE -- THEIR STRATEGY WAS TO SAY, 'THIS IS

7    ALL YOU HAD.'  AND WE'RE ENTITLED TO DESCRIBE THAT THIS IS NOT

8    ALL WE HAD.  WE HAD MARGARET LEAHY.  MARGARET LEAHY, THROUGH

9    HER INDEPENDENT CREATIVITY --

10        THE COURT:  LET'S GO TO THAT.  THAT'S THE SECOND

11   ARGUMENT.

12        I DID REFRESH MYSELF WITH NIMMER'S CHAPTER ON

13   INDEPENDENT CREATION.

14        THE STANDARD FOR INDEPENDENT CREATION IS NOT QUITE AS

15   SIMPLE AS THE FEW CASES THAT YOU CITED.  I LOOKED AT THOSE

16   CASES IN GREATER DETAIL.

17        YOU CERTAINLY HAVE A RIGHT TO PRESENT A DEFENSE OF

18   INDEPENDENT CREATION.  AT THIS POINT, I DON'T HAVE THAT

19   EVIDENCE BEFORE ME.

20        MS. AGUIAR:  WE HAVE NOT PUT IN OUR CASE YET.

21        THE COURT:  I UNDERSTAND.  BUT YOU'RE NOT GOING TO

22   PUT IT BEFORE THE JURY UNTIL I'M SATISFIED THAT THERE IS A

23   SUFFICIENT BASIS TO PRESENT IT TO THE JURY; MUCH LIKE A

24   SELF-DEFENSE OR A DURESS-DEFENSE.  THE COURT NEEDS TO BE

25   SATISFIED THAT THERE IS SUFFICIENT EVIDENCE OF INDEPENDENT

Transcript of Proceedings - AM (Moore Dir)  8/8/2008 8:45:00 AM

1   CREATION BEFORE IT GOES TO THE JURY.  AT LEAST THAT'S WHAT THE

2   AUTHORITY SEEMS TO SUGGEST.

3       BECAUSE OTHERWISE, YOU RUN INTO THE VERY DANGEROUS

4   WATERS, DESCRIBED IN THE CASE CITED BY MATTEL, OF CONFUSING THE

5   JURY ON THIS.

6       THE INDEPENDENT CREATION IS NOT JUST A MATTER OF,

7   'WELL, WE TOOK SOME OF THE COPYRIGHTED WORK, AND THEN WE ADDED

8   A WHOLE BUNCH OF STUFF TO IT OURSELVES.'  THAT'S NOT

9   INDEPENDENT CREATION.

10      MS. AGUIAR:  THAT'S NOT WHAT WE'RE ARGUING.

11      THE COURT:  INDEPENDENT IS, 'YEAH, WE DID HAVE ACCESS

12  TO THE COPYRIGHTED WORK, BUT THAT'S NOT WHAT WE LOOKED AT.  WE

13  INDEPENDENTLY CREATED THIS DOLL WHOLLY AND APART FROM THOSE

14  DRAWINGS.'

15      IF YOU HAVE EVIDENCE OF THAT, A, I'VE NOT HEARD IT;

16  B, I'VE HEARD EVIDENCE TO THE CONTRARY FROM THE CEO; AND, C,

17  I'LL GIVE YOU COMPLETE LEEWAY TO PRESENT AND PROFFER THAT

18  EVIDENCE TO THE COURT.  THEN I'M GOING TO HAVE TO BE SATISFIED

19  BEFORE I LET THAT INTO THE JURY.

20      MS. AGUIAR:  THE WAY I READ THE CASES, YOUR HONOR, IS

21  THAT WHEN MATTEL PUTS FORTH A PRIMA FACIE CASE OF ACCESS AND

22  SUBSTANTIAL SIMILARLY -- AND I'M ASSUMING FOR PURPOSES OF THIS

23  STATEMENT THAT YOU WILL CONCLUDE THAT THEY HAVE DONE THAT --

24      THE COURT:  YES.

25      MS. AGUIAR:  -- THEN WE ARE --

1       THE COURT:  WELL, THE SUBSTANTIAL SIMILARITY, I'M

2   GOING TO BE HEARING EVIDENCE OF THAT.  I DON'T KNOW ABOUT THE

3   SUBSTANTIAL SIMILARITY.  YOU'VE GOT EXPERTS; YOU'VE GOT PEOPLE

4   WHO SAY THAT THEY'RE NOT SUBSTANTIALLY SIMILAR AT ALL.  SO I'M

5   NOT THERE ON THE SUBSTANTIAL SIMILARITY, AND THAT EVIDENCE

6   CERTAINLY COMES IN.

7       MS. AGUIAR:  I GUESS WHAT I'M SAYING IS, THE WAY THE

8   CASES DISCUSS THE BURDEN-SHIFTING IS ALMOST LIKE A BURSTING

9   BUBBLE, THAT MATTEL SAYS, 'OKAY, YOU HAD ACCESS AND THEY'RE

10  SUBSTANTIALLY SIMILAR.'

11      THE BURDEN AT SOME POINT COMES BACK TO US, AND WHEN

12  WE START OUR CASE LATER TODAY, THAT BURDEN WILL BE ON US TO

13  SHOW THAT WE DIDN'T COPY.  SO I ACTUALLY THINK THAT TO PRECLUDE

14  US FROM OFFERING EVIDENCE THAT WE DIDN'T COPY THE WORK PREVENTS

15  US FROM PUTTING ON A DEFENSE.

16      THIS IS NOT A CASE, YOUR HONOR, OF BURYING

17  COPYRIGHTED MATERIAL IN OTHER MATERIAL.  THIS IS JUST NOT

18  ANALOGOUS TO THE CASES WHERE YOU HAVE A 7-CD TRACT --

19      THE COURT:  I AGREE WITH THAT.

20      MS. AGUIAR:  SO THE 7-TRACK CD CASE OR THE CHAPTERS

21  IN A BOOK, WHERE WE COPIED ONE CHAPTER --

22      THE COURT:  WAIT A SECOND.

23      ACTUALLY, DEPENDING ON HOW YOUR EVIDENCE PLAYS OUT,

24  IT MAY BE LIKE THAT, ALTHOUGH IT'S A VISUAL WORK AND NOT A

25  BOOK.  THERE'S A DIFFERENCE BETWEEN -- THE EIGHT TRACKS OF A

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    CD -- YOU HAVE SIX TRACKS THAT ARE NOT INFRINGING AND YOU HAVE

2    ONE THAT IS INFRINGING, FOR APPORTIONMENT PURPOSES, IF THE

3    WHOLE THING SELLS WITH THE SEVEN TRACKS, YOU'RE ONLY -- FOR

4    DAMAGES PURPOSES, YOU'RE ENTITLED TO ONE-SEVENTH.  THAT'S THE

5    APPORTIONMENT.  BUT IN TERMS OF DETERMINING WHETHER OR NOT THAT

6    ONE TRACK IS COPYRIGHTED, IT MAY BE THAT TWO-THIRDS OF IT IS

7    BORROWED FROM SOMETHING ELSE AND ONE-THIRD OF IT IS INNOVATIVE

8    NEW WORDS OR SOMETHING ON THE TRACK.  BUT BECAUSE THE WHOLE

9    THING IS -- THE WHOLE SONG IS INEXTRICABLY INTERTWINED WITH

10   COPYRIGHTED MATERIAL, YOU LOSE THAT ENTIRE SONG.  YOU DON'T GET

11   TO SEVER OUT OR, MIND YOU, PRESENT EVIDENCE THAT ONE-THIRD OR

12   TWO-THIRDS OR 48 PERCENT OF IT IS NEW AND CREATIVE WORK.

13        IF YOU TAKE THE VERSE, FOR EXAMPLE, TO USE THE

14   EXAMPLE, AND YOU COPIED THE REFRAIN BUT YOU ADD A FEW MORE

15   VERSES, YOU'VE STILL COPIED THE SONG, AS IT WERE, AND THERE'S A

16   COPYRIGHT INFRINGEMENT THERE.

17        NOW, TO USE YOUR BOOK ANALOGY, IF YOU -- IT'S

18   DIFFERENT BECAUSE IT'S LITERARY WORK AND NOT VISUAL WORK, BUT

19   THE IDEA OF THE WORK BEING PERMEATED WITH COPYRIGHTED INFRINGED

20   MATERIAL, THEN, DEPENDING ON OTHER CIRCUMSTANCES, THE WHOLE

21   BOOK GETS VIEWED AS AN INFRINGEMENT.  YOU DON'T GET TO SAY,

22   'OH, WELL, THERE'S THESE THREE CHAPTERS THAT WE WROTE

23   OURSELVES; AND, THEREFORE, WE GET THREE-FIFTHS,' IF THERE'S

24   FIVE CHAPTERS IN TOTAL.

25        MS. AGUIAR:  BUT OUR WHOLE POINT OF OUR CASE IS THAT

1    HE HAD AN IDEA, WHICH IS NOT COPYRIGHTABLE, IN HIS DRAWINGS,

2    AND THE COPYRIGHT LAW ENCOURAGES YOU TO BUILD ON IDEAS --

3         THE COURT:  YES.

4         MS. AGUIAR:  -- BUT NOT COPY THEM.

5         THE COURT:  RIGHT.

6         MS. AGUIAR:  OUR WHOLE POINT OF OUR CASE IS THAT WE

7    DIDN'T COPY THEM.  WE WANTED OUR DOLLS TO LOOK DIFFERENT THAN

8    THE DRAWINGS.

9         THE COURT:  THAT EVIDENCE WOULD COME IN.  IF YOU HAVE

10   EVIDENCE -- IF YOU HAVE COMPETENT EVIDENCE THAT SAYS THAT YOU

11   WANTED YOUR DOLLS TO LOOK DIFFERENT THAN THE DRAWINGS, THAT

12   COMES IN.

13        MS. AGUIAR:  AND MARGARET LEAHY'S TESTIMONY IS

14   EXHIBIT A FOR INDEPENDENT CREATION.

15        THE COURT:  YOU'RE GROUPING HER -- I DON'T HAVE HER

16   TESTIMONY BEFORE ME, COUNSEL.  I'M GOING TO BE RULING ON

17   OBJECTIONS, AND I WANT TO GIVE YOU AS MUCH -- THE WHOLE POINT

18   OF THIS EXERCISE HERE IS NOT TO NECESSARILY EXCLUDE OR

19   DEFINITIVELY RULE ON ANY -- SAYING THAT THIS PERSON CAN TESTIFY

20   OR NOT TESTIFY.  I'M TRYING TO GIVE YOU INFORMED GUIDANCE AS TO

21   WHERE THE COURT IS GOING TO SUSTAIN OR NOT SUSTAIN OBJECTIONS

22   ON RELEVANCY GROUNDS.  THAT'S THE GUIDANCE I'M TRYING TO GIVE

23   YOU AND HAVE YOU INTERFACE WITH ME SO THAT WE CAN COME UP WITH

24   A WORKABLE STANDARD HERE.

25        MARGARET LEAHY IS GOING TO TESTIFY THIS AFTERNOON, I

1    PRESUME, AND THAT'S FINE.  THE POINT IS, HOW FAR INTO THE

2    PROCESS, PRODUCTION PROCESS, ARE WE GOING?  WHAT ARE THE

3    ELEMENTS THAT SHE'S GOING TO BE ABLE TO TESTIFY TO?  AND

4    EVIDENCE -- ANYWAYS...

5        MS. AGUIAR:  MAY I INTERJECT SOMETHING HERE AT THIS

6    POINT WHICH I THINK IS ESPECIALLY RELEVANT?

7        THE COURT:  SURE.

8        MS. AGUIAR:  WE'RE DEALING WITH HOW MGA, AND

9    MARGARET LEAHY BEING ONE OF THE MGA VENDORS, CREATED THIS WORK.

10   THIS IS NOT A QUESTION OF TAKING CARTER BRYANT'S DRAWINGS --

11   AND LET'S SAY THEY WERE A CARTOON -- AND INSTEAD OF TURNING

12   THEM INTO A DOLL, WE WERE TAKING THEM AND CREATING A CARTOON OF

13   THEM; AGAIN, A TWO-DIMENSIONAL THING.  THAT WOULD BE DIFFERENT,

14   BECAUSE THEN YOU'D JUST BE LOOKING AT, OKAY, DOES THE EYE IN

15   THE TWO-DIMENSIONAL DRAWING HERE LOOK LIKE THE EYE IN THE

16   TWO-DIMENSIONAL CARTOON?  SO WE TURNED THE BRATZ, BASICALLY,

17   INTO A COMIC BOOK.

18        THAT IS NOT AT ALL WHAT WE HAVE HERE.

19        THE COURT:  I UNDERSTAND THAT.

20        MS. AGUIAR:  AND THE REASON THAT WE -- I KNOW YOU

21   UNDERSTAND, BUT I WANT TO EXPLAIN HOW I THINK IT'S RELEVANT TO

22   THIS PARTICULAR ISSUE.  BECAUSE THE JURY IS GOING TO BE ASKED

23   TO COMPARE A THREE-DIMENSIONAL DOLL AND DECIDE WHETHER IT'S

24   SUBSTANTIALLY SIMILAR TO A DRAWING WHICH, BY DEFINITION,

25   DOESN'T HAVE THREE DIMENSIONS.  THAT'S NOT A SCULPT THAT YOU'RE

1    LOOKING AT ON THAT PAGE.  THAT'S A FRONT VIEW, FLAT

2    ILLUSTRATION.  IT DOES NOT SHOW HOW DEEP THE HEAD SHOULD BE.

3        THE COURT:  ALL THAT EVIDENCE COMES IN, COUNSEL.

4        MS. AGUIAR:  OKAY.

5        THE COURT:  THE EVIDENCE OF HOW THE SCULPT WAS

6    CREATED AND ALL THE PRODUCTION, THAT DOES NOT COME IN.

7        MS. AGUIAR:  I JUST WANTED TO CONFIRM THAT BECAUSE

8    THAT IS CRITICAL TO OUR CASE.

9        THE COURT:  AND YOU MAKE THAT -- SOMETHING BEING

10   CRITICAL TO SOMEONE'S CASE GOES NOWHERE WITH THIS COURT ON

11   EITHER SIDE.  JUST TO SAY THAT 'IT'S CRITICAL TO OUR CASE' --

12       MS. AGUIAR:  I MEANT TO SAY THAT GETTING THAT

13   CONFIRMATION FROM YOU WAS IMPORTANT.

14       THE COURT:  I'M NOT -- OKAY.  I'M GOING TO RULE ON --

15   I BUY THE CASES, AND I THINK THEY'RE DEAD ON, THAT MR. ZELLER

16   PRESENTED ON SWEAT AND BROW.

17       MS. AGUIAR:  I WANT TO ADDRESS THAT.

18       THE COURT:  SO I DON'T WANT ANYTHING I'M SAYING NOW

19   TO BE VIEWED OR INTERRUPTED OR QUOTED BACK TO ME AS UNDERMINING

20   THAT, BECAUSE I THINK THE ANALYSIS IS DEAD-ON.

21       MS. AGUIAR:  I DISAGREE.  AND MAY I EXPLAIN WHY?

22       THE COURT:  PLEASE.

23       MS. AGUIAR:  SWEAT OF THE BROW RELATES TO A TOTALLY

24   DIFFERENT QUESTION.  SWEAT OF THE BROW IS AN ANALYSIS THAT

25   PERTAINS TO ORIGINALITY, NOT TO SUBSTANTIAL SIMILARITY AND

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    COPYING.

2         SWEAT OF THE BROW GOES TO SOMEONE TRYING TO MAKE AN

3    ORIGINALITY ARGUMENT AND PEOPLE SAYING, 'YOU KNOW, IT DOESN'T

4    MATTER HOW LONG IT TOOK YOU TO COPY SOMETHING.  IF YOU COPIED

5    IT, THEN IT'S NOT ORIGINAL, AND IT CAN'T BECOME ORIGINAL JUST

6    BECAUSE YOU PUT A LOT OF SWEAT ON YOUR BROW.'  TOTALLY, TOTALLY

7    DIFFERENT.  SO, FRANKLY, I THINK THAT THEY ARE USING A CONCEPT

8    FROM A COMPLETELY INAPPLICABLE LEGAL IDEA HERE.  WE DON'T

9    CONTEST ORIGINALITY.  WE'RE NOT CLAIMING THAT THE BRATZ DOLL --

10   WE'RE NOT TRYING TO SAY THAT WE HAVE ORIGINALITY IN THE BRATZ

11   DOLLS TO PROVE COPYRIGHT.

12        THE ERG CASE THAT THEY CITE TO YOU -- THAT'S ONE OF

13   THE CASES --

14        THE COURT:  YES.

15        MS. AGUIAR:  -- EXACTLY THE OPPOSITE.  THE DEFENDANT

16   IN THE ERG CASE WAS TRYING TO SHOW THAT THE THREE-DIMENSIONAL

17   PILLSBURY DOUGHBOY WAS JUST LIKE THE TWO-DIMENSIONAL CHARACTER.

18   SO SWEAT OF THE BROW IS A CONCEPT THAT THE COURTS TALK ABOUT

19   WHEN THEY'RE TRYING TO DETERMINE WHETHER YOU'VE SHOWN

20   ORIGINALITY.

21        THAT IS NOT AT ISSUE IN THIS CASE.  AND YOUR HONOR

22   HAS RECOGNIZED THAT IT'S NOT AT ISSUE IN THIS CASE.

23        THE COURT:  ORIGINALITY HAS BASICALLY BEEN CONCEDED,

24   YES.

25        MS. AGUIAR:  RIGHT.  SO SWEAT OF THE BROW IS AN

1    ORIGINALITY CONCEPT; IT IS NOT A COPYRIGHT INFRINGEMENT,

2    SUBSTANTIAL SIMILARITY/INDEPENDENT CREATION CONCEPT.

3        SO I WOULD RESPECTFULLY SUBMIT, YOUR HONOR, THAT THE

4    SWEAT-OF-THE-BROW CASES ARE TOTALLY INAPPLICABLE HERE.

5        NOW, WE DO NOT PLAN, AS I SAID YESTERDAY, TO TALK

6    ABOUT THE FACT THAT SOMEONE PUT IN X NUMBER OF HOURS IN THIS.

7    THAT'S NOT THE PURPOSE OF THE TESTIMONY.

8        THE PURPOSE OF THE TESTIMONY IS TO REBUT.  IT'S THE

9    OPPOSITE OF THE ERG CASE.  OUR CASE HERE IS, 'WE DID NOT COPY

10   YOUR DRAWINGS.'  THE DEFENDANT IN ERG WAS TRYING TO SAY -- AND

11   THE QUOTE THAT I THINK IS SO TELLING FROM THEIR BRIEF SAYS --

12   THIS IS ON PAGE 4 -- "THE ARTISTIC DECISIONS AS TO WHAT CHANGES

13   SHOULD BE MADE TO THE COSTUMES SO THAT THE ORIGINAL CHARACTER'S

14   ESSENCE WOULD NOT BE LOST..."

15       SO IN ERG, IT WAS A 180.  AND WE ARE SAYING,

16   'ORIGINALITY, PUT IT TO THE SIDE.'  THE CASES THEY CITE ON

17   SWEAT OF THE BROW ARE COMPLETELY INAPPLICABLE.

18       LET'S MOVE ON TO A COMPLETELY SEPARATE AND DIFFERENT

19   ANALYSIS:  SUBSTANTIAL SIMILARITY.

20       WHEN THEY HAVE SUGGESTED ACCESS AND SIMILARITY, WE

21   MUST, AS A MATTER OF LAW AND AS A MATTER OF EQUITY, BE ABLE TO

22   EXPLAIN WHY WE DIDN'T COPY THAT WORK AND WHY WE MADE CONSCIOUS

23   DECISIONS, ALL ALONG THE WAY, TO CHANGE THAT.

24       SO I WOULD SUBMIT THAT, ACTUALLY, SWEAT OF THE BROW

25   IS NOT DEAD-ON IN THIS CASE.  AND IN SOME OF THOSE CASES,

1    YOU'LL SEE THE DISTINCTION.

2         LET'S GO TO THE WAYLAND CASE.  THERE'S A FOOTNOTE IN

3    WAYLAND, FOOTNOTE 23 -- AND I THINK YOUR HONOR HAS ALREADY

4    RECOGNIZED THIS, BUT IT SAYS, "ALTHOUGH NOT AN ISSUE IN THIS

5    CASE, IT'S IMPORTANT TO NOTE THAT EVEN THE SHOWING OF

6    SUBSTANTIAL SIMILARITY IS NOT DISPOSITIVE, FOR IT STILL OPENS

7    THE ALLEGED INFRINGER TO PROVE THAT HIS WORK IS AN ORIGINAL

8    CREATION OR THAT THE SIMILARITIES BETWEEN THE WORK WAS NOT ON

9    ACCOUNT OF COPYING."

10        I THINK YOU'VE ALREADY RECOGNIZED THAT.

11        WHAT I'M SAYING --

12        THE COURT:  AND ORIGINALITY IS NOT AN ISSUE, SO

13   YOU'VE CONCEDED ON THAT POINT.

14        MS. AGUIAR:  I HAVE.  BUT WHAT I'M SAYING IS, THEY

15   CITE WAYLAND FOR A PROPOSITION --

16        THE COURT:  BE CAREFUL -- I SUPPOSE IT'S TOO LATE.  I

17   THINK YOU'VE CONCEDED ORIGINALITY, COUNSEL, SO INDEPENDENT

18   CREATION --

19        MS. AGUIAR:  WE'VE CONCEDED ORIGINALITY OF THE

20   DRAWINGS.

21        THE COURT:  YES.

22        MS. AGUIAR:  NOT THE DOLLS.

23        THE COURT:  I UNDERSTAND.  SO THERE'S A QUESTION THAT

24   REMAINS ABOUT SUBSTANTIAL SIMILARITY BETWEEN THE DRAWINGS AND

25   THE DOLLS.  THAT'S THE QUESTION THAT REMAINS.  ORIGINALITY,

1   INDEPENDENT CREATION, THAT, ON THE COPYRIGHTED DRAWINGS, IS

2   GONE; RIGHT?

3        YOU CERTAINLY DON'T CONTEND THAT YOU INDEPENDENTLY

4   CREATED THE DRAWINGS?

5        MS. AGUIAR:  NO, NO, NO.

6        THE COURT:  AT BEST, YOU'RE ARGUING THAT YOU

7   INDEPENDENTLY CREATED THE DOLLS.

8        MS. AGUIAR:  RIGHT.

9        THE COURT:  THAT'S AN INDEPENDENT CREATION.

10       MS. AGUIAR:  I THINK WE'RE SAYING THE SAME THING.

11       HERE'S THE DRAWINGS ON THE ONE SIDE.  THEY ARE NOW

12   THE WORK THAT IS -- YES, THEY ARE THE WORK THAT IS ALLEGED TO

13   HAVE BEEN INFRINGED.

14       THE COURT:  THAT'S RIGHT.

15       MS. AGUIAR:  WE HAVE NOT, FOR MANY MONTHS, CONTESTED

16   ORIGINALITY OF THOSE DRAWINGS.

17       THE COURT:  RIGHT.

18       MS. AGUIAR:  SWEAT OF THE BROW GOES INTO THE CONCEPT

19   OF WHETHER THERE WAS ORIGINALITY.  IN OTHER WORDS, IT'S

20   COMPLETELY FLIPPED IN THIS CASE.  IT WOULD BE AS IF MATTEL OR

21   SOMEBODY WAS SAYING -- IT WOULD BE AS IF CARTER BRYANT WAS THE

22   DEFENDANT AND TRYING TO ARGUE ORIGINALITY OF THE DRAWINGS.

23   THAT'S NOT THE CASE HERE.

24       THE COURT:  CAN YOU CITE ME TO THE PORTION OF WAYLAND

25   OR ANY OF THESE CASES THAT SUGGEST THAT SWEAT OF THE BROW IS

1    LIMITED TO THE CONCEPT OF ORIGINALITY AND -- AS OPPOSED TO THE

2    CONCEPT OF COPYRIGHT CLAIMS.

3         MS. AGUIAR:  BECAUSE THEY ARE ALWAYS IN DIFFERENT

4    SECTIONS OF THE OPINION.  AND FEIST, WHICH IS THE CASE THAT

5    THIS CAME OUT OF, YOUR HONOR --

6         THE COURT:  YES.

7         MS. AGUIAR:  FEIST IS AN ORIGINALITY CASE.  THAT WAS

8    THE ISSUE IN FEIST.  AND I THINK IT'S VERY CLEAR FROM THEIR

9    CITATIONS THAT THE QUESTION OF SWEAT OF THE BROW RELATES TO

10   ORIGINALITY.  THE CASES DISCUSS ACTUAL COPYING AND HOW A

11   DEFENDANT REBUTS ACTUAL COPYING COMPLETELY SEPARATELY FROM

12   DISCUSSING CONCEPTS AND ARGUMENTS ABOUT ORIGINALITY.

13        AGAIN, IN ERG AND IN FEIST, THE ISSUE WAS, IS A WORK

14   SUFFICIENTLY ORIGINAL?  AND PEOPLE WERE TRYING TO ARGUE THAT IT

15   WAS BASED ON ALL OF THE WORK THEY PUT IN.  BUT THEY SAID, BUT

16   IF YOU COPY IT -- I MEAN, IF YOU LOOK AT THE CITATION, THE

17   QUOTATION, FROM WAYLAND --

18        THE COURT:  BUT, COUNSEL, INDEPENDENT CREATION, THAT

19   DEFENSE, WHAT THAT ULTIMATELY GOES TO IS ORIGINALITY.  THAT'S

20   WHY INDEPENDENT CREATION TRUMPS THE PRIMA FACIE CASE.

21        I UNDERSTAND THAT YOU'RE ORIGINALLY CONCEDING

22   ORIGINALITY OF THE DRAWINGS, BUT ONCE MATTEL HAS ESTABLISHED A

23   PRIMA FACIE CASE FOR COPYRIGHT INFRINGEMENT, THE ISSUE OF

24   ORIGINALITY, WHICH IS THE SINE QUA NON, AS THEY SAY -- AND MY

25   FRENCH IS AWFUL, AND I RECOGNIZE THAT -- I GUESS THAT'S LATIN,

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    BUT IT'S BAD TOO.

2        MR. QUINN:  YOUR HONOR, NOBODY KNOWS HOW THAT WAS

3    PRONOUNCED ORIGINALLY, SO...

4        THE COURT:  THAT GOES BACK MANY YEARS AGO.

5        AND BASICALLY, WHAT THE INDEPENDENT CREATION DOES IS

6    BRING A SECOND SHOT OF ORIGINALITY, BECAUSE NOW IT'S NOT -- NOW

7    IT'S NOT THE ORIGINALITY OF THE DRAWINGS AT ISSUE; NOW IT'S THE

8    ORIGINALITY OF THE DOLLS.  BECAUSE HAVING GONE THROUGH THE

9    SUBSTANTIAL SIMILARITY PROCESS AND ESTABLISHING THE PRIMA FACIE

10   CASE, ASSUMING THAT THEY DO SO, MATTEL HAS NOW LAID CLAIM, AT

11   LEAST PRIMA FACIELY -- THEY HAVE ESTABLISHED A PRIMA FACIE CASE

12   THAT NOW THE DOLLS ARE COVERED BY THE COPYRIGHT.  AND WHAT

13   THESE CASES DO -- AND IF YOU GO BACK TO THE SUPREME COURT CASE,

14   THE FEIST CASE THAT YOU JUST STATED -- BASICALLY, THE DEFENDANT

15   GETS YET ANOTHER SHOT OF ESTABLISHING THEIR ORIGINALITY OF

16   THEIR DOLLS BY SAYING, 'NO, WE INDEPENDENTLY CREATED THOSE,

17   SEPARATE AND APART FROM THE DRAWINGS.'

18       SO YOU ARE CORRECT WHEN YOU SAY THAT THE SWEAT OF THE

19   BROW TALKS ABOUT ORIGINALITY, BUT IN A SLIGHTLY DIFFERENT

20   CONTEXT THAT YOU'RE SUGGESTING NOW.  YOU'RE CONFLATING THE

21   ORIGINALITY OF THE DRAWINGS WITH THE BROADER CONCEPT OF

22   ORIGINALITY THAT IS BEING DISCUSSED IN FEIST.

23       MAYBE I'M NOT ARTICULATING THAT ALL THAT WELL, BUT

24   THAT'S MY READING OF THESE CASES.

25       MS. AGUIAR:  I JUST THINK FEIST DOES DISCUSS THE

1      ORIGINALITY OF THE COPYRIGHTED WORK.

2           THE COURT:  IT DOES.  BUT IT'S DIFFERENT.  YOU'RE

3      RIGHT, IT DOES DISCUSS ORIGINALITY.  I'LL LEAVE IT AT THAT.

4           MS. AGUIAR:  OKAY.

5           THERE'S A CASE THAT -- WE'RE OBVIOUSLY DOING THIS IN

6      A MATTER OF TEN HOURS LAST NIGHT, YOUR HONOR, AND I WANTED TO

7      BRING TO YOUR ATTENTION A CASE FROM THE EIGHTH CIRCUIT, FROM

8      2005.  AND I HAVE A COPY FOR YOU.  AND IT CITES THE THREE BOYS

9      MUSIC CORP. V. BOLTON CASE, WHICH I'M SURE YOU'RE FAMILIAR WITH

10     BECAUSE IT'S A NINTH CIRCUIT CASE.

11          THE COURT:  YES.  PLEASE PASS THAT UP TO ME.

12          MR. ZELLER, DO YOU HAVE THIS?

13          MR. ZELLER:  I DO NOT.

14          MS. AGUIAR:  I'LL GIVE YOU MINE, BECAUSE I HAVE IT

15     WRITTEN DOWN.

16          ON THE FLAGGED PAGE, IN THE SECTION ON INDEPENDENT

17     CREATION, IT SAYS -- I DON'T KNOW IF YOU CAN SEE THAT

18     SECTION -- "FOUR SEASONS PRESENTED TESTIMONY FROM EACH ARTIST

19     EXPLAINING HOW THEY CREATED THE CARD DESIGNS.  THE ARTISTS ALSO

20     IDENTIFIED THE SOURCE MATERIAL THEY USED IN CREATING THE CARD

21     DESIGNS WHILE EMPLOYED BY FOUR SEASONS.  THE DISTRICT COURT AND

22     THE ADVISORY JURY EVALUATED ALL OF THIS EVIDENCE, INCLUDING THE

23     CREDIBILITY OF THE WITNESSES"; AND THEY FOUND COPYING IN THAT

24     CASE.

25          THE COURT:  THIS IS DEAD-ON.  THIS IS RIGHT.  I

1    COMPLETELY AGREE WITH EVERYTHING THIS STANDS FOR.

2        MS. AGUIAR:  RIGHT.  BECAUSE WE -- AND THEN IN THIS

3    PARTICULAR CASE, THIS SHOWS THAT WE ACTUALLY HAVE TO BE ABLE TO

4    PUT ON THE EVIDENCE.  IT SHOWS THAT IT'S AN ISSUE OF FACT.

5    THEY SAID THE DISTRICT COURT AND THE JURY CONSIDERED AND

6    EVALUATED THIS EVIDENCE.  AND IN THIS PARTICULAR CASE, THEY

7    DIDN'T -- IN THE CASE OF THE FOUR SEASONS, THEY DIDN'T CONVINCE

8    THE JURY.

9        THE COURT:  THE TWO MATERIAL FACTORS HERE ARE

10   PRECISELY THE TWO LINES THAT YOU HIGHLIGHTED.  AND THAT'S WHY I

11   SAY YOU'RE DEAD-ON.  "FOUR SEASONS PRESENTED TESTIMONY FROM

12   EACH ARTIST EXPLAINING HOW THEY CREATED THE CARD DESIGNS."  BUT

13   THE NEXT SENTENCE, "THE ARTISTS IDENTIFIED THE SOURCE MATERIAL

14   THEY USED IN CREATING THE CARD DESIGNS WHILE EMPLOYED BY FOUR

15   SEASONS."

16       YOU DON'T GET THE FIRST SENTENCE UNLESS THERE'S

17   EVIDENCE OF THE SECOND SENTENCE.  AND THAT'S WHAT I'M SAYING

18   NEEDS TO BE THERE AS A THRESHOLD MATTER.  THERE IS NO SOURCE

19   MATERIAL THAT I'VE HEARD YET.  AND MAYBE IT'S OUT THERE.  AND

20   IF IT'S THERE, THIS COMES IN.  BUT THERE'S BEEN NO SOURCE

21   MATERIAL, OTHER THAN CARTER BRYANT'S DRAWINGS.

22       AND I'VE HEARD THAT FROM MR. LARIAN; I'VE HEARD THAT

23   FROM YOUR OTHER LITIGATION.  I MEAN, THAT'S BEEN THE POINT.

24   AND THAT'S PART OF WHAT YOU NEED TO ESTABLISH FOR THIS

25   INDEPENDENT CREATION.  THIS IS JUST YET ANOTHER CASE WHICH

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    ILLUSTRATES THAT.

2         MS. AGUIAR:  I WANTED TO POINT YOUR HONOR TO SOME

3    EVIDENCE THAT CAME OUT IN PHASE 1-A, WHEN MARGARET LEAHY WAS ON

4    THE STAND.

5         THE COURT:  PLEASE.

6         MS. AGUIAR:  SHE TESTIFIED THAT, IN FACT, THE STEVE

7    MADDEN AD FROM THE PUBLIC DOMAIN WAS WHAT SHE USED PRIMARILY TO

8    DO HER FIRST VERSION OF THE SCULPT.  SO I WOULD ACTUALLY

9    DISAGREE WITH YOUR CHARACTERIZATION OF THE EVIDENCE THAT HAS

10   COME IN WHEN YOU SAID THAT THERE WAS NOTHING TO SHOW THAT THERE

11   WAS ANOTHER SOURCE.  THIS DOLL STARTED WITH MARGARET LEAHY.

12        THIS DOLL NEEDED TO COME INTO BEING THROUGH A SCULPT,

13   THROUGH A THREE-DIMENSIONAL ITEM.

14        THE COURT:  THAT WOULD CERTAINLY BE ADMISSIBLE

15   EVIDENCE.  IT ALREADY IS ADMISSIBLE.  IT'S ALREADY IN TRIAL.

16   IT'S ALREADY IN FRONT OF THE JURY.

17        IF YOU CAN COME UP WITH SOURCE MATERIAL, SUFFICIENT

18   SOURCE MATERIAL, THAT'S INDEPENDENT, THEN YOU'VE GOT AN

19   INDEPENDENT CREATION DEFENSE; AND I'LL CERTAINLY ENTERTAIN THAT

20   EVIDENCE.  I DON'T THINK THAT'S WHAT MR. ZELLER IS EVEN TRYING

21   TO KEEP OUT, BECAUSE IT'S ALREADY COME IN.

22        MS. AGUIAR:  OKAY.  AND INDEPENDENT SOURCE MATERIAL,

23   WHEN YOU'RE CREATING A DOLL, HAS TO ALSO BE PEOPLE.  SO, FOR

24   EXAMPLE, IF VERONICA MARLOW AND THE PEOPLE WHO DID THE

25   PACKAGING AND PAULA GARCIA WHO DIRECTED THE FACE PAINT HAD AN

1    IDEA OF HOW THEY WANTED IT, THAT ALSO -- I MEAN, THAT IS

2    INDEPENDENT, QUOTE, SOURCES.  IT'S ARTISTIC INPUT.  IT'S

3    CREATIVE PEOPLE WITH SKILLS WHO ARE BRINGING TO THE PROCESS HOW

4    THEY ARE INTERPRETING IT.

5         SO OUR VIEW IS, THAT IS EVIDENCE TO SHOW THAT THIS

6    DOLL WAS INDEPENDENTLY CREATED.

7         THE COURT:  THERE'S DEFINITELY A BALANCING THE COURT

8    MUST DO IN THIS.

9         MS. AGUIAR:  I WANTED TO POINT OUT THAT I WANTED TO

10   ADDRESS THE FIRST ISSUE THAT YOU RAISED WITH MR. ZELLER, OR I

11   WANTED MGA TO BE ABLE TO, ABOUT THE LICENSED PRODUCTS.

12        MR. ROTH WAS GOING TO ADDRESS THE RELEVANCE OF ALL OF

13   THIS TESTIMONY TO APPORTIONMENT AND DAMAGES, SO I DIDN'T WANT

14   TO NOT ANSWER YOUR QUESTION.  I THINK ONE OF OUR POINTS IS THAT

15   THE EVIDENCE THAT WE'RE DISCUSSING COMING IN -- I'M NOT TRYING

16   TO CONFLATE APPORTIONMENT AND SUBSTANTIAL SIMILARITY; I'M

17   MERELY POINTING OUT THAT THE SAME EVIDENCE MAY BE RELEVANT, FOR

18   TWO DIFFERENT REASONS -- AND I THINK THAT'S WHAT WE SAID IN OUR

19   BRIEF -- THAT THE DEVELOPMENT OF THE DOLL VERY MUCH RELATES TO

20   HOW WE DIDN'T COPY THE DRAWINGS, BUT IT ALSO, AT THE SAME TIME,

21   RELATES TO APPORTIONMENT.  SO I WOULD URGE THAT --

22        THE COURT:  VERY WELL.

23        MS. AGUIAR:  -- HAVING THIS EVIDENCE COME IN IS

24   EXTREMELY -- IT RELATES TO TWO SEPARATE ISSUES.  SO I DON'T

25   KNOW IF YOU WANT MR. ROTH TO ADDRESS THAT FIRST, YOUR QUESTION

1    ABOUT THE LICENSED PRODUCTS.

2         THE COURT:  WE'RE EATING UP JURY TIME RIGHT NOW.  THE

3    COURT NEEDS TO GET THIS RESOLVED.

4         MR. ROTH.

5         MR. ROTH:  THIS REALLY RELATES TO ALL OF THE CLAIMS,

6    WHETHER IT BE COPYRIGHT OR STATE LAW CLAIMS.  FUNDAMENTALLY,

7    THERE'S A CAUSATION QUESTION THAT NEEDS TO BE ANSWERED.  IT'S

8    ANSWERED DIFFERENTLY, DEPENDING UPON THE PRODUCT AND THE

9    COPYRIGHT CONTEXT, AS MR. ZELLER INDICATED, AND IN THE CONTEXT

10   OF THE STATE LAW CLAIMS.  AT THE END OF THE DAY, THE QUESTION

11   IS, WHAT HARM, IN THE CONTEXT OF THE STATE LAW CLAIMS, OR

12   PROFITS, IN THE CONTEXT OF THE COPYRIGHT CLAIM, WAS CAUSED AS A

13   RESULT OF THE INFRINGING ACTIVITY, AS OPPOSED TO ANYTHING ELSE?

14        I STOOD UP -- AND I APOLOGIZE IF I DID IT -- AT ONE

15   POINT, BECAUSE THIS ANALOGY TO A CD, TEN SONGS -- IF ONE SONG

16   IS INFRINGING, YOU GET 1/10 OF THE PROFITS.

17        THE THREE BOYS MUSIC CASE DOESN'T SAY THAT.  IT

18   ACTUALLY SAYS YOU LOOK INTO THE ONE INFRINGING SONG AND YOU

19   IDENTIFY THE INFRINGING ELEMENTS WITHIN THAT SONG.

20        BEYOND THAT CONTEXT, THERE ARE A NUMBER OF CASES

21   WHICH WE'VE CITED TO YOUR HONOR WHERE YOU LOOK AT THE OTHER

22   CREATIVE AND -- WE'RE USING LOOSE TERMS HERE -- POTENTIALLY

23   NONCREATIVE ELEMENTS PUT INTO THE FINISHED PRODUCT.

24        FOR INSTANCE, THERE ARE A NUMBER OF CASES WHICH TALK

25   ABOUT THE PROMOTIONAL AND ADVERTISING EFFORTS OF THE INFRINGER

Transcript of Proceedings - AM (Moore Dir)  8/8/2008 8:45:00 AM

1    AS BEING RELEVANT TO THE APPORTIONMENT CONTEXT.  SO WE WOULD

2    NEED TO TAKE INTO ACCOUNT THE ADDITIONAL WORK DONE ON THE

3    DRAWINGS, THE WORK DONE ON THE FASHIONS, ACCESSORIES,

4    ET CETERA, IN ORDER TO ADDRESS THE APPORTIONMENT QUESTION.

5         THEN IN THE CONTEXT OF THE STATE LAW CLAIMS, THEY

6    HAVE ASSERTED -- WE OBVIOUSLY DISAGREE ON LEGAL GROUNDS, WHICH

7    WE DON'T NEED TO BOTHER THE COURT WITH NOW -- BUT THEY'VE

8    BASICALLY ASSERTED A CAUSAL CONNECTION EXISTS BETWEEN THE

9    IMPROPER TRANSFER OF THE DRAWINGS TO MGA RESULTED IN A POT OF

10   PROFITS.

11        SO THE QUESTION IS -- THEY NOW HAVE A CAUSAL BURDEN

12   TO ESTABLISH WHAT PART OF THE POT OF PROFITS RESULTED FROM THAT

13   CONDUCT, AS OPPOSED TO ANYTHING ELSE.

14        WE HAVE THE OPPORTUNITY, IN THE CONTEXT OF THOSE

15   CLAIMS -- IF YOU ASSUME THAT THOSE POT OF PROFITS ARE EVEN

16   RELEVANT TO THOSE STATE LAW CLAIMS -- I JUST WANT TO SET THOSE

17   ARGUMENTS ASIDE; WE BELIEVE THEY ARE -- BUT IF YOU ACCEPT THAT

18   THEY ARE, THE TYPICAL TORT CAUSATION ANALYSIS HAS TO BE

19   UNDERTAKEN.  AND IN THAT CONTEXT, ALL OF THESE OTHER FACTORS

20   THAT MAY HAVE CONTRIBUTED TO THOSE PROFITS BEING GENERATED --

21   AND THE CASES ARE VERY CLEAR ON -- WHAT THEY GET ARE THE

22   ILL-GOTTEN PROFITS.  ANYTHING THAT IS NOT SUBJECT TO A

23   SUPERSEDING COST TYPE OF ARGUMENT, FOR INSTANCE, IS RELEVANT.

24   AND WE HAVE THE OPPORTUNITY TO PUT THAT IN.  THEY HAVE AN

25   OPPORTUNITY TO REBUT THAT, IF THEY CAN.

1        THE COURT:  CAN YOU ADDRESS THE QUESTION I ASKED

2    MR. ZELLER?

3        I GUESS I'M GOING TO TAKE A LOOK AT THREE BOYS MUSIC

4    AGAIN.

5        CAN YOU REFER ME TO EXACTLY WHAT YOU WERE TALKING

6    ABOUT ON THREE BOYS MUSIC, ABOUT LOOKING AT THE SONG ITSELF ON

7    ATTRIBUTION OF PROFITS.  I'M READING PAGE 487, AND THAT DOES

8    NOT SEEM TO BE THE CASE.

9        MR. ROTH:  IN THREE BOYS MUSIC, THEY AWARDED -- AT

10   PAGE 487, THEY AWARDED APPROXIMATELY --

11       THE COURT:  THEY WENT INTO THE ALBUM, BUT THERE WAS

12   ONLY ONE SONG ON THE ALBUM, 'LOVE IS A WONDERFUL THING,' THAT

13   WAS INFRINGING.

14       MR. ROTH:  YES.  BUT THEY LOOKED AT THE SPECIFIC

15   ELEMENTS, IF YOU LOOK AT PAGE 487.

16       THE COURT:  THAT'S WHERE I'M AT, "ATTRIBUTION OF

17   PROFITS," SECTION D.

18       MR. ROTH:  I WISH I HAD THE CASE UP HERE.  I DON'T

19   HAVE THE CASE IN FRONT OF ME, YOUR HONOR.

20       THE COURT:  THIS IS JUST LIKE THE 7-TRACK THING THAT

21   WE WERE TALKING ABOUT EARLIER.  THIS IS AN ALBUM, AND THERE

22   WERE MULTIPLE SONGS ON THE ALBUM.  AND THERE WAS EVIDENCE THAT

23   WAS ALLOWED IN TO SAY HOW MUCH OF THE PROFITS WERE ATTRIBUTABLE

24   TO THE SONG.  BECAUSE IT WAS, LIKE, THE LEAD SONG -- YOU HAVE

25   SEVEN OR EIGHT SONGS ON A RECORD, AND ONE SONG IS THE LEAD

1    SONG, AND THAT'S THE REASON WHY EVERYONE BOUGHT THE ALBUM.

2        THAT'S NOT WHAT WE HAVE HERE.

3        AT LEAST WHEN WE'RE TALKING ABOUT THE DOLLS, THE

4    PROTECTABLE ELEMENTS THAT THE COURT IDENTIFIED YESTERDAY ARE SO

5    INEXTRICABLY INTERTWINED INTO THE DOLLS.  IF THIS JURY FINDS --

6    AND IT'S A BIG "IF," IT'S A HUGE "IF," BECAUSE YOU MAY VERY

7    WELL CONVINCE THIS JURY THAT EITHER, A, THERE'S NOT SUBSTANTIAL

8    SIMILARITY BETWEEN THE DRAWINGS AND THE DOLLS, FOR ALL OF THE

9    REASONS THAT MS. AGUIAR WAS JUST CITING, OR, IF THERE IS

10   SUBSTANTIAL SIMILARITY, PERHAPS WE DO GET INTO AN INDEPENDENT

11   CREATION.

12       LIKE I SAY, I HAVE NOT SEEN A LOT OF EVIDENCE.  I

13   MEAN, THERE IS THE REFERENCE TO MARGARET LEAHY, AND WE'LL SEE

14   HOW THAT PLAYS OUT.

15       BUT ASSUMING THAT WE GET TO THAT POINT, AT LEAST WITH

16   RESPECT TO THE DOLLS THAT WE SAW UP THERE, THE PROTECTABLE

17   ELEMENTS ARE SO INEXTRICABLY INTERTWINED WITH THE DOLLS THAT

18   THAT KIND OF APPORTIONMENT IS NOT GOING -- LET ME JUST FINISH

19   HERE.  THIS IS ALL -- YOU HAD TEN HOURS; I HAD LESS THAN THAT,

20   SO I'M STILL WORKING THIS OUT MYSELF.

21       BUT WHERE I DO SEE A BIGGER ISSUE IS RESPECT TO SOME

22   OF THE PRODUCTS, MOST NOTABLY THE ONE THAT MR. KENNEDY HELD UP

23   YESTERDAY, THE SOFA, FOR EXAMPLE -- I REMEMBER SEEING THE TENT

24   UPSTAIRS -- THERE'S SOME OF THESE PRODUCTS, AND MAYBE A GOOD

25   NUMBER OF THESE PRODUCTS, WHERE I DON'T THINK YOU CAN QUITE

1    REACH THE CONCLUSION OF THE CASES THAT MR. ZELLER TALKS ABOUT

2    BEING INEXTRICABLY INTERTWINED.  AND THAT POSES A DIFFERENT

3    QUESTION.

4         HOWEVER, MR. ZELLER'S RESPONSE TO THAT, WHICH I'D

5    LIKE YOU TO ADDRESS, IS THAT THESE ARE THE LICENSEE CASES AND

6    THESE ARE NOT PROFITS THAT MATTEL IS GOING AFTER; SO MAYBE IT

7    IS OF NO MOMENT, BECAUSE THAT'S NOT INCLUDED IN MR. WAGNER'S

8    DAMAGE CALCULATION.  THEY ARE BASICALLY EXCLUDING THAT

9    ALTOGETHER.

10        MR. ROTH:  THERE'S TWO QUESTIONS IN THERE, BUT I'D

11   LIKE TO ADDRESS THAT.

12        FIRST, WITH RESPECT TO THE LICENSEE -- LET ME ANSWER

13   YOUR DIRECT QUESTION -- THERE'S ACTUALLY THREE CATEGORIES OF

14   PRODUCTS THAT WE'RE TALKING ABOUT HERE.  THERE ARE -- ROUGHLY

15   SPEAKING, THERE ARE THE DOLLS, THE FOUR CHARACTERS, AND THEN

16   THE ADDITIONAL CHARACTERS.  THERE'S WHAT IS CALLED

17   BRATZ-BRANDED MERCHANDISE.  IT'S ACTUALLY MERCHANDISE THAT MGA

18   HAS MANUFACTURED AND SOLD THAT HAS A RELATIONSHIP OF SOME SORT,

19   TO BE DETERMINED IN THIS CASE, TO THE BRATZ BRAND.  THEN

20   THERE'S LICENSED GOODS.  THAT'S A SMALLER CATEGORY.  AND THEY

21   HAVE TALKED A LOT ABOUT IT.  BUT IN TERMS OF THE OVERALL

22   PROFITS OF THIS SORT OF INDIRECT PROFITS CATEGORY, IT'S

23   ACTUALLY QUITE SMALL.

24        OUR INDIRECT PROFITS WILL BE DIRECTED PRIMARILY AT

25   THIS.  BRATZ-BRANDED MERCHANDISE, SORT OF THE TERM WE USE,

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    WOULD BE -- YOU KNOW, YOU MIGHT HAVE SPORTING GOODS OR A SOFA.

2    THAT'S NOT ALL LICENSED GOODS.  MOST OF IT IS NOT LICENSED

3    GOODS.

4        THE COURT:  THEN MAYBE THE DIVISION IS NOT AS EASY AS

5    MR. ZELLER SUGGESTED.

6        WITH RESPECT TO THOSE PRODUCTS, I GUESS I DO

7    UNDERSTAND YOUR ARGUMENT THAT SOMEHOW, THERE, SOME KIND OF

8    APPORTIONMENT IS PROBABLY GOING TO HAVE TO GO ON.

9        MR. ROTH:  CAN I ADDRESS THE DOLL QUESTION?

10       THE COURT:  YES.

11       MR. ROTH:  AT THE END OF THE DAY, WHAT WE HAVE IS A

12   GIRL AND HER MOM OR A BOY AND HIS FATHER STANDING IN THE AISLE,

13   LOOKING AT A PACKAGE, BUYING IT.  THAT'S THE PRICE THEY PAY.

14   PROFITS ARE GENERATED OFF OF THAT TRANSACTION.

15       THE COURT:  RIGHT.

16       MR. ROTH:  IT IS NOT A PLASTIC DOLL.  IT IS A VARIETY

17   OF THINGS.  IT IS A PACKAGE.  IT IS THE FACT THAT THEY GOT

18   THERE IN THE FIRST PLACE BECAUSE OF BRANDING, PROMOTIONAL

19   ADVERTISING, ALL OF THAT WORK.  IT IS OTHER THINGS IN THE

20   PACKAGE.  IT'S ACCESSORIES.

21       THE COURT:  I UNDERSTAND YOUR ARGUMENT.

22       DO YOU HAVE ANY AUTHORITY ON THIS?  BECAUSE, LIKE,

23   FOR EXAMPLE, IN THREE BOYS MUSIC, WHICH DOES NOT STAND FOR THE

24   PROPOSITION THAT YOU JUST SUGGESTED A FEW MOMENTS AGO, YOU'RE

25   DEALING WITH A RECORD; AND I ASSUME THAT IN THAT RECORD, THERE

1  IS A RECORD ALBUM.  WE REMEMBER BACK IN THE '70S THAT RECORD

2  ALBUMS, ART, THAT WAS A BIG DEAL.  AND THAT'S NOT CONSIDERED

3  HERE.  ALL THAT IS CONSIDERED IS THE SONG, WHICH IS AT THE CORE

4  OF WHAT IS BEING PURCHASED.

5       HERE, THE CORE OF WHAT IS BEING PURCHASED IS THE

6  DOLL.  THE DOLL IS CERTAINLY INEXTRICABLY INTERTWINED WITH

7  EVERYTHING SURROUNDING THE DOLL.

8       IF THERE ARE CASES WHICH SUGGEST THAT IN A SITUATION

9  WITH A PRODUCT LIKE THIS, THAT WE HAVE TO SOMEHOW SEVER OUT OR

10  APPORTION OUT FOR DAMAGES PURPOSES, I NEED TO SEE THAT

11  AUTHORITY; BECAUSE OTHERWISE, I'M NOT BUYING THIS ARGUMENT.

12       MR. ROTH:  YOUR HONOR, I CERTAINLY WON'T MAKE UP

13  SOMETHING.  THERE ISN'T -- FIRST, JUST TO -- WE HAVE NOW FOUND

14  IT.  I APOLOGIZE.

15       AT PAGE 487 OF THE THREE BOYS MUSIC, THERE'S A

16  PARAGRAPH THAT STARTS, "SONY MUSIC PRESENTED EVIDENCE THAT

17  MICHAEL BOLTON'S" -- THE LAST SENTENCE -- "THE JURY FOUND

18  28 PERCENT OF THE ALBUM'S PROFITS DERIVED FROM THE SONG AND

19  66 PERCENT OF THE SONG'S PROFIT RESULTED FROM THE INFRINGING

20  ELEMENTS."

21       THE COURT:  I SEE THAT.

22       MR. ROTH:  I APOLOGIZE THAT I DIDN'T HAVE THAT IN

23  FRONT OF ME WHEN I CAME TO THE LECTERN.

24       THE COURT:  VERY GOOD, COUNSEL.

25       MR. ROTH:  IN TERMS OF THE QUESTION THAT WE WERE LAST

1    ADDRESSING, NEITHER SIDE HAS BEEN ABLE TO FIND A CASE INVOLVING

2    A CONSUMER PRODUCT LIKE THIS.  I THINK AN APT EXAMPLE WOULD BE

3    A MOVIE -- WE CITED A NUMBER OF THOSE CASES -- WHERE YOU HAVE A

4    SCREENPLAY.  IT'S THE STORY OF THE MOVIE.  THAT MOVIE DOES NOT

5    EXIST WITHOUT THE STORY.  IF IT'S A DIFFERENT SCREENPLAY, IT'S

6    A DIFFERENT STORY.  IF IT'S A DIFFERENT DRAWING, IT'S A

7    DIFFERENT DOLL.

8         NEVERTHELESS, IN THAT CONTEXT, IN A VARIETY OF CASES

9    THAT WE'VE CITED TO YOUR COURT, THE COURT LOOKS AT NOT JUST THE

10   ROLE OF THE SCREENPLAY PLAYED, BUT ALSO THE ROLE OF THE

11   DIRECTOR, THE ACTORS, EVEN THE PROMOTIONAL EFFORTS ASSOCIATED

12   WITH THE MOVIE.  ALL OF THOSE THINGS ARE TAKEN INTO ACCOUNT IN

13   THE CONTEXT OF DETERMINING THE PROFITABILITY OF THE MOVIE AND

14   APPORTIONING PROFITS BETWEEN THE ALLEGED INFRINGER AND THE

15   COPYRIGHT HOLDER.

16        THE COURT:  COULD I SEE THE DOLL YOU HAVE IN FRONT OF

17   YOU.

18        I ASKED YESTERDAY FOR FOUR ORIGINAL DOLLS, AND I'M

19   HOPING THAT SOMEBODY GETS THOSE TO ME AT SOME POINT IN TIME.

20        MR. NOLAN:  I THOUGHT --

21        THE COURT:  IF THE PARTIES WANT ME TO HEAR THIS

22   CASE -- I'VE ASKED FOR THAT.  I REALLY WANT THOSE.

23        DO WE HAVE THEM?

24        MS. AGUIAR:  RIGHT HERE.

25        THE COURT:  THANK YOU.

1      LET ME SEE THE ONE THAT YOU HAVE THERE TOO.

2      MS. AGUIAR:  FOR THE RECORD, THIS IS EXHIBIT 17582.

3      MR. ROTH:  YOUR HONOR, IF I MIGHT.  I HAVE ANOTHER

4   EXAMPLE WHICH COULD BE HELPFUL.

5      THE COURT:  PLEASE.

6      MR. ROTH:  EXHIBIT 17369.

7      THE COURT:  HOW DID THE JURY -- WHAT WAS THE EVIDENCE

8   IN THREE BOYS THAT ALLOWED THE JURY TO SPLICE UP THE SONG INTO

9   THIRDS?

10      MR. ROTH:  IF YOU LOOK AT PAGE 486, THE BOTTOM

11   PARAGRAPH THERE, THERE APPEARS TO HAVE BEEN EXPERT TESTIMONY

12   REGARDING THE VARIOUS ELEMENTS OF THE SONG.

13      THE COURT:  SO THEY BROKE THE ESSENTIAL ELEMENTS DOWN

14   INTO TITLE, BOOK, CHORUS, AND PITCHES, MUCH THE WAY THE COURT

15   HAS ESTABLISHED THE ELEMENTS OF THE DOLL ITSELF.

16      MR. ROTH:  YOUR HONOR, JUST TO BE CLEAR, IN OUR

17   APPROACH TO APPORTIONMENT, WE TAKE THE DOLL, WHICH WE VIEW AS

18   THE PLASTIC, AND WE SORT OF VIEW THAT AS A WHOLE FOR THE

19   PURPOSES OF APPORTIONMENT.

20      THE COURT:  SO WE'RE ALL ON THE SAME PAGE ON THAT.

21   THE DOLL -- WE CAN'T BREAK THE DOLL.

22      MR. ROTH:  YEAH.

23      THE COURT:  YOU'RE LOOKING AT PACKAGING AND ELEMENTS

24   LIKE THAT.

25      SO I GUESS THE QUESTION I HAVE -- AND THAT'S WHY I

1    WANTED TO LOOK AT THESE -- IS -- IT'S A SIMPLER CASE TO RESOLVE

2    A FIRST GENERATION BRATZ.  HERE, YOU LOOK AT THE PACKAGING

3    THERE, AND BESIDES THE DOLL AND THE ACCESSORIES, WHICH ARE

4    PROTECTABLE ELEMENTS, ALL YOU HAVE HERE, THAT I CAN SEE, IS THE

5    BRATZ LOGO, WHICH IS MATTEL'S; THE HERO SHOT, WHICH IS

6    MATTEL'S; THE NAME, WHICH IS MATTEL'S.  THERE'S NOTHING REALLY

7    IN THIS PACKAGING THAT'S NOT INEXTRICABLY INTERTWINED WITH

8    MATTEL'S WORK.

9          MR. ROTH:  THERE'S THE PACKAGE.

10          I DON'T MEAN TO BE FLIP.

11          THE COURT:  YOU'RE TALKING ABOUT THE PHYSICAL

12    PACKAGE.

13          MR. ROTH:  THE PHYSICAL PACKAGE.

14          THE COURT:  THAT IT'S NOT QUITE A SQUARE; THAT IT'S

15    ALMOST IN A PYRAMIDAL SHAPE.

16          MR. ROTH:  EXACTLY.  WE WILL PRESENT EVIDENCE FROM

17    MATTEL --

18          THE COURT:  ON THE BACK -- MR. NOLAN GAVE ME THE

19    TURNAROUND SIGNAL, BUT, AGAIN, YOU HAVE FOUR DRAWINGS, THE

20    BRATZ LOGO -- THIS PACKAGE SEEMS TO BE MORE -- I'M NOT GOING TO

21    PRECLUDE NOW THAT IT'S INEXTRICABLY INTERTWINED WITH

22    COPYRIGHTED MATERIAL, OR ALLEGEDLY COPYRIGHTED MATERIAL.  YOU

23    GET TO "TOKYO A GO-GO," AND THE QUESTION BECOMES A LITTLE

24    DIFFERENT, PERHAPS.

25          THAT'S GOING TO BE A DIFFICULT ROAD TO NAVIGATE WITH

1    THE 910 EXHIBITS, PRODUCTS, THAT WE HAVE.

2         HOW DO YOU PROPOSE WE DO IT?

3         MR. ROTH:  LET ME GIVE YOU AN EXAMPLE OF THE TYPE OF

4    EVIDENCE THAT WE WOULD PRESENT.

5         THE COURT:  RIGHT.

6         MR. ROTH:  THIS, YOUR HONOR, IS SOMETHING CALLED A

7    MONTHLY BRAND TRACKING REPORT.  IT IS PRODUCED BY MATTEL;

8    THAT'S A WITNESS ON OUR WITNESS LIST NEXT WEEK.  THESE ARE

9    STUDIES DONE BY MATTEL EVERY MONTH, FOR A TWO-, THREE-YEAR

10   PERIOD.

11        WHAT WE'LL SEE IS MATTEL, AND TO A LESSER EXTENT MGA,

12   BECAUSE IT JUST HAS LESS RESEARCH CAPABILITY, WAS FOCUSED ON

13   THE IMPORTANCE OF A VARIETY OF ELEMENTS OF THE DOLL.  SO YOU'LL

14   SEE THE THIRD ELEMENT IS, "IT'S PRETTIER THAN OTHER DOLLS."

15   THAT'S, WE WOULD ARGUE, RELEVANT TO WHAT THE DOLL ITSELF LOOKS

16   LIKE.  BUT THEN YOU'LL LOOK AT THE FOURTH, "CLOTHES THAT YOU

17   MOST WANT TO WEAR."  "FASHIONS."  THEY ASKED A SET OF GIRLS --

18   AND THIS IS A COMPARISON BETWEEN, AS YOU CAN SEE OVER ON THE

19   RIGHT, BRATZ AND MYSCENE BARBIE.  SO THIS IS DOING WHAT A

20   COMPANY WOULD DO; THEY'RE TRYING TO DETERMINE THE RELATIVE

21   IMPORTANCE OF WHY SOMETHING IS SUCCEEDING AND WHY IT'S NOT.

22   THAT'S WHAT A COMPANY WOULD DO.

23        LOOK AT THE SIXTH -- "COMES WITH BETTER" -- THAT'S

24   ACCESSORIES.

25        NOW, YOU'VE HEARD --

1        THE COURT:  EXPLAIN, COUNSEL, HOW THIS IS RELEVANT TO

2    THE COPYRIGHT ISSUES.

3        MR. ROTH:  IT IS RELEVANT TO WHAT BOTH COMPANIES

4    THOUGHT WERE THE REASONS FOR THE SUCCESS OF THE BRATZ DOLLS, OF

5    FASHION DOLLS, OF FASHION DOLLS IN GENERAL, BECAUSE WE HAVE

6    MYSCENE BARBIE AND BRATZ, AND THEN WE HAVE A FOCUS ON BRATZ.

7        THE COURT:  THERE'S NO QUESTION -- I UNDERSTAND THIS

8    IS A DYNAMIC PROCESS, AND THERE'S TINKERING THAT GOES ON WITH

9    THE DOLLS AND THE DOLL FASHIONS AND THE DOLL PRESENTATIONS AND

10   THE PACKAGING.  BUT AT CORE IS A DOLL THAT HAS REMAINED

11   ESSENTIALLY UNCHANGED, AS I UNDERSTAND IT, FOR THE BETTER PART

12   OF THE LAST SEVEN OR EIGHT YEARS.

13       MR. ROTH:  IT'S JUST A MATTER OF HOW YOU DEFINE THE

14   DOLL.  WHAT HAS REMAINED UNCHANGED IS THE SCULPT, GENERALLY

15   SPEAKING.  WHAT HAS CHANGED DRAMATICALLY, AFTER WHAT WE CALL

16   THE FIRST GENERATION, IS THE WAY THE SCULPT IS PAINTED.  THE

17   CLOTHES ON THE SCULPT CHANGED CONSTANTLY.  IT'S JUST LIKE

18   CALVIN KLEIN.  THEY NEED TO SELL NEW FASHIONS EVERY YEAR.

19       THE COURT:  YOU'RE GOING TO HAVE TO CONVINCE THIS

20   JURY THAT -- I'M LOOKING AT A FIRST GENERATION AND I'M LOOKING

21   AT TOKYO A GO-GO -- YOU'RE GOING TO HAVE TO CONVINCE A JURY,

22   BECAUSE YOU'D HAVE A HARD TIME CONVINCING ME, THAT THE FACE

23   PAINTING HAS CHANGED DRAMATICALLY, THAT THE PROTECTABLE

24   ELEMENTS THAT I IDENTIFIED YESTERDAY HAVE CHANGED DRAMATICALLY

25   BETWEEN THOSE TWO DOLLS.

1    THAT'S YOUR POSITION, IS THAT THE EYES, THE

2    PARTICULARIZED EYES IN MY RIGHT HAND, THE FIRST GENERATION, AND

3    THE PARTICULARIZED EYE IN THE TOKYO A GO-GO HAVE CHANGED

4    DRAMATICALLY?

5        MR. ROTH:  WE WOULD FOCUS ON THE COLOR OF THE SKIN.

6        THE COURT:  I JUST RULED YESTERDAY THAT COLOR OF THE

7    SKIN IS A NONPROTECTABLE ELEMENT, SO YOU'RE NOT GOING TO FOCUS

8    ON THAT AT ALL.  IT'S NOT PROTECTABLE.  IT'S OUTSIDE.

9        MR. ROTH:  I UNDERSTAND THAT.

10       THE COURT:  NO.  ANSWER MY QUESTION, COUNSEL.  YOU

11   JUST TOLD ME IT CHANGED DRAMATICALLY.

12       LET'S IDENTIFY A PROTECTABLE ELEMENT.

13       HAS IT CHANGED DRAMATICALLY?  BECAUSE I DON'T SEE IT.

14   MAYBE THE JURY WILL.  I'M NOT RULING ON IT.  THE JURY HAS TO.

15   BUT YOUR CONTENTION IS, THE EYES HAVE CHANGED DRAMATICALLY.

16       MR. ROTH:  YOUR HONOR, I CANNOT IDENTIFY FOR YOU

17   PROTECTABLE ELEMENTS THAT HAVE CHANGED DRAMATICALLY.

18       THE COURT:  THAT'S WHAT'S RELEVANT.

19       MR. ROTH:  THE QUESTION IS, WHY DID THEY BUY THE

20   DOLL?  FOR THE PURPOSES OF DETERMINING DAMAGES, THAT'S THE

21   QUESTION.

22       SO IF SOMETHING NONPROTECTABLE CHANGED, AND IF THE

23   NONPROTECTABLE ELEMENT IS THE REASON WHY THEY BOUGHT THE DOLL,

24   THAT'S RELEVANT TO APPORTIONING PROFITS.

25       LET'S SAY HYPOTHETICALLY, THE REASON THEY BUY OUR

1    DOLLS HAS NOTHING TO DO WITH THE DOLLS; IT'S THE GREAT

2    PACKAGING.  WE GET A CHANCE TO PROVE THAT.

3         THE COURT:  I WANT TO HEAR A RESPONSE TO THAT.  I

4    UNDERSTAND THAT ARGUMENT.

5         WE'VE GOTTEN INTO A DIFFERENT ARGUMENT THAT YOU HAVE

6    NOT YET ADDRESSED, MR. ZELLER.

7         MR. ZELLER:  YES, I THINK WE HAVE; AND I THINK THERE

8    ARE REALLY TWO GLOBAL ISSUES THAT ARE ON THE TABLE.

9         ONE HERE IS THE LAST ONE THAT WE WERE DISCUSSING.

10   AND TO SAY THAT IT IS RELEVANT, WHY IT IS THAT CONSUMERS

11   WERE -- LET ME FIRST SAY THAT WHEN THEY PUT A DOCUMENT UP LIKE

12   THIS, IN SOME WAYS, I THINK WE PROBABLY HOPE THAT THIS STUFF

13   COMES IN, BECAUSE MR. ROTH ADMITTED THAT THEY ARE NOT DISPUTING

14   THAT THE DOLL IS SOMETHING -- THAT THE DESIGN IS SO INTERTWINED

15   THAT YOU CAN'T PARSE IT OUT.

16        SO WHY IT IS THAT PEOPLE ARE -- THE MOTIVATIONS FOR

17   PEOPLE BUYING THE DOLLS IS REALLY BESIDE THE POINT.  ALL OF

18   THAT CANNOT BE APPORTIONED.  IT'S IRRELEVANT.

19        THE COURT:  WHAT ABOUT THIS ARGUMENT THAT THE

20   NONPROTECTABLE ELEMENTS ARE WHAT'S -- AND CHANGES TO THE

21   NONPROTECTABLE ELEMENTS ARE WHAT'S DRIVING THE SALES OF THE

22   DOLLS?

23        MR. ZELLER:  FIRST OF ALL, IT IS A MATTER OF

24   COPYRIGHT LAW.  THAT'S COMPLETELY IRRELEVANT.  THAT'S, IN FACT,

25   THOSE CASES -- JUST TO -- AS THE FIRST PRINCIPLE THAT LED US

1    OFF ON ALL OF THIS. IT DOESN'T MATTER HOW MUCH OF THEIR WORK

2    THEY HAVE KIND OF OVERLAID OVER MATTEL'S WORK. WHAT MATTERS IS

3    THE AMOUNT OF OUR WORK THAT IS TAKEN.

4        SO TO FOCUS ON THEIR NONPROTECTABLE ELEMENTS,

5    FOCUSING ON THEIR WORK, IS EXACTLY THE WRONG INQUIRY, THE EXACT

6    WRONG INQUIRY, AS THE NINTH CIRCUIT HAS SAID MANY TIMES IN THE

7    CASES WE QUOTE. MR. ROTH IS DOING EXACTLY WHAT CAUSES US

8    CONCERN, THAT THIS JURY, AFTER MGA IS DONE WITH THEM, IS GOING

9    TO THINK THAT THEIR PURPOSE, THEIR AGENDA, IS TO COMPARE

10   NONPROTECTABLE ELEMENTS. DID THOSE THINGS CHANGE OVER TIME?

11   HOW MUCH?

12       THE COURT: THAT'S THE FILTERING THAT'S CALLED BY THE

13   NINTH CIRCUIT. I UNDERSTAND THAT, IN TERMS OF COPYRIGHT

14   INFRINGEMENT.

15       BUT LET'S LOOK AT DAMAGES IN THE THREE BOYS CASE,

16   WHERE THE COURT DID ULTIMATELY UPHOLD -- WHEN I READ IT QUICKLY

17   THIS MORNING, I DIDN'T CATCH THAT LAST LINE; THAT 66 PERCENT OF

18   THE SONG'S PROFITS RESULTED FROM INFRINGING ELEMENTS. IT DOES

19   SEEM THAT THEY BROKE DOWN THE SONG ITSELF AND ATTRIBUTED THE

20   PROFITS TO INFRINGING ELEMENTS AND NONINFRINGING ELEMENTS IN

21   THE WAY THAT MR. ROTH IS SUGGESTING THAT I SHOULD BREAK DOWN --

22   TO THE EXTENT THAT WE CAN BREAK DOWN -- AND THAT MAY BE THE

23   ANSWER TO THE QUESTION, MY OWN QUESTION -- TO THE EXTENT THAT

24   WE CAN BREAK DOWN PACKAGING.

25       NOW, I LOOK AT THE PACKAGING, PARTICULARLY IN FIRST

1   GENERATION, AND IT'S PERMEATED WITH WHAT THE JURY HAS NOW

2   CONSIDERED TO BE MATTEL'S PROPERTY.  BUT THE SUGGESTION

3   IS --AND I SUSPECT WE'RE GOING TO AT LEAST HAVE PROFFERED

4   TESTIMONY -- THAT THE WAY THAT THE ACTUAL BOX IS DESIGNED --

5   I'M SURE THERE'S THINGS I'M JUST NOT SEEING THAT ALSO GO INTO

6   THIS -- ACCOUNTS FOR SOME OF THAT PROFIT, AND, THEREFORE, THERE

7   SHOULD BE EVIDENCE OF THAT SO THAT THE JURY CAN MAKE THE

8   PERCENTAGE CALCULATION THAT WAS DONE IN THREE BOYS.

9        MR. ZELLER:  THERE'S NO AUTHORITY FOR THAT

10   PROPOSITION, YOUR HONOR, SIMPLY NONE, THAT MR. ROTH WAS

11   ADVOCATING, WHICH IS THAT SOMEHOW YOU LOOK AT THE PACKAGING AND

12   DECIDE -- PEOPLE -- '20 PERCENT OF THE PURCHASE DECISION IS

13   BECAUSE I LIKED THE PLASTIC THAT THE INFRINGING PRODUCT IS IN.'

14        THEY ARE ALLOWED TO CERTAINLY DEDUCT THE COST THAT

15   THEY HAD TO PUT INTO IT.  BUT MOTIVATION UNDER THESE

16   CIRCUMSTANCES IS NOT EVEN REMOTELY THE INQUIRY.  IT IS AN

17   INFRINGING PRODUCT.

18        AND THE COURT DID, I THINK, ANSWER ITS OWN QUESTION.

19   I MEAN, WHAT MATTERS TO -- LET'S MOVE BEYOND PACKAGING FOR A

20   MOMENT, BECAUSE THERE'S A SLIGHTLY DIFFERENT CONSIDERATION, I

21   THINK, THAT'S GOING ON THERE TOO.  BUT WHEN THE COURT IS

22   TALKING ABOUT -- AND MR. ROTH RAISED THIS IDEA OF A DOLL IN

23   PACKAGING WITH ACCESSORIES.  I MEAN, ALL OF THAT STUFF IS

24   INTERTWINED.  THAT IS JUST -- THAT'S EXACTLY THE KINDS OF CASES

25   WE WERE DISCUSSING AND THAT WE CITE IN OUR BRIEF, WHERE -- NO

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    ONE BUYS SEPARATELY, OR WOULD BE BUYING SEPARATELY, THE LITTLE

2    PARTICULAR ACCESSORY THAT'S INSIDE OF THE PACKAGING.  IT GOES

3    WITH THE DOLL.  THE SAME THING IS TRUE OF THOSE FASHIONS.  YOU

4    DO NOT SELL FASHIONS INDEPENDENT OF THE DOLL.

5         SO, I MEAN, THEY ARE PROVING OUR VERY POINT:  THESE

6    THINGS ARE INEXTRICABLY INTERTWINED.  AND JUST BECAUSE YOU PUT

7    OTHER THINGS IN THERE, TECHNICALLY WHETHER THEY'RE INFRINGING

8    OR NOT INFRINGING, IT DOES NOT GET YOU APPORTIONMENT.  IT IS A

9    THING.  IT IS A THING THAT IS INEXTRICABLY INTERTWINED THAT

10   YOU'RE NOT ALLOWED TO APPORTION.

11        THEY'RE ACTUALLY CONFUSING, I THINK, TWO VERY, VERY

12   DIFFERENT CONCEPTS.  ONE IS, FROM THE DESIGN PERSPECTIVE, WHAT

13   REALLY MATTERS?  WHAT MATTERS IS, IS THERE AN INFRINGEMENT?

14   AND ANYTHING THAT'S BOUND UP IN THAT INFRINGEMENT, WE GET THE

15   PROFITS FROM.

16        THAT'S POINT ONE.

17        POINT TWO IS -- THEN THEY'RE TRYING TO SAY, 'WELL,

18   OKAY, SURE, THERE ARE LOTS OF REASONS WHY PEOPLE BUY THESE

19   INFRINGING PRODUCTS, BECAUSE THEY LOVE THE PLASTIC,' AS HE WAS

20   USING IN THE EXAMPLE.  BUT THIS IS AGAIN PRECISELY WHY WE'RE SO

21   CONCERNED.  TO HAVE THE JURY HEARING THAT SORT OF THING, IT

22   MAKES THEM THINK THAT THEY'RE GOING TO HAVE TO MAKE SOME

23   DETERMINATION AS TO, 'THE PARTICULAR KIND OF PLASTIC THAT MGA

24   WAS USING, WAS THAT DRIVING THE DOLL SALES AS OPPOSED TO THE

25   DOLLS?'

1        THAT'S AN IRRELEVANT INQUIRY, FROM OUR PERSPECTIVE.

2        THE COURT:  CIRCLING BACK TO MS. AGUIAR'S POINT ON

3   INDEPENDENT CREATION AND ORIGINALITY.

4        MR. ZELLER:  YES, YOUR HONOR.

5        NUMBER ONE, THAT DEFENSE HAS BEEN WAIVED.  IT IS AN

6   AFFIRMATIVE DEFENSE.  IT WAS NEVER PLED, AND IT WAS NEVER

7   ASSERTED IN THE FINAL PRETRIAL CONFERENCE ORDER.  MGA SUBMITTED

8   JURY INSTRUCTIONS, WHICH I BELIEVE IS THE FIRST TIME -- AND WE

9   OBJECTED.  THERE IS NO INDEPENDENT CREATION DEFENSE.  THAT HAS

10  BEEN PLED AND IT'S BEEN WAIVED.  IT JUST FAILS AS A LEGAL

11  MATTER, RIGHT THEN AND THERE.

12       NUMBER TWO -- AND THE COURT HAS ALREADY MENTIONED

13  THIS -- THE FACT IS, IT IS LEGALLY IMPOSSIBLE FOR THEM, GIVEN

14  THEIR OWN TESTIMONY TO-DATE, TO ASSERT AN INDEPENDENT CREATION

15  DEFENSE.

16       THE COURT:  WHAT ABOUT MARGARET LEAHY'S TESTIMONY

17  THAT THIS HAD NOTHING TO DO WITH THE DRAWINGS?

18       MR. ZELLER:  HONESTLY, FIRST OF ALL, AT A BARE

19  MINIMUM, WE HAVE MGA AND CARTER BRYANT TESTIMONY EXACTLY TO THE

20  CONTRARY.  SO, I MEAN, WE CAN START WITH WHETHER OR NOT IT EVEN

21  MATTERS WHAT SHE HAS SAID.

22       BUT MY UNDERSTANDING -- AND MR. PRICE COULD PROBABLY

23  GIVE BETTER DETAILS, BECAUSE HE SEEMS TO HAVE A BETTER MEMORY

24  OF IT THAN I DO.  MR. PRICE DIDN'T THINK THAT IT WAS BEING

25  ACCURATELY CHARACTERIZED AS TO WHAT HER TESTIMONY IS.

1        BUT IN ANY EVENT, HERE'S THE PROBLEM WITH ANY

2    INDEPENDENT CREATION DEFENSE:  THE TYPICAL SITUATION, AS THE

3    COURT IS AWARE, WHERE INDEPENDENT CREATION COMES UP IS -- YOU

4    KNOW, YOU'VE GOT, MAYBE, A LARGE COMPANY.  THEY HAVE MULTIPLE

5    DEPARTMENTS.  SOMEONE DROPS OFF A SCRIPT AT A STUDIO,

6    DEPARTMENT A.  SO TECHNICALLY, THE CORPORATION HAS ACCESS.

7    MEANWHILE, IN SOME OTHER GROUP, PEOPLE ARE WORKING ON A SCRIPT,

8    AND THEN SIMILARITIES ARISE.

9        THE COURT:  YOU DON'T NEED TO HAVE A BIG COMPANY TO

10   HAVE AN INDEPENDENT CREATION.  IT COULD BE A SMALL COMPANY.  IT

11   COULD BE THE SIZE OF MGA.  AND IF SOMEBODY ELSE AT MGA HAD

12   INDEPENDENTLY CREATED THIS DOLL, WITHOUT INCORPORATING INTO IT,

13   AND USING AS A REFERENCE POINT THE CARTER BRYANT DRAWINGS, THEN

14   THAT WOULD BE INDEPENDENT CREATION.

15       MR. ZELLER:  THIS IS WHERE I HAVE DIFFICULTY

16   UNDERSTANDING MGA'S ARGUMENT, BECAUSE IF YOU'RE USING

17   SOMEBODY'S WORK, THE WORK THAT HAS BEEN INFRINGED, IF THE ONE

18   IS THE SUBJECT OF THE INFRINGEMENT CLAIM, IF IT'S BEING USED AS

19   A REFERENCE, BY DEFINITION, THAT IS NOT INDEPENDENT CREATION.

20   INDEPENDENT CREATION IS WHERE YOU'VE DONE IT ON YOUR OWN.

21       THE COURT:  IF IT WASN'T BEING USED AS A REFERENCE.

22       MR. ZELLER:  OH, I APOLOGIZE.  I MISUNDERSTOOD.

23       THE COURT:  IF IT WAS NOT BEING USED AS A REFERENCE,

24   IF SOMEBODY AT MGA HAD CREATED IT, OR EVEN A COMPANY SMALLER

25   THAN MGA -- IT DOESN'T TURN ON THE SIZE OF THE COMPANY -- BUT

1    YOU'RE RIGHT, THAT'S WHERE IT NORMALLY COMES UP IN REAL LIFE.

2        MR. ZELLER:  RIGHT.  AND THAT'S PRECISELY MY POINT.

3        THEY HAVE ADMITTED -- WE SAW IT IN HONG KONG

4    PLEADINGS; USED AS A REFERENCE; WE HEARD IT FROM MR. LARIAN

5    YESTERDAY.  THEY WANT TO DANCE AROUND WITH THE WORD

6    "INSPIRATION" -- ONE CAN DEBATE, I GUESS, THE NUANCES OF THAT,

7    BUT WHATEVER IT MEANS, IT CERTAINLY DOES NOT MEAN INDEPENDENT

8    CREATION.  SO I THINK FACTUALLY -- AND I THINK THE COURT IS

9    ACTUALLY RIGHT.  I MEAN, THE NEXT STEP ON ANY ATTEMPT TO ASSERT

10   AN INDEPENDENT CREATION DEFENSE, EVEN IF THE COURT IS GOING TO

11   ALLOW IT, DESPITE THE RATHER, I THINK, DISPOSITIVE LEGAL

12   DEFECTS IN HAVING FAILED TO PLEAD IT OR PRESERVE IT IN THE

13   FINAL PRETRIAL CONFERENCE ORDER, WOULD BE AN EVIDENTIARY

14   HEARING; BECAUSE I THINK THE COURT'S SURMISE IS ABSOLUTELY

15   CORRECT, THAT IT IS NOT EVEN GOING TO BE FEASIBLE FOR THEM

16   FACTUALLY TO MOUNT AN INDEPENDENT CREATION DEFENSE.  I MEAN,

17   WHAT HAS BEEN DESCRIBED IS THIS WHOLE PROCESS.  AND THERE'S

18   CERTAINLY AMPLE EVIDENCE THAT -- I MEAN, NOTWITHSTANDING, I

19   SUPPOSE, THEIR CHARACTERIZATION OF WHAT MARGARET LEAHY SAID --

20   I DO THINK IT'S AN INCORRECT CHARACTERIZATION.  WE CAN GO BACK

21   AND LOOK AT IT.

22       THE COURT:  YOUR ARGUMENT THAT IT'S AN AFFIRMATIVE

23   DEFENSE, THAT'S SOMEWHAT UNDERCUT BY THE LANGUAGE IN THE CASES

24   WHICH, AS MS. AGUIAR POINTS OUT -- IS THAT THIS IS JUST PART OF

25   THE COMMON BURDEN-SHIFTING THAT TAKES PLACE IN THE CONTEXT OF

1    COPYRIGHT INFRINGEMENT CASES, AS OPPOSED TO -- I MEAN, THERE'S

2    OTHER INSTANCES IN EMPLOYMENT LAW AND OTHER AREAS WHERE THAT

3    KIND OF BURDEN-SHIFTING GOES ON, THAT -- I'M GOING OUT ON A

4    LIMB HERE, BUT I DON'T SEEM TO RECALL A REQUIREMENT THAT THE

5    AFFIRMATIVE DEFENSE BE ACTUALLY PLED IN ADVANCE OF TRIAL.  I

6    MAY BE MISTAKEN ON THAT.

7         MR. ZELLER:  THERE ARE CASES THAT WE CITED IN OUR

8    JURY INSTRUCTION OBJECTIONS THAT DO SPECIFICALLY SAY IT IS AN

9    AFFIRMATIVE DEFENSE.

10        THE COURT:  THAT HAS TO BE PLED IN ADVANCE.

11        MR. ZELLER:  CORRECT.  THAT'S MY UNDERSTANDING.

12        THE COURT:  I HAVEN'T GOTTEN TO THOSE YET.

13        BUT YOU UNDERSTAND THE POINT THAT I'M MAKING?  THERE

14   ARE OTHER AREAS OF THE LAW WHERE THE COURT TALKS ABOUT THIS

15   BURDEN-SHIFTING IN THE EMPLOYMENT CONTEXT, WHERE I DON'T THINK

16   THAT'S REQUIRED.

17        MR. ZELLER:  I DO UNDERSTAND WHAT THE COURT IS

18   SAYING, AND I KNOW THE LANGUAGE THAT THE COURT IS POINTING TO,

19   AND I RECOGNIZE THAT IS --

20        THE COURT:  IN THE MCDONELL-DOUGLAS CASE, ONE OF THE

21   DISCRIMINATION CASES, I THINK THERE'S A BURDEN-SHIFTING THAT

22   GOES ON.

23        MR. ZELLER:  OH, ABSOLUTELY.  RIGHT.

24        THE COURT:  IT DOESN'T REQUIRE AN AFFIRMATIVE DEFENSE

25   PLEADING.

1      MR. ZELLER:  THERE'S ANY NUMBER OF DOCTRINES WHERE

2   YOU HAVE BURDEN-SHIFTING AND PRESUMPTIONS ARE BURST.  THERE ARE

3   PLENTY OF THEM IN THE COPYRIGHT CONTEXT AS WELL.  BUT I DON'T

4   THINK THERE'S ANYTHING WE CAN HANG OUR HAT ON AND SAY, FOR

5   EXAMPLE, THREE BOYS, AS TO WHETHER OR NOT THEY ARE SAYING IT'S

6   AN AFFIRMATIVE DEFENSE.  IT COULD HAVE BEEN PLED -- OBVIOUSLY,

7   THAT DETAIL IS NOT SET FORTH.  BUT IN GENERAL, ONCE YOU HAVE

8   ACCESS AND SUBSTANTIAL SIMILARITY, I MEAN, THAT USUALLY AMOUNTS

9   TO INFRINGEMENT.  AND WHAT ALSO THOSE CASES COULD VERY WELL BE

10  SAYING IS, YOU DON'T EVEN GET TO INDEPENDENT CREATION UNLESS

11  INFRINGEMENT IS PROVED FIRST.

12      THE COURT:  ALL RIGHT.

13      I THINK I'M IN A POSITION TO MAKE RULINGS ON THE

14  RELEVANCY OF VARIOUS EVIDENCE AS IT COMES UP.

15      LAST THING, MR. ZELLER, ON THE CARTER BRYANT

16  DESIGNATIONS, YOU WANT QUESTIONS IN ABOUT THE PROCESS OF DOLL

17  CREATION?

18      MR. ZELLER:  I'M NOT SURE THAT I WOULD QUITE PUT IT

19  THAT WAY.

20      WE TALK ABOUT -- SOME OF IT'S ANTICIPATORY, IN TERMS

21  OF REBUTTING IT -- WE TALK ABOUT -- AND MAYBE MR. PROCTOR IS

22  BETTER SITUATED --

23      THE COURT:  I SEE HIM BACK THERE.

24      MR. ROTH, I'LL GIVE YOU A CHANCE TO RESPOND TO ALL OF

25  THIS.

1        YOU KNOW WHAT I'M REFERRING TO, MR. PROCTOR?

2        MR. PROCTOR:  I DO.  THAT IS THAT THOSE WERE

3    ANTICIPATORY DESIGNATIONS.  AND, PERHAPS, HAVING THOUGHT IT

4    THROUGH BETTER, I THINK THE CARTER BRYANT DESIGNATIONS WOULD BE

5    BETTER SUITED AS REBUTTAL TESTIMONY, DEPENDING ON EXACTLY WHAT

6    COMES IN IN THEIR CASE-IN-CHIEF, BECAUSE THIS IS TESTIMONY.

7    THE BULK OF IT RESPONDS TO WHAT WE ANTICIPATE MARGARET LEAHY

8    WILL BE TESTIFYING TO.  DEPENDING ON WHAT COMES IN, IT MAY OR

9    MAY NOT BE APPROPRIATE REBUTTAL TESTIMONY.

10        (BRIEF PAUSE.)

11        MR. PROCTOR:  I'M BEING -- FROM MY RIGHT EAR --

12    PERHAPS THE WAY TO HANDLE THIS IN TERMS OF THE DESIGNATIONS --

13    AND I DON'T WANT TO INCONVENIENCE THE COURT IN TERMS OF THE

14    RULINGS ON IT.  THERE IS TESTIMONY IN THE BRYANT TRANSCRIPT

15    THAT WOULD MORE PROPERLY FALL UNDER OUR CASE-IN-CHIEF;

16    TESTIMONY ABOUT THE DOLLS LOOKING LIKE THE DRAWINGS AND BEING

17    BASED ON THE DRAWINGS; TESTIMONY THAT GOES DIRECTLY TO

18    SUBSTANTIAL SIMILARITY.  AND THEN THERE IS THIS OTHER TESTIMONY

19    WHICH WE DESIGNATED AT THE SAME TIME, WHICH UPON REFLECTION, IS

20    PROBABLY MORE PROPERLY REBUTTAL TESTIMONY.  IF THE COURT WANTED

21    US TO HANDLE IT THIS WAY, I COULD TRY TO CARVE OUT THE

22    CASE-IN-CHIEF VERSUS REBUTTAL ASPECTS OF IT.

23        THE COURT:  IT'S NOT FOR ME TO CARVE ANYTHING OUT,

24    AND IT'S NOT FOR ME TO ASK YOU TO HANDLE THINGS A CERTAIN WAY.

25    IT'S FOR YOU TO ASK THE COURT TO RULE ON DESIGNATIONS, AND I'LL

1    RULE ON THEM.  I'M NOT GOING TO TELL YOU OR MGA HOW TO RUN YOUR

2    CASE.

3         MR. PROCTOR:  I UNDERSTAND THAT.

4         IN TERMS OF --

5         THE COURT:  RIGHT NOW YOU'RE PRESENTING THIS TO ME AS

6    A REQUEST TO INTRODUCE THIS EVIDENCE IN YOUR CASE-IN-CHIEF.  IF

7    THAT'S NOT THE CASE, THEN YOU BETTER CLARIFY.

8         MR. PROCTOR:  THEN I WOULD, FOR THE PURPOSE OF

9    CASE-IN-CHIEF, WITH THE COURT'S PERMISSION, WITHDRAW THE

10   DESIGNATIONS THAT RESPOND --

11        MR. PRICE:  HERE'S WHAT I REQUEST:  AND THAT IS,

12   WE'VE OFFERED THESE DESIGNATIONS.  THERE'S ONE SECTION IN

13   PARTICULAR -- I DON'T KNOW IF WE'VE ALREADY WITHDRAWN -- WHICH

14   TALKS ABOUT THE PROCESS.

15        THE COURT:  YES.

16        MR. PRICE:  THAT, WE'LL WITHDRAW ONCE WE MAKE SURE

17   WE'RE ON THE SAME PAGE ON THAT.

18        HOWEVER, I THINK WHAT WE DO WANT TO PUT IN IS THE

19   ACCESS EVIDENCE, WHICH IS, 'I GAVE MARGARET LEAHY THIS, FOR

20   EXAMPLE, SCULPT DRAWING TO RESTART HER SCULPT.'  AND THEN

21   THERE'S ALSO EVIDENCE CONCERNING WHETHER OR NOT HE PROVIDED

22   DRAWINGS FOR THE HONG KONG TOY FAIR DOLLS AND WHETHER THOSE ARE

23   SIMILAR AND WHETHER THE HONG KONG TOY FAIR DOLLS ARE SIMILAR.

24        SO I THINK THE BEST THING TO DO IS TO RULE ON THE

25   OBJECTIONS.  AND I CAN TELL YOU, IF SOMEONE CAN HAND ME THE

1    TRANSCRIPT -- I THINK WE ARE ON THE SAME PAGE -- THERE'S A

2    SECTION WHERE HE TALKS ABOUT, YOU KNOW, YOU GIVE DRAWINGS AND

3    THERE'S THIS PROCESS AND ALL THAT.

4         THE COURT:  I'M GOING TO RULE ON WHAT YOU'VE

5    SUBMITTED TO THE COURT, BUT UNDERSTAND, YOU MAY BE OPENING SOME

6    DOORS IF YOU PLAY THIS.  AND I'VE SAID THAT TO MGA BEFORE; I'VE

7    SAID THAT TO YOU.  YOU DECIDE WHAT YOU PLAY OR WHAT YOU DON'T

8    PLAY.  I'M GOING TO RULE ON IT, THOUGH.  BUT UNDERSTAND THAT

9    SOME OF MY RULING IS NOT BEING INFORMED BY THE DISCUSSION THAT

10   WE'VE HAD THIS MORNING, BUT BY SOME DOORS THAT ARE BEING OPENED

11   BY THIS TESTIMONY.

12        MR. PRICE:  RIGHT.

13        THE COURT:  MR. ROTH, I'LL NOW HEAR FROM YOU.

14        MR. ROTH:  IN TERMS OF THE APPORTIONMENT QUESTION, I

15   JUST REFER THE COURT TO TWO CASES.

16        THE COURT:  OF COURSE, THE IRONY OF THAT IS THAT MGA

17   IS OBJECTING TO THAT VERY TESTIMONY THAT WOULD OPEN THE DOOR

18   FOR THEM TO GET IN WHAT THEY WANT TO GET IN.  BUT I'LL TRY TO

19   SORT THROUGH ALL OF THAT.

20        MR. ROTH:  THE LEADING CASE ON THE APPORTIONMENT

21   QUESTION CITED BY BOTH SIDES IS THE SHELDON CASE.  IT'S A

22   SUPREME COURT CASE.  I THINK THE KEY LANGUAGE IS AT 406.  I'LL

23   JUST READ A COUPLE OF SENTENCES.

24        "THE CONTROLLING FACT IN THE DETERMINATION OF THE

25   APPORTIONMENT WAS THAT THE PROFITS HAD BEEN DERIVED NOT FROM

1   THE MERE PERFORMANCE OF A COPYRIGHTED PLAY, BUT FROM THE

2   EXHIBITION OF A MOTION PICTURE WHICH HAD DISTINCTIVE

3   PROFIT-MAKING FEATURES, APART FROM THE USE OF ANY INFRINGING

4   MATERIAL" -- APART FROM THE DOLL -- "BY REASON OF THE EXPERT

5   AND CREATIVE OPERATIONS INVOLVED IN ITS PRODUCTION AND

6   DIRECTION."

7       THE COURT:  CAN I SEE THAT PARAGRAPH?

8       WE'RE GOING TO WRAP THIS UP IN FIVE MINUTES, GIVE THE

9   REPORTER A BREAK, AND THEN WE'RE GOING TO START WITH THE JURY

10  AT 10:30.  WE DO HAVE TO WRAP THINGS UP HERE.

11      THIS IS IMPORTANT, BUT WE'VE KEPT THE JURY WAITING

12  AWHILE.

13      (BRIEF PAUSE.)

14      THE COURT:  WHAT HAPPENED HERE?

15      MR. ROTH:  IT'S A MOVIE AND THE QUESTION IS,

16  WHAT'S -- THEY'RE APPORTIONING THE ROLE OF --

17      THE COURT:  THE MOVIE WAS BASED ON A PLAY, ON A

18  COPYRIGHTED PLAY.

19      MR. ROTH:  YES.

20      THE COURT:  "THE PROFITS WERE DERIVED NOT FROM THE

21  MERE PERFORMANCE OF A COPYRIGHTED PLAY."  SO YOU HAD A

22  COPYRIGHTED PLAY THAT GOT TURNED INTO A MOVIE; YOU'RE SAYING

23  KIND OF LIKE THE DRAWINGS GET TURNED INTO A DOLL.

24      MR. ROTH:  RIGHT.

25      THE COURT:  "IT WAS NOT FROM THE MERE PERFORMANCE OF

1    THE COPYRIGHTED PLAY, BUT FROM THE EXHIBITION OF A MOTION

2    PICTURE WHICH HAD ITS DISTINCTIVE PROFIT-MAKING FEATURES APART

3    FROM THE USE OF ANY INFRINGING MATERIAL BY REASON OF THE

4    EXPERT."

5        OKAY.  I SEE WHAT YOU'RE SAYING.

6        MR. ROTH:  THEN IF I COULD, THERE'S EVEN A MORE APT

7    CASE.

8        THE COURT:  THEN THE NEXT LINE, "IN THAT ASPECT OF

9    CASES, A CERTAIN RESEMBLANCE TO THAT OF A PATENT INFRINGEMENT,

10   WHERE THE INFRINGER HAS CREATED PROFITS BY THE ADDITION OF

11   NONINFRINGING AND VALUABLE IMPROVEMENTS..."

12       MR. ROTH:  I THINK, YOUR HONOR -- AND WE CITED THIS

13   CASE AS WELL --

14       THE COURT:  THAT'S ON ONE SIDE.  AND THEN I HAVE ON

15   THE OTHER SIDE, THE CASES WHICH ALSO STAND FOR THE PROPOSITION,

16   WHEN IT IS INEXTRICABLY INTERTWINED, YOU CONSIDER IT AS A

17   WHOLE.  SO THE QUESTION GOING FORWARD, AS I LISTEN TO THIS

18   EVIDENCE, WILL BE, TO WHAT EXTENT IS THE EVIDENCE ESTABLISHING

19   THAT THIS IS ALL INEXTRICABLY INTERTWINED IN INFRINGING

20   MATERIAL, OR IS IT TO THE EXTENT THAT THERE IS SOMETHING THAT

21   IS IDENTIFIABLE HERE THAT IS NOT INFRINGING WHICH IS ADDING

22   VALUE TO IT SEPARATE AND APART?

23       MR. ROTH:  THAT'S EXACTLY THE POINT.  WHAT WE'LL SEE

24   IN THE EVIDENCE THAT WILL COME IN FROM BOTH SIDES, WE BELIEVE,

25   IS THAT THE PARTIES FOCUS ON THOSE INDIVIDUAL ASPECTS BESIDES

1    DESIGN AS BEING RELEVANT TO THE SUCCESS OF THE DOLL, BOTH ON

2    THE MATTEL SIDE AND THE --

3        THE COURT:  MR. ROTH, YOU'VE LED TO WHERE THE FOCUS

4    REALLY SHOULD BE; AND THIS HAS BEEN URGED; AND THIS GETS AWAY

5    FROM THIS POTENTIALLY CONFUSING DETAILED EVIDENCE.  AND MAYBE

6    I'VE GOT TO PLACE MORE CONFIDENCE IN MS. AGUIAR'S STATEMENT

7    THAT WE'RE NOT GOING TO GET INTO THE NUMBER OF HOURS AND ALL OF

8    THE WORK THAT'S GONE ON.  AT THE END OF THE DAY, THIS JURY IS

9    COMPARING THINGS.  THEY'RE COMPARING SUBSTANTIAL SIMILARILY IN

10   INFRINGING PRODUCTS, AND THEY'RE ALSO LOOKING AT THE END

11   RESULT, AND THEY MAY CONSIDER EVIDENCE THAT THINGS ENTIRELY

12   APART FROM THE DOLL ACCOUNT FOR THE SALE OF THE PRODUCT.  AND I

13   THINK THAT'S PARTICULARLY TRUE, AS I POINTED OUT, WITH RESPECT

14   TO THINGS WHICH, UNLIKE DOLLS, ARE REALLY AFIELD, LIKE THE

15   TENTS OR THE SOFAS.

16       BUT I HOPE MGA UNDERSTANDS, AND I HOPE MATTEL

17   UNDERSTANDS, THAT THAT'S THE FOCUS.  IT'S NOT IN HEARING

18   TESTIMONY ABOUT ALL OF THE HARD WORK, SWEAT OF THE BROW, THAT

19   WENT INTO DOING IT, BECAUSE THAT HAS THE DANGER OF APPEALING --

20   AS MUCH AS I CAN UNDERSTAND WHY MGA MIGHT WANT TO PRESENT THIS,

21   IT'S NOT A MATTER OF TRYING TO APPEAL TO THE JURY'S SENSE OF

22   SYMPATHY THAT, 'OH, MY GOSH, MGA HAS WORKED REALLY HARD ON THIS

23   PRODUCT FOR SEVEN OR EIGHT YEARS, AND THEY DESERVE MONEY FOR

24   THAT.'  I UNDERSTAND THAT MAY BE AN ARGUMENT YOU WANT TO MAKE,

25   BUT THAT'S AN ARGUMENT THAT'S FORECLOSED BY THE LAW.

1     MR. ROTH:  UNDERSTOOD.

2     THE COURT:  THAT'S THE SWEAT-OF-THE-BROW ARGUMENT

3  THAT IS FORECLOSED IN THIS, NOTWITHSTANDING THE ARGUMENT THAT

4  THAT ONLY APPLIES TO ORIGINALITY.  IT DOESN'T.  IT APPLIES TO

5  THE COPYRIGHT.

6     MR. ROTH:  IF I COULD JUST -- ONE MORE CASE, BECAUSE

7  IT INVOLVE DRAWINGS, SO I THINK IT'S RELEVANT HERE.

8     THIS IS THE DANIELSON CASE, WHICH IS A CASE OUT OF

9  THE FIRST CIRCUIT, PAGE 48.  READING, AGAIN, FROM A PARAGRAPH

10  THERE:  "AT TRIAL, WCP PRESENTED EVIDENCE CONCERNING MANY

11  CONTRIBUTING FACTORS THAT HELPED THE WILLOWS AT WINCHESTER TURN

12  A PROFIT BESIDES DANIELSON'S SKELETAL SITE PLANS."

13     THE COURT:  BUT, AGAIN, THE FOCUS IS ON FACTORS THAT

14  CAN BE POINTED TO IN THE PRODUCT THAT ACCOUNT FOR -- IT'S

15  NOT -- AGAIN, IT'S NOT -- YES.  I UNDERSTAND.

16     MR. ROTH:  LET ME JUST GO ON.

17     "IT POINTED TO FIVE VOLUMES OF SUBSEQUENT AND MORE

18  DETAILED ARCHITECTURAL DRAWINGS NECESSARY TO COMPLETE THE

19  PROJECT.  OTHER EVIDENCE CONCERNED THE EXTENSIVE EFFORTS WCP

20  MADE TO COORDINATE LOGISTICS, SUPERVISE SUBCONTRACTORS, CHOOSE

21  AND INSTALL VARIOUS AMENITIES, MARKET THE DEVELOPMENT, AND SELL

22  THE CONDOMINIUM UNITS.  WCP ALSO ARGUED THAT ASPECTS OF

23  DANIELSON'S SITE PLANS, SUCH AS THE PLACEMENT OF GARAGES AND

24  PARKING AREAS, ACTUALLY MIGHT HAVE DETRACTED FROM THE

25  DEVELOPMENT'S APPEAL.  WC SUPPORTED MANY OF THESE CONTENTIONS

1   WITH TESTIMONY FROM TWO EXPERTS."  AND THEY NAMED THE EXPERTS.

2       SO, AGAIN, THIS IS THE TYPE -- OBVIOUSLY, WE'RE NOT

3   TALKING ABOUT A CONDOMINIUM HERE, BUT WHAT WE'RE TALKING ABOUT

4   IS -- IT'S NOT COMPARING ONE PROTECTABLE ELEMENT NECESSARILY TO

5   ANOTHER; IT'S ANSWERING THE QUESTION, WHY THE PROFITS?

6       AND WE NEED TO ADDRESS THAT QUESTION IN A WAY THAT WE

7   CAN CONVINCE THE JURY AS TO WHY THE PROFITS.

8       THE COURT:  MR. ZELLER?

9       MR. ZELLER:  I THINK THE LAST ARGUMENT WE HEARD IS

10  REALLY INCONSISTENT WITH THE EARLIER CONCESSION BY MGA THAT

11  EVERYTHING IN THE DOLL IS INEXTRICABLY INTERTWINED.  IF WHAT

12  THEY ARE SAYING IS, HERE'S MARKET RESEARCH AS TO WHY PEOPLE BUY

13  THE DOLLS; IT'S NOT BECAUSE OF, SAY, THE FACIAL DECORATION, BUT

14  BECAUSE OF THE HAIRSTYLE OR THE BENDABLE KNEE, YOU KNOW, ANY

15  NUMBER OF FACTORS, THEY'VE ALREADY -- THAT SHIP HAS SAILED.

16  THEY'VE ALREADY CONCEDED THAT PROFITS THAT COME FROM THE

17  DOLLS --

18      THE COURT:  ON THE DOLLS, THE DOLL IS THE DOLL.  ONE

19  THING THEY HAVE IDENTIFIED THAT'S SEPARATE AND APART -- AND I

20  WILL ENTERTAIN EVIDENCE ON -- IS THIS ISSUE OF THE PACKAGING.

21  THAT'S SOMETHING -- TO THE EXTENT THAT THE PACKAGING IS APART

22  AND DISTINCT FROM THE COPYRIGHTED DRAWINGS -- MAYBE I SHOULD

23  GET A LIST FROM MGA.

24      WHAT ELSE IS THERE?

25      MR. ROTH:  IT WOULD NOT BE.

1    THE COURT: I'VE GOT PACKAGING.

2    WHAT ELSE DO WE HAVE?

3    MR. ROTH: IF YOU LOOK AT THE PACKAGE -- YOU START

4  WITH THE PACKAGING, BUT YOU'VE ALSO GOT -- INSIDE THE PACKAGE,

5  YOU'VE GOT CLOTHES THAT CHANGE CONSTANTLY.

6    THE COURT: WELL, NO.

7    TO THE EXTENT THE DOLL ACCESSORIES -- THERE ARE

8  PROTECTABLE ELEMENTS OF DOLL ACCESSORIES AND CLOTHING AND

9  SHOES, AND TO THE EXTENT THAT THOSE ARE COPYRIGHTED, THEN TO

10 THE EXTENT --

11    MR. ROTH: WE WOULD AGREE THAT MAYBE SOME OF THE

12 CLOTHES ARE COPIES OF --

13    THE COURT: ONES THAT ARE NOT, THAT THE JURY DOES NOT

14 FIND ARE SUBSTANTIALLY SIMILAR, THAT'S OUTSIDE.

15    SO WHAT ELSE BESIDES PACKAGING AND NONCOPYRIGHTED

16 ACCESSORIES?

17    MR. ROTH: ACCESSORIES, FASHIONS. THEN THERE ARE THE

18 PROMOTIONAL EFFORTS ASSOCIATED WITH GETTING THE GIRL AND THE

19 MOTHER IN THE STORE IN THE FIRST PLACE, JUST AS CITED IN THOSE

20 CASES.

21    THE COURT: HOW IS THAT SEPARATE AND APART? THE

22 ADVERTISING COSTS ARE TAKEN OUT OF THE DAMAGES. MARKETING AND

23 ADVERTISING, THAT'S ALREADY ACCOUNTED FOR.

24    MR. ROTH: THE CASES THAT I CITED TO YOUR HONOR

25 CLEARLY LOOK AT PROMOTIONAL ACTIVITY AND ADVERTISING AS PART OF

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    THE APPORTIONMENT ANALYSIS.

2        THE COURT:  I'LL TAKE A LOOK AT THAT CASE, BUT MY

3    SENSE IS THAT PROMOTION AND MARKETING IS TAKEN -- WE'VE MOVED

4    BEYOND WHERE THIS MOTION STARTED THIS MORNING.  WE'RE NOW JUST

5    FOCUSING ON THE APPORTIONMENT DAMAGE ASPECT.  MY SENSE IS THAT

6    PROMOTIONAL MARKETING IS TAKEN CARE OF BY SUBTRACTING THAT OUT.

7    AND IF IT DOESN'T GET SUBTRACTED OUT, THEN IT NEEDS TO GET

8    ADDED BACK IN.

9        WHAT ELSE DO WE HAVE?

10       MR. ROTH:  WE THEN HAVE THE THEMES ASSOCIATED WITH

11   THE DOLLS.  THERE WILL BE EVIDENCE THAT WILL SHOW THAT DOLL

12   SALES VARY WIDELY DEPENDING UPON THE THEME ASSOCIATED WITH THE

13   DOLL.  THEREFORE, IT'S NOT THE DOLL; IT'S THE THEME.  IT HAS TO

14   BE.  AND YOU'LL SEE THAT IS CORE TO MATTEL AND MGA'S MARKETING

15   STRATEGIES.

16       THE COURT:  AGAIN, SOME OF THE THEMES, THE ATTITUDE,

17   THE LOOK, WAS CAPTURED AS A PROTECTABLE ELEMENT; BUT, AGAIN, TO

18   THE EXTENT THAT WE CAN GO BEYOND THAT, PERHAPS.

19       MR. ROTH:  TO THE EXTENT THAT THERE'S A DUPLICATION

20   OF A THEME IN CARTER BRYANT'S DRAWINGS, WHICH WE SUBMIT THERE

21   ISN'T, THAT MAY BE A DIFFERENT QUESTION.

22       THE COURT:  THE COURT IDENTIFIED THE THEME AS A

23   PARTICULAR LOOK OR ATTITUDE.  A MERE VARIATION ON THAT LOOK OR

24   ATTITUDE WOULD STILL FALL WITHIN A PROTECTABLE ELEMENT.  BUT

25   SOMETHING THAT GOES MARKEDLY OUTSIDE THAT, I SUPPOSE, MIGHT

1    NOT.  THAT'S FOR THE JURY TO DECIDE.  THAT'S THE WHOLE

2    SUBSTANTIAL SIMILARITY.  WHETHER TOKYO A GO-GO AND CHLOE HERE

3    IN THE FIRST GENERATION IS SUBSTANTIALLY SIMILAR TO THE

4    PROTECTABLE ELEMENT IDENTIFIED AS THE FIRST PROTECTABLE

5    ELEMENT, THAT'S FOR THE JURY TO DECIDE.

6        MR. ROTH:  BUT THE THEMES WE'RE TALKING ABOUT,

7    "WINTER WONDERLAND" AND "ROCKER GIRL," NONE OF THAT IS IN --

8        THE COURT:  RIGHT.  THE FIRE -- WHATEVER IT IS;

9    YOU'RE RIGHT.  THAT THEME IS NOT WHAT I'M TALKING ABOUT.  I'M

10   TALKING ABOUT THE ATTITUDE AND LOOK OF THE DOLL, AS OPPOSED TO

11   THE WINTERTIME WONDERLAND COLLECTION THEME.  AND THIS IS WHERE

12   WE GET INTO A DIFFICULT -- HOW CONNECTED THOSE TWO ARE.

13       ANYWAY, WHAT ELSE BESIDES THEMES?

14       MR. ROTH:  THE CHARACTERS, THE CHARACTERS THAT ARE

15   DEVELOPED.  THERE WERE FOUR ORIGINAL CHARACTERS.  THERE ARE

16   ADDITIONAL CHARACTERS DEVELOPED OVER TIME.  THERE'S SOMETHING,

17   LIKE, 40 CHARACTERS NOW.  THE WAY THE CHARACTERS INTERACT.

18       THE COURT:  ANYTHING ELSE?

19       MR. ROTH:  THAT'S IT.

20       THE COURT:  BUT TO THE EXTENT THAT ANY OF THIS COMES

21   IN, THE FOCUS IS ON THESE ELEMENTS AND THESE FACTORS, NOT THE

22   SWEAT OF THE BROW THAT GOES INTO DEVELOPING THESE FACTORS.

23   THAT'S THE PREJUDICIAL ASPECT THAT I AM QUITE CONVINCED IS OUT.

24       MR. ROTH:  WHAT I UNDERSTAND YOU TO BE SAYING IS,

25   WE'RE NOT LOOKING FOR SYMPATHY BECAUSE WE'RE UP LATE AT NIGHT,

1    SWEATING A LOT, AND WE GET A LOT OF WORK.

2        THE COURT:  SPENDING A LOT OF TIME COMING UP WITH

3    THEMES.  IT'S THE QUESTION OF -- I AM NOT MAKING ANY FINAL

4    DECISIONS ON THIS; BUT, YES, TO THE EXTENT THAT PACKAGING, FOR

5    EXAMPLE, IS IDENTIFIABLE, THAT IS A SEPARATE COMPONENT OR

6    ELEMENT OF THE PROFITABILITY OF THAT PARTICULAR SALE AND THERE

7    ARE NONINFRINGING ELEMENTS OF THE PACKAGING THAT CAN BE

8    ATTRIBUTED TO THAT PROFITABILITY, THAT'S SOMETHING WHICH

9    TESTIMONY COMES IN, EVIDENCE, ARGUMENT, ALL OF THAT.  BUT THE

10   FACT THAT IT TOOK YOU 300 HOURS OF TIME AND THAT YOU SPENT ALL

11   OF THESE RESOURCES, AND GETTING INTO A DETAILED EXPLANATION OF

12   HOW YOU COME UP WITH THE PACKAGING, THAT'S THE 403 PROBLEM THAT

13   HAS BEEN IDENTIFIED.

14       MR. ROTH:  OKAY.  AND, AGAIN, THIS IS JUST A

15   CONVERSATION THAT RELATES TO THE DOLLS.  WE HAD A SEPARATE

16   DISCUSSION -- I'M NOT GOING TO RAISE IT AGAIN -- REGARDING

17   COUCHES AND UMBRELLAS, AND THAT'S A SEPARATE --

18       THE COURT:  RIGHT.  AND AGAIN THERE, IT'S FOCUSING ON

19   ELEMENTS AND NOT ON SWEAT OF THE BROW.

20       MR. ZELLER?

21       MR. ZELLER:  I WOULD SUGGEST, YOUR HONOR, THAT IS A

22   THRESHOLD MATTER.  FOR MGA TO BE ABLE TO GO INTO ANY OF THESE

23   OTHER ELEMENTS THAT THEY WANT TO POINT TO, THEY HAVE TO PROVE

24   THAT THEY'RE NOT INEXTRICABLY INTERTWINED WITH THE COPYRIGHTED

25   MATERIAL.

1       I THINK THAT'S --

2       THE COURT:  THAT'S THE BALANCE.  AND TO THE EXTENT

3   THAT ANYTHING IS ACTUALLY COPYING A PROTECTABLE ELEMENT, OR IS

4   INEXTRICABLY INTERTWINED WITH A PROTECTABLE ELEMENT -- THE

5   CASES YOU SITE ON THAT ARE QUITE CLEAR -- THEN THAT IS PART OF

6   WHAT MATTEL CONCEIVABLY CAPTURES IF THE JURY FINDS

7   INFRINGEMENT.

8       ON THE OTHER HAND, TO THE EXTENT THAT IT IS NOT A

9   PROTECTABLE ELEMENT, SUCH AS PACKAGING, AND THAT PACKAGING IS

10   NOT INEXTRICABLY INTERTWINED, THEN IT IS SOMETHING WHICH MGA

11   RETAINS.  AND THAT IS HOW IT IS FRAMED.

12       MR. ZELLER:  I'M NOT SURE I WOULD AGREE WITH THE WORD

13   "RETAIN."  THAT STRIKES ME AS A LITTLE BIT LOADED, BECAUSE IT

14   COULD STILL BE A DERIVATIVE WORK THAT WOULD BE INFRINGING; BUT

15   WE CAN SET THAT ASIDE.

16       THE COURT:  WE FINALLY COME BACK TO DERIVATIVE WORKS.

17       MR. ZELLER:  YES.  BUT SETTING THAT ASIDE, IN TERMS

18   OF APPORTIONMENT--

19       THE COURT:  ONCE AGAIN --

20       MR. ZELLER:  WHAT I WOULD SUGGEST IS THAT THEY BE

21   REQUIRED TO LAY, AS A FOUNDATIONAL MATTER, THAT THOSE THINGS

22   ARE NOT INEXTRICABLY INTERTWINED BEFORE THEY'RE ALLOWED TO GET

23   INTO IT, BECAUSE OTHERWISE, WE'RE RIGHT BACK WHERE WE STARTED,

24   WHICH IS MGA IS ESSENTIALLY GOING TO BE POINTING AT, 'LOOK AT

25   THE 50 THINGS WE ADDED.'

1    THAT'S WHAT'S NOT PROPER UNDER SUBSTANTIAL

2    SIMILARITY.

3        THE COURT:  IS DERIVATIVE WORKS GOING TO, DEPENDING

4    ON THE OUTCOME OF THIS TRIAL, SURFACE POST TRIAL?

5        MR. ZELLER:  YOU'RE GOING TO HAVE TO FLUSH THAT OUT A

6    LITTLE BIT MORE FOR ME, YOUR HONOR.  I'M NOT QUITE FOLLOWING

7    THE QUESTION ABOUT DERIVATIVE WORKS.

8        THE COURT:  AGAIN, WHAT IS YOUR POSITION ON THE

9    DERIVATIVE WORKS THEORY, VIS-À-VIS THIS CASE?

10       MR. ZELLER:  THE ONES THAT ARE ALREADY AT ISSUE?

11       THAT'S WHERE -- THE WAY, I GUESS, I WOULD START WITH

12   THIS -- I MEAN, IN TERMS OF JUST OUR THINKING ON IT AT THIS

13   JUNCTURE -- IS THAT WHETHER SOMETHING IS A DERIVATIVE WORK OR

14   NOT, IF IT IS SUBSTANTIALLY SIMILAR, IT IS STILL INFRINGING.

15   AND THIS IS ACTUALLY ONE OF THE REASONS WHY ADDING IN A BUNCH

16   OF NEW MATERIAL, WHICH WOULD ARGUABLY MAKE THE WORK A

17   DERIVATIVE, IS KIND OF LEGALLY IRRELEVANT.  IT'S STILL

18   INFRINGING.  AND BECAUSE IT'S AN UNAUTHORIZED DERIVATIVE, MGA

19   HAS NO RIGHTS.

20       THE COURT:  I UNDERSTAND THAT ARGUMENT, BUT THAT

21   ARGUMENT HAS NOT BEEN PRESSED, COUNSEL.

22       MR. ZELLER:  WELL, IT HASN'T BECAUSE, NUMBER ONE, AS

23   THE COURT IS AWARE, CONTRARY TO WHAT HAS BEEN REPRESENTED IN

24   COURT, THIS WHOLE ISSUE IS NOT SOMETHING THAT THEY PLED, AND

25   IT'S NOT SOMETHING THAT WAS IN THE FINAL PRETRIAL CONFERENCE

1   ORDER.  SO, REALLY, IT'S NOT FAIR TO SORT OF SUGGEST THAT

2   SOMEHOW WE HAD A FULL-BLOWN PREVIEW.  I MEAN, WE HEARD

3   MR. NOLAN MAKING THE OPENING STATEMENT ALL AT THE SAME TIME.

4   WE DIDN'T HAVE ANY INSIDE INFORMATION IN ADVANCE AS TO HOW HE

5   WAS GOING TO SO EMPHASIZE THIS ISSUE.

6       FUNDAMENTALLY, YOUR HONOR, I THINK OUR POSITION IS

7   VERY CLEAR ON THIS, IS THAT THE JURY SHOULD BE INSTRUCTED AT

8   THE END OF THE DAY THAT, YOU KNOW, IT DOESN'T MATTER WHETHER OR

9   NOT YOU TRANSLATE SOMETHING; IF IT'S STILL SUBSTANTIALLY

10  SIMILAR, IT'S AN INFRINGEMENT.  THERE ARE FIVE EXCLUSIVE

11  RIGHTS.  THERE'S REPRODUCTION, SAME STANDARD, SUBSTANTIALLY

12  SIMILAR -- PREPARING A DERIVATIVE WORK IS ONE OF THE FIVE

13  EXCLUSIVELY RIGHTS -- NOW, I GUESS, SIX, YOU COULD ARGUE -- BUT

14  ONE OF THE EXCLUSIVE RIGHTS UNDER THE COPYRIGHT ACT.  AND THAT

15  IS STILL AN INFRINGEMENT.  SO NO MATTER HOW YOU CARVE IT UP, IT

16  STILL GETS THE SAME RESULT.

17      THE COURT:  ARE YOU ASKING THE COURT TO INSTRUCT ON

18  DERIVATIVE WORKS?

19      MR. ZELLER:  WELL, YES, YOUR HONOR.  WE WOULD ASK

20  THAT IT BE INSTRUCTED THAT A DERIVATIVE WORK IS -- HERE'S A

21  DEFINITION OF IT, AND IT IS AN INFRINGEMENT.  BECAUSE THEIR

22  WHOLE STRATEGY NOW IS TO FOCUS ON, 'HERE ARE THE 50,000

23  ADDITIONAL THINGS WE HAVE DONE.  EVERYTHING FROM THE TRUCKS

24  THAT CONVEY THE PRODUCT TO THE STORES TO' --

25      THE COURT:  THERE'S FIVE THINGS.

1        MR. ZELLER:  I THINK YOU HEARD MR. ROTH ALSO TALK

2    ABOUT COORDINATING, MARKETING, SELLING.  THOSE WERE THE WORDS

3    HE USED WHEN HE --

4        THE COURT:  PACKAGING, NONCOPYRIGHTED ACCESSORIES,

5    PROMOTIONAL THEMES, AND ADDITIONAL CHARACTERS.  THAT'S IT.

6    IT'S ON THE PAPER.

7        MR. ZELLER:  I'M GRATIFIED TO KNOW THAT THAT'S GOING

8    TO BE THE UNIVERSE, THEN, YOUR HONOR.

9        IN TERMS OF THE WORKS, WHETHER THEY GET CHARACTERIZED

10   AS DERIVATIVE OR JUST SIMPLY A COPY, IT'S STILL AN

11   INFRINGEMENT.  AND PART OF THIS HAS TO DO WITH THE -- AND THE

12   COURT OBVIOUSLY RECENTLY READ THE ERG CASE, WHICH TENDS TO

13   TREAT TRANSLATION OF TWO-DIMENSIONAL CHARACTERS INTO

14   THREE-DIMENSIONAL AS BEING A DERIVATIVE WORK.  SOME CASES

15   SIMPLY SAY, 'NO, IT DOESN'T REALLY MATTER; IT'S JUST A COPY.'

16   BUT AT THE END OF THE DAY, IT'S STILL AN INFRINGEMENT.  AND

17   THAT'S WHY, IF FOR A SECOND REASON, THE ADDITION OF FURTHER

18   MATERIAL DOESN'T REALLY GET MGA ANYWHERE.

19       THE COURT:  AND I UNDERSTAND THAT WITH RESPECT TO THE

20   ACTUAL COPYING ISSUE ITSELF, BUT WITH RESPECT, FOR EXAMPLE, TO

21   FASHIONS THAT ARE NOT PART OF THE FASHIONS THAT ARE CAPTURED OR

22   SUBSTANTIALLY SIMILAR TO THE DRAWINGS -- NOW WE'RE TALKING --

23   LET'S SAY THE WINTER WONDERLAND FASHIONS, FOR EXAMPLE -- I'M

24   NOT FINDING THAT THEY'RE NOT SUBSTANTIALLY SIMILAR, BUT LET'S

25   SAY FOR THE SAKE OF ARGUMENT FOR THIS DISCUSSION THAT THE JURY

1    WERE TO FIND THEY'RE NOT SUBSTANTIAL SIMILAR.  YOU'RE NOT GOING

2    TO FURTHER ARGUE THAT THEY'RE DERIVATIVE OF THE FASHIONS, ARE

3    YOU?

4         MR. ZELLER:  ASSUMING -- LET'S ASSUME THAT THEY LOOK

5    COMPLETELY DIFFERENT.  THEN, NO, WE WOULD NOT SAY --

6         THE COURT:  LET'S ASSUME THAT THEY'RE NOT

7    SUBSTANTIALLY SIMILAR.

8         MR. ZELLER:  THERE WE GO.  AND NO, IN THOSE

9    CIRCUMSTANCES, WE WOULD ABSOLUTELY NOT BE ARGUING THEY'RE

10   DERIVATIVE.  HOWEVER, WHAT OUR ARGUMENT WOULD BE IS THAT IT

11   DOES NOT MATTER, BECAUSE THOSE FASHIONS, WHEN THEY'RE SOLD WITH

12   THE DOLLS, DOLLS THAT ARE OUR DESIGNS, OUR COPYRIGHTED WORKS,

13   STUFF THAT IS INFRINGING OF OUR RIGHTS, BECAUSE THOSE FASHIONS

14   HAVE NO ECONOMIC LIFE, NO LIFE APART FROM THE DOLLS THEY ARE

15   SOLD WITH -- THAT GETS US BACK TO EXACTLY THOSE KIND OF

16   INEXTRICABLY INTERTWINED CASES.

17        THE COURT WILL RECALL ONE THAT WE CITED.  IT'S A

18   LITTLE BIT OF AN OLDER ONE.  I'M SURE WE CAN FIND SOME MORE

19   RECENT EXAMPLES, BUT IT GETS US INTO ALMOST A CONVOYED SALES

20   SITUATION.  BUT IT'S EVEN A CLOSER NEXUS.  IN THE CASE WE

21   CITED, THERE WAS BASICALLY AN INFRINGING INSTRUCTION MANUAL AND

22   A PHONOGRAPH RECORD THAT WERE SOLD AS PART OF A COURSE.  AND

23   BASICALLY, THE COURT JUST SAID, 'WELL, THE VALUE IS IN THE

24   COURSE.  THE PHONOGRAPH RECORD JUST DOESN'T HAVE ANY VALUE

25   APART FROM THE INSTRUCTION MANUAL.  ALL OF IT GOES.  ALL OF THE

1    PROFITS DO.'

2        THE COURT:  I SAW THAT CASE.  BUT THE PHONOGRAPH,

3    WHICH I PRESUME IT WAS A DANCE COURSE --

4        MR. ZELLER:  YES.

5        THE COURT: -- AND THE PHONOGRAPH IS THE MUSIC THAT

6    YOU DANCE TO.  THAT'S NOT -- IN ADDITION TO WHICH, THAT'S NOT

7    WHY PEOPLE ARE BUYING.  THEY ARE BUYING THE COURSE BECAUSE OF

8    ITS -- THE ARTHUR MURRAY, OR WHATEVER, DANCE INSTRUCTION

9    MANUAL.

10       MR. ZELLER:  RIGHT.

11       THE COURT:  MGA IS PROFFERING THERE'S EVIDENCE THAT

12   THE REASON WHY GIRLS ARE BUYING THIS PARTICULAR DOLL IS NOT

13   JUST BECAUSE OF THE DOLL ON THE RIGHT SIDE, BUT BECAUSE OF THE

14   FASHIONS ON THE LEFT SIDE.  AND IF THERE'S COMPETENT EVIDENCE

15   THAT THOSE FASHIONS ARE WHY THIS DOLL IS BEING PICKED OFF THE

16   SHELF AND PURCHASED, THAT WOULD SEEM TO DISTINGUISH IT FROM

17   THAT.

18       NO ONE IS GOING IN AND BUYING THAT MUSICAL DANCE

19   THING BECAUSE, 'OH, I WANT TO LISTEN TO THE TWO-STEP THAT'S

20   GOING ON AS BACKGROUND MUSIC TO THE INSTRUCTION.'  THEY ARE

21   BUYING IT SIMPLY BECAUSE OF THE INSTRUCTION MANUAL.  SO I DO

22   THINK EVIDENCE IS ADMISSIBLE THAT CAN SET UP THESE FIVE

23   ELEMENTS AS SEPARATE FROM.  AND I THINK THAT THREE BOYS

24   SUPPORTS THAT, AS MR. ROTH POINTS OUT.

25       I THINK THAT'S THE DIVIDING LINE THE COURT IS GOING

1    TO TRY TO STRIKE HERE, WITH THE FOCUS ON, FOR THE REASONS THAT

2    YOU WELL POINT IN YOUR BRIEF THIS MORNING, NOT TO PREJUDICE THE

3    JURY WITH SYMPATHY THAT -- AND I UNDERSTAND, FROM MGA'S

4    PERSPECTIVE AND MR. LARIAN'S PERSPECTIVE, WHY THEY THINK THAT,

5    PERHAPS, THAT EVIDENCE SHOULD COME IN.  BUT UNDER THE LAW,

6    THAT'S CLEARLY NOT ADMISSIBLE.  JUST BECAUSE THEY WORKED HARD

7    ON IT -- THE JURY HAS FOUND THAT THEY STOLE THESE DRAWINGS,

8    AND, THEREFORE, NO MATTER HOW HARD YOU WORK ON IT, IF YOU STOLE

9    IT, IT DOESN'T MATTER.

10        I UNDERSTAND THAT.

11        MR. ZELLER:  JUST BRIEFLY ON THE CASE WE WERE

12    DISCUSSING.  I DON'T THINK THERE'S -- I WOULDN'T DISAGREE THAT

13    IT'S FACTUALLY DISTINGUISHABLE IN THE WAY THAT YOU TALKED ABOUT

14    IT.  BUT I STILL THINK -- IT STANDS FOR THE PROPOSITION THAT

15    "INEXTRICABLY INTERTWINED" IN THESE CIRCUMSTANCES MEANS THAT --

16    THEY DON'T HAVE TO BE PHYSICALLY INSEPARABLE.  THEY DON'T HAVE

17    TO EVEN BE INSEPARABLE IN THE SENSE THAT THEY ARE SOMEHOW THAT

18    CLOSELY CONNECTED, BUT RATHER, ONE JUST DOESN'T REALLY HAVE AN

19    INDEPENDENT EXISTENCE OF THE OTHER.  AND THAT'S PART OF MY

20    POINT.

21        THE COURT:  THIS CAN BE A GOOD QUESTION FOR THE JURY,

22    COUNSEL.

23        MR. NOLAN:  REAL QUICK ON --

24        THE COURT:  MR. NOLAN, IS THERE ANYTHING ELSE ON THIS

25    ISSUE?

1        YOU'RE NOW THE THIRD MGA ATTORNEY TO STAND UP.

2        MR. NOLAN:  I'M THE CLOSING ACT, AND IT'S 30 SECONDS.

3        IT JUST GOES TO -- FIVE CATEGORIES.  I JUST WANT TO

4    MAKE SURE WHEN YOU REFERENCE CHARACTERS THAT THEY ALSO

5    INCLUDE THE SUB BRANDS, LIKE BOYZ, KIDZ, BABY TWINZ.  THERE ARE

6    SUB BRANDS UNDERNEATH THAT.  I DIDN'T WANT THAT TO --

7        THE COURT:  I GOT IT, COUNSEL.

8        LET'S TAKE A 15-MINUTE BREAK AND BRING THE JURY IN.

9        (BRIEF RECESS.)

10        THE COURT:  BACK ON THE RECORD, OUTSIDE OF THE

11    PRESENCE OF THE JURY.

12        I JUST RECEIVED WORD THAT THE JURY IS RESTLESS AND

13    ANXIOUS TO GET STARTED.  BUT, MR. SLOAN, I UNDERSTAND YOU

14    WANTED TO TAKE UP SOMETHING OUTSIDE OF THE JURY.

15        MR. SLOAN:  IN LIGHT OF THE FACT YOU SUSTAINED A

16    NUMBER OF OBJECTIONS TO QUESTIONS THAT I ASKED AT THE END OF

17    PROCEEDINGS YESTERDAY -- IN FACT, I THINK YOU SUA SPONTE

18    OBJECTED TO MY LAST QUESTION AND SUGGESTED THAT YOU HAD

19    ADDRESSED SOMETHING PRETRIAL -- I'M CONCERNED THAT THE JURY MAY

20    THINK THAT I'VE DONE SOMETHING INAPPROPRIATE, AND MAYBE EVEN

21    THAT THE DELAY THIS MORNING IS RELATED TO THAT.

22        I WOULD JUST ASK THAT YOU WOULD --

23        THE COURT:  DO YOU HAVE A COPY OF THE TRANSCRIPT AT

24    THE END OF THE DAY, BECAUSE I DON'T REMEMBER...

25        MR. SLOAN:  YES, I DO.

1      MY RECOLLECTION IS THAT YOU ULTIMATELY SAID THE

2      OBJECTION WAS OVERRULED, EVEN THOUGH I SENSE IT WAS YOUR

3      OBJECTION.

4      I'M JUST CONCERNED THAT THE JURY IS GOING TO THINK

5      THAT I'VE DONE SOMETHING IMPROPER.  I THINK THAT WOULD BE AN

6      UNFAIR INFERENCE.

7      MR. ZELLER:  I KNOW I OBJECTED -- WHETHER IT'S

8      REFLECTED ON THE TRANSCRIPT OR NOT, I DON'T KNOW; AND I DON'T

9      KNOW IF THAT'S THE FINAL -- BUT THE FACT IS I ABSOLUTELY DID

10     OBJECT.

11     THE COURT:  YOU OBJECTED TO THE PREVIOUS QUESTION.

12     MR. ZELLER:  IT MAY HAVE BEEN THAT --

13     THE COURT:  THEN MR. SLOAN ASKED ANOTHER QUESTION,

14     AND I SAID "COUNSEL, WE'RE GOING TO HAVE TO HAVE A SIDE-BAR ON

15     THIS; I THOUGHT I MADE THIS CLEAR PRETRIAL. "

16     WHAT DO YOU WANT ME TO SAY, MR. SLOAN?  DO YOU WANT

17     ME TO SAY I MADE A MISTAKE IN CALLING A SIDE-BAR?

18     WHAT LANGUAGE ARE YOU PROPOSING?

19     MR. SLOAN:  NO, YOUR HONOR.

20     I THINK IF YOU JUST SAID THERE WAS AN OBJECTION AT

21     THE END OF TESTIMONY YESTERDAY AND WE EXAMINED IT AND I HAVE

22     OVERRULED THE OBJECTION --

23     THE COURT:  TO THE LAST QUESTION.

24     MR. SLOAN:  -- TO THE LAST QUESTION; AND, YOUR HONOR,

25     THAT THE DELAY THIS MORNING HAD TO DO WITH LEGAL MATTERS

1    TOTALLY UNRELATED TO THIS WITNESS'S TESTIMONY.

2         THE COURT:  I WAS PLANNING ON DOING THAT, COUNSEL,

3    AND, YES, INDICATING THAT WE HAVE NOT SPENT THE LAST TWO HOURS

4    WORKING ON THIS PARTICULAR ISSUE, CERTAINLY.

5         MR. SLOAN:  IN LIGHT OF THE FACT -- I THINK YOU

6    SUSTAINED A NUMBER OF OBJECTIONS.

7         THE COURT:  WHAT OTHER OBJECTIONS ARE YOU SAYING,

8    COUNSEL?

9         MR. SLOAN:  IN LIGHT OF -- I'M NOT GOING TO --

10        THE COURT:  LET ME SEE THE TRANSCRIPT, BECAUSE THE

11   TWO OTHER ONES I'M SEEING ON THIS PAGE ARE FULLY APPROPRIATE.

12   THE FIRST ON THIS PAGE HERE IS "THE QUESTION IS VAGUE," AND I

13   OVERRULED IT; THE SECOND ONE WAS "IRRELEVANT AND FOUNDATION," I

14   JUST CLARIFIED "TO YOUR KNOWLEDGE"; SO THOSE WERE BOTH IN YOUR

15   FAVOR; SO YOU'RE GOING TO HAVE SHOW ME ALL THE OBJECTIONS I

16   RULED AGAINST YOU, COUNSEL.  UNLESS YOU'RE MISSTATING WHAT

17   HAPPENED.

18        MR. ZELLER:  THERE WERE OBJECTIONS I MADE PREVIOUS TO

19   THESE VERY ISSUES.  BUT I THINK MR. SLOAN MAY BE OVER

20   INTERPRETING WHAT HAPPENED.

21        THE COURT:  OH, I THINK SO AS WELL, BUT I WANT TO SEE

22   THE TRANSCRIPT.

23        MR. SLOAN:  YOUR HONOR, YOU KNOW, I --

24        THE COURT:  NO, MR. SLOAN.  YOU ASKED ME TO COME OUT

25   HERE; YOU ASKED ME TO DELAY BRINGING THE JURY OUT HERE; YOU

1    SAID I MADE A BUNCH OF OBJECTIONS THAT I SUSTAINED.

2        I WANT TO SEE THE OBJECTIONS THAT I SUSTAINED.

3        MR. SLOAN:  I THINK THE MAIN ONE WAS THE ONE THAT I

4    POINTED --

5        THE COURT:  I WANT TO SEE ALL OF THE OBJECTIONS THAT

6    YOU JUST REFERRED TO, COUNSEL.

7        I'M WAITING FOR THE TRANSCRIPT.

8        MR. SLOAN:  I HAVE IT HERE.

9        THE COURT:  THANK YOU.  BECAUSE THE TWO PREVIOUS TO

10   THE ONE TO THE SIDE-BAR WERE IN YOUR FAVOR.

11       IT BEGINS ON PAGE 6471, LINE 18, BY MR. SLOAN SAYING

12   "GOOD MORNING, MR. MOORE."  THE FIRST OBJECTION IS ON

13   PAGE 6472; MR. ZELLER OBJECTED THAT THE QUESTION WAS VAGUE; THE

14   COURT SUSTAINED AND ASKED MR. SLOAN TO "CLARIFY, COUNSEL, THAT

15   YOU'RE REFERRING TO ALL OF THE INVESTIGATIVE FILES. "

16       THEN THERE WAS AN OBJECTION IN TERMS OF, AGAIN,

17   VAGUENESS, A REFERENCE TO "THIS CASE"; THE COURT SUSTAINED

18   THAT.  ANOTHER ONE WAS A VAGUENESS REFERENCE AND FOUNDATION,

19   AND THAT WAS SUSTAINED.

20       AGAIN, THERE WAS ANOTHER OBJECTION; YOU KEPT

21   REFERRING TO "THIS ISSUE" WITHOUT EVER EXPLAINING TO WHAT "THIS

22   ISSUE" WAS; SO THERE WERE ESSENTIALLY FOUR OBJECTIONS ALL

23   RELATED TO THE FORM OF YOUR QUESTION, NOT TO THE SUBSTANCE, AND

24   THOSE WERE SUSTAINED, AND THE COURT BELIEVES ALL THOSE

25   OBJECTIONS WERE APPROPRIATE.

1      THE FIFTH OBJECTION, AGAIN, "THE QUESTION IS VAGUE AS

2    TO SUBSTANTIALLY," AND I ACTUALLY OVERRULED THIS, ALTHOUGH THAT

3    MAY HAVE BEEN A MISTAKE; BECAUSE THAT WAS THE ONE, I KNOW I

4    PAUSED AND HESITATED SUBSTANTIALLY; I THINK I EVEN LOOKED AT

5    MR. ZELLER; MR. ZELLER LOOKED BACK AT ME; YOU MADE THAT SAME

6    KIND OF REACTION.  AND I OVERRULED IT.  "SUBSTANTIALLY," IT WAS

7    A POORLY WORDED QUESTION, BUT I OVERRULED THE OBJECTION.

8      THE NEXT ONE WAS THE OBJECTION ON "IRRELEVANT AND

9    FOUNDATION," AND I CLARIFIED "TO YOUR KNOWLEDGE"; AND THAT'S

10   IT; SO I DON'T SEE ALL OF THE OBJECTIONS OUTSIDE OF FORM

11   OBJECTIONS THAT YOU'RE TALKING ABOUT.

12      MR. SLOAN:  THERE'S ONE I THINK YOU MISSED.  IF YOU

13   LOOK AT THE BOTTOM OF 6473, THE QUESTION BEGINNING AT LINE 18:

14   "SIR, ARE YOU AWARE MATTEL HAS BEEN INVESTIGATING THAT ISSUE

15   SINCE?"

16      THE COURT:  RIGHT.  AND I CLARIFIED.  MR. ZELLER

17   OBJECTED ON FOUNDATION, RELEVANCE, AND CONTRARY TO THE COURT'S

18   RULING.  I SAID "SAME QUESTION THAT I SUSTAINED THE OBJECTION

19   TO."  I WAS REFERENCING THAT IT'S THE FORM; YOU'RE USING THAT

20   PHRASE "THAT ISSUE," AND IT WAS ESSENTIALLY, AS I JUST

21   INDICATED, A VAGUENESS OBJECTION; I WAS TRYING TO REFERENCE

22   BACK TO THE SAME QUESTION.  I WASN'T SUSTAINING HIS OBJECTIONS.

23      MR. SLOAN:  I UNDERSTAND IT THAT YOU WERE SUSTAINING

24   HIS OBJECTIONS IN PART ON THAT GROUND.  BUT I UNDERSTAND NOW

25   THAT I WAS MISTAKEN.

1      THE MAIN POINT I WAS TRYING TO RAISE IS THAT THE LAST

2   OBJECTION WAS ACTUALLY FROM THE COURT SUA SPONTE.

3      THE COURT:  I UNDERSTAND THE POINT, MR. SLOAN, BUT

4   YOU'VE MADE A -- AND THIS IS NOT THE FIRST TIME THAT YOU SPEAK

5   WITH A VERY BROAD BRUSH WHEN ADDRESSING THE COURT, AND,

6   FRANKLY, WHEN YOU'RE ADDRESSING WITNESSES; AND YOU'RE GOING TO

7   HAVE TO LEARN, ONE WAY OR ANOTHER, TO CHOOSE YOUR WORDS MORE

8   CAREFULLY.  YOU HAVE AN EXCELLENT ROLE MODEL IN MR. NOLAN, AND

9   I WOULD SUGGEST THAT YOU SPEND MORE TIME CONSULTING WITH HIM

10  BEFORE YOU STAND UP AND BRING THE COURT OUT AND WASTE OUR TIME

11  TALKING ABOUT THINGS THAT ARE GROSSLY OVERSTATED.

12     MR. SLOAN:  DULY NOTED, YOUR HONOR.

13     THE COURT:  VERY WELL.

14     AS FAR AS THE SINGLE ISSUE THAT YOU RAISE, THE COURT

15  DID INDICATE SIDE-BAR -- WHAT DID I SAY?  SIDE-BAR; I THOUGHT

16  WE MADE THIS CLEAR PRETRIAL.  AND AS I INDICATED TO YOU AT

17  SIDE-BAR, I DID MAKE A MISTAKE AND I DID NOT FULLY RECALL THAT

18  PORTION OF MY RULING, AND I'M HAPPY TO MAKE THAT ON THE RECORD.

19  AND IF YOU'RE ASKING ME TO MAKE THAT TO THE JURY AFTER

20  CONSULTING WITH MR. NOLAN, I WILL DO SO.

21     MR. SLOAN:  NO, YOUR HONOR.  I NEVER INTENDED TO

22  SUGGEST THAT.  THE ONLY THING I WAS INTENDING TO SUGGEST IS

23  THAT IF THERE WERE ANY SUGGESTIONS TO THE JURY THAT I HAD DONE

24  SOMETHING WRONG, I HAD STEPPED OVER THE LINE, I THOUGHT -- I

25  THINK ACTUALLY AT THE END OF THE HEARING YESTERDAY, YOU

1    INDICATED -- AND I MAY BE WRONG ABOUT THIS -- THAT THE

2    OBJECTION WAS OVERRULED ESSENTIALLY.

3        THE COURT:  I WILL INDICATE THAT THE OBJECTION WAS

4    OVERRULED; THE OBJECTION THAT THE COURT RAISED SUA SPONTE WAS

5    OVERRULED.

6        MR. SLOAN:  THAT'S FINE, YOUR HONOR.  THAT'S ALL I'M

7    REQUESTING.

8        THE COURT:  VERY WELL.

9        LET'S BRING THE JURY OUT.

10       MR. ZELLER, I DIDN'T GIVE YOU A CHANCE TO RESPOND,

11   AND THAT'S NOT RIGHT.

12       MR. ZELLER:  FAIR ENOUGH.  I DON'T SEE ANY NEED TO

13   RESPOND.

14       MR. NOLAN:  YOUR HONOR, LET ME JUST INTERRUPT.

15       IT'S NOT NECESSARY TO SAY THAT THE COURT'S OBJECTIONS

16   SUA SPONTE -- I THINK IF THE ISSUE IS RESOLVED, THE QUESTION

17   CAN BE RE ASKED OR SOMETHING ELSE.  I'M NOT ASKING FOR --

18       THE COURT:  COUNSEL, WHEN I MAKE A MISTAKE, I'M THE

19   FIRST TO ADMIT IT.  I WISH EVERYONE WOULD DO THAT AS WELL WITH

20   ME.  AND I'LL BE HAPPY TO LET THE JURY KNOW THAT.

21       MR. NOLAN:  I JUST THINK FOR PURPOSES OF FRAMING THE

22   ISSUE THIS MORNING, THAT JUST TO SAY THAT THE DELAY WAS NOT

23   RELATED TO --

24       THE COURT:  MY ONLY POINT WAS THAT I DIDN'T SUSTAIN A

25   WHOLE BUNCH OF OBJECTIONS.

1           MR. NOLAN:  I APPRECIATE THAT, BUT I DIDN'T WANT TO

2    SUGGEST THAT NEITHER MR. SLOAN OR I WERE ASKING YOU TO CORRECT

3    YOURSELF IN FRONT OF THE JURY, OTHER THAN JUST TO SAY THAT THE

4    OBJECTION --

5           THE COURT:  MY REMARKS WERE NOT DIRECTED TO YOU,

6    MR. NOLAN.

7           LET'S BRING THE JURY IN.

8           (JURORS ENTER COURTROOM.)

9           THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.  I

10   APOLOGIZE FOR KEEPING YOU WAITING FOR SO LONG.  I ASSURE YOU

11   WE'VE ALL BEEN WORKING VERY HARD THIS MORNING ON THIS

12   PARTICULAR MATTER, AND I THINK WE'VE MADE SOME IMPORTANT

13   HEADWAY IN TERMS OF MAPPING OUT THE REST OF THE CASE; SO THIS

14   HAS BEEN AN EFFICIENT USE OF YOUR TIME AS WELL.  BUT I DO

15   APOLOGIZE FOR THE DELAY.

16          AT END OF THE DAY -- I KNOW WE ENDED ABRUPTLY

17   YESTERDAY -- THE COURT HAD CALLED A SIDE-BAR.  THE COURT ENDED

18   UP OVERRULING ITS OWN OBJECTION; SO THAT SHOULD BE OF NO MOMENT

19   TO YOU.  WE'RE NOW GOING TO RESUME WITH MR. SLOAN'S

20   CROSS-EXAMINATION OF MR. MOORE.

21          JUST SO YOU KNOW, FOR TODAY, WE'RE GOING TO GO FROM

22   11:00 TO 12:00; WE'RE GOING TO RESUME AT 1:00.  THE COURT HAS A

23   NATURALIZATION CEREMONY THAT IT IS DOING AT 4 O'CLOCK.  IT'S

24   ONE OF THE MORE PLEASANT THINGS I GET TO DO AS A JUDGE.  IT'S

25   ONE OF THE FEW TIMES WHERE EVERYBODY LEAVES THE COURTROOM VERY

1    HAPPY; SO WE'RE DOING THAT AT 4 O'CLOCK, SO WE'LL BE WRAPPING

2    UP AT 4 O'CLOCK.  SO WE'LL HAVE A FULL THREE HOURS THIS

3    AFTERNOON, I WANT TO START AT 1:00.

4         SO, MR. SLOAN?

5         MR. SLOAN:  THANK YOU, YOUR HONOR.

6              DIRECT EXAMINATION

7    BY MR. SLOAN:

8    Q   I WANT TO GO RIGHT BACK TO WHERE WE LEFT OFF YESTERDAY,

9    BUT BEFORE THAT, I JUST WANT TO ASK YOU A COUPLE OF PRELIMINARY

10   QUESTIONS ABOUT YOUR PREPARATION FOR YOUR TESTIMONY HERE.

11        LET ME ASK YOU FIRST OFF, BEFORE YOU TESTIFIED

12   YESTERDAY, YESTERDAY AFTERNOON, HOW MUCH TIME DID YOU SPEND

13   PREPARING FOR YOUR TESTIMONY?

14   A   A FEW HOURS HERE AND THERE FOR THAT PARTICULAR TIME, YES.

15   Q   WAS THAT A FEW HOURS JUST THIS WEEK?

16   A   THAT'S RIGHT.

17   Q   AND WERE YOU PREPARED BY LAWYERS FROM QUINN EMANUEL IN

18   CONNECTION WITH YOUR TESTIMONY?

19   A   YES, I WAS.

20   Q   WHO HELPED PREPARE YOU FOR YOUR TESTIMONY YESTERDAY?

21   A   A GENTLEMAN NAMED SCOTT KIDMAN AND MICHAEL ZELLER.

22   Q   AND APPROXIMATELY HOW MUCH TIME DID YOU SPEND WITH

23   MR. KIDMAN AND MR. ZELLER?

24   A   BOY.  APPROXIMATELY, IN THE LAST WEEK, WITH THEM,

25   PROBABLY, LIKE, SIX HOURS, MAYBE.

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1    Q   AND DID YOU REVIEW DOCUMENTS WITH THEM?

2    A   I DID.

3    Q   CAN YOU IDENTIFY WHAT DOCUMENTS YOU REVIEWED WITH THEM,

4    BRIEFLY?  I'M NOT ASKING FOR --

5    A   I REVIEWED --

6        MR. ZELLER:  THIS IS WORK PRODUCT AS IS ASKED;

7    THERE'S NOTHING.

8        THE COURT:  SUSTAINED.

9    BY MR. SLOAN:

10   Q   DID YOU MEET AGAIN WITH LAWYERS FROM QUINN EMANUEL TO

11   PREPARE FOR YOUR TESTIMONY AFTER THE SESSION THAT ENDED

12   YESTERDAY AFTERNOON?

13   A   NO.

14   Q   SO YOU HAVE NOT MET WITH ANYONE IN PREPARATION FOR YOUR

15   TESTIMONY THIS MORNING, OTHER THAN THE PREPARATION THAT YOU HAD

16   BEFORE YOU APPEARED YESTERDAY AFTERNOON.

17   A   WE DIDN'T DISCUSS MY TESTIMONY, IF THAT'S WHAT YOU MEAN.

18   Q   OKAY.  I'M ASKING YOU A DIFFERENT QUESTION.

19       AFTER YOUR TESTIMONY ENDED YESTERDAY AFTERNOON, DID

20   YOU SPEND MORE TIME WITH ANY LAWYERS FROM QUINN EMANUEL

21   PREPARING FOR TESTIMONY THIS MORNING?

22   A   A FEW MINUTES.

23   Q   WHO DID YOU MEET WITH?

24   A   MIKE ZELLER.

25   Q   DID YOU REVIEW ANY OF THE DOCUMENTS THAT WERE PROVIDED IN

1    THE WITNESS BINDERS, THE WHITE WITNESS BINDERS THAT WERE

2    PROVIDED BY ME?

3    A   IN THIS BINDER HERE?

4    Q   YES.

5    A   YES, I DID.

6    Q   AND HOW MUCH TIME DID YOU SPEND REVIEWING THOSE DOCUMENTS?

7    A   A FEW MINUTES.

8    Q   YOU TESTIFIED YESTERDAY THAT YOU BEGAN INVESTIGATING

9    WHETHER CARTER BRYANT HAD CREATED BRATZ IN APPROXIMATELY THE

10   SUMMER OF 2003; CORRECT?

11   A   WELL, I'M TRYING TO UNDERSTAND WHAT YOU MEAN BY THAT

12   EXACTLY.

13   Q   WELL, YOU WERE INVOLVED IN THE INVESTIGATION THAT LED TO

14   THE FILING OF THIS CASE; IS THAT CORRECT?

15   A   YES.  I WAS LOOKING INTO FACTS WHICH BECAME THE FOUNDATION

16   OF THIS CASE, YES.

17   Q   AND ONE OF THE THINGS YOU WERE INVESTIGATING WAS WHETHER

18   OR NOT CARTER BRYANT HAD BEEN INVOLVED IN THE CREATION OF

19   BRATZ; CORRECT?

20        MR. ZELLER:  MISSTATES THE WITNESS'S TESTIMONY.

21        THE COURT:  REPHRASE THE QUESTION, COUNSEL.

22   BY MR. SLOAN:

23   Q   IRRESPECTIVE OF WHAT YOU SAID YESTERDAY, ISN'T IT TRUE

24   THAT YOU WERE INVOLVED IN INVESTIGATING WHETHER CARTER BRYANT

25   HAD BEEN INVOLVED IN CREATING BRATZ?

1   A   WE WERE LOOKING INTO WHETHER THAT WAS A POSSIBILITY THAT

2   HE WAS INVOLVED IN THAT.

3   Q   SO YOU WERE INVESTIGATING WHETHER OR NOT CARTER BRYANT WAS

4   INVOLVED IN THE CREATION OF BRATZ; CORRECT?

5        MR. ZELLER:  OBJECTION, YOUR HONOR.  THIS IS VAGUE AS

6   TO THE --

7        THE COURT:  IT'S THE WORD "INVESTIGATING."  YOU'RE

8   SAYING "LOOKING INTO."  WHY DON'T YOU HAVE YOUR WITNESS DEFINE

9   TERMS, COUNSEL.

10        MR. ZELLER:  THIS GOES BACK TO THE SIDE-BAR.  THE WAY

11   HE IS PHRASING THE QUESTION IS VAGUE AS TO WHAT WAS BEING

12   LOOKED AT.

13        THE COURT:  "LOOKING INTO. "

14        MR. ZELLER:  IT'S THE SUBJECT.

15        THE COURT:  COUNSEL, YOU'LL HAVE AN OPPORTUNITY ON

16   REDIRECT TO FOLLOW UP ON THAT.

17        OVERRULED.  YOU MAY PROCEED.

18        BUT YOU'RE USING TWO DIFFERENT TERMS, SO YOU MIGHT

19   WANT TO CLARIFY THAT FOR THE RECORD.

20   BY MR. SLOAN:

21   Q   I'VE BEEN USING THE TERM "INVESTIGATING," THAT YOU WERE

22   INVOLVED IN INVESTIGATING WHETHER CARTER BRYANT WAS INVOLVED IN

23   THE CREATION OF BRATZ.

24        DO YOU HAVE AN UNDERSTANDING OF WHAT I MEAN BY

25   INVESTIGATING?

1      MR. ZELLER:  CALLS FOR SPECULATION; HE'S ASKING

2  ABOUT --

3      THE COURT:  AS PHRASED, SUSTAINED.

4  BY MR. SLOAN:

5  Q   SIR, DID YOU PREPARE A DECLARATION IN CONNECTION WITH THIS

6  CASE WHICH YOU SIGNED AUGUST 13, 2007?  AND I DIRECT YOU,

7  ACTUALLY, TO EXHIBIT 18064, WHICH IS IN YOUR BINDER, AND I

8  DIRECT YOU TO PAGE 2 OF THAT DECLARATION AT PARAGRAPH FIVE.

9      DO YOU SEE THAT?

10  A   OKAY.

11  Q   AND IS THIS, IN FACT, YOUR DECLARATION THAT YOU SUBMITTED

12  TO THIS COURT IN CONNECTION WITH THIS CASE?

13  A   YES.

14  Q   AND IF YOU LOOK AT PAGE 6, IS THAT YOUR SIGNATURE WHICH

15  INDICATES IT WAS EXECUTED AS OF AUGUST 13TH OF 2007?

16  A   THAT'S MY SIGNATURE.

17  Q   AND THIS WAS A DECLARATION UNDER PENALTY OF PERJURY; IS

18  THAT CORRECT?

19  A   IT'S A DECLARATION UNDER THE PENALTY OF PERJURY, YES.

20  Q   OKAY.

21      AND YOU INDICATED THERE AT PARAGRAPH FIVE, STARTING

22  AT LINE 17, THAT "I PERSONALLY PARTICIPATED AND SUPERVISED THE

23  INVESTIGATION, COLLECTION, AND PRESERVATION OF DOCUMENTS THAT

24  RELATE TO THE BASE OF MATTEL'S CLAIMS IN THIS LITIGATION";

25  CORRECT?

1   A   THAT'S WHAT IT SAYS.

2   Q   WAS THAT A TRUE AND CORRECT STATEMENT, SIR?

3   A   IT IS.

4   Q   AND THERE YOU USED THE TERM THAT YOU SUPERVISED THE

5   INVESTIGATION RELATING TO THE BASIS OF MATTEL'S CLAIMS IN THIS

6   LITIGATION; CORRECT?

7   A   YES.

8   Q   SO WHEN YOU USE THE TERM "INVESTIGATION" THERE, WHAT DID

9   YOU UNDERSTAND THAT TO MEAN?

10  A   WELL, I USED THAT TERM TO MEAN THAT I WAS LOOKING INTO

11  VARIOUS LEADS AND AVENUES OF FACTS, LOOKING FOR FACTS.

12  Q   SO YOU WERE TRYING TO FIND FACTS THAT WOULD DETERMINE,

13  AMONG OTHER THINGS, WHETHER OR NOT CARTER BRYANT WAS INVOLVED

14  IN THE CREATION OF BRATZ; IS THAT A TRUE STATEMENT, SIR?

15      MR. ZELLER:  QUESTION IS VAGUE.

16      THE COURT:  YOU MAY ANSWER THE QUESTION.

17      THE WITNESS:  DO YOU MEAN WHEN CARTER BRYANT CREATED

18  BRATZ?  WHEN HE CREATED BRATZ?  IS THAT WHAT YOU MEAN?

19  BY MR. SLOAN:

20  Q   NO.  LET'S START HERE.

21      WAS ONE OF THE ISSUES THAT WAS OF INTEREST TO YOU

22  WHETHER OR NOT CARTER BRYANT HAD BEEN INVOLVED IN DESIGNING OR

23  CREATING BRATZ?  IS THAT SOMETHING THAT CONCERNED YOU DURING

24  YOUR INVESTIGATION?

25  A   I WAS INTERESTED IN KNOWING WHETHER HE CREATED BRATZ, YES.

1    Q   ISN'T THAT THE QUESTION THAT I HAVE BEEN ASKING FOR THE

2    LAST FIVE MINUTES?

3          MR. ZELLER:  OBJECTION, YOUR HONOR.

4          THE COURT:  SUSTAINED.

5    BY MR. SLOAN:

6    Q   AND YOU SAID THAT YOU WERE LOOKING INTO EVIDENCE THAT

7    MIGHT SHOW WHETHER OR NOT HE WAS INVOLVED IN CREATING BRATZ;

8    CORRECT?

9    A   I WAS.  I REVIEWED DOCUMENTS, I LOOKED AT THINGS, TO TRY

10   TO DETERMINE THINGS ONE WAY OR ANOTHER.

11   Q   AND AMONG THOSE DOCUMENTS WERE DOCUMENTS INTERNAL TO

12   MATTEL; CORRECT?

13   A   I BELIEVE I REVIEWED SOME DOCUMENTS INTERNAL TO MATTEL,

14   YEAH.

15   Q   WHY DON'T YOU TELL US, WHAT ARE SOME OF THE THINGS YOU DID

16   TO DETERMINE WHETHER OR NOT CARTER BRYANT WAS INVOLVED IN

17   CREATING BRATZ?

18         MR. ZELLER:  OBJECTION; WORK PRODUCT.

19         THE COURT:  ACTUALLY, AS PHRASED, OVERRULED.

20         WHAT YOU DID, WITHOUT GETTING INTO THE CONTENT.

21         MR. ZELLER:  MAYBE I MISUNDERSTOOD THE QUESTION.

22         I THINK HE'S ASKING HIM OF CATEGORIES OF TASKS AS

23   WELL.

24         THE COURT:  ARE YOU ASKING FOR THINGS -- CLARIFY YOUR

25   QUESTION, COUNSEL, IN LIGHT OF THE OBJECTION.  REPHRASE THE

Transcript of Proceedings - AM (Moore Dir)  8/8/2008 8:45:00 AM

1    QUESTION.

2    BY MR. SLOAN:

3    Q   YOU SAID YOU WERE LOOKING INTO FACTS TO DETERMINE WHETHER

4    OR NOT HE WAS INVOLVED IN THE CREATION OF BRATZ; CORRECT?

5    A   THAT'S RIGHT.

6    Q   THAT'S WHAT YOU DO IN AN INVESTIGATION; CORRECT?

7    A   THAT'S ONE OF THE THINGS YOU DO; IT WAS ONE OF THE

8    POSSIBILITIES THAT HE DID CREATE BRATZ.

9    Q   ONE THING YOU DO IS YOU TRY TO GO AROUND AND COLLECT

10   FACTS; CORRECT?

11   A   I LOOKED FOR ANY INFORMATION THAT WAS AVAILABLE.

12   Q   NOW, YOU SAID YESTERDAY THAT -- I ASKED YOU A QUESTION, I

13   ASKED YOU WHETHER -- I SAID, ESSENTIALLY, THAT YOU WEREN'T THE

14   FIRST PERSON AT MATTEL WHO EVER BEGAN TO INVESTIGATE WHETHER

15   CARTER BRYANT WAS INVOLVED IN DESIGNING BRATZ, WERE YOU, SIR,

16   TO THE BEST OF YOUR KNOWLEDGE?

17        AND YOUR ANSWER TO THAT WAS, I THINK I WAS THE FIRST

18   PERSON, IN SOME RESPECTS.  IS THAT CORRECT, SIR?

19   A   SOUNDS LIKE THAT'S WHAT I TESTIFIED TO YES.

20   Q   WOULD YOU LIKE TO SEE YOUR TESTIMONY?

21   A   NO.  I BELIEVE THAT.

22   Q   SO YOUR TESTIMONY WAS, TO THE BEST OF YOUR KNOWLEDGE, YOU

23   WERE THE FIRST PERSON AT MATTEL, IN SOME RESPECTS, WHOEVER

24   BEGAN TO INVESTIGATE WHETHER CARTER BRYANT WAS INVOLVED IN

25   DESIGNING BRATZ; CORRECT?

1          MR. ZELLER:  MISSTATES THE WITNESS'S TESTIMONY; VAGUE

2     AS TO TIME.

3          MR. SLOAN:  CAN WE PUT THE TRANSCRIPT AT PAGE 6474,

4     LINES 15 THROUGH 22, ON THE SCREEN?

5     BY MR. SLOAN:

6     Q   HERE IS THE TESTIMONY.  I ASKED YOU:  "AND YOU WEREN'T THE

7     FIRST PERSON AT MATTEL WHO WAS THE PERSON INVOLVED WITH

8     DESIGNING BRATZ, WERE YOU, SIR, TO THE BEST OF YOUR KNOWLEDGE?

9          MR. ZELLER OBJECTED; THE COURT SAID "TO YOUR

10    KNOWLEDGE."  AND THEN YOU SAID "TO MY KNOWLEDGE, I THINK I WAS

11    -- I THINK I WAS THE FIRST IN SOME RESPECTS."

12         IS THAT CORRECT, SIR?

13    A   YES.

14    Q   THAT ANSWER WAS NOT COMPLETELY ACCURATE, WAS IT, SIR?

15         MR. ZELLER:  QUESTION IS VAGUE; AND IT'S

16    ARGUMENTATIVE, OF COURSE.

17         THE COURT:  IT IS ARGUMENTATIVE.

18         MOVE ON, COUNSEL.  IF YOU WANT TO IMPEACH HIM,

19    IMPEACH HIM.

20    BY MR. SLOAN:

21    Q   DO YOU BELIEVE THAT WAS AN ACCURATE ANSWER?

22         THE COURT:  THERE'S NO OBJECTION.  ANSWER THE

23    QUESTION.

24         THE WITNESS:  YES.

25    BY MR. SLOAN:

1    Q    YOU BELIEVE IT WAS ACCURATE?

2    A    (NO AUDIBLE RESPONSE.)

3    Q    SIR, ISN'T IT TRUE THERE WERE SEVERAL OTHER PEOPLE AT

4    MATTEL BESIDES YOURSELF WHO WERE INVOLVED IN INVESTIGATING

5    CLAIMS INVOLVING MR. BRYANT'S ROLE IN THE CREATION OF BRATZ?

6         MR. ZELLER:  YOUR HONOR, THIS IS CONTRARY TO THE

7    SIDE-BAR.  MOREOVER, IT'S DISTORTING THE TESTIMONY OF

8    MR. MOORE.  THIS IS NOT --

9         THE COURT:  COUNSEL, STOP THE SPEAKING OBJECTION.

10        WHAT'S YOUR LEGAL OBJECTION?

11        MR. ZELLER:  MISSTATES THE WITNESS'S TESTIMONY; LACKS

12   FOUNDATION; ASSUMES FACTS.

13        THE COURT:  I'M AFRAID WE'RE GOING TO HAVE TO HAVE A

14   SIDE-BAR ON THIS.

15        (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

16        THE COURT:  COUNSEL, YOU'RE QUESTIONS ARE SUFFERING

17   FROM THE SAME POINTS THAT I TRIED TO MAKE OUTSIDE OF THE

18   PRESENCE OF THE JURY.  THERE'S A LACK OF PRECISION IN YOUR

19   STATEMENTS.  AND THE COURT TOOK AFFRONT WHEN YOU MADE THE

20   STATEMENTS THAT WERE NOT TRUE TO THE COURT.  THAT'S WHY I GAVE

21   YOU LEEWAY OVER MR. ZELLER'S PROBABLY WELL-FOUNDED OBJECTION

22   THAT IT WAS CUMULATIVE AT THAT POINT, TO POINT OUT AND HAVE YOU

23   LEARN THAT WHEN YOU SUMMARIZE A QUESTION -- AND I CAN SHOW YOU

24   IN THE TRANSCRIPT WHERE YOU DO THAT -- YOU'RE LEAVING OUT

25   CRITICAL ELEMENTS OF THE QUESTION.

1        FOR EXAMPLE, WHEN YOU ASKED THE WITNESS 'DIDN'T YOU

2    TESTIFY YESTERDAY THAT YOU WERE THE FIRST ONE AT MATTEL TO

3    INVESTIGATE THIS?'  YOU LEFT OUT THAT CRITICAL LINE, "TO YOUR

4    KNOWLEDGE."  THAT ADDS A WHOLE WORLD OF DIFFERENCE.  AND IF YOU

5    DON'T SEE THAT, I CAN'T TEACH THAT TO YOU.  BUT I CAN INSIST

6    THAT YOU BE ACCURATE IN YOUR QUESTIONS; SO THAT IS AN ISSUE

7    OUTSIDE OF THE PRESENCE OF THE JURY THAT I'LL REITERATE TO YOU.

8    THAT WAS KIND OF WHY -- I SAW YOU DOING THIS YESTERDAY, AND

9    THAT'S WHY YOU HAD THOSE FOUR OBJECTIONS ON VAGUENESS.

10        YOU NEED TO TAKE BETTER CARE IN FORMULATING YOUR

11    QUESTIONS.

12        AS TO THIS PARTICULAR QUESTION, WHAT IS YOUR PRECISE

13    OBJECTION?

14        MR. ZELLER:  I'M TROUBLED BY THE FACT THAT THE

15    TESTIMONY IS "IN SOME RESPECTS."  MR. SLOAN CONTINUES TO DO

16    EXACTLY WHAT THE PROBLEM WAS YESTERDAY.  HE KEEPS ON ASKING THE

17    QUESTION OF "CARTER BRYANT, THE CREATOR OF BRATZ,' OR 'BEING

18    INVOLVED IN BRATZ,' WITHOUT DEFINING THE TIME PERIOD.

19        IS THIS AT ANY TIME OR IS THIS DURING THE TIME HE WAS

20    EMPLOYED BY MATTEL?  THAT IS THE 403 DANGER.

21        THE COURT:  I UNDERSTAND THERE'S A 403 DANGER.  BUT

22    AS I INDICATED YESTERDAY AT SIDE-BAR, IT IS A COMPONENT.  AND I

23    STRUGGLED WITH THIS -- THAT'S WHY I'M SURPRISED THAT I DIDN'T

24    REMEMBER IT, BECAUSE I REMEMBER STRUGGLING WITH THIS WHEN I WAS

25    UP IN LAKE ALMANOR, BECAUSE TWICE I HAD AN ORDER WRITTEN

1    GRANTING THIS MOTION, THE STATUTE OF LIMITATIONS, OUTRIGHT, ON

2    SUMMARY JUDGMENT, AND TWICE I PUT IT BACK, BECAUSE I AM NOT

3    CONVINCED THAT THERE IS A GENUINE ISSUE OF FACT.

4        THERE MAY BE.  AND WHERE IT MAY BE IS IN A

5    COMBINATION OF THE FACT OF THE ANONYMOUS LETTER, THE

6    INVESTIGATION, AND SOME REASONABLE INFERENCES THAT MAY BE DRAWN

7    FROM OTHER TESTIMONY.

8        MIND YOU, I MAY GO BACK TO MY INITIAL INCLINATION

9    WHICH I TWICE REJECTED, AND THAT IS THAT, YOU'RE RIGHT, AS A

10   MATTER OF LAW, THAT THIS IS NOT A TRIABLE ISSUE.  BUT PART OF

11   THE COMPONENT OF THAT TRIABLE ISSUE OF FACT IS THE STATEMENT

12   THAT, YOU KNOW, YOU'RE GOING TO GET IN THE ANONYMOUS LETTER;

13   THAT COMES IN.  YOU'RE GOING TO GET IN -- NOT NECESSARILY

14   THROUGH THIS WITNESS; YOU HAVE TO LAY FOUNDATION; BUT YOU'RE

15   GOING TO GET THE ANONYMOUS LETTER; AND YOU'RE GOING TO GET IN

16   THAT AS EARLY AS 2002, MAYBE EVEN EARLIER, THAT IT WAS CARTER

17   BRYANT WHO DEVELOPED BRATZ.

18       THE CRITICAL ISSUE IS IN TERMS OF WHETHER OR NOT IT

19   WAS DEVELOPED WHILE HE WAS AS A MATTEL EMPLOYEE.  AND I

20   RECOGNIZE THAT, AND I UNDERSTAND ABOUT THE INVESTIGATION, THAT

21   THAT WAS FOCUSED ON SOMETHING ENTIRELY DIFFERENT.  AND I

22   UNDERSTAND ABOUT THE E-MAIL THAT WAS FOCUSED ON SOMETHING

23   DIFFERENT.  I GET ALL OF THAT.  THAT'S NOT COMING IN.

24       BUT WE JUST NEED TO GET PAST THIS.  AND I'M

25   PERMITTING EVIDENCE IN THAT HE -- BUT I DON'T KNOW WHERE THIS

1    IMPEACHMENT -- WHAT ARE YOU TRY TO IMPEACH WITH HIM AT THIS

2    POINT?  THAT THERE WERE OTHER PEOPLE THAT HE DIDN'T KNOW ABOUT

3    OR THAT HE DID KNOW ABOUT?

4        FOR THAT TO BE IMPEACHED, YOU WOULD HAVE TO SHOW, AND

5    HAVE A GOOD FAITH BASIS FOR BELIEVING, THAT HE KNEW THAT THERE

6    WERE OTHER PEOPLE INVESTIGATING THIS PRIOR TO HIM INVESTIGATING

7    IT?

8        WHAT ARE YOU TRYING TO PROVE?

9        MR. SLOAN:  THERE'S AN INVESTIGATIVE REPORT THAT IS

10   PRODUCED BY MATTEL THAT SHOWS AN INVESTIGATION WHICH BEGAN IN

11   MARCH OF 2002.  I THINK I'M ENTITLED TO INQUIRE WHETHER

12   TESTIMONY FROM SOMEONE FROM THE VIDEO DEPARTMENT TESTIFYING

13   THAT HE DIDN'T KNOW ABOUT THIS KEY PIECE OF EVIDENCE IN

14   NOVEMBER OF 2003 -- HE KNEW ABOUT OTHER EVIDENCE OR OTHER

15   PEOPLE KNEW ABOUT OTHER EVIDENCE; THAT WOULD PUT THEM ON NOTICE

16   THAT CARTER BRYANT WAS INVOLVED IN SOME CREATION OF BRATZ BACK

17   INTO MARCH OF 2002.  I THINK THAT'S A FAIR QUESTION TO ASK

18   ABOUT.  NOT JUST FOR IMPEACHMENT, BUT IT GOES DIRECTLY TO THE

19   FRAUDULENT CONCEALMENT, WHICH IS THE ONLY REASON, I SUBMIT,

20   THAT MR. ZELLER CALLED HIM AS A WITNESS.

21       MR. ZELLER:  THIS IS REALLY A DISTORTION OF THE

22   COURT'S RULINGS.  WHAT MR. SLOAN IS DOING, IT'S QUITE CLEAR

23   FROM THE COURT'S ORDER, THERE IS A KEY DISTINCTION AS TO

24   KNOWING WHETHER CARTER BRYANT WAS CREATING BRATZ WHILE EMPLOYE

25   BY MATTEL OR CREATING IT AT ANY TIME.

1       THE COURT:  I UNDERSTAND THAT.

2       MR. ZELLER:  THEY HAVE NO TIME LIMITATION ON IT; SO

3  THE QUESTION IS VAGUE.

4       OF COURSE MR. MOORE IS GOING TO SAY 'I LOOKED INTO

5  WHETHER OR NOT CARTER BRYANT WAS INVOLVED IN THE CREATION OF

6  BRATZ.'

7       THE COURT:  BUT YOU CAN CLARIFY ON REDIRECT; SO I

8  THINK WE SHOULD JUST MOVE FORWARD AND THAT CLARIFICATION COMES

9  OUT, AND THAT'S THAT.

10      BUT I'M HAVING THE SAME PROBLEM WITH THIS WITNESS

11  THAT I'M HAVING WITH SEVERAL OTHERS.  WHAT IS IT WITH IN-HOUSE

12  COUNSEL THAT THEY CAN'T ANSWER A SIMPLE QUESTION?  I MEAN...

13      MR. ZELLER:  I WILL SAY -- AND I DON'T WANT TO SOUND

14  -- BUT THE QUESTIONS ARE TROUBLING TO ME.  WE'RE OBVIOUSLY

15  OBJECTING TO THEM.  BUT I THINK THEY ARE VAGUE.

16      YES, OF COURSE, HE LOOKED AT THESE THINGS, BUT.

17      THE COURT:  HE NEEDS TO JUST ANSWER THE QUESTIONS.

18  AND YOU CAN REDIRECT; SO LET'S GO THROUGH THIS.

19      BUT PLEASE BE PRECISE IN YOUR QUESTIONS.

20      (SIDE-BAR PROCEEDINGS CONCLUDED.)

21      THE COURT:  YOU MAY PROCEED, COUNSEL.

22      JUST ASK YOUR NEXT QUESTION, COUNSEL.

23      MR. SLOAN:  ARE YOU ASKING ME TO ASK A DIFFERENT

24  QUESTION?

25      THE COURT:  JUST ASK A QUESTION, ANY QUESTION.

Transcript of Proceedings - AM (Moore Dir)  8/8/2008  8:45:00 AM

1        MR. SLOAN:  I'LL TRY TO MAKE IT SOMETHING THAT'S NOT

2    OBJECTABLE, YOUR HONOR.

3        THE COURT:  THANK YOU.

4    BY MR. SLOAN:

5    Q   MR. MOORE, ARE YOU AWARE THAT THERE WERE OTHER PEOPLE AT

6    MATTEL WHO WERE INVESTIGATING MR. BRYANT'S ROLE IN DESIGNING

7    BRATZ BEFORE THE SUMMER OF 2003?

8        MR. ZELLER:  ASSUMES FACTS; LACKS FOUNDATION.

9        MR. SLOAN:  I ASKED WHETHER HE'S AWARE.

10       THE COURT:  YOU DID ASK WHETHER HE'S AWARE.  THAT

11   ASSUMES FACTS NOT IN EVIDENCE.  YOU HAVE TO CHANGE IT TO AN

12   "IF."  DO YOU KNOW "IF" AS OPPOSED TO WHETHER YOU ARE AWARE

13   "THAT"; THAT DOES ASSUME FACTS NOT IN EVIDENCE AS FORMED.

14       OBJECTION SUSTAINED.

15   BY MR. SLOAN:

16   Q   DO YOU KNOW IF THERE WERE OTHER PEOPLE AT MATTEL WHO WERE

17   INVOLVED IN INVESTIGATING MR. BRYANT'S ROLE IN DESIGNING BRATZ

18   BEFORE THE SUMMER OF 2003?

19   A   WHAT YOU HAVE TO UNDERSTAND IS A LOT OF MY KNOWLEDGE IS

20   BASED ON CONVERSATIONS THAT I HAVE HAD WITH LAWYERS AND THINGS;

21   SO JUST MAY AWARENESS --

22       THE COURT:  JUST ANSWER THE QUESTION.

23       THE WITNESS:  OKAY.  I WAS AWARE THAT THERE WAS SOME

24   REVIEW OF BRATZ WITH RESPECT TO TOON TEENZ.

25   BY MR. SLOAN:

1    Q    AND WERE THERE OTHER PEOPLE IN THE LEGAL DEPARTMENT, TO

2    YOUR KNOWLEDGE, WHO WERE INVOLVED IN INVESTIGATING WHETHER

3    MR. BRYANT WAS INVOLVED IN THE CREATION OF BRATZ?

4    A    WHEN YOU SAY "IN THE CREATION OF BRATZ," THAT, I DON'T

5    KNOW.

6    Q    WERE THERE OTHER PEOPLE IN THE LEGAL DEPARTMENT WHO WERE

7    INVOLVED IN INVESTIGATING WHETHER BRATZ IN SOME WAY INFRINGED

8    ON TOON TEENZ?

9    A    I WAS AWARE THERE WAS A REVIEW OF WHETHER BRATZ INFRINGED

10   TOON TEENZ.

11   Q    DO YOU WORK WITH MICHELE MCSHANE?

12   A    I DON'T CURRENTLY.

13   Q    DID YOU FORMERLY WORK WITH HER?

14   A    YES.

15   Q    WAS SHE INVOLVED IN INVESTIGATING THIS CASE IN ANY WAY?

16        MR. ZELLER:  OBJECTION.  VAGUE AS TO "THIS CASE."

17        THE COURT:  REPHRASE, COUNSEL.

18   BY MR. SLOAN:

19   Q    WAS SHE INVOLVED IN INVESTIGATING THE CLAIMS WHICH LED TO

20   THE FILING OF THE COMPLAINT AGAINST MGA AND ISAAC LARIAN IN

21   THIS CASE?

22   A    NO.  NOT TO MY KNOWLEDGE.

23   Q    SHE WASN'T.

24        DID YOU WORK WITH MR. ROBERT NORMILE IN CONNECTION

25   WITH THIS INVESTIGATION?

1    A   I WORKED WITH BOB NORMILE IN CONNECTION WITH MY ACTIVITIES

2    IN 2003, YES.

3    Q   AND ARE YOU AWARE OR ARE YOU AWARE OF WHETHER THE GLOBAL

4    SECURITY DEPARTMENT AT MATTEL CONDUCTED ANY SORT OF

5    INVESTIGATION INTO WHETHER OR NOT CARTER BRYANT WAS INVOLVED IN

6    THE CREATION OF BRATZ?

7    A   AS TO THAT QUESTION, I'M NOT AWARE THAT THEY LOOKED INTO

8    THAT.

9    Q   OKAY.

10       MR. MOORE, YOU TESTIFIED EARLIER, I THINK, THAT

11   YOU -- LET ME DIRECT YOU BACK TO YOUR DECLARATION, WHICH IS

12   EXHIBIT 18064, PARAGRAPH FIVE, THE SECOND SENTENCE OF THAT.

13   YOU SAY "I PERSONALLY SPENT HUNDREDS OF HOURS, BEGINNING IN

14   2003, SEARCHING FOR, COLLECTING AND PRESERVING DOCUMENTS,

15   INCLUDING ELECTRONIC DATA, IN CONNECTION WITH THIS LITIGATION."

16       IS THAT CORRECT?

17   A   THAT'S WHAT I SAID HERE, YES.

18   Q   WELL, I DIDN'T ASK WHETHER THAT'S WHAT YOU SAID HERE.  I

19   SAID IS WHAT YOU SAID THERE CORRECT?

20   A   I DIDN'T MEAN TO -- THAT'S -- WHAT I SAID HERE IS CORRECT.

21   Q   OKAY.

22       AND ARE YOU AWARE THAT THERE'S A GLOBAL SECURITY

23   DEPARTMENT AT MATTEL THAT CONDUCTS INVESTIGATIONS?

24   A   I AM AWARE.

25   Q   AND IN THE NORMAL COURSE OF INVESTIGATING POTENTIAL CLAIMS

1    AGAINST SOMEONE FOR INFRINGING A COPYRIGHT THAT'S OWNED BY

2    MATTEL, WOULD YOU NORMALLY LOOK AT INVESTIGATIVE REPORTS FROM

3    THE GLOBAL SECURITY DEPARTMENT?

4         MR. ZELLER:  ASSUMES FACTS; FOUNDATION; SEEMS TO BE

5    INVADING WORK PRODUCT.

6         THE COURT:  REPHRASE IT, COUNSEL.

7    BY MR. SLOAN:

8    Q    ARE YOU AWARE THAT THE GLOBAL SECURITY DEPARTMENT PREPARES

9    INVESTIGATIVE REPORTS, SIR?

10   A    YES.

11   Q    AND WHEN THERE IS A POTENTIAL BREACH OF INTELLECTUAL

12   PROPERTY RIGHTS OWNED BY MATTEL, DOES THE GLOBAL SECURITY

13   DEPARTMENT SOMETIMES PERFORM AN INVESTIGATION INTO THAT?

14   A    THEY HAVE ON OCCASION, YES.

15   Q    DO YOU KNOW WHETHER IN THIS CASE THE GLOBAL SECURITY

16   DEPARTMENT PERFORMED ANY INVESTIGATION INTO WHETHER OR NOT

17   CARTER BRYANT HAD ANY ROLE IN THE CREATION OF BRATZ?

18        MR. ZELLER:  "THIS CASE," YOUR HONOR.  VAGUE;

19   FOUNDATION.

20        THE COURT:  USING "INVESTIGATION" AS HE PREVIOUSLY

21   DEFINED IT?

22        MR. SLOAN:  YES, YOUR HONOR.

23        THE COURT:  OVERRULED.

24        THE WITNESS:  I'M NOT AWARE THAT THE GLOBAL SECURITY

25   DEPARTMENT EVER LOOKED INTO WHEN CARTER BRYANT CREATED BRATZ.

1    BY MR. SLOAN:

2    Q   ARE YOU AWARE OF WHETHER THE GLOBAL SECURITY DEPARTMENT

3    EVER LOOKED AT WHETHER MR. BRYANT WAS INVOLVED IN THE CREATION

4    OF BRATZ AT ALL?

5        MR. ZELLER:  CALLS FOR PRIVILEGE; WORK PRODUCT.

6        THE COURT:  THERE'S NO FOUNDATION AT THIS POINT.

7    HE'S NOT AWARE OF --

8        HE JUST TESTIFIED HE WAS NOT AWARE OF ANY

9    INVESTIGATION INTO THE CREATION.  THE QUESTION SEEMS TO REPEAT

10   THAT.

11       MR. SLOAN:  YOUR HONOR, I THINK WHAT HE SAID, HE

12   WASN'T AWARE OF AN INVESTIGATION INTO THE TIMING OF WHEN

13   MR. BRYANT CREATED BRATZ.

14       I DON'T HAVE THE TRANSCRIPT IN FRONT OF ME, BUT...

15       I CAN MOVE ON.

16       THE COURT:  HE DID SAY "WHEN."  YOU'RE CORRECT.  BUT

17   LAY A FOUNDATION FOR ANYTHING FURTHER, AND BE CAREFUL ABOUT THE

18   WORK PRODUCT.

19   BY MR. SLOAN:

20   Q   SIR, COULD I HAVE YOU TAKE A LOOK AT EXHIBIT 1195 IN THE

21   WHITE BINDER.  DO YOU SEE THAT DOCUMENT?

22   A   YES.

23   Q   AND IS THAT A DOCUMENT THAT WAS PRODUCED BY MATTEL IN THE

24   COURSE OF THIS LITIGATION?

25   A   I UNDERSTAND IT WAS, YES.

1   Q   AND YOU UNDERSTAND THAT BY VIRTUE OF THE FACT IT HAS A

2   MATTEL BATES NUMBER ON THE BOTTOM?

3   A   THAT'S RIGHT.

4   Q   AND, SIR, YOU HAVE INDICATED IN YOUR DECLARATION, AND I

5   BELIEVE IN YOUR TESTIMONY, THAT YOU WERE INVOLVED AND SPENT

6   HUNDREDS OF HOURS COLLECTING DOCUMENTS IN CONNECTION WITH THIS

7   CASE; IS THAT CORRECT?

8   A   I TESTIFIED TO THAT, YES.

9   Q   AND WAS ONE OF YOUR RESPONSIBILITIES THAT YOU HAD WAS

10  COLLECTING DOCUMENTS TO PRODUCE TO MGA AND ISAAC LARIAN IN

11  RESPONSE TO DISCOVERY REQUESTS?

12  A   YES.

13  Q   AND THIS IS, IN FACT, A DOCUMENT WHICH WAS PRODUCED BY

14  MATTEL BY MATTEL'S LEGAL DEPARTMENT; CORRECT?

15  A   IT WAS.

16  Q   OKAY.

17      HAVE YOU SEEN THIS DOCUMENT BEFORE?

18  A   I'VE SEEN THIS ONLY IN CONNECTION WITH -- ONLY AFTER THE

19  CASE WAS FILED DID I SEE THIS DOCUMENT.

20  Q   ARE YOU AWARE OF WHAT THIS REPORT IS OR WHAT THIS DOCUMENT

21  IS, THOUGH?

22      MR. ZELLER:  QUESTION IS VAGUE.

23      THE COURT:  OVERRULED.

24      THE WITNESS:  IT LOOKS LIKE -- I MEAN, I DON'T REALLY

25  KNOW.  IT LOOKS LIKE AN INVESTIGATION FILE FROM OUR GLOBAL

1    SECURITY GROUP.

2    BY MR. SLOAN:

3    Q   AND TO YOUR KNOWLEDGE, IS IT NORMAL PRACTICE FOR THE

4    GLOBAL SECURITY DEPARTMENT TO PREPARE INVESTIGATIVE REPORTS?

5    A   IT IS.

6    Q   AND ARE THEY KEPT IN THE ORDINARY COURSE OF BUSINESS?

7    A   YES.

8        MR. SLOAN:  YOUR HONOR, I'D MOVE TO ADMIT

9    EXHIBIT 1195.

10        THE COURT:  ANY OBJECTION.

11        MR. ZELLER:  LACKS FOUNDATION; NOT RELEVANT; 403.

12        THE COURT:  COUNSEL, DO YOU PLAN ON ASKING FURTHER

13   QUESTIONS OF THIS WITNESS ABOUT THIS DOCUMENT?

14        MR. SLOAN:  YES, YOUR HONOR.

15        THE COURT:  YOU'RE GOING TO NEED TO LAY FURTHER

16   FOUNDATION FOR THAT.

17        ADMITTING THE DOCUMENT, SEPARATE AND PART FROM THAT,

18   I'LL TAKE THAT UP LATER, BUT YOU'LL NEED FURTHER -- THERE'S NOT

19   SUFFICIENT FOUNDATION TO QUESTION THIS WITNESS ABOUT THIS

20   DOCUMENT.

21   BY MR. SLOAN:

22   Q   YOU SAID YOU HAD SEEN THIS DOCUMENT, BUT YOU SAW IT AFTER

23   THE LITIGATION WAS FILED; IS THAT CORRECT?

24   A   THAT'S RIGHT.

25   Q   AND DO YOU HAVE ANY REASON TO BELIEVE THIS IS AN AUTHENTIC

1    -- THIS IS NOT AN AUTHENTIC DOCUMENT PRODUCED BY MATTEL?

2        MR. ZELLER:  NOT A PROPER FOUNDATION QUESTION.

3        THE COURT:  IT'S FINE WITH THE QUESTION.

4        BUT THAT'S NOT THE FOUNDATION I'M TALKING ABOUT,

5    COUNSEL.  THE FOUNDATION IS THIS WITNESS'S ABILITY TO

6    COMPETENTLY TESTIFY ABOUT THIS DOCUMENT.

7        YOU'VE LAID A FOUNDATION TO INTRODUCE THE DOCUMENT,

8    AND THAT GETS PAST THE HEARSAY EXCEPTION.  THIS FOUNDATION GOES

9    TO THIS WITNESS'S COMPETENCY TO TESTIFY ABOUT THE DOCUMENT.

10        MR. ZELLER:  IT UNDERLIES THE PRIVILEGE AND WORK

11   PRODUCT ISSUE.  THIS IS A MEMBER OF OUR LITIGATION TEAM.  HE'S

12   ASKING HIM ABOUT HIS FAMILIARITY WITH THE DOCUMENTS PRODUCED IN

13   THE CASE; THAT'S WHAT'S CAUSING MY CONCERN.

14        THE COURT:  I WAS HOPING TO AVOID THIS, BUT WE'RE

15   GOING TO NEED TO DISCUSS THIS AT SIDE-BAR.

16        (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

17        THE COURT:  WHAT EXHIBIT NUMBER?

18        MR. SLOAN:  1195; IT'S AN INVESTIGATIVE REPORT

19   PRODUCED BY THEM THAT HAS -- THEY HAVE NOT CLAIMED WORK PRODUCT

20   ON IT; THEY HAVE NOT CLAIMED PRIVILEGE WITH RESPECT TO THE

21   REPORT; THEY PRODUCED IT.  I THINK THAT IF THIS WITNESS HAS

22   SAID THAT HE HAS REVIEWED IT SINCE IT WAS FILED, I THINK IT'S

23   FAIR GAME FOR ME TO ASK HIM ABOUT IT.

24        THE COURT:  LET'S DEAL WITH THE FIRST QUESTION FIRST,

25   WHETHER IT WAS WORK PRODUCT.

1          MR. ZELLER:  THE FILE ITSELF IS NOT WORK PRODUCT.

2     THE PROBLEM IS THE QUESTIONS HE'S ASKING OF THIS WITNESS.  JUST

3     AS A STRAIGHT FOUNDATIONAL ISSUE, THIS IS NO DIFFERENT THAN

4     SOMEONE SAYING --

5          THE COURT:  RIGHT.  BUT YOU'RE NOT OBJECTING TO THE

6     INTRODUCTION OF THE EXHIBIT AT THIS POINT.

7          MR. ZELLER:  WE HAVE NO AUTHENTICITY OBJECTION.  WE

8     HAVE OTHER OBJECTIONS.

9          THE COURT:  WHICH ARE WHAT?

10         MR. ZELLER:  WELL, ONE THING IS THIS WITNESS CANNOT

11    LAY A FOUNDATION FOR IT.  AND THAT'S --

12         THE COURT:  BUT THIS IS SOMETHING -- THIS GOES BACK

13    -- AND I DIDN'T GIVE A LOT OF SEPARATE -- FROM MGA.

14         MR. ZELLER:  I UNDERSTAND THAT.  THAT'S NOT WHERE I'M

15    AT.  WE HAVE THE 403 PROBLEMS.

16         THE COURT:  SO THE DOCUMENT IS ADMISSIBLE.  THAT'S

17    THE ISSUE.  THE QUESTION IS THE QUESTION -- THIS WITNESS --

18    IT'S JUST LIKE PUTTING UP A CUSTODIAN OF RECORDS ON SOME OF THE

19    DOCUMENTS THAT YOU'VE HAD.  IF THE WITNESS DOESN'T KNOW

20    ANYTHING ABOUT THEM, THERE'S NOT GOING TO BE ANY QUESTIONS TO

21    THAT WITNESS.  THAT'S THE FOUNDATION I'M MISSING.

22         SIMPLY BECAUSE HE'S READ IT DOES NOT MEAN HE HAS AN

23    ABILITY TO ANSWER SUBSTANTIVE QUESTIONS ABOUT THE DOCUMENT.

24         I NEED TO KNOW:  WHAT QUESTIONS DO YOU WANT TO ASK

25    HIM ABOUT THIS DOCUMENT?

1      MR. SLOAN:  THERE ARE SPECIFIC STATEMENTS IN THE

2  DOCUMENT WHICH SAY THAT THERE WAS AN INVESTIGATION STARTED IN

3  MARCH OF 2002, AND THERE WERE STATEMENTS MADE TO THE GLOBAL

4  SECURITY DEPARTMENT IN MARCH 2002 AND THEREABOUTS RELATING

5  SPECIFICALLY TO CARTER BRYANT, TO MR. LARIAN, TO MGA, AND THEIR

6  ROLE IN BRATZ.

7      HE MAY SAY I'VE NEVER -- I DON'T KNOW ANYTHING ABOUT

8  THIS; I'VE NEVER LOOKED AT IT.  BUT I THINK I'M ENTITLED TO

9  INQUIRE IF THERE ARE --

10      THE COURT:  HE'S ALREADY SAID THAT HE DIDN'T LOOK AT

11  IT PRIOR TO THIS LITIGATION.

12      THOSE STATEMENTS ARE GOING TO COME IN, MR. ZELLER.

13      MR. ZELLER:  I HAVE NO OBJECTION TO THAT.  I THINK

14  WE'RE ON THE SAME PAGE.  YOUR CONCERN YOU JUST ARTICULATED IS

15  EXACTLY THE ONE I WAS EXPRESSING; BUT IT'S THAT HE CANNOT ASK

16  SUBSTANTIVE QUESTIONS OF THIS WITNESS.

17      THE COURT:  YOU CAN PUT THIS UP ON THE THING, IF YOU

18  WANT, TO SHOW THEM TO THE JURY, DO WHATEVER YOU WANT.  I'M

19  ADMITTING THE EVIDENCE.  YOU CAN SHOW IT.  BUT THERE'S NO BASIS

20  TO IMPEACH HIM OR QUESTION HIM UNLESS AND UNTIL YOU LAY A

21  FOUNDATION.

22      HAVING SIMPLY READ THE DOCUMENT AFTER IT BEING

23  INTRODUCED IS NOT SUFFICIENT.

24      MR. ZELLER:  MY CONCERN, TOO, IS THAT IT WILL BE

25  INVADING A PRIVILEGED WORK PRODUCT.

1        THE COURT:  THAT'S WHAT I WAS LOOKING FOR, COUNSEL.

2        YOU MEAN JUST PUTTING THE DOCUMENT UP?

3        MR. ZELLER:  PUTTING IT UP.  BUT ASKING HIM TO

4    INTERPRET --

5        THE COURT:  I JUST SAID HE CAN'T DO THAT.

6        MR. SLOAN:  MY INTENT WAS TO ASK HIM -- I UNDERSTAND

7    THAT HE'S TESTIFIED HE DIDN'T LOOK AT IT BEFORE, BUT HE'S

8    LOOKED AT IT SINCE THEN, AND HE'S TESTIFIED THAT TO HIS

9    KNOWLEDGE NO ONE KNEW ABOUT THIS BEFOREHAND.

10        THE COURT:  THIS IS GOING TO BE ATTORNEY-CLIENT

11    PRIVILEGE.  YOU CAN USE THE DOCUMENT BUT NOT QUESTION HIM

12    FURTHER ON IT, UNLESS YOU CAN LAY FOUNDATION FOR IT PRIOR TO

13    HIS --

14        MR. SLOAN:  I WANT TO ASK YOU, THEN -- HE SAID THAT

15    HE LOOKED AT IT AFTER THE LITIGATION.  DID YOU LOOK AT THIS

16    PASSAGE?  DID YOU LOOK AT THIS PASSAGE?

17        THE COURT:  SO HE SAYS YES; WHAT'S YOUR QUESTION?

18        MR. SLOAN:  THEN I THINK -- HOW CAN HE HAVE SAID THAT

19    NO ONE KNEW ABOUT THIS BEFORE HIM, TO HIS KNOWLEDGE?

20        MR. ZELLER:  THIS IS A STATEMENT OF MR. MOORE'S

21    TESTIMONY.  THIS IS THE PROBLEM THAT HAS BEEN PERVADING THIS --

22    HE SAID "IN SOME RESPECTS."

23        THE COURT:  THERE IS THAT LANGUAGE.

24        MR. SLOAN:  HE CAN QUALIFY IT.

25        THE COURT:  HE ALREADY DID QUALIFY IT.

1        MR. ZELLER:  MR. SLOAN CONTINUES TO MISSTATE IT;

2    THAT'S THE PROBLEM.

3        THE COURT:  THEN THAT'S --

4        MR. SLOAN:  YOUR HONOR, I DON'T THINK THAT --

5        THE COURT:  I AGREE WITH MR. SLOAN.  YOU CAN ASK HIM

6    THAT QUESTION.  YOU'RE GOING TO HAVE REDIRECT EXAMINATION,

7    COUNSEL.

8        I'M NOT GOING TO ALLOW -- MR. SLOAN, YOU MAY WANT TO

9    HEAR THE REST OF THIS -- I'M NOT GOING TO PERMIT HIM TO GET

10   INTO AN ANALYSIS ON THIS.  AND THAT'S WHERE YOU'RE CORRECT

11   ABOUT WORK PRODUCT.  BUT SIMPLY THE STATEMENT ITSELF AND

12   COMPARING THAT STATEMENT AS TO SOMETHING HE READ, HAVING IT

13   EXPLAIN HIS EARLIER STATEMENT.  HE'S AN ATTORNEY, HE SHOULD BE

14   ABLE TO DO THIS.

15       MR. ZELLER:  THANK YOU.

16       (SIDE-BAR PROCEEDINGS CONCLUDED.)

17       THE COURT:  THE DOCUMENT IS ADMITTED.

18       YOU MAY PUBLISH.

19       (EXHIBIT 1195 IS RECEIVED.)

20   BY MR. SLOAN:

21   Q   SIR, YOU SAID THAT YOU DID REVIEW THIS DOCUMENT AFTER THE

22   LITIGATION WAS COMMENCED; IS THAT CORRECT?

23   A   YEAH.  I'VE SEEN THE DOCUMENT AFTER THE LITIGATION BEGAN,

24   YES.

25   Q   I'D LIKE TO HAVE YOU LOOK AT PAGE 66 OF THIS DOCUMENT, IF

1    WE COULD PUBLISH THAT.

2        BY THE WAY, HAVE YOU LOOKED AT THESE TYPES OF

3    DOCUMENTS BEFORE, MEANING INVESTIGATIVE REPORTS PREPARED BY THE

4    GLOBE SECURITY DEPARTMENT?

5    A    NO.  I MEAN, I MAY HAVE SEEN EXCERPTS, BUT I HAVE NOT

6    LOOKED AT THE FILES BEFORE.

7    Q    I'M NOT TALKING ABOUT THIS PARTICULAR CASE.  I'M TALKING

8    ABOUT IN OTHER CASES, HAVE YOU LOOKED AT -- ARE YOU FAMILIAR

9    WITH THIS TYPE OF A DOCUMENT?

10   A    WELL, LIKE I SAID, I HAVE NEVER REVIEWED A FULL FILE

11   BEFORE.  I'VE PROBABLY SEEN EXCERPTS FROM FILES, BUT I DON'T

12   KEEP THESE FILES; THESE AREN'T IN MY CONTROL.

13   Q    LET ME DIRECT YOUR ATTENTION TO THE SECOND LINE, WERE IT

14   SAYS 3-20, AND IT SAYS "MET WITH IVY ROSS ON THIS CASE AND

15   DISCUSSED IP PROTECTION PROGRAM."

16       DO YOU SEE THAT?

17   A    I SEE WHAT YOU'VE HIGHLIGHTED, YES.

18   Q    WOULD YOU AGREE THAT APPEARS TO BE AN ENTRY PERTAINING TO

19   MARCH 20, 2002?

20   A    I SUPPOSE, YES.

21   Q    DO YOU KNOW WHO WROTE THAT?

22   A    I DON'T.

23   Q    WHEN YOU LOOKED AT THIS INVESTIGATIVE FILE AFTER THE

24   LITIGATION WAS FILED, DID YOU LOOK AT THIS PAGE?

25   A    I DON'T REMEMBER THIS PAGE.

1   Q   BUT YOU LOOKED AT SOME PORTION OF THIS REPORT.

2   A   I DID.

3   Q   LET ME DIRECT YOUR ATTENTION TO THE NEXT LINE, MARCH 28,

4   WHICH SAYS "MET WITH CASSIDY PARK TO GET MORE INFO ON THE MGA

5   ISSUE.  SHE SUGGESTED CARTER BRYANT AS ILLUSTRATOR/FORMER

6   EMPLOYEE WHO MAY HAVE PLAGIARIZED DESIGN OF LILY MARTINEZ AND

7   CREATED BRATZ DOLLS FOR MGA."

8       DO YOU SEE THAT?

9   A   YES.

10   Q   DOES THAT APPEAR TO BE AN ENTRY THAT WAS MADE ON MARCH 28,

11   2002?

12   A   IT SAYS MARCH 28; I'M ASSUMING 2002.

13   Q   AND DID YOU REVIEW THAT AFTER THIS LITIGATION WAS FILED?

14   A   AGAIN, I REALLY DON'T REMEMBER THIS PARTICULAR PAGE.

15   Q   SO YOU'RE NOT SAYING YOU DIDN'T REVIEW IT; YOU'RE JUST

16   SAYING YOU DO NOT RECALL REVIEWING IT; IS THAT CORRECT?

17   A   THERE ARE SO MANY DOCUMENTS IN THIS CASE.  I DON'T RECALL

18   REVIEWING THIS PARTICULAR ONE.  IT DOESN'T -- I DON'T REMEMBER.

19   Q   AND IT SAYS "AT 1500, CHECKED WITH HR FOR BRYANT'S FILE

20   TERM DATE, 10-20-2000; FILE IS AT OFF-SITE STORAGE; REQUESTED

21   IT TO BE RETRIEVED."

22       DO YOU SEE THAT?

23   A   YES.

24   Q   DO YOU THINK IT'S FAIR INTERPRETATION THAT THAT'S AN ENTRY

25   THAT WAS MADE AT 1500 HOURS, OR 3:00 P.M., ON MARCH 28, 2002?

1          MR. ZELLER:  OBJECTION AS TO INTERPRETATION.

2          THE COURT:  REPHRASE, COUNSEL.

3     BY MR. SLOAN:

4     Q    WHAT DO YOU THINK THAT 1500 MEANS THERE?

5     A    I DON'T KEEP THESE FILES.  I MEAN, I COULD SPECULATE THAT

6     IT MEANS 3:00, BUT THAT'S SPECULATION.  I DON'T KNOW.

7     Q    SIR, ARE YOU AWARE OF WHO CASSIDY PARK IS?

8     A    YES.

9     Q    DO YOU HAVE ANY REASON TO DOUBT THE ACCURACY OF THE

10    INFORMATION REFLECTED IN THIS MATTEL INVESTIGATIVE REPORT?

11         MR. ZELLER:  LACKS FOUNDATION.

12         THE COURT:  SUSTAINED.

13         MR. ZELLER:  PRIVILEGED ISSUE.

14         THE COURT:  SUSTAINED.

15    BY MR. SLOAN:

16    Q    SIR, IF YOU HAD SEEN THIS, WOULD YOU STILL HAVE TESTIFIED

17    THAT, TO THE BEST OF YOUR KNOWLEDGE, NO ONE BEFORE YOU HAD BEEN

18    INVOLVED IN INVESTIGATING WHETHER CARTER BRYANT WAS INVOLVED IN

19    CREATING BRATZ IN SOME RESPECTS?

20    A    YOU KNOW, I BELIEVE I WOULD, BECAUSE I THOUGHT -- I WAS

21    TRYING TO UNDERSTAND YOUR QUESTION, AND I ANSWERED ACCORDINGLY.

22    Q    WHAT DIDN'T YOU UNDERSTAND ABOUT MY QUESTION?

23    A    IT SOUNDED LIKE YOUR QUESTION WAS BLURRING THE DISTINCTION

24    BETWEEN WHETHER WE WERE LOOKING AT "WHEN" CARTER BRYANT CREATE

25    BRATZ VERSUS "IF" HE DID.  AND I DON'T THINK, AND TO MY

1    KNOWLEDGE, THAT ANYONE ELSE LOOKED AT "WHEN" CARTER BRYANT WAS

2    CREATING BRATZ REALLY UNTIL THE SUMMER, MAYBE NOVEMBER OF 2003,

3    YOU KNOW.

4    Q   BUT THIS ENTRY WOULD SUGGEST THAT AS OF MARCH 2002, THERE

5    WERE PEOPLE AT MATTEL WHO WERE INVESTIGATING WHETHER CARTER

6    BRYANT WAS INVOLVED IN THE CREATION OF BRATZ; CORRECT?

7         MR. ZELLER:  FOUNDATION; VAGUE.

8         THE COURT:  SUSTAINED.

9         THE DOCUMENT LARGELY SPEAKS FOR ITSELF; THIS WITNESS

10   DOES NOT HAVE FOUNDATION TO EXPAND ON IT.

11   BY MR. SLOAN:

12   Q   SIR, WHEN YOU SAID YOU THOUGHT YOU WERE THE FIRST PERSON,

13   YOU WERE JUST TESTIFYING THAT YOU WERE THE FIRST PERSON, TO

14   YOUR KNOWLEDGE, WHO INVESTIGATED WHEN CARTER BRYANT HAD CREATE

15   BRATZ; CORRECT?

16   A   YEAH.  THERE ARE A LOT OF PEOPLE WHO HAVE WORKED ON THIS

17   CASE.  I THINK THAT I WAS AMONG THE FIRST TO LOOK AT WHEN

18   CARTER BRYANT CREATED BRATZ.

19   Q   BUT THERE WERE OTHER PEOPLE WHO WERE INVOLVED IN

20   INVESTIGATING WHETHER CARTER BRYANT WAS INVOLVED IN THE

21   CREATION OF BRATZ BEFORE YOU GOT INVOLVED IN THE INVESTIGATION;

22   IS THAT A FAIR STATEMENT, SIR?

23        MR. ZELLER:  OBJECTION.  LACKS FOUNDATION AS TO

24   "INVOLVED WITH THE INVESTIGATION"; ALSO VAGUE.

25        THE COURT:  TO THE EXTENT THAT YOU ARE AWARE OF.

1      THE WITNESS:  I BELIEVE SOME PEOPLE WERE WONDERING

2    WHETHER HE DID.  I DON'T KNOW TO THE EXTENT OF WHAT THEY DID.

3    BY MR. SLOAN:

4    Q   AS A MATTER OF FACT, I BELIEVE THAT YESTERDAY, YOU HAD

5    SAID AT SOME POINT THAT THERE WERE SOME RUMORS; IS THAT

6    CORRECT?

7    A   I MENTIONED RUMORS YESTERDAY, YES.

8    Q   AND THOSE WERE RUMORS ABOUT CARTER BRYANT'S INVOLVEMENT IN

9    BRATZ; CORRECT?

10   A   THAT'S RIGHT.

11   Q   AND WHAT WERE THOSE RUMORS?

12      MR. ZELLER:  QUESTION IS VAGUE AS TO TIME.

13      THE COURT:  AS TO TIME, COUNSEL.

14   BY MR. SLOAN:

15   Q   YOU MENTIONED THERE WERE RUMORS FLOATING AROUND MATTEL

16   THAT CARTER BRYANT WAS INVOLVED IN THE CREATION OF BRATZ; IS

17   THAT CORRECT?  IS THAT WHAT YOU TESTIFIED TO YESTERDAY?

18   A   THAT'S RIGHT, YES.

19   Q   OKAY.

20      AND WHEN DID YOU FIRST HEAR THOSE RUMORS?

21   A   I WAS WORKING ON A CASE INVOLVING ANOTHER TOY COMPANY

22   CALLED SIMBA, AND I HEARD THEM ABOUT THE TIME THE WALL STREET

23   JOURNAL ARTICLE CAME OUT.

24   Q   SO THAT WOULD HAVE BEEN JULY 2003.

25   A   YES.

1   Q   AND DID YOU, THEN, SINCE YOU WERE TRYING TO DETERMINE WHEN

2   CARTER BRYANT HAD CREATED BRATZ, DID YOU THEN GO AND TALK TO

3   THOSE PEOPLE TO INVESTIGATE THESE RUMORS?

4   A   I ASKED ABOUT THE RUMORS; I TALKED TO PEOPLE ABOUT THEM.

5   Q   OKAY.  WHO DID YOU TALK TO?

6   A   VARIOUS DESIGNERS IN OUR DESIGN CENTER.  I BELIEVE I

7   PROBABLY SPOKE WITH IVY ROSS.

8   Q   LET'S STOP THERE.

9        YOU SPOKE TO IVY ROSS.

10       WHEN DID SHE TELL YOU SHE FIRST SUSPECTED THAT

11   MR. BRYANT WAS INVOLVED IN THE CREATION OF BRATZ?

12       MR. ZELLER:  ASSUMES FACTS; PRIVILEGED.

13       THE COURT:  AS PHRASED.

14       REPHRASE.

15   BY MR. SLOAN:

16   Q   YOU SAID YOU SPOKE TO IVY ROSS; CORRECT?

17   A   YEAH, I DID.

18   Q   DID YOU ASK HER WHETHER SHE SUSPECTED THAT MR. BRYANT WAS

19   INVOLVED IN THE CREATION OF BRATZ?

20       MR. ZELLER:  QUESTION INVADES PRIVILEGE; VAGUE;

21   FOUNDATION; ASSUMES FACTS.

22       THE COURT:  IT SEEMS TO GET INTO THE PRIVILEGE,

23   COUNSEL.  YOU'RE ASKING ABOUT CONVERSATIONS BETWEEN IN-HOUSE

24   COUNSEL AND MS. ROSS.  SUSTAINED.

25   BY MR. SLOAN:

1    Q   LETS LOOK AT ANOTHER DOCUMENT.

2         CAN YOU LOOK AT EXHIBIT 1703 WHICH IS ALSO IN YOUR

3    BINDER, SIR?  DO YOU HAVE THAT IN YOUR BINDER?

4    A   I DO.

5    Q   YOU SAID THAT YOU'RE A TRADEMARK AND COPYRIGHT COUNSEL;

6    CORRECT?

7    A   YES.

8    Q   ARE YOU AWARE THAT MATTEL SOMETIMES FILES COPYRIGHTS IN

9    FOREIGN JURISDICTIONS?

10   A   ACTUALLY, NO.

11   Q   THEY DON'T?

12   A   I'M TRYING TO REMEMBER IF I HAVE EVER SEEN ONE.  I DON'T

13   THINK I'VE EVER SEEN ONE.

14   Q   LET ME HAVE YOU LOOK AT EXHIBIT 1703.

15         DO YOU RECOGNIZE THAT DOCUMENT?

16   A   I DO.

17   Q   IS THIS A DOCUMENT THAT WAS PRODUCED BY MATTEL?

18   A   I BELIEVE IT WAS.

19   Q   AND IS IT A COPY OF A COPYRIGHT REGISTRATION?

20         MR. ZELLER:  YOUR HONOR, I OBJECT TO THE

21   SUMMARIZATION OF THESE CONTENTS WITHOUT FOUNDATION.

22         THE COURT:  SUSTAINED.

23   BY MR. SLOAN:

24   Q   WHAT DO YOU RECOGNIZE THIS DOCUMENT AS, EXHIBIT 1703?

25   A   WELL, IT'S A DOCUMENT THAT I SAW THAT PURPORTS TO BE A

1    COPYRIGHT REGISTRATION FROM BRAZIL.

2    Q    AND WHO WERE THOSE COPYRIGHT REGISTRATIONS FILED BY.

3         MR. ZELLER:  STILL NO FOUNDATION.

4    BY MR. SLOAN:

5    Q    DO YOU KNOW WHO THESE WERE FILED BY?

6         THE COURT:  COUNSEL, THERE'S AN OBJECTION PENDING

7    BEFORE THE COURT.

8         MR. SLOAN:  I'M SORRY, YOUR HONOR.  I WAS TRYING TO

9    REPHRASE.

10        THE COURT:  VERY WELL.  IF YOU'RE WITHDRAWING, YOU

11   MAY PROCEED.

12   BY MR. SLOAN:

13   Q    DO YOU KNOW WHO THIS COPYRIGHT REGISTRATION WAS FILED BY,

14   SIR?

15   A    DO I KNOW?

16        I MEAN, IT APPEARS TO SAY THAT ABC INTERNATIONAL

17   TRADERS FILED IT.  IT'S THE REGISTER.  I DON'T KNOW.

18        I HAVE NEVER SEEN A BRAZILIAN COPYRIGHT REGISTRATION

19   BEFORE THIS, IF THIS IS ONE, AND SO...

20   Q    BUT THIS IS A DOCUMENT THAT WAS PRODUCED BY MATTEL IN THE

21   COURSE OF THIS LITIGATION; CORRECT?

22   A    CORRECT.

23   Q    AND YOU'RE SAYING THAT IT INDICATES "ABC INTERNATIONAL

24   TRADERS."  DOES IT INDICATE ANOTHER NAME FOR ABC INTERNATIONAL

25   TRADERS?

1    MR. ZELLER:  YOUR HONOR, LACKS FOUNDATION.  NOW HE'S

2   ASKING HIM TO READ THE DOCUMENT.

3    THE COURT:  YOU NEED FURTHER FOUNDATION.  SUSTAINED.

4   BY MR. SLOAN:

5   Q   DO YOU BELIEVE THIS TO BE AN AUTHENTIC COPY OF A COPYRIGHT

6   REGISTRATION FILED IN BRAZIL?

7    MR. ZELLER:  FOUNDATION; RELEVANCE.

8    THE COURT:  COUNSEL, I'VE SUSTAINED THE FOUNDATIONAL

9   OBJECTION.  THAT'S NOT A FOUNDATIONAL QUESTION.

10   BY MR. SLOAN:

11   Q   SIR, ARE YOU FAMILIAR WITH MATTEL'S DOCUMENT RETENTION

12   POLICY?

13   A   I'M NOT THE KEEPER OF THE POLICY, BUT I KNOW ABOUT IT,

14   YES.

15   Q   YOU'VE PROVIDED DECLARATIONS IN THIS CASE ABOUT IT,

16   HAVEN'T YOU, SIR?

17   A   I MAY HAVE.  CAN YOU REFRESH MY RECOLLECTION.

18   Q   YES.  COULD I DIRECT YOUR ATTENTION BACK TO EXHIBIT 18064;

19   THAT'S THE DECLARATION WE'VE LOOKED AT BEFORE.

20   A   OKAY.

21   Q   AND I'LL DIRECT YOUR ATTENTION TO PAGE 3 OF THAT DOCUMENT

22   AT PARAGRAPH SIX, STARTING AT LINE SIX.  YOU SAID THERE THAT

23   BECAUSE MATTEL HAS AN E-MAIL RETENTION POLICY --

24    MR. ZELLER:  OBJECTION.

25    I APOLOGIZE FOR INTERRUPTING, BUT THIS IS IRRELEVANT.

1        THE COURT:  COUNSEL, WHERE DOES THIS GO TO, WHAT

2    LEGAL ISSUE?

3        MR. SLOAN:  YOUR HONOR, THIS GOES TO THE ISSUE OF

4    WHETHER THERE WAS EVIDENCE THAT --

5        THE COURT:  NO, NO.  WHAT LEGAL ISSUE DOES THIS GO

6    TO?  WHAT IS THIS GOING TO?  I DON'T WANT TO HAVE TO TAKE YOU

7    TO SIDE-BAR.  CAN YOU DESCRIBE, WHAT DOES THIS GO TO?

8        MR. SLOAN:  IT GOES TO FRAUDULENT CONCEALMENT, YOUR

9    HONOR.

10       THE COURT:  THAT'S TOO BROAD.

11       LET'S HAVE A SIDE-BAR.

12       (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

13       THE COURT:  PAGE 3, PARAGRAPH SIX.  WHAT DOES

14    DOCUMENT RETENTION GO TO?

15       MR. SLOAN:  IT GOES TO WHETHER THERE MIGHT BE -- THE

16    ISSUE IS FRAUDULENT CONCEALMENT, AND ONE OF THE ISSUES IS

17    WHETHER THERE IS ANY EVIDENCE OF IT.  THE FACT THEY HAVE HAD A

18    DOCUMENT RETENTION POLICY WHICH LEAD TO THE DESTRUCTION OF

19    E-MAILS AND THE E-MAIL SERVER MAY ACCOUNT FOR THE REASON THERE

20    MAY NOT BE CERTAIN EVIDENCE PERTAINING TO FRAUDULENT

21    CONCEALMENT.

22       THE COURT:  SO WE'VE MOVED BEYOND THE BRAZILIAN

23    COPYRIGHT THING?

24       MR. SLOAN:  YES, YOUR HONOR.

25       THE COURT:  SO THIS IS A SEPARATE AREA.

1       IS THERE ANYTHING ELSE, ANOTHER AREA YOU CAN GO TO IN

2   THE NEXT FIVE MINUTES?

3       MR. SLOAN:  YES.

4       THE COURT:  LET'S DO THAT; LET'S TAKE THIS UP DURING

5   LUNCH.

6       (SIDE-BAR PROCEEDINGS CONCLUDED.)

7       THE COURT:  WE'LL COME BACK TO THAT.

8   BY MR. SLOAN:

9   Q   MR. MOORE, YOU STARTED YOUR TESTIMONY YESTERDAY BY SAYING

10  THAT YOU HAD NOT RECEIVED A COPY OF THE CONTRACT BETWEEN

11  MR. BRYANT AND MGA THAT'S DATED AS OF SEPTEMBER 18, 2000, UNTIL

12  YOU TRAVELED WITH MR. ZELLER TO HONG KONG IN NOVEMBER OF 2003;

13  IS THAT CORRECT?

14  A   THAT'S RIGHT.

15  Q   AND YOU TRAVELED THERE TO MEET WITH COUNSEL FOR CITY

16  WORLD; CORRECT?

17  A   THAT WAS ONE OF THE REASONS TO GO TO HONG KONG, YES.

18  Q   BEFORE YOU TRAVELED TO HONG KONG TO MEET WITH THE CITY

19  WORLD COUNSEL, YOU AND OTHER PEOPLE AT MATTEL HAD VARIOUS

20  COMMUNICATIONS WITH THE CITY WORLD COUNSEL; CORRECT?

21  A   YES.

22  Q   IN FACT, YOU HAD EXCHANGED NUMEROUS LETTERS; IS THAT

23  CORRECT?

24  A   I THINK THERE WERE A COUPLE OF LETTERS EXCHANGED.

25  "NUMEROUS" PROBABLY DOESN'T DESCRIBE IT; BUT ONE OR TWO.

1    Q   LET ME HAVE YOU LOOK AT EXHIBIT 4434, WHICH IS ALSO IN

2    YOUR BINDER.

3    A   OKAY.

4    Q   DO YOU RECOGNIZE THAT DOCUMENT?

5    A   YES.

6    Q   IS THAT A DOCUMENT THAT YOU PREPARED?

7    A   I HELPED PREPARE THIS, YES.

8    Q   IS ALL OF THE INFORMATION REFLECTED ON THIS ACCURATE, TO

9    THE BEST OF YOUR BELIEF?

10   A   YES.

11   Q   AND YOU PREPARED THIS IN CONNECTION WITH A DEPOSITION OF

12   ANOTHER MATTEL EMPLOYEE.

13   A   THAT'S RIGHT.

14       MR. SLOAN:  YOUR HONOR, I'D MOVE INTO EVIDENCE

15   EXHIBIT 4434.

16       MR. ZELLER:  NO OBJECTION.

17       THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.

18       (EXHIBIT 4434 RECEIVED.)

19   BY MR. SLOAN:

20   Q   SIR, THIS INDICATES, IF WE LOOK AT THE SECOND LINE --

21   WELL, LET'S LOOK AT THE FIRST LINE.  IT INDICATES AS OF

22   SEPTEMBER 4, 2003, DANNY YU, COUNSEL FOR CITY WORLD, HAD

23   WRITTEN TO MR. BOB NORMILE.  DID YOU SEE THAT LETTER?

24   A   I DID.

25   Q   AND IT INDICATES AS OF SEPTEMBER 23, 2003, THAT MATTEL HAD

1    OBTAINED A COPY OF THE MGA CITY WORLD CLAIM; CORRECT?

2    A   THAT'S WHAT IT SAYS, CORRECT.

3    Q   THAT'S CORRECT, ISN'T IT?

4    A   WELL, IT IS; I MEAN, WHAT WE DID RECEIVE WAS CALLED, I

5    THINK, AN ENDORSEMENT OF A CLAIM, OR SOMETHING LIKE THAT.

6    Q   OKAY.

7        AND THIS INDICATES THAT ON SEPTEMBER 25TH THAT

8    MR. NORMILE SPOKE WITH MR. YU; IS THAT CORRECT?

9    A   YES.

10   Q   AND I'M NOT GOING TO GO THROUGH ALL OF THESE ENTRIES, BUT

11   IF YOU LOOK AT NOVEMBER 18TH, FOR INSTANCE, THIS INDICATES THAT

12   YOU CALLED SIMON CW YUNG FIRM; CORRECT?

13   A   YES.

14   Q   DID YOU MAKE THAT PHONE CALL?

15   A   YES.

16   Q   THEN ON NOVEMBER 20TH, IT SAYS THAT "MOORE MAKES TWO BRIEF

17   CALLS TO DANNY YU; ONE TO HIS OFFICE, ONE TO HIS CELL PHONE."

18       DO YOU SEE THAT?

19   A   YES.

20   Q   SO YOU HAD A NUMBER OF PHONE CALLS WITH CITY WORLD'S

21   COUNSEL; CORRECT?

22   A   YES; TO ARRANGE THE MEETING IN HONG KONG.

23   Q   AND MR. NORMILE ALSO HAD CONTACT WITH THEM.

24   A   YES; THAT'S RIGHT.

25   Q   AND DURING SOME OF THOSE CONVERSATIONS, DID CITY WORLD'S

1    COUNSEL TELL YOU THAT, IN FACT, THEY HAD A COPY OF A CONTRACT

2    BETWEEN MR. BRYANT AND MGA?

3    A   I BELIEVE IN THE CONVERSATIONS, NO.  I THINK THEY WERE

4    REALLY HESITANT TO DISCUSS MUCH WITH US.  THEY WERE EXPLAINING

5    IN HONG KONG THERE'S SOME IMPLIED UNDERTAKING THAT THEY CAN'T

6    REVEAL THINGS; AND SO THEY WERE BEING VERY CAUTIOUS.

7    Q   BUT YOU STARTED OFF YESTERDAY TESTIFYING THAT ONE OF THE

8    MOST IMPORTANT POINTS ABOUT YOUR TRIP WITH MR. ZELLER TO HONG

9    KONG WAS THE FACT THAT YOU GOT THIS CONTRACT DATED AS OF

10   SEPTEMBER 18, 2002, BETWEEN MR. BRYANT AND MGA; CORRECT?

11   A   RIGHT.

12   Q   AND IT'S NOW YOUR TESTIMONY THAT YOU TRAVELED ALL OF THE

13   WAY TO HONG KONG AND -- I'M SORRY, THAT YOU TRAVELED ALL OF THE

14   WAY TO HONG KONG WITH MR. ZELLER TO MEET WITH CITY WORLD'S

15   COUNSEL, AND THEY NEVER LET ON TO YOU AT ALL THAT THEY HAD A

16   COPY OF THIS CONTRACT?

17        MR. ZELLER:  ARGUMENTATIVE; MISSTATES THE WITNESS'S

18   TESTIMONY.

19        THE COURT:  IT'S A QUESTION.  YOU MAY ANSWER IT.

20        THE WITNESS:  YEAH.  I WAS ANSWERING AS TO THE

21   TELEPHONE CONVERSATION.  THE THOSE WERE REALLY JUST TO ARRANGE

22   THE MEETING, I BELIEVE, WITH ME.  THERE MAY BE A DOCUMENT WHICH

23   MENTIONS SOME RELATIONSHIP WITH MGA; I CAN'T RECALL UNLESS I

24   SEE IT.  I KNEW THERE WERE SOME DOCUMENTS THEY WANTED TO

25   EXCHANGE AND I THINK I KNEW THERE WAS SOMETHING SIGNIFICANT.

1    BUT I DIDN'T TRAVEL TO HONG KONG JUST FOR THAT PURPOSE.

2    BY MR. SLOAN:

3    Q    DID YOU KNOW THAT ONE OF THOSE DOCUMENTS MIGHT BE THIS

4    CONTRACT BETWEEN MR. BRYANT AND MGA?

5    A    YOU KNOW, I CAN'T REMEMBER IF I KNEW THAT.  I THINK WHAT I

6    WAS INTERESTED IN WAS THE DRAWINGS; THAT WAS THE FOCUS.

7         MR. SLOAN:  YOUR HONOR, I THINK THIS IS A FINE TIME

8    TO BREAK.

9         THE COURT:  VERY WELL.  LET'S DO THAT.

10        AS I INDICATED, MEMBERS OF THE JURY, I'LL SEE YOU AT

11    1:00.  I APOLOGIZE FOR THE SHORT LUNCH.  IT WILL BE A SHORT

12    DAY.

13        (WHEREUPON JURORS DEPART COURTROOM.)

14        THE COURT:  MR. SLOAN, I'LL TAKE UP THE ISSUE OF

15    PARAGRAPH SIX ON THE 18064 EXHIBIT.

16        MR. SLOAN:  YES, YOUR HONOR.

17        THE COURT:  I THOUGHT WE WERE STILL ON THAT BRAZIL

18    THING.

19        MR. SLOAN:  YOUR HONOR, I MEANT TO MOVE OFF OF

20    BRAZIL, AND I APOLOGIZE THAT I DIDN'T MAKE THAT CLEAR.

21        THE PURPOSE OF INTRODUCING THIS IS THAT, SINCE THIS

22    WITNESS WAS INTRODUCED SOLELY WITH RESPECT TO FRAUDULENT

23    CONCEALMENT, IN MY MIND, AND I THINK THAT IT IS PERTINENT TO

24    THAT ISSUE WHERE THERE MIGHT HAVE BEEN E-MAILS THAT WOULD HAVE

25    REFLECTED THAT MATTEL WAS ON NOTICE, AS EARLY AS 2002 OR SOME

1    TIME EARLIER, THAT MR. BRYANT HAD, IN FACT, BEEN INVOLVED WITH

2    MGA WHILE HE WAS STILL AT MATTEL, AND THOSE DOCUMENTS COULD

3    HAVE BEEN DESTROYED AS A RESULT OF MATTEL'S DOCUMENT RETENTION

4    POLICY, WHERE THEY ROUTINELY ESSENTIALLY DESTROYED E-MAILS

5    EVERY 120 DAYS.

6         THE COURT:  HOW IS THIS ANYTHING DIFFERENT THAN UTTER

7    SPECULATION?

8         MR. SLOAN:  YOUR HONOR, I THINK THAT IF THEY ARE

9    GOING TO ARGUE THAT THERE'S AN ABSENCE OF EVIDENCE THAT ANYONE

10   AT MATTEL WAS ON NOTICE OF THIS, I THINK THAT WE SHOULD BE

11   ALLOWED TO ARGUE THAT IT'S POSSIBLE THAT POSSIBLE EVIDENCE WAS

12   DESTROYED.  AND I'M NOT CASTING ASPERSIONS ON MATTEL.  I

13   UNDERSTAND IT WAS AS A RESULT OF A REGULAR DOCUMENT RETENTION

14   POLICY.  BUT IT COULD EXPLAIN WHY SOME OF THOSE DOCUMENTS ARE

15   NO LONGER IN EXISTENCE.

16        THE COURT:  MR. ZELLER?

17        MR. ZELLER:  NUMBER ONE, OBVIOUSLY THIS DECLARATION

18   AND THE SUBSTANCE OF WHAT IT IS THAT MR. SLOAN WISHES TO GET

19   INTO AND DELVE INTO IS IN THE CONTEXT OF THE TERMINATING

20   SANCTIONS MOTION THAT THE COURT REJECTED.  THERE WAS NO FINDING

21   OF MISCONDUCT.  QUITE THE CONTRARY.  THE COURT WAS VERY CLEAR

22   THERE WAS NO MISCONDUCT.

23        THE COURT IS FULLY COGNIZANT OF THE FACT THAT MGA WAS

24   THE ONE THAT SET THIS EXTREMELY HIGH STANDARD FOR, REALLY,

25   INTRODUCTION OF ANY EVIDENCE RELATING TO THE DESTRUCTION OF

1    EVIDENCE.  WE WENT ROUND AND ROUND OVER EVIDENCE ELIMINATOR AND

2    THE STANDARDS THERE.  JUST TO THEN KIND OF TREAT IT LIKE YOU

3    CAN JUST BACK DOOR IT IN THIS WAY, BECAUSE MR. MOORE PUT IN A

4    DECLARATION IN RESPONSE TO A MOTION THAT THE COURT REJECTED?  I

5    JUST DON'T THINK IT'S PROPER.

6         ALSO, MR. MOORE IS NOT, OF COURSE, THE CUSTODIAN OF

7    THE E-MAILS.  HE IS NOT A PERSON WHO COULD POSSIBLY TESTIFY AS

8    TO SUPPOSEDLY THERE BEING E-MAILS ON THE SYSTEM THAT THEY WANT

9    TO SPECULATE WERE DESTROYED.  IT'S REALLY RANK SPECULATION THAT

10   SHOULD NOT BE PERMITTED IN FRONT OF THE JURY, EVEN APART FROM

11   THE FACT THAT IT DOESN'T EVEN REMOTELY MEETS THE LEGAL

12   STANDARDS MGA ITSELF ADVOCATED IN THIS CASE.

13        THE COURT:  MR. SLOAN, ANYTHING FURTHER?

14        MR. SLOAN:  YOUR HONOR, FIRST OF ALL, I'LL BE CLEAR

15   ON THIS, THIS IS INVOLVING TERMINATING SANCTIONS.  I JUST SAID

16   I'M NOT CLAIMING ANY MISCONDUCT ON MATTEL'S PART.  I'M JUST

17   SAYING THAT IT'S A POTENTIAL REASON THAT POTENTIALLY IS ABSENT.

18   IT'S SIMILAR TO THE ISSUE WITH RESPECT TO THE PHONE RECORDS.

19   MY RECOLLECTION IS THE OCTOBER 2000 RECORDS WHICH HAVE WE DON'T

20   HAVE WHICH COULD BE PERTINENT TO SHOW THAT -- AND WE COULD

21   ARGUE THAT MATTEL SHOULD HAVE BEEN ON NOTICE BECAUSE THEY HAVE

22   THESE RECORDS OF CARTER BRYANT.

23        THE COURT:  I GUESS THE DIFFERENCE IS I ALLOWED IN

24   THAT EVIDENCE; I ALLOWED IN THE STIPULATION, THE PARTIES

25   STIPULATED THAT THERE WAS THIS REFERENCE TO A CERTAIN PERIOD OF

1    TIME; THERE WERE NO RECORDS FOR OTHER PERIODS OF TIME, AND YOU

2    COULD MAKE WHATEVER ARGUMENT YOU WANTED.

3         THIS SEEMS HIGHLY SPECULATIVE.

4         THERE'S NO QUESTION THIS IS A LEGITIMATE RETENTION

5    POLICY.  THERE IS NO EVIDENCE THAT SOMEBODY ATTEMPTED TO

6    COMMUNICATE SOMETHING BY E-MAIL OR ANY OTHER MANNER.  THERE IS

7    JUST NO EVIDENCE THAT MAYBE THERE WAS EVIDENCE.  IT JUST SEEMS

8    A LITTLE TOO SPECULATIVE, COUNSEL.

9         I'LL SUSTAIN THE OBJECTION.

10        HOW MUCH FURTHER DO YOU HAVE WITH THIS WITNESS?

11        MR. SLOAN:  YOUR HONOR, I DON'T THINK I HAVE A LOT.

12        THE COURT:  VERY WELL.

13        AFTER THIS WITNESS, WHO'S MATTEL CALLING?

14        MR. ZELLER:  VIDEOTAPES; AND SOME STIPULATIONS OR TWO

15   TO BE READ.

16        THE COURT:  SO YOU'RE WAITING ON ME FOR THE BRODY AND

17   THE CARTER BRYANT RULINGS.

18        MR. ZELLER:  YES, YOUR HONOR.

19        THE COURT:  LET'S RESUME AT 12:30.

20        (MORNING PROCEEDINGS CONCLUDE. )

21

22

23

24   / / /

25   / / /

1

2                        CERTIFICATE

3

4    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
5    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
6    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

7

8    _____          _____
     THERESA A. LANZA, CSR, RPR                DATE
9    FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25