(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross) 8/14/2008 9:00:00

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                         EASTERN DIVISION

 4                            - - -

 5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                            - - -

 7    MATTEL, INC.,              )
                                 )
 8              Plaintiff,   )
                                 )
 9          vs.              ) No. CV 04-09049
                                 )
10    MGA ENTERTAINMENT, inc., et. Al.,  )  Trial Day 35
                          ) morning session
11              Defendants.  )  Pages 7324-7443
      _____)
12    AND CONSOLIDATED ACTIONS,        )
                                 )
13

14

15          REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                  THURSDAY, AUGUST 14, 2008

18                        9:06 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR

                Federal Official Court Reporter

24              3470 12th Street, Rm. 134

                RIVERSIDE, CALIFORNIA  92501

25                   951-274-0844
```

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

```
 1     APPEARANCES:
 2
       On behalf of MATTEL, INC.:
 3
                    QUINN EMANUEL
 4                  By:  JOHN QUINN
                      JON COREY
 5                    MICHAEL T. ZELLER
                      HARRY OLIVAR
 6                    TIMOTHY ALGER
                      WILLIAM PRICE
 7                  865 S. FIGUEROA STREET,
                    10TH FLOOR
 8                  LOS ANGELES, California  90017
                    213-624-7707
 9
10
       ON BEHALF OF MGA ENTERTAINMENT:
11
                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                  BY:  THOMAS J. NOLAN
                      JASON RUSSELL
13                    RAOUL KENNEDY
                      LAUREN AGUIAR
14                    CARL ROTH
                    300 SOUTH GRAND AVENUE
15                  LOS ANGELES, CALIFORNIA  90071-3144
                    213-687-5000
16
17
18
19
20
21
22
23
24
25
```

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

```
 1                    I N D E X
 2
 3    DEFENSE
      WITNESS        DIRECT     CROSS     REDIRECT     RECROSS
 4    Tim Kilpin (Continued)
 5    BY MR. NOLAN      7327
 6
 7    DEFENSE
      WITNESS        DIRECT     CROSS     REDIRECT     RECROSS
 8    Erich Joachimsthaler
 9    BY MR. KENNEDY    7355                 7394
      BY MR. QUINN               7383                 7401
10
11
      DEFENSE
12    WITNESS        DIRECT     CROSS     REDIRECT     RECROSS
      Jill Nordquist
13
      BY MR. SLOAN      7405
14    BY MR. QUINN               7430
15
16        EXHIBITS        RECEIVED
17        01806           7340
          4999            7354
18        17383           7424
19
20
21
22
23
24
25
```

1    RIVERSIDE, CALIFORNIA; THURSDAY, AUGUST 14, 2008; 9:06 A.M.

2          -oOo-

3    (Whereupon, jurors enter courtroom.)

4    THE CLERK:  Calling Case Number CV04-09049-SGL,

5    Mattel, Inc., v. MGA, Inc., et al.

6    Counsel, please state your appearances for the

7    record.

8    MR. QUINN:  John Quinn, Mike Zeller, Bill Price for

9    Mattel.

10    MR. NOLAN:  Tom Nolan, Lauren Aguiar, Raoul Kennedy

11    on behalf of MGA and Isaac Larian.

12    THE COURT:  Good morning, Counsel.

13    Mr. Nolan, you may continue.

14    DIRECT EXAMINATION(continued)

15    BY MR. NOLAN:

16    Q   Good morning, Mr. Kilpin.

17    A   Good morning.

18    Q   Yesterday, we were referring to a statement that was

19    quoted by you in the Wall Street Journal, the April 16, 2004

20    edition.

21    Do you recall that?

22    A   Yes.

23    MR. NOLAN:  Your Honor, we now have a redacted

24    version of what we talked about in court.

25    THE COURT:  Very well.

1         Just that one paragraph?

2         MR. NOLAN:  Yes.

3         THE COURT:  Okay.

4         MR. NOLAN:  I'm showing it to Mr. Zeller right now.

5         MR. ZELLER:  No objection.

6         MR. NOLAN:  May we publish it just briefly?

7         THE COURT:  You may.

8         MR. NOLAN:  This is now marked as Exhibit 1818.

9    BY MR. NOLAN:

10   Q    This is the statement that you made to the Wall Street

11   Journal while you were the senior vice president of the girls'

12   division at Mattel.

13        "Plot lines increase the dolls' entertainment value

14   and make them more competitive with cartoons, movies, and video

15   games," Mattel says.  "It used to be I'd walk into a product

16   meeting and say, Show me the toy," says Tim Kilpin, Mattel's

17   senior vice president in charge of girls' toys.  "Now I start

18   by saying, Tell me a story."

19        Mr. Kilpin, that comment and that statement that you

20   made to the Wall Street Journal concern your marketing efforts

21   for Mattel in the girls division; yes?

22   A    Well, yeah.  I think I explained yesterday how I

23   envisioned -- why I asked my design team to think that way.

24   Q    At the end of yesterday, we were talking about packaging

25   and the importance of packaging and the overall sale of the

1    product.

2         Do you recall that line of testimony?

3    A   Yes.

4    Q   One of the things we are trying to discern is whether or

5    not a packaging is part of a product.

6         Do you recall that?

7    A   Yes.

8    Q   And I think you testified yesterday at the close that you

9    did not consider packaging to be part of the product sold by,

10   let's say, a competitor, Bratz; is that true?

11   A   I'm not sure exactly what I said.

12   Q   I'm not trying to mischaracterize it.  Let me just ask you

13   straight out.

14        When you talk about the Bratz product offered at

15   retail, and you're making comparisons to it or assessment of

16   it, were you excluding the packaging from the Bratz product?

17   A   When we would look at a competitive product, we would look

18   at both the product in and out of the package; we would look at

19   all aspects of it.

20   Q   Now, can you tell this jury whether or not, at any time in

21   your experience in the girls division, you ever saw a situation

22   where a Bratz product was offered at retail outside of the box.

23   A   Was offered at retail outside of the box?

24   Q   Yes.

25   A   I would imagine most times, it was inside a package.

1    Q    Inside a package?

2    A    Yes.

3    Q    Not a clear plastic package, but a box intended to be the

4    sale, correct, the sale point?

5         MR. ZELLER:  The question is vague.

6         MR. NOLAN:  Inside packaging.

7         THE COURT:  Very well.

8         THE WITNESS:  Yes.  I mean, at retail, that's where

9    the products are normally put.

10   BY MR. NOLAN:

11   Q    Right.

12        So when we're talking about purchasing a product, and

13   you were assessing the product of Bratz at retail -- and you

14   were doing that; correct?

15   A    Well, yeah.  We used to look at the product -- when we

16   talk about looking at and assessing the competition, we would

17   look at every aspect of it.  We would look at the product apart

18   from the packaging.  We would look at the product in packaging.

19   And the reason we'd look at it apart from the packaging is

20   because we wanted to understand how a girl was going to see

21   that product and how a girl might play with that product; so

22   that was as important as any other aspect of assessing the

23   product.

24   Q    But I am sure that when a consumer, when an eight- or

25   nine-year-old or a ten-year-old girl, went into Toys"R"Us with

1    her mother or her father or her aunt to purchase a product, she

2    would buy a Bratz product in packaging.

3    A    Yes.  If they're in the store, then it would be in

4    packaging.

5    Q    Now, I asked you whether or not, while you were in the

6    girls' division, you were aware that Bratz came out with more

7    characters other than the original characters introduced in the

8    first generation.

9         Do you remember that line of questioning?

10   A   Yes, I do.

11   Q    Is it still your best recollection that Bratz had only

12   four characters?

13   A    Well, yeah.  I mentioned yesterday I had forgotten about

14   the boy characters.

15   Q    In addition to the four core first generation characters

16   and boys' Bratz, you're not aware that Bratz had introduced

17   other characters into the marketplace?

18        MR. ZELLER:  Asked and answered.

19        THE COURT:  Rephrase, Counsel.  I think that specific

20   question has been asked and answered.  I think there may be an

21   element -- I'll allow you to rephrase, if you want to get into

22   a new area.

23   BY MR. NOLAN:

24   Q    Sir, isn't it true that under your direction, members of

25   your department would go out and buy a Bratz product?

1          MR. ZELLER:  Your Honor, this is what we talked about

2     at side-bar.  It's irrelevant.

3          MR. NOLAN:  I can do a side-bar, but it's also

4     offered for impeachment.

5          THE COURT:  First of all, we're not going to have

6     speaking objections or speaking responses today; so let's get

7     off to a good start on that.

8          I haven't heard the full question, so I really can't

9     rule on the objection, Counsel.

10          Let's proceed with caution.

11     BY MR. NOLAN:

12     Q    Isn't it true that there was a practice in your department

13     for members of your department to purchase Bratz products as

14     they were introduced into the market?

15          MR. ZELLER:  Irrelevant.

16          THE COURT:  Sustained.

17     BY MR. NOLAN:

18     Q    You're not denying that MGA introduced characters beyond

19     the original four characters introduced in the first

20     generation, are you?

21     A    What I am saying to you is, I recall those original four

22     and then the boy characters.

23     Q    The last subject I want to turn to, if I might, is -- are

24     you familiar with a group within Mattel called the Worldwide

25     Consumer Research Group?

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A    We have a group that is consumer insights, yes.

2    Q    And that's a department within Mattel; correct?

3    A    Yes.  Uh-huh.

4    Q    And that's the group that would conduct focus groups?

5    A    Yes.

6    Q    And isn't it true that you conducted focus groups each

7    month on Bratz products?

8    A    I don't recall that we did that.

9    Q    How often would you conduct focus groups on Bratz

10   products?

11        MR. ZELLER:  Question lacks foundation.

12        THE COURT:  I tend to think this is foundational.

13        Counsel?

14        MR. NOLAN:  Yes.

15        THE COURT:  Okay.  I assume this is going to a

16   relevant area, and I'll give you that benefit.

17        Overruled.

18        THE WITNESS:  Can you ask it again, please.

19   BY MR. NOLAN:

20   Q    During the period of time that you were there, did your

21   department conduct focus groups on various attributes assigned

22   to Bratz products?

23   A    Typically, what we would do is, we do focus groups with a

24   variety of products that would include Mattel products, other

25   competitors' products, including Bratz, Disney, dolls, things

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    like that.

2    Q    I didn't mean to single out that Bratz was the only one

3    that you were conducting a focus group on.

4         In any event, could I ask you for a moment to just

5    take a look at Trial Exhibit 01806; and I would ask you to

6    specifically turn to Page 5 within that exhibit.

7    A    Okay.

8    Q    I'd like to ask your attention to disregard everything

9    above the last portion of the page.

10         Do you see that?

11    A    What do you want me to look at?

12    Q    I want you to just focus on the bottom of that page, where

13    it relates to Bratz.

14         Do you see that?

15    A    Yeah.  Yes.

16         MR. NOLAN:  Your Honor, were we efficient enough to

17    hand up to the Court a copy of the notebook?  Does the Court

18    have this exhibit in front of it?

19         THE COURT:  Counsel, you may ask questions about

20    these areas.  Just proceed, Counsel.

21    BY MR. NOLAN:

22    Q    I want to ask you, sir, this is a marketing plan update;

23    is that correct?

24    A    Yes.

25    Q    During the period of time that you were the senior vice

1    president?

2        (Brief off-the-record discussion.)

3    BY MR. NOLAN:

4    Q    Mr. Kilpin, isn't it true that on some basis, your

5    department, or Mattel, would track various attributes assigned

6    to Bratz, including:  Fun to play with, doll you would most

7    want to show friends, prettiest doll, most aspirational

8    fashions, doll with best accessories, the coolest toys; and

9    then under appearance:  Most favorable clothes, prettiest hair,

10    prettier than other dolls; and then under aspiration-icons:  Is

11    more like a princess, is more like a grownup, is more like a

12    fashion model, is more like a teenager, is more like a pop

13    star, is more like a movie star; then under aspiration-peers,

14    the attributes you would track would be:  Clothes you would

15    most want to wear, most want to be like, most want to show your

16    friends, mom's favorite, is cooler than other dolls; and then

17    under play value attributes:  Comes with better stuff, more fun

18    for pretending stories, has most fun parties, is more fun to

19    play with?

20        Did I read that list correctly?

21    A    Yes.

22    Q    And you're familiar with these attributes?

23    A    Yeah.  Uh-huh.

24    Q    Are these the typical attributes that you would look at

25    and consider from time to time when making analyses of the

1    Bratz product?

2         MR. ZELLER:  Question is vague.

3         THE COURT:  Sustained.

4    BY MR. NOLAN:

5    Q    Would you track the focus group results with respect to

6    each of these aspirational values?

7         MR. ZELLER:  Foundation; assumes facts not in

8    evidence.

9         THE COURT:  Rephrase, Counsel.

10   BY MR. NOLAN:

11   Q    There are various scores that are listed on the bottom of

12   this page, 46, 44, 50, whatever.  I'm just reading from random

13   numbers.

14        How are those numbers on this page derived?

15   A    These are from a tracking study that we would do from time

16   to time.

17   Q    And that tracking study was done within Mattel?

18   A    I actually don't know the methodology of how that was

19   done.

20   Q    But they were done with respect to the Bratz products?

21   A    And other competitors, yes.

22   Q    And what significance, if any, do you attribute to the

23   various attributes that I just listed that are depicted on this

24   page?

25        MR. ZELLER:  Question is vague and compound.

1        THE COURT:  Sustained.

2    BY MR. NOLAN:

3    Q    What value, if any, do you attribute to these attributes

4    with respect to the overall success of a brand?

5        MR. ZELLER:  Same objections.

6        THE COURT:  You're grouping them all together,

7    Counsel.

8        Sustained.

9    BY MR. NOLAN:

10   Q    Do each of these aspirational factors set forth in the

11   pages indicate a particular element of the Bratz doll that you

12   were interested in measuring the response of consumers?

13   A    It wasn't so much that it was an individual element.  What

14   we were looking to try to understand, I guess, on a regular

15   basis was, How was a girl seeing that particular product in

16   relation to another product?  And it was just a number of

17   different ways to sort of ask the question.

18   Q    Why would you ask those questions?

19   A    So we could understand the relative, you know, appeal or

20   strength of one product versus another.

21   Q    Would that aid you in determining what might cause one

22   brand to sell or one type of theme to sell?

23       MR. ZELLER:  Question is compound; assumes facts not

24   in evidence; lacks foundation.

25       THE COURT:  Sustained.

1       It's in the grouping, Counsel.

2    BY MR. NOLAN:

3    Q    Would you use this data for any purpose in your business?

4    A    Yeah, generally.

5    Q    How would you use it?

6    A    As I said, we would tend to look at it in terms of

7    understanding the relative appeal or strength of a product, one

8    product versus another.

9         MR. NOLAN:  Your Honor, I've prepared a very redacted

10   version of Exhibit 01806-001 that I will show to Mr. Zeller.

11        THE COURT:  Could I look at it too, Counsel?

12        MR. NOLAN:  I'm sorry.  I've yet to lay the

13   foundation for the last page.

14        THE COURT:  Very well.

15        MR. NOLAN:  May I proceed?  I'll lay the foundation

16   on the last page first.

17   BY MR. NOLAN:

18   Q    I'd ask you to turn to Exhibit 01806, it's the same one;

19   and now turn to Page 008.

20        Do you have that in front of you?

21   A    Yes.

22   Q    Just so we're on the same page, is the first bullet line

23   relating to marketing and media?

24   A    Yes.

25   Q    Is all of that information contained on this page

1    observations of the Bratz products?

2    A   Yeah.  It looks like it.

3    Q   How do you distinguish, by the way, between marketing and

4    media?

5    A   In the case of this particular bullet point, I'm not sure

6    what the difference was.

7    Q   In any event, you were making the observation at the time

8    of this report, which was March 16, 2004, that marketing and

9    media for Bratz was getting more aggressive; is that correct?

10   A   Yeah.  Uh-huh.

11   Q   And is it your view, sir, and based on your 17 years of

12   experience, that an aggressive marketing and media program can

13   assist in driving up sales?

14       MR. ZELLER:  Question is vague; lacks foundation.

15       THE COURT:  Overruled.

16       THE WITNESS:  Can you ask it again.

17   BY MR. NOLAN:

18   Q   Is it your experience, based on 17 years in marketing,

19   that aggressive marketing and media campaigns have the

20   potential for increasing the sales of fashion dolls?

21   A   Yeah.  If it's a good product, it will.

22       MR. NOLAN:  Your Honor, in its redacted form, I'd

23   offer 01806.

24       THE COURT:  One question:  What is GRP?

25       THE WITNESS:  That's an acronym for "gross rating

1    point."  It's a measurement by which media is purchased.

2        MR. NOLAN:  We'd offer it, Your Honor.

3        MR. ZELLER:  No objection.

4        I would like the opportunity to look at the whole

5    document more carefully at some point.

6        MR. NOLAN:  Sure.

7        MR. ZELLER:  But this is the redacted form.

8        THE COURT:  No objection to the redacted form?

9        MR. ZELLER:  Right.  In this form, I have no

10    objection to it.

11        There may be more that should go with it.  That's all

12    I'm suggesting.  We can determine that, perhaps, at a break.

13        THE COURT:  Very well.

14        It's admitted.

15        You may publish.

16        (Exhibit 01806 is received.)

17    BY MR. NOLAN:

18    Q    This is the first page; this is the marketing plan update,

19    March 16, 2004.  Now, this is for Barbie, and it's marked

20    "confidential, 20 copies only" on the top.

21        Do you see that?

22        There's more pages, but we're just putting in the

23    ones that relate to Bratz.

24        These are the scores that we were talking about,

25    Bratz monthly measures.  Left-hand column, you have some of the

1    attributes.  Then there are scores, 46, 44, 50; and then that

2    final column is 55, with a bullet up, or an arrow going up.

3        Would that indicate that the percentages are moving

4    up or down?  In other words, the first one, "fun to play with,"

5    at the end of that, there's the number 55, with an arrow going

6    up.

7        Is that an increase?

8    A   Yeah.  What you're seeing there is that -- in the far

9    right column, yes, that's an increase; it represents a change

10   versus the prior time.

11   Q   And you have similar attribute ratings for each them,

12   "prettiest doll," "most aspirational fashions."  I want to

13   focus on this for a moment:  "Most aspirational fashions."

14       What is meant by "aspirational fashions"?

15   A   Well, we would typically use the word "aspiration" to

16   describe something that a girl would aspire to, something that

17   a girl might want.

18   Q   And then the next line, "doll with best accessories."

19       So you were tracking whether or not the accessories

20   in the package -- what the reaction was to the consumer?

21   A   Can you say that again.

22   Q   So you were tracking, as an attribute, which doll themes

23   for Bratz, or lines, had the best accessories?

24   A   Yes.

25   Q   Because good accessories can improve the overall

1   appearance of the product?

2   A   As I said, this was one of the many measures we were

3   talking about in terms of understanding --

4   Q   I'm not going to go through all of them, but some of them

5   are not as clear as others.

6        "The coolest toy," what did that mean to you in the

7   toy parlance?

8   A   Pretty much what it says.

9   Q   Just the coolest toy?

10   A   The coolest toy.

11   Q   My girls will explain that to me tonight, I'm sure.

12        And that is going -- at least in this month, that was

13   going up; is that correct?

14   A   Yes.

15   Q   And each one of those scores for each of those register

16   from the focus group conducted by Mattel; is that correct?

17   A   Well, as I told you, I don't remember what methodology we

18   used for this research.  It was a tracking study.

19   Q   But in any event, the scores that are indicated here, if

20   they were scores on a math exam, they may not be that good; but

21   looking at these scores, would you say that these were pretty

22   strong scores?

23   A   Well, they were moving up.

24   Q   Let's go to the next page.

25        There are some more, and we'll go through these.

1           "Appearance."  Under that, "most fashionable

2    clothes," "prettiest hair."

3           And we established yesterday that hair changes from

4    doll theme to doll theme often; is that correct?

5    A    Yeah.

6    Q    And fashionable clothes change to keep the product fresh;

7    is that correct?

8    A    Generally, yes.

9    Q    And then under "aspiration-icons," it's "more like a

10   princess."  And then you track that.

11          "More like a grownup," "more like a fashion model."

12          Do you see that?

13   A    Uh-huh.

14   Q    You understood that one of the things that were driving

15   the theme or the brand of Bratz was its new fashions that it

16   was coming out with; correct?

17          MR. ZELLER:  Foundation; asked and answered.

18          THE COURT:  Sustained.

19   BY MR. NOLAN:

20   Q    Under "aspiration-peers," "clothes you would most want to

21   wear," "most want to be like," "most want to show to your

22   friends," "mom's favorite," "is cooler than other dolls."

23          And then the "play value" -- and that's a term that

24   you identified for us yesterday; right?

25          "Comes with better stuff."

1          I guess "stuff" is another, like, legal term, but

2     it's a marketing term here; it's just stuff.

3          Does that include accessories, et cetera?

4     A   Yeah.  I would think that generally means accessories.

5     Q   "More fun for pretending stories."

6          "Has most fun parties"; do you see that?

7     A   Yes.

8     Q   Now, explain to me, what do you mean by that, "has most

9     fun parties"?

10    A   This whole list is really about getting girls to respond

11    to all of the different ways they might think about playing

12    with a doll.  So these are all various representations of a way

13    a girl might play with a doll.

14    Q   I saw somewhere last night, when I was reviewing this,

15    that you also were tracking an attribute you called "social

16    acceptability."

17         Do you remember that term?

18         Do you remember tracking that score?

19    A   I don't.

20    Q   When we talk about aspirational attributes, explain to me

21    in your own words what you mean by aspirational values, or

22    attributes.

23    A   I thought I just said it.

24         It's more about how a girl wants to be, what a girl

25    might want to be like.  That's the way we used it in this

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    aspect.

2    Q    And you would agree with me that Bratz was viewed as

3    having aspirational fashions and offering play value that was

4    registering well with consumers?

5         MR. ZELLER:  Relevance; foundation.

6         THE COURT:  Sustained.

7    BY MR. NOLAN:

8    Q    Was it your view that Bratz had aspirational fashions?

9    A    Well, if you look at the way we were ranking these

10   particular attributes and tracking them, you know -- you just

11   showed it -- they were moving up.

12   Q    And, also, Bratz was viewed as having strong play value?

13   A    Well, again, based on these ratings, we were watching how

14   those were improving.

15   Q    Two other documents, and I think -- I'd ask you to take a

16   look at Exhibit 4999.

17        By the way, the chart that I showed you, you

18   considered those to be good scores for Bratz, did you not?

19   A    Well, you saw the arrows.  We considered them to be

20   improving.

21   Q    The next document, 4999, do you have that in front of you,

22   sir?

23   A    Yes.

24   Q    And do you recognize the form of this document?

25   A    Yes.

1   Q   How do you recognize it?

2   A   This is, I believe, one of the documents that fed out to

3   what you just showed.

4   Q   So this is one of the Worldwide Consumer Research Group

5   reports that were being conducted, and then the results

6   imported into your marketing report we just talked about?

7           MR. ZELLER:  Foundation.

8           THE COURT:  Sustained.

9           Lay a foundation, Counsel.

10  BY MR. NOLAN:

11  Q   How do you recognize this document?

12  A   Well, this is the format we used to normally get

13  information in.

14  Q   And you say "we."  You mean while you were senior vice

15  president at Mattel?

16  A   Yes.

17  Q   And this was the format that you would receive

18  information, feedback, from your focus groups that were being

19  conducted by the Worldwide Consumer Research Group?

20  A   Yeah.  You keep calling them focus groups.  I don't know

21  what format they were.

22  Q   But in any event, they were conducting some type of

23  research?

24  A   Yes.

25  Q   And you understood they were conducting some type of

1    research with the targeted consumers?

2    A   Yes.

3    Q   And in this instance, they were doing various age groups,

4    including five to seven years old, and then eight to ten years

5    old; correct?

6    A   Yes.

7    Q   And they would report back certain characteristics that

8    they saw with respect to Bratz and what they were learning in

9    their research; correct?

10   A   Yes.

11        MR. NOLAN:  May I approach with a redacted copy,

12   Your Honor?

13        THE COURT:  You may.

14   BY MR. NOLAN:

15   Q   Just as a further foundation, these are the type of

16   reports and information, research information, that you would

17   receive and make available to the members of your marketing

18   team; is that correct?

19        MR. ZELLER:  Foundation; assumes fact.

20        THE COURT:  Rephrase, Counsel.

21   BY MR. NOLAN:

22   Q   Did you use this research information that you would

23   receive from the Worldwide Consumer Research Group within

24   Mattel, within your marketing department?

25   A   Well, yes.  As you just showed in that marketing document,

1    that's how we would use it; we would pull that information out.

2    Q    And you would use that information in terms of making

3    analysis on what your competitor products were doing, as well

4    as what your own products were doing; correct?

5    A    Yes.  Uh-huh.

6    Q    And you would use this in the ordinary course of your

7    business?

8    A    Yes.  Uh-huh.

9        MR. NOLAN:  Your Honor, I'd offer into evidence a

10   redacted version, that I have handed up to the Court, where

11   I've redacted everything other than the name Bratz.

12       MR. ZELLER:  Irrelevant; 403.

13       THE COURT:  I agree with Pages 2 through 10, not

14   necessarily on Page 1.

15       I think we need to discuss Page 1 at side-bar,

16   Counsel.

17       MR. NOLAN:  I'll redact.  Just for concession

18   purposes, I'll redact the --

19       THE COURT:  I agree with the objection on 403 on

20   Pages 2 through 10.  I'm not sure on Page 1.

21       MR. NOLAN:  Oh.  I thought it was the other way.

22       We should go to side-bar.

23       (Whereupon, the following proceedings were held at

24   side-bar:)

25       THE COURT:  The problem with 2 through 10 is that in

1    order to redact it, sufficient to avoid concerns expressed

2    yesterday, it becomes almost meaningless, because there's all

3    these comparisons that don't set forth explanation as to what

4    is being compared, and it should; so I agree with your

5    objection there.

6        The statement that Mr. Zeller's conclusion, that it's

7    highlighted on the first page there, the relevance does seem to

8    outweigh confusion or prejudicial effect.

9        MR. QUINN:  Your Honor, I think that statement about

10   coolness and things like that, these attributes aren't relevant

11   to any issue in the case.  They are not relevant to any -- it

12   doesn't relate to buying decisions.  These are --

13       THE COURT:  It does -- I mean, having the appealing

14   fashions and accessories and play value coolness what you just

15   focused on, I agree, is harder to assess, but essentially,

16   assuming we're talking apples and apples and Mr. Kilpin's

17   definition of aesthetics is the same definition being used here

18   from yesterday -- and it's not clear that it is, because his

19   definition of aesthetics would have included something like

20   coolness.  But that's a foundational issue which has not been

21   raised at this point.

22       But just in terms of relevance, to suggest that Bratz

23   -- the problem is a dominance in those areas.

24       I assume that means relevant to Barbie?  Is that

25   comparative?

1          MR. NOLAN:  It could be considered that way, but I

2     think what this is showing is that Bratz is perceived in the

3     marketplace as cool, play value.  It goes to our themes.  It's

4     all about the apportionments.  It's dominating us.  In fact,

5     it's dominating --

6          THE COURT:  You need to lay a foundation for that.

7          Again, slightly weaker that is relative to Barbie.

8          MR. NOLAN:  Relative to itself.

9          THE COURT:  I think we need to lay foundation for

10    that statement, the graphs themselves.

11         MR. NOLAN:  First of all, there's no indication of

12    what product is being tracked, but what is key is that he did

13    not remember they were tracking it on a monthly basis.

14         This tracks on a monthly basis the Bratz products,

15    and of course we know that Bratz product is --

16         THE COURT:  That would be relevant impeachment.  If

17    you want to impeach with that, if this refreshes his

18    recollection that on a monthly basis -- I think that's --

19         MR. NOLAN:  That, and other one thing is that it also

20    supports our contention there are attributes changing,

21    depending on the products.  This whole idea of the value of

22    themes -- if all of the dolls were substantial similar, they

23    would sell about the same.

24         THE COURT:  The issue with that is this is tracking

25    on a month to month, and we're not -- there's not enough

1    information here for a jury to know that, okay, at this

2    particular month -- this gets back to the foundational issue on

3    the graph.  If you can tie a particular spike or a decline to

4    the introduction of a particular product, then I can see it.

5    But this is just a bunch of lines going up and down; that's why

6    it's 403.  There's not enough information either in the graph

7    or enough foundation with this witness for this to have any

8    meaning for the jury.

9         The statement here -- I just have concerns what it's

10   really saying.  I can see that it certainly discusses

11   attributes that you're arguing need to be apportioned out, but

12   in context, Bratz clearly dominates in most areas.

13        I don't know how Carter Bryant read -- other than

14   vis-à-vis Barbie.

15        MR. QUINN:  The key things about these, this isn't

16   information about consumers, about why they made purchases.

17   These are categories thought up by the marketing department and

18   their testing attitudes.

19        THE COURT:  I understand that.  I agree with you

20   there.  The charts are not coming in.  That's 403.  This

21   opening statement here, that I don't understand.

22        MR. NOLAN:  I'm going to try to refresh his

23   recollection.

24        THE COURT:  That this was monthly tracking?  It's not

25   clear how relevant that is, but it's out there.  If you want to

1      refresh his recollection, that's fine, without getting into the

2      specifics of relative comparisons, because that just isn't -- I

3      don't see how that's relevant to the issue in this case.

4            Mr. Zeller?

5            MR. ZELLER:  Just on the monthly tracking aspects of

6      the -- for impeachment, Mr. Kilpin has not denied it happened.

7      He just said he didn't remember.  If Mr. Nolan wants to put him

8      to those pages and say refresh your recollection -- but that

9      should not be an excuse for the charts coming in.

10           THE COURT:  Fair enough.

11           MR. NOLAN:  I was going to use it for refreshing.

12           THE COURT:  I'll reconsider the objection.

13           Ms. Aguiar?

14           MS. AGUIAR:  Can we leave the lights down for Juror

15     10 because of her eyes?

16           THE COURT:  Sure.  The lights are bothering her.

17     Thank you.

18           (Whereupon, side-bar proceedings were concluded.)

19           THE COURT:  You may proceed, Counsel.

20     BY MR. NOLAN:

21     Q    Mr. Kilpin, do you have Exhibit 4999 in front of you?

22     A    Yes.

23     Q    I want to ask you to turn to Pages 2, 3, 4, 5, 6, and 7,

24     and then 8 and 9.

25           Do you see that?

1    A    Yes.

2    Q    Do the charts depicted on these pages refresh your

3    recollection that, in fact, Mattel was conducting research on

4    Bratz on a monthly basis with respect to the list of attributes

5    that we had introduced earlier in a previous exhibit?

6    A    Yes.  As I said, this coincides with that same list that

7    you saw earlier.

8    Q    Let's go back to the first page, Page 1 of this document.

9    A    Okay.

10    Q    Have you read this provision to yourself?

11    A    Yes.

12    Q    I just want to ask you a couple of questions.

13         Down on the last line, it refers to the term

14    "aesthetics."

15         Do you see that?

16    A    Yes.

17    Q    And do you have an understanding of how that term,

18    "aesthetics," is used?

19    A    Well, in terms of how I used it yesterday?  Looks like

20    it's about the same.

21    Q    Okay.

22         And then where it says, in the first line, that it

23    "dominates in most areas," do you see that?

24    A    Yes.

25    Q    Did you have an understanding that phrase meant that Bratz

1    had a particularly strong position in some of those attributes

2    being measured?

3    A    As it related to that particular aged girl, yes.

4         MR. NOLAN:  Your Honor, with that foundation, I'd

5    offer unredacted 4999-001.

6         MR. ZELLER:  No objection, Your Honor.

7         THE COURT:  It's admitted.

8         You may publish.

9         (Exhibit 4999 is received.)

10   BY MR. NOLAN:

11   Q    This is the Worldwide Consumer Research Group, dated

12   March 4, 2005, distribution.

13        This is the girls' monthly brand tracking study for

14   February 2005; correct?

15   A    Yes.

16   Q    And it says, "Bratz clearly dominates in most areas; most

17   notably play value, coolness, and having appealing fashions and

18   accessories.  Although, as seen previously, the brand posed

19   slightly weaker scores on aesthetics."

20        Do you see that?

21   A    Yes.

22   Q    And how do you interpret it when it says that Bratz is

23   dominating in such things as play value, coolness, and having

24   appealing fashions and accessories?

25   A    How do I interpret that?

1    Q    Yes.

2    A    A very strong product.

3         MR. NOLAN:  Nothing further.

4         MR. ZELLER:  No questions, Your Honor.

5         THE COURT:  You're excused.

6         MR. NOLAN:  I offered that last one in evidence.

7         THE COURT:  It's in evidence.

8         Your next witness, Counsel?

9         MR. KENNEDY:  Good morning, Your Honor.

10        We would next call Dr. Erich Joachimsthaler, please.

11        THE CLERK:  Do you solemnly state that the testimony

12   you may give in the cause now pending before this Court shall

13   be the truth, the whole truth, and nothing but the truth, so

14   help you God?

15        THE WITNESS:  Yes.

16        THE CLERK:  Please state your full name for the

17   record and spell your full name.

18        THE WITNESS:  My name is Erich Joachimsthaler,

19   E-R-I-C-H, J-O-A-C-H-I-M-S-T-H-A-L-E-R.

20              DIRECT EXAMINATION

21   BY MR. KENNEDY:

22   Q    Good morning, Dr. Joachimsthaler, I take it you were not

23   born in this country?

24   A    No, I'm not.

25   Q    Where were you born?

1    A    In Germany.

2    Q    Do you live in the United States now?

3    A    Yes.  I live in New York.

4    Q    And I understand tomorrow you're going to be naturalized

5    as a citizen.

6    A    Yes.

7    Q    And that's in New York, so we promise to get you out of

8    here in time.

9    A    Thank you.

10   Q    Now, what is your occupation and profession, sir?

11   A    I'm a consultant on marketing.

12   Q    And were you retained by MGA in this case to render

13   opinions concerning branding of the Bratz doll?

14   A    Yes.

15   Q    And have you, in fact, reached some opinions in that

16   regard?

17   A    Yes.

18   Q    Now, before getting to those opinions, I'd like to focus

19   briefly first on your educational background, particularly as

20   it bears on the opinions you've reached here.

21         Could you summarize your education, starting at the

22   college level.

23   A    Yes.

24         I began my college work or college studies at the

25   University of Frankfurt in Germany, also called Fachhochschule.

1  Q   I know that's spelled the regular way, but could you do it

2  for us.

3  A   F-A-C-H-H-O-C-H-S-C-H-U-L-E.

4  Q   What year did you graduate?

5  A   1979, 1980.

6  Q   Pick up your education.

7  A   I then came to the United States.  I went to the

8  University of Kansas.  I finished a master's of science in

9  1981.  That master's was about marketing, branding, and

10  research.  In 1985, I finished a Ph.D., also at the University

11  of Kansas, also in marketing, quantitative methods.  And in

12  1988, I finished my post doctoral fellow research work at the

13  Harvard Business School in Boston, focusing on research and

14  marketing and branding.

15  Q   And after finishing your post doc work at Harvard, where

16  did you go next?

17  A   I joined first as a professor at a business school, a

18  global business school, in Europe.  That's a school that has

19  some strong relationships and was actually founded by Harvard

20  Business School, called IESE, in Barcelona, Spain.

21  Q   How long did you teach there?

22  A   Five years.

23  Q   Did you continue to do research while you were there?

24  A   Yes.

25  Q   In what fields?

1   A   Primarily, in '89 to '94, primarily on brand strategy,

2   branding, global brands.

3   Q   And after leaving the school in Spain, where did you go

4   next?

5   A   I returned to the United States and I became a professor

6   at the University of Virginia, Darden School, Charlottesville,

7   Virginia.

8   Q   And Darden School is their school of business

9   administration?

10   A   Yes.

11   Q   How long were you there?

12   A   Five years.

13   Q   And during the time you were at the University of

14   Virginia, tell us whether you had occasion to start your own

15   consulting company.

16   A   Yes.  I also started a consulting firm in Charlottesville,

17   also focused on brand strategy and marketing.

18   Q   And when did you leave the University of Virginia?

19   A   In 1999.

20   Q   And where did you go then?

21   A   I went to New York, and I sold my little consulting firm;

22   and then I became the chairman of a company called Profit.

23   Q   And what was the focus of Profit's business?

24   A   The focus was on brand strategy and marketing and

25   branding.

1    Q    And how long did you stay with Profit?

2    A    One year.

3    Q    Then where did you go?

4    A    In 2000, I started my own consulting firm, also focused on

5    branding, marketing, helping clients, in New York.

6    Q    What is that called?

7    A    That company is called Vivaldi Partners.

8    Q    And is Vivaldi the only company that has branding as its

9    focus, or do you have some competitors?

10    A    Unfortunately, we have competitors.  There are many,

11    really, yes; their are a number of companies like ours.

12    Q    And you say Vivaldi is located in New York?

13    A    Yes.

14    Q    Do you have offices elsewhere?

15    A    Yes.

16    Q    Where else?

17    A    We have offices now from Buenos Aires in Latin America,

18    all the way to Europe.  We have an office in London.  We have

19    an office in Munich; in Zurich, Switzerland; in Hamburg; also

20    in Düsseldorf.

21    Q    In addition to being chief executive officer of Vivaldi,

22    do you also continue to guest-lecture at colleges and

23    universities?

24    A    Yes.  I always have maintained an affiliation with

25    universities.

1    Q    Can you give us a sampling of the institutions where

2    you've guest-lectured in recent years.

3    A    Over the years, I've guest-lectured at University of

4    California at Berkeley, at Harvard Business School, at

5    University of Michigan, at Helsinki School of Economics, at

6    University of Munich; all over the world.

7    Q    In addition to the work you've described so far, have you

8    also published concerning the subjects of branding and

9    marketing strategy?

10    A    Yes.

11    Q    And approximately, how many articles in those fields have

12    you published so far?

13    A    About 80.

14    Q    Are any of those peer-reviewed?

15    A    Yes.

16    Q    And peer here is P-E-E-R, not P-I-E-R; we don't tie boats

17    to this.

18          What's this kind of a peer, P-E-E-R?

19    A    Peer-reviewed articles is the nature of an article, it is

20    an academic article.  They usually are research-based, that is

21    reviewed or, quote, "peer-reviewed" by your colleagues, who

22    then judge whether the article makes sufficient contribution

23    that warrants publication.

24          Yes, that's what peer-reviewed articles are.

25    Q    In addition to the articles, have you published any books

1    concerning branding or branding strategy?

2    A   Yes.

3    Q   How many?

4    A   Two books.

5    Q   Tell us about the first one.

6    A   The first book I published in 2000; it's called Brand

7    Leadership.

8        Actually, you hold it at the hand there.

9    Q   And that was published in 2000?

10   A   In 2000, by the free press.

11   Q   Has that been translated into any languages other than

12   English?

13   A   Yes.

14   Q   How many?

15   A   Thirteen languages now.

16   Q   Still in print in 13 languages?

17   A   Yes.  I know it from the royalties.

18   Q   I realize this isn't Robert Ludlum material, but is this

19   one of the better-selling branding books available?

20   A   Yes, it is.  But I'm no Ludlum.

21   Q   Now, you said you wrote a second book as well.

22   A   Yes.

23   Q   What's the title of that?

24   A   That book is called Hidden In Plain Sight.

25   Q   When was that published?

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A    Just last year, 2007.

2    Q    Who published that?

3    A    Harvard Business School Press.

4    Q    Has that book been translated into any languages other

5    than English?

6    A    Yes.  I'm glad.  It's in nine languages now.

7         MR. KENNEDY:  Your Honor, we would proffer

8    Dr. Joachimsthaler as an expert on branding and branding

9    strategy.

10        THE COURT:  Any objection?

11        MR. QUINN:  No objection, Your Honor.

12        THE COURT:  So designated.

13        MR. KENNEDY:  Thank you, Your Honor.

14   BY MR. KENNEDY:

15   Q    Have you testified before as an expert on branding or

16   branding strategy?

17   A    Yes.

18   Q    Now, when were you first retained by MGA in this case?

19   A    In fall of 2007.

20   Q    And you're getting paid for your time?

21   A    Yes.

22   Q    And what are you charging?

23   A    $700 an hour.

24   Q    Have you ever testified on behalf of MGA before this case?

25   A    No.

1    Q    Have you ever done any work for MGA before this case?

2    A    No.

3    Q    Have you ever had any contact with Mr. Larian before this

4    case?

5    A    No.

6    Q    In the course of forming your opinions in this case, did

7    you have occasion to consult and review various written

8    materials?

9    A    Yes.

10   Q    Could you summarize for us the written materials that you

11   consulted in the course of forming your opinions in this case.

12   A    I reviewed material about brand plans, marketing plans.  I

13   reviewed material that was both given to me from the Mattel

14   side as much from the MGA side.  I also reviewed desk research,

15   we call it, research and written material that we could find in

16   the course of our investigation.

17   Q    Were you assisted by others from Vivaldi Partners in your

18   work on this case?

19   A    Yes.

20   Q    And do you do something called a "store check"?

21   A    Yes.

22   Q    That's a fancy name for going shopping?

23   A    That's actually what we call a store check.  It's a very

24   systematic way; to go to retail stores, to go to Toys"R"Us, to

25   Wal-Mart, and to check the size of the shelf that is attributed

1    to a brand, what's on the shelf, what are the price points,

2    what's the merchandising on a shelf, and so forth.

3    Q    And you did that for Bratz?

4    A    We did that for Bratz, yeah.

5    Q    Now, what's your definition of a brand?  What is it?

6    A    Yeah.  A brand is everything that is in a consumer's mind

7    about a particular name, anything that comes to your mind when

8    you say -- What comes to your mind when you think of Nike, for

9    example?  That's a brand.  Thoughts, feelings, experiences.

10         I like to say a brand is like this proverbial box in

11   your head, with a name on it, and you open up the drawer and

12   see repeated exposure to a particular marketing stimuli; you

13   learn about the brand and you store everything in your memory.

14   That proverbial box in your head, that's the brand.

15   Q    Is there a difference between a brand and a product?

16   A    Yes.

17   Q    What is the difference or differences?

18   A    A brand and a product are very, very different.

19         A product is something that is manufactured or

20   produced in a factory.  A brand is something that resides in

21   your consumer's mind.

22         At Starbucks, the coffee is the product, but the

23   experience of being in that store, that's the brand.

24   Q    And are there non product characteristics that are

25   included within a brand?

1    A   Yes.

2    Q   Can you describe those for us.

3    A   Yes.

4         There are always -- I always distinguish between

5    product or tangible components and non tangible, or non product

6    characteristics, as you say; so the tangible ones are a logo,

7    the name, and the design.  The intangible ones are components,

8    the non product characteristics, as you say, again, thoughts,

9    feelings, a story.  Like you say, I know about Nordstrom's

10   store, about shopping there, the experience.  A metaphor.  A

11   gesture.  Anything that you store in memory around the

12   particular name.

13   Q   Can a brand develop its own identity separate and apart

14   from a product?

15   A   Yes.

16   Q   Can you give us an example?

17   A   Yes.

18        That happens many times, in fact.  Take, for example,

19   Harley Davidson.  Harley Davidson product is one thing.  The

20   lifestyle of Harley Davidson is something else.  Many people

21   look at Harley not from ever thinking about buying a bike, but

22   they may just buy a piece of the brand.  They may buy a

23   T-shirt, and then live in some ways that's a separate identity

24   of Harley.

25   Q   If a company has a well-designed product, tell us whether

1   that does or does not mean they'll automatically have a strong

2   brand.

3   A   If it were that easy, I probably would not be in the

4   business.  A well-designed product is one part, but you have to

5   do a lot of work afterwards to make the brand, to build that

6   brand; so a good product does not necessarily create a great

7   brand.

8   Q   Can you give us an example in that regard.

9   A   There are many products in -- in fact, there are many

10  products in every industry.  Today, you have 1 out of 20

11  products that are good products that are not living beyond the

12  first year, and that means that they never really built that

13  brand.

14  Q   Now, do brands provide value to the companies that own

15  them?

16  A   Yes.

17  Q   What is the value that a brand provides?

18  A   A brand provides many values, but most importantly, a

19  brand allows you to charge a price premium.  A brand allows you

20  to charge something extra, and sometimes it's a lot extra, over

21  and above a regular product.  And that leads into profits, and

22  also, that feeds the bottom line.

23  Q   Is there a school of study now that actually values what a

24  brand is worth in dollars to a business?

25  A   Yes.

1    Q    Is that information that's publicly available?

2    A    Yes.

3    Q    At my request, did you check out what the Google brand is

4    currently valued at?

5    A    I don't know exactly the Google brand.  Every year, the

6    100 biggest brands, biggest global brands, are valued.  That's

7    published these days in BusinessWeek and the major magazines in

8    our business, Financial Times, for example.  And so they rank

9    sort of the biggest brands.

10    Q    Can you give us some examples of actual dollar values that

11    have been assigned to brands.

12    A    Yes.

13          If I recall, like Nike, for example, is a brand worth

14    $12 billion; or the GAP is worth, maybe, $5 billion, $5.5

15    billion; so these are substantial values of the total.

16    Q    In the course of your work on this case, have you also

17    studied whether branding has any importance with regard to

18    purchases of products that are directed at children?

19    A    Yes, absolutely.

20    Q    Can you tell us what you did in that regard.

21    A    Yes.

22          I researched children categories, marketing to

23    children, and how consumers, young consumers, especially girls,

24    the ages of 4 to 12 and more, how they purchase, and what we

25    learn about that.

1    Q    Did that include looking at a study from Nickelodeon?

2    A    Yes.

3    Q    Can you tell us what you found to be the most important

4    facts in that Nickelodeon study.

5    A    There are a number of studies -- one of the most important

6    findings is that young children are very, very brand-conscious;

7    so there's a significant increase in brand consciousness.  You

8    will find, for example, that a study would show that young kids

9    of eight years old can memorize 300 to 400 brands.  They're

10   brand-conscious.

11   Q    Now, let's turn to how a company goes about developing a

12   brand.

13       Can it happen just by default?

14   A    No.  Again, I wouldn't be around if that would be the

15   case.

16       Brands really require a lot of effort.  Brands are

17   nurtured.  Brands are managed.  They are defined.  There is a

18   whole community of consultants and marketers and people in the

19   profession that help companies build brands.

20   Q    And do you and your competitors have something called a

21   "proactive brand management system"?

22   A    Yes.

23   Q    And have you prepared a graphic that outlines how that

24   works?

25   A    Yes.

1    Q    Dr. Joachimsthaler, looking at the graphic that's been put

2    up, starting in the upper right-hand corner, could you briefly

3    describe for the jury what's meant by the brand identity

4    position aspect of a proactive brand management system.

5    A    Yes.

6         Brand identity position is one aspect of a good

7    management system.  It defines what the brand stands for.  It

8    defines what is the promise and the value proposition, what you

9    offer to the consumer.

10   Q    Did you evaluate the Bratz product line brand in context

11   to that consideration?

12   A    Yes.

13   Q    What did you find?

14   A    I found that the Bratz brand identity is defined in terms

15   of specific dimensions, like symbols, like a particular

16   personality, and has a very clear and distinctive promise and

17   value proposition of what we also call meaning for consumers,

18   particularly girls.

19   Q    Continuing on to the upper left-hand corner, can you

20   briefly describe what is meant by brand architecture in this

21   context.

22   A    In brand architecture, we look at a brand not just from

23   one particular product perspective, but we look at the whole --

24   what we call an ecosystem.  We like to say that a brand really

25   always is part of a portfolio.  And every member of the

1    portfolio has a particular role, much like when you play soccer

2    or when you play football.

3    Q    As of tomorrow, it's football, not soccer.

4    A    Starting tomorrow, yes.

5         In football, every player has a particular role; and

6    in the same way, in a brand architecture, a brand always has

7    product themes; it has many different aspects that, together,

8    create that brand.

9    Q    And what, if anything, did you find with regard to the

10   Bratz brand architecture?

11   A    I found that in the Bratz architecture, there's an amazing

12   set of players.  There are over 30 dolls.  There are extensions

13   in the Bratz, in the Petz, into male dolls.  There's an entire

14   ecosystem.  There are themes that matter.  The themes

15   themselves play a role in the entire ecosystem.

16        As I say, it's like an entire brand ecosystem.  And

17   only together, in conjunction, all of these things together,

18   the brand, the sub-brands, the different pieces, even the

19   package, only together, all of this together creates what I

20   call the meaning or the promise to the girls to which this

21   brand appeals.

22   Q    In considering the brand architecture, did you go to the

23   Be-Bratz website?

24   A    Yes.

25   Q    What is the Be-Bratz website?

1    A    The Be-Bratz website is just one way to participate in

2    that community called Bratz, which is really the essence of

3    Bratz, in my opinion; and that is, Be-Bratz -- I went to the

4    store, in fact; and I bought a doll in my store check.  With a

5    doll, you receive -- in the doll, you receive a number, a code

6    number; and with that code number, you can go on the Be-Bratz

7    website, become part of the Be-Bratz, or the Bratz world.  In

8    becoming part of that world, you can design your character

9    interactively on-line.  You can have that character exchange

10    with other people in the same community, other girls in the

11    same community.  You spend a significant amount being in the

12    world of Bratz.

13         And that's what brand architecture is all about.

14    Q    Going next, logically, it is brand building programs.

15    A    Yes.

16    Q    Again, because we are short on time, if you could give us

17    just the essence of what's involved in a brand building

18    program.

19    A    A brand building program is anything that communicates the

20    brand; the merchandise; again, we mentioned the Bratz website;

21    the packaging.  The unique packaging that in and of itself is

22    very specific.  And the brand building program is very

23    important as part of a brand management system, because a brand

24    is not created on day one.  A brand is created after doing

25    something right again and again and again.  16 collections.

1   Several times a year.  Every decision you make.  Every time you

2   touch a consumer.  All of this has to fit together to one

3   thing.  So it's an amazingly difficult task to build a brand.

4         That's what brand building programs are all about.

5   Q    And after a brand is built, do you have to do anything to

6   maintain it, or does it just run by itself?

7   A    Just when you have built a brand, you just have to begin

8   maintaining the brand, you know, reinforcing the brand; because

9   if you don't, people forget about you.  It's our memories.  You

10  know, these are forgetful people.  So you constantly have to

11  refresh and you constantly have to create on-target

12  collections, on-target brand building programs, particularly in

13  this particular business.

14        You have consumers that change every couple of years.

15  You have new consumers coming into the market.  You have

16  fashions change.  You have everything is constantly changing.

17  The music preferences change.  These kids -- I have my own

18  daughters who are about that age, 12, 13 years old.  They don't

19  like things from two years ago; so the brand management is

20  really one of the big parts of a success of anything in that

21  particular category.

22  Q    And going to the fourth element, "organization," can you

23  tell us what that involves.

24  A    Organization is having the right team that does the job.

25  Who inside a company really manages?  Do you have the right

1    partners, the right agency?  How do you manage the advertising

2    agency?  It's really, really very hard.  And when I look at

3    brand management, I always say there's got to be a team of

4    people inside your organization who know to make those millions

5    of decisions on managing the brand and building the brand every

6    day on a daily basis.

7         That's that part.

8    Q    Now, in one of your earlier answers, I think you used the

9    term "price premium."

10        Can you tell us what a price premium is as applied to

11   a brand or brand strategy.

12   A    Yes.

13        A price premium is simply a way of measuring what one

14   can charge on the top, the value or the strength of the brand,

15   expressed in price premium.

16   Q    And are there industry-level studies that assess the price

17   premium that a particular product or a particular industry can

18   achieve in return for a brand?

19   A    Yes.

20   Q    In the course of forming your opinions in this case, did

21   you consult any of those industry studies?

22   A    Yes.

23   Q    Are there multiple methods for attempting to assess the

24   value of the price premium that a particular brand produces?

25   A    Yes.

1   Q    Have you used those methods, aside from this case, in your

2   regular teaching, research, and professional life?

3   A   Yes.  I do that over 20 years.

4   Q    For the past 20 years?

5   A   Yes.

6   Q    And can you briefly describe for us what some of the

7   different brand premium evaluation methods are that you have

8   been using over the past 20 years.

9   A   Yes.

10      Again, there are a number of different methods.  What

11  we like to do, what we do is, we look at how -- for example,

12  how much, in a particular industry, a particular brand can

13  charge over a functionally equivalent; something over, maybe, a

14  private label that doesn't have the brand or over another brand

15  in the market.  We do market research for that.  We have

16  existing research studies that we rely on.  There's a number of

17  different methods such as this.

18  Q    Can you tell us how many times a year on average you and

19  Vivaldi Partners go through the process of trying to determine

20  the price premium for a particular brand.

21  A    We do that fairly frequently.  It's one way of managing

22  the whole brand; maybe 50 times, 60 times, across all of our

23  offices.

24  Q    And coming back to your work in this case, did you consult

25  a book, or study, called Competing for Customers and Capital,

1    by Victor Cook?

2    A    Yes.

3    Q    And can you tell us briefly what Mr. Cook and his people

4    did with regard to studying brand premiums.

5    A    Yes.

6         That book I used because it's one of the many sources

7    that is commonly used, and that book has looked at, I think,

8    479 companies and has said of the total --

9         MR. QUINN:  Your Honor, this is hearsay.

10        THE COURT:  Sustained.

11        Lay a foundation, Counsel.

12        MR. KENNEDY:  Sure.

13   BY MR. KENNEDY:

14   Q    Is the Cook book, the book by Mr. Cook, despite that

15   inauspicious start, is that a recognized authority in the field

16   of brand and brand management?

17   A    Yes.

18   Q    Is that something that you and your colleagues at Vivaldi

19   regularly consult in the course of trying to do brand

20   evaluations?

21   A    Yes.

22   Q    From your teaching, lecturing, can you say whether the

23   Cook Competing For Customers work is something that's generally

24   relied on and accepted in the branding industry?

25   A    Yes.  That method is accepted, yes.

1        MR. KENNEDY:  Your Honor --

2        MR. QUINN:  It's still hearsay, Your Honor.  He can

3    rely on it, but in terms of getting into the contents...

4        THE COURT:  Rephrase your question, Counsel, the

5    substantive question.

6    BY MR. KENNEDY:

7    Q    Does Mr. Cook provide a price premium for brands in the

8    doll and toy industry?

9    A    Yes.

10        MR. QUINN:  Same objection.

11        THE COURT:  Sustained.

12        MR. QUINN:  Move to strike the answer.

13        THE COURT:  It's stricken.

14    BY MR. KENNEDY:

15    Q    The Cook work is part of what you took into account in

16    arriving at your opinions in this case; correct?

17    A    Yes.

18    Q    Did you find Mr. Cook's assessment of price premiums to be

19    consistent with your opinions in this case?

20        MR. QUINN:  Your Honor, hearsay.

21        THE COURT:  Side-bar, Counsel.

22        (Whereupon, the following proceedings were held at

23    side-bar:)

24        THE COURT:  We don't have experts come in just to

25    explain why they are an expert.  If this expert has an opinion

1    that he can express, and it's based on other people's work,

2    that's one thing.  But to ask him what Mr. Cook or anybody else

3    found and have that read to the jury --

4         I'll sustain the hearsay objection.  That's what I

5    mean when I say rephrase.  You're rephrasing it in the very

6    same terms.  You're asking this witness what somebody else

7    said.  That's hearsay.  That's not before the jury.

8         MR. KENNEDY:  Understood.

9         I'd submit this is a scholarly work that comes

10   within --

11        THE COURT:  But we don't have experts come in and

12   give book reports.

13        MR. KENNEDY:  I understand.

14        THE COURT:  Very well.

15        (Whereupon, side-bar proceedings were concluded.)

16   BY MR. KENNEDY:

17   Q    Dr. Joachimsthaler, have you arrived at an opinion in this

18   case as to whether the Bratz brand has a price premium?

19   A    Yes.

20   Q    And have you prepared a chart showing the methodology by

21   which you arrived at that opinion?

22   A    Yes.

23        MR. KENNEDY:  Aaron, could we have Number 3.

24   BY MR. KENNEDY:

25   Q    Let's start reading from bottom to top.

1          First, the part in red, the estimated Bratz price

2     premium?

3          Is that your opinion?

4     A   Yes, that's my opinion.

5     Q    And does that mean that you believe a Bratz product can be

6     priced at 50 to 70 percent more than a no-brand competing

7     product?

8     A   Yes.

9          We call them an unbranded equivalent, yes.

10    Q   Let's go up to the top, starting with accepted industry

11    standards, and turning to intangibles, can you tell us the

12    basis for your opinion that consumer goods -- first off,

13    explain to us what 45 to 75 percent means with regard to

14    consumer goods here.

15    A   Okay.

16         The 45 to 75 percent are the price premiums, or in

17    this case, called intangibles, that companies can charge across

18    different types of consumer products.  I put that range because

19    there are all kinds of consumer products, things you buy daily

20    versus things you buy maybe every once in a while; so the range

21    really reflects that breadth.

22    Q    And then for the line "intangible dolls and toys," what

23    does the 52 percent there mean?

24    A   The 52 percent is the price premium just for companies or

25    brands in the doll and toy category.

1    Q    And then we come down to "role of the brand."

2         Can you tell us what you mean by "role of the brand."

3    A    Yeah.

4         That is a reflection -- it's a different study that I

5    relied on, and that study just looks at how important is the

6    brand, what's the role of the brand; and the estimation there

7    is that consumer goods have 55 percent of the value on the

8    average.

9    Q    And then the next line says "luxury goods, 70 percent."

10   A    Yes.

11   Q    And why would you possibly be talking about luxury goods

12   when we're in a case about dolls?

13   A    In fact, I included that range -- that is at 70 percent.

14   The reason why is -- and I've listed them, actually, further

15   down in my analysis -- because somehow the purchase of a doll,

16   a fashion doll, in particular, is like an affordable luxury.

17   Just like when you buy yourself a Starbucks cup of coffee over,

18   maybe, a regular coffee.  You pay something extra for it for

19   getting the right thing, the right brand.  And that's why I

20   put, also, the luxury goods range in there.

21   Q    And then going back up to "factor analysis," you've put in

22   "degree of social influence," with an upward pointing arrow.

23        First, can you tell us what you intend to signify by

24   that.

25   A    Yeah.

1        I wanted to analyze -- further analyze on this

2    specific context here whether those numbers are reasonable

3    numbers, or whether they should go up or should go down.  And

4    so the degree of social influence is one factor that plays very

5    strongly in this category.

6    Q    Can you tell us what social influence means with respect

7    to trying to figure out whether a brand carries a price

8    premium.

9    A    Generally, we look at how much there is peer group

10    pressure or pressure from friends or social pressure for buying

11    one particular brand over another particular brand.

12    Q    What is your opinion with regard to the social influence

13    or pressure with regard to doll purchases or purchases of other

14    Bratz products?

15    A    From the research on children, and particularly girls, I

16    found that there is very strong social peer pressure,

17    especially in the category of 7 to 12, or 4 to 12 year old.

18    They are very much guided by also what their friends are

19    buying.  And that reflects here.  That's why I felt that in

20    those cases, there is a price premium that is actually slightly

21    higher, and, therefore, the arrow upwards.

22    Q    So when one of our children tells us they want something

23    like Tommy, we now know that that's actually the reflection of

24    social influence and peer pressure.

25    A    That's it.

1    Q    Could you go next to the role of culture, and could you

2    tell us what it is about the role of culture that impacted on

3    your opinions in this case.

4    A    Yeah.

5         We find that culture is actually a very important

6    factor.  Think about here in America.  Many parents -- I'm one

7    of them -- we have less and less time to spend with our

8    children.  With less time spent with our children, if we have

9    an extra dollar in our pocket, we spend it, so we are a lot

10   less -- we almost, like, talk about guilt purchases.  Sometimes

11   parents buy things for children just because of the guilt,

12   because we have less time to spend.  So I put here role of the

13   culture.  So several factors that actually point to the fact

14   that when you are in those situations, you can oftentimes

15   charge a premium price over some other brand.

16   Q    And then going, finally, down to "nature of consumer

17   decision-making."  You've got "gifting."

18        Could you tell us what "gifting" means in this

19   context.

20   A    We also looked, when we analyzed these price premiums, to

21   what extent a purchase is a gift purchase.  Because when it's a

22   gift purchase, you are a lot less sensitive about how much it

23   costs you.  When that person -- when you think that person

24   wants that brand, you just have to buy it, even though it maybe

25   bears a higher price.  So gifting, you can't -- if I'm an

1    uncle, I can't come and say, I have decided for you what brand

2    you want.  I need to really -- the gift has to hit the mark

3    there, and that's why you generally have a higher price premium

4    there.

5    Q    I think you've also already discussed affordable luxuries;

6    correct?

7    A    Yes.

8    Q    I notice you didn't put down a particular percentage point

9    for the estimated Bratz price premium.

10        Why is that?

11   A    I felt it would require further study to quantify that.  I

12   felt that all of these factors point in one direction; namely,

13   that more likely, the price premium is even higher than I

14   estimated.  And I wanted to keep it within the range that I had

15   there and just sort of leave it at that.

16        MR. KENNEDY:  Your Honor, other than to offer the two

17   graphics into evidence, I have no further questions.

18        THE COURT:  Any objections?

19        MR. QUINN:  We do object, Your Honor, to the graphic.

20   They're demonstrative; hearsay.

21        THE COURT:  This one here and the other one is the --

22        MR. KENNEDY:  Brand management system.

23        THE COURT:  This one is what number?

24        MR. KENNEDY:  I don't think we even have exhibits on

25   them yet, Your Honor.

M (Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1          THE COURT:  All right.  We'll take this up outside

2     the presence of the jury.

3          MR. KENNEDY:  Yes, Your Honor.

4          THE COURT:  Let's take our break here.  It's 10:30.

5          Since we just have the morning session, let's keep

6     this to ten minutes; and let's get back to this, if we can, in

7     ten minutes.

8          (Whereupon, jurors depart courtroom.)

9          (Brief recess taken.)

10         (Whereupon, jurors enter courtroom.)

11         MR. KENNEDY:  Your Honor, we've marked the two

12     illustratives with exhibit numbers.

13         THE COURT:  And they are?

14         MR. KENNEDY:  The proactive brand management is

15     18929, and the price premium is 18930.

16         THE COURT:  Counsel?

17         MR. QUINN:  The one that the Court tentatively

18     indicated it was going to admit, may we have a chance to

19     discuss that?

20         THE COURT:  Off the record.  We'll come back to it.

21     Just remind me.

22         Let's have the expert witness back on the stand.

23              CROSS-EXAMINATION

24     BY MR. QUINN:

25     Q    Good morning Dr. Joachimsthaler, my name is John Quinn.

1    I'm counsel for Mattel.

2         I want to ask you some questions about this concept

3    of a brand.

4         You mentioned a couple of different brands that are

5    well known to folks.  Another example, I guess, would be the

6    brand Kellogg's, which people know for cereals.

7    A   Yeah.

8    Q   And if people see the name Kellogg's on a cereal box, that

9    means something to people, I take it?

10   A   Yes.

11   Q   And if someone invents a new cereal, and Kellogg's agrees

12   that the name Kellogg's can go on the box for that cereal, that

13   means it adds some value by doing that, would you agree?

14   A   Yes.

15   Q   And in terms of what you've talked about, what consumers

16   think of the associations they have with Kellogg's, putting

17   that name Kellogg's on a cereal box adds significant value;

18   would you agree with that?

19   A   Yes.

20   Q   But MGA did not bring any established brand to the designs

21   that Carter Bryant brought over from Mattel in September of

22   2000; would you agree with that?

23   A   Yes.

24   Q   As far as you're aware, MGA did not have any substantial

25   brands, toy or otherwise, to contribute to the Carter Bryant

1      design in September of 2000; correct?

2      A    Say that again.  The whole question.  There were lots of

3      things in there.

4      Q    So far as you're aware, MGA did not have a substantial

5      brand, like the Kellogg's brand, to contribute to

6      Carter Bryant's designs that he brought from Mattel in

7      September of 2000?

8      A    I understand that they acquired the Bratz name.

9      Q    Are you familiar with the jury's verdict as it relates to

10     the name --

11     A    No.

12     Q    -- the name Bratz and that it came from Mattel?  Are you

13     familiar with that?

14     A    I only know --

15          MR. KENNEDY:  Objection.  Misstates the verdict.

16          THE COURT:  The verdict is what the verdict is.

17          Counsel, do you have a copy of the verdict?

18          MR. KENNEDY:  Change the objection to, The document

19     speaks for itself.

20          THE COURT:  That's overruled.

21          But I do want to have an accurate statement of what

22     the verdict was.

23          MR. QUINN:  We have a copy, Your Honor.

24          THE COURT:  Counsel, you can set forth and use the

25     exact verbatim language on the timing of ideas, on Page 5,

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    Questions 5 and 6.

2    BY MR. QUINN:

3    Q    Are you familiar with the jury's verdict in this case,

4    that Mattel proved by a preponderance of the evidence that

5    Carter Bryant conceived the name Bratz while employed by

6    Mattel?  Are you familiar with that?

7    A    I just heard it, yes.

8    Q    But in any event, at the time that Mr. Bryant brought over

9    these designs in September of 2000, MGA did not have itself a

10   brand like Kellogg's to contribute to those designs at the time

11   they were brought over; isn't that correct?

12   A    Yes.

13   Q    So MGA bringing out a new doll at that time was not like

14   Kellogg's putting its name on a new cereal box?

15   A    No, it was not the same.

16   Q    And when MGA began selling the dolls, Bratz was the dolls'

17   name, but in the beginning, that was not an established brand

18   name; would you agree with that?

19   A    Yes.

20   Q    No one had ever heard of the Bratz, at least as it relates

21   to dolls, until the dolls came out; correct?

22   A    That's correct.

23   Q    So this isn't like a chicken-and-the-egg riddle, which

24   came first.  Here, there's no question, the doll, the doll

25   design, came before the brand; correct?

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A    Yes.

2    Q    And when the dolls were first introduced into the market,

3    the brand itself was unknown; correct?

4    A    Yes.

5    Q    And, in fact, in early 2001, when the Bratz dolls were

6    first introduced into the market, the dolls were regarded as

7    very unique and very striking; isn't that true?

8    A    Yes.

9    Q    In doing your work, you talked to some people at MGA about

10    the Bratz dolls, didn't you?

11    A    Yes.

12    Q    And one of the people you spoke to was Paula Garcia?

13    A    Yes.

14    Q    And you spoke to her in January 2008 as part of your

15    investigation, I think.

16    A    2008, yes.

17    Q    And do you remember her telling you about these designs

18    that -- well, first, that she said she can remember the day she

19    met Carter Bryant like yesterday.

20         Do you recall that?

21    A    Yes.

22    Q    And you also remember her telling you about these unique

23    designs that, and I quote, "I was blown away by his ability to

24    look outside the box.  His ability to create this amazing trend

25    was very impressive.  It takes a very different designer to

1    look outside the box and see the huge lips and tiny, tiny nose.

2    It was so much bigger than the fashions.  I remember thinking

3    he was a true creative genius.  He can think about fashion as

4    such a bigger concept."

5        Do you recall her telling you that?

6    A   Yes.

7    Q    And, in fact, one of your own conclusions here about the

8    product, about the dolls, about the Bratz dolls, was that they

9    were a radical innovation when they were first launched;

10   correct?

11   A   The brand is a radical innovation, yes.  I would like to

12   say it's the brand.  I'm a brand expert.  I'm not a doll

13   expert.

14   Q    Sir, didn't you say in your report that "MGA launched what

15   can be called a radical innovation, the Bratz dolls were so

16   different from anything else in the fashion doll space of 2000,

17   2001"?

18   A   Yes.  But you never launch just a product.  You always

19   launch a brand with it.  You launch the packaging.  You launch

20   the decisions on how the brand name looks.  Their color.  The

21   whole meaning -- the meaning that is created for consumers, for

22   young girls, has all to do with the whole package, meaning the

23   whole brand, and not just a particular doll itself.  So

24   that's -- when I refer to that radical innovation, I refer to

25   that brand, how they define the brand, what the brand stands

1    for.  And, of course, that includes also the design; but it's

2    not the only thing.

3    Q    Sir, do you have your report there?

4    A    Yes.

5    Q    Up there with you?

6    A    Yes.

7    Q    If you would take a look at Page 81 of your report,

8    Paragraph 149.  I'm going to read.

9         What you wrote was, quote, "MGA Entertainment

10   launched what can be called a radical innovation.  The Bratz

11   dolls were so different from anything else in the fashion doll

12   space, 2000 to 2001."

13        Did I read that correctly?

14   A    Yeah.

15        And, again, I'm a brand expert.  The fact that I

16   didn't talk about brands here doesn't mean that I didn't refer

17   to brands.  This is a conclusion of a report about brands and

18   not about a doll.

19   Q    And those statements you made there, about radical

20   innovation, and about the Bratz dolls being so different than

21   anything else, that was true as of 2001 when the dolls were

22   introduced; correct?

23   A    That the brand was so different, yes.

24   Q    Sir, the Bratz dolls were so different from anything else

25   in the fashion doll space of 2000, 2001; was that a true

1    statement that you wrote there?

2    A    Yes.

3         And, again, I refer to the brand Bratz, of which the

4    doll is one part of it.

5    Q    It doesn't say "brand" in those sentences that I read,

6    does it?  Does that word appear there, sir?

7    A    My whole report is about brands.  I'm a branding expert,

8    and I just want to opine on the brand Bratz.  And that's what I

9    also had intention here when I wrote the report.

10   Q    As of 2001, when the Bratz dolls, what you said were so

11   different than anything else in the fashion doll space when

12   they were introduced, as of then, did the Bratz dolls have

13   themes?  Do you know?

14   A    Yes.  The Bratz dolls came with very different

15   personalities.  That's a brand personality.  They had a very

16   different theme, a counselor.  For example, they were much more

17   rebellious, maybe irreverent, much more sexy, much more edgy,

18   and incredibly cool to young girls like that.

19        My girls were just in that age.

20   Q    So you're describing to us what the dolls were when they

21   were introduced?

22   A    When the Bratz brand was launched in that first year, it

23   was an entirely innovative concept, the way the package was

24   designed, the trapezoidal package, the way they launched.  The

25   Bratz brand and dolls actually had almost an attitude.  The

1    fashions that came with it, the merchandise that came with it,

2    was totally different from what you were seeing at that time in

3    the market.  And it hit the bull's-eye with those consumers.

4    Q    And that was true as of the time the dolls were first

5    introduced; correct?

6    A    That is exactly right.

7    Q    And in terms of themes, what I'm -- I mean, you haven't

8    been here during the trial -- I'm talking in terms of, like,

9    Winter Wonderland theme, or a beach theme, or a holiday theme,

10    or a Tokyo theme.  When they were first introduced, those first

11    generation dolls, did they have those kinds of themes?

12    A    There were several themes that developed early on.

13    Q    I'm asking about when they were first introduced, sir.

14        Do you know?

15    A    First?  No.

16    Q    Now, Ms. Garcia told you how unique she thought these were

17    and how different they were from anything else in the fashion

18    doll space.

19        Having heard what she told you and having reached the

20    conclusion that you reached, that I just read about the Bratz

21    doll, did you do anything to study what the impact of the

22    design of the dolls was on the success of the Bratz brand?

23    A    No.

24    Q    So, if I understand correctly, in trying to assess the

25    value of the brand, you didn't do any type of study to

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    determine what the impact of Carter Bryant's designs were on

2    the doll; correct?

3    A    No.  I can't refer to Carter Bryant's designs.  I can

4    refer to the role of symbols and visuals as part of a brand.

5    The unique thing about a brand like Bratz is that there are

6    many symbols, many visual cues, that invoke the brand.  And

7    only one part is actually the doll design.  There are many,

8    many others.

9    Q    Sir, I was asking about the doll design features,

10    Carter Bryant's design features.

11         Did you make any effort to study what the impact of

12    Carter Bryant's design features had on the ultimate success of

13    the brand?

14    A    No.

15    Q    Now, you're aware that MGA makes dolls without the Bratz

16    design?

17    A    Yes.

18    Q    Have you heard of a doll called Singing Bouncy Baby?

19    A    Yes.

20    Q    Is that as successful as Bratz?

21    A    No, I don't think so.

22    Q    Did MGA have a website for Singing Bouncy Baby?

23    A    I don't know.

24    Q    Did they have a proactive brand management system for

25    Singing Bouncing Baby?

(Kilpin Direct; Joachimsthaler Direct/Cross; ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A    I don't know.

2    Q    Have you heard of a doll called Prayer Angel?

3    A    No.

4    Q    Do you know whether MGA has been able to grow any brands

5    as successful as the Bratz brand?

6    A    I know success and failure of brands at MGA, yes.

7    Q    Are you aware of any MGA brand that MGA has ever had that

8    is anywhere near as successful as Bratz?

9    A    No.  And it's not surprising.

10   Q    You gave us some testimony about price premium, and you

11   referred to unbranded fashion dolls.

12        Do you know what percentage of the fashion doll

13   market unbranded fashion dolls have?

14   A    It's a small percentage.

15   Q    Do you know what percentage?

16   A    No, not exactly.

17   Q    And do you know what a Bratz fashion doll sells for today?

18   If I were to go into a Toys"R"Us and buy a basic Yasmin or

19   Cloe, do you know what it sells for today?

20   A    Maybe $16, $17.

21   Q    Is that your understanding?

22   A    Yes.

23   Q    Do you know whether that price has declined over time?

24   A    No.

25        MR. QUINN:  Nothing further.

1          THE COURT:  Further direct?

2                    REDIRECT EXAMINATION

3    BY MR. KENNEDY:

4    Q   Dr. Joachimsthaler, do you have an opinion whether, if

5    Mr. Larian had taken Mr. Bryant's drawings and put them in the

6    top desk drawer of his office, there would be a Bratz brand

7    today?

8    A   Yeah.

9    Q   What's your opinion?

10   A   There would not be a brand.

11   Q   Do you have an opinion whether, if MGA had taken

12   Mr. Bryant's drawings and made copies of them and put them on

13   shelves in toy stores, there would be a Bratz brand today?

14   A   Yes, I have an opinion.

15   Q   What is that opinion?

16   A   There would be no brand.

17   Q   In the course of all your work, have you ever found an

18   idea that became a brand all by itself, without more?

19   A   That doesn't happen.  As I mentioned earlier, 1 in 20

20   great products don't live beyond one year in the toy industry.

21          There are 12 great music players, each one with a

22   great name, each with a great design, each one with a great

23   name; but there's only one brand:  It's called iPOD.

24          It doesn't happen that way.

25   Q   Turn to the questions about radical innovation.

1       The MP3 player, does that qualify as a radical

2    innovation in your business?

3    A    It's a technology innovation.

4    Q    Can you tell us whether that innovation, in and of itself,

5    is able to create a brand.

6    A    Exactly not.  As we just said, you can't have a radical

7    innovation, especially technology innovation -- but you have no

8    brand, you have no success, until you meet the marketplace.

9    And in the toy business, and in the fashion business, it is all

10   about connecting with consumers, in a very changing, very

11   fickle market, a market that changes, that is faddish and

12   fickle, that changes every year, twice a year, even more so.

13   Q    And going beyond MP3 players, have you ever found a

14   product that became a brand without being actively promoted?

15   A    Yes.

16   Q    What have you found there?

17   A    A product becoming a brand without being promoted?

18   Q    Yes.

19   A    We have things like Harley Davidson.  Harley promotes an

20   entire lifestyle, as I mentioned earlier in my testimony.  It's

21   oftentimes not just the bike.

22   Q    And have you ever found, in your experience, a brand that

23   once it was created, sustains itself without continued effort?

24   A    There's no way that happens.

25   Q    Why do you say that?

1    A    Because the whole effort and the whole value is created --

2    not at the beginning -- that's in my way, oftentimes, the

3    biggest illusion, the whole -- if a tangible component of a

4    brand, which we generally refer in layman's terms as a brand,

5    the name, the symbol, the designs, is void of meaning, it

6    doesn't really mean anything.  The Nike swoosh, at the

7    beginning, had no meaning.  Only over time, only through a lot

8    of effort, a million decisions that --

9         MR. QUINN:  Your Honor, I object.  Effort is

10   irrelevant.

11        THE COURT:  Counsel, let's rephrase.

12        I'll see you at side-bar.

13        MR. KENNEDY:  Thank you, Your Honor.

14        (Whereupon, the following proceedings were held at

15   side-bar:)

16        MR. NOLAN:  I'm now offering this with regard to the

17   state law claims only.  If they want to have a limiting

18   instruction, I can understand how that would be proper.  But

19   we're offering them -- the state law claims.  I'm unaware of

20   any similar limitations existing.

21        MR. QUINN:  I think we discussed this, and the

22   Court's ruling was that all efforts to develop the product,

23   what MGA did, are simply irrelevant.  If he wants to talk

24   about -- and he has talked about -- the brand, the value of the

25   brand -- but what they did to get there and all of the millions

1    of decisions, that's not --

2         THE COURT:  I have ruled on 403.  We had extensive

3    hearings on this, and the Court did rule on the 403 grounds

4    with respect to this whole sweat-of-the-brow concern and how

5    confusing that is to the jury; so you can certainly get into

6    the value of the brand, but it's the effort -- what I ruled is,

7    that was a 403 issue in terms of confusing or prejudicial --

8    getting into a belabored explanation as to how much time,

9    effort, and energy was poured into this; as opposed to just the

10   value of the brand; that's certainly fair game; so that's why

11   we directed the jury away from that.

12        MR. KENNEDY:  I wasn't here.  I must have misread the

13   transcript.  Thank you.

14        THE COURT:  Very well.

15        (Whereupon, side-bar proceedings were concluded.)

16        THE COURT:  I'm going to strike the last answer.  But

17   I will allow you to rephrase the question and proceed again.

18        MR. KENNEDY:  Thank you, Your Honor.

19   BY MR. KENNEDY:

20   Q    Again, sticking with Carter Bryant's contribution, did you

21   find that Carter Bryant's drawings were the reason why you felt

22   that Bratz had satisfied the brand identity and position

23   element for creating a brand?

24        MR. QUINN:  Lacks foundation.

25        THE COURT:  Sustained on foundation.

1    BY MR. KENNEDY:

2    Q    Taking, for example, the Be-Bratz website, in the course

3    of all of your work on this case, did you find any indication

4    that Carter Bryant made any contribution to the design of that

5    website?

6         MR. QUINN:  Objection.  Lacks foundation; irrelevant.

7         THE COURT:  I'll overrule the relevancy, but you need

8    to lay a foundation in terms of how he would know this,

9    Counsel.

10   BY MR. KENNEDY:

11   Q    In the course of working on this case, you reviewed

12   documents, as you've told us; is that correct?

13   A    Yes.

14   Q    And you spoke to people at MGA?

15   A    Yes.

16   Q    And in the course of those conversations, did anybody tell

17   you that Carter Bryant had made any contribution to the

18   website?

19        MR. QUINN:  Objection.  Hearsay; lacks foundation.

20        THE COURT:  Sustained.

21   BY MR. KENNEDY:

22   Q    In the course of your work on the case, did anybody or did

23   you see from any source any indication that Carter Bryant had

24   contributed in any way to the packaging of the Bratz product?

25        MR. QUINN:  Lacks foundation.

1          THE WITNESS:  No.

2          THE COURT:  That is a foundational question.

3          You may answer yes or no.

4          THE WITNESS:  The question again.

5     BY MR. KENNEDY:

6     Q    In the course of your work on this case, did anybody tell

7     you or did you see any indication that Carter Bryant had played

8     any role in the design of the trapezoidal shape of the Bratz

9     package?

10    A    No.

11         THE COURT:  The way I understood the question is

12    whether or not he did.

13         We need to lay a foundation, Counsel, for how he

14    knows any of this; so however you want to word your question,

15    you may, but let's lay a foundation for it.

16         MR. KENNEDY:  Sure.

17    BY MR. KENNEDY:

18    Q    Let's assume hypothetically that the evidence in this case

19    shows that Carter Bryant played no role in the development of

20    the website; Carter Bryant played no role in the design of the

21    packaging or the selection of the trapezoidal shape; that

22    Carter Bryant played no role in any of the other factors that

23    you have considered in this case, other than to supply the

24    intellectual property that the jury has found belongs to

25    Mattel.

1        Do you have an opinion whether there would be a Bratz

2    brand with a premium today?

3        MR. QUINN:  Your Honor, calls for speculation.  It's

4    beyond the scope of his opinion.

5        THE COURT:  Counsel, can you address the latter

6    issue?  Is it within his opinion?

7        I don't have his expert report in front of me.

8        MR. KENNEDY:  He's broken things down by task rather

9    than by name.

10       THE COURT:  Very well.

11       Overruled.

12       You may answer.

13       THE WITNESS:  Please repeat the question.

14   BY MR. KENNEDY:

15   Q    Assuming, hypothetically, the evidence in this case

16   discloses that Carter Bryant played no role in the design of

17   the Be-Bratz website or the selection of the trapezoidal shape

18   or any of the other factors that you have told us about this

19   morning that you think give the Bratz brand a premium, if that

20   were the case and the evidence showed that the only thing he

21   had contributed was the two-dimensional drawings that this jury

22   has found to be Mattel's confidential property, is it your

23   opinion today that Mr. Bryant would be responsible for a brand

24   with a price premium?

25   A    No way.

1          MR. KENNEDY:  Thank you very much.  I have no further

2    questions.

3                        RECROSS-EXAMINATION

4    BY MR. QUINN:

5    Q    Doctor, you don't know to what extent Carter Bryant's

6    designs are reflected on the website, do you?

7    A    I have seen the Carter Bryant designs, and I've seen the

8    website.  The website is something very different.  It's a

9    three-dimensional, interactive community for young girls.

10   Q    Sir, that's not my question.

11          My question is, you don't know to what extent

12   Carter Bryant's designs are reflected in the website or in the

13   characters or in the present Bratz dolls on the market?  That's

14   not your area of expertise?

15   A    That's true.

16   Q    I'd like you to assume hypothetically that MGA had tried

17   for some period of time to come up with a fashion doll and had

18   not been able to come up with one until Carter Bryant brought

19   over to MGA Mattel's confidential designs.

20          Are you with me so far?

21   A    Yes.

22          Keep it simple, please.

23   Q    All right.

24          Assuming that to be true, do you have an opinion as

25   to whether or not, today, there would be a Bratz brand if

1    Carter Bryant had not brought over Mattel's designs to MGA?  Do

2    you have an opinion?

3    A    It's very likely that there will never be a brand, because

4    to be successful in the branding business, in this business,

5    it's a very unique situation that takes, as I have said in my

6    testimony, a lot of factors.  It's not just the design.  It's

7    not just the brand building effort.  It takes all of those

8    amazing work that I have discussed during my testimony.

9    Q    Sir, if Carter Bryant had not brought over the designs,

10    there never would be a Bratz brand; true?

11    A    I don't know that.

12    Q    Do you have any information at all that indicates to you

13    that MGA would have come out with the Bratz dolls without

14    Carter Bryant's designs?

15    A    No.

16        MR. QUINN:  No further.

17        MR. KENNEDY:  Nothing further, Your Honor.

18        THE COURT:  You're excused, sir.  Thank you.

19        Defendant may call the next witness.

20        MR. NOLAN:  Your Honor, MGA calls as its next witness

21    Jill Nordquist.

22        MR. QUINN:  Your Honor, may we approach side-bar?

23        THE COURT:  You may.

24        (Whereupon, the following proceedings were held at

25    side-bar:)

1          MR. QUINN:  I'm just a little confused.  The order

2     keeps changing.  Yesterday it was very important to MGA that

3     Ms. Polk be here so she could go on the stand.

4          THE COURT:  That's why I asked.  There was quite an

5     issue made about her before Dr. Joachimsthaler.

6          MR. NOLAN:  Your Honor, the issue was, we were going

7     to try to work out with Mr. Quinn, and I have a document to

8     stipulate through -- they said they wouldn't stipulate.  So I

9     met with Mr. Proctor right outside the door, and I made a

10    proposal with respect to the Polk documents.

11         But in light of how we handled Kilpin's redactions,

12    to do that -- he said he would talk to them, Mr. Zeller and

13    Mr. Quinn.

14         I didn't get a response.

15         THE COURT:  So we're done with Polk.

16         MR. NOLAN:  I don't know yet.  I have to get an

17    answer back as to whether or not --

18         MR. QUINN:  We're not agreeable to that.

19         MR. NOLAN:  May I just frame the issue for you,

20    Your Honor.

21         The documents that came in through Mr. Kilpin, in

22    redacted form -- Worldwide Research Data, those are the

23    documents we were going to -- there's other documents similar

24    that we were going to lay foundation through Ms. Polk; she's in

25    that division.  Then what I was going to do is propose we

1    redact out -- similar to what we did on some --

2        THE COURT:  We're wasting valuable time here.  We'll

3    take this up later.  It sounds like we've got another witness.

4    The Nordquist was listed as a video, and I required it to be in

5    person; it's not clear where she would ever fit in; so there's

6    nothing out of order here at this point.

7        I assume the next one will be Mr. Kerner or

8    Mr. Larian?

9        MR. NOLAN:  Probably Mr. Larian, if we get through

10    and we don't put Ms. Polk on; or Mr. Kerner.

11        MR. ZELLER:  May I interject, Your Honor.

12        This is the witness list I got last night.  There was

13    a new one -- there was another one; we got this last night at

14    8:40 p.m.  This is the order:  Mr. Kilpin, Ms. Polk, their

15    experts, Dr. Joachimsthaler, Mr. Kerner, and Ms. Nordquist.

16    And so the Court, I think, sees --

17        THE COURT:  Let's proceed with the witness we have on

18    the stand here.  We're wasting jury time.  I'll take this up

19    afterwards.

20        MR. NOLAN:  The other point is, given the time --

21    this is all measured in time, so we may play the Farr

22    deposition after him, after Ms. Nordquist, because it's in the

23    can, it's 20 minutes.  I'm trying to play the clock.

24        THE COURT:  Let's take this up at the end of the day.

25        (Whereupon, side-bar proceedings were concluded.)

1          THE CLERK:  Do you solemnly state that the testimony

2    you may give in the cause now pending before this court shall

3    be the truth, the whole truth, and nothing but the truth, so

4    help you God?

5          THE WITNESS:  Yes, I do.

6          THE CLERK:  Please state your full name and spell

7    your last name for the record.

8          THE WITNESS:  Jill Nordquist, N-O-R-D-Q-U-I-S-T.

9               DIRECT EXAMINATION

10   BY MR. SLOAN:

11   Q    My name is Matthew Sloan, and I represent MGA

12   Entertainment and Isaac Larian.

13         We've never met before; is that correct?

14   A    Correct.

15   Q    How are you employed, Ms. Nordquist?

16   A    I'm currently employed by Mattel.

17   Q    What's your position there?

18   A    I'm a director of marketing.

19   Q    Are you a director in the consumer products division?

20   A    No, I'm not.  I recently changed positions.  I'm a

21   director of marketing in boys marketing.

22   Q    And you have been employed by Mattel for approximately

23   11 years; is that correct?

24   A    That is correct.

25   Q    And did you work in the Barbie collectibles division from

1    approximately 1997 through 2004?

2    A   Yes, that is correct.

3    Q   And during that time period, did you work with Carter

4    Bryant?

5    A   Yes, I did.

6    Q   In fact, you had almost daily contact with Mr. Bryant; is

7    that correct?

8    A   That is correct.

9    Q   Ma'am, at some point in 2000, did you learn that

10   Mr. Bryant had submitted his resignation from Mattel?

11   A   Yes, I did.

12   Q   And who did you hear that from?

13   A   I originally heard it from Mina Mirkazemi.

14   Q   I'm sorry?

15   A   I originally heard it from a woman by the name of

16   Mina Mirkazemi.

17   Q   And after you heard that, did you go with another employee

18   from Mattel to speak with Mr. Bryant to ask him why he was

19   resigning?

20   A   I did speak with Carter after I heard he had resigned,

21   yes.

22   Q   Did you go and ask him where he was going?

23   A   I did.

24   Q   Did you ask him whether he was going to a competitive doll

25   company?

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A   I asked him if he was going to a competitor, yes.

2    Q   What did he say?

3    A   He said "no."

4    Q   Did you ask where he was going?

5    A   Yes.

6    Q   And what did he tell you?

7    A   He said he would not say.

8    Q   Well, did he tell you that he was going to a place that

9    would allow him to have more creative control and input into

10   what he was doing?

11   A   Yes, he did.

12   Q   He did say that?

13   A   Yes.

14   Q   You said that he said he was not going to a competitor;

15   correct?

16   A   That is correct.

17   Q   And this is in end of October 2000?

18   A   Yes.

19   Q   At that time, had you heard of MGA Entertainment?

20   A   I believe I had heard of MGA.

21   Q   Did you consider them to be a competitor doll company?

22   A   They were a toy company; therefore, they were a

23   competitor.

24   Q   Were they a competitor in the doll market, in the fashion

25   doll market?

1    A    I don't know for certain at that time if I knew that or

2    not.

3    Q    At that time, you did not consider them to be a competitor

4    in the fashion doll market; is that correct?

5    A    I didn't say that.  I said I did not know at that time if

6    they were a competitor in the fashion doll market.

7    Q    Ma'am, when Mr. Bryant refused to tell you exactly where

8    he was going, exactly what company, you told him that if he

9    worked for you, you would make him leave immediately, didn't

10    you?

11    A    I did.

12    Q    And that's because you were concerned that he was going to

13    a competitor; correct?

14    A    That's because I thought it was odd that someone would not

15    say where they were going.

16    Q    Well, your concern was that he was going to a competitor;

17    correct?

18    A    I thought it was odd that he wouldn't say where he was

19    going, and I asked him point-blank if he was going to a

20    competitor, to which he replied "no."

21    Q    Okay.

22        This conversation, by the way, took place in early

23    October 2000; is that correct?

24    A    I don't know the exact date.  I just know that I heard he

25    had resigned and the conversation took place shortly

(Kilpin Direct; Joachimsthaler Direct/Cross; ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1      thereafter.

2      Q   But it was in the fall of 2000; is that correct?

3      A   Yes.

4      Q   And at that time, you were convinced that he was

5      absolutely going to a competitor, weren't you?

6      A   No.

7      Q   You were concerned, weren't you?

8      A   I don't think concerned was the word, no.

9      Q   Ma'am, were you deposed in this litigation earlier?

10     A   Yes.

11     Q   Were you deposed in July of 2007?

12     A   Yes.

13     Q   And weren't you asked whether you were concerned whether

14     Mr. Bryant was potentially going to competitor, and you said

15     "absolutely"; is that correct?

16     A   If that's what my deposition says, then...

17           MR. SLOAN:  Could we show the deposition, Your Honor?

18           MR. QUINN:  Page and line?

19           MR. SLOAN:  Page 134, lines four through six.

20           MR. NOLAN:  May I approach the witness with the

21     transcript?

22           THE COURT:  You may.

23           THE WITNESS:  Can you repeat the page number, please.

24           MR. SLOAN:  Sure.  It's Page 134, lines four through

25     six.

1          THE COURT:  Any objection?

2          MR. QUINN:  Yes, there is an objection.  This relates

3    to something else, a different conversation.

4          If you look at Page 132 --

5          MR. SLOAN:  Your Honor, I can clarify that,

6    Your Honor.  I'll withdraw it and ask it a different way.

7          THE COURT:  Then everything is stricken that the jury

8    has heard about the deposition.

9          You may start over.

10   BY MR. SLOAN:

11   Q   Ma'am, after you spoke to Mr. Bryant, did you have a

12   subsequent conversation with a woman named Kitty Hammons?

13   A   Yes.

14   Q   And Kitty Hammons was a fellow employee at Mattel; is that

15   correct?

16   A   Correct.

17   Q   She is, in fact, the employee who went with you to speak

18   with Mr. Bryant to question him about his resignation?

19   A   Yes.

20   Q   And that was in October of 2000?

21   A   Yes.

22   Q   And you spoke to Mr. Bryant at his cubicle in the Mattel

23   Design Center; correct?

24   A   Yes.

25   Q   Now, just after you had that conversation with

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    Ms. Hammons -- I'm sorry, with Mr. Bryant, did you discuss the

2    conversation you had with Mr. Bryant with Ms. Hammons?

3    A    Yes.

4    Q    And during that conversation, you were concerned and you

5    expressed concern that Mr. Bryant was going to a competitor; is

6    that correct?

7    A    Yes.  After he had told me he wasn't going to a competitor

8    but continued to refuse to say where he was going.

9    Q    Okay.

10        And is it fair to say that at that point in time, you

11    were concerned that he was potentially going to a competitor?

12    A    Yes.

13    Q    Did you express your concerns about the fact that

14    Mr. Bryant was going to a competitor to anyone else at Mattel?

15        MR. QUINN:  Misstates the testimony; assumes facts.

16        THE COURT:  Rephrase, counsel.

17        MR. SLOAN:  Your Honor, I asked 'Did you report your

18    conversation with Bryant and your concerns to anyone else at

19    Mattel.'

20        THE COURT:  Did you hear my ruling, Counsel?

21    BY MR. SLOAN:

22    Q    Did you have any conversation with anyone at Mattel after

23    your conversation with Mr. Bryant about your concerns?

24    A    I had a conversation with Kitty Hammons.

25    Q    Besides Kitty Hammons, did you also have a conversation

1    with Mr. Ron Longsdorf?

2    A   I did.

3    Q   And Mr. Longsdorf was the senior vice president at Barbie

4    Collectibles.

5    A   That is correct.

6    Q   And did you express your concerns about Mr. Bryant to

7    Mr. Longsdorf?

8    A   I wouldn't say it was a concern.  We had a very casual

9    conversation during which Carter's name came up.

10   Q   When was this conversation in relation to the conversation

11   that you had with Mr. Bryant about his resignation?

12   A   Approximately one to two hours later.

13   Q   And again, the conversation with Mr. Bryant was before he

14   had left Mattel; correct?

15   A   Yes.

16   Q   And didn't you express to Mr. Longsdorf that if you were

17   Mr. Bryant's supervisor, and he had refused to tell you where

18   he was going, that you would ask him to leave Mattel

19   immediately?

20   A   I think that was -- I don't know the exact words that I

21   used, but yes, I did state that.

22   Q   And you said that because you were concerned, again, that

23   Mr. Bryant was going to a competitor; correct?

24   A   I don't think I'm comfortable with the word "concern."

25        I had asked a question, to which somebody told me no,

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    I'm not going to a competitor; so I don't know that I was

2    concerned.

3    Q    But when you were deposed in July of 2007, you indicated

4    that you were concerned; is that correct?

5         MR. QUINN:  Vague as to time, Your Honor.

6         THE COURT:  Rephrase, counsel.

7    BY MR. SLOAN:

8    Q    When you were deposed in July of 2007, and you were asked

9    whether you were concerned about the fact that Mr. Bryant

10   refused to tell you where he was going, you said that you were

11   concerned, absolutely; is that correct?

12        MR. QUINN:  Same objection, Your Honor; multiple

13   comments.

14        THE COURT:  Clarify as to time, counsel.

15   BY MR. SLOAN:

16   Q    I'll ask you this, Ma'am.

17        What was Mr. Longsdorf's reaction when you said that

18   if Mr. Bryant were your supervisor, that you would ask him to

19   leave immediately?

20   A    I think he shrugged.

21   Q    At some point after this, did you learn Mr. Bryant was

22   involved in the creation of Bratz?

23   A    Approximately one year after he left, I found out he

24   worked on Bratz.

25   Q    And this was approximately in the summer of 2001?

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A    Yes.

2    Q    And to the best of your knowledge, was that soon after

3    Bratz was released?

4    A    To the best of my knowledge.

5    Q    And did you hear from in the Mattel design center that

6    Mr. Bryant was working on Bratz?

7    A    Yes.

8    Q    Approximately how many other people told you that they

9    believed that Mr. Bryant was working on the Bratz project?

10    A    I can't quantify for certain, but I would guess maybe two

11    to three people.  I don't know, really.

12    Q    Do you recall the names of the people at the Mattel design

13    center who told you in the summer of 2001 that they knew that

14    Carter Bryant was working on Bratz?

15    A    I don't.

16    Q    But it was definitely, you said, two or three people, at

17    least?

18    A    I don't know that I said at least.  I think it was about

19    two to three people.

20    Q    Did you mention the fact that you had learned that

21    Mr. Bryant was working on Bratz to anyone at Mattel?

22    A    Yes.

23    Q    Did you mention it to Ann Parducci?

24    A    Yes.

25    Q    How did you happen to mention it to Ann Parducci?

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1    A    I believe I ran into her at some point in a hallway, and

2    she was holding a Bratz doll.

3    Q    And when was this?

4    A    After Bratz were on the marketplace; I don't remember the

5    exact day or date.

6    Q    But was it in approximately the summer of 2001?

7    A    It was either the summer of 2001 or fall 2001.

8    Q    And Ms. Parducci was a fellow employee at Barbie

9    Collectibles?

10   A    She was a fellow Mattel employee.  I'm not certain what

11   her title was at the time.

12   Q    Wasn't Ms. Parducci a senior vice president at Mattel?

13   A    She was, but at that time I don't remember what her

14   specific role was.

15   Q    She's now a senior vice president; is that what you are

16   saying?

17   A    No.  I'm saying that during my course of employment, which

18   has been eleven years, I know that at some point she had been

19   senior vice president; but I don't remember what her title was

20   in the year 2001.

21   Q    And you recall in the summer or fall of 2001 when you had

22   this conversation with her, you said that she was carrying a

23   Bratz doll with her; correct?

24   A    Correct.

25   Q    And that was at the Mattel design center; correct?

1    A   No.  It was in the tower.

2    Q   But it was in a Mattel office building?

3    A   Yes.

4    Q   Is it common for people at Mattel to be carrying

5    competitor's products?

6         MR. QUINN:  Objection.  Relevance.

7         THE COURT:  Sustained.

8    BY MR. SLOAN:

9    Q   Do you know why she was carrying a Bratz product with her?

10        MR. QUINN:  Objection.  Relevance.

11        THE COURT:  Sustained.

12   BY MR. SLOAN:

13   Q   Did you report your conversation -- did you report the

14   fact that you had found out that Carter Bryant was working at

15   Mattel to anyone else in the summer or fall of 2001?

16        MR. QUINN:  Misstates the testimony, Your Honor.

17        THE COURT:  Sustained.

18   BY MR. SLOAN:

19   Q   Did you report the fact that you had learned that Carter

20   Bryant was working at MGA on Bratz in the summer or fall of

21   2001 to anyone else at Mattel?

22        MR. QUINN:  Assumes facts.

23        THE COURT:  Overruled.

24        The witness indicated she had learned Mr. Bryant was

25   working on Bratz.

(Kilpin Direct; Joachimsthaler Direct/Cross/ReDirect/ReCross; Nordquist Direct/Cross)  8/14/2008  9:00:00

1       MR. QUINN:  I wouldn't have a problem with that

2    question.

3       THE COURT:  That's the question; that's all she's

4    testified to, is that she did learn that in the summer of 2001

5    that Mr. Bryant was working on Bratz.

6       You can incorporate that into your question, Counsel.

7    BY MR. SLOAN:

8    Q   You said that you reported the fact that you had learned

9    in the summer of 2001 that Mr. Bryant was working at MGA on

10   Bratz; you said that you reported that to Ann Parducci;

11   correct?

12      MR. QUINN:  That assumes facts.

13      THE COURT:  Sustained.

14      You can ask the question, though, Counsel, whether

15   she did.

16   BY MR. SLOAN:

17   Q   Did you report what you had learned to anyone besides Ann

18   Parducci?

19   A   There was nothing to report.

20   Q   Let me ask you this.  What was your initial reaction when

21   you saw the Bratz doll?

22      MR. QUINN:  Objection.  Relevance.

23      THE COURT:  Rephrase it for focus, Counsel.

24   BY MR. SLOAN:

25   Q   Did you think that the Bratz doll looked like anything

1      else that you had seen before?

2              MR. QUINN:  Objection.  Relevance; vague.

3              THE COURT:  It's foundational.  Overruled.

4              You may answer.

5              THE WITNESS:  Yes.

6      BY MR. SLOAN:

7      Q    What did you think it looked like, the Bratz doll?

8      A    I thought it was similar to -- it reminded me of

9      Diva Starz.

10     Q    And Diva Starz was another doll or a doll that was

11     produced by Mattel; is that correct?

12     A    Yes.

13     Q    And it's an electronic doll that talks; is that correct?

14     A    Yes.

15     Q    And was that released originally in approximately the year

16     2000?

17     A    I don't know the release date.

18     Q    Was it released -- as of October 2000, had it been

19     released?

20     A    I don't know the release date.

21     Q    Can you tell me why you thought that the Diva Starz -- or

22     why the Bratz doll looked similar to Diva Starz?

23             MR. QUINN:  Irrelevant, your Honor; 403.

24             THE COURT:  Sustained.

25             MR. SLOAN:  Could we have a side-bar, Your Honor?

1          THE COURT:  Yes.

2          (Side-bar proceedings as follows:)

3          MR. NOLAN:  Your Honor, her testimony was the first

4     time she sees Bratz, she thinks it reminds her of Diva Starz.

5     The point we were going to make in the connection is that the

6     Bratz name -- which the jury finds he conceived at while at

7     Mattel -- was one of the names that was being considered for

8     Diva Starz.  And then so the concealment portion of the

9     evidence, when you look at the package art -- we would just

10    like to identify what is it about this doll that reminded her

11    that it looked like Bratz.

12          And our point, Your Honor, would be that if the

13    package art or some other component of this product, together

14    with the name Bratz which had been considered for this project,

15    was available to Mattel, that would have been more building

16    blocks.  We're trying to build on concealment.

17          MR. QUINN:  Your Honor, I think this has very

18    significant potential to just mislead and confuse the jury

19    about what the issues are in this case.  There's never been any

20    claim that the Bratz were based on Diva Starz or were a copy of

21    Diva Starz.  We've said it was Toon Teens -- was an operation,

22    and we used that to place time.  But this is really far afield.

23          MR. NOLAN:  He used Bratz the same way, the name

24    Bratz, to time it within Mattel in the 1999, 2000 time period.

25    The Exhibit that we showed, Your Honor, on the bottom, has the

1    release date of 2000 on it.

2        MR. ZELLER:  Your Honor, this product was, first of

3    all, already publicly available in various forms throughout

4    2000.  It was already on the shelves by fall of 2000; so it's

5    hard to see how they can create any sort of linkage between

6    supposedly what was going on here and somehow giving notice to

7    Mattel of anything.

8        This witness, of course, has already testified she

9    doesn't know when it was released; so there's a foundational

10   problem there.

11       THE COURT:  She doesn't know.

12       MR. ZELLER:  She said she did not know when the doll

13   was released.  But I'm representing to the court that someone

14   who does have that foundation would be able to testify.

15       THE COURT:  This came out in 2001.

16       MR. SLOAN:  This is from 2000; it says right there,

17   "2000."

18       MR. ZELLER:  It was out in 2000.  The packaging date

19   is usually -- it's the packaging date.  It can sometimes be a

20   fair indicator of when it's on the market.  But this was out --

21   I mean, the product came out in the fall of 2000; so, I mean,

22   if it does not create even inferentially anything that would be

23   a link here in terms of notice to Mattel of what it is that

24   Carter Bryant or MGA did.  And I think that's what Mr. Nolan is

25   trying to offer for that purpose.

1          THE COURT:  It's a stretch, but I want to hear more.

2          MR. SLOAN:  The other thing is if you look at the

3    package art, the package art has a lot of similarities.  Again,

4    it's another thing, and it's a building block, Your Honor.  He

5    left Mattel; they were concerned that he disclosed where he was

6    going; they come out -- MGA comes out with a competitive

7    product which has some similarity.  Her first reaction, her

8    deposition, was that it looked like Diva Starz.  Again, it's an

9    additional fact that puts together a connection of steps.

10          THE COURT:  I think we need to lay more foundation

11    for this.  And you need to ask her why it is that she believes

12    that -- the way you framed your last question is poorly framed.

13    That can be rectified.  Rephrase the question.

14          MR. SLOAN:  I know you're not in the business of

15    giving advisory opinions, but what is it to lay that

16    foundation --

17          THE COURT:  You're right.  I'm not in the business of

18    giving advisory opinions.  We've taken that up.  I don't give

19    out opinions.  That's one thing -- I just rule on objections.

20          MR. NOLAN:  This is not advisory.  This is just

21    warning -- I was going to -- in order to look at the package.

22          THE COURT:  I'm just thinking -- so if this witness

23    says that I think that --

24          MR. NOLAN:  Then I'll just --

25          THE COURT:  I don't know what she's going to say.

1    Let's hear it and then I'll rule in context.

2        MR. ZELLER:  I'll just remind the Court, they made

3    this same kind of argument already on summary judgment.  It was

4    literally the most inferential of all their arguments.  This is

5    Toon Teens redux.  They are going to be suggesting, and the

6    jury is going to be confused, thinking somehow Mattel thought

7    we had a claim and should have sued.  That is exactly the

8    point.

9        THE COURT:  That's not a basis for the claim that you

10   have brought in this case.  And if that's all the evidence,

11   then I'm prepared to rule.  It's never going to see the light

12   of day in the jury box.  So we'll see.

13       I want to give MGA every opportunity to present

14   evidence.  That's why I preserved this thing for trial.  I've

15   already indicated, I almost twice struck this down as a matter

16   of law.  I want to hear the evidence.  If there really is

17   nothing there, Mr. Zeller -- I'm not letting it go to the jury.

18   I've already indicated that if there is something there, I'll

19   let the jury decide.

20       MR. NOLAN:  Before we leave this, just to make

21   certain there's no dispute, the name Bratz internally at Mattel

22   was one of the names to be used on this product; that's an

23   important linkage, in our view, in terms of building blocks

24   that we're trying to present.  That's the point.  So that the

25   Bratz name ultimately used at toy fairs and business displays

1    -- and her reaction is it reminds her of Diva Starz --

2    internally, if Bratz is proprietary, someone should have

3    said --

4         THE COURT:  Whether she knows that or not, we're not

5    even close to that.

6         MR. NOLAN:  Just to provide linkage.

7         THE COURT:  Let's save that for later.  We've got

8    very limited jury time left.

9         (Side-bar proceedings concluded.)

10   BY MR. SLOAN:

11   Q   Ms. Nordquist, did you work on the Diva Starz project?

12   A   No.

13   Q   Are you familiar with Diva Starz?

14   A   I've seen the product.

15   Q   You said that your initial reaction when you saw Bratz was

16   that it looked like Diva Starz; is that correct?

17   A   Yes.

18   Q   Can you tell us what about the Bratz dolls looked like

19   Diva Starz dolls?

20   A   The exaggerated features; the style of clothing; the large

21   feet.

22        MR. SLOAN:  Your Honor, may I approach?

23        THE COURT:  You may.

24   BY MR. SLOAN:

25   Q   Ms. Nordquist, I've placed before you what's been marked

1    as Exhibit 17383, I believe; is that correct?

2    A    Yes.

3    Q    And do you recognize what that is?

4    A    Yes.

5    Q    Is that a Diva Starz doll?

6    A    Yes.

7    Q    If you look at the bottom of the package, can you tell me

8    what the date on that particular product is?

9    A    The exhibit date?

10   Q    No.  The date on the bottom of the Diva Starz package,

11   does it indicate what date that was created or the copyright on

12   it?

13   A    Yes.  It indicates a copyright date.

14   Q    Is that 2000?

15   A    Yes.

16        MR. SLOAN:  Your Honor, can we ask that Exhibit 17383

17   be admitted into evidence?

18        MR. QUINN:  No objection.

19        THE COURT:  It's admitted.

20        (Exhibit 17383 received.)

21   BY MR. SLOAN:

22   Q    Now, there's package art on this doll as well, is that

23   correct, on the package?

24   A    Yes.

25   Q    And the package art, would you agree it pictures four

1    girls?

2    A    Yes.

3    Q    With big heads?

4    A    Yes.

5    Q    And big feet?

6    A    Yes.

7    Q    And they have a certain amount of attitude, don't they?

8    A    Yes.

9    Q    They also have small noses.

10   A    This may be the first time I've looked at their noses.

11   Q    Would you agree that they are small?

12   A    Yes, they are small.

13   Q    Did you also look at the package art on the Bratz dolls,

14   the first generation of Bratz dolls, that were released in the

15   summer of 2001?

16   A    At some point I looked at them, yes.

17          MR. SLOAN:  Can we display Exhibit 12286, which has

18   already been admitted into evidence side-by-side with this,

19   AARON?

20   BY MR. SLOAN:

21   Q    On the right, we have the package art from the Bratz doll,

22   12286.  Do you see that?

23   A    I do.

24   Q    And would you agree that the Bratz package art also has

25   these oversized heads?

1   A   It's a bit blurry, but...

2   Q   The what?

3   A   The image is a bit blurry.

4   Q   Would you agree that they have oversized heads?

5   A   Yes.

6   Q   And would you agree that they also have large feet?

7   A   Yes.

8   Q   And they also have big eyes; would you agree with that?

9   Again, I'm talking about package art on the Bratz packaging.

10   A   And again, it is pretty blurry.

11   Q   But do you remember seeing the package art on the Bratz

12   dolls in the summer of 2001 when you first saw them?

13   A   The first time I saw a Bratz doll was inside a Bratz

14   package, but I don't recollect what the package looked like at

15   the time.

16       MR. SLOAN:  Your Honor, I believe there's a first

17   generation doll right behind you, right behind the witness;

18   it's Cloe, Exhibit 12286, or JADE, Exhibit 17551.

19   BY MR. SLOAN:

20   Q   Ma'am, can you tell me what exhibit you're looking at?

21   A   I'm looking at 12286.

22   Q   Is that one of the first generation Cloe Bratz dolls?

23   A   I don't know the generations of Bratz dolls.

24   Q   Assuming that's one of the first generation, that has the

25   package art we were just speaking about; is that correct?

1          MR. QUINN:  Your Honor, calls for an assumption.

2          THE COURT:  Sustained.

3     BY MR. SLOAN:

4     Q   Can you look at the bottom of the package and me what the

5     date on that is?

6     A   The copyright?

7     Q   Yes.

8     A   2001.

9     Q   And if you look at the package arts on that, is that the

10    package arts we were looking at earlier?  Look at the physical

11    exhibit, the exhibit that you have.

12    A   Is this the packaging art that's being projected on the

13    screen?

14    Q   No.

15          Look at the packaging art there.

16          Would you agree that the package art on that

17    Exhibit 12286, the Cloe doll, is very similar in many respects

18    to the package art on the Diva Starz doll, Exhibit 17383?

19          MR. QUINN:  Vague; overbroad; improper opinion.

20          THE COURT:  Counsel, we're going to have to take a

21    side-bar on this, briefly.

22          (Side-bar proceedings as follows: )

23          THE COURT:  This is becoming surreal, almost, in

24    terms of the 403 confusing issue.

25          As I understand it, what MGA is trying to elicit from

1  this witness is whether or not, when seeing the Diva Starz that

2  she introduced per her testimony, in response to your question,

3  that somehow because she recognized this as Diva Starz, she

4  should have assumed that Carter Bryant must have borrowed that

5  idea?

6       MR. SLOAN:  May have stolen that idea.

7       THE COURT:  Which is irrelevant to the fraudulent

8  concealment theory.  The only issue is whether or not he was

9  working at MGA.  Ultimately, this is a building block, as you

10  indicated, to indicate that he did this work while he was at

11  MGA.  I don't see how this furthers that at all.  This came out

12  in 2000.  Bratz came out in 2001.

13       Let's assume he stole this outright.  That does

14  nothing to show that he worked on this while he was still

15  employed at --

16       MR. NOLAN:  One of the other things that they contend

17  is that we stole the idea of Bratz -- conceived and owned by

18  Mattel.  And our only point is that the name Bratz -- from a

19  concealment point of view -- if the jury found that information

20  was owned by Mattel.  Our only competitor -- by looking at the

21  name Bratz she says is like Diva Starz.  And Diva Starz was one

22  of the product names being considered for Diva Starz.  I just

23  want to ask her that.

24       THE COURT:  But none of that -- we're getting into a

25  substantially similarity analysis on a product which is

1    completely irrelevant.  If anything, this somewhat proves

2    Mattel's case.  I mean, to the extent this gets -- like I say,

3    this almost becomes surreal at this point.

4         MR. NOLAN:  I told Mr. Sloan, the only question that

5    he should ask her now is, without making any comparison, did

6    you know that Bratz was a name that was being considered by

7    Mattel for the Diva Starz project?

8         THE COURT:  That question hasn't come anywhere near

9    what we've gotten.

10        MR. ZELLER:  If I may, Your Honor, the two claims at

11   issue, the only ones in which they have -- the statute of

12   limitations defense is still alive.

13        THE COURT:  Intentional interference.

14        MR. ZELLER:  These aren't ideas; they are not based

15   upon what it is they are questioning this witness of.  They are

16   conversations.

17        THE COURT:  They predicate, in part, on the name

18   Bratz, for example.

19        MR. ZELLER:  Well, I guess we can take it up outside

20   of the presence of the jury.

21        THE COURT:  But the foundation isn't here.  And this

22   is getting horribly muddled on 403.  I'm not saying there's

23   another way this could have been approached, but given how this

24   is coming out, this is not coming out properly.

25        Let's go back to that.

1          (Side-bar proceedings concluded.)

2     BY MR. SLOAN:

3     Q    Ms. Nordquist, were you aware that the name Bratz was

4     considered as an early name for the Diva Starz project?

5     A    No.

6          MR. SLOAN:  Nothing further, Your Honor.

7          THE COURT:  Very well.

8          The jury is instructed to disregard the testimony

9     about the comparison between Diva Starz and Bratz.  That's of

10    no moment.

11                    CROSS-EXAMINATION

12    BY MR. QUINN:

13    Q    Ms. Nordquist, you indicated some time in the summer or

14    fall of 2001, you learned that Mr. Bryant was working on Bratz.

15    A    Yes.

16    Q    And where did you hear that?

17    A    In the design center.

18    Q    Do you recall who said that to you?

19    A    I don't.

20    Q    At that time did you have any other information on that

21    subject other than this comment that you can't recall who said

22    it?

23    A    No.  That was all I heard.

24    Q    Did somebody tell you then that Mr. Bryant had worked on

25    Bratz while he was still employed by Mattel?

1    A    Never.  No.

2    Q    When did you first learn that Mr. Bryant had worked on the

3    Bratz designs while he was employed by Mattel?

4         MR. SLOAN:  Objection.  Foundation, Your Honor.

5         THE COURT:  Sustained.

6    BY MR. QUINN:

7    Q    Did you ever learn that Mr. Bryant had worked on the Bratz

8    designs while he was employed by Mattel?

9         MR. SLOAN:  Objection.  Foundation.

10        THE COURT:  Overruled.

11        "Did you ever learn?"

12        You may answer.

13        THE WITNESS:  I believe it was in the spring of --

14        THE COURT:  It was a yes or no question.

15        THE WITNESS:  Can it be repeated or what?

16   BY MR. QUINN:

17   Q    The question is, did you ever learn that Mr. Bryant had

18   worked on the Bratz designs while he was employed by Mattel?

19   A    I guess I have a question about the question.

20   Q    Let me ask it this way.

21        Did you have any information available --

22        THE COURT:  Counsel, what's confusing is the last

23   clause of that question; she does not know what it modifies.

24        I think rephrase your question.  It's vague.

25   / / /

1    BY MR. QUINN:

2    Q    At any point in time prior to this lawsuit, did you ever

3    learn any information indicating that Mr. Bryant had worked on

4    Bratz designs while employed by Mattel?

5          MR. SLOAN:  Objection.  Foundation; also assumes

6    facts.  It's not clear this witness knows when the lawsuit was

7    filed.

8          THE COURT:  It's a yes or no --

9          Overruled.  Yes or no.  Then we'll go to the

10   foundation.

11         THE WITNESS:  I only learned --

12         THE COURT:  Just yes or no question.  Do you?  Did

13   you?

14         THE WITNESS:  So can it be repeated one more time.

15         THE COURT:  The court reporter will read it back,

16   please.

17         (Last question is read.)

18         THE WITNESS:  No.

19         MR. QUINN:  Nothing further.

20         MR. SLOAN:  Nothing further, Your Honor.

21         THE COURT:  We're at the noon hour.  The court is

22   going to recess for the day.

23         The jury will be back here at 9:00 tomorrow morning.

24         My condolences to Mr. Nichols.

25         (WHEREUPON JURORS DEPART COURTROOM.)

1      MR. QUINN:  Your Honor, the court wanted me to remind

2   the Court that we were going to discuss this Exhibit that came

3   in and was offered with the expert.

4      THE COURT:  Right.

5      I'll hear your argument on that.  My tentative is to

6   allow -- the second one, the one I think you're looking at

7   right now.

8      MR. QUINN:  Measuring the Bratz brand price premium.

9      THE COURT:  My inclination is we'll let that one in.

10   The other one seemed simple enough.  It does not come in.  The

11   question is whether or not the summary is necessary to --

12   assuming there's authentication, a foundation, that it's

13   necessary, given the complexity of the figures.  The second one

14   seems to fall into that category; the first one does not.

15   That's my tentative thought, but I'll hear from both sides on

16   that.

17      MR. QUINN:  Your Honor, I guess our thought on this,

18   the price premium slide, is that there was no indication that

19   there's any data behind this at all, to say nothing of any

20   large volume of data.  Under 1006, if it's a summary of

21   voluminous data, it may be admissible.  But there's no

22   predicate laid that this was anything other than the witness's

23   own horseback judgment.

24      THE COURT:  There was no objection to his

25   articulation of those judgments, Counsel.

1          MR. QUINN:  Correct, Your Honor.  We have no problem

2     with his opinion coming in, as it did.  But all this is, then,

3     is an illustration or summary of his opinion.  It's not a

4     summary of voluminous data, which is what 1006 requires; so all

5     we'd be sending into the jury room is a summary of the

6     witness's testimony, which should not come in.

7          THE COURT:  Counsel?

8          MR. KENNEDY:  Your Honor, this is exactly the same

9     sort of thing that was offered with Mr. Wagner.  I deliberately

10    did not object at that time, thinking 'if it will help the

11    jury, let it go.'

12          Perhaps I should have been more obstreperous at that

13    point.  I think we're talking about --

14          THE COURT:  We don't want you to be obstreperous.

15          MR. KENNEDY:  There's been no lack of that in this

16    case, your Honor.

17          THE COURT:  We have enough of that to go around.

18          MR. KENNEDY:  But seriously, he detailed all of the

19    people he talked to, all of the documents.  To be sure, we

20    didn't quote from them verbatim pursuant to an objection that

21    was sustained.  But clearly, there is a massive volume of

22    information he consulted.

23          THE COURT:  Just for the record, the second one, the

24    Exhibit number again is...

25          MR. KENNEDY:  18930.

1          THE COURT:  I'll permit that in.  I'm not going to

2    allow the other one in.

3          The instruction will go along with this, of course,

4    that it's only entitled to the weight that the jury believes it

5    is entitled to, based on what's behind it.

6          MR. QUINN:  Understood, Your Honor.

7          THE COURT:  You can make that point in closing.

8          MR. KENNEDY:  Thank you, Your Honor.

9          MR. NOLAN:  Your Honor, on the same evidentiary

10   issues we still have hanging, we have 18882-A and B.

11         THE COURT:  Could I see those again?

12         MR. NOLAN:  Sure.

13         THE COURT:  Again, I'm going to be applying same kind

14   of analysis.  Whether it's complex enough that it seems to be

15   warranted.  I know we did introduce for Mattel several

16   documents along these lines.

17         These were the summary of the items.

18         Counsel, you may use all four of these in your

19   closing arguments.  But this is basically compilations of

20   statements made that the jury heard.  This isn't like it is

21   reflecting something which has evidence behind it; so I think

22   these are slides that you can use in your closing argument to

23   summarize the testimony that was given.  But I'm not going to

24   admit these four as separate exhibits.

25         You questioned the witness on these twice and then

1    you went through the summary.  I think, if I recall, you even

2    said again, on one of your questions, it was quite cumulative.

3    I think to now admit it as a separate exhibit would not be

4    appropriate.

5        I think that takes care of all of the exhibits.

6        Mr. Zeller?

7        MR. ZELLER:  I did want to discuss further these

8    serious witness issues we now have.

9        THE COURT:  Right.  You were going to go back to

10   those.

11       The Court does have a full court meeting at 12:15, so

12   I am under the gun somewhat myself.

13       Let me ask Mr. Nolan.  You've represented twice now

14   that -- Ms. Polk is it -- was going to be called before the

15   expert witness that we've already heard from.  There was a big

16   commotion made about this.  You wanted to call her at the end

17   of the day yesterday, but she had already been sent back to Los

18   Angeles.  Mattel indicated it's a problem bringing her out.  I

19   ordered them to bring her out this morning.  We've now been

20   through this morning and she was not called.

21       Are you planning to call her tomorrow?

22       MR. NOLAN:  To put this in the right framework, when

23   this issue came up, I tried to alleviate the concern by asking

24   Mr. Quinn last night whether or not he would stipulate.  He

25   sent over an E-mail.  We sent over the documents.  Then this

1      morning, of course, the first witness was Mr. Kilpin.  And

2      based on the testimony from Mr. Kilpin in laying in those

3      redacted forms from the worldwide research report as we did.  I

4      went to Mr. Proctor and asked him.  That's all we want to do

5      with Polk.

6            THE COURT:  I want to get a straight answer to this

7      question.  Are you or are you not intending to call Ms. Polk?

8            MR. NOLAN:  Not live if we can get the stipulations.

9      We're going to work out a stipulation.  And if we can't --

10            THE COURT:  It's a yes or no question, Counsel.

11            MR. NOLAN:  No.  I don't plan to.

12            THE COURT:  You know at side-bar they said no to the

13      stipulation.  Yes or no, are you calling her?

14            MR. NOLAN:  No.  Based on the record now, no, we

15      don't have the time to do it.

16            THE COURT:  Very well; so Polk is off.

17            Kerner is the next witness?

18            MR. ZELLER:  Yes, Your Honor.

19            MR. NOLAN:  Yes.  We are planning to call Mr. Kerner

20      for financial documents.

21            THE COURT:  As your next witness?

22            MR. NOLAN:  Yes.

23            THE COURT:  And then Mr. Larian and then Mr. Vilppu.

24            MR. NOLAN:  Mr. Larian, yes.  Mr. Vilppu, no,

25      your Honor, we're not going to call Mr. Vilppu.

1          THE COURT:  Very well.

2          Mr. Erins?

3          MR. NOLAN:  We are still considering that tonight,

4     and we will let them know.

5          THE COURT:  And Mr. Gruca and Mr. Meyer, you're

6     ending with those two?

7          MR. NOLAN:  Yes.

8          THE COURT:  Very well.

9          There's the videotape.  And as the Court has allowed

10    you to do throughout, you can play the videotape whenever you

11    want.  The Court has ruled on Farr.  I have not had anything

12    submitted to me on Ms. Martinez or Mr. Bryant.

13         MR. NOLAN:  Ms. Aguiar just pointed that out.  We're

14    going to be submitting that, your Honor.

15         THE COURT:  If you could get that to me this

16    afternoon.

17         Does that answer your question, mr. Zeller?

18         MR. ZELLER:  It does substantially.  The one issue

19    concerns Mr. Kerner.

20         And we were given a witness order in which he was

21    supposed to go before Jill Nordquist; that was actually one of

22    the reasons we were complaining, is because he would have been

23    up and off the stand.  They only have a couple of documents, as

24    I understand, that they want to have him testify about.  He is

25    now going to have to cancel a family vacation and incur

1    charges.  MGA ought to be ordered to pay for it.

2         That was the order we were given last night, Judge.

3    People make these plans.  And while I certainly am the first

4    person to be entirely sympathetic with scheduling and

5    everything else, they are taking people out of order; that's

6    the big difference here.  They are giving us an order that they

7    are not following.  We never did that.  We told them in advance

8    the order and when we were doing it.  We were off on our time

9    estimates, but it was never playing shuffling the deck with the

10   witnesses.

11        MR. NOLAN:  Your Honor, yesterday we had the

12   conversation about Ms. Nordquist.  She was ordered to be here

13   this morning.  We put her on when we did.  Mr. Kerner was the

14   very next witness.  If time would have allowed, we were going

15   to go to Mr. Kerner.

16        THE COURT:  I think Mr. Zeller's point -- I don't

17   have that before me.  He showed me the Blackberry.  When you

18   responded last night, you indicated that Mr. Kerner would go

19   before Ms. Nordquist.  Is that correct or not?

20        MR. NOLAN:  It may have been, Your Honor, and I'll

21   take responsibility for that.  I made the call because I

22   specifically asked yesterday that Ms. Nordquist be here, so she

23   made a special trip out here.  I didn't understand the

24   sensitivity with respect to the other one.  I knew that

25   Nordquist's timing could get in perfectly during that period of

1    time.

2         Mr. Kerner has some financial documents, your Honor,

3    that, frankly, should simply be stipulated to.  We stipulated

4    to the introduction of -- I'd say literally hundreds, if not

5    thousands, of financial data upon which our experts -- which

6    their experts relied on.  That's all he is.  It's really like a

7    custodian of record that we're trying to get them in.

8         THE COURT:  All right.

9         I'm going to permit you to call Mr. Kerner tomorrow.

10   And I will allow Mr. Zeller to revisit this issue of costs.

11   I'm not going to address that right now.  Let's see if perhaps

12   if that's just out there, we can get a resolution between now

13   and tomorrow morning.  But I will allow MGA to call Mr. Kerner

14   tomorrow morning, and he's going to have to show up.

15        MR. ZELLER:  It's going to be for his whole family.

16   That's what's been disruptive.  And also, Your Honor, those

17   financial documents, as the court will see when we have more

18   time on this, they are Barbie financials.  They have nothing to

19   do with this case.

20        THE COURT:  That will be a factor, Counsel; that's

21   why I'm going to address the issue of costs after I've had a

22   chance to review all that.  So Mr. Kerner will be here tomorrow

23   morning.  We'll begin with him.  We'll go to Mr. Larian.  We'll

24   go to Mr. Erins, if he's going to testify.  And then Mr. Gruca,

25   Mr. Meyer, and whatever videos you want whenever you want to

1    play them.

2        MS. AGUIAR:  The last word on Mr. Kerner.  I've been

3    exchanging e-mails, as you can see, with Mr. Zeller regarding

4    witness order, and I was never, never told anything about a

5    family vacation.  We were never told that if he wasn't called

6    today that there would be a problem.

7        THE COURT:  I'll hear all of this --

8        MS. AGUIAR:  I understand.

9        THE COURT:  Mr. Nolan just indicated you have some

10   additional designations for the Court?

11       MS. AGUIAR:  We have the Martinez designations, and I

12   believe the only other one would be Carter Bryant; and if you

13   don't have that already, we'll get those to you this afternoon,

14   so if they need to be played tomorrow, we can do that.

15       I know you are running to the meeting, so there was

16   just one other -- could we pick them up before the charging

17   conference this afternoon?

18       THE COURT:  Absolutely.  And I'm going to push that

19   conference off until 3:00, because the Court has some more work

20   to do; so I'll see you at 3:00 and we can take up whatever

21   matters we need to at that time.

22       MR. NOLAN:  On this point about Mr. Kerner, the last

23   thing we want to do is ruin his family vacation.

24       I'm wondering, maybe, at 3:00, if we could raise the

25   issue -- they say they are all related to Barbie.  I had

1    articulated why financial records are important for the base of

2    some testimony we're attacking.  And then maybe we can work out

3    a stipulation, because it's just data; or they don't come in,

4    in which case his schedule won't be interrupted.

5         THE COURT:  Very good.

6         As far as timing, Mattel is down to an hour and 30

7    minutes, and MGA is down to two hours and ten minutes.  We're

8    only 40 minutes apart in time.  The clock has served its

9    purpose; it has brought the trial down to the one day that we

10   have left.  We do have some additional time tomorrow, and the

11   Court will certainly give leave to consider affording

12   additional time if necessary.

13        This has not been a precise science throughout, in

14   terms of keeping the clock, but it's been a reasonably close

15   approximation and we're in good shape.

16        We do have tomorrow.  The case is ending tomorrow.

17   There will not be any testimony beyond tomorrow.  But to the

18   extent that everyone is being reasonable, we'll have the day to

19   use.

20        MS. AGUIAR:  I take it that would be time for both

21   parties, Your Honor.

22        THE COURT:  Absolutely.

23        MS. AGUIAR:  Okay.

24        We have some revised verdict forms.  Can we slip it

25   into your binder?  I believe Mattel also last night filed

1   something new; so the parties are still trying to stay updated.

2          THE COURT:  I've been taking notes, but I don't think

3   I've written on either of the binders; so I'll let you update

4   those at this time.

5          MS. AGUIAR:  Great.  I'll just substitute that tab.

6          THE COURT:  Let's get those fixed.

7          Court is in recess.

8          (Morning session is concluded.)

9

10

11

12

13

14

15

16

17                    CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, united

     states code, the foregoing is a true and correct transcript of

20   the stenographically recorded proceedings held in the above-

     entitled matter and that the transcript page format is in

21   conformance with the regulations of the judicial conference of

     the united states.

22

23   _____          _____

     THERESA A. LANZA, CSR, RPR                Date

24   FEDERAL Official COURT Reporter

25