1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    ---

4      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    ---

6    MATTEL, INC.,            :

                              :

7          PLAINTIFF,        :

                              :

8      VS.              :  NO. ED CV04-09049-SGL

                        :  [CONSOLIDATED WITH

9    MGA ENTERTAINMENT, INC.,     :  CV04-9059 & CV05-2727]

     ET AL.,              :

10                        :  JURY CHARGE CONFERENCE

          DEFENDANTS.      :

11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17              MONDAY, JULY 7, 2008

18

19

20

21

22              MARK SCHWEITZER, CSR, RPR, CRR

                OFFICIAL COURT REPORTER

23              UNITED STATES DISTRICT COURT

                181-H ROYBAL FEDERAL BUILDING

24              255 EAST TEMPLE STREET

                LOS ANGELES, CALIFORNIA 90012

25              (213) 663-3494

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4        Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.

5        B. Dylan Proctor, Esq.
         Michael T. Zeller, Esq.

6        Harry Olivar, Esq.
         John Corey, Esq.

7        Diane Hutnyan, Esq.
         William Price, Esq.

8        Sanford Weisburst, Esq.
         855 South Figueroa Street

9        10th Floor
         Los Angeles, CA 90017

10       (213) 624-7707

11

12

         On Behalf of MGA Entertainment:

13
         Skadden, Arps, Slate, Meagher & Flom LLP

14       By Thomas J. Nolan, Esq.
         Carl Alan Roth, Esq.

15       Jason Russell, Esq.
         Lauren Aguiar, Esq.

16       David Hansen, Esq.
         Matthew Sloan, Esq.

17       Robert Herrington, Esq.
         300 South Grand Avenue

18       Los Angeles, CA 90071-3144
         (213) 687-5000

19

20

21

22

23

24

25

1                    I N D E X

2

3           MATTER:   JURY CHARGE CONFERENCE.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Riverside, California; Monday, July 7, 2008

2                  2:50 P.M.

3         THE COURT:  Good afternoon to you all.  We're on

4    calendar to go through the jury instructions.  The Court

5    directed counsel to prepare two binders, which they did,

6    containing the most recent collection of jury instructions.

7    Several rounds of submissions have been made, and the Court

8    wanted to have before it for the weekend what the parties

9    were urging the Court to consider.

10        I've gone through all of them.  What I'd like to

11   do, to begin with, is let's just focus on jury instructions.

12   We'll get to verdict forms later, and I have a number of

13   questions regarding the use of any number of these different

14   instructions.  So let me go through my questions, and then

15   we'll circle back, and the Court will try to make some

16   rulings in terms of what we're actually going to use and put

17   before the jury.  And, of course, most importantly right now

18   are my notes.

19        But I can begin with the proposed jury

20   instructions.  There has been some agreement.  We all agree

21   that we're going to use the English translation of all

22   interpretations.  Not much, but it's a start.

23        MR. RUSSELL:  It's better than Swedish.

24        Ironically, your Honor, we offered to withdraw that

25   instruction.  And I'm being serious.

1          THE COURT:  It looks like a copy of the joint

2     proposed jury instructions submitted by both sides is in fact

3     the same.  So I can move quickly through tab 1 here.  And the

4     Court plans to give most of these, not quite all.  1.13 has

5     already been given.  And it's more appropriate to be given at

6     the outside of trial, as is 1.14, about note taking.  It's a

7     little late to tell them about notes.  Same with 1.19.

8     Again, that's an outline.

9          The 1.10, ruling on objections, has been given, and

10    I'll be giving something similar to it.  But I'm not going to

11    give this one again.

12          Same with 1.12, conduct of the jury.  That has been

13    given.

14          So the first one that has not been given that I'll

15    begin with is 1.1C, duty of the jury.

16          The next one will be the burden of proof,

17    preponderance of the evidence, which governs the various

18    claims that are set forth in this trial.  And this is a

19    question of counsel.  The next one is 1.4, clear and

20    convincing evidence.  In this phase, do we have anything

21    which calls for a clear and convincing evidence standard?

22          MR. RUSSELL:  No, your Honor.

23          THE COURT:  Agreed, Mr. Zeller?

24          MR. ZELLER:  I believe that's correct, your Honor.

25          THE COURT:  All right.  So 1.4 is out.  We'll do

1  this exercise again, of course, if there is a 1-B in advance

2  of 1-B.  So even though I know that there were some 1-B

3  submissions, I'm going to take those out for the time being.

4      This is a good point, I think, after the definition

5  of the preponderance of the evidence, to insert the

6  defendant's substantial factor test statement, because I

7  think it's related to -- it's a general definitional, like

8  burden of proof that applies to any number of claims.  So I'm

9  going to insert that, which is also part of the joint

10  proposed jury instructions at this point.

11      All right.  Then the next one is 1.5.  Two or more

12  parties with different legal rights.

13      1.6, even though I've given it, I'm going to give

14  it again.  What is evidence.

15      1.7, what is not evidence, that will be given

16  again.

17      1.8, I'm going to give again, but I'm going to

18  eliminate the last line.  I'm simply going to say, "Some

19  evidence has been admitted for a limited purpose only,"

20  change the tense of the verb there.  And the second sentence

21  will be, "When I have instructed you that an item of evidence

22  has been admitted for a limited purpose, you must consider it

23  only for that limited purpose and for no other."  There were

24  several times I gave a limiting instruction to the jury, but

25  I didn't elaborate on that point.  So I think it's well taken

1    to repeat it.

2           Obviously, the last sentence falls off.

3           1.9, circumstantial evidence.

4           2.02, failure to produce available stronger

5    evidence.

6           1.11, which I think covers a number of the proposed

7    instructions, credibility of witness, will definitely be

8    given, even though it's already been given once, it will be

9    given a second time.

10          The one that I made the reference to, actually, I'm

11   planning not to give, the jury to be guided by the official

12   English translation, I don't think we have an issue here.

13          MR. RUSSELL:  If I might, Mr. Proctor and I spoke

14   over the weekend and agree to withdraw 1.16, and 1.17, and

15   17.20, which is the last instruction.

16          THE COURT:  What's 17.20?

17          MR. RUSSELL:  It's a derivative liability.  It was

18   listed in the tables of instructions.

19          THE COURT:  I'm sorry.  Yes.  That's a 1-B

20   instruction.

21          MR. RUSSELL:  Yes.  And then there was one which

22   we're going to get to, but I just wanted to point it out to

23   your Honor, and that is instruction 4.1, there is a modified

24   instruction submitted by Mattel on July 2nd.  They submitted

25   it.  We made a proposal on it.  I haven't heard back, but

1   there might be a modification on 4.1 when we get to it.

2        THE COURT:  Let's wait until we get to that.

3   That's towards the end.  Very good.  1.16, 17 are out.  1.18

4   I'm going to give.  I'm going to modify the tense of the verb

5   on line 4.  "From time to time during the trial, it has been

6   necessary for me to talk with attorneys."  And then on line

7   8, I'll change it from is to was.

8        2.2 will be the next one.  This raises another

9   question.  The parties have agreed to certain facts to be

10   placed in evidence as Exhibit blank.  You should therefore

11   treat these facts as having been proved.

12        I've never done this before, but I kind of like the

13   idea of having a singular exhibit which sets forth the

14   different stipulations.  If you don't want to do it that way,

15   I don't know if that's what you are proposing, but if you

16   are, that's fine with the Court.  If you'd rather me simply

17   say the parties have agreed to certain facts to be placed in

18   evidence, you should therefore treat those facts as having

19   been proved.  I'll do that.  I don't know what you were

20   suggesting by this.

21        MR. NOLAN:  I think we were anticipating the latter

22   because, of course, during the trial, we have not gathered

23   all the stipulations, which sometimes happens, and I would

24   just propose that we do it the way you last described it.

25   It's the easier way to handle it.

1    MR. ZELLER:  And I think that's fine.  There also

2    were other facts agreed to in the final pretrial conference

3    order that I'm not sure have ever been read to the jury,

4    stated to the jury, whether they matter at this point or not

5    being a different issue.  But there at least was that --

6    THE COURT:  I'm leaving that to the parties to

7    determine whether it matters to their cases, and I trust the

8    parties, if they need to read a stipulation to the jury, they

9    will.  I'll leave that up to you.

10   So I'll modify this and put a period after the line

11   evidence on line 4, cross out as exhibit, and on line 5,

12   eliminate the blank space.

13   So that's 2.2.

14   Next one is 2.3, and that is out because I don't

15   believe at the end of the day I took judicial notice of

16   anything.

17   2.4, deposition in lieu of live testimony, that's

18   certainly something which the Court will include.

19   2.5, a transcript of tape-recording.  I'm going to

20   take that out because I don't believe any transcripts were

21   provided.  The closest we have was the transcript that was

22   provided during the video depositions.  That really wasn't

23   provided to the jurors.  There was no request from any party

24   for me to instruct at that time that they should be listening

25   to the tape and not reading the transcript.  But that's

1    waived at this point.  I don't think there's any further need

2    for that.

3         Perhaps if the jury asks for the replay of

4    videotaped deposition, we can cross that bridge when we get

5    to it in terms of the transcript versus what is being said.

6         MR. NOLAN:  Your Honor, with respect to 2.5, we

7    totally agree, and to the extent that could be interpreted

8    that it may apply to the video presentation, we certainly

9    waived it.

10        I believe that the parties probably in anticipation

11   of some evidence that may have come in, but didn't come in,

12   included that tape-recording.  It had to do with an issue

13   that didn't develop.

14        THE COURT:  Okay.  2.8, impeachment evidence of a

15   witness, that will come in.

16        2.10, use of Interrogatories of a party, that is

17   appropriate.

18        Mattel's special jury instruction regarding use of

19   admissions of a party, that is appropriate.

20        2.11 will be the next one.  That's expert opinion.

21   That will come in.

22        2.12, charts and summaries not received in

23   evidence.

24        And then, of course, 2.13, charts and summaries in

25   evidence.  That all comes in.

1    2.14, evidence in electronic format.  I got a big

2    question mark here.  The idea of sending a computer back to

3    the jury is both tempting and disheartening.  I don't know if

4    we have any basis to do that in this case.  If there's any

5    evidence that we have that would require them to use a

6    computer to discern; is that correct?

7        MR. RUSSELL:  That's correct, your Honor.

8        THE COURT:  Mr. Zeller, you agree?

9        MR. ZELLER:  I believe that that is true, at least

10   up until now.  Whether or not there is going to be additional

11   evidence pertaining to electronic matters, I mean I can't

12   guarantee you that there would not be anything in addition.

13   But it's true as of now.

14       THE COURT:  Okay.  I'm going to take that out for

15   the time being.  If there's something which comes in

16   tomorrow, we'll revisit it.

17       MR. NOLAN:  I have a pretty good idea of what

18   tomorrow is going to look like from our side, and I don't

19   think that's going to develop.  We're not going to be

20   introducing a computer.

21       THE COURT:  Okay.  2.14 comes out, then.

22       Now, at the end -- so those are going to be the

23   preliminary instructions I'm going to give.  Those will be

24   the first 19 instructions, 20 instructions I'm going to give.

25       Then I'm going to give one more preliminary

1    instruction, or what I'm calling a preliminary instruction.

2    It's not really preliminary, but preliminary before we get to

3    the substantive claims, and that's the 4.1 corporations and

4    partnerships, fair treatment thereof.  All parties are equal

5    before the law, and a corporation is entitled to the same

6    fair and conscientious consideration by you as any party.  I

7    think that's kind of part of these same preliminary ones.

8         So I'll put that after 2.13.

9         Then we will insert what I will call the

10   substantive instructions relating to the actual claims in the

11   case and, of course, I will end with these three agreed-to

12   instructions, 3.1, 3.2, and 3.3 relating to duty to

13   deliberate, communication with the Court, and return of the

14   verdict.

15        So that takes us through the beginning and the end

16   of the instructions.

17        And now to the heart of the matter.

18        MR. ZELLER:  If I may.  I'm not sure if this is

19   when the Court was contemplating addressing this one, but

20   there is a modification that the parties have been seeking, I

21   think, with respect to 4.1.  We submitted an additional

22   instruction.  I know that MGA had some -- a few reservations

23   on some of the verbiage, but I think in substance, the

24   parties are fairly close on that.  It's a more tailored

25   instruction than 4.1 initially was.

1      THE COURT:  My thought on that, and you're going to

2      see that this is my thought on many instructions, and this

3      thought has been not on my own experience, but having sat for

4      a year and a half on the Ninth Circuit Model Jury Instruction

5      committee, is that less is more on jury instructions.  And

6      unless the parties can agree on language, my inclination

7      would be to give 4.1 in the form that it appears in the model

8      instructions.

9           Now, if there's some specific language that you can

10     agree on to expand beyond that, but I think it provides what

11     you need to argue.  I understand that it may not be quite as

12     tailored as you would like to the particular case, but it

13     certainly gets the point across, and I think provides an

14     adequate basis for you to make your argument, which is

15     probably an argument not best emphasized in any event, but

16     that's up to you to decide.

17          MR. ZELLER:  Part of it has to do with the fact

18     that there certainly has been reference, during the course of

19     the trial, to the relative size of the parties, and that's, I

20     guess, where kind of for -- I'm not sure that the model

21     instruction, as framed for 4.1 quite gets the point across.

22     It certainly does say that there should be equality in

23     treatment, but it doesn't come across as saying basically the

24     jury should not consider the fact that one company is larger

25     than the other and so on.

1     THE COURT:  Well, it says that you are entitled to

2     the same fair and conscientious consideration by you as any

3     other party.

4     MR. ZELLER:  And I see the Court's point.  Don't

5     get me wrong.  I definitely see that what the Court is saying

6     is that that language is broad enough that we could argue it

7     in closing, in some respects.  Because of the fact that it's

8     come in in various kinds of ways, I do think just something

9     more specific would let the jury know that, you know, that's

10    not the purpose for which any of that evidence has been

11    admitted.  It's not for that of being decided --

12    THE COURT:  Let me ask Mr. Russell.  Are you -- or

13    Mr. Nolan, whoever from MGA.  I think Mr. Zeller is making

14    reference to what's tab 4 of their binder, the Mattel

15    supplemental proposed jury instructions for Phase 1-A.  The

16    first one they submitted is this modified version of 4.1.  Is

17    there any language beyond the language that's set forth in

18    the model instruction that you believe is appropriate to be

19    included?

20    Mr. Zeller, you did suggest that you were close to

21    coming up to an agreement on this.

22    MR. NOLAN:  By just addressing this one, I don't

23    volunteer to answer all the other questions on all of the

24    other instructions.  Mr. Russell will address most of those.

25    I do want to go back to this.

1        I think in the spirit of trying to cooperate with

2    the parties over the weekend, there were discussions about a

3    modification to 4.1.  I've not denying that; however, your

4    Honor, I think that your comment with respect to the general

5    instruction of 4.1, this is not a unique issue that has

6    arisen only in this case.  And when you go back and you look

7    at the tailored version, no matter how you try to tailor it

8    to this case, it all seems to be favoring Mattel and singling

9    out Mattel.  Where I thought the simplicity of -- simplicity

10   is the wrong word.  But the shortness of the standard

11   instruction really captures the same essence.

12       If, however, the Court were to be inclined to go

13   with the tailored one, we had, you know, suggested

14   modifications to that language, but, your Honor, on behalf of

15   MGA, we think that the spirit of the issue is addressed

16   adequately by 4.1, and it's the one that's typically given in

17   these situations.

18       THE COURT:  Very good.  Thank you, Counsel.

19       The other special that applies to this case for

20   Mattel, while we're here, is this instruction regarding

21   obligations of a notary public.  And perhaps I just missed

22   it.  I don't see a response or an objection to this by MGA.

23       MR. RUSSELL:  This was something that was submitted

24   after the binders were submitted.  So we lodged our

25   objections literally this morning.  I apologize that it was

1    that late.

2         THE COURT:  Why don't you tell me what the

3    objections are.  Because I'd really like to keep the universe

4    of materials that I'm considering to these two binders that

5    I've spent so much time with.

6         MR. RUSSELL:  Of course, your Honor.  I think

7    fundamentally our problem with this is this is a very

8    ancillary issue, and the instruction is extremely

9    argumentative.  There's no need to even give it.  They can

10   make all the arguments they need to make without instructing

11   the jury on what we think is an unnecessary and corollary

12   point.

13        The notary is not on trial here.  There are no

14   claims against the notary.  This just seems like a necessary

15   instruction and certainly argumentative as drafted would be

16   our objection.

17        THE COURT:  Mr. Zeller?

18        MR. ZELLER:  Briefly, your Honor.  Certainly if any

19   aspect is argumentative, we don't intend it to be.  That's

20   for sure.  We do think, however, a point needs to be put

21   across neutrally to the jury.  Because Mr. Nolan in opening

22   specifically treated the fact that it was a notary public as

23   basically bolstering Ms. Prince's credibility.  That was a

24   point specifically made in opening.

25        Of course, her deposition was played.  The jury

1    knows she's a notary.  There are certain legal obligations

2    that she had that she did not abide by, and we think that the

3    jury needs to be told at least, and again, in a neutral

4    nonargumentative way, that that's the case, because of that

5    juxtaposition in terms of attempting to bolster and say well,

6    of course, she's credible, of course, she wouldn't lie.  She

7    wouldn't shade anything.  She was a notary public.

8         THE COURT:  I think the better approach to doing

9    this, as opposed to putting it in the jury instructions and

10   carrying that imprimatur from the Court, is this -- and I'm

11   going to have to revisit the judicial notice, but this might

12   be something which might be appropriate to take judicial

13   notice of.  But I don't know if this is appropriate to take

14   as a jury instruction.

15        MR. ZELLER:  And I think that would be acceptable

16   to us, your Honor.  One thing I could suggest is that perhaps

17   if we're entitled and were given leave under the auspices of

18   judicial notice where we could make the point to the jury

19   using these California code provisions.  It's obviously a

20   little legally argumentative, but because the fact is that

21   the jury won't be hearing it from another source, but if --

22   but that is, I think, an acceptable alternative to us.

23        THE COURT:  Well, I would consider a request for

24   that.  That's not before me right now, but I think in the

25   matter of a jury instruction, I tend to agree that this is

1    not the proper place for it.  We'll cross that bridge when we

2    get to it.

3        MR. ZELLER:  Thank you.

4        THE COURT:  And let me get into -- let me now get

5    to the substance.  And what I've tried to do, and I know that

6    MGA kind of did this for me in something they provided the

7    Court this morning, but what I tried to do over the weekend

8    is come up with a flow chart where I take basically the four

9    claims, the one related to the inventions agreement, the

10   intentional interference, the aiding and abetting, the breach

11   of fiduciary duty and duty of loyalty, and of conversion, and

12   line up the instructions proposed by Mattel and those with

13   MGA.

14        And I have some questions with respect to

15   deviations essentially from the model instructions on those.

16   The Court is well aware, notwithstanding the favorable

17   comments I've made about model instructions, that if the

18   model instruction doesn't fit, that we need to find something

19   else.  But I do think it's a useful starting point, and in

20   many instances it's a useful ending point, but be that as it

21   may, I'm certainly open to other suggestions.

22        There's two -- in addition to covering the

23   substantive claims, there are two adverse inference

24   instructions that are presented by Mattel.  One related to

25   spoliation and one related to privilege, which the Court is

1   disinclined to give at this point.  I don't think, and I

2   think I have addressed these previously to some extent, but I

3   don't think the evidence before the Court is sufficient to

4   give either of the two adverse inference instructions that

5   Mattel is requesting.

6          That is not to say that Mattel is not free to argue

7   the points that they wish to make, but I think there may be

8   evidence for the inference to be drawn.  I just don't believe

9   there's a sufficient basis at this time for the adverse

10  inference instruction to be given.

11         But I'll hear -- before I get into the substantive,

12  I'll hear further on those two instructions if counsel wish.

13         MR. RUSSELL:  Your Honor, when speaking to

14  Mr. Proctor this weekend, we had reached an agreement that

15  with respect to the Fifth Amendment instruction, that would

16  be withdrawn.  Since I don't believe --

17         THE COURT:  That's out altogether.

18         MR. RUSSELL:  Obviously, with respect to the

19  spoliation, it would be MGA's position that that not be

20  given, but that was not the subject of any agreement between

21  the parties.

22         THE COURT:  Very well.  Mr. Zeller, is that your

23  understanding?

24         MR. ZELLER:  Yes, we don't see any reason at this

25  juncture to have the Fifth Amendment instruction.

1      THE COURT:  What about the spoliation issue?

2      MR. ZELLER:  The Court is going to have to remind

3   me which version we're at.  Because there have been various

4   spoliation instructions that we have proposed at various

5   times, and the Court already, of course, has read at least

6   one with respect to Evidence Eliminator.

7          So certainly to the extent that what we are talking

8   about is the intentional spoliation type instruction, you

9   know, I think at this point we'll submit on it because of the

10   Court's prior rulings.  I don't see any reason to reargue

11   those.

12         To the extent that it is simply an inference that

13   can be drawn, because of the fact that there is missing

14   evidence, more in the nature of the inference we talked about

15   the other day at some length, but that kind of instruction, I

16   think, may still be appropriate.  But that has more to do

17   with the fact that there is simply evidence that from our

18   perspective should have been made available that was not.

19         THE COURT:  And, of course, MGA takes the position

20   that there is some evidence that should be available, namely,

21   phone records, that was not.

22         I think both sides are in a position to make the

23   arguments that they want to make as forcefully and as

24   appropriately as they can.  But I don't see the role of an

25   instruction at this point.  We'll see if something develops

1    in the next day that would change the course.  But that's my

2    view at this juncture.

3           Focusing on the four categories of claims, I don't

4    want to call the first one a breach of contract claim because

5    Mattel has expressly disavowed that it is a breach of

6    contract claim at this point, even though it originated as

7    such.  And that's my first question.  MGA is urging the Court

8    instruct using 303, which is the classic breach of contract

9    instruction.  Mattel has taken the position that no such

10   instruction is appropriate because there's no longer a breach

11   of contract claim, that it's simply an Interrogatory request

12   for the jury to determine when and where certain drawings,

13   ideas were conceived or reduced to practice.

14          And so let's begin with that issue, whether or not

15   actually the Court needs to instruct on breach of contract or

16   given the Court's rulings on the motions for partial summary

17   judgment, that this simply is what is left is the

18   Interrogatory and the ownership and inventions instructions

19   that Mattel is suggesting, versus the breach of contract and

20   then ancillary to that, the copyright action section 204 and

21   California Civil Code, breach of contract type issues need to

22   be further explored.

23          MR. ZELLER:  I think that that's substantially

24   where we are, your Honor.  At least in terms of Mattel's

25   viewpoint on this.  Which is that, number one, certainly

1    there does not need to be a breach of contract type

2    instruction, elaboration in connection with the ownership of

3    inventions.  Because the Court has already construed the

4    contract.  It's really up to the jury to make certain kinds

5    of factual determinations as to whether or not applying the

6    law as the Court has found it, as to whether or not they were

7    created during the time that Carter Bryant was employed by

8    Mattel, and therefore, owned by Mattel.

9           Now, obviously when we get to the tort issue there,

10   perhaps it has to be treated slightly differently.  You know,

11   depending on really the phrasing of the tortious interference

12   with contract type instructions, but I think for purposes of

13   focusing now on the ownership of inventions, we think that

14   the appropriate course is for the Court to instruct the jury

15   basically as to the bottom line law and have the jury find

16   the facts as to when certain inventions were created.

17          THE COURT:  The general issue of this breach of

18   contract issue first.

19          MR. RUSSELL:  Yes, your Honor.  I think as an over

20   arching matter, it's hard to conceive how we wouldn't have a

21   breach of contract instruction when you've got torts that

22   involve the showing of a breach of contract, but even more

23   fundamentally, for Mattel to show that they own these

24   inventions, they have got to show the language of the

25   agreement and show Mr. Bryant, A, what he did was within the

1      scope of it, and B, he didn't turn it over to them.  This is

2      a contract case at base, and there can't be any getting away

3      from that.  When we get to the specifics of our objections,

4      you'll see more of the problems we have is that the

5      instructions from Mattel basically ignore the contract.

6           If you don't want to frame it as a breach of

7      contract claim, that might be acceptable, but I think what's

8      important is to ground what the jury is being instructed in

9      the language of the contract, and what specific obligations,

10     what specific language the contract provides, and if the

11     Court wishes to give further guidance in terms of what the

12     Court cannot instruct certain provisions to mean, that can

13     certainly be done in a neutral fashion.

14          THE COURT:  I want to get into the meat of that in

15     terms of exactly how I'm going to instruct that.  Right now I

16     wanted to get the framework.  But you agree conceptually that

17     this could be approached without necessarily getting into the

18     breach of contract elements provided that the Court

19     adequately instructs on essentially what the Court has found

20     the contract holds and make sure that the findings of the

21     jury are consistent with the language of the contract as the

22     Court has already interpreted it.

23          MR. RUSSELL:  The problem I have is it's difficult

24     to detach the breach of contract claim from the tort claims.

25     I mean, the reason why I hesitate to say yes to your Honor's

1    question is simply that because we have a tortious

2    interference claim, an interference with contract, there has

3    to be a showing in this instance, we believe, of a breach.  I

4    know this will be an issue we'll get into, and I don't want

5    to go down the tortious interference too far, but it is our

6    position that Mattel must show a breach of the contract, and

7    therefore, they must show the elements of a breach by Carter

8    Bryant.  And again, I don't want to take this too far.

9          THE COURT:  All right.  Because I actually think

10   those elemental elements -- that's not a good phrase.  Those

11   elements you referred to are captured largely in the

12   instructions that you both propose with respect to those

13   torts.  I'm talking about 29200 series for intentional

14   interference and the 4100 series with respect to breaches of

15   fiduciary duty and breaches of loyalty.

16          The breach of contract that I'm focusing on right

17   now is simply that initial one with respect to the inventions

18   agreement and the question that the Court intended to leave,

19   if I artfully explained this or not, but I intended to leave

20   in what was -- what did Carter Bryant, when did Carter Bryant

21   do the drawings.  And, of course, the impact of those

22   drawings and to the extent that they constitute copyright

23   infringement is reserved for 1-B.  But for right now, all

24   we're trying to do is determine whether or not the jury, at

25   least the element on this claim, is whether or not the jury

1    believes that these drawings, or which of these drawings or

2    which of these ideas were reduced to practice in 1999 through

3    October of 2000 versus 1998 or some period post-October 2000.

4         MR. RUSSELL:  And it may be possible to transplant

5    some of what we have in our breach of contract instructions

6    to the substantive torts.

7         THE COURT:  What I don't want the jury to do is

8    potentially redo what the Court has already found.

9         MR. RUSSELL:  Yes.

10        THE COURT:  On the breach of contract.

11        MR. RUSSELL:  But I do think it important for the

12   jury to understand precisely the questions being asked, which

13   I think -- and then to have the language of the contract so

14   that it understands when it gets to the injured form what it

15   is it's supposed to decide.

16        THE COURT:  Exactly.

17        MR. RUSSELL:  So I think we're on the same page.

18        THE COURT:  Very good.  Again, I want to go down

19   through some conceptual issues.  The intentional interference

20   claim, basically it's understood by both parties, urge the

21   Court to adopt CACI 2201, which is the intentional

22   interference with contractual relations, and 2203, which

23   relates to the issue of intent and knowledge.

24        There is a big dispute as to whether or not the

25   Court should include 2202, the intentional interference with

1    prospective economic relations and incorporated certain

2    elements from that into 2201 and 2203.  But that's more of a

3    substantive issue.

4         There's also a second issue, and maybe you can

5    address this now because I just don't get this, this at-will

6    employment practice.  As I understand it, the contract at

7    issue here is the inventions agreement.  It is not the

8    at-will employment contract or relationship that Carter

9    Bryant had with Mattel.  I just don't get this at all.

10        MR. RUSSELL:  Okay, your Honor.  And I apologize if

11   I didn't make this clear in our drafting, but I think that

12   there are several components to what I'll call the contract

13   claim that we're talking about.  There are the inventions

14   agreement component, but there are also components that MGA

15   has been alleged to have aided and abetted in inducing

16   Mr. Bryant to leave.

17        In other words, poaching away, if you will, and as

18   to that, Mr. Bryant has an absolute right as an at-will

19   employee to leave, and if they are going to base any part of

20   their claim on the fact that we aided and abetted him in

21   signing a contract and doing work for us while he was an

22   at-will employee, then we're entitled to graft onto the claim

23   that additional element.

24        Maybe it only relates to that specific component.

25   You can parse this claim in several buckets, if you will.

1    There's the inventions agreement.  Thou shalt maintain our

2    confidential information.  Thou shalt turn over the

3    inventions.  And then a conflict for the employer, hiring

4    away an employee of Mattel is the last bucket.  So the last

5    bucket arguably in our view would have the --

6          THE COURT:  I guess I'm not seeing that bucket

7    really holds any water.

8          MR. RUSSELL:  I completely agree that that

9    shouldn't be a claim at all.

10         THE COURT:  Is it a claim at all?

11         MR. ZELLER:  Not in terms of him leaving Mattel and

12   going to MGA.  I mean, certainly the circumstances, that's a

13   different issue.  But the fact that he had an employment

14   agreement, we'll call it, you know, and that he went to MGA

15   is not the basis for the claim.  The basis of the --

16         THE COURT:  As I understood it -- and maybe I'm

17   mistaken -- I understood your claim is that you were alleging

18   that there were two contracts that were interfered with.  One

19   is the inventions agreement, what has been called the

20   employment agreement, but I think is more correctly called

21   the inventions agreement.  It's that one-page document which

22   talks about inventions.  And the second is the

23   confidentiality agreement.  And that is what you are

24   alleging, and nothing more than that, have been interfered

25   with by MGA and Mr. Larian.  Is that true or not true?

1       MR. ZELLER:  Is the Court referring to the

2   conflicts of interest --

3       THE COURT:  I'm sorry.  The conflict of interest.

4       MR. ZELLER:  That is correct, your Honor.  Those

5   are the two agreements, and it's not an employment-based

6   claim.  We are certainly saying that those contracts were

7   interfered with.  But it is not by virtue of the fact that

8   Carter Bryant simply left and went to MGA.  We're not basing

9   the claim on that.

10      THE COURT:  We won't hear anything even remotely

11  like that in closing argument; right?

12      MR. ZELLER:  Right.  The bare fact that he's gone

13  over.  Now, the circumstances in terms of him not

14  communicating to us the inventions, the fact that he took the

15  inventions, sold them to MGA, including while he was employed

16  by Mattel, those are the -- those are the facts as well as

17  others --

18      THE COURT:  What was the first one you said?

19      MR. ZELLER:  The first one was the failure to

20  communicate the inventions to Mattel.

21      THE COURT:  To Mattel.  Right.

22      MR. ZELLER:  Because, of course, he had that

23  obligation as well.

24      THE COURT:  But none of the predicates, you're not

25  alleging that the fact that he sought employment elsewhere or

1    in fact was hired elsewhere is a predicate for the breach of

2    contract or interference of contract.

3          MR. ZELLER:  Correct.  As to the bare fact of that

4    occurring.  Again, the circumstances under which --

5          THE COURT:  I understand about the circumstances.

6    It's in that context, of course, that the compromise and

7    the -- the conflict of interest and the -- yes, okay.  Let me

8    hear from Mr. Russell in response.

9          MR. RUSSELL:  First, your Honor, I'd just like to

10   go back because I think it grounds everything, to the

11   pleadings that Mattel filed.  I mean, if you look at their

12   intentional interference claim, and I know it has been

13   superseded by the pretrial conference order, but it says

14   quite plainly what it is that their alleged contracts are,

15   and one of them, paragraph 124, is that Mattel employees had

16   a duty under their agreements --

17         THE COURT:  Wait a second.  Let me find this --

18         MR. RUSSELL:  No, it's not in the pretrial

19   conference order.  This is in the second amended answer and

20   counterclaims.  I'm just pointing out --

21         THE COURT:  We're done with that.  Now we're to the

22   final pretrial conference order.

23         MR. RUSSELL:  I think it's fairly encapsulated.

24   The point in the second amended answer and counterclaims does

25   guide and make clear that this is one of the breaches.  One

1    of the alleged breaches is that Mr. Bryant signed a contract,

2    signed a contract with MGA, and the allegation against MGA is

3    that MGA intentionally induced Mr. Bryant to breach his

4    contract by hiring him.  The mere fact that he signed a

5    contract is and has been found by this Court to be a breach.

6    So if Mr. Bryant is an at will --

7        THE COURT:  But you're leaving out the -- it's a

8    breach of the inventions agreement.  That's all I found.  I

9    didn't even -- until I saw this jury instruction, I hadn't

10   even thought about at-will employment agreements or anything

11   like that.  That has never been an issue in this case.

12       MR. RUSSELL:  Let me explain where it is that we

13   thought it was important, and maybe that will help.  The

14   reason is that in California an employee has an absolute

15   right to seek employment.  And a prospective employer has the

16   right to hire someone who is employed by another company.  I

17   think the concern is because your Honor is going to tell the

18   jury at some point in some form or fashion Mr. Bryant's

19   signing a contract with MGA is a breach, the jury needs to

20   understand there has to be something wrongful about that.

21       In other words, MGA had to do something wrong.

22   That's why the at-will component is important.

23       THE COURT:  Well, the way that it plays is on the

24   breach of the duty of loyalty or breach of the duty of

25   fiduciary -- breach of the duty of loyalty when he signed his

1    agreement with MGA.  The argument that Mattel is making is

2    that he signed his agreement, which provided the priority

3    allocation of his time to MGA while he was still an employee

4    at Mattel.  That violated -- they are not making a breach of

5    contract claim on that.  They are making a breach of duty of

6    loyalty claim on that.  If they were using that to argue

7    breach of the at-will employment agreement, then I would

8    readily agree with you that these additional elements are

9    necessary.  But I think it's really confusing things

10   dramatically for the jury.

11        MR. RUSSELL:  I guess I have a problem.  It's true

12   they don't have a breach of contract claim.  Instead what

13   they have is a tort claim and have a finding of a breach

14   untethered from the fact that MGA has a right to go out and

15   solicit people to work for them.  And there has to be --

16        THE COURT:  That's not the basis for the -- perhaps

17   an instruction along those lines might be appropriate to make

18   it clear to the jury, but the solution is not giving them an

19   instruction on claims that are not being made.  It is to

20   inform them of what the claims that are being made.

21        MR. RUSSELL:  And let me help you on that for a

22   second, if I might, your Honor.  Because when we get to the

23   aiding and abetting, we pointed out and tried to draw for the

24   jury the distinction for the jury between wrongful inducement

25   and legitimate preparations to compete or legitimate seeking

1    out of prospective employees.  And perhaps your Honor might

2    consider something similar on tortious interference just to

3    make clear the mere fact that MGA hired Mr. Bryant in and of

4    itself is not actionable.

5            Mr. Zeller is now candidly saying that's not the

6    basis for their claims.  The problem they have is what flows

7    from that; so the jury should understand it's not entering a

8    contract.  It's wrongful conduct that we're talking about.

9            MR. ZELLER:  I think we made that clear some time

10   ago.  But what I'm saying is this seems to be an endeavor to

11   have the Court tell the jury MGA didn't do anything wrong.  I

12   mean, we're focused on the claims that have been brought.

13   There's a whole universe of claims that have not been

14   brought.

15           So I do disagree that this is something that's an

16   appropriate instruction.  And it also seems to conflate

17   different concepts, particularly when you get to the notion

18   of preparation to compete.  It's going to be conflating the

19   idea that it's proper preparation to compete with this idea

20   of at-will employment.

21           THE COURT:  I agree with you, Mr. Zeller, up to a

22   point.  And I think it avoids a lot of the -- what I think

23   are rather unbalanced instructions on this inducement and

24   at-will employees.  I think they are confusing.  I don't like

25   the way they are worded in terms of -- I do agree with

1    Mr. Russell, though, that given the way this has played out

2    and given how much evidence just turns on the circumstances,

3    as you say, turn on his leaving employment with Mattel and

4    going to MGA, which actually is not, at the end of the day,

5    all that significant to your case.  He could have stayed at

6    Mattel for another six months and done what he was doing

7    during this time period, and you'd have the same claims

8    against Carter Bryant.

9        So I do see some value, and I'd have to work on the

10   wording of informing the jury that the mere fact that Carter

11   Bryant solicited employment and the mere fact that MGA

12   offered employment by itself with nothing more is not

13   sufficient to establish the intentional interference with

14   employment or the breach of the duty of loyalty or anything

15   else, that something more is what -- your evidence of turning

16   over inventions, not disclosing to Mattel what was going on,

17   doing work during this period.  Those are all the something

18   more which takes it out.

19       But there's a lot of, in particularly the criminal

20   law jury instructions, but there's a lot of times where the

21   model instructions will have language to the effect that

22   merely doing X by itself is not sufficient when the Court

23   believes that that impression may be given.

24       MR. ZELLER:  It may be the Devil's in the details,

25   as we've talked about before, of course, as to what exactly

1    the jury is told.  But one concern that I have about that

2    very point is that I think it's confused, and it gets

3    confused in the notion that, for example, there's commercial

4    bribery that's involved.  There are payments made.  This

5    could be -- it depends again on the wording how clear this

6    is, but I am concerned it ends up being basically a security

7    blanket for all manner of other kinds of conduct, where they

8    basically say look, the judge is going to tell you the mere

9    fact that we did X just cannot be actionable.

10        THE COURT:  By itself is not enough, yeah, right.

11   And you'll stand up and say absolutely right.  The judge has

12   told you that just because Carter Bryant applied for a job

13   someplace else, I suspect you're going to say this anyway,

14   that just because MGA offered him a job, that by itself,

15   there's nothing unlawful about that in the State of

16   California.  That's a given.  What's wrong, you'll submit

17   that the evidence has shown your allegations.

18        MR. ZELLER:  I think that's correct.

19        THE COURT:  As opposed to going down this road of

20   instructing on at-will employees and inducement and --

21   because I do think, Mr. Russell, we're not going to sit here

22   and instruct the jury as to what they would have to find to

23   find a claim that is not being argued by the plaintiffs.

24   That's not the appropriate way of doing this.

25        MR. ZELLER:  And if I may, your Honor, just one

1    other point on this, which is this leads me to question,

2    then, why is this being -- made a point to the jury in the

3    instructions.  I mean the same rule --

4         THE COURT:  Because there's been so much evidence

5    of -- this really is one of -- I guess I accept defendant's

6    point that this one really is -- I could see the jury getting

7    confused on this.  And I've kept out a lot of evidence by

8    both parties' urgings, I suppose.  I've tried to -- although

9    the jury has heard some about other employees at Mattel or

10   MGA leaving or seeking employment, and that type of stuff.

11   I've tried to keep that out.

12        But the jury certainly has heard evidence about

13   that, and I think just to kind of make it clear, that that

14   type of normal applying for jobs at other places, being

15   interviewed, and offering that position, there's nothing

16   wrong with that.  What's wrong is if, as you have alleged,

17   that as part of that interview process or as part of that new

18   employment, you are violating your duties of loyalty or

19   compromising confidential information, et cetera, et cetera.

20        MR. ZELLER:  But again, and this is all with the

21   caveat of exactly what does this look like.  Part of my

22   concern is it goes too far where it makes it sound like it

23   was perfectly fine for the sample makers to be working for

24   MGA for some period of time.  You know, under the guise that

25   that's --

1          THE COURT:  We're talking about soliciting

2     employment or offering employment.  We're not -- that's their

3     very point.  Once you get into actually doing work in

4     conflict with your contractual agreements, that's when the

5     problem comes.  That's the line of demarcation.

6          MR. ZELLER:  Right.  And so fundamentally, your

7     Honor, I'll submit at this point, but just as long as, I

8     guess, the more global point of that it depends on the

9     context of what's being said on the other side of this as

10    well as making clear that there is that line.  And it's not

11    just simply kind of an open-ended invitation under the guise

12    of well, it's merely preparing to compete.  It's merely a

13    solicitation to be doing these other kinds of activities.

14          What it may mean is that we have to be more

15    particular about some of the obligations that we believe have

16    been breached, that have been touched upon previously because

17    it may require striking a further balance.

18          THE COURT:  All right.  Very good.

19          Let me move along to some other structural areas.

20    We're going to go back through all of this again and get

21    through the details.  I just want to get the -- so the

22    parties understand generally the structure.  And what I'm

23    intending to do is give CACI 2201 and CACI 2203.  We need to

24    talk about intent, willful blindness -- I'm planning to cover

25    2201 and 2203 and intentional interference just as I

1   indicated with the first group, my intention is to provide

2   the jury the background they need to determine ownership of

3   inventions in 1999 and through October of 2000.

4       On the aiding and abetting, the parties take two

5   different approaches.  I've got my arrows going everywhere on

6   this.  And just structurally speaking, I think we all agree

7   that the relevant model instructions, at least to base these

8   on, is CACI 4100 and CACI 4102.  The question is how to

9   structure this and the simplicity and straightforwardness of

10   Mattel's approach seems -- has a greater appeal to the Court

11   just in terms of structure, putting aside the substance for a

12   moment.

13       The idea of starting out that Mattel alleges a

14   breach of fiduciary duty and duty of loyalty, that MGA and

15   Mr. Larian aided and abetted in a breach of Carter Bryant's

16   breach of fiduciary duty and duty of loyalty, setting out the

17   elements of aiding and abetting, and then getting into Carter

18   Bryant breached his fiduciary duty, and that's CACI 4100, and

19   then Carter breached his duty of loyalty, 4102.

20       It keeps it simpler as opposed to the approach that

21   MGA took of, first of all, talking about aiding and abetting,

22   breach of fiduciary duty, then defining fiduciary duty, then

23   talking about the burden of harm that takes out one of the

24   elements as a separate instruction, and takes out duty of

25   loyalty defined, and then does breach of duty of loyalty,

1    which seems to be almost a repetition of the previous

2    instruction And then takes out consent further from that.

3    And then further takes out harm caused by breach of loyalty.

4         It's not that any of it is necessarily inaccurate.

5    It's just cumbersome.  And I kind of like the approach of the

6    claim is aiding and abetting these two breaches.  Let's get

7    that instruction out, an instruction for breach of fiduciary

8    duty, an instruction for breach of duty of loyalty, and call

9    it a day.

10        MR. RUSSELL:  Your Honor, I certainly appreciate

11   the comments that you gave.  I think the concern that we had

12   and the reason we tried to strike the balance the way we did

13   is that it's a little odd to have the jury leap right into

14   aiding and abetting before they know what the substantive

15   claim that underlies it is.

16        I really think if we're going to do this logically,

17   you would define fiduciary duty and duty of loyalty up front.

18   Then you would lay out the elements of those claims, and

19   last, you would go to the aiding and abetting.  Because

20   otherwise, the jury is being told the simplistic elements.

21   They don't even know what a fiduciary duty is and an --

22        THE COURT:  That's the best argument for your

23   structure.  I don't disagree that it doesn't have its appeal

24   as well.  Because that is the awkwardness of starting out

25   with an aiding and abetting before you design the substantive

1    act.  The problem with your approach, though, and it's a --

2    I'm not saying it's not a close call.  I think having gone

3    back and forth several times this weekend on this, at the end

4    of the day, I think the simpler approach, each side has its

5    awkwardness, because starting off with aiding and abetting,

6    true enough, you're not getting to the substance until you've

7    gotten through that.

8        But when you start off with the substantive

9    definition of breach of duty of loyalty and breach of

10   fiduciary duty, you're not even talking about what Isaac

11   Larian and MGA are accused of until you get down to the

12   aiding and abetting.  It turns it on its head to a certain

13   extent.  And there doesn't seem to be too much in terms of a

14   dispute in terms of what the aiding and abetting standard is.

15   Or the substantial assistance, and we already have your

16   instruction on substantial assistance.

17       Then just getting into kind of a simple setting

18   forth the 4100, for breach of fiduciary duty and 4102, it

19   captures all those elements that you've set out as separate

20   instructions.  And then, of course, having the Court's

21   finding, what the Court has found, I think that certainly

22   Mattel is entitled to that.

23       MR. RUSSELL:  If I might, your Honor, since you

24   mentioned that we seemed to have a redundant instruction, I

25   thought I'd explain to your Honor where we were coming from.

1        THE COURT:  Please.

2        MR. RUSSELL:  When you look at your Honor's prior

3    rulings, both the May 25th and April 1st order, I believe it

4    is fair to say that you left open, and this is really our

5    50-A motion, you left open an obligation for Mattel to prove

6    certain duties for fiduciary duty and certain breaches for

7    the duty of loyalty, and we were really saying, and it's in

8    our verdict form as well, there is this -- there is

9    essentially a dual track on the duty of loyalty.

10        You've got on the one hand the entering into the

11    contract, and on the other hand, there is something else, and

12    that's why we tried to break them apart that way.

13        THE COURT:  I already found that there was a

14    fiduciary duty and a duty of loyalty.

15        MR. RUSSELL:  Absolutely true, your Honor, but I

16    think you did leave open certainly for the fiduciary duty,

17    your Honor said that there is a fiduciary duty to maintain

18    the confidential information that Mattel reposed in

19    Mr. Bryant.  And we're not here to reargue that, but you then

20    said that you couldn't go beyond that, and it would be our

21    position reading the contract and your Honor's rulings that,

22    for example, fiduciary duty has not been found as a matter of

23    law with respect to the inventions.

24        In other words, Mr. Bryant did not have a fiduciary

25    duty to turn over any inventions, and there's been no

1    evidence, and certainly the contract can't be read to say

2    Mr. Bryant expressly undertook a fiduciary duty to turn over

3    inventions.  He undertook a fiduciary duty, if he undertook

4    one at all, to maintain Mattel's confidential information.

5    That's what the inventions agreement says.

6           And so we have this tension because you have found

7    duties -- you have found breaches, but you haven't designed

8    the scope.  You left that for the parties.  And it would be

9    our position that Mattel had the obligation to --

10          THE COURT:  It's much easier in the context of duty

11   of loyalty than in breach of fiduciary duty.

12          MR. RUSSELL:  I would agree, even as you pointed

13   out on the duty of loyalty, you have to take care because the

14   breach that you found was entering into a contract with MGA

15   and performing work for MGA as a top priority basis for those

16   two weeks.  There could be other things that happened that

17   could be a breach.  In other words --

18          THE COURT:  Well, that's a good point.  I'd like to

19   hear Mattel's response to your argument on the scope of the

20   breaches and how we deal with instructing the jury on that.

21          MR. WEISBURST:  Good afternoon, your Honor.

22   Sanford Weisburst.  Let me take the two duties in turn.

23          The fiduciary duty, the Court did find that the

24   duty was owed, the Court's May 21st order, the duty that was

25   owed was not to disclose confidential information.  I think

1    it's important to understand what confidential information

2    means in the context of this agreement.

3        What it means is not just materials that Mattel may

4    have given to Bryant, but also materials that Bryant

5    developed himself during that employment.  That is also

6    confidential information that he was not permitted by the

7    agreement to disclose.

8        And this is crystal clear, we believe, from

9    paragraph 1-C of the inventions agreement -- excuse me.

10    1-A -- where the agreement says I acknowledge that the

11    company possesses and will continue to develop and acquire

12    valuable proprietary information, including information that

13    I may develop or discover.

14        This is --

15        THE COURT:  Where in your proposed instructions do

16    we inform the jury of this?

17        MR. WEISBURST:  We have an instruction entitled

18    previous findings of the Court.

19        THE COURT:  I'm looking at it.  And I don't see

20    where it says what you just said.  Beginning at line 5:  "The

21    Court has already found, as a matter of law, that Carter

22    Bryant owed both a fiduciary duty and a duty of loyalty to

23    Mattel."  That's fine as far as it goes.

24        The Court has also found, as a matter of law, that

25    Mr. Bryant breached his duty of loyalty when he secretly

1    entered into a contract with MGA, Mattel's competitor, while

2    still employed by Mattel, to produce a line of fashion dolls

3    to be marketed in direct competition with Mattel's products.

4    There's some wording issues there, but at least that attempts

5    to define the duty of loyalty.  I don't see anything about

6    defining the scope of the --

7         MR. WEISBURST:  The rationale for that was we were

8    trying to comply with the May 21st order where the Court had

9    stepped back from what the Court had said on April 25th --

10        THE COURT:  I do.

11        MR. WEISBURST:  So we only are addressing here in

12   terms of the Court's findings as to fiduciary duty, the fact

13   that there is a duty and not its breach.

14        THE COURT:  Now we go back to my question two

15   minutes ago.  Where do we in your instructions instruct the

16   jury?  How is this jury supposed to come up with the scope of

17   the fiduciary duty based on these instructions?

18        MR. WEISBURST:  Well, stepping back, we have the

19   instruction on breach of fiduciary duty.

20        THE COURT:  And I looked at that as well, and that

21   doesn't give us too much of a guideline either.

22        It says that Bryant owed a fiduciary duty to

23   Mattel.  True.  Bryant failed to act in the best interests of

24   Mattel while he was employed by Mattel.

25        Is that -- Mattel did not give informed consent to

1    Mr. Bryant's conduct.  Mattel was harmed.  Substantial

2    factor.

3          You see the problem?  How is a jury supposed to

4    know what the scope of the fiduciary duty was based on that

5    instruction?  Or how is the jury supposed to know how to

6    figure out the scope of the fiduciary duty based on that

7    instruction?

8          MR. WEISBURST:  I think -- and I'm not sure if

9    there's a model instruction on scope of fiduciary duty -- I

10   believe that we have agreed with opposing -- with MGA's

11   counsel on an instruction.  Counsel can correct me if I'm

12   wrong, that speaks specifically to the scope of duty.

13         THE COURT:  Where is that?

14         MR. RUSSELL:  May I?

15         MR. WEISBURST:  Yes.

16         THE COURT:  Is that someplace in this binder?

17         MR. RUSSELL:  Well, your Honor, I believe that my

18   adversary is a little bit confused.  What Mr. Proctor and I

19   agreed -- as you noted, we submitted in MGA's instructions

20   fiduciary duty defined.  That does not talk about the scope.

21   That merely articulates for the jury --

22         THE COURT:  Is that the one you agreed on with

23   Mr. Proctor?

24         MR. RUSSELL:  That's the one Mr. Proctor agreed on

25   with me.  But it does not talk about the scope.

1      THE COURT:  Well, that's what I'm -- we need a

2    scope instruction here.

3      MR. ZELLER:  I think that is the short answer, your

4    Honor.  The parties need to come up with a scope instruction.

5    And part of what happened, I think, is that simply the Court

6    had left that issue open, and I think there was more

7    contemplation that it would be argued based on the contract

8    language than probably, frankly, is suitable.  I think the

9    jury needs more guidance in retrospect.

10      THE COURT:  I found what you just said, and I did

11    have a big okay here.  So now that you mention this, this

12    does need to go in there, but I don't think it's adequate

13    either.  Once a party assumes a fiduciary duty to another,

14    that party is obligated to act on behalf of the other party

15    to hold the interests of the other paramount over his own

16    interests and to take no action that would further his

17    interests -- well, you see, that's actually a pretty good

18    instruction.

19      MR. RUSSELL:  Thank you, your Honor.

20      THE COURT:  And it's pretty good in the context of

21    this trial because this then allows the parties to argue

22    based on the evidence, to what extent that fiduciary duty was

23    breached or not.

24      MR. RUSSELL:  If you look, your Honor, I think the

25    clarification that perhaps we think would be most helpful is

1    in two instructions prior, our aiding and abetting the

2    fiduciary duty sets out what your Honor ruled and says to the

3    jury here's what more you need to determine to do a scope.

4        So we'd submit we've proposed a scope instruction

5    for the jury, and I would respectfully submit that the Court

6    take a look at that, that it might be helpful.

7        THE COURT:  I'll take a look at that and compare

8    that.  All right.  That gives us some -- very good.  And then

9    moving along, and I'm going to come back to all of this.

10   Conversion, CACI 2100.  Both sides seem to agree.  And that

11   is the appropriate instruction.  There is some slight

12   modification.

13       So that's -- and then I had some extra notes here.

14   We've already dealt with Mattel's supplemental.  Oh, there

15   were some MGA supplementals.  MGA No. 2.  Number 2 is tab 2.

16   There was a separate witness credibility instruction that was

17   proffered.  CACI 107, discrepancies in testimony.  I believe

18   this is covered by the credibility of witnesses instruction

19   that's given.  You can make the same arguments.

20       Extrajudicial admissions, the cautionary

21   instructions.  There's some dispute here about whether or not

22   the full instruction is being quoted from the O'Malley.

23   Mattel -- there was a line that would be helpful to Mattel

24   that was not included in there, just to short-circuit this.

25   My sense is to not go down this road and just find that the

1    credibility of witnesses covers this as well -- even MGA said

2    that they submitted this out of an abundance of caution.  You

3    don't seem to be pressing this too vociferously.

4        MR. RUSSELL:  No, your Honor, it would be fine to

5    withdraw this.

6        THE COURT:  Very well.  Declaratory relief.  I want

7    to take that up in a second.  Well, let's take it up right

8    now.

9        The declaratory relief that's been sought in this

10   particular case is something that the Court seems to think

11   that it can give once the jury has made the findings that

12   we're asking the jury to make.

13       MR. RUSSELL:  May I, your Honor?  Mr. Proctor and I

14   discussed this over the weekend, and we agreed to withdraw

15   this instruction.

16       THE COURT:  Very good.  That takes care of that.

17   All right.  Now let's go back to the top.  Ownership of

18   inventions.

19       Now I want to get into the actual nitty-gritty of

20   these instructions.  And I've got both in front of me, and I

21   want to compare.  So bear with me.  It's going to take some

22   time.  Okay.

23       MS. AGUIAR:  I would offer, your Honor, if you're

24   interested, the thing that we gave you on the disk, which has

25   each one of them right next to each other.  I have a hard

1    copy if you want.

2         THE COURT:  I made a hard copy of it already.

3    Thank you, though.  I do have this here in front of me.  But

4    the benefit is these have my notes on it.  And that's what

5    you didn't have on the disk, understandably so.  I didn't

6    want to lose -- I don't want to reinvent all of this stuff.

7         The first paragraph of Mattel's is largely in

8    keeping with the Court's thoughts.

9         The next two paragraphs, I don't necessarily see,

10   and I'm looking at page 6 of tab 3.  This is Mattel's special

11   jury instruction, ownership of inventions.  Mattel claims

12   that it owns the rights to all Bratz-related ideas, concepts,

13   drawings, designs, and other works created by Carter Bryant

14   in whole or in part while he was employed by Mattel,

15   including Bratz drawings and the idea for the name Bratz.

16        I know there's objections to Bratz related, but I

17   think we all get it.  I think the jury gets it.  I can't

18   think of a substitute for it.  To prevail on its claim for

19   ownership, Mattel must show that it is more likely than

20   not -- the preponderance of evidence standard -- that any

21   particular Bratz-related idea, concept, drawing, design, or

22   work, and that's language taken from the contract, the

23   inventions agreement, was created by Mr. -- or at his

24   direction, and I understand there's an objection there.  I

25   think solely or jointly, to use the language in the

1    agreement, while employed by Mattel.

2         It is for to you decide what, if any, Bratz-related

3    works were created by Mr. Bryant solely or jointly while

4    employed at Mattel.  And then we have a verdict form or

5    verdict question which asks them to identify which

6    questions -- what works were created during that time.  And I

7    understand everyone is hung up on the word created on both

8    sides, and I would certainly be open to a different

9    definition or different word that's been designed by the

10   jury, at least that's been used in this trial, as putting the

11   pen to paper, actually doing the drawing.

12        If we want to make it more simplistic, I'm open to

13   that as well.  But we're not talking about a legal term here.

14   We're talking about what he did while he was at Mattel.  And

15   then the whole point here, and the whole point of this -- or

16   primary point in Phase 1-A was to find out if he did any of

17   these drawings or creations while he was at Mattel.

18        So I'm not going to avoid asking that question or

19   telling the jury that that's what they have to find.  That

20   would kind of defeat the whole purpose of what we've engaged

21   in in the last six weeks.

22        So that to me, just that first paragraph there does

23   a fairly good job of doing that.

24        Now, the appeal of MGA's instruction on this point

25   is that it actually refers to the agreement, but then it has

1    all this language about purchasing rights in good faith and

2    determining under section 204(a) of the Copyright Act,

3    section 988 of the California Civil Code, and this gets us

4    far afield of what this jury is required to do here.  So

5    that's why I'm tempted to go with the simpler instruction by

6    Mattel.

7           MR. RUSSELL:  Well, your Honor, let me start in

8    reverse order, and that is these instructions were prepared a

9    long time ago, and we didn't revise them substantially as the

10   course of the trial unfolded.

11          We'd certainly agree the good faith should come

12   out, the 1-B issue, if it's to be heard at all.  The 988 and

13   204, I'd like to be heard on separately, but certainly I

14   think as a starting point it's difficult to get away from the

15   language of the contract itself.  I don't think we should

16   supplant the language that's in the contract for something

17   that we all attempt to create, to use that word lightly.  I

18   think it's important that the jury be asked was it conceived

19   and was it reduced to practice, because that's what the

20   contract provides.

21          THE COURT:  Well, the language I like is on lines

22   10 through 12.  Mattel's claim is based on an agreement

23   between Carter Bryant and Mattel called the employee

24   confidential information and inventions agreement, or simply

25   the inventions agreement.  I like that because it helps make

1    clear some of the future claims about intentional

2    interference with contractual relationships.  So I agree that

3    should go in.

4         But the Court has already found that 2-A applies to

5    this case, although from your next instruction, you continue

6    with this on page 7.  Mattel specifically claims that Carter

7    Bryant breached sections -- section 2-A of his inventions

8    agreement, and there you have the language itself.

9         MR. RUSSELL:  Yes.

10        THE COURT:  Both gives the language and the terms.

11   But at the end of the day, the Court has already interpreted

12   this to apply to things that he created, that he drew, that

13   he did while he was at Mattel.  And that's where I circle

14   back to Mattel's language, and then the jury is going to be

15   asked to identify.  It's a simple fact-finding task.  It's

16   not a legal exercise.  A fact-finding task of identifying,

17   you know, which ones he did.

18        And when we get to the verdict form, there's going

19   to be this discussion of whether we list them all as Mattel

20   proposes or just leave a blank, as you propose, which I'm

21   probably going to go with the list just because the blank

22   doesn't seem efficacious.

23        MR. RUSSELL:  Let's start with our section 2-A

24   contract claim instruction.  I think perhaps what might make

25   some sense would be to perhaps meld a little bit of theirs

1    and a little bit of ours.  It's hard to argue, I would hope,

2    that we would have the language of the contract in there and

3    then say the issue for you, ladies and gentlemen of the jury,

4    is when did Mr. Bryant conceive and reduce to practice the

5    Bratz-related works.

6          THE COURT:  Well, I agree.  Be mindful that simply

7    because the Court may very well put in that language, that

8    that's not a basis, then, to argue to the jury that there was

9    no contract or not a valid contract or --

10          MR. RUSSELL:  Understand that, your Honor.  And

11    while I'm on that, your Honor, and purely to protect the

12    record, we filed with your Honor dozens of pages of

13    instructions related to the interpretation of the contract.

14    We did not put them in your binder, but we did file them.

15    And I just wanted to note we filed them purely on the

16    understanding you would reject them because you have found

17    the contract unambiguous.  But it is our view that that is

18    something we'd like to take up.  So I just want to be clear.

19          THE COURT:  Well, I want to be -- I think I was

20    clear last week.  I asked for any instruction you wanted me

21    to consider to be in these two binders.  I had two feet of

22    stuff that was filed here.  I asked it to be reduced here.

23    If it's not in these binders, it's waived, it's gone.

24          MR. RUSSELL:  I apologize.  It was our

25    understanding that we could submit those and basically have

1    you deny them out of hand.

2         THE COURT:  The record is what the record is.  I

3    think I made myself clear last week.

4         MR. RUSSELL:  Very well.  Returning back to the

5    contract.  I think it does make sense.

6         Returning back to the language of the contract, I

7    do believe --

8         THE COURT:  Okay.  I'm with you.

9         Let me hear from Mattel on these two paragraphs I

10   think should be stricken.  Lines 15 through 25.  These seem

11   to be basically arguments you want to make.

12        MR. ZELLER:  Arguments is a strong word here, I

13   think.  But I will say, your Honor, I think there's no

14   question that in some nature what we are requesting here is

15   something that's curative.  To focus the jury on this fact.

16   I mean, there has been, I don't think there's much dispute

17   about it, there has been testimony about those additional

18   efforts, whatever one --

19        THE COURT:  That was stopped pretty early on in the

20   trial.  If that would have continued throughout the trial,

21   I'm reluctant to go down the roadside starting to give

22   curative instructions because I suspect everyone thinks there

23   should be more curative instructions until we get to the

24   point where no closing argument is necessary, and the Court

25   has simply cured the trial.

1      But I would agree with you, and I think I even

2      raised this as a possibility that the Court would give you

3      leave to seek this, but I think that that was pretty much

4      stopped fairly early on.  Not even last month.  I think it

5      was the month before last that it was stopped.  So if that's

6      the only basis, I would be disinclined to do that at this

7      point.

8          MR. ZELLER:  I think that is really the principle

9      basis, your Honor.  The evidence that was introduced.  I

10     think we made our pitch on it, and the Court did -- we did

11     discuss it previously.

12         THE COURT:  Very good.  Thee was a second one that

13     you have here, though.  And I would give the -- as MGA

14     suggests, I should give the language of the agreement itself

15     and then the Court's interpretation of that agreement and

16     then they answer the question.  Okay?  I can work this out.

17     This is -- I have enough before me now.

18         Let's move on to intentional interference.  Okay.

19     Here what the Court wants to do is give CACI 2201, CACI 2203,

20     the previous findings of the Court, and call it a day.  That

21     would be my preference if there was no way that we can do

22     this.  So I guess what I need to line up is in what way the

23     parties differ from 2201 and why.

24         I have on page 14 of tab 3 Mattel's recitation of

25     CACI 2201, which seems to be fairly faithful to the model

1    instruction.  And then I have on page 11, somehow we end up

2    with seven elements.  What are you adding here, Mr. Russell?

3    It went from six to seven.  We got something stuck in here.

4         MR. RUSSELL:  I believe, your Honor, it's the

5    wrongful conduct we discussed earlier, the additional element

6    of wrongful conduct, No. 4.

7         THE COURT:  Number 4.

8         MR. RUSSELL:  This is what we discussed early in

9    the --

10        THE COURT:  This relates to the at will.

11        MR. RUSSELL:  Correct.

12        THE COURT:  Okay.  The Court is going to strike

13   that.  We're just going to go with the six elements as set

14   forth in CACI 2201.

15        MR. RUSSELL:  And other than that, we had minor

16   linguistic differences.

17        THE COURT:  Is there any reason we don't go with

18   this here?

19        MR. RUSSELL:  We would say looking at Mattel's, I'm

20   happy to work off their 2201, is that for element 2, you

21   should insert the word "actually" in front of "knew"

22   because we're going to have a fight over willful blindness.

23        We also think that it's appropriate to insert at

24   the end of the second element, knew of the contract or

25   contracts and their terms.  I mean, obviously MGA knew he had

1    a contract, but that doesn't prove much if you don't know

2    what it provides.

3        THE COURT:  Yeah, but the law that Mattel cites

4    seems to suggest that that's not required.

5        MR. RUSSELL:  We would respectfully submit, your

6    Honor, that the law does require some showing, if you're

7    going to have actual knowledge and intent, you have to intend

8    to cause the result.  It's hard to conceive that someone

9    could intend to cause a result if they don't know the

10   terms --

11       THE COURT:  The cases seem to suggest that if you

12   know that someone has a contract, even if you don't know any

13   of the actual terms, and you're intending to interfere in

14   that contract, dispute or break up that relationship, that's

15   enough.

16       MR. RUSSELL:  But you have to know generally what

17   the contract provides.  In other words, it is true that MGA

18   knew Mr. Bryant had a contract.

19       THE COURT:  But to say and their terms suggests

20   that you need to know all of the terms of the contract.  That

21   way --

22       MR. RUSSELL:  Maybe it's material terms, but it

23   can't simply be the existence of a contract.  I think that

24   goes not far enough, given the specific scienter

25   requirements.

1          THE COURT:  Very well.  I understand your argument.

2     Now let's get into the intent here.  And this is where we get

3     to 2203 goes to the intent and knowledge element.  In

4     deciding whether MGA or Isaac Larian acted intentionally, you

5     may consider whether he or it knew that a breach was

6     substantially certain to result from his or its conduct.

7          Mattel adds this language about it may be inferred

8     from circumstantial evidence.  But the jury has already been

9     instructed that they can consider circumstantial evidence

10    along with direct evidence.  So I don't think it's necessary.

11    2203 as it's written is just fine.

12          Let's see.

13          I think the language is rather neutral in the model

14    instruction itself.  And that's what I'll use for intent.

15    Inducement and at will are out per our previous discussion.

16          The but-for causation seems to relate directly to

17    the substantial relation that you already defined early on.

18    So I'm not going to give that again.

19          And that brings us to willful blindness.  So let me

20    hear on that.  Simply put, the instruction proposed by Mattel

21    is in deciding whether MGA or Isaac Larian acted knowingly or

22    intentionally, you may consider that a party's willful

23    blindness can be equivalent to knowledge.  Citing the Sony

24    case for the proposition of willful blindness is no defense

25    to a charge of knowing and intentional counterfeiting.  It is

1      enough that a defendant failed to inquire further because he

2      was afraid of what the inquiry would yield.

3            MR. WEISBURST:  To try to frame this point for your

4      Honor, obviously there's a knowledge element in the model

5      instruction.  And the question is what satisfies knowledge.

6      We are not arguing for a recklessness standard here.  What

7      we're arguing is that under case law, including the Sony case

8      that your Honor referred to, that willful blindness, and

9      that's an intentional act when a party chooses not to find

10     out certain information.

11           So it's not just recklessness.  It's an intent not

12     to find out what was the contract or was there a contract.

13     That that is knowledge under the law.  And the purpose of our

14     proposed instruction here is to clarify that for the jury.

15           THE COURT:  Is there any -- there is a criminal

16     case involving counterfeit.  Counterfeiting; correct?  Sony?

17           MR. WEISBURST:  I don't recall whether it's a

18     criminal case.  It is a trademark case.

19           THE COURT:  It's a civil case.

20           MR. WEISBURST:  Subsequently in our instructions,

21     and I apologize that these authorities are not cited here.

22     When we get to aiding and abetting, there's a similar issue

23     about what is knowledge.  We've cited some additional

24     authorities there, including a case called UMG and Phillip

25     Morris.  I can grab the cites for the Court in a second, that

1    one of those, at least UMG, is a copyright case.  And hence

2    is at least closer to this case than a trademark case.  But

3    really the principle, the Sony case that, as your Honor noted

4    is a trademark case, it's not a trademark specific principle.

5    It's a general tort principle of what does knowledge mean.

6          And you know, we haven't cited, certainly to be

7    honest, we haven't cited an intentional interference case

8    that says this, but it's a broader tort principle.  We don't

9    believe that MGA for its own part has cited a case that

10   rejects in the intentional interference context that willful

11   blindness is knowledge.  And we think that therefore, the

12   Court needs to look to those broader tort principles.

13         MR. RUSSELL:  Your Honor, first, I'd just like to

14   start out by noting that every single case cited by Mattel,

15   they are newly cited cases.  Sony, of course, is a trademark

16   case construing the definition of willful counterfeit.  So

17   obviously, a willful blindness in the context of defining

18   willfulness, not very helpful.

19         Phillip Morris, which they cite, same thing.

20         UMG is a copyright case defining willful copyright

21   infringement.

22         None of those cases have anything to do with

23   anything.  They don't cite a single case in the California

24   tort context that says actual knowledge can be replaced with

25   willful blindness.  We, however, do cite cases, your Honor.

1    We cite your Honor to the Nielson versus Union Bank case,

2    which is 290 F sub 2nd 1101, pin cite 1119.  And we cite your

3    Honor to the Resolution Trust Corp.  --

4         THE COURT:  What does Nielson say?  You have the

5    pin cite there -- I see, it.  In regards to aiding and

6    abetting liability, the term knows does not include both

7    actual knowledge and recklessness.

8         They are not claiming recklessness.

9         MR. RUSSELL:  Understood.  And I think that --

10        THE COURT:  Wait a second.  I'm sorry.  Where is

11   that?

12        MR. RUSSELL:  It's on page 29 of their

13   objections -- the same.

14        THE COURT:  Resolution Trust says under California

15   law, actual knowledge and intent are required.  Right.  But

16   it begs the question, in establishing actual knowledge, can

17   you do willful blindness.

18        MR. RUSSELL:  Correct, but there's not a single

19   case that says willful blindness.  Actual knowledge is actual

20   knowledge.

21        THE COURT:  There's not a single case out there

22   that I could find that says it doesn't.  It's one of these

23   things that has not been addressed.

24        MR. RUSSELL:  But it requires scienter, which

25   requires real knowledge.  We're not talking about imputed

1  knowledge.  We're not talking about constructive knowledge.

2  And that's what willful blindness is, it's a substitute for

3  actual knowledge.  Since it's their case and their burden, it

4  only seems reasonable that that we shouldn't allow them to

5  dispense what we think is a critical element.

6      THE COURT:  That's a good point.

7      Mr. Weisburst?

8      MR. WEISBURST:  He respectfully submit, as I noted,

9  we did not --

10      THE COURT:  You know, there are cases that

11  interpret -- in the statute that refer to willfulness as

12  opposed to knowledge.

13      MR. WEISBURST:  I believe the UMG case -- well, the

14  point, and perhaps we can submit supplemental authority,

15  although I believe we gave the Court the best we had.  But

16  the point I want to just emphasize and maybe the way to

17  accommodate this is to explain to the jury that we're not

18  arguing recklessness.  And there is an intent scienter

19  element with willful blindness because you're making a

20  conscious decision not to find out something.

21      It's not that you could have done something or you

22  were reckless in not doing something, you have actually done

23  something.

24      THE COURT:  Can you find me any case which equates

25  actual knowledge with willful blindness?

1          MR. WEISBURST:  I'm going to review our

2     authorities, but willfulness is different from

3     recklessness --

4          THE COURT:  That's a red herring.  I understand

5     that.  You're right.  It's not recklessness.  You are asking

6     for something at a higher level.

7          The question is if the statute calls for actual

8     knowledge, does, under California law, willful blindness

9     substitute?

10          MR. WEISBURST:  Right.  And there are no on point

11     cases in either direction on interference or under the --

12          THE COURT:  I can't believe this has never come up

13     before.

14          MR. WEISBURST:  It's hard to believe.

15          THE COURT:  It is.

16          MR. WEISBURST:  Your Honor has an opportunity to

17     step into the breach, perhaps, but that's the State of

18     California law as we stand here today.

19          THE COURT:  Do you agree with that, Mr. Russell?

20          MR. RUSSELL:  Well, your Honor, I think the reason

21     that there aren't any California cases addressing this is I

22     think that actual knowledge on its face coupled with scienter

23     leaves no room for willful blindness.  And the cases that we

24     cited to your Honor make it clear.  It's true recklessness

25     is, I guess, slightly below willful blindness, but it is not

1    actual knowledge.  It is a basis to impute actual knowledge.

2    THE COURT:  Oh, yeah, recklessness and willful

3    blindness --

4    MR. RUSSELL:  Willful blindness is not actual

5    knowledge scienter.  This is a theory of imputed knowledge,

6    and the cases talk about actual knowledge.

7    THE COURT:  Well, I certainly don't think that we

8    can out research either of the two fine legal teams assembled

9    here, but I will try and see what the Court can come up with.

10    MR. RUSSELL:  Very well, your Honor, but if you are

11    successful, I would respectfully submit that you not go with

12    stars.

13    THE COURT:  All right.  That's what we're doing

14    with this one.  2201, previous findings of the Court

15    regarding 2201, 2203 on knowledge, and maybe or maybe not

16    willful blindness.

17    MR. RUSSELL:  May I ask, is it your Honor's

18    intention to have the instruction actually read previous

19    findings of the Court?

20    THE COURT:  Yes.  If you have objections to it, now

21    is the time, beyond which you've already stated.

22    MR. RUSSELL:  I don't know what I stated --

23    THE COURT:  I've got to say, I have to comment

24    these previous findings are consistently fairly balanced.  I

25    mean, they don't seem to overstate it too much.  What exactly

1      do you object to here?

2            MR. RUSSELL:  I just think that there's no reason

3      for your Honor to place the words findings of the court

4      before the jury.  You can simply eliminate elements --

5            THE COURT:  Well, there's two brief paragraphs,

6      Counsel, there's two different ways we can do it.  We can

7      take away the elements and just tell them -- I'm not going to

8      have the jury making findings that are -- particularly if I

9      adopt the verdict form that you are proposing, which goes

10     down each of these elements and have the jury make findings.

11     I'm not going to have the jury come back and make findings

12     that are contrary to the Court.

13           So we either take that out of them and we define

14     the elements, or we give them all the elements, which I

15     prefer, and saying with respect to elements 1, 2, or 3, or

16     whatever it might be, the Court has already found on these,

17     and you are to take these --

18           MR. RUSSELL:  Maybe it's a question of phrasing.

19           THE COURT:  What's the phraseology you would like?

20           MR. RUSSELL:  It could be as simple as you are to

21     assume X as opposed to the Court as found.  I think that the

22     Court puts its imprimatur onto findings against the MGA

23     parties is prejudicial, and I don't think there's a reason to

24     do that.  Let's at least make it more neutral because I do

25     have a concern that your Honor has tremendous sway over this

1    jury, and let's just back it back.

2            THE COURT:  Okay.  I'll be mindful of that.

3            MR. ZELLER:  If I may address at some part, your

4    Honor.

5            THE COURT:  Mr. Zeller.

6            MR. ZELLER:  We do have a problem with that kind of

7    terminology.  I know it seems to be an invitation for someone

8    on the jury to say well, maybe it's an unfounded assumption.

9    Maybe it's something we need to examine.  I think it needs to

10   be made clear to them that they should not be looking behind

11   these determinations.

12           THE COURT:  And there is case law indicating that

13   you are entitled to the Court's rulings.  That's the benefit

14   of a motion for summary -- for partial summary judgment or

15   summary adjudication.  So I'll do so in such a way as to make

16   it clear, while at the same time I'll be mindful of the

17   prejudicial concerns, and I'll do the best I can.

18           MR. RUSSELL:  Thank you.

19           MR. ZELLER:  And I don't know if this is the

20   appropriate time to go back to one issue that we were dealing

21   with previously.

22           THE COURT:  Yes, it is.

23           MR. ZELLER:  In the context of the fiduciary duty

24   scope.  And --

25           THE COURT:  I'm sorry.  I thought you were going to

1    say something else, Counsel.  The one thing I skipped over

2    that I thought you were going to point out was I wanted to

3    include line -- this is where I was first going to put in

4    that the mere fact that Carter Bryant solicited employment or

5    that MGA offered employment is not sufficient by itself to

6    establish the intentional interference.  I think that

7    concept, I agree with MGA that that concept needs to be --

8    and quite frankly, the best place to put it will be in the

9    Court's instructions in terms of its previous findings.

10        This is like a finding of a Court.  And that way

11    it's not out there by itself as some, you know, the Court's

12    going to be finding that as a matter of law, yes, there was a

13    valid contract, but as a matter of law, the mere hiring or

14    solicitation is not sufficient to violate the inventions

15    agreement or whatever.

16        MR. ZELLER:  Without agreeing substantively as to

17    that, as we discussed previously, that's a perfectly fine

18    place to put it.

19        THE COURT:  And I'll try to work that out.  That's

20    a way of taking care of your prejudicial concerns,

21    Mr. Russell, because there the Court is making findings that

22    help both sides, and the jury has spent six, seven weeks

23    watching the Court make legal decisions that have sometimes

24    been on the benefit of one side and sometimes been to the

25    benefit of the other.

1          Let's move to intentional interference.

2          I'm sorry.  Aiding and abetting on breach of

3     fiduciary duty and duty of loyalty.  I am convinced that the

4     better approach structurally is the approach proffered,

5     submitted by Mattel, where I first define aiding and abetting

6     and then I define the breach of fiduciary duty and the breach

7     of loyalty.

8          For breach of fiduciary duty, my inclination is to

9     give CACI 4100 and then for breach of fiduciary duty, 4100,

10    breach of duty of loyalty, 4102, previous findings.  After I

11    give breach of fiduciary duty, my inclination is to borrow

12    MGA's fiduciary duty defined and include that after the CACI

13    4100.  I think that comes as close as we're going to be able

14    to come to give the jury the guidance it needs to render a

15    decision.  That's my tentative.

16          MR. ZELLER:  That's the language the Court was

17    reading previously of the more general instruction about what

18    a fiduciary duty is.

19          THE COURT:  Yes.

20          MR. ZELLER:  And I think that there is agreement

21    that that's appropriate.

22          THE COURT:  You do -- that is appropriate.

23          MR. ZELLER:  But we do think that there needs to be

24    some more particular said, and part of it has to do with a

25    concern that I have that's actually being raised during the

1     course of these discussions here, which is MGA has been

2     putting this gloss on this that somehow it's limited to

3     information given by -- excuse me, given to Bryant by Mattel.

4     In other words, information that he creates, his proprietary

5     information is somehow not within the scope of those

6     obligations, and I do think that that's something --

7          THE COURT:  You've got to identify where that gloss

8     is.  Where are you talking?

9          MR. ZELLER:  I know it is -- I'll find the

10    particulars of where it is in their written instructions.  I

11    know it is in there.  But Mr. Russell was even today standing

12    at the podium making this very point.  The way he was

13    phrasing it, well, the scope of Mr. Bryant's obligations with

14    respect to the proprietary information found by the Court was

15    that it was information, proprietary information given to

16    Bryant by Mattel.

17         THE COURT:  Well, obviously proprietary information

18    of Mattel, whether it was given to him by Mattel or whether

19    he created it himself, the Court has already ruled that

20    anything he created while he was employed by Mattel is

21    Mattel's proprietary information.  So if he gave that,

22    obviously that would be a violation.

23         Do you disagree, Mr. Russell?

24         MR. RUSSELL:  Actually, your Honor, with respect to

25    fiduciary duty, I do.  Because if you look at the inventions

1    agreement --

2         THE COURT:  You're absolutely right.  That's where

3    I need to look.  You are suggesting that fiduciary duty

4    doesn't extend to those inventions, just that portion at

5    the --

6         MR. RUSSELL:  Correct.

7         THE COURT:  Where is that?

8         MR. RUSSELL:  1-A, provisions related to trade

9    secrets.

10        THE COURT:  Does someone have an extra copy of the

11   inventions agreement?

12        MR. RUSSELL:  Yes, your Honor.  It's in very small

13   font.

14        THE COURT:  I know.  Okay.  I'm sorry.  Where are

15   you referring the Court to?

16        MR. RUSSELL:  1-A.

17        THE COURT:  That I may develop or discover.

18        MR. RUSSELL:  I think you need to keep on going.

19   As a result of my employment with the company.

20        THE COURT:  As a result of him working at Mattel,

21   he developed some stuff, he did drawings, and he received

22   some stuff, and that's proprietary information.

23        MR. RUSSELL:  Well, the problem, your Honor, is

24   that the agreement itself defines proprietary information one

25   way and defines inventions differently in --

1      THE COURT:  Wait a second.  Proprietary

2    information -- so you are suggesting that the

3    proprietary information is more limited than the inventions?

4      MR. RUSSELL:  Absolutely, your Honor; otherwise,

5    there would be no reason to have a separate provision, and I

6    think the critical point that your Honor pointed out in

7    finding a duty and a breach -- excuse me, a duty, was that

8    the language of 1-A has the repose and accept trust language

9    in it.  But section 2, ownership of inventions, does not.

10      THE COURT:  You're right.  Let me hear from Mattel

11    on this.

12      MR. ZELLER:  I think we need to step back as to how

13    we ended up here.  I mean, the argument that MGA has been

14    making is that proprietary information excludes inventions,

15    information, whatever it is that Carter Bryant came up with,

16    but only extends to information that is given to Bryant by

17    Mattel.  That is clearly incorrect under this agreement.

18    Under any reading of this agreement.  And that, I think, is

19    the point that --

20      THE COURT:  It may be incorrect, but it doesn't

21    necessarily include the inventions that he developed or ideas

22    that he reduced to -- reduced to writing.

23      MR. ZELLER:  I think that that is -- if what the

24    Court is asking is does it automatically follow, I agree with

25    that.  That those are different provisions with different

1   dimensions to it.

2       THE COURT:  You have the universe of things that he

3   invented, you'd have the universe of things that are

4   proprietary information and they may overlap.  But they don't

5   necessarily co-exist based on the definitions that are set

6   forth in the inventions agreement.

7       How do we convey that to the jury?

8       MR. ZELLER:  Well, I think first and foremost, the

9   way we convey it to the jury is not to use the language MGA

10  has been agitating for, because that, I think, is a big

11  problem.  That basically is telling the jury that if Bryant

12  developed it, it can't be proprietary information.

13      THE COURT:  What language are you referring to?

14  The only language I've been proposed to use is the language

15  that Mr. Russell says he and Mr. Proctor worked out, which I

16  read in court, and does not place this kind of limitation on

17  it.  It states simply once a party assumes a fiduciary duty

18  to another, that party is obligated to act on behalf of the

19  other party to hold the interests of the other paramount over

20  his own interests and to take no action that would further

21  his interests over the other person's interests.

22      That is certainly vague and general enough.  That

23  doesn't really get into this hair splitting between whether

24  or not it was proprietary information or inventions agreement

25  type stuff or somehow a combination of the two.

1       MR. ZELLER:  This is tab 2 of MGA's binder.  MGA

2   parties revised disputed repose Phase 1-A jury instructions.

3       THE COURT:  What page?

4       MR. ZELLER:  Page 18.

5       THE COURT:  I'm not planning to use this, Counsel.

6       MR. ZELLER:  I understand.  And that's in response

7   to the Court's question.

8       THE COURT:  This is not a particularly well

9   balanced instruction.  I'm not using this.

10      MR. ZELLER:  The one I've been trying to articulate

11  is that if we use the more general instruction, which I think

12  everyone is in agreement at least up to that point.  I am

13  concerned that we're going to get this very argument during

14  closing.  And as far as we're concerned, that's a contract

15  instruction issue.  We don't think that that's something that

16  ought to be left to the imagination of the juror, the

17  argument of the parties, for them to get up there based on

18  that general instruction and then the contract, and basically

19  say you'll see here.  Now, you know, anything that was given

20  to Carter Bryant by Mattel, that can be proprietary

21  information.  But --

22      THE COURT:  It says information that I may develop

23  or discover as a result of my employment with the company.

24  And then proprietary information means any information known

25  to the public -- I'm sorry.  Any -- gosh, it's hard to read

1    this.  As used in the agreement, proprietary information

2    means any information, parenthesis -- where does the

3    parenthesis end?

4         MR. RUSSELL:  It doesn't.  I believe it's a typo.

5         THE COURT:  I need to find glasses for something

6    that doesn't exist?  It doesn't end?  There's no close

7    parenthesis?

8         MR. RUSSELL:  I don't think so, your Honor.  Maybe

9    it's at the end of process on the first line.  Right before

10   that derives.  It's hard to tell.  Perhaps that's where it

11   is.

12        MR. ZELLER:  It's after process, your Honor.  It's

13   just this copy is obviously --

14        THE COURT:  Okay.  All right.  So it means any

15   information that devises independent economic value, actual

16   potential from not being generally known to the public.  Does

17   that include inventions or not?  Do inventions have

18   independent economic value from not being known to the

19   public?  I can see an argument that that they do it and an

20   argument that they don't.

21        MR. ZELLER:  The way this starts off, the language

22   people have been focusing on actually starts off in saying

23   including information that I may develop.  But it starts off,

24   it says, possesses and will continue to develop and acquire

25   valuable proprietary information as defined below.  That is

1     the beginning of this provision.  And it says, of course, it

2     defines proprietary information, and then it goes on to say

3     what the employee's obligations are with respect to that

4     proprietary information.

5          So I mean there's no question that these are

6     different --

7          THE COURT:  What are you asking the Court to find

8     here?

9          MR. ZELLER:  Well, I think first and foremost, what

10    we're asking the Court is to prohibit MGA from making an

11    argument that this proprietary --

12         THE COURT:  I got to stop you, Mr. Zeller.  How are

13    you asking me to interpret this contract?  I'm going to ask

14    Mr. Russell this in a moment.  But how are you asking me to

15    interpret this contract?  You're saying that I can't give to

16    the jury based on the instructions that are proposed here,

17    you're suggesting that I interpret this contract to mean

18    something.  What are you asking me, before we get into

19    stopping somebody from arguing something, what is the

20    interpretation that you're asking for here?

21         MR. ZELLER:  I am asking for an interpretation that

22    makes it clear that proprietary information, as defined in

23    this agreement, does not matter whether its source is, if it

24    was something that Bryant came up with, or it's something

25    that Mattel gave him.

1      THE COURT:  Well, that is clear just from the

2   language that I may develop or discover.  So, Mr. Russell,

3   you don't disagree that Mr. Bryant himself can come up with

4   the information that is subject to proprietary information?

5      MR. RUSSELL:  I think I'm turned around a little

6   bit there, your Honor.  I mean first, I think we're off a

7   little bit sideways from what I think was the argument that I

8   was making to your Honor, and I'd like to bring us back there

9   for a second.

10      THE COURT:  Sure.

11      MR. RUSSELL:  What I was concerned about is that

12   your Honor has made a finding that there is a fiduciary duty

13   by virtue of this contract.  It is our information, and I

14   believe the language of the contract is susceptible only to

15   the interpretation I proffer that inventions does not fall

16   within proprietary information, and therefore, there is

17   not --

18      THE COURT:  I'm not willing to go there either.  I

19   agree with you that the proprietary information and what's

20   subject to the fiduciary duty is set forth in section 1,

21   provisions related to trade secrets.  I am with you on that.

22   What I am not with you on that is that that necessarily

23   excludes information related to inventions that are further

24   defined in section 2.

25      MR. RUSSELL:  Maybe the question is excluded.  What

1    I am concerned is your Honor is going to say something to the

2    jury and is going to tell the jury a finding has been made,

3    and what I don't want and I don't think Mattel is entitled to

4    is an instruction that says Mr. Bryant has a fiduciary duty

5    to turn over the inventions to Mattel.

6          THE COURT:  I'm not going to make -- now is not the

7    time for the Court to be making rulings on motions for

8    summary judgment that were not brought.

9          It's clear to the Court that this refers to -- that

10   proprietary information includes information that I may

11   develop or discover as a result of my employment with the

12   company so that it -- by its clear language, and you

13   certainly have the technology to make it yellow and make it

14   big and all of that stuff that, Mr. Zeller, you can certainly

15   indicate that it's not limited to information that he

16   receives by its own words.

17         At the same time, Mr. Russell, this contract is

18   evidence.  You can certainly indicate proprietary information

19   refers to what's in paragraph 1 and the inventions appear at

20   paragraph 2.  There's nothing which excludes inventions from

21   paragraph 1.  But it spells out what it is here.

22         MR. RUSSELL:  Well, your Honor, that's fine.

23         THE COURT:  That's as far as it goes.  Really at

24   this juncture, to do anything further would be unfair to

25   either side, for the Court to start making -- there's not a

1   proper motion before the Court right now to do this.

2        MR. RUSSELL:  Yes, your Honor, and that was the

3   concern, just what your Honor's findings would look like.  If

4   you're simply going to say there was a finding to maintain

5   the confidential information of Mattel citing to 1-A and the

6   parties will argue their respective interpretations, that's

7   fine.

8        THE COURT:  The findings that I'm going to make

9   which have been urged by Mattel are no more than this.  The

10  Court has found, as a matter of law, that there is a valid

11  contract between Mattel and Mr. Bryant.  I've also found that

12  Mr. Bryant directly competed with Mattel by entering into a

13  contract with MGA.  And the Court has found that Mattel has

14  been harmed.  I found all three of those things.

15       Now, the extent of the harm obviously is related to

16  another -- the damages is related to a further phase.  The

17  remaining requirements of intentional interference, though,

18  the other three, have not been resolved, and that's what has

19  to be decided by the jury.  Most significantly intent and

20  knowledge.

21       MR. RUSSELL:  We'll stand on our objections.  I

22  would make one additional objection, and that is to the

23  extent your Honor has found the harm, Mattel didn't move for

24  summary judgment either, and I know your Honor issued an

25  order saying it found harm, but Mattel never moved for

1    summary judgment on intentional interference.  We have

2    objected to the fact that your Honor has made findings

3    against MGA when MGA was the only moving party.

4         THE COURT:  This is not the most timely point to be

5    making this objection, Counsel, but I'll certainly consider

6    it.

7         MR. RUSSELL:  Thank you, your Honor.

8         THE COURT:  Mr. Zeller?

9         MR. ZELLER:  I apologize if I just missed it.  But

10   in terms of what the Court then intends to say about the

11   scope of the fiduciary duty, I mean, I do think it would be

12   appropriate to go back to the Court's more pointed question

13   about what are we asking for.  In this particular context, I

14   think it is appropriate to tell the jury that Carter Bryant

15   had a fiduciary duty to Mattel not to disclose Mattel's

16   proprietary information, including information, such

17   information developed by Carter Bryant to a Mattel

18   competitor.

19        THE COURT:  I'm sorry.  I was reading from the

20   finding on intentional interference on the harm.  Are you

21   making that objection on that one as well?

22        MR. RUSSELL:  Yes, your Honor.

23        THE COURT:  I was reading the wrong one.

24        Mr. Zeller, Mr. Russell says I never -- that you

25   never asked the Court -- Mattel never asked the Court to make

1    a finding on harm on intentional interference, and therefore,

2    that they never had a chance to respond to that.

3         MR. ZELLER:  On tortious interference with

4    contract?

5         THE COURT:  Intentional interference with

6    contractual relations, we're -- he's raising an objection

7    now.  I don't think you've raised this before, Mr. Russell.

8    Have you?

9         MR. RUSSELL:  I believe I have, your Honor.  I can

10   certainly try and find it.  But we've repeatedly objected to

11   this, both on summary judgment and on reconsideration.  I

12   know we submitted some of our jury instruction objections.  I

13   can try to find it.  I just raised it since your Honor

14   mentioned it now, it seemed the appropriate time.  But I know

15   this has been raised repeatedly because Mattel never moved,

16   and we were surprised that they were getting findings against

17   us.

18        MR. ZELLER:  If the Court would indulge me, I think

19   I'll have to go back and look to give the Court a precise

20   answer.

21        THE COURT:  I'll go back myself.  I don't recall.

22        MR. ZELLER:  I don't have an answer for the Court

23   offhand.  I would be a little surprised, but I can be proven

24   wrong.

25        THE COURT:  And in terms of the previous findings

1    of the Court on this instruction, I'm inclined to give the

2    first paragraph, although not the second one.  The Court has

3    already found that Carter Bryant owed both a fiduciary duty

4    and a duty of loyalty to Mattel.  The Court has also found,

5    as a matter of law, that he breached his duty of loyalty.

6          I see.  So what you're asking me to do is what is

7    my finding with respect to the breach of the fiduciary duty

8    or the existence of the fiduciary duty.

9          MR. ZELLER:  Yes, exactly.  The scope of what the

10   Court has found already has been imposed.  And make it clear

11   that it does extend to information, proprietary information

12   that meets that definition that Mr. Bryant developed.

13         THE COURT:  Well, the fiduciary duty is predicated

14   upon -- I think Mr. Russell would agree with this -- upon

15   paragraph 1 of the inventions agreement related to the

16   obligation to keep proprietary information confidential;

17   correct?  And if not that, Mr. Russell, what is it?

18         MR. RUSSELL:  Your Honor found in its prior

19   rulings, clarified on May 21st, that if a fiduciary duty

20   exits, and your Honor found one, it arises out of paragraph

21   1-A.

22         My only quarrel was simply, and I think it's

23   Mr. Zeller's, too, we are each arguing about what that means.

24   And I'm perfectly content.  You know, maintaining our

25   objection to the initial finding, of course, we're perfectly

1    content to have your Honor say I have found in neutral

2    language a fiduciary duty arising out of 1-A.  And we'll each

3    argue about what that means.

4          THE COURT:  Very well.

5          MR. ZELLER:  Again, what that means as long as it's

6    made clear to the jury and there's no confusion.

7          THE COURT:  It's not.  And it's clearly that he

8    develops or discovers.  So it's clearly -- and you would

9    agree with that, Mr. Russell?

10         MR. RUSSELL:  No, your Honor.  I won't.

11         THE COURT:  Well, then, I'll have to find, as a

12   matter of law, that it is.  When it says I develop, that is

13   talking about what he learns, what he comes up with himself.

14         MR. RUSSELL:  I'm not trying to upset the Court.

15   I'm just trying to maintain the distinction between

16   inventions on the one hand and proprietary information on the

17   other.

18         THE COURT:  I understand that.  The proprietary

19   information is separate and distinct from the inventions.

20   But the proprietary information may be information that he

21   receives from another source at Mattel and that he develops

22   himself.  And if you need an instruction from the Court, I'll

23   give that, but that's pretty clear.

24         MR. RUSSELL:  I apologize, your Honor.  I was

25   confused.

1    THE COURT:  Very well.  That's all I'm saying.  So

2  that's fine.

3       So with that in mind, I think that addresses

4  Mr. Zeller's concern, and it also, Mr. Russell, gives you the

5  opportunity to argue that clearly this is separate and

6  distinct from the inventions.  This is the proprietary

7  information.  The language I think is, assuming that we can

8  get it to a size that people can actually read, is actually

9  relatively unambiguous.

10      All right.  Moving right along.  And that takes

11  care of the aiding and abetting.

12      Conversion, CACI 2100.  Again, let me ask, let me

13  look at the two versions and see where they diverge.  There

14  we are, page 48 of Mattel's tab 3.  Page 33 of MGA's tab 2.

15  3 is exact the same in both.  4 is the same in both.  This is

16  an issue that relates in part to the JMOL.  This focus just

17  on MGA in Hong Kong?  Mr. Zeller?  That's the position that

18  MGA is taking?

19      MR. ZELLER:  I'm sorry.  I'm not quite following.

20  When you say relates to MGA Hong Kong?

21      THE COURT:  I'll let Mr. Russell explain.

22      MR. ZELLER:  Okay.  If it's the argument they are

23  making on the JMOL, that I understand.  I'm not sure this

24  there was a separate argument.

25      THE COURT:  That it does apply to MGA

1    Entertainment.

2         MR. RUSSELL:  Your Honor, we've worked that out

3    with Mr. Proctor, and we're going to withdraw that.  It's not

4    subject to the JMOL.  That's a separate argument.

5         THE COURT:  All right.

6         MR. RUSSELL:  So the record is clear, we omitted

7    MGA from the instruction.  We put them back, and that's the

8    only change.

9         THE COURT:  Got it.

10         So the two elements that are really in confusion or

11    dispute are 1 and 2.  Mattel says that Mattel was the

12    rightful owner of the property at issue.  MGA says that

13    Mattel owned the Bratz sketches under section 2-A of the

14    inventions agreement.  The problem with the MGA definition is

15    that it limits it to the Bratz sketches.  There's arguably

16    the jury may or may not find that it's more than just the

17    Bratz sketches that's at issue here.

18         MR. RUSSELL:  I think we will be okay, given that

19    the sculpts were now --

20         THE COURT:  The second element.  Mattel says that

21    any of the defendants intentionally took possession of such

22    property for a significant period of time.  And you have that

23    Larian and MGA intentionally prevented Mattel from having

24    access -- or destroyed Mattel's portion of the property.

25         Would you agree that if Mattel is not seeking to

1    have the stuff about destruction of property, that can come

2    out.

3         MR. RUSSELL:  Absolutely.

4         THE COURT:  So that's out.  Now the question is

5    whether it's preventing from having access to or

6    intentionally taking possession of.

7         MR. RUSSELL:  Well, your Honor, it's funny.  If I

8    may argue against myself for a second.  But in doing the Rule

9    50(a) motion and doing research on the conversion issue, I

10   realize we should have added an additional component to

11   section 2, because otherwise, I don't think it's in accord

12   with California law.

13        If you look at the cases we cite in our 50-A

14   motion, I think the key is that there has to be a wrongful

15   act, a wrongful possession by the defendants, not mere

16   possession.  If you -- we cite your Honor to two cases, the

17   Farmers Insurance and Exchange case, and then the Worth

18   versus Universal Pictures.

19        THE COURT:  So you're saying there has to be

20   wrongful possession by the defendants.

21        MR. RUSSELL:  Correct.  And we cite your Honor to

22   the cases in our 50-A motion.  And it was at that time --

23        THE COURT:  Isn't the possession wrongful if you

24   intentionally take something for a significant period of time

25   for which you did not consent and you are harmed?  Taking the

1    elements together, doesn't that equal the wrongful

2    possession?

3        MR. RUSSELL:  I'm not sure, because I think

4    wrongful implies there has to be more than simply it took

5    possession and Mattel didn't consent.

6        THE COURT:  It needs to have a failure to consent.

7    I have to take your tie, not without you knowing about it.

8    Then it's wrongful.

9        MR. RUSSELL:  And in that example, you have to know

10   it's my tie.

11       THE COURT:  That's the intentional part here.

12       MR. RUSSELL:  But looking at the cases, I see that

13   the cases talk about a wrongful possession.

14       THE COURT:  I agree that there has to be a wrongful

15   possession, but I think that's addressed by the elements in

16   CACI 2100.  When you put those things together, when you

17   knowingly or intentionally take something that belongs to

18   somebody else without their consent, then it's wrongful.  If

19   they have your consent, then it's not wrongful; if there's an

20   affirmative defense out of necessity, it's not wrongful,

21   et cetera, et cetera.

22       MR. RUSSELL:  And that's the reason we originally

23   cited virtually identical language.

24       THE COURT:  I think I understand your concern.

25       MR. RUSSELL:  Thank you, your Honor.

1      MR. WEISBURST:  Starting from CACI 2100, the first

2   alternative that's given for this possession element is the

3   one that Mattel -- that is in Mattel's instruction, which is

4   that the defendant took possession of the property for a

5   significant period of time.  The wrong -- the word wrongful

6   in the preamble here does not -- MGA doesn't have to know

7   whose property it is.  The only intent is that they are

8   intentionally taking possession of it as opposed to someone

9   stuffing a tie in their pocket, they actually picked up the

10  tie.  And if I could refer --

11      THE COURT:  How do you address the issue of the

12  wrongfulness?  Is that without the consent?

13      MR. WEISBURST:  Exactly.  Without the consent.  And

14  if I could just cite one case for the Court which explicitly

15  addresses this point and calls conversion a species of strict

16  liability.  It's a California case called Virtanen, 140

17  Cal.App. 4th 68.  It's a recent case from 2006.  And it says

18  conversion is a species of strict liability.  It basically

19  turns on the fact that someone is the owner of the property

20  and someone else has taken it.

21      THE COURT:  All right.  That brings us to the end

22  of the instructions.  What I'm going to do tonight is,

23  mindful of the various issues that we've discussed here, I'm

24  going to take a run at drafting up the substantive

25  instructions.  I will then provide them to counsel in the

1    morning.  And I will also lay out in the order that I want

2    the instructions, and I'm hoping that I can impose on

3    somebody to go and create the final version of the

4    instructions based on the Court's findings.

5            Essentially, I'll have the first 20 that I named

6    kind of standard instructions.  I will then insert along the

7    lines of what we were discussing this afternoon, the

8    additional instructions, and have those typed up on a disk,

9    and then the final three, 3.1, 3.2, and 3.3, and then we'll

10   have those done tomorrow during the day while we're wrapping

11   up this case.

12           And then at the end of the day tomorrow, which I

13   anticipate we're going to have some time, given current

14   estimates, we'll circle back, and I'll hear final objections

15   and hopefully by the end of the day, then we'll have a --

16   maybe we could even do that during the lunch break.  If

17   someone could be ready to put this together in the morning.

18   Assuming that the Court has its work done.  And at lunch we

19   can go through this so that hopefully after lunch we might be

20   able to instruct the jury.  But we'll see how that plays out.

21   Mr. Zeller?

22           MR. ZELLER:  I actually had a separate issue at

23   some point I wanted to raise before we adjourn.  I didn't

24   have any other comment with what the Court has just said.

25           THE COURT:  Okay.  I was just going to the verdict

1    form next.  I've looked at your verdict forms.  And I know

2    the Court called for a special verdict form.  What I had in

3    mind was the need for a special verdict form on the jury

4    identifying the specific drawings, sketches, et cetera, that

5    were done by Carter Bryant while he was at Mattel.

6         As far as the remaining claims, the Court is much

7    more inclined to, given the specificity that we're going into

8    in the jury instructions, to simply have a general verdict

9    form, and so the Court will put that together and not go down

10   and have separate questions on each particular element,

11   particularly given that a number of the elements have already

12   been ruled on by the Court.

13        So anyway, that's where I am on that, and hopefully

14   I'll have that together tomorrow.

15        I'll hear briefly on that if anyone wants to speak

16   to that, and then I'll circle back, Mr. Zeller, to your

17   issue.

18        MS. AGUIAR:  What would be the time that your Honor

19   would like to address the aspects of the verdict forms that

20   do pertain to the drawings?

21        THE COURT:  Which drawings?

22        MS. AGUIAR:  The drawings.  The list of drawings.

23   Because I just want to -- I want to think positively about

24   this.  And so I don't want to --

25        THE COURT:  I'm just trying to ignore it, actually.

1          MS. AGUIAR:  It's funny you say that, because I

2     think the jury would ignore it or revolt based on that list.

3     Seriously, I think it's a major problem, and I can explain to

4     you why.  I'm not saying this we don't need to get a finding

5     from this jury on his drawings, but the way that it is in

6     Mattel's verdict form, we have major issues with it that I'm

7     happy to lay out for you.  And I know you want to take a

8     break.

9          THE COURT:  Let's take about a five or ten-minute

10    break.

11         Mr. Zeller, what is your issue?

12         MR. ZELLER:  Briefly put, it is that MGA has

13    possession of the originals of documents that have been

14    admitted into evidence.  It's really a custodial type issue.

15    I mean, obviously under normal circumstances, like with the

16    tangible things, the clerk has maintained possession of that.

17    We have asked to see certain of the originals so we can

18    prepare our closing, and we are getting some push back on

19    that.  And so what I was -- I wanted to ask the Court was one

20    of two things.  Either to instruct MGA to give us access to

21    those original exhibits -- these are things that are in

22    evidence -- or direct that they be turned over to the clerk

23    so that we then have access to them.

24         MS. AGUIAR:  I don't think this is something your

25    Honor needs to order.

1          THE COURT:  Why don't we do this.  I'm going to

2     take this break, and maybe you could talk about this while

3     we're having our break.

4          MS. AGUIAR:  I wasn't aware of this issue, but I

5     don't think it's something you need to order.

6          THE COURT:  We'll take up both the verdict form and

7     the --

8          MS. AGUIAR:  The pending motions would not be on

9     the table today?

10          THE COURT:  The JMOL?

11          MS. AGUIAR:  Were you thinking you would get

12     through that this evening?  I do want to say that I think

13     that, and Mr. Russell was going to argue our motion.  I think

14     that our motion relates -- I'm sorry.  Mattel's motion and

15     our opposition relates very directly to this issue of the

16     drawings and the verdict form.  So I think they kind of do go

17     together.  I leave that for you to decide.

18          THE COURT:  Very good.

19          MR. NOLAN:  And one last comment before the break.

20     I just wanted to, since Mr. Price and Mr. Quinn are obviously

21     working on their closing argument and I'm not, I was

22     wondering -- I hope the Court would not be offended if I were

23     to leave now and go back.  Especially since it's two against

24     one.  I think I need to do some work.

25          THE COURT:  You are leaving it in good hands,

1    Counsel.

2         (Recess taken.)

3         THE COURT:  Okay.  We're back on the record.  The

4    Court has looked -- I now know what you're referring to, the

5    light box issue.

6         MS. AGUIAR:  Yes, the light box issue and the issue

7    that was previously before your Honor.  I forget what day it

8    was, but it was last week, and it concerned this issue of if

9    the drawings -- if the master drawings were conceived of and

10   reduced to practice in 1998 --

11        THE COURT:  Then all he did was sketch over them or

12   draw over them, was that actually anything of moment under

13   the inventions agreement.

14        MS. AGUIAR:  And so I leave it to you how it makes

15   sense.  I was just thinking that since that issue that was

16   raised by Mattel in its JMOL and our response goes directly

17   to the issue of how you structure the verdict form on the

18   issue of the drawings, I was just -- I just wanted to raise

19   that for your Honor.

20        THE COURT:  And had then the bigger issue just in

21   terms of the sheer volume.

22        MS. AGUIAR:  That's right.  And depending where you

23   come out on this, I can address this and actually have a

24   proposal.

25        THE COURT:  Why don't you do that.  I'd like to

Transcript of Proceedings - PM (Jury Charge Conference)  7/7/2008  2:50:00 PM

1    hear your proposal.

2         MS. AGUIAR:  Okay.  I think there's probably not

3    a -- I'm sure that there's a reason why Mattel structured its

4    form the way it did.  There are -- and I actually had a

5    colleague count this.  If I'm wrong, I'm sure Mr. Zeller will

6    correct me, but on Mattel's proposed form there are 118

7    different lines for groupings of drawings, and on those pages

8    there are a total of 272 drawings.  That's quite a lot.  And

9    I think that your predisposition to go with a general verdict

10   form and the way Mattel has the drawings laid out are not

11   particularly consistent with one another.

12         So that's one point I wanted to make.

13         Let me tell you a little bit about -- just because

14   I think you want the jury to be able to not be frustrated by

15   this process.  We want to give them guidance, and they need

16   to make specific findings with respect to the drawings, but

17   let me tell you a little bit about what those 172 drawings

18   are so that you can understand what's behind that list and

19   then the proposal that I'm going to make.

20         First off, a lot of them are duplicates.  And what

21   I mean by that is that they are the same basic drawing, but

22   they may have different notations on them.  Or different

23   writing or, as you've seen, they were either blown up on a

24   copier or reduced, something like that.  It's a variation,

25   but the drawing itself, what we're fighting about here, the

1   character that was drawn, is the same.

2         I'll just give you an example.  It's Lupe with her

3   red hair in an up-do.  Or it's Hallidae with, you know, a

4   vest on and dreadlocks.  It may be in a different form with

5   or without a text box on the right, or it may be a copy of a

6   copy.  But it's the same character.

7         So in Mattel's verdict form, they make some attempt

8   to group those drawings together, but by and large, those

9   drawings, even though they are the same character, are listed

10   at times on many different lines.  So that's one point.

11         The second point is that these drawings are not in

12   any sort of -- and since we've used that word already today,

13   I'll use it, buckets.  So in that list, you go from a drawing

14   where there's been testimony that it was done in '98 to

15   '99-2000, and even in some instances to after Mr. Bryant left

16   Mattel in later 2000 and 2001.

17         So there's a couple of aspects to the proposal that

18   I would make, considering your guidance that we do need to

19   address this issue of the drawings on the verdict form.

20         The first is that in their JMOL we certainly are

21   opposed to it, but because they have approached it from the

22   perspective of ownership of the drawings, I think we can

23   safely say, given the testimony at trial and probably even

24   before that, MGA does not dispute that with respect to a

25   subset, a bucket, let's say, of those drawings, that they

1    were drawn during the period of Mr. Bryant's employment with

2    Mattel.

3        So the question I think we're creating work for the

4    jury where there's not a dispute between the parties.  So in

5    other words, the parties don't dispute that he drew them in

6    1999 and 2000 when he was working at Mattel.  What we

7    dispute --

8        THE COURT:  Is the copyright implications of them.

9        MS. AGUIAR:  Sure.  The copyright implications of

10   that.  Whether or not there is any originality in that, and

11   again, when you create something under the copyright law,

12   it's the first time you do it.  So we're saying he may have

13   drawn 38 drawings and colored them in while he was at Mattel

14   by tracing on a light box, but that's of no moment here.

15       So I think what the jury needs to determine, or I

16   would submit that what the jury needs to determine is okay,

17   the following drawings were drawn during his employment at

18   Mattel, but they need to determine on some level are those

19   based on the drawings that he did and that we contend were

20   done in '98.

21       THE COURT:  And I'm afraid -- I see your point.  My

22   concern is that gets into too much of the 1-B issue of what

23   is and what is not copyrightable and to what extent, you

24   know.  My guess at the end of the day here is we may very

25   well be left with a situation where the jury finds some but

1    not all of these to have been drawn in the -- I want to use

2    the relevant time period from the plaintiff's perspective.

3         You may even suggest here that you might stipulate

4    that that will in fact happen.  All that does is set up our

5    next phase of the trial where I imagine through evidence and

6    testimony and the Court's instructions will make a

7    determination or the jury will make a determination as to

8    whether there's any copyright significance to those drawings

9    for which they have either found or it's been stipulated that

10   Carter Bryant did them while he was subject to the inventions

11   agreement.

12        MS. AGUIAR:  But I would submit, your Honor, that

13   the jury can make a factual finding in 1-A, having sat

14   through six weeks of this testimony and the drawings, seen

15   process, and understanding this 1-A case, can make factual

16   findings that even if we were, let's just say under the

17   scenario I think you were just laying out, and perhaps I'm

18   being hopeful, but let's just say they find that the master

19   drawings were -- he could not perceive of the idea and he

20   reduced to practice those drawings in '98.

21        They find -- they wouldn't even really need to

22   find, because the parties would stipulate that another bucket

23   of drawings were drawn during his Mattel employment period,

24   but that they could find that those drawings were phrased

25   from the '98 drawings.  That is the evidence.  In other

1    words, I think the jury, it's absolutely within their

2    province, and we've been here, and they have listened to

3    testimony on this.  We would not be asking them legally the

4    copyright implications of that.

5        But I think we need to get from this jury basic

6    factual findings --

7        THE COURT:  That go beyond simply when the actual

8    drawing was done.

9        MS. AGUIAR:  Because if that's the case -- and I

10    don't think I'll surprise anyone here by what I'm about to

11    say -- then I think -- and we're going to ask your Honor to

12    submit a brief to you once we get the jury's verdict, if it

13    does go that way, that we would say, as a matter of law, you

14    don't need a 1-B because it's a question of copyright law as

15    a matter of law.

16        So I think that we need to take advantage of the

17    fact that we've had a jury sitting here for six weeks.  They

18    have heard relevant testimony on this.  And we need them to

19    make factual findings regarding what those drawings are that

20    were drawn during his Mattel employment period.

21        And so just to get back to my proposal, the

22    drawings that are at issue, so if you look at Mattel's 272

23    drawings, the ones that are at issue that we say were done in

24    '98 and that they say were done in '99 -- I think they say

25    they were done in '99 -- I just need to look at my notes.

1    Hold on.  Are about, and I'm using Mattel's verdict form to

2    come up with this number, are about 38 individual drawings.

3    And there may be duplicates of those.

4          So I think that we need to frame this for the jury

5    in a more workable way.

6          THE COURT:  Let me get to Mattel.  This is an

7    interesting suggestion.

8          MR. ZELLER:  We're delighted that any mechanism

9    that will reduce the number of drawings that the jury has to

10   evaluate and make a decision on.  So if everyone else can be

11   stipulated to except for these 38 drawings, then we're

12   delighted.

13         The issue, however, and where there is a

14   disagreement is how far does this go.  Which is, I do

15   disagree, and I think the Court is absolutely right, that if

16   you get into these other issues about the tracing,

17   originality, that's 1-B.  There's no question that it's 1-B.

18   That's also frankly nothing that we had notice of that we

19   were supposed to be adjudicating in this phase.  We

20   understood it to be what was created during what time period.

21   And that is, I think, the proper question for the jury.

22         And certainly just even looking at it from a pure

23   legal perspective, even setting apart the fairness and the

24   surprise and everything else, but the matter is that under

25   the contract, Mattel owns improvements.  I don't think

1    there's much of a debate that regardless of whether he wants

2    to say he did his master drawings back in '98, the fact is

3    that by putting them together and coloring them, that was an

4    improvement.

5          Now, they want to argue in 1-B that that doesn't

6    amount to a hill of beans and we don't get any money, that's

7    their prerogative.  But that is not a 1-A issue.  And that is

8    not something I think that we can interject into this

9    proceeding at this stage.

10         You know, but that said, to the extent there is a

11   universe of drawings where the parties would stipulate these

12   were done in '99, and then we will deal in 1-B with whatever

13   the consequences are for purposes of originality,

14   protectability, copyright, other kinds of damages, that's

15   fine.  That's something I think we can deal with.

16         But the other issue in terms of having, and this is

17   how MGA's verdict form is set up, is trying to kind of

18   categorize things as like the master drawings and the like.

19   I mean, this is their theory of the case.  This is not asking

20   the jury to make specific factual findings.

21         THE COURT:  Well, the problem I have with MGA's

22   verdict form is the -- the problem I have is that I haven't

23   received it.

24         MS. AGUIAR:  I gave a copy to Mr. Holmes earlier,

25   your Honor.  I'm sorry.

1     THE COURT:  There it is.  Thank you.

2     This is interesting.  You've seen this, Mr. Zeller?

3     MR. ZELLER:  I am looking at one dated the 7th.  It

4  is entitled MGA's parties' third revised --

5     THE COURT:  Right, right.

6     MR. ZELLER:  That's the one I have.  And yes, we do

7  have problems with it.

8     THE COURT:  I see that.  But in terms of their -- I

9  just kind of like this.  This is a -- these groupings

10  together, what did you do here with these, Counsel?

11     MS. AGUIAR:  Sure.  Okay.  So what I've done is

12  I've taken the universe of drawings on Mattel's verdict form,

13  and I put them into three buckets.  And the bucket you are

14  looking at right now is the bucket that is the bucket of

15  during Mr. Bryant's employment bucket.

16     THE COURT:  This whole thing here.

17     MS. AGUIAR:  Yes.  And in terms of the groupings,

18  what I've done is I've put together drawings that are the

19  same basic drawing, but there might be a duplicate or there

20  was a stipulation entered between the parties on June 13th

21  regarding Carter Bryant originals, and part of that

22  stipulation was that the parties refer to the same document

23  by different number.  So that's part of this, too.

24     So I am trying to have the jury understand that

25  everything on a line is really the same drawing, but we just

Transcript of Proceedings - PM (Jury Charge Conference)  7/7/2008  2:50:00 PM

1    added the numbers in there in case, when they were taking

2    notes, their notes said 779 rather than 3-1.

3         THE COURT:  So your position is there's essentially

4    only 23 different drawings.

5         MS. AGUIAR:  Exactly.  My position is that there's

6    23 that pertain to his employment period.  And these are the

7    ones that -- and I just want to make sure that I articulated

8    myself well before -- which is that we would agree that these

9    were done during his employment period and stipulate to that.

10        But we need to have that basic finding of the jury

11   if, well, what's the relationship of those drawings to the

12   drawings that you may find, members of the jury, were done in

13   '98?  Because otherwise --

14        THE COURT:  Where do they find that?  Where is that

15   listed?

16        MS. AGUIAR:  It's a question, your Honor, on page

17   1, and I actually will tell you right off the bat, I think

18   we can reword that question to make it a lot more

19   understandable.  But 1-B is basically saying has Mattel

20   proven by a preponderance of the evidence, and we had to do

21   this any double negative.  Although we can think about how to

22   do it better.  Have they proven by a preponderance of the

23   evidence that these drawings were not based on something that

24   he did prior to the time he came to Mattel?

25        THE COURT:  Mr. Zeller is correct, though, that the

1    inventions agreement doesn't just call for something that can

2    be based on or loosely based on or strictly based on -- it

3    can be a shadow light box, or it can be loosely based on like

4    an inspiration.  You made the argument that the Bratz dolls

5    are based on a Steve Madden ad.  The word based on is very,

6    very broad.  And that's belied by the inventions agreement.

7         MS. AGUIAR:  We can come up with different

8    language, but I think if you are going to -- if we're going

9    to stipulate that certain drawings were drawn during his

10   employment period, when Mr. Zeller says he doesn't know that

11   this is one thing that we were trying during this case, it's

12   been a lot of testimony during this 1-A phase on the drawing

13   process and how he did it, and Mr. Price examined Mr. Bryant

14   for extended periods on this exact point.

15        So clearly they knew that this was a 1-A issue.  So

16   when we stood up and asked questions about how did you do

17   this and then when you did the drawing in '99, how did you --

18   what was your process for that, and many questions by

19   Mr. Nolan, when did you do that, and when you colored them

20   in, did it change your idea from before.

21        THE COURT:  Let me ask the point.  I think your

22   best point was with respect to the traced from, where it's

23   not just based on or loosely based on, but where it's shadow

24   box traced.

25        Mr. Zeller, let me ask you this.  With respect to

Transcript of Proceedings - PM (Jury Charge Conference)  7/7/2008  2:50:00 PM

1    those, assuming that the jury were to find that there was

2    something created in 1998 upon which to trace, which is one

3    of the primary questions that both sides recognize needs to

4    be answered, assuming that's the case, would there be value,

5    and if not, why not, to having a jury make a finding that

6    while these were done in 1999, these were clearly traced and

7    not -- there was nothing new.  It was not an improvement, it

8    wasn't a development.  It wasn't a new design.  There was

9    nothing new to this.  It was simply tracing.

10          Or is Mattel taking the position that even if

11   Carter did nothing more than take a master drawing that he

12   came up with in 1999 and literally traced over it using a

13   light box, that that's somehow an improvement.

14          MR. ZELLER:  Yes, it could be, your Honor.  And

15   what I would say is this.  There are actually a number of

16   issues that are being sort of brought together here.  But let

17   me say this, that while it's certainly true that there was

18   light box testimony and everything else, that was not so that

19   the jury could make, from our perspective, so the jury could

20   make some determination about what was in fact traced or what

21   was based on what.

22          That was their explanation to say well, Carter

23   Bryant, while he certainly did do things in 1999, he really

24   did it all back in 1998.  That was their explanation for the

25   timing of it.  As we have perceived this phase of the case,

1    it is a simple up and down question as to particular works.

2    Was this drawing created in 1998 versus '99.  And then in

3    Phase 1-B, we get into the copyright --

4         THE COURT:  Mr. Zeller, this grouping of duplicate

5    drawings, where they are referred to as one exhibit and then

6    the same drawing is referred to as another exhibit, I do like

7    that approach, at a minimum, simplifying this so there's not

8    so many.  I don't know if it can be reduced to the number of

9    23 that counsel has because you may find some differences

10   that you view as significant, whereas the jury might find one

11   was done in '98 and another in '99 and a third in 2001.

12        But be that as it may, at least there's some degree

13   of -- I do think that Ms. Aguiar is right, that the jury is

14   going to be really overwhelmed by this laundry list.

15        MR. ZELLER:  And I do agree, your Honor.  We have

16   struggled long and hard in terms of trying to come up with a

17   form that will first of all give the specificity of findings

18   that we think are necessary and appropriate so that all of

19   this obviously comes to fruition in a way that I think

20   everyone expects, which is that we're going to get a

21   determination.

22        On the other hand, we're certainly mindful that we

23   don't want to overwhelm the jury, and we don't want them

24   going through all of this.

25        I had thought, and maybe this is more a matter of

Transcript of Proceedings - PM (Jury Charge Conference)  7/7/2008  2:50:00 PM

1    the parties attempting to discuss it and don't see what we

2    can do about a more condensed list, but I can say that my

3    understanding of what we did in our list is that it does not

4    have a bunch of duplicates.  In other words, we aren't saying

5    even if one is exactly the same drawing, that we're having

6    them make separate determinations.

7        I mean, I think in various forms we have attempted

8    to, you know, to instill that, and that may be what counsel

9    is referring to when she said there are a certain number of

10   lines that encapsulate a certain number of drawings.  We are

11   all for reducing that number, whether it's by way of

12   stipulation, whether it be by taking them off the table and

13   saying these are just '99 or 2000 and no determination needs

14   to be made, or, alternatively, if the parties can come up

15   with an acceptable way of grouping it, we are absolutely all

16   for that.

17       MS. AGUIAR:  First, I omitted mentioning the third

18   bucket because I sort of got into other things.  We've got

19   the 1998.  We've got the during the Mattel employment, and

20   we've got the after.

21       THE COURT:  Yes.

22       MS. AGUIAR:  So I do think that if we're going to

23   go down the road of stipulating that certain of the drawings

24   were drawn while he was employed by Mattel, I do feel that

25   there has to be a question that is presented to this jury

1    regarding what that means as a factual matter, and they have

2    listened -- it wasn't just presented by us so that the jury

3    could get drawing 101 class.

4         It was presented by us to show that when he created

5    these things, he then just did a mechanical process of

6    tracing, and he said on the stand both on cross and direct,

7    that when he -- the process that he did later on in '99 was

8    traced from -- based on '99 and didn't change his original

9    concept.

10        THE COURT:  The problem Mr. Zeller points out, and

11   I'm having trouble with this, I guess, is that that is only

12   of significance if we all can agree that that has -- that

13   that's dispositive of the copyright issue.

14        MS. AGUIAR:  But, your Honor, I think when

15   Mr. Zeller said that Phase 1-A is about ownership,

16   absolutely.  It's about ownership, but if Mr. Bryant is found

17   to have conceived of and reduced to practice, using the words

18   from his agreement, this idea for Bratz and the Bratz

19   drawings, if the jury finds that that was done in '98, yes,

20   that pertains to ownership.

21        THE COURT:  But it's a little bit more broad than

22   that.

23        MS. AGUIAR:  What I was going to say, though, as

24   that if they find that he, Mr. Bryant, owned and then

25   transferred duly to MGA later ownership of the '98 drawings,

1    then he and he alone/MGA, had the right to make tracings of

2    those drawings and to color them in.  Because if he doesn't

3    have that right, then it would flip everything on its head.

4          THE COURT:  But the Court could find that as a

5    matter of law.  And I don't know if I need at this stage that

6    finding.  I think it may confuse things dramatically.

7          MS. AGUIAR:  But I do think that if we're going to

8    stipulate as to certain drawings, then there has to be some

9    connection and some factual finding of some sort by the jury

10   because they have heard all of the evidence about the

11   relationship, let's call it, the relationship between the '98

12   drawings and the during Mattel employment drawings.

13         THE COURT:  And they are going to hear a lot more

14   about that, depending on when they find those drawings to be

15   done.

16         I think we may be getting ahead of ourselves.  And

17   I hate to say it, but I think it might be best if you don't

18   stipulate.  Simply without a clear understanding of what

19   you're stipulating to, because it's not clear.  We haven't

20   yet reached the copyright significance of any drawings

21   whatsoever.  The Court hasn't gotten there.  We haven't

22   gotten there as a matter of law.

23         So I don't want anything that I would be

24   encouraging in terms of a stipulation to be taken as the

25   Court's views on the copyright issue, because I'm just not

1      there yet myself, and it's not clear to me what impact or

2      what significance for ownership, ultimate ownership, legal

3      ownership, which is not what the jury is deciding.  I think

4      the jury may have used shorthand there.

5              The issue for the jury is what was done and when.

6      That's the factual issue.  The Court will ultimately have the

7      issue of ownership to decide based on findings in Phase 1-A

8      and, if necessary, findings in Phase 1-B.

9              And I'm concerned -- I'm just not in a position

10     right now to say that, as a matter of law, that a tracing --

11             MS. AGUIAR:  But I don't think you have to say, as

12     a matter of law, that a tracing does or does not have a

13     copy -- is copyright protectable or gives anyone any

14     interest.

15             But I'm suggesting that there -- what you do seem

16     to in other situations, you've suggested that it is

17     appropriate for the jury to make sort of the underlying

18     factual findings that would later allow your Honor to make

19     those legal findings, because frankly, I do anticipate, if

20     things go reasonably well for our side, as we hope they will,

21     in filing a motion to your Honor that says based on a

22     finding, if they were to find these are -- these were done in

23     '98, then anything they find that was done in '99, as a

24     matter of law, can't have any --

25             THE COURT:  I think the best that we can say at

1    this point is that we need to find out when these drawings

2    were done.  And the Court is very mindful that simply because

3    drawings were done in '99 will not come close to answering

4    the question of whether or not Mattel has ownership of these,

5    because there is the copyright ability, and we're going to

6    have the same jury considering the issue of whether or not

7    these were actually based on 1998 drawings, and they are

8    going to hear the copyright evidence and receive the Court's

9    instructions as a matter of law on that.

10        And we may want to have a question along those

11   lines, but I think at this point it's premature to make that

12   distinction.  We don't know what the jury is going to find in

13   terms of when these drawings were done.  I think we're

14   getting too far ahead of ourselves to be asking this question

15   at this juncture.

16        MS. AGUIAR:  I do think, though, your Honor, that

17   Mattel's form and the way it's structured is a recipe for

18   disaster with the jury.  It is not grouped --

19        THE COURT:  I agree with you on that point.

20        MS. AGUIAR:  It doesn't say, you know, and again,

21   maybe a question can go along, and again, I do want to say I

22   believe -- we don't believe that this is appropriate, but if

23   this is the way your Honor is heading, then I would submit

24   that you need to have -- I'd like to see a question that says

25   okay, have they proven -- something that's directed, in other

Transcript of Proceedings - PM (Jury Charge Conference)  7/7/2008  2:50:00 PM

1    words, to the drawings that are truly at issue, which are

2    those, quote, master drawings, and I have a list that I can

3    give a copy to Mattel and a copy to you of these.  You have

4    bucket 2 right there, which is Exhibit A.

5         THE COURT:  We're going to be able to create your

6    buckets based on the findings of the jury.  They may throw

7    everything into the same bucket.  They may find or Mattel

8    across the board and say all of this was done in '99.  They

9    may find entirely for MGA and find that all of this is done

10   in 1998.  Probably not, given certain admissions and what

11   have you.

12        More likely, they are going to find that some was

13   done -- well, I don't want to say more likely.  Depending on

14   how they view the timing evidence, they are either going to

15   find that some was in '98-99 or that all of it was in '99

16   with some in 2000.

17        MS. AGUIAR:  But I think we can reasonably at least

18   help them with the process.  We're talking about 272 drawings

19   and 118 lines which flip-flop back and forth in the list

20   among different time periods.

21        THE COURT:  This is the point that I fully agree

22   with you.  I think the organization of this list and the

23   elimination of duplicates or the combining of duplicates, the

24   combining of -- and just the organization needs to --

25   something needs to be done with that, Mr. Zeller.  And you

1    need to get together with counsel for MGA.  I think at the

2    end of the day, I -- I am going to stick to what I believe

3    this first phase to be about, and that's the timing of these

4    drawings, and I think to go beyond that risks improperly

5    going into the copyright issues at this point.

6         But I do agree with Ms. Aguiar, that the way it's

7    structured right now, this long laundry list, that there's a

8    real risk of a miscarriage here simply because the jury is

9    not --

10        MS. AGUIAR:  You know, there really is.  You look

11   at this list, and they are going to start looking at these

12   numbers, and they are going to ask -- I imagine that they are

13   going to send out repeated requests for testimony.  I mean, a

14   lot of these exhibits --

15        THE COURT:  Well, I'm hoping that closing arguments

16   on both sides can assist the jury on that process somewhat.

17   That's kind of the point of closing argument.  But still,

18   having said that, I still agree with Ms. Aguiar that

19   something's got to give on this list.

20        MS. AGUIAR:  And I just want guidance, and we will

21   confer with each other this evening.

22        THE COURT:  I will work on the verdict form but for

23   the list.  I'll use the MGA approach of see attached, but

24   I'll --

25        MS. AGUIAR:  In terms of guidance from you for our

1    discussion tonight, I believe it's not just the duplicates.

2    Clearly the duplicates is an issue, but it's also the

3    organization, as you just said a few minutes ago.

4         THE COURT:  It's the duplicates and the

5    organization.  I'm declining to go with you on this point on

6    the light box or trace box issue.  I understand your point.

7    I think that's reserved for 1-B.

8         MS. AGUIAR:  But the jury should at least have a

9    map that if they are thinking, and again, I'm trying to stay

10   positive here for our side, but let's just say they are in

11   there and they are like okay, we heard him.  We believe he

12   came up with the idea, and he did think he didn't recall

13   drawings in '98.  They need to be able to look at the list

14   and say okay.  If we've come o that conclusion, what are the

15   ones we would check off?

16        THE COURT:  That's fair enough, Mr. Zeller.  If the

17   jury adopts the theory of MGA's case, that they can

18   readily -- I complimented you earlier on your approach to the

19   jury instructions were quite balanced in large measure.  I

20   think we need to achieve that same -- I think the verdict

21   form was fine with respect to the general verdict form for

22   the remaining claims, but I did look at this thing this

23   weekend, and I just said -- I couldn't go anywhere with it

24   because I didn't have the exhibits with me.

25        So I didn't know what any of these were, and I

1    think that out of fairness, this jury is going to come down

2    kind of one way or another.  If they find for Mattel and they

3    don't find Carter Bryant credible and they don't believe his

4    mom and the friend, you know, this whole '98 thing is made up

5    and that he did this in '99, that it was off of the Seventeen

6    magazine from August of 1999, there's got to be a way for

7    them to kind of conclusively demonstrate that to us.

8         Conversely, if they find, you know, the basic stuff

9    here, the primary drawings were all done in 1998, and based

10   off the Seventeen magazine and Kickapoo High School and what

11   his mom and his mom's friend said, there's got to be a way

12   for them to identify these and not get confused with a bunch

13   of drawings admittedly done in '99.

14        So when I say organization, that's what I'm talking

15   about.  The jury needs to be able to signal which way they

16   are going on that.  I agree with your point that it's

17   premature to get into copyright type issue in terms of

18   setting this up so we can evaluate what is relevant to a

19   copyright claim and what isn't.

20        But I agree that the collective brains out there

21   have got to come up with a better way than we've got right

22   now.

23        MR. ZELLER:  And that's all fair, Judge.  Just so

24   the Court is aware, we have struggled mightily to come up

25   with something that resolves these conflicting

1    considerations.  You know, just for the record, our list

2    already has the duplicates accounted for.  I mean, that's --

3    it's not that these are separately listed as duplicates, but

4    we will talk to the other side and see what we can do.

5         THE COURT:  The organizational point is probably

6    more important than the duplicates.  There's just got to be a

7    way of presenting this balanced, fair, and at the same time

8    depending on which way the jury is going in terms of whether

9    they are believing Carter Bryant or not believing Carter

10   Bryant, that they can render a just decision.

11        So I will leave that in your hands.  We'll take

12   this up tomorrow morning.  I'll be in here very early in the

13   morning working on the rest of the instructions and the rest

14   of the verdict form.  I'll hope to have it ready to go by

15   nine o'clock, and if you could work on this aspect, we'll

16   work from there.

17        MS. AGUIAR:  May I give the Court a copy of what

18   I'm going to give to Mr. Zeller in terms of the --

19        THE COURT:  Sure.  But I'm going to hold this at

20   bay until I see what you come up to tomorrow morning.

21   Because I'll have this.

22        MR. ZELLER:  And in addition to the things that we

23   have discussed already, you know, particularly dealing with

24   breaking down each of these claims by elements and everything

25   else, there were other issues that we had with the verdict

1    form that MGA submitted.  Since it was done today, and this

2    isn't being critical, we haven't had time to submit written

3    objections.

4         THE COURT:  As far as the verdict form, I've

5    already indicated I'm going with Mattel's convenient verdict

6    form on the remaining questions.

7         MR. RUSSELL:  If I might, just purely to preserve

8    the record, since your Honor has, I understand, indicated

9    that it's going to go with the general verdict for the

10   remainder, I just want to note that we should have a Special

11   Verdict form, just purely for the record.

12        THE COURT:  Did you want to give an explanation?

13        MR. RUSSELL:  Yes, absolutely.  One of the reasons

14   we felt the Special Verdict form was particularly important

15   here is precisely because your Honor has issued rulings and

16   made findings, and fiduciary duty in particular on the aiding

17   and abetting claims are really -- really where I start to

18   think about these issues taking on importance.

19        The jury is being told that there is a duty.  The

20   jury is being told there is a breach.  But the jury isn't

21   going to be specifically instructed on the scope.  And we'd

22   like to have specific findings so that we can challenge, you

23   know --

24        THE COURT:  We don't get any language in there on

25   scope and definition of the fiduciary duty.  But I understand

1      your position.  It's noted for the record.

2           All right.  Have we taken up this issue in terms of

3      the originals?  Were you able to take that up during the

4      break?

5           MS. AGUIAR:  I think we should not have a problem

6      with that.  One thing, and I just looked at the e-mail

7      exchanges.  We had a representation from Mr. Quinn on July

8      3rd, your Honor, that the only potential rebuttal witnesses

9      would be Carter Bryant or Cassidy Park.  We basically,

10     without you having to rule on it, said we would not try to

11     call Cassidy Park, and you ruled this morning on Carter

12     Bryant.  Can we get a representation of the new one just so

13     we're clear?  Because now we're talking about tomorrow

14     morning, that there are no rebuttal witnesses.

15          THE COURT:  As of this time, I understand there's

16     not, but your case isn't over yet.

17          MS. AGUIAR:  But the exchange on the record on the

18     3rd, you said well, Mr. Nolan has said it's two videos and a

19     custodian, and we said yes, and then Mr. Quinn said okay, on

20     that basis -- he was making the representation.

21          THE COURT:  Mr. Zeller?

22          MR. ZELLER:  I'm sure this will not be the answer

23     that will make anybody happy.  First of all --

24          THE COURT:  I'm used to you doing that, Counsel.

25          MR. ZELLER:  I have not had an opportunity to

1    consult with Mr. Quinn, and particularly what we want to do

2    in the aftermath of the Court's ruling of this afternoon.

3        THE COURT:  Can you give a definitive answer to

4    defense counsel in the next hour or so?

5        MR. ZELLER:  Yes, as soon as we're done here, I

6    will consult with Mr. Quinn and get a response.  There may be

7    other things that we are going to want to ask the Court to

8    consider as a result of the ruling.

9        THE COURT:  Just tell them what those things are

10   and get an answer to them by seven o'clock, a definitive

11   statement of whatever it is that you are planning on doing

12   tomorrow, subject, of course, to the Court's rulings.

13       MR. ZELLER:  We will do that.  And then I'm not so

14   sure about whether there's agreement on those originals

15   because this is imperative to us, and the clock is ticking

16   towards closing.

17       THE COURT:  Essentially, MGA is holding these

18   originals in a trust for the Court, and I trust there's not

19   going to be an issue.

20       MS. AGUIAR:  Mr. Zeller made the point that the

21   clock is ticking for closing.  The clock is ticking, and your

22   rule at the beginning of the case, which everyone has abided

23   by, is the 48-hour notice on witnesses.

24       THE COURT:  That was for the case in chief.

25   Rebuttal is a slightly different bird, given its nature and

1    definition.  But you're going to have your answer within an

2    hour.

3            MS. AGUIAR:  Before we wrap up on the verdict form,

4    can I address something?

5            THE COURT:  What's that?

6            MS. AGUIAR:  At the bottom of page 7 of Mattel's

7    proposed form, there is a reference there to -- it's question

8    11.  If you look at question 11, it says for each of the

9    three dimensional sculpts or works listed below, did Carter

10   Bryant create or direct others to create --

11           THE COURT:  Wait.  I need the fourth amended

12   verdict form because this -- No. 11 is did Isaac Larian act

13   with malice, oppression, or fraud.

14           MR. RUSSELL:  May I provide it to the clerk?

15           THE COURT:  Did Mattel send another verdict form?

16           MR. ZELLER:  I believe it's tab 12.

17           THE COURT:  Question number what?

18           MS. AGUIAR:  On mine, I'm looking at the fourth.

19           THE COURT:  I see it.

20           MS. AGUIAR:  It's No. 11.

21           THE COURT:  All right.  I have two issues.  One

22   with the question and one with the items under the question.

23   With regard to the question, I think you pointed this out

24   earlier in the jury instructions.  There's no basis either in

25   the contract language or the law, frankly, to include --

1          THE COURT:  It's going to be written solely or

2     jointly.  We're going to replace all, create or direct others

3     to create -- or direct others with the sole or joint language

4     of the inventions agreement.

5          MS. AGUIAR:  And then it lists underneath there the

6     prototype doll.  That's No. 1.  This is the subject of the

7     judgment as a matter of law.  To ask the jury to make a

8     factual finding with regard to an item that doesn't exist so

9     that therefore, there can be no legal rights to flow from

10    that, there's nothing -- I mean, they make the point, it's

11    not in evidence.  Obviously, it's not in evidence because it

12    doesn't exist.

13         So I -- when we're talking about confusing the

14    jury, they are saying well, you know, I think there's a

15    negative implication there like, well, gosh, the judge put it

16    on its verdict form so where is it and MGA didn't produce it

17    and Mr. Bryant didn't produce it.

18         No, there's no testimony that this thing doesn't

19    exist.  I believe, and I can find the cite for you, that he

20    said, and they have not challenged it, he threw it out.  And

21    there's been unrebutted testimony from two MGA --

22         THE COURT:  I'm definitely not going to let it say

23    in that Bryant testified that he presented it to MGA.  That's

24    definitely inappropriate on a verdict form, but the September

25    1st, 2000, prototype doll.

1       MS. AGUIAR:  I think it's confusing for the jury

2    because it doesn't exist, and we're putting something on the

3    verdict form that's not in evidence.  And that's a real

4    problem.  Trial Exhibit 537 is not in evidence.  They never

5    moved that exhibit into evidence.  I've checked the

6    transcripts, and I've checked the log that we keep.  So I

7    think that that should come off.

8       THE COURT:  Okay.  Very good.

9       MS. AGUIAR:  And trial exhibit -- I'm just trying

10   to again put myself in the mind of a juror who is trying to

11   fill out this form.  Let's skip down to 1136.  1136, I think,

12   should be on there.  That is the gray resin casting that

13   we've had up there for a number of witnesses' testimony, and

14   there's lots of testimony about it.  The Trial Exhibit 1105

15   is an e-mail that attaches two photographs to it, one

16   photograph being the body of a Mattel Skipper doll, and then

17   another photograph of, frankly, I don't know what.  I don't

18   know what it is.

19      THE COURT:  Very well.  I note your objections.

20   Well, 537 either is or isn't in evidence.  And we'll

21   determine that.

22      What's your position on the prototype?

23      MR. ZELLER:  Well, I don't think it matters to

24   anything as to whether or not it exists currently.  That's

25   not even material under copyright law.  The fact is it's

1    something that was created during the term of Mattel's

2    employment, and we're asking the jury to determine does

3    Mattel own this.

4          There can be arguments again about scope and what's

5    it mean and everything else down the road in 1-B, but

6    certainly it was something he created when employed by

7    Mattel.  And I think the undisputed evidence shows that it

8    was.  It is something that is susceptible to the inventions

9    agreement.

10         As far as the other things go, your Honor, what I

11   would respectfully submit is that we have an opportunity to

12   look at these things.  I mean, as we speak today, I know the

13   parties have been working through and trying to reconcile all

14   the lists of what's in, what's not in, what should be in, is

15   there anything that's left in terms of exhibits.  So if

16   Exhibit 537 is a problem, that presumably will be known or

17   otherwise resolved.  And the same is true of these other

18   exhibits.

19         THE COURT:  I understand.  Very good.  I'm going to

20   wrap things up for now.

21         I will accept Mattel's corrected fourth amended

22   proposed verdict form.  I will accept MGA's third revised

23   propose Phase 1-A special verdict form, and MGA's objections

24   to Mattel's supplemental proposed jury instructions.

25         But that's it.  We're done.  The binders are now

1   complete.  If it wasn't in the binders, it wasn't accepted

2   today, that's done.  That's it.  Everything else waived,

3   gone.  And I've got to close the universe.

4        All right.  I'll be here early tomorrow morning.

5   I'll try to get on the record as soon as I can with the jury

6   instructions.  I'll work on the substantive ones myself.

7   I'll then turn that over to you to add the non-disputed

8   preliminary ones and finishing ones, and hopefully by

9   noontime tomorrow, we'll have a completed jury instruction,

10  and then I'll hear final objections at that point.

11       Same thing with the verdict form, and we should

12  have a productive day tomorrow and be at trial's end or at

13  least Phase 1-A's end and ready to go with closing arguments.

14  I will be looking for Mr. Nolan, Mr. Quinn, Mr. Price to give

15  me estimates tomorrow.  Please let me, by seven o'clock,

16  Ms. Aguiar, know if there's anything further.  I trust MGA is

17  going to make available any originals you need.  And if

18  there's anything else, we'll take it up in the morning.

19       MR. ZELLER:  And I just wanted to let the Court

20  know, we did look into the whole issue about harm on summary

21  judgment, that element that --

22       THE COURT:  Oh, the harm thing.

23       MR. ZELLER:  It can certainly wait until tomorrow

24  from my perspective, but I did want the Court to know we did

25  look into it and found what we think is an answer to it.

1          THE COURT:  Briefly let me hear from both sides.

2          MR. ZELLER:  Please, very brief.  It affects my

3    work tonight.  The short answer is that with respect to

4    breach of contract specifically, we did not technically move

5    on that element as to harm.  We did move on it with respect

6    to breach of duty of loyalty and fiduciary duty.  And --

7          THE COURT:  That's not the issue.  The issue is it

8    comes up in the context of intentional interference with

9    contractual relations.

10         MR. ZELLER:  It is, but it's still the same element

11   with respect to breach of the duty of loyalty, and that still

12   stands, that there was such a breach.  And moreover, the

13   Court has made that determination --

14         THE COURT:  It is so self-evident.  Is it really an

15   issue here?  That's probably why the Court made the finding

16   in the order.  It's kind of almost self-evident, that if the

17   other two elements that the Court did find were established,

18   then so was the harm.  Is there an argument here?

19         MR. RUSSELL:  Well, yes, it depends on what the

20   jury finds.  And this raises the concern about the general

21   versus the special verdict.  They are not going to know what

22   duty they found, and now yes, even more so, the jury is being

23   told there's harm without being given an option to fill out

24   boxes to let us know what they found.

25              I think, given that they didn't move, it is

1    particularly unfair for them to be given that sort of -- if

2    it's so evident, that will be perfectly easy for Mr. Quinn

3    and Mr. Price to close it.

4         THE COURT:  I see.  I'll take a look at this.

5         MR. ZELLER:  I apologize, but the fairness here is

6    by the way that we have been relying on this throughout

7    trial.  We would have to put on evidence, because then they

8    are going to argue that we didn't put on evidence as to that

9    element.  And so I mean it would potentially significantly

10   change the shape of the trial in what we have submitted to

11   date.

12         I would submit, your Honor, briefly, that the fact

13   that they did not move for reconsideration after that

14   happened, when the Court granted summary judgment months ago,

15   that is a waiver.  This is something that the parties had

16   been relying upon, and it is too late.

17         THE COURT:  You indicated earlier that you thought

18   you did move for reconsideration on that.  Did you, Counsel?

19         MR. RUSSELL:  I'd have to go back and look at this.

20   I know we logged objections through the process.  If your

21   Honor would like the cites, I will get them by tomorrow

22   morning.

23         THE COURT:  Let's do that.

24         MS. AGUIAR:  What time would you like us in the

25   morning, your Honor?

Transcript of Proceedings - PM (Jury Charge Conference)  7/7/2008  2:50:00 PM

1        THE COURT:  Say around 8:30 or so.

2        MR. RUSSELL:  One last question.  When do you

3    intend to take argument --

4        THE COURT:  I'm probably going to take the JMOL's

5    under submission pending the jury's decision.  That's

6    probably what I'm going to do.  To the extent that they are

7    relevant to this, but to the extent that the jury -- I think

8    it's probably the better course to wait until after we've had

9    a jury decision.

10

11        (Proceedings concluded at 6:00 P.M.)

12

13

14             C E R T I F I C A T E

15

16

17        I hereby certify that pursuant to Title 28,

18    Section 753 United States Code, the foregoing is a true and

19    correct transcript of the stenographically reported

20    proceedings in the above matter.

21        Certified on July 7, 2008.

22

23

                    _____

24             MARK SCHWEITZER, CSR, RPR, CRR

              Official Court Reporter

25             License No. 10514