1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                      EASTERN DIVISION

4                          - - -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                          - - -

7    MATTEL, INC.,                    )
                                      )
8                      Plaintiff,     )
                                      )
9              vs.                    )  No. ED CV 04-09049
                                      )
10   MGA ENTERTAINMENT, inc., et. Al.,)
                                      )
11                     Defendants.    )  TRIAL DAY 2,
     _____)  MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )
     _____)

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                   RIVERSIDE, California

17               TUESDAY, MAY 27TH, 2008

18                       8:30 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                    951-274-0844
                  WWW.THERESALANZA.COM

```
 1

 2    APPEARANCES:

 3

 4    On behalf of MATTEL, INC.:

 5                         QUINN EMANUEL
                           By:  JOHN QUINN
 6                         BY:  JON COREY
                           BY:  MICHAEL T. ZELLER
 7                         BY:  WILLIAM PRICE
                           865 S. FIGUEROA STREET,
 8                         10TH FLOOR
                           LOS ANGELES, California  90017
 9                         213-624-7707

10

      ON BEHALF OF MGA ENTERTAINMENT:
11
                           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                         BY:  THOMAS J. NOLAN
                           BY:  CARL ALAN ROTH
13                         BY:  RAOUL KENNEDY
                           BY:  LAUREN aguiar
14                         300 SOUTH GRAND AVENUE
                           LOS ANGELES, CALIFORNIA  90071-3144
15                         213-687-5000

16

17

18

19

20

21

22

23

24

25
```

MAY 27, 2008                    TRIAL DAY 2, MORNING SESSION

1

I N D E X

2                                                      Page

3    Hearing.......................................    4

4    Jury instructions.............................   53

5    Opening Statement – Plaintiff.................   61

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAY 27, 2008                    TRIAL DAY 2, MORNING SESSION

1          RIVERSIDE, CALIFORNIA; TUESDAY, MAY 27, 2008; 8:30 A.M.

2                                -oOo-

3          **THE CLERK:**  CALLING ITEM ONE, CASE NUMBER

4     CV04-09049-SGL, MATTEL, INC., V. MGA, INC., ET AL.

5          APPEARANCES, PLEASE.                                        -06:-

6          **MR. QUINN:**  JOHN QUINN, MIKE ZELLER, JON COREY,

7     TIM ALGER, dylan proctor, AND SCOTT WATSON, APPEARING FOR

8     MATTEL.

9          **MR. NOLAN:**  ON BEHALF OF MGA, TOM NOLAN,

10    JASON RUSSELL, LAUREN AGuiAR, JEREMY ROSS, CARL ROTH, ROB      -06:-

11    HERRINGTON, AND RAOUL KENNEDY.

12          **THE COURT:**  GOOD MORNING, COUNSEL.

13          WE'RE ON CALENDAR THIS MORNING FOR THE TRIAL TO

14    BEGIN.  BUT BEFORE THAT, I WANTED TO RESOLVE AS MANY OF THESE

15    MOTIONS AS WE COULD IN ADVANCE OF THAT.                        -06:-

16          I APPRECIATE THE EFFORTS THAT COUNSEL MADE OVER THE

17    WEEKEND TO PROVIDE THE COURT WITH ALL OUTSTANDING MOTIONS.  ONE

18    OF THE FIRST ISSUES -- AND WE DISCUSSED THIS AT SIDE-BAR

19    BRIEFLY AS WE WERE WAITING TO BEGIN -- ARE THE MOTIONS PENDING

20    BEFORE DISCOVERY MASTER INFANTE.  THE COURT WAS UNAWARE THERE   -06:-

21    WERE THESE MOTIONS PENDING IN THIS CASE.

22          I ASKED MR. ZELLER ON BEHALF OF MATTEL AND COUNSEL ON

23    BEHALF OF MGA TO IDENTIFY WHICH, IF ANY, OF THESE MIGHT APPLY

24    TO PHASE TWO, SUCH THAT WE DON'T HAVE TO GET THOSE RESOLVED AT

25    THIS TIME.                                                      -06:-

```
1              MR. ZELLER, I'LL START WITH YOU, SINCE I THINK ALL
2    BUT ONE ARE FROM MATTEL.
3              MR. ZELLER:  YOUR HONOR, I THINK IN THE MAIN, THEY
4    ARE 1-A MOTIONS.  I THINK THAT THERE ARE A COUPLE OF EXCEPTIONS
5    THAT I CAN POINT TO WITH SOME CONFIDENCE THAT I THINK CAN BE      -06:-
6    PERHAPS BACK-BURNERED TO SOME DEGREE BECAUSE EITHER IT'S 1-B OR
7    EVEN IF IT HAS AN EFFECT ON 1-A, AS LONG AS CIRCUMSTANCES DON'T
8    CHANGE, IT MAY NOT REQUIRE A RULING AT THIS POINT.
9              THE COURT:  WHICH ARE THOSE?
10             MR. ZELLER:  WHAT I WOULD SAY IS NUMBER TWO, WHICH IS    -06:-
11   MATTEL'S MOTION FOR RECONSIDERATION OF PORTIONS OF THE
12   DISCOVERY MASTER'S DECEMBER 31, 2007 ORDER.
13             THE COURT:  IN FIVE WORDS OR LESS, WHAT IS THE
14   SUBJECT MATTER OF WHAT MOTION?
15             MR. ZELLER:  THAT MOTION RELATES TO THE SCOPE OF AN     -06:-
16   ORDER THAT JUDGE INFANTE ISSUED COMPELLING MGA TO PRODUCE
17   CERTAIN DOCUMENTS THAT RELATE TO OUR TRADE SECRET CLAIMS.
18             IN ESSENCE, THE JUDGE HAD RULED THAT --
19             THE COURT:  THAT'S ALL I NEED; SO IT RELATES TO TRADE
20   SECRETS, AND THAT'S WHY IT'S BASICALLY A PHASE 2, UNLESS          -06:-
21   CERTAIN THINGS HAPPEN WITH APPORTIONMENT IN PHASE ONE.
22             MR. ZELLER:  CORRECT.
23             THE COURT:  ALL RIGHT.  WHAT ELSE?
24             MR. ZELLER:  MOTION NUMBER TEN THAT WE'VE LISTED,
25   WHICH IS THE MOTION TO COMPEL MGA AND BRYANT WITH RESPECT TO      -06:-
```

```
 1   CERTAIN RFA'S.

 2           OBVIOUSLY, WITH RESPECT TO CARTER BRYANT IT IS MOOT.

 3           AS TO MGA, THERE ARE SOME -- A LIMITED NUMBER, AT

 4   LEAST -- OF RFA'S THAT WOULD POTENTIALLY GO TO PHASE 1-A; SOME

 5   OF THEM MAY NOT.  THE ONES THAT I KNOW THAT ARE LIKELY TO HAVE    -06:-

 6   SOME BEARING ON PHASE 1-A WOULD BE RFA'S THAT ARE DIRECTED TO

 7   MGA INQUIRING ABOUT FOCUS GROUPS THAT WERE CONDUCTED IN THE

 8   YEAR 2000, INCLUDING DURING TIME PERIODS WHEN CARTER BRYANT WAS

 9   EMPLOYED BY MATTEL.

10           SO IT COULD BE THAT IF THE COURT WOULD LIKE, WE COULD    -06:-

11   TRY AND NARROW THAT DOWN AND FIND PARTICULAR ISSUES FOR THE

12   COURT TO CONSIDER ON THAT MOTION, AS OPPOSED TO ITS ENTIRETY.

13           THE COURT:  VERY WELL.

14           ANYTHING ELSE?

15           MR. ZELLER:  YES, YOUR HONOR.                            -06:-

16           NUMBER 11, WHICH IS MATTEL'S MOTION TO COMPEL MGA AND

17   CARTER BRYANT TO RETURN PRIVILEGED DOCUMENTS, OR A PRIVILEGED

18   DOCUMENT.

19           THIS MOTION IS A LITTLE -- IT HAS SOME PROCEDURAL

20   COMPLEXITY IN ITS HISTORY.  IT'S A FAIRLY STRAIGHTFORWARD        -06:-

21   ISSUE.  THERE'S MORE THAN ONE VERSION OF A SECURITY FILE PAGE

22   THAT'S BEEN REDACTED FOR PURPOSES OF PRIVILEGE.  UNDER THE

23   CLAWBACK PROVISION, WE HAD CLAWED BACK A VERSION OF IT AND THEN

24   REDACTED IT IN ORDER TO CONFORM, WE THOUGHT, BETTER TO WHAT THE

25   PRIVILEGE ASSERTION SHOULD BE.                                  -06:-
```

1          ALSO BEAR IN MIND, THIS IS A DOCUMENT THAT JUDGE

2    INFANTE HAS BEEN OVER, IN TERMS OF PRIVILEGE, MORE THAN ONCE;

3    SO THERE WAS ANOTHER VERSION OF THIS DOCUMENT WITH A DIFFERENT

4    FORM OF REDACTION ON IT THAT THE DEFENDANTS DID NOT RETURN.  WE

5    ASKED FOR IT TO BE CLAWED BACK UNDER THE PROTECTIVE ORDER, AND      -06:-

6    IT WAS NOT RETURNED; SO ITS HISTORY IS SOMEWHAT COMPLEX.  IT'S

7    A 1-PAGE DOCUMENT THAT WE'RE TALKING ABOUT.

8          **THE COURT:**  VERY WELL.

9          THERE'S ONLY ONE MOTION FROM MGA ON THIS LIST; THAT'S

10   RELATED TO THE WACHOVIA DEPOSITION.                                 -06:-

11         **MR. NOLAN:**  CORRECT.

12         **THE COURT:**  IS THAT RELATED TO THE MOTION ALSO

13   PENDING BEFORE THIS COURT IN TERMS OF THE PRODUCTION THAT'S

14   BEEN MADE BY WACHOVIA RELATED TO THE LOANS IN 1999 AND 2000

15   FROM WACHOVIA TO ISAAC LARIAN OR MGA?                               -06:-

16         **MR. NOLAN:**  IT'S RELATED IN THE SENSE, YOUR HONOR,

17   THAT OBVIOUSLY ANYTHING THAT'S DIRECTED TO OR INVOLVES WACHOVIA

18   HAS TO DO WITH FINANCIAL DOCUMENTS THAT HAVE BEEN PRODUCED.

19         IT IS TECHNICALLY OUR MOTION BECAUSE WE ARE

20   PRESENTING WACHOVIA'S DEFENSE SINCE TECHNICALLY WACHOVIA --         -06:-

21   THERE'S NO JURISDICTION HERE TO DEAL WITH THAT ISSUE; SO WE'VE

22   ASSERTED THOSE OBJECTIONS.  WE DID SO IN FRONT OF JUDGE

23   INFANTE.  THAT'S A SINGLE ISSUE.  IF I COULD BE HEARD VERY

24   BRIEFLY ON THAT.

25         **THE COURT:**  I AM GOING TO ORDER, BASED ON THE MOTION      -06:-

1   THAT I HAVE REVIEWED, THAT WACHOVIA PRODUCE THOSE DOCUMENTS FOR

2   1999 AND 2000, THE LOAN DOCUMENTS, THE LOAN AGREEMENTS, HOWEVER

3   YOU WANT TO CLARIFY THEM, TO THE EXTENT WACHOVIA GAVE MONEY TO

4   MGA OR ISAAC LARIAN IN 1999 AND 2000 AND THEY HAVE DOCUMENTS

5   RELATED TO THAT, THAT'S GOING TO BE PRODUCED.                    -06:-

6          DOES THAT RENDER THIS MOTION MOOT, OR IS THERE STILL

7   REQUESTS OR DEPOSITION ISSUES OUTSIDE OF THOSE 1999, 2000 LOAN

8   DOCUMENTS, AGREEMENTS, ET CETERA?

9          **MR. NOLAN:**  I BELIEVE IT MAY MAKE IT MOOT, BUT I'D

10  JUST LIKE TO FOOTNOTE THE OPPORTUNITY TO COME BACK AND REVIEW    -06:-

11  IT.

12         **THE COURT:**  VERY GOOD.

13         **MR. NOLAN:**  IF I COULD RAISE ONE THING MR. ZELLER

14  RAISED HAVING TO DO WITH THIS CLAWBACK DOCUMENT, THE PRIVILEGED

15  DOCUMENT, OUT OF THE MATTEL INVESTIGATIVE REPORT.  WE HAVE NO    -06:-

16  OBJECTION.  WE RETURNED, I THINK, MOST COPIES OF THAT.  IF THEY

17  BELIEVE THAT THERE WAS A COPY -- AND I THINK THERE MAY HAVE

18  BEEN A COPY INADVERTENTLY PUT TO THE SUMMARY JUDGMENT PAPERS --

19  BUT WE'VE NEVER ARGUED WHAT WAS SUPPOSED TO BE REDACTED.  IT'S

20  JUST A SIMPLE ONE LINE.  IT'S ONE OF THE EXAMPLES OF DOCUMENTS  -06:-

21  THAT HAVE BEEN USED MANY TIMES AT DEPOSITIONS IN THE UNREDACTED

22  FORM.  WHEN THEY CLAWED IT BACK, IT WAS OUR INTENT TO CLEANSE

23  EVERYTHING.

24         I HAVE NO ISSUE WITH THAT AT ALL ON THAT, SO I DON'T

25  THINK THE COURT HAS TO SPEND ANY SIGNIFICANT TIME ON THAT AT    -06:-

```
 1    ALL.  I'LL WORK WITH MR. ZELLER TO MAKE CERTAIN THAT IF HE'S

 2    IDENTIFIED ANY PLACE WHERE IN THE PUBLIC RECORD THAT ONE LINE

 3    APPEARS, WE'RE HAPPY TO COMPLY WITH IT.

 4              THE COURT:  VERY WELL.  HOPEFULLY THAT WILL BE

 5    RENDERED MOOT BY FURTHER MEETING AND CONFERRING.                -06:-

 6              I'M GOING TO HAVE MY JUDICIAL ASSISTANT CALL UP TO

 7    THE DISCOVERY MASTER'S ASSISTANT AND FIND OUT WHAT THE STATUS

 8    IS OF THESE MOTIONS.  IF THE DISCOVERY MASTER IS ON THE VERGE

 9    OF ISSUING A RULING ON THEM, I'M NOT GOING TO DISTURB THAT.

10              MY GUESS IS THAT, BASED ON WHAT HE TOLD ME A FEW      -06:-

11    WEEKS AGO, THESE MAY NOT BE ON HIS RADAR AT ALL, FOR WHATEVER

12    REASON.  THAT'S ONLY SPECULATION ON MY PART.  IF THAT IS THE

13    CASE, I'M GOING TO RECALL ALL OF THESE MOTIONS.

14              I'M GOING TO DIRECT COUNSEL ACTUALLY TO DO WHAT I HAD

15    YOU DID THIS WEEKEND, AND THAT IS CREATE A BINDER WITH THESE 12 -06:-

16    MOTIONS, AND SINCE THERE'S ONLY A FEW THAT MIGHT COME OUT, WE

17    MIGHT AS WELL DO THEM ALL -- HAVE THE MOVING PAPERS, THE

18    OPPOSING PAPERS AND REPLY, IF ANY, PLACED INTO THEM.  IF I NEED

19    TO ACCESS THE DECLARATIONS OR EXHIBITS, I WILL DO SO.  I CAN DO

20    THAT THROUGH THE ELECTRONIC FILING.                            -06:-

21              BUT AS FAR AS THE MOTIONS THEMSELVES, I'D LIKE TO GET

22    THROUGH THESE IN THE NEXT SEVERAL DAYS BECAUSE I DON'T WANT TO

23    GET WELL INTO THIS TRIAL WITHOUT HAVING THESE RULED AND HAVING

24    SOME KIND OF ISSUES OUT THERE THAT, IF WE WOULD HAVE HAD THIS

25    EVIDENCE OR IF WE WOULD HAVE HAD THIS MOTION RULED UPON, WE     -06:-
```

1    WOULD HAVE HAD EVIDENCE THAT WOULD HAVE CHANGED THE OUTCOME OF

2    THE TRIAL.

3              WE HAVE ENOUGH TIME IN THIS TRIAL THAT I CAN'T

4    IMAGINE ANYTHING NOT BEING RESOLVED TODAY IS GOING TO AFFECT --

5    WE HAVE TIME, AS LONG AS WE GET THESE RESOLVED THIS WEEK.        -06:-

6              WOULD YOU AGREE WITH THAT, MR. ZELLER?

7         **MR. ZELLER:**  I DO.

8         **THE COURT:**  MR. NOLAN, I TRUST YOU AGREE AS WELL?

9         **MR. NOLAN:**  I DO, YOUR HONOR.

10        **THE COURT:**  VERY WELL.                                  -06:-

11             SO WE'LL TAKE CARE OF THESE MOTIONS SOME TIME THIS

12   WEEK.  I DO WANT TO GIVE A CALL TO JUDGE INFANTE FIRST.

13        **MR. NOLAN:**  YOUR HONOR, IF I MAY JUST -- ON FRIDAY WE

14   WERE TALKING ABOUT -- THERE HAVE BEEN A LOT OF MOTIONS FILED IN

15   THIS CASE, A LOT OF DISCOVERY TAKEN ON THIS CASE, AND SINCE THE  -06:-

16   COURT WAS GOING TO TAKE A LOOK AT THE MOTIONS AND THEN DECIDE

17   WHICH ONES TRULY NEEDED TO BE BRIEFED, BECAUSE OUR CONCERN HAS

18   ALWAYS BEEN A STRATEGY TO KEEP EVERYONE BUSY ON ANYTHING OTHER

19   THAN GETTING THIS TRIAL PRESENTED.

20             I'LL JUST GIVE YOU, AS AN EXAMPLE, YOUR HONOR, WHICH   -06:-

21   I THINK IS WHAT I CAN ONLY DESCRIBE AS A FLAGRANT ABUSE OF THIS

22   DISCOVERY PROCESS.  LET THERE BE NO DOUBT, I THINK THE RECORD

23   IS QUITE CLEAR, THAT YOU HAVE ARTICULATED AT MANY HEARINGS,

24   BOTH ON THE TELEPHONE AND IN PERSON:  THAT'S IT, EVERYTHING IS

25   OVER IN FRONT OF JUDGE INFANTE; GET EVERYTHING FILED.           -06:-

1   JUDGE INFANTE SAID THE SAME THING TO US NUMEROUS TIMES.  AND

2   YOU HAVE INDICATED BEFORE, YOU'RE DEALING WITH SOPHISTICATED

3   COUNSEL ON BOTH SIDES HERE.

4          THE MOTION ON ONE OF THEM, JUST NUMBER 10, TO SHOW

5   YOU AN EXAMPLE, THE IDEA THAT IN THIS CASE WITH MORE THAN SIX          -06:-

6   THOUSAND REQUESTS FOR ADMISSIONS IN THE COURSE OF THE REGULAR

7   DISCOVERY PERIOD, THAT THEY ARE NOW SUBMITTING REQUESTS FOR

8   ADMISSIONS HAVING TO DO WITH FOCUS GROUPS -- THAT MAY OR MAY

9   NOT HAVE BEEN CONDUCTED AT MGA WHILE CARTER BRYANT WAS EITHER

10  EMPLOYED AT MATTEL OR AT MGA, I'M NOT ABSOLUTELY CERTAIN OF          -06:-

11  IT -- WHICH WOULD HAVE OCCURRED SOME EIGHT YEARS AGO HAS BEEN

12  THE SUBJECT OF FOUR YEARS OR FIVE YEARS OF LITIGATION -- THAT

13  WE WOULD HAVE TO RESPOND RESPECTFULLY, YOUR HONOR, TO THAT KIND

14  OF DISCOVERY REQUEST AS WE HAVE A JURY AND WE'RE GOING TO BE

15  DOING OPENING STATEMENTS TODAY.  SOME OF THESE ARE A LITTLE BIT     -06:-

16  LATE.  BUT FOR US NOW TO BE FILING OBJECTIONS --

17          **THE COURT:**  LET ME STOP YOU THERE.

18          AS FAR AS THESE MOTIONS, AS I UNDERSTAND IT, THESE

19  WERE FILED QUITE AWHILE AGO; DECEMBER 2007 JANUARY 2008, THE

20  LATEST ONE IS FEBRUARY OF 2008.  I TAKE THAT BACK, THERE'S ONE       -06:-

21  ON APRIL 3, 2008, ASKING FOR FURTHER DEPOSITIONS OF

22  ANA CABRERA, BEATRICE MORALES AND MARIE SALAZAR.

23          I DOUBT WE'RE GOING TO BE DOING DEPOSITIONS IN THE

24  MIDDLE OF TRIAL ON THESE.  WE'RE PROBABLY PAST THE TIME FOR

25  THAT.                                                               -06:-

1      **MR. NOLAN:**  I JUST WANTED TO ALERT YOU TO THAT,

2  BECAUSE, AS YOU KNOW, OF COURSE, ON FRIDAY --

3      **THE COURT:**  BUT I TRUST YOU HAVE OPPOSITIONS FILED TO

4  ALL OF THESE MOTIONS, GIVEN THE AGE OF THEM?

5      **MR. NOLAN:**  I SUSPECT WE DO.  ALTHOUGH, THERE SOME ON      -06:-

6  FRIDAY --

7      **THE COURT:**  I'M GOING TO GO THROUGH THOSE RIGHT NOW.

8      **MR. ZELLER:**  IF I MAY JUST CLARIFY SOME POINTS HERE,

9  YOUR HONOR.  NUMBER ONE, THE MOTION PERTAINING TO CABRERA,

10  MORALES, AND SALAZAR, ONE OF THE MAIN ISSUES ON THAT MOTION IS      -06:-

11  THAT WE FOUND OUT THAT CABRERA HAD IN HER POSSESSION A NUMBER

12  OF TORN UP DRAWINGS, CARTER BRYANT DRAWINGS, RELATING TO BRATZ

13  DURING THE COURSE OF THIS DISCOVERY.  AND THE COURT WILL

14  RECALL, OF COURSE, THE RATHER BELATED REVELATION BY THE

15  DEFENDANTS THAT THERE WERE THESE ADDITIONAL MATTEL EMPLOYEES      -06:-

16  WHO HAD WORKED ON BRATZ WHILE EMPLOYED BY MATTEL.

17      WE DID NOT KNOW THAT UNTIL DECEMBER 28TH.

18      THEN THERE WAS CONSIDERABLE MOTION PRACTICE EVEN TO

19  GET CABRERA, MORALES, AND SALAZAR IN THE CHAIR.

20      **THE COURT:**  MR. ZELLER, I'M NOT HEARING ARGUMENT ON      -06:-

21  THESE MOTIONS RIGHT NOW.  WE'VE GOT A LOT TO DO IN THE NEXT

22  15 MINUTES.  I'LL TAKE A LOOK AT THESE MOTIONS, BUT I'M NOT

23  MAKING ANY RULING NOW.  LET'S JUST HOLD OFF FOR THE TIME BEING.

24  WE'VE GOT A NUMBER OF RULINGS THE COURT WANTS TO MAKE ON

25  MOTIONS THAT I HAVE LOOKED AT, ONES THAT NEED TO BE BRIEFED,      -06:-

```
1   AND THEN I'LL TAKE UP THE DISCOVERY ONES AS I RECEIVE THEM AND
2   REVIEW THEM.
3           I DID RESERVE TWO CHAIRS IN THE BACK WITH YELLOW
4   PIECES OF PAPER PLACED ON THEM; THOSE TWO CHAIRS SHOULD BE
5   RESERVED.                                                          -06:-
6           IN GOING THROUGH THE MOTIONS THAT WERE SUBMITTED TO
7   THE COURT AT THE END OF LAST WEEK, AND WHAT THE COURT IS
8   PREPARED TO RULE ON, THE FIRST ONE IS MATTEL'S EX-PARTE
9   APPLICATION FOR AN ORDER FINDING NO BASIS FOR A PROTECTIVE
10  ORDER, UNDER THE PROTECTIVE ORDER, FOR MATTEL TO RETURN THE        -06:-
11  FIVE DOCUMENTS PRODUCED BY MGA.
12          IS THERE ANY FURTHER ARGUMENT ON THIS THAT'S NOT BEEN
13  SUBMITTED IN THE PAPERS?
14      MR. COREY:  NO, YOUR HONOR.
15      MR. NOLAN:  NO, YOUR HONOR.                                    -06:-
16      THE COURT:  VERY WELL.
17          THE COURT IS GOING TO GRANT IN PART AND DENY IN PART
18  THIS MOTION.  THE COURT CONSIDERS THE UNAMBIGUOUS LANGUAGE OF
19  THE PROTECTIVE ORDER, BUT ALSO THE REASONABLENESS AND
20  TIMELINESS OF MGA'S REQUEST TO RETURN SAID DOCUMENTS, THE          -06:-
21  RELATIVE PREJUDICE TO THE PARTIES, AND THE TOTALITY OF THE
22  CIRCUMSTANCES.
23          REGARDING THE PAYMENT LIST, WHICH IS MGA 3819497
24  THROUGH 506, THE EMPLOYEES' LIST ONE, WHICH IS MGA 0868630
25  THROUGH 631, AND THE EMPLOYEE LIST TWO, WHICH IS MGA 1134723       -06:-
```

1    THROUGH 730, THE COURT FINDS MGA KNEW OR SHOULD HAVE KNOWN THAT

2    THEY HAD PRODUCED SAID DOCUMENTS LONG BEFORE THEIR MAY 7TH AND

3    MAY 11TH CLAWBACK REQUEST AS EACH OF THESE DOCUMENTS, ALTHOUGH

4    CREATED AT THE DIRECTION OF MGA COUNSEL FOR MANAGING DISCOVERY

5    IN THIS CASE, WERE PRODUCED AND THEN USED IN DEPOSITION AND/OR    -06:-

6    SUMMARY JUDGMENT LITIGATION WITHOUT ANY OBJECTION BY MGA.

7            IN FACT, DESPITE MATTEL'S REFUSAL TO RETURN SAID

8    DOCUMENTS, MGA HAS YET TO FILE A MOTION FOR THEIR RETURN.  THIS

9    ONLY CAME TO LIGHT BY VIRTUE OF THE EX-PARTE APPLICATION

10   SUBMITTED BY MATTEL.                                             -06:-

11           TO ORDER THESE DOCUMENTS RETURNED AT THIS LATE DATE

12   WOULD PREJUDICE MATTEL WHO IS NOW UNABLE TO OBTAIN THE

13   INFORMATION THROUGH ALTERNATIVE MEANS OF DISCOVERY.

14   ACCORDINGLY, THE COURT GRANTS MATTEL'S REQUEST FOR A FINDING

15   THAT THERE ARE NO GROUNDS TO RETURN TO MGA THE PAYMENTS LIST     -06:-

16   AND THE EMPLOYEES LISTS ONE AND TWO.

17           REGARDING THE BRATZ SALES SHEET, THIS IS MGA 0815789,

18   MGA ACTED REASONABLY IN SEEKING CLAWBACK OF THIS DOCUMENT ON

19   APRIL 1, 2008, WHICH DOCUMENT WAS CREATED BY MGA COUNSEL FOR

20   USE IN AN UNRELATED TRADEMARK APPLICATION IN INDIA AND WHICH     -06:-

21   MATTEL PROMPTLY RETURNED.

22           ALTHOUGH MATTEL RESERVED ITS RIGHT TO CHALLENGE THE

23   PRIVILEGE DESIGNATION, IT DID NOT DO SO UNTIL THE INSTANT

24   APPLICATION, WELL OVER A MONTH AFTER THE CLAWBACK.

25           UNDER THE TOTALITY OF THE CIRCUMSTANCES, THE COURT       -06:-

1    DENIES MATTEL'S REQUEST FOR THE RETURN OF THE BRATZ SALES SHEET

2    FROM MGA.

3            THE DISPUTE OVER THE FIFTH DOCUMENT IN QUESTION, THE

4    DECEMBER 7, 2000 FAX, MGA 0829296, WAS RESOLVED THROUGH THE

5    MEET AND CONFER PROCESS, AS THE COURT UNDERSTANDS IT.                -06:-

6            SO THAT IS THE COURT'S RULING ON THOSE FIVE

7    DOCUMENTS.

8            THE NEXT MOTION IS MATTEL'S MOTION TO ENFORCE TRIAL

9    SUBPOENAS ISSUED TO CABRERA AND MORALES.  IS THERE ANY FURTHER

10   ARGUMENT ON THIS MOTION FROM MATTEL?                                 -06:-

11           **MR. QUINN:**  NO, YOUR HONOR.

12           **MR. NOLAN:**  NO, YOUR HONOR.  WE WOULD SUBMIT.

13           **THE COURT:**  VERY WELL.

14           THE MOTION FOR AN ORDER ENFORCING THE COURT'S

15   DECEMBER 27, 2007 ORDER COMPELLING PRODUCTIONS OF CERTAIN           -06:-

16   DOCUMENTS IS DENIED AS SUCH; ALTHOUGH THE COURT WILL BE MINDFUL

17   OF THE HISTORY OF THE PRODUCTION OF THE LARIAN NET WORTH

18   DOCUMENTS AND THE RULING THEREON AND ANY OBJECTIONS TO SAID

19   DOCUMENTS -- WHILE RULING ON ANY OBJECTIONS TO SAID DOCUMENTS.

20           IN NOT ORDERING FURTHER PRODUCTION, THE COURT IS           -06:-

21   PROMPTED IN PART BY THE TIMING OF THE MOTION, ALMOST TWO MONTHS

22   AFTER THE LARIAN DEPOSITION.  THE EX-PARTE APPLICATION FOR AN

23   ORDER EXPEDITING THE HEARING ON THIS MOTION IS DENIED AS MOOT.

24           I'M ALSO GOING TO TAKE THIS UP ON THE TRIAL SUBPOENA

25   ON NUMBER EIGHT.  I'M GOING TO BE GRANTING IN PART AND DENYING      -06:-

```
 1   IN PART THAT MOTION.

 2           BASICALLY WHAT I'M SAYING HERE IS THAT MR. LARIAN IS

 3   GOING TO HAVE TO COMPETENTLY TESTIFY TO HOW MUCH MONEY HE MADE

 4   OFF OF BRATZ WHILE OWNING MGA.  AND I AM NOT GOING TO BOOK AN

 5   "I DON'T KNOW; I DON'T KNOW ABOUT THIS DOCUMENT; I DON'T KNOW    -06:-

 6   WHERE THIS CAME FROM."

 7           IF WHAT WENT ON AT THE DEPOSITION HAPPENS ON THE

 8   TRIAL STAND HERE, MATTEL IS GOING TO BE GIVEN A LOT OF LEEWAY

 9   AND A LOT OF LEAVE TO SEEK AND BRING IN A LOT MORE DOCUMENTS;

10   SO THIS IS REALLY SOMETHING THAT IS GOING TO BE CONTROLLED BY    -06:-

11   MR. LARIAN HIMSELF.

12           MR. NOLAN:  UNDERSTOOD.

13           I DO WANT TO SAY THAT I THINK THE RECORD EVIDENCE IN

14   THIS CASE IS THAT MGA AND ISAAC LARIAN HAS PRODUCED ALL

15   RELEVANT INFORMATION WITH RESPECT TO WHAT DISTRIBUTIONS WERE     -06:-

16   MADE.  IF ISSUES CAME UP AT THE DEPOSITION BECAUSE DOCUMENTS

17   WERE NOT IN FRONT OF HIM AT THE TIME, THAT HAS OCCURRED.

18   MATTEL HAS NOT BEEN DENIED ACCESS TO THOSE DOCUMENTS, AND

19   MR. LARIAN WILL BE PREPARED TO TESTIFY.

20           THE COURT:  AS LONG AS MR. LARIAN IS FULLY PREPARED      -06:-

21   TO TESTIFY AS TO HIS NET AND GROSS RECEIPTS FROM THE BRATZ

22   DOLLS, WE'RE NOT GOING TO HAVE A PROBLEM.

23           MR. NOLAN:  THAT'S CORRECT.

24           THE COURT:  IF WE HAVE A REPEAT OF WHAT HAPPENED AT

25   THE DEPOSITION -- AND I'M NOT ASSIGNING FAULT FOR THAT -- THEN   -06:-
```

1   THERE'S GOING TO BE A PROBLEM.

2          **MR. NOLAN:**  WE UNDERSTAND THAT.

3          **THE COURT:**  VERY WELL.

4          **MR. ZELLER:**  AND TO BE CLEAR, YOUR HONOR, THOSE

5   DOCUMENTS WERE IN FRONT OF MR. LARIAN.  THEY PROVIDED SUMMARY

6   SHEETS TO US THAT PURPORTED TO STATE ISAAC LARIAN'S ASSETS.  I

7   PUT THOSE DOCUMENTS IN FRONT OF MR. LARIAN AND ASKED HIM ABOUT

8   THEM.  HE WALKED AWAY FROM THEM.  THAT IS WHAT LED TO THESE

9   MOTIONS, INCLUDING OVER THE TRIAL SUBPOENA AND THE LIKE.

10  BECAUSE, AS THE COURT IS AWARE, FOR CERTAIN PURPOSES, WE DO

11  BEAR SOME BURDENS IN ESTABLISHING CERTAIN MONETARY AMOUNTS,

12  WHETHER FOR DAMAGES OR PUNITIVE DAMAGES.

13         **THE COURT:**  LET ME GO TO THAT TRIAL SUBPOENA, THEN,

14  BECAUSE THIS IS RELATED TO THIS ISSUE; THAT IS THE MOTION OF

15  PLAINTIFF FOR AN ORDER COMPELLING ISAAC LARIAN TO RESPOND TO

16  THE TRIAL SUBPOENA.

17         MY THOUGHT ON THAT IS TO GRANT IN PART AND DENY IN

18  PART.  THE DOCUMENTS THAT I'M GOING TO ORDER MR. LARIAN TO HAVE

19  AVAILABLE FOR HIS TESTIMONY AT TRIAL AS PART OF THE TRIAL

20  SUBPOENA, IS ITEM NUMBER FOUR; AND THAT IS DOCUMENTS SUFFICIENT

21  TO SHOW THE REVENUE, GROSS AND NET PROFITS BY HIM FROM THE SALE

22  OF BRATZ PRODUCTS, INCLUDING WITHOUT LIMITATION DOCUMENTS

23  SUFFICIENT TO SHOW SALES REVENUE, COSTS OF GOODS SOLD, VARIABLE

24  COSTS, GROSS MARGINS, ROYALTIES PAID AND RECEIVED, GROSS

25  PROFITS AND NET PROFITS.

1    I JUST DON'T WANT TO GET TO A POINT, GIVEN THE

2   HISTORY OF THE LARIAN DEPOSITION AND THE HISTORY OF THIS

3   PARTICULAR REQUEST FOR INFORMATION, TO RUN INTO A PROBLEM AT

4   TRIAL; SO I WANT THOSE DOCUMENTS AVAILABLE.

5    I'M NOT SAYING THAT THEY HAVE TO BE PRODUCED AND THEY    -06:-

6   HAVE TO BE INTRODUCED, BUT I WANT THEM AVAILABLE SO WE CAN PIN

7   THIS DOWN DURING THE TRIAL.  I THINK MATTEL IS ENTITLED TO

8   THAT.  AND THAT'S BEEN CONSISTENT WITH MY RULINGS ON THE MOTION

9   *IN LIMINE* IN TERMS OF WEALTH AND WHAT HE HAS TO DISCLOSE ON

10  THAT; IT'S CONSISTENT WITH THE RULINGS BY THE DISCOVERY MASTER    -06:-

11  IN TERMS OF WHAT NEEDS TO BE TURNED OVER AND WHAT QUESTIONS

12  NEED TO BE ANSWERED AT DEPOSITION.

13    **MR. NOLAN:**  WE UNDERSTAND YOUR RULING.

14    THERE HAVE BEEN OVER 37,000 FINANCIAL RECORDS

15  PRODUCED FROM MGA REFLECTING THAT INFORMATION; 30(B)(6)    -06:-

16  DEPOSITIONS HAVE BEEN TAKEN FROM THE PROPER EDUCATED PERSON AT

17  MGA.  THOSE DOCUMENTS, TO THE EXTENT THAT THEY ARE NOT --

18    **THE COURT:**  LET ME STOP YOU THERE.  BECAUSE THIS MAY

19  BE ONE OF THOSE INSTANCES WHERE THAT'S ALMOST TOO MUCH AND TOO

20  LITTLE AT THE SAME TIME.    -06:-

21    THE QUESTION IS THAT MR. LARIAN NEEDS TO BE PREPARED

22  TO ANSWER THE PRECISE QUESTIONS THAT RELATE TO DAMAGES:  HOW

23  MUCH MONEY HE MADE FROM BRATZ.  WHETHER IT TAKES 38,000

24  DOCUMENTS OR TWO -- MY PREFERENCE WOULD BE FOR THE TWO, OR THE

25  TEN THAT WERE SUBMITTED IN RESPONSE TO JUDGE INFANTE'S ORDER.    -06:-

1    THE BOTTOM LINE IS THAT INFORMATION HAS TO COME OUT.

2              I'M JUST MAKING SURE THAT EVERYBODY IS ON CLEAR

3    NOTICE THAT THE COURT EXPECTS THAT INFORMATION TO COME OUT

4    READILY.

5              I DON'T WANT TO ORDER MR. LARIAN, AS MATTEL REQUESTS,    -06:-

6    TO TURN OVER INCOME TAX RECORDS.  I DON'T WANT TO HAVE HIM TURN

7    OVER ANY OF THIS.  BUT I WILL IF WE RUN INTO PROBLEMS ON THIS

8    POINT IN THE TESTIMONY.

9              **MR. NOLAN:**  RIGHT, YOUR HONOR.

10             AS I SAID, WE'RE COMMITTED.  THE INFORMATION IS    -06:-

11   ALREADY THERE.  BUT I WANT TO MAKE CERTAIN THIS IS A 1-B ISSUE.

12   WE'RE NOT GOING TO BE TALKING ABOUT ISSUES IN PHASE 1-A OF

13   REVENUES FROM BRATZ FOR MR. LARIAN.  IF IT IS, THEN I THINK

14   WE'RE GOING TO HAVE TO REVISIT SOME MOTIONS *IN LIMINE* THAT WE

15   DISCUSSED BEFORE.  I SEE THIS AS A MOTION DIRECTED TO 1-B IN    -06:-

16   THE EVENT WE EVER GET TO A POSTURE IN THIS CASE WHERE DAMAGES

17   COULD BE AWARDED.

18             **THE COURT:**  NO.  I RULED AT MOTION *IN LIMINE* NUMBER

19   TWO THAT IT COULD COME IN ON 1-A, MR. NOLAN.  EVIDENCE OF HIS

20   INTEREST IN THE COMPANY.  NO.  THAT WAS THE COURT'S RULING.    -06:-

21   I'M LOOKING DIRECTLY AT MY NOTES HERE.

22             MR. COREY?

23             **MR. COREY:**  I BELIEVE THE DISTINCTION THAT THE COURT

24   DREW WAS THE FACT THAT MR. LARIAN'S OWNERSHIP AND THE INTEREST

25   IN THE COMPANY AS A GENERAL MATTER COMES IN.  BUT WHEN IT COMES    -06:-

1    TO QUANTIFICATION --

2          **THE COURT:**  IT'S NOT A CATEGORICAL EXCLUSION FROM

3    1-A.  I DON'T WANT THAT TO BE MISUNDERSTOOD.

4          **MR. NOLAN:**  I UNDERSTAND THAT, YOUR HONOR.  I THOUGHT

5    THE TESTIMONY THAT WAS GOING TO RELATE TO 1-A WOULD HAVE TO GO          -06:-

6    TO WHAT MR. LARIAN'S EXPECTATION, IF ANY, AT THE LAUNCH OF

7    BRATZ.

8          **THE COURT:**  BUT PART OF HIS EXPECTATION IS GOING TO

9    BE BASED ON HIS OWNERSHIP OF MGA AND HIS INTERESTS IN MGA.

10   RIGHT.  WE'RE NOT GOING TO GET INTO THE DETAILS OF HOW MUCH HE         -06:-

11   MADE, BECAUSE THAT WOULD BE FUTURE -- WHAT HE MADE OVER THE

12   YEARS OF, SAY, 2001 THROUGH 2006; THAT WILL GO TO DAMAGES.

13         WHAT HE EXPECTED TO MAKE AND WHAT HIS POSITION IN THE

14   COMPANY WAS IS RELEVANT IN 2000 IN TERMS OF HIS INTENT OR PART

15   OF MATTEL'S EVIDENCE OF HIS INTENT TO AID AND ABET IN WHATEVER        -06:-

16   IT IS THEY ARE CLAIMING, THE VARIOUS BREACHES THEY ARE CLAIMING

17   THAT HE AIDED AND ABETTED IN DOING.

18         **MR. NOLAN:**  CORRECT.

19         BUT JUST SO WE'RE CLEAR ON THIS, YOUR HONOR, I DON'T

20   WANT TO, IF, FOR INSTANCE, THE EVIDENCE IS THAT AT THE TIME OF        -06:-

21   THE LAUNCH OF BRATZ IN 2000, IT WAS IN ITS INFANCY, NEW DOLLS

22   CRASH ALL OF THE TIME; THEY ARE NOT COMMERCIALLY SUCCESSFUL.

23   IF THEY ATTEMPT TO IMPEACH HIM ON THAT WITH LATER EVIDENCE

24   SHOWING THAT BRATZ BECAME A WORLDWIDE SUCCESS, WE BELIEVE WE

25   SHOULD THEN BE ABLE TO INTRODUCE EVIDENCE AS TO WHAT WE CONTEND       -06:-

1   IN 1-B TO BE THE MOTIVE EVIDENCE OF MATTEL IN BRINGING THIS

2   LAWSUIT.

3          **THE COURT:**  WE'RE GETTING BEYOND THIS MOTION RIGHT

4   NOW, COUNSEL.

5          **MR. NOLAN:**  OKAY.                                    -06:-

6          **THE COURT:**  MR. COREY, ANYTHING FURTHER?

7          **MR. COREY:**  FOR CLARIFICATION, THE SCOPE OF THE ORDER

8   I BELIEVE SHOULD INCLUDE UP THROUGH AND INCLUDING THE END OF

9   FISCAL YEAR 2007.

10          **THE COURT:**  2007.                                   -06:-

11          DID I STOP AT 2006?

12          **MR. COREY:**  YOU DIDN'T SAY ANYTHING, YOUR HONOR.

13          **THE COURT:**  ALL RIGHT.  VERY WELL.

14          GETTING BACK TO THE ORIGINAL ORDER HERE.

15          THAT'S THE COURT'S RULING.  SO THE MOTION IS DENIED    -06:-

16   AS SUCH.  BUT I THINK WHAT THE COURT IS GOING TO REQUIRE OF

17   MR. LARIAN IS HOPEFULLY CLEAR.

18          THE NEXT MOTION IS THE MOTION TO ENFORCE TRIAL

19   SUBPOENAS ISSUED TO ANA CABRERA AND BEATRICE MORALES.  I DO NOT

20   HAVE AN OPPOSITION TO THIS FILED SO FAR.  HOWEVER, I BELIEVE   -06:-

21   THAT IT SEEMS PREMATURE.  A MOTION TO ENFORCE A TRIAL SUBPOENA

22   BROUGHT BEFORE THE TRIAL HAS EVEN BEGUN, WHEN THERE'S NO

23   INDICATION THERE'S NOT GOING TO BE AN HONORING OF THE TRIAL

24   SUBPOENA STRIKES THE COURT AS NOT RIPE FOR CONSIDERATION.

25          I'VE READ THE MOTION.  I'M MINDFUL OF THE ISSUES.     -06:-

1          IS THERE ANY REASON THIS HAS TO BE ADDRESSED AT THIS

2     POINT, OR DO WE HAVE ANY REASON WHY WE SHOULD NOT TO TAKE THIS

3     UP IN THE COURSE OF THE ACTUAL TESTIMONY ITSELF?

4          **MR. PROCTOR:**  THAT'S FINE.  THEY DID SERVE FORMAL

5     WRITTEN OBJECTIONS.  IT'S CLEAR THEY ARE NOT INTENDING TO                -06:-

6     PRODUCE THE DOCUMENTS.  SOME GUIDANCE FROM THE COURT AS TO

7     THEIR OBLIGATIONS TO PRODUCE MIGHT BE HELPFUL.  BUT I DO THINK

8     IT COULD BE DEFERRED, IF THAT'S THE COURT'S PREFERENCE.

9          **MR. NOLAN:**  I WOULD ONLY NOTE THAT THESE TWO

10    INDIVIDUALS ARE REPRESENTED BY SEPARATE COUNSEL.  THEY ARE NOT         -06:-

11    REPRESENTED BY MGA.  AND THAT COUNSEL IS NOT PRESENT TODAY.

12          **THE COURT:**  VERY WELL.

13          THE MOTION FOR AN ORDER COMPELLING PRODUCTION OF

14    COMMUNICATIONS MADE IN FURTHERANCE OF CRIMES AND FRAUD.  I'M

15    GOING TO FIRST TAKE UP THE EX-PARTE APPLICATION TO SHORTEN TIME       -06:-

16    ON HEARING THIS BECAUSE OF THE NEED TO GET CRITICAL EVIDENCE.

17          I GUESS MY CONCERN ON THIS IS THAT I GUESS I'M NOT

18    SEEING THE COMPELLING NEED TO SHORTEN TIME.  I SUPPOSE THIS

19    GOES, TO A CERTAIN EXTENT, TO THE MERITS OF THE MOTION ITSELF.

20    I UNDERSTAND THERE'S NO OPPOSITION THAT'S BEEN FILED TO THIS AS       -06:0

21    OF YET.  I'M RELUCTANT TO GET TO THE MERITS.

22          ALTHOUGH, I SUPPOSE IF I DENY IT, MR. NOLAN IS NOT

23    GOING TO OBJECT TO ME NOT ALLOWING HIM TO SPEAK TO THE

24    OPPOSITION.

25          **MR. NOLAN:**  NO, YOUR HONOR.  WE'LL JOIN IN THAT               -06:0

```
 1   RULING.

 2           THE COURT:  I GUESS THE ISSUE IS THIS WHOLE ALIBI

 3   SCHEME IS NOT NEW.  THE ONLY THING THAT'S NEW HERE IS

 4   MS. GLASER'S DEPOSITION.  THE PRIVILEGE LOGS WHICH CONTAIN THE

 5   INFORMATION AT QUESTION WERE MADE AVAILABLE BACK IN JANUARY.        -06:0

 6   WHY ARE WE GETTING THIS MOTION NOW, ON THE EVE OF TRIAL?

 7           I UNDERSTAND MS. GLASER MAY HAVE ADDED TO THE CRIME

 8   FRAUD THEORY THAT'S BEING ADVANCED BY MATTEL, BUT I DON'T SEE

 9   THAT AS BEING SOMETHING COULD NOT HAVE BEEN AIRED WELL IN

10   ADVANCE OF THIS.                                                   -05:-

11           YOUR LAST SECTION IN YOUR EX-PARTE APPLICATION WAS

12   THAT THE URGENCY WAS NOT OF MATTEL'S CREATION.  THE COURT, AT

13   LEAST IN MY FIRST READING OF THIS, TENDS TO THINK IT MAY VERY

14   WELL HAVE BEEN.

15           I'LL HEAR ON THAT, COUNSEL.                                -05:-

16           MR. QUINN:  YOUR HONOR, WHAT WE LEARNED THE WEEK

17   BEFORE LAST AT MS. GLASER'S DEPOSITION WAS THAT SHE HAD

18   RECEIVED THIS COPY OF THE CONTRACT WITH THE DATE WHITED OUT.

19   THAT WAS NEW INFORMATION.  WE GOT THE FAX COVER SHEET THAT

20   INDICATED WHEN SHE HAD RECEIVED THAT IN RELATION TO THE CLAWED     -05:-

21   BACK DOCUMENT.  AND THE CLAWED BACK DOCUMENT WAS RELATIVELY

22   RECENTLY PRODUCED AND CLAWED BACK PRETTY SOON THEREAFTER.

23           BUT THE NEW PIECE OF INFORMATION WAS HER TESTIMONY

24   THAT SHE GOT THE CONTRACT IN THE VERY SHORT PERIOD OF TIME THAT

25   HAD BEEN REDACTED AFTER THAT COMMUNICATION FROM MR. LARIAN         -05:-
```

MAY 27, 2008                    TRIAL DAY 2, MORNING SESSION

1    WHERE HE REFERS TO THIS WORK WAS DONE ON NIGHTS AND WEEKENDS.

2    THAT IS THE NEW FACT, THE TIMING BETWEEN THAT AND THE NIGHTS

3    AND WEEKENDS E-MAIL, AS WELL AS THE FACT THAT NOW MR. LARIAN

4    WAS WITHHOLDING INFORMATION FROM HIS ATTORNEY.  THE KEY FACT AS

5    TO WHEN MR. BRYANT ENTERED INTO THIS CONTRACT WITH MGA, SHE          -05:-

6    WHITED THAT OUT.  AND THE PRIVILEGE LOG DID NOT SHOW THE DATE.

7    THEY HAD GIVEN US A PRIVILEGE LOG.

8            **THE COURT:**  SHE WHITED THAT OUT.  YOU'RE NOT --

9            **MR. QUINN:**  NO.  NOT THAT SHE WHITED IT OUT.

10           WE KNEW IT HAD BEEN WHITED OUT.  WE KNEW THAT THE          -05:-

11   HEADER HAD BEEN WHITED OUT.

12           **THE COURT:**  EXACTLY.

13           **MR. QUINN:**  WE DIDN'T KNOW THE DATE HAD BEEN WHITED

14   OUT.

15           **THE COURT:**  WELL, I UNDERSTAND THIS ADDS ANOTHER        -05:-

16   DIMENSION TO IT AND THIS IS ANOTHER EVIDENTIARY PIECE.  BUT YOU

17   HAVE YOUR THEORY; YOU HAVE YOUR CRIME FRAUD EXCEPTION THEORY;

18   YOU HAVE EVIDENCE SUPPORTING IT.  WHY WASN'T THIS MOTION

19   BROUGHT MONTHS AGO AFTER THE PRIVILEGE LOGS WERE LOGGED?

20           **MR. QUINN:**  THE DATE OF THE DOCUMENT WAS NOT IN THE     -05:-

21   PRIVILEGE LOGS.  IT WASN'T UNTIL WE TOOK MS. GLASER'S

22   DEPOSITION AND WE GOT DOCUMENTS FROM HER THAT WE LEARNED THAT

23   SHE HAD RECEIVED AN ALTERED DOCUMENT WITHIN DAYS OF THIS

24   COMMUNICATION WITH MR. LARIAN WHERE MR. LARIAN SAID, COMPLETELY

25   CONTRARY TO THEIR THEORY OF THE CASE, THAT THIS WAS NOT CREATED    -05:-

1  BACK IN 1998 BUT MR. BRYANT HAD DONE THIS WORKING NIGHTS AND

2  WEEKENDS; SO IT TIED THOSE TWO TOGETHER IN A WAY THAT WE COULD

3  NOT HAVE KNOWN BEFORE UNTIL WE HAD MS. GLASER'S TESTIMONY.

4         **THE COURT:**  YOU CAN STILL BRING IN THAT TESTIMONY;

5  CORRECT?                                                      -05:-

6         **MR. QUINN:**  WE CAN.  BUT WE NEED THE DOCUMENT THAT

7  THEY CLAWED BACK, THE NIGHTS AND WEEKENDS DOCUMENT; THAT SHOWS

8  HE'S CONCEALING INFORMATION FROM HIS OWN LAWYER.  IT'S PART OF

9  THE FRAUD SCHEME.  HE'S NOW LYING TO HIS LAWYER.  AND THAT'S

10  OUR CASE FOR GETTING BACK THAT CLAWED BACK DOCUMENT, YOUR      -05:-

11  HONOR.

12         **THE COURT:**  MR. NOLAN?

13         **MR. QUINN:**  I'M TOLD THAT THE FAX AND THE DOCUMENT

14  WAS JUST PRODUCED BY THE CHRISTENSEN FIRM LAST WEEK.  IT WAS

15  NEVER PRODUCED BY MGA WITH THE DATE WHITED OUT.               -05:-

16         **THE COURT:**  SO YOU HAVE THE FAX AND THE DOCUMENT?

17         **MR. QUINN:**  YES.  AND THAT GIVES US THE KNOWLEDGE OF

18  THE FRAUDULENT SCHEME WHICH GIVES US A BASIS TO PIERCE THE

19  CLAIM OF PRIVILEGE AS TO THE CLAWED-BACK DOCUMENT; IT'S PART OF

20  A FRAUDULENT CRIMINAL SCHEME.                                 -05:-

21         **THE COURT:**  WHAT'S THE DIFFERENCE BETWEEN THE CLAWED

22  BACK DOCUMENT AND THE DOCUMENT THAT YOU RECEIVED THIS LAST

23  WEEK?

24         **MR. QUINN:**  THE CLAWED-BACK DOCUMENT IS THE DOCUMENT

25  THAT MR. LARIAN WRITES TO MS. GLASER SAYING MR. BRYANT CREATED  -05:-

1    THESE DRAWINGS.

2           **THE COURT:**  YOU DON'T HAVE THAT?  MS. GLASER DIDN'T

3    PRODUCE THAT?

4           **MR. QUINN:**  WE HAD IT.  THEY CLAWED IT BACK.  WE DO

5    NOT HAVE IT NOW.  WE GAVE IT BACK WHEN THEY CLAWED IT BACK.          -05:-

6           **THE COURT:**  WHAT DID MS. GLASER PRODUCE?

7           **MR. QUINN:**  MS. GLASER PRODUCED THE FAX COVER SHEET

8    SHOWING WHEN SHE GOT THE CONTRACT AND SHE ALSO PRODUCED THE

9    CONTRACT ITSELF SHOWING THE DATE WHITED OUT.

10          **THE COURT:**  IS SHE GOING TO TESTIFY TO THE FACTS          -05:-

11   YOU'RE SUGGESTING HERE?

12          **MR. QUINN:**  YES.

13          **MR. NOLAN:**  YOUR HONOR, I WANT TO POINT OUT THAT WHAT

14   MR. QUINN DOES IS HE GENEROUSLY QUOTES FROM A CLAWED-BACK

15   DOCUMENT THAT IS PRIVILEGED.                                        -05:-

16          **THE COURT:**  I UNDERSTAND.

17          **MR. NOLAN:**  BUT TO GO BACK TO THE BASIC ISSUE, YOUR

18   HONOR, THIS IDEA, THIS NOTION, THAT SOME ALLEGATION OF AN ALIBI

19   AND CRIME FRAUD EXCEPTION IS COMPLETELY BOGUS.

20          HAVING SAID THAT --                                          -05:-

21          **THE COURT:**  WELL, THERE'S EVIDENCE OF IT, COUNSEL.

22          I'M NOT WILLING TO SAY THAT IT'S BOGUS OR NOT BOGUS.

23          **MR. NOLAN:**  THE CHARACTERIZATION THAT SOMEHOW THIS IS

24   A CRIME FRAUD COVER UP IN THIS CASE, WE'RE GOING TO SHOW THAT'S

25   NOT THE CASE AT ALL.                                                -05:-

1          BUT MORE TO THE MERITS OF THIS, YOUR HONOR, THIS

2     ISSUE AS TO WHEN THE COMMUNICATIONS WERE MADE TO PATTY GLASER'S

3     OFFICE, COMMUNICATIONS BETWEEN MGA AND THEIR LAWYERS, CAME OUT

4     IN VICTORIA O'CONNOR'S DEPOSITION MANY YEARS AGO.  AND I THINK,

5     YOUR HONOR, IN THE MOTION FOR SUMMARY JUDGMENT, WE CERTAINLY          -05:-

6     HEARD EVIDENCE AND ARGUMENT ON THE POINT THAT VICTORIA O'CONNOR

7     TESTIFIED THAT SHE WAS INSTRUCTED OR ASKED TO WHITE OUT CERTAIN

8     PORTIONS OF THE DOCUMENT AS IT WAS BEING FAXED TO MS. GLASER'S

9     OFFICE.  THEY HAVE BEEN AWARE OF THAT SITUATION.  THEY ARE ABLE

10    TO ARGUE THAT.  THEY HAVE ARGUED IT IN THE MOTION FOR SUMMARY        -05:-

11    JUDGMENT.

12          WHAT THEY ARE NOW TRYING TO TAKE ADVANTAGE OF IS TO

13    TAKE IT ONE STEP FURTHER AND PIERCE THE ATTORNEY-CLIENT

14    PRIVILEGE BETWEEN PATTY GLASER AND MR. LARIAN.  PATTY GLASER,

15    WHO IS AND WAS A FORMER COUNSEL AND TRIAL COUNSEL IN THIS CASE,      -05:-

16    UNDER THE SHELDON TEST AND EVERYTHING ELSE, I THINK WE'RE GOING

17    INTO VERY DANGEROUS GROUNDS HERE.  IT'S NOT NECESSARY.  THEY

18    HAVE THE ARGUMENTS.  THEY HAVE IT.  THE CLAWED-BACK DOCUMENT IS

19    CLEARLY A PRIVILEGED COMMUNICATION BETWEEN MR. LARIAN AND

20    MS. GLASER.  WE ACTED REASONABLY IN REQUESTING THE IMMEDIATE        -05:-

21    CLAWBACK OF THAT.  THAT'S NOT SOMETHING THAT'S BEEN OUT THERE.

22          **THE COURT:**  I'M GOING TO DENY THE MOTION AT THIS TIME

23    WITHOUT PREJUDICE.  DEPENDING ON HOW THIS PLAYS OUT IN TRIAL

24    AND WHAT KIND OF FOUNDATION IS LAID, THE COURT MIGHT RECONSIDER

25    IT IN THE COURSE OF THE TRIAL ITSELF.  I THINK THIS MAY BE          -05:-

1    CUMULATIVE.  I THINK MATTEL PROBABLY HAS ENOUGH EVIDENCE ON THE

2    POINT.  THE COURT IS CONCERNED ABOUT THE DELAY.

3         AT THE SAME TIME, DEPENDING ON HOW THIS PLAYS OUT AND

4    HOW MS. GLASER'S TESTIMONY PLAYS OUT, AND IF IT'S TRULY --

5    DEPENDING ON HOW THE OBJECTIONS COME IN, THE COURT MAY CONSIDER        -05:-

6    ADMITTING THIS EVIDENCE OR ORDERING THAT THIS EVIDENCE BE

7    PRODUCED IN THE COURSE OF THE TRIAL.

8         NO REFERENCE TO IT IN OPENING STATEMENT; NO REFERENCE

9    TO THE PRIVILEGED DOCUMENTS IN OPENING STATEMENT.  YOU CAN

10   CERTAINLY REFERENCE YOUR THEORY IN OPENING STATEMENT AND ANY          -05:-

11   EVIDENCE THAT'S NOT PRIVILEGED.  BUT NO REFERENCE TO THIS IN

12   OPENING STATEMENT, THIS EVIDENCE ITSELF; SO IT'S DENIED WITHOUT

13   PREJUDICE AND THE COURT WILL RECONSIDER IT IN THE CONTEXT OF

14   THE TRIAL.

15        THE NEXT MOTION IS THE MOTION TO ENFORCE THE                     -05:-

16   DISCOVERY MASTER'S MAY 7, 2008 ORDER.  AS I INDICATED EARLIER,

17   I'M GOING TO GRANT THIS MOTION.  THIS REALLY IS DIRECTED OR AT

18   LEAST THE EX-PARTE APPLICATION IS DIRECTED TOWARDS WACHOVIA.

19   THEY DON'T OPPOSE IT.  THE REPRESENTATION BY MATTEL IS THAT

20   THEY ARE SEEKING CLARIFICATION.                                       -05:-

21        IS THERE ANY OPPOSITION TO THIS FROM THE DEFENSE?

22        **MR. NOLAN:**  YOUR HONOR, WE FILED, I THINK, AN OMNIBUS

23   OBJECTION TO THE EX-PARTE NOTICE.  WITH RESPECT TO THE

24   SUBSTANTIVE PORTION OF IT, THERE WERE ARGUMENTS THAT WERE MADE

25   TO JUDGE INFANTE WITH RESPECT TO THE SUBSTANCE; SO WE HAVE A          -05:-

1  SUBSTANTIVE OBJECTION TO THE REQUEST ITSELF.  WE THINK THAT

2  WHAT JUDGE INFANTE'S RULING ON THIS SUBJECT WAS WITH RESPECT TO

3  THE BREADTH AND SCOPE AND ALL OF THAT STILL APPLIES.  WE'D LIKE

4  TO BE HEARD ON THAT AT SOME TIME.

5           I DON'T THINK IT'S NECESSARY TO RAISE IT THIS MORNING   -05:-

6  OR RULE ON IT THIS MORNING.  I JUST WOULD LIKE A BREAK TO

7  RESERVE IT AND ADDRESS IT SPECIFICALLY.

8           **THE COURT:**  WHAT IS YOUR OPPOSITION TO IT?

9           **MR. NOLAN:**  A, YOUR HONOR, I THINK THE REQUEST WAS

10 LATE.  NUMBER TWO IS, JUDGE INFANTE, I BELIEVE, SAID THAT THE    -05:-

11 INFORMATION WAS CUMULATIVE TO THE -- I DON'T WANT TO

12 SAY THOUSANDS OF --

13          **THE COURT:**  DID NOT JUDGE INFANTE RULE THAT THE LOAN

14 AGREEMENTS WERE TO BE PRODUCED FOR THIS PERIOD, 1999, 2000?

15          **MR. NOLAN:**  THE LOAN AGREEMENTS, YOUR HONOR, I       -05:-

16 UNDERSTAND THE COURT'S PRIOR RULING ON THIS ISSUE.  I THOUGHT

17 WE WERE GOING INTO A DIFFERENT ISSUE.

18          **THE COURT:**  NO.  THIS IS JUST THE LOAN AGREEMENT AND

19 WHETHER OR NOT THAT INCLUDES LOAN DOCUMENTS.  FOR SOME REASON,

20 AND IT'S COMPLETELY UNCLEAR TO ME, THE GOOD LAWYERS AT WACHOVIA  -05:-

21 INTERPRETED LOAN AGREEMENTS NOT TO INCLUDE LOAN DOCUMENTS WHEN

22 THEY WERE ESSENTIALLY EXTENSIONS OF CREDIT THAT HAD BEEN

23 INITIALLY OFFERED IN 1996, BUT EXPANSIONS OF THOSE CREDIT

24 FACILITIES WERE SOUGHT IN 1999 AND 2000, AND WACHOVIA WAS

25 TAKING A VERY CONSERVATIVE RESTRICTIVE INTERPRETATION OF JUDGE   -05:-

1    INFANTE'S ORDERS, WHICH THIS COURT DOES NOT FIND TO BE

2    REASONABLE ON ITS FACE.

3              **MR. NOLAN:**  THAT'S THE RULING I ACCEPT FROM THE

4    COURT.

5              **THE COURT:**  VERY WELL.                                    -05:-

6              **MR. NOLAN:**  SINCE WE DON'T REPRESENT WACHOVIA IN

7    THIS, I NEED TO JUST TRANSLATE WHAT WACHOVIA SAID AND WHAT THEY

8    HAVE DONE.  WHATEVER THEY DID WAS NOT AT OUR DIRECTION.  I JUST

9    NEED TO LOOK AT THAT.

10             **THE COURT:**  I APPRECIATE THAT.                           -05:-

11             I'LL ISSUE AN ORDER TODAY ORDERING WACHOVIA TO

12   PRODUCE ALL LOAN AGREEMENTS AND LOAN DOCUMENTS RELATED TO ANY

13   LOANS THAT MGA ENTERED INTO, SOUGHT, OR REQUESTED FROM WACHOVIA

14   IN 1999 AND 2000, INCLUDING THOSE RELATED TO EARLIER LOAN

15   AGREEMENTS OR FINANCING AGREEMENTS.                                   -05:-

16             JUST TO MAKE IT CLEAR, IF WACHOVIA LOANED MONEY IN

17   1999 OR 2000 TO MGA, THE LOAN DOCUMENTS AND AGREEMENTS RELATED

18   TO THAT NEED TO BE PRODUCED.

19             **MR. NOLAN:**  RIGHT.

20             **THE COURT:**  I THINK THAT IS WHAT JUDGE INFANTE WAS       -05:-

21   TRYING TO GET AT.

22             **MR. NOLAN:**  RIGHT.

23             TO THE EXTENT THEY ARE IN THE CUSTODY OF WACHOVIA, IF

24   YOU LOOK AT EXHIBIT 6, YOUR HONOR, TO OUR OMNIBUS OPPOSITION TO

25   MATTEL'S EX-PARTE APPLICATIONS, THERE'S A LETTER FROM THE LAW        -05:-

1   FIRM OF DAVIS, POLK & WARDWELL, DATED MAY 25, 2008.

2           **THE COURT:**  COUNSEL, WOULD YOU REFER ME TO WHERE IN

3   THE BINDER THIS IS THAT YOU SENT ME OVER THE WEEKEND?

4           **MR. NOLAN:**  YOUR HONOR, BECAUSE WE DID NOT FILE ANY

5   NEW DOCUMENTS OVER THE WEEKEND, AT THE COURT'S REQUEST, WHAT      -05:-

6   WE --

7           **THE COURT:**  I DON'T HAVE IT, THEN.

8           **MR. NOLAN:**  WE FILED IT THIS MORNING.  I APOLOGIZE.

9           **THE COURT:**  I DO NOT HAVE SOMETHING OVER THE WEEKEND

10  THAT YOU FILED THIS MORNING, AND I GUARANTEE THAT I DID NOT      -05:-

11  READ IT.

12          **MR. NOLAN:**  AT LEAST I GET CREDIT FOR NOT FILING

13  ANYTHING OVER THE WEEKEND.

14          ALL I WOULD SAY IS, YOUR HONOR --

15          **THE COURT:**  AND I GET CREDIT FOR NOT HAVING TO READ   -05:-

16  SOMETHING THAT'S NOT BEEN FILED.

17          **MR. NOLAN:**  ABSOLUTELY.

18          ALL I'M SAYING IS THAT ON THIS, I DON'T THINK THERE'S

19  GOING TO BE AN ISSUE, BUT I JUST WANT TO POINT OUT THAT

20  WACHOVIA'S POSITION ON THIS WAS SET FORTH AS AN EXHIBIT TO THIS  -05:-

21  OMNIBUS MOTION THAT WE FILED THIS MORNING OBJECTING TO THE

22  EX-PARTE APPLICATION THAT HAD BEEN FILED ON FRIDAY.  THAT'S ALL

23  I'M SAYING.

24          WHEN YOU SEE THIS DOCUMENT, IT MAY NOT BE AN ISSUE,

25  BUT IF IT IS, I JUST WANT TO POINT IT OUT THAT --                -05:-

```
 1            THE COURT:  I APPRECIATE THAT.  THE OBJECTION IS
 2   OVERRULED.  THE ORDER IS ISSUED AS STATED ON THE RECORD.
 3            THE NEXT MOTION IS THE MOTION TO QUASH THE DONALD K.
 4   MOON TRIAL SUBPOENA.  THERE'S NO OPPOSITION TO THIS, BUT MY
 5   TENTATIVE IS TO DENY THE MOTION TO QUASH.                      -05:-
 6            I UNDERSTAND THIS MAY NOT BE RELEVANT AT THE END OF
 7   THE DAY, BUT I CAN'T SAY THAT NOW BASED ON WHAT'S BEFORE ME.
 8   MR. MOON IS GOING TO HAVE TO COME IN AND TESTIFY PURSUANT TO
 9   THE TRIAL SUBPOENA.  I'LL CERTAINLY ALLOW MATTEL TO RESERVE ANY
10   OBJECTIONS ON RELEVANCY AND I'M NOT RULING ON THAT AT THIS      -05:-
11   POINT, BUT I'M NOT GOING TO QUASH THE SUBPOENA.
12            THE MOTION TO COMPEL MR. LARIAN TO RESPOND TO THE
13   TRIAL SUBPOENA HAS ALREADY BEEN ADDRESSED.
14            THE LAST WRITTEN MOTION IS THE OMNIBUS MOTION FILED
15   BY MATTEL.  MY FIRST QUESTION TO MATTEL ON THIS IS, WHY        -05:-
16   SHOULDN'T I TREAT THIS AS THE 17TH MOTION *IN LIMINE* AND DENY IT
17   ON THAT BASIS?
18            MR. ZELLER:  WELL, I THINK THERE'S A VERY PRAGMATIC
19   MATTER, YOUR HONOR.  MUCH OF THIS, OF COURSE, AROSE --
20            THE COURT:  THE PRAGMATIC MATTER BEING THAT YOU RAN   -05:-
21   OUT OF 15?
22            MR. ZELLER:  CORRECT.  AND ON THAT BASIS I WOULD ASK
23   FOR LEAVE.
24            IT SEEMS TO ME, NUMBER ONE, THAT THIS IS NOT A MOTION
25   *IN LIMINE* PER SE.  WE ARE ASKING FOR RULINGS THAT ARE        -05:-
```

1   ULTIMATELY BASED ON WHAT KIND OF JURY INSTRUCTIONS SHOULD BE

2   GIVEN AS A RESULT OF THIS.  I UNDERSTAND THAT OF COURSE THERE

3   ARE OTHER ISSUES THAT ARE PRESENTED BY THIS MOTION.  CERTAINLY,

4   I UNDERSTAND THE COURT'S PERSPECTIVE, AT LEAST AS TO THOSE,

5   THAT PERHAPS ONE WOULD CONSIDER THEM IN THE CONTEXT OF BEING A   -05:-

6   MOTION *IN LIMINE*.

7           **THE COURT:**  I'LL TELL YOU MY THOUGHT.  IT'S MORE THAN

8   JUST THE ADVERSE INSTRUCTION THAT YOU SEEK IN HERE.  YOU'RE

9   ACTUALLY ASKING THE COURT TO ORDER AND REQUIRE ANSWERS OR

10   PROVIDE CERTAIN RELIEF TO MATTEL IN THE COURSE OF THE   -05:-

11   WITNESSES' TESTIMONY.  I DO THINK THOSE ARE BEST DETERMINED IN

12   THE CONTEXT OF THE WITNESSES TESTIFYING.  WHETHER THEY ARE

13   GOING TO TESTIFY CONSISTENT WITH THEIR DEPOSITION OR WHETHER

14   THEY ARE GOING TO TESTIFY CONSISTENT WITH THE INFORMAL

15   INTERVIEW THAT MATTEL HAD WITH THE WITNESSES IN JANUARY.   -05:-

16           I THINK I NEED TO GIVE LEAVE TO MGA, THOUGH, TO

17   EDUCATE THE COURT FROM THEIR PERSPECTIVE ON THE LAW ON THIS

18   ISSUE.  I'VE READ YOUR MOTION.  I'M MINDFUL OF THE LAW.  I

19   THINK I NEED TO GIVE MGA A CHANCE TO RESPOND.  NOT SO MUCH AS

20   AN OPPOSITION BUT JUST MORE OF A TRIAL BRIEF ON THE ISSUES   -05:-

21   RAISED IN THIS SO THE COURT CAN THEN MAKE A DECISION IN THE

22   CONTEXT OF ACTUALLY HEARING THE WITNESSES AND THEN ULTIMATELY

23   IN DRAFTING THE JURY INSTRUCTIONS.

24           **MR. ZELLER:**  CERTAINLY WE WOULD AGREE WITH THAT

25   APPROACH.   -05:-

```
 1              THE COURT:  VERY WELL.  THAT'S THE APPROACH I'LL

 2   TAKE, THEN.

 3              MR. NOLAN, DO YOU DISAGREE?

 4              MR. NOLAN:  NO, YOUR HONOR.

 5              THE COURT:  THAT MEANS YOU AGREE, THEN.            -05:-

 6              MR. NOLAN:  I AGREE WITH YOU.  BUT FROM A TIMING

 7   POINT OF VIEW, UNTIL THOSE WITNESSES ARE GOING TO BE CALLED, WE

 8   HAVE SOME TIME TO FILE A TRIAL BRIEF.  THAT'S ALL I'M ASKING.

 9              THE COURT:  I THINK THESE ARE THE TYPE OF WITNESSES

10   THAT WE SHOULD DEFINITELY HAVE AN OUT-OF-THE-JURY DISCUSSION    -05:-

11   BEFORE, IN TERMS OF HOW WE'RE GOING TO DEAL WITH THE FIFTH

12   AMENDMENT ISSUES.  CERTAINLY, THIS IS A CIVIL CASE.  THIS IS

13   NOT A CRIMINAL CASE.  AND I KNOW COUNSEL IS AWARE OF THE

14   CONSEQUENCES OF THAT.  THEY CERTAINLY HAVE A RIGHT TO INVOKE

15   THEIR FIFTH AMENDMENT.  BUT AT THE SAME TIME, THAT'S NOT A      -05:-

16   PERFECT SHIELD FOR MGA OR FOR THEM.  IT'S ALL GOING TO COME OUT

17   IN THE WASH, AND WE'LL SEE HOW IT COMES OUT.

18              MR. NOLAN:  MY ONLY POINT IS THESE WITNESSES ARE

19   REPRESENTED BY SEPARATE COUNSEL.  THEY WERE NOT EMPLOYEES OF

20   MGA.  THEY ARE EMPLOYEES OF VERONICA MARLOW.                   -05:-

21              THE COURT:  IS MR. MCDONALD BEING PAID BY MGA?

22              MR. NOLAN:  NO, YOUR HONOR.  NOT TO MY KNOWLEDGE.

23              I'LL DOUBLE CHECK ON THAT POINT.

24              THE COURT:  DO DOUBLE-CHECK ON THAT.

25              MR. NOLAN:  BUT, YOUR HONOR, MY POINT IS FROM A      -05:-
```

1    TIMING POINT OF VIEW IN FILING THE ACTUAL TRIAL BRIEF, DOES THE

2    COURT HAVE A PREFERENCE?  CAN WE HAVE A FEW DAYS TO DO THAT, OR

3    BY THE END OF THE WEEK?

4            **THE COURT:**  IN ADVANCE OF THESE WITNESSES BEING

5    CALLED; SO COORDINATE THAT WITH MR. QUINN.                          -05:-

6            **MR. NOLAN:**  ALL RIGHT.

7            **THE COURT:**  SO I WILL DENY THAT MOTION WITHOUT

8    PREJUDICE AT THIS TIME.  THE COURT WILL TREAT IT AS A TRIAL

9    BRIEF FROM MATTEL.  I'LL TAKE THE SAME TRIAL BRIEF FROM MGA.

10           **MR. NOLAN:**  YOU ASKED ABOUT MR. MCDONALD.                -05:-

11           IF IT'S MR. MCFARLAND YOU MEANT --

12           **THE COURT:**  YES, THANK YOU.  MR. MCFARLAND.

13           **MR. NOLAN:**  WE AFFIRMATIVELY ARE NOT PAYING

14   MR. MCDONALD'S FEES.  I DON'T KNOW WHO HE IS.

15           WITH RESPECT TO MR. McFARLAND, I'LL SORT THAT OUT AS        -05:-

16   TO WHO EXACTLY IS PAYING HIS REPRESENTATION FOR THOSE

17   PARTICULAR WITNESSES.

18           **THE COURT:**  PLEASE DO.  THERE'S BEEN A LOT OF

19   DISCUSSION ON THIS POINT, AND I WOULD LIKE TO GET THAT

20   RESOLVED.                                                          -05:-

21           **MR. NOLAN:**  MY BELIEF IS WITH RESPECT TO THOSE

22   REPRESENTATIONS, YOUR HONOR, WE ARE NOT PAYING MR. MCFARLAND IN

23   THAT REPRESENTATION.  I WANT TO BE CLEAR ON THAT.  BUT WE'LL

24   CONFIRM THAT.  BUT CERTAINLY NOT MR. MCDONALD'S.

25           **THE COURT:**  ALL RIGHT.                                 -05:-

1          ANOTHER MOTION THAT IS IN WRITTEN FORM, I'VE RECEIVED

2     A NUMBER OF BRIEFS, THIS IS THE MOTION TO STRIKE WHAT MGA HAS

3     CHARACTERIZED AS AN AMENDMENT TO THE PRETRIAL CONFERENCE ORDER.

4          THERE ARE TWO ISSUES HERE.  MAYBE THEY ARE JOINED AND

5     I'M JUST NOT -- THERE'S THE ISSUE OF THE BRATZ NAME ITSELF AND     -05:-

6     THEN THERE'S THE ISSUE OF THIS DRAWING THAT I GUESS CONTAINS

7     THE BRATZ NAME.

8          ARE THESE ONE AND THE SAME?

9          **MR. NOLAN:**  NO.  THEY ARE DIFFERENT, YOUR HONOR.  OUR

10    BELIEF IS THAT THEY ARE DIFFERENT.                                -05:-

11         **THE COURT:**  THEY ARE DIFFERENT.  OKAY.

12         I'LL GIVE YOU MY TENTATIVE ON BOTH OF THEM BECAUSE

13    IT'S ACTUALLY SPLIT.

14         WITH RESPECT TO THE BRATZ NAME, THE COURT IS INCLINED

15    TO OVERRULE THE OBJECTION AS THE COURT FINDS NO SURPRISE OR        -05:-

16    PREJUDICE TO MGA.  THE NAMING OF THE BRATZ IS PROPERLY WITHIN

17    THE SCOPE OF MATTEL'S BREACH OF CONTRACT CLAIMS AND WAS FULLY

18    EXPLORED IN DISCOVERY.

19         WITH RESPECT TO THE REGISTRATION OF THAT DRAWING --

20    AND I THINK YOU ALL UNDERSTAND THE DRAWING I'M REFERRING TO;       -05:-

21    IT'S IN THE TRIAL CONFERENCE ORDER; IT WAS THE ONE THAT WAS

22    REGISTERED JUST RECENTLY -- I'M INCLINED TO GRANT THE MOTION TO

23    STRIKE THAT.

24         THE ONLY REASON THAT I'M GETTING, MR. ZELLER -- AND I

25    THINK YOU'RE THE ONE BRIEFING THIS ISSUE -- IS THE AEO NATURE      -05:-

1    OF THE DOCUMENT.  THIS WOULD HAVE BEEN CLEAR GROUNDS TO SEEK

2    RELIEF FROM THIS COURT OR FROM JUDGE INFANTE FROM THE

3    PROTECTIVE ORDER TO REGISTER THE DRAWING, GIVEN THE

4    CIRCUMSTANCES OF THIS CASE.  I THINK TO COME IN AT THE LAST

5    MINUTE AND TO INSERT THAT INTO THE TRIAL IS UNFAIR.  UNFAIR IN      -05:-

6    AN EQUITABLE SENSE, NOT AN ETHICAL SENSE.

7         BUT IN ANY EVENT, I'LL HEAR FROM YOU BEFORE I MAKE

8    THE RULINGS FINAL.

9         **MR. ZELLER:**  YES, YOUR HONOR.

10        I KNOW THAT WE DID SUBMIT A DECLARATION THAT LAID OUT      -05:-

11   FOR YOU THE HISTORY OF WHAT WE HAD DONE HERE.  AND I AM MINDFUL

12   OF THE COURT'S POINT THAT WE COULD HAVE BROUGHT A MOTION, AS

13   WE, OF COURSE, AMPLY DEMONSTRATE THROUGHOUT THE COURSE OF THE

14   CASE.

15        **THE COURT:**  THAT'S ONE ARGUMENT YOU CANNOT MAKE, IS      -05:-

16   THAT YOU DON'T KNOW HOW TO BRING A MOTION FOR AN APPLICATION.

17   GOD KNOWS YOU KNOW HOW TO DO THAT.

18        **MR. ZELLER:**  THAT'S CORRECT; WE'RE NOT DISPUTING

19   THAT.

20        I WILL SAY THAT IT IS SOMEWHAT DISCONCERTING FOR MGA      -05:-

21   TO BE CRITICIZING US ON ONE HAND FOR BRINGING TOO MANY MOTIONS

22   AND THEN NOT YET ANOTHER ONE.

23        WE DID MAKE EFFORTS TO REGISTER THE DRAWING.  WE DID

24   MAKE THOSE APPROACHES TO THE COPYRIGHT OFFICE TO SEE IF IT

25   COULD BE DONE.  AND WE DID TRY TO WORK THROUGH IT IN THE MEET      -05:-

1    AND CONFER PROCESS.

2            BUT I DO THINK FUNDAMENTALLY THE POINT IS THAT THIS

3    DOES NOT EXPAND THE CASE ONE BIT.  THE REGISTRATION DOES NOT

4    CHANGE THE SCOPE OF THE CASE.  THAT DRAWING HAS BEEN AT ISSUE

5    FROM THE VERY BEGINNING OF THE CASE.  THE ARGUMENT THAT MGA HAS          -05:-

6    MADE ESSENTIALLY GOES TO THIS POINT, WHICH IS, WELL, YOU NEEDED

7    TO HAVE A REGISTRATION FOR SUBJECT MATTER JURISDICTION IN ORDER

8    TO GRANT RELIEF.

9            THAT'S JUST NOT CORRECT.

10           THE PERFECT TEN CASE, FOR EXAMPLE, BY THE NINTH               -05:-

11    CIRCUIT SAYS VERY CLEARLY THAT YOU DON'T HAVE TO HAVE A

12    REGISTRATION FOR EVERY SINGLE WORK THAT IS THE SUBJECT OF A

13    COPYRIGHT CLAIM.  RATHER, THE SUBJECT MATTER JURISDICTION IS

14    SUFFICIENT IF THEY ARE COPYRIGHTED WORKS AND YOU HAVE A

15    REGISTRATION FOR SOMETHING.  YOU DON'T HAVE TO HAVE ONE FOR            -05:-

16    EVERY SINGLE ONE.

17           **THE COURT:**  THEN WHAT'S YOUR PROBLEM?

18           **MR. ZELLER:**  THEY ARE GOING TO ARGUE LATER ON THAT

19    MEANS THAT WE CAN'T GET DAMAGES AS A RESULT OF THAT DRAWING.

20    THAT IS REALLY WHERE THE TURNING POINT ON THIS IS.                    -05:-

21           IT DOESN'T CHANGE THE SCOPE OF THE CASE AT ALL.  WHAT

22    THEY ARE GOING TO ARGUE, HOWEVER, GOING FORWARD IS, WELL, YOU

23    DON'T HAVE A REGISTRATION; THEREFORE, YOU CANNOT GET PAST

24    COPYRIGHT DAMAGES.  AND THEN THEY ARE GOING TO ARGUE THAT ANY

25    OTHER KIND OF RELIEF THAT WE COULD SEEK MONETARILY IS                 -05:-

```
 1   PREEMPTED; THAT IS THE ARGUMENT THAT'S COMING.

 2           THE COURT:  AND I UNDERSTAND WHY YOU TOOK THAT

 3   PROPHYLACTIC STAGE.  BUT THIS IS ALL THE MORE REASON WHY YOU

 4   SHOULD HAVE BROUGHT THIS TO THE COURT'S ATTENTION A LOT

 5   EARLIER, COUNSEL.  IF THIS REALLY IS THAT IMPORTANT, THEN        -05:-

 6   THAT IS PRECISELY -- IT'S NOT LIKE YOU WEREN'T AWARE OF THIS

 7   ISSUE MONTHS, IF NOT YEARS AGO.

 8           MR. QUINN:  I'M NOT SAYING HOW IMPORTANT IT IS; I'M

 9   TELLING YOU WHAT THEIR ARGUMENT WILL BE.

10           THE COURT:  WE'LL DEAL WITH THEIR ARGUMENTS WHEN THEY   -05:-

11   COME.

12           GETTING BACK TO THIS ISSUE, THOUGH, I DON'T FIND ANY

13   GOOD CAUSE FOR THIS LAST-MINUTE AMENDMENT ON THAT POINT.

14           THE BRATZ NAME ITSELF, I THINK THAT REALLY WAS IN

15   PLAY IN THE DISCOVERY THROUGHOUT.  THIS REGISTRATION IS OF A     -05:-

16   SUBSTANTIVELY DIFFERENT NATURE, IN THE COURT'S PERSPECTIVE.

17           MR. ZELLER:  THANK YOU.

18           THE COURT:  THANK YOU, COUNSEL.

19           ANYTHING FURTHER?

20           MR. NOLAN:  NO, YOUR HONOR.  WE'LL SUBMIT.              -05:-

21           EXCEPT WITH RESPECT TO THE WAY THAT IT SAYS THE BRATZ

22   NAME.  I THINK THAT AT THE LAST HEARING AND A FEW HEARINGS

23   BACK, WHAT THEY WERE SAYING IS THEY ARE NOT DEALING WITH THE

24   TRADEMARK OF BRATZ; THEY ARE DEALING WITH THE IDEA OF BRATZ,

25   THE NAME ITSELF, JUST TO BE CLEAR, AGAIN, FOR THE RECORD.       -05:-
```

1          **THE COURT:**  YES.  AND I UNDERSTAND THE DISTINCTION.

2    IT'S NOT A TRADEMARK CLAIM BECAUSE IT WAS NEVER PUT INTO USE BY

3    MATTEL DURING THE TIME PERIOD.

4          **MR. NOLAN:**  THANK YOU VERY MUCH.

5          **THE COURT:**  ALL RIGHT.                                    -05:-

6          I'VE RECEIVED AND REVIEWED THE PROPOSED ORDER

7    REGARDING VARIOUS DISCOVERY MOTIONS, APPLICATIONS, AND OTHER

8    MATTERS UPON WHICH THE COURT RULED ON MAY 21ST THROUGH 23RD,

9    2008.  I APPRECIATE COUNSELS' EFFORTS IN THIS REGARD.  I AM

10   SIGNING THIS ORDER.  THE ONE DISPUTE WAS ON THE FIRST ORDER     -05:-

11   LISTED, OR THE FIRST MOTION LISTED, MATTEL'S OBJECTION TO THE

12   DISCOVERY MASTER'S MAY 8TH, 2008 ORDER REGARDING MATTEL'S

13   MOTION FOR RECONSIDERATION OF THE FEBRUARY 26, 2008 ORDER

14   DENYING THE MOTION TO COMPEL THE DEPOSITION OF

15   CHRISTOPHER PALMERI.                                           -05:-

16         I AM ADOPTING MATTEL'S PROPOSED ORDER ON THIS.  I

17   BELIEVE THAT ALL OBJECTIONS, OTHER THAN THE OBJECTION THAT THE

18   ARTICLE IS CUMULATIVE, HAVE BEEN WAIVED.  THE FOUNDATION

19   AUTHENTICITY ISSUES ARE RESOLVED BY STIPULATION, AND THE

20   HEARSAY IS SOMETHING I'VE ALREADY RULED UPON; SO THAT ARTICLE   -05:-

21   IS COMING IN SUBJECT TO AN OBJECTION ON IT BEING CUMULATIVE.

22         OTHERWISE, THE ORDER IS CONSISTENT WITH THE COURT'S

23   RECOLLECTION AND NOTES, AND THE ORDER IS SIGNED THIS DATE,

24   MAY 27, 2008 AND WILL BE PROCESSED BY THE COURT CLERK.

25         I AM GOING TO BE ASKING COUNSEL TO PREPARE A SIMILAR      -05:-

1    ORDER BASED ON THE COURT'S RULINGS THIS MORNING.

2           THERE ARE TWO OTHER ISSUES THAT I WANT TO GO THROUGH

3    BRIEFLY AND THEN WE CAN START THE TRIAL.

4           THE AMENDED FINAL PRETRIAL CONFERENCE ORDER FOR THE

5    PHASE-ONE TRIAL HAS BEEN FULLY REVIEWED BY THE COURT.  I HAVE      -05:-

6    MARKED IT UP.  I HAVE NOT MADE ANY SUBSTANTIVE CHANGES EXCEPT

7    THE FOLLOWING:

8           I AM DELETING THE KEY EVIDENCE PORTIONS ON BOTH THE

9    CLAIMS AND THE COUNTERCLAIMS.  AS I INDICATED TO YOU SEVERAL

10   WEEKS AGO, THE COURT IS QUITE FAMILIAR WITH THE FACTUAL           -05:-

11   POSITIONS OF THE RESPECTIVE PARTIES AND WHAT THEY BELIEVE THE

12   EVIDENCE IS GOING TO SHOW; SO I DISPENSED WITH THE REQUIREMENT

13   FOR TRIAL BRIEFS OF CONTENTIONS OF FACT AND LAW.  THAT'S

14   BASICALLY NOT NEEDED IN THE PRETRIAL CONFERENCE ORDER.

15          WHAT I'M GOING TO DO IS I'M IDENTIFYING ALL OF THE         -05:-

16   CLAIMS IN THE AFFIRMATIVE DEFENSES AS SUBMITTED BY THE PARTIES.

17   I AM DELETING THOSE SECTIONS WHERE THEY SPAR OVER THE ELEMENTS

18   FOR THOSE VARIOUS CLAIMS AND AFFIRMATIVE DEFENSES.  WE WILL

19   TAKE THAT UP AT THE JURY INSTRUCTION CHARGING SESSIONS WHERE WE

20   WILL SORT THROUGH AND DETERMINE WHAT ELEMENTS ARE GOING TO BE     -05:-

21   INSTRUCTED UPON TO THE JURY.  I WILL BE GIVING OUT LATER TODAY

22   A FINAL VERSION OF THE ORDER.

23          BUT IN ITS ESSENCE, IT CONTAINS ALL OF THE CLAIMS AND

24   ALL OF THE AFFIRMATIVE DEFENSES STIPULATED TO BY COUNSEL IN

25   ADVANCE OF THIS.                                                  -05:-

```
 1          THE ONE AFFIRMATIVE DEFENSE THAT I WANT TO TAKE UP,
 2   AND IT'S THE LAST ISSUE BEFORE CALLING THE JURY IN, IS THE
 3   STATUTE OF LIMITATIONS.  THE COURT HAS SPENT A LOT OF TIME ON
 4   THIS PARTICULAR ISSUE, AND FRANKLY, IT'S A VERY CLOSE ISSUE.
 5   BUT I'LL TELL YOU WHERE IT'S CLOSE.  IT'S CLOSE BETWEEN ME        -05:-
 6   GRANTING IT OUTRIGHT IN FAVOR OF MATTEL VERSUS SUBMITTING IT TO
 7   THE JURY.
 8          THE EVIDENCE THAT IS CAUSING THE COURT THE GREATEST
 9   CONCERN ABOUT DECIDING IT AS A MATTER OF LAW IS THE EVIDENCE
10   THAT WAS SUBMITTED LAST WEEK BY MR. NOLAN CONCERNING THE          -05:-
11   ALLEGATION THAT IN SEPTEMBER OF 2003 THERE WAS A DOCUMENT IN
12   THE TRIAL DOCUMENTS AND THE HONG KONG LITIGATION, WHICH SERVED
13   TO ESSENTIALLY ALERT MATTEL AS TO THE CLAIM THAT THEY WERE
14   ADVANCING IN THIS CASE.
15          THE COURT'S ANALYSIS ON THE DISCOVERY RULE SET OUT IN      -05:-
16   A VERY LONG AND DETAILED ORDER, AND AS TO HOW I GET TO THE
17   POINT OF FINDING THAT THE DISCOVERY RULE RELATES TO THE CLAIM
18   SET FORTH BY MATTEL AS OPPOSED TO SOME OTHER CLAIM THAT COULD
19   HAVE BEEN BROUGHT AT AN EARLIER DATE INVOLVING THE ALLEGED
20   COPYRIGHT OF TOON TEENS OR DIVA STARZ OR ANYTHING ELSE.  BUT I    -05:-
21   DO HAVE A REAL CONCERN THAT THE DOCUMENTS AND THE TIMING OF THE
22   SUBMISSION OF THE DOCUMENTS.
23          I'VE READ MR. MOORE'S DECLARATION INDICATING HE DID
24   NOT RECEIVE IT UNTIL NOVEMBER, BUT THAT REALLY STRIKES THE
25   COURT AS A TRIABLE ISSUE OF FACT IN TERMS OF WHAT MATTEL          -05:-
```

 1   RECEIVED AND WHEN.

 2          TO A LESSER EXTENT, I AM STILL CONCERNED ABOUT THE

 3   ANONYMOUS LETTER AND HOW MUCH WEIGHT TO GIVE TO THAT IN TERMS

 4   OF DETERMINING WHETHER OR NOT THERE IS KNOWLEDGE OR SUSPICION

 5   OF THE GENERIC ELEMENTS OF THE CLAIM THAT IS ACTUALLY BROUGHT      -05:-

 6   BY MATTEL.  BUT THAT MIGHT BE A FURTHER REASON TO SUBMIT THIS

 7   ISSUE, AS NARROWED BY THE COURT, TO THE JURY FOR THE FACTUAL

 8   FINDINGS.

 9          MR. ZELLER, I'D LIKE TO HEAR FURTHER FROM YOU AND, OF

10   COURSE, MR. NOLAN IN RESPONSE.                                     -05:-

11          **MR. ZELLER:**  I THINK FUNDAMENTALLY ON THOSE TWO

12   ISSUES, WE JUST GO BACK TO THE SUMMARY JUDGMENT STANDARD.

13          THERE IS NO EVIDENCE, AND MR. MOORE HAS PUT IN

14   CONTRARY EVIDENCE, THAT IN SEPTEMBER OF 2003, MATTEL RECEIVED

15   THE DRAWINGS OR INFORMATION, SUCH AS THE CONTRACT, THAT SHOWED     -05:-

16   THE BASIS FOR MATTEL'S CLAIM.

17          WE HAVE SUBMITTED, IN FACT, PRECISELY WHAT IT WAS

18   THAT --

19          **THE COURT:**  THE CONTRACT, YOU'RE TALKING ABOUT THE

20   MATTEL CONTRACT?                                                   -05:-

21          **MR. ZELLER:**  NO.  I'M TALKING ABOUT THE MGA BRYANT

22   CONTRACT.  BECAUSE THE TWO PIECES OF INFORMATION, TO GO BACK TO

23   IT, YOUR HONOR, THAT MATTEL RECEIVED AT --

24          **THE COURT:**  I DON'T MEAN TO CUT YOU OFF, BUT WE'RE

25   SHORT FOR TIME HERE.  WHY IS IT NOT SUFFICIENT FOR MGA TO TAKE     -05:-

```
1   THE POSITION THAT -- THIS LITIGATION INDICATES THAT BETWEEN

2   1998 AND 2000, ACCORDING TO THE TIMELINE THAT IS ALLEGEDLY PART

3   OF THIS LITIGATION, THAT BETWEEN 1998 AND 2000, CARTER BRYANT

4   DEVELOPED BRATZ; DURING MUCH OF THAT TIME, OF COURSE, HE WAS

5   EMPLOYED BY MATTEL.  IT WAS COMMON KNOWLEDGE THAT BRYANT HAD          -05:-

6   DEVELOPED BRATZ.  CERTAINLY MATTEL WAS ON NOTICE OF ITS OWN

7   EMPLOYMENT OR INVENTIONS AGREEMENT WHICH PROVIDED THAT ANYTHING

8   THAT CARTER BRYANT MADE WHILE AN EMPLOYEE AT BRATS WOULD BE

9   THEIR PROPERTY.

10          ONCE YOU GET THAT INFORMATION THAT, IN FACT, THAT IT        -05:-

11  WASN'T ISAAC LARIAN, IT WASN'T SOMEBODY ELSE, BUT IT WAS

12  CARTER BRYANT BETWEEN 1998 AND 2000 WHO DEVELOPED THE BRATZ

13  DOLL, AND THAT'S THE OFFICIAL POSITION THAT MGA IS NOW TAKING

14  IN COURT, WHY ISN'T THAT SUFFICIENT TO PUT YOU ON NOTICE IN

15  SEPTEMBER OF 2003, ASSUMING THAT YOU RECEIVED THAT IN SEPTEMBER     -05:-

16  OF 2003, ESSENTIALLY OF THE CLAIM THAT YOU'VE BROUGHT IN THIS

17  CASE?

18          MR. ZELLER:  IF ALL OF THE INFORMATION THAT THE COURT

19  JUST DESCRIBED WERE, IN FACT, IN THE SEPTEMBER OF 2003

20  DOCUMENTS, I DON'T THINK THAT I WOULD DISAGREE WITH YOU.           -05:-

21          THE COURT:  OKAY.

22          AND I UNDERSTAND YOU DISPUTE THAT INFORMATION WAS IN

23  THOSE DOCUMENTS.  MGA CONTENDS OTHERWISE.

24          ISN'T THAT A TRIABLE ISSUE OF FACT?

25          MR. ZELLER:  I DON'T THINK SO, YOUR HONOR.                 -05:-
```

1          **THE COURT:**  EXPLAIN.

2          **MR. ZELLER:**  BECAUSE WHAT WE'VE PUT IN IS WE PUT IN

3     THE ACTUAL INFORMATION THAT MATTEL RECEIVED.  YOU RECALL THAT

4     THE WAY THIS ALL STARTED WAS THAT THEY SAID, OH, WELL, ACTUALLY

5     MATTEL OBTAINED BACK IN SEPTEMBER SOME INFORMATION FROM THE          -05:-

6     HONG KONG COURT FILE.  AND THEY SPECULATED FROM THERE, AND I

7     USE THE TERM SPECULATION QUITE PRECISELY, THAT FROM THERE WHILE

8     MATTEL MUST HAVE HAD ALL THIS OTHER INFORMATION, THAT WOULD

9     HAVE PUT IT ON NOTICE OF ITS CLAIM.

10          THAT LINK IS MISSING.                                          -05:-

11          WE HAVE PROVIDED TO THE COURT THE EXACT INFORMATION

12     THAT MATTEL RECEIVED AND WE SUPPORTED IT WITH THE MOORE

13     DECLARATION; SO THE COURT CAN SEE RIGHT IN THERE EXACTLY WHAT

14     IT IS THAT MATTEL RECEIVED.  AND THE KIND OF INFORMATION THAT

15     THE COURT HAS JUST DESCRIBED IS NOT IN THERE.                       -05:-

16          **THE COURT:**  YOUR POSITION IS THAT'S NOT DISPUTED.

17          **MR. ZELLER:**  CORRECT.  IT'S UNDISPUTED FACTS.

18          ALSO, JUST AS A MORE GENERAL MATTER, UNLIKE COURTS

19     HERE IN THE UNITED STATES, WHERE FILES ARE GENERALLY FREELY

20     AVAILABLE WITH EXCEPTIONS OF WHERE THINGS ARE UNDER SEAL, HONG      -05:-

21     KONG IS THE OPPOSITE.  YOU CAN'T JUST GO INTO THE COURT FILES

22     AND GET ANY KIND OF COURT FILING.

23          WHAT MATTEL SPECIFICALLY RECEIVED WAS THAT FAX ON

24     SEPTEMBER 23, 2003.  WE HAVE PROVIDED IT.  IT IS BASICALLY A

25     WRIT OF SUMMONS.  IT DESCRIBES INFORMATION ABOUT THE CASE.  BUT     -05:-

1    IT DOESN'T HAVE THE KIND OF INFORMATION IN IT THAT THE

2    DEFENDANTS ARE SAYING WOULD HAVE PUT MATTEL ON NOTICE.

3              I THINK I WOULD AGREE WITH THE COURT, IF ALL THAT

4    INFORMATION WAS IN THERE, IT WOULD GIVE NOTICE.

5              SO THAT IS AN UNDISPUTED FACT.                        -05:-

6              I WOULD ALSO SAY THIS, IS THAT, IT'S UNDISPUTED THAT

7    WHATEVER IT IS THAT MATTEL RECEIVED, THEY WERE NOT THE

8    DRAWINGS.  THERE IS NO EVIDENCE WHATSOEVER THAT MATTEL RECEIVED

9    THE DRAWINGS BEFORE NOVEMBER OF 2003.  AND CERTAINLY IT HAS

10   BEEN MATTEL'S POSITION THAT IT WOULD HAVE BEEN IMPOSSIBLE TO    -05:-

11   BRING A COPYRIGHT INFRINGEMENT CLAIM BASED ON THOSE DRAWINGS

12   WITHOUT HAVING THE DRAWINGS.

13        **THE COURT:**  LET ME ASK YOU TWO UNRELATED QUESTIONS

14   BUT RELATED TO THE STATUTE OF LIMITATIONS.

15             IS IT YOUR POSITION THAT THE DISCOVERY RULE APPLIES   -05:-

16   TO BOTH CONVERSION AND THE STATUTORY UNFAIR COMPETITION CLAIM?

17        **MR. ZELLER:**  YES, IT IS YOUR HONOR.  AND WE HAVE

18   CITED AUTHORITY ON THAT.  THAT GETS INTO A LEGAL ISSUE,

19   CERTAINLY, AS TO WHAT CLAIMS THE DISCOVERY RULE APPLIES TO.  I

20   CERTAINLY WOULD RECOGNIZE THAT -- AND THIS IS IN THE BRIEFS --  -05:-

21   THAT ON AT LEAST A COUPLE OF CLAIMS, THE CASE LAW DOESN'T

22   APPEAR TO BE UNIFORM.

23        **THE COURT:**  IT DOESN'T.

24        **MR. ZELLER:**  BUT CERTAINLY, OUR VIEWPOINT IS THAT YOU

25   CAN'T HAVE A SITUATION WHERE -- WE THINK THE DISCOVERY RULE     -05:-

1    OUGHT TO BE APPLIED TO ALL OF THOSE.

2            **THE COURT:**  VERY WELL.

3            MR. RUSSEL?

4            **MR. RUSSELL:**  LET ME START FIRST WITH -- MR. ZELLER

5    TELLS YOU THE EVIDENCE IS UNDISPUTED.  THAT'S NOT TRUE AT ALL.    -05:-

6    WE SHOWED YOUR HONOR THAT MATTEL HAD IN ITS POSSESSION PRODUCED

7    TO US DOCUMENTS SHOWING THAT IT HAD IN SEPTEMBER THE CITY WORLD

8    CLAIM.  THE CLAIM LISTS AND ATTACHES THE CONTRACT BETWEEN MGA

9    AND BRYANT.

10           **THE COURT:**  THEY HAD THE CLAIM.  FINE.                -05:-

11           DID THEY HAVE THE DOCUMENTS ATTACHED TO THE CLAIM?

12   THAT'S WHAT IS --

13           **MR. RUSSELL:**  THAT IS UNCLEAR, YOUR HONOR.  THAT IS

14   UNCLEAR.  BUT EVEN IF THEY DIDN'T HAVE IT, THEY CERTAINLY KNEW

15   FROM THE CITY WORLD CLAIM --                                     -05:-

16           **THE COURT:**  WHAT'S THE EVIDENCE THEY DIDN'T HAVE IT?

17   I HAVE YOU DECLARATION FROM MR. MOORE SAYING THEY DIDN'T HAVE

18   IT.

19           HOW ARE YOU GOING TO RESPOND OR PROVE THE NEGATIVE?

20           **MR. RUSSELL:**  MR. MOORE ONLY SAYS THAT HE DIDN'T HAVE    -05:-

21   THE CONTRACT.  HE DOESN'T DISPUTE THAT HE HAD THE COMPLAINT,

22   THE CITY WORLD CLAIM.  THERE IS NO DISPUTE THERE.

23           **THE COURT:**  WHERE IS THE TIMELINE?  THE TIMELINE IS

24   IN THAT.  THE QUESTION IS WHETHER OR NOT HE HAD THAT TIMELINE.

25           **MR. RUSSELL:**  HE HAD THE TIMELINE.  THE CITY WORLD       -05:-

1    CLAIM RIGHT IN THE CONTENTS OF THE CLAIM LISTS THE DATE OF THE

2    CONTRACT, IDENTIFIES THE DRAWINGS, SAYS WHEN THE DRAWINGS WERE

3    MADE, AND IT SAYS DURING 1998 TO 2000; SO AS OF SEPTEMBER,

4    ACCORDING TO THEIR OWN DOCUMENTS, NOT DENIED BY MR. MOORE, THEY

5    HAD POSSESSION OF ALL OF THE INFORMATION THEY NEEDED TO BE ON     -05:-

6    INQUIRY NOTICE.  NO DISPUTE THERE.  THEY HAD THE DOCUMENTS.

7    THAT'S ALL WE NEED.

8            NOW, YOU ASKED, YOUR HONOR, ABOUT A COUPLE OF OTHER

9    POINTS.  THE DISCOVERY RULE, WE CITED YOUR HONOR TO EXTENSIVE

10   CASE LAW AS A MATTER OF LAW DOES NOT APPLY TO THE UNFAIR         -05:-

11   COMPETITION CLAIM.  I WON'T BORE YOU WITH THE CITES, BUT THEY

12   ARE IN OUR PAPERS.

13           **THE COURT:**  I KNOW THEM.

14          **MR. RUSSELL:**  THE SAME IS TRUE FOR THE CONVERSION

15   CLAIM; SO FOR THOSE TWO CLAIMS, THERE IS NO DISCOVERY RULE,      -05:-

16   THERE IS NO FRAUDULENT CONCEALMENT.  CALIFORNIA LAW IS HARSH,

17   BUT THAT'S THE LAW.  THOSE TWO CLAIMS ARE CERTAINLY TIME

18   BARRED.

19           **THE COURT:**  ALL RIGHT.

20           MR. ZELLER?  BRIEFLY.                                    -05:-

21          **MR. ZELLER:**  WHAT I WOULD DO IS POINT THE COURT'S

22   ATTENTION TO -- ITS NOT ONLY MR. MOORE'S DECLARATION; IT'S NOT

23   ONLY WE PROVIDED THE COURT WITH THE SEPTEMBER FAX THAT SHOWS

24   THAT IN FACT THOSE MATERIALS WERE NOT IN MATTEL'S POSSESSION.

25   BUT I WOULD ALSO POINT THE COURT TO THE OCTOBER LETTER THAT IS   -05:-

1    PART OF THE RECORD THAT WE SUBMITTED; THAT IS FROM CITY WORLD'S

2    COUNSEL AFFIRMATIVELY POINTING OUT THAT WE DON'T HAVE THESE

3    MATERIALS.  MATTEL DOES NOT HAVE THOSE MATERIALS, AND THEY ARE

4    NOT GOING TO GIVE THEM TO US UNTIL THERE IS SOME SORT OF

5    AGREEMENT THAT'S REACHED.  SO THERE'S NOT ONLY THE DECLARATION,        -05:-

6    THE FAX, BUT THERE'S CORROBORATION EVEN FROM THE

7    CORRESPONDENCE; AND THAT IS AN OCTOBER OF 2003 LETTER.

8          IT WOULD MAKE NO SENSE FOR CITY WORLD TO HAVE

9    PROVIDED THIS INFORMATION OR FOR MATTEL TO HAVE OBTAINED IT

10   FROM THE COURT FILE, IF IT COULD HAVE DONE THAT, AND THEN,           -05:-

11   NEVERTHELESS, HAVE SOME SORT OF AGREEMENT WITH CITY WORLD TO

12   GET THE SAME DOCUMENT.  LITERALLY, IT'S NOT ONLY SPECULATION

13   THAT IS BEING POSITED BY MGA, BUT IT'S ONE THAT DOESN'T MAKE

14   ANY SENSE AND ONE THAT IS COMPLETELY CONTRADICTED BY THE

15   RECORD.                                                             -05:-

16          **THE COURT:**  THANK YOU, COUNSEL.

17          **MR. RUSSELL:**  YOUR HONOR, AS THE CHRONOLOGY SHOWS, IT

18   WASN'T JUST THAT THEY GOT THE DOCUMENTS.  THEIR CHRONOLOGY

19   SHOWS, AND IT'S UNDISPUTED FROM THE DEPOSITION OF MS.

20   SIMPSON-TAYLOR TAKEN BY MR. NOLAN -- THEY ACTUALLY SPOKE TO THE      -05:-

21   CITY WORLD ATTORNEY.  WE HAVE ADDITIONAL BASIS.  FORGET THAT

22   THEY DIDN'T GET THE DOCUMENTS, WHICH I WANT TO TALK ABOUT

23   BRIEFLY, BUT ORALLY THEY HAD THE OPPORTUNITIES TO HAVE THE

24   DISCUSSION.

25          THE LETTER THAT MR. ZELLER IS REFERRING TO DOES NOT           -05:-

```
 1   INDICATE THAT MATTEL WAS NOT IN THE POSSESSION OF THOSE

 2   DOCUMENTS.  WHAT IT SAYS IS WE NEED TO HAVE AN ARRANGEMENT

 3   MEMORIALIZING THE TERMS BY WHICH WE'RE GOING TO TURN OVER

 4   ADDITIONAL MATERIALS.  IT'S NOT CLEAR AT ALL, AND IT'S

 5   CERTAINLY A TRIABLE ISSUE, AS TO WHETHER OR NOT THEY TOOK      -05:-

 6   POSSESSION.

 7           BUT I WANT TO MAKE ONE MORE POINT --

 8           THE COURT:  YOU SAID THERE WAS ONLY ONE POINT,

 9   COUNSEL.

10           MR. RUSSELL:  ONE MORE POINT.  IT'S SHORT, I PROMISE.  -05:-

11           AS WE POINT OUT IN OUR ADDITIONAL SUBMISSION, THERE

12   IS SUBSTANTIAL REASON TO QUESTION THAT MATTEL DID NOT GET THE

13   CONTRACT.  WE POINTED OUT IN OUR PAPERS, THERE WAS A GAP IN THE

14   INITIAL FAX --

15           THE COURT:  I'VE READ THAT.  THANK YOU, COUNSEL.      -05:-

16           MR. RUSSELL:  THANK YOU, YOUR HONOR.

17           THE COURT:  ALL RIGHT.

18           THE COURT IS PLANNING TO GIVE A LOT OF GUIDANCE ON

19   THE STATUTE OF LIMITATIONS ISSUE, AND THE COURT WILL BE ISSUING

20   ITS OWN ORDER ON THAT.  I AM GOING TO ASK COUNSEL TO SUBMIT A   -05:-

21   JOINT ORDER ON ALL OF THE OTHER MATTERS THAT WE ADDRESSED THIS

22   MORNING FOR THE COURT'S REVIEW.

23           MR. QUINN, IS THERE ANY OTHER MOTION THAT IS

24   OUTSTANDING THAT WOULD PREJUDICE MATTEL IF THE COURT DOES NOT

25   RULE ON IT BEFORE OPENING STATEMENTS?                          -05:-
```

```
 1              MR. QUINN:  NO, YOUR HONOR.

 2              THE COURT:  MR. NOLAN, IS THERE ANY OUTSTANDING

 3   MOTION THAT WOULD PREJUDICE MGA IF THE COURT DID NOT RULE ON IT

 4   BEFORE OPENING STATEMENTS?

 5              MR. NOLAN:  NO, YOUR HONOR.                           -05:-

 6              THE COURT:  VERY WELL.

 7              LET'S BRING THE JURY IN.

 8              MR. QUINN:  WELL, YOUR HONOR, THIS COURT HAS MADE

 9   SOME IMPORTANT DETERMINATIONS IN THE SUMMARY ADJUDICATION

10   STAGE; AND I KNOW THAT THE COURT IS GOING TO PREINSTRUCT THE    -05:-

11   JURY, THE COURT HAS INDICATED.

12              WE WOULD SUBMIT THAT THERE'S NO REASON TO HIDE FROM

13   THE JURY THAT THIS COURT HAS ALREADY DETERMINED THAT MATTEL

14   OWNS ANYTHING THAT MR. BRYANT CREATED IN MATTEL'S LINE OF

15   BUSINESS.                                                       -05:-

16              THE COURT:  YES, THERE IS, COUNSEL.

17              IT'S NOT THAT I WANT TO HIDE IT FROM THE JURY.

18              THIS JURY IS GOING TO BE DETERMINING FACTS, AND THE

19   COURT IS GOING TO INSTRUCT THEM ON THE LAW THAT THEY NEED TO

20   KNOW.                                                           -05:-

21              YOUR OPENING STATEMENT IS TO BE DEVOTED TO EXPLAINING

22   TO THE JURY WHAT THE FACTS WILL SHOW.  THE COURT WILL INSTRUCT

23   THEM AT THE END CONCERNING THE LAW.

24              THERE'S NO REASON TO INSTRUCT THIS JURY THROUGH YOUR

25   OPENING STATEMENTS ON THE LAW OR WHAT YOU THINK THE LAW IS OR   -05:-
```

```
 1   WHAT THE COURT HAS RULED ON THE LAW; THAT RAISES FAR MORE
 2   PROBLEMS THAN IT SOLVES.
 3          MR. QUINN:  UNDERSTOOD, YOUR HONOR.
 4          ONE OTHER QUESTION IN TERMS OF THE COURT'S PREFERENCE
 5   IN OPENING STATEMENTS.  THERE ARE ABOUT THREE, NOW, VERY SHORT    -05:-
 6   PASSAGES OF DEPOSITION TESTIMONY I WOULD PROPOSE TO READ TO THE
 7   JURY, IF THAT'S SATISFACTORY TO THE COURT.
 8          THE COURT:  HAVE YOU REVIEWED IT WITH MR. NOLAN?
 9          MR. QUINN:  I HAVE PROVIDED THEM TO MR. NOLAN.
10          THE COURT:  VERY WELL.                                    -05:-
11          MR. QUINN:  MR. NOLAN IS OF THE VIEW THAT IT WOULD
12   NOT BE APPROPRIATE TO READ DEPOSITION TESTIMONY.  HE BELIEVES
13   IT'S BETTER TO SUMMARIZE IT.
14          THESE ARE VERY SHORT.  I WOULD PREFER TO READ IT.
15          THE COURT:  IF THERE'S NO EVIDENTIARY OBJECTION AND       -05:-
16   IF THE EVIDENCE IS COMING IN -- AND THIS APPLIES ACROSS THE
17   BOARD, AND I THINK I INDICATED THIS TO BOTH SIDES -- IF IT'S AN
18   EXHIBIT OR DEPOSITION THAT EITHER SIDE HAS STIPULATED IS COMING
19   IN, IT MAY BE USED IN OPENING STATEMENTS.  IF THERE'S AN
20   EVIDENTIARY OBJECTION TO IT, IT MAY NOT BE.                      -05:-
21          MR. QUINN:  ALL RIGHT.
22          THE COURT:  DISCUSS THAT AMONG YOURSELVES.  I DON'T
23   NEED TO HEAR IT.
24          ANYTHING FURTHER, COUNSEL?
25          VERY WELL.  WE'LL TAKE A TEN-MINUTE RECESS AND BRING      -05:-
```

1    THE JURY IN.  I'LL GIVE THEM THE PRELIMINARY INSTRUCTIONS, AND

2    THEN WE'LL HAVE OPENING STATEMENTS.

3              (WHEREUPON A BRIEF RECESS WAS HELD.)

4              (WHEREUPON, THE CASE, HAVING BEEN PREVIOUSLY

5              CALLED AND APPEARANCES GIVEN, PROCEEDED

6              AS FOLLOWS:)

7         **THE COURT:**  GOOD MORNING, COUNSEL, AND GOOD MORNING,

8    MEMBERS OF THE JURY.

9         I APOLOGIZE FOR THE TARDY START THIS MORNING, BUT

10   WE'LL CERTAINLY TRY TO GET STARTED RIGHT ON TIME GOING FORWARD.   -04:-

11        I'M GOING TO BEGIN WITH SOME VERY PRELIMINARY

12   INSTRUCTIONS TO YOU THIS MORNING, AND THEN WE'RE GOING TO HEAR

13   THE OPENING STATEMENTS BY COUNSEL.

14                      **JURY INSTRUCTIONS**

15        **THE COURT:**  LADIES AND GENTLEMEN, YOU ARE NOW THE        -04:-

16   JURY IN THIS CASE.  IT IS MY DUTY TO INSTRUCT YOU ON THE LAW.

17   THESE INSTRUCTIONS ARE PRELIMINARY INSTRUCTIONS TO HELP YOU

18   UNDERSTAND THE PRINCIPLES THAT APPLY TO CIVIL TRIALS AND TO

19   HELP YOU UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.  YOU WILL

20   BE ALLOWED TO KEEP THIS SET THROUGHOUT THE TRIAL TO WHICH TO     -04:-

21   REFER.  THIS SET OF INSTRUCTIONS IS NOT TO BE TAKEN HOME AND

22   MUST REMAIN IN THE COURTROOM WHEN YOU LEAVE IN THE EVENINGS.

23        YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

24   ANYTHING I MAY SAY OR DO AS INDICATING THAT I HAVE AN OPINION

25   REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.  IT IS    -04:-

1    YOUR DUTY TO FIND THE FACTS FROM ALL OF THE EVIDENCE IN THE

2    CASE.  TO THOSE FACTS YOU WILL APPLY THE LAW AS I GIVE IT TO

3    YOU.  YOU MUST FOLLOW THE LAW AS I GIVE IT TO YOU WHETHER YOU

4    AGREE WITH IT OR NOT, AND YOU MUST NOT BE INFLUENCED BY ANY

5    PERSONAL LIKES OR DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.    -04:-

6    THAT MEANS THAT YOU MUST DECIDE THE CASE SOLELY ON THE EVIDENCE

7    BEFORE YOU.  YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO

8    WHEN WE ASSEMBLED YOU LAST WEEK.

9            IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF

10   THEM AND NOT SINGLE OUT SOME AND IGNORE OTHERS.  THEY ARE ALL    -04:-

11   IMPORTANT.

12           THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING THE

13   FACTS OF THIS CASE CONSIST OF THE FOLLOWING:  ONE, THE SWORN

14   TESTIMONY OF ANY WITNESS; TWO, THE EXHIBITS WHICH ARE RECEIVED

15   INTO EVIDENCE; AND, THREE, ANY FACTS TO WHICH THE LAWYERS HAVE    -04:-

16   AGREED.

17           IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

18   TESTIMONY AND EXHIBITS RECEIVED INTO EVIDENCE.  CERTAIN THINGS

19   ARE NOT EVIDENCE, AND YOU MAY NOT CONSIDER THEM IN DECIDING

20   WHAT THE FACTS ARE.  I WILL LIST THEM FOR YOU.                    -04:-

21           ONE:  ARGUMENTS AND STATEMENTS BY LAWYERS ARE NOT

22   EVIDENCE.

23           THE LAWYERS ARE NOT WITNESSES.  WHAT THEY HAVE SAID

24   IN THEIR OPENING -- WHAT THEY WILL BE SAYING IN THEIR OPENING

25   STATEMENTS, WHAT THEY WILL BE SAYING IN THEIR CLOSING ARGUMENTS   -04:-

1  AND AT OTHER TIMES IS INTENDED TO HELP YOU INTERPRET THE

2  EVIDENCE, BUT IT IS NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER

3  THEM DIFFER FROM THE WAY THE LAWYERS HAVE STATED THEM, YOUR

4  MEMORY OF THEM CONTROLS.

5          TWO:  QUESTIONS AND OBJECTIONS BY LAWYERS ARE NOT          -04:-

6  EVIDENCE.

7          ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT WHEN

8  THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF

9  EVIDENCE.  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY

10  THE COURT'S RULING ON THE OBJECTION.                            -04:-

11          THREE:  TESTIMONY THAT HAS BEEN EXCLUDED OR STRICKEN

12  OR THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD IS NOT EVIDENCE

13  AND MUST NOT BE CONSIDERED.  IN ADDITION, SOMETIMES TESTIMONY

14  AND EXHIBITS ARE RECEIVED ONLY FOR A LIMITED PURPOSE.  WHEN I

15  GIVE A LIMITING INSTRUCTION, YOU MUST FOLLOW IT.               -04:-

16          AND FOUR:  ANYTHING YOU MAY HAVE HEARD OR SEEN WHEN

17  THE COURT WAS NOT IN SESSION IS NOT EVIDENCE.  YOU ARE TO

18  DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED AT TRIAL.

19          SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE

20  ONLY.  WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN    -04:-

21  ADMITTED FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR

22  THAT LIMITED PURPOSE AND FOR NO OTHER.

23          EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT

24  EVIDENCE IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A

25  WITNESS ABOUT WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID. -04:-

1  CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

2  WHICH YOU CAN FIND ANOTHER FACT.  YOU SHOULD CONSIDER BOTH

3  KINDS OF EVIDENCE.  THE LAW MAKES NO DISTINCTION BETWEEN THE

4  WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.

5  IT IS FOR YOU TO DECIDE HOW MUCH WEIGHT TO GIVE TO ANY          -04:-

6  EVIDENCE.

7          THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

8  RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

9  OFFERS AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER SIDE

10  THINKS THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT   -04:-

11  LAWYER MAY OBJECT.  IF I OVERRULE THE OBJECTION, THE QUESTION

12  MAY BE ANSWERED OR THE EXHIBIT RECEIVED.  IF I SUSTAIN THE

13  OBJECTION, THE QUESTION CANNOT BE ANSWERED AND THE EXHIBIT

14  CANNOT BE RECEIVED.  WHENEVER I SUSTAIN AN OBJECTION TO A

15  QUESTION, YOU MUST IGNORE THE QUESTION AND YOU MUST NOT GUESS    -04:-

16  WHAT THE ANSWER MIGHT HAVE BEEN.

17          SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM

18  THE RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

19  MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

20  CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.             -04:-

21          IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO

22  DECIDE WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO

23  BELIEVE.  YOU MAY BELIEVE EVERYTHING A WITNESS SAYS OR PART OF

24  IT OR NONE OF IT.  PROOF OF A FACT DOES NOT NECESSARILY DEPEND

25  ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT IT.               -04:-

1          IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY

2   TAKE INTO ACCOUNT THE FOLLOWING:  ONE, THE OPPORTUNITY AND

3   ABILITY OF THE WITNESS TO SEE OR HEAR OR KNOW THE THINGS

4   TESTIFIED TO; TWO, THE WITNESS'S MEMORY; THREE, THE WITNESS'S

5   MANNER WHILE TESTIFYING; FOUR, THE WITNESS'S INTEREST IN THE          -04:-

6   OUTCOME OF THE CASE AND ANY BIAS OR PREJUDICE; FIVE, WHETHER

7   OTHER EVIDENCE CONTRADICTED THE WITNESS'S TESTIMONY; SIX, THE

8   REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT OF ALL OF

9   THE EVIDENCE; AND SEVEN, ANY OTHER FACTORS THAT BEAR ON

10  BELIEVABILITY.  THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES          -04:-

11  NOT NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY

12  ABOUT IT.

13          NOW I'LL REPEAT THE WORDS THAT I GAVE YOU LAST WEEK

14  ABOUT YOUR CONDUCT AS JURORS.  AND THIS IS VERY IMPORTANT.

15          FIRST:  YOU ARE NOT TO DISCUSS THIS CASE WITH ANYONE,        -04:-

16  INCLUDING MEMBERS OF YOUR FAMILY, PEOPLE INVOLVED IN THE TRIAL,

17  OR ANYONE ELSE.  THIS INCLUDES DISCUSSING THE CASE IN INTERNET

18  CHAT ROOMS OR THROUGH INTERNET BLOGS, INTERNET BULLETIN BOARDS,

19  OR E-MAILS, NOR ARE YOU ALLOWED TO PERMIT OTHERS TO DISCUSS THE

20  CASE WITH YOU.  IF ANYONE APPROACHES YOU AND TRIES TO TALK TO        -04:-

21  YOU ABOUT THE CASE, PLEASE LET ME KNOW ABOUT IT IMMEDIATELY.

22          SECOND:  DO NOT READ OR LISTEN TO ANY NEWS STORIES,

23  ARTICLES, RADIO, TELEVISION, OR ON-LINE REPORTS ABOUT THE CASE

24  OR ABOUT ANYONE WHO HAS ANYTHING TO DO WITH THE CASE.

25          THIRD:  DO NOT DO ANY RESEARCH, SUCH AS CONSULTING          -04:-

1   DICTIONARIES, SEARCHING THE INTERNET, OR USING OTHER REFERENCE

2   MATERIALS; AND DO NOT MAKE ANY INVESTIGATION ABOUT THE CASE ON

3   YOUR OWN.

4          FOURTH:  IF YOU NEED TO COMMUNICATE WITH ME, SIMPLY

5   GIVE A SIGNED NOTE TO THE COURTROOM DEPUTY TO GIVE TO ME.           -04:-

6          AND FIFTH:  DO NOT MAKE UP YOUR MIND ABOUT WHAT THE

7   VERDICT SHOULD BE UNTIL AFTER YOU HAVE GONE TO THE JURY ROOM TO

8   DECIDE THE CASE AND YOU AND YOUR FELLOW JURORS HAVE DISCUSSED

9   THE EVIDENCE.  KEEP AN OPEN MIND UNTIL THEN.

10          UNTIL THIS CASE IS GIVEN TO YOU FOR YOUR DELIBERATION   -04:-

11   AND VERDICT, YOU ARE NOT TO DISCUSS THE CASE WITH YOUR FELLOW

12   JURORS.

13          NOW, DURING DELIBERATIONS, YOU WILL HAVE TO MAKE YOUR

14   DECISION BASED ON WHAT YOU RECALL OF THE EVIDENCE.  AND AS YOU

15   KNOW, THIS IS GOING TO BE A LONGER TRIAL THAN NORMAL.  YOU WILL   -04:-

16   NOT HAVE A TRANSCRIPT OF THE TRIAL.  I URGE YOU TO PAY CLOSE

17   ATTENTION TO THE TESTIMONY AS IT IS GIVEN.  IF AT ANY TIME YOU

18   CANNOT HEAR OR SEE THE TESTIMONY, EVIDENCE, QUESTIONS, OR

19   ARGUMENTS, LET ME KNOW SO THAT I CAN CORRECT THE PROBLEM.

20          IF ANY OTHER PROBLEM COMES UP THAT YOU WANT TO ALERT   -04:-

21   ME TO, IF IT'S TOO COLD OR TOO HOT, ANYTHING AT ALL, AND WE'RE

22   IN COURT LIKE THIS, JUST RAISE YOUR HAND; OR, IF YOU'RE BACK IN

23   THE JURY ROOM, SEND A NOTE TO THE COURTROOM DEPUTY.

24          NOW, IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU

25   REMEMBER THE EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM   -04:-

1    TO YOURSELF UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY

2    ROOM TO DECIDE THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU.

3            WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE

4    COURTROOM ON YOUR SEAT.  NO ONE WILL READ YOUR NOTES.  THEY

5    WILL BE DESTROYED AT THE CONCLUSION OF THE CASE.                    -04:-

6            WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON

7    YOUR OWN MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR

8    MEMORY.  YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR

9    THOSE OF YOUR FELLOW JURORS.

10           FROM TIME TO TIME DURING THE TRIAL, IT MAY BECOME          -04:-

11   NECESSARY FOR ME TO TALK WITH THE ATTORNEYS OUT OF THE HEARING

12   OF THE JURY, EITHER BY HAVING A CONFERENCE AT THE BENCH WHEN

13   THE JURY IS PRESENT IN THE COURTROOM OR BY CALLING A RECESS.

14   PLEASE UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE WORKING.

15   THE PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT         -04:-

16   INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE IS TO

17   BE TREATED UNDER THE RULES OF EVIDENCE, AND TO AVOID CONFUSION

18   AND ERROR.  OF COURSE, WE WILL DO WHAT WE CAN TO KEEP THE

19   NUMBER AND LENGTH OF THESE CONFERENCES TO A MINIMUM.

20           I MAY NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A        -04:-

21   CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING THE REQUEST

22   FOR A CONFERENCE AS ANY INDICATION OF MY OPINION OF THE CASE OR

23   OF WHAT YOUR VERDICT SHOULD BE.

24           TRIALS PROCEED IN THE FOLLOWING WAY:

25           FIRST, EACH SIDE MAY MAKE AN OPENING STATEMENT.  AN       -04:-

1    OPENING STATEMENT IS NOT EVIDENCE.  IT IS SIMPLY AN OUTLINE TO

2    HELP YOU UNDERSTAND WHAT THAT PARTY EXPECTS THE EVIDENCE WILL

3    SHOW.

4           A PARTY IS NOT REQUIRED TO MAKE AN OPENING STATEMENT.

5           THE PLAINTIFF WILL THEN PRESENT EVIDENCE AND COUNSEL       -04:-

6    FOR THE DEFENDANT MAY CROSS-EXAMINE.  THEN THE DEFENDANT MAY

7    PRESENT EVIDENCE AND COUNSEL FOR THE PLAINTIFF MAY

8    CROSS-EXAMINE.

9           AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL

10   INSTRUCT YOU ON THE LAW THAT APPLIES TO THE CASE, AND THE        -04:-

11   ATTORNEYS WILL MAKE CLOSING ARGUMENTS.

12          AFTER THAT, YOU WILL GO TO THE JURY ROOM TO

13   DELIBERATE ON YOUR VERDICT.

14          NOW, THERE'S ONE SPECIAL INSTRUCTION THAT I'M GOING

15   TO GIVE AT THIS TIME CONCERNING THE PARTIES IN THIS CASE.        -04:-

16   CARTER BRYANT, AN INDIVIDUAL, WAS PREVIOUSLY A PARTY IN THIS

17   CASE.  CARTER BRYANT FILED SUIT AGAINST MATTEL IN THIS COURT,

18   AND MATTEL FILED SUIT AGAINST CARTER BRYANT IN THIS COURT.

19   CARTER BRYANT IS NO LONGER A PARTY TO THIS CASE.

20          YOU SHOULD NOT INFER ANY ADMISSION OF WRONGDOING OR        -04:-

21   LIABILITY FROM THE FACT THAT CARTER BRYANT AND MATTEL HAVE

22   RESOLVED THEIR CLAIMS, NOR ARE YOU TO SPECULATE AS TO THE TERMS

23   AND CONDITIONS OF THAT RESOLUTION.

24          WE'RE NOW GOING TO BEGIN WITH OPENING STATEMENTS.

25   AFTER MATTEL AND MR. QUINN GIVE THEIR OPENING STATEMENT, WE'LL    -04:-

```
 1   BREAK FOR LUNCH, AND THEN WE'LL HEAR FROM MR. NOLAN AND MGA.
 2          AT THIS TIME, COUNSEL, I INVITE YOU TO MAKE YOUR
 3   OPENING STATEMENT.
 4          MR. QUINN:  THANK YOU, YOUR HONOR.
 5              OPENING STATEMENT - PLAINTIFF             -04:-
 6          MR. QUINN:  GOOD MORNING, LADIES AND GENTLEMEN.  WE
 7   MET LAST WEEK.  MY NAME IS JOHN QUINN.  YOU ALSO MET
 8   LILY MARTINEZ FROM MATTEL LAST WEEK.  ONE PERSON YOU DIDN'T
 9   MEET, BECAUSE HE WASN'T HERE LAST WEEK, IS MY LAW PARTNER,
10   BILL PRICE, WHO'S GOING TO BE TRYING THIS CASE WITH ME.      -04:-
11          ALSO I'D LIKE TO INTRODUCE, IN THE AUDIENCE HERE
12   TODAY, BOB ECKERT.
13          BOB, WOULD YOU STAND.
14          BOB IS THE CHIEF EXECUTIVE OFFICER AND CHAIRMAN OF
15   THE BOARD OF DIRECTORS OF MATTEL.                            -04:-
16          I'D BE REMISS IF I DIDN'T ALSO MENTION MY WIFE AND
17   ONE OF MY FIVE DAUGHTERS, WHO HAVE COME TODAY.
18          FOLKS, THIS IS A CASE ABOUT TWO TOY COMPANIES.  IT'S
19   ABOUT MATTEL ON THE ONE HAND AND MGA AND ISAAC LARIAN ON THE
20   OTHER HAND.                                                  -04:-
21          THE QUESTION FOR YOU IS GOING TO BE, WHO OWNS CERTAIN
22   DRAWINGS TO A DOLL?
23          BEFORE BRATZ, MGA DIDN'T HAVE ANY FASHION DOLLS.
24   THEY HAD NEVER DONE ONE.  IT DIDN'T HAVE A FASHION DOLL DESIGN
25   DEPARTMENT.  IT DIDN'T HAVE ANY FASHION DOLL DESIGNERS IN-HOUSE  -04:-
```

1    AT MGA.  AT MGA, THEY THOUGHT THAT THE BEST WAY TO GET A

2    FASHION DESIGN WAS TO GO OUT AND TAKE ONE.  AND THERE WAS A

3    PERSON AT MGA BY THE NAME OF PAULA GARCIA, WHO WAS HEAD OF

4    THEIR GIRLS' TOYS DIVISION, WHO USED HER CONTACTS -- SHE WAS A

5    FORMER MATTEL EMPLOYEE -- AND SHE USED HER CONTACTS TO FIND          -04:-

6    SOMEBODY AT MATTEL WHO HAD A FASHION DOLL DESIGN THAT HE WAS

7    WILLING TO SELL.  NOT A FORMER MATTEL DESIGNER, NOT A FORMER

8    MATTEL DESIGNER, A CURRENT MATTEL DESIGNER.

9              FOR NEARLY A YEAR, THIS MATTEL FASHION DOLL DESIGNER

10   HAD BEEN WORKING ON A DESIGN FOR A FASHION DOLL WHICH HE CALLED      -04:-

11   "BRATZ."

12             BUT MGA DID NOT HIRE HIM RIGHT AWAY.  THEY WERE

13   INTERESTED; THEY WANTED HIS DESIGN, BUT THEY DIDN'T HIRE HIM

14   RIGHT AWAY.  THEY WORKED WITH HIM TO POLISH THOSE DESIGNS, ALL

15   WHILE HE WAS STILL WORKING AT MATTEL.  AND THEY USED MATTEL         -04:-

16   RESOURCES, AND THEY USED MATTEL EMPLOYEES, WHO UNFORTUNATELY

17   DIDN'T KNOW, HADN'T BEEN TOLD, THAT THEY WERE HELPING A

18   COMPETITOR TO POLISH THESE FASHION DOLL DESIGNS.

19             WHEN THE DESIGNS WERE READY FOR MGA, WHEN THEY WERE

20   NEARLY DONE, MGA SIGNED A CONTRACT WITH THIS MATTEL FASHION        -04:-

21   DOLL DESIGNER, TO PURCHASE HIS RIGHTS TO THIS DESIGN.

22             NOW, YOU'RE GOING TO HEAR -- AND THE EVIDENCE ON

23   THIS, REALLY, I DON'T EXPECT TO BE DISPUTED; I DON'T EXPECT IT

24   TO BE DISPUTED AT ALL, THAT IN THE TOY BUSINESS, IT'S EVERY

25   COMPANY'S PRACTICE, ESSENTIALLY, TO HAVE WHAT'S CALLED AN          -04:-

1    "INVENTIONS AGREEMENT," WHICH PROVIDES THAT IF YOU'RE WORKING

2    FOR THAT COMPANY AND YOUR JOB IS TO CREATE SOMETHING, THAT

3    WHILE YOU'RE WORKING FOR THAT COMPANY AND GETTING A PAYCHECK,

4    ANYTHING THAT YOU CREATE IN THAT COMPANY'S LINE OF BUSINESS IS

5    OWNED BY THE COMPANY.  AND THE REASONS FOR THIS ARE OBVIOUS, I        -04:-

6    THINK.  OTHERWISE, THE COMPANY WOULDN'T GET THE BENEFIT OF WHAT

7    THEY WERE PAYING THEIR EMPLOYEES TO DEVELOP.

8            MGA KNEW, WHEN THEY WERE TALKING TO THIS MATTEL

9    FASHION DOLL DESIGNER ABOUT ACQUIRING THESE DRAWINGS -- THEY

10   KNEW THEY WERE DEALING WITH A MATTEL FASHION DOLL DESIGNER;        -04:-

11   THEY KNEW THAT HE HAD A CONTRACT; AND THEY WERE CAREFUL, AS YOU

12   WILL HEAR, THEY WERE CAREFUL TO HIDE THEIR DEALINGS WITH HIM

13   AND THAT THEY HAD ACQUIRED THESE RIGHTS FROM HIM.  BECAUSE THEY

14   KNEW THAT IF MATTEL EVER LEARNED, IF MATTEL KNEW, THAT THEY HAD

15   TAKEN THIS FROM A MATTEL FASHION DOLL DESIGNER WHILE HE WAS        -04:-

16   WORKING FOR MATTEL, THAT MATTEL WOULD OWN THE RIGHTS TO THOSE

17   DRAWINGS.  SO THEY COVERED IT UP.

18            NOW, THAT MATTEL FASHION DOLL DESIGNER, AS YOU'VE

19   HEARD, CARTER BRYANT, IS NO LONGER A PARTY TO THIS CASE, AND HE

20   NO LONGER HAS ANY RIGHTS TO THOSE DESIGNS.  HE SIGNED THEM        -04:-

21   AWAY.  THE QUESTION FOR YOU ALL IS GOING TO BE, DID HE SIGN

22   THEM AWAY IN CONNECTION WITH THIS SECRET CONTRACT THAT HE

23   ENTERED INTO WITH MGA WHILE HE WAS A MATTEL EMPLOYEE, OR HAD HE

24   AGREED THAT THEY WERE MATTEL'S, IN ACCORDANCE WITH THE

25   INVENTIONS AGREEMENT THAT HE SIGNED IN HIS MATTEL EMPLOYMENT?        -04:-

1          THE BRATZ DOLL CAME OUT.  IT WAS AN INCREDIBLE

2    SUCCESS, AS YOU'LL HEAR.  AND FOR NEARLY THREE YEARS, MGA HID

3    FROM THE WORLD THE IDEA OF WHERE THIS CAME FROM.  THEY HID

4    THEIR INVOLVEMENT WITH CARTER BRYANT.

5          AT THE END, WORD LEAKED OUT, AND THEY WERE FORCED TO   -04:-

6    ADMIT THAT CARTER BRYANT WAS THE AUTHOR OF THESE DRAWINGS.

7          BUT THEY CAME UP WITH AN EXCUSE THAT YOU'RE GOING TO

8    HEAR, IT'S THEIR LATEST AND GREATEST EXPLANATION, AND THAT IS,

9    MR. BRYANT HAD WORKED FOR MATTEL OVER A PERIOD OF SEVERAL

10   YEARS, AS I'LL SHOW YOU, AND DURING THAT PERIOD OF EMPLOYMENT,   -04:-

11   HE HAD A GAP OF EIGHT OR NINE MONTHS WHERE HE DIDN'T WORK FOR

12   MATTEL.  AND HE ACTUALLY LEFT TOWN, WENT BACK TO A SMALL TOWN

13   IN WESTERN MISSOURI, LIVED WITH HIS PARENTS.

14         AND THEIR LATEST AND GREATEST EXCUSE NOW IS, THEY'LL

15   SAY, THE TIME HE WASN'T AT MATTEL, THAT LITTLE WINDOW, THAT'S   -04:-

16   WHEN HE CREATED THESE DRAWINGS.  THAT'S WHAT THEY SAY, THAT HE

17   CREATED THEM THEN; DIDN'T DO ANYTHING WITH THEM; PUT THEM IN

18   THE DRAWER; AND IT WASN'T UNTIL HE WENT BACK TO WORK AT MATTEL

19   THAT HE TOOK THEM OUT AND DECIDED TO DO SOMETHING WITH THEM.

20         I WILL PROVE TO YOU, WE WILL PROVE TO YOU, DURING THE   -04:-

21   COURSE OF THIS TRIAL, THAT THAT'S NOT TRUE.  WE WILL PROVE TO

22   YOU THAT THESE DRAWINGS WERE CREATED BY CARTER BRYANT WHILE HE

23   WAS WORKING AT MATTEL, WHILE HE WAS UNDER AN INVENTIONS

24   AGREEMENT, AND THAT PURSUANT TO THAT AGREEMENT, THOSE DRAWINGS

25   WERE OWNED BY MATTEL, AND MOREOVER, THAT MGA KNEW THIS AND TOOK   -04:-

```
 1   GREAT STEPS TO COVER THAT UP.

 2          MGA NEVER HAD ANY RIGHTS TO THESE DRAWINGS.  THEY

 3   SPENT YEARS HIDING THE ORIGINS OF THE BRATZ DRAWINGS.  AND BY

 4   THE END OF THE TRIAL, I THINK IT WILL BE CLEAR TO YOU THAT THEY

 5   NEVER HAD ANY RIGHTS, THAT THEY WERE ALWAYS MATTEL'S.          -04:-

 6          YOU'RE GOING TO HEAR, I THINK, ABOUT THE AMERICAN

 7   DREAM.  MR. LARIAN IS AN IMMIGRANT TO THIS COUNTRY.  I SUBMIT,

 8   THE AMERICAN DREAM HAS NOTHING TO DO WITH THIS TYPE OF

 9   MISREPRESENTATION, INAPPROPRIATE CONDUCT, AND CONCEALMENT.

10          SO THAT, IN AN OVERVIEW, IS WHAT WE WILL PROVE TO       -04:-

11   YOU, LADIES AND GENTLEMEN.

12          NOW LET ME GO INTO THE EVIDENCE THAT YOU'LL HEAR IN A

13   LITTLE MORE DETAIL.  LET ME TELL YOU A LITTLE BIT ABOUT THE TWO

14   COMPANIES INVOLVED IN THIS LAWSUIT.

15          IN JURY SELECTION, I THINK JUST ABOUT EVERYBODY HAD     -04:-

16   HEARD OF MATTEL.  MATTEL WAS FOUNDED BY RUTH AND ELLIOTT

17   HANDLER AND AN ELLIOTT MATSON.  BY THE WAY, THAT'S WHERE THE

18   NAME COMES FROM, MATSON ELLIOTT, MATTEL.  IT WAS FOUNDED BACK

19   IN 1945, AND AFTER THE SECOND WORLD WAR, THE COMPANY FLOURISHED

20   AND BECAME RENOWNED AROUND THE WORLD FOR ITS INNOVATIVE TOY     -04:-

21   DESIGNS.  SOME OF THE MOST FAMOUS TOY BRANDS IN THE WORLD:

22   BARBIE, OF COURSE; HOT WHEELS; FISHER PRICE; MATCH BOX TOYS.

23   SOME OF THE BEST KNOWN TOY BRANDS IN THE WORLD ARE MATTEL

24   BRAND.

25          OF COURSE, BARBIE IS PERHAPS THE BEST KNOWN.  AND      -04:-
```

1    YOU'RE GOING TO HEAR THIS TERM "FASHION DOLL."  BARBIE WAS THE

2    FIRST FASHION DOLL.  THAT'S WHAT IT'S CALLED IN THE TOY

3    INDUSTRY, THE IDEA OF A FASHION DOLL.  AND WHAT A FASHION DOLL

4    IS, IT'S A DOLL WHERE CHILDREN CAN -- IT'S GOT AN EMPHASIS ON A

5    KIND OF PLAY, WITH HAIR AND CLOTHES.  AND BARBIE WAS THE FIRST        -04:-

6    FASHION DOLL.  AND IT HAS BEEN A WONDERFUL SUCCESS, THE LEADING

7    FASHION DOLL, FOR DECADES.

8             NOW, MATTEL'S SUCCESS, IT JUST DOESN'T HAPPEN.  IT

9    REQUIRES CONSTANT INNOVATION.  MATTEL INTRODUCES THOUSANDS OF

10   NEW TOYS EVERY YEAR.  OVER HALF OF THE TOYS THAT MATTEL SELLS        -04:-

11   ARE NEW EVERY YEAR.  THESE TOYS ARE THE RESULT OF MILLIONS OF

12   DOLLARS THAT ARE SPENT IN DEVELOPMENT, IN DEVELOPING THE TOYS.

13   THEY ARE DREAMED UP BY HIGHLY TALENTED, SKILLED ARTISTS, LIKE

14   LILY MARTINEZ, THAT WORK IN A DESIGN CENTER THAT'S IN

15   EL SEGUNDO, CALIFORNIA, OUT NEAR L.A.X.  IT'S A 180,000-SQUARE       -04:-

16   FOOT FACILITY.  THERE ARE HUNDREDS OF DESIGNERS WHO WORK THERE,

17   AND THEY WORK TOGETHER IN A COLLABORATIVE FASHION.  THEY HAVE

18   TO.  THEY HAVE DIFFERENT SKILLS AND TALENTS.  THEY CAN'T HIDE

19   THINGS FROM EACH OTHER.  THEY CAN'T HIDE IDEAS FROM EACH OTHER.

20   DO YOU SEE?  THEY HAVE TO WORK TOGETHER.  THEY WORK IN TEAMS,       -04:-

21   AS LILY MARTINEZ WILL TELL YOU, BECAUSE THE PROCESS OF

22   DEVELOPING NEW TOYS ISN'T SIMPLE.  IT REQUIRES DIFFERENT

23   DISCIPLINES.

24             BUT IT ALL BEGINS WITH A DRAWING, AN IDEA, THAT

25   SOMEBODY HAS THAT THEY PUT DOWN ON PAPER.  AND DECISIONS ARE        -04:-

1    MADE THEN BASED ON THAT DRAWING.  THE DRAWING ILLUSTRATES THE

2    AESTHETIC OF THE DOLL, WHAT THE IDEA OF IT IS, WHAT THE DYNAMIC

3    WITH THE CHILD MIGHT BE.  AND THESE FOLKS IN THE DESIGN CENTER

4    WORK TOGETHER TO DEVELOP THESE IDEAS.  AND IT'S A

5    COLLABORATIVE, AS I SAID, IT'S A COLLABORATIVE EFFORT, THAT          -04:-

6    REQUIRES TRUST.

7         INNOVATION, THESE TYPES OF DESIGNS, WHICH ARE

8    SOMETIMES CALLED "INTELLECTUAL PROPERTY," IS THE LIFEBLOOD OF

9    MATTEL'S BUSINESS.  MATTEL COULDN'T BE WHERE IT IS, PRODUCING

10   THOUSANDS OF NEW TOYS EVERY YEAR, WITHOUT THE HEART AND             -04:-

11   DETERMINATION OF ITS DESIGNERS, AND WITHOUT THEIR ABILITY TO

12   WORK TOGETHER AND TO COLLABORATE AND TO TRUST EACH OTHER.

13        NOW, OBVIOUSLY, IT WOULDN'T MAKE SENSE FOR A TOY

14   COMPANY TO EMPLOY PEOPLE AND HAVE THIS KIND OF MULTI-MILLION

15   DOLLAR INVESTMENT WITHOUT HAVING SOME AGREEMENT WITH THE            -04:-

16   EMPLOYEES WHICH MADE SURE THAT WHATEVER WAS CREATED, THE

17   COMPANY OWNS.  AND THAT'S WHY WE HAVE THESE INVENTIONS

18   AGREEMENTS.

19        AND MR. BRYANT SIGNED ONE OF THOSE INVENTIONS

20   AGREEMENTS IN JANUARY 1999.  WE'LL COME TO A TIMELINE LATER ON,     -04:-

21   BUT THAT'S WHEN HE CAME BACK TO WORK.  ACTUALLY, THERE WERE TWO

22   STINTS AT MATTEL, WITH A FEW MONTHS GAP IN-BETWEEN.  HE SIGNED

23   ONE AT THE BEGINNING OF THE FIRST STINT, AND HE SIGNED ONE AT

24   THE BEGINNING OF THE SECOND STINT.  STANDARD IN THE INDUSTRY.

25   MGA HAS THOSE KINDS OF INVENTIONS AGREEMENTS ALSO THAT THEIR        -04:-

```
 1    EMPLOYEES SIGN, AS I WILL SHOW YOU.

 2            SO THAT'S MATTEL.

 3            WHAT IS MGA?

 4            MGA IS ALSO A TOY COMPANY.  HISTORICALLY, FRANKLY,

 5    THEY HAD NOT BEEN VERY SUCCESSFUL IN DEVELOPING NEW PRODUCTS.    -04:-

 6    THE COMPANY WAS FOUNDED BY ISAAC LARIAN AND HIS BROTHER

 7    FARHAD LARIAN.  AND THERE'S ACTUALLY KIND OF A DISAGREEMENT

 8    BETWEEN THE TWO OF THEM, THE BROTHERS, AS TO WHERE THE MONEY

 9    CAME FROM TO START THE COMPANY.  MR. ISAAC LARIAN SAYS HE CAME

10    TO THIS COUNTRY FROM IRAN; HE ONLY HAD $750 IN HIS POCKET AND    -04:-

11    THAT REALLY HE CAME UP WITH THE SEED MONEY TO START THE

12    COMPANY.  FARHAD LARIAN SAID THAT THEIR WEALTHY PARENTS OVER IN

13    IRAN PROVIDED THEM WITH THE MONEY TO START THE COMPANY; SO WE

14    HAVE TWO DIFFERENT ACCOUNTS.

15            BEFORE 2001, MGA WAS PRIMARILY KNOWN FOR PRODUCING        -04:-

16    INEXPENSIVE, SHALL WE SAY, ELECTRONIC TOYS THAT WERE MADE IN

17    THE FAR EAST.  AND THEY HAD HAD SOME PROBLEMS.  IN 1997, THEY

18    HAD GONE THROUGH A BANKRUPTCY AT MGA, WHICH SOMETIMES HAPPENS

19    TO COMPANIES.  BUT IN 2000, THE TIME PERIOD WE'RE TALKING

20    ABOUT, MGA DID NOT HAVE ANY TYPE OF FASHION DOLL DESIGN CENTER;  -04:-

21    IT DID NOT HAVE FASHION DOLL DESIGNERS TO SPEAK OF IN-HOUSE,

22    AND IT DID NOT HAVE ANY FASHION DOLL PRODUCT.  IN FACT, MGA HAD

23    NEVER SOLD, OR HAD NEVER DEVELOPED AND SOLD, A FASHION DOLL

24    PRODUCT.

25            BUT IN 2001, MGA WENT FROM BEING A SELLER OF              -04:-
```

1    INEXPENSIVE ELECTRONIC TOYS FROM THE FAR EAST, OVERNIGHT, TO

2    BEING ONE OF THE MOST SUCCESSFUL INNOVATIVE TOY COMPANIES IN

3    THE WORLD BECAUSE THEY INTRODUCED THIS BRATZ FASHION DOLL,

4    WHICH WAS AN INSTANT HUGE SUCCESS.

5            THEY SHOWED THIS DOLL FOR THE FIRST TIME AT THE                    -04:-

6    HONG KONG TOY FAIR.  LET ME TELL YOU WHAT A TOY FAIR IS.  TOY

7    FAIRS HAPPEN AROUND THE WORLD IN DIFFERENCE PLACES.  AND THAT'S

8    WHERE TOY MANUFACTURERS CAN COME AND SHOW THEIR NEW TOYS FOR

9    THE NEXT SEASON, AND BUYERS CAN COME -- I IMAGINE WAL-MART OR

10   TOYS-R-US OR OTHERS -- PEOPLE CAN COME AND SEE WHAT THE                    -04:-

11   OFFERINGS ARE, WHAT THE NEW TOYS ARE GOING TO BE.

12           AND IN JANUARY OF 2001, IN THE HONG KONG TOY FAIR,

13   MGA INTRODUCED AND SHOWED FOR THE FIRST TIME THIS BRATZ DOLL.

14   IT WAS A MULTI-ETHNIC DOLL, WITH OVERSIZED FEET, OVERSIZED

15   HEAD, OVERSIZED EYES, LARGE LIPS.  THIS WAS A DIFFERENT LOOK TO          -04:-

16   THE DOLL.  A MONTH LATER, THEY SHOWED THE SAME DOLL IN

17   NEW YORK, AT THE NEW YORK TOY FAIR.  AND IN JUNE OF 2001, SIX

18   MONTHS AFTER IT HAD FIRST BEEN SHOWN IN THE TOY FAIR IN

19   HONG KONG, THEY SOLD IT FOR THE FIRST TIME.  THEY INTRODUCED

20   IT, ACTUALLY, IN THE MARKETPLACE IN EUROPE.                              -04:-

21           AND AS I SAID, IT WAS AN EXTRAORDINARY SUCCESS,

22   OVERNIGHT.

23           HOW?  HOW DID THIS HAPPEN?  HOW DID A COMPANY THAT

24   HAD SORT OF MIXED RESULTS IN THE MARKETPLACE WITH OTHER TOY

25   PRODUCTS SUDDENLY OVERNIGHT BECOME ONE OF THE MOST INNOVATIVE            -04:-

1    TOY COMPANIES IN THE WORLD?  SUDDENLY, THEY'VE GOT A FASHION

2    DOLL THAT'S SUCH A HUGE, SENSATIONAL HIT.  HOW DID THIS HAPPEN?

3            SIMPLE.  THEY TOOK THE DESIGN, THEY TOOK THE

4    DRAWINGS, FROM A MATTEL DESIGNER.  THAT'S WHAT THE EVIDENCE

5    WILL BE IN THIS CASE.                                        -04:-

6            NOW, GETTING TO THAT POINT, GETTING TO THE TRUTH IN

7    THIS CASE, IS LIKE PEELING AN ONION.  YOU PEEL IT BACK AND GET

8    FURTHER AND FURTHER, THE DIFFERENT STORIES AND ACCOUNTS.  AND

9    FOR THE REST OF MY OPENING STATEMENT HERE TO YOU TODAY, WHEN I

10   DESCRIBE WHAT THE EVIDENCE IS GOING TO BE, I'M GOING TO START   -04:-

11   ON THE OUTSIDE, THE SKIN OF THE ONION, AND PEEL IT AWAY ONE AT

12   A TIME.  SO I'M GOING TO SHARE WITH YOU NOW THE DIFFERENT

13   ACCOUNTS OF WHAT YOU'RE GOING TO HEAR ABOUT WHERE THE BRATZ

14   DRAWINGS CAME FROM.

15           BUT IT'S VERY, VERY IMPORTANT -- THERE'S ONE DATE I   -04:-

16   WOULD HOPE THAT YOU COULD REMEMBER, AND THAT'S OCTOBER 19,

17   2000.  UNTIL THAT DATE, OCTOBER 19, 2000, CARTER BRYANT WAS A

18   MATTEL EMPLOYEE, WORKING AT ITS DESIGN CENTER IN EL SEGUNDO,

19   WORKING UNDER AN INVENTIONS AGREEMENT.  OCTOBER 19, 2000.

20           AND I'M GOING TO BE TALKING TO YOU ABOUT EVERYTHING   -04:-

21   THAT HE DID AND EVERYTHING THAT MGA DID WITH THESE DRAWINGS AND

22   TO CREATE THESE DRAWINGS PRIOR TO THAT DATE, WHILE MR. BRYANT

23   IS STILL A MATTEL EMPLOYEE.

24           LET'S BEGIN WITH THE LAYER OF THE ONION, MR. BRYANT'S

25   STORY, HIS ACCOUNT.  AND WE KNOW WHAT MR. BRYANT'S ACCOUNT IS,   -04:-

1   BECAUSE BEFORE TRIAL, THERE'S SOMETHING -- I'M SURE MANY OF YOU

2   KNOW WHAT'S CALLED A "DEPOSITION," WHERE OUR EMPLOYEES GET

3   DEPOSED, MGA'S EMPLOYEES GET DEPOSED, AND YOU HAVE A CHANCE TO

4   ASK QUESTIONS UNDER OATH OF WITNESSES.  AND THAT WAS DONE WITH

5   MR. BRYANT.                                                     -04:-

6           AND ACCORDING TO MR. BRYANT, HERE'S HIS ACCOUNT, HIS

7   LAYER OF THE ONION:  HE ACKNOWLEDGES IT WAS WHILE HE WAS STILL

8   A MATTEL DOLL DESIGNER WITH A CONTRACT.  HE HAD SOME DRAWINGS

9   OF A DOLL WHICH HE CALLED "BRATZ" THAT HE WANTED TO SELL.  SO

10  HE APPROACHED A WOMAN BY THE NAME OF VERONICA MARLOW, ANOTHER   -04:-

11  NAME YOU'RE GOING TO HEAR OF A LOT.

12          NOW, VERONICA MARLOW WAS A FORMER MATTEL EMPLOYEE WHO

13  WAS DOING SOME WORK NOW, AT THAT TIME, WITH MGA.  MR. BRYANT

14  SAYS HE APPROACHED VERONICA MARLOW IN JULY OF 2000, SHOWED HER

15  THE DRAWINGS.  AND MS. MARLOW, ACCORDING TO HIM, SAID, 'WELL,   -04:-

16  MGA MIGHT BE INTERESTED IN THIS.  LET'S SET UP A MEETING.'

17  THEY SET UP A MEETING AT MGA, WHERE MR. BRYANT, ACCORDING TO

18  HIM, MET WITH A WOMAN BY THE NAME OF PAULA GARCIA, ANOTHER

19  FORMER MATTEL EMPLOYEE, NOW WORKING FOR MGA.  SHE WAS AN MGA

20  PRODUCT MANAGER AT THE TIME.  VERONICA MARLOW SET UP A MEETING  -04:-

21  AT MGA WITH PAULA GARCIA AND VICTORIA O'CONNOR, WHO WAS MGA'S

22  DIRECTOR OF LICENSING.  THIS IS IN LATE AUGUST OF 2000,

23  ACCORDING TO MR. BRYANT.

24          AND AT THAT MEETING, HE SAYS HE SHOWED THEM HIS BRATZ

25  DRAWINGS; HE SHOWED THEM THE BRATZ DRAWINGS.  AND ACCORDING TO  -04:-

1   HIM, THAT WAS FOLLOWED BY A SECOND MEETING WITH ESSENTIALLY THE

2   SAME PEOPLE, BUT MR. LARIAN, ISAAC LARIAN, ALSO ATTENDED THAT

3   MEETING.  AND THAT'S WHEN MR. LARIAN CLAIMS TO HAVE FIRST SEEN

4   THE DRAWINGS FOR THE BRATZ DOLL.

5          NOW, FOLKS, WE DON'T KNOW WHEN MR. BRYANT FIRST            -04:-

6   CONTACTED MGA.  WE DO KNOW THAT HIS BROTHER, MR. LARIAN'S

7   BROTHER, FARHAD LARIAN, IN A LAWSUIT THAT HE HAD --

8   FARHAD LARIAN HAD A LAWSUIT WITH ISAAC LARIAN -- AND

9   FARHAD LARIAN, IN THAT LAWSUIT, SAID THAT THE BRATZ DEVELOPMENT

10  BEGAN BY EARLY 2000.                                            -04:-

11         I'M PUTTING UP ON THE SCREEN A STATEMENT UNDER OATH

12  FROM THAT LAWSUIT THAT FARHAD LARIAN FILED AGAINST

13  ISAAC LARIAN, WHERE HE SAID, "IN AND ABOUT 2000, ISAAC CALLED A

14  MEETING TO DISCUSS THE NEW BRATZ PRODUCT LINE WITH SELECTED

15  INDIVIDUALS AT THE COMPANY."                                    -04:-

16         ANOTHER MGA EMPLOYEE, A JENNIFER MAURUS -- YOU'RE

17  GOING TO HEAR HER TESTIMONY -- SHE SAYS THAT AS EARLY AS JUNE

18  2000, THEY FIRST SAW THE BRATZ DRAWINGS, OR WERE WORKING ON THE

19  BRATZ DRAWINGS.

20         IN A WAY, WHETHER IT'S JANUARY OR WHETHER IT'S JUNE,      -04:-

21  IT DOESN'T REALLY MATTER, BECAUSE IT'S UNDISPUTED THAT AT THE

22  TIME MR. BRYANT IS GOING OVER THERE, HE'S STILL A MATTEL

23  EMPLOYEE, HE STILL HAS ONE OF THESE INVENTIONS AGREEMENTS, AND

24  MGA KNEW THAT.

25         LET ME TURN TO THAT POINT NOW.                           -04:-

1          MGA KNEW, WHEN IT WAS DEALING WITH A MATTEL DOLL

2   DESIGNER, IT KNEW IT WAS DEALING WITH SOMEBODY WHO HAD A

3   CONTRACT THAT SAID DESIGNS HE CREATES IN HIS EMPLOYMENT ARE

4   OWNED BY MATTEL.

5          BOTH MR. BRYANT AND MR. ISAAC LARIAN TESTIFIED THAT        -04:-

6   MGA KNEW THAT CARTER BRYANT WORKED FOR MATTEL WHEN HE CAME AND

7   BROUGHT THE DRAWINGS; MGA KNEW THAT MR. BRYANT HAD AN

8   AGREEMENT.  HOW DO WE KNOW THIS?  MGA AGREES, THIS IS STANDARD

9   INDUSTRY PRACTICE; ALL TOY COMPANIES HAVE IT.

10         LET'S TAKE A LOOK AT MR. BRYANT'S AGREEMENT, HIS          -04:-

11  INVENTIONS AGREEMENT, WITH MATTEL, WHICH I'VE BEEN TELLING YOU

12  ABOUT.  IT'S UP ON THE SCREEN NOW, ITS "OWNERSHIP OF

13  INVENTIONS."

14         THE AGREEMENT SAYS, "I AGREE TO COMMUNICATE TO THE

15  COMPANY, AS PROMPTLY AND FULLY AS PRACTICAL, ALL INVENTIONS, AS  -04:-

16  DEFINED, CONCEIVED OR REDUCED TO PRACTICE BY ME ALONE OR

17  JOINTLY BY OTHERS AT ANY TIME DURING MY EMPLOYMENT.  I HEREBY

18  ASSIGN TO THE COMPANY" -- THAT'S MATTEL -- "OR ITS NOMINEES,

19  ALL OF MY RIGHT, TITLE, AND INTEREST IN SUCH INVENTIONS, AND

20  ALL OF MY RIGHT, TITLE, AND INTEREST IN ANY PATENTS,            -04:-

21  COPYRIGHTS, PATENT APPLICATIONS, OR COPYRIGHT APPLICATIONS

22  BASED THEREON."

23         AND THEN THERE'S A DEFINITION OF WHAT'S AN INVENTION

24  FOR THIS PURPOSE.  YOU CAN SEE IT'S VERY BROAD.  "INVENTIONS

25  INCLUDE BUT IS NOT LIMITED TO ALL DISCOVERIES, IMPROVEMENTS,    -04:-

1    PROCESSES, DEVELOPMENTS, DESIGNS, KNOW-HOW, DATA, COMPUTER

2    PROGRAMS, AND FORMULAE."

3             CLEARLY BROAD ENOUGH TO INCLUDE THE DRAWINGS.

4             I DON'T THINK MGA IS GOING TO DISPUTE THAT, THAT THE

5    DRAWINGS WERE COVERED BY THIS INVENTIONS AGREEMENT.  AND THEN,    -04:-

6    I WON'T BOTHER TO READ IT, BUT THERE'S ALSO A CONFLICTS OF

7    INTEREST PROVISION, PURSUANT TO WHICH HE AGREES TO AVOID

8    CONFLICTS OF INTEREST.  AND ELSEWHERE, HE AGREES THAT IF HE

9    DEVELOPS ANY CONFLICTS, HE'LL INFORM THE COMPANY.

10            BUT, FOLKS, IT'S REALLY PRETTY SIMPLE.  HE AGREES,      -04:-

11   ANYTHING HE COMES UP WITH, IN MATTEL'S LINE OF WORK, THE

12   COMPANY OWNS IT.

13            NOW, LET'S TAKE A LOOK AT MGA'S AGREEMENT.  I TOLD

14   YOU, MGA ALSO -- THEY DO THE SAME THING WITH THEIR EMPLOYEES.

15   AND WHAT I PUT UP ON THE SCREEN NOW IS THE LANGUAGE FROM THE    -04:-

16   MGA AGREEMENT, THE AGREEMENT THAT MGA HAD IN EFFECT IN

17   AUGUST 2000, WHICH IS THE TIME PERIOD WHEN, ACCORDING TO

18   MR. BRYANT, HE FIRST WENT TO MGA.

19            AND YOU CAN SEE, THE LANGUAGE IS NOT VERY DIFFERENT.

20   IT SAYS, "EMPLOYEE AGREES TO ASSIGN, AND DOES HEREBY ASSIGN TO   -04:-

21   THE COMPANY, ALL INTERESTS WHICH THE EMPLOYEE MAY HAVE IN ALL

22   PATENTABLE AND/OR NONPATENTABLE IDEAS OR INVENTIONS, MADE OR

23   CONCEIVED BY EMPLOYEES, SOLELY OR JOINTLY WITH OTHERS, DURING

24   THE EMPLOYEE'S EMPLOYMENT WITH THE COMPANY."  IT SAYS IT

25   DOESN'T COVER THINGS THAT ARE JUST PURELY ON YOUR OWN TIME AND   -04:-

1  EQUIPMENT, UNLESS THE INVENTION OR IDEA RELATES TO THE BUSINESS

2  OF THE COMPANY, UNLESS IT'S A TOY, IN THE CASE OF MGA, OR IT

3  RESULTS FROM ANY WORK PERFORMED BY THE EMPLOYEE OF THE COMPANY.

4          AND THEY SIMILARLY HAVE A DISCLOSURE PROVISION, JUST

5  LIKE MATTEL, THAT YOU'VE GOT TO DISCLOSE INVENTIONS DEVELOPED          -04:-

6  SOLELY OR JOINTLY; SO VERY SIMILAR, MGA AND MATTEL, IN THESE

7  AGREEMENTS.

8          SO MGA KNEW AT THE TIME THEY WERE TALKING WITH

9  MR. BRYANT THAT HE HAD A CONTRACT WHICH ENTITLED MATTEL TO HIS

10  DESIGNS.  BUT WE'RE NOT JUST TALKING ABOUT A HANDFUL OF          -04:-

11  DRAWINGS.  THERE WERE MANY DRAWINGS.  AND ACTUALLY, IT TOOK

12  SOME STEPS BEYOND DRAWINGS.  WHILE CARTER BRYANT WAS WORKING

13  FOR MATTEL, THE DEVELOPMENT WENT BEYOND DRAWINGS.  AS EARLY AS

14  JUNE OF 2000, MR. BRYANT, WORKING INSIDE MATTEL, BEGAN,

15  ACTUALLY, TO TAKE STEPS TO START PREPARING TO MAKE A DOLL.          -04:-

16          THERE'S A WOMAN BY THE NAME OF ANNA RHEE, AND SHE WAS

17  A VENDOR, A MATTEL VENDOR, AT MATTEL'S DESIGN CENTER.  AND SHE

18  HAS TESTIFIED THAT IN JUNE 2000, MR. BRYANT HIRED HER TO

19  ACTUALLY DO FACE PAINTING ON BRATZ DOLLS, JUNE OF 2000 -- THIS

20  IS MONTHS BEFORE HE LEFT HIS EMPLOYMENT AT MATTEL -- AND THAT          -04:-

21  HE HAD HER USE THE CODE NAME "ANGEL" RATHER THAN "BRATZ."

22          THIS IS A JUNE 12, 2000 INVOICE, FROM MS. RHEE TO

23  MGA, AND YOU CAN SEE THE NAME "ANGEL" THERE.

24          NOW, MGA AND ANNA RHEE ACTUALLY ENTERED INTO A

25  WRITTEN AGREEMENT REGARDING HER WORK ON THE BRATZ DOLLS.  THAT          -04:-

1    AGREEMENT RECITES THAT THE PARTIES ORIGINALLY ENTERED INTO

2    THEIR AGREEMENT ON DECEMBER 1, 1999, ALMOST A YEAR BEFORE

3    BRYANT LEFT MATTEL.  HERE'S THE AGREEMENT, AND IT'S DATED

4    DECEMBER 1, 1999, BETWEEN MGA AND ANNA RHEE.  AND YOU CAN SEE

5    THERE, IT SAYS, "WHEREAS MGA HAS RETAINED, AND CONTINUES TO          -04:-

6    RETAIN, ANNA RHEE TO PERFORM SERVICES ON ONE OR MORE PROJECTS

7    RELATING TO THE BRATZ PROPERTY FOR MGA," REFERENCING CLEAR BACK

8    IN DECEMBER 1999.

9           BUT THAT'S NOT ALL.

10          PAULA GARCIA, WHO BECAME MGA'S PROJECT MANAGER ON           -04:-

11   BRATZ, INFORMED MGA'S TRADEMARK COUNSEL IN DECEMBER 2000 THAT

12   MGA WAS USING THE NAME "BRATZ" AT LEAST AS EARLY AS JUNE 15,

13   2000.  THIS IS A MEMORANDUM FROM MGA'S TRADEMARK COUNSEL TO

14   MS. GARCIA.  AND THEY'VE PREPARED THE TRADEMARK APPLICATIONS

15   AND INDICATE THIS RELATES TO THE NAME "BRATZ."  AND IT SAYS THE    -04:-

16   APPLICATIONS HAVE A DATE OF FIRST USE OF JUNE 15, 2000.

17          YOU CAN ACTUALLY GO TO THE DOCKET IN THE PATENT AND

18   TRADEMARK OFFICE IN WASHINGTON, D.C., AND YOU CAN SEE THAT MGA

19   THERE FILED A TRADEMARK FOR BRATZ.  IT SAYS DATES OF FIRST USE,

20   JUNE 15, 2000; LONG BEFORE, LONG BEFORE MR. BRYANT HAS LEFT       -04:-

21   MATTEL.

22          THERE'S MORE EVIDENCE.

23          THERE'S EVIDENCE THAT MR. BRYANT ASKED SOME OF HIS

24   MATTEL CO-WORKERS TO DO HIM FAVORS -- HE CALLED THEM 'FAVORS,'

25   'DO ME A FAVOR' -- AND HE ASKED THEM TO WORK ON A PROJECT,        -04:-

1   WHICH HE DIDN'T TELL THEM WHAT IT WAS.  HE DIDN'T TELL THEM

2   THAT HE WAS ACTUALLY GETTING THEIR HELP AS A FAVOR TO WORK ON A

3   PROJECT FOR A COMPETITOR.

4           YOU'LL HEAR FROM ANOTHER FACE PAINTER BY THE NAME OF

5   SHEILA KYAW AND A HAIR DESIGNER NAMED CARMEN MONTEAGUDO, WHO,

6   WITHOUT THEIR KNOWLEDGE, HE ENLISTED THEIR HELP ON THIS

7   PROJECT, SAYING IT WAS JUST A FAVOR.  YOU'LL HEAR THEIR

8   TESTIMONY.

9           HERE'S A CHECK THAT MR. BRYANT WROTE TO SHEILA KYAW,

10  MATTEL EMPLOYEE, ON AUGUST 25, 2000, FOR WORK THAT HE ASKED HER

11  TO DO.  IT WAS ON BRATZ.  SHE DIDN'T KNOW IT.

12          AFTER THE TRUTH CAME OUT, AS YOU'RE GOING TO HEAR,

13  MATTEL FOUND OUT ACTUALLY THAT THERE WERE MANY, MANY TELEPHONE

14  CALLS AND FAXES THAT MR. BRYANT SENT FROM THE DESIGN CENTER

15  OVER TO MGA BEFORE HE EVER LEFT MATTEL.

16          HE CONTACTED A MATTEL HAIR VENDOR, GETTING HAIR

17  TOGETHER FOR THE DOLL, IN SEPTEMBER OF 2000, AND CONTACTED THIS

18  VENDOR AND SAID HE WAS ALREADY WITH MGA.  SEPTEMBER 18, 2000,

19  HE'S ORDERING A SUPPLY OF HAIR.  HE SAYS, 'THE COMPANY I'M

20  WORKING WITH IS CALLED MGA ENTERTAINMENT.'  AT THIS TIME, HE'S

21  STILL EMPLOYED BY MATTEL; HE'S STILL UNDER A MATTEL INVENTIONS

22  AGREEMENT.

23          ONE MGA VENDOR SUBMITTED BILLS TO MGA FOR 169 HOURS

24  OF WORK ON BRATZ WHILE MR. BRYANT WAS STILL EMPLOYED BY MATTEL.

25          OH, AND THE PEOPLE DOING THAT WORK, LADIES AND

```
 1    GENTLEMEN, AT LEAST ONE OF THEM WAS ANOTHER MATTEL EMPLOYEE,
 2    WHO WAS WORKING ON BRATZ.  THAT WAS KEPT HIDDEN.  THAT WAS KEPT
 3    SECRET.
 4            HERE'S THE BILLS, WORK DONE BY MGA VENDORS.  THOSE
 5    HOURS, A LOT OF THOSE HOURS, BILLED BY ANOTHER MATTEL EMPLOYEE.    -04:-
 6            IN SHORT, WHAT HAPPENED HERE?  FOR ALL INTENTS AND
 7    PURPOSES, MR. BRYANT HAD CO-OPTED MATTEL'S DESIGN CENTER.  HE
 8    WAS PULLING TOGETHER ALL OF THESE DIFFERENT KINDS OF SKILLS,
 9    TALENTS, FROM THESE ARTISTS IN THE DESIGN CENTER.  MGA'S DESIGN
10    CENTER WAS MATTEL'S DESIGN CENTER.  THEY WERE CREATING THESE      -04:-
11    DRAWINGS AND TAKING STEPS TO CREATE A DOLL WHILE MR. BRYANT WAS
12    STILL EMPLOYED AT MATTEL.
13            THIS EXPLAINS, THIS EXPLAINS, FOLKS, HOW A SMALL
14    COMPANY THAT HAD NEVER DONE A FASHION DOLL BEFORE, HAD NEVER
15    DEVELOPED A FASHION DOLL, WHICH HAD NO FASHION DOLL DESIGN        -04:-
16    CENTER, HAD NO FASHION DOLL DESIGNERS, WAS ABLE, IN A VERY
17    SHORT PERIOD OF TIME, TO COME UP WITH A DOLL WHICH BECAME A
18    GLOBAL HIT.
19            FINALLY, ON OCTOBER 4, 2000, AFTER THE DRAWINGS WERE
20    DONE AND THIS EFFORT WAS WELL UNDERWAY, MR. BRYANT GAVE NOTICE,   -04:-
21    GAVE TWO-WEEKS NOTICE, AND QUIT MATTEL.  HE TOLD FOLKS, WHEN
22    ASKED, AS OFTEN HAPPENS WHEN YOU LEAVE AN EMPLOYER, 'WHAT ARE
23    YOU GOING TO DO; ARE YOU GOING TO GO WORK FOR A COMPETITOR' --
24    HE TOLD PEOPLE HE WASN'T GOING TO GO WORK FOR A COMPETITOR.  HE
25    KEPT THAT TO HIMSELF.                                            -04:-
```

1        NOW, AS I'VE SAID, WHEN BRATZ WAS INTRODUCED IN THE

2   MARKETPLACE, IT BECAME AN ASTONISHING SUCCESS.  AND REPORTERS

3   COVERING THE TOY INDUSTRY, MANY OF WHOM ARE HERE, BEGAN ASKING

4   THESE QUESTIONS -- 'THIS IS AMAZING.  THIS COMPANY THAT'S NEVER

5   DONE A FASHION DOLL SUDDENLY COMES OUT WITH SOMETHING THAT'S A          -04:-

6   SENSATIONAL HIT AROUND THE WORLD.'  REPORTERS BEGAN ASKING,

7   'WHERE DID THIS COME FROM; WHERE DID THESE DRAWINGS COME FROM;

8   WHERE DID THIS IDEA FOR A DOLL LOOKING LIKE THIS COME FROM?'

9        IN INTERVIEW AFTER INTERVIEW, LADIES AND GENTLEMEN,

10  ISAAC LARIAN CONCEALED CARTER BRYANT'S ROLE, CONCEALED THAT            -04:-

11  CARTER BRYANT HAD ANYTHING TO DO WITH IT.  IN INTERVIEW AFTER

12  INTERVIEW, MR. LARIAN CLAIMED THAT HE WAS THE CREATOR OF THE

13  BRATZ IDEA.  HE NEVER ONCE MADE ANY -- FOR A LONG, LONG TIME,

14  UNTIL IT LEAKED OUT, NEVER ONCE MADE ANY DISCLOSURE OR

15  REFERENCE TO CARTER BRYANT.                                           -04:-

16       IN A BUSINESSWEEK ARTICLE IN 2003, HE'S INTERVIEWED.

17  I MEAN, THIS IS A HUGE SUCCESS.  HE'S INTERVIEWED BY THE

18  BUSINESSWEEK REPORTER, AND HE'S ASKED THE QUESTION, 'WHERE DID

19  THIS COME FROM?'  AND HE SAID, "WELL, LIKE THEY SAY IN BUSINESS

20  SCHOOL, 'NO RISK, NO REWARD,' SAYS ISAAC LARIAN, CEO OF            -04:-

21  PRIVATELY-HELD MGA.  HE SHOULD KNOW.  HE GOT THE IDEA FOR BRATZ

22  AFTER SEEING HIS OWN KIDS RUN AROUND IN NAVAL-BEARING TOPS AND

23  HIPHUGGERS."

24       NO MENTION OF CARTER BRYANT.  HE GOT THE IDEA AFTER

25  WATCHING HIS KIDS.                                                -04:-

```
 1            IN DECEMBER OF 2003, ON A NATIONAL PUBLIC RADIO SHOW
 2     CALLED "ALL THINGS CONSIDERED," MR. LARIAN GAVE A DIFFERENT
 3     ACCOUNT AND SAID, 'I, ISAAC LARIAN, GOT THE IDEA FOR BRATZ WHEN
 4     MY OWN DAUGHTER OUTGREW BARBIE.'
 5            AGAIN, NO REFERENCE TO CARTER BRYANT.
 6            IN ANOTHER INTERVIEW IN THE SAN FERNANDO BUSINESS
 7     JOURNAL, HE SAID IT WAS HIS SON JASON WHO CAME UP WITH IT.  HE
 8     SAID, "MY OLDEST SON, 17-YEAR-OLD JASON, IS VERY CREATIVE AND A
 9     MUSIC WRITER.  HE'S COME UP WITH SOME OF OUR POPULAR TOYS.'
10     LARIAN SAID HE CAME UP WITH COMMANDOBOT, A ROBOT THAT WAS THE
11     FIRST EVER ROBOT TOY TO WORK ON VOICE RECOGNITION.  IT WAS A
12     FANTASTIC SELLER THAT WAS FEATURED IN WIRED MAGAZINE.  'IT WAS
13     JASON'S IDEA FOR BRATZ.'
14            WE HEAR ALL OF THESE DIFFERENT ACCOUNTS.
15            IN A SWORN STATEMENT UNDER OATH IN ANOTHER LAWSUIT,
16     IN A SUIT THAT MGA BROUGHT -- MGA BRINGS LAWSUITS OVER THESE
17     DRAWINGS, ACCUSING OTHER PEOPLE OF COPYING THE DRAWINGS, WHICH
18     IT CLAIMS IT OWNS IN BRATZ -- IN A SWORN STATEMENT IN ANOTHER
19     LAWSUIT THAT MGA BROUGHT, MR. ISAAC LARIAN CLAIMED THAT HE WAS
20     THE INSPIRATION BEHIND BRATZ.  HE SAYS, 'I ESTABLISHED THE
21     CLAIMANT.'  THE CLAIMANT THERE WAS MGA.  HE SAYS, 'I
22     ESTABLISHED IT AND I WAS THE INSPIRATION BEHIND THE BRATZ
23     DOLLS.'
24            HE TOLD THE CHICAGO SUN TIMES THAT MGA'S CREATIVE
25     TEAM HAD INVENTED THE NAME "BRATZ," THAT THEY CAME UP WITH IT.
```

1   THIS IS THE CHICAGO SUN TIMES.

2           AND WHAT HE TOLD THEM WAS THAT HIS 'CREATIVE TEAM

3   DECIDED THE NAME SHOULD BE CATCHY AND NOT HAVE MORE THAN SIX

4   LETTERS.  WHEN LOOKING AT SKETCHES AND PITCHING IDEAS, SOMEONE

5   SAID THE DOLLS LOOKED LIKE LITTLE BRATS.  KEEPING WITH TODAY'S    -04:-

6   TREND OF MAKING NAMES MORE COOL BY CHANGING THE SPELLING, MGA

7   EXECUTIVES DECIDED TO REPLACE THE S WITH A Z.'

8           NOW, WE'RE GOING TO SEE THAT THE NAME "BRATZ" WAS

9   ALSO TAKEN FROM MATTEL.  AND I'M GOING TO PROVE THAT TO YOU AS

10  WELL.                                                            -04:-

11          FOR YEARS AFTER 2001, WHEN THE BRATZ DOLL HIT THE

12  MARKET, FOR YEARS THE WORLD BELIEVED WHAT ISAAC LARIAN HAD TOLD

13  THEM, THAT HE OR ONE OF HIS FAMILY MEMBERS WAS THE PERSON WHO

14  CAME UP WITH THE IDEA FOR BRATZ.  THERE WAS NO PUBLIC

15  ACKNOWLEDGMENT, NONE AT ALL, LADIES AND GENTLEMEN, OF            -04:-

16  CARTER BRYANT'S ROLE.  THERE WAS NO PUBLIC EVIDENCE THAT BRYANT

17  HAD CREATED BRATZ WHILE HE WAS WORKING FOR MATTEL.

18          MGA WAS VERY GOOD AT HIDING THE TRUTH.  BUT IN THE

19  END, THE TRUTH CAME OUT.  BECAUSE OF THIS HISTORY, AS YOU MIGHT

20  IMAGINE, MGA'S WITNESSES HAVE TOLD INCONSISTENT STORIES OVER     -04:-

21  TIME ABOUT THE ORIGIN OF BRATZ, BECAUSE, YOU KNOW, AS MOST

22  PEOPLE LEARN, ONCE YOU START GOING DOWN A PATH OF TELLING

23  SOMETHING THAT'S NOT TRUE, IT'S EASY TO GET TRIPPED UP, AND IT

24  CAN BECOME IMPOSSIBLE TO KEEP YOUR STORIES STRAIGHT, ESPECIALLY

25  IF YOU'RE DEALING WITH MULTIPLE PEOPLE.                          -04:-

```
1              IN MY OPENING STATEMENT TO YOU HERE TODAY, I JUST
2    SIMPLY CAN'T TELL YOU ALL OF THE UNTRUTHS.  DURING THE COURSE
3    OF THE TRIAL, THEY'LL COME OUT.  BUT LET ME GIVE YOU A COUPLE
4    OF EXAMPLES.
5              FIRST, WHEN MR. BRYANT PITCHED HIS BRATZ DESIGNS TO      -04:-
6    MGA, MGA KNEW THAT HE WAS EMPLOYED BY MATTEL.  AS I'VE SAID,
7    MGA HAS NOW ADMITTED THIS.  BUT PAULA GARCIA, WHO I'VE REFERRED
8    TO, THE PROJECT MANAGER, WHO, ACCORDING TO MR. BRYANT, WAS THE
9    FIRST PERSON HE DEALT WITH WHEN HE WENT OVER TO MGA, SHE DENIED
10   THAT SHE EVEN KNEW THAT HE WAS WORKING FOR MATTEL.  SHE CLAIMS    -04:-
11   SHE DIDN'T LEARN THAT UNTIL YEARS LATER, AFTER THE LAWSUIT WAS
12   FILED; THAT WAS HER TESTIMONY.
13             THIS CONTRADICTS MR. BRYANT'S TESTIMONY.  THIS IS THE
14   PROBLEM OF KEEPING STORIES STRAIGHT.  HE SAYS THAT HE TOLD BOTH
15   MS. GARCIA AND MR. LARIAN THAT HE WAS EMPLOYED BY MATTEL WHEN     -04:-
16   HE MET THEM.
17             SECOND, MGA'S EMPLOYEES CAN'T KEEP THE MOST BASIC
18   FACTS STRAIGHT ABOUT HOW MR. BRYANT FIRST PITCHED THE BRATZ
19   IDEA TO MGA.
20             IF WE COULD GO TO 25-1.                                 -04:-
21             YOU'RE GOING TO HEAR COMPLETELY DIFFERENT ACCOUNTS
22   ABOUT WHO WAS THERE WHEN IT WAS PITCHED, HOW IT HAPPENED, WHEN
23   IT HAPPENED.  MS. GARCIA TESTIFIED THAT SHE ONLY ATTENDED ONE
24   PITCH MEETING WITH MR. BRYANT AND THAT MR. LARIAN WAS THERE.
25   SHE SAYS THAT'S THE FIRST TIME THAT SHE MET HIM.  BUT THERE'S A   -04:-
```

1    FORMER MGA EMPLOYEE, WHO YOU'LL HEAR FROM, ANDREAS KOCH, WHO

2    SAID THAT HE AND GARCIA, HE AND GARCIA, WERE THE FIRST TWO

3    PEOPLE THAT MR. BRYANT PITCHED.  AND THERE'S A JENNIFER MAURUS,

4    ANOTHER MGA EMPLOYEE, WHO HAS SAID THAT MGA HAD MET WITH

5    MR. BRYANT BY THE EARLY SUMMER OF 2000.                        -04:-

6         YOU KNOW, THERE'S SIMILAR INCONSISTENCIES IN THE

7    STORIES ABOUT WHERE THE NAME "BRATZ" COMES FROM.  YOU'RE GOING

8    TO HEAR SIMILAR INCONSISTENCIES.

9         MR. BRYANT HAS TESTIFIED THAT HE CAME UP WITH THE

10   NAME IN 1998, WHEN HE CAME UP WITH THE IDEA FOR THE BRATZ DOLL. -04:-

11        MS. GARCIA TESTIFIED THAT WHEN HE CAME TO PITCH THE

12   DOLL, HE ALREADY HAD THE NAME "BRATZ" WHEN HE PITCHED IT TO

13   THEM IN 2000.

14        BUT RACHEL HARRIS, A FORMER MGA EMPLOYEE, AND

15   MARGARET LEAHY, AN MGA VENDOR, BOTH SAY THE DOLLS, WHEN HE CAME -04:-

16   TO PITCH THEM, THEY DIDN'T HAVE NAMES AT THAT POINT; THAT HE

17   DIDN'T SAY ANYTHING ABOUT BRATZ.

18        OF COURSE, AS WE'VE SEEN, MR. LARIAN TOLD REPORTERS

19   THAT MGA'S CREATIVE TEAM CAME UP WITH THE NAME "BRATZ."

20        SO THERE ARE REAL PROBLEMS HERE, YOU'RE GOING TO SEE,  -04:-

21   KEEPING THE STORIES STRAIGHT.

22        BUT THERE IS ONE THING THAT WE DO KNOW, LADIES AND

23   GENTLEMEN.  AND THAT IS THAT IN-HOUSE AT MATTEL, THEY ALREADY

24   HAD IDENTIFIED THE NAME "BRATZ"; THAT MATTEL -- AND THIS WAS

25   TRUE WHILE MS. GARCIA WAS STILL AT MATTEL -- THAT MATTEL HAD  -04:-

1    IDENTIFIED "BRATZ" AS A NAME FOR A POTENTIAL DOLL.  MATTEL

2    CONSIDERED THE NAME "BRATS" WITH AN S, NOT A Z, FOR A DOLL

3    WHICH ULTIMATELY BECAME NAMED "DIVA STARZ," S-T-A-R-Z.

4           BUT HERE ARE SOME INTERNAL MATTEL DOCUMENTS.

5    "BRATZ."  "MALL BRATZ."  MGA COMES OUT WITH A PRODUCT ALSO

6    CALLED "MALL BRATZ."  THESE ARE INTERNAL MATTEL DOCUMENTS.  THE

7    NAME "BRATZ," "MALL BRATZ," IS ALREADY BEING CONSIDERED.  YOU

8    CAN SEE "BRATZ" -- THIS IS ANOTHER INTERNAL MATTEL DOCUMENT.

9    THIS IS ALL BACK WHEN MS. GARCIA WAS AT MATTEL.

10          NEXT DOCUMENT, PLEASE.

11          "BRATZ," INTERNAL TO MATTEL.

12          BUT, PERHAPS, THE MOST TELLING EVIDENCE OF ALL ARE

13   THE STEPS THAT MR. LARIAN TOOK TO KEEP MR. BRYANT AND HIS ROLE

14   UNDER WRAPS.  AS I'VE SAID, IN HIS PUBLIC ACCOUNTS, WHEN HE'S

15   INTERVIEWED, HE CONSISTENTLY AVOIDED MENTIONING CARTER BRYANT.

16   IN THE STORY THAT HE TOLD, IT WAS ALWAYS HIM OR HIS CHILDREN.

17   MR. BRYANT HAD NO ROLE IN IT AT ALL.  HE DIDN'T EXIST.

18          WITHIN MGA, MR. LARIAN TOOK STEPS TO COVER UP

19   MR. BRYANT'S INVOLVEMENT, AND HE ISSUED AN EDICT THAT NOBODY

20   WITHIN MGA -- BECAUSE THERE'S PEOPLE WHO KNEW ABOUT

21   MR. BRYANT'S INVOLVEMENT -- HE ISSUED AN EDICT THAT NOBODY

22   SHOULD MENTION CARTER BRYANT.

23          HERE'S AN INTERNAL MGA DOCUMENT FROM 2002.  AND WHAT

24   HAD HAPPENED HERE IS, A VENDOR, AN MGA VENDOR, BY THE NAME OF

25   DAVID DEES WROTE THE E-MAIL IN THE LOWER RIGHT.  HE SAID, "I

1  CAN'T TAKE CREDIT FOR THE BRATZ DOLLS OR EVEN THE FIRST BRATZ

2  ILLUSTRATIONS, FOR THAT HONOR WOULD GO TO A FELLOW NAMED

3  CARTER BRYANT."  THE VENDOR IS SPILLING THE BEANS IN AN E-MAIL.

4  AND HE COPIES, MR. DEES COPIES, MR. BRYANT ON THIS E-MAIL.

5       MR. LARIAN'S RESPONSE TO THAT E-MAIL, I THINK, IS

6  VERY TELLING, AT THE TOP:  "THERE MUST BE NO MENTION ABOUT

7  MATTEL OR ANY OF THEIR PROPERTIES; CARTER, ANY MGA, BRATZ,

8  ARTS, ET CETERA.  DON'T MENTION IT.  KEEP IT UNDER WRAPS.

9       NOW, MGA MAY SAY, 'WELL, WE DIDN'T WANT TO MENTION IT

10 BECAUSE WE WERE AFRAID WE'D GET SUED.'

11      AS MY KIDS USED TO SAY, 'DUH.  YEAH.'

12      WHEN MR. BRYANT SENT MR. LARIAN HIS NEW SIGNED MGA

13 CONTRACT, WHILE HE'S STILL EMPLOYED -- REMEMBER, HE SIGNED A

14 CONTRACT WHILE HE'S STILL EMPLOYED BY MATTEL -- HE SENT THAT

15 OVER, HE FAXED IT, FROM MATTEL'S DESIGN CENTER.  HE'S THERE; HE

16 SIGNS THE CONTRACT WITH MGA.  HE PUTS IT OVER A MATTEL FAX.

17      NOW, FAX MACHINES, AS YOU KNOW, WHEN THEY COME OUT,

18 THEY HAVE A LITTLE HEADER THAT APPEARS ON THE TOP OF THEM THAT

19 TELLS YOU WHERE THE FAX IS COMING FROM; IT IDENTIFIES THE FAX.

20 AND THIS ONE WOULD HAVE SAID "BARBIE COLLECTIBLES," BECAUSE

21 THAT'S WHERE HE FAXED IT FROM.

22      MR. LARIAN DIRECTED HIS HEAD OF LICENSING,

23 VICTORIA O'CONNOR, TO WHITE OUT THE "BARBIE COLLECTIBLES"

24 FAX HEADER FROM MR. BRYANT'S SIGNATURE PAGE.  YOU CAN SEE IT'S

25 UP ON THE RIGHT.  IT'S BLANK.  THERE'S NO FAX HEADER THERE.

1  ALSO HAD TO WHITE OUT THE DATE THERE.  YOU SEE, IT SAYS, "DATED

2  AS OF SEPTEMBER 18, 2000."  HE'S STILL EMPLOYED BY MATTEL AT

3  THAT TIME.  MR. BRYANT SAID, 'WHITE THAT OUT, WHITE OUT THAT

4  DATE, WHITE OUT THE FAX HEADER BARBIE COLLECTIBLES,' BEFORE,

5  INTERESTINGLY, SENDING IT TO MGA'S LAWYER.  HE WAS KEEPING IT        -04:-

6  FROM A WOMAN BY THE NAME OF PATRICIA GLASER, HIS OWN LAWYER.

7  THERE USED TO BE A DATE THERE, A DATE WHICH WOULD HAVE SHOWN HE

8  WAS STILL WORKING AT MATTEL.

9          MGA CONTINUED TO CONCEAL MR. BRYANT'S ROLE.  BOTH

10  MR. LARIAN AND MS. GARCIA -- YOU MAY ALSO HEAR HER REFERRED TO      -04:-

11  AS PAULA TREANTAFELLES; HER NAME CHANGED DURING THESE EVENTS;

12  SHE GOT MARRIED -- THEY GAVE STRICT INSTRUCTIONS THAT NO ONE

13  WAS TO MENTION MR. BRYANT'S INVOLVEMENT.  AND THE WITNESS WILL

14  TELL YOU ABOUT THAT.  SHE'S A WOMAN BY THE NAME OF

15  RACHEL HARRIS.                                                     -04:-

16          THE MGA EMPLOYEES UNDERSTOOD THIS, THAT YOU WEREN'T

17  SUPPOSED TO MENTION "CARTER BRYANT."  THAT WAS VERBOTEN.  YOU

18  DON'T MENTION THAT.

19          ONE OF THE IDEAS THAT ONE OF THE EMPLOYEES HAD WAS

20  FOR A SIGNATURE DOLL, A REALLY FANCY DOLL, THAT WOULD BE SIGNED     -04:-

21  BY THE DESIGNER, THAT YOU COULD MAYBE CHARGE A PREMIUM FOR.

22  AND THERE'S THIS EMPLOYEE, DEEDEE VALENCIA, WHO HAD THIS IDEA,

23  YOU KNOW, 'LET'S HAVE A SIGNATURE BRATZ DOLL.'  BUT SHE FACED A

24  QUANDARY, 'HOW ARE WE GOING TO DO THIS SIGNED BY...  I KNOW WE

25  WANT TO KEEP CARTER UNDER WRAPS.'                                  -04:-

```
 1              KIND OF TOUGH TO DO A CARTER BRYANT SIGNATURE DOLL
 2     AND PUT IT OUT TO THE WORLD AND NOT DISCLOSE THAT
 3     CARTER BRYANT'S INVOLVED.
 4              ANOTHER EXAMPLE, EXHIBIT 1932, IF WE CAN PULL THAT
 5     UP.  THERE CAME A POINT WHERE, WITHIN MGA, THEY'RE PREPARING A
 6     LIST OF THEIR EMPLOYEES THAT HAVE THE DATES THAT THEY STARTED
 7     WORKING AND WHETHER THEY'RE STILL EMPLOYED, AND IF THEY'VE
 8     LEFT, WHAT THEIR DATES ARE AND THE DATES THEY WORKED AT MATTEL.
 9     AND FOR CARTER BRYANT, IT SAYS, MATTEL DATES, WHAT WERE THE
10     DATES THAT MR. BRYANT WAS WORKING FOR MATTEL?
11              "DON'T ASK."
12              AND WHEN DID HE START?
13              QUESTION, QUESTION, QUESTION MARK, "TO THE PRESENT."
14              ANOTHER INDICATION OF HOW THEY WERE KEEPING IT UNDER
15     WRAPS.
16              MR. ISAAC LARIAN AND MGA HAVE EVEN MISREPRESENTED
17     THINGS TO THE UNITED STATES GOVERNMENT.  IN TRYING TO HIDE
18     MR. BRYANT'S INVOLVEMENT, MR. LARIAN FALSELY REPRESENTED TO THE
19     UNITED STATES PATENT AND TRADEMARK OFFICE THAT HE PERSONALLY
20     CAME UP WITH THE IDEA FOR BRATZ.  REMOVABLE FEET WAS A FEATURE
21     OF THE DOLL.  MR. BRYANT'S -- THIS IS THE APPLICATION:  "DOLL
22     WITH AESTHETIC CHANGEABLE FOOTWEAR.  INVENTOR:  ISAAC LARIAN."
23     THAT'S WHAT THEY FILED.
24              THAT IDEA WAS CLEARLY IN MR. BRYANT'S ORIGINAL PITCH.
25              WE'RE LOOKING AT A PAGE NOW FROM MR. BRYANT'S
```

1   ORIGINAL PITCH.  HE TALKS ABOUT POPPING OFF THE HAIRSTYLE AND

2   THE SHOES.

3          AND IF WE CAN LOOK AT THE NEXT SLIDE, YOU CAN SEE

4   DOWN THERE AT THE BOTTOM, THE IDEA WAS THAT THEY WERE

5   REMOVABLE, THAT THE FEET COULD BE DISCONNECTED.                     -03:-

6          IT WAS IN MR. BRYANT'S ORIGINAL PITCH.

7          WHAT DOES MR. LARIAN -- HE CAN'T BRING HIMSELF TO PUT

8   IN A PUBLIC FILING IN THE UNITED STATES PATENT AND TRADEMARK

9   OFFICE THAT THIS COMES FROM CARTER BRYANT.  HE CLAIMS THAT HE'S

10  THE INVENTOR.                                                       -03:-

11         YOU'RE GOING TO HEAR OTHER EVIDENCE -- LADIES AND

12  GENTLEMEN, THAT'S AS FAR AS I'M GOING TO GO NOW -- YOU'RE GOING

13  TO HEAR OTHER EVIDENCE ABOUT STEPS THAT MGA TOOK TO HIDE THE

14  EVIDENCE OF ITS WRONGDOING.

15         BUT MGA COULD NOT KEEP IT A SECRET FOREVER.  IT WAS        -03:-

16  TOO BIG.  TOO MANY PEOPLE KNEW.  TOO MANY REPORTERS WERE ASKING

17  ABOUT IT AND INVESTIGATING IT.  WORD LEAKED OUT.  AND ON

18  JULY 18, 2003, A WALL STREET JOURNAL ARTICLE IDENTIFIED

19  CARTER BRYANT AS THE DESIGNER OF BRATZ.  "THE HISTORY OF THE

20  BRATZ IS INTERTWINED WITH MATTEL.  MGA SAYS THE BRATZ WERE        -03:-

21  DESIGNED BY CARTER BRYANT, A FORMER MEMBER OF THE BARBIE TEAM."

22  AND IT GOES ON.  "HE SAYS HE CHOSE MR. BRYANT'S IDEA FOR THE

23  BRATZ OVER SEVERAL OTHERS AFTER HOLDING A FASHION DOLL DESIGN

24  CONTEST IN LATE 1999."

25         THIS WAS AN ASTONISHING DISCLOSURE FOR A COUPLE OF         -03:-

```
 1    REASONS.

 2            WHY?

 3            ONE, FOR THE FIRST TIME, FOR THE FIRST TIME, MGA

 4    IDENTIFIED SOMEBODY OTHER THAN ISAAC LARIAN OR ONE OF HIS

 5    FAMILY MEMBERS AS THE CREATOR OF THE BRATZ IDEA.  FOR THE FIRST    -03:-

 6    TIME.

 7            AND WHO DID THEY IDENTIFY?

 8            THEY IDENTIFIED SOMEBODY WHO, AT SOME POINT, HAD BEEN

 9    A MATTEL DOLL DESIGNER.

10            SECOND, HE DATED IT TO A TIME PERIOD, 1999.  NOW HE'S      -03:-

11    SAYING IT'S A FASHION DOLL DESIGN CONTEST.

12            HAVEN'T HEARD THAT BEFORE.

13            BUT HE DATED IT TO, HE SAYS, A DESIGN CONTEST IN

14    1999, WHEN MR. BRYANT IS STILL EMPLOYED BY MATTEL.

15            STARTLING DEVELOPMENT SUDDENLY.                            -03:-

16            'IT'S CARTER BRYANT, FORMER MATTEL EMPLOYEE, FASHION

17    DOLL DESIGN CONTEST.'  NEVER HEARD THAT BEFORE.  BUT IN 1999,

18    WHEN HE'S STILL EMPLOYED BY MATTEL.

19            AND THEN THERE IS A HUGE BREAKTHROUGH.

20            THE BREAKTHROUGH IS THIS:  TWO MONTHS LATER, TWO           -03:-

21    MONTHS AFTER THIS WALL STREET JOURNAL ARTICLE, IN SEPTEMBER OF

22    2003, MATTEL IS CONTACTED BY SOME LAWYERS IN HONG KONG WHO ARE

23    DEFENDING A CASE THAT'S BROUGHT BY MGA AGAINST THEIR CLIENTS.

24    MGA HAD SUED IN HONG KONG, ALLEGING INFRINGEMENT OF THEIR

25    RIGHTS AND WHAT THEY CLAIM WERE THEIR BRATZ DRAWINGS.  AND         -03:-
```

1    THESE HONG KONG LAWYERS SAID THEY HAD SOME INFORMATION THAT

2    THEY THOUGHT MIGHT BE OF INTEREST TO MATTEL, AND A MEETING WAS

3    ARRANGED BETWEEN MATTEL REPRESENTATIVES AND THESE HONG KONG

4    LAWYERS.

5             THE HONG KONG LAWYERS WHO ARE DEFENDING THIS CASE          -03:-

6    THAT MGA HAS BROUGHT GAVE THE MATTEL FOLKS TWO DOCUMENTS.  ONE,

7    THEY GAVE THEM A CONTRACT BETWEEN MGA AND MR. BRYANT, DATED AS

8    OF SEPTEMBER 18, 2000, THAT HE HAD ENTERED INTO WHILE HE WAS

9    STILL -- TALKING ABOUT PEELING THE ONION; NOW WE'RE GETTING

10   DOWN TO THE SURFACE NOW -- HONG KONG LAWYERS GIVE THEM A          -03:-

11   CONTRACT THAT MR. BRYANT HAD SIGNED WHILE HE WAS STILL EMPLOYED

12   BY MATTEL.

13            AND THEY ALSO GAVE THE DRAWINGS, THE ORIGINAL BRATZ

14   DRAWINGS, WHICH NOBODY AT MATTEL HAD EVER SEEN.

15            UNDER THAT CONTRACT, YOU CAN SEE, THAT MR. BRYANT        -03:-

16   SIGNED WHILE HE WAS STILL WORKING FOR MATTEL, HE AGREES TO WORK

17   ON THIS BRATZ, AND IT SAYS THAT HE'LL PROVIDE HIS SERVICES ON A

18   TOP PRIORITY BASIS.

19            FOR THE VERY FIRST TIME, MATTEL HAD PROOF, CONCRETE

20   PROOF, THAT MR. BRYANT, NOT ISAAC LARIAN, WAS THE ORIGINATOR OF   -03:-

21   THE BRATZ DOLL DESIGNS.  EVEN MORE SHOCKINGLY, THE DOCUMENT

22   CONFIRMED THAT HE HAD DONE THIS WHILE HE WAS STILL EMPLOYED BY

23   MATTEL, THAT HE WAS WORKING ON WHILE HE STILL HAD A CONTRACT,

24   AN INVENTIONS AGREEMENT.

25            WHAT DID THAT MEAN, FOLKS?                               -03:-

1          THAT MEANT MATTEL OWNED THOSE BRATZ DRAWINGS.

2          SO MATTEL BEGAN AN INVESTIGATION, AND ON APRIL 27,

3    2004, MATTEL BROUGHT THIS LAWSUIT.

4          NOW, MGA HAS KNOWN FROM THE BEGINNING THAT IF THEY

5    WERE EVER CAUGHT, IT WOULD MEAN THAT MATTEL WOULD OWN THESE          -03:-

6    DRAWINGS.

7          AND, IN FACT, THERE ARE MANY DRAWINGS, MANY BRATZ

8    DRAWINGS, TO WHICH THERE'S NO DISPUTE THEY WERE CREATED BY

9    MR. BRYANT WHILE HE WAS EMPLOYED BY MATTEL.  THEY WON'T DISPUTE

10   THIS AS TO SOME OF THESE DRAWINGS.                                  -03:-

11         IF WE COULD LOOK AT 75-1.

12         THERE'S NO DISPUTE THAT MR. BRYANT WAS DOING DESIGN

13   WORK ON BRATZ WHILE EMPLOYED BY MATTEL.  MR. BRYANT WILL

14   TESTIFY, FOR EXAMPLE, THAT THESE PARTICULAR DRAWINGS -- I KNOW

15   HE WILL, BECAUSE WE ASKED HIM IN DEPOSITION AND HE CONFIRMED       -03:-

16   IT -- THAT HE DID THESE PARTICULAR BRATZ DRAWINGS WHILE HE

17   WAS -- HE CREATED THOSE WHILE HE WAS AT MATTEL.

18         THERE'S OTHER BRATZ DRAWINGS; IF WE COULD LOOK AT

19   73-1; HE HAS SIMILARLY ACKNOWLEDGED HE DID THESE WHILE HE WAS

20   EMPLOYED BY MATTEL.  AND 73-2, AS TO ALL OF THESE, THERE'S         -03:-

21   REALLY NO DISPUTE THAT HE DID THESE.  HE TESTIFIED TO THAT:  'I

22   DID THESE WHILE I WAS EMPLOYED BY MATTEL.'

23         SO WHAT DO THEY SAY, THOUGH?

24         THEY HAVE TO SAY, 'WELL, THEY'RE JUST LIKE DRAWINGS I

25   DID EARLIER.  THESE AREN'T THE ORIGINALS.  THE ORIGINALS ARE       -03:-

1   ONES THAT I DID EARLIER.  THEY JUST HAPPEN TO LOOK LIKE THE

2   ONES I DID EARLIER.'

3           AND THAT GETS TO THEIR LATEST AND GREATEST EXCUSE AND

4   EXPLANATION, WHEN THIS ALL CAME OUT, THAT, REALLY, THERE WAS A

5   TIME, THIS GAP IN TIME, WHEN MR. BRYANT WASN'T EMPLOYED BY          -03:-

6   MATTEL, AND THAT'S WHEN HE CREATED THE ORIGINAL BRATZ DRAWINGS.

7           HERE'S THE TIME PERIOD, MR. BRYANT'S EMPLOYMENT

8   HISTORY WITH MATTEL:  HE BEGINS WORKING IN SEPTEMBER OF 1995.

9   HE LEAVES APRIL 29, 1998.  DURING THAT PERIOD OF EIGHT OR NINE

10  MONTHS, HE LEAVES THE LOS ANGELES AREA.  HE GOES TO A SMALL         -03:-

11  TOWN IN WESTERN MISSOURI; LIVES WITH HIS PARENTS; RETURNS TO

12  MATTEL; SIGNS THE AGREEMENT AGAIN ON JANUARY 4, 1999.  AND

13  LO AND BEHOLD, GUESS WHAT?  WHEN IS THE TIME PERIOD THAT MGA

14  SAYS THE ORIGINAL BRATZ DRAWINGS WERE CREATED?

15          WELL, YOU'LL HAVE A CHANCE TO HEAR THE EVIDENCE ON          -03:-

16  THAT, AND YOU'LL HAVE TO MAKE JUDGMENTS ABOUT THE CREDIBILITY

17  OF THAT.

18          BUT FOR NOW, I'D JUST LIKE YOU TO CONSIDER ONE THING:

19  UNDER THEIR ACCOUNT, HE DREW THESE DRAWINGS DURING THAT PERIOD

20  WHEN HE WASN'T WORKING AT MATTEL AND HE DID NOTHING WITH THEM.      -03:-

21          THEY HAVE TO SAY THAT BECAUSE HE DIDN'T COME TO MGA

22  UNTIL, BY THEIR ACCOUNT, AUGUST OF 2000.  SO THEY SAY HE DREW

23  THEM; HE LOVED THEM; HE WAS EXCITED ABOUT THEM; HE PUT THEM IN

24  A DRAWER AND DID NOTHING WITH THEM, AND DIDN'T PULL THEM OUT

25  UNTIL SOMETIME LATER.                                              -03:-

1      LET'S PEEL THE ONION NOW ANOTHER LAYER, AND LET'S

2    TALK ABOUT MGA'S STORY, MGA'S CREATION STORY, OF WHERE BRATZ

3    CAME FROM.

4          AS YOU'VE SEEN FROM THE TIMELINE, THEY SAY, 'WELL, HE

5    WORKED AT MATTEL SEPTEMBER 1995 TO APRIL 1998; THEN HE LEFT,          -03:-

6    WENT TO THE SMALL TOWN OF KIMBERLING CITY, MISSOURI, IN WESTERN

7    MISSOURI.'

8          THERE HE WAS WORKING AT A STORE CALLED OLD NAVY; HE'S

9    WORKING AT AN OLD NAVY STORE.  ONE DAY HE'S DRIVING HOME FROM

10   WORK, RETURNING TO HIS PARENT'S HOUSE WHERE HE'S LIVING, AND HE       -03:-

11   HAPPENS TO DRIVE BY THE KICKAPOO HIGH SCHOOL.  I KID YOU NOT;

12   THAT'S THE NAME OF THE HIGH SCHOOL.  AND HE SAYS THAT THERE AT

13   THE KICKAPOO HIGH SCHOOL, AS HE'S DRIVING BY, HE SEES THESE

14   KIND OF URBAN-LOOKING, ETHNIC, HIPHOP KIDS WITH ATTITUDES,

15   HANGING AROUND THE SCHOOL.  AND HE SAYS HIS ACCOUNT WAS, 'WOW.'       -03:-

16   HE WAS INSPIRED BY THAT.  HE WENT RIGHT HOME AND THAT DAY, DREW

17   THE DRAWINGS.  THAT'S THEIR ACCOUNT.

18         NOW, BY THE WAY, LET'S TAKE A LOOK AT THE ROUTE THAT

19   YOU WOULD NEED TO DRIVE FROM OLD NAVY TO HIS FOLKS' HOME.  OLD

20   NAVY IS IN THE BATTLEFIELD MALL UP THERE.  HIS FOLKS' HOME IS        -03:-

21   DOWN HERE.  SO MAYBE THERE WERE SOME ROAD CLOSURES OR

22   SOMETHING, BUT IT RAISES AN ISSUE ABOUT THE ACCOUNT.

23         AND THEN HE SAYS HE WAS INSPIRED BY THESE KIDS, THAT

24   THEY'RE HIPHOP, URBAN, MULTI-ETHNIC WITH ATTITUDE.  WELL, WE'RE

25   GOING TO SHOW YOU SOME OF THOSE HIPHOP, URBAN-ATTITUDE KIDS IN        -03:-

WESTERN MISSOURI, BECAUSE WE GOT THE YEARBOOK, THE HIGH SCHOOL

YEARBOOK FOR THAT YEAR.  IT'S GOING TO COME INTO EVIDENCE, AND

YOU'RE GOING TO SEE THEM, AND YOU'RE GOING TO HAVE A CHANCE TO

JUDGE THE CREDIBILITY OF THAT STORY, THAT THESE KIDS IN THAT

SCHOOL WOULD HAVE INSPIRED WHAT HE DESCRIBES AS HIPHOP,

URBAN-ATTITUDE, MULTI-ETHNIC KIDS.

        AND, AGAIN, THIS IS GOING TO BE FOR YOU FOLKS TO

ASSESS THE CREDIBILITY.  I'M JUST PRESENTING THE EVIDENCE TO

YOU.

        NOW, THERE ARE SOME OTHER PROBLEMS WITH THIS ACCOUNT.

MR. BRYANT SAYS THAT THESE DRAWINGS THAT HE DID, THESE ORIGINAL

ONES THAT HE DID, ARE BLACK AND WHITE DRAWINGS, JUST BLACK AND

WHITE DRAWINGS.  THAT'S WHAT MR. BRYANT NOW SAYS.  AND HE SAYS

THAT ALTHOUGH HE'S VERY EXCITED ABOUT THEM, HE THOUGHT THEY

WERE GREAT, HE DIDN'T DO ANYTHING WITH THEM.

        A COUPLE OF MONTHS LATER, HE APPLIES FOR A JOB TO

RETURN TO MATTEL, IN THE FALL OF 1998, AND HE STARTS UP AT

MATTEL ON JANUARY 4, 1999.

        NOW, MGA IS GOING TO BRING TO YOU SOME WITNESSES WHO

WILL SAY THAT THIS STORY THAT HE CREATED THEM DURING THIS TIME

PERIOD IS TRUE.  HE'S GOING TO BRING YOU SOME PEOPLE WHO WILL

SAY, 'I SAW THE DRAWINGS IN THAT TIME PERIOD.'

        WHO DO YOU THINK THEY ARE?

        HIS MOM, HIS DAD, HIS COMPANION, A FAMILY FRIEND.

        WITHOUT MAKING TOO MUCH OF IT, THESE PEOPLE ALL

1    UNDERSTAND THAT MR. BRYANT HAS A FINANCIAL INTEREST IN BRATZ.

2    I MEAN, HE'S RECEIVED MILLIONS OF DOLLARS OF ROYALTIES.  UNDER

3    HIS CONTRACT, HE'S GOT AN AGREEMENT THAT HE CAN GET ROYALTIES

4    GOING INTO THE FUTURE.  I SUPPOSE IT'S NATURAL THAT PEOPLE

5    WOULD WANT THE BEST FOR THEIR FAMILY, BUT THESE FOLKS, I      -03:-

6    SUBMIT, ARE HARDLY UNBIASED WITNESSES.  AND I'M SAYING THAT YOU

7    REALLY CAN'T NECESSARILY RELY ON THEIR MEMORIES VERSUS THE

8    ACTUAL EMPIRICAL EVIDENCE THAT WE'RE GOING TO SHOW YOU.

9            SO ACCORDING TO MR. BRYANT, HE PUT THESE DRAWINGS

10   AWAY AND HE GOES BACK TO WORK AT MATTEL IN JANUARY OF 1999;    -03:-

11   SOMETIME IN THE MIDDLE OF 1999, HE PULLS OUT HIS BRATZ DRAWINGS

12   AND DOES SOME ADDITIONAL WORK ON THEM.  HE ADDS SOME COLOR, HE

13   SAYS, AND HE REFINES THE DESIGNS, AND HE SAYS THAT THOSE

14   DRAWINGS, WHICH HE THEN REFINES AND COLORS, ARE THE ONES THAT

15   HE TOOK OVER TO MGA, VERONICA MARLOW, IN MID 2000.            -03:-

16           AGAIN, THESE DRAWINGS, THEY'RE MULTI-ETHNIC,

17   HIPHOP-LOOKING, LARGE HEAD, LARGE FEET, LARGE LIPS, LARGE EYES,

18   REMOVABLE FEET.

19           AND IN SEPTEMBER OF 2000, MGA ENTERS INTO THAT

20   CONTRACT, WHERE THEY PURCHASE THE RIGHTS TO THE DRAWINGS, AND   -03:-

21   MGA SETS OUT WORK AFTER THAT ACTUALLY CREATING THE DOLLS.

22           WHAT'S MGA GOING TO TELL YOU ABOUT THIS?

23           MGA IS GOING TO KIND OF HEDGE ITS BETS HERE.  THEY'RE

24   GOING TO TELL YOU ALL THIS IS TRUE, THAT IT WAS CREATED IN

25   1998, ET CETERA.  BUT THEY'RE ALSO GOING TO TELL YOU SOMETHING  -03:-

1   ELSE.  MGA IS GOING TO TELL YOU THAT, 'LOOK, IF THIS TURNS OUT

2   TO BE NOT TRUE, WHAT MR. BRYANT SAID, IT'S NOT OUR FAULT.

3   THAT'S WHAT HE TOLD US.  HE MISREPRESENTED IT TO US.  WE WERE

4   DUPED TOO.'  THAT'S WHAT MGA IS GOING TO SAY.

5          NOW, OF COURSE, PEOPLE ACTING IN GOOD FAITH DON'T

6   ORDINARILY NEED TO TAMPER WITH EVIDENCE, WHITE OUT THINGS,

7   CONCEAL THINGS, TELL DIFFERENT STORIES TO NEWSPAPERS,

8   MISREPRESENT THINGS TO THE FEDERAL GOVERNMENT, OR MISREPRESENT

9   THINGS TO THEIR OWN LAWYERS.  IT STILL RAISES THE QUESTION

10  ABOUT WHY YOU WOULD DO ALL OF THOSE THINGS.

11         BUT THE TRUTH IS, AND THE EVIDENCE WILL BE, THAT

12  ALTHOUGH MR. LARIAN KNEW THAT HE WAS DEALING WITH A MATTEL DOLL

13  DESIGNER, HE AND MGA PERFORMED ESSENTIALLY NO INVESTIGATION, NO

14  INVESTIGATION, TO DETERMINE WHETHER THESE DRAWINGS WERE OWNED

15  BY MATTEL.

16         REMEMBER, MGA KNEW THAT MR. BRYANT, LIKE ALL MATTEL

17  DESIGNER EMPLOYEES, HAD ONE OF THESE INVENTIONS AGREEMENTS.

18  THEY KNEW THAT.  PAULA GARCIA, A FORMER MATTEL EMPLOYEE, SHE

19  USED TO HAVE ONE OF THESE AGREEMENTS WHEN SHE WAS AT MATTEL.

20         AND ALTHOUGH MGA'S EMPLOYEES TELL DIFFERENT STORIES

21  ABOUT WHEN THEY FIRST MET WITH MR. BRYANT -- YOU SAW SOME OF

22  THAT; MIGHT HAVE BEEN JUNE, MIGHT HAVE BEEN SEPTEMBER -- ALL OF

23  THEM AGREE THAT HE WAS A MATTEL EMPLOYEE AT THE TIME.  THEY DID

24  ESSENTIALLY NOTHING TO FIND OUT WHETHER THESE DRAWINGS WERE

25  OWNED BY MATTEL.

1          THEY SAY THEY DID TWO THINGS.  ISAAC LARIAN SAID HE

2    DID TWO THINGS TO CONFIRM THIS.  FIRST, HE ASKED HIS LICENSING

3    PERSON, VICTORIA O'CONNOR, TO CONDUCT AN INVESTIGATION AND

4    CONFIRM THAT THESE DRAWINGS ARE ACTUALLY MR. BRYANT'S PROPERTY

5    AND THAT THEY DON'T BELONG TO MATTEL.  VICTORIA O'CONNOR SAYS,      -03:-

6    'IT NEVER HAPPENED.  HE DIDN'T ASK ME TO DO THAT.'  SHE'LL COME

7    HERE AND TESTIFY, AND SHE WILL TELL YOU THAT NEVER HAPPENED.

8          THE SECOND THING THAT THEY SAY THEY DID TO TRY TO

9    CONFIRM THIS WAS THAT THEY HAD MGA'S LAWYER WHO WAS DEALING

10   WITH THIS AT THE TIME, A DAVID ROSENBAUM, DO AN INVESTIGATION.     -03:-

11         WELL, WHAT WAS HIS INVESTIGATION?

12         IF WE COULD LOOK AT 70-1.

13         MR. LARIAN ASKED MR. ROSENBAUM, MGA'S LAWYER, IF

14   BRYANT HAS THE RIGHTS.  MR. ROSENBAUM SAID, 'I ASKED MS. WANG

15   IF BRYANT HAS THE RIGHTS.'  MS. WANG SAYS, 'I ASKED MR. BRYANT.    -03:-

16   HE SAID HE HAS THE RIGHTS.'

17         THAT'S IT.

18         THAT'S THE FULL EXTENT OF THE INVESTIGATION.  IT'S

19   COMPLETELY CIRCULAR.  'JUST TELL US THAT YOU HAVE THE RIGHTS.'

20   THEY PUT ON A SHOW, FOLKS.  THIS WASN'T AN INVESTIGATION.          -03:-

21         AND IN THIS CLAIMED INVESTIGATION, ONE THING THAT

22   NEVER TURNED UP WAS THAT THESE WERE SUPPOSEDLY CREATED BACK IN

23   MISSOURI IN 1998.  THAT STORY DIDN'T SURFACE.  THAT'S MORE

24   RECENT.

25         SO THE SUM TOTAL OF THE INVESTIGATION THEY DID IS           -03:-

1   THAT MGA'S LAWYER ASKED MR. BRYANT'S LAWYER IF HE'S TELLING THE

2   TRUTH.  THEY SAY 'YES.'  PERIOD.  END OF STOP.  'THAT'S ALL I

3   WANT TO HEAR.'

4          THERE WILL BE NO EVIDENCE THAT AT ANY TIME WAS

5   ANYBODY AT MATTEL EVER ASKED.  SIMPLE THING TO DO.  AT NO TIME        -03:-

6   WAS ANYBODY AT MATTEL EVER ASKED WHETHER MATTEL OWNED THESE OR

7   WHETHER THESE WERE LEGITIMATELY MR. BRYANT'S PROPERTY.

8          SO NOW WE'RE GETTING DOWN NEAR THE CENTER OF THE

9   ONION.  AND I WANT TO TELL YOU NOW THE REAL CREATION STORY, AS

10  WE'VE BEEN ABLE TO PUT IT TOGETHER AS A RESULT OF THE               -03:-

11  INVESTIGATION THAT WE'VE DONE IN THIS CASE.  THE REAL STORY,

12  WHAT ACTUALLY HAPPENED.  WHAT ACTUALLY HAPPENED IS THAT THESE

13  DRAWINGS, THE BRATZ DRAWINGS, WERE CREATED BY MR. BRYANT WHILE

14  HE WAS WORKING FOR MATTEL, USING MATTEL RESOURCES, AND WHILE HE

15  WAS UNDER CONTRACT TO MATTEL.  AND BY VIRTUE OF THAT, THESE         -03:-

16  DRAWINGS ARE OWNED BY MATTEL.

17         HOW DO WE KNOW THIS?

18         THE REAL STORY BEHIND THE CREATION OF BRATZ DRAWINGS

19  BEGINS IN MID 1999.  AT THAT TIME, MR. BRYANT WAS WORKING IN A

20  DESIGN CENTER.  AMONG OTHER THINGS, HE WAS DOING DESIGNS FOR        -03:-

21  BARBIE.  AND HERE ARE SOME OF HIS DRAWINGS FROM AROUND THAT

22  TIME.

23         IN 1999, HE'D COME BACK TO MATTEL.  AND HERE ARE SOME

24  EXAMPLES OF SOME OF HIS DRAWINGS.

25         AS YOU CAN SEE, MR. BRYANT -- THIS IS HIS STYLE.           -03:-

1    HE'S GOT A CERTAIN STYLE.  THE FIGURES ARE WILLOWY.  YOU CAN

2    SEE THE ELEGANCE.  CLEARLY SUITED FOR THE KINDS OF THINGS THAT

3    HE WAS DOING FOR BARBIE.

4           IN THE SPRING OF 1998, THERE WAS A TERRIFIC STUDENT

5    AT THE FASHION INSTITUTE OF DESIGN IN LOS ANGELES BY THE NAME        -03:-

6    OF LILY MARTINEZ, WHO SOME FOLKS FROM MATTEL RECRUITED WHEN

7    THEY CAME BY TO SEE SOME WORK SHE HAD DONE AND THE STUDENTS HAD

8    DONE.  THEY RECRUITED HER.  AND THEY BROUGHT HER IN ON A BASIS

9    OF AN INTERNSHIP.  AND AFTER SHE HAD DONE GREAT WORK AND AFTER

10   HER INTERNSHIP WAS DONE, THEY BROUGHT HER ON ON A PERMANENT         -03:-

11   BASIS.  AND MS. MARTINEZ HAS BEEN AT MATTEL EVER SINCE.

12          ONE OF HER EARLY ASSIGNMENTS WAS TO CREATE A

13   DECORATIVE DECAL THAT WOULD GO ON A BARBIE DOLL CALLED

14   "COOL-SKATING BARBIE."  AND SHE WAS ASKED TO -- ONE OF THE VERY

15   FIRST THINGS THAT SHE DID WAS TO DESIGN -- THERE'S              -03:-

16   "COOL-SKATING BARBIE" IN THE BOX ON THE LEFT-HAND SIDE.  IT'S A

17   MULTI-ETHNIC BARBIE DOLL.  THERE ARE DIFFERENT VERSIONS OF IT.

18   AND SHE WAS ASKED TO CREATE THAT IMAGE THAT YOU SEE THERE ON

19   THE DECAL THERE.

20          HER BOSS WAS SO IMPRESSED WITH THIS DECAL, THE IMAGE       -03:-

21   THAT SHE DREW, THAT HER BOSS ASKED HER, 'WHY DON'T YOU SEE IF

22   YOU CAN TURN THAT INTO A DOLL.  SEE WHAT YOU CAN DO WITH IT' --

23   THE BOSS REALLY LIKED IT -- WHICH SHE DID; SHE WENT TO WORK ON

24   IT.  SHE WAS VERY EXCITED ABOUT THIS.  SHE WAS RELATIVELY NEW

25   TO THE COMPANY, AND HERE SOMEBODY WAS GIVING HER THE GO-AHEAD    -03:-

1   TO DESIGN A DOLL BASED ON THIS DECAL IMAGE THAT SHE CAME UP

2   WITH.

3          SHE DID DESIGN A DOLL, WHICH SHE CALLED "TOON TEENS."

4   THE TOON TEENS DOLLS WERE MULTI-ETHNIC; HAD LARGE FEET, LARGE

5   HEADS, LARGE EYES.  THERE'S ONE OF THEM, LOOKING RIGHT THERE ON          -03:-

6   THE SCREEN NOW, ONE OF HER DRAWINGS FOR THE TOON TEENS DOLL.

7          DO YOU SEE THE ARM POSE THERE?  THE ARM POSE THAT YOU

8   SEE IN THAT TOON TEENS DRAWING CAME FROM THE FACT THAT

9   ORIGINALLY -- REMEMBER, THE DECAL WAS ON SKATES.  REMEMBER YOU

10  SAW THAT FIGURE; IT WAS ON ROLLER-SKATING BARBIE.  AND THE          -03:-

11  DECAL WAS ON SKATES, AND THE HANDS WERE OUT ON THE DECAL, LIKE

12  A CHILD MIGHT BALANCE ITSELF ON SKATES.  AND SHE CARRIED THIS

13  OVER WHEN SHE STARTED TO DO HER DRAWING FOR TOON TEENS.

14         THESE ARE SOME OF THE DRAWINGS THAT SHE DID.  THIS

15  ONE IS ACTUALLY A DRAWING FROM THE DECAL, I BELIEVE, THAT WE'RE          -03:-

16  LOOKING AT NOW.  AGAIN, THE HANDS OUT.  AND SHE WAS VERY PROUD

17  OF THESE TOON TEENS DRAWINGS THAT SHE DID.  SO SHE POSTED THEM

18  ON HER CUBICLE.  AND YOU'RE GOING TO SEE, SHE WORKED IN THAT

19  DESIGN CENTER I TOLD YOU ABOUT WITH ALL OF THESE DIFFERENT

20  DESIGNERS.  THE DESIGNERS WORK IN CUBICLES.  IT'S A VERY OPEN          -03:-

21  SPACE.  IT'S NOT LIKE YOU'RE BEHIND CLOSED DOORS.  PEOPLE CAN

22  WALK BY AND SEE WHAT PEOPLE ARE WORKING ON.  THIS IS PART OF

23  THE SHARING AND THE COLLABORATION THAT I TOLD YOU ABOUT.

24         NOW, MR. BRYANT SWEARS -- WE ASKED HIM -- HE SWEARS

25  THAT HE NEVER SAW THE TOON TEENS DRAWINGS.  BUT HIS ROOMMATE,          -03:-

1    AND HIS CLOSE FRIEND, A WOMAN BY THE NAME OF ELISE CLOONAN, SAT

2    IN A CUBICLE THAT WAS JUST TWO CUBICLES AWAY FROM LILY.  AND

3    MR. BRYANT -- YOU'LL HEAR TESTIMONY -- HE WAS BY A LOT,

4    VISITING LILY.  AND MR. BRYANT DOESN'T DENY THAT HE SAW THE

5    ACTUAL THREE-DIMENSIONAL TOON TEENS DOLLS.  HE SAYS, 'I NEVER       -03:-

6    SAW THE DRAWINGS WHICH LILY HAD POSTED IN HER CUBICLE,' BUT HE

7    ADMITS THAT HE DID SEE THE DOLLS THEMSELVES WHEN LILY CREATED

8    THEM.

9            ELISE BROUGHT THEM BY TO SHOW HIM THE DOLLS.  THEY

10   WERE IN AN OPEN WORK AREA, WHERE LILY HAD SET THEM OUT.  AND       -03:-

11   THERE WILL BE TESTIMONY THAT MR. BRYANT MADE A COMMENT, 'MATTEL

12   WOULD BE CRAZY IF THEY DON'T DO THESE DOLLS.  THIS IS

13   FANTASTIC.'  THAT'S THE TESTIMONY THAT YOU'RE GOING TO HEAR.

14           MR. BRYANT WAS, IN FACT, SO STRUCK BY THESE

15   TOON TEENS DRAWINGS THAT HE MADE SOME DRAWINGS OF HIS OWN THAT     -03:-

16   WERE CLEARLY INFLUENCED BY MS. MARTINEZ'S TOON TEENS DRAWINGS.

17           IF YOU LOOK AT THE RIGHT-HAND SIDE, THAT'S A DRAWING

18   THAT MR. BRYANT DID.  AND I'D ASK YOU TO COMPARE IT THERE TO

19   MS. MARTINEZ'S TOON TEENS DRAWINGS.  YOU CAN SEE, MR. BRYANT'S

20   DRAWING, IT'S NOT THE WILLOWY KIND OF THING THAT WE LOOKED AT      -03:-

21   BEFORE, BUT HE'S CLEARLY BEEN INFLUENCED BY WHAT HE SAW IN

22   MS. MARTINEZ'S DRAWING.  BUT IT LACKED THE UNIQUENESS.  HIS

23   DRAWING THERE ON THE RIGHT, IT LACKED THE UNIQUENESS OF THE

24   TOON TEENS DRAWINGS; AND HE APPARENTLY RECOGNIZED IT.  THE HEAD

25   IS STILL PROPORTIONAL; THE FEET AREN'T NEARLY AS LARGE; THE        -03:-

```
 1    ARMS HAD A CLASSIC FASHION DOLL POSE.  IT'S KIND OF A MODIFIED
 2    BARBIE, IF YOU WILL, WHICH IS HARDLY A SURPRISE, SINCE THAT'S
 3    THE KIND OF WORK THAT MR. BRYANT HAD BEEN DOING, DOING A LOT OF
 4    WORK REGARDING BARBIE.
 5         BUT MR. BRYANT DIDN'T GIVE UP.  HE CONTINUED TO                    -03:-
 6    EXPERIMENT.  AND IN HIS FINAL BRATZ DRAWINGS, YOU CAN SEE HE
 7    CLEARLY BORROWED MORE OF LILY'S WORK.  THIS IS ONE OF THE FINAL
 8    BRATZ DRAWINGS THAT THIS CASE IS ABOUT, FOLKS.  THE HEAD IS
 9    LARGER, AS LARGE AS THE ENTIRE TORSO.  THERE ARE CHANGES TO THE
10    FEET, TO THE EYES.  AND, PERHAPS, IN THE MOST TELLING CHANGE,         -03:-
11    YOU CAN SEE HE MIMICKED THE HANDS THAT LILY HAD DONE ON THE
12    TOON TEENS DOLL.  REMEMBER, THAT CAME BACK FROM THE
13    ROLLER-SKATING BARBIE DECAL.  HE MIMICKED IT.  EVEN THOUGH IT'S
14    NOT ON SKATES, HE'S KEPT THAT.  HE'S KEPT THAT POSE.
15         IF WE COULD GO TO 68-2.  THIS IS SIDE-BY-SIDE.  YOU            -03:-
16    CAN SEE HOW HE'S MIMICKED THAT, HOW HE'S BEEN INFLUENCED.
17         AND 78-2.  HERE, THESE ARE THE FOUR ORIGINAL BRATZ
18    DOLLS, THE ORIGINAL DRAWINGS.  THIS IS WHAT YOU FOLKS ARE GOING
19    TO HAVE TO DECIDE, WHO OWNS THEM, AMONG OTHERS.  YOU CAN SEE IN
20    EACH ONE OF THEM THAT POSE, THE HANDS; AND IT GOES BACK TO THE      -03:-
21    DECAL, THE ROLLER-SKATING BARBIE.
22         NOW, THERE'S NO QUESTION THAT MR. BRYANT BROUGHT HIS
23    OWN STYLE TO THIS.  I'M NOT DENYING THAT.  HE HAD HIS OWN
24    STYLE.  BUT THERE'S ALSO NO DOUBT THAT HE'S BORROWED HEAVILY
25    FROM LILY'S DRAWINGS.                                              -03:-
```

```
 1              JUST TO BE CLEAR HERE, WE'RE NOT HERE IN COURT TODAY
 2    SAYING THAT MR. BRYANT COPIED TOON TEENS AND THAT'S WHAT THIS
 3    LAWSUIT IS ABOUT.  WE'RE NOT ASSERTING THE CLAIM BECAUSE OF
 4    SOME INFRINGEMENT IN RIGHTS TO TOON TEENS BECAUSE OF COPYING
 5    TOON TEENS.  I AM SHOWING YOU THE TOON TEENS BECAUSE IT HELPS       -03:-
 6    YOU, IT HELPS US ALL, UNDERSTAND WHEN IT WAS THAT MR. BRYANT
 7    HAD TO HAVE CREATED THESE DRAWINGS.
 8              IT SHOWS THAT HE COULD NOT HAVE CREATED THEM IN 1998
 9    WHEN HE WAS IN MISSOURI, BECAUSE TOON TEENS DIDN'T EXIST THEN.
10    HE LEFT IN APRIL OF 1998 TO GO TO MISSOURI.  IT WAS IN APRIL OF     -03:-
11    1998 THAT MS. MARTINEZ JOINS MATTEL.  IT'S NOT LONG AFTER THAT
12    THAT SHE DOES THE DECAL.  AND IT'S THE FOLLOWING YEAR, IN THE
13    MIDDLE OF THE YEAR, IN 1999, THAT SHE DOES THE TOON TEENS
14    DRAWINGS.  MR. BRYANT COMES BACK IN JANUARY OF 1999.
15              THE FACT THAT HE WAS INFLUENCED BY TOON TEENS, WHAT       -03:-
16    THAT PROVES IS, HE COULDN'T HAVE DONE IT, BECAUSE WHEN HE WAS
17    BACK IN MISSOURI, BECAUSE AT THE TIME HE LEFT, NEITHER THE
18    DECAL NOR THE TOON TEENS DRAWINGS -- THEY DIDN'T EXIST YET.
19              SO TO GO BACK TO THE STORY, THE TRUE CREATION STORY,
20    MR. BRYANT CREATED THESE DRAWINGS IN 1999, AFTER HE'S             -03:-
21    INFLUENCED BY TOON TEENS.  AND AFTER HE CREATED THEM, HE
22    THOUGHT THEY HAD SOME COMMERCIAL VALUE, AND HE WANTED TO SEE IF
23    HE COULD COMMERCIALIZE THEM SOMEHOW.
24              THERE'S AN ARTIST REPRESENTATIVE COMPANY WITH THE
25    INTERESTING NAME OF "ALASKA MAMA."  AND HE SENT HIS DRAWINGS TO     -03:-
```

1   ALASKA MAMA TO SEE IF THEY COULD MARKET THEM, IF THERE'S

2   ANYTHING THAT THEY COULD DO WITH THEM.  BUT BEFORE HE SENT

3   THEM, HE DID AN INTERESTING THING.  HE WENT TO A NOTARY, A

4   JACQUELINE RAMONA PRINCE, WHO IS A NOTARY AT MATTEL, AND HAD

5   THESE DRAWINGS NOTARIZED BEFORE HE SENT THEM OFF.                    -03:-

6        NOW, THE NOTARY BOOK ENTRY REFLECTS THAT THE DRAWINGS

7   WERE NOTARIZED ON AUGUST 26, 1999.  AND WHAT HE MUST HAVE BEEN

8   THINKING, APPARENTLY, IS, IF SOMEBODY AT ALASKA MAMA HAD TRIED

9   TO STEAL THEM, AT LEAST HE WOULD HAVE A RECORD THAT THEY

10  EXISTED, THAT SOME NOTARY HAD PUT A SEAL ON THEM, INDICATING       -03:-

11  THAT THEY EXISTED AS OF THAT DATE.

12       BUT ALASKA MAMA DIDN'T DO ANYTHING WITH THE DRAWINGS,

13  AND AFTER ALASKA MAMA PASSED ON THE DRAWINGS, HE CONTINUED

14  LOOKING FOR SOMEONE WHO WOULD BUY THEM.  AND HE WENT TO

15  VERONICA MARLOW, THE EX-MATTEL EMPLOYEE, WHO WAS NOW WORKING       -03:-

16  WITH MGA.  SHE SAID MGA MIGHT BE INTERESTED.  THEY SET UP A

17  MEETING.  BUT INTERESTINGLY, AT SOME POINT ALONG THE WAY

18  HERE -- AND WE CAN'T TELL YOU WHEN OR HOW -- THERE WAS A CHANGE

19  TO THAT NOTARY BOOK.

20       I'D LIKE TO SHOW THAT TO YOU, 51-1.  REMEMBER, HE GOT        -03:-

21  THESE NOTARIZED BEFORE HE SENT THEM.  AND YOU CAN'T SEE IT VERY

22  WELL, BUT THIS IS THE NOTARY BOOK ENTRY.  RIGHT UNDER THERE,

23  "FROM 1998, MISSOURI."  CAN YOU SEE THAT?  IT SAYS, "ORIGINAL

24  SKETCHES OF DOLLS."  IT GIVES THE NAME OF THE CHARACTERS.

25  "FROM 1998, MISSOURI."  DO YOU SEE HOW THAT'S KIND OF SQUEEZED    -03:-

1    IN THERE?

2          AND EVERYONE KNOWS, I THINK, YOU'RE NOT SUPPOSED TO

3    MAKE CHANGES TO A NOTARY BOOK; THAT'S NOT SUPPOSED TO HAPPEN.

4    BUT JUST LOOKING AT IT, I THINK YOU CAN -- IT RAISES A

5    QUESTION.                                                        -03:-

6          SO WE HAD AN INK EXPERT COME AND LOOK AT THIS, AND

7    THE INK EXPERT FOUND THAT THE ADDITIONAL LANGUAGE THERE, "FROM

8    MISSOURI, 1998" -- REMEMBER, THAT'S THE STORY THEY WANT TO TELL

9    YOU DURING THE GAP OF HIS EMPLOYMENT -- THAT THAT'S IN

10   DIFFERENT INK THAN THE REST THERE.                              -03:-

11         NOW, THAT'S INTERESTING, BECAUSE HERE HE IS IN -- IT

12   SEEMS THAT IN 1999, SOMETHING IS BEING ADDED TO SORT OF TRY TO

13   PROVE THAT HE CREATED SOMETHING BACK IN 1998.  WHICH IS

14   INTERESTING, BECAUSE MR. BRYANT WAS VERY, VERY SAVVY ABOUT HOW

15   YOU PROVE WHEN YOU CREATE SOMETHING.  HE WASN'T A BABE IN THE   -03:-

16   WOODS ABOUT THIS.

17         YOU ARE GOING TO HEAR TESTIMONY THAT HE TOLD HIS

18   FATHER -- BACK WHEN HE WAS IN DESIGN SCHOOL, MR. BRYANT TOLD

19   HIS FATHER SOMETHING -- WHAT HE CALLED "A POOR MAN'S

20   COPYRIGHT," THAT TO PROVE SOMETHING EXISTED AS OF A CERTAIN     -03:-

21   DATE, WHAT YOU DO IS, YOU PUT IT IN A LETTER, PUT A STAMP ON

22   IT, ADDRESS IT TO YOURSELF, AND MAIL IT TO YOURSELF.  THEN YOU

23   HAVE A POSTMARK, INDICATING THAT IT EXISTED AS OF THAT DATE.

24   HE CALLED IT "A POOR MAN'S COPYRIGHT."

25         AND, IN FACT, HE HAS COPYRIGHTED, MR. BRYANT HAS          -03:-

```
 1   COPYRIGHTED, SOMETHING LIKE 12 OR 13 SONGS HIMSELF.

 2           AND THE PITCH BOOK THAT HE TOOK TO MGA, HE SAYS IN

 3   AUGUST -- THE PITCH BOOK HE TOOK, IF WE COULD LOOK AT 69-2, HE

 4   PUT A COPYRIGHT NOTICE ON THE PITCH BOOK.  IF THE POINT IS TO

 5   PROVE WHEN YOU CREATED SOMETHING, THIS IS A RELATIVELY SAVVY

 6   GUY.  HE KNOWS HOW TO DO THAT.  BUT THERE WILL BE NO EVIDENCE

 7   THAT HE EVER TOOK ANY STEPS TO CREATE PROOF THAT HE CREATED

 8   THESE BRATZ DRAWINGS BEFORE HE RETURNED TO MATTEL.

 9           THAT WASN'T MR. BRYANT'S ONLY ATTEMPT TO DOCTOR

10   DOCUMENTS, TO TRY TO SUPPORT MGA'S STORY THAT HE MADE THESE

11   DRAWINGS IN 1998.

12           MR. BRYANT HAS ADMITTED THAT HE WROTE A DATE, AUGUST

13   1998, ON THE 1999 COLOR BRATZ DRAWINGS THAT WE LOOKED AT.  HE

14   WROTE THAT DATE, 8-98.  HE ADMITTED THAT HE DID THAT IN 1999

15   DURING HIS EMPLOYMENT.

16           THINK ABOUT THAT FOR A MINUTE.  HE ACKNOWLEDGES THAT

17   DURING HIS MATTEL EMPLOYMENT, HE WENT BACK AND DATED THESE

18   DRAWINGS IN 1998.

19           WE ASKED HIM, 'WHY DID YOU ADD THAT DATE?  WHY DID

20   YOU ADD THOSE DATES THEN?'

21           HE HAD NO EXPLANATION.  HE COULD GIVE US NO

22   EXPLANATION.

23           'WHY CHANGES TO A NOTARY BOOK?  WHY ADDING DATES

24   WITHOUT EXPLANATION?'

25           BECAUSE IF THE BRATZ DRAWINGS WERE CREATED WHILE
```

1    MR. BRYANT WAS EMPLOYED BY MATTEL, THEN MATTEL OWNS THEM.

2    THAT'S WHY.  THAT'S WHY ALL OF THIS EFFORT.

3             MGA NEEDED A CREATION DATE THAT WAS EARLIER, AND

4    THAT'S WHY THESE CHANGES WERE MADE.

5             SO THEY CONCOCTED A STORY.  IN AUGUST OF 1998, HE WAS

6    ALLEGEDLY INSPIRED -- THIS IS THE STORY -- TO CREATE BRATZ

7    AFTER DRIVING BY THE HIGH SCHOOL.  HE COMES BACK TO MATTEL IN

8    JANUARY 1999.  TOON TEENS DRAWINGS DATED JUNE OF 1999.

9    MR. BRYANT SEES THE TOON TEENS DOLLS.  HE SAYS HE NEVER SAW THE

10   DRAWINGS.  THERE WILL BE OTHER TESTIMONY ON THAT.  HE NOTARIZES

11   HIS DRAWINGS; COMES UP NOW WITH THE FINAL BRATZ DRAWINGS, WHICH

12   HE NOTARIZES AUGUST 26, 1999; SENDS THEM OFF TO THE ARTIST

13   REPRESENTATIVE COMPANY ALASKA MAMA, FALL OF 1999.

14            MGA'S STORY HERE IS CONTRADICTED BY EVIDENCE, COMMON

15   SENSE, AND THE SCIENTIFIC PROOF AS WELL.  THESE DRAWINGS WERE

16   MADE IN 1999.

17            HOW DO WE KNOW THAT?  WHAT'S SOME OF THE SCIENTIFIC

18   PROOF?

19            MGA CLAIMS THAT MR. BRYANT'S FIRST DRAWINGS, WHICH

20   THEY SAY WERE MADE IN 1998 -- REMEMBER, I TOLD YOU THAT THEY

21   ARE THESE BLACK AND WHITE DRAWINGS -- THEY SAY THAT THESE WERE

22   MADE, THESE BLACK AND WHITE DRAWINGS WERE MADE, BACK IN 1998.

23   THE PROBLEM WITH THIS IS TWO-FOLD.

24            THIS DRAWING, WE WILL SHOW YOU, WAS MADE FROM PAPER

25   TORN FROM THE MIDDLE OF A NOTEBOOK THAT MR. BRYANT WAS USING,

1    WORKING ON MATTEL PROJECTS IN 1999 TO 2000.  THAT WILL BE THE

2    SCIENTIFIC EVIDENCE THAT YOU WILL HEAR.

3              MOREOVER, ANOTHER OF THE 1998 DRAWINGS, SEVERAL OF

4    THEM THAT HE CLAIMS WERE CREATED BACK IN 1998 -- IF WE COULD

5    LOOK AT 57-1 -- HE SAYS THAT THESE CAME FIRST, THESE BLACK AND

6    WHITE DRAWINGS WERE THE ORIGINAL ONES CREATED IN 1998, AND THEN

7    IN 1999, HE JUST COLORED THEM IN.  BUT THE EVIDENCE ON THAT

8    WILL BE THAT THE COLOR ONES CAME FIRST AND THAT THE BLACK AND

9    WHITE DRAWINGS WERE TRACED OVER THOSE.  THEY CAME SECOND.

10             YOU'RE GOING TO HEAR TESTIMONY FROM EXPERT -- AS YOU

11   CAN IMAGINE, IF YOU DRAW IT FREEHAND, YOUR LINE LOOKS A CERTAIN

12   WAY.  YOU'RE FREER; IT'S UNHESITATING.  IF YOU'RE TRACING, YOUR

13   HAND MOVES A LITTLE BIT.  AND YOU'RE GOING TO HEAR FROM AN

14   EXPERT THAT THESE BLACK AND WHITE DRAWINGS SHOW THOSE LITTLE

15   MOVEMENTS THAT ARE INCONSISTENT WITH A FREEHAND DRAWING.  THEY

16   WERE TRACED.

17             IN OTHER WORDS, THE BLACK AND WHITE DRAWINGS WEREN'T

18   FIRST, AS THEY CLAIM.  THE BLACK AND WHITE DRAWINGS WERE

19   SECOND.  THEY WERE TRACED AFTER THE COLOR DRAWINGS, WHICH MGA

20   ADMITS WERE CREATED IN 1999.

21             THIS LEADS TO ONE CONCLUSION, THAT ALL OF THESE

22   DRAWINGS, THE BLACK AND WHITE DRAWINGS, THE COLOR DRAWINGS,

23   WERE ALL CREATED IN 1999, WHEN MR. BRYANT WAS EMPLOYED BY

24   MATTEL.

25             IN ANOTHER LAWSUIT, IN ANOTHER LAWSUIT THAT MGA

1    BROUGHT TO ENFORCE WHAT IT CLAIMED WERE ITS RIGHTS TO THESE

2    DRAWINGS, MGA ADMITTED THAT MR. BRYANT DIDN'T DESIGN BRATZ WHEN

3    THEY NOW CLAIM THEY DID.  IN THAT CASE, THEY WERE SUING ANOTHER

4    DOLL COMPANY.  AND MR. LARIAN -- THE LAWYERS FOR MGA

5    REPRESENTED IN THAT OTHER LITIGATION THAT THEY BROUGHT THAT THE    -03:-

6    DESIGNS OF THE BRATZ DOLLS WERE ORIGINALLY CREATED BY

7    MR. CARTER BRYANT IN 1999 AND SUBSEQUENTLY AMENDED; COPIES OF

8    THE DRAWINGS ARE ATTACHED.

9            THIS IS FROM THAT HONG KONG CASE.  AND THERE, THE

10   DOCKET IS SECRET, UNLIKE HERE, IN THE COURTHOUSE HERE, ANY        -03:-

11   MEMBER OF THE PUBLIC CAN GO DOWN AND SEE WHAT THE COURT RECORD

12   SHOWS.  THAT'S NOT TRUE IN HONG KONG.  IT WAS ONLY IN

13   CONNECTION WITH THIS CASE THAT WE WERE ABLE TO GET THIS KIND OF

14   INFORMATION THAT THEY HAD TOLD THAT COURT IN A SECRET FILING,

15   NOT OPEN TO THE PUBLIC.  THEY ACKNOWLEDGED THAT THE ORIGINAL      -03:-

16   DRAWINGS WERE CREATED IN 1999.

17           MGA WILL TELL YOU THAT ALL OF THIS IS ALL UNTRUE.

18   THEY WILL TELL YOU THAT MR. BRYANT JUST DID A FEW THINGS.

19   THEY'LL TRY TO TRIVIALIZE IT.  THEY'LL SAY HE JUST DID A FEW

20   THINGS WHILE HE WAS ON HIS WAY OUT THE DOOR, NOT A REALLY BIG     -03:-

21   DEAL; HE ONLY DID A MINIMAL AMOUNT OF WORK.

22           MOSTLY, I SUBMIT, WHEN YOU LISTEN TO MR. NOLAN,

23   MOSTLY, THEY TRY TO CHANGE THE SUBJECT.  THEY CAN'T DENY THAT

24   BRATZ DRAWINGS WERE CREATED, AND THEY WON'T DENY THE BRATZ

25   DRAWINGS WERE CREATED WHILE MR. BRYANT WAS WORKING FOR MATTEL.    -03:-

1    THEY'RE GOING TO TELL YOU THAT THERE'S A LOT OF DIFFERENT

2    INFLUENCES ON MR. BRYANT.

3           BUT ONE THING THAT THEY WON'T EVER ACKNOWLEDGE IS

4    THAT MR. BRYANT WAS INFLUENCED BY ANYTHING AT MATTEL OR

5    INFLUENCED BY TOON TEENS.  AGAIN, THEY'RE GOING TO TRY TO          -03:-

6    CHANGE THE SUBJECT.  THEY'RE GOING TO TRY TO SAY, 'THIS IS

7    COMPETITION,' OR SOMETHING LIKE THAT.

8           BUT THEY WON'T HAVE EVIDENCE TO CONTROVERT WHAT I'VE

9    SHOWN YOU.

10          SO I'M COMING TO THE END OF MY REMARKS HERE, FOLKS.         -03:-

11          BUT IN THE END, WHEN YOU HEAR ALL OF THE EVIDENCE,

12   YOU WILL SEE THAT THIS IS A COMPANY THAT HAD NEVER DEVELOPED A

13   FASHION DOLL.  THEY HAD NEVER DONE IT BEFORE.  AND THEY WERE

14   ONLY ABLE TO COME OUT WITH THIS FASHION DOLL BECAUSE THEY STOLE

15   DRAWINGS FROM MATTEL.  THEY ENTERED INTO A CONTRACT WITH A        -03:-

16   MATTEL FASHION DOLL DESIGNER WHILE HE WAS EMPLOYED BY MATTEL,

17   WHEN THEY KNEW HE WAS EMPLOYED BY MATTEL, AND WHEN THEY KNEW HE

18   HAD AN INVENTIONS AGREEMENT THAT SAID THAT ANYTHING HE CREATED

19   DURING HIS MATTEL EMPLOYMENT WAS OWNED BY MATTEL.  THAT WILL BE

20   THE EVIDENCE IN THIS CASE.                                        -03:-

21          AND THEN YOU'LL SEE HOW THERE WAS MISDIRECTION,

22   MISREPRESENTATIONS, CONCEALMENT, POINTING EVERY WHICH WAY ABOUT

23   THE ORIGIN OF BRATZ.  BUT NO REFERENCE TO CARTER BRYANT, FOR

24   THE VERY REASON THAT THEY KNEW, IF IT EVER CAME OUT, THOSE

25   DRAWINGS WOULD BE OWNED BY MATTEL.                                -03:-

1          THE ANSWER TO THE VERY SIMPLE QUESTION THAT YOU'VE

2     ALL BEEN ASKED TO COME HERE AND DECIDE IS THAT THESE DRAWINGS

3     WERE CREATED BY A MATTEL DOLL DESIGNER WHILE HE WAS EMPLOYED BY

4     MATTEL; MGA KNEW IT; AND THE DRAWINGS BELONG TO MATTEL.

5          THANK YOU VERY MUCH FOR YOUR ATTENTION.                      -03:-

6          **THE COURT:**  THANK YOU, COUNSEL.

7          WE'RE GOING TO BREAK FOR LUNCH AT THIS TIME.  I'M

8     GOING TO ASK THE JURY TO BE BACK AND READY TO GO AT 1:15.  THAT

9     WILL GIVE YOU AN HOUR AND A HALF.

10         AND, COUNSEL, I'LL ASK YOU TO BE BACK AT 1:00.               -03:-

11         (WHEREUPON, JURORS DEPART COURTROOM.)

12         **THE COURT:**  MR. NOLAN.

13         **MR. NOLAN:**  YOUR HONOR, THE COURT HAD PREVIOUSLY

14    INDICATED THAT FOLLOWING MR. QUINN'S OPENING STATEMENT, WE

15    WOULD HAVE A CHANCE TO REVIEW.                                    -03:-

16         **THE COURT:**  THAT'S AT 1:00.

17         **MR. NOLAN:**  ALL RIGHT.

18         I JUST WANT TO MAKE CERTAIN THAT -- WE CAN DO IT AT

19    1:00, BECAUSE, YOUR HONOR, WE BELIEVE THAT THE DOOR NOW HAS

20    BEEN OPENED TO SOME OF THE ISSUES THAT THE COURT HAD PREVIOUSLY   -03:-

21    RULED SHOULD BE GOING INTO 1-B.  I DID NOT SHOW MR. QUINN THOSE

22    TYPE OF GRAPHICS THAT WE WANTED TO USE IN THE EVENT THAT HE

23    OPENED THE DOOR.  I WILL DO THAT DURING THE LUNCH HOUR.

24         **THE COURT:**  EXACTLY.

25         **MR. NOLAN:**  THAT'S WHAT I WAS GOING TO ALERT YOU TO.     -03:-

1       **THE COURT:**  WHY DON'T YOU MEET WITH MR. QUINN AND YOU

2   CAN DISCUSS THIS.  IF YOU CAN AGREE TO IT, GREAT.  IF NOT, I'LL

3   TAKE IT UP AT 1:00.

4       **MR. NOLAN:**  EXCELLENT.  THANK YOU.

5       **MR. QUINN:**  I DON'T AGREE WITH THAT.  MY                    -03:-

6   UNDERSTANDING IS THAT EVERYTHING IS TO BE SHOWN BEFORE.

7       **THE COURT:**  I WOULDN'T EXPECT YOU TO AGREE.

8       WHY DON'T YOU MEET DURING THE BREAK, AND THEN AT

9   1:00, WE'LL TAKE IT UP, AND THE COURT WILL MAKE ITS DECISION.

10      WE'RE IN RECESS UNTIL 1:00.                                    -03:-

11      (WHEREUPON, A LUNCH RECESS WAS HELD.)

12      (CONCLUSION OF MORNING SESSION.)

13

14

15

16

17                          CERTIFICATE

18

19  I hereby certify that pursuant to section 753, title 28, united
    states code, the foregoing is a true and correct transcript of
20  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
21  conformance with the regulations of the judicial conference of
    the united states.

22

23  _____        _____
    THERESA A. LANZA, CSR, RPR                     Date
24  FEDERAL Official COURT Reporter

25

MAY 27, 2008                    TRIAL DAY 2, MORNING SESSION