1 | QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
2 | (johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
3 | (michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
4 | (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
5 | Los Angeles, California 90017-2543
Telephone: (213) 443-3000
6 | Facsimile: (213) 443-3100

7 | Attorneys for Mattel, Inc.

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10 | EASTERN DIVISION

| | |
|---|---|
| 11 CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| 12 Plaintiff, | Consolidated with Case Nos. CV 04-09059 & CV 05-2727 |
| 13 vs. | Hon. Stephen G. Larson |
| 14 MATTEL, INC., a Delaware corporation, | **MATTEL, INC.'S NOTICE OF LODGING OF FOREIGN AUTHORITIES IN SUPPORT OF MATTEL, INC.'S MOTION FOR ISSUANCE OF LETTER OF REQUEST** |
| 15 | |
| 16 Defendant. | |
| 17 AND CONSOLIDATED ACTIONS | Hearing Date: March 30, 2009 Time: 10:00 a.m. Courtroom: 1 |
| 18 | |
| 19 | **Phase 2** Discovery Cut-off: Not Set Pre-trial Conference: Not Set Trial Date Not Set |
| 20 | |

21
22
23
24
25
26
27
28

00505.07975/2770368.1

NOTICE OF LODGING

1   For the convenience of the Court, Mattel Inc. hereby lodges copies of the

2   following foreign authorities cited in support of Mattel, Inc.'s Motion for Issuance of

3   Letter of Request and Request for Judicial Assistance (Letter of Request) by the

4   United States District Court for the Central District of California.

5

6   CASES                                                                      EXHIBIT

7   Advance/Newhouse Partnership and Bright House Networks, LLC
8   v. Brighthouse, Inc.,
     [2005] CarswellOnt 1371 (S.C.J.) ............................................................. 1

9   Campbell Estate,
10   [1995] B.C.J. No. 2304 ............................................................................. 2

11   Friction Division Products Inc. v. E.I. DuPont de Nemours & Co. (No. 2),
12   [1986] 56 O.R. (2d) 722 (H.C.J.) .............................................................. 3

13   Ontario Public Service Employees Union Pension Trust Fund v. Clark,
     [2006] 270 D.L.R. (4th) 429 (C.A.) ........................................................... 4

14   Zingre v. The Queen et al.,
15   1981 CanLII 32 (S.C.C.) ............................................................................ 5

16

17

18   DATED:   January 26, 2009        QUINN EMANUEL URQUHART OLIVER &
                                       HEDGES, LLP
19

20                                     By  /s/ Jon Corey
21                                         Jon Corey
                                           Attorneys for Mattel, Inc.
22

23

24

25

26

27

28

00505.07975/2770368.1

-2-

# EXHIBIT 1

Page 1

2005 WL 775577 (Ont. S.C.J.), 2005 CarswellOnt 1371

▷2005 CarswellOnt 1371

Advance/Newhouse Partnership v. Brighhthouse Inc.

Advance/Newhouse Partnership and Brighthouse Networks, LLC v. Brighthouse,
Inc., D/B/A/Brighthouse Branding Group

Ontario Superior Court of Justice

Reilly J.

Heard:
Judgment: March 22, 2005
Docket: C-1036-04

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Proceedings: additional reasons to *Advance/Newhouse Partnership & Bright House Networks, LLC v. Brighthouse Inc.* (2005), 2005 CarswellOnt 576 (Ont. S.C.J.)

Counsel: L.E. Trent Home for Applicants

John R. Weber for Respondent

Subject: Civil Practice and Procedure; Evidence; International

Civil practice and procedure --- Costs -- Effect of success of proceedings -- Divided success -- General principles

Plaintiff brought action against defendants in Florida for trade-mark infringement -- Defendants claimed that plaintiff did not have exclusive right to mark as it was being used by Ontario company -- Defendants applied successfully to give effect to letters rogatory issued by United States District Court to examine president of company in Ontario -- While defendants were largely successful, plaintiff was partially successful given conditions court directed would apply to his examination under oath -- Given quantum claimed by each party, and divided result on application, each party was to bear its own costs of application.

ADDITIONAL REASONS to judgment reported at *Advance/Newhouse Partnership & Bright House Networks, LLC v. Brighthouse Inc.* (2005), 2005 CarswellOnt 576 (Ont. S.C.J.) with respect to costs.

*Reilly J.*:

**Ruling on Costs**

EXHIBIT ___1___

PAGE ___3___

2005 WL 775577 (Ont. S.C.J.), 2005 CarswellOnt 1371

1    Both parties have now filed submissions in writing as to the costs of this application to give effect to letters ro-
gatory issued by the United States District Court for the Middle District of Florida. It could be fairly said that the
applicant was largely successful. This Court did indeed direct that the letters rogatory would be given effect, and
that Mr. Haag would attend before an official examiner to be examined under oath.

2    However, it could also be said that the respondent on the application, Mr. Haag, was partially successful on the
application, given the conditions the Court directed would apply to his examination under oath. I am mindful of the
costs claimed by the respondent, and the costs claimed by the applicant (quite modest, in my view).

3    While the circumstances of contested letters rogatory may be quite different on a case by case basis, the princi-
ples that apply do not make this case particularly novel.

4    In the normal course, costs simply follow the result. Given the quantum claimed by each party, and the divided
result on the application, I direct that each party shall bear its own costs of the application.

*Order accordingly.*

END OF DOCUMENT

EXHIBIT ___1___

PAGE ___4___

Copr. © West 2008 No Claim to Orig. Govt. Works

# EXHIBIT 2

Date of Release: November 1, 1995

NO A952686
VANCOUVER REGISTRY

# IN THE SUPREME COURT OF BRITISH COLUMBIA

1995 CanLII 1931 (BC S.C.)

BETWEEN: )
)
THE ESTATE OF JAMES CAMPBELL )
)
                PETITIONER )
)
AND: )
)
JAMES F. STENHOUSE, E. NIGEL )
DOYLE, and PETER J. NOAKES )
)
            RESPONDENTS )

REASONS FOR JUDGMENT

OF THE HONOURABLE

MADAM JUSTICE SAUNDERS

(IN CHAMBERS)

D. Sanderson and R. Brown            Counsel for the Petitioner

C.A. Donovan                           Counsel for the Respondents

B.J. Freedman                       Counsel for Cominco Limited

**Heard at Vancouver:**                     **September 8, 1995**

1         The petitioner seeks an order under section 59 of the *Evidence Act*, R.S.B.C. 1979, c. 116, to examine witnesses pursuant to a request made by Letters Rogatory on August 4, 1995 by the Honourable Francis I. Yamashita of the United States District Court for the District of Hawaii in proceeding No. 92-00587 ACK described as *United States of America v. Hawaiian Western Steel Limited, Inc.*

2         When the respondents Mr. Doyle and Mr. Noakes were first requested to voluntarily attend at a deposition they each refused to do so. When the respondent Mr. Stenhouse was first requested to

EXHIBIT   2

PAGE   5

- 2 -

attend an interview he advised counsel for the United States of
America in the Hawaiian action that he would not attend or give
evidence in that action.  They have since advised counsel for the
petitioner, through their counsel, that they will consent to appear
voluntarily at the trial in Hawaii, provided their expenses are
paid.  At the hearing before me, their counsel reiterated this
willingness to attend the trial, on reasonable terms as to notice
and payment of expenses.

3          The Hawaiian action is described in the Letters Rogatory.
The plaintiff United States of America instituted an action against
the petitioner, Cominco Limited and others.  In this action the
petitioner also made a complaint against Cominco Limited, as third
party.  A portion of that action has settled, leaving unresolved
the claims of United States of America and the petitioner against
Cominco Limited.

4          The Hawaiian action is brought under United States and
Hawaiian environmental laws for restitution, indemnity and damages
arising from hazardous waste decisions and hazardous waste disposal
in the State of Hawaii.  The United States of America and the
petitioner allege that Cominco Limited, through a subsidiary, owned
the majority of shares of Hawaiian Western Steel Limited, Inc., and
participated in hazardous waste decisions concerning Hawaiian

EXHIBIT _____ 2

PAGE _____ 6

- 3 -

Western Steel Limited, Inc. or arranged for disposal of waste at
certain locations without proper permits.

5          Mr. Stenhouse is a former officer of the subsidiary
company.  Mr. Doyle and Mr. Noakes are former employees of Cominco
Limited.  The petitioner wishes to depose them for the purposes of
obtaining trial testimony and believes all three are knowledgeable
of issues in dispute in the Hawaiian action.  The Letters Rogatory
reflect the court's acceptance that the evidence of the three
respondents is relevant to the case and state:

> The evidence known and possessed by these
> witnesses is relevant to this Court's
> determination of the rights, responsibilities,
> and liabilities of the parties, and the
> interests of justice provide that the evidence
> be received by this Court for trial.
>
> ... it appears to this Court that it is
> necessary for the purposes of justice and for
> the due determination of the matters in
> dispute between the United States, the Estate
> and Cominco, that Messrs. Stenhouse, Doyle,
> and Noakes should be examined upon oath or
> affirmation and produce documents relating to
> the matters identified in this request.

6          The District Court of Hawaii's request is made in these
terms:

> THIS COURT REQUESTS that, in the interest of
> justice and judicial economy and for
> assistance of this Court, you issue an order
> by your proper and usual process summoning

1995 CanLII 1931 (BC S.C.)

EXHIBIT __2__

PAGE __7__

- 4 -

each of James F. Stenhouse and Peter J. Noakes
to appear before David Black, an Official
Court Reporter, or his designate, or any other
duly appointed official, in Vancouver, British
Columbia, and E. Nigel Doyle to appear before
Patti A. Kortegaard, an Official Court
Reporter, or her designate, or any other duly
appointed official, in Rossland, British
Columbia, at a time as you shall appoint, to
give testimony upon oath or affirmation by
questions and answers propounded by counsel
for the Estate, and produce and permit the
copying of documents by counsel, such
depositions to continue from day-to-day until
their completion, and upon notice given by the
Estate to other parties and their counsel,
permit other parties and their counsel to
attend and obtain testimony by questions and
answers, and examine and copy documents.

THIS COURT FURTHER REQUESTS that evidence by
testimony and documents be given on the
following subjects:

> The witnesses' positions,
> responsibilities, supervisors, and
> subordinates at Cominco, Western
> Steel, and HWS.

1. The organization and operation
   of Western Steel, Cominco, and
   HWS and the companies'
   interrelationships, financial
   support, and inter-company
   transactions.

2. The control that the directors,
   officers, and employees of
   Cominco and/or Western Steel
   may have exercised over HWS.

3. The handling, storage,
   treatment, sale, or disposal of
   baghouse dust at Western Steel,
   Cominco, and HWS.

4. The waste material survey
   conducted by Cominco of its
   subsidiaries, and any updates

1995 CanLII 1931 (BC S.C.)

EXHIBIT _2_

PAGE _8_

- 5 -

or correspondence regarding that subject.

5. A 1985 environmental audit by VERSAR of Cominco's United States operations, any environmental insurance policies, or applications therefor, related to HWS, baghouse dust, cadmium, or lead.

6. Remediation or cleanup of the HWS Plant or Landfill sites, or plans to perform projects related to remediation or cleanup.

7. Cleanup of lead or cadmium contamination at any other Cominco or Cominco subsidiary property.

1995 CanLII 1931 (BC S.C.)

7      The respondents ask the court to decline to make the order sought, contending that the application is an attempt to engage in examinations for discovery and that an order from this court is unnecessary, given that all three respondents have agreed to appear at trial. Further, Mr. Doyle and Mr. Noakes deny material knowledge of the matters enumerated in the Letters Rogatory.

8      In the circumstances of this case, the latter objection is not a basis upon which to refuse the order sought. The petitioner has represented that Mr. Doyle and Mr. Noakes have knowledge of matters relevant to the Hawaiian action and this has been accepted by the Hawaiian court in its decision to issue

EXHIBIT 2

PAGE 9

- 6 -

Letters Rogatory. If the petitioner has otherwise established a basis for the order, this court will respect the request of the Hawaiian court and grant the order, leaving the deposition process to uncover the extent of knowledge of Mr. Doyle or Mr. Noakes within the rules for admissibility of evidence at the trial.

9        All three respondents contend that the request of the District Court of Hawaii should be denied because the anticipated deposition is in the nature of examination for discovery, which, they say, is a purpose British Columbia courts typically do not accept.

10        In the recent British Columbia authority, *Henry Baron Building Materials Inc. v. Royal Canadian Mounted Police* (1994), 98 B.C.L.R. (2d) 59, Mr. Justice Edwards discussed this proposition and, based upon his view that the primary concern of Canadian courts asked to enforce a request made by Letters Rogatory is "the imposition and inconvenience being required to testify in a foreign proceeding may entail for residents of Canada" (p.65), concluded that the question of whether the examination proposed is "for a discovery or trial purpose is one factor, but not necessarily the determining factor in the exercise of the court's discretion." (p.67).

11        *Henry Baron Building Materials Inc. v. Royal Canadian Mounted Police* is binding upon me. It is not a complete answer for

1995 CanLII 1931 (BC S.C.)

PAGE _____ 10

- 7 -

respondents to an application such as this to say the purpose of the deposition is discovery of the deponents. In any case, the Letters Rogatory issued by the District Court of Hawaii make it clear that the purpose of obtaining the depositions is to obtain testimony for trial. I conclude that the purposes of the request are ones recognized by the courts of British Columbia.

1995 CanLII 1931 (BC S.C.)

12    The sole remaining question is whether the respondents' present willingness to attend at trial makes the proposed depositions prior to trial of such imposition and inconvenience to the respondents that the application should be denied. In *Zingre v. R.*, [1981] 2 S.C.R. 392, Mr. Justice Dickson laid down the following test at p.403:

> The Court or judge must balance the possible
> infringement of Canadian sovereignty with the
> natural desire to assist the courts of justice
> of a foreign land.

13    The phrase "Canadian sovereignty" was described by Mr. Justice Doherty in *France (Republic) v. De Havilland Aircraft of Canada Ltd.* (1991), 3 O.R. (3d) 705 at 718-19:

> The considerations encompassed by the phrase
> "Canadian sovereignty" ... include an
> assessment of whether ... the request
> impose an undue burden on, or do prejudice to,
> the individual whose evidence is requested.

EXHIBIT __2__

PAGE __11__

- 8 -

1995 CanLII 1931 (BC S.C.)

14          In this case the respondents point to their present willingness to attend at trial and the possibility of the case settling before trial, rendering the depositions useless and their time and effort wasted. It is true that cases cited to me are ones in which there is evidence before the court that the witnesses may not, or are unlikely to, attend the trial.

15          The willingness of a witness to attend the foreign trial is certainly one factor the court should consider in reviewing the burden placed on the witness by compelled attendance in British Columbia. It is, however, not determinative of the exercise of judicial discretion. Where, as here, the respondents initially declined co-operation and the foreign court, with that knowledge, requested co-operation by issuing the Letters Rogatory, this court may make the order sought.

16          In these circumstances the respondents have not established that the potential burden or prejudice to them in attending for depositions in British Columbia outweighs the force of international judicial good manners.

17          Cominco Limited also opposes the application, contending the witnesses' evidence would be more helpful to the District Court of Hawaii if it were *viva voce*, rather than by deposition. This is

EXHIBIT _____2_____

PAGE _____12_____

- 9 -

a matter of trial management of the Hawaiian action and is, in my view, a concern which is properly for the courts of Hawaii to consider.

18     For these reasons the application is granted. The respondents shall attend for deposition for the purposes of trial, as requested. This includes examination and cross-examination by the parties to the Hawaiian action as would occur at trial.

19     A question has arisen as to timing of the depositions. In my view, they should occur after the conclusion of the discovery process in the Hawaiian action. This will have the advantage of ensuring these depositions are not mistaken for discovery, and increase the likelihood that settlement, if it is to occur, will precede the date of the depositions and thereby minimize the inconvenience to the respondents.

20     Each respondent is entitled to conduct money and a reasonable fee for preparation in accordance with the *Rules of Court*. The depositions shall be conducted in accordance with the evidentiary rules of the District Court of Hawaii and of British Columbia, with the latter to prevail in cases of conflict.

1995 CanLII 1931 (BC S.C.)

EXHIBIT   2

PAGE   13

- 10 -

21          If the parties are unable to agree on the schedule for
the examinations, the petitioner may apply to have a time set by
the court.

                         "M.E. SAUNDERS, J."

November 1, 1995
Vancouver, B.C.

1995 CanLII 1931 (BC S.C.)

EXHIBIT 2

PAGE 14

# EXHIBIT 3

[HIGH COURT OF JUSTICE]

## Re Friction Division Products, Inc. and E. I. Du Pont de Nemours & Co. Inc. et al. (No. 2)

OSBORNE J.                                      15TH OCTOBER 1986.

Judgments and orders — Res judicata — Application to enforce letters rogatory — Application dismissed — Subsequent application based on more extensive affidavit material — Subsequent application not barred by res judicata.

Conflict of laws — Letters rogatory — Patent action — Plaintiff in foreign action seeking evidence of patent infringement — Situation such that Ontario court would not allow discovery — Order enforcing letters rogatory — Canada Evidence Act, R.S.C. 1970, c. E-10, s. 43—Evidence Act, R.S.O. 1980, c. 145, s. 60.

The plaintiff sought an order giving effect to letters rogatory issued by a U.S. District Court in a patent action. The plaintiff alleged that the defendants had induced two Canadian companies to infringe the patent and sought evidence relating to the defendants' activity in Canada with respect to the patent. A previous application to obtain the same evidence was dismissed on the ground that the evidence was unnecessary, that it was not clearly established that it was for trial rather than discovery, and that the order was more burdensome upon the respondents than if the action had been brought in Ontario. The present application was based upon new letters rogatory and upon new evidence alleged by the applicant to correct the deficiencies of the previous application.

Held, the application should be allowed. The application was based on a new request and on far more extensive evidence. It had been established that counsel acting for the applicant on the first application did not expect that the relevance of evidence sought would be challenged. This error had led to there being an absence of evidence. The applicant should not be precluded from proceeding with the fresh application based upon different evidence. Letters rogatory may be enforced even though they go beyond the circumstances in which an Ontario court would make an order for discovery.

The applicant did seek evidence rather than mere discovery and it would be unfair to require the applicant to proceed to trial without the evidence. The linkage between the defendant and the two Ontario companies had been established on the evidence and although the production sought was wide it was not unreasonable or unduly onerous.

Re Mulroney et al. and Coates et al.; Re Southam et al. and Mulroney et al. (1986), 54 O.R. (2d) 353, 27 D.L.R. (4th) 118, 8 C.P.C. (2d) 109, **folld**

Zingre, Wuest and Reiser v. The Queen (1981), 127 D.L.R. (3d) 223, 61 C.C.C. (2d) 465, [1981] 2 S.C.R. 392, 10 Man. R. (2d) 62, 38 N.R. 272, 23 C.P.C. 259; Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago (1984), 46 O.R. (2d) 590, 10 D.L.R. (4th) 317, **apld**

**Other cases referred to**

District Court of United States, Middle District of Florida v. Royal American Shows Inc. et al. (1982), 134 D.L.R. (3d) 32, 66 C.C.C. (2d) 125, [1982] 1 S.C.R. 414, 36 A.R. 361, 19 Alta. L.R. (2d) 97, [1982] 3 W.W.R. 481, 25 C.P.C. 287, 27

EXHIBIT    3

PAGE    15

C.R. (3d) 1; *Re Raychem Corp. v. Canusa Coating Systems, Inc.*, [1971] 1 O.R.
192, 14 D.L.R. (3d) 684, 64 C.P.R. 247; *Appeal Enterprises, Ltd. et al. v. First
National Bank of Chicago* (1984), 46 O.R. (2d) 590, 10 D.L.R. (4th) 317; *American
Express Warehousing Ltd. v. Doe et al.*, [1967] 1 Lloyd's Rep. 222; *Penn-Texas
Corp. v. Murat Anstalt et al. (No. 2)*, [1964] 2 All E.R. 594

**Statutes referred to**

*Canada Evidence Act*, R.S.C. 1970, c. E-10, s. 43
*Evidence Act*, R.S.O. 1980, c. 145, s. 60 (am. 1984, c. 11, s. 176(2))

APPLICATION to enforce a request for letters rogatory.

*Donald J. Wright*, Q.C., and *P. E. J. Wells*, for applicant.
*Roger T. Hughes*, Q.C., and *Donald M. Cameron*, for respon-
dent, E. I. Du Pont de Nemours & Company Inc.
*Arnold Somers*, Q.C., for respondent, Canparts.
*Peter Israel*, for respondent, Canadian Metallic Brake Ltd.
*D. I. Hamer*, for respondent, Du Pont Canada Inc., intervenor.

OSBORNE J.:—This is an application for an order giving effect to
letters rogatory issued by the U.S. District Court for the District
of Delaware in patent litigation in which the applicant, as plaintiff,
has alleged that E. I. Du Pont de Nemours & Company Incorpo-
rated (Du Pont U.S.A.) induced two Canadian companies (the
respondents Canparts and Canadian Metallic) to infringe the appli-
cant's patent.

If this matter has a familiar ring to it, that is explained because
Barr J., in a decision reported 6 C.P.R. (3d) 66, 51 O.R. (2d) 244,
refused to give effect to letters rogatory seeking virtually the
same evidence.

The applicant seeks to obtain evidence from Canparts and
Canadian Metallic for use at a trial to be held in the State of
Delaware in which the alleged infringement of the applicant's
patent is the central issue. I do not think it is necessary to explore
U.S. patent law in any detail for the purpose of dealing with this
application. It seems to be common ground that under U.S. patent
law anyone who makes, uses or sells a product within the scope of
a patent, or any product made under a process within the scope of
a patent infringes the patent. Further, U.S. law imposes liability
on any person who teaches another how to manufacture a
patented product, or teaches another how to use a patented
process, or sells another an essential component of a patented
product or process intending that it be used for a patented product
or process. I take it that in the end result inducing infringement of
a patent results in the inducer being guilty of patent infringement.
The essence of the U.S. action, in any event, is patent infringe-

EXHIBIT   **7**
PAGE   **16**

ment. The pleadings in the U.S. action suggest that at least one
route the applicant intends to follow is to establish patent
infringement by Du Pont U.S.A. by establishing that in its          *a*
dealings with Canparts and Canadian Metallic, Du Pont U.S.A.
induced one or both of those companies to breach Friction Division
Products, Inc.'s U.S. patent. To succeed, Friction must establish
that Du Pont U.S.A. has induced Canparts or Canadian Metallic
to infringe Friction's patent. Canparts is involved because it is in   *b*
the automobile after-market brake manufacturing business.
Friction's contention is that Canparts uses a material in its brake
pads which results in Friction's patent being infringed. Friction
alleges that Du Pont U.S.A. is the manufacturer of the product
(Kevlar) which is said to infringe Friction's patent. Du Pont        *c*
Canada sells the allegedly offending product to Canadian
companies including Canparts and Canadian Metallic. Canparts
ships its brake pads to a distributor in North Carolina and the
distributor in turn sells the brake pads in the United States.
Canadian Metallic's involvement is so similar to that of Canparts
that it need not be separately referred to.                          *d*

The letters rogatory seek evidence in these areas:

(1) When and under what circumstances Canparts first learned
    from Du Pont, from others, or within Canparts of the use of
    Kevlar pulp for the production of a preform in the             *e*
    manufacture of non-asbestos friction products;

(2) (a) The purchase and/or use by Du Pont of Canpart's non-
        asbestos friction products or mixes containing Kevlar pulp
        from 1981 to the present:

        (i) on Du Pont's owned, leased or employee motor           *f*
            vehicles,

        (ii) at Du Pont's booths at the Society of Automotive
             Engineers or other promotional shows, and

        (iii) for testing purposes, including at the Ohio Transpor-   *g*
              tation Research Center or within Du Pont's
              Wilmington facility;

(3) The advertising and/or technical assistance rendered by Du
    Pont to Canparts, including payments to Canparts by Du
    Pont, and all advertisements placed in magazines, journals      *h*
    and/or other publications, under the Du Pont-Canparts joint
    advertising contract;

(4) (a) The chemical formulations of:

EXHIBIT ___3___
PAGE ___12___

      (i) Canparts' frictional products which were advertised under the Du Pont-Canadian Metallic joint advertising contract, including the Canparts products identified in the documents attached hereto as exhibits;

      (ii) Canparts' Kevlar pulp containing frictional products or mixes, including those Canparts products or mixes obtained by Du Pont for testing, promotional or other purposes;

    (b) The process and/or methods used by Canparts from 1978 to the present by which Canparts made non-asbestos friction products containing Kevlar pulp;

    (c) the sale of Canparts' non-asbestos friction products containing Kevlar pulp, including the sales figures attributed to the advertising under the Du Pont-Canparts contract; and

    (d) the purchases by Canparts of Du Pont's Kevlar pulp and fibre from 1980 to the present.

The request for evidence from an officer of Canadian Metallic is in similar form.

As previously indicated, this is the second request for evidence from Canparts and Canadian Metallic in connection with the Delaware litigation between Friction and Du Pont U.S.A. On July 3, 1985, Barr J. dismissed Friction's application. Barr J. concluded that the evidence sought was not necessary; that it was not clearly established that the evidence was for trial not simply discovery; that as to both Canparts and Canadian Metallic the order sought was more burdensome than would be the case if the action were in Ontario in that the provisions of the Rules of Civil Procedure, rule 31.10, regarding discovery of non-parties, had not been satisfied; that the order sought with respect to documents was oppressive and burdensome because of the enormous spectrum of documents sought to be produced; and that documents need not be produced until it is demonstrated that the documents existed.

Following the release of Barr J.'s reasons, Friction returned to the Delaware court and sought new letters rogatory. Judge Longobardi of the Delaware District Court issued new letters rogatory after a review of Barr J.'s reasons. Previous evidentiary deficiencies were purportedly corrected so as to clearly establish the direct involvement of Canparts and Canadian Metallic in the U.S. market, and Du Pont U.S.A.'s relationship with both companies, including the extent to which Du Pont assisted with the promotion and marketing of the brake pads manufactured by the two Canadian companies.

EXHIBIT 3
PAGE 18

The order sought has been frontally challenged by the respondents, which include Du Pont Canada added as an intervenor by order of the master.

It seems to me that this application should be dealt with by focusing on two general questions. They are:

(1) Is there any reason to deny relief to the applicant because of matters bearing upon the previous application, including its dismissal? I will refer to this application as *Friction (No. 1)*. This gives rise to a consideration of *res judicata*, issue estoppel and abuse of process.

(2) If the applicant is not foreclosed from obtaining the order it now seeks because of the dismissal of the first application, has the applicant established an entitlement to the relief sought? The answer to this question requires resort to the evidence on this application, unencumbered by a consideration of the fact that a previous application for essentially the same relief was dismissed. It boils down to this: on this evidence, should the order sought issue?

All respondents take the position that Friction is now, and forever, foreclosed from obtaining the order it seeks because of Barr J.'s decision on Friction's first application. The respondents' position on this issue, given particular emphasis by Mr. Hamer for Du Pont Canada, breaks down this way:

(1) Barr J.'s judgment, not having been appealed, finally disposes of the very issue before me and is *res judicata*;

(2) in the alternative, the doctrine of issue estoppel applies so as to prevent Friction from resurrecting its permanently lost cause;

(3) in any event, the respondents contend I am bound by Barr J.'s findings of fact and law;

(4) reopening the issue dealt with by Barr J. amounts to an abuse of process and is unduly burdensome and onerous.

In support of their *res judicata*-estoppel position, the respondents refer to the following passage from Spencer Bower and Turner on *The Doctrine of Res Judicata*, 2nd ed. (1969), at pp. 14-5:

> It is not essential, or even relevant, to prove that the decision relied upon to found an estoppel is itself correct, or well founded in law or fact; if it is pronounced as a final judicial decision, by a tribunal having jurisdiction, as to the same question, and between the same parties, it will be conclusively deemed correct, as between these parties, unless and until set upset on appeal. This proposition rests on the well-known fact that a competent tribunal has jurisdiction to give a wrong judgment. It has jurisdiction to decide wrongly,

EXHIBIT 3

PAGE 19

as well as rightly, and if it makes a mistake that mistake is conclusive
between the parties unless and until corrected by an appeal duly constituted.

**a**      In Du Pont Canada's factum the practical import of Barr J.'s
*Friction* judgment is dealt with this way:

> If, contrary to the submissions advanced above, the applicant here is entitled
> to launch a renewed application to enforce letters rogatory at all, then it is
> respectfully submitted that the renewed application must be governed by the
> principles laid down by Mr. Justice Barr and not those espoused by Mr.
**b**   > Justice Catzman. Even if Mr. Justice Barr's findings of fact and rulings of law
> are wrong (and it is strenuously submitted they are not), those findings and
> rulings represent a conclusive and binding determination as amongst the
> parties to the present applications.

      The reference to Mr. Justice Catzman above was occasioned by
**c**  Catzman J.'s judgment in *Re Mulroney et al. and Coates et al.;
Re Southam et al. and Mulroney et al.* (1986), 27 D.L.R. (4th)
118, 54 O.R. (2d) 353, in which Catzman J. differed somewhat
with Barr J.'s views: see *Mulroney, supra,* at pp. 127-8 D.L.R.,
p. 362 O.R. In *Mulroney,* Catzman J. correctly pointed out that in
**d**  *Friction (No. 1)* the applicant did not rely on s. 60 of the Ontario
*Evidence Act,* R.S.O. 1980, c. 145. Catzman J. also dealt with
Barr J.'s approach to the burdensome issue of *Friction (No. 1)*
where Barr J. said this at pp. 69-71 C.P.R., pp. 247-9 O.R.:

> An order should not be made if it would be more burdensome to the witness
> than the court could properly order in an action taken within this jurisdiction:
**e**   > *Re Radio Corp. of America v. Rauland Corp., supra* [26 C.P.R. 29, 5 D.L.R.
> (2d) 424, [1956] O.R. 630], at p. 638.

> . . . . .

> Rule 39.01(5) limits the use of affidavits of information and belief to facts
> that are not contentious. Whether the evidence is required for trial or not is
> contentious and the statement of Mr. Tamas cannot therefore be received to
**f**   > establish this fact.

> 3. The order sought is more burdensome to the witness than would be the
> case if this action had been brought in Ontario. Here, the plaintiff could only
> interrogate and require production of documents from the Canadian respon-
> dents upon satisfying a provision of rule 31.10. Under this rule the moving
> party would have to establish that he had been unable to obtain the inform-
**g**   > ation from other persons whom he was entitled to examine and that it would
> be unfair to require the moving party to proceed to trial without having had
> the examination that he seeks. The plaintiff's evidence does not satisfy these
> requirements. This court will not impose greater requirements on persons
> within its jurisdiction at the request of a foreign court than it would impose in
> proceedings taken within this jurisdiction.

**h**      In *Mulroney,* Catzman J. dealt with this issue and its treatment
in *Friction (No. 1)* in this way, at pp. 127-8 D.L.R., pp. 361-2
O.R.:

> I make three observations with respect to the *Friction Division* case.

EXHIBIT __3__

PAGE __20__

The first is that the only basis of the application was s. 43 of the *Canada Evidence Act*. The applicant in that case did not rely on s. 60(1) of the Ontario *Evidence Act*, and no reference to that Act or to its 1985 amendment appears in the reasons for judgment.

The second relates to the authority which Barr J. cited in support of the proposition set out by him at p. 247, quoted above, namely, *Re Radio Corp. of America v. Rauland Corp.*, *supra*, at p. 638 O.R., at p. 431 D.L.R. The comments of Gale J. on the page mentioned were not directed to the question whether the proposed examination should take place, for he had considered that question at an earlier stage of his judgment and had declined to set aside that part of an order which implemented letters rogatory to that effect. Rather, the comments of Gale J. at p. 638 O.R., p. 431 D.L.R., were addressed to the breadth of the proposed examination and, in particular, to the wide, vague and general description of the documents which it was sought to require strangers to the litigation to bring to their examination.

I make the third observation with considerable deference. I have the highest regard for the views of my brother Barr, but if the passage set out on p. 249 of his reasons for judgment, quoted above, is intended as an expression of a proposition of general application on the subject, I do not find that proposition compelled by the earlier authorities and I respectfully do not agree with it. While I consider that the recent changes in Ontario's Rules of Civil Procedure and *Evidence Act* have the result of effecting a relaxation of the former practice, I do not agree that, whether as a matter of legal precedent, of statutory construction or of judicial discretion, such relaxation ought to be limited to instances where the foreign court has seen fit to issue letters of request in circumstances which meet the requirements in which an Ontario court would make an order for discovery of non-parties under rule 31.10. With respect to legal precedent and to statutory construction, I find such a limitation compelled neither by the earlier authorities nor by the words of the *Canada Evidence Act* or those of the Ontario *Evidence Act*; indeed, the language of the 1985 amendment to the latter statute — which is directed not to a *situation* in which a letter of request *would* be issued in Ontario but rather to a *purpose* for which a letter of request *could* be issued here — suggests, to my mind, a contrary interpretation.

In my view Catzman J. is correct. But the respondents contend I am forbidden from so concluding, at least to the extent that such conclusion conflicts with Barr J.'s findings of fact and law in *Friction (No. 1)*.

Mr. Hamer for Du Pont Canada contends that Catzman J. relied upon "the somewhat exceptional case of *Zingre, Wuest and Reiser v. The Queen* (1981), 127 D.L.R. (3d) 223, 61 C.C.C. (2d) 465, [1981] 2 S.C.R. 392, and the later decision of the Supreme Court of Canada in *District Court of United States, Middle District of Florida v. Royal American Shows Inc. et al.* (1982), 134 D.L.R. (3d) 32, 66 C.C.C. (2d) 125, [1982] 1 S.C.R. 414, does not appear to have been drawn to his attention": see Du Pont Canada Factum, para. 19. I have these comments on this aspect of the matter. First, I agree with Catzman J. Secondly, I do not regard

EXHIBIT 3

PAGE 24

*Zingre* as an exceptional case so as to limit the application of the
principles set out in it. Thirdly, I do not think anything in *Royal*
*American Shows Inc.* dilutes those general principles set forth by
Dickson J. in *Zingre*, about which I will say more later. Fourthly,
it is noteworthy that in *Royal American Shows Inc.* the Supreme
Court of Canada did not seem to be troubled by the prospect of
there being a second request for evidence through further letters
rogatory.

This application is based on another and different request from
the Delaware court. The evidence is far more complete in essential
areas previously mentioned than was the case on the application
before Barr J. Judge Longobardi reviewed Barr J.'s decision and
tried to accommodate those deficiencies which were clearly
outlined by Barr J. and which led to the application being
dismissed. Judge Longobardi also considered Du Pont's objections
to the new letters rogatory being issued. I have no quarrel with
Barr J.'s decision on the evidence before him; that evidence led to
Barr J.'s conclusion that "the proposed witnesses have had no
dealings with either of the parties to the U.S. action". I assume
Barr J. was referring to the absence of evidence establishing that
Canparts and Canadian Metallic had dealings with either or both
parties to the U.S. action (Friction and Du Pont U.S.A.).

Mr. Hughes for Du Pont U.S.A. contends that Barr J.'s
dismissal of the first application to give effect to the letters
rogatory was not made "without prejudice". Absent these magic
words, all respondents take the position that the matter is at an
end, and the order sought cannot issue. Surely this kind of rigidity
ought to be avoided if at all possible. I do not accede to the
respondents' submissions on this point.

It is, however, appropriate that the previous application be
taken into account when considering whether this, the second
application, is oppressive or an abuse of process. I am satisfied
that counsel acting for Friction on the first application (not counsel
appearing on this application), did not expect that relevance of the
evidence sought to be challenged. This point is dealt with in the
affidavit of Steven Kreiss as follows:

> 26. On the first application to seek the assistance of this Court pursuant to the
> first set of Letters Rogatory, FDP was not aware that the relevance of the
> evidence sought was an issue. Consequently Exhibits A to H to the present
> Letters Rogatory were not part of the first Letters Rogatory. As well, FDP
> had been given to understand the first application would be unopposed. The
> cumulative effect was to omit from the first application evidence showing the
> Canparts' direct involvement in the United States market, DuPont's assis-
> tance to Canparts and DuPont's relationship with Canparts.

EXHIBIT ___3___

PAGE ___22___

This error led to there being an absence of persuasive evidence showing Canparts and Canadian Metallic's involvement in the U.S. market, Du Pont U.S.A.'s assistance to Canparts and Canadian Metallic and Du Pont U.S.A.'s relationship with those companies.

Neither *res judicata* nor issue estoppel apply to prevent the applicant from pursuing the relief it seeks. I can see no basis for the contention that this second application is, in the circumstances, an abuse of process or unduly burdensome. A discretion has to be exercised in this area, and I choose to exercise it in favour of the applicant. This is a fresh application based upon new letters rogatory and different evidence from that considered by Barr J. in *Friction (No. 1)*. This may be a second bite, but at a different apple.

The statutory basis upon which the order sought may issue comes from s. 43 of the *Canada Evidence Act*, R.S.C. 1970, c. E-10, and s. 60 of the Ontario *Evidence Act*. Those sections provide:

> 43. Where, upon an application for that purpose, it is made to appear to any court or judge, that any court or tribunal of competent jurisdiction, in the Commonwealth and Dependent Territories, or in any foreign country, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to such matter, of a party or witness within the jurisdiction of such first mentioned court, or of the court to which such judge belongs, or of such judge, the court or judge may, in its or his discretion, order the examination upon oath upon interrogatories, or otherwise, before any person or persons named in the order, of such party or witness accordingly, and by the same or any subsequent order may command the attendance of such party or witness for the purpose of being examined, and for the production of any writings or other documents mentioned in the order, and of any other writings or documents relating to the matter in question that are in the possession or power of such party or witness.

> 60(1) Where it is made to appear to the Supreme Court or a judge thereof, or to a judge of a county or district court, that a court or tribunal of competent jurisdiction in a foreign country has duly authorized, by commission, order or other process, the obtaining of the testimony in or in relation to an action, suit or proceeding pending in or before such foreign court or tribunal, of a witness out of the jurisdiction thereof and within the jurisdiction of the court or judge so applied to, such court or judge may order the examination of such witness before the person appointed, and in the manner and form directed by the commission, order or other process, and may, by the same or by a subsequent order, command the attendance of a person named therein for the purpose of being examined, or the production of a writing or other document or thing mentioned in the order, and may give all such directions as to the time and place of the examination, and all other matters connected therewith as seem proper, and the order may be enforced, and any disobedience thereto punished, in like manner as in the case of an order made

EXHIBIT 3

PAGE 23

by the same court or judge in an action pending in such court or before such
judge.

*a*    (2) A person whose attendance is so ordered is entitled to the like conduct
money and payment for expenses and loss of time as upon attendance at a
trial in the Supreme Court.

(3) A person examined under such commission, order or process has the like
right to object to answer questions tending to criminate himself, and to refuse
to answer any questions that, in an action pending in the court by which or by
*b*    a judge whereof or before the judge by whom the order for examination was
made, the witness would be entitled to object or to refuse to answer, and no
person shall be compelled to produce at the examination any writing,
document or thing that he could not be compelled to produce at the trial of
such an action.

(4) Where the commission, order or other process, or the instructions of the
*c*    court accompanying the same, direct that the person to be examined shall be
sworn or shall affirm, the person so appointed has authority to administer the
oath to him or take his affirmation.

In addition to the letters rogatory, there is affidavit evidence
outlining the issues in the Delaware action, and the evidence
*d*    sought from officers of Canparts and Canadian Metallic. The
affidavit evidence deals at some length with the necessity of
having what the applicant seeks, for trial purposes, and purports
to establish that the evidence cannot otherwise be obtained.

Aside from matters which bear upon the application before Barr
J., the respondents frontally challenge the applicant's right to the
*e*    relief it seeks. The respondents' position, looked at generally,
breaks down this way:

(1) the evidence sought must be otherwise unobtainable, and this
evidence cannot be so characterized;

*f*    (2) the applicant has not established that the evidence sought is
necessary, and further, the evidence on this application estab-
lishes that the evidence sought is not necessary in that such
evidence is merely supplemental to evidence either obtained
through pre-trial depositions, or otherwise obtainable in the
U.S. action;

*g*    (3) if the letters rogatory are given effect to, the examination
which would result would be more burdensome to Canparts
and Canadian Metallic than would be the case were those
companies involved in similar circumstances in an Ontario
*h*    action;

(4) the examination sought is oppressive in that it requires
Canparts and Canadian Metallic to conduct a virtual corporate
scavenger hunt to unearth 38 kinds of documents and to
determine which are relevant to the issues;

EXHIBIT __3__

PAGE __24__

(5) the respondents' position is that the application must, and did not, demonstrate that the evidence sought is relevant.

Before an order giving effect to letters rogatory will be made, the evidence (including the letters rogatory) must establish that:

(1) the evidence sought is relevant;

(2) the evidence sought is necessary for trial and will be adduced at trial, if admissible;

(3) the evidence is not otherwise obtainable;

(4) the order sought is not contrary to public policy;

(5) the documents sought are identified with reasonable specificity;

(6) the order sought is not unduly burdensome, having in mind what the relevant witnesses would be required to do, and produce, were the action to be tried here.

There may well be other factors which bear upon a request for an order giving effect to letters rogatory. The above listed factors apply here.

The court's policy involves a consideration of comity of nations in support of lending assistance to a foreign court, in this case a court in the United States. In *Zingre, Wuest and Reiser v. The Queen et al.* (1981), 127 D.L.R. (3d) 223 at p. 230, 61 C.C.C. (2d) 465, [1981] 2 S.C.R. 392 at pp. 400-1, Dickson J., as he then was, set forth what I regard to be this general statement of principle:

> As that great jurist, U.S. Chief Justice Marshall, observed in *Schooner Exchange v. McFaddon et al.* (1812), 7 Cranch's Reports 116, at pp. 136-7, the jurisdiction of a nation within its own territory is necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but common interest impels sovereigns to mutual intercourse and an interchange of good offices with each other.

> It is upon this comity of nations that international legal assistance rests. Thus the Courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation but out of mutual deference and respect. A foreign request is given full force and effect unless it be contrary to the public policy of the jurisdiction to which the request is directed (see *Gulf Oil Corp. v. Gulf Canada Ltd.* (1980), 111 D.L.R. (3d) 74, 51 C.P.R. (2d) 1, [1980] 2 S.C.R. 39) or otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction.

The evidence sought is relevant, as Zuber J.A. noted in *Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago* (1984), 10 D.L.R. (4th) 317, 46 O.R. (2d) 590, "from this vantage point". That is the only point from which I can assess the evidence the applicant seeks. Its admissibility is for the trial judge in Delaware. I am satisfied that a link between Du Pont U.S.A. and

EXHIBIT 3

PAGE 25

*a*  Du Pont Canada and the two Ontario companies as related to Friction's patent has been established. That link was not found to have been demonstrated when Friction's application for an order giving effect to the first letters rogatory was heard by Barr J. That evidentiary deficiency seems to me to have been the crux of Barr J.'s decision to refuse the order sought, although Barr J. had other concerns with which I will deal later.

*b*  It seems to me that this evidence is necessary having in mind the issues in the American litigation and the evidentiary link developed between Du Pont U.S.A. and Du Pont Canada and the two Ontario companies from which evidence is sought. That evidence is not really challenged. The applicant seeks this

*c*  evidence, not as part of a discovery process, but for trial. I am satisfied that it would be unfair to require the applicant to proceed to trial without this evidence. Having reached that conclusion it does not seem to me to be productive to dissect the authorities to determine whether the evidence must be necessary, or absolutely

*d*  necessary, or really necessary. In *Re Raychem Corp. v. Canusa Coating Systems, Inc.* (1970), 64 C.P.R. 247, 14 D.L.R. (3d) 684, [1971] 1 O.R. 192, all three terms of reference were mentioned. At p. 252 C.P.R., p. 688 D.L.R., p. 196 O.R., Brooke J.A. said:

> It is, however, clear from the material filed, which I have referred to as the
*e*  second issue, the evidence sought is not *really necessary* for the determination of the United States action. There can be no more than a mere suggestion that this information is *necessary*. In this regard, it was stated by Aylesworth, J.A., in *Re McCarthy and Menin and United States Securities and Exchange Comm'n*, [1963] 2 O.R. 154 at p. 160, 38 D.L.R. (2d) 660 at p. 666:

*f*  >> "In any event, judicial pronouncement has established the principle that the order sought should not be granted under either of our statutes 'unless *absolutely necessary* for the purposes of justice': *Keogh v. Brady* (1905), 6 O.W.R. 552; *Quality Steels (London) Ltd. v. Atlas Steels Ltd.*, [1949] O.W.N. 110; *Ehrmann v. Ehrmann*, [1896] 2 Ch. 611."

(Emphasis added.)

*g*  I agree with Catzman J.'s observation in *Mulroney* that s. 60 (as amended) of the Ontario *Evidence Act* indicates an intent to achieve a relaxation in those circumstances in which requests of a foreign court will be given effect to in Ontario. That relaxation applies to productions as well as to the examination of a witness.

*h*  Apart from statute, the Supreme Court of Canada's judgment in *Zingre, supra,* suggests requests of foreign courts for assistance should be looked at without rigidity.

The respondents' contend that the evidence sought could be obtained, and could have been obtained in the U.S.A. Mr.

EXHIBIT 3

PAGE 26

Hughes, for Du Pont U.S.A., ably pressed this point in both his submissions and his factum. All respondents share this position. Mr. Hughes argued that the applicant has already examined a number of witnesses in the United States who, if asked, could have given evidence on what I will refer to as the Canadian-Kevlar issue. Moreover, Mr. Hughes contends that representatives of Canparts and Canadian Metallic have been examined in the United States, and the kind of evidence sought here was not then explored. Lastly, Du Pont U.S.A. has offered to permit the applicant to test relevant products which allegedly infringe the Friction patent. That offer has not been accepted, as far as I know.

I do not think that examining an independent sales representative of Canparts or Canadian Metallic can come close to filling Friction's evidentiary needs. I accept Mr. Wright's submission that Friction cannot be criticized for not seeking from those independent sales representatives evidence of the sort the applicant hopes to obtain through an order giving effect to these letters rogatory. Nor do I accede to the submission that other U.S. witnesses can produce the evidence the applicant seeks to obtain. There is an insufficient evidentiary basis to permit me to reach the conclusion the respondents submit is appropriate, on that issue.

The respondents' testing argument is persuasive, but only to a limited degree. If an appropriate product is tested, it will not in my view eliminate, or substantially dilute, the applicant's need for the evidence sought. Testing would undoubtedly answer some technical questions; however, the evidence sought is far wider than evidence which would emerge from product testing. The Canparts/Canadian Metallic-Du Pont connection, in all its aspects, is crucial to the applicant's Delaware case, based as it is on infringement through inducement. That connection has both a commercial (sales marketing) and technical part.

I do not think the two proposed witnesses are being asked to do anything which can be said to be burdensome or oppressive, measured against the witnesses' obligations in Ontario were this matter to be tried here. I agree with Catzman J.'s approach to this issue in *Mulroney*, *supra*. In any event, the evidence sought, on the facts of this matter, does not place the proposed witnesses or the companies they represent in an unfair or burdensome position.

In *Friction (No. 1)*, Barr J. found the order sought was more burdensome to the witnesses involved than would be the case had

EXHIBIT 3

PAGE 27

the action been tried in Ontario. On this point Barr J. said this at
p. 70 C.P.R., p. 248 O.R.:

**a**

> 1. A Canadian court will not order a Canadian resident to submit to the
> process of a foreign court unless it is necessary. Neither the letters rogatory
> nor the affidavit material establish this. Here, the subject of the matter is the
> alleged infringement of a United States patent in the United States. The
> defendant in that action does not carry on business in Canada. The proposed
> witnesses have had no dealings with either of the parties to the U.S. action.

**b**

> The plaintiff has had discovery of the Canadian corporation with which the
> parties sought to be examined have been dealing, and have had production of
> its correspondence and documents relating to Canadian respondents. In these
> circumstances it is hard to see that the success of the plaintiff's U.S. action
> could depend upon the granting or refusing of the order sought in this case.

**c**

Barr J. found the obligation to search out 38 kinds of documents
and to determine which were relevant to the issue to be too
burdensome. At p. 71 C.P.R., p. 249 O.R., Barr J. said this:

> The time and expense required of the Canadian parties to satisfy these
> requirements is an unreasonable price to exact for the "comity of nations" in
> the circumstances of this case.

**d**

Barr J. also concluded it was not established the documents
sought existed.

As I have indicated, the evidence before Barr J. was, to put it
mildly, less complete than the evidence on this application. In
dealing with the evidentiary deficiencies, Barr J. said this at p. 67

**e**

C.P.R., p. 246 O.R.:

> Canadian Metallic Brake Ltd. is Mr. Beri's company. Canparts Automotive
> International Ltd. is Mr. Salt's. It is not suggested that they have ever dealt
> with either of the parties to the Delaware action. The questioning is sought
> because it is said that the Canadian companies have used Kevlar pulp and
> fibre in their business. The patent to these products is the subject of the

**f**

> Delaware litigation. E. I. Du Pont de Nemours & Company Incorporated is
> the defendant in that litigation. It is also the majority shareholder in Du Pont
> Canada Inc., a Canadian company with a substantial number of Canadian
> shareholders. It appears that Du Pont Canada purchased Kevlar pulp and
> fibre from E. I. Du Pont and resold it to a number of Canadian users including
> the Canadian respondents. The goods were ordered, delivered and paid for in

**g**

> Canada. These sales were entirely between three Canadian companies—Du
> Pont Canada and the two Canadian respondents.

The linkage between Du Pont U.S.A. and the two Ontario
companies has now been established and is the basis of my
conclusion that the evidence is relevant and necessary, and part of

**h**

the basis of my conclusion that it would be unfair to require the
applicant to proceed to trial without it.

While I concede that some authorities (including Barr J.'s
judgment in *Friction (No. 1)* suggest documents sought must be
proved to exist, I think the need for specificity is better served by

EXHIBIT  3

PAGE  29

requiring documents to be identified with reasonable precision, in the circumstances of each case. In many instances it will be impossible for a party on the outside, denied a look inside, to determine what documents are relevant to the issues and what documents may be reasonably ancillary to the evidence of a witness sought to be examined. Requiring a witness to search a number of files may in one case be burdensome, and in another quite reasonable. Because Friction is a stranger to the dealings between Du Pont U.S.A., Du Pont Canada and the two Ontario companies, Friction can do no more than to identify the documents it seeks by topics, as has been done.

In *Appeal Enterprises, Ltd. et al. v. First National Bank of Chicago* (1984), 10 D.L.R. (4th) 317 at p. 319, 46 O.R. (2d) 590 at p. 592, one of the two issues before the Ontario Court of Appeal was put this way by Zuber J.A.:

> It is argued by the appellant that the amount of material sought pursuant to the subpoena is simply too large, is described too generally and amounts to a discovery. It cannot be denied that the amount of documentary material sought is very large indeed.

*Appeal Enterprises* involved an Illinois request that an employee of Peat, Marwick, Mitchell & Co. give evidence of his firm's involvement with the plaintiff and to produce an enormous quantity of documentation in the accountant's possession. The breadth of the order appealed from can best be understood by setting out the production part of the order:

> 4. AND IT IS FURTHER ORDERED that The First National Bank of Chicago, the Defendant in the above-captioned action, be and it is hereby given leave to apply to this court and to have issued a subpoena duces tecum requiring the said David V. Bosworth to produce at the said examination all documents prepared by or for Peat, Marwick, Mitchell & Co. during their examination of the business records of the various plaintiffs which documents are now in the possession or control of Peat, Marwick, Mitchell & Co., including but not limited to all documents reflecting or otherwise pertaining to, (i) the calculation or review of the provisions and/or allowances for losses on individual loans receivable of the plaintiff companies, and (ii) the calculation or review of the values at which Real Estate Owned is reflected on the books and records of the plaintiff companies;

Zuber J.A. held that the issues in the U.S. litigation were complex and involved large sums of money. The same observation applies here. It is implicit in Zuber J.A.'s judgment that although the documentation involved was voluminous and not identified with much precision, it was relevant and at least ancillary to the evidence of the witness sought to be examined in Ontario.

In my view, the production of documents is not a discovery process, but evidence reasonably required as ancillary to the

EXHIBIT ___3___

PAGE ___29___

evidence to be given by officers of Canparts and Canadian Metallic, which evidence will in my view be relevant to the issues in the U.S. litigation. In *American Express Warehousing Ltd. v. Doe et al.*, [1967] 1 Lloyd's Rep. 222 at p. 225, Lord Denning M.R. said this:

> Where the documents are sufficiently specified, there is no objection to an order being made on a person to give his testimony and to produce supporting documents as ancillary to that testimony. That is so in the present case. This application, as I see it, is not a mere application for discovery. It is an appli-cation that the brokers should give testimony. The request to produce documents is only ancillary to their oral testimony. The documents are described as "slips" and "quote slips" and also the correspondence in their "files" relating to those particular insurances. That seems to me to be sufficient specification. It would satisfy a *subpoena duces tecum*: and satisfies a request of this kind for supporting documents.

> As to the point on "pre-trial" procedure, it seems to me to have no substance in it. The evidence is requested in this case very much on the same lines as we ask for evidence to be taken on Commission, or before an Examiner before the trial. It is taken down, and afterwards at the trial it is admitted in evidence if it is relevant. But it can be rejected if it is inadmis-sible for some special reason or other.

> I think we in this Court should do what the United States Courts ask us to do. The witnesses should be examined here to help the United States Courts to do justice. If the position were reversed, we would confidently expect the United States Courts to help us. So we should help them.

The documents sought must be "sufficiently identified": see *Penn-Texas Corp. v. Murat Anstalt et al. (No. 2)*, [1964] 2 All E.R. 594 at p. 599. Documents may be specifically identified, or identified by class, to pass the threshold test for production. Although the production sought is wide, it is not unreasonable or unduly onerous.

Counsel for Canparts emphasized the fact that Canparts was a small company, unwillingly enveloped in litigation involving corporate giants in the United States, in support of his submission that it would be unduly oppressive and burdensome for this small company to undertake the document searches, and then the productions required, were the letters rogatory given effect to. The David and Goliath rhetoric is misplaced. All that Canparts will be required to do is to produce documents relating to those issues clearly spelled out in the letters rogatory. The productions, looked at generally, will relate to the anatomy of Canparts brakes and the sales-marketing connection between Du Pont U.S.A. and Canparts as related to the brakes said to contain the Du Pont product Kevlar.

Du Pont Canada had itself added as an intervenor. Some might

wonder why. Du Pont Canada's position on that issue is that its basic reason for intervening is to support its customers Canparts and Canadian Metallic in "resisting their being caught up in the toils of complex and wide ranging United States patent litigation". This lofty goal, unrelated to any mundane desire to assist Du Pont Canada's parent company, brings to mind the concluding comments of Salmon L.J. in *Penn-Texas Corp. v. Murat Anstalt et al. (No. 2), supra.* There in dealing with an English company's refusal to produce documents Salmon L.J. said this at p. 602:

> If the appellants' real purpose in bringing this appeal is merely to demonstrate their zeal to their clients, the appellants should regard this appeal as a triumph in spite of its result. It must surely now be obvious to everyone, that every point that human ingenuity could devise for the purpose of keeping these documents from the light of day has been taken and pursued with skill, vigour and persistence—but to no avail.

In the end result, an order will issue giving effect to the letters rogatory. If necessary, I may be spoken to as to its forum.

I have not dealt with the confidentiality issue. That is a legitimate concern and I would ask counsel to write to me with their suggestions on that issue as soon as is reasonably possible. I am optimistic counsel will be able to agree on terms to accommodate the need for confidentiality as outlined in counsel's submissions on that issue. I would also ask counsel to write to me with their submissions on costs, although I am inclined to the view that there should be no costs because evidentiary differences on the first application made this application necessary.

It is noteworthy that the Supreme Court of Canada in *District Court of United States, Middle District of Florida v. Royal American Shows Inc. et al.* (1982), 134 D.L.R. (3d) 32, 66 C.C.C. (2d) 125, [1982] 1 S.C.R. 414, did not seem to be troubled by the potential of there being a second request for evidence through further letters rogatory.

*Application granted.*

---

[COURT OF APPEAL]

## Re Partition Holdings Ltd. et al. and Minister of Transportation & Communications

THORSON, CORY AND                           16TH OCTOBER 1986.
TARNOPOLSKY JJ.A.

Expropriation — Compensation — Interest — Ministry registering highway plan but not expropriating lands for another three years — Interest payable on

EXHIBIT 2
PAGE 31

# EXHIBIT 4

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R. (4th) 429

▷
2006 CarswellOnt 3748

### O.P.S.E.U. Pension Trust Fund (Trustee of) v. Clark

THE TRUSTEES OF THE ONTARIO SERVICE EMPLOYEES UNION PENSION TRUST FUND, individually and on behalf of all other persons similarly situated (Applicant / Respondent in Appeal) and RICHARD CLARK, MARK WAYLAND and DELOITTE & TOUCHE LLP (Respondents / Appellants in Appeal) and NORTEL NETWORKS CORP. (Respondent / Respondent in Appeal)

Ontario Court of Appeal

E.E. Gillese, R.A. Blair, R.G. Juriansz JJ.A.

Heard: January 24, 2006
Judgment: June 21, 2006
Docket: CA C44065

Copyright © CARSWELL,

a Division of Thomson Canada Ltd. or its Licensors. All rights reserved.

Proceedings: affirming *O.P.S.E.U. Pension Trust Fund (Trustee of) v. Clark* (2005), 19 C.P.C. (6th) 312, 77 O.R. (3d) 38, 2005 CarswellOnt 4658 (Ont. S.C.J.); additional reasons at *O.P.S.E.U. Pension Trust Fund (Trustee of) v. Clark* (2005), 2005 CarswellOnt 5162 (Ont. S.C.J.)

Counsel: Joseph M. Steiner, Christopher P. Naudie for Appellants

Kirk Baert, Celeste Poltak for Respondent, The Trustees of the Ontario Service Employees Union Pension Trust Fund

Jennifer Teskey for Respondent, Nortel Networks Corp.

Subject: Evidence; International; Civil Practice and Procedure

Evidence --- Taking evidence before trial -- Letters rogatory and commission evidence in civil matters -- Letters rogatory

Plaintiffs were trustees of public service pension fund who purchased shares in defendant N Corp. -- C and W were employees of D LLP, which was independent auditor of N Corp. -- Plaintiffs brought action in Ontario against N Corp., alleging that N Corp. made false or misleading public overstatements of its financial condition and performance between October 2000 and February 2001 -- Plaintiffs were also plaintiffs in parallel United States federal securities fraud class action against N Corp. and certain individuals -- Plaintiffs applied to Ontario court requesting court to make order enforcing letters rogatory issued by US District Court for Southern

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ____4____

PAGE ____32____

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

District of New York requiring production of specified documents from D LLP and depositions of C and W --
Application was granted and plaintiff was required to give undertaking confining use of documents and evid-
ence -- D LLP appealed -- Appeal dismissed -- Evidence sought was relevant, crucial, identified with reason-
able specificity, and not otherwise obtainable -- Canadian enforcement order was consistent with Canadian pub-
lic policy -- It would not be contrary to interests of justice or infringe Canadian sovereignty to give full faith
and credit to orders and judgments of US court -- Allegations of improper financial reporting and accounting
practices were at heart of US class action -- D LLP had prepared both financial statements and restatements and
had been directly involved in restatement process -- Defence of N Corp. put contents of D LLP's working pa-
pers and other documents in issue -- Requested documents were relevant and of paramount evidentiary import-
ance to US class action -- It would be unfair to plaintiffs to require them to proceed to trial without requested
evidence -- Documents were not unduly burdensome to prepare for production -- Interests of D LLP would not
be unduly prejudiced.

**Cases considered by *R.A. Blair J.A.*:**

> *Fecht v. Deloitte & Touche* (1997), 97 O.A.C. 241, 32 O.R. (3d) 417, 1997 CarswellOnt 1013, 15
> C.P.C. (4th) 293 (Ont. C.A.) -- distinguished

> *France (Republic) v. De Havilland Aircraft of Canada Ltd.* (1991), 3 O.R. (3d) 705, 1 C.P.C. (3d) 76,
> 65 C.C.C. (3d) 449, 49 O.A.C. 283, 1991 CarswellOnt 366, [1992] I.L.Pr. 589 (Ont. C.A.) -- considered

> *Optimight Communications Inc. v. Innovance Inc.* (2002), 2002 CarswellOnt 510, 155 O.A.C. 202, 17
> C.P.C. (5th) 238, 18 C.P.R. (4th) 362 (Ont. C.A.) -- considered

> *R. v. Zingre* (1981), [1981] 2 S.C.R. 392, 23 C.P.C. 259, 10 Man. R. (2d) 62, 38 N.R. 272, 61 C.C.C.
> (2d) 465, 127 D.L.R. (3d) 223, 1981 CarswellMan 47, 1981 CarswellMan 142 (S.C.C.) -- referred to

**Statutes considered:**

*Canada Evidence Act*, R.S.C. 1985, c. C-5

>    s. 46 -- considered

*Evidence Act*, R.S.O. 1990, c. E.23

>    s. 60 -- considered

**Words and phrases considered:**

**Impact on Canadian sovereignty**

[Per R.A. Blair J.A. (Gillese and Juriansz JJ.A. concurring):] [ . . . ] In *Fecht*, [*Fecht v. Deloitte & Touche*
(1997), 32 O.R. (3d) 417 (Ont. C.A.)] the court noted that the exercise of judicial discretion in the context of en-
forcing letters rogatory "requires the balancing of two broad considerations: the impact of the proposed order on
Canadian sovereignty and whether justice requires that the taking of commission evidence be ordered" (p. 419).
Impact on Canadian sovereignty in this sense refers to the imposition of an unfair burden on, or prejudice to, the
non-party citizen of the requestee state who is the target of the request.

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ___4___

PAGE ___33___

Page 3

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

APPEAL by repondent from judgment reported at *O.P.S.E.U. Pension Trust Fund (Trustee of) v. Clark* (2005),
19 C.P.C. (6th) 312, 77 O.R. (3d) 38, 2005 CarswellOnt 4658 (Ont. S.C.J.), additional reasons at *O.P.S.E.U.
Pension Trust Fund (Trustee of) v. Clark* (2005), 2005 CarswellOnt 5162 (Ont. S.C.J.), granting application for
order enforcing letters rogatory.

*R.A. Blair J.A.:*

**Overview**

1 The Trustees of the Ontario Service Employees Union Pension Trust Fund ("OPT") are the plaintiffs in a
U.S. federal securities fraud class proceeding commenced in New York against Nortel Networks Corp.
("Nortel") and certain individuals. Deloitte & Touche LLP ("Deloitte") is Nortel's independent auditor.

2 OPT applied for, and obtained, letters rogatory in the U.S. Class Action requesting the cooperation of the
Superior Court of Justice in Ontario in compelling the production of a wide range of documentation from De-
loitte, as well as the *viva voce* examination of Richard Clark and Mark Wayland. Mr. Clark was the lead audit
partner with Deloitte and Mr. Wayland was the audit manager with respect to the Nortel engagement. On July
25, 2005, Justice Sanderson granted an order enforcing the letters rogatory in their entirety.

3 Deloitte appeals that order.

**Facts**

4 In the U.S. Class Action, OPT alleges that Nortel made false or misleading public statements concerning its
financial condition and performance during the period October 24, 2000 to February 15, 2001 ("the class peri-
od"). It is alleged that when Nortel subsequently disclosed its true financial condition, the value of its shares de-
clined substantially and OPT suffered significant losses. OPT states that Nortel caused its public statements to
be false or misleading by the deliberate use of five improper financial reporting and accounting practices in rela-
tion to its third and fourth quarters of 2000, namely:

> • Improper vendor financing -- inadequately reserving for vendor-financed loans and artificially in-
> flating and improperly recognizing revenues;
>
> • Improper inventory valuation -- failing to take adequate charges against earnings to reflect the di-
> minished value of its products recovered after defaults on vendor-financed loans, thereby inflating
> inventory value;
>
> • Improper revenue recognition -- inflating revenues by improperly and prematurely recognizing
> revenue;
>
> • Failure to Account for Uncollectible Receivables; and
>
> • Goodwill impairment -- failing to recognize and report billions of dollars in goodwill impairment.

5 Deloitte audited Nortel's year-end financial statements and reviewed its quarterly financial statements in the
years 2000 and following. On December 23, 2003, Nortel issued a restatement of its financial statements for
2000, 2001, 2002 and certain quarters of 2003 ("the 2002 Restatement"). Later, in January 2005, it also re-filed
audited financial statements for 2003 ("the 2003 Restatement").

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ___4___

PAGE ___34___

Page 4

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

6 OPT wants to examine the audit documentation pertaining to these restatements and audits. It tried unsuc-
cessfully to get access to the Canadian documentation through Deloitte U.S. OPT then subpoenaed Deloitte in
the U.S. proceedings, but Deloitte did not respond to the U.S. subpoena. On the heels of these failed attempts it
resorted to, and obtained, the letters rogatory from Magistrate Judge Dolinger of the United States District
Court, Southern District of New York, on September 21, 2004.

7 The contested provisions are paragraphs 11 and 15 of the letters rogatory. Paragraph 11 requests the produc-
tion of the two representatives of Deloitte, Messrs. Clark and Wayland, for examination. Paragraph 15 requests
the following documentation (the "Requested Documents"):

>     (a) All working papers and other documents concerning Deloitte's audit of Nortel's financial state-
>     ments for year-end 2000 and year-end 2001.

>     (b) All workpapers and other documents concerning Deloitte's review of Nortel's financial state-
>     ments for the third and fourth quarters of 2000 and the first quarter of 2001;

>     (c) All workpapers and other documents concerning Deloitte's review of Nortel's financial state-
>     ments for the second and third quarters of 2001, to the extent that such documents are related to a
>     financial charge/write-down, in excess of $12 billion, as announced in Nortel's Form 10-Q for the
>     quarterly period ending June 30, 2001, filed with the SEC on or about August 8, 2001;

>     (d) All documents relating to Nortel's analysis of whether or not any transaction, customer, con-
>     tract, arrangement or other such entry ([...]) during the class period included in Nortel's 2000 con-
>     solidated financial statements as originally filed with the SEC on March 31, 2001, was considered,
>     and/or formed the basis for, any restatement of Nortel's financial statements...; and

>     (e) All indices and/or inventories of work papers relating to any engagement or service performed
>     by Deloitte for Nortel.

8 Compliance with the demand for the Requested Documents will entail considerable time and effort, and ex-
pense, by Deloitte. Their affiant, Mr. Morrison, deposed that the requested documents number in the hundreds of
thousands of pages, and possibly exceed a million pages. The documents are both in hardcopy and electronic
form and are stored at various locations. Those relating to the 2000 and 2001 financial statements include over
400 working paper files, consisting mostly of documents in electronic form. Deloitte generates and stores docu-
ments in electronic form using a software program (Audit System 2), which does not allow text searching across
multiple documents or records. Users must open documents individually before examining and/or printing them.
The requested documents also include more than a hundred thousand pages of personal desk files that are not or-
ganised by subject matter. Mr. Morrison estimated a minimum of fifteen hundred person-hours by Deloitte to
conduct a file-by-file and document-by-document review for the purpose of identifying and segregating the rel-
evant documents from the irrelevant materials.

9 For its part, as noted by the application judge, OPT has offered to contribute up to $100,000 towards De-
loitte's costs in this regard.

**The Positions of the Parties**

10 The application judge ordered that the letters rogatory were to be enforced, subject to certain precondi-

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ___4___

PAGE ___35___

Page 5

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R. (4th) 429

tions. The preconditions were that OPT and its counsel were to give their written undertakings:

> (a) that the documents and evidence produced pursuant to the judgment enforcing the letters rogatory would be used only for the purposes of the U.S. Class Action and not for the purposes of (i) adding Deloitte and/or Clark or Wayland as a party defendant to that action, or (ii) commencing any new proceedings against Deloitte and/or Clark or Wayland, or (iii) otherwise advancing any new claim against Deloitte and/or Clark and/or Wayland; and

> (b) that OPT and its counsel shall not provide documents and/or evidence produced pursuant to the judgment to any other person unless that other person acknowledges and undertakes to be bound by the foregoing provision.

11 Deloitte asserts that most of the requested documents are not relevant, either temporally (they do not relate to the class period) or in subject matter (they do not relate to the improper accounting practices raised in the U.S. Class Action). Deloitte therefore seeks to set aside the judgment of Sanderson J. to the extent that it orders production of the work papers and other documents listed in subparagraphs (a) through (c) of the letters rogatory on the basis that it would require a massive and burdensome effort to review, identify, separate and produce relevant documents. Alternatively, Deloitte requests -- for the first time on appeal -- that sub-paragraphs 15(a) through (c) be narrowed to require production of only those particular sections of the working papers that have been identified as potentially containing relevant documents and that would not be burdensome for Deloitte to produce. In short, Deloitte submits that the letters rogatory "are unjustifiably overbroad, unduly burdensome, and should not be enforced".[FN1]

12 OPT argues that the evidence sought by it through the enforcement of the letters rogatory is of particular relevance to the U.S. Class Action, that the evidence is not otherwise obtainable, does not violate principles of Canadian public policy, was defined with reasonable particularity, and would not be unduly burdensome to Deloitte to produce. The respondent therefore submits that the application judge properly exercised her discretion to enforce the letters rogatory issued by the U.S. District Court. Nortel took no position at the application to enforce the letters rogatory and takes no position on this appeal.

13 For the reasons that follow, I would dismiss the appeal.

Law and Analysis

14 The court's authority to enforce letters rogatory is derived from s. 60 of the Ontario *Evidence Act*[FN2] and from s. 46 of the Canada *Evidence Act*. [FN3] The order is discretionary in nature.

15 The application judge correctly, and succinctly, articulated the test to be applied in a proceeding for the enforcement of letters rogatory. Indeed, counsel before her agreed on the test. She said:

> All counsel agree on the criteria this Court should use in deciding whether or not the letters rogatory should be enforced. The evidence sought must be relevant, not otherwise obtainable and identified with reasonable specificity. The Canadian enforcement order must be consistent with Canadian public policy and must not be unduly burdensome. *OptiMight Communications Inc. v. Innovance Inc.*, [2002] O.J. No. 577 (C.A.) at para. 22, relying on *Re Friction Division Products Inc. and E.I. 'DuPont de Nemours & Co. et al.* (No. 2) (1986), 56 O.R. (2d) 722 at 732 [underlining added].

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ___4___

PAGE ___36___

Page 6

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

16 This test is consistent with the principles also enunciated by this court in *Fecht v. Deloitte & Touche*
(1997), 32 O.R. (3d) 417 (Ont. C.A.) and in *France (Republic) v. De Havilland Aircraft of Canada Ltd.* (1991),
3 O.R. (3d) 705 (Ont. C.A.). See also *R. v. Zingre*, [1981] 2 S.C.R. 392 (S.C.C.). In *Fecht*, the court noted that
the exercise of judicial discretion in the context of enforcing letters rogatory "requires the balancing of two
broad considerations: the impact of the proposed order on Canadian sovereignty and whether justice requires
that the taking of commission evidence be ordered" (p. 419). Impact on Canadian sovereignty in this sense refers
to the imposition of an unfair burden on, or prejudice to, the non-party citizen of the requestee state who is the
target of the request.

17 The application judge considered and weighed all of the foregoing factors. She reviewed the submissions
of the parties in relation to each of them and thereafter conducted her own analysis of those factors based on the
record before her. Having done so, she found that:

> (a) the Requested Documents were "clearly relevant" and of "paramount evidentiary importance to
> the U.S. Class Action";
>
> (b) the requested testimony of Messrs. Clark and Wayland was "highly relevant" and that they pos-
> sessed "unique and specific knowledge touching on the matters complained of";
>
> (c) the Requested Documents and Testimony were "crucial to the determination of the issues in the
> U.S. Class Action";
>
> (d) it would be unfair to the plaintiffs to require them to proceed to trial without the Requested
> Documents and the testimony and justice required the enforcement of the letters rogatory;
>
> (e) the Requested Documents were identified with sufficient specificity;
>
> (f) the documents generated by Deloitte in the course of the audits and restatements touching on the
> issues set out in the complaint "will be unique to Deloitte", and are therefore not available from
> other sources; and
>
> (g) the request for the documents was not unduly burdensome for Deloitte in the manner she
> ordered and subject to the undertakings given by OPT.

18 On behalf of Deloitte, Mr. Steiner relies heavily on the decision at first instance, and on appeal, in *Fecht*.
He submits the case cannot be distinguished from the present litigation. And, indeed, there are similarities. *Fecht*
involved letters rogatory from the same U.S. District Court, in relation to a U.S. class proceeding alleging that a
predecessor of Nortel had made falsely optimistic public statements about the company's performance, as a res-
ult of which its share prices had fallen dramatically. The letters rogatory sought the production of a wide-ran-
ging set of documents from the same auditors, Deloitte & Touche. The request for an order enforcing the letters
rogatory was declined on the basis that the relevancy of the requested documentation had not been established
(they were said only to be "potentially" relevant), that the request was overly burdensome on Deloitte, and that
the applicant had not established a sufficiently substantial link to the foreign jurisdiction (Ontario) to conclude
that justice required the enforcement of the letters rogatory. The decision was upheld on appeal.

19 *Fecht* is distinguishable from the present case, however. In *Fecht*, the allegedly false and misleading state-
ments related to primarily non-financial matters. There was one specific accounting related issue involving the

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ___4___

PAGE ___37___

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

write-down of goodwill, but it was held that the request for production was overly broad to respond to that par-
ticular issue. In short, Deloitte's link to the issues in the *Fecht* U.S. proceeding was nothing more than that it was
Northern Telecom's general auditor, and some information in relation to the audit was "potentially relevant" to
the lawsuit.

20 Here, however, the allegations of false and misleading statements pertain directly to Nortel's financial
statements, and its restatements. The complaint alleges that Nortel issued false and misleading public statements
that overstated its financial condition and performance during the class period, and further that the statements in-
cluded false and misleading information with respect to the nature and extent of the actual sales made by Nortel
-- all resulting in the artificial inflation of Nortel's stock price. Thus, allegations relating to improper financial
reporting and accounting practices -- as encapsulated in the five complaints referred to above -- are at the heart
of the U.S. Class Action. Deloitte prepared both the financial statements and the restatements that are in issue
and was directly involved in the restatement process. Moreover, Nortel specifically defends on the grounds that
it relied on the advice of its advisors, thus putting the contents of Deloitte's working papers and other document-
ation in issue, as the application judge noted.

21 The case management judge in the U.S. Class Action made the order for production and testimony and re-
quested the assistance of the Ontario court in enforcing the order on the bases, amongst others, that:

> • The testimony sought is both relevant and probative, and thus it would be unfair to require the
> Class Plaintiffs to proceed to trial without obtaining this evidence;

> • The Deloitte witnesses will have specific knowledge of facts that are directly relevant to the alleg-
> ations;

> • The documents and testimony sought are not otherwise available and are of paramount eviden-
> tiary importance to the case;

> • Justice cannot be completely achieved among the parties without such evidence.

22 I do not accept the appellants' criticism that the application judge accorded too much deference to the U.S.
court's order. She correctly observed that she was not bound by the conclusions of the requesting judge, but that
"his observations and conclusions are entitled to deference and respect." I agree with her view that an Ontario
court should "'give full faith and credit' to the orders and judgments of a U.S. court unless it is of the view that
to do so would be contrary to the interests of justice or would infringe Canadian sovereignty": see *R. v. Zingre,*
*supra,* at p. 401; *France (Republic) v. De Havilland Aircraft of Canada Ltd., supra,* at p. 715-716. At the end of
the day, she arrived at her own findings and conclusions, as summarized above.

23 The unseverable mix of relevant and irrelevant documents amongst the Requested Documents, together
with the sheer volume of the production sought, is admittedly troubling in this case, as it was in *Fecht v. Deloitte*
*& Touche.* However, Deloitte is a major financial audit and consulting firm, worldwide. The application judge
noted that it is obliged by professional standards to compile and secure its working papers in a manner in which
they can be made available to regulatory entities and successor auditors. It should follow that the documentation
is not impossible to prepare for production. Requests for the production of voluminous documentation, in elec-
tronic and hard copy form, are hardly unknown in today's world of complex general and class action litigation.
In that sense, there is a certain "cost of doing business" element in the call for Deloitte to respond to the letters
rogatory -- an offset to the undoubtedly considerable revenues that the appellant earns from providing high level

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT 4

PAGE 78

Page 8

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

and complex auditing services to companies such as Nortel.

24 Deloitte took an "all or nothing" approach before the application judge, contending that it would not be
feasible to narrow the request by attempting to separate the relevant from the irrelevant in the circumstances --
thereby tactically strengthening its argument based on "burdensomeness". On appeal, Deloitte attempted to
resile from that position and argued that, if the court were to uphold the enforcement order, it should order one
of a series of suggested options narrowing the production permitted under the letters rogatory. While it was open
to the application judge to narrow the request, she was not invited to do so, on the basis that it was impractic-
able. In my view, fairness considerations preclude Deloitte from reversing that position now, on appeal.

25 The application judge was satisfied that the Requested Documents had been identified by subject matter
and timeframe, and that this was sufficiently specific in the circumstances. She was also satisfied that the re-
quests for documents and for the testimony of Messrs. Clark and Wayland were not unduly burdensome or pre-
judicial to Deloitte, particularly in light of the undertakings given by OPT and the conditions that the application
judge intended to impose. Applying the specific criteria set out in *Optimight Communications Inc.* and the more
general principles synthesized in *Fecht* and in *France*, she concluded (reasons, para. 94):

I am of the view that justice requires the production of the Specified Documents and Specified Evid-
ence. I am satisfied that an order enforcing the letters rogatory in the form of Magistrate Judge
Dolinger's order of September 21, 2004 is in the interests of justice. The evidence is indeed relevant,
crucial and otherwise unavailable. Its production in the manner ordered will not be unduly burdensome
to Deloittes. Given the undertakings of the Applicants and the pre-existing confidentiality agreements
and protective orders, Deloittes' interests will not be unduly prejudiced in a manner that would infringe
Canadian sovereignty.

26 This was a discretionary decision and is entitled to considerable deference. I see no palpable or overriding
error on the part of the application judge in the findings she made and no error in principle justifying interfer-
ence on the part of this court.

**Disposition**

27 I would dismiss the appeal.

28 The respondent Trustees are entitled to their costs of the appeal, fixed in the amount of $20,000 all inclus- ive.

*E.E. Gillese J.A.:*

I agree.

*R.G. Juriansz J.A.:*

I agree.

*Appeal dismissed.*

FN1. Deloitte factum, para 68.

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT _____ 4

PAGE _____ 39

Page 9

2006 C.E.B. & P.G.R. 8206, 212 O.A.C. 286, 30 C.P.C. (6th) 261, 270 D.L.R.
(4th) 429

FN2. R.S.O. 1990, c. E.23.

FN3. R.S.C. 1985, c. C-5.

END OF DOCUMENT

Copr. © West 2008 No Claim to Orig. Govt. Works

EXHIBIT ____4____

PAGE ____4 0____

# EXHIBIT 5



# Zingre v. The Queen et al., 1981 CanLII 32 (S.C.C.)

Date:               1981-09-28
Parallel citations: [1981] 2 S.C.R. 392
URL:                http://www.canlii.org/en/ca/scc/doc/1981/1981canlii32/1981canlii32.html

Reflex Record (noteup and cited decisions)

**SUPREME COURT OF CANADA**
**Zingre v. The Queen et al., [1981] 2 S.C.R. 392**
**Date: 1981-09-28**

Alfred Robert Zingre (Respondent) Appellant;

and

Her Majesty The Queen (Applicant) Respondent;

and

Kurt Wuest and Oskar Reiser (Respondents). Oskar Reiser (Respondent) Appellant; and

Her Majesty The Queen (Applicant) Respondent;

and

Kurt Wuest and Alfred Robert Zingre

(Respondents).

1981: May 11; 1981: September 28.

Present: Laskin C.J. and Martland, Ritchie, Dickson, Beetz, Estey, McIntyre, Chouinard and Lamer JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR MANITOBA

*Evidence — Swiss nationals, now resident in Switzer—land and not subject to extradition, charged in Canada with criminal offences committed in Canada — Proceedings commenced in Swiss courts at Canada's request pursuant to treaty — Swiss examining judges seeking sworn testimony for pre-trial stage necessary to Swiss judicial system — Whether or not order allowing commission evidence should be made — Canada Evidence Act, R.S.C. 1970, c. E- l0, ss. 40, 43, 48.*

EXHIBIT ___S___

The Court in these appeals considered the right of a Manitoba court to issue a commission authorizing two Swiss "extraordinary investigating judges" to take testimony in Canada in respect of the prosecution in Switzerland of three Swiss nationals for crimes allegedly committed in Manitoba. Swiss law prevented the extradition of Swiss nationals from Switzerland but an Anglo-Swiss Treaty of 1880 provided for prosecution of a fugitive on the charge according to the laws of the fugitive's canton.

Held: The appeals should be dismissed.

[Page 393]

Section 43 of the Canada Evidence Act and the treaty must be fairly and liberally interpreted with a view to fulfilling Canada's international treaty obligation. Although generally only made for use at trial, orders for examinations for gathering evidence may be made at the pre-trial stage. No distinction is made in s. 43 between trial and pre-trial proceedings. The court should exercise its discretion and grant this order for the order would not compromise Canadian sovereignty and was necessary for the carriage of justice. Without it, the treaty would be frustrated for the Swiss authorities would be unable to continue the surrogate criminal proceedings being conducted by them at Canada's request. The requirements of s. 43 were met. The Swiss request, made through the proper diplomatic channels, complied with the treaty and satisfied that section. The charges laid in Winnipeg underlay the Swiss proceedings and met the condition that charges be before a foreign court. The testimony was sought by a foreign court.

Re Geneva v. Comtesse, [1959] O.R, 668; The Schooner Exchange v. M'Faddon & Others (1812), 7 Cranch's Reports 116; Gulf Oil Corporation v. Gulf Canada Limited et al., [1980] 2 S.C.R. 39; Re Radio Corporation of America v. The Rauland Corporation et al., [1956] O.R. 630; Radio Corporation of America v. Rauland Corporation and Another, [1956] 1 Q.B. 618; Re Request for International Judicial Assistance (1979), 49 C.C.C. (2d) 276; Re Uszinska and the Republic of France (1980), 52 C.C.C. (2d) 39; In Re Application by Letters Rogatory from United States District Court, Middle District of Florida, [1980] 1 W.W.R. 7; Re Kirchoffer v. The Imperial Loan and Investment Company (1904), 17 O.L.R. 295; Re Isler (1915), 34 O.L.R. 375; R. v. Dzambas (1973), 24 C.R.N.S. 118, referred to.

APPEALS from a judgment of the Manitoba Court of Appeal[1] allowing the Crown's appeal against an order in respect of Zingre setting aside an order against him, and dismissing Reiser's appeal with respect to the order made against him. Appeals dismissed.

[Page 394]

*K. P. Regier, Q.C., and A. Stewart, for the appellant Alfred Robert Zingre.*

*H. Walsh, Q.C., and P. Walsh, for the appellant Oskar Reiser.*

*J. P. Nelligan, Q.C., J. Chapman, Q.C., and Paul Teskey, for respondent Her Majesty The Queen.*

The judgment of the Court was delivered by

DICKSON J.—The Court in this appeal is called upon to consider an unusual procedural

EXHIBIT ___ S
PAGE _42_   1/27/2008

matter of some considerable importance. At issue is the right of a Manitoba court to issue a
commission authorizing two Swiss "extraordinary investigating judges" to take testimony in
Canada in respect of the prosecution in Switzerland of three Swiss nationals for crimes
allegedly committed in the Province of Manitoba.

l

The proceedings relate to the Churchill Forest Industries (Manitoba) Limited forestry
complex at the Town of The Pas in Manitoba constructed during the mid and latter 1960's.
The project, intended to stimulate industrial growth in an underdeveloped area of the
province, was basically financed by public funds through an agency of the Government of
Manitoba, namely, the Manitoba Development Fund, latterly known as the Manitoba
Development Corporation. As a result of an investigation into the construction and
financing of the project criminal charges were laid against the appellants Alfred Robert
Zingre and Oskar Reiser and others alleging fraud and conspiring to defraud. Large
amounts of money are involved. One of the charges against Zingre and Reiser and two
other named individuals alleges conspiracy to defraud the Manitoba Development
Corporation of $36,596,262.22. The investigation has been pursued in nine countries.

During the month of February 1972 members of the Royal Canadian Mounted Police and
two special prosecutors continued investigations in

[Page 395]

Europe. Prior to their attendance in Europe John N. Turner, then Attorney General and
Minister of Justice of Canada, issued a Letter of Request, directed to the Competent Legal
Authority, Switzerland, requesting the assistance of the Swiss police in the inspection of
records and documents of a number of companies and banks and in the interviewing of
persons, including the accused. In response to Mr. Turner's letter the Swiss Department of
Justice and Police provided assistance to the R.C.M.P. and the special prosecutors.

In the latter part of 1973 sworn testimony was given by some thirty-three witnesses before
the Chief Provincial Court Judge of Manitoba. The evidence was taken in four different
countries. On December 14, 1973 the judge issued warrants to arrest all the accused
persons including Zingre against whom nine warrants to arrest were issued for charges of
fraud, conspiracy to defraud and theft, and Reiser against whom twenty-three warrants to
arrest were issued for like charges.

Prior to and following December 14, 1973 attempts were made to locate and apprehend
the various accused persons with a view to having them extradited to Canada to face the
criminal charges outstanding against them. Zingre and Reiser were, however, residents of
Switzerland and, because of their citizenship, expressly exempted by treaty from
extradition.

On August 8, 1975 Howard Pawley, then Attorney General of Manitoba wrote to the Chief
of Extradition Section, Federal Department of Justice and Police, at Berne, Switzerland
making an official request that Zingre and Reiser and one Wuest be prosecuted in
Switzerland in a court of competent jurisdiction for offences committed in the Province of
Manitoba. The request was pursuant to the treaty and convention between Switzerland and
Great Britain for the mutual surrender of fugitive criminals, signed at Berne on November

EXHIBIT                    S

26, 1880. Article 1 of the treaty reads:

> Her Majesty the Queen of the United Kingdom of Great Britain and Ireland engages to
> deliver up, under the circumstances and on the conditions stipulated in the

[Page 396]

> present Treaty, all persons, and the Swiss Federal Council engages to deliver up,
> under the like circumstances and conditions, all persons, excepting Swiss citizens,
> who, having been charged with or convicted by the tribunals of one of the two High
> Contracting Parties of the crimes or offences enumerated in Article II, committed in
> the territory of the one party, shall be found within the territory of the other.
>
> In the event of the Federal Council being unable, by reason of his Swiss nationality, to
> grant the extradition of an individual who, after having committed in the United
> Kingdom one of the crimes or offences enumerated in Article II, should have taken
> refuge in Switzerland, the Federal Council engages to give legal effect to and
> prosecute the charge against him according to the laws of the Canton of his origin;
> and the Government of the United Kingdom engages to communicate to the Federal
> Council all documents, depositions, and proofs relating to the case, and to cause the
> commissions of examination directed by the Swiss Judge, and transmitted through
> the proper diplomatic channel, to be executed gratuitously.

The Canadian Embassy in Berne transmitted by a note verbale under the seal of the
Embassy of Canada to the Police Division of the Federal Department of Justice and Police
the request of the Attorney General of Manitoba for the prosecution of the Swiss citizens
Zingre, Reiser and Wuest. As the three accused were domiciled in separate Cantons of
Switzerland the Swiss authorities decided that the Canton of Thurgau should be the Canton
to handle the Canadian request. Extensive answers were provided by Canadian authorities
to questions posed by the Swiss authorities and there was an exchange of documents.

On June 27, 1978 the Public Prosecutor's office of the Canton of Thurgau rejected the
launching of criminal proceedings in that jurisdiction against the appellant Zingre, the
appellant Reiser, and Kurt Wuest on the basis that: (a) 16 charges involving conspiracy to
defraud were foreign to Swiss law; (b) 13 cases of theft against Oskar Reiser were covered
by the Statute of Limitations; (c) 16 charges of fraud required proof of deceitful misleading
which was not evident; (d) the entire matter was marked by political overtones and
damages were not substantiated as at that time; (e) the doubtful outcome did not warrant
the

[Page 397]

expenditure of the sum of at least 250,000 francs likely to be incurred in the investigation
and prosecution.

This ruling was appealed. On March 13, 1979 the Chamber of Indictment of the Canton of
Thurgau handed down its decision, ordering the Public Prosecutor to open the criminal
inquiry requested by Canada and Manitoba. Reiser appealed to the Supreme Court of
Switzerland. The appeal was dismissed.

EXHIBIT _____ **5**

PAGE ___ **44**

In accordance with the order of the Chamber of Indictment, two "extraordinary investigating judges" were appointed in Thurgau. The function of these magistrates is to examine documents and to interrogate witnesses in order to assist the authorities in determining whether the evidence justified a formal trial. At the end of the investigation a report is submitted to the State Attorney who will then make a decision as to whether or not there is sufficient evidence before him. If he thinks that a crime has been committed, he will submit the case to the competent court and the accused will have to stand trial to face the charges brought by the State Attorney.

II

As might be expected, much of the evidence relevant to the inquiry is in Canada, the situs of the alleged offence. On October 31, 1980 the Federal Office for Police Matters of the Federal Department of Justice and Police submitted to the Canadian Embassy in Berne a request for assistance addressed to the Chief Justice of the Court of Queen's Bench for the Province of Manitoba. The request aimed at Messrs. Hanspeter Hirt and August Biedermann, both extraordinary investigating judges for the Canton of Thurgau, being appointed as Commissioners to take evidence in Canada in respect of the prosecution in Switzerland of Zingre, Reiser and Wuest. The request recited the investigations taking place in the Canton of Thurgau dealing with possible criminal charges against Zingre, Reiser and Wuest for possible violations of the Criminal Laws of Canada and possible violations of the Criminal Laws of Switzerland. The charges laid in Canada against

[Page 398]

these three individuals are also recited. The following recital then appears:

AND WHEREAS it has been represented to the Department of Justice and Police of the Country of Switzerland that it is necessary for the purposes of the proper administration of justice and for the due determination of the matter in dispute between the parties that the following named persons:

Nine persons are named. This further recital follows:

AND WHEREAS Mr. Hanspeter Hirt, LL.M., extraordinary investigating judge for the Canton of Thurgau, Frauenfeld, and Mr. August Biedermann, Attorney, extraordinary investigating judge for the Canton of Thurgau, Frauenfeld, are the Examining Magistrates in charge of the conduct of this examination and accordingly would be responsible for the examination of, and production of all writings, records and documents by the aforesaid witnesses who are located in Canada.

The request asks Chief Justice Dewar to summon the witnesses and cause them to be examined under oath. All of the witnesses have indicated a consent to appear and give testimony as required.

On February 2, 1981 Mr. Justice Hamilton of the Manitoba Court of Queen's Bench made an order for the issuance of a commission to Messrs. Hirt and Biedermann for the examination under oath of the nine persons named in the request. Crown counsel and counsel for Reiser were present upon the motion. The appellant Zingre and Kurt Wuest were not present nor represented by counsel. Zingre filed a notice of motion for an order

EXHIBIT     $\underset{\text{PAGE}}{\text{5}}$

Case 2:04-cv-09049-DOC-RNB  Document 4721-5  Filed 01/26/09  Page 51 of 60  Page ID
#:145956

rescinding or reversing the order, in response to which the order issuing the commission
was discharged and set aside with respect to Zingre on the ground that s. 43 of the Canada
Evidence Act, R.S.C. 1970, c. E-10 had not been complied with. Section 43 provides that:

> 43. Where, upon an application for that purpose, it is made to appear to any court or
> judge, that any court or tribunal of competent jurisdiction, in the Commonwealth and
> Dependent Territories, or in any foreign country, before which any civil, commercial or
> criminal matter is pending, is desirous of obtaining the testimony

[Page 399]

> in relation to such matter, of a party or witness within the jurisdiction of such first
> mentioned court, or of the court to which such judge belongs, or of such judge, the
> court or judge may, in its or his discretion, order the examination upon oath upon
> interrogatories, or otherwise, before any person or persons named in the order, of
> such party or witness accordingly, and by the same or any subsequent order may
> command the attendance of such party or witness for the purpose of being examined,
> and for the production of any writings or other documents mentioned in the order, and
> of any other writings or documents relating to the matter in question that are in the
> possession or power of such party or witness.

Two other sections of the Canada Evidence Act should be noted. Section 40 reads:

> 40. This Part applies to the taking of evidence relating to proceedings in courts out of
> Canada.

Section 48 reads:

> 48. (1) The court may frame rules and orders in relation to procedure, to the evidence
> to be produced in support of the application for an order for examination of parties
> and witnesses under this Part, and generally for carrying this Part into effect.

> (2) In the absence of any order in relation to such evidence, letters rogatory from any
> court of justice in the Commonwealth and Dependent Territories, or from any foreign
> tribunal, in which such civil, commercial or criminal matter is pending, shall be
> deemed and taken to be sufficient evidence in support of such application.

Mr. Justice Hamilton held there was no "pending criminal matter" within the meaning of s.
43 of the Canada Evidence Act. Reference was made to Re Geneva v. Comtesse[2], an
application by the Swiss Consulate for an order pursuant to the Canada Evidence Act.

The Crown appealed. So did Reiser. In brief reasons, Freedman C.J.M., speaking for the
Court said:

> The main ground of attack by counsel for Reiser and counsel for Zingre is that an
> order should go only if the request for it emanates from a court or tribunal and if the
> evidence it seeks is to be used at a trial in respect of

[Page 400]

EXHIBIT ___5___

PAGE __66__

which a charge has been laid. It is contended that the investigating judges who have
been authorized to take the testimony in Manitoba are not members of a court or
tribunal, and are seeking the evidence, not for a trial, but rather to determine whether
the evidence is of sufficient weight to support a decision that the accused be placed
on trial.

The Court referred to the difference in nature and function of judicial personnel here and
abroad, more specifically, the fact that judges frequently carry on an investigatory function
in European jurisdictions. The Court added:

> We must add that Hamilton J. erred in saying that there was no charge outstanding.
> The charges laid in Winnipeg qualified sufficiently for this purpose.

and concluded:

> We conclude accordingly that the persons who are to take the testimony in Manitoba
> are indeed "judges" and are, ipso facto, members of a court. Further, the testimony
> they obtain here will be available for use at a trial in Switzerland.

> We should not forget that the criminal proceedings originated in Manitoba, and that
> Manitoba has sought the assistance of the Swiss authorities in accordance with the
> terms of Article 1 Paragraph 2 of the Treaty. It is in furtherance of the obligations
> under the treaty that Switzerland is now seeking the assistance of the Manitoba
> courts in this matter.

The Court allowed the Crown's appeal against the order respecting Zingre and dismissed
Reiser's appeal in respect of the order against him.

III

As that great jurist, U.S. Chief Justice Marshall, observed in The Schooner Exchange v.
M'Faddon & Others[3] at pp. 136-37, the jurisdiction of a nation within its own territory is
necessarily exclusive and absolute, susceptible of no limitation not imposed by itself, but
common interest impels sovereigns to mutual intercourse and an

[Page 401]

interchange of good offices with each other.

It is upon this comity of nations that international legal assistance rests. Thus the courts of
one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not
as a matter of obligation but out of mutual deference and respect. A foreign request is
given full force and effect unless it be contrary to the public policy of the jurisdiction to
which the request is directed (see Gulf Oil Corporation v. Gulf Canada Limited et al.[4]) or
otherwise prejudicial to the sovereignty or the citizens of the latter jurisdiction.

The interests of sovereignty have come into conflict with the principle of judicial comity in a
number of situations and Canadian courts have refused to order the testimony of the
individual for use in the foreign proceedings: for example, (i) where a request for production
of documents was vague and general (Re Radio Corporation of America v. The Rauland

EXHIBIT ____S____

PAGE ____47____ 1/27/2008

Corporation et al.[5]) and the court held that if the litigation were being conducted in Canada the litigants would not be required to comply with such a request; (ii) when discovery was sought against an individual not a party to the litigation, in violation of local laws of civil procedure (Radio Corporation of America v. Rauland Corporation and Another [6]); (iii) when the main purpose of the examination was to serve as a "fishing expedition", a procedure not allowed in English or Canadian courts. (See RCA case (England), supra, per Lord Goddard C.J. at p. 625); (iv) where the granting of the order would place the person sought to be examined in the position of having to commit an offence such as violation of s. 178.2 of the Criminal Code in order to comply with the order (Re Request for International Judicial Assistance[7]); (v) where the person whose attendance for examination is sought is an accused in pending criminal proceedings in the requesting court and the testimony sought is for

[Page 402]

the purpose of such proceedings (Re Uszinska and the Republic of France[8]).

It is sometimes said that an order for examination will never be issued if the testimony is to be used as part of a pre-trial or investigatory procedure. This rule has been applied in large part in civil proceedings in which American courts have sought the assistance of Canadian authorities in the discovery process. It should be remembered that American rules relating to discovery are much broader than those in Canada and this in part may explain the reluctance of Canadian courts to enforce letters rogatory in these instances. While the rule has its genesis in civil litigation (the first application of the rule in Canada appears in the judgment of Gale J. in Re Radio Corporation of America v. The Rauland Corporation et al., supra, at p. 635) it has also been applied in criminal proceedings. In Re Application by Letters Rogatory from United States District Court, Middle District of Florida[9], an American criminal court sought documents for use at a trial of American citizens on charges of income tax evasion. Mr. Justice Miller of the Alberta Supreme Court granted the application for an order, but he noted the following principle [at p. 18]:

> I infer from this that it must be established to the satisfaction of this court that the material requested by the Florida court in the letters rogatory is to be used at the trial of the criminal charges pending against the named persons, as set out in the letters rogatory. It also follows from this that, if the purpose of requesting the information or assistance is to provide a basis for an examination for discovery or a preliminary inquiry, the court should not accede to the request.

It may be worth noting that in the RCA litigation in England (applied by Gale J. in the Canadian litigation), Devlin J., supra, at pp. 643-44, spoke of "pre-trial procedure" and discovery of

[Page 403]

documents in these terms:

> In the United States of America it is not restricted merely to obtaining a disclosure of documents from the other party to the suit, but there is a procedure, which might be called a pre-trial procedure, in the courts of the United States which allows interrogation not merely of the parties to the suit but also of persons who may be

EXHIBIT     $\int$

PAGE    46

witnesses in the suit, or whom it may be thought may be witnesses in the suit, and
which requires them to answer questions and produce documents.

In general, our courts will only order an examination for the purpose of gathering evidence
to be used at a trial, but that is not to say that an order will never be made at the pre-trial
stage. Section 43 does not make a distinction between pre-trial and trial proceedings. It
merely speaks of the foreign court or tribunal "desiring" the testimony of an individual "in
relation to" a matter pending before it. I do not think it would be wise to lay down an
inflexible rule that admits of no exceptions. The granting of an order for examination, being
discretionary, will depend on the facts and particular circumstances of the individual case.
The Court or judge must balance the possible infringement of Canadian sovereignty with
the natural desire to assist the courts of justice of a foreign land. It may well be that,
depending on the circumstances, a court would be prepared to order an examination even
if the evidence were to be used for pre-trial proceedings. An illustration is the case of Re
Kirchoffer v. The Imperial Loan and Investment Company[10]. An action had been brought
in Manitoba against a corporation by a former employee. The plaintiff had sought to
examine the former manager of the defendant corporation on discovery, but the individual
was a resident of Ontario and he refused to comply. The plaintiff then sought an order from
the Ontario Court under the provisions of The Ontario Evidence Act and Canada Evidence
Act compelling the former manager to submit to discovery. It was argued that the order
should be refused, as the statute did not contemplate examinations for discovery.
Chancellor Boyd at p. 296] rejected the argument and ordered the examination for

[Page 404]

discovery:

> The Imperial Statute 19 & 20 Vict. ch. 113, sec. 1, relates to witnesses; ours extends
> to parties as well as witnesses: R.S.C. 1886, ch. 140.

> The order asked is to examine Dr. Kertland, a manager of the defendants, for
> discovery. As such officer he is a quasi party, or stands for the person to be examined
> for the corporation who is the defendant. I think the statute applies on a liberal
> construction to such a case, and grant the order as upon an ex parte application.

In Re Isler[11] the Ontario High Court ordered the examination of an individual based on
letters rogatory from a "juge d'instruction" in France. The function of the "juge d'instruction"
is described by René David in English Law and French Law (1980) at p. 65 as follows:

> The role of a juge d'instruction is not to pronounce if the accused is guilty or not guilty;
> it is only to direct and supervise the procedure of enquiry led by ministère public and it
> is to decide, at the close of such enquiry, if it is appropriate or not to remand the
> accused for trial before a criminal Court ... The accused will only appear before such
> Court if, in the mind of juge d'instruction, there is a probability that he is guilty.

It is clear that the testimony was for use at a pre-trial inquiry, yet the court ordered the
examination.

In Re Geneva v. Comtesse, supra, the Ontario High Court received letters rogatory from a
"juge d'instruction" in Switzerland. The Court refused to order the examination on another

EXHIBIT _____ **S**

ground, with no reference being made to the fact that the testimony was for use at a pre-trial inquiry. Where there is no limitation or infringement of Canadian sovereignty, and where the facts are such that justice can only be done by ordering the examination, the court should not refuse to make the order solely because the testimony relates to a pre-trial proceeding.

[Page 405]

IV

Section 43 of the Canada Evidence Act has its origin in s. 1 of the English Foreign Tribunals Evidence Act, 1856 (U.K.), c. 113, s. 1, which applies to civil proceedings. This section was made to apply to evidence for foreign criminal proceedings by s. 24 of The Extradition Act, 1870, 1870 (U.K.), c. 52.

In Canada, legislation was enacted duplicating the English legislation: 1868 (Can.), c. 76, s. 1; 1870 (U.K.), c. 52, s. 24; 1877 (Can.), c. 25, s. 4; 1883 (Can.), c. 35, s. 1. The criminal and civil provisions were amalgamated in R.S.C. 1886, c. 140, in An Act respecting the taking of Evidence relating to proceedings in Courts out of Canada which subsequently in 1906 was incorporated in the Canada Evidence Act, R.S.C. 1906, c. 145, ss. 38-46. Section 41 of the 1906 Canada Evidence Act is virtually identical with the present s. 43.

Section 43 is framed in extremely broad terms. It provides, as far as relevant:

> Where, upon an application for that purpose, it is made to appear to any court or judge, that any court or tribunal of competent jurisdiction, ... in any foreign country, before which any civil, commercial or criminal matter is pending, is desirous of obtaining the testimony in relation to such matter, of a ... witness within the jurisdiction of such first mentioned court, ... the court or judge may, in its or his discretion, order the examination upon oath ... of such party or witness accordingly

The section merely requires that:

> 1. There be an application made to a Superior Court in Canada (s. 41 defines 'court' as the Supreme Court of Canada and any Superior court of a province);

> 2. There must be a civil, commercial or criminal matter 'pending' before a foreign court or tribunal;

> 3. It must be 'made to appear' to the Canadian court or judge that the foreign tribunal is 'desirous' of obtaining the testimony of a party or witness within Canadian jurisdiction in relation to the pending matter.

If these conditions are satisfied, the Canadian court or judge "may, in its or his discretion" order

[Page 406]

the examination under oath of the party or witness concerned.

EXHIBIT ___5___

PAGE ___50___

The appellants take four points. First, it is said that the request for assistance did not emanate from a court or tribunal of competent criminal jurisdiction in Switzerland. The letters rogatory in this case emanate from a department of government, the Federal Office for Police Matters of the Federal Department of Justice and Police (Office fédéral de la police).

I do not think this objection can be sustained, having regard to the legal proceedings conducted to date in Switzerland and the terms of the Treaty and of s. 43 of the Canada Evidence Act. Section 43 simply requires that there be "an application" and on that application, it be "made to appear" that a court or tribunal is "desirous" of obtaining testimony. The section does not speak of a specific application or request from a tribunal. I would interpret s. 43 in light of Article I of the 1880 Treaty, which recites that the commissions of examination shall be transmitted through the "proper Diplomatic channel". I consider that the Federal Office for Police Matters of the Federal Department of Justice and Police is the "proper Diplomatic channel", in light of the fact that the Swiss Chief of Federal Police was one of the signatories of the 1880 Treaty. Since the request complied with the Treaty, I would consider it sufficient for the purposes of s. 43 of the Act. In any event, the primary source of the letters rogatory was a "tribunal of competent jurisdiction" desirous of obtaining the testimony of witnesses within the jurisdiction of the Court of Queen's Bench in Manitoba.

Second, it is submitted that the evidence is sought by the Swiss Department of Justice and Police not for the purpose of trial but for the purpose of carrying on an investigation which is deemed necessary in order to determine whether criminal charges should be laid against the appellants. I have already discussed the "pre-trial" issue, and it is my view that, depending on the circumstances, it may be appropriate to invoke s. 43 in a pre-trial context. In my opinion, the circumstances of the present case are such that the court should exercise its discretion in favour of the

[Page 407]

investigating magistrates. I reach this conclusion because the contrary view would result in the purpose of the 1880 Treaty being completely frustrated. Article I of that Treaty is designed to ensure that Swiss nationals who commit crimes in Great Britain, or in Canada, are prosecuted in Switzerland. There will be no evidence of the crime in Switzerland, the crime having been committed in another jurisdiction. It will be impossible for the Swiss authorities to fulfil their obligations unless they are permitted to gather evidence at the scene of the alleged offence. This is recognized in the treaty itself, which makes explicit provision for the gathering of evidence by the Swiss magistrate in Great Britain. In short, if we prohibit the Swiss authorities from gathering evidence here, we will effectively make it impossible for them to conduct the prosecution which Canadian authorities asked them to undertake. The Swiss will not hold a trial because the investigating magistrates have not gathered sufficient evidence. We will not permit the magistrates to gather evidence because a trial has not yet been commenced. The only beneficiaries from this absurdity would be the accused who would be exempted from answering for their alleged offences.

Third, it is argued that in order for a criminal matter to be "pending" before a foreign court, a criminal charge or charges must be outstanding. Counsel take issue with the holding of the Manitoba Court of Appeal that the "charges laid in Winnipeg qualified sufficiently" for the purpose of concluding there was a charge outstanding. Again, I think s. 43 must be read

EXHIBIT

S

and construed in the light of the Treaty. The effect of Article I is this. If a Swiss national commits an Article II crime or offence in England, or in Canada, and seeks refuge in Switzerland, where he is non-extraditable, Switzerland will give legal effect to and prosecute the charge against him according to the laws of the Canton of his origin. Switzerland in effect conducts what has been referred to as a "surrogate" criminal prosecution in respect of the English or Canadian, as the case may be, charges. Also it is obvious, for the reasons given in discussing the second point raised by the appellants, that if charges had to be laid in Switzerland before the

[Page 408]

Swiss authorities had the right to investigate the alleged offence in the country of its commission, the treaty would be rendered completely ineffective. I have no difficulty in concluding that a criminal matter is pending before a court or tribunal of competent jurisdiction in Switzerland affecting the appellants.

Fourth, according to s. 43 it must be "made to appear" that a foreign court is desirous of obtaining the testimony of the witnesses in Canada. The Court of Appeal held that the "extraordinary examining judges" were judges and, ipso facto, members of a court. These judges were desirous of obtaining the testimony of the witnesses in Canada. Therefore, the Court of Appeal concluded, the requirement of s. 43 had been satisfied.

The appellants attack this argument. They suggest that the examining judges are not members of any court, but rather are impartial investigating officers similar to police investigators despite their designation as "extraordinary investigating judges" or "examining magistrates". That contention is incorrect in that it fails to have regard to the differences between the continental systems of criminal justice and our own.

One should be wary of analysing the Swiss judicial system using our model. The European approach is quite different. In continental systems of criminal justice, there are three distinct stages to criminal procedure. The first is a preliminary investigation conducted by police officials and prosecution. This is followed by a judicial phase in which there is investigation by career judges known as "examining magistrates" or "juges d'instruction". Witnesses are required to testify and documents are examined. If, following this judicial inquiry, the case is deemed by the prosecuting attorneys to be an appropriate one for trial a formal trial is held. (See generally Gerhard O. W. Mueller and Fré Le Poole-Griffiths, Comparative Criminal Procedure (1969) ch. 2).

What is now transpiring is the judicial investigating procedures of the Swiss judicial system. It amounts to a procedure similar to the preliminary

[Page 409]

inquiry in Canadian criminal procedure. It appears that this procedure was contemplated in the 1880 Treaty, Article I speaks of "commissions of examination directed by the Swiss judge". The Article speaks of a "judge" and not of a "court". We must assume that the drafters of the Treaty were familiar with the Swiss Criminal Procedure and the reference to a "Swiss judge" must have been to an examining magistrate charged with taking evidence from witnesses. Thus the interpretation suggested by the Court of Appeal of Manitoba seems to accord with the intention of the Treaty.

EXHIBIT 5
PAGE

Even if the Court of Appeal was wrong, it can be said that the Chamber of Indictment is
"desirous" of receiving the testimony of the witnesses in Canada. The Chamber of
Indictment has general powers of supervision over the investigation of crime. The Chamber
ordered the investigation in this case, and it made specific mention of the appointment of
an examining judge. The Chamber of Indictment stated:

Art. I, par. 2 of the Swiss-British Treaty of Extradition of November 26, 1880 (AS12 page
114) obligates Switzerland to "take over the criminal litigation of the applications in
accordance with the law of the home Canton" as it pertains to Swiss citizens. This includes
the possibility to reject the initiation of criminal investigations if the examining judge is of the
opinion that the charges brought before him are not punishable and that the legal
conditions for prosecution by law are not given.

V

This case is exceptional and differs in vital respects from the other cases to which the
Court has been referred. The argument in favour of granting the order in the case at bar
does not rest merely on the notion of "comity". It rests on treaty. In responding affirmatively
to the request which has been made the Court will be recognizing and giving effect to a
duty to which Canada is subject, by treaty, under international law. It is common ground
that the treaty applies. None of the cases cited by the appellants involves a situation where
Canada is under obligation to provide assistance to foreign authorities. It is the duty of the
Court, in interpreting the 1880 Treaty and s. 43 of the Canada Evidence Act to give them a

[Page 410]

fair and liberal interpretation with a view to fulfilling Canada's international obligations.
Canada forced Switzerland to undertake criminal proceedings because Canada was
unable to extradite the appellants from Switzerland. Now, Switzerland is asking Canada for
assistance in those proceedings. The Treaty of 1880 places Canada under a specific
obligation to comply with the Swiss request. If Canada denies the Swiss request it will be in
breach of its international obligations. By the terms of the Treaty, orders for commission
evidence, as requested by the Swiss, are part and parcel of the surrogate criminal
proceedings in Switzerland. It must be assumed in the absence of evidence to the contrary
that the request has been made in compliance with the Treaty, in conformity with Swiss
rules and practice, and "with a view to the better administration of justice, and to the
prevention of crime", the purpose for which the Treaty, as expressly stated herein, was
entered into.

As the Canadian Department of External Affairs stated in a note to the Swiss Federal
Policy Department, at the time of Canada's appeal from the decision of the public
prosecutor "it is a recognized principle of international customary law that a state may not
invoke the provisions of its internal law as justification for its failure to perform its
international obligations."

The crimes alleged against the appellants were committed in Canada and, Swiss
authorities are simply responding to a Canadian request that prosecution be initiated in
Switzerland. It is one thing for country A to ask country B to permit the examination of
citizens of country B in respect of a transaction arising in country A. Country B has no
direct interest in the proceedings and it is proper to interpret s. 43 in a fairly strict fashion. It

EXHIBIT **5**

PAGE **53** 1/27/2008

is quite another thing for country A to ask country B to permit the examination of citizens of country B in respect of matters arising in country B. Country B, in this case Canada, has a direct interest in the proceedings, the prosecution of the appellants.

[Page 411]

To the extent that the Manitoba courts have a discretionary right to issue the order requested, I can see no basis upon which the discretion should be exercised in favour of the appellants. Warrants for the arrest of the appellants have been outstanding since 1973. As Swiss nationals, they rely on the terms of the 1880 Treaty to protect them from extradition. They invoke, from a distance, Canadian legal processes in an attempt to frustrate the very Treaty upon which they rely. We are advised that none of the witnesses sought to be interviewed objects in any way to appearing. The only objection has come from the fugitive accused. Crown counsel challenged the status of the appellants. He contended that the appellants had no right even to appear before Canadian courts considering they are fugitives from charges laid in Manitoba: R. v. Dzambas[12]. It is not necessary for the resolution of this appeal to decide whether the appellants have status. Their anomalous position is, however, relevant to the exercise of discretion.

I would dismiss the appeals. No costs should be awarded.

Appeals dismissed.

*Solicitors for Alfred Robert Zingre: Regier, Stewart, Winnipeg.*

*Solicitors for Oskar Reiser: Walsh, Micay & Company, Winnipeg.*

*Solicitors for Her Majesty the Queen: Simkin, Gallagher, Winnipeg.*

[1] February 13, 1981.

[2] [1959] O.R. 668.

[3] (1812), 7 Cranch's Reports 116.

[4] [1980] 2 S.C.R. 39.

[5] [1956] O.R. 630.

[6] [1956] 1 Q.B. 618.

[7] (1979), 49 C.C.C. (2d) 276.

[8] (1980), 52 C.C.C. (2d) 39.

[9] [1980] 1 W.W.R. 7.

EXHIBIT _S_

PAGE _S 9_

[10] (1904), 7 O.L.R. 295.

[11] (1915), 34 O.L.R. 375.

[12] (1973), 24 C.R.N.S. 118.

Scope of Databases | RSS Feeds | Terms of Use | Privacy | Help | Contact Us | About

by *Lex*UM for the Federation of Law Societies of Canada

EXHIBIT _5_

PAGE _55_