1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7  MATTEL, INC.,                      )
                                      )
8                      Plaintiff,     )
                                      )
9           vs.                       )   No. CV 04-09049
                                      )
10  MGA ENTERTAINMENT, inc., et. Al., )   trial day 6,
                                      )   morning session
11                     Defendants.    )   Pages 1007 - 1096
    _____   )
12  AND CONSOLIDATED ACTIONS,         )
    _____   )
13

14

15    REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16    Riverside, California

17    Tuesday, June 3rd, 2008

18    8:53 A.M.

19

20

21

22

23    THERESA A. LANZA, RPR, CSR
      Federal Official Court Reporter
24    3470 12th Street, Rm. 134
      Riverside, California  92501
25    951-274-0844
      WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                            TIMOTHY ALGER
                              William price
 7                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                       LOS ANGELES, California  90017
                         213-624-7707
 9


10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                       BY:  THOMAS J. NOLAN
                              JASON RUSSELL
13                            RAOUL KENNEDY
                              Lauren aguiar
14                            Carl roth
                         300 SOUTH GRAND AVENUE
15                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
16

17

18

19

20

21

22

23

24

25
```

tuesday, june 3rd, 2008                    trial day 6, morning session

```
1                      I N D E X

2                                               Page

3    Plaintiff case (cont'd)......................... 1015

4

5

6    PLAINTIFF
     WITNESS          DIRECT       CROSS      REDIRECT      RECROSS
7    Jennifer Lynn Maurus

8    BY MR. QUINN     1015                    1054, 1062
     BY MR. NOLAN                  1031                    1058, 1063
9

10
     PLAINTIFF
11   WITNESS          DIRECT       CROSS      REDIRECT      RECROSS
     Nana Ashong (via videotaped deposition)
12
                      1080
13

14

15
          EXHIBITS          RECEIVED
16
          1352-1            1025
17

18

19

20

21

22

23

24

25
```

1    RIVERSIDE, CALIFORNIA; Tuesday, June 3rd, 2008; 8:53 A.M.

2                              -oOo-

3         **THE COURT:**  GOOD MORNING, COUNSEL.

4         CALLING THE CASE OF MATTEL VERSUS MGA, CASE NUMBER

5    CV 04-9049.                                                      00:00

6         COUNSEL, PLEASE MAKE YOUR APPEARANCES.

7         **MR. QUINN:**  JOHN QUINN FOR MATTEL.

8         **MR. NOLAN:**  TOM NOLAN AND LAUREN AGUIAR ON BEHALF OF

9    MGA.

10        **THE COURT:**  GOOD MORNING TO YOU ALL.                     00:00

11        I UNDERSTAND WE ARE PLANNING TO PLAY THE NANA ASHONG

12   DEPOSITION LATER.  I WANTED TO RULE ON THE OBJECTIONS AT THIS

13   TIME.

14        FIRST ONE, ON PAGE 15, LINES 7 THROUGH 12, THE

15   OBJECTIONS ARE SUSTAINED.                                         00:00

16        TURNING TO PAGE 19, THE OBJECTIONS ARE SUSTAINED IN

17   PART AND OVERRULED IN PART.  THE LAST SENTENCE IS ACTUALLY ON

18   PAGE 20, LINES 1 THROUGH 3, BEGINNING WITH THE WORD "SOME" AND

19   ENDING WITH THE WORD "NEEDED."  THE OBJECTION IS SUSTAINED

20   THERE.                                                            00:01

21        OBJECTIONS ON PAGE 21 ARE OVERRULED.

22        OBJECTIONS ON PAGE 34 ARE SUSTAINED.  THEY'RE POORLY

23   FORMED QUESTIONS.

24        SKIP TO PAGE 182, WHICH I BELIEVE IS THE NEXT SET OF

25   OBJECTIONS, IF I'M CORRECT HERE.  THE OBJECTIONS ON 182 ARE      00:02

1    OVERRULED.

2           OBJECTIONS ON PAGE 203 -- LET ME STOP HERE FOR A

3    SECOND, BECAUSE THIS WAS AN ISSUE THAT WAS RAISED YESTERDAY.

4           STARTING ON 203, THERE'S A SERIES OF DOCUMENTS --

5    E-MAILS THAT CAME IN IN 2001, APRIL OF 2001.  I UNDERSTAND THAT     00:02

6    MATTEL IS SEEKING TO INTRODUCE THIS TESTIMONY RELATED TO A

7    CLAIM THAT THE WORD "ANGEL" WAS A CODE WORD FOR BRATZ.  THERE'S

8    SOME QUESTIONS LATER ON THAT ADDRESS THAT SPECIFICALLY, BUT A

9    LOT OF THIS LEADING UP TO THAT IS RELEVANT.  THE DOCUMENTS ARE

10   NOT RELEVANT.                                                       00:03

11          I'LL HEAR FROM SOMEBODY ON THIS.

12          YOU WANT TO GO THROUGH EXHIBITS 4913, 4914,

13   ET CETERA, BUT WHEN YOU GET UP TO PAGE 213 IS THE FIRST

14   QUESTION RELATING TO ANGEL.  AND I CAN UNDERSTAND THAT QUESTION

15   COMING IN, AND THERE NEEDS TO BE A PROPER FOUNDATION FOR THAT       00:03

16   QUESTION.  BUT BEYOND THAT, I REALLY THINK THAT WE'RE GETTING

17   INTO THINGS THAT ARE OPENING THE DOOR FOR MATTERS THAT THE

18   COURT HAS ALREADY SUSTAINED RELEVANCY OBJECTIONS from MATTEL

19   ON, QUITE FRANKLY.

20          **MR. PROCTOR:**  RIGHT.                                     00:03

21          IN GENERAL, WE AGREE THAT THE 2001 E-MAILS, 2001

22   DEVELOPMENT, THAT IS 1-B AND NOT RELEVANT TO 1-A.

23          SOME OF THESE DOCUMENTS -- AND THEY, PERHAPS, DON'T

24   ALL NEED TO BE THERE, AND PART OF THIS PROCESS IS DESIGNATING

25   SO THE COURT CAN SEE WHAT THE FOUNDATION IS.                        00:04

1    **THE COURT:** RIGHT.

2    **MR. PROCTOR:** SOME OF THESE DOCUMENTS ALSO, ASIDE

3  FROM THE ANGEL ISSUE WE DISCUSSED YESTERDAY, GO TO THE E-MAIL

4  WHICH HAS NOW BEEN INTRODUCED INTO EVIDENCE, WHERE MS. ASHONG

5  WRITES THAT 'THE KEY LEGALLY RELEVANT DATES FOR BRATZ ARE AS          00:04

6  FOLLOWS,' AND THEN WRITES THE DATE OF CREATION AS SEPTEMBER 18,

7  2000.

8    **THE COURT:** THE DATE OF CREATION QUESTION, I'M GOING

9  TO OVERRULE THE OBJECTION ON. THERE'S ONE QUESTION IN HERE,

10  AND I understood that; THAT'S FINE.                                   00:04

11    BUT ALL OF THE REST OF THIS, EXCEPT FOR THE ANGEL --

12  AND I THINK YOU CAN PROBABLY GET THIS IN AND LAY THE FOUNDATION

13  SIMPLY THROUGH 4916, WHICH IS ON PAGE 212, AND THEN THE

14  QUESTION ON 213, WHERE YOU GET THE 'YES' ANSWER, AND BE DONE

15  WITH IT.                                                             00:04

16    **MR. PROCTOR:** YES. AND THE BUILDUP IS FOUNDATIONAL.

17  AND IF THE COURT DOESN'T REQUIRE IT, THAT'S FINE.

18    **THE COURT:** THEN I'M GOING TO SUSTAIN THE OBJECTION

19  ON 203. I'M GOING TO SUSTAIN THE OBJECTION ON 205. I'M GOING

20  TO SUSTAIN THE OBJECTION ON 206. I'M GOING TO SUSTAIN THE             00:04

21  OBJECTION ON 208, BOTH OBJECTIONS ON 209. I WILL OVERRULE THE

22  OBJECTION ON 212.

23    **MR. NOLAN:** 209, WAS THAT SUSTAINED?

24    BOTH OBJECTIONS ON 209 ARE SUSTAINED?

25    **THE COURT:** BOTH OBJECTIONS ON 209 ARE SUSTAINED,               00:05

1  THAT'S CORRECT.

2         ON 212, I WILL OVERRULE THE OBJECTION TO GET IN 4916,

3  WHICH LAYS THE FOUNDATION FOR THE QUESTION ON 213, AND I'LL

4  OVERRULE THE OBJECTION ON 213.

5         I WISH THERE WAS A WAY OF DOING THIS WITHOUT GETTING      00:05

6  INTO OTHER INFORMATION ON THERE.  MAYBE THE PARTIES CAN DISCUSS

7  THE REDACTION OF DOCUMENT 4916, BECAUSE THE ONLY PART THAT'S

8  RELEVANT IS THE PART THAT RELATES TO ANGEL.

9         **MR. NOLAN:**  WE'LL TRY TO DO THAT, YOUR HONOR.

10        **THE COURT:**  I'LL LEAVE THAT TO THE PARTIES IN TERMS     00:05

11 OF THE ACTUAL DOCUMENT ITSELF.

12        I'LL OVERRULE THE OBJECTION ON 214.  THAT'S ANOTHER

13 ANGEL-SPECIFIC QUESTION, ALTHOUGH --

14        I'LL LEAVE IT AT THAT.

15        THEN ON PAGES 216 AND 217, THIS IS THAT DATE OF            00:06

16 CREATION ISSUE.  I'M GOING TO OVERRULE THE OBJECTION ON

17 RELEVANCY, ON THAT GROUND.

18        218, I'LL SUSTAIN THE OBJECTION.

19        220, I WILL OVERRULE THE OBJECTION.

20        ON PAGE 280, I WILL SUSTAIN THE OBJECTION.  THE            00:06

21 QUESTION IS VERY AMBIGUOUS.  I'M NOT SURE WHAT IT MEANS.

22        ON PAGE 282, THERE ARE THREE OBJECTIONS.  I'LL

23 OVERRULE THE FIRST ONE.  IT GOES TO FOUNDATION.  I'LL SUSTAIN

24 THE NEXT TWO PORTIONS THAT ARE OBJECTED TO.  THE LAST ONE IS

25 BEING SUSTAINED JUST BECAUSE IT'S SPECULATION.  THERE'S NOT       00:07

```
 1   ADEQUATE FOUNDATION.

 2           MS. AGUIAR:  COULD WE GET LINE NUMBERS FROM YOU ON

 3   THAT.  THERE'S A LITTLE CONFUSION.

 4           THE COURT:  WHAT?

 5           MS. AGUIAR:  WHICH LINE NUMBERS ON 282?              00:07

 6           THE COURT:  I'M OVERRULING THE OBJECTION -- THAT'S A

 7   VERY GOOD POINT.  THANK YOU, COUNSEL.

 8           I'M OVERRULING THE OBJECTION ON LINES 13 THROUGH 14;

 9   I'M SUSTAINING THE OBJECTION ON 15 THROUGH 20; AND THEN I'M

10   SUSTAINING THE OBJECTION ON 24 AND 25, AND THEN ON PAGE 283,  00:07

11   LINES 1 THROUGH 4.

12           MS. AGUIAR:  THANK YOU.

13           THE COURT:  ON PAGE 288 AND 289, I'M OVERRULING THE

14   OBJECTIONS ON BOTH PAGES, AS I AM ON 290.

15           AND THAT IS IT.                                      00:08

16           ANY QUESTIONS ON THE COURT'S RULINGS?

17           MR. QUINN:  THANK YOU, YOUR HONOR.

18           MR. NOLAN:  THANK YOU, YOUR HONOR.

19           THE COURT:  LET'S BRING IN THE JURY.

20           OH, I ASKED THE ATTORNEYS THAT WERE HERE YESTERDAY   00:08

21   ABOUT TOMORROW AFTERNOON.

22           Is that FINE WITH MGA?

23           MR. NOLAN:  NO PROBLEM AT ALL, YOUR HONOR.

24           MR. QUINN:  FINE, YOUR HONOR.

25           THE COURT:  VERY WELL.                               00:08
```

```
 1            I'M GOING TO TRY TO START TOMORROW MORNING WITH THE

 2    JURY AT 8:30, IF IT'S OKAY WITH THE JURY, JUST SO WE GET IN A

 3    FULL HALF DAY.

 4            (WHEREUPON, JURORS ENTER COURTROOM.)

 5            THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.          00:14

 6            COUNSEL, YOU MAY PROCEED.

 7            MR. QUINN:  THANK YOU, YOUR HONOR.  MATTEL CALLS

 8    JENNIFER MAURUS.

 9            THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

10    YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

11    BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

12    HELP YOU GOD?

13            THE WITNESS:  YES.

14            THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

15    YOUR LAST NAME FOR THE RECORD.

16            THE WITNESS:  JENNIFER LYNN MAURUS, M-A-U-R-U-S.

17                    DIRECT EXAMINATION

18    BY MR. QUINN:

19    Q   GOOD MORNING, MS. MAURUS.  MY NAME IS JOHN QUINN, AND YOU

20    AND I HAVE NEVER MET BEFORE.                                   00:15

21    A   RIGHT.

22    Q   I REPRESENT MATTEL.

23            YOU'RE HERE PURSUANT TO A SUBPOENA THAT'S BEEN SERVED

24    ON YOU?

25    A   CORRECT.                                                   00:15
```

1   Q     NOW, YOU'RE A FORMER MGA EMPLOYEE?

2   A     YES.

3   Q     AND COULD YOU JUST GIVE THE JURY AN IDEA OF WHAT TIME

4   PERIOD YOU WORKED FOR MGA.

5   A     FROM JUNE 1999 UNTIL THE END OF 2001.                    00:15

6   Q     BEFORE WE GO INTO THAT, LET'S BACK UP A BIT, IF WE COULD.

7         I WAS WONDERING IF YOU COULD GIVE US A RUNDOWN OF

8   YOUR EDUCATIONAL BACKGROUND AFTER HIGH SCHOOL.

9   A     SURE.

10        I HAVE A BACHELOR OF SCIENCE DEGREE IN FINANCE FROM      00:15

11  SAN DIEGO STATE UNIVERSITY.

12  Q     WHAT YEAR DID YOU GET THAT IN?

13  A     1993.

14  Q     DID YOU GET EMPLOYMENT AFTER YOU GRADUATED FROM SAN DIEGO

15  STATE?                                                         00:16

16  A     YES, I DID.

17  Q     WHAT WAS THE FIRST JOB THAT YOU HELD?

18  A     MARKETING SPECIALIST AT MUTUAL OF NEW YORK.

19  Q     WHAT KIND OF WORK DID YOU DO IN THAT POSITION?

20  A     I PUT TOGETHER MARKETING PROGRAMS FOR SOME OF THE AGENTS.  00:16

21  I TOOK OVER WHAT WERE CALLED ORPHAN ACCOUNTS, ACCOUNTS THAT NO

22  LONGER HAD AN AGENT.  I WAS LICENSED TO SELL LIFE AND HEALTH

23  INSURANCE, SO I DID THAT AS WELL.

24  Q     AND FOR HOW LONG DID YOU WORK IN THAT POSITION?

25  A     ABOUT A YEAR AND A HALF.                                 00:16

```
 1   Q    SO DOES THAT TAKE US UP TO MID 1994 SOMETIME?

 2   A    PROBABLY, YES.

 3   Q    OR MID '95?

 4   A    PROBABLY END OF '94, EARLY 95.

 5   Q    WHAT DID YOU DO AFTER THAT?                              00:17

 6   A    I WORKED FOR A BOOK DISTRIBUTOR CALLED ADVANCED MARKETING

 7   SERVICES.

 8   Q    WHAT WAS THE BUSINESS OF THAT?

 9   A    IT DISTRIBUTED BOOKS TO WAREHOUSE CLUBS.

10   Q    WAS THAT LIKE BOOK-OF-THE-MONTH CLUB, THINGS LIKE THAT?   00:17

11   A    NO.  WE SOLD TO RETAIL ACCOUNTS, LIKE COSTCO, sAM'S CLUB,

12   BJ'S WHOLESALE.

13   Q    I SEE.

14        AND WHAT POSITION DID YOU HAVE THERE?

15   A    I WAS A MARKETING MANAGER.                               00:17

16   Q    SO WERE YOUR FIRST TWO JOBS AFTER YOU GOT YOUR DEGREE FROM

17   SAN DIEGO STATE BOTH BASICALLY IN THE MARKETING AREA?

18   A    NOT REALLY.  THE MARKETING MANAGER POSITION WAS SOMEWHAT

19   OF A MISNOMER.  IT WAS REALLY A SALES POSITION.

20   Q    ALL RIGHT.                                               00:18

21        SO AT ADVANCED -- I'M SORRY.  WHAT WAS THE NAME?

22   A    ADVANCED MARKETING SERVICES, A-M-S.

23   Q    AND HOW LONG DID YOU WORK THERE?

24   A    FROM SPRING '95, I BELIEVE, UNTIL JUNE 1999.

25   Q    AND WERE YOU RESPONSIBLE FOR ANY PARTICULAR ACCOUNTS      00:18
```

1    THERE?

2    A    YES.

3    Q    WHAT WOULD BE AN EXAMPLE OF ONE OF THOSE ACCOUNTS THAT YOU

4    WERE RESPONSIBLE FOR?

5    A    I WORKED ON the SAM'S CLUB ACCOUNT ONLY.                    00:18

6    Q    EXCLUSIVELY?

7    A    YES.

8    Q    WAS THAT A LARGE ACCOUNT FOR THAT COMPANY?

9    A    YES.

10   Q    CAN YOU GIVE US AN IDEA OF HOW IMPORTANT THAT WAS TO THAT   00:18

11   COMPANY.

12   A    IT WAS THE COMPANY'S LARGEST ACCOUNT; IT WAS ABOUT

13   $240 MILLION IN REVENUE PER YEAR.

14   Q    YOU WERE IN CHARGE OF THAT?

15   A    YES.                                                        00:19

16   Q    WAS YOUR NEXT POSITION WITH MGA?

17   A    YES.

18   Q    AND I THINK YOU'VE TOLD US THAT THAT WAS IN JUNE OF 1999.

19   A    YES.

20   Q    WHAT WAS THE FIRST POSITION THAT YOU HELD AT MGA?          00:19

21   A    I WAS HIRED AS A SALES ANALYST.

22   Q    JUST IN GENERAL, WHAT WERE YOUR JOB DUTIES IN THAT

23   POSITION?

24   A    I WAS HIRED TO WORK ON THE WAL-MART ACCOUNT AND TO ANALYZE

25   THE BUSINESS.                                                   00:19

```
 1   Q    EXCLUSIVELY WITH RESPECT TO THE WAL-MART ACCOUNT?

 2   A    CORRECT.

 3   Q    WAS WAL-MART AN IMPORTANT ACCOUNT FOR MGA?

 4   A    YES.

 5   Q    CAN YOU GIVE US SOME IDEA OF HOW IMPORTANT IT WAS COMPARED    00:19

 6   TO OTHER ACCOUNTS THAT MGA HAD THEN.

 7        MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF

 8   FOUNDATION.

 9        THE COURT:  SUSTAINED.

10        LAY A FOUNDATION ON THAT.                                    00:20

11   BY MR. QUINN:

12   Q    DO YOU KNOW HOW THE WAL-MART ACCOUNT COMPARED TO OTHER

13   ACCOUNTS THAT MGA HAD, IN TERMS OF THEIR IMPORTANCE OR SIZE FOR

14   MGA?

15   A    YES.                                                         00:20

16   Q    HOW DO YOU KNOW WHAT YOU KNOW ABOUT THAT?

17   A    BECAUSE I WORKED THERE.

18   Q    DID YOU ALSO ATTEND MARKETING MEETINGS WHERE THAT TYPE OF

19   INFORMATION WAS SHARED?

20   A    SALES MEETINGS.                                              00:20

21   Q    SO CAN YOU GIVE US SOME IDEA ABOUT HOW IMPORTANT THE

22   WAL-MART ACCOUNT WAS FOR MGA, THEN, THAT YOU WERE IN CHARGE OF?

23        MR. NOLAN:  AGAIN, YOUR HONOR, LACK OF FOUNDATION.

24   BY MR. QUINN:

25   Q    CAN YOU FLUSH OUT FOR US A LITTLE BIT HOW YOU KNEW WHAT      00:20
```

1    YOU knew ABOUT THE IMPORTANCE OF THE WAL-MART ACCOUNT.  IS

2    THERE INFORMATION THAT YOU HAD ACCESS TO OR FOLKS THAT YOU

3    SPOKE WITH OR WORKED WITH?

4    A    YES.  WE HAD FOUR CASH REPORTS WHICH GAVE DOLLARS ON THEM.

5    WE HAD ROLL-UP REPORTS, WHICH HAD ALL OF THE ACCOUNTS LISTED          00:21

6    FOR THE COMPANY, BROKEN OUT BY ACCOUNT AND TERRITORY.  SO ONE

7    COULD LOOK AT THOSE REPORTS AND COMPARE THE NUMBERS.

8    Q    DID YOU PARTICIPATE IN MEETINGS WHERE THESE TYPES OF

9    REPORTS WERE ACTUALLY DISCUSSED BETWEEN YOU AND YOUR COLLEAGUES

10   AND OTHER PEOPLE AT MGA?                                             00:21

11            **MR. NOLAN:**  OBJECTION, YOUR HONOR.  LEADING.

12            **THE COURT:**  SUSTAINED.

13            REPHRASE.

14   **BY MR. QUINN:**

15   Q    CAN YOU TELL US WHETHER OR NOT THESE REPORTS WERE THE           00:21

16   SUBJECT OF DISCUSSION IN BUSINESS MEETINGS.

17   A    YES, THEY WERE.

18   Q    SO CAN YOU JUST GIVE US A GENERAL PICTURE AS TO HOW LARGE

19   THE WAL-MART ACCOUNT THAT YOU WERE RESPONSIBLE FOR WAS AS

20   COMPARED TO OTHER ACCOUNTS AT MGA.                                   00:21

21   A    WAL-MART WAS ONE OF THE TOP THREE OR FOUR ACCOUNTS.

22   Q    MS. MAURUS, I THINK YOU SAID YOU STARTED AS A SALES

23   ANALYST.

24            AFTER THAT, DID YOU ASSUME ANOTHER POSITION WITH MGA

25   AT SOME POINT?                                                       00:22

```
1   A    YES.

2   Q    WHAT WAS YOUR NEXT POSITION?

3   A    SHORTLY THEREAFTER, I WAS PROMOTED TO DISTRICT SALES

4   MANAGER.

5   Q    WHAT WERE YOUR RESPONSIBILITIES AS A DISTRICT SALES        00:22

6   MANAGER?

7   A    I HAD THE WEST COAST TERRITORY, AND I ALSO CONTINUED TO

8   WORK ON WAL-MART.

9          MR. NOLAN:  COULD WE HAVE FOUNDATION AS TO THE DATE

10  OF THAT PROMOTION.                                             00:22

11         THE COURT:  FAIR ENOUGH.

12  BY MR. QUINN:

13  Q    DO YOU RECALL WHEN THAT PROMOTION WAS, APPROXIMATELY?

14  A    YES.  I WAS GIVEN THE TERRITORY RESPONSIBILITIES PROBABLY

15  TWO MONTHS AFTER I STARTED AT MGA, AND I WAS -- IT WAS          00:22

16  OFFICIALLY ANNOUNCED, I BELIEVE, IN DECEMBER OF 1999.

17  Q    SO YOU STARTED IN JUNE OF '99, AND BY THE END OF THAT

18  SUMMER, YOU WERE GIVEN THE TERRITORY?

19  A    I BELIEVE SO, YES.

20  Q    DID YOU SAY THAT YOU CONTINUED TO HAVE RESPONSIBILITY FOR  00:23

21  WAL-MART?

22  A    YES, I DID.

23  Q    DO YOU KNOW HOW MANY DIFFERENT STATES THAT WAL-MART HAD

24  DONE BUSINESS IN WHERE YOU WERE THE MGA PERSON WHO WAS IN

25  CHARGE, FROM A MARKETING STANDPOINT, APPROXIMATELY?            00:23
```

```
 1   A    THE TERRITORIES WERE BASED ON THE CORPORATE OFFICE

 2   LOCATION.

 3          I GUESS I DON'T UNDERSTAND YOUR QUESTION.

 4   Q    WELL, AT THIS POINT, ARE YOU RESPONSIBLE FOR ALL OF MGA'S

 5   BUSINESS WITH WAL-MART, FROM A MARKETING STANDPOINT, OR JUST      00:23

 6   SOME PORTION OF IT?

 7            MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

 8            THE COURT:  IT'S A CLARIFICATION.  I'M GOING TO

 9   OVERRULE.

10            THE WITNESS:  FROM A SALES PERSPECTIVE, YES, I WORKED    00:23

11   ON ALL OF WAL-MART'S U.S. BUSINESS.

12   BY MR. QUINN:

13   Q    AND DO YOU KNOW HOW MANY STATES THAT COVERED?

14   A    AT THAT TIME I BELIEVE WAL-MART WAS IN ALL BUT A COUPLE OF

15   STATES.                                                          00:24

16   Q    AFTER YOUR PROMOTION TO SALES MANAGER, WERE YOU PROMOTED

17   TO ANOTHER JOB AT MGA?

18   A    YES, I WAS.

19   Q    WHAT WAS YOUR NEXT POSITION?

20   A    NATIONAL SALES MANAGER.                                     00:24

21   Q    IN YOUR CAPACITY AS NATIONAL SALES MANAGER FOR MGA, WHAT

22   WERE YOUR JOB DUTIES?

23   A    I HAD A LARGER TERRITORY, AND IT MEANT THAT I MANAGED ONE

24   OF THE MAJOR NATIONAL ACCOUNTS AS WELL.  AND IT DIFFERED

25   THROUGHOUT THE TIME I HAD THAT POSITION, BUT I HAD WAL-MART AT    00:24
```

1   ONE POINT; AT ONE POINT, I HAD TARGET; AND THEN AT ANOTHER

2   POINT, I HAD K-MART.

3   Q    SO WHEN YOU SAY YOU HAD THESE DIFFERENT COMPANIES AT

4   DIFFERENT TIMES, CAN YOU EXPLAIN WHAT YOU MEAN BY THAT, PLEASE.

5   A    YES.                                                          00:25

6        WE HAD SEVERAL RESTRUCTURINGS OF THE SALES

7   DEPARTMENT; SO MY TERRITORY RESPONSIBILITIES CHANGED THROUGHOUT

8   THE TIME I WAS THE NATIONAL SALES MANAGER.  SO FOR A DURATION

9   OF THE TIME, I WAS ON WAL-MART.  FOR A SHORT PERIOD, I WAS

10  MOVED TO TARGET.  THEN I WAS MOVED TO K-MART.  THEN I WAS PUT    00:25

11  BACK ON WAL-MART.

12       IN ADDITION TO THE NATIONAL ACCOUNT, I ALSO HAD A

13  TERRITORY OF MANY STATES, WHICH INCLUDED ALL OF THE OTHER

14  ACCOUNTS WITHIN THOSE STATES.

15  Q    DO YOU RECALL WHAT THOSE OTHER STATES WERE, JUST ROUGHLY?   00:25

16  A    AT SOME POINT, I HAD ABOUT 37 STATES.  I HAD THE WHOLE

17  WEST COAST.  I HAD THE SOUTHEAST.  I HAD PART OF THE SOUTH.

18  AGAIN, IT FLUCTUATED.  WE HAD A LOT OF DIFFERENT

19  REORGANIZATIONS.

20  Q    NOW, WAS THAT THE LAST JOB THAT YOU HELD AT MGA, OR DID     00:26

21  YOU GET A SUBSEQUENT POSITION?

22  A    THAT WAS THE LAST POSITION.

23  Q    AT THAT TIME, AT THE TIME THAT YOU WORKED AT MGA, SAY,

24  BEFORE THE SUMMER OF 2000, WHAT WAS THE BUSINESS OF MGA?

25  A    PRIMARILY, ELECTRONIC HANDHELD TOYS; WALKIE-TALKIES,         00:26

```
1    LICENSEd BOYS' TOYS.

2    Q    DID IT HAVE ANY KIND OF A FASHION DOLL BUSINESS?

3    A    NO.

4    Q    WERE THERE ANY FASHION DOLL DESIGNERS OR SOME TYPE OF A

5    FASHION DOLL DESIGN DEPARTMENT?                               00:26

6    A    NO.

7    Q    THERE SHOULD BE A NOTEBOOK THERE IN FRONT OF YOU, MA'AM.

8    IF YOU WOULD LOOK, PLEASE, AT THE DOCUMENT BEHIND TAB 13532.

9         BEFORE WE LOOK AT THAT, IF I COULD JUST ASK YOU A

10   QUESTION.                                                     00:27

11        AT MGA, WHILE YOU WORKED THERE, DID EMPLOYEES ENTER

12   INTO WHAT WERE CALLED INVENTIONS AGREEMENTS AND CONFIDENTIALITY

13   AGREEMENTS WITH THE COMPANY?

14   A    YES.

15   Q    AND WHAT WAS YOUR UNDERSTANDING OF WHAT THOSE INVENTIONS  00:27

16   AGREEMENTS MEANT?

17        MR. NOLAN:  OBJECTION, YOUR HONOR.  RELEVANCE AS TO

18   HER STATE OF MIND.

19        THE COURT:  OVERRULED.

20        THE WITNESS:  IT MEANT THAT ANYTHING WE DEVELOPED OR      00:27

21   CREATED WHILE WE WORKED AT MGA BELONGED TO MGA.

22   BY MR. QUINN:

23   Q    MA'AM, DID YOU SIGN ONE OF THESE AGREEMENTS YOURSELF?

24   A    YES, I DID.

25   Q    IF YOU WOULD LOOK AT THE DOCUMENT THAT'S BEHIND TAB 13532, 00:28
```

```
 1   I'D LIKE TO ASK YOU THE QUESTION WHETHER YOU CAN IDENTIFY THIS.

 2   A    YES.

 3   Q    WHAT IS THIS?

 4   A    IT'S A CONFIDENTIALITY AGREEMENT AND PROPRIETARY

 5   INFORMATION AGREEMENT.                                            00:28

 6   Q    FOR MGA?

 7   A    YES.

 8   Q    IS THIS SOMETHING THAT YOU SAW AT THE TIME, WHILE YOU

 9   WORKED AT MGA?

10   A    YES.                                                         00:28

11          MR. QUINN:  I'D OFFER THIS INTO EVIDENCE, YOUR HONOR.

12          MR. NOLAN:  NO OBJECTION.

13          THE COURT:  IT'S ADMITTED.

14          YOU MAY PUBLISH.

15          MR. QUINN:  IF WE COULD PUT ON THE SCREEN THE FIRST        00:28

16   PAGE, EXHIBIT 1352-1.

17   BY MR. QUINN:

18   Q    THIS INDICATES THAT AS OF AUGUST 10, 2000, THERE'S A

19   DISTRIBUTION TO ALL MGA EMPLOYEES OF A NEWLY REVISED MGA

20   ENTERTAINMENT CONFIDENTIALITY AGREEMENT AND A NEW PROPRIETARY     00:28

21   INFORMATION AGREEMENT.

22          DO YOU SEE THAT?

23   A    YES.

24   Q    PRIOR TO THE TIME THESE NEW FORMS WERE DISTRIBUTED IN

25   AUGUST OF 2000, HAD THERE BE A PREEXISTING FORM OF               00:29
```

1    CONFIDENTIALITY AND PROPRIETARY INFORMATION AGREEMENT?

2    A    YES.

3    Q    WHILE YOU WERE WORKING AT MGA, DID YOU KNOW A WOMAN NAMED

4    PAULA TREANTAFELLES, NOW KNOWN AS PAULA GARCIA?

5    A    YES.                                                                00:29

6    Q    WAS SHE AN EMPLOYEE THERE WHILE YOU WERE?

7    A    YES.

8    Q    WHO STARTED WITH THE COMPANY FIRST?  YOU OR

9    MS. TREANTAFELLES?

10   A    I DID.                                                             00:29

11   Q    DO YOU RECALL WHEN SHE STARTED WITH THE COMPANY?

12   A    YES.

13   Q    WHEN DID SHE START WITH THE COMPANY?

14   A    SPRING OF 2000.

15   Q    AND BY THAT TIME, YOU HAD BEEN THERE -- I THINK YOU TOLD           00:30

16   US YOU STARTED IN JUNE OF '99, SO YOU WOULD HAVE BEEN THERE

17   ABOUT NINE MONTHS BY THEN?

18   A    YES.

19   Q    AT SOME POINT, DID YOU MEET AN INDIVIDUAL NAMED

20   CARTER BRYANT?                                                         00:30

21   A    YES.

22   Q    HOW DID YOU COME TO MEET MR. BRYANT?

23   A    PAULA INTRODUCED ME TO HIM.

24   Q    AND YOU SAID SHE STARTED IN APRIL OF 2000.

25          CAN YOU TELL US APPROXIMATELY HOW LONG AFTER SHE                 00:30

1    STARTED SHE INTRODUCED YOU TO MR. BRYANT.

2    A    A FEW MONTHS.

3    Q    CAN YOU NARROW IT DOWN AT ALL?  IF SHE STARTS IN APRIL,

4    CAN YOU SAY APPROXIMATELY HOW MANY MONTHS AFTER SHE STARTED?

5    A    APPROXIMATELY THREE.                                    00:30

6    Q    SO IT WOULD BE YOUR BEST ESTIMATE, JULY?

7            MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

8            THE COURT:  SUSTAINED.

9    BY MR. QUINN:

10   Q    WHAT WOULD BE YOUR BEST ESTIMATE OF THE MONTHS, IF YOU    00:31

11   CAN'T NARROW IT DOWN TO ONE MONTH?

12   A    JUNE OR JULY 2000.

13   Q    AND WHAT WERE THE CIRCUMSTANCES UNDER WHICH SHE INTRODUCED

14   YOU TO MR. BRYANT?

15   A    I WALKED OVER TO HER DESK AND HE WAS THERE WITH HER; SO   00:31

16   SHE INTRODUCED HIM.

17   Q    WAS SHE IN AN OFFICE THAT HAD, LIKE, A CLOSED DOOR, OR WAS

18   IT AN OPEN CUBICLE?  COULD YOU DESCRIBE IT FOR US.

19   A    YES.

20         AT THAT TIME, SHE WAS IN A CUBICLE, AN OPEN CUBICLE.    00:31

21   Q    WERE YOU WALKING BY, OR WERE YOU GOING TO SEE HER?  WHAT

22   WAS THE OCCASION, IF YOU RECALL?

23   A    I DON'T RECALL WHETHER I WAS WALKING BY AND STOPPED BY OR

24   IF I WENT THERE SPECIFICALLY TO TALK TO HER ABOUT AN ISSUE.

25   Q    WAS MR. BRYANT STANDING THERE?                          00:32

```
 1   A     YES.

 2   Q     WHEN SHE INTRODUCED YOU TO HIM, WHAT DID SHE SAY?

 3   A     SHE INTRODUCED ME TO HER FRIEND, CARTER.

 4   Q     DO YOU RECALL ANYTHING ELSE THAT SHE SAID, BY WAY OF

 5   INTRODUCTION?                                               00:32

 6   A     SHE SAID SHE WORKED WITH HIM AT MATTEL.

 7   Q     SHE SAID SHE HAD WORKED WITH HIM AT MATTEL?

 8   A     AS I RECALL, YES.

 9   Q     DID YOU KNOW THAT MS. GARCIA HAD COME OVER TO MGA FROM

10   MATTEL?                                                     00:32

11   A     YES, I DID.

12   Q     DID SHE SAY ANYTHING ELSE ABOUT MR. BRYANT OR HER

13   RELATIONSHIP WITH HIM, OTHER THAN THAT SHE KNEW HIM FROM

14   MATTEL?

15   A     SHE REFERRED TO HIM AS HER FRIEND, CARTER.            00:32

16   Q     DID SHE SAY ANYTHING ABOUT WHAT HE WAS DOING THERE OR

17   ANYTHING FURTHER ABOUT MR. BRYANT?

18   A     YES.

19   Q     WHAT DID SHE SAY?

20   A     SHE SHOWED ME SOME DRAWINGS THAT HE HAD DONE FOR A NEW 00:33

21   PRODUCT.

22   Q     CAN YOU DESCRIBE THESE DRAWINGS FOR THE JURY.

23   A     SURE.

24         THEY WERE -- THEY LOOKED LIKE FASHION DESIGNER

25   DRAWINGS, OF A FIGURE WITH FASHIONS ON THEM.  THEY WERE COLOR 00:33
```

1   LINE DRAWINGS, PROBABLY COLOR PENCIL.

2   Q    IN TERMS OF THE SIZE OF THE TORSO, THE HEAD, THE FEET, CAN

3   YOU DESCRIBE THEM AT ALL?

4   A    THE HEAD AND THE FEET WERE MORE EXAGGERATED IN

5   RELATIONSHIP TO THE MIDDLE OF THE BODY.                           00:33

6   Q    LARGER?

7   A    YES.

8   Q    AND IN TERMS OF THE FACIAL FEATURES OF THESE DRAWINGS, CAN

9   YOU DESCRIBE THOSE AT ALL?

10  A    THE FACIAL FEATURES WERE ALSO EXAGGERATED.              00:34

11  Q    IS IT POSSIBLE TO BE ANY MORE SPECIFIC IN TERMS OF THE

12  EYES AND THE NOSE?

13  A    YES.

14        THE EYES WERE LARGE AND THE LIPS WERE LARGE.

15  Q    NOW, ON THESE DRAWINGS, WAS THERE ANY TEXT OR ANY WRITING?   00:34

16  A    I DON'T BELIEVE SO.

17  Q    WERE THERE ANY DATES?

18  A    NOT THAT I RECALL.

19  Q    DID SHE SHOW YOU ANY TEXT THAT ACCOMPANIED THE DRAWINGS,

20  OR WAS IT JUST DRAWINGS?                                     00:34

21  A    JUST DRAWINGS.

22  Q    WAS THE WORD OR NAME "BRATZ" ON ANY OF THE DRAWINGS?

23  A    NO.

24  Q    DID SHE MENTION THE WORD OR THE NAME "BRATZ"?

25  A    NO.                                                     00:35

```
 1   Q    DID MR. BRYANT?

 2   A    NO.

 3   Q    DID SHE SAY ANYTHING ABOUT WHAT WAS GOING TO BE DONE WITH

 4   THESE DRAWINGS?

 5   A    YES.  SHE TOLD ME THAT THEY WERE CONCEPTS FOR A PRODUCT     00:35

 6   THAT WE WERE GOING TO BE MAKING.

 7   Q    DID SHE SAY WHETHER OR NOT IT WAS SOMETHING THAT

 8   MR. LARIAN HAD ALREADY SEEN OR APPROVED?

 9        MR. NOLAN:  OBJECTION TO THIS CONTINUING LEADING IN

10   QUESTIONS, YOUR HONOR.                                          00:35

11        THE COURT:  REPHRASE, COUNSEL.

12   BY MR. QUINN:

13   Q    DID SHE SAY ANYTHING ONE WAY OR ANOTHER ABOUT WHETHER

14   THERE HAD BEEN ANY APPROVAL TO GO FORWARD WITH THIS?

15   A    I DON'T KNOW THAT SHE USED THE TERM "APPROVAL," BUT SHE     00:35

16   INDICATED THAT IT WAS A PRODUCT THAT SHE WAS GOING TO BE

17   DEVELOPING FOR THE COMPANY.

18   Q    CAN YOU TELL US WHETHER OR NOT MR. ISAAC LARIAN'S NAME WAS

19   MENTIONED AT ALL.

20   A    YES.                                                       00:36

21   Q    WHAT WAS SAID?

22   A    SHE TOLD ME THAT ISAAC HAD SEEN THE DRAWINGS AND THAT WE

23   WERE GOING TO BE MAKING A PRODUCT BASED OFF OF IT.

24   Q    THANK YOU VERY MUCH.

25        MR. QUINN:  NOTHING FURTHER.                               00:36
```

```
 1              THE COURT:  CROSS EXAMINATION.

 2                       CROSS-EXAMINATION

 3   BY MR. NOLAN:

 4   Q    LIKE MR. QUINN, YOU'VE NEVER MET WITH ME BEFORE, HAVE YOU?

 5   A    NO.                                                          00:36

 6   Q    YOU DON'T EVEN KNOW WHAT FIRM I'M WITH?

 7   A    NO.

 8   Q    MR. QUINN ASKED WHETHER OR NOT YOU HAD EVER MET WITH

 9   MR. QUINN.  MY QUESTION IS A LITTLE BIT DIFFERENT.

10            PRIOR TO YOUR TESTIMONY TODAY, DID YOU MEET WITH        00:36

11   LAWYERS IN MR. QUINN'S OFFICES?

12   A    I MET WITH A LAWYER, BUT NOT IN HIS OFFICE.

13   Q    WHAT WAS THE NAME OF THE LAWYER?

14   A    DYLAN PROCTOR.

15   Q    DYLAN PROCTOR?                                              00:37

16   A    YES.

17   Q    DO YOU SEE MR. PROCTOR IN THE COURTROOM TODAY?

18   A    YES.

19   Q    COULD YOU POINT HIM OUT FOR US.

20   A    SURE.                                                       00:37

21            HE'S DIRECTLY BEHIND MR. QUINN.

22            MR. NOLAN:  YOUR HONOR, MAY HAVE MR. PROCTOR STAND UP

23   FOR A MOMENT.

24   BY MR. NOLAN:

25   Q    DO YOU KNOW IF MR. PROCTOR WORKS FOR MR. QUINN?            00:37
```

```
 1   A    I BELIEVE HE DOES.

 2   Q    WHEN DID YOU MEET WITH MR. PROCTOR?

 3   A    ABOUT A MONTH AGO.

 4   Q    AND WHERE WAS THAT MEETING AT?

 5   A    IT WAS IN SANTA MONICA.                          00:37

 6   Q    WHERE IN SANTA MONICA?

 7   A    I MET HIM AT A RESTAURANT.

 8   Q    HOW LONG DID THAT MEETING TAKE PLACE?

 9   A    APPROXIMATELY TWO HOURS.

10   Q    WAS MR. PROCTOR REPRESENTING YOU AT THAT TIME?    00:37

11   A    NO.

12   Q    SO NOBODY AT MR. QUINN'S FIRM SERVES AS YOUR LAWYER IN

13   THIS CASE; CORRECT?

14   A    CORRECT.

15   Q    WERE YOU REPRESENTED BY COUNSEL AT THAT TWO-HOUR LUNCH    00:38

16   WITH MR. PROCTOR?

17   A    NO.

18   Q    DURING THAT MEETING, DID MR. PROCTOR SHOW YOU VARIOUS

19   DOCUMENTS?

20   A    NO.                                              00:38

21   Q    DID MR. PROCTOR REVIEW WITH YOU ANY PRIOR TESTIMONY YOU

22   MAY HAVE GIVEN CONCERNING ANY OF THESE EVENTS?

23   A    NO.

24   Q    DID YOU TAKE NOTES DURING THIS MEETING?

25   A    NO.                                              00:38
```

1   Q    HOW DID THE MEETING GET ARRANGED WITH MR. PROCTOR?  DID HE

2   CALL YOU, OR DID YOU CALL HIM?

3   A    HE CALLED ME AT MY PLACE OF WORK.

4   Q    DO YOU KNOW HOW HE GOT YOUR NUMBER?

5   A    NO, I DON'T.                                                    00:38

6   Q    MR. QUINN ASKED YOU IF YOU WERE SUBPOENAED TO TESTIFY

7   TODAY.

8        MR. PROCTOR ASKED YOU AT THAT LUNCH WHETHER OR NOT

9   YOU WOULD TESTIFY AT THE TRIAL?

10  A    NO.                                                             00:39

11  Q    DID YOU TELL MR. PROCTOR THAT YOU WOULD NOT APPEAR AND

12  TESTIFY FOR MATTEL IN THIS CASE?

13  A    NO.

14  Q    DID MR. PROCTOR, AT THAT MEETING, REVIEW VARIOUS DATES

15  WITH YOU CONCERNING, LET'S SAY, YOUR EMPLOYMENT AT MGA?          00:39

16  A    YES.

17  Q    BEFORE THAT MEETING WITH MR. PROCTOR, AND IT WAS SET UP

18  FOR LUNCH, WHAT DID MR. PROCTOR TELL YOU WAS THE REASON WHY HE

19  NEEDED TO MEET WITH YOU?

20  A    HE IDENTIFIED HIMSELF; HE MENTIONED THE CASE; HE TOLD ME    00:39

21  HE HAD REVIEWED TRANSCRIPTS OF ANOTHER CASE THAT I HAD

22  TESTIFIED IN AND HE WANTED -- HE ASKED IF I WOULD MEET WITH

23  HIM.

24  Q    NOW, PRIOR TO ACTUALLY MEETING WITH MR. PROCTOR FOR THIS

25  TWO-HOUR LUNCH, WHAT, IF ANYTHING, DID YOU DO TO REFRESH YOUR   00:40

```
 1   RECOLLECTION OF THE EVENTS FOR WHICH YOU HAVE OFFERED TESTIMONY

 2   TODAY?

 3   A    NOTHING.

 4   Q    HELP ME OUT.  AND IF YOU SAID THIS, I APOLOGIZE.

 5            APPROXIMATELY HOW LONG AGO DID YOU HAVE LUNCH WITH       00:40

 6   MR. PROCTOR?

 7   A    A MONTH.

 8   Q    AND YOU WERE TALKING ABOUT EVENTS THAT OCCURRED IN 1999

 9   AND 2000; CORRECT?

10   A    YES.                                                        00:40

11   Q    DID YOU BRING ANY DOCUMENTS WITH YOU AT THAT LUNCH?

12   A    NO.

13   Q    DID YOU BRING ANY CALENDARS WITH YOU OR NOTES THAT YOU MAY

14   HAVE TAKEN IN 1999 OR 2000?

15   A    I BROUGHT NOTHING.                                          00:41

16   Q    SO FROM THE TIME OF 1999 AND 2000 THROUGH THE TIME THAT

17   YOU HAD LUNCH WITH MR. PROCTOR A MONTH AGO, ON HOW MANY

18   OCCASION DURING THOSE EIGHT YEARS HAD YOU EVER THOUGHT ABOUT

19   THE EVENTS YOU'VE TESTIFIED ABOUT THIS MORNING?

20   A    I COULDN'T SAY.                                             00:41

21   Q    WELL, DO YOU RECALL TESTIFYING IN A PROCEEDING INVOLVING

22   MR. ISAAC LARIAN AND HIS BROTHER FRED LARIAN?

23   A    YES, I DO.

24   Q    AND APPROXIMATELY WHEN DID THAT TESTIMONY TAKE PLACE?

25   A    AT THE END OF 2005, I BELIEVE.                              00:41
```

1  Q    IF I RECALL CORRECTLY, IT WAS MR. FRED LARIAN THAT CALLED

2  YOU IN CONNECTION WITH WHETHER OR NOT YOU WOULD BE WILLING TO

3  TESTIFY IN THOSE PROCEEDINGS; YES?

4  A    YES.

5  Q    AND DO YOU RECALL APPROXIMATELY WHEN FRED LARIAN CALLED          00:42

6  YOU TO TESTIFY CONCERNING THOSE EVENTS?

7  A    JULY OR AUGUST OF 2005.

8  Q    IF I RECALL, FROM THE PERIOD THAT YOU -- LET'S SAY FROM

9  THE MEETING THAT YOU ALLEGEDLY HAD WITH CARTER BRYANT AND

10 PAULA GARCIA, THROUGH JULY OR AUGUST OF 2005, IT'S TRUE THAT         00:42

11 YOU HAD NEVER GIVEN ANY THOUGHT TO THAT PARTICULAR ENCOUNTER

12 THAT YOU'VE TESTIFIED TO ABOUT CARTER BRYANT, WITH

13 CARTER BRYANT AND PAULA GARCIA, CORRECT, IN THOSE FIVE YEARS

14 BEFORE FRED LARIAN GAVE YOU A CALL?

15 A    COULD YOU ASK THE QUESTION AGAIN.                               00:43

16 Q    SURE.

17      AT THE TIME THAT MR. LARIAN, FRED LARIAN, HAD

18 CONTACTED YOU IN JULY OR AUGUST OF 2005, HE ASKED YOU WHETHER

19 OR NOT YOU WOULD BE A WITNESS FOR HIM IN A MATTER -- IN A

20 DISPUTE THAT HE HAD WITH HIS BROTHER ISAAC LARIAN; YES?             00:43

21 A    YES.

22 Q    OKAY.

23      AND DURING THAT PHONE CALL OR IN ANY SUBSEQUENT

24 MEETING -- WELL, LET ME APPROACH IT THIS WAY:  AT THE TIME OF

25 THE PHONE CALL, DID YOU EXPECT THAT FRED LARIAN WOULD BE GIVING     00:43

1   YOU A CALL?

2   A    NO.

3   Q    HAD YOU KEPT IN CONTACT WITH FRED LARIAN FOR FIVE YEARS

4   AFTER YOU LEFT MGA?

5   A    NO.                                                              00:43

6   Q    AND FOR THOSE FIVE YEARS AFTER YOU LEFT MGA, HAD YOU TAKEN

7   ANY NOTES OR CALENDARS OR ANYTHING ELSE DOCUMENTING THE EVENTS

8   FOR WHICH YOU WERE DISCUSSING AND TESTIFYING IN THE YEAR 2005?

9   A    NO.

10  Q    HAD YOU EVEN GIVEN ANY THOUGHT TO WHETHER OR NOT YOU MET     00:44

11  WITH CARTER BRYANT AND PAULA GARCIA IN JUNE OR JULY OF 2000, OR

12  SEPTEMBER OF 2000, BY THE TIME THAT MR. LARIAN HAD GIVEN YOU A

13  CALL?

14  A    I MAY HAVE.

15  Q    AS YOU'RE SITTING HERE TODAY, DO YOU HAVE ANY RECOLLECTION  00:44

16  OF EVER THINKING ABOUT WHETHER OR NOT YOUR FIRST ENCOUNTER WITH

17  CARTER BRYANT WAS IN EITHER JUNE OR JULY OF 2000 OR IN

18  SEPTEMBER OF 2000?

19  A    I MAY HAVE THOUGHT ABOUT THAT, YES.

20  Q    BUT YOU'RE JUST GUESSING ON THAT?                           00:44

21  A    NO, I'M NOT GUESSING.

22  Q    WHAT ARE YOU BASING YOUR ANSWER ON THAT YOU MAY HAVE

23  THOUGHT ABOUT IT?

24  A    I CONTINUED TO SEE PAULA, FOR EXAMPLE, AT TOY SHOWS, SO I

25  MAY HAVE TALKED TO HER AND ASKED HOW BRATZ WAS DOING.  I MAY     00:45

```
 1   HAVE THOUGHT ABOUT CARTER.  I DON'T REMEMBER.  I DON'T RECALL
 2   ANY SPECIFIC INSTANCE, BUT I WOULDN'T SAY THAT I ABSOLUTELY
 3   NEVER THOUGHT ABOUT IT IN THOSE FIVE YEARS.
 4   Q    WELL, LET'S JUST TAKE THIS:  UP TO THE YEAR 2005, ASSUMING
 5   THAT YOU DID SEE PAULA GARCIA AT A TOY SHOW, DID YOU EVER HAVE       00:45
 6   A CONVERSATION WITH PAULA GARCIA WHERE YOU SAID WORDS TO THE
 7   EFFECT, 'HEY, PAULA, DO YOU REMEMBER THE FIRST TIME I MET WITH
 8   YOU AND CARTER WAS IN JUNE OR JULY OF 2000?'
 9   A    NO.
10   Q    WHEN YOU SAW CARTER BRYANT AT ANY OF THOSE TOY FAIRS, DID       00:45
11   YOU SAY, 'HEY, CARTER, REMEMBER I MET WITH YOU IN JUNE OR JULY
12   OF THE YEAR 2000?'
13   A    NO.
14   Q    DID EITHER PAULA OR CARTER, AT ANY POSSIBLE MEETING THAT
15   YOU MAY HAVE HAD WITH THEM AFTER YOU LEFT MGA -- DID EITHER OF       00:46
16   THEM SAY, 'HEY, JENNIFER, REMEMBER WHEN WE SHOWED YOU THE
17   DRAWINGS OF BRATZ IN JUNE OR JULY OF 2000?'
18   A    NO.
19   Q    AT ANY TIME AFTER YOU LEFT MGA AND YOU SAW PAULA GARCIA OR
20   YOU SAW CARTER BRYANT, DID EITHER OF THEM OR BOTH OF THEM EVER       00:46
21   SAY TO YOU WORDS TO THE EFFECT, 'WHATEVER YOU DO, DON'T TELL
22   ANYBODY THAT YOU SAW CARTER BRYANT AT MGA'?
23   A    NO.
24   Q    DID ANYBODY AT ANY TIME EVER TELL YOU TO CONCEAL THE
25   IDENTITY OF CARTER BRYANT AS THE CREATOR OF BRATZ?                   00:46
```

1    A    NO.

2    Q    I WANT TO GO BACK TO THIS MEETING THAT YOU HAVE TESTIFIED

3    THIS MORNING TO, WHERE YOU SAW SOME DRAWINGS WITH CARTER BRYANT

4    AND PAULA GARCIA.

5         DO YOU RECALL THAT?                                    00:47

6    A    YES.

7    Q    NOW, IN YOUR TESTIMONY IN THE ARBITRATION WITH FRED LARIAN

8    AND ISAAC LARIAN, YOU PUT THE DATE OF THAT MEETING IN THE

9    SUMMER OF 2000; ISN'T THAT CORRECT?

10   A    I'D HAVE TO LOOK AT THE TESTIMONY.                     00:47

11   Q    DO YOU HAVE ANY DOCUMENTS THAT SUPPORT YOUR TESTIMONY THAT

12   THAT FIRST MEETING OCCURRED IN EITHER JUNE OR JULY OF 2000?

13   A    NO.

14   Q    DO YOU HAVE ANY E-MAILS THAT WERE SENT IN EITHER JUNE OR

15   JULY OF 2000 CONFIRMING THAT THE MEETING THAT YOU HAD WITH     00:47

16   CARTER BRYANT AND PAULA GARCIA TOOK PLACE IN EITHER JUNE OR

17   JULY OF 2000?

18   A    NO.

19   Q    WHERE DID YOU GROW UP?  IN CALIFORNIA?

20   A    PARTLY.                                                00:48

21   Q    DO YOU CONSIDER SEPTEMBER 1ST TO BE PART OF THE SUMMER?

22   A    NO.

23   Q    WHICH SEASON DOES SEPTEMBER 1ST FALL IN?

24   A    TECHNICALLY, IT'S SUMMER.

25   Q    BUT IN YOUR MIND, YOU HAVE A DIFFERENT DEFINITION OF    00:48

1   SEPTEMBER 1ST, BEING IN THE SUMMER VERSUS THE WINTER?

2   A    NO.  IN MY MIND, IT'S FALL.

3   Q    DO YOU HAVE ANY DOCUMENTS THAT WOULD SUGGEST THAT THE

4   MEETING THAT YOU HAVE TESTIFIED AS HAVING OCCURRED IN JUNE OR

5   JULY -- ANY DOCUMENTS THAT PROVE THAT MEETING DID NOT TAKE          00:49

6   PLACE ACTUALLY ON SEPTEMBER 1ST OR LATER OF 2000?

7   A    NO.

8   Q    NOW, THESE EVENTS WERE EIGHT YEARS AGO.

9         IS IT POSSIBLE IN YOUR MIND -- THAT YOUR RECOLLECTION

10  OF THAT FIRST MEETING COULD HAVE BEEN THAT THE MEETING ACTUALLY     00:49

11  TOOK PLACE IN SEPTEMBER OF 2000?

12  A    NO.

13  Q    IS THERE A PARTICULAR REASON WHY YOU CAN SAY CATEGORICALLY

14  THAT THE MEETING DID NOT TAKE PLACE IN SEPTEMBER OR OCTOBER OF

15  2000?                                                              00:50

16  A    YES.

17  Q    WHAT IS THAT?

18  A    BY OCTOBER OF 2000, THE IDEA WAS MUCH MORE FLUSHED OUT AND

19  WE WERE ALREADY PREPARING TO SELL IT; AND WHEN I FIRST MET

20  CARTER, IT WAS MUCH EARLIER IN THE PROCESS AND ALL THERE WAS        00:50

21  WERE A COUPLE OF DRAWINGS.

22  Q    THE ONLY DRAWINGS THAT YOU SAW IN THE FIRST MEETING WERE A

23  COUPLE OF DRAWINGS; CORRECT?

24  A    CORRECT.

25  Q    AND THIS WAS AT A CUBICLE WITHIN MGA; CORRECT?                 00:50

1   A    CORRECT.

2   Q    YOUR FIRST MEETING WITH CARTER BRYANT AND PAULA GARCIA WAS

3   NOT IN SOME CONFIDENTIAL OFF-SITE LOCATION; IS THAT CORRECT?

4   A    CORRECT.

5   Q    IT WAS IN A PUBLIC AREA WITHIN MGA WHERE OTHER EMPLOYEES        00:51

6   COULD OBSERVE CARTER BRYANT, YOURSELF, AND PAULA GARCIA

7   MEETING?

8   A    CORRECT.

9   Q    DID PAULA GARCIA OR CARTER BRYANT EVER TELL YOU WORDS TO

10  THE EFFECT THAT THE DRAWINGS THAT THEY WERE SHOWING YOU WERE        00:51

11  THE ONLY DRAWINGS THAT CARTER BRYANT HAD DONE WITH RESPECT TO

12  BRATZ?

13  A    I DON'T BELIEVE SO.

14  Q    AT THAT TIME, IN THE SUMMER OF 2000, DID YOU HAVE

15  RESPONSIBILITY TO APPROVE PROJECTS THAT WERE UNDER                 00:51

16  CONSIDERATION AT MGA?

17  A    NO.

18  Q    DID YOU TAKE IT UPON YOURSELF REGULARLY TO GO OUT AND

19  DETERMINE WHEN PROJECTS WERE UNDER CONSIDERATION AT MGA AT ANY

20  TIME?                                                              00:51

21  A    NO.

22  Q    YOU WORKED WITH PAULA GARCIA?

23  A    YES.  TREANTEFELLAS.

24  Q    AT THAT TIME, SHE WAS PAULA TREANTEFELLAS; RIGHT?

25  A    UH-HUH.                                                       00:52

```
 1   Q    DID YOU BELIEVE SHE WAS AN HONEST PERSON?

 2   A    YES.

 3   Q    AND YOU HAVE SEEN PAULA AT TOY SHOWS SINCE YOU'VE LEFT

 4   MGA?

 5   A    YES.                                                      00:52

 6   Q    HAS YOUR OPINION OF PAULA, NOW GARCIA, THEN TREANTEFELLAS,

 7   BEING AN HONEST PERSON CHANGED IN ANY WAY?

 8           MR. QUINN:  THIS IS IRRELEVANT, YOUR HONOR.

 9           THE COURT:  REPHRASE YOUR QUESTION, COUNSEL.

10   BY MR. NOLAN:                                                  00:52

11   Q    DO YOU STILL BELIEVE PAULA TREANTEFELLAS IS AN HONEST

12   PERSON?

13           MR. QUINN:  SAME OBJECTION, YOUR HONOR.

14           THE COURT:  OVERRULED.

15           YOU MAY ANSWER.                                        00:52

16           THE WITNESS:  YES.

17   BY MR. NOLAN:

18   Q    MR. QUINN SHOWED YOU A DOCUMENT, 13532, WHICH IS NOW IN

19   EVIDENCE.

20           MR. NOLAN:  YOUR HONOR, MAY I PUBLISH IT?  THIS IS     00:52

21   THE MGA CONFIDENTIALITY AGREEMENT.

22           THE COURT:  YES.

23   BY MR. NOLAN:

24   Q    THIS IS A DOCUMENT THAT YOU IDENTIFIED DURING YOUR DIRECT

25   EXAMINATION.                                                   00:53
```

1           DO YOU RECALL THAT?

2     A     YES.

3     Q     THIS IS THE AUGUST REVISION OF THE CONFIDENTIALITY

4     AGREEMENT AND PROPRIETARY INFORMATION AGREEMENT AT MGA;

5     CORRECT?                                                      00:53

6     A     CORRECT.

7     Q     DO YOU BELIEVE YOU UNDERSTAND THE TERMS OF THAT AGREEMENT?

8     A     I DO.

9     Q     DO YOU HAVE AN UNDERSTANDING AS TO WHETHER OR NOT A

10    PROSPECTIVE EMPLOYEE -- IF A PROSPECTIVE EMPLOYEE AT MGA HAD     00:53

11    CONCEIVED OF AN IDEA AND A CONCEPT ON THEIR OWN TIME BY SIGNING

12    THIS AGREEMENT, DID SUCH AN EMPLOYEE ASSIGN OR TRANSFER THAT

13    CONCEPT OR IDEA TO MGA?

14    A     THE EMPLOYEE HAD TO DISCLOSE IT.

15    Q     IN ALL CIRCUMSTANCES OR ONLY IN CIRCUMSTANCES WHERE THERE   00:53

16    WAS A POTENTIAL CONFLICT OF INTEREST?

17    A     AS I UNDERSTAND IT, THE EMPLOYEE HAD TO DISCLOSE CONCEPTS

18    AND IDEAS.

19    Q     AND WHERE DO YOU GET THAT FROM?

20    A     FROM THE DOCUMENT.                                        00:54

21    Q     CAN YOU LOOK AT THE DOCUMENT AND TELL US WHERE IT SHOWS

22    THAT AN EMPLOYEE HAS TO DISCLOSE CONCEPTS AND/OR IDEAS

23    CONCEIVED BEFORE JOINING MGA.

24    A     YES.

25    Q     WHAT PAGE IS THAT?                                        00:54

```
 1  A    PAGE 3.

 2  Q    IS THAT UNDER "DISCLOSURE OF IDEAS OR INVENTIONS"?

 3  A    THE HEADING IS "INVENTIONS ASSIGNMENT."  AND IT'S UNDER

 4  NUMBER TWO.

 5  Q    "DISCLOSURE OF IDEAS OR INVENTIONS"?                        00:55

 6  A    CORRECT.

 7          MR. NOLAN:  CAN WE HAVE THAT, PLEASE.  CAN WE BLOW UP

 8  NUMBER TWO.

 9  BY MR. NOLAN:

10  Q    WOULD YOU PLEASE READ THAT TO THE JURY.                     00:55

11  A    "DISCLOSURE OF IDEAS OR INVENTIONS.  EMPLOYEE AGREES TO

12  PROPERLY DISCLOSE IN WRITING TO FRED LARIAN ALL INVENTIONS

13  DEVELOPED SOLELY OR JOINTLY WITH OTHERS DURING EMPLOYEE'S

14  EMPLOYMENT WITH EMPLOYER, WHETHER SUCH INVENTIONS ARE

15  PATENTABLE, NONPATENTABLE, OR ASSIGNABLE UNDER THIS AGREEMENT.    00:55

16  EMPLOYER AGREES TO MAINTAIN SUCH DISCLOSURE IN CONFIDENCE."

17  Q    SO GOING BACK, DO YOU SEE WHERE THIS REQUIREMENT IS A

18  DISCLOSURE FOR ALL INVENTIONS DEVELOPED SOLELY OR JOINTLY WITH

19  OTHERS DURING EMPLOYEE'S EMPLOYMENT WITH EMPLOYER?

20          DO YOU SEE "EMPLOYER" BEING CAPITALIZED?                 00:55

21  A    YES, I DO.

22  Q    AND WHO'S THE EMPLOYER REFERRED TO IN THIS AGREEMENT?

23  A    MGA ENTERTAINMENT.

24  Q    SO THAT DOES NOT IN ANY WAY DEAL WITH IDEAS OR INVENTIONS

25  CONCEIVED OF BY AN EMPLOYEE BEFORE JOINING MGA; CORRECT?         00:55
```

1   A    CORRECT.

2   Q    DO YOU KNOW WHEN CARTER BRYANT ACTUALLY DID HIS CONCEPT

3   DRAWINGS FOR BRATZ?

4   A    NO.

5   Q    IN ANY CONVERSATION WITH PAULA GARCIA OR CARTER BRYANT,          00:56

6   DID PAULA GARCIA, PAULA TREANTEFELLAS, OR CARTER BRYANT EVER

7   TELL YOU THAT CARTER BRYANT DEVELOPED, CONCEIVED, AND DEVELOPED

8   THE CONCEPT FOR BRATZ WHILE HE WAS EMPLOYED AT MATTEL?

9   A    I BELIEVE THERE WAS SOME REFERENCE TO HIM HAVING DONE THEM

10  WHILE HE WAS AT MATTEL.                                              00:57

11  Q    DID YOU EVER TELL ANYONE ABOUT SUCH A REFERENCE PRIOR TO

12  GIVING THIS ANSWER JUST NOW?

13  A    I DON'T KNOW.  I DON'T REMEMBER.

14  Q    AND WHEN WAS THIS ALLEGED CONVERSATION HAD BETWEEN YOU,

15  CARTER BRYANT, AND PAULA TREANTEFELLAS?                             00:57

16  A    DURING THE COURSE OF DEVELOPING BRATZ, PAULA EXPRESSED THE

17  EXCITEMENT ABOUT THE IDEA, AND SHE EXPRESSED THAT IT WAS GREAT

18  THAT MGA -- SHE COULD DO SOMETHING LIKE THAT AT MGA, BECAUSE IT

19  WOULDN'T BE DONE -- MATTEL WOULDN'T DO SOMETHING LIKE THAT.  SO

20  MY UNDERSTANDING WAS THAT CARTER HAD DONE IT WHILE HE WAS AT        00:57

21  MATTEL.

22  Q    SO SIMPLY FROM THE STATEMENT FROM PAULA TREANTEFELLAS THAT

23  MATTEL WOULD NEVER HAVE PRODUCED BRATZ, THAT WAS THE BASIS UPON

24  YOUR INFERENCE THAT CARTER BRYANT MUST HAVE DONE THEM AT

25  MATTEL?                                                             00:58

```
 1   A    YES.

 2   Q    I WANT TO GO BACK TO THIS TESTIMONY THAT YOU OFFERED IN

 3   THE ARBITRATION PROCEEDINGS BETWEEN FRED LARIAN AND

 4   ISAAC LARIAN.

 5        IF I RECALL CORRECTLY, IT WAS FRED LARIAN WHO ASKED      00:58

 6   YOU TO TESTIFY ON HIS BEHALF; CORRECT?

 7   A    CORRECT.

 8   Q    AND YOU ACTUALLY TESTIFIED AT THAT ARBITRATION; YES?

 9   A    YES.

10   Q    AND YOU WERE CROSS-EXAMINED AT THAT ARBITRATION; YES?   00:58

11   A    YES.

12   Q    WHILE YOU WERE TESTIFYING, YOU WERE UNDER OATH; CORRECT?

13   A    YES.

14   Q    DO YOU KNOW WHAT HAPPENED IMMEDIATELY AFTER YOU -- WHEN I

15   SAY "AFTER," THERE WAS A NOON BREAK AFTER YOU TESTIFIED -- WHAT  00:59

16   OCCURRED IN THAT ARBITRATION PROCEEDING AFTER YOUR TESTIMONY?

17        MR. QUINN:  OBJECTION.  RELEVANCE.

18        THE COURT:  COUNSEL?

19        MR. QUINN:  IT'S ALSO BEYOND THE SCOPE, YOUR HONOR.

20        THE COURT:  WHAT IS THIS GOING TO, COUNSEL?           00:59

21        MR. NOLAN:  THE DISPOSITION OF THAT PROCEEDING WHERE

22   SHE TESTIFIED; I GUESS THE END RESULT.  I CAN DO IT IN ONE

23   QUESTION.

24        THE COURT:  ALL RIGHT.

25        OVERRULED.                                             00:59
```

1     **MR. NOLAN:**  THANK YOU.

2   **BY MR. NOLAN:**

3   Q    YOU KNOW THAT FOLLOWING YOUR TESTIMONY THAT VERY

4   AFTERNOON, FOLLOWING YOUR TESTIMONY, THAT FRED LARIAN DROPPED

5   ALL OF HIS CLAIMS AGAINST HIS BROTHER; RIGHT?                    00:59

6   A    HE TOLD ME THAT HE DROPPED THEM SOMETIME AFTER I

7   TESTIFIED.

8   Q    LET'S GO BACK.

9         WHEN YOU HAD YOUR TWO-HOUR LUNCH WITH DYLAN PROCTOR,

10  DID YOU EVER TELL MR. PROCTOR THAT YOU HAD SUED MGA?            01:00

11  A    I DON'T REMEMBER IF I TOLD HIM.

12  Q    DO YOU RECALL WHETHER OR NOT YOU EVER TOLD ANYONE

13  CONNECTED WITH MATTEL THAT YOU PREVIOUSLY HAD FILED A LAWSUIT

14  AGAINST MGA?

15  A    I DON'T THINK SO.                                          01:00

16  Q    LET'S GO BACK AND TALK ABOUT THE EVENTS THAT LED UP TO THE

17  LAWSUIT THAT YOU FILED AGAINST MGA.

18         WHILE YOU WERE AT MGA, DID YOU BECOME PREGNANT?

19  A    YES.

20  Q    DID YOU TAKE MATERNITY LEAVE WHILE EMPLOYED AT MGA?        01:00

21  A    YES.

22  Q    HOW LONG WERE YOU OFF ON MATERNITY LEAVE AT MGA?

23  A    16 WEEKS, I BELIEVE.

24  Q    AND DURING WHAT PERIOD OF TIME IN YOUR EMPLOYMENT DID YOU

25  TAKE THE 16 WEEKS MATERNITY LEAVE?                              01:01

```
 1   A     FROM JUNE 6TH TO OCTOBER 1ST.

 2   Q     OF WHICH YEAR?

 3   A     2001.

 4   Q     DID YOU RETURN TO WORK AT MGA ON OCTOBER 1ST?

 5   A     YES, I DID.                                          01:01

 6   Q     HOW LONG DID YOU WORK AT MGA AFTER RETURNING FROM YOUR

 7   MATERNITY LEAVE BEFORE YOU TOOK LEAVE AGAIN?

 8   A     ABOUT TEN DAYS.

 9   Q     WHY WAS IT THAT YOU TOOK LEAVE AFTER THOSE TEN DAYS?

10   A     MY DOCTOR PUT ME BACK OUT ON LEAVE.                  01:01

11   Q     AND THEN WHILE YOU WERE ON THIS ADDITIONAL LEAVE, DID YOU

12   RESIGN FROM MGA?

13   A     YES, I DID.

14   Q     SO YOU RESIGNED FROM MGA; CORRECT?

15   A     YES, I DID.                                          01:02

16   Q     WHILE YOU WERE ON LEAVE; CORRECT?

17   A     YES, I DID.

18   Q     NOW, SUBSEQUENTLY, DID YOU GO TO WORK FOR ANOTHER TOY

19   COMPANY?

20   A     MULTIPLE.  YES.                                      01:02

21   Q     LET'S TALK ABOUT THE FIRST ONE.

22         WHAT WAS THE FIRST TOY COMPANY THAT YOU WENT TO WORK

23   FOR AFTER YOU RESIGNED FROM MGA?

24   A     MAUI TOYS.

25   Q     WHAT IS MAUI TOYS?                                   01:02
```

```
 1   A     A TOY MANUFACTURER.

 2   Q     WHAT TYPE OF TOYS?

 3   A     SPRING AND SUMMER, SEASONAL ITEMS.

 4   Q     WHEN DID YOU START WORKING AT MAUI TOYS?

 5   A     DECEMBER 2001.                                        01:03

 6   Q     HOW SOON AFTER RESIGNING WHILE YOU WERE ON LEAVE AT MGA

 7   DID YOU JOIN MAUI TOYS?

 8         MR. QUINN:  RELEVANCE, YOUR HONOR.

 9         THE COURT:  I'LL OVERRULE IT, COUNSEL.

10         MR. NOLAN:  I NEED TO HAVE A FEW QUESTIONS TO          01:03

11   ESTABLISH THE BIAS.

12         THE COURT:  VERY WELL.

13         OVERRULED.

14   BY MR. NOLAN:

15   Q     HOW LONG AFTER RESIGNING FROM MGA DID YOU JOIN MAUI TOYS?   01:03

16   A     PROBABLY A WEEK.

17   Q     WHAT WAS YOUR POSITION AT MAUI TOYS?

18   A     NATIONAL SALES MANAGER.

19   Q     SO THERE WAS NOTHING IN YOUR EMPLOYMENT AGREEMENT THAT YOU

20   SIGNED AT MGA, THE CONFIDENTIALITY AGREEMENT AND PROPRIETARY   01:03

21   INFORMATION AGREEMENT, THAT PREVENTED YOU FROM GOING TO WORK

22   FOR A COMPETITOR AFTER LEAVING MGA?

23   A     THERE MAY HAVE BEEN LANGUAGE TO SUCH EFFECT, BUT MAUI TOYS

24   WASN'T A DIRECT COMPETITOR, AND I DON'T BELIEVE THAT THE TERM

25   WAS -- I DON'T BELIEVE THAT THE TERM WAS ENFORCEABLE.         01:04
```

```
1   Q    DID ANYBODY AT MGA EVER ATTEMPT TO PREVENT YOU FROM GOING

2   TO WORK AT MAUI TOYS?

3   A    NOT THAT I'M AWARE OF.

4   Q    DID YOU INTERVIEW AT MAUI TOYS WHILE YOU WERE ON LEAVE

5   FROM MGA?                                                    01:04

6   A    YES.

7   Q    SO YOU INTERVIEWED AT MAUI TOYS BEFORE YOU RESIGNED FROM

8   MGA; YES?

9   A    YES.

10  Q    TELL THE JURY HOW LONG YOU WORKED FOR MAUI TOYS.        01:04

11  A    SIX OR SEVEN WEEKS.

12  Q    DID YOU RESIGN, OR WERE YOU TERMINATED?

13          MR. QUINN:  OBJECTION.  RELEVANCE, YOUR HONOR.

14          MR. NOLAN:  YOUR HONOR, PATIENCE, PLEASE.

15          THE COURT:  OVERRULED.                               01:04

16  BY MR. NOLAN:

17  Q    DID YOU RESIGN, OR WERE YOU FIRED?

18  A    I WAS TERMINATED.

19  Q    WHERE AFTER DID YOU GO TO WORK, AFTER MAUI TOYS?

20  A    ATOMIC TOYS.                                            01:05

21  Q    IS THAT ANOTHER TOY COMPANY?

22  A    YES, IT IS.

23  Q    AND HOW LONG DID YOU STAY WORKING AT ATOMIC TOY COMPANY?

24  A    APPROXIMATELY FEBRUARY OF 2002, THROUGH SEPTEMBER, OCTOBER

25  OF 2005.                                                    01:05
```

1    Q    DID YOU LEAVE ATOMIC TOYS VOLUNTARILY?

2    A    YES.

3    Q    NOW, DURING WHAT PERIOD OF TIME DID YOU FILE A

4    DISCRIMINATION CASE AGAINST YOUR FORMER EMPLOYER, MGA?

5    A    I BELIEVE IT WAS FALL OF 2004.                            01:05

6    Q    AND YOU HAD LEFT YOUR EMPLOYMENT AT MGA AT THE END OF THE

7    YEAR 2001?

8    A    YES.

9    Q    SO THREE YEARS LATER, AND AFTER WORKING AT TWO DIFFERENT

10   OTHER EMPLOYERS, YOU FILED A LAWSUIT AGAINST MGA?          01:06

11   A    YES.

12   Q    WHERE WAS THE LAWSUIT FILED?

13   A    LOS ANGELES.

14   Q    CAN YOU TELL THE JURY WHAT WAS THE DISPOSITION OF THAT

15   LAWSUIT.                                                       01:06

16   A    I DROPPED IT.

17   Q    WERE YOU PAID ANY MONEY BY MGA TO SETTLE THAT CASE?

18   A    NO.

19   Q    MR. QUINN ASKED YOU ABOUT WHETHER OR NOT, WHILE YOU WERE

20   EMPLOYED AT MGA, PRIOR TO BRATZ, IF MGA HAD EVER MADE A FASHION   01:07

21   DOLL.

22         DO YOU RECALL THAT QUESTION?

23   A    YES, I DO.

24   Q    AND YOUR ANSWER WAS NO, IT HAD NOT; CORRECT?

25   A    CORRECT.                                                  01:07

1   Q    BUT YOU WERE AWARE THAT MGA DID MANUFACTURE AND DISTRIBUTE

2   TO RETAIL, DOLLS.

3   A    YES.

4   Q    CAN YOU EXPLAIN TO THE JURY THE VARIOUS DOLLS THAT YOU

5   RECALL HAVING RESPONSIBILITY FOR WHILE YOU WERE MONITORING THE          01:07

6   ACCOUNT FOR MGA AT WAL-MART.

7   A    YES.

8         WE SOLD WHAT ARE CALLED SPECIAL FEATURE LARGE DOLLS.

9   THEY WERE -- I DON'T KNOW EXACTLY THE SIZE, BUT THEY WERE

10  LARGER BABY DOLL TYPE DOLLS THAT HAD ELECTRONICS IN THEM.              01:07

11  THERE WERE -- WHEN I FIRST STARTED, THERE WERE TWO, AND THEN WE

12  ENDED UP EXTENDING THE LINE.  BUT THEY DID THINGS LIKE WHEN YOU

13  BOUNCED THEM ON YOUR KNEE, THEY SANG A SONG.  ONE OF THEM WAS A

14  COWGIRL THEME, AND WHEN YOU HOOKED HER FEET TOGETHER, SHE SAID,

15  'GIDDY UP' AND MADE COWGIRL TALKING REFERENCES.                        01:08

16         LATER ON, WE HAD A VERY HIGH-END DOLL CALLED MY DREAM

17  BABY, WHICH HAD QUITE A LOT OF ELECTRONICS IN IT AND VOICE

18  COMMAND AND VOICE RECOGNITION TECHNOLOGY.  AND WE ALSO

19  DEVELOPED A SMALLER DOLL CALLED PRAYER ANGELS, WHICH ALSO HAD

20  ELECTRONICS.  WHEN YOU PUT HER HANDS TOGETHER, SHE RECITED             01:08

21  PRAYERS, AND SHE LOOKED LIKE A CHERUB WITH WINGS.

22  Q    ANY OTHER DOLLS, THAT YOU RECALL?

23  A    NOT THAT I RECALL.

24  Q    SO IT'S TRUE, TO SUPPLEMENTAL YOUR ANSWER TO MR. QUINN,

25  THAT IN ADDITION TO SELLING ELECTRONIC GAMES AND BOY TOYS, MGA         01:09

1   WAS MAKING DOLLS FOR THE GIRL MARKET AND DISTRIBUTING THEM IN

2   STORES SUCH AS WAL-MART AND K-MART; CORRECT?

3   A    YES.

4   Q    WHAT OTHER STORES DO YOU RECALL THAT MGA WAS MANUFACTURING

5   AND PRODUCING DOLLS FOR DURING THE TIME YOU WERE EMPLOYED,          01:09

6   BEFORE THEY INTRODUCED BRATZ?

7   A    I BELIEVE TOYS-R-US WAS CARRYING OUR DOLLS.  I BELIEVE

8   TARGET WAS CARRYING SOME OF THE DOLLS.  J.C. PENNEY.

9            A NUMBER OF RETAIL ACCOUNTS WERE.

10  Q    DO YOU RECALL SOME OF THE DOLLS THAT MGA MANUFACTURED          01:09

11  DURING THAT PERIOD OF TIME ACTUALLY WON AWARDS FROM VARIOUS

12  AGENCIES?

13  A    I HAVEN'T THOUGHT ABOUT IT, SO I DON'T REMEMBER, BUT IT'S

14  POSSIBLE.

15  Q    NOW, YOU TALKED ABOUT ATTENDING A SALES MEETING AT MGA         01:10

16  WHERE BRATZ WAS DISCUSSED.

17            DO YOU RECALL THAT TESTIMONY?

18  A    YES, I DO.

19  Q    AND DO YOU HAVE A SPECIFIC RECOLLECTION OF WHEN THAT SALES

20  MEETING TOOK PLACE?                                                 01:10

21  A    YES.

22  Q    WHAT IS THAT SPECIFIC RECOLLECTION AS TO THE DATE?

23  A    IT WAS IN SEPTEMBER OR OCTOBER 2000.

24  Q    SO YOU JUST DON'T HAVE AN EXACT DATE, BUT IT COULD HAVE

25  BEEN IN EITHER SEPTEMBER OR OCTOBER OF 2000; YES?                   01:10

```
 1   A    YES.

 2   Q    WERE OTHER LINES OF DOLLS ALSO DEMONSTRATED AT THAT SALES

 3   MEETING?

 4   A    YES.

 5   Q    DO YOU RECALL ANYTHING PARTICULAR ABOUT THE BRATZ              01:11

 6   PRESENTATION AT THAT SALES MEETING?

 7   A    YES.

 8   Q    WHAT DO YOU RECALL?

 9   A    I RECALL THE CONCEPT, THE CONVERSATION, THE PITCH THAT THE

10   MARKETING TEAM GAVE US; SOME OF THE FEATURES; SOME OF THE PLANS     01:11

11   FOR THE EVENTUAL LINE EXTENSIONS; ACCESSORIES.  THERE'S A

12   NUMBER OF THINGS THAT WERE DISCUSSED.

13   Q    DO YOU RECALL, AT THAT OCTOBER SALES MEETING, THAT THERE

14   WAS ANY DISPLAY OF AN ACTUAL BRATZ DOLL, A 3-D VERSION OF IT?

15   A    NO.                                                            01:12

16   Q    DO YOU RECALL, AT THAT SALES PRESENTATION IN OCTOBER OF

17   2000, ANY PRESENTATION OF FINAL FASHIONS FOR THE DOLL ITSELF?

18   A    I RECALL FASHIONS AND THEMES FOR THE ACCESSORY PACKS, BUT

19   I DON'T KNOW THAT THEY WERE FINAL.

20   Q    NOW, THAT IS THE FIRST TIME, THAT IS, IN OCTOBER OF 2000,      01:12

21   THAT YOU RECALL EVER SEEING A PRESENTATION, FORMAL

22   PRESENTATION, WITH RESPECT TO THE BRATZ DOLL; YES?

23           MR. QUINN:  YOUR HONOR, MISSTATES THE TESTIMONY.  I

24   THINK SHE SAID SEPTEMBER OR OCTOBER.

25   / / /                                                              01:12
```

```
 1    BY MR. NOLAN:

 2    Q    I APOLOGIZE.  SEPTEMBER OR OCTOBER OF 2000.

 3    A    YES.

 4              MR. NOLAN:  NOTHING FURTHER, YOUR HONOR.

 5              THE COURT:  ANYTHING FURTHER FROM THE PLAINTIFF?      01:12

 6              MR. QUINN:  YES, YOUR HONOR.

 7                       REDIRECT EXAMINATION

 8    BY MR. QUINN:

 9    Q    MS. MAURUS, YOU WERE ASKED SOME QUESTIONS ABOUT YOUR PRIOR

10    TESTIMONY ON THE SUBJECT OF WHEN THIS CONVERSATION WITH         01:13

11    MS. GARCIA, THEN TREANTEFELLAS, AND MR. BRYANT TOOK PLACE.

12              DO YOU RECALL BEING ASKED THOSE QUESTIONS?

13    A    YES.

14    Q    YOU'LL FIND IN THE BINDER THERE IN FRONT OF YOU, BEHIND

15    TAB 12079, A COPY OF THAT TESTIMONY.  I'D ASK IF YOU WOULD      01:13

16    PLEASE TURN TO PAGE 12079-0055.

17              I'D LIKE TO BEGIN AT -- JUST READ YOUR TESTIMONY,

18    BEGINNING AT THE BOTTOM OF PAGE 55, LINE 25, CONTINUING OVER TO

19    56, THE NEXT PAGE, LINE 5.

20    A    QUESTION: "LET ME STOP YOU RIGHT THERE.  WHEN EXACTLY DID  01:14

21    THIS FIRST CONVERSATION TAKE PLACE?"

22              ANSWER:  "I DON'T KNOW EXACTLY WHEN, BUT IT WOULD

23    HAVE BEEN IN THE SUMMER OF 2000."

24              QUESTION:  "WOULD IT BE IN THE EARLY SUMMER OR LATE

25    SUMMER?"                                                        01:14
```

```
 1              ANSWER:  "I BELIEVE IT WAS EARLY SUMMER."
 2    BY MR. QUINN:
 3    Q    NOW, YOU INDICATED IN RESPONSE TO ONE OF MR. NOLAN'S
 4    QUESTIONS THAT FROM WHERE YOU COME FROM, SEPTEMBER 1ST IS FALL.
 5    A    YES.                                                           01:14
 6    Q    AND WHY DO YOU SAY THAT?
 7    A    I THINK OF SUMMER AS MEMORIAL DAY TO LABOR DAY.
 8    Q    YOU WERE ASKED QUESTIONS ABOUT WHEN YOU WENT OVER TO
 9    MAUI TOYS AND INTERVIEWED.
10              WHEN YOU WENT TO MAUI TOYS TO INTERVIEW, DID YOU         01:15
11    SHARE WITH THEM ANY CONFIDENCES THAT YOU HAD OBTAINED WHILE YOU
12    WERE WORKING AT MGA; THAT IS TO SAY, MGA CONFIDENTIAL
13    INFORMATION?
14    A    NO.
15    Q    DID YOU BRING WITH YOU OR SHARE WITH THE FOLKS AT             01:15
16    MAUI TOYS ANY DESIGNS, ANY MGA DESIGNS?
17    A    NO.
18    Q    YOU WERE ASKED SOME QUESTIONS ABOUT THE MGA
19    CONFIDENTIALITY AND PROPRIETARY INFORMATION AGREEMENT THAT CAME
20    OUT IN AUGUST OF 2000.                                             01:15
21         MR. QUINN:  IF WE COULD PUT ON THE SCREEN EXHIBIT
22    13532-0004.
23    BY MR. QUINN:
24    Q    MR. NOLAN ASKED YOU A QUESTION ABOUT INVENTIONS OR IDEAS
25    THAT PEOPLE CAME UP WITH BEFORE THEY CAME TO WORK TO MGA, AND I    01:16
```

1   THINK YOUR TESTIMONY WAS THAT THERE'S A DUTY TO DISCLOSE THAT.

2          DO YOU RECALL SAYING THAT?

3   A    YES.

4   Q    AND HE CALLED YOUR ATTENTION TO PARAGRAPH TWO HERE,

5   "DISCLOSURE OF IDEAS OR INVENTIONS."                              01:16

6          DO YOU RECALL THAT?

7   A    YES.

8   Q    RELATING TO INVENTIONS DEVELOPED DURING THE EMPLOYEE'S

9   EMPLOYMENT; RIGHT?

10  A    YES.                                                         01:16

11  Q    LET'S LOOK AT THE VERY NEXT PARAGRAPH THAT MR. NOLAN DID

12  NOT SHOW YOU:  "WRITTEN DISCLOSURE OF PRIOR INVENTIONS.

13  EMPLOYEE AGREES TO PROVIDE A COMPLETE LIST OF ALL PATENTED OR

14  NONPATENTED IDEAS AND INVENTIONS CONCEIVED BY EMPLOYEE, OR

15  ANYONE ELSE JOINTLY WITH EMPLOYEE, PRIOR TO THE DATE EMPLOYEE     01:16

16  HAS SIGNED THIS AGREEMENT.  THE FAILURE OF EMPLOYEE TO PROVIDE

17  COMPANY WITH A WRITTEN DISCLOSURE OF IDEAS OR INVENTIONS SHALL

18  BE DEEMED TO CONSTITUTE AN AFFIRMATIVE ACKNOWLEDGEMENT BY

19  EMPLOYEE THAT NO SUCH IDEAS OR INVENTIONS EXIST."

20          IS THAT THE PARAGRAPH THAT YOU WERE THINKING OF WHEN      01:17

21  YOU ANSWERED MR. NOLAN'S QUESTION?

22          **MR. NOLAN:**  OBJECTION, YOUR HONOR.  LEADING.

23          **THE COURT:**  OVERRULED, AS PHRASED.

24          YOU MAY ANSWER.

25          **THE WITNESS:**  YES.                                    01:17

1  **BY MR. QUINN:**

2  Q    HE ALSO ASKED YOU ABOUT THINGS THAT EMPLOYEES COME UP WITH

3  ON THEIR OWN TIME.

4         DO YOU RECALL HIM ASKING YOU ABOUT THAT AND THE WAY

5  THE MGA EMPLOYMENT AGREEMENT WORKS?                           01:17

6  A    YES.

7  Q    IF WE COULD LOOK AT THE TOP PARAGRAPH, "ASSIGNMENT OF

8  INTERESTS."

9         IT SAYS, "THIS ASSIGNMENT SHALL NOT APPLY TO ANY IDEA

10 OR INVENTION DEVELOPED BY EMPLOYEE ON EMPLOYEE'S OWN TIME      01:18

11 WITHOUT EQUIPMENT, SUPPLIES, FACILITIES, OR TRADE SECRET

12 INFORMATION OF COMPANY, UNLESS SAID INVENTION OR IDEA, ONE,

13 RELATES TO THE BUSINESS OF THE COMPANY OR TO COMPANY'S ACTUAL

14 OR ANTICIPATED RESEARCH OR DEVELOPMENT, OR, TWO, RESULTS FROM

15 ANY WORK PERFORMED BY EMPLOYEE FOR COMPANY."                  01:18

16        WHAT WAS YOUR UNDERSTANDING ABOUT WHAT THIS MEANT IN

17 TERMS OF THINGS THAT AN EMPLOYEE COMES UP WITH ON THEIR OWN

18 TIME?

19 A    THE EMPLOYEE WOULD HAVE HAD TO COME UP WITH SOMETHING THAT

20 WAS COMPLETELY IRRELEVANT TO THE CURRENT BUSINESS OR THE      01:18

21 INDUSTRY ON THEIR OWN TIME, WITHOUT ANY INFORMATION EVER

22 GLEANED FROM WORKING AT THE COMPANY, IN ORDER FOR IT TO BE

23 DEEMED AS THAT PERSON'S IDEA.

24 Q    AND SUPPOSE THE EMPLOYEE CAME UP WITH THE IDEA ON THEIR

25 OWN TIME, BUT IT RELATED TO TOYS?                             01:19

```
 1   A    IT WOULD HAVE TO BE DISCLOSED, AND IT WOULD BE ASSIGNED TO

 2   THE EMPLOYER.

 3   Q    MR. NOLAN ASKED YOU SOME QUESTIONS ABOUT A CIVIL CASE THAT

 4   YOU FILED AGAINST MGA SOMETIME AFTER YOU LEFT MGA.

 5        DO YOU RECALL WHETHER OR NOT, PRIOR TO FILING THAT       01:19

 6   CIVIL CASE, YOU FILED A COMPLAINT WITH THE DEPARTMENT OF FAIR

 7   EMPLOYMENT AND HOUSING RELATING TO PREGNANCY DISCRIMINATION?

 8   A    YES, I DO.

 9   Q    AND WAS IT YOUR UNDERSTANDING YOU WERE REQUIRED TO DO THAT

10   BEFORE YOU COULD FILE A CIVIL LAWSUIT?                        01:19

11   A    YES.

12   Q    AND DID YOU FILE THAT COMPLAINT LESS THAN ONE YEAR AFTER

13   YOU LEFT MGA?

14   A    YES.

15        MR. QUINN:  NOTHING FURTHER.  THANK YOU.                 01:20

16        THE COURT:  MR. NOLAN, ANYTHING FURTHER?

17                   RECROSS-EXAMINATION

18   BY MR. NOLAN:

19   Q    YOU KNOW THE EMPLOYMENT AGREEMENT AT MGA THAT MR. QUINN

20   ASKED YOU SOME QUESTIONS ABOUT?                               01:20

21   A    YES.

22   Q    YOU DIDN'T SIGN SUCH AN AGREEMENT AT MGA; RIGHT?

23   A    YES, I DID.

24   Q    YOU ACTUALLY SIGNED A FORM OF THIS AGREEMENT?

25   A    NOT THIS ONE.  BUT ONE WHEN I WAS HIRED.  IT'S PART OF THE  01:20
```

```
 1   EMPLOYMENT PACKAGE.

 2   Q    IN FACT, ISN'T IT TRUE THAT YOU REFUSED TO SIGN THE

 3   REVISED VERSION?

 4   A    YES.

 5   Q    NOW, MR. QUINN WAS SHOWING YOU A THIRD PARAGRAPH THAT YOU        01:20

 6   HAD NOT IDENTIFIED IN RESPONSE TO ONE OF MY QUESTIONS REGARDING

 7   THE DISCLOSURE OF IDEAS -- I THINK IT'S THE WRITTEN DISCLOSURE

 8   OF PRIOR INVENTIONS.

 9          DO YOU SEE THAT?

10          DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THAT             01:21

11   THIRD PARAGRAPH IS PRETTY COMMON, PRETTY STANDARD, IN THE

12   INDUSTRY?

13   A    I BELIEVE IT'S STANDARD.

14   Q    DO YOU HAVE ANY IDEA AS TO WHETHER OR NOT MATTEL HAS SUCH

15   A PROVISION IN THEIR CONTRACT?                                      01:21

16   A    I HAVE NO IDEA.

17   Q    IN FACT, YOU HAVE NO KNOWLEDGE WITH RESPECT TO THE TERMS

18   OF THE EMPLOYMENT AGREEMENT THAT CARTER BRYANT SIGNED AT

19   MATTEL, DO YOU?

20   A    NO, I DON'T.                                                   01:21

21   Q    DO YOU STILL HAVE A COPY OF YOUR ARBITRATION TESTIMONY IN

22   FRONT OF YOU?

23   A    YES.

24   Q    I'D LIKE TO ASK YOU TO TURN TO PAGE 251, STARTING AT

25   LINE 10.                                                           01:22
```

```
 1   A    WHICH PAGE NUMBERS ARE YOU USING?

 2   Q    IT WOULD BE EXHIBIT NUMBER 12079-0079.  I'LL READ THIS,

 3   AND IF YOU COULD JUST READ ALONG WITH ME.

 4           MR. QUINN:  WHAT LINES?

 5           MR. NOLAN:  LINES 10 THROUGH 21.              01:23

 6   BY MR. NOLAN:

 7   Q    THIS WAS DURING THE CROSS-EXAMINATION OF YOU AT THE

 8   ARBITRATION.

 9           MR. QUINN:  COULD WE GO TO 252, LINE 18?

10           THE COURT:  MR. NOLAN, ANY OBJECTION?          01:23

11           MR. NOLAN:  "SO THE ANSWER IS, THERE'S NO DOOR IN HER

12   OFFICE"; RIGHT?

13           MR. QUINN:  RIGHT.

14           THE COURT:  VERY WELL.

15   BY MR. NOLAN:

16   Q    I'LL READ, AND THEN JUST TELL ME -- I'LL TRY NOT TO SKIP

17   OVER ANY WORDS, BUT READ ALONG WITH ME HERE, TO YOURSELF

18   QUIETLY.

19           AND THIS IS, BY THE WAY, ISAAC LARIAN'S ATTORNEY,

20   LARRY FELDMAN, ASKING THESE QUESTIONS OF YOU, I BELIEVE.    01:23

21           QUESTION:  "I ASSUME YOU HADN'T THOUGHT ABOUT THIS

22   ISSUE ABOUT WHEN YOU FIRST MET WITH CARTER BRYANT, PAULA AND

23   CARTER BRYANT?"

24           ANSWER:  "YES."

25           QUESTION:  "THE DISCUSSION YOU SAID YOU HAD.  YOU    01:24
```

1    HADN'T THOUGHT ABOUT THIS, I GATHER, FOR SEVERAL YEARS?"

2           ANSWER:  "CORRECT."

3           QUESTION:  "AND THE FIRST TIME YOU THOUGHT ABOUT THIS

4    ISSUE, I GATHER, IS AFTER FRED CALLED YOU SOMETIME, ALMOST FIVE

5    YEARS AFTER THE CONVERSATION ALLEGEDLY TOOK PLACE?"                 01:24

6           ANSWER:  "CORRECT."

7           QUESTION:  "OKAY.  AND YOU DON'T HAVE ANYTHING IN

8    WRITING TO DOCUMENT THAT CONVERSATION; CORRECT?"

9           ANSWER:  "CORRECT."

10          QUESTION:  "IN THAT CONVERSATION, CARTER BRYANT WAS     01:24

11   THERE AND PAULA WAS THERE; CORRECT?"

12          ANSWER:  "CORRECT."

13          ANSWER:  "AND PAULA'S OFFICE AT THAT TIME -- THE

14   COMPANY WAS IN THE OLD BUILDING ON shoenenberg, WAS IT?"

15          ANSWER:  "THAT'S THE ONLY BUILDING I KNOW OF."          01:24

16          QUESTION:  "AND WHERE WAS PAULA'S OFFICE?  WAS IT IN

17   THE MAIN BUILDING?"

18          ANSWER:  "THERE WAS ONLY ONE BUILDING."

19          QUESTION:  "WAS PAULA'S OFFICE ON THE SAME FLOOR AS

20   ISAAC LARIAN'S?"                                              01:24

21          ANSWER:  "YES."

22          QUESTION:  "WAS IT ON THE SAME FLOOR AS

23   FRED LARIAN'S?"

24          ANSWER:  "YES."

25          QUESTION:  "WAS IT IN AN OPEN CUBICLE?"                01:25

```
 1              ANSWER:  "YES.

 2              QUESTION:  "THERE'S NO DOOR TO HER OFFICE; RIGHT?"

 3              ANSWER:  "NO."

 4   BY MR. NOLAN:

 5   Q    DID I READ THAT CORRECTLY?                                01:25

 6   A    YES.

 7   Q    THOSE WERE THE QUESTIONS THAT YOU WERE ASKED AND THOSE

 8   WERE THE ANSWERS THAT YOU GAVE UNDER OATH AT THE ARBITRATION;

 9   CORRECT?

10   A    YES.                                                     01:25

11   Q    BY THE WAY, WHERE DO YOU WORK NOW?

12   A    I WORK FOR ANOTHER TOY COMPANY.

13   Q    WHAT'S THE NAME OF THAT TOY COMPANY?

14   A    SNAP TV GAMES.

15   Q    DID YOU AGREE TO SIGN THEIR CONFIDENTIALITY AGREEMENT?    01:25

16   A    THEY DIDN'T GIVE ME ONE.

17           MR. NOLAN:  NOTHING FURTHER.

18                       REDIRECT EXAMINATION

19   BY MR. QUINN:

20   Q    WHY IS IT THAT YOU REMEMBER THAT CONVERSATION WHERE       01:25

21   MS. GARCIA, THEN TREANTAFELLES, INTRODUCED YOU TO MR. BRYANT?

22           MR. NOLAN:  OBJECTION.  ASKED AND ANSWERED,

23   YOUR HONOR.

24           THE COURT:  OVERRULED.

25           THE WITNESS:  I REMEMBERED THE FIRST TIME I SAW THE    01:25
```

1   DRAWINGS, AND I REMEMBERED AN IMPRESSION CARTER MADE UPON ME.

2   Q    WERE YOU THE ONLY ONE WHO DECLINED TO SIGN THE NEW FORM OF

3   MGA'S INVENTIONS AND PROPRIETARY INFORMATION AGREEMENT WHEN IT

4   CAME OUT IN AUGUST OF 2000?

5   A    NO.                                                              01:26

6   Q    WERE THERE OTHER EMPLOYEES WHO DECLINED TO SIGN IT?

7   A    YES.

8   Q    WAS IT A CAUSE OF CONTROVERSY AT MGA?

9   A    YES.

10  Q    WHY?                                                            01:26

11  A    BECAUSE MANY OF US WERE IN THE TOY INDUSTRY AND PLANNED TO

12  STAY IN THE TOY INDUSTRY, AND IT WAS SO OVER-ENCOMPASSING AND

13  IT VIRTUALLY TRIED TO PROHIBIT US EVER WORKING FOR ANOTHER TOY

14  COMPANY AGAIN IF WE WERE TO HAVE LEFT.

15  Q    WAS THERE A PREVIOUS INVENTIONS AND PROPRIETARY                 01:26

16  INFORMATION AGREEMENT THAT HAD BEEN IN PLACE?

17  A    I BELIEVE THERE WAS, YES.

18  Q    WHICH YOU AND OTHERS HAD SIGNED?

19  A    YES.

20           **MR. QUINN:**  THANK YOU.                                  01:27

21                       **RECROSS-EXAMINATION**

22  **BY MR. NOLAN:**

23  Q    BY THE WAY, WHEN YOU REFUSED TO SIGN THE REVISED MGA

24  AGREEMENT, WERE YOU FIRED?

25  A    NO.                                                             01:27

```
 1          THE COURT:  YOU'RE EXCUSED, MA'AM.  THANK YOU.

 2          LET'S TAKE OUR MORNING BREAK AT THIS TIME.

 3          (WHEREUPON, JURORS DEPART COURTROOM.)

 4          THE COURT:  I WANT TO TAKE UP THE -- I KNOW WE HAVE

 5  MS. ASHong GOING ON NEXT FOR 30 MINUTES, APPROXIMATELY.  THAT'S

 6  THE ESTIMATE THAT I WAS GIVEN.  AND THEN FOLLOWING THAT,

 7  STEVE LINKER.  SO I WANT TO RULE ON THE OBJECTIONS ON THE

 8  LINKER DEPOSITION.

 9          WHO'S GOING TO BE SPEAKING TO THAT?

10          MR. QUINN:  MR. COREY FOR MATTEL, YOUR HONOR.

11          THE COURT:  AND FOR MGA?

12          MR. NOLAN:  AND I'LL ADDRESS THOSE.

13          THE COURT:  VERY WELL.

14          MR. NOLAN, LET ME START WITH YOU.

15          THERE'S A SERIES OF OBJECTIONS AT THE BEGINNING,

16  WHICH ARE ALL ESSENTIALLY THE SAME OBJECTION, IRRELEVANT TO

17  PHASE 1-A, BUT THEY ALL SEEM TO DEAL WITH MEETINGS HELD IN

18  OCTOBER OF 2000.

19          MR. NOLAN:  YOUR HONOR, I THINK --

20          THE COURT:  THE ONLY OBJECTION THAT'S MADE IS PHASE

21  1-A.  I THINK THESE PROBABLY DO COME IN.

22          MR. NOLAN:  YOUR HONOR, IN LIGHT OF THE DEVELOPMENT

23  OF THE STORY AND THE TESTIMONY WITH RESPECT TO THE MEETING AT

24  STARBUCKS THAT WAS ELICITED WITH PAULA GARCIA, I AGREE WITH

25  YOU.  I DON'T NEED TO EXPLAIN.  BUT I THOUGHT THE PACKAGING
```

01:28
01:28
01:28
01:28
01:28
01:29

```
 1    ISSUES AND THOSE TYPE OF THINGS WE SAW AS BEING 1-B ISSUES.

 2              THE COURT:  I UNDERSTAND.

 3              I'M GOING TO GO THROUGH THESE AS QUICKLY AS I CAN.

 4    IF I'M GOING TOO QUICKLY, PLEASE, SOMEBODY LET ME KNOW.

 5              THE FIRST OBJECTION, I BELIEVE, APPEARS ON PAGE 48,        01:29

 6    AND IT IS OVERRULED.

 7              THE NEXT OBJECTION APPEARS ON PAGE 54.  IT WAS

 8    OVERRULED.

 9              THE NEXT OBJECTION IS ON 68.  IT IS OVERRULED -- I'M

10    SORRY -- 66 IS OVERRULED.                                          01:29

11              68 IS OVERRULED; 69 IS OVERRULED.

12              70 IS OVERRULED; 79 IS OVERRULED.

13              83 IS OVERRULED; 84 IS OVERRULED.

14              BOTH OBJECTIONS ON 86 ARE OVERRULED.

15              87 IS OVERRULED.                                         01:30

16              88 AND 89 ARE OVERRULED.

17              93 IS OVERRULED; 95 IS OVERRULED.

18              97 IS OVERRULED; 99 IS OVERRULED.

19              105 IS OVERRULED.

20              110, 111, 112, 113 ARE ALL OVERRULED.                    01:31

21              116 IS OVERRULED.

22              BOTH OBJECTIONS ON 115 AND BOTH OBJECTIONS ON 117 ARE

23    OVERRULED.

24              120 IS OVERRULED.

25              THAT BRINGS US UP TO 157.                                01:31
```

tuesday, june 3rd, 2008                    trial day 6, morning session

1        SO BASICALLY, ALL OBJECTIONS THROUGH 157 ARE

2   OVERRULED.  THEY'RE essentially ALL RELEVANCY OBJECTIONS.

3        157, I HAVE A QUESTION.  THIS IS EXHIBIT 308.

4        IT'S NOT CLEAR THE TIMING ON THIS.  I DON'T HAVE 308

5   ATTACHED AS AN EXHIBIT TO THE DEPOSITION, SO I CAN'T SEE IT.      01:31

6   SO SOMEONE IS GOING TO NEED TO SPEAK TO WHAT THIS IS.

7        **MR. NOLAN:**  WE'RE PULLING IT UP RIGHT NOW,

8   YOUR HONOR.

9        **MR. COREY:**  IF IT WOULD HELP, MATTEL IS NOT OFFERING

10  308, YOUR HONOR.                                                 01:32

11       **MR. NOLAN:**  BASED ON THAT PROFFER, YOUR HONOR, WE

12  WOULD SAY THAT THIS SHOULD NOT BE THEN USED DURING THE

13  DEPOSITION.

14       **THE COURT:**  MR. COREY, WHAT WAS THAT?

15       **MR. COREY:**  MATTEL IS NOT OFFERING 308 INTO EVIDENCE.    01:32

16       **THE COURT:**  IF THAT'S THE CASE, I'M GOING TO SUSTAIN

17  THE OBJECTION THEN, BECAUSE THE QUESTION -- IT'S GETS INTO THE

18  SUBSTANCE OF 308.

19       SO 157 IS SUSTAINED.

20       I ASSUME THE SAME IS TRUE, MR. COREY, FOR                   01:32

21  EXHIBIT 309, WHICH IS ON PAGE 161?

22       IT'S ESSENTIALLY THE SAME QUESTION, RELATED TO YET

23  ANOTHER EXHIBIT, WHICH I DON'T HAVE; SO I ASSUME THAT MEANS

24  IT'S NOT COMING IN?

25       **MR. COREY:**  THAT'S CORRECT, YOUR HONOR.                 01:33

1        **THE COURT:**  VERY WELL.

2        I'LL SUSTAIN THAT OBJECTION AS WELL.

3        TURNING TO PAGE 168, I WILL SUSTAIN BOTH OBJECTIONS

4   TO LINES 14 THROUGH 18 AND 21 THROUGH 24, SPILLING OVER TO

5   LINES 1 THROUGH 8, ON PAGE 169.                              01:33

6        I'LL ALSO SUSTAIN THE OBJECTIONS ON LINES 14 THROUGH

7   20 ON 169.  THIS IS AN ENTIRELY DIFFERENT CLAIM.

8        I'LL ALSO SUSTAIN BOTH SETS OF OBJECTIONS ON

9   PAGE 170.

10       **MS. AGUIAR:**  I JUST WANT TO MAKE SURE WE DIDN'T SKIP   01:33

11  ONE ON PAGE 168.

12       **THE COURT:**  I COULD HAVE.

13       WHICH PAGE, COUNSEL?

14       **MS. AGUIAR:**  168, STARTING AT LINE 6.

15       **THE COURT:**  168, LINES 6 THROUGH 10, THERE'S NO       01:34

16  OBJECTION THERE.  I'M SUSTAINING THE OBJECTIONS 14 TO 18 AND 21

17  TO 24 ON THAT PAGE.

18       **MR. NOLAN:**  YOUR HONOR, I MAY BE MISREADING IT, BUT

19  OUR COPY SHOWS THAT FOR LINES 6 THROUGH 10, MGA HAS LODGED THE

20  OBJECTION "ASSUMES FACTS NOT IN EVIDENCE; LACK OF FOUNDATION;   01:34

21  CALLS FOR SPECULATION."

22       AND I THINK MR. COREY IS CONFIRMING THAT ON HIS COPY,

23  HE HAS THE SAME, YOUR HONOR.  I COULD HAND IT UP TO THE COURT,

24  IF YOU'D LIKE.

25       **THE COURT:**  JUST TO BE CLEAR, I'M EXPECTING THE        01:34

1   OBJECTION, ANY OBJECTION AT THIS POINT, TO BE WRITTEN IN THE

2   MARGIN OR SOMEPLACE.

3          OKAY.  IT'S NOT WRITTEN IN THE MARGIN -- OH, THERE IT

4   IS.  I DO SEE IT.  I'M SORRY.  I DID SKIP OVER IT.  I THOUGHT

5   YOU WERE REFERRING TO THE OBJECTION THAT WAS IMBEDDED IN THE          01:35

6   TEXT.

7          THOSE ARE ALL OVERRULED, UNLESS THEY ARE RENEWED BY

8   WRITING IN THE MARGIN.

9          I JUST MISSED THAT THERE.  I'M SORRY.

10         I'LL SUSTAIN ALL THREE OBJECTIONS ON PAGE 168.               01:35

11         THANK YOU, COUNSEL.

12         MR. NOLAN, YOU'RE CORRECT.

13         MS. AGUIAR, THANK YOU.

14         I JUST MISSED THAT.

15         I THINK I ALREADY INDICATED THAT I SUSTAINED BOTH            01:35

16  OBJECTIONS ON 170.

17         I'LL OVERRULE THE OBJECTION ON 181.  IT'S A CLOSE

18  CALL.

19         I THINK THE FOUNDATION, THOUGH, IS IMPLICIT IN THE

20  FIRST FIVE WORDS OF THE QUESTION.                                   01:35

21         ON PAGE 182, THE OBJECTION IS OVERRULED; PAGE 184,

22  THE OBJECTION IS OVERRULED; 185, THE OBJECTION IS OVERRULED.

23         186 AND 187, THIS IS WHERE I'D LIKE THE QUESTION

24  REPHRASED, BECAUSE IT CERTAINLY IS POORLY FORMED AS A QUESTION.

25         LET ME HEAR ON THIS QUESTION HERE.                           01:36

tuesday, june 3rd, 2008                    trial day 6, morning session

1      MR. COREY?

2      I'M LOOKING AT LINE 20, PAGE 186.

3      I HAVE NO PROBLEM WITH LINES 3 THROUGH 10 OF 187.

4  IT'S JUST THE BROADLY-PHRASED QUESTIONS ON LINE 20, AND AGAIN

5  ON LINE 24, THAT SEEM TO BE GOING BEYOND THE SCOPE.                01:37

6      I SUPPOSE I SHOULD BE DIRECTING THIS QUESTION TO MGA.

7      **MR. COREY:**  THAT'S WHAT I WAS GOING TO SAY.  I THINK

8  I AGREE WITH THE COURT; THIS IS MGA'S DESIGNATION.

9      **MR. NOLAN:**  YOUR HONOR, I BELIEVE THAT, ESPECIALLY IN

10 LIGHT OF THE TESTIMONY THAT'S BEEN DEVELOPED BY MATTEL IN THIS      01:37

11 CASE IN TERMS OF PUSHING IT OUT, WE'RE NOT ASKING HERE -- THIS

12 TESTIMONY DOES NOT GO TO WHEN THE ACTUAL DOLL WAS MANUFACTURED;

13 SO WE DON'T HAVE THAT ISSUE.

14     BUT I DO THINK IT'S RELEVANT, YOUR HONOR, DURING THIS

15 DEVELOPMENTAL STAGE, THAT HE WAS NOT SHOWN A 3-DIMENSIONAL          01:37

16 OBJECT, WHETHER OR NOT IT WAS SCULPTED; AND THE JURY HAS HEARD

17 A LOT OF TESTIMONY ALREADY ON THAT.

18     **THE COURT:**  RIGHT.

19     AND MATTEL HASN'T PUSHED IT OUT AS MUCH AS I'M

20 ALLOWING EVIDENCE OUTSIDE THE TIME FRAME, PROVIDED THAT IT'S        01:37

21 CLEARLY REFLECTING BACK TO THAT CRITICAL TIME FRAME.

22     **MR. NOLAN:**  AT THIS TIME, IF YOU GO RIGHT UP TO THE

23 BEGINNING AT LINE 18 -- IT'S THE OCTOBER 19TH MEETING, WHICH IS

24 REALLY RIGHT ON THE MARK AT THAT MEETING; THIS IS THE

25 OCTOBER 19TH MEETING.                                              01:38

```
 1          THE COURT:  IN CONTEXT, ALTHOUGH IT'S A CONTEXT THE

 2    JURY PROBABLY WON'T HAVE, I THINK IT'S PROBABLY A LEGITIMATE

 3    QUESTION TO ASK.

 4          I'LL OVERRULE THE OBJECTION.

 5          MR. COREY:  BUT, YOUR HONOR, IF WE'RE GOING TO DO           01:38

 6    THAT, I DO THINK THE JURY NEEDS SOME CONTEXT, BECAUSE

 7    OTHERWISE, IT IS --

 8          THE COURT:  THAT'S A GOOD POINT, MR. COREY.

 9          WE COULD BACK IT UP TO THE QUESTION, I SUPPOSE,

10    BEFORE, WHICH PLACES IT BACK IN THE OCTOBER 19TH MEETING.        01:38

11          MR. NOLAN:  RIGHT.

12          THE COURT:  BUT HE'S SAYING HE NEVER SAW ANYONE AND

13    NEVER SAW ANY FACE PAINTS.  I PRESUME HE'S TALKING ABOUT THIS

14    PERIOD OF TIME.

15          MR. NOLAN:  THAT'S CORRECT, YOUR HONOR.                    01:38

16          THE COURT:  I DON'T KNOW HOW ELSE TO DO THIS WITH THE

17    TEXT THAT WE HAVE, OTHER THAN BACKING IT UP A QUESTION, WHICH

18    MAKES REFERENCE TO THE OCTOBER 19TH MEETING.

19          ALL OF THE QUESTIONS BEFORE THAT ARE REFERENCING THE

20    OCTOBER 19TH MEETING.  I THINK IT'S PRETTY CLEAR IN THE CONTEXT  01:39

21    AS TO WHAT'S GOING ON HERE.

22          IF YOU WANT TO MAKE THAT CLEAR TO THE JURY, I'LL BACK

23    IT UP.  OTHERWISE, I'M GOING TO OVERRULE THE OBJECTION AND MOVE

24    FORWARD.

25          I DON'T KNOW IF THERE'S REALLY ANY OTHER WAY OF DOING      01:39
```

```
 1    IT WHEN WE'RE DEALING WITH VIDEOTAPED TESTIMONY.

 2              MR. COREY:  I UNDERSTAND, YOUR HONOR.  WE CAN CLARIFY

 3    THAT WHEN THE VIDEOTAPE IS BEING PLAYED, IF THAT'S ACCEPTABLE.

 4              THE COURT:  VERY WELL.

 5              MOVING ALONG TO PAGE 188, THIS EXHIBIT 325, IS THIS         01:39

 6    COMING IN?  I GUESS IT IS.  IT'S THE OCTOBER 20TH --

 7              MR. COREY:  WHAT WAS THAT IN REFERENCE TO,

 8    YOUR HONOR?

 9              THE COURT:  NEVER MIND.

10              I HAVE EXHIBIT 325 HERE.  I'LL OVERRULE THE                01:39

11    OBJECTIONS ON 188 AND 189 AND 190 AND 193, 191, 192.

12              194 IS OVERRULED.

13              I'LL SUSTAIN THE OBJECTIONS ON 195, BOTH SETS.

14              I'LL ALSO SUSTAIN THE OBJECTIONS ON 196.

15              I THINK THAT'S IT.                                         01:40

16              SO THOSE ARE THE COURT'S RULINGS ON THOSE OBJECTIONS.

17              ANYTHING FURTHER ON THE STEVEN LINKER DEPOSITION?

18              MR. NOLAN:  NO, YOUR HONOR.

19              THE COURT:  MR. COREY.

20              MR. COREY:  HOW DOES THE COURT PROPOSE TO HANDLE THE       01:40

21    ADMISSION OF EXHIBITS IN CONNECTION WITH THE TESTIMONY?

22              THE COURT:  THE EXHIBITS IN WHICH THE COURT DID NOT

23    SUSTAIN OBJECTIONS, IS THERE A STIPULATION BY BOTH SIDES?

24              WHY DON'T YOU WORK THAT OUT DURING THE BREAK AND SEE

25    IF THERE'S ANY OBJECTION.                                           01:40
```

```
 1              WHAT I'D LIKE TO DO IS, HAVE YOU IDENTIFY THEM,

 2    MR. COREY.

 3              ARE YOU GOING TO BE CALLING THE WITNESS?

 4         MR. COREY:  YES.

 5         THE COURT:  SET FORTH BY STIPULATION WHAT EXHIBITS      01:41

 6    ARE BEING ADMITTED, AND I'LL ASK MR. NOLAN TO JOIN IN.

 7         MR. NOLAN:  YES, YOUR HONOR.

 8              THE OTHER POINT, WOULD WE DO IT BEFORE OR AFTER IT'S

 9    PLAYED?

10         THE COURT:  BEFORE.  BECAUSE I WANT TO HAVE THE          01:41

11    EXHIBITS IN BEFORE THERE'S ANY REFERENCE TO THEM MADE.

12         MR. NOLAN:  I DON'T KNOW IF MR. RUSSELL RAISED THIS,

13    AND IF HE DID, I APOLOGIZE.

14              IS THE COURT GOING TO GIVE ANY INSTRUCTION TO THE

15    JURY WITH RESPECT TO VIDEO DEPOSITIONS AND THE USE OF THEM, OR  01:41

16    WILL THAT COME AT THE END?

17         THE COURT:  THERE'S AN INSTRUCTION GIVEN AT THE END

18    OF TRIAL CONCERNING THOSE.

19         MR. NOLAN:  THAT'S FINE WITH US, YOUR HONOR.

20         THE COURT:  THAT'S RIGHT, MR. QUINN.  THANK YOU.        01:41

21              THERE WAS AN INSTRUCTION CONCERNING -- EVEN THOUGH

22    MATTEL IS CALLING THE WITNESS, THAT I AM INCLUDING PORTIONS

23    DESIGNATED BY BOTH SIDES; SO I WILL GIVE THAT.  THANK YOU.

24              A COUPLE OF OTHER MATTERS, JUST HOUSEKEEPING.

25              ONE IS, I'D LIKE A PROPOSED ORDER ON THE COURT'S   01:41
```

```
 1   RULINGS ON THE DISCOVERY MOTIONS YESTERDAY, JUST SO WE CAN HAVE

 2   A WRITTEN RECORD OF WHAT THE COURT RULED ON ON THE RECORD.  IF

 3   YOU MAKE REFERENCE TO THE COURT'S FINDINGS ON THE RECORD, JUST

 4   LET'S HAVE A RULING ON THOSE SO THAT THERE'S NO DISPUTE.

 5            MR. COREY:  WE'RE PREPARING THAT, YOUR HONOR.          01:42

 6            THE COURT:  THANK YOU.

 7            THE LAST ISSUE IS, THE COURT DID RECEIVE FROM JUROR

 8   NUMBER SEVEN'S MANAGER THE FOLLOWING LETTER:

 9            "TO:  U.S. DISTRICT COURT; SUBJECT:  PAUL RUSSELL'S

10   JURY DUTY SERVICE; I RESPECTFULLY REQUEST THAT THE COURT EXCUSE  01:42

11   MR. PAUL RUSSELL FROM JURY DUTY AT THIS TIME.  MR. RUSSELL

12   POSSESSES SPECIFIC DEPARTMENT OF DEFENSE SECURITY ACCESSES AND

13   IS CURRENTLY SUPPORTING A PROJECT THAT REQUIRES THE COMBINATION

14   OF HIS CLEARANCE AND TECHNICAL SKILL SET.  THERE ARE CURRENTLY

15   NO OTHER EMPLOYEES WHO HAVE THE NECESSARY QUALIFICATIONS TO      01:42

16   PERFORM PAUL'S STATEMENT OF WORK, AND WE WOULD APPRECIATE YOU

17   CONSIDERING OUR REQUEST TO RELEASE MR. RUSSELL FROM HIS JURY

18   DUTY OBLIGATION."

19            THIS IS FROM NATHAN SHEFFIELD, MANAGER OF LABORATORY

20   OPERATIONS.                                                     01:43

21            MY PROPOSED RESPONSE IS AS FOLLOWS:

22            "DEAR MR. SHEFFIELD, THANK YOU FOR YOUR LETTER OF

23   MAY 29, 2008, CONCERNING JURY SERVICE BY YOUR EMPLOYEE,

24   MR. PAUL RUSSELL.  MR. RUSSELL WAS SELECTED FOR JURY SERVICE ON

25   MAY 20, 2008, FOR A FEDERAL JURY TRIAL THAT BEGAN ON MAY 27,    01:43
```

1    2008.

2              "MR. RUSSELL WAS SELECTED FROM A POOL OF

3    TIME-QUALIFIED JURORS WHO HAD RESPONDED AFFIRMATIVELY TO A

4    SCREENING QUESTIONNAIRE FOR A TWO-MONTH TRIAL.  AT THIS TIME,

5    THE JURY HAS ALREADY BEEN SELECTED.  ANY POTENTIAL REPLACEMENTS          01:43

6    HAVE LONG BEEN EXCUSED, AND THE TRIAL IS WELL UNDER WAY.

7              "THE RULE OF LAW, A CORNERSTONE OF OUR WAY OF LIFE,

8    IMPOSES IMPORTANT RESPONSIBILITIES ON ALL AMERICAN CITIZENS,

9    INCLUDING OUR GOOD CORPORATE CITIZENS SUCH AS NORTHROP GRUMMAN.

10   WE WILL DO ALL WE CAN TO MOVE THIS TRIAL ALONG AS EXPEDITIOUSLY         01:44

11   AS POSSIBLE, BUT I'M NOT ABLE TO EXCUSE MR. RUSSELL FROM HIS

12   SERVICE.  I REGRET THE INCONVENIENCE THAT THIS CAUSES YOU AND

13   YOUR COMPANY."

14             MR. QUINN?

15             **MR. QUINN:**  SOUNDS FINE, YOUR HONOR.                      01:44

16             **THE COURT:**  MR. NOLAN?

17             **MR. NOLAN:**  SOUNDS FINE, YOUR HONOR.

18             **THE COURT:**  VERY WELL.

19             I'LL SEND THIS OUT TODAY.

20             LET'S GO AHEAD AND TAKE OUR BREAK AT THIS TIME.               01:44

21             (WHEREUPON, A BRIEF RECESS WAS HELD.)

22             **THE COURT:**  I UNDERSTAND THERE'S AN ISSUE BEFORE WE

23   BRING IN THE JURY?

24             **MR. NOLAN:**  YES, YOUR HONOR.  THIS HAS TO DO WITH

25   EXHIBIT 4916 THAT WAS GOING TO BE PLAYED IN THE ASHONG VIDEO.          02:05

1       IN FACT, DO YOU HAVE the COPY OF 4916 IN FRONT OF

2   YOU?

3       **THE COURT:**  I DO, YES; 4916; IT'S GOT THE WORD

4   'ANGEL' ON IT SOMEPLACE.

5       **MR. NOLAN:**  THAT'S CORRECT; THIS IS THE ONE that you    02:05

6   SUGGESTED POSSIBLY REDACTING, BECAUSE SOME OF IT GOES to the

7   subject of --

8       **THE COURT:**  I WAS HOPING you COULD WORK THIS OUT.

9       I THINK THE ANGEL AND THE STUFF HERE on THE BACK AND

10  THE BULLET POINTS IS IRRELEVANT, BUT PERHAPS SOME OF THIS STUFF    02:05

11  MIGHT NOT BE.

12      **MR. NOLAN:**  OUR PROPOSAL for the redaction WAS THAT

13  THE FIRST PART OF THE DOCUMENT ON PAGE 1, THE FIRST E-MAIL,

14  SHOULD BE OUT; AND THEN THE SECOND PART WHERE IT SAYS 'HELLO,

15  FRED,' MATTEL HAS ASKED THAT CERTAIN PORTIONS OF THE SECOND    02:06

16  PARAGRAPH BE INCLUDED.  We BELIEVE THAT IF YOU'RE GOING TO TAKE

17  ONE SENTENCE OUT OF IT, THAT THE ENTIRE PARAGRAPH SHOULD BE PUT

18  INTO CONTEXT.

19      AND THEN THE LAST ISSUE FOR US, YOUR HONOR, IF YOU

20  TURN TO PAGE 2 OF THIS DOCUMENT, THERE IS A REFERENCE TO    02:06

21  'ANGEL' ON THE TOP.  BUT IF YOU CONTINUE TO LOOK THROUGH THESE

22  LISTs OF NAMES, IN FACT, THAT IS EXACTLY WHAT IS GOING ON.

23  THEIR ARGUMENT, of course, is THAT 'ANGEL' IS A CODE WORD.

24      IF YOU LOOK DOWN TO THE THIRD BULLET POINT FROM THE

25  TOP UP, IT SAYS 'THE BRATZ PACK.'  OUR ARGUMENT WOULD BE TO THE    02:06

1   JURY:  WHY IN THE WORLD WOULD YOU USE A CODE WORD 'ANGEL' ON

2   THE SAME LISTING WHERE YOU HAVE 'BRATZ PACK'?

3          **THE COURT:**  If that's your argument, I'M SURE WE'LL

4   HEAR THAT IN YOUR CLOSING.

5          **MR. NOLAN:**  Yes, your honor.  BUT I CAN'T USE THAT          02:06

6   CLOSING if -- THEY WANT TO REDACT ALL OF THOSE names.

7          **THE COURT:**  WE'RE not GOING TO DO that.

8          What we're going to do IS REDACT THE FIRST E-MAIL

9   FROM ISAAC LARIAN TO FRED LARIAN; THAT IS GONE.  WE WILL

10  INCLUDE THE ENTIRE SECOND E-MAIL, WHICH IS FROM NANA ASHONG TO   02:07

11  FRED LARIAN.  LET'S PUT THE ENTIRE DOCUMENT IN.

12         **MR. PROCTOR:**  THAT'S FINE, YOUR HONOR.

13         IF I MAY, THE ONE POINT THAT I WOULD MAKE IS THE

14  CONTENTS OF PAULA TREANTEFELLAS' E-MAIL TO MR. LARIAN AND

15  MR. LARIAN'S RESPONSE TO FRED LARIAN SHOWS TWO THINGS; IT        02:07

16  SHOWS, ONE, HOW IMPORTANT THIS MATTER IS being TREATED AND HOW

17  IMPORTANT OBTAINING PROTECTION FOR 'ANGEL' WAS TO MGA AT THE

18  TIME, WHICH IS RELEVANT.

19         **THE COURT:**  WHEN YOU CALL MR. LARIAN TO THE STAND,

20  YOU CAN INTRODUCE IT AT THAT TIME.                                02:07

21         **MR. PROCTOR:**  THAT'S FINE.

22         ALSO, WE WERE UNCLEAR AS TO WHAT THE COURT'S RULING

23  ON PAGE 218 OF THE DEPOSITION WAS.

24         **THE COURT:**  PAGE 218?

25         **MR. PROCTOR:**  THE COURT SUSTAINED AN OBJECTION, BUT     02:08

```
 1    WE, apparently, HAVE A DIFFERENT INTERPRETATION OF --
 2          THE COURT:  I BELIEVE THE OBJECTION ONLY WENT TO THAT
 3    FIRST QUESTION AND ANSWER.
 4          MR. PROCTOR:  OKAY.
 5          COULD THE COURT GIVE US LINES FOR THAT.              02:08
 6          THE COURT:  LINES 14 THROUGH 19.
 7          MR. PROCTOR:  SO THAT SHOULD BE OUT?
 8          THE COURT:  RIGHT; THAT QUESTION JUST WENT TO
 9    COPYRIGHT APPLICATIONs, WHICH have NOTHING TO DO WITH PHASE
10    1-A.                                                      02:08
11          MR. PROCTOR:  JUST TO LET THE COURT KNOW, IF
12    POSSIBLE, WE WOULD LIKE TO PLAY THE O'NEAL AND TKACIK
13    DESIGNATIONS TOMORROW MORNING; THE COURT HAS BINDERS OF THOSE;
14    JUST FOR PLANNING PURPOSES.
15          THE COURT:  WHAT ABOUT PRINCE?  WHEN DOES PRINCE COME  02:08
16    IN?
17          MR. PROCTOR:  That's not going to be until LATER THIS
18    WEEK OR next WEEK.
19          THE COURT:  SO IN OTHER WORDS, TONIGHT I JUST NEED TO
20    DO THE O'NEAL AND THE --                                  02:08
21          MR. PROCTOR:  AND THEY ARE SHORT, I PROMISE.
22          THE COURT:  VERY GOOD.  ALL RIGHT.
23          MR. NOLAN:  The other TECHNICAL ISSUE IS THAT WITH
24    RESPECT TO THE SECOND VIDEO, THE LINKER VIDEO, DURING THE
25    COURSE OF THE BREAK, WE DISCOVERED -- AND IT WAS NOT       02:09
```

```
 1   INTENTIONAL ON ANYBODY'S PART -- THAT MATTEL DOES NOT HAVE THE
 2   COUNTER DESIGNATIONs IMBEDDED INTO THE TAPE.  THEY ARE TRYING
 3   TO WORK THAT OUT RIGHT NOW, BUT WE HAVE NOT HAD A CHANCE TO
 4   CLEAR THAT YET.
 5          I THINK THE BEST ESTIMATE WAS THAT IT WAS GOING TO       02:09
 6   TAKE ABOUT TEN MINUTES TO MAKE SURE ALL OF THE COUNTERS ARE IN
 7   THERE.  I JUST wanted TO ALERT THE COURT that WE CANNOT FLOW
 8   IMMEDIATELY INTO THE LINKER DEPOSITION.
 9          THE COURT:  LET'S BRING THE JURY BACK IN NOW.
10          AS I UNDERSTAND IT, THE FIRST ONE IS GOING TO TAKE       02:09
11   ABOUT HALF AN HOUR.  I HAVE TO INSTRUCT THE JURY.  COUNSEL HAS
12   TO STIPULATE TO THE EXHIBITS.  THEN LET'S TAKE OUR LUNCH BREAK
13   AT THAT TIME; we'll take A SLIGHTLY EARLY LUNCH BREAK.  THEN
14   WE'LL COME BACK EARLIER AND WE'LL GO FROM THERE.
15          MR. NOLAN:  GREAT.  THANK YOU VERY MUCH, YOUR HONOR.     02:09
16          THE COURT:  THAT WILL GIVE YOU TIME TO WORK THIS OUT.
17          LET'S BRING THE JURY IN.
18          (JURORS ENTER COURTROOM.)
19          THE COURT:  COUNSEL, YOU MAY CALL YOUR NEXT WITNESS.
20          MR. QUINN:   YOUR HONOR, THE NEXT WITNESS WE'LL BE       02:11
21   CALLING, WE'LL BE PRESSING 'PLAY' ON A MACHINE, BECAUSE IT'S
22   VIDEOTAPED.
23          THE COURT:  JUST FOR THE RECORD, PUT THE NAME ON THE
24   RECORD.
25          MR. QUINN:  It will be NANA ASHONG.                      02:11
```

1        **THE COURT:**  VERY WELL.

2        LADIES AND GENTLEMEN, THE NEXT WITNESS, AND ACTUALLY

3    SEVERAL OF THE WITNESSES THAT YOU'LL HEAR FROM, ARE GOING TO BE

4    from VIDEOTAPED DEPOSITIONS, AND TO MOVE THIS ALONG

5    EXPEDITIOUSLY, INSTEAD OF HAVING THE PLAINTIFFS FIRST DESIGNATE      02:11

6    THEIR PORTION THAT THEY WANT TO PLAY AND THEN HAVE THE

7    DEFENDANTS GO AND DESIGNATE THEIRS AND TAKE SOME OF THE

8    TESTIMONY OUT OF ORDER, I'VE HAD BOTH SIDES DESIGNATE WHAT THEY

9    WANT PLAYED, AND WE'RE GOING TO PLAY IT ALL IN CHRONOLOGICAL

10   ORDER AND YOU'LL just HEAR ALL OF THE TESTIMONY.                     02:12

11       AS YOU WERE INSTRUCTED EARLIER, IT DOES NOT MATTER

12   WHICH SIDE OFFERS a particular piece of EVIDENCE.  YOU SHOULD

13   CONSIDER ALL OF THE EVIDENCE PRESENTED IN REACHING YOUR

14   VERDICT.  JUST SO YOU KNOW, THE TESTIMONY YOU'RE HEARING HAS

15   BEEN DESIGNATED, IN VARYING DEGREES, BY BOTH SIDES; SO YOU          02:12

16   SHOULD TREAT THIS TESTIMONY JUST AS YOU WOULD ANY other

17   TESTIMONY THAT YOU WOULD HEAR FROM THE WITNESS STAND.

18       **MR. QUINN:**  PURSUANT TO A STIPULATION IN ADVANCE,

19   WE'D LIKE TO MOVE EXHIBIT 4916 INTO EVIDENCE.

20       **THE COURT:**  ARE THERE ANY OTHER EXHIBITS?                    02:12

21       **MR. QUINN:**  I THINK THAT'S THE ONLY ONE AT THIS

22   POINT.

23       **MR. PROCTOR:**  THAT'S THE ONLY ONE that's NOT IN

24   EVIDENCE.

25       **THE COURT:**  ANY OBJECTION?                                  02:12

1      **MR. NOLAN:**  NO OBJECTION, WITH THE REDACTIONS NOTED.

2      **THE COURT:**  VERY WELL.  IT'S ADMITTED, AND IT MAY BE

3   PUBLISHED along WITH THIS DEPOSITION.

4      AT THIS TIME WE'LL PLAY THE DEPOSITION.

5      **(VIDEOTAPED DEPOSITION OF NANA ASHONG IS PLAYED. )**      02:13

6      (The following excerpts were provided and

7      Inserted as received from counsel:)

8   Q   If you could, please tell us your full name for
          the record.

9
    A   Nana Ashong.

10
    Q   At one point, you worked for a company called
11          MGA Entertainment?

12  A   I did.

13  Q   Did you start at MGA in approximately April of
          2001?

14
    A   That's correct.

15
    Q   How long were you there?

16
    A   Five months.

17
    Q   So, approximately the October time period?

18
    A   September 10.

19
    Q   So, then your -- your tenure there at MGA was
20          from April of 2001 until September 10th of
            2001?

21
    A   Thereabouts, yeah.

22
    Q   If you could, please tell us why you left MGA.

23
    A   I left MGA in September of 2001 because I was
24          looking for a different type of -- a
            different type of occupational opportunity.
25          It wasn't quite the right fit.

1   Q   If you can, please tell me what you mean by
        that.  What -- what were you looking for in
2       terms of another opportunity?

3   A   I was looking for either a -- a position in --
        in a different area of marketing or in fact in
4       film, which is the industry that I'm in now.

5   Q   During the time you worked there at MGA, who did
        you report to directly?

6

7   A   Paula Treantafelles.

    Q   Was she your supervisor the whole time?

8
    A   She was.

9
    Q   Was your position associate product manager when
10      you started?

11  A   That is correct.

12  Q   Is that the only title you had when you were
        there with MGA?

13
    A   Yes.

14
    Q   Was part of your -- your responsibility to -- to
15      help manage the -- the application process as
        it was being handled by the lawyers?

16
    A   Well, I -- I would say the answer to that was
17      no.  I, obviously, was party to certain
        information and did certain research as it
18      related to that; however, I was not in a
        position to manage that level of engagement.

19
    Q   You mentioned that you did research in
20      connection with the copyright and trademark
        applications for Bratz.

21
    A   Yes.

22
    Q   Well, was -- was it true that as part of your
23      role there when you were at MGA was to gather
        certain kinds of information for potential
24      Use in trademark and copyright applications?

25  A   Essentially just aggregating our existing
        creative information, names we were using,

1      potential secondary names, et cetera, and
       passing those on.

2

       Q    To the outside lawyers so they could prepare the
3           applications?

4      A    Yes, and do initial searches as to conflicts,
            potential conflicts.

5

       Q    Generally speaking, what was the source of the
6           information or materials that -- that you
            gathered?

7

       A    I would say the materials came from, in some
8           cases, brainstorming sessions about
            additional and alternative terms, and in some
9           cases, preexisting information on branding
            positioning for the brand, i.e., the name
10          Bratz, the character names.  All of these
            things were established prior to my tenure at
11          MGA.

12     Q    Then with respect to information that came from
            time periods prior to when your -- your
13          actual employment there at MGA --

14     A    Yes.

15     Q    -- where did you obtain that information from in
            connection with the trademark and copyright
16          applications?

17     A    That information, I guess, was obtained from a
            number of sources, word of mouth from employees
18          present prior to my tenure, any formally -- I
            guess formally processed documentation
19          regarding the product.  I would say those are
            the two key sources of information.

20

       Q    You mentioned that "word of mouth from
21          employees."  I assume that these were
            employees who were working there at MGA at
22          the pertinent time period?

23     A    Absolutely.  Yes.

24     Q    Was another source of information that was --
            that was used in connection with these
25          applications Carter Bryant?

1   A No.  My engagement with Carter was principally
     of a creative nature and didn't relate to any
2      prior establishment of the product.  It was
      simply further design.

3

   Q Was one of the sources of information that was
4     -- that you gathered and -- and used in
      connection with these applications Isaac
5      Larian?

6   A I would say no.  My engagement with Isaac did
      not deal with the minutia and core elements
7      of my projects.

8   Q Well, let me try it this way then.  Other than
     Paula Treantafelles, who else within MGA was a
9      person who provided you with the information,
      that was the information you had gathered in
10      connection with the copyright and trademark
      applications for Bratz?

11

   A I would -- I would say I -- I can't recall the
12     -- the breadth of that.  Obviously, there were a
      number of people there prior to me.  At any
13      point in time, I may have requested a piece
      of information and -- and be directed to so
14      and so, who may have had it in a file.
      Whether or not they engaged with it, I can't
15      recall.

16   Q Is it fair to say that your -- your memory is
      that Paula was the one who provided most
17      of the information that was provided by
      MGA employees in that -- in that regard?

18

   A I would say yes; however, I would qualify that
19     with -- when you say the majority of --
      that's, you know, just as easily 51 percent.
20      There were a number of people, obviously, that
      I interacted with, but Paula was the creative
21      leader on the product, was my primary contact.

22   Q Other than Paula Treantafelles and outside legal
     counsel, is there anyone else who you
23      regularly dealt with in -- in terms of your
      involvement with the Bratz trademark and
24      copyright applications?

25   (INTERRUPTion WITH an OBJECTION BY COUNSEL:)  02:19
   **MR. NOLAN:**  YOUR HONOR, OBJECTION.

1        I THINK THIS PORTION WAS RULED ON BY THE COURT.

2            **THE COURT:**  PAGE AND LINE NUMBER, COUNSEL?

3            **MR. NOLAN:**  PAGE 19, LINES 19 THROUGH 25, SPILLING

4    OVER TO PAGE 20, LINES ONE THROUGH THREE.

5            **THE COURT:**  THE COURT HAS SUSTAINED THE OBJECTION TO    02:20

6    LINES ONE THROUGH THREE, THE LAST SENTENCE, BEGINNING WITH THE

7    WORD 'SOME' AND ENDING WITH THE WORD 'NEEDED.'  IT OVERRULED

8    WITH RESPECT TO LINES 19 THROUGH 25 AND THE FIRST PART ON LINE

9    ONE.

10           **MR. NOLAN:**  THANK YOU, YOUR HONOR.    02:20

11           **THE COURT:**  VERY WELL.

12           **(VIDEOTAPED DEPOSITION resumes PLAYING. )**

13       A    I can't recall that -- certainly within that
                context, there was not a -- there was not a
14               point person for me on that.

15       Q    What, I guess, I'm trying to figure out is, is
                there -- were the main people you interacted
16               with or the main groups of people that you
                interacted with in connection with the Bratz
17               trademark and copyright applications Paula
                Treantafelles and the outside lawyers or was
18               there somebody else?
                That's what I'm trying to figure out.
19
         A    Right.  I think that legal counsel and Paula
20               were my two key connections with that process.

21       Q    If you could, just tell me, generally speaking,
                what your involvement was with respect to the
22               trademark and copyright applications for --
                For Bratz when you were there at MGA.  In
23               other words, if you could, just tell me a
                little bit about the process that you went
24               through.

25       A    Sure.  On any number of occasions, I began by
                researching our key terms online to see if in

1    common databases there had been an established prior use.

2    Again, my -- the focus of my work was for the International launch.  Domestically, any terms

3    were simply sent to the lawyers, and that's what they did.

4    So, I connected with legal counsel abroad to forward those terms on to them after a

5    preliminary search and received the -- received an address, the -- the responses

6    coming back in.

7    Q    When you say you received the responses coming back in, those were the responses from outside

8    legal counsel?

9    A    That's right.

10   Q    In other words, you would provide that initial research that -- that you just described and

11   then they would give you some feedback?

12   A    Right.  They would do their appropriate searches, but we -- I went through additional

13   research to look for red flags.

14   Q    Typically, what was the format which you prepared this information that you sent to

15   outside legal counsel?  Was it a memo, an e-mail?

16

17   A    Likely, a simple e-mail with a list of terms that were requested for consideration.

18   Q    Was the -- was the Boyz product extension an idea that you believe came from Carter Bryant?

19

20   A    I -- I have no basis for that.

     Q    Did it come from Paula?

21

22   A    I -- I have -- I have no basis for the source of idea.  Simply, we had creative discussions

     about it.

23

24   Q    So, if -- if I understand you correctly, it is your best recollection that it had been

     suggested to you within MGA, at some point

25   when you were there, that Isaac Larian may have been the one who came up with the

1       removable feet?

2    A   Can you refine that a little for me?

3    Q   Sure.  Sure.  What I'm really driving at is
         this:  Is that you -- you've -- you've given
4        -- you've given us testimony of your
         impression, right, with respect to credit that
5        -- that Isaac Larian had taken in connection
         with removable feet?  What I'm -- what I'm
6        trying to just simply drive at is you have a
         recollection of this; is that true?

7

8    A   I have -- I have a -- again, as I said, I have a
         recollection of Isaac often appropriating as
         sort of the origin of a number of -- of
9        things, his company.  I have never -- I never
         in my time at MGA heard or had the -- I never
10       in my time at MGA heard from anyone a
         contradiction of any of Isaac's assertions.

11

12   Q   Was it part of the approval process that you
         recall for the development of dolls there at
         MGA?

13

14   A   Yes, it was.

15   Q   Do you remember was the JOS that required
         approval, was that something that Isaac Larian
         had to do or was it somebody else?

16

17   A   Any product would have to be approved by Isaac
         before finally being produced and released to
         market.

18

19   Q   Before proceeding to development?

20   A   Yes.
     Q   Before proceeding to design?

21   A   I wouldn't say before proceeding to design.
         Initial design and considerations obviously
22       would occur in a free forum but before
         prototypes, et cetera, were produced, Isaac
23       would have to okay that.

24   Q   So it was the commencement of the development
         process more than the design process itself.

25

     A   If -- if development begins at prototype, yes.

```
 1          Q    That's generally how you understood how matters
 2               proceeded when you were there at MGA?

 3          A    Yes.
            BY MR. ZELLER:
 4
            Q    What I would like to really focus your attention
 5               on with respect to Exhibit 4916 is the part
                 where it says original message from you to
 6               Fred Larian, Martin Hitch, Paula
                 Treantafelles, Victoria O'Connor on April 30,
 7               2001, and then the rest of your message which
                 continued on to the second page.
 8
            A    Yes.
 9
            Q    Do you recognize the portion that begins
10               "original message" about halfway down the
                 first page of Exhibit 4916 as an e-mail that
11               you sent on or about April 30, 2001 to Fred
                 Larian, Martin Hitch, Paula Treantafelles and
12               Victoria O'Connor?

13          A    Yes.

14          Q    You'll see that you addressed this set starting
                 with "Hello Fred."  That's Fred Larian?
15
            A    Yes.
16
            Q    You say, "I just wanted to recap our earlier
17               conversation and provide you with a listing of
                 elements for protection."  Do you see that?
18
            A    Yes.
19
            Q    In this, are the elements for protection that
20               you're referencing here in connection with
                 Bratz?
21
            A    Yes.
22
            Q    Turning your attention to the list itself,you
23               will see that the first element that you list
                 there for Bratz is Angel, A-N-G-E-L, right?
24
            A    Yes.
25
            Q    You'll agree with me that by this time, April 30
```

1          of 2001, one element that people were
           considering at least internally within MGA in
2          Terms of protecting the Bratz property was the
           term "Angel," right?
3
     A     Yes.
4
     Q     That's a term that by the time you were working
5          there at MGA you associated as a possible name
           in connection with the Bratz line; is that
6          True?
7
     A     It was a nickname for an existing character.
8
     Q     Which character was it a nickname for?
9
     A     Cloe.
10
     Q     Directing your attention further down the second
           page of Exhibit 4916, you see that heading
11         where it says "for copyright"?
12
     A     Yes.
13
     Q     Then the first bullet point is actual dolls,
           right?
14
     A     Yes.
15
     Q     Then it lists the four names of the individual
16         dolls as of that time:  Yasmin, Sesha, or
           Sasha rather, Jade and Cloe?
17
     A     Yes.
18
     Q     By this you were indicating that the copyright
19         registration or application for registration
           that was an element for protection was for the
20         Bratz dolls themselves; is that true?
21   A     In -- in terms of my research, yes.
22   Q     In terms of what you understood was -- was the
           protection that was appropriate for the
23         company to have in connection with the launch
           of Bratz, right?
24
     A     In my understanding, yes.
25
         Q    Do you recognize Exhibit 551 as an e-mail

| | | |
|---|---|---|
| 1 | | that you sent to Victoria O'Connor, Paula Treantafelles, Martin Hitch and Janet |
| 2 | | Bielke in or about September of 2001? |
| 3 | A | Yes. |
| 4 | Q | You'll see that it says the first line of your e-mail to them "here are key legally relevant |
| 5 | | dates for Bratz." |
| | | Do you see that part? |
| 6 | | |
| 7 | A | Yes. |
| | Q | Then you have three entries with dates below it? |
| 8 | | |
| | A | Yes. |
| 9 | | |
| | Q | When you say the "relevant dates for Bratz," are |
| 10 | | you referring to the Bratz dolls? |
| 11 | A | Yes. |
| 12 | Q | It says here "Date of creation, September 18, |
| | | 2000"? |
| 13 | | |
| | A | Yes. |
| 14 | | |
| | Q | You wrote that date down as being the date of |
| 15 | | creation for the Bratz dolls in this e-mail |
| | | that we marked as 551? |
| 16 | | |
| | A | In this e-mail, yes.  As relating to the Bratz |
| 17 | | dolls or concept, I don't know specifically |
| | | how broad that was. |
| 18 | | |
| | Q | Did you, in fact, obtain the information that's |
| 19 | | reflected here on Exhibit 551 from copyright |
| | | applications that existed, at least in some |
| 20 | | Form, even if it's in draft as of that time? |
| 21 | A | My terminology here is a bit presumptuous in |
| | | this e-mail as I don't know -- I don't know |
| 22 | | when the copyright applications were actually |
| | | Filed. These are dates that I obviously had |
| 23 | | in my reference or record that -- that I |
| | | -- that I attached as the key dates for Bratz. |
| 24 | | I don't know when the -- when that paperwork |
| | | was filed and my information is based on some |
| 25 | | research.  I don't know what the source of my |
| | | data is. |

```
 1         Q    It's fair to say that the dates that are
 2              reflected here in this e-mail that we've
                marked as Exhibit 551 was based on records
 3              that you had at your disposal there within MGA
                at the time; is that true?
 4
           A    Records that I -- I -- I had or had seen. In
 5              sending this e-mail, my understanding at the
                time was that my information was accurate in
 6              some context.

 7         Q    In response to this e-mail that you sent as
                Exhibit 551, did Victoria O'Connor, Paula
 8              Treantafelles, Martin Hitch or anyone come
                back to you and say that any of this
 9              information was incorrect?

10         A    I have no recollection either way.

11         Q    It's fair to say you do not recall an instance
                of any of those people coming to you and
12              saying these dates are incorrect; is that
                true?
13
           A    That is -- that is correct.  Given the time
14              period, I don't think anyone would have.  My
                knowledge of the correct information would
15              have been irrelevant as -- again, my last day
                of work was 9/10/2001.
16
           Q    It's fair to say that when you prepared Exhibit
17              551, you had MGA records that you were basing
                this on, right?
18
           A    Yes.  Whether preexisting or that I generated
19              within -- within my time period. Obviously, as
                in the first -- first in date.
20       BY MR. ZELLER:

21         Q    You put down these dates on or about the time
                that this e-mail bears, right?
22
           A    Yes.
23
           Q    You believed the information was accurate when
24              you wrote it down, right?

25         A    Yes.
```

1   Q   Sitting here today, do you have any information
        that would suggest that any of the dates that
2       are reflected here are inaccurate?

3   A   No.  I have no connection to the product beyond
        my time there.  And as such, whatever I
4       believed to currently be correct.  At this
        time, it is all that I would know.

5

6   Q   In other words, you believed the information you
        have down in here was correct at the time that
        you wrote it and then, sitting here today,
7       have no reason to think it was incorrect; is
        that true?

8

9   A   That is correct.

    **MR. ZELLER:**  I appreciate your -- your patience.  I
10      know he has a few questions.
    MR. ECKLES:  I have a few questions.  I'm going to be
11      much faster than Mr. Zeller was.

12  Q   Your title, again, was associate product
        manager?

13

14  A   Yes.

    Q   What generally were your duties and
15      responsibilities as associate product manager?

16  A   I would say that the -- the one area in which I
        had most significant responsibility in the
17      process was with regard to trademarks on Bratz
        And managing and -- and keeping tabs on that
18      process. Aside from that, I was a secondary --
        secondary to Paula in all the -- in all the
19      Elements.  Tasks were broken off to me
        specifically as needed and I was simply
20      another point of contact in -- on the brand
        team for everyone from production to
21      packaging.

22  Q   Do you have personal knowledge of when the Bratz
        dolls or any aspect of them were developed as
23      far as the timing?

24  A   Not -- not beyond what apparently is -- is
        within an e-mail that I sent.  I don't
25      specifically recall anything about that
        timeline.

1

2          Q     You don't have any -- apart from the e-mail, you
                 don't have any personal knowledge about when
3                the event took place?

4          A     I do not.

           Q     I would like to show a document that's been
5                previously marked as Exhibit 15.

6          Q     Have you seen this document before?

7          A     (Witness views document.)
                 It looks like Carter Bryant's contract,
8                possibly the document that I received from
                 Victoria O'Connor upon request in the previous
9                e-mail.

10         Q     We saw a previous e-mail where you requested a
                 copy of this contract.
11
           A     Yes.
12
           Q     You did receive a copy in response to that?
13
           A     I did.
14
           Q     You see right below the heading it says dated as
15               of September 18, 2000?

16         A     Yes.

17         Q     Do you see that?  If you look back at Exhibit
                 551 where you see a date of creation,
18               9/18/2000, is it possible that this is the
                 document you were using when you referred to
19               the date of creation?

20         A     I don't recall the document.  I think it's
                 unlikely that it was this document within the
21               context of the date of creation would have had
                 to be prior to this contract.  But, again, I
22               don't recall what document brought me to that.

23         Q     Well, does this document refresh your
                 recollection or effect your opinion at all
24               about the 9/18/2000 date you have in Exhibit
                 551?
25
           A     It does not because I believe that that --

1           indicating that date would have, for me, come
            from an alternate document or an advisement
2           from a legal party of that date.

3     Q     We've talked about you're not a lawyer.

4     A     Absolutely not.

5     Q     So, you weren't offering an opinion as to what
            that meant or what the date was?

6     A     No.

7     Q     In response to some questions that Mr. Zeller
8           asked, you referred to the fact that Isaac
            Larian took a defensive posture vis-a-vis
9           Mattel.  Is that generally correct?

10    A     Yes.

11    Q     Do you know whether MGA had ever developed any
            other products that contained -- unrelated to
12          Bratz that contained the word "angel" in it,
            either during your time there or before?

13    A     Not my knowledge.

14    Q     Did you ever hear the term "prayer angels"?

15    A     Actually, yes, I -- I am familiar with that
16          product.

17    Q     What is that?

18    A     They were small soft body dolls with hands
            clasped together that I believe when the hands
19          were squeezed, they said a short -- a short
            prayer.
20    Q     Was that part of the Bratz line?

21    A     No.  That -- that predated Bratz.

22    Q     You mentioned that there was an episode in which
            Isaac Larian had the impression that you'd
23          interviewed with another company?

24    A     Yes.

25    Q     This occurred when you were working at MGA?

```
 1          A    Yes.

 2          Q    Was it another toy company?

 3          A    Yes.

 4          Q    Did Isaac -- what is it that Isaac said to you
                 about that?
 5
            A    He asked me -- he asked me flat out if I had.
 6               He -- it was -- I think he may have brought it
                 up a couple of times.  I think it was --
 7               again, he was of a -- of a competitive spirit.
                 And in the context of a conversation, it might
 8               have been a meeting where I -- I mentioned
                 Competitive product or -- or, you know, an
 9               approach and he took from that the
                 possibility.
10               I think I mentioned that I had heard from
                 elsewhere that Company X was -- was hiring.  I
11               mentioned something further about their
                 product and I think he took it as how did I
12               know they were hiring if I were not seeking
                 which was quite an extrapolation.
13
            Q    If I understood you correctly before, you had
14               not, in fact, interviewed with that toy
                 company or any other?
15
            A    Or any other, no.
16
            Q    Did you have an understanding, when you were
17               employed by MGA, whether or not you could work
                 for a competitor at the same time you were
18               Working for MGA?

19          A    It was my assessment as with any other company
                 that as a full-time employee, my services were
20               only to be retained by that company.

21          Q    But you wouldn't work for a competitor while
                 working for your employer?
22
            A    That was a none spoken to me.  That was
23               understood.

24          Q    It was something you didn't need to be told?

25          A    Absolutely.
```

1           **(End of videotaped deposition of nana ashong.)**

2           (END TIME:  11:35 a.m.)

3           **MR. QUINN:**   THAT CONCLUDES THE DEPOSITION.

4           **THE COURT:**  VERY WELL.

5           LADIES AND GENTLEMEN, THE NEXT WITNESS IS GOING TO BE          02:41

6    A video DEPOSITION AS WELL, BUT THERE'S GOING TO BE ABOUT TEN

7    OR 15 MINUTEs OF TECH TIME needed to set that up; SO WE'RE

8    GOING TO BREAK EARLY TODAY for lunch.  INSTEAD OF MEETing AT

9    1:30, i'd like to HAVE THE JURY READY TO GO AT 1:15.

10          ALSO, i'd like to LET the JURY KNOW NOW, SO THEY CAN          02:41

11   MAKE ANY ARRANGEMENTS, PERHAPS, DURING LUNCH TODAY, WE'RE NOT

12   GOING TO have COURT TOMORROW AFTERNOON.  WE'RE GOING TO BE DARK

13   TOMORROW AFTERNOON.  WE ARE GOING TO HAVE A HALF-DAY SESSION

14   TOMORROW; so I'D LIKE TO START AT 8:30 SO WE GET UP AND RUNNING

15   TOMORROW AND HAVE A FULL morning SESSION.                          02:42

16          DOES THAT POSE A PROBLEM FOR ANYBODY TOMORROW TO COME

17   IN AT 8:30?

18          I SEE NO HANDS.

19          WE'LL START TOMORROW AT 8:30; WE'LL GO TO 11:30,

20   11:45; and then we'll be dark in the afternoon; AND THEN        02:42

21   THURSDAY WE'LL GO BACK TO OUR REGULAR SCHEDULE.

22          I'LL SEE YOU BACK HERE AT 1:15 AND I'LL SEE COUNSEL

23   BACK AT 1:00.

24          (WHEREUPON JURORS DEPART COURTROOM.)

25          **THE COURT:**  SO COUNSEL, THIS AFTERNOON THEN, WE'LL      02:42

1   PICK UP WITH THE STEVE LINKER TESTIMONY AND THEN YOU'LL HAVE

2   SOME POTENTIALLY ADDITIONAL WITNESSES TO CALL AFTER THAT.

3           **MR. QUINN:**  YES.

4           **THE COURT:**  HOW MUCH TIME OF THIS WAS ALLOCATED TO

5   THE DEFENSE?                                                    02:43

6           **MR. QUINN:**  WE HAVE TO REDO THE CALCULATIONs AFTER

7   THE RULINGS.

8           **THE COURT:**  Why don't you DO THAT.  JUST GIVE ME A

9   TIME TO ALLoCATE TO THE DEFENSE, and i'll make the adjustment.

10  RIGHT NOW, I CREDITED ALL OF THE TIME TO THE PLAINTIFF, BUT     02:43

11  I'LL MAKE THE SWITCH AFTER YOU LET ME KNOW WHAT THAT IS.

12          HAVE A GOOD LUNCH.

13          (WHEREUPON A BRIEF RECESS WAS HELD.)

14          (MORNING SESSION CONCLUDED. )

15

16

17                      CERTIFICATE

18

19  I hereby certify that pursuant to section 753, title 28, united
    states code, the foregoing is a true and correct transcript of
20  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
21  conformance with the regulations of the judicial conference of
    the united states.

22

23  _____        _____
    THERESA A. LANZA, CSR, RPR                      Date
24  FEDERAL Official COURT Reporter

25