1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                   - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9            vs.                     )   No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al.,)
                                     )
11                   Defendants.     )   TRIAL DAY 7
    _____)   PAGES 1255-1390
12  AND CONSOLIDATED ACTIONS,        )
    _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              Riverside, California

17           Wednesday, June 4th, 2008

18                 8:28 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24          3470 12th Street, Rm. 134
          Riverside, California  92501
25              951-274-0844
            WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                            TIMOTHY ALGER
                         865 S. FIGUEROA STREET,
 7                       10TH FLOOR
                         LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL KENNEDY
13                            LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2                                              Page

 3     Plaintiff CASE (CONTINUED)....................  1293

 4

 5

 6     PLAINTIFF
       WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
 7     DENISE O'NEAL( VIA VIDEOTAPED DEPOSITION)

 8                       1293

 9

10     PLAINTIFF
       WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
11     VICTORIA O'CONNOR

12     BY MR. QUINN     1308                   1369
       BY MR. NOLAN                 1335                     1377

13

14

15            EXHIBITS          RECEIVED

16              927              1304
                 15              1326
17            13383              1330
              16995              1378
18

19

20

21

22

23

24

25
```

```
 1        RIVERSIDE, CALIFORNIA; WEDNESDAY, JUNE 4, 2008; 8:27 A.M.

 2                              -oOo-

 3        THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

 4   MATTEL, INC., V. MGA, INC., ET AL.

 5        MAY WE HAVE COUNSEL IN THIS MATTER PLEASE STATE YOUR

 6   APPEARANCES FOR THE RECORD.

 7        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER

 8   APPEARING FOR MATTEL.

 9        MR. NOLAN:  TOM NOLAN AND LAUREN AGUIAR FOR MGA.

10        THE COURT:  GOOD MORNING.                          00:02

11        WE'RE STILL WAITING FOR ONE JUROR, BUT I THINK I'LL

12   GO OVER THE OBJECTIONS ON THE TWO VIDEOTAPED DEPOSITIONS.

13        BEGINNING WITH DENISE O'NEAL, IF YOU TURN TO PAGE 16,

14   THE FIRST OBJECTION ON LINES 15 THROUGH 22, I'M GOING TO

15   SUSTAIN THE OBJECTION.  IT'S NOT PARTICULARLY -- BASICALLY,  00:03

16   IT'S JUST A REORIENTATION QUESTION, BUT I DON'T THINK IT'S

17   NECESSARY IN LIGHT OF EARLIER QUESTIONS ASKED, AND PERHAPS IT

18   DOES MISSTATE THE TESTIMONY A BIT.

19        I'M GOING TO OVERRULE THE REMAINING OBJECTIONS,

20   THOUGH, BOTH BY MGA AND MATTEL, ON PAGES 16 AND 18.  LET'S TAKE  00:03

21   OUT THAT ONE QUESTION.

22        ON THE MAUREEN TKACIK, THERE'S A NUMBER OF HEARSAY

23   OBJECTIONS, WHICH I'M GOING TO OVERRULE AND PERMIT THE ARTICLE

24   IN.  THIS IS THE WALL STREET JOURNAL ARTICLE.  I'M GOING TO

25   OVERRULE THE OBJECTIONS ON PAGES 7, 9, AND 10.  SINCE I AM    00:04
```

1   LETTING IT IN, THEN MATTEL TURNS AROUND, AFTER IT BRINGS IN THE

2   SUBSTANCE OF THE ARTICLE, AND MAKES OBJECTIONS TO QUESTIONS

3   THAT ARE ASKED BY MGA CONCERNING THE CONTENTS OF THE ARTICLE.

4   I GUESS I'M NOT REALLY FOLLOWING WHY WHAT'S GOOD FOR THE GOOSE

5   IS NOT GOOD FOR THE GANDER.                                      00:04

6           MR. ALGER:  WE ALSO SUBMITTED A REDACTED VERSION OF

7   THE ARTICLE TO YOUR CLERK YESTERDAY, AND PROVIDED TO THE OTHER

8   SIDE, THAT LIMITS THE ARTICLE TO THE PORTION THAT DEALS WITH

9   THE CREATION OF THE BRATZ DOLLS.  AND IT'S OUR VIEW THAT THE

10  BULK OF THE ARTICLE, INCLUDING THE LINE OF QUESTIONING BY MGA    00:05

11  THAT'S BEEN DESIGNATED, DEALS WITH MATTERS THAT ARE IRRELEVANT

12  FOR THE CASE AND, IF ANYTHING, ARE PROPER FOR PHASE 1-B.

13          THE COURT:  LET'S DEAL WITH THIS IN THE CONTEXT OF

14  SPECIFIC QUESTIONS.

15          ON PAGE 23, THERE'S A SERIES OF QUESTIONS RELATED TO      00:05

16  FLAVAS, BUT THE POINT THERE SEEMS TO BE WHETHER OR NOT IT TAKES

17  -- HOW LONG IT TAKES TO DEVELOP A LINE OF DOLLS.

18          MR. ALGER:  THAT'S RIGHT, YOUR HONOR.

19          THE COURT:  THAT SEEMS TO BE AN ISSUE IN TERMS OF

20  TIMING IN THIS.                                                  00:05

21          MR. ALGER:  YES.  BUT WE ALSO OBJECTED ON LACK OF

22  FOUNDATION.  MS. TKACIK DOESN'T -- THERE'S INSUFFICIENT

23  FOUNDATION FOR THESE ANSWERS THAT ARE PROVIDED, AND THE REST IS

24  HEARSAY.

25          THE COURT:  BUT THAT GOES BACK -- I MEAN, ARGUABLY,       00:06

1  THIS WHOLE THING IS HEARSAY, AND MAYBE I SHOULD THROW THE WHOLE

2  ARTICLE OUT, COUNSEL.

3          **MR. ALGER:**  THE ARTICLE ITSELF, OF COURSE, IS

4  SELF-AUTHENTICATING.  THE QUESTION THEN IS WHETHER THE CONTENTS

5  COME IN FOR THE TRUTH OF WHETHER MR. LARIAN SAID THOSE THINGS          00:06

6  TO MS. TKACIK.  OUR LINE OF QUESTIONING IS PRECISELY THAT; WE

7  ASKED MS. TKACIK, 'DID MR. LARIAN SAY THESE THINGS TO YOU?'

8  AND SHE CONFIRMS THEM.  SO AT THAT POINT, THAT'S OFFERED FOR

9  TRUTH.  THE FACT THAT LARIAN SAID THAT TO HER IS OFFERED FOR

10  TRUTH.  THE UNDERLYING CONTENTS, OF COURSE, WHAT MR. LARIAN          00:06

11  TOLD HER OR NOT, WE'RE NOT OFFERING THAT FOR TRUTH.

12          BUT MGA GOES OFF ON A WHOLE SERIES OF QUESTIONS ABOUT

13  FLAVAS AND OTHER ASPECTS OF MATTEL'S BUSINESS THAT ARE

14  COMPLETELY IRRELEVANT FOR PHASE 1-A.

15          **THE COURT:**  LET ME HEAR FROM MGA ON THIS.          00:06

16          **MR. NOLAN:**  YOUR HONOR, I THINK YOU NAILED IT WHEN

17  YOU SAID, 'WHAT'S GOOD FOR THE GOOSE IS GOOD FOR THE GANDER.'

18  YOU CAN'T HAVE YOUR CAKE AND EAT IT TOO.

19          **THE COURT:**  BUT COUNSEL PUTS A MORE REFINED SPIN ON

20  THAT; THAT ALL THEY ARE LOOKING FOR AT THIS POINT ARE          00:07

21  ADMISSIONS BY MR. LARIAN.  AND IT'S NOT SO MUCH THE HEARSAY

22  OBJECTION, BECAUSE I AGREE WITH -- YOU KNOW, THAT'S MY THOUGHT

23  ON JUST GENERALLY WHETHER OR NOT THE ARTICLE COMES IN, BUT IN

24  TERMS OF SPECIFIC CLAIMS IN THE ARTICLE, THE QUESTION IS

25  WHETHER OR NOT -- THEY HAVE THE SPECIFIC -- ALL THEY ARE          00:07

1   LOOKING FOR ARE STATEMENTS BY MR. LARIAN.  THESE OTHER THINGS

2   ARE NOT NECESSARILY ATTRIBUTED TO ANYBODY.

3        **MR. NOLAN:**  BUT, YOUR HONOR, I THINK THAT BY DOING

4   THE REDACTIONS THE WAY THEY HAVE, THEY HAVE, MORE OR LESS,

5   SLANTED THE STORY AS THOUGH THE ONLY ISSUE IN THAT ARTICLE WAS        00:07

6   MR. LARIAN'S COMMENTS.  AND WITHOUT PUTTING INTO CONTEXT THE

7   HISTORY OF BRATZ AND WHAT ELSE WAS GOING ON IN THAT ARTICLE, I

8   THINK IT IS VERY PREJUDICIAL AND SUGGESTS TO THE JURY THAT

9   THAT'S THE ONLY REASON FOR THAT ARTICLE, WHICH, IN FACT, OF

10  COURSE, IS NOT THE TRUTH.        00:08

11       **THE COURT:**  BUT IT'S NOT THE ARTICLE THAT'S THE

12  ISSUE.  THE ARTICLE IS JUST A SOURCE OF MR. LARIAN'S

13  STATEMENTS.  WHAT THEY ARE TRYING TO DO IS GET IN MR. LARIAN'S

14  STATEMENTS, WHATEVER FORM THEY ARE IN.

15       THESE OTHER STATEMENTS, THE CONCERN IS THAT THEY ARE        00:08

16  NOT ATTRIBUTIVE.

17       **MR. NOLAN:**  WITH RESPECT TO FLAVAS, THAT GOES TO THE

18  TIMING OF IT.  ONE OF THE LINE OF QUESTIONS --

19       **THE COURT:**  I AGREE IT'S RELEVANT.  THE QUESTION IS,

20  WHO SAID THAT?        00:08

21       **MR. NOLAN:**  WELL, YOUR HONOR, I THINK THE POINT IS

22  THAT THEY ARE GOING TO SAY TO MR. LARIAN WORDS TO THE EFFECT

23  OF, 'DID YOU EVER CALL THE WALL STREET JOURNAL AND ASK THEM TO

24  CORRECT IT?'

25       WE HAVE THIS LINE OF QUESTIONING ALL OF THE TIME WHEN        00:08

```
1   WE HAVE THESE REPORTER STORIES.  THE FACT THAT MATTEL NEVER

2   OBJECTED TO OR TRIED TO CORRECT ANY OF THE STATEMENTS THAT ARE

3   CONTAINED IN THE ARTICLE, I THINK, IS ALSO RELEVANT IN THIS

4   CASE.  AND TO TAKE IT OUT OF IT, AGAIN, I SAY, IT PUTS THE

5   WHOLE CONTEXT OF MR. LARIAN'S STATEMENTS IN A VERY SELECTED       00:09

6   FASHION THAT'S NOT FAIR FOR THE TRIER OF FACT.  I THINK THEY

7   SHOULD SEE IT WITHIN THE CONTEXT OF THE STORY, THE WAY THE

8   STORY WAS WRITTEN.

9        AND THE OTHER FACT IS THAT YOU COULD DO A LIMITING

10  INSTRUCTION TO THE JURY THAT THE OTHER STATEMENTS IN THE          00:09

11  ARTICLE ARE NOT BEING OFFERED FOR THE TRUTH OF THE MATTER

12  ASSERTED, BUT RATHER, JUST THE FACT THAT THOSE STATEMENTS WERE

13  CONTAINED IN THE SAME ARTICLE, IF THERE'S THAT KIND OF A

14  CONCERN.

15       THE COURT:  THANK YOU, COUNSEL.                              00:09

16       TURN TO PAGE 38.

17       THIS IS ALSO A SUBMISSION BY MATTEL.  IT SAYS -- IT'S

18  A QUESTION "NOW, IN YOUR ARTICLE, ON THAT SAME PAGE, IN THE

19  PARAGRAPH THAT STARTS 'THE HISTORY OF BRATZ IS INTERTWINED WITH

20  MATTEL...'  AND SOME ARE CONVINCED THE BRATZ BORROWED LIBERALLY   00:09

21  FROM A MATTEL PROJECT, DID MR. BOUSQUETTE GIVE YOU THAT

22  INFORMATION?'

23       THERE'S A WHOLE SERIES OF QUESTIONS THERE THAT ARE

24  NOT ATTRIBUTED TO MR. LARIAN.

25       MR. ALGER:  YES, YOUR HONOR.  WE'RE WILLING TO               00:10
```

```
 1   WITHDRAW THAT PORTION OF THE DESIGNATION, FROM 38-18 TO 17.  IT
 2   GOES OVER MATERIAL THAT'S ALREADY BEEN COVERED IN THE OTHER
 3   DESIGNATIONS.
 4        BUT THE POINT HERE, I THINK WE'VE MADE ALREADY, IS
 5   THAT THE ORIGINS OF FLAVAS, WHICH OCCURRED LATER IN THE SUMMER     00:10
 6   OF 2003, ARE CERTAINLY IRRELEVANT FOR THIS CASE.  AND WHAT'S AT
 7   ISSUE HERE IS WHAT MR. LARIAN --
 8        THE COURT:  I READILY SEE THE RELEVANCY, BECAUSE IT
 9   GOES TO THE TIMING OF THE DEVELOPMENT OF A DOLL WHICH DOES GO
10   INTO THIS CASE TO A CERTAIN EXTENT.                                00:10
11        MR. ALGER:  WHAT MAKES THE ARTICLE NOTEWORTHY --
12        THE COURT:  YOUR MORE CONVINCING ARGUMENT IS, WE
13   DON'T KNOW WHO SAID THIS.
14        MR. NOLAN RESPONDS BY SAYING -- WE DON'T KNOW WHO
15   SAID ANY OF THIS STUFF, BASICALLY, OUTSIDE OF MR. LARIAN, BUT      00:10
16   MATTEL NEVER OBJECTED; THEY NEVER TRIED TO RETRACT THIS.
17        MR. ALGER:  YOUR HONOR, WE'RE WILLING TO REDACT IT
18   FURTHER, IF YOU WISH.  WHAT WE DID WAS -- OF COURSE, THERE'S
19   TWO PARAGRAPHS THAT WE CARE ABOUT; THE VERY FIRST PART OF THE
20   REDACTED PORTION, WHERE WE SAY THAT MGA ACKNOWLEDGES THAT          00:11
21   CARTER BRYANT CREATED BRATZ; AND THEN THE LAST PARAGRAPH OF THE
22   UNREDACTED PORTION, WHICH MENTIONS THE FASHION DOLL CONTEST.
23   THE REST OF IT WE'RE PREPARED TO REDACT.
24        I HAD LEFT IT IN TO GIVE CONTEXT TO THOSE PORTIONS.
25   THE REST OF THE ARTICLE, AT THE VERY BEGINNING AND THE VERY        00:11
```

1    END, REALLY GO OFF ON OTHER ISSUES; AND THAT IS, MATTEL'S

2    PERFORMANCE IN THE MARKETPLACE, MGA'S PERFORMANCE IN THE

3    MARKETPLACE, THE REASON FOR THE EXISTENCE OF FLAVAS AND SO

4    FORTH.

5              AND WHAT'S NOTEWORTHY ABOUT THE ARTICLE AND WHAT                    00:11

6    MAKES THE TESTIMONY RELEVANT IS THE STATEMENTS BY MR. LARIAN

7    REGARDING THE ORIGINS OF BRATZ.

8         **THE COURT:**  WHAT ABOUT MR. NOLAN'S ARGUMENT THAT IF

9    YOU'RE GOING TO HAVE PARTS OF THE ARTICLE IN, YOU NEED TO HAVE

10   THE ENTIRE ARTICLE IN IN ORDER TO GIVE IT ITS CONTEXT?                        00:12

11        **MR. ALGER:**  I DON'T THINK WE COULD ASK THE JURY TO

12   DISCRIMINATE LIKE THAT.  IF THE JURY GETS THE WHOLE ARTICLE,

13   THEY VERY WELL MIGHT CREDIT THE WHOLE ARTICLE, AND THEY MAY

14   ALSO BECOME CONFUSED BY ALL OF THIS OTHER MATERIAL COMING IN,

15   ABOUT EVENTS THAT HAPPENED IN 2003.                                          00:12

16             CONSISTENT WITH YOUR HONOR'S RULINGS AS TO PHASE 1-A

17   AND PHASE 1-B, THE QUESTION IS, ARE WE ALLOWING EVIDENCE IN

18   THAT DEALS WITH THE ORIGINS OF BRATZ; AND TO THE EXTENT THAT IT

19   POSTDATES THE ORIGINS BRATZ, DOES IT LOOK BACK AT THE ORIGINS

20   OF BRATZ?  DOES IT BEAR ON WHAT WAS GOING ON WHEN MR. BRYANT                  00:12

21   TOOK BRATZ OVER TO MGA?

22        **THE COURT:**  THE LAST THING I WANT TO ASK YOU ABOUT IS

23   THE -- YOU'RE OBJECTING TO REFERENCES TO THOSE PORTIONS OF THE

24   ARTICLE THAT REFER TO MR. LARIAN AS BEING BORN IN IRAN, COMING

25   FROM IRAN.                                                                   00:13

1        THIS ARISES IN THE CONTEXT OF WHETHER OR NOT THERE

2   MAY HAVE BEEN A MISUNDERSTANDING CONCERNING HIS ACCENT OR

3   SOMETHING ALONG THOSE LINES.

4        **MR. ALGER:**  YOUR HONOR, THE OTHER SIDE PUT A PORTION

5   IN ABOUT THAT.  I DON'T HAVE A STRONG FEELING ABOUT IT.  WE        00:13

6   ADDED A COUNTER DESIGNATION THAT HAD MS. TKACIK EXPLAIN THAT

7   SHE HEARD HIM QUITE CLEARLY AND UNDERSTOOD HIS LANGUAGE.  WE

8   DON'T THINK THAT'S AN ISSUE.

9        IF THE COURT IS GOING TO ALLOW THAT IN ABOUT HIS

10  LANGUAGE SKILLS, THEN WE WOULD WANT OUR COUNTER DESIGNATION IN     00:13

11  ON THAT POINT.

12       **THE COURT:**  MR. NOLAN.

13       **MR. NOLAN:**  TWO REALLY QUICK POINTS, YOUR HONOR.

14       I FORGOT TO MENTION ALSO THAT IVY ROSS, WHO TESTIFIED

15  IN THIS CASE, ADMITTED THAT SHE AND A PR REPRESENTATIVE OF         00:13

16  MATTEL MET AND WAS INTERVIEWED BY MS. TKACIK; SO IN TERMS OF

17  THE SOURCE OF ANY INFORMATION FROM MATTEL, IVY ROSS HERSELF

18  ADMITTED TO PARTICIPATING IN AN INTERVIEW SHORTLY BEFORE THIS

19  ARTICLE APPEARED.

20       THAT'S NUMBER ONE.                                            00:14

21       NUMBER TWO, I CAN MOVE ON, BUT LET ME GO TO THIS NEXT

22  POINT ABOUT THE IRAN ISSUE.

23       MR. QUINN, IN HIS OPENING STATEMENT, WENT SO FAR TO

24  EVEN RAISE THE ISSUE OF WHETHER OR NOT THE SOURCE OF THE MGA

25  MONEY WAS MR. LARIAN'S WEALTHY PARENTS IN IRAN.  I THINK IT'S A    00:14

```
 1    LITTLE BIT TOO LATE NOW FOR THEM TO BE TRYING TO TAKE THAT OUT.

 2    BUT I REALLY GO BACK TO JUST SUPPLEMENTING IT, SAYING THAT FOR

 3    COMPLETENESS PURPOSES, WE THINK IT SHOULD BE IN; THE JURY

 4    SHOULD SEE THE ENTIRE ARTICLE.

 5            AND NUMBER TWO IS THAT MANY OF THESE ISSUES THAT ARE      00:14

 6    REFERENCED IN THIS ARTICLE HAVE BEEN SPECIFICALLY, AND I ASSUME

 7    INTENTIONALLY, OPENED UP BY THE QUESTIONING OF SOME OF THESE

 8    WITNESSES WITH RESPECT TO THE INTRODUCTION OF DOLLS, THE

 9    SUCCESS OF BRATZ, THE SUCCESS -- THERE'S A LACK OF SUCCESS OF

10    MATTEL.                                                          00:14

11            MR. QUINN, EVEN IN QUESTIONING ANNA RHEE YESTERDAY,

12    ASKED HER A QUESTION ABOUT THE FABULOUS SUCCESS OF BRATZ.

13    THAT'S IN THE CASE.  THEY INTRODUCED THAT LINE OF TESTIMONY

14    THEMSELVES.  SO I DON'T REALLY SEE THE HARM IN THAT REGARD,

15    YOUR HONOR.  IT'S ALL IN.                                        00:15

16            I'LL SUBMIT ON THAT.

17            THE COURT:  VERY WELL.

18            MR. ALGER:  WHAT MGA IS TRYING TO DO IS GET IN BEFORE

19    THE JURY UNATTRIBUTED STATEMENTS IN THE ARTICLE.  AND WHEN

20    MS. TKACIK WAS DEPOSED, THEY HAD AN OPPORTUNITY TO ASK HER       00:15

21    ABOUT THE SOURCES OF THE STATEMENTS AND WHETHER MR. LARIAN MADE

22    THOSE STATEMENTS OR OTHER PARTICULAR PEOPLE MADE THOSE

23    STATEMENTS.  THEY DID NOT GET THAT KIND OF TESTIMONY.  WE GOT

24    THAT TESTIMONY FROM MS. TKACIK, AND IT'S RELEVANT FOR THIS

25    CASE, AND THAT'S WHAT WE'RE OFFERING THIS FOR.                   00:15
```

1   AND FOR MGA TO SQUEEZE IN IN FRONT OF THE JURY

2   UNATTRIBUTED STATEMENTS BY UNKNOWN PEOPLE, THAT IS JUST GOING

3   TO CONFUSE THE JURY, AND THE JURY IS NOT GOING TO BE ABLE TO

4   SPLIT THAT OUT.

5   MS. ROSS TESTIFIED, I BELIEVE, THAT SHE WAS                    00:15

6   INTERVIEWED ABOUT FLAVAS.  FLAVAS WAS A LINE THAT SHE WAS

7   WORKING ON.  I DON'T BELIEVE SHE TESTIFIED THAT SHE SAID

8   ANYTHING ABOUT THE ORIGINS OF BRATZ TO THE WALL STREET JOURNAL.

9   **THE COURT:**  BUT SHE DID TESTIFY ABOUT -- THERE WAS

10   FLAVAS, YOU'RE RIGHT.                                          00:16

11   **MR. NOLAN:**  THE LAST POINT I WOULD SAY, MY MEMORY IS

12   THAT MR. QUINN, IN HIS OPENING STATEMENT, DID SHOW THE ENTIRE

13   WALL STREET JOURNAL ARTICLE ON THE SCREEN.  I'M TRYING TO

14   CONFIRM THAT.  I BELIEVE THAT IT WAS SHOWN IN AN UNREDACTED

15   FORMAT.                                                        00:16

16   **THE COURT:**  IS THAT TRUE?

17   **MR. QUINN:**  TO TELL YOU THE TRUTH, I CAN'T REMEMBER.

18   IF WE PUT IT UP THERE, WE WOULD HAVE BLOWN UP THE PARAGRAPH

19   THAT WE WANTED TO QUOTE.

20   DOES ANYBODY REMEMBER?                                         00:16

21   **MR. ZELLER:**  I THINK, YOUR HONOR, THAT IT WAS THE

22   ARTICLE, BUT I'M PRETTY SURE PEOPLE FROM THAT DISTANCE COULD

23   NOT READ THE TINY PRINT, BECAUSE THERE WAS A BLOWUP.  SO IT WAS

24   SORT OF A GRAPHIC THAT HAD THE ARTICLE IN THE BACKGROUND AND

25   THEN A BLOW-UP.  BUT IT WOULD BE SURPRISING TO ME, AT LEAST, IF  00:16

1    PEOPLE COULD SEE AND ACTUALLY READ THE PRINT OF THE ARTICLE.

2         **THE COURT:**  ALL RIGHT.

3         I'VE HEARD ARGUMENT.  I'M GOING TO TAKE A LOOK AT

4    THIS.

5         THE JURY IS ALL HERE.  I JUST GOT A NOTE THAT ALL                   00:17

6    JURORS ARE PRESENT.

7         MR. HOLMES, WHY DON'T YOU BRING THEM IN.

8         ARE WE GOING TO HEAR FROM MS. O'CONNOR?

9         **MR. ZELLER:**  YES.  AND THERE'S AN ISSUE THAT RELATES

10   TO MS. O'CONNOR, PRIOR TO THE TIME THAT SHE TESTIFIES.                   00:17

11        LATE LAST NIGHT, WE RECEIVED FROM MGA A FEW E-MAILS

12   THAT WERE BETWEEN MS. O'CONNOR AND DAVID ROSENBAUM, AN MGA

13   ATTORNEY BACK IN 2000.  BY WAY OF BACKGROUND, THE COURT WILL

14   REMEMBER WE'VE HAD REPEATED MOTIONS, REPEATED ARGUMENTS, OVER

15   MGA'S ATTEMPT TO HAVE THIS EXTREMELY NARROW LIMITED WAIVER OF           00:17

16   PRIVILEGE, WHICH WE HAVE REPEATEDLY FOUGHT OFF.  WE BROUGHT A

17   MOTION *IN LIMINE*, NUMBER SEVEN, THAT DEALT SPECIFICALLY WITH

18   THESE E-MAILS.

19        NOW THEY HAVE, ON THE EVE OF THE TIME WHEN

20   MS. O'CONNOR, AT TRIAL, IS GOING TO TESTIFY, PRODUCED THESE             00:17

21   E-MAILS.  THEY ARE CLEARLY PRIVILEGED COMMUNICATIONS BETWEEN

22   DAVID ROSENBAUM AND MS. O'CONNOR.  AND I CAN ONLY ASSUME THAT

23   THEY HAVE DONE THIS BECAUSE THEY INTEND TO USE THEM WITH

24   MS. O'CONNOR THIS MORNING.

25        I DON'T KNOW HOW MUCH THE COURT RECALLS OF THESE                   00:18

```
1   PARTICULAR CIRCUMSTANCES, BUT THOSE COMMUNICATIONS HAVE BEEN

2   REPEATEDLY INSTRUCTED ON AT DEPOSITIONS; MR. LARIAN'S

3   DEPOSITION, DAVID ROSENBAUM'S DEPOSITION, MS. O'CONNOR'S

4   DEPOSITION.  AND THEY WERE, OF COURSE -- THESE COMMUNICATIONS

5   THEMSELVES, THE WRITTEN COMMUNICATIONS, WERE NEVER PRODUCED IN        00:18

6   DISCOVERY.

7           SO, IN OUR VIEW, THIS IS A FAIRLY EXTREME FORM OF

8   SANDBAGGING, AND IT ACTUALLY VIOLATES THE COURT'S MOTION

9   IN LIMINE ORDER NUMBER SEVEN, BECAUSE THE COURT DID GRANT THAT.

10  THOSE PARTICULAR E-MAIL COMMUNICATIONS WERE ON A PRIVILEGE LOG       00:18

11  UP UNTIL LAST NIGHT, AND SO THERE'S NO QUESTION THAT WAS THE

12  SUBJECT OF MOTION IN LIMINE SEVEN, WHICH THE COURT GRANTED.

13          THE COURT:  AGAIN, REFRESH MY RECOLLECTION.

14          MOTION IN LIMINE SEVEN WAS...

15          MR. ZELLER:  THAT WAS THE ONE THAT WAS ENTITLED           00:19

16  "MATTEL'S MOTION IN LIMINE TO PRECLUDE RELIANCE UPON ADVICE OF

17  COUNSEL," WHICH DEALT WITH BOTH EXPLICIT AND IMPLICIT.  AND WE

18  POINTED OUT THAT THEY HAD BEEN ASSERTING CONSISTENTLY

19  THROUGHOUT THIS CASE PRIVILEGE AS TO THOSE VERY COMMUNICATIONS

20  BETWEEN PEOPLE AT MGA, AND DAVID ROSENBAUM, IN PARTICULAR.         00:19

21          THE COURT:  MR. NOLAN, THIS SEEMS TO BE A RATHER

22  UNTIMELY TIME TO BE SUBMITTING PRIVILEGED DOCUMENTS.

23          MR. NOLAN:  FIRST OF ALL, MR. ZELLER IS INCORRECT.

24          MY UNDERSTANDING IS THAT AT MONDAY'S HEARING, WHICH

25  MR. ZELLER WAS NOT PRESENT AT AND MR. RUSSELL WAS REPRESENTING    00:19
```

1    US, YOU ORDERED US TO PRODUCE IN UNREDACTED FORMAT THOSE

2    DOCUMENTS THAT WERE NOT CONTAINED WITH THE

3    ATTORNEY-CLIENT PRIVILEGE.  THESE ARE NOT DOCUMENTS THAT ARE

4    USED FOR THE ASSERTION OF RELIANCE ON COUNSEL OR ANYTHING ELSE.

5    THESE ARE CONVEYING FACTS.                                     00:19

6         **THE COURT:**  COULD I TAKE A LOOK AT THESE DOCUMENTS

7    THAT WE'RE TALKING ABOUT?

8         SO YOUR POSITION, MR. NOLAN, IS THAT THESE ARE NOT

9    ATTORNEY-CLIENT PRIVILEGED DOCUMENTS?

10        **MR. NOLAN:**  RIGHT.  AND THESE ARE THE ONES THAT YOU    00:20

11   ORDERED US TO BE PRODUCED IN 48 HOURS.  I THINK WE PRODUCED

12   THEM IN 36.  WE PRODUCED THEM LAST NIGHT WHEN WE KNEW THAT THEY

13   WERE GOING TO CALL VICTORIA O'CONNOR.

14        **MR. ZELLER:**  IF I MAY COMMENT ON THAT, YOUR HONOR.

15        THE MONDAY HEARING DEALT WITH VERY SPECIFIC              00:20

16   DOCUMENTS, WHICH WERE MR. ROSENBAUM'S HANDWRITTEN NOTES ON A

17   DRAFT OF THE AGREEMENT THAT REFLECTED HIS COMMUNICATIONS

18   WITH --

19        **THE COURT:**  THAT'S MY RECOLLECTION.

20        **MR. ZELLER:**  RIGHT.                                   00:20

21        AND, OF COURSE, THIS NOTION THAT THEY WEREN'T

22   PRIVILEGED, THESE OTHER E-MAILS, IS REALLY QUITE SURPRISING.

23   NUMBER ONE, THEY WERE NEVER PRODUCED IN DISCOVERY; AND, TWO,

24   THEY WERE SPECIFICALLY ON MGA'S PRIVILEGE LOG.

25        AND BY THE WAY, IT WAS QUITE CLEAR, FROM THE HEARING      00:20

1    ON MONDAY, THAT MGA WAS MAKING ANOTHER RUN AGAIN AT THIS VERY

2    LIMITED INAPPROPRIATE PARTIAL WAIVER.  AND THE COURT MADE IT

3    VERY CLEAR THAT THE ONLY THING THAT WAS BEING ORDERED WAS THAT

4    PARTICULAR DOCUMENT.  AND NOW THEY HAVE PRODUCED A BUNCH OF

5    E-MAILS, WHICH WE SPECIFICALLY STATED AT THE HEARING WE WERE          00:21

6    NOT MOVING ON.  SO THE ORDER COMPELLING THEM TO PRODUCE THESE

7    DOCUMENTS DOESN'T HAVE ANYTHING TO DO WITH THIS BELATED

8    PRODUCTION.

9            THE COURT:  MR. NOLAN, THE ISSUE ON MONDAY WAS THE

10   RETENTION OF MR. ROSENBAUM'S NOTES ON THAT.                           00:21

11           MR. NOLAN:  I'M SORRY?

12           THE COURT:  MR. ROSENBAUM'S NOTES ON THIS AGREEMENT.

13           IT WAS A PARTICULAR DOCUMENT.  IT WAS A DOCUMENT THAT

14   WAS ON MR. LARIAN'S PRIVILEGE LOG.  IT WAS A DOCUMENT ON

15   MR. ROSENBAUM'S PRIVILEGE LOG.  AND THEN THERE WERE INDIVIDUAL        00:21

16   PAGES ON SOMEBODY ELSE'S PRIVILEGE LOG.

17           WHO WAS THAT?

18           MR. PROCTOR:  MGA'S PRIVILEGE LOG.

19           THE COURT:  IT WAS A SINGULAR DOCUMENT.  SO DON'T BE

20   RELYING ON MONDAY'S RULING.                                          00:21

21           MR. NOLAN:  BUT, YOUR HONOR, MY RECOLLECTION IS --

22   AND, OF COURSE --

23           THE COURT:  AND YOU WEREN'T HERE ON MONDAY.

24           MR. NOLAN:  AND THAT'S WHY I SAID, I'M JUST LOOKING

25   AT THE TRANSCRIPT.

```
1        I RECALL THE ISSUE ALSO COMING UP AS TO THE

2   REDACTIONS, IN LIGHT OF THE COURT'S RECENT REDACTIONS OF

3   DOCUMENTS WITH RESPECT TO HOW YOU WERE VIEWING FACTUAL

4   STATEMENTS VERSUS LEGAL ADVICE.  AND THERE WAS AN EXCHANGE

5   BETWEEN MR. RUSSELL AND YOURSELF WITH RESPECT TO, 'WE'RE GOING        00:22

6   TO TAKE THAT AND ALSO REVIEW THESE DOCUMENTS AND PRODUCE THEM.'

7   AND I THINK THEY WERE CLEARLY ON NOTICE ON THAT.

8        WHAT WE DID IS -- YOU'LL SEE ON SOME OF THE EARLIER

9   RULINGS, WHEN YOU WERE LOOKING AT CLAWBACK DOCUMENTS, IN

10  PARTICULAR THE ONE DEALING WITH THE DAVID DEES THINGS, WHERE         00:22

11  YOU WERE TAKING OUT OF THE SENTENCE WHAT WAS ACTUALLY

12  ATTRIBUTED --

13        THE COURT:  RIGHT.  THAT WAS CONSIDERING A PARTICULAR

14  DOCUMENT THAT WAS SUBJECT TO A CHALLENGE.

15        THIS DOESN'T SEEM APPROPRIATE, MR. NOLAN.                      00:22

16        THESE DOCUMENTS HAVE BEEN ON A PRIVILEGE LOG, I TAKE

17  IT, UP UNTIL THIS LAST EVENING?

18        MR. NOLAN:  YES, YOUR HONOR.

19        THE COURT:  THERE IS NOTHING IN EITHER THE MONDAY

20  ORDER OR ANY OTHER ORDER ADDRESSING A PARTICULAR DOCUMENT THAT       00:23

21  ADDRESSES THESE DOCUMENTS.  IT DOES SEEM RATHER UNFAIR IN THE

22  MIDDLE OF TRIAL TO BE PRODUCING DOCUMENTS THAT HAVE BEEN

23  WITHHELD THAT HAVE BEEN THE SUBJECT OF DEPOSITIONS.

24        MR. NOLAN:  BUT, YOUR HONOR, THROUGHOUT THIS CASE,

25  THROUGHOUT THE TRIAL, MATTEL HAS BEEN PRODUCING TO US               00:23
```

1  ADDITIONAL DOCUMENTS DURING THE COURSE OF THE TRIAL.  WE GET

2  THEM ALMOST ON A REGULAR BASIS FOR EACH WITNESS.

3          THERE'S NO DISPUTE ABOUT THAT, YOUR HONOR.  WE'RE

4  GETTING ADDITIONAL EXHIBITS BEING ADDED ALL OF THE TIME.  WE'VE

5  NOT OBJECTED TO A SINGLE ONE OF THEM.                          00:23

6          THEY ARE OBJECTING BECAUSE THEY DON'T LIKE THESE

7  DOCUMENTS.

8          **THE COURT:**  MR. ZELLER, IF THAT'S THE CASE -- I MEAN,

9  THAT SHOULDN'T BE THE CASE ON EITHER SIDE.  I'M SYMPATHETIC TO

10 YOUR ARGUMENT THAT THIS SEEMS TO BE UNTIMELY.  MR. NOLAN SAYS    00:23

11 YOU'RE DOING THE SAME THING.

12         IS THAT TRUE?

13         **MR. ZELLER:**  THAT IS NOT CORRECT.

14         WHAT WE'VE DONE IS, THE DOCUMENTS THAT ARE INCLUDED

15 ON THE TRIAL EXHIBIT LIST DO CHANGE AS ISSUES IN THE CASE        00:24

16 CHANGE.  CERTAIN THINGS NO LONGER BECOME RELEVANT.  CERTAIN

17 THINGS BECOME RELEVANT.  WE HAVE DIFFERENT WITNESSES, OBVIOUSLY

18 DIFFERENT ORDER.  THINGS ARE CHANGING.  AND BOTH SIDES HAVE

19 BEEN CHANGING WHAT'S DESIGNATED ON THE TRIAL EXHIBIT LIST.

20         **THE COURT:**  HAVE YOU TO-DATE USED ANY DOCUMENTS IN     00:24

21 THIS TRIAL THAT WERE NOT PRODUCED BEFORE THE START OF THIS

22 TRIAL?

23         **MR. ZELLER:**  NOT THAT I'M AWARE OF, YOUR HONOR.

24         **MR. QUINN:**  EXCUSE ME.

25         I ACTUALLY DON'T THINK THAT'S CORRECT.  FOR EXAMPLE,      00:24

```
 1   I KNOW THAT THE PHOTOGRAPHS OF THE DESIGN CENTER THAT WERE USED
 2   WITH AN EARLY WITNESS WERE NOT EXCHANGED IN DISCOVERY.  THERE
 3   MAY WELL HAVE BEEN A COUPLE OF OTHER THINGS.
 4          THE QUESTION I WOULD HAVE, YOUR HONOR, IS WHETHER ANY
 5   OF THOSE DOCUMENTS THAT WE'VE USED WERE EVER THE SUBJECT OR      00:24
 6   RESPONSIVE TO DISCOVERY REQUESTS.  BUT BOTH SIDES --
 7          THE COURT:  I ASSUME THEY WOULD BE, COUNSEL.  I CAN'T
 8   IMAGINE, WITH THE NUMBER OF DISCOVERY REQUESTS THAT HAVE BEEN
 9   MADE IN THIS CASE, THAT ANYTHING POTENTIALLY RELATED TO ANY OF
10   THIS STUFF HAS NOT BEEN THE SUBJECT OF SOME DISCOVERY REQUEST.   00:25
11          MR. QUINN:  I UNDERSTAND, YOUR HONOR.  BUT THEN THOSE
12   GO THROUGH MOTIONS TO COMPEL AND THERE ARE ORDERS THAT ARE
13   ENTERED.
14          THE COURT:  I UNDERSTAND THAT.
15          MR. QUINN:  BOTH SIDES HAVE DONE THAT SORT OF THING.      00:25
16   THERE HAVE BEEN A HANDFUL -- AND NEITHER SIDE HAS MADE A FUSS
17   ABOUT THOSE KINDS OF ADDITIONS.
18          THE COURT:  YOU'RE MAKING A FUSS NOW.
19          MR. QUINN:  WELL, THOSE KINDS OF ADDITIONS.
20          HERE IS SOMETHING THAT'S BEEN A HOT ISSUE, HOTLY         00:25
21   CONTESTED ISSUE, FOR MONTHS, WHERE THEY HAVE SOUGHT A SELECTIVE
22   WAIVER OF THE PRIVILEGE.  THEY WANTED TO GIVE US SOME DOCUMENTS
23   IN DISCOVERY AND WITHHOLD OTHERS.  AND THIS HAS BEEN LITIGATED
24   BEFORE JUDGE INFANTE MORE THAN ONCE, AND I BELIEVE BEFORE THIS
25   COURT; AND CONSISTENTLY, THE RULING HAS BEEN, NO, YOU CAN'T DO   00:25
```

1    THAT.

2            SO NOW, PRETEXTUALLY, THE DAY BEFORE MS. O'CONNOR IS

3    GOING TO TESTIFY, SEIZING ON THE PRETEXT OF AN ORDER ON MONDAY,

4    IN COME THESE DOCUMENTS.

5            **THE COURT:**  THE ORDER ON MONDAY WAS CLEARLY DIRECTED          00:26

6    TOWARDS A PARTICULAR DOCUMENT, SO THAT DOES NOT PROVIDE A BASIS

7    TO DO IT.

8            SO IF THERE'S A BASIS TO DO THIS -- WELL, FIRST OF

9    ALL, IS THIS EVERYTHING?  IT'S NOT A SELECTIVE WAIVER AT THIS

10   POINT; YOU'RE GIVING UP EVERYTHING; CORRECT?                            00:26

11           **MR. NOLAN:**  THAT'S EVERYTHING; THE E-MAILS THAT WE'RE

12   PRODUCING, THAT CONTAINS THE FACTUAL REPRESENTATIONS, YOUR

13   HONOR.

14           AND I POINT OUT, YOUR HONOR, I HAVE A LETTER OF

15   JUNE 3, 2008, WHERE THEY ARE ENCLOSING FOR THE FIRST TIME             00:26

16   MATTEL DOCUMENT PRODUCTION NUMBER M0920041 THROUGH M0920045.

17   AND IN ADVANCE OF SOME OF THE WITNESSES THAT HAVE GONE ON,

18   WE'VE BEEN HANDED DOCUMENTS.  THERE'S NOT A FUSS ON THIS.

19           THESE DOCUMENTS, YOUR HONOR, THESE ARE THE FACTUAL

20   ASSERTIONS FROM MR. ROSENBAUM.  HE'S GOING TO BE A WITNESS AS          00:26

21   WELL.  HE'LL BE CROSS-EXAMINED ON THESE DOCUMENTS.  THESE ARE

22   DOCUMENTS THAT THEY HAVE KNOWN ABOUT AND WE HAVE DISCUSSED.

23           AND THE FACT THAT JUDGE INFANTE -- THEY SAY HE RULED

24   ON THIS.  THAT'S NOT TRUE, YOUR HONOR.  THEY WITHDREW A MOTION

25   WHERE WE WERE TRYING TO GIVE THIS TO THEM.  THEY DON'T WANT            00:27

1   THESE DOCUMENTS, YOUR HONOR.  EVERY TIME WE WANT TO GIVE THEM

2   TO THEM, THEY'RE REFUSING.  THESE ARE NOT PRIVILEGED DOCUMENTS.

3   WE'VE PRODUCED THEM, JUST LIKE THEY'RE PRODUCING NONPRIVILEGED

4   DOCUMENTS TO US.

5          THE COURT:  YOU'RE SAYING THESE WERE NEVER PRIVILEGED        00:27

6   DOCUMENTS?

7          MR. NOLAN:  YOUR HONOR, IN LIGHT OF --

8          THE COURT:  WHY WEREN'T THESE PRODUCED EARLIER, THEN?

9          MR. NOLAN:  BECAUSE OF THE COURT'S PREVIOUS RULINGS

10  IN TERMS OF WHAT WAS PRIVILEGED IN FRONT OF JUDGE INFANTE.        00:27

11  APPLYING THE SAME STANDARD AS TO WHAT THE FACTS WERE, THERE WAS

12  GOING TO BE A MOTION IN FRONT OF JUDGE INFANTE.  THEY WITHDREW

13  THE MOTION.  WE MADE AN OFFER TO THEM.  THEY DIDN'T TAKE US UP

14  ON THAT OFFER.  WE THEN RAISED IT IN THE SENSE OF --

15         THE COURT:  MR. NOLAN, MAYBE I WAS UP TOO LATE LAST        00:27

16  NIGHT.  I'M NOT FOLLOWING YOU.  YOU JUST TOLD ME THESE ARE NOT

17  PRIVILEGED DOCUMENTS.

18         MR. NOLAN:  THESE ARE NOT.

19         THE COURT:  THEN WHY WEREN'T THEY PRODUCED MONTHS

20  AGO?                                                             00:27

21         MR. NOLAN:  THE PORTIONS OF THESE DOCUMENTS THAT ARE

22  BEING PRODUCED ARE NOT PRIVILEGED DOCUMENTS.

23         THE COURT:  WHY WEREN'T THOSE PORTIONS PRODUCED

24  MONTHS AGO?

25         MR. NOLAN:  BECAUSE MATTEL WAS NOT AGREEING THAT THEY      00:28

```
 1   COULD TAKE THESE FACTS AND THEN NOT CONTEND --

 2           THE COURT:  IF YOU WANT TO PRODUCE SOMETHING, YOU

 3   MAKE COPIES OF IT AND YOU PUT IT IN AN ENVELOPE AND YOU SEND IT

 4   OVER TO THEM.  IF THEY WANT TO THROW IT OUT THE WINDOW, THAT'S

 5   THEIR PROBLEM.  BUT YOU CAN'T TELL ME YOU'RE NOT PRODUCING        00:28

 6   SOMETHING BECAUSE THEY WON'T ACCEPT IT.  IT'S NOT LIKE YOU GUYS

 7   MEET AT HIGH NOON AND TURN IT OVER.  I KNOW YOU'RE CAPABLE OF

 8   PRODUCING DOCUMENTS TO THEM.

 9           MR. NOLAN:  YOUR HONOR, THE COURT KNOWS THAT THERE

10   WAS A LOT OF DISCUSSION IN MOTION PRACTICE WITH RESPECT TO WHAT   00:28

11   WOULD CONSTITUTE A WAIVER IF YOU PRODUCE CERTAIN DOCUMENTS.

12   THEY DID THAT WITH RESPECT TO THE INVESTIGATIVE FILES.  IN

13   OPERATING UNDER THOSE RULES, WE ASKED THEM, 'WE WILL PRODUCE

14   THESE DOCUMENTS IF YOU AGREE WITH US THAT YOU WILL NOT ASSERT

15   THAT IT'S A WHOLESALE WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE.'   00:28

16   THEY WOULD NOT DO THAT.

17           IN LIGHT OF THE COURT'S RULINGS WITH RESPECT TO THE

18   REDACTION OF CERTAIN PORTIONS, WE WENT BACK -- AND WE DIDN'T

19   KNOW WHEN VICTORIA O'CONNOR WAS GOING TO BE PRODUCED -- WE

20   PRODUCED THESE DOCUMENTS.  WE WENT BACK AND REVIEWED IT.  WE      00:29

21   PRODUCED THESE NONPRIVILEGED DOCUMENTS, AND WE WILL ARGUE

22   STRENUOUSLY THAT THAT DOES NOT CONSTITUTE A WAIVER.

23           THEY ARE NOT SURPRISED BY THIS, YOUR HONOR.  THEY

24   DECIDED THEY WERE GOING TO CALL VICTORIA O'CONNOR TODAY, AND

25   WE'VE PRODUCED THESE FACTUAL DOCUMENTS THAT ARE NOT PRIVILEGED,   00:29
```

```
 1   JUST LIKE THEY'VE PRODUCED DOCUMENTS DURING THE COURSE OF THIS

 2   TRIAL.

 3           THE COURT:  DO YOU HAVE TO CALL MS. O'CONNOR AT THIS

 4   TIME?

 5           MR. ZELLER:  WE DO, YOUR HONOR.                          00:29

 6           YOU'LL RECALL, SHE IS THE ONE WHO WAITED AROUND ALL

 7   OF FRIDAY.  SHE WAS UNABLE TO GET ON AT THAT TIME; YOU KNOW,

 8   HER MOTHER HAD SURGERY.  SHE IS AVAILABLE THIS MORNING.  IT

 9   REALLY WOULDN'T BE -- SHE'S A THIRD PARTY, AND IT REALLY

10   WOULDN'T BE FAIR.                                               00:29

11           AND I WOULD RESPECTFULLY SUBMIT THIS, YOUR HONOR:  WE

12   BROUGHT A SPECIFIC MOTION IN LIMINE ON THESE SPECIFIC

13   COMMUNICATIONS WEEKS, MONTHS AGO.  THE COURT GRANTED IT.

14           THEY HAVE NOW, AS THE COURT HAS STATED QUITE CLEARLY,

15   TRIED TO SEIZE UPON AN ORDER, AN APPLICABLE ORDER, TO JUSTIFY  00:29

16   PRODUCING IT RIGHT BEFORE THIS WITNESS TESTIFIES.  THAT'S NOT

17   FAIR.

18           THE COURT:  WHAT WE ORDERED ON THE MOTION IN LIMINE

19   WAS THAT IF THEY DON'T PRODUCE THIS, THEN THEY CAN'T -- NOW

20   THEY HAVE PRODUCED THEM.                                       00:30

21           MR. ZELLER:  BUT THAT WAS WEEKS AGO, YOUR HONOR.  AND

22   THESE VERY E-MAILS WERE DISCUSSED AND WERE THE SUBJECT OF THE

23   MOTION IN LIMINE ON PAGE 8.  WE SPECIFICALLY CALLED OUT THESE

24   PRIVILEGE LOG ENTRIES THAT THEY NOW HAVE PRODUCED THE E-MAILS

25   FOR.                                                           00:30
```

1       AND LET ME ALSO STRESS SOMETHING ELSE, BECAUSE

2   MR. NOLAN HAS STARTED TO REARGUE THE VERY WAIVER ISSUE WE HAVE

3   TALKED WITH THE COURT TIME AND TIME AND TIME AGAIN.  THERE IS

4   THE NINTH CIRCUIT CASE -- THE COLUMBIA BROADCASTING CASE MAKES

5   IT VERY CLEAR THAT THE BELATED WAIVER OF PRIVILEGE IN THESE                    00:30

6   CIRCUMSTANCES IS INAPPROPRIATE; IT'S IMPROPER; IT'S

7   SANDBAGGING.  AND THAT ABSOLUTELY IS THE CASE HERE.

8       WE ASKED WITNESSES REPEATEDLY QUESTIONS ABOUT THOSE

9   KINDS OF COMMUNICATIONS, AND THEY ASSERTED THE PRIVILEGE.  WE

10  ARE NOW IN TRIAL.  THEY MADE THEIR CHOICE MONTHS AGO.  AND AS                  00:31

11  THE COURT HAS POINTED OUT, IF THEY WERE GOING TO MAKE THAT

12  WAIVER AND TAKE THEIR CHANCES -- BECAUSE, TO BE SURE, WE WERE

13  GOING TO ARGUE AND WE WILL CONTINUE TO ARGUE, IF THEY'RE

14  ALLOWED TO PUT THESE IN, THAT THERE IS A WHOLESALE WAIVER.

15      BUT ALSO, JUST TO FOCUS THE COURT ON THIS PARTICULAR               00:31

16  ISSUE ABOUT THESE E-MAILS -- BECAUSE I THINK WE CAN DEAL WITH

17  THE MORE NARROW ISSUE AT THE MOMENT, WHICH ARE THESE E-MAILS

18  THAT THEY HAVE PRODUCED.  BUT IN FAIRNESS, YOUR HONOR, IT'S

19  INTERESTING THAT ALL THEY HAVE PRODUCED ARE THE COMMUNICATIONS

20  BETWEEN VICTORIA O'CONNOR AND DAVID ROSENBAUM, AND FOR A VERY        00:31

21  NARROW TIME PERIOD IN 2000.  COMPLETELY ABSENT ARE OTHER

22  COMMUNICATIONS BETWEEN THE LAWYER AND MS. O'CONNOR DURING OTHER

23  TIME PERIODS.  COMPLETELY ABSENT ARE HIS COMMUNICATIONS WITH

24  ISAAC LARIAN.  SO WE'RE TALKING ABOUT NOT JUST A SELECTIVE

25  LIMITED WAIVER, WE'RE TALKING ABOUT AN EXTREMELY LIMITED AND        00:31

1    UNFAIR ONE.  SO IF WE'RE GOING TO GET INTO THESE ISSUES ABOUT

2    THE SCOPE OF THE WAIVER, THIS IS CLASSIC SWORD AND SHIELD THAT

3    THEY ARE ENGAGING IN HERE, AND IT'S IN VIOLATION OF THE MOTION

4    *IN LIMINE*, WHICH THE COURT PRECLUDED THEM, PRECLUDED THEM FROM

5    RELYING ON EXACTLY THESE E-MAILS AND EXACTLY THIS KIND OF                    00:32

6    INFORMATION.

7              **THE COURT:**  MR. NOLAN, I HAVEN'T READ THESE E-MAILS.

8    WHAT DO THESE E-MAILS SAY?  WHAT IS THE GRAVAMEN OF THEM?

9              **MR. NOLAN:**  THE E-MAIL EXCHANGE IS BETWEEN

10   DAVID ROSENBAUM AND VICTORIA O'CONNOR, RECITING FACTUAL                      00:32

11   STATEMENTS THAT HAVE BEEN OBTAINED FROM ANNE WANG, WHO WAS

12   REPRESENTING CARTER BRYANT, REGARDING INFORMATION THAT WAS

13   CONVEYED AND THEN CONVEYED TO VICTORIA O'CONNOR.

14             ISAAC LARIAN, BY THE WAY, WAS QUESTIONED ON THIS

15   INFORMATION AT HIS DEPOSITION.  THEY ARE NOT SURPRISED BY THIS              00:32

16   CONTENT.

17             ALL IT SAYS, YOUR HONOR, IS -- THERE'S A STATEMENT

18   FROM ANNE WANG THAT CARTER BRYANT HAS CONFIRMED, IN LOOKING AT

19   CHRONOLOGY OF THE PRODUCTION OF THE DRAWINGS, THAT THEY WERE

20   DONE OUTSIDE THE SCOPE OF MATTEL.                                           00:33

21             ISAAC LARIAN WAS QUESTIONED EXTENSIVELY ABOUT THAT.

22   THAT'S NOT BASED ON ADVICE OF COUNSEL.  THAT'S A FACTUAL

23   RECITATION THAT HAS BEEN IN THIS CASE.  IT'S OF NO SURPRISE;

24   IT'S NO SIGNIFICANT MOMENT; IT'S NOT A 'GOTCHA' MOMENT.

25             THAT'S THE GIST OF IT, YOUR HONOR.                                00:33

1       AND REPORTING THAT CARTER BRYANT SIGNED THE AGREEMENT

2   AT 3:52 P.M. ON OCTOBER 4TH.

3       THOSE ARE THE TWO FACTUAL STATEMENTS THAT ARE BEING

4   INCLUDED HERE.

5       AND BY THE WAY, VICTORIA O'CONNOR TESTIFIED ALREADY                00:33

6   IN HER DEPOSITION THAT SHE WAS TOLD THAT BY CARTER BRYANT

7   HERSELF.  IT'S NOT THE 'GOTCHA' MOMENT THAT THEY'RE ALL SAYING

8   IT IS.

9       **MR. ZELLER:**  THE MOTION *IN LIMINE* NUMBER SEVEN THAT

10  THE COURT GRANTED CITED, QUOTED, CHAPTER AND VERSUS, THE               00:33

11  REPEATED EFFORTS WE MADE WHEN WE ASKED DEPOSITION QUESTIONS

12  ABOUT THOSE VERY COMMUNICATIONS.  THEY INSTRUCTED -- TO A

13  PERSON THEY INSTRUCTED.  THAT INCLUDED THE LARIAN DEPOSITION.

14      WE HAVE CERTAINLY NEVER TAKEN THE POSITION THAT A

15  COMMUNICATION BETWEEN MR. BRYANT AND MR. LARIAN WOULD BE               00:34

16  PRIVILEGED.  THE COURT CAN SEE FROM THE E-MAILS BEFORE IT THAT

17  THESE ARE CLEARLY PRIVILEGED COMMUNICATIONS.  THEY ARE BY A

18  LAWYER TO A PERSON WHO IS AN EXECUTIVE AT THE TIME TO MGA.

19      **THE COURT:**  ON 18468, WHOSE NOTES ARE THESE?

20      **MR. NOLAN:**  THOSE ARE NOTES OF ANNE WANG,                      00:34

21  REPRESENTING CARTER BRYANT, AND DAVID ROSENBAUM, BOTH OF WHOM

22  ARE GOING TO BE TESTIFYING IN THIS CASE.

23      **MR. ZELLER:**  WE WERE DENIED THE OPPORTUNITY TO TAKE

24  DEPOSITION DISCOVERY FROM THEM BECAUSE THEY WERE INSTRUCTED.

25      I ALSO NOTE, YOUR HONOR -- JUST TO SHOW HOW UNFAIR                  00:34

```
 1   THIS REALLY IS, AND HOW INCOMPLETE THIS PARTIAL WAIVER IS, THE
 2   COURT WILL RECALL THAT IT HAD BEFORE IT THAT E-MAIL BETWEEN
 3   ISAAC LARIAN AND PATTIe GLASER, THAT, IN FACT, IS QUITE
 4   DIFFERENT IN TERMS OF A FACTUAL REPRESENTATION THAN WHAT'S SAID
 5   IN THIS E-MAIL.  AND THEY HAVE ASSERTED PRIVILEGE OVER THAT.        00:35
 6   WE HAVE BEEN DENIED THE OPPORTUNITY TO PUT THE FULL PICTURE AND
 7   THE FULL FACTS IN FRONT OF THE JURY.
 8          BUT BOTTOM LINE, THE COURT HAS PRECLUDED THIS.  THEY
 9   HAVE ARGUED ABOUT THIS VERY POINT HALF A DOZEN TIMES IN THIS
10   COURTROOM AND IN FRONT OF JUDGE INFANTE, AND THE COURT AND        00:35
11   JUDGE INFANTE HAVE CONSISTENTLY REJECTED IT.
12          WITH ALL DUE RESPECT, IN TERMS OF THE OTHER EXHIBITS
13   AND THAT SORT OF THING, IF THOSE ARE AN ISSUE, THEY NEED TO
14   RAISE THEM.  WE CAN DEAL WITH THEM ONE BY ONE, IF THEY ARE
15   TRULY AN ISSUE.  THINGS THAT ARE UNCONTROVERTED, PRESUMABLY,      00:35
16   WILL NOT BE AN ISSUE AND WON'T BE DRAGGED IN FRONT OF THE
17   COURT.  BUT THIS IS SOMETHING WE USED UP ONE OF OUR MOTIONS
18   IN LIMINE ON TO SPECIFICALLY PRECLUDE SO THAT THIS VERY THING
19   DID NOT HAPPEN.  AND NOW THEY ARE DOING IT.
20          THE COURT:  WE'RE WASTING A LOT OF JURY TIME RIGHT         00:35
21   NOW, WHICH I'M GOING TO HAVE TO CHARGE TO BOTH SIDES.
22          LET'S GET THE BRODE WITNESS GOING FIRST.  I'M GOING
23   TO HAVE TO TAKE A LOOK AT THESE AND LOOK AT THE MOTION
24   IN LIMINE, AND I MAY EVEN HAVE TO HEAR FURTHER ARGUMENT ON
25   THIS.  BUT LET'S GET BRODE AND THE FIRST ONE -- DENISE O'NEAL.    00:36
```

1   LET'S GET THAT DONE, AND THEN WE'LL TAKE A BREAK AND GO BACK TO

2   THIS.

3        **MR. ZELLER:**  WE'VE DECIDED WE'RE NOT CALLING

4   MS. BRODE AT THIS TIME.  OUR PLAN WAS TO CALL MS. O'CONNOR

5   FIRST.  THERE ARE A COUPLE OF OTHER WITNESSES WE COULD          00:36

6   POTENTIALLY CALL.

7        **THE COURT:**  HOW LONG IS YOUR DIRECT OF MS. O'CONNOR?

8        **MR. QUINN:**  HALF HOUR.

9        **THE COURT:**  IF THERE ARE OTHER WITNESSES YOU CAN CALL

10  -- AND YOU'VE NOTIFIED THE OTHER SIDE?                          00:36

11       **MR. ZELLER:**  ABOUT MS. BRODE?

12       **THE COURT:**  NO.  OTHER WITNESSES.

13       **MR. ZELLER:**  YES, WE HAVE.

14       **THE COURT:**  LET'S GET THE JURY IN HERE.  I CAN BE

15  LOOKING AT THIS WHILE WE'RE GOING THROUGH THIS.                 00:36

16       **MR. NOLAN:**  WOULD THE COURT WANT ME TO SUBMIT UP THE

17  DEPOSITION TESTIMONY OF ISAAC LARIAN ON JULY 18, 2006, WHERE HE

18  TESTIFIED EXPLICITLY TO THE E-MAIL THAT IS REFERRED TO IN THIS

19  DOCUMENT?  MR. NOLAN WAS ASKING A QUESTION AND MR. LARIAN WAS

20  FULLY QUESTIONED ON THE E-MAIL.                                 00:37

21       **THE COURT:**  THAT'S FINE, COUNSEL.  THE PROBLEM IS

22  THAT THIS WASN'T TURNED OVER UNTIL LAST NIGHT.  AND THIS REALLY

23  STRIKES THE COURT AS IMPROPER.  THAT'S MY FIRST BLUSH.

24       I'M GOING TO TAKE A LOOK AT THE MOTION *IN LIMINE*.

25  I'M GOING TO TAKE A LOOK AT MONDAY'S MOTION.  AND I'M NOT       00:37

1    SAYING THAT I'M CONDONING ANYBODY ELSE FROM DOING THIS.  I

2    MEAN, THIS IS THE FIRST TIME THIS HAS BEEN BROUGHT TO THE

3    COURT'S ATTENTION.  THIS SHOULD NOT BE GOING ON.  ABSENT AN

4    EXPRESSED ORDER BY THE COURT TO TURN OVER SOMETHING -- IF THIS

5    TRIAL IS GOING TO TURN INTO SOMETHING WHERE, THE NIGHT BEFORE,      00:37

6    PREVIOUSLY-DESIGNATED ATTORNEY-PRIVILEGED DOCUMENTS ARE BEING

7    TURNED OVER, IT'S GOING TO BE MISERABLE FOR BOTH SIDES.

8            LET ME TAKE A LOOK AT THIS MOTION *IN LIMINE*, AND

9    WE'LL GO FROM THERE.

10           **MR. ZELLER:**  IF I MAY JUST DIRECT THE COURT'S          00:38

11   ATTENTION TO WHERE WE SPECIFICALLY TALKED -- IN FACT, IN

12   RESPONSE TO MR. NOLAN'S ASSERTION THAT SOMEHOW WE WERE FREELY

13   ALLOWED TO QUESTION MR. LARIAN, WE INCLUDED, ON PAGES 7 AND 8

14   OF OUR MOTION *IN LIMINE* -- AND THEN IT GOES ON TO PAGE 9, WHERE

15   IT TALKS SPECIFICALLY THE DOCUMENTS THAT THEY WITHHELD;            00:38

16   SPECIFICALLY THE DOCUMENTS THEY PUT ON THEIR PRIVILEGE LOG; AND

17   SPECIFICALLY, IN THIS BRIEF AS WELL, THE VARIOUS ASSERTIONS OF

18   PRIVILEGE.  BECAUSE ONCE WE TRIED TO FOLLOW UP WITH MR. LARIAN

19   ON THIS VERY POINT THAT MR. NOLAN RAISES FROM THE TRANSCRIPT,

20   THAT'S WHEN THE INSTRUCTIONS WERE RAISED.                          00:38

21           SO IT'S VERY MUCH AN INSTANCE WHERE THEY ARE TRYING

22   TO HAVE BOTH SIDES OF THIS.

23           **THE COURT:**  I NEED TO GO BACK AND LOOK AT THAT MOTION

24   *IN LIMINE*.  I'M GOING TO BRING IT OUT TO THE BENCH HERE.  I'LL

25   TRY TO RECONSTRUCT THIS, AND WE'LL TALK ABOUT THIS LATER.          00:38

1    **MR. NOLAN:**  WE HAVE AN ANSWER FOR JUROR NUMBER 10'S

2    QUESTION.

3         **THE COURT:**  THERE WAS A QUESTION AT THE END OF THE

4    DAY, YES.

5         **MR. NOLAN:**  I THINK WE HAVE AN ANSWER THAT WE COULD        00:38

6    GIVE TO YOU, IF YOU WANT TO ANSWER THE QUESTION.

7         **THE COURT:**  IS THERE A STIPULATION BETWEEN THE TWO OF

8    YOU?

9         **MR. NOLAN:**  YES.

10        **MR. ZELLER:**  YES.                                          00:39

11        **THE COURT:**  VERY WELL.

12        AND WE HAVE ANOTHER NOTE HERE.

13        WHY DON'T WE DEAL WITH THIS FIRST NOTE FIRST.

14        WHAT IS YOUR ANSWER TO THAT?

15        **MR. ZELLER:**  WE EXCHANGED E-MAILS OVER IT.                 00:39

16        **MR. NOLAN:**  'THE 1613 FORD AVENUE, REDONDO BEACH,

17   CALIFORNIA, ADDRESS ON THE JUNE 12, 2000 INVOICE, WAS

18   ANNA RHEE'S ADDRESS, AND THE SOUTH GUADELOUPE AVENUE, REDONDO

19   BEACH ADDRESS IS DIFFERENT.'

20        AND I COULD HAND UP TO YOU THE E-MAIL.                        00:39

21        **THE COURT:**  WHY DON'T YOU PROVIDE THAT TO THE COURT,

22   AND THE COURT WILL ANSWER THAT QUESTION.

23        I'VE RECEIVED ANOTHER QUESTION, WHICH ACTUALLY CALLS

24   FOR MATTERS THAT I'M JUST GOING TO TELL THE JURY THAT I'LL BE

25   INSTRUCTING THEM ON LATER.                                        00:40

```
 1              JUROR NUMBER 7, MS. DOME, ASKS THE FOLLOWING TWO
 2    QUESTIONS:  CAN A CONCEPT OR PRODUCT BE COPYWRITTEN YEARS
 3    BEFORE MANUFACTURING?  ALSO, CAN A PRODUCT BE UPGRADED,
 4    CHANGED, OR ALTERED AFTER IT IS COPYWRITTEN AND MANUFACTURED?
 5              I'M NOT EVEN REALLY SURE WHAT THE QUESTIONS ARE.        00:40
 6              THEY GO TO ISSUES THAT OBVIOUSLY SHOULD NOT BE
 7    ADDRESSED AT THIS TIME.  I'M SIMPLY GOING TO TELL THE JURY THAT
 8    I'LL BE INSTRUCTING THEM ON THE LAW RELATED TO WHATEVER
 9    DECISIONS THEY NEED TO MAKE AT THE CLOSE OF THIS CASE.
10              MR. ZELLER:  THIS IS THE KIND OF QUESTION THAT WOULD,   00:40
11    I THINK, HAVE US RENEW OUR REQUEST THAT PERHAPS THERE BE SOME
12    INSTRUCTION IN LIGHT OF THE FACT THAT A LOT OF THIS DEVELOPMENT
13    STUFF HAS COME IN THROUGH THE DEFENSE WITNESSES.
14              AND IT'S CLEAR THAT, IF THEY'RE ASKING ABOUT WHAT ARE
15    THE MATERIALITY OF CHANGES DOWN THE ROAD, SOME JUROR IS FOCUSED  00:41
16    ON THAT ISSUE.
17              THE COURT:  WELL, COUNSEL, YOU SAY THROUGH THE
18    DEFENSE.  IT'S ALSO COME IN THROUGH QUESTIONING BY MATTEL AS
19    WELL.  WE'VE GOTTEN INTO ISSUES TWO, THREE YEARS OUT, OVER
20    OBJECTIONS BY MGA TO KEEP IT OUT BECAUSE OF THE TIMING.  BUT     00:41
21    IT'S NOT A CLEAR, FINE LINE.
22              YOU'RE ABSOLUTELY CORRECT, MR. ZELLER, THAT THAT'S
23    WHAT'S GOING ON, THAT THE JURY IS STARTING TO FOCUS.  AND THEY
24    WILL BE INSTRUCTED AT THE END OF THE FIRST PHASE THAT THE ONLY
25    ISSUES THAT ARE RELEVANT -- AND IT WILL BE IMPLICIT AND THEY     00:41
```

1   WILL ONLY BE ASKED TO RULE ON ISSUES RELEVANT TO THE PERIOD OF

2   THE CREATION.

3          MY CONCERN ABOUT GIVING INSTRUCTIONS AT THIS POINT --

4   GIVEN THE DISAGREEMENT BETWEEN THE PARTIES CONCERNING THOSE

5   INSTRUCTIONS, I JUST THINK THAT'S A CAN OF WORMS I DON'T WANT                00:41

6   TO OPEN UP RIGHT NOW.

7          UNLESS, MR. NOLAN, YOU AGREE THAT SOME LIMITED

8   INSTRUCTION IS APPROPRIATE AT THIS TIME?

9          **MR. NOLAN:**  NO, WE DO NOT, YOUR HONOR.  I THINK THE

10  TIME AND APPROPRIATE PLACE WOULD BE AT THE TIME OF JURY                      00:42

11  INSTRUCTIONS.

12         **THE COURT:**  WHAT I WILL DO IN ANSWERING THIS

13  QUESTION, THOUGH, IS INDICATE TO THEM THAT THEIR ROLE IS GOING

14  TO BE DECIDING CERTAIN FACTS IN TERMS OF WHAT HAPPENED AND THAT

15  THEY SHOULD NOT BE CONCERNED AT THIS POINT WITH THE LAW OF                   00:42

16  COPYRIGHT OR ANY OTHER LAW AT THIS POINT; BUT THAT THE COURT

17  WILL BE PROVIDING THEM WRITTEN INSTRUCTIONS AND THEY CAN

18  ADDRESS THOSE ISSUES AT THAT TIME, TO THE EXTENT NECESSARY; BUT

19  THAT THEY ARE GOING TO BE CALLED UPON TO DECIDE THE DISPUTED

20  FACTS, IN TERMS OF WHAT HAPPENED WHEN, AND TO PUT OFF FOR                    00:42

21  ANOTHER DAY ANY CONCERN ABOUT THESE LEGAL ISSUES.

22         **MR. ZELLER:**  FAIR ENOUGH, YOUR HONOR.

23         ONE OTHER THING, IF I MAY, IS MAKE A PLEA TO HAVE

24  VICTORIA O'CONNOR PUT ON.  AS I WAS MENTIONING BEFORE, SHE WAS

25  HERE ALL OF LAST FRIDAY.                                                     00:42

```
 1          MR. QUINN:  TWO DAYS.

 2          MR. ZELLER:  TWO DAYS.

 3          BUT I UNDERSTAND THAT, IN FACT, SHE'S NOT REALLY

 4   GOING TO BE AVAILABLE MUCH GOING FORWARD EITHER.  THERE'S A

 5   NEW YORK LICENSING SHOW THAT SHE'S SCHEDULED TO BE AT ALL OF      00:43

 6   NEXT WEEK.

 7          THE COURT:  IF WE DON'T STOP THIS PRETTY SOON,

 8   COUNSEL, WE'RE NOT GOING TO GET THROUGH ANY TESTIMONY.

 9          MR. ZELLER:  I UNDERSTAND.  BUT IF WE'RE GOING TO

10   DEFER HER, THAT'S GOING TO BE A PROBLEM.                          00:43

11          MR. PRICE:  THE OTHER PROBLEM IS, WE DON'T HAVE ANY

12   OTHER LIVE WITNESS RIGHT NOW.  MR. WEISS IS GOING TO BE CALLED.

13   HE WAS GOING TO GET HERE AT 9:30.

14          HE, BY THE WAY, IS A REPORTER.  HE BRINGS UP THE SAME

15   ISSUE AS TO WHETHER OR NOT THIS ENTIRE ARTICLE COMES IN OR JUST   00:43

16   A PORTION THAT REFLECTS WHAT MR. LARIAN SAID.  WE WERE GOING TO

17   OFFER --

18          THE COURT:  LET'S START WITH THE O'NEAL TESTIMONY.

19   LET'S GET THROUGH THAT.

20          MR. NOLAN:  THAT WILL BE FINE, YOUR HONOR.              00:43

21          I JUST WANT YOU TO KNOW, YOUR HONOR, WE'VE HAD BRODE

22   AND PEMBLETON AND ANOTHER WITNESS FOR TWO DAYS OUTSIDE; THAT

23   WAS THE ORDER THAT WE'VE HAD.

24          WE'VE HAD 15 WITNESSES, I BELIEVE, DESIGNATED,

25   SITTING AROUND; WE'VE BEEN PREPARED FOR THEM.  WE GOT A CALL   00:43
```

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

1  LAST NIGHT AT 10:00 THAT BRODE WASN'T GOING TO GO ON, AFTER WE

2  BROUGHT HER DOWN HERE FOR TWO DAYS.  THIS ORGANIZATION, THIS

3  STRUCTURE, HAS GOT TO BE CHANGED, BUT IT'S BEING DONE ON THE

4  PART OF MATTEL, NOT BY MGA.

5          THE COURT:  VERY WELL.                                    00:44

6          THIS STATEMENT, 'THE SOUTH GUADELOUPE AVENUE ADDRESS

7  IS DIFFERENT,' WHAT ARE YOU SAYING HERE?

8          OBVIOUSLY, IT'S DIFFERENT.  IT'S NOT THE SAME AS THE

9  OTHER ADDRESS.

10         MR. NOLAN:  SHE WAS NOT LIVING AT THE GUADELOUPE --       00:44

11         MR. ZELLER:  THE QUESTION ITSELF WAS ONLY, 'IS THAT A

12 DIFFERENT ADDRESS,' OR 'IS THAT DIFFERENT?'  THAT'S THE

13 QUESTION, LITERALLY, AS WE HEARD IT.

14         MR. PRICE:  TO BE COMPLETE, YOU COULD SAY THAT IT WAS

15 A LATER ADDRESS OF THE WITNESS.                                   00:44

16         MR. ZELLER:  WE CAN DO THAT.

17         THE COURT:  IT WAS A LATER ADDRESS.

18         MR. NOLAN:  SHE DIDN'T ASK A TEMPORAL QUESTION WITH

19 RESPECT TO --

20         THE COURT:  I KNOW.  BUT TO SIMPLY SAY IT'S             00:44

21 DIFFERENT -- ALL RIGHT.  I'M JUST GOING TO TELL THE JURY THAT

22 THIS IS YOUR ANSWER.  I'M NOT GOING TO DEAL WITH IT.

23         (LAUGHTER.)

24         MR. ZELLER:  IT IS A LATER ADDRESS.  I DON'T THINK

25 THERE'S A DISPUTE OVER THAT.                                      00:45

1          THE COURT:  IT DOESN'T MAKE SENSE TO SIMPLY SAY 'IT'S

2    DIFFERENT.'

3          MR. NOLAN:  YOUR HONOR, THERE IS NO DISPUTE THAT IT

4    WAS A DIFFERENT ADDRESS, AND THERE IS NO DISPUTE THAT SHE'S NOT

5    LIVING AT BOTH HOUSES AT THE SAME TIME AND THAT THE GUADELOUPE          00:45

6    ADDRESS, WE BELIEVE, SHE MOVED INTO AT A LATER TIME.

7          THE COURT:  SO YOU BOTH AGREE THAT IT WAS A LATER

8    ADDRESS?

9          MR. ZELLER:  THAT'S OUR UNDERSTANDING.

10          THE COURT:  LET ME AT LEAST SAY THAT, WITHOUT          00:45

11    SPECIFYING THE TIME.

12          I'M GOING TO STOP EVERYBODY NOW.  WE'RE DONE.  WE'RE

13    CALLING THE JURY IN RIGHT NOW.  WE'RE GOING TO HAVE A WITNESS.

14    I'LL HEAR FROM YOU AT THE NEXT BREAK.  WE'VE GOT TO MOVE

15    FORWARD.          00:45

16          (WHEREUPON, A BRIEF RECESS WAS HELD.)

17          (WHEREUPON, JURORS ENTER COURTROOM.)

18          THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.

19          I APOLOGIZE FOR HAVING TO KEEP YOU WAITING.  I

20    APPRECIATE YOU ALL BEING IN HERE AT 8:30.  IT IS OUR FAULT THAT          00:48

21    WE WEREN'T READY TO GO.

22          THE COURT HAS RECEIVED TWO QUESTIONS FROM THE JURY,

23    WHICH I WANT TO ANSWER AS BEST I CAN.

24          THE FIRST QUESTION WE RECEIVED AT THE END OF THE DAY

25    YESTERDAY WAS:  IS THE ADDRESS ON THE INVOICE, 1613 FORD          00:48

1    AVENUE, REDONDO BEACH, ANNA RHEE'S ADDRESS; AND IS THE LUPE

2    HOUSE DIFFERENT?

3              AND THE ANSWER I CAN GIVE YOU TO THAT AT THIS

4    POINT -- AND THIS IS STIPULATED BY COUNSEL, SO YOU CAN TREAT

5    THIS FACT AS HAVING BEEN PROVED -- IS THAT THE 1613 FORD          00:48

6    AVENUE, REDONDO BEACH, CALIFORNIA, ADDRESS ON THE JUNE 12, 2000

7    INVOICE WAS ANNA RHEE'S ADDRESS, AND THE SOUTH GUADELOUPE

8    AVENUE, REDONDO BEACH, CALIFORNIA, ADDRESS IS A DIFFERENT LATER

9    ADDRESS.

10             A SECOND QUESTION I RECEIVED THIS MORNING WAS:  CAN A    00:49

11   CONCEPT OR PRODUCT BE COPYWRITTEN YEARS BEFORE MANUFACTURING?

12   ALSO, CAN A PRODUCT BE UPGRADED, CHANGED, OR ALTERED AFTER IT

13   IS COPYWRITTEN AND MANUFACTURED?

14             THE COURT IS GOING TO DECLINE AT THIS POINT TO

15   ADDRESS THIS QUESTION.  THIS IS MORE OF A LEGAL QUESTION.  THE    00:49

16   COURT WILL BE INSTRUCTING YOU ON THE LAW CONCERNING WHATEVER IT

17   IS THAT YOU'RE GOING TO HAVE TO DECIDE.  YOU'VE HEARD DIFFERENT

18   OBJECTIONS FROM TIME TO TIME CONCERNING PHASES OF THE TRIAL.

19   THIS TRIAL IS ACTUALLY GOING TO BE IN TWO DIFFERENT PHASES, AND

20   THE ISSUE OF COPYRIGHT IS NOT EVEN SOMETHING WHICH IS GOING TO    00:49

21   BE ADDRESSED IN THE FIRST PHASE.  SO DON'T WORRY ABOUT THE LAW

22   AND COPYRIGHT OR WHETHER THINGS CAN BE COPYWRITTEN OR NOT.

23   YOU'RE GOING TO BE CALLED UPON TO ANSWER CERTAIN FACTUAL

24   QUESTIONS.  SO IT'S THE FACTS OF THE CASE THAT I NEED YOU TO BE

25   FOCUSING ON RIGHT NOW.  YOU'LL BE FULLY INSTRUCTED ON BOTH THE    00:50

1  LAW AND WHAT QUESTIONS THAT YOU NEED TO ANSWER AT THE END OF

2  EACH PHASE.

3           SO I HOPE THAT ANSWERS THE QUESTIONS THAT YOU HAVE.

4           JUROR NUMBER 6, MR. RUSSELL, I RECEIVED A LETTER FROM

5  YOUR EMPLOYER.  THE COURT HAS RESPONDED.  OBVIOUSLY, BY YOUR          00:50

6  PRESENCE HERE, THE COURT HAS NOT EXCUSED YOU AT THIS TIME.

7           I APPRECIATE THE LETTER, I APPRECIATE YOUR EMPLOYER'S

8  CONCERN AND YOUR VALUE TO YOUR EMPLOYER, BUT WE NEED TO HAVE

9  YOU SERVE ON THIS JURY AT THIS TIME.  THE COURT TRIED TO

10 EXPLAIN THAT AS BEST I COULD TO YOUR EMPLOYER.  IF HE HAS ANY         00:50

11 OTHER QUESTIONS, THE COURT WILL ALWAYS WELCOME A LETTER FROM

12 ANYBODY.

13          I THINK THAT TAKES CARE OF THE JURY ISSUES.

14          AS I INDICATED, WE'RE ONLY GOING TO GO THIS

15 MORNING -- WE'RE PROBABLY GOING TO FINISH AROUND 11:30 OR            00:50

16 11:45.  WE'LL BE TAKING A COUPLE OF BREAKS DURING THE MORNING,

17 BECAUSE THERE'S SOME LEGAL ISSUES, CONTINUING LEGAL ISSUES,

18 THAT WE HAVE TO ADDRESS, THAT THE COURT NEEDS TO ADDRESS,

19 CONCERNING WITNESSES.  BUT I DO BELIEVE THAT WE CAN CALL A

20 WITNESS AT THIS TIME.                                                00:51

21          IS THAT CORRECT?

22          **MR. QUINN:**  YES, YOUR HONOR.

23          IT WOULD BE DENISE O'NEAL, BY VIDEOTAPED DEPOSITION.

24          **THE COURT:**  VERY WELL.

25          (WHEREUPON, VIDEOTAPED DEPOSITION PLAYS.)                    00:51

WEDNESDAY, JUNE 4, 2008                     TRIAL DAY 7

```
 1              (WHEREUPON, THE FOLLOWING EXCERPTS WERE

 2         INSERTED AS PROVIDED BY COUNSEL: )

 3         Q.    Good afternoon, Ms. O'Neal.

 4         A.    Hi.

 5         Q.    Could you spell your full name for

 6    The record, please?

 7         A.    My first name is Denise,

 8    D-e-n-i-s-e.  My last name is O'Neal,

 9    O'-N-e-a-l.

10         Q.    And could you also state for the

11    Record your current address?

12         A.    14732 South Princeton Avenue,

13    Dolton, D-o-l-t-o-n, Illinois 60419.

14         Q.    And where are you currently

15    Employed?

16         A.    Chicago Sun-Times.

17         Q.    And when did you start working for

18    The Sun-Times?

19         A.    December.  Yeah, December of 1990.

20         Q.    And have you worked for the

21    Sun-Times from December 1990 until now?

22         A.    Yes.

23         Q.    And did you have any -- what was

24    Your employment history prior to the Sun-Times?

25         A.    Prior to the Sun-Times I worked for
```

```
 1            Advertising Age Magazine.
 2            Q.    Could you just give us a brief
 3            Description of your educational background?
 4            A.    I have a bachelor's from Roosevelt
 5            University in Chicago, Illinois, in mass
 6            Communication, which covered broadcast and
 7            Print media.
 8            Q.    Could you give us a brief summary of
 9            Your job titles while you have been at the
10            Sun-Times?
11            A.    I have been -- my current title is
12            Editorial assistant, food staff writer.  I have
13            Worked for a food section, our weekend section,
14            And have been assistant and still assistant to
15            Our features editor.
16            Q.    And do you recall what your official
17            Position was in March of 2004?
18            A.    Editorial assistant and staff
19            Writer.
20            Q.    Thank you.  I would like to show you
21            An article and we will mark it as an exhibit
22            For the deposition, and I believe we are going
23            In order so that will be marked as Exhibit 927.
24            Q.I would ask you to take a quick
25            Look at that and tell me if you recognize it,
```

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

```
 1          This document?
 2          A.    It appears to be a story that I
 3          Wrote for the paper.  It has my byline, so I am
 4          Assuming it is the story I wrote.
 5          Q.    Do you recall this particular
 6          Article?
 7          A.    I know that I wrote an article on
 8          The Bratz, one lengthy article, and that is the
 9          Only I do believe.  It is the one that appeared
10          In 2004, yes.
11          Q.    Okay.  And would you like to take a
12          Minute and review it, or are you quite
13          Confident you wrote this article?
14          A.    If it has my byline, I am sure I
15          Wrote it.
16          Q.    If you could turn to page 2, please?
17          You will see some highlighted portions.  And if
18          I could have you focus on the first sentence,
19          It says, "When Larian's daughter was 7, he
20          Noticed she had become bored with Barbie
21          Dolls."
22          Do you see that?
23          A.    Yes.
24          Q.    Do you recall interviewing for this
25          Article an individual named Isaac Larian?
```

```
 1            A.     Yes.

 2            Q.     You do.  Do you remember

 3      Approximately when that interview occurred

 4      Compared to the publication of this article?

 5            A.     It would more likely be one to two

 6      Weeks prior to --

 7            Q.     To the publication date?

 8            A.     -- to the publication date.  Right.

 9            Q.     So approximately between mid

10      February?

11            A.     Somewhere in February, yeah.

12            Q.     2004?

13            A.     Yeah.  Right.

14            Q.     Thank you.  Now turning back to that

15      First sentence, do you recall Mr. Larian

16      Telling you that information during your

17      Interview with him?

18            A.     I do.

19            Q.     And if I could have you focus on the

20      Next sentence, it says, "He decided to again

21      Change the focus of his company, wanting to

22      Create a doll product for girls ages 7 to 13.

23      The dolls would have to be urban dolls

24      Representing America's multi-ethnicity.   They

25      Also had to reflect the trends and attitudes of
```

```
 1              The tween generation."
 2          Do you recall Mr. Larian
 3          Telling you that information?
 4          A.    To the best of my knowledge, yes.
 5          Q.    Turning to the next paragraph, you
 6          Will see a quote.  It says, "We were looking
 7          For a new toy to challenge Barbie.  Something
 8          That would span girls' interest in dolls for a
 9          Few more years," says Larian.
10          And you attribute that quote to
11          Mr. Isaac Larian, correct?
12          A.    Yes.
13          Q.    And to the best of your knowledge,
14          That was an exact quote from him to you,
15          Correct?
16          A.    Most quotes are pretty much
17          Verbatim, yes.
18          Q.    And to the best of your memory, that
19          Quote was words specifically spoken by Mr.
20          Larian?
21          A.    To the best of my knowledge, yes, it
22          Was.
23          Q.    Thank you.  Turning to the next
24          Paragraph it says, "Larian began shopping
25          Around for interested vendors.  Getting
```

1    Negative response because of the company name,

2    Larian once again changed the company's name,

3    Shortening it to MGA Entertainment.  That done,

4    Larry needed a name for his dolls."

5    Do you recall Mr. Larian telling

6    You that information?

7    A.    To the best of my knowledge, yes, I

8    Do.

9    Q.    And the next paragraph reads, "His

10   Creative team decided the name should be catchy

11   And not have more than six letters."

12   Do you recall him telling you

13   That?

14   A.    To the best of my knowledge, yes.

15   Q.    It goes on to say, "When looking at

16   Sketches and pitching ideas, someone said the

17   Dolls looked like little brats.  Keeping with

18   Today's trend of making names more cool by

19   Changing the spelling, MGA executives decided

20   To replace the S with a Z."

21   And you recall Mr. Larian

22   Telling you that information?

23   A.    Yes.

24   Q.    If you could turn a few paragraphs

25   Down below, you will see a highlighted quote

1       That reads, "We don't have plans laid out for

2       The Bratz.  We come up with new ideas as we go

3       Along and we are having fun doing it."

4       Do you see that?

5       A.    Yes.

6       Q.    And is it your recollection that

7       That is a quote from Mr. Isaac Larian?

8       A.    It is in quotation marks.  Yes, it

9       Would have been a quote from Mr. Larian.

10      Q.    Thank you.  If I could have you turn

11      Back to page one of the exhibit, you will see

12      Another series of paragraphs that are

13      Highlighted.

14      A.    Um-hmm.

15      Q.    The first one is also a quote which

16      Reads, "We wanted a respectable product that

17      Reflected the lifestyle of school girls and

18      Fashionable trends, but also one that

19      Represented clean fun with learning values," he

20      Says.

21          And is it your recollection

22      That that quote came from Mr. Larian as well?

23      A.    Yes, it did.

24      Q.    Turning to the next paragraph, it

25      Reads, "The Bratz are moving into another

1    Medium this year, starring in their first

2    Direct-to-DVD movie titled, "The Bratz Go

3    Hollywood."  The movie is set for a late summer

4    Release.  The dolls also will star in an

5    Animated feature film, which is expected to be

6    Released in late 2005."

7        Do you recall Mr. Larian

8    Telling you that information?

9    A.    To the best of my knowledge, yes.

10   Q.    Thank you.  And continuing with the

11   Next paragraph, it reads, "Doll products new

12   For 2004 include Bratz Petz, cats Brigitte,

13   Kendall, Jolie and Daphne; Bratz Wild Life, an

14   Exclusive set featuring Nevra, Meyghan and

15   Fianna; Bratz Girls Nite Out, with Cloe, Sasha,

16   Yasmin, Jade and Dana preparing for Saturday

17   Night fun; Sun-kissed Summer, with Cloe,

18   Yasmin, Sasha, Jade and Dana dressed in beach

19   Attire; Best Friends Beach Party, with friends

20   Calista and Noelle spending a day at the beach;

21   Best Friends Pajama Party, with Brianne and

22   Zana in a themed slumber party setting, and

23   Flower Fairies, featuring Rose, Daisy and

24   Sunflower, a trio of scented dolls."

25   Do you recall Mr. Larian

```
 1              Giving you all of that information?

 2              A.    The best of my knowledge, yes, I do.

 3              Q.    A few more quick housekeeping things

 4              Just for the record.  Also did you -- do you

 5              Recall interviewing anybody else from MGA in

 6              Preparation for this article?

 7              A.    No, I did not.

 8              Q.    Just Mr. Larian?

 9              A.    Isaac Larian, yes.

10              Q.    When we discuss the timing of the

11              Interview, do you recall was it in person or

12              Was it on the telephone?

13              A.    It was a telephone interview.

14              Q.    Do you recall approximately how long

15              It lasted?

16              A.    No, I don't.

17              Q.    Would you say more than a few

18              Minutes, less than an hour?

19              A.    I would be speculating in saying

20              Probably 15 to 20 minutes.

21              Q.    And was that your only conversation

22              With Mr. Larian in preparation for this

23              Article?

24              A.    Yes, it was.  Yes.

25              Q.    Were you ever contacted by Mr.
```

```
 1            Larian at any point after this article was
 2            Published and asked for a correction or a
 3            Retraction of anything in this article?
 4            A.    No.
 5            Q.    Were you ever contacted by a person
 6            Named Carter Bryant asking for a retraction or
 7            Correction?
 8            A.    No.
 9            Q.    Do you recall ever being contacted
10            By anybody from MGA asking for a correction or
11            Retraction of anything in this article?
12            A.    No.
13            Q.    And are you aware of anybody ever
14            Contacting the Chicago Sun-Times asking for a
15            Correction or retraction of this article in any
16            Way?
17            A.    No.
18            Q.    And to the best of your recollection
19            It would have been within one to two weeks
20            Before publication of the article?
21            A.    Normally that is the time span
22            Between interviews because we have to have
23            Stories filed a week prior to publication.
24            Q.    And you have a specific recollection
25            Following that policy in this particular case
```

1        In interviewing Mr. Larian in February of '04?

2        A.    As I said, it was sometime within

3        Two weeks prior to the publication.  I can't

4        Give you an exact date.

5        Q.    Sometime within two weeks before

6        Publication?

7        A.    To my best recollection.

8        MR. O'BRIEN:  I just have a few

9        Follow-ups.

10       Q.    With respect to the stuff in the

11       Article that you just attributed to Mr. Larian

12       Which was not in quotes, were you

13       Characterizing what Mr. Larian said to you?

14        MR. DUNN:  Yes or no.

15        THE WITNESS:  Yes.

16       BY MR. O'BRIEN:

17       Q.    Are there things that Mr. Larian

18       Said to you during the interview that did not

19       Find themselves in the article?

20        MR. DUNN:  You can give a yes or no

21       To that one.

22        THE WITNESS:  Yes, most likely.

23       Q.    Is this any reason to believe that

24       The information that you actually published in

25       The article does not accurately reflect what

```
 1              Mr. Larian told you during your interview?

 2              MR. DUNN:  You can answer that one.

 3              THE WITNESS:  No.

 4              (CONCLUSION OF DEPOSITION EXCERPT OF
                 DENISE O'NEAL.)
 5

 6              MR. QUINN:  YOUR HONOR, THAT CONCLUDES THE DEPOSITION

 7    OF MS. O'NEAL.

 8              THE COURT:  THANK YOU, COUNSEL.

 9              ARE YOU PREPARED TO CALL ANOTHER WITNESS AT THIS

10    TIME?                                                          01:02

11              MR. PRICE:  I THINK WE DO NEED TO MOVE IN

12    EXHIBIT 927.

13              MR. NOLAN:  THAT'S CORRECT, BY STIPULATION.

14              THE COURT:  VERY WELL.  IT'S ADMITTED.

15              MR. NOLAN:  THAT WAS THE ARTICLE THAT WAS POSTED.     01:02

16              THE COURT:  IT'S ADMITTED.

17              I KNOW YOU INDICATED THAT AT 9:30 SOMEONE WOULD BE

18    READY.

19              MR. PRICE:  THAT'S WHAT I WAS TOLD.  WE HAVE ANOTHER

20    WITNESS HERE.                                                  01:02

21              MR. QUINN:  WE HAVE A THOUGHT THAT MAY GET US THROUGH

22    THE ISSUE WE WERE DISCUSSING, IF I COULD APPROACH SIDE-BAR.

23              THE COURT:  VERY WELL.

24              (WHEREUPON, THE FOLLOWING PROCEEDINGS WERE HELD AT

25    SIDE-BAR:)                                                     01:03
```

1    **MR. QUINN:**  MY DISCUSSION WAS GOING TO BE WERE WE

2    PERMITTED TO CALL MS. O'CONNOR.  THE COURT CAN CONSIDER THE

3    MATTER.  IF THE COURT ULTIMATELY DECIDES THAT THEY ARE

4    APPROPRIATE TO BE USED, THEY CAN CALL HER IN THEIR CASE.

5         **THE COURT:**  I'M PRETTY CLOSE TO RULING.  I'VE LOOKED          01:03

6    AT THE MOTION *IN LIMINE* AND IT'S NOT AS CLEAN CUT AS EITHER

7    SIDE IS PRESENTING.  BASICALLY, GIVEN THE COURT'S RULING ON

8    WHAT ROSENBAUM -- AND I WAS FOCUSING, WHEN I MADE THE RULING ON

9    WHAT ROSENBAUM CAN TESTIFY TO -- I MADE THE DISTINCTION IN THAT

10   RULING THAT THE FACTUAL BASIS, THE FACTUAL ACT OF WHAT WAS          01:04

11   DONE, MR. ROSENBAUM CAN TESTIFY TO.  WHEREAS, THE LEGAL ADVICE,

12   THAT'S GOING TO BE EXCLUDED.

13        THE PROBLEM IS THAT NOBODY WAS FOCUSING ON THAT AT

14   THE TIME OF THAT MOTION *IN LIMINE* ON MS. O'CONNOR, AND THAT IS

15   WHAT I THINK IS UNFAIR AT THIS POINT, TO BE TURNING OVER THESE          01:04

16   PRIVILEGE DOCUMENTS THE NIGHT BEFORE MS. O'CONNOR COMES IN AND

17   MR. QUINN DOES NOT HAVE A CHANCE, MR. PRICE DOES NOT HAVE A

18   CHANCE TO REVIEW THOSE DOCUMENTS.

19        SO SINCE, UNDER THE MOTION IN LIMINE RULING, I'LL

20   FLUSH THIS OUT OUTSIDE OF THE PRESENCE OF THE JURY.  I WOULD BE          01:04

21   INCLINED TO CONSIDER THESE DOCUMENTS WITH RESPECT TO

22   MR. ROSENBAUM WHEN HE IS CALLED.  I'M INCLINED TO EXCLUDE THEM

23   FOR THE PURPOSES OF MS. O'CONNOR; THAT WAY WE CAN PROCEED WITH

24   MS. O'CONNOR THIS MORNING; THOSE DOCUMENTS WILL NOT BE USED;

25   AND THEN WE CAN REVISIT THIS ISSUE OF TO WHAT EXTENT THEY ARE          01:04

1  GOING TO BE USED WITH MR. ROSENBAUM.

2         YOU'RE NOT COMPROMISING YOUR ABILITY TO GET THIS IN,

3  DEPENDING ON HOW THIS IS FLUSHED OUT.  BUT AT THE SAME TIME,

4  MR. QUINN IS NOT BEING, AS YOU SAY, SAND BAGGED BY HAVING THESE

5  DOCUMENTS USED THIS MORNING.                                    01:05

6         **MR. QUINN:**  AND THE BASIS FOR THAT IS THAT IT'S

7  PURELY FACTUAL MATERIAL.

8         **THE COURT:**  YES.

9         **MR. QUINN:**  I'LL SEE IF THAT'S IT.  THEN, REMEMBER,

10  THERE IS IN THIS E-MAIL TO PATTIE GLASER WHERE HE SAYS HE DID   01:05

11  THIS NIGHTS AND WEEKENDS.

12         **THE COURT:**  I WILL LOOK AT THAT.  I UNDERSTAND THAT

13  IT WAS A VERY CURSORY REVIEW OF ALL OF THESE EXHIBITS.  THEY DO

14  APPEAR TO BE FACTUAL TYPE EXHIBITS, EXCEPT FOR THE ONES WHERE

15  THE NOTES ON THE AGREEMENT -- SOME OF THAT APPEARS TO BE        01:05

16  ADVICE.  BUT LIKE I SAY, IT WAS A VERY QUICK REVIEW.  I JUST

17  SAW THESE DOCUMENTS MYSELF FOR THE FIRST TIME.  BUT I THINK THE

18  WAY TO RESOLVE THIS IN A MORE THOUGHTFUL MANNER IS TO NOT WASTE

19  ANY MORE OF THE JURY'S TIME AND TO PROCEED WITH MS. O'CONNOR

20  THIS MORNING.  YOU HAVE OTHER WITNESSES.                        01:05

21         AND YOU HAVE OTHER EVIDENCE.  YOU CAN GET THIS IN.

22  YOU MAKE THIS POINT IN YOUR OPPOSITION TO THE MOTION *IN LIMINE*,

23  SO I DON'T THINK YOU'RE BEING PREJUDICED BY GOING FORWARD WITH

24  MS. O'CONNOR.

25         **MR. NOLAN:**  JUST SO THE RECORD IS CLEAR, NOT THAT I   01:06

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

```
 1   FEEL LIKE I NEED TO DEFEND, BECAUSE IT'S NOT INTENTIONAL, SAND
 2   BAGGING.  IT WASN'T UNTIL YESTERDAY, BECAUSE VICTORIA
 3   O'CONNOR'S SCHEDULE HAS BEEN A MOVING TARGET.  WHEN I HEARD
 4   ABOUT IT AND REVIEWED THE DOCUMENTS AND SAW SHE WAS COPIED ON
 5   IT, OUT OF AN ABUNDANCE OF CAUTION, I DID PRODUCE THEM LAST      01:06
 6   NIGHT.  WE CAN USE THEM WITH MR. ROSENBAUM.  I ASSUME HE NEEDS
 7   TO BE A WITNESS TODAY -- NOT TODAY, BUT HE'LL BE IN THIS CASE.
 8           I UNDERSTAND AND ACCEPT THE COURT'S RULING.
 9           SHE DOES TESTIFY -- I WILL WARN THE COURT, SHE
10   TESTIFIES TO SOME OF THE SAME INFORMATION.  WE CAN GET IT FROM   01:06
11   HER.
12           THE COURT:  IF THAT'S ALREADY COME OUT IN HER
13   DEPOSITION, THAT'S FACT BASED AND NOT ADVICE AND NOT IN THE
14   PRIVILEGE LOG, THAT'S FAIR GAME.  THAT'S WHY, TO A CERTAIN
15   EXTENT, SOME MAY BE CUMULATIVE.  I'M KEEPING THE DOCUMENTS OUT   01:06
16   FROM MS. O'CONNOR; SO WE CAN GO FORWARD AND CALL MS. O'CONNOR
17   OR WHOEVER ELSE.
18           MR. QUINN:  WE'LL CALL MS. O'CONNOR.
19           MS. AGUIAR:  SHE IS UNDER SUBPOENA, SO IF WE WANT TO
20   CALL HER IN OUR CASE, WE HAVE AN INTERESTING -- WE WOULD STILL   01:07
21   CALL HER IN OUR CASE, THIS WOULD STILL BE -- I'M CONCERNED
22   ABOUT HER AVAILABILITY.
23           THE COURT:  I'M NOT GOING TO PERMIT THESE DOCUMENTS
24   IN WITH RESPECT TO MS. O'CONNOR.
25           MS. AGUIAR:  I UNDERSTAND THAT.  I'M SAYING THAT IF      01:07
```

```
 1   WE, TWO WEEKS FROM NOW, WANT TO CALL HER IN OUR CASE AND GO

 2   OVER DOCUMENTS WITH HER...  I THINK THAT WAS WHAT MR. QUINN --

 3          THE COURT:  JUDICIAL EFFICIENCY WOULD SUGGEST WE DO

 4   THIS TOGETHER.  I DON'T LIKE THE IDEA OF SPITTING UP WITNESSES.

 5   IT'S YOUR TIME AND IF YOU LEGALLY PROTECTED YOUR ABILITY TO        01:07

 6   CALL HER, I'LL TAKE THAT UP AT THAT TIME.

 7          MR. NOLAN:  MAYBE AT THE END OF THE DAY WE CAN GET A

 8   TIME COUNT AS TO WHERE WE STAND.

 9          THE COURT:  I CHARGED YOU BOTH 15 MINUTES FOR THIS

10   MORNING.                                                          01:07

11          (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

12          MR. QUINN:  YOUR HONOR, MATTEL CALLS

13   VICTORIA O'CONNOR.

14          THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

15   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

16   BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

17   HELP YOU GOD?

18          THE WITNESS:  I DO.

19          THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

20   YOUR LAST NAME FOR THE RECORD.

21          THE WITNESS:  VICTORIA O'CONNOR,

22   O-APOSTROPHE-C-O-N-N-O-R.

23                      DIRECT EXAMINATION

24   BY MR. QUINN:

25   Q   GOOD MORNING, MS. O'CONNOR.  I'M JOHN QUINN.  AS YOU KNOW,    01:09
```

```
 1    I REPRESENT MATTEL.  WE MET AT YOUR DEPOSITION SOME TIME AGO.

 2            WE KEPT YOU WAITING FOR A COUPLE OF DAYS, FOR WHICH

 3    WE APOLOGIZE.

 4    A    THAT'S OKAY.

 5    Q    YOU WERE FORMERLY EMPLOYED BY MGA?                    01:09

 6    A    I WAS.

 7    Q    WHAT WERE THE INCLUSIVE DATES OF YOUR EMPLOYMENT?

 8    A    I BELIEVE I STARTED IN AUGUST 1999 -- NO, APRIL 1999

 9    THROUGH FEBRUARY 2003.

10    Q    WHAT WAS FIRST THE POSITION THAT YOU HAD WITH MGA?   01:09

11    A    LICENSING MANAGER.

12    Q    WHAT WERE YOUR DUTIES AS LICENSING MANAGER?

13    A    TO SEEK OUT POTENTIAL PROPERTIES FOR LICENSING AND TO

14    BRING THEM IN-HOUSE.

15    Q    COULD YOU EXPLAIN TO THE JURY WHAT THAT INVOLVES, WHAT  01:10

16    YOU'RE DOING IN THAT CAPACITY.

17    A    SURE.

18            WHAT I WOULD LOOK FOR ARE HOT TV SHOWS OR HOT BRANDS,

19    LIKE RUGRATS OR WORLD WRESTLING FEDERATION, AND CONTACT THE

20    COMPANIES THAT OWN THE RIGHTS TO RUGRATS OR TO WWF OR SPIDERMAN  01:10

21    AND SEE IF THEY HAD ANY INTEREST IN WORKING WITH MGA

22    ENTERTAINMENT, FOR US TO MANUFACTURE THE TOYS OR THE PRODUCTS

23    THAT WERE IN WHAT WOULD EVENTUALLY BE A LICENSE AGREEMENT.  AND

24    MGA WOULD MANUFACTURE THE TOYS AND SELL THE TOYS TO RETAILERS.

25    SO I DID THE CONTRACT NEGOTIATIONS WITH THESE COMPANIES, WHO   01:10
```

```
 1   ARE CALLED LICENSORS.

 2   Q    DID YOU LATER HOLD A DIFFERENT POSITION?

 3   A    I DID.

 4   Q    WHAT WAS THE NEXT POSITION YOU HELD?

 5   A    WELL, ALSO IN MY ROLE AS LICENSING MANAGER, I MET WITH        01:10

 6   INVENTORS.  AND THESE WERE JUST REGULAR PEOPLE THAT HAD AN IDEA

 7   FOR A TOY CONCEPT THAT WOULD COME TO ME AND SAY, 'I HAVE THIS

 8   GREAT IDEA FOR A TOY, A DOLL, A GAME.  WOULD MGA BE INTERESTED

 9   IN LICENSING IT?'

10   Q    AND THOSE ARE THE THINGS THAT YOU DID AS LICENSING           01:11

11   MANAGER?

12   A    CORRECT.

13   Q    DID YOU CHANGE JOBS AT SOME POINT, OR ASSUME A DIFFERENT

14   POSITION?

15   A    I DID.  I WAS PROMOTED TO LICENSING DIRECTOR.                01:11

16   Q    AND THAT WOULD HAVE BEEN ROUGHLY WHEN, IF YOU REMEMBER?

17   A    I BELIEVE IT WAS SOMETIME IN 2000, BUT I CAN'T SAY FOR

18   CERTAIN.

19   Q    WAS THAT A PROMOTION?

20   A    YES, IT WAS.                                                 01:11

21   Q    DID YOUR DUTIES CHANGE WHEN YOU BECAME A LICENSING

22   DIRECTOR?

23   A    YES.  I TOOK ON ADDITIONAL RESPONSIBILITIES, INCLUDING

24   PUBLIC RELATIONS.  AND THERE WAS ALSO A BRIEF PERIOD WHEN I WAS

25   DOING HUMAN RESOURCES.                                           01:12
```

```
 1   Q     DID YOU GET A SUBSEQUENT POSITION AFTER THAT?

 2   A     I DID.

 3   Q     AND WHAT WAS THAT?

 4   A     VICE PRESIDENT OF LICENSING.

 5   Q     WAS THAT ANOTHER PROMOTION?                            01:12

 6   A     YES, IT WAS.

 7   Q     WHEN WAS IT THAT YOU RECEIVED THAT PROMOTION?

 8   A     I BELIEVE IT WAS SOMETIME IN 2002.

 9   Q     WHEN YOU FIRST STARTED AT MGA, WERE YOU THE ONLY PERSON

10   WORKING IN THE LICENSING AREA?                               01:12

11   A     YES.

12   Q     AND BY THE TIME YOU LEFT -- I THINK YOU SAID IT WAS IN

13   2003.

14   A     CORRECT.

15   Q     HOW MANY PEOPLE DID YOU HAVE WORKING DIRECTLY OR       01:12

16   INDIRECTLY UNDER YOU?

17   A     THERE WERE FIVE, AND THEN MYSELF.

18   Q     WERE YOU INVOLVED WITH MGA'S CONTACTS WITH CARTER BRYANT

19   CONCERNING THE BRATZ IDEA?

20   A     YES.                                                   01:13

21   Q     AND IS THAT SOMETHING THAT WOULD BE WITHIN YOUR BAILIWICK,

22   AS IT WERE, AS A LICENSING PERSON?

23   A     BAILIWICK?

24   Q     IN YOUR AREA OF RESPONSIBILITY.

25   A     YES.                                                   01:13
```

WEDNESDAY, JUNE 4, 2008                          TRIAL DAY 7

```
 1           THE COURT:  THAT WAS A LEGAL PHRASE.

 2           (LAUGHTER.)

 3   BY MR. QUINN:

 4   Q    JUST IN GENERAL, WHAT WAS THE NATURE OF YOUR INVOLVEMENT?

 5   IF YOU COULD JUST GIVE US AN OVERVIEW OF THE NATURE OF YOUR        01:13

 6   INVOLVEMENT IN DEALINGS WITH CARTER BRYANT.

 7   A    SURE.

 8           HE WAS ONE OF THE INVENTORS WHO HAD A DOLL CONCEPT

 9   AND CAME TO MGA TO PRESENT HIS DOLL CONCEPT FOR US TO LICENSE,

10   TO SEE IF WE WERE INTERESTED IN LICENSING IT.                     01:13

11   Q    DID YOU MEET WITH MR. BRYANT IN THE SUMMER OF 2000?

12   A    I DID.

13   Q    CAN YOU TELL US HOW THAT CAME TO BE SET UP.  WHAT WERE THE

14   CIRCUMSTANCES OF THAT MEETING?

15   A    THE MEETING WAS SET UP BECAUSE PAULA TREANTAFELLES TOLD ME    01:14

16   THAT SHE HAD A GENTLEMAN WHO WAS INTERESTED IN PRESENTING A

17   DOLL CONCEPT, AND I BELIEVE -- I DON'T REMEMBER WHO SCHEDULED

18   THE MEETING, BUT SHE TOLD ME THAT SHE AND I WOULD BE MEETING

19   WITH HIM AS HE PRESENTED HIS DOLL CONCEPT TO US.

20   Q    DID SHE EXPLAIN TO YOU WHY SHE WANTED YOU THERE?             01:14

21   A    SHE DIDN'T HAVE TO EXPLAIN IT TO ME, SINCE I MANAGED THE

22   INVENTOR RELATIONS.

23   Q    LOGICAL THAT YOU WOULD BE THERE?

24   A    YES.

25   Q    DID YOU ATTEND THAT FIRST MEETING WITH MR. BRYANT?          01:14
```

```
 1   A     I DID.

 2   Q     DID MS. TREANTAFELLES INDICATE WHETHER OR NOT SHE HAD MET

 3   WITH MR. BRYANT PRIOR TO THAT?

 4   A     YES, SHE DID.  AND SHE HAD NOT MET WITH HIM PRIOR.

 5   Q     WHO WAS IN ATTENDANCE AT THAT FIRST MEETING WITH          01:14

 6   MR. BRYANT, THAT YOU RECALL?

 7   A     MYSELF AND PAULA.  AND AT SOME POINT, ISAAC WAS PRESENT.

 8   AND I DON'T RECALL WHETHER OR NOT IT WAS THAT FIRST MEETING OR

 9   THERE WAS A FOLLOW-UP MEETING.

10   Q     THAT MR. LARIAN WAS PRESENT?                              01:15

11   A     CORRECT.

12   Q     IN THE ONE YOU'RE SURE OF, IN THE FIRST MEETING YOU'RE

13   THINKING OF, WERE YOURSELF?

14   A     CORRECT.

15   Q     MS. TREANTAFELLES?                                        01:15

16   A     YES.

17   Q     AND OBVIOUSLY, MR. BRYANT?

18   A     YES.

19         AND ALSO AT SOME POINT, DIDI BROWN, WHO WAS AN MGA

20   EMPLOYEE, WAS ALSO BROUGHT INTO THE ROOM.  AND, AGAIN, THAT WAS 01:15

21   WHEN ISAAC LARIAN WAS PRESENT.  AND I DON'T REMEMBER IF THAT

22   WAS THE INITIAL MEETING OR A FOLLOW-UP MEETING.

23   Q     WHAT WAS DIDI BROWN'S POSITION?

24   A     SHE WAS AN EXECUTIVE ASSISTANT TO MR. LARIAN.

25   Q     WHERE DID THIS INITIAL MEETING THAT YOU RECALL TAKE PLACE? 01:15
```

```
 1    A    IN MR. LARIAN'S OFFICE.

 2    Q    HOW LONG DID THE MEETING LAST?

 3    A    I DON'T RECALL.

 4    Q    DID MR. BRYANT BRING WITH HIM ANY MATERIALS?

 5    A    HE DID.                                              01:15

 6    Q    WHAT DID HE BRING WITH HIM?

 7    A    HE BROUGHT A PROTOTYPE OF THE DOLL AND SOME DRAWINGS OF

 8   THE DOLL.

 9    Q    DO YOU RECALL HOW MANY DRAWINGS HE HAD?

10    A    NO.                                                 01:16

11    Q    AND DO YOU RECALL HOW MANY DIFFERENT CHARACTERS OR FIGURES

12   OF DOLLS HE HAD DEPICTIONS OF?

13    A    AT LEAST FOUR.

14    Q    DID HE REFER TO THEM BY A PARTICULAR NAME?

15    A    YES.                                                01:16

16    Q    WHAT WAS THE NAME THAT HE USED?

17    A    THE NAME FOR ALL OF THE CHARACTERS?

18    Q    YES.

19    A    "BRATZ."

20    Q    HAD YOU EVER HEARD THE NAME "BRATZ" FOR A DOLL PRIOR TO    01:16

21   THAT FIRST MEETING WITH MR. BRYANT?

22    A    NO.

23    Q    CAN YOU DESCRIBE FOR THE JURY THIS DOLL PROTOTYPE THAT HE

24   HAD WITH HIM IN THE FIRST MEETING, THAT YOU CAN RECALL.

25    A    IT HAD A BIG HEAD.  IT WAS BEAUTIFULLY PAINTED.  SHE WAS    01:16
```

1    BLONDE, LONG HAIR, AND HAD A SMALL BODY WITH BIG FEET.

2    Q    WAS THE BODY -- WAS IT LIKE A DOLL THAT HAD BEEN IN A

3    MOLD?

4              **MR. NOLAN:**  OBJECTION.  LEADING, YOUR HONOR.

5              **THE COURT:**  REPHRASE.                                01:17

6    **BY MR. QUINN:**

7    Q    ARE YOU FAMILIAR WITH MOLDS, MOLDED DOLL BODIES?

8    A    YES.

9    Q    COULD YOU TELL WHETHER OR NOT THIS HAD BEEN IN A MOLD?

10   A    YES.  IT LOOKED LIKE IT WAS A PART FROM ANOTHER DOLL.        01:17

11   Q    WHAT WAS IT MADE OF?  COULD YOU TELL?

12   A    I DON'T KNOW.

13   Q    YOU SAY THE FACE WAS PAINTED?

14   A    YES.

15   Q    CAN YOU DESCRIBE THE FACIAL FEATURES AT ALL?                01:17

16   A    TWO EYES, A NOSE, A MOUTH, EYELASHES.

17   Q    WERE THE EYES LARGER THAN NORMAL?

18   A    YES.

19   Q    THERE SHOULD BE A BINDER THERE IN FRONT OF YOU, AND IF YOU

20   WOULD TAKE A LOOK AT EXHIBIT 1, MY QUESTION TO YOU IS GOING TO    01:17

21   BE WHETHER THESE ARE COPIES OF -- I BELIEVE THIS IS IN

22   EVIDENCE, EXHIBIT 1 -- COULD YOU IDENTIFY EXHIBIT 1.  ARE THESE

23   PICTURES YOU'VE SEEN BEFORE?

24   A    YES.

25   Q    CAN YOU TELL US WHETHER OR NOT THESE ARE COPIES OF THE       01:18

1    PICTURES THAT MR. BRYANT HAD WITH HIM AT THE FIRST MEETING THAT

2    YOU HAD WITH HIM.

3    A    YES.

4              **MR. QUINN:**  WE'D OFFER EXHIBIT 1, YOUR HONOR.

5              **THE COURT:**  ANY OBJECTION?                          01:18

6              **MR. NOLAN:**  NO OBJECTION, YOUR HONOR.

7              **THE COURT:**  IT'S ADMITTED.

8              YOU MAY PUBLISH.

9              **MR. QUINN:**  TO JUST GIVE THE JURY SOME IDEA WHAT

10   WE'RE LOOKING AT HERE, IF WE COULD JUST GO THROUGH THOSE         01:18

11   QUICKLY.

12   **BY MR. QUINN:**

13   Q    IF YOU'D ALSO LOOK, PLEASE, AT THE DOCUMENT BEHIND

14   EXHIBIT 10 IN YOUR BINDER.  AFTER THE FIRST PAGE, YOU'LL SEE

15   SOME DRAWINGS.  I'M GOING TO ASK YOU THE SAME QUESTION, WHETHER  01:19

16   THOSE ALSO APPEAR TO BE COPIES OF IMAGES THAT YOU CAN IDENTIFY.

17   A    IDENTIFY AS TO HAVING SEEN THEM BEFORE?

18   Q    YES.

19   A    I DON'T RECALL SEEING THESE.

20   Q    THESE YOU HAVE NOT SEEN BEFORE?                             01:19

21   A    I COULD HAVE.  I DON'T REMEMBER.

22   Q    ONE WAY OR THE OTHER?

23   A    CORRECT.

24   Q    AT THIS MEETING, THE FIRST MEETING YOU HAD WITH

25   MR. BRYANT, DID HE INDICATE TO YOU WHETHER HE WAS EMPLOYED?     01:20

```
 1   A     YES.

 2   Q     WHAT DID HE SAY ON THAT SUBJECT?

 3   A     THAT HE WORKED FOR MATTEL AND BARBIE COLLECTIBLES AS A

 4   DESIGNER.

 5   Q     DID HE SAY THAT THAT WAS THEN HIS CURRENT EMPLOYMENT?      01:20

 6   A     YES.

 7   Q     WHEN HE SAID THAT, WAS MS. TREANTAFELLES THERE?

 8   A     I DON'T BELIEVE SO OR -- I DON'T REMEMBER.

 9   Q     YOU DON'T REMEMBER ONE WAY OR THE OTHER?

10   A     NO.  BECAUSE WE -- SHE HAD -- BOTH SHE AND I HAD ALREADY   01:20

11   KNOWN THAT HE WAS ALREADY WORKING AT MATTEL PRIOR TO THE

12   MEETING.

13   Q     HOW IS IT THAT YOU KNEW HE WAS WORKING AT MATTEL PRIOR TO

14   THE MEETING?

15   A     PAULA TOLD ME.                                            01:20

16   Q     DID SHE TELL YOU HOW SHE KNEW THAT HE WAS THEN A MATTEL

17   EMPLOYEE?

18   A     YES.

19   Q     WHAT DID SHE SAY?

20   A     HE CAME REFERRED THROUGH SOMEBODY THAT DID SOME FREELANCE  01:20

21   WORK FOR HER BY THE NAME OF VERONICA MARLOW.

22   Q     IF PAULA TREANTAFELLES TESTIFIED THAT SHE DIDN'T LEARN

23   THAT MR. BRYANT WAS A MATTEL EMPLOYEE UNTIL 2004, WOULD YOU

24   DISPUTE THAT?

25   A     YES.                                                      01:21
```

1   Q    WHEN YOU SPOKE WITH MS. TREANTAFELLES BEFORE THE MEETING,

2   DID SHE TELL YOU WHAT AREA OF MATTEL HE WORKED IN?

3   A    I BELIEVE SHE DID, BUT I CAN'T SAY FOR CERTAIN.

4   Q    DID SHE MENTION BARBIE COLLECTIBLES?

5   A    I DON'T RECALL.                                              01:21

6   Q    WAS IT A CONCERN TO YOU AT THE TIME, AS SOMEBODY WHOSE JOB

7   IT WAS TO DEAL WITH LICENSING ARRANGEMENTS LIKE THIS, THAT YOU

8   WERE BEING PRESENTED WITH A DOLL BY SOMEBODY WHO WAS THEN, AT

9   THE TIME THEY WERE PRESENTING IT TO YOU, EMPLOYED BY A

10  COMPETITOR?                                                      01:21

11  A    YES.

12  Q    WHY WAS THAT A CONCERN?

13  A    BECAUSE HE WORKED FOR A COMPETITOR.

14  Q    HOW MANY TIMES IN YOUR CAREER UP TO THAT POINT HAD AN

15  EMPLOYEE OF A COMPETITOR, A CURRENT EMPLOYEE, COME TO YOUR       01:22

16  OFFICE AND PITCH YOU WITH AN IDEA FOR A PRODUCT THAT WOULD BE

17  COMPETITIVE?  HOW MANY TIMES DID THAT HAPPEN?

18  A    ZERO.

19  Q    DID YOU EXPRESS THE CONCERN YOU HAD TO ANYONE ABOUT

20  RECEIVING THIS PITCH FROM AN EMPLOYEE OF A COMPETITOR?          01:22

21  A    I'M SURE I DID, BUT I CAN'T RECALL SPECIFIC CONVERSATIONS.

22  Q    IF YOU, IN YOUR JOB DUTIES, CAME ACROSS A SITUATION WHICH

23  YOU THOUGHT MIGHT RESULT IN LIABILITY FOR MGA, IS THAT

24  SOMETHING THAT YOU WOULD SPEAK UP AND TALK ABOUT?

25  A    I'M SURE I WOULD.                                           01:22

```
 1   Q    IS THAT WHAT LEADS YOU TO BELIEVE YOU PROBABLY BROUGHT

 2   THAT UP?

 3              MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

 4              THE COURT:  REPHRASE, COUNSEL.

 5   BY MR. QUINN:                                              01:23

 6   Q    WHY DO YOU THINK YOU LIKELY WOULD HAVE BROUGHT UP YOUR

 7   CONCERN ABOUT THE FACT THAT 'HERE, WE WERE TALKING TO SOMEBODY

 8   WHO'S EMPLOYED BY A COMPETITOR'?

 9              WHY DO YOU THINK YOU WOULD HAVE BROUGHT THAT UP?

10              MR. NOLAN:  OBJECT.  LEADING.                   01:23

11              THE COURT:  SUSTAINED.

12   BY MR. QUINN:

13   Q    YOU INDICATED THAT YOU THINK YOU LIKELY BROUGHT IT UP.

14              WHY DO YOU THINK IT'S LIKELY YOU BROUGHT IT UP?

15   A    BECAUSE I WAS CONCERNED ABOUT IT AND I'M NOT THE TYPE OF  01:23

16   PERSON THAT'S JUST GOING TO KEEP IT IN.  IF I WAS CONCERNED, I

17   WOULD HAVE ADDRESSED IT.

18   Q    WHO WOULD YOU HAVE ADDRESSED IT TO?

19              MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION; CALLS FOR

20   SPECULATION, THE WAY IT'S PHRASED.                        01:23

21              THE COURT:  YOU'RE ASKING WHO SHE WOULD HAVE

22   ADDRESSED IT TO?

23              MR. QUINN:  YES.

24              THE COURT:  OVERRULED.

25              THE WITNESS:  TO ISAAC LARIAN AND TO PAULA.     01:23
```

1    **BY MR. QUINN:**

2    Q    IN THIS MEETING, THE FIRST MEETING YOU HAD WITH

3    MR. BRYANT, DID ANYONE ASK HIM WHERE AND WHEN HE HAD CREATED

4    THIS DOLL?

5    A    NOT THAT I RECALL.                                      01:24

6    Q    DID YOU ATTEND ANOTHER MEETING WITH MR. BRYANT AFTER THAT?

7    A    NOT THAT I REMEMBER.  I REMEMBER THERE WAS A MEETING WHERE

8    ISAAC LARIAN WAS PRESENT.  BUT, AS I SAID EARLIER, I DON'T

9    REMEMBER IF THAT WAS THE INITIAL MEETING OR THERE WAS A FOLLOW-

10   UP MEETING.                                                 01:24

11   Q    IT SORT OF BLENDS, IN YOUR MIND?

12   A    YES.

13   Q    WHETHER IT WAS IN THAT INITIAL MEETING THAT YOU HAD OR

14   WHETHER IT WAS IN A SUBSEQUENT MEETING, DO YOU REMEMBER ANY

15   COMMENTS BEING MADE BY MR. LARIAN CONCERNING THE DOLL?       01:24

16   A    YOU MEAN WHAT HIS THOUGHTS WERE ABOUT THE DOLL?

17   Q    AS HE EXPRESSED THEM.

18   A    HE SAID HE LIKED IT, BUT HE DIDN'T TELL CARTER BRYANT THAT

19   HE WAS GUN HOE ABOUT IT.  HE SAID WE WOULD CONSIDER IT AND GET

20   BACK TO HIM.                                                01:25

21   Q    DO YOU KNOW WHETHER OR NOT MR. LARIAN KNEW THAT MR. BRYANT

22   WAS THEN A MATTEL EMPLOYEE?

23   A    I BELIEVE HE DID.

24   Q    AND WHAT'S THE BASIS FOR THAT BELIEF?

25   A    YOU MEAN AT THAT POINT, AT THE INITIAL MEETING, DID HE    01:25

1    KNOW?

2    Q    YES.

3    A    BECAUSE PAULA TOLD ME HE WORKED FOR MATTEL.  I'M GUESSING

4    THAT SHE ALSO INFORMED ISAAC, BUT I CAN'T SAY FOR CERTAIN THAT

5    ISAAC KNEW.                                                        01:25

6    Q    DID MR. LARIAN ASK MR. BRYANT WHEN HE HAD CREATED THIS

7    DOLL OR COME UP WITH THE CONCEPT?

8    A    NOT THAT I RECALL.

9    Q    AFTER THAT, DID MGA NEGOTIATE A CONTRACT WITH MR. BRYANT?

10   A    YES.                                                          01:26

11   Q    WERE YOU INVOLVED IN THAT PROCESS?

12   A    YES.

13   Q    AND WHAT, IN GENERAL, WAS THE NATURE OF YOUR INVOLVEMENT

14   IN THAT?

15   A    I WORKED WITH ISAAC LARIAN AND WITH CARTER BRYANT TO COME     01:26

16   UP WITH THE TERMS THAT WOULD EVENTUALLY BE IN THE LICENSE

17   AGREEMENT BETWEEN MGA AND CARTER BRYANT.

18   Q    AND IN THAT CONNECTION DID YOU SPEAK WITH MR. BRYANT?

19   A    YES.

20   Q    AND WAS THAT IN PERSON OR OVER THE TELEPHONE?                 01:26

21   A    IT WAS MOSTLY OVER THE TELEPHONE.

22   Q    DID THOSE TELEPHONE CALLS TAKE PLACE DURING THE BUSINESS

23   DAY?

24   A    YES.

25   Q    AND WERE THESE SITUATIONS WHERE, BOTH, YOU CALLED HIM AND     01:26

1    HE CALLED YOU?

2    A    YES.

3    Q    DID THESE CONVERSATIONS COVER TERMS OF THE AGREEMENT YOU

4    WERE NEGOTIATING?

5    A    YES.                                                          01:26

6    Q    AND AT ONE POINT, DID AN ATTORNEY GET INVOLVED, AN

7    ATTORNEY FOR MGA?

8    A    YES.

9    Q    WHAT WAS THAT PERSON'S NAME?

10   A    DAVID ROSENBAUM.                                              01:27

11   Q    AND WHO IS MR. ROSENBAUM?

12   A    HE WAS OUTSIDE COUNSEL FOR MGA ENTERTAINMENT.

13   Q    AND WHAT WAS HIS ROLE WITH RESPECT TO THE AGREEMENT?

14   A    HE ACTUALLY DRAFTING A LICENSE AGREEMENT; AND, IF THERE

15   WERE ANY CONCERNS FROM CARTER BRYANT'S ATTORNEY, HE WOULD        01:27

16   ADDRESS THEM WITH ISAAC LARIAN AND MYSELF.

17   Q    DID YOU PERSONALLY EVER DO ANYTHING TO VERIFY WHETHER

18   MR. BRYANT HAD CREATED THIS DOLL AND THE CONCEPT OUTSIDE OF HIS

19   MATTEL EMPLOYMENT?

20   A    NO.                                                          01:27

21   Q    DID MR. LARIAN EVER DIRECT YOU TO DO SOMETHING TO MAKE

22   SURE THAT THIS WAS SOMETHING THAT MATTEL DIDN'T OWN, THAT IT

23   WAS SOMETHING THAT MR. BRYANT HAD CREATED OUTSIDE OF HIS MATTEL

24   EMPLOYMENT?

25   A    NO.                                                          01:27

```
 1   Q    AND IF MR. LARIAN TESTIFIED THAT HE DIRECTED YOU TO MAKE

 2   SURE THAT THIS IS SOMETHING THAT MR. BRYANT HAD CREATED OUTSIDE

 3   OF HIS EMPLOYMENT, WOULD YOU DISPUTE THAT?

 4   A    COULD YOU REPEAT THE QUESTION.

 5   Q    YES.                                                           01:28

 6        IF MR. LARIAN TESTIFIED THAT HE INSTRUCTED YOU TO

 7   MAKE SURE THAT THIS WAS SOMETHING THAT MR. BRYANT HAD CREATED

 8   OUTSIDE OF HIS EMPLOYMENT WITH MATTEL, WOULD YOU DISPUTE THAT?

 9   A    IF HE SAID HE DIRECTED ME TO DO THAT?

10   Q    YES.                                                           01:28

11   A    I WOULD DISPUTE THAT.

12        MR. QUINN:  IF WE COULD PUT EXHIBIT 305, WHICH IS IN

13   EVIDENCE, YOUR HONOR, ON THE SCREEN, PLEASE.

14        THE COURT:  YOU MAY.

15        MR. QUINN:  WITH ANY LUCK, THERE'S A 305 IN YOUR BOOK          01:28

16   THERE, MS. O'CONNOR.

17   BY MR. QUINN:

18   Q    YOU'LL SEE, THIS IS AN E-MAIL STRING WHERE YOU ASK

19   SOMEBODY, A DENNIS MEDICI ASKS VICTORIA, "PLEASE REPLY WHAT

20   AMOUNT WE SHOULD PAY CARTER AND HAVE ISAAC APPROVE."               01:29

21        DO YOU SEE THAT?

22   A    I DO.

23   Q    WHO WAS DENNIS MEDICI?

24   A    MGA ENTERTAINMENT'S CFO.

25   Q    AND YOU RESPOND, YOU E-MAIL PAULA TREANTAFELLES, SAYING       01:29
```

```
 1   "PLEASE LET ME KNOW HOW MANY HOURS CARTER HAS WORKED AND THE

 2   DAY HE STARTED MEETINGS WITH YOU."  AND SHE RESPONDS, "I WOULD

 3   SAY THAT CARTER HAS WORKED AN AVERAGE OF ABOUT FOUR HOURS A

 4   DAY, AND WE BEGAN WORKING ON THIS LINE THE FIRST PART OF

 5   SEPTEMBER."                                                   01:29

 6        DO YOU RECALL RECEIVING THIS E-MAIL FROM

 7   MS. TREANTAFELLES?

 8   A    NO.

 9   Q    IS THAT CONSISTENT WITH YOUR OBSERVATION THAT HE WAS

10   WORKING FOUR HOURS A DAY?                                     01:29

11        MR. NOLAN:  OBJECTION.  LACKS FOUNDATION; ALSO CALLS

12   FOR SPECULATION.

13        THE COURT:  LAY FOUNDATION AS TO HOW SHE WOULD KNOW

14   HOW MUCH HE WAS WORKING.

15   BY MR. QUINN:                                                 01:30

16   Q    DID YOU SEE MR. BRYANT IN MGA'S OFFICES?

17   A    I DID.

18   Q    ONCE OR MORE THAN ONCE?

19   A    MORE THAN ONCE.

20   Q    DID HE ATTEND DEVELOPMENT MEETINGS WITH MS. TREANTAFELLES? 01:30

21   A    I DON'T KNOW WHAT BUSINESS WAS CONDUCTED.  I WASN'T

22   INVOLVED IN THOSE MEETINGS.

23   Q    DO YOU KNOW WHAT HE WAS DOING WHEN HE WAS COMING TO THE

24   OFFICE MGA OFFICES IN SEPTEMBER?

25   A    I KNOW HE WAS MEETING WITH PAULA TO DISCUSS DOLL         01:30
```

1  DEVELOPMENT.

2  Q    I TAKE IT YOU'RE NOT IN A POSITION TO CONFIRM OR DENY HOW

3  MANY HOURS HE WAS WORKING.

4  A    THAT'S CORRECT.

5  Q    THE CONTRACT WAS SIGNED UP WITH MR. BRYANT, EVENTUALLY.        01:30

6  A    YES.

7  Q    DID YOU RECEIVE THAT SIGNED CONTRACT FROM MR. BRYANT?

8  A    I DID.

9  Q    HOW DID YOU RECEIVE THAT SIGNED CONTRACT?

10  A    VIA FAX.                                                       01:31

11  Q    DID HE FAX IT TO YOU?

12  A    HE DID.

13  Q    AND SO FAR AS YOU KNOW, WERE YOU THE FIRST PERSON AT MGA

14  TO RECEIVE THAT FAX?

15  A    YES.                                                           01:31

16  Q    WHEN YOU GOT THAT FAX OF THE SIGNED CONTRACT, DID IT HAVE

17  A FAX HEADER ON THE TOP?

18  A    YES.

19  Q    WHAT DID THAT FAX HEADER SAY?

20  A    IT SAID "MATTEL, BARBIE COLLECTIBLES," AND IT HAD THE FAX      01:31

21  NUMBER FROM WHERE IT WAS SENT.

22  Q    WERE YOU CONCERNED ABOUT THE FACT THAT YOU HAD RECEIVED A

23  SIGNED CONTRACT FROM MR. BRYANT WHICH HAD THIS FAX HEADER AT

24  THE TOP THAT SAID "BARBIE COLLECTIBLES"?

25  A    YES.                                                           01:31

```
 1   Q    WERE YOU STILL UNCOMFORTABLE THAT MR. BRYANT WAS STILL

 2   WORKING FOR A MATTEL COMPETITOR?

 3   A    YES.

 4   Q    DID YOU SPEAK WITH MR. LARIAN OR MS. TREANTAFELLES OR

 5   ANYONE ELSE ABOUT THAT FACT?                                01:32

 6   A    YES.

 7   Q    WHO DID YOU SPEAK TO?

 8   A    FOR CERTAIN, I SPOKE TO ISAAC LARIAN, AND I'M SURE I SPOKE

 9   TO PAULA AS WELL.

10   Q    DID YOU CALL ATTENTION TO THE FACT THAT YOU RECEIVED THIS  01:32

11   SIGNED CONTRACT AND IT HAD THIS FAX HEADER ON THE TOP?

12   A    I DID.

13   Q    IF YOU COULD LOOK AT EXHIBIT 15.

14        I'M GOING TO ASK YOU IF YOU CAN IDENTIFY THAT

15   DOCUMENT.                                                   01:32

16   A    OKAY.

17   Q    CAN YOU IDENTIFY IT?

18   A    YES.

19   Q    WHAT IS IT?

20   A    IT'S THE LICENSE AGREEMENT BETWEEN MGA AND CARTER BRYANT.  01:32

21   Q    AND IS THAT THE FINAL SIGNED AGREEMENT?

22   A    YES, IT APPEARS TO BE.

23        MR. QUINN:  I'D OFFER EXHIBIT 15, YOUR HONOR.

24        MR. NOLAN:  NO OBJECTION, YOUR HONOR.

25        THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.           01:33
```

1    **BY MR. QUINN:**

2    Q    AND THIS IS THE AGREEMENT THAT YOU RECEIVED FROM

3    MR. BRYANT BY FAX.

4    A    I BELIEVE SO.

5    Q    IT SHOWS THERE, IN THE UPPER RIGHT, THAT IT'S DATED AS OF          01:33

6    SEPTEMBER 18, 2000.

7              DO YOU SEE THAT?

8    A    YES.

9    Q    WAS THAT DATE THERE WHEN YOU RECEIVED THIS DOCUMENT FROM

10   MR. BRYANT?                                                            01:33

11   A    I BELIEVE SO, BUT I COULDN'T SAY FOR CERTAIN.

12   Q    BUT YOU DID NOTICE THAT A DATE WAS MISSING THERE.

13             THIS APPEARS TO BE THE DOCUMENT YOU GOT FROM

14   MR. BRYANT.

15   A    YES.                                                             01:33

16   Q    AND YOU UNDERSTOOD THAT MR. BRYANT WAS STILL WORKING FOR

17   MATTEL AT THE TIME.

18   A    CORRECT.

19   Q    AND DID YOU RECEIVE THIS AROUND OR ABOUT SEPTEMBER 18,

20   2000?                                                                 01:34

21   A    I BELIEVE SO, BUT IT WAS A LONG TIME AGO.

22   Q    SURE.

23             I'D LIKE YOU TO JUMP FORWARD NOW TO SOME TIME LATER

24   IN THE NEXT YEAR, IN 2001, WERE YOU EVER ASKED TO SEND THIS

25   CONTRACT TO ANYONE?                                                   01:34

```
1    A    YES.

2    Q    WHO WERE YOU ASKED TO SEND IT TO?

3    A    PATTIE GLASER.

4    Q    WHO'S PATTIE GLASER?

5    A    OUTSIDE COUNSEL FOR MGA ENTERTAINMENT.                01:34

6    Q    SHE'S A LAWYER WHO DID WORK FOR MGA?

7    A    YES.

8    Q    WHO ASKED YOU TO SEND THAT AGREEMENT TO MS. GLASER?

9    A    ISAAC LARIAN.

10   Q    WHEN HE ASKED YOU TO SEND THAT AGREEMENT TO HIS OUTSIDE    01:34

11   LAWYER, DID HE GIVE YOU ANY PARTICULAR INSTRUCTIONS?

12   A    NO; NOT THAT I REMEMBER; JUST TO FAX IT TO HER.

13   Q    DID HE GIVE YOU ANY INSTRUCTIONS WITH RESPECT TO THE FAX

14   HEADER?

15   A    I WAS ASKED TO WHITE OUT THE FAX HEADER AT SOME POINT, AND  01:35

16   I DON'T RECALL IF THAT WAS UPON RECEIVING THE EXECUTED CONTRACT

17   OR AT THE TIME I SENT THE FAX TO PATTIE GLASER.

18   Q    I MAY HAVE GOTTEN THAT WRONG.  LET ME BACK UP.

19        AT SOME POINT YOU WERE ASKED TO WHITE OUT THE FAX

20   HEADER THAT SAID "BARBIE COLLECTIBLES"?                     01:35

21   A    YES.

22   Q    YOU'RE JUST NOT SURE WHEN THAT WAS.

23   A    CORRECT.

24   Q    ARE THERE A COUPLE OF POSSIBILITIES YOU'RE THINKING OF AS

25   TO WHAT THAT WAS?                                          01:35
```

1        **MR. NOLAN:**  I THINK IT'S LEADING; AND IT'S ALSO

2    TESTIFYING.

3            **THE COURT:**  SUSTAINED.

4    **BY MR. QUINN:**

5    Q    WHAT'S YOUR BEST RECOLLECTION AS TO WHEN IT WAS YOU WERE        01:35

6    ASKED TO WHITE OUT THAT FAX HEADER?

7    A    I BELIEVE IT WAS UPON FIRST RECEIVING IT.

8    Q    AND WHO WAS IT THAT ASKED YOU TO DO THAT?

9    A    ISAAC LARIAN.

10   Q    DID HE DO THAT AFTER YOU CALLED HIS ATTENTION TO IT?        01:35

11   A    YES.

12   Q    DO YOU RECALL WHEN IT WAS THAT HE LATER ASKED YOU TO SEND

13   IT TO HIS OUTSIDE LAWYER?

14   A    IT WAS SOME TIME IN 2001.

15   Q    DID HE TELL YOU WHY HE WANTED YOU TO SEND IT TO HIS        01:36

16   OUTSIDE LAWYER?

17   A    NOT THAT I RECALL.

18   Q    PUTTING ASIDE THE ISSUE OF THE HEADER, DID HE TELL YOU TO

19   MAKE ANY OTHER CHANGES BEFORE FAXING THIS TO MS. GLASER?

20   A    NOT THAT I RECALL.        01:36

21   Q    WHEN YOU SENT IT TO MS. GLASER, DID YOU HAVE A COPY OF THE

22   CONTRACT OR DID YOU HAVE TO GET A COPY OF THE CONTRACT?

23   A    I BELIEVE THE CONTRACT WAS HANDED TO ME AND TOLD TO FAX IT

24   TO HER.

25   Q    WHO HANDED IT TO YOU AND TOLD YOU TO FAX IT TO HER?        01:36

1330

```
 1   A     ISAAC LARIAN.

 2   Q     DID YOU DO THAT?

 3   A     I DID.

 4   Q     WOULD YOU TAKE A LOOK AT EXHIBIT 13383, WHICH IS IN YOUR

 5   BINDER.  MY QUESTION TO YOU IS WHETHER YOU CAN IDENTIFY THAT      01:37

 6   DOCUMENT?

 7   A     YES.

 8   Q     WHAT IS THAT?

 9   A     THIS IS THE FAX THAT I SENT TO PATTIE GLASER WITH THE

10   LICENSE AGREEMENT BETWEEN CARTER BRYANT AND MGA.                 01:37

11   Q     THAT YOU SENT IN RESPONSE TO MR. LARIAN'S REQUEST.

12   A     YES.

13             MR. QUINN:  WE'D OFFER THAT, YOUR HONOR.

14             MR. NOLAN:  NO OBJECTION, YOUR HONOR.

15             THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.           01:37

16             MR. QUINN:  IF WE COULD JUST ENLARGE THIS FIRST PAGE,

17   HERE.

18   BY MR. QUINN:

19   Q     IS THIS THE FAX COVER PAGE THAT YOU USED TO TRANSMIT THE

20   CONTRACT TO MS. GLASER?                                          01:38

21   A     YES.

22   Q     AND DOES SEEING THIS REFRESH YOUR RECOLLECTION AS TO WHEN

23   IT WAS YOU SENT IT TO MS. GLASER?

24   A     YES.

25   Q     IF WE COULD SEE THE NEXT PAGE.                             01:38
```

1        YOU SEE IN THE UPPER RIGHT, THE DATE IS NOT THERE.

2            **MR. QUINN:**  IS IT POSSIBLE FOR US TO HAVE THOSE TWO

3    COPIES OF THE CONTRACT PUT UP ON THE SCREEN.

4            **THE COURT:**  FOR THE RECORD, COUNSEL, IDENTIFY THE TWO

5    DOCUMENTS ON THE SCREEN.                                         01:38

6            **MR. QUINN:**  WE'RE LOOKING AT, ON THE RIGHT SIDE,

7    EXHIBIT 13383, AND ON THE LEFT-HAND SIDE WE'RE LOOKING AT

8    EXHIBIT 15.

9    **BY MR. QUINN:**

10   Q    DID YOU ALSO WHITE OUT THE DATE ON THIS CONTRACT?           01:39

11   A    NOT THAT I RECALL.

12   Q    WHEN MR. LARIAN GAVE YOU THE CONTRACT TO SEND TO

13   MS. GLASER, DO YOU RECALL WHETHER OR NOT THE DATE WAS ON THERE?

14   A    NO.

15   Q    ONE WAY OR THE OTHER.                                       01:39

16   A    CORRECT.

17   Q    WHEN MR. LARIAN GAVE YOU THE INSTRUCTION TO WHITE OUT THE

18   "BARBIE COLLECTIBLES" HEADER ON THE FAX, DID HE GIVE YOU ANY

19   EXPLANATION OR WAS THERE ANY DISCUSSION WITH HIM ABOUT WHY YOU

20   WERE DOING THAT?                                                 01:40

21   A    NO.  I THINK IT WAS UNDERSTOOD WHY I WAS DOING IT.

22           **MR. NOLAN:**  OBJECTION.  MOTION TO STRIKE; NOT

23   RESPONSIVE, YOUR HONOR; ALSO LACKS FOUNDATION.

24           **THE COURT:**  I WILL STRIKE THAT.  BUT I WILL PERMIT

25   YOU TO REPHRASE THE QUESTION.                                    01:40

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

```
 1   BY MR. QUINN:

 2   Q    DO YOU RECALL ANY DISCUSSION WITH MR. LARIAN?

 3         AT THE TIME HE TOLD YOU TO WHITE OUT THE "BARBIE

 4   COLLECTIBLES" ON THE FAX HEADER?  DO YOU RECALL ANY DISCUSSION

 5   WITH HIM ON THAT SUBJECT?                                        01:40

 6   A    NO.

 7   Q    WHAT WAS YOUR UNDERSTANDING AS TO WHY YOU WERE BEING ASKED

 8   TO DO THAT?

 9         MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION, YOUR

10   HONOR.                                                           01:40

11         THE COURT:  OVERRULED.  IT'S HER UNDERSTANDING.

12         THE WITNESS:  BECAUSE HE WAS STILL A MATTEL EMPLOYEE.

13         THE COURT:  FAIR ENOUGH.

14         LAY A FOUNDATION.

15         DOES SHE HAVE AN UNDERSTANDING, A BASIS, THEN.            01:40

16   BY MR. QUINN:

17   Q    YOU HAVE AN UNDERSTANDING, I TAKE IT.  WHAT IS THE BASIS

18   FOR YOUR UNDERSTANDING AS TO WHY YOU WERE BEING ASKED TO WHITE

19   OUT THE FAX HEADER?

20   A    BECAUSE CARTER BRYANT WAS STILL A MATTEL EMPLOYEE WHEN HE   01:41

21   EXECUTED THE LICENSE AGREEMENT.

22   Q    DID YOU DISCUSS THAT INSTRUCTION TO WHITE OUT THE FAX

23   HEADER WITH ANYONE ELSE AT MGA?

24   A    YES.

25   Q    WHO ELSE DID YOU DISCUSS IT WITH?                          01:41
```

```
 1   A     PAULA.

 2   Q     ANYONE ELSE?

 3   A     NOT THAT I RECALL.

 4   Q     DO YOU RECALL THE SUBSTANCE OF THAT DISCUSSION?

 5   A     NO.                                                      01:41

 6   Q     DID YOU HAVE THAT DISCUSSION WHILE YOU WERE STILL EMPLOYED

 7   AT MGA?

 8   A     YES.

 9   Q     HAD ANYONE AT MGA EVER PREVIOUSLY ASKED YOU TO WHITE OUT A

10   HEADER ON A FAX?                                               01:41

11   A     NO.

12   Q     AT ANY OTHER OCCASION IN ANY OTHER EMPLOYMENT, HAVE YOU

13   EVER BEEN ASKED TO WHITE OUT A HEADER ON A FAX?

14   A     NO.

15         MR. QUINN:  YOUR HONOR, REQUEST PERMISSION TO            01:42

16   APPROACH THE WITNESS.  THIS IS AN EXHIBIT THAT'S IN EVIDENCE,

17   IT'S EXHIBIT 11328.

18         THE COURT:  YOU MAY.

19   BY MR. QUINN:

20   Q     I'LL SHOW YOU THIS DOCUMENT, MS. O'CONNOR, JUST TO SEE IF  01:42

21   IT REFRESHES YOUR RECOLLECTION AS TO THE DATE WHEN YOU HAD YOUR

22   FIRST MEETING WITH MR. BRYANT.

23         IT'S UP ON THE SCREEN NOW.

24         DOES SEEING THIS E-MAIL REFRESH YOUR RECOLLECTION AS

25   TO WHEN YOU HAD YOUR FIRST MEETING WITH MR. BRYANT?             01:42
```

```
 1    A    YES.

 2    Q    AND WHEN WAS IT?  THE DATE THAT APPEAR HERE, AUGUST 18,

 3    2000?

 4    A    CORRECT.

 5    Q    NOW, IN THE YEARS AFTER THE CONTRACT WITH MR. BRYANT WAS          01:43

 6    SIGNED UP, DID YOU SEE REPORTS IN THE MEDIA TO THE EFFECT THAT

 7    MR. LARIAN HAD BEEN THE CREATOR OF THE BRATZ DOLL?

 8    A    YES.

 9    Q    WHAT WAS YOUR REACTION TO THAT, WHEN YOU SAW THOSE

10    REPORTS?                                                             01:43

11    A    I SAW CONFLICTING REPORTS.

12    Q    WHAT REPORTS DID YOU SEE?

13    A    I SAW REPORTS THAT HIS DAUGHTER HAD COME UP WITH THE

14    CONCEPT AND THAT HIS SON HAD COME UP WITH THE CONCEPT AND THAT

15    HE HAD COME UP WITH THE CONCEPT.                                     01:43

16    Q    DID YOU KNOW THAT WASN'T TRUE?

17    A    YES.

18    Q    DID YOU EVER SEE ANYTHING IN THE MEDIA THAT MR. BRYANT WAS

19    THE CREATOR?

20    A    YES.                                                            01:43

21    Q    EVENTUALLY.

22    A    EVENTUALLY.

23    Q    YOU TOLD US YOU LEFT MGA IN 2003.

24    A    CORRECT.

25    Q    WAS THAT YOUR IDEA TO LEAVE, OR WERE YOU TERMINATED?            01:44
```

```
 1              WHAT WERE THE CIRCUMSTANCES?

 2   A    I RESIGNED.

 3   Q    AND YOU ARE NOW EMPLOYED IN WHAT INDUSTRY?

 4   A    ENTERTAINMENT; STILL LICENSING.

 5   Q    DO YOU HAVE ANY REASON TO HAVE SOME BIAS AGAINST MGA?      01:44

 6   A    NO.

 7   Q    ISN'T IT TRUE THAT YOUR BROTHER USED TO WORK AT MGA?

 8   A    YES.

 9   Q    AND ISN'T IT TRUE THAT HE WAS LAID OFF BY MGA?

10   A    YES.                                                       01:44

11   Q    WAS YOUR BROTHER LAID OFF BEFORE OR AFTER YOUR DEPOSITION

12   WAS TAKEN IN THIS CASE?

13   A    AFTER.

14   Q    AND WHEN YOUR DEPOSITION WAS TAKEN IN THIS CASE, DID YOU

15   TELL US THE SAME THING THAT YOU HAVE TOLD THIS JURY ABOUT THE   01:44

16   WHITING OUT OF THIS DOCUMENT?

17   A    YES.

18           MR. QUINN:  NOTHING FURTHER.

19           THE COURT:  CROSS-EXAMINATION.

20                   CROSS-EXAMINATION                               01:45

21   BY MR. NOLAN:

22   Q    GOOD MORNING.

23           MY NAME IS TOM NOLAN.  I REPRESENT MGA.  WE HAVE NOT

24   HAD THE PLEASURE TO MEET; RIGHT?

25   A    NICE TO MEET YOU.  NO.                                     01:45
```

```
 1   Q    NICE TO MEET YOU TOO.

 2             YOU'VE BEEN WAITING AROUND, AND TO THE EXTENT WE

 3   CONTRIBUTED TO IT, WE APOLOGIZE.

 4             ONE OF THE DAYS, THOUGH, THAT YOU WERE WAITING

 5   OUTSIDE, YOU SAW PAULA GARCIA; CORRECT?                        01:45

 6   A    YES.

 7   Q    AND AS I UNDERSTAND IT, YOU GAVE HER A GREETING AND

 8   DISCUSSED GETTING TOGETHER WITH HER IN THE FUTURE; RIGHT?

 9   A    SHE MENTIONED WE SHOULD GET TOGETHER, YES.

10   Q    DO YOU HAVE ANY ANIMOSITY AGAINST PAULA GARCIA?          01:45

11   A    NO.

12   Q    AND YOU DON'T HAVE ANY ANIMOSITY AGAINST MGA; RIGHT?

13   A    NO.

14   Q    OR ME; RIGHT?

15   A    NO.                                                      01:45

16   Q    LET'S GO BACK TO THE TWO EXHIBITS THAT WE WERE SHOWN JUST

17   A MINUTE AGO AND THAT ARE IN EVIDENCE; I BELIEVE THEY ARE

18   EXHIBIT NUMBER 13383, AND THE OTHER ONE I BELIEVE IS EXHIBIT

19   NUMBER 15; THESE ARE THE TWO CONTRACTS YOU WERE ASKED TO TALK

20   ABOUT.                                                        01:46

21             I WANT TO, JUST FOR A MOMENT, SINCE WE HAVE THEM BOTH

22   UP THERE -- LOOKING AT THE LEFT-HAND SIDE, IT SAYS "DATED AS OF

23   SEPTEMBER 18, 2000"; CORRECT?

24   A    YES.

25   Q    NOW, IF I UNDERSTAND YOUR TESTIMONY THAT AT NO TIME WHILE 01:46
```

```
1   YOU WERE EMPLOYED AT MGA WERE YOU EVER DIRECTED TO REDACT THAT

2   DATE FROM THE CONTRACT; CORRECT?

3   A    NOT THAT I RECALL.

4   Q    IT'S YOUR TESTIMONY THAT WHEN CARTER BRYANT -- BY THE WAY,

5   WHEN DID CARTER BRYANT ACTUALLY SIGN THE AGREEMENT REFLECTED ON      01:46

6   THE LEFT-HAND SIDE HERE?

7   A    I BELIEVE IT'S THE DATE ON THE CONTRACT.

8   Q    WHAT IS THE DATE ON THE CONTRACT?

9   A    I BELIEVE IT WAS SEPTEMBER 18TH, BUT I CAN'T SAY FOR

10  CERTAIN.                                                            01:47

11  Q    SO JUST KEEP THAT OPEN, AND GO TO EXHIBIT 15 FOR A MINUTE.

12  AND AARON, LET'S PUT UP 15 FOR JUST A SECOND.

13         HOW IS YOUR EYESIGHT?  PRETTY GOOD?

14  A    OKAY; ABOUT 20/25.

15  Q    I WANT YOU TO TAKE A LOOK AT EXHIBIT 15 FOR ME FOR JUST A      01:47

16  MOMENT.  I WANT YOU TO, IF YOU CAN, LOOK AT THE VERY BOTTOM OF

17  THE DOCUMENT, IT'S CALLED A 'FOOTER' SOMETIMES, I THINK WORD

18  PROCESSORS PUT FOOTERS ON DOCUMENTS.

19         DO YOU SEE THAT?

20  A    YES.                                                          01:47

21  Q    CAN YOU SEE THAT DATE?

22  A    YES.

23  Q    JUST TAKE A MOMENT; THE DOCUMENT IS SIX PAGES; CAN YOU

24  TELL ME WHETHER OR NOT THE SAME FOOTER APPEARS ON EVERY SINGLE

25  PAGE OF EXHIBIT NUMBER 15.                                         01:48
```

```
 1   A    NO.

 2   Q    FIRST OF ALL, WHAT IS THE DATE OF THE FOOTER?

 3   A    OCTOBER 4, 2000.

 4   Q    AND THE TIME?

 5   A    4:38 OR 4:39.                                          01:48

 6   Q    WHAT PAGE DOES THE FOOTER NOT APPEAR ON?

 7   A    THE PRIOR PAGES; IT'S ONLY ON THE FINAL PAGE.

 8   Q    DO YOU SEE IN THE BOTTOM FIRST-HAND PAGE OF EXHIBIT NUMBER

 9   15, IN THE LOWER LEFT-HAND CORNER OF THE FIRST PAGE.

10        DO YOU SEE THAT?                                       01:48

11   A    YES.

12   Q    THAT'S THE DATE I'M REFERRING TO AS THE FOOTER.

13        DO YOU SEE THAT DATE?

14   A    YES.

15   Q    THAT APPEARS ON THE FIRST PAGE; YES?                   01:49

16   A    YES.

17   Q    AND THAT'S OCTOBER 4, 2000?

18   A    YES.

19   Q    AND DOES THAT OCTOBER 4, 2000 FOOTER APPEAR ON EACH OF THE

20   PAGES OF EXHIBIT NUMBER 15?                                 01:49

21   A    YES.

22   Q    IN YOUR EXPERIENCE IN THE WORKPLACE, DO YOU UNDERSTAND THE

23   SIGNIFICANCE OF THAT FOOTER APPEARING ON THE BOTTOM OF THE

24   DOCUMENT?

25   A    YES.                                                   01:49
```

1    Q    WHAT IS THAT?

2    A    THAT IT'S PRINTING OUT A DATE -- THE DATE IT'S PRINTED OR

3    GENERATED IS THE TIME STAMP ON THE DOCUMENT.

4    Q    AND THAT'S THE FINAL VERSION OF THAT PARTICULAR DOCUMENT;

5    CORRECT?                                                          01:50

6    A    THE MOST RECENT, YES.

7    Q    AND SO NOW, IF YOU COULD, TURN TO THE LAST PAGE OF

8    EXHIBIT 15, THE PAGE THAT HAS THE SIGNATURES ON IT.

9         FIRST OF ALL, IF YOU LOOK AGAIN AT THE BOTTOM

10   LEFT-HAND CORNER FOR ME, THAT IS THE PAGE THAT HAS THE           01:50

11   SIGNATURES OF CARTER BRYANT.

12        DO YOU RECOGNIZE THAT SIGNATURE?

13   A    NO.

14   Q    DO YOU HAVE ANY BASIS TO DISPUTE THAT IT'S CARTER BRYANT

15   THAT SIGNED THE CONTRACT?                                        01:50

16   A    NO.

17   Q    WHAT ABOUT THE SIGNATURE OR THE SCRIBBLE THAT APPEARS

18   UNDER THE NAME "MGA ENTERTAINMENT," DO YOU RECOGNIZE THAT?

19   A    I DO.

20   Q    IS THAT ISAAC'S SIGNATURE?                                  01:50

21   A    IT IS.

22   Q    SO ON THE SIGNATURE PAGE WHERE BOTH OF THOSE SIGNATURES

23   ARE AFFIXED, THE DATE OF THE FOOTER IS OCTOBER 4, 2000, AT 3:05

24   P.M.; CORRECT?

25   A    CORRECT.                                                    01:50

1   Q    EARLIER, YOU WERE TALKING ABOUT ANOTHER -- AND I THINK

2   IT'S A FAX HEADER -- I JUST WANT TO ASK YOU, ON THE BOTTOM OF

3   THE SIGNATURE PAGE OF EXHIBIT NUMBER 15, THIS IS THE DATE OF

4   OCTOBER 4, 4:38 P.M. NOW, MGA ENTERTAINMENT, AND THEN IT HAS

5   THE TELEPHONE NUMBER ON IT, (818) 894-408...                    01:51

6   A    8094.

7   Q    THAT'S THE TELEPHONE NUMBER FOR MGA?

8   A    THE FAX NUMBER.

9   Q    LOOKING AT THIS, DOES THIS REFRESH YOUR RECOLLECTION THAT

10  THE AGREEMENT WAS NOT SIGNED ON SEPTEMBER 18TH, BUT, RATHER, IT   01:51

11  WAS SIGNED BY CARTER BRYANT ON OCTOBER 4TH, AT 4:32 OR SO IN

12  THE AFTERNOON?

13  A    I DON'T RECALL.

14  Q    DO YOU HAVE AN EXPLANATION FOR THE JURY AS TO HOW A DATE

15  OF SEPTEMBER 18, 2000, APPEARS AT THE TOP OF THE PAGE, AND YET   01:51

16  THE FOOTER ON THE BOTTOM OF THE CONTRACT HAS A DATE OF

17  OCTOBER 4, 2000?

18  A    I DON'T, SINCE I DIDN'T DRAFT THE CONTRACT.

19  Q    SO AS YOU SIT HERE TODAY, DO YOU KNOW WHETHER OR NOT

20  CARTER BRYANT SIGNED A CONTRACT WITH MGA ON SEPTEMBER 18, 2000,  01:52

21  OR OCTOBER 4, 2000?

22  A    NO.

23  Q    SO IF CARTER BRYANT AND ISAAC LARIAN AND THE LAWYERS CAME

24  IN TO TESTIFY THAT THE CONTRACT WAS ACTUALLY SIGNED ON

25  OCTOBER 4TH OF 2000, YOU WOULD HAVE NO EVIDENCE TO SUGGEST THAT  01:52

1    THEY WERE MISINFORMED, DO YOU?

2    A    NO.

3    Q    NOW, BACK TO EXHIBIT 15 FOR A MOMENT.

4         DID MR. LARIAN INSTRUCT YOU TO DELETE THE FOOTER, OR

5    WHITE OUT, THE FOOTER OF OCTOBER 4, 2000, ON ANY PAGE OF          01:53

6    EXHIBIT NUMBER 15?

7    A    WHITE OUT THE FOOTER?  NO.

8    Q    AND DID MR. LARIAN ASK YOU TO WHITE OUT THE FACT THAT MGA

9    HAD SENT OUT THE LAST PAGE, THE SIGNATURE PAGE, TO CARTER

10   BRYANT ON OCTOBER 4, 2000?                                        01:53

11   A    I DON'T RECALL.

12   Q    DO YOU KNOW WHETHER OR NOT CARTER BRYANT WAS AN EMPLOYEE

13   OF MATTEL ON OCTOBER 4TH OF 2000?

14   A    I DON'T, BUT I KNOW HE WAS A MATTEL EMPLOYEE WHEN HE

15   SIGNED THE CONTRACT.                                              01:53

16   Q    BY WHITING OUT THE FAX LINE THAT APPEARED ON THE CONTRACT,

17   DID YOU CHANGE ANY OF THE MATERIAL TERMS OF THE CONTRACT

18   ITSELF?

19   A    NO.

20   Q    DID YOU EVER CALL ANYBODY OUTSIDE OF MGA, FOR INSTANCE      01:54

21   CARTER BRYANT OR ANY OF THE LAWYERS, AND ASK THEM OR DIRECT

22   THEM TO WHITE OUT ANY PORTION OF ANY OF THESE CONTRACTS?

23   A    NO.

24   Q    DID MR. LARIAN OR ANYBODY AT MGA EVER INSTRUCT YOU TO

25   CHANGE ANY OF THE DATES ON MR. BRYANT'S EMPLOYMENT AGREEMENT     01:54

1   WITH MGA?

2   A    NO.

3          **THE COURT:**  COUNSEL, LET ME STOP YOU HERE AND TAKE

4   THIS DOCUMENT OFF THE SCREEN.

5          WE'RE GOING TO TAKE A BREAK AT THIS TIME FOR ABOUT                   01:55

6   TEN MINUTES.

7          (WHEREUPON JURORS DEPART COURTROOM.)

8          **THE COURT:**  FIRST OF ALL, ON THAT LAST DOCUMENT, I

9   SHOULD HAVE CAUGHT THIS EARLIER, BUT MR. CARTER BRYANT'S SOCIAL

10  SECURITY NUMBER WAS PUBLISHED TO THE ENTIRE COURTROOM AND THE               01:55

11  JURY.  THAT SHOULDN'T HAPPEN.  LET'S MAKE SURE THOSE ARE

12  REDACTED WHEN THE EXHIBIT GOES TO THE JURY.

13         LET'S BE MINDFUL OF THAT; THAT WE DON'T PUBLISH

14  PEOPLE'S PERSONAL SOCIAL SECURITY NUMBERS.

15         **MR. NOLAN:**  I APOLOGIZE.                                         01:55

16         THERE'S ALSO, ON ALL THESE DOCUMENTS, I JUST NOTICED

17  IT, "ATTORNEY'S EYES ONLY."  AND I WAS GOING TO ASK HER, FOR

18  INSTANCE, ON ONE OF THESE EXHIBITS WHEN SHE SAW IT, IT DIDN'T

19  HAVE THAT ON IT.

20         I THINK AT SOME POINT IN TIME, MAYBE THE JURY SHOULD               01:56

21  BE TOLD THAT THIS IS A STAMP THAT WAS DONE IN THE COURSE OF

22  LITIGATION AND THAT THEY ARE TO DISREGARD IT.

23         **THE COURT:**  VERY WELL.

24         **MR. NOLAN:**  I DON'T KNOW IF MR. QUINN HAS ANY --

25         **MR. QUINN:**  I AGREE.                                          01:56

WEDNESDAY, JUNE 4, 2008                        TRIAL DAY 7

1      THE NUMBER OF DOCUMENTS THE JURY HAS SEEN THAT SAY
2  "ATTORNEYS EYES ONLY," THEY MAY BE WONDERING WHAT THAT MEANS.
3          THE COURT:  I'LL INSTRUCT THE JURY ON THAT.  AND
4  YOU'LL TAKE CARE OF THE SOCIAL SECURITY NUMBERS, THOUGH.
5          MR. NOLAN:  YES.                                      01:56
6          THE COURT:  I'M READY TO RULE ON THESE VARIOUS
7  MATTERS.
8      MR. ALGER, I CUT YOU OFF, SO I'LL GIVE YOU A CHANCE
9  TO TALK NOW.
10          MR. ALGER:  THANK YOU, YOUR HONOR.                   01:56
11      WE PRINTED OUT AND I'D LIKE TO HAND UP TO THE COURT
12  THE SLIDES WE USED IN OPENING STATEMENTS THAT RELATED TO THE
13  WALL STREET JOURNAL ARTICLE.  THE COURT WILL SEE THAT WE ONLY
14  DREW OUT AND MADE IT VISIBLE TO THE JURY THE TWO PARAGRAPHS
15  THAT MS. TKACIK WAS QUESTIONED ABOUT.                        01:56
16          THE COURT:  THANK YOU, COUNSEL.
17          MR. ALGER:  WE'RE PREPARED, IF THE COURT WISHES, TO
18  AGREE TO REDACT THE ARTICLE DOWN TO THESE TWO PARAGRAPHS THAT
19  WERE BLOWN UP FOR THE JURY AT OPENING STATEMENTS.
20          THE COURT:  VERY WELL.                               01:57
21      THE COURT IS PREPARED TO RULE ON THE OBJECTIONS TO
22  THAT.  AND AS FAR AS THE EXHIBIT THAT WILL BE USED, IT WILL
23  INCLUDE THOSE PARAGRAPHS THAT THE COURT PERMITS IN, WHICH GOES
24  BEYOND THOSE TWO PARAGRAPHS BUT DOES NOT INCLUDE THE ENTIRE
25  ARTICLE.                                                     01:57

1    BEFORE THAT, I THINK I BASICALLY INDICATED TO THE

2  PARTIES MY RULING AT SIDE-BAR.  THE MOTION *IN LIMINE* WAS TO

3  PRECLUDE MGA DEFENDANTS FROM ASSERTING OR RELYING ON THE

4  "ADVICE OF COUNSEL" DEFENSE.  IT WAS GRANTED.  HOWEVER, THE

5  COURT INDICATED, THE MGA PARTIES CAN INTRODUCE MR. ROSENBAUM'S          01:57

6  TESTIMONY RELAYING HIS FACTUAL CONVERSATIONS, NOT AS RELYING ON

7  ANY LEGAL ADVICE HE GAVE, BUT THE FACT THAT HE UNDERTOOK

8  CERTAIN ACTIONS AND HAD CERTAIN CONVERSATIONS, PROVIDED THEY

9  ARE OTHERWISE ADMISSIBLE.

10    WE DID NOT ADDRESS THIS IN THE CONTEXT OF                            01:58

11  MS. O'CONNOR.  AND LOOKING BACK AT THE MOTION ITSELF AND MY

12  RECOLLECTION OF THE ORAL ARGUMENT, THAT REALLY WASN'T

13  ADDRESSED.

14    I DON'T THINK IT'S PROPER AT THIS TIME, AS I

15  INDICATED AT SIDE-BAR, FOR MS. O'CONNOR TO BE EXAMINED ON THESE        01:58

16  DOCUMENTS, SO I AM PRECLUDING THEIR USE WITH RESPECT TO THIS

17  WITNESS.

18    HOWEVER, I AM GIVING LEAVE FOR MR. NOLAN TO RAISE

19  THIS AGAIN WITH RESPECT TO MR. ROSENBAUM, AND WHEN AND IF HE IS

20  CALLED, BY WHOMEVER HE IS CALLED, THE COURT CAN ADDRESS THE            01:58

21  APPROPRIATENESS OF THESE DOCUMENTS AT THIS TIME.

22    IT ALSO APPEARS TO BE CUMULATIVE OF OTHER EVIDENCE

23  REFERRED TO IN MGA'S OPPOSITION TO THE MOTION ITSELF IN WHICH

24  IT INDICATES THERE IS ALREADY, THROUGH DEPOSITION AND OTHER

25  EXHIBITS, TESTIMONY AND EVIDENCE RELATED TO THESE FACTS AS            01:58

```
 1    OPPOSED TO ANY LEGAL ADVICE.  BUT THE LEGAL ADVICE REMAINS OFF
 2    LIMITS PURSUANT TO THE COURT'S RULING ON A MOTION *IN LIMINE*.
 3    AND I THINK, JUST OUT OF FAIRNESS, THAT THESE DOCUMENTS SHOULD
 4    NOT BE USED IN THE CONTEXT OF THIS WITNESS, GIVEN THE
 5    TIMELINESS OR LACK THEREOF OF THEIR PRODUCTION.              01:59
 6            MR. ZELLER:  IF I MAY JUST RAISE THIS PARTICULAR
 7    ISSUE, BECAUSE THE DISTINCTION BETWEEN FACTUAL INFORMATION
 8    BEING CONVEYED TO THE CLIENT, OR THE FACTUAL INFORMATION THAT
 9    MR. ROSENBAUM AND OTHERS TESTIFIED ABOUT, THAT DISTINCTION,
10    WHILE, I THINK, CAN THEORETICALLY MAKE SOME SENSE, THAT'S NOT  01:59
11    THE LINE THEY DREW.
12            IN DEPOSITIONS, THE LINE THEY DREW IS THAT IF
13    MR. ROSENBAUM COMMUNICATED TO MGA OR MGA COMMUNICATED BACK, ALL
14    THAT WAS PROTECTED.
15            THEY DIDN'T SAY, OH, WELL, YOU KNOW, MR. ROSENBAUM,  01:59
16    PLEASE GO AHEAD AND TELL MATTEL'S LAWYERS WHAT FACTS IT WAS YOU
17    CONVEYED TO MGA.  THEY ASSERTED PRIVILEGE OVER THE
18    COMMUNICATIONS THEMSELVES; SO THE DISTINCTION THEY ARE NOW
19    TRYING TO MAKE IS NOT THE DISTINCTION THAT THEY ASSERTED IN
20    DISCOVERY.  AND THAT'S WHY WE WERE PREJUDICED.              02:00
21            WE WERE NEVER ALLOWED TO EXAMINE MR. ROSENBAUM, FOR
22    EXAMPLE, ON THE CONTENT OF THE COMMUNICATIONS THAT HE HAD.
23            THE COURT:  WHEN IS MR. ROSENBAUM GOING TO BE CALLED?
24            MR. ZELLER:  I HESITATE TO MAKE ANY COMMITMENT AS TO
25    THE SCHEDULING, BUT IT WOULD BE OUR BEST ESTIMATE AT THIS     02:00
```

```
 1   MOMENT THAT IT WOULD PROBABLY BE FRIDAY, ASSUMING MR. LARIAN IS

 2   OFF THE STAND AT SOME REASONABLE POINT ON FRIDAY AT THE LATEST.

 3           THE COURT:  ANYWAY, YOU'VE RECEIVED THE RELIEF YOU

 4   REQUESTED CONCERNING THIS WITNESS, COUNSEL.  THESE DOCUMENTS

 5   WILL NOT BE USED FOR THIS WITNESS.                              02:00

 6           MR. ZELLER:  YES, THANK YOU.

 7           MR. NOLAN:  WITHOUT PUBLISHING THE DOCUMENT OR USING

 8   THEM IN ANY FASHION, ONE OF THEM, WHICH SHE IS COPIED ON, COULD

 9   I ASK HER TO TAKE A LOOK AT IT TO SEE IF IT REFRESHES HER

10   RECOLLECTION AS TO THE DATE THE CONTRACT WAS SIGNED, BECAUSE     02:01

11   SHE CANNOT RECALL THAT DATE.

12           THE COURT:  I UNDERSTAND THAT.

13           NO.  YOU'RE NOT USING THESE DOCUMENT IN THIS

14   EXAMINATION.

15           MR. NOLAN:  I UNDERSTAND.                               02:01

16           THE COURT:  WITH RESPECT TO THE TKACIK DEPOSITION,

17   THE COURT WILL MAKE THE FOLLOWING RULINGS:

18           PAGE 7, OVERRULED.

19           PAGE 9, BOTH HEARSAY OBJECTIONS ARE OVERRULED.

20           PAGE 10, OVERRULED.  PAGE 23 TO 24, OVERRULED.          02:01

21           PAGE 25, IT IS SUSTAINED WITH RESPECT TO LINES FOUR

22   AND FIVE, BUT OVERRULED AS TO THE REMAINING PART, QUOTE:  "THAT

23   IS DIRECTLY ATTRIBUTED TO MATT BOUSQUETTE"; SO WHAT IS TO BE

24   DELETED IS THE PHRASE "MATTEL NOW CONCEDES BARBIE HAS GRADUALLY

25   LOST TOUCH WITH SOME YOUNG GIRL'S LIVES."  THAT'S OUT; THAT'S    02:02
```

1   NOT ATTRIBUTED TO ANYBODY.  IT'S AN ANALYSIS, APPARENTLY, OF

2   THE QUOTE THAT FOLLOWS, WHICH IS ATTRIBUTED.  THE COURT WILL

3   ALLOW THE ATTRIBUTED QUOTE IN.

4           **MR. NOLAN:**  DOES YOUR TRANSCRIPT SAY 25 OR PAGE 26?

5           **THE COURT:**  I'M SORRY.  PAGE 26.  THANK YOU.                02:02

6           I SAID 25.  IT'S PAGE 26, LINES FOUR AND FIVE, THE

7   LINE "MATTEL" THROUGH "LIVES" IS OUT.  BUT THE REMAINDER IS

8   OVERRULED; IT'S SUFFICIENTLY ATTRIBUTED.

9           PAGE 34, I'LL SUSTAIN THE OBJECTIONS.  IT ONLY GOES

10  TO LINES 17 THROUGH 22, THAT QUESTION AND ANSWER.                      02:02

11          PAGE 37, THE OBJECTION IS OVERRULED.

12          PAGE 38, BOTH OBJECTIONS BY MATTEL AND MGA ARE

13  OVERRULED.

14          PAGE 45, THERE'S AN OBJECTION TO A QUESTION.  IT'S

15  NOT CLEAR THIS IS EVEN BEING DESIGNATED, BECAUSE THE                   02:03

16  DESIGNATION HAS BEEN WHITED OUT; SO I TRUST MATTEL IS NO LONGER

17  DESIGNATING THIS; IS THAT CORRECT?

18          **MR. ALGER:**  YES, YOUR HONOR.

19          **THE COURT:**  THEN THAT IS WITHDRAWN.

20          PAGE 46, I'LL SUSTAIN THE OBJECTIONS ON LINES 23              02:03

21  THROUGH 25, BECAUSE THERE'S NO ANSWER GIVEN TO THAT QUESTION,

22  ACTUALLY.  I'LL ALSO SUSTAIN THE OBJECTION ON LINES SIX THROUGH

23  17 ON 47, THERE'S SIMPLY NO FOUNDATION HERE, BECAUSE WHOEVER IT

24  WAS, THIS UNIDENTIFIED PERSON, THE OFFER DID NOT THINK THEY

25  WERE A CURRENT EMPLOYEE MATTEL AT THE TIME.                            02:04

1    MOVING TO PAGE 58, I WILL OVERRULE THE FIRST

2  OBJECTION ON LINES 18 TO 23.  I WILL SUSTAIN THE SECOND

3  OBJECTION ON LINES 24, INCLUDING ALL OF PAGE 59, BECAUSE WE HAD

4  A SERIES OF I DON'T KNOW, I DON'T REMEMBER, I DON'T KNOW;

5  THERE'S NO FOUNDATION THERE.                                02:04

6    SAME THING WITH THE OBJECTION ON PAGE 60:  I DON'T

7  KNOW, I DON'T REMEMBER, I DON'T KNOW.  THAT'S ALSO SUSTAINED;

8  SO 60 IS OUT.

9    AND ON PAGE 61, I WILL OVERRULE THE OBJECTION.

10    AND THAT IS IT.                                         02:04

11    **MR. NOLAN:**  ON THE TOP OF PAGE 60 --

12    **THE COURT:**  I SUSTAINED THE OBJECTION THERE; SO 60 IS

13  ENTIRELY OUT.  AND THE TOP OF PAGE 60 IS OUT BECAUSE THAT IS

14  THE CARRYOVER FROM PAGE 59, WHICH IS OUT AS WELL.

15    AS FAR AS THEIR FINAL REDACTED ARTICLE, GO THROUGH     02:05

16  THE COURT'S RULINGS AND WHATEVER IS LEFT IN THE ARTICLE CAN BE

17  INCLUDED; EVERYTHING THAT'S BEEN OUT IS OUT AND IS TO BE

18  EXCLUDED FROM THE ARTICLE.

19    **MR. NOLAN:**  THANK YOU.

20    **MR. ALGER:**  THANK YOU, YOUR HONOR.                  02:05

21    **THE COURT:**  TAKE A BRIEF BREAK NOW, AND THEN WE'LL

22  RESUME WITH O'CONNOR.  AND I HOPE WE CAN FINISH UP THE MORNING

23  WITH TKACIK.

24    **MR. PRICE:**  WE DO HAVE ANOTHER LIVE WITNESS, NOW THAT

25  MR. WEISS IS GONE.  BUT THERE'S AN ARTICLE, SO WHEN I ASK HIM   02:05

1    ABOUT THE ARTICLE, THE ISSUE WILL COME UP AS TO WHAT ELSE IN

2    THE ARTICLE CAN BE ASKED ABOUT AND COME IN.

3            **THE COURT:**  WE'LL GO TO 11:40.  I HAVE A TELEPHONE

4    CONFERENCE THAT I HAVE TO BE ON, SO I'M NOT GOING TO HAVE ANY

5    TIME FOR ANY ADDITIONAL STUFF.  THE COURT WILL BREAK AT 11:40    02:06

6    SHARP.

7            **MR. MCFARLAND:**  JUST SO THE COURT KNOWS, LUCY ARANT

8    IS HERE, JUST SO EVERYONE KNOWS.

9            **THE COURT:**  BRIEF RECESS.

10           (WHEREUPON A BRIEF RECESS WAS HELD.)                    02:06

11           **THE CLERK:**  ALL RISE FOR THE JURY.

12           (JURORS ENTER COURTROOM.)

13   **BY MR. NOLAN:**

14   Q    MS. O'CONNOR, BEFORE the BREAK, we were TALKING ABOUT

15   EXHIBIT 15.  I'D LIKE TO PUT IT BACK UP; IT'S IN EVIDENCE; THIS    02:19

16   IS THE CONTRACT DATED AS OF SEPTEMBER 18, 2000.

17           IT'S YOUR TESTIMONY, MA'AM, THAT THIS IS THE VERSION

18   OF THE CONTRACT WHERE YOU WERE asked to WHITEOUT A FAX LINE

19   THAT SAID Barbie Collectibles ON THE TOP; IS THAT CORRECT?

20   A    YES.                                                        02:20

21   Q    AND I BELIEVE YOUR TESTIMONY WAS THAT YOU DID THAT AT OR

22   ABOUT THE TIME THAT THE CONTRACT WAS SENT TO YOU; CORRECT?

23   A    I BELIEVE SO.

24   Q    AND YOU BELIEVE THAT WAS SEPTEMBER 18TH; YES?

25   A    I BELIEVE IT WAS AFTER THE CONTRACT WAS EXECUTED.           02:20

```
 1   Q    ON SEPTEMBER 18TH.

 2   A    OR, I testified EARLIER that i WASN'T SURE IF IT WAS

 3   OCTOBER 4TH.

 4   Q    THAT'S WHAT I WANT TO BE CLEAR on.

 5            NOW, BASED ON WHAT YOU'VE SEEN TODAY, YOU'RE NOT      02:20

 6   CERTAIN IF THE CONTRACT WAS ACTUALLY SIGNed ON SEPTEMBER 18TH

 7   OR OCTOBER 4TH.

 8   A    CORRECT.

 9   Q    EITHER AWAY, ON EITHER DATE, YOU KNEW CARTER BRYANT WAS AN

10   EMPLOYEE OF MATTEL; YES?                                      02:20

11   A    YES.

12   Q    And THAT FACT of HIS EMPLOYMENT AT MATTEL WAS NOT A SECRET

13   WITHIN MGA; CORRECT?

14   A    CORRECT.

15   Q    NOW, YOU HAD SOME ROLE WITH THE ATTORNEY DAVID ROSENBAUM  02:20

16   IN CONNECTION WITH THE DRAFTING OF THE AGREEMENT; is that

17   CORRECT?

18   A    YES.

19   Q    AND WAS IT YOU, IN FACT, THAT FIRST reached out and

20   CONTACTED MR. ROSENBAUM?                                      02:21

21   A    I BELIEVE SO.  I DON'T RECALL.

22   Q    AND MR. ROSENBAUM WAS OUTSIDE COUNSEL FOR MGA; CORRECT?

23   A    YES.

24   Q    AND YOU WERE TASKED TO HANDLE THE ARRANGEMENTS IN TERMS OF

25   FINALIZING THE LICENSE AGREEMENT WITH CARTER BRYANT; IS THAT  02:21
```

1    RIGHT?

2    A    YES.

3    Q    AND ISAAC LARIAN KNEW YOU WERE MAKING CONTACT WITH THE

4    OUTSIDE COUNSEL FOR MGA; CORRECT?

5    A    YES.                                                          02:21

6    Q    AND YOU WOULD REPORT BACK TO ISAAC THE STATUS OF THOSE

7    COMMUNICATIONS; CORRECT?

8    A    YES.

9    Q    SO THIS IS A TASK THAT MR. LARIAN NOT ONLY ASKED YOU TO

10   TAKE ON, BUT ALSO ASKED YOU TO REPORT TO HIM AT VARIOUS          02:22

11   OCCASIONS ABOUT THE DEVELOPMENT OF THE CONTRACT; CORRECT?

12   A    YES.  BUT IN SOME INSTANCES, I BELIEVE DAVID ROSENBAUM

13   ALSO E-MAILED ISAAC LARIAN DIRECTLY.

14   Q    AT ANY TIME IN THE CONVERSATIONS THAT YOU WERE HAVING WITH

15   ISAAC LARIAN DURING THE NEGOTIATIONS, DO YOU RECALL MR. LARIAN   02:22

16   EVER TELLING YOU, "DON'T TELL DAVID ROSENBAUM THAT CARTER

17   BRYANT IS A MATTEL EMPLOYEE"?

18   A    NO.

19   Q    YOU TALKED ABOUT HAVING A CONCERN THAT YOU WERE HAVING A

20   MEETING WITH CARTER BRYANT AT MGA WHILE CARTER WAS STILL         02:22

21   EMPLOYED AT MATTEL; CORRECT?

22   A    I DON'T RECALL IF I TESTIFIED TO BEING CONCERNED ABOUT

23   HAVING THE MEETING OR DOING THE DEAL.

24   Q    DID YOU HAVE A CONCERN ABOUT HAVING THE MEETING?

25   A    I DON'T BELIEVE I DID.                                       02:23

1   Q    AND IS THAT BECAUSE YOU UNDERSTOOD THAT CARTER BRYANT HAD

2   APPROACHED MGA TO PITCH HIS IDEA; CORRECT?

3   A    YES.

4   Q    NOW, THE QUESTION ABOUT WHETHER OR NOT YOU HAD A CONCERN

5   AROSE WITH RESPECT TO WHETHER OR NOT CARTER BRYANT WAS AN              02:23

6   EMPLOYEE AT THE TIME HE SIGNED THIS AGREEMENT; CORRECT?

7   A    CORRECT.

8   Q    NOW, ISN'T IT TRUE THAT YOU RAISED THAT VERY CONCERN WITH

9   CARTER BRYANT; THAT IS, YOUR CONCERN THAT AS AN EMPLOYEE AT

10  MATTEL, HE WAS GOING TO BE SIGNING AN AGREEMENT WITH MGA;             02:24

11  CORRECT?

12  A    CORRECT.

13  Q    AND DIDN'T CARTER BRYANT TELL YOU WHEN YOU RAISED THAT

14  CONCERN, THAT HE WAS GOING TO RESIGN FROM MATTEL THE MOMENT

15  THAT HE SIGNED THE CONTRACT?                                         02:24

16  A    CORRECT.

17  Q    DO YOU HAVE ANY REASON TO BELIEVE, MS. O'CONNOR, THAT, IN

18  FACT, CARTER BRYANT DID NOT RESIGN FROM MATTEL THE MOMENT THAT

19  HE SIGNED THE CONTRACT WITH MGA?

20  A    I DON'T KNOW IF IT WAS THE EXACT MOMENT.  I REMEMBER WHEN        02:24

21  I RECEIVED IT, I THINK HE WAS GOING TO QUIT EITHER THE NEXT DAY

22  OR LATER ON THAT DAY; IT WAS VERY QUICKLY AFTER HE SIGNED THE

23  CONTRACT.

24  Q    SO YOUR CONCERN ABOUT CARTER BRYANT SIGNING THE AGREEMENT

25  WITH MGA WHILE AN EMPLOYEE AT MATTEL WAS SUFFICIENTLY IMPORTANT       02:24

1   TO YOU TO RAISE IT WITH CARTER BRYANT; YES?

2   A    ABSOLUTELY.

3   Q    AND CARTER BRYANT GAVE YOU A PROMISE THAT HE WOULD RESIGN

4   ONCE HE GOT THE FINAL CONTRACT AND HAD SIGNED IT WITH MGA; YES?

5   A    CORRECT.                                                    02:25

6   Q    DID THAT RELIEVE YOUR CONCERN?

7   A    NOT REALLY.

8   Q    DID YOU TELL CARTER THAT DIDN'T RELIEVE YOUR CONCERN?

9   A    I DON'T REMEMBER IF I SAID I'M CONCERNED.  I DON'T

10  REMEMBER MY EXACT WORDS.  BUT HE WAS PRETTY STEADFAST IN NOT     02:25

11  WANTING TO CHANGE HIS MIND.

12  Q    BUT DID YOU TELL ISAAC LARIAN, "LISTEN, CARTER IS NOT

13  GOING TO RESIGN FROM MATTEL UNTIL HE HAS A SIGNED AGREEMENT

14  WITH US."  DID YOU EVER TELL ISAAC LARIAN THAT WAS A CONCERN OF

15  YOURS?                                                          02:25

16  A    YES.

17  Q    DID MR. LARIAN EVER TELL YOU TO TELL CARTER BRYANT TO

18  RESIGN IMMEDIATELY FROM MATTEL ONCE HE HAD SIGNED THE CONTRACT?

19  A    NO.

20  Q    DID MR. LARIAN EVER TELL YOU THAT IT WAS OKAY, THAT HE      02:26

21  DIDN'T CARE, WHEN CARTER BRYANT LEFT MATTEL?

22  A    NO.

23  Q    DID MGA APPROACH CARTER BRYANT OR DID CARTER BRYANT

24  APPROACH MGA?

25          MR. QUINN:  LACKS FOUNDATION, YOUR HONOR.                02:26

WEDNESDAY, JUNE 4, 2008                    TRIAL DAY 7

1      **THE COURT:**  SUSTAINED.

2           LAY A FOUNDATION FOR THAT, COUNSEL.

3  **BY MR. NOLAN:**

4  Q    DO YOU KNOW HOW CARTER BRYANT WAS INTRODUCED TO MGA?

5  A    AS I TESTIFIED EARLIER, HE WAS INTRODUCED THROUGH

6  VERONICA MARLOW, A FREE-LANCE DESIGNER, I BELIEVE, FOR MGA.

7  Q    MR. QUINN SHOWED YOU A CALENDAR POSTING WITH RESPECT TO A

8  DATE OF AUGUST 18TH.

9           DO YOU RECALL THAT CALENDAR NOTICE THAT WAS SHOWN TO

10  YOU?

11  A    I RECALL IT FROM THIS MORNING; I DON'T RECALL IT FROM

12  EIGHT YEARS AGO.

13  Q    THAT WAS MY QUESTION.

14           DO YOU KNOW WHETHER OR NOT YOU ACTUALLY MET ON

15  AUGUST 18TH WITH CARTER BRYANT?

16  A    NOT WITHOUT LOOKING AT A FRANKLIN PLANNER OR SOME OTHER

17  DOCUMENTATION, NO.

18  Q    IN ANY EVENT, I BELIEVE IN YOUR DEPOSITION, IS IT POSSIBLE

19  IN YOUR MIND, THAT THE FIRST MEETING THAT YOU HAD WITH

20  CARTER BRYANT WAS ACTUALLY ON SEPTEMBER 1ST OF THE YEAR 2000?

21  A    IT'S POSSIBLE.

22  Q    AS I UNDERSTAND YOUR TESTIMONY, YOU'RE NOT CERTAIN WHETHER

23  OR NOT THERE WERE TWO DIFFERENT MEETINGS ON DIFFERENT DATES OR

24  THAT THE MEETING ON ONE OF THE DATES WAS SPLIT AND THAT

25  MR. LARIAN CAME IN A LITTLE BIT LATER; IS THAT CORRECT?

02:26

02:27

02:27

02:27

02:27

02:27

```
 1   A    CORRECT.

 2   Q    SO THAT WHEN WE'RE TALKING ABOUT EITHER TWO MEETINGS, IT

 3   ACTUALLY COULD BE ONE MEETING WITH DIFFERENT SEGMENTS OF

 4   PARTICIPANTS.

 5   A    CORRECT.                                                      02:28

 6   Q    THAT'S A REALLY BAD WORD.  I'M SORRY.

 7          IN ANY EVENT, MY QUESTION TO YOU IS, PRIOR TO THE

 8   MEETING THAT YOU HAD WITH CARTER BRYANT, DID YOU HAVE A

 9   CONVERSATION WITH PAULA TREANTAFELLES GARCIA?

10   A    ABOUT...                                                      02:28

11   Q    CONCERNING HER REACTION WHEN SHE SEES THE ARTIST'S

12   DRAWINGS?

13   A    YES.

14   Q    AND CAN YOU RELATE FOR THE JURY THE CONTENTS OF THAT

15   CONVERSATION AND WHY YOU FELT YOU HAD TO HAVE THAT CONVERSATION    02:28

16   WITH PAULA GARCIA?

17   A    I EXPLAINED TO PAULA THAT AS THE INVENTOR, AS CARTER

18   BRYANT SHOWED US THE CONCEPT, IF SHE LIKED IT, NOT TO GET TOO

19   EXCITED ABOUT IT, BECAUSE IF WE WERE GOING TO LICENSE IT, I

20   NEEDED TO NEGOTIATE THE TERMS WITH HER.  IT'S LIKE BUYING A        02:28

21   CAR.  YOU DON'T WANT TO SAY HOW EXCITED YOU ARE ABOUT BUYING

22   IT.  YOU HAVE TO STAY COOL.

23          SO I ASKED HER JUST TO KEEP HER COOL, JUST REFRAIN,

24   AND WE'LL HANDLE IT AFTER THE MEETING, THE CONTRACT

25   NEGOTIATIONS.  THAT, IF SHE LIKED IT, THAT'S FINE, BUT NOT TO      02:29
```

 1   GET TOO OVERLY EXCITED.

 2   Q    BY THE WAY, LET'S JUST SET THE ORIGINAL CHART FOR A

 3   MOMENT.

 4            WERE YOU IN A SUPERIOR POSITION TO PAULA AT THAT

 5   TIME?                                                        02:29

 6   A    I DON'T REMEMBER IF IT WAS SUPERIOR OR EQUAL.

 7   Q    WHY DID YOU FEEL YOU HAD TO HAVE THAT CONVERSATION WITH

 8   PAULA ABOUT, 'DON'T GET TOO EXCITED, ONCE YOU SEE THESE

 9   DRAWINGS'?

10   A    BECAUSE SHE HADN'T DEALT WITH INVENTORS PREVIOUSLY AT MGA.   02:29

11   I DON'T KNOW IF SHE HAD DONE THAT.  I FELT IT IMPORTANT FOR HER

12   TO KNOW THAT WHEN SHE LOOKS AT A CONCEPT -- BECAUSE I WOULD

13   HAVE TO DO ALL OF THE NEGOTIATIONS AFTERWARDS -- JUST TO PLAY

14   IT COOL.  SHE DIDN'T UNDERSTAND THE PROCESS.

15   Q    HAD YOU SEEN THE DRAWINGS OF CARTER BRYANT BEFORE THAT     02:29

16   MEETING?

17   A    NO.

18   Q    HAD PAULA GARCIA SEEN THE DRAWINGS BEFORE THAT MEETING?

19   A    NO.

20   Q    THIS CONVERSATION THAT YOU WERE HAVING WITH PAULA GARCIA,   02:30

21   WAS THAT WITHIN MGA?

22   A    YES.

23   Q    DO YOU REMEMBER ANY DISCUSSIONS PRIOR TO THAT MEETING

24   ABOUT 'IT'S HUSH, DON'T TELL ANYBODY THAT AN INVENTORY IS

25   COMING IN TO MEET WITH US'?                                    02:30

1    A    NO.

2    Q    SO WHEN CARTER BRYANT ENTERED THE MEETING, COULD YOU TELL

3    THE JURY WHETHER OR NOT PAULA FOLLOWED YOUR ADVICE ABOUT

4    KEEPING A POKER FACE?

5    A    NO.  SADLY, SHE DIDN'T.                                    02:30

6    Q    AND WHETHER OR NOT IT WAS SADLY OR WHATEVER, EXPLAIN FOR

7    THE JURY WHAT PAULA DID AT THIS FIRST MEETING AUGUST OR

8    SEPTEMBER, 2000?

9    A    I THINK SHE SCREAMED "OH, MY GOD."  SHE LOVED IT SO MUCH,

10   SHE WAS LIKE, "OH, MY GOD."  SHE WAS VERY EXCITED ABOUT IT.     02:30

11   Q    SO I GUESS, FROM THAT, YOU WOULD NEVER RECOMMEND THAT ANY

12   OF US GO CAR SHOPPING WITH PAULA GARCIA.

13   A    DEFINITELY NOT.

14   Q    HOW LONG DID THIS MEETING TAKE PLACE ON EITHER THE END OF

15   AUGUST OR SEPTEMBER 1ST OF 2000?                                02:31

16        **MR. QUINN:**  OBJECTION.  THE QUESTION MISSTATES

17   TESTIMONY.

18        **THE COURT:**  REPHRASE.

19   **BY MR. NOLAN:**

20   Q    THIS MEETING THAT WE'RE TALKING ABOUT, WHAT IS YOUR BEST   02:31

21   ESTIMATE AS TO WHEN IT OCCURRED?

22   A    WHEN DID IT OCCUR?

23   Q    YES.

24   A    AUGUST OR SEPTEMBER; I DON'T KNOW THE EXACT DATE.

25   Q    OF WHAT YEAR?                                              02:31

```
 1   A    2000.

 2   Q    AT SOME POINT IN TIME, WAS VERONICA MARLOW ALSO AT THIS

 3   MEETING?

 4   A    I DON'T RECALL.  I DON'T THINK SO.

 5   Q    WAS ISAAC LARIAN PRESENT AT THE MEETING?              02:31

 6   A    LIKE I SAID, I DON'T REMEMBER IF IT WAS THAT INITIAL

 7   MEETING.  WHEN HE FIRST PRESENTED IT, HE WAS NOT THERE.  AND I

 8   DON'T RECALL IF PAULA AND I CALLED HIM IN TO SEE IT OR IF THERE

 9   WAS A SUBSEQUENT MEETING.

10   Q    YOU DESCRIBED THE REACTION THAT MR. LARIAN HAD FOR     02:32

11   MR. QUINN, AND I WAS JUST WONDERING IF YOU WOULD MIND

12   ELABORATING A LITTLE BIT MORE ON MR. LARIAN'S REACTION TO

13   CARTER BRYANT'S CONCEPT DRAWINGS THAT WERE PRESENTED.

14   A    HE LIKED IT, BUT HE PLAYED IT VERY COOL.

15   Q    NOW, AT SOME TIME AROUND THERE, YOU AND MR. LARIAN HAD  02:32

16   BEEN CONSIDERING FASHION DOLLS FOR MGA; CORRECT?

17   A    WE WERE LOOKING AT GETTING A CONCEPT, YES.

18   Q    A CONCEPT FOR FASHION DOLLS.

19   A    CORRECT.

20   Q    HOW LONG HAD YOU BEEN AWARE OF MGA'S INTEREST IN LOOKING 02:32

21   TO DEVELOP A FASHION DOLL FOR MGA?

22   A    I DON'T RECALL.  I KNOW IT WAS SOME TIME AFTER PAULA HAD

23   STARTED WORKING.

24   Q    BUT IT WAS CERTAINLY BEFORE THE MEETING IN EITHER AUGUST

25   OR SEPTEMBER OF THE YEAR 2000 WITH CARTER BRYANT; YES?      02:33
```

```
 1   A    YES.

 2   Q    NOW, CAN YOU EXPLAIN FOR US WHAT YOU UNDERSTOOD BY THE

 3   TERM "FASHION DOLL."

 4   A    A FASHION DOLL WOULD BE ABOUT A TEN-INCH DOLL, SOMETHING

 5   SIMILAR TO BARBIE.                                                    02:33

 6   Q    NOW, AT THIS MEETING WITH CARTER BRYANT, DID CARTER BRYANT

 7   BRING -- I UNDERSTAND HE BROUGHT SOMETHING LIKE A PROTOTYPE.

 8   A    CORRECT.

 9   Q    FIRST OF ALL, CAN YOU EXPLAIN TO THE JURY THE SIZE OF THE

10   PROTOTYPE THAT HE BROUGHT.  DO YOU REMEMBER?                          02:33

11   A    I DON'T REMEMBER.  I DON'T REMEMBER HOW MANY INCHES.  IT

12   WAS PROBABLY ABOUT THIS HIGH.  IT WAS TALLER THAN WHAT IT

13   EVENTUALLY ENDED UP TO BE.

14   Q    SO WOULD THAT BE A BEST ESTIMATE OF MAYBE 18 INCHES?

15   A    I DON'T HAVE RULER, BUT I GUESS SO.                              02:34

16   Q    ON A SCALE OF 1 TO 10, 10 BEING "OH, MY GOD, I LOVE IT,"

17   AND 1 BEING NOT INTERESTED AT ALL, WHAT WAS YOUR REACTION TO

18   THIS PROTOTYPE DOLL?

19   A    TEN.

20   Q    YOU LOVED IT?                                                    02:34

21   A    MAYBE AN 11.

22   Q    YOU LOVED THE DOLL ITSELF?  THE PROTOTYPE?

23   A    THE PROTOTYPE?  I LOVED THE FACE.  I LOVED THE CONCEPT.

24   Q    WHAT ABOUT THE BODY?

25   A    THE BODY JUST LOOKED A LITTLE ODD BECAUSE THE HEAD WAS SO        02:34
```

1    BIG AND THE BODY WAS SO SMALL.

2    Q    DO YOU KNOW WHETHER OR NOT ISAAC LARIAN OR PAULA GARCIA

3    LIKED THE DOLL ITSELF, THE PROTOTYPE?

4    A    I DON'T RECALL HAVING SPECIFIC DISCUSSIONS ABOUT THE

5    ACTUAL PROTOTYPE; JUST THE DISCUSSIONS ABOUT JUST BRATZ IN          02:34

6    GENERAL AND THE WHOLE CONCEPT OF THE DOLL LINE.

7    Q    IS IT TRUE THAT DURING THAT FIRST MEETING, THE MAIN FOCUS

8    WAS ON THE CONCEPT DRAWINGS?

9    A    YES.

10   Q    AND WE SHOWED THOSE CONCEPT DRAWINGS TO YOU, MR. QUINN          02:35

11   DID, AND I JUST WANTED TO ASK YOU A QUICK QUESTION ABOUT THAT.

12          YOU IDENTIFIED THESE, AND WHAT I WANTED TO ASK YOU

13   IS, DO YOU RECALL THAT WHEN YOU SAW THEM ON SEPTEMBER 1ST, THAT

14   THE LOGO THERE, "BRATZ," WAS AFFIXED TO THE DRAWINGS AT THAT

15   TIME?                                                               02:35

16   A    I DON'T RECALL THAT.

17   Q    AFTER THE SEPTEMBER 1ST MEETING, DID YOU EVER SEE --

18          **MR. QUINN:**  MISSTATES THE TESTIMONY.

19          **MR. NOLAN:**  I'M SORRY.

20   **BY MR. NOLAN:**                                                   02:35

21   Q    AFTER THE MEETING THAT TOOK PLACE IN AUGUST OR SEPTEMBER

22   OF THE YEAR 2000, DO YOU RECALL EVER SEEING THAT 18-INCH

23   PROTOTYPE?

24   A    EVER SEEING IT AGAIN?

25   Q    YES.                                                           02:35

```
 1   A    NO.
 2   Q    HOW DID THE MEETING, THIS FIRST MEETING IN AUGUST OR
 3   SEPTEMBER OF 2000, END UP?
 4   A    IT ENDED UP WITH MGA DECIDING WE WERE GOING TO DISCUSS IT
 5   INTERNALLY AND WE WOULD GET BACK TO CARTER BRYANT ON WHETHER OR    02:36
 6   NOT WE WANTED TO LICENSE HIS INVENTION.
 7   Q    WAS, IN FACT, A DISCUSSION OR A DECISION MADE AT THAT
 8   MEETING THAT, YES, IN FACT, MGA WAS GOING TO MAKE A DOLL NAMED
 9   BRATZ?
10   A    INTERNALLY?                                                   02:36
11   Q    YES.
12   A    YES.
13   Q    HOW SOON AFTER THAT FIRST MEETING WAS SUCH A DECISION
14   MADE?
15   A    THAT VERY DAY.                                                02:36
16   Q    WHO WAS PART OF THAT DECISION?
17   A    ISAAC LARIAN, PAULA, AND I DON'T REMEMBER WHO ELSE.
18   Q    WHAT STEPS FOLLOWING THAT MEETING WERE TAKEN --
19        ARE YOU AWARE OF A WOMAN NAMED MARGARET LEAHY?
20   A    NO.                                                           02:36
21   Q    WERE YOU IN DEVELOPMENT AT THAT TIME?  DID YOU HAVE ANY
22   RESPONSIBILITIES FOR DEVELOPMENT?
23   A    NO.
24   Q    SO YOU HAVE NO KNOWLEDGE OF WHAT EFFORTS WERE DONE TO
25   EXPLORE WHETHER OR NOT A 3-D DOLL COULD, IN FACT, BE MADE FROM     02:37
```

1    THE CONCEPT DRAWINGS.

2    A    CORRECT.

3    Q    BEFORE THE MEETING THAT YOU HAD WITH CARTER BRYANT, HAD

4    YOU EVER HEARD OF CARTER BRYANT BEFORE?

5    A    NO.                                                        02:37

6    Q    DO YOU HAVE ANY RECOLLECTION OF TALKING WITH CARTER BRYANT

7    ABOUT WHETHER OR NOT HE HAD DONE ANYTHING SIMILAR TO THE BRATZ

8    PRODUCTS WHILE AT MATTEL?

9    A    NO.

10   Q    DO YOU RECALL A CONVERSATION DURING ONE OF YOUR MEETINGS   02:38

11   WITH CARTER BRYANT WHERE CARTER BRYANT TOLD YOU THAT HE

12   WOULDN'T HAVE DONE ANYTHING SIMILAR AT MATTEL BECAUSE BRATZ

13   PRODUCT WAS TOO HIP?

14           MR. QUINN:  OBJECTION.  ASSUMES FACTS AS PHRASED.

15           THE COURT:  REPHRASE, COUNSEL.                          02:38

16           MR. NOLAN:  YOUR HONOR, I'D LIKE TO PASS UP TO THE

17   WITNESS, IF I MIGHT, IT'S A DEPOSITION, DECEMBER 6TH, HER

18   DEPOSITION TRANSCRIPT, YOUR HONOR.

19           THE COURT:  YES.

20   BY MR. NOLAN:                                                   02:39

21   Q    I'D ASK YOU TO TURN TO PAGE 230.

22   A    I DON'T HAVE A PAGE 230.

23   Q    YOU DON'T?

24           I THINK I GAVE YOU THE WRONG COPY.

25           (DOCUMENT IS RETRIEVED.)                                02:39

```
 1   BY MR. NOLAN:

 2   Q    DO YOU REMEMBER HAVING YOUR DEPOSITION TAKEN IN THIS CASE?

 3   A    YES.

 4   Q    AND DO YOU RECALL THAT PRIOR TO YOUR OFFERING TESTIMONY,

 5   YOU WERE PLACED UNDER OATH?                                      02:40

 6   A    YES.

 7   Q    LOOKING AT PAGE 230, STARTING AT LINES FOUR THROUGH TEN.

 8           THE COURT:  ANY OBJECTION?

 9           MR. QUINN:  YES.  THE FIRST IS IT'S HEARSAY; ALSO,

10   MOTION IN LIMINE NUMBER 8 WAS GRANTED ON THE SUBJECT.            02:40

11           MR. NOLAN:  IT'S JUST THROUGH LINE TEN, YOUR HONOR.

12           THE COURT:  SUSTAINED.

13           LET'S MOVE ALONG TO ANOTHER AREA.  WE'LL COME BACK TO

14   THIS, IF WE NEED TO.

15   BY MR. NOLAN:

16   Q    DO YOU KNOW WHEN THE FIRST BRATZ DOLL WAS OFFERED FOR SALE

17   IN RETAIL?

18           MR. QUINN:  YOUR HONOR, OBJECT; BEYOND THE SCOPE;

19   OUTSIDE OF THE TIME FRAME.

20           MR. NOLAN:  JUST FOR EFFICIENCY, YOUR HONOR.            02:41

21           THE COURT:  OVERRULED.

22           THE WITNESS:  WHAT TIME, YOU'RE ASKING, WHEN WAS IT A

23   RETAIL?

24   BY MR. NOLAN:

25   Q    YES.                                                        02:41
```

```
 1  A    IN THE UNITED STATES OR INTERNATIONALLY?

 2  Q    LETS START WITH THE UNITED STATES FIRST.

 3  A    THAT WAS JUNE 2001.

 4  Q    WHAT ABOUT INTERNATIONALLY?

 5  A    I TAKE THAT BACK.  I THINK JUNE 2001 IT WAS                   02:42

 6  INTERNATIONALLY, AND I THINK THE U.S. WAS LATER.  I THINK SPAIN

 7  WAS THE FIRST COUNTRY AND THEN U.S. FOLLOWED.

 8  Q    MR. QUINN WAS ASKING YOU ABOUT ARTICLES THAT YOU SAW IN

 9  THE PAPER WITH RESPECT TO MR. LARIAN'S STATEMENTS WITH RESPECT

10  TO THE CREATION OF BRATZ.                                         02:42

11           WHAT I'D LIKE TO DO IS JUST FOR A MOMENT DISTINGUISH,

12  FOR THE PURPOSE OF THIS QUESTION, BETWEEN THE CONCEPT DRAWINGS

13  OF CARTER BRYANT AND THE BRATZ DOLL ITSELF.

14  A    OKAY.

15           MR. NOLAN:  YOUR HONOR, COULD I SHOW HER ONE OF THE      02:43

16  BRATZ DOLLS IN EVIDENCE FROM YESTERDAY?

17           THE COURT:  YOU MAY.

18           MR. NOLAN:  I'M APPROACHING THE WITNESS WITH

19  EXHIBIT 1369, THE DOLL CHLOE.

20  BY MR. NOLAN:                                                     02:43

21  Q    MS. O'CONNOR, YOU RECOGNIZE THIS AS ONE THE BRATZ DOLLS;

22  RIGHT?

23  A    YES.

24  Q    MY QUESTION IS THIS:  FOR THE DOLL, NOT THE CONCEPT

25  DRAWINGS, WOULD YOU CONSIDER THAT ISAAC LARIAN HAD INPUT INTO     02:43
```

1    THE CREATION OF THE DOLL ITSELF?

2    A    ABSOLUTELY.

3    Q    AFTER YOUR FIRST MEETING WITH CARTER BRYANT, IN AUGUST OR

4    SEPTEMBER OF THE YEAR 2000, MY UNDERSTANDING IS THAT THEREAFTER

5    YOU DID NOT HAVE MEETINGS WITH CARTER BRYANT; CORRECT?          02:44

6    A    FORMAL MEETINGS?

7    Q    YES.

8    A    NO.  I WOULD SEE HIM IN THE HALLWAY, TALK TO HIM, BUT NOT

9    A FORMAL MEETING.

10   Q    WHEN WAS CARTER BRYANT EMPLOYED BY MGA?                     02:44

11   A    AS A CONSULTANT?

12   Q    YES.

13   A    AS SOON AS THE CONTRACT WAS EXECUTED.

14   Q    EITHER SEPTEMBER 18TH OR OCTOBER 4TH.

15   A    CORRECT.                                                    02:45

16   Q    PRIOR TO THAT DATE, DID YOU CONSIDER CARTER BRYANT TO BE

17   AN EMPLOYEE OF MGA?

18   A    NO.

19   Q    DID YOU, AS THE PERSON TASKED WITH ARRANGING FOR THE

20   CONTRACT TO BE EXECUTED BETWEEN MATTEL AND MGA, AT ALL TIMES    02:45

21   YOU WERE ACTING AT THE DIRECTION OF ISAAC LARIAN; CORRECT?

22   A    YES.

23   Q    WAS IT YOUR INTENT AT ANY TIME TO EVER INTERFERE WITH

24   CARTER BRYANT'S CONTRACTUAL OBLIGATION AT MATTEL?

25   A    NO.                                                        02:46

1    Q    BEFORE BRATZ, MGA DID HAVE A SUCCESSFUL LINE OF DOLLS;

2    CORRECT?

3    A    LARGE DOLLS, YES.

4    Q    JUST FOR THE RECORD, LIST THE ONES THAT YOU RECALL THAT

5    WERE SUCCESSFUL BY MGA BEFORE BRATZ.                              02:46

6    A    BOUNCY BABY, GIDDY UP GIRL, MY DREAM BABY; THAT'S ALL I

7    CAN RECALL.

8    Q    YOU'RE FAMILIAR WITH A PROJECT CALLED PRAYER ANGELS?

9    A    YES.

10   Q    WAS PRAYER ANGELS ALSO A PROJECT INTRODUCED INTO THE        02:46

11   MARKET BY MGA?

12   A    YES.

13   Q    AND PRAYER ANGELS WAS INTRODUCED INTO THE MARKET BEFORE

14   BRATZ.

15   A    I DON'T REMEMBER.                                            02:47

16         MR. QUINN:  BEYOND THE SCOPE.

17         THE COURT:  I'LL GIVE YOU SOME LEEWAY.

18         MR. NOLAN:  THAT IS THE ONLY REASON, YOUR HONOR.

19   BY MR. NOLAN:

20   Q    YOU DON'T RECALL EXACTLY?                                    02:47

21   A    I DON'T REMEMBER.  I DON'T RECALL WHEN IT WAS INTRODUCED.

22   Q    YOU RECALL THAT DURING THE SUMMER OF 2000, PRAYER ANGELS

23   WAS UNDER DEVELOPMENT?

24   A    I DON'T RECALL THE DATE.

25   Q    YOU MENTIONED YOUR HUSBAND WAS LAID OFF BY MGA.              02:47

```
 1    A     NO.

 2    Q     I'M SORRY; YOUR BROTHER.

 3    A     YES.

 4    Q     I WAS CLOSE; IT WAS IN THE FAMILY.

 5          YOUR BROTHER HAD BEEN LAID OFF.                           02:47

 6    A     CORRECT.

 7    Q     OTHER EMPLOYEES AT MGA WERE LAID OFF AT THE SAME TIME;

 8    CORRECT?

 9    A     CORRECT.

10    Q     YOU HAVE NO REASON TO BELIEVE THAT YOUR BROTHER WAS       02:47

11    SINGLED OUT TO BE LAID OFF SIMPLY BECAUSE YOU OFFERED TESTIMONY

12    IN THIS CASE.

13    A     DO I BELIEVE OR DO I HAVE REASON TO BELIEVE IT?

14    Q     DO YOU HAVE A BASIS, DID ANYBODY EVER TELL YOU THAT YOUR

15    HUSBAND WAS LAID OFF --                                         02:48

16    A     MY BROTHER.

17    Q     -- YOUR BROTHER WAS LAID OFF BECAUSE YOU OFFERED A

18    DEPOSITION IN THIS CASE?

19    A     NO.  NO ONE TOLD ME THAT.

20    Q     NOW, AFTERWARDS YOU WENT TO WORK AT WARNER BROTHERS;       02:48

21    CORRECT?

22    A     CORRECT.

23    Q     AND WARNER BROTHERS CURRENTLY DOES LICENSING WORK FOR

24    MATTEL PRODUCTS, OR IS IT THE OTHER WAY AROUND?

25    A     IT'S THE OTHER WAY AROUND.                                02:48
```

1    Q    SO MATTEL LICENSES AND SELLS SOME OF WARNER BROTHERS'

2    PRODUCTS; CORRECT?

3    A    CORRECT.

4    Q    AND ARE YOU REPRESENTED BY COUNSEL IN THIS CASE?

5    A    I AM NOT.                                              02:48

6         **MR. NOLAN:**  NOTHING FURTHER.  THANK YOU.

7         YOUR HONOR, I'VE BEEN TOLD THAT THE TRANSCRIPT MAY

8    READ WRONG, AND I APOLOGIZE, SO MAY I REASK A QUESTION, IF I

9    MIGHT?

10   **BY MR. NOLAN:**                                          02:49

11   Q    DO YOU REMEMBER I WAS ASKING YOU ABOUT YOU WERE TASKED TO

12   HANDLE THE CONTRACT NEGOTIATIONS WITH THE LAWYERS NEGOTIATIONS

13   WITH CARTER BRYANT, AND MGA; CORRECT?

14   A    YES.

15   Q    AND THAT ISAAC LARIAN HAD GIVEN YOU DIRECTION TO DO SO.   02:49

16   A    YES.

17   Q    AND HE KNEW YOU WERE DOING THAT AT ALL TIMES; CORRECT?

18   A    MOST OF THE TIME, YES.

19   Q    MY QUESTION TO YOU IS THIS:  AT ANY TIME, DID YOU INTEND,

20   AS THE REPRESENTATIVE OF MGA DEALING WITH CARTER BRYANT IN HIS  02:49

21   CONTRACT NEGOTIATIONS WITH MGA, EVER INTEND TO INTERFERE WITH

22   CARTER BRYANT'S EMPLOYMENT AGREEMENT AT MATTEL?

23        **MR. QUINN:**  OBJECTION.  CALLS FOR A LEGAL CONCLUSION.

24        **THE WITNESS:**  NO.

25        **THE COURT:**  WAIT A SECOND.                         02:49

```
 1              OVERRULED.

 2              YOU'RE ASKING IN THE LAY PERSON'S SENSE?

 3         MR. NOLAN:  IN THE LAY PERSON'S SENSE.

 4         THE WITNESS:  NO.

 5         MR. NOLAN:  THANK YOU.                              02:50

 6         THE COURT:  FURTHER DIRECT?

 7                   REDIRECT EXAMINATION

 8    BY MR. QUINN:

 9    Q    COUNSEL ASKED YOU ABOUT YOUR BROTHER BEING LAID OFF AFTER

10    YOU GAVE YOUR DEPOSITION TESTIMONY.                      02:50

11              DO YOU BELIEVE YOUR BROTHER WAS LAID OFF BECAUSE OF

12    YOUR DEPOSITION TESTIMONY?

13         MR. NOLAN:  OBJECTION, YOUR HONOR.  HER STATE OF MIND

14    AND BELIEF IS IRRELEVANT WITHOUT FOUNDATION.

15         MR. QUINN:  HE RAISED IT.                           02:50

16         THE COURT:  I'LL SUSTAIN AS TO FOUNDATION.  LAY THE

17    FOUNDATION FOR THAT.

18              YOU MAY ANSWER THE QUESTION THAT'S ASKED, BUT ONLY

19    YES OR NO.  DO YOU HAVE A BELIEF?

20         THE WITNESS:  YES.                                  02:50

21         THE COURT:  LAY A FOUNDATION FOR THE BELIEF.

22    BY MR. QUINN:

23    Q    WHAT IS THE BASIS FOR WHATEVER BELIEFS YOU HAD?

24    A    JUST KNOWING ISAAC FOR AS LONG AS I HAVE.

25    Q    IS IT BASED ON ANYTHING ELSE OTHER THAN THAT?       02:51
```

```
 1  A    MY BROTHER WAS TOLD BY AN MGA EMPLOYEE THAT HE WAS IN A

 2  MEETING --

 3           MR. NOLAN:  OBJECTION.  CALLS FOR HEARSAY, YOUR

 4  HONOR.

 5           THE COURT:  COUNSEL, YOU MAY PROCEED WITH YOUR NEXT      02:51

 6  QUESTION.

 7  BY MR. QUINN:

 8  Q    WHAT WAS YOUR BROTHER TOLD ABOUT THIS MGA MEETING?

 9           MR. NOLAN:  SAME OBJECTION, YOUR HONOR.  HEARSAY.

10           THE COURT:  PARTY OPPONENT.  OVERRULED.                 02:51

11  BY MR. QUINN:

12  Q    WHAT WAS YOUR BROTHER TOLD?

13  A    HE WAS IN A MEETING WITH ISAAC LARIAN, AND WHEN THEY WERE

14  PUTTING TOGETHER THE LIST OF EMPLOYEES WHO WERE TO BE LAID OFF,

15  IT WAS ALREADY DONE.  AND THEN ISAAC LARIAN TOLD AN MGA          02:51

16  EMPLOYEE "ADD CHARLES O'CONNOR TO THE LIST."

17  Q    WHO WAS THE MGA EMPLOYEE WHO MR. LARIAN INSTRUCTED TO ADD

18  ROGER O'CONNOR TO THE LIST --

19  A    CHARLES O'CONNOR.

20  Q    WHO WAS THE INDIVIDUAL WHO MR. LARIAN INSTRUCTED TO ADD     02:52

21  YOUR BROTHER'S NAME TO THE LIST?

22  A    DAVE MALACRIDA.

23  Q    WHAT WAS MR. MALACRIDA'S POSITION AT MGA?

24  A    DIRECTOR OF PUBLIC RELATIONS.  HE COULD HAVE BEEN VICE

25  PRESIDENT, I DON'T KNOW HIS TITLE.                              02:52
```

```
 1   Q    APPROXIMATELY HOW LONG AFTER YOU GAVE YOUR DEPOSITION WAS

 2   YOUR BROTHER LAID OFF?

 3   A    I BELIEVE IT WAS FOUR MONTHS.

 4   Q    AND IN YOUR DEPOSITION, YOU RELATED TESTIMONY ABOUT

 5   MR. LARIAN'S INSTRUCTION TO WHITE OUT THE FAX HEADER?          02:52

 6   A    I DID.

 7   Q    SO TO GET BACK TO THE ORIGINAL QUESTION, WHAT'S YOUR

 8   UNDERSTANDING AS TO WHY YOUR BROTHER WAS LAID OFF FROM MGA?

 9        MR. NOLAN:  YOUR HONOR, SAME OBJECTION; ALSO

10   CUMULATIVE; ALSO NO FOUNDATION.                                02:52

11        THE COURT:  I THINK THERE IS FOUNDATION AT THIS

12   POINT.

13        OVERRULED.

14        THE WITNESS:  I BELIEVE HE WAS LAID OFF AS A RESULT

15   OF MY DEPOSITION.                                              02:53

16   BY MR. QUINN:

17   Q    YOU WERE SHOWN THAT BRATZ DOLL THAT COUNSEL GAVE TO YOU

18   AND YOU WERE ASKED A QUESTION ABOUT 'DID MR. LARIAN HAVE ANY

19   INPUT INTO THAT AT ALL.'

20        DO YOU RECALL BEING ASKED THAT QUESTION?                  02:53

21   A    YES.

22   Q    THAT BRATZ DOLL THAT YOU ARE LOOKING AT, THAT FACE, IS

23   THAT THE SAME FACE THAT YOU SAW IN YOUR FIRST MEETING WITH

24   MR. BRYANT?

25   A    IT'S VERY SIMILAR.  I COULDN'T SAY EXACTLY THAT THE COLORS  02:53
```

```
 1   WERE THE SAME, BUT IT WAS VERY SIMILAR.

 2           YOU'RE SAYING IN TERMS OF THE PAINTING ON THE FACE?

 3   Q    YES.

 4   A    VERY SIMILAR.

 5   Q    AS YOU'RE SITTING HERE, CAN YOU IDENTIFY ANY DIFFERENCES?    02:53

 6           MR. NOLAN:  OBJECTION TO THE RELEVANCE.

 7           THE COURT:  COUNSEL, WE'RE GETTING INTO AN AREA

 8   THAT --

 9           MR. QUINN:  THIS WOULD BE THE LAST QUESTION, YOUR

10   HONOR.                                                           02:53

11           THE COURT:  I UNDERSTAND.  IT MAY BE THE LAST

12   QUESTION, BASED ON...

13           I'M GOING TO SUSTAIN THE OBJECTION.

14           MR. QUINN:  VERY WELL, YOUR HONOR.

15   BY MR. QUINN:                                                    02:54

16   Q    GOING BACK TO THE PERIOD BEFORE THE CONTRACT BETWEEN MGA

17   AND MR. BRYANT WAS SIGNED, DO YOU KNOW WHETHER -- YOU INDICATED

18   BEFORE THAT MR. BRYANT WAS IN THE OFFICES AT MGA; IS THAT

19   CORRECT?

20   A    YES.                                                        02:54

21   Q    AND DO YOU KNOW WHETHER OR NOT DURING THAT TIME PERIOD HE

22   WAS UNDERTAKING EFFORTS TO ASSIST MS. TREANTAFELLES?

23           MR. NOLAN:  OBJECTION.  LACKS FOUNDATION.

24           THE COURT:  LAY A FOUNDATION, COUNSEL.

25   / / /                                                            02:54
```

```
 1   BY MR. QUINN:

 2   Q    DID YOU OBSERVE WHAT MR. BRYANT WAS DOING DURING THIS TIME

 3   PERIOD, AT ANY POINT?

 4   A    NO.

 5   Q    SO FAR AS YOU KNEW, WAS HE WORKING ON ANY PROJECTS WITH        02:54

 6   MGA OTHER THAN BRATZ?

 7            MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

 8            THE COURT:  SUSTAINED.

 9   BY MR. QUINN:

10   Q    YOU WERE ASKED A QUESTION BY MR. NOLAN ABOUT WHETHER, WHEN     02:55

11   MR. BRYANT TOLD YOU THAT HE WOULD RESIGN AFTER THE CONTRACT WAS

12   SIGNED, WHETHER THAT ALLEVIATED THE CONCERN YOU HAD.  YOUR

13   ANSWER WAS NO.

14            WHY WAS YOUR CONCERN NOT ALLEVIATED WHEN THE CONTRACT

15   WAS SIGNED AND MR. BRYANT TOLD YOU THAT?                           02:55

16   A    I'M SORRY.  SAY THAT AGAIN.

17   Q    MR. NOLAN HAD ASKED YOU A QUESTION ABOUT THESE CONCERNS

18   THAT YOU HAD, WHETHER THEY WERE ALLEVIATED WHEN MR. BRYANT TOLD

19   YOU HE WOULD RESIGN AFTER THE CONTRACT WAS SIGNED.  IN RESPONSE

20   TO HIS QUESTION, YOU TOLD HIM, NO, YOUR CONCERNS WERE NOT          02:55

21   ALLEVIATED.

22            MY QUESTION TO YOU IS, WHY WERE YOUR CONCERNS NOT

23   ALLEVIATED?

24   A    BECAUSE HE WAS STILL EMPLOYED AT MATTEL WHEN THE CONTRACT

25   WAS SIGNED.                                                        02:56
```

```
 1   Q    WERE YOU CONCERNED AT THE TIME OF THE FIRST MEETING THAT
 2   YOU HAD WITH MR. BRYANT WHEN HE WAS THERE SHOWING THESE
 3   DRAWINGS, SHOWING THIS PROTOTYPE?
 4   A    I WAS A LITTLE CONCERNED.
 5   Q    DID YOU HAVE CONCERN WHEN YOU SAW HIM IN THE OFFICES WITH    02:56
 6   MS. GARCIA BEFORE THE CONTRACT WAS SIGNED?
 7   A    I HAD CONCERNS THROUGHOUT THE ENTIRE NEGOTIATION PROCESS.
 8   Q    WERE YOUR CONCERNS ABOUT THAT PROCESS, THAT HISTORY, DID
 9   THEY GO AWAY, WERE THEY ALLEVIATED, BY THE FACT THAT HE
10   ULTIMATELY RESIGNED FROM MATTEL?                                  02:56
11   A    NO.
12   Q    IF WE COULD LOOK AT EXHIBIT 11328 IN EVIDENCE, PLEASE.
13        WE'LL PUT THAT ON THE SCREEN.
14        WHAT IS THIS DOCUMENT?
15   A    IT LOOKS LIKE AN OUTLOOK CALENDAR.                          02:57
16   Q    WHO'S DIDI BROWN?
17   A    ISAAC LARIAN'S EXECUTIVE ASSISTANT.
18   Q    IS THIS THE TYPE OF CALENDAR ENTRY THAT WOULD GO OUT TO
19   MEMORIALIZE WHEN, FOR EXAMPLE, A MEETING WAS SCHEDULED?
20   A    YES.                                                         02:57
21   Q    IF YOU WOULD LOOK AT EXHIBIT 15, THE SIGNATURE PAGE, AND
22   WE'LL BLOW UP THAT FAX HEADER AT THE BOTTOM.
23        THE COURT:  LET ME STOP YOU HERE FOR A SECOND,
24   BECAUSE THIS IS A GOOD ILLUSTRATION FOR THE JURY.
25        MEMBERS OF THE JURY, YOU MAY HAVE SEEN, FROM TIME TO        02:58
```

```
 1   TIME, A STAMP ON A LOT OF THESE DOCUMENTS THAT SAYS "ATTORNEYS'

 2   EYES ONLY."  THAT IS COMPLETELY UNRELATED.  THAT WAS PLACED ON

 3   THOSE DOCUMENTS DURING THIS LITIGATION, DURING THE DISCOVERY

 4   PROCESS.  THAT WAS NOT PART OF THE ORIGINAL OF ANY OF THESE

 5   DOCUMENTS.  JUST IGNORE THAT.  THAT WAS SOMETHING BEING DONE          02:58

 6   WHILE WE WERE GOING THROUGH DISCOVERY TO PROTECT THE DOCUMENTS

 7   FROM GOING OUTSIDE OF THE DISCOVERY PROCESS UNTIL TRIAL.

 8            THE COURT HAS LIFTED THAT "ATTORNEY'S EYES ONLY"

 9   DESIGNATION, WE JUST HAVEN'T FULLY REDACTED THEM; SO JUST

10   DISREGARD THAT.                                                      02:58

11            THANK YOU, COUNSEL.

12   BY MR. QUINN:

13   Q   WE'VE LOOKED AT THIS FAX HEAD THERE AT THE BOTTOM; THAT'S

14   ACTUALLY AN MGA FAX HEADER.

15            DO YOU KNOW WHY THAT IS THERE?                              02:58

16   A   NO.

17   Q   IS IT POSSIBLE THAT YOU FAXED THE CONTRACT TO MR. BRYANT

18   AT MATTEL AND HE THEN FAXED IT BACK?

19   A   YES.

20   Q   AND IN THAT CASE, THERE WOULD BE TWO FAX HEADERS.               02:59

21   A   YES.

22   Q   NOW, IN YOUR POSITION AS SOMEONE WHO'S INVOLVED IN

23   LICENSING, YOU DEAL A LOT WITH CONTRACTS, LICENSING AGREEMENTS?

24   A   YES.

25   Q   IS IT UNCOMMON TO HAVE A SO-CALLED "AS OF" DATE OR A            02:59
```

1   CONTRACT IS DATED "AS OF" A SPECIFIC DATE, WHICH IS DIFFERENT

2   THAN THE DATE IT'S ACTUALLY SIGNED?

3   A    NO.

4   Q    DOES THAT SOMETIMES HAPPEN?

5         **MR. NOLAN:**  OBJECTION, YOUR HONOR.  LACK OF                    02:59

6   FOUNDATION; ALSO CALLS FOR A LEGAL CONCLUSION.

7         **THE COURT:**  SUSTAINED.

8   **BY MR. QUINN:**

9   Q    IF WE COULD LOOK AT EXHIBIT 15, THE "AS OF" DATE, I'LL ASK

10  YOU, WHAT IS YOUR UNDERSTANDING OF THE SIGNIFICANCE OF DATING      02:59

11  SOMETHING AS OF A CERTAIN DATE?

12  A    WHAT IS MY UNDERSTANDING OF IT?

13  Q    YES, MA'AM.

14  A    I DON'T REALLY KNOW.

15  Q    I THINK YOU INDICATED THAT MGA'S ATTORNEY GOT INVOLVED IN    03:00

16  ACTUALLY DRAFTING THE AGREEMENT.

17  A    CORRECT.

18  Q    AND THAT'S MR. ROSENBAUM.

19  A    YES.

20  Q    AND WOULD HE KNOW WHEN THE ACTUAL TERMS OF THE AGREEMENT     03:00

21  WERE REACHED BETWEEN THE PARTIES?

22        **MR. NOLAN:**  OBJECTION.  CALLS FOR SPECULATION.

23        **THE COURT:**  SUSTAINED.

24  **BY MR. QUINN:**

25  Q    IN YOUR EXPERIENCE, DOES IT SOMETIMES HAPPEN THAT PARTIES    03:00

```
 1    REACH AGREEMENTS ON THE TERMS THAT ARE GOING TO BE IN A
 2    CONTRACT AND THAT AGREEMENT IS REACHED ON A DIFFERENT DATE THAN
 3    THE CONTRACT IS ACTUALLY SIGNED?  DOES THAT SOMETIMES HAPPEN?
 4    A    YES.
 5    Q    YOU INDICATED THAT, AND I ASKED YOU WHAT THE BASIS FOR        03:01
 6    YOUR UNDERSTANDING WAS THAT YOUR BROTHER WAS LAID OFF BECAUSE
 7    OF YOUR TESTIMONY.  ONE OF THE THINGS THAT YOU SAID WAS KNOWING
 8    ISAAC LARIAN.
 9          HOW DOES KNOWING ISAAC LARIAN CONTRIBUTE TO THE
10    UNDERSTANDING THAT YOUR BROTHER WAS LAID OFF BECAUSE OF YOUR       03:01
11    TESTIMONY?
12             MR. NOLAN:  OBJECTION, YOUR HONOR.  RELEVANCY; 403.
13             THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  I
14    THINK THAT BASIS WAS AN INITIAL BASIS SET FORTH.  THAT WAS NOT
15    THE BASIS UPON WHICH THE COURT PERMITTED THE QUESTIONING.         03:01
16          THE QUESTION IS PERMITTED ON THE BASIS OF THE
17    INFORMATION FROM ANOTHER MGA EMPLOYEE.  YOU MAY QUESTIONS ON
18    THAT, COUNSEL.
19             MR. QUINN:  NOTHING FURTHER, THANK YOU.
20                     RECROSS-EXAMINATION                              03:01
21    BY MR. NOLAN:
22    Q    MS. O'CONNOR, THIS WILL BE SHORT.
23          IN THE WHITE NOTEBOOK, COULD YOU PLEASE TURN TO TRIAL
24    EXHIBIT 16995-001.
25    A    I DON'T HAVE A DASH 01; I JUST HAVE 16995.                   03:02
```

```
 1   Q    DO YOU RECOGNIZE THAT DOCUMENT AS ALSO BEING A CALENDAR

 2   NOTICE?

 3   A    YES.

 4   Q    YOUR NAME IS ON THAT; CORRECT?

 5   A    YES.                                                      03:02

 6            MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 16995.

 7            MR. QUINN:  NO OBJECTION.

 8            THE COURT:  ADMITTED.  YOU MAY PUBLISH.

 9   BY MR. NOLAN:

10   Q    MR. QUINN SHOWED YOU THE CONTACT NOTICE SHOWING THE DATE  03:02

11   OF AUGUST 18, 2000.

12            COULD YOU PLEASE LOOK AT THIS, AND DO YOU SEE YOUR

13   SUBJECT:  CARTER BRYANT; DOLL DESIGNER WITH VICTORIA AND PAULA.

14   LOCATION:  ISAAC'S OFFICE; CORRECT?

15   A    YES.                                                      03:02

16   Q    DO YOU RECALL THAT YOUR MEETING WITH CARTER BRYANT AND

17   PAULA OCCURRED IN ISAAC'S OFFICE; CORRECT?

18   A    Yes.

19   Q    And you SEE THIS NOTICE, could you TELL THE JURY WHAT TIME

20   IT STARTED?                                                    03:03

21   A    FRIDAY, NOVEMBER 1, 2000, 10:00 A.M.

22   Q    IS THAT SEPTEMBER 1, 2000?

23   A    YES.

24            MR. NOLAN:  I'd like to APPROACH with an EXHIBIT

25   that's not in the book, but it is marked 17251.               03:03
```

```
 1              THE COURT:  YOU MAY APPROACH.

 2    BY MR. NOLAN:

 3    Q    I'd ASK YOU TO LOOK AT THIS E-MAIL.

 4              DO YOU SEE THAT YOU'RE COPIED ON THIS E-MAIL,

 5    VICTORIA O'CONNOR, BY E-MAIL?                              03:04

 6    A    YES.

 7    Q    SUBJECT:  BRYANT/MGA AGREEMENT.

 8    A    YES.

 9    Q    DO YOU SEE THE DATE, OCTOBER 4, 2000?

10    A    YES.                                                  03:04

11    Q    WERE YOU EMPLOYED AT MGA AS OF OCTOBER 4, 2000?

12    A    YES.

13    Q    AND HAD YOU BEEN HAVING ANY COMMUNICATION WITH AN ATTORNEY

14    NAMED ANNE WONG?

15    A    NOT THAT I REMEMBER.                                  03:04

16    Q    DO YOU RECALL WHO ANNE WONG IS?

17    A    NO.

18    Q    YOU WERE WORKING WITH THE BRYANT/MGA AGREEMENT; CORRECT?

19    A    YES.

20    Q    DO YOU HAVE ANY DOUBT THAT YOU RECEIVED THIS E-MAIL AT THE   03:04

21    MGA ADDRESS INDICATED ON THIS E-MAIL?

22    A    NO.

23              MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 17251.

24              MR. QUINN:  HEARSAY, YOUR HONOR.

25              THE COURT:  COUNSEL?                             03:05
```

1      **MR. NOLAN:**  YOUR HONOR, IT'S NOT BEING OFFERED FOR

2   THE TRUTH OF THE MATTER; JUST MERELY THAT THE MATTER WAS

3   STATED; THAT SHE RECEIVED IN THE ORDINARY COURSE; IT'S ALSO

4   USED TO REFRESH HER RECOLLECTION AS TO WHAT THE DATE AND STATUS

5   OF THE NEGOTIATIONS WERE ON THAT DATE.                        03:05

6      **THE COURT:**  ESTABLISH THAT SHE NEEDS TO HAVE HER

7   MEMORY REFRESHED, THEN, COUNSEL.

8   **BY MR. NOLAN:**

9   Q    DOES THIS E-MAIL, IN ANY WAY AFFECT YOUR MEMORY AS TO

10  WHETHER OR NOT THE CONTRACT BETWEEN CARTER BRYANT AND MGA WAS   03:05

11  SIGNED ON SEPTEMBER 18, 2000, OR OCTOBER 4, 2000?

12  A    I WISH IT DID, BUT MY MEMORY IS NOT REFRESHED.  BUT BASED

13  ON THE E-MAIL IT LOOKS LIKE, IT WASN'T SIGNED AS OF

14  OCTOBER 4TH.

15     **MR. QUINN:**  MOVE TO STRIKE EVERYTHING AFTER THAT        03:06

16  FIRST ANSWER.

17     **THE COURT:**  THAT LAST THING IS STRICKEN; THE ONLY

18  PART THE JURY SHOULD CONSIDER IS THE TESTIMONY THAT HER MEMORY

19  IS NOT REFRESHED.

20  **BY MR. NOLAN:**                                              03:06

21  Q    DO YOU RECALL WORKING WITH AN ATTORNEY NAMED DAVID

22  ROSENBAUM?

23  A    YES.

24  Q    WOULD DAVID ROSENBAUM COPY YOU ON COMMUNICATIONS THAT HE

25  WAS HAVING WITH RESPECT TO THE NEGOTIATIONS OF THE BRYANT/MGA  03:06

```
 1   AGREEMENT?

 2   A    IT APPEARS HE DID, YES.

 3          MR. QUINN:  MOVE TO STRIKE THE ANSWER; SPECULATION.

 4          THE COURT:  COUNSEL, I'M GOING TO SUSTAIN THE

 5   OBJECTION.  MOVE ALONG.  YOU'VE NOT LAID FOUNDATION FOR THE    03:06

 6   PURPOSE THAT YOU WANTED TO.

 7          THE JURY IS TO DISREGARD THE TOPICS OF THIS E-MAIL,

 8   TO THE EXTENT IT IS REVEALED.

 9          MR. NOLAN:  THAT WAS NOT PART OF THE EARLIER RULING;

10   THIS HAD ALREADY BEEN PRODUCED.                                03:06

11   BY MR. NOLAN:

12   Q    ISN'T IT TRUE THAT AFTER YOUR DEPOSITION IN THIS CASE,

13   YOUR BROTHER WASN'T LAID OFF FOR FOUR MONTHS; CORRECT?

14   A    YES.

15   Q    AND ISN'T IT TRUE THAT AT A NEW YORK TOY FAIR, WHEN BRATZ  03:07

16   WAS NAMED BRAND TOY OF THE YEAR, THAT ISAAC LARIAN SPECIFICALLY

17   IDENTIFIED YOU AS ONE OF THE CONTRIBUTORS TO THE SUCCESS OF THE

18   BRATZ LINE?

19   A    YES.

20   Q    THANK YOU.                                                03:07

21          MR. NOLAN:  NOTHING FURTHER.

22   BY MR. QUINN:

23   Q    MS. O'CONNOR, YOU'VE INDICATED A COUPLE OF TIMES, YOU'RE

24   UNSURE HOW MANY MEETINGS THERE WERE IN THE AUGUST/SEPTEMBER

25   TIME FRAME?                                                    03:07
```

1   A    CORRECT.

2   Q    NOW SEEING TWO OUTLOOK CALENDAR ENTRIES SCHEDULING

3   MEETINGS, DOES THAT SUGGEST TO YOU THAT IN FACT THERE WERE TWO

4   MEETINGS?

5   A    IT COULD BE POSSIBLE.  I STILL CAN'T SAY FOR CERTAIN.          03:07

6           **MR. QUINN:**  THANK YOU.

7           **MR. NOLAN:**  NOTHING FURTHER.  THANK YOU.

8           **THE WITNESS:**  CAN I SAY SOMETHING, YOUR HONOR?

9           **THE COURT:**  I'M SORRY, YOU CAN'T.

10          THANK YOU.  YOU'RE EXCUSED.                                 03:07

11          I'M GOING TO EXCUSE THE JURY.  I WANT TO TALK TO

12   COUNSEL.

13          MEMBERS OF THE JURY, WE'RE GOING TO START SHARP AT

14   9:00 TOMORROW.  WE'LL HAVE A FULL DAY TOMORROW, AS WE WILL ON

15   FRIDAY.  HAVE A GOOD AFTERNOON.                                    03:08

16          (WHEREUPON JURORS DEPART COURTROOM.)

17          **THE COURT:**  I JUST WANT TO ELABORATE ON TWO RULINGS.

18   FIRST, THIS LATTER ONE REGARDING THE E-MAIL.  IT WAS OFFERED --

19   I UNDERSTAND THAT IT'S NOT PART OF THE DOCUMENTS THAT WERE

20   PRODUCED LAST NIGHT THAT THE COURT RULED COULD NOT BE ADMITTED     03:09

21   FOR THIS WITNESS.

22          HOWEVER, IT WAS OFFERED TO REFRESH RECOLLECTION, AND

23   THERE WAS NO FOUNDATION FOR THAT AND THERE WAS NO OTHER

24   RESPONSE TO THE HEARSAY OBJECTION; SO THAT'S WHY THAT WAS

25   SUSTAINED.                                                         03:09

 1          THE DEPOSITION QUESTION, IT RAISES A CLOSE CALL.  THE

 2   PROBLEM WITH THIS, AND WHY I SUSTAINED THE OBJECTION ON THIS,

 3   IS THAT THE WAY THE QUESTION IS WORDED -- AND THIS IS AT

 4   PAGE 230, LINE FOUR, THE DEPOSITION OF VICTORIA O'CONNOR, IT

 5   STATES: "DO YOU HAVE ANY RECOLLECTION OF TALKING TO CARTER                03:09

 6   BRYANT ABOUT WHETHER OR NOT HE HAD DONE ANYTHING SIMILAR TO THE

 7   BRATZ PRODUCTS AT MATTEL?"  AND THEN HE SAYS "NO."  AND IT GETS

 8   INTO THE INFORMATION ABOUT THE PRODUCT BEING TOO HIP FOR

 9   MATTEL.

10          THE PROBLEM WITH THE QUESTION IS IT FOCUSES ON THE                 03:09

11   BRATZ PRODUCT.  YOU DIDN'T DO A PRODUCT AT MATTEL.  IT WASN'T

12   ABOUT THE DRAWINGS AT MATTEL.

13          I UNDERSTAND WHAT CARTER BRYANT DID AT MATTEL IS

14   CERTAINLY RELEVANT FOR THIS CASE, BUT THIS WAS AIMED AT THE

15   PRODUCTS.  AND THE RESPONSE SEEMS TO HAVE FOCUSED IN ON 'HE                03:10

16   DIDN'T DO THAT BECAUSE IT WASN'T HIP,' AND IT DOES GET INTO

17   THIS OTHER AREA THAT THE COURT IS TRYING KEEP OUT THROUGH THE

18   MOTION *IN LIMINE*, AND THAT'S THE GENERAL DISCUSSION OF WHAT WAS

19   GOING ON AT MATTEL.

20          **MR. NOLAN:**  I DIDN'T ASK THE QUESTION AT THE                   03:10

21   DEPOSITION.  BUT THE OTHER POINT I WAS, FRANKLY, DOING, IS

22   BECAUSE THEY HAVE OPENED UP THIS QUESTION THAT CARTER BRYANT

23   HAD BEEN WORKING ON BRATZ.  THE WITNESS YESTERDAY WAS TALKING

24   ABOUT ALL OF THIS SUPPOSED WORK ON THE SO-CALLED SECRET PROJECT

25   AT MATTEL.                                                                03:10

```
1          THE COURT:  RIGHT.  I THINK IT'S THE THEORY OF THEIR
2    CASE THAT CARTER BRYANT WORKED ON BRATZ WHILE HE WAS AT MATTEL,
3    AND THESE ARE THE DRAWINGS.
4          MR. NOLAN:  BUT THEY WERE TALKING YESTERDAY ABOUT
5    ROTOCAST HEADS AND RESIN SCULPTS, AND THAT'S THE POINT I WAS       03:11
6    TRYING TO MAKE.
7          THE COURT:  BUT THIS TALKS ABOUT THE BRATZ PRODUCT,
8    AND THE WAY THIS IS WORDED, AND GIVEN THE ANSWER, I THINK THAT
9    IT WOULD BE MISREPRESENTATIVE OF WHAT THE WITNESS WAS TRYING TO
10   CONVEY THROUGH THE ANSWER.                                        03:11
11         IT'S A CLOSE CALL.  IT'S JUST A POORLY WORDED
12   QUESTION, AND THAT'S MY REASONING ON THAT.
13         MR. NOLAN:  I APPRECIATE THE CLARIFICATION.
14         THE COURT:  ANYTHING ELSE, MR. ZELLER?
15         MR. ZELLER:  THERE ARE SUBSTANTIVE MATTERS THAT WE          03:11
16   WOULD LIKE TO RAISE WITH YOU.  PERHAPS WE COULD DO IT TOMORROW
17   MORNING.
18         THE COURT:  REGARDING...
19         MR. ZELLER:  NUMBER ONE, WE HAVE STARTED TO GET INTO
20   THIS TERRITORY, WHICH HAS BEEN INTERJECTED NOW BY MGA, IN         03:11
21   PARTICULAR, A NUMBER OF TIMES, CONCERNING LAYOFFS ABOUT MATTEL;
22   TALKING ABOUT WHAT A FAMILY FRIENDLY PLACE MGA HAS BEEN.  IN
23   GENERAL, WE HAVE NOT BEEN ALLOWED TO GO INTO THOSE AREAS; SO I
24   WAS HOPING --
25         THE COURT:  THERE HAS BEEN SOME DISCUSSION OF THAT AS       03:11
```

 1  EARLY AS -- YOUR FIRST COUPLE OF WITNESSES THAT YOU CALLED GOT

 2  INTO HOW GREAT A PLACE MATTEL WAS TO WORK AT; SO BOTH SIDES

 3  HAVE GONE INTO IT TO A LIMITED EXTENT.  NOBODY HAS OPENED THE

 4  DOOR FOR ANYTHING FURTHER.

 5          I'M TRYING TO HOLD THE LINE AS BEST I CAN, COUNSEL.        03:12

 6          **MR. ZELLER:**  THANK YOU.

 7          **THE COURT:**  WHERE ARE YOU GOING?  WHAT ARE YOU ASKING

 8  THE COURT TO DO?

 9          **MR. ZELLER:**  ONE THING IS THAT -- A PARTICULAR

10  CONCERN WAS WHEN PAULA GARCIA WAS ALLOWED TO TESTIFY ABOUT WHAT      03:12

11  A FAMILY FRIENDLY PLACE IT WAS.  SHE WASN'T ALLOWED TO BE

12  CROSS-EXAMINED ON THAT ISSUE.

13          I CAN UNDERSTAND THE COURT, PERHAPS, WANTING TO TAKE

14  A WITNESS BY WITNESS APPROACH TO IT.  BUT EVEN AS TO HER, WE

15  WEREN'T REALLY ALLOWED TO CROSS-EXAMINE HER ON THAT POINT.         03:12

16  THERE ARE WITNESSES WHO WILL BE COMING UP -- AND THIS IS WHY I

17  RAISE IT -- WHERE, YOU KNOW, THEIR TREATMENT AT MGA WILL

18  POTENTIALLY BE AN ISSUE; THAT'S SOMETHING WE THINK MAY BE

19  RELEVANT TO ELICIT DURING THE COURSE OF THEIR TESTIMONY.

20          **THE COURT:**  LILY MARTINEZ TESTIFIED HOW MUCH SHE        03:13

21  ENJOYED WORKING AT MATTEL.  BOTH SIDES -- THE FOUNDATION, THE

22  BACKGROUND, KIND OF GOES INTO THEIR CREDIBILITY, WHERE THEIR

23  ALLEGIANCES LIE; THAT'S WHY I ALLOWED SOME OF THAT IN.

24          WHAT I'M NOT ALLOWING IN IS ON CROSS-EXAMINATION FOR

25  EITHER SIDE TO GET INTO A EFFORT TO TRY TO MAKE HITS AT THE        03:13

```
 1    COMPETITOR.  THAT'S WHERE I'M TRYING TO DRAW THE LINE.  SOME OF

 2    THIS IS RELEVANT, I THINK, JUST IN TERMS OF THE WITNESSES OR

 3    THE JURY BEING ABLE TO EVALUATE THE WITNESS'S CREDIBILITY.

 4              MR. ZELLER:  FAIR ENOUGH.

 5              THE COURT:  BUT BEYOND THAT, WHEN YOU START GETTING      03:13

 6    INTO A SUBSTANTIVE -- I'LL LET YOU FINISH YOUR CONVERSATION

 7    WITH MR. PRICE.

 8              MR. ZELLER:  I APOLOGIZE.  I WAS LISTENING.  I JUST

 9    WAS MAKING SURE THAT -- THE OTHER QUICK ISSUE THAT MR. PRICE

10    WANTED TO ADDRESS IS JEFFREY WEISS.                              03:13

11              MR. PRICE:  MR. WEISS HAS BEEN HERE.  HE IS NOT HAPPY

12    HE DID NOT GET ON THE STAND.  HE'S A THIRD-PARTY WITNESS.

13              I WAS WONDERING IF YOU COULD ORDER HIM TO APPEAR

14    TOMORROW.

15              THE COURT:  YOU'RE CONCERNED HE'S NOT GOING TO APPEAR   03:13

16    TOMORROW?

17              MR. PRICE:  THAT'S THE SUBTEXT.

18              HE'S HERE THROUGH SUBPOENA, AND, AS SOME THIRD

19    PARTIES ARE, THEY ARE NOT HAPPY IF THEY --

20              THE COURT:  VERY WELL.  YOU CAN BRING MR. WEISS IN.     03:14

21              IS HE REPRESENTED?

22              MR. PRICE:  NO, YOUR HONOR.

23              THE COURT:  MR. WEISS, IF YOU WOULD COME FORWARD,

24    PLEASE.

25              MR. WEISS, I UNDERSTAND YOU WERE SUBPOENAED TO BE A     03:14
```

```
 1   WITNESS IN THIS CASE.

 2            MR. WEISS:  I NEVER RECEIVED OF A SUBPOENA, BUT I WAS

 3   TOLD OF ONE.

 4            THE COURT:  AND YOU ARE WITH...

 5            MR. WEISS:  WHAT DO YOU MEAN?                        03:14

 6            THE COURT:  WHAT COMPANY ARE YOU WITH?

 7            MR. WEISS:  I'M A FREELANCE WRITER FOR THE LOS

 8   ANGELES TIMES AND THE LA WEEKLY.

 9            THE COURT:  WAS HE SERVED THE SUBPOENA?

10            MR. ZELLER:  YES.  HE WAS SERVED AT HIS DEPOSITION,  03:14

11   YOUR HONOR.

12            THE COURT:  DID YOU RECEIVE A SUBPOENA AT YOUR

13   DEPOSITION?

14            MR. WEISS:  I DON'T RECALL SO, BUT I ASSUME.  I'LL

15   TAKE THEIR WORD FOR IT.                                      03:15

16            THE COURT:  UNFORTUNATELY, WE WERE NOT ABLE TO GET TO

17   YOU THIS MORNING.  THE COURT IS GOING TO HAVE TO ORDER YOU TO

18   APPEAR TOMORROW MORNING AT 9:30.

19            MR. WEISS:  YOU KNOW, I HAVE DEADLINES, AND AS MUCH

20   AS I'D LOVE TO, I HAVE 48-HOURS TO WRITE SOMETHING, AND I CAN'T  03:15

21   BE WRITING SOMETHING IF I'M SHUFFLING BACK AND FORTH, APPEARING

22   IN COURT.  I HAVE DEADLINES FOR THE LOS ANGELES TIMES.  I'M NOT

23   MAKING SOMETHING UP.  IT'S A VERY BIG ARTICLE.

24            IT TOOK A LOT OF MY TIME TO COME HERE TODAY.  AND I

25   APPRECIATE YOU BEING CIVIL AND TRYING TO HELP EVERYONE OUT    03:15
```

1   HERE, BUT, UNFORTUNATELY, LIFE IMPINGES ON CERTAIN THINGS.  AND

2   YOU HAVE A JOB, I HAVE A JOB.  IF I CAN'T PAY MY RENT, IT'S

3   SERIOUS.  IF I DON'T WRITE STORIES, I CAN'T PAY MY RENT.  IT'S

4   A BIG STORY.

5           **MR. PRICE:**  IF HE COULD AGREE TO COME BACK ON             03:15

6   TUESDAY?

7           **MR. WEISS:**  I HAVE A MEETING ON TUESDAY.

8           I COULD DO WEDNESDAY, MAYBE.

9           **THE COURT:**  I WANT TO HAVE A DATE CERTAIN, COUNSEL.

10          ALSO, I THINK, IN LIGHT OF THE WITNESS'S CONCERNS, WE        03:16

11  NEED TO HAVE A DATE AND A TIME CERTAIN THAT HE'S ACTUALLY GOING

12  TO BE CALLED TO TESTIFY.  LET'S DO THIS AT THE BEGINNING OF A

13  DAY ON A DAY THAT WORKS FOR THIS WITNESS.

14          CAN YOU OFFER SUCH A DATE?

15          **MR. WEISS:**  THANK YOU VERY MUCH.                         03:16

16          **MR. PRICE:**  WOULD NEXT WEDNESDAY AT 9:00 WORK?

17          **MR. WEISS:**  I DON'T HAVE MY CALENDAR IN FRONT OF ME.

18  I DO HAVE LOTS OF APPOINTMENTS AND LOTS OF STORIES TO WRITE.

19  AS I SAID, I DO HAVE TO PAY MY RENT WITH A CONSTANT STREAM OF

20  FREE-LANCE WORK.  I'M NOT GETTING PAID FOR COMING OUT HERE        03:16

21  TODAY.

22          **THE COURT:**  I APPRECIATE THAT.

23          **MR. WEISS:**  OBVIOUSLY, I'D HAVE TO CHECK MY CALENDAR.

24  I KNOW I HAVE A MEETING ON TUESDAY, BUT I DON'T BELIEVE I DO

25  NEXT WEDNESDAY; SO BARRING ANY UNFORESEEN CIRCUMSTANCES, YES, I   03:16

```
 1    SHOULD BE ABLE TO COME OUT NEXT WEDNESDAY.

 2           MR. NOLAN:  MY SUGGESTION WOULD BE, WHY DON'T WE WORK

 3    WITH MR. WEISS TO FIND WHAT WILL WORK BEST.

 4           I PROMISE THAT I'LL.

 5           THE COURT:  WE'RE COMING UP WITH A DATE AND A TIME         03:17

 6    CERTAIN, COUNSEL, FROM YOU.

 7           MR. PRICE:  WEDNESDAY AT 9:00?

 8           THE COURT:  MR. NOLAN?

 9           MR. NOLAN:  FINE, YOUR HONOR.

10           THE COURT:  VERY GOOD.                                   03:17

11           I WILL EXCUSE YOU FOR TODAY AND TOMORROW.  I AM GOING

12    TO ORDER YOU TO APPEAR WEDNESDAY AT 9:00.

13           MR. WEISS:  THAT'S FINE.  I APPRECIATE THAT.

14           THE COURT:  IF THERE IS SOMETHING, LET ME KNOW.

15    DON'T JUST IGNORE THE ORDER, BECAUSE --                         03:17

16           MR. WEISS:  I WON'T.

17           THE COURT:  I'LL SEE YOU WEDNESDAY AT 9:00, SIR.

18           EVERYBODY ELSE, I'LL SEE YOU TOMORROW MORNING AT

19    9:00.  ENJOY THE AFTERNOON.

20           I'LL SEE THE ATTORNEYS AT 8:30; JURORS HERE AT 9:00.    03:17

21           ARE THERE ANY OTHER DEPOSITIONS?  I'VE RULED ON

22    EVERYTHING?  ARE THERE ANY OTHER LODGED DEPOSITIONS WITH

23    OBJECTIONS?

24           MR. COREY:  I BELIEVE THE COURT HAS THE PRINCE

25    TRANSCRIPT AND I BELIEVE THAT'S THE ONLY ONE THE COURT HAS THAT 03:17
```

WEDNESDAY, JUNE 4, 2008                          TRIAL DAY 7

1 | THE COURT HAS NOT RULED ON.

2 |    **THE COURT:**  OKAY.  THANK YOU.

3

4

5

6

7

8

9

10

11 |          CERTIFICATE

12

13 | I hereby certify that pursuant to section 753, title 28, united
states code, the foregoing is a true and correct transcript of
14 | the stenographically recorded proceedings held in the above-
entitled matter and that the transcript page format is in
15 | conformance with the regulations of the judicial conference of
the united states.

16

17 | _____   _____
THERESA A. LANZA, CSR, RPR      Date
18 | FEDERAL Official COURT Reporter

19

20

21

22

23

24

25