1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    MATTEL, INC.,                    )
                                      )
8                    Plaintiff,       )
                                      )
9            vs.                      )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, inc., et. Al., )
                                      )
11                   Defendants.      )   TRIAL DAY 8,
     _____)   MORNING SESSION
12   AND CONSOLIDATED ACTIONS,        )   pages 1391-1514
     _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               Riverside, California

17              Thursday, June 5, 2008

18                  8:39 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24           3470 12th Street, Rm. 134
           Riverside, California  92501
25                951-274-0844
               WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                           QUINN EMANUEL
 4                         By:  JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                                Dylan Proctor
 7                         865 S. FIGUEROA STREET,
                           10TH FLOOR
 8                         LOS ANGELES, California  90017

 9


10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                         BY:  THOMAS J. NOLAN
                                JASON RUSSELL
13                              RAOUL KENNEDY
                                LAUREN AGUIAR
14                              CARL ROTH
                           300 SOUTH GRAND AVENUE
15                         LOS ANGELES, CALIFORNIA  90071-3144
                           213-687-5000
16

17

18

19

20

21

22

23

24

25
```

thursday, june 5, 2008                    trial day 8, morning session

```
1                        I N D E X

2                                              Page

3    Motion hearing.............................    1394

4    Plaintiff case (continued)...................    1418

5


6


7    PLAINTIFF
     WITNESS          DIRECT      CROSS     REDIRECT       RECROSS
8    Lucy Arant

9    BY MR. ZELLER    1418                  1469, 1503, 1510
     BY MR. NOLAN                 1452                      1508
10


11


12
              EXHIBITS           RECEIVED
13
              11937
14            (Paragraphs 3,4,5)   1427
              11897                1442
15            11192                1496
              00557                1460
16            00558                1463
              00559                1465
17            00560                1466
              00561                1468
18            00562                1468
              00563                1468
19            5528                 1498
              5529                 1498
20            18477                1498
              18478                1498
21            18479                1498

22


23


24


25
```

thursday, june 5, 2008            trial day 8, morning session

```
 1        RIVERSIDE, CALIFORNIA; THURSDAY, JUNE 5, 2008; 8:39 A.M.

 2                               -oOo-

 3        THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

 4   MATTEL, INC., V. MGA, INC., ET AL.

 5        MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR   00:03

 6   THE RECORD.

 7        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 8   MATTEL.

 9        MR. NOLAN:  TOM NOLAN, JASON RUSSELL, LAUREN AGUIAR

10   ON BEHALF OF MGA.                                            00:03

11        THE COURT:  GOOD MORNING TO YOU ALL.

12        WE'RE ON CALENDAR THIS MORNING FOR the TRIAL.  THERE

13   WERE A FEW MATTERS FROM MONDAY THAT WE PUT OVER TO THIS

14   MORNING, AND I WANTED TO TAKE THOSE UP AT THIS TIME.

15        COUNSEL, I'LL LEAVE IT UP TO YOU AS TO HOW YOU WISH     00:03

16   TO PROCEED.

17        WHO'S READY TO GO?

18        MS. ANDERSON, NICE TO HAVE YOU BACK.  I'M SURE YOU'RE

19   THRILLED TO BE BACK.

20        MS. ANDERSON:  ALWAYS A PLEASURE.

21        THE COURT:  THIS IS THE MOTION THAT WAS BROUGHT

22   CONCERNING THE COMPUTER, THE HARD DRIVES, FOR MR. BRYANT, AND

23   WE TOOK THIS UP, BUT OBVIOUSLY, YOU HAD NOT RECEIVED ENOUGH

24   NOTICE ABOUT THE HEARING.  THIS WAS ONE OF A SERIES OF MOTIONS

25   THAT THE COURT HAD THOUGHT HAD BEEN RESOLVED BUT I FOUND OUT   00:04
```

1    LAST WEEK HAD NOT BEEN RESOLVED, SO I CONSIDERED THEM, I TOOK

2    THEM BACK FROM JUDGE INFANTE, AND I DECIDED THEM MYSELF.  BUT I

3    WANTED TO HEAR FROM YOU BEFORE WE WENT FURTHER ON THIS MOTION.

4         **MS. ANDERSON:**  THANK YOU, YOUR HONOR.  THIS IS

5    CHRISTA ANDERSON FOR NONPARTY CARTER BRYANT.                    00:04

6         IF I MIGHT MAKE A BRIEF PRELIMINARY STATEMENT BEFORE

7    I begin.

8         **THE COURT:**  PLEASE.

9         **MS. ANDERSON:**  WE'RE HERE, SIMPLY, YOUR HONOR, TO

10   PROVIDE INFORMATION TO THE COURT.  BECAUSE WE'RE NOT A PARTY,   00:04

11   WE DO NOT BELIEVE WE'RE PROPERLY HERE TO BE HEARD ON THIS

12   MOTION.  WE DON'T THINK IT SHOULD BE BEFORE THE COURT.  BUT I

13   WOULD LIKE TO PROVIDE THIS INFORMATION FOR THE COURT.

14        **THE COURT:**  PLEASE.

15        **MR. MILLER:**  Excuse me, YOUR HONOR.                    00:05

16        I'M WILLIAM MILLER, and i represent LITTLER

17   MENDELSON.

18        WITH WHAT LITTLE I KNOW, WHAT SHE JUST SAID

19   APPARENTLY INVOLVES LITTLER MENDELSON AS WELL.

20        **MS. ANDERSON:**  ACTUALLY --                             00:05

21        **THE COURT:**  NO.  I THINK THAT'S ANOTHER MOTION.

22        **MR. MILLER:**  SINCE I FOUND OUT ABOUT THIS AT ALMOST

23   3:00 YESTERDAY AFTERNOON, I HAVE NO CLUE, SO YOU LET ME KNOW

24   WHEN i --

25        **THE COURT:**  I'LL LET YOU KNOW -- YOU'LL HAVE ANOTHER   00:05

thursday, june 5, 2008          trial day 8, morning session

1   ONE, AND WE'LL CERTAINLY WANT TO HEAR FROM YOU BEFORE WE GO ANY

2   FURTHER ON THAT ONE.

3           THIS IS THE CARTER BRYANT MOTION WITH RESPECT TO THE

4   HARD DRIVES.

5           **MS. ANDERSON:**  YES.  THANK YOU, YOUR HONOR.                  00:05

6           NOW, WE'RE PRESENTING THIS INFORMATION WITHOUT

7   WAIVING ANY OBJECTIONS TO JURISDICTION OR OTHER ISSUES.

8           AS THE COURT IS AWARE, MR. BRYANT HAS BEEN DISMISSED

9   WITH PREJUDICE.  THERE IS A SETTLEMENT IN THIS CASE.  THE

10  SETTLEMENT IS CONFIDENTIAL, BUT I UNDERSTAND THE COURT HAS BEEN    00:05

11  PROVIDED WITH A COPY OF IT.

12          **THE COURT:**  YES.  IN-CAMERA.  YOU SHOULD MAKE NO

13  REFERENCE TO THE SUBJECT MATTER.

14          **MS. ANDERSON:**  I WILL NOT.

15          BUT THAT SETTLEMENT ABSOLUTELY BARS PROCEEDING ON          00:06

16  THIS MOTION.

17          ASIDE FROM THE FACT THAT THE MOTION CONCERNS A

18  REQUEST FOR PRODUCTION UNDER RULE 34, WHICH IS A REQUEST THAT

19  CAN ONLY BE MADE TO A PARTY AND REQUESTS SANCTIONS UNDER A RULE

20  THAT ONLY PERMITS SANCTIONS TO A PARTY UNLESS THERE'S CERTAIN     00:06

21  CIRCUMSTANCES PRESENT, WHICH ARE NOT HERE.

22          SO, YOUR HONOR, I AM HAPPY TO ENTERTAIN ARGUMENT IN

23  WHATEVER FORM YOU THINK IS APPROPRIATE, GIVEN THE CONFIDENTIAL

24  NATURE OF THIS SETTLEMENT; BUT IT IS CRITICALLY IMPORTANT TO MY

25  CLIENT THAT THE RIGHTS THAT HE OBTAINED THROUGH SETTLEMENT WITH   00:06

1   MATTEL BE ACKNOWLEDGED AND RESPECTED.  WE HAD REQUESTED THAT

2   MATTEL'S COUNSEL PROVIDE YOU WITH THIS INFORMATION, AND

3   APPARENTLY, THEY DID NOT.  AND THAT'S WHY WE'RE HERE TODAY.

4            AGAIN, I DON'T KNOW WHAT THE COURT WOULD LIKE TO DO

5   IN TERMS OF THE APPROPRIATE PROCEDURE TO be FOLLOWed IN THIS        00:07

6   REGARD.

7            **THE COURT:**  I MAY NEED TO TAKE COUNSEL FOR MATTEL AND

8   YOU IN CHAMBERS AND DO SOMETHING UNDER SEAL, BECAUSE I THINK WE

9   PROBABLY NEED -- I'M LOOKING AT THE SETTLEMENT AGREEMENT NOW.

10  I THINK WE MAY NEED TO DISCUSS THE TERMS OF THE SETTLEMENT           00:07

11  AGREEMENT, AND I THINK IT WOULD BE APPROPRIATE TO DO SO IN

12  CHAMBERS.

13           IS THERE ANYTHING FURTHER, BESIDES THE SETTLEMENT

14  AGREEMENT, OR FROM YOUR PERSPECTIVE, THIS ENDS THE DISCUSSION

15  AT THIS POINT?                                                      00:07

16           **MS. ANDERSON:**  BETWEEN THE FACT THAT HE'S NOT A PARTY

17  AND CAN'T BE SUBJECT TO RULE 34 AND RULE 37 RELIEF REQUESTS,

18  AND THE SETTLEMENT COMBINED, THERE'S NO MOTION THAT CAN BE HAD

19  HERE; NO RELIEF AVAILABLE; IT'S BEEN WAIVED.

20           **THE COURT:**  PERHAPS WE CAN ADDRESS THIS WITHOUT EVEN    00:08

21  GETTING TO THE SETTLEMENT AGREEMENT ITSELF.

22           LET ME HEAR FROM SOMEONE FROM mattel.

23           MR. ZELLER, ARE YOU SPEAKING ON THIS?

24           **MR. ZELLER:**  MR. COREY WILL ADDRESS IT.

25           **THE COURT:**  THIS IS MORE OF A PROCEDURAL ISSUE.  I'M    00:08

thursday, june 5, 2008            trial day 8, morning session

1  NOT SAYING THAT AT THE END OF THE DAY, THERE MAY NOT BE SOME

2  OTHER PROCEDURE IN WHICH TO OBTAIN THE INFORMATION YOU HAVE.

3  BUT BASICALLY, THE POSTURE OF THE PARTIES HAS CHANGED

4  DRAMATICALLY SINCE THE INITIAL DISCOVERY WAS SERVED AND THE

5  INITIAL MOTION WAS BROUGHT, ARGUABLY, FROM CARTER BRYANT'S          00:08

6  PERSPECTIVE, RENDERING THIS MOOT.

7          **MR. COREY:**  AND I UNDERSTAND THE ARGUMENT AND I

8  UNDERSTAND THAT THE POSTURE HAS CHANGED, YOUR HONOR.  BUT THAT

9  REALLY DOESN'T MATTER, BECAUSE WHAT WE'RE TALKING ABOUT HERE IS

10 NOT A RULE 34 REQUEST.  WHAT WE'RE TALKING ABOUT HERE IS           00:08

11 COMPLIANCE WITH A PREVIOUSLY-EXISTING COURT ORDER; SO IT'S NOT

12 A REQUEST.

13         THE QUESTION HERE IS, THESE HARD DRIVES HAVE BEEN

14 COMPELLED.  THERE'S AN ORDER THAT'S IN PLACE BY THE DISCOVERY

15 MASTER; THAT WAS NOT APPEALED, EFFECTIVELY BECOMING AN ORDER OF     00:09

16 THIS COURT.  AND THE FACT THAT THE PARTY DID NOT COMPLY AND HAS

17 NOW BEEN DISMISSED DOESN'T EXCUSE THEIR FAILURE TO COMPLY WITH

18 THE ORDER.

19         THEY ARE IN THE POSSESSION OF INFORMATION THAT

20 JUDGE INFANTE HAS FOUND TO BE RELEVANT, AND WE BELIEVE WE          00:09

21 SHOULD HAVE IT FOR PURPOSES OF THIS PHASE OF THE TRIAL.

22         **THE COURT:**  FROM THEIR PERSPECTIVE -- I MEAN, IT'S

23 SET FORTH IN THEIR OPPOSITION; I UNDERSTAND YOU DISAGREE WITH

24 THIS -- THEY DID COMPLY WITH THE ORDER.

25         **MR. COREY:**  AND I UNDERSTAND THAT THEY HAVE AN          00:09

```
 1   ARGUMENT IN THAT REGARD, AND WE HAVE A RESPONSE TO THAT.
 2          THE COURT:  AND YOU DO.  AND WITHOUT GETTING TO THE
 3   SUBSTANCE, JUST PROCEDURALLY -- I MEAN, ONCE YOU STIPULATED TO
 4   DISMISS THIS PARTY -- IT'S HARD TO IMAGINE HOW YOU CAN CONTINUE
 5   TO LITIGATE WHAT IS ESSENTIALLY A DISCOVERY DISPUTE.            00:09
 6          MR. COREY:  I THINK WHAT WE NEED TO COME BACK TO IS,
 7   DOES THEIR DISMISSAL ABSOLVE THEM OF THEIR RESPONSIBILITY TO
 8   COMPLY WITH THE COURT'S ORDERS?  AND I HAVEN'T FOUND ANY
 9   AUTHORITY THAT SUGGESTS THAT IS, IN FACT, THE LAW.
10          THE COURT:  BUT THINK ABOUT THIS.  PLAY THIS OUT.       00:10
11          I MEAN, ONCE ANY PARTY IS DISMISSED, WOULD YOU
12   SUGGEST THAT THEY HAVE CONTINUING DISCOVERY OBLIGATIONS UNDER
13   OTHER ORDERS THAT HAVE BEEN ISSUED?  IS MATTEL CONTINUING TO
14   SERVE DISCOVERY, AS IT PRODUCES DISCOVERY TO MGA, TO CARTER
15   BRYANT AT THIS POINT?                                          00:10
16          ISN'T IT UNDERSTOOD THAT WHEN YOU REACH A SETTLEMENT
17   AND A DISPOSITION AND A PARTY IS DISMISSED, THAT THOSE
18   DISCOVERY OBLIGATIONS -- and I HAVEN'T RESEARCHED THIS, SO THIS
19   IS NEW TO THE COURT IN TERMS OF -- YOU'RE GETTING LOTS OF NOTES
20   AND LOTS OF SUGGESTIONS from your learned colleagues, SO I'LL   00:10
21   BE INTERESTED TO HEAR WHAT you have TO SAY.
22          MR. COREY:  I'M THE PUPPET TODAY.  THEY'RE PULLING
23   THE STRINGS.
24          THE COURT:  YOU'RE ANYTHING BUT A PUPPET, MR. COREY.
25          MR. COREY:  I UNDERSTAND.                               00:11
```

1      **THE COURT:**  YOU'RE NOT CONTINUING TO PROVIDE

2  DISCOVERY TO CARTER BRYANT, ARE YOU?

3      **MR. COREY:**  NO, I'M NOT.

4      **THE COURT:**  WHY NOT?

5      **MR. COREY:**  THEY HAVEN'T REQUESTED IT, AND AS FAR AS        00:11

6  I'M AWARE, WE HAVE COMPLIED WITH ALL THE COURT ORDERS THAT

7  MATTEL HAS BEEN SUBJECT TO, THAT MR. BRYANT HAS OBTAINED.

8      **THE COURT:**  WELL, IT'S NOT JUST ABOUT COURT ORDERS.

9  I MEAN, IT'S ABOUT THE WHOLE PROCESS OF DISCOVERY.

10      ALL THE COURT ORDER DID WAS CLARIFY THE DISCOVERY        00:11

11  PARAMETERS; CORRECT?

12      **MR. COREY:**  THE COURT ORDER COMPELLED A CERTAIN

13  ACTION THAT THEY HAD TO UNDERTAKE, AND IT COMPELLED AN ACTION

14  LONG BEFORE THEY WERE DISMISSED.

15      MATTEL SHOULD NOT BE PREJUDICED BY THEIR FAILURE TO        00:11

16  COMPLY WITH A COURT ORDER FOR MONTHS.

17      **THE COURT:**  LET'S SAY YOU HAD SETTLED WITH MGA AS

18  WELL.  I UNDERSTAND THAT YOU HAVEN'T, BUT LET'S HYPOTHETICALLY

19  SAY YOU HAD AND THERE WAS NO TRIAL GOING ON RIGHT NOW.

20      WOULD CARTER BRYANT BE OBLIGATED TO PRODUCE THE HARD        00:11

21  DRIVE THAT YOU CLAIM THEY HAVEN'T PRODUCED?

22      **MR. COREY:**  NO.  IN THAT CIRCUMSTANCE, THEY WOULD

23  NOT.

24      **THE COURT:**  HOW IS THIS ANY DIFFERENT?

25      **MR. COREY:**  WELL, NOW WE DO HAVE A TRIAL GOING ON,        00:12

```
1   AND THAT INFORMATION IS RELEVANT TO THE TRIAL, AND WE WOULD

2   LIKE INFORMATION FROM THAT TO PRESENT TO THE JURY.

3           THE COURT:  WOULD THEY NOT HAVE TO PROVIDE IT BY

4   VIRTUE OF THE FACT THAT YOU NO LONGER NEEDED IT OR BY VIRTUE OF

5   THE FACT THAT THE CASE AGAINST THEM HAD BEEN DISMISSED, IN MY     00:12

6   HYPOTHETICAL?

7           MR. COREY:  IN YOUR HYPOTHETICAL, THERE'S NO TRIAL

8   CONTINUING TO GO ON.

9           THE COURT:  SO WOULD THAT BE THE REASON?  WOULD IT BE

10  THE FACT THAT YOU NO LONGER NEEDED THE INFORMATION, OR WOULD IT  00:12

11  BE BY VIRTUE OF THE FACT THAT THE CASE HAD BEEN DISMISSED?

12          MR. COREY:  IT WOULD BE BY VIRTUE OF THE FACT THAT

13  THe CASE HAD BEEN DISMISSED AND ANY OF THE ORDERS WOULD BE

14  MOOT.  BUT WE DON'T HAVE THAT SITUATION HERE.

15          IF THE WAY THE COURT WOULD LIKE --                       00:12

16          THE COURT:  WE DO HAVE THAT SITUATION HERE.

17  CARTER BRYANT HAS BEEN DISMISSED.  THERE IS NO CASE AGAINST

18  CARTER BRYANT ANYMORE.  YOU'VE GOT THIS RELATED BUT, FROM

19  CARTER BRYANT'S PERSPECTIVE, IRRELEVANT CASE AGAINST MGA.

20          MR. COREY:  IT'S NOT IRRELEVANT, YOUR HONOR.            00:12

21          THE COURT:  WELL, FROM CARTER BRYANT'S PERSPECTIVE --

22  CARTER BRYANT, AT THIS POINT, PROBABLY -- I MEAN, CERTAINLY, HE

23  CARES BECAUSE HE HAS TO SHOW UP AS A WITNESS IN THIS CASE, BUT

24  BEYOND THAT, AS FAR AS HE'S CONCERNED, THE CASE IS OVER; RIGHT?

25          MR. COREY:  I ACTUALLY CAN'T RESPOND TO THAT HERE,      00:13
```

```
 1   YOUR HONOR.

 2              THE COURT:  YOU CAN'T?

 3         MR. COREY:  I CANNOT.  BUT I WOULD LIKE THE

 4   opportunity TO ADDRESS THAT.

 5              THE COURT:  PLEASE.

 6         MR. COREY:  BUT I CANNOT IN THIS CONTEXT.

 7              DOES THE COURT UNDERSTAND?

 8              I CANNOT ANSWER THAT IN OPEN COURT.

 9              THE COURT:  FAIR ENOUGH.

10              SO IT LOOKS LIKE WE'RE GOING TO HAVE TO HAVE A

11   HEARING UNDER SEAL.

12              MR. COREY:  IF THE COURT WOULD LIKE US TO PROCEED

13   WITH AN EX-PARTE APPLICATION, TO SERVE THEM AS A THIRD PARTY TO

14   OBTAIN THIS INFORMATION...  I'M VERY RELUCTANT TO DO THAT.

15              THE COURT:  I'M NOT ASKING YOU TO DO ANYTHING.  I'M

16   ONLY GOING TO RESOLVE THE MOTION BEFORE ME.  I'M NOT GOING TO

17   RESOLVE EX-PARTES THAT HAVEN'T BEEN FILED YET.  I DON'T NEED TO

18   ADVISE YOU IN TERMS OF WHAT OTHER RECOURSES YOU MIGHT HAVE TO

19   OBTAIN THE SAME INFORMATION.  THAT'S A SEPARATE ISSUE.

20              MR. COREY:  I UNDERSTAND.

21              THE COURT:  I HAVE A PARTICULAR MOTION BEFORE ME THAT

22   I WANT TO RESOLVE, THAT SHOULD HAVE BEEN RESOLVED A FEW WEEKS

23   AGO, BUT IT WASN'T.

24              BE THAT AS IT MAY, I WANT THIS MOTION RESOLVED.

25              WHAT OTHER RECOURSES YOU MIGHT TAKE TO GET THE
```

00:13
00:13
00:13
00:14
00:14

1    INFORMATION, THAT'S NOT BEFORE THE COURT RIGHT NOW.

2         **MR. COREY:**  I WOULD PREFER NOT TO DO THAT.  I DON'T

3    THINK THAT'S THE APPROPRIATE COURSE.  I DO THINK THAT THE COURT

4    CAN RESOLVE THE MOTION, AND I THINK IT SHOULD BE BY THEM

5    COMPLYING WITH THE ORDER.                                    00:14

6         **THE COURT:**  LET ME ASK YOU THIS; AND I'LL ASK BOTH

7    COUNSEL THIS:  I CERTAINLY UNDERSTAND THE ARGUMENT.  PER

8    CHANCE, is there ANY AUTHORITY WHICH MIGHT ADDRESS A SITUATION

9    LIKE THIS?

10        **MS. ANDERSON:**  FUNNY YOU SHOULD ASK, YOUR HONOR.     00:14

11   I DO HAVE A CASE, AND I DID NOT INCLUDE IT IN MY LETTER BRIEF

12   BECAUSE BY POINTING YOUR HONOR TO THIS AUTHORITY, BY ANALOGY, I

13   DIDN'T WANT OTHER FOLKS TO ARGUE THAT I HAD INADVERTENTLY

14   REVEALED THE NATURE OF OUR SETTLEMENT.

15        **THE COURT:**  JUST HELP THE COURT OUT AND GIVE ME THE   00:14

16   CITE, COUNSEL.

17        **MS. ANDERSON:**  I HAVE A CASE FOR YOU, TOO.

18        **THE COURT:**  IF YOU WOULD.

19        **MS. ANDERSON:**  THE CASE CITE IS 649 F.2D 646, AND

20   IT'S ENTITLED DART INDUSTRIES; AND IT'S A NINTH CIRCUIT CASE.  00:15

21        **THE COURT:**  IF YOU WOULD PROVIDE THAT TO THE COURT,

22   AS AN OFFICER OF THE COURT AND NOT IN ANY OTHER FUNCTION, I

23   WOULD APPRECIATE THAT, COUNSEL.

24        AND, OF COURSE, COUNSEL, IF YOU WOULD GIVE A COPY TO

25   COUNSEL AS WELL.                                             00:15

1        AND I INVITE MATTEL TO DO THE SAME THING.

2        **MS. ANDERSON:**  YES.

3        **THE COURT:**  I'M NOT ASKING FOR BRIEFING AT THIS

4   POINT, BUT IF THERE is ANY AUTHORITy THAT...

5        **MS. ANDERSON:**  The DISCUSSION STARTS ON PAGE 490.          00:15

6        **THE COURT:**  WHY DON'T WE DO THIS:  I DON'T WANT TO

7   TAKE TOO MUCH MORE TIME HERE, BECAUSE I DO WANT TO START THE

8   TRIAL AT 9:00.  BUT, COUNSEL, I wOULD ASK YOU, PERHAPS DURING

9   THE BREAK, IF WE COULD HAVE OUR SESSION IN CHAMBERS AND

10  CONTINUE THIS.  WE'LL BE BREAKING IN ABOUT AN HOUR AND          00:15

11  15 MINUTES OR 20 MINUTES, AROUND 10:20 OR SO.  IF I COULD ASK

12  YOU TO STAY AROUND UNTIL THEN.  AND THEN WE'LL GO FROM THE

13  COURT INTO CHAMBERS AND CONTINUE THIS CONVERSATION.

14        AND IN THE MEANTIME, I SUGGEST, MR. COREY, IF YOU

15  COULD LOOK AT THIS CASE, AND IF THERE'S ANYTHING ELSE THAT YOU  00:16

16  WANT TO PRESENT TO THE COURT, JUST BY WAY OF AUTHORITY, AND

17  THEN WE CAN RESOLVE THIS.

18        **MR. COREY:**  OF COURSE, YOUR HONOR.

19        **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

20        **THE COURT:**  LET'S TAKE UP THE LITTLER MENDELSON        00:16

21  MATTER.

22        **MR. MILLER:**  WILLIAM MILLER, for LITTLER MENDELSON.

23        **THE COURT:**  THERE IS A MOTION TO COMPEL A DEPOSITION,

24  ESSENTIALLY, OF YOUR FIRM, OF THE PERSON MOST KNOWLEDGEABLE.

25        ARE YOU FAMILIAR WITH THAT MOTION?                          00:16

1    **MR. MILLER:**  NO.

2       **THE COURT:**  HAVE YOU HAD A CHANCE TO REVIEW THAT?

3       **MR. MILLER:**  I'VE BEEN GIVEN A TRANSCRIPT OF THE

4    PROCEEDING ON MONDAY, IN WHICH A REPRESENTATION WAS MADE THAT

5    LITTLER MENDELSON WAS REPRESENTED, WHICH IT WAS NOT.                    00:17

6          WITH RESPECT TO THAT MOTION, WHAT LITTLER THINKS IT

7    WAS BASED ON WAS A DECEMBER MOTION THAT WAS MADE, APPARENTLY,

8    TO BE HEARD BY JUDGE INFANTE.

9       **THE COURT:**  YES.

10      **MR. MILLER:**  AND THEY GAVE ME THAT.  BUT THAT DOESN'T    00:17

11   SEEM TO BE THE MOTION THAT'S BEFORE THE COURT, BECAUSE, READING

12   IT, IT SEEMS, ON ITS FACE, THAT THE ISSUE WAS WHAT THE STATE OF

13   THE COMPUTER INFORMATION WAS AT A PARTICULAR DATE, WHEN, IN

14   EFFECT, A SNAPSHOT WAS TAKEN OF THAT.  BUT ALL OF THE QUESTIONS

15   ARE WHAT HAPPENED AFTER THAT, WHICH DOESN'T MAKE ANY SENSE.  SO    00:17

16   I DON'T THINK THAT'S THE MOTION.

17         SO THERE MUST BE ANOTHER MOTION THAT IS BEFORE THE

18   COURT THAT I DON'T HAVE.

19      **THE COURT:**  LET ME ASK COUNSEL.

20      WHO'S REPRESENTING --                                              00:18

21      **MR. PROCTOR:**  I BELIEVE IT'S THE SAME MOTION,

22   YOUR HONOR.

23      **THE COURT:**  IT'S THROUGH THIS MOTION THAT PART OF THE

24   RELIEF THAT YOU'RE SEEKING IS AN ORDER FROM THE COURT TO

25   BASICALLY PROVIDE A 30(B) DEPOSITION, OR A                          00:18

1   PERSON-MOST-KNOWLEDGEABLE DEPOSITION, FROM LITTLER MENDELSON

2   TO, IN FACT, PROVIDE ANY FACTUAL INFORMATION, NONPRIVILEGED

3   FACTUAL INFORMATION, CONCERNING ANY INFORMATION THAT LITTLER

4   MENDELSON MIGHT HAVE ABOUT THE STATUS OF SAID COMPUTER.

5        **MR. PROCTOR:**  CORRECT.                                    00:18

6        **THE COURT:**  THAT IS WHAT MATTEL IS SEEKING FROM THE

7   COURT.  IT WAS BEFORE JUDGE INFANTE.  JUDGE INFANTE DID NOT GET

8   AROUND TO DECIDING THIS, SO THAT'S WHY I TOOK THE MOTION BACK.

9        I DO NOT WANT TO PROCEED UNTIL YOU'VE HAD A CHANCE TO

10  BASICALLY REVIEW THE MOTION AND OPPOSE IT, BECAUSE IT AFFECTS   00:18

11  YOUR RIGHTS MUCH MORE SO THAN PROBABLY ANYBODY ELSE'S RIGHTS.

12       **MR. MILLER:**  WHAT THE COURT HAS JUST STATED IS ALSO

13  DIFFERENT THAN WHAT I'VE BEEN TOLD, WHICH WAS THAT

14  JUDGE INFANTE HAD RULED ON IT AND DENIED IT.

15       **THE COURT:**  NO, NO, NO.  THAT HAS NOT BEEN RULED ON.    00:19

16       **MR. MILLER:**  OKAY.  THEN, AGAIN, I DON'T KNOW.

17       **THE COURT:**  I PUT IT OFF PRECISELY BECAUSE I ASSUMED

18  THAT SOMEONE FROM LITTLER MENDELSON MIGHT HAVE SOMETHING TO SAY

19  ABOUT THIS.

20       **MR. MILLER:**  WELL, WE'LL RESPOND IN DUE COURSE.  But    00:19

21  WE NEED TO, ONE, KNOW WHAT THE MOTION IS.  I THINK IT'S THIS.

22  I'VE BEEN TOLD IT'S THIS.  BUT I'D LIKE TO HAVE IT FROM THE

23  PEOPLE WHO MADE THE MOTION.  AND THEN WE'LL RESPOND.

24       **THE COURT:**  OKAY.

25       TIME IS SOMEWHAT OF THE ESSENCE, BECAUSE WE'RE             00:19

thursday, june 5, 2008          trial day 8, morning session

1    RESOLVING A DISCOVERY DISPUTE IN THE MIDST OF TRIAL; SO WE NEED

2    TO MOVE EXPEDITIOUSLY ON THIS.  I WILL CONTINUE THIS MATTER FOR

3    A FEW DAYS TO GIVE YOU A CHANCE TO GET A HANDLE ON IT, BUT I'M

4    NOT GOING TO BE ABLE TO GIVE YOU THE NORMAL TIME THAT YOU WOULD

5    BE AFFORDED TO RESPOND TO A MOTION.                          00:19

6            **MR. MILLER:**  UNDERSTOOD, YOUR HONOR.

7            **THE COURT:**  I WANT TO MAKE SURE THAT YOU HAVE

8    EVERYTHING THAT YOU NEED.

9            **MR. MILLER:**  RATHER THAN TRYING TO GUESS AT IT, IT

10   WOULD BE HELPFUL.                                           00:20

11           **THE COURT:**  FAIR ENOUGH.

12           LET ME HAVE MR. PROCTOR STATE ON THE RECORD EXACTLY

13   EVERYTHING THAT THE COURT HAS, BASICALLY, THAT HAS BEEN

14   SUBMITTED TO THE COURT, AND THAT MATTEL BELIEVES IS RELEVANT TO

15   THIS MOTION.                                                00:20

16           **MR. PROCTOR:**  IF I MAY, YOUR HONOR.

17           THIS IS THE FIRST THAT MATTEL HAS BEEN INFORMED THAT

18   THE KEKER FIRM IS NOT REPRESENTING LITTLER MENDELSON IN

19   CONNECTION WITH THIS.

20           **THE COURT:**  THAT'S FINE.  I ACCEPT THAT.  AND I   00:20

21   UNDERSTAND THAT COUNSEL JUST INDICATED THAT IT WAS A

22   MISREPRESENTATION.  BUT I UNDERSTAND THAT THERE MAY BE

23   CONFUSION ON THIS.  THAT'S WHY WE'RE HAVING A HEARING THIS

24   MORNING.

25           **MR. PROCTOR:**  SURE.                              00:20

1    AND TO ELABORATE ON WHAT THE COURT JUST SAID, THE

2  HEARING ON "EVIDENCE ELIMINATOR" IS SCHEDULED FOR NEXT MONDAY.

3  MR. BRYANT IS EXPECTED TO TESTIFY EARLY NEXT WEEK.  THE

4  DEPOSITION OF LITTLER MENDELSON, IF IT IS TO GO FORWARD, WE

5  WOULD SUBMIT, NEEDS TO GO FORWARD BEFORE THEN; SO TIME TRULY IS          00:20

6  OF THE ESSENCE ON THIS.

7    THIS IS A MOTION THAT WE FILED SIX MONTHS AGO AT THIS

8  STAGE, AND THE KEKER FIRM REPRESENTED LITTLER THROUGHOUT THE

9  BRIEFING ON IT.

10    THE MOTION WAS FILED ON DECEMBER 13, 2007.  IT'S          00:21

11  CALLED "MATTEL, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL

12  DEPOSITION OF LITTLER MENDELSON, PC, PURSUANT TO SUBPOENA."

13  THERE IS AN OPPOSITION FROM MR. BRYANT, DATED DECEMBER 19TH.

14  THERE IS A REPLY OF MATTEL, DATED DECEMBER 24TH.  THERE IS A

15  LETTER THAT MATTEL SENT TO JUDGE INFANTE, SEEKING A RULING ON          00:21

16  THE MATTER, DATED MAY 7TH, WHICH HAS ATTACHMENTS WHICH

17  INCLUDES -- AND I MAY BE ABLE TO CLARIFY THIS.

18    JUDGE INFANTE DID HEAR THIS MOTION PRELIMINARILY.  HE

19  QUASHED THE SUBPOENA THAT WE SERVED AS TO THE DRAWINGS, AS TO

20  THE INK TESTING ON THE DRAWINGS; SO HE QUASHED THAT; THAT HAS          00:22

21  BEEN RESOLVED, THAT ASPECT OF THE MOTION.  AS TO THE HARD

22  DRIVES, IT HAS NOT.  HE SUGGESTED HE WANTED TO HEAR WHAT

23  HAPPENED AT THE CARTER BRYANT DEPOSITION.

24    THERE'S A RESPONSE FROM THE KEKER FIRM, REPRESENTING

25  LITTLER, DATED MAY 8TH.  AND THEN THERE ARE A SERIES OF --          00:22

1        **THE COURT:**  I WANT TO TAKE A LOOK AT THAT LATER.

2        THAT IS EXHIBIT WHAT?

3        **MR. PROCTOR:**  I BELIEVE IT'S EXHIBIT 4 IN YOUR

4    BINDER, ALTHOUGH I DON'T THINK I HAVE AN EXACT DUPLICATE OF THE

5    BINDER THAT WENT TO THE COURT IN FRONT OF ME.                          00:22

6        **THE COURT:**  VERY WELL.

7        CONTINUE, COUNSEL.

8        **MR. PROCTOR:**  THERE IS A DECLARATION OF

9    MICHAEL ZELLER IN SUPPORT OF THE MOTION, DATED DECEMBER 13,

10   2007.  THERE'S A DECLARATION OF JOHN TRINIDAD OF THE KEKER FIRM   00:22

11   IN OPPOSITION TO THE MOTION, DATED DECEMBER 19, 2007.  THERE'S

12   A DECLARATION OF HEIDI FROMM OF MATTEL IN SUPPORT OF THE

13   MOTION, DATED DECEMBER 24, 2007.

14       TO THE BEST OF MY KNOWLEDGE, THAT IS THE RECORD.

15       **THE COURT:**  VERY WELL.                                   00:23

16       WHAT I'M GOING TO ASK YOU TO DO IS MAKE SURE THAT

17   COUNSEL, THIS MORNING, HAS A COPY, IS PROVIDED A COPY OF THESE

18   dOCUMENTS, SO THAT HE CAN LEAVE THIS COURTHOUSE ARMED WITH

19   EVERYTHING THAT IS RELEVANT TO THIS MOTION.

20       COUNSEL, I KNOW IT'S VERY SHORT NOTICE, BUT I'M GOING   00:23

21   TO HAVE TO GET A RESPONSE BACK FROM YOUR FIRM BY THE CLOSE OF

22   BUSINESS TOMORROW.  THAT PROVIDES YOU TWO DAYS TO REVIEW THIS.

23   BUT WE DO HAVE A HEARING SET FOR MONDAY, AND THAT'S WHEN -- NOT

24   FOR MONDAY.

25       **MR. PROCTOR:**  IT IS FOR MONDAY.                      00:23

thursday, june 5, 2008          trial day 8, morning session

1          **THE COURT:**  WHAT TIME ON MONDAY?

2          **MR. PROCTOR:**  1:30.

3          AS THE COURT KNOWS, IF IT'S ORDERED, WE NEED SOME

4     LEAD TIME ON THE DEPOSITION ITSELF.

5          **THE COURT:**  WHEN IS CARTER BRYANT BEING CALLED AT          00:23

6     THIS POINT, MR. QUINN?

7          **MR. PROCTOR:**  EARLY NEXT WEEK.

8          **MR. QUINN:**  THE WAY THINGS ARE GOING, I WOULD BE

9     SURPRISED IF IT WERE BEFORE -- it should be TOWARDS THE END OF

10    NEXT WEEK.                                                       00:24

11         **THE COURT:**  MAYBE WE CAN MOVE THIS MONDAY HEARING,

12    JUST TO GIVE COUNSEL A LITTLE BIT MORE TIME, AND ALSO TIME, IF

13    THERE'S GOING TO BE A DEPOSITION, TO HAVE A DEPOSITION.

14         **MR. PROCTOR:**  ONE CONCERN, IF I MAY, WITH THAT IS,

15    THERE HAS BEEN -- AND THIS IS WITH OUR OWN EXPERT -- THERE HAS   00:24

16    BEEN SCHEDULING PROBLEMS, BECAUSE HE'S IN TRIAL IN ANOTHER CASE

17    NEXT WEEK; SO GETTING HIM LINED UP FOR MONDAY IS SOMETHING THAT

18    TOOK SOME WORK.  I'M HAPPY TO LOOK INTO WHATEVER ELSE YOU WANT,

19    BUT IF WE MOVE IT LATER IN THE WEEK, AS THE COURT SUGGESTED,

20    THERE'S GOING TO BE LIVE TESTIMONY FROM AT LEAST THREE          00:24

21    WITNESSES, AND IT'S GOING TO TAKE SOME TIME.  AND THE COURT'S

22    CONCERN WAS TAKING AWAY JURY TIME, WHICH I THINK IS A VALID

23    CONCERN.  IT'S NOT GOING TO BE A 15-MINUTE HEARING.

24         **THE COURT:**  BUT JUST SAYING THAT, IT SEEMS -- HAVING

25    A LAW FIRM SUBMIT TO A DEPOSITION IS A SERIOUS MATTER, AND JUST  00:25

1    GIVING TO THE CLOSE OF BUSINESS TOMORROW, THAT JUST DOESN'T

2    SEEM LIKE A REASONABLE AMOUNT OF TIME FOR ANY LAW FIRM.  I

3    THINK I NEED TO GIVE AT LEAST THE WEEKEND TO LITTLER MENDELSON

4    TO ADDRESS THIS.  IT JUST SEEMS THAT THAT'S REASONABLE.

5            **MR. PROCTOR:**  ONE SUGGESTION I CAN MAKE:  WE COULD          00:25

6    PROCEED WITH THE EVIDENTIARY HEARING WITHOUT THE BENEFIT OF THE

7    DEPOSITION.  THAT WAY, THE HEARING CAN GO FORWARD ON MONDAY;

8    THE PARTIES WILL KNOW WHAT'S GOING TO BE IN PLAY, WHAT'S NOT

9    GOING TO BE IN PLAY, WHICH IS IMPORTANT FOR SCHEDULING.  WE

10   NEED TO SCHEDULE THE EXPERT TESTIMONY IN FRONT OF THE JURY, IF     00:25

11   THE EXPERT TESTIMONY IS GOING TO BE COMING IN.

12           TO THE EXTENT WE CAN GET A RULING AS EARLY AS

13   POSSIBLE, MONDAY, AND TO THE EXTENT THE COURT CAN GIVE SOME

14   GUIDANCE TODAY AS TO HOW EXPEDITIOUSLY IT WILL EXPECT THE

15   DEPOSITION TO OCCUR, SO THAT WE CAN HAVE THE RESULTS OF THE        00:26

16   DEPOSITION BEFORE THE ACTUAL EXPERT TESTIMONY, AND POTENTIALLY,

17   BEFORE MR. BRYANT'S TESTIMONY, THAT MIGHT BE ONE WAY TO

18   PROCEED.

19           **THE COURT:**  VERY WELL.

20           WHAT I'M GOING TO DO, COUNSEL, I'M GOING TO GIVE YOU        00:26

21   TO THE CLOSE OF BUSINESS ON MONDAY TO RESPOND.  THEN I'M GOING

22   TO ASK YOU TO APPEAR FOR A HEARING ON -- THIS IS JUST ON THE

23   POTENTIAL DEPOSITION FOR LITTLER MENDELSON -- ON TUESDAY

24   MORNING AT 8:00.  I'M SORRY TO BRING YOU IN SO EARLY IN THE

25   MORNING, BUT WE'VE JUST GOT TO DO IT.                              00:26

1        **MR. MILLER:**  IT'S NOT A PROBLEM.

2        **THE COURT:**  YOU'LL HAVE THE BENEFIT OF THE DOCUMENTS

3   TODAY.  YOU'LL HAVE TODAY, TOMORROW, SATURDAY, SUNDAY, and

4   MONDAY TO GET A RESPONSE IN.  I THINK THAT PROVIDES SUFFICIENT,

5   ALTHOUGH EXPEDITED, OPPORTUNITY TO RESPOND.  AND THEN WE'LL          00:26

6   TAKE UP THAT ISSUE MONDAY MORNING.

7        LET ME THINK SOME MORE ABOUT THE HEARING ON monday

8   AND WHETHER OR NOT THAT CAN PROCEED WITHOUT THIS.  BUT WE'LL GO

9   FROM THERE.  BUT WE'LL HAVE THAT ON MONDAY MORNING -- I MEAN ON

10  TUESDAY MORNING, WITH A FILING BY THE END OF THE DAY.  AND ALL      00:27

11  I'M GOING TO ASK IS THAT BY THE CLOSE OF BUSINESS ON MONDAY

12  THAT YOU FAX TO CHAMBERS -- AND YOU CAN GET THE FAX NUMBER FROM

13  MR. HOLMES -- WHATEVER YOUR RESPONSE IS.

14       **MR. MILLER:**  TWO MATTERS.  ONE IS THAT MR. JACOBY,

15  WHO IS ONE OF THE PEOPLE REQUESTED FOR DEPOSITION, HAS PAID FOR     00:27

16  A VACATION NEXT WEEK, STARTING ON TUESDAY.  AND SO THAT'S GOING

17  TO BE AN ISSUE.

18       MR. WICKHAM WOULD BE AVAILABLE NEXT WEEK, BUT

19  MR. JACOBY WILL NOT BE AFTER TUESDAY.

20       **THE COURT:**  WELL, WHAT I BELIEVE MATTEL IS LOOKING         00:27

21  FOR IS A DEPOSITION FROM A PERSON MOST KNOWLEDGEABLE.  AND IT

22  SOUNDS LIKE, IF SOMEONE IS NOT GOING TO BE AVAILABLE, THAT

23  KNOWLEDGE CAN BE IMPARTED LAWYER TO LAWYER TO SOMEBODY ELSE IN

24  THE FIRM.

25       SO WHAT I WOULD ORDER, AS OF THIS MORNING, JUST IN            00:27

```
 1   LIGHT OF WHAT I KNOW SO FAR, IS THAT IF ANYONE IS NOT GOING TO
 2   BE AVAILABLE, THAT THEY MAKE SURE THAT THE PERSON MOST
 3   KNOWLEDGEABLE AT THE LAW FIRM HAS WHATEVER INFORMATION THAT IS
 4   RELEVANT.  AND YOU'RE GOING TO SEE THROUGH THESE PAPERS THE
 5   CLEAR SUBJECT MATTER THAT'S AT ISSUE HERE.  IT'S RATHER         00:28
 6   LIMITED.  BUT THAT INFORMATION NEEDS TO BE IMPARTED TO SOMEBODY
 7   WHO CAN COMPETENTLY TESTIFY.  BECAUSE I DON'T WANT TO BE IN THE
 8   POSITION IN THE MIDDLE OF NEXT WEEK HAVING SOMEONE SAY, 'WELL,
 9   THE ONLY PERSON THAT KNOWS IT IS OFF ON VACATION,' AND then
10   HAVE TO BRING THAT PERSON BACK.                                 00:28
11        MR. MILLER:  I UNDERSTAND A PMK DEPOSITION UNDER RULE
12   30 IS A CORPORATE DEPOSITION; SO PERSONAL KNOWLEDGE IS NOT THE
13   ISSUE.
14        THE COURT:  YOU NEED TO MAKE SURE THAT THERE'S
15   SOMEBODY AVAILABLE, IF THE COURT ORDERS IT ON TUESDAY MORNING,  00:28
16   TO SPEAK COMPETENTLY ON THIS SUBJECT MATTER FOR THE FIRM.
17   WHOEVER THAT IS IS UP TO YOU.
18        MR. MILLER:  UNDERSTOOD.
19        THE COURT:  ANYTHING FURTHER?
20        MR. MILLER:  I'M SURE THE CONFUSION IS THAT THE KEKER      00:28
21   FIRM REPRESENTED MR. BRYANT AND THE ISSUE RELATED TO
22   MR. BRYANT'S FORMER COUNSEL IN DISCOVERY THAT THEY ENGAGED IN
23   AND THE CONDUCT THEY ENGAGED IN.  SO I PRESUME THAT THE
24   CONFUSION CAME FROM THE FACT THAT THE KEKER FIRM OPPOSED THE
25   MOTION ORIGINALLY ON BEHALF OF THEIR CLIENT, WHO WAS IN THE     00:29
```

```
 1   CASE, ABOUT THEIR FORMER ATTORNEYS.

 2           HOWEVER, AT THE PRESENT TIME, MR. BRYANT IS NOT IN

 3   THE CASE, AND THIS is RELATED TO THE COMPELLING TESTIMONY FROM

 4   A THIRD PARTY, AND THEY WERE NOT REPRESENTED BEFORE THIS COURT

 5   BEFORE I SHOWED UP TODAY.                                          00:29

 6       THE COURT:  I APPRECIATE THAT.  AND I DON'T KNOW IF

 7   IT'S NECESSARY FOR THE COURT TO GET TO THE BOTTOM OF WHY MATTEL

 8   IS UNDER THE BELIEF THAT THE KEKER FIRM WAS OR WAS NOT

 9   REPRESENTING.  I'D RATHER NOT OPEN THAT CAN of WORMS IF I DON'T

10   HAVE TO.  BUT SUFFICE IT TO SAY, I WANT TO HAVE A RESPONSE TO     00:29

11   THIS FROM YOUR FIRM, AND WE WILL PROCEED ON TUESDAY MORNING.

12           MS. ANDERSON?

13       MS. ANDERSON:  TWO VERY BRIEF STATEMENTS.

14           LESS MY SILENCE BE TAKEN AS A CONCESSION, THE KEKER

15   VAN NEST FIRM DID NOT REPRESENT LITTLER WITH REGARD TO THESE      00:30

16   MATTERS.  WE FILED OBJECTIONS AND MOTIONS ON BEHALF OF

17   CARTER BRYANT WHERE HIS INTERESTS WERE IMPLICATED.

18           SECOND OF ALL, IN TERMS OF THE TIMING OF THE

19   SCHEDULING, I HAD UNDERSTOOD THE COURT had WANTED A HEARING ON

20   MONDAY WITH RESPECT TO WHICH MR. BRYANT MAY BE TESTIFYING,        00:30

21   DEPENDING ON WHAT THE COURT REQUESTS.  AND I UNDERSTOOD THAT

22   MATTEL WOULD BE CALLING MR. BRYANT AS A WITNESS ON TUESDAY, OR

23   SOMETIME SHORTLY THEREAFTER.

24       THE COURT:  WE'RE NOW HEARING IT'S GOING TO BE LATER

25   IN THE WEEK.                                                      00:30
```

1    **MS. ANDERSON:**  I'M NOW HEARING IT'S LATER IN THE

2  WEEK.

3        **THE COURT:**  MR. BRYANT SHOULD MAKE HIMSELF AVAILABLE

4  ON STANDBY THROUGHOUT THIS TRIAL.

5        **MS. ANDERSON:**  AND WE HAVE BEEN, YOUR HONOR.  AND          00:30

6  WHAT WE HAD AGREED -- WHICH IS PART OF THE PUBLIC RECORD, SO I

7  CAN SAY IT -- is TO APPEAR, IN PHASE 1-A, AS A WITNESS.

8        HOWEVER, I WOULD REQUEST THAT TO THE EXTENT THIS IS

9  TAKEN INTO ACCOUNT IN SCHEDULING OF HEARINGS -- AND IF

10  ADDITIONAL TIME IS NEEDED TO ACCOMMODATE THE LITTLER MENDELSON    00:31

11  LAWYERS -- PUSHING THE HEARING BACK TO ENABLE MR. BRYANT NOT TO

12  HAVE TO TRAVEL BACK AND FORTH FROM MISSOURI MANY, MANY TIMES IN

13  A ROW WOULD BE GREATLY APPRECIATED.  AND I DON'T KNOW WHAT THE

14  COURT HAS IN MIND FOR SCHEDULING, BUT THAT WOULD BE

15  APPRECIATED.                                                      00:31

16        **THE COURT:**  WE'VE GOT A LOT OF CALENDARS WITH A LOT

17  OF VERY IMPORTANT PEOPLE, AND I CONSIDER EVERYONE INVOLVED IN

18  THIS CASE IMPORTANT ON AN EQUAL LEVEL.  I DO UNDERSTAND THAT

19  THERE are INCONVENIENCES.

20        **MS. ANDERSON:**  I JUST WANTED TO RAISE THAT TO THE        00:31

21  COURT'S ATTENTION THAT HE'S TRAVELING QUITE A DISTANCE.

22        **THE COURT:**  I'M MINDFUL OF THAT, AND I'M SURE MATTEL

23  IS MINDFUL OF THAT.

24        **MS. ANDERSON:**  THANK YOU, YOUR HONOR.

25        **MR. ZELLER:**  IF I MAY JUST, FOR THE RECORD, YOUR        00:31

1    HONOR.

2         I DON'T BELIEVE THAT THE COURT REALLY NEEDS TO

3    RESOLVE THE WHOLE REPRESENTATION ISSUE.

4         WE DON'T HAVE AN OBJECTION, THEORETICALLY, AS LONG AS

5    IT DOES NOT CREATE TOO MUCH DELAY IN HAVING LITTLER MENDELSON          00:31

6    FILE A SEPARATE RESPONSE.  BUT FOR THE RECORD, I COMMUNICATED

7    WITH KEITH JACOBY OF LITTLER MENDELSON IN WRITING BY E-MAIL, IN

8    WHICH I ACTUALLY INVITED HIM AT THE OUTSET, AS TO WHETHER OR

9    NOT HE WANTED LITTLER TO BE DIRECTLY INVOLVED.  HE TOLD ME --

10   AND THIS IS IN WRITING -- THAT HE WANTED THE KEKER FIRM TO           00:32

11   HANDLE IT.

12        AND BY THE WAY, THE KEKER FIRM IS THE ONE THAT DID

13   FILE, I BELIEVE, OBJECTIONS, OR THE MOTION TO QUASH.  I MEAN,

14   THEIR NAME IS ON IT AS REPRESENTING LITTLER MENDELSON; SO I

15   JUST WANT THE RECORD TO BE CLEAR ON THAT POINT.                       00:32

16        IN TERMS OF THE TIMING OF MR. BRYANT'S TESTIMONY, WE

17   WILL, OF COURSE, SURELY TALK WITH MR. BRYANT'S COUNSEL AND MAKE

18   ARRANGEMENTS AS BEST AS WE CAN.  OBVIOUSLY, THERE'S ONLY SO

19   MUCH CONTROL WE HAVE OVER THE SCHEDULE, AS THE COURT IS AWARE.

20   BUT IT'S NOT OUR PURPOSE TO INCONVENIENCE ANYONE OR HAVE THEM         00:32

21   WAITING AROUND ENDLESSLY.  AND I'M SURE, IN THE NEXT DAY OR SO,

22   WE'LL HAVE A CLEARER IDEA OF EXACTLY WHEN NEXT WEEK IT IS MORE

23   LIKELY THAT MR. BRYANT WILL BE APPEARING, WHETHER IT'S LATER IN

24   THE WEEK, WHETHER IT'S WEDNESDAY, WHATEVER THE CASE MAY BE.

25        **THE COURT:**  VERY GOOD.                                       00:33

1       I APPRECIATE THAT, MR. ZELLER, AND I, TOO, HOPE THAT

2  I'M NOT GOING TO HAVE TO RESOLVE THIS ISSUE ON REPRESENTATION.

3  I JUST THINK IT'S IMPORTANT TO GIVE LITTLER MENDELSON AN

4  OPPORTUNITY TO RESPOND TO THIS, GIVEN THAT WE'RE ASKING -- IT'S

5  A RATHER EXTRAORDINARY MEASURE TO HAVE ANY LAW FIRM TESTIFY IN         00:33

6  THIS CAPACITY ABOUT INFORMATION THAT WAS GOING BACK AND FORTH

7  BETWEEN A CLIENT.  I would WANT TO EXTEND THAT TO ANY LAW FIRM

8  APPEARING BEFORE THIS COURT.

9           **MR. ZELLER:**  AND WE HAVE NO QUARREL WITH THAT.

10          **THE COURT:**  VERY WELL.                                   00:33

11      IF THERE'S NOTHING ELSE THAT WE HAVE TO ADDRESS RIGHT

12  NOW, I'D RATHER GET THE JURY IN HERE.  LET'S GET A WITNESS

13  GOING, AND WE CAN TAKE UP MATTERS DURING LUNCH TODAY AND DURING

14  BREAKS.

15          BRING THE JURY IN, MR. HOLMES.                               00:33

16      **MR. QUINN:**  WE HAVE THE TIME ALLOCATIONS FOR THE

17  WITNESS WHO APPEARED BY VIDEO YESTERDAY, O'NEAL.

18          **THE COURT:**  I CREDITED ALL OF THE TIME TO MATTEL, SO

19  HOW MUCH SHOULD I SUBTRACT FOR --

20      **MR. QUINN:**  WELL, MGA HAD 28 SECONDS.                        00:34

21      (LAUGHTER.)

22      **THE COURT:**  IT'S ON YOUR TIME, COUNSEL.  My clock

23  JUST DOES MINUTES, IT DOESN'T DO SECONDS; NO SECOND HAND.

24      IF MR. NOLAN CAN KEEP EVERY CROSS-EXAMINATION UNDER A

25  MINUTE, HE'S NOT GOING TO LOSE A SINGLE...                          00:34

1      **MR. QUINN:**  I ASSUME THAT GOES BOTH WAYS.

2      **MR. NOLAN:**  NOW YOU TELL ME.

3      **THE COURT:**  THE SUBMISSION THAT YOU GAVE ME THIS

4  MORNING, COUNSEL, I TRUST WE CAN TAKE UP LATER IN THE DAY

5  TODAY?                                                              00:34

6      **MR. NOLAN:**  YES, WE WILL, YOUR HONOR.  I ONLY DID IT

7  BECAUSE I NEED TO ASK YOUr PERMISSION TO follow UP AND FILE

8  SOMETHING.

9      **THE COURT:**  Lets HOLD OFF.  WE'LL TAKE THAT UP LATER.

10     AND THEN DURING THE BREAK, WE'RE GOING TO TAKE UP THE        00:34

11  IN-CHAMBERS matter WITH MS. ANDERSON.

12     (WHEREUPON, JURORS ENTER COURTROOM.)

13     **THE COURT:**  COUNSEL, YOUR NEXT WITNESS.

14     **MR. ZELLER:**  WE WOULD CALL LUCY ARANT.

15     **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY     00:36

16  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

17  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

18  HELP YOU GOD?

19     **THE WITNESS:**  I DO.

20     **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

21  YOUR LAST NAME FOR THE RECORD.

22     **THE WITNESS:**  LUCY ARANT, A-R-A-N-T.

23                    **DIRECT EXAMINATION**

24  BY MR. ZELLER:

25  Q    YOU AND I HAVE NOT MET.  MY NAME IS MIKE ZELLER.  I'M A    00:37

```
 1   LAWYER FOR MATTEL.
 2            YOU ARE A LAWYER WHO HAS REPRESENTED MGA IN THE PAST;
 3   IS THAT CORRECT?
 4   A    TRUE.
 5   Q    AND YOU'RE HERE TO TESTIFY TODAY BECAUSE MATTEL SENT YOU A    00:37
 6   SUBPOENA?
 7   A    YES.
 8   Q    AND YOU STARTED PRACTICING LAW BACK IN 1980?
 9   A    YES.
10   Q    AND YOUR AREA OF LEGAL PRACTICE IS TRADEMARK LAW; IS THAT    00:37
11   CORRECT?
12   A    YES.
13   Q    YOU'VE BEEN A TRADEMARK LAWYER FOR ABOUT 25 YEARS OR SO
14   NOW?
15   A    YES.                                                        00:37
16   Q    IF YOU COULD GIVE US YOUR EDUCATIONAL BACKGROUND.
17   A    I HAVE A BA IN SPANISH; I HAVE AN MA IN COMPARATIVE
18   LITERATURE; AND I HAVE A JD IN LAW.
19   Q    AND WHAT YEAR DID YOU GET YOUR LAW DEGREE?
20   A    1980.                                                       00:38
21   Q    AND THAT'S WHEN YOU BEGAN PRACTICING LAW?
22   A    YES.
23   Q    IF YOU COULD TELL US BRIEFLY YOUR EMPLOYMENT HISTORY AS A
24   TRADEMARK LAWYER.
25   A    I BEGAN AT THE UNITED STATES PATENT AND TRADEMARK OFFICE    00:38
```

1   IN WASHINGTON, D.C., AS A TRADEMARK EXAMINING ATTORNEY.  I THEN

2   WORKED AT steven BERRY IN SEATTLE, WASHINGTON.  I THEN WORKED

3   AT KNOBBE, MARTENS, OLSEN & BEAR IN NEWPORT BEACH, CALIFORNIA.

4   I THEN WORKED AT BODY GLOVE, AMERICAN MARKETING WORKS.  I THEN

5   WORKED AT RUSS, AUGUST, KABAT & KENT.  AND I'M PRESENTLY AT                   00:38

6   MITCHELL, SILBERBERG & KNUPP.

7   Q    DURING THIS TIME PERIOD, THESE VARIOUS POSITIONS, YOU

8   PRACTICED TRADEMARK LAW?

9   A    YES.

10  Q    IF YOU COULD PLEASE TELL US A LITTLE BIT ABOUT WHAT YOU          00:38

11  DID WHEN YOU WERE AN EXAMINING ATTORNEY THERE AT THE U.S.

12  TRADEMARK OFFICE.

13  A    I LOOKED OVER PEOPLE'S APPLICATIONS FOR TRADEMARKS AND

14  DECIDED IF THEY MET THE STATUTORY CRITERIA TO RECEIVE A

15  TRADEMARK.                                                                    00:39

16  Q    SO YOU'VE BEEN WORKING ON OR PREPARING TRADEMARK

17  APPLICATIONS FOR OVER 25 YEARS NOW?

18  A    YES.

19  Q    AND IF YOU COULD TELL US A LITTLE BIT ABOUT WHAT A

20  TRADEMARK APPLICATION IS.                                                     00:39

21  A    A TRADEMARK CAN BE A WORD OR A DESIGN OR A COMBINATION OF

22  BOTH, AND A PERSON USES IT AS A SOURCE INDICATOR.  THAT'S THE

23  PURPOSE OF A TRADEMARK.

24  Q    AND IN SOME CIRCUMSTANCES, PEOPLE FILE APPLICATIONS WITH

25  THE FEDERAL GOVERNMENT, THE TRADEMARK OFFICE, IN ORDER TO GET          00:39

1    PROTECTION FOR THAT PARTICULAR TRADEMARK, IF THE TRADEMARK

2    OFFICE GIVES THEM THE REGISTRATION?

3    A    CORRECT.

4    Q    AND THE TRADEMARK OFFICE IS PART OF THE FEDERAL

5    GOVERNMENT?                                                    00:39

6    A    YES.

7    Q    NOW, HAS IT BEEN YOUR USUAL PRACTICE, IN PREPARING

8    TRADEMARK APPLICATIONS, TO GATHER INFORMATION FROM YOUR CLIENTS

9    BEFORE YOU FILE IT?

10   A    PERSONALLY OR THROUGH AN ASSISTANT?                       00:39

11   Q    EITHER WAY.

12   A    YES.

13   Q    WHAT KIND OF INFORMATION, JUST AS A GENERAL MATTER, DO YOU

14   TYPICALLY GATHER, WHETHER YOURSELF OR THROUGH AN ASSISTANT,

15   FROM YOUR CLIENTS BEFORE YOU FILE A TRADEMARK APPLICATION?     00:40

16   A    WHAT THE MARK THAT THEY WISH TO HAVE PROTECTED IS; WHETHER

17   OR NOT THEY'VE USED THE MARK; IF SO, THE DATES OF FIRST USE;

18   HOW THEY'VE USED THE MARK; WAS IT ON A LABEL, A HANG TAG,

19   PACKAGING FOR THE GOODS?  IS IT A SERVICE MARK?  WHO WILL OWN

20   THE MARK?  WHAT GOODS OR SERVICES IN CONNECTION WITH WHICH THE  00:40

21   MARK WILL BE USED?

22   Q    AND THAT'S ALL INFORMATION THAT'S IMPORTANT FOR YOU TO

23   KNOW AS A TRADEMARK ATTORNEY IN ADVANCE OF FILING AN

24   APPLICATION SO YOU CAN GIVE PROPER LEGAL ADVICE AND ALSO MAKE

25   SURE THAT YOU FILE AN ACCURATE APPLICATION WITH THE TRADEMARK   00:40

1    OFFICE; IS THAT TRUE?

2    A    YES.

3    Q    YOU DID MENTION THERE WAS THIS CONCEPT OF "DATE OF FIRST

4    USE."

5           WHAT IS THAT?                                              00:40

6    A    THERE ARE DIFFERENT TYPES OF TRADEMARK APPLICATIONS; SOME

7    CAN BE FILED BASED ON USE, and OTHERS CAN BE FILED ON AN

8    INTENT-TO-USE BASIS.

9    Q    THE DATE OF FIRST USE, JUST GENERALLY SPEAKING, IS WHEN

10   THE NAME OR THE MARK THAT'S GOING TO BE THE SUBJECT OF THE        00:41

11   APPLICATION WAS FIRST USED BY THE CLIENT FOR PARTICULAR GOODS

12   OR SERVICES; IS THAT TRUE?

13   A    WAS FIRST OFFERED FOR SALE IN INTERSTATE COMMERCE OR IN

14   COMMERCE BETWEEN THE UNITED STATES AND A FOREIGN COUNTRY.

15   Q    AND THAT CAN HAPPEN IN VARIOUS WAYS; RIGHT?                  00:41

16   A    I'M NOT SURE I KNOW WHAT YOU MEAN BY "VARIOUS WAYS."

17   Q    WELL, A CLIENT CAN USE A TRADEMARK EVEN BEFORE THERE'S AN

18   ACTUAL PRODUCT ON THE MARKET; ISN'T THAT TRUE?

19   A    THAT WOULD BE AN INTENT-TO-USE, BECAUSE IT HADN'T BEEN

20   OFFERED FOR SALE YET IN INTERSTATE COMMERCE.                     00:41

21   Q    THE DISTINCTION I'M MAKING HERE IS, IF IT'S OFFERED FOR

22   SALE, THAT CAN BE SUFFICIENT AS A USE; IS THAT TRUE?

23   A    AS LONG AS IT'S OFFERED FOR SALE IN INTERSTATE COMMERCE OR

24   COMMERCE BETWEEN THE U.S. AND A FOREIGN COUNTRY.

25   Q    AND YOU'VE BEEN USING THE TERM "INTERSTATE COMMERCE."       00:42

1    WHY DON'T YOU TELL US WHAT THAT IS.

2    A    FROM ONE STATE TO ANOTHER.

3    Q    IT'S SIMPLY COMMERCE THAT'S OUTSIDE THE STATE OF

4    CALIFORNIA.

5    A    CORRECT.                                          00:42

6    Q    NOW, IN YOUR EXPERIENCE AS A TRADEMARK LAWYER, YOU'LL

7    AGREE THAT IT'S IMPORTANT FOR YOU TO GET ACCURATE FIRST-

8    DATE-OF-USE INFORMATION FROM YOUR CLIENT; IS THAT TRUE?

9    A    YES.

10   Q    AND PLEASE TELL US, GENERALLY SPEAKING, WHY THAT IS.   00:42

11   A    BECAUSE IN THE UNITED STATES, AS OPPOSED TO SOME OTHER

12   FOREIGN COUNTRIES, A PERSON WOULD HAVE SUPERIOR RIGHTS TO A

13   TRADEMARK BASED ON ITS FIRST DATE OF USE, RATHER THAN THE DATE

14   OF FILING.

15   Q    AND HAVING ACCURATE FIRST-USE-DATE INFORMATION IS      00:42

16   IMPORTANT, BECAUSE IT CAN AFFECT YOUR CLIENT'S RIGHTS; IS THAT

17   TRUE?

18   A    YES.

19   Q    AND, IN FACT, GENERALLY SPEAKING, THERE ARE CERTAIN

20   CIRCUMSTANCES IN WHICH, IF A CLIENT OF YOURS GIVES FALSE      00:43

21   INFORMATION ON AN APPLICATION TO THE TRADEMARK OFFICE, ANY

22   REGISTRATION THAT COMES ABOUT FROM IT CAN then BE INVALID;

23   RIGHT?

24   A    YES.

25   Q    SO YOU CONSIDER THAT INFORMATION TO BE IMPORTANT IN YOUR   00:43

1    PRACTICE AS A TRADEMARK LAWYER; IS THAT TRUE?

2    A    YES.

3    Q    AND THEN, ALSO, YOU KNOW FROM YOUR EXPERIENCE IN THE

4    TRADEMARK FIELD THAT THE TRADEMARK OFFICE ITSELF BELIEVES,

5    EXPECTS, AND REQUIRES THAT APPLICANTS PROVIDE ACCURATE AND    00:43

6    TRUTHFUL INFORMATION TO IT; IS THAT TRUE?

7    A    YES.

8    Q    BACK IN THE 2000 TIME PERIOD, YOU WERE A TRADEMARK LAWYER

9    AT A LAW FIRM CALLED RUSS, AUGUST, KABAT & KENT; IS THAT

10   CORRECT?    00:43

11   A    YES.

12   Q    AND YOU PREPARED TRADEMARK APPLICATIONS FOR MGA BACK THEN?

13   A    YES.

14   Q    YOU PREPARED TRADEMARK APPLICATIONS FOR MGA FOR BRATZ BACK

15   IN 2000; IS THAT TRUE?    00:44

16   A    YES.

17   Q    NOW, BACK IN 2000, YOU ALSO PREPARED TRADEMARK

18   APPLICATIONS FOR MGA FOR THE INDIVIDUAL BRATZ DOLL NAMES,

19   SASHA, YASMIN, AND JADE; IS THAT TRUE?

20   A    YES.    00:44

21   Q    IN ORDER TO PREPARE THESE APPLICATIONS, YOU GATHERED

22   INFORMATION FROM MGA.

23           MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION AS TO THE

24   WORD "YOU."

25           THE COURT:  SUSTAINED.    00:44

1    **MR. ZELLER:**  I'M SORRY.  I'M NOT SURE I UNDERSTAND

2    THE OBJECTION.

3         **MR. NOLAN:**  FOUNDATION.

4         **THE COURT:**  HOW SHE KNOWS.

5         **MR. ZELLER:**  I SEE.                                    00:44

6    **BY MR. ZELLER:**

7    Q    YOU WERE INVOLVED IN PREPARING THOSE APPLICATIONS FOR THE

8    "BRATZ" NAME; IS THAT TRUE?

9    A    YES.

10   Q    AND YOU WERE PERSONALLY INVOLVED IN PREPARING THE         00:44

11   APPLICATIONS FOR THE SASHA, YASMIN, AND JADE APPLICATIONS; IS

12   THAT TRUE?

13   A    COULD YOU PLEASE ELABORATE ON WHAT YOU MEAN BY "PERSONALLY

14   INVOLVED."

15   Q    YOU HAVE PERSONAL KNOWLEDGE OF WHAT WAS DONE IN PREPARING  00:44

16   THOSE APPLICATIONS; IS THAT TRUE?

17   A    NO.

18   Q    THERE SHOULD BE A BINDER THERE IN FRONT OF YOU.  PLEASE

19   TURN TO TAB 11937.

20   A    YES.                                                       00:45

21   Q    AND IF YOU LOOK AT THE LAST PAGE, YOU RECOGNIZE THAT THIS

22   IS A DECLARATION THAT YOU SIGNED UNDER OATH ON OR ABOUT

23   AUGUST 31, 2007; IS THAT TRUE?

24   A    YES.

25   Q    NOW, IF YOU COULD PLEASE JUST TAKE A LOOK AT PARAGRAPHS    00:45

```
 1   THREE AND FOUR OF THIS DECLARATION.  JUST READ IT TO YOURSELF

 2   AT THIS STAGE.  AND IF YOU COULD PLEASE READ IT AND TELL ME IF

 3   THAT REFRESHES YOUR RECOLLECTION THAT YOU GATHERED INFORMATION

 4   FROM MGA IN PREPARING THOSE TRADEMARK APPLICATIONS FOR BRATZ

 5   AND THE INDIVIDUAL DOLL NAMES WE WERE DISCUSSING.                 00:46

 6   A    YES.

 7   Q    HAVING HAD AN OPPORTUNITY TO READ THIS DECLARATION OF

 8   YOURS, DOES THAT REFRESH YOUR RECOLLECTION THAT YOU HAD

 9   COMMUNICATIONS WITH MGA IN WHICH YOU GATHERED INFORMATION IN

10   CONNECTION WITH THOSE APPLICATIONS?                               00:46

11   A    NO.

12   Q    DID PEOPLE DO THAT UNDER YOUR DIRECTION?

13   A    YES.

14   Q    SO THEN --

15   A    WELL, GENERALLY SPEAKING.  I DON'T KNOW ABOUT THIS           00:46

16   PARTICULAR...

17   Q    WELL, ISN'T IT TRUE THAT YOU HAD COMMUNICATIONS WITH MGA

18   PERTAINING TO THE APPLICATIONS?

19   A    I DON'T REMEMBER.

20   Q    WELL, LET'S THEN GO BACK TO EXHIBIT 11937.                   00:47

21        YOU RECOGNIZE THIS DOCUMENT AS A DECLARATION THAT YOU

22   SIGNED IN THIS CASE; IS THAT TRUE?

23   A    YES.

24   Q    AND YOU MADE IT UNDER OATH; IS THAT TRUE?

25   A    YES.                                                         00:47
```

```
 1   Q    YOU READ IT BEFORE YOU SIGNED IT AND SUBMITTED IT TO THIS
 2   COURT; CORRECT?
 3   A    YES.
 4   Q    YOU SEE PARAGRAPHS THREE AND FOUR THAT I JUST DIRECTED
 5   YOUR ATTENTION TO; CORRECT?                                       00:47
 6   A    UH-HUH.  YES.
 7         MR. ZELLER:  YOUR HONOR, AT THIS TIME, I WOULD SUBMIT
 8   EXHIBIT 11937 INTO EVIDENCE; FOR THE MOMENT, JUST PARAGRAPHS
 9   THREE, FOUR, AND FIVE.
10         THE COURT:  ANY OBJECTION?                                  00:47
11         MR. NOLAN:  NO OBJECTION, YOUR HONOR.
12         THE COURT:  ADMITTED.
13         YOU MAY PUBLISH THREE, FOUR, AND FIVE.
14   BY MR. ZELLER:
15   Q    DIRECTING YOUR ATTENTION TO PARAGRAPH THREE, IT SAYS,       00:48
16   "WHILE AT RUSS, AUGUST, KABAT & KENT, I SERVED AS U.S.
17   TRADEMARK COUNSEL FOR MGA ENTERTAINMENT, INC."
18         DO YOU SEE THAT?
19   A    YES.
20   Q    THAT'S A TRUE STATEMENT?                                    00:48
21   A    YES.
22   Q    THE NEXT SENTENCE SAYS, "ONE OF MY RESPONSIBILITIES IN
23   THIS CAPACITY WAS TO PREPARE INTENT-TO-USE TRADEMARK
24   APPLICATIONS FOR BRATZ AND INDIVIDUAL BRATZ DOLLS, INCLUDING
25   SASHA, YASMIN, AND JADE."                                        00:48
```

```
 1            IS THAT A TRUE STATEMENT?

 2   A    YES.

 3   Q    THE NEXT PARAGRAPH, FOUR, SAYS, "FROM TIME TO TIME, I

 4   NECESSARILY COMMUNICATED WITH EMPLOYEES OF MGA ENTERTAINMENT,

 5   INC., TO OBTAIN INFORMATION FOR MGA'S TRADEMARK APPLICATIONS."      00:48

 6            DO YOU SEE THAT?

 7   A    YES.

 8   Q    THAT'S A TRUE STATEMENT?

 9   A    I DON'T REMEMBER ANYMORE.

10   Q    YOU SIGNED THIS DECLARATION IN AUGUST OF LAST YEAR; IS        00:49

11   THAT TRUE?

12   A    YES.

13   Q    DID YOU REMEMBER THAT YOU HAD DONE THAT, WHAT'S REFLECTED

14   HERE IN PARAGRAPH FOUR, BACK IN AUGUST OF 2007?

15   A    I DON'T REMEMBER.                                             00:49

16   Q    SO IT'S YOUR TESTIMONY THAT YOU'RE NOT SURE ONE WAY OR

17   ANOTHER WHETHER, WHEN YOU SIGNED THIS, YOU KNEW IT WAS TRUE.

18   A    NO.  WHEN I SIGNED IT, I BELIEVED IT TO BE TRUE.

19   Q    AND WHY DID YOU BELIEVE IT TO BE TRUE WHEN YOU SIGNED IT?

20   A    BECAUSE I WOULDN'T SIGN ANYTHING UNDER PENALTY OF PERJURY     00:49

21   I DIDN'T BELIEVE TO BE TRUE.

22   Q    WELL, MY QUESTION IS A MORE SPECIFIC ONE THAN THAT.

23            WHAT IS IT THAT YOU DID TO SATISFY YOURSELF, IN ORDER

24   TO MAKE THIS STATEMENT UNDER OATH, THAT IT WAS TRUE?

25   A    I DON'T KNOW.                                                 00:49
```

1429

```
 1   Q    YOU DON'T HAVE ANY REASON TO DISPUTE, AS YOU SIT HERE NOW
 2   BEFORE THE JURY, THAT WHAT YOU SAID IN PARAGRAPH FOUR IS TRUE;
 3   IS THAT CORRECT?
 4   A    I DON'T HAVE ANY REASON TO AGREE OR DISPUTE, BECAUSE I
 5   DON'T REMEMBER.                                                  00:50
 6   Q    TELL US ALL OF THE REASONS WHY YOU WOULD DISPUTE THE
 7   CONTENT OF WHAT YOU SAID IN THIS SWORN DECLARATION AT
 8   PARAGRAPH FOUR.
 9   A    BECAUSE I MIGHT NOT HAVE BEEN THE ONE WHO HAD COMMUNICATED
10   WITH MGA.  IT MIGHT HAVE BEEN MY ASSISTANT OR MY PARALEGAL.  IT  00:50
11   MIGHT NOT HAVE BEEN ME PERSONALLY.
12   Q    I'M NOT ASKING WHAT MIGHT HAVE HAPPENED.  I'M ASKING YOU,
13   WHAT DO YOU KNOW?  AND IT SAYS HERE, "I NECESSARILY
14   COMMUNICATED WITH EMPLOYEES OF MGA ENTERTAINMENT."
15        DO YOU STAND BY THAT STATEMENT?                            00:50
16   A    THE "I NECESSARILY," I COULD HAVE INTERPRETED IT TO MEAN I
17   OR THROUGH MY ASSISTANT AND MY PARALEGAL COMMUNICATED.  THERE
18   WAS SOME COMMUNICATION FROM SOMEBODY TO GET THE INFORMATION.
19   Q    WELL, LET'S TAKE A LOOK AT PARAGRAPH FIVE.
20        DO YOU SEE WHERE IT SAYS, QUOTE, "IN LATE 2000, FOR        00:51
21   PURPOSES OF OBTAINING THE STRONGEST AND EARLIEST POSSIBLE
22   TRADEMARK PROTECTION FOR THE BRATZ MARK, AND OTHER BRATZ DOLLS,
23   I COMMUNICATED WITH PAULA TREANTAFELLES"?
24        DO YOU SEE THAT?
25   A    YES, I DO.                                                 00:51
```

```
 1   Q     IS THAT A TRUE STATEMENT?

 2   A     I DON'T REMEMBER.

 3   Q     YOU'RE NOT SURE?

 4   A     CORRECT.

 5   Q     YOU BELIEVED IT WAS A TRUE STATEMENT WHEN YOU WROTE IT        00:51

 6   BACK IN AUGUST OF 2007; IS THAT TRUE?

 7   A     I'M NOT SURE I WROTE THAT.

 8   Q     YOU DON'T THINK YOU WROTE IT?

 9   A     NO.

10   Q     BUT YOU READ IT BEFORE YOU SIGNED IT.                        00:51

11   A     YES.

12   Q     DO YOU HAVE ANY REASON TO DOUBT OR DISPUTE THAT THAT'S A

13   TRUE STATEMENT?

14   A     AGAIN, I DON'T REMEMBER WHETHER IT WAS ME OR MY ASSISTANT

15   OR PARALEGAL.                                                      00:52

16   Q     BUT WHETHER IT WAS YOURSELF PERSONALLY OR THROUGH YOUR

17   ASSISTANT, YOU DO BELIEVE THAT YOU HAD SOME COMMUNICATIONS WITH

18   MGA AS IT PERTAINED TO THESE TRADEMARK APPLICATIONS; IS THAT

19   CORRECT?

20   A     ALTHOUGH I DON'T PERSONALLY REMEMBER, EITHER I OR MY         00:52

21   ASSISTANT DID.

22   Q     YOU'LL GENERALLY AGREE WITH ME THAT IF YOU DID NOT BELIEVE

23   THESE STATEMENTS THAT WE'VE BEEN TALKING ABOUT HERE, IN

24   PARAGRAPHS THREE, FOUR, AND FIVE OF YOUR DECLARATION, IF YOU

25   DIDN'T THINK THEY WERE TRUE, YOU WOULDN'T HAVE SWORN TO THEM       00:52
```

1   UNDER OATH; IS THAT TRUE?

2   A    TRUE.

3   Q    NOW, IS IT THE CASE THAT BACK IN DECEMBER OF 2000, WHEN

4   YOU WERE PREPARING THESE TRADEMARK APPLICATIONS, THAT YOU HAD

5   OR YOUR ASSISTANT HAD, OR SOMEBODY ON YOUR BEHALF HAD, SOME                00:53

6   COMMUNICATIONS WITH MS. TREANTAFELLES ABOUT WHEN THE "BRATZ"

7   NAME WAS FIRST USED?

8   A    I DON'T REMEMBER.

9   Q    I'M SORRY?

10  A    I DON'T REMEMBER.                                                     00:53

11  Q    ARE YOU DISPUTING THAT YOU DID, OR YOU'RE JUST NOT SURE?

12  A    I DON'T REMEMBER.  IT WAS EIGHT YEARS AGO.  I DON'T

13  REMEMBER.

14  Q    IF WE COULD LOOK AT EXHIBIT 11897 FOR IDENTIFICATION.

15  THAT SHOULD BE IN YOUR BINDER THERE.  IF YOU COULD LET US KNOW             00:53

16  WHEN YOU'VE HAD A CHANCE TO LOOK AT THAT.

17  A    OKAY.

18  Q    THIS IS A FAX THAT YOU HAD SENT TO PAULA TREANTAFELLES ON

19  OR ABOUT DECEMBER 12, 2000.

20  A    IT LOOKS LIKE IT WAS SENT BY MY ASSISTANT.                           00:54

21  Q    YOU DON'T HAVE ANY REASON TO DOUBT THAT THIS FAX WAS SENT

22  ON YOUR BEHALF TO PAULA TREANTAFELLES ON OR ABOUT DECEMBER 12,

23  2000; IS THAT CORRECT?

24        **MR. NOLAN:**  OBJECTION, YOUR HONOR.  LACK OF

25  FOUNDATION.                                                              00:54

```
 1            THE COURT:  OVERRULED.

 2            THE WITNESS:  COULD YOU REPEAT THE QUESTION, PLEASE.

 3   BY MR. ZELLER:

 4   Q    YOU DON'T HAVE ANY REASON TO DOUBT THAT THIS FAX, WHICH IS

 5   THIS EXHIBIT HERE, WAS SENT BY YOU, THROUGH YOUR ASSISTANT, TO     00:54

 6   PAULA TREANTAFELLES ON OR ABOUT DECEMBER 12, 2000; IS THAT

 7   CORRECT?

 8   A    IT SAYS DECEMBER 7TH HERE.

 9   Q    I APOLOGIZE.

10            YOU DON'T HAVE ANY REASON TO DOUBT THAT'S WHEN IT WAS     00:54

11   SENT; IS THAT CORRECT?

12   A    THAT'S CORRECT.

13            MR. ZELLER:  YOUR HONOR, I WOULD MOVE EXHIBIT 11897

14   INTO EVIDENCE.

15            THE COURT:  ANY OBJECTION?                                 00:54

16            MR. NOLAN:  YOUR HONOR, STILL LACK OF FOUNDATION AS

17   TO WHETHER OR NOT SHE HAS PERSONAL KNOWLEDGE OF THIS DOCUMENT.

18            THE COURT:  SUSTAINED.

19   BY MR. ZELLER:

20   Q    PLEASE TAKE A LOOK AT THE SECOND PAGE OF THIS EXHIBIT.        00:55

21            DO YOU SEE YOUR NAME THERE?

22   A    YES.

23   Q    THIS REFLECTS WHAT IS A NOTE THAT YOU EXPECT THAT YOU SENT

24   TO PAULA TREANTAFELLES ON OR ABOUT DECEMBER 7TH; IS THAT TRUE?

25            MR. NOLAN:  OBJECTION.  ASSUMES FACTS NOT IN              00:55
```

```
1   EVIDENCE; LACK OF FOUNDATION.

2            THE COURT:  REPHRASE.

3   BY MR. ZELLER:

4   Q    YOU RECOGNIZE THE SECOND PAGE AS HAVING YOUR NAME THERE AT

5   THE BOTTOM; RIGHT?                                              00:55

6   A    YES.

7   Q    YOU DON'T HAVE ANY REASON TO DISPUTE THAT THIS IS A NOTE

8   THAT YOU SENT TO PAULA TREANTAFELLES, WHETHER DIRECTLY OR

9   THROUGH YOUR SECRETARY, BACK IN DECEMBER OF 2000; ISn't THAT

10  TRUE?                                                           00:55

11  A    I DON'T REMEMBER.

12  Q    YOU ALSO SEE YOUR NAME ON OTHER PAGES OF THIS EXHIBIT; IS

13  THAT TRUE?

14  A    MY NAME TYPED, YOU MEAN?

15       I DON'T SEE MY SIGNATURE.  I SEE MY NAME TYPED IN.         00:56

16  Q    I'M SORRY.  I COULDN'T HEAR ALL OF THAT.

17  A    I DON'T SEE MY SIGNATURE.  I SEE MY NAME TYPED IN.

18  Q    RIGHT.  I JUST ASKED IF YOU SAW YOUR NAME ON THIS

19  DOCUMENT.

20  A    YES.  UH-HUH.                                              00:56

21  Q    ON OTHER PLACES AS WELL.

22       TURNING TO THE FIRST PAGE, YOU RECOGNIZE THIS AS THE

23  LETTERHEAD OF THE LAW FIRM YOU WERE WORKING AT; IS THAT TRUE?

24  A    YES.

25  Q    AND THEN SHARON LITTMAN, LEGAL ASSISTANT, WAS YOUR         00:56
```

1   ASSISTANT; RIGHT?

2   A    YES.

3   Q    AND THEN YOU ALSO RECOGNIZE THE LETTERHEAD OF THE LAW FIRM

4   YOU WERE WORKING AT ON THE SECOND PAGE OF THIS DOCUMENT; IS

5   THAT CORRECT?                                                    00:56

6   A    YES.

7   Q    AND THE INFORMATION THAT'S REFLECTED IN THIS FAX IS THE

8   TYPE OF INFORMATION THAT YOU REGULARLY SOLICITED FROM CLIENTS

9   IN YOUR ROLE AS A TRADEMARK ATTORNEY; IS THAT TRUE?

10  A    YES.                                                        00:57

11  Q    AND YOU DOCUMENT COMMUNICATIONS WITH YOUR CLIENTS IN THE

12  NORMAL COURSE OF YOUR WORK AS A TRADEMARK ATTORNEY; IS THAT

13  TRUE?

14  A    IN GENERAL, YES.

15  Q    AND IT WAS YOUR REGULAR PRACTICE TO DOCUMENT ANY           00:57

16  COMMUNICATIONS WITH YOUR CLIENTS, THE KIND OF INFORMATION

17  THAT'S SHOWN IN THIS FAX; IS THAT TRUE?

18          **MR. NOLAN:**  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

19  "YOU" DOCUMENTED.

20          **THE COURT:**  CLARIFY THAT, COUNSEL, AS TO WHO WOULD DO   00:57

21  IT.

22  **BY MR. ZELLER:**

23  Q    WAS IT YOUR REGULAR PRACTICE, WHETHER YOURSELF OR THROUGH

24  YOUR ASSISTANT, TO DOCUMENT ANY COMMUNICATIONS WITH YOUR

25  CLIENTS THE TYPE OF INFORMATION THAT'S SHOWN IN THIS FAX, IN    00:57

```
 1   CONNECTION WITH THE PREPARATION OF TRADEMARK APPLICATIONS?
 2           MR. NOLAN:  OBJECTION, YOUR HONOR.  COMPOUND AS TO
 3   HER ASSISTANT AND HERSELF.
 4           THE COURT:  IT IS COMPOUND.  BREAK IT UP, COUNSEL.
 5   BY MR. QUINN:                                              00:58
 6   Q    WAS IT YOUR REGULAR PRACTICE, YOU YOURSELF, TO DOCUMENT
 7   SUCH COMMUNICATIONS?
 8   A    SOMETIMES I DID; SOMETIMES MY ASSISTANT did.
 9   Q    BUT WHETHER IT WAS EITHER WAY, IT WAS PART OF YOUR REGULAR
10   PRACTICE AS A TRADEMARK ATTORNEY; IS THAT TRUE?            00:58
11   A    THAT THE MATERIAL BE DOCUMENTED.
12   Q    AND IT WAS YOUR REGULAR PRACTICE TO DOCUMENT
13   COMMUNICATIONS WITH YOUR CLIENTS AT OR ABOUT THE TIME THAT YOU
14   HAD THEM; IS THAT TRUE?
15   A    EITHER I OR MY ASSISTANT.                             00:58
16   Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT'S WHAT YOU DID
17   HERE WITH THIS FAX; IS THAT TRUE?
18           MR. NOLAN:  OBJECTION, YOUR HONOR.  LACK OF
19   FOUNDATION; CALLS FOR SPECULATION.
20           THE COURT:  OVERRULED.                             00:58
21           YOU MAY ANSWER THAT QUESTION.
22           THE WITNESS:  I DON'T REMEMBER ANYTHING ABOUT THIS
23   PARTICULAR APPLICATION.
24   BY MR. ZELLER:
25   Q    BUT YOU'RE NOT DISPUTING THAT; RIGHT?                 00:58
```

1    A    I HAVE NO PERSONAL KNOWLEDGE.  I DON'T REMEMBER.

2    Q    IT WAS YOUR REGULAR PRACTICE TO DOCUMENT, WHETHER

3    YOURSELF -- I'LL BREAK IT DOWN, IN LIGHT OF THE COURT'S PRIOR

4    RULING.

5         IT WAS YOUR REGULAR PRACTICE, BACK IN THAT TIME    00:59

6    PERIOD, TO DOCUMENT COMMUNICATIONS WITH YOUR CLIENTS ACCURATELY

7    AND BASED ON KNOWLEDGE THAT YOU HAD AT THE TIME; ISn't THAT

8    TRUE?

9         **MR. NOLAN:**  YOUR HONOR, JUST --

10        **THE COURT:**  JUST THE OBJECTION, COUNSEL.    00:59

11        **MR. NOLAN:**  AMBIGUOUS AS TO "YOU."

12        IS SHE TALKING ABOUT PERSONALLY?

13        **THE COURT:**  SUSTAINED.

14   **BY MR. ZELLER:**

15   Q    DO YOU HAVE ANY REASON TO DOUBT THAT THIS FAX THAT YOU    00:59

16   HAVE IN FRONT OF YOU IS AN ACCURATE RECORD OF YOUR LAW FIRM,

17   YOUR FORMER LAW FIRM?

18        **MR. NOLAN:**  OBJECTION.  LACK OF FOUNDATION.

19        **THE COURT:**  OVERRULED.

20        **THE WITNESS:**  I CAN'T SAY ONE WAY OR THE OTHER.    00:59

21        **MR. ZELLER:**  I WOULD ASK THAT THIS EXHIBIT BE MOVED

22   INTO EVIDENCE, YOUR HONOR.

23        **MR. NOLAN:**  YOUR HONOR, OBJECTION.  LACK OF

24   FOUNDATION.

25        **THE COURT:**  LET ME SEE YOU AT SIDE-BAR, COUNSEL.    00:59

```
 1              (WHEREUPON, THE FOLLOWING PROCEEDINGS
 2         WERE HELD AT SIDE-BAR:)
 3         THE COURT:  I DON'T KNOW WHAT TO SAY.
 4              IF THE DOCUMENT IS WHAT IT PURPORTS TO BE, THEN THIS
 5    TESTIMONY IS UNBELIEVABLE.  HOWEVER, I TEND TO AGREE.
 6    TECHNICALLY, THE FOUNDATION IS NOT HERE.
 7              MR. ZELLER:  HERE'S WHAT I'D LIKE TO DO, YOUR HONOR.
 8              THIS IS BEING OFFERED AS A PRIOR INCONSISTENT
 9    STATEMENT FOR IMPEACHMENT, BECAUSE SHE'S CLAIMED SHE DOES NOT
10    REMEMBER HAVING THIS COMMUNICATION OR KNOWING ABOUT THIS
11    COMMUNICATION.
12              THE COURT:  BUT YOU HAVEN'T SUCCEEDED IN
13    AUTHENTICATING THAT THIS IS HER PRIOR STATEMENT.
14              I WOULD AGREE WITH YOU, BUT THAT'S THE FOUNDATION
15    THAT'S MISSING.
16              COUNSEL, WHAT IS GOING ON HERE?
17              IS THERE SOMEONE REPRESENTING THIS ATTORNEY HERE?
18              MR. NOLAN:  LARRY McFARLAND IS, YOUR HONOR.
19              BUT HERE'S THE POINT.  THIS WOMAN FILES -- MGA WAS
20    NOT HER PERSONAL CLIENT; IT'S THE FIRM'S CLIENT.  SHE WAS ASKED
21    TO DO SOME WORK.  SHE HAS NO RECOLLECTION OF -- EACH YEAR, SHE
22    FILES APPROXIMATELY 3,000 OR 2000 A YEAR.  SHE HAS NO
23    INDEPENDENT RECOLLECTION OF THIS PARTICULAR DOCUMENT; NO
24    RECOLLECTION OF ANY CONVERSATIONS WITH --
25              THE COURT:  THAT'S WHY WE -- ALL OF US AS LAWYERS,
```

01:00
01:00
01:00
01:01
01:01

1    HAVE LOTS OF PAPERS THAT COME AND GO; THAT'S WHY WE -- AS YOUR

2    BUSINESS PRACTICE, THAT'S PLACE OF BUSINESS -- YOU NEED TO LAY

3    FOUNDATION FOR THIS AS A BUSINESS RECORD.

4            **MR. NOLAN:**  I UNDERSTAND THE COURT'S CONCERN.

5            **THE COURT:**  I DON'T WANT THERE TO BE A FRAUD ON THE    01:01

6    COURT.  BECAUSE THIS APPEARS TO THE COURT -- UNLESS IT'S A

7    FORGERY -- IT APPEARS TO BE A STANDARD LEGAL MEMORIALIZATION.

8    THIS IS A BUSINESS MEMORIALIZATION.

9            **MR. NOLAN:**  I UNDERSTAND.  BUT PAULA GARCIA TESTIFIED

10   SHE DIDN'T HAVE -- HAS NO MEMORY OF EVER RECEIVING THIS.  BUT    01:02

11   THE DOCUMENT, AT THE END OF THE DAY, HAS A JUNE 2000 --

12   RECEIVED IN 2001.  THIS ATTORNEY HAS NO INDEPENDENT

13   RECOLLECTION OF HAVING THESE SPECIFIC CONVERSATIONS.  THIS IS

14   NO DIFFERENT THAN --

15           **THE COURT:**  WHERE DID THIS COME FROM?    01:02

16           **MR. ZELLER:**  THIS DOCUMENT WAS PRODUCED BY MGA, WHICH

17   HAS NOT DISPUTED THE AUTHENTICITY.  THEY HAVE NOT OBJECTED TO

18   THE AUTHENTICITY; SO THAT'S NOT A FOUNDATION PROBLEM.

19           **THE COURT:**  UNLESS THIS IS A FORGERY BY MGA, THIS

20   DOCUMENT IS WHAT IS BEING PURPORTED TO BE -- I'M JUST CONCERNED    01:02

21   ABOUT WHAT'S GOING ON HERE.

22           **MR. NOLAN:**  YOUR HONOR, ALL SHE'S SAYING IS THAT SHE

23   DOES NOT REMEMBER THIS DOCUMENT.

24           **THE COURT:**  FAIR ENOUGH.

25           **MR. NOLAN:**  BUT, YOUR HONOR, NO DISRESPECT INTENDED,    01:02

1  BUT WHEN I TRIED TO GET IN E-MAILS DIRECTED TO IVY ROSS OR

2  DOCUMENTS FOR LILY MARTINEZ, OR EVEN VICTORIA O'CONNOR, WHEN IT

3  DIDN'T REFRESH HER RECOLLECTION, EVEN THOUGH THE DOCUMENTS WERE

4  COMMUNICATIONS, THEY WERE OBJECTING ON FOUNDATION.

5       **THE COURT:**  I GUESS, COUNSEL, I DO HOLD A SLIGHTLY          01:03

6  DIFFERENT STANDARD WHEN I HAVE AN ATTORNEY OF LAW ADMITTED TO

7  PRACTICE BEFORE THIS COURT, SITTING ON THE WITNESS STAND.  AND

8  I DON'T CARE WHICH SIDE PRODUCES IT, I EXPECT ATTORNEYS TO --

9  IF THIS IS HER RECORD -- AND I DON'T KNOW IF IT IS OR NOT

10  BECAUSE I DON'T KNOW IF THE FOUNDATION HAS BEEN LAID FOR          01:03

11  THAT -- I EXPECT AN ATTORNEY OF RECORD TO BE ABLE TO RECOGNIZE

12  AND AUTHENTICATE WHETHER OR NOT THIS IS THEIR RECORD.

13       **MR. ZELLER:**  IF I MAY ADD, YOUR HONOR, NUMBER ONE,

14  THE DOCUMENTS THAT MR. NOLAN IS ATTEMPTING TO INTERJECT, WHICH

15  I THINK ARE IRRELEVANT, THOSE ARE NOT DOCUMENTS THOSE PEOPLE      01:03

16  AUTHORIZED OR RECEIVED.  THAT'S THE DISTINCTION.  THIS IS AN

17  ATTORNEY.

18       **THE COURT:**  I UNDERSTAND THE DISTINCTION.  I THINK

19  MR. NOLAN DOES AS WELL.

20       **MR. NOLAN:**  ALL I'M POINTING OUT, AGAIN, IS, LET ME       01:04

21  SHOW YOU SOMETHING.  THERE ARE DOCUMENTS BACK HERE WHERE SHE

22  WILL, I ASSUME, ADMIT BECAUSE THEY ARE HER SIGNATURES THAT ARE

23  FILED.

24       **THE COURT:**  BETWEEN THE DECLARATIONS SUBMITTED, SHE

25  DID SIGN THESE DOCUMENTS.  THIS COURT HAS COMPLETE CONFIDENCE     01:04

1  THAT THESE DOCUMENTS AND THE FACT THESE WERE PRODUCED BY MGA --

2  THIS COURT HAS CONFIDENCE THESE DOCUMENTS WERE, IN FACT,

3  PRODUCED WHEN THEY WERE SAID TO BE.

4          **MR. NOLAN:**  THAT'S FINE.  I COMPLETELY ACCEPT THE

5  COURT'S RATIONALE.  BUT ALL I'M SAYING IS THAT THEY KEEP ASKING       01:04

6  HER 'IS THIS YOUR...' 'DID YOU DO THIS...'

7          SHE HAS NO INDEPENDENT MEMORY OF THAT.

8          **THE COURT:**  I UNDERSTAND THAT'S TRUE.

9          IF YOU LAY BUSINESS FOUNDATION --

10         **MR. ZELLER:**  BUT SHE WAS FIGHTING ME EVEN ON THAT,         01:04

11  HOWEVER.  SHE KEPT ON SAYING -- SHE WOULDN'T EVEN TELL ME IF

12  SHE COULD DOUBT SOMETHING.  SHE WAS SAYING 'I DON'T KNOW,' 'I

13  DON'T REMEMBER.'

14         **MR. PRICE:**  HE'S ESTABLISHED THIS IS THEIR

15  LETTERHEAD.  SHE DOES IT THROUGH HER SIGNATURE.  HER NAME IS ON       01:05

16  IT.  IT'S THE PRACTICE OF THE FIRM.  I THINK HE'S ESTABLISHED

17  THE BUSINESS RECORD.

18         **THE COURT:**  WE'RE PRETTY CLOSE TO IT.  I'LL GIVE YOU

19  LEEWAY.  I SUSTAIN THE FOUNDATION AT PRESENT.

20         **MR. NOLAN:**  IF HE CAN ESTABLISH IT AS A BUSINESS           01:05

21  RECORD, I WOULDN'T OBJECT ON THAT BASIS.

22         **THE COURT:**  I ASSURE YOU, MR. NOLAN, IF YOU CALL AN

23  ATTORNEY AND THE SAME THING HAPPENS...  IT IS JUST NONSENSE

24  WITH AN ATTORNEY TO BE DOING THIS.

25         **MR. NOLAN:**  BUT FRANKLY, YOUR HONOR, I THINK THE WAY       01:05

1    THAT THE QUESTIONS HAVE BEEN ASKED SPECIFICALLY TO HER WITH

2    RESPECT TO LOOKING AT THE DOCUMENT, THE DOCUMENT -- SHE DOES

3    NOT EVEN KNOW THAT SHE SENT IT BECAUSE IT'S NOT HER SIGNED

4    NAME.  SOMEONE MAY HAVE TYPED IT FOR HER.  THAT'S THE POINT.

5            **THE COURT:**  FAIR ENOUGH.                              01:05

6            **MR. NOLAN:**  I THINK AS AN ATTORNEY SHE WOULD BE MORE

7    PRECISE ON THAT PARTICULAR POINT THAN OTHERWISE.

8            **THE COURT:**  FAIR ENOUGH.

9            (SIDE-BAR PROCEEDINGS CONCLUDED.)

10           **The COURT:**  YOU MAY PROCEED, COUNSEL.                 01:00

11           **MR. NOLAN:**  THE LAST OBJECTION WAS SUSTAINED,

12   YOUR HONOR?

13           **THE COURT:**  YES.

14   **BY MR. ZELLER:**

15   Q    DIRECTING YOUR ATTENTION TO THE EXHIBIT THAT WE WERE       01:06

16   DISCUSSING, THIS IS THE TYPE OF DOCUMENT THAT YOU AND YOUR FIRM

17   MAINTAINED IN THE NORMAL COURSE OF ITS BUSINESS; IS THAT TRUE?

18   A    THE TYPE OF DOCUMENT?  YOU MEAN A FAX ON LETTERHEAD WOULD

19   BE...

20   Q    RIGHT.  THAT REFLECTS COMMUNICATIONS THAT YOUR LAW FIRM    01:06

21   HAD WITH YOUR CLIENTS AND ATTACHES DRAFT TRADEMARK

22   APPLICATIONS.

23   A    IN GENERAL, YOU MIGHT FIND INFORMATION LIKE THIS IN THE

24   FILE.

25   Q    AND WHEN YOU WANTED TO CHECK ON COMMUNICATIONS WITH YOUR   01:07

```
 1   CLIENT OR WHAT YOU HAD SENT THEM, THIS IS THE TYPE OF DOCUMENT
 2   YOU WOULD GO BACK AND LOOK IN YOUR FILES AND FIND TO RELY UPON;
 3   IS THAT TRUE?
 4   A    IN GENERAL.
 5   Q    AND WHEN YOU WANTED TO CHECK ON THE CONTENTS OF A DRAFT      01:07
 6   TRADEMARK APPLICATION THAT YOU HAD SENT TO YOUR CLIENT, THIS IS
 7   THE TYPE OF DOCUMENT THAT YOU WOULD GO BACK AND CONSULT AND
 8   RELY ON; IS THAT TRUE?
 9   A    AT TIMES.
10          MR. ZELLER:  AGAIN, YOUR HONOR, I'D ASK THAT THIS         01:07
11   EXHIBIT BE MOVED IN.
12          MR. NOLAN:  NO OBJECTION, YOUR HONOR.
13          THE COURT:  IT'S ADMITTED.
14          MR. ZELLER:  IF WE COULD PULL THAT EXHIBIT UP.
15          THE COURT:  YOU MAY PUBLISH.                              01:07
16   BY MR. ZELLER:
17   Q    IF WE COULD GO TO PAGE DASH 3 AND DASH 4.
18          DO YOU HAVE THAT IN FRONT OF YOU?
19   A    YES.
20   Q    AND YOU'LL SEE THAT THIS IS AN APPLICATION FOR TRADEMARK    01:07
21   REGISTRATION FOR THE NAME "JADE" THAT YOU OR YOUR OFFICE
22   PREPARED BACK IN THE 2000 TIME PERIOD.
23   A    YES.
24   Q    THIS WAS DONE FOR MGA.
25   A    YES.                                                        01:08
```

```
1    Q     DIRECTING YOUR ATTENTION, THEN, TO DASH 5 AND DASH 6, THIS

2    IS AN APPLICATION FOR TRADEMARK REGISTRATION FOR THE NAME

3    "YASMIN" THAT YOU OR YOUR OFFICE PREPARED FOR MGA BACK IN 2000;

4    IS THAT TRUE?

5    A     YES.                                                              01:08

6    Q     AND BY THE WAY, THE NAMES "JADE" AND "YASMIN," THOSE ARE

7    NAMES FOR INDIVIDUAL BRATZ DOLLS; IS THAT RIGHT?

8    A     THAT'S MY UNDERSTANDING.

9    Q     IF WE COULD LOOK AT DASH 7 AND DASH 8.

10           THIS IS AN APPLICATION FOR TRADEMARK REGISTRATION FOR        01:08

11   THE NAME "SASHA" THAT YOUR LAW FIRM PREPARED FOR MGA BACK IN

12   THE 2000 TIME PERIOD; IS THAT CORRECT?

13   A     YES.

14   Q     AND THEN, FINALLY, IF WE COULD LOOK AT DASH 9, DASH 10.

15           THIS IS AN APPLICATION FOR TRADEMARK REGISTRATION FOR        01:09

16   THE "BRATZ" NAME THAT YOU PREPARED, OR YOUR LAW FIRM PREPARED,

17   I SHOULD SAY, BACK IN THE 2000 TIME PERIOD; IS THAT CORRECT?

18   A     YES.

19   Q     IF WE COULD HAVE THE FIRST PAGE OF THIS EXHIBIT, 11897.

20   A     YES.                                                             01:09

21   Q     YOU'LL SEE THERE AT THE TOP -- THIS IS, OF COURSE, A FAX

22   COVER PAGE; RIGHT?

23   A     YES.

24   Q     AND IT SHOWS THAT YOUR OFFICE SENT THIS FAX TO

25   PAULA TREANTAFELLES ON DECEMBER 7, 2000; IS THAT RIGHT?              01:09
```

```
 1   A    YES.

 2   Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT, DO YOU?

 3   A    I DON'T KNOW ONE WAY OR ANOTHER.

 4   Q    LET'S LOOK AT THE SECOND PAGE.

 5        NOW, YOU'LL SEE THE TEXT HERE AT THE TOP.  THIS IS        01:09

 6   THE SECOND PAGE.  AND YOU'LL SEE THAT THE TEXT HERE REFLECTS A

 7   NOTE THAT YOU SENT, WHETHER DIRECTLY OR THROUGH YOUR ASSISTANT,

 8   TO MS. TREANTAFELLES BACK IN DECEMBER OF 2000; IS THAT RIGHT?

 9   A    YES.

10   Q    IN FACT, IT STARTS OFF, "DEAR PAULA," WHO IS              01:10

11   PAULA TREANTAFELLES.

12   A    I DON'T REMEMBER.

13   Q    YOU DON'T HAVE ANY REASON TO DOUBT THAT THAT'S WHO THE

14   PAULA HERE IS, DO YOU?

15   A    NO.                                                       01:10

16   Q    I'D LIKE TO FOCUS YOUR ATTENTION -- DO YOU SEE WHERE IT

17   SAYS, QUOTE, "YOU INDICATED THAT ALL FOUR OF THE APPLICATIONS

18   HAVE A DATE OF FIRST USE OF JUNE 15, 2000"?

19        DO YOU SEE THAT?

20   A    YES.                                                      01:10

21   Q    AND IT'S YOUR UNDERSTANDING THAT THE "YOU" HERE IS

22   PAULA TREANTAFELLES.

23   A    SO IT WOULD APPEAR.

24   Q    YOU DON'T DENY THAT.

25   A    I DON'T KNOW ONE WAY OR THE OTHER.  I DON'T DENY IT.      01:10
```

```
 1   Q    AND THE FOUR APPLICATIONS THAT ARE BEING REFERRED TO HERE

 2   IN THIS SENTENCE ARE THE FOUR TRADEMARK APPLICATIONS WE JUST

 3   LOOKED AT; NAMELY, FOR THE "BRATZ" NAME AND THE THREE

 4   INDIVIDUAL BRATZ DOLL NAMES; IS THAT CORRECT?

 5   A    I DON'T REMEMBER.                                          01:11

 6   Q    YOU DON'T HAVE ANY REASON TO DISPUTE THAT, DO YOU?

 7   A    NOT ONE WAY OR ANOTHER.  I DON'T KNOW.

 8   Q    AND I TAKE IT, HAVING SEEN THIS, IT DOES NOT REFRESH YOUR

 9   RECOLLECTION WHETHER YOU HEARD FROM PAULA TREANTAFELLES, BACK

10   IN DECEMBER OF 2000, THAT THE FIRST USE OF THE "BRATZ" NAME OR    01:11

11   THESE THREE INDIVIDUAL BRATZ DOLL NAMES WAS JUNE 15TH OF 2000;

12   IS THAT TRUE?

13   A    I HAVE NO MEMORY OF THAT, NO.

14   Q    BUT YOU'RE NOT DENYING THAT'S THE STATEMENT THAT WAS MADE;

15   IS THAT TRUE?                                                   01:11

16   A    I DON'T REMEMBER.

17   Q    SO AS FAR AS YOU CAN TELL THE JURY HERE TODAY, YOU CAN'T

18   DISPUTE THAT THAT'S WHAT PAULA TREANTAFELLES TOLD YOU; IS THAT

19   RIGHT?

20   A    I CAN'T SAY ONE WAY OR ANOTHER.                           01:12

21   Q    IN THE FIRST SENTENCE HERE, YOU TALK -- THIS IS ON THE

22   SECOND PAGE OF THIS EXHIBIT -- YOU REFER TO, QUOTE,

23   "INTENT-TO-USE TRADEMARK APPLICATIONS FOR MR. LARIAN'S REVIEW

24   AND SIGNATURE."

25            DO YOU SEE THAT?                                      01:12
```

```
1    A    YES.

2    Q    AND YOU UNDERSTAND "MR. LARIAN" HERE IS ISAAC LARIAN.

3    A    YES.

4    Q    NOW, ONE TYPE OF TRADEMARK APPLICATION THAT YOU'RE

5    FAMILIAR WITH IS CALLED AN INTENT-TO-USE APPLICATION; IS THAT    01:12

6    RIGHT?

7    A    YES.

8    Q    AND SOMETIMES PEOPLE ABBREVIATE THAT AS "ITU".

9    A    YES.

10   Q    AND EVEN THOUGH THESE TYPES OF TRADEMARK APPLICATIONS ARE    01:12

11   CALLED "INTENT-TO-USE APPLICATIONS," YOU HAVE, AS A TRADEMARK

12   LAWYER, PREPARED THESE APPLICATIONS EVEN WHERE THE CLIENT HAS

13   TOLD YOU THAT THE TRADEMARK WAS ALREADY BEING USED; IS THAT

14   TRUE?

15   A    THAT HAS HAPPENED.    01:13

16   Q    AND ONE REASON THAT YOU HAVE FILED ITU APPLICATIONS,

17   INTENT-TO-USE APPLICATIONS, EVEN WHERE THE CLIENT HAS TOLD YOU

18   THAT THEY'RE ALREADY USING THE TRADEMARK IN SOME WAY, IS

19   BECAUSE THAT'S A FASTER PROCEDURE; YOU'D HAVE TO HAVE LESS

20   DOCUMENTATION; IS THAT RIGHT?    01:13

21   A    IN GENERAL, YES.

22   Q    RETURNING TO THE SENTENCE HERE, WHERE IT SAYS, "TO

23   PAULA TREANTAFELLES," YOU INDICATED THAT ALL FOUR OF THE

24   APPLICATIONS HAVE A DATE OF FIRST USE OF JUNE 15, 2000.

25        DO YOU HAVE ANY RECOLLECTION OF PAULA TREANTAFELLES    01:13
```

1    CONTACTING YOU AND TELLING YOU THAT THIS INFORMATION THAT WAS

2    REFLECTED HERE WAS INCORRECT?

3    A    NO.

4    Q    DID ANYONE AT MGA?

5    A    I DON'T REMEMBER.                                          01:13

6    Q    YOU DON'T HAVE A RECOLLECTION OF THAT HAPPENING?

7    A    NO, I DON'T REMEMBER SPEAKING WITH ANYONE AT MGA.

8    Q    NOW, ONE WAY THAT YOU, AS A TRADEMARK ATTORNEY, HAVE

9    TRACKED INFORMATION ABOUT TRADEMARK APPLICATIONS, WHETHER

10   YOURSELF OR THROUGH YOUR STAFF, IS TO BASICALLY PUT THE       01:14

11   INFORMATION INTO KINDS OF DATABASES; IS THAT RIGHT?

12   A    SOMEONE AT THE FIRM WOULD DO IT.  NOT ME.

13   Q    IN GENERAL, AS A TRADEMARK LAWYER, YOU CONSIDER IT

14   IMPORTANT TO TRACK THE VARIOUS DEADLINES THAT GO ALONG WITH

15   APPLICATIONS; IS THAT TRUE?                                   01:14

16   A    OH, YES.

17   Q    AND LAW FIRMS, INCLUDING THE LAW FIRMS THAT YOU'VE WORKED

18   AT, THEY HAVE COMPUTER DATABASES AND SOFTWARE THAT THEY USE TO

19   MAKE SURE THAT THAT'S DONE PROPERLY.

20   A    YES.                                                      01:14

21   Q    AND IT'S IMPORTANT TO MAINTAIN ACCURATE INFORMATION IN

22   THOSE KINDS OF DATABASES; RIGHT?

23   A    YES.

24   Q    BECAUSE IF THERE ARE MISTAKES IN THERE, IT COULD MEAN THAT

25   DEADLINES ARE MISSED, TRADEMARK REGISTRATIONS CAN LAPSE, AND IT  01:14

1    CAN OTHERWISE AFFECT THE RIGHTS OF THE CLIENT.

2    A    TRUE.

3    Q    AND SOMETIMES THESE KINDS OF DATABASES ARE SOMETHING

4    CALLED "TRADEMARK DOCKETS" OR "TRADEMARK DOCKET SHEETS".

5    A    YES.                                                           01:15

6    Q    AND BACK IN 2000, YOUR FIRM CREATED A TRADEMARK DOCKET

7    SHEET THAT ALSO DOCUMENTED THIS CONVERSATION WITH

8    PAULA TREANTAFELLES ABOUT THE JUNE 15, 2000 FIRST-USE DATE; IS

9    THAT TRUE?

10   A    I WOULDN'T KNOW THAT.                                          01:15

11   Q    IF YOU WOULD LOOK AT EXHIBIT 11192.  IN PARTICULAR, WE'LL

12   FOCUS ON THE SECOND PAGE OF THIS DOCUMENT; IT'S THE ONE DASH

13   TWO.

14        YOU RECOGNIZE THIS AS A PRINTOUT OF A RUSS AUGUST

15   TRADEMARK DOCKET SHEET; IS THAT TRUE?                              01:15

16   A    NO.

17   Q    DO YOU HAVE ANY REASON TO DOUBT THAT'S WHAT IT IS?

18   A    I HAVE NO REASON TO SAY ONE WAY OR ANOTHER.  I'VE NEVER

19   LOOKED AT THE DOCKET SHEET.

20   Q    YOU'RE SAYING YOU'VE NEVER IN YOUR ENTIRE LIFE SEEN A         01:16

21   TRADEMARK DOCKET SHEET IN THIS FORM?

22   A    I HAVE SEEN A DOCKET SHEET, BUT IT ISN'T MY USUAL PRACTICE

23   TO LOOK AT THE INFORMATION ON THE DOCKET SHEET.

24   Q    WHETHER IT'S YOUR USUAL PRACTICE OR NOT, THOUGH, YOU'VE

25   SEEN THEM.                                                          01:16

```
 1   A    I HAVE SEEN A DOCKET SHEET IN MY LIFE, YES.
 2   Q    AND YOU HAVE A GENERAL UNDERSTANDING AS TO WHAT THEY'RE
 3   USED FOR; IS THAT TRUE?
 4   A    YES.
 5   Q    AND HOW THEY'RE MAINTAINED?                              01:16
 6   A    NO -- YES.
 7   Q    YOU KNOW GENERALLY THE KINDS OF INFORMATION THAT GO INTO
 8   THEM AND THE PROCESSES AND PROCEDURES THAT ARE USED TO MAINTAIN
 9   THEM; IS THAT TRUE?
10   A    YES.                                                    01:16
11   Q    AND, IN FACT -- WELL, MAYBE YOU DON'T DO IT FREQUENTLY --
12   YOU DO, FROM TIME TO TIME, CONSULT WITH THIS KIND OF
13   INFORMATION, OR HAVE OTHER PEOPLE OBTAIN THIS KIND OF
14   INFORMATION, SO YOU CAN PROVIDE ADVICE TO CLIENTS; IS THAT
15   TRUE?                                                        01:16
16   A    COULD YOU REPEAT THE QUESTION AGAIN.  I WANT TO MAKE SURE
17   I ANSWER IT ACCURATELY.
18   Q    SURE.
19        WHILE I UNDERSTAND THAT YOU'RE SAYING THAT YOU DON'T
20   CONSULT THEM FREQUENTLY, FROM TIME TO TIME, IN THE COURSE OF  01:17
21   YOUR PRACTICE, YOU HAVE LOOKED AT TRADEMARK DOCKET SHEETS OF
22   THIS KIND IN ORDER TO LEARN INFORMATION OR REFRESH YOURSELF
23   ABOUT INFORMATION SO YOU CAN PROVIDE LEGAL ADVICE; IS THAT
24   TRUE?
25   A    I HAVE.                                                 01:17
```

thursday, june 5, 2008          trial day 8, morning session

```
 1          MR. NOLAN:  IF MR. ZELLER WANTS TO OFFER THIS AS A
 2   BUSINESS RECORD --
 3          THE COURT:  HE HASN'T OFFERED ANYTHING YET.
 4          MR. NOLAN:  I WAS JUST GOING TO SAY I DIDN'T OBJECT
 5   TO IT.  I'M JUST TRYING TO SHORTCUT THIS.                01:17
 6          MR. ZELLER:  I APPRECIATE THAT.
 7          I WOULD THEN MOVE THIS EXHIBIT INTO EVIDENCE,
 8   YOUR HONOR.
 9          MR. NOLAN:  WE HAVE NO OBJECTION.
10          MR. ZELLER:  THEN WE DON'T HAVE TO GO THROUGH THE  01:17
11   BUSINESS RECORD AGAIN.
12          THE COURT:  VERY WELL.
13          MR. QUINN:  IF WE COULD PLEASE PULL UP EXHIBIT
14   11192-2 IN EVIDENCE.  ONLY PAGE 2.  I'M NOT INTERESTED IN
15   PAGE 1.                                                  01:17
16   BY MR. ZELLER:
17   Q    NOW, IN GENERAL, YOU RECOGNIZE THIS AS A TRADEMARK DOCKET
18   SHEET OF THE LAW FIRM YOU WERE WITH BACK IN 2000; IS THAT
19   RIGHT?
20   A    IN GENERAL.                                         01:18
21   Q    AND YOU'LL SEE THAT THERE'S A CLIENT NUMBER THERE, AND
22   HERE, IT SAYS "2067-57."
23          DO YOU SEE THAT?
24   A    YES.
25   Q    AND THAT POINT 57 MEANS THAT THAT'S, LIKE, THE 57TH MATTER  01:18
```

```
 1   THAT YOUR FIRM HAS HANDLED FOR THE PARTICULAR CLIENT?  IS THAT
 2   GENERALLY TRUE?
 3   A    YES.
 4   Q    AND THEN IT SAYS, "ATTORNEY:  LBA."
 5        THAT'S YOU?                                            01:18
 6   A    YES.
 7   Q    AND THEN IF YOU LOOK DOWN FURTHER, YOU'LL SEE THAT THE
 8   TRADEMARK REFERENCED HERE IS BRATZ.
 9   A    YES.
10   Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT THAT'S WHAT   01:18
11   THIS DOCKET SHEET IS ABOUT; IT'S ABOUT BRATZ.
12   A    CORRECT.
13   Q    THEN IF WE CAN GO FURTHER DOWN TO THE REMARK SECTION.
14        YOU'LL SEE, RIGHT THERE AT THE BEGINNING, IT SAYS,
15   "DATES OF USE:  6-15-2000."                                 01:18
16        DO YOU SEE THAT?
17   A    I SEE THAT.
18   Q    AND YOU DON'T HAVE ANY REASON TO DISPUTE THAT THAT'S THE
19   INFORMATION THAT WAS PUT INTO THE RUSS AUGUST DOCKET SHEET; IS
20   THAT TRUE?                                                  01:19
21   A    TRUE.
22   Q    AND THEN IT GOES ON TO SAY, "CLIENT WANTS TO FILE ASAP, SO
23   ITU STATUS AS OF 12-7-00."
24        DO YOU SEE THAT?
25   A    YES.                                                   01:19
```

```
 1   Q    AND DO YOU AGREE WITH ME THAT THIS REFLECTS THAT MGA

 2   WANTED THE APPLICATION FILED AS AN ITU SO, AS WE TALKED ABOUT

 3   EARLIER, IT COULD BE FILED AS QUICKLY AS POSSIBLE?

 4   A    THAT'S WHAT THAT NOTATION WOULD SEEM TO INDICATE.

 5           THE COURT:  WHAT DOES "ITU" STAND FOR?                 01:19

 6           THE WITNESS:  INTENT TO USE.

 7   BY MR. ZELLER:

 8   Q    JUST A COUPLE MORE QUESTIONS, THEN.

 9           MGA IS PAYING FOR YOUR LEGAL REPRESENTATION IN THIS

10   CASE; IS THAT TRUE?                                           01:19

11   A    YES.

12   Q    AND THE LAWYER INVOLVED IS A LARRY MCFARLAND?

13   A    YES.

14   Q    HE'S REPRESENTING YOU?

15   A    YES, HE IS.                                              01:19

16   Q    AND YOU'RE GENERALLY AWARE THAT MR. MCFARLAND HAS

17   REPRESENTED MGA FOR A NUMBER OF YEARS; IS THAT TRUE?

18   A    I WASN'T AWARE OF THAT.

19           MR. ZELLER:  THANK YOU.

20                      CROSS-EXAMINATION                          01:20

21   BY MR. NOLAN:

22   Q    MS. ARANT, COULD YOU TELL THE JURY APPROXIMATELY HOW MANY

23   TRADEMARK APPLICATIONS YOU FILE FOR CLIENTS EACH YEAR.

24   A    EACH YEAR?  WELL, I HAPPENED TO LOOK UP THAT I FILED 4,917

25   SINCE 2000.                                                   01:20
```

```
 1   Q    I'M NOT GOING TO ASK YOU QUESTIONS ABOUT EACH ONE OF

 2   THOSE; BUT GENERALLY, IF I DID, WOULD YOU BE ABLE TO RECALL ANY

 3   OF THEM SPECIFICALLY?

 4   A    NOT ONCE.  DEPENDS HOW RECENTLY I'VE DONE THEM; BUT NO.

 5   Q    WHAT ABOUT GOING BACK EIGHT YEARS?                          01:21

 6   A    DEFINITELY NOT.

 7   Q    HAVE YOU OR YOUR ASSISTANT, IN ANY OF THOSE 4,917

 8   APPLICATIONS, EVER NOTICED A TYPO OR AN ERROR BEING MADE IN A

 9   PARTICULAR APPLICATION?

10   A    YES.                                                        01:21

11   Q    WHAT HAPPENS WHEN THERE'S A MISTAKE IN AN APPLICATION?  IS

12   THERE A PROCEDURE WHEREBY A CLIENT CAN CORRECT THOSE ERRORS?

13   A    YES.

14   Q    CAN YOU EXPLAIN TO THE JURY HOW THOSE PROCEDURES FOR

15   CORRECTING ERRORS OCCUR.                                         01:21

16   A    YOU CAN FILE A NEW STATEMENT OF USE OR A NEW ALLEGATION OF

17   USE WITH THE TRADEMARK OFFICE, SAYING THERE HAD BEEN A MISTAKE

18   IN THE ORIGINAL DATES OF USE AND YOU WISH TO CORRECT IT.

19   Q    AND WERE THOSE NOTICES OF CORRECTION FILED?

20   A    IN CERTAIN CASES, YES.                                      01:22

21   Q    AND WHERE ARE THEY FILED?

22   A    AT THE UNITED STATES PATENT AND TRADEMARK OFFICE.

23   Q    THOSE ARE PUBLIC FILINGS?

24   A    YES, THEY ARE.

25   Q    AS YOU SIT HERE TODAY -- AND I KNOW YOUR RECOLLECTION IS    01:22
```

1   NOT GOOD, BUT IN THAT LAST DOCUMENT --

2           **MR. NOLAN:**  CAN WE GO BACK TO THE LAST EXHIBIT THAT

3   WAS UP FOR THE JURY.

4   **BY MR. NOLAN:**

5   Q    THIS IS EXHIBIT 11192-002.                                    01:22

6           DID YOU INPUT ANY OF THIS DATA?

7   A    NO.

8   Q    IF WE COULD JUST GO DOWN TO DATES OF USE.

9           IF I UNDERSTAND FROM YOUR TESTIMONY, MS. ARANT, THE

10  DATES OF USE WOULD BE THAT THE PRODUCT HAD BEEN OFFERED FOR        01:23

11  SALE IN EITHER INTERSTATE COMMERCE, FOREIGN, OR IN THE UNITED

12  STATES; CORRECT?

13  A    YES.

14  Q    DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO WHEN BRATZ, THE

15  DOLL, WAS EVER OFFERED FOR SALE IN EITHER THE UNITED STATES OR     01:23

16  FOREIGN COMMERCE?

17  A    NO.

18  Q    IF THERE WAS TESTIMONY IN THIS CASE FROM COMPETENT

19  WITNESSES THAT INDICATED THAT THE BRATZ DOLL WAS FIRST OFFERED

20  FOR USE IN INTERSTATE COMMERCE, IN EITHER SPAIN OR THE UNITED      01:23

21  STATES, ON JUNE 15, 2001, WOULD YOU HAVE ANY BASIS TO DISPUTE

22  THAT EVIDENCE?

23          **MR. ZELLER:**  MISSTATES THE TESTIMONY, YOUR HONOR.

24  LACKS FOUNDATION.

25          **MR. NOLAN:**  I'M JUST ASKING IF SHE WOULD DISPUTE IT.   01:24

```
 1              THE COURT:  I UNDERSTAND, COUNSEL.

 2              I'M GOING TO SUSTAIN THE OBJECTION.

 3              REPHRASE YOUR QUESTION.

 4   BY MR. NOLAN:

 5   Q    A PRIOR EMPLOYEE OF MGA, VICTORIA O'CONNOR, TESTIFIED      01:24

 6   YESTERDAY THAT THE FIRST TIME THAT BRATZ WAS SOLD WAS IN SPAIN

 7   IN JUNE OF 2001; AND MY QUESTION TO YOU IS, DO YOU HAVE ANY

 8   EVIDENCE OR KNOWLEDGE THAT WOULD DISPUTE VICTORIA O'CONNOR'S

 9   TESTIMONY?

10   A    NO.                                                        01:24

11              MR. ZELLER:  I THINK THAT STILL MISSTATES THE

12   TESTIMONY, YOUR HONOR.  IT DOES LACK FOUNDATION, IN ANY EVENT.

13              THE COURT:  OVERRULED.  FOUNDATION, I'LL SUSTAIN.

14              LAY A FOUNDATION FOR THIS WITNESS TO KNOW THAT,

15   COUNSEL, TO DISPUTE THE JUNE 2001 DATE.                         01:25

16   BY MR. NOLAN:

17   Q    AS I RECALL YOUR TESTIMONY, YOU HAVE NO INDEPENDENT

18   RECOLLECTION OF ANY CONVERSATION WITH ANY REPRESENTATIVE OF

19   MGA; CORRECT?

20   A    CORRECT.                                                   01:25

21   Q    NOR DO YOU HAVE ANY RECOLLECTION OF ANY COMMUNICATIONS

22   BETWEEN YOUR ASSISTANT AND YOURSELF REGARDING ANY

23   COMMUNICATIONS BACK IN THE YEAR 2000 WITH A REPRESENTATIVE OF

24   MGA; CORRECT?

25   A    CORRECT.                                                   01:25
```

```
 1   Q    GOING BACK TO 11192-002.  THIS IS THE TRADEMARK DOCKET
 2   ENTRY SHEET.
 3            DO YOU SEE IT SAYS, "DATES OF USE:  6-15-2000;
 4   AWAITING SPECIMENS; CLIENT WANTS TO FILE ASAP, SO ITU STATUS OF
 5   12-7-00"?                                                         01:26
 6            THAT'S WHAT MR. ZELLER DIRECTED YOU TO.
 7            I WANT TO DIRECT YOU TO THE NEXT POINT.
 8            IT SAYS, "VICTORIA O'CONNOR AT ABC D.B.A. MGA" --
 9   THAT'S KIND OF A FANCY WAY OF SAYING IT'S MGA; RIGHT?
10   A    YES.                                                         01:26
11   Q    "STATUS OF APPLICATION:  SHE CALLED ON MARCH 26, 2001.
12   SHE IS THE LICENSING DIRECTOR AT MGA.  HER EXTENSION IS 194."
13            DO YOU SEE THAT?
14   A    YES.
15   Q    NOW, DO YOU HAVE ANY BASIS TO SAY THAT YOUR KNOWLEDGE OF     01:27
16   THE STATUS OF THE DATE OF FIRST USE FOR BRATZ WAS SUPERIOR TO
17   THAT OF VICTORIA O'CONNOR?
18   A    NO.
19   Q    SO IF SOMEONE WANTED TO KNOW THE ACTUAL AND CORRECT DATE
20   OF FIRST USE FOR THE BRATZ DOLL, BY LOOKING AT THIS TRADEMARK     01:27
21   TRACKING SHEET, IF YOU HAD TO CONTACT SOMEONE, WHO WOULD YOU
22   CONTACT TO GET THAT INFORMATION?
23   A    VICTORIA O'CONNOR.
24   Q    EXPLAIN TO ME AGAIN, SO THAT I'M CLEAR ON THIS, WHEN YOU
25   SAY 'DATE OF FIRST USE FOR BRATZ:  6-15-2000.'  IN YOUR MIND,     01:28
```

1    WHAT DOES THAT MEAN?  THAT IT WAS ACTUALLY OFFERED FOR SALE IN

2    INTERSTATE COMMERCE IN EITHER FOREIGN OR THE UNITED STATES?

3    A    YES.

4            **MR. ZELLER:**  LACKS FOUNDATION AS TO THIS DOCUMENT.

5            **THE COURT:**  REPHRASE YOUR QUESTION, COUNSEL.                    01:28

6    **BY MR. NOLAN:**

7    Q    WITHOUT REFERENCE TO THIS DOCUMENT, JUST BASED ON YOUR

8    EXPERIENCE AS A LAWYER, WHAT WOULD IT MEAN IF THE DOCUMENT SAID

9    THAT THE FIRST DATE OF USE WAS JUNE 15, 2000?

10   A    THAT WOULD MEAN IT WAS OFFERED FOR SALE IN INTERSTATE          01:28

11   COMMERCE OR IN COMMERCE BETWEEN THE UNITED STATES AND A FOREIGN

12   COUNTRY.

13   Q    WOULD IT BE SUFFICIENT JUST TO SAY THAT THE DOLL WAS IN

14   DEVELOPMENT BUT NOT OFFERED FOR RETAIL?

15   A    NO.                                                            01:29

16   Q    SO BASED ON YOUR EXPERIENCE, IN ORDER FOR THAT DATE OF

17   FIRST USE TO BE ACCURATE, IT WOULD HAVE TO BE TIED TO THE

18   ACTUAL DATE THAT THE BRATZ DOLL WAS OFFERED FOR RETAIL IN

19   INTERSTATE COMMERCE; CORRECT?

20           **MR. ZELLER:**  FOUNDATION.                                   01:29

21           **THE COURT:**  LAY A FOUNDATION.

22   **BY MR. NOLAN:**

23   Q    HOW LONG HAVE YOU BEEN A LAWYER?

24   A    SINCE 1980; 28 YEARS.

25   Q    AND YOU'VE FILED OVER 4,900 APPLICATIONS?                      01:29

thursday, june 5, 2008            trial day 8, morning session

1   A   YES.

2   Q   IN THOSE APPLICATIONS, YOU, AS MR. ZELLER POINTED OUT, ARE

3   FAMILIAR WITH THE VARIOUS TERMS THAT ARE USED IN THE TRADEMARK

4   APPLICATIONS; CORRECT?

5   A   YES.                                                          01:29

6   Q   AND YOU TRY TO BE CORRECT WHEN YOU FILE THESE

7   APPLICATIONS?

8   A   OF COURSE.

9   Q   SOMETIMES YOU MAKE MISTAKES; CORRECT?

10  A   CORRECT.                                                      01:29

11  Q   BUT NEVERTHELESS, YOUR UNDERSTANDING OF FIRST DATE OF USE

12  OF A PRODUCT, FOR PURPOSES OF FILING A DOCUMENT WITH THE U.S.

13  TRADEMARK OFFICE, IS BASED ON YOUR YEARS OF EXPERIENCE;

14  CORRECT?

15  A   CORRECT.                                                      01:30

16  Q   AS WELL AS BEING AN EXAMINER AT THE OFFICE; CORRECT?

17  A   CORRECT.

18  Q   SO CAN YOU PLEASE EXPLAIN TO THE JURY WHAT "DATE OF FIRST

19  USE" MEANS WITH RESPECT TO OFFERING BRATZ FOR RETAIL.

20  A   "DATE OF FIRST USE" MEANS FIRST OFFERED FOR SALE IN          01:30

21  INTERSTATE COMMERCE OR OFFERED FOR SALE BETWEEN THE UNITED

22  STATES AND A FOREIGN COUNTRY.

23  Q   I'D LIKE YOU TO TURN YOUR ATTENTION TO EXHIBIT 00557

24  THAT'S IN FRONT OF YOU.

25          CAN YOU IDENTIFY FOR THE JURY WHAT THIS DOCUMENT IS.     01:31

```
 1   A     IT APPEARS TO BE A COPYRIGHT REGISTRATION.

 2   Q     TURN TO 557-0003.

 3         DO YOU SEE YOUR SIGNATURE?

 4   A     YES.

 5   Q     WHAT PAGE DOES THAT APPEAR ON?                          01:31

 6   A     557-003.

 7   Q     AND THIS DOCUMENT IS A COPYRIGHT APPLICATION, CERTIFICATE

 8   OF REGISTRATION, FILED WITH THE UNITED STATES COPYRIGHT AND

 9   TRADEMARK OFFICE; CORRECT?

10   A     IT APPEARS TO BE, YES.                                  01:31

11   Q     AND THIS WAS FILED ON OR AROUND JUNE 18, 2001.

12   A     THE DATE I SEE IS JULY 16, 2001.

13         MR. ZELLER:  YOUR HONOR, THIS IS OUTSIDE THE SCOPE.

14   WE'RE GETTING INTO DIFFERENT ISSUES THAN WAS ADDRESSED THROUGH

15   MY DIRECT.                                                    01:32

16         THE COURT:  OVERRULED.

17         MR. NOLAN:  THANK YOU.

18   BY MR. NOLAN:

19   Q     YOU'RE CORRECT ON THE DATE.  I APOLOGIZE.

20         IN ANY EVENT, DID YOU CAUSE THIS DOCUMENT TO BE FILED    01:32

21   WITH THE COPYRIGHT OFFICE OF THE UNITED STATES OF AMERICA?

22   A     I DON'T REMEMBER PERSONALLY.

23   Q     BUT YOU DID SIGN IT; CORRECT?

24   A     YES.

25   Q     IN SIGNING IT, DID YOU HAVE THE INTENT TO HAVE IT FILED  01:32
```

1    WITH THE COPYRIGHT OFFICE?

2    A    YES.

3           **MR. NOLAN:**  YOUR HONOR, WE'D OFFER

4    EXHIBIT NUMBER 00557.

5           **MR. ZELLER:**  NO OBJECTION, YOUR HONOR.                    01:32

6           **THE COURT:**  IT'S ADMITTED.

7           **MR. ZELLER:**  IF I COULD HAVE THIS ON THE SCREEN.

8    **BY MR. NOLAN:**

9    Q    NOW, THIS IS A DOCUMENT WITH A GOLD SEAL.

10          SO THIS IS THE FIRST PAGE OF THE DOCUMENT THAT'S            01:32

11   FILED WITH THE COPYRIGHT OFFICE; CORRECT?

12   A    AGAIN, I DON'T KNOW FOR SURE, BUT IT SEEMS TO BE.

13   Q    TURN TO THE SECOND PAGE.  AND THIS IS THE CERTIFICATE, AND

14   THERE'S A "FORM VA" ON IT.

15          DO YOU SEE THAT?                                            01:33

16   A    YES.

17   Q    THE FIRST LINE REFERS TO THE JADE DOLL CONFIGURATION,

18   ACCESSORIES, AND PACKAGING.

19          DO YOU SEE THAT?

20   A    YES.                                                          01:33

21   Q    TURN YOUR ATTENTION DOWN TO THE LEFT-HAND CORNER, RIGHT

22   ABOVE "COPYRIGHT CLAIMANTS."  IT SAYS, "YEAR IN WHICH CREATION

23   OF THIS WORK WAS COMPLETED."

24          DO YOU SEE THAT?

25   A    YES.                                                          01:33

thursday, june 5, 2008              trial day 8, morning session

```
 1   Q    WHAT IS THE DATE THERE?

 2   A    2000.

 3   Q    AND THEN IT SAYS, "DATE AND NOTICE OF FIRST PUBLICATION OF

 4   THIS PARTICULAR WORK."

 5        DO YOU SEE THAT?                                            01:33

 6   A    YES.

 7   Q    AND THAT DATE IS FEBRUARY 12, 2001.

 8   A    YES.

 9   Q    IF YOU COULD TURN TO THE SECOND PAGE; THIS IS THE PAGE

10   THAT HAS YOUR SIGNATURE ON IT.                                  01:34

11        DO YOU RECOGNIZE YOUR SIGNATURE?

12   A    YES.

13   Q    AND THE DATE OF YOUR SIGNATURE IS 7-16-01.

14   A    YES.

15   Q    KEEPING THAT DOCUMENT CLOSE BY, FLIP TO EXHIBIT 00558.     01:34

16        FIRST OF ALL, BEFORE I GO OFF OF THAT LAST DOCUMENT,

17   DO YOU REMEMBER WHERE YOU GOT ANY OF THE INFORMATION THAT WAS

18   LISTED IN THAT APPLICATION THAT YOU SIGNED?

19   A    NO.

20   Q    DIRECTING YOU TO 0558, DO YOU SEE THIS DOCUMENT?           01:34

21   A    YES.

22   Q    THIS IS A CORRECTION FORM DOCUMENT FILED WITH THE

23   COPYRIGHT AND PATENT OFFICE; CORRECT?

24   A    IT'S A DIFFERENT ONE THAT'S ON THE SCREEN; CORRECT?

25        I JUST WANT TO MAKE SURE WE'RE LOOKING AT THE SAME         01:34
```

```
 1   THING.
 2            MR. ZELLER:  THIS HASN'T ACTUALLY BEEN OFFERED INTO
 3   EVIDENCE YET.  I DON'T HAVE AN OBJECTION TO IT BEING
 4   INTRODUCED, BUT I DON'T THINK THERE'S FOUNDATION TO ASK THE
 5   WITNESS ABOUT IT.                                              01:35
 6            THE COURT:  VERY WELL.
 7            MR. NOLAN:  YOUR HONOR, INSTEAD OF GOING THROUGH THE
 8   FOUNDATION, COULD I JUST OFFER IT INTO EVIDENCE?
 9            THE COURT:  LAY A FOUNDATION COUNSEL.  KEEP IT IN
10   ORDER.                                                         01:35
11   BY MR. NOLAN:
12   Q    SO DO YOU HAVE NOW IN FRONT OF YOU 00558?
13   A    YES.
14   Q    AND ON THE TOP, IT SAYS "FORM CA."
15        DO YOU SEE THAT?                                          01:35
16   A    YES.
17   Q    IT'S DATED MARCH 28, 2005.
18   A    YES.
19   Q    AND THERE IS A REGISTRATION NUMBER ON THERE OF VA
20   1090-287.                                                      01:35
21   A    YES.
22   Q    AND THEN RIGHT ABOVE THAT REGISTRATION NUMBER, AGAIN, IT
23   HAS THE DESCRIPTION OF "JADE DOLL CONFIGURATION, ACCESSORIES,
24   AND PACKAGING."
25   A    YES.                                                      01:36
```

1    Q    AND WHAT IS THIS DOCUMENT?

2    A    THIS IS A CORRECTED FORM THAT YOU WOULD FILE IF THERE HAD

3    BEEN A MISTAKE IN A COPYRIGHT.

4    Q    AND THIS IS FILED WITH WHICH OFFICE?

5    A    I'M NOT A COPYRIGHT ATTORNEY.  I'M NOT SURE.  BUT THE         01:36

6    COPYRIGHT OFFICE.

7    Q    IF YOU TURN TO THE SECOND PAGE, DO YOU SEE THERE THAT

8    THERE'S A SPACE WHERE CORRECTIONS CAN BE MADE TO THE DOCUMENT

9    THAT YOU HAD PREVIOUSLY SIGNED?

10   A    I SEE THAT.                                                   01:36

11         MR. NOLAN:  YOUR HONOR, WE'D OFFER THIS.

12         MR. ZELLER:  NO OBJECTION TO THE INTRODUCTION OF THE

13   EXHIBIT; BUT, AGAIN, I DON'T THINK THERE'S PROPER FOUNDATION

14   WITH THIS WITNESS.

15         THE COURT:  OVERRULED.                                       01:36

16         YOU MAY INTRODUCE IT.

17   BY MR. NOLAN:

18   Q    SO THE FIRST PAGE, WE TALKED ABOUT.

19         I JUST WANT TO GO TO THE SECOND PAGE.  THIS IS THE

20   BLOCK WHERE THERE'S ROOM FOR THE CORRECTIONS TO BE MADE.          01:37

21         DO YOU SEE THAT?

22   A    YES.

23   Q    AND I JUST WANT TO MAKE CERTAIN WE PUT THIS IN CONTEXT.

24   THE DOCUMENT THAT I SHOWED YOU FIRST, WHERE YOU WERE FILING THE

25   COPYRIGHT APPLICATION THAT YOU SIGNED FOR JADE COLLECTIBLES,      01:37

1    HAD A DATE DURING WHICH CREATION OF THIS WORK WAS THE YEAR

2    2000.

3            DO YOU REMEMBER THAT?

4    A    THE ONE YOU JUST SHOWED ME BUT TOLD ME TO KEEP, YES.

5    Q    NOW, IF YOU WOULD GO BACK TO THE CORRECTED FORM, WHICH IS        01:37

6    THE NEXT EXHIBIT.  DO YOU SEE THAT?

7    A    YES.

8    Q    LET'S GO UP TO 3-A, LINE 3-A; YEAR OF COMPLETION:

9    INCORRECT INFORMATION, 2000, AND THEN CORRECTED INFORMATION,

10   YEAR 2001; CORRECT?                                                  01:38

11   A    I SEE THAT, YES.

12   Q    AND THIS IS A FORM WHEREBY THE APPLICANT CAN GO BACK TO

13   THE UNITED STATES TRADEMARK AND COPYRIGHT OFFICE AND SAY, 'HEY,

14   ONE OF THE FORMS HAD THE WRONG DATE ON IT.  IT'S EITHER A TYPO,

15   MISINFORMED, AND THE CORRECTED INFORMATION IS THERE OF 2001';        01:38

16   CORRECT?

17   A    YES.

18   Q    IF YOU COULD TURN TO 00559.

19           DO YOU SEE THAT?

20   A    YES.                                                            01:39

21   Q    AND THIS IS AN APPLICATION FOR COPYRIGHT FOR THE SASHA

22   DOLL CONFIGURATION, ACCESSORIES, AND PACKAGING; CORRECT?

23   A    YES.

24   Q    AND THIS WAS FILED WITH THE COPYRIGHT OFFICE?

25   A    YES.                                                            01:39

1    Q    AND THE DATE OF CREATION ON THIS WAS THE YEAR 2000?

2    A    YES.

3         **MR. NOLAN:**  YOUR HONOR, WE'D OFFER EXHIBIT NUMBER

4    00559.

5         **MR. ZELLER:**  NO OBJECTION.                          01:39

6         **THE COURT:**  IT'S ADMITTED.

7         YOU MAY PUBLISH.

8    **BY MR. NOLAN:**

9    Q    LET'S GO TO THE YEAR, WHERE IT SAYS 2000, CREATION,

10   SIMILAR TO THE APPLICATION FOR JADE, RIGHT, THAT I JUST SHOWED   01:39

11   YOU?

12   A    YES.

13   Q    SO NOW, IF YOU COULD LOOK AT 00560, WHICH IS NEXT IN YOUR

14   BOOK.

15        DO YOU RECOGNIZE THIS DOCUMENT ALSO AS A CORRECTION       01:40

16   FORM?

17   A    YES.

18   Q    SO THIS IS, AGAIN, THE CORRECTION FORM FOR SASHA DOLL

19   CONFIGURATION, ACCESSORIES, AND PACKAGING, A CORRECTION FORM

20   FOR THAT EARLIER COPYRIGHT APPLICATION; CORRECT?               01:40

21   A    YES.

22   Q    AND IF YOU TURN TO PAGE 2, DO YOU SEE CORRECTIONS WERE

23   MADE ON THAT PAGE?

24   A    YES.

25        **MR. NOLAN:**  YOUR HONOR, WE'D OFFER EXHIBIT NUMBER     01:40

```
 1    00560.

 2              MR. ZELLER:  NO OBJECTION, YOUR HONOR.

 3              THE COURT:  IT'S ADMITTED.

 4              YOU MAY PUBLISH.

 5              MR. NOLAN:  GO TO LINE 3-A.                        01:40

 6    BY MR. NOLAN:

 7    Q    DO YOU SEE WHERE THE INCORRECT INFORMATION WAS 2000 AND

 8    THE CORRECT INFORMATION WAS THE YEAR 2001?

 9    A    YES.

10    Q    THIS ONE APPEARS TO BE SIMILAR TO THE OTHER ONE,        01:40

11    CORRECTING A TYPO.

12    A    YES.

13    Q    NOW GOING BACK TO --

14              MR. ZELLER:  LET ME MAKE A BELATED OBJECTION.

15              "CORRECTING THE TYPO," THERE'S NO FOUNDATION FOR    01:40

16    THAT.

17              THE COURT:  SUSTAINED.

18    BY MR. NOLAN:

19    Q    IT IS CORRECTING THE DATE OF 2000 TO THE YEAR 2001;

20    CORRECT?                                                    01:41

21    A    YES.

22    Q    IT APPEARS THAT THE DATE OF 2000 WAS PLACED ON THE FORM

23    INCORRECTLY; YES?

24    A    IT APPEARS.

25              MR. ZELLER:  FOUNDATION.  AND, ALSO, THERE'S LOTS OF  01:41
```

thursday, june 5, 2008          trial day 8, morning session

```
 1   LEADING QUESTIONS AS WELL.

 2          THE COURT:  LET'S STOP.

 3          I SUSTAIN THE OBJECTION TO THAT LAST QUESTION.

 4   BY MR. NOLAN:

 5   Q   LET'S GO TO 00561.                                01:41

 6          THE COURT:  COUNSEL, THIS IS THE SAME ISSUE.

 7          COULD WE GET A STIPULATION ON THIS?  IS THIS A MATTER

 8   OF DISPUTE, COUNSEL?

 9          MR. NOLAN:  I'M HAPPY TO GO THROUGH IT, BECAUSE

10   THERE'S ONLY A FEW MORE.                              01:41

11          THE COURT:  MR. ZELLER?

12          MR. ZELLER:  THERE'S NOT NECESSARILY A MATTER OF

13   DISPUTE AS TO THE AUTHENTICITY OR ADMISSIBILITY OF THESE

14   DOCUMENTS.

15          THE COURT:  FOR ALL FOUR?                      01:41

16          MR. ZELLER:  THERE IS WITH RESPECT TO WHAT THIS

17   WITNESS CAN TESTIFY TO ABOUT THEM.

18          THE COURT:  THAT'S WHY I'M SUGGESTING A STIPULATION

19   AT THIS POINT, IN THE INTEREST OF TIME.

20          MR. NOLAN:  IF I MIGHT, YOUR HONOR, I WOULD STIPULATE   01:42

21   THAT WE WOULD OFFER INTO EVIDENCE THE COPYRIGHT APPLICATION

22   MARKED 00561, FOR CLOE DOLL; AND THE CORRESPONDING CORRECTED

23   FORM, WHICH IS TRIAL 00562; AND THEN THE CORRECTED FORM, SHOWN

24   00563, FOR YASMIN; AND 00564, WHICH IS ANOTHER CORRECTED FORM,

25   YOUR HONOR, FOR THE DOLLS.  AND THAT'S THE LAST IN THE SERIES   01:42
```

```
1   OF THOSE.

2           THE COURT:  ANY OBJECTION TO THOSE THREE BEING

3   ADMITTED, COUNSEL?

4           MR. ZELLER:  NO, YOUR HONOR.

5           THE COURT:  VERY WELL.                              01:42

6           MR. NOLAN:  THANK YOU, YOUR HONOR, FOR SPEEDING THAT

7   UP.

8   BY MR. NOLAN:

9   Q   HAS ANYBODY SUGGESTED TO YOU THAT YOU SHADE YOUR TESTIMONY

10  IN THIS CASE?                                               01:43

11  A   NO.

12  Q   OR THAT YOU SHOULD FORGET APPLICATIONS THAT YOU FILED IN

13  THE YEAR 2000?

14  A   NO.

15  Q   BASED ON YOUR EXPERIENCE, BOTH AS AN EXAMINER AND AS A   01:43

16  PRACTICING ATTORNEY, HAVING FILED OVER 4,917 TRADEMARK

17  APPLICATIONS, ATTORNEYS AND CLIENTS SOMETIMES MAKE MISTAKES;

18  CORRECT?

19  A   CORRECT.

20  Q   THERE'S A PROCEDURE, AUTHORIZED BY LAW, TO MAKE         01:44

21  CORRECTIONS; CORRECT?

22          MR. ZELLER:  QUESTION IS VAGUE AS TO WHAT CORRECTIONS

23  HE'S TALKING ABOUT.

24          THE COURT:  FAIR ENOUGH.

25          SPECIFY, COUNSEL.                                   01:44
```

1   BY MR. NOLAN:

2   Q    SO THERE ARE PROCEDURES APPROVED BY THE COPYRIGHT OFFICE

3   THAT ALLOW CLAIMANTS, EITHER THROUGH THEIR LAWYERS OR BY

4   THEMSELVES, TO FILE FORMS TO CORRECT INFORMATION THAT HAS BEEN

5   CONTAINED IN EARLIER APPLICATIONS; CORRECT?                    01:44

6   A    CORRECT.

7   Q    AND MANY OF YOUR CLIENTS TAKE ADVANTAGE OF THE OPPORTUNITY

8   TO CORRECT INFORMATION THAT WAS PUT IN BY ERROR ON FORMS.

9   A    MANY?

10  Q    SOME.                                                     01:44

11  A    SOME.

12  Q    MGA IS NOT THE ONLY CLIENT THAT YOU KNOW OF WHO'S EVER

13  FILED A CORRECTED FORM WITH THE COPYRIGHT OFFICE; IS THAT

14  CORRECT?

15  A    NO.                                                       01:45

16  Q    THANK YOU.

17          MR. NOLAN:  NOTHING FURTHER.

18                   REDIRECT EXAMINATION

19  BY MR. ZELLER:

20  Q    COUNSEL JUST TOOK YOU THROUGH A SERIES OF WHAT HE CALLED   01:45

21  CORRECTION FORMS; RIGHT?

22  A    CORRECT.

23  Q    THOSE ARE CORRECTION FORMS WITH THE U.S. COPYRIGHT OFFICE;

24  CORRECT?

25  A    CORRECT.                                                  01:45

1   Q    THEY ARE NOT CORRECTION FORMS WITH THE U.S. TRADEMARK

2   OFFICE, ARE THEY?

3   A    NO.

4   Q    THOSE ARE SEPARATE OFFICES AND DIFFERENT PARTS OF THE

5   FEDERAL GOVERNMENT, AREN'T THEY?                          01:45

6   A    YES.

7   Q    AND, IN FACT, A CORRECTION IN THE COPYRIGHT OFFICE IS NOT

8   A CORRECTION TO A TRADEMARK APPLICATION; RIGHT?

9   A    RIGHT.

10  Q    SO YOU'LL AGREE WITH ME THAT THOSE FORM CA'S THAT HE      01:45

11  SHOWED YOU, THESE CORRECTIONS FOR COPYRIGHT APPLICATIONS, HAVE

12  NOTHING TO DO WITH STATEMENTS THAT WERE MADE TO YOU, THAT WE'VE

13  SEEN IN THESE DOCUMENTS, REGARDING THE FIRST USE OF THE "BRATZ"

14  NAME; IS THAT TRUE?

15  A    TRUE.                                                 01:45

16  Q    AND, IN FACT, ARE YOU AWARE OF ANY EFFORTS EVER MADE BY

17  MGA TO CORRECT STATEMENTS MADE TO THE TRADEMARK OFFICE ABOUT

18  WHEN THE "BRATZ" NAME WAS FIRST USED?

19  A    I'M NOT AWARE, NO.

20  Q    AND THEN FOCUSING SPECIFICALLY ON THE FACTS THAT I SHOWED  01:46

21  YOU THAT CAME FROM YOUR OFFICE TO PAULA TREANTAFELLES, ARE YOU

22  AWARE OF ANY EFFORT EVER MADE BY MGA TO CORRECT

23  PAULA TREANTAFELLES'S STATEMENT THAT THE FIRST-USE DATE OF THE

24  "BRATZ" DOLL NAME OR THE INDIVIDUAL BRATZ DOLL NAMES WAS

25  JUNE 15, 2000?                                           01:46

```
 1   A     NO.

 2   Q     ARE YOU AWARE OF ANY EFFORT EVER MADE BY YOUR LAW FIRM OR

 3   BY MGA TO CORRECT THE FIRST-USE DATE OF JUNE 15, 2000, FOR THE

 4   BRATZ TRADEMARK, AS REFLECTED IN THE DOCKET SHEET THAT I SHOWED

 5   YOU?                                                          01:46

 6   A     NO.

 7   Q     NOW, YOU WERE ASKED BY COUNSEL IF YOU'VE EVER MADE A

 8   MISTAKE OR A TYPO; I HAD A TYPO IN THE DOCUMENT.

 9         DO YOU HAVE ANY INFORMATION OR KNOWLEDGE THAT THE

10   JUNE 15, 2000 DATE REFLECTED IN YOUR FAX, THE FAX OF YOUR       01:47

11   OFFICE, AND THE DOCKET SHEET WAS A TYPO?

12   A     I HAVE NO INFORMATION ONE WAY OR THE OTHER.

13   Q     YOU DON'T KNOW IF IT WAS A MISTAKE OR NOT; ISN'T THAT

14   TRUE?

15   A     TRUE.                                                   01:47

16   Q     SO YOU CAN'T TURN TO THE JURY AND TELL THEM THAT DATE WAS

17   A TYPO OR A MISTAKE; IS THAT TRUE?

18   A     TRUE.

19   Q     AND I TAKE IT YOU DO NOT HAVE PERSONAL KNOWLEDGE OF WHEN

20   THE "BRATZ" NAME WAS FIRST USED; IS THAT TRUE?                01:47

21   A     THAT'S TRUE.

22   Q     OR THE INDIVIDUAL DOLL NAMES?

23   A     THAT'S TRUE.

24   Q     AND, IN FACT, WHAT YOU DO AS A TRADEMARK LAWYER -- YOU

25   DON'T GO OUT AND INDEPENDENTLY INVESTIGATE WHAT THE CLIENTS    01:47
```

1    TELL YOU; ISN'T THAT TRUE?

2    A    TRUE.

3    Q    SO IF THEY TELL YOU THE FIRST-USE DATE OF SOMETHING LIKE

4    THE BRATZ TRADEMARK WAS JUNE 15, 2000, YOU HAVE TO RELY ON THE

5    CLIENT.                                                          01:48

6    A    YES.

7    Q    AND SO, AS FAR AS YOU KNOW, THE INFORMATION THAT WAS

8    CONVEYED TO YOU AND WHAT'S REFLECTED IN THOSE DOCUMENTS IS, IN

9    FACT, WHAT PAULA TREANTAFELLES SAID TO YOUR OFFICE BACK IN

10   DECEMBER OF 2000; IS THAT TRUE?                                  01:48

11   A    I DON'T KNOW ONE WAY OR ANOTHER.

12   Q    YOU CAN'T DISPUTE IT.

13   A    I HAVE NO REASON TO DISPUTE IT.  I JUST DON'T REMEMBER.

14   Q    YOU RECALL THAT MR. NOLAN, MGA'S COUNSEL, SHOWED YOU WHAT

15   WAS CALLED THE "FORM CA," WHICH IS A COPYRIGHT OFFICE FORM THAT  01:48

16   HAS NOTHING TO DO WITH THE TRADEMARKS; RIGHT?

17   A    CORRECT.

18   Q    AND YOU ANSWERED QUESTIONS WITH HIM ABOUT WHAT THE FORM CA

19   MEANS; IS THAT TRUE?

20   A    YES.                                                        01:49

21   Q    WHAT I'D LIKE TO DO IS -- YOUR DEPOSITION SHOULD BE UP

22   THERE.  IF YOU COULD TAKE A LOOK AT IT.  I'D LIKE TO DIRECT

23   YOUR ATTENTION TO PAGE 51, LINES 2 THROUGH 18.

24   A    YES.

25   Q    DO YOU SEE THAT TESTIMONY THERE?                            01:49

```
 1   A    YES.
 2              THE COURT:  ANY OBJECTION FROM MR. NOLAN?
 3          MR. NOLAN:  NO OBJECTION, YOUR HONOR.
 4          THE COURT:  VERY WELL.  YOU MAY PROCEED.
 5   BY MR. ZELLER:                                          01:50
 6   Q    YOU'LL SEE HERE THAT MR. WEBSTER, A MATTEL ATTORNEY, WAS
 7   ASKING YOU A QUESTION; RIGHT?
 8   A    YES.
 9   Q    BY THE WAY, YOU GAVE YOUR DEPOSITION IN MAY OF THIS YEAR;
10   RIGHT?                                                  01:50
11   A    YES.
12   Q    AND YOU REMEMBER THAT WHEN YOU GAVE THE DEPOSITION, YOU
13   RAISED YOUR HAND AND YOU SWORE TO TELL THE TRUTH.
14   A    YES.
15   Q    YOU CERTAINLY INTENDED TO DO THAT; RIGHT?          01:50
16   A    YES.
17   Q    SO THEN LOOKING BACK HERE, STARTING AT LINE 2,
18   "MR. WEBSTER, LET'S MARK AS THE NEXT EXHIBIT" -- AND THEN IT
19   SHOWS EXHIBIT 5531 WAS MARKED.
20          QUESTION:  "HAVE YOU EVER PREPARED COPYRIGHT     01:50
21   APPLICATIONS DURING YOUR CAREER?"
22          ANSWER:  "YES."
23          QUESTION:  "DO YOU RECOGNIZE THIS FORM AS A FORM THAT
24   IS PREPARED FOR THE COPYRIGHT OFFICE?"
25          ANSWER:  "YES."                                  01:50
```

```
 1          QUESTION:  "WHAT'S THIS KIND OF FORM PREPARED FOR?
 2   WHAT REASON?"
 3          AND THERE'S AN OBJECTION.
 4          ANSWER:  "YEAH.  OKAY.  I HAVEN'T DONE THE CA ONES IN
 5   A WHILE, SO I DON'T REALLY REMEMBER WHAT THEY'RE FOR.'      01:51
 6   BY MR. ZELLER:
 7   Q    THAT'S THE TESTIMONY THAT YOU GAVE AT YOUR DEPOSITION
 8   ABOUT A MONTH AGO.
 9   A    YES.
10   Q    SO WHAT IS IT THAT YOU'VE DONE TO BE ABLE TO COME IN AND  01:51
11   TELL THE JURY WHAT THE PURPOSE OF A FORM CA IS IN RESPONSE TO
12   MR. NOLAN'S QUESTIONS?
13   A    BECAUSE AFTER I SAW THE FORM CA, I EDUCATED MYSELF AS TO
14   WHAT THEY'RE FOR.
15   Q    AND SO HOW DID YOU GO ABOUT DOING THAT?             01:51
16   A    I SPOKE WITH THE PARALEGAL IN OUR OFFICE ABOUT WHAT THE
17   CA FORMS ARE USED FOR.  I LOOKED AT A FEW OF THEM, SO I WOULD
18   KNOW WHAT THEY'RE FOR.
19   Q    SO YOU COULD COME IN AND TESTIFY FOR MGA?
20   A    SO -- NO, NOT --                                    01:51
21   Q    WHAT WAS THE PURPOSE, JUST BETWEEN LAST MONTH AND TODAY,
22   SUDDENLY NOW KNOWING, OR REMEMBERING, I SHOULD SAY, THE PURPOSE
23   OF THE FORM CA IS?
24   A    FOR MY OWN PERSONAL BETTERMENT.  I HAD SEEN THE CA AT THE
25   DEPOSITION.  I WANTED TO KNOW WHAT THEY WERE FOR AND I ASKED  01:51
```

```
 1   THE PARALEGAL ABOUT IT.

 2   Q    SO IT WAS A COINCIDENCE.

 3   A    NO.  IT WAS SOMETHING THAT I HAD BEEN EXPOSED TO AT THE

 4   DEPOSITION THAT I WANTED TO EDUCATE MYSELF ABOUT.

 5   Q    BUT YOU DID THAT ON YOUR OWN, JUST SO IN THE EVENT            01:52

 6   MR. NOLAN ASKED YOU QUESTIONS ABOUT IT, YOU COULD ANSWER HIM?

 7   A    NO.  I WANTED TO KNOW FOR MY OWN BETTERMENT.

 8   Q    IF WE COULD, PLEASE -- AND THIS IS IN YOUR WHITE BINDER --

 9   TAKE A LOOK AT THE FIRST EXHIBIT, 557 IN EVIDENCE, IN

10   PARTICULAR, THE SECOND PAGE.                                      01:52

11   A    YES.

12   Q    THAT'S ON THE SCREEN.

13        IN PARTICULAR, YOU'LL SEE WHERE IT SAYS, "YEAR IN

14   WHICH CREATION OF THIS WORK WAS COMPLETED."

15        DO YOU SEE THAT?                                             01:53

16   A    YES.

17   Q    BY THE WAY, YOU FILLED OUT THIS FORM AND YOU SIGNED IT AND

18   SENT IT TO THE COPYRIGHT OFFICE; RIGHT?

19   A    I DON'T REMEMBER -- ACTUALLY, I DID NOT FILL IT OUT.

20   Q    WELL, YOU SIGNED IT AS MGA'S ATTORNEY?                       01:53

21   A    YES.

22   Q    AND IT WAS SUBMITTED TO THE COPYRIGHT OFFICE?

23   A    YES.

24   Q    DID YOU READ IT BEFORE IT WENT?

25   A    YES.                                                         01:53
```

```
 1    Q    AND BY THE WAY, THE INFORMATION THAT'S REFLECTED IN THIS

 2    FORM, THAT'S INFORMATION THAT YOU OR YOUR OFFICE RECEIVED FROM

 3    MGA; RIGHT?

 4    A    YES.

 5    Q    SO WHERE IT SAYS, "YEAR IN WHICH CREATION OF THIS WORK WAS    01:53

 6    COMPLETED," AND IT SAYS 2000, THAT IS INFORMATION MGA GAVE YOUR

 7    OFFICE?

 8    A    I DON'T KNOW PERSONALLY IN THIS CASE, BUT --

 9    Q    YOU DON'T HAVE ANY REASON TO DOUBT THAT?

10    A    I DON'T KNOW.                                                 01:53

11    Q    BUT IT'S YOUR EXPECTATION THAT'S WHERE IT CAME FROM?

12    A    YES.

13    Q    AND THIS FORM VA IS A COPYRIGHT APPLICATION FOR THE BRATZ

14    JADE DOLL; ISN'T THAT TRUE?

15    A    YES.                                                          01:54

16    Q    SO AT THE TIME, WHEN THIS COPYRIGHT APPLICATION WAS

17    PREPARED AND YOU SIGNED IT AND IT WAS SUBMITTED TO THE

18    COPYRIGHT OFFICE, YOU BELIEVED, BASED ON INFORMATION THAT MGA

19    GAVE YOU, THAT THE JADE DOLL HAD BEEN COMPLETED BY THE END OF

20    2000; ISN'T THAT TRUE?                                            01:54

21    A    YES.

22    Q    DIRECTING YOUR ATTENTION TO EXHIBIT 558, WHICH IS THE

23    FORM CA FOR THIS JADE DOLL REGISTRATION.  IT SHOULD BE THE NEXT

24    ONE IN THAT WHITE BINDER.

25    A    YES.
```

```
 1   Q    THIS FORM CA WAS NOT SUBMITTED BY YOU; IS THAT TRUE?

 2   A    TRUE.

 3   Q    YOU YOURSELF, PRIOR TO THIS LAWSUIT, NEVER SAW THIS FORM;

 4   IS THAT TRUE?

 5   A    TRUE.                                                        01:55

 6   Q    YOU DON'T HAVE ANY KNOWLEDGE OR INFORMATION ABOUT WHY

 7   THINGS WERE CHANGED, SHOWING IN THIS FORM, OR WHAT THE BASIS OF

 8   IT WAS; IS THAT TRUE?

 9   A    TRUE.

10   Q    NOW, YOU'LL SEE THE DATE ON THIS IS MARCH 28, 2005.         01:55

11   A    YES.

12   Q    AND SO, GENERALLY, YOU UNDERSTAND THAT MGA WENT BACK TO

13   THE COPYRIGHT OFFICE AND MADE CHANGES TO THE REPRESENTATIONS IT

14   HAD MADE TO THE COPYRIGHT OFFICE PREVIOUSLY IN THAT

15   REGISTRATION YOU SIGNED; RIGHT?                                  01:55

16   A    I HAVE NO PERSONAL KNOWLEDGE, BUT THAT'S WHAT THIS

17   DOCUMENT WOULD SEEM TO INDICATE.

18   Q    YOU KNOW THAT BASED ON THE KNOWLEDGE YOU'VE NOW OBTAINED

19   ABOUT FORM CA'S; RIGHT?

20   A    YES.                                                        01:55

21   Q    AND DO YOU SEE THE DATE ON WHICH THIS WAS FILED, MARCH 28,

22   2005?

23   A    YES.

24   Q    THAT'S ALMOST A YEAR AFTER THIS LAWSUIT WAS FILED; ISN'T

25   IT?                                                              01:56
```

```
 1   A     I DON'T KNOW WHEN THIS LAWSUIT WAS FILED.

 2   Q     YOU DON'T HAVE ANY INFORMATION ABOUT WHETHER OR NOT

 3   MARCH 28, 2005 IS AFTER THE LAWSUIT WAS FILED, THE ONE THAT

 4   BRINGS US HERE TODAY?

 5   A     I DON'T KNOW WHEN IT WAS FILED.                                01:56

 6   Q     ARE YOU PERSONALLY FAMILIAR WITH SITUATIONS WHERE YOU'VE

 7   HAD CLIENTS, AFTER LITIGATION HAS STARTED, GO BACK TO THE

 8   COPYRIGHT OFFICE THREE, FOUR YEARS LATER AND CHANGE INFORMATION

 9   IN THE COPYRIGHT APPLICATIONS THEY HAD PREVIOUSLY SUBMITTED?

10   A     HAVE I PERSONALLY?                                            01:56

11   Q     RIGHT.

12   A     NO.

13   Q     SO YOU CAN'T TELL US THAT'S A NORMAL EVENT; ISN'T THAT

14   TRUE?

15         MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.                   01:56

16         THE COURT:  IT'S ALSO VAGUE AS TO "NORMAL."  I'LL

17   SUSTAIN THE OBJECTION TO THE QUESTION.

18         YOU CAN REPHRASE, COUNSEL, IF YOU WISH.

19   BY MR. ZELLER:

20   Q     THERE'S NOT A SINGLE EPISODE IN YOUR CAREER THAT YOU CAN      01:56

21   TELL US ABOUT WHERE YOU HAD A CLIENT GO BACK THREE, FOUR YEARS

22   LATER, AFTER A LAWSUIT WAS FILED, AND CHANGE THE

23   REPRESENTATIONS THEY HAD MADE TO THE COPYRIGHT OFFICE ABOUT

24   WHEN THE WORK THAT'S AT ISSUE IN THE LAWSUIT WAS CREATED; IS

25   THAT TRUE?                                                          01:57
```

```
 1   A     THAT'S TRUE.

 2   Q     DIRECTING YOUR ATTENTION TO EXHIBIT 559 --

 3              THE COURT:  COUNSEL, I DON'T KNOW HOW LONG THIS IS

 4   GOING TO GO.  LET'S TAKE OUR MORNING BREAK.

 5              (WHEREUPON, JURORS DEPART COURTROOM.)                  01:57

 6              THE COURT:  COUNSEL, WE'RE GOING TO SET UP BACK IN

 7   CHAMBERS.  IT'S GOING TO TAKE US ABOUT FIVE MINUTES TO DO THIS

 8   IN-CAMERA, UNDER-SEAL HEARING.

 9              MS. ANDERSON, IF YOU WOULD COME BACK; AND COUNSEL FOR

10   MATTEL.

11              I KNOW YOU WANT TO BE THERE, MR. NOLAN, BUT, AGAIN,

12   YOU'RE NOT GETTING THE SETTLEMENT AGREEMENT AT THIS POINT.

13              I AM GOING TO ASK, ON BEHALF OF THE COURT REPORTER,

14   TO SHUT DOWN THE REAL TIME TRANSMISSION; SO LET'S MAKE SURE

15   THAT'S DONE.  AND THEN ONCE WE'VE COMPLETED BACK THERE, THE      01:58

16   COURT WILL TAKE ANOTHER FIVE MINUTES BEFORE WE RESUME.

17              COURT IS IN RECESS.

18              (BRIEF RECESS TAKEN.)

19              THE CLERK:  ALL RISE FOR THE JURY.

20              (JURORS ENTER COURTROOM.)                             02:43

21   BY MR. ZELLER:

22   Q     GOOD MORNING AGAIN.

23              IF WE COULD PLEASE TAKE A LOOK AT EXHIBIT 559; AND IF

24   WE CAN PULL THE SECOND PAGE UP ON THE SCREEN; IT'S IN EVIDENCE.

25              YOU'LL SEE HERE THAT THIS IS A COPYRIGHT REGISTRATION  02:44
```

1  THAT YOU SIGNED AND SUBMITTED TO THE COPYRIGHT OFFICE FOR THE

2  SASHA DOLL; IS THAT TRUE?

3  A    I DON'T SEE MY SIGNATURE HERE.  559?

4  Q    I APOLOGIZE.  IT COULD BE THE WAY IT WAS PRODUCED IN THIS

5  FORM; IT DOESN'T HAVE THE SIGNATURE PAGE.                    02:44

6         BUT YOU'LL SEE YOUR NAME DOES APPEAR ON THIS.

7         **MR. NOLAN:**  SOMETHING WAS BEING SHOWN THAT WAS

8  INCONSISTENT WITH HER TESTIMONY.  I DIDN'T KNOW WHERE THE PAGE

9  WAS.

10        **THE COURT:**  IS THIS IN EVIDENCE?                  02:44

11        **MR. ZELLER:**  I BELIEVE SO, AS 559.

12        **THE COURT:**  VERY WELL.  YOU MAY PROCEED.

13 **BY MR. ZELLER:**

14 Q    YOU DON'T HAVE ANY REASON TO DOUBT THAT BACK IN THE 2001

15 TIME PERIOD, YOU SIGNED AND SUBMITTED TO THE COPYRIGHT OFFICE    02:45

16 FOR MGA FOUR DIFFERENT COPYRIGHT APPLICATIONS FOR FOUR BRATZ

17 DOLLS; IS THAT TRUE?

18 A    I HAVE NO REASON TO DISPUTE THAT.

19 Q    AND FROM WHAT WE'VE SEEN IN THE DOCUMENTS, THAT WOULD BE

20 THE CLOE DOLL, THE SASHA DOLL, AND THE JADE DOLL.               02:45

21 A    YES.

22 Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT IN EACH OF

23 THOSE APPLICATIONS, ALL FOUR OF THEM THAT YOU SUBMITTED TO THE

24 COPYRIGHT OFFICE, THAT YOU, ON BEHALF OF MGA, REPRESENTED TO

25 THE COPYRIGHT OFFICE THAT THE YEAR THAT THE DOLLS WERE           02:45

```
 1   COMPLETED OR WAS COMPLETED WAS THE YEAR 2000; IS THAT TRUE?
 2   A    I HAVE NO REASON TO DISPUTE THAT.
 3   Q    AND YOU HAVE NO REASON TO DISPUTE THAT AS WITH RESPECT TO
 4   ALL FOUR APPLICATIONS SUBMITTED TO THE COPYRIGHT OFFICE, THAT
 5   YOU OR SOMEONE AT YOUR OFFICE RECEIVED THAT INFORMATION FROM      02:46
 6   MGA.
 7   A    TRUE.
 8   Q    IN FACT, IT'S YOUR EXPECTATION THAT'S WHERE IT CAME FROM.
 9   A    YES.
10   Q    ISN'T IT TRUE WITH RESPECT TO ALL FOUR APPLICATIONS AND      02:46
11   WITH RESPECT TO THE FORM CA'S THAT WERE FILED THAT MR. NOLAN
12   SHOWED YOU FOR EACH OF THOSE REGISTRATIONS, AS FAR AS YOU KNOW,
13   ALL OF THOSE WERE FILED AFTER THIS LAWSUIT WAS FILED; IS THAT
14   TRUE?
15   A    AGAIN, I DON'T KNOW WHEN THIS LAWSUIT WAS FILED, SO...        02:46
16   Q    BUT YOU CAN'T DISPUTE THAT.
17        MR. NOLAN:  WITHOUT KNOWING THE DATE OF THE LAWSUIT,
18   YOUR HONOR, I DON'T KNOW HOW SHE WOULD HAVE FOUNDATION TO
19   DISPUTE IT ONE WAY OR THE OTHER.
20        THE COURT:  IS THERE A STIPULATION CONCERNING WHEN IT        02:46
21   WAS FILED?
22        MR. NOLAN:  WHY DON'T WE STIPULATE WHEN THE FIRST
23   LAWSUIT WAS FILED.
24        THE COURT:  LETS ELIMINATE THE MYSTERY.
25        MR. ZELLER:  I BELIEVE IT'S APRIL 27, 2004.                  02:46
```

1          **MR. NOLAN:**  WE WILL STIPULATE TO THAT, YOUR HONOR.

2          **THE COURT:**  MEMBERS OF THE JURY, THE LAWSUIT WAS

3    FILED APRIL 27, 2004.

4          YOU MAY PROCEED.

5    **BY MR. ZELLER:**                                              02:47

6    Q    THEN IF WE COULD LOOK AT THE OTHER FORM CA'S, AND THE

7    FIRST ONE IS EXHIBIT 560.  YOU'LL REMEMBER MR. NOLAN ASKED YOU

8    QUESTIONS ABOUT THIS FORM CA, AND YOU SEE THIS ONE IS DATED

9    MARCH 28, 2005.

10   A    YES.                                                       02:47

11   Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT'S WHEN IT WAS

12   FILED; IS THAT TRUE?

13   A    I DON'T KNOW ONE WAY OR THE OTHER.

14   Q    DIRECTING YOUR ATTENTION TO EXHIBIT 562, ONE OF THE OTHER

15   FORM CA'S MR. NOLAN ASKED YOU ABOUT.                            02:47

16   A    YES.

17   Q    YOU'LL SEE THIS ONE IS DATED MARCH 28, 2005.

18   A    YES.

19   Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT IS, IN FACT,

20   WHEN IT WAS FILED; IS THAT TRUE?                                02:47

21   A    NO REASON TO DOUBT THAT.

22   Q    AND THEN, FORTUNATELY, THE VERY LAST ONE IS EXHIBIT 564.

23   YOU'LL SEE THIS IS ANOTHER ONE OF THE FORM CA'S THAT MR. NOLAN

24   ASKED YOU ABOUT.  YOU'LL SEE IT'S DATED MARCH 28, 2005 AS WELL.

25   A    YES.                                                       02:48

1483

```
1   Q    AND YOU DON'T HAVE ANY REASON TO DISPUTE THAT IS WHEN IT

2   WAS FILED WITH THE COPYRIGHT OFFICE CHANGING THE YEAR OF THE

3   DATE OF CREATION OF THE DOLLS; IS THAT TRUE?

4   A    TRUE.

5   Q    I KNOW MR. NOLAN ASKED YOU SOME QUESTIONS ABOUT THE RATHER    02:48

6   LARGE VOLUME OF TRADEMARK APPLICATIONS THAT YOU'VE FILED OVER

7   THE YEARS OR BEEN RESPONSIBLE FOR OR PARTICIPATED IN FILING

8   OVER THE YEARS.  DO YOU REMEMBER THAT?

9   A    YES.

10  Q    BUT YOU'LL AGREE WITH ME THAT THIS CASE IS A LITTLE          02:48

11  DIFFERENT.  IN THIS CASE, YOU ACTUALLY SWORE TO CERTAIN

12  CIRCUMSTANCES SURROUNDING THE PARTICULAR APPLICATIONS, THE

13  TRADEMARK APPLICATIONS, FOR THE BRATZ NAME AND THE INDIVIDUAL

14  BRATZ DOLL NAMES, WITHIN THE LAST YEAR; RIGHT?

15  A    YOU MEAN IN THE DECLARATIONS THAT YOU WERE REFERRING TO?     02:49

16       YES.

17  Q    THAT'S NOT SOMETHING YOU DO ALL OF THE TIME, IS IT?

18  A    WELL, THIS IS THE FIRST LITIGATION I'VE BEEN INVOLVED IN,

19  SO, NO.

20  Q    SO THAT'S PRETTY MEMORABLE.                                  02:49

21  A    YES.

22  Q    SO YOU UNDERSTOOD THAT WHEN YOU WERE SUBMITTING --

23       LET'S ACTUALLY CLEAR SOMETHING UP FIRST, TOO.

24       YOU SUBMITTED THAT DECLARATION BECAUSE MGA ASKED YOU

25  TO SUBMIT IT; IS THAT TRUE?                                       02:49
```

```
 1    A    YES.

 2    Q    AND YOU UNDERSTOOD THAT YOU WERE SUBMITTING THAT

 3    DECLARATION IN SUPPORT OF MGA'S EFFORTS TO WITHHOLD FROM MATTEL

 4    THE FACTS THAT I SHOWED YOU THAT REFERS TO THE JUNE 15, 2000

 5    DATE OF FIRST USE; CORRECT?                                      02:49

 6              MR. NOLAN:   YOUR HONOR, OBJECT.  FOUNDATION; ALSO 403

 7    PURPOSES SUBJECT TO AN EARLIER RULING.

 8              THE COURT:   LAY FOUNDATION, COUNSEL.

 9    BY MR. ZELLER:

10    Q    MGA CAME TO YOU AND ASKED YOU TO PROVIDE A SUPPORTING       02:50

11    DECLARATION FOR THAT; IS THAT RIGHT?

12    A    YES.

13    Q    AND YOU UNDERSTOOD FROM YOUR CONVERSATIONS WITH THE MGA

14    LAWYERS AND YOUR COMMUNICATIONS WITH THE MGA LAWYERS, WHY YOU

15    WERE SUBMITTING THE DECLARATION; IS THAT TRUE?                   02:50

16    A    NO.

17    Q    THAT WAS NEVER DISCUSSED WITH YOU?

18    A    NOT AT THAT TIME.

19    Q    WELL, AT SOME POINT WAS IT DISCUSSED WITH YOU?

20    A    WHILE I WAS DOING IT, YES.                                  02:50

21    Q    AND AT SOME POINT, YOU LEARNED THAT YOU WERE PROVIDING

22    THIS DECLARATION IN SUPPORT OF MGA'S EFFORTS TO AVOID HAVING TO

23    PRODUCE THAT DECEMBER 2000 FAX THAT I SHOWED YOU EARLIER; IS

24    THAT TRUE?

25              MR. NOLAN:   OBJECTION, YOUR HONOR.  SUBJECT TO MOTION  02:50
```

1    *IN LIMINE* WITH RESPECT TO VARIOUS LITIGATION ISSUES AND

2    POSITIONS TAKEN IN THIS LAWSUIT.

3            THE COURT:  LET ME SEE YOU AT SIDE-BAR.

4            (SIDE-BAR PROCEEDINGS HELD AS FOLLOWS:)

5            THE COURT:  YOUR RESPONSE --                          02:51

6            MR. ZELLER:  I THINK IT GOES TO BIAS.  WE'VE ALREADY

7    TALKED ABOUT THE DECLARATION.  SHE'S GIVEN TESTIMONY ABOUT --

8            THE COURT:  HOW DOES IT GO TO HER BIAS, THOUGH?

9            MR. ZELLER:  BECAUSE SHE SAID CERTAIN THINGS JUST A

10   FEW MONTHS AGO WHERE SHE BASICALLY SAYS IN HER DECLARATION, "I   02:51

11   REMEMBER THE CIRCUMSTANCES UNDER WHICH I DID THESE

12   APPLICATIONS."  SHE PURPORTS TO SAY SHE UNDERSTOOD, REMEMBERED,

13   WHY IT WAS SHE HAD COMMUNICATIONS WITH PAULA TREANTAFELLES IN

14   THAT DECLARATION.

15           THE COURT:  WHEN WAS THAT DECLARATION SUBMITTED?        02:52

16           MR. NOLAN:  I BELIEVE ABOUT A YEAR AGO, YOUR HONOR.

17   I CAN GIVE YOU THE CIRCUMSTANCES, IF I MIGHT, YOUR HONOR.

18           I WANT TO SAY THAT IS THE ONE OF THE MOST OUTRAGEOUS

19   QUESTIONS I'VE HEARD ASKED IN THIS CASE, FOR THIS REASON.  THEY

20   KNOW THAT THERE WAS A MOTION THAT THEY BROUGHT TO WAIVE THE      02:52

21   ENTIRE ATTORNEY-CLIENT COMMUNICATIONS BETWEEN MS. ARANT AND HER

22   CLIENT.  JUDGE INFANTE RULED PARTIALLY THAT THE PRIVILEGE

23   EXTENDED TO CERTAIN COMMUNICATIONS, BUT NOT TO THIS PARTICULAR

24   FAX.  HE GRANTED THE MOTION IN PART AND THEN RELEASED THIS.

25           AGAIN, YOUR HONOR, NOW WHAT MR. ZELLER IS DOING --      02:52

```
 1    KNOWING THAT AND KNOWING WE HAVE A MOTION IN LIMINE IN THIS
 2    CASE WHERE WE'RE NOT ALLOWED TO GO INTO VARIOUS ARGUMENTS THAT
 3    WERE MADE, HE'S NOW POISONED THIS JURY REGARDING WHY WE WERE
 4    TRYING TO BLOCK THIS FAX.  THAT'S NOT WHAT WE WERE TRYING TO
 5    BLOCK.  WE WERE TRYING TO BLOCK THE WAIVER OF THE PRIVILEGE          02:53
 6    WITH AN ATTORNEY.  THAT'S INAPPROPRIATE.
 7            THE COURT:  I THINK THIS OPENS THE DOOR, IN A WAY.
 8    AND I UNDERSTAND YOUR THEORY.  I'M GOING TO SUSTAIN THE
 9    OBJECTION.  LET'S MOVE ON TO ANOTHER AREA, COUNSEL.
10            MR. ZELLER:  THANK YOU.                                     02:53
11            (SIDE-BAR PROCEEDINGS CONCLUDED.)
12            THE COURT:  OBJECTION IS SUSTAINED.  THE JURY IS TO
13    DISREGARD THE LAST QUESTION.
14            MR. ZELLER, ANYTHING FURTHER?
15            MR. NOLAN:  MOTION TO STRIKE ANY RESPONSE FROM THE          02:53
16    WITNESS.
17            THE COURT:  THERE WASN'T A RESPONSE; THAT'S WHAT I
18    WAS CHECKING.
19    BY MR. ZELLER:
20    Q    IS IT THE CASE THAT IN-BETWEEN THE TIME THAT YOU REVIEWED      02:53
21    AND SIGNED THE DECLARATION THAT WE SHOWED PARAGRAPHS FROM,
22    IN-BETWEEN THE TIME THAT YOU DID THAT AND THEN THE TIME THAT
23    YOUR DEPOSITION WAS TAKEN, DID YOU REVIEW ANYTHING TO TRY AND
24    REFRESH YOUR RECOLLECTION ABOUT WHAT YOU HAD DONE FOR MGA IN
25    CONNECTION WITH THESE BRATZ RELATED TRADEMARK APPLICATIONS?         02:54
```

```
 1   A     NO.

 2   Q     DID YOU DO ANYTHING BETWEEN THE TIME THAT YOU SIGNED THAT

 3   DECLARATION AND THE TIME THAT YOU CAME HERE TO TESTIFY TODAY AT

 4   TRIAL HERE TO BETTER YOUR RECOLLECTION ON THOSE EVENTS?

 5   A     YES.  I FILED A SUBSTITUTE DECLARATION.                      02:54

 6   Q     YOU DID SOMETHING -- YOU REFRESHED YOURSELF IN SOME WAY TO

 7   FILE THE SUBSTITUTE DECLARATION?

 8   A     NO.

 9   Q     MY QUESTION GOES TO WHAT YOU DID TO REFRESH YOURSELF ABOUT

10   SOMETHING; SO MY QUESTION LET ME JUST ASK IT MORE BROAD THAN       02:54

11   THAT.

12          IN-BETWEEN THE TIME THAT YOU REVIEWED AND YOU SIGNED

13   THE DECLARATION, WHICH IS BACK IN AUGUST OF 2007, WE TALKED

14   ABOUT, DID YOU DO ANYTHING TO REFRESH YOUR RECOLLECTION ABOUT

15   THOSE EVENTS BETWEEN THAT TIME AND THE TIME THAT YOU CAME IN       02:55

16   HERE TO TESTIFY TODAY?

17   A     NO.

18   Q     THANK YOU.

19          MR. NOLAN:  YOUR HONOR, COULD WE HAVE A SIDE-BAR FOR

20   A MOMENT?  I'D ASK FOR A STIPULATION.                             02:55

21          THE COURT:  YES.

22          (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

23          MR. NOLAN:  YOUR HONOR, I ASKED MR. ZELLER WHETHER OR

24   NOT HE WOULD STIPULATE TO WHEN MGA WAS SUED IN THIS CASE, SINCE

25   HE'S DRAWING THE INFERENCE THAT HE WANTS TO, WITH RESPECT TO      02:56
```

1   THIS LITIGATION.  HE'S REFUSING TO.  THIS IS A TIME YOU TAKE

2   JUDICIAL NOTICE OF THE FILING OF THE LAWSUIT AGAINST MGA.  I

3   THINK IT'S IMPROPER HAVING IT ONLY OUT THERE BY STIPULATION --

4   WHEN THE FIRST LAWSUIT WAS AGAINST CARTER BRYANT AND NOT

5   AGAINST MGA.                                                       02:56

6           THE COURT:  WHEN WAS THAT?

7           MR. NOLAN:  WE WERE SUED IN --

8           THE COURT:  I SHOULD KNOW THIS; I'VE GONE THROUGH

9   THESE DATES.

10          MR. ZELLER:  MGA BECAME A PARTY IN THE BRYANT SUIT IN    02:56

11  DECEMBER OF 2004 AND THEN THEY FILED THEIR LAWSUIT IN 2005.

12          THE COURT:  I THINK FOR THIS, THE RELATIONSHIPS ARE

13  SO CLOSE, COUNSEL.

14          MR. NOLAN:  BUT THE CLAIMS WERE NOT BEING BROUGHT

15  AGAINST MGA IN THIS CASE BY MATTEL UNTIL LATER.  IT'S UNFAIR,    02:57

16  AND HE KEPT RAISING IT.

17          THE COURT:  CAN WE AGREE ON WHAT DATE THAT WAS?

18          MS. AGUIAR:  JANUARY OF 27.

19          THE COURT:  JANUARY OF 2007.

20          WHICH IS AFTER THE DATE ON THE DOCUMENT.                 02:57

21          MR. ZELLER:  THAT'S NOT CORRECT.  I DON'T THINK

22  THAT'S A CORRECT --

23          THE COURT:  THIS IS SOMETHING WE CAN DO -- BECAUSE

24  THIS WITNESS DOES NOT KNOW WHEN IT WAS BROUGHT.

25          MR. NOLAN:  BUT MR. ZELLER HAS REPEATEDLY NOW BEEN       02:57

thursday, june 5, 2008          trial day 8, morning session

1    BACK TO 'AND THIS WAS AFTER THE LAWSUIT, THIS WAS AFTER THE

2    LAWSUIT,' AND I WANT TO MAKE CERTAIN THAT THE JURY NOW KNOWS

3    RIGHT NOW WHAT THE DATE WAS THAT THE CLAIMS WERE FILED AGAINST

4    MGA.

5            **THE COURT:**  I THINK THAT SOUNDS REASONABLE; TO COME          02:57

6    UP WITH -- TO EXPLAIN TO THE JURY THAT THE VARIOUS DATES THAT

7    THE LAWSUITS WERE BROUGHT, JUST TO CLARIFY.  IF YOU TWO CAN

8    STIPULATE AND GIVE ME A PIECE OF PAPER WITH THE DATES OF WHEN

9    THE MAJOR PLAYERS IN THIS LAWSUIT WERE BROUGHT, I WILL READ

10   THAT TO THE JURY.                                                      02:58

11           **MR. NOLAN:**  IN THE INTERIM --

12           **THE COURT:**  I'LL DO THAT AS SOON AS YOU HAVE THAT

13   READY.

14           **MR. NOLAN:**  IN THE INTERIM --

15           **THE COURT:**  IN THE INTERIM, GO ASK SOME QUESTIONS.          02:58

16           (SIDE-BAR PROCEEDINGS CONCLUDED. )

17   **BY MR. NOLAN:**

18   Q    MS. ARANT, DO YOU KNOW HOW MANY LAWSUITS HAVE BEEN FILED

19   IN THIS CASE?

20   A    NO.                                                               02:58

21   Q    DO YOU KNOW WHEN THE FIRST LAWSUIT WAS FILED NAMING MGA AS

22   A PARTY?

23   A    NO.

24   Q    MR. ZELLER ASKED YOU SOME QUESTIONS ABOUT WHETHER OR NOT

25   ANY CORRECTED FORMS WERE FILED BY YOU OR BY YOUR OFFICE               02:59

1    FOLLOWING YOUR FILING OF THE INTENDED USE TRADEMARK

2    APPLICATION; CORRECT?

3    A    I DIDN'T KNOW HE STIPULATED WHETHER THEY WERE FILED BY OUR

4    FIRM OR NOT.

5    Q    BUT IN ANY EVENT, YOU KNEW OF ANY EFFORTS TO CORRECT THE          02:59

6    APPLICATIONS THAT YOU HAD FILED.

7    A    HE DID ASK ME THAT QUESTION.

8    Q    OKAY.

9         IF YOU COULD GO BACK IN MATTEL'S EXHIBIT BOOK TO

10   EXHIBIT 11897.  WHAT I'D LIKE TO DO IS PUT THIS UP IN EVIDENCE,       02:59

11   YOUR HONOR -- PUT UP FOR THE JURY 11897-0003.

12        THIS IS THE APPLICATION FOR REGISTRATION THAT YOU

13   PREPARED FOR JADE; CORRECT?

14   A    YES.

15   Q    WILL YOU EXPLAIN TO THE JURY WHETHER OR NOT THIS WAS A           03:00

16   STATED USE APPLICATION OR AN INTENDED TO USE APPLICATION.

17   A    OKAY.  JUST ONE SECOND.  I'M ON THE WRONG -- I WAS TOLD IT

18   WAS 11897, AND WHAT I'M LOOKING AT AT 11897 DOESN'T MATCH WHAT

19   IS UP ON THE SCREEN.

20        **MR. NOLAN:**  MAY I HAVE A MOMENT TO LOOK AT HER              03:00

21   NOTEBOOK.

22        **THE COURT:**  YOU MAY.

23        **THE WITNESS:**  I'M SORRY.  IT'S PAGE 03 AND I WAS

24   LOOKING AT 01.

25   **BY MR. NOLAN:**

1    Q    ARE YOU THERE?

2    A    YES, I AM.

3    Q    AND THIS IS THE APPLICATION THAT YOU FILED?

4    A    YES.

5    Q    THIS IS THE INTENDED USE APPLICATION?                           03:01

6    A    YES.

7    Q    TAKE A MINUTE, IF YOU NEED TO, BUT COULD YOU PLEASE TELL

8    THE JURY IF THERE'S ANY PLACE IN THE APPLICATION THAT YOU FILED

9    WHERE YOU PUT IN A DATE OF USE OF THIS DOLL.

10   A    THERE IS NOT.                                                    03:01

11   Q    SO WHEN MR. ZELLER ASKED YOU IF THEY EVER CORRECTED IT,

12   WHAT WOULD HAVE BEEN CORRECTED?

13   A    NOTHING.

14   Q    AND THAT'S BECAUSE THIS WAS AN INTENDED USE APPLICATION;

15   CORRECT?                                                             03:01

16   A    RIGHT; AN INTENT TO USE APPLICATION, SO IT HAD NO DATES.

17   Q    IN FACT, YOU SEE THERE, THE SECOND PARAGRAPH, THE

18   APPLICANT HAS A BONA FIDE INTENTION...

19        DO YOU SEE THAT?

20        **MR. ZELLER:**  HE'S NOW LAPSING BACK INTO THE LEADING        03:02

21   QUESTIONS, SO I DON'T THINK IT'S APPROPRIATE.

22        **MR. NOLAN:**  I WAS LEADING AARON.  I MEANT TO LEAD

23   AARON AND NOT THE WITNESS.  I'M SORRY.

24        **THE COURT:**  VERY WELL.

25   **BY MR. NOLAN:**

1492

```
 1   Q    I HAVE UP ON THE SCREEN A STATEMENT THAT'S CONTAINED IN

 2   THE APPLICATION THAT YOU PREPARED; CORRECT?

 3   A    YES.

 4   Q    AND YOU FILED THIS WITH AN AGENCY OF THE UNITED STATES

 5   GOVERNMENT.                                                    03:02

 6   A    YES.

 7   Q    AT THE REQUEST OF MGA.

 8   A    YES.

 9   Q    AND COULD YOU JUST READ THIS TO THE JURY AND THEN EXPLAIN

10   WHAT IS MEANT BY THAT TERM.                                    03:02

11   A    YES.

12        THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE

13   MARK IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

14   GOODS/SERVICES.  15 USC 1051(B) AS AMENDED.  THIS IS THE

15   LANGUAGE THAT YOU USE IN A TRADEMARK APPLICATION FOR THE ITU,  03:03

16   OR THE INTENT TO USE APPLICATIONS.  THEY ARE KNOWN AS 1-B

17   APPLICATIONS, FOR THAT SMALL 'B,' MEANING THERE ARE NO DATES

18   BECAUSE THE MARK ISN'T YET IN USE IN COMMERCE IN CONNECTION

19   WITH THE GOODS OR SERVICES.

20   Q    AND THAT WAS FOR JADE; RIGHT?                             03:03

21   A    YES.

22   Q    NOW, IF YOU TURN TO 11897-005, DO YOU SEE THIS IS AN

23   APPLICATION THAT YOU PREPARED AND SUBMITTED TO THE UNITED

24   STATES AGENCY FOR YASMINE?

25   A    YES.                                                      03:03
```

thursday, june 5, 2008          trial day 8, morning session

1   Q    AND, LOOK AT THIS.  MR. ZELLER ASKED YOU, 'DID ANYBODY

2   EVER CORRECT IT?'  WAS THERE ANY NEED TO CORRECT THAT DOCUMENT?

3   A    THERE'S NOTHING TO BE CORRECTED BECAUSE IT'S AN INTENT TO

4   USE APPLICATION.

5          **MR. ZELLER:**  A BELATED OBJECTION.  MISCHARACTERIZES          03:03

6   THE QUESTIONS THAT WERE ASKED.

7          **THE COURT:**  SUSTAINED.  REPHRASE THE QUESTION,

8   COUNSEL.

9   **BY MR. NOLAN:**

10  Q    AGAIN, WE'RE GOING TO LOOK AT THIS DOCUMENT.                      03:04

11         IS THERE ANYWHERE IN THIS DOCUMENT THAT YOU LIST A

12  DATE WHERE YASMINE WAS INTRODUCED INTO INTERSTATE COMMERCE?

13  A    NO.

14  Q    IN FACT, THIS APPLICATION FOR YASMINE CONTAINS THE SAME

15  PARAGRAPH WE READ EARLIER ABOUT "THE APPLICANT HAS A BONA FIDE         03:04

16  INTENTION TO USE THE MARKS IN COMMERCE"; CORRECT?

17         **MR. ZELLER:**  LEADING.

18         **THE COURT:**  SUSTAINED.

19  **BY MR. NOLAN:**

20  Q    I'D ASK YOU TO TAKE A LOOK AT THIS DOCUMENT.  DO YOU SEE          03:04

21  ANYWHERE ON THIS DOCUMENT LANGUAGE WHICH WOULD SUGGEST --

22  STRIKE THAT.

23         COULD YOU READ THE SECOND PARAGRAPH TO THE JURY.

24  A    YES.

25         "THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE            03:04

1   MARK IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

2   GOODS/SERVICES.  15 USC 1051(B) AS AMENDED.

3   Q    I'D ASK YOU NOW TO TURN TO THE SAME EXHIBIT, 11897-0007.

4        DO YOU RECOGNIZE THIS AS THE INTENT TO USE

5   APPLICATION FOR TRADEMARK THAT YOU PREPARED FOR THE DOLL, FOR        03:05

6   THE MARK SASHA?

7   A    YES.

8   Q    DO YOU SEE ANYWHERE WHERE THERE'S A DATE OF USE LISTED IN

9   THIS APPLICATION FOR SASHA?

10  A    NO.                                                            03:05

11  Q    AGAIN, COULD YOU READ TO THE JURY THE SECOND PARAGRAPH ON

12  THIS APPLICATION.

13  A    "THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE MARK

14  IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

15  GOODS/SERVICES, 15 USC 1051(B) AS AMENDED."                         03:05

16  Q    CAN YOU TURN TO THE NEXT, 0009, THIS IS FOR THE MARK

17  BRATZ.

18        DO YOU SEE THAT?

19  A    CORRECT.

20  Q    AND THIS IS AN INTENDED USE APPLICATION THAT YOU PREPARED      03:05

21  FOR MGA CONCERNING THE MARK BRATZ?

22  A    YES.

23  Q    AND THIS APPLICATION WAS FILED WITH THE UNITED STATES

24  AGENCY?

25  A    YES.                                                           03:06

1   Q    I'D ASK YOU TO LOOK AT THIS.  IN THIS APPLICATION THAT YOU

2   FILED, DO YOU LIST ANY DATE OF USE FOR BRATZ?

3   A    NO.

4   Q    IN FACT, COULD YOU READ AGAIN THE SECOND PARAGRAPH OF THIS

5   APPLICATION?                                                    03:06

6   A    "THE APPLICANT HAS A BONA FIDE INTENTION TO USE THE MARK

7   IN COMMERCE ON OR IN CONNECTION WITH THE ABOVE IDENTIFIED

8   GOODS/SERVICES, 15 USC 1051(B) AS AMENDED."

9   Q    I WANT TO GO BACK VERY QUICKLY TO ANOTHER EXHIBIT THAT

10  MR. ZELLER SHOWED YOU; THIS IS 11192; IT'S IN HIS BLACK BOOK.   03:06

11  THESE ARE DOCKET SHEETS AND THEN A TRADEMARK DOCKET FORM FROM

12  YOUR FIRM; CORRECT?

13  A    YES.

14  Q    FIRST OF ALL, MR. ZELLER ASKED YOU WHETHER OR NOT MGA EVER

15  CORRECTED THESE FORMS; CORRECT?                                 03:07

16  A    I BELIEVE HE ASKED ME THAT.

17  Q    DOES THE CLIENT SEE THESE FORMS?

18  A    NO.

19  Q    LET'S GO TO THE FIRST SHEET FOR JUST A MOMENT.

20       THIS IS THE DOCKET SHEET.                                  03:07

21       IS THERE ANYTHING ON YOUR DOCKET SHEET, YOUR INTERNAL

22  DOCKET SHEET, THAT SHOWS A DATE OF FIRST USE?

23       **MR. QUINN:**  YOUR HONOR, THIS IS TECHNICALLY NOT IN

24  EVIDENCE.  I DIDN'T MOVE PAGE 1.  THIS IS PAGE 1 OF 2; I DON'T

25  KNOW WHAT THIS DOCUMENT IS.  MGA PRODUCED IT.                   03:07

1       **MR. NOLAN:**  TAKE IT DOWN.

2       **MR. ZELLER:**  I DON'T HAVE AN ISSUE WITH IT BEING

3   INTRODUCED.  JUST SO THE RECORD IS CLEAR, THAT PAGE HAS NOT

4   BEEN INTRODUCED.

5       **THE COURT:**  I RECALL YOU INTRODUCING THE EXHIBIT AND          03:07

6   SAYING THAT YOU WANTED TO SKIP PAGE 1 AND PAGE 2, BUT I WAS NOT

7   CLEAR THAT YOU WERE ONLY INTRODUCING PAGE 2.

8       **MR. ZELLER:**  I'M SORRY IF I WAS UNCLEAR, BUT THE ONLY

9   THING I PUT IN AND ASKED HER ABOUT SO FAR WAS PAGE 2.

10      THERE IS NO FOUNDATION FOR PAGE 1.                               03:08

11      **THE COURT:**  DO YOU HAVE AN OBJECTION TO PAGE 1 BEING

12  INTRODUCED?

13      **MR. ZELLER:**  NO.

14      **THE COURT:**  VERY WELL.  THE ENTIRE DOCUMENT IS

15  INTRODUCED.  YOU MAY PROCEED AND PUBLISH.                            03:08

16      **MR. NOLAN:**  THIS IS 11192-001.

17      **THE COURT:**  THE ENTIRE 11192 IS IN EVIDENCE.  YOU MAY

18  USE IT AS YOU WISH.

19  **BY MR. NOLAN:**

20  Q    THIS IS AN INTERNAL DOCKET SHEET AT YOUR LAW FIRM?             03:08

21  A    YES.

22  Q    COULD YOU LOOK AT THIS _FIRST OF ALL, DO YOU KNOW WHAT

23  THIS DOCKET SHEET IS?  CAN YOU EXPLAIN THE PURPOSE?

24  A    IT'S A DOCKET SHEET SO WE CAN KEEP TRACK OF DEADLINES; AND

25  THIS INFORMATION IS INPUT INTO A COMPUTER SO THAT WE CAN MAKE        03:08

```
 1   SURE WE DON'T MISS ANY DEADLINES.

 2   Q    THIS DOCKET SHEET, IS THERE ANY STATEMENT WITH RESPECT TO

 3   THE DATE OF FIRST USE?

 4   A    THERE IS NOT.

 5   Q    AND THEN THE SECOND, THE TRADEMARK DOCKET, WHICH IS-0002,        03:09

 6   IF YOU OPEN THIS UP AND GO DOWN UNDER "REMARKS" IT SAYS DATE OF

 7   USE, 6-15-2000.  DO YOU SEE THAT?

 8   A    YES.

 9   Q    IS THIS A DOCUMENT, IN YOUR EXPERIENCE, THAT'S EVER MAILED

10   TO THE CLIENT?                                                        03:09

11   A    NEVER.

12            MR. NOLAN:  MAY I APPROACH THE WITNESS?

13            AND I HAVE A SET FOR THE CLERK.

14            THE COURT:  DO WE HAVE THOSE DATES YET?

15            MS. AGUIAR:  WE'RE WORKING ON IT, YOUR HONOR.                03:09

16            THE COURT:  MR. ZELLER, HAVE YOU SEEN THIS YET?

17            MR. ZELLER:  I'M LOOKING AT IT NOW; I WAS JUST HANDED

18   IT.

19            THE COURT:  VERY WELL.

20   BY MR. NOLAN:

21   Q    I'VE PLACED BEFORE YOU, MS. ARANT, EXHIBITS 5528, 5529,

22   EXHIBIT 18477, EXHIBIT 18478, AND EXHIBIT 18479.

23            DID I AT LEAST READ THE NUMBERS CORRECTLY?

24   A    YES.

25   Q    SO YOU HAVE THE SAME PACKAGE I DO.                               03:10
```

```
 1   A    YES.

 2   Q    NOW, EACH OF THESE DOCUMENTS HAVE ON THE FRONT PAGE -- YOU

 3   HAVE A BLACK AND WHITE COPY -- A COPY OF A SEAL AND IT SAYS

 4   UNITED STATES OF AMERICA, CERTIFICATE OF REGISTRATION; THEN IT

 5   SAYS PRINCIPAL REGISTER.                                          03:11

 6           TAKE A LOOK AT IT.  DO YOU RECOGNIZE THIS FORM?

 7   A    YES.

 8   Q    WITHOUT DISCLOSING THE CONTENTS OF THE FORM, CAN YOU

 9   DESCRIBE WHAT THE FORM IS?

10   A    THIS IS YOUR OFFICIAL -- IF IT HAD THE GOLD SEAL AND IT      03:11

11   WERE THE ORIGINAL, IT WOULD BE YOUR ORIGINAL CERTIFICATE OF

12   REGISTRATION FOR THE TRADEMARK LISTED INSIDE.

13   Q    AND WHERE ARE THESE FORMS FILED?

14   A    THEY COME TO US FROM THE TRADEMARK OFFICE ONCE WE ACHIEVE

15   REGISTRATION.                                                     03:11

16   Q    SO THEY ARE ACTUALLY ISSUED BY THE UNITED STATES TRADEMARK

17   OFFICE?

18   A    YES.

19           MR. NOLAN:  YOUR HONOR, WE WOULD OFFER INTO EVIDENCE

20   EXHIBITS 5528, 5529, 18477, 18478, AND 18479.                     03:11

21           THE COURT:  ANY OBJECTION?

22           MR. ZELLER:  NO OBJECTION, YOUR HONOR.

23           THE COURT:  ADMITTED.  YOU MAY PUBLISH.

24   BY MR. NOLAN:

25   Q    THIS IS EXHIBIT 5528 NOW.                                    03:12
```

```
1              WE HAVE A BLACK AND WHITE VERSION OF THE SEAL, BUT,
2    MORE IMPORTANTLY, I WANT TO TURN TO THE SECOND PAGE.  THIS IS
3    THE CERTIFICATE OF REGISTRATION.  AND THEN ON THE SECOND PAGE,
4    THERE ARE SOME DATA.  BUT I WANT TO TURN TO THE THIRD PAGE.
5              CAN YOU READ THAT?                                     03:12
6    A    YES.
7    Q    WHAT IS THIS?
8    A    THIS IS THE INFORMATION ABOUT THE TRADEMARK AS IT APPEARS
9    ON THE PRINCIPAL REGISTER.
10             MR. ZELLER:  IF I COULD INTERJECT A FOUNDATION          03:12
11   OBJECTION AT THIS POINT.  IF HE'S GOING TO HAVE HER -- I DON'T
12   KNOW IF SHE'S EVER SEEN THEM BEFORE.
13             THE COURT:  LAY THE FOUNDATION, COUNSEL.
14             I'LL SUSTAIN THE FOUNDATIONAL OBJECTION.
15   BY MR. NOLAN:
16   Q    MS. ARAN, YOU'VE SEEN FORMS SIMILAR TO THIS; CORRECT?
17   A    YES.
18   Q    AND YOU'RE FAMILIAR WITH THE INFORMATION THAT IS SET FORTH
19   IN THE PRINTED FORM ISSUED BY THE UNITED STATES TRADEMARK
20   OFFICE; YES?                                                     03:13
21   A    YES.
22   Q    IS THE INFORMATION THAT IS SET FORTH, BY THE FORMS FILED
23   BY APPLICANTS AND REGISTERED WITH THE UNITED STATES PATENT
24   OFFICE AND TRADEMARK OFFICE, SOMETHING THAT YOU WERE FAMILIAR
25   WITH WHEN YOU WERE AN EXAMINER IN THE OFFICE?                    03:13
```

1    A    YES.

2    Q    HAVE YOU PERSONALLY REVIEWED THE ACTUAL TRADEMARK

3    PRINCIPAL REGISTER FOR THE NAME BRATZ?

4    A    I DON'T KNOW.

5    Q    THE FORM HAS A DATE LISTED UNDER FIRST USE.  WHAT I WANT          03:13

6    TO KNOW IS, BASED ON YOUR EXPERIENCE, WHEN THE TERM 'FIRST USE'

7    IS INCLUDED ON AN OFFICIAL PRINCIPAL REGISTRATION TRADEMARK

8    ISSUED BY THE PATENT OFFICE, WHAT DOES THAT MEAN?

9          **MR. ZELLER:**  OBJECTION.  FOUNDATION.  SECONDLY, THIS

10   IS OUTSIDE OF THE SCOPE.                                              03:14

11          **THE COURT:**  OVERRULED.  YOU MAY ANSWER.

12          **THE WITNESS:**  THIS MEANS THAT THE MARK THAT WAS FIRST

13   USED ON THE GOODS COVERED BY THAT TRADEMARK REGISTRATION --

14   FIRST OFFERED FOR SALE IN INTERSTATE COMMERCE ON, IN THIS CASE,

15   IT WOULD BE MAY 21, 2001.                                            03:14

16   **BY MR. NOLAN:**

17   Q    WOULD YOU PLEASE READ TO THE JURY THE DATES THAT FOLLOW

18   FOR BRATZ FOR FIRST USE.

19   A    MAY 21, 2001.

20   Q    AND AFTER 'IN COMMERCE.'                                        03:14

21   A    5-21-2001.

22   Q    ASKING YOU NOW TO TURN TO EXHIBIT 5529.

23          DO YOU RECOGNIZE THAT AS BEING A SIMILAR FORM THAT IS

24   ISSUED BY THE UNITED STATES OF AMERICA AT THE TRADEMARK OFFICE?

25   A    YES, I DO.                                                      03:15

```
 1    Q    AND I'D ASK YOU TO TURN TO THE THIRD PAGE, AND THIS TAKES
 2    GENERALLY THE SAME FORM AS THE EARLIER ONE; THIS IS THE
 3    DIFFERENCE INVOLVING THE MARK.
 4              WHAT MARK IS THIS FOR?
 5    A    YASMINE.                                                      03:15
 6    Q    AGAIN, DOES IT HAVE A LISTING OF FIRST USE IN COMMERCE?
 7    A    YES.
 8    Q    COULD YOU READ FOR THE JURY THE FIRST USE DATE.
 9    A    MAY 13, 2001.
10    Q    AND COULD YOU READ IN COMMERCE THE DATE LISTED?            03:15
11    A    MAY 13, 2001.
12    Q    LOOK AT 18477, AGAIN, THE FRONT PAGE, THIS IS THE OFFICIAL
13    FORM ISSUED BY THE UNITED STATES OF AMERICA THROUGH THE
14    TRADEMARK OFFICE; CORRECT?
15    A    YES.                                                        03:15
16    Q    TURN TO THE THIRD PAGE, IF YOU WOULD.
17              THIS IS FOR THE MARK 'JADE'?
18    A    YES.
19    Q    COULD YOU READ THE DATE THAT IS LISTED AFTER FIRST USE.
20    A    5-21-01.                                                    03:16
21    Q    AND IN COMMERCE.
22    A    5-21-01.
23    Q    AND FOR EXHIBIT 18478, THIS IS THE CERTIFICATE
24    REGISTRATION OF THE TRADEMARK; CORRECT?
25    A    YES.                                                        03:16
```

```
 1   Q     FROM THE TRADEMARK OFFICE.  I APOLOGIZE.

 2           IF YOU TURN TO PAGE 3, YOU SEE THE NAME OF THE MARK.

 3   A     YES.

 4   Q     WHAT'S THE NAME OF THE MARK?

 5   A     SASHA.                                              03:16

 6   Q     COULD YOU READ TO THE JURY THE FIRST USE DATE.

 7   A     5-22-2001.

 8   Q     CAN YOU READ THE FIRST DATE OF IN COMMERCE.

 9   A     5-22-2001.

10   Q     TURNING TO THE LAST EXHIBIT, DO YOU HAVE EXHIBIT 18479 IN   03:16

11   FRONT OF YOU?

12   A     YES.

13   Q     DO YOU RECOGNIZE THIS IS ALSO ISSUED BY THE UNITED STATES

14   TRADEMARK OFFICE?

15   A     YES.                                                03:16

16   Q     TURNING TO THE THIRD PAGE OF THIS DOCUMENT, COULD YOU TELL

17   THE JURY WHICH OFFICIAL TRADEMARK REGISTRATION CERTIFICATE THIS

18   IS FOR?

19   A     CLOE.

20   Q     AND COULD YOU READ FOR THE JURY THE FIRST USE FOR THE MARK   03:17

21   CLOE?

22   A     5-21-2001.

23   Q     COULD YOU ALSO READ FOR THE JURY THE FIRST DATE FOR IN

24   COMMERCE?

25   A     5-21-2001.                                          03:17
```

```
 1              MR. NOLAN:  NOTHING FURTHER.

 2                   FURTHER REDIRECT EXAMINATION

 3   BY MR. ZELLER:

 4   Q    MR. NOLAN WAS ASKING YOU QUESTIONS ABOUT THESE TRADEMARK

 5   REGISTRATIONS WHICH HE BEGAN WITH EXHIBIT 5528.                   03:17

 6              DO YOU HAVE THOSE?

 7   A    YES.

 8   Q    AND YOU UNDERSTOOD THROUGH HIS QUESTIONING HE WAS TRYING

 9   TO SUGGEST SOMEHOW THE TRADEMARK OFFICE HAD INVESTIGATED AND

10   ACTUALLY DETERMINED THAT'S WHEN MGA FIRST USED THE BRATZ         03:17

11   TRADEMARK; IS THAT TRUE?

12   A    NO.

13   Q    YOU DIDN'T UNDERSTAND THE QUESTIONS THAT WAY.

14   A    NO.

15   Q    BECAUSE ISN'T IT A FACT THAT THE TRADEMARK OFFICE DOES NO   03:17

16   INVESTIGATION AS TO WHEN AN APPLICANT, SUCH AS MGA, CLAIMS TO

17   HAVE FIRST USED THE MARK?

18   A    NO.

19   Q    THAT IS TRUE, ISN'T IT?

20   A    THAT IS TRUE.                                               03:18

21   Q    SO THE TRADEMARK OFFICE RELIES UPON THE HONESTY OF THE

22   APPLICANT'S STATEMENTS AS TO WHEN THE APPLICANT FIRST BEGAN

23   USING THE TRADEMARK; IS THAT TRUE?

24   A    YES.

25   Q    AND SO LET'S USE EXHIBIT 5528 AS AN EXAMPLE.               03:18
```

```
 1          IF WE CAN PLEASE HAVE PAGE 3 BLOWN UP.

 2          FOCUSING YOUR ATTENTION ON THE PORTION THAT MGA'S

 3  COUNSEL HIGHLIGHTED, WHERE IT SAYS HERE "FIRST USE, 5-21-2001;

 4  IN COMMERCE, 5-21-2001."

 5          THAT INFORMATION, DO YOU SEE THAT?                    03:18

 6  A   YES.

 7  Q   NOW, THIS REFLECTS INFORMATION THAT WAS GIVEN TO THE

 8  TRADEMARK OFFICE BY MGA AT SOME POINT; RIGHT?

 9  A   YES.

10  Q   AND THE TRADEMARK OFFICE DOESN'T VALIDATE, DOESN'T        03:18

11  INVESTIGATE.  DOES NOT ISSUE A REGISTRATION, THAT CONFIRMS THAT

12  THAT'S WHEN IT WAS ACTUALLY FIRST USED; IS THAT TRUE?

13  A   I'M NOT SURE I UNDERSTAND THE QUESTION.

14  Q   I'LL BREAK IT DOWN A LITTLE BIT, THEN.

15          SO WE TALKED ABOUT HOW THE FIRST USE DATE, IN BOTH    03:19

16  FIRST USE AND IN COMMERCE DATES, THOSE ARE BASED ON

17  REPRESENTATIONS THAT MGA MADE TO THE TRADEMARK OFFICE; YOU

18  UNDERSTAND THAT?

19  A   YES.

20  Q   AND WHEN THOSE REPRESENTATIONS WERE MADE BY MGA TO THE    03:19

21  TRADEMARK OFFICE, THE TRADEMARK OFFICE DIDN'T DO ANYTHING TO

22  INVESTIGATE WHETHER MGA WAS TELLING THE TRUTH OR NOT; IS THAT

23  TRUE?

24  A   YES.

25  Q   SO THE TRADEMARK OFFICE IS NOT AGREEING THAT WAS THE DATE  03:19
```

1   OF FIRST USE; IS THAT CORRECT?

2   A    RIGHT.

3   Q    IT RELIES ON WHAT MGA TOLD IT.

4   A    RIGHT.

5   Q    IF I ASKED YOU THOSE SAME QUESTIONS ABOUT THE OTHER          03:19

6   REGISTRATIONS THAT YOU WERE SHOWN, EXHIBITS 5529,

7   EXHIBIT 18477, EXHIBIT 18478, AND 18479, YOU WOULD GIVE ME THE

8   SAME ANSWERS.

9   A    YES, I WOULD.

10  Q    SO FOR ALL OF THEM, THE TRADEMARK OFFICE DIDN'T           03:20

11  INVESTIGATE THE DATES OF FIRST USE THAT MGA TOLD IT?

12  A    TRUE.

13  Q    AND WHAT IS REFLECTED IN ALL THOSE REGISTRATIONS IS JUST

14  WHAT IT IS THAT MGA TOLD THE TRADEMARK OFFICE.

15  A    YES.                                                     03:20

16  Q    NOW, DO YOU KNOW ONE WAY OR ANOTHER, WHETHER MGA EVER TOLD

17  THE U.S. TRADEMARK OFFICE THE TRUE FIRST USE DATE OF THE USE OF

18  THE BRATZ NAME?

19  A    I HAVE NO PERSONAL KNOWLEDGE.

20  Q    I COULDN'T HEAR THAT.                                    03:20

21  A    I KNOW SOMEBODY GAVE THEM THE DATES OF FIRST USE, BUT IT

22  WASN'T ME.

23  Q    IT WASN'T YOU.  AND YOU DON'T KNOW IF THEY ARE ACCURATE OR

24  NOT, DO YOU?

25  A    PERSONALLY?  NO.                                         03:20

1   Q    BECAUSE YOU, TOO, JUST LIKE THE TRADEMARK OFFICE, RELY ON

2   WHAT MGA TOLD YOU WITH RESPECT TO FIRST USE.

3   A    IN GATHERING INFORMATION, CERTAINLY.

4   Q    IF WE COULD PLEASE PULL UP EXHIBIT 11192; AND BOTH PAGES

5   ARE NOW IN EVIDENCE.  IF WE COULD BLOW UP THE MGA PORTION.          03:21

6        I KNOW YOU'RE NOT A LITIGATOR, BUT YOU GENERALLY

7   UNDERSTAND WHERE IT SAYS "MGA" AND THEN IT HAS THAT SEQUENCE OF

8   NUMBERS, THIS MEANS IT WAS PRODUCED IN THIS CASE BY MGA.

9        DO YOU RECOGNIZE THAT?

10  A    IF YOU SAY SO, YES.                                            03:22

11  Q    LOOKING AT THE SECOND PAGE, YOU'LL SEE THERE'S ALSO THE

12  MGA STAMP, AND SO YOU'LL AGREE WITH ME THAT THIS DOCKET SHEET

13  WE TALKED ABOUT ALSO APPEARS TO HAVE BEEN PRODUCED OUT OF MGA'S

14  OWN FILES AT SOME POINT.

15  A    I DIDN'T KNOW WHAT THAT DESIGNATION MEANT, BUT IF THAT'S       03:22

16  WHAT IT MEANS --

17       **MR. NOLAN:**  YOUR HONOR, I'M GOING TO OBJECT.

18  FOUNDATION; 403; IT'S ALSO ARGUMENTATIVE.

19       **THE COURT:**  I'LL SUSTAIN THE OBJECTION ON FOUNDATION.

20       **MR. ZELLER:**  LET ME TRY IT THIS WAY.                       03:22

21  **BY MR. ZELLER:**

22  Q    MR. NOLAN ASKED YOU A SERIES OF QUESTIONS THAT SEEMED TO

23  SUGGEST -- AND TELL ME IF I WAS WRONG -- THAT SOMEHOW THESE TWO

24  PAGES DIDN'T COME FROM YOUR CLIENT FILES.

25       IN OTHER WORDS, YOUR CLIENTS DON'T SEE THESE                   03:22

1  DOCUMENTS.  DO YOU RECALL THAT?

2  A    YES.

3  Q    AND SO MY QUESTION IS, DO YOU HAVE ANY BASIS TO DISPUTE

4  THAT, IN FACT, THESE DOCUMENTS, WHICH YOU SEEM TO SUGGEST YOUR

5  CLIENTS DIDN'T SEE, IN FACT, WERE SEEN BY MGA?                03:23

6  A    AS I SAID, I DO NOT KNOW WHAT THAT STAMP MEANS.  I'M NOT A

7  LITIGATOR.  I DON'T KNOW WHAT IT MEANS.

8  Q    SO IT'S FAIR TO SAY THAT YOU DON'T KNOW --

9  A    I DON'T KNOW.

10 Q    -- WHETHER OR NOT MGA HAD THESE DOCUMENTS IN THEIR FILE OR  03:23

11 HOW LONG THEY HAVE HAD THEM IN THEIR FILE OR WHETHER THEY HAVE

12 SEEN THEM OR NOT; RIGHT?

13 A    THAT'S RIGHT.

14 Q    MR. NOLAN ASKED YOU SOME QUESTIONS ABOUT THE INTENT TO USE

15 APPLICATION, AND THIS IS THE FAX THAT WE HAD TALKED ABOUT       03:23

16 WHICH, FOR THE RECORD, IS EXHIBIT 11897.

17         IF YOU RECALL, MR. NOLAN WALKED THROUGH THESE

18 APPLICATIONS WITH YOU AND MADE A POINT THAT THESE WERE INTENT

19 TO USE APPLICATIONS.  DO YOU RECALL THAT?

20 A    YES.                                                       03:24

21 Q    BUT IT'S TRUE, ISN'T IT, THAT IN THE COURSE OF YOUR WORK

22 AS A TRADEMARK ATTORNEY, YOU HAVE FILED INTENT TO USE

23 APPLICATIONS WHERE THE CLIENT HAS ALREADY BEEN USING THE

24 TRADEMARK OR TOLD YOU THAT THEY HAD ALREADY BEEN USING IT.

25 A    YES.                                                       03:24

1           **MR. ZELLER:**  NOTHING FURTHER.

2                    **FURTHER RECROSS-EXAMINATION**

3    **BY MR. NOLAN:**

4    Q    MR. ZELLER WAS POINTING YOU TO A STAMP NUMBER ON THE

5    BOTTOM WHERE IT SAYS "MGA."  DO YOU SEE THAT?                      03:24

6    A    YES.

7    Q    DO YOU HAVE ANY IDEA HOW DOCUMENTS HAVE BEEN PRODUCED IN

8    THIS LAWSUIT?

9    A    NO.

10   Q    DO YOU KNOW WHETHER OR NOT THAT DOCUMENT AND THAT            03:24

11   PRODUCTION NUMBER IN ANY WAY SUGGESTS THAT MGA, AT THE TIME OF

12   THE ENTRIES IN THE INTERNAL RECORDS OF YOUR LAW FIRM, HAD

13   ACCESS TO THEM?

14   A    I DON'T KNOW WHAT IT MEANS.

15   Q    QUICKLY GO TO 5528; THIS IS THE MARK FOR BRATZ.             03:25

16          DO YOU SEE THE REGISTRATION DATE?

17   A    YES.

18   Q    COULD YOU READ THE REGISTRATION DATE?

19   A    DECEMBER 2, 2003.

20   Q    WHAT DOES THE REGISTRATION DATE MEAN?                       03:25

21   A    THAT IS THE DAY THAT THE TRADEMARK HAS OFFICIALLY BECOME

22   REGISTERED WITH THE UNITED STATES PATENT TRADEMARK OFFICE.

23   Q    THAT WAS FOR BRATZ; RIGHT?

24   A    YES.

25   Q    IF YOU LOOK AT 5529, PAGE 3, RIGHT CORNER, THIS IS THE      03:25

1    MARK FOR YASMINE; YES?

2    A    YES.

3    Q    AND THE DATE FOR THAT REGISTRATION IS?

4    A    DECEMBER 30, 2003.

5    Q    AND IF YOU GO TO EXHIBIT 18477, THE MARK FOR JADE?                03:26

6          **MR. ZELLER:**  I'LL OFFER TO STIPULATE TO THESE.

7          **MR. NOLAN:**  I JUST HAVE TWO MORE; IT'S VERY QUICK.

8          **THE WITNESS:**  JULY 30TH, 2002.

9    **BY MR. NOLAN:**

10   Q    THE LAST ONE IS 18478, PAGE 2, THE REGISTRATION DATE IS           03:26

11   APRIL 22, 2003.

12   A    YES.

13   Q    THE LAST ONE IS 18479, GO TO PAGE THREE, THIS ONE IS FOR

14   CLOE.

15   A    YES.                                                              03:26

16   Q    THE LAST ONE WAS FOR THE MARK OF SASHA; RIGHT?

17          SO THE REGISTRATION DATE FOR CLOE IS JUNE 17, 2003?

18   A    YES.

19   Q    WHEN YOU WERE TESTIFYING EARLIER, THERE WAS A STIPULATION

20   THAT THE FIRST LAWSUIT IN THIS CASE WAS FILED IN APRIL OF 2004.        03:26

21          ALL OF THE DATES FOR ALL OF THE REGISTRATIONS FOR

22   THOSE DOCUMENTS WERE ISSUED BY THE UNITED STATES TRADEMARK

23   OFFICE PRIOR TO THE LAWSUIT; YES?

24   A    YES.

25          **MR. NOLAN:**  THANK YOU.                                      03:27

```
 1              NOTHING FURTHER.

 2              THE COURT:  MR. ZELLER?

 3                   FURTHER REDIRECT EXAMINATION

 4    BY MR. ZELLER:

 5    Q    NOW, TO YOUR KNOWLEDGE, MGA, AND CERTAINLY, YOU, NEVER    03:27

 6    TOLD THE U.S. TRADEMARK OFFICE THAT PAULA TREANTAFELLES HAD

 7    TOLD YOU THAT, IN FACT, THE FIRST USE DATE OF BRATZ WAS

 8    JUNE 15, 2000; CORRECT?

 9              MR. NOLAN:  OBJECTION.  LACKS FOUNDATION.

10              THE COURT:  YOU'RE ASKING WHAT SHE TOLD --          03:27

11              MR. ZELLER:  YES.

12              THE COURT:  OVERRULED.

13              THE WITNESS:  CORRECT.

14    BY MR. ZELLER:

15    Q    YOU NEVER TOLD THE TRADEMARK OFFICE THAT.                03:27

16    A    NO.

17    Q    SO AS FAR AS YOU KNOW, PAULA TREANTAFELLES TOLD YOU THAT

18    THE TRUE FIRST USE DATE OF BRATZ WAS JUNE 15, 2000, AND THAT

19    WAS NEVER DISCLOSED TO THE TRADEMARK OFFICE' RIGHT?

20    A    I DON'T KNOW.                                            03:27

21    Q    YOU CAN'T DENY THAT.

22              MR. NOLAN:  I WITHDRAW THE OBJECTION.

23              THE COURT:  VERY WELL.

24    BY MR. ZELLER:

25    Q    YOU'RE NOT DENYING THAT.                                 03:28
```

1   A    DENYING WHAT?

2   Q    YOU'RE NOT DENYING THAT AS FAR AS YOU KNOW, NO ONE EVER

3   TOLD THE TRADEMARK OFFICE THE TRUE FIRST USE DATE FOR BRATZ.

4   A    I DON'T KNOW.

5   Q    AND YOU DON'T HAVE ANY KNOWLEDGE OR INFORMATION THAT WOULD    03:28

6   ALLOW YOU TO DENY THAT; RIGHT?

7   A    TRUE.

8   Q    NOW, MR. NOLAN WAS SHOWING YOU THE TRADEMARK REGISTRATIONS

9   AND MAKING A POINT ABOUT THE DATE IN WHICH THEY WERE ISSUED.

10        YOU'LL AGREE WITH ME THAT, AS FAR AS YOU KNOW, THE    03:28

11  CORRECTIONS MADE TO THE COPYRIGHT APPLICATIONS THAT HAD TOLD

12  THE COPYRIGHT OFFICE THAT THE BRATZ DOLLS WERE COMPLETED IN THE

13  YEAR 2000, AS FAR AS YOU KNOW, THOSE STATEMENTS WERE NEVER

14  CHANGED UNTIL AFTER THIS LAWSUIT WAS FILED IN 2004; CORRECT?

15  A    I DON'T KNOW.    03:29

16  Q    WELL, YOU NOW KNOW WHAT THE DATE OF THE LAWSUIT IS; YOU

17  ANSWERED IT IN RESPONSE TO MR. NOLAN'S QUESTIONS; CORRECT?

18  A    CORRECT.

19  Q    SO DID YOU SEE ANY CORRECTIONS, ANY CHANGES, TO THOSE

20  COPYRIGHT OFFICE REPRESENTATIONS THAT MGA HAD MADE, NAMELY THAT    03:29

21  YOU HAD MADE, TO THE COPYRIGHT OFFICE THAT THE BRATZ DOLLS WERE

22  COMPLETED IN THE YEAR 2000 THAT WAS DONE BEFORE THIS LAWSUIT

23  WAS FILED IN 2004?

24  A    WE NEVER MADE ANY CHANGES TO THE COPYRIGHT REGISTRATIONS.

25  I WASN'T THE PERSON WHO DID THOSE CHANGES.    03:29

```
 1   Q    LET'S BE CLEAR ABOUT THIS.

 2              YOU TOLD THE U.S. COPYRIGHT OFFICE, ON BEHALF OF MGA,

 3   IN THOSE REGISTRATIONS THAT THE BRATZ DOLLS WERE COMPLETED IN

 4   THE YEAR 2000.  DO YOU RECALL THAT?

 5   A    THAT WAS, YES, WHAT THEY SAID, UH-HUH.            03:29

 6   Q    AS FAR AS YOU KNOW, THERE WAS NO CHANGE EVER MADE, BY YOU

 7   OR ANYBODY ELSE, TO THAT REPRESENTATION THAT THE DOLLS WERE

 8   COMPLETED IN 2000 UNTIL AFTER THIS LAWSUIT WAS FILED IN 2004;

 9   IS THAT CORRECT?

10   A    YES.                                              03:30

11              MR. ZELLER:  THANK YOU.

12              MR. NOLAN:  VERY BRIEFLY.

13   BY MR. NOLAN:

14   Q    YOU DON'T HAVE ANY RECOLLECTION OF A CONVERSATION WITH

15   PAULA TREANTAFELLES, DO YOU?                           03:30

16   A    THAT'S TRUE.

17   Q    YOU DON'T HAVE ANY PERSONAL KNOWLEDGE AS TO WHETHER OR NOT

18   PAULA TREANTAFELLES EVEN SPOKE WITH YOU OR WITH YOUR ASSISTANT;

19   CORRECT?

20   A    TRUE.                                             03:30

21   Q    YOU DON'T EVEN HAVE ANY KNOWLEDGE AS TO WHETHER OR NOT

22   PAULA TREANTAFELLES RESPONDED TO THE E-MAIL FROM YOUR

23   ASSISTANT; CORRECT?

24   A    CORRECT.

25   Q    AND ISN'T IT TRUE THAT VICTORIA O'CONNOR, THE HEAD OF  03:30
```

```
 1   LICENSING AT MGA, WOULD HAVE MORE KNOWLEDGE WITH RESPECT TO THE
 2   DATE OF FIRST USE THAN YOU DO?
 3            MR. ZELLER:  FOUNDATION.
 4            THE COURT:  SUSTAINED.
 5            THE LAST ANSWER WAS STRICKEN.  ARE YOU WITHDRAWING      03:30
 6   THE QUESTION?  I SUSTAINED THE OBJECTION.
 7   BY MR. NOLAN:
 8   Q    WOULD YOU EXPECT THAT IF A WITNESS TESTIFIED IN THIS CASE,
 9   VICTORIA O'CONNOR, YESTERDAY, THAT THE FIRST SALE OF BRATZ WAS
10   SOMETIME IN MID 2001, YOU HAVE NO EVIDENCE TO DISPUTE THAT, DO   03:31
11   YOU?
12   A    I SAID --
13            MR. ZELLER:  LACKS FOUNDATION.
14            THE COURT:  DON'T ANSWER.  WHEN THEY ARE STANDING UP,
15   THAT MEANS THEY ARE MAKING AN OBJECTING.
16            COUNSEL?
17            MR. ZELLER:  ARGUMENTATIVE; LEADING; LACKS
18   FOUNDATION.
19            THE COURT:  SUSTAINED.
20            REPHRASE, COUNSEL.                                     03:31
21   BY MR. NOLAN:
22   Q    DO YOU HAVE ANY EVIDENCE THAT WOULD DISPUTE TESTIMONY FROM
23   A REPRESENTATIVE OF MGA THAT BRATZ DOLLS WERE FIRST SOLD IN
24   INTERSTATE COMMERCE IN MAY/JUNE OF 2001?  DO YOU HAVE ANY SUCH
25   EVIDENCE?                                                       03:32
```

1       **MR. ZELLER:**  LEADING; ARGUMENTATIVE; LACKS

2  FOUNDATION.

3       **THE COURT:**  SUSTAINED ON FOUNDATION, COUNSEL.

4  **BY MR. NOLAN:**

5  Q    AS YOU SIT HERE, DO YOU HAVE ANY PERSONAL KNOWLEDGE AS TO          03:32

6  WHEN THE BRATZ DOLLS WERE FIRST INTRODUCED INTO COMMERCE?

7  A    NO.

8       **MR. NOLAN:**  NOTHING FURTHER.  THANK YOU.

9       **MR. ZELLER:**  NOTHING, YOUR HONOR.  THANK YOU.

10      **THE COURT:**  YOU'RE EXCUSED, MA'AM.                              03:32

11      WE'RE GOING TO TAKE OUR LUNCH BREAK AT THIS TIME.

12      I'M GOING TO EXCUSE THE JURY.  I'LL SEE THE JURY BACK

13  HERE AT 1:30.

14      (CONCLUSION OF MORNING SESSION.)

15

16

17

18                        CERTIFICATE

19

20  I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
    STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
21  THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
    ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
22  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
    THE UNITED STATES.

23

24  _____           _____
    THERESA A. LANZA, CSR, RPR                    DATE
25  FEDERAL OFFICIAL COURT REPORTER