1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9            vs.                     )   No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al., )
                                     )
11                   Defendants.     )   TRIAL DAY 10
    _____)       MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )   pages 1889 - 1975
    _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              Riverside, California

17            Tuesday, June 10, 2008

18                 8:13 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
           Federal Official Court Reporter
24           3470 12th Street, Rm. 134
           Riverside, California  92501
25                951-274-0844
              WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        By:  JOHN QUINN
                               JON COREY
 5                             MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                             TIMOTHY ALGER
                          865 S. FIGUEROA STREET,
 7                        10TH FLOOR
                          LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                          BY:  THOMAS J. NOLAN
12                             JASON RUSSELL
                               RAOUL KENNEDY
13                             LAUREN AGUIAR
                               CARL ROTH
14                        300 SOUTH GRAND AVENUE
                          LOS ANGELES, CALIFORNIA  90071-3144
15                        213-687-5000

16

17

18

19

20

21

22

23

24

25
```

TUESDAY, JUNE 10, 2008                    TRIAL DAY 10,  MORNING SESSION

```
1                            I N D E X

2                                                    Page

3    DISCOVERY MOTION HEARING......................  1889

4    SEALED PROCEEDINGS UNDER SEPARATE TRANSCRIPT....  1942

5    Plaintiff CASE (CONTINUED).....................  1948

6

7

8    PLAINTIFF
     WITNESS          DIRECT     CROSS     REDIRECT      RECROSS
9    ISAAC LARIAN (CONT'D)

10   BY MR. PRICE         1948
     BY MR. NOLAN                  1959
11

12

13

14          EXHIBITS          RECEIVED

15          17281               1963

16

17

18

19

20

21

22

23

24

25
```

TUESDAY, JUNE 10, 2008                    TRIAL DAY 10,  MORNING SESSION

1       RIVERSIDE, CALIFORNIA; TUESDAY, JUNE 10, 2008; 8:13 A.M.

2                            -oOo-

3           The CLERK:  CALLING CASE NUMBER CV04-09049-SGL, IN

4   THE MATTER OF MATTEL, INC., V. MGA, INC., ET AL.

5           COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

6   RECORD.

7           MR. QUINN:  JOHN QUINN, MIKE ZELLER, JON COREY FOR

8   MATTEL.

9           MR. NOLAN:  TOM NOLAN, RAOUL KENNEDY, AND

10  BERNARD SHEK ON BEHALF OF MGA.                              00:05

11          THE COURT:  GOOD MORNING TO YOU ALL.

12          DO WE HAVE APPEARANCES FROM LITTLER MENDELSON AND

13  CARTER BRYANT?

14          MS. ANDERSON:  CHRISTA ANDERSON FOR MR. BRYANT.

15          MR. KRAMER:  JEFF KRAMER, TROY GOULD, FOR          00:05

16  LITTLER MENDELSON.

17          THE COURT:  I RECEIVED YOUR FILING THAT CAME IN LATE

18  LAST NIGHT.  FOR THE RECORD, I RECEIVED YOUR OPPOSITION TO

19  MATTEL'S MOTION TO COMPEL THE DEPOSITION, AND I'VE REVIEWED

20  THAT THIS MORNING;                                         00:06

21          I THEN HAVE MR. WICKHAM'S DECLARATION, WHICH GOES

22  THROUGH THE TIMELINE ON THE COMPUTERS;

23          I THEN HAVE SOMETHING WHICH IS NOT CLEAR TO ME.

24          WHAT IS THIS?  THIS DECLARATION OF...BLANK?

25          MR. KRAMER:  THAT IS, YOUR HONOR, AN EXHIBIT TO     00:06

1    MR. WICKHAM'S DECLARATION.  IT WAS A DECLARATION THAT WAS

2    PROPOSED, AS WE UNDERSTAND IT -- AS MR. WICKHAM DESCRIBES IT,

3    IN THE MEET-AND-CONFER PROCESS RELATED TO THIS DEPOSITION.  IT

4    WAS PROPOSED BY COUNSEL FOR THE PLAINTIFF.  WE ATTACHED IT

5    BECAUSE WE THINK IT'S INDICATIVE OF THE FACT THAT A DECLARATION    00:07

6    SHOULD SUFFICE.

7          **THE COURT:**  VERY GOOD.

8          THEN I HAVE THE DECLARATION OF KEITH JACOBY.

9          AND THEN THERE'S ANOTHER FAX THAT CAME IN AT 8:00

10   A.M., THE CORRECTED FILING, WHICH HAS BASICALLY THE SAME THING;   00:07

11   IT JUST ADDED THE PAGE 1 THAT WAS MISSING FROM THE OPPOSITION.

12         **MR. KRAMER:**  THAT'S CORRECT, YOUR HONOR.

13         **THE COURT:**  VERY GOOD.

14         COUNSEL, I HAD ASKED FOR THIS BY THE CLOSE OF

15   BUSINESS YESTERDAY, AND IT DIDN'T COME UNTIL AFTER THE COURT      00:07

16   WAS GONE; SO I JUST RECEIVED THIS 10 OR 15 MINUTES AGO, SO I

17   HAVE NOT HAD A CHANCE TO REVIEW THIS.  BUT I HAVE EXTENSIVELY

18   GONE THROUGH THE RECORD, AND THIS MAY OR MAY NOT BE NECESSARY;

19   SO I'M GOING TO PUT THIS ASIDE FOR THE TIME BEING.

20         I HAVE SPENT A LOT OF TIME GOING THROUGH AND TRYING          00:08

21   TO RECREATE WHAT HAPPENED HERE WITH RESPECT TO THE COMPUTERS,

22   BASED ON ALL OF THE EVIDENCE THAT I HAVE HAD A CHANCE TO

23   REVIEW.  I DID THIS OVER THE WEEKEND AND YESTERDAY.  AND

24   THERE'S A LOT OF ALLEGATIONS THAT GO BACK AND FORTH ON BOTH

25   SIDES, AND I THINK AT THE END OF THE DAY, WHILE CERTAINLY SOME     00:08

1   MISTAKES WERE MADE, AND, OF COURSE, I HAVE THE BENEFIT OF

2   HINDSIGHT, WHICH THE PARTIES, IN THE MIDST OF BATTLE, PERHAPS,

3   DON'T HAVE; BUT WITH THE BENEFIT OF HINDSIGHT, IT'S JUST NOT

4   QUITE AS CONFUSING AS I THINK IT'S MADE OUT TO BE.

5        AS I UNDERSTAND THE RECORD, IN NOVEMBER OF 2000,          00:09

6   CARTER BRYANT, IN HIS DEPOSITION, INDICATES THAT HE HAS THREE

7   COMPUTERS THAT HE WORKED ON; HIS PARENTS' COMPUTER, WHICH I

8   THINK EVERYBODY AGREES IS LONG GONE; AND WHAT I'M GOING TO CALL

9   THE 2000 DESKTOP AND THE 2001 LAPTOP.  THAT COMES OUT IN THE

10  DEPOSITION OF NOVEMBER OF 2004.                               00:09

11       FAST-FORWARDING TO JANUARY 3, 2007, MATTEL FILES A

12  MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS.  IN THE MOTION

13  ITSELF, IT SEEKS, QUOTE, AMONGST OTHER THINGS, OF COURSE,

14  "CARTER BRYANT TO PRODUCE THE HARD DRIVES OF COMPUTERS IN HIS

15  POSSESSION, CUSTODY, OR CONTROL FOR FORENSIC IMAGING."  THERE'S  00:09

16  NO LIMITATIONS PLACED ON THE REQUEST.  IT USES THE PLURAL.

17  IT'S CLEARLY A REQUEST FOR ALL HARD DRIVES OF COMPUTERS IN HIS

18  POSSESSION, CUSTODY, OR CONTROL.

19       NOW, IN MATTEL'S SEPARATE STATEMENT, WHICH IS

20  LANGUAGE THAT IS DECIDED BY THE DEFENSE ON THIS, IT IS TRUE    00:10

21  THAT MATTEL STATES, QUOTE, "THERE ARE THREE DIFFERENT COMPUTERS

22  THAT MATTEL IS AWARE OF THAT ARE RELEVANT HERE."  THAT'S A

23  SEPARATE STATEMENT ON PAGE 58.  BUT THAT'S NOT A SUGGESTION

24  THAT THE MOTION IS LIMITED TO THAT.  IT'S SIMPLY SUGGESTING

25  THAT THOSE ARE THE THREE COMPUTERS THAT MATTEL IS AWARE OF,    00:10

1   WHICH, BASED ON THE DEPOSITION IN NOVEMBER OF 2004, IS ALL

2   MATTEL COULD BE AWARE OF.  AND IF THERE'S SOMETHING ELSE IN THE

3   RECORD WHICH INDICATES THAT MATTEL WAS AWARE OF ADDITIONAL

4   COMPUTERS AS OF JANUARY 3, 2007, I'D LIKE TO SEE IT.  BUT I

5   COULDN'T FIND THAT ANYPLACE.                                        00:10

6            ON JANUARY 11, 2007, CARTER BRYANT SERVES BUT DOES

7   NOT FILE AN OPPOSITION TO THE MOTION.  IN HIS SEPARATE

8   STATEMENT, CARTER BRYANT REPRESENTS THAT, QUOTE, "HE MADE A

9   DILIGENT AND REASONABLE EFFORT TO LOCATE ALL THREE COMPUTERS

10  REFERENCED AT HIS DEPOSITION AND THAT AFTER THE SEARCH, HE IS      00:11

11  ONLY ABLE TO LOCATE ONE OF THE OLD COMPUTERS THAT HE USED

12  AND/OR OWNED."  IT DOESN'T INDICATE WHICH OF THE THREE

13  COMPUTERS HE'S REFERRING TO, BUT HE DOES INDICATE THAT HE WAS

14  ONLY ABLE TO LOCATE ONE.

15           THE KEITH JACOBY DECLARATION, ACCOMPANYING THE           00:11

16  SEPARATE STATEMENT, INDICATES THAT THE COMPUTER HARD DRIVE IN

17  QUESTION IS THE COMPUTER HE USED FROM 2000 TO 2002.  SINCE YOU

18  HAVE ONE COMPUTER THAT WAS PURCHASED IN 2000, ANOTHER ONE THAT

19  WAS IN 2001, I ASSUME THE COMPUTER THAT'S BEING REFERRED TO IS

20  THE 2000 DESKTOP, BECAUSE OBVIOUSLY, THE 2001 LAPTOP COULDN'T      00:11

21  HAVE BEEN USED IN 2000.

22           IN THE NEXT PARAGRAPH, MR. JACOBY INDICATES THAT

23  COUNSEL HAS EXAMINED CARTER BRYANT'S HARD DRIVE -- HE USES THE

24  SINGULAR -- BUT THEN HE GOES ON TO SAY THAT BRYANT HAS

25  TIRELESSLY SEARCHED FOR AND INSPECTED HIS COMPUTER HARD DRIVES,    00:12

1    PLURAL.  IT DOES ADD TO THE CONFUSION.

2              NONETHELESS, ON JANUARY 18, 2007, MATTEL FILED A

3    REPLY IN WHICH IT NOTES THE ABSENCE OF OPPOSITION TO ITS

4    REQUEST TO PRODUCE HIS COMPUTER HARD DRIVES -- AGAIN THE

5    PLURAL -- AND REQUESTS THE COURT TO COMPEL HIM, CARTER BRYANT,        00:12

6    TO PERMIT MATTEL TO INSPECT AND IMAGE THE HARD DRIVE HE ADMITS

7    HE POSSESSES; SO MATTEL IS GUILTY OF ESSENTIALLY THE SAME

8    THING, THE PLURAL-SINGULAR THING.

9              THEY DON'T SPECIFY WHICH OF THESE HARD DRIVES THAT

10   THEY'RE ASKING FOR, BUT THEY DO GO ON TO SAY, "AS WELL AS ANY        00:12

11   OTHERS HE CAN LOCATE, FOLLOWING A REASONABLE GOOD FAITH

12   SEARCH."

13             ON JANUARY 24, 2007, THE DISCOVERY MASTER CONDUCTS A

14   TELEPHONIC HEARING.  AND I ASKED FOR AND RECEIVED OVER THE

15   WEEKEND -- OR ACTUALLY, LAST WEEK -- THE TRANSCRIPT FROM THAT        00:12

16   HEARING.  DURING THE HEARING, THE DISCOVERY MASTER FINDS THE

17   DOCUMENTS SOUGHT ARE RELEVANT UNDER RULE 26 AND CARTER BRYANT

18   FAILED TO DEMONSTRATE THAT THE DISCOVERY SHOULD BE BARRED UNDER

19   26(B)(2) AND THE MOTION SHOULD BE GRANTED NEARLY IN FULL.

20             THE DISCOVERY MASTER ASKS COUNSEL FOR CARTER BRYANT        00:13

21   HOW MUCH TIME HE NEEDS TO COMPLY WITH A FULL GRANTING.  IT SAYS

22   30 DAYS.  THE DISCOVERY MASTER ENTERS THE ORDER, REQUIRING FULL

23   COMPLIANCE IN 30 DAYS.  THE ORDER ITSELF, WHICH WAS ISSUED ON

24   JANUARY 26TH, GRANTED THE MOTION TO COMPEL AND EXPRESSLY STATED

25   THAT PURSUANT TO RULE 34, BRYANT SHALL PRODUCE THE HARD DRIVES       00:13

1    OF HIS COMPUTER FOR FORENSIC IMAGING.  PERIOD.

2         IT SAID HARD DRIVES WERE ORDERED TO BE PRODUCED BY

3    FEBRUARY 23RD.  THE ORDER WAS NEVER APPEALED.  IT IS AN ORDER

4    OF THIS COURT.  PERIOD.

5         AFTER THE ORDERS, THE PARTIES STIPULATE TO CERTAIN          00:14

6    CONTINUANCES, WHICH THEY SHOULD HAVE NOT DONE.  YOU CAN'T

7    CHANGE AN ORDER OF THE FEDERAL COURT BY STIPULATION OR

8    AGREEMENT.  IF YOU WANT TO CHANGE AN ORDER, THE PROPER

9    PROCEDURE IS TO SUBMIT AN APPLICATION OR A STIPULATION TO HAVE

10   THE ORDER CHANGED.  THAT WAS NEVER DONE.  BUT BE THAT AS IT      00:14

11   MAY, BOTH PARTIES SEEM TO AGREE THAT THEY WOULD JUST, ON THEIR

12   OWN, MODIFY THE COURT'S ORDER AND ALLOW FOR ADDITIONAL TIME TO

13   PRODUCE.

14        AFTER THAT, AT LEAST THE RECORD THAT I HAVE BEFORE

15   ME, APPARENTLY ON MARCH 26, 2007, MR. ZELLER SENDS MR. WICKHAM,  00:14

16   COUNSEL FOR CARTER BRYANT, A LETTER THREATENING A MOTION TO

17   COMPEL FOR CARTER BRYANT'S, QUOTE, "FAILURE TO PRODUCE HIS HARD

18   DRIVE," SINGULAR, "AS ORDERED BY JUDGE INFANTE'S ORDER

19   COMPELLING ITS PRODUCTION."  SO AT LEAST AS MR. ZELLER IS

20   CHARACTERIZING THE ORDER IN THE MARCH 26TH LETTER; IT'S SIMPLY   00:14

21   A REFERENCE TO A SINGULAR HARD DRIVE.

22        ON APRIL 6, 2007, MR. ZELLER SENDS MR. WICKHAM A

23   LETTER CONFIRMING A CONVERSATION IN WHICH MR. WICKHAM

24   APPARENTLY REPRESENTED THAT COUNSEL HAS IMAGES FOR FIVE

25   COMPUTERS THAT CARTER BRYANT USED, INCLUDING THE 2000 DESKTOP    00:15

1    AND THE 2001 LAPTOP.  MR. ZELLER UNDERSTANDS THAT MR. WICKHAM

2    WILL PROVIDE DETAILS OF THE OTHER THREE COMPUTERS FOR WHICH

3    IMAGES WERE MADE IN MARCH OF 2007.

4         SO NOW WE'RE AT SIX COMPUTERS THAT EVERYBODY KNOWS

5    ABOUT; THE PARENTS', THE 2001 DESKTOP, THE 2001 LAPTOP, AND        00:15

6    THESE THREE OTHER COMPUTERS THAT COME TO LIGHT SOMETIME IN

7    MARCH OF 2007.

8         ON APRIL 23, 2007, AS I UNDERSTAND IT, OR

9    THEREABOUTS, CARTER BRYANT PRODUCES THE DESKTOP AND THE DESKTOP

10   IMAGE.  THIS IS THE 2000 DESKTOP AND THE 2000 DESKTOP IMAGE.  I    00:15

11   GUESS THE IMAGE WAS TAKEN SOMETIME IN 2004, 2005.

12        ABOUT JULY OF 2007, CARTER BRYANT PRODUCES THE 2001

13   LAPTOP.  AND THAT WAS AFTER THIS COURT HAD AFFIRMED THE

14   DECISION OF THE DISCOVERY MASTER REGARDING THE DISCOVERY OF

15   UNRELEASED BRATZ PRODUCTS.                                         00:16

16        SO TWO OF THE FIVE KNOWN COMPUTERS ARE PRODUCED BY

17   JULY OF 2007.

18        THEN THE NEXT EVIDENCE OF COMPUTERS THAT I FOUND WAS

19   THIS JANUARY 14, 2008 CARTER BRYANT AFFIDAVIT.  AND WE ALL KNOW

20   THE HISTORY OF THAT.  THE COURT HAD ISSUED IN OCTOBER OF 2007      00:16

21   AN ORDER DIRECTING ALL PARTIES TO SUBMIT, BASICALLY, AN

22   ACCOUNTING OF THEIR RETENTION PROCEDURES.

23        FOR REASONS THAT ARE STILL UNCLEAR TO THE COURT,

24   CARTER BRYANT DID NOT THINK THAT IT APPLIED TO HIM.  THE COURT

25   ISSUED A CLARIFYING ORDER IN JANUARY, EARLY JANUARY.  AND ON       00:16

1   JANUARY 14TH OR 15TH, WE GET THIS AFFIDAVIT.

2           THE AFFIDAVIT IDENTIFIES THE 2000 DESKTOP, WHICH HE

3   GAVE TO HIS NIECE IN 2003; THE 2001 -- OR NOW HE'S

4   CHARACTERIZING IT AS AN EARLY 2002 LAPTOP; HE MAKES REFERENCE

5   TO THE IMAGING OF THREE COMPUTERS THAT HE HAD USED SINCE          00:17

6   JULY 2004, WHICH THE COURT ASSUMES ARE THE THREE COMPUTERS THAT

7   MR. WICKHAM WAS REFERRING TO MR. ZELLER IN HIS CORRESPONDENCE

8   BACK IN 2007.

9           AND THEN HE STATES IN HIS AFFIDAVIT, "I DO NOT HAVE

10  ANY COMPUTERS, FILES, MATERIALS, OR OTHER DOCUMENTS OR THINGS     00:17

11  AT ANY LOCATION THAT HAVE NOT BEEN PROVIDED TO COUNSEL FOR

12  INSPECTION."

13          INSTEAD OF DISCLOSING THE TWO 2007 COMPUTERS THAT WE

14  FIND OUT ABOUT IN HIS DEPOSITION, THERE'S THIS CAREFUL USE OF,

15  "I DON'T HAVE ANY COMPUTERS THAT HAVE NOT BEEN PROVIDED TO        00:17

16  COUNSEL FOR INSPECTION."  OF COURSE, WE LEARN A WEEK LATER, ON

17  JANUARY 23RD, DURING HIS DEPOSITION, THAT HE HAS TWO ADDITIONAL

18  COMPUTERS THAT WERE PURCHASED DURING 2007, WHICH HE CERTAINLY

19  WOULD HAVE KNOWN ABOUT IN HIS AFFIDAVIT OF 2008.  THEY WEREN'T

20  REALLY DENIED, BUT THEY DIDN'T REALLY COME TO LIGHT UNTIL         00:17

21  JANUARY 23RD.

22          SO AT THE END OF THE EVIDENCE, THAT'S WHAT WE HAVE.

23  WE HAVE, GOING BACK TO THE BEGINNING, THE 1998 COMPUTER OWNED

24  BY HIS PARENTS, WHICH WAS APPARENTLY TRASHED; THE 2000 DESKTOP,

25  WHICH WAS PRODUCED; THE 2001, MAYBE EARLY 2002, LAPTOP COMPUTER   00:18

```
 1   THAT WAS PRODUCED; APPARENTLY TWO -- WHAT I'M GOING TO CALL AND

 2   WHAT MATTEL CALLS THE 2004 COMPUTERS; WE DON'T KNOW EXACTLY

 3   WHEN THEY WERE PURCHASED, BUT THEY WERE PURCHASED SOMETIME,

 4   ACCORDING TO CARTER BRYANT, AFTER THE 2000 AND 2001 COMPUTERS

 5   WERE IMAGED; AND THEN WE HAVE TWO OR THREE FROM 2007.          00:18

 6            APPARENTLY, ALL OF THESE HAVE BEEN IMAGED; ALL OF

 7   THESE ARE IN THE POSSESSION OF CARTER BRYANT.

 8            THAT'S MY UNDERSTANDING OF THE COMPUTERS.

 9            IF ANY OF THAT IS INACCURATE, NOW IS THE TIME FOR

10   SOMEONE TO SPEAK UP AND LET ME KNOW.                          00:18

11            I'LL BEGIN WITH MS. ANDERSON.

12       MS. ANDERSON:  THANK YOU, YOUR HONOR.

13       LET ME START AT THE END.

14       THE COURT:  SPECIFIC QUESTION BY THE COURT:

15       WHERE AM I INACCURATE?                                    00:19

16       WE HAVE TWO HOURS THIS MORNING.  WE WERE SUPPOSED TO

17   START AT 8:00.  COUNSEL WASN'T READY UNTIL 8:10.

18       MS. ANDERSON:  THANK YOU, YOUR HONOR.

19            AND I'LL PREFACE THIS WITH THE STATEMENT I MADE

20   BEFORE THAT WE DO HAVE CONTINUING OBJECTIONS TO JURISDICTIONAL 00:19

21   AND SETTLEMENT RELATED ISSUES.

22       THE COURT:  I THINK THE COURT HAS ALREADY ORDERED AND

23   RULED ON THEM, COUNSEL.  YOU'VE GOT YOUR RECORD.

24       MS. ANDERSON:  I APPRECIATE THAT.

25            AS FAR AS THE COMPUTERS ARE CONCERNED, YOUR HONOR,    00:19
```

```
 1   THE IDENTIFICATION AND BANDYING AMONG LAWYERS OVER TIME, DURING
 2   TIME PERIODS WHEN MY FIRM WAS NOT INVOLVED IN THE CASE, IT IS
 3   DIFFICULT FOR ME TO ADDRESS SOME OF THAT.  PEOPLE AT TIMES USE
 4   THE WORD HARD DRIVES, HARD DRIVE --
 5        THE COURT:  I ASKED YOU A PARTICULAR QUESTION,               00:19
 6   COUNSEL.  I REALLY WANT TO GET TO THE BOTTOM OF THESE
 7   COMPUTERS.  I DON'T WANT TO HEAR ABOUT -- WE'VE USED ENOUGH
 8   LANGUAGE, ENOUGH VERBIAGE.  I HAVE READ THESE BRIEFS AD NAUSEAM
 9   THIS WEEKEND.  I UNDERSTAND EVERYONE'S RESPECTIVE POSITIONS.
10        AM I CORRECT IN MY ASSESSMENT OF WHAT COMPUTERS             00:20
11   EXIST?  AND IF I'M NOT, PLEASE LET ME KNOW WHERE I'M MISTAKEN.
12        MS. ANDERSON:  YES.
13        I WAS A LITTLE BIT CONFUSED BY WHAT YOU SAID IN TERMS
14   OF LISTING, SO I WANT TO TELL YOU WHAT I UNDERSTAND TO BE THE
15   CASE, JUST TO MAKE SURE WE'RE ON THE SAME PAGE.                  00:20
16        MY UNDERSTANDING IS, THERE WAS THIS OCTOBER 2000
17   DESKTOP; THERE WAS A LATE 2001, OR EARLY 2002 -- IT'S
18   UNCLEAR -- LAPTOP.
19        THE COURT:  YES.
20        MS. ANDERSON:  THOSE ARE THE ONES THAT HAVE BEEN            00:20
21   PRODUCED.
22        THE COURT:  YES.
23        MS. ANDERSON:  MY UNDERSTANDING IS THAT THERE'S A
24   SONY VAIO LAPTOP THAT WAS IMAGED BY MR. BRYANT'S PREVIOUS
25   COUNSEL IN 2007.  AND MY UNDERSTANDING IS THAT WE HAVE THAT      00:20
```

1    COMPUTER AND THE IMAGE.

2            THE COURT:   OKAY.   AND THAT WAS PURCHASED WHEN?

3            MS. ANDERSON:   I BELIEVE THAT'S ONE OF THE 2004 ONES,

4    YOUR HONOR.   I'LL CONFIRM IN JUST A SECOND.

5            AND AGAIN, THE DATES ON THAT ARE NOT SET IN STONE;                  00:21

6    BUT I BELIEVE THAT'S A 2004 ONE.

7            THERE'S A SONY DUAL-DRIVE LAPTOP, AT LEAST THAT'S

8    WHAT I REFER TO IT AS, WHICH, AGAIN, WAS ANOTHER COMPUTER THAT

9    I UNDERSTAND TO HAVE BEEN IMAGED IN MAY OF 2007.

10           THE COURT:   SO THERE WAS A SECOND LAPTOP AMONGST THE            00:21

11   2004 COMPUTERS.

12           THIS IS ONE OF THE THINGS THAT DID GO BACK AND FORTH,

13   WHETHER IN THE 2004 COMPUTERS, THERE WERE TWO OR THREE.

14           SO NOW YOU'RE SAYING THAT THERE WERE TWO LAPTOPS?

15           MS. ANDERSON:   WELL --                                          00:21

16           THE COURT:   WE'VE GOT TO HAVE THIS STRAIGHT.

17   EVERYONE WAS CERTAINLY ON NOTICE THAT I WAS GOING TO BE ASKING

18   THESE QUESTIONS THIS MORNING.

19           WERE THERE TWO OR ONE LAPTOPS AMONGST THESE 2004

20   COMPUTERS?                                                              00:21

21           MS. ANDERSON:   MY UNDERSTANDING IS THAT THERE WERE

22   TWO COMPUTERS THAT WERE PURCHASED SOMETIME AROUND 2004, AND MY

23   UNDERSTANDING IS THAT THERE WERE THREE COMPUTERS PURCHASED

24   LATER.

25           WHAT'S UNCLEAR TO ME, BECAUSE THE RECORD IS NOT                 00:22

1    CLEAR, AND MY CLIENT'S MEMORY IS NOT CLEAR ABOUT THE SPECIFIC

2    NAMES OF LAPTOPS, DUAL-DRIVE, ET CETERA, IT'S DIFFICULT TO PIN

3    DOWN THE NAME -- A SONY DUAL-DRIVE OR A VAIO LAPTOP, WHETHER

4    IT'S TIED TO A PARTICULAR DATE.

5           **THE COURT:**  WELL, HOW MANY COMPUTERS DO YOU HAVE IN          00:22

6    YOUR --

7           **MS. ANDERSON:**  MY UNDERSTANDING IS THAT THERE ARE

8    FIVE TOTAL TODAY.  THERE'S THREE THAT ARE IN MY CLIENT'S

9    POSSESSION, AND THERE ARE TWO THAT ARE IN MY FIRM'S POSSESSION.

10   THAT IS MY UNDERSTANDING.                                             00:22

11          THERE ARE ALSO IMAGES THAT HAVE BEEN TAKEN.

12          **THE COURT:**  OF ALL FIVE?

13          IMAGES OF WHAT?

14          **MS. ANDERSON:**  THERE'S AN IMAGE OF THE SONY VAIO

15   LAPTOP, WHICH IS ALSO THE COMPUTER THAT WE HAVE.                      00:22

16          **THE COURT:**  OKAY.

17          **MS. ANDERSON:**  THERE'S AN IMAGE OF THE SONY

18   DUAL-DRIVE LAPTOP, WHICH IS ALSO A COMPUTER WE HAVE.

19          **THE COURT:**  OKAY.

20          **MS. ANDERSON:**  THERE IS ANOTHER SONY DESKTOP, WHICH        00:22

21   APPEARS TO HAVE BEEN IMAGED BY LITTLER IN MAY OF 2007; LITTLER

22   BEING THE FORMER COUNSEL.

23          **THE COURT:**  DO YOU KNOW WHEN IT WAS PURCHASED?

24          **MS. ANDERSON:**  WE DON'T HAVE A PRECISE PURCHASE DATE.

25          **THE COURT:**  THAT SOUNDS LIKE THE THIRD 2004 COMPUTER.      00:23

```
 1   BECAUSE HE DOES REFERENCE AT ONE POINT IN TIME THAT HE USED
 2   THREE COMPUTERS AFTER THE FIRST TWO, THE 2000 AND THE 2001,
 3   WERE IMAGED AND TAKEN.  HE USED THREE COMPUTERS, AND HE STATES
 4   THAT IN HIS AFFIDAVIT THAT HE SUBMITTED IN JANUARY OF THIS
 5   YEAR.                                                              00:23
 6          MS. ANDERSON:  I BELIEVE PART OF THE CONFUSION MAY BE
 7   BECAUSE MY UNDERSTANDING IS THAT THE LAPTOP CONTINUED TO BE
 8   USED.
 9          THE COURT:  WHICH LAPTOP?
10          MS. ANDERSON:  THE 2002.                                   00:23
11          AND I'M GOING TO CONFIRM IN MY NOTES IN ONE SECOND.
12          BUT THERE SEEMS TO HAVE BEEN IMAGES TAKEN OF THINGS
13   BY LITTLER MENDELSON IN 2004, RIGHT AFTER THE LAWSUIT STARTED.
14   THEY WENT TO MR. BRYANT; THEY TOOK IMAGES OF HIS COMPUTERS.
15          THE COURT:  RIGHT.  OF THE 2000 AND 2001 COMPUTER,         00:24
16   RIGHT.  THAT IS CLEAR.
17          MS. ANDERSON:  EXACTLY.
18          WHAT APPEARS TO BE TRUE FROM THE RECORD, THOUGH, IS
19   THAT THE DESKTOP WENT TO THE NIECE, RIGHT; THE 2000 DESKTOP
20   COMPUTER IS THE COMPUTER THAT WAS THE NIECE'S.  BUT THE LAPTOP    00:24
21   WAS MR. BRYANT'S; AND WHILE IMAGED, IT DOESN'T APPEAR TO HAVE
22   BEEN PHYSICALLY TURNED OVER RIGHT AWAY.
23          THE COURT:  OKAY.
24          MS. ANDERSON:  IT MAY HAVE REMAINED IN MR. BRYANT'S
25   POSSESSION.                                                       00:24
```

1        THAT'S WHERE, PURCHASING AN ADDITIONAL COUPLE OF

2   COMPUTERS IN 2004 WOULD LEAVE HIM WITH THREE COMPUTERS, IS WHY

3   THERE'S CONFUSION WITH THE NUMBERS, I BELIEVE.

4        **THE COURT:**  WHAT ABOUT THE 2007 COMPUTERS?

5        **MS. ANDERSON:**  NOW, PRESENTLY, THE COMPUTERS THAT WE     00:24

6   DO NOT HAVE, MY FIRM DOES NOT HAVE, AND MR. BRYANT HAS, ARE

7   THREE COMPUTERS WHICH WE IDENTIFY AS A SONY DESKTOP, ANOTHER

8   SONY VAIO DESKTOP AND A SONY LAPTOP.

9        **THE COURT:**  RIGHT.

10       **MS. ANDERSON:**  ALTHOUGH MY CLIENT HAS SOME CONFUSION    00:25

11  DURING HIS DEPO, THESE WERE NOT IMAGED IN 2008.

12       **THE COURT:**  THESE ARE THE ONES THAT HE REFERS TO IN

13  HIS AFFIDAVIT KIND OF CRYPTICALLY, WHERE HE SAYS, 'I DON'T HAVE

14  ANY OTHER COMPUTERS THAT HAVE NOT BEEN REVIEWED BY MY

15  ATTORNEYS.'                                                     00:25

16       THESE ARE THE THREE THAT YOU WENT IN; YOU REVIEWED

17  THEM; YOUR FIRM HAS REVIEWED THEM; AND YOU TOOK ANY RELEVANT

18  DOCUMENTS OFF OF THEM.  BUT YOU DID NOT IMAGE THEM; CORRECT?

19       **MS. ANDERSON:**  ABSOLUTELY CORRECT.

20       I WOULD LIKE TO STATE, FOR CLARIFICATION OF THE           00:25

21  RECORD, WE DID NOT IN ANY WAY INTEND, YOUR HONOR, TO HIDE ANY

22  BALLS.

23       **THE COURT:**  I'M NOT MAKING ANY -- THIS IS NOT

24  ABOUT -- PLEASE, LET THIS GO FORWARD.

25       THE ALLEGATIONS THAT HAVE BEEN MADE BY BOTH SIDES,        00:25

```
 1   ALL SIDES, AGAINST EACH OTHER, FROM MY PERSPECTIVE, ARE JUST

 2   UNCALLED FOR.  IF I'M COMING ACROSS A LITTLE BIT ABRUPT THIS

 3   MORNING, IT'S HAVING SPENT A WEEKEND READING LANGUAGE THAT JUST

 4   BORDERS ON THE IRRESPONSIBLE, BY ALL SIDES.  I'M REALLY KIND OF

 5   TIRED OF IT.  I'M TIRED OF THE -- INSTEAD OF DEALING WITH           00:26

 6   FACTS -- I CAN'T COUNT THE NUMBER OF TIMES THAT CERTAIN LINES,

 7   CERTAIN BUZZ LINES, ARE USED OVER AND OVER AND OVER AND OVER

 8   AGAIN, TO NO EFFECT.

 9           YOU'RE AMONGST THE MOST PROFESSIONAL LAWYERS THAT

10   I'VE EVER ENCOUNTERED.  JUST GET TO THE FACTS.  THIS HAS BEEN       00:26

11   ONE OF THE MOST FRUSTRATING EXPERIENCES IN THIS CASE, IS JUST

12   TO GO THROUGH AND COME UP WITH UNADORNED FACTUAL ASSERTIONS.

13           WE NEED TO GET TO THE BOTTOM OF THIS.  THE LAST THING

14   I WANT TO DO IS HAVE LITTLER MENDELSON, A LAW FIRM, SUBMIT TO A

15   DEPOSITION.  THE LAST THING THAT I WANT TO DO IS CREATE A BIG       00:26

16   ISSUE OUT OF THIS.  WHAT I'M TRYING TO DO IS CUT THROUGH THE

17   YOU KNOW WHAT AND FIND OUT WHAT'S REALLY AT ISSUE HERE.  AND

18   NOBODY SEEMS TO WANT TO HELP OUT IN THAT PROCESS.  YOU WANT TO

19   COME UP HERE AND START TALKING ABOUT GENERAL CONCERNS ABOUT

20   WHAT WAS SAID -- LET'S JUST FIGURE OUT WHAT HAPPENED HERE,          00:26

21   COUNSEL.

22           MS. ANDERSON:  I DON'T, YOUR HONOR.  I WAS SIMPLY

23   TRYING TO RESPOND, YOUR HONOR.  I'M NOT TRYING TO DISTRACT FROM

24   THE PROCESS.

25           AS FAR AS THE DESCRIPTIONS OF DIFFERENT STATEMENTS          00:27
```

1   YOUR HONOR MADE THAT WERE QUOTED FROM THE PLEADINGS OVER THE

2   YEARS BETWEEN LITTLER AND QUINN EMANUEL, I CAN'T DISPUTE THE

3   QUOTES THAT YOUR HONOR READ INTO THE RECORD.  THERE CERTAINLY

4   IS A LOT OF CONFUSION IN REVIEWING THE PLEADINGS.  I DON'T KNOW

5   WHETHER YOUR HONOR WANTS ME TO ARGUE THE MOTION OR --          00:27

6           **THE COURT:**  OH, NO.  I'VE HEARD ENOUGH ARGUMENT,

7   REALLY.  I'VE HEARD PLENTY OF ARGUMENT.

8           IF THERE'S ANYTHING THAT YOU BELIEVE THAT HAS NOT

9   BEEN COVERED IN YOUR PAPERS, NOW IS THE TIME TO MAKE THAT

10  ARGUMENT.  BUT IF IT WAS COVERED IN YOUR PAPERS, YOU DO NOT    00:27

11  NEED TO SAY ANYTHING THAT'S ALREADY BEEN --

12          **MS. ANDERSON:**  WELL, THERE'S TWO THINGS THAT WERE NOT

13  COVERED THAT I BELIEVE ARE OF THE NATURE OF CLARIFYING THINGS,

14  TO MAKE SURE THERE'S NO DISPUTE ON AT LEAST SOME OF THE

15  ISOLATED ISSUES RELATED TO THIS.                              00:27

16          **THE COURT:**  PLEASE.

17          **MS. ANDERSON:**  MY UNDERSTANDING, FROM HAVING REVIEWED

18  MATTEL'S REPLY, IS THAT THEY ARE NOT SEEKING PRODUCTION OF

19  PRIVILEGED MATERIALS ON HARD DRIVES AND THAT THEY ARE PREPARED

20  TO ENTER INTO SOME STIPULATED PROTOCOL TO ENSURE THAT MY       00:28

21  CLIENT'S PRIVILEGED COMMUNICATIONS WOULD NOT BE DISCLOSED.

22          **THE COURT:**  THAT'S STATED AS MUCH, YES.

23          **MS. ANDERSON:**  SIMILARLY, THIS WAS NOT IN THE PAPERS,

24  SO I WANT TO GET CLARIFICATION:  TO THE EXTENT THE COURT WERE

25  EVER TO ORDER ANY ADDITIONAL PRODUCTION AND TO THE EXTENT ANY  00:28

1    OF THESE COMPUTERS CONTAINED EXTREMELY PERSONAL MATERIAL,

2    TOTALLY UNRELATED TO ANY ISSUE IN THIS CASE, IN THE PAST,

3    MATTEL HAS BEEN WILLING TO AGREE TO A PROTOCOL TO ENSURE SOME

4    ADDED PROTECTION FOR THOSE.  AND I DON'T KNOW, BUT WOULD HOPE,

5    MATTEL WOULD DO THE SAME WERE THE COURT TO ORDER SUCH                00:28

6    PRODUCTION.

7            **THE COURT:**  OF COURSE.  THOSE ISSUES HAVE BEEN

8    ADDRESSED PREVIOUSLY BY THE DISCOVERY MASTER, AND THERE'S NO

9    CHANGE.

10           I GUESS THE ONE QUESTION THAT I HAVE THAT I JUST             00:28

11   DON'T GET IS, WHY WASN'T THIS ORDER FOLLOWED?

12           **MS. ANDERSON:**  YOUR HONOR, SPEAKING JUST FROM THE

13   TIME THAT WE CAME INTO THIS CASE, IN MAY OR JUNE OF 2007, LAST

14   YEAR, MY UNDERSTANDING FROM REVIEWING THE PAPERS IS THAT THE

15   ONLY COMPUTERS THAT WERE IDENTIFIED IN THE MOTION PAPERS WERE        00:29

16   THE THREE COMPUTERS, ONE OF WHICH WE DIDN'T HAVE, AND TWO OF

17   WHICH WE IMMEDIATELY TURNED OVER SHORTLY AFTER WE GOT INTO THIS

18   CASE.

19           AS FAR AS THE OTHER COMPUTERS ARE CONCERNED, IT WAS

20   NOT OUR UNDERSTANDING THAT ALL HARD DRIVES AND COMPUTERS IN          00:29

21   PERPETUITY THAT MR. BRYANT EVER HAD WOULD HAVE TO BE TURNED

22   OVER TO MATTEL.  THE DOCUMENT DEMANDS THAT UNDERLIE THIS

23   MOTION, THEY ARE THE FOUNDATION OF A MOTION THAT THE COURT

24   RULED UPON, THAT THE DISCOVERY MASTER RULED UPON.  THEY SPECIFY

25   A TIME PERIOD, EVEN BY MATTEL'S OWN ADMISSION.  IT WAS A DATE        00:29

```
 1    IN 1995 THROUGH JUNE OF 2004.  AND MATTEL CORRECTED ME.  I

 2    INITIALLY SAID SEPTEMBER 2004.  THEY WERE RIGHT; IT WAS JUNE.

 3    THAT WAS THE TIME PERIOD.

 4          CARTER BRYANT'S FORMER COUNSEL HAD NO REASON OR

 5    IMPETUS TO ARGUE AND PRESENT FACTS ABOUT COMPUTERS THAT FALL          00:29

 6    OUTSIDE THAT TIME FRAME.

 7          WHY WOULD THEY HAVE TO DO THAT?

 8          THE COURT:  THE ANSWER TO YOUR QUESTION IS THIS:  IN

 9    JANUARY OF 2007, MATTEL MAKES A MOTION FOR ALL HARD DRIVES.  AT

10    THIS POINT, THERE'S ARGUMENT OF SPOLIATION; THERE'S ANY NUMBER       00:30

11    OF ARGUMENTS THAT ARE OUT THERE; AND THE DISCOVERY MASTER

12    ORDERS THAT ALL HARD DRIVES BE TURNED OVER.

13          NOW, I UNDERSTAND YOU LOOK TO MOTIONS, BUT I TRUST

14    IT'S NOT YOUR PRACTICE TO LOOK TO THE UNDERLYING MOTION TO

15    INTERPRET AN UNAMBIGUOUS ORDER BY A COURT?                           00:30

16          MS. ANDERSON:  IT WAS OUR PRACTICE, IN THE SENSE THAT

17    WE WERE TRYING TO UNDERSTAND THE CONTEXT GIVEN.  WE WERE NOT

18    COUNSEL AT THE TIME, AND WE WANTED TO MAKE SURE WE UNDERSTOOD

19    WHAT WAS GOING ON.  AND OUR UNDERSTANDING WAS THAT THIS WAS

20    PURSUIT BY MATTEL OF DISCOVERY DEMANDS THEY HAD MADE.                00:30

21          WE PUT IT IN THE CONTEXT AND UNDERSTOOD AND BELIEVED

22    THAT WAS WHAT WE WERE SUPPOSED TO DO, YOUR HONOR; AND

23    ESPECIALLY BECAUSE NO ARGUMENT HAD BEEN PRESENTED TO THE

24    DISCOVERY MASTER FOR CONSIDERATION OF WHAT IT WOULD MEAN FOR AN

25    INDIVIDUAL TO HAVE TO PRODUCE FOR INSPECTION EVERY PERSONAL          00:31
```

1    COMPUTER THEY EVER HAVE THAT WOULD COVER ANY ASPECT OF THEIR

2    PRIVATE LIFE.

3        **THE COURT:**  I WON'T DISAGREE.  BUT YOU KNOW THE

4    PROCESS.  WHEN A JUDGE ISSUES AN ORDER THAT IS OVERBROAD OR

5    THAT IS RIDICULOUS, FROM YOUR PERSPECTIVE, WHAT DO YOU DO?  DO          00:31

6    YOU IGNORE THE ORDER OR DO YOU APPEAL IT OR DO YOU SEEK

7    CLARIFICATION?

8        **MS. ANDERSON:**  AGAIN, YOUR HONOR, THERE'S A TIME

9    ISSUE HERE ABOUT WHEN WE ENTERED THE CASE AND WHEN WE HAD WHICH

10   ROLES OF APPEALING WHICH ORDERS.                                       00:31

11       AS FAR AS WE UNDERSTOOD, THAT WAS THE INTENT.  AND WE

12   UNDERSTOOD THAT WHAT WE HAD DONE WAS COMPLY WITH THE ORDER.

13       **THE COURT:**  IN THE HISTORY THAT YOU'VE APPEARED

14   BEFORE THIS COURT, HAS THIS COURT EVER DENIED YOU AN

15   OPPORTUNITY TO ASK THE COURT TO RECONSIDER SOMETHING, TO CHANGE        00:31

16   AN ORDER?

17       I THINK I'VE DEMONSTRATED THAT, A WILLINGNESS TO

18   CHANGE ORDERS WHEN SOMETHING HAS BEEN BROUGHT TO MY ATTENTION

19   THAT MAY BE MISTAKEN.

20       **MS. ANDERSON:**  YOUR HONOR, AGAIN, I CANNOT SPEAK TO            00:32

21   WHAT MIGHT HAVE GONE ON PRIOR TO OUR ENTERING THE CASE.

22       **THE COURT:**  I'M TALKING ABOUT WHEN YOU WERE ON THE

23   CASE.  I'LL TALK TO LITTLER MENDELSON IN A FEW MOMENTS.  I'M

24   ASKING ABOUT WHEN YOU WERE IN THIS CASE.

25       **MS. ANDERSON:**  CERTAINLY, I FEEL FREE AND WOULD BRING          00:32

1    TO YOUR HONOR'S ATTENTION A REQUEST FOR CLARIFICATION, IF I WAS

2    CONFUSED.  YES, YOUR HONOR.

3           **THE COURT:**  BUT YOU DIDN'T DO THAT IN THIS CASE,

4    THOUGH.  THIS ORDER DIDN'T JUST -- THIS ORDER HAS BEEN IN

5    EXISTENCE SINCE JANUARY OF 2007, WHILE YOU'VE BEEN IN THIS          00:32

6    CASE.

7           **MS. ANDERSON:**  WELL, MY UNDERSTANDING IS TWO PARTS.

8           FIRST OF ALL, YOUR HONOR, AS FAR AS THE JANUARY 2007

9    ORDER IS CONCERNED, I DON'T KNOW THAT WE WERE IN THE CASE

10   DURING WHATEVER THE TIME PERIOD IS THAT ONE CAN --                  00:32

11          **THE COURT:**  YOU UNDERSTAND A DISCOVERY OBLIGATION IS

12   TO BE ONGOING?

13          **MS. ANDERSON:**  YES, YOUR HONOR.  BUT I DO NOT

14   UNDERSTAND THAT ONE HAS TO -- YOU HAVE ONGOING DISCOVERY

15   OBLIGATIONS TO RESPOND TO THE PENDING DISCOVERY DEMANDS.  BUT       00:33

16   WHEN THE DISCOVERY DEMANDS, FROM OUR UNDERSTANDING, WERE

17   CABINED BY A DATE LIMITATION, THAT DATE LIMITATION DOESN'T KEEP

18   GETTING EXTENDED AS THE TIME OF THE CASE GOES FORWARD.

19          **THE COURT:**  WHERE IN THE MOTION OR IN THE ORDER IS

20   THERE A DATE LIMITATION?                                           00:33

21          **MS. ANDERSON:**  THERE'S NOT, YOUR HONOR.  IT'S IN A

22   SEPARATE STATEMENT.  AND IT'S ALSO IN THE DOCUMENT DEMANDS

23   THEMSELVES WHICH UNDERLIE THE MOTION.

24          **THE COURT:**  ALL RIGHT.

25          LET ME HEAR FROM COUNSEL FOR LITTLER MENDELSON.              00:33

1        **MR. KRAMER:**  GOOD MORNING, YOUR HONOR.

2        **THE COURT:**  CAN YOU ANSWER THE QUESTION OF, WHAT, IN

3  TERMS OF THE COURT'S UNDERSTANDING OF THE COMPUTERS AT ISSUE,

4  IS MISTAKEN?

5        **MR. KRAMER:**  NOTHING THAT I KNOW OF, YOUR HONOR.    00:33

6        BUT I NEED TO QUALIFY THAT BY SAYING THAT WE

7  UNDERSTOOD THIS MOTION PERTAINED TO THE OCTOBER 2000 DESKTOP

8  AND THE 2002 LAPTOP.  AND LITTLER'S HANDLING OF THOSE, ARE

9  ADDRESSED IN OUR PAPERS AND IN MR. WICKHAM'S DECLARATION.

10       **THE COURT:**  LET ME STOP YOU THERE.    00:34

11       IF YOU UNDERSTOOD THAT, THEN WHY DIDN'T YOU PRODUCE

12  BOTH THOSE HARD DRIVES IMMEDIATELY, WHEN THE ORDER ORDERED YOU

13  TO DO SO?  IF YOU UNDERSTOOD AT LEAST THAT -- BECAUSE I WAS

14  ACTUALLY GIVING YOU MORE -- I WAS READING YOUR CORRESPONDENCE

15  AND MR. ZELLER'S CORRESPONDENCE TO SUGGEST THAT YOU GUYS, BOTH    00:34

16  OF YOU, THOUGHT, AT LEAST AT ONE POINT IN TIME, IT ONLY APPLIED

17  TO THE 2000 DESKTOP.

18       IF YOU'RE TELLING ME THAT YOU UNDERSTOOD IT TO APPLY

19  TO THE 2000 DESKTOP AND THE 2001 LAPTOP, WHY DID IT TAKE YOU

20  UNTIL JULY OF 2007 TO PRODUCE THAT LAPTOP?    00:34

21       **MR. KRAMER:**  I CAN'T SPEAK TO THAT, YOUR HONOR.

22       WHAT I CAN SPEAK TO, AND WHAT I THOUGHT THE COURT'S

23  CONCERN WAS, WAS WHETHER THERE WAS SPOLIATION OF EVIDENCE,

24  WHETHER THERE WAS SOMETHING MISSING, SOME EVIDENCE MISSING.

25       **THE COURT:**  WE'LL BE GETTING TO THAT IN A FEW    00:35

```
 1    MOMENTS.  BEFORE I CAN GET TO THAT, I HAVE TO FIGURE OUT WHAT

 2    COMPUTERS I HAVE IN QUESTION HERE.

 3            MR. KRAMER:  UNDERSTANDABLY SO, YOUR HONOR.

 4            AND AS THE EVIDENCE THAT WE THOUGHT WAS BEFORE THE

 5    COURT AND PUT BEFORE THE COURT TODAY, THE TWO LAPTOPS WERE          00:35

 6    IMAGED IN JULY OF 2004; THAT WOULD BE THE 2000 DESKTOP AND THE

 7    2001 LAPTOP.  THOSE FULL FORENSIC COMPUTER IMAGES WERE IN THE

 8    POSSESSION OF THE COMPUTER COMPANY THAT DID THE IMAGING FROM

 9    JULY OF 2004, AND, WE BELIEVE, TODAY BUT CERTAINLY THROUGH THE

10    END OF LITTLER'S INVOLVEMENT IN THIS CASE, SO THAT EVERYTHING      00:35

11    THAT WAS ON THOSE COMPUTERS IN 2004 IS, WE BELIEVE, IN THE

12    POSSESSION OF THE PARTIES AND NOTHING WAS LOST.

13            LITTLER DID NOT HAVE PHYSICAL POSSESSION OF THOSE TWO

14    COMPUTERS, NEVER TOOK POSSESSION OF THOSE COMPUTERS, NOT BEFORE

15    THEY WERE IMAGED, NOT AFTER THEY WERE IMAGED, UNTIL SEVERAL        00:35

16    YEARS LATER.  AND AS MR. WICKHAM INDICATES IN HIS DECLARATION,

17    THEY GOT POSSESSION BACK AGAIN OF THE -- NOVEMBER OF 2006 IS

18    WHEN LITTLER ACTUALLY RECEIVED PHYSICAL CUSTODY OF THE COMPACT

19    LAPTOP COMPUTER, AND RETAINED THAT UNTIL LITTLER TRANSFERRED IT

20    TO THE KEKER LAW FIRM WHEN THE LITTLER LAW FIRM WITHDREW.          00:36

21            THE COURT:  SO IT WAS REALLY THE KEKER LAW FIRM THAT

22    PRODUCED THAT LAPTOP IN JULY OF 2007?  YOU NEVER COMPLIED WITH

23    THE ORDER TO PRODUCE IT?

24            MR. KRAMER:  I CAN'T SPEAK TO WHETHER IT WAS

25    COMPLIANCE WITH THE ORDER, YOUR HONOR.  I CAN SIMPLY ADDRESS       00:36
```

```
 1   THE PHYSICAL FACT THAT IT WAS NOT PRODUCED BY THE LITTLER FIRM.

 2             THE COURT:  WHO IN YOUR FIRM COULD SPEAK TO THE

 3   COMPLIANCE ISSUE?

 4             MR. KRAMER:  I WOULD ASSUME IT WOULD BE EITHER

 5   MR. JACOBY OR MR. WICKHAM WHO COULD SPEAK TO THAT, YOUR HONOR.      00:37

 6             THE COURT:  WHAT ABOUT THIS ISSUE ABOUT THE 2004

 7   COMPUTERS?

 8             THE ONE THING THAT WAS LEFT UNSETTLED BY

 9   MS. ANDERSON'S ACCOUNT IS WHETHER THERE WERE TWO OR THREE

10   COMPUTERS BETWEEN THE 2000, 2001 COMPUTERS AND WHAT WE'RE          00:37

11   REFERRING TO AS THE 2007.  AND THERE'S NO DISPUTE THERE WERE

12   THREE 2007 COMPUTERS.

13             BETWEEN THAT, WERE THERE TWO, OR WERE THERE THREE?

14             MR. KRAMER:  I CAN'T ADDRESS THAT, AGAIN, YOUR HONOR.

15   AND I WISH THAT I COULD.  BUT I WAS, AGAIN, REVIEWING THE          00:37

16   PAPERS THAT WE LOOKED AT.  WE UNDERSTOOD THIS WAS THE MOTION

17   THAT MATTEL HAD FILED IN JANUARY OF 2008; THAT ADDRESSES THE

18   THREE COMPUTERS; THE PARENTS' COMPUTER THAT NOBODY HAS ANYMORE,

19   THE 2001 DESKTOP, AND THE 2002 LAPTOP.  WE UNDERSTOOD THAT

20   THAT'S WHAT THIS MOTION WAS ABOUT AND WHAT THE COURT WAS           00:38

21   CONCERNED WITH.  THAT'S WHY WE ADDRESSED THOSE.

22             I REGRET TO SAY, YOUR HONOR, I CAN'T SPEAK TO THE

23   2004 COMPUTERS.  I CERTAINLY TOOK NOTES OF YOUR HONOR'S

24   COMMENTS, BUT I CAN'T OFFER ANY INFORMATION TO THE COURT ON

25   THOSE THIS MORNING.                                                00:38
```

1    **THE COURT:**  LIKE I SAY, IT'S HARD TO GET TO THE ISSUE

2  OF WHETHER OR NOT THE COURT CAN SATISFY THAT THERE WAS NO

3  SPOLIATION UNTIL I KNOW THE UNIVERSE OF COMPUTERS THAT ARE OUT

4  THERE.

5    **MR. KRAMER:**  I HOPE WE'VE SATISFIED THE COURT, WITH          00:38

6  RESPECT TO THE OCTOBER 2007 DESKTOP AND THE 2001-2002 LAPTOP,

7  THAT THERE CERTAINLY WAS NO SPOLIATION OF EVIDENCE, CERTAINLY

8  NOT AS FAR AS LITTLER WAS CONCERNED.

9    **THE COURT:**  AS FAR AS LITTLER IS CONCERNED, I AM

10  SATISFIED.  THAT'S NOT THE ISSUE.                                00:38

11    I DON'T HAVE ANY QUESTIONS ON THAT.

12    CAN ANYBODY ANSWER THIS QUESTION ABOUT THE NUMBER OF

13  COMPUTERS FOR CERTAIN, BETWEEN THE 2000, 2001, AND WHAT I'LL

14  CALL THE 2007 COMPUTERS?  CAN ANYONE ANSWER THAT QUESTION AS TO

15  HOW MANY AND IDENTIFY THE STATUS OF THOSE COMPUTERS?             00:39

16    **MS. ANDERSON:**  YOUR HONOR, AGAIN, MY UNDERSTANDING IS

17  THAT THERE WERE TWO FROM 2004; THREE LATER; AND THERE'S FIVE IN

18  EXISTENCE BEYOND THE ONES THAT WERE ALREADY PRODUCED TO MATTEL.

19    I WASN'T PERSONALLY THERE.  I DON'T HAVE PERSONAL

20  KNOWLEDGE OF THIS.  BUT HAVING TRIED TO PIECE TOGETHER THE       00:39

21  HISTORY, REVIEWING ALL OF THESE PAPERS AND DISCUSSING THINGS

22  AND READING THE TESTIMONY, THAT'S MY UNDERSTANDING.

23    **THE COURT:**  THAT THERE WERE TWO 2004 COMPUTERS?

24    **MS. ANDERSON:**  THERE WERE TWO.

25    AND THE CONFUSION, AGAIN, AS I SAID BEFORE, MAY HAVE           00:39

1   RESULTED FROM THE FACT THAT MR. BRYANT HELD ON TO THE LAPTOP

2   COMPUTER FROM 2001 PAST THE POINT THAT THEY HAD BEEN IMAGED;

3   THAT MAY HAVE ADDED TO SOME CONFUSION ABOUT NUMBERS.

4        **THE COURT:**  BOTH OF THOSE 2004 COMPUTERS HAVE BEEN

5   IMAGED?

6        **MS. ANDERSON:**  YES.

7        AND WE ALSO BELIEVE WE HAVE THE COMPUTER.  WE HAVEN'T

8   MATCHED IT UP PERFECTLY, BUT WE THINK WE HAVE THE COMPUTER AS

9   WELL.

10        **THE COURT:**  VERY GOOD.

11        LET ME HEAR FROM MATTEL ON THIS.

12        **MR. COREY:**  A COUPLE OF VERY QUICK COMMENTS,

13   YOUR HONOR, AND ONE QUESTION.

14        I THINK, IN ADDITION TO ASKING THE QUESTION ABOUT THE

15   NUMBER OF COMPUTERS THAT EXIST, IT MAY BE HELPFUL FOR THE COURT

16   TO ASK THE QUESTION IF THERE ARE IMAGES THAT WERE MADE OF ANY

17   OF THESE HARD DRIVES AT MULTIPLE TIMES SO THAT MULTIPLE IMAGES

18   EXIST; BUT I'LL LEAVE THAT TO THE COURT.

19        ONE THING THAT IS AT LEAST UNCLEAR IN MY NOTES IS

20   WITH RESPECT TO THE THREE 2007 COMPUTERS.  I THINK THE COURT

21   HAD SAID THAT THOSE WERE IMAGED, AND I BELIEVE, AT LEAST OUR

22   NOTES SHOW, THAT THOSE WERE NOT IMAGED.

23        **THE COURT:**  THOSE WERE NOT IMAGED.  THAT'S CLEAR AT

24   THIS POINT; THAT THE 2007 COMPUTERS, THE THREE OF THEM WERE

25   NOT.

00:40
00:40
00:40
00:41
00:41

```
 1          THE 2004 COMPUTERS, MS. ANDERSON IS TELLING ME THAT
 2   THEY WERE IMAGED.  AND THEN THE 2000 AND THE 2001 COMPUTERS, OF
 3   COURSE, WERE IMAGED.  AND THE 1998 WAS NOT.
 4          THAT'S MY UNDERSTANDING AT THIS POINT.
 5          I'LL MAKE THIS CONTINUING DIRECTIVE:  IF ANYTHING I'M    00:41
 6   SAYING IS NOT CORRECT, PLEASE LET ME KNOW.  NOW IS THE TIME,
 7   BECAUSE THE COURT WANTS TO MAKE SOME FINDINGS AT THE END OF
 8   THIS HEARING AND THEN MOVE FORWARD, AND I'M GOING TO REST ON
 9   THOSE FINDINGS.
10          MS. ANDERSON?                                            00:41
11          MS. ANDERSON:  MY UNDERSTANDING IS THAT THE LITTLER
12   FIRM, IN MARCH OF 2000, TOOK SOME FORMS OF IMAGES.  I DON'T
13   KNOW IF THEY WERE, LIKE, THE ENTIRE COMPUTER OR JUST PARTS OF
14   THE DRIVE; BUT THAT'S MY UNDERSTANDING.
15          BUT YOU'RE CORRECT THAT IN 2008, NO IMAGES WERE          00:42
16   TAKEN.
17          THE COURT:  VERY GOOD.
18          MR. COREY:  AND THEN TWO OTHER VERY BRIEF COMMENTS,
19   ONE OF WHICH DID NOT APPEAR IN OUR PAPERS.
20          GOING TO THE SCOPE OF THE ORDER THAT JUDGE INFANTE       00:42
21   MADE, AND COUNSEL'S UNDERSTANDING OF THE SCOPE OF THE ORDER,
22   THE STIPULATION THAT THE COURT REFERENCED ABOUT CONTINUING THE
23   TIME TO COMPLY, THE PRETEXT FOR THAT, THE JUSTIFICATION FOR
24   THAT, WAS THAT THERE WERE MATERIALS IN SPRINGFIELD, MISSOURI,
25   THAT COUNSEL FOR CARTER BRYANT NEEDED TO GO COLLECT.  SO THEY   00:42
```

```
 1   ASKED FOR, AND WE AGREED TO GIVE THEM UNTIL MARCH 16, 2007, TO

 2   COLLECT THAT INFORMATION.

 3            COUNSEL WAS THERE, ACCORDING TO MR. BRYANT'S

 4   DECLARATION, A COUPLE OF DAYS EARLIER; AND ONE OF THE THINGS

 5   THAT COUNSEL DID ON MARCH 8TH WAS TO COLLECT THE IMAGES OF      00:43

 6   THOSE THREE 2004 COMPUTERS.  SO THEY WERE ENGAGED IN THE

 7   PROCESS OF COLLECTING THAT INFORMATION, I THINK BY IMPLICATION

 8   TO COMPLY WITH THE COURT'S ORDER, WITH THE DISCOVERY MASTER'S

 9   ORDER; AND AS THE COURT KNOWS, THAT WAS NOT PROVIDED TO US.

10        THE COURT:  I'M NOT SAYING THAT THERE WAS NOT GOOD         00:43

11   CAUSE.  AND I ALWAYS ENCOURAGE COUNSEL TO GET TOGETHER AND

12   REACH AGREEMENTS ON STIPULATIONS, BUT YOU NEVER SUBMITTED AN

13   APPLICATION OR A STIPULATION TO MODIFY THAT ORDER.

14        MR. COREY:  AND I ACKNOWLEDGE THAT THAT WAS IN ERROR.

15        WHAT I WAS TRYING TO ADDRESS IS, I THINK LITTLER           00:43

16   MENDELSON UNDERSTOOD THE SCOPE OF THE ORDER, BASED ON THEIR

17   CONDUCT.

18        THE COURT:  MR. ZELLER WRITES THIS LETTER ON

19   MARCH 26TH; SO THIS IS SEVERAL WEEKS AFTER THE TIME PERIOD THAT

20   YOU'RE TALKING ABOUT.  AND THIS IS MATTEL THREATENING TO BRING  00:43

21   A MOTION TO COMPEL AND FOR SANCTIONS AS A RESULT, QUOTE, "OF

22   BRYANT'S FAILURE TO PRODUCE HIS HARD DRIVE," SINGULAR, "AS

23   ORDERED BY JUDGE INFANTE'S ORDER COMPELLING ITS PRODUCTION."

24        THEY HADN'T PRODUCED ANYTHING AT THIS POINT.

25        MR. COREY:  CORRECT.                                       00:44
```

1        **THE COURT:**  THEN MR. ZELLER SENDS A LETTER REFERRING

2   TO A SINGULAR HARD DRIVE.  THAT MAKES MR. JACOBY'S RESPONSE, I

3   THINK, QUITE REASONABLE WHEN HE FIGURES OUT THAT WHAT THEY HAVE

4   IS THE IMAGE OF THE DESKTOP, NOT THE LAPTOP, AND THEN HE

5   PROVIDES THAT.  AND IN THAT VERY LETTER THAT HE DOES THAT, HE          00:44

6   SAYS, 'WE HAVE A LAPTOP, AND WE HAVE IMAGES OF THESE THREE

7   OTHER COMPUTERS.'

8        **MR. COREY:**  I THINK MR. ZELLER WOULD LIKE TO SPEAK TO

9   THAT.

10        **THE COURT:**  AND THAT'S THE PART THAT UNDERMINES          00:44

11   MS. ANDERSON'S POSITION THAT THERE WERE ONLY TWO COMPUTERS IN

12   2004, BECAUSE MR. JACOBY, IN HIS LETTER, SETS APART THE DESKTOP

13   AND THE LAPTOP AND STILL IS REFERRING TO THREE ADDITIONAL

14   COMPUTERS.  SO THERE IS STILL A MISSING COMPUTER IN ALL OF

15   THIS.  AND I THINK THERE WAS JUST A THIRD 2004 COMPUTER.  BUT          00:44

16   THAT'S BASED ON THESE LETTERS.

17        MR. ZELLER?

18        **MR. ZELLER:**  AS THE AUTHOR OF THAT LETTER, I THINK

19   THAT THE EXPLANATION IS SIMPLY THAT DURING THAT TIME PERIOD, I

20   WAS DEALING WITH A LACK OF CLARITY AS TO, WHAT DID THEY HAVE?          00:45

21   AT VARIOUS POINTS, AS THE COURT IS AWARE, TO THE COURT, LITTLER

22   MENDELSON REPRESENTED THAT THERE WAS ONLY ONE DRIVE THAT WAS

23   LOCATED.  THERE WAS ALSO ADDITIONAL BACK AND FORTH -- AND I

24   DON'T KNOW HOW MUCH OF THIS -- I MEAN, I KNOW WE'VE BURDENED

25   THE COURT WITH A LOT OF PAPER.  I DON'T KNOW IF WE'VE BURDENED          00:45

```
 1    THE COURT WITH ALL OF THE OTHER E-MAILS BACK AND FORTH THAT

 2    MR. JACOBY AND I HAD.  BUT THERE WAS A PERIOD OF TIME WHERE HE

 3    WAS TELLING ME THAT, IN FACT, 'THERE WAS ONE THAT I WAS TOLD;

 4    MAYBE THERE'S MORE.'  THEN I GET ADDITIONAL E-MAILS, WHERE

 5    MR. JACOBY WAS SAYING, 'WELL, MAYBE WE WERE WRONG THE FIRST        00:45

 6    TIME.'  I MEAN, THERE WAS A LOT OF BACK AND FORTH.

 7            TO GO TO THE COURT'S POINT, AT ONE POINT I WAS

 8    ESSENTIALLY SAYING, 'LOOK, WE KNOW THAT THERE IS ONE HARD DRIVE

 9    THAT YOU HAVE.  AT LEAST GIVE US THAT.'

10            I MEAN, THERE WERE OTHER ISSUES THAT --                    00:46

11         THE COURT:  THAT'S NOT WHAT YOU SAID, THOUGH, IN THE

12    LETTER.

13         MR. ZELLER:  I UNDERSTAND.

14         THE COURT:  OKAY.

15            I GUESS THE OTHER CONCERN I HAVE, JUST TO WHY WE'RE        00:46

16    SITTING HERE ON THIS PARTICULAR DAY, HAVING THIS PARTICULAR

17    DISCUSSION -- CERTAINLY, AS OF THE APRIL 23RD LETTER FROM

18    MR. JACOBY, YOU'RE AWARE OF THE LAPTOP, YOU'RE AWARE OF THE

19    DESKTOP, AND YOU'RE AWARE OF THE THREE OTHER COMPUTERS.

20         MR. ZELLER:  UH-HUH.                                         00:46

21         THE COURT:  WHERE IS THE MOTION TO COMPEL?

22         MR. ZELLER:  WELL --

23         THE COURT:  THIS DOESN'T COME IN NOW UNTIL -- I GUESS

24    DECEMBER IS WHEN YOU FILED THIS MOTION?

25         MR. ZELLER:  THAT'S RIGHT.                                   00:46
```

1          ADMITTEDLY, YOUR HONOR, YES, WE WENT THROUGH A

2    LENGTHY PROCESS.  AS THE COURT KNOWS, WE HAD TO BRING, AND DID

3    BRING, A LOT OF DISCOVERY MOTIONS.

4          WE ALSO SPENT A LOT OF TIME, IN ADVANCE OF THOSE

5    MOTIONS -- I MEAN, WE DIDN'T HAVE A HAIR TRIGGER ON THESE.  WE          00:47

6    SPENT A LOT OF TIME TALKING WITH THE OTHER SIDE, TRYING TO

7    ADDRESS THEIR CONCERNS, PARTICULARLY ON ISSUES LIKE THE HARD

8    DRIVES.  AND AS MS. ANDERSON POINTED OUT, THERE WERE ISSUES --

9    AND THESE WERE VOLUNTARILY RESOLVED -- ON MATTEL'S PART, AS TO

10   THE OTHER TWO HARD DRIVES, BECAUSE THERE WERE CERTAIN CONCERNS        00:47

11   THAT WERE EXPRESSED ABOUT THEM.  AND WE RESOLVED THOSE.  WE

12   DIDN'T HAVE TO.  WE COULD HAVE SIMPLY SAID, 'LOOK, THE COURT'S

13   ORDER IS THE COURT'S ORDER.'  BUT WE DIDN'T WANT TO BURDEN THE

14   COURT WITH YET MORE MOTION PRACTICE ON WHAT EXACTLY THE SCOPE

15   OF THAT SHOULD BE AND EXACTLY HOW THIS SHOULD BE DEALT WITH, SO       00:47

16   WE PRIORITIZED THESE THINGS.

17          **THE COURT:**  AND THAT'S FINE.

18          I GUESS WHAT I TAKE ISSUE WITH IS, IN YOUR PAPERS,

19   THE ONES FILED IN DECEMBER, AND THEN AGAIN IN THE MOTION

20   *IN LIMINE*, YOU MAKE IT APPEAR AS THOUGH CARTER BRYANT AND          00:47

21   CARTER BRYANT'S COUNSEL ARE NOT BEING FORTHRIGHT IN THEIR

22   DISCUSSION OF THESE COMPUTERS.  YOU REPEATEDLY MAKE THIS

23   ALLEGATION.

24          HERE YOU HAVE A LETTER IN APRIL OF 2007 IN WHICH

25   MR. JACOBY IS TELLING YOU, 'HEY, THERE'S OTHER COMPUTERS.            00:48

1    THERE'S THE LAPTOP, THERE'S THE DESKTOP, AND THERE'S THESE

2    OTHER COMPUTERS.'

3            SO WHEN YOU FIND OUT, THEN, IN 2008 FROM

4    MR. CARTER BRYANT THAT, YEAH, HE HAS THESE THREE 2007

5    COMPUTERS, THAT SHOULDN'T BE ALL THAT MUCH OF A SURPRISE.        00:48

6        **MR. ZELLER:**  IT'S NOT NECESSARILY -- AND I DO

7    APOLOGIZE FOR THE RHETORIC, YOUR HONOR.  OBVIOUSLY, THIS WAS

8    SOMETIME AGO.  I DON'T HAVE FIRMLY IN MIND, PERHAPS, ALL OF THE

9    VERBIAGE THAT WAS USED.

10       **THE COURT:**  YOU DIDN'T WRITE THESE BRIEFS.        00:48

11       **MR. ZELLER:**  NO.

12           AND WHAT I WOULD SAY IS THIS, YOUR HONOR:  THERE WAS

13   AN OVERLAY THAT WE ALSO WERE DEALING WITH IN TERMS OF THE

14   ADDITIONAL HARD DRIVES.  THE COURT WILL RECALL AND HAD MADE

15   REFERENCE TO THE FACT THAT JUDGE INFANTE ALSO ISSUED AN ORDER        00:48

16   THAT ALLOWED FOR BASICALLY A THIRD TIER, FOR THE PROTECTIVE

17   ORDER.

18       **THE COURT:**  YES.

19       **MR. ZELLER:**  AND CARTER BRYANT'S COUNSEL WAS TAKING

20   THE POSITION THAT BECAUSE OF THAT, THEY DID NOT HAVE TO PROVIDE        00:49

21   THE HARD DRIVES.  PART OF THAT WAS A TIMING ISSUE, BECAUSE THEY

22   WERE SAYING, WELL, THERE WERE THINGS ON THIS HARD DRIVE THAT --

23   BECAUSE THEY RELATED TO WHAT WOULD BE UPCOMING 2008, BACK IN

24   2007, THAT WE WEREN'T ENTITLED TO THEM AT THAT POINT; SO THERE

25   WAS A TIMING ISSUE THAT OVERLAID THOSE OTHER DRIVES.        00:49

1      AND THAT'S PART, TOO, OF WHY, IN TERMS OF

2  PRIORITIZING THE DRIVES, SAYING, 'WELL, GIVE US THE FIRST TWO,'

3  AND TRYING TO WORK OUT THE ADDITIONAL ISSUES ON THE OTHERS --

4  THAT IS WHY IT TOOK SOME PERIOD OF TIME.

5      BUT I DON'T THINK THERE'S ANY DISPUTE, YOUR HONOR,      00:49

6  THAT WE DID MAKE AN EFFORT TO RESOLVE THE ISSUE.  WE MADE AN

7  EFFORT TO GET THOSE DRIVES AND WE DIDN'T GET THEM AND WE

8  BROUGHT A MOTION.  WE THINK WE'RE ENTITLED TO COMPLIANCE WITH

9  THAT.

10      AND WITHOUT ATTEMPTING TO CAST ASPERSIONS ON ANYONE    00:49

11  AT THIS POINT, AS THE COURT IS AWARE, THERE, EVEN TO THIS DAY,

12  HAS BEEN A FAIR AMOUNT OF CONFUSION ABOUT WHAT DRIVES THERE

13  ARE, WHAT TIME PERIODS THERE ARE, AND WHAT IMAGES EXIST.  SO I

14  WOULD AT LEAST HOPE THAT THE COURT WOULD RECOGNIZE THAT THERE

15  HAS BEEN -- WHETHER IT WAS MISCOMMUNICATION, WHETHER IT WAS    00:50

16  MISINFORMATION -- INADVERTENCE, THAT WE WERE, OF COURSE,

17  DEALING WITH, FROM OUR PERSPECTIVE, SOMETHING OF A MOVING

18  TARGET.

19      THE COURT:  ALL RIGHT.

20      MR. NOLAN, ANYTHING FROM MGA'S PERSPECTIVE ON THIS?    00:50

21      MR. NOLAN:  I DON'T THINK WE HAVE A DOG IN THE FIGHT

22  HERE ON THIS ONE.

23      THANK YOU.

24      THE COURT:  FAIR ENOUGH.

25      LET'S MOVE ON TO THE ISSUE OF SPOLIATION.    00:50

```
 1          THIS IS ANOTHER RELATED ISSUE IN WHICH A LOT OF
 2   ALLEGATIONS HAVE GONE BACK AND FORTH.
 3          IT'S CLEAR TO THE COURT -- I DON'T NEED TO HAVE THIS
 4   ARGUMENT REPEATED BY EITHER SIDE -- THAT ANY DELETIONS OF FILES
 5   TOOK PLACE ON THESE COMPUTERS BY SOMEBODY, AND THAT ALL THAT     00:51
 6   EVIDENCE ELIMINATOR DID -- I SAY "ALL," BUT WHAT EVIDENCE
 7   ELIMINATOR DID WHEN IT WAS RUN THAT WOULD BE RELEVANT TO THE
 8   ISSUE OF SPOLIATION IS TO REPLACE THE FILE NAMES WITH SOME KIND
 9   OF GIBBERISH.
10          IT APPEARS FROM THE RECORD -- ALTHOUGH I'M NOT           00:52
11   CERTAIN OF THIS, AND I'LL CERTAINLY ENTERTAIN FURTHER
12   ARGUMENT -- THAT THE EVIDENCE ELIMINATOR PROGRAM THAT DID THAT
13   FUNCTION -- NOT DELETE FILES, BUT DELETED THE FILE NAMES FOR
14   ALREADY DELETED FILES -- WAS RUN WITHIN A DAY OR TWO OF IMAGING
15   OF ONE OR BOTH OF THE 2000, 2001 COMPUTERS.                     00:52
16          THAT AND THAT ALONE IS THE COURT'S CONCERN ABOUT
17   EVIDENCE ELIMINATOR.  AND THAT'S THE POINT THAT I WOULD LIKE
18   ADDRESSED BY WHOEVER WISHES TO ADDRESS IT.
19          MR. KENNEDY:  RAOUL KENNEDY ON BEHALF OF MGA.
20          AND I CAN PUT THIS IN THE FORM OF AN OFFER OF PROOF.     00:53
21   WE DO HAVE WITNESSES HERE TODAY IN ANTICIPATION OF A HEARING.
22          THE COURT:  YES.
23          MR. KENNEDY:  I THINK WHAT'S SIGNIFICANT IS THAT
24   MR. BRYANT BOUGHT A DESKTOP IN LATE 2000, RIGHT AFTER HE LEFT
25   MATTEL.  WE THEN GO ALL OF THE WAY OVER TO NOVEMBER OF 2001,    00:53
```

1    WHEN HE BUYS A LAPTOP.  AS I UNDERSTAND IT, THOSE ARE THE TWO

2    COMPUTERS WHOSE HARD DRIVES HAVE BEEN IMAGED.

3           **THE COURT:**  YES.

4           **MR. KENNEDY:**  MR. BRYANT WILL TESTIFY THAT HE DID NOT

5    DOWNLOAD ANYTHING FROM ANY COMPUTER HE HAD AT MATTEL ONTO THE    00:53

6    COMPUTER HE BOUGHT THE DAY AFTER HE STOPPED WORKING THERE.

7    HE'LL ALSO TESTIFY HE DIDN'T TRANSFER ANYTHING FROM THE DESKTOP

8    THAT HE BOUGHT IN LATE 2000 ONTO THE LAPTOP THAT HE BOUGHT IN

9    2001.

10         OUR FORENSIC EXPERT WILL CORROBORATE THE LATTER POINT   00:54

11    BY SAYING HE'S CHECKED THE FILES ON THE DESKTOP AND LAPTOP, THE

12    HARD DRIVE IMAGES, AND THERE ISN'T ANY OVERLAP.

13         HE ALSO WILL TESTIFY THAT ON THE DESKTOP,

14    EVIDENCE ELIMINATOR COULD, AT MOST, HAVE FUNCTIONED FOR FIVE

15    DAYS IN JULY OF 2002.  I THINK ALL OF THE EXPERTS WILL AGREE,   00:54

16    ON THE DESKTOP, INSTALLATION OCCURS ON JULY 24TH.  THE LAST DAY

17    THAT EVIDENCE ELIMINATOR COULD HAVE BEEN USED TO OVERWRITE ANY

18    FILES ON THE DESKTOP IS JULY 29TH.  AND THERE'S NO INDICATION

19    THAT IT WAS EVEN USED IN-BETWEEN.

20         SO I SUBMIT, WHEN IT COMES TO SPOLIATION, THE FOCUS   00:54

21    IS ON THE LAPTOP, WHICH IS THE COMPUTER YOU'VE REFERRED TO,

22    THAT WAS ACCESSED IN JULY OF 2004.

23         THE POINT IS, NOTHING FROM MATTEL MADE IT ONTO THE

24    DESKTOP; NOTHING FROM THE DESKTOP MAKES IT ONTO THE LAPTOP.

25    EVIDENCE ELIMINATOR ISN'T EVEN HOOKED UP ON THE LAPTOP UNTIL   00:55

1    SEPTEMBER OF 2002, AND IT'S USED THEREAFTER ON IT.

2         COMING UP TO THE SEQUENCE IN JULY OF 2004,

3    SOMEBODY -- AND WE DON'T KNOW WHO -- THIS COMPUTER, THE LAPTOP,

4    WAS IN MR. BRYANT'S POSSESSION, UNLIKE THE DESKTOP, WHICH WAS

5    THEN IN HIS NIECE'S POSSESSION -- SOMEBODY -- AND I THINK THE          00:55

6    COURT WOULD BE FULLY JUSTIFIED IN FINDING IT WAS MR. BRYANT --

7    USED THE SAFE SHUTDOWN MODE ON THAT DAY, 27TH, 28TH, WHATEVER

8    IT IS.  THE EFFECT OF THAT WAS TO RENAME 9,400 FILES OR FOLDERS

9    WHICH HAD PREVIOUSLY BEEN DELETED.

10        NOW, 9,400, WHEN I FIRST HEARD ABOUT THIS, SOUNDED          00:56

11   LIKE A BIG NUMBER TO ME.  OUR FORENSIC EXPERT WILL TESTIFY THAT

12   THE 9,400 COULD HAVE BEEN DELETED FILES THEMSELVES AT ANY

13   POINT.  IN ADDITION, THERE'S A SUBSTANTIAL POSSIBILITY THAT ALL

14   OR NEARLY ALL OF THEM WERE DELETED BY THE COMPUTER ITSELF.

15   WHAT HE WILL TELL YOU IS, HE TOOK ANOTHER COMPUTER WITH AN XP          00:56

16   OPERATING SYSTEM, HOOKED UP THE SAME MODEL OF EVIDENCE

17   ELIMINATOR, AND JUST BROWSED --

18        **THE COURT:**  THIS IS THE NEGATIVE THAT'S IMPOSSIBLE TO

19   PROVE.  IT'S THE TIMING THAT I'M CONCERNED ABOUT.  IT'S THE

20   FACT THAT THIS ACTION TOOK PLACE.  AND I DO PRESUME THAT IT WAS          00:56

21   MR. BRYANT.  BASED ON THE PREPONDERANCE OF THE CLEAR AND

22   CONVINCING EVIDENCE BEFORE ME, THAT IT WAS MR. BRYANT WHO RAN

23   THE EVIDENCE ELIMINATOR.  AND IT'S THE TIMING OF THAT RUNNING,

24   IN CONNECTION WITH THE IMAGING THAT WAS DONE A DAY OR TWO

25   LATER.          00:57

1        **MR. KENNEDY:**  UNDERSTOOD, YOUR HONOR.

2           AND IF WE WERE IN PHASE TWO OF THIS TRIAL, I THINK

3   THIS MIGHT BE A CLOSER CALL, BUT WE'RE TALKING ABOUT DELETION

4   OF FILE NAMES IN 2004 ON A COMPUTER FOR WHICH THERE'S NO DIRECT

5   CONNECTION BACK TO ANYTHING THAT WAS HAPPENING.                    00:57

6           **THE COURT:**  AND YOU RAISE A VERY GOOD POINT THERE.

7           SO THE QUESTION OF WHETHER OR NOT THERE WOULD BE

8   DOCUMENTS THAT WOULD BE ADMISSIBLE IN PHASE 1-A OR 1-B IS FAR

9   LESS LIKELY THAN THERE WOULD BE DOCUMENTS RELATED TO THE TRADE

10  SECRET CLAIMS, ET CETERA, IN PHASE TWO.                           00:57

11          BUT THE BASIS UPON WHICH MATTEL IS SEEKING THIS, AND

12  THE ONLY BASIS THAT I WOULD ADMIT IT IN PHASE 1-A, WOULD BE AS

13  EVIDENCE OF CONSCIOUSNESS OF GUILT, OF CREDIBILITY.

14          THE QUESTION THAT I KEEP COMING TO -- AND I'VE GONE

15  BACK AND FORTH PROBABLY A DOZEN TIMES THIS WEEKEND IN MY OWN      00:58

16  MIND -- IS WHETHER OR NOT A JURY SHOULD HEAR THAT THIS WAS

17  DONE, FOR PURPOSES OF CREDIBILITY.

18          THERE'S NO CONNECTION TO MGA IN THIS.  AND THE COURT

19  WOULD CERTAINLY INSTRUCT THE JURY THAT SUCH A CONNECTION WOULD

20  BE IMPROPER.  THE ONLY EVIDENCE ON THIS IS, IN MY MIND,          00:58

21  CONNECTED TO CARTER BRYANT.  BUT THAT HE DID THIS -- AND HAVING

22  REVIEWED THE REPORTS -- AND MY UNDERSTANDING OF THE EXPERTS IS

23  THAT YOU DO HAVE TO AFFIRMATIVELY TAKE THIS STEP TO DO THIS

24  SAFE SHUTDOWN, OR CALL IT WHATEVER WE WANT.  EVERYONE HAS

25  DIFFERENT WAYS OF CHARACTERIZING WHAT TOOK PLACE HERE.  I        00:58

1   REALLY STRUGGLE WITH THE IDEA OF KEEPING THAT AWAY FROM THE

2   JURY, BECAUSE OF WHAT IT SHOWS.  TO RUN SOMETHING LIKE THIS,

3   RIGHT BEFORE THE IMAGING, THAT'S PRETTY POWERFUL IMPEACHMENT

4   EVIDENCE.

5            **MR. KENNEDY:**  YOUR HONOR, YOU WEREN'T THE ONLY ONE            00:59

6   WHO WAS WRESTLING WITH THAT ISSUE OVER THE WEEKEND.  LET ME TRY

7   TO PLAY MIND READER FOR A SECOND AND SUGGEST WHAT ELSE WE WOULD

8   BE PREPARED TO OFFER HERE THIS MORNING THAT I THINK BEARS

9   DIRECTLY ON THAT.

10           FIRST, I THINK WE ALL -- WHEN WE HEAR THE WORDS            00:59

11  "EVIDENCE ELIMINATOR," THAT DOESN'T SOUND GOOD.  OBVIOUSLY,

12  THEY HAD A FOCUS GROUP WHO TOLD THEM IT'S DYNAMITE, OR WE

13  WOULDN'T BE GOING THROUGH ALL OF THIS.

14           **THE COURT:**  AND IT'S A GOOD POINT.  AND MY THOUGHT ON

15  THAT IS, YEAH, I UNDERSTAND THAT IT SOUNDS BAD.  BUT THAT GOES            00:59

16  INTO THE WHOLE CONSCIOUSNESS OF GUILT.  WHO GOES OUT AND BUYS

17  SOMETHING CALLED "EVIDENCE ELIMINATOR"?  AND HE BUYS IT AT A

18  TIME -- AND YOU HAVE MADE THIS POINT, MGA HAS MADE THIS POINT,

19  OVER AND OVER AGAIN, THAT THE RUMORS ARE ALL SWIRLING AROUND

20  ABOUT, IS THIS A COPYRIGHT INFRINGEMENT OF TOON TEENS, AND WHO            00:59

21  DID THIS, AND WHO INVENTED IT?  AND CONSISTENT WITH ALL

22  THESE -- KIND OF WHAT'S GOING ON AT THIS TIME PERIOD -- I

23  UNDERSTAND A CASE HASN'T BEEN FILED, BUT YOU HAVE BEEN URGING

24  THIS COURT, ON THE STATUTE OF LIMITATIONS ISSUE, TO FIND THAT

25  AS EARLY AS 2000, THAT MATTEL SHOULD HAVE KNOWN THAT CARTER            01:00

```
 1   BRYANT HAD INFRINGED ON THEIR TOON TEENS COPYRIGHT, OR WHAT

 2   HAVE YOU.

 3           MR. KENNEDY:  YOUR HONOR, IF I MIGHT.

 4           AGAIN, I SPENT SOME TIME ON THIS ONE AS WELL.

 5           FIRST, ON THE LAPTOP, EVIDENCE ELIMINATOR GETS            01:00

 6   INSTALLED IN OCTOBER OF 2002.  AND I SUBMIT, THAT'S ABOUT AS

 7   CLOSE AS WE CAN COME IN TERMS OF HAVING A DATE THAT'S BOTH TOO

 8   LATE AND TOO EARLY, IN TERMS OF MR. BRYANT, BY 2002, IS

 9   SUPPOSED TO BE SUSPECTING SOMETHING -- THAT MATTEL IS GOING TO

10   SUE HIM FOR -- THAT MATTEL SAYS THEY AREN'T GOING TO LEARN       01:00

11   ABOUT UNTIL LATER IN 2003.

12           BUT IN ADDITION, WHAT IS THERE, EVEN ON THE LAPTOP BY

13   THAT POINT -- BUT HERE'S THE POINT, IN TERMS OF AN OFFER OF

14   PROOF, YOUR QUESTION, WHY WOULD SOMEBODY BUY THIS?

15           IN HIS DEPOSITION, MR. BRYANT WAS ASKED WHY, AND HE      01:01

16   SAID, 'I WANTED TO SPEED UP MY COMPUTER.  I WAS HAVING PROBLEMS

17   WITH POP-UPS.'  AND THAT APPEARS TWO OR THREE TIMES.

18           INCREDIBLY, IN THIS CASE, THERE'S A QUESTION THAT

19   WASN'T ASKED.  NOBODY FOLLOWED UP AND SAID, 'AND WHAT WERE THE

20   DETAILS OF THOSE POP-UPS?'  MR. BRYANT, IF CALLED THIS MORNING,  01:01

21   WILL TESTIFY THAT THEY DEALT WITH SEXUALLY-EXPLICIT MATERIAL,

22   AND HE WAS HAVING A PROBLEM WHEN HE LOGGED ON TO HIS COMPUTER;

23   THAT HE WAS GETTING AS MANY AS FIVE OR SIX POP-UPS BEFORE HE

24   COULD ACCESS WHAT WAS GOING ON; AND THAT SOME OF THEM WERE,

25   LET'S SAY, ADULT MATERIAL, WOULD BE THE UNDERSTATEMENT.          01:01
```

```
 1              THIS IS AT A POINT -- OCTOBER.  HE'S MOVED BACK TO

 2    MISSOURI.  HE'S IN THE SAME TOWN WITH HIS FOLKS AND OTHER

 3    RELATIVES WHO ARE COMING TO VISIT HIM.  HE'S CONCERNED THEY MAY

 4    WANT TO USE HIS COMPUTER; THEY MAY EVEN BE STANDING BEHIND HIM

 5    WHEN HE LOGS ON.  SO IN TERMS OF WHY WAS EVIDENCE ELIMINATOR       01:02

 6    BOUGHT, HE'LL TELL YOU, AS HE DID IN HIS DEPOSITION -- AGAIN,

 7    IT MAY HAVE BEEN CLINTON-ESQUE.  HE DIDN'T VOLUNTEER A LOT OF

 8    ADDITIONAL MATERIAL.  I THINK THE COURT CAN UNDERSTAND WHY,

 9    UNDER THOSE CIRCUMSTANCES, THAT HE WOULDN'T HAVE ANSWERED THE

10    QUESTION MR. QUINN DIDN'T ASK.  BUT THE TESTIMONY HERE WILL BE,    01:02

11    THERE WAS SEXUALLY-EXPLICIT POP-UPS AND OTHER MATERIAL ON THAT

12    COMPUTER, AND THAT'S WHY EVIDENCE ELIMINATOR, AS OPPOSED TO THE

13    OTHER KINDS OF PROGRAMS THAT SOMEBODY COULD HAVE CHOSEN, WAS

14    SELECTED.  AND AGAINST THAT, I DON'T THINK IT TAKES A LOT TO

15    PUT TWO AND TWO TOGETHER AND SAY, 'YEP, MR. BRYANT, WHEN HE        01:02

16    HEARD THAT A THIRD-PARTY STRANGER WAS COMING TO VIEW HIS

17    COMPUTER, AT LEAST TURNED IT ON TO CHECK AND SEE WHAT WAS

18    HAPPENING.'

19              THE COURT:  LET'S SAY I FULLY ACCEPT AND FULLY CREDIT

20    THAT TESTIMONY.  NOW LET'S FAST FORWARD TO 2004, TWO DAYS         01:03

21    BEFORE IT'S GOING TO BE IMAGED.  WHY DOES HE RUN IT THEN?

22              HE'S BACK HERE IN CALIFORNIA, RIGHT, IN 2004?

23              MR. KENNEDY:  CORRECT.

24              THE COURT:  HE DOESN'T HAVE ANY RELATIVES IN MISSOURI

25    WHO'S GOING TO STOP IN ON HIS COMPUTER.  WHY IS HE RUNNING IT     01:03
```

```
 1    THEN?

 2            MR. KENNEDY:  HAVING DONE A NUMBER OF THESE CASES,

 3    I'VE NEVER HEARD OF ANYBODY WHO DIDN'T AT LEAST CHECK THEIR

 4    COMPUTER BEFORE IT WAS BEING IMAGED.  SO FAR I HAVEN'T HAD THE

 5    LUCK OF GETTING ONE THAT DIDN'T HAVE SOMETHING DELETED, WITH      01:03

 6    PEOPLE SAYING, 'THERE WERE PICTURES OF A GIRLFRIEND,' OR 'THERE

 7    WAS TAX INFORMATION.'

 8            THE COURT:  I CAN UNDERSTAND, PERHAPS, DELETING A

 9    PICTURE OF A GIRLFRIEND FROM A COMPUTER.  I'M ASKING, WHY DID

10    HE RUN EVIDENCE ELIMINATOR AND HAVE ALL OF THE FILES THAT HAD    01:03

11    BEEN PREVIOUSLY DELETED RENAMED, A DAY BEFORE OR TWO DAYS

12    BEFORE IT IS IMAGED?  THAT'S THE QUESTION.

13            I HAVEN'T GOTTEN PAST THAT.

14            MR. KENNEDY:  FIRST, YOUR HONOR, MY HAND WAS POINTED.

15    I MADE A MISTAKE.  HE IS STILL IN MISSOURI IN 2004, WHEN THE     01:04

16    IMAGING OCCURS.

17            THE COURT:  OH, THAT'S RIGHT.  BECAUSE YOU WENT TO

18    MISSOURI TO GET THE -- WELL, NOT YOU, BUT LITTLER MENDELSON

19    WENT TO MISSOURI.

20            MR. KENNEDY:  IT WAS DONE AT HIS HOUSE.  THEY EVEN       01:04

21    BROUGHT THE NIECE'S COMPUTER OVER.  SO THE CONCERNS ABOUT

22    FRIENDS, ET CETERA -- AND, AGAIN, I DON'T WANT TO INVADE HIS

23    PRIVACY COMPLETELY, BUT WE ARE TALKING ABOUT SOMEBODY WITH AN

24    ALTERNATIVE SEXUAL LIFESTYLE, WITH SOME CONSERVATIVE PARENTS,

25    AS I UNDERSTAND IT.  THERE'S A LOT GOING ON THERE.  FOR ME TO    01:04
```

1    GET THERE, MAYBE THE COURTROOM OUGHT TO BE SEALED, IF YOUR

2    HONOR IS REALLY CONCERNED.

3            BUT TAKING A 403 BALANCE WITH THE OBVIOUSLY

4    INSCINDIARY EFFECT OF EVIDENCE ELIMINATOR -- I MEAN, THEY ARE

5    WORDS LIKE "ABORTION," THAT ONCE THEY GET OUT, YOU CAN'T JUST          01:04

6    TELL THE JURY TO UNRING THE BELL.  AND THE EFFECT THAT'S GOING

7    TO HAVE AS AGAINST THE LIKELIHOOD THAT AT THAT POINT IN TIME,

8    GIVEN THE MULTIPLE STEPS WITH THE COMPUTERS THAT THERE'S

9    GOING -- HE'S GOT DRAWINGS OF BRATZ IN 1999 THAT WEREN'T ON HIS

10   DESKTOP, HAVEN'T BEEN FOUND SOMEPLACE ELSE.  THE ONLY THING         01:05

11   MATTEL HAS EVER SUGGESTED MIGHT BE MISSING ARE E-MAILS.

12           NOW, E-MAILS, BY DEFINITION, THERE'S AT LEAST ONE

13   OTHER PERSON INVOLVED.  SO AFTER THE DISCOVERY THAT'S TAKEN

14   PLACE IN THIS CASE, IS THERE ANYBODY THAT MR. BRYANT COULD

15   POSSIBLY HAVE SENT AN INCRIMINATING E-MAIL TO THAT WOULD HAVE        01:05

16   HAD TO HAVE GONE ON HIS LAPTOP SOMETIME AFTER 2001.  THE

17   RECIPIENT'S E-MAILS HAVEN'T BEEN DISCOVERED --

18           **THE COURT:**  YOU'RE ON WEAKER GROUND ON THIS PART,

19   COUNSEL, BECAUSE I DO ACCEPT THE ARGUMENT THAT THERE'S --

20   PARTICULARLY, WITH RESPECT TO PHASE B, BUT EVEN POTENTIALLY          01:05

21   WITH RESPECT TO PHASE ONE -- WITH RESPECT TO PHASE TWO, THE

22   SECOND TRIAL, THE CONCERN ABOUT TRADE SECRETS.

23           THIS IS DELETED FILES, AND THIS IS JUST A HARD

24   NEGATIVE TO PROVE.  I'D BE MORE INTERESTED IN THE RESPONSE,

25   HOWEVER, TO YOUR 403 ANALYSIS.                                      01:06

```
1          MR. KENNEDY:  YOUR HONOR, EVEN IF I MIGHT, THE COURT
2   JUST DID IT.  YOU SAID 'DELETED FILES.'  AND THAT'S WHAT THIS
3   JURY IS GOING TO THINK WHEN THEY HEAR IT.  AND WE'RE NOT
4   TALKING ABOUT DELETING FILES.
5          THE COURT:  YES, WE ARE.  WE'RE TALKING ABOUT DELETED    01:06
6   FILES THAT WERE THEN RENAMED.
7          THE PROBLEM HERE IS THAT IF THE FILES WERE JUST
8   DELETED BUT THE NAMES REMAINED, ARGUABLY FORENSIC ANALYSIS
9   COULD GO BACK AND RECONSTITUTE, OR LEAST HAVE A BASIS FOR
10  MATTEL -- I MEAN, PART OF YOUR ARGUMENT, TOWARDS THE END, WHEN  01:06
11  YOU GET INTO THE PREJUDICIAL ANALYSIS, IS THAT THEY GOT ALL
12  THESE FILES AND THEY GOT ALL THESE E-MAILS FROM OTHER SOURCES.
13  AND IF THE NAMES OF THE FILES WERE STILL THERE AND WERE
14  FORENSICALLY RECOVERABLE, THEN PERHAPS MATTEL COULD SIT DOWN
15  AND COMPARE, 'OKAY, WELL THAT'S THE E-MAIL, OR THAT WAS THE     01:06
16  DRAWING, OR THAT WAS THE CREATION OF THIS; WE ALREADY HAVE THAT
17  FROM SOME OTHER SOURCE.'
18         BUT THAT'S THE BEAUTY OF EVIDENCE ELIMINATOR, IS THAT
19  IT SCRAMBLES THOSE FILE NAMES, SO THAT THE PARTY THEN RECEIVING
20  THE HARD DRIVE, THEY HAVE NO IDEA WHAT FILES MIGHT HAVE         01:07
21  EXISTED.  WHAT IT DOES IS, IT PERFECTS THE DELETION; IT TAKES
22  THE DELETION TO A HIGHER LEVEL.
23         SO, YES, WE ARE TALKING ABOUT DELETED FILES.
24         I UNDERSTAND THE DELETIONS TOOK PLACE EARLIER.  I
25  UNDERSTAND THAT THE DELETIONS WERE NOT DONE BY EVIDENCE         01:07
```

```
 1   ELIMINATOR.  BUT EVIDENCE ELIMINATOR, AS I UNDERSTAND IT -- AND
 2   I THINK THE EXPERTS ARE IN AGREEMENT ON THIS -- REPLACES THE
 3   FILE NAMES WITH A SCRAMBLED WORD WHERE IT MAKES NO SENSE
 4   WHATSOEVER.
 5            MR. KENNEDY:  ABSOLUTELY SO.                        01:07
 6            MY CONCERN, THOUGH, IS THAT THIS CARRIES WITH IT THE
 7   IDEA THAT CARTER BRYANT WENT DOWN, 'OH, I'LL GET RID OF THIS
 8   FILE, GET RID OF THAT FILE, GET RID OF THIS FILE'; THAT THERE
 9   WAS A CONSCIOUS DECISION.  AND HOW DOES ANYBODY HAVE 9,400
10   FILES THEY NEED TO GET RID OF?                               01:07
11            BUT THERE'S MORE THAN THAT, YOUR HONOR.  AND, AGAIN,
12   IN KEEPING WITH THE ORDER OF PROOF, OUR FORENSIC EXPERT, AS I
13   SAY, GOT A SIMILAR OPERATING SYSTEM, ET CETERA, AND JUST SURFED
14   THE NET FOR 20 MINUTES, GETTING COOKIES AND EVERYTHING ALONG
15   THE WAY, AND THEN HE PUSHED THE SAFE SHUTDOWN BUTTON ON THE EE  01:08
16   PROGRAM.  HE HAD ACCUMULATED 5,000 FILES DURING THAT PROCESS.
17   AND THESE WERE ALL FILES THAT THE COMPUTER CREATED.  HE DIDN'T
18   PUT ANYTHING IN THE WASTEBASKET.  THESE ARE ALL, THEN, FILES
19   THAT ARE IN TEMPORARY HOLD, AND THAT'S WHAT GOT DELETED.
20            SO, AGAIN, TRYING TO PUT 9,400 IN CONTEXT, THE       01:08
21   MACHINE ITSELF GENERATES THOUSANDS AND THOUSANDS OF FILES IN
22   JUST A MATTER OF MINUTES, AND THE MACHINE ITSELF, AS WE KNOW,
23   GOES AHEAD AND DELETES A LOT OF THOSE ON ITS OWN.  SO WE HAVE
24   NO WAY OF KNOWING HOW MANY OF THOSE 9,400 WERE MACHINE-DELETED.
25            THERE'S NO TESTIMONY HERE THAT MR. BRYANT CONSCIOUSLY  01:08
```

1    WENT THROUGH AND PUT ANY OF THOSE IN THE WASTEBASKET.

2              NOW, YOUR HONOR WILL COME BACK, QUITE CORRECTLY, AND

3    SAY, 'YEAH, BUT, KENNEDY, THAT'S THE PROBLEM.  WE CAN'T TELL.

4    AND THE REASON IS BECAUSE IT WAS EVIDENCE ELIMINATOR.'  AND

5    THIS IS WHERE THE TOUGH 403 DECISION IS.                         01:09

6              UNLIKE EVERYBODY ELSE IN THIS CASE, I DON'T GET EASY

7    MOTIONS.  MINE ARE CLOSE.  NOTHING IS PATENTLY CLEAR ON THE

8    THINGS I'VE WORKED ON IN THIS CASE.  AND THIS ONE IS AN

9    ULTIMATE DISCRETION CALL.  AND I'M SURE OUR APPELLATE LAWYERS

10   WILL GO CRAZY WHEN I SAY THAT ON THE RECORD.  BUT IT'S JUST      01:09

11   BALANCING OF WHAT'S GOING TO BE THE IMPACT OF

12   EVIDENCE ELIMINATOR AND 9,400 -- WELL, THEY WEREN'T FILES, BUT

13   THEY WERE ACTUALLY NAMES -- VERSUS WHAT'S THE LIKELIHOOD --

14   GIVEN WHAT COMPUTERS GENERATE AND GET RID OF THEMSELVES, PLUS

15   THE POINT IN TIME THAT THIS TOOK PLACE, PLUS THE LACK OF ANY     01:09

16   DIRECT CONTACT WITH THAT COMPUTER GOING BACK.

17             **THE COURT:**  THANK YOU, MR. KENNEDY.

18             LET ME HEAR FROM MATTEL.

19             **MR. COREY:**  THANK YOU, YOUR HONOR.

20             LET ME START WITH, I THINK, SOMETHING THAT IS A        01:10

21   LITTLE BIT MORE NUANCE WITH RESPECT TO EVIDENCE ELIMINATOR THAN

22   THE COURT ARTICULATED.  AND I'LL DO THIS IN THE FORM OF A

23   PROFFER.

24             AS MR. KENNEDY, WE DO HAVE OUR EXPERT WITNESS HERE,

25   MR. MENZ.                                                        01:10

```
 1           NOT ONLY DOES EVIDENCE ELIMINATOR SCRAMBLE THE FILE
 2    NAMES, AS THE COURT CORRECTLY IDENTIFIED, WHAT IT THEN DOES IS,
 3    IT GOES THROUGH THE HARD DRIVE, THE UNALLOCATED PORTION OF THE
 4    HARD DRIVE, WHERE PIECES OF THE DELETED FILE COULD REMAIN, AND
 5    IT OVERWRITES THE ENTIRETY OF THAT PORTION OF THE HARD DRIVE      01:10
 6    WITH ZEROS.  SO NOT ONLY IS THE FILE NAME NOT RECOVERABLE;
 7    EVIDENCE ELIMINATOR ALSO MAKES NONRECOVERABLE ANY PIECES OF THE
 8    FORMERLY DELETED FILE.
 9           I JUST WANT TO MAKE THAT CLARIFICATION.
10           THE COURT:  I APPRECIATE THAT.                             01:11
11           I DO UNDERSTAND, WHILE IT'S NOT DELETING ANYTHING,
12    THAT IT'S, FOR LACK OF A BETTER PHRASE, PERFECTING THE
13    DELETION.
14           I'D APPRECIATE IT IF YOU WOULD ADDRESS MR. KENNEDY'S
15    ARGUMENTS, AT LEAST THE ONES I CONSIDER -- WELL, A FEW OF THEM.   01:11
16           FIRST OF ALL, THE 9,400 PLUS FILES.  THEIR EXPERT
17    DOES SEEM TO INDICATE THAT'S NOT A LOT.  AND THERE REALLY ISN'T
18    A RESPONSE TO THAT IN TERMS OF NUMBERS, HOW QUICKLY ONE CAN GET
19    TO 9,400 JUST BY SEARCHING THE INTERNET, APPARENTLY.
20           BUT I GUESS ANOTHER DIMENSION -- AND I'M TRYING TO         01:11
21    PUT THIS AS DELICATELY AS I CAN, AND THAT'S WHY I'M KIND OF
22    SCRAMBLING FOR WORDS.  MR. BRYANT HAS PROFFERED, THROUGH HIS
23    ATTORNEYS, AN ALTERNATIVE EXPLANATION AS TO WHY HE WOULD WANT
24    TO CLEANSE HIS COMPUTERS BEFORE TURNING THEM OVER FOR IMAGING
25    THAT HAVE NOTHING TO DO WITH HIDING EVIDENCE, BUT PERHAPS NOT     01:12
```

1    DISCLOSING OTHER THINGS THAT HE MAY HAVE ACCESSED WITH HIS

2    COMPUTER.

3            IS THERE ANY EVIDENCE SUGGESTING ONE THEORY OVER THE

4    OTHER, OR IS THIS KIND OF A TOSSUP AND WE JUST LET THE JURY TRY

5    TO FIGURE IT OUT?                                              01:12

6            **MR. COREY:**  WELL, I THINK THAT'S EXACTLY RIGHT.  THEY

7    DO HAVE AN INNOCENT EXPLANATION.  THEY'VE COME UP WITH IT OVER

8    THE PAST LITTLE BIT.

9            **THE COURT:**  IF IT WAS TRULY -- AGAIN, I DON'T KNOW

10   HOW TO CHOOSE THE WORDS EXACTLY -- IF IT WAS TRULY AN INNOCENT    01:12

11   EXPLANATION IN THE SENSE THAT IF EVERYONE HEARD, THEY WOULD

12   THINK, OH, OKAY, THAT'S NO PROBLEM.  BUT THIS IS WHERE THE 403

13   ANALYSIS COMES IN.  THE INNOCENT EXPLANATION ITSELF, FROM SOME

14   PEOPLE'S PERSPECTIVE, MIGHT NOT BE SO INNOCENT.  LET ME PHRASE

15   IT THAT WAY.  AND THAT'S WHERE THE UNDUE PREJUDICE COMES IN.      01:12

16   IT'S LIKE THERE'S ALMOST A DAMNED-IF-HE-DOES,

17   DAMNED-IF-HE-DOESN'T TYPE SITUATION HERE, WHERE THE JURY

18   ARGUABLY COULD BE CONFUSED AND WALK AWAY WITH A NEGATIVE

19   INFERENCE REGARDLESS OF WHETHER OR NOT THEY ACCEPTED THE

20   INNOCENT EXPLANATION.                                            01:13

21           DO YOU UNDERSTAND WHAT I'M SAYING?

22           **MR. COREY:**  YES, I UNDERSTAND EXACTLY WHAT YOU'RE

23   SAYING.

24           AND LET ME START HERE:  MR. BRYANT WAS REPRESENTED BY

25   SOPHISTICATED COUNSEL, AND HE KNEW, REGARDLESS OF WHAT STEPS     01:13

1   THAT HE TOOK, REGARDLESS OF WHAT YOU CALL IT, ONCE YOU START

2   DOWN THE PATH OF AFFECTING THE INTEGRITY OF A DEVICE THAT COULD

3   POTENTIALLY HAVE RELEVANT INFORMATION ON IT, THEN YOU'VE

4   CROSSED THE LINE.  AND IT DOESN'T REALLY MATTER WHAT MECHANISM

5   YOU USED TO DO THAT.                                          01:13

6         AND THE COURT HAS ABSOLUTELY PROPERLY IDENTIFIED THE

7   FACT THAT THIS INFORMATION, THIS TYPE OF CONDUCT, GOES TO

8   MR. BRYANT'S CREDIBILITY AND HIS GUILTY KNOWLEDGE, I THINK IS

9   HOW THE COURT PUT IT.

10        AND ONCE YOU PASS THAT LINE, THEN IT'S REALLY HARD TO    01:14

11  PUT THE GENIE BACK IN THE BOTTLE.  WHAT THEY'RE TRYING TO DO AT

12  THAT POINT IS SAY, 'WELL, YEAH, HE CROSSED THE LINE, BUT IT'S

13  INNOCENT; IT'S OKAY.  HE HAD A JUSTIFICATION FOR IT, SEPARATE

14  AND APART FROM DESTROYING EVIDENCE RELEVANT TO THE CASE.'

15        THEN WHAT WE RUN INTO AT THAT POINT IS WHAT THE COURT    01:14

16  HAS IDENTIFIED:  NOW HOW DO YOU PROVE THE NEGATIVE?

17        AND I THINK ONCE YOU CROSS THAT LINE --

18        **THE COURT:**  I SUPPOSE HOW YOU'D PROVE THE NEGATIVE OR

19  HOW YOU'D OFFER SOME EVIDENCE -- ADMITTEDLY, YOU CAN'T PROVE

20  ANYTHING WITH RESPECT TO THE FILES; BUT, PERHAPS, THERE WOULD   01:14

21  BE SOME EVIDENCE -- AND I HAVEN'T SEEN ANY OF THIS -- THAT HE

22  DID THIS FOR THE REASONS THAT YOU'RE SUGGESTING, AS OPPOSED TO

23  THE REASONS THAT MR. KENNEDY IS SUGGESTING.

24        WHAT EVIDENCE WOULD THAT BE?  TELLING SOMEBODY ELSE,

25  'HEY, I'VE GOT THIS PROGRAM THAT CAN KNOCK OUT THE E-MAILS,'   01:14

```
 1   SOME STATEMENT, SOMETHING WHERE WE COULD TIP THE BALANCE.

 2   BECAUSE WHAT I'M THINKING OF DOING IS -- I DON'T KNOW IF I

 3   REALLY NEED TO HEAR FROM THE EXPERTS AFTER THE REPORTS AND

 4   AFTER EVERYONE'S RECITATION OF THE REPORTS; BUT, PERHAPS, WE

 5   NEED TO HEAR FROM MR. BRYANT.                                  01:15

 6           MR. COREY:  LET ME ANSWER THE FIRST QUESTION THAT THE

 7   COURT ASKED, AND THEN WE'LL GET TO THE NEXT ONE.  AND THIS MAY

 8   LEAD US TO HEAR, AT LEAST IN PART, FROM ONE OF THE EXPERTS.

 9           THE EXPLANATION THAT MR. KENNEDY PROFFERED WAS THAT

10   EVIDENCE ELIMINATOR WAS PURCHASED TO DEAL WITH A POP-UP        01:15

11   PROBLEM.  EVIDENCE ELIMINATOR DOES NOT ELIMINATE POP-UPS.  THAT

12   IS WHAT MR. MENZ WILL TESTIFY TO.  I THINK THAT MAY BE ALL THAT

13   THE COURT NEEDS TO KIND OF POP THAT PARTICULAR BALLOON.

14           THE COURT:  THANK YOU.

15           IS THERE ANYTHING ELSE YOU WANTED TO SAY?              01:15

16           MR. COREY:  YES.

17           THE OTHER THING THAT I DID WANT TO SAY IS, THE OTHER

18   PIECE OF MR. KENNEDY'S ARGUMENT WAS, THERE REALLY IS NO GUILTY

19   KNOWLEDGE HERE, THERE CAN'T BE, BECAUSE WHO IS HE TO ASSUME

20   THAT MATTEL WOULD BE COMING AFTER HIM WHEN HE PURCHASED THE     01:16

21   COMPUTER?

22           THE COURT:  THAT GOES TO THE PURCHASE OF IT.  BUT

23   OBVIOUSLY, BY JULY OF 2004, YOU FILED A LAWSUIT; AND THIS IS

24   DAYS BEFORE THE IMAGING.  THAT'S WHY I'M FOCUSING ON THIS

25   PARTICULAR TIME FRAME, BECAUSE TO ME, IT DOES GET A LITTLE TOO  01:16
```

```
 1   SPECULATIVE EARLY ON.  BUT THE USE OF IT AT THIS PARTICULAR

 2   TIME PERIOD, I THINK THAT YOU MAY HAVE MET YOUR BURDEN.

 3           MR. COREY:  AND THE LAST THING I'LL SAY, YOUR HONOR,

 4   IS, THERE ARE TWO COMPETING EXPLANATIONS HERE.  HE HAS, IN

 5   FACT, CROSSED THE LINE.  THE JURY GETS TO DECIDE WHICH ONE THEY    01:16

 6   FIND TO BE MORE CREDIBLE.

 7           THE COURT:  VERY GOOD.

 8           LET'S CALL MR. BRYANT TO THE STAND.

 9           MR. NOLAN:  SIDE-BAR, YOUR HONOR?

10           (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

11           MR. NOLAN:  ALTHOUGH MR. KENNEDY HAS BEEN ADDRESSING

12   THE ARGUMENT, I WANT TO RAISE THIS ONE PARTICULAR POINT:  WOULD

13   IT BE POSSIBLE, FOR THIS PART OF THE EXAMINATION, THAT THE

14   MATTER BE SEALED AND THE COURTROOM CLEARED FROM THE PRESS, FOR

15   THIS REASON:  I THOUGHT IT WAS INTERESTING THAT FOR PRIVACY        01:17

16   POINTS OF VIEWS THE COURT WOULD REDACT THE SOCIAL SECURITY

17   NUMBER OF CARTER BRYANT FOR PRIVACY PURPOSES.  HERE WE'RE GOING

18   TO GET INTO A VERY, VERY SENSITIVE AREA, AND OUR CONCERN REALLY

19   IS ONE OF CARTER BRYANT'S PRIVACY.

20           MATTEL HAS SETTLED WITH HIM.  THIS IS BEING COVERED        01:18

21   WORLDWIDE.  WE EXPECT THE JURY NOT TO BE READING ANY OF THIS

22   ANYWAY.  I KNOW THAT.  BUT I'M WORRIED.

23           THE COURT:  I APPRECIATE YOUR CONCERN, BUT I WOULD

24   EXPECT THIS TO BE AN ISSUE THAT WOULD BE RAISED BY

25   CARTER BRYANT'S ATTORNEYS.  NOT BY --                             01:18
```

1    **MR. NOLAN:**  I WILL REPRESENT, YOUR HONOR, THAT

2   CHRISTA ANDERSON ASKED ME TO MAKE THIS REQUEST YESTERDAY.  I

3   DIDN'T GIVE CHRISTA A HEADS UP AS TO WHEN SHE CAME HERE, BUT

4   SHE'LL CONFIRM THAT WAS REQUESTED.

5           **THE COURT:**  FAIR ENOUGH.                          01:18

6           **MR. KENNEDY:**  IF YOU PREFER, SHE WILL DO IT.

7           **THE COURT:**  LET ME HEAR FROM MATTEL, JUST ON THE

8   ISSUE OF SEALING.

9           **MR. ZELLER:**  WE HAVE NO REASON AND DON'T WANT TO

10  CAUSE MR. BRYANT EMBARRASSMENT.  HOWEVER, I DON'T THINK WE CAN   01:18

11  TAKE THE POSITION THAT THERE ARE -- OTHER PARTIES MAY HAVE SOME

12  INTEREST.  I DON'T THINK WE CARE.  I DON'T THINK MATTEL HAS A

13  POSITION ON WHETHER OR NOT THIS IS SEALED.

14          IF THE COURT THINKS THAT IS SUFFICIENT CAUSE, WE'RE

15  FINE WITH THAT.  BUT I'M NOT IN A POSITION TO EVALUATE WHAT, IF   01:19

16  ANY, POSITION WE SHOULD TAKE, BECAUSE I DO NOT KNOW, FRANKLY

17  WHAT HE'S GOING TO SAY BEYOND WHAT MR. KENNEDY HAS SAID IN THE

18  PROFFER.

19          **THE COURT:**  VERY WELL.

20          **MR. NOLAN:**  WOULD YOU LIKE MS. ANDERSON TO COME UP,   01:19

21  YOUR HONOR?

22          **THE COURT:**  I DON'T WANT TO EMBARRASS ANYBODY, SO WHY

23  DON'T WE DO THIS IN CHAMBERS.

24          **MR. NOLAN:**  PERFECT.

25          **THE COURT:**  GIVE US A FEW MINUTES TO SET UP.          01:19

1    **MR. ZELLER:**  JUST SO I CAN PLAN AHEAD, WE'RE GOING TO

2    DO THE ENTIRE EXAMINATION OF MR. BRYANT IN CHAMBERS?

3         **THE COURT:**  I THINK SO.  LETS JUST DO IT ALL, KEEP IT

4    VERY TIGHT; JUST GO RIGHT TO THE ISSUE.  WE DON'T NEED TO HAVE

5    A LOT OF BACKGROUND ON THIS.                                    01:20

6         **MR. ZELLER:**  THANK YOU.

7         (SIDE-BAR PROCEEDINGS CONCLUDED.)

8         **THE COURT:**  A MOTION HAS BEEN MADE ON BEHALF OF

9    CARTER BRYANT.

10        MS. ANDERSON, APPARENTLY, YOU AUTHORIZED MR. NOLAN TO    01:20

11   MAKE A MOTION ON YOUR BEHALF TO HAVE THIS CONDUCTED IN

12   CHAMBERS.  THE COURT WILL GRANT THAT MOTION, SO WE'LL CONDUCT

13   THIS HEARING IN CHAMBERS.

14        GIVE US A FEW MINUTES TO SET UP.

15        I WILL INVITE NOT ONLY COUNSEL FOR THE PARTIES BUT       01:20

16   ALSO COUNSEL FOR CARTER BRYANT INTO CHAMBERS; AND WE'LL TAKE A

17   BRIEF RECESS TO SET THAT UP.

18        (SEALED PROCEEDINGS BEGIN,

19         UNDER SEPARATE TRANSCRIPT.)

20        (BRIEF RECESS TAKEN.)                                    02:51

21        **THE COURT:**  WE'RE BACK ON THE RECORD, OUTSIDE THE

22   PRESENCE OF THE JURY.

23        THE COURT MADE SOME RULINGS IN CHAMBERS WHICH WILL BE

24   PART OF THE RECORD, AND I JUST WANTED TO ANNOUNCE THOSE, ALSO

25   FOR THE BENEFIT OF EVERYONE PRESENT.                           02:51

1    WITH RESPECT TO THE MOTION TO DEPOSE LITTLER

2  MENDELSON, that is DENIED.  AND AS I INDICATED IN CHAMBERS AND

3  WHICH WILL BE reflected IN THE court's FINAL ORDER, the COURT

4  IS MAKING A FINDING THAT BASED on the EVIDENCE BEFORE IT, THE

5  COURT FINDS THAT THERE WAS NO MISCONDUCT BY ANY OF THE COUNSEL        02:52

6  ASSOCIATED with LITTLER MENDELSON, OR ANY OF the COUNSEL

7  ASSOCIATED WITH THIS MOTION.  THAT WILL BE SET FORth IN THE

8  COURT'S ORDER.  SO THAT MOTION IS RESOLVED.

9    SECONDLY, WITH RESPECT TO MOTION *IN LIMINE*

10  NUMBER 13 -- AND THIS IS MGA'S MOTION TO EXCLUDE ANY EVIDENCE        02:52

11  OF SPOLIATION, ADVERSE JURY INSTRUCTION.  THAT MOTION IS

12  GRANTED IN PART.  AND IT'S GRANTED, ACTUALLY, WITH RESPECT TO

13  ALL EVIDENCE, EXCEPT FOR THE USE OF EVIDENCE ELIMINATOR ON

14  JULY 12, 2004.  THE COURT HAS YET TO MAKE a decision WITH

15  RESPECT TO THAT.  THE COURT WILL ANNOUNCE THAT DECISION AT          02:52

16  1:15.  I WANT TO DO A LITTLE FURTHER WORK IN THINKING ABOUT

17  THAT.  BUT IT WILL OTHERWISE BE DENIED; SO IT'S JUST THE ISSUE

18  OF THE JULY 12TH USE OF THE SAFE EXIT FEATURE ON

19  EVIDENCE ELIMINATOR.

20    WITH THE RESPECT TO THE FINAL DISCOVERY MOTION -- AND   02:53

21  THAT IS THE MOTION SEEKING TO ENFORCE THE JANUARY 2007 ORDER OF

22  THE DISCOVERY MASTER -- THAT IS GRANTED IN PART AND DENIED IN

23  PART.  I HAVE DIRECTED COUNSEL FOR CARTER BRYANT, MS. ANDERSON,

24  TO PREPARE THE LIST OF COMPUTERS USED BY MR. CARTER BRYANT

25  FROM, ESSENTIALLY, 2000 TO THE PRESENT, ALTHOUGH INCLUDING THE      02:53

1    1998 USE OF HIS PARENTS' COMPUTER AND VARIOUS OTHER INFORMATION

2    THAT THE COURT HAS FOUND, BASED ON THE EVIDENCE BEFORE IT.

3            I AM GOING TO ORDER WHAT THE COURT IS REFERRING TO AS

4    THE 2004 COMPUTERS TO BE TURNED OVER TO MATTEL PURSUANT TO THAT

5    JANUARY 2007 ORDER.  AND THEY WILL BE TURNED OVER PURSUANT TO          02:54

6    THE PROTOCOL THAT JUDGE INFANTE SET UP TO AVOID ANY DISCLOSURE

7    OF ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS, AS WELL AS TO

8    ENSURE THAT PERSONAL OR PRIVATE MATERIAL IS REMOVED.  AND THAT

9    PROTOCOL WILL GOVERN THE PRODUCTION OF THE 2004 COMPUTERS.

10           I HAVE DENIED THE MOTION, WITHOUT PREJUDICE, WITH            02:54

11   RESPECT TO THE 2007 COMPUTERS AND AFFORDED LEAVE TO COUNSEL FOR

12   MATTEL TO SEEK THE PRODUCTION OF THOSE IN CONNECTION WITH THE

13   SECOND TRIAL.

14           I HAVE FURTHER ORDERED CARTER BRYANT AND COUNSEL FOR

15   CARTER BRYANT TO MAKE SURE THAT THOSE 2007 COMPUTERS ARE             02:54

16   PRESERVED PENDING ANY FURTHER LITIGATION RELATED TO THEM.

17           SO I THINK THAT CLEARS THE DECK, EXCEPT FOR THE ISSUE

18   OF THE JULY 12TH USE OF EVIDENCE ELIMINATOR; AND I'LL MAKE THAT

19   DECISION AT 1:15.

20           MR. ZELLER, IS THIS RECAP CONSISTENT WITH YOUR              02:55

21   UNDERSTANDING OF WHAT THE COURT RULED?

22           **MR. ZELLER:**  YES, IT IS, WITH ONE CLARIFICATION, YOUR

23   HONOR, WHICH IS -- AND I DON'T KNOW IF IT MATTERS TO THE

24   COURT'S DECISION, BUT SO THE COURT IS CLEAR, I DON'T BELIEVE

25   THAT JUDGE INFANTE HAS EVER APPROVED THE PROTOCOL THAT THE           02:55

```
 1   COURT WAS DISCUSSING WITH RESPECT TO THE PROTECTION OF
 2   ATTORNEY-CLIENT INFORMATION.  I KNOW MOST RECENTLY IT WAS A
 3   PROTOCOL THAT WAS NEGOTIATED BETWEEN MATTEL AND MGA WITH
 4   RESPECT TO ISAAC LARIAN'S HARD DRIVES, WHICH WAS BASICALLY --
 5   TO THE EXTENT IT WAS UNDER ANY COURT'S AUSPICES, IT WAS UNDER       02:55
 6   YOUR HONOR'S.  BUT THERE HAS NOT BEEN, TO MY KNOWLEDGE, A PRIOR
 7   ORDER WHERE SOME SPECIFIC PROTOCOL WAS HAMMERED OUT WITH
 8   JUDGE INFANTE'S APPROVAL.
 9            I JUST WANTED TO MAKE SURE THAT WAS UNDERSTOOD.
10            THE COURT:  VERY WELL.                                    02:55
11            I GUESS THE PROTOCOL THAT WAS IRONED OUT BY
12   JUDGE INFANTE RELATES TO THE PRIVATE INFORMATION, THIS
13   HEIGHTENED-LEVEL PROTECTIVE ORDER; IS THAT CORRECT?
14            MR. ZELLER:  NO.  THAT'S A SEPARATE ONE AS WELL.  THE
15   HEIGHTENED PROTECTION THAT JUDGE INFANTE PROVIDED WAS NOT FOR      02:56
16   PRIVATE MATERIAL, BUT, RATHER, IT WAS FOR MATERIAL THAT HAD
17   PARTICULAR SENSITIVITY AS TO TRADE SECRETS, BECAUSE IT INVOLVED
18   VERY SHORT-TERM, FORWARD-LOOKING BUSINESS PLANS, OR PRODUCT
19   LINE LAUNCHES; SO, FOR EXAMPLE, IF IN 2007, THERE WAS
20   INFORMATION ABOUT WHAT THE SPRING OF '08 LINE WAS GOING TO LOOK    02:56
21   LIKE.
22            THE COURT:  VERY WELL.
23            WELL, THAT WOULD CERTAINLY APPLY, THEN, TO ANY TRADE
24   SECRET TYPE INFORMATION THAT IS CONTAINED ON THE 2004.
25            A PROTOCOL DOES NEED TO BE WORKED OUT WITH RESPECT TO     02:56
```

1   PRIVATE INFORMATION, PERSONAL INFORMATION, AS WELL AS

2   ATTORNEY-CLIENT PRIVILEGED COMMUNICATIONS.

3            I TRUST, MR. ZELLER, YOU AND MS. ANDERSON CAN WORK

4   THAT OUT AND INCLUDE THAT IN THE PROPOSED ORDER THAT WILL BE

5   SUBMITTED TO THIS COURT IN ADVANCE OF FRIDAY, OR BY FRIDAY; AND   02:56

6   IF YOU HAVE ANY QUESTIONS ON THAT, OR IF YOU CAN'T COME TO AN

7   AGREEMENT, THE COURT WILL ISSUE ITS OWN LANGUAGE.  BUT I WOULD

8   APPRECIATE YOU, IN THE FIRST INSTANCE, SEEING IF YOU CAN'T COME

9   UP WITH A RESOLUTION THAT IS CONSISTENT, THEN, WITH THE

10  PROTOCOLS THAT HAVE BEEN ENTERED INTO WITH RESPECT TO THIS   02:57

11  OTHER INFORMATION.

12            MR. ZELLER:  RIGHT.

13            AND IN THE PAST, BRYANT'S COUNSEL AND MATTEL'S

14  COUNSEL -- WE HAVE REACHED AGREEMENT ON THE TREATMENT OF

15  PRIVATE MATERIAL.  SO THAT HAS, AGAIN, BEEN SORT OF A   02:57

16  PRIVATELY-NEGOTIATED PROTOCOL.

17            SO THERE'S PRECEDENT FOR ALL OF THIS, BUT I JUST

18  DIDN'T WANT THE COURT TO BELIEVE THAT WHAT WE HAD DONE IN THE

19  PAST HAD BEEN PREMATURE OF THE COURT.

20            THE COURT:  I APPRECIATE THAT, MR. ZELLER.   02:57

21            MS. ANDERSON, IS THERE ANYTHING ELSE?

22            MS. ANDERSON:  NO.  I WAS GOING TO JUST ADD ALL OF

23  THE THINGS THAT MR. ZELLER JUST ADDED.

24            THE COURT:  VERY WELL.

25            COUNSEL FOR LITTLER MENDELSON, ANY QUESTIONS ON YOUR   02:57

```
 1   BEHALF?

 2            MR. KRAMER:  NO THANK YOU, YOUR HONOR.

 3            THE COURT:  VERY WELL.  YOU'RE EXCUSED.

 4            MS. ANDERSON, YOU'RE EXCUSED.

 5            AND WHAT I'D LIKE TO DO IS PROCEED WITH AT LEAST      02:57

 6   45 MINUTES OF TESTIMONY THIS MORNING.  I GUESS MY GOAL OF

 7   HAVING TWO HOURS IS GOING TO FALL SHORT.

 8            WE DO HAVE A JUROR NOTE THAT, I THINK, WAS PROVIDED

 9   TO COUNSEL.  I ALSO HAVE RECEIVED INFORMATION THAT BECAUSE OF

10   PARKING PROBLEMS aCROSS THE STREET, TWO OF THE JURORS HAD TO    02:58

11   PARK AT ALTERNATIVE PLACES, AND ONE OF THE JURORS HAS TO LEAVE

12   AT 11:45 TO GO MOVE HER CAR; SO WE'RE GOING TO HAVE TO BREAK AT

13   11:45.

14            JUROR NUMBER THREE, WHAT I'M INCLINED TO DO IS TAKE

15   THAT UP -- ASK HER TO COME BACK AT 1:15 AND TAKE THAT UP       02:58

16   OUTSIDE THE PRESENCE OF THE OTHER JURORS; GIVE COUNSEL A CHANCE

17   TO THINK ABOUT IT.  I'LL ASK HER TO SIT THROUGH THIS MORNING'S

18   TESTIMONY.

19            IF THERE'S NOTHING ELSE, I'D LIKE TO BRING THE

20   TESTIMONY IN.                                                 02:58

21            MR. LARIAN, IF YOU COULD RETURN TO THE WITNESS STAND,

22   AND WE'LL GET GOING.

23            (WHEREUPON, JURORS ENTER COURTROOM.)

24            THE COURT:  WE'RE BACK ON THE RECORD BEFORE THE JURY.

25            I UNDERSTAND THAT ONE OF THE MEMBERS OF THE JURY      03:01
```

 1    NEEDS TO LEAVE TO RETRIEVE THEIR CAR AT 11:45, SO WE'LL BREAK

 2    AT THAT TIME.

 3           I ALSO UNDERSTAND THAT ANOTHER JUROR NEEDS TO TAKE UP

 4    AN ISSUE WITH THE COURT.  JUROR NUMBER THREE, MS. JOHNSON.

 5    WE'VE RECEIVED YOUR LETTER.  WHAT WE'LL DO IS, WE'LL TAKE THAT         03:02

 6    UP AT 1:15 THIS AFTERNOON.

 7           SO LET'S RESUME WITH THE EXAMINATION OF MR. LARIAN AT

 8    LEAST FOR THE NEXT 35 MINUTES.

 9           COUNSEL.

10               **DIRECT EXAMINATION**(CONTINUED)                          03:02

11    **BY MR. PRICE:**

12    Q    I'M GOING TO SHOW YOU A DOCUMENT.  IT'S BEEN IDENTIFIED AS

13    EXHIBIT 10175.

14           MR. LARIAN, LOOK THAT OVER BRIEFLY, AND I'M GOING TO

15    ASK YOU WHETHER YOU HAVE SEEN THIS DOCUMENT BEFORE.                   03:03

16    A    I DON'T RECALL EVER SEEING IT.

17    Q    DID YOU EVER HAVE ANY DISCUSSIONS CONCERNING A LAWYER

18    NAMED RAYMOND DAVID BLACK, REPRESENTING MGA?

19    A    I KNOW A LAWYER NAMED DAVID BLACK.  I DO KNOW HIM.

20    Q    AND WHO IS HE?                                                   03:03

21    A    HE'S A LAWYER FOR US IN THE UK.

22    Q    AND DID MR. BLACK FILE, ON YOUR BEHALF, AN ACTION AGAINST

23    DOUBLE GRAND CORPORATION, LIMITED?

24    A    I DON'T RECALL THAT.

25    Q    MORE PARTICULARLY, IF YOU'D LOOK AT PAGE 30.  I'LL ASK YOU       03:03

```
 1   WHETHER YOU RECOGNIZE THAT DOCUMENT, OR THAT PORTION OF

 2   EXHIBIT 10175.

 3   A    I DO NOT.

 4   Q    DID YOU EVER BECOME AWARE THAT ATTORNEYS ON BEHALF OF MGA

 5   REPRESENTED TO COURTS IN THE UK THAT CARTER BRYANT CAME UP WITH   03:04

 6   THE DESIGNS OF THE BRATZ DOLLS IN 1999?

 7          MR. NOLAN:  OBJECTION, YOUR HONOR.  LACKS FOUNDATION;

 8   REFERRING TO THE DOCUMENT.

 9          THE COURT:  LAY A FOUNDATION, COUNSEL.

10   BY MR. PRICE:                                                    03:04

11   Q    DO YOU HAVE ANY UNDERSTANDING AS TO WHETHER OR NOT MGA HAS

12   MADE REPRESENTATIONS TO COURTS AS TO WHEN MR. BRYANT CREATED

13   THE BRATZ DESIGN?

14   A    I DO NOT.

15   Q    ARE YOU AWARE THAT ISSUE CAME UP, THAT IS, WHEN MR. BRYANT  03:04

16   CREATED THE BRATZ DESIGNS -- ARE YOU AWARE OF WHETHER OR NOT

17   THAT ISSUE HAS EVER COME UP IN ANY LITIGATION OTHER THAN THIS

18   ONE IN WHICH MGA HAS BEEN INVOLVED?

19   A    NOT THAT I RECALL AS I SIT HERE, NO.

20   Q    DID YOU PERSONALLY EVER HAVE DISCUSSIONS WITH MR. BLACK     03:05

21   ABOUT THE FACTUAL BACKGROUND OF WHEN BRATZ WAS ORIGINATED OR

22   THE HISTORY OF MGA OR ANYTHING OF THAT NATURE?

23          MR. NOLAN:  YOUR HONOR, I'M GOING TO OBJECT TO THE

24   EXTENT THAT HE HAD CONVERSATIONS WITH COUNSEL FOR MGA THAT

25   WOULD BE PRIVILEGED.                                             03:05
```

1          **THE COURT:**  REPHRASE.

2   **BY MR. PRICE:**

3   Q    WITHOUT GETTING INTO ANY SUBSTANCE, HAVE YOU HAD

4   DISCUSSIONS WITH FOREIGN LAWYERS CONCERNING THE HISTORY OF

5   BRATZ?                                                          03:05

6   A    I'M SORRY?  WITH FOUR LAWYERS?

7   Q    FOREIGN LAWYERS, LIKE MR. BLACK, OR OTHERS, CONCERNING THE

8   HISTORY OF BRATZ.

9   A    I DON'T RECALL ONE WAY OR ANOTHER.

10  Q    IF ONE OF YOUR LAWYERS WANTED TO LEARN THE HISTORY OF    03:06

11  BRATZ, WHEN MR. BRYANT CREATED THESE DESIGNS OR ANYTHING OF

12  THAT NATURE, WOULD IT BE THE PRACTICE THAT THEY WOULD TALK TO

13  YOU OR SOMEBODY ELSE WITHIN MGA?

14          **MR. NOLAN:**  OBJECTION.  LACKS FOUNDATION; CALLS FOR

15  SPECULATION WITH SOMEONE HE WOULD HAVE TALKED TO.              03:06

16          **THE COURT:**  OVERRULED.

17          YOU MAY ANSWER.

18          **THE WITNESS:**  MOST LIKELY WE WOULD TALK TO OUR

19  IN-HOUSE GENERAL COUNSEL.

20  **BY MR. PRICE:**                                              03:06

21  Q    THAT WOULD BE WHOM?

22  A    AT WHAT TIME?

23  Q    IN 2003.

24  A    I BELIEVE THAT WOULD BE DAPHNE GRONICH, IF I'M NOT

25  MISTAKEN.  AGAIN, I DON'T KNOW EXACTLY IF IT WAS HER OR        03:06

1   SOMEBODY ELSE.  I DON'T RECALL EXACTLY WHO WAS THE GENERAL

2   COUNSEL IN 2003.

3   Q    BEFORE PLEADINGS WERE FILED IN CASES THAT MGA WAS PURSUING

4   IN WHICH THE COMPANY WAS TAKING POSITIONS ON WHEN THE BRATZ

5   DESIGNS WERE CREATED, BEFORE THAT HAPPENED, WAS IT YOUR                    03:06

6   PRACTICE TO REVIEW THOSE PLEADINGS FOR ACCURACY?

7   A    NO.

8   Q    WAS THERE SOMEONE AT MGA WHO HAD THAT RESPONSIBILITY?

9   A    AGAIN, I'M SPECULATING.  MOST LIKELY, OUR LAWYERS, OUR

10  GENERAL COUNSEL.                                                          03:07

11  Q    JUST A FEW MORE QUESTIONS.

12        MR. LARIAN, WE SHOWED YOU EXHIBIT 633, WHICH IS IN

13  EVIDENCE, ON FRIDAY.  WE'LL PUT THAT UP AGAIN.

14        THAT WAS AN E-MAIL THAT YOU WROTE TO MR. ROSS,

15  MS. O'CONNOR, AND DAVID MALACRIDA ABOUT THE POLICY OF NO ONE             03:07

16  TALKING TO THE PRESS UNLESS YOU KNEW IN ADVANCE WHAT THEY WERE

17  GOING TO SAY.

18  A    YES.

19  Q    SO MY QUESTION IS THIS:  I THINK YOU SAID MR. MALACRIDA

20  HAD FUNCTIONS IN PUBLIC RELATIONS; IS THAT RIGHT?                        03:07

21  A    YES.  HE'S HEAD OF PUBLIC RELATIONS.

22  Q    AND YOU WERE HERE WHEN MS. O'CONNOR TESTIFIED?

23  A    I WAS.

24  Q    IS IT TRUE THAT AFTER MS. O'CONNOR'S DEPOSITION WAS TAKEN,

25  IN WHICH SHE SAID YOU INSTRUCTED HER TO WHITE OUT THE FAX               03:08

```
 1   HEADER FOR MATTEL -- IS IT TRUE THAT AFTER THAT, YOU INSTRUCTED

 2   MR. MALACRIDA TO ADD HER BROTHER, CHARLES O'CONNOR, TO A LAYOFF

 3   LIST?

 4   A    THAT IS ABSOLUTELY NOT TRUE.

 5   Q    DO YOU RECALL THERE BEING A LAYOFF LIST IN WHICH            03:08

 6   MS. O'CONNOR'S BROTHER WAS ON?

 7   A    I BELIEVE MS. O'CONNOR'S BROTHER WAS LAID OFF, YES.

 8   Q    AND IT'S YOUR UNDERSTANDING THAT WAS ABOUT FOUR MONTHS

 9   AFTER MS. O'CONNOR TESTIFIED IN HER DEPOSITION.

10   A    I DON'T RECALL WHEN WAS IT.  I HAVE NO IDEA.               03:08

11   Q    IT'S FAIR TO SAY, THOUGH, AT SOME POINT AFTER

12   MS. O'CONNOR'S DEPOSITION, YOU HEARD ABOUT HER TESTIMONY UNDER

13   OATH THAT YOU HAD INSTRUCTED HER TO WHITE OUT THE FAX HEADER

14   SAYING THAT THE CONTRACT WAS FAXED FROM MATTEL, THE BRYANT

15   CONTRACT?                                                       03:08

16   A    CAN YOU PLEASE -- I DON'T UNDERSTAND YOUR QUESTION.

17   Q    SURE.

18        AT SOME TIME AFTER MS. O'CONNOR'S DEPOSITION, IT'S

19   TRUE, IS IT NOT, THAT YOU LEARNED THAT MS. O'CONNOR HAD SAID

20   THAT YOU HAD INSTRUCTED HER TO WHITE OUT THE FAX HEADER THAT    03:09

21   SAID THAT MR. BRYANT'S CONTRACT WAS FAXED FROM MATTEL?

22   A    I DON'T RECALL THAT.

23   Q    THAT SORT OF ACCUSATION WOULD MAKE YOU SOMEWHAT UPSET IF

24   IT WEREN'T TRUE; CORRECT?

25   A    WELL, TO THE BEST OF MY RECOLLECTION, MOST OF THESE        03:09
```

1  DEPOSITIONS WERE TAKEN AS ATTORNEYS' EYES ONLY, AND OUR

2  ATTORNEYS WERE NOT SUPPOSED TO TELL US ANYTHING ABOUT ANY OF

3  THE DEPOSITIONS; SO I HAVE NO RECOLLECTION OF THAT ONE WAY OR

4  ANOTHER.

5  Q   IS IT YOUR TESTIMONY THAT THAT PART OF MS. O'CONNOR'S          03:09

6  DEPOSITION WAS FOR ATTORNEYS' EYES ONLY; THAT IS, THE PART

7  WHERE SHE SAID YOU TOLD HER TO WHITE OUT THE FAX HEADER SHOWING

8  THAT MR. BRYANT'S CONTRACT WAS FAXED FROM MATTEL?

9  A   I DON'T KNOW.  I WAS NOT AT HER DEPOSITION, SO I DON'T

10 KNOW IF IT WAS OR NOT.                                            03:09

11 Q   SO IS IT YOUR TESTIMONY THAT YOU NEVER LEARNED THAT SHE

12 HAD TESTIFIED IN THAT DEPOSITION UNDER OATH THAT YOU HAD

13 DIRECTED HER TO WHITE OUT THIS FAX HEADER?

14 A   BESIDES WHAT I LEARNED DURING THE COURSE OF THIS

15 LITIGATION?                                                       03:10

16 Q   WELL, THAT WOULD BE DURING THE COURSE OF THE LITIGATION.

17        AFTER HER DEPOSITION.

18 A   TECHNICALLY, YEAH, YOU CAN SAY AFTER THE DEPOSITION, YES,

19 I DID LEARN THAT SHE SAID THAT.

20 Q   HOW SOON WAS IT AFTER MS. O'CONNOR'S DEPOSITION THAT YOU      03:10

21 LEARNED THAT SHE HAD SAID THAT YOU HAD WHITED OUT THE FAX

22 HEADER THAT SHOWED THAT MR. BRYANT'S CONTRACT WAS FAXED TO MGA

23 FROM MATTEL?

24 A   I WOULD NOT BE ABLE TO PUT A DATE ON THAT.  I DON'T KNOW

25 WHEN WAS HER DEPOSITION.                                          03:10

```
1   Q    BUT JUST SAY WITHIN A CERTAIN TIME PERIOD.

2            WAS IT WITHIN A MONTH?  A DAY?  A FEW WEEKS?  TWO

3   MONTHS?  TWO YEARS?

4   A    I DON'T RECALL.  I DON'T THINK IT WOULD BE TWO YEARS,

5   BECAUSE -- BUT I DON'T RECALL.                              03:10

6   Q    SO YOU DON'T RECALL AN INSTANCE WHERE YOU LEARNED OF THAT

7   AND YOU WERE UPSET BECAUSE YOU THOUGHT THAT WAS UNTRUE?

8   A    I AM UPSET, BECAUSE IT IS UNTRUE.  BUT I DON'T RECALL WHEN

9   I LEARNED ABOUT IT.

10  Q    DO YOU RECALL THAT YOU WERE ASKED ABOUT EXHIBIT 13223; AND  03:11

11  THIS IS THE REDACTED E-MAIL FROM PETER MARLOW.  YOU RECALL THAT

12  THE E-MAIL WAS FROM MR. MARLOW TO MS. GARCIA, COPYING YOU.

13           I WANT TO ASK YOU ABOUT MS. GARCIA'S RELATIONSHIP TO

14  VERONICA MARLOW.

15           WAS IT YOUR UNDERSTANDING THAT THEY WERE FRIENDS?     03:11

16  A    AS OF WHEN?

17  Q    LET'S SAY AS OF 2005.

18  A    I DON'T KNOW IF THEY WERE FRIENDS OR NOT.  I KNOW THAT

19  VERONICA MARLOW WAS A FREELANCE CONTRACTOR TO MGA.  I HAVE NO

20  IDEA IF THEY WERE FRIENDS OR NOT.                           03:11

21  Q    WAS IT YOUR UNDERSTANDING THAT IT WAS MS. GARCIA WHO MADE

22  THE DECISION AS TO WHETHER OR NOT TO SEND WORK TO

23  VERONICA MARLOW?

24  A    I UNDERSTAND THAT, FOR HER TO BE -- YES.  YES, THAT'S

25  CORRECT.                                                    03:12
```

1  Q    AND MS. GARCIA WOULD BE THE ONE WHO WOULD APPROVE THE

2  INVOICES THAT CAME IN FROM VERONICA MARLOW.

3  A    I DON'T KNOW IF IT WAS HER WHO APPROVED THEM OR THE

4  ACCOUNTING DEPARTMENT OR SOMEBODY ELSE.  I HAVE NO IDEA WHO

5  APPROVED HER INVOICES.                                    03:12

6  Q    IT'S YOUR UNDERSTANDING THAT MS. GARCIA, BEING THE PERSON

7  WHO WOULD SEND THE WORK TO MS. MARLOW, WOULD BE EXPECTED TO

8  OVERSEE THAT WORK; CORRECT?

9  A    CAN YOU REPEAT THAT QUESTION.

10 Q    SURE.                                                03:12

11        SINCE MS. GARCIA WAS THE ONE SENDING THE WORK TO

12 MS. MARLOW, SHE WAS THE ONE WHO WOULD BE OVERSEEING THAT WORK,

13 TO MAKE SURE IT WAS SATISFACTORY.

14 A    I HOPE SO.  THAT'S MY BEST RECOLLECTION -- EXPECTATION, I

15 GUESS.                                                    03:12

16 Q    AND YOU WOULD EXPECT THAT MS. MARLOW WOULD OVERSEE THE

17 WORK TO MAKE SURE SHE WAS GETTING HER MONEY'S WORTH; THAT IS,

18 THAT MGA WAS GETTING ITS MONEY'S WORTH.

19 A    CAN YOU REPEAT THAT AGAIN.

20 Q    YOU WOULD EXPECT THAT MS. GARCIA, IN THIS OVERSIGHT       03:13

21 FUNCTION, WOULD BE MAKING SURE THAT MGA WAS GETTING ITS MONEY'S

22 WORTH FOR THE WORK THAT IT WAS GETTING FROM MS. MARLOW.

23 A    I'M SORRY.  I DON'T UNDERSTAND EXACTLY WHAT YOUR QUESTION

24 IS.

25 Q    I'LL BREAK IT UP.                                    03:13

```
 1              MGA WANTS TO MAKE SURE IT DOESN'T OVERPAY ITS

 2    VENDORS; RIGHT?

 3    A    YES.  I HOPE SO.

 4    Q    YOU'RE CONCERNED ABOUT COSTS.

 5    A    WE ARE CONCERNED ABOUT COSTS.                         03:13

 6    Q    AND YOU SAID MS. GARCIA WAS THE ONE RESPONSIBLE FOR

 7    SENDING BUSINESS TO MS. MARLOW; CORRECT?

 8    A    I THINK SHE WAS, YES.

 9    Q    AND PART OF HER DUTIES WOULD BE TO MAKE SURE THAT THE WORK

10    SHE WAS GETTING FROM MS. MARLOW WAS WORTH THE COST.         03:13

11    A    YES.  YOU CAN SAY THAT.

12    Q    DOES MGA HAVE ANY POLICIES ABOUT WHETHER OR NOT A VENDOR

13    WHO'S RECEIVING WORK FROM AN MGA EMPLOYEE CAN GIVE GIFTS TO

14    THAT MGA EMPLOYEE?

15    A    IF WE HAVE A POLICY, WE CAN GIVE GIFTS TO THE MGA        03:14

16    EMPLOYEE?

17    Q    YES.

18              FOR EXAMPLE, MS. GARCIA IS THE ONE SENDING WORK TO

19    MS. MARLOW.

20              DID MGA HAVE A POLICY THAT MS. GARCIA, YOU KNOW,    03:14

21    SHOULDN'T BE ACCEPTING MONEY FROM MS. MARLOW?

22    A    IT'S POSSIBLE.  I DON'T KNOW ONE WAY OR ANOTHER.

23    Q    WELL, WOULD YOU EXPECT THAT THERE WOULD BE SOME POLICY

24    AGAINST THAT?

25    A    I DON'T KNOW IF THERE IS OR NOT.  I DON'T THINK THERE'S  03:14
```

1   ANYTHING WRONG IF SOMEBODY IS GIVING GIFTS TO SOMEBODY ELSE, AS

2   FAR AS MGA IS CONCERNED.

3   Q    LET ME SHOW YOU WHAT'S IN EVIDENCE AS EXHIBIT 13172.  IT'S

4   NOT IN YOUR BINDER.  I'M PUTTING IT UP HERE.

5          IT'S A CHECK FROM MS. MARLOW TO PAULA TREANTAFELLES,          03:15

6   MS. GARCIA, FOR $8,000, IN AUGUST OF 2004.

7          DO YOU HAVE ANY AWARENESS AS TO THIS CHECK; THAT IS,

8   MS. MARLOW, THE VENDOR, SENDING MS. GARCIA, THE PERSON WHO GAVE

9   HER BUSINESS, A CHECK FOR $8,000?

10  A    I DO NOT.                                                      03:15

11  Q    SINCE FRIDAY, HAVE YOU HAD THE OPPORTUNITY TO TALK WITH

12  ANYONE ABOUT YOUR TESTIMONY?

13  A    NO, I HAVE NOT.

14  Q    HAVE YOU HAD ANY DISCUSSIONS WITH ATTORNEYS OR ANYONE

15  ABOUT YOUR TESTIMONY?                                              03:15

16  A    I HAVE NOT.

17  Q    PRIOR TO TAKING THE STAND LAST WEEK, DID YOU HAVE ANY

18  MEETINGS WITH YOUR COUNSEL CONCERNING YOUR TESTIMONY?

19  A    I DID.

20  Q    AND WITHOUT GETTING INTO ANY SUBSTANCE, CAN YOU TELL US       03:15

21  WHO YOU MET WITH.

22  A    MR. TOM NOLAN.  CRAIG HOLDEN, I BELIEVE, CAME IN AND OUT.

23  I THINK EVEN TOM NOLAN CAME IN AND OUT.  HE WENT TO DO HIS

24  LAUNDRY.

25          **MR. NOLAN:**  OBJECTION, YOUR HONOR.  ACTUALLY, I        03:16

```
 1   PICKED IT UP FROM THE LAUNDRY.

 2            MR. QUINN:  WE'RE JUST GRATEFUL HE DID IT,

 3   YOUR HONOR.

 4            THE COURT:  VERY WELL.

 5            THE WITNESS:  AND ROB HERRINGTON.                    03:16

 6   BY MR. PRICE:

 7   Q    PADDINGTON?

 8   A    NO.  ROB HERRINGTON.

 9   Q    AND COULD YOU IDENTIFY -- WE KNOW MR. NOLAN.

10   A    YES.                                                    03:16

11   Q    THE OTHER FOLKS ARE IN HERE AS WELL?

12   A    ROB HERRINGTON IS RIGHT THERE.

13            AGAIN, CRAIG HOLDEN CAME IN AND OUT.

14   Q    HOW LONG WERE YOU MEETING WITH THESE FOLKS?

15   A    ABOUT TWO TO THREE HOURS.                               03:16

16   Q    DURING THAT TIME, DID YOU LOOK AT ANY DOCUMENTS TO REFRESH

17   YOUR MEMORY?

18   A    I LOOKED AT DOCUMENTS, YES.

19   Q    DID ANY OF THEM REFRESH YOUR RECOLLECTION?

20   A    NOT AS I RECALL THEM HERE ONE WAY OR ANOTHER.  THEY MIGHT   03:17

21   BE, BUT -- YEAH, I SAW A BUNCH OF DOCUMENTS.

22   Q    WAS THIS THE ONLY TIME, THIS TWO- OR THREE-HOUR PERIOD,

23   WAS THIS THE ONLY TIME YOU MET WITH THESE GENTLEMEN TO DISCUSS

24   YOUR TESTIMONY?

25   A    BEFORE I CAME ON THE STAND HERE?                        03:17
```

```
 1   Q    AT THIS POINT, LIMIT IT TO THAT, YES.

 2   A    YES.

 3   Q    HAD THERE BEEN PREVIOUS TIMES WHEN YOU HAD MET WITH

 4   ATTORNEYS TO DISCUSS YOUR TESTIMONY?

 5   A    I HAVE MET WITH MY LAWYERS TO DISCUSS MY DEPOSITION, WHEN    03:17

 6   I WAS GIVING MY DEPOSITION, YES.

 7   Q    AND ABOUT HOW MANY HOURS DID YOU MEET WITH YOUR LAWYERS IN

 8   THAT CONNECTION?

 9   A    I DON'T RECALL.  I GAVE TWO DEPOSITIONS TWO DIFFERENT

10   TIMES.  I DON'T RECALL EXACTLY.                                  03:17

11   Q    DURING ANY OF THESE TIMES, WAS ANY OF THIS VIDEOTAPED?

12   A    NO, IT WAS NOT.

13          MR. PRICE:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS

14   OF MR. LARIAN AT THIS TIME.

15          THE COURT:  VERY WELL.                                    03:18

16          CROSS-EXAMINATION.

17                        CROSS-EXAMINATION

18   BY MR. NOLAN:

19   Q    MR. LARIAN, I WANT TO TURN TO THAT LAST SUBJECT WE

20   DISCUSSED, ABOUT MEETINGS WITH COUNSEL.                          03:18

21          I THINK YOU INDICATED THAT YOU MET LAST WEEK SOMETIME

22   WITH COUNSEL.

23          IS IT TRUE, MR. LARIAN, THAT AFTER JURY SELECTION AND

24   BEFORE YOU TOOK THE STAND, YOU TOOK A TRIP OUT OF THE

25   UNITED STATES?                                                   03:18
```

```
 1   A     I DID.

 2              MR. PRICE:  OBJECTION.  IRRELEVANT AND LEADING.

 3              THE COURT:  OVERRULED.

 4              THE WITNESS:  YES, I DID.

 5   BY MR. NOLAN:

 6   Q     WHAT WERE THE CIRCUMSTANCES?  WHY DID YOU TRAVEL ABROAD?

 7              MR. PRICE:  OBJECTION.  THIS IS NOT RELEVANT.

 8              THE COURT:  OVERRULED.

 9          I THINK THE DOOR HAS BEEN OPENED TO THIS.

10              THE WITNESS:  I WAS NAMED ENTREPRENEUR OF THE YEAR      03:18

11   FOR THE UNITED STATES, AND I WAS GOING TO EUROPE TO COMPETE FOR

12   ENTREPRENEUR OF THE WORLD.

13   BY MR. NOLAN:

14   Q     AND DO YOU HAVE IN FRONT OF YOU EXHIBIT 18480?

15   A     YES.                                                        03:19

16   Q     DO YOU RECOGNIZE THIS DOCUMENT?

17   A     I DO.

18   Q     WHAT IS IT, SIR?

19   A     THIS WAS BASICALLY THE STORY THAT WAS ON U.S. STATE

20   DEPARTMENT'S WEBSITE REGARDING I WINNING THE ENTREPRENEUR --      03:20

21              MR. PRICE:  OBJECTION.  THIS IS TESTIFYING TO BEFORE

22   THE EXHIBIT IS IN.

23              THE COURT:  LET'S GO TO SIDE-BAR, COUNSEL, BRIEFLY.

24          (SIDE-BAR PROCEEDINGS WERE HELD AS FOLLOWS:)

25              THE COURT:  MR. NOLAN, I'LL GIVE YOU LEEWAY -- THE     03:20
```

```
 1   DOOR HAS BEEN OPENED -- BY ASKING ABOUT THIS MEETING.  WHAT IS

 2   YOUR EXPLANATION ABOUT WHY HE WAS THERE?  IT'S TO UPDATE HIM ON

 3   WHAT HAPPENED WHILE HE WAS GONE?

 4             MR. NOLAN:  RIGHT.

 5             THE COURT:  THERE IS INFORMATION ABOUT THAT, BUT            03:20

 6   THERE'S NO DISPUTE THAT HE WENT OVER AND WAS AMERICAN

 7   ENTREPRENEUR OF THE YEAR.  WHY GET INTO THE ARTICLE AT THIS

 8   TIME?  DOES IT LEAD TO ANOTHER ARTICLE, I'M AFRAID?

 9             MR. NOLAN:  IT PROBABLY DOES.  I WON'T GO INTO THIS.

10             WELL, AS JUDGE TAKASUGI WOULD SAY, A LITTLE BIT TOO        03:21

11   MUCH MUSTARD ON THE HOT DOG.

12             THE COURT:  WISE MAN.

13             (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

14   BY MR. NOLAN:

15   Q   MR. LARIAN, WITHOUT REFERENCE TO THIS PARTICULAR DOCUMENT,      03:21

16   WHAT COUNTRIES WERE REPRESENTED IN THIS INTERNATIONAL

17   COMPETITION, IF YOU KNOW?

18             MR. PRICE:  OBJECTION.  THE 'MUSTARD' RELEVANCE.

19             THE COURT:  OVERRULED, COUNSEL.

20             THEN LET'S MOVE ON FROM THIS QUESTION.                    03:21

21             THE WITNESS:  OVER 49 COUNTRIES WERE REPRESENTED IN

22   THIS COMPETITION.

23   BY MR. NOLAN:

24   Q   DO YOU KNOW WHETHER OR NOT YOU WERE SELECTED BECAUSE OF

25   YOUR INVOLVEMENT WITH THE DEVELOPMENT OF THE BRATZ DOLL?            03:22
```

```
 1    A    NO.  I WAS SELECTED BECAUSE --

 2              MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.

 3              THE COURT:  SUSTAINED.

 4    BY MR. NOLAN:

 5    Q    DID THE UNITED STATES WIN THE COMPETITION?              03:22

 6    A    NO, WE DID NOT.

 7    Q    WHICH COUNTRY DID?

 8    A    SWITZERLAND.

 9    Q    MR. PRICE ASKED YOU A NUMBER OF QUESTIONS CONCERNING

10    ALLEGED CONCEALMENT OF CARTER BRYANT AS THE ILLUSTRATOR FOR THE   03:22

11    DRAWINGS OF BRATZ.

12              DO YOU RECALL THAT LINE OF QUESTIONS?

13    A    I DO.

14    Q    DO YOU HAVE EXHIBIT NUMBER 17281 IN FRONT OF YOU, SIR?

15    A    YES.                                                    03:22

16    Q    DO YOU RECOGNIZE 17281?

17    A    I DO.

18    Q    WHAT IS IT?

19    A    THIS IS AN E-MAIL THAT ERIC YIP, WHO WORKED FOR MGA HONG

20    KONG, SENT TO A LADY NAMED ELING POON, WHO WORKED AT THE TIME   03:23

21    FOR PREL, WHICH WAS THE AGENT FOR WAL-MART IN HONG KONG.

22              MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 17281.

23              MR. PRICE:  OBJECTION.  FOUNDATION AS TO HOW HE'S

24    SEEN THIS DOCUMENT.

25              THE COURT:  SUSTAINED.                             03:24
```

TUESDAY, JUNE 10, 2008                    TRIAL DAY 10,  MORNING SESSION

1963

BY MR. NOLAN:

1   Q    DO YOU RECALL THE CIRCUMSTANCES BY WHICH THIS E-MAIL WAS

2   SENT?

3   A    YES.

4   Q    DID ANYBODY APPROACH YOU AND ASK YOU FOR PERMISSION TO          03:24

5   TAKE THE ACTIONS THAT ARE SET FORTH IN THIS E-MAIL?

6   A    YES.  ERIC YIP DID.  AND I GAVE HIM AN INSTRUCTION TO DO

7   IT.

8   Q    WAS THIS E-MAIL SENT PURSUANT TO YOUR SPECIFIC

9   INSTRUCTIONS?                                                        03:24

10  A    YES, IT WAS.

11           MR. NOLAN:  YOUR HONOR, WE'D NOW OFFER EXHIBIT 17281.

12           MR. PRICE:  NO OBJECTION.

13           THE COURT:  IT'S ADMITTED.

14           YOU MAY PUBLISH.                                            03:24

15  BY MR. NOLAN:

16  Q    I JUST WANT TO GO TO THIS BEFORE THE LUNCH HOUR, AND THEN

17  WE'LL COME BACK AND TALK ABOUT OTHER ISSUES.

18           DO YOU SEE WHERE IT SAYS, "SUBJECT:  FASHION DOLLS

19  BRATZ FOR RON STOVER"?  DO YOU SEE THAT?                             03:24

20  A    YES.

21  Q    AND IMMEDIATELY ABOVE THAT, IT'S THE SENT DATE; AND,

22  AGAIN, BECAUSE WE'RE READING IT, THE WAY IT'S SET FORTH IN THE

23  ADDRESS THERE, IT'S DECEMBER 14, 2000.

24  A    THAT'S CORRECT.                                                 03:25

1    Q    AND CARTER BRYANT HAS BEEN WORKING AT MGA SINCE

2    APPROXIMATELY OCTOBER 20TH; CORRECT?

3    A    THAT'S CORRECT.

4    Q    NOW, THIS SAYS, "FASHION DOLLS FOR RON STOVER."

5         WOULD YOU MIND EXPLAINING TO THE JURY WHO                  03:25

6    RON STOVER IS.

7    A    RON STOVER WAS THE BUYER FOR WAL-MART AT THE TIME FOR

8    FASHION DOLLS.

9    Q    AND HAD YOU EVER HAD ANY CONVERSATIONS WITH MR. STOVER

10   CONCERNING MGA DEVELOPING FASHION DOLLS?                        03:25

11   A    YES.  RON STOVER WAS A BUYER AT WAL-MART.  WAL-MART IS,

12   PERHAPS, THE BIGGEST RETAILER IN THE U.S.A., AND AT THE TIME, I

13   WAS THE SALESMAN WHO WOULD CALL ON WAL-MART.  I USED TO GO TO

14   WAL-MART FROM HERE.  I HAD TO FLY TO DALLAS, AND FROM DALLAS,

15   TAKE A SMALL PLANE TO FAYETTEVILLE, ARKANSAS.  FROM THERE, I    03:26

16   HAD TO DRIVE TO BENTONVILLE, ARKANSAS, WHERE THE HEADQUARTERS

17   OF WAL-MART IS.  AND I HAD MADE MANY, MANY PRESENTATIONS TO HIM

18   OF PRODUCTS, AND UNFORTUNATELY, HE WOULD NOT BUY ANYTHING FROM

19   ME.  I RECALL ON ONE OCCASION --

20        **MR. PRICE:**  YOUR HONOR, THIS SEEMS TO BE BEYOND THE    03:26

21   SCOPE AT THIS POINT.

22        **THE COURT:**  LET'S BREAK IT UP, COUNSEL.

23   **BY MR. NOLAN:**

24   Q    YOU WERE TALKING ABOUT NUMEROUS TRIPS THAT YOU HAD TAKEN

25   TO MEET WITH MR. WAL-MART, OR A REPRESENTATIVE OF WAL-MART.     03:26

1    WAS THERE A TIME THAT YOU HAD A MEETING WITH

2  MR. STOVER WHERE THE SUBJECT OF MGA POSSIBLY DEVELOPING A

3  FASHION DOLL CAME UP?

4  A    NOT SPECIFICALLY A FASHION DOLL.

5  Q    DO YOU RECALL DISCUSSIONS WITH MR. STOVER AT WAL-MART WITH    03:26

6  RESPECT TO THE POTENTIAL OF PRESENTING ADDITIONAL NEW PRODUCTS

7  TO HIM?

8  A    I REMEMBER ONE SPECIFIC MEETING WHERE HE SAID -- BECAUSE

9  HE WOULD NOT BUY ANYTHING FROM ME, SO -- AND I SAID, 'WHAT IS

10  IT GOING TO TAKE?'  HE SAID, 'BRING ME SOMETHING THAT COMPETES    03:27

11  WITH BARBIE, AND I WOULD BUY IT.'

12  Q    AND WHAT YEAR WAS THAT?

13  A    IT WAS -- I DON'T REMEMBER THE EXACT YEAR, BUT IT WAS

14  DEFINITELY BEFORE 2000.

15  Q    NOW, TURNING BACK TO THIS EXHIBIT THAT WE HAVE UP HERE,    03:27

16  ELING, IT SAYS "ELING."  AND THIS IS FROM ERIC YIP.  AND ELING,

17  AGAIN, WORKS FOR PREL.

18    AND PREL IS CONNECTED TO WHOM?

19  A    PREL WAS, AS OF 2000, WHAT THEY CALL THE AGENT, THE BUYING

20  AGENT, FOR WAL-MART, IN HONG KONG AND CHINA.    03:27

21  Q    AND THEN YOU SEE THAT IT SAYS, "ELING, PLEASE SEE ATTACHED

22  PICTURES AND PHOTOS FOR THE FASHION DOLLS THAT WE ARE GOING TO

23  PRESENT TO RON IN JANUARY.  IN FACT, THIS SERIES OF DOLLS IS

24  ONE OF OUR KEY ITEMS FOR 2001.  PLEASE NOTE THAT THESE PICTURES

25  ARE PRELIMINARY CONCEPT DRAWINGS AND ARE FOR YOUR REFERENCE    03:28

```
 1   ONLY.  THE FINAL PRODUCTS MAY VARY WHEN WE PUT THESE IN
 2   PRODUCTION.  HOWEVER, WE WILL HAVE MOCK-UPS/WORKING SAMPLES
 3   AVAILABLE IN THE JANUARY TOY SHOW."
 4        DO YOU SEE THAT?
 5   A   YES.                                                    03:28
 6   Q   DID I READ THAT CORRECTLY?
 7   A   YOU DID.
 8   Q   SO YOU KNEW THAT ERIC YIP FROM MGA WAS GOING TO SEND TO
 9   THE AGENT OF WAL-MART CONCEPT DRAWINGS; CORRECT?
10   A   I INSTRUCTED HIM TO DO SO.  YES.                        03:28
11   Q   WOULD YOU TURN TO THE SECOND PAGE OF THIS EXHIBIT.
12        DO YOU RECOGNIZE THE DRAWING THAT'S DEPICTED ON THE
13   VERY FIRST PICTURE THAT WAS INCLUDED IN THIS E-MAIL?
14   A   I DO.
15   Q   AND WHAT IS THAT?                                       03:28
16   A   THIS IS WHAT WE CALL THE HERO DRAWINGS THAT HE DREW, TO
17   THE BEST OF MY RECOLLECTION, FOR THE CONCEPT OF BRATZ, AFTER HE
18   HAD LEFT MATTEL.
19   Q   CAN I JUST SHOW YOU ON THE BOTTOM -- YOU SEE WHERE IT
20   SAYS, "ALL MATERIALS COPYRIGHT 2000, CARTER BRYANT?"        03:29
21        DO YOU SEE THAT?
22   A   I DO.
23   Q   IF YOU WERE CONCEALING CARTER BRYANT AS THE ILLUSTRATOR
24   FOR THE BRATZ DRAWING, WHY ARE YOU ALLOWING CARTER BRYANT'S
25   NAME TO BE ATTACHED TO DRAWINGS SENT TO WAL-MART?           03:29
```

```
 1   A     WE WERE NOT CONCEALING CARTER BRYANT'S NAME.

 2   Q     DO YOU HAVE EXHIBIT NUMBER 01703 IN FRONT OF YOU?

 3   A     I DO.

 4   Q     DO YOU RECOGNIZE THIS DOCUMENT?

 5   A     I DO.                                                   03:30

 6   Q     WHAT IS THIS DOCUMENT?

 7   A     THESE WERE DOCUMENTS THAT WE FILED, TO THE BEST OF MY

 8   RECOLLECTION, IN BRAZIL, TO REGISTER THE COPYRIGHT FOR BRATZ.

 9   Q     AND DO YOU SEE IN THE LOWER RIGHT-HAND CORNER, WHERE IT

10   SAYS "RIO DE JANEIRO," THERE'S A DATE?                        03:30

11   A     YES.

12   Q     WHAT IS THE DATE?

13   A     JANUARY 26, 2002.

14         AGAIN, I DON'T READ PORTUGUESE, BUT I CAN READ THOSE

15   NUMBERS.                                                      03:31

16         MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 1703.

17         THE COURT:  ANY OBJECTION?

18         MR. PRICE:  LACK OF FOUNDATION.

19         THE COURT:  WHAT IS YOUR OBJECTION?

20         MR. PRICE:  HE CAN'T READ THIS.  LACK OF FOUNDATION.    03:31

21         THE COURT:  SUSTAINED.

22   BY MR. NOLAN:

23   Q   REGARDLESS OF WHETHER OR NOT YOU CAN READ PORTUGUESE, DO

24   YOU HAVE AN UNDERSTANDING OF WHAT THIS DOCUMENT IS?

25   A    IT IS A COPYRIGHT REGISTRATION FOR BRATZ IN PORTUGAL, AND 03:31
```

1    THE DATE IS ON THE TOP ALSO; AND THE DATE -- YOU CAN FIGURE OUT

2    THAT IT'S JANUARY 26, 2002.

3    Q    WERE YOU AWARE THAT MGA WAS --

4    A    IT'S IN NUMBERS.  IT'S NOT IN PORTUGUESE.  IT WAS JUST

5    BASICALLY ENGLISH NUMBERS.                                          03:32

6    Q    WERE YOU AWARE THAT MGA WAS REGISTERING THE TRADEMARK OF

7    BRATZ IN RIO DE JANEIRO?

8    A    IN BRAZIL.

9    Q    IT'S IN BRAZIL.

10   A    RIO DE JANEIRO IS IN BRAZIL, YES.                              03:32

11   Q    NOW, LOOKING AT THIS DOCUMENT, NOT ALL OF THE WORDS ARE IN

12   PORTUGUESE; RIGHT?

13   A    NO, THEY ARE NOT.

14          **MR. NOLAN:**  YOUR HONOR, WE'D OFFER EXHIBIT 1703.

15          **MR. PRICE:**  SAME OBJECTION.  LACK OF FOUNDATION.          03:32

16          **THE COURT:**  COUNSEL, I THINK YOU CAN GO A LITTLE BIT

17   FURTHER IN CONNECTING THE TWO POINTS THAT YOU JUST MADE, IN

18   TERMS OF HOW HE KNOWS THAT THESE DOCUMENTS ARE ACTUALLY

19   CONNECTED WITH THAT REGISTRATION.

20          I'M GOING TO SUSTAIN THE OBJECTION AGAIN.                    03:32

21   **BY MR. NOLAN:**

22   Q    CONTINUING TO LOOK AT EXHIBIT 1703 FOR A MOMENT, DID YOU

23   UNDERSTAND THAT WITH RESPECT TO SELLING THE BRATZ DOLLS AND

24   OFFERING THEM FOR COMMERCE IN VARIOUS PARTS OF THE WORLD, THAT

25   TRADEMARK REGISTRATION WOULD BE FILED IN VARIOUS COUNTRIES?        03:33

```
 1    A     YES.

 2    Q     DID YOU EVER, AT ANY TIME, DIRECT YOUR LAWYERS TO CONCEAL

 3    THE NAME OF CARTER BRYANT IN ANY OF THE FILINGS?

 4    A     ABSOLUTELY NOT.

 5              MR. PRICE:  OBJECTION.  MOVE TO STRIKE AS TO          03:33

 6    PRIVILEGE.

 7              THE COURT:  SUSTAINED.

 8              REPHRASE YOUR QUESTION.

 9    BY MR. NOLAN:

10    Q     EXHIBIT NUMBER 01703 CONSISTS OF NUMEROUS PAGES; CORRECT?  03:33

11    A     THAT'S CORRECT.

12              THE COURT:  COUNSEL, YOU'RE ASKING FOR ALL OF 1703?

13    THERE APPEARS TO BE ENGLISH TRANSLATIONS, BUT THERE'S NO

14    FOUNDATION LAID FOR THOSE ENGLISH TRANSLATIONS.

15              MR. NOLAN:  I WAS GOING TO TRY A DIFFERENT WAY,       03:34

16    YOUR HONOR.

17              THE COURT:  VERY WELL.

18    BY MR. NOLAN:

19    Q     IN SEPTEMBER OF 2002, WAS A DOLL BY THE NAME OF "JADE"

20    MANUFACTURED AND OFFERED FOR SALE BY MGA?                       03:34

21    A     IT WAS.

22    Q     WAS IT YOUR INTENT TO HAVE THAT "JADE" NAME TRADEMARKED IN

23    BRAZIL --

24    A     I DID.

25    Q     -- IN 2002?                                               03:34
```

```
 1    A     THAT'S CORRECT.

 2    Q     AND ALSO IN 2002, WAS MGA MANUFACTURING AND OFFERING FOR

 3    SALE A BRATZ DOLL BY THE NAME OF "SASHA"?

 4    A     WE DID.

 5    Q     WAS IT YOUR INTENTION TO HAVE THE TRADEMARK FOR SASHA          03:34

 6    REGISTERED IN BRAZIL?

 7    A     YES, WE DID.

 8    Q     IN OR AROUND SEPTEMBER OF 2002?

 9    A     YES, WE DID.

10    Q     AND, ALSO, IN OR ABOUT SEPTEMBER OF 2002, WAS MGA             03:35

11    MANUFACTURING AND OFFERING FOR SALE IN BRAZIL A BRATZ DOLL WITH

12    THE NAME "YASMIN"?

13    A     YES, WE DID.

14    Q     DID YOU INTEND TO HAVE THE NAME "YASMIN" TRADEMARKED IN

15    BRAZIL?                                                             03:35

16    A     YES, WE DID.

17    Q     AND IN SEPTEMBER OF 2002, WAS MGA MANUFACTURING AND

18    OFFERING FOR SALE IN BRAZIL A BRATZ DOLL WITH THE NAME "CLOE"?

19    A     YES, WE DID.

20    Q     WAS IT YOUR INTENT TO HAVE THE NAME "CLOE" REGISTERED IN      03:35

21    BRAZIL?

22    A     YES, WE DID.

23          MR. NOLAN:  YOUR HONOR, WITH THAT FOUNDATION, I WOULD

24    OFFER EXHIBIT 1703, PAGES 001, 002, 003, AND 004, OFFERED INTO

25    EVIDENCE.                                                           03:36
```

```
 1        MR. PRICE:  THERE'S NO FOUNDATION FOR THIS WITNESS.

 2        THE COURT:  LET'S COME BACK TO THIS, COUNSEL.

 3        ACTUALLY, WE'RE A MINUTE AWAY FROM 11:45.  LET'S TAKE

 4   OUR BREAK NOW, AND WE CAN DISCUSS THIS DURING THE BREAK.

 5        LET'S EXCUSE THE JURY.                              03:36

 6        (WHEREUPON, JURORS DEPART COURTROOM.)

 7        THE COURT:  MR. NOLAN, THE PROBLEM WITH THESE SERIES

 8   OF DOCUMENTS, BESIDES BEING A FOREIGN LANGUAGE, IS THAT YOU

 9   HAVEN'T TIED THE DOCUMENTS THEMSELVES TO MR. LARIAN'S

10   TESTIMONY.  HE'S TESTIFIED THAT, YES, HE HAD THESE PREPARED, OR  03:37

11   WANTED TO HAVE THEM PREPARED, BUT THERE'S NOT A CONNECTION OF

12   THESE DOCUMENTS TO HIM.

13        MR. NOLAN:  YOUR HONOR, I'LL LAY THE FOUNDATION THAT

14   HE IS AWARE THAT, IN FACT, THESE DOCUMENTS WERE FILED AT HIS

15   DIRECTION IN RIO DE JANEIRO.  AND, OF COURSE, THE IMPORT OF ALL  03:37

16   OF THIS IS THAT THE NAME "CARTER BRYANT" IS PROMINENTLY

17   DISPLAYED HERE, NOT IN PORTUGUESE, BUT IN ENGLISH.

18        THE COURT:  I UNDERSTAND WHY YOU WANTED TO GET THEM

19   IN.  THERE'S JUST A QUESTION OF THE FOUNDATION TO GET THEM IN

20   THROUGH THIS WITNESS.                                   03:37

21        MR. NOLAN:  WELL, YOUR HONOR --

22        THE COURT:  CAN HE TESTIFY TO HAVING REVIEWED THESE

23   DOCUMENTS BEFORE THEY WERE SUBMITTED?

24        MR. NOLAN:  YOUR HONOR, RESPECTFULLY, I DOUBT THAT,

25   IN TERMS OF LOOKING AT THIS.  BUT WHAT HE WILL SAY IS THAT HE  03:37
```

1  AUTHORIZED IT, HE WANTED IT, HE UNDERSTOOD IT, AND THAT HE

2  UNDERSTOOD IT WAS DONE, AND THAT HE UNDERSTOOD THAT, IN FACT,

3  HIS DIRECTIONS WERE CARRIED OUT.

4          AND, YOUR HONOR, THERE'S NO DISPUTE WITH RESPECT TO

5  THE VALIDITY OF THESE DOCUMENTS OR THAT THEY WERE FILED IN          03:38

6  BRAZIL.

7          **THE COURT:**  IF THAT'S THE CASE, WHY DON'T YOU DISCUSS

8  THIS DURING THE BREAK, AND WE'LL TAKE THIS UP AT 1:15.

9          **MR. NOLAN:**  I'M SURPRISED THEY WERE FIGHTING IT.

10          **THE COURT:**  AS IT STANDS RIGHT NOW, MR. PRICE IS          03:38

11  CORRECT, THERE'S INADEQUATE FOUNDATION.  IT SOUNDS LIKE THIS

12  COULD ULTIMATELY BE INTRODUCED THROUGH ANOTHER WITNESS.  TO

13  SAVE TIME, IF THERE REALLY IS NO DISPUTE ABOUT THIS, PERHAPS A

14  STIPULATION CAN BE REACHED.  BUT I'LL LEAVE THAT UP TO COUNSEL

15  DURING THE BREAK.          03:38

16          **MR. PRICE:**  BECAUSE OF THE (UNINTELLIGIBLE), THE

17  DISPUTE IS WHETHER HE KNEW ANYTHING ABOUT MR. BRYANT'S NAME

18  BEING REVEALED, AND IF HE NEVER SAW THESE, AND GIVEN HIS

19  TESTIMONY ABOUT REVIEWING LAWYER WORK PRODUCT, I DOUBT HE DID.

20  BUT (UNINTELLIGIBLE) FOR 403 IN THE SENSE THIS GENTLEMEN -- THE          03:38

21  IMPORT OF THIS IS, THIS GENTLEMAN KNEW CARTER BRYANT'S NAME WAS

22  BEING REVEALED TO THE WORLD, AND YOU CAN'T DO THAT THROUGH THIS

23  DOCUMENT, UNLESS HE SAW THIS DOCUMENT, OR UNLESS HE INSTRUCTED,

24  'I WANT CARTER BRYANT'S NAME IN THAT DOCUMENT.'

25          **THE COURT:**  THERE'S GOT TO BE A GREATER NEXUS,          03:39

```
 1   COUNSEL.

 2            AT THIS POINT, I'M GOING TO SUSTAIN THE FOUNDATION.

 3   THERE'S DIFFERENT WAYS THAT I COULD THINK OF THIS BEING DONE,

 4   BUT I'LL LEAVE THAT UP TO YOU.

 5            MR. NOLAN:  CAN I TAKE ONE MORE MINUTE?  BECAUSE        03:39

 6   WE'RE GOING TO COME BACK AT 1:15 AND TALK TO THE JUROR.

 7            THE COURT:  WE'RE GOING TO COME BACK AT 1:15 AND TALK

 8   WITH THE JUROR, AND I'M GOING TO COME BACK AT 1:15 AND ANNOUNCE

 9   MY DECISION ON MOTION IN LIMINE NUMBER 13.

10            MR. NOLAN:  I HAVE A SUGGESTION WITH RESPECT TO THE     03:39

11   JUROR NOTE, AND I DON'T KNOW WHETHER OR NOT YOU WANT TO ADDRESS

12   IT RIGHT NOW.

13            NUMBER ONE, IT SEEMS TO ME THAT WHAT IS BEING DONE

14   WITH RESPECT TO THE RECISION OF HER SUMMER CONTRACT BECAUSE

15   SHE'S ON JURY DUTY IS INAPPROPRIATE.  I WOULD ASK THE COURT TO   03:39

16   AT LEAST CONSIDER A PHONE CALL TO SUGGEST THAT THE POWERS OF

17   THE UNITED STATES DISTRICT COURT, SIMILAR TO THE LETTER THAT

18   WAS WRITTEN FOR, I THINK, JURY NUMBER 7, BE EVOKED.

19            WITH RESPECT TO THE RHEUMATOID ARTHRITIS CONDITION,

20   THE NEED FOR MEDICATION, AGAIN, YOUR HONOR, THERE, I THINK      03:40

21   WE'VE MADE ACCOMMODATIONS WITH RESPECT TO OTHER THINGS, THAT WE

22   COULD EASILY ACCOMMODATE THE EARLIEST APPOINTMENT AND MAYBE

23   START A LITTLE BIT LATER OR BREAK EARLIER IN THE DAY.

24            THAT'S WHAT I WOULD SUGGEST, YOUR HONOR.

25            WHAT I'M CONCERNED ABOUT IS, THIS IS THE SECOND NOTE   03:40
```

```
 1   FROM A JUROR, AND WE'VE STILL GOT A LONG WAY TO GO.

 2            THE COURT:  VERY WELL.

 3            DOES MATTEL WISH TO BE HEARD AT THIS TIME?

 4            MR. QUINN:  WE ACTUALLY JOIN IN MR. NOLAN'S COMMENTS.

 5            THE COURT:  VERY WELL.                              03:40

 6            WHAT I'LL DO WHEN I BRING HER IN AT 1:15 IS TRY TO

 7   EXPLORE WHO IT IS THAT THE COURT MIGHT CONTACT TO ENFORCE

 8   WHATEVER AGREEMENT SHE HAD PREVIOUSLY WORKED OUT.  IT SOUNDS

 9   LIKE SHE HAD DONE WHAT SHE WAS SUPPOSED TO DO BY GETTING THIS

10   CLEARED WITH THE APPROPRIATE AUTHORITIES; AND THEN FOR WHATEVER  03:40

11   REASON, SOMEONE CHANGED THEIR MIND.  LET ME FLUSH THAT OUT A

12   LITTLE BIT WITH HER; SEE WHAT THE COURT CAN DO.  IN THE

13   MEANTIME, I'LL KEEP HER ON THE JURY.  AND CERTAINLY, IF SHE

14   NEEDS TO SCHEDULE A DOCTOR'S APPOINTMENT TUESDAY THROUGH

15   FRIDAY, WE CAN JUST BREAK EARLY OR START LATER.             03:40

16            ANYTHING ELSE?

17            SEE YOU AT 1:15.

18            (CONCLUSION OF MORNING SESSION.)

19

20

21

22

23

24   / / /

25   / / /
```

1

2                              CERTIFICATE

3

4    I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
5    the stenographically recorded proceedings held in the
     above-entitled matter and that the transcript page format is in
6    conformance with the regulations of the judicial conference of
     the united states.

7

8
     _____          _____
9    THERESA A. LANZA, RPR, CSR                              Date
     Official COURT Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TUESDAY, JUNE 10, 2008                       TRIAL DAY 10,  MORNING SESSION