1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                        - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7   MATTEL, INC.,                    )
                                     )
8                     Plaintiff,     )
                                     )
9            vs.                     )  No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al.,)
                                     )
11                    Defendants.    )  TRIAL DAY 12
    _____ )  MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )  pages 2353-2427
    _____ )

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                  Riverside, California

17               Thursday, June 12, 2008

18                      9:24 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24            3470 12th Street, Rm. 134
            Riverside, California  92501
25                  951-274-0844
               WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                            TIMOTHY ALGER
                         865 S. FIGUEROA STREET,
 7                       10TH FLOOR
                         LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL KENNEDY
13                            LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

thursday, june 12, 2008                    trial day 12, morning session

1                        I N D E X

2                                              Page

3    Plaintiff case (continued)...................... 2372

4

5

6

   WITNESS           DIRECT        CROSS       REDIRECT      RECROSS
7    **Rachel Harris**

8    BY MR. Quinn    2372                      2414
     BY MR. Nolan                  2389                      2423
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Riverside, California; Thursday, June 12, 2008; 9:24 A.M.

2                              -oOo-

3          **THE CLERK:**  CALLING CASE NUMBER CV04-09049-SGL,

4    MATTEL, INC., V. MGA, INC., ET AL.

5          MAY WE HAVE COUNSEL IN THIS MATTER PLEASE STATE YOUR          00:30

6    APPEARANCES FOR THE RECORD.

7          **MR. QUINN:**  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8    MATTEL.

9          **MR. NOLAN:**  TOM NOLAN, LAUREN AGUIAR, CARL ROTH ON

10   BEHALF OF MGA AND ISAAC LARIAN.                                     00:30

11         **THE COURT:**  GOOD MORNING.

12         THERE are A FEW ISSUES THE COURT WANTS TO TAKE UP

13   WITH COUNSEL BEFORE WE START.

14         THE FIRST ISSUE IS THE BRYAN ARMSTRONG ISSUE.

15         THERE ARE BASICALLY TWO ISSUES, AFTER REFLECTING ON           00:31

16   THIS LAST NIGHT, THAT THE COURT NEEDS TO ADDRESS ON THE

17   ADMISSIBILITY OF THE ARMSTRONG EVIDENCE.

18         THE FIRST IS THE RELEVANCE AND THE ADMISSIBILITY OF

19   THE EVIDENCE FOR PURPOSES OF COMPETENCE.  AND IN THIS REGARD, I

20   BELIEVE THAT MATTEL IS CORRECT.  THIS IS A 30(B)(6)                 00:31

21   DESIGNATION.  THIS IS SOMEONE WHO IS TESTIFYING AND WAS

22   DESIGNATED ON BEHALF OF MGA.  AND IT IS WELL SETTLED IN THE

23   CASES THAT I REVIEWED ON 30(B)(6) DEPOSITION THAT A 30(B)(6)

24   DESIGNEE BINDS THE CORPORATION.

25         THE RULE OF WAIVER THAT MR. NOLAN WAS CITING TO               00:32

1   YESTERDAY, WHILE THAT MIGHT APPLY TO A GENERAL DEPOSITION,

2   WHERE, IF THE COMPETENCE OBJECTION IS NOT MADE, THAT IT COULD

3   BE MADE AT TRIAL.  THERE IS NOTHING IN MY REVIEW OF THE CASES

4   RELATING TO 30(B)(6) THAT WOULD SUGGEST IT WOULD APPLY TO THAT

5   SITUATION.  A 30(B)(6), BY DEFINITION, IS SOMETHING WHICH IS           00:32

6   GIVEN TO THE OTHER SIDE.  NOTICE IS GIVEN OF THE TOPIC TO BE

7   EXPLORED, AND IT IS ENTIRELY UP TO THE OTHER SIDE TO DESIGNATE

8   WHO THEY BELIEVE TO BE THE PERSON MOST COMPETENt TO TESTIFY,

9   THE PERSON MOST KNOWLEDGEable; AND THEN TO TURN AROUND AND

10  LATER MAKE A COMPETENCY OBJECTION, JUST SEEMS TO DEFEAT THE           00:32

11  ENTIRE PURPOSE OF THE EXERCISE.

12          HOWEVER -- AND THIS IS A BIG HOWEVER -- I'M CONVINCED

13  BY MS. AGUIAR'S ARGUMENT YESTERDAY THAT PURSUANT to RULE 403,

14  THAT ALTHOUGH RELEVANT, THE EVIDENCE AND THE PROBATIVE VALUE OF

15  THE EVIDENCE IS OUTWEIGHED BY THE DANGER OF the CONFUSION OF          00:33

16  THE ISSUES, MISLEADING THE JURY, POTENTIAL OF UNDUE DELAY,

17  WASTE OF TIME, AND, FRANKLY, CUMULATIVE EVIDENCE.

18          THE PROBLEM HERE, PRIMARILY -- AND I THINK MS. AGUIAR

19  DID A VERY GOOD JOB OF IDENTIFYING THIS ISSUE -- IS THAT WE

20  ESSENTIALLY HAVE TO GET INTO A MARKMAN TYPE HEARING, BECAUSE AT       00:33

21  THE END OF THE DAY, THE TRUTH OR VORACITY OF THE DECLARATION

22  SUBMITTED BY MGA IN SUPPORT OF THE PATENT APPLICATION, IN WHICH

23  THEY ALLEGED THE DATE THAT THE PARTICULAR DOLL OR FEATURE CAME

24  ON LINE, IS TIED UP WITH AN ANALYSIS OF THE CLAIMS SET FORTH IN

25  THE PATENT APPLICATION ITSELF.  AND WHILE I THINK MR. ZELLER IS       00:34

```
 1   CORRECT THAT THE ANSWERS THAT WERE GIVEN SHOULD BE -- THAT MGA
 2   IS BOUND BY THEM, IN PRESSING MR. ZELLER FOR THE SIMPLEST WAY
 3   TO PRESENT THIS, THERE'S STILL NO GETTING AROUND THE FACT THAT
 4   IT'S ALL TIED UP WITH WHETHER OR NOT THE CLAIM AND THE DIAGRAM
 5   ARE, IN FACT, CONNECTED.  WHILE WE MIGHT BE ABLE TO GET THROUGH    00:34
 6   MR. ARMSTRONG'S TESTIMONY, IT opens UP AN ENTIRE SERIES OF
 7   WITNESSES THAT WOULD HAVE TO GO BACK AND FORTH.  AND I THINK
 8   THE PROBATIVE VALUE THAT WOULD COME OUT OF THIS SERIES IS
 9   SIMPLY OUTWEIGHED BY THE CONFUSION AND THE COMPLEXITY OF THE
10   ISSUE THAT WOULD NEED TO BE PRESENTED TO THE JURY.                 00:35
11          IT'S A VERY CLOSE CALL.
12          I'M MINDFUL THAT MR. QUINN MADE REFERENCE TO THIS AS
13   ONE OF THE ALLEGEDLY MISLEADING submissions MADE IN OPENING
14   STATEMENTs.  I'M MINDFUL THAT THIS WAS A 30(B)(6) DEPOSITION,
15   AND I AGREE THAT MGA NEEDS TO BE BOUND BY THIS ANSWER.  BUT AT     00:35
16   THE END OF THE DAY, I THINK THE 403 ANALYSIS -- NOT ON UNFAIR
17   PREJUDICE, BUT ON CONFUSING THE JURY AND COMPLEXITY, IS SUCH
18   THAT, IN THIS CASE, IT TIPS IN FAVOR OF MGA.
19          SO THAT IS THE COURT'S RULING ON THE ARMSTRONG
20   TESTIMONY.                                                        00:35
21          ANY QUESTIONS CONCERNING THE COURT'S RULING?
22          MR. ZELLER:  NOT REALLY ANY QUESTIONS, YOUR HONOR.
23          WELL, MAYBE IT IS A QUESTION, WHICH IS THAT WE DO, IN
24   FACT, ALSO HAVE AN EXPERT, WHO WE DISCLOSED, WHO CAN TALK ABOUT
25   THESE SAME ISSUES.                                                00:36
```

1          WHAT I WOULD REQUEST OF THE COURT IS IF I COULD MAKE

2   AN OFFER OF PROOF THAT GOES TO THESE ISSUES, AND, IN

3   PARTICULAR, WHAT THIS PATENT EXPERT CAN TESTIFY TO.

4          I MEAN, the FIRST IS THAT, FROM OUR PERSPECTIVE, THIS

5   GOES TO THE PATTERN OF CONCEALment, AS THE COURT IS AWARE OF.        00:36

6          **THE COURT:**  I UNDERSTAND.  AND THERE'S OTHER EVIDENCE

7   OF THAT PATTERN OF CONCEALMENT.  AND THAT'S PART OF THE

8   CUMULATIVE FINDING THAT THE COURT IS MAKING.  I GUESS MY

9   QUESTION -- AND, PERHAPS, YOU'RE ABOUT TO ANSWER THIS --

10  IS WHETHER OR NOT -- I'M ADDRESSING THIS NOT SO MUCH AS          00:36

11  WITNESS-SPECIFIC, BUT AS SUBJECT-SPECIFIC.  I UNDERSTAND YOU

12  WANT TO GET IN THIS DECLARATION AND if THIS DECLARATION WAS

13  FALSE, that THIS WAS PART OF THE CONCEALMENT.

14          IS THERE SOME WAY OF USING SOME OTHER WITNESS BESIDES

15  MR. ARMSTRONG, WHICH I'VE JUST RULED ON, THAT AVOIDS THIS        00:36

16  PROCESS THAT MS. AGUIAR POINTED OUT YESTERDAY OF ESSENTIALLY

17  DOING A MARKMAN-TYPE CLAIM CONSTRUCTION, WHICH I REALLY THINK

18  IS TOO CONFUSING AT THIS POINT FOR THE JURY TO GET INTO, GIVEN

19  THE ISSUES THAT WE WANT THE JURY TO FOCUS ON IN THIS PHASE OF

20  THE TRIAL.                                                      00:37

21          **MR. ZELLER:**  THAT WAS EXACTLY THE CRUX OF THE

22  QUESTION THAT I HAD AS WELL, WHICH IS, YOU KNOW, HOW FAR DOES

23  THE COURT'S RULING EXTEND?

24          THERE ARE AT LEAST A COUPLE OF POSSIBILITIES IN TERMS

25  OF THE POTENTIAL OTHER AVENUES OF GETTING THIS INTO EVIDENCE,    00:37

1    THROUGH A WITNESS ANYWAY.

2              NUMBER ONE WOULD BE MR. BRYANT, QUESTIONING

3    MR. BRYANT ABOUT THE DECLARATION THAT HE MADE.

4              I DON'T WANT TO SOUND LIKE I'M REARGUING THE COURT'S

5    DETERMINATION AS TO THE MARKMAN HEARING, BUT IN SOME WAYS, THE          00:37

6    PROCESS CAN BE SIMPLIFIED, PERHAPS, THROUGH OTHER MEANS, WHICH

7    IS SIMPLY LOOKING AT AND COMPARING THE TWO DOLLS.

8              I MEAN, THE CRUX OF THEIR ARGUMENT ISN'T NECESSARILY

9    JUST SIMPLY, 'WELL, WHAT WE DISCLOSED IN THE PATENT IS

10   SOMETHING COMPLETELY DIFFERENT AND REQUIRES SOME EXTENSIVE            00:37

11   CLAIM CONSTRUCTION,' BUT, RATHER, IT'S THAT THE FIRST WAVE OF

12   DOLLS RELEASED IN 2001 ARE DIFFERENT THAN THOSE THAT WERE

13   RELEASED IN 2002.

14             THE COURT:  BUT DIFFERENT NOT JUST FROM A LAY

15   PERSON'S PERSPECTIVE, BUT DIFFERENT FROM AN INTELLECTUAL             00:38

16   PROPERTY PERSPECTIVE.  THAT'S WHERE, I THINK, WE GET INTO THE

17   CLAIM CONSTRUCTION.

18             MR. ZELLER:  WHAT I WOULD OFFER AS AN OFFER OF PROOF

19   TO THE COURT IS THAT MGA HAS ADMITTED, INCLUDING IN OTHER

20   DEPOSITION TESTIMONY, THAT THE BODY SCULPT AND THOSE CONNECTORS       00:38

21   AND EVERYTHING ELSE HAS NEVER CHANGED.  AND THE COURT CAN

22   ACTUALLY SEE, LOOKING AT THE 2001 DOLLS OR THE 2002 DOLLS, THEY

23   ARE IDENTICAL.  THIS IS NOT A MATTER OF SUBTLE DIFFERENCES AND

24   IS THERE SOME MECHANICAL DIFFERENCE IN TERMS OF THE KEKER TORE.

25   I MEAN, THEY ARE IDENTICAL.                                          00:38

1        WE ACTUALLY HAD INTENDED TO GO THROUGH -- AGAIN, PART

2   OF OUR OFFER OF PROOF HERE IS HAVING THOSE TWO DOLLS.

3        **THE COURT:**  YOU'RE OFFERING SOMETHING DIFFERENT NOW.

4   WHAT YOU'VE SAID UP TO THIS POINT HAS BEEN A MATTER OF

5   COMPARISON.  AND THE MATTER OF COMPARISON NECESSARILY INVOLVED        00:39

6   WHAT MS. AGUIAR INDICATED, THIS CLAIM CONSTRUCTION.

7        THAT'S WHAT I'M RULING ON AND THAT'S WHY I'M

8   PRECLUDING THE ARMSTRONG DEPOSITION AND THAT'S ALL I'M GOING TO

9   SAY AT THIS POINT.

10        IF THERE'S SOMETHING ELSE, WHY DON'T YOU DISCUSS IT        00:39

11   WITH MS. AGUIAR.  PERHAPS, THERE MAY BE SOME OTHER APPROACH TO

12   THIS, BUT THAT'S NOT BEFORE THE COURT.  JUST LIKE I'VE ASKED

13   MGA NOT TO BE A MOVING TARGET, I'M GOING TO ASK --

14        DO YOU UNDERSTAND THE RULING WITH RESPECT TO

15   ARMSTRONG?        00:39

16        **MR. ZELLER:**  I DO, YOUR HONOR.

17        **THE COURT:**  VERY WELL.  I'LL LEAVE IT UP TO YOU TO

18   MEET AND CONFER WITH COUNSEL TO SEE IF THERE MIGHT BE SOME

19   OTHER WAY TO EXPLORE THIS, AND WE'LL GO FROM THERE.

20        **MR. ZELLER:**  THANK YOU.        00:39

21        **THE COURT:**  ANY QUESTIONS FROM MGA ON THIS POINT?

22        **MS. AGUIAR:**  NO THANK YOU, YOUR HONOR.

23        **THE COURT:**  VERY WELL.  ARMSTRONG, THEN, IS OFF THE

24   TABLE.

25        THERE WAS A PROPOSED ORDER I ASKED COUNSEL TO PREPARE        00:39

1   CONCERNING THE COURT'S RULINGS FROM THE OTHER DAY.

2           HAS THAT BEEN DONE?

3           **MS. AGUIAR:**  WE HAVE A JOINT PROPOSED ORDER REGARDING

4   MGA'S MOTION *IN LIMINE* NUMBER 13; AND I CAN PROVIDE COPIES OF

5   THAT.                                                              00:40

6           **THE COURT:**  I TRUST THAT SOMEONE FROM MATTEL HAS

7   REVIEWED THIS?

8           **MR. Proctor:**  YES, YOUR HONOR.

9           **MS. AGUIAR:**  AND WE ARE IN THE PROCESS OF WORKING OUT

10  A STIPULATION AND PROPOSED SCHEDULE REGARDING THE NEW EXPERT       00:40

11  REPORTS.

12          **THE COURT:**  EXCELLENT.

13          ON A TOPIC THAT WAS RAISED BY MR. ZELLER LAST

14  EVENING, AND that WE HAD A SIDE-BAR ON -- THIS IS CONCERNING

15  THE UNDER-SEAL FILING.                                            00:40

16          AFTER COUNSEL LEFT, IT CAME TO THE COURT'S ATTENTION

17  THAT THE ONLY DOCUMENT FILED WAS NOT JUST A NOTICE OF THE

18  MANUAL FILING, BUT AN EX-PARTE APPLICATION TO SHORTEN TIME.

19          IT'S NOT CLEAR TO ME WHY THAT WAS NECESSARY, SINCE,

20  OBVIOUSLY, I'd GIVEN LEAVE TO FILE THE MOTION, AND, OBVIOUSLY,     00:40

21  I WANT TO HEAR THIS ON SHORTENED TIME.  THAT'S WHAT THIS IS ALL

22  ABOUT.

23          MATTEL HAS DONE THOSE MOTIONS; AND THAT'S FINE.

24          THE FUNDAMENTAL PROBLEM HERE IS THAT EX-PARTE

25  APPLICATION INCLUDED A DECLARATION FROM MR. RUSSELL WHICH SET      00:41

1    OUT THE SUBSTANCE OF THE MOTION; AND THAT WAS NOT PLACED UNDER

2    SEAL.  AND I HAD RECEIVED A PERSONAL ASSURANCE, IN FRONT OF

3    COUNSEL, FROM MR. NOLAN, THAT HIS TEAM UNDERSTOOD THAT THIS WAS

4    TO REMAIN UNDER SEAL; SO I'M SOMEWHAT AT A LOSS, COUNSEL, TO

5    UNDERSTAND HOW ANY OF THIS COULD HAVE HAPPENED; BUT                    00:41

6    PARTICULARLY, THE DECLARATION FROM MR. RUSSELL IS OF GREAT

7    CONCERN.

8          **MR. NOLAN:**  IF I MAY TRY TO RESPOND.

9          YESTERDAY AT SIDE-BAR, I HAD CERTAIN INFORMATION

10   WHICH I REPRESENTED TO THE COURT WAS ACCURATE.  WHEN I WENT         00:41

11   BACK TO THE HOTEL, I CALLED MR. RUSSELL AND SAID TO

12   MR. RUSSELL, 'HOW DID THIS HAPPEN?  THIS WAS EMBARRASSING.  WE

13   ALL UNDERSTOOD THIS WAS GOING TO BE FILED UNDER SEAL.'

14         HE FIRST ADDRESSED THE QUESTION OF THE MANUAL FILING

15   FORM, WHICH I HAD MISUNDERSTOOD AND THOUGHT THAT IT WAS AN          00:42

16   INTERNAL DOCUMENT DONE BY THE CLERK'S OFFICE.  I LATER LEARNED

17   THAT, IN FACT, it IS A DOCUMENT THAT IS SIMPLY FILLED OUT BY --

18   NOT SIMPLY -- FILLED OUT BY A LEGAL ASSISTANT, AND JUST LISTS

19   THE TITLE OF THE DOCUMENT.  I SAID TO MR. RUSSELL, ABOUT OUR

20   CONVERSATION, THAT THAT HAD TO BE CHANGED.                          00:42

21         **THE COURT:**  WE DON'T THROW LEGAL ASSISTANTS UNDER THE

22   BUS.

23         **MR. NOLAN:**  NO.  I BLAMED MR. RUSSELL.

24         TEN MINUTES LATER, MR. RUSSELL CALLED ME, AND HE SAID

25   WORDS TO THE EFFECT, 'TOM, I JUST FOUND OUT THAT ANOTHER            00:42

```
 1   MISTAKE WAS MADE AND THAT MY EX-PARTE APPLICATION, WHICH

 2   CONTAINS MY DECLARATION, WAS FILED, AND IT WAS NOT PLACED UNDER

 3   SEAL.'  AND HE APOLOGIZED TO ME.  I MEAN, I COULD BRING HIM AND

 4   HAVE HIM APOLOGIZE.

 5         YOUR HONOR, I THEN TOLD EVERYBODY; WE HAD A MEETING.      00:43

 6   I WAS FURIOUS ABOUT THIS.  I SAID IT WAS COMPLETELY UNDERSTOOD

 7   that IT WAS A DIRECTION TO HAVE THIS DOCUMENT FILED UNDER SEAL

 8   WITH THE COURT.  WE MADE ALL ATTEMPTS LAST NIGHT TO WITHDRAW

 9   EVERYTHING.  WE REFILED IT, I BELIEVE.  WE GAVE IT TO MATTEL

10   LAST NIGHT.                                                    00:43

11         YOUR HONOR, IT WAS NOT BY DESIGN.

12         I CAN ASSURE YOU THAT IT WAS NOT BY DESIGN.

13         THE COURT:  HOW CAN YOU ASSURE ME OF THAT?  BECAUSE I

14   GUESS WHAT I'M STRUGGLING WITH -- AND I REALLY -- I'VE TRIED TO

15   THINK THIS THROUGH.  FIRST OF ALL, IT WAS AN UNNECESSARY        00:43

16   EX-PARTE APPLICATION.  SECOND OF ALL, EVEN IF IT WAS DETERMINED

17   TO BE NECESSARY, it DIDN'T REQUIRE FIVE PAGES.  I MEAN, THIS IS

18   SOMETHING WHICH -- IT'S SO SELF-EVIDENT THAT WE'RE NOT GOING TO

19   HAVE A HEARING ON THIS IN SEPTEMBER THAT I CAN'T IMAGINE ANY

20   ATTORNEY FROM SKADDEN ARPS WOULD HAVE REASONABLY THOUGHT THAT   00:44

21   THE COURT WAS GOING TO REQUIRE THAT THIS BE HELD --

22         IS IT AUGUST OR SEPTEMBER, MR. HOLMES, THAT OUR

23   CURRENT MOTIONS ARE BEING HEARD ON, THAT ARE FILED?

24         THE CLERK:  AUGUST.

25         THE COURT:  IT'S AUGUST.                                 00:44
```

```
 1          I CAN'T BELIEVE THAT ANYBODY REALLY THOUGHT THAT I

 2   WAS GOING TO PUT OFF THIS ISSUE, GIVEN HOW CONCERNED I AM ABOUT

 3   THE SUBSTANCE OF THE ISSUE AND HOW URGENT IT IS FOR US TO GET

 4   TO THE BOTTOM OF THE UNDERLYING ISSUE, THAT ANYONE, INCLUDING

 5   MR. RUSSELL -- WHO'S A PARTNER WITH YOUR FIRM; CORRECT?          00:44

 6          MR. NOLAN:  OF COURSE, HE IS, YOUR HONOR.

 7          THE COURT:  -- WOULD THINK THAT THE COURT WAS GOING

 8   TO WAIT UNTIL AUGUST TO HEAR THE MOTION.

 9          SO THAT WASN'T NECESSARY.

10          BUT EVEN IF HE THOUGHT JUST PROCEDURALLY IT WAS          00:44

11   NECESSARY, HE GOES INTO PAGES OF DETAIL IN THIS EX-PARTE

12   APPLICATION, WITH NO INDICATION OF FILING IT UNDER SEAL.

13          BELIEVE ME, MR. NOLAN, I WANT TO BELIEVE THAT THIS

14   WAS A COMPLETE ACCIDENT AND OVERSIGHT.

15          MR. NOLAN:  YOUR HONOR, AT TIMES LIKE THIS, COUNSEL      00:45

16   HAS TO HOPE THAT THE COLLECTIVE CONDUCT OF A TEAM REPRESENTING

17   A CLIENT AND APPEARING BEFORE YOU FOR SIX MONTHS HAS CREATED AN

18   IMPRESSION THAT UNDER NO CIRCUMSTANCES WOULD WE EVER

19   INTENTIONALLY DO SOMETHING LIKE THAT.

20          I HAVE PRACTICED A LONG TIME.  MY REPUTATION IS MY       00:45

21   BOND.  MY WORD IS MY BOND.  I MADE THOSE REPRESENTATIONS TO

22   YOU.

23          MISTAKES HAPPEN WITH THE FLURRY OF ACTIVITY.  THIS

24   WAS AN ASSIGNMENT THAT WAS NOT DONE BY THE TRIAL TEAM HERE IN

25   RIVERSIDE, YOUR HONOR.  IT WAS DONE IN LOS ANGELES.             00:45
```

1   MR. RUSSELL WAS IN CHARGE OF THAT.  MR. RUSSELL ASSURED ME LAST

2   NIGHT THAT IT WAS HIS UNDERSTANDING AND HIS DIRECTION, BECAUSE

3   HE KNEW THAT I DIRECTED IT, THAT EVERYTHING SHOULD BE FILED

4   UNDER SEAL.

5          I DIDN'T EVEN KNOW ABOUT THE EX-PARTE APPLICATION.  I       00:46

6   APOLOGIZE.

7          **THE COURT:**  I DO BELIEVE THAT, BASED ON YOUR REACTION

8   YESTERDAY.

9          **MR. NOLAN:**  BUT IT WAS A MISTAKE.

10         **THE COURT:**  I UNDERSTAND THAT WE MAKE MISTAKES.  AND     00:46

11  THAT'S WHY I'VE BEEN RELUCTANT THROUGHOUT THIS, BECAUSE I MAKE

12  MISTAKES; AND we DON'T WANT TO START THROWING ROCKS AROUND,

13  BECAUSE WE ALL LIVE IN GLASS HOUSES IN VARYING DEGREES.  BUT

14  THERE'S MISTAKES, AND THERE'S ERRORS, AND THEN THERE'S -- THIS

15  IS SOMETHING.                                                     00:46

16         **MR. NOLAN:**  I'M HAPPY TO -- HAVING TO BRING SOMEONE

17  ELSE IN -- HERE'S THE BOTTOM LINE, YOUR HONOR:  I AM ABSOLUTELY

18  RESPONSIBLE FOR EVERY SINGLE DOCUMENT THAT COMES OUT OF

19  SKADDEN ARPS AND IS FILED WITH THIS COURT.  THIS WAS A MISTAKE.

20  I TAKE FULL RESPONSIBILITY FOR IT, YOUR HONOR, AND I WILL        00:46

21  ACCEPT WHATEVER APPROPRIATE MEASURES THE COURT WISHES TO TAKE.

22         I APOLOGIZE.  I WILL ASSURE YOU -- AND THIS IS THE

23  ONLY THING I CAN TELL YOU, YOUR HONOR:  IT WAS NOT BY DESIGN.

24  IT WAS NOT OUR INTENT TO TRY TO GET THIS INTO THE PUBLIC DOMAIN

25  OR ANYTHING ELSE LIKE THAT.  AND I CAN ASSURE YOU THAT THE TEAM  00:47

1   LAST NIGHT, AT THE HOTEL, SAW THE WORST SIDE OF MY IRISH TEMPER

2   WITH RESPECT TO THIS, YOUR HONOR.  BUT I HAVE NO EXCUSE.  I

3   HAVE ABSOLUTELY NO EXCUSE, EXCEPT TO WALK THROUGH THE MECHANICS

4   OF IT.  IT'S NOT OUR FINEST PERFORMANCE.

5           **THE COURT:**  LET ME HEAR FROM SOMEONE FROM MATTEL ON        00:47

6   THIS ISSUE.

7           **MR. ZELLER:**  AT THE OUTSET, I'M VERY MINDFUL OF THE

8   COURT'S COMMENT, BECAUSE I THINK IT'S ABSOLUTELY CORRECT.  WE

9   ALL LIVE IN GLASS HOUSES.  IF THIS WERE AN ISOLATED MISTAKE, I

10  DON'T THINK THIS WOULD CAUSE A RIPPLE.  THE COURT IS AWARE,        00:48

11  HOWEVER, THAT THIS DOCUMENT WAS FIRST LODGED WITH THE COURT,

12  and MADE AVAILABLE TO THE PUBLIC, WITHOUT ANY NOTICE TO US.  IT

13  WAS HANDED OUT TO THE PRESS BY MGA.  SO THERE WAS ALREADY A

14  HISTORY OF THIS BEING DISSEMINATED IN THIS WAY.

15          AGAIN, IF IT WERE SOME ISOLATED MISTAKE, BECAUSE           00:48

16  EVERYONE HAS DONE IT, SURELY, IN THIS CASE, OF NOT FILING

17  SOMETHING UNDER SEAL WHEN IT SHOULD HAVE BEEN.  AND THOSE

18  THINGS ARE PROMPTLY CORRECTED.  BUT THIS IS A DIFFERENT

19  SITUATION.  AND IT'S ALSO A DIFFERENT SITUATION BECAUSE AS THE

20  COURT HAS INDICATED, AND it WAS STRIKING TO ME, THERE'S NO        00:48

21  INDICATION ON MR. RUSSELL'S PAPERS THAT THEY WERE EVER INTENDED

22  TO BE FILED UNDER SEAL.  THERE IS NO STATEMENT ON IT.  THIS WAS

23  NOT, BY THAT INDICATION ANYWAY, SOMETHING THAT WAS A MISTAKE BY

24  SOMEBODY IN THE MECHANICS OF THE FILING.  SO THE HISTORY OF

25  THIS IS, IN FACT, VERY TROUBLING.                                 00:49

1          AND, OF COURSE, AS THE COURT KNOWS FROM THE

2    ALLEGATIONS, AND THE COURT'S RULINGS WITH RESPECT TO THESE

3    ALLEGATIONS, THESE ISSUES SHOULD NOT BE PUBLICLY DISSEMINATED.

4    AND IT'S HAPPENED, YET AGAIN, FOR AT LEAST THE THIRD TIME.

5          **THE COURT:**  THANK YOU, COUNSEL.                        00:49

6          AS BOTH PARTIES KNOW, THIS COURT HAS DENIED EVERY

7    MOTION AND REQUEST FOR SANCTIONS THAT HAS BEEN BROUGHT BY EACH

8    SIDE.  I HAVE REALLY TRIED TO GIVE THE BENEFIT OF THE DOUBT TO

9    EVERY COUNSEL IN THIS CASE.  I'VE EXPRESSED THE COURT'S

10   PROFOUND RESPECT FOR COUNSEL IN THIS CASE.  BUT I NEED MORE OF   00:49

11   AN EXPLANATION FROM MR. RUSSELL ON THIS, SO THE COURT IS GOING

12   TO ISSUE AN ORDER TO SHOW CAUSE TO MR. RUSSELL AS TO WHY

13   SANCTIONS SHOULD NOT BE IMPOSED FOR HAVING FILED THIS

14   APPLICATION IN THE PUBLIC RECORD, GIVEN THE COURT'S RECENT

15   ADMONITION TO COUNSEL FOR SKADDEN ARPS AND SKADDEN ARPS'       00:50

16   REPEATED ASSURANCES TO THE COURT THAT THIS ENTIRE MATTER WOULD

17   BE KEPT UNDER SEAL.

18          I DON'T KNOW IF, IN THE TWO HOURS THAT THIS WAS IN

19   THE PUBLIC RECORD, IT WAS PICKED UP BY THE PRESS OR NOT, BUT

20   THAT'S NOT ALMOST even -- I DON'T even KNOW HOW RELEVANT THAT   00:50

21   IS.

22          THE COURT HAS TO BE ABLE TO RELY ON THE

23   REPRESENTATIONS OF COUNSEL.  THIS ISN'T ABOUT THE CLIENTS.

24   THIS DOES NOT REFLECT ON MR. LARIAN.  THIS DOES NOT REFLECT ON

25   MGA.  THERE HAVE BEEN ALLEGATIONS ABOUT WHAT BOTH MGA AND      00:50

1   MATTEL HAVE DONE.  THE COURT HAS A MORE LIMITED ABILITY TO

2   CONTROL THE CONDUCT OF PARTIES, BUT THE COURT JUST DOESN'T HAVE

3   THE ABILITY, IT HAS THE RESPONSIBILITY TO MONITOR THE CONDUCT

4   OF THE OFFICERS OF THIS COURT, OF WHICH ALL COUNSEL ARE.

5           SO WE'RE GOING TO HAVE TO HAVE A HEARING WITH                    00:51

6   MR. RUSSELL, AND I WOULD LIKE TO DO THIS AS SOON AS POSSIBLE.

7   I'D LIKE TO GET THROUGH THIS AND BEYOND THIS AND PUT THIS

8   BEHIND US AS SOON AS POSSIBLE.

9           I'LL ASK MR. NOLAN, ON BEHALF OF SKADDEN ARPS, HOW

10  MUCH TIME WOULD BE NECESSARY FOR MR. RUSSELL TO PREPARE TO          00:51

11  RESPOND TO AN OSC?

12          **MR. NOLAN:**  YOUR HONOR, IF YOU NEED A WRITTEN

13  RESPONSE, I ASSUME I CAN CALL MR. RUSSELL.  IF THE COURT WOULD

14  WANT TO ENTERTAIN AN APPEARANCE TODAY, MR. RUSSELL IS IN

15  LOS ANGELES.  HE WILL BE HERE ON A MOMENT'S NOTICe.  ASSUMING       00:51

16  HE'S WEARING A SUIT TODAY, HE'LL BE IN A CAR AND WE CAN HAVE A

17  HEARING AS QUICKLY AS POSSIBLE.

18          **THE COURT:**  I THINK I NEED TO HEAR FROM MR. RUSSELL,

19  AND I THINK IT'S BEST IF I PUT THIS OVER FOR AT LEAST ONE MORE

20  NIGHT.                                                              00:52

21          **MR. NOLAN:**  I UNDERSTAND.

22          **THE COURT:**  TOMORROW IS FRIDAY.

23          I DON'T HAVE A FATHER'S DAY BREAKFAST TOMORROW, SO I

24  CAN BE HERE AT 8:30.

25          **MR. NOLAN:**  WE'LL DO IT AT 8:30 TOMORROW.                   00:52

1          **THE COURT:**  YES.  AND WE'LL GO FROM THERE.

2          IF MR. RUSSELL WANTS TO SUBMIT SOMETHING IN ADVANCE

3   OF THAT, HE SHOULD DO SO.  HE MAY DO SO.  BUT I WANT TO HEAR

4   FROM HIM IN COURT.

5          **MR. NOLAN:**  I UNDERSTAND.                                    00:52

6          8:30 TOMORROW.

7          **THE COURT:**  YES.

8          THE LAST ISSUE I WANTED TO TAKE UP BEFORE THE JURY

9   COMES IN -- IS MS. ANDERSON HERE?

10         MR. PAGE is.                                                     00:52

11         MR. PAGE, IF YOU COULD COME FORWARD.

12         I THINK IT WAS MR. WERDEGAR FROM YOUR FIRM INVOLVED

13  IN THESE CONVERSATIONS; BUT ONE OF THE THINGS THE COURT HAS

14  BEEN DOING IS TRYING TO UNSEAL ALL OF THE PRETRIAL DOCUMENTS IN

15  THIS CASE, BASICALLY FOR FIRST AMENDMENT PURPOSES, EXCEPT FOR    00:53

16  THOSE THAT ARE SPECIFICALLY DESIGNATED AS HAVING GOOD CAUSE TO

17  REMAIN UNDER SEAL; IN PARTICULAR, EXHIBITS THAT NEED TO REMAIN

18  UNDER SEAL, ET CETERA.

19         I HAVE RECEIVED FROM BOTH MGA AND MATTEL THEIR

20  DESIGNATIONS OF THOSE DOCUMENTS, AND I'VE FOUND GOOD CAUSE FOR   00:53

21  CERTAIN DOCUMENTS TO REMAIN UNDER SEAL.

22         I HAVEN'T RECEIVED ANYTHING FROM CARTER BRYANT.

23         I DON'T KNOW IF YOU'RE SIMPLY JOINING IN WHAT MGA HAS

24  DESIGNATED, BUT I WANTED TO MAKE SURE THAT I HAD A

25  REPRESENTATION FROM YOU THAT THERE WAS NOTHING, IN ADDITION TO   00:53

1  WHAT MGA HAS DESIGNATED TO REMAIN UNDER SEAL, THAT NEEDS TO BE

2  KEPT UNDER SEAL.

3          **MR. PAGE:**  I'M NOT AWARE OF ANY.  I KNOW THAT OUR

4  POSITION HAS BEEN THAT THE ONLY THINGS THAT WE WISH TO REMAIN

5  UNDER SEAL ARE SUCH THINGS AS MR. BRYANT'S SOCIAL SECURITY          00:53

6  NUMBER OR BANK ACCOUNT NUMBERS, NOW PURELY PRIVATE FINANCIAL

7  INFORMATION.  I BELIEVE THAT'S ALREADY REFLECTED IN MGA'S

8  DESIGNATIONS.

9          **THE COURT:**  WOULD YOU CHECK ON THAT TODAY AND BE ABLE

10 TO MAKE A REPRESENTATION BY THE END OF MR. BRYANT'S TESTIMONY,     00:54

11 BEFORE YOU LEAVE, THAT THAT'S THE CASE.  I JUST WANT TO HAVE

12 THAT ON THE RECORD, BECAUSE I'D LIKE TO ISSUE THAT ORDER TODAY,

13 AND THE CLERK'S OFFICE HAS A LOT OF WORK TO DO IN TERMS OF

14 DOING THIS.

15          DON'T WORRY, MR. HOLMES.  I'LL THINK OF SOMEBODY          00:54

16 ELSE.

17          **MR. PAGE:**  IT IS A SOMEWHAT LARGE RECORD, YOUR HONOR.

18          **THE COURT:**  IT IS A LARGE RECORD.  AND I THINK WE'RE

19 ABOUT TO CROSS THE 4,000 NUMBER ON THE DOCKET SHEET, WHICH MAY

20 BE A RECORD.  WELL, IT'S CERTAINLY A RECORD FOR THIS COURT.        00:54

21          **MR. PAGE:**  AS FAR AS I KNOW, IT IS, YOUR HONOR.

22          **THE COURT:**  SO IF YOU'LL DO THAT AND REPORT BACK TO

23 THE COURT OR HAVE SOMEONE REPORT BACK TO THE COURT BY DAY'S

24 END, I WOULD APPRECIATE IT.

25          **MR. PAGE:**  I WILL, YOUR HONOR.                         00:54

1          **THE COURT:**  THANK YOU VERY MUCH.

2          I THINK THAT IS IT.

3          IF THE JURY IS ALL HERE, LET'S BRING THEM IN,

4    MR. HOLMES, AND LET'S -- OH, WE HAVE MS. HARRIS; CORRECT?

5          **MR. QUINN:**  YES, YOUR HONOR, WE HAVE RACHEL HARRIS.          00:54

6          **THE COURT:**  VERY WELL.

7          (WHEREUPON, JURORS ENTER COURTROOM.)

8          **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

9    YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

10   BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

11   HELP YOU GOD?

12         **THE WITNESS:**  YES.

13         **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

14   YOUR LAST NAME FOR THE RECORD.

15         **THE WITNESS:**  RACHEL HARRIS, H-A-R-R-I-S.          00:59

16         **THE COURT:**  GOOD MORNING, MEMBERS OF THE JURY.

17         THIS IS ANOTHER INSTANCE WHERE WE'RE GOING TO TAKE A

18   WITNESS OUT OF ORDER, JUST FOR THE BENEFIT OF HER SCHEDULE.

19         WE'LL RESUME WITH THE TESTIMONY OF CARTER BRYANT

20   AFTER THIS WITNESS HAS TESTIFIED.          01:00

21         MR. QUINN, YOU MAY PROCEED.

22         **MR. QUINN:**  THANK YOU, YOUR HONOR.

23                    **DIRECT EXAMINATION**

24   BY MR. QUINN:

25   Q    MY NAME IS JOHN QUINN.  I REPRESENT MATTEL.          01:00

1              YOU AND I MET THIS MORNING, JUST BEFORE COURT, OUT IN

2    THE HALLWAY.

3    A    YES.

4    Q    YOU USED TO WORK AT MGA?

5    A    YES.                                                        01:00

6    Q    WHAT WERE THE DATES THAT YOU WORKED AT MGA, YOUR START

7    DATE AND YOUR ENDING DATE?

8    A    START DATE WAS OCTOBER 11TH, I BELIEVE, IN 2000.

9    Q    AND DO YOU RECALL WHEN IT WAS that YOU LEFT?

10   A    END DATE WAS OCTOBER 2001.                                  01:00

11   Q    AND WHAT WAS YOUR POSITION THERE?

12   A    DIRECTOR OF CREATIVE SERVICES.

13   Q    WHAT DOES A DIRECTOR OF CREATIVE SERVICES AT MGA DO?  WHAT

14   DID YOU DO WHEN YOU WERE THERE?

15   A    MANAGED ALL OF THE PACKAGING ART WORK, ALL OF THE FINAL     01:01

16   ART GOING TO CHINA, MANAGed ALL OF THE ARTISTS, ANYTHING LIKE

17   THAT.

18   Q    SO YOU WORKED THERE FOR ABOUT ONE YEAR?

19   A    YES.

20   Q    You STARTED IN OCTOBER OF 2000?                             01:01

21   A    2000.

22   Q    WHAT IS IT YOU'RE DOING NOW?

23   A    SAME EXACT THING; DIRECTOR OF CREATIVE SERVICES.

24   Q    FOR ANOTHER COMPANY?

25   A    YES.                                                        01:01

1    Q    WHEN YOU STARTED WORK AT MGA IN OCTOBER OF 2000, DID YOU

2    MEET A CARTER BRYANT?

3    A    YES.

4    Q    AND IN RELATION TO YOUR START DATE, HOW SOON AFTER THAT

5    WAS IT THAT YOU MET CARTER BRYANT?                               01:01

6    A    WITHIN, PROBABLY, A WEEK AND A HALF, AT THE MOST.

7    Q    AND HOW DID THAT MEETING COME ABOUT?

8    A    IT WAS JUST A SCHEDULED MEETING THAT I WAS TOLD I NEEDED

9    TO ATTEND.

10   Q    WHO IS IT THAT TOLD YOU THAT YOU NEEDED TO ATTEND A        01:02

11   MEETING WITH MR. BRYANT?

12   A    MOST LIKELY, IT CAME BY E-MAIL AS A MEETING REQUEST, BUT

13   IT WAS WITH PAULA, CARTER, AND MERCEDEH.

14   Q    YOU KNEW IN ADVANCE IT WAS GOING TO BE WITH THOSE FOUR

15   PEOPLE?                                                          01:02

16   A    YES.

17   Q    AND MERCEDEH, IS THAT MERCEDEH WARD?

18   A    YES.

19   Q    WHAT WAS HER POSITION?

20   A    I DON'T KNOW EXACTLY WHAT HER TITLE WAS, BUT I BELIEVE SHE  01:02

21   WAS PRODUCT DEVELOPMENT, DIRECTOR OF PRODUCT DEVELOPMENT.

22   Q    AND PAULA IS PAULA TREANTAFELLES, NOW KNOWN AS

23   PAULA GARCIA?

24   A    YES.

25   Q    AND BEFORE THE MEETING, DID YOU GET ANY UNDERSTANDING AS   01:02

```
 1   TO WHAT THE PURPOSE OF THE MEETING WAS?

 2   A    TO INTRODUCE MERCEDEH WARD AND I TO THE NEW DOLL LINE.

 3   Q    THE NEW DOLL LINE, MEANING...

 4   A    THE NEW FASHION DOLL LINE THAT WAS GOING TO BE STARTED.

 5   Q    DID IT HAVE A NAME, THEN, AT THE TIME?                    01:03

 6   A    NOT TO MY KNOWLEDGE.

 7   Q    AT LEAST THEY DIDN'T TELL YOU THAT?

 8   A    CORRECT.

 9   Q    DID MS. GARCIA, IN ADVANCE OF THIS MEETING, TELL YOU

10   ANYTHING ELSE ABOUT MR. BRYANT OR WHAT WOULD BE HAPPENING AT   01:03

11   THE MEETING?

12   A    SHE JUST MENTIONED THAT CARTER WAS COMING IN AND HE WAS

13   THE CREATOR; HE HAD -- HE WAS COMING IN ON HIS LUNCH, SO WE

14   NEEDED TO KIND OF MOVE QUICKLY, THAT HE WAS GOING TO BE

15   PRESENTING THE DOLLS TO US, AND THAT WE SHOULDN'T REALLY       01:03

16   MENTION MUCH ABOUT HIM COMING HERE AT LUNCH BECAUSE HE HAD

17   ALREADY GIVEN HIS NOTICE AT MATTEL AND HE WAS GOING TO BE

18   LEAVING THERE.

19   Q    DID SHE INDICATE SHE KNEW THAT HE WAS A MATTEL EMPLOYEE AT

20   THE TIME?                                                      01:04

21   A    YES.

22   Q    DID SHE INDICATE WHETHER YOU SHOULD SAY ANYTHING ONE WAY

23   OR ANOTHER ABOUT THE FACT THAT MR. BRYANT WAS COMING OVER?

24   A    YES.  SHE MENTIONED NOT TO SAY ANYTHING BECAUSE HE WAS

25   COMING OVER DURING HIS LUNCH BREAK.                            01:04
```

1   Q    OKAY.

2        DID SHE SAY ANYTHING ABOUT WHETHER OR NOT MATTEL

3   WOULD BE UPSET IF THEY KNEW that MR. BRYANT WAS COMING OVER TO

4   MGA?

5   A    I DON'T RECALL IF SHE MENTIONED IT AT THAT POINT, NO.    01:04

6   Q    LET ME ENLARGE THE QUESTION, THEN.

7        AT ANY POINT, DID SHE SAY ANYTHING TO YOU ON THAT

8   SUBJECT, AS TO WHETHER MATTEL WOULD BE UPSET IF MATTEL KNEW

9   THAT MR. BRYANT WAS COMING OVER TO MGA?

10  A    I CAN'T REMEMBER EXACTLY IF SHE MENTIONED IT, BUT IT WAS    01:04

11  IMPLIED.

12  Q    DO YOU RECALL WHAT SHE SAID THAT IMPLIED THAT TO YOU?

13       **MR. NOLAN:**  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

14  TIME; TEMPORAL FOUNDATION.

15       **THE COURT:**  SUSTAINED.    01:05

16  **BY MR. QUINN:**

17  Q    WHAT YOU'VE INDICATED, THAT SHE IMPLIED THAT MATTEL WOULD

18  BE UPSET IF IT WAS KNOWN THAT MR. BRYANT WAS COMING OVER, WHEN

19  WAS IT THAT MS. TREANTAFELLES SAID THIS THAT CAUSED YOU TO HAVE

20  THIS UNDERSTANDING?  WAS IT BEFORE THE MEETING?    01:05

21  A    IT WAS JUST BEFORE THE MEETING THAT SHE HAD MENTIONED THE

22  DETAILS ABOUT HIM COMING, YES.

23  Q    THAT SHE SAID THAT?

24  A    YES.

25  Q    DID SHE INDICATE WHETHER OR NOT SHE HAD KNOWN MR. BRYANT    01:05

```
 1   FROM MATTEL?

 2   A    AT THAT TIME, NO.

 3   Q    AT ANY TIME, DID SHE INDICATE THAT?

 4   A    IN THE FUTURE, YES.

 5   Q    THIS WAS SOME FUTURE CONVERSATION YOU HAD WITH HER?        01:05

 6   A    YES.  JUST, SHE HAD MENTIONED THAT SHE KNEW CARTER FROM

 7   MATTEL WHEN SHE WAS THERE.

 8   Q    SO MS. TREANTAFELLES --

 9        MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

10   TEMPORAL TIME IN THAT CONVERSATION.                            01:06

11        THE COURT:  SUSTAINED.

12   BY MR. QUINN:

13   Q    CAN YOU TELL US WHEN IT WAS THAT MS. TREANTAFELLES TOLD

14   YOU THAT SHE HAD KNOWN MR. BRYANT WHEN SHE had WORKED AT

15   MATTEL?                                                        01:06

16   A    I CAN'T SAY THE EXACT DATE.  I DON'T KNOW THE EXACT DATE.

17   Q    CAN YOU PUT IT, ROUGHLY?  WAS IT IN 2000, OCTOBER

18   NOVEMBER, DECEMBER?

19   A    YES.

20   Q    OTHER THAN THAT OCCASION, JUST BEFORE THE MEETING WHERE   01:06

21   SHE TOLD YOU THAT MATTEL WOULD BE UPSET AND YOU SHOULDN'T SAY

22   ANYTHING ABOUT MR. BRYANT COMING OVER, WAS THERE EVER ANY OTHER

23   OCCASION WHEN MS. TREANTAFELLES SAID TO YOU THAT YOU REALLY

24   SHOULDN'T BE SAYING ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT IN

25   BRATZ?                                                         01:06
```

```
 1   A    NO.

 2   Q    DID YOU EVER HAVE A CONVERSATION WITH ANYONE ELSE AT MGA

 3   WHERE IT WAS INDICATED TO YOU THAT YOU SHOULDN'T SAY ANYTHING

 4   ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

 5   A    YES.                                                      01:07

 6   Q    WHO WAS IT THAT YOU HAD THAT CONVERSATION WITH?

 7   A    MERCEDEH.

 8   Q    MERCEDEH WARD?

 9   A    YES.

10   Q    ANYONE ELSE THAT YOU SPOKE TO -- WELL, LET ME FOLLOW UP ON  01:07

11   THAT.

12        WHAT WAS IT THAT MERCEDEH WARD SAID ABOUT WHY YOU

13   SHOULDN'T SAY ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

14        MR. NOLAN:  OBJECTION, YOUR HONOR.  FOUNDATION AS TO

15   TIME.                                                         01:07

16        THE COURT:  SUSTAINED.

17   BY MR. QUINN:

18   Q    WHEN WAS IT THAT MERCEDEH WARD SAID THIS TO YOU?

19   A    SHE WOULD PERIODICALLY COME INTO MY OFFICE, AND WE WOULD

20   DISCUSS DIFFERENT PRODUCTS AND THINGS; SO IT WAS AT ONE OF    01:07

21   THOSE OCCASIONS THAT SHE HAD MENTIONED IT TO ME.

22   Q    DOES THAT SEEM TO YOU LIKE IT WAS SOMETIME IN THE YEAR

23   2000?

24        MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.

25        THE COURT:  REPHRASE.                                    01:08
```

```
 1            SUSTAINED.
 2   BY MR. QUINN:
 3   Q    CAN YOU NARROW IT AT ALL IN TIME, IN TERMS OF THE MONTH OR
 4   YEAR, WHEN YOU HAD THIS CONVERSATION WITH Mercedeh Ward?
 5   A    IT WAS DEFINITELY WITHIN HER FIRST FEW WEEKS AT MGA.          01:08
 6   Q    AND do you know WHEN MERCEDEH WARD STARTed AT MGA?
 7   A    I DO.  SHE STARTED WITHIN DAYS OF MY START DATE.
 8   Q    DID SHE INDICATE TO YOU WHY YOU SHOULDN'T SAY ANYTHING
 9   ABOUT MR. BRYANT'S INVOLVEMENT WITH BRATZ?
10            MR. NOLAN:  OBJECT ON THE BASIS OF HEARSAY,             01:08
11   YOUR HONOR.
12            THE COURT:  SUSTAINED.
13   BY MR. QUINN:
14   Q    WHAT WAS MERCEDEH WARD'S POSITION?  WAS SHE IN CHARGE OF
15   ENGINEERING FOR BRATZ?                                          01:08
16   A    YES.
17   Q    AND WHEN YOU HAD THIS CONVERSATION WITH HER, DID SHE
18   INDICATE TO YOU WHY YOU SHOULDN'T SAY ANYTHING TO ANYONE ABOUT
19   HIS INVOLVEMENT IN BRATZ?
20            THE COURT:  That SEEMS TO BE THE SAME QUESTION,         01:09
21   COUNSEL.
22            MR. NOLAN:  SAME OBJECTIONS.
23            MR. QUINN:  THAT'S AN ADMISSION, YOUR HONOR.
24            THE COURT:  OVERRULED.
25   / / /                                                           01:09
```

1    **BY MR. QUINN:**

2    Q    DID SHE INDICATE TO YOU WHY --

3            **THE COURT:**  I'LL HEAR YOU AT SIDE-BAR, IF YOU WANT,

4    COUNSEL.  THIS SEEMS TO BE AN ADMISSION OF a PARTY OPPONENT.

5            **MR. NOLAN:**  SIDE-BAR REAL QUICKLY.                    01:09

6            (WHEREUPON, THE FOLLOWING PROCEEDINGS

7            WERE HELD AT SIDE-BAR:)

8            **THE COURT:**  I WASn't THINKING about it being a PARTy

9    opponent.

10           **MR. NOLAN:**  YOUR HONOR, THIS IS a CONVERSATION BY an    01:09

11   EMPLOYEE TWO WEEKS INTO MGA, APPARENTLY.  WHEN THE TIME this

12   TOOK PLACE, SHE IS NOT AN OFFICER, SHE'S NOT A DIRECTOR, SHE'S

13   NOT IN MANAGEMENT, PER SE.  SHE'S IN A PARTICULAR AREA.  THIS

14   IS WITHIN HER FIRST TWO WEEKS WHERE -- it's a CONFIDENTIAL

15   LINE.  I DON'T THINK THAT IS GROUNDS FOR IMPOSING UPON HER THE    01:10

16   ABILITY TO BIND THE COMPANY ON AN ADMISSION.  AND I THINK IT'S

17   JUST RANck HEARSAY.

18           **THE COURT:**  COUNSEL?

19           **MR. QUINN:**  WHAT THE WITNESS SAID IS SHE WAS IN

20   CHARGE OF ENGINEERING FOR BRATZ.  THIS IS A CONVERSATION ON      01:10

21   THAT VERY SUBJECT.  SO, AS TO THAT SUBJECT, I THINK SHE'S FULLY

22   QUALIFIED.

23           **THE COURT:**  WHO is THE SOURCE OF THE ACTUAL

24   STATEMENT?

25           **MR. QUINN:**  Mercedeh Ward makes the STATEMENT.        01:10

1          **THE COURT:**  WHO is the HEAD OF ENGINEERING.

2          **MR. QUINN:**  EXACTly; THAT'S WHAT THE WITNESS SAID.

3          **THE COURT:**  COUNSEL, i'd LIKE TO HAVE THIS done

4    OUTSIDE OF THE PRESENCE OF THE JURY.

5          DOES THIS WITNESS KNOW THE -- DO WE HAVE ANYTHING          01:10

6    ABOUT WHERE Mercedeh Ward GOT THAT INFORMATION FROM?

7          **MR. QUINN:**  I DON'T KNOW THE ANSWER TO THAT.  I WOULD

8    ASK.

9          **THE COURT:**  NO.

10         **MR. NOLAN:**  IT'S DOUBLe HEARSAY.          01:11

11         **THE COURT:**  SHE MAY NOT BE A director, but IT'S a

12   HIGH ENOUGH POSITION IN THE PARTICULAR CONTEXT OF THE BRATZ

13   DIVISION.  I'LL OVERRULE THE OBJECTION.

14         THANK YOU, counsel.

15         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)          01:11

16   **BY MR. QUINN:**

17   Q    MS. HARRIS, DID MERCEDEH WARD INDICATE TO YOU WHY YOU

18   SHOULDN'T SAY ANYTHING TO ANYONE ABOUT MR. BRYANT'S INVOLVEMENT

19   WITH BRATZ?

20   A    YES.          01:11

21   Q    WHAT DID SHE SAY?

22   A    SHE HAD MENTIONED THAT CARTER HAD PREVIOUSLY WORKED AT

23   MATTEL AND HAD PRESENTED THE DOLL LINE TO MATTEL AND THEY HAD

24   TURNED IT DOWN; SO THEREFORE, ONCE HE PRESENTED IT TO MGA AND

25   DECIDED TO LEAVE, THAT WE SHOULD JUST NOT MENTION ANY OF THAT          01:12

```
 1   HAD HAPPENED.

 2   Q    DID SHE SAY YOU SHOULDN'T MENTION IT WITHIN MGA OR OUTSIDE

 3   OF MGA?

 4   A    OUTSIDE OF MGA.

 5   Q    WAS THERE EVER ANYONE ELSE AT MGA WHO GAVE YOU THE              01:12

 6   INSTRUCTION THAT CARTER BRYANT REALLY SHOULDN'T BE MENTIONED AS

 7   HAVING ANYTHING TO DO WITH BRATZ?

 8   A    ISAAC LARIAN, AT CERTAIN TIMES, IN JUST GENERAL MEETINGS.

 9   Q    ISAAC LARIAN?

10   A    YES.                                                           01:12

11   Q    AND THIS WAS ON ONE OCCASION OR on MORE THAN ONE OCCASION?

12   A    AT MOST, TWO.

13   Q    WHAT DO YOU RECALL MR. LARIAN SAYING ON THE FIRST OCCASION

14   ABOUT NOT SAYING ANYTHING ABOUT MR. BRYANT HAVING ANYTHING TO

15   DO WITH BRATZ?                                                      01:13

16          MR. NOLAN:  FOUNDATION WITH RESPECT TO TIME.

17          THE COURT:  SUSTAINED.

18   BY MR. QUINN:

19   Q    WHEN, APPROXIMATELY, WAS THE FIRST OCCASION?

20   A    I WOULD SAY WITHIN THE FIRST TWO MONTHS OR SO.                 01:13

21   Q    AND CAN YOU RECALL WHERE YOU WERE, WHERE HE WAS, WHEN HE

22   GAVE YOU THIS INSTRUCTION?

23   A    NO.

24   Q    AND WHAT WAS IT THAT MR. LARIAN SAID TO YOU AT THAT TIME?

25   A    I DON'T RECALL WORD FOR WORD.                                  01:13
```

```
 1    Q    ALL RIGHT.

 2          WHAT'S YOUR BEST RECOLLECTION OF THE INSTRUCTION THAT

 3    YOU RECEIVED?

 4    A    JUST THAT WE SHOULDN'T MENTION THAT CARTER WAS INVOLVED

 5    WITH IT; that IT SHOULD HAVE BEEN A DOLL LINE COMING FROM MGA.   01:13

 6    Q    DID HE SAY THAT YOU SHOULDN'T MENTION IT TO ANYONE WITHIN

 7    MGA, OR you SHOULDN'T MENTION IT TO ANYONE OUTSIDE OF MGA, OR

 8    BOTH?

 9    A    OUTSIDE OF MGA.

10    Q    WAS THERE EVER ANOTHER OCCASION -- I TAKE IT THERE WAS     01:13

11    ANOTHER OCCASION WHERE YOU RECEIVED SIMILAR INSTRUCTION FROM

12    MR. LARIAN.

13    A    I'M SURE THERE WAS.  I DON'T REMEMBER IF IT WAS E-MAILED

14    OR IN PERSON.  I DON'T RECALL.

15    Q    BUT YOU'RE CONFIDENT YOU RECEIVED THAT INSTRUCTION MORE    01:14

16    THAN ONCE?

17    A    YES.

18    Q    LET ME ASK YOU THIS ABOUT MR. LARIAN:  DID YOU GIVE ANY

19    CONSIDERATION AT ALL TO NOT FOLLOWING HIS INSTRUCTION?

20    A    NO.                                                        01:14

21    Q    WHY?

22          MR. NOLAN:  OBJECTION AS TO THE RELEVANCE OF WHY,

23    YOUR HONOR.

24          THE COURT:  SUSTAINED.

25          WELL, OVERRULED.                                          01:14
```

**BY MR. QUINN:**

Q    WHY?

A    BECAUSE I WAS WORKING FOR THE COMPANY, AND I WAS LOYAL TO THE COMPANY.

Q    WERE PEOPLE AFRAID OF MR. LARIAN AT MGA?                    01:14

        **MR. NOLAN:**  OBJECTION.  RELEVANCE; ALSO FOUNDATION.

        **THE COURT:**  SUSTAINED.

**BY MR. QUINN:**

Q    DID MR. LARIAN SAY ANYTHING TO YOU ABOUT WHAT YOU SHOULD

SAY ABOUT WHO CAME UP WITH THE BRATZ DOLL?  HE SAID, 'DON'T        01:14

MENTION CARTER BRYANT.'  DID HE SAY ANYTHING TO YOU ABOUT WHO

SHOULD BE CREDITED WITH COMING UP WITH THE BRATZ DOLL?

A    JUST MGA.

Q    NOW, YOU TOLD US ABOUT WHAT MERCEDEH WARD TOLD YOU ABOUT

MR. BRYANT HAVING PRESENTED THE BRATZ DOLL AT MATTEL.              01:15

        THAT'S WHAT SHE SAID?

A    YES.

Q    YOU DON'T KNOW WHETHER THAT'S TRUE OR NOT?

A    NO IDEA.

Q    BASED ON THE INSTRUCTIONS THAT YOU RECEIVED FROM             01:15

MS. GARCIA AND MR. LARIAN, WAS IT YOUR UNDERSTANDING THAT

MR. BRYANT'S PARTICIPATION IN BRATZ WAS TO BE KEPT SECRET?

        **MR. NOLAN:**  OBJECTION, YOUR HONOR.  FOUNDATION; ALSO

RELEVANCE WITH RESPECT TO HER STATE OF MIND.

        **THE COURT:**  SUSTAINED.                                01:15

1           COUNSEL, YOU CAN ASK HER ABOUT HER UNDERSTANDING OF

2    COMMUNICATIONS, BUT NOT JUST IN THE ABSTRACT.

3           SUSTAINED AS PHRASED.

4       **MR. QUINN:**  ALL RIGHT.

5    **BY MR. QUINN:**                                                      01:16

6    Q    DID YOU EVER RECEIVE ANY INSTRUCTION THAT, IF ASKED, YOU

7    SHOULD BE TOLD THAT MR. LARIAN OR HIS DAUGHTER CAME UP WITH THE

8    IDEA FOR BRATZ?

9           **MR. NOLAN:**  OBJECTION.  LEADING.

10          **THE COURT:**  SUSTAINED.                                      01:16

11   **BY MR. QUINN:**

12   Q    DO YOU RECALL EVER RECEIVING ANY OTHER INSTRUCTION, ONE

13   WAY OR ANOTHER, ABOUT WHETHER PARTICULAR PEOPLE WERE TO BE

14   GIVEN CREDIT FOR COMING UP WITH THE IDEA FOR THE DOLL?

15          **MR. NOLAN:**  SAME OBJECTION, YOUR HONOR.                     01:16

16          **THE COURT:**  IT'S BEEN ASKED AND ANSWERED.

17          SUSTAINED.

18   **BY MR. QUINN:**

19   Q    WHEN MR. LARIAN GAVE YOU THIS INSTRUCTION, DID HE TELL YOU

20   WHY YOU WERE NOT TO SAY ANYTHING ABOUT MR. BRYANT'S INVOLVEMENT       01:17

21   WITH BRATZ?

22   A    NO, I DON'T BELIEVE SO.

23   Q    DID YOU HAVE ANY UNDERSTANDING AS TO WHY NOTHING WAS TO BE

24   SAID ABOUT MR. BRYANT'S INVOLVEMENT IN BRATZ?

25          **MR. NOLAN:**  OBJECTION.  RELEVANCE; NO FOUNDATION.          01:17

1        **THE COURT:** AGAIN, AS PHRASED, COUNSEL.

2        YOU'VE ASKED HER ABOUT HER UNDERSTANDING OF

3 PARTICULAR COMMUNICATIONS FROM MGA, BUT NOT IN THE ABSTRACT.

4 **BY MR. QUINN:**

5 Q    BASED ON THE SPECIFIC INSTRUCTIONS THAT YOU RECEIVED FROM        01:17

6 MS. GARCIA AND MR. LARIAN, DID YOU HAVE ANY UNDERSTANDING AS TO

7 WHY YOU WERE NOT TO TALK ABOUT MR. BRYANT'S INVOLVEMENT WITH

8 BRATZ?

9        **MR. NOLAN:** SAME OBJECTION, YOUR HONOR. HER STATE OF

10 MIND IS NOT RELEVANT. IT'S ALSO BEEN ASKED AND ANSWERED.        01:17

11        **THE COURT:** COUNSEL, I AGREE. I SUSTAIN THE

12 OBJECTION.

13        YOU CAN ASK HER ABOUT HER UNDERSTANDING OF WHAT

14 PARTICULAR STATEMENTS MEANT TO HER, BUT IN TERMS OF THE WHY AND

15 BEYOND THAT, IT GETS --        01:18

16        **MR. QUINN:** UNDERSTOOD, YOUR HONOR.

17        **THE COURT:** SUSTAINED.

18        **MR. QUINN:** THANK YOU, YOUR HONOR.

19 **BY MR. QUINN:**

20 Q    WAS MR. LARIAN SOMEONE WHO GOT INVOLVED IN THE DETAILS OF        01:18

21 THE BUSINESS, IN YOUR EXPERIENCE?

22 A    YES.

23        **MR. NOLAN:** OBJECTION. RELEVANCE TO THIS LINE OF

24 QUESTIONING; ALSO LACK OF FOUNDATION.

25        **THE COURT:** I'LL OVERRULE THE FIRST OBJECTION.        01:18

```
 1              LAY A FOUNDATION IN TERMS OF THIS.
 2              I'LL SUSTAIN THE SECOND ONE.
 3    BY MR. QUINN:
 4    Q    AS DIRECTOR OF CREATIVE SERVICES, DID YOU -- I TAKE IT
 5    THAT'S A DEPARTMENT?                                          01:18
 6    A    YES.
 7    Q    AND DID YOU INTERACT WITH MR. LARIAN A GREAT DEAL IN THAT
 8    JOB?
 9    A    YES.
10    Q    IN YOUR RELATIONS WITH HIM, WAS HE SOMEONE WHO GOT       01:18
11    INVOLVED A LOT IN THE DETAILS OF THE BUSINESS?
12    A    YES, HE DID.
13    Q    WOULD YOU REGARD HIM -- SOME PEOPLE -- IT'S NOT
14    NECESSARILY A BAD THING, BUT YOU HEAR THE PHRASE SOMETIMES
15    "MICROMANAGER."                                               01:19
16    A    SOMEWHAT.
17              MR. NOLAN:  OBJECTION.  IRRELEVANT WITH RESPECT TO
18    CHARACTERIZATION; ALSO LACK OF FOUNDATION.
19              THE COURT:  REPHRASE YOUR QUESTION, COUNSEL.
20    BY MR. QUINN:                                                 01:19
21    Q    IN TERMS OF THE THINGS THAT YOU WORKED WITH HIM ON, DID HE
22    GET VERY INVOLVED IN THE DETAILS?
23    A    YES.
24    Q    FROM THE TIME YOU STARTED THERE -- I TAKE IT YOU FIRST
25    HEARD ABOUT THIS BRATZ PROJECT WITHIN THE FIRST TEN DAYS OF   01:19
```

1    YOUR STARTING AT MGA?

2    A    YES.

3    Q    FROM THE TIME THAT YOU STARTED, WAS THERE EVER ANY

4    CONSIDERATION TO NOT GOING FORWARD WITH THE BRATZ DOLL?

5              **MR. NOLAN:**  OBJECTION, YOUR HONOR.  AGAIN, CALLS FOR     01:19

6    SPECULATION; LACK OF FOUNDATION.

7              **THE COURT:**  SUSTAINED.

8    **BY MR. QUINN:**

9    Q    YOU GOT INVOLVED IN THE BRATZ DOLL YOURSELF, I TAKE IT?

10   A    YES.                                                            01:20

11   Q    AND WAS THERE EVER ANY INDICATION TO YOU THAT THERE WAS

12   ANY DOUBT AS TO WHETHER THE COMPANY WAS GOING FORWARD WITH THE

13   BRATZ DOLL?

14   A    NO.

15   Q    LET ME SEE IF I CAN REFRESH YOUR RECOLLECTION.              01:20

16              IF YOU COULD LOOK, PLEASE -- YOU SHOULD SEE UP THERE

17   A COPY OF YOUR DEPOSITION.  IF YOU COULD TURN, PLEASE, TO

18   PAGE 264.  IF YOU COULD JUST READ that TO YOURSELF, NOT OUT

19   LOUD, ON PAGE 264, LINES 3 TO 11, PERHAPS DOWN TO 15.  LET ME

20   KNOW WHEN YOU HAVE HAD A CHANCE TO DO THAT.                     01:21

21   A    OKAY.

22   Q    DOES READING THAT REFRESH YOUR RECOLLECTION ABOUT ANY

23   OTHER DIRECTION YOU RECEIVED ABOUT WHO SHOULD BE CREDITED WITH

24   THE IDEA FOR THE BRATZ DOLL?

25   A    YES.                                                           01:21

1   Q    WHAT IS IT THAT YOU NOW REMEMBER, HAVING READ YOUR

2   TESTIMONY?

3   A    JUST THAT IF ANYONE WAS TO ASK, IT WAS TO BE CREDITED TO

4   ISAAC OR THE INSPIRATION OF HIS DAUGHTER.

5   Q    AND WHO WAS IT WHO TOLD YOU THAT?                          01:22

6   A    THAT CAME FROM ISAAC.

7              **MR. QUINN:**  NOTHING FURTHER.

8              **THE COURT:**  CROSS-EXAMINATION?

9                         **CROSS-EXAMINATION**

10  **BY MR. NOLAN:**

11  Q    I REPRESENT MGA.

12            WE'VE NEVER MET, HAVE WE?

13  A    NO.

14  Q    YOU WERE TERMINATED BY MGA; IS THAT CORRECT?

15  A    YES.                                                       01:22

16  Q    AND AFTER YOU WERE TERMINATED BY MGA, DID YOU APPLY FOR A

17  JOB AT MATTEL?

18  A    YES.

19  Q    NOW, LAST NIGHT WHEN I WAS READING YOUR DEPOSITION, I

20  NOTICED THAT YOUR DEPOSITION WAS TAKEN FEBRUARY 26, 2008;       01:22

21  CORRECT?

22  A    YES.

23  Q    SO THAT'S A FEW MONTHS AGO.

24            I THINK YOU SAID THAT YOUR APPLICATION WAS STILL

25  PENDING AT MATTEL; IS THAT CORRECT?                            01:23

```
 1  A    WELL, I'VE PUT APPLICATIONS IN ON-LINE AT MATTEL FOR

 2  YEARS.  THAT'S THE TOY INDUSTRY.  THERE'S ONLY SO MANY TOY

 3  COMPANIES, AND IN ORDER TO CONTINUE WORKING IN CALIFORNIA, I

 4  WOULD NEED TO APPLY TO EVERY TOY COMPANY THAT'S OUT THERE.

 5  Q    CAN YOU TELL THE JURY HOW MANY TIMES YOU'VE APPLIED FOR        01:23

 6  EMPLOYMENT AT MATTEL.

 7  A    AS POSITIONS ARISE AT MATTEL, IF THEY ARE OF INTEREST, I

 8  HAVE APPLIED; SO IT COULD HAVE BEEN TWO OR THREE OVER THE

 9  YEARS.

10  Q    COULD IT BE MORE THAN TWO OR THREE?                           01:23

11  A    POSSIBLY.

12  Q    AND YOUR LATEST APPLICATION, YOU'VE NOT HEARD BACK YET

13  FROM MATTEL; CORRECT?

14  A    NO.  THE POSITIONS ARE ALREADY FILLED.  THERE'S NOT ANY

15  AVAILABLE POSITIONS THAT I HAVE APPLIED FOR.                       01:23

16  Q    HAVE YOU WITHDRAWN YOUR APPLICATION?

17  A    NO.  I DON'T THINK THERE'S A WAY TO DO THAT ON-LINE.

18  Q    WE'VE BEEN TALKING TODAY ABOUT EVENTS IN THE YEAR 2000;

19  RIGHT?

20  A    YES.                                                          01:24

21  Q    YOU STARTED TO WORK AT MGA -- YOUR FIRST DAY WAS

22  OCTOBER 11TH?

23  A    YES.

24  Q    OF THE YEAR 2000?

25  A    YES.                                                          01:24
```

```
 1  Q    WHAT I'M INTERESTED IN IS WHO FIRST APPROACHED YOU ABOUT

 2  ANY KNOWLEDGE THAT YOU HAD CONCERNING THIS LITIGATION.

 3  A    I WAS CONTACTED, PROBABLY, IN '06 BY A MATTEL ATTORNEY.

 4  Q    AND DID YOU EVENTUALLY MEET WITH THAT MATTEL ATTORNEY?

 5  A    YES.                                                          01:24

 6  Q    AND DID THAT ATTORNEY GO TO YOUR HOUSE?

 7  A    YES.

 8  Q    WAS IT ONLY ONE ATTORNEY?

 9  A    I BELIEVE THERE WERE TWO PEOPLE THERE.

10  Q    AND DO YOU KNOW WHO THAT SECOND PERSON WAS?                   01:25

11  A    I DON'T REMEMBER.  IT WAS SO LONG AGO, AND I DON'T

12  REMEMBER THE DIFFERENT ATTORNEYS, BETWEEN MGA'S AND MATTEL'S,

13  THAT CAME TO VISIT.

14  Q    THE TWO PEOPLE THAT CAME TO YOUR HOUSE IN 2006 WERE BOTH

15  ASSOCIATED WITH MATTEL; CORRECT?                                  01:25

16  A    I DON'T KNOW EXACTLY IF IT WAS A LAW FIRM OR MATTEL.  I'M

17  NOT SURE.

18  Q    DO YOU RECOGNIZE IN THE COURTROOM THE ATTORNEY THAT CAME

19  TO YOUR HOUSE IN THE YEAR 2006?

20  A    I THINK SO.                                                   01:25

21  Q    DO YOU MIND POINTING HIM OUT TO THE JURY.

22  A    THE BLONDE WOMAN.

23  Q    THIS IS JILL THOMAS.

24  A    YES.

25  Q    AND DID YOU KNOW THAT JILL THOMAS WAS AN ATTORNEY AT         01:25
```

1    MATTEL IN CHARGE OF LITIGATION?

2    A    I'M SURE I KNEW AT THAT TIME.

3    Q    NOW, PRIOR TO THAT VISIT, HAD YOU BEEN FOLLOWING THE

4    EVENTS OF ANY LITIGATION BETWEEN MGA AND MATTEL?

5    A    NO.                                                            01:26

6    Q    WERE YOU EVEN AWARE OF IT?

7    A    I WAS AWARE.

8    Q    BUT YOU HAD NEVER READ THE COMPLAINT.

9    A    NO.

10   Q    DID MS. THOMAS HAVE DOCUMENTS WITH HER AT THAT TIME?          01:26

11   A    NO.  NOTHING THAT I SAW.

12   Q    I'M JUST CURIOUS, YOU KNOW THESE EVENTS THAT YOU WERE

13   TESTIFYING ABOUT IN OCTOBER OF 2000?

14   A    YES.

15   Q    DID YOU MAKE ANY NOTES OF ANY CONVERSATIONS THAT YOU HAD      01:26

16   WITH PAULA GARCIA?

17   A    NO.

18   Q    HAVE YOU EVER SEEN CARTER BRYANT'S EMPLOYMENT AGREEMENT?

19   A    NO.

20   Q    HAVE YOU EVER SEEN HIS RESIGNATION LETTER?                    01:26

21   A    NO.

22   Q    DO YOU KNOW THE DATE HE rESIGNED FROM MATTEL?

23   A    ONLY FROM WHAT I'VE BEEN TOLD.  NOT DIRECTLY FROM HIM, NO.

24        **MR. NOLAN:**  YOUR HONOR, IF I COULD GET THIS PAD OF

25   PAPER OVER HERE.                                                   01:27

1          **THE COURT:** YOU MAY.

2    **BY MR. NOLAN:**

3    Q    CAN YOU SEE THIS OKAY?

4    A    YES.

5    Q    SO YOUR FIRST DAY AT MGA WAS OCTOBER 11TH OF THE YEAR          01:27

6    2000; RIGHT?

7    A    I BELIEVE IT WAS EITHER THE 10TH OR 11TH.  I'M PRETTY SURE

8    IT WAS THE 11TH.

9    Q    SO I WANT TO FOCUS YOU RIGHT NOW FOR A MOMENT ON

10   OCTOBER 11TH.                                                       01:28

11         WOULD IT BE TRUE TO SAY THAT YOU HAVE ABSOLUTELY NO

12   PERSONAL KNOWLEDGE OF WHAT OCCURRED BETWEEN CARTER BRYANT AND

13   MGA PRIOR TO YOUR FIRST DAY ON OCTOBER 11TH?

14   A    CORRECT.

15   Q    SO, FOR INSTANCE, YOU DON'T KNOW WHAT DATE THE PITCH           01:29

16   MEETING WAS OR THE FIRST TIME THAT MGA EVER MET WITH

17   CARTER BRYANT; CORRECT?

18   A    YES.

19   Q    AND YOU DON'T KNOW WHO WAS PRESENT AT THAT FIRST MEETING

20   BETWEEN MGA AND CARTER BRYANT; CORRECT?                            01:29

21   A    YES.

22   Q    YOU DON'T KNOW ONE WAY OR THE OTHER WHETHER OR NOT

23   MR. LARIAN HAD MET WITH CARTER BRYANT ON SEPTEMBER 1ST OF THE

24   YEAR 2000; CORRECT?

25   A    CORRECT.                                                       01:29

```
 1   Q    NOR DO YOU HAVE ANY KNOWLEDGE AS TO WHETHER OR NOT HIS

 2   DAUGHTER, YASMIN, WAS PRESENT AT THAT MEETING, DO YOU?

 3   A    CORRECT.

 4   Q    NOW, AS I UNDERSTAND YOUR TESTIMONY, YOU SAID THAT WITHIN

 5   A WEEK OR A WEEK AND A HALF, YOU FIRST MET WITH CARTER BRYANT.     01:29

 6   A    YES.

 7   Q    AND SO THAT WOULD BE OCTOBER 21, 2000.

 8   A    IT WOULD HAVE BEEN BEFORE THAT DATE.

 9   Q    BUT THAT'S TEN DAYS FROM OCTOBER 11TH; YES?

10   A    A WEEK AND A HALF IS SEVEN -- FIVE, SIX, SEVEN, EIGHT DAYS    01:30

11   AT THE MOST.

12   Q    I'M GOING TO DO A WEEK AND A HALF FIRST; BECAUSE A WEEK IS

13   SEVEN DAYS; RIGHT?

14   A    YES.

15   Q    AND SO YOUR FIRST MEETING WITH CARTER BRYANT OCCURRED         01:30

16   SOMETIME BETWEEN THE 18TH OF OCTOBER AND OCTOBER 21ST; is that

17   CORRECT?

18   A    YES.

19   Q    IT'S YOUR BEST TESTIMONY THAT YOU MET WITH CARTER BRYANT

20   FOR THE VERY FIRST TIME SOMEWHERE BETWEEN OCTOBER 18TH AND         01:31

21   OCTOBER 21ST; CORRECT?

22   A    SOMETIME BETWEEN THE 11TH, TO BEFORE THE 20TH, YES.

23   Q    I'M SORRY.  WHEN MR. QUINN WAS ASKING YOU QUESTIONS, YOUR

24   TESTIMONY WAS THAT YOU HAD MET WITH MR. CARTER BRYANT FOR THE

25   FIRST TIME SOMETIME BETWEEN A WEEK OR TEN DAYS AFTER YOU           01:31
```

1    STARTED; CORRECT?

2    A    NO.  FROM A WEEK TO A WEEK AND A HALF OF THE TIME I

3    STARTED, FROM THE TIME I STARTED.

4    Q    ALL RIGHT.

5         SO IT'S POSSIBLE, THEN, YOU COULD HAVE EVEN MET A                01:31

6    LITTLE BIT EARLIER THAN OCTOBER 18TH?  IS THAT YOUR TESTIMONY?

7    A    YES.

8    Q    OTHER THAN JILL THOMAS THAT DAY, AND A LITTLE BIT OF TIME,

9    I GUESS, THIS MORNING WITH MR. QUINN, HAVE YOU MET WITH OTHER

10   ATTORNEYS FOR MATTEL?                                                 01:32

11   A    AT THE DEPOSITION.

12   Q    PRIOR TO THE DEPOSITION, DID YOU MEET WITH THEM?

13   A    I HAD MET -- I DON'T REMEMBER.

14   Q    DO YOU RECALL MEETING WITH THE ATTORNEYS FOR MATTEL BEFORE

15   YOUR DEPOSITION IN THIS CASE?                                         01:32

16   A    I DON'T BELIEVE SO.

17   Q    AS OF THE TIME THAT YOU STARTED WORKING AT MGA, WAS THERE

18   A 3-D MODEL OF THE BRATZ DOLL THAT YOU SAW?

19   A    NO.

20   Q    IN FACT, AS OF THE TIME THAT YOU STARTED WORKING AT MGA,        01:32

21   DO YOU KNOW WHETHER OR NOT THE NAME "BRATZ" HAD EVEN BEEN

22   FINALIZED FOR THE DOLL?

23   A    AS FAR AS WHAT I REMEMBER, BRATZ HAD NOT BEEN CONFIRMED AT

24   ALL.

25   Q    "BRATZ," THE NAME?                                              01:33

```
 1   A     YES.

 2   Q     THERE WAS SOME WORK GOING ON, HOWEVER, ON THAT FIRST DAY

 3   THAT YOU ARRIVED WITH RESPECT TO THE DOLL LINE; CORRECT?

 4   A     MY FIRST DAY WAS SPENT IN PAPERWORK AND MEETING PEOPLE;

 5   SO, AS FAR AS I'M CONCERNED, I DIDN'T WORK ON IT THE VERY FIRST     01:33

 6   DAY.

 7   Q     YOU WERE REFERRING EARLIER, BY THE WAY, TO CONVERSATIONS

 8   THAT YOU HAD WITH MERCEDEH WARD.

 9         DO YOU RECALL THEM?

10   A     YES.                                                          01:34

11   Q     MERCEDEH WARD ACTUALLY TOLD YOU THAT CARTER BRYANT HAD

12   COME UP WITH THE CONCEPT DRAWINGS FOR BRATZ YEARS BEFORE HE

13   JOINED MATTEL; CORRECT?

14   A     YEARS BEFORE HE JOINED MATTEL?

15   Q     YES.                                                          01:34

16   A     I DON'T REMEMBER.

17         MR. QUINN:  HEARSAY, YOUR HONOR.

18         THE COURT:  SUSTAINED, UNLESS YOU LAY A FOUNDATION

19   FOR THE ADMISSION, COUNSEL.

20         MR. NOLAN:  WE'LL COME BACK TO THAT, YOUR HONOR.              01:34

21   BY MR. NOLAN:

22   Q     WHEN YOU FIRST CAME TO WORK AT MGA, IN THE VERY BEGINNING,

23   THERE WAS NO FINAL NAME FOR THE DOLL; CORRECT?

24   A     CORRECT.

25   Q     WERE THERE ANY FINAL FASHIONS FOR THE DOLLS?                  01:34
```

1  A    NO.

2  Q    AND WHAT ABOUT PACKAGING?  WAS THERE ANY WORK EVEN DONE ON

3  PACKAGING?

4  A    NOT TO MY KNOWLEDGE, NO.

5  Q    ARE YOU FAMILIAR WITH A FORM CALLED THE "PDF"?                    01:35

6  A    YES.

7  Q    AND COULD YOU TELL THE JURY WHAT YOUR UNDERSTANDING OF THE

8  FORM "PDF" IS.

9  A    THAT'S WHERE ALL OF THE INFORMATION IS PUT DOWN ON PAPER,

10  FROM THE PRODUCT MANAGER, and THAT GOES TO HONG KONG FOR            01:35

11  DEVELOPMENT TO BEGIN.

12  Q    IS IT YOUR UNDERSTANDING THAT THE PDF IS LIKE THE FORM

13  THAT SAYS, 'ALL RIGHT, WE'VE APPROVED; WE'RE GOING TO MOVE

14  FORWARD WITH THE PROJECT"?

15  A    YES.  BUT SOMETIMES THEY'RE KILLED AFTER THAT ALSO; SO         01:35

16  IT'S NOT SET IN STONE.

17  Q    NOW, YOUR HIRING WAS NOT LIMITED TO THE BRATZ PROJECT;

18  CORRECT?

19  A    RIGHT.  BRATZ WAS JUST ONE OF THE PRODUCTS THAT WE WERE

20  WORKING ON.                                                         01:35

21  Q    DO YOU KNOW WHEN CARTER BRYANT DID THE CONCEPT DRAWINGS

22  THAT EVENTUALLY BECAME OR LED TO OR WAS THE INSPIRATION FOR THE

23  BRATZ DOLLS?

24         **MR. QUINN:**  LACKS FOUNDATION, YOUR HONOR.

25         **THE COURT:**  SUSTAINED.                                   01:36

```
 1              LAY A FOUNDATION.

 2   BY MR. NOLAN:

 3   Q    DO YOU HAVE ANY KNOWLEDGE AS TO WHEN CARTER BRYANT DID THE

 4   CONCEPT DRAWINGS THAT BECAME THE INSPIRATION FOR THE BRATZ

 5   DOLLS?                                                      01:36

 6   A    NO.

 7   Q    IN THE CONVERSATION THAT YOU HAD WITH ISAAC LARIAN, WHERE

 8   ISAAC LARIAN WAS DISCUSSING CARTER BRYANT, WERE THOSE

 9   CONVERSATIONS TALKING ABOUT THE ACTUAL DOLL ITSELF THAT BECAME

10   BRATZ?                                                      01:36

11   A    THE ACTUAL DOLL WAS NEVER CREATED BY CARTER.  IT WAS

12   CREATED BY OUR HONG KONG OFFICE AFTER DIRECTION FROM PAULA; SO

13   I DON'T KNOW EXACTLY WHAT YOU'RE MEANING.

14   Q    WELL, I GUESS MY POINT IS THIS:  WHEN YOU SAY "OUR HONG

15   KONG OFFICE," YOU'RE SAYING THAT THE BRATZ DOLL WAS CREATED BY  01:37

16   MGA; YES?

17   A    THE PHYSICAL DOLL, YES.

18   Q    AND THAT PAULA WAS INVOLVED IN THE CREATION OF THE

19   PHYSICAL DOLL; YES?

20   A    YES.                                                   01:37

21   Q    AND ISAAC LARIAN, WHO YOU DESCRIBED, I THINK, AS

22   MICROMANAGING FROM TIME TO TIME?

23   A    OH, YOU KNOW, SOMETIMES.

24   Q    BUT ON THE BRATZ DOLL, THAT WAS AN IMPORTANT PROJECT TO

25   ISAAC; YES?                                                 01:37
```

1    A    YES.

2    Q    AND CERTAINLY, ISAAC WAS INVOLVED IN THE CREATION OF THE

3    MGA BRATZ DOLL; YES?

4    A    YES.

5    Q    AS WELL AS A NUMBER OF OTHER EMPLOYEES AT MGA; CORRECT?    01:38

6    A    YES.

7    Q    DO YOU KNOW ONE WAY OR THE OTHER WHETHER OR NOT ISAAC'S

8    DAUGHTER, YASMIN, HAD ANY INVOLVEMENT IN THE DEVELOPMENT OF THE

9    BRATZ DOLL?

10   A    TO MY KNOWLEDGE, NO.    01:38

11   Q    WHAT'S THAT BASED ON?

12   A    JUST FROM MY TIME AT MGA AND MY EXPERIENCE WORKING WITH

13   EVERYONE.

14   Q    WELL, DO YOU KNOW WHETHER OR NOT MGA HAD FOCUS GROUPS WITH

15   CHILDREN DURING THE DEVELOPMENT PROCESS?    01:38

16   A    YES.

17   Q    DO YOU HAVE ANY KNOWLEDGE AS TO WHETHER OR NOT ISAAC HAD

18   CONVERSATIONS WITH YASMIN REGARDING THE DEVELOPMENT OF THE

19   BRATZ DOLLS?

20   A    I'M SURE HE DID.    01:39

21   Q    DO YOU HAVE ANY IDEA AS TO WHAT YASMIN'S INPUT WAS INTO

22   THE DEVELOPMENT OF THE BRATZ DOLLS?

23   A    SHE HAD SEVERAL SUGGESTIONS.  ISAAC WOULD COME IN AND GIVE

24   WHATEVER CRITIQUING THAT SHE GAVE, IF HE TOOK SOMETHING HOME OR

25   ASKED HER, YES.    01:39

```
 1   Q    SO ISAAC WOULD GO HOME, GET SOME CRITIQUES FROM YASMIN,

 2   THEN COME BACK AND REPORT TO THE COMMITTEE?

 3            MR. QUINN:  OBJECTION.  FOUNDATION, YOUR HONOR.

 4            THE COURT:  SUSTAINED.

 5   BY MR. NOLAN:                                              01:39

 6   Q    DURING WHAT PERIOD OF TIME DID ISAAC MAKE THESE STATEMENTS

 7   WITH RESPECT TO CRITIQUES FROM YASMIN?

 8            MR. QUINN:  AGAIN, HEARSAY ALSO, YOUR HONOR.

 9            MR. NOLAN:  IT'S FOR IMPEACHMENT, YOUR HONOR.

10            THE COURT:  OVERRULED.                            01:39

11            THE WITNESS:  AT VARIOUS TIMES THROUGH DEVELOPMENT;

12   JUST VARIOUS TIMES.

13   BY MR. NOLAN:

14   Q    VARIOUS TIMES OF THE DEVELOPMENT OF THE DOLL ITSELF;

15   CORRECT?                                                  01:40

16   A    YES.

17   Q    DID ISAAC LARIAN EVER TELL YOU THAT HE WAS TAKING CREDIT

18   FOR THE CONCEPT DRAWINGS THAT CARTER BRYANT HAD DONE?

19   A    WE NEVER DISCUSSED THAT.

20   Q    HAVE YOU EVER BEEN IN A MEETING WHERE ISAAC LARIAN SAID,  01:40

21   'I DREW THE CONCEPT DRAWINGS FOR BRATZ'?

22   A    NO.

23   Q    DURING YOUR FIRST MEETING WITH CARTER BRYANT, COULD YOU

24   TELL ME WHO ELSE WAS PRESENT.

25   A    PAULA AND MERCEDEH.                                  01:40
```

```
 1   Q    HOW LONG DID THE MEETING TAKE PLACE?

 2   A    UNDER AN HOUR.  I'M NOT SURE AT THIS POINT.  IT WAS A LONG

 3   TIME AGO.

 4   Q    SO YOU CAN'T REMEMBER HOW LONG THE MEETING TOOK PLACE?

 5   A    IT WAS UNDER AN HOUR.                                      01:41

 6   Q    DO YOU RECALL ANYTHING THAT MERCEDEH MAY HAVE SAID DURING

 7   THAT MEETING?

 8   A    NO.  MERCEDEH AND I JUST ASKED QUESTIONS AND WERE GIVEN

 9   THE INFORMATION ABOUT THE DOLL LINE.

10   Q    DO YOU RECALL ANY OF THE QUESTIONS THAT YOU WERE ASKING?   01:41

11   A    JUST WHAT THE LOOK AND FEEL SHOULD BE; JUST GENERAL

12   QUESTIONS ON PACKAGE DIRECTION.

13   Q    NOW, IF I UNDERSTAND, PAULA WAS LEADING THE DISCUSSION;

14   CORRECT?

15   A    PAULA AND CARTER.                                         01:41

16   Q    WHO WAS SPEAKING MORE AT THAT MEETING?  PAULA OR CARTER?

17   A    PROBABLY PAULA.

18   Q    WAS CARTER RATHER QUIET DURING THE MEETING?

19   A    YES; PRETTY MUCH.

20   Q    CARTER WAS THERE WITH HIS DRAWINGS; CORRECT?              01:42

21   A    YES.

22   Q    ISN'T IT TRUE THAT THE FIRST TWO WEEKS OF YOUR EMPLOYMENT

23   AT MGA, YOU FELT IT WAS TOO EARLY TO BE TALKING TO ANYBODY

24   ABOUT PACKAGING OF THE BRATZ PROJECT; CORRECT?

25   A    NOT NECESSARILY, NO.                                      01:42
```

```
 1   Q     DO YOU HAVE YOUR DEPOSITION STILL IN FRONT OF YOU?

 2   A     YES.

 3   Q     COULD YOU PLEASE TURN TO PAGE 77.

 4         PLEASE READ TO YOURSELF LINES 22 THROUGH LINE 10 ON

 5   PAGE 78.                                                          01:43

 6         MR. NOLAN:  YOUR HONOR, WE'D LIKE PERMISSION TO

 7   PUBLISH THIS.

 8         IT'S PAGE 77, STARTING AT LINE 25, RUNNING THROUGH

 9   LINE 10 ON PAGE 78.

10         THE COURT:  ANY OBJECTION?                                  01:43

11         MR. QUINN:  NO OBJECTION.

12         THE COURT:  YOU MAY PUBLISH.

13         (WHEREUPON, VIDEO DEPOSITION PLAYS;

14         EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS:)

15

16              A  IT MAY HAVE BEEN AT THAT TIME.  I -- I CAN'T

17                 SAY 100%.

18              Q  AND WHEN YOU SAY "AT THAT TIME," YOU'RE

19                 REFERRING TO THE OCTOBER 19TH, 2000,

20                 ENTRY?

21              A  RIGHT.  THE ONLY OTHER AYZENBERG MEETING

22                 WOULD hAVE BEEN OCTOBER 24TH, WHICH IS

23                 PAGE 298.

24              Q  THERE'S AN ENTRY THERE FOR AYZENBERG AT 2

25                 O'CLOCK ON THAT DAY?
```

1           A    RIGHT, SO THAT WOULD HAVE BEEN THE SECOND

2               TIME tHEY CAME IN, WHICH COULD HAVE,

3               POSSIBLY, BEEN THE BRATZ MEETING BECAUSE,

4               AGAIN, THE FIRST TWO WEEKS WAS jUST TOO

5               EARLY TO BE TALKING TO ANYBODY ABOUT

6               BRATZ AND tHE POSITIONING OF PACKAGING.

7           (Excerpts concluded.)

8   BY **MR. NOLAN:**

9   Q    NOW, YOU ALSO, DURING THAT EARLY PERIOD OF TIME, MET WITH

10  A WOMAN NAMED VERONICA MARLOW; CORRECT?                              01:45

11  A    NO.

12  Q    DO YOU EVER RECALL MEETING WITH VERONICA MARLOW?

13  A    I MET HER.  I DIDN'T SIT DOWN WITH HER, I DON'T BELIEVE.

14  Q    DID YOU SEE ANY OF THE PROPOSED FASHION SKETCHES FOR THE

15  BRATZ DOLLS?                                                        01:46

16  A    YES.

17  Q    WHEN WAS THE FIRST TIME YOU SAW THOSE?

18  A    I DON'T KNOW THE EXACT DATE OFFHAND.

19  Q    WELL, WERE THEY WITHIN THE FIRST TWO WEEKS OF YOU COMING

20  TO WORK AT MGA, OR LATER?                                           01:46

21  A    I BELIEVE THOSE MAY HAVE BEEN LATER.

22  Q    SO THAT COULD HAVE BEEN AS EARLY AS NOVEMBER, OR AS LATE

23  AS NOVEMBER?

24  A    MAYBE AS LATE AS NOVEMBER.

25  Q    IN ANY EVENT, WHEN YOU SAW THEM, YOU WERE SHOWN tHAT THEY     01:46

1   WERE SOME SORT OF A -- THEY WERE PINNED ON A BOARD; IS THAT

2   CORRECT?

3   A    YES.

4   Q    AND YOUR UNDERSTANDING IS THAT THEY WERE JUST

5   ILLUSTRATIONS, WITH FABRIC SAMPLES ATTACHED TO THE            01:46

6   ILLUSTRATIONS; CORRECT?

7   A    YES.

8   Q    AND YOUR BEST RECOLLECTION IS THAT WASN'T UNTIL NOVEMBER

9   OF 2000; CORRECT?

10  A    IT WAS SOMETIME AFTER THE FIRST TWO WEEKS I WAS THERE.    01:46

11  Q    NOW, THERE WAS NO FINAL SCULPT FOR BRATZ IN OCTOBER OF

12  2000, WAS THERE?

13          **MR. QUINN:**  OBJECTION.  LACKS FOUNDATION.

14          **THE COURT:**  SUSTAINED.

15  **BY MR. NOLAN:**

16  Q    DID YOU EVER SEE A SCULPT FOR THE BRATZ DOLL IN THE MONTH

17  OF OCTOBER?

18  A    I DON'T BELIEVE IT WAS IN OCTOBER.

19  Q    DO YOU RECALL THAT IT WAS MORE IN NOVEMBER?

20  A    YES.  IT WAS BEFORE WE HAD RECEIVED ANY INFORMATION FROM  01:47

21  Ayzenberg ON THEIR PITCH.

22  Q    DO YOU KNOW WHEN CARTER BRYANT ACTUALLY BECAME A

23  CONSULTANT TO MGA?

24  A    NO.  NOT THE EXACT DATE.

25  Q    BUT YOU DID NOT SEE A SCULPT OF THE BRATZ DOLL BEFORE     01:48

```
 1   CARTER BRYANT BECAME A CONSULTANT TO MGA; CORRECT?

 2           MR. QUINN:  OBJECTION.  LACKS FOUNDATION; CALLS FOR

 3   SPECULATION.

 4           THE COURT:  SUSTAINed, COUNSEL, ON FOUNDATION.

 5           LAY A FOUNDATION AS TO HOW THIS WITNESS COULD HAVE     01:48

 6   SEEN THE SCULPT.

 7   BY MR. NOLAN:

 8   Q    DID YOU ATTEND VARIOUS DEVELOPMENT MEETINGS AFTER JOINING

 9   MGA WHERE THE SUBJECT OF THE BRATZ DOLL WAS DISCUSSED?

10   A    YES.                                                     01:48

11   Q    AND AT ANY OF THOSE DEVELOPMENT MEETINGS, WERE YOU EVER

12   SHOWN A SCULPT -- a 3-D VERSION OF THE BRATZ SCULPT?

13   A    IT WAS NOT DURING THE MEETING.  PAULA HAD BROUGHT IT UP TO

14   THE CREATIVE SERVICES DEPARTMENT FOR ME TO TAKE A LOOK AT.

15   Q    AND DO YOU RECALL THE DATE OF THAT?                      01:49

16   A    NO.

17   Q    WAS IT ABOUT A MONTH AND A HALF AFTER YOU STARTED WORKING

18   AT MGA?

19   A    IT WAS AWHILE AFTER.  IT WAS BEFORE WE ACTUALLY WERE ABLE

20   TO FINALIZE PACKAGING.                                        01:49

21   Q    IN YOUR MIND, AS YOU'RE SITTING HERE TODAY, WHAT IS YOUR

22   BEST RECOLLECTION AS TO WHEN YOU WERE ABLE TO FINALIZE

23   PACKAGING?

24   A    WE DIDN'T FINALIZE IT FOR ABOUT A MONTH AFTER, MAYBE A FEW

25   WEEKS AFTER THE FIRST SCULPT CAME, BECAUSE ONCE WE SAW THE     01:49
```

```
 1   SCULPT, WE KIND OF RETHOUGHT PACKAGING, BECAUSE THEY WERE --

 2   THEY JUST CAME OUT A THOUSAND TIMES BETTER THAN WE ANTICIPATED.

 3   Q    SO WHEN YOU SAID WE 'reTHOUGHT PACKAGING,' WHAT DO YOU

 4   MEAN BY THAT?

 5   A    WHAT DO YOU MEAN?                                         01:49

 6   Q    YOU SAID THAT YOU HAD A REACTION AFTER YOU SAW THE BRATZ

 7   SCULPT, AND THEN THAT CAUSED YOU TO DO SOMETHING WITH THE

 8   PACKAGING; IS THAT CORRECT?

 9   A    YES.

10   Q    CAN YOU PLACE FOR THE JURY, THEN, WHEN YOU FIRST SAW THE   01:49

11   FINISHED BRATZ SCULPT WHICH WOULD ALLOW YOU TO DO FINALIZED

12   PACKAGING?

13   A    WHAT DATE THAT I SAW THE SCULPT?  I DON'T REMEMBER.

14   Q    OR THE MONTH.

15   A    MAYBE NOVEMBER.  I DON'T KNOW EXACTLY, BUT IT WOULD HAVE   01:50

16   BEEN...

17   Q    YOU TALKED ABOUT ISAAC LARIAN HAVING AN INTEREST AND

18   PAYING ATTENTION TO SOME THINGS.  I WANT TO SHOW YOU AN

19   EXHIBIT, IF I MIGHT.

20           DO YOU HAVE, IN YOUR BOOK, EXHIBIT NUMBER 17298?       01:50

21           DO YOU RECALL RECEIVING THIS E-MAIL FROM

22   PAULA TREANTAFELLES?

23   A    YES.

24   Q    AND THE DATE ON THIS E-MAIL IS DECEMBER 21, 2000.

25           DO YOU SEE THAT?                                       01:52
```

```
 1   A    YES.

 2            MR. NOLAN:  YOUR HONOR, WE'D OFFER EXHIBIT 17298.

 3            MR. QUINN:  OBJECTION.  TIME PERIOD, YOUR HONOR.

 4   RELEVANCE.

 5            THE COURT:  LET ME TAKE A LOOK HERE.                    01:52

 6        MR. NOLAN, PERHAPS YOU COULD DIRECT THE COURT,

 7   WITHOUT RESTATING THE SUBSTANCE, to the PORTION THAT MIGHT

 8   ESTABLISH THE TEMPORAL RELEVANCE.

 9            MR. NOLAN:  I MIGHT JUST TRY IT A DIFFERENT WAY.

10            THE COURT:  WHY DON'T YOU DO THAT.                     01:53

11   BY MR. NOLAN:

12   Q    BY LOOKING AT THIS E-MAIL, DOES THIS REFRESH YOUR

13   RECOLLECTION AS TO WHETHER OR NOT PACKAGING HAD BEEN FINALIZED

14   BY DECEMBER 21, 2000?

15            MR. QUINN:  OBJECTION.  NO FOUNDATION.                 01:53

16            THE COURT:  LAY A FOUNDATION FOR THE QUESTION,

17   COUNSEL.

18   BY MR. NOLAN:

19   Q    WERE YOU IN CHARGE OF THE PACKAGING FOR BRATZ AT MGA?

20   A    YES.                                                       01:53

21   Q    AS PART OF YOUR RESPONSIBILITY, WAS IT ONE OF YOUR DUTIES

22   TO DEVELOP A FINAL VERSION OF THE PACKAGING FOR BRATZ THAT

23   WOULD BE USED TO PLACE BRATZ DOLLS AND ACCESSORIES INTO IT?

24   A    YES.

25   Q    AND IT WAS DONE WITH THE INTENT TO HAVE THOSE DISPLAYED AT 01:53
```

1   RETAIL AND SOLD AT RETAIL IN VARIOUS STORES; CORRECT?

2   A    YES.

3   Q    MY ONLY QUESTION TO YOU IS, ISN'T IT TRUE THAT PACKAGING

4   FOR BRATZ WAS NOT FINAL EVEN BY LATE DECEMBER OF THE YEAR 2000?

5   A    THE PACKAGE THAT THIS E-MAIL IS REFERRING TO WAS THE FINAL      01:54

6   PACKAGE.  IT WAS JUST A REQUEST TO POSSIBLY RETHINK IT.

7   Q    AND DID YOU, IN FACT, RETHINK IT?

8   A    WE DID.  BUT THEN WE ENDED UP PRETTY MUCH BACK WHERE WE

9   WERE WHEN WE had come UP WITH THE STRUCTURE THAT IS KNOWN

10  TODAY.                                                              01:54

11  Q    BUT, IN ANY EVENT, IT'S TRUE THAT SOMETIME IN DECEMBER OF

12  2000, MAYBE TWO MONTHS AFTER YOU JOINED MGA, THAT'S WHEN THE

13  PACKAGING FOR BRATZ WAS ACTUALLY COMING TO BEING CLOSE TO

14  FINAL; CORRECT?

15  A    YES.                                                           01:55

16  Q    DID YOU PARTICIPATE, AFTER JOINING MGA, IN BRAINSTORMING

17  MEETINGS ABOUT WHAT THE NAME OF THE DOLL SHOULD BE?

18  A    YES.

19  Q    AND ULTIMATELY, AS A RESULT OF THE BRAINSTORMING, THE NAME

20  "BRATZ" WITH A "Z" WAS DECIDED; CORRECT?                           01:55

21  A    YES.

22  Q    DO YOU HAVE A BEST RECOLLECTION, MS. HARRIS, AS TO HOW

23  LONG AFTER YOU JOINED MGA ON OCTOBER 11TH THAT THE NAME "BRATZ"

24  WAS ACTUALLY AGREED TO?

25  A    I BELIEVE, AS OF OCTOBER 20TH, 21ST, IT BECAME OUR WORKING     01:55

```
 1   NAME.

 2   Q    DO YOU RECALL THAT PRIOR TO THAT TIME, ISAAC LARIAN HAD

 3   SUGGESTED OTHER NAMES FOR THE PROJECT?

 4   A    YES.

 5   Q    AND DO YOU RECALL THAT OTHER PEOPLE HAD SUGGESTED OTHER      01:56

 6   NAMES AS WELL?

 7   A    YES.

 8   Q    BEST GUESS:  APPROXIMATELY, HOW MANY NAMES WERE BEING

 9   BRAINSTORMED?  DO YOU KNOW?

10   A    TWENTY.                                                     01:56

11   Q    AND DO YOU KNOW WHY THE NAME "BRATZ" WAS ULTIMATELY

12   SELECTED?

13   A    IT WAS THE MOST EDGY.  IT WAS JUST A COOL NAME.

14   Q    THAT WAS THE CONSENSUS OF THE MGA COMMITTEE?

15   A    YES.                                                        01:56

16   Q    OF WHICH YOU WERE A MEMBER?

17   A    YES.

18   Q    BY THE WAY, WHEN YOU WERE MEETING WITH CARTER BRYANT AND

19   PAULA TREANTAFELLES AND MERCEDEH WARD, AT THAT MEETING, DID

20   CARTER BRYANT EVER TELL YOU THAT HE WAS STILL EMPLOYED AT        01:57

21   MATTEL?

22   A    YES.

23   Q    WHAT DID HE SAY IN THAT REGARD?

24   A    HE JUST MENTIONED THAT HE WAS THERE ON HIS LUNCH AND HE

25   NEEDED TO HURRY; THAT WAS PRETTY MUCH IT.                        01:57
```

```
 1   Q    DID HE TELL YOU NOT TO TELL ANYBODY THAT HE WAS THERE?

 2   A    I DON'T BELIEVE HE MENTIONED THAT AT THAT TIME.

 3   Q    DIDN'T HE TELL YOU THAT HE HAD RESIGNED FROM MATTEL?

 4   A    YES.  I KNEW THAT HE -- I'M NOT SURE IF IT WAS THAT PAULA

 5   HAD MENTIONED IT JUST BEFORE THAT MEETING, BUT I KNOW IN THAT        01:57

 6   MEETING I KNEW HE HAD ALREADY GIVEN A TWO-WEEK NOTICE.

 7   Q    OKAY.

 8   A    SO HE WAS LEAVING MATTEL.

 9   Q    AND DURING THAT MEETING, DID CARTER BRYANT TALK ABOUT ANY

10   PRODUCT LINES AT MATTEL?                                            01:57

11   A    NO.

12   Q    DID CARTER BRYANT DISCUSS ANY OF THE PROJECTS THAT HE WAS

13   WORKING ON AT MATTEL?

14   A    NO.

15   Q    DID CARTER BRYANT BRING WITH HIM ANY MATTEL PRODUCTS?          01:58

16   A    NO.

17   Q    IN FACT, ISN'T IT TRUE YOU'VE CHARACTERIZED THAT MEETING

18   AS NOT BEING VERY SUBSTANTIVE AT ALL?

19   A    NO, I WOULDN'T SAY THAT.  I WAS ABLE TO SEE SKETCHES OF

20   THE DOLLS AND GET INFORMATION REGARDING THE DOLL LINE.              01:58

21   Q    AND MOST OF THAT INFORMATION WAS COMING FROM PAULA AT THE

22   MEETING; CORRECT?

23   A    FROM BOTH PAULA AND CARTER.

24   Q    DO YOU RECALL SPECIFICALLY WHAT CARTER WAS TELLING YOU AT

25   THAT MEETING?                                                       01:58
```

```
 1   A    NOT SPECIFICALLY; MORE OF ACTUALLY WHERE HE CAME UP WITH

 2   THE IDEA; JUST, YOU KNOW, HOW IT CAME TO HIM.

 3   Q    AND WHAT DID HE SAY IN THAT REGARD?

 4           MR. QUINN:  OBJECTION.  HEARSAY.

 5           THE COURT:  SUSTAINED.                              01:59

 6           MR. NOLAN:  BECAUSE I DELAYED IN ANSWERING.

 7           YOUR HONOR, WE'LL OFFER IT FOR THE FACT IT WAS STATED

 8   AND FOR HER STATE OF MIND AND UNDERSTANDING AT THE TIME.

 9           THE COURT:  SUSTAINED.

10           AS YOU POINTED OUT, COUNSEL, HER STATE OF MIND IS NOT  01:59

11   RELEVANT.  THERE WERE SEVERAL OBJECTIONS IN THAT REGARD.

12           MR. NOLAN:  I UNDERSTAND.  I WAS JUST TRYING.

13           (LAUGHTER.)

14           THE COURT:  NEXT QUESTION.

15   BY MR. NOLAN:

16   Q    HAVE YOU KEPT IN TOUCH WITH CARTER BRYANT?

17   A    NO.

18   Q    HOW MANY TIMES DID YOU MEET WITH CARTER BRYANT OVER YOUR

19   EMPLOYMENT?

20   A    I BELIEVE I MET WITH HIM THAT ONCE.                  02:00

21   Q    THAT'S THE ONLY TIME?

22   A    I HAD SEEN HIM SEVERAL OTHER TIMES, BEEN CALLED INTO A

23   MEETING TO JUST LOOK AT SOMETHING, BUT NOT SAT DOWN IN A

24   MEETING WITH HIM.  EVERYTHING ELSE FROM THAT POINT WAS WITH

25   PAULA.                                                    02:00
```

```
 1    Q    AND AFTER THIS FIRST TIME THAT YOU MET WITH CARTER BRYANT,

 2    CAN YOU GIVE THE JURY AN ESTIMATE OF THE VERY NEXT TIME YOU MAY

 3    HAVE SEEN CARTER BRYANT?

 4    A    I SAW HIM PERIODICALLY IN THE OFFICE, BUT ANY OTHER TIME

 5    THAT I ACTUALLY SPOKE WITH HIM WOULD HAVE BEEN IN DECEMBER.        02:01

 6    Q    THE YEAR 2000?

 7    A    YES.

 8    Q    WAS HE AN EMPLOYEE OF MATTEL AT THE TIME?

 9    A    NO.

10    Q    WHEN YOU GOT TO MGA, DID ANYBODY TELL YOU THERE WAS A        02:01

11    CODE WORD FOR THE BRATZ PROJECT?

12    A    NO.  NEVER.

13    Q    WOULD YOU AGREE WITH ME THAT THE BRATZ DEVELOPMENT, THAT

14    IS, THE DEVELOPMENT OF THE DOLL ITSELF BY MGA, IN OCTOBER OF

15    THE YEAR 2000, WAS CONFIDENTIAL INFORMATION TO MGA?              02:01

16    A    YES.

17    Q    YOU WOULD AGREE THAT WAS TRUE UP UNTIL THE TIME THAT MGA

18    DECIDED TO DISCLOSE THE DECISION TO COME FORWARD WITH THE BRATZ

19    DOLLS TO THE RETAIL MARKET; CORRECT?

20    A    YES.                                                        02:02

21    Q    UP UNTIL THAT TIME, YOU UNDERSTOOD, AS AN EMPLOYEE OF MGA,

22    THAT YOU COULD NOT MENTION ANYTHING ABOUT THAT PROJECT TO

23    ANYBODY IN THE WORLD; CORRECT?

24    A    YES; THAT AND EVERY OTHER PROJECT.

25    Q    AND YOU WOULD NOT HAVE BEEN ALLOWED, FOR INSTANCE, TO       02:02
```

1  DISCLOSE THAT PAULA TREANTAFELLES GARCIA WAS THE PROJECT

2  MANAGER ON THE BRATZ DOLL; CORRECT?

3  A    SORRY?  I DON'T --

4  Q    I'M TALKING ABOUT THE CONFIDENTIALITY.

5         YOU BELIEVED THAT AT THAT MEETING WITH CARTER BRYANT,   02:02

6  SOMETIME WITHIN THE FIRST TEN DAYS OF YOU COMING TO WORK AT

7  MGA, THAT CERTAINLY YOU COULD NOT DISCLOSE EVEN THE FACT THAT

8  MEETING HAD OCCURRED TO ANYBODY; CORRECT?

9  A    YES.

10  Q    AND YOU COULD NOT HAVE DISCLOSED, FOR INSTANCE, TO ANYBODY   02:03

11  THAT PAULA TREANTAFELLES GARCIA WAS WORKING ON THE BRATZ

12  PROJECT; CORRECT?

13  A    YES.

14  Q    AND YOU WERE ALSO OF THE UNDERSTANDING THAT YOU WERE NOT

15  ALLOWED TO TELL ANYBODY OUTSIDE OF MGA CONCERNING YOUR   02:03

16  INVOLVEMENT IN THE BRATZ DEVELOPMENT; CORRECT?

17  A    WELL, ANYONE IN THE INDUSTRY.  I'M GOING TO GO HOME AND

18  TALK ABOUT IT.

19  Q    I UNDERSTAND.  I DO THE SAME THING.

20         YOU UNDERSTOOD that IN THE INDUSTRY, YOU COULDN'T SAY   02:03

21  ANYTHING.

22  A    CORRECT.

23         **MR. NOLAN:**  THANK YOU VERY MUCH.

24         **THE COURT:**  ANYTHING FURTHER, MR. QUINN?

25         **MR. QUINN:**  YES.   02:03

1                    **FURTHER DIRECT EXAMINATION**

2    **BY MR. QUINN:**

3    Q    MS. HARRIS, YOU'VE INDICATED THAT OVER TIME A NUMBER OF

4    DIFFERENT PEOPLE WORKED ON THE BRATZ DOLL PROJECT.

5    A    YES.                                                      02:04

6    Q    DID ANYONE EVER TELL YOU, 'DON'T MENTION

7    PAULA TREANTAFELLES'S INVOLVEMENT'?

8    A    NO.

9    Q    DID ANYONE EVER TELL YOU, 'DON'T MENTION YOUR

10   INVOLVEMENT'?                                                  02:04

11   A    NO.

12   Q    DID ANYONE EVER TELL YOU, 'DON'T MENTION THE INVOLVEMENT

13   OF ANY OF THESE OTHER MGA EMPLOYEES WHO WORKED ON THE BRATZ

14   PROJECT'?

15   A    NO.                                                       02:04

16   Q    HOW MANY NAMES WERE YOU TOLD NOT TO DISCLOSE AS HAVING

17   SOME INVOLVEMENT WITH BRATZ?

18   A    JUST ONE.

19   Q    THAT NAME IS?

20   A    CARTER.                                                   02:04

21   Q    YOU TOLD US THAT MR. LARIAN TOLD YOU THAT IF QUESTIONS

22   WERE ASKED, YOU WERE TO SAY THAT HE OR HIS DAUGHTER CREATED

23   BRATZ.

24            DO YOU RECALL THAT?

25   A    YES.                                                      02:05

1    Q    AND I ASKED YOU WHEN IN RELATION TO YOUR STARTING AT MGA

2    THAT WAS FIRST SAID TO YOU.  AND I CAN'T REMEMBER WHAT YOU

3    SAID.

4    A    I DON'T KNOW THE EXACT DATE OR TIME.  I KNOW IT WAS ON

5    MORE THAN ONE OCCASION, BUT I DON'T KNOW EXACTLY WHEN.  BUT IT        02:05

6    WAS EARLY ON.

7    Q    ALL RIGHT.

8         CAN YOU SAY WHETHER IT WAS WITHIN THE FIRST MONTH

9    AFTER YOU STARTED, THE FIRST TIME HE SAID THAT TO YOU?

10        **MR. NOLAN:**  OBJECTION, YOUR HONOR.  LEADING.              02:05

11        **THE COURT:**  SUSTAINED.

12        REPHRASE.

13   **BY MR. QUINN:**

14   Q    CAN YOU TELL US WHETHER OR NOT IT WAS WITHIN THE FIRST

15   MONTH?                                                             02:05

16   A    IT COULD HAVE BEEN.

17   Q    CAN YOU TELL US WHETHER OR NOT IT WAS WITHIN THE FIRST TWO

18   MONTHS THAT HE FIRST SAID THAT TO YOU?

19   A    YES.

20   Q    YOU'RE CONFIDENT ABOUT THAT?                                 02:05

21   A    YES.

22   Q    AS OF THE TIME HE FIRST GIVE YOU THAT INSTRUCTION, THAT IF

23   ANYONE ASKED, YOU WERE TO SAY THAT IT WAS MR. LARIAN OR HIS

24   DAUGHTER WHO HAD COME UP WITH THE BRATZ IDEA, WHAT WORK HAD HE

25   DONE, TO YOUR KNOWLEDGE, TO CREATE THE BRATZ DOLL, AS OF THE       02:06

```
 1    TIME HE FIRST SAID THAT?

 2              THE COURT:  WHO'S THE "HE"?  MR. LARIAN?

 3         MR. QUINN:  MR. LARIAN, YES.

 4         MR. NOLAN:  AGAIN, FOUNDATION.

 5         THE COURT:  HE'S ASKING TO HER KNOWLEDGE.              02:06

 6         IT'S OVERRULED.

 7         THE WITNESS:  EVERY PROJECT WAS RUN BY ISAAC FOR

 8    COMMENTS, POSITIVE or NEGATIVE; SO I'M SURE EVERY PART OF THE

 9    SCULPT, THE CONCEPT, THE WHOLE -- ALL OF THE DIRECTION, WAS

10    BACKED BY SOMETHING ISAAC HAd SAID, POSITIVE OR NEGATIVE.     02:06

11    BY MR. QUINN:

12    Q    SO HE WOULD SIGN OFF ON EVERYTHING?

13    A    YES.

14    Q    AND IN THAT RESPECT, WAS THE BRATZ DOLL ANY DIFFERENT THAN

15    ANY OTHER MGA PROJECT?                                       02:06

16    A    NO.

17              MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

18              THE COURT:  LIMIT IT TO HER, COUNSEL.

19    BY MR. QUINN:

20    Q    JUST LIMITING IT TO TOYS OR PROJECTS THAT YOU WORKED ON,  02:07

21    MS. HARRIS, WAS HIS INVOLVEMENT IN THAT RESPECT, SIGNING OFF ON

22    EVERYTHING, WAS IT ANY DIFFERENT WITH RESPECT TO BRATZ AS TO

23    OTHER PROJECTS THAT YOU WORKED ON WITH HIM?

24    A    NO.

25    Q    YOU INDICATED THAT WHEN YOU FIRST STARTED AND           02:07
```

```
 1   MS. TREANTAFELLES TOLD YOU ABOUT THIS MEETING YOU WERE GOING TO

 2   HAVE WITH CARTER BRYANT, SHE TOLD YOU, 'THIS IS THE CREATOR OF

 3   OUR NEW DOLL LINE.'

 4          IS THAT WHAT SHE SAID?

 5          MR. NOLAN:  OBJECTION, YOUR HONOR.  LEADING.          02:07

 6          THE COURT:  SUSTAINED.

 7   BY MR. QUINN:

 8   Q    WHAT DID SHE SAY WHEN SHE TOLD YOU that YOU WERE GOING TO

 9   BE MEETING WITH MR. BRYANT and HIS RELATIONSHIP TO THIS NEW

10   PRODUCT?                                                    02:07

11   A    SHE MENTIONED THAT CARTER WAS THE PERSON WHO CREATED

12   BRATZ.

13   Q    DID SHE REFER TO 'DOLL LINES' SPECIFICALLY?  DO YOU

14   RECALL?

15   A    SHE SAID 'DOLL LINE,' 'FASHION DOLL LINE.'             02:07

16   Q    YOU WERE ASKED QUESTIONS ABOUT ATTORNEYS THAT YOU MET WITH

17   IN THE PAST RELATING TO THIS MATTER, AND YOU INDICATED THAT YOU

18   MET WITH MS. THOMAS, AND I THINK YOU SAID SOMEBODY ELSE.

19   A    YES.

20   Q    DID YOU ALSO MEET WITH ATTORNEYS FOR MGA?              02:08

21   A    YES.

22   Q    AND DO YOU RECALL THE NAMES OF THOSE ATTORNEYS FOR MGA

23   THAT WANTED TO COME TALK TO YOU?

24   A    I DON'T RECALL THEIR NAMES AT THIS TIME.  I KNOW I HAVE

25   THEM, BUT I DON'T REMEMBER THEIR NAMES.                     02:08
```

1   Q    DID YOU ALSO SPEAK WITH AN INDIVIDUAL NAMED FARHAD LARIAN?

2   DID HE CALL YOU?

3   A    YES.

4   Q    AND YOU WERE ASKED SOME QUESTIONS ABOUT JOB APPLICATIONS

5   AT MATTEL.                                                          02:08

6        HAVE YOU APPLIED MORE THAN ONCE FOR A JOB AT MATTEL?

7   A    YES.  THROUGHOUT THE YEARS.

8   Q    SINCE YOU LEFT MGA, HAVE YOU APPLIED FOR A JOB AT MATTEL?

9   A    YES.

10  Q    AND I TAKE IT YOU HAVEN'T GOTTEN ONE YET.                      02:09

11  A    NO.

12  Q    BEAR A GRUDGE?

13  A    NO, NOT AT ALL.

14  Q    THE FACT THAT YOU'VE APPLIED FOR JOBS AT MATTEL IN THE

15  PAST AND HAVEN'T GOTTEN ONE, HAS THAT SOMEHOW AFFECTED YOUR         02:09

16  TESTIMONY HERE?

17  A    NO, NOT AT ALL.

18  Q    YOU WERE ASKED SOME QUESTIONS BY MR. NOLAN ABOUT WHAT YOU

19  KNEW OR DIDN'T KNOW OR COULDN'T HAVE KNOWN ABOUT PRIOR

20  DISCUSSIONS THAT MR. BRYANT HAD IN PITCH MEETINGS AND THINGS        02:09

21  LIKE THAT.

22        DO YOU RECALL THOSE QUESTIONS THAT HE ASKED YOU?

23  A    YES.

24  Q    DO YOU KNOW WHAT MR. BRYANT WAS DOING WITH MGA, IF

25  ANYTHING, IN SEPTEMBER?                                             02:09

```
 1   A     NO.

 2   Q     OR AUGUST?

 3   A     NO.

 4   Q     OR JUNE?

 5   A     NO.                                              02:09

 6   Q     OR OCTOBER, BEFORE THE 11TH?

 7   A     NO.

 8         MR. QUINN:  I'D LIKE TO READ FROM THE WITNESS'S

 9   DEPOSITION AT PAGE 31, LINES 12 TO 14.

10         MR. NOLAN:  NO OBJECTION.                        02:10

11   BY MR. QUINN:

12   Q    YOU WERE ASKED SOME QUESTIONS ABOUT WHETHER THE MEETING

13   WAS SEVEN DAYS TO TEN DAYS OR WITHIN THE FIRST SEVEN DAYS OR

14   WITHIN THE FIRST TEN DAYS.

15         DO YOU RECALL MR. NOLAN ASKING YOU THOSE QUESTIONS?  02:10

16   A    YES.

17   Q    I'D LIKE TO READ FROM YOUR DEPOSITION NOW, PAGE 31, LINES

18   12 TO 14.

19         QUESTION:  "SO WHAT'S YOUR EARLIEST MEMORY OF CARTER

20   BRYANT?"                                               02:11

21         ANSWER:  "PROBABLY MY FIRST WEEK AT MGA."

22         MR. QUINN:  COULD WE PUT ON THE SCREEN EXHIBIT 1105

23   IN EVIDENCE.  LET'S LOOK AT THE SECOND PAGE FIRST.

24   BY MR. QUINN:

25   Q    CAN YOU IDENTIFY THIS, ON THE SECOND PAGE OF THIS EXHIBIT  02:11
```

1    HERE.

2    A    THAT'S A BRATZ SCULPT.

3    Q    AND IF YOU WOULD LOOK AT THE FIRST PAGE, THIS IS AN

4    E-MAIL, IT'S IN EVIDENCE, DATED OCTOBER 16, 2000.

5         DO YOU RECALL SEEING THIS E-MAIL AT THE TIME,                    02:12

6    TRANSMITTING THAT BRATZ SCULPT?

7    A    I DID SEE THIS E-MAIL LATER.  I BELIEVE IT WAS FORWARDED

8    TO ME TO SEE THE SCULPTS.

9    Q    DO YOU HAVE A RECOLLECTION THAT THE BRATZ SCULPT DID EXIST

10   IN OCTOBER, MID OCTOBER, OF 2000?                                      02:12

11   A    BASED ON THIS E-MAIL, YES.

12   Q    DOES THAT REFRESH YOUR RECOLLECTION?

13   A    YES.

14   Q    COULD WE LOOK AT EXHIBIT 1236 IN EVIDENCE.

15        LOOK AT WHERE IT SAYS "CECILIA" THERE.  THIS IS AN               02:13

16   E-MAIL DATED OCTOBER 24, 2000?

17        DO YOU SEE THIS E-MAIL?

18   A    YES.

19   Q    DO YOU KNOW WHO CECILIA IS?

20   A    YES.                                                              02:13

21   Q    WHO IS CECILIA?

22   A    SHE WAS IN HONG KONG.  SHE WAS A COUNTERPART TO PAULA.

23   Q    AND DID SHE HAVE SOME INVOLVEMENT WITH FASHION DESIGNS?

24   A    SHE DIDN'T DESIGN ANYTHING, NO; BUT SHE WOULD HAVE SOURCED

25   FABRIC FOR PAULA.                                                     02:13

```
 1   Q    YOU SEE HERE IT SAYS, "WE HAVE FINALIZED THE FASHION

 2   DESIGNS, AND I'M RELEASING THE FOLLOWING FINAL FASHION DESIGNS

 3   TO YOU ON OUR FRIDAY."

 4          AND I BELIEVE THIS IS FROM PAULA TREANTAFELLES.

 5          MR. NOLAN:  YOUR HONOR, IS THERE ANY FOUNDATION THAT     02:14

 6   SHE EVEN SAW THIS E-MAIL?

 7          THE COURT:  SUSTAINED.

 8   BY MR. QUINN:

 9   Q    DO YOU RECALL SEEING THIS E-MAIL AT THE TIME?

10   A    IT'S VERY POSSIBLE.  I'M NOT ON IT AS BEING SENT TO,        02:14

11   BUT...

12   Q    DOES SEEING THIS REFRESH YOUR RECOLLECTION CONCERNING THE

13   TIMING OF WHEN THE FASHIONS WERE FINALIZED?

14   A    YES.

15   Q    WHAT DO YOU RECALL NOW?                                     02:14

16   A    WELL, THE WORD "FINAL" GETS USED SO MANY TIMES.  IT'S

17   FINAL ONE MONTH.  IT'S ALSO FINAL THE NEXT MONTH.  IT JUST

18   DEPENDS ON WHAT VERSION, YOU KNOW.

19   Q    FINAL ISN'T ALWAYS FINAL?

20   A    EXACTLY.                                                    02:14

21   Q    SOMEBODY THOUGHT THEY HAD FINAL FASHIONS, THOUGH.

22   A    EXACTLY.  AT THAT POINT, THOSE WERE HER FINAL DESIGNS.  IT

23   DIDN'T MEAN THAT'S WHAT WAS GOING TO BE SET IN STONE.

24   Q    YOU'RE NOT SAYING THERE WERE NO CHANGES AFTER THAT.

25   A    CORRECT.                                                    02:15
```

1          "FINAL DESIGNS" MEANT PAULA WAS OKAY WITH WHATEVER

2    WAS DESIGNED; SO FROM THERE, IT MOVES ON.

3    Q    SO WOULD YOUR UNDERSTANDING BE THAT, AS OF THIS DATE,

4    PAULA WAS OKAY WITH WHATEVER DESIGNS THEY had COME UP WITH?

5    WOULD THAT BE YOUR UNDERSTANDING?                              02:15

6          **MR. NOLAN:**  OBJECTION, YOUR HONOR.  LACK OF

7    FOUNDATION AS TO PAULA TREANTAFELLES'S STATE OF MIND.  THERE'S

8    NO FOUNDATION.

9          **THE COURT:**  LAY A FOUNDATION.

10   **BY MR. QUINN:**                                              02:15

11   Q    YOU WORKED WITH PAULA TREANTAFELLES ON THIS PROJECT?

12   A    YES.

13   Q    AND DID SHE SOMETIMES GIVE YOU DIRECTION?

14   A    YES.

15   Q    IT WAS IMPORTANT FOR YOU TO BE ABLE TO INTERPRET AND      02:15

16   UNDERSTAND WHAT SHE WAS SAYING TO YOU.

17   A    YES.

18   Q    BASED ON THIS, WAS IT YOUR UNDERSTANDING, AT LEAST AS OF

19   THAT TIME, MS. TREANTAFELLES WAS SATISFIED WITH THE FASHIONS AS

20   THEY EXISTED THEN?                                             02:16

21         **MR. NOLAN:**  OBJECTION.  LACK OF FOUNDATION.  THERE'S

22   NO BASIS THAT SHE HAD A CONVERSATION AT THIS TIME ABOUT THIS

23   E-MAIL.

24         **THE COURT:**  YOU NEED TO LAY A FURTHER FOUNDATION,

25   COUNSEL.                                                       02:16

**BY MR. QUINN:**

Q    HAVING LOOKED AT THIS NOW, DO YOU HAVE ANY RECOLLECTION ONE WAY OR ANOTHER AS TO WHETHER YOU SAW THIS E-MAIL -- YOUR NAME ISN'T ON IT, BUT DO YOU HAVE ANY RECOLLECTION ONE WAY OR ANOTHER AS TO WHETHER YOU SAW IT AT THE TIME?

A    NO, NOT AT THAT TIME.

          **MR. QUINN:**  NOTHING FURTHER.

          **MR. NOLAN:**  VERY BRIEFLY.

                    **FURTHER CROSS-EXAMINATION**

**BY MR. NOLAN:**

Q    I WANT TO PUT BACK UP THE E-MAIL OF THE SCULPT.  I THINK IT'S 1105.  IT SAYS OCTOBER 16, 2000.

          DO YOU SEE THAT?

A    YES.

Q    MR. QUINN ASKED YOU, 'DOES THIS REFRESH YOUR RECOLLECTION?'

          DO YOU REMEMBER THAT?

A    THIS EXACT E-MAIL?

Q    YES.

A    I BELIEVE I WAS FORWARDED THIS E-MAIL MUCH LATER.

Q    WELL, WAS YOUR NAME COPIED ON THIS?

A    NO.

Q    YOU TESTIFIED, WHEN I WAS ASKING YOU QUESTIONS, THAT WHEN YOU FIRST CAME TO MGA, YOU DID NOT SEE A SCULPT.

A    CORRECT.

1  Q    AND I GUESS WHAT I'M WONDERING IS, HOW COULD AN E-MAIL

2  THAT YOU WERE NOT COPIED ON REFRESH YOUR RECOLLECTION THAT YOU

3  DID SEE A SCULPT?

4  A    WHEN YOU ASKED ME THE QUESTION, I HAD NOT SEEN A PHYSICAL

5  SCULPT.  I'VE SEEN THIS E-MAIL WITH THE PICTURE OF THE SCULPT.    02:18

6  THIS WAS NOT A SCULPT THAT WAS IN OUR OFFICE.  THIS WAS NOTHING

7  MORE THAN AN E-MAIL OF A PICTURE THAT HONG KONG TOOK OF THE

8  SCULPT.

9  Q    OKAY.

10       LET'S GO TO THE PICTURE.  I WANT TO FOCUS ON YOUR         02:18

11  PHRASE "THE SCULPT."

12       MS. HARRIS, IS IT YOUR TESTIMONY, BEFORE THE JURY,

13  THAT THE PICTURE OF THAT SCULPT IS THE FINAL BRATZ SCULPT THAT

14  WENT INTO MANUFACTURING?

15  A    I DOUBT IT.  BUT THERE'S NO WAY TO TELL FROM JUST LOOKING  02:18

16  AT IT HERE.

17  Q    WELL, DO YOU RECALL THAT YOU ATTENDED A MEETING ON OR

18  ABOUT OCTOBER 25, 2000, WITH MERCEDEH WARD BEING PRESENT, WHERE

19  A SCULPT WAS BEING LOOKED AT?

20  A    I WAS SHOWN A SCULPT ONCE IT ARRIVED IN OUR OFFICE.  IT    02:19

21  WAS BEYOND CLAY FORM.  IT WAS NOT IN THE BLACK MATERIAL EITHER.

22  Q    BY THE WAY, THIS PICTURE WE HAVE UP HERE, THAT'S IN CLAY,

23  ISN'T IT?

24  A    I CAN'T TELL FROM THIS.

25  Q    YOU CAN'T TELL FROM THAT; RIGHT?                           02:19

```
1    A    NO.

2    Q    CAN YOU TELL IF IT'S RESIN?

3    A    IT MIGHT BE RESIN.  IT'S HARD TO TELL.

4         OH, IT SAYS "CLAY."  THERE YOU GO.

5    Q    DO YOU SEE THAT?                                    02:19

6    A    UH-HUH.

7    Q    SO DOES THAT MAKE YOU BELIEVE THAT IT WAS A CLAY SCULPT?

8    A    IT COULD HAVE BEEN.  LIKE I SAID, THIS WAS A PICTURE.  THE

9    FIRST PHYSICAL SAMPLE I SAW WAS NOT IN CLAY.

10   Q    DO YOU UNDERSTAND THAT HONG KONG MANUFACTURES DOLLS BASED    02:20

11   ON CLAY SCULPTS?

12   A    YES.

13   Q    AND DO YOU KNOW IF THAT'S WHAT WAS DONE WITH THE BRATZ

14   PROJECT?

15   A    MOST LIKELY, YES.                                   02:20

16   Q    WELL, DO YOU KNOW THAT FOR SURE?

17   A    I WASN'T INVOLVED IN SCULPTING.

18   Q    NOW, WHEN YOU FIRST CAME TO MGA IN THE FIRST WEEK OF YOUR

19   EMPLOYMENT, ISN'T IT TRUE THAT YOU ONLY SAW ROUGH ILLUSTRATIONS

20   OF BRATZ DRAWINGS?                                       02:20

21   A    YES.

22   Q    AND ISN'T IT TRUE THAT THEY WERE COLOR ILLUSTRATIONS?

23   A    YES.

24   Q    AND ISN'T IT TRUE THAT THOSE COLOR IMAGES WERE STILL VERY

25   ROUGH?                                                   02:21
```

```
 1   A     YES.

 2   Q     IN FACT, ISN'T IT TRUE THAT THE FACIAL FEATURES WEREN'T

 3   DEFINED AT ALL LIKE THEY WERE FURTHER ON?

 4   A     YES.

 5         MR. QUINN:  BEYOND THE SCOPE.                              02:21

 6         THE COURT:  OVERRULED.

 7         YOU MAY ANSWER.

 8         THE WITNESS:  YES.

 9   BY MR. NOLAN:

10   Q     SO WITHIN A WEEK OF YOU STARTING AT MGA, THE FACIAL       02:21

11   FEATURES ON THE ROUGH COLOR ILLUSTRATIONS WEREN'T DEFINED AT

12   ALL LIKE THEY WERE FURTHER ON WITH THE BRATZ DOLLS?

13   A     CORRECT.

14         MR. NOLAN:  NOTHING FURTHER.  THANK YOU.

15         MR. QUINN:  NOTHING FURTHER, YOUR HONOR.                  02:21

16         THE COURT:  VERY WELL.

17         YOU'RE EXCUSED, MA'AM.

18         LET'S TAKE A BRIEF RECESS.

19         (Conclusion of morning session.)

20

21

22

23

24   /  /  /

25   /  /  /
```

1

2

3                              CERTIFICATE

4

5    I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
6    the stenographically recorded proceedings held in the
     above-entitled matter and that the transcript page format is in
7    conformance with the regulations of the judicial conference of
     the united states.

8

9

    _____          _____
10   THERESA A. LANZA, RPR, CSR                      Date
     Official COURT Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25