# EXHIBIT 19

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
  Duane R. Lyons (Bar No. 125091)
  (duanelyons@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CARTER BRYANT, an individual,

                              Plaintiff,

          v.

MATTEL, INC., a Delaware
corporation,

                              Defendant.

_____

MGA ENTERTAINMENT, INC. a
California corporation,

                              Plaintiff,

          v.

MATTEL, INC., a Delaware
corporation, and DOES 1-10,

                              Defendants.

CASE NO. CV 04-9049 SGL (RNBx)

Consolidated With Case No. 04-9059 and
Case No. 05-2727

MATTEL, INC.'S SECOND AMENDED
ANSWER IN CASE NO. 05-2727 AND
COUNTERCLAIMS FOR:

1.   COPYRIGHT INFRINGEMENT;
2.   VIOLATION OF THE
     RACKETEER INFLUENCED AND
     CORRUPT ORGANIZATIONS
     ACT;
3.   CONSPIRACY TO VIOLATE THE
     RACKETEER INFLUENCED AND
     CORRUPT ORGANIZATIONS
     ACT;
4.   MISAPPROPRIATION OF TRADE
     SECRETS;
5.   BREACH OF CONTRACT;
6.   INTENTIONAL INTERFERENCE
     WITH CONTRACT;
7.   BREACH OF FIDUCIARY DUTY;
8.   AIDING AND ABETTING
     BREACH OF FIDUCIARY DUTY;
9.   BREACH OF DUTY OF
     LOYALTY;

**CONFIDENTIAL FILED UNDER
SEAL, PURSUANT TO
PROTECTIVE ORDER**

Volume I

CLERK, U.S. DISTRICT COURT

JUL 1 2 2007

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION     BY DEPUTY

Exhibit 19
Page 172

7·12·07

209/2154363.3

SECOND AMENDED ANSWER AND COUNTERCLAIMS

MATTEL, INC., a Delaware corporation,

                    Counter-claimant,

    v.

MGA ENTERTAINMENT, INC., a California corporation; ISAAC LARIAN, an individual; CARTER BRYANT, an individual; MGA ENTERTAINMENT (HK) LIMITED, a Hong Kong Special Administrative Region business entity; MGAE DE MEXICO, S.R.L. DE C.V., a Mexico business entity; CARLOS GUSTAVO MACHADO GOMEZ, an individual; and DOES 4 through 10,

                    Counter-defendants.

AND CONSOLIDATED CASES

10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION; AND
13. DECLARATORY RELIEF.

DEMAND FOR JURY TRIAL

Exhibit 19
Page 173

:09/2154363.3

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## SECOND AMENDED ANSWER

Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007, Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment, Inc. ("Complaint") as follows:

### Preliminary Statement

The Complaint in this case contravenes Rule 8(a) of the Federal Rules of Civil Procedure in multiple respects. For example, in many places, the Complaint improperly mixes factual averments with argumentative rhetoric. The Complaint also includes a selective recitation of alleged historical facts and "rumor," much of which is both irrelevant and inflammatory in tone and content. In addition, many of the allegations of the Complaint are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings. Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the Complaint as a whole. These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Second Amended Answer.

Mattel further submits that the use of the headings throughout the Complaint is improper, and therefore no response to them is required. In the event that a response is required, Mattel denies those allegations.

The Complaint also contains many purported photographs of various items, and it uses one or more headings purporting to describe, either individually or in groups, these various photographs. The images of these photographs contained in the Complaint are all relatively small and some are of less than optimal quality, making it difficult to evaluate the adequacy of the photographs or their fairness and accuracy in depicting what they purport to represent. The Complaint also does not describe the circumstances or time frame in which these photographs were taken.

2154363.2

-3-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

Exhibit 19
Page 174

1 and in many cases does not identify, or does not sufficiently or properly identify, the
2 item depicted in the photographs. All of these factors, as well as the use of these
3 photographs and headings out of context, or with an insufficient context, impair the
4 ability of Mattel to fully respond to these photographs and headings, or to any
5 purported allegations involving, or relying upon, the use of such photographs and
6 accompanying headings. By way of a general response, Mattel therefore does not
7 admit the authenticity of any photograph, or the accuracy or adequacy of any
8 heading, nor does it admit any allegation or inference that is based on, or purports to
9 be based on, any photograph or accompanying heading in the Complaint. Mattel
10 reserves the right to challenge the authenticity of any photograph and the accuracy
11 or adequacy of any heading (either as included in the Complaint or in the context of
12 additional material not included). Further, with reference to all photographs and
13 accompanying headings, or any averments based on the Complaint's use of such
14 photographs and headings, which might be offered into evidence, Mattel specifically
15 reserves its right to object to any use of such photographs, headings, and averments,
16 or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

17       To the extent that Mattel has endeavored to answer any particular
18 allegation containing any such photographs and headings, any admission concerning
19 the item purported to be depicted in such photograph, or described in such headings,
20 shall not constitute an admission that the photograph is authentic, adequate, or
21 admissible, nor that any heading is accurate, adequate, or admissible. All such items
22 purportedly depicted in such photographs, and described in such headings, "speak
23 for themselves". Accordingly, to the extent that any such referenced materials are
24 deemed allegations against Mattel, they are denied.

25 Responses

26     1.    Answering paragraph 1 of the Complaint, Mattel admits that
27 plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California
28 corporation with a principal place of business in Van Nuys, California.

Exhibit 19
Page 175

-4-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    2.    Answering paragraph 2 of the Complaint, Mattel admits that

2  Mattel is a Delaware corporation with a principal place of business in El Segundo,

3  California.

4    3.    Answering paragraph 3 of the Complaint, Mattel denies that

5  there has been wrongful conduct on its part and states that it is without knowledge

6  or information sufficient to form a belief as to the truth or falsity of the remaining

7  allegations set forth therein and, on that basis, denies them.

8    4.    Answering paragraph 4 of the Complaint, Mattel admits that

9  plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and

10  (c), California Business and Professions Code §§ 17200 *et seq.*, California Business

11  and Professions Code § 14330 and California common law, denies that plaintiff is

12  entitled to any relief thereunder and denies the truth of the remaining allegations set

13  forth in paragraph 4.

14    5.    Answering paragraph 5 of the Complaint, Mattel admits that it is

15  subject to personal jurisdiction in this District and denies the truth of the remaining

16  allegations set forth in paragraph 5.

17    6.    Answering paragraph 6 of the Complaint, Mattel admits that

18  venue is proper in this District and denies the truth of the remaining allegations set

19  forth in paragraph 6.

20    7.    Answering paragraph 7 of the Complaint, Mattel admits that

21  MGA has filed the instant lawsuit and denies the truth of the remaining allegations

22  set forth in paragraph 7.

23    8.    Answering paragraph 8 of the Complaint, Mattel states that it is

24  without knowledge or information sufficient to form a belief as to the truth or falsity

25  of the allegations regarding MGA's history set forth therein and, on that basis,

26  denies them, states that MGA has made conflicting representations, including in

27  sworn statements, that are at odds with the allegations of the Complaint and denies

28  the truth of the remaining allegations set forth in paragraph 8.

1    9.    Answering paragraph 9 of the Complaint, Mattel admits that
2  MGA filed this action, states that Mattel's web site and corporate governance
3  policies speak for themselves and denies the truth of the remaining allegations set
4  forth in paragraph 9.

5    10.    Answering paragraph 10 of the Complaint, Mattel admits that it
6  is the world's most successful toy company, states that the first doll in its BARBIE
7  line was publicly introduced in 1959 and that BARBIE-branded dolls have been the
8  world's best-selling toys, states that Mattel's sales and stock price speak for
9  themselves, and denies the truth of the remaining allegations set forth in paragraph
10  10.

11    11.    Answering paragraph 11 of the Complaint, Mattel admits that
12  Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is
13  without knowledge or information sufficient to form a belief as to the truth or falsity
14  of the allegations regarding an alleged statement by Ms. Fontanella, and denies the
15  truth of the remaining allegations set forth in paragraph 11.

16    12.    Answering paragraph 12 of the Complaint, Mattel is without
17  knowledge or information sufficient to form a belief as to the truth or falsity of the
18  allegations regarding alleged statements by unidentified "analysts," states that
19  Mattel's sales and stock price speak for themselves, and denies the truth of the
20  remaining allegations set forth in paragraph 12.

21    13.    Answering paragraph 13 of the Complaint, Mattel admits that Jill
22  Barad became President and Chief Executive Officer of Mattel in January 1997, that
23  Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired
24  Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999,
25  that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned
26  by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company
27  at the time of that entity's acquisition, and denies the truth of the remaining
28  allegations set forth in paragraph 13.

1363.2

Exhibit 19
Page 177

ID AMENDED ANSWER AND COUNTERCLAIMS

1         14.    Answering paragraph 14 of the Complaint, Mattel states that its

2   public announcements speak for themselves, and denies the truth of the remaining

3   allegations set forth therein.

4         15.    Answering paragraph 15 of the Complaint, Mattel states that its

5   stock price and its public announcements speak for themselves, and denies the truth

6   of the remaining allegations set forth therein.

7         16.    Answering paragraph 16 of the Complaint, Mattel states that its

8   stock price speaks for itself, states that it is without knowledge or information

9   sufficient to form a belief as to the truth or falsity of the allegations regarding the

10  alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the

11  remaining allegations set forth therein.

12        17.    Answering paragraph 17 of the Complaint, Mattel admits that

13  Ms. Barad resigned in February 2000.

14        18.    Answering paragraph 18 of the Complaint, Mattel admits that

15  Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000

16  and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is

17  without knowledge or information sufficient to form a belief as to the truth or falsity

18  of the allegations regarding the views of unnamed "[i]nvestors" and others, and

19  denies the truth of the remaining allegations set forth in paragraph 18.

20        19.    Answering paragraph 19 of the Complaint, Mattel admits that the

21  *Wall Street Journal* published an article on August 10, 2000 the content of which

22  speaks for itself, and denies the truth of the remaining allegations set forth therein.

23        20.    Answering paragraph 20 of the Complaint, Mattel admits that it

24  disposed of the Learning Company in October 2000, states that its sales and

25  revenues speak for themselves, states that the remainder of the allegations contained

26  therein are characterizations, not factual assertions, and therefore no response is

27  necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is

28  required, denies the truth of any remaining allegations set forth in paragraph 20.

21.     Answering paragraph 21 of the Complaint, Mattel admits that products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and other product lines and states that the remainder of the allegation contained therein—consisting of a sentence fragment—is unintelligible and on that basis denies the truth of any such remaining allegation set forth therein.

22.     Answering paragraph 22 of the Complaint, Mattel admits that products in plaintiff's "Bratz" line compete with Mattel products, states that the remainder of the allegations contained therein are characterizations, not factual assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies the truth of any remaining allegations set forth therein.

23.     Answering paragraph 23 of the Complaint, Mattel states that MGA has made conflicting statements, including in sworn statements, that are inconsistent with the allegations set forth in paragraph 23 of the Complaint and states that it is therefore without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

24.     Answering paragraph 24 of the Complaint, Mattel states that the "look" of the referenced dolls speak for themselves and denies the truth of the remaining allegations set forth therein.  By way of further answer, Mattel states that the photographs and their accompanying caption on page 7 of the Complaint are false and misleading to the extent they are intended to suggest that MGA has produced or used a consistent packaging shape or look or that it has protectible rights in the matters depicted in the photographs.

25.     Answering paragraph 25 of the Complaint, Mattel admits that Bratz dolls are between approximately 9.5 to 10 inches in height, states that the appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

Exhibit 19
Page 179

1 dolls "looked like no other" and denies the truth of the remaining allegations set
2 forth in paragraph 25.

3       26.   Answering paragraph 26 of the Complaint, Mattel states that the
4 use of the term "classic" is unintelligible, since Mattel has designed and sold
5 different dolls using different heads and with different fashions and themes over the
6 years, and denies the truth of any remaining allegations. By way of further answer,
7 Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the
8 Complaint is misleading in that it depicts one of the doll heads that have been used
9 as part of the BARBIE line for many years, and therefore ignores that Mattel has
10 long designed and sold an array of different BARBIE line dolls that use different
11 doll heads, including doll heads which depict different ethnicities, and that are
12 dressed in different clothing and fashion styles.

13       27.   Answering paragraph 27 of the Complaint, Mattel admits that
14 MGA has used the line "The Girls With a Passion for Fashion" in some contexts,
15 denies that MGA originated or otherwise has rights to that phrase, admits that one
16 audience for products in the "Bratz" line has been "tweens" and denies the truth of
17 the remaining allegations set forth in paragraph 27.

18       28.   Answering paragraph 28 of the Complaint, Mattel admits that
19 certain "Bratz" dolls have won certain awards, the terms of which speak for
20 themselves, states that it is without knowledge or information sufficient to form a
21 belief as to the truth or falsity of the allegations regarding the "awards" MGA claims
22 and, on that basis, denies them, denies that plaintiff has protectible rights and denies
23 the truth of any remaining allegations set forth in paragraph 28.

24       29.   Answering paragraph 29 of the Complaint, Mattel admits that
25 dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that
26 Mattel has or has ever had a "stranglehold" on any market, states that the market
27 allegations contained in paragraph 29 are vague and ambiguous, including without
28 limitation in that the allegations fail to specify what products among the parties'

Exhibit 19
Page 180
-9-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1 | respective lines are being referred to and what time period is being referred to, and

2 | denies the truth of any remaining allegations set forth in paragraph 29.

3 |      30.    Answering paragraph 30 of the Complaint, Mattel admits that

4 | MGA has been a licensee of Mattel, states that the market allegations are vague and

5 | ambiguous, including without limitation in that the allegations fail to specify what

6 | products are being referred to and what time periods or points in time are being

7 | referred to, and states that the remainder of the allegations contained therein are

8 | characterizations, not factual assertions, and therefore no response is necessary

9 | under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies

10 | the truth of any remaining allegations set forth in paragraph 30.

11 |      31.    Answering paragraph 31 of the Complaint, Mattel states that the

12 | allegations contained therein are characterizations, not factual assertions, and

13 | therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any

14 | further response is required, denies the truth of the allegations set forth in paragraph

15 | 31.

16 |      32.    Answering paragraph 32 of the Complaint, Mattel denies the

17 | truth of the allegations set forth therein.

18 |      33.    Answering paragraph 33 of the Complaint, Mattel denies the

19 | truth of the allegations set forth therein.

20 |      34.    Answering paragraph 34 of the Complaint, Mattel states that it

21 | has released various MY SCENE dolls, including MY SCENE dolls named

22 | "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY

23 | SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE

24 | dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff

25 | has protectible rights, states that MGA has made conflicting representations that are

26 | at odds with the allegations of the Complaint and that it is therefore without

27 | knowledge or information sufficient to form a belief as to the truth or falsity of the

28 | allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

1 │ denies them, and denies the truth of the remaining allegations set forth therein. By

2 │ way of further answer, Mattel states that the photographs and their accompanying

3 │ captions on page 10 of the Complaint are misleading and false to the extent they are

4 │ intended to suggest that a particular Mattel doll has been changed over time as

5 │ purportedly depicted. Among other things, Mattel has long designed and sold an

6 │ array of different BARBIE line dolls using different doll heads, and the photographs

7 │ encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been

8 │ used, and continues to be used, as part of the BARBIE line. In addition, the

9 │ photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll

10 │ character called BARBIE that continues to be sold and/or marketed with that head,

11 │ and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY

12 │ SCENE doll character separate and apart from the one depicted in the "circa 2002"

13 │ image (and is not a revised character as plaintiff apparently attempts to imply).

14 │         35.    Answering paragraph 35 of the Complaint, Mattel admits that

15 │ Mattel released a product line called FLAVAS, states that the appearance of the

16 │ FLAVAS dolls speaks for themselves, states that it is without knowledge or

17 │ information sufficient to form a belief as to the truth or falsity of the allegations

18 │ regarding the  "rumor" relied upon by plaintiff and the undefined "media"

19 │ purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel

20 │ has abandoned the FLAVAS line, and denies the truth of the remaining allegations

21 │ set forth in paragraph 35.

22 │         36.    Answering paragraph 36 of the Complaint, Mattel denies the

23 │ truth of the allegations set forth therein.

24 │         37.    Answering paragraph 37 of the Complaint, Mattel denies the

25 │ truth of the allegations set forth therein. By way of further answer, Mattel states that

26 │ the unnumbered photographs and their accompanying captions on pages 11 through

27 │ 16 of the Complaint -- which apparently were included to purportedly support the

28 │ allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

-11-
SECOND A.

Exhibit 19
Page 182

INTERCLAIMS

1 | specifically denies -- are false and misleading. Among other things, the heads
2 | depicted are among an array of different doll heads that Mattel has used, and
3 | continues to use, over the course of many years. Moreover, the images purport to
4 | compare different Mattel doll lines to show alleged changes in appearance even
5 | though, in fact, each of the heads are currently sold and/or marketed to the public.
6 | The "Blonde" series of photographs encaptioned "original" and "recent" MY
7 | SCENE is further and specifically misleading in that it purports to compare two
8 | differently named and outfitted dolls in the MY SCENE doll line, both of which
9 | continue to be sold and/or marketed.

10 |     38.    Answering paragraph 38 of the Complaint, Mattel states that the
11 | phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
12 | denies that MGA was the originator of or the first to use the eye shape or makeup
13 | depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has
14 | copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations
15 | contained in paragraph 38. By way of further answer, Mattel states that the
16 | unnumbered photographs and accompanying caption on page 13 of the Complaint
17 | are false and misleading. Among other things, the purported "Original Mattel 'My
18 | Scene' Eye" is one of the eye and makeup designs that Mattel has used over the
19 | course of many years, and Mattel continues to sell and/or market dolls using the eye
20 | and makeup design depicted therein.

21 |     39.    Answering paragraph 39 of the Complaint, Mattel states that the
22 | phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,
23 | denies that MGA was the originator of or the first to use the eye shape or makeup
24 | purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has
25 | copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and
26 | denies the truth of the remaining allegations contained in paragraph 39. By way of
27 | further answer, Mattel states that the unnumbered photographs and accompanying
28 | captions on page 14 of the Complaint are false and misleading. Among other things,

1  the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs

2  that Mattel has used over the course of many years, and Mattel continues to sell

3  and/or market dolls using the eye and makeup design depicted on page 14 of the

4  Complaint.

5          40.    Answering paragraph 40 of the Complaint, Mattel denies the

6  truth of the allegations therein. By way of further answer, Mattel states that the

7  unnumbered photographs and their accompanying captions on pages 15 to 16 are

8  false and misleading. Among other things, the heads depicted are among an array of

9  different doll heads that Mattel has used, and continues to use, over the course of

10  many years. Moreover, the photographs purport to compare different Mattel doll

11  lines to show alleged changes in appearance even though, in fact, each of the heads

12  are currently sold and/or marketed to the public. The "Blonde" series of

13  photographs encaptioned "original" and "recent" MY SCENE is further and

14  specifically misleading in that it purports to compare two differently named and

15  outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or

16  marketed.

17          41.    Answering paragraph 41 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19          42.    Answering paragraph 42 of the Complaint, Mattel admits that the

20  photographs purport to depict two packages that were, among others, part of the MY

21  SCENE line, state that the packages speak for themselves and denies the truth of any

22  remaining allegations set forth therein.

23          43.    Answering paragraph 43 of the Complaint, Mattel admits that the

24  photograph purports to depict one of the packages that were, among others, part of

25  the MY SCENE line, states that the parties' packages speak for themselves, states

26  that MGA has failed to establish that it originated, or has protectible rights in, an

27  "open and transparent style" for packaging and denies the truth of the remaining

28  allegations set forth therein.

44.     Answering paragraph 44 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

45.     Answering paragraph 45 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

46.     Answering paragraph 46 of the Complaint, Mattel states that it has utilized a wide variety of packaging styles and shapes over the years, states that the relevant packaging speaks for itself, states that MGA lacks protectible rights in "non-rectangular shaped box" packaging or in the other elements MGA claims in paragraph 46, and denies the truth of the remaining allegations set forth therein.

47.     Answering paragraph 47 of the Complaint, Mattel denies that any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to any theme and denies the truth of the remaining allegations set forth therein.

48.     Answering paragraph 48 of the Complaint, Mattel admits that it released a doll called "Chillin Out!", states that it has released such themed dolls over the course of many years, admits MGA released a "Wintertime Wonderland" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

Exhibit 19
Page 185

-14-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1    49.    Answering paragraph 49 of the Complaint, Mattel admits that it
2 released a doll called "Night on the Town", states that it has released such themed
3 dolls over the course of many years, admits MGA released a "Formal Funk" themed
4 doll, denies that MGA originated or has rights to such theme, states that the relevant
5 products speak for themselves and denies the truth of the remaining allegations set
6 forth therein.

7    50.    Answering paragraph 50 of the Complaint, Mattel admits that it
8 released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki
9 Lounge", states that it has released such themed dolls and products over the course
10 of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and
11 playset, denies that MGA originated or has rights to such theme, states that the
12 relevant products speak for themselves and denies the truth of the remaining
13 allegations set forth therein.

14    51.    Answering paragraph 51 of the Complaint, Mattel admits that it
15 has aired television commercials for its MY SCENE line, states that such
16 commercials speak for themselves, denies the truth of the remaining allegations set
17 forth therein and specifically denies that MGA was the originator of or has rights to
18 commercials "combining live action with animated sequences" set to "pop music
19 and lyrics".

20    52.    Answering paragraph 52 of the Complaint, Mattel denies the
21 truth of the allegations set forth therein.

22    53.    Answering paragraph 53 of the Complaint, Mattel admits that it
23 released a MY SCENE "Sound Lounge", admits that MGA released a product called
24 "Runway Disco", states that the relevant products speak for themselves, denies that
25 it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and
26 denies the truth of the remaining allegations set forth therein.

27    54.    Answering paragraph 54 of the Complaint, Mattel denies the
28 truth of the allegations set forth therein.

1         55.    Answering paragraph 55 of the Complaint, Mattel admits that,

2  among the styling heads it has produced and sold over the course of many years, it

3  released a MY SCENE styling head, admits that MGA released a styling head called

4  "Funky Fashion Makeover Head", states that the relevant products speak for

5  themselves, denies that MGA has protectible rights and denies the truth of the

6  remaining allegations set forth in paragraph 55.

7         56.    Answering paragraph 56 of the Complaint, Mattel is without

8  knowledge or information sufficient to form a belief as to the truth or falsity of the

9  allegations set forth therein because plaintiff fails to identify the alleged instances of

10  confusion, including the source of the unidentified picture titled "Hairstyle practice",

11  and on that basis, denies them, and denies the truth of any remaining allegations set

12  forth in paragraph 56.

13         57.    Answering paragraph 57 of the Complaint, Mattel admits that it

14  has aired television commercials for its MY SCENE line, states that such

15  commercials speak for themselves and denies the truth of the remaining allegations

16  set forth therein.

17         58.    Answering paragraph 58 of the Complaint, Mattel admits that

18  MGA has used the line "The Girls With a Passion for Fashion" in some contexts,

19  denies that MGA originated that phrase or otherwise has rights to it, states that

20  Mattel's web site speaks for itself and denies the truth of the remaining allegations

21  set forth therein.

22         59.    Answering paragraph 59 of the Complaint, Mattel admits that,

23  among the plush products that it has produced and sold over the course of many

24  years, it has released plush dogs as part of its MY SCENE "Miami Getaway"

25  themed product line, states that Mattel has for many years sold plush pets of the type

26  used with its MY SCENE dog, admits that MGA has released various Bratz pets,

27  states that MGA was not the originator of and has no rights to the features and other

28

Exhibit 19
Page 187

63.2

NSWER AND COUNTERCLAIMS

1  elements described therein, states that the relevant products speak for themselves

2  and denies the truth of the remaining allegations set forth therein.

3        60.   Answering paragraph 60 of the Complaint, Mattel admits that,

4  among the plush toys that it has released over the course of many years, its MY

5  SCENE dog has been sold in packaging depicted (in part) on page 22 of the

6  Complaint, states that Mattel has for many years sold plush pets and other plush

7  products in packaging of the type used with its MY SCENE dog, admits that MGA

8  has released a "Bratz" dog, states that MGA was not the originator of and has no

9  rights to the packaging described therein, states that the relevant packages speak for

10  themselves and denies the truth of the remaining allegations set forth therein.

11        61.   Answering paragraph 61 of the Complaint, Mattel denies that it

12  has intended to cause any consumer confusion and states that it is without

13  knowledge or information sufficient to form a belief as to the truth or falsity of the

14  allegations set forth therein concerning unnamed retailers, customers and others

15  because plaintiff fails to identify any source for the matters alleged and, on that

16  basis, denies them and denies the truth of any remaining allegations set forth therein.

17        62.   Answering paragraph 62 of the Complaint, Mattel denies that it

18  has intended to cause any confusion and states that it is without knowledge or

19  information sufficient to form a belief as to the truth or falsity of the allegations set

20  forth therein concerning alleged comments and conversations because plaintiff fails

21  to identify any source for the alleged comments and conversations and, on that

22  basis, denies them, and denies the truth of any remaining allegations set forth

23  therein.

24        63.   Answering paragraph 63 of the Complaint, Mattel denies that it

25  has intended to cause any confusion and states that it is without knowledge or

26  information sufficient to form a belief as to the truth or falsity of the allegations set

27  forth therein because plaintiff fails to identify any source for the alleged comments

28

**Exhibit 19**
**Page 188**

.CLAIMS

1 and conversations and, on that basis, denies them, and denies the truth of any
2 remaining allegations set forth therein.

3     64.   Answering paragraph 64 of the Complaint, Mattel denies that it
4 has intended to cause any confusion and states that it is without knowledge or
5 information sufficient to form a belief as to the truth or falsity of the allegations set
6 forth therein because plaintiff fails to identify any source for the alleged comments
7 and conversations and, on that basis, denies them, and denies the truth of any
8 remaining allegations set forth therein.

9     65.   Answering paragraph 65 of the Complaint, Mattel denies the
10 truth of the allegations set forth therein.

11     66.   Answering paragraph 66 of the Complaint, Mattel admits that it
12 sued a competitor in the German courts for unfair competition for copying various
13 Mattel BARBIE line products, states that such claims exclusively arose under and
14 were the subject of German law, states that since that time the Federal Supreme
15 Court has rejected the contention made by MGA in paragraph 66 that
16 "systematically copying and borrowing elements" from competing dolls supports a
17 claim for unfair competition, and denies the truth of the remaining allegations set
18 forth therein.

19     67.   Answering paragraph 67 of the Complaint, Mattel denies the
20 truth of the allegations set forth therein.

21     68.   Answering paragraph 68 of the Complaint, Mattel admits that it
22 has released dolls called "Wee 3 Friends," admits that MGA has released dolls
23 called "4-Ever Best Friends," states that the relevant products speak for themselves,
24 denies that MGA's packaging is distinctive, denies that MGA has protectible rights
25 thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26     69.   Answering paragraph 69 of the Complaint, Mattel admits that its
27 Fisher Price division has released, among other dolls called "Little Mommy," the
28 "Little Mommy Potty Training Baby Doll," admits that MGA has released a

1 "Mommy's Little Patient" doll and denies the truth of the remaining allegations set
2 forth therein.

3       70.   Answering paragraph 70 of the Complaint, Mattel admits that it
4 has released die-cast cars and other products called "Acceleracers" as part of its
5 HOT WHEELS line, admits that MGA has released products called "AlienRacers,"
6 denies that MGA was the originator of or has rights to the elements and matters
7 described in paragraph 70, states that the relevant products speak for themselves and
8 denies the truth of the remaining allegations set forth therein.

9       71.   Answering paragraph 71 of the Complaint, Mattel admits that it
10 has aired commercials relating to "Acceleracers," states that such commercials
11 speak for themselves, denies the truth of the remaining allegations set forth therein
12 and specifically denies that MGA originated or has rights to commercials and other
13 matters described therein.

14       72.   Answering paragraph 72 of the Complaint, Mattel states that its
15 web site speaks for itself, denies the truth of the remaining allegations contained in
16 paragraph 72 and specifically denies that Mattel intended to create confusion in the
17 marketplace.

18       73.   Answering paragraph 73 of the Complaint, Mattel denies the
19 truth of the allegations set forth therein.

20       74.   Answering paragraph 74 of the Complaint, Mattel denies the
21 truth of the allegations set forth therein.

22       75.   Answering paragraph 75 of the Complaint, Mattel admits that it
23 has reminded certain former employees who became employed by MGA by letter of
24 their contractual and fiduciary obligation to maintain the secrecy of all Mattel
25 confidential and proprietary business information, states that such letters were
26 prepared and sent to their recipients in good faith contemplation of litigation, admits
27 that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles
28 Superior Court, entitled <u>Mattel. Inc. v. Brawer</u>, Case No. BC323381, on October 21,

Exhibit 19
Page 190
-19-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  2004, states that pursuant to the Court's Order of August 25, 2005 it need not
2  respond to the allegations in paragraph 75 relating to that action, and denies the truth
3  of the remaining allegations set forth in paragraph 75.

4         76.    Answering paragraph 76 of the Complaint, Mattel states that
5  MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
6  including such acts that are lawful in foreign nations, and denies the truth of
7  allegations set forth therein.

8         77.    Answering paragraph 77 of the Complaint, Mattel states that
9  MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
10 including such acts that are lawful in foreign nations, and denies the truth of the
11 allegations set forth therein.

12        78.    Answering paragraph 78 of the Complaint, Mattel states that it is
13 without knowledge or information sufficient to form a belief as to the truth or falsity
14 of the allegations regarding MGA's claimed "shortage of doll hair" and, on that
15 basis, denies them and denies the truth of the remaining allegations set forth therein.

16        79.    Answering paragraph 79 of the Complaint, Mattel states that
17 MGA cannot establish subject matter jurisdiction regarding extra-territorial acts,
18 including such acts that are lawful in foreign nations, and denies the truth of
19 allegations set forth therein.

20        80.    Answering paragraph 80 of the Complaint, Mattel denies the
21 truth of the allegations set forth therein.

22        81.    Answering paragraph 81 of the Complaint, Mattel admits that
23 NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and
24 video games industries, admits that to Mattel's knowledge NPD restricts the use of
25 its subscriber information, states that MGA was sued by NPD and states that it is
26 without knowledge or information sufficient to form a belief as to the truth or falsity
27 of the allegations regarding the need of unspecified "toy companies" for NPD

28

1  statistics and, on that basis, denies them and denies the truth of any remaining
2  allegations set forth therein.

3        82.    Answering paragraph 82 of the Complaint, Mattel denies the
4  truth of the allegations set forth therein.

5        83.    Answering paragraph 83 of the Complaint, Mattel states that it is
6  without knowledge or information sufficient to form a belief as to the truth or falsity
7  of the allegations set forth therein because MGA fails to quantify its annual
8  subscription fees and, on that basis, denies them.

9        84.    Answering paragraph 84 of the Complaint, Mattel states that it is
10 without knowledge or information sufficient to form a belief as to the truth or falsity
11 of the allegations set forth therein and, on that basis, denies them.

12       85.    Answering paragraph 85 of the Complaint, Mattel states that
13 MGA was sued by NPD, states that it is without knowledge or information sufficient
14 to form a belief as to such nature and grounds for such litigation (to which Mattel
15 was not a party) and, on that basis, denies the allegations relating thereto, and denies
16 the truth of the remaining allegations set forth therein.

17       86.    Answering paragraph 86 of the Complaint, Mattel denies the
18 truth of the allegations set forth therein.

19       87.    Answering paragraph 87 of the Complaint, Mattel admits that the
20 Children's Advertising Review Unit ("CARU") is the children's arm of the
21 advertising industry's self-regulation program, states that compliance with CARU's
22 Privacy Program can provide FTC-approved Safe Harbor under the Children's
23 Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining
24 allegations set forth therein.

25       88.    Answering paragraph 88 of the Complaint, Mattel admits that it
26 is one of dozens of CARU Supporters and denies the truth of the remaining
27 allegations set forth therein.

28

53.2

Exhibit 19
Page 192

Ɔ ANSWER AND COUNTERCLAIMS

1      89.     Answering paragraph 89 of the Complaint, Mattel denies the

2 truth of the allegations set forth therein.

3      90.     Answering paragraph 90 of the Complaint, Mattel states that it is

4 without knowledge or information sufficient to form a belief as to the truth or falsity

5 of the allegations as to the consequences to MGA of MGA's violations of CARU

6 standards and, on that basis, denies them.

7      91.     Answering paragraph 91 of the Complaint, Mattel states that it is

8 without knowledge or information sufficient to form a belief as to the truth or falsity

9 of the allegations as to the consequences to MGA of MGA violation of CARU

10 standards and, on that basis, denies them.

11      92.     Answering paragraph 92 of the Complaint, Mattel admits that the

12 Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits

13 that at certain times TIA has given awards called the People's Choice Toy of The

14 Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA

15 and states that it is without knowledge or information sufficient to form a belief as

16 to the truth or falsity of the remaining allegations set forth therein and, on that basis,

17 denies them.

18      93.     Answering paragraph 93 of the Complaint, Mattel states that the

19 allegations set forth therein are vague and ambiguous, including in that they fail to

20 properly identify the years in which the referenced awards were given and/or the

21 particular product which won such awards, and accordingly lacks knowledge or

22 information sufficient to form a belief as to the truth or falsity of the allegations set

23 forth therein and, on that basis, denies them.

24      94.     Answering paragraph 94 of the Complaint, Mattel admits that

25 Neil Freidman was the chairman of TIA from approximately May 2002 to May

26 2004, states that Fischer Price is a division of Mattel and denies the truth of the

27 remaining allegations set forth therein.

28

2154363.2

-22-

SECOND AMENDED

**Exhibit 19**
**Page 193**

AIMS

95.    Answering paragraph 95 of the Complaint, Mattel admits that Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the remaining allegations set forth therein.

96.    Answering paragraph 96 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

97.    Answering paragraph 97 of the Complaint, Mattel denies the truth of the allegations set forth therein.

98.    Answering paragraph 98 of the Complaint, Mattel denies the truth of the allegations set forth therein.

99.    Answering paragraph 99 of the Complaint, Mattel denies the truth of the allegations set forth therein.

100.    Answering paragraph 100 of the Complaint, Mattel denies the truth of the allegations set forth therein.

101.    Answering paragraph 101 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 100 of this Second Amended Answer and incorporates them by reference as though fully and completely set forth herein.

102.    Answering paragraph 102 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that MGA's alleged trade dress is distinctive.

103.    Answering paragraph 103 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that MGA's alleged trade dress is distinctive.

104.    Answering paragraph 104 of the Complaint, Mattel denies the truth of the allegations set forth therein.

105.    Answering paragraph 105 of the Complaint, Mattel denies the truth of the allegations set forth therein.

1    106.   Answering paragraph 106 of the Complaint, Mattel denies the
2    truth of the allegations set forth therein.

3    107.   Answering paragraph 107 of the Complaint, Mattel denies the
4    truth of the allegations set forth therein.

5    108.   Answering paragraph 108 of the Complaint, Mattel denies the
6    truth of the allegations set forth therein and specifically denies that plaintiff is
7    entitled to injunctive relief.

8    109.   Answering paragraph 109 of the Complaint, Mattel repeats its
9    responses contained in paragraphs 1 through 108 of this Second Amended Answer
10   and incorporates them by reference as though fully and completely set forth herein.

11   110.   Answering paragraph 110 of the Complaint, Mattel denies the
12   truth of the allegations set forth therein.

13   111.   Answering paragraph 111 of the Complaint, Mattel denies the
14   truth of the allegations set forth therein.

15   112.   Answering paragraph 112 of the Complaint, Mattel denies the
16   truth of the allegations set forth therein.

17   113.   Answering paragraph 113 of the Complaint, Mattel denies the
18   truth of the allegations set forth therein.

19   114.   Answering paragraph 114 of the Complaint, Mattel denies the
20   truth of the allegations set forth therein.

21   115.   Answering paragraph 115 of the Complaint, Mattel denies the
22   truth of the allegations set forth therein.

23   116.   Answering paragraph 116 of the Complaint, Mattel denies the
24   truth of the allegations set forth therein.

25   117.   Answering paragraph 117 of the Complaint, Mattel denies the
26   truth of the allegations set forth therein and specifically denies that plaintiff is
27   entitled to injunctive relief.

28

1        118.   Answering paragraph 118 of the Complaint, Mattel denies the

2  truth of the allegations set forth therein.

3        119.   Answering paragraph 119 of the Complaint, Mattel repeats its

4  responses contained in paragraphs 1 through 118 of this Second Amended Answer

5  and incorporates them by reference as though fully and completely set forth herein.

6        120.   Answering paragraph 120 of the Complaint, Mattel denies the

7  truth of the allegations set forth therein.

8        121.   Answering paragraph 121 of the Complaint, Mattel denies the

9  truth of the allegations set forth therein.

10        122.   Answering paragraph 122 of the Complaint, Mattel denies the

11  truth of the allegations set forth therein.

12        123.   Answering paragraph 123 of the Complaint, Mattel denies the

13  truth of the allegations set forth therein and specifically denies that plaintiff is

14  entitled to injunctive relief.

15        124.   Answering paragraph 124 of the Complaint, Mattel repeats its

16  responses contained in paragraphs 1 through 123 of this Second Amended Answer

17  and incorporates them by reference as though fully and completely set forth herein.

18        125.   Answering paragraph 125 of the Complaint, Mattel denies the

19  truth of the allegations set forth therein.

20

21                                General Denial

22        Unless specifically admitted herein, Mattel denies the truth of each and

23  every allegation set forth in plaintiff's Complaint and specifically denies that

24  plaintiff is entitled to any relief against Mattel.

25

26

27

28

Exhibit 19
Page 196

-25-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

## Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

## First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

## Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

## Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

## Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

## Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

1

## Sixth Affirmative Defense

2      Plaintiff's claims are barred in whole or in part by its lack of standing.

3

4

## Seventh Affirmative Defense

5      Plaintiff's claims are barred in whole or in part by the applicable

6  statutes of limitation and the doctrine of laches.

7

8

## Eighth Affirmative Defense

9      Plaintiff's claims are barred in whole or in part by the doctrines of

10  waiver, estoppel and acquiescence.

11

12

## Ninth Affirmative Defense

13      Plaintiff's claims are barred in whole or in part by Mattel's

14  constitutional rights of free speech, petitioning and association, including without

15  limitation by the litigation privilege as protected by and/or codified in *inter alia*

16  Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the

17  common interest privilege and by other privileges.

18

19

## Tenth Affirmative Defense

20      Plaintiff's claims are barred in whole or in part by Mattel's federal and

21  state constitutional rights of free speech, including without limitation under the First

22  Amendment of the United States Constitution.

23

24

## Eleventh Affirmative Defense

25      Plaintiff's claims are barred in whole or in part by the competitor

26  privilege.

27

28

1363.2

Exhibit 19
Page 198

ANSWER AND COUNTERCLAIMS

1

### Twelfth Affirmative Defense

2    Plaintiff's claims are in whole or in part preempted by the Copyright

3  Act and barred by the *Sears-Compco* doctrine.

4

5

### Thirteenth Affirmative Defense

6    Plaintiff's requested relief, including plaintiff's requests for punitive

7  and/or enhanced damages, are barred in whole or in part because all of Mattel's

8  actions were in good faith.

9

10

### Fourteenth Affirmative Defense

11    Plaintiff's damages, if any, were not caused by Mattel and are not

12  attributable to the acts or omissions of Mattel.

13

14

### Fifteenth Affirmative Defense

15    Plaintiff has failed to mitigate its damages, if any.

16

17

### Additional Defenses

18    Mattel has insufficient knowledge or information upon which to form a

19  belief as to whether additional defenses are available.  Mattel reserves the right to

20  amend this Second Amended Answer to add, delete, or modify additional defenses

21  based on legal theories which may or will be divulged through clarification of the

22  Complaint, through discovery, through change or clarification of the governing law

23  or through further legal analysis of plaintiff's positions in this litigation.

24

25

### Prayer for Relief

26

27    WHEREFORE, Mattel prays for relief as follows:

28

1       1.      That the Complaint be dismissed with prejudice;

2       2.      That plaintiff take nothing by reason of the Complaint against

3   Mattel and that judgment be entered in Mattel's favor;

4       3.      That Mattel recover its costs and attorneys' fees; and

5       4.      That this Court award such other and further relief as it deems

6   just and proper.

7

8                              **COUNTERCLAIMS**

9           Pursuant to the Court's Orders of January 12, 2007 and June 27, 2007,

10  and incorporating its [Proposed] Amended Complaint dated November 19, 2006,

11  Mattel, Inc. alleges as follows:

12                          **Preliminary Statement**

13      1.      For years MGA Entertainment, Inc. has engaged in a pattern of

14  stealing and using Mattel, Inc.'s property and trade secrets.  MGA's use of the

15  stolen property and trade secrets caused and continues to cause significant harm to

16  Mattel.  MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

17  stealing Mattel's confidential and proprietary information to fuel MGA's growth.

18      2.      Carter Bryant conceived, created and developed Bratz designs

19  while he was employed by Mattel as a doll designer.  He concealed his Bratz work

20  from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

21  As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful

22  owner of those Bratz designs, Mattel has registered copyrights for them and seeks

23  damages arising from MGA's repeated infringement of those copyrights.

24      3.      Emboldened by the success of its illegal conduct, MGA has

25  repeated—and even expanded—its pattern of theft on numerous occasions.  For

26  example, in or about 2004, MGA decided to expand into Mexico. To do so, and

27  operating from its Southern California offices, MGA hired away three key Mattel

28  employees in Mexico, who, on their way out, stole virtually every category of

1   Mattel's sensitive and trade secret business plans and information for the Mexican

2   market, as well as a significant quantity of sensitive and trade secret information

3   for Mattel's U.S. and worldwide businesses, and took them to MGA. Armed with

4   Mattel's confidential business plans and methods, MGA claimed to have increased

5   its market share in Mexico alone by 90% in a single year.

6       4.   In 2005, MGA needed help in Canada. So MGA, again

7   operating from its Southern California headquarters, hired Janine Brisbois from

8   Mattel. At that time, Ms. Brisbois was responsible for Mattel's account with Toys

9   'R Us ("TRU") and Wal-Mart. MGA gave her responsibility for those same

10  accounts, and she took from Mattel documents containing proprietary advertising,

11  project, sales, customer and strategy information for not only Canada, but for the

12  United States. Eliminating any doubt that MGA then proceeded to use those stolen

13  materials, Brisbois subsequently accessed and modified certain of those Mattel

14  documents while employed by MGA.

15      5.   These are not the only instances of such misconduct, which

16  MGA orchestrated and carried out from its headquarters in this District. Counter-

17  defendants have engaged in an ongoing, widespread pattern of illegal acts,

18  consisting of inducing Mattel employees to steal Mattel's confidential information

19  or other property and take it with them to MGA to further MGA's business interests

20  and to harm Mattel.

21                          **Jurisdiction**

22      6.   This Court has federal question jurisdiction over this action

23  pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c).

24  This Court has supplemental jurisdiction over Mattel's state law claims pursuant to

25  28 U.S.C. § 1367.

26                            **Venue**

27      7.   Venue is proper in this District pursuant to 28 U.S.C.

28  §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

Exhibit 19
Page 201

-30-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

## Parties

8.    Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

9.    Counter-defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California. Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as ABC International Traders, Inc. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

10.    Counter-defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contactor for MGA. Mr. Bryant currently resides in the State of Missouri.

11.    Counter-defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong. Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel hereby amends its Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

1       12.   Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA

2  de Mexico") is a business entity organized and existing under the laws of Mexico,

3  with its principal place of business in Mexico City, Mexico.

4       13.   Mattel is informed and believes, and on that basis alleges, that

5  Counter-defendant Larian is the President and CEO of MGA and an individual

6  residing in the County of Los Angeles.   Upon the filing of the Complaint, Mattel,

7  being ignorant of the nature, extent and scope of involvement and complicity of

8  Larian in the conduct alleged therein and having designated Larian in the

9  Complaint as Doe 3 and having discovered his involvement and complicity, Mattel

10  hereby amends its Complaint by substituting Larian for the fictitious Doe name

11  Doe 3.

12       14.   Counter-defendant Carlos Gustavo Machado Gomez is an

13  individual who is employed by Counter-defendant MGA and who, on information

14  and belief, currently resides in the County of Los Angeles.

15       15.   The true names and capacities of Counter-defendants sued herein

16  as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said

17  Counter-defendants by such fictitious names.   Mattel will amend its pleadings to

18  allege their true names and capacities when the same are ascertained.

19                    **Factual Background**

20  **I.   MATTEL**

21       16.   Mattel manufactures and markets toys, games, dolls and other

22  consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in

23  1945.  The name of the company was created by incorporating the names of two of

24  its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in

25  Southern California, the company greatly expanded its operations following World

26  War II.  During the next several decades, Mattel became famous for producing

27  high-quality products at reasonable prices.

28

17.   Critical to Mattel's success is its ability to design and develop new products.  Mattel invests millions of dollars in product design and development and introduces hundreds of new products each year.  Mattel maintains a 180,000 square-foot design center in El Segundo, California, that houses hundreds of designers, sculptors, painters and other artists, who work exclusively to create the products on which Mattel's business depends.

18.   Mattel also has invested substantial amounts over many years to develop its business methods and practices, including, without limitation, its marketing and advertising research, plans, methods and processes; its business research and forecasts; its costs, budgets, pricing, credit terms, deal terms and finances; its manufacturing, distribution, and sales methods and processes; and its inventory methods and processes.  These represent a material part of the intellectual infrastructure of Mattel and are highly valuable.

## II.   MGA ENTERTAINMENT

19.   MGA is also a toy manufacturer.  MGA began as a consumer electronics business, but expanded into the toy business with licenses to sell handheld electronic games.  By approximately late 1999 or early 2000, MGA developed a strategy to expand its business and compete directly with Mattel by launching a fashion doll line, so it stole a fashion doll that was owned by Mattel – "Bratz."

20.   MGA intentionally stole not just specific Mattel property, such as Bratz designs, prototypes and related materials, but also a vast array of trade secrets and other confidential information that comprise Mattel's intellectual infrastructure.  MGA's rapid growth was not organic, but rather was based upon its theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure for a company of its size and it became increasingly difficult to manage.  To deal with these problems, as detailed below, time and time again MGA simply stole Mattel's proprietary business methods, practices and information.  This not only

1    allowed MGA to avoid expending time, money and effort necessary to build a

2    legitimate business, but also allowed MGA to unfairly compete against Mattel by

3    taking Mattel's playbook.

4    **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

5            21.    Carter Bryant is a former Mattel employee.  Bryant joined Mattel

6    in September 1995, where he worked in Mattel's Design Center as a BARBIE

7    product designer.  In or about April 1998, Bryant resigned his position with Mattel

8    and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

9    Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

10    Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

11            22.    Upon his return to Mattel in January 1999, Bryant executed an

12    Employee Confidential Information and Inventions Agreement (the "Employment

13    Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

14            23.    Pursuant to his Employment Agreement and as a condition of

15    and in consideration for his employment, Bryant agreed, among other things, that

16    he held a position of trust with Mattel, that the designs and inventions he created

17    during his Mattel employment (with certain exceptions not relevant here) were

18    owned by Mattel, and that he would be loyal to the company by agreeing not to

19    assist or work for any competitor of Mattel while he was employed by Mattel.

20            24.    On January 4, 1999, Bryant also executed Mattel's Conflict of

21    Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

22    certified in the Conflict Questionnaire that, other than as disclosed, he had not

23    worked for any competitor of Mattel in the prior twelve months and had not

24    engaged in any business venture or transaction involving a Mattel competitor that

25    could be construed as a conflict of interest.  Bryant understood what the Conflict

26    Questionnaire required because, among other things, he disclosed on it the

27    freelance work he had performed while in Missouri for Ashton-Drake, which is

28

1 | unrelated to the conduct alleged herein. A true and correct copy of the Conflict
2 | Questionnaire executed by Bryant is attached hereto as Exhibit B.

3 |      25. Pursuant to the Conflict Questionnaire, Bryant also agreed that
4 | he would immediately notify his supervisor of any change in his situation that
5 | would cause him to change any of the foregoing certifications. Despite this
6 | obligation, at no time did Bryant disclose to Mattel that he was engaging in any
7 | business venture or transaction with MGA or any other Mattel competitor.

8 |      26. More specifically, while Bryant was employed by Mattel, Bryant
9 | and other Counter-defendants misappropriated and misused Mattel property and
10 | Mattel resources for the benefit of Bryant and MGA. Such acts included, but are
11 | not limited to, the following:

12 |      a. using his exposure to Mattel development programs to
13 | create the concept, design and name of Bratz;

14 |      b. using Mattel resources, and while employed by Mattel,
15 | Bryant worked by himself and with other Mattel employees and contractors to
16 | design and develop Bratz, including without limitation by creating drawings and
17 | three-dimensional models of Bratz dolls, and fashion designs for the dolls'
18 | associated clothing and accessories; and

19 |      c. using Mattel resources, and while employed by Mattel,
20 | Bryant took steps to assist MGA to produce Bratz dolls.

21 |      27. During the time that he was employed by Mattel and thereafter,
22 | Bryant concealed these actions from Mattel, including by failing to notify his
23 | supervisor of the conflict of interest he created when he began working on MGA's
24 | behalf and when he began receiving payments from MGA. Bryant additionally
25 | enlisted other Mattel employees to perform work on Bratz during the time he was
26 | employed by Mattel and, by all indications, in at least some cases led them to
27 | believe that they were performing work on a project for Mattel.

28 |

Exhibit 19
Page 206

-35-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

28. Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000. For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits. Bryant's representations to his supervisors and his co-workers were false. Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

29. As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000. Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel. Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

30. Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz. On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

31.   Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001. By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

32.   Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world. Mattel is informed and believes that MGA also licenses Bratz to third parties. Mattel is also informed and believes that MGA derives annual revenue from its sales and licenses of Bratz in excess of $500 million. Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto. MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

33.   Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel. Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

34.   Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom. Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

1         35.   Bryant and MGA deliberately and intentionally concealed facts

2    sufficient for Mattel to suspect or to know that it was the true owner of Bratz.

3    Their acts of concealment include, but are not limited to, concealing the fact that

4    Bryant conceived, created, designed and developed Bratz while employed by

5    Mattel, including by tampering with and defacing documents which showed that, in

6    fact, Bryant was a Mattel employee while he was working for and with MGA;

7    concealing the fact that Bryant worked with and assisted MGA during the time

8    Bryant was employed by Mattel and was compensated for that assistance;

9    concealing that Bryant was providing consulting services to MGA; concealing

10   Bryant's role in Bratz by falsely claiming that Larian and others were the creators

11   of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among

12   other things, filing fraudulent registrations and/or amendments to registrations with

13   the United States Copyright Office claiming MGA as the author of Bratz as a work

14   for hire and altering relevant dates on such documents to further obscure the true

15   facts of when the works were created.

16        36.   Because of Bryant's and MGA's acts of concealment and Bryant's

17   misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had

18   worked with MGA, or assisted MGA, while he still employed by Mattel until

19   approximately November 24, 2003, when Mattel received, through an unrelated

20   legal action, a copy of Bryant's agreement with MGA which showed that the date

21   of Bryant's agreement with MGA predated Bryant's departure from Mattel. It was

22   then, as a result, that Mattel learned for the first time that Bryant had secretly aided,

23   assisted and worked for and with MGA while employed at Mattel and in violation

24   of his Mattel Employment Agreement.  Specifically, Bryant's agreement with

25   MGA obligated Bryant to provide product design services to MGA on a "top

26   priority" basis.  Bryant's agreement with MGA also provided that Bryant would

27   receive royalties and other consideration for sales of products on which Bryant

28   provided aid or assistance; that all works and services furnished by Bryant under

Exhibit 19
Page 209

1   the agreement, including those he purportedly provided while still a Mattel

2   employee, purportedly would be considered "works for hire" of MGA; and that all

3   intellectual property rights to preexisting works by Bryant, including Bratz designs,

4   purportedly were assigned to MGA.

## IV.   MGA STEALS MATTEL TRADE SECRETS IN MEXICO

6        37.   On information and belief, in or about late 2003 or early 2004,

7   MGA decided to open business operations in Mexico. Faced with the difficult task

8   of developing an overall strategy for expanding into a market in which it had only a

9   nominal presence and no operations, MGA elected to steal Mattel's plans, strategy

10  and business information for the Mexican market and materials related to Mattel's

11  worldwide business strategies. As detailed below, MGA and Larian approached

12  three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to

13  steal Mattel's most sensitive business planning materials, and then hired them to

14  assist in establishing and running MGA's new Mexican subsidiary.

### A.   MGA Hires Three Senior Mattel Employees in Mexico

16       38.   Carlos Gustavo Machado Gomez ("Machado") was the Senior

17  Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and

18  confidence. He was employed at Mattel Mexico from April 1, 1997 until April 19,

19  2004. His duties included short, medium and long-term marketing planning,

20  generating product sales projections, and assisting in creation of the media plan. In

21  his position, Machado had access to highly confidential and sensitive marketing

22  and product development information. Machado had an employment agreement

23  with Mattel in which he agreed to maintain the confidentiality of Mattel's protected

24  information. Mattel's policies also required Machado to protect Mattel's

25  proprietary information and not to disclose it to competitors.

26       39.   Mariana Trueba Almada ("Trueba") was the Senior Marketing

27  Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.

28  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

1  Like Machado, her duties included short, medium and long-term marketing

2  planning, generating product sales projections, and assisting in creation of the

3  media plan.  In her position, Trueba had access to highly confidential and sensitive

4  marketing and product development information.  Trueba had an employment

5  agreement with Mattel in which she agreed to maintain the confidentiality of

6  Mattel's protected information.  Mattel's policies also required Trueba to protect

7  Mattel's proprietary information and not to disclose it to competitors.

8         40.    Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing

9  Manager with Mattel Mexico, a position of trust and confidence.  He was employed

10  at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was

11  responsible for ensuring that point-of-sale promotions were carried out, analyzing

12  the results of such promotions, negotiating promotion budgets, and generally

13  managing promotional activities.  Vargas also had access to highly confidential and

14  sensitive marketing and product development information.  Vargas had an

15  employment agreement with Mattel in which he agreed to maintain the

16  confidentiality of Mattel's protected information.  Mattel's policies also required

17  Vargas to protect Mattel's proprietary information and not to disclose it to

18  competitors.

19         41.    Beginning in late 2003 or early 2004, Machado, Trueba and

20  Vargas began planning to leave Mattel Mexico to join MGA.  In connection with

21  that plan, and with the encouragement of Larian and other MGA officers operating

22  in the United States, they began accessing, copying and collecting proprietary

23  Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and

24  Vargas each resigned their positions with Mattel, effective immediately.  They

25  stated that they had been hired by a Mattel competitor, but refused to identify that

26  competitor.  In fact, they had been offered and accepted employment by MGA to

27  establish and run MGA's new operation in Mexico.

28

54363.2

Exhibit 19
Page 211

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.    Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations. The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>. On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.    In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel. Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City. On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA. This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned. For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park. In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing: "Attached you will find our analysis for future discussion. We will be available during the nights of the week after 16:30 Los Angeles time . . . ." In another e-mail message, showing that the

Exhibit 19
Page 212

-41-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  participants intentionally sought to maximize the damage to Mattel from their

2  conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3  to resign (all at the same time, and you can believe my smile!) next Wednesday."

4         44.   Beginning on April 12, 2004, a week before his resignation and

5  after numerous communications and meetings with Larian and other MGA

6  personnel, Machado began transferring additional Mattel confidential and

7  proprietary information to a portable USB storage device (also know as a "thumb

8  drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the

9  last business day before he gave notice, Machado copied at least 70 sensitive

10  documents to the portable USB storage device.

11         45.   Starting on April 12, 2004, Vargas also copied a host of

12  confidential and proprietary materials to a portable USB storage device, including

13  sales plans, sales projections and customer profiles.

14         46.   On April 16, 2004, Trueba also copied Mattel confidential and

15  proprietary information to a portable USB storage device connected to her Mattel

16  computer.

17         47.   With full knowledge that she was going to leave Mattel for a

18  competitor, Trueba also took steps to increase further her access to Mattel's

19  confidential information shortly before her resignation.  For example, just four days

20  before leaving, Trueba went out of her way to seek to attend a meeting at which

21  Mattel personnel analyzed BARBIE programs for the United States, Canada and

22  South America.  Two days before her resignation, she contacted both a Mattel

23  employee located in El Segundo, California and Mattel's advertising agency to

24  request updated confidential information about advertising plans for BARBIE.  On

25  information and belief, Trueba acted at the direction of MGA and Larian and did so

26  in order to obtain further information that would allow MGA to obtain unfair

27  competitive advantage over Mattel.

28

48.    Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.    The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.    MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

Exhibit 19
Page 214

D ANSWER AND COUNTERCLAIMS

market share by 90 percent over the prior year.  This increase came at the expense of Mattel, which lost market share during 2004 in Mexico and was forced to increase its advertising and promotional spending to offset further losses.

51.    Machado, Trueba and Vargas attempted to conceal their widespread theft of Mattel's proprietary information.  For example, Machado ran a software program on his Mattel personal computer in an attempt to erase information, including information that would reveal the addresses to which he had sent, or from which he had received, e-mail messages.  On information and belief, for the same purpose Machado also damaged the hard drive of the personal computer that he used at Mattel.

52.    On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

53.    Mattel notified Mexican authorities about the theft of its trade secret and confidential information.  On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

54.    Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado and he was transferred to MGA's main office in Van Nuys, California.  On information and belief, Machado currently resides in the County of Los Angeles, California.

V.   MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND
     GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF
     MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND
     PRACTICES

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

Employees and Directors have an obligation to protect the
confidentiality of Mattel's proprietary information.  Proprietary
information is any information not generally known to the public
that is useful to Mattel, that would be useful to its competitors or
other third parties or that would be harmful to Mattel or its
customers if disclosed.  Proprietary information includes trade
secrets, revenue and profit information and projections, new
product information, marketing plans, design and development
efforts, manufacturing processes and any information regarding
potential acquisitions, divestitures and investments.
We can protect the security of Mattel's proprietary information
by limiting access to it.  Confidential information should not be
discussed with those who are not obligated to maintain the
information in confidence and in public places where the

1        information is not likely to be kept secret, such as planes,

2        restaurants and elevators.  The obligation to preserve confidential

3        information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6      57.  By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence.  In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13      58.  In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19      59.  On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25      60.  In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for a

Exhibit 19
Page 217
-46-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

strategic partnership with a key Mattel retailer, covering all aspects of the business, including both traditional toy sales and retail development of licensed products.

61.   In or about late May 2004, Brawer began performing General Manager duties, working with one of Mattel's major retail customer accounts. Thereafter, Brawer began receiving information related not only to the Senior Vice President, Customer Marketing position that he still formally held, but also began receiving detailed information related to his role as General Manager.  Brawer began requesting and analyzing detailed information related to Mattel and its four key retail accounts.

62.   On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders and other materials.  Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

63.   On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

64.   On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

65.   At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment.  Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy

Exhibit 19
Page 218

because he had not signed it. Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

66. On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67. Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing. In that role he was responsible for MGA's sales worldwide. As part of those responsibilities, Brawer had and continues to have responsibility for MGA's accounts with the same retailers that he worked with while at Mattel.

68. Brawer represented during his Mattel exit interview that he had returned all proprietary information to Mattel. That representation was false. On information and belief, Brawer removed proprietary and trade secret information from Mattel that he did not return. Mattel is informed and believes that Brawer did not return to Mattel, for example, the information contained in his contacts file. The contacts file included contact information for Mattel customers, most notably TRU, and extensive contact information for Mattel employees, including titles, e-mail addresses and telephone numbers.

69. Mattel has recently learned that Brawer has been using that contact information on a regular basis, including within recent months. Since leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone and by electronic mail. Based on his knowledge of Mattel's operations and the roles of certain Mattel employees, he has targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets. Brawer has done so by

1   promising these Mattel employees salaries 25 percent or more higher than they earn

2   at Mattel and stating to them that they should not be concerned by legal action

3   taken by Mattel to protect its trade secrets and its rights because such claims are

4   hard to prove and easy to defeat.

5   **VI.  MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6           70.    In an effort to increase its market share and sales in Canada and

7   elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,

8   projects, advertising and strategy, not only for Canada, but the United States and

9   the rest of the world.

10          71.    Janine Brisbois was a Director of Sales for the Girls Division in

11  Canada.  Mattel hired her as a National Account Manager in August 1999.  When

12  she was hired as a Mattel employee, Brisbois agreed that she would preserve and

13  would not disclose Mattel's proprietary or confidential information.  For example,

14  Brisbois agreed:

15          You must keep Mattel's Proprietary Information confidential,

16          and you may only use or disclose such information as necessary

17          to perform your job responsibilities in accordance with Mattel

18          policies.  Your obligation to keep Mattel's Proprietary

19          Information confidential will continue even after any termination

20          of your employment with your employer.

21          . . .

22          Mattel takes steps to maintain the secrecy and confidential nature

23          of Mattel's Proprietary Information and, if a competitor

24          discovered Mattel's Proprietary Information, it could

25          significantly damage Mattel and your Employer.

26          72.    While with Mattel, Brisbois had responsibility for Mattel's

27  account with TRU and later had responsibility for Mattel's Wal-Mart account.  In

28  her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

1 Mattel confidential and proprietary information regarding Mattel's future product
2 lines, advertising and promotional campaigns and product profitability.

3       73.  On September 26, 2005, Brisbois resigned from Mattel to take a
4 position as Vice President of Sales at MGA. Mattel is informed and believes that
5 in that position Brisbois has responsibility for MGA's accounts with both TRU and
6 Wal-Mart. During Brisbois' exit interview she was specifically asked whether she
7 was "taking anything." Brisbois responded, "No." Both during and after her exit
8 interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's
9 confidential and proprietary information.

10       74.  Mattel is informed and believes that Brisbois spoke with Isaac
11 Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he
12 called Ms. Brisbois at her home. Mattel subsequently learned that on the same day
13 that she spoke with Mr. Larian and four days before she resigned, Brisbois copied
14 approximately 45 Mattel documents on to a USB or "thumb" drive with the volume
15 label "BACKPACK." On information and belief, Brisbois removed the thumb
16 drive from Mattel Canada's office by concealing it in her backpack or gym bag the
17 last time that she left that office. These documents contained Mattel trade secret
18 and proprietary information, and included:

19      •  a document containing the price, cost, sales plan and quantity of every
20         Mattel product ordered by every Mattel customer in 2005 and 2006;
21      •  the BARBIE television advertising strategy and information concerning
22         sales increases generated by television advertisements;
23      •  competitive analysis of Mattel vis-à-vis its competitors in Canada;
24      •  an analysis of Mattel's girls business sales beginning in 2003 and
25         forecasts through 2006;
26      •  profit and loss reviews for Mattel's products being sold in Wal-Mart,
27         including margins and profit in not only Canada, but in the United
28         States and Mexico; and

Exhibit 19
Page 221

-50-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1     •  a document containing the product launch dates and related advertising

2        for all Mattel new products between Fall 2005 and Spring 2006.

3        75.   After Mattel discovered that Brisbois had copied these sensitive

4 documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

5 Canadian law enforcement authorities recovered from Brisbois a thumb drive with

6 the volume label "BACKPACK" containing the documents that Brisbois had

7 copied from Mattel's computer system. Mattel later learned that while she was

8 working as a Vice President of Sales at MGA, Brisbois accessed and modified

9 documents on that thumb drive.

10        76.   After joining MGA, Brisbois repeatedly traveled to MGA's

11 offices in Van Nuys, California and met with Larian and Brawer. In February,

12 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City

13 offices and that at least three MGA employees were under criminal investigation,

14 MGA nonetheless issued a press release trumpeting its 2005 performance, with

15 Larian himself concluding, "Our international teams in Mexico and Canada have

16 done a fantastic job."

17 **VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**

18      **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**

19      **FOR THE BENEFIT OF MGA**

20        77.   In the past few years, MGA has hired directly from Mattel's

21 United States operations at least 25 employees, from Senior Vice-President level to

22 lower level employees. On information and belief, many of these employees were

23 specifically targeted and recruited by MGA, including by Larian and Brawer, based

24 on the Mattel confidential and proprietary information they could access. Many of

25 these employees had access to information that Mattel considers to be highly

26 proprietary and confidential. Mattel believes that some of those former Mattel

27 employees may be observing their obligations not to misappropriate, disclose or

28 use Mattel's confidential and proprietary information. Mattel is informed and

54363.2

Exhibit 19
Page 222

DED ANSWER AND COUNTERCLAIMS

1   believes, however, that certain additional employees accessed, copied and took

2   from Mattel confidential and proprietary information, including Mattel's strategic

3   plans; business operations, methods and systems; marketing and advertising

4   strategies and plans; future product lines; product profit margins; and customer

5   requirements.  The misappropriated confidential and proprietary information

6   included information that these Mattel employees were not authorized to access.

7   On information and belief, the misappropriated confidential and proprietary

8   information taken from Mattel is being disclosed to and used by MGA for the

9   benefit of MGA and to the detriment of Mattel.

10  **VIII.  LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11         **ABOUT MATTEL'S PRODUCTS**

12        78.   Counter-defendants have engaged in other illegal practices in

13  their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-

14  mail messages to a "Bratz News" distribution list that Larian created or that was

15  created for him.  Mattel is informed and believes that the recipients of e-mail

16  messages sent to the "Bratz News" distribution list include members of the media

17  as well as representatives of many of Mattel's most significant customers.

18        79.   On May 12, 2006, Larian sent an e-mail message to the "Bratz

19  News" distribution list that included a reference to Mattel's updated MY SCENE

20  MY BLING BLING product with real gems.  Mattel had not publicly announced

21  this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel

22  had guarded the identification of this particular product.

23        80.   Shortly thereafter, Larian engaged in a campaign of calling

24  Mattel's most significant customers, including but not limited to Target and TRU,

25  regarding the MY SCENE MY BLING BLING product with real gems.  In an

26  effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27  BLING product with real gems, Larian knowingly made false factual statements

28  about that product to each retailer.  As of the writing of this Second Amended

1 Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

2 that each was the only retailer to purchase the product and that Mattel would not be

3 supporting the product with television advertising.  At the time that Larian made

4 these statements, he knew them to be false.  As a result of Larian's

5 misrepresentations, at least one retailer cancelled its order for 75,000 units of the

6 MY SCENE MY BLING BLING product with real gems.  Only after Mattel

7 learned of Larian's misrepresentations and was able to correct them was Mattel able

8 to assure the retailer that Larian's representations were false and to persuade the

9 retailer to reinstate the order.

10          81.    Such conduct is not an isolated incident.  MGA and Larian, in an

11 effort to gain an unfair competitive advantage, repeatedly issued false and

12 misleading press releases.  In these press releases, MGA and Larian have

13 misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis

14 Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market

15 share of Mattel's BARBIE products.

**CLAIMS FOR RELIEF**

**First Counterclaim**

**Copyright Infringement**

**(Against MGA, MGA Entertainment (HK) Limited,**

**Larian, Bryant and Does 4 through 10)**

21          82.    Mattel repeats and realleges each and every allegation set forth in

22 paragraphs 1 through 81, above, as though fully set forth at length.

23          83.    Mattel is the owner of copyrights in works that are fixed in

24 tangible media of expression and that are the subject of valid, and subsisting,

25 copyright registrations owned by Mattel.  These include, without limitation, the

26 works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

27 378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

28

378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

84.   Counter-defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization.  Counter-defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

85.   Counter-defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to deliberately further their significant financial interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-defendants have engaged in direct, contributory and vicarious infringement of Mattel's copyrighted works.

86.   By virtue of defendants' infringing acts, Mattel is entitled to recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief permitted under the Copyright Act.

87.   Counter-defendants' actions described above have caused and will continue to cause irreparable damage to Mattel, for which Mattel has no remedy at law.  Unless Counter-defendants are restrained by this Court from continuing their infringement of Mattel's copyrights, these injuries will continue to occur in the future.  Mattel is accordingly entitled to injunctive relief restraining Counter-defendants from further infringement.

Exhibit 19
Page 225

-54-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

## Second Counterclaim

### Violation of the Racketeer Influenced and Corrupt Organizations Act

### 18 U.S.C. §§ 1962(c) and 1964(c)

### (Against All Counter-defendants)

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).  In addition, beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, were employed by and associated-in-fact with a second enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by

1   means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully

2   and knowingly conduct and participate, directly and indirectly, in the conduct of

3   the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA

4   Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-

5   defendants, the Bratz Criminal Enterprise's affairs, through a pattern of

6   racketeering activity.  Their actions include multiple, related acts in violation of:

7   18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512

8   (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and

9   foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. §

10   506(a)(1)(A) (criminal copyright infringement).

11          91.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

12   Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

13   Brisbois, and the Other Former Employees, and each of them, shared the common

14   purpose of enabling MGA to obtain confidential, proprietary and otherwise

15   valuable Mattel property through improper means in order to assist MGA in

16   illegally competing with Mattel domestically and throughout the world.

17          92.   The MGA Criminal Enterprise and Bratz Criminal Enterprise as

18   described herein are and have been at all relevant times continuing enterprises

19   because, among other reasons, each is designed to and did unlawfully acquire the

20   confidential business information and property of Mattel and incorporated this

21   information and property into MGA's ongoing business, marketing strategies and

22   business methods, practices and processes.  The conduct of each enterprise

23   continues through the date of this Second Amended Answer and Counterclaims and

24   is ongoing by virtue of MGA's continuing use of Mattel's information and property,

25   all to the detriment of Mattel.

26          93.   The pattern of racketeering activity, as defined by 18 U.S.C.

27   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

28   of continuing criminal activity.  This activity consists of multiple acts of

2154363.2

**Exhibit 19**
**Page 227**

ANSWER AND COUNTERCLAIMS

1    racketeering by each member of the MGA Criminal Enterprise and Bratz Criminal

2    Enterprise, is interrelated, not isolated and is perpetrated for the same or similar

3    purposes by the same persons.  This activity extends over a substantial period of

4    time, up to and beyond the date of this Second Amended Answer and

5    Counterclaims.  These activities occurred after the effective date of 18 U.S.C.

6    §§ 1961 *et seq.,* and the last such act occurred within 10 years after the commission

7    of a prior act of racketeering activity.  These racketeering activities included

8    repeated acts of:

9              (a)    Mail Fraud:  Counter-defendants MGA, MGA Entertainment

10                   (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and

11                   Does 4 through 10, aided and abetted by each other and some or

12                   all of the remaining members of the MGA Criminal Enterprise,

13                   having devised a scheme or artifice to defraud Mattel of its

14                   confidential trade secret information and property by conversion,

15                   false representations, concealment and breaches of fiduciary duty,

16                   did for the purpose of furthering and executing such a scheme or

17                   artifice to defraud, deposited or caused to be deposited matters or

18                   things to be sent or delivered by the Postal Service, or any private

19                   or commercial interstate carrier, or took or received matters or

20                   things therefrom, or knowingly caused matters or things to be

21                   delivered by mail or such carrier according to the direction

22                   thereon, or at the place at which it is directed to be delivered by

23                   the person to whom it is addressed, in violation of 18 U.S.C.

24                   § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in

25                   the foregoing paragraphs and as evidenced by, among other

26                   things, the true and correct copies of communications and other

27                   evidence included in Exhibit C;

28

(b)  <u>Wire Fraud</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other things, the true and correct copies of communications and other evidence included in Exhibit C;

(c)  <u>Tampering With a Witness, Victim or Informant</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

i.     altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

machine owned by Mattel and while Bryant was employed by Mattel;

   ii. altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

   iii. destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives.

   Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

  (d) <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

  (e) <u>Criminal Copyright Infringement</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by

1        each other and some or all of the remaining members of the MGA

2        Criminal Enterprise, willfully infringed Mattel's copyrights,

3        including with respect to documents containing Mattel trade

4        secret and confidential information, for purposes of commercial

5        advantage and private financial gain, all in violation of 18 U.S.C.

6        § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7        particularity in the foregoing paragraphs.

8        94.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9  are separate from, though employed by or associated with, MGA, the MGA Group,

10  the Bryant Group, the Mexican Group and the Canadian Group.

11        95.   MGA had a role in the racketeering activity that was distinct

12  from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

13  and did benefit, from the activity of its employees and agents alleged herein, and

14  thus was not a passive victim of racketeering activity, but an active perpetrator.

15        96.   Mattel has been injured in its business or property as a direct

16  and proximate result of the Counter-defendants' and the other enterprise members'

17  violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18  constituting the pattern of racketeering activity.

19        97.   As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

20  MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

21  Does 4 through 10, Brawer, Trueba, Vargas, Brisbois and the Other Former

22  Employees, Mattel has suffered substantial damages, in an amount to be proved at

23  trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its

24  general and special compensatory damages, plus interest, costs and attorneys, fees,

25  incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

26

27

28

### Third Counterclaim

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

98.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.  These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

101.  The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

1  U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

2  18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

3  racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

4  acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

5  U.S.C. § 506(a)(1)(A).

6     102. Counter-defendants and the other members of the MGA Criminal

7  Enterprise schemed to defraud Mattel and steal its property and trade secret

8  information by means of false representation, breaches of fiduciary duty,

9  conversation and concealment, as more fully set forth in the foregoing paragraphs.

10    103. In furtherance of this unlawful conspiracy, and to effect its

11  objectives, Counter-defendants and various co-conspirators committed numerous

12  overt acts, including but not limited to those set forth in the foregoing paragraphs.

13    104. Mattel has been injured in its business or property as a direct and

14  proximate result of the Counter-defendants' and the other enterprise members'

15  violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

16  constituting the pattern of racketeering activity.

17    105. As a result of the conspiracies between and among all Counter-

18  defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

19  suffered substantial damages, in an amount to be proved at trial. Pursuant to 18

20  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

21  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

22  of Counter-defendants' violations of 18 U.S.C. § 1962(d).

**Fourth Counterclaim**

**Misappropriation of Trade Secrets**

**(Against Counter-defendants MGA, MGA de Mexico,**

**Larian, Machado and Does 4 through 10)**

27    106. Mattel repeats and realleges each and every allegation set forth in

28  paragraphs 1 through 105, above, as though fully set forth at length.

Exhibit 19
Page 233
-62-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

107. As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its existing and would-be competitors, including MGA. This advantage, as to MGA, has now been compromised as a result of Counter-defendants' unlawful activities.

108. Mattel made reasonable efforts under the circumstances to maintain the confidentiality of the Trade Secret Materials, including by having employees and consultants who may have access the Trade Secret Materials sign confidentiality agreements that oblige them not to disclose the Trade Secret Materials or characteristics of the Trade Secret Materials; by limiting the circulation of said materials within Mattel; by protecting and limiting access to computers with log-in identifications and passwords; by limiting each employee's access to electronic files to those that the particular employee needs to access; by educating employees on the nature of Mattel's information that is confidential and proprietary; and by reminding employees on a regular and periodic basis of their obligation to protect and maintain Mattel's confidential and proprietary information.

109. Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

110. Counter-defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

111. Counter-defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and

1   without compensation, permission, or licenses for the benefit of themselves and
2   others.

3     112. Counter-defendants' conduct was, is, and remains willful and
4   wanton, and was taken with blatant disregard for Mattel's valid and enforceable
5   rights.

6     113. Counter-defendants' wrongful conduct has caused and, unless
7   enjoined by this Court, will continue in the future to cause irreparable injury to
8   Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel
9   is therefore entitled to a permanent injunction restraining and enjoining Counter-
10  defendants, and each of them, as well as their agents, servants, and employees, and
11  all persons acting thereunder, in concert with, or on their behalf, from further using
12  in any manner Mattel's trade secrets.

13    114. In addition, as a proximate result of Counter-defendants'
14  misconduct, Mattel has suffered actual damages, and Counter-defendants have been
15  unjustly enriched.

16    115. The aforementioned acts of the Counter-defendants were willful
17  and malicious, including in that Counter-defendants misappropriated Mattel's trade
18  secrets with the deliberate intent to injure Mattel's business and improve their own.
19  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to
20  reasonable attorney's fees.

### Fifth Counterclaim
### Breach of Contract
### (Against Bryant)

24    116. Mattel repeats and realleges each and every allegation set forth in
25  paragraphs 1 through 115, above, as though fully set forth at length.

26    117. Pursuant to his Employment Agreement, Bryant agreed that he
27  would not, without Mattel's express written consent, engage in any employment or
28  business other than for Mattel or assist in any manner any business competitive

1  with the business or future business plans of Mattel during his employment with

2  Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to

3  Mattel all right, title and interest in "inventions," including without limitation

4  "designs" and other works that he conceived, created or reduced to practice during

5  his employment by Mattel. In addition, pursuant to the Conflict Questionnaire,

6  Bryant certified that, other than as disclosed, he had not worked for any competitor

7  of Mattel and had not engaged in any business venture or transaction involving a

8  Mattel competitor that could be construed as a conflict of interest. Bryant further

9  promised that he would notify his supervisor immediately of any change in his

10  situation that would cause him to change any of the foregoing certifications or

11  representations.

12        118. The Employment Agreement and the Conflict Questionnaire are

13  valid, enforceable contracts, and Mattel has performed each and every term and

14  condition of the Employment Agreement and Conflict Questionnaire required to be

15  performed by Mattel.

16        119. Bryant materially breached the foregoing contracts with Mattel,

17  in that, among other things, he secretly aided, assisted and worked for a Mattel

18  competitor during his employment with Mattel without the express written consent

19  of Mattel.

20        120. As a consequence of Bryant's breach, Mattel has suffered and

21  will, in the future, continue to suffer damages in an amount to be proven at trial.

22  Such damages include, without limitation, the amounts paid by the competitor to

23  Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

24  his Mattel employment; the amount that Mattel paid Bryant during the time he

25  wrongfully worked with MGA; the value of information and intellectual property

26  owned by Mattel which Bryant provided to MGA; the value of the benefits that

27  MGA obtained from Bryant during the time he was employed by Mattel; and the

28

1 value of the benefits that MGA obtained from Bryant as a result of the work he

2 performed for or with MGA during his Mattel employment.

3      121. Bryant's conduct has caused, and unless enjoined will continue to

4 cause, irreparable injury to Mattel that cannot be adequately compensated by

5 money damages and for which Mattel has no adequate remedy at law.  Bryant

6 specifically acknowledged in his Employment Agreement that his breach of the

7 Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

8 entitled to injunctive relief to enforce this Agreement, in addition to damages and

9 other available remedies."  Accordingly, Mattel is entitled to orders mandating

10 Bryant's specific performance of his contracts with Mattel and restraining Bryant

11 from further breach.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

15      122. Mattel repeats and realleges each and every allegation set forth in

16 paragraphs 1 through 121, above, as though fully set forth at length.

17      123. Valid agreements existed between Mattel and Bryant, Brawer,

18 Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

19 the "Mattel Employees")

20      124. At all times herein mentioned, MGA, Larian and Does 4 through

21 10 knew that the Mattel Employees had a duty under their agreements not to work

22 for or assist any competitor of Mattel, such as MGA.  In addition, at all times

23 mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

24 assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

25 designs and other works, created, conceived or reduced to practice during their

26 employment with Mattel.

27

28

Exhibit 19
Page 237

-66-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

125.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126.  As a direct and proximate result of Counter-defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127.  As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128.  Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Seventh Counterclaim

### Breach of Fiduciary Duty

### (Against Bryant and Machado)

129.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130.  Bryant and Machado held positions of trust and confidence with Mattel.  In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties.  In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel.  They confirmed their relationship of trust with Mattel in respective employee agreements.  Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests

1   or that would deprive Mattel of any opportunities, profit or advantage which Bryant
2   or Machado might bring to Mattel.

3        131. Bryant breached his fiduciary duty to Mattel in that, while
4   employed by Mattel, he secretly aided and assisted a competitor of Mattel,
5   including without limitation by entering into an agreement with a Mattel
6   competitor. As alleged above, Bryant also breached the aforementioned duty by
7   using Mattel property and resources for the benefit of, and to aid and assist, himself
8   personally and MGA.

9        132. Machado breached his fiduciary duty to Mattel, in that while
10  employed by Mattel, he secretly aided and assisted a competitor of Mattel by,
11  among other things, misappropriating Mattel trade secret and proprietary
12  information and providing said information to officers of MGA. Machado also
13  breached the aforementioned duty by using Mattel property and resources for the
14  benefit of, and to aid and assist, himself personally and MGA.

15       133. As a direct and proximate result of Counter-defendants' wrongful
16  conduct, Mattel has incurred damages in an amount to be determined at trial.

17       134. Counter-defendants acted with malice, fraud and oppression, and
18  in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an
19  award of exemplary damages against Counter-defendants in an amount to be
20  determined at trial.

21       135. Furthermore, Counter-defendants' conduct has caused, and unless
22  enjoined will continue to cause, irreparable injury to Mattel that cannot be
23  adequately compensated by money damages and for which Mattel has no adequate
24  remedy at law. Accordingly, Mattel is entitled to an order restraining further
25  breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants
26  from continuing to benefit from such breach.

27

28

Exhibit 19
Page 239

...NDED ANSWER AND COUNTERCLAIMS

## Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

138. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel. At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140. As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

Exhibit 19
Page 240

JUNTERCLAIMS

1363.2

1    141.  In taking the aforesaid actions, MGA, Larian and Does 4 through
2    10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's
3    rights.  Accordingly, Mattel is entitled to recover exemplary damages from
4    Counter-defendants in an amount to be determined at trial.

5    **Ninth Counterclaim**
6    **Breach of Duty of Loyalty**
7    **(Against Bryant and Machado)**

8    142.  Mattel repeats and realleges each and every allegation set forth in
9    paragraphs 1 through 141, above, as though fully set forth at length.

10    143.  As employees of Mattel, Bryant and Machado owed a duty of
11   undivided loyalty to Mattel.  Pursuant to this duty, Bryant and Machado could not
12   compete with Mattel or assist a competitor of Mattel during their employment with
13   Mattel.  Pursuant to this duty, Bryant and Machado were required to always give
14   preference to Mattel's business over their own, similar interests during the course of
15   their employment with Mattel.

16    144.  Bryant and Machado breached their duty of loyalty to Mattel in
17   that, while employed by Mattel, they secretly aided, assisted and worked for a
18   competitor of Mattel, including without limitation by entering into agreements with
19   a Mattel competitor.  As alleged above, they also breached the aforementioned duty
20   by using Mattel property and resources for the benefit of, and to aid and assist,
21   themselves personally and the competitor of Mattel.

22    145.  As a direct and proximate result of Counter-defendants' wrongful
23   conduct, Mattel has incurred damages in an amount to be determined at trial.

24    146.  Counter-defendants acted with malice, fraud and oppression, and
25   in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an
26   award of punitive damages against Counter-defendants in an amount to be
27   determined at trial.

28

147.   Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.   Accordingly, Mattel is entitled to an order restraining further breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

148.   In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.   Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Tenth Counterclaim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

149.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 148, above, as though fully set forth at length.

150.   MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer.   MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel.   MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar interests or those of Mattel's competitors. or those of Mattel's competitors during the course of his employment with Mattel.

151.   MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) were employed by Mattel, and, as employees of Mattel, that they owed duties of loyalty to Mattel.   MGA, Larian and Does 4 through 10 knew that these duties included an obligation on the part of the Mattel

Exhibit 19
Page 242

-71-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   Employees (excluding Bryant) not to compete with Mattel or assist a competitor of
2   Mattel during their Mattel employment.

3          152. Despite such knowledge, Counter-defendants MGA, Larian and
4   Does 4 through 10 intentionally and without justification solicited, encouraged,
5   aided and abetted and gave substantial assistance to the Mattel Employees to
6   breach their duties of loyalty to Mattel, knowing that their conduct would constitute
7   breaches of their duties of loyalty to Mattel.

8          153. As a further consequence of Counter-defendants' efforts, Mattel
9   has suffered injury and is entitled to compensatory damages in an amount to be
10  proven at trial.

11         154. In taking the aforesaid actions, MGA, Larian and Does 4 through
12  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's
13  rights. Accordingly, Mattel is entitled to recover exemplary damages from
14  Counter-defendants in an amount to be determined at trial.

15                            **Eleventh Counterclaim**
16                                  **Conversion**
17                      **(Against All Counter-defendants)**

18         155. Mattel repeats and realleges each and every allegation set forth in
19  paragraphs 1 through 154, above, as though fully set forth at length.

20         156. Counter-defendants wrongfully converted Mattel property and
21  resources by appropriating and using them for their own benefit and gain and for
22  the benefit and gain of others, without the permission of Mattel.

23         157. Mattel was entitled to, among other things, the exclusive right
24  and enjoyment in property and tangible materials owned by Mattel, including
25  without limitation such proper and materials that were created by Bryant while he
26  was a Mattel product designer. Such property was taken by Bryant from Mattel to
27  further his own interests and, in at least some instances, provided by Bryant to
28  Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

158. In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices. Counter-defendants did so without Mattel's permission and continue to possess them.

159. As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

160. As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the Counter-defendants that would not have been generated but for the conversion. Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to Counter-defendants' acts of conversion.

161. Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

162. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining Counter-defendants from further conversion of Mattel property and resources and/or restraining Counter-defendants from continuing to benefit from such conversion.

**Twelfth Counterclaim**

**Unfair Competition**

**(Common Law and *Cal. Bus. & Prof. Code* § 17200)**

**(Against All Counter-defendants)**

163. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164. Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165. By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166. As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial. No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

## Thirteenth Counterclaim

### Declaratory Relief

### (Against All Counter-defendants)

167. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168. As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169. Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170. Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

### Prayer for Relief

WHEREFORE, Mattel respectfully requests judgment:

1. For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

Exhibit 19
Page 246
-75-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   created or reduced to practice by Bryant during the term of his Mattel employment

2   and/or by any others then-employed by Mattel, as well as in all derivatives

3   prepared therefrom, and that Mattel is the true owner of the foregoing;

4          2.   For a declaration that any agreement between Bryant, on the one

5   hand, and MGA or any person or entity, on the other hand, in which Bryant

6   purported to assign any right, title or interests in any work that he conceived,

7   created or reduced to practice while a Mattel employee, including but not limited to

8   the Bratz designs, is void and of no effect;

9          3.   For an Order enjoining and restraining Counter-defendants, their

10   agents, servants and employees, and all persons in active concert or participation

11   with them, from further wrongful conduct, including without limitation from

12   imitating, copying, distributing, importing, displaying, preparing derivatives from

13   and otherwise infringing Mattel's copyright-protected works;

14          4.   For an Order, pursuant to 17 U.S.C. § 503(a) and other

15   applicable law, impounding all of Counter-defendants' products and materials that

16   infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17   by which copies of the works embodied in Mattel's copyrights may be reproduced

18   or otherwise infringed;

19          5.   For an Order mandating that Counter-defendants return to Mattel

20   all tangible items, documents, designs, diagrams, sketches or any other

21   memorialization of inventions created or reduced to practice during Bryant's

22   employment with Mattel as well as all Mattel property converted by Counter-

23   defendants;

24          6.   For an Order mandating specific performance by Bryant to

25   comply with and satisfy Bryant's contractual obligations to Mattel;

26          7.   That Mattel be awarded, and Counter-defendants be ordered to

27   disgorge, all payments, revenues, profits, monies and royalties and any other

28   benefits derived or obtained as a result of the conduct alleged herein, including

363.2

Exhibit 19
Page 247

-76-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

1  without limitation of all revenues and profits attributable to Counter-defendants'

2  infringement of Mattel's copyrights under 17 U.S.C. § 504;

3         8.    For an accounting of all profits, monies and/or royalties from the

4  exercise of ownership, use, distribution, sales and licensing of Bratz;

5         9.    For the imposition of a constructive trust over Bratz, including

6  without limitation registrations and applications for registrations relating thereto

7  made or filed by Counter-defendants and third parties, and all profits, monies,

8  royalties and any other benefits derived or obtained from Counter-defendant's

9  exercise of ownership, use, sale, distribution and licensing of Bratz;

10        10.   That Mattel recover its actual damages and lost profits;

11        11.   That Counter-defendants be ordered to pay exemplary damages

12  in a sum sufficient to punish and to make an example of them, and deter them and

13  others from similar wrongdoing;

14        12.   That Counter-defendants be ordered to pay treble its general and

15  special damages, plus interest, costs and attorney's fees incurred by reason of

16  Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

17        13.   That Counter-defendants be ordered to pay double damages due

18  to their willful and malicious misappropriation of Mattel's trade secrets with

19  deliberate intent to injure Mattel's business and improve its own;

20        14.   That Counter-defendants pay to Mattel the full cost of this action

21  and Mattel's attorneys' and investigators' fees; and

22

23

24

25

26

27

28

1          15.   That Mattel have such other and further relief as the Court may

2    deem just and proper.

3

4    DATED:  July 12, 2007           QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6                  By_____

7                  John B. Quinn
              Attorneys for Defendant and Counter-

8                  claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED AN

Exhibit 19
Page 249

# DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED: July 12, 2007

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

By _____

John B. Quinn
Attorneys for Defendant and Counter-claimant Mattel, Inc.

2154363.2

**Exhibit A**

Exhibit 19
Page 251

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: [i] I will maintain the confidentiality of the Company's trade secrets; [ii] I will use those trade secrets for the exclusive benefit of the Company; [iii] inventions that I create will be owned by the Company; [iv] my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and [v] when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable consideration, I agree that:

**1. Provisions Related to Trade Secrets**

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in the Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

**2. Ownership of Inventions**

(a) I agree to communicate to the Company as promptly and fully as practicable all inventions (as defined below) conceived or reduced to practice by me (alone or jointly by others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such inventions, and all my right, title and interest in any patents, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any invention does not apply to an invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those inventions that either [1] relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer, or [2] result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any document and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

**3. Conflicts with Other Activities**

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

**4. Miscellaneous**

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause, and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will insure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. The Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _Carter Bryant_

Employee Name (print) **CARTER H. BRYANT**

Date **01/04/99**

MATTEL, INC.

By _Teresa Newcomb_
Signature

Name of Witness (print) **TERESA NEWCOMB**

Exhibit 19
Page 252

EXHIBIT H PAGE 80

M 0001622

**Exhibit B**

Exhibit 19
Page 253

# CONFLICT OF INTEREST QUESTIONNAIRE

BRYANT, CARTER H.        PROJECT DESIGNER

Name (Last, First, M.I.)                    Job Title                    Department

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES ● NO    1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES ● NO    2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES ● NO    3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES ○ NO    4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

○ YES ○ NO    5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES ● NO    6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES ● NO    7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES ● NO    8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES ● NO    9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

4, 5, freelance design & artwork in 1998,
from appx. 5/98 - 11/98, for the Ashton Drake
galleries.

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to divulge any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

Signature _____        Date 01/04/98

Exhibit 19
Page 254                    EXHIBIT B PAGE 81        M 0001621