incidental benefits in connection with trust transactions, (2) a trustee must avoid actual or

potential conflicts of economic interest with the Trust or its beneficiaries, (3) a trustee must keep

the trust beneficiaries reasonably informed about the trust's activities, (4) prior to taking any

controversial or uncertain action, Kadisha should seek court approval; and (5) Kadisha should

seek legal advise and, where appropriate, petition the court for instructions if there were any

questions regarding the propriety of a particular act under Kadisha's fiduciary obligations as a

trustee.  (TE 122.)

      The loan was exceedingly risky and was not a loan that any reasonable trustee would

have made; the loan violated the terms of the Trust; Qualcomm was losing money; Kadisha's

own Qualcomm investments were at risk, and he loaned Trust 2's money to Qualcomm to shore

up his own Qualcomm holdings and to fulfill his duties as a Qualcomm director to raise money.

      The only conclusion that can be drawn from the evidence is that the loan was made for

Kadisha's benefit, since it is evident that the loan was not made for Dafna's benefit, and Kadisha

was the only other person who stood to benefit from the loan.  Kadisha's loan of $300,000 to

Qualcomm was made for one purpose only – to help protect Kadisha's interests which were

vitally connected to Qualcomm's continuing viability.  This was a conflicted situation where

Kadisha acted to obtain necessary cash for Qualcomm, leaving Trust 2  with a long shot that

would out shadow anything offered at Santa Anita.

|  | FARAHNIK TIME LINE |
|---|---|
| January 11, 1988: | The trust instruments are executed. |
| February 8, 1988: | Kadisha draws down $85,000 from his Union Bank line of Credit and deposits it into his personal Union Bank account. |
| February 8, 1988: | Kadisha deposits $3,000 into his personal Union Bank Account. |

Exhibit 1
Page 115

Exhibit 43
Page 609

| | **FARAHNIK TIME LINE (CONT'D)** |
|---|---|
| February 10, 1988: | Kadisha loans Farahnik $75,000 from Hisunien Bank account (See February 8, 1988 above). |
| February 26, 1988: | The final version of the Trust instruments are executed. |
| March 3, 1988: | Kadisha draws down $100,000 from his Union Bank line of credit and deposits it into his personal Union Bank account. |
| March 18, 1988: | Kadisha draws down $55,000 from his Union Bank line of credit and deposits it into his personal Union Bank account. |
| March 18, 1988: | As of this date, Kadisha has drawn down $240,000 on his Union Bank line of credit consisting of: (i) $85,000 on February 8, 19888, (ii) $100,000 on March 3, 1988; and (iii) $55,000 on March 18, 1988). |
| March 24, 1988: | Kadisha loans Farahnik $76,000. If Kadisha had not drawn down the $155,000 (consisting of $100,000 on March 3, 1988 and the $55,000 on March 18, 1988) his Union Bank account would have been overdrawn approximately $19,000, and he would have been able to loan Farahnik $76,000. |
| April 5, 1988: | Kadisha loans Farahnik $70,000 bringing the total loans to $221,000 ($75,000 on February 10, 1988; $76,000 on March 24, 1988; and $70,000 on April 5, 1988). On these funds, only $151,000 came from Kadisha's Union Bank line of credit ($75,000 on February 10, 1988 and $76,000 on March 24, 1988). |
| April 1988: | Kadisha causes Trust 2 to apply for a $500,000 loan from Namco to be secured by the Strathmore Residence. |
| May 17, 1988: | Kadisha deposits the $500,000 Namco Loan proceeds into his personal Union Bank account. |
| May 26, 1988: | Kadisha uses $240,000 of the $500,000 Namco Loan proceeds to repay Union Bank the $240,000 he had drawn down in February and March 1988 from his line of credit, of which $151,000 was loaned to Farahnik. |

Exhibit 43
Page 610

Kadisha used trust assets to acquire 30,000 shares of Qualcomm stock from Farahnik (Which has nothing to do with Farahnik's original purchase thereof by money other than from either Trust 1 or 2).

One of the principal claims of Petitioner Dafna Uzyel relates to Kadisha loaning money to Farahnik—which he used to buy Qualcomm stock—and to subsequent forgiveness by Kadisha of the loan money due him in exchange for receiving 30,000 shares of Qualcomm stock. The Petitioner contends the two transactions between Kadisha and Farahnik resulted in damages to Petitioner because Trust 2's money was used by Kadisha to (1) make the original loans to Farahnik by which he was able to purchase the subject shares of Qualcomm stock, and (2) the second claim of Petitioner Dafna Uzyel that Kadisha used some of Trust 2's money to acquire the subject shares of Qualcomm stock is valid. The first claim is not.

While Petitioner Dafna Uzyel would have it in respect to the first claim that Kadisha had his eye on Trust 2's probable assets at the time he loaned Farahnik the $76,000 on March 24, 1988 and $70,000 on April 5, 1988, such contention is without proof, falling into the legal junkyard of speculation.

The second claim is valid.

Kadisha loaned Farahnik a total of $221,000. (The $7,000 and the $76,000 loans totaling $151,000) were funded by Kadisha's Union Bank line of credit advance—which was repaid with Trust 2's funds when Kadisha misappropriated the $500,000 Namco loan proceeds (the property of Trust 2) for his own use. The court finds beyond any doubt the acquisition of the subject 30,000 shares of Qualcomm was enabled by Kadisha embezzlement of practically all the subject Namco loan proceeds. The damages are detailed subsequently under the Damages section.

///

STATEMENT OF DECISION

111

Exhibit 1
Page 117

Exhibit 43
Page 611

## DAMAGES

"Equitable relief is flexible and expanding, and the theory that 'for every wrong there is a remedy' (CC 3523) may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs" (See Witkin, 9th Ed. Vol. 11, Equity #3, pg. 681). By classification, this case falls within the jurisdiction of the probate court which can fashion an equitable remedy against a trustee who has breached his lawful duties to the beneficiaries and caused them damages or the right to a constructive trust of assets acquired by trust money.

Kadisha's reliance on certain terms of trust agreements as escape hatches to relieve himself of his numerous derelictions as trustee and damages resulting therefrom is, as stated elsewhere in this opinion, totally lacking in merit as the trust agreements are the product of fraud by the respondent.

Respondent contends that Petitioners have not presented any "damage model" upon which the Court can calculate damages. Although it is unclear what Respondent means by a "damage model," the evidence, case law and common sense provide an adequate basis for calculating Petitioners' damages. Respondent's argument is also belied by the fact that Respondent presented his own formulas for calculating damages, in the event the Court awarded them.

"Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty." (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District 1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 371, and *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778]) "The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." (Emphasis

STATEMENT OF DECISION

112

Exhibit 1
Page 118

Exhibit 43
Page 612

1    added; *Id.* At p. 874, citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) <u>"**This is**</u>

2    <u>**especially true where…it is the wrongful acts of the defendant that have created the**</u>

3    <u>**difficulty in proving the amount of loss of profits…or where it is the wrongful acts of the**</u>

4    <u>**defendant that have caused the other party to not realize a profit to which that party is**</u>

5    <u>**entitled.**</u>" (Emphases added; *Id.* Citing *Ramona Manor Convalescent Hospital v. Care*

6    *Enterprises* (1986) 177 Cal.App.3d 1120, 1140; *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12

7    and *James v. Herbert* (1957) 149 Cal.App.2d 741, 749.) The selection of which measure of

8    damages to apply is within the sound discretion of the trier of fact. (Id.) The measure that most

9    appropriately compensates the injured party for the loss sustained should be adopted. *Strebel v.*

10   *Brenlar Investments, Inc.* (2006) 135 Cal.App.4[th] 740, 749.

11   Furthermore, this is a court of equity and:

12
> "The object of equity is to do right and justice. It 'does not wait
> upon precedent which exactly squares with the facts in
> controversy, but will assert itself in those situations where right
> and justice would be defeated but for its intervention.' 'It has
> always been the pride of courts of equity that they will so mold and
> adjust their decrees as to award substantial justice according to the
> requirements of the varying complications that may be presented to
> them for adjudication.' [Citations omitted.] 'The powers of a
> court of equity, dealing with the subject-matters within its
> jurisdiction, are not cribbed or confined by the rigid rules of law.
> From the very nature of equity, a wide play is left to the conscience
> of the chancellor in formulating his decrees. It is the very essence
> of equity that its powers should be so broad as to be capable of
> dealing with novel conditions.' [Citation omitted.] Equity acts 'in
> order to meet the requirements of every case, and to satisfy the
> needs of a progressive social condition, in which new primary
> rights and duties are constantly arising, and new kinds of wrongs
> are constantly committed.' [Citation omitted.]"

26   *Toscano v. Green Music* (2004) 124 Cal.App.4[th] 685, 693-694.

27   The Court has been cognizant of these principles in arriving at its damages award on the

28   following claims.

Exhibit 43
Page 613

1   The Court is using the date of September 18, 2000 as the date for determining Petitioners'

2   damages on certain of their claims.  This was the last day upon which Kadisha turned over Trust

3   assets to Petitioners.  Therefore, the assets were under Kadisha's control and subject to his

4

5   fiduciary duties until September 18, 2000.

6       During trial, Kadisha attempted to introduce evidence about what happened to the assets

7   once Petitioners regained control of them.  The Court ruled that such evidence was irrelevant.

8   Kadisha's argument in support of introducing the evidence was, in substance, that Petitioners

9   should have done something after he turned over the assets to them to mitigate, for example, the

10

11   $10 million loss Petitioners suffered when he stood idly by while the value of Trust 1's

12   Qualcomm stock plummeted.  In other words, Kadisha is looking to Petitioners as if they have a

13   fiduciary duty to him to cure his intentional breaches of duty.  This is another of Kadisha's

14   attempts to blame the victim and the Court rejects it.  Kadisha had control of the assets until

15

16   September 18, 2000, they were subject to his fiduciary duties until then, and that is the date the

17   Court is using to calculate damages. *see amendment*

18       **Damages:  Re $300,000 loan to Qualcomm from Trust 2.**

19       Since it is evident that the loan was not made for Dafna's benefit, and that Kadisha was

20

21   the only other person who stood to benefit from the loan, the only conclusion that can be drawn

22   is that Kadisha made the loan for his own benefit; Qualcomm was losing money; Kadisha's own

23   Qualcomm's investments were at risk, and he loaned Trust 2's money to Qualcomm to aid

24   Qualcomm, which in turn would improve his holdings of Qualcomm stock.

25       Kadisha is incorrect when he argues that he should be excused from liability because of

26

27   the high rate of return earned by the $300,000 loan to Qualcomm.  The loan was an extremely

28   bad gamble by Kadisha and violated every investment rule for trustees in the book.  But Kadisha

---

STATEMENT OF DECISION

114

Exhibit 1
Page 120

Exhibit 43
Page 614

got lucky and the gamble paid off.  Naturally, Kadisha expects to be rewarded, and all his

derelictions excused because of one lucky bet, but such is not the case.  Otherwise, trustees

would be given license to steal millions of dollars but be excused by some lucky bet.  No such

license is issued by any decision.

In fact, the opposite is true.  Probate Code section 16440 gives courts discretion to excuse

a trustee from liability only where the trustee has acted reasonably and in good faith, and it

would be equitable to excuse the trustee's liability.  In fact, Kadisha *intentionally* set out to take

advantage of Dafna's inexperience and lack of sophistication to gain control over the trust assets

so that he could use them for his own benefit.  Subjecting Dafna and her children to such

extreme risk in a conflicted transaction to loan Qualcomm $300,000 made purely to protect his

own investment – when Kadisha knew that Dafna was utterly incapable of replenishing the Trust

principal if this risky investment failed – was neither reasonable nor in good faith.  Kadisha

never stopped to consider the welfare of Dafna and her children.  He was solely interested in his

own financial welfare, and there is no evidence of any instances in which Kadisha acted in the

beneficiaries' interests.  There is *no* evidence that Kadisha acted reasonably and in good faith.

Nor did Kadisha provide any financial analysis to show how Trust 2's $300,000 loan to

Qualcomm would actually contribute to generating the required monthly distributions.

Qualcomm was a private company and losing more money than it was able to make or raise from

investors.  There was thus no performance or financial data from which to project what the future

value of Trust 2's $300,000 loan would be and therefore how it would enable Trust 2 to make

$20,000 monthly distributions to Dafna.  In fact, because Kadisha agreed to defer interest on the

loan to help Qualcomm, Trust 2's ability to generate the monthly distributions was *reduced by*

the $300,000 loan, not enhanced.

---

STATEMENT OF DECISION

· 115

Exhibit 1
Page 121

Exhibit 43
Page 615

Kadisha also incorrectly contends that Qualcomm did not need Trust 2's money because it could raise all of the cash it needed, and that Kadisha did not, therefore benefit from Trust 2's loan to Qualcomm. The evidence is exactly the opposite – Qualcomm was losing money, it needed additional working capital that it could not raise, and it needed Trust 2's $300,000.

Entering into the $300,000 loan transaction with Trust 2, which provided the beneficial right to acquire 37,500 shares of Qualcomm stock at $8 per share, is one indication that Qualcomm was *not* wallowing in cash, as suggested by Kadisha, particularly since Qualcomm made repayment of the loan a five-year obligation with deferred interest.

As well, at the time of Trust 2's loan on December 7, 1988, Qualcomm's liabilities (including its payroll and short-term payables) exceeded its available cash by millions of dollars. Qualcomm was consistently losing money. Its financial position had been further weakened by the Omninet transaction. On the date of Trust 2's loan, December 7, 1988, Qualcomm's August 20, 1988 "Series A" offering had not raised all of the money Qualcomm needed. In fact, the evidence was that as of December 1988, Qualcomm had raised only $300,000 in addition to Trust 2's loan. In February 1989, Qualcomm amended its "Series A" PPM. The amended PPM disclosed that a substantial portion of the money that had ultimately been raised came from officers and directors, not unaffiliated third parties. It also admitted that there was no assurance that Qualcomm would be able to raise all of the financing it needed.

Kadisha, as a director, was intimately familiar with these facts. The evidence of Qualcomm's financial conditions shows that the $300,000 loan was so risky that no faithful trustee would have made it. The evidence amply supports the inference that Trust 2's $300,000 contribution was looked for aid by Qualcomm in its financial dilemma.

Exhibit 1
Page 122

Exhibit 43
Page 616

Petitioners were not required to show precisely what Qualcomm did with Trust 2's money, as Kadisha contends.   Since money is fungible, it would have been impossible for Petitioners to determine precisely how Qualcomm used their $300,000.  It is abundantly clear, however, that Qualcomm needed additional cash to survive.  In each of its PPM's between August 20, 1988 and August 24, 1989, Qualcomm consistently indicated that even if it raised the money sought, it would need more money, and it was uncertain whether it would be able to raise enough money to continue operating.  The evidence is thus clear that Qualcomm was struggling to survive, that it needed more money, that Kadisha knew it needed more money to survive, and, that during this period he loaned it $300,000 of Trust 2's money.  Moreover, Petitioners are aided by the presumption of Probate Code section 16004(c).  They established that Kadisha breached his fiduciary duties by making the $300,000 loan for his own benefit.  The burden then shifted to Kadisha to show that he did not benefit from the loan.  Kadisha failed to meet this burden.

Kadisha incorrectly contends that the loan was a permissible exercise of his fiduciary duties because only a small percentage of the Trust's principal was at risk.  Kadisha is wrong.  The loan was a conflicted transaction that breached his fiduciary duties regardless of whether it involved 10% or 100% of the value of the Trust assets.  Moreover, Kadisha also misappropriated the rest of the Imperial Loan proceeds for his own use so the $300,000 loan was Trust 2's only documented asset (other than the now heavily mortgaged Strathmore Residence).

Kadisha's claim that he is entitled to the protection of the conflict of interest provision in the Trust is equally far fetched.  The Court finds that the conflict of interest provision, and others, are unconscionable as created, and Kadisha therefore cannot rely on them.

STATEMENT OF DECISION

117

Exhibit 1
Page 123

Exhibit 43
Page 617

1   Kadisha also testified that he was forced to make such a risky investment to meet the

2   terms of the Trusts, which required him to make $20,000 monthly distributions to Dafna.  As

3   previously noted, the Court is disregarding Kadisha's testimony.  As well, Kadisha was regularly

4   consulted throughout the preparation of Trust 2, and he expressly agreed to be bound by its

5   terms.  If he thought that the Trust's assets were not substantial enough to generate monthly

6   $20,000 distributions through conservative investments, why did he agreed to be bound by the

7   requirement that the trust estate be conservatively invested, "with primary consideration being

8   given to preserving principal.  Kadisha did not offer any credible evidence that in December

9   1988 when the loan was made, the trust's assets were too unsubstantial to make the required

10  distributions to Dafna with conservative investments.

11      Having determined all of the above, the Court is unable to find Petitioner's claim for

12  damages in the sum of $19,202,211 as being Trust 2's proportionate share of Kadisha's

13  Qualcomm stock transactions, plus prejudgment interest from September 20, 2000.  The method

14  of calculation is unsupportable proof of damages.  What the Petitioners would do is take the

15  percentage $300,000 was at the time of the loan to the total cash investments of Kadisha and

16  determine this to be 22.86%.  This percentage was taken by adding Kadisha's Qualcomm stock

17  investments as $662,000, $250,000, $100,000 and the $300,000 for a total of $1,312,000.  The

18  $300,000 is 22.86% of the $1,312,000.  But while practically everything Kadisha did in his so-

19  called management of the Trusts was done by embezzlement of trust money for his own interests

20  and without regard to any of his obligations as trustee his gain in loaning the $300,000 has not

21  been shown by Petitioners, even by the use of power-point boards, which Yossi Vardi, a tech

22  investor and distinguished prankster from Israel remarked: "Power Point presentations damage

STATEMENT OF DECISION

118

Exhibit 1
Page 124

Exhibit 43
Page 618

your brain.  If you look at too many, you become immoral."  The court did not look at too many but enough to discount Petitioner's theory of damages by the formula above described.

The court is not denying that Kadisha benefited Qualcomm in some degree by the $300,000 loan but it was hardly the economic lifeline the Petitioners would have it.  And Kadisha probably benefited himself in the eyes of Qualcomm's Board of Directors by showing his dedication and financial acumen in obtaining the $300,000 for Qualcomm.  And obviously in some hardly calculable measure increased the value of his Qualcomm stock.  But saying the foregoing does not equate to proof of damages suffered by Trust 2 in Kadisha's making of the subject $300,000 loan.

Petitioner's claim for damages against Kadisha for his loaning $300,000 of Trust 2's money acquired by Kadisha in the making of the Namco loan is denied.

### Damages:  Re the Farahnik loan, funding by Trust 2, and Acquisition by Kadisha.

Because Kadisha used a portion of the Namco Loan proceeds (the property of Trust 2) to wipe out his obligation to Union Bank, there was clearly substitute funding of $112,302 of the Farahnik loans by the use of Trust 2's money.  Kadisha, by his actions and conduct, had to know that what he was doing with Trust 2's money was wrongful.  He abstained from making any note to trust 2 concurrent with his taking of the Namco Loan proceeds.  He never had a note signed by Farahnik to Trust 2 concurrent with Kadisha paying off Union Bank with Trust 2's money.  He gave six different, incorrect explanations for what he did with the Namco Loan proceeds prior to trial to prevent Petitioners from discovering that he had used a portion of the proceeds to pay off his Union Bank line of credit for funds he had borrowed to loan to Farahnik.

STATEMENT OF DECISION

119

Exhibit 1
Page 125

Exhibit 43
Page 619

Under the circumstances of this case, the idea that Kadisha, being guilty of perjury among other misdeeds as trustee, can suggest that he should be the total beneficiary of millions of dollars of profit on the 30,000 shares of Qualcomm stock he acquired from Farahnik made possible by the use of Trust 2's money is unbelievable.  He would have it that Dafna and her children are well rewarded by his paying 13% on the money he took from Trust 2 via the Namco Loan. Equity is shocked by such a conception of justice.  It is tantamount to rewarding a thief for stealing money.  Kadisha must instead disgorge any profit, benefit or advantage he acquired through his dealings with trust assets.

Petitioner Dafna Uzyel is awarded $15,818,000, plus prejudgment interest at 10% per annum from September 19, 2000.  The amount is calculated as follows:

Petitioners are entitled to a proportionate share of the 30,000 shares.  The court arrives at the $112,302 figure by first determining that $151,000 is part of the amount Kadisha wrongfully stole in taking practically all the $500,000 Namco loan proceeds for his own use.  But the court is giving Kadisha credit for $38,698 of his own money ($10,000 being highly questioned by Petitioners, who contend he got $10,000 of Trust 2's money and used it for his own purposes) which reduces the Petitioner's correct contention that the $112,302 was used by Kadisha in the acquisition off the subject 30,000 shares of Qualcomm stock and said stock so acquired is their property or they are entitled to damages equal to the value of the stock and its progeny as of the date of termination of the trusts in September 2000.  Damages are computed as follows:  Using the 17,540 shares as acquired by Trust 2 by Kadisha's use of Trust 2 money there followed stock splits bringing the total stock held by Kadisha from 30,000 to 480,000 shares in September 2000. Applying 53.48 percent to 480,000 reveals Trust 2 owns or is entitled to the value of 256,704 shares which multiplied by $61.62 a share (being the lowest price between September 14 and

Exhibit 43
Page 620

September 18, 2000) brings the value of the subject shares to $15,818,000.  Petitioner Dafna Uzyel is awarded $15,818,000 as damages, plus interest at 10% per annum from September 18, 2000.

The Court rejects Kadisha's reason for asserting that the percentage of Trust 2's shares should be other than 53.48% is that the consideration for Kadisha's acquisition of the misappropriated shares was $221,000 rather than $210,000.  The Stock Purchase and Sale Agreement between Kadisha and Farahnik for the acquisition of the misappropriated shares specified consideration of $210,000.  There is no evidence that the consideration for the shares was $221,000.

### Damages – Kadisha's 1992 Sale of Trust 2's 37,500 Shares of Qualcomm Stock:

Kadisha was self-dealing when he sold Trust 2's assets when he sold Trust 2's 37,500 shares of stock in May 1992.  He needed money for his own use, being under substantial financial pressure.  But this time, he did not use any "loan" or "investment" acknowledgement of his taking.  Instead, he concocted a phony loan of $1,400,000 to a real or fictitious person by the name of David Rahban who reputedly lives in Switzerland or Israel.  He might just as well be living on the moon or on Mars with an odd-shaped head.  Nothing by way of a note, letter, address, security or usual evidence of a loan has been provided by Kadisha.  The Court finds Kadisha is not telling the truth.  That in fact, he just took the money for his own use.  That in addition to the $1,400,000, he took $1,200,000 with the same phony ploy that it was a loan to Rahban.  Good story telling is not a major or credential of Kadisha.  He does it badly.  Theresa Makhaili, Kadisha's assistant, gave untrue testimony on direct examination to support Kadisha's untrue testimony about the Rahban loan.  However, she admitted on cross-examination that she

Exhibit 43
Page 621

never knew Rahban, never saw a promissory note from Rahban, and never had an address for him. Mikhaili, who kept the Trust records, also admitted on cross-examination that she did not make the entries on the Trust accounting that showed Rahban's purported $1.4 million loan, or his alleged payments. The Court finds that Kadisha and Mikhaili are not telling the truth when they claim that Kadisha loaned $1.4 million to Rahban. That in fact Kadisha sold Trust 2's Qualcomm stock solely for his own benefit and took the proceeds of the sale, along with other Trust funds, for his own use in the guise of the phony loan to Rahban.

The May 1992 sale and the Rahban loan represent two separate transactions (albeit closely related ones) and different damages pertain to each. The May 1992 sale violated Kadisha's fiduciary duty of loyalty, his duty to refrain from using Trust assets for his own purposes, his duty to keep the Trust assets separate from his own, and his duty to prudently invest Trust 2's assets. (The "Rahban" loan is dealt with in the section in the decision on Kadisha's misappropriations.) Although courts generally do not like to second-guess a trustee's investment decisions, Kadisha's self-dealing in selling Trust 2's Qualcomm stock to raise cash for his own use did not constitute prudent investing. Furthermore, Kadisha did not consult with an investment advisor about the advisability of the sale, or invest or diversify the sale proceeds (he embezzled them instead), or tell Dafna about the sale either beforehand or afterwards.

Petitioners have also raised the issue of Kadisha's bad faith in selling Trust 2's Qualcomm stock for his own use. There is no question that Kadisha had an ever-present, continuing appetite for the use of trust assets for his own benefit. This is crystal clear. But when Kadisha sold Trust 2's stock at its then market value for his own beneficial use, was this "bad faith?"

Exhibit 43
Page 622

"Bad faith implies or involves actual or constructive fraud, or a design to mislead or deceive another, or a neglect to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interest or sinister motive. The term 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong, because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design or ill will." Black's Law Dictionary; 5th Edition.

Kadisha breached his fiduciary duties in many ways, including, but not limited to using trust assets for his own benefit. Selling Trust 2's Qualcomm stock to raise cash for his own use and concocting the fiction of the Rahban loan to cover up his embezzlement of the sale proceeds were conscious doings of wrong. Kadisha was not merely negligent. His purpose was dishonest. His acts were the turning aside of moral conduct. In short, they were in bad faith – and they breached Kadisha's duty to treat Trust 2's beneficiaries with the *utmost* good faith.

Probate Code section 16440(a) provides that if a trustee commits a breach of trust, he is chargeable with any of the following that is appropriate under the circumstances: (1) any loss or depreciation in the value of the trust estate resulting from the breach of trust, with interest; (2) any profit made by the trustee through the breach of trust, with interest; or (3) any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

Kadisha's actions in selling Trust 2's Qualcomm stock in 1992 with no economic justification and for his own benefit resulted in a loss to the value of Trust 2, and/or lost profits, because of the subsequent increase in the value of Qualcomm stock. By absconding with the sale proceeds, Kadisha also foreclosed Trust 2's ability to make other profitable investments. That opportunity was lost to Trust 2 forever. In addition, because Kadisha sold Trust 2's stock to

Exhibit 43
Page 623

raise the cash he needed, he did not have to sell his own stock. He therefore profited from the appreciation of *his* stock but prevented Trust 2's beneficiaries from similarly profiting from the appreciation of *their* stock.

The Court cannot excuse Kadisha from liability for the Trust's loss (and his corresponding gain) under Probate Code section 16440(b). That section states: "If the trustee has acted *reasonably and in good faith* under the circumstances as known to the trustee, the Court, in its discretion, may excuse the trustee in whole or in part from liability under subsection (a) *if it would be equitable to do so.* Kadisha did not act reasonably or in good faith in selling Trust 2's Qualcomm stock for his own purposes and attempting to conceal his wrongdoing in the fraudulent guise of the Rahban loan. Kadisha therefore cannot be excused from liability for Trust 2's loss from his self-dealing sale of its Qualcomm stock (or for his corresponding gain).

Accordingly, on this claim, the proper measure of damages is $35,389,242, plus prejudgment interest from September 19, 2000. This is calculated as follows.

Kadisha improperly sold 37,500 shares of Trust 2's Qualcomm stock in May 1992 for $801,000. Interest on the $801,000 as of September 18, 2000 was $781,750 (using 13% interest from May 1 1992 until November 30, 1996 and 10% thereafter.) Petitioners' total benefit from the May 1992 stock sale was therefore $801,000 plus $781,750 or $1,582,758 ("Petitioner's 1992 Sale Benefits"). On September 18, 2000, 37,500 shares, after stock splits, had grown to 600,000 shares. Using the stock price of $61.62 per share that the Court has used on other claims, the 600,000 shares were worth $36,972,000 on September 18, 2000. After deducting Petitioners' 1992 Sale Benefits ($1,582,758) from $36,972,000, the damages are $35,389,242.

STATEMENT OF DECISION

124

Exhibit 1
Page 130

Exhibit 43
Page 624

1      In considering what measure of damages to assess against Kadisha for his many

2  derelictions as trustee, the Court is fully aware of his effort to have the court ignore the totality of

3  his conduct, which reveals his complete pattern of treating Trust 2's assets as those which he

4  could embezzle and use for his own purposes, and have the court focus on denial of each

5  embezzlement, converting each to some sort of minor transgression of his trustee's duties.  The

6  compartmental device of Respondent's as a cover-up is not acceptable to the court as a blind-

7  sided approach.  This is not to say the court ignores analyzing each of the claimed abuses of his

8  trust as alleged by the Petitioners but such analysis may reveal a pattern of conduct that produces

9  a true picture of Kadisha's embezzlement driven takings.  A look below the surface of the veneer

10  of his argument reveals the truth.

11

12

13      Petitioners, in seeking damages elect to ignore the sale of the 37,500 shares and treat it as

14  though it had never happened, contending Kadisha's sale was a part of his intent to embezzle

15  Trust 2's money, and, therefore, the Court must treat the sale as not having been made, and the

16  stock should have been held until the termination of Trust 2 when it was worth $35,389,942.

17

18      The truth of the business is that Kadisha needed money, and this is plainly obvious as he

19  then made the fictitious "loans" to Rebhan.  They were nothing more than a clear integral part of

20  the embezzlement by Kadisha of Trust 2's money.

21

22      Kadisha's defense is that all is forgiven once he repaid the Rebhan embezzlements and

23  paid interest thereon.  As empathized herein, Kadisha as embezzler does not determine when he

24  is to return the embezzled money or what penalty shall be imposed upon him for his

25  embezzlement.  The Petitioners have the option on how to treat the embezzlement.  They were

26  never consulted about the sale and obviously Kadisha did not suggest the Petitioners seek legal

**STATEMENT OF DECISION**

125

Exhibit 1
Page 131

Exhibit 43
Page 625

advice about the sale.  So Petitioners have every right to contend we are seeking damages against you for the amount of money our Qualcomm stock was worth had you held it until your control over the trusts were terminated.  Hence, the Petitioner Dafna Uzyel is awarded $35,389,242 in damages as computed above, plus interest at the legal rate of 10% per annum as andd from September 18, 2000.

### Damages:  Kadisha's Misappropriations of Trust Funds.

The Uzyel Trusts provide that: (1) [t]he principal of the Trust estate be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, (2) within such guidelines to maximize the income from the trust estate, and (3) the trustee may lend money at an adequate interest rate and with adequate security.

Kadisha's misappropriation of millions of dollars of trust money from 1988 to 1996 were not loans made at an adequate interest rate or with adequate security, as Kadisha contends. Kadisha embezzled the funds in flagrant violation of his fiduciary duties.  In fact, Kadisha could have been charged under the Penal Code for Grand Theft (Penal Code section 487) for embezzlement for his misappropriations.  Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been entrusted."

Fortunately, this does not require the Court to forego awarding damages, as Kadisha erroneously contends.

Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty.  (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District,

STATEMENT OF DECISION

126

Exhibit 1
Page 132

Exhibit 43
Page 626

1   1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 317 and

2   *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778].) "The law requires only

3   that some reasonable basis of computation of damages be used, and the damages may be

4   computed even if the result reached is an approximation." (Emphasis added; *Id.* At p. 874,

5   citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) "This is especially true where…it is

6   the wrongful act of the defendant that have created the difficulty in proving the amount of

7   loss of profits…or where it is the wrongful acts of the defendant that have caused the other

8

9   party to not realize a profit to which that party is entitled." (Emphasis added; *Id.* Citing

10  *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140;

11  *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12, and *James v. Herbert* (1957) 149 Cal.App.2d

12  741, 749.) The selection of which measure of damages to apply is within the sound discretion of

13  the trier of fact. (Id.) The measure that most appropriately compensates the injured party for the

14  loss sustained should be adopted. *Strebel v. Brenlar Investments, Inc., supra,* 135 Cal.App.4th at

15  p. 749.

16

17

18      Furthermore, this is a court of equity and:

19

20          "The object of equity is to do right and justice. It 'does not wait
            upon precedent which exactly squares with the facts in
21          controversy, but will assert itself in those situations where right
            and justice would be defeated but for its intervention.' 'It has
22          always been the pride of courts of equity that they will so mold and
            adjust their decrees as to award substantial justice according to the
23          requirements of the varying complications that may be presented to
            them for adjudication.' [Citations omitted.] 'The powers of a
24          court of equity, dealing with the subject matters within its
            jurisdiction are not cribbed or confined by the rigid rules of law.
25          From the very nature of equity, a wide play is left the conscience
            of the chancellor in formulating his decrees. It is of the very
26          essence of equity that its powers should be so broad as to be
            capable of dealing with novel conditions.' [Citation omitted.]
27          Equity acts 'in order to meet the requirements of every case, and to

28

Exhibit 1
Page 133

Exhibit 43
Page 627

satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.' [Citation omitted.]"

*Toscano v. Green Music, supra,* (2004) 124 Cal.App.4[th] 693-694.

In the case before the court, prime consideration must be given to section 16440 of the Probate Code. It provides, in pertinent parts, as follows:

"(a)    If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances.

(1)    Any loss or depreciation in value of the trust estate, with interest.

(2)    Any profit made by the trustee through the breach of trust, with interest.

(3)    Any profit that would have accrued to the trust estate if the loss of profit is the result of breach of trust."

It is the Respondent's position that "Whether takings were unauthorized "loans" or even outright "looting" makes no difference -- the liability is limited to 10% simple interest."

The Respondent's position requires analysis.

The Respondent ignores Section 16440, Section (a)(1). This section clearly states the trustee is liable for "any loss or depreciation in the value of the trust estate, with interest."

There are clearly two factors, i.e., (1) the loss, and (2) the interest on the loss. Obviously, if the trustee lost thousands of dollars for which he is liable, the loss is not reduced to simple interest at 10%. The interest accrues on the money lost. The statute so states, "with interest."

STATEMENT OF DECISION

128

Exhibit 1
Page 134

Exhibit 43
Page 628

With the foregoing in mind, how can the court fix loss or profit by Kadisha's unlawful takings of trust money?

The Petitioners gear the Petitioners' right to damages under the claim the Petitioners lost money by Kadisha's takings in that the 13% interest rate Kadisha set as his idea of a fair return should be disregarded in favor of the court determining from the evidence that a higher amount than just interest (the 13%) should be paid upon the evidence presented that high quality second trust deeds, at the time of the takings, were paying 15%, plus five points.

Two experts were presented, Charles Bercy for Petitioners and George Katzer for the Respondent. Bercy had 2nd Trust Deeds paying 15%, plus five points. Katzer had 2nd Trust Deeds paying 11 to 13% and three to six points.

But no matter how you cut or slice it, Petitioners are talking about interest on money used wrongfully by Kadisha. The loss element is not present as contemplated by the statute which contemplates action by the trustee in dealing with a trust asset improperly causes a loss. The loss is recoverable, plus interest. The failure to maximize interest on money taken is not the kind of loss contemplated by the statute. Obtaining interest on money is a value judgment requiring many considerations not the least of which is the security, if any, supporting the loan. Second trust deeds require acute attention to the value marketability of the subject property and the percentage of that figure which the first trust deed represents. And the holder of the second must be able to cover or take over the first trust deed. And always, there is the haunting question of a real estate slump substantially reducing the market value of the property, placing second trust deeds in jeopardy. The bottom line as to second trust deeds buyers is whether the interest rate (and perhaps points) is commensurate with the risk. So it is really all about interest and being

Exhibit 43
Page 629

about interest.  There is no compensable "loss" under the terms of Probate Code 16440(a)(1)(2) by the Respondent not investing in second trust deeds as opposed to his paying 15%.  Hence, Petitioner's request for damages arising out of Respondent's failure to pay the equivalent second trust deed interest rates (and points) on the money he purloined from the trusts is denied. Petitioners are entitled to 10% percent simple interest on the money taken, but Kadisha gets no credit for his paying the excess over 10%, i.e, three percent.

RE:  KADISHA'S FORFEITURE OF ANY RIGHT TO ENFORCE ANY PROVISIONS IN ANY OF THE TRUST INDENTURES AGAINST THE PETITIONERS.

Kadisha is grossly in error when he says that he was allowed to make loans to himself because of the Trusts' conflict of interest clauses.

Civil Code section 1670.5 provides that if a court, as a matter of law, finds that a contract or any clause of the contract was unconscionable at the time it was made, it may refuse to enforce the contract or the unconscionable clause, or limit the application of an unconscionable clause so as to avoid an unconscionable result.  The Court may also enforce the remainder of the contract.  This section applies either directly or by analogy to the Trusts.

In determining whether a provision is unconscionable, the Court must look to the facts at the time the instrument was executed.  The facts at the time the Trusts were executed are as follows.

After her husband's death, Dafna was under Kadisha's influence, dependent on him and in a confidential relationship with him.  Dafna needed legal advise, and Kadisha referred her to his own attorney, Hugo DeCastro.  Even prior to being appointed Trustee, DeCastro

STATEMENT OF DECISION

130

Exhibit 1
Page 136

Exhibit 43
Page 630

communicated almost exclusively with Kadisha about the status of Dafna's assets rather than

Dafna. After Kadisha was chosen to be the trustee, DeCastro represented both Kadisha, as

trustee, and Dafna, as the settler. As a result of his firm's involvement with the financially

troubled Omninet, DeCastro also knew that Kadisha needed money. DeCastro never represented

Dafna with the requisite undivided loyalty and never fully protected her from Kadisha's need for

money and the penchant for avoiding his legal and ethical duties. In fact, he promoted Kadisha's

interests over Dafna's.

The purported exculpatory provision and the conflict of interest provisions are prime

examples. As to the conflict of interest provisions, DeCastro knew that Kadisha needed money

to support his various business interests – particularly the failing Omninet. This knowledge

should have prompted him to craft Trust provisions that protected Dafna and her children from

Kadisha using Trust funds to satisfy this need. Instead, he did the opposite by inserting conflict

of interests provisions into both Trusts that Kadisha interpreted as invitations to use the Trust

assets exclusively for his own benefit.

In fact, there is an even more fundamental issue as to why Trust 2 was set up in the first

place. Only Trust 1 (which was established for Izzet's and Joelle's benefit) was a condition to

the settlement with Lillian Nomaz. Dafna was not required by the settlement (or any other

reason) to limit her access to her own assets by placing them in a trust. An attorney who was

protecting Dafna's interests would undoubtedly have pointed that out to her. Instead, Dafna's

assets wound up in Trust 2, under the control of Kadisha, who DeCastro knew needed money.

There can be no doubt that DeCastro was acting in Kadisha's interests rather than Dafna's in

establishing Trust 2.

STATEMENT OF DECISION

131

Exhibit 1
Page 137

Exhibit 43
Page 631

The egregiousness of DeCastro's improper favoritism towards Kadisha is amplified by the fact that Dafna was incapable of understanding DeCastro's conflict of interest, the danger that that conflict of interest posed or any of the Trust provisions. (DeCastro never even informed Dafna of the conflict.) Dafna was thus essentially unrepresented, incapable of understanding the Trust provisions, and a victim of Kadisha's plan to gain control of her assets and DeCastro's acquiescence in Kadisha's plan.

The Court is not going to set forth all the sections of the various trust agreements that cannot be enforced by the Respondent due to the facts Mrs. Uzyel was never independently represented. DeCastro, her purported lawyer in the making of the original agreements, was never really her lawyer. He was Respondent's lawyer and was grossly conflicted, exhibited by his including covenants against her interest. There are two major ones, the first allowing the Respondent to engage in conflict of interest transactions; and the second being an exculpatory clause holding the Respondent harmless for his conduct as trustee. There is no need to mention the others unless Respondent attempts to rely upon same. All sections against Mrs. Uzyel's interest shall be disregarded and declared void. While there is evidence amendments to the trust agreements were prepared by counsel, they exhibited their desire not to be accused of creating such outrageous documents by leaving their name off of same. But with or without the name of counsel, they are outrageous and no provisions of any of them may be enforced against Mrs. Uzyel. They are void as to enforcements against her.

The Court has already indicated that Kadisha's misappropriations were not "loans" as he insists on calling them. Even if they were loans, they violated the terms of the Trusts because they were unsecured. Contrary to Kadisha's contention, the $5 million dollar life insurance policy that he took out naming the Trusts as beneficiaries did not constitute adequate security

STATEMENT OF DECISION

132

Exhibit 1
Page 138

Exhibit 43
Page 632

since it only protected the Trusts in the event Kadisha died. This was highly unlikely since Kadisha was only in his thirties at that time. The real reason for the life insurance was to protect Kadisha's family if he died and Petitioners discovered that he had taken millions of dollars from the Trusts. If he lived, there was no security for the misappropriations.

Kadisha's claim that he "guaranteed" the Trust and that his guaranty was adequate security is nonsense. For one thing, nothing in the Trusts constitutes such a "guaranty." Even if the Trust contained such a "guaranty," Kadisha's financial condition would have made it impossible for him to honor it. Finally, since the Court is disregarding all of Kadisha's and his witnesses' trial testimony, there is no evidence to support any of Kadisha's contentions regarding his misappropriations.

Kadisha also incorrectly claims that Probate Code section 16441(a) limits the Court's ability to measure Petitioners damages to 10% (rather than the 15% the Court is awarding). Respondent's argument is incorrect. Probate Code section 16441(a) only applies to interest on the awards made under Probate Code section 16440, not to the awards themselves.

**Damages: Kadisha's Conflicts Re the Carson '93 Partnership.**

Kadisha, confident of never having to answer for his trustee duty derelictions marched the Trusts into another incredible conflict of interest arrangement.

Carson '93 was formed on July 12, 1993. (TE 608.) The general partner was Texollini, of which Kadisha was a shareholder, president and CEO. (TE 161e, 607.) The limited partners were Texollini, Kadisha, Kadisha's brother (Daniel Kadisha), Kadisha's father (Abraham Kadisha), Kadisha's father-in-law (Parviz Nazarian), and Kadisha's friend (Leon Farahnik). (TE

STATEMENT OF DECISION

133

Exhibit 1
Page 139

Exhibit 43
Page 633

608.)  Trust 1 contributed capital of $475,000 to Carson '93, and Trust 2 contributed capital of $125,000.  (TE 614, 626; 3497.)

Texollini made capital contributions to Carson '93 of $20,000 as a general partner and $480,000 as a limited partner.  (TE 608.)  Carson '93 was formed to acquire the Presidio Property, which it purchased for $4 million.  (TE 616a-i.)  Carson '93 borrowed $2.4 million from First Credit Bank to purchase the Presidio Property.  The loan was secured by a first deed of trust on the property.  Concurrently with the closing of the $2.4 million loan, Texollini borrowed an additional $500,000.  Texollini's loan was secured by a second deed of trust on the partnership property, which made the partnership liable if Texollini defaulted on its loan.  (TE 617 a-g, 618.)

Texollini also received an additional $250,000 at the closing to make tenant improvements.

Petitioners are in error in their assumption Texollini got its $500,000 back, and therefore had no money in the deal, and hence should not have shared pro-rata with the other investors.  Texollini was still liable on its 2nd trust deed.

Petitioners also failed to make their case in contending Texollini got a rent advantage from Carson '93 due to Kadisha's conflict of interest.  Petitioner's expert, Smart, got up-ended by respondent's expert Andrew Minstein.  Smart failed to do his homework in failing to inspect the interior of the subject property, which was ill-suited for warehousing or manufacturing without substantial modification.

STATEMENT OF DECISION

134

Exhibit 1
Page 140

Exhibit 43
Page 634

In January 1997, Kadisha purchased Trust 2's interest in Carson '93 for $190,000 without obtaining an independent appraisal of the value of Trust 2's interest or Dafna's consent. (TE 921)  The purchase breached Kadisha's fiduciary duty to avoid conflicts of interest since he was both the buyer (as an individual) and the seller (as the Trustee of Trust 2), and he set the price. Following Kadisha's purchase of Trust 2's interest, Carson '93 refinanced the Presidio Property for $4 million and made distributions to the partners.  Kadisha received the distributions that Trust 2 would have received in the absence of Kadisha's improper sale of Trust 2's interest to himself.  Additionally, in November 2000, Kadisha sold his Carson '93 limited partner interest, which included Trust 2's partnership interest.  Kadisha profited from his wrongful acquisition of Trust 2's interest and must disgorge his profit.

Accordingly, on this claim, Petitioners are awarded damages for Kadisha's profits in the amount of $224,533 plus prejudgment interest at the rate of 10% per annum from September 19, 2000.[25]

---

[25] Carson 93 Damages Calculation:

| DATE | AMOUNT | 10% SIMPLE INTEREST | DAMAGES |
|---|---|---|---|
| January, 1997 (Respondent Buys Trust 2's Interest. | ($190,000) | | ($190,000 |
| October, 1988 ($2 Million Refinancing Distribution) | $147,060 | ($38,000) | ($ 80,940) |
| February, 1999 ($500,000 Refinancing Distribution) | $ 36,765 | ($ 1,417) | ($ 45,592) |
| November, 2000 (Respondent Sells Trust 2's Interest) | $194,000 | ($ 1,028) | $143,380 |
| June 30, 2006 | | $81,153 | $224,533 |

STATEMENT OF DECISION

135

Exhibit 1
Page 141

Exhibit 43
Page 635

Kadisha incorrectly contends that his 1997 purchase of Trust 2's Carson '93 Ltd partnership interest was with Dafna's consent, at fair market value, and that Petitioner's measure of damages is incorrect.

The Court does not believe Kadisha's testimony that in December 1996 he met with Ron Levi, who informed him that Dafna wanted to sell Trust 2's Carson '93 Ltd partnership interest in order to have money with which to purchase a home. Ron Levi denies that there was any such meeting. Even if there had been a meeting, Kadisha has not established that Ron Levi was Dafna's agent. His acts, if any, therefore are not binding on Dafna.

Kadisha's testimony is also not believable because he was already obligated under the Trust and amendments to make up to $1 million available for the acquisition of a home for Dafna. There was therefore no need to sell the partnership interest. Moreover, if Kadisha had intended to use the funds to buy a house for Dafna, why did he cause Trust 2 to use $105,000 of the $190,000 he paid for the partnership interest to repay Trust 1 for monies advanced?

As to damages, Respondent argues that Petitioners suffered no damages because he paid fair market value for Trust 2's partnership interest. Andrew Minstein testified, however, that fair market value is the price a willing buyer will pay a willing seller in an arm's length transaction. Since Kadisha was both the buyer and the seller, the sale was not an arm's length transaction between a willing seller and a willing buyer who come to a meeting of the minds. This was an egregiously conflicted transaction.

Dafna was not given an opportunity to consult an independent advisor about the sale or negotiate an arm's length transaction. Dafna was never given that choice. She was not a willing

Exhibit 1
Page 142

Exhibit 43
Page 636

seller. Kadisha established the price, without obtaining an appraisal or Dafna's consent. The Court is therefore disregarding Minstein's testimony.

Kadisha also incorrectly contends that Petitioners' damages should not include any distributions Kadisha received from the 1998 refinance of the Carson '93 Ltd property because Petitioners would thereby receive the benefit of the distributions without being saddled with the liability for the loan. Kadisha has not proffered a statute or case that permits such a result. Adopting Kadisha's argument would allow Kadisha to improperly benefit from the use of Trust assets – which the Court will not allow.

Probate Code section 16440 mandates that Kadisha disgorge any profit he received from a breach of fiduciary duty. As a result of Kadisha's improper purchase, he received Trust 2's share of operating cash flow distributions, refinance distributions, and the proceeds from the sale of Kadisha's Carson '93 Ltd partnership interest. Kadisha produced no evidence that he repaid any portion of the refinance money or is liable for repaying it.

The Petitioners seek damages against Kadisha arising out of Kadisha's sale of Trust 2's 53,348 shares of Qualcomm stock in April 1999.

Since equity is the laboratory for ascertaining and formulating justice unavailable at law, a consideration of the facts relevant to Kadisha's selling 53,348 shares owned by Trust 2 must be considered.

It is difficult to glean just what Kadisha had in mind when he made the sale. There is no evidence he considered or complied with Probate Code section 16047(a) which provides:

STATEMENT OF DECISION

137

Exhibit 1
Page 143

Exhibit 43
Page 637

"A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the Trust."

There is no evidence Kadisha acted as a "prudent investor." And he never sought professional advice about the sale. Further, the catch-all phrase "and other circumstances of the trust" is of no help to Kadisha.

Kadisha's unacceptable creativity as to the facts as to why he made the sale and what he did by altering the facts concerning the sale are of substantial concern to the Court, certainly revealing some sort of character defect but not of such magnitude as to alone give cause for the Court to award damages.

**Damages:  Re Claim that Kadisha breached his fiduciary duties and retaliated against Petitioners for suing him by not taking any action as Trust 1's 80,000 shares of Qualcomm stock radically declined in value.**

Kadisha neglected and refused to take any action to preserve the value of Trust 1's 80,000 shares of Qualcomm stock after Petitioners sued him. On October 27, 1999, Petitioners filed their initial petition against Kadisha. On January 3, 2000, the value of Trust 1's Qualcomm stock at the opening of the market was $15,940,000 and the stock constituted approximately 90% of Trust 1's assets. (TE 1394, 1960.) By the time Kadisha turned over the 80,000 shares of Qualcomm stock to Petitioners in September 2000, the value of the stock had declined by over $10 million to $5,299,944.

STATEMENT OF DECISION

138

Exhibit 1
Page 144

Exhibit 43
Page 638

At the same time the stock value was declining, Kadisha was diversifying his own stock portfolio by buying millions of dollars of stock in other public companies.

Kadisha knew that he was duty-bound to fulfill the requirement of Trust 1 "that the principal of the trust estate at all times be invested in a conservative manner with primary consideration being given to preserving principal and protecting against inflation, and with such guidelines to maximize the income from the trust estate." (Trust 1, Art. C., TE 44.) He also had fiduciary duties "to preserve the trust property" under Probate Code section 16006, to act as a prudent investor under Probate Code section 16047, and to diversify the Trust assets under Probate Code section 16048.

Kadisha's failure to diversify Trust 1's assets and to hold approximately 90% of the assets in Qualcomm stock was neither conservative nor prudent because it placed all of the Trust's eggs in one basket. It also illustrates that Kadisha did not have an investment strategy for Trust 1's assets, as required by Probate Code section 16047. As a result of Kadisha's failure to diversify Trust 1's assets, Trust 1 was extremely vulnerable to volatility in the price of Qualcomm stock. This vulnerability became reality. On January 3, 2000, the first trading day in 2000, the stock opened at $199.25 per share. It traded as low as $174, and closed at $179.31. Therefore, in one trading day, Trust 1's Qualcomm stock declined in value by approximately $1,595,200 or about 10%. The stock declined further after the close of business and opened nearly seven points lower the next day. Thus, the stock lost another $560,000 overnight. In total, the stock had declined by about 13% by the opening of the market on January 4, 2000.

Kadisha admitted that he was following the price of Qualcomm stock on a daily basis in 2000. (RT 22, 8-7-03.) Therefore, he was aware of these dramatic price declines. The nearly

Exhibit 43
Page 639

$1.6 million decline in value in one day should have been a wake-up call for Kadisha to take immediate action to preserve Trust principal. Nevertheless, he did nothing. He got another wake-up call when the market opened on January 4, and again on January 5, and he did nothing to preserve Trust principal. He never informed Petitioners or their counsel about the situation, and he never consulted with an investment advisor about stemming the Trust's losses. When he finally turned the Trust assets over to Petitioners, the value of Trust 1's Qualcomm stock had declined by approximately 60%, from $15,940,000 to $5,299,944.

The Court finds that when Trust 1's 80,000 shares of Qualcomm stock declined in value from $176.12 (January 3, 2000) to $156.44 (January 5, 2000) {TE 4633}, it was an unacceptable breach of duty by Kadisha to not act to preserve the asset. Kadisha was required under the terms of the Trust and the Probate Code to preserve the Trust's principal and had demonstrated the investment skills that would have enabled him to do so.[26] Nevertheless, he did nothing to preserve Trust principal in January 2000 or at any other time over the nine-month catastrophic drop in the share value of Trust 1's Qualcomm stock.

He did nothing, in fact, other than watch the stock continue to decline. Kadisha's continuing to hold the stock was a gambler's choice not available to him. He could gamble with his own stock, but not the beneficiaries.' By doing nothing to preserve the value of Trust 1's Qualcomm stock upon a $19.68 per share (or a total of $1,575,400) decline in value, Kadisha violated his fiduciary duties to preserve principal, to use the full extent of his skills in investing

---

[26] From 1991 through 2000, Kadisha was a Qualcomm director, owned and sold thousands of shares of his Qualcomm stock, bought and sold stock in other companies, and demonstrated extensive knowledge of complex transactions in dealing with publicly traded stock. For example, in December 1998, Kadisha collared 500,000 shares of his Qualcomm stock. In preserving Trust 1's Qualcomm stock after it lost 15% of its value, he could have sold it, entered into a collar, purchased a "put," placed a stop-loss order with the broker, or utilized other available options.

Exhibit 43
Page 640

the Trust assets and to act as a prudent investor. A prudent trustee cannot stand idly by when the stock market goes into a free fall, particularly when a stock comprises about 90% of the trust assets. It requires a different state of mind than a gambler's choice.

Accordingly, on this claim, the Court awards Petitioners the sum of $5,792,000 plus prejudgment interest from September 19, 2000. The amount represents the difference between what Petitioners should have received if Kadisha had protected the stock upon a 19.68 decline and what they actually received (i.e., the value of Trust 1's Qualcomm stock when it was finally turned over to them). (The $5,792,000 is arrived at by multiplying the total value of the subject 30,000 shares of stock on January 5, 2000 at 156.44 per share) which equals $11,715,200. Deducting the 75.05 per share due September 20, 2000 (which totals $5,923,200) = $5,792,000.

Kadisha argues (incorrectly) that he should not be found liable for Trust 1's losses because there were periods in which Qualcomm's stock rose (briefly) during the nine-month decline, and it was therefore impossible to predict its future price. However, Kadisha has it backwards. He created the situation in which 90% of the principal of Trust 1 was highly sensitive to fluctuations in the price of Qualcomm stock by holding such a high concentration of stock rather than diversifying. The unpredictability of the stock price only made it more imperative that Kadisha take action when the stock's price began to fall so precipitously since he had made Trust 1 so vulnerable to dips in the price of its Qualcomm stock.

Furthermore, Kadisha's failure to take advantage of any of the price increases to minimize the beneficiaries' losses adds to the deplorability of his conduct rather than excusing it. It also supports Petitioners' claim that he was intentionally retaliating against them for suing him.

STATEMENT OF DECISION

141

Exhibit 1
Page 147

Exhibit 43
Page 641

Kadisha also incorrectly contends, based upon the testimony of his expert DeBard, that he should not be found liable for Trust 1's losses because analysts were recommending buying or holding Qualcomm stock during 2000. No analysts' reports were introduced into evidence, although DeBard testified that he reviewed some such reports. The analysts' reports are, however, irrelevant. For one thing, Kadisha never read any of them. Even more importantly, the advice that an analyst would or would not give an investor is irrelevant to what a trustee must do to fulfill his fiduciary duties. DeBard admitted that he did not know that a trustee's fiduciary duties are. Kadisha did not offer any expert testimony on what a trustee should have done in this situation. Petitioners' expert testified that a trustee should have acted to preserve the Trust principal, and the Court agrees.

Ordinarily, in cases where the trustee has acted in good faith and with undivided loyalty to the beneficiaries, courts are reluctant to second guess his investment decisions. Kadisha was not such a trustee. He never served the interests of the beneficiaries, and his retaliation against them for suing him is just another demonstration of his consistent and overwhelming bad faith.

Kadisha also incorrectly argues that Petitioners should have mitigated their damages because on January 26, 2000 he allowed Petitioners to copy his trust files, and included within the thousands of pages of documents was a copy of Trust 1's December 31, 1999 Lehman Brothers account statement. Producing copies of Trust documents to Petitioners did not relieve Kadisha of his duty to continue to prudently manage the assets and preserve principal or shift Kadisha's duty to Petitioners. Both the duty and the opportunity to reduce Petitioners' damages laid with Kadisha. It is unreasonable for Kadisha to claim that Petitioners -- who did not have his knowledge of the situation or any control over the stock -- should have done what he did not do. In essence, Kadisha is arguing that the Trust beneficiaries should have forced him to do his duty

Exhibit 1
Page 148

Exhibit 43
Page 642

or suffer the consequences of his malfeasance. This argument is inimical to the spirit, policy and word of the law governing the conduct of trustees, and the Court rejects it.

Moreover, as a practical matter, Kadisha's control of the stock prevented Petitioners from being able to do anything to mitigate their damages. They would have had to wrest control of the stock from Kadisha. Kadisha's resistance to turning over the Trust assets when Petitioners applied to the Court for a formal turn-over order illustrates that even if they had discovered that Trust 1 still owned Qualcomm stock, they would not have been able to gain control of the stock in time to prevent their losses. They were not, however, required to do so. The duty to preserve the principal and prevent the beneficiaries' losses was Kadisha's alone.

**Damages: The DNK Trusts**

The Court finds the Petitioners have no claim to any of the Qualcomm stock held in the DNK trust, and therefore will not award any damages. However, the Court finds that Petitioners claim was legally tenable and brought in good faith.

**Damages: Kadisha's Taking of Trust Funds for His Legal Fees.**

On January 13, 2000, Kadisha paid his attorney $13,761 from Trust 2's funds. On February 23, 2000, Kadisha took $250,000 from Trust 1 and $250,000 from Trust 2 to pay his legal fees in this case. The takings were done without Court approval or the consent of the beneficiaries. Judge Gary Klausner ordered Kadisha to return the total sum of $500,000, but to date, he has not done so. While orders of the court can be appealed, Kadisha's action in refusing to abide with the Court's order was frivolous, and it is with much restraint the Court does not impose a substantial sanction upon him.

STATEMENT OF DECISION

143

Exhibit 1
Page 149

Exhibit 43
Page 643

Kadisha is herewith surcharged $543,055, plus interest at 10% per annum from September 19, 2000.[27]

Respondent incorrectly argues that Petitioners' counsel stipulated at the Court of Appeal that the $500,000 was deemed returned, and that based on this stipulation, interest should not be awarded from the date of the stipulation. The Court has read the transcript of the oral argument before the Court of Appeal and disagrees with Respondent's interpretation. The $500,000 was not returned as Petitioners did not have the use of or control over the funds. The $500,000 was then, and is still now, in Mr. Burn's trust account until the Court's judgment.

Respondent also incorrectly claims that he should not be required to pay interest because he too had no control over the funds. However, whether or not Kadisha was able to control the use of the funds is irrelevant. The $500,000 was not his to take and his taking of it deprived Petitioners of the use of their money. He could have ended his obligation to pay interest by returning the money when Judge Klausner ordered him to instead of appealing the order.

**Damages: Failure of Kadisha to exercise preferential rights.**

On September 29, 1989, Qualcomm informed Trust 2 that it had preferential right to purchase 6,630 shares of Qualcomm shares "C" Convertible Preferred stock for $8.00 per share. Kadisha did not exercise Trust 2's preferential rights. The court finds there was no obligation for Kadisha to exercise Trust 2's preferential rights, even though it would appear an advantage to do so. The same opinion applies to Trust 2's preferential rights to acquire Qualcomm stock on September 7, 1999. Petitioners' claim(s) in regard to said preferential rights are denied.

**Damages: Punitive Damages**

---

[27] The Court calculated the $543,055 surcharge as follows: $13,761 (the amount Kadisha paid Burns from Trust 2) plus interest at 10% per annum from January 13, 2000 until September 18, 2000 = $14,696 plus $500,000 plus interest at 15% per annum from February 23, 2000 until September 18, 2000 = $528,359. $14,696 plus $528,359 equals $543,055.

STATEMENT OF DECISION

144

Exhibit 1
Page 150

Exhibit 43
Page 644

The Court accepts the rule that punitive damages may not be awarded for litigation conduct, including giving false testimony and suborning perjury.  But it is a "most unfortunate rule and a most grievous one, and no doubt the legislature and the courts would be glad to redress it if a rule could be devised that would remedy the evil without producing mischief far worse than the evil to be remedied." *United States v. Throckmorten*, 98 U.S. 65, 66, cited in *Kachig v. Booth* (1971) 22 Cal.App.3d 626.  With all the remarkable talent of our judges and lawyers, a rule should be developed to give effectiveness to Penal Code section 118, which provides:

> "(a) every person who, having taken an oath that he or she will testify, declare, depose or certify truly before any competent tribunal, officer or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares deposes or certifies under penalty of perjury in any of the cases in which the testimony, declarations, depositions or certification is permitted by law of the State of California under penalty of perjury and willfully states as true and material matter which he or she knows to be false, is guilty of perjury."

The "litigation conduct" rule does not fall within the category "if it ain't broken, don't try and fix it."  The rule is deeply flawed and needs to be fixed.

The Court finds no support for maintaining the rule based upon the pronouncements contained in *Kachig v. Boothe* (1971) 22 Cal.App.3d 626, nor in *Silberg v. Anderson* (1990) 50 Cal.App.3d 205 or *Rasheen v. Cohen* (2006) 37 Cal.4th 1048.  In *Kachig v. Boothe*, the Court finds "the lack of any really effective remedy against perjurers is simply part of the price that is paid for witnesses who are free from intimidation by the probability of civil liability for what they say."  But perjury is not a "civil remedy" as it falls under the category of "Crimes Against Public Justice."  Public justice should prevent witnesses from the license to lie provided by

Exhibit 1
Page 151

Exhibit 43
Page 645

section 47(b)(2).  The said section puts a cancer into the system of justice on an unsupportable premise that people free to testify from liability for what they say will foster truthful answers. This is the very error of *Silberg* in holding that the "litigation conduct" rule promotes "complete and truthful testimony."  This is plain wrong.  It does the opposite.  To allow witnesses to plan, scheme and design to give false testimony as allowable by Section 47(b)(2) is shocking if the idea of justice under the law is considered.

But just as though for what seemed ages, the law supported contributory negligence as a complete bar to recovery and fault divorce was adhered to as something that came down from the mount, they both, like others, fell by the wayside as lacking common sense.  And perhaps common sense may light up the road to improved justice by eliminating the concept of "litigation conduct" as a shield for witnesses against civil suits or the possibility a charge of perjury may be brought by the District Attorney.

Section 47(b)(2) does not repeal or invalidate Section 118 of the Criminal Code regarding perjury directly or by inference as a crime against Public Justice.  Said section 11888 declares in relevant part:

"Section 118. Perjury Defined.

"Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer or person, in any of the cases in which the oath may by law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false, and every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which the testimony, declarations or depositions or certification is permitted by law of the State of

STATEMENT OF DECISION

146

Exhibit 1
Page 152

Exhibit 43
Page 646

California under penalty of perjury and willfully states as true any material matter which he or she knows to be false, is guilty of perjury."

Now perhaps the legislature should amend Penal Code section 118 to state it does not apply to civil suits or it should be put to the voters of the State of California as to whether Penal Code section 118 shall cease to apply to civil lawsuits. The court cannot do this not having the power to legislate.

But there are other fundamental issues that need to be addressed as to the application of Civil Code section 47(b)(2) and *Booth, Silberg and Cohen.*

One of the first in what appears to this court to be erroneous is the application of the "witness shield law" (Civil Code Section 47(b)(2)) to the equal application to both a party as a witness, and a witness as a party. There is a rather monumental difference. A party originates documents and testimony (depositions in trial) so he does not fall within the classification of a person more likely to tell the truth without fear of being sued by anyone, including the District Attorney. He is the instigator of a complaint or an answer, which may or may not contain an oath of affirmation, and it would render allegations in pleadings and depositions meaningless if the party swearing to tell the truth is not bound thereby. While it is true that asking a District Attorney to bring an action against a party for false testimony is beyond rare because the District Attorney is too busy with his crush of work and the outcome of any action for perjury is doubtful. This does not mean the threat of perjury should be dropped. And if it is to be dropped from civil cases, this would have to be done by the Legislature, not the courts. While this court does not approve of the "witness shield" at all, a witness for a party is in an entirely different category from that of a party witness. Some may be truthfully supportive. Others may be supportive fabricators. Some may be dragged in by subpoena. Few really want to go to court

Exhibit 43
Page 647

1   and testify.  So granting them a "witness shield" as a method of eliciting truthful answers is a far

2   cry from allowing a party to lie under oath and give false testimony in depositions.  So the

3   "witness shield" should not be applied to a party.

4

5       A second very major problem that is not addressed in Section 47(b)(2) or in *Kachig,*

6   *Silberg* or *Rasheen* is the matter of instructing the jury about the "witness shield."  The new Civil

7   Jury Instructions in the Preliminary Admonitions of Sections 100 and 107, nor in the swearing of

8   witnesses, advise the jury properly.

9

10      The following instruction, or one containing words of the same effect, should be given

11  sua sponte to the jury as a preliminary instruction:

12      "You are instructed that the law no longer requires a witness before testifying to swear to

13  tell the truth and nothing but the truth in the matter before the court.  The elimination of swearing

14  the witness to tell the truth has been abolished because the law has determined that allowing a

15  witness to testify in any way he desires, including telling a lie, without fear of someone filing a

16

17  suit against him for what he says and without the possibility of the District Attorney charging the

18  witness with perjury, results in the witness being more likely to tell the truth."

19      The reason for so instructing the jury is crystal clear.  If the court fails to so instruct the

20  jury, there becomes a due process problem when the witness is sworn to tell the truth.  An

21

22  objection properly lies because the law has declared the witness does not have to tell the truth.

23  The request of the witness to take an oath to tell the truth would constitute an attempt by the

24  court to get an implied waiver of the witness's right not to tell the truth.  But it cannot constitute

25  a waiver because a waiver must be explicit in its terms.  The court can only back off stating,

26

27  "The objection is sustained.  In lieu of having the witness swear to tell the truth, I will now

28  instruct as follows:  Pursuant to what the law has determined to be the "litigation privilege," you

---

STATEMENT OF DECISION

148

Exhibit 1
Page 154

Exhibit 43
Page 648

are now free to testify in any way you desire, including telling a lie, without fear that whatever you say no civil action or criminal charge of perjury will be brought against you. By the "litigation privilege," the law has declared you are more likely to tell the truth. And then to the witness: "Please state your name."

In respect to the foregoing, the jury should be instructed as part of any instruction advising them of their right to determine the credibility of any witness the following:

"The fact that the witnesses in this case have not been sworn to tell the truth, but to the contrary can testify as they so desire, including telling a lie, increases your awareness that you and you alone determine whether to believe all of a witness' testimony, part of it, or none at all."

While the case before the court is obviously not a jury trial, the foregoing further lights up the "witness shield" deficiency.

Finally, no case known to this court over 59 years in the law business has presented the problem more forcefully than in considering awarding punitive damages against Kadisha for his untruthful answers in giving answers to questions asked in the taking of his depositions or during trial, but the Court's soap-box presentation against the "Litigation Exemption" must fall by the wayside as the Court is bound by the exception as it now stands.

The Court will, hence, limit its considerations to acts of Kadisha prior to litigation. And they are more than several.

As in all cases considering the applicability of a statute to be applied to the facts, so it is with a consideration of punitive damages. The Court must look to the applicable provisions of Civil Code section 3294, which are as follows:

"3294: Exemplary damages; when allowable; definitions:

(a) in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that

STATEMENT OF DECISION

149

Exhibit 1
Page 155

Exhibit 43
Page 649

the defendant has been guilty of oppression, fraud or malice, the plaintiff, in addition to actual damages, may recover damages for the sake of example and by way of punishing the defendant.

(c) As used in this section, the following definitions apply:

(1) 'Malice' means the conduct which is intended by the defendant to cause injury to the plaintiff OR despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety or others.

(2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

(3) 'Fraud' means an intentional misrepresentation, deceit or concealment of a material fact known to the defendant with the intention on the part of the defendant and thereby depriving a person of property or legal rights or otherwise causing injury."

The exemplary (or better referred to as the punitive damage section 3294) has been with us for about 134 years, with some modifications, the most important being the addition of the word "despicable" in the definition of malice.

It is Civil Code section 3294 which must guide the Court and any applicable decisions relating thereto as applied to the facts of this particular case. It must be noted that the Legislature has not deemed it fit to amend section 3294 to include any dictionary definitions of any terms in the section or court determinations concerning same, although this Court would be bound by same if applicable. And it must also be noted that the punitive damage jury instruction formerly given, BAJI 14.71, and the new CACI instruction 3941 add a definition to the definitions of Civil Code section 3294 in respect to "despicable conduct," which states:

"'Despicable conduct' is conduct that is so vile, base or contemptible that it would be looked down on as despised by reasonable people."

STATEMENT OF DECISION

150

Exhibit 1
Page 156

Exhibit 43
Page 650

*Simon v. San Paolo* (2005) 35 Cal.4th 1159, held that "at a minimum, California law requires conduct done with 'willful and conscious disregard of the rights or safety of others' or despicable conduct done 'in conscious disregard' of a person's rights." "Conscious disregard" means that 'the defendant was aware of the probable dangerous consequences of his conduct and that he willfully and deliberately failed to avoid those consequences." *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 895-896.

The Court finds that Kadisha's acts, as enumerated below and throughout this decision, constitute conduct that was vile, base, and contemptible, and would be looked down on as despised by reasonable people. The Court also finds that these acts were intentional, or done with a willful and conscious disregard of Petitioners' rights. The Court is persuaded by clear and convincing evidence that Kadisha was aware of the financially dangerous consequences of his conduct and willfully and deliberately failed to avoid those consequences.

In addition to Civil Code section 3294 and California judicial decisions, in *BMW v. Gore* (1996) 517 U.S. 559 and *State Farm v. Campbell* (2003) 538 U.S. 408, the United States Supreme Court set forth constitutional guideposts for determining whether punitive damages should be awarded and their amount. These guideposts are: (1) the degree of reprehensibility of a respondent's misconduct; (2) the disparity between the actual or potential harm suffered by Petitioners and the punitive damage award; and (3) the difference between the punitive damages awarded and the civil penalties authorized or imposed in comparable cases.

The degree of reprehensibility of the defendant's conduct is the most important indicia of the reasonableness of the punitive damages award against a defendant. *State Farm, supra*, 538 U.S. at 419.

STATEMENT OF DECISION

151

Exhibit 1
Page 157

Exhibit 43
Page 651

There are five factors to be evaluated in determining the reprehensibility of the defendant's conduct:  (a) whether the harm caused was physical as opposed to economic; (b) whether the tortuous conduct evinced an indifference to or a reckless disregard of the health or safety of others; (c) whether the target of the conduct had financial vulnerability; (d) whether the conduct involved repeated actions or was an isolated incident; and (e) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.*

These factors were adopted for use in California in *Simon,* and *Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191.  In determining the reprehensibility of Kadisha's conduct, the Court has considered Petitioners' financial vulnerability, the recidivism of Kadisha's acts and omissions, and whether the harm was the result of malice, trickery or deceit, or mere accident.

With the foregoing in mind, the Court finds that Petitioners have shown, by clear and convincing evidence, that they are entitled to punitive damages against Kadisha for his conduct in the management of both Trusts 1 and 2.

In considering Kadisha's conduct, the total pattern of Kadisha's conduct comes into play. His malice, fraud, recidivism, and reprehensibility may be singular.  The evidence of his overall conduct over the 12 years of his trusteeship establishes by clear and convincing evidence that none of his acts were innocent or an accident, and that each of them was undertaken with a conscious disregard of Petitioners' rights and their extreme financial vulnerability.

The following facts, among others, support the Court's finding by clear and convincing evidence that Kadisha's acts were extremely reprehensible.

Throughout Kadisha's trusteeship and, in particular, from 1988 through 1992, Petitioners were extremely financially vulnerable. Dafna had a 10th-grade education, minimal understanding of the English language, and a total lack of financial business experience.  Her only job

---

STATEMENT OF DECISION

152

Exhibit 1
Page 158

Exhibit 43
Page 652

experience in her entire life had been a short stint as a makeup artist. Prior to her husband's death, she had never even opened a bank account by herself. During this same period, Kadisha misappropriated substantially all of the Trust's assets for his own use to bolster his shaky finances and the shaky finances of business in which he was heavily invested, including Omninet and Qualcomm. Dafna did not have any assets to replace the Trust assets that Kadisha put at extreme risk for his own benefit, and she had no skills with which to earn enough income to support herself and her two young children if Kadisha lost the Trust principal. Izzet and Joelle, who were the primary beneficiaries of Trust 1, were minors when Kadisha was risking the trust assets for his own benefit.

In addition, in 1988 Kadisha took the entire $500,000 Namco Loan proceeds and used the money to pay his personal loans and expenses. Kadisha defaulted on the loan, exposing Petitioners to the possibility of losing the Strathmore Residence, which was the security for the loan. The Strathmore Residence was the only Trust asset at the time and represented the vast bulk of Dafna's property. Kadisha did not document his taking of the Namco Loan proceeds. His accountant testified that Kadisha's purported accountings would not apprise a reader of the Namco Loan.

Also in 1988, Kadisha loaned $300,000 of Trust 2's funds to Qualcomm, knowing that there was a substantial likelihood that the entire $300,000 would be lost. In order to raise cash for the $300,000 Qualcomm loan, Kadisha took out a second loan on the Strathmore Residence (the "Imperial Loan"). He misappropriated $1 million of the $2 million Imperial Loan proceeds for his own use. (The balance was used to repay the delinquent Namco Loan and fund the $300,000 extremely risky loan to Qualcomm.) If Kadisha was not able to repay the $1 million

STATEMENT OF DECISION

153

Exhibit 1
Page 159

Exhibit 43
Page 653

he misappropriated and Qualcomm went under, Petitioners would have lost substantially all of the then-existing Trust assets.

From 1988-1991, Kadisha misappropriated virtually all of the Trusts' cash for his personal use, without documentation or security. Kadisha's own finances were in turmoil. His inability to repay the Trusts for his misappropriations is amply demonstrated by the fact that he did not repay them. Petitioners were therefore at extreme risk of losing all of their assets.

In 1992, Kadisha sold all of Trust 2's Qualcomm stock to raise cash for his own use. He then misappropriated the sale proceeds for his own use, but claimed that he had loaned the money to Rahban. Kadisha knew there was no Rahban, and that even if there was, Rahban had no assets in the United States, and the supposed loan was unsecured. In 1992, Kadisha's expenditures exceeded his cash by over $1 million. Kadisha was therefore not only putting the sale proceeds at extreme risk by taking it when his finances were in the red, but he was throwing up a smoke screen that the beneficiaries would have to penetrate if he could not repay the money.

In 1993, Kadisha invested $600,000 of the Trusts' funds in Carson '93 Ltd. so that the partnership could purchase real property to lease to Texollini. Kadisha was the CEO and a substantial shareholder of Texollini. Texollini was not only the tenant, but also the general partner of Carson '93. There were thus not only conflicts of interest here, but lawyers of conflicts.

Kadisha's expert, Andrew Minstein, made it abundantly clear, at trial, that Carson '93's purchase of the 2575 El Presidio building was an imprudent investment. He testified that the El Presidio property had numerous physical deficiencies and was burdened by restrictive CC&R's.

Exhibit 43
Page 654

1    The Court therefore finds by clear and convincing evidence that Dafna, Izzet and Joelle

2    were all extremely vulnerable financially, and that Kadisha consistently disregarded their

3    financial vulnerability for his own gain.

4

5    ### Kadisha's Recidivism and Intentional Versus Accidental Acts

6    "[C]ertainly, evidence that a defendant has repeatedly engaged in prohibited conduct

7    while knowing or suspecting that it was unlawful would provide relevant support for an

8    argument that strong medicine is required to cure the defendant's disrespect for the law.

9
10   [Citations omitted.] Our holdings that a recidivist may be punished more severely than a first

11   offender recognized that repeated misconduct is more reprehensible than an individual instance

12   of malfeasance." *Johnson, supra,* 35 Cal.4th at page 1203, citing *BMW.*

13   Kadisha did not engage in an isolated act of misconduct – he repeatedly, systematically

14   and intentionally engaged in conduct that he knew was prohibited to him as a trustee.  Kadisha's

15   numerous and egregious acts establish, by clear and convincing evidence, a pattern of extreme

16   recidivism.  As previously noted, his course of conduct also establishes that his acts were

17   intentionally malicious and/or fraudulent or undertaken with a conscious disregard of Petitioners'

18   rights and that none of them was inadvertent or an accident.

19

20   ### Kadisha's Malice and Fraud

21   Respondent's first line of defense is to attempt to overcome Kadisha's deficiencies by the

22   very large ultimate financial gain by the Petitioners.  But malice or fraud is not waived, ignored,

23   or forgiven by a fortuitous financial gain.  The almighty dollar does not bear a cross or other

24   religious symbol.

25   Kadisha took advantage of Petitioners for his own benefit throughout his trusteeship.  He

26   exploited Dafna's helplessness after the death of her husband, her lack of experience, and her

---

STATEMENT OF DECISION

155

Exhibit 1
Page 161

Exhibit 43
Page 655

cognitive insufficiencies to gain control of her assets.  He intentionally and consistently violated his fiduciary duties.  He looted the Trusts.  He induced Dafna to sign unconscionable amendments.  He concealed his wrongdoings with fraudulent accountings, backdated promissory notes and phony transactions.  As one example of his fraud, Kadisha intentionally concealed from the beneficiaries that fact that he had used $240,000 of Namco Loan proceeds to repay his Union Bank line of credit and, in connection therewith, had acquired 21,571 shares of Farahnik's Qualcomm stock as another example of his fraud, Kadisha stole money from the Trusts under the guise of making loans to David Rahban, whom the Court has found to be a non-existent person in the claimed loan transaction.  Had the District Attorney stepped in after the taking, he could have charged Kadisha with Grand Theft (Penal Code section 487) or embezzlement.  Section 503 of the Penal Code defines embezzlement as "the fraudulent appropriation of property by a person to whom it has been entrusted."

Kadisha's malice and/or fraud also includes his bad faith stock sales in 1992 and 1999; his persistent refusal to account for his use of Trust funds; his intentional self-dealing with trust assets, his continuing exploitation of Dafna's inability to understand or grasp almost anything about the Trusts; his use of money or promise of money, as a carrot to get Dafna to sign trust amendments that purported to relieve Kadisha of his fiduciary duties and release him from liability for his egregious acts; his use of Ron Levi, Dafna's second husband, as a willing dupe (having the same cognitive insufficiency as Dafna); his retaliation against Petitioners for suing him by allowing Trust 2's Qualcomm stock to decline in value by over $10 million; his taking of $500,000 from Petitioners to pay his legal fees and refusing to return it after Judge Gary Klausner ordered him to do so; his backdating of promissory notes and creating backdated, phony transactions; his misappropriations of over $10 million of the Trusts' cash without

STATEMENT OF DECISION

156

Exhibit 1
Page 162

Exhibit 43
Page 656

adequate security or even the most minimal documentation; investing Trust funds in Carson '93 Ltd. for Kadisha's own economic benefit, and purchasing Trust 2's partnership interest without Dafna's knowledge in yet another conflicted transaction.

Each of these acts was malicious or fraudulent, despicable, and done with intentional or willful and conscious disregard of Petitioners' rights.

Kadisha would like the Court to believe he was well fixed financially at all times so it cannot be said that he acted with malice, i.e., that his conduct was despicable and done with a willful and knowing disregard of Petitioners' rights.

The clear and convincing evidence is to the contrary. While the Court might entertain the thought early on in his acting that Kadisha made a simple mistake in taking all of the available cash from the Namco Loan available to Dafna for the support of herself and her children, such a thought dissipates like fog on a hot summer day as Kadisha set the course of his entire trusteeship on the impermissible taking of Trust assets, false accountings, back-dating of notes and the many other intentional breaches of trust hereinbefore set forth.

Kadisha's actions immediately after the Namco taking fortify the Court's position. After defaulting on the Namco Loan, Kadisha procured an additional loan of $2 million on Dafna's home (i.e., the "Imperial Loan"). Kadisha took practically all of the imperial Loan proceeds for his own use. He amazingly used her money to pay off his taking of the Namco Loan proceeds. Swindlers present and past would marvel at this taking, and they would marvel at how Kadisha was able to bypass the consent of Dafna to such a huge taking.

But the Namco and Imperial Loans were only the beginning of Kadisha's malice and fraud. The Court has found that Kadisha's acts in loaning Qualcomm $300,000 and subsequently converting the loan to equity (which plunged the Trust into even more troubled

STATEMENT OF DECISION

157

Exhibit 1
Page 163

Exhibit 43
Page 657

financial waters) was by clear and convincing evidence conduct that was despicable and done with willful and knowing disregard of Petitioners' rights. These acts and the subsequent acts of Kadisha discussed above and in the earlier discussion of the United States Supreme Court guidelines are contemptible in "that [they] would be looked down upon as despised by reasonable people.

Kadisha also contends that the Court can only award punitive damages on a claim on which it has awarded compensatory damages. The California and United States Supreme Courts disagree. *Johnson*, citing *State Farm*, stated that the relevant relationship is between punitive damages and actual or potential harm. *Johnson, supra*, 35 Cal.4th at page 1207. The potential harm that is properly included in the analysis is "harm that is likely to occur from the defendant's conduct." *Simon, supra*, 35. Cal.4th at page 1177. In arriving at its conclusions, the Court has considered the claims on which Petitioners were awarded compensatory damages, and also the claims on which there was potential harm. The Court can, and has also considered the totality of Kadisha's conduct in arriving at its conclusions regarding Kadisha's deliberateness in disregarding Petitioners' rights and his recidivism, among other things.

**Punitive Damages Award**

**The Court fixes punitive damages against Kadisha at $5 million for his numerous pre-litigation acts as trustee.**

While it may be repetitive, Kadisha didn't borrow Trust funds – he embezzled them, millions of dollars of them. He made bad-faith sales of Trust 2's Qualcomm stock in 1992 and 1999. He backdated notes in an effort to cover up his wrongful takings. He intentionally and carelessly caused accountings to be prepared that were deliberately designed to deceive and did deceive Dafna. Although thoroughly advised by his counsel, DeCastro, as to his limitations and

STATEMENT OF DECISION

158

Exhibit 1
Page 164

Exhibit 43
Page 658

obligations as a trustee, he totally ignored DeCastro's advice and repeatedly entered into conflicted transactions. He considered his beneficiary Dafna "stupid," and took every opportunity to blatantly and deliberately breach his fiduciary duty of loyalty to her and her children. He contrived a phony transaction that robbed her of $3 million. He willfully, maliciously and despicably induced Dafna to execute Trust amendments by which she released all of his then-existent derelictions of duty and purported to give him unfettered control over her assets. He retaliated against Petitioners for suing him by doing nothing while the Trusts' only remaining Qualcomm stock catastrophically declined. He invented the fiction of the Rahban loans to conceal his stealing over $2 million of Trust funds. He placed the Petitioners in financial jeopardy over and over again by risking the Trust assets on his own speculative ventures.

While Petitioners would like to see the Court award punitive damages against Kadisha in a sum vastly greater, and one calculated at least two, three or four times the compensatory damages as fixed by the court, what the Court has done is apply ample punishment to Kadisha, knowing that making him pay $5 million will batter his delusion that he can prevail over his abandonment of principle and obligations under the law and engage in malicious and fraudulent conduct. Ample notice will be given to those who elect to assume the duties and obligations of a trustee that the laws respecting trustee mean what they say and are not to be ignored.

Consistent with the Supreme Courts' guidelines, the Court in arriving at the amount of punitive damages has taken into account Kadisha's financial condition. Throughout the trial, Kadisha made numerous applications for the release of funds from his Qualcomm stock that was subject to the Court's restraining order. In each of these applications, Kadisha attached a copy of his then current general ledger. During the punitive damages phase of the trial, Kadisha

Exhibit 43
Page 659

produced his October 2005 financial statement. The financial documents produced by Kadisha

show that he has net assets in excess of $100,000,000. The Court's award of $5,000,000

therefore does not offend the Supreme Court's guideline.

**Damages: Attorney fees.**

Petitioners are clearly entitled to recover attorney fees under section (b) of Probate Code

section 17211, which states in applicable part, as follows:

(b)     If a beneficiary contests the trustee's account and the court determines that the
trustee's opposition to the contest was without reasonable cause and in bad faith, the court may
award the contestant the costs of the contestant and other expenses and costs of litigation,
including attorney's fees, incurred.

Kadisha incorrectly contends that Petitioners' claims do not come within the purview of

this section because: (1) this is not an action on a "trustee's account" and (2) Petitioners' claims

are surcharge claims and therefore unrelated to Kadisha's account. Kadisha is wrong on both

counts.

Typically, in a trust proceeding, the trustee files his accounting with the court and asks

the court to approve it. In response, the beneficiaries assert their objections to the accounting, if

any, and their surcharge claims against the trustee, if any. In fact, the beneficiaries must assert

their surcharge claims against the trustee in this proceeding or their claims will be deemed

waived. *Coberly v. Superior Court* (1965) 231 Cal.App.2d 685, 688. As *Coberly* illustrates, the

proceedings regarding the trustee's account encompass more than the trustee's written

accounting. In deciding the beneficiaries' claims against the trustee, the court also assesses the

reasonableness and propriety of the trustee's actions in administering the trust. The

beneficiaries' surcharge claims are thus part and parcel of the proceeding on the trustee's

Exhibit 43
Page 660

accounting. This was made explicit in *Estate of Fain* (1999) 75 Cal.App.4[th] 973, 991, which held that a surcharge claim for breach of fiduciary duty is a matter "relating to an account."

Kadisha's failure to file his purported accountings with the court forced Petitioners to bring them before the court themselves. Kadisha provided Petitioners with a set of purported accountings (from the commencement of the Trusts) in 2000 and a set of revised purported accountings in 2001. Petitioners objected to Kadisha's purported accountings in their pleadings; the accountings were admitted into evidence at trial; and Petitioners adduced substantial evidence that established by clear and convincing evidence that the accountings were fraudulent and misleading. *Days* of trial were devoted to testimony and argument about the accountings, and Kadisha himself relied on the accountings for two of his affirmative defenses. In deciding this case (including ruling on Kadisha's affirmative defenses), the Court was required to make findings about the accountings. Thus, the fact that Petitioners initiated this action and attacked Kadisha's accountings – rather than Kadisha initiating the action of formally requesting court approval of his accountings – does not make this action any less of a proceeding on a trustee's account than it would have been if Kadisha had initiated the proceedings.

Although Kadisha is now arguing something different, his reliance on the accountings for two of his affirmative defenses tacitly acknowledges that this proceeding is an action on a trustee's account. One of Kadisha's (unsuccessful) affirmative defenses is based on the (erroneous) claim that Petitioners' claims are barred by the statute of limitation because Dafna allegedly received accountings that put her on notice of the claims more than three years before Petitioners commenced this action. Another of Kadisha's (failed) affirmative defenses is based on the (incorrect) contention that the accountings he allegedly provided to Dafna are binding on the beneficiaries pursuant to the terms of the Trusts. If this action was not related to his

STATEMENT OF DECISION

161

Exhibit 1
Page 167

Exhibit 43
Page 661

accountings, as Kadisha now claims, why did he assert affirmative defenses that are based on them?

Moreover, in Respondent's objections to Petitioners' petitions, he requested attorney's fees. In addition, Respondent repeated this request during trial and represented to the Court that Respondent was requesting attorney's fees. Obviously, this constitutes to the Court Respondent's acknowledgement that attorney's fees are awardable in this case.

It is inconceivable that the Legislature intended – as Kadisha belatedly suggests – that beneficiaries can recover their attorney's fees for the trustee's bad faith defense of his account only if the trustee files an accounting with the Court. That would produce the absurd result that a trustee could mount an unreasonable and bad faith opposition to the beneficiary's challenge to his administration of the trust and avoid the imposition of attorney's fees simply by refusing to file an accounting. Statutes may not be interpreted to produce so absurd a result.

The Court concludes that this matter falls within the purview of Probate Code section 17211.

### Without reasonable cause and in bad faith

The Court also finds that the requirements of Section 17211 are satisfied because Kadisha's contest was without reasonable cause and in bad faith.

In analyzing "reasonable cause," courts have relied upon the definition of "probable cause" used in malicious prosecution actions. In those actions, a finding of "probable cause" requires the court to objectively determine the reasonableness of the defendant's conduct in bringing a claim on the basis of the facts known to him at the time and whether, based on those facts, the claim was legally tenable. What facts were known to the Respondent, is a question of fact. Whether a claim is legally tenable is a question of law, and is determined by whether any

Exhibit 43
Page 662

reasonable attorney would have thought the claim tenable. *Sheldon Appel v. Albert & Oliker* (1989) 47 Cal.3d 863, 878. Since, in this case, the Court is the trier of fact, it was required to determine: (1) what facts Kadisha had in possession when he mounted his opposition to Petitioners' challenges to his account of his administration of their Trusts, and (2) whether, based on those facts, any reasonable attorney would have thought his opposition as to <u>each</u> claim was legally tenable. (See, e.g., *Crowley v. Kattelman* (1944) 8 Cal.4th 666.)

Kadisha cannot escape liability for his opposition to a claim that was unreasonable by joining it with the opposition to a claim for which he had probable cause (if any). *Appel, supra,* 47 Cal.3d 677. (The rule was first enunciated in *Bertero v. National General* (1974) 13 Cal.3d 43, and *Appel* affirms it.)

The following are some of the facts Kadisha knew when he opposed Petitioners' claims.

<u>Kadisha's 1988 Acquisition of Qualcomm Stock and his $300,000 Loan to Qualcomm.</u>

With respect to this claim, Kadisha knew, among other things, that:

- Following the death of Dafna's husband, he intended to and succeeded at gaining control over Dafna's assets so that he could use them for his own purposes. He knew that Dafna was dependent on him, that she had only a 10th-grade education, no business experience and only limited English, and that he could take full advantage of her. He took her to his attorney, DeCastro, whose firm was an advisor to Omninet and was well aware of Kadisha's financial difficulties, and who did not protect her from Kadisha's overreaching.

- Only the establishment of Trust 1 was a condition of the settlement with Lillian Nomaz over the foreign assets. There was no need for Dafna to put her other assets into Trust 2

STATEMENT OF DECISION

163

Exhibit 1
Page 169

Exhibit 43
Page 663

1  under his control, and the creation of Trust 2 was the product of DeCastro's

2  representation of him, not Dafna.

3

4  • He pocketed the entire $500,000 Namco Loan proceeds as part of his plan to use the

5  Trust assets for his own purposes and never used a dime of it for Dafna's benefit or Trust

6  2's. His misappropriation of the Namco Loan proceeds left Trust 2 with zero cash to pay

7  Dafna the $20,000 per month distributions she was entitled to under the terms of the

8  Trust, or even all of her expenses. Kadisha did not make the required monthly

9

10  distributions to Dafna. He also failed to pay Joelle's and Izzet's overdue tuition after

11  DeCastro negotiated a grace period so that Joelle and Izzet could stay in school.

12  • Qualcomm's $4 million purchase of Omninet's assets in August 1988 (through which

13  Kadisha obtained his stock) further weakened an already weak Qualcomm. In November

14  1988, Kadisha (who was now a Qualcomm director) knew that Qualcomm was

15  consistently losing money and needed additional funding to survive. Kadisha did not

16

17  have funds of his own to loan to Qualcomm, or even to repay the overdue Namco Loan.

18  Therefore, he took out an unnecessary $2 million loan secured by the Strathmore

19  Residence, and loaned Qualcomm $300,000 from the loan proceeds. (He also used over

20  $500,000 of the proceeds to repay the Namco Loan and misappropriated most of the rest.)

21

22  • Kadisha knew when he made the conflicted $300,000 loan that Qualcomm was in dire

23  financial straits, that it was consistently losing money, that Qualcomm needed money to

24  survive until it could raise additional capital, and that the loan was extremely risky. He

25  therefore knew that the loan was not a conservative investment as he (ludicrously)

26  claimed at trial. He also knew, from DeCastro's memo, that he could not benefit, even

27

28

STATEMENT OF DECISION

164

Exhibit 1
Page 170

Exhibit 43
Page 664

incidentally, from the use of Trust assets, and that he was prohibited from engaging in conflicted transactions.

## The 1992 Stock Sale.

When he opposed this claim, Kadisha knew, among other things, that:

- He did not have any economic justification for the sale.

- He sold Trust 2's stock purely to raise cash for his own use.

- He funneled the cash to himself through a fictitious, phantom loan to David Rahban.

- He had fraudulent trust accountings prepared to reflect a loan to Rahban when he knew that there was no such loan.

## Acquisition of Qualcomm Stock from Farahnik

When he opposed this claim, Kadisha knew, among other things, that:

- He loaned money to Farahnik which he borrowed from his Union Bank line of credit because he knew that he would have control of Dafna's assets and could use them to repay the Union Bank line of credit for the money he borrowed to loan to Farahnik.

- He used $240,000 of the Namco Loan proceeds to repay his Union Bank line of credit. He knew, however, that he could not admit this because DeCastro had advised him that using Trust assets for his own benefit was a breach of his fiduciary duties.

- He knew that the first six explanations that he gave for what he did with the Namco Loan proceeds were made under penalty of perjury, but that he nevertheless did not disclose in any of those explanations that he had used $240,000 of the Namco Loan proceeds to pay down his Union Bank line of credit.

- He knew that there were no entries in the accounting or any other documents that would notify Petitioners of his actions.

STATEMENT OF DECISION

165

Exhibit 1
Page 171

Exhibit 43
Page 665

**Carson '93 Ltd.**

When he opposed this claim, Kadisha knew, among other things, that:

- He was prohibited from engaging in conflicted transactions.

- Nonetheless, he invested $600,000 of Trust funds to enable his partnership to buy a property to house his corporation.

- He intentionally engaged in yet another conflicted transaction when he bought Trust 2's interest in Carson '93, without Dafna's consent, an appraisal or Court approval.

**Kadisha's misappropriations.**

When he opposed this claim, Kadisha knew, among other things, that:

- His takings were not "loans" as he persisted in claiming throughout trial. He had embezzled the money for his own use without executing a promissory note or any other form of documentation; he only paid interest retroactively when, years later, he had enough money to repay the misappropriations; and he had fraudulent accountings prepared that concealed his takings.

- He backdated promissory notes prepared after he repaid the misappropriations and knew that he had to conceal the fact that they were backdated, as demonstrated by his untruthful testimony at his deposition about the preparation and execution of the notes.

- He intentionally designed his accountings to conceal his misappropriations.

**The 2000 Stock Decline.**

When he opposed this claim, Kadisha knew, among other things, that:

- He did not inform Petitioners that Trust 1 owned Qualcomm stock.

- He was watching the stock on a daily basis in 2000, and would do nothing to preserve the value of Trust 1's Qualcomm stock.

Exhibit 43
Page 666

- He never diversified Trust 1's assets to reduce Petitioners' risk.

- He never acted in Petitioners' best interests during the entire time he was trustee.

- He did not do anything to staunch the losses to Trust 1's Qualcomm stock because he was retaliating against Petitioners for suing him.

- After Petitioners sued him, he used his control of Petitioners' assets to extort them to settle.

### $500,000 Legal Fees

When he opposed this claim, Kadisha knew, among other things, that:

- He ignored DeCastro's admonition that he not obtain any benefit or advantage from the use of trust assets.

- He ignored DeCastro's admonition that whenever he contemplated an act that could be beneficial to himself, he should obtain court approval.

- He did not provide any form of notice to Petitioners that he was taking the money.

- He opposed Petitioners' attempts to terminate the trusts and require him to turn over the Trust assets.

### Affirmative Defenses

In asserting his (baseless) affirmative defenses, Kadisha knew, among other things, that he had not given Dafna the accountings he claimed he had given her; that his accountings concealed rather than disclosed his malfeasance; that he had never acted for the benefit of Petitioners; that the three egregious trust amendments that purportedly exculpated and released him had been extracted from Dafna through economic coercion; and that he had intentionally ignored DeCastro's advice regarding what his fiduciary duties were over and over again.

Exhibit 1
Page 173

Exhibit 43
Page 667

But one of the most important things that Kadisha knew, which relates to his opposition to each of Petitioners' claims as well as his affirmative defenses, is that he would have to give false testimony and suborn perjury in order to prevent his wrongdoings from being discovered by the Court.

### Would any reasonable attorney have thought Kadisha's opposition legally tenable?

The next question is, based on those facts, would any reasonable attorney have thought Kadisha's opposition legally tenable? The answer is a resounding no.

Rule 5-200 of the California Rules of Professional Conduct provides that an attorney, in presenting a matter in court, shall only provide a defense that is consistent with truth and shall not seek to mislead the judge with a false statement of fact. No reasonable attorney could believe that presenting the facts outlined above in a way that is consistent with the truth could result in Kadisha's exoneration on any legal ground. And no reasonable attorney could have put Kadisha and his witnesses on the stand knowing that they would have to give untrue testimony (as they did) in order to provide a defense. In addition, a reasonable attorney would have known that if the Court did not believe Kadisha or his witnesses, it could disregard all of their testimony (as the Court has done), and that, as a result, Kadisha would have no evidence to support his opposition. In short, no reasonable attorney could have believed that an opposition based on false testimony was legally tenable.

Since no reasonable attorney would have thought Kadisha's opposition legally tenable, the Court finds that Kadisha's opposition was unreasonable.

### Bad Faith

Probate Code section 17211 also requires the Court to find that Kadisha's opposition was in bad faith. The Court finds that it was.

---

STATEMENT OF DECISION

168

Exhibit 1
Page 174

Exhibit 43
Page 668

In determining whether Kadisha's opposition was in bad faith, the Court must determine whether Kadisha's opposition was subjectively in bad faith. "Bad faith" is closely analogous to "malice" as defined in malicious prosecution actions. "[T]he malice required in an action for malicious prosecution is not limited to actual hostility or ill will towards plaintiff, but exists when the proceedings are instituted primarily for an improper purpose."

"Good faith" has been defined as "that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, being faithful to one's duty or obligation." *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187, 192.

The question is therefore whether Kadisha's opposition was conducted primarily for an improper purpose. Throughout Kadisha's trusteeship, he acted in bad faith and in total derogation of his fiduciary duties. There can be no doubt that Kadisha knew that what he did was wrong – he did exactly what DeCastro advised him not to do and then tried to cover up his misconduct.

As well, since the Court has concluded that Kadisha knew what he did was wrong, the conclusion that he mounted his opposition for an improper purpose must follow. The Court has found that Kadisha acted in bad faith by continuously breaching his fiduciary duties throughout his trusteeship, and with intentional, willful and conscious disregard of Petitioners' rights. The court has also found that Kadisha perjured and suborned perjury at trial. The Court therefore concludes that he would have lied to his lawyer and never conveyed any of the facts set forth above and therefore no lawyer could have presented a tenable opposition to Petitioners' claims.

The finding that Kadisha knew that what he did was wrong is bolstered by the Evidence Code.

Exhibit 43
Page 669

A presumption is an assumption of fact that the law requires to be made from another fact or facts. (Evidence Code §600(a))  A party is presumed to intend the ordinary consequences of his voluntary act, and an unlawful intent is presumed from the doing of an unlawful act. (Evidence Code §§665, 668)  Since Kadisha's breaches of fiduciary duty, perjury and suborning of perjury were both intentional and unlawful, and an unlawful intent is presumed from the doing of an unlawful act, the court can presume that Kadisha acted with an unlawful intent.

Kadisha incorrectly contends that because Petitioners had probable cause to bring their claims, this means that he had probable cause to oppose them.  The Court rejects this.  Kadisha also incorrectly contends that since the trial has lasted four years, he had reasonable cause to oppose Petitioners' claims.  The Court rejects this too.

### The Amount of the Attorney Fee Award.

Petitioners could not afford to pay their counsel on an hourly basis, and therefore entered into a contingency fee agreement with their attorneys ("Fee Agreement"), which the parties amended in 2000.  The Court is not limited to an award of attorney fees based solely on the Fee Agreement.  It is to award a reasonable fee based on factors enumerated by the California Supreme Court and various Courts of Appeal.

In entering into the Fee Agreement, Petitioners never anticipated the length of the trial (over four years), which was due in part to Kadisha's perjury and suborning of perjury, and the full complexity of the issues and proof required.  In determining the amount of attorneys' fees, the Court took into account the following:

1.     The contingency fee agreement;

2.     A loadstar amount based on the number of hours of work performed, and the reasonable hourly rate an attorney would charge (assuming his fees were paid monthly).

STATEMENT OF DECISION

170

Exhibit 1
Page 176

Exhibit 43
Page 670

3.     An enhancement of the loadstar.

4.     The novelty of claims.  Any one of the numerous claims in this case, if brought separately, would have required a complicated trial.  The trial was conducted over four years, with approximately 3,000 exhibits, 20,000 pages of trial testimony and arguments as well as Kadisha's applications for funds.

5.     The complexity and difficulty of proof.  Counsel was required to examine thousands of pages of Kadisha's personal records, his business records, and the Trust's records.  This included hundreds of pages of complex documents produced by Qualcomm, including its voluminous securities filings.  Counsel took 19 depositions that consumed over 50 days.  Counsel's evaluation of the documents was made more difficult by the fact that Kadisha lied about his entries in the purported accountings, his backdating and his creation of phony transactions, among other things.  An extraordinary effort was required to expose the perjury of Kadisha and his witnesses in discovery and at trial.  In addition, the case required the analysis of numerous factual and legal issues in addition to the breach of fiduciary duty issues.  There were accounting issues, real estate issues, partnership issues, contract issues, and professional responsibility issues, among others.

6.     Counsel for Petitioners demonstrated extraordinary excellence in connection with briefs, oral arguments, direct and cross-examination, as well as discovering and proving Petitioners' claims against Kadisha;

7.     Samuel Krane, counsel for Petitioners, testified that this matter, which has thus far encompassed over seven years (including over four years in trial) precluded him and his firm from accepting other employment;

STATEMENT OF DECISION

171

Exhibit 1
Page 177

Exhibit 43
Page 671

8.     Counsel for Petitioners have never been paid one dollar for legal fees over seven years; and

9.     By taking this matter on a contingency, Petitioners' counsel was gambling on the outcome, and, therefore, the amount of fees they would receive.

10.    Its own experience as a practicing attorney for approximately 18 years, and a judge for approximately 24 years during which the Court has heard many, many motions for attorney fees.[28]

The California Supreme Court has stated: "[A] contingent fee must be higher than the fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders, but for the loan of those services. The implicit interest rate on such a loan is higher because the risk of default (the loss of the case which cancels the debt of the client to the lawyer) is much higher than that of conventional loans." *Ketchum v. Moses* (2001) 24 Cal.4[th] 1122.

Kadisha erroneously contends that the language of Probate Code §17211 which states: "...including attorneys' fees incurred to contest the account," limits the Court's award of attorney fees to fees that were actually incurred." In *Ketchum*, the California Supreme Court held that the analogous phrase "his or her attorneys' fees and costs" in Code of Civil Procedure section 425.16(c) did not indicate a legislative intent to limit a prevailing party's attorneys' fees to "actual expenses caused by the improper pleading." In other words, the simple omission of the word "reasonable" does not imply any such purpose. Therefore, *Ketchum* allowed the trial court to determine the loadstar and enhance it in a contingency fee case. Consistent with the

---

[28] Appointed to Pasadena Municipal Court in 1965; appointed to Superior Court (L.A. County) in 1967. Retired in 1986. Assigned Judge Since about 1991/1992.

STATEMENT OF DECISION

172

Exhibit 1
Page 178

Exhibit 43
Page 672

Supreme Court's holding in *Ketchum*, this Court has calculated attorney's fees in precisely the same way.

Kadisha also incorrectly argues that when you divide the Court's award by the number of hours Petitioners' counsel worked on this case, the result is an hourly rate in excess of any reasonable hourly rate. This is a nonsensical analysis in a case, such as this, where the Court has enhanced the award.

The issue of apportionment that Kadisha has raised and any other issues involving attorney's fees will be dealt with when the court rules on Petitioners motion for attorneys' fees, which will be heard after entry of judgment.

## IV.    KADISHA'S AFFIRMATIVE DEFENSES

Since the court has found that Kadisha and his witnesses gave perjured testimony and is disregarding their testimony, Respondent has not produced any credible evidence to support any of his defenses.

Nevertheless, in analyzing Respondent's defenses, the court finds some review of important facts very revealing as to how equity should consider Respondent's defenses and, in particular, the statute of limitations defense.

The court granted Dafna's request to be questioned and give her answers in Hebrew, the court finding her oral communication ability, however, weak, would be better in Hebrew.  While Respondent cites pages of her testimony, they do not reveal the bewildered look on her face as she sought to understand Nussbaum's questions.  "I don't remember," is the best she could do.  The court finds these answers were not evasive.  Dafna is plain and simply a person who lacks understanding of financial matters, let alone what trusts are all about and her rights to know how her funds and her children's funds were being handled by Kadisha.

STATEMENT OF DECISION

173

Exhibit 1
Page 179

Exhibit 43
Page 673

1   The court has already covered the appalling legal representation by DeCastro. The more

2   the court reviews his conduct, the more disgusting the picture becomes.

4   Equally appalling as DeCastro's representation of Dafna is the production by a law firm —

5   of three amendments to the original Trust agreement re Trust 2, relieving Kadisha from any and

6   all liability for anything, as herein before stated, as well as the fact a reasonable person could

7   well consider the amendments as acknowledgment of wrong doing and, further the obtaining of

8   all waivers was without consideration. Equity cannot permit such an attempted travesty of

9   

10  justice.

11  Respondent seeks legal cover in the statute of limitations by advancing a very chilling ~

12  proposition akin to "buyer beware." Respondent urges upon the court the belief, a very chilling

13  one, that beneficiaries must assume their trustee is not to be trusted based upon some sort of due

14  diligence requirement. Apparently, Respondent would have it that all beneficiaries employ

15  Pinkertons and constant auditors to investigate everything a trustee does, and if not, the

16  

17  beneficiaries will be victimized not only by their trustee, but also the statute of limitations. The

18  court finds this profoundly shocking. There must be medication for Respondent to overcome

19  this aberration.

20  

21  Probate Code sections 16460 and 16460(b) re the Statute of Limitations cannot be

22  applied to bar Petitioners' claims. How could equity ever think of applying the Statute of

23  Limitations to a helpless, not-too-bright lady when her lawyer and trustee have left her bereft of

24  any thought of inquiry as to their conduct? Consideration of Dafna is in many ways similar to

25  drafting a complete evaluation of a developmentally disabled person in need of protection from

26  

27  those who would take advantage of her in an incredibly difficult social and economic adjustment.

28  

STATEMENT OF DECISION

174

Exhibit 1
Page 180

Exhibit 43
Page 674

An interesting question arises when a defendant seeks to raise the Statute of Limitations as a barrier to his fraudulent conduct. Mildred Lillie, one of the all-time great Appellate Court Justices of the State of California had zero tolerance for a witness testifying falsely under oath. In one case, she declared that a witness giving false testimony under oath was not entitled to the attorney-client privilege. The court is certain she would regard, as does this court, the idea that a witness can give false testimony and later attempt to change the impact thereof by an "amendment" should be treated as contemptuous of testifying truthfully as a cornerstone of the judicial process, i.e., having the duty to tell the truth under oath. The court having found Kadisha as giving false testimony under oath, he should be deprived of any benefit of a statute of limitations. His fraud is a continuing thread during his term as trustee eliminating his statute of limitations defense.

While Petitioners have pointed out the lacking of ability of Kadisha to charge Dafna with inquiry or notice, the court cannot express too strongly her intellectual inability in matters Respondent would like to show knowledge, duty to inquire or whatever. Dafna was badgered by Respondent with an array of questions that left her baffled as to how to answer. A typical question was to ask her if she received a certain document. When she would answer "No," then the following question would be asked: "Do you have any reason to believe you did not receive this document?" Dafna would look bewildered and then say she didn't see or get the document counsel referred to. The examination of Dafna took many days and only offered further proof she was not capable of being "reasonably capable of understanding any account or report," or if present with some document, "reasonably should have inquired into the existence of the claim."

The court cannot accept, as Kadisha urges, that the provisions of Probate Code Sections 16460(a) and 16460(b) can be used to shield a trustee who has unlawfully used trust funds,

STATEMENT OF DECISION

175

Exhibit 1
Page 181

Exhibit 43
Page 675

stolen trust money and committed perjury. There is also no way a beneficiary can be reasonably capable of knowing what the trustee has done as to wrongdoing if that cannot be ascertained from an account or report which provides insufficient information for the beneficiary to reasonably know the claim or be put on notice of the claim.

The Legislature has not provided and determined a trustee can keep a little black book of all his misdeeds and then run up the victory flag after the statutory period has run. In fact, the Legislature in 2004 recognized a deficiency in Probate Code sections 16460(a) and 16460(b) and enacted Probate Code section 16461 which provides for a specified notice and a period in which a beneficiary may object. But in doing this, the Legislature did not find any notice requirement where the trustee has committed fraud, perjury or outright theft of trust assets.

The court must put to rest any idea that Ron Levi is a responsible factor in determining Dafna's mental capacity to know or understand the terms and conditions of the trust documents or the so-called accountings made by Kadisha or his employee or anything relating to what Kadisha was doing with trust money. Levi is as dumb as a fence post. He is not a party to this action. There is no legal document authorizing Levi to act as Dafna's agent. There is no evidence that Dafna made or regarded Levi as her agent. There is no evidence Levi read any trust documents. He was, at best, a delivery boy. He got checks from Kadisha. The fact he may have received documents is meaningless. Proof would have to be that he read and understood them. If he did, he would not know how to interpret them, and his understanding would not be binding on Dafna. He had no knowledge of Kadisha's self dealing and using trust funds to his own advantage. Accountings (if they can be so improperly labeled) were meaningless to him. Levi's sole interest was how much Dafna was getting from Kadisha.

STATEMENT OF DECISION

176

Exhibit 1
Page 182

Exhibit 43
Page 676

Allowing Kadisha to have control of the Uzyel assets was a recipe for disaster. Kadisha, looking for glue everywhere to bolster up his claim of knowledge, dug up a letter to Kadisha with an acknowledgment by Dafna, Ron Levi and Izzet that $400,000 annual income would be sufficient for their living expenses. Dafna and Ron Levi is no brainer combination. Levi should not be allowed to tell time. Dafna's sole interest, perhaps better defined as an obsession, was to get money. Perhaps a psychiatrist could peel the layers of lifetime events and reveal her compulsion. Money may well have been an opiate to relieve her of the incomprehensible life without her husband. To try and tag Izzet or Joelle with any of the knowledge requirements of Probate Code sections 16460(a) and (b) they try and impute their knowledge to their mother is beyond silly.

The concept of Kadisha trying to use Probate Code section 16460(a) and (b) is without merit. Kadisha had no respect for the obligations of a trustee; he had no hesitation to take nearly all the trust money obtained by loans on trust property for his own use and benefit, yet he would proffer knowledge about trust and his conduct by a letter written without any legal advice in an attempt to get money to live on. (A standard few know, but one to which they had become accustomed.) Dafna had to plead for money. In fact, that is what brought her to Krane & Smith. Dafna had the idea she was to get money from Trust 2. Her trust. Her money. Ron Levi, a signatory to the letter is as dumb as a fence post. A perfect match for Dafna. He had no authority in the matter. Kadisha would make him an agent for Dafna. He was no such thing. In any event, an agent does not sign a letter upon which the signature of the principle appears. It is a legal nothing. He had absolutely no standing – a rooter for the team. And what did young Izzet and Joelle know of all the horrors of Kadisha as a trustee? Nothing. Izzet testified and appears to be a fine young man who, hopefully, can be of assistance to his mother in the future.

STATEMENT OF DECISION

177

Exhibit 1
Page 183

Exhibit 43
Page 677

In short, the letter is not evidence of knowledge but quite to the contrary. With knowledge about Kadisha's helmsmanship of the trusts acquired by an able lawyer, Kadisha would have been long gone.

The other acts claimed by Kadisha to show knowledge about the trusts are equally without merit. To suggest the accountings gave notice to Dafna is absurd. (To suggest the accountings gave notice to a reasonable person is equally absurd.) As to conversations, Dafna is purported to have had with Kadisha's other helpers, the court finds more probably not true than true. None of the instances recited in Respondent's brief convinces the court that Dafna ever had the wherewithal mentally to make any value judgment about what was going on with the trusts, or the fact she had been deprived of representation by DeCastro acting as her attorney when in truth and fact he was Kadisha's lawyer.

Mr. Nussbaum, a counsel for Kadisha, sought to show Dafna's right to sue Kadisha on some of her claims and those of her children fail pursuant to the Probate Code sections 16460(a) and (b) because of knowledge of Levi. Of course, Levi's knowledge (if any) about anything cannot be imputed to Dafna or her children. Mr. Nussbaum used a trick question on Levi as he had done with Dafna. He had Levi look at a trial document 3492. He then asked Mr. Levi, "Do you have any reason to believe you didn't get...I'm sorry. Do you have any reason to believe that you did not get a copy of that letter and the enclosure?" Dumb Levi says, "No." The trick of Nussbaum's question is the assumption he did receive the document. The court does not buy the answer as evidence he received the subject document. Nussbaum asked Dafna his usual question, "Q. Do you have any reason to believe you didn't receive it?" Dafna was definitely confused and answered that she had not received the document.

Exhibit 1
Page 184

Exhibit 43
Page 678

In his examination of Levi, Nussbaum asked, "And is it your best recollection that you did receive this letter and the enclosures?" Levi is now confused. He answers, "I don't remember if I get it, but I think I did. I'm not sure. Usually when I used to get letters, I used to get an explanation before, so I didn't really read this letter. It was either verbally explained to me or whatever, but I never bothered to read whatever is inside." This answer affirms that as to the subject exhibit Levi was presented with, he does not say he read it or knew what it was about. "Usually," is not definite to prove he knew what was in Exhibit 3492. In no event can his answer be used for proof of the contents, particularly given Levi's mentality rating. The court's general inquiry was not about Exhibit 3492, yet Respondent argues, "Mr. Levi's testimony confirms Mikhaili's testimony that she had given TE 3492 to Mr. Levi with the 1992 Trust General Ledgers. It does no such thing. All Levi's testimony is in response to the court's inquiry was he "got a general ledger account." He did not identify the account.

Respondent further states: "'everything' Mr. Levi received concerning the trusts he passed on to Dafna." There is no evidence that Mr. Levi received "everything." What Levi received as a delivery boy in no way falls within *Clark Equipment Co. v. Wheat*, 92 Cal.App.3d 503. No notice can be imputed to Dafna by Levi acting as a delivery boy. The Respondents' following statement is just wild conjecture.

"The 1992 Trust General Ledger accountings Mr. Levi received and discussed with Dafna contained ample information, at minimum, to cause a reasonable person to suspect that Mr. Kadisha might personally be engaged in financial transactions with the trusts." The Respondent then lists what it would take an able trial lawyer or CPA to discern as "the fuel for that suspicion."

---

STATEMENT OF DECISION

179

Exhibit 1
Page 185

Exhibit 43
Page 679

The wild conjecture is based upon the fact Levi and Dafna "discussed" the accountings. There is not a vestige of acceptable evidence that they did. Respondent would have the court draw an inference of knowledge of what Levi and Dafna discussed. It is the court's opinion that the Levis together or singly could not understand the so-called accountings. The Respondent is grasping at thin air in attempting to use the so-called accountings as placing Dafna on notice of anything. To the contrary, the so-called accountings were designed to deceive and hide Kadisha's devious and gross abuse of the trust assets given to his care.

Kadisha's "accountings" are basically fraudulent as they fail to disclose the willful and unlawful taking by Kadisha of trust money, his conflicted transactions and his profits from Trust assets. The Respondent cannot rely on such concealment as a statute of limitations defense. If you fraudulently and unlawfully administer a trust, there is no way you can charge a beneficiary with knowledge or duty to inspect -- it is not the beneficiary's duty to be on constant vigilance for fraudulent conduct of the trustee. A beneficiary must have the comfort a trust is supposed to provide, not administered by a dishonest person. Concealment and fraud cannot be used as a sword in favor of the statute of limitations. What Kadisha is really saying is that if I can cleverly disguise my so-called accounting but provide some slight clue as to my wrongful dealing and you are not smart enough to find it, you can suffer without equity's assistance. It does not work that way.

There is a further basis for disallowing Kadisha to escape from liability by use of the statute of limitations. The court finds the case of *Gold v. Weissman* (2004) 114 Cal.App.4th 1195 supportive of the concept that where a trustee continues to act as a trustee on any claim of breach of a trustees duties, the statute of limitations will be tolled, and the breach need not involve the same matter, but only that the trustee continued to act as trustee.

Exhibit 43
Page 680

1    While the *Gold* case involved malpractice, the same assumptions are made, i.e., duty, and

2    the continued duty tolls the statute.  It is particularly applicable in this case where Kadisha has

3    control of trust documents and the creation or modification of same over which Dafna would

4    have no knowledge or control.  It cannot be just to allow Kadisha to drop the iron curtain on any

5    of his derelictions as long as he is in power and places an innocent, bewildered beneficiary from

6    having the right of legal action.

7

8    Kadisha's arguments regarding the statute of limitations, laches, failure to mitigate,

9    equitable estoppel, unclean hands, and ratification/affirmation are all fatally defective.  These

10   arguments either fail to comply with the express language of the Probate code or are based on

11   inapposite or miss-cited cases cited by Respondent.  Most critical, Kadisha disingenuously

12

13   argues that the true meaning of his intentionally misleading and deceptive accountings – which

     Kadisha claims he gave to Dafna – could have been deciphered by his hypothetical "reasonable

15   person beneficiary."  The threshold question, assuming arguendo that Dafna actually received the

16   "accountings," (which the Court does not believe she did) is whether *Dafna* was "reasonably

17   capable" of understanding them.  Since it required a Herculeon effort by Petitioners' counsel and

18   their experts to unravel Kadisha' accountings," the answer can only be no.

19

20   In short, the evidence unequivocally showed that Kadisha exploited Dafna's lack of

21   capacity to reasonably understand the accountings.  Since Dafna was not reasonable capable of

22   understanding the "accountings," therefore, she cannot be deemed to have received them under

23   Probate Code section 16460(b)(1) and the three-year limitations period did not commence

24   running.

25

26   Kadisha's argument that Petitioner's pre-1996 claims are barred by the statute of

27   limitations because Petitioners allegedly received accountings and other documents

28

---

**STATEMENT OF DECISION**

181

Exhibit 1
Page 187

Exhibit 43
Page 681

1   ("Respondent's Documents") for the years 1988-1992 that would have put a reasonable person

2   on notice of financial transactions between Kadisha and the Trusts pointedly ignores Probate

3   Code sections 16460(b) and 16460(b)(1).[29]  Since this analysis must be based on *Dafna's*

4   capabilities and Dafna was *not* reasonably capable of understanding Respondent's documents,

5   

6   she cannot be deemed to have received them, and therefore the statute of limitations cannot be

7   deemed to have commenced running.

8       It is undeniable that for the entire duration of Kadisha's trusteeship, Dafna could *not* have

9   understood the accountings.  This is underscored by Kadisha's admission during trial that even

'10  

11  *he* could not understand the critical components of the accountings that he professes Dafna

12  should have understood.  Finally, although Kadisha knew that he did not understand the

13  accountings, and that Dafna (whom he described as "stupid") could not have understood them,

14  

15  i.e., Hugo DeCastro ("DeCastro") and Aaron Doodkevitch ("Doodkevitch"), Dafna's accountant.

16      Even assuming arguendo that Kadisha *could* have established at trial that Dafna was

17  reasonably capable of understanding Kadisha's accountings – which he did not – Respondent's

18  Documents do not meet the disclosure requirements of Probate Code section 16460(a), nor did

19  they disclose Petitioners' claims.  Under that section, the statute of limitations does not begin

20  running unless the accountings received by the beneficiary adequately disclosed the existence of

21  

22  a claim.[30]  The issue framed by this section is whether *Dafna* knew or, given her capabilities,

23  should have known of the existence of her claims.  Kadisha's argument that this issue must be

24  decided on the basis of what a hypothetical "reasonable person beneficiary" should have

25  

---

26  [29] Sections 16460(b) and 16460(b)(1) provide, inter alia, that: "For purposes of subdivision (a), a beneficiary is

27  deemed to have received the accounting or report as follows:  (1)  In the case of an adult *who is reasonably capable of understanding the account or report,* if it is received by the adult personally."  (Emphasis added.)

28  [30] An account or report adequately disclosed the existence of a claim if it provide sufficient information so that *the beneficiary* knows of the claim or reasonably should have inquired into the existence of the claim."  (Probate Code section 16460(a).)

**STATEMENT OF DECISION**

182

Exhibit 1
Page 188

Exhibit 43
Page 682

1  understood is not supported by his inapposite cases, the plain wording of the statute, or logic.[31]

2  In addition to the plain wording of the statute, Goldring, Petitioners' expert testified that under

3  the standard of care for a California trustee, (1) trust accountings should be prepared so that the

4  beneficiary can understand them; and (2) it is the trustee's responsibility to consider the

5  education, economic and business sophistication, and experience of the beneficiary when

6  preparing his accountings.  (RT 17, 7-30-03; RT 29-33, 7-30-03.)  These are obvious corollaries

7  to Probate Code section 16460's rule that an accounting is not deemed received by a beneficiary

8
9  unless the beneficiary can understand it.

10

11      The evidence established that Respondent's Documents were *intended* to confuse and

12  mislead Dafna or anyone else who might see them.  Kadisha is estopped to now argue that Dafna

13  should have discovered and pierced through his deliberate and fraudulent deceptions (e.g.,

14  Kadisha identifying his misappropriations of Trust funds "investments" and backdating

15
16  promissory notes to retroactively convert his takings into loans).

17      Even if a "reasonable person beneficiary" standard applies, Respondent's Documents did

18  not disclose Petitioners' claims to a reasonable person and would not have put a reasonable

19  person on notice.  They were *intentionally* misleading, deceptive, confusing and fraudulent and

20
21  were designed to hide Kadisha's breaches of fiduciary duty.

22      In sum, there is no credible evidence that Dafna received Respondent's Documents.

23  Even if Dafna had received the documents, she could not have understood them.  She lacked the

24  intelligence and education to do so.  Kadisha's accountant admitted that understanding the

25

26  _____

27  [31] In determining a reasonable person standard, should an inexperienced, elderly uneducated beneficiary be held to the same standard as a Wharton graduate CPO beneficiary?  Or vise versa?  That would obviously impose an impossible burden on the elderly beneficiary.  Is a "reasonable person beneficiary" then the average of the two?

28  That would still impose an impossible burden on the elderly beneficiary.  Kadisha's objective reasonable person standard – which is derived exclusively from non-Trust cases – simply does not make sense in the trust context where the duty of loyalty is owed to a specific individual with specific characteristics.

STATEMENT OF DECISION

183

Exhibit 1
Page 189

Exhibit 43
Page 683

accountings would require specialized knowledge about accounting.  And, it took Petitioners' counsel hundreds of hours to uncover Kadisha's acts from his documents.  Dafna, therefore, cannot be deemed to have "received" Respondent's Documents under Probate Code section 16460(b)(1) even if they had been personally delivered to her.  Even if Dafna could be deemed to have received Respondent's Documents, they would not have revealed to her, or any reasonable person, the basis for Petitioners' claims or further inquiry.  Therefore, Kadisha's statute of limitations defense must fail.

### The evidence conclusively proved that Dafna was not reasonably capable of understanding Respondent's Documents.

The evidence abundantly illustrated that Dafna was not reasonably capable of understanding the accountings.  At trial, Dafna repeatedly demonstrated a total lack of understanding of even the simplest financial matter or legal concept.  The Court during trial made the following observation:

> "Ms. Uzyel may be a very delightful mother and a wonderful person, but when it comes to these financial matters, she was practically brain-dead in the handling of financing and knowing what's going on. This is just – she's just incompetent. What she needed was a conservator in this matter."

The court has not changed its opinion.

The inability to understand financial matters Dafna demonstrated at trial was undoubtedly even more pronounced in 1988 through 1992, when Kadisha contends Dafna received the documents that purportedly disclosed her pre-1996 claims.

Preliminarily, Dafna's primary language was Hebrew; she had trouble understanding English or reading a newspaper; and when she spoke to Kadisha, it was in Hebrew or Farsi. (RT

Exhibit 1
Page 190

Exhibit 43
Page 684

17, 6-18-02; RT 29, 1-21-03; RT 35, 1-21-03; RT 39, 1-21-03.)  The accountings, however, were in English.

Dafna only had a 10th-grade education, and the only job she held in her entire life was a makeup artist after high school.  (RT 27, 1-21-03.)  Dafna stopped working after her marriage.  (RT 28, 1-21-03.)  Before Dafna's husband died, she had never opened a bank account herself or signed a loan document.  (RT 39, 1-21-03.)  Kadisha admitted Dafna and Ron Levi were "stupid."  (RT 7 1-72, 11-5-03.)  Kadisha's accountant, Michael Feldman, admitted that Dafna would have required knowledge of accounting to understand the accountings.  (RT 6, 1-24-03.)

### Kadisha's other affirmative defenses must also fail.

#### A.   Laches.

Kadisha argues that laches bars Petitioners' claims for lost profits for Kadisha's purported "loans" to himself, the "Rahban" loans, and the Farahnik loans.  His laches' argument relies mainly upon the unsupportable premise that the accountings disclosed that Kadisha was "loaning" Trust funds to himself so that Petitioners knew about the improper "loans" but did nothing.  As discussed at length above, Kadisha's accountings concealed rather than disclosed his misappropriations of Trust funds.

The accountings misleadingly showed Kadisha's unlawful taking of trust monies from December 1988 – 1991 as "investments Kadisha" not loans receivable from Kadisha.

The accountings also failed to disclose that the Rahban loans were disguised unsecured loans to Kadisha.  Kadisha cannot be equitably permitted to argue that the delay in discovering his misconduct, which was created by his own attempts to conceal it, bars Petitioners' claims.

Kadisha's claims to having been prejudiced are equally unfounded.  He first claims that by not complaining about the "loans," Petitioners "gulled" him into staying on as Trustee when

Exhibit 1
Page 191

Exhibit 43
Page 685

he wanted to resign. The evidence, however, demonstrated that Kadisha never had any intention of resigning, and, in fact, *could not* resign because a successor trustee would have readily discovered his malfeasance. For example, Kadisha drafted the June 14, 1991 First Amendment which, among other things, amended paragraphs A.6 and A.7 of the original trust agreement, to now require that Dafna give him 36 months' notice before she could remove him as Trustee (and to then allow Kadisha to select his successor.) (TE 428.) These provisions were an obvious stalling device to give Kadisha time to repay the Trusts for the millions of dollars he had misappropriated from them, and shows that he *could not* resign because of the risk of discovery. The most compelling evidence to debunk Kadisha's contention is that in 1999, he had Kahn draft a modified trust agreement (TE 3592), which provided, among other things, that Kadisha could only be removed for cause, that Kadisha had the right to choose a co-trustee, and that he had the power to choose a successor trustee.[32]

As well, in 1999, after commencing this litigation, Petitioners attempted to terminate the Trusts and recover the Trust assets. Kadisha refused to voluntarily comply with Petitioners' notices of termination, and they were forced to seek turnover orders from the Court. Even then, Kadisha dragged his feet in turning over the assets. In other words, throughout his trusteeship, Kadisha actively sought to prolong his tenure as Trustee. In fact, when he was given the opportunity to be released from his trusteeship, he refused.

Kadisha also claims that Petitioners "gulled" him into continuing his "high-income-yielding strategy." This refers to Kadisha's absurd claim that he was forced to make risky investments and loan Trust funds to himself in order to meet Dafna's income needs. This specious claim is simply another form of the "blaming the victim" defense. Petitioners' Closing

---

[32] "For Cause" was more restrictive than the definition for any other trustee.

**STATEMENT OF DECISION**

186

Exhibit 1
Page 192

Exhibit 43
Page 686

Brief also points out that Kadisha *could not* have repaid the loans because he did not have the funds to repay them (hence, the provision he inserted in the First Amendment). Kadisha initiated his breaches of fiduciary duty of his own free will and continued breaching his fiduciary duties of his own free will – he was not "gulled" into it by Petitioners.

Kadisha's claims that if Petitioners had complained about the "loans," he could have sought Court approval before continuing on in the same vein. This claim is also absurd because it would have required that Kadisha go to the Court, voluntarily disclose his improper activities, and seek its blessing to continue breaching his fiduciary duties. (One can imagine the difficulties of explaining to the Court that the "loans" were unsecured, as required by the Trust, or that there were no signed notes documenting them, or that "Rahban" lived somewhere in Iran or Europe and did not have any assets in the U.S.) Seeking court approval was something Kadisha would not have done under any circumstances. His failure to do so was therefore not the result of anything Petitioners did or did not do.

A.    **Failure to mitigate.**

A party is only obligated to mitigate when he is harmed, is aware of the harm, and has the ability to mitigate his damages. In this case, Kadisha concealed his breaches, and now claims that Petitioners should have mitigated. But Petitioners did not know the full extent of Kadisha's breaches until trial. Even then, Kadisha lied and obfuscated the true facts. The court will not reward Kadisha for his egregious breaches and his extensive concealment of these breaches.

B.    **Equitable estoppel.**

For a court to impose equitable estoppel, it would have to find that it was Petitioners' failure to act that prejudiced Kadisha. It is, however, Kadisha who should be equitably estopped from raising this defense. It is he who concealed his breaches and lulled Petitioners into

STATEMENT OF DECISION

187

Exhibit 1
Page 193

Exhibit 43
Page 687

1   believing that he was acting in their best interests when the opposite was true.  Furthermore,

2   Kadisha was always aware of his own wrongdoing because it was intentional.  Therefore, his

3   defense of his wrongdoing cannot have been compromised in any way by Petitioners' failure to

4   discover them earlier.  Kadisha's contention that Petitioners intended to mislead Kadisha by not

5   complaining about his actions is absurd.  Since he concealed his wrongdoings, Petitioners could

6   not possibly have complained about them.

7

8   **C.      Unclean hands.**

9   Petitioners did not, as noted above, "encourage" Kadisha to breach his fiduciary duties.

10   Kadisha did that of his own volition.  Kadisha was completely in charge of the Trust assets, and

11   the flow of information and money to Dafna.  He not only held all of the cards but was

12   unquestionably stronger than Petitioners in terms of intelligence, education and experience.  He

13   thought Dafna was "stupid."  Kadisha's unclean hands defense is a ridiculous attempt to claim

14   that he was helplessly misled by a woman he regarded with contempt, and her minor children.

15   **D.      Ratification/Affirmation.**

16   An enforceable ratification or affirmation of Kadisha's breaches required full disclosure

17   to Dafna of her material rights and the material facts, and the transaction in question involved a

18   bargain with the trustee that was fair and reasonable to the beneficiaries.  (Prob. Code §16465.)

19   Kadisha has not claimed that he or anyone else made such a disclosure to Dafna, or proven that

20   the acts or omissions allegedly ratified or affirmed were fair and reasonable to the beneficiaries.

21   Kadisha asks that he be excused from surcharge under Probate Code section 16440(b) for

22   Petitioners' loss when he failed to act to preserve the value of Trust 1's Qualcomm stock during

23   its 2000 freefall because his conduct as Trustee "was in good faith."  Although his closing brief

24   concludes that the evidence at trial established his good faith, it does not point to a single piece

STATEMENT OF DECISION

188

Exhibit 1
Page 194

Exhibit 43
Page 688

1  of evidence that does so.  To the contrary, Petitioners proved by clear and convincing evidence

2  that Kadisha did *not* act in good faith and that he  retaliated against Petitioner's.

3

4

5  ## CONCLUSION

6  From the inception of the Trusts, Kadisha totally ignored the Trusts' terms, DeCastro's

7  memorandum detailing his duties as a trustee, his fiduciary duties, and his duty of loyalty in

8  favor of his own economic self-interest.  Even a perfunctory review of his defenses exposes their

9  defects.  No respondent could, in good faith, believe that the statute of limitations or the other

10

11  asserted defenses would bar Petitioners' claims.  Kadisha's acts and omissions were flagrant,

12  numerous and deceptively hidden.  Kadisha's actions are not worthy of reward, but, to the

13  contrary, call for compensation, the disgorgement of profits and punitive damages.

14

15  Kadisha has the arrogance to ask equity to uphold provisions in the trust agreements

16  which inure to his benefit.  Cheat Dafna's trust.  Steal from Dafna's trust.  Take from Dafna's

17  trust what you want for personal gain.  Kadisha lost any such rights.  Equity under the

18  circumstances will give to Dafna and her children any benefits of the trust agreements.  Kadisha

19  forfeited any considerations in his favor by his dishonest and deceitful conduct.

20

21  Kadisha attempts to make a mark against Dafna because in mid-1999, Dafna employed

22  Krane & Smith.  Kadisha neglects to mention that Dafna went to Krane & Smith re enforcement

23  of certain provisions in Trust 2 that she be paid $300,000, and she had not received said sum at

24  any time.  Little did Krane & Smith know or have any inkling at that time of what a can of

25

26  worms they had gotten themselves into.  Obviously, they did not know of the many derelictions

27  of Kadisha as trustee of Trust 1 or Trust 2, yet Kadisha accuses them of playing "dog in the

28  manger," waiting to see if Qualcomm stock would rise or fall.  He further charges that "no

Exhibit 43
Page 689

1  professional or lay trustee should be subject to such "Heads-I-win, tails-you-lose" conduct. The

2  foregoing accusation is pure desperation on behalf of Kadisha. It is an attack on the moral fiber

3  of Krane & Smith, who have represented Dafna and her children with extraordinary excellence,

4

5  reflecting both legal ability and the very best of moral character.

6       Samuel Krane of Krane & Smith shall now cause to be prepared a judgment based upon

7  this Statement of Decision. Said judgment shall be filed and served within 15 days from the date

8  of mailing of this Statement of Decision, but Krane may request additional time from the court

9

10  (ex parte) upon good cause being shown.

11

12  Dated: October 24, 2006               _Henry Shatford_

13                            Honorable Henry W. Shatford (A)

14                            Judge of the Los Angeles Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF DECISION

190

Exhibit 1
Page 196

Exhibit 43
Page 690

1   professional or lay trustee should be subject to such "Heads-I-win, tails-you-lose" conduct. The
2   foregoing accusation is pure desperation on behalf of Kadisha. It is an attack on the moral fiber
3   of Krane & Smith, who have represented Dafna and her children with extraordinary excellence,
4
5   reflecting both legal ability and the very best of moral character.

6      Samuel Krane of Krane & Smith shall now cause to be prepared a judgment based upon
7   this Statement of Decision. Said judgment shall be filed and served within 15 days from the date
8
9   of mailing of this Statement of Decision, but Krane may request additional time from the court
10   (ex parte) upon good cause being shown.

11

12   Dated:  October 24, 2006

                              *Henry Shatford*
13                               Honorable Henry W. Shatford (A)
14                               Judge of the Los Angeles Superior Court

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF DECISION

Exhibit 1
Page 197

Exhibit 43
Page 691