# EXHIBIT 100

CONFORMED COPY
LODGED
FILED

2007 MAY 16  PM 1:59   2007 MAY 16  PM 2:00

CLERK U.S. DISTRICT COURT   CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.   CENTRAL DIST. OF CALIF.
RIVERSIDE   RIVERSIDE
BY_____

Hon. Edward A. Infante (Ret.)
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, California  94111
Telephone:  (415) 774-2611
Facsimile:  (415) 982-5287

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. C 04-09049 SGL (RNBx)<br>JAMS Reference No. 1100049530<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727<br><br>**ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES BY MGA** |
| CONSOLIDATED WITH<br>MATTEL, INC. v. BRYANT and<br>MGA ENTERTAINMENT, INC. v. MATTEL, INC. | |

## I.  INTRODUCTION

On February 2, 2007, Mattel, Inc. ("Mattel") submitted its Motion To Compel Production of Documents and Interrogatory Answers by MGA Entertainment, Inc. ("MGA").  On February 20, 2007, MGA submitted its opposition brief, and on February 26, 2007, Mattel submitted a reply brief.  The matter was heard on March 5, 2007.  Thereafter the motion was taken under submission pending the parties' submission of a proposed protective order, which was received

Exhibit 100
Page 1524

1    on April 23, 2007.  Having considered the motion papers and comments of counsel at the hearing,

2    Mattel's motion to compel is granted.

## II.  BACKGROUND

A.  Requests for Documents

In June of 2004, two months after Mattel filed suit against Bryant, and before MGA

became a party to the action, Mattel served MGA with an eight-page subpoena for twenty-one

categories of documents, to be produced in ten days.  MGA filed a motion to quash, which the

court granted because of the short amount of time provided for compliance with the subpoena.

The parties met and conferred in July of 2004, and reached an agreement to limit the scope of

some of Mattel's requests.  In particular, the parties agreed to limit production to the "first

generation" Bratz dolls.  On August 12, 2004, MGA produced documents.

In 2005, the parties stipulated to supplementing their document productions on May 16,

2005.  Mattel agreed to continue limiting its discovery requests to "first generation" Bratz dolls.

In September of 2006, MGA made a supplemental production of documents.  On February

5, 2007, MGA produced about 2,300 pages of documents to replace earlier produced documents

with legibility problems.  On February 20, 2007, MGA produced an additional 224 pages of

documents to replace earlier produced documents with legibility problems.

Mattel now moves to compel MGA to produce documents responsive to its requests.  As a

preliminary matter, Mattel contends that MGA's production is deficient because it contains

redactions and cut-off text.  Further, Mattel contends that MGA's production is incomplete with

respect to essentially five categories of documents.  First, Mattel contends that MGA is

withholding documents relating to the origins of Bratz and Bryant's work for MGA.  Mattel

believes that MGA's production is incomplete based upon its review of documents that have been

produced by third party Steven Linker.  According to Mattel, Linker's documents from October

of 2000 show that Bratz was much farther along before Bryant left Mattel than MGA or Bryant

previously represented.  Mattel also contends that MGA's responses to the document requests

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

2

Exhibit 100
Page 1525

1   contain inappropriate limitations, such as MGA's statement that it will produce "relevant and

2   responsive non-objectionable documents" or only that it will produce documents "sufficient" to

3   show when certain dates relating to Bratz occurred. Mattel contends that these "carve outs

4   purport to allow MGA to cherry-pick what it will and will not produce to Mattel." Mattel's

5   Separate Statement at 17:11-13. Mattel also contends that the carve-outs fail to provide notice of

6   what is or is not being withheld. Mattel also contends that MGA's objections based upon its

7   confidentiality concerns or the privacy rights of third parties are unwarranted in light of the

8   protective order in place. In addition, Mattel contends that MGA's objection to producing

9   documents relating to activities or conduct in foreign countries is wholly improper because those

10  documents may contain information relevant to Mattel's claims.

11      Second, Mattel seeks documents relating to the origins of Bratz, regardless of whether

12  such documents relate to the "first generation" Bratz dolls. Mattel argues that whether the work

13  ultimately resulted in Bratz dolls that were released at a particular time does not matter for

14  discovery purposes. Mattel contends that the works created by Bryant during his Mattel

15  employment are highly relevant because Mattel owns them, regardless of whether they resulted in

16  a Bratz doll released at a particular time.[1]

17      Mattel next contends that MGA is improperly withholding documents about designs

18  Bryant created on Bratz dolls that were released after June 2001, even though such designs may

19  be derivative of work he did when employed by Mattel. Mattel contends that it is entitled to

20  explore whether such works and the profits from Bratz dolls other than the "first generation"

21  Bratz dolls were derived from works owned by Mattel both for purposes of establishing liability

22  and damages. Furthermore, Mattel asserts that the "first generation" limitation on discovery is

23  improper in light of Bryant's continuing duty not to use Mattel's confidential and proprietary

24  information as well as MGA's unfair competition claims.

25  _____

26  [1] Mattel also reiterates many of the arguments it made previously in connection with its earlier filed motion
    to compel Bryant to produce documents.

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

3

Exhibit 100
Page 1526

1    Mattel also asserts that MGA is improperly withholding documents relating to products,

2    services and matters other than those relating to "dolls."  According to Mattel, it has evidence that

3    Bryant conceived of marketing and advertising ideas for the Bratz line while he was employed by

4    Mattel.  Mattel contends that any such ideas or contributions may belong to it pursuant to the

5    Inventions Agreement.

6        Third, Mattel seeks documents relating to all of MGA's payments to Bryant, and not just

7    payments for the "first generation" Bratz dolls.  Mattel asserts that such information is relevant

8    because (1) Mattel seeks all benefits Bryant received as a result of violating his duties to Mattel;

9    (2) under the Copyright Act, Mattel is entitled to all profits from infringement as well as actual

10   damages; and (3) payments may show when and what trade secret information Bryant and other

11   defendants allegedly misappropriated from Mattel.

12       Fourth, Mattel seeks documents relating to MGA's agreements with Bryant.  Mattel

13   contends that all agreements between Bryant and MGA are relevant, not just the original

14   September 18, 2000 agreement.  In particular, Mattel contends that it is entitled to discover all

15   documents relating to MGA and Bryant's alleged joint defense agreement because such

16   information would be relevant to demonstrate bias and lack of credibility.

17       Fifth, Mattel seeks production of all declarations, affidavits and other sworn written

18   statements from other cases that refer or relate to Bratz or Angel.  Mattel contends that such

19   information may reveal relevant information about the date of creation of Bryant's Bratz

20   drawings.

21       In response, MGA denies withholding responsive documents and asserts that it has

22   produced volumes of documents responsive to Mattel's requests.  In particular, MGA represents

23   that it has produced all responsive and relevant documents that it was able to locate in response to

24   request nos. 6, 7, 9, 26, 27, 32, 33, 34, 35, 36, 55, 69, and 70.  Further, MGA asserts that even

25   before the motion was filed, it had agreed to address the vast majority of the issues raised in this

26   motion.  In particular, MGA represents that it is diligently working to produce documents related

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

4

Exhibit 100
Page 1527

1    to Bratz other than "first generation" Bratz in response to request nos. 1, 2, 8, 10, 11, 43, 45, 46,

2    49, 50, 51, 53, 57, 59, 61, 63, 64, 66, 96, 97, 98, 99 and 100.  MGA represents that it informed

3    Mattel that it would produce documents pertaining to subsequent generations of Bratz dolls that

4    have been released on the market.  In addition, MGA represents that it has agreed to produce

5    documents relevant to Bratz or Prayer Angels that it received from Union Bank.  More

6    specifically, MGA represents that it agreed to review and produce documents provided to it by

7    Union Bank for the years 1999 – 2001 concerning payments that it could identify as being for

8    Bratz or Prayer Angels.  MGA also represents that it has agreed to produce royalty statements.

9    Therefore, MGA views the motion as unnecessary.

10         MGA next contends that Mattel's motion should be denied for the following additional

11    reasons.  First, MGA contends that Mattel is not entitled to MGA's product design documents for

12    unreleased products.  MGA asserts that its product design documents for its unreleased toy

13    concepts are among its most highly valuable trade secrets.  Furthermore, MGA contends that

14    designs and drawings for products currently under development, over six years after Bryant first

15    created his original Bratz drawings, have no relevance to any of Mattel's claims.  In the event that

16    documents relating to unreleased products are ordered produced, MGA requests a protective order

17    under Rule 26(c), Fed.R.Civ.P., that limits the dissemination of its documents more drastically

18    than the current protective order provides.  In the alternative, MGA requests that any order

19    compelling production of documents relating to unreleased products should essentially be stayed

20    until after MGA's products are publicly released.

21         Second, MGA contends that Mattel is not entitled to information concerning Bryant's

22    attorneys' fees because the information is privileged.  Furthermore, MGA contends that the

23    information is not relevant to demonstrate bias because "there is no dispute that Bryant's interests

24

25

26

27

28

Exhibit 100
Page 1528

1    in this case are aligned with those of MGA, and that Bryant is 'biased' in that sense." MGA's

2    Opposition at 24:9-12.[2]

3         Third, MGA asserts that Mattel is not entitled to review all non-public witness statements

4    and litigation documents concerning Bratz for a variety of reasons, including because Mattel has

5    refused to produce similar types of documents. More significantly, MGA contends that Mattel's

6    requests for non-public witness statements are "a blatant attempt to avoid the discovery

7    limitations imposed by both the Federal Rules of Civil Procedure and those additional limitations

8    imposed by this Court." MGA's Opposition at 25:6-7. MGA explains its position as follows.

9    MGA is involved in litigation against a number of counterfeiters and infringers in Asia. In 2003,

10   Mattel allegedly began feeding documents concerning "Toon Teens" to those defendants in an

11   attempt to prove that Bryant created Bratz while working at Mattel, even though Mattel

12   abandoned its claims based upon "Toon Teens" in this court. Thereafter, those defendants took

13   the position that MGA did not own, and therefore could not enforce, the rights to Bratz. MGA

14   was thus forced to litigate the issue of ownership. MGA contends that "[i]n effect, by prompting

15   foreign counterfeiters to espouse a theory that Mattel now admits has no merit, Mattel has created

16   a situation in which MGA has been forced to give testimony and provide evidence related to

17   issues in this case that Mattel now seeks to obtain wholesale." MGA's Opposition at 25:5-24.

18        Fourth, MGA contends that Mattel is not entitled to documents concerning a family

19   dispute between MGA's chief executive officer and his brother because such documents are in no

20   way relevant to this lawsuit. MGA explains that the brothers were involved in an arbitration

21   proceeding relating to MGA's CEO's purchase of his brother's interest in MGA. Moreover,

22   MGA contends that the brothers were bound by a protective order prohibiting the use of any

23   documents or testimony for any purpose other than the arbitration.

24

25   _____

26        [2] Nevertheless, MGA represents that it has produced the only non-privileged document responsive to the request.

27

28   Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)

                                                                                                6

Exhibit 100
Page 1529

1    Fifth, MGA contends that Mattel is not entitled to its chief executive officer's personnel

2    files because they contain confidential information and are not relevant to the lawsuit. Sixth,

3    MGA contends that Mattel is not entitled to obtain documents from MGA that belong to, and are

4    in the possession, custody and control of, its indirect foreign subsidiary, MGA HK Ltd. Lastly,

5    MGA objects to producing documents relating to any testing performed to determine the date that

6    Bratz documents were created. MGA contends that such discovery is premature and should not

7    proceed until experts are designated.

8        B. Interrogatories

9    On April 28, 2005, Mattel served its Second Set of Interrogatories. On May 20, 2005,

10   however, the district court stayed the action. On May 17, 2006, the district court lifted the stay.

11   On May 30, 2006, MGA responded to the interrogatories.

12   Mattel contends that MGA's responses to the interrogatories were untimely. Further,

13   Mattel contends that the interrogatory responses to numbers five through eleven are deficient

14   because they lack substantive information and consist almost entirely of objections. MGA

15   responds that the motion is moot because it is prepared to provide supplemental responses to its

16   interrogatories. MGA does not otherwise assert any additional grounds for opposing Mattel's

17   motion to compel responses to interrogatories.

18                                   III. DISCUSSION

19       A. Rule 26 of the Federal Rules of Civil Procedure

20   Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain

21   discovery regarding any matter, not privileged, that is relevant to the claim or defense of any

22   party." Fed.R.Civ.P. 26(b)(1). "Relevant information need not be admissible at trial if the

23   discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.

24   Discovery shall, however, be limited by the court if it determines that: "(i) the discovery sought is

25   unreasonably cumulative or duplicative, or is obtainable from some other source that is more

26   convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample

27

28
     Bryant v. Mattel, Inc.,
     CV-04-09049 SGL (RNBx)                                                      7

Exhibit 100
Page 1530

1  opportunity by discovery in the action to obtain the information sought; or (iii) the burden or

2  expense of the proposed discovery outweighs its likely benefit, taking into account the needs of

3  the case, the amount in controversy, the parties' resources, the importance of the issues at stake in

4  the litigation, and the importance of the proposed discovery in resolving the issues." Fed.R.Civ.P.

5  26(b)(2).

6      B. Document Requests

7          1. Requests re Origins of Bratz and Bryant's Work for MGA (Nos. 6, 26, 27, 32, 33,

8             34, 35, 51, 53, 55, 64, 69, 96, 97, 98, 99, 100

9      The requests above seek discoverable information regarding the origins of Bratz and

10  Bryant's work for MGA.  MGA represents that it has produced all responsive documents in

11  response to request nos. 6, 26, 27, 32, 33, 34, 35, 55,and  69 (MGA's Opposition at 13:4-5), and is

12  "diligently working to produce documents in response to" request nos. 51, 53, 64, 96, 97, 98, 99,

13  and 100, including documents related to Bratz other than "first generation" (MGA's Opposition at

14  14:1-4 and note 39).  MGA does, however, object to producing design documents for unreleased

15  products and documents from MGA Hong Kong.

16      As a threshold matter, MGA's responses are inadequate to the extent MGA has restricted

17  its production to "relevant and responsive non-objectionable documents" or documents

18  "sufficient" to show when events relating to Bratz occurred.  These restrictions suggest that MGA

19  might be excluding documents that are responsive to the request based upon its unilateral

20  determination of what is "relevant" or "sufficient."  Mattel shall provide the responses to

21  document requests ordered herein without these restrictions.

22                          Design Documents for Unreleased Products

23      MGA's design documents for unreleased products are relevant to Mattel's claims and

24  defenses and must be produced.  See Order Modifying Protective Order.  On April 23, 2007, the

25  parties submitted a stipulation to modify the existing protective order to limit the disclosure of

26  design documents for unreleased products that constitute trade secret information.  See Stipulation

27

28  Bryant v. Mattel, Inc.,
    CV-04-09049 SGL (RNBx)

                                                                              8

Exhibit 100
Page 1531

1  to Modify Protective Order; And Proposed Order Thereon ("stipulation").  The parties' stipulation

2  has been approved and entered as an order of the court.  MGA is ordered to produce design

3  documents for unreleased products that are responsive to Mattel's document requests in

4  accordance with the terms of the stipulation and order.

5                              Documents from MGA Hong Kong

6          Documents relating to activities or conduct in foreign countries are relevant and

7  discoverable because Mattel has evidence indicating that MGA Hong Kong was involved with

8  Bratz.  Nevertheless, MGA objects to producing documents from Hong Kong unless Mattel

9  provides reciprocal discovery from its subsidiaries.

10         Whether MGA is entitled to discovery from Mattel's subsidiaries has not been briefed in

11  the context of this motion, and therefore is not addressed herein.  MGA is ordered to produce

12  documents from MGA Hong Kong.

13         Mattel's motion is granted with respect to request nos. 6, 26, 27, 32, 33, 34, 35, 51, 53, 55,

14  64, 69, 96, 97, 98, 99, 100.

15              2. Additional Requests re Origins of Bratz (Nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57, 59,

16                  61, 63, 66, 67, 70, 88, 90, 91

17         Mattel contends that MGA is improperly limiting its document production to the "first

18  generation" Bratz dolls.  MGA represents, however, that it has agreed to produce subsequent

19  generations of Bratz products (MGA's Opposition at 9:20-25, 13:6-14:1), except design

20  documents for yet unreleased products.

21         As stated previously, design documents for yet unreleased products are relevant and

22  discoverable.  See Order Modifying Protective Order.  Accordingly, MGA is ordered to produce

23  all non-privileged documents that are responsive to request nos. 7, 8, 9, 10, 11, 12, 13, 36, 46, 57,

24  59, 61, 63, 66, 67, 70, 88, 90, and 91.

25         //

26         //

27

28
   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)                                                              9

Exhibit 100
Page 1532

### 3. MGA's Payments to Bryant (Nos.43, 45)

MGA represents that it has already agreed to produce documents related to Bratz, without limiting its production to "first generation" Bratz. MGA's motion at 13:7-14:3. Nevertheless, Mattel is entitled to an order compelling production of such documents by a date certain. Mattel's motion is granted with respect to request nos. 43 and 45.

### 4. MGA's Agreements with Bryant (Nos. 1, 2, 49, 50)

MGA represents that it has already agreed to produce non-privileged documents responsive to request nos. 1, 2, 49, and 50, even though it believes that such documents are not relevant (MGA's motion at 13:7-14:3). These requests seek documents relating to fee or indemnity agreements between MGA and Bryant .

Fee or indemnity agreements are relevant to demonstrate bias and lack of credibility. Accordingly, Mattel's motion is granted with respect to request nos. 1, 2, 49, and 50. Any responsive documents withheld on the basis of a privilege must be properly identified in a privilege log.

### 5. Declarations, Affidavits & Other Sworn Written Statements (Nos. 37, 38, 39, 40, 41,

In request nos. 37, 38, 390, 40, and 41, Mattel seeks production of declarations, affidavits, and other sworn written statements from cases that refer or relate to Bratz or Angel. Mattel anticipates that these documents could provide evidence relating to the conception date for Bratz.

Request nos. 37, 38, 39, 40, and 41 seek relevant information regarding the conception date for Bratz. MGA admits in its opposition brief that this issue was litigated in its suits against alleged counterfeiters and infringers.[3] The issue also appears to have been raised in the arbitration proceedings between MGA's chief executive officer, Isaac Larian, and his brother Farhad Larian. In those proceedings, Farhad Larian alleged that Isaac Larian concealed from him

---

[3] Although MGA questions the propriety of Mattel providing assistance to the alleged counterfeiters and infringers in raising ownership of Bratz as a defense against MGA's claims, MGA has not cited to any legal authority that prohibits Mattel's conduct.

Exhibit 100
Page 1533

1  that MGA was developing Bratz by early 2000.  Nevertheless, MGA objects to producing

2  documents from the Larians' arbitration on the grounds that the arbitration was governed by a

3  protective order that prohibits the use of any documents or testimony for any purpose other than

4  the arbitration.  MGA, however, has not provided any evidence of the protective order.

5  Accordingly, Mattel's motion to compel is granted as to request nos. 37, 38, 39, 40 and 41.[4]

6        6. <u>Documents Regarding Date-Testing (Request No. 92)</u>

7        Mattel's request no. 92 seeks documents that refer or relate to "any testing of or sampling

8  from any documents that refer or relate to Bratz or Bryant, including without limitation any such

9  testing or sampling in connection with ink, paper or chemical analysis to date any such documents

10 and including without limitation all results and reports relating thereto."  MGA contends that the

11 request is premature, and should proceed in the course of expert discovery.

12       The request calls for relevant discovery and there is no basis for delaying production of

13 responsive documents, other than expert reports.  The timing of expert reports is governed by

14 Rule 26(a)(2)(C), Fed.R.Civ.P.  Accordingly, Mattel's motion is granted as to request no. 92.

15       C. <u>Interrogatories</u>

16       Mattel contends that MGA's responses to interrogatories were untimely, and therefore

17 MGA has waived its objections to the interrogatories.  Pursuant to Rule 33(b)(3), Fed.R.Civ.P.,

18 responses to interrogatories are due thirty days after service.  In this case, Mattel served its

19 interrogatories on April 28, 2005, and responses were initially due May 31, 2005.  The district

20 court, however, issued a stay on May 20, 2005, twenty-two days after the interrogatories were

21 served.  The district court lifted the stay on May 17, 2006.

22

23

24

25

26      [4]  In its discussion of the arbitration proceedings, MGA raises an objection to producing Isaac Larian's
personnel file based upon privacy grounds.  The personnel file may have documents relevant to Bratz, and therefore
should be produced.  The protective order is sufficient to alleviate Mr. Isaac Larian's privacy concerns.

27

28
   Bryant v. Mattel, Inc.,
   CV-04-09049 SGL (RNBx)                                                                    11

Exhibit 100
Page 1534

1    Neither party has cited to any caselaw governing the calculation of the 30-day period

2    when there is an intervening stay in discovery.  In the absence of any caselaw, MGA's responses

3    will be treated as timely in order to preserve any valid objections MGA may have asserted.

4    Interrogatory No. 5 seeks the identity of each and every person who was involved in the

5    conception, origin, creation, design, development, sculpting, engineering, reduction to practice,

6    tooling or painting of, or who otherwise produced or contributed to any embodiment of Bratz

7    before December 31, 2001, including a description of each person's role and the start and end

8    dates of each person's involvement.  In response, MGA asserted numerous objections, but did

9    provide the names of five individuals.

10    The interrogatory clearly seeks information relevant to the claims at issue.  MGA's

11    objections are without merit.  The interrogatory is not vague, ambiguous, compound or overbroad.

12    Nor has MGA carried its burden of establishing that the interrogatory is unduly burdensome, calls

13    for confidential, proprietary or commercially sensitive information, or seeks information

14    protected by the attorney-client privilege.  Furthermore, MGA's response is incomplete insofar as

15    it fails to provide the description of each person's role and the start and end dates of each person's

16    involvement.  Accordingly, MGA is ordered to provide a complete response to Interrogatory No.

17    5 and identify documents in compliance with Rule 33(d), Fed.R.Civ.P.

18    Interrogatory No. 6 seeks the same information as Interrogatory No. 5 with respect to any

19    embodiment of Angel.  MGA is ordered to provide a complete response to Interrogatory No. 6 for

20    the reasons previously discussed in connection with Interrogatory No. 5.

21    Interrogatory No. 7 asks MGA to identify each and every embodiment of Bratz prior to

22    December 31, 2001.  In response, MGA asserted numerous objections and did not provide any

23    substantive information.

24    MGA's objections are without merit.  The interrogatory clearly seeks information relevant

25    to establishing when Bryant first conceived Bratz.  The interrogatory is not vague, ambiguous,

26    compound or overbroad.  Nor has MGA carried its burden of establishing that the interrogatory is

27

28

Exhibit 100
Page 1535

1   unduly burdensome, calls for confidential, proprietary or commercially sensitive information, or

2   seeks information protected by the attorney-client privilege.  Accordingly, MG is ordered to

3   provide a complete response to Interrogatory No. 7.

4       Interrogatory No.8 asks MGA to identify each and every embodiment of Angel.  MGA is

5   ordered to provide a complete response to Interrogatory No. 8 for the reasons previously

6   discussed in connection with Interrogatory No. 7.

7       Interrogatory No. 9 requires MGA to identify each and every sworn statement that refers

8   or relates to the conception, origin, creation, design, development, sculpting, engineering, tooling

9   or painting of Bratz.  In response, MGA asserted numerous objections and did not provide any

10  substantive information.

11      The interrogatory seeks information relevant to establishing when Bryant first conceived

12  Bratz.  Furthermore, MGA's boiler-plate objections are unsubstantiated.  Accordingly, MGA is

13  ordered to provide a complete response to Interrogatory No. 9.

14      Interrogatory No. 10 requires MGA to identify each and every instance in which Bratz

15  was shown, displayed, or exhibited prior to June 1, 2001, including by stating the date(s) on

16  which each such instance occurred, the location of each show or exhibit, and the identity of

17  persons with knowledge of the shows or exhibits.  In response, MGA asserted numerous

18  objections and provided the following information:  Hong Kong Toy Fair in Hong Kong in or

19  about January 2001 and New York Toy Fair, New York, in or about February 2001.

20      Once again, MGA's boiler-plate objections are unsubstantiated.  The information is

21  potentially relevant to establish when Bryant conceived Bratz.  Further, the response is

22  incomplete insofar as it fails to identify any persons with knowledge.  Therefore, MGA is ordered

23  to provide a complete response to Interrogatory No. 10.

24      Interrogatory No. 11 requires MGA to state the "number for each and every telephone,

25  including without limitation each office, home and cell phone number, in the name of, for the

26  benefit of or for the account of Isaac Larian and any other telephone that Isaac Larian used from

27

28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

13

Exhibit 100
Page 1536

1 | January 1, 1998 through the present, and IDENTIFY each and every carrier (including without
2 | limitation any long-distance carrier) for each such number. In response, MGA asserted numerous
3 | boiler-plate objections.

4 |      Once again, MGA has failed to substantiate any of its objections with supporting
5 | declarations or legal authorities. Accordingly, all objections are overruled and MGA is ordered to
6 | provide a full response to Interrogatory No. 11.

7 | <center>IV. CONCLUSION</center>

8 |      For the reasons set forth above, Mattel's motion to compel production of documents is
9 | granted. MGA shall produce all non-privileged documents that are responsive to the requests
10 | identified in this Order. Further, MGA shall produce all documents in un-redacted form, except
11 | for redactions that are justified by the attorney-client privilege or work product doctrine. Mattel's
12 | motion to compel interrogatory answers is also granted. MGA shall produce documents and
13 | provide responses to interrogatories consistent with this Order, and produce a privilege log in
14 | compliance with Rule 26(b)(5), Fed.R.Civ.P., no later than May 31, 2007. Mattel's request for
15 | sanctions is denied.

16 |      Pursuant to Paragraph 6 of the Stipulation and Order for Appointment of a Discovery
17 | Master, Mattel shall file this Order with the Clerk of Court forthwith.

18
19
20
21 | Dated: May 15, 2007

HON. EDWARD A. INFANTE (Ret.)
Discovery Master

22
23
24
25
26
27
28

Bryant v. Mattel, Inc.,
CV-04-09049 SGL (RNBx)

14

Exhibit 100
Page 1537

## PROOF OF SERVICE BY E-MAIL

I, Anthony Sales, not a party to the within action, hereby declare that on May 15, 2007, I served the attached ORDER GRANTING MATTEL'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND INTERROGATORY RESPONSES BY MGA in the within action by e-mail addressed as follows:

| | | |
|---|---|---|
| Robert Millman Esq. | Littler Mendelson | rfmillman@littler.com |
| Douglas Wickham Esq. | Littler Mendelson | dwickham@littler.com |
| Keith Jacoby Esq. | Littler Mendelson | kjacoby@littler.com |
| Dominic Messiha Esq | Littler Mendelson | dmessiha@littler.com |
| Diba Rastegar Esq. | Littler Mendelson | drastegar@littler.com |
| Michelle Park Esq. | Littler Mendelson | mpark@littler.com |
| Alaya B. Meyers, Esq. | Littler Mendelson | ameyers@littler.com |
| Brady Mitchell, Esq. | Littler Mendelson | bmitchell@littler.com |
| Carol Miller, Esq. | Littler Mendelson | cmiller@littler.com |
| Ryan P. Eskin, Esq. | Littler Mendelson | reskin@littler.com |
| John Quinn Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | jbq@quinnemanuel.com |
| Michael Zeller Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | michaelzeller@quinnemanuel.com |
| Jon Corey Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | joncorey@quinnemanuel.com |
| Duane Lyons Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | duanelyons@quinnemanuel.com |
| Timothy Alger Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | timalger@quinnemanuel.com |
| Dominic Surprenant Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | DominicSurprenant@QuinnEmanuel.com |
| B. Dylan Proctor Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | dylanproctor@quinnemanuel.com |
| Shane McKenzie Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | shanemckenzie@quinnemanuel.com |
| Bridget Morris Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | bridgetmorris@quinnemanuel.com |
| Tamar Buchakjian Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | tamarbuchakjian@quinnemanuel.com |
| Juan Pablo Alban, Esq. | Quinn, Emanuel, Urquhart, Oliver & Hedges | juanpabloalban@quinnemanuel.com |
| Dale Cendali Esq. | O'Melveny & Myers LLP | dcendali@omm.com |
| Diana Torres Esq. | O'Melveny & Myers LLP | dtorres@omm.com |
| James Jenal Esq. | O'Melveny & Myers LLP | jjenal@omm.com |
| Alicia Meyer Esq. | O'Melveny & Myers LLP | ameyer@omm.com |
| Jennifer Glad Esq. | O'Melveny & Myers LLP | jglad@omm.com |
| David Hurwitz, Esq. | O'Melveny & Myers LLP | dhurwitz@omm.com |
| Johanna Schmitt Esq. | O'Melveny & Myers LLP | jschmitt@omm.com |
| Patricia Glaser Esq. | Christensen, Glaser, Fink, Jacobs, Weil & Shapiro, LLP | pglaser@chrisglase.com |

I declare under penalty of perjury under the laws of the Untied States of America that the above is true and correct.

Executed on May 15, 2007, at San Francisco, California.

Anthony Sales

Exhibit 100
Page 1538

# EXHIBIT 101

California Business Search

# California Business Portal

## Secretary of State DEBRA BOWEN

**DISCLAIMER:** The information displayed here is current as of Jan 30, 2009 and is updated weekly. It is not a complete or certified record of the Limited Partnership or Limited Liability Company.

| LP/LLC | | |
|---|---|---|
| IGWT 826 INVESTMENTS, LLC | | |
| **Number:** 200824110196 | **Date Filed:** 8/27/2008 | **Status:** active |
| **Jurisdiction:** CALIFORNIA | | |
| **Address** | | |
| 156 COPLEY PL | | |
| BEVERLY HILLS, CA 90210 | | |
| **Agent for Service of Process** | | |
| NATIONAL CORPORATE RESEARCH, LTD. (C2003899) | | |

Blank fields indicate the information is not contained in the computer file.

If the agent for service of process is a corporation, the address of the agent may be requested by ordering a status report. Fees and instructions for ordering a status report are included on the Business Entities Records Order Form.

**Exhibit 101**
**Page 1539**

# EXHIBIT 102

1

DALE M. CENDALI
*(of counsel, not admitted in California)*
2 DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
3 O'MELVENY & MYERS LLP
400 South Hope Street
4 Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
5 Facsimile: (213) 430-6407
email: dtorres@omm.com
6
PATRICIA GLASER (S.B. # 55668)
7 CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
8 SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
9 Los Angeles, CA 90067
Telephone: (310) 553-3000
10 Facsimile: (310) 556-2920

11 Attorneys for Plaintiff
MGA Entertainment, Inc.
12

13

14 **UNITED STATES DISTRICT COURT**

15 **CENTRAL DISTRICT OF CALIFORNIA**

CV 05 - 02727 CBM (RZx)

16 MGA ENTERTAINMENT, INC.,

Case No.
17 Plaintiff,

**COMPLAINT FOR FALSE**
18 v. **DESIGNATION OF ORIGIN,
AFFILIATION, ASSOCIATION OR**
19 MATTEL, INC., a Delaware **SPONSORSHIP (15 U.S.C. § 1125**
Corporation, and DOES 1-10, **(a)); UNFAIR COMPETITION (15**
20 **U.S.C. § 1125 (a), Cal. Bus. & Prof.
Code § 17200** *et seq.* **and California**
21 Defendants. **Common Law); DILUTION (15
U.S.C. § 1125 (c), Cal. Bus. & Prof**
22 **Code § 14330 and California Common
Law); AND UNJUST ENRICHMENT**
23
**DEMAND FOR JURY TRIAL**
24

25

26

27

28

**Exhibit 102**
**Page 1540**

Plaintiff MGA Entertainment, Inc. for its complaint against Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.     Plaintiff MGA Entertainment, Inc. ("MGA") is a California corporation organized and existing under the laws of the State of California, with a principal place of business in Van Nuys, California.

2.     MGA is informed and believes, and based thereon alleges, that Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place of business in El Segundo, California.

3.     MGA is ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will seek leave of court to amend this complaint to allege such names and capacities when they are ascertained.  MGA is informed and believes, and based thereon alleges, that each of the fictitiously named DOE defendants is responsible in some manner for the wrongful conduct alleged herein.  MGA further alleges that each defendant acted in concert with, as agent or representative for, or at the request or on behalf of another or Mattel.  Each charging allegation contained herein is, therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.     Through this action MGA asserts claims against Mattel arising under the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and Professions Code Sections 17200 *et seq.*, California Business and Professions Code Section 14330 and California common law.  This Court has original subject matter jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and 1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

Exhibit 102
Page 1541

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2  Section 1367(a).

3      5.    This Court has specific personal jurisdiction over Mattel, as it has

4  purposefully committed, within the State of California, the acts from which these

5  claims arise and/or has committed tortious acts outside California, knowing and

6  intending that such acts would cause injury to MGA within the state.  The Court

7  also has general personal jurisdiction over Mattel, as it conducts continuous,

8  systematic and routine business within the State of California and the County of

9  Los Angeles.

10      6.    Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13  ## **FACTUAL BACKGROUND**

14      7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19      8.    MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business.  In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters.  Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

2

**Exhibit 102**
**Page 1542**

1    sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2    new, exciting and inventive.  "BRATZ" fit the bill.  It is the first fashion doll that

3    has been able to seriously challenge "Barbie" for market share, and begin to loosen

4    Mattel's 50-year iron-fisted grip on the fashion doll market.

5         9.      Mattel has not taken kindly to the challenge.  Either unable or

6    unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7    has, instead, taken a more expeditious approach, resorting to unfair and anti-

8    competitive business practices.  Wielding its substantial clout and influence in the

9    toy industry, Mattel has tried to muscle MGA out of business.  MGA is informed

10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11   suppliers and others in the industry – both in the U.S. and internationally – in order

12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13   from obtaining licensees, contracts and supplies for its products.  Mattel has also

14   serially imitated and copy-catted the look of MGA products, trade dress,

15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16   line of dolls.  MGA brings this action to stop Mattel's tortious, unfair and anti-

17   competitive conduct and to recover the extensive damage that Mattel's illicit

18   behavior has caused, and continues to cause, MGA.  Mattel's own website states:

19   "As the global leader in the toy industry, we believe that how we achieve success is

20   just as important as the success itself."  It also proclaims that "unwavering integrity

21   defines our corporate culture on every level, guiding how we work and how we do

22   business."  Mattel's own corporate governance standards require it to "play by the

23   rules," complete fairly and be a good corporate citizen.  Mattel's actions, however,

24   speak louder than its words.

25

26

27

28

Exhibit 102
Page 1543

## Mattel History and Performance

10.    Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

**Exhibit 102**
**Page 1544**

reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later, it spent $700 million for the Pleasant Co., a mail-order doll company and maker of the "American Girl" doll collection. And in December 1998, Mattel announced plans to fork out a monumental $3.5 billion to buy the Learning Company, followed quickly by Mattel's purchase, in March 1999, of a software company, Purple Moon.

14.    Despite these acquisitions, the company continued to struggle. The retail environment and buying patterns had unquestionably changed, but Mattel had not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary profit-generator was still "Barbie." But "Barbie" had grown stale, and sales languished. Posting additional losses in the first quarter of 1999, Mattel announced that it would lay off 3,000 employees – 10% of its work force.

15.    Mattel's stock plummeted again in late 1999, dropping 30% on Mattel's announcement that it would fall as much as 55% short of analysts' earning estimates for the third quarter. Mattel blamed its troubles primarily on its expensive, $3.5 billion acquisition of the Learning Company, which had turned out to be a disaster fraught with licensing and distribution problems, bad debt, high product returns and high advertising costs.

16.    By early 2000, Mattel's stock had crashed to as low as $8 per share, and some analysts considered Mattel vulnerable to a takeover. Investors clamored for Ms. Barad's resignation, and got their wish.

17.    Jill Barad resigned from Mattel in February 2000.

18.    For three months, the company was without a permanent chief executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23 years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

5

Exhibit 102
Page 1545

1   with reviving its ailing cheese business. Investors looked for him to do the same

2   for Mattel.

3       19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4   *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,

6   closed factories in the United States, shipped production to Mexico, and sold off the

7   Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's

8   bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner

9   meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an

10  industry that had become increasingly driven by consumer whims and fads, and the

11  hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12  resources to searching for or developing a new blockbuster toy. Mr. Eckert's

13  business plan was not to diversify, but to build upon and expand sales of its existing

14  brands. Mattel was, after all, still generating billions in revenue despite the decline

15  of "Barbie." And so, Mattel remained committed to its age-worn icon and its two

16  other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17  for approximately a third of the company's sales.

18      21.    Then came the competition -- MGA's "BRATZ".

19

20  **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21      22.    "BRATZ" challenged "Barbie's" half-century domination of the

22  fashion-doll market like nothing ever before had been able to do.

23      23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24  Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25  that spring. Finished products were first shipped in May 2001. MGA introduced

26  the line to consumers in June 2001.

27

28

6

Exhibit 102
Page 1546

24.   Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"






25.   At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

Exhibit 102
Page 1547

26.     Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

|                   |                   |
| :---------------: | :---------------: |
| **MGA's "BRATZ"** | **Mattel's "Barbie"** |
|  |  |

27.     Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.     The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

Exhibit 102
Page 1548

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel.  Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ".  With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel – and Mr. Eckert – simply could not afford the untimely competition.  Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share.  Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

**Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

31.    Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own – indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers.  Mattel had to take a more expeditious route.

32.    Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind – to banish MGA from the market – or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

Exhibit 102
Page 1549

**Mattel's serial copycatting and intellectual property infringement**

33.   Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.   The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" – also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

| **Mattel's Traditional "Barbie"** | **Mattel's "My Scene" Doll** | |
| --- | --- | --- |
| | circa 2002 | circa 2004 |

 

  

Exhibit 102
Page 1550

35.     These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.     Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill -- Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.     Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

## BLONDE

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |
|---|---|---|
|  |  |  |

11

Exhibit 102
Page 1551

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

12

Exhibit 102
Page 1552

## AFRICAN AMERICAN

| **Mattel's Traditional "Barbie"** | **Mattel's Original "My Scene"** | **Mattel's Recent "My Scene"** |

  

  

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

## Original Mattel "My Scene" Eye

 

13

Exhibit 102
Page 1553

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                          **New Mattel "My Scene" Eye**

          

40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

Exhibit 102
Page 1554

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## BLONDE

**Mattel's Traditional "Barbie"**  **Mattel's Original "My Scene"**  **Mattel's Recent "My Scene"**

  

  

## BRUNETTE

**Mattel's Traditional "Theresa"**  **Mattel's Original "My Scene"**  **Mattel's Recent "My Scene"**

  

15

Exhibit 102
Page 1555

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

16

Exhibit 102
Page 1556

41.     Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.     To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.     Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

Exhibit 102
Page 1557

44.   Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

| MGA's "BRATZ" "Wintertime Wonderland" Packaging | Mattel's "My Scene" "Chillin' Out" Packaging |
| --- | --- |
|  |  |

45.   Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

| MGA's "BRATZ" "SPORTZ" Packaging | Mattel's Recent "My Scene" "MIAMI GETAWAY" Packaging |
| --- | --- |
|  |  |

18

Exhibit 102
Page 1558

46.    In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.    As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.    For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.    When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.    When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

Exhibit 102
Page 1559

51.   Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.   Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.   For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.   Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition.  It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products.  Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.   As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

Exhibit 102
Page 1560

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |
|---|---|

  

   

56.    Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ".  The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice



Exhibit 102
Page 1561

57. Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58. At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59. Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**        **Mattel's "My Scene" dog**

   

60. And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61. Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line. It comes as no surprise that

Exhibit 102
Page 1562

1    customers too have been confused.

2        62.    Indeed, Mattel's television commercials and "My Scene" products
3    have become so confusingly similar to MGA's that even advertising executives
4    have expressed concern. One went so far as to say that although imitation is the
5    best form of flattery, what the individual had seen at Mattel's showroom, and how
6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was
7    "shocking." This person further opined that it was clear that Mattel is intending to
8    confuse customers and capture "BRATZ" market share, and even asked MGA if it
9    was considering legal action.

10        63.    The press also has taken notice of Mattel's attempts to confuse
11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a
12   prominent news publication stated, "Oh my, I just came from Mattel's showroom
13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."
14   Another member of the press visiting MGA's showroom offered the unsolicited
15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like
16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like
17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had
18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.
19   On or about February 16, 2005, during an interview of a Mattel representative on
20   local network news in New York, "My Scene Barbie" was displayed by a Mattel
21   representative. During conversation about the dolls, the interviewer exclaimed that
22   they looked like "BRATZ". The Mattel representative just laughed – but this is no
23   laughing matter. This colloquy was available for replay and viewing, and was even
24   transcribed, on the internet.

25        64.    Customers too have been similarly confused. Some actually contacted
26   MGA seeking to purchase "My Scene" dolls.

27        65.    Mattel's conduct is planned, deliberate and intentional. Mattel has
28   systematically, copied, imitated and liberally borrowed many of the distinctive,

**Exhibit 102**
**Page 1563**

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.    Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off."  Indeed it does.

67.    What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.    For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line.  Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**          **Mattel's "Wee 3 Friends"**







24

Exhibit 102
Page 1564

69.     In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

| **MGA's**<br>**"Mommy's Little Patient"** | **Mattel's**<br>**"Little Mommy Potty Training Baby Doll"** |
|:---:|:---:|



70.     Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

Exhibit 102<br>Page 1565

71.    Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.    None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.    MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.    This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

26

**Exhibit 102**
**Page 1566**

75.    For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76.    Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.    Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.    When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.    Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

Exhibit 102
Page 1567

1  and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2  lines, in order to make such line less attractive to buyers and thereby attempt to

3  increase sales of the competitive Mattel product and improve its own sales, at

4  MGA's expense.

5      80.    Even supposedly unbiased and impartial industry organizations have

6  fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7      81.    NPD Funworld ("NPD"), for one, is the leading supplier of sales

8  statistics in the toy industry.  Accurate NPD statistics are essential for efficient

9  product-line management.  Without these statistics, it is difficult, if not impossible,

10 for toy companies to assess and measure the relative success of their products in

11 key categories.  It is, however, a subscription service, and NPD restricts the manner

12 in which its subscribers may use the data it provides.

13     82.    Mattel has regularly ignored the restrictions – using NPD data about

14 Mattel's comparative standing relative to other companies in press releases and in

15 communications with retailers and financial investors who are not NPD subscribers.

16     83.    Mattel generates substantially more annual subscription revenue for

17 NPD than does MGA, and carries more clout.

18     84.    After MGA had subscribed to the service for more than 12 years, NPD

19 terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20 misused NPD data in a press release.

21     85.    MGA is informed and believes that the termination was the result of

22 pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23 restrictions.

24     86.    In addition to this, the market share numbers that NPD generates are

25 heavily dependent on the category in which NPD places a particular product.  MGA

26 is informed and believes that Mattel also pressured NPD into changing certain

27 product classifications for its "BRATZ" products in order to manipulate the data

28

Exhibit 102
Page 1568

1  and preserve Mattel's market share rankings in the critical fashion doll category –
2  and thereby lower MGA's.

3      87.    The Children's Advertising Review Unit ("CARU") is another
4  organization that, upon information and belief, appears to have been subject to
5  improper influence by Mattel.  CARU is the toy industry's supposedly independent
6  self-regulatory body in charge of maintaining standards in advertising.  CARU's
7  approval is considered critical within the toy industry to avoiding regulatory action
8  by the Federal Trade Commission.

9      88.    CARU is heavily subsidized by Mattel.

10      89.    Upon information and belief, Mattel has used its influence as a major
11  contributor to CARU's budget to induce CARU to place onerous restrictions on
12  MGA advertisements, and require MGA to amend aspects of commercials that have
13  gone unchallenged in other parties' commercials.

14      90.    As a result of CARU's restrictions, MGA has been forced to incur
15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.    On several occasions, CARU has also either strongly suggested, if not
17  also required, that MGA respond to inquiries about its website policies and make
18  substantial changes to the "BRATZ" website notably and significantly in excess of
19  restrictions imposed on Mattel and others.

20      92.    Even TIA, the toy industry's trade association, is apparently not
21  untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-
22  the-Year Awards, the most prestigious of which had been the award for Toy of the
23  Year.  Winning the Toy of the Year Award is a significant achievement that not
24  only very likely increases the sales of the winning toy, but also denotes the winning
25  company as a leader in toy innovation and generates substantial goodwill with
26  retailers, distributors, licensees, and customers.

27      93.    For the years 2000 (the first year of the award), 2001 and 2002, the
28  Toy of the Year award was chosen by consumer vote.  The awards ceremony was

29

Exhibit 102
Page 1569

then held the following year, at a dinner in New York. (For example, the awards dinner for the year 2000 award was held in February 2001). Leap Frog won the 2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002 People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award, however, the rules suddenly changed. Now, the award is selected by members of the industry.

94.     Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA.

95.     Perhaps not surprisingly given this change in the winner selection procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal Funk Super Stylin' Runway Disco."

96.     TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

97.     MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's "Kids' Choice Awards."

98.     Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

99.     Mattel may not shield its illegal, unfair and unethical business practices from the public eye. It is time for the truth to be told, and the world to know of Mattel's unfair, unethical and illegal business practices and unfair competition. "Barbie" does not "play nice" with others (particularly her competitors), and needs to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

Exhibit 102
Page 1570

1   allowed to continue to be the playground bully and trample on the rights of others,
2   including MGA.

3       100.  As a result of Mattel's manipulative, illegal, unfair, unethical and anti-
4   competitive conduct, MGA has suffered and, unless abated, will continue to suffer
5   lost sales, lost licensing fees, lost contracts, lost relationships, lost business
6   opportunities and other damages and harm for which there is no adequate remedy at
7   law.  Its ability to enter new markets and product lines has been hampered and
8   delayed.  Its production costs have increased, its reputation and relationships with
9   important players in the industry have been negatively impacted, the value of its
10  business has been diminished, and its ability to attract, hire and retain employees
11  has been affected.

12

13                       **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.  MGA repeats and realleges the allegations contained in paragraphs 1
16  through 100 of this Complaint and incorporates them by reference as though fully
17  and completely set forth herein.

18      102.  MGA's "BRATZ" line has a unique and distinctive style and
19  distinctive characteristics, such as the disproportionately large head, large dramatic
20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),
21  pouty, plump lips with a distinctive presentation (including the lip shape and make-
22  up), small, thin bodies, oversized feet, and up-to-date fashions.  MGA's "BRATZ"
23  line is known for and recognized by the total image that is presented by its product
24  and the style and arrangement of the packaging and display.  This "*tout ensemble*"
25  is representatively described and depicted herein.  The characteristics of MGA's
26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line
27  and its source, MGA, and thus serve as protectable trade dress.  MGA's trade dress
28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

Exhibit 102
Page 1571

1    is not essential to the purpose, quality or source identifying attributes of the

2    aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3    acquired distinction within the meaning of the Lanham Act.

4        103.  Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5    has its own unique and distinctive characteristics, such as the humanlike eye and

6    unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7    line has become known for and recognized by the total image that is presented by

8    the product and the style and arrangement of its packaging. This "*tout ensemble*" is

9    representatively described and depicted herein. The characteristics of MGA's

10   "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11   PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12   trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13   any utility exists, it is not essential to the purpose, quality or source identifying

14   attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15   inherently distinctive or has acquired distinction within the meaning of the Lanham

16   Act.

17       104.  Mattel's production, sale and marketing of "My Scene" dolls,

18   including styling heads and doll heads, and "My Scene" pets that are confusingly

19   similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20   permission or consent, constitutes designation and use of a term, symbol, device or

21   combination thereof that is false or misleading within the meaning of 15 U.S.C.

22   Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23   to the affiliation, connection, or association, or as to the origin, sponsorship, or

24   approval of Mattel's goods or commercial activities, within the meaning of 15

25   U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26       105.  Mattel's conduct has been intentional and willful, and is calculated

27   specifically to trade off the goodwill that MGA has developed in its successful

28   "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

**Exhibit 102**
**Page 1572**

features of MGA's "BRATZ" line in connection with goods sold and distributed in interstate commerce, Mattel has infringed and is likely to continue to infringe on MGA's substantial rights in and to the "BRATZ" line trade dress.  In so doing, Mattel has falsely represented and designated to the public generally and consumers of fashion doll products specifically the source and origin of Mattel's "My Scene" fashion doll products in violation of 15 U.S.C. § 1125(a).

106.  MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

107.  For each act of infringement, MGA is entitled to recover its actual damages as well as Mattel's profits from such infringement.

108.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's illegal actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade dress.

## SECOND CLAIM FOR RELIEF

### (Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law)

109.  MGA repeats and realleges the allegations contained in paragraphs 1 through 108 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and mimicked the make-up, appearance, features, trade dress, and image of MGA's products, packaging and advertising, including its repackaging and refreshing of older Mattel toys.  Mattel's actions were and are done with the intent to deceive consumers, cause confusion and mistake, and interfere with the ability of consumers to identify the source of goods by appearance and packaging.  By this

33

Exhibit 102
Page 1573

conduct, Mattel pirates and exploits, by subliminal or conscious association with MGA, the goodwill and reputation of MGA and derives benefit therefrom.

111.   Mattel has particularly and deliberately poached upon the commercial magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line.

112.   By its acts, including its intentional imitation of the distinctive features of MGA's "BRATZ" dolls, which has progressively become closer and closer, as well as its imitation of "BRATZ" themes, packaging and the overall look, feel and total image of the "BRATZ" line, imitation of other MGA products, packaging and advertising, and other conduct alleged herein, Mattel has engaged in unfair competition under both federal and California state law.

113.   Mattel has also willfully and maliciously used its power, influence and intimidation to threaten certain retailers, suppliers, licensees, distributors and manufacturers so as to limit, if not prevent, MGA from doing business with these retailers, suppliers, licensees, distributors and manufacturers, using its power and influence to intimidate and manipulate industry bodies. Mattel has further used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury.

114.   Alone, in combination, or in totality, Mattel's actions discussed and alleged herein constitute unfair competition and unfair business practices within the meaning of federal law, California statutory law and/or California common law.

115.   As a result of its conduct, Mattel has derived substantial monetary and non-monetary benefit and business advantage. Mattel has also wrongfully diverted profits away from MGA and to Mattel and, on information and belief, deprived MGA of the patronage of a large number of actual and potential customers.

116.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

34

Exhibit 102
Page 1574

117.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from engaging in acts of unfair competition and unfair business practices.

118.   MGA is further entitled to relief whereby Mattel is ordered to pay restitution for damages resulting from Mattel's unfair competition and unfair business practices.

## THIRD CLAIM FOR RELIEF

### (Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330 and California Common Law)

119.   MGA repeats and realleges the allegations contained in paragraphs 1 through 118 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

120.   The look and trade dress of the MGA products referenced herein are distinctive and famous, and have been since before Mattel launched its similar versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and dilution of the distinctive look of MGA's products and trade dress, which previously served as a unique source identifier for MGA, within the meaning of the Lanham Act, California Business and Professions Code § 14330 and/or California common law.

121.   Mattel's conduct has been intentional and willful, calculated specifically to trade on MGA's goodwill and reputation and to cause dilution of MGA's famous marks, particularly those connected with MGA's famous and successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky Fashion Makeover Head" and "BRATZ PETZ" line.

122.   MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

35

**Exhibit 102**
**Page 1575**

123.   Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.   MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.   As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.   That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.   using confusingly similar trade dress;

    b.   improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.   engaging in unfair competition and unfair business practices; and

    d.   diluting MGA's trade dress;

2.   For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.   For the disgorgement of all profits derived by Mattel for its acts of:

    a.   false designation of origin or affiliation;

36

Exhibit 102
Page 1576

1      b.      unfair competition and unfair business practices; and

2      c.      dilution;

3   4.   For costs of suit and reasonable attorneys' fees;

4   5.   For punitive and/or exemplary damages as a result of Mattel's willful

5   and malicious conduct to the extent allowable by law; and

6   6.   For such other and further relief as the Court deems just and proper.

7

8   Dated:      April 13, 2005            PATRICIA GLASER
                                          CHRISTENSEN, MILLER, FINK,
9                                         JACOBS, GLASER, WEIL &
                                          SHAPIRO LLP
10
                                          DALE M. CENDALI
11                                        DIANA M. TORRES
                                          PAULA E. AMBROSINI
12                                        O'MELVENY & MYERS LLP

13

14

15   By:
        Diana M. Torres
16      Attorneys for Plaintiff
        MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

37

Exhibit 102
Page 1577

1

## **DEMAND FOR JURY TRIAL**

2

3        MGA hereby demands a jury trial on all triable issues.

4

5    Dated:        April 13, 2005              PATRICIA GLASER
                                              CHRISTENSEN, MILLER, FINK,
6                                             JACOBS, GLASER, WEIL &
                                              SHAPIRO LLP

7                                             DALE M. CENDALI
                                              DIANA M. TORRES
8                                             PAULA E. AMBROSINI
                                              O'MELVENY & MYERS LLP
9

10
                                              By:
11                                               Diana M. Torres
                                              Attorneys for Plaintiff
12                                            MGA ENTERTAINMENT, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 102
Page 1578

# EXHIBIT 103

1   DALE M. CENDALI (admitted pro hac vice)
    DIANA M. TORRES (S.B. #162284)
2   MARC F. FEINSTEIN (S.B. #158901)
    O'MELVENY & MYERS LLP
3   400 South Hope Street
    Los Angeles, California 90071-2899
4   Telephone: (213) 430-6000
    Facsimile: (213) 430-6407
5   Email: dtorres@omm.com

6   PATRICIA GLASER (S.B. # 55668)
    CHRISTENSEN, GLASER, FINK,
7   JACOBS, WEIL & SHAPIRO LLP
    10250 Constellation Boulevard, 19th Floor
8   Los Angeles, California 90067
    Telephone:   (310) 553-3000
9   Facsimile:   (310) 556-2920
    Email: pglaser@chrisglase.com

10
    Attorneys for Counter-defendants MGA
11  Entertainment, Inc., Isaac Larian, MGA
    Entertainment (HK) Limited, and MGAE de
12  Mexico S.R.L. de C.V.

13

14

15                  **UNITED STATES DISTRICT COURT**

16                  **CENTRAL DISTRICT OF CALIFORNIA**

17                        **EASTERN DIVISION**

| | |
|---|---|
| 18   CARTER BRYANT, an individual, | Case No. CV 05-2727 SGL (RNBx) |
| 19            Plaintiff, | (Consolidated with CV 04-09049 and CV 04-9059) |
| 20         v. | **AMENDED ANSWER AND** |
| 21   MATTEL, INC., a Delaware Corporation, | **AFFIRMATIVE DEFENSES OF MGA ENTERTAINMENT INC., MGA ENTERTAINMENT (HK)** |
| 22            Defendant | **LIMITED, AND MGAE DE MEXICO S.R.L. DE C.V. TO** |
| 23 | **MATTEL, INC.'S SECOND AMENDED ANSWER AND** |
| 24 | **COUNTERCLAIMS** |
| 25 | |
| 26   CONSOLIDATED WITH | Judge:     Hon. Stephen G. Larson |
| 27   MATTEL, INC. v. BRYANT and | Courtroom: 1 |
|     MGA ENTERTAINMENT, INC. v. | |
| 28   MATTEL, INC. | |

Exhibit 103
Page 1579

1           Counter-defendants MGA Entertainment, Inc. ("MGA"), MGA

2   Entertainment (HK) Limited, and MGAE de Mexico S.R.L. de C.V. (collectively

3   the "MGA Defendants") hereby answer, for themselves alone, the Second

4   Amended Answer and Counterclaim of Counter-claimant Mattel Inc., as follows:

5           As a preliminary matter, Mattel's use of headings throughout its

6   counterclaims is improper, and therefore no response to Mattel's headings is

7   required.  If any response is required, MGA Defendants deny all allegations

8   contained in Mattel's headings.

9                    **RESPONSES**

10         1.   MGA Defendants deny the allegations set forth in paragraph 1.

11         2.   MGA Defendants deny the allegations set forth in paragraph 2.

12         3.   MGA Defendants admit that MGA decided to expand into

13   Mexico in or about 2004, and deny the remaining allegations set forth in paragraph

14   3.

15         4.   MGA Defendants deny the allegations set forth in paragraph 4.

16         5.   MGA Defendants deny the allegations set forth in paragraph 5.

17         6.   MGA Defendants admit that the Court has federal question

18   jurisdiction over this action pursuant to 28 U.S.C. § 1331, deny that 17 U.S.C. §§

19   101 and 18 U.S.C. § 1964(c) apply to the extraterritorial conduct alleged in the

20   Counterclaims, and deny that Mattel is entitled to any relief on its Counterclaims.

21         7.   MGA Defendants admit that venue is proper in this District for

22   Mattel's claims based on conduct alleged to have occurred within this District and

23   deny that venue is proper in this District for acts alleged to have occurred in

24   Mexico, Canada, Hong Kong, or other places outside of this District.

25         8.   MGA Defendants admit the allegations set forth in paragraph 8.

26         9.   MGA Defendants admit the allegations set forth in the first and

27   second sentences of paragraph 9, and deny the remaining allegations set forth in

28   paragraph 9.

LA2:841935.2

- 2 -

**Exhibit 103**
**Page 1580**

1       10.     MGA Defendants admit the allegations set forth in paragraph
2   10.
3       11.     MGA Defendants admit the allegations set forth in the first
4   sentence of paragraph 11, and deny the remaining allegations set forth in paragraph
5   11.
6       12.     MGA Defendants admit the allegations set forth in paragraph
7   12.
8       13.     MGA Defendants admit the allegations set forth in the first
9   sentence of paragraph 13, and deny the remaining allegations set forth in paragraph
10  13.
11      14.     MGA Defendants admit the allegations set forth in paragraph
12  14.
13      15.     Paragraph 15 is a statement of Mattel's legal position, to which
14  no response is necessary.  To the extent a response is required, MGA Defendants
15  deny the allegations set forth in paragraph 15.
16      16.     MGA Defendants admit the allegations set forth in the first
17  sentence of paragraph 16.  MGA Defendants are without sufficient knowledge to
18  admit or deny the remaining allegations set forth in paragraph 16, and on that basis,
19  deny the remaining allegations set forth in paragraph 16.
20      17.     MGA Defendants are without sufficient knowledge to admit or
21  deny the allegations set forth in paragraph 17, and on that basis, deny the
22  allegations set forth in paragraph 17.
23      18.     MGA Defendants are without sufficient knowledge to admit or
24  deny the allegations set forth in paragraph 18, and on that basis, deny the
25  allegations set forth in paragraph 18.
26      19.     MGA Defendants admit that MGA is a toy manufacturer, that
27  MGA began as a consumer electronics business and expanded into the toy business
28  with licenses to sell handheld electronic games, and later expanded its business by

LA2:841935.2

- 3 -

Exhibit 103
Page 1581

1   launching the Bratz fashion doll line, and deny the remaining allegations set forth in

2   paragraph 19.

3         20.   MGA Defendants deny the allegations set forth in paragraph 20.

4         21.   MGA Defendants admit that Carter Bryant is a former employee

5   of Mattel, and state that they are without sufficient knowledge to admit or deny the

6   remaining allegations set forth in paragraph 21, and on that basis, deny the

7   remaining allegations set forth in paragraph 21.

8         22.   MGA Defendants are without sufficient knowledge to admit or

9   deny the allegations set forth in paragraph 22, and on that basis, deny the

10   allegations set forth in paragraph 22.

11         23.   MGA Defendants are without sufficient knowledge to admit or

12   deny the allegations set forth in paragraph 23, and on that basis, deny the

13   allegations set forth in paragraph 23.

14         24.   MGA Defendants are without sufficient knowledge to admit or

15   deny the allegations set forth in paragraph 24, and on that basis, deny the

16   allegations set forth in paragraph 24.

17         25.   MGA Defendants are without sufficient knowledge to admit or

18   deny the allegations set forth in paragraph 25, and on that basis, deny the

19   allegations set forth in paragraph 25.

20         26.   MGA Defendants deny the allegations set forth in paragraph 26.

21         27.   MGA Defendants deny the allegations set forth in paragraph 27.

22         28.   MGA Defendants deny the allegations set forth in paragraph 28.

23         29.   MGA Defendants deny the allegations set forth in paragraph 29.

24         30.   MGA Defendants admit that after MGA made the decision to

25   proceed with the manufacture of the Bratz dolls, MGA employees communicated

26   with employees of MGA Entertainment (HK) Limited on subjects including the

27   manufacturing of Bratz, and deny the remaining allegations set forth in the first

28

1  sentence of paragraph 30. MGA Defendants admit the second sentence of

2  paragraph 30.

3        31. MGA Defendants admit that samples of the four original Bratz

4  dolls were shown at the Hong Kong Toy Fair in January 2001, and deny the

5  remaining allegations set forth in paragraph 31.

6        32. MGA Defendants admit that MGA and its subsidiaries have

7  distributed and sold Bratz and Bratz-related products in many countries throughout

8  the world, that MGA and its subsidiaries have licensed Bratz to third parties, that

9  MGA has derived annual revenues from its sales and licenses of Bratz in excess of

10  $500 million, that MGA and its subsidiaries continue to market, sell and license

11  Bratz and intend to continue to do so, and deny the remaining allegations set forth

12  in paragraph 32.

13        33. MGA Defendants deny the allegations set forth in paragraph 33.

14        34. MGA Defendants deny the allegations set forth in paragraph 34.

15        35. MGA Defendants deny the allegations set forth in paragraph 35.

16        36. MGA Defendants admit that Bryant had an agreement with

17  MGA, state that the terms of the agreement speak for themselves, and deny the

18  remaining allegations set forth in paragraph 36.

19        37. MGA Defendants admit that in or about late 2003 or early 2004,

20  MGA decided to form a new corporation, MGAE de Mexico, S.R.L. de C.V., to

21  conduct business in Mexico, admit that MGAE de Mexico hired three employees of

22  Mattel's Mexican subsidiary, and deny the remaining allegations set forth in

23  paragraph 37.

24        38. MGA Defendants admit that Carlos Gustavo Machado Gomez

25  was a Marketing Manager, Boys Division, for Mattel Mexico, admit that Machado

26  was employed at Mattel Mexico from April 1997 until April 19, 2004, admit that

27  Machado had access to some nonpublic business information of Mattel Mexico, and

28  state that they are without sufficient knowledge to admit or deny the remaining

LA2:841935.2

- 5 -

Exhibit 103
Page 1583

1   allegations set forth in paragraph 38, and on that basis, deny the remaining

2   allegations set forth in paragraph 38.

3       39.   MGA Defendants admit that Mariana Trueba Almada was a

4   Marketing Manager, Girls Division, for Mattel Mexico, admit that Trueba had

5   access to some nonpublic business information of Mattel Mexico, and state that

6   they are without sufficient knowledge to admit or deny the remaining allegations

7   set forth in paragraph 39, and on that basis, deny the remaining allegations set forth

8   in paragraph 39.

9       40.   MGA Defendants admit that Pablo Vargas San Jose was a Trade

10   Marketing Manager for Mattel Mexico, admit that Vargas was employed at Mattel

11   Mexico from March 2001 until April 19, 2004, admit that Vargas had access to

12   some nonpublic business information of Mattel Mexico, and state that they are

13   without sufficient knowledge to admit or deny the remaining allegations set forth in

14   paragraph 40, and on that basis, deny the remaining allegations set forth in

15   paragraph 40.

16       41.   MGA Defendants admit that in or about early 2004, Machado,

17   Trueba and Vargas discussed leaving Mattel Mexico, admit that Machado, Trueba

18   and Vargas resigned from Mattel Mexico on April 19, 2004, admit that they did not

19   identify their new employer to Mattel Mexico, admit that Machado, Trueba and

20   Vargas were offered and accepted employment with MGAE de Mexico, and deny

21   the remaining allegations set forth in paragraph 41.

22       42.   MGA Defendants admit that MGA personnel communicated by

23   telephone with Machado and Vargas prior to their Mattel resignations, admit that

24   MGA personnel, including Isaac Larian, communicated by e-mail with Machado

25   and Vargas concerning terms of employment through an America Online e-mail

26   account with the address <plot04@aol.com>, and deny the remaining allegations

27   set forth in paragraph 42.

28

1    43.   MGA Defendants admit that in or about March 2004, Machado,
2  Trueba, and Vargas made plans to travel from Mexico to Los Angeles in April
3  2004, admit that in or about March 2004, Machado, Trueba and Vargas discussed
4  with MGA personnel, including Larian, employment at MGAE de Mexico, state
5  that the quoted <plot04@aol.com> e-mails speak for themselves, and deny the
6  remaining allegations set forth in paragraph 43.

7    44.   MGA Defendants are without sufficient knowledge to admit or
8  deny the allegations set forth in paragraph 44, and on that basis, deny the
9  allegations set forth in paragraph 44.

10    45.   MGA Defendants are without sufficient knowledge to admit or
11  deny the allegations set forth in paragraph 45, and on that basis, deny the
12  allegations set forth in paragraph 45.

13    46.   MGA Defendants are without sufficient knowledge to admit or
14  deny the allegations set forth in paragraph 46, and on that basis, deny the
15  allegations set forth in paragraph 46.

16    47.   MGA Defendants are without sufficient knowledge to admit or
17  deny the allegation set forth in the third sentence of paragraph 47, and on that basis,
18  deny these allegations, and deny the remaining allegations set forth in paragraph 47.

19    48.   MGA Defendants deny the allegations set forth in paragraph 48.

20    49.   MGA Defendants deny the allegations set forth in paragraph 49.

21    50.   MGA Defendants are without sufficient knowledge to admit or
22  deny the allegation that MGA publicized a claim that, in 2005, it had increased its
23  Mexican market share by 90% over the prior year, and on that basis, deny this
24  allegation, and deny the remaining allegations set forth in paragraph 50.

25    51.   MGA Defendants deny the allegations set forth in paragraph 51.

26    52.   MGA Defendants deny the allegations set forth in paragraph 52.

27    53.   MGA Defendants admit that on October 27, 2005, Mexican
28  authorities searched MGAE de Mexico and seized certain documents, and state that

LA2:841935.2

- 7 -

Exhibit 103
Page 1585

1    they are without sufficient knowledge to admit or deny the remaining allegations

2    set forth in paragraph 53, and on that basis, deny the remaining allegations set forth

3    in paragraph 53.

4          54.    MGA Defendants admit that Machado was transferred from

5    MGAE de Mexico to MGA's office in Van Nuys, California, admit that Machado

6    resides in the County of Los Angeles, and deny the remaining allegations set forth

7    in paragraph 54.

8          55.    MGA Defendants admit the allegations set forth in the first

9    sentence of paragraph 55. MGA Defendants admit that Tyco Toys hired Brawer on

10   April 22, 1996, and state that they are without sufficient knowledge to admit or

11   deny the remaining allegations set forth in the second sentence of paragraph 55, and

12   on that basis, deny the remaining allegations set forth in the second sentence of

13   paragraph 55. MGA Defendants admit the allegations set forth in third sentence of

14   paragraph 55. MGA Defendants admit that on April 9, 1997, Brawer became a

15   Marketing Director for Mattel in Mount Laurel, New Jersey, and state that the

16   remaining allegations in the fourth sentence of paragraph 55 are a statement of

17   Mattel's legal position, to which no response is necessary. To the extent a response

18   is required, MGA Defendants deny the remaining allegations set forth in paragraph

19   55.

20         56.    MGA Defendants are without sufficient knowledge to admit or

21   deny the allegations set forth in paragraph 56, and on that basis, deny the

22   allegations set forth in paragraph 56. The last sentence of paragraph 56 is a

23   statement of Mattel's legal position, to which no response is necessary. To the

24   extent a response is required, MGA Defendants deny the remaining allegations set

25   forth in paragraph 56.

26         57.    MGA Defendants admit that by 2003, Brawer had advanced

27   within Mattel to a Senior Vice President position over customer marketing, and

28   state that the remaining allegations in the first sentence of paragraph 57 are a

LA2:841935.2

- 8 -

Exhibit 103
Page 1586

1    statement of Mattel's legal position, to which no response is necessary.  To the

2    extent a response is required, MGA Defendants deny the remaining allegations set

3    forth in the first sentence of paragraph 57.  MGA Defendants admit that in his

4    executive position, Brawer was provided access to certain nonpublic Mattel

5    information.

6              58.    MGA Defendants admit the allegations set forth in the first

7    sentence of paragraph 58.  MGA Defendants deny the allegations set forth in the

8    second sentence of paragraph 58.  MGA Defendants are without sufficient

9    knowledge to admit or deny the remaining allegations set forth in paragraph 58, and

10   on that basis, deny the remaining allegations set forth in paragraph 58.

11             59.    MGA Defendants are without sufficient knowledge to admit or

12   deny the allegations set forth in paragraph 59, and on that basis, deny the

13   allegations set forth in paragraph 59.

14             60.    MGA Defendants admit that in April 2004, Mattel made Brawer

15   a Senior Vice President/General Manager, and state that they are without sufficient

16   knowledge to admit or deny the remaining allegations set forth in paragraph 60, and

17   on that basis, deny the remaining allegations set forth in paragraph 60.

18             61.    MGA Defendants admit that in May 2004, Brawer began

19   performing General Manager duties, working with one of Mattel's major retail

20   customer accounts, and state that they are without sufficient knowledge to admit or

21   deny the remaining allegations set forth in paragraph 61, and on that basis, deny the

22   remaining allegations set forth in paragraph 61.

23             62.    MGA Defendants admit the allegations set forth in the first

24   sentence of paragraph 62.  MGA Defendants admit that as Brawer left, he carried a

25   large cardboard box, and deny the remaining allegations set forth in the second

26   sentence of paragraph 62.  MGA Defendants state that they are without sufficient

27   knowledge to admit or deny the remaining allegations set forth in paragraph 62, and

28   on that basis, deny the remaining allegations set forth in paragraph 62.

LA2:841935.2

- 9 -

Exhibit 103
Page 1587

63.   MGA Defendants admit the allegations set forth in paragraph 63.

64.   MGA Defendants admit that on September 20, 2004, Mattel hand-delivered a letter to Brawer, state that the contents of the letter speak for themselves, and deny the remaining allegations set forth in paragraph 64.

65.   MGA Defendants admit that at his exit interview on September 29, 2004, Brawer was given a copy of an agreement with Tyco that he had signed on April 22, 1996, and a copy of Mattel's Code of Conduct, admit that Brawer stated that he had not signed the Code of Conduct, and deny the remaining allegations set forth in paragraph 65.

66.   MGA Defendants admit that on October 1, 2004, Brawer's last day of employment with Mattel, Mattel delivered a letter to Brawer, state that the contents of the letter speak for themselves, and deny the remaining allegations set forth in paragraph 66.

67.   MGA Defendants admit that Brawer became MGA's Executive Vice President of Sales and Marketing, admit that he was responsible for sales worldwide, admit that he had and continues to have responsibility for MGA's accounts with some of the same retailers that he worked with while at Mattel, and deny the remaining allegations set forth in paragraph 67.

68.   MGA Defendants admit that Brawer stated during his exit interview that he had returned all confidential proprietary information to Mattel, state that he did not provide copies of information from his personal contacts file, and deny the remaining allegations set forth in paragraph 68.

69.   MGA Defendants admit that since leaving Mattel, Brawer has had contacts with certain Mattel employees, both by telephone and electronic mail, and deny the remaining allegations set forth in paragraph 69.

70.   MGA Defendants deny the allegations set forth in paragraph 70.

LA2:841935.2

- 10 -

Exhibit 103
Page 1588

1      71.   MGA Defendants are without sufficient knowledge to admit or
2  deny the allegations set forth in paragraph 71, and on that basis, deny the
3  allegations set forth in paragraph 71.

4      72.   MGA Defendants are without sufficient knowledge to admit or
5  deny the allegations set forth in paragraph 72, and on that basis, deny the
6  allegations set forth in paragraph 72.

7      73.   MGA Defendants admit that on September 26, 2005, Brisbois
8  resigned from Mattel Canada, state that she took a position as Vice President of
9  National Accounts at MGAE Canada, and deny the remaining allegations set forth
10  in the first sentence of paragraph 73. MGA Defendants are without sufficient
11  knowledge to admit or deny the remaining allegations set forth in paragraph 73, and
12  on that basis, deny the remaining allegations set forth in paragraph 73.

13      74.   MGA Defendants admit that Brisbois spoke with Isaac Larian
14  by telephone on or about the evening of September 22, 2005, deny that Brisbois
15  copied approximately 45 Mattel documents onto a USB or thumb drive on that
16  same date, deny that Brisbois concealed the thumb drive the last time she left
17  Mattel Canada's office, and state that they are without sufficient knowledge to
18  admit or deny the remaining allegations set forth in paragraph 74, and on that basis,
19  deny the remaining allegations set forth in paragraph 74.

20      75.   MGA Defendants are without sufficient knowledge to admit or
21  deny the allegations set forth in paragraph 75, and on that basis, deny the
22  allegations set forth in paragraph 75.

23      76.   MGA Defendants admit that Brisbois traveled several times to
24  MGA's offices in Van Nuys, California and met with Larian and Brawer, that
25  MGA issued a press release, state that the press release speaks for itself, and state
26  that they are without sufficient knowledge to admit or deny the remaining
27  allegations set forth in paragraph 76 and, on that basis, deny the remaining
28  allegations set forth in paragraph 76.

LA2:841935.2        - 11 -

Exhibit 103
Page 1589

1    77.    MGA Defendants admit that MGA has hired at least 25

2  employees directly from Mattel's United States operations in the past few years,

3  and deny the remaining allegations set forth in paragraph 77.

4    78.    MGA Defendants deny the allegations set forth in the first

5  sentence of paragraph 78. MGA Defendants admit that Larian has sent email

6  messages to a "Bratz News" distribution list, admit that the recipients of e-mail

7  messages sent to the "Bratz News" distribution list includes members of the media

8  as well as representatives of customers of both MGA and Mattel, and deny the

9  remaining allegations set forth in paragraph 78.

10    79.    MGA Defendants admit that on May 12, 2006, Larian sent an

11  email message to the "Bratz News" distribution list that included a reference to the

12  new My Scene product with real gems, and state that they are without sufficient

13  knowledge to admit or deny the remaining allegations set forth in paragraph 79, and

14  on that basis, deny the remaining allegations set forth in paragraph 79.

15    80.    MGA Defendants admit that Larian told one retailer that such

16  retailer was the only retailer with plans to purchase MY SCENE BLING BLING

17  with real gems, at a time when Larian had a good faith belief that such retailer was

18  the only retailer with plans to purchase MY SCENE BLING BLING with real

19  gems, and deny the remaining allegations set forth in paragraph 80.

20    81.    MGA Defendants deny the allegation set forth in paragraph 81.

21    82.    MGA Defendants repeat their responses contained in paragraphs

22  1 through 81 of this Answer and incorporate them by reference as though fully and

23  completely set forth herein.

24    83.    MGA Defendants deny the allegations set forth in paragraph 83.

25    84.    MGA Defendants deny the allegations set forth in paragraph 84.

26    85.    MGA Defendants deny the allegations set forth in paragraph 85.

27    86.    MGA Defendants deny the allegations set forth in paragraph 86.

28    87.    MGA Defendants deny the allegations set forth in paragraph 87.

LA2:841935.2

- 12 -

Exhibit 103
Page 1590

1    88.    MGA Defendants repeat their responses contained in paragraphs

2  1 through 87 of this Answer and incorporate them by reference as though fully and

3  completely set forth herein.

4    89.    MGA Defendants deny the allegations set forth in paragraph 89.

5    90.    MGA Defendants deny the allegations set forth in paragraph 90.

6    91.    MGA Defendants deny the allegations set forth in paragraph 91.

7    92.    MGA Defendants deny the allegations set forth in paragraph 92.

8    93.    MGA Defendants deny the allegations set forth in paragraph 93.

9    94.    MGA Defendants deny the allegations set forth in paragraph 94.

10    95.    MGA Defendants deny the allegations set forth in paragraph 95.

11    96.    MGA Defendants deny the allegations set forth in paragraph 96.

12    97.    MGA Defendants deny the allegations set forth in paragraph 97.

13    98.    MGA Defendants repeat their responses contained in paragraphs

14  1 through 97 of this Answer and incorporate them by reference as though fully and

15  completely set forth herein.

16    99.    MGA Defendants deny the allegations set forth in paragraph 99.

17    100.    MGA Defendants deny the allegations set forth in paragraph

18  100.

19    101.    MGA Defendants deny the allegations set forth in paragraph

20  101.

21    102.    MGA Defendants deny the allegations set forth in paragraph

22  102.

23    103.    MGA Defendants deny the allegations set forth in paragraph

24  103.

25    104.    MGA Defendants deny the allegations set forth in paragraph

26  104.

27    105.    MGA Defendants deny the allegations set forth in paragraph

28  105.

LA2:841935.2

- 13 -

Exhibit 103
Page 1591

1   106.   MGA Defendants repeat their responses contained in paragraphs
2   1 through 105 of this Answer and incorporate them by reference as though fully and
3   completely set forth herein.

4   107.   MGA Defendants deny the allegations set forth in paragraph
5   107.

6   108.   MGA Defendants deny the allegations set forth in paragraph
7   108.

8   109.   MGA Defendants deny the allegations set forth in paragraph
9   109.

10   110.   MGA Defendants deny the allegations set forth in paragraph
11   110.

12   111.   MGA Defendants deny the allegations set forth in paragraph
13   111.

14   112.   MGA Defendants deny the allegations set forth in paragraph
15   112.

16   113.   MGA Defendants deny the allegations set forth in paragraph
17   113.

18   114.   MGA Defendants deny the allegations set forth in paragraph
19   114.

20   115.   MGA Defendants deny the allegations set forth in paragraph
21   115.

22   116.   MGA Defendants repeat their responses contained in paragraphs
23   1 through 115 of this Answer and incorporate them by reference as though fully and
24   completely set forth herein.

25   117.   MGA Defendants deny the remaining allegations set forth in
26   paragraph 117.

27   118.   MGA Defendants deny the allegations set forth in paragraph
28   118.

LA2:841935.2

- 14 -

Exhibit 103
Page 1592

1      119.   MGA Defendants deny the allegations set forth in paragraph

2    119.

3      120.   MGA Defendants deny the allegations set forth in paragraph

4    120.

5      121.   MGA Defendants deny the allegations set forth in paragraph

6    121.

7      122.   MGA Defendants repeat their responses contained in paragraphs

8    1 through 121 of this Answer and incorporate them by reference as though fully and

9    completely set forth herein.

10      123.   MGA Defendants deny the allegations set forth in paragraph

11    123.

12      124.   MGA Defendants deny the allegations set forth in paragraph

13    124.

14      125.   MGA Defendants deny the allegations set forth in paragraph

15    125.

16      126.   MGA Defendants deny the allegations set forth in paragraph

17    126.

18      127.   MGA Defendants deny the allegations set forth in paragraph

19    127.

20      128.   MGA Defendants deny the allegations set forth in paragraph

21    128.

22      129.   MGA Defendants repeat their responses contained in paragraphs

23    1 through 128 of this Answer and incorporate them by reference as though fully and

24    completely set forth herein.

25      130.   The first and fifth sentences of paragraph 130 are statements of

26    Mattel's legal position, to which no response is necessary.  To the extent a response

27    is required, MGA Defendants deny the allegations set forth in the first and fifth

28    sentences of paragraph 130.  MGA Defendants are without sufficient knowledge to

Exhibit 103
Page 1593

1    admit or deny the remaining allegations set forth in paragraph 130, and on that

2    basis, deny the remaining allegations set forth in paragraph 130.

3           131.   MGA Defendants deny the allegations set forth in paragraph

4    131.

5           132.   MGA Defendants deny the allegations set forth in paragraph

6    132.

7           133.   MGA Defendants deny the allegations set forth in paragraph

8    133.

9           134.   MGA Defendants deny the allegations set forth in paragraph

10   134.

11          135.   MGA Defendants deny the allegations set forth in paragraph

12   135.

13          136.   MGA Defendants repeat their responses contained in paragraphs

14   1 through 135 of this Answer and incorporate them by reference as though fully and

15   completely set forth herein.

16          137.   MGA Defendants deny the allegations set forth in paragraph

17   137.

18          138.   MGA Defendants deny the allegations set forth in paragraph

19   138.

20          139.   MGA Defendants deny the allegations set forth in paragraph

21   139.

22          140.   MGA Defendants deny the allegations set forth in paragraph

23   140.

24          141.   MGA Defendants deny the allegations set forth in paragraph

25   141.

26          142.   MGA Defendants repeat their responses contained in paragraphs

27   1 through 141 of this Answer and incorporate them by reference as though fully and

28   completely set forth herein.

1    143.   Paragraph 143 is a statement of Mattel's legal position, to which
2    no response is necessary.  To the extent a response is required, MGA Defendants
3    deny the allegations set forth in the paragraph 143.

4    144.   MGA Defendants deny the allegations set forth in paragraph
5    144.

6    145.   MGA Defendants deny the allegations set forth in paragraph
7    145.

8    146.   MGA Defendants deny the allegations set forth in paragraph
9    146.

10    147.   MGA Defendants deny the allegations set forth in paragraph
11    147.

12    148.   MGA Defendants deny the allegations set forth in paragraph
13    148.

14    149.   MGA Defendants repeat their responses contained in paragraphs
15    1 through 148 of this Answer and incorporate them by reference as though fully and
16    completely set forth herein.

17    150.   MGA Defendants deny the allegations set forth in paragraph
18    150.

19    151.   MGA Defendants deny the allegations set forth in paragraph
20    151.

21    152.   MGA Defendants deny the allegations set forth in paragraph
22    152.

23    153.   MGA Defendants deny the allegations set forth in paragraph
24    153.

25    154.   MGA Defendants deny the allegations set forth in paragraph
26    154.

27

28

LA2:841935.2

- 17 -

Exhibit 103
Page 1595

1    155.   MGA Defendants repeat their responses contained in paragraphs
2    1 through 154 of this Answer and incorporate them by reference as though fully and
3    completely set forth herein.

4    156.   MGA Defendants deny the allegations set forth in paragraph
5    156.

6    157.   MGA Defendants deny the allegations set forth in paragraph
7    157.

8    158.   MGA Defendants deny the allegations set forth in paragraph
9    158.

10   159.   MGA Defendants deny the allegations set forth in paragraph
11   159.

12   160.   MGA Defendants deny the allegations set forth in paragraph
13   160.

14   161.   MGA Defendants deny the allegations set forth in paragraph
15   161.

16   162.   MGA Defendants deny the allegations set forth in paragraph
17   162.

18   163.   MGA Defendants repeat their responses contained in paragraphs
19   1 through 162 of this Answer and incorporate them by reference as though fully and
20   completely set forth herein.

21   164.   MGA Defendants deny the allegations set forth in paragraph
22   164.

23   165.   MGA Defendants deny the allegations set forth in paragraph
24   165.

25   166.   MGA Defendants deny the allegations set forth in paragraph
26   166.

27

28

LA2:841935.2

Exhibit 103
Page 1596

1         167.   MGA Defendants repeat their responses contained in paragraphs

2 1 through 166 f this Answer and incorporate them by reference as though fully and

3 completely set forth herein.

4         168.   MGA Defendants deny the allegations set forth in paragraph

5 168.

6         169.   Paragraph 169 is a statement of Mattel's legal position, to which

7 no response is necessary.  To the extent a response is required, MGA Defendants

8 deny the allegations set forth in the paragraph 169.

9         170.   Paragraph 170 is a statement of Mattel's legal position, to which

10 no response is necessary.  To the extent a response is required, MGA Defendants

11 deny the allegations set forth in the paragraph 170.

12 <div align="center">**AFFIRMATIVE DEFENSES**</div>

13       Without admitting any wrongful conduct on the part of MGA Defendants or

14 any Counter-Defendant, and without admitting that Mattel suffered any loss,

15 damage, or injury, MGA Defendants allege the following affirmative defenses to

16 the Counterclaims.  By designating the following as affirmative defenses, MGA

17 Defendants do not in any way waive or limit any defenses which are or may be

18 raised by their denials, allegations, and averments set forth herein.  MGA

19 Defendants also do not, by alleging any affirmative defense, admit that Mattel does

20 not have the burden of proof for any or all facts underlying any of those defenses.

21 These defenses are pled in the alternative, and are raised to preserve the rights of

22 MGA Defendants to assert such defenses, and are without prejudice to their ability

23 to raise other and further defenses.

24 <div align="center">**FIRST AFFIRMATIVE DEFENSE**</div>

25 <div align="center">(Failure to State a Claim)</div>

26      Mattel's counterclaims fail to state a claim against MGA Defendants upon

27 which relief can be granted.

28

LA2:841935.2

<div align="center">- 19 -</div>

**Exhibit 103**
**Page 1597**

## SECOND AFFIRMATIVE DEFENSE

### (Unclean Hands/*in Pari Delicto*)

Mattel's counterclaims are barred in whole or in part by Mattel's unclean hands and wrongful acts. This affirmative defense is based, in part, on Mattel's efforts to undermine MGA's business and to "kill" Bratz at any cost which include, but are not limited to, Mattel's efforts to infringe and dilute MGA's trade dress, copy MGA's products, packaging, themes, and advertising (including for Mattel products My Scene, Diva Starz, Wee 3 Friends, Acceleracers, Polly Pocket, and Little Mommy products, to name a few), and engage in other acts of unfair competition against MGA as alleged in MGA's complaint against Mattel; Mattel's efforts to create negative publicity or press about MGA, MGA products, Bryant, Larian, or MGA employees; Mattel's efforts to fund or commission market research or studies that portray Bratz or MGA products negatively; Mattel's efforts to interfere with MGA's acquisition of or investment in Zapf Creation AG; Mattel's efforts to include negative references to MGA or Bratz on Mattel's "We Believe in Girls" website; Mattel's efforts or intent to interfere with business dealings or contractual relations between MGA and Smoby Group; Mattel's influencing Nickelodeon to reject MGA advertisements or to limit time slots for advertisements; assisting parties in lawsuits against MGA; Mattel's monitoring, "spying on" or gaining knowledge of MGA's trade secrets, non-public information, non-public activities, unreleased products, and product development; gaining access, or attempts to gain access, to MGA showrooms, Plan-o-Grams, merchandising displays, Toy Fair displays on false pretenses; Mattel's wrongfully obtaining MGA's costs and sales information through Mattel-employed category managers at retailers; Mattel's inducing non-party customers to breach confidentiality agreements with MGA and divulge non-public information about MGA's unreleased products; Mattel's covertly investigating MGA, its officers and employees, and their family members; Mattel's contacting persons under false

LA2:841935.2

- 20 -

Exhibit 103
Page 1598

1   pretense in order to interrogate them about Bratz and this litigation; Mattel's

2   coercing its employees to accept restrictive covenants (right before a massive

3   layoff) and non-compete clauses and other efforts to prevent prospective MGA

4   employees from accepting offers of employment; Mattel's delay in suing Carter

5   Bryant because, *inter alia*, Mattel wanted Bryant to testify in an unrelated Mattel

6   case; Mattel's falsely inflating its Barbie sales figures in an effort to mislead the

7   public and retailers; and Mattel's taking all measures to conceal its bad acts,

8   including the willful non-retention and destruction of documents. Additionally,

9   Mattel believed from the time that Carter Bryant left Mattel's employ that he was

10  going to perform work for a Mattel competitor. Mattel began investigating Bryant

11  and MGA Defendants, including Bryant's role in the creation and development of

12  Bratz, at least as early as March 2002. Nonetheless, Mattel waited years to bring

13  suit, all the while allowing MGA Defendants to spend years developing their

14  business and invest tens of millions of dollars developing the Bratz products and

15  building the Bratz brand. These averments are made on information and belief

16  except where MGA Defendants have knowledge thereof.

### THIRD AFFIRMATIVE DEFENSE

#### (Laches)

19       Mattel's counterclaims are barred by the equitable doctrine of laches

20  because, among other things, Mattel believed from the time that Carter Bryant left

21  Mattel's employ that he was going to perform work for a Mattel competitor. Mattel

22  began investigating Bryant and MGA Defendants, including Bryant's role in the

23  creation and development of Bratz, at least as early as March 2002 and thereafter

24  continued its investigation into Bryant's role in the creation and development of

25  Bratz, as well as his work with MGA, in August 2002 after Mattel's CEO, Robert

26  Eckert, received an "anonymous letter" that claimed that Bryant stole the idea for

27  Bratz from Mattel and sold it to MGA Defendants. Nonetheless, Mattel waited

28  years to bring suit, all the while allowing MGA Defendants to spend years

LA2:841935.2

- 21 -

Exhibit 103
Page 1599

1   developing their business and invest tens of millions of dollars developing the Bratz

2   products and building the Bratz brand.

3   ### FOURTH AFFIRMATIVE DEFENSE

4   ### (Statute of Limitations)

5   Mattel's counterclaims are barred by the applicable statutes of limitations,

6   including but not limited to, 18 U.S.C. § 1961 *et seq.*, 17 U.S.C. § 507(b), and Code

7   of Civil Procedure §§ 337, 339, 343 and 338(c).

8   ### FIFTH AFFIRMATIVE DEFENSE

9   ### (*Bona Fide* Purchaser for Value)

10   Mattel cannot maintain its counterclaims against MGA Defendants because

11   MGA Defendants paid valuable consideration for Bryant's assignment of his rights

12   in the original Bratz drawings to MGA Defendants, and MGA Defendants acted

13   with a good faith belief that Bryant owned the rights to his original Bratz drawings

14   and that his assignment of such rights to MGA Defendants was valid and

15   permissible.

16   ### SIXTH AFFIRMATIVE DEFENSE

17   ### (17 U.S.C. § 205(d))

18   Mattel cannot maintain its counterclaims against MGA Defendants because,

19   among other things, MGA Defendants acted with a good faith belief that Bryant

20   owned the rights to his original Bratz drawings and that his assignment of such

21   rights to MGA Defendants was valid and permissible.

22   ### SEVENTH AFFIRMATIVE DEFENSE

23   ### (Information Readily Ascertainable)

24   MGA Defendants cannot be liable, either on their own account or by

25   association with other defendants, for misappropriation of information that was

26   readily ascertainable by proper means at the time of the alleged acquisition or use.

27   Such information includes, but is not limited to, the identity of suppliers,

28

LA2:841935.2

- 22 -

**Exhibit 103**
**Page 1600**

1  manufacturers, distributors and retailers; contact information for the same; and
2  sales, marketing and media data.

### EIGHTH AFFIRMATIVE DEFENSE

#### (Acts or Omissions of Others)

5  Mattel's damages, if any, were not caused by MGA Defendants and are not
6  attributable to any acts or omissions of MGA Defendants.

### NINTH AFFIRMATIVE DEFENSE

#### (Estoppel)

9  Mattel's counterclaims are barred in whole or in part by the equitable
10  doctrine of estoppel because, among other things, Mattel believed from the time
11  that Carter Bryant left Mattel's employ that he was going to perform work for a
12  Mattel competitor. Mattel began investigating Bryant and MGA Defendants,
13  including Bryant's role in the creation and development of Bratz, at least as early as
14  March 2002. Nonetheless, Mattel waited years to bring suit, all the while allowing
15  MGA Defendants to spend years developing their business and invest tens of
16  millions of dollars developing the Bratz products and building the Bratz brand.

### TENTH AFFIRMATIVE DEFENSE

#### (Acquiescence)

19  Mattel's counterclaims are barred in whole or in part by acquiescence
20  because, among other things, Mattel believed from the time that Carter Bryant left
21  Mattel's employ that he was going to perform work for a Mattel competitor. Mattel
22  began investigating Bryant and MGA Defendants, including Bryant's role in the
23  creation and development of Bratz, at least as early as March 2002. Nonetheless,
24  Mattel waited years to bring suit, all the while allowing MGA Defendants to spend
25  years developing their business and invest tens of millions of dollars developing the
26  Bratz products and building the Bratz brand. Additionally, Mattel tolerated and
27  condoned conduct by other employees similar to the alleged conduct by Bryant and
28  others on which Mattel bases its claims.

LA2:841935.2

- 23 -

Exhibit 103
Page 1601

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

MGA Defendants deny that Mattel suffered any damages, but even if it did, Mattel failed to take reasonable steps to mitigate those purported damages.

## TWELFTH AFFIRMATIVE DEFENSE

### (No Statutory Damages or Attorneys' Fees)

Mattel is barred from recovering statutory damages and/or attorneys' fees because it failed to register the copyrights that are purportedly at issue within the time required by 17 U.S.C. § 412.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Waiver)

Mattel's counterclaims are barred in whole or in part by waiver because, among other things, Mattel believed from the time that Carter Bryant left Mattel's employ that he was going to perform work for a Mattel competitor. Mattel began investigating Bryant and MGA Defendants, including Bryant's role in the creation and development of Bratz, at least as early as March 2002. Nonetheless, Mattel waited years to bring suit, all the while allowing MGA Defendants to spend years developing their business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Abandonment)

Mattel has abandoned any interest it may have had in the alleged copyrighted works.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (_De Minimus_ Use)

MGA Defendants deny that Mattel owns any copyright interest in the alleged works, but even if Mattel could craft a claim that the Bratz dolls incorporate an

LA2:841935.2

- 24 -

Exhibit 103
Page 1602

1  aspect of a Mattel copyrighted work, such use would be *de minimus* and non-
2  infringing.

### SIXTEENTH AFFIRMATIVE DEFENSE

#### (Joint Authorship)

5  MGA Defendants deny that Mattel owns any copyright interest in the alleged
6  works, but even if it did, any liability would be eliminated or greatly diminished by
7  the doctrine of joint authorship.

### SEVENTEENTH AFFIRMATIVE DEFENSE

#### (Competition Privilege/Justification)

10  Mattel's counterclaims are barred in whole or in part on the grounds that the
11  acts of the MGA Defendants were lawful competition or justified.

### EIGHTEENTH AFFIRMATIVE DEFENSE

#### (Good Faith)

14  Mattel's counterclaims are barred in whole or in part because the MGA
15  Defendants acted in good faith.

### NINETEENTH AFFIRMATIVE DEFENSE

#### (Lack of Authority)

18  Mattel's counterclaims are barred in whole or in part on the grounds that to
19  the extent any person committed an unlawful or tortious act, the person lacked
20  authority to commit such act on behalf of the MGA Defendants.

### TWENTIETH AFFIRMATIVE DEFENSE

#### (Lack of Standing)

23  Mattel's counterclaims are barred in whole or in part by its lack of standing.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

#### (Joinder in Defenses of Co-Defendants)

26  MGA Defendants hereby adopt and incorporate by reference any and all
27  other affirmative defenses that have been or will be asserted by any other defendant
28  (including Bryant) in this litigation to the extent that defendants may share in such

LA2:841935.2

- 25 -

**Exhibit 103**
**Page 1603**

1  affirmative defenses.

2  **TWENTY-SECOND AFFIRMATIVE DEFENSE**

3  (Undiscovered Defenses)

4  MGA Defendants have insufficient knowledge or information upon which to

5  form a belief as to whether additional defenses are available. MGA Defendants

6  reserve the right to assert any further or additional defenses upon receiving more

7  complete information regarding the matters alleged in the Counterclaims, through

8  discovery or otherwise.

9

10  WHEREFORE, MGA Entertainment, Inc., MGA Entertainment (HK)

11  Limited, and MGAE de Mexico S.R.L. de C.V., pray for relief as follows:

12  a.  that the Counterclaims be dismissed with prejudice;

13  b.  that judgment be entered in favor of counter-defendants and against

14  counterclaimant;

15  c.  that counter-defendants recover their costs and attorneys' fees; and

16  d.  that the Court award such other and further relief as is just and proper.

17

18  Dated:  September 19, 2007

O'MELVENY & MYERS LLP

19

20

Marc F. Feinstein
Attorneys for Counter-defendants
MGA Entertainment, Inc., Isaac Larian,
MGA Entertainment (HK) Limited, and
MGAE de Mexico S.R.L. de C.V.

21

22

23

24

25

26

27

28

LA2:841935.2

- 26 -

Exhibit 103
Page 1604

1

## PROOF OF SERVICE

2

I, Karen A. Nakatsu, declare:

3

I am a resident of the State of California and over the age of eighteen years, and not a party to the within action; my business address is 400 South Hope Street, Los Angeles, California 90071-2899. On September 19, 2007, I served the within document(s):

4

5

**AMENDED ANSWER AND AFFIRMATIVE DEFENSES OF MGA ENTERTAINMENT, INC., MGA ENTERTAINMENT (HK) LIMITED, AND MGAE DE MEXICO S.R.L. DE C.V. TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS**

6

7

8

☒   by causing to be personally served the document(s) listed above to the person(s) listed below.

9

10   John B. Quinn, Esq.
Michael T. Zeller, Esq.
B. Dylan Proctor, Esq.

11   Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street,

12   10th Floor
Los Angeles, CA 90017

13

14   ☒   by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

15

16

17

18

19   Patricia Glaser, Esq.                    Michael H. Page, Esq.
Christensen, Glaser, Fink, Jacobs,    Keker & Van Nest LLP

20   Weil & Shapiro, LLP                      710 Sansome Street
10250 Constellation Blvd.,            San Francisco, CA 94111

21   19th Floor
Los Angeles, CA 90067

22

23   James W. Spertus, Esq.
Law Offices of James W. Spertus

24   12100 Wilshire Blvd., Suite 620
Los Angeles, CA 90025

25

26

27

28

LA2:817525.2

Exhibit 103
Page 1605

1    I declare under penalty of perjury under the laws of the United States that the

2  above is true and correct.

3    Executed on September 19, 2007, at Los Angeles, California.

4

5    _____
      Karen A. Nakatsu

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA2:817525.2

Exhibit 103
Page 1606

# EXHIBIT 104

RECEIVED

NOV 1 3 2007

1  THOMAS J. NOLAN (Bar No. 066992)
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  300 South Grand Avenue
   Los Angeles, California 90071-3144
3  Telephone:  (213) 687-5000
   Facsimile:  (213) 687-5600
4  E-mail:    tnolan@skadden.com

5  KENNETH A. PLEVAN
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
6  4 Times Square
   New York, NY 10036
7  Telephone:  (212) 735-3000
   Facsimile:  (212) 735-2000
8  E-mail:    kplevan@skadden.com
   (application for admission *pro hac vice* pending)
9
   Attorneys for Counter-Defendants,
10 MGA ENTERTAINMENT, INC.,
   ISAAC LARIAN, MGA ENTERTAINMENT (HK)
11 LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15 CARTER BRYANT, an individual    )  CASE NO. CV 04-9049 SGL (RNBx)
                                   )
16              Plaintiff,         )  Consolidated with Case No. 04-9059
                                   )  and Case No. 05-2727
17     v.                          )
                                   )  **ISAAC LARIAN'S AMENDED**
18 MATTEL, INC., a Delaware        )  **ANSWER AND AFFIRMATIVE**
   corporation                     )  **DEFENSES TO MATTEL, INC.'S**
19                                 )  **SECOND AMENDED ANSWER**
                Defendant.         )  **AND COUNTERCLAIMS**
20                                 )
                                   )  Honorable Stephen G. Larson
21                                 )  Courtroom 1
   _____)
22 Consolidated with MATTEL, INC. v. )
   BRYANT and MGA                  )
23 ENTERTAINMENT, INC. v.          )
   MATTEL, INC.                    )
24                                 )
                                   )
25

26

27

28                         *1-8*
   _____
   ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED
                    ANSWER AND COUNTERCLAIMS

Exhibit 104
Page 1607

1    Counter-defendant Isaac Larian hereby answers, for himself alone, the Second

2  Amended Counterclaim of Counter-claimant Mattel Inc., as follows:

3    As a preliminary matter, Mattel's use of headings throughout its counterclaims

4  is improper, and therefore no response to Mattel's headings is required.  If any

5  response is required, Larian denies all allegations contained in Mattel's headings.

6                              **RESPONSES**

7         1.    Larian denies the allegations set forth in paragraph 1.

8         2.    Larian denies the allegations set forth in paragraph 2.

9         3.    Larian admits that MGA decided to expand into Mexico in or

10  about 2004, and denies the remaining allegations set forth in paragraph 3.

11        4.    Larian denies the allegations set forth in paragraph 4.

12        5.    Larian denies the allegations set forth in paragraph 5.

13        6.    Larian admits that the Court has federal question jurisdiction over

14  this action pursuant to 28 U.S.C. § 1331, denies that 17 U.S.C. §§ 101 and 18 U.S.C.

15  § 1964(c) apply to the extraterritorial conduct alleged in the Counterclaims, and

16  denies that Mattel is entitled to any relief on its Counterclaims.

17        7.    Larian admits that venue is proper in this District for Mattel's

18  claims based on conduct alleged to have occurred within this District and denies that

19  venue is proper in this District for acts alleged to have occurred in Mexico, Canada,

20  Hong Kong, or other places outside of this District.

21        8.    Larian admits the allegations set forth in paragraph 8.

22        9.    Larian admits the allegations set forth in the first and second

23  sentences of paragraph 9, and denies the remaining allegations set forth in paragraph

24  9.

25        10.    Larian admits the allegations set forth in paragraph 10.

26        11.    Larian admits the allegations set forth in the first sentence of

27  paragraph 11, and denies the remaining allegations set forth in paragraph 11.

28

1

Exhibit 104
Page 1608

1   12. Larian admits the allegations set forth in paragraph 12.

2   13. Larian admits the allegations set forth in the first sentence of

3 paragraph 13. Larian denies the remaining allegations set forth in paragraph 13.

4   14. Larian admits the allegations set forth in paragraph 14.

5   15. Paragraph 15 is a statement of Mattel's legal position, to which

6 no response is necessary. To the extent a response is required, Larian denies the

7 allegations set forth in paragraph 15.

8   16. Larian admits the allegations set forth in the first sentence of

9 paragraph 16. Larian is without sufficient knowledge to admit or deny the remaining

10 allegations set forth in paragraph 16, and on that basis, denies the remaining

11 allegations set forth in paragraph 16.

12   17. Larian is without sufficient knowledge to admit or deny the

13 allegations set forth in paragraph 17, and on that basis, denies the allegations set

14 forth in paragraph 17.

15   18. Larian is without sufficient knowledge to admit or deny the

16 allegations set forth in paragraph 18, and on that basis, denies the allegations set

17 forth in paragraph 18.

18   19. Larian admits that MGA is a toy manufacturer, that MGA began

19 as a consumer electronics business and expanded into the toy business with licenses

20 to sell handheld electronic games, and later expanded its business by launching the

21 Bratz fashion doll line, and denies the remaining allegations set forth in paragraph

22 19.

23   20. Larian denies the allegations set forth in paragraph 20.

24   21. Larian admits that Carter Bryant is a former employee of Mattel,

25 and states he is without sufficient knowledge to admit or deny the remaining

26 allegations set forth in paragraph 21, and on that basis, denies the remaining

27 allegations set forth in paragraph 21.

28

2

Exhibit 104
Page 1609

22. Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 22, and on that basis, denies the allegations set forth in paragraph 22.

23. Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 23, and on that basis, denies the allegations set forth in paragraph 23.

24. Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 24, and on that basis, denies the allegations set forth in paragraph 24.

25. Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 25, and on that basis, denies the allegations set forth in paragraph 25.

26. Larian denies the allegations set forth in paragraph 26.

27. Larian denies the allegations set forth in paragraph 27.

28. Larian denies the allegations set forth in paragraph 28.

29. Larian denies the allegations set forth in paragraph 29.

30. Larian admits that after MGA made the decision to proceed with the manufacture of the Bratz dolls, MGA employees communicated with employees of MGA Entertainment (HK) Limited on subjects including the manufacturing of Bratz, and denies the remaining allegations set forth in the first sentence of paragraph 30. Larian admits the second sentence of paragraph 30.

31. Larian admits that samples of the four original Bratz dolls were shown at the Hong Kong Toy Fair in January 2001, and denies the remaining allegations set forth in paragraph 31.

32. Larian admits that MGA and its subsidiaries have distributed and sold Bratz and Bratz-related products in many countries throughout the world, that MGA and its subsidiaries have licensed Bratz to third parties, that MGA has derived

3

Exhibit 104
Page 1610

1  annual revenues from its sales and licenses of Bratz in excess of $500 million, that

2  MGA and its subsidiaries continue to market, sell and license Bratz and intend to

3  continue to do so, and denies the remaining allegations set forth in paragraph 32.

4      33.   Larian denies the allegations set forth in paragraph 33.

5      34.   Larian denies the allegations set forth in paragraph 34.

6      35.   Larian denies the allegations set forth in paragraph 35.

7      36.   Larian admits that Bryant had an agreement with MGA, states

8  that the terms of the agreement speak for themselves, and denies the remaining

9  allegations set forth in paragraph 36.

10      37.   Larian admits that in or about late 2003 or early 2004, MGA

11  decided to form a new corporation, MGAE de Mexico, S.R.L. de C.V., to conduct

12  business in Mexico, admits that MGAE de Mexico hired three employees of Mattel's

13  Mexican subsidiary, and denies the remaining allegations set forth in paragraph 37.

14      38.   Larian admits that Carlos Gustavo Machado Gomez was a

15  Marketing Manager, Boys Division, for Mattel Mexico, admits that Machado was

16  employed at Mattel Mexico from April 1997 until April 19, 2004, admits that

17  Machado had access to some nonpublic business information of Mattel Mexico, and

18  states that he is without sufficient knowledge to admit or deny the remaining

19  allegations set forth in paragraph 38, and on that basis, denies the remaining

20  allegations set forth in paragraph 38.

21      39.   Larian admits that Mariana Trueba Almada was a Marketing

22  Manager, Girls Division, for Mattel Mexico, admits that Trueba had access to some

23  nonpublic business information of Mattel Mexico, and states that he is without

24  sufficient knowledge to admit or deny the remaining allegations set forth in

25  paragraph 39, and on that basis, denies the remaining allegations set forth in

26  paragraph 39.

27

28

4

ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED
ANSWER AND COUNTERCLAIMS

Exhibit 104
Page 1611

40.     Larian admits that Pablo Vargas San Jose was a Trade Marketing Manager for Mattel Mexico, admits that Vargas was employed at Mattel Mexico from March 2001 until April 19, 2004, admits that Vargas had access to some nonpublic business information of Mattel Mexico, and states that he is without sufficient knowledge to admit or deny the remaining allegations set forth in paragraph 40, and on that basis, denies the remaining allegations set forth in paragraph 40.

41.     Larian admits that in or about early 2004, Machado, Trueba and Vargas discussed leaving Mattel Mexico, admits that Machado, Trueba and Vargas resigned from Mattel Mexico on April 19, 2004, admits that they did not identify their new employer to Mattel Mexico, admits that Machado, Trueba and Vargas were offered and accepted employment with MGAE de Mexico, and denies the remaining allegations set forth in paragraph 41.

42.     Larian admits that MGA personnel communicated by telephone with Machado and Vargas prior to their Mattel resignations, admits that MGA personnel, including Larian, communicated by e-mail with Machado and Vargas concerning terms of employment through an America Online e-mail account with the address <plot04@aol.com>, and denies the remaining allegations set forth in paragraph 42.

43.     Larian admits that in or about March 2004, Machado, Trueba, and Vargas made plans to travel from Mexico to Los Angeles in April 2004, admits that in or about March 2004, Machado, Trueba and Vargas discussed with MGA personnel, including Larian, employment at MGAE de Mexico, states that the quoted <plot04@aol.com> e-mails speak for themselves, and denies the remaining allegations set forth in paragraph 43.

Exhibit 104
Page 1612

44.     Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 44, and on that basis, denies the allegations set forth in paragraph 44.

45.     Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 45, and on that basis, denies the allegations set forth in paragraph 45.

46.     Larian is without sufficient knowledge to admit or deny the allegations set forth in paragraph 46, and on that basis, denies the allegations set forth in paragraph 46.

47.     Larian is without sufficient knowledge to admit or deny the allegation set forth in the third sentence of paragraph 47, and on that basis, denies these allegations, and denies the remaining allegations set forth in paragraph 47.

48.     Larian denies the allegations set forth in paragraph 48.

49.     Larian denies the allegations set forth in paragraph 49.

50.     Larian is without sufficient knowledge to admit or deny the allegation that MGA publicized a claim that, in 2005, it had increased its Mexican market share by 90% over the prior year, and on that basis, denies this allegation, and denies the remaining allegations set forth in paragraph 50.

51.     Larian denies the allegations set forth in paragraph 51.

52.     Larian denies the allegations set forth in paragraph 52.

53.     Larian admits that on October 27, 2005, Mexican authorities searched MGAE de Mexico and seized certain documents, and states that he is without sufficient knowledge to admit or deny the remaining allegations set forth in paragraph 53, and on that basis, denies the remaining allegations set forth in paragraph 53.

54.     Larian admits that Machado was transferred from MGAE de Mexico to MGA's office in Van Nuys, California, admits that Machado resides in

6

Exhibit 104
Page 1613

1 the County of Los Angeles, and denies the remaining allegations set forth in
2 paragraph 54.

3        55.   Larian admits the allegations set forth in the first sentence of
4 paragraph 55. Larian admits that Tyco Toys hired Brawer on April 22, 1996, and
5 states that he is without sufficient knowledge to admit or deny the remaining
6 allegations set forth in the second sentence of paragraph 55, and on that basis, denies
7 the remaining allegations set forth in the second sentence of paragraph 55. Larian
8 admits the allegations set forth in third sentence of paragraph 55. Larian admits that
9 on April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel,
10 New Jersey, and states that the remaining allegations in the fourth sentence of
11 paragraph 55 are a statement of Mattel's legal position, to which no response is
12 necessary. To the extent a response is required, Larian denies the remaining
13 allegations set forth in paragraph 55.

14        56.   Larian is without sufficient knowledge to admit or deny the
15 allegations set forth in paragraph 56, and on that basis, denies the allegations set
16 forth in paragraph 56. The last sentence of paragraph 56 is a statement of Mattel's
17 legal position, to which no response is necessary. To the extent a response is
18 required, Larian denies the remaining allegations set forth in paragraph 56.

19        57.   Larian admits that by 2003, Brawer had advanced within Mattel
20 to a Senior Vice President position over customer marketing, and states that the
21 remaining allegations in the first sentence of paragraph 57 are a statement of Mattel's
22 legal position, to which no response is necessary. To the extent a response is
23 required, Larian denies the remaining allegations set forth in the first sentence of
24 paragraph 57. Larian admits that in his executive position, Brawer was provided
25 access to certain nonpublic Mattel information.

26        58.   Larian admits the allegations set forth in the first sentence of
27 paragraph 58. Larian denies the allegations set forth in the second sentence of

28

7

Exhibit 104
Page 1614

1  paragraph 58.  Larian is without sufficient knowledge to admit or deny the remaining

2  allegations set forth in paragraph 58, and on that basis, denies the remaining

3  allegations set forth in paragraph 58.

4        59.  Larian is without sufficient knowledge to admit or deny the

5  allegations set forth in paragraph 59, and on that basis, denies the allegations set

6  forth in paragraph 59.

7        60.  Larian admits that in April 2004, Mattel made Brawer a Senior

8  Vice President/General Manager, and states that he is without sufficient knowledge

9  to admit or deny the remaining allegations set forth in paragraph 60, and on that

10  basis, denies the remaining allegations set forth in paragraph 60.

11        61.  Larian admits that in May 2004, Brawer began performing

12  General Manager duties, working with one of Mattel's major retail customer

13  accounts, and states that he is without sufficient knowledge to admit or deny the

14  remaining allegations set forth in paragraph 61, and on that basis, denies the

15  remaining allegations set forth in paragraph 61.

16        62.  Larian admits the allegations set forth in the first sentence of

17  paragraph 62.  Larian admits that as Brawer left, he carried a large cardboard box,

18  and denies the remaining allegations set forth in the second sentence of paragraph

19  62.  Larian states that he is without sufficient knowledge to admit or deny the

20  remaining allegations set forth in paragraph 62, and on that basis, denies the

21  remaining allegations set forth in paragraph 62.

22        63.  Larian admits the allegations set forth in paragraph 63.

23        64.  Larian admits that on September 20, 2004, Mattel hand-delivered

24  a letter to Brawer, states that the contents of the letter speak for themselves, and

25  denies the remaining allegations set forth in paragraph 64.

26        65.  Larian admits that at his exit interview on September 29, 2004,

27  Brawer was given a copy of an agreement with Tyco that he had signed on April 22,

28

<div align="center">8</div>

Exhibit 104
Page 1615

1   1996, and a copy of Mattel's Code of Conduct, admits that Brawer stated that he had

2   not signed the Code of Conduct, and denies the remaining allegations set forth in

3   paragraph 65.

4        66.   Larian admits that on October 1, 2004, Brawer's last day of

5   employment with Mattel, Mattel delivered a letter to Brawer, states that the contents

6   of the letter speak for themselves, and denies the remaining allegations set forth in

7   paragraph 66.

8        67.   Larian admits that Brawer became its Executive Vice President of

9   Sales and Marketing, admits that Brawer was responsible for sales worldwide,

10  admits that Brawer had and continues to have responsibility for MGA's accounts

11  with some of the same retailers that Brawer worked with while at Mattel, and denies

12  the remaining allegations set forth in paragraph 67.

13       68.   Larian admits that Brawer stated during his exit interview that he

14  had returned all confidential proprietary information to Mattel, states that he did not

15  provide copies of information from his personal contacts file, and denies the

16  remaining allegations set forth in paragraph 68.

17       69.   Larian admits that since leaving Mattel, Brawer has had contacts

18  with certain Mattel employees, both by telephone and electronic mail, and denies the

19  remaining allegations set forth in paragraph 69.

20       70.   Larian denies the allegations set forth in paragraph 70.

21       71.   Larian is without sufficient knowledge to admit or deny the

22  allegations set forth in paragraph 71, and on that basis, denies the allegations set

23  forth in paragraph 71.

24       72.   Larian is without sufficient knowledge to admit or deny the

25  allegations set forth in paragraph 72, and on that basis, denies the allegations set

26  forth in paragraph 72.

27

28

Exhibit 104
Page 1616

1   73. Larian admits that on September 26, 2005, Brisbois resigned from

2 Mattel Canada, states that she took a position as Vice President of National Accounts

3 at MGAE Canada, and denies the remaining allegations set forth in the first sentence

4 of paragraph 73. Larian is without sufficient knowledge to admit or deny the

5 remaining allegations set forth in paragraph 73, and on that basis, denies the

6 remaining allegations set forth in paragraph 73.

7   74. Larian admits that Brisbois spoke with him by telephone on or

8 about the evening of September 22, 2005, denies that Brisbois copied approximately

9 45 Mattel documents onto a USB or thumb drive on that same date, denies that

10 Brisbois concealed the thumb drive the last time she left Mattel Canada's office, and

11 states that he is without sufficient knowledge to admit or deny the remaining

12 allegations set forth in paragraph 74, and on that basis, denies the remaining

13 allegations set forth in paragraph 74.

14   75. Larian is without sufficient knowledge to admit or deny the

15 allegations set forth in paragraph 75, and on that basis, denies the allegations set

16 forth in paragraph 75.

17   76. Larian admits that Brisbois traveled several times to MGA's

18 offices in Van Nuys, California and met with Larian and Brawer, that MGA issued a

19 press release, states that the press release speaks for itself, and states that they are

20 without sufficient knowledge to admit or deny the remaining allegations set forth in

21 paragraph 76 and, on that basis, deny the remaining allegations set forth in paragraph

22 76.

23   77. Larian admits that MGA has hired at least 25 employees directly

24 from Mattel's United States operations in the past few years, and denies the

25 remaining allegations set forth in paragraph 77.

26   78. Larian denies the allegations set forth in the first sentence of

27 paragraph 78. Larian admits that he has sent email messages to a "Bratz News"

28

ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED
ANSWER AND COUNTERCLAIMS

Exhibit 104
Page 1617

1 | distribution list, admits that the recipients of e-mail messages sent to the "Bratz
2 | News" distribution list includes members of the media as well as representatives of
3 | customers of both MGA and Mattel, and denies the remaining allegations set forth in
4 | paragraph 78.

5 |        79.    Larian admits that on May 12, 2006, he sent an email message to
6 | the "Bratz News" distribution list that included a reference to the new My Scene
7 | product with real gems, and states that he is without sufficient knowledge to admit or
8 | deny the remaining allegations set forth in paragraph 79, and on that basis, denies the
9 | remaining allegations set forth in paragraph 79.

10 |        80.    Larian admits that Larian told one retailer that such retailer was
11 | the only retailer with plans to purchase MY SCENE BLING BLING with real gems,
12 | at a time when Larian had a good faith belief that such retailer was the only retailer
13 | with plans to purchase MY SCENE BLING BLING with real gems, and denies the
14 | remaining allegations set forth in paragraph 80.

15 |        81.    Larian denies the allegation set forth in paragraph 81.

16 |        82.    Larian repeats his responses contained in paragraphs 1 through 81
17 | of this Answer and incorporates them by reference as though fully and completely
18 | set forth herein.

19 |        83.    Larian denies the allegations set forth in paragraph 83.
20 |        84.    Larian denies the allegations set forth in paragraph 84.
21 |        85.    Larian denies the allegations set forth in paragraph 85.
22 |        86.    Larian denies the allegations set forth in paragraph 86.
23 |        87.    Larian denies the allegations set forth in paragraph 87.

24 |        88.    Larian repeats his responses contained in paragraphs 1 through 87
25 | of this Answer and incorporates them by reference as though fully and completely
26 | set forth herein.

27 |        89.    Larian denies the allegations set forth in paragraph 89.

28 |

90.    Larian denies the allegations set forth in paragraph 90.

91.    Larian denies the allegations set forth in paragraph 91.

92.    Larian denies the allegations set forth in paragraph 92.

93.    Larian denies the allegations set forth in paragraph 93.

94.    Larian denies the allegations set forth in paragraph 94.

95.    Larian denies the allegations set forth in paragraph 95.

96.    Larian denies the allegations set forth in paragraph 96.

97.    Larian denies the allegations set forth in paragraph 97.

98.    Larian repeats his responses contained in paragraphs 1 through 97 of this Answer and incorporates them by reference as though fully and completely set forth herein.

99.    Larian denies the allegations set forth in paragraph 99.

100.    Larian denies the allegations set forth in paragraph 100.

101.    Larian denies the allegations set forth in paragraph 101.

102.    Larian denies the allegations set forth in paragraph 102.

103.    Larian denies the allegations set forth in paragraph 103.

104.    Larian denies the allegations set forth in paragraph 104.

105.    Larian denies the allegations set forth in paragraph 105.

106.    Larian repeats his responses contained in paragraphs 1 through 105 of this Answer and incorporates them by reference as though fully and completely set forth herein.

107.    Larian denies the allegations set forth in paragraph 107.

108.    Larian denies the allegations set forth in paragraph 108.

109.    Larian denies the allegations set forth in paragraph 109.

110.    Larian denies the allegations set forth in paragraph 110.

111.    Larian denies the allegations set forth in paragraph 111.

112.    Larian denies the allegations set forth in paragraph 112.

12

Exhibit 104
Page 1619

113.   Larian denies the allegations set forth in paragraph 113.

114.   Larian denies the allegations set forth in paragraph 114.

115.   Larian denies the allegations set forth in paragraph 115.

116.   Larian repeats his responses contained in paragraphs 1 through 115 of this Answer and incorporates them by reference as though fully and completely set forth herein.

117.   Larian denies the remaining allegations set forth in paragraph 117.

118.   Larian denies the allegations set forth in paragraph 118.

119.   Larian denies the allegations set forth in paragraph 119.

120.   Larian denies the allegations set forth in paragraph 120.

121.   Larian denies the allegations set forth in paragraph 121.

122.   Larian repeats his responses contained in paragraphs 1 through 121 of this Answer and incorporates them by reference as though fully and completely set forth herein.

123.   Larian denies the allegations set forth in paragraph 123.

124.   Larian denies the allegations set forth in paragraph 124.

125.   Larian denies the allegations set forth in paragraph 125.

126.   Larian denies the allegations set forth in paragraph 126.

127.   Larian denies the allegations set forth in paragraph 127.

128.   Larian denies the allegations set forth in paragraph 128.

129.   Larian repeats his responses contained in paragraphs 1 through 128 of this Answer and incorporates them by reference as though fully and completely set forth herein.

130.   The first and fifth sentences of paragraph 130 are statements of Mattel's legal position, to which no response is necessary.  To the extent a response is required, Larian denies the allegations set forth in the first and fifth sentences of

13

Exhibit 104
Page 1620

1  paragraph 130.  Larian is without sufficient knowledge to admit or deny the

2  remaining allegations set forth in paragraph 130, and on that basis, denies the

3  remaining allegations set forth in  paragraph 130.

4          131.   Larian denies the allegations set forth in paragraph 131.

5          132.   Larian denies the allegations set forth in paragraph 132.

6          133.   Larian denies the allegations set forth in paragraph 133.

7          134.   Larian denies the allegations set forth in paragraph 134.

8          135.   Larian denies the allegations set forth in paragraph 135.

9          136.   Larian repeats his responses contained in paragraphs 1 through

10  135 of this Answer and incorporates them by reference as though fully and

11  completely set forth herein.

12          137.   Larian denies the allegations set forth in paragraph 137.

13          138.   Larian denies the allegations set forth in paragraph 138.

14          139.   Larian denies the allegations set forth in paragraph 139.

15          140.   Larian denies the allegations set forth in paragraph 140.

16          141.   Larian denies the allegations set forth in paragraph 141.

17          142.   Larian repeats his responses contained in paragraphs 1 through

18  141 of this Answer and incorporates them by reference as though fully and

19  completely set forth herein.

20          143.   Paragraph 143 is a statement of Mattel's legal position, to which

21  no response is necessary.  To the extent a response is required, Larian denies the

22  allegations set forth in the paragraph 143.

23          144.   Larian denies the allegations set forth in paragraph 144.

24          145.   Larian denies the allegations set forth in paragraph 145.

25          146.   Larian denies the allegations set forth in paragraph 146.

26          147.   Larian denies the allegations set forth in paragraph 147.

27          148.   Larian denies the allegations set forth in paragraph 148.

28

<center>14</center>

<center>ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS</center>

Exhibit 104
Page 1621

1     149.   Larian repeats his responses contained in paragraphs 1 through

2   148 of this Answer and incorporates them by reference as though fully and

3   completely set forth herein.

4     150.   Larian denies the allegations set forth in paragraph 150.

5     151.   Larian denies the allegations set forth in paragraph 151.

6     152.   Larian denies the allegations set forth in paragraph 152.

7     153.   Larian denies the allegations set forth in paragraph 153.

8     154.   Larian denies the allegations set forth in paragraph 154.

9     155.   Larian repeats his responses contained in paragraphs 1 through

10   154 of this Answer and incorporates them by reference as though fully and

11   completely set forth herein.

12     156.   Larian denies the allegations set forth in paragraph 156.

13     157.   Larian denies the allegations set forth in paragraph 157.

14     158.   Larian denies the allegations set forth in paragraph 158.

15     159.   Larian denies the allegations set forth in paragraph 159.

16     160.   Larian denies the allegations set forth in paragraph 160.

17     161.   Larian denies the allegations set forth in paragraph 161.

18     162.   Larian denies the allegations set forth in paragraph 162.

19     163.   Larian repeats his responses contained in paragraphs 1 through

20   162 of this Answer and incorporates them by reference as though fully and

21   completely set forth herein.

22     164.   Larian denies the allegations set forth in paragraph 164.

23     165.   Larian denies the allegations set forth in paragraph 165.

24     166.   Larian denies the allegations set forth in paragraph 166.

25     167.   Larian repeats his responses contained in paragraphs 1 through

26   166 f this Answer and incorporates them by reference as though fully and completely

27   set forth herein.

28

15

Exhibit 104
Page 1622

1    168.   Larian denies the allegations set forth in paragraph 168.

2    169.   Paragraph 169 is a statement of Mattel's legal position, to which

3 no response is necessary.  To the extent a response is required, Larian denies the

4 allegations set forth in the paragraph 169.

5    170.   Paragraph 170 is a statement of Mattel's legal position, to which

6 no response is necessary.  To the extent a response is required, Larian denies the

7 allegations set forth in the paragraph 170.

8                          **AFFIRMATIVE DEFENSES**

9    Without admitting any wrongful conduct on the part of Larian or any Counter-

10 Defendant, and without admitting that Mattel suffered any loss, damage, or injury,

11 Larian alleges the following affirmative defenses to the Counterclaims.  By

12 designating the following as affirmative defenses, Larian does not in any way waive

13 or limit any defenses which are or may be raised by his denials, allegations, and

14 averments set forth herein.  Larian also does not, by alleging any affirmative defense,

15 admit that Mattel does not have the burden of proof for any or all facts underlying

16 any of those defenses.  These defenses are pled in the alternative, and are raised to

17 preserve the rights of Larian to assert such defenses, and are without prejudice to his

18 ability to raise other and further defenses.

19                       **FIRST AFFIRMATIVE DEFENSE**

20                         (Failure to State a Claim)

21    Mattel's counterclaims fail to state a claim against Larian upon which relief

22 can be granted.

23                     **SECOND AFFIRMATIVE DEFENSE**

24                     (Unclean Hands/*in Pari Delicto*)

25    Mattel's counterclaims are barred in whole or in part by Mattel's unclean

26 hands and wrongful acts.  This affirmative defense is based, in part, on Mattel's

27 efforts to undermine MGA's business and to "kill" Bratz at any cost which include,

28

16

1  but are not limited to, Mattel's efforts to infringe and dilute MGA's trade dress, copy

2  MGA's products, packaging, themes, and advertising (including for Mattel products

3  My Scene, Diva Starz, Wee 3 Friends, Acceleracers, Polly Pocket, and Little

4  Mommy products, to name a few), and engage in other acts of unfair competition

5  against MGA as alleged in MGA's complaint against Mattel; Mattel's efforts to

6  create negative publicity or press about MGA, MGA products, Bryant, Larian, or

7  MGA employees; Mattel's efforts to fund or commission market research or studies

8  that portray Bratz or MGA products negatively; Mattel's efforts to interfere with

9  MGA's acquisition of or investment in Zapf Creation AG; Mattel's efforts to include

10  negative references to MGA or Bratz on Mattel's "We Believe in Girls" website;

11  Mattel's efforts or intent to interfere with business dealings or contractual relations

12  between MGA and Smoby Group; Mattel's influencing Nickelodeon to reject MGA

13  advertisements or to limit time slots for advertisements; assisting parties in lawsuits

14  against MGA; Mattel's monitoring, "spying on" or gaining knowledge of MGA's

15  trade secrets, non-public information, non-public activities, unreleased products, and

16  product development; gaining access, or attempts to gain access, to MGA

17  showrooms, Plan-o-Grams, merchandising displays, Toy Fair displays on false

18  pretenses; Mattel's wrongfully obtaining MGA's costs and sales information through

19  Mattel-employed category managers at retailers; Mattel's inducing non-party

20  customers to breach confidentiality agreements with MGA and divulge non-public

21  information about MGA's unreleased products; Mattel's covertly investigating MGA,

22  its officers and employees, and their family members; Mattel's contacting persons

23  under false pretense in order to interrogate them about Bratz and this litigation;

24  Mattel's coercing its employees to accept restrictive covenants (right before a

25  massive layoff) and non-compete clauses and other efforts to prevent prospective

26  MGA employees from accepting offers of employment; Mattel's delay in suing

27  Carter Bryant because, *inter alia*, Mattel wanted Bryant to testify in an unrelated

28

17

Exhibit 104
Page 1624

1  Mattel case; Mattel's falsely inflating its Barbie sales figures in an effort to mislead

2  the public and retailers; and Mattel's taking all measures to conceal its bad acts,

3  including the willful non-retention and destruction of documents.  Additionally,

4  Mattel believed from the time that Carter Bryant left Mattel's employ that he was

5  going to perform work for a Mattel competitor.  Mattel began investigating Bryant

6  and MGA, including Bryant's role in the creation and development of Bratz, at least

7  as early as March 2002.  Nonetheless, Mattel waited years to bring suit, all the while

8  allowing MGA to spend years developing its business and invest tens of millions of

9  dollars developing the Bratz products and building the Bratz brand.  These averments

10  are made on information and belief except where Larian has knowledge thereof.

11  ### THIRD AFFIRMATIVE DEFENSE

12  ### (Laches)

13  Mattel's counterclaims are barred by the equitable doctrine of laches because,

14  among other things, Mattel believed from the time that Carter Bryant left Mattel's

15  employ that he was going to perform work for a Mattel competitor.  Mattel began

16  investigating Bryant and MGA, including Bryant's role in the creation and

17  development of Bratz, at least as early as March 2002 and thereafter continued its

18  investigation into Bryant's role in the creation and development of Bratz, as well as

19  his work with MGA, in August 2002 after Mattel's CEO, Robert Eckert, received an

20  "anonymous letter" that claimed that Bryant stole the idea for Bratz from Mattel and

21  sold it to MGA.  Nonetheless, Mattel waited years to bring suit, all the while

22  allowing MGA to spend years developing its business and invest tens of millions of

23  dollars developing the Bratz products and building the Bratz brand.

24

25

26

27

28

18

Exhibit 104
Page 1625

### FOURTH AFFIRMATIVE DEFENSE

(Statute of Limitations)

Mattel's counterclaims are barred by the applicable statutes of limitations, including but not limited to, 18 U.S.C. § 1961 *et seq.*, 17 U.S.C. § 507(b), and Code of Civil Procedure §§ 337, 339, 343 and 338(c).

### FIFTH AFFIRMATIVE DEFENSE

(*Bona Fide* Purchaser for Value)

Mattel cannot maintain its counterclaims against Larian because MGA paid valuable consideration for Bryant's assignment of his rights in the original Bratz drawings to MGA, and Larian acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA was valid and permissible.

### SIXTH AFFIRMATIVE DEFENSE

(17 U.S.C. § 205(d))

Mattel cannot maintain its counterclaims against Larian because, among other things, Larian acted with a good faith belief that Bryant owned the rights to his original Bratz drawings and that his assignment of such rights to MGA was valid and permissible.

### SEVENTH AFFIRMATIVE DEFENSE

(Information Readily Ascertainable)

Larian cannot be liable, either on his own account or by association with other defendants, for misappropriation of information that was readily ascertainable by proper means at the time of the alleged acquisition or use.  Such information includes, but is not limited to, the identity of suppliers, manufacturers, distributors and retailers; contact information for the same; and sales, marketing and media data.

Exhibit 104
Page 1626

## EIGHTH AFFIRMATIVE DEFENSE

### (Acts or Omissions of Others)

Mattel's damages, if any, were not caused by Larian and are not attributable to any acts or omissions of Larian.

## NINTH AFFIRMATIVE DEFENSE

### (Estoppel)

Mattel's counterclaims are barred in whole or in part by the equitable doctrine of estoppel because, among other things, Mattel believed from the time that Carter Bryant left Mattel's employ that he was going to perform work for a Mattel competitor.  Mattel began investigating Bryant and MGA, including Bryant's role in the creation and development of Bratz, at least as early as March 2002.  Nonetheless, Mattel waited years to bring suit, all the while allowing MGA to spend years developing its business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand.

## TENTH AFFIRMATIVE DEFENSE

### (Acquiescence)

Mattel's counterclaims are barred in whole or in part by acquiescence because, among other things, Mattel believed from the time that Carter Bryant left Mattel's employ that he was going to perform work for a Mattel competitor.  Mattel began investigating Bryant and MGA, including Bryant's role in the creation and development of Bratz, at least as early as March 2002.  Nonetheless, Mattel waited years to bring suit, all the while allowing MGA to spend years developing its business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand.  Additionally, Mattel tolerated and condoned conduct by other employees similar to the alleged conduct by Bryant and others on which Mattel bases its claims.

ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS

Exhibit 104
Page 1627

## ELEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Larian denies that Mattel suffered any damages, but even if it did, Mattel failed to take reasonable steps to mitigate those purported damages.

## TWELFTH AFFIRMATIVE DEFENSE

### (No Statutory Damages or Attorneys' Fees)

Mattel is barred from recovering statutory damages and/or attorneys' fees because it failed to register the copyrights that are purportedly at issue within the time required by 17 U.S.C. § 412.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Waiver)

Mattel's counterclaims are barred in whole or in part by waiver because, among other things, Mattel believed from the time that Carter Bryant left Mattel's employ that he was going to perform work for a Mattel competitor. Mattel began investigating Bryant and MGA, including Bryant's role in the creation and development of Bratz, at least as early as March 2002. Nonetheless, Mattel waited years to bring suit, all the while allowing MGA to spend years developing its business and invest tens of millions of dollars developing the Bratz products and building the Bratz brand.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Abandonment)

Mattel has abandoned any interest it may have had in the alleged copyrighted works.

21

Exhibit 104
Page 1628

## FIFTEENTH AFFIRMATIVE DEFENSE

### (*De Minimus* Use)

Larian denies that Mattel owns any copyright interest in the alleged works, but even if Mattel could craft a claim that the Bratz dolls incorporate an aspect of a Mattel copyrighted work, such use would be *de minimus* and non-infringing.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Joint Authorship)

Larian denies that Mattel owns any copyright interest in the alleged works, but even if it did, any liability would be eliminated or greatly diminished by the doctrine of joint authorship.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Competition Privilege/Justification)

Mattel's counterclaims are barred in whole or in part on the grounds that the acts of the Larian were lawful competition or justified.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Good Faith)

Mattel's counterclaims are barred in whole or in part because Larian acted in good faith.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Lack of Authority)

Mattel's counterclaims are barred in whole or in part on the grounds that to the extent any person committed an unlawful or tortious act, the person lacked authority to commit such act on behalf of the Larian.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Mattel's counterclaims are barred in whole or in part by its lack of standing.

Exhibit 104
Page 1629

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Joinder in Defenses of Co-Defendants)

Larian hereby adopts and incorporates by reference any and all other affirmative defenses that have been or will be asserted by any other defendant (including Bryant) in this litigation to the extent that defendants may share in such affirmative defenses.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Undiscovered Defenses)

Larian has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available.  Larian reserves the right to assert any further or additional defenses upon receiving more complete information regarding the matters alleged in the Counterclaims, through discovery or otherwise.

WHEREFORE, Larian prays for relief as follows:

a.    that the Counterclaims be dismissed with prejudice;

b.    that judgment be entered in favor of Larian and against counterclaimant;

c.    that Larian recover his costs and attorneys' fees; and

d.    that the Court award such other and further relief as is just and proper.

DATED: November 8, 2007.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____
Thomas J. Nolan
Attorneys for Counter-Defendants, MGA ENTERTAINMENT, INC., ISAAC LARIAN, MGA ENTERTAINMENT (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.

23

ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS

Exhibit 104
Page 1630

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 300 South Grand Avenue, 34th Floor, Los Angeles, CA 90071.

On **November 8, 2007**, I served the foregoing documents described as:

**ISAAC LARIAN'S AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS**

on the interested parties in this action addressed as follows:

### SEE ATTACHED SERVICE LIST

☒ **(BY MAIL)** I am readily familiar with the firm's practice for the collection and processing of correspondence for mailing with the United States Postal Service and the fact that the correspondence would be deposited with the United States Postal Service that same day in the ordinary course of business; on this date, the above-referenced correspondence was placed for deposit at Los Angeles, California and placed for collection and mailing following ordinary business practices.

☒ **(VIA FACSIMILE)** By transmitting the document listed above to the fax numbers on the attached service list.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the above is true and correct.

Executed on November 8, 2007 at Los Angeles, California.

Nandi Berglund
PRINT NAME                                    SIGNATURE

1

Exhibit 104
Page 1631

John B. Quinn, Esq.
Michael T. Zeller, Esq.
Jon D. Corey, Esq.
Timothy L. Alger, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000
(213) 443-3100 (Fax)

*Attorneys for Mattel, Inc.*

OVERLAND BORENSTEIN
SCHEPER & KIM
MARK E. OVERLAND
ALEXANDER H. COTE
DAVID C. SCHEPER
300 South Grand Avenue, Suite 2750
Los Angeles, CA  90071
(213) 613-4655
(213) 613-4656 (Fax)
*Attorneys for Carlos Gustavo Machado
Gomez*

John W. Keker, Esq.
Michael H. Page, Esq.
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415)391-5400
(415) 397-7188 (Fax)

*Attorneys for Carter Bryant*

2

Exhibit 104
Page 1632

# EXHIBIT 105

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                              Date: January 7, 2009

Title:    MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
========================================================================
PRESENT:   HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

      Jim Holmes                                  None Present
      Courtroom Deputy                            Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:         ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                              None Present

PROCEEDINGS:    **ORDER MODIFYING STAY OF PERMANENT INJUNCTION**

**ORDER APPOINTING FORENSIC AUDITOR**

      After an initial hearing on December 30, 2008, and a sealed hearing on January 5, 2009, and after consideration of the parties' papers relating to the MGA parties' motion for stay pending appeal (which specific relief the Court denied for the reasons stated on the record), and after consideration of the parties' papers relating to Mattel's ex parte application to appoint a receiver, the Court issues the following Order modifying the stay set forth in the Court's December 3, 2008, Order, and appointing a forensic auditor.

**MODIFYING STAY OF PERMANENT INJUNCTION**

      Notwithstanding any previous Order of the Court, the December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction (docket #4439), shall remain **STAYED**, ineffective and non-final, until further order of the Court. Specifically, retailers and distributors will be permitted to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from MGA and MGA licensees, up to and including December 31, 2009.

      In the event that the Court awards control over the rights to the Bratz products referenced in the Court's December 3, 2008, Order and the January 7, 2009 Stipulation and Order (regarding

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                        1

Exhibit 105
Page 1633

Case 2:04-cv-09049-DOC-RNB   Document 4771-18   Filed 02/04/09   Page 117 of 125   Page
ID #:148670
Case 2:04-cv-09049-SGL-RNB     Document 4657     Filed 01/ᴜ//2009     Page 2 of 10

the Spring and Fall 2009 lines) to a Court-appointed receiver or to Mattel, Inc., that award will be subject to a requirement that retailers and distributors be permitted to purchase the Spring and Fall 2009 lines up to and including December 31, 2009.

## APPOINTMENT OF FORENSIC AUDITOR

As discussed on the record, the Court **HOLDS IN ABEYANCE** Mattel's ex parte application for appointment of a receiver pending a forensic audit of MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong.

For good cause shown, the Court hereby **APPOINTS** Ronald L. Durkin to serve as the Court's forensic auditor (hereinafter referred to as "the Auditor"). Mr. Durkin's qualifications appear in an attachment to this Order. The Court has provided the Auditor with the parties' attorneys' contact information. The Auditor shall direct his initial communications to counsel.

Defendants MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong, shall provide the Auditor with access to any and all MGA records, regardless of the medium or media of the maintenance of those records, **including but not limited to the "Document/Information Request List" attached to this Order,** that the Auditor deems necessary to enable him to provide the Court with a report, in camera, regarding MGA's finances sufficient to enable the Court to determine whether or not appointment of a receiver is warranted. The audit shall extend to any and all related entities as the Auditor deems necessary. Defendants shall also make available for interview individuals identified to them by the Auditor. Defendants shall make its computer systems, physical premises, and offices, available to the Auditor upon his reasonable request during normal business hours. Defendants shall permit the Auditor's reasonable use of its office machines, such as copiers and fax machines, as may be necessary to complete the audit.

The Auditor shall have the authority to seek the services of fellow professionals (as well as para-professionals and support staff) necessary to accomplish the Court-appointed audit. The provisions of this Order extend to the Auditor's delegatees as he so directs. The Auditor and his delegatees shall be compensated at their reasonable customary hourly rates.

The expense of the forensic audit shall be borne, in the first instance, by Mattel. After the Court considers the Auditor's report[s], the Court will consider whether the audit expenses should be shared with, or shifted completely to, defendants, based on the equities. The Auditor and his team shall submit periodic billing statements to Mattel to an address specified by Mattel's counsel.

All parties (and individuals and entities under their control) shall cooperate with the Auditor so that he may report to the Court in an expeditious manner.

**IT IS SO ORDERED.**

MINUTES FORM 90                                    Initials of Deputy Clerk __jh_____
CIVIL -- GEN                        2

Exhibit 105
Page 1634

**FORENSIC AUDITOR**
**DOCUMENT/INFORMATION REQUEST LIST**
**January 7, 2009**

1.    Audited financial statements for the last three years.  If audited financial statements are not available, then the most current draft of financial statements for the last three years.

2.    Quarterly financial statements for the last three years.

3.    Detailed electronic monthly general ledgers and trial balances for the last three years. If electronic files are not available, then please produce in hard copies.

4.    Detailed electronic revenue or sales subsidiary ledgers for the last three years.  If electronic files are not available, then please produce the request in hard copies.

5.    Detailed electronic receipts or cash subsidiary ledgers for the last three years.  If electronic files are not available, then please produce in hard copies.

6.    Detailed electronic accounts payables and disbursements subsidiary ledgers for the last three years.  Details should include, but should not be limited to, vendor/payee ID, vendor/payee name, check/payment number, payment date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), payment amount, currency indicator (if other than US dollars), foreign exchange rate (if other than US dollars), invoice number, invoice date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), invoice amount, comment or description, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

7.    Detailed electronic vendor master files of all active and inactive vendors for the last three years.  Details should include, but should not be limited to, vendor ID, vendor name, status (active/inactive), vendor address (including City, State, Zip, Country), date created, created by user ID.  If electronic files are not available, then please produce in hard copies.

8.    Detailed electronic payroll files for the last three years.  Details should include, but not be limited to, employee ID, employee name, payment date, payment number, deductions (e.g. tax, contributions, etc.), gross payment amount, net payment amount, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

9.    Any and all records that substantiate transfers of assets to other entities, individuals, and/or parties, within the US and outside of the US.

10.   Copies of all bank statements, canceled checks, wire instructions, and all other information and notices sent with bank statements for the last three years.

MINUTES FORM 90                                          Initials of Deputy Clerk __jh_____
CIVIL -- GEN                              3

Exhibit 105
Page 1635

11.   Federal and state tax returns for the last three years.

12.   A summary of all contributions, loans and any sources of funding during the last twelve months.  Copies of agreements and/or contracts supporting these transactions.

13.   A summary of all related party transactions detailing any compensation, loans, advances, payments, fees or any other form of consideration paid to Isaac Larian, family members, or affiliates, or any other related party.

14.   Detail of all loan facilities with an indication of creditor and relevant terms.

15.   Copies of any notices from federal or state tax authorities regarding audits or audit adjustments during the last 3 years.

16.   All detailed corporate credit card statements for the last three years.  If electronic files are not available, then please produce in hard copies.

17.   Information and documents regarding expense reimbursement of owners, officers, employees, family members, or affiliates.

18.   Detailed human resources files (electronic) of all employee information (for all current and terminated employees to date) including but not limited to employee name, employee number, address, phone number, start date, termination date, status, position, social security number, and any other information contained in the files.  If electronic files are not available, then please produce in hard copies.

19.   Electronic files of all emails including attachments to the emails from the network server and from backup tapes (please identify dates of backup tapes in order for selection of time period).

20.   Forensic images of personal computer hard drives and PDAs of selected individuals.

MINUTES FORM 90
CIVIL -- GEN

4

Initials of Deputy Clerk __jh_____

Exhibit 105
Page 1636





Ronald L. Durkin
CPA/CFF, CFE, CIRA

**Senior Managing Director**

619 481 5201

rdurkin@durkinforensic.com

701 B Street Suite 1310
San Diego, CA 92101

Ronald L. Durkin is a CPA with over 30 years combined experience in public accounting and as a Special Agent with the FBI. He has testified in accounting, financial, and bankruptcy matters in U.S. District Court, U.S. Bankruptcy Court, U.S. Tax Court and in various State courts. During his tenure with the FBI, Ron was responsible for investigations involving white collar crime, political and public corruption, money laundering, organized crime, labor racketeering, racketeer-influenced and corrupt organization statute (RICO) violations, and narcotics matters. Since leaving the FBI, he has assisted clients in matters involving fraud prevention, detection, and internal investigations. He has worked on cases involving Foreign Corrupt Practices Act, employee embezzlement, management fraud, financial statement fraud, conflict-of-interest, check kiting, bankruptcy fraud, money laundering, and Ponzi schemes.

In 2008 Ron retired from KPMG. While at KPMG, Ron was the National Partner in Charge of the Fraud and Misconduct Investigations practice and served as the Western Region's forensic practice leader as well as the office coordinating partner for the Los Angeles office's forensic practice.

**Exhibit 105**
**Page 1637**



## Service Lines

Fraud & Misconduct Investigations
Fraud Risk Management
Forensic in the Audit/Shadow Procedures

## Education and Certifications

Bachelor of Science, Accounting,
California State University, Sacramento

Masters of Business Administration
(Emphasis in Accounting), California
State University, Sacramento

Certified Public Accountant,
licensed in California, Arizona,
Nevada, and Washington

Certified in Financial Forensics

Certified Fraud Examiner

Certified Insolvency and
Restructuring Advisor

He is a frequent speaker at the FBI Academy and at the AICPA National Fraud Conference, California and other State CPA Societies, and he has made presentations to the IRS Criminal Investigative Division and the U.S. Postal Inspectors CPA seminars. He is a member of the AICPA National Accreditation Commission and a former member of the Business Valuation and Forensic Litigation Services Executive Committee. He is the former chair of the AICPA Anti-Fraud Programs and Controls Task Force and past chair of the AICPA Litigation and Dispute Resolution Services Subcommittee. Ron is also the Chair of the California Society of CPA's Litigation Services Steering Committee and the past Chair of the California Society of CPAs Fraud Section.

Ron was a 2003 AICPA Volunteer of the Year. Ron was also honored with the Distinguished Achievement Award by the AICPA in 2006 for his long time commitment to the AICPA. In 2007, Ron was awarded the first-ever FLS Lifetime Achievement Award by the AICPA.

Exhibit 105
Page 1638



**Durkin FORENSIC INCORPORATED**

## Professional Associations

American Institute of Certified Public Accountants (Immediate Past Chair of Litigation & Dispute Resolution Services Subcommittee) – member since 1995

California Society of Certified Public Accountants (member of Steering Committee for statewide Litigation Services Sections and Chair of Fraud Section)

Association of Certified Fraud Examiners (Member of Faculty since 1995)

Association of Insolvency and Restructuring Advisors

Society of Former Special Agents of the FBI

Institute of Internal Auditors

## Investigative and Integrity Advisory Experience

On an International level, he has worked on a number of matters involving alleged Foreign Corrupt Practices Act (FCPA) violations. Working on behalf of U.S. based companies, Ron investigated allegations that members of management of foreign subsidiaries were involved in either bribing foreign officials, diverting corporate opportunities and funds, or conspiring with others to defraud U.S. based victims.

Conducted an investigation of certain allegations of political and public corruption surrounding an international sporting event that was to be held in the US. The allegations involved FCPA, bribery, and public corruption.

Conducted an investigation of an alleged kickback scheme on the part of a purchasing manager of a global technology company.

Conducted an internal investigation with a multi-national corporation regarding corruption involving a former manager in the accounts receivable department. The case was referred to the United States Attorney's Office and the FBI for prosecution.

**Exhibit 105**
**Page 1639**



Conducted an internal investigation, on behalf of a publicly traded company, regarding alleged diversion of funds with the accounts payable department. The case was referred to the United States Attorney's Office and the FBI for prosecution.

Investigated allegations of fraud in the real estate industry, including new construction projects, as well as management and operation of office buildings, apartment buildings and shopping centers.

Investigated allegations of corruption by certain members of a County Board of Supervisors who were indicted by a Federal Grand Jury.

Served as an undercover agent in a case involving 35 State Court judges who were indicted and convicted of public corruption.

Conducted a number of investigations of cases involving Pyramid and Ponzi schemes. He also has testified in U.S. District Court, State Court, and Bankruptcy Court in several of these cases.

During career with the FBI and as a bankruptcy trustee, investigated allegations of fraud, corruption and organized crime within the solid waste industry.

Exhibit 105
Page 1640



As the Chapter 11 Trustee of two failed insurance agencies, he conducted investigations into allegations of fraud and mis-management on the part of senior management.

As a Chapter 7 Trustee, Chapter 11 Trustee, and Examiner in bankruptcy matters, has conducted hundreds of investigations where allegations of fraud have been alleged.

Served as a "keeper" for the Department of Corporations, investigated a State securities fraud matter.

Served as trustee of the parent of one of the largest financial institutions in California where securities fraud and other actions were alleged against senior management.

Exhibit 105
Page 1641



## Publications

One of the principal authors of the AICPA Practice Aid 07-1 – "Forensic Accounting – Fraud Investigations" (2007)

Chair of the AICPA Forensic Procedures Task Force responsible for the writing of the "Forensic Procedures and Specialists: Useful Tools and Techniques" – AICPA Special Report, 2006

Chair of the AICPA Antifraud Programs and Controls Task Force responsible for the writing of "Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention" – AICPA Practice Aid, 2005

Principal author – AICPA Technical Consulting Practice Aid 97-1 "Fraud Investigations in Litigation and Dispute Resolution Services"

Co-author – California Society of CPA "The Witness Chair" – SAS 99 – Is It Enough To Help Close the Expectation Chasm? (2003)

Author – "A Systematic Approach to Fraud Investigation" – The CPA Expert, Spring 2000 (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Co-author – "Defining the Practice of Forensic Accounting" The CPA Expert, 1999 Special Issue (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Contributing and Reviewing author to Guide to Fraud Investigations published by Practitioners Publishing Company

Contributing author to Handbook of Litigation Services for John Wiley and Sons. The chapter written by Mr. Durkin is entitled "Criminal Cases and the Investigative Accountant."

Book review of Investigating White Collar Crime: Embezzlement and Financial Fraud for "CPA Management Consultant".

Exhibit 105
Page 1642