to shore up Kadisha's own Qualcomm holdings. (TE 153, 157, 158, see item No. 504, "Payoff of first mortgage loan $505,000" and item No. 506, "Interest 11/11 to 12/18 $3,839.56;" TE 158; 164, 166, 167, 152, 1776.)

Kadisha thereafter used the Trusts as a veritable piggy bank for *over $5 million* in unsecured, undocumented loans to himself, his real estate partnership (Dan Investments), and his friends. (TE 44, 44A; 164-166, 167, 173, 254, 255, 257, 258, 271, 272, 303, 304, 332, 333, 357, 364-366, 509, 510, 513, 514, 518, 519, 560, 573, 574, 576, 580, 760, 1719a, 3409.) In 1992, Kadisha improperly sold Trust 2's Qualcomm stock to raise cash for his own use. He used Trust funds to help fund a real estate purchase by the Carson '93 partnership while he was a shareholder, president and CEO of the general partner Texollini. And, after this lawsuit was commenced, Kadisha improperly withdrew $500,000 from the Trusts to pay for his legal fees. The fact that Kadisha took *half a million dollars for his own use* from the Trusts without any authorizing provision in the trust instruments demonstrates his attitude that the Trusts existed for his benefit rather than for the benefit of the beneficiaries.

In fact, although the evidence shows numerous (egregious) instances in which Kadisha used Trust assets or his position as Trustee for his own benefit, there is no evidence of any instances in which Kadisha acted *in the beneficiaries' interests*. In short, Kadisha did precisely the opposite of what the duty of loyalty compelled him to do. Rather than administering the trust and dealing with the trust assets solely for the interest of the beneficiaries, he administered the trust and dealt with the trust assets *solely for his own benefit*.

///

///

///

EXHIBIT 17

PAGE 153

2. <u>**Kadisha is therefore not entitled to be excused from liability on equitable considerations.**</u>

Probate Code §16440(b) permits a court, in its discretion, to excuse a trustee from liability for a breach of trust if it would be equitable to do so. This is not a case in which the trustee is entitled to equitable consideration, e.g., a case where a well-intentioned trustee made a good-faith error in judgment. This is a case where the Trustee – throughout his tenure as Trustee – consistently breached virtually every fiduciary duty he had and intentionally took advantage of the beneficiaries' youth, inexperience and lack of education to use the Trust assets as his personal piggy bank. The equities in this case must lie with Kadisha's victims. In other words, the rule that a trustee must disgorge any profit, gain, benefit or advantage he has acquired through his dealings with the trust assets or his position as trustee must be rigorously applied and all doubts resolved in Petitioners' favor.

3. <u>***Nickel v. Bank of America* reflects the law in California that a trustee who has committed a breach of trust must disgorge any profit derived from the breach.**</u>

As previously noted, in California, as elsewhere, "[a] *"[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency.'"* *Terry v. Bender* (1956 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P. 2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr. 429, 446. *Nickel v. Bank of America* (2002) 290 F.3d 1134, reflects the law in California that a trustee who has committed a breach of trust must disgorge any profit derived from the breach, since the profit properly belongs to the trust and its beneficiaries.

EXHIBIT 17

PAGE 154

In *Nickel*, the trustee bank breached its fiduciary obligations by overcharging 2,500 trusts for its trustee's fees. After discovering the error, the successor trustee bank repaid the fees with interest. The trial court found that this was a sufficient remedy, and that the profits that would have accrued to the 2,500 trusts was speculative because the overcharges could not be traced into any particular loans or investments of the bank. The Ninth Circuit Court of Appeal *reversed.*

The Court of Appeal began its analysis with the "elementary rule of restitution" that "if you take my money and make money with it, your profit belongs to me," citing §1 of the *Restatement of Restitution. Nickel v. Bank of America, supra,* 290 F.3d at 1138. This "elementary rule" reflects the broad purpose of restitution and the maxim of jurisprudence in California that "[n]o one can take advantage of his own wrong." *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237; Civil Code §3517.

Section 1 of the *Restatement of Restitution* states the general rule that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." The *Restatement* also recognizes, however, that in the context of a fiduciary relationship, the unjust enrichment need not be at the beneficiary's expense. That is, "where a person in a fiduciary relation to another makes a profit in connection with transactions conducted by him as a fiduciary, he is ordinarily accountable to his beneficiary for the profit, although the beneficiary suffered no loss." *Restatement of Restitution* §1, comment e (1937).

The *Restatement* also explains: "A person is enriched if he has received a benefit." "The word "benefit"...denotes any form of advantage." And, "a person is unjustly enriched if the retention of the benefit (i.e., retention of any form of advantage) would be unjust." *Restatement of Restitution* §1, comments a and b (1937). A trustee who profits through *"any form of*

EXHIBIT 17

PAGE 155

*advantage"* derived from the fiduciary relationship or the trust estate is *unjustly* enriched because the profit belongs to the trust. The trustee must therefore disgorge the profit.

The principle is codified in the California Probate Code. Probate Code §16004 imposes a duty on a trustee *not* to *use or deal with* trust property for the trustee's own profit. "A violation by the trustee of any duty that the trustee owes the beneficiary is a breach of trust." Probate Code §16400. Thus, if a trustee uses or deals with trust property for the trustee's own benefit, he has committed a breach of trust. If the trustee derives a profit from the breach of trust, he is liable for that profit, i.e., he is required to disgorge it. Probate Code §16440(a)(2).

The *Nickel* Court concluded that because money is "*fungible*," the bank *did* benefit from retaining the overcharges:

> "The money misappropriated from the trusts added directly to what the banks had to loan or to invest or, if not directly loaned or invested, was used to meet expenses, freeing an equal amount for loan or investment." *Id.* at 1139.

The overcharges, which were the product of the trustee's breach of fiduciary duties, thus caused an addition to profit in either case. *Id.* at 1138.

The Court of Appeal concluded that the bank's repayment of the overcharges with simple interest to the 2,500 trusts was not a sufficient remedy because it did not "give the trusts an amount close to equaling a share in the profits made with their money." *Id.* at 1139. It found instead that the appropriate remedy was "to allot these unwitting and unwilling contributors a proportionate share of the banks' profits during the years of misappropriation." *Id.* at 1139.

The Court's decision thus reflects the principle that a trustee who profits through "*any form of advantage"* derived from the trust assets or the trustee's position is unjustly enriched, and must disgorge the profits. The trustee in *Nickel* benefited because the misappropriated overcharges added to the capital it had available for investment, and therefore added to the

EXHIBIT 17

PAGE 156

trustee's profit during the period of misappropriation regardless of whether the overcharges directly or indirectly produced the addition to profit. In either case, the trustee was unjustly enriched and was required to disgorge the portion of the profit attributable to the use of the trusts' funds during the period of misappropriation.

**4. <u>The trustee in Nickel profited from using the misappropriated overcharges in its business because it had the benefit of the use of money it would not have had if it had not breached its fiduciary duties.</u>**

The trustee in *Nickel* benefited each time it made a transaction with its own funds rather than repaying the misappropriated overcharges because so long as it retained possession of the overcharges rather than repaying them, they added to the total capital that was available to the bank for investment.

In addition to breaching the fiduciary duty not to deal with trust property for his own profit (Prob. Code §16010, a trustee who fails to repay a trust for misappropriated funds also breaches other fiduciary duties, i.e.: (1) the duty to take and keep control of and preserve the trust property (Probate Code §16007), (2) the duty to make the trust property productive "in furtherance of the purpose of the trust," (3) the duty to keep the trust's property separate from the trustee's property (Prob. Code §16009, (4) the duty to enforce the trust's claims – including claims against himself for money the trustee has misappropriated from the trust (Prob. Code §16010), (5) the duty not to take part in any transaction in which the trustee has an interest adverse to the beneficiary (Prob. Code §16004(a), and (6) the duty to place the beneficiaries' interests ahead of his own (*Heckman v. Ahmanson* (1985) 168 Cal.App.3d 119, 126: [The trustee cannot "serve himself first and his cestuis [beneficiaries] second." He cannot abandon his fiduciary role "for personal aggrandizement." *Id.* at p. 129.

EXHIBIT 17

PAGE 157

The *Nickel* Court required the trustee to disgorge the profit earned in such circumstances by giving the beneficiaries a proportionate share of the trustee's profits during the period in which the trustee retained and had the use of the misappropriated and fungible overcharges. As is shown below, the *Nickel* remedy is an appropriate equitable remedy as it gives the beneficiaries the benefit of the use of their funds, and it gives the trustee the benefit of the use of his funds.

5. **Nickel's remedy of giving the beneficiaries a share of the profits earned during the period of misappropriation is eminently equitable.**

Nickel awarded the plaintiff beneficiaries a proportionate share of the trustee's profits during the period of misappropriation. It thus gave the beneficiaries the benefit of the use of their money, and it gave the trustee the benefit of the use of his money during the period of misappropriation.

As will be discussed in more detail later in this brief, Petitioners are seeking the *Nickel* remedy on several of their claims – a proportionate share of Kadisha's profits during the period of misappropriation – i.e., a proportionate share of his Qualcomm stock. Contrary to what Kadisha claims, this remedy does not give Petitioners something that does not belong to them.

6. **An award of interest is not a sufficient remedy for the trustee's use of the trust funds.**

An award of interest is not a sufficient remedy for the trustee's use of the trust funds. It is insufficient because it allows the trustee to retain a gain that was achieved from dealing with the trust for his own benefit. If a trustee did not have to disgorge this gain, there would be an enormous incentive for him to use trust funds for his own investments. (For one thing, it would be easier to dip into trust funds that the trustee wholly controls than to qualify for a bank loan for

EXHIBIT 17

PAGE 158

the trustee's speculative investments.) Providing that kind of incentive, however, runs contrary to the fundamental purpose of the trust law, which is to "put fiduciaries beyond the reach of temptation by making it profitable for them to yield to it."

*MacIsaac v. Pozzo* (1943) 81 Cal.App.2d 278.

Interest is also an insufficient remedy because it does not give the beneficiaries, who are unknowing and unwitting lenders, a return for the risk.

Kadisha's track record of losing hundreds of millions of dollars underscores the enormous risk that was forced upon Petitioners in this case. (TE 1930.1-1930.11) It appears from Kadisha's frequent applications to the Court for living expenses that virtually the only substantial successful investment Kadisha has made has been Qualcomm. Had Qualcomm gone the way of a multitude of other dot coms, Petitioners would have had no recourse against Kadisha because of the failure of his other investments. Since they were forced to unwittingly share in the risk of Kadisha's investment decisions, they are also entitled to share in the benefits, including the benefits of the Qualcomm stock purchase.

7. <u>Kadisha incorrectly contends that tracing the trustee's profit to actual trust dollars is necessary to establish that the trustee profited from trust assets.</u>

Tracing was laid to rest as the exclusive remedy for the unlawful taking and use of trust assets by a trustee by *Nickel v. Bank of America* (2002) 290 F.3d 1134. *Nickel* brought about a much needed equitable change. A change like *Nickel* invites a fury of attack by packs of perennially misanthrophic malcontents. They cannot be missed. Their number is legion. They are everywhere, eyes wild, fangs barred – fiercely incensed by the mere notion of anything that resembles change. The objectors have for the most part gone away – but not Kadisha. It is he,

EXHIBIT 17

PAGE 159

the architect of concealment and camouflaged accountings that look to the tracing doctrine as his salvation. And while the court is not going to reach out and order a taking of Kadisha's Qualcomm stock, opting instead to award damages as was done in *Nickel*, a discussion of "tracing" is in order as it is a course of action available to the court which has been considered but not requisite to awarding monetary damages to Petitioners.

Kadisha incorrectly and throughout the trial steadfastly maintains that directly tracing the trustee's personal profit to actual trust dollars is necessary to establish that the trustee profited from trust assets. This is tantamount to saying: (1) that causation requires tracing; and (2) that the only possible way a trustee can benefit from the trust assets or his position as trustee is where he uses actual trust dollars for a personal investment. Kadisha has not, however, offered a single authority that supports his position – *nor are there any.* In fact, the only decision that directly discusses this point – *Nickel v. Bank of America* (2002) 290 F.3d 1134, 1138 – says precisely the *opposite*, that under California law, "[t]raceability and causation are *not* the same." Emphasis added.

The Court of Appeal in *Nickel* specifically found that the trial court *erred* "in reading a requirement of traceability into a tortfeasor's obligation to make whole its victims." *Nickel v. Bank of America, supra*, 290 F.3d at 1138. In other words, the trial court erred because it required the plaintiffs to trace the path of the overcharges into particular loans or investments of the bank. The Court of Appeal stated pointedly: "A requirement of traceability nullifies the bank tortfeasor's obligation to cough up the profits it has made by the use of what it has wrongfully taken." *Id.*

The Court reasoned:

> "Traceability and causation are not the same. If the bank had taken the overcharges and thrown the money out the window, there

> would be no causation, and, if the banks could prove they had done this, the plaintiff would lose." *Id.*

In other words, if the bank had thrown the overcharges out the window, it would not have received a benefit from them. However, because money is *"fungible,"* the bank *did* receive a benefit from the overcharges:

> "The money misappropriated from the trusts added directly to what the banks had to loan or to invest or, if not directly loaned or invested, was used to meet expenses, freeing an equal amount for loan or investment." *Id.* at 1139.

The overcharges, which were the product of the trustee's breach of fiduciary duties, thus caused an addition to profit *in either case. Id.* at 1138. *Nickel* says, in other words, that adding the misappropriated funds to the trustee's own funds *caused* the trustee's additional profit, because the trustee either had additional funds to directly invest or it had additional funds to pay its expenses – which freed up an equal amount for investment.

*Nickel* also says that because money is fungible, requiring beneficiaries to trace the profit to actual trust dollars would allow the trustee to escape liability for the profit earned by indirectly using the beneficiaries' money. If a trustee uses misappropriated funds to buy groceries, he benefits because he can invest the funds he would otherwise have had to spend for groceries. Because money is fungible, however, there is no demonstrable connection between a dollar that is used to buy groceries and another dollar that is thereby freed up and can be invested. Showing which dollar actually produced (i.e., caused) the profit is therefore not *possible* in this context. *Nickel* therefore correctly concludes that tracing is not an element of causation.

///

///

///

EXHIBIT 17

PAGE 161

**8. <u>Kadisha's incorrect formulation of the law also contradicts the "inveterate and unbending" rule that a trustee cannot gain *any advantage* from the trust estate or his position as trustee.</u>**

Kadisha's incorrect formulation of the law also contradicts the "inveterate and unbending rule" that a trustee cannot gain *any advantage* from the use of trust assets or his position as trustee. His incorrect formulation of the law can be summed up in the following propositions:

(1) If a trustee uses $1,000 of trust funds for his personal investments, the trustee is liable to the trust's beneficiaries for the trustee's profit. According to Kadisha, this is because *the trustee's profit can be directly traced to trust funds.*

(2) However, if a trustee uses $1,000 of trust funds to pay his obligations and thereby frees up $1,000 of his own funds for investment, the trustee is *not* liable to the beneficiaries for the trustee's profit from that $1,000. According to Kadisha, this is because *the profit can be "traced away" to the trustee's separate funds.* ("Tracing away" is a term invented by Kadisha – it does not appear in any decision by any California court.)

Kadisha's incorrect formulation of the law contradicts the rule that a trustee breaches his fiduciary duties when he gains *any advantage* from the trust assets or his position as trustee. In both of the above scenarios, the trustee has an additional $1,000 for his own investments that he would not have had if he had not breached his fiduciary duties. And, under both scenarios, the trustee would earn the same profit on that $1,000. *The trustee would therefore benefit equally under either scenario.* Nonetheless, Kadisha claims that tracing (and what he terms "tracing

away") dictates that the trustee is liable for the trustee's profit under the first scenario, and the trustee is *not* liable for his profit under the second.

Kadisha utterly disregards the express holding of *Nickel*, the rule in California that *"[a] faithless trustee must disgorge to his principal the secret profits and unauthorized benefits and advantages he has acquired as an outgrowth of the agency,"*[22] and the equitable principle that "no one can take advantage of his own wrong" because it allows trustees to use trust assets for their own benefit so long as the benefit is *indirect*. Kadisha's scheme also violates the fundamental rule that a party cannot do indirectly what it cannot do directly. See, e.g., Civ. Code §3511: "Where the reason is the same, the rule should be the same."

Nonetheless, a trustee would escape liability under Kadisha's formulation of the law by doing the following: (1) openly depositing trust funds into an account in his own name, (2) using the trust funds in that account to pay for his living expenses and debts, (3) funding his personal investments from a different account containing the money the trustee saved by using trust funds instead of his own funds to pay his expenses and debts; and (4) using the bank statements from each of these accounts to "trace away," i.e., to prove that he used trust dollars only for his personal expenses – which did not produce a profit – and that only his own dollars were used for the personal investments that did produce a profit.

Kadisha's faulty reasoning would act as an incentive for wrongdoing by making it *profitable* for trustees to breach their fiduciary duties – in direct contradiction to the public policy of putting trustees beyond temptation "by making it *unprofitable* for them to yield to it." *MacIsaac v. Pozzo*, *supra*, 81 Cal.App.2d at 285.

///

[22] *Terry v. Bender* (1956 2nd Dist.) 143 Cal.App.2d 198, 212, 300 P.2d 119, 128; *People v. Vallerga* (1977 2nd Dist.) 67 Cal.App.3d 847, 877, 136 Cal.Rptr.429, 446.

EXHIBIT 17

PAGE 163

9. **The language of the California Probate Code also confirms that tracing is not a requirement for causation.**

The language of the California Probate Code also confirms that tracing is not a requirement of causation.

Probate Code §16440, which codifies a trustee's liability for a breach of trust, provides (among other things) that "if the trustee commits a breach of trust," he is chargeable with (among other things) "any profit made by the trustee through the breach of trust, with interest." Probate Code §16440(a). It does *not* provide that if the trustee commits a breach of trust, he is only chargeable with a profit "that can be traced to actual trust dollars." The Legislature did not, in other words, place the stringent limitation Kadisha proposes on the trustee's liability.

The actual issue regarding causation can be seen by applying the applicable standard of proof of Probate Code §16440. The standard of proof in a breach of fiduciary duty case is preponderance of the evidence – i.e., more likely than not. Evidence Code §115. Applying this standard to Probate Code §16440 the relevant questions are thus: (1) whether it is more likely than not that the trustee breached his fiduciary duties (duty, breach); (2) whether it is more likely than not that the trustee profited from the breach of trust (causation); and (3) what is the trustee's profit (damages).[23]

The fact that tracing is not a requirement for causation can also be confirmed by referring to Probate Code §16420, which lists the *remedies* for a breach of trust and includes tracing as a

[23] These are all questions of fact for the Court and its determinations can be overturned on appeal only if there is no substantial evidence that supports them. *Bowers v. Bernard* (1984) 150 Cal.App.3d 870, 873 [T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court." Emphasis in original.]

EXHIBIT 17

PAGE 164

*remedy* (one of many), not an element of liability (which causation is). Probate Code §16420(a)(9).

**10. Efron v. Kalmonovitz does not hold, as Kadisha claims, that tracing is an element of causation.**

Kadisha relies upon *Efron v. Kalmonovitz* (1967) 249 Cal.App.2d 187 for his mistaken theory that causation requires tracing. Kadisha incorrectly contends that *Efron* demonstrates that "fungibility" and "freeing up assets" are not enough to show causation and that it is therefore necessary to show that actual trust dollars were used to purchase an asset (*i.e.*, strict tracing) to establish causation. (Respondent's Reply Memorandum in Support of His Motion for Judgment on Petitioners' Claims Regarding Respondent's Qualcomm Stock, 5:18-22)

*Efron* did not, however, deal with the issues of "fungibility" or "freeing up assets" since the misappropriated assets in that case *were not fungible assets*. Nor did it state or imply that tracing is an element of causation, as Kadisha has been contending. When it talked about tracing at all, it talked about it only in the context of the appropriate *remedy* to be applied, not as an element of liability.

In *Efron*, S & P Corporation ("S&P") was owned by Kalmonovitz, who was also the majority shareholder of the Maier Brewing Company ("Maier"). S&P was a real estate investment company, and Maier was a brewery. Kalmonovitz breached his fiduciary duties to the minority shareholders in acquiring Maier's assets. Kalmonovitz continued to run the brewery after the fraudulent sale but the evidence at trial left substantial doubts that the brewery was profitable. Nevertheless, the trial court impressed a constructive trust on the real property purchased by S&P after the Maier acquisition. The Court of Appeal reversed. It concluded, essentially, that there was no evidence that Kalmonovitz actually received any benefit from the

Maier assets, and it remanded the case back to the trial court for further findings to determine whether Kalmonovitz earned a profit or cash surplus from the Maier assets and whether he used that profit or cash surplus in some way to acquire the properties.

In other words, the trial court had failed to make any findings that there was a causal connection between the brewery assets and S&P's real estate acquisitions. Because the brewery assets Kalmonovitz improperly acquired were fungible, the causal connection between those assets and S&P's real estate acquisitions had to be established in a different way than it can be established in a case involving fungible cash. Adding the non-fungible brewery equipment to Kalmonovitz' holdings did not have the same economic impact that adding fungible cash to his holdings would have had because the assets by themselves did not add to the store of capital that was available to Kalmonovitz for investment. The issue in *Nickel* and the issue in this case (with respect to Petitioners' claim regarding Kadisha's Qualcomm stock acquisition) involves the economic effect of fungible cash on the store of capital that the trustee has available for investment. *Efron*, does not address that fact situation and is therefore distinguishable and inapplicable.

*Efron* is also distinguishable because the fiduciary was a director rather than a trustee. A trustee has additional statutory duties. For example, a trustee has statutory duties to marshal, control and preserve the trust property and to pursue claims held by the trust, even if it involves a claim against the trustee. The trustee bank in *Nickel* and Kadisha were therefore duty bound to restore the funds they misappropriated to the trusts. By breaching this fiduciary duty, they each benefited because they had cash for investment that they would not have had if they had repaid the rightful owners for the misappropriated funds. Kadisha and the *Nickel* trustee thus gained an improper – and disgorgeable benefit – by breaching a duty that Kalmonovitz did not have.

EXHIBIT 17

PAGE 166

**11. The disgorgement of an advantage, benefit, gain or profit obtained through a breach of fiduciary duty may be accomplished by imposing a constructive trust on the advantage, benefit, gain or profit.**

There are numerous (nonexclusive) remedies to redress a trustee's breach of trust, including payment of money, imposition of a constructive trust, and tracing. Prob. Code §16420(a)(3)(8)(9). (Notably, the imposition of a constructive trust and tracing are listed as separate remedies. Their intentional separation strongly argues against Kadisha's other theory that all constructive trusts require strict tracing.)

The *Restatement of Restitution* (upon which Kadisha relies) provides, however, that if a fiduciary has made a profit through violating a fiduciary duty, he can be compelled to surrender the profit through the remedy of a constructive trust. *Restatement of Restitution* §160, comment d (1937).

California law is in accord:

> *Where trustees have acquired property by virtue of a breach of their fiduciary duty of loyalty to a beneficiary*, the latter may proceed against them personally to recover damages for the fraud *or may charge them as constructive trustee of the property for his own benefit as rightful owner.*

*Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles, supra,* 269 P.2d at 652.

This rule is codified in Civil Code §2224 which states: "One who gains a thing by …the violation of a trust…is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." Civil Code §2224 is part of the "comprehensive legislative design to inhibit the temptation of a trustee to use his fiduciary position for personal gain." *Kenny v. Citizens Nat. Trust & Savings Bank of Los Angeles*, *supra*, 269 P.2d at 650.

Probate Code §16420(a)(8) is another part of this legislative scheme. It provides that if a trustee commits a breach of trust, a beneficiary may (among other remedies) commence an action to impose a constructive trust *on trust property*. A profit, benefit, or gain acquired by a trustee through a breach of trust indisputably belongs to the trust and is *therefore trust property*. *Purdy v. Johnson, supra*, 163 P.2d at p. 897 [any advantage or profit received by the trustee through a breach of trust "is deemed in law to belong to the beneficiaries."] As *trust property*, a trustee's illicit profit is subject to a constructive trust under Probate Code §16420(a)(8). See, for example, *Heckman v. Ahmanson* (1985) 168 Cal.App.3d at 123 [plaintiff shareholders entitled to a constructive trust on greenmail profits earned through a breach of fiduciary duty]; *Bank of America National Trust & Savings Ass'n. v. Ryan* (1962) 207 Cal.App.2d 698, 705.

12. **<u>The essence of the constructive trust remedy is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing.</u>**

"The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing." *Martin v. Kehl* (1983) 145 Cal.App.3d 228, 237.

*Martin v. Kehl* also noted that the only conditions necessary to create a constructive trust are set forth in Civil Code §2223 (which states: "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner" and §2224 (which states ["o]ne who gains a thing by…the violation of a trust, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.") *Martin v. Kehl, supra*, 145 Cal.App.3d at p. 237. Notably, the "only conditions" for creating a constructive trust do not mention "tracing."

EXHIBIT 17

PAGE 168

Moreover "[i]n order to provide the necessary flexibility to apply an equitable doctrine to individual cases, these sections state general principles for a court's guidance rather than restrictive rules." *Id.* at page 237. Thus:

> It has been pointed out that a constructive trust may be imposed in practically any case where there is a wrongful acquisition or detention of property to which another is entitled.

*Id.* at p. 238.

In other words, "[a]ll that must be shown is that the acquisition of the property was wrongful and that the keeping of the property by the defendant would constitute unjust enrichment." *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 116.

Where a trustee acquires property by an advantage gained from the trust assets or his position as trustee, the acquisition is wrongful (as it is the result of the trustee's breach of duty) and the keeping of the property, which rightfully belongs to the trust, constitutes unjust enrichment. Therefore, where a trustee acquires property by an advantage gained from the trust assets or his position as trustee, the beneficiaries are entitled to the remedy of a constructive trust.

**13. Kadisha gained numerous advantages from the "administration of the trust, dealing with trust property, or the trustee's relation to the trust estate," and he is therefore liable for and must disgorge his profits.**

**a. Kadisha benefits from the use of Trust assets in 1988 through 1989.**

Kadisha benefited from the use of Trust assets during 1988 and 1989 by, among other things:

EXHIBIT 17

PAGE 169

- Misappropriating the $500,000 Namco Loan proceeds for his own use,
- Defaulting on the Namco Loan and buying Qualcomm stock for himself instead of repaying Trust 2 for the misappropriated Namco Loan proceeds,
- ~~Loaning Qualcomm $100,000 to protect his Qualcomm holdings instead of repaying Trust 2 for the misappropriated Namco Loan proceeds,~~
- Using Trust assets to secure an unnecessary $2 million loan to raise cash for Trust 2 to loan Qualcomm $300,000 in an extremely risky loan, ~~to insure Qualcomm's survival until it could raise other money,~~
- Selling the Strathmore Residence, misappropriating the proceeds and loaning $1,250,000 to Stadco, a corporation in which Kadisha, Parviz and Younes had a substantial investment, and which had guaranteed Omninet's Sanwa loans;
- Converting the risky $300,000 note to an even riskier equity investment to help Qualcomm, and
- Misappropriating from the Trust to pay back the $390,000 money that his family and friends advanced that he used to meet his obligations in the 1998 Qualcomm stock acquisition.

**Kadisha's claims that he did not need to use the Trust asset because he had other money available is not credible.**

Kadisha's claims that he had other money available to him at the time of the Qualcomm stock purchase are not credible. Although he testified that he transferred $750,000 from an offshore account to his Independence Bank account on July 1988, this is unbelievable (RT 89, 10-8-02).

Tellingly, Kadisha did not produce at trial a copy of the account statement showing the purported transfer. Instead, he called Parviz Semsar ("Semsar"), a former Independence Bank, employee who testified, incredibly, that he remembered receiving the transfer – some 15 *years ago* from among the 300 *accounts* (including 50 hight net worth accounts) he was handling at the time. (RT 15, 2-23-04, RT 21, 2-23-04.) Semsar also testified that Kadisha deposited the overseas proceeds into certificates of deposit that remained at Independence Bank as of September 1988. (RT 17-19, 2-23-04.)

In addition to being incredible, Semsar's testimony is contradicted by the documentary evidence. Kadisha's January 27, 1988 financial statement (TE 35) reflects "cash overseas" of $650,000. The October 24, 1988 financial statement that Kadisha submitted to Imperial Bank (for purposes of the Imperial Loan) does not mention either an Independence Bank account or the purported certificates of deposit and reflects overseas deposits of $600,000. (TE 139.) Thus, if Kadisha had $650,000 in overseas cash on January 27, 1988, and still had overseas cash of $600,000 on October 24, 1988, he did not transfer $750,000 as he and Semsar testified.[24]

**Kadisha's actions at the time of the Qualcomm stock transaction are a more reliable indicator of his financial condition – and they are not the actions of a man with a surplus of cash.**

Kadisha's actions at the time of the Qualcomm stock transaction are a more reliable indicator of his financial condition – and they were not the actions of a man with a surplus of cash. The evidence shows that Kadisha was, in fact, short of cash and could not have completed the Qualcomm stock purchase if he had repaid Trust 2 the $428,000 he owed it. For example:

[24] ~~Semsar's testimony represents one of many instances of Kadisha's pattern of soliciting untrue or dubious~~ trial testi~~mony from third-party witnesses.~~

EXHIBIT 17

PAGE 171

- As of January 27, 1988, Kadisha had only $84,000 in cash in the United States. Kadisha never produced any evidence as to how much money he had in the United States as of August 8, 1988, and the Court infers from that, that the evidence would have been favorable of Kadisha. (TE 35.)
- He had $400,000 tied up in a loan to Stadco. (TE 35.)
- He paid exorbitant points and interest on the Namco Loan – 3 points and 13% on a 4-month loan. (TE 63.)
- He used the entire $500,000 of the Namco Loan proceeds for his personal needs within three weeks. (TE 68, 76.)
- On August 1, 1988, Kadisha was in default on the Namco Loan. (TE 97) On August 8, 1988, when he entered into the Qualcomm stock purchase, Kadisha had not made the July 1 or August 1 payments on the Namco Loan. (TE 65c.)
- Kadisha did not pay the tuition for Izzet's and Joelle's schooling that was due by the end of June. (TE 61, TE 22, p. 1.)
- For several months in 1988, Kadisha did not pay Dafna the $20,000 a month she was entitled to under the terms of Trust 2. (TE 22.)
- In the Spring of 1988, Ominet was bankrupt and in danger of losing the rights to the technology that formed its core business. (TE 1776)
- Kadisha (alone of his partners) engineered his participation in the Broadway loan/Qualcomm deal so that he ended up with $390,000 in cash which he used to fund $136,000 of a $750,000 loan he was required to make as part of the deal. (The fact that Kadisha took out yet another loan shows that he needed additional cash *on the very day* of the Qualcomm stock purchase.)

- Kadisha did not produce an August 1988 bank statement for his Wells Fargo account at trial (although he did produce his Union Bank account statement for August 1988) to show what his balance was on August 8-9, 1988 after his purported deposit of the $390,000 he received from friends and family. His failure to produce the statement raises the inference that the $390,000 Kadisha eked out of the transaction represented substantially all of the funds in the account and that Kadisha could *not have* both repaid Trust 2 for misappropriated Namco Loan proceeds and come up with $136,000 to meet his obligations in the Qualcomm stock purchase.
- Kadisha was unable to repay the Namco Loan when it was due 21 days after the Qualcomm stock purchase, or when he received a strong warning memo from Hugo DeCastro on August 30, 1988, or when he used Trust 2's funds rather than his own to repay the Namco Loan in December 1988.
- In May 1988, when Kadisha, Parviz Nazarian and Younes Nazarian agreed to purchase the interests of Raminfar and Shoohed, partners in Omnin, Kadisha stated, "...we certainly had no cash to spare." (TE 1776).
- Kadisha (alone of his partners) engineered his participation in the Broadway loan/Qualcomm deal so that he ended up with $390,000 in cash, which he useed to fund $136,000 of a $750,000 loan he was required to make as part of the deal. (The fact that Kadisha took out yet another loan shows that he needed additional cash on the very day of the Qualcomm stock purchase.).
- Kadisha did not produce his August 1988 Wells Fargo Bank account statement (although he did produce his Union Bank account statement for August 1988) to show his balance on August 8-9, 1988 after his purported deposit of the $390,000 he received from friends

EXHIBIT 17

PAGE 173

and family. His failure to produce the statement raises the inference that the $390,000 Kadisha eked out of the transaction represented substantially all of the funds in the account and that Kadisha could not have both repaid Trust 2 for misappropriated Namco Loan proceeds and come up with $136,000 to meet his obligations in the Qualcomm stock purchase.

- Kadisha was unable to repay the Namco Loan when it was due 21 days after the Qualcomm stock purchase, or when he received a strong warning memo from DeCastro on August 30, 1988, or when he used Trust 2's funds rather than his own to repay the Namco Loan in December 1988.
- In December 1988, Kadisha did not have money of his own to loan to Qualcomm when Qualcomm needed money, and he had Trust 2 loan Qualcomm $300,000.

All of these actions speak volumes about Kadisha's cash *shortage* at the time of the Qualcomm stock purchase. Kadisha benefited from continuing to hold Trust 2's $428,000 at the time of the Qualcomm stock purchase because the Trust's money made up for Kadisha's cash shortage. (Kadisha had $428,000 more than he would have had if he had repaid Trust 2 for the misappropriated funds because repaying Trust 2 would have reduced his available cash by $428,000.) Moreover, his actions demonstrate that he could not have both repaid Trust 2 for the misappropriated Namco Loan proceeds, as his fiduciary duties required him to do *before* pursuing his own interests, and fund his $136,000 obligation in the Qualcomm stock purchase.

///

///

///

EXHIBIT 17

PAGE 174

**Kadisha benefited from the Use of Trust assets when he loaned Qualcomm $300,000 of Trust 2's money in an extremely risky investment in order to shore up his own Qualcomm holdings.**

The financial interests of Kadisha and his wife's family were tied to the success of Omninet. Omninet had a contract with Qualcomm under which Omninet produced Omnitracs, a satellite communications system. (TB 1776, Exhs. A&B.) The contract provided that if Omninet defaulted on its performance, ownership of the Omnitracs technology would go to Qualcomm. Kadisha believed that a default on the contract and loss of Omnitracs technology would have been the "death knell" for Omninet. (TE 16, 1753, 1754, 1755, 1776, p. 19 ¶¶2, 3, and 15.)

In the Fall of 1987, Omninet was in dire financial straits. Its attempts to raise equity capital were unsuccessful. By April 1988, it was insolvent and the shareholders were deadlocked as to how to raise additional capital. Kadisha, who was on the Board of Directors, recommended that it file for bankruptcy. In June 1988, Qualcomm sued Omninet for defaulting on the contract. In a last-ditch effort to save Omninet, Kadisha negotiated a sale of Omninet to Qualcomm.

Qualcomm was in equally dire straits – it was losing money and had only $200,000 in cash. In August 1988, Kadisha, Parviz and Younes agreed to purchase 3,156,000 shares of Qualcomm stock at $1 per share, loan Qualcomm $750,000 and guarantee certain other obligations to Qualcomm. This enabled Qualcomm to pay $4 million to purchase Omninet's assets, including the Omnitracs technology.

The Omninet acquision further weakened Qualcomm's finances. In November 1988, Kadisha (who was now a Qualcomm director) knew that Qualcomm was consistently losing money and needed additional funding to survive. Kadisha was strapped for cash himself and did not have funds to loan to Qualcomm. He had already expended all of the Namco Loan proceeds

for his own use and defaulted on the Namco loan. Therefore, on November 23, 1988, Kadisha signed an agreement committing Trust 2 to loan Qualcomm $300,000. Trust 2 at the time of the signing did not have a single dime to make the $300,000 loan since Kadisha had already stripped the Trust of its only cash (i.e., the proceeds of Namco Loan). Only on December 7, 1988, after Kadisha used Dafna's home (the Strathmore Residence) as security for a totally unnecessary $2,000,000 loan from Imperial Bank, did Kadisha have the money to have Trust 2 make the $300,000 loan to Qualcomm.

There can be no doubt that Kadisha knew that Qualcomm was troubled financially and that it was a very risky loan. In Kadisha's own words:

> "I was one of the investors who signed the Stock Purchase Agreement with Qualcomm, and I in fact purchased in excess of 660,000 shares for my own account pursuant to that Agreement. I consider myself to be a knowledgeable investor. **In my opinion, Qualcomm was an extremely risky investment.** At that time, it had no proven products, and Omninet Corporation had been its major, dominant customer; Qualcomm was privately held, so that there was no secondary market for Qualcomm's shares; and Qualcomm's financial statements, attached to the Stock Purchase Agreement, showed that Qualcomm had consistently lost money – indeed, it had lost over $3.6 million in the first ten months of fiscal 1988."

And:

> "The Court should recognize that we did not simply step out of Omninet and into a lucrative investment with Qualcomm. Quite the contrary is true. **I have been a director of Qualcomm since my initial investment pursuant to the Stock Purchase Agreement in August 1988. For over three years, Qualcomm's very survival was questionable.** During that time, Qualcomm's losses continued to mount, and I considered my entire investment to be a substantial risk of loss."

Tellingly, Kadisha never advised Dafna of the $300,000 loan. (RT 76, 1-21-03.) Nor did he seek DeCastro's advice about the propriety of the loan or his obvious conflicts of interest. The $300,000 loan violated DeCastro's advice to Kadisha that: (1) a trustee cannot receive even

EXHIBIT 17

PAGE 176

incidental benefits in connection with trust transactions, (2) a trustee must avoid actual or potential conflicts of economic interest with the Trust or its beneficiaries, (3) a trustee must keep the trust beneficiaries reasonably informed about the trust's activities, (4) prior to taking any controversial or uncertain action, Kadisha should seek court approval; and (5) Kadisha should seek legal advise and, where appropriate, petition the court for instructions if there were any questions regarding the propriety of a particular act under Kadisha's fiduciary obligations as a trustee. (TE 122.)

The loan was exceedingly risky and was not a loan that any reasonable trustee would have made; the loan violated the terms of the Trust; Qualcomm was losing money; Kadisha's own Qualcomm investments were at risk, and he loaned Trust 2's money to Qualcomm to shore up his own Qualcomm holdings and to fulfill his duties as a Qualcomm director to raise money.

The only conclusion that can be drawn from the evidence is that the loan was made for Kadisha's benefit, since it is evident that the loan was not made for Dafna's benefit, and Kadisha was the only other person who stood to benefit from the loan. Kadisha's loan of $300,000 to Qualcomm was made for one purpose only – to help protect Kadisha's interests which were vitally connected to Qualcomm's continuing viability. This was a conflicted situation where Kadisha acted to obtain necessary cash for Qualcomm, leaving Trust 2 with a long shot that would out shadow anything offered at Santa Anita.

| | **FARAHNIK TIME LINE** |
|---|---|
| January 11, 1988: | The trust instruments are executed. |
| February 8, 1988: | Kadisha draws down $85,000 from his Union Bank line of Credit and deposits it into his personal Union Bank account. |
| February 8, 1988: | Kadisha deposits $3,000 into his personal Union Bank Account. |

EXHIBIT 17

PAGE 177

| | FARAHNIK TIME LINE (CONT'D) |
|---|---|
| February 10, 1988: | Kadisha loans Farahnik $75,000 from Hisunien Bank account (See February 8, 1988 above). |
| February 26, 1988: | The final version of the Trust instruments are executed. |
| March 3, 1988: | Kadisha draws down $100,000 from his Union Bank line of credit and deposits it into his personal Union Bank account. |
| March 18, 1988: | Kadisha draws down $55,000 from his Union Bank line of credit and deposits it into his personal Union Bank account. |
| March 18, 1988: | As of this date, Kadisha has drawn down $240,000 on his Union Bank line of credit consisting of: (i) $85,000 on February 8, 19888, (ii) $100,000 on March 3, 1988; and (iii) $55,000 on March 18, 1988). |
| March 24, 1988: | Kadisha loans Farahnik $76,000. If Kadisha had not drawn down the $155,000 (consisting of $100,000 on March 3, 1988 and the $55,000 on March 18, 1988) his Union Bank account would have been overdrawn approximately $19,000, and he would have been able to loan Farahnik $76,000. |
| April 5, 1988: | Kadisha loans Farahnik $70,000 bringing the total loans to $221,000 ($75,000 on February 10, 1988; $76,000 on March 24, 1988; and $70, 000 on April 5, 1988). On these funds, only $151,000 came from Kadisha's Union Bank line of credit ($75,000 on February 10, 1988 and $76,000 on March 24, 1988). |
| April 1988: | Kadisha causes Trust 2 to apply for a $500,000 loan from Namco to be secured by the Strathmore Residence. |
| May 17, 1988: | Kadisha deposits the $500,000 Namco Loan proceeds into his personal Union Bank account. |
| May 26, 1988: | Kadisha uses $240,000 of the $500,000 Namco Loan proceeds to repay Union Bank the $240,000 he had drawn down in February and March 1988 from his line of credit, of which $151,000 was loaned to Farahnik. |

EXHIBIT 17

PAGE 178

Kadisha used trust assets to acquire 30,000 shares of Qualcomm stock from Farahnik (Which has nothing to do with Farahnik's original purchase thereof by money other than from either Trust 1 or 2).

One of the principal claims of Petitioner Dafna Uzyel relates to Kadisha loaning money to Farahnik—which he used to buy Qualcomm stock—and to subsequent forgiveness by Kadisha of the loan money due him in exchange for receiving 30,000 shares of Qualcomm stock. The Petitioner contends the two transactions between Kadisha and Farahnik resulted in damages to Petitioner because Trust 2's money was used by Kadisha to (1) make the original loans to Farahnik by which he was able to purchase the subject shares of Qualcomm stock, and (2) the second claim of Petitioner Dafna Uzyel that Kadisha used some of Trust 2's money to acquire the subject shares of Qualcomm stock is valid. The first claim is not.

While Petitioner Dafna Uzyel would have it in respect to the first claim that Kadisha had his eye on Trust 2's probable assets at the time he loaned Farahnik the $76,000 on March 24, 1988 and $70,000 on April 5, 1988, such contention is without proof, falling into the legal junkyard of speculation.

The second claim is valid.

Kadisha loaned Farahnik a total of $221,000. (The $7,000 and the $76,000 loans totaling $151,000) were funded by Kadisha's Union Bank line of credit advance—which was repaid with Trust 2's funds when Kadisha misappropriated the $500,000 Namco loan proceeds (the property of Trust 2) for his own use. The court finds beyond any doubt the acquisition of the subject 30,000 shares of Qualcomm was enabled by Kadisha embezzlement of practically all the subject Namco loan proceeds. The damages are detailed subsequently under the Damages section.

///

EXHIBIT 17

PAGE 179

**DAMAGES**

"Equitable relief is flexible and expanding, and the theory that 'for every wrong there is a remedy' (CC 3523) may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs" (See Witkin, 9th Ed. Vol. 11, Equity #3, pg. 681). By classification, this case falls within the jurisdiction of the probate court which can fashion an equitable remedy against a trustee who has breached his lawful duties to the beneficiaries and caused them damages or the right to a constructive trust of assets acquired by trust money.

Kadisha's reliance on certain terms of trust agreements as escape hatches to relieve himself of his numerous derelictions as trustee and damages resulting therefrom is, as stated elsewhere in this opinion, totally lacking in merit as the trust agreements are the product of fraud by the respondent.

Respondent contends that Petitioners have not presented any "damage model" upon which the Court can calculate damages. Although it is unclear what Respondent means by a "damage model," the evidence, case law and common sense provide an adequate basis for calculating Petitioners' damages. Respondent's argument is also belied by the fact that Respondent presented his own formulas for calculating damages, in the event the Court awarded them.

"Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty." (Emphasis in original; *GHK Associates v. Mayer Group, Inc.* (2nd District 1990) 24 Cal.App.3d 856, 873, citing *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 371, and *Noble v. Tweedy* (1949) 90 Cal.App.2d 738, 745, 746 [203 P.2d 778]) "**The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.**" (Emphasis

added; *Id.* At p. 874, citing *Allen v. Gardner* (1954) 126 Cal.App.2d 335, 340.) "**This is especially true where...it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits...or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.**" (Emphases added; *Id.* Citing *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140; *Mann v. Jackson* (1956) 141 Cal.App.2d 6, 12 and *James v. Herbert* (1957) 149 Cal.App.2d 741, 749.) The selection of which measure of damages to apply is within the sound discretion of the trier of fact. (Id.) The measure that most appropriately compensates the injured party for the loss sustained should be adopted. *Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740, 749.

Furthermore, this is a court of equity and:

> "The object of equity is to do right and justice. It 'does not wait upon precedent which exactly squares with the facts in controversy, but will assert itself in those situations where right and justice would be defeated but for its intervention.' 'It has always been the pride of courts of equity that they will so mold and adjust their decrees as to award substantial justice according to the requirements of the varying complications that may be presented to them for adjudication.' [Citations omitted.] 'The powers of a court of equity, dealing with the subject-matters within its jurisdiction, are not cribbed or confined by the rigid rules of law. From the very nature of equity, a wide play is left to the conscience of the chancellor in formulating his decrees. It is the very essence of equity that its powers should be so broad as to be capable of dealing with novel conditions.' [Citation omitted.] Equity acts 'in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.' [Citation omitted.]"

*Toscano v. Green Music* (2004) 124 Cal.App.4th 685, 693-694.

The Court has been cognizant of these principles in arriving at its damages award on the following claims.

The Court is using the date of September 18, 2000 as the date for determining Petitioners' damages on certain of their claims. This was the last day upon which Kadisha turned over Trust assets to Petitioners. Therefore, the assets were under Kadisha's control and subject to his fiduciary duties until September 18, 2000.

During trial, Kadisha attempted to introduce evidence about what happened to the assets once Petitioners regained control of them. The Court ruled that such evidence was irrelevant. Kadisha's argument in support of introducing the evidence was, in substance, that Petitioners should have done something after he turned over the assets to them to mitigate, for example, the $10 million loss Petitioners suffered when he stood idly by while the value of Trust 1's Qualcomm stock plummeted. In other words, Kadisha is looking to Petitioners as if they have a fiduciary duty to him to cure his intentional breaches of duty. This is another of Kadisha's attempts to blame the victim and the Court rejects it. Kadisha had control of the assets until September 18, 2000, they were subject to his fiduciary duties until then, and that is the date the Court is using to calculate damages.

see amendment

**Damages: Re $300,000 loan to Qualcomm from Trust 2.**

Since it is evident that the loan was not made for Dafna's benefit, and that Kadisha was the only other person who stood to benefit from the loan, the only conclusion that can be drawn is that Kadisha made the loan for his own benefit; Qualcomm was losing money; Kadisha's own Qualcomm's investments were at risk, and he loaned Trust 2's money to Qualcomm to aid Qualcomm, which in turn would improve his holdings of Qualcomm stock.

Kadisha is incorrect when he argues that he should be excused from liability because of the high rate of return earned by the $300,000 loan to Qualcomm. The loan was an extremely bad gamble by Kadisha and violated every investment rule for trustees in the book. But Kadisha

EXHIBIT 17

PAGE 182

got lucky and the gamble paid off. Naturally, Kadisha expects to be rewarded, and all his derelictions excused because of one lucky bet, but such is not the case. Otherwise, trustees would be given license to steal millions of dollars but be excused by some lucky bet. No such license is issued by any decision.

In fact, the opposite is true. Probate Code section 16440 gives courts discretion to excuse a trustee from liability only where the trustee has acted reasonably and in good faith, and it would be equitable to excuse the trustee's liability. In fact, Kadisha *intentionally* set out to take advantage of Dafna's inexperience and lack of sophistication to gain control over the trust assets so that he could use them for his own benefit. Subjecting Dafna and her children to such extreme risk in a conflicted transaction to loan Qualcomm $300,000 made purely to protect his own investment – when Kadisha knew that Dafna was utterly incapable of replenishing the Trust principal if this risky investment failed – was neither reasonable nor in good faith. Kadisha never stopped to consider the welfare of Dafna and her children. He was solely interested in his own financial welfare, and there is no evidence of any instances in which Kadisha acted in the beneficiaries' interests. There is *no* evidence that Kadisha acted reasonably and in good faith.

Nor did Kadisha provide any financial analysis to show how Trust 2's $300,000 loan to Qualcomm would actually contribute to generating the required monthly distributions. Qualcomm was a private company and losing more money than it was able to make or raise from investors. There was thus no performance or financial data from which to project what the future value of Trust 2's $300,000 loan would be and therefore how it would enable Trust 2 to make $20,000 monthly distributions to Dafna. In fact, because Kadisha agreed to defer interest on the loan to help Qualcomm, Trust 2's ability to generate the monthly distributions was *reduced by* the $300,000 loan, not enhanced.

EXHIBIT 17

PAGE 183

Kadisha also incorrectly contends that Qualcomm did not need Trust 2's money because it could raise all of the cash it needed, and that Kadisha did not, therefore benefit from Trust 2's loan to Qualcomm. The evidence is exactly the opposite – Qualcomm was losing money, it needed additional working capital that it could not raise, and it needed Trust 2's $300,000.

Entering into the $300,000 loan transaction with Trust 2, which provided the beneficial right to acquire 37,500 shares of Qualcomm stock at $8 per share, is one indication that Qualcomm was *not* wallowing in cash, as suggested by Kadisha, particularly since Qualcomm made repayment of the loan a five-year obligation with deferred interest.

As well, at the time of Trust 2's loan on December 7, 1988, Qualcomm's liabilities (including its payroll and short-term payables) exceeded its available cash by millions of dollars. Qualcomm was consistently losing money. Its financial position had been further weakened by the Omninet transaction. On the date of Trust 2's loan, December 7, 1988, Qualcomm's August 20, 1988 "Series A" offering had not raised all of the money Qualcomm needed. In fact, the evidence was that as of December 1988, Qualcomm had raised only $300,000 in addition to Trust 2's loan. In February 1989, Qualcomm amended its "Series A" PPM. The amended PPM disclosed that a substantial portion of the money that had ultimately been raised came from officers and directors, not unaffiliated third parties. It also admitted that there was no assurance that Qualcomm would be able to raise all of the financing it needed.

Kadisha, as a director, was intimately familiar with these facts. The evidence of Qualcomm's financial conditions shows that the $300,000 loan was so risky that no faithful trustee would have made it. The evidence amply supports the inference that Trust 2's $300,000 contribution was looked for aid by Qualcomm in its financial dilemma.

Petitioners were not required to show precisely what Qualcomm did with Trust 2's money, as Kadisha contends. Since money is fungible, it would have been impossible for Petitioners to determine precisely how Qualcomm used their $300,000. It is abundantly clear, however, that Qualcomm needed additional cash to survive. In each of its PPM's between August 20, 1988 and August 24, 1989, Qualcomm consistently indicated that even if it raised the money sought, it would need more money, and it was uncertain whether it would be able to raise enough money to continue operating. The evidence is thus clear that Qualcomm was struggling to survive, that it needed more money, that Kadisha knew it needed more money to survive, and, that during this period he loaned it $300,000 of Trust 2's money. Moreover, Petitioners are aided by the presumption of Probate Code section 16004(c). They established that Kadisha breached his fiduciary duties by making the $300,000 loan for his own benefit. The burden then shifted to Kadisha to show that he did not benefit from the loan. Kadisha failed to meet this burden.

Kadisha incorrectly contends that the loan was a permissible exercise of his fiduciary duties because only a small percentage of the Trust's principal was at risk. Kadisha is wrong. The loan was a conflicted transaction that breached his fiduciary duties regardless of whether it involved 10% or 100% of the value of the Trust assets. Moreover, Kadisha also misappropriated the rest of the Imperial Loan proceeds for his own use so the $300,000 loan was Trust 2's only documented asset (other than the now heavily mortgaged Strathmore Residence).

Kadisha's claim that he is entitled to the protection of the conflict of interest provision in the Trust is equally far fetched. The Court finds that the conflict of interest provision, and others, are unconscionable as created, and Kadisha therefore cannot rely on them.

EXHIBIT 17

PAGE 185

Kadisha also testified that he was forced to make such a risky investment to meet the terms of the Trusts, which required him to make $20,000 monthly distributions to Dafna. As previously noted, the Court is disregarding Kadisha's testimony. As well, Kadisha was regularly consulted throughout the preparation of Trust 2, and he expressly agreed to be bound by its terms. If he thought that the Trust's assets were not substantial enough to generate monthly $20,000 distributions through conservative investments, why did he agreed to be bound by the requirement that the trust estate be conservatively invested, "with primary consideration being given to preserving principal. Kadisha did not offer any credible evidence that in December 1988 when the loan was made, the trust's assets were too unsubstantial to make the required distributions to Dafna with conservative investments.

Having determined all of the above, the Court is unable to find Petitioner's claim for damages in the sum of $19,202,211 as being Trust 2's proportionate share of Kadisha's Qualcomm stock transactions, plus prejudgment interest from September 20, 2000. The method of calculation is unsupportable proof of damages. What the Petitioners would do is take the percentage $300,000 was at the time of the loan to the total cash investments of Kadisha and determine this to be 22.86%. This percentage was taken by adding Kadisha's Qualcomm stock investments as $662,000, $250,000, $100,000 and the $300,000 for a total of $1,312,000. The $300,000 is 22.86% of the $1,312,000. But while practically everything Kadisha did in his so-called management of the Trusts was done by embezzlement of trust money for his own interests and without regard to any of his obligations as trustee his gain in loaning the $300,000 has not been shown by Petitioners, even by the use of power-point boards, which Yossi Vardi, a tech investor and distinguished prankster from Israel remarked: "Power Point presentations damage

your brain. If you look at too many, you become immoral." The court did not look at too many but enough to discount Petitioner's theory of damages by the formula above described.

The court is not denying that Kadisha benefited Qualcomm in some degree by the $300,000 loan but it was hardly the economic lifeline the Petitioners would have it. And Kadisha probably benefited himself in the eyes of Qualcomm's Board of Directors by showing his dedication and financial acumen in obtaining the $300,000 for Qualcomm. And obviously in some hardly calculable measure increased the value of his Qualcomm stock. But saying the foregoing does not equate to proof of damages suffered by Trust 2 in Kadisha's making of the subject $300,000 loan.

Petitioner's claim for damages against Kadisha for his loaning $300,000 of Trust 2's money acquired by Kadisha in the making of the Namco loan is denied.

**Damages: Re the Farahnik loan, funding by Trust 2, and Acquisition by Kadisha.**

Because Kadisha used a portion of the Namco Loan proceeds (the property of Trust 2) to wipe out his obligation to Union Bank, there was clearly substitute funding of $112,302 of the Farahnik loans by the use of Trust 2's money. Kadisha, by his actions and conduct, had to know that what he was doing with Trust 2's money was wrongful. He abstained from making any note to trust 2 concurrent with his taking of the Namco Loan proceeds. He never had a note signed by Farahnik to Trust 2 concurrent with Kadisha paying off Union Bank with Trust 2's money. He gave six different, incorrect explanations for what he did with the Namco Loan proceeds prior to trial to prevent Petitioners from discovering that he had used a portion of the proceeds to pay off his Union Bank line of credit for funds he had borrowed to loan to Farahnik.

EXHIBIT 17

PAGE 187