QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
John B. Quinn (Bar No. 090378)
(johnquinn@quinnemanuel.com)
Michael T. Zeller (Bar No. 196417)
(michaelzeller@quinnemanuel.com)
Jon D. Corey (Bar No. 185066)
(joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual, | CASE NO. CV 04-9049 SGL (RNBx) |
| Plaintiff, | Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-2727 |
| vs. | |
| MATTEL, INC., a Delaware corporation, | **DISCOVERY MATTER** |
| Defendant. | **[To Be Heard By Discovery Master Robert C. O'Brien Pursuant To Order Of January 6, 2009]** |
| AND CONSOLIDATED ACTIONS | [PUBLIC REDACTED] MATTEL, INC.'S OPPOSITION TO THE MGA PARTIES' MOTION TO QUASH SUBPOENAS ISSUED BY MATTEL TO OMNI 808 INVESTORS, LLC, OMNINET CAPITAL, LLC, IGWT GROUP, LLC, IGWT 826 INVESTMENTS, LLC AND VISION CAPITAL, LLC |
| | [Declaration of Stephen Hauss and Notice of Lodging filed concurrently herewith] |
| | Hearing Date: TBD<br>Time: TBD<br>Place: TBD |
| | Phase 2:<br>Discovery Cut-off: Not set<br>Pre-trial Conference: Not set<br>Trial Date: Not set |

07975/2789634.6

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 3

ARGUMENT ................................................................................................... 11

I.  MATTEL'S SUBPOENAS DO NOT VIOLATE THE COURT'S
    ORDERS ................................................................................................. 11

    A.  The Plain Language of the Janaury 7, 2009 Order Imposes No
        Limit on Phase 2 Discovery ...................................................... 11

    B.  MGA's Implied Discovery Limitation Argument Similarly Fails ........ 12

II. MATTEL'S SUBPOENAS SEEK RELEVANT DISCOVERY .................... 13

    A.  The Documents Sought Are Relevant to Mattel's Phase 2 RICO
        Claims ....................................................................................... 14

    B.  The Documents Sought Are Also Relevant to Mattel's Phase 2
        Disgorgement Claim ................................................................... 16

    C.  The Documents Sought Are Relevant to Phase 2 Damages ................. 18

    D.  The Documents Sought Are Relevant to the MGA Parties'
        Credibility In Phase 2 ................................................................. 19

    E.  The Documents Sought are Relevant to the MGA Parties'
        Unclean Hands Defense In Phase 2 ............................................. 20

    F.  The Documents Sought Are Relevant to Mattel's Phase 2 Unfair
        Competition Claim ..................................................................... 21

CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page**

## Cases

Asdourian v. Konstantin,
  77 F. Supp. 2d 349 (E.D.N.Y. 1999) ................................................... 15

Blain v. Doctor's Co.,
  222 Cal. App. 3d 1048 (1990) ............................................................. 20

Burlesci v. Petersen,
  68 Cal. App. 4th 1062 (1998) .............................................................. 17

Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc.,
  175 F.R.D. 646 (C.D. Cal. 1997).......................................................... 19

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,
  20 Cal. 4th 163 (1999).......................................................................... 21

Clark v. Bunker,
  453 F.2d 1006 (9th Cir. 1972) ............................................................. 16

Cramer v. Biddison,
  65 Cal. Rptr. 624, 257 Cal. App. 2d 720 (1968) ................................. 17

Eastman Kodak Co. v. Camarata,
  238 F.R.D. 372 (W.D.N.Y. 2006) ....................................................... 15

Farmers Ins. Exchange v. Zerin,
  53 Cal. App. 4th 445 (1997)................................................................. 17

GoTo.com, Inc. v. Walt Disney Co.,
  202 F.3d 1199 (9th Cir. 2000).............................................................. 20

Granberry v. Islay Investments,
  9 Cal. 4th 738 (1995)............................................................................ 20

Hilao v. Estate of Marcos,
  103 F.3d 767 (9th Cir. 1996) ............................................................... 18

Korea Supply Co. v. Lockheed Martin Corp.,
  29 Cal. 4th 1134 (2003).................................................................. 16, 17

Kraus v. Trinity Management Servs., Inc.,
  23 Cal. 4th 116 (2000).......................................................................... 16

Kraus v. Willow Park Public Golf Course,
  73 Cal. App. 3d 354 (1977).................................................................. 17

In re Lifschultz Fast Freight,
  132 F.3d 339 (7th Cir. 1996) ................................................................. 7

In re McKesson HBOC, Inc. Erisa Litigation,
    391 F. Supp. 2d 812 (N.D. Cal. 2005)..................................................20

In re Mobile Steel,
    563 F.2d 692 (5th Cir. 1977) ...............................................................8

Nelmida v. Shelly Eurocars, Inc.,
    112 F.3d 380 (9th Cir. 1997) ..............................................................20

Robert L. Cloud & Associates v. Mikesell,
    69 Cal. App. 4th 1141 (1999) .............................................................18

Rubin v. Green,
    4 Cal. 4th 1187 (1993) .......................................................................21

Southern California Housing Rights Center v. Krug,
    2006 WL 4122148 (C.D. Cal. 2006) ...................................................18

Taylor v. Polackwich,
    145 Cal. App. 3d 1014 (1983) .............................................................17

In re Uzyel Irrevocable Trust, No. BP 058 898 (Los Angeles Sup. Ct. October 24,
    2006), at 13:19 .....................................................................................5

Weiss v. Marchus,
    51 Cal. App. 3d 590 (1975) .................................................................17

### Statutes

11 U.S.C. § 510(c) ........................................................................................8

18 U.S.C. § 1956...........................................................................................15

18 U.S.C. § 1957...........................................................................................16

18 U.S.C. § 2314...........................................................................................16

Cal. Civ. Code §§ 2223.................................................................................17

Cal. Civ. Code §§ 2224.................................................................................17

### Miscellaneous

4 Callmann, Unfair Competition and Monopolies § 14.45 (4th ed.)........................16

Business and Professions Code § 17200 ......................................................21

**Preliminary Statement**

MGA claims that snippets during the colloquy of counsel and the Court during the January 5, 2009 hearing regarding Mattel's request for *expedited* discovery show the Court's intent to prevent all discovery into MGA's or Larian's finances, and as a result, Mattel's subpoenas to find out this information should be quashed. MGA is wrong. The Court issued no Order limiting discovery in any way. To the contrary, the day after the January 5, 2009 hearing, the Court issued an order lifting *in its entirety* the stay on Phase 2 discovery without limitation. Nor did the Court's January 7, 2009 Order appointing a forensic auditor change that. Not a single word in that Order bars *all* discovery relating to MGA's or Larian's finances from *any* source. Not a single word in that Order limits, suspends or otherwise affects, much less overrules, the Court's January 6, 2009 Order allowing Phase 2 discovery to proceed without limitation. Because the text of the Orders does not support MGA's suggested limitation, the motion should be denied.

MGA does not dispute that Mattel's subpoenas here[1] seek relevant, discoverable information. Nor could it. Omni 808 is a shell entity that was formed during the Phase 1B damages trial and that now claims ███████████████. According to UCC financing statements, Omni 808's alleged acquisition of that MGA debt – which also occurred during trial – was funded by another shell entity called Vision Capital. Vision Capital, which owns Omni 808, was formed mid-trial as well. Vision Capital's funds, in turn, came from Lexington Financial, an offshore shell entity with a London mail drop.

In papers filed with the District Court, MGA itself affirmatively relied on this transaction as supposed evidence of its financial viability but offered no evidence or specifics as to who owned its new purported business partners, who was actually

---

[1] These subpoenas are to Omni 808 Investors, LLC, OmniNet Capital, LLC, IGWT Group, LLC, IGWT 826 Investments, LLC, Wachovia Corporation, Vision Capital, LLC, Lexington Financial, LLC, Fred Mashian and Neil Kadisha

-1-

OPPOSITION TO MOTION TO QUASH

1   behind these transactions, the source of the alleged funding or even the transactions'

2   true terms.  What little MGA did disclose about the facts was false – as MGA had to

3   concede when confronted with evidence Mattel's investigation had turned up about

4   these entities and the transactions.  MGA also admitted, belatedly after Mattel had

5   exposed it through its own investigation, that Isaac Larian had formed the IGWT

6   companies mid-trial ██████████████████████████████

7   ████████████████████████.

8          All of this was troubling enough, especially given that MGA was already

9   found to have engaged in fraudulent concealment during trial, and alone would amply

10  justify the discovery Mattel seeks.  But even since then, Omni 808 has repeatedly

11  touted the superiority of its supposed interests – devised during the damages phase of

12  trial – over Mattel and represented to the Court that these financial transactions were

13  purportedly "arms-length."  Like MGA, however, Omni 808 refuses to disclose who its

14  alleged unnamed "investors" are, who owns Omni 808, Vision Capital or Lexington

15  Financial, where Omni 808 ████████████████████████████████

16  ████████████████████████ or even the actual terms of its alleged transactions

17  with MGA, Vision Capital, Lexington or anyone else.

18         Mattel has learned through investigation, but neither MGA nor Omni 808

19  disclosed, that Vision Capital and Lexington Financial are anything but arms-length

20  actors.  In fact, both Vision Capital and Lexington Financial – the alleged source of

21  funding for Omni 808 and thus for MGA – are directly tied to Isaac Larian's brother-in-

22  law, Leon Neman.  Thus, for example, Vision Capital purports to have an address of

23  1525 South Broadway in Los Angeles.  No company called Vision Capital is located

24  there; in fact, the receptionist at the building said she had never heard of it.  Rather,

25  Leon Neman owns the property at 1525 South Broadway and runs his businesses from

26  there.  Multiple Leon Neman entities list as their agent Fred Mashian.  Mr. Mashian

27  purports to be Lexington Financial's agent in the UCC financing statement.  And,

28

1  Vision Capital's Delaware address is the same address as a Neman entity that lists Mr.

2  Mashian as its agent.

3  As this makes evident, the discovery sought by the subpoenas is

4  reasonably calculated to lead to the discovery of evidence relevant to multiple Phase 2

5  claims and defenses and to other matters pending before the Court. The requested

6  documents are relevant to understand MGA's and Larian's financial condition and to

7  significant transactions affecting their condition. MGA's and Larian's net worth,

8  financial condition, and ability to pay are also relevant to the punitive damages that will

9  be tried as part of Phase 2 of this case. The MGA Parties' actions in manipulating the

10 sources of funding and apparently using single-purpose companies controlled by Larian

11 to ███████████████████████████████████████

12 ███ are relevant to Mattel's Phase 2 criminal copyright infringement claims, affects

13 MGA's and Larian's financial condition, and represents anti-competitive conduct

14 actionable under Mattel's unfair competition claim. MGA's mid-trial transactions with

15 non-operating entities bear the classic hallmarks of an attempt to fraudulently transfer

16 assets to its controlling shareholders that, if substantiated, may constitute predicate acts

17 of wire and mail fraud that support Mattel's RICO claims. The requested documents

18 are also to relevant to the MGA Parties' unclean hands defense. Mattel is entitled to

19 respond to this defense by demonstrating that MGA is precluded from invoking the

20 unclean hands defense because they have not themselves acted with clean hands. The

21 information sought by the subpoenas is also highly pertinent to Mattel's pending

22 receivership motion and to defending against MGA's multiple, serial stay motions that

23 place MGA's own financial condition squarely at issue.

24 The Discovery Master should deny the MGA Parties' motion to quash

25 Mattel's third-party subpoenas.

26 **Statement of Facts**

27 **MGA Misrepresents Its Financial Condition.** In connection with

28 MGA's applications for an order staying the December 3, 2008 injunctive orders, MGA

1  represented to the District Court and to the Ninth Circuit that, ███████████████

2  ████████████████████.[2]   Mattel reviewed the financing statements filed

3  regarding MGA and learned that this was apparently false. Since the Phase 1B verdict,

4  a new alleged creditor, Omni 808 Investors, LLC ("Omni 808") has purported to take a

5  security interest in the bulk of MGA's assets,[3] which facially would suggest the

6  possibility that new credit had been extended to MGA. After Mattel brought the Omni

7  808 transaction to the Court's attention, and contrary to MGA's earlier, sworn

8  representations to the Court and to the Ninth Circuit ████████████████████████

9  ████████████████████████████████████████████████████████████

10  ███████.[4]

11          The transaction revealed in the financing statements also appears to be

12  structured to conceal the ultimate source of funds for the Omni 808/MGA transaction.

13  MGA claims that this transaction is with the venerable OmniNet Capital private equity

14  firm.[5]  That does not appear to be accurate, nor should any association with OmniNet

15  be a basis to assuage concerns. Far from it. OmniNet Capital is a private equity firm

16  owned and controlled by the Nazarian family, including Nazarian family brother-in-law

17  Neil Kadisha.[6]  Mr. Kadisha is also the alleged CEO of Omni 808, MGA's new

18

19      [2]  See Declaration of Brian Wing in Support of the MGA Parties' Request for a Stay, dated

20  December 11, 2008, at ¶ 13, attached as Exhibit 36 to the Declaration of Jon Corey in Support of Mattel, Inc.'s Motion to Compel Production of Documents Responsive to Third Party

21  Subpoenas, dated February 3, 2009, ("Corey Dec."), which has been concurrently lodged with the Discovery Master.

22      [3]  See UCC Financing Statement Amendment dated September 9, 2008, amending prior UCC Financing Statement to add Omni 808 Investors, LLC as a creditor to MGA with co-

23  priority with Wachovia Bank, N.A., Corey Dec., Exh. 37.
        [4]  See MGA Parties Corrections to the Opposition to Mattel, Inc.'s Ex Parte Application

24  for Appointment of a Receiver or for Alternative Relief, dated December 31, 2008, at 1-2, Corey Dec., Exh. 38.

25      [5]  See MGA Parties' Opposition to Mattel's Ex Parte Application for Appointment of a Receiver, dated December 30, 2008, at 8-9 n.4, Corey Dec., Exh. 39.

26      [6]  Compare Omni 808 registration information (with address of 9420 Wilshire Boulevard, 4th Floor, Beverly Hills, CA 90212), Corey Dec., Exh. 37 at UCC Financing Statement

27  Amendment ¶ 7(c) with OmniNet Capital address (with address of 9420 Wilshire Boulevard, 4th Floor, Beverly Hills, CA 90212), OmniNet "Contact Us", Corey Dec., Exh. 40; see also

28  OmniNet "About Us", Corey Dec., Exh. 41.

business partner.[7]  In a 2006 Los Angeles Superior Court decision, Mr. Kadisha was found to be "no more than a common thief" for his embezzlement of millions (including for OmniNet), his fabrication of financial records and his perjury.[8]  In that decision, the Los Angeles Superior Court found Kadisha liable for stealing millions of dollars as part of a decade-long pattern of fraudulent conduct that included perjury, subordination of perjury, fabrication of financial records, sham transactions, preparation of back-dated documents, fraudulent accountings, acts of looting, embezzlement and other misappropriations of funds, breaches of fiduciary duty, conflicts of interest and illegal self-dealing.[9]

Equally significantly, if the transaction were a straightforward purchase of Wachovia's debt by OmniNet, then MGA, Larian, OmniNet and others would have no incentive to conceal the ultimate source of funds, as apparently happened here. OmniNet is not the secured party, and thus presumably not an actual debt purchaser/lender.  Rather, the company purporting to hold the security interest is Omni 808, a single purpose entity which was formed on August 12, 2008, during the damages phase of trial.[10]  Nor does it appear that OmniNet owns Omni 808.  Omni 808 appears to be owned and funded by a company called Vision Capital, LLC that, like Omni 808, was formed during the damages phase of the trial.[11]

According to the UCC financing statement, Vision Capital, LLC ("Vision Capital") obtained the money used to fund Omni 808, and presumably MGA, from a

---

[7]  See December 31, 2008 Letter from Omni 808 Investors, LLC, attached as Exhibit B to the Declaration of Brian Wing in Support of MGA's Correction to the Opposition to Mattel's *Ex Parte* Application for a Receiver, dated December 31, 2008, Corey Dec., Exh. 42.

[8]  See In re Uzyel Irrevocable Trust, No. BP 058 898 (Los Angeles Sup. Ct. October 24, 2006), at 13:19, Corey Dec., Exh. 43.

[9]  E.g., id., at 2:13-25, 4:13-18, 26:3-11; 31:22-24, 34:6-7, 41:23-24, 45:25-27, 48:25-28, 50-51 n. 12, 62:24-63:2, 71:7-9, 72:15-16, 102:1-20, 111:24-27, 112:10-13, 117:17-23, 118:23, 120:1-2, 121:1, 125:1-27, 126:16, 141:27-28, 152:17-22, 153:1-6, 155:13-14, 156:1-157:24, 158:23-28, 166:11-22, 168:1-5, 175:10-13, 181:13, 183:11-21.

[10]  See Omni 808 Investors, LLC Certificate of Status and Articles of Organization, Corey Dec., Exh. 44.

[11]  See Vision Capital, LLC Certificate of Formation dated August 19, 2008, Corey Dec. Exh. 45.

OPPOSITION TO MOTION TO QUASH

1   company called Lexington Financial, LLC ("Lexington").  Lexington is an offshore
2   company registered in the Caribbean island of Nevis, a country notorious for its
3   corporate and banking secrecy laws.[12]  Indeed, the official corporate records for
4   Lexington from Nevis declare that Nevis does not ask – and therefore will not disclose
5   – any information about Lexington, including even the bare identities of its principals.[13]
6   Lexington also has an address in London at the same location as a company that
7   provides "virtual office" services, i.e., mail drop and answering service.[14]

8          Fred Mashian, a Sunset Boulevard "estate-planning" attorney, is identified
9   as the Lexington contact on a UCC financing statement showing that Vision Capital
10  secured its alleged loan from Lexington with its ownership interest in Omni 808.[15]
11  Lexington perfected its purported security interest in Vision Capital's ownership
12  interest in Omni 808 on August 29, 2008–three days after the jury's damages verdict.[16]
13  The public records Mattel has obtained thus far do not disclose who provided
14  Lexington with the funds that it ostensibly provided to Vision Capital and that Vision
15  Capital supposedly contributed to Omni 808 for the loan/debt purchase related to MGA.
16  Nor has MGA been able to explain why, if OmniNet is truly on the other side of this
17  transaction, it is using shell companies and offshore vehicles, which may be used to
18  conceal the flow of funds, and a sole-practitioner estate planning attorney to process
19  UCC Financing Statements.

20         On January 12, 2009, Mattel attempted to serve a subpoena on Vision
21  Capital at 1525 South Broadway in Los Angeles—the address provided in the August

22  _____
    [12]  See UCC Financing Statement dated August 29, 2008, Corey Dec., Exh. 46 (with
23  Lexington Capital taking a security interest in Vision Capital's ownership interest in Omni 808
    Investors LLC); "Offshore-Based Limited Liability Company (LLC)" at www.offshore-
24  protection.com/nevisLLC.html, Corey Dec., Exh. 47.
        [13]  See December 12, 2008 letter from Registrar Clevelan Williams, Corey Dec., Exh. 49.
25      [14]  See UCC Financing Statement dated August 29, 2008, Corey Dec., Exh. 46; December
    12, 2008 letter from Registrar Clevelan Williams, Corey Dec., Exh. 49.  Office Front "Home"
26  (offering website by Office Front allowing a person to obtain a "virtual office" for as little as
    £10 a month), Corey Dec., Exh. 48.
27      [15]  See UCC Financing Statement dated August 29, 2008, Corey Dec., Exh. 46.

28

07975/2789634.6

29, 2008 UCC financing statement.[17] Vision Capital was not located at that address; in fact, the receptionist at the building said she had never heard of the company.[18] Rather, 1525 South Broadway is the address of Neman Brothers & Associates.[19] Leon Neman is a principal of Neman Brothers & Associates and owns the building at 1525 Broadway, where Vision Capital is ostensibly located.[20] Leon Neman is Isaac Larian's brother-in-law and has served as a director of MGA.[21] Mr. Mashian, the agent for Lexington Financial, is the listed agent for several entities that Leon Neman owns.[22] Indeed, Rock-Hill Holdings, LLC, a Leon Neman entity that lists Mashian as its registered agent, also has a Delaware address that is the same as Vision Capital's alleged Delaware address.[23]

There may be an innocent explanation for the mid-damages-trial transaction in which MGA's largest creditor became a newly formed shell corporation owned and funded by another newly formed shell corporation that obtained its funding from an offshore corporation registered in the corporate secrecy haven of Nevis and using a fictional London address. But such an explanation has yet to be provided. And, it is a common (but unlawful) tactic for shareholders of a company to create the impression of an arms-length loan to a questionable corporation (rather than a proper capital contribution) while concealing that the shareholder is the source of the funds.[24]

---

[16] See August 29, 2008 Lexington Financial UCC financing statement, Corey Dec., Exh. 46.

[17] See Declaration of David Antolin, dated February 4, 2009, lodged concurrently herewith.

[18] Id.

[19] Id.

[20] See Declaration of Michael T. Zeller in Support of Mattel's Opposition to Omni 808 Investors, LLC's *Ex Parte* Application to Intervene, dated February 5, 2009, at ¶ 6 ("Zeller Dec."), lodged concurrently herewith.

[21] See Zeller Dec. ¶ 4.

[22] See Zeller Dec. ¶ 11.

[23] See Zeller Dec. ¶ 12.

[24] For example, one reason this is done is so that a shareholder's sham creditor can claim priority over unsecured or secured creditors with lower priority, rather than being last in line as an owner. In re Lifschultz Fast Freight, 132 F.3d 339, 343 (7th Cir. 1996) (noting that "[e]quityholders come last in bankruptcy, which generally means they get nothing at liquidation. To avoid this, an owner might disguise her equity claim as debt. The doctrine of (footnote continued)

07975/2789634.6

-7-

**Mattel Discovers that Larian is Setting Up New Companies to Purchase Bratz Product from MGA for Pennies on the Dollar.** In addition to MGA's other questionable financial dealings, Larian appears to be transferring assets from MGA as well. Larian, through a company called IGWT Group (apparently an abbreviation of "In God We Trust"), is purchasing Bratz product for pennies on the dollar and reselling it. Larian created this company on June 26, 2008 – during the Phase 1 trial – and registered its place of business as his home address.[25] Larian also created an affiliated company called IGWT 826 Investments on August 27, 2008 – the day after the Phase 1 trial ended.[26] IGWT 826 is registered at the home address of Shirin Makabi (Isaac Larian's sister) and Eli Makabi (Isaac Larian's brother-in-law and the only shareholder of MGA other than Isaac Larian).[27]

In a spate of "emergency" filings which MGA submitted to the District Court and the Ninth Circuit, MGA relied on claims about Bratz inventory, but made no mention of these entities nor disclosed on what terms IGWT is obtaining Bratz inventory. After Mattel (and not MGA) brought IGWT to the Court's attention, MGA admitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[28] The few pages of documents that MGA then self-selected and provided to the Court showed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[29] Tellingly, although Larian now purports to own this inventory, the

---

equitable subordination empowers a bankruptcy court to foil this queue-jumping."); see generally In re Mobile Steel, 563 F.2d 692 (5th Cir. 1977); 11 U.S.C. section 510(c) (authorizing equitable subordination). It is presumably therefore no coincidence that Omni 808 now repeatedly has proclaimed that the transactions at issue here -- but for which no one will provide any actual discovery -- give it supposed priority over Mattel.

[25] See IWGT Group, LLC registration information, Corey Dec., Exh. 50.
[26] See IWGT 826 Investments, LLC registration information, Corey Dec., Exh. 101.
[27] See id.
[28] See MGA Parties' Opposition to Mattel, Inc.'s *Ex Parte* Application For Appointment of a Receiver, dated December 30, 2008, at 10, Corey Dec., Exh. 39.
[29] See Declaration of Cyrus Naim in Support of Mattel's *Ex Parte* Application For Appointment of a Receiver, dated January 2, 2009, at ¶ 2, Corey Dec., Exh. 51.

OPPOSITION TO MOTION TO QUASH

1    IGWT-MGA agreement that MGA and Larian belatedly provided to the Court requires

2    ████████████████████████████████████████████████.[30]

3    **The Court Appoints a Forensic Auditor to Investigate MGA's**

4    **Finances and Lifts the Phase 2 Discovery Stay.** After MGA applied, both in the

5    District Court and in the Ninth Circuit, to stay the December 3, 2008 injunctive orders

6    based on ████████████████████████████████████████████

7    ███████████████████████████████████, Mattel applied *ex parte* for

8    the appointment of a receiver.[31] Given MGA's conflicting assertions about its financial

9    condition, Mattel believes a receiver is justified, as there are serious doubts about

10    MGA's ability to (a) pay the Phase 1 trial damages award and any award rendered in

11    Phase 2 trial to Mattel and (b) maintain and preserve the Bratz intellectual property that

12    the jury and the District Court determined are Mattel's. Further, a receiver is

13    appropriate given the mounting evidence, set forth above, that MGA and Larian have

14    engaged in questionable business arrangements and failed to disclose to the Court and

15    Mattel significant financial information. Indeed, in setting a hearing on Mattel's *ex*

16    *parte*, the Court remarked that ████████████████████████████████████

17    ██████████████████[32]

18         The Court heard arguments on Mattel's *Ex Parte* Application for

19    Appointment of a Receiver on January 5, 2009. At the hearing, the Court indicated that

20    before appointing a receiver, it was inclined to first order an independent audit of

21    MGA.[33] During that hearing, Mattel presented to the Court a listing of proposed

22    expedited discovery.[34] One day after the hearing and before ruling on the application

23

24    [30]   See 2008 Inventory Purchase Agreement Between MGA and IGWT Group, LLC, Corey Dec,. Exh. 106.

25    [31]   See Mattel, Inc.'s *Ex Parte* Application for Appointment of a Receiver, dated December 28, 2008, attached as Exhibit I to the Declaration of Stephen Hauss, dated February

26    10, 2009 ("Hauss Dec.") and filed concurrently herewith.
     [32]   See 12/30/08 Hearing Tr. at 57:11-18, Corey Dec., Exh. 78.

27    [33]   See 1/5/09 Hearing Tr. at 19:21-24, Hauss Dec., Exh. 2.
     [34]   See Notice of Lodging Expedited Discovery Requested in Connection With Mattel,

28    Inc.'s *Ex Parte* Application for Receiver, dated January 4, 2009, Hauss Dec., Exh. 3.

OPPOSITION TO MOTION TO QUASH

1  for the receiver, the Court lifted the stay on Phase 2 discovery without limitation,
2  writing, in bold-face type that "The stay on discovery for Phase 2 of this case is hereby
3  VACATED."[35]  On the following day, January 7, 2009, the Court issued a written order
4  holding Mattel's *ex parte* application in abeyance and appointing a forensic auditor to
5  investigate MGA's finances.[36]  Nothing in the Court's January 7 Order narrowed the
6  scope of Phase 2 discovery which the Court had expressly authorized the previous
7  day.[37]

8         **Mattel Subpoenas Relevant Documents From Third Parties.**  After the
9  Court lifted the Phase 2 discovery stay, Mattel served subpoenas seeking the production
10  of documents relevant to Phase 2 claims and defenses on Omni 808 Investors, LLC,[38]
11  OmniNet Capital, LLC,[39] Vision Capital, LLC,[40] IGWT Group, LLC,[41] IGWT 826
12  Investments, LLC,[42] Wachovia Corporation,[43] Lexington Financial, LLC[44] and Fred
13  Mashian.[45]  Mattel has been attempting to serve a document subpoena on Neil Kadisha
14  since January 23, 2009.[46]  On each occasion that Mattel has attempted service,
15  however, service has been refused because Mr. Kadisha has allegedly been "out of
16  town" over this entire time period.[47]

17         In addition to serving subpoenas, Mattel also sought documents relating to
18  MGA's and Larian's involvement with the Omni/Wachovia transaction and their
19  dealings with the IGWT entities.  On Friday, February 6, 2009, Mattel received MGA's

---

[35] Court's January 6, 2009 Order Appointing Discovery Master, at 2, Corey Dec., Exh. 35.
[36] Court's January 7, 2009 Order Appointing Forensic Auditor, at 2, Corey Dec., Exh. 105.
[37] See id.
[38] Omni 808 Investors, LLC (Beverly Hills) and Omni 808 Investors, LLC (Los Angeles) subpoenas, dated January 9, 2009, Corey Dec., Exh. 56.
[39] OmniNet Capital, LLC subpoena, dated January 9, 2009, Corey Dec., Exh. 55.
[40] Vision Capital, LLC subpoena, dated January 13, 2009, Corey Dec., Exh. 54.
[41] IGWT Group, LLC subpoena, dated January 12, 2009, Corey Dec., Exh. 52.
[42] IGWT 826 Investments, LLC subpoena, dated January 12, 2009, Corey Dec., Exh. 53.
[43] Wachovia Corporation subpoena, dated January 12, 2009, Corey Dec., Exh. 57.
[44] Lexington Financial, LLC subpoena, dated January 30, 2009, Hauss Dec., Exh. 4.
[45] Fred Mashian subpoena, dated January 30, 2009, Hauss Dec., Exh. 5.
[46] See Hauss Dec. ¶ 7.
[47] See id.

OPPOSITION TO MOTION TO QUASH

and Larian's responses to these requests.[48]   MGA and Larian only objected,[49] and neither agreed to produce a single document in responses to the requests that Mattel served.[50]

## **Argument**

### I.    MATTEL'S SUBPOENAS DO NOT VIOLATE THE COURT'S ORDERS

Making no effort to dispute that Mattel's subpoenas seek relevant, discoverable information, MGA's sole argument for an order quashing the subpoenas is that they violate the Court's January 7, 2009 Order appointing a forensic auditor, and are therefore premature. (Mot. at 4-6).   According to MGA's interpretation of the January 7 Order, the Court barred Mattel from seeking *any* discovery relating to MGA's finances from *any* source when it appointed a forensic auditor. (Mot. at 4-6).   The January 7, 2009 Order does not say that, and MGA's argument by implication ignores the January 6, 2009 Order allowing Phase 2 discovery to proceed without limitation.

### A.    The Plain Language of the Janaury 7, 2009 Order Imposes No Limit on Phase 2 Discovery

MGA does not, and cannot, point to any language in the Court's January 7, 2009 Order that supports its erroneous reading. No such language exists.[51]   The Court found "good cause" to appoint a forensic auditor to review MGA's financial records. Not a single word or phrase in that January 7, 2009 Order reconsiders, overrules or limits the January 6, 2009 Order lifting the Phase 2 discovery stay.   Nor does a single word or phrase in the January 7, 2009 Order preclude Mattel from seeking relevant information from any source.[52]   Without support for a discovery limitation in the

---

[48]   See Responses to Requests for Documents and Things to MGA Entertainment, Inc. (Phase 2), dated February 6, 2009, Hauss Dec., Exh. 8; Responses to Requests for Documents and Things to Isaac Larian (Phase 2), dated February 6, 2009, Hauss Dec., Exh. 9.
[49]   See id.
[50]   See id.
[51]   Court's January 7, 2009 Order Appointing Forensic Auditor, Corey Dec., Exh. 105.
[52]   See id.

OPPOSITION TO MOTION TO QUASH

1   January 7, 2009, the discovery is not premature or otherwise improper and must be

2   denied.

### B.   MGA's Implied Discovery Limitation Argument Similarly Fails

4          Tacitly conceding that its argument is unsupported by any language in the

5   January 7 Order, MGA relies on comments made by the Court at the January 5, 2009

6   hearing on Mattel's application.   It is true that the Court discussed an incremental

7   approach to the process of deciding whether or not to appoint a receiver. (Mot. at 3).

8   As the Court stated:



13   (1/5/09 Hearing Tr. at 11:19-24).  The Court's comments thus reflect its preference to

14   appoint an independent auditor to uncover ████████████████████,

15   before appointing a receiver.

16          The Court did not discuss an incremental approach with respect to Phase 2

17   discovery.  Mattel submitted to the Court a listing of proposed expedited discovery.[53]

18   MGA argues that the appointment of a receiver is an implicit rejection of any effort by

19   Mattel to seek discovery into MGA's or Larian's finances.  Of course, if the District

20   Court meant to block Mattel's ability to obtain discovery, it could have and would have

21   said so.  The timing of the orders and the hearing also do not support the implication

22   that MGA attempts to draw.  If anything, they refute it.  The hearing at which the

23   statements that MGA relies upon were made, and at which Mattel's request for

24   expedited discovery was made, was January 5, 2009.  Mattel had made that request for

25   expedited discovery because at the time of the hearing, and prior to the January 6, 2009

---

[53]   See Notice of Lodging Expedited Discovery Requested in Connection With Mattel, Inc.'s *Ex Parte* Application for Receiver, dated January 4, 2009, Hauss Dec., Exh. 3.

07975/2789634.6

OPPOSITION TO MOTION TO QUASH

Order, all Phase 2 discovery had been stayed.[54]  The very next day, with Mattel's expedited requests in hand, the Court lifted the Phase 2 discovery stay without limitation.[55]  While the Court knows what its intent was, the only fair implication from a reading of the circumstances and the language of the Orders is that the Court did not wish to administer expedited, narrow discovery, but instead chose to allow discovery to proceed on these and all other Phase 2 topics.  Once the Court issued the order lifting the Phase 2 discovery stay, that Order governs until vacated or otherwise altered.  The January 7, 2009 Order does neither.

Notwithstanding the post-hearing Order allowing all discovery to proceed, MGA argues that the Court essentially intended to issue two, conflicting orders.  But that makes no sense.  MGA cannot credibly argue that the Court implicitly intended its January 7, 2009 Order to limit discovery based on colloquy about staging or staggering the decision to appoint a receiver, when between colloquy and order, the Court issued an order allowing all Phase 2 discovery to proceed.  If, as MGA contends, the Court had intended to narrow the scope of permissible Phase 2 discovery, it would have so stated in its Order.  It did not.

## II.   MATTEL'S SUBPOENAS SEEK RELEVANT DISCOVERY

Mattel's third-party subpoenas are relevant to Phase 2 claims and defenses.  They are thus expressly authorized by the Court's January 6, 2009 Order, which lifted the Phase 2 discovery stay and permitted Phase 2 discovery to proceed without limitation.[56]  MGA does not even attempt to show otherwise.  Instead, MGA points to a list of proposed, expedited discovery requests that Mattel lodged in support of its application for a receiver, and notes that Mattel's notice of lodging is marked "Phase 1C" on its cover page.[57]  MGA argues that this fact establishes that the third-party

---

[54]  February 4, 2008 Order, at 3 (staying Phase 2 discovery), Hauss Dec., Exh. 11.
[55]  Court's January 6, 2009 Order Appointing Discovery Master, at 2, Corey Dec., Exh. 35.
[56]  Id.
[57]  See Notice of Lodging Expedited Discovery Requested in Connection With Mattel, Inc.'s *Ex Parte* Application for Receiver, dated January 4, 2009, Hauss Dec., Exh. 3.

subpoenas at issue here cannot possibly relate to Phase 2. (Mot. at 5). The Discovery Master should reject this illogical, unsupported argument for the red herring that it is.

That Mattel lodged a list of proposed, expedited discovery requests to assist the Court in assessing whether to appoint a receiver–requests which sought different information *and which were directed at MGA*, rather than the third-parties at issue here–simply has no bearing on the relevance of Mattel's third-party subpoenas. Further, the "Phase 1C" marking, which appears on the cover of Mattel's notice of lodging (and not on the discovery requests themselves), is unremarkable. It merely reflects that this proposed discovery was lodged in support of Mattel's application for a receiver–nothing more.

In any event, MGA's arguments necessarily concede that Mattel's subpoenas seek information relevant to issues that are currently before the Court or undoubtedly will be raised again before the Court, such as in Mattel's pending application for a receiver and in MGA's repeated stay requests. That alone justifies the discovery sought here. But contrary to MGA's thesis, merely because the documents are relevant to such issues scarcely precludes the subpoenaed documents from *also* relating to Phase 2.[58] As shown below, Mattel's subpoenas seek information that is indisputably relevant to Phase 2 issues and therefore properly seek discoverable information for these independent reasons.

## A.   The Documents Sought Are Relevant to Mattel's Phase 2 RICO Claims

Mattel's requests are directly relevant to its RICO claims. In its counterclaims, Mattel alleges that the counter-defendants have operated a widespread criminal enterprise that has engaged in numerous acts of mail and wire fraud and other

---

[58]   Indeed, the Court has previously recognized that discovery can be relevant to both Phase 1 and Phase 2, which is precisely why the Court permitted Phase 1 and 2 discovery to proceed simultaneously through February 4, 2008. See October 31, 2007 Order, at 2 (denying MGA's request to stay or otherwise bifurcate discovery regarding Phase 2 issues), Hauss Dec., (footnote continued)

OPPOSITION TO MOTION TO QUASH

1   predicate acts in violation of the RICO statute.[59]   MGA's mid-trial transactions with

2   Omni 808 and the other non-operating entities, which bear the classic hallmarks of an

3   effort to fraudulently transfer assets to its controlling shareholders, are a continuation of

4   that pattern of racketeering activity in which MGA and Larian have long been engaged.

5   See, e.g., Asdourian v. Konstantin, 77 F. Supp. 2d 349, 355, 359 (E.D.N.Y. 1999)

6   (allegations that defendant "siphoned away" corporation's assets through "systematic

7   looting" accomplished through fraudulent mortgages constitute predicate acts for

8   RICO).  At a minimum, then, the requests are likely calculated to lead to evidence of

9   additional acts of wire and mail fraud.[60]  As such, they are unquestionably relevant,

10  because a plaintiff alleging RICO violations should be permitted discovery into each

11  instance of a predicate act, even where further discovery is "unnecessary" to establish

12  the category of predicate act.  See Eastman Kodak Co. v. Camarata, 238 F.R.D. 372,

13  376 (W.D.N.Y. 2006).[61]

14              The discovery sought by the subpoenas may also reveal additional, distinct

15  predicate acts in support of Mattel's RICO allegations.  Mattel's requests seek to

16  unravel the true nature of these "financing" transactions, which involve various shell

17  and off-shore companies and appear to be deliberately structured to conceal the ultimate

18  source of funding.  It may be intended to "conceal or disguise the nature, the location,

19  the source, the ownership, or the control of the proceeds" derived from defendants'

20  unlawful activity—here, among other things, their infringement of Mattel's intellectual

21  property. 18 U.S.C. § 1956.  Whatever the reason, MGA's recent "financing" raises a

22  host of potential predicate RICO violations, regarding which Mattel is entitled to

---

Exh. 10; February 4, 2008 Order, at 3 (staying Phase 2 discovery, but expressly excepting certain depositions "that may be related to both Phase 1 and Phase 2"), Hauss Dec., Exh. 11.
[59]   Mattel's Second Am. Complaint and Counter-Claims, dated July 12, 2007, at ¶¶ 88-105, Corey Dec., Exh. 19.
[60]   See id. at ¶ 93(a) & (b).
[61]   Moreover, even the terms of the loans are themselves relevant.  MGA has paid hundreds of millions of dollars to Larian and his family or associates throughout this litigation.  See Corey Dec., ¶ 92 and reference exhibits therein.  That is directly relevant to Larian's (footnote continued)

1  discovery.  See, e.g., 18 U.S.C. § 1957 (use of unlawful funds), 18 U.S.C. § 2314

2  (transportation of converted funds).  Likewise, the sales by the IGWT entities of

3  infringing Bratz product may constitute predicate acts of criminal copyright

4  infringement by MGA – predicate acts that Mattel has alleged against MGA in Phase

5  2.[62]  Thus, the discovery sought is plainly proper.

6  **B.**   **The Documents Sought Are Also Relevant to Mattel's Phase 2**

7        **Disgorgement Claim**

8        One remedy Mattel seeks is disgorgement of all amounts wrongfully

9  obtained.  Mattel may also be entitled to damages for lost profits pursuant to its

10  disgorgement theory of damages.  The disgorgement remedy further provides for the

11  imposition of constructive trusts to recover the ill-gotten gains of MGA and Isaac

12  Larian that have been transferred to other parties.  For purposes of establishing

13  disgorgement, Mattel is entitled to take into account money transferred from MGA and

14  Isaac Larian, regardless of the manner in which it was transferred. Mattel is entitled to

15  discovery that shows assets siphoned from MGA or Isaac Larian during the period of

16  the alleged wrongful conduct.

17        Disgorgement is an available remedy for Mattel's claims against MGA and

18  Larian, including Mattel's claim for trade secret misappropriation.  See 4 Callmann,

19  Unfair Competition and Monopolies § 14.45 (4th ed.); Clark v. Bunker, 453 F.2d 1006,

20  1011 (9th Cir. 1972).  The scope of the disgorgement remedy is set forth in two recent

21  California Supreme Court decisions.  See Kraus v. Trinity Management Servs., Inc., 23

22  Cal. 4th 116 (2000); Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134

23  (2003).  The court indicated that:

24        "disgorgement" is a broader remedy than restitution. . . .

25        [A]n order for disgorgement "may compel a defendant to

26

27  personal liability for RICO violations and evidence of his association with and control over the enterprise.
   [62] SAAC, ¶ 93.

28

1        surrender *all* money obtained through an unfair business

2        practice even though not all is to be restored to the persons

3        from whom it was obtained or those claiming under those

4        persons.  It has also been used to refer to surrender of *all*

5        profits earned as a result of an unfair business practice

6        regardless of whether those profits represent money taken

7        directly from persons who were victims of the unfair

8        practice."

9    Korea Supply, 29 Cal. 4th at 1145 (quoting Kraus, 23 Cal. 4th at 127) (emphasis

10   added).

11        Moreover, an important part of disgorgement is the imposition of a

12   constructive trust to recover ill-gotten gains that have been transferred to others by the

13   defendant. A constructive trust is intended to prevent unjust enrichment, with equity

14   compelling the restoration to another of property to which the holder thereof is not

15   justly entitled. Taylor v. Polackwich, 145 Cal. App. 3d 1014, 1022 (1983); Cal. Civ.

16   Code §§ 2223, 2224.  See also Weiss v. Marchus, 51 Cal. App. 3d 590, 600 (1975)

17   (constructive trust may be imposed in case of fraud, mishandling, or almost any case of

18   wrongful acquisition or detention of property to which another is entitled).  When

19   personal property is in dispute, the legislature has allowed plaintiffs to invoke the

20   remedy of constructive trust. Cal. Civ. Code §§ 2223, 2224. To create a constructive

21   or involuntary trust only three conditions are necessary: existence of a res, i.e. property

22   or some interest in property, plaintiff's right to that res and defendant's gain of the res

23   by fraud, accident, mistake, undue influence, violation of the trust or other wrongful

24   act. Kraus v. Willow Park Public Golf Course, 73 Cal. App. 3d 354 (1977); see Cramer

25   v. Biddison, 65 Cal. Rptr. 624, 257 Cal. App. 2d 720 (1968). See Burlesci v. Petersen,

26   68 Cal. App. 4th 1062, 1067 (1998) (constructive trust); Farmers Ins. Exchange v.

27   Zerin, 53 Cal. App. 4th 445, 454-55 (1997) (equitable lien is proper if unjust

28   enrichment and detrimental reliance are implicated)

1    By these subpoenas, Mattel seeks evidence to prove the amount the
2  defendants must disgorge.  Money that properly belonged to Mattel was transferred
3  from MGA or Isaac Larian to an entity controlled by them.  Mattel should be able to
4  understand how that money was used because MGA and Isaac Larian have no right to
5  whatever additional gains realized with Mattel's money.  Rather, the right to those
6  additional gains vests solely in Mattel.

7    **C.    The Documents Sought Are Relevant to Phase 2 Damages**

8    The subpoenas also seek documents relevant to the MGA parties' financial
9  condition, which is relevant to Mattel's Phase 2 damages claims.  A defendant's net
10  worth, financial condition, and ability to pay any award are all factors relevant to an
11  award of punitive damages.  See, e.g., Hilao v. Estate of Marcos, 103 F.3d 767, 781-82
12  & n. 7 (9th Cir. 1996) (financial condition a relevant factor in awarding punitive
13  damages); Southern California Housing Rights Center v. Krug, 2006 WL 4122148, *4
14  (C.D. Cal. 2006) ("When a punitive damages claim has been asserted, a majority of
15  federal courts permit pretrial discovery of financial information about defendants
16  without requiring the plaintiff to establish a prima facie case on the issue of punitive
17  damages."); Robert L. Cloud & Associates v. Mikesell, 69 Cal. App. 4th 1141,148-
18  1152 (1999) (defendant's "ability to pay damages award" and "financial condition"
19  were relevant to determining award of punitive damages for misappropriation of trade
20  secrets).

21    Judge Larson and the former Discovery Master have ruled that Mattel is
22  entitled to evidence related to MGA's net worth.  For example, Mattel moved to compel
23  MGA to produce a Rule 30(b)(6) witness on issues related to MGA's net worth after
24  MGA claimed such evidence was irrelevant and should be left to expert testimony.  The
25  Discovery Master agreed with Mattel and ordered the deposition to proceed on the issue
26  of net worth, among others.  MGA objected and appealed to Judge Larson, who
27  affirmed the Discovery Master and held "[t]hat net worth is generally the subject of
28

07975/2789634.6

-18-

OPPOSITION TO MOTION TO QUASH

1   expert testimony at trial – a proposition disputed by neither Mattel nor the Court – does

2   not render it an improper subject for a Rule 30(b)(6)."[63]

3        Omni 808 and Vision Capital are directly involved in providing funding to

4   MGA in exchange for a purported security interest. Such funding, and ostensible

5   security interests, are in and of themselves directly relevant to the financial condition of

6   the MGA Parties, including the amount of the security interests, the terms and

7   conditions of the funding, and the rate of the funding. The true identity of the persons

8   and entities providing the funding and obtaining a security interest in MGA are likewise

9   relevant to that issue. Moreover, given the level of financing, the parties must have

10  engaged in evaluations of the past, present, and future value of the MGA parties. It is

11  just such documents that the third-party subpoenas at issue seek.

12       Finally, as noted above, MGA is using IGWT to sell Bratz products and

13  conduct Bratz business. Obviously, these sales and this kind of evasion is directly

14  relevant to the claims at issue, as well as to the net worth and financial condition of the

15  MGA Parties. Mattel is entitled to the information sought by the subpoenas for these

16  additional reasons.

17  **D.**   **The Documents Sought Are Relevant to the MGA Parties' Credibility**

18      **In Phase 2**

19       Information is also relevant and discoverable if it relates to "the credibility

20  of any witness." Cable & Computer Tech., Inc. v. Lockheed Sanders, Inc., 175 F.R.D.

21  646, 650 (C.D. Cal. 1997). MGA and Larian have made repeated statements under oath

22  about their financial condition as well as about the role of Omni 808 and the other non-

23  operating entities in providing MGA with additional funding.[64] Mattel is therefore

24

25

26  [63] July 2, 2007 Order, at 5, Corey Dec., Exh. 12.

27  [64] Compare Declaration of Brian Wing in support of the MGA Parties' Request for a Stay, dated December 11, 2008, at ¶ 13, Corey Dec., Exh. 36 with MGA Parties' Corrections to the Opposition to Mattel's *Ex Parte* Application for Appointment of a Receiver, dated December

28  31, 2008, at 1, Corey Dec., Exh. 38.

OPPOSITION TO MOTION TO QUASH

1   entitled to discovery to determine the true state of these matters – information which is

2   directly relevant to MGA's and Larian's credibility.

3       **E.    The Documents Sought are Relevant to the MGA Parties' Unclean**

4           **Hands Defense In Phase 2**

5           The subpoenas also seek documents relevant to the MGA Parties' defense

6   of unclean hands.  In their answers to Mattel's cross-claims, MGA and Larian asserted

7   that "Mattel's counterclaims are barred in whole or in part by Mattel's unclean hands."[65]

8   The alleged basis for their unclean hands defense is wide ranging, touching on every

9   aspect of Phases 1 and 2 of this case, including the alleged infringement of MGA's

10  trade dress and Bratz products as well as allegedly interfering with MGA's efforts to

11  hire Mattel employees.[66]

12          Mattel is entitled to respond to these allegations by demonstrating that the

13  MGA Parties are precluded from invoking the unclean hands defense because they have

14  not themselves acted with clean hands.  The invocation of "unclean hands" is an

15  equitable defense.  GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1209-10 (9th

16  Cir. 2000) (discussing "equitable defense" of "unclean hands"); In re McKesson HBOC,

17  Inc. Erisa Litigation, 391 F.Supp.2d 812, 842 (N.D. Cal. 2005) ("[U]nclean hands is an

18  equitable defense.").  A party asserting an equitable defense, however, must itself have

19  "clean hands."  Nelmida v. Shelly Eurocars, Inc., 112 F.3d 380, 385 (9th Cir. 1997)

20  (("A cardinal maxim of equity jurisprudence is that he who comes into equity must

21  come with clean hands.") (quoting Banks v. Rockwell Intern. North American Aircraft

22  Operations, 855 F.2d 324, 327 (6th Cir. 1988)); Granberry v. Islay Investments, 9 Cal.

23  4th 738, 743-744, 750 (1995) (equitable defense may be "barred by any of the generally

24  applicable equitable affirmative defenses, including . . . unclean hands"); Blain v.

25  Doctor's Co., 222 Cal. App. 3d 1048, 1059 (1990) ("He who comes into Equity must

26  ───────────────────

27  [65]   MGA's Amended Answer and Affirmative Defenses, dated September 19, 2007, at 20-
      21, Corey Dec., Exh. 103; Isaac Larian's Amended Answer and Affirmative Defenses, dated
      November 8, 2007, at 16-18, Corey Dec., Exh. 104.

28

                                                OPPOSITION TO MOTION TO QUASH

1   come with clean hands."). As discussed above, MGA may be engaging in sham and

2   fraudulent financial transactions such as concealing profits and sales of Bratz and other

3   products "off the books" through newly created single purpose companies. If true,

4   MGA and Larian would be acting with unclean hands and thus precluded from

5   invoking the unclean hands defense themselves.

6   **F.     The Documents Sought Are Relevant to Mattel's Phase 2 Unfair**

7        **Competition Claim**

8            The subpoenas seek documents related to Mattel's claim for unfair

9   competition. The MGA Parties' actions in manipulating the sources of funding and

10  apparently using single-purpose companies to unload Bratz products for pennies on the

11  dollar and resell them may be anti-competitive actions that are encompassed by

12  California's unfair competition laws. Under Business and Professions Code § 17200,

13  "unfair competition" includes "any unlawful, unfair or fraudulent business act or

14  practice...." Section 17200's scope is "sweeping, embracing anything that can properly

15  be called a business practice and that at the same time is forbidden by law." Rubin v.

16  Green, 4 Cal. 4th 1187, 1200 (1993) (internal quotation marks and citation omitted). It

17  encompasses "anti-competitive business practices as well as injuries to consumers, and

18  has as a major purpose the preservation of fair business competition." Cel-Tech

19  Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 180

20  (1999). Accordingly, the documents sought are reasonably calculated to lead to the

21  discovery of admissible evidence relating to Mattel's unfair competition claim.

22                              **Conclusion**

23          For the foregoing reasons, Mattel respectfully requests that the Discovery

24  Master deny the MGA Parties' motion to quash Mattel's third-party subpoenas.[67]

25

26  ───────────

    [66]  Id.

27  [67]  In the event the Discovery Master decides to grant MGA's motion to quash, Mattel
    respectfully submits that it should be permitted to revive its third-party subpoenas upon

28  written notice to counsel, and should not be required to re-serve them.

1

2    DATED:  February 10, 2009        QUINN EMANUEL URQUHART OLIVER &
                                      HEDGES, LLP
3

4                                     By  /s/ Jon D. Corey
                                          Jon D. Corey
5                                         Attorney for Mattel, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION TO QUASH