# EXHIBIT K

# Filed Under Seal

# EXHIBIT L

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____ Send _____
Entered _____ Closed _____
JS-5/JS-6 _____ JS-2/JS-3 _____
Scan Only_____ Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
ENTRY AS REQUIRED BY FRCP 77(d)
JUN 27 2007
EASTERN DIVISION
BY _____ DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY     JIM HOLMES     DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | |
| | CONSOLIDATED WITH |
| v. | CV 04-09059 SGL |
| | CV 05-02727 SGL |
| MATTEL, INC., | |
| | ORDER RE MOTIONS HEARD ON |
| Defendant, | JUNE 11, 2007 |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of parties in these consolidated cases. The factual allegations underlying the present actions are expansive and complex. They are set forth below only to the extent necessary for the Court's consideration of the present motions. At their essence, although involving a number of other legal and factual issues, these cases involve the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the motions, filed by certain counter-defendants, address the sufficiency of the allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these motions challenge the sufficiency of the allegations which underlie Mattel's claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

EXHIBIT   L
PAGE   26

●                                    ●

1   §§ 1961-1968 ("RICO").  Another motion challenges the Court's exercise of

2   personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V.

3   ("MGA Mexico").  Two additional motions seek review of a ruling, issued by a court-

4   appointed discovery master, overruling objections made during a party's deposition

5   that were based on the attorney-client and joint-defense privileges.  A final motion

6   heard on June 11, 2007, addresses the Court's scheduling order that divided the

7   issues to be tried in these consolidated cases into two phases.  This last motion will

8   be addressed in a separate order.

9        The Court has reviewed the parties' filings regarding these motions and held

10   a hearing on June 11, 2007.  For the reasons and in the manner set forth more fully

11   herein, the Court makes the following rulings regarding these motions:

12        1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian

13   ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1]

14   **GRANTED IN PART AND DENIED IN PART.**

15        2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and

16   XI (docket # 191):  **GRANTED IN PART AND DENIED IN PART.**

17        3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and

18   Counterclaims (docket # 266):  **DENIED.**

19        4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order

20   (docket # 308):  **GRANTED IN PART AND DENIED IN PART.**

21        5.    Motion of Carter Bryant Objecting to Discovery Master's March 7,

22   2007, Order (docket # 306):  **GRANTED IN PART AND DENIED IN PART.**

23

24

25

26

27
        [1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong
28   Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

EXHIBIT L
PAGE 81

# I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

## A.   Bryant's Employment by Mattel

Carter Bryant was hired by Mattel as a Barbie product designer in January 1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept. (AAC ¶ 26.) Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project. (AAC ¶ 27.)

## B.   MGA's Involvement in Bryant's Conduct

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources. (AAC ¶ 33). Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.) Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.)

Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

EXHIBIT L
PAGE 82

1   showed the Bratz prototypes to focus groups and retailers.  (AAC ¶ 29.)  Soon

2   thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in

3   January, 2001, and then began manufacturing and selling the dolls to retailers for

4   an annual revenue in the excess of $500 million.  (AAC ¶¶ 31-32.)

5   **C.   Proprietary Information**

6       **1.   Mexico**

7       Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty

8   Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose

9   ("Vargas") were upper-level employees at Mattel Mexico.  (AAC ¶¶ 38-40.)  In the

10  three months before all three simultaneously resigned from Mattel Mexico on April

11  19, 2004, they were in contact with MGA via an email account with the address

12  "plot04@aol.com".  (AAC ¶ 42.)  The three former employees allegedly used this

13  account to supply MGA with confidential and proprietary Mattel information.  (AAC

14  ¶ 42.)  The three also copied various proprietary Mattel documents onto USB flash

15  drives prior to resigning.  (AAC ¶ 44-46.)  Shortly before her departure, Trueba

16  increased her access to Mattel's confidential information and attended a meeting at

17  which Mattel personnel analyzed Barbie programs for the United States, Canada,

18  and South America.  (AAC ¶ 47.)

19      Among them, Machado, Trueba, and Vargas stole documents containing

20  information regarding Mattel's future products, production and shipping costs, sales

21  information, customer information, marketing information, and strategic research

22  information both in Mexico and worldwide.  (AAC ¶ 48.)  The stolen data was not

23  limited to the Mexican market; rather, the information stolen had the potential, and

24  in fact did, give MGA an unfair competitive advantage in the United States and

25  around the world.  (AAC ¶ 49.)

26      In an attempt to conceal his actions, Machado ran a software program on his

27  Mattel computer in order to erase information pertaining to his contact with MGA.

28  (AAC ¶ 51.)  When Mattel alerted Mexican authorities about the theft, they seized

EXHIBIT **L**

PAGE **83**

4

from MGA's Mexico City offices, pursuant to a search warrant, a large number of
documents containing Mattel trade secrets and confidential information. (AAC
¶ 53.)

    Shortly after the theft, Machado, Trueba, and Vargas traveled to Los
Angeles to meet face-to-face with MGA personnel. (AAC ¶ 52.)

### 2.  Canada

    Jane Brisbois was the Director of Sales for the Girls Division in Canada.
(AAC ¶ 71.) When she was hired in 1999, she agreed to preserve and not disclose
Mattel's proprietary information. (AAC ¶ 71.)  While still employed by Mattel,
Brisbois spoke with Larian on September 22, 2005. (AAC ¶ 74.) That same day,
Brisbois copied approximately 45 Mattel documents containing Mattel trade secret
information into a USB flash drive that she took from the Mattel Canada office.
(AAC ¶ 74.) The files taken by Brisbois included documents regarding Mattel sales,
advertising strategies, market analyses, product launch dates, and profit margins in
Canada, Mexico, and the United States. (AAC ¶ 74.) Four days later, she resigned
from Mattel.  (AAC ¶ 74.)

    When Mattel learned of Brisbois' misappropriation of Mattel documents, it
notified Canadian law enforcement officials, who were able to recover the flash
drive and the documents from Brisbois. (AAC ¶ 75.)

### 3.  United States

    Ron Brawer was Mattel's Senior Vice President and General Manager.
(AAC ¶ 55.) On September 17, 2004, Brawer informed Mattel that he was leaving
Mattel to work for MGA. (AAC ¶ 63.) During Brawer's exit interview, he falsely
represented that he had returned all proprietary information to Mattel; specifically,
Brawer took the information in his contacts file which included contact information
for Mattel customers and Mattel employees. (AAC ¶ 68.) Brawer has since used
the contact information to induce certain Mattel employees to join MGA and
misappropriate Mattel trade secrets. (AAC ¶ 69.)

RightFAX                   6/2   2007 3:04:15PAGE  007/037     ax Server

1    MGA has also allegedly hired at least 25 other Mattel employees, some of

2    whom have provided MGA with Mattel's confidential information. (AAC ¶ 77.)

3    **D.**    **Larian's Communications Regarding Mattel's New Product Line**

4        On May 12, 2006, Larian sent an email message to an email distribution list

5    that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING

6    BLING") which Mattel had not yet made public. (AAC ¶ 79.) The distribution of the

7    email included members of the media and many of Mattel's most significant

8    customers. (AAC ¶ 78.) Soon after sending the email, Larian began calling these

9    significant customers and making false representations about the product;

10   specifically, Larian told each that it was the only retailer to purchase the product

11   and that Mattel would not be supporting the product with television advertising.

12   (AAC ¶ 80.)

13   **E.**    **Exhibit C**

14       In Exhibit C to the AAC, Mattel references a number of communications,

15   numbering well over one hundred, that it contends constitutes predicate acts of mail

16   fraud or wire fraud. Exhibit C does not describe the contents of those

17   communications.

18                                    **II. Counterclaims Asserted**

19       Based on these allegations, Mattel asserts the following counterclaims:

20   (1) Copyright Infringement, including willful, vicarious, and contributory

21   infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;

22   (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as

23   authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate

24   acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a

25   violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted

26   against all defendants; (4) state-law misappropriation of trade secrets against MGA,

27   MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant

28   only and based on certain employment agreements between Bryant and Mattel;

6

EXHIBIT __L__

PAGE __85__

1   (6) intentional interference with contract, asserted against MGA and Larian and

2   based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3   against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4   asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5   against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6   asserted against MGA and Larian; (11) conversion, asserted against all counter-

7   defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8   Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9   declaratory relief.

10  **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11          The parties have moved to dismiss a number of Mattel's counterclaims on

12  various grounds.  The Court addresses each claim in turn, considering at all times

13  the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14  **A.     Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)**

15          In lieu of an answer, a party may, as the counter-defendants have here, file a

16  motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17  motion may be made where the pleader has "fail[ed] to state a claim upon which

18  relief can be granted."  Id.  In deciding a Rule 12(b)(6) motion, the Court must also

19  consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20  plain statement of the claim showing that the pleader is entitled to relief" or, when

21  the claim at issue avers fraud or mistake, the motion must be considered in

22  conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23  with particularity.  See 5A Charles A. Wright & Arthur Miller, Federal Practice and

24  Procedure, §1356 (1990); James Wm. Moore, Moore's Federal Practice, Vol. 2

25  § 12.34[1][c].

26          In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27  burden of persuading the Court that the complaint has failed to state a claim upon

28  which relief can be granted.  Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406,

7

1   1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991). In considering the motion,

2   "courts must consider the complaint in its entirety," and read it in the light most

3   favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

4   well as reasonable inferences to be drawn therefrom. Tellabs, Inc. v. Makor Issues

5   & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL 1773208, at *9 (June 21, 2007);

6   Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998). However, the Court need not

7   accept any unwarranted deductions of fact, or conclusory legal statements cast in

8   the form of factual allegations. See Western Mining Council v. Watt, 643 F.2d 618,

9   624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

10         Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

11  motion; however, a court may consider exhibits attached to the complaint as well as

12  documents that are not physically attached to the complaint but "whose contents

13  are alleged in [the] complaint and whose authenticity no party questions." Branch v.

14  Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

15  Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

16  also properly considered. Mir v. Little Company of Mary Hospital, 844 F.2d 646,

17  649 (9th Cir. 1988).

18  **B.    RICO Claims**

19         The counter-defendants devote most of their motions to the sufficiency of the

20  allegations regarding Mattel's RICO claims. The Court's analysis begins, as it must

21  when considering a federal statute, with the language of that statute. The

22  substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

23              It shall be unlawful for any person employed by or associated

24         with any enterprise engaged in, or the activities of which affect,

25         interstate or foreign commerce, to conduct or participate, directly or

26         indirectly, in the conduct of such enterprise's affairs through a pattern

27         of racketeering activity or collection of unlawful debt.

28  Id. Conspiracies to violate this substantive prohibition are themselves prohibited by

8

EXHIBIT  L
PAGE  87

1   § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2   violate any of the provisions of subsection (a), (b), or (c) of this section."  Id.  Many

3   of these terms are defined by the statutory language, including "racketeering

4   activity," "enterprise," and "pattern of racketeering activity":

5           (1) "racketeering activity" means . . . (B) any act which is

6       indictable under any of the following provisions of title 18, United

7       States Code: . . . section 1341 (relating to mail fraud), section 1343

8       (relating to wire fraud), . . . section 1512 (relating to tampering with a

9       witness, victim, or an informant), . . . section 1952 (relating to

10      [interstate and foreign travel or transportation in aid of racketeering

11      enterprises]), [and] section 2319 (relating to criminal infringement of a

12      copyright)[.]

13                          . . . .

14          (4) "enterprise" includes any individual, partnership,

15      corporation, association, or other legal entity, and any union or group

16      of individuals associated in fact although not a legal entity;

17          (5) "pattern of racketeering activity" requires at least two acts of

18      racketeering activity, one of which occurred after the effective date of

19      this chapter and the last of which occurred within ten years (excluding

20      any period of imprisonment) after the commission of a prior act of

21      racketeering activity[.]

22   18 U.S.C. § 1961.

23          In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24   Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25   fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26   measures the sufficiency of all other predicate acts by the more lenient standard set

27   forth in Rule 8(a).  Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28   mistake, the circumstances constituting fraud or mistake shall be stated with

EXHIBIT  L

PAGE  68

9

1  particularity. Malice, intent, knowledge, and other condition of mind of a person

2  may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3  claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4  showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5  v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6  9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7  repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8  predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9         In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property." Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted). Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14         **1.    "Conduct or Participate"**

15         Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability. In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ." 18 U.S.C. § 1962(c). The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22         [T]he word "participate" makes clear that RICO liability is not limited to

23         those with primary responsibility for the enterprise's affairs, just as the

24         phrase "directly or indirectly" makes clear that RICO liability is not

25         limited to those with a formal position in the enterprise, but some part

26         in directing the enterprise's affairs is required.

27  Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact

10

EXHIBIT __L__

PAGE __89__

1  when he had a duty to disclose it, and that he did these things in order to facilitate

2  the development of the Bratz concept by Mattel's direct competitor, in violation of,

3  *inter alia*, criminal copyright law. These allegations, if proven to be true, are

4  sufficient to impose RICO liability on Bryant.

5  **2.  Enterprise**

6  Bryant's motion challenges the sufficiency of the allegations regarding a

7  RICO enterprise. That enterprise is alleged to be an "association-in-fact" enterprise

8  comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and

9  others. (AAC ¶ 89.) Mattel alleges that counter-defendants participated in or

10 conducted the affairs of the association-in-fact enterprise through a pattern of

11 racketeering activities, including, as detailed in the AAC, predicate acts of mail

12 fraud, wire fraud, evidence tampering, interstate and foreign travel to aid

13 racketeering activities, and criminal copyright infringement. (AAC ¶ 90.) The

14 counter-defendants' goal is alleged to have been to "execut[e] or attempt to

15 execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or

16 otherwise confidential and proprietary information . . . ." (AAC ¶ 90.)

17 A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive

18 analysis of the sufficiency of allegations regarding a RICO enterprise necessary to

19 state a claim. See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th

20 Cir. 2007) (designated for publication). That decision provides the blueprint for the

21 Court's present analysis.

22 Odom involved an alleged scheme involving consumers who purchased

23 computers from Best Buy retail stores. Id. at 543. The computers would include a

24 Microsoft compact disc that the cashier would scan; the consumer's credit card was

25 also scanned for purchase. Id. The credit card information was transmitted to

26 Microsoft, and Microsoft would, at some point, begin making unauthorized charges

27 to the credit card used to purchase the computer, ostensibly for Microsoft's

28 provision of internet services. Id. Odom brought substantive RICO and RICO

EXHIBIT __L__

PAGE __90__

1  conspiracy claims based on these allegations. Id. at 544.

2      The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3  lower courts, contrasted with the Supreme Court's four reversals of such narrow

4  readings of RICO. Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5  (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6  businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7  (1985) (rejecting notion that RICO could be used to impose civil liability only where

8  the defendant had been criminally convicted and that such liability was limited to a

9  narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities). In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly." Odom, 486 F.3d at 547 (internal citation omitted).

19      In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" In the text of RICO is fairly

22      straightforward. In its entirety, the definition is as follows: "'enterprise'

23      includes any individual, partnership, corporation, association, or other

24      legal entity, and any union or group of individuals associated in fact

25      although not a legal entity." 18 U.S.C. § 1961(4). As is evident from

26      the text, this definition Is not very demanding. A single "individual" Is

27      an enterprise under RICO. Similarly, a single "partnership," a single

28      "corporation," a single "association," and a single "other legal entity"

12

EXHIBIT __L__
PAGE __9l__

1    are all enterprises. At issue in this case is the last kind of enterprise

2    listed in the definition -- a "group of individuals associated in fact." It is

3    undisputed that a corporation can be an "individual" for purposes of

4    an associated-in-fact enterprise.

5    Id. at 548.

6    The Ninth Circuit acknowledged that "enterprise" must be something greater

7    than merely a pattern of racketeering activity; however, the court rejected the notion

8    that an enterprise must have a particular ascertainable organizational structure.  Id.

9    at 551 ("We take this opportunity to join the circuits that hold that an

10   associated-in-fact enterprise under RICO does not require any particular

11   organizational structure, separate or otherwise.") (citations omitted).  A party need

12   only set forth factual allegations of "a group of persons associated together for a

13   common purpose of engaging in a course of conduct," "evidence of an ongoing

14   organization, formal or informal," and "evidence that the various associates function

15   as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16   As for the common purpose, it was met in Odom, where the plaintiff had

17   alleged the following:

18       [D]efendants had the common purpose of increasing the

19       number of people using Microsoft's Internet Service, and doing so by

20       fraudulent means.  Best Buy furthered this common purpose by

21       distributing Microsoft Internet Trial CD's and conveying its customers'

22       debit and credit card information to Microsoft.  Microsoft then used the

23       information to activate customer accounts.

24   Id. Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25   and steal its trade secrets. Mattel's many factual allegations, detailed herein,

26   support this alleged common purpose.

27   As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28   noted that the plaintiffs had met that element, which was met where the

13

EXHIBIT __L__

PAGE ___9L___

1 | organization was alleged to be "a vehicle for the commission of two or more
2 | predicate crimes." Id. (internal quotation marks and citation omitted). The Ninth
3 | Circuit noted the following factual allegations:

4 | Microsoft and Best Buy established mechanisms for
5 | transferring plaintiffs' personal and financial information from Best Buy
6 | to Microsoft. That information then allowed Microsoft to activate
7 | plaintiffs' Internet accounts without their knowledge or permission.
8 | These mechanisms enabled Microsoft to bill plaintiffs improperly for
9 | MSN services in 2001, 2002 and 2003.

10 | Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many
11 | efforts at depriving Mattel of its proprietary information and its intellectual property.
12 | The allegations regarding common use of the "plot04@aol.com" email address to
13 | transfer confidential Mattel information to MGA support the finding of an "ongoing
14 | organization." So, too, do the allegations regarding the repeated communications
15 | between Bryant and MGA.

16 | The "continuing unit" requirement does not appear to the Court to mandate
17 | that the organization continues to this day;[2] rather, the requirement is related to the
18 | notion that RICO was not meant to address discrete instances of fraud or criminal
19 | conduct. "[T]he continuity requirement focuses on whether the associates'
20 | behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation
21 | marks and citation omitted). Related to that concern, it is also clear to the Court
22 | that this requirement is related to the duration of the racketeering activities. See id.
23 | ("An almost two-year time span is far more than adequate to establish that Best
24 | Buy and Microsoft functioned as a continuing unit."). Here, the allegations do not
25 | reveal that the conduct complained of was mere isolated activity; rather, Mattel sets
26 | forth allegations of racketeering activity that spanned a period of three years. The

27 |

28 | [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
of its continued use of Mattel's information and property.

14

EXHIBIT __L__

PAGE __93__

1  allegations describe a scheme consisting of corporate warfare between competitors
2  that has been waged over a long period of time and waged on a number of fronts,
3  both foreign and domestic. The "continuing unit" requirement is therefore satisfied.
4      Accordingly, the Court finds that Mattel has sufficiently pleaded the existence
5  of a RICO enterprise.
6      **3.  Predicate Acts of Racketeering Activity**
7          ***a.  Mail Fraud and Wire Fraud***
8      The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:
9          *Whoever, having devised or intending to devise any scheme or*
10         *artifice to defraud, . . . for the purpose of executing such scheme or*
11         *artifice or attempting so to do, places in any post office or authorized*
12         *depository for mail matter, any matter or thing whatever to be sent or*
13         *delivered by the Postal Service, or deposits or causes to be deposited*
14         *any matter or thing whatever to be sent or delivered by any private or*
15         *commercial interstate carrier, or takes or receives therefrom, any such*
16         *matter or thing, . . . shall be fined under this title or imprisoned not*
17         *more than 20 years, or both.*
18  Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a
19  scheme to defraud; (2) using or causing the use of the mails to further the
20  fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321
21  F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).
22      The criminal prohibition against wire fraud is similar:
23         *Whoever, having devised or intending to devise any scheme or*
24         *artifice to defraud, . . . transmits or causes to be transmitted by means*
25         *of wire, radio, or television communication in interstate or foreign*
26         *commerce, any writings, signs, signals, pictures, or sounds for the*
27         *purpose of executing such scheme or artifice, shall be fined under this*
28         *title or imprisoned not more than 20 years, or both.*



EXHIBIT _____

15                                              PAGE ___ 99

1  18 U.S.C. § 1343. The Ninth Circuit has described the elements of wire fraud as

2  "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

3  (3) a specific intent to deceive or defraud." United States v. Shipsey, 363 F.3d 962,

4  971 (9th Cir. 2004) (citations omitted).

5       As all parties acknowledge, the predicate acts of mail fraud and wire fraud

6  must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b). Specifically,

7  Mattel must detail "the time, place, and manner of each act of fraud, [and it must

8  set forth] the role of each defendant in each scheme." Lancaster Community

9  Hosp., 940 F.2d at 405. This standard applies in RICO actions alleging predicate

10 acts of mail fraud. Id.

11      Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

12 fraud referenced in Exhibit C to the AAC. However, these alleged predicate acts

13 are insufficiently pleaded because they fail to adequately describe the contents of

14 the communications; specifically, they fail to detail time, place and manner of "each

15 act of fraud." The substantive RICO claim is therefore dismissed to the extent it is

16 premised on those communications. Mattel is **GRANTED** leave to amend the RICO

17 claim based on this insufficiency; Mattel must attach to the Second Amended

18 Answer and Counterclaims ("SAAC") copies of the referenced communications.

19 The contents of packages referenced in Exhibit C must be described in order to

20 meet the Rule 9(b) requirements.

21      At oral argument, counsel for MGA argued that the substance of many, if not

22 all of the communications, cannot be read to further a scheme to defraud. That

23 argument will be considered another day, after Mattel files the SAAC. However, the

24 Court takes the opportunity today to note that, given the broad scope of the alleged

25 scheme to defraud, including the criminal copyright infringement allegations,

26 otherwise innocuous and routine communications regarding day-to-day operations

27 and product development may be found to be in furtherance of that scheme. See

28 Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484, 2007 WL

16

EXHIBIT __L__

PAGE __95__

1  1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,
2  "courts must consider the complaint in its entirety").

3      Counter-defendants also argue that Mattel failed to plead each defendant's
4  role in furtherance of the scheme to defraud. As interpreted by the Ninth Circuit,
5  the Rule 9(b) standard clearly requires that a plaintiff so plead. Lancaster
6  Community Hosp., 940 F.2d at 405. However, the Court will view the
7  communications alleged to constitute mail and wire fraud in conjunction with all the
8  allegations set forth regarding the alleged scheme in the counterclaims. See Flood
9  v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,
10  2004) (applying the principle that reasonable inferences in favor of a plaintiff must
11  be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough
12  Plaintiffs' Complaint does not expressly identify how each particular mail or wire
13  communication furthered the scheme, the Complaint clearly alleges facts which
14  create an unquestionable inference that the alleged communications furthered the
15  scheme.").

16      Counter-defendants also argue that, because the emails alleged to
17  constitute wire fraud were sent among individuals physically located in the same
18  state, Mattel will not be able to establish the interstate nature of the
19  communications. See 18 U.S.C. § 1343 (setting forth the requirement that
20  communications be transmitted "in interstate or foreign commerce"). Mattel has
21  alleged that the communications were transmitted in interstate or foreign
22  commerce. (AAC ¶ 93(b).) This suffices at the pleadings stage; however,
23  eventually Mattel will be called upon to support these allegations with evidence.
24  See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly
25  holding that wire fraud must be supported, at the summary judgment stage, by
26  evidence of interstate wire fraud).

27      The Court dismisses the RICO claim to the extent it is based on the alleged
28  predicate acts of mail fraud and wire fraud because those acts are not pleaded with

17

EXHIBIT __L__

PAGE __96__

1   particularity as required by Rule 9(b). Mattel is **GRANTED** ten days' leave to file a

2   SAAC that incorporates and attaches and/or describes the communications and the

3   contents of packages referenced in Exhibit C.

4                **b.    Evidence Tampering**

5        Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6   remaining predicate acts are governed by the more lenient pleading standards of

7   Rule 8(a). See Slade v. Gates, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8   Cal., Oct. 11, 2002). The Court considers the sufficiency of those remaining

9   allegations pursuant to this Rule.

10       The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12           Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13           record, document, or other object, or attempts to do so, with the intent

14           to impair the object's integrity or availability for use in an official

15           proceeding . . . shall be fined under this title or imprisoned not more

16           than 20 years, or both.

17  Id. Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents: The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

25

26           [3] The AAC merely alleges that counter-defendants Bryant and MGA
27  "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
    Mattel employee while he was working for and with MGA . . . ." (AAC ¶ 35.)
28  However, it is clear from other filings by the parties that, at a minimum, this
    allegation refers to MGA's contract with Bryant.

                              18

EXHIBIT ___L___

PAGE ___97___

1    relevant dates.  (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2         As to the first category, a predicate act is sufficiently alleged.  Mattel has

3    alleged that a document was altered in a manner designed to conceal critical

4    evidence, highly relevant to the present official proceeding, regarding the timing of

5    the execution of the document.

6         Conversely, it is unclear whether Mattel has alleged a predicate act with

7    respect to the second category of documents.  The issue of whether submitting

8    fraudulent registrations and "altering relevant dates" on documents submitted to the

9    United States Copyright Office has not been fully briefed by the parties; the issue

10   was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court

11   reserves this issue for a later date, and anticipates that it will be addressed by the

12   parties in a motion to dismiss the SAAC.

13              **c.    Travel Act Violation**

14        Federal criminal law prohibits interstate or foreign travel to aid in

15   racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16   violation of § 1962 as a RICO predicate act).  In relevant part, the criminal

17   prohibition states:

18              Whoever travels in interstate or foreign commerce or uses the

19        mail or any facility in interstate or foreign commerce, with intent to . . .

20        promote, manage, establish, carry on, or facilitate the promotion,

21        management, establishment, or carrying on, of any unlawful activity,

22        and thereafter performs or attempts to perform . . . [such an act,] shall

23        be fined under this title, imprisoned not more than 5 years, or

24        both . . . .

25                            . . . .

26              As used in this section . . . "unlawful activity" means . . .

27   _____

28        [4]  The Court does not view this failure as the fault of any party.

                                   19

EXHIBIT L
PAGE    98

1    extortion, bribery, or arson in violation of the laws of the State in which

2    committed or of the United States . . . .

3    Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit

4    commercial bribery in violation of California's prohibition against commercial

5    bribery, which in relevant part provides:

6          (a) Any employee who solicits, accepts, or agrees to accept

7          money or any thing of value from a person other than his or her

8          employer, other than in trust for the employer, corruptly and without

9          the knowledge or consent of the employer, in return for using or

10         agreeing to use his or her position for the benefit of that other person,

11         and any person who offers or gives an employee money or any thing

12         of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3.  Several allegations support a violation of § 641.3(a),

14   which in turn supports a violation of 18 U.S.C. § 1952.  Mattel has alleged that

15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16   design services to MGA on a "top priority" basis, and used Mattel property,

17   employees, and resources to develop and design the Bratz concept.

18         Counter-defendants argue that the requirement under California's

19   commercial bribery statute that a violator act "corruptly" is not met because Bryant

20   did not intend to injure Mattel.  Such an intent is not required; rather it is sufficient

21   that Bryant is alleged to have intended to defraud Mattel.  See Cal. Penal Code

22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure or defraud")

23   (emphasis added).

24         **d.    Criminal Copyright Violations**

25         The parties dispute the relevant pleading standard that governs the

26   allegations which underlie the criminal copyright violation claim.  Counter-

27   defendants would have the Court apply the more exacting Rule 9(b) standards

28   because, in their assessment, the claim "sounds in fraud."  Mattel, however,

20

EXHIBIT  L

PAGE  44

1   contends that there is no reason to depart from the more lenient Rule 8(a) standard

2   generally applied to copyright claims because, in its assessment, the claims "sound

3   in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4       The recent Ninth Circuit case on this issue, cited by both parties, stands for

5   the unremarkable proposition that, consistent with Rule 9(b), all *averments* of fraud

6   must be pleaded with particularity, regardless of whether fraud is an essential

7   element of the claim to which the averment relates. See Vess v. Ciba-Geigy Corp.

8   USA, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all *averments*

9   of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10  with particularity.") (emphasis added).

11      Considering Rules 8(a), 9(b), and the teachings of Vess, a spectrum

12  emerges. At the left end of this spectrum are claims that do not involve any

13  allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain

14  statement" standard. At the opposite end of the spectrum are claims based solely

15  on fraud, and the facts underlying such a claim must be alleged with particularity

16  pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a

17  category of claims discussed in Vess:

18          In cases where fraud is not a necessary element of a claim, a

19          plaintiff may choose nonetheless to allege in the complaint that the

20          defendant has engaged in fraudulent conduct. In some cases, the

21          plaintiff may allege a unified course of fraudulent conduct and rely

22          entirely on that course of conduct as the basis of a claim. In that

23          event, the claim is said to be "grounded in fraud" or to "sound in

24          fraud," and the pleading of that claim as a whole must satisfy the

25          particularity requirement of Rule 9(b).

26  Vess, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA

27  contends that the allegations of criminal copyright claims fit, and MGA therefore

28  contends that all allegations regarding the criminal copyright claims must be

EXHIBIT ___

21          PAGE ___ 160

1   pleaded with particularity.

2       However, <u>Vess</u> sets up another category, lying closer to the Rule 8(a) part of
3   the spectrum (but nevertheless requiring pleading with some particularity):

4         In other cases, however, a plaintiff may choose not to allege a
5       unified course of fraudulent conduct in support of a claim, but rather
6       to allege some fraudulent and some non-fraudulent conduct. In such
7       cases, only the allegations of fraud are subject to Rule 9(b)'s
8       heightened pleading requirements. . . . The rule does not require that
9       allegations supporting a claim be stated with particularity when those
10      allegations describe non-fraudulent conduct.

11      [In other words,] in a case where fraud is not an essential
12      element of a claim, only allegations ("averments") of fraudulent
13      conduct must satisfy the heightened pleading requirements of Rule
14      9(b). Allegations of non-fraudulent conduct need satisfy only the
15      ordinary notice pleading standards of Rule 8(a).

16   <u>Id.</u> at 1104-05.

17       Whether fraud is an essential element of criminal copyright infringement
18   must be determined by reference to the statutory language and any interpretative
19   case law. In relevant part, the prohibition against criminal copyright infringement
20   provides: "Any person who violates section 506(a) (relating to criminal offenses) of
21   title 17 shall be punished as provided [herein] in and such penalties shall be in
22   addition to any other provisions of title 17 or any other law." 18 U.S.C. § 2319. In
23   turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully
24   infringes a copyright shall be punished as provided under section 2319 of title 18, if
25   the infringement was committed . . . for purposes of commercial advantage or
26   private financial gain . . . ." 17 U.S.C. § 506(a)(1)(A). The elements of the offense
27   are easily gleaned from the straightforward statutory language: "Criminal
28   infringement of copyright has three elements: (1) infringement of a copyright

EXHIBIT __L__
PAGE __161__

1  (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2  United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3       Clearly, fraud is not an essential element of a criminal copyright claim, taking

4  it out of the category at the far end of the spectrum described above, and

5  necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6  element into its criminal copyright claim. The AAC at ¶ 93(e) reveals that the

7  criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8  copyrights, including with respect to documents containing Mattel trade secret and

9  confidential information . . . ." The Opposition fills in more details regarding this

10 claim, noting that the criminal copyright claim is premised upon the Bratz-related

11 works, Bratz-derivative works, and works contained within Mattel's allegedly

12 purloined trade secrets and confidential information.  (Mattel Opposition to MGA's

13 Motion at 5).

14       These allegations do not "allege a unified course of fraudulent conduct and

15 rely entirely on that course of conduct as the basis of a claim" such that the claim

16 could be said to "sound in fraud" and therefore require pleading with particularity as

17 to the entire claim.  The allegations establish that much of the conduct complained

18 of consists of simple copying of the Bratz-related works or the creation of Bratz-

19 derivative works.  Such allegations are unrelated to allegations of fraud.  Therefore,

20 if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21 falls in the category described by Vess as those claims in which a claimant chooses

22 to "allege some fraudulent and some non-fraudulent conduct." Id. at 1104.

23       When one considers that the alleged predicate acts of criminal copyright

24 infringement are but a small part of a larger, and singular, claim brought pursuant to

25 RICO, it is evident that the RICO claim falls neatly into the category of claims that

26 are based partly on fraudulent and partly on non-fraudulent conduct.  The Court

27 has already found that certain fraudulent conduct -- that supporting the alleged

28 predicate acts of mail fraud and wire fraud -- is insufficiently pleaded.  The current

23

EXHIBIT __L__

PAGE ___162___

1   focus, however, is whether the allegations supporting the predicate acts of criminal

2   copyright infringement involve fraudulent conduct.

3       Here, there are two types of works allegedly infringed. The first type is the

4   Bratz-related and Bratz-derivative works. The second type is Mattel's other trade

5   secrets and confidential information. Both types are alleged -- with particularity -- to

6   have been procured by MGA through fraudulent conduct, but the criminal copyright

7   infringement predicate acts do not implicate that fraudulent conduct. Rather, they

8   implicate only questions of whether counter-defendants wilfully infringed Mattel's

9   works for commercial advantage or private financial gain. Here, Mattel has

10  sufficiently alleged predicate acts of criminal copyright infringement by alleging that

11  MGA and other counter-defendants willfully infringed its copyrights for purposes of

12  gaining commercial advantage and private financial gain. As Mattel correctly

13  contends, state of mind, in this instance willfulness, may be pleaded generally. <u>See</u>

14  <u>Ferguson Beauregard/Logic Controls v. Mega systems, LLC</u>, 350 F.3d 1327, 1343

15  (Fed. Cir. 2003).

16      **4.    Injury to Business or Property**

17      "Recovery under RICO is limited to those injuries flowing from predicate

18  acts . . . ." <u>Resolution Trust Corp. v. Keating</u>, 186 F.3d 1110, 1117 (9th Cir. 1999)

19  (citing <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 497 (1985)). Here, Mattel

20  has alleged damages flowing from the alleged acts of racketeering activity. (AAC

21  ¶ 96). Damages easily flow from theft of trade secrets and confidential information

22  committed by a direct competitor and from infringement of copyrights that are

23  alleged to have been used to make millions -- if not billions -- of dollars.

24      Counter-defendants argue that Mattel lacks standing to sue on behalf of its

25  subsidiaries. This issue arises because many of the allegations of the thefts of

26  trade secrets involve actions taken in Mexico or Canada by employees of Mattel's

27  foreign subsidiaries. Mattel argues that it is not attempting to sue for damages

28  incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

24

EXHIBIT _____
PAGE _____ 103

1   information stolen by the employees of Mattel's subsidiaries belonged not to

2   Mattel's subsidiaries, but to Mattel itself.  Based on these allegations, Mattel may

3   sue for damages it sustained.  Mattel may not sue for damages incurred by its

4   foreign subsidiaries.

5                    **5.    Ruling on Motions to Dismiss**

6          The Motions to Dismiss the RICO claims are **GRANTED** in part.  As set forth

7   herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8   alleged, and Mattel is **GRANTED** leave to amend the AAC.

9   **C.    Trade Secrets**

10         MGA contends that Mattel has failed to plead its trade secrets with sufficient

11  particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12  provides:

13              In any action alleging the misappropriation of a trade secret

14         under the Uniform Trade Secrets Act . . . , before commencing

15         discovery relating to the trade secret, the party alleging the

16         misappropriation shall identify the trade secret with reasonable

17         particularity subject to any orders that may be appropriate under

18         Section 3426.5 of the Civil Code [involving in camera reviews and

19         sealing of court documents].

20  Id.  Based on the unambiguous language of the statute, the Court agrees with

21  Mattel's characterization of this requirement as one related to discovery rather than

22  related to pleading.

23         The Court also agrees that, by identifying documents in discovery by Bates-

24  stamp number, Mattel has complied with the dictates of § 2019.210.  See

25  Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26  (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27  means that the plaintiff must make some showing that is reasonable, i.e., fair,

28  proper, just and rational[,] . . . under all of the circumstances to identify its alleged

                                25

EXHIBIT ___L___

PAGE ___164___

1   trade secret in a manner that will allow the trial court to control the scope of

2   subsequent discovery, protect all parties' proprietary information, and allow them a

3   fair opportunity to prepare and present their best case or defense at a trial on the

4   merits."). MGA's complaints regarding the volume of documents so identified, and

5   their skepticism of Mattel appropriately attaching such an identification to many of

6   those identified documents, are not properly addressed at this stage of the

7   proceedings.

8        The motion to dismiss the trade secrets claim on this basis is therefore

9   **DENIED.**

10  **D.    Duplicative State-Law Claims**

11       Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED.**

12  The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

13  with the claims asserted against him in the 04-9059 case, however, the factual

14  allegations underlying the claims asserted in the AAC are broader in scope than

15  those underlying the claims asserted in the 04-9059 case.

16                  **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17       MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

18  As set forth below, the Court concludes that it may, consistent with California law

19  and the federal Due Process Clause, exercise specific personal jurisdiction over

20  this admittedly foreign corporation.

21  **A.    The Constitutional Exercise of Personal Jurisdiction**

22       Where a party moves to dismiss a claim for lack of personal jurisdiction, the

23  party asserting the claim bears the burden of demonstrating that jurisdiction is

24  appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

25  2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

26  the party asserting the claim need only make a *prima facie* showing of jurisdictional

27  facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

28  jurisdiction. Id.

EXHIBIT   L
PAGE    105

1    Because there is no applicable federal statute governing personal

2  jurisdiction, the Court applies the law of the state in which the district court sits.  Id.

3  (citations omitted). "Because California's long-arm jurisdictional statute is

4  coextensive with federal due process requirements, the jurisdictional analyses

5  under state law and federal due process are the same." Id. at 800-01 (citations

6  omitted). In order for a court's exercise of personal jurisdiction over a nonresident

7  defendant to be constitutionally permissible, the defendant must have "minimum

8  contacts" with the forum state "such that the exercise of jurisdiction does not offend

9  traditional notions of fair play and substantial justice." Id. at 801 (internal quotation

10  marks and citation omitted).

11    Personal jurisdiction may be either general or specific.  For general personal

12  jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in

13  continuous and systematic general business contacts . . . that approximate a

14  physical presence in the forum state." Id. (internal quotation marks and citations

15  omitted).

16    To determine whether it has specific personal jurisdiction over a nonresident

17  defendant, the Court employs a three-part test:

18        (1) The non-resident defendant must purposefully direct his

19        activities or consummate some transaction with the forum or resident

20        thereof; or perform some act by which he purposefully avails himself

21        of the privilege of conducting activities in the forum, thereby invoking

22        the benefits and protections of its laws; (2) the claim must be one

23        which arises out of or relates to the defendant's forum-related

24        activities; and (3) the exercise of jurisdiction must comport with fair

25        play and substantial justice, i.e. it must be reasonable.

26  Id. at 802.

27    The party asserting the claim bears the burden of establishing the first two

28  parts of the test. Id. If that party establishes the first two parts, then the burden

EXHIBIT ___L___

PAGE ___166___

1    shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2    **compelling case** that the exercise of jurisdiction would not be reasonable." Id.

3    (emphasis added).

4            The first part of the test is satisfied by either "purposeful availment" or

5    "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6    itself of the privilege of doing business in a forum state, usually met when the

7    defendant took some action in the forum, such as executing or performing a

8    contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9    of the privilege of conducting activities within the forum State, thus invoking the

10   benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11   When taking advantage of these "benefits and protections," a defendant must also

12   "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13   471 U.S. 462, 476 (1985).

14           By contrast, purposeful direction, involves actions by the defendant outside

15   of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16   803. The purposeful direction analysis is derived from a three-part "effects test"

17   that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18   (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19   intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20   defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21   374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22   the effects test is described by the Ninth Circuit as the "express aiming"

23   requirement, and requires that the counter-defendants "expressly aimed" its

24   intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25   "express aiming" is found where the defendant is alleged to have engaged in

26   wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27   of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

EXHIBIT ___L___
PAGE ___(6)___