# EXHIBIT 17

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

WRITER'S DIRECT DIAL NO.
(213) 443-3203

WRITER'S INTERNET ADDRESS
scottwatson@quinnemanuel.com

February 6, 2009

VIA FACSIMILE AND MAIL

Amman Khan, Esq.
Glaser, Weil, Fink, Jacobs & Shapiro, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067

Re:  Mattel, Inc. v. MGA Entertainment, Inc. et al.

Dear Counsel:

I write further to our meet and confer of this afternoon and my January 28, 2009 letter regarding MGA Entertainment, Inc.'s response to Interrogatory No. 45 of Mattel's Sixth Set of Interrogatories, and MGA's and Isaac Larian's responses to Mattel's Supplemental Interrogatories.

MGA and Larian agreed during our call that their objection to Mattel's Interrogatories on the grounds that Phase Two discovery was stayed until further order of the Court is no longer viable.

You agreed to let me know on Monday, February 9, 2009 which interrogatories MGA and Larian will respond to and whether those responses will be limited by the remaining objections.  If we cannot resolve this matter next Monday, Mattel will move for an order overruling objections and compelling a full and complete response.

Very truly yours,

Scott L. Watson
07209/2789524.1

EXHIBIT _17_

PAGE _273_

**quinn emanuel urquhart oliver & hedges, llp**

07209/2789524.1

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
SAN DIEGO | 4445 Eastgate Mall, Suite 200, San Diego, California 92121 | TEL 858-812-3107 FAX 858-812-3336

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

| | | |
|---|---|---|
| **NEW YORK**<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000<br>Facsimile: (212) 849-7100 | **LOS ANGELES**<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>(213) 443-3000<br>Facsimile: (213) 443-3100 | **TOKYO**<br>Akasaka Twin Tower Main Building, 6th Floor<br>17-22 Akasaka 2-Chome<br>Minato-ku, 107-0052<br>+81 3 5561-1711<br>Facsimile: +81 3 5561-1712 |
| **SILICON VALLEY**<br>555 Twin Dolphin Drive, Suite 560<br>Redwood Shores, CA 94065<br>(650) 801-5000<br>Facsimile: (650) 801-5100 | **SAN FRANCISCO**<br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>(415) 875-6600<br>Facsimile: (415) 875-6700 | **LONDON**<br>16 Old Bailey<br>London United Kingdom<br>+44(0) 20 7653 2000<br>Facsimile: +44(0) 20 7653 2100 |

## LOS ANGELES OFFICE

# FACSIMILE TRANSMISSION

**DATE:**   February 6, 2009

**NUMBER OF PAGES, INCLUDING COVER: 2**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Amman Kahn, Esq.<br>Christensen, Glaser, Fink, Jacobs<br>Weil & Shapiro, LLP | (310) 553-3000 | (310) 556-2920 ✓ |
| Thomas Nolan, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP | (213) 687-5000 | (213) 687-5600 ✓ |
| Jean Nogues<br>Mitchell Silberberg & Knupp | (310) 312-3152 | (310) 213-8352<br>*310 - 312 - 3100* |

**FROM:**   Scott L. Watson

**RE:**   Mattel v. MGA, Ent.

**MESSAGE:**   EXHIBIT *17*

PAGE *274*

*FAXED FEB 6 2009*

07209/2783724.1

| CLIENT # | 7975 | ROUTE/<br>RETURN TO: | Tiffany Garcia - 3rd Floor | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED?   ☐ NO ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.**

**Group Send Report**

```
Page       : 001
Date & Time: 02-06-2009   16:59
Line 1     : 2134433100
Line 2     :
Machine ID : QUINN EMANUEL
```

| Job number | : | 925 |
|---|---|---|
| Date | : | 02-06  16:55 |
| Number of pages | : | 002 |
| Start time | : | 02-06  16:55 |
| End time | : | 02-06  16:59 |

Successful nbrs.

Fax numbers

☎3+13105562920#  √

Unsuccessful nbrs.                                                      Pages sent

Fax numbers

☎3+13102138352#                                                        000

EXHIBIT __17__

PAGE __275__

## Group Send Report

```
Page        : 001
Date & Time: 02-06-2009   16:53
Line 1      : 2134433100
Line 2      :
Machine ID : QUINN EMANUEL
```

Job number          :   924

Date                :   02-06  16:49

Number of pages     :   002

Start time          :   02-06  16:49

End time            :   02-06  16:53

Successful nbrs.

    Fax numbers

        ☎3*12136875600#  ✓

Unsuccessful nbrs.                                                              Pages sent

    Fax numbers

        ☎3*13105562920#                                        000
        ☎3*13102138352#                                        000

EXHIBIT ___17_____

PAGE ____276_____

Confirmation Report — Memory Send

Page         : 001
Date & Time: 02-06-2009   17:13
Line 1       : 2134433100
Line 2       :
Machine ID : QUINN EMANUEL

| | | |
|---|---|---|
| Job number | : | 928 |
| Date | : | 02-06  17:11 |
| To | : ☎3#13103123100# | |
| Number of pages | : | 002 |
| Start time | : | 02-06  17:11 |
| End time | : | 02-06  17:13 |
| Pages sent | : | 002 |
| Status | : | OK |

Job number     : 928          *** SEND SUCCESSFUL ***

## QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

NEW YORK
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

SILICON VALLEY
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

LOS ANGELES
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

SAN FRANCISCO
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

TOKYO
Akasaka Twin Tower Main Building, 6th Floor
17-22 Akasaka 2-Chome
Minato-ku,    107-0052
+81 3 5561-1711
Facsimile: +81 3 5561-1712

LONDON
16 Old Bailey
London United Kingdom
+44(0) 20 7653 2000
Facsimile: +44(0) 20 7653 2100

LOS ANGELES OFFICE
### FACSIMILE TRANSMISSION

DATE:     February 6, 2009

NUMBER OF PAGES, INCLUDING COVER: 2

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Amman Kahn, Esq.<br>Christensen, Glaser, Fink, Jacobs<br>Weil & Shapiro, LLP | (310) 553-3000 | (310) 556-2920 |
| Thomas Nolan, Esq.<br>Skadden, Arps, Slate, Meagher & Flom LLP | (213) 687-5000 | (213) 687-5600 |
| Jean Nogues<br>Mitchell Silberberg & Knupp | (310) 312-3152 | (310) 213-8352<br>310 - 312 - 3150 |

FROM:     Scott L. Watson

RE:        Mattel v. MGA, Ent.

MESSAGE:

07209/2783724.1

| CLIENT # | 7975 | ROUTE/<br>RETURN TO: | Tiffany Garcia - 3rd Floor | ☒ CONFIRM FAX<br>☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED? | ☐ No  ☐ Yes: |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT _____17_____

PAGE _____277_____

# Confirmation Report — Memory Send

Page          : 001
Date & Time: 02-06-2009    17:05
Line 1        : 2134433100
Line 2        :
Machine ID : QUINN EMANUEL

| | | |
|---|---|---|
| Job number | : | 927 |
| Date | : | 02-06  17:02 |
| To | : | ☎3⋆131.02138352# |
| Number of pages | : | 002 |
| Start time | : | 02-06  17:02 |
| End time | : | 02-06  17:05 |
| Pages sent | : | 000 |
| Status | : | NG  BO |

Job number      : 927                         *** SEND FAILED ***

## QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

**NEW YORK**
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Facsimile: (212) 849-7100

**LOS ANGELES**
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
Facsimile: (213) 443-3100

**TOKYO**
Akasaka Twin Tower Main Building, 6th Floor
17-22 Akasaka 2-Chome
Minato-ku, 107-0052
+81 3 5561-1711
Facsimile: +81 3 5561-1712

**SILICON VALLEY**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA 94065
(650) 801-5000
Facsimile: (650) 801-5100

**SAN FRANCISCO**
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600
Facsimile: (415) 875-6700

**LONDON**
16 Old Bailey
London United Kingdom
+44(0) 20 7653 2000
Facsimile: +44(0) 20 7653 2100

### LOS ANGELES OFFICE
### FACSIMILE TRANSMISSION

**DATE:**   February 6, 2009                    **NUMBER OF PAGES, INCLUDING COVER: 2**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Amman Kahn, Esq. Christensen, Glaser, Fink, Jacobs Weil & Shapiro, LLP | (310) 553-3000 | (310) 556-2920 |
| Thomas Nolan, Esq. Skadden, Arps, Slate, Meagher & Flom LLP | (213) 687-5000 | (213) 687-5600 |
| Jean Nogues Mitchell Silberberg & Knupp | (310) 312-3152 | (310) 213-8352 |

**FROM:**   Scott L. Watson

**RE:**   Mattel v. MGA, Ent.

**MESSAGE:**

07209/2783724.1

| CLIENT # | 7975 | ROUTE/ RETURN TO: | Tiffany Garcia – 3rd Floor | ☒ CONFIRM FAX ☒ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | | | CONFIRMED? ☐ NO  ☐ YES: | |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.

EXHIBIT   17

PAGE   278

# EXHIBIT 18

**MSＫ**

# MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

Jean Pierre Nogues
A Professional Corporation
(310) 312-3152 Phone
(310) 231-8352 Fax
jpn@msk.com

February 6, 2009

**VIA E-MAIL AND U.S. MAIL**

Jon Corey, Esq.
Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:     **Bryant v. Mattel, Inc. and Consolidated Actions, C.D. Cal. (Eastern Div.) Case No.
CV04-09049 SJL (RNBx); Meet and Confer re MGA Responses to Mattel
Interrogatories 43, 44, 51-55 and 64**

Dear Jon,

This will confirm MGA's proposal during our meet-and-confer session today that MGA would
provide further responses to Mattel's Interrogatories 43, 44, 51 through 55, and 64, all of which
deal with MGA's trade dress claims, not later than 30 days after the Court decides the trade dress
summary judgment motion which Mattel has indicated it will be bringing. If granted in whole or
in part, Mattel's motion, which does not depend in any respect on responses to these
interrogatories, would limit or eliminate issues relating to MGA's trade dress claims and the
discovery necessary to litigate those claims. It does not make sense to us that either party would
expend time or money conducting discovery which may prove unnecessary if Mattel's motion is
successful.

I also advised that if Mattel did not agree to this proposal, MGA would make a motion for a
protective order that would defer its obligation to respond until after the Mattel summary
judgment motion is heard.

EXHIBIT _18_

PAGE _279_

11377 West Olympic Boulevard, Los Angeles, California 90064-1683
Phone: (310) 312-2000  Fax: (310) 312-3100  Website: www.msk.com

<u>MITCHELL SILBERBERG & KNUPP LLP</u>

Jon Corey, Esq.
February 6, 2009
Page 2

You indicated you would get back to me about this proposal after speaking with your client.  I look forward to hearing back from you.

Very truly yours,

Jean Pierre Nogues
of
MITCHELL SILBERBERG & KNUPP LLP


JPN/jpn
cc:    Amman Khan, Esq.

EXHIBIT _18_

PAGE _280_

# EXHIBIT 19

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

February 8, 2009

**VIA FACSIMILE AND U.S. MAIL**

Amman Khan, Esq.
Glaser, Weil, Fink, Jacobs & Shapiro LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067

Re:     Mattel v. MGA Entertainment, Inc., et al.

Dear Amman:

I write in furtherance of our meeting of counsel of February 6, 2009 regarding various Phase 2 discovery issues.

First, regarding Mattel's Renewed Motion to Compel Production of Documents and Things by MGA Entertainment, Inc., filed January 26, 2008 and currently pending before the Discovery Master, you agreed that MGA would produce, within thirty days, all non-privileged documents responsive to Mattel's Request No. 48 from its First Set of RFPs for the twelve individuals indentified in Mattel's motion. You also agreed to produce, within thirty days, all non-privileged documents responsive to Mattel's Request Nos. 43-75 from its Third Set of RFPs regarding "Scooter Samantha," "Space Babies" and Scott Reyes, as set forth in Mattel's motion.

As to Mattel's Request Nos. 87 and 88, regarding personnel files for former Mattel employees and vendors, you stated that your objections to producing the personnel files in their entirety arose from concerns over employee privacy. As I stated at the conference, the prior Discovery Master and the Court have time and again held that the Protective Order in this case sufficiently ameliorates any such concerns. As an example, I direct your attention to the attached Discovery Master's May 15, 2007 wherein he overruled similar privacy objections and ordered the production of personnel files. See May 15, 2007 Order Granting Mattel's Motion to Compel Production of Documents and Things, at 3, 9 (overruling MGA's privacy objections on behalf of

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700
SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100
TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

EXHIBIT _____19_____

PAGE _____281_____

third parties and ordering production of responsive documents); see also id. at 11 n.4 ("The personnel file may have documents relevant to Bratz, and therefore should be produced. The protective order is sufficient to alleviate . . . privacy concern[s]."). Similarly, in another Order the Discovery Master overruled Bryant's objections based on the privacy of third parties because "the protective order is sufficient to address . . . confidentiality concerns." January 26, 2007 Order Granting Mattel's Motion to Compel Production of Documents and Things, at 15.

I trust this adequately alleviates your concerns and that MGA will also produce these files. Separately, I explained that Mattel is not only interested in what may be in the personnel files, but what may not be in there, such as instances of no disciplinary action taken. Mattel will agree, however, to exclude from its request any health care specific information. Once MGA agrees to a stipulation so ordering the production of these documents, then Mattel will take its motion off-calendar.

Second, with regard to MGA's outstanding responses to a number of Mattel's Interrogatories, you agreed that MGA would respond to Interrogatory No. 41 within thirty days.

Regarding Mattel's Interrogatory Nos. 43, 44, 51-55 and 64, your colleague, Mr. Nouges proposed that, in light of Mattel's intention to seek summary adjudication of MGA's claims of trade dress infringement, MGA be permitted to delay its response to these interrogatories until thirty days after any ruling on Mattel's contemplated motion. I informed you that I would discuss your proposal with our client, but that I did not expect them to agree.

Additionally, you questioned whether MGAE de Mexico was bound by the Order compelling responses to Interrogatory Nos. 41-43. Both the original February 15, 2008 Order and the subsequent April 22, 2008 Clarification were directed to the "MGA Parties," including MGAE de Mexico. Moreover, as I stated at the conference, the interrogatories to MGAE de Mexico are identical to those that Mattel propounded upon MGA, and assuming MGAE de Mexico takes the same positions that were advanced by MGA and rejected by the Discovery Master, there is no reason MGAE should not be similarly bound by the logic of the Order. As you indicated that you did not have the requests at issue, I have attached Mattel's interrogatories to MGAE de Mexico.

Third, regarding Mattel's request to schedule the continued deposition of Isaac Larian on Phase 2 matters, you indicated that as MGA's CEO, any such deposition would be impermissibly burdensome. You asked me why additional time was justified. I told you that, at most, Mattel had five hours to depose Mr. Larian regarding Phase 2 issues, that he was a named defendant, that there are tens of thousands, if no hundreds of thousands, of pages of documents that he authored or related to him and the five hours (much of which was devoted to further Phase 1 issues given that MGA and Larian produced the vast majority of their documents amounting to millions of pages after Mr. Larian was first deposed). As such, further deposition is warranted. Because we were unable to reach an agreement on this issue, Mattel will seek an order form the Discovery Master compelling Mr. Larian's further deposition testimony.

Fourth, regarding Mattel's request to schedule the continued deposition of Ron Brawer on Phase 2 matters, you took the position that his deposition was unwarranted because he had already been

2

EXHIBIT ___*19*___

PAGE ___*282*___

deposed and because you did not see Mr. Brawer's continued relevance. Mr. Brawer is a key
witness and/or actor at the core of Mattel's Phase 2 allegations. His deposition was never
completed, and now that Phase 2 has begun, it should be scheduled immediately. You agreed
that you would consider this issue and to provide a response on Monday.

Fifth, regarding Mattel's intention to file a motion for reconsideration of the order compelling
Isaac Larian's communications with Mattel employees, but limiting the response to
communications that occurred prior to 2005, you indicated that you needed more time to
consider the issue because you claimed that your firm did not have the documents, and you
needed to determine whether compliance with Mattel's request would be unduly burdensome.
I informed you that it was not my understanding that the Discovery Master's time limitation was
based on burden considerations. As we discussed, the Discovery Master's prior order limited the
scope of Mattel's request based on misapprehension of Mattel's counterclaims. The temporal
limitation was not an issue discussed at the hearing or briefed, but a decision made, *sua sponte*,
by the Discovery Master.   Plainly Mr. Larian's communications with Mattel's employees are
highly relevant—indeed, more so, if there may be, as you initially suggested, that Mr. Larian has
had so many communications with Mattel employees that responding to such a request would
impose an undue burden upon Mr. Larian or upon MGA. We agreed that you would provide me
with a firm position on Monday.

Sixth, regarding Mattel's 30(b)(6) deposition of MGAE de Mexico and MGA, you agreed that at
the conference on Monday you would be in a position to state which employees would be
designated for which topics and their dates of availability.  To assist you, I've am attaching
Mattel's January 9, 2008 Deposition Notices of MGAE de Mexico and MGA.

Seventh, regarding MGA's supplemental document production regarding financial information,
as required by Rule 26(e)(1) and the Discovery Master's Orders of December 28 and 31, 2007,
you indicated that you were not in a position to respond to Mattel's request at this time because
you did not have the document requests or orders at issue. To assist you, I am attaching Mattel's
Requests Nos. 207, 208, 209 and the relevant Discovery Master orders.  Please be prepared to
respond substantively to Mattel's request on Monday.

Eighth, regarding Mattel's deposition notices of Mr. Vargas, Ms. Trueba and Ms. Salemnia, you
agreed that MGA was no longer were objecting on the grounds that Judge Larson's January 7,
2008 order required all Phase 2 depositions to be completed by the end of January 2008.  I
requested, and you agreed, to provide by Monday, February 9, 2009, amended objections to
those deposition notices with that objection omitted.

Ninth, regarding Ms. Salemnia's last known address, you indicated that you would be able to
respond at our Monday conference.

Tenth, regarding the current procedures for discovery disputes, I had requested that MGA agree
to amend the discovery master stipulation to reflect the parties' long-standing practice of
conducting meetings of counsel telephonically.  Further, we will take under consideration your
request that we amend the procedures to allow a party extended time to file any opposition and
reply.

EXHIBIT _____19_____

PAGE _____283_____

Finally, I must note that you were not adequately prepared to substantively discuss a number of issues which we had planned to address at last Friday's meeting of counsel. For a number of these disputes you did not even have the relevant pleadings or underlying orders. As a courtesy, I am providing you with those documents that you lack, but I am sure that your co-counsel has. We do not expect that your association in of this case will cause further delay in its prosecution or defense of this case. If the association of your firm was going to cause delay in any respect, then the time to raise that was with the Court upon the request for association. Your failure to do so does not justify any delay or excuses for not being fully prepared, particularly given that your firm is but one of MGA's counsel in this case.

If you have any questions regarding the foregoing, please do not hesitate to call.

Best regards,

Jon Corey

Jon Corey

Enclosures

cc:     Jean P. Nogues, Esq. (via electronic mail w/ enclosures)

4

EXHIBIT ___19___

PAGE ___284___

# EXHIBIT 20

1

1       UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA

3           EASTERN DIVISION

4             - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6             - - -

7    MATTEL, INC.,                    )
                                      )
8                    Plaintiff,       )
                                      )
9         vs.                         )   No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, INC., ET. AL.,)
                                      )
11                   Defendants.      )
                                      )
12   _____      )   Motions
     AND CONSOLIDATED ACTIONS,        )
13   _____      )

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16           Riverside, California

17        Wednesday, February 11, 2009

18              10:03 A.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
        Federal Official Court Reporter
24        3470 12th Street, Rm. 134
        Riverside, California  92501
25           951-274-0844
          WWW.THERESALANZA.COM

:dnesday, February 11, 2009   EXHIBIT 20        Mattel vs. MGA Entertainme:

PAGE 285

2

```
 1   APPEARANCES:

 2   ON BEHALF OF MATTEL, INC.:

 3                        QUINN EMANUEL
                         By:  JOHN QUINN
 4                            DYLAN PROCTOR
                              MICHAEL T. ZELLER
 5                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 6                       LOS ANGELES, California  90017
                         213-624-7707
 7

 8   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
     (Outgoing)
 9                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
10                            JASON RUSSELL
                         300 SOUTH GRAND AVENUE
11                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
12

13   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
     (Incoming)
14                        GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                         BY:  JOEL KLEVENS
15                       10250 Constellation Boulevard
                         Los Angeles, California  90067
16                       310-553-3000

17                       MITCHELL, SILBERBERG & KNUPP LLP
                         BY:  RUSSELL J. FRACKMAN
18                       11377 West Olympic Boulevard,
                         Los Angeles, California  90064-1683
19                       310-312-2000

20
     ON BEHALF OF DEFENDANT GUSTAVO MACHADO:
21
                         OVERLAND BORENSTEIN SCHEPER & KIM LLP
22                       BY:  ALEXANDER H. COTE
                         601 West Fifth Street,
23                       12th Floor
                         Los Angeles, California  90071
24                       213-613-4660

25   /  /  /
```

:dnesday, February 11, 2009   EXHIBIT ___20_____ Mattel vs. MGA Entertainmen

PAGE ___286___

3



1                          I N D E X  (Continued)

2

3    APPEARANCES (continued):

4

     On behalf of OMNI 808:

5

6                          BINGHAM McCUTCHEN LLP
                           BY:   Todd E. Gordinier
7                          600 Anton Boulevard
                           Costa Mesa, CA   92626-1924
8                          714-830-0622

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT ___20___

PAGE ___281___

Mattel vs. MGA Entertainmer

4

```
 1                    I N D E X

 2                                              Page

 3  Motions......................................    4

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ednesday, February 11, 2009   EXHIBIT ___20_____Mattel vs. MGA Entertainmer

PAGE___288_____

5

```
 1   Riverside, California; Wednesday, February 11, 2009; 10:03 A.M.
 2                        -oOo-
 3            THE CLERK:  Calling calendar item one, in the matter
 4   of Mattel Incorporated versus MGA Entertainment Incorporated,
 5   Case Number CV 04-9049.                                          00:03
 6            Counsel, please state your appearances for the
 7   record.
 8            MR. QUINN:   John Quinn, Mike Zeller, Dylan Proctor
 9   for Mattel.
10            MR. NOLAN:   Tom Nolan, Jason Russell,                  00:03
11   Jennifer del Castillo on MGA and Isaac Larian's post trial
12   chamber on motions and motion for remittitur on Phase 1.
13            MR. COTE:   Alexander Cote on behalf of
14   Gustavo Machado.  I'll be sitting back in the gallery.
15            MR. KLEVENS:   Joel Klevens of Glaser Weil for the MGA  00:03
16   defendants.
17            MR. FRACKMAN:   Russell Frackman of Mitchell,
18   Silberberg & Knupp for the MGA defendants.
19            MR. GORDINIER:   Todd Gordinier for Omni 808.
20            THE COURT:   Counsel, good morning.                     00:04
21            We have several matters on calendar this morning to
22   take up.  I have the judgment as a matter of law by Mattel; I
23   have a motion for judgment as a matter of law from MGA; I have
24   MGA's motion for remittitur; I have the ex-parte application by
25   Omni 808 to intervene for limited purpose; I have MGA's request 00:04
```

EXHIBIT ___20___

PAGE ___289___

Mattel vs. MGA Entertainmel

| | |
|---|---|
| 1 | **THE COURT:**  What's your sense? |
| 2 | **MR. KLEVENS:**  I would hope we could have a trial date |
| 3 | in the latter part of November. |
| 4 | **THE COURT:**  Of this year? |
| 5 | **MR. KLEVENS:**  Yes, and work backward from that with |
| 6 | our other deadlines, rather than pushing this all of the way to |
| 7 | next spring.  And I'm hoping that we'll find ways to reduce the |
| 8 | incredibly exorbitant amount of discovery that took place in |
| 9 | Phase 1 and the incredible expense to both parties that was |
| 10 | entailed in that and figure out some ways to streamline some of |
| 11 | this in Phase 2 so that we don't have that kind of thing that |
| 12 | counsel and parties had in Phase 1.  And I think a tighter |
| 13 | schedule will hopefully facilitate that as well. |
| 14 | **THE COURT:**  Very well. |
| 15 | So if we had a November trial date, you'd be |
| 16 | suggesting a discovery cutoff, then, in July or August? |
| 17 | **MR. KLEVENS:**  I guess, right, or September. |
| 18 | **THE COURT:**  Because we'd still have to fit in the |
| 19 | dispositive motions. |
| 20 | **MR. KLEVENS:**  You're saying the motions would have to |
| 21 | follow the discovery cutoff? |
| 22 | **THE COURT:**  Yes.  I found it helps to have -- |
| 23 | **MR. KLEVENS:**  So I guess August would be the |
| 24 | discovery cutoff. |
| 25 | **THE COURT:**  Very good. |

02:28
02:28
02:29
02:29
02:29

EXHIBIT _20_

PAGE _290_

dnesday, February 11, 2009                              Mattel vs. MGA Entertainmei

1      **MR. KLEVENS:**  I would simply request the latter part

2   of November rather than the early part, because we do have a

3   conflict in the first week of November, the 5th and 13th.

4          (Brief pause. )

5      **THE COURT:**  I think, on the one hand, trying to wrap       02:32

6   up discovery, given my understanding of the Phase 2 issues, by

7   August or even September, I think, is unworkable.

8          At the same time, I do agree that spring of next

9   year, given how much discovery has gone on here and my sincere

10  hopes that we will be able to streamline discovery, is too much   02:33

11  time.

12         I'm going to set a discovery cutoff for the end of

13  this year; December 11, 2009 will be the discovery cutoff.

14         I have just received a note.

15         There's another defendant in this case.                    02:34

16         Counsel, you did not weigh in on this.

17     **MR. COTE:**  Alexander Cote, representing Gustavo

18  Machado.

19         Either plan sounds fine with us, Your Honor.  We

20  don't anticipate a lot of discovery, so we'll defer to counsel.   02:34

21         Would that be for expert and fact discovery?

22     **THE COURT:**  All discovery cutoff, all discovery will

23  be done by this date.

24     **MR. COTE:**  Thank you.

25     **THE COURT:**  We've gone through this before; all            02:34

:dnesday, February 11, 2009 EXHIBIT ___*20*_____ Mattel vs. MGA Entertainmer

PAGE ____*291*____

 1   discovery is cut off December 11, 2009.

 2          I will schedule dispositive motions for February 1st,

 3   2010, at 10:00 A.M.; I'll schedule a pretrial conference for

 4   March 1st, 2010, at 11:00 A.M.; and the trial date for Phase 2

 5   will be March 23, 2010, at 9:30 A.M.  I will have the cutoff          02:35

 6   for the mandatory settlement conference also scheduled for

 7   December 11, 2009.

 8          My hope would be that we could wrap this case up this

 9   year, but, if not, we'll have dispositive motions and the trial

10   in the early part of next year.                                      02:35

11          Are there any conflicts, known conflicts at this

12   point, with any of those dates?

13          From Mattel's perspective?

14          MR. ZELLER:  No.  Not with Mattel, Your Honor.

15          THE COURT:  With MGA?                                         02:35

16          MR. KLEVENS:  I don't believe so, Your Honor.

17          MR. COTE:  None, Your Honor.

18          THE COURT:  Very well.

19          Is there anything else we need to address at this

20   time?                                                               02:35

21          MR. ZELLER:  Yes, Your Honor.

22          Given these deadlines -- and I regret having to

23   embroil the Court in this, because this is a, quote, "discovery

24   issue," but it involves the Court's orders from January.

25          As I've mentioned, we have received nothing from MGA,         02:35

EXHIBIT ___20___

PAGE ___292___

dnesday, February 11, 2009                          Mattel vs. MGA Entertainmer

1  even as to things that were compelled before the stay.  They

2  have been taking the position that the Court's orders of

3  January 6th and January 7th effectively stayed our ability to

4  get financial discovery.

5           I would ask the Court to make a ruling on this.      02:36

6           I regret having to raise it, but we are going to lose

7  at least another month, if not another two months, in getting

8  financial information which is absolutely critical for our

9  ability to prepare for this.  And this is one reason why I was

10  suggesting as long as I was.                                 02:36

11          THE COURT:  I understand, Counsel.

12          MR. ZELLER:  But, the idea that there's a stay in

13  place is --

14          THE COURT:  I thought I made it clear that I lifted

15  all stays on discovery, but perhaps not.                     02:36

16          MR. KLEVENS:  The system the Court has set up cannot

17  work if counsel are allowed to come to the Court and give some

18  distorted view of what they think the dispute is about and not

19  leave it to the Discovery Master to look at and resolve and

20  give the parties the opportunity to brief.                   02:36

21          I'm not going to respond to what he says.  I don't

22  agree with a word that he said.  But I'm not going to

23  respond to it.

24          THE COURT:  I think you have responded, Counsel, and

25  I take your response at its value.                           02:37

dnesday, February 11, 2009     EXHIBIT _____20_____     Mattel vs. MGA Entertainmer

PAGE _____293_____

1        For the record, I previously indicated that all stays

2    on discovery have been lifted.  All discovery matters should

3    rightfully be referred to the Discovery Master.  And I'll let

4    it go at that.

5        MR. ZELLER:  And that no discovery issues or no                    02:37

6    requests for discovery are premature at this point, because

7    that's the other term they are using on this.

8        THE COURT:  I will instruct the Discovery Master this

9    afternoon, in no uncertain terms, that there is no stay on any

10   discovery related to this case at all.  There's no longer a          02:37

11   Phase 1/Phase 2 distinction.

12       As I indicated, I thought that I made this clear

13   before.  If it's not, it will be expressly set forth in the

14   minutes coming out of today's hearing.

15       There is no stay on discovery.  Period.                          02:37

16       MR. ZELLER:  And we're fully entitled to the

17   financial information that --

18       THE COURT:  Lets leave it at that, Counsel.

19       Thank you, Mr. Zeller.

20       MR. RUSSELL:  Could I say one thing, since                       02:38

21   Mr. Zeller injected this.

22       When he's talking about this stay -- and this is the

23   twilight between Phase 1 and Phase 2 counsel -- they

24   promulgated a series of receiver-related discovery which we

25   contend and run your Honor's orders saying let's talk it out of     02:38

EXHIBIT 20

PAGE 294

1    discovery, let's let Mr. Durkin handle this.  And that's what

2    he's talking about.

3         There may be other issues, but a major component --

4    and I would not want Your Honor to paint with too broad a

5    brush -- it is MGA's position as to Phase 1 receiver-related          02:38

6    issues, that Your Honor appropriately, at our request, took out

7    of discovery the financial discovery issues.

8         **THE COURT:**  Mr. Durkin is acting at the Court's

9    direction to inform the Court of information.  I may or may not

10   release any of the information that Mr. Durkin provides; so no        02:38

·11  one, neither side, should be relying upon the information that

12   Mr. Durkin is gathering for purposes of litigating this case.

13   That's an entirely separate matter.  And I have not stayed any

14   discovery, and there should be no reliance on that.

15        If that was misunderstood, it's clarified now.                   02:39

16        **MR. RUSSELL:**  Just so I can make sure I'm clear, Your

17   Honor, because I really, since we were the ones at the hearing

18   when this was discussed, and we asked Your Honor for this

19   precise relief, which is to say the financial discovery, the

20   allegations against Omni and IGWT and the like, and I thought I       02:39

21   heard Your Honor to say that it made sense for Mr. Durkin to

22   get to the base of it.  And if, then, there were any merit to

23   it, we could allow this discovery to go forward.

24        **THE COURT:**  Wait a second.

25        You're adding something in there.  I didn't say                  02:39

EXHIBIT __20__

PAGE __295__                    Mattel vs. MGA Entertainmer

1  scope of what Your Honor refused to give them.  Let's let the

2  discovery master rule on it.  It can always come back to you.

3          THE COURT:  Okay.

4          But I guess, Mr. Russell, I'm not sure of the

5  characterization that you're making.                          02:41

6          I handled the receivership application and request

7  made thereunder in the way that I'm handling the receivership

8  application; that should not be taken one way or the other as a

9  discovery ruling.

10          MR. RUSSELL:  I guess, Your Honor, the question is if  02:41

11  there was, as part of that application, and there's an

12  assumption built in that we'd like to have the Discovery Master

13  resolve, is it just receiver discovery or is it Phase 2?  That

14  seems like a question that Mr. O'Bryan should answer.  But I

15  assume, since you don't have any of the briefs and you don't    02:41

16  have the discovery and this has just been dropped on you,

17  assume for the sake of this discussion, that it is solely

18  related to the receiver; that it is, as we pause it, identical

19  to the discovery submitted.

20          THE COURT:  I guess where I would distinguish,         02:41

21  counsel, is this notion of receiver discovery, or that phrase,

22  that's not a phrase the Court has used.  Not that I can recall

23  using.  If I did, I certainly did not intend to.  I'm not

24  designating that as a separate and severable part of the

25  discovery.                                                     02:42

EXHIBIT ___20___

PAGE ___296___

1      The question for the discovery master will be whether

2  or not the disputed discovery request is related or relevant to

3  the trial that has now been scheduled for March or not.  I can

4  see tremendous overlap between, for example, discovery on

5  financial condition of the company as it relates to damages in      02:42

6  the Phase 2 and also issues that the receiver is looking at.

7  And without making a ruling on any of this, I would not suggest

8  for a moment that these are mutually exclusive categories.

9      MR. RUSSELL:  They may not be, Your Honor.  That's

10  the reason why Mr. O'Bryan in the first instance should deal      02:42

11  with it.  Because if you take it the way we take it, this might

12  not be Phase 2 discovery.

13      THE COURT:  You can make that argument to

14  Mr. O'Bryan.

15      MR. RUSSELL:  Thank you, Your Honor.      02:43

16      MR. ZELLER:  And just so it's clear, what Mr. Russell

17  is articulating is a basis as to why MGA has refused to give us

18  any financial --

19      THE COURT:  Mr. Zeller, I'm going to cut you off

20  here.  Take that up with the Discovery Master.  I don't mean to      02:43

21  cut you off, but I think I made my position as clear as I can

22  today that there is nothing from this Court which is precluding

23  any discovery that is properly sought for the trial that is

24  scheduled.

25      Whatever has happened has happened and we need to      02:43

EXHIBIT ___20___      Mattel vs. MGA Entertainmei

PAGE ___297___

```
 1   move forward.

 2           MR. ZELLER:  Thank you, Your Honor.

 3           THE COURT:  Thank you, counsel.

 4           MR. FRACKMAN:  I'm last, and I think I'll be the

 5   shortest.  On the issue of streamlining discovery, I've read     02:43

 6   the Court's prior orders concerning the number of depositions,

 7   for example, and I confess, I'm a bit confused.

 8           We would request from the Court that there be a

 9   reasonable limit placed on Phase 2 depositions.  I don't know

10   whether that comes to Your Honor or whether that goes to the     02:44

11   discover referee.

12           THE COURT:  In the first instance, that would go to

13   the discovery referee.  The limits that were placed were limits

14   that were placed on the earlier discovery phase.

15           To be clear again, I have placed no limits, no          02:44

16   restrictions, other than what is set forth in the rules of

17   civil procedure and in local rule 37 on discovery from this

18   point until March 23rd.

19           If the parties wish to stipulate, they may.  If the

20   parties think that the Court needs to be involved in this in     02:44

21   the first instance, that needs to go to the Discovery Master.

22           MR. FRACKMAN:  I think we're prepared to follow the

23   federal rules, Your Honor.  Thank you.

24           THE COURT:  Very good.

25           MR. ZELLER:  I feel like I'm being more difficult at     02:44
```

EXHIBIT ___20___

PAGE ___298___

```
 1   we'll go from there.

 2              MR. ZELLER:   Thank you.

 3              THE COURT:   Anything further?

 4              Thank you.   Good day.

 5

 6

 7

 8

 9

10                            CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.
15

16   _____        _____
     THERESA A. LANZA, CSR, RPR                 Date
17   Federal Official Court Reporter

18

19

20

21

22

23

24

25
```

EXHIBIT _____ 20

# EXHIBIT 21

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

<table>
<tr>
<td align="center"><u>NEW YORK</u><br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000<br>Facsimile: (212) 849-7100</td>
<td align="center"><u>LOS ANGELES</u><br>865 South Figueroa Street, 10th Floor<br>Los Angeles, CA 90017<br>(213) 443-3000<br>Facsimile: (213) 443-3100</td>
<td align="center"><u>TOKYO</u><br>Akasaka Twin Tower Main Building, 6th Floor<br>17-22 Akasaka 2-Chome<br>Minato-ku, 107-0052<br>+81 3 5561-1711<br>Facsimile: +81 3 5561-1712</td>
</tr>
<tr>
<td align="center"><u>SILICON VALLEY</u><br>555 Twin Dolphin Drive, Suite 560<br>Redwood Shores, CA 94065<br>(650) 801-5000<br>Facsimile: (650) 801-5100</td>
<td align="center"><u>SAN FRANCISCO</u><br>50 California Street, 22nd Floor<br>San Francisco, CA 94111<br>(415) 875-6600<br>Facsimile: (415) 875-6700</td>
<td align="center"><u>LONDON</u><br>16 Old Bailey<br>London United Kingdom<br>+44(0) 20 7653 2000<br>Facsimile: +44(0) 20 7653 2100</td>
</tr>
</table>

## LOS ANGELES OFFICE

## FACSIMILE TRANSMISSION

**DATE:**   February 12, 2009            **NUMBER OF PAGES, INCLUDING COVER: 2**

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Jean Pierre Nogues<br>Mitchell Silberberg & Knupp LLP | 310 312-3152 | 310 231-8352 |

**FROM:**   Jon D. Corey

**RE:**   Mattel, Inc. v. Bryant

**MESSAGE:**



FAXED
FEB 1 2 2009

| CLIENT # | 7209 | ROUTE/<br>RETURN TO: | **Johanna Minassian 10th<br>Floor** | ☐ CONFIRM FAX<br>☐ INCLUDE CONF. REPORT |
|---|---|---|---|---|
| OPERATOR: | PRICILLA | | CONFIRMED? | ☐ NO ☐ YES: |

The information contained in this facsimile is confidential and may also contain privileged attorney-client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please immediately notify us by telephone, and return the original message to us at the address above via the U.S. Postal Service. Thank you.

**IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE PHONE (213) 443-3000 AS SOON AS POSSIBLE.**

EXHIBIT ___21___

PAGE ___300___

02/12/2009 14:04 FAX   12134433          QEUOH-LAU                                 ☑ 001

```
                    *********************
               ***    TX REPORT    ***
                    *********************


         TRANSMISSION OK

         TX/RX NO              4135
         RECIPIENT ADDRESS     76706#7209#13102318352
         DESTINATION ID
         ST. TIME             02/12 14:03
         TIME USE.            0'0'34
         PAGES SENT               2
         RESULT               OK
```

# QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

| NEW YORK | LOS ANGELES | TOKYO |
|---|---|---|
| 51 Madison Avenue, 22nd Floor | 865 South Figueroa Street, 10th Floor | Akasaka Twin Tower Main Building, 6th Floor |
| New York, NY 10010 | Los Angeles, CA 90017 | 17-22 Akasaka 2-Chome |
| (212) 849-7000 | (213) 443-3000 | Minato-ku, 107-0052 |
| Facsimile: (212) 849-7100 | Facsimile: (213) 443-3100 | +81 3 5561-1711 |
|  |  | Facsimile: +81 3 5561-1712 |

| SILICON VALLEY | SAN FRANCISCO | LONDON |
|---|---|---|
| 555 Twin Dolphin Drive, Suite 560 | 50 California Street, 22nd Floor | 16 Old Bailey |
| Redwood Shores, CA 94065 | San Francisco, CA 94111 | London United Kingdom |
| (650) 801-5000 | (415) 875-6600 | +44(0) 20 7653 2000 |
| Facsimile: (650) 801-5100 | Facsimile: (415) 875-6700 | Facsimile: +44(0) 20 7653 2100 |

## LOS ANGELES OFFICE

# FACSIMILE TRANSMISSION

DATE:   February 12, 2009                    NUMBER OF PAGES, INCLUDING COVER: 2

| NAME/COMPANY | PHONE NO. | FAX NO. |
|---|---|---|
| Jean Pierre Nogues | 310 312-3152 | 310 231-8352 |
| Mitchell Silberberg & Knupp LLP |  |  |

FROM:   Jon D. Corey

RE:   Mattel, Inc. v. Bryant

MESSAGE:

EXHIBIT  21

PAGE  301

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017 | TEL 213-443-3000 FAX 213-443-3100

February 12, 2009

<u>**Via Facsimile and U.S. Mail**</u>

Jean Pierre Nogues
Mitchell Silberberg & Knupp LLP
11377 West Olympic Blvd.
Los Angeles, CA 90064

Re:   Mattel, Inc. v. Bryant

Dear Jean,

I write in response to your letter of February 6, 2009 in which you propose that MGA's responses to certain interrogatories related to MGA's contentions regarding its trade dress claims be held in abeyance pending resolution of Mattel's contemplated motion for summary judgment of the MGA's claims. In light of the Court's comments toward the end of yesterday's hearing regarding Phase 2 discovery and having set a discovery cut-off, please confirm by the close of business on February 13, 2009 whether MGA will be providing full and complete responses to the interrogatories seeking MGA's contentions regarding its affirmative claims against Mattel. Because these claims have been pending since April 2005 and MGA has had almost 4 years to develop its contentions, Mattel expects MGA to be able to provide full and complete responses to them on or before February 27, 2009. If we are in agreement, then I will provide a stipulation to document it.

Best regards,

*Jon Corey*

Jon Corey

EXHIBIT ___21___

PAGE ___302___

**quinn emanuel urquhart oliver & hedges, llp**

NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL 212-849-7000 FAX 212-849-7100

SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California 94111 | TEL 415-875-6600 FAX 415-875-6700

SILICON VALLEY | 555 Twin Dolphin Drive, Suite 560, Redwood Shores, California 94065 | TEL 650-801-5000 FAX 650-801-5100

TOKYO | Akasaka Twin Tower Main Building, 6th Floor, 17-22 Akasaka 2-Chome, Minato-ku, Tokyo 107-0052, Japan | TEL +81-3-5561-1711 FAX +81-3-5561-1712

# EXHIBIT 22

# MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

**MS&K**

Jean Pierre Nogues
A Professional Corporation
(310) 312-3152 Phone
(310) 231-8352 Fax
jpn@msk.com

February 13, 2009

**VIA E-MAIL AND U.S. MAIL**

Jon Corey, Esq.
Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543

Re:   **Bryant v. Mattel, Inc. and Consolidated Actions, C.D. Cal. (Eastern Div.) Case No. CV04-09049 SJL (RNBx); Meet and Confer re MGA Responses to Mattel Interrogatories 43, 44, 51-55 and 64 and Your Letter of February 12, 2009**

Dear Jon,

As you know, we are scheduled to meet and confer with your office next Wednesday, February 18, concerning Mattel's January 6, 2009 letter indicating an intent to file a summary judgment motion on MGA's trade dress claims. Mattel's anticipated summary judgment motion and our request that Mattel agree to defer trade dress discovery are inextricably intertwined. As a consequence, our meeting next week regarding the summary judgment motion, which we anticipate will include discussion of the claims on which Mattel intends to move, the basis of the motion and the anticipated timing of the motion, could impact our request regarding trade dress discovery.

As a consequence, it is premature to ask us to respond to your February 12 letter until after we have completed the meet and confer process on Mattel's anticipated motion underlying our request. While we are well aware of what Judge Larson said earlier this week, we are also aware that the discovery cutoff for Phase 2 is now December 11, 2009, some ten months away. Accordingly, waiting until next Wednesday to complete the meet and confer process before we respond to your letter does not in any way prejudice Mattel, and may result in avoidance of a potential dispute.

EXHIBIT _22_

PAGE _303_

11377 West Olympic Boulevard, Los Angeles, California 90064-1683
Phone: (310) 312-2000  Fax: (310) 312-3100  Website: www.msk.com

MITCHELL SILBERBERG & KNUPP LLP

Jon Corey, Esq.
February 13, 2009
Page 2

I look forward to discussing your February 12 letter with you next week.

Very truly yours,

Jean Pierre Nogues
of
MITCHELL SILBERBERG & KNUPP LLP

JPN/jpn

EXHIBIT _22_

PAGE _304_

# EXHIBIT 23

MITCHELL SILBERBERG & KNUPP LLP

A LAW PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

**MS&K**

Jean Pierre Nogues
A Professional Corporation
(310) 312-3152 Phone
(310) 231-8352 Fax
jpn@msk.com

February 19, 2009

**VIA E-MAIL AND U.S. MAIL**

Jon Corey, Esq.
Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
865 South Figueroa Street
10th Floor
Los Angeles, CA 90017-2543

Re:   **Bryant v. Mattel, Inc. and Consolidated Actions, C.D. Cal. (Eastern Div.) Case No. CV04-09049 SJL (RNBx); Meet and Confer re MGA Responses to Mattel Interrogatories 43, 44, 51-55 and 64**

Dear Mr. Corey,

I am responding to your letter of February 12 letter asking the MGA parties to agree to provide supplemental responses to the aforementioned interrogatories by February 27.

Yesterday, we had an opportunity to complete our discussions with your office concerning Mattel's anticipated summary judgment motion. During yesterday's session, Mr. Webster confirmed that Mattel's anticipated motion is premised entirely on the Court's Phase I rulings and determinations, and will assert that MGA cannot maintain trade dress claims on any elements relating to the Bratz dolls because (1) those claims are premised entirely on conduct which the Court found to be unlawful, and (2) Mattel essentially owns everything related to Bratz. Mr. Webster also informed us that Mattel would be filing its motion within a week of the Court's rulings on the Phase I matters heard February 11.

It is now clear that Mattel's motion does not depend on any discovery to be taken in Phase 2. It is also clear that because Mattel will file that motion very soon, it makes the most sense to await the outcome of that motion to begin trade dress discovery. Since Mattel will not voluntarily agree to suspend trade dress discovery until its summary judgment motion is decided, MGA will be filing a motion for protective order staying discovery until after the motion is decided.

Consequently, the MGA parties will not agree to provide supplemental responses to the aforementioned interrogatories by February 27, 2009. Instead, they offer to provide their supplemental responses either: (1) if the protective order motion is denied, 21 days after its denial; or (2) if the protective order motion is granted, 21 days after the Court decides Mattel's summary judgment motion, to the extent any trade dress claims remain after that decision. MGA plans to file its protective order motion next week.

2134954.1/39416-00002

EXHIBIT   23

PAGE   305

11377 West Olympic Boulevard, Los Angeles, California  90064-1683
Phone: (310) 312-2000   Fax: (310) 312-3100   Website: www.msk.com

## MITCHELL SILBERBERG & KNUPP LLP

Jon Corey, Esq.
Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
February 19, 2009
Page 2

Please let me know if this is acceptable to you, or you would like to discuss this matter further.

Very truly yours,

*[signature]*

Jean Pierre Nogues
of
MITCHELL SILBERBERG & KNUPP LLP

JPN/jpn
cc:    Russell J. Frackman, Esq.
       Joel N. Klevens, Esq.

EXHIBIT *23*

PAGE *306*

# EXHIBIT 24

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
email:      dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone:  (310) 553-3000
Facsimile:  (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05 - 02727  CBM (RZx)

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 et seq. and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** |
| v. | |
| MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

EXHIBIT __24__

PAGE __307__

1    Plaintiff MGA Entertainment, Inc. for its complaint against
2    Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:
3
4                              **PARTIES**
5    1.    Plaintiff MGA Entertainment, Inc. ("MGA") is a California
6    corporation organized and existing under the laws of the State of California, with a
7    principal place of business in Van Nuys, California.
8    2.    MGA is informed and believes, and based thereon alleges, that
9    Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place
10   of business in El Segundo, California.
11   3.    MGA is ignorant of the true names and capacities of the defendants
12   sued herein under the fictitious names DOES 1 through 10 inclusive. MGA will
13   seek leave of court to amend this complaint to allege such names and capacities
14   when they are ascertained. MGA is informed and believes, and based thereon
15   alleges, that each of the fictitiously named DOE defendants is responsible in some
16   manner for the wrongful conduct alleged herein. MGA further alleges that each
17   defendant acted in concert with, as agent or representative for, or at the request or
18   on behalf of another or Mattel. Each charging allegation contained herein is,
19   therefore, also hereby alleged against each fictitiously named DOE defendant.
20
21                    **JURISDICTION AND VENUE**
22   4.    Through this action MGA asserts claims against Mattel arising under
23   the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and
24   Professions Code Sections 17200 *et seq.*, California Business and Professions Code
25   Section 14330 and California common law. This Court has original subject matter
26   jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and
27   1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental
28

EXHIBIT _____24_____    1

PAGE _____308_____

1   subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2   Section 1367(a).

3       5.    This Court has specific personal jurisdiction over Mattel, as it has

4   purposefully committed, within the State of California, the acts from which these

5   claims arise and/or has committed tortious acts outside California, knowing and

6   intending that such acts would cause injury to MGA within the state. The Court

7   also has general personal jurisdiction over Mattel, as it conducts continuous,

8   systematic and routine business within the State of California and the County of

9   Los Angeles.

10       6.    Venue is proper in the United States District Court for the Central

11   District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13   **FACTUAL BACKGROUND**

14       7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15   competition-by-intimidation and serial copycatting of MGA's products, which

16   Mattel has used in an unbridled effort to cause confusion in the market place and

17   eliminate MGA as a competitor in the toy and fashion doll market long dominated

18   and controlled by Mattel.

19       8.    MGA is a privately-held company in the San Fernando Valley that

20   began in 1979 as a small consumer electronics business. In 1987, the company

21   made its first foray into the toy business when it secured rights to market handheld

22   LCD games featuring licensed Nintendo® characters. Building on that small

23   success, the company began marketing products for popular licensed properties

24   such as the "Power Rangers"® and "Hello Kitty"®. This little-known but

25   successful company, however, was propelled into the limelight after its daring

26   release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27   "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28   contemporary look and fashion. At the time of the release of "BRATZ", "Barbie"

EXHIBIT __*24*__ ^2

PAGE __*309*__

1    sales were in a slump, Mattel was in turmoil, and the market was ripe for something
2    new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that
3    has been able to seriously challenge "Barbie" for market share, and begin to loosen
4    Mattel's 50-year iron-fisted grip on the fashion doll market.

5         9.    Mattel has not taken kindly to the challenge. Either unable or
6    unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel
7    has, instead, taken a more expeditious approach, resorting to unfair and anti-
8    competitive business practices. Wielding its substantial clout and influence in the
9    toy industry, Mattel has tried to muscle MGA out of business. MGA is informed
10   and believes that Mattel has intimidated, coerced and threatened retailers, licensees,
11   suppliers and others in the industry – both in the U.S. and internationally – in order
12   to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA
13   from obtaining licensees, contracts and supplies for its products. Mattel has also
14   serially imitated and copy-catted the look of MGA products, trade dress,
15   trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"
16   line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-
17   competitive conduct and to recover the extensive damage that Mattel's illicit
18   behavior has caused, and continues to cause, MGA. Mattel's own website states:
19   "As the global leader in the toy industry, we believe that how we achieve success is
20   just as important as the success itself." It also proclaims that "unwavering integrity
21   defines our corporate culture on every level, guiding how we work and how we do
22   business." Mattel's own corporate governance standards require it to "play by the
23   rules," complete fairly and be a good corporate citizen. Mattel's actions, however,
24   speak louder than its words.

25
26
27
28

EXHIBIT __24__ 3

PAGE __310__

## Mattel History and Performance

10.    Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

EXHIBIT _____α/_____  4

PAGE _____311_____

1  reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us

2  and Wal-Mart.  Mattel spent a reported $881 million in March 1997 to purchase

3  Tyco Toys and acquire the "Matchbox" toy car brand.  Just more than a year later,

4  it spent $700 million for the Pleasant Co., a mail-order doll company and maker of

5  the "American Girl" doll collection.  And in December 1998, Mattel announced

6  plans to fork out a monumental $3.5 billion to buy the Learning Company,

7  followed quickly by Mattel's purchase, in March 1999, of a software company,

8  Purple Moon.

9       14.    Despite these acquisitions, the company continued to struggle.  The

10  retail environment and buying patterns had unquestionably changed, but Mattel had

11  not kept up.  Despite Mattel's feverish acquisitions, Mattel's mainstay and primary

12  profit-generator was still "Barbie."  But "Barbie" had grown stale, and sales

13  languished.  Posting additional losses in the first quarter of 1999, Mattel announced

14  that it would lay off 3,000 employees – 10% of its work force.

15       15.    Mattel's stock plummeted again in late 1999, dropping 30% on

16  Mattel's announcement that it would fall as much as 55% short of analysts' earning

17  estimates for the third quarter.  Mattel blamed its troubles primarily on its

18  expensive, $3.5 billion acquisition of the Learning Company, which had turned out

19  to be a disaster fraught with licensing and distribution problems, bad debt, high

20  product returns and high advertising costs.

21       16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,

22  and some analysts considered Mattel vulnerable to a takeover.  Investors clamored

23  for Ms. Barad's resignation, and got their wish.

24       17.    Jill Barad resigned from Mattel in February 2000.

25       18.    For three months, the company was without a permanent chief

26  executive until Robert Eckert took the helm in May 2000.  Mr. Eckert had spent 23

27  years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28



EXHIBIT ___  5

PAGE ___

1    with reviving its ailing cheese business. Investors looked for him to do the same

2    for Mattel.

3       19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall*

4    *Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

5       20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds,

6    closed factories in the United States, shipped production to Mexico, and sold off the

7    Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's

8    bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner

9    meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an

10   industry that had become increasingly driven by consumer whims and fads, and the

11   hot, must-have toys of the moment, Mattel remained disinterested in devoting its

12   resources to searching for or developing a new blockbuster toy. Mr. Eckert's

13   business plan was not to diversify, but to build upon and expand sales of its existing

14   brands. Mattel was, after all, still generating billions in revenue despite the decline

15   of "Barbie." And so, Mattel remained committed to its age-worn icon and its two

16   other core brands, Fisher-Price and Hot Wheels, with each of the three accounting

17   for approximately a third of the company's sales.

18      21.    Then came the competition – MGA's "BRATZ".

19

20   **"BRATZ" Dolls Revolutionize The Fashion Doll Market**

21      22.    "BRATZ" challenged "Barbie's" half-century domination of the

22   fashion-doll market like nothing ever before had been able to do.

23      23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong

24   Kong Toy Fair in January 2001, while continuing to finalize the product throughout

25   that spring. Finished products were first shipped in May 2001. MGA introduced

26   the line to consumers in June 2001.

27

28

EXHIBIT 24       6

PAGE 313

24.   Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

## MGA's "BRATZ"



25.   At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

EXHIBIT 24  7

PAGE 314

26.   Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

**MGA's "BRATZ"**                    **Mattel's "Barbie"**

          

27.   Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls — those between childhood and adolescence — who had been all but abandoned as a market by Mattel.

28.   The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT ___24___

PAGE ___315___

1  2004, including the Suppliers Performance Award by Retail Category (the

2  "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing

3  Today/Apparel Merchandising.

4      29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA

5  was able to chip away at Mattel's stranglehold on the fashion doll market, gaining

6  shelf space and market share as "Barbie" sales remained flat or, at times, declined.

7      30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ"

8  posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had

9  once enjoyed a 90% share of the fashion doll market in 1997, that share had already

10  slipped to 85% or less by the time of the release of "BRATZ". With the company

11  still struggling under Mr. Eckert to overcome prior years of declining sales and

12  mounting debt, "Barbie," Mattel and Mr. Eckert simply could not afford the

13  untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more

14  potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and

15  MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

16

17  **Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition**

18      31.    Mattel was not poised to nimbly respond to "BRATZ" with a new,

19  creative product of its own – indeed, it had been antithetical to Mattel's corporate

20  culture and mentality for Mattel to even conceive that a product might vie for shelf

21  space with "Barbie", let alone be available for sale to consumers mere months after

22  first being shown to retailers. Mattel had to take a more expeditious route.

23      32.    Instead of fairly competing, Mattel waged war against MGA using a

24  wide-array of tortious, unfair and anti-competitive practices including systematic,

25  serial copycatting and intellectual property infringement, aided by intimidation,

26  threats and other acts of unfair competition and anti-competitive conduct, all with

27  one goal in mind – to banish MGA from the market – or minimize its ability to

28  capture any meaningful share before it could do any real harm to Mattel.

EXHIBIT _24_ [9]

PAGE _316_

Mattel's serial copycatting and intellectual property infringement

33.   Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.   The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ" — also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

| **Mattel's Traditional "Barbie"** | **Mattel's "My Scene" Doll** | |
| --- | --- | --- |
| | circa 2002 | circa 2004 |
|  |  |  |
|  |  |  |

EXHIBIT __24__ 10

PAGE __317__

35.    These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.    Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.    Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

EXHIBIT 24  11

PAGE 318

Mattel's Traditional "Barbie"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

**BRUNETTE**

Mattel's Traditional "Theresa"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

EXHIBIT _24_ 12

PAGE _319_

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |
|  |  |  |

38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye

 

EXHIBIT ___24___ 13

PAGE ___320___

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed. The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison. The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ." The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye. The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                    **New Mattel "My Scene" Eye**

   

40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

EXHIBIT ___24___ 14

PAGE ___321___



BLONDE

Mattel's
Traditional "Barbie"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

BRUNETTE

Mattel's
Traditional "Theresa"

Mattel's
Original "My Scene"

Mattel's
Recent "My Scene"

EXHIBIT _____

PAGE _____

15



Mattel's Traditional "Theresa"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

## AFRICAN AMERICAN

Mattel's Traditional "Barbie"

Mattel's Original "My Scene"

Mattel's Recent "My Scene"

EXHIBIT 24   16
PAGE 323

41.    Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.    To illustrate. Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging



43.    Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



EXHIBIT __24__     17

PAGE __324__

44.    Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

**MGA's "BRATZ"**
**"Wintertime Wonderland" Packaging**



**Mattel's "My Scene"**
**"Chillin' Out" Packaging**



45.    Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble,*" as shown here

**MGA's "BRATZ"**
**"SPORTZ" Packaging**



**Mattel's Recent "My Scene"**
**"MIAMI GETAWAY" Packaging**



EXHIBIT ___24___   18

PAGE ___325___

46.     In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.     As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme – but not just *any* theme, often *MGA's theme.*

48.     For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.     When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.     When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

EXHIBIT __24__     19

PAGE __326__

51.    Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.    Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.    For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.    Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.    As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar — indeed, practically identical – "My Scene" styling head.

EXHIBIT __24__    20

PAGE __327__

MGA's "BRATZ"
"Funky Fashion Makeover Head"

Mattel's "My Scene"
"Stylin' Head"



56.   Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hairstyle practice



EXHIBIT ___24___   21

PAGE ___327___

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's' website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

**MGA's "BRATZ Dogz"**          **Mattel's "My Scene" dog**

          

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

EXHIBIT ___24___  22

PAGE ___328___

1    customers too have been confused.

2        62.   Indeed, Mattel's television commercials and "My Scene" products

3    have become so confusingly similar to MGA's that even advertising executives

4    have expressed concern. One went so far as to say that although imitation is the

5    best form of flattery, what the individual had seen at Mattel's showroom, and how

6    its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7    "shocking." This person further opined that it was clear that Mattel is intending to

8    confuse customers and capture "BRATZ" market share, and even asked MGA if it

9    was considering legal action.

10       63.   The press also has taken notice of Mattel's attempts to confuse

11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a

12   prominent news publication stated, "Oh my, I just came from Mattel's showroom

13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14   Another member of the press visiting MGA's showroom offered the unsolicited

15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like

17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19   On or about February 16, 2005, during an interview of a Mattel representative on

20   local network news in New York, "My Scene Barbie" was displayed by a Mattel

21   representative. During conversation about the dolls, the interviewer exclaimed that

22   they looked like "BRATZ". The Mattel representative just laughed – but this is no

23   laughing matter. This colloquy was available for replay and viewing, and was even

24   transcribed, on the internet.

25       64.   Customers too have been similarly confused. Some actually contacted

26   MGA seeking to purchase "My Scene" dolls.

27       65.   Mattel's conduct is planned, deliberate and intentional. Mattel has

28   systematically, copied, imitated and liberally borrowed many of the distinctive,

23

EXHIBIT _____ 24

PAGE _____ 329

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.     Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.     What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.     For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**          **Mattel's "Wee 3 Friends"**





EXHIBIT ___24___

PAGE ___330___

69.    In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

|  |  |
|---|---|
| **MGA's**<br>**"Mommy's Little Patient"** | **Mattel's**<br>**"Little Mommy Potty Training Baby Doll"** |
|  |  |

70.    Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line. When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines. Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo. MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme. MGA's logo accentuates the "A", "R", and "S" in compressed block lettering. Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme. Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

EXHIBIT 24   25

PAGE   331

71.   Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line.  In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials.  For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world,". mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.   None of this is coincidence.  Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA.  Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow."  It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.   MGA has suffered extensive injury from Mattel's conduct.  Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.   This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

EXHIBIT _24_   26

PAGE _332_

75.    For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76.    Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.    Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.    When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.    Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

EXHIBIT ___24___    27

PAGE ___334___

1    and falsely told a United Kingdom retailer that MGA was discontinuing one of its

2    lines, in order to make such line less attractive to buyers and thereby attempt to

3    increase sales of the competitive Mattel product and improve its own sales, at

4    MGA's expense.

5        80.    Even supposedly unbiased and impartial industry organizations have

6    fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7        81.    NPD Funworld ("NPD"), for one, is the leading supplier of sales

8    statistics in the toy industry. Accurate NPD statistics are essential for efficient

9    product-line management. Without these statistics, it is difficult, if not impossible,

10   for toy companies to assess and measure the relative success of their products in

11   key categories. It is, however, a subscription service, and NPD restricts the manner

12   in which its subscribers may use the data it provides.

13       82.    Mattel has regularly ignored the restrictions – using NPD data about

14   Mattel's comparative standing relative to other companies in press releases and in

15   communications with retailers and financial investors who are not NPD subscribers.

16       83.    Mattel generates substantially more annual subscription revenue for

17   NPD than does MGA, and carries more clout.

18       84.    After MGA had subscribed to the service for more than 12 years, NPD

19   terminated MGA's subscription in 2003 theoretically on the grounds that MGA

20   misused NPD data in a press release.

21       85.    MGA is informed and believes that the termination was the result of

22   pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's

23   restrictions.

24       86.    In addition to this, the market share numbers that NPD generates are

25   heavily dependent on the category in which NPD places a particular product. MGA

26   is informed and believes that Mattel also pressured NPD into changing certain

27   product classifications for its "BRATZ" products in order to manipulate the data

28

EXHIBIT __24__          28

PAGE ____335____

1    and preserve Mattel's market share rankings in the critical fashion doll category
2    and thereby lower MGA's.

3        87.    The Children's Advertising Review Unit ("CARU") is another
4    organization that, upon information and belief, appears to have been subject to
5    improper influence by Mattel.  CARU is the toy industry's supposedly independent
6    self-regulatory body in charge of maintaining standards in advertising.  CARU's
7    approval is considered critical within the toy industry to avoiding regulatory action
8    by the Federal Trade Commission.

9        88.    CARU is heavily subsidized by Mattel.

10       89.    Upon information and belief, Mattel has used its influence as a major
11   contributor to CARU's budget to induce CARU to place onerous restrictions on
12   MGA advertisements, and require MGA to amend aspects of commercials that have
13   gone unchallenged in other parties' commercials.

14       90.    As a result of CARU's restrictions, MGA has been forced to incur
15   unnecessary costs for reshooting and producing or re-editing its commercials.

16       91.    On several occasions, CARU has also either strongly suggested, if not
17   also required, that MGA respond to inquiries about its website policies and make
18   substantial changes to the "BRATZ" website notably and significantly in excess of
19   restrictions imposed on Mattel and others.

20       92.    Even TIA, the toy industry's trade association, is apparently not
21   untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-
22   the-Year Awards, the most prestigious of which had been the award for Toy of the
23   Year.  Winning the Toy of the Year Award is a significant achievement that not
24   only very likely increases the sales of the winning toy, but also denotes the winning
25   company as a leader in toy innovation and generates substantial goodwill with
26   retailers, distributors, licensees, and customers.

27       93.    For the years 2000 (the first year of the award), 2001 and 2002, the
28   Toy of the Year award was chosen by consumer vote.  The awards ceremony was

EXHIBIT __24__        29

PAGE __336__

1   then held the following year, at a dinner in New York. (For example, the awards
2   dinner for the year 2000 award was held in February 2001). Leap Frog won the
3   2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002
4   People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award,
5   however, the rules suddenly changed. Now, the award is selected by members of
6   the industry.

7       94.   Upon information and belief, this change was orchestrated by a Fisher
8   Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of
9   TIA.

10      95.   Perhaps not surprisingly given this change in the winner selection
11  procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year
12  2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal
13  Funk Super Stylin' Runway Disco."

14      96.   TIA has refused to provide MGA with the vote count procedure and
15  totals for this award, despite repeated requests.

16      97.   MGA is also informed and believes that Mattel was instrumental in
17  attempting to keep MGA from participating as a sponsor in this year's "Kids'
18  Choice Awards."

19      98.   Mattel has clearly engaged in tortious, illegal and unethical behavior in
20  its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently
21  Mattel's current *modus operandi* when it comes to "competing" in the industry.
22  The once immensely successful "LeapFrog" interactive learning product, for
23  example, has apparently been one of Mattel's other recent victims.

24      99.   Mattel may not shield its illegal, unfair and unethical business practices
25  from the public eye. It is time for the truth to be told, and the world to know of
26  Mattel's unfair, unethical and illegal business practices and unfair competition.
27  "Barbie" does not "play nice" with others (particularly her competitors), and needs
28  to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT __24__   30

PAGE __337__

1  allowed to continue to be the playground bully and trample on the rights of others,
2  including MGA.

3      100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-
4  competitive conduct, MGA has suffered and, unless abated, will continue to suffer
5  lost sales, lost licensing fees, lost contracts, lost relationships, lost business
6  opportunities and other damages and harm for which there is no adequate remedy at
7  law. Its ability to enter new markets and product lines has been hampered and
8  delayed. Its production costs have increased, its reputation and relationships with
9  important players in the industry have been negatively impacted, the value of its
10  business has been diminished, and its ability to attract, hire and retain employees
11  has been affected.

12

13              **FIRST CLAIM FOR RELIEF**

14  **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15      101.   MGA repeats and realleges the allegations contained in paragraphs 1
16  through 100 of this Complaint and incorporates them by reference as though fully
17  and completely set forth herein.

18      102.   MGA's "BRATZ" line has a unique and distinctive style and
19  distinctive characteristics, such as the disproportionately large head, large dramatic
20  eyes with a distinctive presentation (including the eye shape, make-up and lashes),
21  pouty, plump lips with a distinctive presentation (including the lip shape and make-
22  up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"
23  line is known for and recognized by the total image that is presented by its product
24  and the style and arrangement of the packaging and display. This "*tout ensemble*"
25  is representatively described and depicted herein. The characteristics of MGA's
26  "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line
27  and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress
28  in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

EXHIBIT ___24___      31

PAGE ___338___

1    is not essential to the purpose, quality or source identifying attributes of the

2    aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has

3    acquired distinction within the meaning of the Lanham Act.

4         103.  Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also

5    has its own unique and distinctive characteristics, such as the humanlike eye and

6    unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"

7    line has become known for and recognized by the total image that is presented by

8    the product and the style and arrangement of its packaging. This *"tout ensemble"* is

9    representatively described and depicted herein. The characteristics of MGA's

10    "BRATZ PETZ", alone or in combination, have come to identify the "BRATZ

11    PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's

12    trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if

13    any utility exists, it is not essential to the purpose, quality or source identifying

14    attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is

15    inherently distinctive or has acquired distinction within the meaning of the Lanham

16    Act.

17         104.  Mattel's production, sale and marketing of "My Scene" dolls,

18    including styling heads and doll heads, and "My Scene" pets that are confusingly

19    similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's

20    permission or consent, constitutes designation and use of a term, symbol, device or

21    combination thereof that is false or misleading within the meaning of 15 U.S.C.

22    Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as

23    to the affiliation, connection, or association, or as to the origin, sponsorship, or

24    approval of Mattel's goods or commercial activities, within the meaning of 15

25    U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

26         105.  Mattel's conduct has been intentional and willful, and is calculated

27    specifically to trade off the goodwill that MGA has developed in its successful

28    "BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

EXHIBIT __24__ 32

PAGE __339__

1  features of MGA's "BRATZ" line in connection with goods sold and distributed in

2  interstate commerce, Mattel has infringed and is likely to continue to infringe on

3  MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing,

4  Mattel has falsely represented and designated to the public generally and consumers

5  of fashion doll products specifically the source and origin of Mattel's "My Scene"

6  fashion doll products in violation of 15 U.S.C. § 1125(a).

7      106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8  wrongful conduct in an amount to be proven at trial.

9      107.  For each act of infringement, MGA is entitled to recover its actual

10  damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the

12  irreparable injury that Mattel's illegal actions have caused and will continue to

13  cause MGA, if not enjoined. MGA is therefore entitled to preliminary and

14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15  dress.

16          **SECOND CLAIM FOR RELIEF**

17      **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19          **Code § 17200 *et seq.* and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1

21  through 108 of this Complaint and incorporates them by reference as though fully

22  and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24  mimicked the make-up, appearance, features, trade dress, and image of MGA's

25  products, packaging and advertising, including its repackaging and refreshing of

26  older Mattel toys. Mattel's actions were and are done with the intent to deceive

27  consumers, cause confusion and mistake, and interfere with the ability of

28  consumers to identify the source of goods by appearance and packaging. By this

EXHIBIT  24        33

PAGE  340

1   conduct, Mattel pirates and exploits, by subliminal or conscious association with

2   MGA, the goodwill and reputation of MGA and derives benefit therefrom.

3       111.  Mattel has particularly and deliberately poached upon the commercial

4   magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct

5   has been intentional and willful, and is calculated specifically to trade off the

6   goodwill that MGA has developed in its successful "BRATZ" line.

7       112.  By its acts, including its intentional imitation of the distinctive features

8   of MGA's "BRATZ" dolls, which has progressively become closer and closer, as

9   well as its imitation of "BRATZ" themes, packaging and the overall look, feel and

10  total image of the "BRATZ" line, imitation of other MGA products, packaging and

11  advertising, and other conduct alleged herein, Mattel has engaged in unfair

12  competition under both federal and California state law.

13      113.  Mattel has also willfully and maliciously used its power, influence and

14  intimidation to threaten certain retailers, suppliers, licensees, distributors and

15  manufacturers so as to limit, if not prevent, MGA from doing business with these

16  retailers, suppliers, licensees, distributors and manufacturers, using its power and

17  influence to intimidate and manipulate industry bodies. Mattel has further used its

18  power and influence to attempt to, if not actually, intimidate and threaten MGA's

19  current and potential employees so as to cause MGA competitive injury.

20      114.  Alone, in combination, or in totality, Mattel's actions discussed and

21  alleged herein constitute unfair competition and unfair business practices within the

22  meaning of federal law, California statutory law and/or California common law.

23      115.  As a result of its conduct, Mattel has derived substantial monetary and

24  non-monetary benefit and business advantage. Mattel has also wrongfully diverted

25  profits away from MGA and to Mattel and, on information and belief, deprived

26  MGA of the patronage of a large number of actual and potential customers.

27      116.  MGA has been damaged by, and Mattel has profited from, Mattel's

28  wrongful conduct in an amount to be proven at trial.

EXHIBIT ___24___ 34

PAGE ___341___

1    117.  Monetary relief alone, however, is not adequate to address fully the

2   irreparable injury that Mattel's actions have caused and will continue to cause

3   MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent

4   injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from

5   engaging in acts of unfair competition and unfair business practices.

6    118.  MGA is further entitled to relief whereby Mattel is ordered to pay

7   restitution for damages resulting from Mattel's unfair competition and unfair

8   business practices.

9                          **THIRD CLAIM FOR RELIEF**

10   **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**

11                          **and California Common Law)**

12    119.  MGA repeats and realleges the allegations contained in paragraphs 1

13   through 118 of this Complaint and incorporates them by reference as though fully

14   and completely set forth herein.

15    120.  The look and trade dress of the MGA products referenced herein are

16   distinctive and famous, and have been since before Mattel launched its similar

17   versions.  By its aforesaid acts, Mattel caused and continues to cause blurring and

18   dilution of the distinctive look of MGA's products and trade dress, which

19   previously served as a unique source identifier for MGA, within the meaning of the

20   Lanham Act, California Business and Professions Code § 14330 and/or California

21   common law.

22    121.  Mattel's conduct has been intentional and willful, calculated

23   specifically to trade on MGA's goodwill and reputation and to cause dilution of

24   MGA's famous marks, particularly those connected with MGA's famous and

25   successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky

26   Fashion Makeover Head" and "BRATZ PETZ" line.

27    122.  MGA has been damaged by, and Mattel has profited from, Mattel's

28   wrongful conduct in an amount to be proven at trial.

EXHIBIT __24__  35

PAGE __342__

123.  Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124.  MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125.  As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment.  MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1.  That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a.  using confusingly similar trade dress;

    b.  improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c.  engaging in unfair competition and unfair business practices; and

    d.  diluting MGA's trade dress;

2.  For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3.  For the disgorgement of all profits derived by Mattel for its acts of:

    a.  false designation of origin or affiliation;

EXHIBIT _24_   36

PAGE _343_

1            b.      unfair competition and unfair business practices; and

2            c.      dilution;

3      4.      For costs of suit and reasonable attorneys' fees;

4      5.      For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6      6.      For such other and further relief as the Court deems just and proper.

7

8 Dated:        April 13, 2005            PATRICIA GLASER
9                                       CHRISTENSEN, MILLER, FINK,
10                                       JACOBS, GLASER, WEIL &
                                      SHAPIRO LLP

11                                       DALE M. CENDALI
                                      DIANA M. TORRES
12                                       PAULA E. AMBROSINI
                                      O'MELVENY & MYERS LLP

13

14

15                                       By:

16                                         Diana M. Torres
                                     Attorneys for Plaintiff
                                     MGA ENTERTAINMENT, INC.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __24__    37

PAGE __344__

1

## DEMAND FOR JURY TRIAL

2

3        MGA hereby demands a jury trial on all triable issues.

4

5   Dated:        April 13, 2005                PATRICIA GLASER
                                                CHRISTENSEN, MILLER, FINK,
6                                               JACOBS, GLASER, WEIL &
                                                SHAPIRO LLP
7
                                                DALE M. CENDALI
8                                               DIANA M. TORRES
                                                PAULA E. AMBROSINI
9                                               O'MELVENY & MYERS LLP

10

11                                              By:_____
                                                    Diana M. Torres
12                                              Attorneys for Plaintiff
                                                MGA ENTERTAINMENT, INC.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __24__        38

PAGE __345__