QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 090378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>**DISCOVERY MATTER**<br><br>**[To Be Heard By Discovery Master Robert C. O'Brien]**<br><br>MATTEL, INC.'S REPLY IN SUPPORT OF ITS *EX PARTE* APPLICATION FOR AN ORDER DEEMING LEXINGTON FINANCIAL, LLC SERVED, OR IN THE ALTERNATIVE, TO (1) COMPEL AN AUTHORIZED REPRESENTATIVE OF LEXINGTON FINANCIAL, LLC TO APPEAR TO ACCEPT SERVICE OF SUBPOENA, OR (2) ISSUE AN ORDER AUTHORIZING LEXINGTON FINANCIAL, LLC TO BE SERVED THROUGH THE CALIFORNIA SECRETARY OF STATE<br><br>[Supplemental Declaration of Jon D. Corey Filed Concurrently]<br><br>**Phase 2:**<br>Discovery Cut-off:      Dec. 11, 2009<br>Pre-trial Conference:   Mar. 1, 2010<br>Trial Date:             Mar. 23, 2010 |

1

# <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................... 1

I.    LEXINGTON DOES NOT DISPUTE THE CENTRAL ISSUE PRESENTED HERE—THAT IT HAS RECEIVED ACTUAL NOTICE OF MATTEL'S SUBPOENA. .......................................... 1

II.   LEXINGTON'S UNTIMELY TECHNICAL OBJECTION TO MATTEL'S SUBPOENA IS WAIVED AND WITHOUT MERIT ............... 3

III.  CONTRARY TO LEXINGTON'S OBJECTIONS TO FORM, MATTEL'S FILING OF THIS *EX PARTE* APPLICATION WAS PROPER .......................................................................................... 6

      A.    Good Cause Exists For *Ex Parte* Relief ................................ 6

      B.    Mattel Provided Proper Notice Of Its *Ex Parte* Motion ....... 8

      C.    Lexington Has Suffered No Prejudice .................................... 9

IV.   IN THE EVENT THE COURT DETERMINES THAT SERVICE UPON LEXINGTON HAS NOT YET BEEN EFFECTUATED, IT SHOULD ORDER LEXINGTON SERVED BY ALTERNATE MEANS ...................................................................................... 10

      A.    Lexington Should Be Ordered Subject To Service Via The California Secretary Of State ............................................... 10

      B.    Lexington Should Be Ordered Served Via Email Or International Federal Express ................................................ 12

CONCLUSION ...................................................................................... 14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**<u>Page</u>**

3

<u>Cases</u>

4
Brockmeyer v. May,
383 F.3d 798 (9th Cir. 2004) ........................................................... 14

5
Chan v. Soc'y Expeditions, Inc.,
39 F.3d 1398 (9th Cir. 1994) ............................................................. 2

6

7
Forum Financial Group, LLC v. President & Fellows of Harvard College,
199 F.R.D. 22 (D. Me. 2001) ........................................................ 4, 14

8
Green v. Baca,
2005 WL 283361 (C.D. Cal. 2005) .................................................... 2

9

10
Hall v. Sullivan,
229 F.R.D. 501 (D. Md. 2005) ........................................................ 2, 3

11
King v. Crown Plastering Corp.,
170 F.R.D. 355 (E.D.N.Y. 1997) ....................................................... 2

12

13
LeVecke v. Griesedieck Western Brewery Co.,
233 F.2d 772 (9th Cir. 1956) ........................................................... 11

14
McCoy v. Southwest Airlines Co.,
211 F.R.D. 381 (C.D. Cal. 2002) ....................................................... 5

15

16
Morrel v. Nationwide Mut. Fire Ins. Co.,
188 F.3d 218 (4th Cir. 1999) ............................................................. 5

17
Rio Properties, Inc. v. Rio Int'l Interlink,
284 F.3d 1007 (9th Cir. 2002) .................................................... 12, 13

18

19
Samsung SDI Co. v. Matsushita Elec. Indus. Co.,
2006 WL 5097404 (C.D. Cal. 2006) ................................................... 6

20
See E.A. Renfroe & Co. v. Moran,
2008 WL 1806200 (D. Colo. 2008) ............................................ 2, 3, 4

21

22
In re Shur,
184 B.R. 640 (Bankr. E.D.N.Y. 1995) ................................................ 3

23
Uzzell v. Teletech Holdings, Inc.,
2007 WL 4358315 (W.D. Wash. 2007) ............................................... 5

24

25
West Publishing Co. v. Sup. Ct.,
20 Cal. 2d 720 (1942) ...................................................................... 11

26
Western Resources, Inc. v. Union Pacific R. Co.,
2002 WL 1822432 (D. Kan. 2002) ..................................................... 2

27

28

1

## **Statutes**

2

Cal. Corp. Code
   § 2105...................................................................................... 10, 11
   § 2105(a)(5) ................................................................................ 10
   § 2111 .......................................................................................... 10
   § 2111(b) ..................................................................................... 11

Fed. R. Civ. P.
   Rule 4(f)(3) ........................................................................ 12, 13, 14
   Rule 5(b) ........................................................................................ 2
   Rule 45 ....................................................................................... 2, 3
   Rule 45(b) ...................................................................................... 2
   Rule 45(c)(2)(B) ............................................................................. 3

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### Preliminary Statement

The single most important factor in assessing the propriety of service of a subpoena is whether the service conferred actual notice.  Nowhere in Lexington's opposition papers does it dispute that critical fact—that Lexington indeed received actual notice of Mattel's subpoena.  Instead, Lexington devotes its brief to quarreling about dubious side-issues, such as whether Mattel should have filed its motion on an *ex parte* basis and whether there is a typo in Lexington's name as it appears on the subpoena.   Courts routinely reject such quibbles that are advanced to evade compliance with a duly issued subpoena.  Having received actual notice of Mattel's subpoena and having had the opportunity to object thereto, the Discovery Master should deem Lexington served.  Alternatively, the Discovery Master should order that Lexington may be served via the Secretary of State, or via email and/or international Federal Express.

### Argument

**I.   LEXINGTON DOES NOT DISPUTE THE CENTRAL ISSUE PRESENTED HERE—THAT IT HAS RECEIVED ACTUAL NOTICE OF MATTEL'S SUBPOENA.**

Lexington expends considerable energy arguing that Mattel's service was a "nullity" because Mr. Mashian and Bingham were purportedly not formally anointed to accept service on Lexington's behalf.  (Opp. at 13-16).  However, Lexington does ***not*** dispute the most critical point in Mattel's Application—that Lexington has received actual notice of the subpoena.  Indeed, two different sets of Lexington's attorneys have been served with the subpoena, Lexington's counsel has made a court appearance (at which it made various representations to the Discovery Master on Lexington's behalf) at the March 4, 2009 discovery hearing and Lexington has opposed the instant motion.  Plainly, Lexington is well-aware of Mattel's subpoena.

Where a party has received actual notice of process, courts will not put form over substance, or deem minor technical defects fatal to service. See Chan v. Soc'y Expeditions, Inc., 39 F.3d 1398, 1404 (9th Cir. 1994) ("Rule 4 is a flexible rule that should be liberally construed to uphold service so long as a party receives sufficient notice of the complaint. Technical defects in a summons do not justify dismissal unless a party is able to demonstrate actual prejudice.") (citations omitted). And so it is here. Mattel delivered the subpoena to Lexington repeatedly in a manner reasonably calculated to ensure receipt and notice of the subpoena. Lexington in fact received actual notice and therefore had ample time to avail itself of the procedural protections of Rule 45 and has demonstrated no actual prejudice. (App. at 9-10). See E.A. Renfroe & Co. v. Moran, 2008 WL 1806200, at *5 (D. Colo. 2008) ("[O]bvious purpose of Rule 45(b) is to mandate effective notice to the subpoenaed party, rather than 'slavishly adhere to one particular type of service.'"); Hall v. Sullivan, 229 F.R.D. 501, 505 (D. Md. 2005) ("So long as it actually receives the subpoena, it is just as able to avail itself of the procedural protections of Rule 45(c)(2)(B) as they would be if personally served.").

It is no longer the law that service **must** be effectuated by personal service, especially where (as here) actual receipt is effectuated. See, e.g., Green v. Baca, 2005 WL 283361, at *1 n.1 (C.D. Cal. 2005) (holding that leaving subpoena at various witnesses' offices pursuant to Rule 5(b) was sufficient for service under Rule 45); Hall, 229 F.R.D. at 506 ("delivery of the subpoena via Federal Express comported with the service requirements of Rule 45"); Western Resources, Inc. v. Union Pacific R. Co., 2002 WL 1822432, at *2 (D. Kan. 2002) ("service upon the non-party's counsel and Federal Express" satisfied Rule 45); King v. Crown Plastering Corp., 170 F.R.D. 355, 356 (E.D.N.Y. 1997) ("Accordingly, the court sees no reason for requiring in hand delivery for subpoenas served under Rule 45, so long as service is made in a manner that reasonably insures actual receipt of the subpoena by the witness."). These cases provide that Rule 45 merely requires that

"service be made in a manner which reasonably insures actual receipt of the subpoena by the witness." E.A. Renfroe, 2008 WL 1806200, at *5; Hall, 229 F.R.D. at 505; In re Shur, 184 B.R. 640, 644 (Bankr. E.D.N.Y. 1995) ("We therefore hold that the only limitation upon service under Rule 45 is that the procedure employed be reasonably calculated to give the non-party actual notice of the proceedings and an opportunity to be heard.").

Mattel has demonstrated that its method of service—personally serving the contact person identified on Lexington's UCC filing[1], and then electronically transmitting a copy of the subpoena to Lexington at Lexington's counsel's own written request[2]—reasonably insured actual receipt of the subpoena by Lexington. Indeed, Lexington does not dispute that it received actual notice. Nor does Lexington dispute that it had sufficient time to seek the procedural protections of Rule 45(c)(2)(B), including by seeking an extension of time to respond.[3] Lexington also has had sufficient time to move to quash the subpoena, had it wished to do so. In light of the reasonableness of Mattel's service efforts, coupled with Lexington's actual receipt of the Mattel subpoena, the Discovery Master should hold that service of the subpoena was properly effectuated upon Lexington.

## II.   LEXINGTON'S UNTIMELY TECHNICAL OBJECTION TO MATTEL'S SUBPOENA IS WAIVED AND WITHOUT MERIT

In a further attempt to avoid responding to Mattel's discovery requests, Lexington now raises a new objection to Mattel's subpoena on technical grounds. Specifically, Lexington seizes on the fact that Mattel inadvertently used the terms

---

[1]   See UCC Financing Statement dated August 29, 2008, attached as Exhibit 1 to the Declaration of Jon D. Corey in Support of Mattel's *Ex Parte* Application, dated March 3, 2009 ("Corey Dec.").

[2]   See E-mail from Jon Corey to Peter Villar, dated February 12, 2009, Corey Dec., Exh. 12.

[3]   See E-mail from Peter Villar to Jon Corey, dated February 12, 2009, Corey Dec., Exh. 11.

1  "Lexington Financial, *LLC*" (i.e. a limited liability corporation) as opposed to

2  "Lexington Financial *Limited*," to argue that the subpoena should be invalidated on

3  its face. (Opp. at 12). Lexington is incorrect.

4      As an initial matter, this objection is untimely. Mattel first served its

5  subpoena on Lexington, through its agent, Fred Mashian, more than a month ago, on

6  January 31, 2009.[4] Lexington's counsel, Bingham McCutchen LLP ("Bingham"),

7  received notice of the subpoena no later than February 6, 2009.[5] Bingham does not

8  dispute that it received a copy of the subpoena itself, with a caption allegedly

9  reflecting the erroneous entity name.[6] Rather than informing Mattel of this alleged

10 defect at that time, serving objections on that basis, or requesting that Mattel amend

11 the caption, Lexington's counsel stood silent for several weeks. Indeed, in the e-

12 mail Lexington's counsel sent to Mattel on February 12,[7] they merely stated that

13 Bingham would be representing Mr. Mashian *and Lexington*, noted their

14 understanding that Mattel had "*served* Mr. Mashian *and Lexington Financial* with

15 subpoenas"; and requested that Mattel's counsel send them additional copies of the

16 subpoenas and provide a one-week extension to respond.[8] Nor did Lexington's

17 counsel make the purported objection even in his e-mail message of February 23,

18 2009.[9] In that e-mail, Lexington's counsel merely suggested, for the first time, that

19 Mattel had not properly served Lexington because Mashian was supposedly "not the

20 agent for service for any such entity."[10]

21

22  _____

23  [4]  See Declaration of John Shurlock, dated February 26, 2009, at ¶ 2-3.
    [5]  See Declaration of Peter Villar, dated March 9, 2009, at ¶ 2.

24  [6]   See E-mail from Peter Villar to Jon Corey, dated February 12, 2009 (noting that

25 Bingham's copies did not "contain any *Attachments*") , Corey Dec., Exh. 11.
    [7]  Id.

26  [8]  Id.
    [9]   See E-mail from Peter Villar to Jon Corey, dated February 23, 2009, Corey Dec.,

27 Exh. 13.
    [10]  Id.

28

07975/2826122.3

-4-

EX PARTE REPLY

Had Lexington notified Mattel of this minor defect earlier, Mattel would have corrected it immediately. Instead, Lexington elected to sit on this objection for more than a month, only to belatedly raise it on Mattel in response to the present *Ex Parte* Application. The Discovery Master should reject this effort to sandbag Mattel, but in any event, the Discovery Master need not even consider the merits of Lexington's technical objection, because Lexington has waived it. Having received actual notice of Mattel's subpoena, Lexington was obliged to serve formal objections to the subpoena, if it had any. Lexington did not do so,[11] and thus, has waived any objections to the subpoena—including its technical objection regarding the entity name. See, e.g., McCoy v. Southwest Airlines Co., 211 F.R.D. 381, 385 (C.D. Cal. 2002) ("Failure to serve timely objections waives all grounds for objection. . . ."); Uzzell v. Teletech Holdings, Inc., 2007 WL 4358315, at *1 (W.D. Wash. 2007) (holding objections waived by failure to timely object or move to quash).

Even had Lexington not waived this objection, it still fails. Such minor errors are insufficient to invalidate a subpoena "if it names the[] [company] in such terms that every intelligent person understands who is meant ... the misnomer of a corporation in a notice, summons ... or other step in a judicial proceeding is immaterial if it appears that [the corporation] could not have been, or was not, misled." Morrel v. Nationwide Mut. Fire Ins. Co., 188 F.3d 218, 224 (4th Cir. 1999). Here, not even Lexington claims that its counsel or Mr. Mashian misapprehended the entity to which the subpoena was directed. To the contrary, after receiving the subpoena, Lexington's counsel noted in his February 12 email counsel's understanding that Mattel had "***served*** Mr. Mashian ***and Lexington Financial*** with subpoenas".

---

[11]  Corey Dec., ¶ 16.

## III. CONTRARY TO LEXINGTON'S OBJECTIONS TO FORM, MATTEL'S FILING OF THIS *EX PARTE* APPLICATION WAS PROPER

Lexington devotes almost half of its argument in Opposition to mere technical attacks on the form of Mattel's application—a request for *ex parte* relief—arguing that this issue should have been presented as a regularly noticed motion, and that additional notice should have been given.  (Opp. at 1-2, 6-11)  Lexington's arguments are moot as a practical matter, because Lexington had six full days to prepare and file its opposition, and thus it cannot be heard to complain regarding the form of Mattel's application.  Moreover, good cause exists for seeking *ex parte* relief here, and ample notice was given.

### A.  Good Cause Exists For *Ex Parte* Relief

By the very standard Lexington advances, Mattel will be irreparably prejudiced if Lexington is permitted to continue to evade service and engage in its obstructionist tactics.  (See Opp. at 7 (citing Samsung SDI Co. v. Matsushita Elec. Indus. Co., 2006 WL 5097404, at *1 (C.D. Cal. 2006) (ex parte relief will be granted if "(1) the 'moving party's cause will be irreparably prejudiced if the underlying motion is heard according to regular noticed motion procedures;' (2) 'the moving party is without fault in creating the crisis that requires ex parte relief;' and (3) that the proposed motion has a likelihood of success on the merits").

First, as Mattel's counsel explained at the March 4, 2009 Discovery Master hearing, *ex parte* relief is necessary to prevent the destruction of documents under the guise of arguments that Lexington has not yet been served, and that it is therefore not under any legal obligation to preserve relevant evidence.  Mattel's concern is not without basis.  Several MGA-affiliated witnesses have destroyed evidence in this case, including in circumstances where they claimed they were not obligated to maintain evidence.  For example, in 2005, after he knew this suit had been filed, Farhad Larian, the brother of Isaac Larian and a former MGA executive

1  and director who was still working as a paid consultant for MGA at the time,
2  destroyed ten to twelve boxes of documents and numerous emails and computer
3  files containing information about Bratz from the 2000 and 2001 time period.[12]  He
4  intentionally did so to keep the documents from Mattel in this case.[13]  Larian's
5  proffered justification for destroying these materials was that he "knew that [he] had
6  no legal or contractual obligation to Mattel to preserve any documents," and that he
7  supposedly destroyed the evidence before any obligation attached pursuant to
8  Mattel's specific notices to him that it would be subpoenaing his documents.[14]
9  Lexington should not be given the same opportunity to irreparably injure Mattel's
10 discovery efforts.

11         Additionally, as Mattel has repeatedly demonstrated, its subpoena seeks
12 documents and information which are critically important to Phase 2 claims and
13 defenses.[15]  Mattel's requests further are directly relevant to other issues that both
14 MGA and Mattel have raised before the Court, such as in Mattel's pending
15 application for a receiver and in MGA's repeated stay requests.[16]  Yet, to date,
16 Lexington, MGA and the affiliated third-party entities have refused to produce even
17 a single document responsive to Mattel's requests -- or produce documents that even
18 support their own repeated claims to the Court and the Discovery Master.  Indeed,

---

20 [12]    Deposition Transcript of Farhad Larian, Vol. 1 ("F. Larian Tr. Vol. 1"), dated
21 February 4, 2008, at 53:10-16, 56:9-57:5, 65:25-67:2, attached as Exhibit 1 to the
   Supplemental Declaration of Jon D. Corey in Further Support of Mattel's *Ex Parte*
22 Application, dated March 10, 2009 ("Supp. Corey Dec.").

23 [13]    F. Larian Tr. Vol. 1 at 56:12-57:2, Supp. Corey Dec., Exh. 1.

   [14]    Trial Tr. at 3783:13-14, Supp. Corey Dec., Exh. 2.
24 [15]    See Mattel's Motion to Compel Production of Documents Responsive to Third Party
25 Subpoenas, dated February 3, 2009, attached as Exhibit 21 to the Declaration of Jon D.
   Corey, dated March 3, 2009, ("Corey Dec."); Mattel's Opposition to the MGA Parties'
26 Motion to Quash Subpoenas Issued by Mattel, dated February 10, 2009, Corey Dec., Exh.
   22.  Rather than repeat the lengthy relevancy discussions here, Mattel incorporates them
27 herein by reference.
28 [16]    See id.

because Lexington purports to be beyond the power of this Court, Mattel needs to know sooner rather than later about these service issues.  For example, if Mattel is forced to go through the Hague Convention to serve Lexington, that process could take months or longer -- and thus additional delay by Lexington for weeks or months in resolving the service issues in the first instance could effectively allow Lexington to run out the clock.  Given the swift schedule for Phase 2 discovery and trial set by Judge Larson at the February 11, 2009 hearing, it is imperative to have clarity on service, so that Mattel is afforded sufficient time to obtain this critical discovery and to pursue any necessary follow-up discovery.

Second, Mattel brings its *Ex Parte* Application through no fault of its own.  Mattel diligently pursued its service on Lexington, and once Lexington belatedly attempted to claim that it had not been properly served, Mattel sought to avoid an unnecessary dispute by requesting that Lexington's counsel agree to accept service on Lexington's behalf or to identify Lexington's current authorized agent for service of process (if in fact Mr. Mashian was not so authorized).[17]  Lexington never responded to that request.[18]  Thus, it is Lexington's conduct in claiming the subpoena was invalid and purposely evading service of Mattel's subpoena which has necessitated court intervention where none should be necessary.[19]

### B.  Mattel Provided Proper Notice Of Its *Ex Parte* Motion

For its next technical argument, Lexington contends that Mattel failed to provide the notice required by Local Rule 7-19, and in particular, that Mattel did not include "a statement of opposing counsel's position" (Opp. at 9-10).  Lexington is incorrect.  As explained in Mattel's application, Mattel sent Lexington's counsel a letter on February 24, 2009, which (1) advised Lexington of Mattel's intent to apply

---

[17]  See id. at ¶ 18.
[18]  See id. at ¶ 19.
[19]  As shown above, Mattel's motion also meets the third element posited by Lexington because it is meritorious.

to the Court *ex parte* to compel service on Lexington; and (2) requested a meet and confer on this subject.[20]   Lexington never responded to this letter and never indicated whether it would oppose Mattel's *Ex Parte*.[21]   Mattel informed the Court of these facts in its Notice of Application, filed on March 3.   Lexington's own refusal to respond to Mattel's notice or to engage in the meet and confer process does not somehow negate Mattel's compliance with the governing rules.   The Discovery Master should reject this baseless argument.

### C.   Lexington Has Suffered No Prejudice

Lexington next claims that it will be unduly prejudiced if this Court were forced to respond to Mattel's Application on an "expedited basis."  (Opp. at 11).  This is a non-starter, since Lexington was ***not*** forced to respond in the usual 24 hours permitted for *ex parte* matters.   To the contrary, at the March 4, 2009 Discovery Master hearing, Lexington's counsel ***was granted*** a several-day extension of time to file its Opposition.   Indeed, because the length of the extension that Lexington received was the very one that Lexington's counsel requested, Lexington cannot credibly complain that it was denied sufficient time.  Lexington also filed its Opposition six calendar days (four court days) after being served with Mattel's Application.   By contrast, had Mattel filed its application as a regularly noticed motion, Lexington would have had at most just one additional day to respond.[22] Moreover, Mattel notified Lexington of its intent to seek this relief a full week before filing its Application.[23]   Thus, Lexington was afforded ample time to prepare

---

[20]   See Letter from Jon Corey to Peter Villar, dated February 24, 2009, Corey Dec., Exh. 15.
[21]   Corey Dec., ¶ 19.
[22]   See Discovery Master Order, dated December 6, 2006 at ¶ 5, Supp. Corey Dec., Exh. 3.
[23]   See Letter from Jon Corey to Peter Villar, dated February 24, 2009, Corey Dec., Exh. 15.

1  for and draft its response to Mattel's Application—nearly two weeks, in fact—and
2  suffered no cognizable prejudice in doing so.

3  **IV.**  **IN THE EVENT THE COURT DETERMINES THAT SERVICE UPON**
4  **LEXINGTON HAS NOT YET BEEN EFFECTUATED, IT SHOULD**
5  **ORDER LEXINGTON SERVED BY ALTERNATE MEANS.**

6  Nothing in Lexington's opposition demonstrates that Mattel's service of
7  the Lexington subpoena was improper.  However, should the Court decide that
8  service has not yet been effectuated, it should put an end to Lexington's efforts to
9  quarrel about service and order Lexington served by alternate means.

10  **A.**  **Lexington Should Be Ordered Subject To Service Via The**
11  **California Secretary Of State**

12  As set forth in Mattel's Application, Lexington—as a foreign company
13  transacting intrastate business—is subject to service via personal delivery on the
14  California Secretary of State.  (App. at 12).  See Cal. Corp. Code § 2105(a)(5)
15  (requiring foreign corporations that transact intrastate business to designate an agent
16  for service of process and give its consent to service on the California Secretary of
17  State if its agent cannot be found); Cal. Corp. Code § 2111 (allowing corporation to
18  be served by personal delivery to the California Secretary of State where designated
19  agent cannot be found with due diligence).  Lexington responds that (1) it is not
20  subject to the applicable sections of the California Corporations Code because
21  Lexington has neglected to register with the California Secretary of State; and (2)
22  Lexington does not "transact intrastate business" in California.  (Opp. at 18).
23  Lexington is wrong on both counts.

24  Lexington's suggestion that it is somehow exempt from Section 2111's
25  service provision as a result of its own failure to comply with Section 2105's
26  registration requirement is absurd and contradicted by the plain language of the
27  Corporations Code.  Section 2111 expressly contemplates service via the Secretary
28  of State on a foreign corporation which has failed to comply with Section 2105's

registration requirement.  See Cal. Corp. Code § 2111(b) (requiring that the Secretary of State send "a copy of the process and order to the address specified in the order if the corporation has not filed the statement required by Section 2105"). Nor could the Code support a reading whereby a foreign corporation could avail itself of the protections and benefits that arise from transacting business in the state, while it simultaneously avoided any resulting service consequences by simply disregarding the Code's requirements.

Lexington's claim that it does not transact intrastate business in California is likewise unavailing.   The determination of whether a foreign corporation is transacting intrastate business depends upon the particular facts of a given case.  See LeVecke v. Griesedieck Western Brewery Co., 233 F.2d 772, 775 (9th Cir. 1956) (citing West Publishing Co. v. Sup. Ct., 20 Cal.2d 720 (1942)). Here, Lexington has (1) agreed to do business with and extended a loan to Vision Capital, LLC—a company purporting to have a Los Angeles business address[24] and is tied to Larian family members here in California; (2) took collateral in the assets of Vision Capital (a company with an ostensible California address) that was ownership in another California company, Omni 808;[25] (3) filed a UCC financing statement in California, purporting to perfect its secured interest in Omni 808 and thereby availing itself of the protections of the California Commercial Code;[26] (4) had the loan documents drafted and prepared in California;[27] and (5) hired California attorneys "[f]rom time to time" to conduct business beyond merely resisting jurisdiction in this case.[28]  These activities clearly constitute "repeated and

---

[24] See UCC Financing Statement dated August 29, 2008, Corey Dec., Exh. 1.
[25] Id.
[26] Id.
[27] See Declaration of Fred Mashian, dated March 8, 2009, at ¶ 6.
[28] Id. at ¶ 3.

1  successive transactions" of Lexington's business within the state of California.

2  Nothing more is required.

3     **B.     Lexington Should Be Ordered Served Via Email Or International**

4          **Federal Express**

5          In the event the Discovery Master concludes that Lexington's in-state

6  contacts and activities are not sufficiently robust to qualify it for service via the

7  California Secretary of State, the Discovery Master should order Lexington served

8  via e-mail and/or International Federal Express.  Courts have broad discretion to

9  fashion alternative means of serving foreign corporations (as Lexington now

10 professes to be) located outside of the United States, including by e-mail.  See Fed.

11 R. Civ. P. 4(f)(3) (permitting service in a foreign country "by other means not

12 prohibited by international agreement, as the court orders"); Rio Properties, Inc. v.

13 Rio Int'l Interlink, 284 F.3d 1007, 1015 (9th Cir. 2002) (permitting service of

14 foreign corporation by e-mail).

15         The Ninth Circuit's decision in Rio Properties is directly on point.

16 There, the plaintiff attempted to serve a summons and complaint on a foreign entity

17 in the United States.  284 F.3d at 1013.  When the plaintiff attempted to serve the

18 entity at its claimed address in Miami, Florida, it found that the address only housed

19 the entity's international courier, which was purportedly not authorized to accept

20 service on the entity's behalf.  Id.  The summons and complaint nonetheless

21 ultimately made their way to the entity, which forwarded them to its Los Angeles

22 attorney.  Id.  The entity's attorney thereafter contacted the plaintiff to obtain a

23 "complete copy" of the complaint, since the copy that had been forwarded to him

24 was partially illegible.  Id.  The attorney refused, however, to accept formal service

25 on behalf of his client.  Id.  The plaintiff filed an emergency motion with the district

26 court for alternate service of process, and pursuant to Rule 4(f)(3), the district court

27 ordered service on the foreign entity by mail and e-mail.  Id.

28

1    The Ninth Circuit affirmed, holding that "service of process under <u>Rule</u>
2    4(f)(3) is . . . merely one means among several which enables service of process on
3    an international defendant." <u>Id.</u> at 1014.  Further, the Court rejected the foreign
4    entity's contention that <u>Rule</u> 4(f)(3) is merely a "last resort" which first requires that
5    service be attempted by all other feasible means.  <u>See id.</u>  Rather, it ruled that <u>Rule</u>
6    4(f)(3) "is an equal means of effecting service of process under the <u>Federal Rules of</u>
7    <u>Civil Procedure</u>, and we commit to the sound discretion of the district court the task
8    of determining when the particularities and necessities of a given case require
9    alternate service of process under <u>Rule</u> 4(f)(3)." <u>Id.</u>

10   Alternate service is appropriate here as well.  Like the plaintiff in <u>Rio</u>
11   <u>Properties</u>, Mattel has made diligent, good faith efforts to serve Lexington in the
12   United States, including by serving copies of the subpoena on Mr. Mashian and on
13   counsel representing Lexington in this litigation (which was done at the latter's
14   written request).  Further, Mattel has requested that Lexington's counsel agree to
15   accept service on Lexington's behalf, or at least identify Lexington's current
16   authorized agent for service of process.[29]  Lexington has refused to do so.[30]  And,
17   throughout all of this, the only evidence in the case suggests that Lexington has no
18   functioning office locations where process could be served (or at least where
19   Lexington would apparently concede would be proper).  The only business address
20   it purports to have is a business service company in London, and Mr. Mashian
21   tellingly does not dispute Mattel's showing that Lexington evidently has no
22   personnel or actual operations there (or anywhere else for that matter).

23   Accordingly, the Discovery Master should (1) order that Lexington, as
24   a foreign corporation located outside of the United States, may be served via e-mail
25   and/or international Federal Express, and (2) compel Lexington to disclose a valid e-

26

27   [29]  Corey Dec., ¶ 18; Corey Dec., Exh. 15.
28   [30]  Corey Dec., ¶ 19.

mail address for service purposes.  See 284 F.3d at 1018-19 (approving e-mail service on foreign entity, and leaving it "to the discretion of the district court to balance the limitations of email service against its benefits in any particular case"); see also Brockmeyer v. May, 383 F.3d 798, 805 (9th Cir. 2004) ("[C]ourts have authorized a variety of alternative methods of service abroad under current Rule 4(f)(3)."); Forum Financial Group, LLC v. President & Fellows of Harvard College, 199 F.R.D. 22, 25 (D. Me. 2001) (service on a party through an attorney who is not authorized to accept such service is acceptable when made pursuant to a court order under Rule 4(f)(3)).[31]

## **Conclusion**

For the foregoing reasons, Mattel respectfully requests that the Discovery Master grant Mattel's Application to deem Lexington served, or to order alternative means of service upon Lexington.

DATED:  March 10, 2009          QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


                                By /s/ Michael T. Zeller
                                   Michael T. Zeller
                                   Attorneys for Mattel, Inc.

---

[31]   Lexington's opposition papers fail to meaningfully address Mattel's request for alternate service via e-mail, instead baldly claiming that "the authority purportedly relied upon by Mattel is inapplicable." See Opp. at 19.  Lexington is incorrect.  As demonstrated above, Mattel has cited governing Ninth Circuit authority holding that alternate service may be ordered in situations on all fours with this one.

EX PARTE REPLY