# EXHIBIT 35

2708



```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                          EASTERN DIVISION

 4                             - - -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                             - - -

 7    MATTEL, INC.,                )
                                   )
 8                    PLAINTIFF,   )
                                   )
 9             VS.                 )   NO. CV 04-09049
                                   )
10    MGA ENTERTAINMENT, INC., ET. AL., )
                                   )
11                    DEFENDANTS.  )   TRIAL DAY 14
      _____)   MORNING SESSION
12    AND CONSOLIDATED ACTIONS,    )   PAGES 2708-2817
      )
13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                  TUESDAY, JUNE 17, 2008

18                       8:47 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
           FEDERAL OFFICIAL COURT REPORTER
24              3470 12TH STREET, RM. 134
             RIVERSIDE, CALIFORNIA  92501
25                   951-274-0844
                WWW.THERESALANZA.COM
```

CERTIFIED COPY

EXHIBIT PAGE

TUESDAY, JUNE 17, 2008   EXHIBIT 35   TRIAL DAY 14, MORNING SESSION

PAGE 463

```
 1   AUTHENTICITY.  IT SEEMS TO ME, THEN, THE ONLY ISSUE BEFORE THE
 2   COURT IS WHETHER IT'S RELEVANT.
 3            NOW, THERE'S A SEPARATE ISSUE ABOUT WHETHER A
 4   PARTICULAR WITNESS CAN BE QUESTIONED ABOUT THAT DOCUMENT IF
 5   THEY'VE NEVER SEEN IT BEFORE OR THEY DON'T KNOW WHAT IT IS.       08:58
 6   WHAT I'M SUGGESTING, I DON'T THINK, IS -- IT'S NOT ONE-SIDED.
 7   WE'VE STIPULATED TO THE AUTHENTICITY --
 8            THE COURT:  IF IT'S NOT ONE-SIDED, IT'S THE TYPE OF
 9   THING THAT YOU SHOULD ALL AGREE ON AND MOVE FORWARD.  BUT IF
10   YOU'RE NOT ABLE TO AGREE ON IT -- QUITE FRANKLY, YOU CAN PUT UP   08:58
11   JUST ABOUT ANYBODY.  IF THERE'S NO ARGUMENT ON AUTHENTICITY,
12   YOU CAN PUT UP ANY --
13            MR. QUINN:  98.6 TEMPERATURE HUMAN BEING?
14            THE COURT:  JUST ABOUT.  BECAUSE THERE'S NO ISSUE ON
15   AUTHENTICITY AND IT'S JUST A MATTER OF RELEVANCE.  YOU KNOW,      08:59
16   BRING SOMEBODY FROM MATTEL AND PUT THEM UP THERE AND MOVE THE
17   DOCUMENTS IN.
18            BUT THAT WAY, WE'RE NOT GETTING INTO THIS -- BECAUSE
19   WHAT I DON'T WANT TO DO -- I SEE THE DOWNSIDE OF CARVING OUT
20   EXCEPTIONS ON THIS.  I SEE THE DOWNSIDE.                         08:59
21            MR. QUINN:  THE COURT HAS GIVEN US SOME USEFUL
22   GUIDANCE, YOUR HONOR.
23            THE COURT:  VERY WELL.
24            MR. QUINN:  THERE'S ANOTHER ISSUE I'D LIKE TO RAISE,
25   YOUR HONOR.                                                      08:59
```

EXHIBIT PAGE

2720

1          WE MADE A MOTION BEFORE TRIAL DIRECTED TO CERTAIN

2   ASSERTED PRIVILEGE DOCUMENTS, INCLUDING ONE IN PARTICULAR WHICH

3   HAD BEEN CLAWED BACK BY MGA.  THIS WAS AN E-MAIL FROM

4   MR. LARIAN TO PATTIE GLASER, I BELIEVE IN MAY OR JUNE OF 2001,

5   WHERE HE STATES THAT -- I THINK IT'S ALREADY IN THE RECORD WHAT          08:55

6   HE STATES.

7          MR. NOLAN:  YOUR HONOR, SUBJECT TO A CLAWBACK MOTION,

8   I BELIEVE THAT WE HAVE ASSERTED IT AS A PRIVILEGED STATEMENT,

9   AND I DON'T THINK MR. QUINN SHOULD ON THE RECORD BE STATING

10  WHAT'S IN THE ADMISSION.                                                09:00

11         THE COURT:  FAIR ENOUGH.

12         MR. QUINN:  I THINK IT HAS BEEN ON THE RECORD.  I

13  WON'T SAY ANYTHING RIGHT NOW.  IT'S ON THE RECORD BEFORE.  THE

14  COURT DENIED THAT MOTION SUBJECT TO IT BEING RENEWED.  AND

15  BEFORE WE REST, YOUR HONOR, WE WOULD RENEW THAT MOTION.                 09:00

16         I WOULD JUST REMIND THE COURT, AS WE'VE SAID BEFORE,

17  THIS IS SIMPLY A FACTUAL STATEMENT ABOUT WHEN THESE DRAWINGS

18  WERE CREATED.  THAT'S ALL IT IS.  AND THE COURT HAS RECOGNIZED,

19  IN ANOTHER CONTEXT, THAT IF IT'S SIMPLY A FACTUAL

20  COMMUNICATION, IT'S NOT PRIVILEGED.                                     09:00

21         THE COURT:  YOU WANT TO BRING THIS EVIDENCE IN PRIOR

22  TO THE CLOSE OF YOUR CASE?

23         MR. QUINN:  YES, YOUR HONOR.

24         THE COURT:  REFRESH MY RECOLLECTION.

25         WHAT MOTION *IN LIMINE* NUMBER WAS THAT?                         09:00

EXHIBIT PAGE

1          **MR. QUINN:** IT WASN'T A MOTION *IN LIMINE*. IT WAS A

2    MOTION TO BASICALLY DETERMINE THAT CERTAIN DOCUMENTS WERE NOT

3    PRIVILEGED BASED ON A CRIME FRAUD EXCEPTION.

4          BUT DURING THE COURSE OF THE TRIAL, I THINK THE COURT

5    HAS ANOTHER BASIS IN WHICH TO LOOK BEYOND THE CLAIM OF                09:01

6    PRIVILEGE. AND THAT IS WAIVER. THEY HAVE NOW, BY PRODUCING

7    DOCUMENTS AFTER THAT, IN THE MIDDLE OF A TRIAL, SOME

8    COMMUNICATIONS WITH MR. ROSENBAUM, ON THAT VERY SUBJECT.

9          **THE COURT:** THE COURT HAS BEEN VERY RESTRICTIVE.

10   MR. QUINN, BE CAREFUL HERE.                                          09:01

11         **MR. QUINN:** I UNDERSTAND.

12         **THE COURT:** OKAY.

13         **MR. QUINN:** IT'S A TRADE WE'D TAKE.

14         **THE COURT:** WELL, THEN, IF THAT'S A TRADE YOU'LL

15   TAKE, MAYBE YOU SHOULD TALK WITH THE PEOPLE YOU'RE TRYING TO         09:01

16   BARGAIN WITH.

17         **MR. QUINN:** I WAS JUST ANTICIPATING WHERE THE COURT

18   WAS GOING.

19         **THE COURT:** BECAUSE I SUSPECT THERE'S A NUMBER OF

20   DOCUMENTS THAT THEY WOULD LIKE TO GET IN UNDER THE SAME THEORY;      09:01

21   THAT THESE ARE JUST COMMUNICATIONS OF A FACT-BASED NATURE.

22         **MR. QUINN:** WELL, YOUR HONOR, THERE IS THAT BASIS.

23   THERE'S A CRIME FRAUD ISSUE, WHICH WE'D LIKE THE COURT TO

24   ADDRESS. SECOND, THE COURT HAS ATTACHED SIGNIFICANCE TO THE

25   FACT THAT A COMMUNICATION WITH A LAWYER IS PURELY FACTUAL. AND       09:02

EXHIBIT
PAGE

EXHIBIT
PAGE

1  I WOULD POINT OUT, THAT'S WHAT THIS IS.  AND THIRD, IN THE

2  MIDDLE OF THE TRIAL, WE HAVE A SUBJECT MATTER WAIVER ON THIS

3  SUBJECT, I.E., COMMUNICATIONS WITH LAWYERS ABOUT WHEN THESE

4  DRAWINGS WERE CREATED; SO WE THINK THAT'S A WAIVER.

5        **THE COURT:**  LET ME HEAR FROM MGA IN RESPONSE.          09:02

6        **MR. NOLAN:**  I LIKE WORKING WITH MR. QUINN IN TRIAL,

7  BECAUSE AFTER THE FACT, WE GET THESE OFFERS AND THEY SEEM

8  GREAT.  I JUST WONDER WHY WE'RE GETTING THE TRADE-OFF NOW AT

9  THE END OF THE CASE, WHEN I WANTED TO GET THESE DOCUMENTS IN A

10 LITTLE BIT EARLIER.  BUT I'LL SET THAT ASIDE FOR A MOMENT, YOUR   09:02

11 HONOR.

12       THIS WAS JUST OFFERED TO US.  LET ME THINK ABOUT IT,

13 IF I MIGHT.

14       **THE COURT:**  VERY WELL.

15       **MR. NOLAN:**  I'VE GOT SOME COLLEAGUES I SHOULD CONSULT   09:02

16 WITH, BUT I UNDERSTAND THE PROPOSAL.

17       IF I COULD JUST RAISE A COUPLE OF QUICK POINTS, JUST

18 TO ALERT THE COURT OF A COUPLE OF THINGS TODAY, FOR AN AGENDA

19 TO DISCUSS LATER AT A BREAK.

20       FIRST OF ALL, WE'D LIKE, BEFORE WE START TODAY,           09:03

21 YOUR HONOR, IF YOU COULD GIVE US AN UPDATE ON THE COUNT, THE

22 TIME COUNT.  I THINK THAT WOULD BE HELPFUL.

23       **THE COURT:**  YES.  AND WE'VE RECONSTRUCTED THAT

24 MISSING TIME THAT I HAVE FROM THURSDAY; SO I'LL BE GETTING THAT

25 FROM MY COURT REPORTER SHORTLY, AND AS SOON AS I HAVE THAT,      09:03

2817

1

2

3                           CERTIFICATE

4

5    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
6    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
7    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
8

9    _____              6-18-08
                                            _____
10   THERESA A. LANZA, RPR, CSR               DATE
     OFFICIAL COURT REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TUESDAY, JUNE 17, 2008   EXHIBIT 35       TRIAL DAY 14, MORNING SESSION

PAGE 468

EXHIBIT
PAGE

# EXHIBIT 36

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    EASTERN DIVISION

4    - - -

5    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6    - - -

7    MATTEL, INC.,

8                          PLAINTIFF,

9         VS.                          NO. CV 04-09049

10   MGA ENTERTAINMENT, INC., ET. AL.,

11                       DEFENDANTS.

12   AND CONSOLIDATED ACTIONS,          MOTIONS IN LIMINE
                                        AFTERNOON SESSION
13

**CERTIFIED COPY**

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17         THURSDAY, MAY 22, 2008

18              1:34 P.M.

19

20

21

22

23        THERESA A. LANZA, RPR, CSR
         FEDERAL OFFICIAL COURT REPORTER
24         3470 12TH STREET, RM. 134
         RIVERSIDE, CALIFORNIA  92501
25            951-274-0844
            WWW.THERESALANZA.COM

2

```
 1   APPEARANCES:

 2
     ON BEHALF OF MATTEL, INC.:
 3
                          QUINN EMANUEL
 4                        BY:   JOHN QUINN
                                JON COREY
 5                              MICHAEL T. ZELLER
                                HARRY OLIVAR
 6                              TIMOTHY ALGER
                                DIANE HUTNYAN
 7                        865 S. FIGUEROA STREET,
                          10TH FLOOR
 8                        LOS ANGELES, CALIFORNIA  90017
                          213-624-7707
 9

10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                        BY:   THOMAS J. NOLAN
                                JASON RUSSELL
13                              MATTHEW E. SLOAN
                          300 SOUTH GRAND AVENUE
14                        LOS ANGELES, CALIFORNIA  90071-3144
                          213-687-5000
15

16

17

18

19

20

21

22

23

24

25
```

MAY 22, 2008                    AFTERNOON SESSION

EXHIBIT  34

PAGE  470

46

1   MATTEL -- WOULD ENGAGE IN MOONLIGHTING, AND SHE HAD A READY

2   LIST OF EMPLOYEES AT MATTEL THAT SHE COULD RETAIN TO DO

3   MOONLIGHTING.  IT GOES TO OUR STATE OF MIND THAT WHILE THIS

4   THING THAT WE THOUGHT WOULD BE GOING ON HERE IS THAT WE WOULD

5   BE ACCUSED OF BREACHING A FIDUCIARY DUTY OR INTENTIONALLY          02:33

6   INTERFERING.

7           I UNDERSTAND THAT IT CAN'T BE WITH A BROAD BRUSH, BUT

8   I WOULD SAY THAT IF I LAY A PROPER FOUNDATION ON THAT, THAT

9   WOULD GO INTO MGA'S STATE OF KNOWLEDGE ON THAT SUBJECT.

10          THE COURT:  IF YOU CAN CONNECT IT TO MGA'S STATE OF       02:33

11  MIND, THEN I'M, MOST LIKELY, GOING TO OVERRULE THE OBJECTION.

12          NOW, I IMAGINE MR. ZELLER IS GOING TO TELL ME RIGHT

13  NOW THAT THE BIG DIFFERENCE BETWEEN THAT AND THIS CASE IS THAT

14  THERE, THE LEADS WERE BEING PROVIDED BY MATTEL AND SHE HAD THE

15  PERMISSION OF MATTEL TO DO WHAT SHE WAS DOING; WHEREAS HERE, NO   02:34

16  SUCH PERMISSION WAS PROVIDED.

17          MR. QUINN:  ACTUALLY, WITH MS. LEAHY, SHE WAS DOING

18  IT THEN AND DID NOT LET PEOPLE KNOW.

19          WHAT I ACTUALLY WOULD LIKE TO SAY ON THIS IS THAT I

20  DON'T KNOW THAT WE ACTUALLY HAVE MUCH AGREEMENT, FROM AT LEAST    02:34

21  THE MGA SIDE, AS TO ONE OF THE MAIN DRIVERS OF THIS MOTION.

22  AND I BELIEVE THAT THE COURT'S BEEN VERY CLEAR ON THIS, BUT I

23  STILL DON'T KNOW WHAT MGA'S POSITION IS.

24          I THINK HE'S TRYING TO CREATE THIS EXCEPTION, THROUGH

25  STATE OF MIND, TO HAVE PEOPLE GO UP AND SAY EXACTLY WHAT SOME     02:34

MAY 22, 2008                    AFTERNOON SESSION EXHIBIT __34__

                                                  PAGE ___471___

47

1   OF THEIR FORMER PEOPLE HAVE CONVENIENTLY SAID, WHICH IS, 'WELL,

2   EVERYBODY DID IT.'

3          THE COURT:   THEN THAT'S HEARSAY.  AND YOU'RE GOING TO

4   STAND UP AND YOU'RE GOING TO SAY, 'OBJECTION; HEARSAY'; I'M

5   GOING TO SAY, 'SUSTAINED'; AND WE'RE GOING TO GO ON TO THE NEXT          02:35

6   QUESTION.

7          MR. ZELLER:   AND HE'S GOING TO SAY, OF COURSE, 'WELL,

8   THAT'S AN EXCEPTION BECAUSE IT BEARS ON OUR STATE OF MIND.'

9   THAT'S GOING TO BE HIS ARGUMENT.

10         THAT IS ONE CONCERN THAT WE HAVE OVER THIS.          02:35

11         THE COURT:   YOU UNDERSTAND, MR. NOLAN, THAT'S NOT

12   GOING TO WORK.

13         MR. NOLAN:   I UNDERSTAND.  BUT I'M GOING TO TAKE DOWN

14   THESE SUGGESTIONS, BECAUSE --

15         THE COURT:   I'LL SPELL THIS OUT IN THE ORDER FOR THE          02:35

16   MOTION *IN LIMINE*, BUT I'M DENYING THE MOTION *IN LIMINE* AS

17   PHRASED, HOWEVER, SUBJECT TO THE STRICT LIMITATIONS THAT I'M

18   DISCUSSING HERE.

19         NUMBER SEVEN:  ADVICE OF COUNSEL.

20         MGA TAKES THE POSITION THAT THEY'RE NOT RELYING ON          02:35

21   ADVICE OF COUNSEL.  AND IF THEY DO RELY ON THE ADVICE OF

22   COUNSEL, OF COURSE THEY'RE GOING TO HAVE TO PRODUCE PRIVILEGED

23   DOCUMENTS RELATED TO THAT ADVICE.  THEY SEEM TO READILY

24   RECOGNIZE THAT.  SO I GUESS IT'S NOT CLEAR TO ME WHAT THE

25   PROBLEM IS AT THIS POINT.          02:36

MAY 22, 2008                    AFTERNOON SESSION

EXHIBIT  36

PAGE  472

48

1          **MR. PROCTOR:**  THE PROBLEM IS THAT MGA WANTS TO -- I

2    DON'T PARTICULARLY LIKE THIS EXPRESSION, BUT IT FITS -- "HAVE

3    ITS CAKE AND EAT IT TOO."

4          YOU CAN RELY ON ADVICE OF COUNSEL IMPLIEDLY.

5          WHAT MGA WANTS TO DO IS CALL MR. ROSENBAUM, THEIR          02:36

6    COUNSEL, AND SAY, 'I PERFORMED A DOLL OWNERSHIP INQUIRY,' AND

7    SAY, 'MR. ROSENBAUM WAS TASKED TO PERFORM A DOLL OWNERSHIP

8    INQUIRY AND INVESTIGATE WHETHER MR. BRYANT OWNED THESE

9    DRAWINGS, WHICH HE THEN WARRANTED TO US HE OWNED.'  THEY'RE NOT

10   GOING TO SAY WHAT MR. ROSENBAUM ACTUALLY ADVISED THEM.          02:36

11         BUT WHEN YOU COMBINE THE FACT THAT HE PERFORMED A

12   DOLL OWNERSHIP INQUIRY, ACCORDING TO THEM, THE TESTIMONY THAT

13   HE PERFORMED A DOLL OWNERSHIP INQUIRY, INVESTIGATED, AND THEN

14   THEY PURCHASED BRATZ FROM MR. BRYANT AND THEY HIRED A LAWYER TO

15   DO THIS -- THAT'S GOING TO BE A MAJOR PART OF THE PRESENTATION.  02:37

16   THE OBVIOUS INFERENCE TO THE JURY IS, 'HEY, HE MUST HAVE SIGNED

17   OFF ON IT.  THE LAWYER MUST HAVE APPROVED IT.'

18         AND THAT IS ABSOLUTELY, IF THEY DO THAT,

19   UNEQUIVOCALLY, A WAIVER OF THE PRIVILEGE.

20         THERE'S A CASE -- MGA CITED IT, ACTUALLY; IT'S THE        02:37

21   BROADCOM CASE; THIS COURT, TWO YEARS AGO -- IT'S DIRECTLY ON

22   POINT.  "A RELIANCE ON COUNSEL PRIVILEGE WAIVER DOES NOT

23   REQUIRE A PARTY'S DIRECT STATEMENT THAT COUNSEL WAS RELIED

24   UPON.  IT MAY ALSO ARISE FROM MORE INDIRECT EVIDENCE, WHERE A

25   PARTY AFFIRMATIVELY RAISES AN INFERENCE OF RELIANCE ON COUNSEL  02:37

49

1    FOR THE PARTY'S OWN BENEFIT."

2            IN THEIR OPPOSITION, THEY TALK ABOUT HOW WE'RE TRYING

3    TO PRECLUDE THEIR GOOD FAITH DEFENSE.  THIS ISN'T ABOUT THEIR

4    GOOD FAITH DEFENSE.  MGA DENIES INTENT, HAS A GOOD FAITH

5    DEFENSE, AND IT'S ENTITLED TO PUT ON EVIDENCE ON THAT.  THAT'S         02:37

6    NOT WHAT IT'S ABOUT.  BUT WHAT IT'S NOT ENTITLED TO DO IS MAKE

7    A SUGGESTION TO THE JURY, A VERY OBVIOUS INTENTIONAL

8    SUGGESTION, AS TO WHAT ITS LAWYERS ADVISED IT, WITHOUT ACTUALLY

9    PRODUCING ITS LAWYERS' ADVICE ON THE SUBJECT MATTER.

10           **THE COURT:**  MR. RUSSELL?                                   02:38

11           **MR. RUSSELL:**  YOUR HONOR, I WAS AT MR. ROSENBAUM'S

12   DEPOSITION.  I AM PROBABLY THE MOST FAMILIAR PERSON IN THIS

13   ROOM WITH THIS TESTIMONY.  I WAS AT MS. WANG'S DEPOSITION AS

14   WELL.  THE TESTIMONY THAT MR. PROCTOR IS REFERRING TO WAS

15   ELICITED BY MATTEL'S COUNSEL, ESSENTIALLY TRYING TO EXPERTISE        02:38

16   MR. ROSENBAUM ABOUT HIS EXPERIENCE --

17           **THE COURT:**  EXPERTISE?

18           **MR. RUSSELL:**  YES; THAT WAS THE WORD THEY USED.

19           EXPERTISE; TO MAKE HIM AN EXPERT ON THE TOY INDUSTRY

20   AND WHAT TYPES OF INQUIRIES ONE COULD DO.                           02:38

21           THE TESTIMONY MR. ROSENBAUM IS GOING TO GIVE IS QUITE

22   SIMPLE.  IT'S NO DIFFERENT THAN IF, TO USE THE EXAMPLE FROM

23   THEIR PAPERS, "THE JANITOR DID IT."

24           ALL HE'S GOING TO TALK ABOUT IS, HE ASKED MR. BRYANT,

25   'DO YOU OWN THE RIGHTS TO BRATZ?  ARE YOU SUBJECT TO A             02:38

MAY 22, 2008                    AFTERNOON SESSION  EXHIBIT  3 b

                                                    PAGE _____ 4 7 4

50

1   CONTRACT?'

2       HE COULDN'T DO ANY ANALYSIS.  THE EVIDENCE -- IN

3   FACT, THEY WANT TO USE IT AGAINST US -- THE EVIDENCE IS, HE

4   DIDN'T SEE MR. BRYANT'S CONTRACT; HE COULDN'T ACCESS IT; SO HE

5   ASKED MR. BRYANT.  AND HE PUT DOWN INTO A CONTRACT A                    02:39

6   REPRESENTATION THAT MR. BRYANT SIGNED OFF ON THAT SAID, 'I OWN

7   THE RIGHT TO BRATZ.  IT'S NOT SUBJECT TO RIGHTS FROM ANY OTHER

8   PARTY.  AND I AGREE TO INDEMNIFY MGA IF I, CARTER BRYANT, AM

9   NOT TELLING THE TRUTH.'

10      HE WILL ALSO TESTIFY THAT HE SPOKE WITH MS. WANG AND           02:39

11  HE ASKED MS. WANG, CARTER BRYANT'S ATTORNEY, 'IS THIS CONTRACT

12  SUBJECT TO ANY AGREEMENT WITH MATTEL?'  MS. WANG, AN

13  EXPERIENCED PATENT ATTORNEY, TOLD HIM 'NO.'

14      THAT INFORMATION WAS CONVEYED TO MGA.  THAT IS NOT

15  ADVICE OF COUNSEL.  THAT IS A RELAYING OF FACTUAL INFORMATION.        02:39

16      WE'VE NEVER PLACED AT ISSUE MR. ROSENBAUM'S ADVICE.

17  THEY DON'T NEED TO RELY ON IT.  IN FACT, YOUR HONOR, WE CITE

18  YOU TO A NUMBER OF CASES IN OUR BRIEF.  THE NINTH CIRCUIT CASE

19  IN RE: GEOTHERMAL IS THE KEY ONE, WHEREAS HERE, YOU'VE GOT

20  MULTIPLE SOURCES OF INFORMATION VERIFYING A PARTICULAR PIECE OF       02:40

21  FACTUAL INFORMATION.  AND THERE'S EVEN AN ARGUMENT, BY

22  INFERENCE, THAT THE ATTORNEY-CLIENT PRIVILEGE COULD COME UP.

23  THERE'S NO WAIVER.

24      THE COURT:  YOU WOULD AGREE THAT IF, IN THE COURSE OF

25  THIS TRIAL, YOU ELICIT LEGAL ADVICE, YOU WILL HAVE PIERCED THE        02:40

MAY 22, 2008                    AFTERNOON SESSION

EXHIBIT 36

475

PAGE

51

1   PRIVILEGE?

2           **MR. RUSSELL:**  YES, I DO, YOUR HONOR.

3           I JUST WANT TO TAKE A STEP BACK AND NOTE THE IRONY

4   HERE, OF COURSE.

5           AS WE NOTE IN OUR PAPERS, WE OFFERED TO MATTEL TO

6   MAKE AVAILABLE THESE PRIVILEGED DOCUMENTS THAT THEY'RE SO

7   ANXIOUS TO TALK ABOUT, BECAUSE WE NOTED THE INCONSISTENCY

8   BETWEEN THEIR POSITION ON THE INVESTIGATION AND OURS HERE.

9           **THE COURT:**  I READ THAT.

10          **MR. RUSSELL:**  NOT ONLY DID THEY WITHDRAW THEIR MOTION

11  SEEKING THE PRIVILEGED INFORMATION; THEY SAID THEY DON'T NEED

12  IT.  AND NOW THEY TURN AROUND -- AND IT'S NOT US TRYING TO HAVE

13  OUR CAKE AND EAT IT TOO.  IT'S THEM.  THEY'RE THE ONES WHO WANT

14  TO -- HAVING WALKED AWAY FROM THE RIGHT TO GET DISCOVERY,

15  HAVING WALKED AWAY FROM A CHANCE TO GET THIS IN-CAMERA, THEY

16  NOW, AT TRIAL, WOULD LIKE YOUR HONOR TO FORCE US TO THIS POINT

17  OF PRIVILEGE.

18          **THE COURT:**  I'M GOING TO GRANT THE MOTION THAT YOU

19  ARE NOT TO RELY ON ADVICE OF COUNSEL, BECAUSE YOU HAVE NOT

20  PRODUCED THE PRIVILEGE.  BUT I WILL ENTERTAIN AN APPROPRIATE

21  OBJECTION IF IT COMES UP DURING THE TRIAL THAT YOU ARE RELYING

22  ON ADVICE OF COUNSEL, AND WE'LL SEE WHERE WE'RE AT.  BUT YOU'RE

23  NOT TO DO THAT.  THE MOTION IS GRANTED.  THERE'S REALLY NO

24  DISAGREEMENT HERE.

25          **MR. RUSSELL:**  I JUST WANT TO BE CLEAR ON THE RECORD

02:40
02:40
02:41
02:41
02:41

MAY 22, 2008          AFTERNOON SESSION
EXHIBIT 36
PAGE 476

52

1    THAT THAT IS NOT THE SAME AS SAYING MR. ROSENBAUM IS SOMEHOW

2    PRECLUDED FROM RELAYING HIS CONVERSATIONS WITH MS. WANG OR

3    RELAYING HIS CONVERSATIONS WITH MR. BRYANT.

4         IN OTHER WORDS, THERE'S NO PROHIBITION --

5         THE COURT:  I DON'T HAVE A COPY OF THE DEPOSITION        02:41

6    BEFORE ME.  I'M NOT REALLY SURE EXACTLY WHAT IS GOING TO BE

7    SAID OR NOT SAID, BUT WHAT I'M COMFORTABLE IN RULING IS THAT

8    THERE IS TO BE NO ADVICE OF COUNSEL PROVIDED.

9         IF WHAT YOU'RE SAYING IS ACCURATE -- AND I HAVE NO

10   REASON TO QUESTION IT; YOU KNOW THE DEPOSITION BETTER THAN ANY    02:42

11   OF US --

12        MR. RUSSELL:  I DO.

13        THE COURT:  -- THAT THE ONLY INFORMATION THAT'S GOING

14   TO COME OUT IS NONADVICE, NONOPINION TESTIMONY, FROM THE

15   ATTORNEY, I'M NOT GOING TO EXPERTISE ANYBODY AND YOU'RE NOT     02:42

16   GOING TO EXPERTISE ANYBODY.  WE'RE NOT GOING TO HAVE A PROBLEM.

17        MR. RUSSELL:  WITH THAT UNDERSTANDING, I THINK WE'RE

18   FINE.

19        THE COURT:  GOOD.

20        NUMBER EIGHT:  WHETHER MATTEL WOULD HAVE MARKETED         02:42

21   BRATZ.

22        THIS IS THE ONE THAT WE REFERRED TO EARLIER AS WELL,

23   THE INEVITABLE BREACH MOTION *IN LIMINE.*

24        MR. OLIVAR:  THE INEVITABLE BREACH THEORY.

25        IT IS NOT A DEFENSE TO A CRIME OR A TORT TO SAY THAT      02:42

53

1    SOMEONE ELSE WOULD HAVE DONE IT OR TO SAY THAT I STOLE THE

2    VEHICLE BUT THE OWNER WASN'T USING IT ANYWAY.  THOSE ARE NOT

3    DEFENSES.  BUT THOSE ARE THE TWO ARGUMENTS THAT ARE IN THE

4    OPPOSITION ON THIS MOTION.

5             THE COURT:  THEY RELATE TO DAMAGES, THOUGH; NO?          02:43

6             MR. OLIVAR:  THEY DON'T, BECAUSE THE DAMAGES WE'RE

7    SEEKING ARE PURE DISGORGEMENT IN THIS CASE.  I'M SURE SOMEONE

8    WILL CORRECT ME IF I'M WRONG.

9             THE DAMAGES THEORY IS SOLELY FOCUSED ON WHAT MGA AND

10   MR. LARIAN AND THE OTHER DEFENDANTS RECEIVED AS A RESULT OF     02:43

11   THEIR IMPROPER CONDUCT.  NOT WHAT MATTEL COULD HAVE MADE.

12   THERE'S NO EVIDENCE BEING PRESENTED ON THAT POINT.  THEY

13   HALF-HEARTEDLY PUT THAT IN A FOOTNOTE, BUT WE DEALT WITH IT IN

14   OUR REPLY.  THEY DON'T RELATE TO ANY DAMAGE THEORY BEING

15   PRESENTED AT ANY PORTION OF ANY TRIAL HERE.                     02:43

16            SO WITH THAT, GIVEN THAT -- WHAT MATTEL MIGHT HAVE

17   DONE IN A HYPOTHETICAL WORLD IF THINGS HAD GONE DIFFERENTLY HAS

18   NOTHING TO DO WITH MGA'S CONDUCT.  AND THE CASES THEY CITE TO

19   SAY THAT IT HAS SOMETHING TO DO WITH CAUSATION ARE ALL

20   COMPLETELY OFF THE MARK.  YOU CAN GO CASE BY CASE AND LOOK AT   02:43

21   THE FACTS OF THE THINGS -- THEY LIKE SOME LANGUAGE FROM SOME

22   CASES AND CITE THEM, BUT IF YOU ACTUALLY LOOK AT THE HOLDING OF

23   ANY OF THE CASES CITED IN THEIR OPPOSITION, IT SHOWS THAT THEY

24   HAVE NO CASE THAT SUPPORTS EITHER OF THE THEORIES ADVANCED IN

25   THEIR OPPOSITION.                                               02:43

133

1        I APPRECIATE THAT VERY MUCH.

2        **THE COURT:**   GOOD EVENING, EVERYONE.

3        (PROCEEDINGS CONCLUDED.)

4

5

6

7

8

9

10

11                          CERTIFICATE

12

13   I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
14   THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE ABOVE-
     ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
15   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.
16

17   _____        5-23-08
     THERESA A. LANZA, CSR, RPR /      _____
18   FEDERAL OFFICIAL COURT REPORTER          DATE

19

20

21

22

23

24

25

          MAY 22, 2008                 AFTERNOON SESSION
                                        EXHIBIT  36
                                        PAGE  479

# EXHIBIT 37

1976

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    ---

4    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5    ---

6    MATTEL, INC.,                          :    PAGES 1976 - 2117

7              PLAINTIFF,                    :

8        VS.                                 :    NO. ED CV04-09049-SGL
                                             :    [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,                :    CV04-9059 & CV05-2727]
     ET AL.,                                 :

10                                           :

11           DEFENDANTS.                     :

12

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    RIVERSIDE, CALIFORNIA

17    TUESDAY, JUNE 10, 2008

18    JURY TRIAL - DAY 10

19    AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23    **CERTIFIED**             UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24    **COPY**                  255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                              (213) 663-3494

EXHIBIT 37
PAGE 48 d

1   Q.   But at that time was MGA making a fashion doll?

2   A.   In 2000?

3   Q.   In 2000.

4   A.   When she started to work at MGA?

5   Q.   Yes.

6   A.   Again, I'm going to go back, if you look at the industry

7   definition for fashion doll, no, we did not.  But if you

8   adapt the definition that Ivy Ross gave to fashion doll, then

9   yes, we did.

10  Q.   My question, though, is this, and it's a little bit more

11  precise.  When you were meeting and considering other ideas

12  for fashion dolls before you met with Carter Bryant, was

13  Paula Garcia part of those discussions, or was it you and

14  Victoria O'Connor?

15  A.   Victoria O'Connor was in charge of licensing, talking to

16  other designers.  So I don't think Paula Garcia was part of

17  that discussion, no.

18  Q.   And at some point in time -- strike that.

19          As of September 1st, you knew Carter Bryant was an

20  employee of Mattel; yes?

21  A.   When I met with him, he told me on September 1, 2000,

22  that he works for Mattel.

23  Q.   Did you stop the discussion immediately once you heard

24  that?

25  A.   I did not.

EXHIBIT 37
PAGE 480.1

1   Q.   Did you have any concern about whether or not you wanted

2   to get designs from Mattel?

3   A.   I'm sorry?  Can you repeat?

4   Q.   At that meeting, when he told you he was employed at

5   Mattel, did that raise a concern to you about whether or not

6   you were going to get a design from Mattel?

7   A.   Yes.

8   Q.   Did you want anything that Mattel was doing?

9   A.   I did not want anything that Mattel was doing.

10  Q.   Did you say anything to Mr. Bryant with respect to that?

11  A.   I did.

12  Q.   What did you say?

13  A.   I asked him do these belong to Mattel?  Is this

14  something that Mattel is doing?  And he said no.

15  Q.   Why did you ask that question?

16  A.   Because if this was something that he was doing for

17  Mattel or it belonged to Mattel, I was not interested in it.

18  Q.   At some point in time, did you learn that Carter Bryant

19  had retained a lawyer?

20  A.   Yes.

21  Q.   Do you remember the name of that lawyer?

22  A.   Yes.

23  Q.   What was the name of Mr. Bryant's lawyer?

24  A.   Ann Wang.

25  Q.   And were you, MGA, represented by counsel?

EXHIBIT __37__

PAGE __400.2__

1  A.    Yes, we were.

2  Q.    And his name was?

3  A.    David Rosembaum.

4  Q.    Now, during the course of those negotiations -- strike

5  that.

6        Victoria O'Connor testified that during those

7  negotiations, she would keep you apprised of the status of

8  the negotiations; correct?

9  A.    Yes, she did.

10 Q.    Were there points in those discussions when you had

11 doubt as to whether or not a deal would actually be struck

12 with Mr. Bryant?

13 A.    Yes.

14 Q.    Can you explain for us the basis for your understanding

15 of that?

16 A.    He wanted to have -- the most major one that I remember

17 is that he wanted to have royalties on anything that we do

18 for Bratz, and I said no.  We're going to build that brand.

19 If MGA invests a lot of money and we build it, we're not

20 going to give royalties to Carter Bryant for that.  And that

21 contract negotiation almost fell apart on October 3rd, 2000.

22 Q.    And why did it almost fall apart?

23 A.    Because he through his lawyer was not accepting that.

24 Q.    And how do you know this?

25 A.    How did I know it?  Because I did call him myself on

EXHIBIT 37

PAGE 4903

1    that.

2    **Q.**   Did you -- let me ask you to take a look at

3    Exhibit 18467.

4    **A.**   I have it.

5    **Q.**   Before I ask you about that, Mr. Larian, I want to ask

6    you, did Carter Bryant ever agree to be hired as an employee

7    at MGA?

8    **A.**   No, he did not.  He did not want to become an employee.

9    **Q.**   Did you ever offer him a position as an employee of MGA?

10   **A.**   I did.

11   **Q.**   And was that in a telephone conversation you had with

12   him?

13   **A.**   That's correct.

14   **Q.**   Did Mr. Bryant tell you why he did not want to become an

15   employee at MGA?

16          MR. PRICE:  Object, unless it's not offered for the

17   truth.

18          THE COURT:  Is it being offered for the truth,

19   Counsel?

20          MR. NOLAN:  No, your Honor.  For state of mind at

21   this point in time.

22          THE COURT:  Very well, very well.

23   **Q.**   BY MR. NOLAN:  What did Mr. Bryant say to you?

24   **A.**   I'm sorry.  Can you repeat the question?

25   **Q.**   Sure.  After you offered Carter Bryant a position as a

EXHIBIT 37

PAGE 480.4

```
 1   full-time employee at MGA, what did Mr. Bryant say to you?
 2   A.   He did not want to become an employee.  He wanted to be
 3   a free-lance designer.  He wanted to go back to Israel to be
 4   near his parents.  So he did not want to work as a full-time
 5   employee.
 6   Q.   At any point after -- I'm sorry.  At any point before
 7   the lawyers started negotiating, did Carter Bryant make any
 8   statement to you with respect to when he conceived of the
 9   idea for his drawings known as Bratz?
10   A.   He did.
11   Q.   What did he tell you?
12   A.   He said he did these in 1998 when he lived in Missouri
13   with his parents.
14   Q.   At some point in time -- now, let me go to -- let me ask
15   you to take a look at Exhibit 18467.
16            And without disclosing the contents of it,
17   Mr. Larian, first of all, can you identify that as an e-mail?
18   A.   Just give me one second, please.  This is an e-mail
19   exchange.  Go ahead.
20   Q.   Have you seen -- did you see this document, this e-mail?
21   A.   Yes, I'm copied on it.
22   Q.   Did you read this e-mail?
23   A.   Did I received it?
24   Q.   Yes.
25   A.   I don't recall if I did or not.
```

EXHIBIT 37
PAGE 480.5

1   Q.   Do you see that it's dated September -- the top part is

2   dated September 28, 2000?

3   A.   Yes, I do.

4   Q.   And the bottom part is also an e-mail exchange on

5   September 28, 2000, from Victoria O'Connor to David Rosembaum

6   and was copied to you; correct?

7   A.   That's correct.

8   Q.   Now, during questions that Mr. Price was asking of you,

9   you made reference to seeing an e-mail that contained certain

10  representations concerning the origins of Bratz.

11           Do you recall that?

12  A.   I do.

13           MR. PRICE:   I'm going to object to further inquiry

14  on this based on the Court's order.

15           THE COURT:   Further inquiry, that's premature,

16  Counsel.

17  Q.   BY MR. NOLAN:   In signing the October 4 employment

18  agreement with Carter Bryant --

19  A.   There was no employment agreement with Carter Bryant.

20  Q.   I apologize.   The consulting agreement with Carter

21  Bryant.   Did you rely on representations that were made to

22  you with respect to -- strike that.   Let me ask it a

23  different way.

EXHIBIT 37

PAGE 480.6

24           Did you know ahead of time, before you signed the

25  contract, of any factual confirmation received from your

1    privileged, well, then they were in violation of a court

2    order, and specifically the January 25, 2007, order of Judge

3    Infante that the Court is now, of course, very familiar with,

4    in which all such documents were ordered produced long ago.

5              So either they have violated that court's order or

6    the court's order, or number two, they are at this point

7    revealing privileged communications.  Those are the only

8    alternatives at this point.

9              And in either case, it's either a complete

10   wholesale waiver --

11             THE COURT:  Let me stop you there.  Why wasn't this

12   produced if this is not privileged?

13             MR. NOLAN:  At the time of the production and the

14   time that this issue came up, and I wasn't personally

15   involved --

16             THE COURT:  I know that.  You are unfortunately

17   held responsible with prior counsel.

18             MR. NOLAN:  Mattel has taken the position in

19   various privilege assertions that they were making that the

20   factual recitations would not be disclosed because it would

21   be considered a waiver of the privilege.

22             We offered a scenario where both sides could work

23   out an exchange where the factual assertions would be

24   exchanged -- at the very time we were also working on the

25   investigative report.  That whole issue.

EXHIBIT 37
PAGE 481

2094

 1          THE COURT:  I understand.

 2          MR. NOLAN:  So then what happened, your Honor, is

 3  both of us made a motion to Judge Infante.  We asked for a

 4  disclosure of the factual assertions containing --

 5          THE COURT:  When was this disclosed?

 6          MR. NOLAN:  Oh, we had these arguments just a week

 7  ago just before Victoria O'Connor.

 8          MR. ZELLER:  We have never had these documents,

 9  your Honor, until the midst of trial.  And that, I think, is

10  undisputed.

11          THE COURT:  You may continue to examine on areas

12  that have been brought up.  I'm not going to let the document

13  itself in.  But you can certainly -- Mr. Price did elicit

14  that there was an e-mail that he relied upon related to the

15  chronology.  And I'll permit you to examine on that.  As far

16  as the document itself, given the totality of the

17  circumstances here, I'm going to sustain objection to the

18  admission of the document.  But you can ask about the e-mail

19  and the chronology that he received.

20          MR. ZELLER:  And just so, if I may, your Honor, to

21  the extent he starts going into those communications that we

22  were not allowed to take discovery on, which also occurred at

23  the deposition, so it wasn't just the documents we were

24  denied, we were also denied the opportunity to cross-examine

25  Mr. Larian about these very same --

EXHIBIT 37
PAGE 482

2095

1          THE COURT:  And you're going to have an opportunity

2   to cross-examine when Mr. Price stands back up.

3          MR. PRICE:  And I'm not going to make any more

4   objections on this.  They are reserved.

5          THE COURT:  Very well.  It's understood.  The

6   document is not in.

7          MR. NOLAN:  I understand.

8          THE COURT:  Very well.

9          **(CONCLUSION OF SIDEBAR CONFERENCE.)**

10         MR. NOLAN:  Your Honor, I apologize.  Mr. Larian

11  went to the restroom.

12         THE COURT:  There's no need to apologize about

13  that.

14         And just for the record, we're going to be ending

15  in about 10 minutes because we have a juror who has a car

16  issue.  And we don't want to have any tickets.

17         Mr. Nolan.

18         MR. NOLAN:  Thank you.

19  Q.   Mr. Larian, before signing the consulting agreement with

20  Carter Bryant on October 4th, had you had conversations with

21  Victoria O'Connor?

22  A.   I did.

23  Q.   Did Ms. O'Connor tell you anything about a chronology of

24  when the drawings were done?

25  A.   She did.

EXHIBIT 37
PAGE 483

1    Q.   Based on what Ms. O'Connor advised you, did you go

2    forward and sign the agreement?

3    A.   I did.

4    Q.   When you signed the consulting agreement with

5    Mr. Bryant, what was your belief and understanding as to when

6    Carter Bryant did the concept drawings for Bratz?

7    A.   In 1998 in Missouri, when he was living with his

8    parents.

9    Q.   If you had believed that he had done these drawings, the

10   master drawings while at Mattel, would you have ever signed

11   the contract?

12   A.   I would not have signed it if he had done it at Mattel,

13   no.

14   Q.   Would you have ever risked millions of dollars to

15   develop Bratz?

16   A.   No, I would not.

17   Q.   By the way, after you released Bratz, did you ever

18   receive a letter from Mattel directly or through their

19   lawyers saying words to the effect, hey, Bratz is a name that

20   was proprietary to Mattel?  Did you ever receive such a

21   letter?

22   A.   I did not.

23   Q.   Did you ever receive a letter from anybody at Mattel or

24   their lawyers, any law firm, saying gee, the pose of one of

25   the doll drawings, Chloe, the pose is similar to Toon Teens?

EXHIBIT 37
PAGE 483.1

```
 1              MR. PRICE:  Object.

 2              THE COURT:  Sustained.

 3   Q.    BY MR. NOLAN:  Had you ever heard of Toon Teens before

 4   this litigation?

 5   A.    I had not.

 6   Q.    Had you ever heard that Mattel was considering the name

 7   of Bratz for any project?

 8   A.    No.

 9   Q.    Did Carter Bryant ever tell you any information

10   regarding product lines at Mattel?

11   A.    No, never.

12   Q.    Let me turn to 16789.  Do you have it?

13   A.    I do.

14   Q.    Do you recognize it?

15   A.    Yes, I do.

16   Q.    And what is it?

17   A.    It's an e-mail dated at the bottom, starts as an e-mail

18   on October 5, 2000, at 11:32 A.M. from me to Carter Bryant,

19   copy to Paula Treantafelles and Victoria O'Connor.

20              MR. NOLAN:  We'd offer Exhibit 16789.

21              THE COURT:  It's already in evidence, Counsel.

22              MR. NOLAN:  I apologize.  Can we have it up?

23   Q.    Mr. Larian, when you signed the consulting agreement

24   with Carter Bryant on October 4th, did you have an

25   understanding as to whether or not Carter Bryant was going to
```

2117

1

2

3

4

5

6

7                     C E R T I F I C A T E

8

9

10          I hereby certify that pursuant to Title 28,

11   Section 753 United States Code, the foregoing is a true and

12   correct transcript of the stenographically reported

13   proceedings in the above matter.

14          Certified on June 10, 2008.

15

16

17   _____
     MARK SCHWEITZER, CSR, RPR, CRR
18   Official Court Reporter
     License No. 10514

19

20

21

22

23

24

25

EXHIBIT 37
PAGE 484

# EXHIBIT 38

1669

1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                  - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7  MATTEL, INC.,                )

8              PLAINTIFF,   )

9        VS.            )  NO. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL., )

11           DEFENDANTS.  )  TRIAL DAY 9

                          )  MORNING SESSION

12  AND CONSOLIDATED ACTIONS,    )  PAGES 1669-1756

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16             RIVERSIDE, CALIFORNIA

17             FRIDAY, JUNE 6, 2008

18               9:27 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR

24        FEDERAL OFFICIAL COURT REPORTER

            3470 12TH STREET, RM. 134

25       RIVERSIDE, CALIFORNIA  92501

                951-274-0844

            WWW.THERESALANZA.COM

CERTIFIED COPY

EXHIBIT PAGE

EXHIBIT _38_

PAGE _465_

1    A    IT IS NOT.

2    Q    SO MS. O'CONNOR WAS, IN YOUR VIEW AGAIN, MISTAKEN ON THIS

3    MATTER AS WELL?

4    A    MAYBE SHE HAD THE WRONG RECOLLECTION.  I'M VERY CLEAR IN

5    MY MIND THAT FOR A FEW WEEKS, WE HAD NOT DECIDED TO DO THIS,      09:34

6    BECAUSE WE DIDN'T KNOW IF IT COULD EVEN BE MADE INTO A DOLL OR

7    NOT.

8    Q    LET ME ASK YOU ABOUT YOUR RECOLLECTION.

9         DO YOU RECALL YESTERDAY WE PUT UP ON THE OVERHEAD --

10   I THINK IT'S 12842.  DO YOU REMEMBER THAT E-MAIL CONCERNING      09:34

11   WHEN BRATZ WAS INTRODUCED?

12   A    WHEN DOES IT SAY IT WAS INTRODUCED?

13   Q    WHERE IT SAYS "...CONCERNED YOU CHANGED BRATZ, ENTER DATE

14   TO OCTOBER WHERE IT SAID TWO HUNDRED, AND YOU SAID OCTOBER 2000

15   FOR LEGAL PURPOSES."                                             09:34

16   A    YES.

17   Q    AND DO YOU RECALL YOUR TESTIMONY THAT YOU BARELY RECALL

18   THIS E-MAIL BECAUSE IT WAS SO LONG AGO?

19   A    I'M SORRY?

20   Q    DO YOU RECALL YOUR TESTIMONY THAT YOU BARELY RECALL THIS    09:34

21   E-MAIL BECAUSE IT WAS SO LONG AGO?

22   A    I DON'T REMEMBER THE EXACT E-MAIL.

23   Q    AND DO YOU REMEMBER I WAS ASKING QUESTIONS ABOUT WHETHER

24   YOU HAD A MEETING WITH PAT WILLIAMS AND MARTIN HITCH IN

25   FEBRUARY OF 2001?  DO YOU RECALL THOSE QUESTIONS?                09:35

EXHIBIT 38
PAGE 485.1

FRIDAY, JUNE 6, 2008

1    A    YES, I DO.

2    Q    AND YOU SAID, AGAIN, IT'S POSSIBLE YOU DON'T REMEMBER

3    BECAUSE THAT WAS SO LONG AGO.

4    A    I DID.

5    Q    SO WE'RE TALKING ABOUT EVENTS THAT HAPPENED SEVEN, EIGHT

6    YEARS AGO; AND IT'S SOMETIMES DIFFICULT TO REMEMBER THOSE

7    THINGS; CORRECT?

8    A    THAT'S CORRECT.

9    Q    SO LET'S FOCUS, THEN, ON THIS SEPTEMBER 2000 MEETING.

10            YOU DO REMEMBER THAT MR. BRYANT WAS THERE.

11   A    YES.

12   Q    YOU DO REMEMBER THAT HE SHOWED YOU THESE DRAWINGS AND

13   CALLED THEM "BRATZ."

14   A    YES.

15   Q    AND IF YOU GO BACK AND THINK ABOUT IT, YOU REALLY DON'T

16   RECALL ONE WAY OR ANOTHER -- IT'S POSSIBLE HE DID; IT'S

17   POSSIBLE HE DIDN'T -- WHETHER HE SAID THAT HE WORKED ON THESE

18   DRAWINGS AT NIGHTS AND ON WEEKENDS?

19   A    I'M SORRY.  CAN YOU REPEAT THAT.

20   Q    YOU DON'T REALLY RECALL WHETHER IN THIS MEETING, WHEN

21   MR. BRYANT PRESENTED THESE DRAWINGS TO YOU, WHETHER HE SAID

22   THAT HE WORKED ON THESE DRAWINGS AT NIGHTS OR ON THE WEEKENDS?

23   A    HE TOLD ME HE DID THEM IN 1998, WHEN HE WAS IN MISSOURI,

24   ON NIGHTS AND WEEKENDS.

25   Q    SO SITTING BACK EIGHT YEARS AGO, YOU HAVE A SPECIFIC

EXHIBIT 38
PAGE 485.2

09:35

09:35

09:35

09:36

09:36

FRIDAY   JUNE 6   2008

```
 1   RECOLLECTION THAT MR. BRYANT TOLD YOU THAT HE WORKED ON THESE

 2   IN 1998; IS THAT RIGHT?

 3   A    YES, I DO.

 4   Q    AND DID HE TELL YOU THAT HE HAD WORKED AT MATTEL BETWEEN

 5   APRIL '95 AND APRIL 1998?                                           09:36

 6   A    NO, NOT TO THAT DETAIL.  HE TOLD ME HE WORKED AT MATTEL

 7   RIGHT NOW.

 8   Q    HE TOLD YOU AT THAT TIME HE WORKED AT MATTEL?

 9   A    CORRECT; IN SEPTEMBER OF 2000.

10   Q    AND IF MS. O'CONNOR TESTIFIED SHE HAS NO RECOLLECTION OF       09:36

11   THERE BEING ANY DISCUSSION AS TO WHEN MR. BRYANT CREATED THESE

12   DRAWINGS, SHE WOULD BE, AGAIN, INCORRECT.

13   A    HER RECOLLECTION WOULD BE WRONG AGAIN.  I HEARD HER SAY

14   THAT THE CONTRACT WAS SIGNED ON SEPTEMBER 18TH, AND WHEN YOU

15   SHOWED HER, OR MR. NOLAN SHOWED HER, THE CONTRACT, THE TIME         09:37

16   STAMP ON THE BOTTOM, WHERE IT SAYS OCTOBER 4TH, SHE SAID,

17   'OKAY, MAYBE IT WAS DONE ON OCTOBER 4, 2000.'

18   Q    LET ME ASK YOU THIS, SIR:  IT'S TRUE, IS IT NOT, THAT,

19   SITTING THERE IN SEPTEMBER, YOU NEVER TOLD MR. BRYANT AT THAT

20   MEETING THAT IF HE CREATED THESE DOLLS WHILE THEY WERE AT           09:37

21   MATTEL, THAT THAT WASN'T SOMETHING YOU WERE INTERESTED IN?

22   A    THERE WERE NO DOLLS THAT HE WAS SHOWING US, IN SEPTEMBER 1,

23   2000, WITH THE DRAWINGS.

24        ARE YOU REFERRING TO THE DRAWINGS?

25   Q    LET ME REPHRASE IT SO THAT WE'RE NOT BICKERING ABOUT           09:37
```

EXHIBIT 38
PAGE 485.5

1   DEFINITIONS HERE.

2   IT'S TRUE, IS IT NOT, THAT IN THAT MEETING, YOU HAVE

3   NO RECOLLECTION OF SAYING TO MR. BRYANT THAT IF HE HAD MADE ANY

4   OF THESE DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

5   WAS AT MATTEL, YOU DIDN'T WANT THEM?  YOU DON'T RECALL SAYING

6   ANYTHING LIKE THAT?

7   A   NO.  I RECALL SAYING TO HIM THAT IF THIS WAS SOMETHING

8   THAT WAS DONE AT MATTEL, I WAS -- I HAD NO INTEREST IN IT.

9   MR. PRICE:  IF WE COULD PLAY FROM PAGE 439,

10  VOLUME II.

11  THE WITNESS:  WHICH VOLUME IS THAT, SIR?

12  MR. PRICE:  PAGE 439, LINE 7 TO LINE 14.

13  THE WITNESS:  WHICH VOLUME IS THAT, PLEASE?

14  MR. PRICE:  SECOND VOLUME.  IT'S MARCH 26, 2008;

15  439, LINE 7 THROUGH LINE 14.

16  MR. NOLAN:  NO OBJECTION, YOUR HONOR.

17  THE COURT:  YOU MAY READ, OR PLAY IT.

18  (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

19  (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL.)

20  "Q.   NOW, DURING THAT MEETING DID YOU TELL

21  CARTER BRYANT THAT IF HE HAD MADE ANY OF THOSE

22  DRAWINGS THAT HE WAS SHOWING YOU DURING THE TIME HE

23  WAS A MATTEL EMPLOYEE THAT M.G.A. DID NOT WANT THEM?

24  A.   I DON'T RECALL HAVING THAT -- HAVING SAID

25  THAT.

EXHIBIT 38
PAGE 485.4

09:38

09:38

09:38

FRIDAY, JUNE 6, 2008

1    Q.    WAS THAT EVER CONVEYED TO HIM?

2    A.    I DON'T KNOW.  I DON'T THINK SO."

3         (END OF EXERPT PROVIDED.)

4         **MR. NOLAN:**  YOUR HONOR, IT'S NOT FROM THE SAME

5    DEPOSITION.  IT'S FROM THE FIRST VOLUME, JULY 18TH OF 2006.    09:40

6    THIS WAS JUST HANDED UP TO ME FOR COMPLETION PURPOSES.  OR I

7    COULD DO IT IN MY DIRECT.

8         **MR. PRICE:**  I THOUGHT THE COMPLETENESS APPLIES -- WE

9    WERE TALKING ABOUT IT EARLIER --

10        **THE COURT:**  CLARIFY FOR THE RECORD, COUNSEL, THE DATE    09:40

11   OF THE DEPOSITION.

12        **MR. PRICE:**  THE DATE OF THE DEPOSITION I PLAYED WAS

13   MARCH 26, 2008.  THE DATE MR. NOLAN WANTS TO PLAY IS JULY 18,

14   2006.

15        **MR. NOLAN:**  CORRECT, YOUR HONOR.  AND I'LL PLAY IT    09:4

16   DURING MY EXAMINATION.

17        **THE COURT:**  VERY WELL.

18        YOU MAY PROCEED.

EXHIBIT 38
PAGE 4855

19   **BY MR. PRICE:**

20   Q    IN FACT, MR. LARIAN, SITTING THERE IN THAT MEETING, YOUR    09:4

21   VIEW WAS -- IT WOULDN'T HAVE BEEN A PROBLEM TO YOU IF

22   CARTER BRYANT HAD CREATED OR MADE ANY OF THESE DRAWINGS WHEN HE

23   WAS EMPLOYED AT MATTEL; THAT WOULDN'T HAVE BOTHERED YOU AT ALL?

24   A    THAT IS NOT CORRECT.  IF HE HAD MADE THESE DRAWINGS OR HAD

25   DONE ANYTHING WITH THEM AT MATTEL, I WAS NOT -- OR ANYWHERE    09:4

1   ELSE, ANY OTHER TOY COMPANY -- I WAS NOT INTERESTED.

2           MR. PRICE:  I'D LIKE TO PLAY FROM MARCH 26, 2008,

3   PAGE 450, LINES 10 THROUGH 17.

4           THE COURT:  ANY OBJECTION?

5           MR. NOLAN:  NO OBJECTION.                          09:42

6           THE COURT:  YOU MAY PLAY.

7           (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

8           (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

9           "Q.   WOULD IT HAVE BEEN A PROBLEM IF CARTER.

10          BRYANT HAD CREATED OR MADE ANY OF HIS DRAWINGS WHEN

11          HE WAS EMPLOYED BY MATTEL IN YOUR VIEW?

12          A.   NO.

13          Q.   WHY NOT?

14          A.   BECAUSE I DON'T THINK, WHETHER IT'S M.G.A.

15          OR MATTEL, WE OWN THE PEOPLE, ESPECIALLY THE

16          CREATIVE PEOPLE, FOREVER."

17          (END OF EXERPT PROVIDED.)

18  BY MR. PRICE:

19  Q   MR. LARIAN, YOU BELIEVE IN THE GOLDEN RULE; RIGHT?

20  A   WHAT'S THE GOLDEN RULE?                                09:42

21  Q   THE SAME RULES SHOULD APPLY TO YOU AS TO EVERYBODY ELSE.

22  A   YES.

23  Q   IF WE CAN LOOK AT EXHIBIT 1117, WHICH IS ALREADY IN

24  EVIDENCE, THE THIRD PAGE.

25          NOW, YOU SEE EXHIBIT 1117 WE SPOKE ABOUT YESTERDAY.   09:43

EXHIBIT 38
PAGE 485.6

FRIDAY  JUNE 6  2008

1       THIS IS THE AGREEMENT THAT MS. GARCIA SIGNED WITH MGA

2   IN APRIL OF 2000; IS THAT CORRECT?

3   A    CORRECT.

4   Q    AND AS WE DISCUSSED YESTERDAY, YOU UNDERSTAND THAT UNDER

5   HER CONTRACT WITH MGA, IF SHE CAME UP WITH ANYTHING THAT

6   RELATED TO THE COMPANY'S WORK WHILE SHE WAS AT MGA, THAT

7   BELONGED TO MGA; RIGHT?

8   A    THAT'S WHAT THE CONTRACT SAID, YES.

9   Q    YET, YOUR TESTIMONY UNDER OATH WAS THAT IT WOULD NOT HAVE

10  BEEN A PROBLEM FOR YOU IF CARTER BRYANT HAD CREATED OR MADE ANY

11  OF HIS DRAWINGS WHEN HE WAS EMPLOYED BY MATTEL; THAT WAS YOUR

12  TESTIMONY UNDER OATH; CORRECT?

13  A    I DID NOT SAY ANY OF HIS DRAWINGS.  HE HAD DONE HIS

14  INITIAL DRAWINGS IN 1998 IN MISSOURI, AND AFTER -- WHEN HE WAS

15  NOT WORKING AT MATTEL -- AND AFTERWARD, IF HE WAS WORKING ON

16  THEM AND REFINING THEM WHILE HE WAS STILL WORKING AT MATTEL, I

17  WOULDN'T SEE ANY PROBLEM WITH THAT.

18  Q    MR. LARIAN, YOU DON'T RECALL ANY STORY ON SEPTEMBER 1,

19  2000, ABOUT MR. BRYANT CREATING THESE DRAWINGS BETWEEN A SMALL

20  EIGHT-MONTH WINDOW, BETWEEN TWO STINTS AT MATTEL, DO YOU?

21  A    I'M NOT TELLING STORIES.  I'M TELLING THE TRUTH HERE.

22  Q    YOU SAID THAT YOU WERE NOT REFERRING TO -- YOU DIDN'T SAY

23  THAT IT WOULDN'T BOTHER YOU IF ANY OF HIS DRAWINGS --

24       LET'S PUT UP THE TRANSCRIPT OF WHAT WE JUST LOOKED

25  AT, THEN; PAGE 450, LINE 10 THROUGH 17

EXHIBIT 38

PAGE 4857

09:43
09:44
09:44
09:44
09:44
09:45

1    THE QUESTION WAS, "WOULD IT HAVE BEEN A PROBLEM IF

2  CARTER BRYANT HAD CREATED OR MADE ANY OF HIS DRAWINGS WHEN HE

3  WAS EMPLOYED BY MATTEL, IN YOUR VIEW?"

4        "NO."

5        AND THEN IT GOES ON.                                       09:45

6  **BY MR. PRICE:**

7  Q    THIS IS ONE OF THOSE TRANSCRIPTS THAT YOU ACTUALLY

8  REVIEWED; CORRECT?

9  A    YES.  AND MAYBE AT THE TIME, WHEN MR. ZELLER WAS ASKING ME

10 THOSE QUESTIONS, I DID NOT PAY ATTENTION TO THE WORD "ANY."     09:45

11 AND I APOLOGIZE FOR THAT.

12 Q    MY QUESTION IS DIFFERENT.

13       THIS IS ONE OF THOSE TRANSCRIPTS THAT YOU ACTUALLY,

14 AFTERWARDS, READ AND MADE CORRECTIONS ON; CORRECT?

15 A    I BELIEVE I DID, YES.                                       09:45

16 Q    IN FACT, YOU MADE CORRECTIONS TO THE TRANSCRIPT.

17 A    I BELIEVE I DID, YES.

18 Q    THEN YOU SIGNED AT THE LAST PAGE WHERE IT SAYS, "I DECLARE

19 UNDER PENALTY OF PERJURY THAT THIS IS AN ACCURATE TRANSCRIPT."

20 A    I DID.                                                      09:46

21 Q    YOU DID NOT CORRECT THE ANSWER THAT WE PLAYED UNDER OATH,

22 WHICH IS THAT IT WOULDN'T HAVE BEEN A PROBLEM IF MR. BRYANT HAD

23 CREATED OR MADE ANY OF HIS DRAWINGS WHEN HE WAS EMPLOYED BY

24 MATTEL?  YOU DIDN'T CORRECT THAT, DID YOU?

25 A    NO.  I MISSED THAT ONE.  I'M SORRY.  I APOLOGIZE.          09:46

EXHIBIT 38

PAGE 485.8

FRIDAY, JUNE 6, 2008

1   Q    NOW, IT'S YOUR TESTIMONY THAT YOU ASKED

2   VICTORIA O'CONNOR --

3   A    YES.

4   Q    -- TO LOOK INTO WHETHER OR NOT CARTER BRYANT ACTUALLY

5   OWNED THE DRAWINGS.

6   A    I TOLD VICTORIA O'CONNOR, TO THE BEST OF MY RECOLLECTION,

7   TO MAKE SURE THAT THE STORY HE WAS TELLING US IS TRUE, THAT HE

8   DID THESE IN 1998, WHEN HE WAS IN MISSOURI.  AND I BELIEVE HE

9   DID THAT -- I MEAN, SHE DID THAT.  I'M SORRY.

10  Q    ACTUALLY, SIR, ISN'T IT TRUE THAT YOU ASKED

11  VICTORIA O'CONNOR TO MAKE SURE THAT HIS DRAWINGS DIDN'T BELONG

12  TO ANOTHER DESIGNER OR ANOTHER PERSON, BECAUSE YOU HAD NO

13  CONCERNS, REALLY, ABOUT WHETHER THEY BELONGED TO MATTEL?

14  A    I'M SORRY.  I DON'T UNDERSTAND YOUR QUESTION.

15  Q    SURE.

16       ISN'T IT TRUE THAT BECAUSE YOU WOULDN'T HAVE HAD ANY

17  PROBLEM IF HE HAD DRAWN THESE WHEN HE WAS AT MATTEL, WHAT YOU

18  ASKED VICTORIA O'CONNOR TO LOOK INTO WAS, ACCORDING TO YOU,

19  WHETHER OR NOT THESE DRAWINGS BELONGED TO ANOTHER DESIGNER?

20  A    THAT'S NOT CORRECT.  I WANTED TO MAKE SURE THAT IF HE WAS

21  TELLING US THAT HE HAD DONE THESE IN 1998, WHEN HE WAS LIVING

22  WITH HIS PARENTS IN MISSOURI, IF THAT'S WHAT HE IS SAYING, TO

23  MAKE SURE THAT STORY IS TRUE.  AND SHE DID VERIFY THAT IT WAS

24  TRUE.

25       MR. PRICE:  YOUR HONOR, IF WE COULD PLAY FROM

EXHIBIT 38
PAGE 465.9

1683

 1    MR. LARIAN'S DEPOSITION TRANSCRIPT, VOLUME II, MARCH 26, 2008,

 2    457.

 3              THE COURT:  YOU SAID LINE 2 THROUGH --

 4              MR. PRICE:  LINE 15 THROUGH 23, PAGE 457.

 5              THE COURT:  VERY WELL.                              09:48

 6              ANY OBJECTION, MR. NOLAN?

 7              MR. NOLAN:  I WOULD JUST ASK UP TO PAGE 458, LINE 16,

 8    FOR COMPLETENESS.

 9              MR. PRICE:  NO OBJECTION TO THAT AT ALL.

10              THE COURT:  VERY WELL.                              09:48

11              (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

12              (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

13              "Q.   WHAT IS IT YOU ASKED VICTORIA O'CONNOR TO

14              CONFIRM?

15              A.   TO GO AHEAD AND MAKE SURE THAT IF HE SAYS

16              THESE DRAWINGS BELONG TO HIM, THAT IN FACT THESE

17              DRAWINGS BELONG TO HIM AND -- AND NOT -- AND NOT --

18              THAT'S -- THAT'S ALL I'M GOING TO ANSWER.

19              Q.   AND -- AND NOT TO WHOM?

20              A.   NOT, FOR EXAMPLE, ANOTHER DESIGNER, ANOTHER

21              ARTIST.

22              Q.   WERE YOU CONCERNED THAT CARTER BRYANT'S

23              DRAWINGS MIGHT BELONG TO ANOTHER DESIGNER OR ARTIST?

24              A.   NO.  I BELIEVED WHAT HE SAID; I JUST -- AS

25              A PRUDENT BUSINESSMAN, I JUST WANTED TO MAKE SURE

EXHIBIT PAGE

EXHIBIT ____ 28
PAGE ____ AO6

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

1684

1     THAT WHAT HE WAS SAYING WAS RIGHT BEFORE WE GO AHEAD

2     AND INVEST A LOT OF MONEY IN SOMETHING.

3     Q.    DID YOU ASK VICTORIA O'CONNOR TO CONFIRM

4     THAT CARTER BRYANT HAD MADE THE DRAWINGS THAT HE

5     SHOWED YOU IN 1998?

6     A.    NOT AS SPECIFIC LIKE THAT.  I JUST TOLD --

7     TOLD HER WHAT I JUST TOLD YOU EARLIER.

8     Q.    DID VICTORIA O'CONNOR EVER COME BACK AND

9     TELL YOU WHETHER OR NOT SHE HAD CONFIRMED WHEN

10    CARTER BRYANT HAD MADE THE DRAWINGS?

11    A.    DIRECTLY TO ME?

12    Q.    YES.

13    A.    I DON'T RECALL.  SHE MIGHT HAVE.  I DON'T

14    RECALL IT WITHOUT LOOKING AT DOCUMENTS."

15    (END OF EXERPT PROVIDED.)

16    BY MR. PRICE:

17    Q    NOW, YOUR TESTIMONY, MR. LARIAN, IS THAT SOMEONE CAME BACK

18    AND SAID, YES, MR. BRYANT MADE THESE DRAWINGS IN 1998.

19    A    SPECIFICALLY, HIS ATTORNEY, ANNE WANG; AND I HAVE SEEN AN

20    E-MAIL TO THAT EFFECT.                                            09:5(

21          MR. PRICE:   YOUR HONOR, MOVE TO STRIKE THE ANSWER.

22          THE COURT:   IT'S NONRESPONSIVE.

23          JUST ANSWER THE QUESTION.

24    BY MR. PRICE:

25    Q    IT'S A YES OR NO QUESTION.                                   09:5(

EXHIBIT  38
PAGE  487

EXHIBIT
PAGE

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

1685

1    YOUR TESTIMONY IS THAT -- AND THIS IS, I THINK, A YES

2  OR NO QUESTION -- IS THAT, ESSENTIALLY, AT SOME POINT, SOMEONE

3  CAME TO YOU AND SAID, 'I CONFIRM CARTER BRYANT DID THIS IN

4  1998'?

5  A    THAT IS CORRECT.                                                    09:51

6  Q    AND ACCORDING TO YOUR TESTIMONY, ACCORDING TO YOU, WHETHER

7  CARTER BRYANT DID IT IN 1998 HAD NO SIGNIFICANCE AT ALL AS TO

8  WHETHER OR NOT MATTEL MIGHT HAVE RIGHTS TO THOSE DRAWINGS.

9        IS THAT YOUR TESTIMONY?

10  A    MY TESTIMONY IS THAT IF HE DID THESE IN 1998, WHEN HE WAS      09:51

11  NOT WORKING AT MATTEL, THEN THERE WAS NO QUESTION THAT THOSE

12  BELONGED TO HIM AND HE COULD DO WHATEVER HE WANTED TO DO WITH

13  THEM.

14  Q    ISN'T THE TRUTH OF THE MATTER, SIR, THAT IN THIS TIME

15  FRAME, IT DIDN'T MATTER TO YOU WHETHER MATTEL HAD RIGHTS TO       09:51

16  THESE DRAWINGS?

17  A    THAT'S NOT CORRECT.  AT THAT TIME, I WANTED TO KNOW IF --

18  TWO THINGS WERE IN MY MIND:  A, DID THEY BELONG TO HIM; AND, B,

19  CAN THEY BE MADE INTO A DOLL; CAN WE MAKE A DOLL FROM THIS?

20       MR. PRICE:  YOUR HONOR, IF I COULD PLAY FROM 459,            09:52

21  LINE 12, THROUGH 460, LINE 3.

22       MR. NOLAN:  WE WOULD ASK THAT WE CONTINUE THROUGH TO

23  PAGE 460, LINE 20.

24       MR. PRICE:  ABSOLUTELY.

25       THE COURT:  VERY WELL.                                       09:52

EXHIBIT 38
PAGE 488

EXHIBIT PAGE

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION



1    (WHEREUPON, VIDEO DEPOSITION IS PLAYED.)

2    (EXCERPTS ARE INCLUDED AS PROVIDED BY COUNSEL:)

3    "Q.    WAS THE FACT THAT CARTER BRYANT'S LAWYER

4    REPRESENTED TO M.G.A. THAT CARTER BRYANT HAD DONE

5    THE DRAWINGS IN 1998 IN MISSOURI WHEN HE WAS NOT A

6    MATTEL EMPLOYEE HAVE ANY SIGNIFICANCE TO YOU AT THAT

7    TIME?

8    A.    IT -- HE CONFIRMED WHAT CARTER BRYANT HAD

9    TOLD US.

10    Q.    AND DID YOU FIND SOME COMFORT IN THIS?

11    A.    OF COURSE.

12    Q.    AND WHY WAS THAT?

13    A.    BECAUSE, YOU KNOW, I HOPED THE LAWYERS IN

14    COURT -- YOUR PROFESSION TELL THE TRUTH.

15    Q.    WELL, YOU THOUGHT THAT IT WOULD HAVE SOME

16    SIGNIFICANCE TO WHETHER OR NOT MATTEL MIGHT HAVE

17    RIGHTS TO THOSE DRAWINGS; IS THAT TRUE?

18    A.    NO.

19    Q.    WELL, THEN, PLEASE TELL ME WHAT COMFORT YOU

20    DERIVED FROM THE FACT THAT THIS, AS YOU DESCRIBE IT,

21    CONFIRMED WHAT CARTER BRYANT HAD TOLD YOU ABOUT

22    CREATING THESE DRAWINGS IN 1998 IN MISSOURI WHEN HE

23    WAS NOT EMPLOYED BY MATTEL.

24    A.    BESIDE WHAT I JUST TESTIFIED, I HAVE

25    NOTHING ELSE TO ADD.

38

EXHIBIT PAGE

EXHIBIT _____

PAGE _____ 489

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

1687

1     Q.    SO YOU WERE JUST COMFORTED BY THE FACT THAT

2     HE HAD TOLD YOU THE TRUTH?

3     A.    AND HIS LAWYER CONFIRMED IT.

4     Q.    AND BEYOND THAT IT HAD NO SIGNIFICANCE TO

5     YOU; IS THAT TRUE?

6     A.    THAT'S TRUE."

7          (END OF EXERPT PROVIDED.)

8     BY MR. PRICE:

9     Q    THIS, AGAIN, IS TESTIMONY THAT YOU DID NOT CORRECT.

10         I'M GOING TO GET A DOUBLE NEGATIVE HERE.  I'LL REASK     09:54

11    IT.

12         WHEN YOU WERE ASKED, "WELL, YOU THOUGHT IT WOULD HAVE

13    SOME SIGNIFICANCE TO WHETHER OR NOT MATTEL MIGHT HAVE RIGHTS TO

14    THOSE DRAWINGS; IS THAT TRUE?"  AND YOU ANSWERED "NO," THIS IS

15    NOT AN ANSWER UNDER OATH THAT YOU CORRECTED WHEN YOU WENT       09:54

16    THROUGH THE TRANSCRIPT.

17    A    NO.  THERE WAS NOTHING TO CORRECT.  WHAT I SAID WAS THAT

18    HIS LAWYER HAD CONFIRMED THAT HE HAD DONE THIS IN 1998, AND HE

19    HAD SAID THE SAME THING; SO THERE WAS NOTHING TO CORRECT.  THEY

20    DIDN'T BELONG TO MATTEL.                                        09:54

21    Q    MY QUESTION WAS DIFFERENT, SIR.

22         FIRST, THE QUESTION WAS WHETHER OR NOT THAT WOULD

23    HAVE ANY SIGNIFICANCE TO YOU WITH RESPECT TO WHETHER OR NOT

24    MATTEL HAD RIGHTS TO THE DRAWINGS.

25         YOUR ANSWER WAS, 'IT HAD NOTHING TO DO -- NO, IT HAD       09:55

EXHIBIT PAGE

1688

1    NOTHING TO DO WITH THAT.'

2         DID YOU CORRECT YOUR ANSWER OF 'NO' IN THAT

3    TRANSCRIPT?

4    A    I DID NOT, BECAUSE, AGAIN, HIS LAWYER HAD CONFIRMED THAT

5    HE HAD DONE THIS IN 1998 IN MISSOURI, AS HE HAD SAID, AND THERE          09:55

6    WAS NOTHING FOR ME TO CORRECT.

7    Q    THE QUESTION YOU WERE ASKED, IF THAT, IN FACT, HAPPENED,

8    WHETHER THAT WOULD HAVE SOME SIGNIFICANCE TO YOU AS TO WHETHER

9    OR NOT MATTEL MIGHT HAVE RIGHTS TO THOSE DRAWINGS.

10   A    TO ME, THAT WAS A HYPOTHETICAL QUESTION, THAT WAS NOT THE          09:55

11   FACT.  THE FACT WAS, AND IS, THAT HE DID THESE DRAWINGS IN 1998

12   WHEN HE WAS IN MISSOURI LIVING WITH HIS PARENTS.  AND HE COULD

13   PROVE THAT.

14   Q    BY THE WAY, YOU WERE HERE WHEN MS. O'CONNOR DENIED THAT

15   YOU EVER DIRECTED HER TO FIND OUT WHEN THE DRAWINGS WERE

16   CREATED.                                                                09:55

17   A    YES.  BUT THERE ARE E-MAILS IN HERE THAT I GUESS YOU DID

18   NOT WANT TO SHOW HER.

19        MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE AFTER

20   "YES."                                                                  09:55

21        THE COURT:  STRIKE AFTER "YES."  "YES" IS THE ANSWER.

22   BY MR. PRICE:

23   Q    I TAKE IT YOU'RE SAYING HER TESTIMONY THAT YOU DID NOT

24   DIRECT HER TO DO THIS IS MISTAKEN?

25   A    HER TESTIMONY IS A MISTAKE.  AND I HAVE SEEN E-MAILS TO           09:56

EXHIBIT ___38___
PAGE ___49___

FRIDAY, JUNE 6, 2008                          TRIAL DAY 9, MORNING SESSION

EXHIBIT PAGE

1689

1    THAT EFFECT.

2              MR. PRICE:  MOVE TO STRIKE, YOUR HONOR.

3              THE COURT:  JUST TRY TO ANSWER THE QUESTION,

4    MR. LARIAN.

5              THAT LAST PORTION IS STRICKEN.                    09:56

6    BY MR. PRICE:

7    Q    AND YOU SAID YOU WANTED TO CONFIRM A STORY ABOUT 1998.

8              I BELIEVE YOU SAID THAT EVEN IF IT HAD NO

9    SIGNIFICANCE AS TO WHETHER MATTEL OWNED THE DRAWINGS, YOU DID

10   WANT TO CONFIRM THAT CARTER BRYANT WAS TRUTHFUL.            09:56

11   A    YES.

12   Q    NOW, OBVIOUSLY, IF YOU WANT TO INVESTIGATE SOMEONE'S

13   WORD --

14   A    CAN YOU REPEAT THAT QUESTION AGAIN, BECAUSE I THINK IT WAS

15   A LITTLE BIT CONVOLUTED.  CAN YOU REPEAT THAT FIRST QUESTION   09:56

16   ONE MORE TIME.

17   Q    YOU WANTED TO CONFIRM CARTER BRYANT WAS TRUTHFUL.

18   A    YES, I WANTED TO MAKE SURE WHAT HE WAS TELLING US WAS THE

19   TRUTH.

20   Q    NOW, OBVIOUSLY, IF YOU WANT TO INVESTIGATE SOMEONE'S WORD,  09:56

21   YOU HAVE TO GO BEHIND HIS WORD; RIGHT?

22   A    THAT'S WHAT WE DID.  YES.

23   Q    IF YOU REALLY WANT TO DO AN INVESTIGATION, YOU HAVE TO GO

24   BEHIND HIS WORD; YOU CAN'T JUST TAKE HIS WORD FOR IT AGAIN;

25   RIGHT?                                                      09:57

EXHIBIT 3 Y
492

FRIDAY, JUNE 6, 2008     PAGE_____     TRIAL DAY 9, MORNING SESSION

1690

1   A    I TOOK HIS WORD.  BUT AS A PRUDENT BUSINESSMAN, I ALSO

2   DIRECTED OUR HEAD OF LICENSING TO CHECK WITH OUR ATTORNEY AND

3   HIS ATTORNEY TO MAKE SURE WHAT HE WAS TELLING ME WAS TRUE.  AND

4   THEY DID.  AND HE CAME BACK AND SAID IT IS TRUE.  HIS ATTORNEY

5   CAME BACK IN WRITING SAYING THAT HE DID THIS IN 1998.     09:57

6   Q    NOW, LET'S SEE IF WE CAN LISTEN TO MY QUESTION.

7          WHAT YOU WANTED TO DO, ACCORDING TO YOU, WAS TO SEE

8   WHETHER OR NOT MR. BRYANT'S WORD WAS TRUE; CORRECT?

9   A    YES; THAT HE HAD DONE THIS IN 1998, IN MISSOURI; I WANTED

10   TO MAKE SURE THAT'S TRUE.  AND THAT CAME BACK TO BE TRUE.    09:57

11   Q    AND, OBVIOUSLY, IF YOU REALLY WANTED TO DETERMINE THAT,

12   YOU WOULDN'T JUST GO ASK MR. BRYANT AGAIN, 'HEY, DO THESE

13   BELONG TO YOU?'  YOU WOULDN'T TRUST HIS WORD TO TEST HIS WORD.

14   A    I DON'T THINK I UNDERSTAND YOUR QUESTION, SIR.

15   Q    YOU'RE SAYING MR. BRYANT TOLD YOU SOMETHING; CORRECT?    09:58

16   A    CORRECT.

17   Q    YOU WANTED TO SEE WHETHER OR NOT WHAT HE TOLD YOU WAS

18   TRUE, ACCORDING TO YOU.

19   A    CORRECT.

20   Q    AND YOU WANTED TO DO A REAL INVESTIGATION, NOT JUST    09:58

21   SOMETHING YOU COULD SHOW LATER AND SAY, 'SEE, I LOOKED INTO

22   IT.'

23   A    BESIDES THAT INVESTIGATION, I DIDN'T KNOW WHAT ELSE YOU

24   WANTED ME TO DO.  HIRE PRIVATE DETECTIVES?

25   Q    BY THE WAY, WAS IT YOUR TESTIMONY THAT MR. BRYANT'S    09:58

EXHIBIT PAGE

EXHIBIT ___38___

PAGE ___493___



```
 1    ATTORNEY CAME BACK IN WRITING WITH SOMETHING?

 2            THAT'S A YES OR NO QUESTION.

 3    A    CAN YOU ASK THE QUESTION AGAIN.

 4    Q    ARE YOU TESTIFYING MR. BRYANT'S ATTORNEY PROVIDED YOU

 5    SOMETHING IN WRITING?                                      09:58

 6    A    OUR ATTORNEY --

 7    Q    NO, NO.  MY QUESTION IS, DID MR. BRYANT'S ATTORNEY PROVIDE

 8    YOU SOMETHING IN WRITING?

 9    A    TO ME PERSONALLY?  NO.

10    Q    NOW, MY QUESTION IS THIS:  IF YOU WERE TO FIND OUT WHETHER  09:58

11    SOMEONE'S WORD IS ACCURATE, AND YOU WANTED TO DO A REAL

12    INVESTIGATION AND NOT JUST A SHOW, WOULDN'T YOU DO SOMETHING

13    BESIDES JUST ASK THEM, 'HEY, DID YOU REALLY MEAN THAT'?

14    A    WHAT I DID IS -- NO.  THAT'S NOT HOW I -- MAYBE LAWYERS DO

15    IT LIKE THAT, BUT I DON'T.  I DID NOT.                     09:59

16    Q    SO YOUR TESTIMONY IS THAT MR. BRYANT TOLD YOU SOMETHING;

17    RIGHT?

18    A    RIGHT.

19    Q    YOU WANTED TO SEE WHETHER OR NOT WHAT MR. BRYANT TOLD YOU

20    WAS TRUE; CORRECT?                                         09:59

21    A    RIGHT.

22    Q    AND SO THEN YOU HAD MR. BRYANT'S LAWYER GO AND ASK HIM,

23    'WILL YOU TELL ME THE SAME THING?'

24    A    NO.  THAT'S NOT WHAT HAPPENED.

25    Q    WELL, SIR, ISN'T THAT EXACTLY WHAT YOU'RE SAYING HAPPENED,  09:59
```

EXHIBIT
PAGE

EXHIBIT ___38___

PAGE ___49a___

1692

1   THAT MR. BRYANT'S LAWYER -- AND YOU SAID YOU ASKED HIM THE SAME

2   QUESTION AND GOT THE SAME ANSWER AND SAID, 'I GOT THE SAME

3   ANSWER.'

4   A    NO.   THIS IS NOT EXACTLY THE SEQUENCE OF EVENTS THAT

5   HAPPENED.                                                          09:59

6           I DIRECTED VICTORIA O'CONNOR TO MAKE SURE, TO FIND

7   OUT, THAT IF HE SAID HE HAD DONE THIS IN 1998 IN MISSOURI, THAT

8   HE HAD.

9           SHE WENT TO OUR ATTORNEY, DAVID ROSENBAUM, WHO WENT

10  TO CARTER BRYANT'S ATTORNEY AND ASKED THIS.   CARTER BRYANT'S    10:00

11  ATTORNEY CAME BACK LATER ON -- AND I HAVE SEEN AN E-MAIL TO

12  THAT EFFECT -- AND SAID SHE HAD INVESTIGATED AND THAT HIS STORY

13  WAS TRUE, THAT HE HAD DONE THIS IN 1998 WHEN HE WAS IN

14  MISSOURI.

15          MR. PRICE:   MOVE TO STRIKE A REFERENCE TO ANY

16  E-MAILS, GIVEN THE COURT'S ORDER.                                10:00

17          THE COURT:   OVERRULED.

18  BY MR. PRICE:

19  Q    SIR, ISN'T IT TRUE THAT THE ONLY THING THAT HAPPENED WAS,

20  YOUR ATTORNEY WENT TO MR. BRYANT'S ATTORNEY AND SAID, 'SEE IF    10:00

21  HE'LL TELL YOU THE SAME THING THAT HE'S TOLD US'?

22          MR. NOLAN:   OBJECTION, YOUR HONOR.   LACK OF

23  FOUNDATION WITH RESPECT TO CONVERSATIONS THAT WERE GOING ON,

24  WHETHER MR. LARIAN WAS PRESENT OR NOT.

25          THE COURT:   SUSTAINED.                                  10:00

EXHIBIT _38_

EXHIBIT PAGE

FRIDAY, JUNE 6, 2008   PAGE _#96_   TRIAL DAY 9, MORNING SESSION

1693

1        JUST FOUNDATION, COUNSEL.

2   **BY MR. PRICE:**

3   Q    SO SITTING HERE TODAY, YOU HAVE ABSOLUTELY NO IDEA WHAT

4   MR. BRYANT'S ATTORNEY SAID TO YOUR ATTORNEY.  THERE'S NO

5   FOUNDATION FOR THAT.                                            10:01

6           **MR. NOLAN:**  OBJECTION.  MR. PRICE IS POINTING TO ME.

7   I WAS NOT --

8           **THE COURT:**  COUNSEL, REPHRASE YOUR QUESTION.

9           PLEASE, NO SPEAKING OBJECTIONS, COUNSEL.

10  **BY MR. PRICE:**                                               10:01

11  Q    IS IT CORRECT THAT YOU HAVE NO IDEA WHAT MR. BRYANT'S

12  ATTORNEY -- WELL, LET'S TAKE IT IN STEPS.

13          YOU HAVE NO IDEA WHAT MR. BRYANT'S ATTORNEY DID AS

14  PART OF THIS INVESTIGATION; CORRECT?

15  A    I PERSONALLY HAVE NO DIRECT KNOWLEDGE OF THAT, NO.         10:01

16  Q    AND YOU HAVE NO DIRECT KNOWLEDGE AS TO WHAT MR. BRYANT'S

17  ATTORNEY AND YOUR ATTORNEY TALKED ABOUT; YOU HAVE NO DIRECT

18  KNOWLEDGE.

19  A    YES, I DO.  I HAVE SEEN AN E-MAIL TO THE EFFECT.

20  Q    BY "DIRECT KNOWLEDGE," I THINK THE QUESTION IS, WERE YOU   10:01

21  THERE?  WERE YOU PART OF THE CONVERSATION?  DID YOU HEAR IT?

22  A    NO, I WAS NOT PART OF THE CONVERSATION OR -- I WAS NOT

23  PART OF THE CONVERSATION TO HEAR SOMETHING.

24  Q    CERTAINLY, IT'S FAIR TO SAY THAT YOU WOULD NOT BE

25  SATISFIED -- IF YOU WERE TRYING TO FIND OUT WHETHER MR. BRYANT  10:02

EXHIBIT 38

EXHIBIT
PAGE

1694

1   WAS TRUTHFUL, YOU WOULDN'T BE SATISFIED WITH AN INVESTIGATION

2   THAT CONSISTED MERELY OF GOING TO MR. BRYANT AND SAYING, 'WILL

3   YOU TELL ME, THAT YOU CREATED THIS WHEN YOU WEREN'T WITH

4   MATTEL'?

5   A    I WAS SATISFIED WHEN WE GOT CONFIRMATION BACK FROM

6   VICTORIA O'CONNOR THAT HIS LAWYER, CARTER BRYANT'S LAWYER,

7   AFTER INVESTIGATION, HAD TESTIFIED -- HAD SENT CONFIRMATION

8   THAT HE HAD DONE THIS.

9            FURTHERMORE, IF YOU LOOK AT CARTER BRYANT'S CONTRACT

10   WITH US --

11            MR. PRICE:   YOUR HONOR, MOVE TO STRIKE NOW AS

12   NONRESPONSIVE.

13            THE COURT:   I'LL STRIKE THAT.

14            RESTATE THE QUESTION -- LET THE COURT REPORTER REREAD

15   THE QUESTION.

16            MR. PRICE:   YES.

17            (WHEREUPON, THE LAST QUESTION WAS READ

18             BACK BY THE COURT REPORTER.)

19            THE COURT:   COUNSEL, REPHRASE THE QUESTION.

20            PERHAPS THE CONFUSION WAS IN THE LENGTH OF THE --

21   IT'S A COMPLICATED QUESTION.

22            THE WITNESS:   I WAS GOING TO ASK THAT.   THANKS.

23            THE COURT:   FAIR ENOUGH.

24            REPHRASE.

25   / / /

10:02
10:02
10:02
10:02
10:03
10:03

EXHIBIT PAGE

EXHIBIT 38
PAGE 996.1

FRIDAY, JUNE 6, 2008                          TRIAL DAY 9, MORNING SESSION

1695

BY MR. PRICE:

1 Q    MR. LARIAN, AS CEO, TRYING TO INVESTIGATE WHETHER SOMEONE

3 SAID THE TRUTH --

4 A    YES.

5 Q    -- WOULD YOU BE SATISFIED WITH AN INVESTIGATION THAT

6 CONSISTED OF NO MORE THAN SOMEONE ELSE GOING TO THAT PERSON AND

7 SAYING, 'DID YOU SAY THE TRUTH?'

8       MR. NOLAN:  OBJECTION.  ASSUMES FACTS NOT IN

9 EVIDENCE.  IT'S ALSO ARGUMENTATIVE.

10       THE COURT:  REPHRASE THAT QUESTION.

11       SUSTAINED.

12 BY MR. PRICE:

13 Q    MR. LARIAN, YOU TOLD US THAT YOU WERE SEEKING THE TRUTH;

14 CORRECT?

15 A    YES, I DID.

16 Q    SEEKING THE TRUTH ABOUT WHETHER OR NOT MR. BRYANT TOLD YOU

17 SOMETHING WAS TRUE; CORRECT?

18 A    I WANTED TO MAKE SURE THAT IF CARTER BRYANT SAID HE DID DO

19 THE ORIGINAL DRAWINGS IN 1998 IN MISSOURI, THAT THAT WAS A TRUE

20 STORY.  THAT'S WHAT I WANTED TO KNOW, AND I GOT SATISFACTION

21 FOR THAT.

22 Q    AND IT'S FAIR TO SAY YOU WOULD NOT HAVE BEEN SATISFIED

23 WITH AN INVESTIGATION THAT CONSISTED OF SOMEONE ELSE GOING TO

24 MR. BRYANT AND SAYING, 'WILL YOU TELL ME THE STORY?'

25       MR. NOLAN:  OBJECTION, YOUR HONOR.  ASSUMES FACTS NOT

10:03

10:04

10:04

10:04

10:04

EXHIBIT PAGE

EXHIBIT _____ 38

PAGE _____ 494.2

FRIDAY, JUNE 6, 2008                    TRIAL DAY 9, MORNING SESSION

1696

1    IN EVIDENCE; ARGUMENTATIVE.

2            **THE COURT:**  IT'S A HYPOTHETICAL.

3            OVERRULED.

4            **THE WITNESS:**  I DON'T KNOW HOW TO ANSWER THAT

5    QUESTION.                                                    10:04

6            I ASKED VICTORIA O'CONNOR TO MAKE SURE THAT --

7            **MR. PRICE:**  MOVE TO STRIKE AS NONRESPONSIVE.

8            **THE COURT:**  IT'S STRICKEN.

9            MAKE IT CLEAR THAT IT'S A HYPOTHETICAL, COUNSEL.

10   **BY MR. PRICE:**                                             10:05

11   Q    WE HAVEN'T HAD YOUR ATTORNEY HERE YET TO TESTIFY, SO I

12   NEED TO ASK YOU TO ASSUME THE FOLLOWING, WHETHER YOU WOULD BE

13   SATISFIED WITH THE FOLLOWING TYPE OF INVESTIGATION:

14           WOULD YOU BE SATISFIED WITH AN INVESTIGATION FROM

15   MR. BRYANT'S ATTORNEY SIMPLY REPORTING BACK TO YOUR ATTORNEY,  10:05

16   'HE TOLD ME THE SAME THING'?

17   A    AGAIN, I WAS NOT PART OF THAT CONVERSATION.

18           IF MY ATTORNEY AND HIS ATTORNEY, AS OFFICERS OF THE

19   COURT, CAME BACK IN WRITING AND SAID THAT THEY HAD

20   INVESTIGATED -- HIS ATTORNEY HAS INVESTIGATED AND HIS STORY IS  10:05

21   TRUE, I BELIEVE THAT.

22   Q    THAT WASN'T MY QUESTION.

23           I'M TALKING ABOUT THE TYPE OF INVESTIGATION.

24           YOU WERE TRYING TO GET TO THE TRUTH; RIGHT?

25   A    I DID.                                                   10:05

EXHIBIT _38_

EXHIBIT
PAGE

PAGE_____  _496.3_

FRIDAY, JUNE 6, 2008                      TRIAL DAY 9, MORNING SESSION

1697

1   Q    SO IN TRYING TO GET TO THE TRUTH, WOULD YOU BE SATISFIED

2   WITH SIMPLY A REPRESENTATION FROM MR. BRYANT'S ATTORNEY THAT

3   SHE ASKED MR. BRYANT AND HE TOLD HER THE SAME THING?  WOULD YOU

4   BE SATISFIED WITH THAT INVESTIGATION, TO TRY TO FIND THE TRUTH?

5   A    I DON'T KNOW IF -- I WASN'T THERE, SO I DON'T KNOW IF SHE        10:06

6   JUST CALLED HIM AND ASKED HIM, 'IS THIS TRUE OR NOT,' OR SHE

7   WENT BEYOND THAT.  I DON'T KNOW.  I THINK YOU SHOULD GET HER ON

8   THE STAND AND ASK HER.

9           THE COURT:  MR. LARIAN, HE'S NOT ASKING YOU ABOUT

10  WHAT ACTUALLY HAPPENED, BUT JUST HYPOTHETICALLY, TRYING TO FIND      10:06

11  OUT WHAT TYPE OF INVESTIGATION YOU WOULD BE SATISFIED WITH.

12          THE WITNESS:  IF I WAS HIS ATTORNEY, CARTER BRYANT'S

13  ATTORNEY?  IS THAT WHAT YOU'RE ASKING?

14  BY MR. PRICE:

15  Q    NO.  I'M ASKING YOU WHAT WOULD SATISFY YOU.  IF YOU WERE        10:06

16  REALLY LOOKING FOR THE TRUTH, WOULD YOU BE SATISFIED IF ALL

17  THAT THE INVESTIGATION CONSISTED OF WAS JUST MR. BRYANT'S

18  ATTORNEY ASKING HIM THE SAME QUESTION AND GETTING THE SAME

19  ANSWER?

20  A    BEING THROUGH THIS CASE NOW, I HOPE I ASSUME THAT HE WOULD      10:06

21  ASK, 'DID YOU DO THIS IN 1998?'  AND HE WOULD SAY 'YES.'  'DO

22  YOU HAVE PROOF OF IT?'  HE WOULD SAY 'YES.  LOOK AT THE

23  SEVENTEEN MAGAZINE.  LOOK AT THE PICTURES OF PARIS BLUE.  THIS

24  WAS IN AUGUST 1998, AND THOSE WERE INSPIRATIONS FOR MY

25  DRAWINGS.'

EXHIBIT 38
PAGE 496.4

10:07

EXHIBIT
PAGE
38
496.4

FRIDAY, JUNE 6, 2008

TRIAL DAY 9, MORNING SESSION

1    A     THOSE WERE THE DRAWINGS THAT HE SHOWED US.  THE BRATZ

2    DOLLS DID NOT LOOK LIKE THEM.

3          MR. PRICE:  MOVE TO STRIKE EVERYTHING AFTER "THOSE

4    WERE THE DRAWINGS HE SHOWED US."

5          THE COURT:  OVERRULED.                                10:1:

6    BY MR. PRICE:

7    Q     AND YOU KNEW AT THAT POINT HE WAS A MATTEL EMPLOYEE.

8    A     YES, I DID KNOW.  WHEN HE CAME TO US -- WHEN HE CAME TO MY

9    OFFICE ON SEPTEMBER 1ST, HE TOLD ME THAT HE WAS A MATTEL

10   EMPLOYEE AT THE TIME, THAT'S CORRECT.                       10:1:

11   Q     SO SITTING THERE, YOU KNEW THAT THIS MATTEL EMPLOYEE WAS

12   SITTING THERE PITCHING YOU A DOLL IDEA?

13   A     YES, HE WAS PITCHING DRAWINGS FOR A DOLL IDEA, THAT'S

14   CORRECT.

15   Q     AND YOU KNEW THAT IF HE HAD COME UP WITH THESE DRAWINGS AT   10:1:

16   THE TIME HE WAS A MATTEL EMPLOYEE, THEY BELONGED TO MATTEL.

17   A     THESE DRAWINGS, AGAIN, IF HE HAD DONE THEM IN 1998 AND

18   THEN LATER ON HAD WORKED ON THEM, DIDN'T BELONG TO MATTEL.

19         MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

20         THE COURT:  IT'S STRICKEN.                            10:1:

21         ANSWER THE QUESTION.

22         MR. PRICE:  DO YOU WANT ME TO REPEAT THE QUESTION?

23         THE COURT:  LET THE COURT REPORTER DO SO.

24         (WHEREUPON, THE LAST QUESTION WAS READ

25         BACK BY THE COURT REPORTER.)  EXHIBIT 38
                                        PAGE 446.5

FRIDAY  JUNE 6  2008

1        **THE WITNESS:**  YES.  I WAS NOT INTERESTED IN THEM IF

2   HE HAD DONE THEM WHEN HE WAS WORKING AT MATTEL.  THAT'S

3   CORRECT.

4        **MR. PRICE:**  MOVE TO STRIKE EVERYTHING AFTER "YES,"

5   YOUR HONOR.                                                    10:1⌐

6        **THE COURT:**  OVERRULED.

7   BY MR. PRICE:

8   Q    SO YOU KNEW THAT ONE OF THE CRITICAL QUESTIONS WAS, DID

9   MATTEL OWN THESE DRAWINGS?

10  A    YES.                                                      10:14

11  Q    ASSUMING THAT MR. BRYANT AT THAT MEETING TOLD YOU, 'OH, I

12  DID THEM IN 1998, IN THIS TIME FRAME WHEN I WASN'T AT MATTEL,'

13  YOU WOULD WANT TO INVESTIGATE THAT CRITICAL QUESTION; CORRECT?

14  A    FIRST OF ALL, IT WASN'T AN ASSUMPTION.  HE DID SAY THAT HE

15  DID THEM IN 1998 WHEN HE WAS IN MISSOURI.  AND, YES, WE DID     10:14

16  WANT TO INVESTIGATE THAT.  AND WE DID THAT.

17  Q    AND WHAT YOU'D WANT TO DO IS SAY, BASICALLY, 'PROVE IT TO

18  ME'?

19  A    TELL HIM TO PROVE IT TO ME, DIRECTLY TO ME?  NO, I DID NOT

20  ASK THAT, TO PROVE IT TO ME.  I GAVE DIRECTION TO MY HEAD OF    10:15

21  LICENSING TO MAKE SURE THAT WHAT HE WAS SAYING WAS THE TRUTH.

22  Q    WHOEVER YOU TOLD TO LOOK INTO IT, THE GOAL WAS TO TRY TO

23  PROVE TO YOU, THE CEO OF MGA, THAT THESE DRAWINGS DIDN'T BELONG

24  TO MATTEL; CORRECT?            EXHIBIT 38

25  A    CORRECT.                  PAGE 496.6                       10:15

FRIDAY  JUNE 6  2008

1704

1    Q    AND IT'S FAIR TO SAY THAT YOU WOULDN'T BE SATISFIED IF THE

2    ONLY PROOF WAS THAT MR. BRYANT TOLD HIS LAWYER THE SAME THING

3    HE TOLD YOU; CORRECT?

4            MR. NOLAN:  OBJECTION.  ASKED AND ANSWERED.

5            THE COURT:  IT HAS BEEN ASKED AND ANSWERED, COUNSEL.     10:15

6    BY MR. PRICE:

7    Q    SO YOU TOLD US ABOUT WHAT, THEN, THE CERTAIN INVESTIGATION

8    YOU MIGHT DO IF YOU HAD BEEN IN MR. BRYANT'S LAWYER'S SHOES;

9    CORRECT.

10   A    I'M NOT A LAWYER.  BUT YOU'RE ASKING FOR A HYPOTHETICAL      10:16

11   QUESTION, AND I ANSWERED IT.  AND I DON'T LIKE TO BE A LAWYER.

12   Q    IT'S TRUE, IS IT NOT, THAT IN TRYING TO FIND THE ANSWER TO

13   THIS CRITICAL QUESTION, YOU HAVE NO FIRST-HAND KNOWLEDGE WHAT

14   MR. BRYANT'S LAWYER DID TO TRY TO, QUOTE, "PROVE THE STATEMENT

15   OF MR. BRYANT THAT THESE DIDN'T BELONG TO MATTEL"?              10:16

16           MR. NOLAN:  AGAIN, YOUR HONOR, ASKED AND ANSWERED.

17           THE COURT:  OVERRULED.

18           YOU MAY ANSWER.

19           THE WITNESS:  THAT IS TRUE.  I DON'T HAVE FIRST-HAND

20   KNOWLEDGE OF WHAT HIS LAWYER DID TO MAKE SURE THAT WHAT HE WAS   10:16

21   SAYING IS TRUE OR NOT.

22   BY MR. PRICE:

23   Q    YOU LEFT YOURSELF INTENTIONALLY IN THE DARK, DIDN'T YOU?

24   A    NO, I DID NOT.

25   Q    WELL, DID YOU GO TO EITHER MR. ROSENBAUM OR MS. O'CONNOR,   10:16

EXHIBIT ___35___

FRIDAY, JUNE 6, 2008                      496.7    TRIAL DAY 9, MORNING SESSION

1   OR EVEN MR. BRYANT'S LAWYER, AND SAY, 'I WANT YOU TO TELL ME,

2   TO PROVE TO ME, THAT THESE DON'T BELONG TO MATTEL'?

3   A    I PERSONALLY DID NOT DO THAT.  I DELEGATED THAT -- WE HAD

4   EMPLOYEES.  I DELEGATED THAT TO AN EMPLOYEE WHOSE JOB WAS TO DO

5   THIS.  AND SHE DID.                                         10:17

6   Q    SO YOU'RE SAYING THAT MS. O'CONNOR WAS GIVEN PROOF OF A

7   STORY THAT THESE DRAWINGS WERE NOT DONE WHILE MR. BRYANT WAS AT

8   MATTEL?

9   A    MS. O'CONNOR WENT TO DAVID ROSENBAUM, WHO WENT TO

10  ANNE WANG, WHO WAS CARTER BRYANT'S LAWYER; AND ACCORDING TO AN   10:17

11  E-MAIL THAT I HAVE SEEN, HIS LAWYER CAME BACK AND SAID THAT SHE

12  HAS PROOF, SHE KNOWS IT WAS DONE IN 1998 WHEN CARTER SAID THAT,

13  THE INITIAL DRAWINGS.

14  Q    SO, OF COURSE, SINCE THIS IS A CRITICAL QUESTION AS TO

15  WHETHER OR NOT THESE DRAWINGS BELONGED TO MATTEL, YOUR RESPONSE   10:17

16  WAS, 'WHAT PROOF ARE YOU TALKING ABOUT BESIDES MR. BRYANT'S

17  WORD?'  THAT WAS YOUR RESPONSE; CORRECT?

18  A    I DID NOT ASK THAT SPECIFIC QUESTION THAT YOU JUST ASKED.

19  I DID NOT.

20  Q    INSTEAD, YOU WENT FORWARD TO CREATE DOLLS BASED ON THESE   10:18

21  DRAWINGS THAT A MATTEL EMPLOYEE PRESENTED TO YOU IN SEPTEMBER

22  OF 2000.

23  A    FIRST WHAT WE DID IS, WE ENTERED INTO A CONTRACT WITH

24  CARTER BRYANT ON OCTOBER 4, 2000, AND THEN WE PROCEEDED TO

25  START DEVELOPMENT OF THE BRATZ DOLLS, WHAT BECAME BRATZ DOLLS   10:18

EXHIBIT ___25___

1706

1    LATER ON.

2    Q    IT'S FAIR TO SAY, WITHOUT GETTING INTO NUMBERS, THE BRATZ

3    DOLLS, THE BRATZ MERCHANDISE, ARE A SIGNIFICANT PERCENTAGE OF

4    MGA'S BUSINESS?

5    A    YES.   OVER THE YEARS, THEY HAVE BECOME SIGNIFICANT.   THEY    10:18

6    WERE NOT SIGNIFICANT IN 2001 WHEN THEY WERE LAUNCHED, BUT THEY

7    HAVE BEEN OUT NOW FOR SEVEN YEARS, AND THEY HAVE BECOME

8    SIGNIFICANT.

9    Q    IN FACT, YOU, EVEN AS EARLY AS OCTOBER OF 2000, PREDICTED

10   THAT JUST FOR THE FIRST YEAR, YOU WERE GOING TO SELL 25 MILLION    10:19

11   OF THESE DOLLS?

12   A    YES, I DID PREDICT THAT, AS I DID WITH A LOT OF OTHER TOYS

13   THAT WERE NOT SUCCESSFUL.

14   Q    BUT SOMETIMES YOU'RE RIGHT; SOMETIMES YOU'RE WRONG.

15   A    IN THE TOY BUSINESS, THAT'S A FACT.    10:19

16   Q    WHEN YOU MAKE A PREDICTION, THOUGH, YOU'RE DOING THE BEST

17   YOU CAN; RIGHT?

18   A    I'M SORRY?

19   Q    WHEN YOU MAKE THESE PREDICTIONS, YOU'RE DOING THE BEST YOU

20   CAN.

21   A    YES.    10:19

22   Q    AND YOU PUT RESOURCES INTO CERTAIN DOLL LINES BASED UPON

23   YOUR PREDICTIONS.

24   A    WE SURE DID PUT A LOT OF RESOURCES IN MAKING BRATZ DOLLS,

25   WHAT THEY BECAME, BY NOW.    10:19

EXHIBIT    38

PAGE    498

1756

1       CERTIFICATE

2

3    I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
     STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
4    THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
     ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
5    CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
     THE UNITED STATES.

6

7    _____          6-8-08
                                                _____
8    THERESA A. LANZA, RPR, CSR                      DATE
     OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT ___38___

PAGE ___499___

EXHIBIT PAGE

# EXHIBIT 39

3881

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                EASTERN DIVISION

4                   - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                   - - -

7   MATTEL, INC.,                )
                                 )
8                  PLAINTIFF,    )
                                 )
9         VS.                    )   NO. CV 04-09049
                                 )
10  MGA ENTERTAINMENT, INC., ET. AL.,  )
                                 )
11                 DEFENDANTS.   )   TRIAL DAY 19
    _____)   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,    )   PAGES 3881-4021
    _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17             WEDNESDAY, JULY 2, 2008

18                  8:48 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
        FEDERAL OFFICIAL COURT REPORTER
24         3470 12TH STREET, RM. 134
        RIVERSIDE, CALIFORNIA  92501
25            951-274-0844
            WWW.THERESALANZA.COM

CERTIFIED COPY


EXHIBIT PAGE 500

3902

1    HAPPENING.

2          THE COURT:  I WANT TO HEAR HIS TESTIMONY.

3          MS. AGUIAR:  AS IF WE'RE DOING, FOR LACK OF A BETTER

4    WORD, A DRY RUN?

5          THE COURT:  YES.

6          MS. AGUIAR:  LIKE, JUST GO THROUGH IT AND 'WHAT WOULD

7    YOU SAY,' RATHER THAN MORE OF LIKE A VOIR DIRE, LIKE 'WHAT

8    WOULD YOU SAY, WHAT DO YOU THINK ABOUT THIS' --

9          THE COURT:  WHAT I MAY DO, FOR THE COURT'S

10   CONVENIENCE, IS BREAK IT DOWN INTO THE FOUR CATEGORIES THAT          09:15

11   YOU'VE SUGGESTED HERE.  WE'VE COME UP WITH THE CREATIVE DESIGN

12   PROCESS FOR THE DRAWINGS; THE COMPARATIVE INFLUENCE PROCESS;

13   THE COLORIZATION, WHICH ADDS BOTH THE COLORIZATION OF THE

14   DRAWINGS AND THE FASHION DRAWINGS; AND THE SCULPTING.  AND IN

15   EACH OF THOSE FOUR AREAS, I'D LIKE TO HEAR HIS TESTIMONY AS          09:15

16   ELICITED FROM YOU, AND I'D LIKE TO HEAR THE CROSS-EXAMINATION;

17   AND THEN THE COURT WILL ASSESS WHETHER OR NOT THIS EXPERT IS

18   REALLY QUALIFIED, AND THE COURT WILL PERFORM ITS GATEKEEPING

19   FUNCTION.

20         MS. AGUIAR:  OKAY.  THEN WE MAY NEED THE BETTER PART          09:15

21   OF 12:30 TO 1:30.

22         THE COURT:  ALL RIGHT.  THEN LET'S START AT 12:15;

23   HAVE HIM READY TO GO AT 12:15.

24         MS. AGUIAR:  I WILL.

25         THE COURT:  VERY WELL.                                         09:16

EXHIBIT 39
PAGE 501

1          THE WAIVER ISSUE.  I'LL TELL YOU WHERE I AM ON THIS

2    AT THIS POINT.

3          I THINK IT'S PRETTY CLEAR TO THE COURT THAT THE

4    ROSENBAUM E-MAIL WAS A PRIVILEGED COMMUNICATION.  THERE IS NO

5    QUESTION THAT IT CONTAINED ADVICE FROM AN ATTORNEY TO A CLIENT.          09:17

6    IT MADE A RECOMMENDATION.  IT DID SET FORTH FACTUAL STATEMENTS.

7    THE FACTUAL STATEMENTS WERE IN THE CONTEXT OF THE E-MAIL, THE

8    PREDICATE FOR THE RECOMMENDATION; SO I THINK THE FACTUAL

9    STATEMENT IS INEXTRICABLY INTERTWINED WITH THE ADVICE.

10          THE ADVICE-OF-COUNSEL DEFENSE HAS NOT BEEN ASSERTED,          09:17

11   OR HAS BEEN OTHERWISE DEALT WITH.  BUT I THINK THAT'S A BIT OF

12   A RED HERRING IN THIS CASE, BECAUSE I DON'T THINK IT'S

13   NECESSARY TO ASSERT AN ADVICE-OF-COUNSEL DEFENSE TO WAIVE

14   ATTORNEY-CLIENT PRIVILEGE BY PRODUCTION OF A PRIVILEGED

15   COMMUNICATION.          09:17

16          BUT WHERE I THINK MGA HAS A FAIRLY CONVINCING

17   ARGUMENT GOES TO THE SCOPE OF THE WAIVER, AND PARTICULARLY THIS

18   IN RE: SEAGATE TECH CASE THAT THEY CITE ON PAGE 19 OF THEIR

19   OPPOSITION, WHICH I DON'T REALLY HAVE A CLEAR RESPONSE FROM

20   MATTEL.  SO I WANT TO BEGIN THIS BY GIVING MATTEL AN          09:18

21   OPPORTUNITY TO RESPOND TO BOTH THE ANALYSIS AND THE CONCLUSION

22   OF THE SEAGATE CASE.  AND SEPARATE AND APART FROM THE MERITS OF

23   THIS ISSUE, THE COURT IS SOMEWHAT CONCERNED ABOUT THE TIMING OF

24   THE MOTION SEEKING THE WAIVER.  I'D LIKE THAT ISSUE ADDRESSED

25   AS WELL.          09:18

EXHIBIT 39
PAGE 504

```
 1            SO I'M GOING TO INVITE MATTEL TO PROCEED FIRST ON

 2   THIS.  I GUESS THE FIRST TWO ISSUES ARE NOT NECESSARY TO

 3   ADDRESS, BECAUSE I DO THINK THAT THIS WAS A PRIVILEGED

 4   COMMUNICATION; BUT I DO SEE THE COURT'S DISTINCTION IN SEAGATE,

 5   THE FEDERAL CIRCUIT'S DISTINCTION, AND I SEE HOW IT MIGHT APPLY   09:18

 6   TO THIS PARTICULAR COMMUNICATION.  AND I'M ALSO CONCERNED ABOUT

 7   THE TIMING.

 8            WHO FROM MATTEL -- I DON'T SEE ANYONE JUMPING UP.

 9            MR. PROCTOR:  I'M TRYING TO REFRESH MYSELF ON THE

10   SEAGATE CASE, YOUR HONOR.                                        09:19

11            THE COURT:  I'LL READ THE QUOTE FROM SEAGATE THAT MGA

12   RELIES UPON.  "WHEREAS OPINION COUNSEL SERVES TO PROVIDE AN

13   OBJECTIVE ASSESSMENT FOR MAKING INFORMED BUSINESS DECISIONS,

14   TRIAL COUNSEL FOCUSES ON LITIGATION STRATEGY AND EVALUATES THE

15   MOST SUCCESSFUL MANNER IN PRESENTING A CASE TO A JUDICIAL        09:19

16   DECISION MAKER AND TRIAL COUNSEL ENGAGED IN AN ADVERSARIAL

17   PROCESS."

18            THE COURT DISTINGUISHES BETWEEN, ESSENTIALLY, THE

19   ADVICE BEING OFFERED IN A BUSINESS CONTEXT.

20            HERE, THE ADVICE BEING OFFERED IS CLEARLY RELATED TO    09:19

21   TIME LIMITATIONS ON PATENT LAWS.  AND I DON'T BUY THIS

22   DISTINCTION THAT -- THIS DISSECTION THAT MGA TRIES TO SAY,

23   'WELL, THE LINE BEFORE THAT IS UNRELATED FACTUAL ASSERTION FROM

24   THE ADVICE THAT'S GIVEN.'  IT'S CLEARLY GIVEN -- THE ADVICE IS

25   GIVEN RELYING ON THAT FACTUAL OR CONCLUSION OF FACT THAT THE     09:20
```

EXHIBIT 29
PAGE 563

4021

1          **MS. AGUIAR:**  BUT THERE WOULD BE LESS THAN ASKING

2     EVERY SINGLE QUESTION, I WOULD JUST ASK HIM TO EXPLAIN TO YOU

3     HIS TESTIMONY, AND THEN MR. COREY WOULD BE ABLE TO FOLLOW UP ON

4     THAT.

5          **THE COURT:**  VERY WELL.                                    12:18

6          LET'S GET BACK TOGETHER IN ABOUT TEN OR 15 MINUTES.

7          (WHEREUPON A BRIEF RECESS WAS HELD.)

8          (MORNING SESSION CONCLUDED. )

9

10

11

12

13

14

15                         CERTIFICATE

16

17     I HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED
       STATES CODE, THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF
18     THE STENOGRAPHICALLY RECORDED PROCEEDINGS HELD IN THE
       ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN
19     CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF
       THE UNITED STATES.

20

21

22     THERESA A. LANZA, RPR, CSR                7-3-08
       OFFICIAL COURT REPORTER                     DATE

23

24

25

EXHIBIT 39
PAGE 504

WEDNESDAY, JULY 2, 2008                 TRIAL DAY 19, MORNING SESSION

4022

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                      ---

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                      ---

6    MATTEL, INC.,                :  PAGES 4022- 4201
                                  :
7           PLAINTIFF,            :
                                  :
8       VS.                       :  NO. ED CV04-09049-SGL
                                  :  [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,     :  CV04-9059 & CV05-2727]
     ET AL.,                      :
10                                :
            DEFENDANTS.           :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            WEDNESDAY, JULY 2, 2008

18             JURY TRIAL - DAY 19

19              AFTERNOON SESSION

20

21

22                          MARK SCHWEITZER, CSR, RPR, CRR
                            OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                            181-H ROYBAL FEDERAL BUILDING
24                          255 EAST TEMPLE STREET
                            LOS ANGELES, CALIFORNIA 90012
25                          (213) 663-3494

CERTIFIED COPY

EXHIBIT 39
PAGE 505

1  them in '99, then it's relevant to have an expert testify on

2  that, and it's relevant if the jury is going to be asked

3  about that, which they are.   It's in the verdict forms.

4          If there's no implication, and they find that the

5  drawings are essentially the same drawings, except that they

6  are colored in, then that doesn't translate to ownership.

7          THE COURT:   Right.

8          MS. AGUIAR:   Okay.   And then with regard to

9  sculpting, I think yes, it's true that this witness doesn't

10  know what happened between certain dates, but again, getting

11  back to the verdict form, just because we're almost getting

12  to that point and the parties have been amending it to

13  reflect how this case has been tried, they are asking this

14  jury whether Mr. Bryant created or directed someone else to

15  create these 3-D things.

16          So if the jury is going to have to decide, well,

17  was it him that did it or was it the sculptor, I think it's

18  pertinent to have a sculpting expert talk about the fact that

19  it's critical for the process, and what Mr. Bryant provided

20  could have resulted in 16 different sculpts, but it resulted

21  in this one because of the sculptor, not because of

22  Mr. Bryant.   What Mr. Corey read from a hearing that happened

23  before we had our first day of trial, as your Honor observed

24  earlier today, things change.

25          THE COURT:   Things change.   And no one should

EXHIBIT  39
PAGE  506

1   presume that any particular question is going to be asked of

2   the jury.  The Court will make that determination.

3          MS. AGUIAR:  Of course.  I just mean that both

4   sides --

5          THE COURT:  I just don't want Mattel to think they

6   have already figured out the verdict form.

7          MS. AGUIAR:  Thank you, your Honor.

8          THE COURT:  All right.  If there's nothing further,

9   the Court is prepared to rule on this motion and the motion

10  for waiver.

11         Okay.  Let me begin with the earlier motion that we

12  discussed, the motion regarding waiver.  The Court is going

13  to deny that motion.  I do believe that there was a waiver of

14  the privilege; however, I do not believe the scope extends as

15  far as Mattel is seeking.  However, having said that, if MGA

16  goes any further down this road at all, the Court will

17  revisit this ruling.

18         Regarding the motion to preclude the expert

19  witness, Mr. Robert Tonner, the Court grants that motion.

20  Putting aside the issue of the relevance of any of this, the

21  Court has a much more fundamental problem, after considering

22  the testimony of Mr. Robert Tonner.  And I will only --

23  certainly not to embarrass anybody, but I simply don't find

24  Mr. Tonner credible.  I find his testimony lacking in

25  credibility.  And I find it to be tailored testimony and not

EXHIBIT 39
PAGE 507

1   suitable for an expert witness.  And exercising its Daubert

2   required function, the Court precludes the testimony of

3   Mr. Tonner.

4          If parties would seek a further elaboration of the

5   Court's reasoning on this, the Court is happy to provide it.

6   I'm always reluctant to do so when one requires the Court to

7   comment on the character and credibility of the witness.

8   Based on the Court's assessments of the testimony that was

9   given here in response not only to counsel's questions but

10  the Court's questions, I simply don't find this witness to be

11  credible as an expert or in any other way.

12         So motion in limine to exclude Mr. Tonner's

13  testimony is granted.

14         MS. AGUIAR:  Just one clarification, your Honor.  I

15  don't know that it will become an issue, but Mattel has an

16  expert who essentially is very much along the same lines as

17  Mr. Tonner in terms of his -- I don't want to say they have

18  the same background, but they have similar comparisons that

19  they are drawing, very similar graphics, and the bar graphics

20  were drawn from their expert.  We tried to make the points we

21  were -- we think needed to be made.

22         So I don't think this is what you are saying, but

23  if we could have some guidance on whether this area of

24  testimony -- you seem to be saying apart from commenting on

25  Mr. Tonner himself, that this area of testimony is just

EXHIBIT 39
PAGE 508

4201

1

2

3

4

5

6                        C E R T I F I C A T E

7

8

9           I hereby certify that pursuant to Title 28,

10   Section 753 United States Code, the foregoing is a true and

11   correct transcript of the stenographically reported

12   proceedings in the above matter.

13           Certified on July 2, 2008.

14

15           _____

16           MARK SCHWEITZER, CSR, RPR, CRR
             Official Court Reporter
17           License No. 10514

18

19

20

21

22

23

24

25

EXHIBIT 39
PAGE ___ 589

# EXHIBIT 40

7446

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3                        - - -

 4      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 5                        - - -

 6   MATTEL, INC.,              :   PAGES 7446 - 7547
                                :
 7             PLAINTIFF,        :
                                :
 8      VS.                     :   NO. ED CV04-09049-SGL
                                :   [CONSOLIDATED WITH
 9   MGA ENTERTAINMENT, INC.,   :   CV04-9059 & CV05-2727]
     ET AL.,                    :
10                              :
               DEFENDANTS.      :
11   _____:

12

13

14

15         REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            THURSDAY, AUGUST 14, 2008

18             JURY TRIAL - DAY 35

19              AFTERNOON SESSION

20

21

22                           MARK SCHWEITZER, CSR, RPR, CRR
                             OFFICIAL COURT REPORTER
23                           UNITED STATES DISTRICT COURT
                             181-H ROYBAL FEDERAL BUILDING
24                           255 EAST TEMPLE STREET
                             LOS ANGELES, CALIFORNIA 90012
25                           (213) 663-3494
```

CERTIFIED COPY

EXHIBIT 40
PAGE 510

1          But just it seems a way of making it clear on the
2   record and for the jury what is at issue here.
3          MR. ZELLER:  You know, perhaps there's one way of
4   doing it, your Honor, is giving the jury a copy of the
5   verdict form in Phase 1-A and saying these are the works.  I
6   mean, those are the works that are at issue.  And those are
7   the works that any claim is being based on.
8          So we give them a copy of the verdict.  I suppose
9   we could put in the instruction and maybe not read or give
10  them an appendix or whatever is mechanically the easiest
11  thing just to give them the list.  They are going to, of
12  course, remember well, I'm sure, those drawings, having seen
13  them, and they will be made available to them again as well.
14         So I think it's -- frankly, to refresh them on here
15  is the universe of works that you decided upon in 1-A.  And
16  I, the Court, am instructing you that because they were
17  created while Carter Bryant was a Mattel employee, Mattel
18  owns them.  And proceeding from there.
19         THE COURT:  All right.  I appreciate your arguments
20  on that.  I'll try to figure out what's the best way to craft
21  that preliminary or introductory introduction, instruction.
22         MR. HANSEN:  Could I, just last on that?
23         THE COURT:  Sure.
24         MR. HANSEN:  I have to strongly disagree with the
25  notion that this is a mere formality.  Because what's

EXHIBIT  40
PAGE  511

1  happening here is that, as your Honor said back in the May --

2  I think it was May 23rd hearing, that in not allowing the

3  single extra drawing, the 17th drawing, that it would be

4  unfair in the equitable sense, not the ethical sense, to at

5  that late date allow that additional drawing to be added.

6          The unfairness here is, first of all, compounded

7  tenfold by the fact that had that happened with these at the

8  time, the issue regarding the authorship and the joint

9  authorship would have been clearly raised.  And we would have

10  had the opportunity at that time not to be even having these

11  waiver arguments right now.  Putting aside the fact that we

12  have never waived sole authorship of the sculpt.

13          What's happening is that we're in essence being

14  sued, if the sculpt comes in, on something that we own the

15  copyright on.  I personally believe that, having registered a

16  sculpt that Mr. Bryant has no argument to be an author for is

17  an improper registration with the copyright office.  But

18  that's another issue.  At this point we're not talking about

19  adding a couple of drawings.  This is a stack of --

20          THE COURT:  But this is what's changed.  And I know

21  this is frustrating.  I'm sure this accounts for a lot of

22  frustration that's been expressed by MGA and Mr. Larian since

23  the return of the verdict.  The landscape changes when the

24  jury finds, as they did, that contrary to the presumptive

25  position that we were in at the pretrial conference where the

EXHIBIT 40
PAGE 512

1    burden of proof for all of this rested on Mattel, we're no

2    longer there.

3           We're now in a world in which it's been

4    established, at least from a legal perspective, that all of

5    these drawings were done at a different time than what's

6    being alleged, that acts of fraud and conversion were

7    perpetrated to essentially steal these drawings.  And that's

8    the change.  That puts us in a different position, and they

9    have now actually been registered in the copyright office.

10          And to say that notwithstanding the fraud and the

11   conversion and the misrepresentations with respect to the

12   timing of the drawings, now that the jury is considering

13   copyright infringement, they must put blinders on and ignore

14   all of that and just look at the 16 drawings that were

15   undisputedly registered as of the time of the pretrial

16   conference, that seems to be fundamentally unfair.

17          MR. HANSEN:  The issue that I go to is

18   fundamentally unfair is that if you look at the transcript

19   from the 1-A trial, we attempted to put copyright ownership

20   at issue, and Mr. Zeller said he understood -- everyone

21   understood the straight up and down issue --

22          THE COURT:  We're not going back to that decision,

23   Counsel.  That water has left and gone down river and stream

24   a long time ago.

25          MR. HANSEN:  You understand our position, I think,

EXHIBIT ___46___

PAGE ___513___

7547

1  idea for the characters.  That question related to the state

2  law claims.  The jury instruction that we are proposing

3  relates to the characters as depicted in the drawings, which

4  is a separate copyright issue.

5          THE COURT:  I do understand that distinction,

6  Counsel.

7          MR. PROCTOR:  Thank you.

8          THE COURT:  All right.  Court is in recess.

9

10

11

12

13          C E R T I F I C A T E

14

15

16          I hereby certify that pursuant to Title 28,

17  Section 753 United States Code, the foregoing is a true and

18  correct transcript of the stenographically reported

19  proceedings in the above matter.

20          Certified on August 14, 2008.

21

22

23  MARK SCHWEITZER, CSR, RPR, CRR
    Official Court Reporter
24  License No. 10514

25

EXHIBIT ___40___
PAGE ___514___

# EXHIBIT 41

6745

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION

4                      - - -

5      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                      - - -

7   MATTEL, INC.,                )
                                 )
8                 Plaintiff,     )
                                 )
9            vs.                 )  No. CV 04-09049
                                 )
10  MGA ENTERTAINMENT, INC., ET. AL., )  Trial Day 33
                                 )  Morning Session
11                Defendants.    )  Pages 6745-6855
                                 )
12  AND CONSOLIDATED ACTIONS,    )
    ─────────────────────────────)

13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17            TUESDAY, AUGUST 12, 2008

18                  8:23 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24           3470 12th Street, Rm. 134
          Riverside, California  92501
25              951-274-0844
          WWW.THERESALANZA.COM

**CERTIFIED COPY**

EXHIBIT  4

PAGE  515

1   Mr. Corey is talking about the methodology, but I think this is

2   actually to MGA's benefit.

3          The last thing that you want to have is to call a

4   witness, lay the foundation, and have an objection sustaining

5   it and have that witness turn around and be sent back out the

6   door.  It's just to flesh out any evidentiary objections

7   outside the presence of the jury.  It's not so much a Daubert

8   hearing proffer as it is a relevancy foundational issue.

9          **MR. ROTH:**  Perhaps if we could get some indication

10  from Mattel as to what the concerns are, I could better address

11  the issue.

12         **THE COURT:**  Why don't you discuss that amongst

13  yourselves, and then if you still have this concern, Mr. Roth,

14  I'll invite you to take it up during the break.

15         **MR. ROTH:**  Thank you, Your Honor.

16         **THE COURT:**  We're missing one juror.  As soon as this

17  one juror comes in, I'll be bringing the jury in, and we'll go

18  forward.

19         Court is in brief recess.

20         (Whereupon, a brief recess was held.)

21         (Whereupon, jurors enter courtroom.)

22         **MR. NOLAN:**  Your Honor, we have Margaret Leahy on the

23  stand.

24         **THE COURT:**  You may.

25         I just want to take up a very brief issue with the

1     jury.

2            Mr. Nichols, I've received word concerning the

3     funeral that you need to attend on Thursday; and that, of

4     course, is most important and we'll certainly take Thursday

5     afternoon off to attend to that.

6            That creates a bit of an issue in terms of

7     scheduling, in terms of my promise that we'd have things

8     wrapped up by Friday, because we were somewhat depending on

9     that Thursday afternoon to wrap the case up; so we're going to

10     need an extra half a day someplace.

11            One alternative is, the Court has Monday reserved for

12     its motions, but I understand that some of you work on Monday,

13     or have made commitments on Monday.

14            Does anybody have a commitment on Monday?

15            One option would be for the Court to continue its

16     calendar on Monday.

17            There's a criminal trial that I have to get underway

18     on Tuesday.  I have to pick a jury in that on Tuesday.

19            Another option is, I could pick that jury, send them

20     home for a day, and we could wrap up on Wednesday next.

21            So those are the two options the Court is

22     considering.  I want to accommodate things like a funeral,

23     certainly.

24            So we won't have court Thursday afternoon.  I believe

25     you were contacted yesterday that we are going to try to really

EXHIBIT ___ 41

PAGE ___ 517

Tuesday, August 12, 2008         Trial Day 33, Morning Session

1   be industrious this week; go to 5:30 and only take an hour for

2   lunch.  We really need to wrap this up because of our schedule.

3   But then, certainly, if things come up that you need to bring

4   to the Court's attention, let me know, because life goes on as

5   well.

6          All right.  Mr. Nolan, you may call Ms. Leahy.

7          **MR. NOLAN:**  Your Honor, may I approach with

8   Exhibit 1136, the gray sculpt, and have it on the witness

9   stand?

10         **THE COURT:**  You may.

11              **DIRECT EXAMINATION (continued)**

12  BY MR. NOLAN:

13  Q    I want to go back to where we left off on Friday

14  afternoon.  I think some of the exhibits have been put in front

15  of you, and it might be easy for you to take them out of the

16  boxes as we talk about them.

17         First of all, the gray sculpt, we've referred to that

18  as 1136.

19         Would you mind taking that out of the exhibit bag.

20         And this is the first exploratory sculpt, your first

21  sculpt; is that correct?

22         **MR. PRICE:**  Object to the characterization of

23  "exploratory."

24         **THE COURT:**  Rephrase, counsel.

25  / / /

EXHIBIT _____ 41

PAGE _____ 515

6855

1
2
3                              CERTIFICATE
4
5    I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
6    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
7    conformance with the regulations of the judicial conference of
     the united states.
8
9    _____                _8-30-08___
     THERESA A. LANZA, CSR, RPR                      Date
10   FEDERAL Official COURT Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24   EXHIBIT ___41___
25
     PAGE _____519_____

Tuesday, August 12, 2008              Trial Day 33, Morning Session

# EXHIBIT 42

8172

1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4      HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    - - -

6   MATTEL, INC.,                    :   PAGES 8172 - 8274
                                     :
7            PLAINTIFF,              :
                                     :
8       VS.                          :   NO. ED CV04-09049-SGL
                                     :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
    ET AL.,                          :
10                                   :
            DEFENDANTS.              :
11  _____

12

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16            RIVERSIDE, CALIFORNIA

17        WEDNESDAY, AUGUST 20, 2008

18            JURY TRIAL - DAY 37

19            AFTERNOON SESSION

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
23   CERTIFIED            UNITED STATES DISTRICT COURT
                          181-H ROYBAL FEDERAL BUILDING
24   COPY                 255 EAST TEMPLE STREET
                          LOS ANGELES, CALIFORNIA 90012
25                        (213) 663-3494

EXHIBIT ___42___

PAGE ___520___

8270

1    deliberate.

2            So just let us know what the timing is, and you are

3    excused until noon.  Of course, do not start deliberating

4    until noon, until you are all together.  I'm going to bring

5    in the bailiff at this time, who will now take charge of you.

6    Go ahead and --

7            Mr. Holmes, will you take care of bringing the

8    notes up to the jury room?

9            THE CLERK:  Yes, I will.

10           THE COURT:  Why don't you leave the notes right on

11   the chair that you're in right now.  Mr. Holmes will secure

12   them, and they will be waiting for you up in the jury

13   deliberation room noon tomorrow.

14           All rise for the jury.

15           **(WHEREUPON THE JURY WITHDRAWS.)**

16           THE COURT:  Counsel, I understand a stipulation has

17   been reached concerning the exhibits in this case.  Is that

18   accurate?

19           MR. ZELLER:  Yes, your Honor.  I believe that we

20   have worked out -- the one remaining set that I understood

21   really of exhibits that had not been agreed upon were the

22   Hong Kong exhibits.  I believe that we did reach an agreement

23   on that.  I believe that everything should be in order on

24   that.  We were redacting them this afternoon in accordance

25   with the parties' agreement.  But I can double-check to make

EXHIBIT ___42___

PAGE ___521___

1    sure everything is in order.  But I believe it is at this

2    juncture.

3              THE COURT:  Very well.  Why don't we do this.  What

4    I'd like to do is meet with counsel tomorrow morning, say, at

5    8:45 before I start the other trial at 9:00 tomorrow morning.

6    And I'll just get that on the record that all exhibits have

7    been agreed to.  If there are still any outstanding disputes,

8    the Court with resolve them at that time.

9              The jury is not going to be convening until noon,

10   and that will give us the morning hours to make sure that

11   we've collected everything here and it's up in the courtroom

12   and the jury room and that there is no issue.  So that once

13   the jury comes in, everything is completely laid out for

14   them.

15             MR. ZELLER:  Thank you.

16             THE COURT:  Anything further from Mattel?

17             MR. ZELLER:  Yes, your Honor.  I had some requests

18   or some guidance that people would like on the -- really for

19   the technicians.  I understand that they will be breaking

20   down equipment.  They will be doing it today.  It may be that

21   they have to do some of it tomorrow and wanted to make sure

22   that was okay with the Court.  Obviously we now have the

23   morning.  So presumably it should all be done.

24             THE COURT:  That's fine.  I just don't want any

25   interference with the other trial we have going on.  We have

EXHIBIT ___42___

PAGE ___522___

8272



```
 1   a very important criminal trial that's beginning at 9:00.
 2   And I don't want to have any disturbances in the courtroom
 3   during that trial.
 4          MR. ZELLER:   If they are unable to complete it
 5   today, can we ask that perhaps it be done over noontime
 6   tomorrow?
 7          THE COURT:   That makes a lot of sense.   Noon
 8   tomorrow will be fine.
 9          MR. ZELLER:   We'll plan on doing that.   Thank you,
10   your Honor.   The other issue has to do with the Court's
11   expectations.   I know the last time during deliberations,
12   obviously, we had the technicians at hand in order if there
13   was any playback that was needed or perhaps any other kind of
14   technical assistance.
15          Obviously with the equipment broken down, that
16   would not be -- that's not going to be feasible.   What we
17   were talking about was the prospect -- and I don't
18   necessarily anticipate that it would be that important for
19   this phase, but in the event that somebody wants some video
20   played back or something, we could perhaps have something set
21   up in the other courtroom, a small television or screen or
22   something.   I don't know that it would require a lot of
23   equipment.
24          THE COURT:   That makes sense.   You can work that
25   out together or perhaps have something on standby up there in
```

EXHIBIT _____ 4.2
PAGE _____ 527

8274

```
 1
 2
 3
 4
 5
 6
 7                    C E R T I F I C A T E
 8
 9
10         I hereby certify that pursuant to Title 28,
11   Section 753 United States Code, the foregoing is a true and
12   correct transcript of the stenographically reported
13   proceedings in the above matter.
14         Certified on August 20, 2008.
15
16
17   _____
     MARK SCHWEITZER, CSR, RPR, CRR
18   Official Court Reporter
     License No. 10514
19
20
21
22
23
24
25
```

EXHIBIT ___42___

PAGE ___524___

# EXHIBIT 43

1   LARRY W. MCFARLAND (State Bar No. 129668)
2   DAVID K. CAPLAN (State Bar No. 181174)
    ELLIE SCHWIMMER (State Bar No. 221522)
3   KEATS MCFARLAND & WILSON LLP
    9720 Wilshire Boulevard
    Penthouse Suite
4   Beverly Hills, California 90212
    Tel: (310) 248-3830
5   Fax: (310) 860-0363

6   Attorneys for Plaintiff
    MGA ENTERTAINMENT, INC.
7

8

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

                  **CV 04-2524 CBM** (CWx)

13  MGA ENTERTAINMENT, INC.,              **UNDER SEAL**

14              Plaintiff,                Civil Action No.:

15          v.                            COMPLAINT FOR:

16  MULTITOY, INC., YUAN-LAN LIU,         1. FEDERAL COPYRIGHT
17  an individual, JEFF WU, an individual    INFRINGEMENT (17 U.S.C. §§ 501
    and dba IMC TOYS, ALL TOYS              et seq.);
18  IMPORTS, INC., SUSAN LIU, an          2. FEDERAL TRADEMARK
    individual, TOYSDIVISION, INC.,          COUNTERFEITING (15 U.S.C.
19  TOM LIU, an individual, and DOES 1-     § 1114);
20,                                       3. FALSE DESIGNATION OF ORIGIN
20                                           AND FALSE DESCRIPTION (15
                                             U.S.C. § 1125(a));
21              Defendants.               4. TRADE DRESS INFRINGEMENT-
                                             PRODUCT PACKAGING (15 U.S.C.
22                                           §§ 1125 et seq.);
                                          5. TRADE DRESS INFRINGEMENT-
23                                           PRODUCT CONFIGURATION
                                             (15 U.S.C. §§ 1125 et seq.);
24                                        6. STATE STATUTORY UNFAIR
                                             COMPETITION;
25                                        7. STATE COMMON LAW
                                             TRADEMARK INFRINGEMENT
26                                           AND UNFAIR COMPETITION; and
                                          8. CONSTRUC...
27

28

I:\IP\10306\00009\pleadings\Complaint4 - downtown.doc

FILED
CLERK, U S DISTRICT COURT
APR 12 2004
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

DOCKETED ON CM
APR 16 2004
BY                    019

EXHIBIT 43
PAGE 525

M 0078522

EX 10783-0001

1    Plaintiff MGA Entertainment, Inc. ("Plaintiff") for its Complaint alleges and
2    avers as follows:

3    ### JURISDICTION AND VENUE

4    1.    This Court has jurisdiction over this matter pursuant to 17 U.S.C. § 501
5    et seq.; 15 U.S.C. § 1121; 28 U.S.C. § 1331, and § 1338(a) and (b); and 28 U.S.C. §
6    1367. Venue in this district is proper pursuant to 28 U.S.C. § 1391 (b) and (c) and
7    § 1400(a).

8    ### PLAINTIFF AND ITS RIGHTS.

9    2.    Plaintiff MGA Entertainment, Inc. is a corporation organized pursuant to
10   the laws of the State of California, with its principal place of business in this judicial
11   district. Plaintiff is a manufacturer and distributor of a wide variety of popular toys,
12   including dolls, plush animals and radio controlled vehicles.

13   3.    Plaintiff is the exclusive owner of all rights in and to the internationally
14   famous BRATZ characters, which include, but are not limited to, "Cloe," "Jade,"
15   "Sasha," "Yasmin," "Meygan," "Dana," "Fianna," "Nevra," "Cameron," "Dylan,"
16   "Eitan," "Koby," "Cade," "Ailani," "Nazalia," "Talia," "Zada," "Mikko," "Colin,"
17   "Deavon" and "Lakin" (including all of the different dolls and authorized versions of
18   these characters). These characters are hereinafter referred to as the "BRATZ
19   Characters." True and correct copies of exemplars of depictions of the BRATZ
20   Characters, in the form of selected pages from Plaintiff's copyrighted BRATZ Purse
21   Style Guide, are attached hereto as **Exhibit 1**.

22   4.    The BRATZ Characters, the associated images, accessories, designs, and
23   all other forms of intellectual property associated with the BRATZ Characters,
24   including the distinctive trapezoidal packaging therefor, are extremely valuable to
25   Plaintiff.

26   5.    In 2001, Plaintiff introduced a new line of fashion dolls known as the
27   "BRATZ" or, alternatively, the "BRATZPACK" which are three-dimensional
28   depictions of the BRATZ Characters (hereinafter the "BRATZ Dolls"). When first

I:\P\10309\00009\pleadings\Complaint4 - downtown.doc          -1-

EXHIBIT 13
PAGE 526

M 0078523

EX 10783-0002

1  introduced, the BRATZ Dolls only included "Cloe," "Jade," "Sasha" and "Yasmin."

2  Dolls based on the additional characters listed in paragraph 3 have been introduced

3  since that time.

4       6.    Plaintiff's rights in and to the internationally famous BRATZ Characters

5  and the BRATZ Dolls include all intellectual and industrial property rights associated

6  therewith, including, without limitation, all copyrights, patents, trademarks, industrial

7  designs, trade secrets, contract and licensing rights, design rights, moral rights and

8  trade dress rights in and to the BRATZ Characters, the BRATZ Dolls and the BRATZ

9  Packaging Trade Dress (as defined in paragraph 54 below), consisting of the

10  distinctive packaging in which such dolls, playsets and accessories are sold, as well as

11  the BRATZ Product Configuration Trade Dress (as defined in paragraph 65 below), in

12  any country of the world (collectively referred to as the "BRATZ Property").

13       7.    Plaintiff has obtained numerous federal copyright registrations for the

14  BRATZ Characters and the BRATZ Dolls (the "BRATZ Copyrights"). Plaintiff has

15  complied with all applicable copyright laws. The BRATZ Copyrights are valid,

16  subsisting and in full force and effect. True and correct photocopies of representative

17  copyright registrations, including copyright registrations for Plaintiff's BRATZ Dolls,

18  are attached hereto as **Exhibit 2**.

19       8.    More than 50 million BRATZ Dolls have been sold to date on a

20  worldwide basis, of which over 35 million have been sold in the United States.  In

21  addition, more than 25 million packages of accessories for such BRATZ Dolls have

22  been sold worldwide, including over 15 million sold in the United States.

23       9.    For two consecutive years in 2001 and 2002, Plaintiff won the toy

24  industry's most prestigious award, the People's Choice Toy of the Year Award, for its

25  BRATZ Dolls.  In 2003, Plaintiff won the Toy Industry Association, Inc. ("TIA")

26  Property Toy of the Year Award, the TIA Girl Toy of the Year Award, the Family Fun

27  Toy of the Year, Toy Wishes Magazine Hot Dozen, MSNBC Hottest Toy of the Year

28  2003, MSN.com Top Holiday Toy 2003, NBC Today Show Toy Test Winner 2003,

I:\IP\10306\00009\pleadings\Complaint4 - downtown.doc        -2-

EXHIBIT ___43___

PAGE ___527___

M 0078524

EX 10783-0003

1   Toys R. Us/Amazon.com, eBay, and KB Toys Host Lists for 2003, and CNN Money
2   Top 10 Holiday Toys for Girls 2003.

3        10.    Plaintiff operates a web site to promote the BRATZ Dolls and BRATZ
4   Products (as defined below in paragraph 12) at www.bratzpack.com. This web site
5   provides games, e-greetings and the Mix 'N Match Mall of BRATZ fashion and hair
6   designs. The web site also offers visitors the opportunity to join the "Bratz" fan club.
7   Over 250,000 BRATZ fans have signed up and have asked to be notified of new
8   fashion trends that the BRATZ Dolls will wear, as well as the launch and marketing of
9   those new fashions and new dolls.

10        11.    Plaintiff has spent millions of dollars to develop, build and promote the
11   BRATZ Property including, without limitation, the placement of advertisements in all
12   media, including print ads, television spots and radio spots.

13        12.    A significant portion of Plaintiff's business since 2001 has been devoted
14   to the creation and commercial exploitation of the BRATZ Property.  Plaintiff licenses
15   the right to use the BRATZ Characters in a wide range of products such as apparel,
16   back-to-school products, home decor, jewelry and beauty products.  Plaintiff
17   manufactures a wide range of merchandise, including the BRATZ Dolls, and has also
18   produced an upcoming direct-to-video production entitled "BRATZ: The Video,
19   Starrin' 'N' Stylin'!" which will be released in the third quarter of 2004 (these
20   products are hereinafter referred to as the "BRATZ Products").  Plaintiff has
21   numerous active merchandise and promotional licenses, and the number of licenses is
22   continuing to grow. In order to maintain its reputation as well as the value of its
23   licenses, Plaintiff carefully selects each licensee to ensure the quality of its licensed
24   products and has subjected each licensee to a strict quality review and approval
25   program.  Plaintiff currently has over 200 licensees worldwide for BRATZ Products.

26        13.    In keeping with the importance of the BRATZ Property, Plaintiff and/or
27   its licensees have expended tens of millions of dollars in advertising the BRATZ
28   Products and promoting the use of the BRATZ Characters on original licensed

I:\UP\10300\00009\pleadings\Complaint4 - downtown.doc      -3-

EXHIBIT ___43___
PAGE ___528___

M 0078525

EX 10783-0004

1    J.    That Plaintiff be awarded damages for Defendant All Toys' trademark

2  counterfeiting in the form of either: (i) treble damages in an amount to be determined

3  at trial, or (ii) statutory damages for each counterfeit mark per type of goods or

4  services sold, offered for sale or distributed in an amount provided by law, as set forth

5  in 15 U.S.C. §1117(c), together with pre-judgment and post-judgment interest;

6    K.    That Defendants account for and pay over to Plaintiff all damages

7  sustained by Plaintiff and profits realized by Defendants by reason of Defendants'

8  unlawful acts herein alleged, and that those profits be increased as provided and

9  allowed by law;

10    L.    That Defendants hold, as constructive trustees for the benefit of Plaintiff,

11  any and all personal and/or real properties and assets consisting of and/or obtained by

12  profits derived from Defendants' infringing activities, and that Plaintiff be granted

13  possession of or trustee rights over these properties;

14    M.    That the Court issue an order requiring Defendants to deliver to Plaintiff

15  or, at Plaintiff's option, destroy, at Defendants' cost, all infringing copies of the

16  BRATZ Property at the conclusion of the present matter;

17    N.    That the Court award Plaintiff its reasonable attorneys' fees pursuant to

18  17 U.S.C. § 505 and 15 U.S.C. § 1117(a);

19    O.    That the Court award Plaintiff its costs of suit incurred herein; and

20    P.    That the Court grant Plaintiff such other and further relief as it deems just

21  and equitable.

22

23  DATED:  April 7, 2004                Respectfully submitted,

24                                        KEATS MCFARLAND & WILSON LLP

25

26

27                                        Larry W. McFarland

28                                        Attorneys for Plaintiff
                                          MGA Entertainment, Inc.

I:\IP\10300\00009\pleadings\Complaint4 - downtown.doc          -27-

EXHIBIT   43
PAGE   529

M 0078549

EX 10783-0028



EXHIBIT __2__
PAGE __48__

EXHIBIT __43__
PAGE __580__

M 0078571

EX 10783-0050



EXHIBIT ___2___
PAGE ___49___

EXHIBIT ___43___
PAGE ___531___

M 0078572

EX 10783-0051

EXHIBIT 3

EXHIBIT 4?
PAGE 532

M 0078573

EX 10783-0052

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**Form VA**
For a Work of the Visual Arts

**VA 1-233-273**

EFFECTIVE DATE OF REGISTRATION

**MAR 01 2004**

Month   Day   Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1**

Title of This Work ▼
BRATZ Purse Style Guide

NATURE OF THIS WORK ▼ See instructions
Text Illustrations

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

---

**2**

**NOTE**
Under the law, the author of a work made for hire is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** NAME OF AUTHOR ▼
MGA Entertainment Inc

DATES OF BIRTH AND DEATH
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
Domiciled in   USA

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes   ☒ No
Pseudonymous?   ☐ Yes   ☒ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es) See instructions
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2 Dimensional artwork   ☐ Photograph   ☒ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**b** Name of Author ▼

Dates of Birth and Death
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

Nature of Authorship Check appropriate box(es) See instructions
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

---

**3**

**a** Year in Which Creation of This Work Was Completed
2002
This information must be given   Year in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
at least as early as
Month October   Day 14   Year 2002
United States of America   Nation

---

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼
MGA Entertainment Inc
16730 Schoenborn Street  North Hills  California 91343

APPLICATION RECEIVED
ONE DEPOSIT RECEIVED
TWO DEPOSITS RECEIVED   MAR - 1 2004
FUNDS RECEIVED

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

DO NOT WRITE HERE
OFFICE USE ONLY

---

MORE ON BACK ▶   Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
See detailed instructions.   Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages

EXHIBIT   3
PAGE   50

EXHIBIT 43
PAGE 533

M 0078574

EX 10783-0053

| EXAMINED BY | | FORM VA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE IF YOU NEED MORE SPACE USE A SEPARATE CONTINUATION SHEET**

**5** **PREVIOUS REGISTRATION** Has registration for this work or for an earlier version of the work already been made in the Copyright Office?

☐ Yes ☐ No If your answer is Yes why is another registration being sought? (Check appropriate box) ▼

a ☐ This is the first published edition of a work previously registered in unpublished form

b ☐ This is the first application submitted by this author as copyright claimant

c ☐ This is a changed version of the work as shown by space 6 on this application

If your answer is Yes Previous Registration Number ▼          Year of Registration ▼

**6** **DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work complete only 6b for a compilation

**a** Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

Preexisting artwork including Reg Nos VA 1 218-487 VA 1 218 488 VA 1 218 489 VA 1 218-490 VA 1 218 491 VA 1 090 287 VA 1 090 288 VA 1 090 289 and VA 1 090 290 and other prior character artwork

**a**
See instructions before completing this space

**b** Material Added to This Work Give a brief general statement of the material that has been added to this work and in which copyright is claimed ▼

New illustrations and text

**b**

**7** **DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office give name and number of Account

Name ▼          Account Number ▼

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent Name/Address/Apt/City/State/ZIP ▼

Larry W McFarland Keats McFarland & Wilson LLP
9720 Wilshire Boulevard Penthouse Suite
Beverly Hills California 90212

**b**

Area code and daytime telephone number  ( 310 ) 248 3830          Fax number  ( 310 ) 860 0363

Email  lmcfarland@kmwlaw com

**8** **CERTIFICATION*** I the undersigned hereby certify that I am the

check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☒ authorized agent of  MGA Entertainment Inc

Name of author or other copyright claimant or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name and date ▼ If this application gives a date of publication in space 3 do not sign and submit it before that date

Larry W McFarland          Date February 27 2004

Handwritten signature (X) ▼

X _____

**9**

| | Certificate will be mailed in window envelope to this address |
|---|---|
| | Name ▼ Larry W McFarland Keats McFarland & Wilson LLP |
| | Number/Street/Apt ▼ 9720 Wilshire Boulevard Penthouse Suite |
| | City/State/ZIP ▼ Beverly Hills California 90212 |

**YOU MUST**
Complete all necessary spaces
Sign your application in space 8

**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE**
1 Application form
2 Nonrefundable filing fee in check or money order payable to Register of Copyrights
3 Deposit material

**MAIL TO**
Library of Congress
Copyright Office
101 Independence Avenue S E
Wash gton D C 20559-6000

17 U S C §506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409 or in any written statement filed in connection with the application shall be fined not more than $2 500

Rev August 2003—30 000   Web Rev Ju e 2002   ⊚ P Printed on recycled paper          U S Government Printing Office 2003-496 605/60 029

EXHIBIT 3

EXHIBIT 43
PAGE 534

M 0078575

EX 10783-0054

# Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts

UNITED STATES COPYRIGHT OFFICE

VA 1—218—489

EFFECTIVE DATE OF REGISTRATION

**DEC 22 2003**
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET**

**1**

Title of This Work ▼

BRATZ Group Drawing

NATURE OF THIS WORK ▼ See Instructions

color drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical serial or collective give information about the collective work in which the contribution appeared  Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

---

**2**

**a**  NAME OF AUTHOR ▼

Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _USA_
Domiciled in

Was This Author's Contribution to the Work
Anonymous?  ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes" see detailed instructions

**NOTE**

Under the law the author of a work made for hire is generally the employer not the employee (see instructions) For any part of this work that was made for hire check "Yes" in this space provided give the employer (or other person for whom the work was prepared) as Author of that part and leave the space for dates of birth and death blank

Nature of Authorship  Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture
☑ 2 Dimensional artwork
☐ Reproduction of work of art
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

**b**  Name of Author ▼

Dates of Birth and Death
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of
Domiciled in

Was This Author's Contribution to the Work
Anonymous?  ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship  Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture
☐ 2 Dimensional artwork
☐ Reproduction of work of art
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

---

**3**

**a**  Year in Which Creation of This Work Was Completed
1998
This Information must be given Year in all cases

**b**  Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published
Month  February  Day  12  Year  2001
U.S.A.    Nation

---

**4**

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼

MGA Entertainment Inc  16730 Schoenborn Street
North Hills  CA  91343 6122

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2  give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

Assignment

APPLICATION RECEIVED

ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
**DEC 22 2003**

FUNDS RECEIVED

---

MORE ON BACK ▶  Complete all applicable spaces (numbers 5-9) on the reverse side of this page
See detailed instructions    Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ___ pages

EXHIBIT  3
PAGE  52

EXHIBIT  43
PAGE  535

M 0078576

EX 10783-0055

| EXAMINED BY | | FORM VA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work  or for an earlier version of this work  already been made in the Copyright Office?

☐ Yes  ☑ No  If your answer is Yes  why is another registration being sought  (Check appropriate box ) ▼

**a** ☐ This is the first published edition of a work previously registered in unpublished form

**b** ☐ This is the first application submitted by this author as copyright claimant

**c** ☐ This is a changed version of the work  as shown by space 6 on this application

If your answer is Yes  give Previous Registration Number ▼     Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work  complete only 6b for a compilation

**a** Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

**b** Material Added to This Work Give a brief  general statement of the material that has been added to this work and in which copyright is claimed ▼

**6**

a   See instructions before completing this space

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office  give name and number of Account
Name ▼     Account Number ▼

**7**

a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼

Larry W  McFarland   Keats  McFarland & Wilson  LLP
9720 Wilshire Boulevard  Penthouse Suite
Beverly Hills  California  90212

b

Area code and daytime telephone number    (310 ) 248 3830        Fax number    (310 ) 860 0363

Email  lmcfarland@kmwlaw com

**CERTIFICATION** I the undersigned hereby certify that I am the

check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive rights(s)
☑ authorized agent of  MGA Entertainment  Inc
      Name of author or other copyright claimant  or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name and date ▼ If this application gives a date of publication in space 3  do not sign and submit it before that date

Larry W  McFarland              Date  December 16  2003

Handwritten signature (X) ▼

X

**8**

**9**

| Certificate will be mailed in window envelope to this address | Name ▼   Larry W  McFarland   Keats  McFarland & Wilson  LLP |
|---|---|
| | Number/Street/Apt ▼   9720 Wilshire Boulevard  Penthouse Suite |
| | City/State/ZIP ▼   Beverly Hills  California  90212 |

YOU MUST
Complete all necessary spaces
Sign your application in space 8
SEND ALL 3 ELEMENTS
IN THE SAME PACKAGE
1 Application form
2 Nonrefundable filing fee in check or money order payable to Register of Copyrights
3 Deposit material
MAIL TO
Library of Congress
Copyright Office
101 Independence Avenue  S E
Washington  D C  20559-6000

17 U S C § 506(e)  Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409  or in any written statement filed in connection with the application  shall be fined not more than $2 500

Rev June 2003—20 000   Web Rev June 2002   ℗ Printed on recycled paper        U S Government Printing Office  2000 461 113/20 021

EXHIBIT 3
PAGE 53

EXHIBIT 43
PAGE 596

M 0078577

EX 10783-0056



8/1996

EXHIBIT 3
PAGE 54

EXHIBIT 43
PAGE 597

M 0078578

EX 10783-0057

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE



VA 1-218-487

**EFFECTIVE DATE OF REGISTRATION**

DEC 2 2 2003

Month        Day        Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE. USE A SEPARATE CONTINUATION SHEET

**1**

**Title of This Work ▼**
JADE Drawing

**NATURE OF THIS WORK ▼** See instructions
color drawing

**Previous or Alternative Titles ▼**

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. **Title of Collective Work ▼**

If published in a periodical or serial give **Volume ▼**    **Number ▼**    **Issue Date ▼**    **On Pages ▼**

---

**2**

**NOTE**

Under the law, the author of a work made for hire is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** **NAME OF AUTHOR ▼**
Carter Bryant

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

**Was this contribution to the work a "work made for hire"?**
☐ Yes
☒ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of _USA_
Domiciled in _____

**Was This Author's Contribution to the Work**
Anonymous?    ☐ Yes  ☒ No
Pseudonymous?  ☐ Yes  ☒ No
If the answer to either of these questions is "Yes," see detailed instructions

**Nature of Authorship** Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture
☒ 2 Dimensional artwork
☐ Reproduction of work of art
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

**b** **Name of Author ▼**

**Dates of Birth and Death**
Year Born ▼    Year Died ▼

**Was this contribution to the work a "work made for hire"?**
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of _____
Domiciled in _____

**Was This Author's Contribution to the Work**
Anonymous?    ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

**Nature of Authorship** Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture
☐ 2 Dimensional artwork
☐ Reproduction of work of art
☐ Map
☐ Photograph
☐ Jewelry design
☐ Technical drawing
☐ Text
☐ Architectural work

---

**3**

**a** **Year in Which Creation of This Work Was Completed**
1998
This information must be given in all cases

Year

**b** **Date and Nation of First Publication of This Particular Work**
Complete this information ONLY if this work has been published.
Month February    Day 12    Year 2001
U.S.A.    Nation

---

**4**

See instructions before completing this space.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼
MGA Entertainment Inc   16730 Schoenborn Street
North Hills CA 91343 6122

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼
Assignment

**APPLICATION RECEIVED**
DEC 2 2 2003
**ONE DEPOSIT RECEIVED**

**TWO DEPOSITS RECEIVED**
DEC 2 2 2003
**FUNDS RECEIVED**

---

**MORE ON BACK ▶**   Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
See detailed instructions.   Sign the form at line 8.

Page 1 of ___ pages

EXHIBIT 3
PAGE 55

EXHIBIT 43
PAGE 538

M 0078579

EX 10783-0058

| EXAMINED BY | _Hb_ | FORM VA |
|---|---|---|
| CHECKED BY | | |
| ☐ CORRESPONDENCE Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work  or for an earlier version of this work  already been made in the Copyright Office?
☐ Yes  ☑ No  If your answer is  Yes   why is another registration being sought? (Check appropriate box )▼
a  ☐ This is the first published edition of a work previously registered in an unpublished form
b  ☐ This is the first application submitted by this author as copyright claimant
c  ☐ This is a changed version of the work, as shown by space 6 on this application
If your answer is  Yes  give  Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work  complete only 6b for a compilation
a  Preexisting Material  Identify any preexisting work or works that this work is based on or incorporates  ▼

b  Material Added to This Work  Give a brief  general statement of the material that has been added to this work and in which copyright is claimed  ▼

**6**
a  See instructions before completing this space

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office  give name and number of Account
Name ▼                                              Account Number ▼

**7**
a

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼
Larry W McFarland  Keats McFarland & Wilson LLP
9720 Wilshire Boulevard  Penthouse Suite
Beverly Hills  California 90212

b

Area code and daytime telephone number  (310 ) 248 3830          Fax number  (310 ) 860 0363
Email  lmcfarland@kmwlaw com

**CERTIFICATION**  I the undersigned hereby certify that I am the
check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  MGA Entertainment  Inc
Name of author or other copyright claimant  or owner of exclusive right(s) ▲
of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3  do not sign and submit it before that date
Larry W  McFarland                                    Date  December 16  2003

Handwritten signature (X) ▼
X _____

| Certificate will be mailed in window envelope to this address | **Name ▼** Larry W  McFarland  Keats McFarland & Wilson LLP |
|---|---|
| | **Number/Street/Apt ▼** 9720 Wilshire Boulevard  Penthouse Suite |
| | **City/State/ZIP ▼** Beverly Hills  California  90212 |

**YOU MUST**
Complete all necessary spaces
Sign your application in space 8
**SEND ALL 3 ELEMENTS IN THE SAME PACKAGE**
1 Application form
2 Nonrefundable filing fee in check or money order payable to Register of Copyrights
3 Deposit material
**MAIL TO**
Library of Congress
Copyright Office
101 Independence Avenue  S E
Washington  DC  20559-6000

**9**

17 U S C  § 506(e)  Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409  or in any written statement filed in connection with the application  shall be fined not more than $2 500

Rev  June 2002—20 000   Web Rev  June 2002   ⊕ Printed on recycled paper          U S Government Printing Office 2000 461 113/20 021

EXHIBIT  3
56

EXHIBIT  43
PAGE  539

M 0078580

EX 10783-0059



EXHIBIT 3
PAGE 57

EXHIBIT 43
PAGE 540

M 0078581

EX 10783-0060

## Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

VA 1-218-491

EFFECTIVE DATE OF REGISTRATION

DEC 22 2003

Month     Day     Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

**1**

**Title of This Work ▼**
YASMIN Drawing

**NATURE OF THIS WORK ▼** See instructions
color drawing

**Previous or Alternative Titles ▼**

**Publication as a Contribution** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼   Number ▼   Issue Date ▼   On Pages ▼

---

**2**

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**a** **NAME OF AUTHOR ▼**
Carter Bryant

**DATES OF BIRTH AND DEATH**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☑ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of  U S A
{ Domiciled in

**Was This Author's Contribution to the Work**
Anonymous?   ☐ Yes   ☑ No
Pseudonymous?   ☐ Yes   ☑ No
If the answer to either of these questions is "Yes" see detailed instructions.

**Nature of Authorship** Check appropriate box(es) **See Instructions**
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☑ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

**b** **Name of Author ▼**

**Dates of Birth and Death**
Year Born ▼   Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**Author's Nationality or Domicile**
Name of Country
OR { Citizen of
{ Domiciled in

**Was This Author's Contribution to the Work**
Anonymous?   ☐ Yes   ☐ No
Pseudonymous?   ☐ Yes   ☐ No
If the answer to either of these questions is "Yes" see detailed instructions.

**Nature of Authorship** Check appropriate box(es) **See Instructions**
☐ 3 Dimensional sculpture   ☐ Map   ☐ Technical drawing
☐ 2 Dimensional artwork   ☐ Photograph   ☐ Text
☐ Reproduction of work of art   ☐ Jewelry design   ☐ Architectural work

---

**3**

**a** Year in Which Creation of This Work Was Completed
1998
This information must be given Year in all cases.

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month February   Day 12   Year 2001
U.S.A.   Nation

---

**4**

See Instructions before completing this space.

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2 ▼
MGA Entertainment Inc  16730 Schoenborn Street
North Hills CA 91343 6122

**Transfer** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼
Assignment

APPLICATION RECEIVED
DEC 22 2003
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
DEC 22 2003
FUNDS RECEIVED

DO NOT WRITE HERE OFFICE USE ONLY

---

**MORE ON BACK ▶** Complete all applicable spaces (numbers 5-9) on the reverse side of this page
See detailed instructions   Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ___ pages

EXHIBIT 3
PAGE 58

EXHIBIT 43
PAGE 541

M 0078582

EX 10783-0061

EXAMINED BY ____ FK____                                    **FORM VA**

CHECKED BY

☐ CORRESPONDENCE  Yes

FOR COPYRIGHT OFFICE USE ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

**5** PREVIOUS REGISTRATION Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes ☑ No  If your answer is Yes, why is another registration being sought? (Check appropriate box.) ▼
a ☐ This is the first published edition of a work previously registered in unpublished form
b ☐ This is the first application submitted by this author as copyright claimant
c ☐ This is a changed version of the work, as shown by space 6 on this application
If your answer is Yes, give: Previous Registration Number ▼                Year of Registration ▼

**6** DERIVATIVE WORK OR COMPILATION Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation
a Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

a   See instructions before completing this space

b Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed ▼

b

**7** DEPOSIT ACCOUNT If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account
Name ▼                               Account Number ▼

a

CORRESPONDENCE Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

b

Larry W McFarland  Keats McFarland & Wilson LLP
9720 Wilshire Boulevard Penthouse Suite
Beverly Hills California 90212

Area code and daytime telephone number    (310 ) 248 3830              Fax number   ( 310 ) 860 0363

Email  lmcfarland@kmwlaw.com

**8** CERTIFICATION* I, the undersigned, hereby certify that I am the
check only one ▶
☐ author
☐ other copyright claimant
☐ owner of exclusive rights
☑ authorized agent of MGA Entertainment Inc
Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date
Larry W McFarland                                              Date December 16 2003

Handwritten signature (X) ▼
X _____

**9** Certificate will be mailed in window envelope to this address

Name ▼
Larry W McFarland  Keats McFarland & Wilson LLP
Number/Street/Apt ▼
9720 Wilshire Boulevard Penthouse Suite
City/State/ZIP ▼
Beverly Hills California 90212

YOU MUST:
Complete all necessary spaces
Sign your application in space 8
SEND ALL 3 ELEMENTS IN THE SAME PACKAGE:
1 Application form
2 Nonrefundable filing fee in check or money order payable to Register of Copyrights
3 Deposit material
MAIL TO:
Library of Congress
Copyright Office
101 Independence Avenue, S.E.
Washington, D.C. 20559-6000

17 U.S.C. § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

Rev June 2002—20 000   Web Rev June 2002   ⊕ Printed on recycled paper                    U S Government Printing Office 2000-461 113/20 021

EXHIBIT   3
PAGE   59

EXHIBIT   43
PAGE   542

M 0078583

EX 10783-0062



8/1998

EXHIBIT ___ 3 ___
PAGE ___ 60 ___

EXHIBIT __AB__
PAGE __543__

M 0078584

EX 10783-0063

Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE
VA 1-218-490



EFFECTIVE DATE OF REGISTRATION

DEC 22 2003

Month        Day        Year

---

DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE USE A SEPARATE CONTINUATION SHEET

**1** Title of This Work ▼
CLOE Drawing

NATURE OF THIS WORK ▼ See instructions
color drawing

Previous or Alternative Titles ▼

Publication as a Contribution If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared. Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

---

**2** NAME OF AUTHOR ▼
**a** Carter Bryant

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a work made for hire?
☐ Yes
☑ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of ___USA___
     Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?      ☐ Yes ☑ No
Pseudonymous?   ☐ Yes ☑ No
If the answer to either of these questions is "Yes," see detailed instructions

**NOTE**
Under the law, the author of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was made for hire check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3 Dimensional sculpture      ☐ Map              ☐ Technical drawing
☑ 2 Dimensional artwork        ☐ Photograph       ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design   ☐ Architectural work

**b** Name of Author ▼

Dates of Birth and Death
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of _____
     Domiciled in _____

Was This Author's Contribution to the Work
Anonymous?      ☐ Yes ☐ No
Pseudonymous?   ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions

Nature of Authorship Check appropriate box(es). See Instructions
☐ 3 Dimensional sculpture      ☐ Map              ☐ Technical drawing
☐ 2 Dimensional artwork        ☐ Photograph       ☐ Text
☐ Reproduction of work of art  ☐ Jewelry design   ☐ Architectural work

---

**3** **a** Year in Which Creation of This Work Was Completed
1998
This information must be given in all cases
Year in all cases

**b** Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published.
Month February    Day 12    Year 2001
U.S.A.    Nation

**4** COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼
MGA Entertainment Inc  16730 Schoenborn Street
North Hills CA 91343 6122

APPLICATION RECEIVED
DEC 22 2003
ONE DEPOSIT RECEIVED

TWO DEPOSITS RECEIVED
DEC 22 2003
FUNDS RECEIVED

See instructions before completing this space.

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright ▼
Assignment

---

MORE ON BACK ▶  Complete all applicable spaces (numbers 5-9) on the reverse side of this page
See detailed instructions    Sign the form at line 8

DO NOT WRITE HERE
Page 1 of ___ pages

Exhibit 3
61

EXHIBIT 43
PAGE 544

M 0078585

| EXAMINED BY | | FORM VA |
| CHECKED BY | | |
| CORRESPONDENCE ☐ Yes | | FOR COPYRIGHT OFFICE USE ONLY |

**DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work or for an earlier version of this work already been made in the Copyright Office?
☐ Yes  ☑ No  If your answer is Yes  why is another registration being sought? (Check appropriate box ) ▼

**5**

a ☐ This is the first published edition of a work previously registered in unpublished form
b ☐ This is the first application submitted by this author as copyright claimant
c ☐ This is a changed version of the work as shown by space 6 on this application
If your answer is Yes  give Previous Registration Number ▼          Year of Registration ▼

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work  complete only 6b for a compilation
a Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

**6**

**a**
See instructions before completing this space

b Material Added to This Work  Give a brief  general statement of the material that has been added to this work and in which copyright is claimed ▼

**b**

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office  give name and number of Account
Name ▼                                                    Account Number ▼

**7**

**a**

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent  Name/Address/Apt/City/State/ZIP ▼

**b**

Larry W McFarland  Keats McFarland & Wilson LLP
9720 Wilshire Boulevard  Penthouse Suite
Beverly Hills  California  90212

Area code and daytime telephone number  ▸ ( 310 ) 248 3830                    Fax number    ( 310 ) 860 0363
Email  lmcfarland@kmwlaw com

**CERTIFICATION*** I the undersigned  hereby certify that I am the

check only one ▸

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  **MQA Entertainment  Inc**

**8**

Name of author or other copyright claimant  or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

Typed or printed name and date ▼ If this application gives a date of publication in space 3  do not sign and submit it before that date
Larry W McFarland
                                                                          Date  December 16 2003

Handwritten signature (X) ▼

X _____

| Certificate will be mailed in window envelope to this address | Name ▼ Larry W McFarland  Keats McFarland & Wilson LLP | **9** |
| | Number/Street/Apt ▼ 9720 Wilshire Boulevard  Penthouse Suite | |
| | City/State/ZIP ▼ Beverly Hills  California  90212 | |

17 U S C § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409  or in any written statement filed in connection with the application  shall be fined not more than $2,500

Rev June 2002—20,000   Web Rev June 2002   ☺ Printed on recycled paper                    U S Government Printing Office 2000-461 113/20 021

EXHIBIT  43
PAGE  545

M 0078586

EX 10783-0065



8/1998

All Rights Assigned to ABC International Traders
d/b/a MGA Entertainment.

Isaac Larian, CEO

3
63

EXHIBIT _A3_
PAGE _546_

M 0078587

EX 10783-0066

# EXHIBIT 44

1   THOMAS J. NOLAN (Bar No. 66992)
    (tnolan@skadden.com)
2   SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
3   300 South Grand Avenue, Suite 3400
4   Los Angeles, CA  90071-3144
    Tel.: (213) 687-5000  Fax: (213) 687-5600
5
6   PATRICIA L. GLASER (Bar No. 55668)
    (glaser@glaserweil.com)
7   GLASER WEIL FINK JACOBS & SHAPIRO LLP
8   10250 Constellation Blvd 19th Floor
    Los Angeles, CA, 90067
9   Tel.: (310) 553-3000  Fax: (310) 556-2920

10  RUSSELL J. FRACKMAN (Bar No. 49087)
11  (rjf@msk.com)
    MITCHELL SILBERBERG & KNUPP LLP
12  11377 W. Olympic Blvd
    Los Angeles, CA 90064
13  Tel.: (310) 312-2000  Fax: (310) 312-3100
14
    Attorneys for MGA ENTERTAINMENT, INC.,
15  ISAAC LARIAN, MGA ENTERTAINMENT (HK)
    LIMITED, AND MGAE de MEXICO S.R.L. de
16  C.V.
17
                UNITED STATED DISTRICT COURT
18
              CENTRAL DISTRICT OF CALIFORNIA
19
                     EASTERN DIVISION
20
    CARTER BRYANT, an individual      )   CASE NO. CV 04-9049 SGL (RNBx)
21                                     )
              Plaintiff,               )   Consolidated with Case No. 04-9059
22                                     )   and Case No. 05-2727
         v.                            )
23                                     )   Honorable Stephen G. Larson
    MATTEL, INC., a Delaware           )
24  corporation                        )   REQUEST FOR APPROVAL OF
                                       )   SUBSTITUTION OF COUNSEL; and
25            Defendant.               )
    _____     )   **Lodged under separate cover:**
26  AND CONSOLIDATED ACTIONS.          )   [PROPOSED] ORDER
                                       )
27  _____
28

---

REQUEST FOR APPROVAL OF SUBSTITUTION OF COUNSEL
CASE NO. CV 04-9049 SGL (RNBx)

EXHIBIT ___44___

PAGE ___547___

1   MGA   ENTERTAINMENT,   INC.,   ISAAC   LARIAN,   MGA
2   ENTERTAINMENT (HK) LIMITED, AND MGAE de MEXICO S.R.L. de C.V.
3   hereby request that the Court approve the substitution of Patricia L. Glaser of Glaser
4   Weil Fink Jacobs & Shapiro LLP and Russell Frackman of Mitchell, Silberberg and
5   Knupp LLP as attorneys of record in place and stead of Skadden, Arps, Slate,
6   Meagher & Flom LLP for any and all matters relating to Phase 2 of the proceedings
7   in the above-referenced actions before this Court. Skadden, Arps, Slate, Meagher &
8   Flom LLP shall remain counsel of record for the purpose of all remaining Phase 1
9   proceedings before this Court, including the pending motions scheduled to be heard
10   on February 11, 2009, and any further matters relating to the December 3, 2008
11   Orders. Skadden, Arps shall also remain co-counsel of record for the MGA Parties'
12   Ninth Circuit appeal relating to Phase 1, including the verdict and the December 3
13   Orders.

14

15   DATED: January 9, 2009

16                              By: _____

17                                         Isaac Larian
18                              MGA ENTERTAINMENT, INC., ISAAC
                               LARIAN, MGA ENTERTAINMENT (HK)
19                              LIMITED, and MGAE de MEXICO S.R.L.
20                                         de C.V.

21

22       I have given proper notice pursuant to Local Rule 83-2.9 and consent to the
23   above substitution.

24   DATED: January 9, 2009
25                              SKADDEN, ARPS, SLATE, MEAGHER &
                               FLOM LLP
26
27                              BY: _____
28                                         Thomas J. Nolan

                                           1
REQUEST FOR APPROVAL OF SUBSTITUTION OF COUNSEL
        CASE NO. CV 04-9049 SGL (RNBx)

EXHIBIT _____ 44
PAGE _____ 548

1

2     I am duly admitted to practice in this District pursuant to Local Rule 83-2 and

3  consent to the above substitution.

4

5  DATED: January 9, 2009

6                   GLASER WEIL FINK JACOBS & SHAPIRO LLP

7

8                   BY: _____
                            Patricia L. Glaser

9

10  DATED: January __, 2009

                   MITCHELL, SILBERBERG & KNUPP LLP

11

12                   BY: _____
                           Russell J. Frackman

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 44
PAGE 549

1

2        I am duly admitted to practice in this District pursuant to Local Rule 83-2 and

3    consent to the above substitution.

4

5    DATED: January __, 2009

6                                        GLASER WEIL FINK JACOBS & SHAPIRO
                                         LLP
7
                                         BY: _____
8                                                 Patricia L. Glaser

9
     DATED: January 9, 2009
10
                                         MITCHELL, SILBERBERG & KNUPP LLP
11
                                         BY: Russell J. Frackman (PR3)
12                                                Russell J. Frackman

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         2
                    REQUEST FOR APPROVAL OF SUBSTITUTION OF COUNSEL
                            CASE NO. CV 04-9049 SGL (RNBx)

EXHIBIT 44
PAGE 550

# EXHIBIT 45

1

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7   MATTEL, INC.,                    )

8                   Plaintiff,       )

9          vs.                       )   No. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL.,)

11                  Defendants.      )

12  _____ )   STATUS CONFERENCE
    AND CONSOLIDATED ACTIONS,        )

13  _____ )

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              Riverside, California

17            Monday, January 26, 2009

18                 11:16 A.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24            3470 12th Street, Rm. 134
              Riverside, California  92501
25                 951-274-0844
              WWW.THERESALANZA.COM

```
 1        RIVERSIDE, CALIFORNIA; MONDAY, JANUARY 26, 2009; 11:16 A.M.

 2                            -oOo-

 3        THE CLERK:  Calling item number 12, in the matter of

 4   Mattel versus MGA, Case Number CV 04-9049.

 5        May we have the parties in that matter please come

 6   forward and state your appearances for the record.

 7        MR. NOLAN:  Tom Nolan and Jason Russell on behalf of

 8   Isaac Larian and MGA.

 9        MR. ZELLER:  Mike Zeller and Dylan Proctor on behalf

10   of Mattel.

11        THE COURT:  The Court has before it the request for

12   approval of substitution of counsel and the proposed order.  I

13   asked for a hearing on this.

14        I see, Ms. Glaser, you're here as well, if you want

15   to put your name on for the record.

16        MS. GLASER:  Hopefully, not too short-lived.

17        Patricia Glaser and Joel Klevens of the Glaser law

18   firm on behalf of MGA and Mr. Larian.

19        MR. FRACKMAN:  Russell Frackman of

20   Mitchell, Silberberg & Knupp.

21        MR. COTE:  Alexander Cote on behalf of

22   Gustavo Machado.

23        If I could ask the Court's indulgence.  I'm not sure

24   if you requested Mr. Machado's counsel to be here today,

25   because I believe the main issue is MGA's representation.  And
```

00:00
00:00
00:01

Monday, January 26, 2009       EXHIBIT ___45___       STATUS CONFERENCE
                               PAGE ___552___

1   if there's nothing that concerns Mr. Machado, I'd ask to be

2   excused.  But if you'd like us to stay, that's, of course, fine

3   as well.

4           **THE COURT:**  I don't envision this going very long, so

5   if you wouldn't mind just staying a few minutes, that would be     00:01

6   great.

7           **MR. COTE:**  Sure.  Thank you.

8           **THE COURT:**  Thank you, sir.

9           As I indicated, I have this request for approval of

10  substitution of counsel, and I certainly have no issue with        00:01

11  additional counsel coming in on a case, clients choosing

12  whoever they want to represent them in a civil case.  The

13  problem, as I tried to explain in the minute order that I sent

14  out, is having two different lead counsel for the same case.

15          I tried to indicate, as best I could, some concerns        00:01

16  that I had in my minute order; Mattel raised some additional

17  ones.  I've kind of come up with more as I've thought about

18  this over the course of the last couple of weeks.

19          Just based on the complicated nature of this case to

20  begin with, I can see a lot of issues coming up; that having,      00:02

21  essentially, two heads, no matter how well they get along, no

22  matter how professional they are -- and, of course, I have

23  nothing but the highest regard for everyone who's involved in

24  this -- just becoming a problem.

25          And then there's the further issue with respect to         00:02

Monday, January 26, 2009   EXHIBIT __45__   STATUS CONFERENCE
                           PAGE ____533____

6

| | |
|---|---|
| 1 | Ms. Glaser, in terms of her potentially being a witness. And, |
| 2 | again, if that's not an issue, then it's not an issue; but I |
| 3 | just want to have that fleshed out in advance. |
| 4 | So that's what I want to have addressed at the status |
| 5 | conference. |
| 6 | **MS. GLASER:** Thank you, your Honor. Very briefly. |
| 7 | Recognizing your Honor's concerns -- we, obviously, |
| 8 | read carefully your order -- I will be the lead counsel. |
| 9 | **THE COURT:** For all of it? |
| 10 | **MS. GLASER:** For all of it. |
| 11 | Skadden will -- it's effectively going to be an |
| 12 | association of counsel. |
| 13 | **THE COURT:** Okay. |
| 14 | **MS. GLASER:** If you actually want us to refile, we |
| 15 | will refile in that way. We don't want any -- |
| 16 | **THE COURT:** I will, just to clarify the record; but |
| 17 | that can be done. |
| 18 | **MS. GLASER:** Not a problem. And we'll do that. |
| 19 | With respect to the potential of Glaser being a |
| 20 | witness, we have a waiver, an informed waiver, from the client, |
| 21 | to the extent that is ever going to be an issue. We don't |
| 22 | anticipate it being an issue, frankly; but if it ever were to |
| 23 | be an issue, I have with me, and I'm glad to share it with your |
| 24 | Honor, if you'd like to see it, the informed waiver of the |
| 25 | client. |

Right margin timestamps:
00:02 (line 5)
00:02 (line 10)
00:03 (line 15)
00:03 (line 20)
00:03 (line 25)

Monday, January 26, 2009    EXHIBIT  45    STATUS CONFERENCE
                            PAGE  554

```
 1              THE COURT:  That would be great.  If you could pass
 2    that forward to Mr. Holmes.
 3              MS. GLASER:  Certainly.
 4              (Brief pause.)
 5              THE COURT:  Very good.  I'll have this filed under      00:04
 6    seal with the Court, just so we'll have a record of that.
 7              MS. GLASER:  Thank you, your Honor.
 8              THE COURT:  So then, on a going-forward basis, if and
 9    when the Court approves the refiled substitution of counsel,
10    which will indicate that you are lead counsel, you will be the   00:05
11    counsel of record for what we've been calling Isaac Larian and
12    the MGA parties.
13              MS. GLASER:  Yes, sir.
14              THE COURT:  Very well.
15              Mr. Nolan, anything further?                           00:05
16              MR. NOLAN:  No, your Honor.
17              We apologize for any confusion that may have been
18    created.  The idea was to try to make it actually clear who was
19    going to be responsible.  Certainly, I read the Court's order.
20    I understand the Court's concern.  Given the professionalism, I  00:05
21    think, of both counsel and how we are coordinated, we thought
22    it made better sense to do it the way we had suggested; that
23    is, so that there's no confusion; that if there's a discovery
24    dispute on Phase 2, that we're not having all of the law firms
25    down here.  And I think that with Ms. Glaser being in the lead,  00:05
```

EXHIBIT __45__

PAGE __555__

1    And that's why I would refer the Court to the Prantil case in

2    connection with.  So we do have that concern.

3            THE COURT:  Specifically, what's your concern,

4    Mr. Zeller?  How is Mattel prejudiced in any way?

5            MR. ZELLER:  Well, we would be prejudiced -- and it's   00:10

6    really, in some respects, the same as the institutional

7    concern.

8            THE COURT:  I can see, I suppose more readily -- and

9    maybe I just have a blind spot here -- I can see more readily,

10   perhaps, how MGA or Isaac Larian might feel awkward having      00:10

11   their attorney called up as a witness by Mattel.  But they're

12   willing to waive that, so I defer entirely to their discretion

13   on that.

14           How is Mattel in any way prejudiced by this?

15           MR. ZELLER:  I would, in fact, refer to exactly the     00:10

16   language in the Prantil case, your Honor.  And this is

17   basically where it's talking about the witness advocate issue

18   in that particular case, and it goes on to say, "When, however,

19   the proposed testimony is germane to his adversary's case, the

20   balance of hardships is no longer an equilibrium.  Instead of   00:11

21   merely mitigating the hardship to his client's cause, the

22   attorney may wish to deprive an adversary of the benefits of

23   his testimony by electing to appear as an advocate and not as a

24   witness.  Under the veil of 'ethics,' opposing counsel is

25   deprived of a material witness while the witness, although      00:11

12

1   unsworn, is permitted to be an advocate.  This cannot be.  The

2   advocate-witness rule is aimed at protecting the integrity of

3   the fact-finding process, not at distorting the process

4   itself."

5        So the concern is, number one, that we will be in a          00:11

6   position where we may need her testimony and will be denied it.

7   The Court will recall, of course, they opposed our ability to

8   even take these depositions in Phase 1.

9        **THE COURT:**  I can address that issue by getting a

10  waiver on that right now.  If they agree that they're not going   00:12

11  to use that as a basis -- I can't believe that this

12  substitution is designed just to avoid having Ms. Glaser called

13  as a witness.  But I can address that with Ms. Glaser.

14       Ms. Glaser, is that --

15       **MS. GLASER:**  I can assure you that's not the case,        00:12

16  your Honor.

17       **THE COURT:**  Very well.

18       So your client would waive any concern on that basis

19  to you being called?  I mean, you may have other reasons in

20  terms of relevancy and foundation and other reasons why you       00:12

21  cannot testify; but in terms of that being an issue, that is

22  waived; correct?

23       **MS. GLASER:**  Assuming that were even a legitimate

24  issue, that is absolutely correct, your Honor.

25       **THE COURT:**  Very well.                                    00:12

Monday, January 26, 2009    EXHIBIT __45__    STATUS CONFERENCE
                            PAGE ___557___

13

```
 1          What else, Mr. Zeller?

 2          MR. ZELLER:  Well, then, I think also we still have

 3   the issue of whether or not MGA can essentially interject her

 4   into these proceedings.

 5          We had it happen involuntarily to us in Phase 1, as     00:12

 6   the Court may recall; those e-mails, all of those things are

 7   still at issue in the case.  Mr. Larian, over our objection,

 8   repeatedly referred to them, even after Mr. Nolan made a

 9   representation to the Court -- and we're not contesting that

10   he, in fact, did this; but he told Mr. Larian to stop doing it.  00:13

11   And he continued to do it.  So we have very serious concerns

12   that Phase 2 is going to turn into a situation where Mr. Larian

13   is going to essentially try and force us to put Ms. Glaser on

14   the stand.

15          So what I would also think is that as part of this,      00:13

16   MGA should not be allowed to themselves call her.  Obviously,

17   if we call Ms. Glaser, they should be allowed to obviously

18   redirect, or whatever they're going to do; but I don't think it

19   should be left to their choice.

20          That also would seem to be the other part of this        00:13

21   equation, so that we are not into these exact issues that

22   Prantil is concerned about.  Because you do still have, whether

23   an attorney is actually called to the stand or not, what's

24   considered the 'unsworn witness problem,' because it confuses

25   the boundaries between advocate and witness.                    00:13
```

Monday, January 26, 2009    EXHIBIT ___45___    STATUS CONFERENCE

PAGE ___55⨍___

16

1

2                              CERTIFICATE

3

4    I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
5    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
6    conformance with the regulations of the Judicial Conference of
     the United States.

7

8    _____          _1-28-09_
     THERESA A. LANZA, CSR, RPR                    Date
9    Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Monday, January 26, 2009    EXHIBIT 15    STATUS CONFERENCE
                            PAGE __551__

# EXHIBIT 46

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    - - -

4    **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5    - - -

6    MATTEL, INC.,                    :    PAGES 1753 - 1888
                                       :
7           PLAINTIFF,                 :
                                       :
8       VS.                            :    NO. ED CV04-09049-SGL
                                       :    [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,          :    CV04-9059 & CV05-2727]
     ET AL.,                           :
10                                     :
            DEFENDANTS.        _____  :
11

12

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    RIVERSIDE, CALIFORNIA

17    FRIDAY, JUNE 6, 2008

18    JURY TRIAL - DAY 9

19    AFTERNOON SESSION

20

21

22    MARK SCHWEITZER, CSR, RPR, CRR
      OFFICIAL COURT REPORTER
23    UNITED STATES DISTRICT COURT
      181-H ROYBAL FEDERAL BUILDING
24    255 EAST TEMPLE STREET
      LOS ANGELES, CALIFORNIA 90012
25    (213) 663-3494

CERTIFIED
COPY

EXHIBIT  46
PAGE   560

1  | **Appearances of Counsel:**

2

3  | On Behalf of Mattel:

4  |     Quinn Emanuel
   |     By John B. Quinn, Esq.
5  |         B. Dylan Proctor, Esq.
   |         Michael T. Zeller, Esq.
6  |         Harry Olivar, Esq.
   |         John Corey, Esq.
7  |         Diane Hutnyan, Esq.
   |         William Price, Esq.
8  |     855 South Figueroa Street
   |     10th Floor
9  |     Los Angeles, CA 90017
   |     (213) 624-7707
10

11

12 | On Behalf of MGA Entertainment:

13 |     Skadden, Arps, Slate, Meagher & Flom LLP
   |     By Thomas J. Nolan, Esq.
14 |         Carl Alan Roth, Esq.
   |         Jason Russell, Esq.
15 |         Lauren Aguiar, Esq.
   |         David Hansen, Esq.
16 |         Matthew Sloan, Esq.
   |     300 South Grand Avenue
17 |     Los Angeles, CA 90071-3144
   |     (213) 687-5000
18

19

20

21

22

23

24

25

EXHIBIT   44
PAGE   561

1

### I N D E X

2   ISAAC LARIAN, PREVIOUSLY SWORN...................... 1764

3   DIRECT EXAMINATION (CONTINUED) BY MR. PRICE:.......... 1764

4

### E X H I B I T S

5   (Exhibit 593, Pages 2 and 3, received.)............... 1773

6   (Exhibit 16789 received.)............................ 1782

7   (Exhibit 1762 received.)............................. 1785

8   (Exhibit 11276 received.)............................ 1786

9   (Exhibit 11277 received.)............................ 1789

10  (Exhibit 11245 received.)............................ 1795

11  (Exhibit 12 received.)............................... 1798

12  (Exhibit 10, Page 1, received.)...................... 1802

13  (Exhibit 11336 received.)............................ 1813

14  (Exhibit 11203 received.)............................ 1823

15  (Exhibit 13223, Page 2, last paragraph, received.).....1834

16  (Exhibit 13223, Page 3, paragraphs 2 and 6 received.)..1836

17  (Exhibit 633 received.).............................. 1850

18  (Exhibit 4941 received.)............................. 1852

19  (Exhibit 947, paragraph 8, received.)..................1862

20

21

22

23

24

25

EXHIBIT 46
PAGE 562

1  **Q.**   So it's fair, Mr. Larian, that after reading this, that

2  these women have secure day jobs with stability, that they

3  are unwilling to leave, and that they moonlight, that if they

4  are discovered, they will be painfully humiliated and fired,

5  that they are talented doll makers, that they have more than

6  a hundred years of doll making experience between them.  All

7  of these certainly lead you to suspect that Veronica Marlow

8  is using a competitor's employees to make the fashions for

9  your Bratz dolls.

10 **A.**   I did not pay attention, as I told you, to this whole

11 long e-mail, nor did I read every line as you're doing right

12 now.

13 **Q.**   Well, it's certainly accurate to say that you did not do

14 anything in response to this e-mail to determine whether or

15 not the woman making fashions for Bratz was using competitors

16 of an employee.

17 **A.**   I did not do anything one way or another that I recall,

18 no.

19 **Q.**   And you didn't, for example, communicate with Mr. Marlow

20 or Veronica Marlow and say identify who these ladies are who

21 have a hundred years total doll-making experience and have

22 this secure employment and who are moonlighting and who would

23 be fired and humiliated if it was discovered.

24 **A.**   Again, as I testified, I did not read this long e-mail.

25 It was not sent to me.  It was sent to Paula.  I was copied

1  on it.  So I didn't recall even reading this whole e-mail.

2  **Q.**  Well, sitting here today, your business-making decision

3  would be I would do nothing if I received this.  I wouldn't

4  investigate it?

5  **A.**  I'm sorry?

6  **Q.**  I -- sitting here reading this today, your decision

7  still would be I wouldn't do anything about it, I wouldn't

8  investigate it?

9  **A.**  Paula was working with Veronica, and I hope she would

10  look into it.  I was not involved in that detail, no.

11  **Q.**  My question was different.  You said that you don't

12  recall reading this e-mail on which you are copied.

13  **A.**  That's correct.

14  **Q.**  My question is, sitting here today reading it, you still

15  wouldn't do anything about it?

16  **A.**  Probably I would not.

17          THE COURT:  Now, in recognition to the tech people,

18  they were able to get the date up there and the paragraph.

19          MR. PRICE:  He surprised himself.

20  **Q.**  And is that the same attitude you had when Mr. Bryant

21  came to you, as a Mattel employee, and showed you drawings?

22  That you didn't really care whether he had done those

23  drawings while he was at Mattel or not?

24  **A.**  I asked Carter Bryant specifically if he done those

25  drawings at Mattel, and he has told them he had done them in

EXHIBIT _46_

PAGE _564_

1  | 1998 when he was not working for Mattel.

2  | Q.   Do you have any reason to believe that the facts in this

3  | e-mail about how Veronica Marlow's workers had secure

4  | full-time jobs and were moonlighting and would be humiliated

5  | and fired and had all of this doll-making experience, do you

6  | have any reason to believe that Paula Garcia didn't know all

7  | of this?

8  | A.   I have no idea what she knew or not.  There are

9  | statements in there like hundred years of doll making.  I

10 | don't know if any of those are facts are not.  I have no

11 | idea.  I didn't write this e-mail.

12 | Q.   Well, the truth is you didn't want to know; right?

13 | A.   That is not true, Mr. Price.  Your statement is not

14 | true.

15 | Q.   Then tell me everything you did after receiving this

16 | e-mail to find out whether or not these women were working at

17 | Mattel and working on the Bratz dolls at the same time.  Tell

18 | me everything you did.

19 | A.   I don't even know if they worked at Mattel or anywhere

20 | else.  I told you I don't recall reading this e-mail.  This

21 | long e-mail.  It was not addressed to me.

22 | Q.   So it's your practice not to read e-mails that are --

23 | let's see, three pages long?

24 | A.   I get over 4- to 500 e-mails a day, and I cannot sit

25 | down and read every one of them every line.  Yes, that's

EXHIBIT  46

PAGE  565

1   true.

2   **Q.**   But this e-mail was in the middle of e-mail exchanges

3   between whether or not Ms. Marlow was going to join MGA;

4   correct?

5   **A.**   Probably, yes.

6   **Q.**   E-mails saying -- in which you were involved.

7   **A.**   I was concerned about the amount of money that Veronica

8   Marlow was charging, and I wanted to know if she can come and

9   work in house.   That's what I was focused on and concerned

10  with.

11  **Q.**   Well, Ms. Garcia, did she come to you and say Isaac,

12  Peter has put in this e-mail that the women working for

13  Veronica Marlow have secure day jobs, that they are

14  moonlighting, that they will be humiliated and fired if

15  anybody finds out, and that they have a hundred hours --

16  years of doll-making experience between them?   Did Paula

17  Garcia, to whom this was addressed, come to you and tell

18  you that?

19  **A.**   Not that I recall, no.

20  **Q.**   It's certainly something you would have expected her to

21  talk to you about if you didn't already know about it;

22  correct?

23  **A.**   Not necessarily, no.

24  **Q.**   Why wouldn't you expect your subordinate to tell you

25  that they had received an e-mail from a vendor which

EXHIBIT 46

PAGE 566

**C E R T I F I C A T E**

I hereby certify that pursuant to Title 28,

Section 753 United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings in the above matter.

Certified on June 6, 2008.


**MARK SCHWEITZER, CSR, RPR, CRR**
Official Court Reporter
License No. 10514


EXHIBIT 46
PAGE 567

# EXHIBIT 47

2226

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4     **HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING**

5                    - - -

6  MATTEL, INC.,                    :   PAGES 2226 - 2352
                                    :
7            PLAINTIFF,             :
                                    :
8       VS.                         :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9  MGA ENTERTAINMENT, INC.,         :   CV04-9059 & CV05-2727]
   ET AL.,                          :
10                                   :
            DEFENDANTS.             :
11  _____:

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17             WEDNESDAY, JUNE 11, 2008

18               JURY TRIAL - DAY 11

19                AFTERNOON SESSION

20

21

22                        MARK SCHWEITZER, CSR, RPR, CRR
                          OFFICIAL COURT REPORTER
23                        UNITED STATES DISTRICT COURT
                          181-H ROYBAL FEDERAL BUILDING
24                        255 EAST TEMPLE STREET
                          LOS ANGELES, CALIFORNIA 90012
25                        (213) 663-3494

CERTIFIED
COPY

EXHIBIT  47
PAGE  568

1    Appearances of Counsel:

2

3    On Behalf of Mattel:

4         Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
          By John B. Quinn, Esq.
5              B. Dylan Proctor, Esq.
               Michael T. Zeller, Esq.
6              Harry Olivar, Esq.
               John Corey, Esq.
7              Diane Hutnyan, Esq.
               William Price, Esq.
8         855 South Figueroa Street
          10th Floor
9         Los Angeles, CA 90017
          (213) 624-7707

10

11

12   On Behalf of MGA Entertainment:

13        Skadden, Arps, Slate, Meagher & Flom LLP
          By Thomas J. Nolan, Esq.
14             Carl Alan Roth, Esq.
               Jason Russell, Esq.
15             Lauren Aguiar, Esq.
               David Hansen, Esq.
16             Matthew Sloan, Esq.
          300 South Grand Avenue
17        Los Angeles, CA 90071-3144
          (213) 687-5000

18

19   For Carter Bryant:
          Keker & Van Nest
20        By Christa Anderson, Esq.
               Michael H. Page, Esq.
21        710 Sansome Street
          San Francisco, California 94111-1704
22        (415) 391-5400

23

24

25

EXHIBIT  47
PAGE  569

1

I N D E X

2

3   ISAAC LARIAN, PREVIOUSLY SWORN........................ 2231

4   REDIRECT EXAMINATION (CONTINUED) BY MR. PRICE:........ 2231

5   BRYAN JOSEPH ARMSTRONG, SWORN........................ 2269

6   DIRECT EXAMINATION BY MR. ZELLER:.................... 2270

7   VIDEOTAPED DEPOSITION EXCERPTS OF SARAH ODOM.......... 2318

8   CARTER BRYANT, SWORN................................. 2329

9   DIRECT EXAMINATION BY MR. PRICE...................... 2329

10

E X H I B I T S

11

    (Exhibits A-1, A-2, and A-3 received.)................ 2326

12
    (Exhibit 23 received.).............................. 2334

13
    (Exhibit 24 received.).............................. 2341

14
    (Exhibit 25 received.).............................. 2344

15
    (Exhibit 26 received.).............................. 2345

16

17

18

19

20

21

22

23

EXHIBIT ___47___

24

PAGE ___570___

25

1   Mr. Quinn told the jury was absolutely untrue, which is that

2   you have one story, and your brother has another.  You can't

3   say that is untrue, can you?

4   A.  What is untrue is that I came to this country -- what is

5   untrue that I got money from my wealthy parents to start my

6   company.  That is not true.

7   Q.  And I'm just trying to ask questions about Mr. Quinn's

8   honor and credibility.  You said that what he told the jury

9   was absolutely untrue, and you can't say that, can you?

10  A.  I can.

11  Q.  So you can say that your brother does not have say

12  different version than you do of how the company started.

13  A.  What I can say is that I started the company --

14          MR. PRICE:  Move to strike as nonresponsive.

15          THE COURT:  Sustained.  Stricken.

16  Q.  BY MR. PRICE:  You can't say that your brother has told

17  a different version -- hasn't told a different version than

18  you.

19  A.  I can't say if he has or not.  No, I cannot.

20  Q.  So you can't say what Mr. Quinn told the jury, which is

21  that there are two versions, you can't say that's false, can

22  you?

23  A.  The version that Mr. Quinn attributed to my brother is

24  false, and he knows it.

25  Q.  Sir, you can't say that this statement is false, which

EXHIBIT   47

PAGE   571

1   is that you have one version and your brother has another

2   one.  You simply can't say that's false.

3   A.   Beside what I have testified, I have nothing else to

4   add.

5   Q.   Let's talk about the discussions you had with

6   Mr. Carter.  And you said in the September 1st meeting that

7   you said, Mr. Bryant, Mr. Carter Bryant, that you wanted

8   nothing to do with these drawings if they had anything to do

9   with Mattel; correct?

10  A.   That's right.

11  Q.   And Victoria O'Connor and Carter Bryant were at that

12  September 1st meeting; correct?

13  A.   To the best of my recollection, yes, they were.

14  Q.   I assume you were fairly emphatic about what you were

15  saying, which is you were emphatic about saying I want

16  nothing to do with these if they have anything to do with

17  Mattel.

18  A.   I apologize.  I don't know what the word emphatic means.

19  Q.   That you were very strongly saying this.

20  A.   That what?

21  Q.   That you want nothing to do with these if they have

22  anything to do with Mattel.

23  A.   I said that here.

24  Q.   And you said that September 1st as your testimony;

25  correct?

EXHIBIT    47

PAGE    572

```
 1   A.   I did not want -- my state of mind is there and here
 2   that I want nothing to do with any drawing that Carter Bryant
 3   had done if those belong to Mattel.  If they belong to
 4   Mattel, I want nothing to do with it.
 5   Q.   And you told the jury that's what you said at that
 6   September 1st meeting, yes?
 7   A.   I said I do not want to do anything with these drawings
 8   if they belong to Mattel.
 9   Q.   And when you said that, you weren't whispering it.  You
10   were saying something strongly; is that right?
11   A.   I don't know if I was whispering or saying it strong.
12   But I was saying it.
13   Q.   Do you have any explanation as to why neither Victoria
14   O'Connor nor Carter Bryant remembers any such statement?
15   A.   I don't know if they do or not.
16   Q.   Well, let's look at the contracts that you were looking
17   at, and you recall that Mr. Nolan asked you to compare
18   Exhibit 15 to Exhibit 13621, and maybe we can put up 15 and
19   13621.
20   A.   Can you tell me what book to look for here?
21   Q.   I believe those were in the book provided by your
22   attorney.
23   A.   Did you say 13621?
24   Q.   It's 15 and 13621.
25   A.   Yeah, go ahead.
```

EXHIBIT 47
PAGE 573

1   **Q.**  I know that both of them are in the big binder.

2   **A.**  I found them.

3   **Q.**  But your attorney asked you questions about them, so

4   they might be in yours as well.

5   **A.**  I found them.

6           THE COURT:  Did you find them?

7           THE WITNESS:  I found them.

8   **Q.**  BY MR. PRICE:  And first Mr. Nolan's question was do you

9   remember when Mr. Price said these were the same documents?

10  **A.**  Yes.

11  **Q.**  You remember me saying that?

12  **A.**  I don't remember a lot of things he said.

13  **Q.**  Then why did you answer yes?

14  **A.**  I think to those effects, you were saying those are the

15  same contracts.  Indeed, if you look at them without looking

16  at the detail, they look like the same document.

17  **Q.**  But Mr. Nolan said do you remember Mr. Price saying they

18  are the same document.  I mean, do you actually have a memory

19  of me saying that?

20  **A.**  I don't have an exact memory of it.  And if I do, I

21  apologize.

22  **Q.**  Okay.  Now, the first page here, the first page here is

23  the same; correct?

24  **A.**  It's just looking at it, it appears to be the same.

25  **Q.**  And I pointed that out to you in your examination, that

EXHIBIT 47
PAGE 574

1    Q.   In any event, it's your understanding, is it not, that

2    this was faxed back signed by Mr. Bryant to MGA?

3    A.   I'm sorry.  Can you repeat that?

4    Q.   Sure.  That 15 was faxed back to MGA by Mr. Bryant after

5    he signed it?

6            MR. NOLAN:  Objection.  Lack of foundation.

7            THE WITNESS:  I don't recall --

8            THE COURT:  Wait a second.  Sustained.

9    Q.   BY MR. PRICE:  Well, you've got two documents with two

10   signatures; right?

11   A.   Yes.

12   Q.   Isn't the reason you have the second document, which is

13   13621, is that after Mr. Bryant faxed back his contract, you

14   wanted another copy of the contract that didn't have the fax

15   headers on them?

16   A.   Absolutely not true, sir.

17   Q.   So is it your testimony that Ms. O'Connor was not being

18   truthful when she said you asked her to white-out the fax

19   header?

20   A.   I think her recollection is not correct.

21   Q.   Now, you talked about the signing of the document

22   yesterday.

23   A.   Should I put these away?

24   Q.   If it's in your way, put it away.

25           Do you recall being asked by Mr. Nolan if you had

EXHIBIT  47
PAGE  575

1 believed that he, Carter Bryant, had done these drawings, the

2 master drawings while at Mattel, would you have ever signed

3 the contract? And you said, "I would not have signed it if

4 he had done it at Mattel, no."

5       Do you remember that question and answer?

6 **A.** Yes, and the master drawing means the drawings that he

7 did in 1998 in Missouri.

8 **Q.** You were asked questions about Carter Bryant's, whether

9 it be that these drawings were in 1998 or otherwise, at your

10 deposition, were you not?

11 **A.** I was asked a lot of questions about this. I take your

12 representation that yes.

13 **Q.** Well, a critical issue was whether it mattered to you

14 whether Carter Bryant had done these drawings at Mattel or at

15 some other time. That was a critical issue at your

16 deposition, wasn't it?

17 **A.** If you are talking about the master drawings, the

18 original drawings, yes, that was a critical issue.

19 **Q.** And if we could --

20       We played this before, your Honor, put up from the

21 deposition, page 450, lines 10 through 19.

22 **A.** You may.

23 **Q.** 450, 10, to 451 -- let's do 450, lines 10 through 17:

24       "QUESTION: Would it have been a problem if

25     Carter Bryant had created or made any of his

EXHIBIT 47
PAGE 536

1    drawings when he was employed by Mattel in your

2    view?

3         "ANSWER: No."

4         That was your testimony under oath as of the date

5    of your deposition; correct?

6    A.   As it is today, yes.

7    Q.   (Reading.)

8         "Why not?

9         "ANSWER: Because I don't think, whether it's

10   MGA or Mattel, we own the people, especially the

11   creative people, forever."

12        You also testified at your deposition, did you not,

13   that when you were told by someone that Mr. Bryant's attorney

14   had confirmed some drawings were done in 1998, that in your

15   mind that made no difference at all as to whether or not

16   Mattel owned them.

17   A.   I'm sorry. Can you repeat the question?

18   Q.   Sure.

19   A.   I'm not sure if I understand.

20   Q.   Let's break it up. You told us in your examination from

21   Mr. Nolan that someone did an investigation as to whether or

22   not Mr. Bryant had done some drawings in 1998.

23        Do you recall that?

24   A.   I believe I said somebody had confirmed, and that person

25   being Ann Wang, Carter Bryant's attorney, had confirmed the

EXHIBIT 47

PAGE 577

1    chronology that Carter Bryant had given us, that he had done

2    these, the original master drawings, in 1998. And I believe

3    that, yes.

4    **Q.**   And you recall during my examination of you, I asked you

5    what you actually knew about that investigation.

6            Do you recall that?

7    **A.**   We probably have.

8    **Q.**   Isn't it true, sir, that at your deposition, you

9    previously, as testified under oath, that whether the

10   drawings were done in 1998 had no significance to you as to

11   whether or not Mattel might have owned the drawings.

12   **A.**   I might have. Again, if he had done it in 1998, when he

13   was in Missouri, Mattel absolutely cannot have any ownership

14   of the drawings.

15   **Q.**   Well, let's look at what you said in 2006. 459, line

16   12, to 460, line 20. It's been previously played:

17           "QUESTION: Was the fact that Carter Bryant's

18           lawyer represented to MGA that Carter Bryant had

19           done the drawings in 1998 in Missouri, when he was

20           not a Mattel employee, have any significance to you

21           at that time?

22           "ANSWER: It -- he confirmed what Carter

23           Bryant had told us.

24           "QUESTION: And did you find some comfort in

25           this?

EXHIBIT 47
PAGE 378

```
1                "ANSWER:  Of course.

2                "QUESTION:  And why was that?

3                "ANSWER:  Because, you know, I hoped the

4      lawyers in court -- your profession tell the truth.

5                "QUESTION:  Well, you thought that it would

6      have some significance to whether or not Mattel

7      might have rights to those drawings; is that true?

8                "ANSWER:  No."

9                That was the answer you gave under oath in 2006;

10     correct?

11  A.   Those were the answers I gave in 2006.

12  Q.   And then it went on to ask:

13               "QUESTION:  Well, what comfort did you derive?

14               "ANSWER:  Because what I just testified.  I

15     have nothing else to add.

16               "QUESTION:  So you were just comforted by the

17     fact that he had told you the truth?

18               "ANSWER:  And his lawyer confirmed it.

19               "QUESTION:  And beyond that, it had no

20     significance to you.  Is that true?

21               "ANSWER:  That's true."

22               That was your testimony as of that date; correct?

23  A.   Yes, it is.

24               MR. PRICE:  Your Honor, for completeness purposes,

25     we would ask the jury be shown the question and answer
```

EXHIBIT 47

PAGE 579

1                    (Proceedings concluded at 5:10 P.M.)

2

3

4

5

6

7

8                          C E R T I F I C A T E

9

10

11          I hereby certify that pursuant to Title 28,

12   Section 753 United States Code, the foregoing is a true and

13   correct transcript of the stenographically reported

14   proceedings in the above matter.

15          Certified on June 11, 2008.

16

17

18          MARK SCHWEITZER, CSR, RPR, CRR
            Official Court Reporter
19          License No. 10514

20

21

22

23

24

25

EXHIBIT  47
PAGE  580

# EXHIBIT 48

6048



1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    - - -

4     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                    - - -

6   MATTEL, INC.,              :   PAGES 6048 - 6190
                                :
7          PLAINTIFF,           :
                                :
8     VS.                       :   NO. ED CV04-09049-SGL
                                :   [CONSOLIDATED WITH
9   MGA ENTERTAINMENT, INC.,    :   CV04-9059 & CV05-2727]
    ET AL.,                     :
10                              :
          DEFENDANTS.           :
11

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              RIVERSIDE, CALIFORNIA

17          WEDNESDAY, AUGUST 6, 2008

18              JURY TRIAL - DAY 30

19              AFTERNOON SESSION

20

21

22                    MARK SCHWEITZER, CSR, RPR, CRR
                      OFFICIAL COURT REPORTER
23                    UNITED STATES DISTRICT COURT
                      181-H ROYBAL FEDERAL BUILDING
24                    255 EAST TEMPLE STREET
                      LOS ANGELES, CALIFORNIA 90012
25                    (213) 663-3494

**CERTIFIED COPY**

EXHIBIT 48
PAGE 581

6049

```
1  │ Appearances of Counsel:
   │
2  │
   │
3  │ On Behalf of Mattel:
   │
4  │      Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
   │      By John B. Quinn, Esq.
5  │         B. Dylan Proctor, Esq.
   │         Michael T. Zeller, Esq.
6  │         Harry Olivar, Esq.
   │         John Corey, Esq.
7  │         Diane Hutnyan, Esq.
   │         William Price, Esq.
8  │      855 South Figueroa Street
   │      10th Floor
9  │      Los Angeles, CA 90017
   │      (213) 624-7707
10 │
   │
11 │
   │
12 │ On Behalf of MGA Entertainment:
   │
13 │      Skadden, Arps, Slate, Meagher & Flom LLP
   │      By Thomas J. Nolan, Esq.
14 │         Carl Alan Roth, Esq.
   │         Jason Russell, Esq.
15 │         Lauren Aguiar, Esq.
   │         David Hansen, Esq.
16 │         Matthew Sloan, Esq.
   │         Robert Herrington, Esq.
17 │      300 South Grand Avenue
   │      Los Angeles, CA 90071-3144
18 │      (213) 687-5000
   │
19 │
   │
20 │
   │
21 │
   │
22 │
   │
23 │
   │
24 │
   │
25 │
```

EXHIBIT _48_
PAGE _582_

1               I N D E X

2

3   EDMOND YEUNG, PREVIOUSLY SWORN......................... 6059

4   CROSS-EXAMINATION BY MR. HANSEN:  ..................... 6059
    REDIRECT EXAMINATION BY MR. QUINN: .................... 6074
5   RECROSS-EXAMINATION BY MR. HANSEN: .................... 6082
    FURTHER REDIRECT EXAMINATION BY MR. QUINN: ........... 6084
6

7   ISAAC LARIAN, PREVIOUSLY SWORN........................ 6085

8   DIRECT EXAMINATION BY MR. PRICE:...................... 6085

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                        EXHIBIT _____48_____
24                      PAGE _____583_____
25

1    That's what MGA wrote in its business plan of March

2    of 2001; correct?

3    A.    Yes.

4    Q.    Now, prior to September of 2001, when Mr. Bryant

5    presented you -- prior to September of 2000, when Mr. Bryant

6    presented you with Mattel's confidential information and

7    design, did MGA have any plans to introduce an advanced

8    design of a doll with big eyes, pronounced lips, where their

9    head and feet were oversized?

10   A.    Not that I recall, no.

11   Q.    And you'll agree that the designs, the drawings, the

12   confidential information Mr. Bryant gave you in September

13   2000, those drawings are drawings of dolls where the eyes are

14   big, the lips are pronounced, the feet and heads are

15   oversized; correct?

16   A.    Those were drawings that were the inspiration for the

17   Bratz dolls that MGA created, yes.

18        MR. PRICE:    Move to strike as nonresponsive.

19        THE COURT:    Would you rephrase your question,

20   Counsel.

21   Q.    BY MR. PRICE:    You'll agree that the drawings you saw in

22   September 2000, Mattel's confidential information, those

23   drawings showed, were drawings of figures where the eyes were

24   big, the lips were pronounced, and the feet and heads were

25   oversized.



EXHIBIT  48
PAGE  584

1          You'll agree with that; correct?

2    A.    Those drawings had those features, yes.

3    Q.    And by the way, the first phase, you described the

4    contest you had as sort of a fashion doll contest.

5          You recall that?

6    A.    Yes.

7    Q.    You didn't call it a fashion drawing contest; correct?

8    A.    No.

9    Q.    Okay.  That's correct?

10   A.    That's correct.

11   Q.    That's because you were looking for a fashion doll;

12   right?

13   A.    Yes.

14   Q.    Now, prior, in the first phase of this case, you recall

15   that you told the jury that if what you were shown in

16   September of 2000 were Mattel drawings, you wanted nothing to

17   do with them.

18         Do you recall that?

19   A.    Yes.

20   Q.    And that's because you had that thought, or you said

21   that because you knew that if what Carter Bryant was showing

22   you was Mattel property, their confidential information, you

23   shouldn't be looking at it; correct?

24   A.    I just didn't want to have anything to do with it.

25   Q.    Well, let me ask you.  You knew in September of 2000

EXHIBIT  4 0
PAGE  5 8 5

6098

1   that if someone came to you with confidential information of

2   a competitor, you shouldn't even look at it.

3          You knew that, didn't you?

4   A.   All I know is what I testified to.  That if they at that

5   time, if I believed that they belonged to Mattel, I didn't

6   want to have anything to do with it.  And that's the truth.

7   Q.   And my question is different, sir.  I'm asking about

8   your -- the way you practice as a businessman.

9   A.   Yes.

10  Q.   In September of 2000, you knew that if what Carter

11  Bryant was showing you belonged to Mattel and was

12  confidential and proprietary, that you should not even be

13  looking at it.  You knew that, didn't you?

14  A.   I cannot answer that one way or another state of my mind

15  at that time.  So I cannot answer that truthfully beside what

16  I answered.

17  Q.   Well, I'm just asking you about the way you would do

18  business.  Are you telling the jury it was your understanding

19  it was okay to look at another company's confidential,

20  private information -- I'll stop the question there.  That

21  was okay?  That's even okay business practice?

22  A.   No, and I told the jury it's not.  And I told you on the

23  Phase 1-A that if they belonged to Mattel, I didn't want to

24  have anything to do with it.

25  Q.   Okay.  So you just told the jury it's not okay.  And my

EXHIBIT 48

PAGE 536

6099

1  question is simple.  You knew in September 2000 that you

2  should not be looking at a competitor's confidential

3  information; right?

4  A.   I shouldn't be looking at -- I guess you can say that,

5  yes.

6  Q.   And you told us that if you knew that that was Mattel's

7  property, their confidential information, you wouldn't have

8  looked at it; right?

9  A.   I didn't say that.  I said that -- I said -- you're

10  asking me to speculate what would I have done.  And I said to

11  you and I said to this jury that if I believed those belonged

12  to Mattel, I wanted nothing to do with it.

13  Q.   And you say that because you know it would have been

14  wrong for you to build a business based upon Mattel's

15  proprietary confidential information.  You know that, don't

16  you?

17  A.   It is wrong -- I don't understand your question.  You

18  said it wouldn't be wrong?

19  Q.   It would be wrong.

20  A.   To do what?

21  Q.   It would be wrong to create a business based upon

22  Mattel's confidential proprietary information; right?

23  A.   Yes.

24  Q.   It would be wrong for you to profit a penny by using

25  Mattel's proprietary confidential information.

EXHIBIT 48
PAGE 587

6100

1              You understand that?

2   A.    Yes.

3   Q.    Now, you said that these drawings, this Mattel

4   confidential information inspired you.

5              Do you recall saying that?

6   A.    I said those drawings were the inspiration for what

7   became the Bratz dolls, which MGA created through many, many

8   changes and many employees.

9   Q.    Well, you know --

10  A.    And a lot of investment.  Over seven years.

11  Q.    You also know, sir, that you shouldn't be inspired to

12  act by looking at a competitor's private confidential

13  information.  You know that, don't you?

14  A.    Yes.

15  Q.    So let's talk about how you were inspired to act based

16  upon this Mattel information.  Within a couple of weeks you

17  had decided you are going to spend millions to make Bratz

18  into a brand.

19              Do you recall that?

20  A.    Yes.

21  Q.    And if you look at Exhibit 16788.

22              And that's already admitted, your Honor, if we can

23  put that up.

24  A.    Go ahead.

25  Q.    And this is September 13th, not even two weeks after

EXHIBIT 48
PAGE 588

6124

1   Q.   Well, let's talk about what happened next.  You had

2   meetings with a major customer set up in November of 2000;

3   right?

4   A.   I'm not sure if we had major meetings.  I think we do,

5   as I explained to you last time, what we call pretoy fair,

6   prepresentation.

7   Q.   That was to Kmart in November of 2000?

8   A.   Yes.

9   Q.   And one of the things you were trying to do is see

10  whether or not they were interested in dolls you were

11  planning to come out with; correct?

12  A.   Yes, that's one of the things.

13  Q.   All right.  And you sent someone to Kmart to see if they

14  would be interested in Bratz dolls; correct?

15  A.   Amongst other products that we had made.

16  Q.   And what you used to see whether or not Kmart would be

17  interested in buying Bratz dolls, what you used to do that

18  was Mattel's property.

19  A.   I don't recall exactly what we showed them.  I know that

20  we showed them boards because there was not a doll in

21  November 2000.  But I don't remember what was on those

22  boards.

23  Q.   Well, you recall the previous testimony.  I'm going to

24  show you Exhibits 1107 -- if we can show that -- 1108, 1109,

25  and 1110.

EXHIBIT 48
PAGE 569

```
 1            When you went to Kmart to try to get customers to
 2   buy Bratz dolls, what they were shown, as has been previously
 3   testified, were the boards of Carter Bryant's drawings, which
 4   are Mattel's property; right?
 5   A.    Again, I wasn't in that presentation.  I know that our
 6   salespeople showed to Kmart drawings.  I cannot tell you one
 7   way or another if they were Carter Bryant's drawings or other
 8   drawings that were done afterward.  I cannot testify to that.
 9   Q.    You do understand that MGA had no right to try to get
10   customer interest in Bratz dolls by showing customers
11   Mattel's property.  You know that.
12   A.    Know that as of when?
13   Q.    At the time it did it.  You know that MGA had no right
14   to solicit customer interest in Bratz dolls by going out and
15   showing customers Mattel's property.
16   A.    I think this jury came to that verdict.  I believed that
17   Carter Bryant had done those drawings in 1998, when he was
18   not working at Mattel, and that's what he had represented to
19   us.  So I did not in November 2000 believe that he was lying
20   to us basically.  And you settled with him.
21   Q.    So let's ask it this way.  Certainly you would agree
22   that it would be in appropriate for MGA to make any profits
23   by soliciting customer sales by using Mattel's confidential
24   property.  You would agree that would be inappropriate?
25   A.    Yes, if you know about it, yes.
```

EXHIBIT 48
PAGE 590

1   Q.   And by the way, you've always known that what was shown

2   to Kmart was drawings or boards, not dolls; right?

3   A.   That's correct.

4   Q.   But when you made the presentation to Kmart, I assume

5   you're telling them this is what the dolls are going to look

6   like; right?

7   A.   As I said. --

8        MR. NOLAN:  Objection, your Honor.  Lack of

9   foundation, ambiguous as to what he would say, and also best

10  evidence rule, what was presented to --

11       THE COURT:  Overruled.  It's a question.  You may

12  answer it.

13       THE WITNESS:  I was, as I testified before, I was

14  not in that presentation to Kmart.  Or any of those

15  customers.  So I don't know what our salespeople showed and

16  presented.  I know that we didn't have a doll.  And I know

17  that they showed them boards.  What was on those boards, they

18  were drawings.  Were they Carter Bryant's drawings?  Were

19  they other drawings?  I cannot tell you.  I don't know.

20  Q.   BY MR. PRICE:  I take it you would have expected that

21  your salespeople would have shown a customer drawings that

22  were to be representative of the dolls that the customer's

23  going to be asked to buy; right?

24  A.   I think they were shown to them drawings that were going

25  to become the inspiration for the dolls.

EXHIBIT 48
PAGE 591

6190

1                   Court is in recess.

2                  (Proceedings concluded at 5:12 P.M.)

3

4

5                     C E R T I F I C A T E

6

7

8            I hereby certify that pursuant to Title 28,

9  Section 753 United States Code, the foregoing is a true and

10  correct transcript of the stenographically reported

11  proceedings in the above matter.

12            Certified on August 6, 2008.

13

14

15          MARK SCHWEITZER, CSR, RPR, CRR
           Official Court Reporter
16          License No. 10514

17

18

19

20

21

22

23

24

25

EXHIBIT ___48___
PAGE ___592___