# EXHIBIT 8

# REDACTED

# SUBJECT TO

# PROTECTIVE ORDER

# EXHIBIT 9



1

1          UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            EASTERN DIVISION

4              - - -

5   HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6            - - -

7  MATTEL, INC.,

8          Plaintiff,  )
                    )

9      VS.        )  No. CV 04-09049

10  MGA ENTERTAINMENT, INC., ET. AL.,  )

11         Defendants.  )

12  AND CONSOLIDATED ACTIONS,  )  Motions

13

14

15     REPORTER'S TRANSCRIPT OF PROCEEDINGS

16        Riverside, California

17     Wednesday, February 11, 2009

18          10:03 A.M.

19

20

21

22

23       THERESA A. LANZA, RPR, CSR

24     Federal Official Court Reporter
        3470 12th Street, Rm. 134

25     Riverside, California  92501
          951-274-0844
       WWW.THERESALANZA.COM

:dnesday, February 11, 2009  EXHIBIT _____ 9    Mattel vs. MGA Entertainme:

PAGE _____ 30

2

```
1    APPEARANCES:

2    ON BEHALF OF MATTEL, INC.:

3                        QUINN EMANUEL
                         By:  JOHN QUINN
4                             DYLAN PROCTOR
                             MICHAEL T. ZELLER
5                        865 S. FIGUEROA STREET,
                         10TH FLOOR
6                        LOS ANGELES, California  90017
                         213-624-7707
7

8    ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
     (Outgoing)
9                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
10                            JASON RUSSELL
                         300 SOUTH GRAND AVENUE
11                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
12

13   ON BEHALF OF MGA ENTERTAINMENT/ISAAC LARIAN:
     (Incoming)
14                       GLASER, WEIL, FINK, JACOBS & SHAPIRO, LLP
                         BY:  JOEL KLEVENS
15                       10250 Constellation Boulevard
                         Los Angeles, California  90067
16                       310-553-3000

17                       MITCHELL, SILBERBERG & KNUPP LLP
                         BY:  RUSSELL J. FRACKMAN
18                       11377 West Olympic Boulevard,
                         Los Angeles, California  90064-1683
19                       310-312-2000

20

     ON BEHALF OF DEFENDANT GUSTAVO MACHADO:
21
                         OVERLAND BORENSTEIN SCHEPER & KIM LLP
22                       BY:  ALEXANDER H. COTE
                         601 West Fifth Street,
23                       12th Floor
                         Los Angeles, California  90071
24                       213-613-4660

25   / / /
```

3

1                          I N D E X  (Continued)

2

3      APPEARANCES  (continued):

4

       On behalf of OMNI 808:

5

6                          BINGHAM McCUTCHEN LLP
                           BY:  Todd E. Gordinier
7                          600 Anton Boulevard
                           Costa Mesa, CA  92626-1924
8                          714-830-0622

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT        9

PAGE        32

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X

                                              Page

Motions.......................................    4

ednesday, February 11, 2009    EXHIBIT ____ 9 ____    Mattel vs. MGA

PAGE ____ 33 ____

70

1   follow the logical reason, their full amount of damages, based

2   on the instructions that they were provided and the evidence

3   that they were given, comes out to a consistent verdict.

4        THE COURT:  I do understand your argument.  Thank

5   you, Counsel.

6        MR. ZELLER:  Your Honor --

7        THE COURT:  No.  I've allowed the moving party to

8   speak first and last, and let's stick to that.  You have well

9   briefed these things.

10       I next want to take up Omni 808's ex-parte                01:34

11  application to intervene for limited purposes.

12       Mr. Gordinier.

13       MR. GORDINIER:  Thank you for offering me the

14  opportunity to address the Court.

15·      We've set out in our papers, really, what we're          01:34

16  looking for here.  The transaction by which Omni 808 acquired

17  its interest and stepped into the shoes of Wachovia was

18  straightforward and it was at arm's length.  And I, frankly,

19  although naively, believed that if we would get stipulated to

20  be a party to the proceeding going forward, to the extent the  01:35

21  Court --

22       THE COURT:  Where do those funds come from?

23       MR. GORDINIER:  Mr. Kadisha, Your Honor, is a very

24  substantial individual.  Mr. Kadisha, Neil Kadisha, who is the

25  president and CEO of Omni 808, was one of the founders of      01:35

:dnesday, February 11, 2009          EXHIBIT ____ 9 ____          Mattel vs. MGA E

PAGE ____ 34 ____

71

1   Qualcomm.  With everything that's gone on in the market in the

2   last six or seven months, I don't want to make any

3   representations, but Mr. Kadisha has from time to time appeared

4   on the Forbes 400 list.  I don't know what his net worth is.

5           What happened, Your Honor, is, Wachovia called the          01:35

6   note.  I don't know why.  I've been involved in these cases

7   where everybody feels like the world revolves around what's

8   happening in this courtroom.  As the Court knows, Wachovia had

9   other issues.

10          Wachovia and its syndicate wanted it off its balance      01:35

11  sheet, and MGA needed relief from the immediate need to pay

12  money they did not have.  And my client was approached and put

13  together people and bought the indebtedness and assumed the

14  debt at a discount, at a substantial discount; and he expects

15  to make money.                                                    01:36

16          THE COURT:  You're representing to the Court, though,

17  that this was not MGA's money; that this was -- from wherever

18  it came from, it came from someplace else.

19          MR. GORDINIER:  Your Honor, two things.  I've never

20  met Mr. Larian, and I know less about MGA than almost everybody  01:36

21  else.

22          THE COURT:  I'm not asking about what you know from

23  MGA but of what you know from your client.

24          MR. GORDINIER:  What I know from my client is, he put

25  in many millions of dollars.  He had a couple of investors with  01:36

:dnesday, February 11, 2009            9            Mattel vs. MGA

PAGE    35

72

1   him to put in many millions of dollars.

2           THE COURT:   Those investors and that money did not

3   come from MGA?

4           MR. GORDINIER:   That's the best of my understanding,

5   Your Honor.   That's true.                                      01:36

6           And the best way to resolve that is what the Court

7   has already done.   The Court did exactly the right thing and

8   set up Mr. Durkin, who's very accomplished, to look at MGA's

9   books.   Step number one, he can tell the Court what their

10  balance sheet is, what their income statement is, and also the   01:37

11  sources and uses of cash.

12          And if there are any issues -- and, by the way, I'm

13  happy to talk to Mr. Durkin or have Mr. Durkin talk to my

14  client.   This is not intended to be -- this wasn't a fraudulent

15  transaction, Your Honor.   We negotiated -- we -- I didn't do     01:37

16  it -- Omni 808 negotiated with Davis Polk on behalf of Wachovia

17  and bought at a discount; and Omni 808 expects to and would

18  like to make money on its investment, and will not be able to

19  do so, obviously, if MGA goes out of business.   So our interest

20  here is in protecting Omni 808's investment.   And part of that   01:38

21  is wanting a say in how MGA's business on this receiver issue

22  is dealt with.

23          THE COURT:   The interest to intervene is focused, as

24  you indicate in your papers, on the receivership issue?

25          MR. GORDINIER:   That's correct, Your Honor.   That's     01:38

ednesday, February 11, 2009   EXHIBIT _____ 9 _____   Mattel vs. MGA

PAGE _____ 36 _____

73

1    correct.

2              THE COURT:  Very well.

3         Does anyone wish to be heard in opposition to the

4    ex-parte application?

5              MR. ZELLER:  Yes, Your Honor.                    01:38

6         I don't know that we've been -- and maybe the Court

7    heard it differently, but I still do not hear anything that

8    certainly approaches evidence that this was, in fact, an arm's

9    length transaction.

10             THE COURT:  I have a representation from respected    01:38

11   counsel.

12             MR. ZELLER:  Well, he said -- Your Honor, the

13   Court -- all he said was to the best of his knowledge.  He

14   didn't say it didn't come from it.

15        Second, the Court asked MGA; it didn't ask from        01:39

16   Larian, Larian's brother-in-law, his wife -- there are other

17   family members involved in this, and their fingerprints are on

18   this.  So, certainly, I want to be very clear, Your Honor, we

19   have not gone so far as to say, this is a fraud, this is a

20   sham, or so on.  The fact is that there are substantial       01:39

21   questions here as to the bona fides of this transaction and

22   whether or not this has been papered in a way to basically

23   create debt and credit, where, in fact, it would simply be

24   treated by the tax code, by the bankruptcy code, by the courts,

25   for every other purpose, as, in fact, being nothing but a loan,  01:39

dnesday, February 11, 2009     EXHIBIT_____9_____     Mattel vs. MGA

                               PAGE_____37_____

77

1    Because, otherwise, the Court is creating, I mean, truly very,

2    very pragmatic problems.  And that's just even on the

3    settlement front.  There are others I can talk about, in terms

4    of the complication of the proceedings.

5        If we now have yet another party, and particularly          01:44

6    one who we do not really know who it is, floating around in

7    this case, asserting rights -- and whatever it is that Omni 808

8    claims to have, namely this credit interest, can be fully

9    protected by Local Rule 66 procedures.

10       In fact, if that's all they're really trying to do,          01:44

11   to intervene on that basis, that's coextensive with Local Rule

12   66.  So there is nothing to be gained, and huge amounts to be

13   potentially lost, by allowing them in.

14       THE COURT:  Thank you, Counsel.

15       Mr. Gordinier, do you wish to respond?                       01:44

16       MR. GORDINIER:  Yes.  The last point first.

17       The last thing I want to do is sit at a settlement

18   table with these gentlemen, no offense to either of them, who I

19   know well.  We are entitled as a matter of right to intervene,

20   to protect our interests.  These unprovoked and unwarranted     01:44

21   personal attacks are just inappropriate.

22       I said as far as I know because I wasn't involved in

23   the actual funding of the deal.  But it's my understanding that

24   many millions of dollars went to Wachovia, for which Wachovia

25   transferred its interest in the debt.  And that was an arm's    01:45

ednesday, February 11, 2009        EXHIBIT ____9____        Mattel vs. MGA Entertainme

                                    PAGE ____39____

78

```
 1  length deal, and it was a straightforward negotiation, and
 2  Davis Polk represented Wachovia.  There is no reason for the
 3  kind of repeated personal --
 4          THE COURT:  And who represented --
 5          MR. GORDINIER:  My partner in San Francisco, Bingham.      01:45
 6          THE COURT:  Bingham.
 7          MR. GORDINIER:  It's a fine firm, Your Honor.
 8          Bingham represented Omni 808 in this transaction.
 9          THE COURT:  Your representation, then, is that based
10  on your information and belief, the proceeds for that were not    01:45
11  proceeds -- I said MGA, but MGA, Isaac Larian, any other MGA
12  entity.
13          MR. GORDINIER:  As far as I know, Your Honor, this
14  was structured by Mr. Kadisha and the monies went to Wachovia.
15          THE COURT:  I know that part.  The question is where       01:46
16  the monies came from.
17          MR. GORDINIER:  I know at least $50 million came from
18  Mr. Kadisha and his immediate -- that's -- it's serious money,
19  Your Honor.  This was an arm's length transaction.
20          The focus of the receiver motion should be, and I          01:46
21  know is, from the Court's perspective, on MGA.  And Mr. Durkin,
22  when he finishes his process, or in the middle of his
23  process -- I'd be happy to talk to him about how this
24  transaction was structured.
25          THE COURT:  Very good.                                     01:46
```

ednesday, February 11, 2009    EXHIBIT _____ 9        Mattel vs. MGA Entertainmen

PAGE _____ 39

79

1        MR. GORDINIER:  We are not intending to hold up or

2   obstruct.  We've moved with the drift of this case as it's gone

3   for the ten days I've been involved in it.  We're not going to

4   hold the case up.  But we do believe we're entitled to be heard

5   on the receiver issue.                                          01:47

6        THE COURT:  Very good.

7        We're going to take a very brief five-minute break

8   for the court reporter.  I'll come back and rule on these

9   matters, and then we'll proceed with the hearing.

10       (Whereupon, a brief recess was held.)                      01:47

11       THE COURT:  We're back on the record.

12       Regarding the receivership and everything, there's

13   actually three matters that are related.  First of all, there

14   is the ex-parte application for receivership which was being

15   held in abeyance by the Court; I have the ex-parte application  02:07

16   by Omni 808 for intervention for this limited purpose; and then

17   I have a request for a briefing schedule on the appointment of

18   a receiver.

19       For the record, the Court wishes to disclose that

20   last evening, or yesterday afternoon, the Court held a meeting  02:07

21   with the forensic auditor, Mr. Durkin, and his staff, as well

22   as certain judicial officers of the court and certain other

23   nonjudicial individuals assisting the Court.  All have been

24   expressly ordered not to disclose the contents of the interim

25   report pending further order of this Court, and the Court did   02:08

ednesday, February 11, 2009    EXHIBIT ___9___    Mattel vs. MGA

PAGE ___40___

105

1   we'll go from there.

2          MR. ZELLER:   Thank you.

3          THE COURT:   Anything further?

4          Thank you.   Good day.

5

6

7

8

9

10                          CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
14   conformance with the regulations of the Judicial Conference of
     the United States.

15

16   _____       _____
     THERESA A. LANZA, CSR, RPR                   Date
17   Federal Official Court Reporter

18

19

20

21

22

23

24

25

:dnesday, February 11, 2009    EXHIBIT ____9____    Mattel vs. MGA

                               PAGE ____u1____

# EXHIBIT 10

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

CARTER BRYANT, an individual,

     Plaintiff,

    vs.

MATTEL, INC., a Delaware
corporation,

       Defendants.

No. CV 04-9049 SGL (RNBx)
Consolidated with
Nos. CV 04-9405 and
05-2727

**CERTIFIED COPY**

AND CONSOLIDATED ACTIONS.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Wednesday, March 4, 2009

Volume 1

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 106479

EXHIBIT ___-10

PAGE ___42

877.955.3855
www.sarnoffcourtreporters.com

IRVINE ▪ LOS ANGELES ▪ SAN FRANCISCO ▪ LAS VEGAS ▪ SAN DIEGO



SARNOFF
Court Reporters and
Legal Technologies

TRANSCRIPT OF PROCEEDINGS                           03/04/09

```
 1   APPEARANCES:
 2
 3   Discovery Master:
 4        ROBERT C. O'BRIEN
          Attorney at Law
 5        555 West Fifth Street, Suite 4800
          Los Angeles, California  90013-1065
 6        (213) 629-7400
 7   For Defendant Mattel, Inc.:
 8        QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
          BY:  MICHAEL T. ZELLER
 9        BY:  JON COREY
          Attorneys at Law
10        865 South Figueroa Street, 10th Floor
          Los Angeles, California 90017
11        (213) 624-7707
12        MATTEL, INC.
          BY:  JILL E. THOMAS
13        Assistant General Counsel
          333 Continental Boulevard
14        El Segundo, California 90245-5012
          (310) 252-2000
15
     For Defendants MGA and Isaac Larian:
16
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
17        BY:  JASON D. RUSSELL
          BY:  JENNIFER K. DEL CASTILLO
18        Attorneys at Law
          300 South Grand Avenue
19        Los Angeles, California 90071
          (213) 687-5000
20
     For Defendant IGWT Group and IGWT 826 Investments:
21
          VALLE & ASSOCIATES
22        BY:  JEFFREY B. VALLE
          BY:  ILAN WISNIA
23        Attorneys at Law
          11911 San Vicente Boulevard, Suite 324
24        Los Angeles, California 90049
          (310) 476-0300
25
```

                                                            3

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
                    877.955.3855
                        10
PAGE _____              43

TRANSCRIPT OF PROCEEDINGS          03/04/09

1    APPEARANCES (Continued):

2

3    For 808 Investors, LLC, Vision Capital, LLC, and OmniNet
     Capital, LLC:

4

         BINGHAM McCUTCHEN LLP
5        BY:   TODD E. GORDINIER
         BY:   PETER VILLAR
6        Attorneys at Law
         600 Anton Boulevard, 18th Floor
7        Costa Mesa, California 92626-1924
         (714) 830-0622

8
_____

     Also Present:
9
         STEPHEN HAUSS
10       CRAIG HOLDEN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

EXHIBIT ___10___
PAGE ___44___

1   compel is improper and should be denied for both serious

2   substantive and procedural reasons.  If we're going to

3   have these rules, they have a purpose, they have to be

4   followed.  And the Court's very order, the Court's

5   standing order says if this isn't done, it won't be

6   considered.  They now are walking away from these other

7   orders and they want to rely on the discovery stipulation

8   and order which, of course, I had no knowledge of when we

9   were having this discussion.  As you're well aware of,

10  they didn't even comply with that.  Perhaps if they had,

11  and set out, as they're required to do in writing, what it

12  is they want, why they want it, let's talk about it, let's

13  sit down and discuss it, we could, perhaps, have narrowed

14  it.  In fact, both I and my colleague told Mr. Corey we

15  were pretty sure we could satisfy himself with respect to

16  the bona fides of the transaction.  That was rejected.

17      MR. O'BRIEN:  Let me ask you this question.

18  You've said the discovery's overbroad.  What narrow

19  request could Mattel make that you believe would be proper

20  under the circumstances here?  In other words, what kind

21  of request do you think would be, as a third party?  I

22  mean, I understand you don't want to respond to anything,

23  it's a burden.  But assuming there's always a burden in

24  responding to discovery, what narrow request, based on

25  your understanding of the issues in phase 2, would be

50

EXHIBIT _____ 10

PAGE _____ 45

1   proper for your -- that you wouldn't come in here and file

2   a motion to quash?

3        MR. GORDINIER:  What documents do we have that

4   show that either Mr. Larian or MGA paid money into this to

5   purchase this debt?  I can tell you there are none.  This

6   is a ready, fire, aim situation.  The allegations that

7   were made and were made publicly are unconscionable and

8   can't be undone.

9        MR. O'BRIEN:  What other areas?  For example,

10  would the payment history with respect to the debt from

11  MGA to 808, assuming there is one, I don't know if this is

12  a balloon payment or that sort of thing --

13       MR. GORDINIER:  I assume that's in MGA's

14  financial statements, but -- I mean, I assume that they've

15  made payments.  I don't know the answer to that, that's

16  reflected on their financial statements, which I'm

17  assuming have been exchanged, but I don't know that.

18       MR. O'BRIEN:  Mr. Russell said that there was

19  discovery that was taken of Wachovia in phase 1.  I was

20  not involved in the case.  I don't know what discovery was

21  taken of Wachovia.  But, presumably -- but it sounds like,

22  and I'll let Mr. Zeller answer this and Mr. Russell

23  address it as well, but if there was discovery in phase 1

24  that was proper as to Wachovia in establishing the debt

25  and looking at the payment terms, and all that sort of

51

EXHIBIT ____ 10

PAGE ____ 44

 1    thing, would that same sort of discovery be proper

 2    vis-a-vis 808 --

 3            MR. GORDINIER:  We absolutely offered -- we

 4    offered, without knowing any of this, to give them the

 5    deal documents.  Absolutely.  I don't know that it's

 6    proper.  I think it's overbroad and I think it's

 7    premature, but I'll just tell you, we offered to give them

 8    the deal documents.  There's no secret there.  We did buy

 9    the debt at a discount.  You've read the transcript.  I

10    told Judge Larson my client wants to make money at this,

11    and so he made a business decision that -- you know,

12    Wachovia has its own reasons for doing what it's doing

13    that we all can kind of guess -- but I don't know.  My

14    client had his own reasons for doing what he's doing.  The

15    only thing that seems to relate to all this is do they

16    have -- are there any documents that show the disgorgement

17    thing, or whatever he's trying to argue, and I'm not

18    familiar with the phase 2 -- but I have no problem

19    conceptually giving them the deal documents.  None at all.

20    But that doesn't entitle them to look at all records that

21    reflect all my nonparty entities, all documents detailing

22    or setting forth.  Read through them; they're overbroad

23    and they're improper.

24            MR. O'BRIEN:  What about performance, the

25    performance of the loan.

                                                              52

EXHIBIT    10

PAGE       47

1    So, for example, would communications regarding

2  the loan -- because one of the statements that Mr. Zeller

3  made is that he thought that this loan might be forgiven

4  or that it might be a sham loan, would communications

5  between the 808 entities and MGA regarding whether the

6  loan should be paid back, whether the loan has to be paid

7  back, when the loan has to be paid back, would those sorts

8  of communications, if they exist -- I have no idea if they

9  exist or not -- would those be, in your view, discoverable

10  from your clients or would those be --

11    MR. GORDINIER: In my view under the law, given

12  what they've propounded and given the motion they've made,

13  you have no choice but to deny it.

14    Having said that, informally we're sitting here

15  trying to cut through all this stuff. I have no trouble,

16  and I've told them in the one conversation they deemed to

17  have, that we would have no trouble giving them the deal

18  documents. I can tell you we have no trouble giving you,

19  or giving them the payments reflected or that sort of

20  stuff. That doesn't mean, and I don't think the law would

21  require or permit that at this point. I think at this

22  point you have to go -- they have to go to MGA first,

23  because all that's coming from MGA, and I really do think

24  that's the appropriate procedure. And I really don't

25  think it's proper to encourage this precise kind of

54

EXHIBIT 10
PAGE 48

1    abusive fishing expedition, which is what we've got going

2    on.

3              MR. O'BRIEN:  And I understand your position.

4    I'm not negotiating with you on MGA's behalf and I'm not

5    suggesting that you -- I'm just trying to get an idea of

6    where you think the law -- what the parameters of

7    discovery are with respect to your client.  So I'm not

8    telling you you should, on the record or otherwise, offer

9    to give them documents if you don't think they're due.

10   I'm not trying to push you into that position and hold

11   it -- the point of this isn't to meet and confer.  I'm

12   just trying to get an idea of where you see the contours

13   of the law with respect to your client as to what

14   discovery might or might not be proper.

15             And I understand your position that on this

16   record you don't think any of the current discovery is

17   proper, but --

18             MR. GORDINIER:  Right.  Assuming they can't get,

19   from MGA, the payments from MGA on the loan, I have no

20   problem with that.  I have no problem with the loan

21   documents.

22             Now, it's true MGA was not a party directly to

23   the transaction between Omni 808 and Wachovia.  They had

24   to sign some guarantees, I think, or some

25   indemnifications, I'm not sure exactly, I'm not a

55

EXHIBIT _____ 10

PAGE _____ 49

1   corporate guy.  But that deal was negotiated between

2   Omni 808 and Wachovia.  And so -- let's make sure that I'm

3   communicating with you, and that is on this record they're

4   not entitled to anything.  However, what I want more than

5   anything out of today is efficiency and economy and peace

6   and you guys in the front of this table go on and do your

7   thing leading to the trial between all the MGA entities

8   and the Mattel entities and leave me and my clients alone.

9   And if that will cut it off, I'd be happy to do that.

10   That's my position.  Do you see what I'm saying?

11           MR. O'BRIEN:  I do.  I understand.  Mr. Zeller

12   took the position that in the Ninth Circuit the law that

13   we're dealing with here, unlike New York, a party isn't

14   required to go to their adversary before going to a third

15   party to seek discovery.  Do you have a -- you seem to be

16   taking a different position --

17           MR. GORDINIER:  It's ironic --

18           MR. O'BRIEN:  -- as a practical matter.  Is there

19   a case cite or.

20           MR. GORDINIER:  Absolutely.  It's ironic that

21   Mr. Zeller would cite the Ninth Circuit.  Google

22   Mr. Zeller and Mattel and read the Ninth Circuit's opinion

23   on why a subpoena like this should be quashed, and why

24   sanctions against an attorney can be granted.  The case

25   name is Mattel versus Walking Mountain Productions.  So

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT _____ 10

PAGE _____ 50

1    that's the case I'd cite to you.

2              MR. O'BRIEN:  All right.

3              MR. GORDINIER:  Here it is, it's 353 F 3rd 792.

4    If you want, I can hand it up to you.

5              MR. O'BRIEN:  I can take a look at it.  One --

6              MR. GORDINIER:  Most of it is not related.  Go to

7    the end where they're upholding -- Judge Lew found that

8    what Mr. Zeller was doing was improper, and sanctioned

9    him, and the Ninth Circuit affirmed it.  So if you want

10   the authority I'm relying on, that's it.

11             MR. O'BRIEN:  Okay.  I'll take it -- if that's

12   the authority you're relying on for that position, I'll

13   take it.

14             The one thing that I do want to caution here is

15   that we're not litigating that case.  I don't know what

16   the discovery issues were in that case.  We're going to be

17   together for a fair amount of time.  I know you may not --

18             MR. GORDINIER:  Hopefully not me.

19             MR. O'BRIEN:  I understand that.

20             MR. GORDINIER:  No offense, Mr. O'Brien.

21             MR. O'BRIEN:  None taken.  But I do -- I don't

22   want to have, unless it's directly relevant, and I'm

23   sure you weren't intending to do so, but I don't want any

24   sort of ad hominum attacks on counsel and question their

25   motives and that sort of thing.  My feeling here is that

57

EXHIBIT _____ 10

PAGE _____ 51

1    country and going to China and we're never going to see

2    him again, then I need to know that.  But absent that sort

3    of a situation, I'd like to give counsel until Monday to

4    respond.

5                MR. ZELLER:  I hate to delve into this, and I'll

6    try and be as noncontroversial as possible, which, I'm

7    sure, is not going to be possible here.

8                The ex parte seeks to basically have Lexington

9    deemed served with our subpoena.  I'm not going to go into

10   all the details, but one concern I do have is that we

11   asked counsel to accept the subpoena for Lexington after

12   we'd already served, we thought, their proper agent.  They

13   came back on the day that the subpoena was due, the return

14   date, and said that's not the right guy.

15               MR. O'BRIEN:  Let's do this in the papers.  I

16   need to see the papers.  Is there some statute of

17   limitations issue or someone going to flee the

18   jurisdiction?

19               MR. ZELLER:  There's a preservation issue that

20   I'm concerned about.  Right now they're taking the

21   position that they are under no obligation under the

22   subpoena.  If we're having -- if -- because we asked over

23   a week ago whether they would accept service.  We got no

24   response on that.  So my point is that we have a situation

25   where Lexington, which we have suspicion about, for

EXHIBIT _____ 10

PAGE _____ 52

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

 1    obvious reasons, considers itself under no obligation of

 2    the subpoena.  If they're willing to say that obviously

 3    they understand that Lexington is under an obligation to

 4    preserve documents during this time period, then Monday is

 5    fine by me.  But I don't want an argument that somehow

 6    between the time that this got teed up and Monday

 7    something's happened that somehow their legal obligations

 8    are different from how we view them.

 9                MR. O'BRIEN:  Is that a representation you --

10                MR. GORDINIER:  Exhibit A.  Let me just tell you

11    this, nothing is going to be destroyed between now and

12    Monday close of business.  I'm not going to concede

13    anything else with respect to what he said.

14                MR. O'BRIEN:  I'm not asking -- I don't want to

15    get into the issue of whether the subpoena was proper or

16    not.  He's raised an issue about document preservation

17    that he believes your putative client -- do you represent

18    Lexington?

19                MR. GORDINIER:  It's a more complicated issue

20    than that.  We will address it on the papers on Monday

21    but --

22                MR. O'BRIEN:  I will take your representation

23    today that Lexington or affiliated entities are not going

24    to destroy any documents that would have been subject to

25    the subpoena that may or may not have been served so that

                                                              97

1    we can deal with that issue, but there will be no document

2    destruction of any nature, and I'm going to ask you to

3    convey that to the Lexington people and let them know that

4    you've made that representation on their behalf.

5              MR. GORDINIER:  Will do.

6              MR. O'BRIEN:  Okay.  So then we'll see your

7    response on Monday.  And if we need to set a hearing, once

8    I get the response, I'll either take it under submission

9    and make a ruling or I'll set a hearing and I'll address

10   the document issue further in the ruling, if necessary.

11             MR. GORDINIER:  I have one more thing, and this

12   really can be off the record.

13             MR. O'BRIEN:  Okay.  Let's go off the record.

14   We're going to conclude today's hearing.  I want to thank

15   counsel for the excellent argument, all-around, and,

16   again, I'll get back to you with a ruling in the very near

17   future.

18   ///

19   ///

20

21

22

23

24

25

1      I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3           That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11           Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [  ] was [  ] was not requested.

15           I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18           IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: -_____ MAR 0 9 2009

22

23           _____
                 *Cheryl R. Kamalski*

24           CHERYL R. KAMALSKI
             CSR No. 7113

25

EXHIBIT ___10___

PAGE ___55___