QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  John B. Quinn (Bar No. 90378)
  (johnquinn@quinnemanuel.com)
  Michael T. Zeller (Bar No. 196417)
  (michaelzeller@quinnemanuel.com)
  Jon D. Corey (Bar No. 185066)
  (joncorey@quinnemanuel.com)
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100

Attorneys for Mattel, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>              Plaintiff,<br><br>        v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>              Defendant.<br>_____<br><br>_____<br><br>AND CONSOLIDATED CASES | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated With Case No. 04-9059 and Case No. 05-2727<br><br>MATTEL, INC.'S THIRD AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR:<br><br>1.  COPYRIGHT INFRINGEMENT;<br>2.  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;<br>3.  CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;<br>4.  MISAPPROPRIATION OF TRADE SECRETS;<br>5.  BREACH OF CONTRACT;<br>6.  INTENTIONAL INTERFERENCE WITH CONTRACT;<br>7.  BREACH OF FIDUCIARY DUTY;<br>8.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;<br>9.  BREACH OF DUTY OF LOYALTY;<br><br>**PUBLIC REDACTED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11. CONVERSION;
12. UNFAIR COMPETITION;
13. AVOIDANCE OF INTENTIONAL AND CONSTRUCTIVE FRAUDULENT TRANSFERS UNDER UNIFORM FRAUDULENT TRANSFER ACT; AND
14. DECLARATORY RELIEF.

DEMAND FOR JURY TRIAL

-1-

THIRD AMENDED ANSWER AND COUNTERCLAIMS

## **THIRD AMENDED ANSWER**

Defendant Mattel, Inc. ("Mattel") answers the Complaint of MGA Entertainment, Inc. ("Complaint") as follows:

Preliminary Statement

The Complaint in this case contravenes Rule 8(a) of the Federal Rules of Civil Procedure in multiple respects. For example, in many places, the Complaint improperly mixes factual averments with argumentative rhetoric. The Complaint also includes a selective recitation of alleged historical facts and "rumor," much of which is both irrelevant and inflammatory in tone and content. In addition, many of the allegations of the Complaint are overly broad, vague or conclusory and include terms which are undefined and which are susceptible to different meanings. Accordingly, by way of a general response, all allegations are denied unless specifically admitted, and any factual averment admitted is admitted only as to the specific facts and not as to any conclusions, characterizations, implications or speculations which are contained in the averment or in the Complaint as a whole. These comments and objections are incorporated, to the extent appropriate, into each numbered paragraph of this Third Amended Answer.

Mattel further submits that the use of the headings throughout the Complaint is improper, and therefore no response to them is required. In the event that a response is required, Mattel denies those allegations.

The Complaint also contains many purported photographs of various items, and it uses one or more headings purporting to describe, either individually or in groups, these various photographs. The images of these photographs contained in the Complaint are all relatively small and some are of less than optimal quality, making it difficult to evaluate the adequacy of the photographs or their fairness and accuracy in depicting what they purport to represent. The Complaint also does not describe the circumstances or time frame in which these photographs were taken, and in many cases does not identify, or does not sufficiently or properly identify, the

item depicted in the photographs.  All of these factors, as well as the use of these photographs and headings out of context, or with an insufficient context, impair the ability of Mattel to fully respond to these photographs and headings, or to any purported allegations involving, or relying upon, the use of such photographs and accompanying headings.  By way of a general response, Mattel therefore does not admit the authenticity of any photograph, or the accuracy or adequacy of any heading, nor does it admit any allegation or inference that is based on, or purports to be based on, any photograph or accompanying heading in the Complaint.  Mattel reserves the right to challenge the authenticity of any photograph and the accuracy or adequacy of any heading (either as included in the Complaint or in the context of additional material not included).  Further, with reference to all photographs and accompanying headings, or any averments based on the Complaint's use of such photographs and headings, which might be offered into evidence, Mattel specifically reserves its right to object to any use of such photographs, headings, and averments, or the Complaint as a whole or in part, in evidence for any purpose whatsoever.

To the extent that Mattel has endeavored to answer any particular allegation containing any such photographs and headings, any admission concerning the item purported to be depicted in such photograph, or described in such headings, shall not constitute an admission that the photograph is authentic, adequate, or admissible, nor that any heading is accurate, adequate, or admissible.  All such items purportedly depicted in such photographs, and described in such headings, "speak for themselves."  Accordingly, to the extent that any such referenced materials are deemed allegations against Mattel, they are denied.

<u>Responses</u>

1.    Answering paragraph 1 of the Complaint, Mattel admits that plaintiff MGA Entertainment, Inc. ("plaintiff" or "MGA") is a California corporation with a principal place of business in Van Nuys, California.

1         2.     Answering paragraph 2 of the Complaint, Mattel admits that

2    Mattel is a Delaware corporation with a principal place of business in El Segundo,

3    California.

4         3.     Answering paragraph 3 of the Complaint, Mattel denies that

5    there has been wrongful conduct on its part and states that it is without knowledge

6    or information sufficient to form a belief as to the truth or falsity of the remaining

7    allegations set forth therein and, on that basis, denies them.

8         4.     Answering paragraph 4 of the Complaint, Mattel admits that

9    plaintiff purports to assert claims under the Lanham Act, 15 U.S.C. §§ 1125(a) and

10   (c), California Business and Professions Code §§ 17200 *et seq.*, California Business

11   and Professions Code § 14330 and California common law, denies that plaintiff is

12   entitled to any relief thereunder and denies the truth of the remaining allegations set

13   forth in paragraph 4.

14        5.     Answering paragraph 5 of the Complaint, Mattel admits that it is

15   subject to personal jurisdiction in this District and denies the truth of the remaining

16   allegations set forth in paragraph 5.

17        6.     Answering paragraph 6 of the Complaint, Mattel admits that

18   venue is proper in this District and denies the truth of the remaining allegations set

19   forth in paragraph 6.

20        7.     Answering paragraph 7 of the Complaint, Mattel admits that

21   MGA has filed the instant lawsuit and denies the truth of the remaining allegations

22   set forth in paragraph 7.

23        8.     Answering paragraph 8 of the Complaint, Mattel states that it is

24   without knowledge or information sufficient to form a belief as to the truth or falsity

25   of the allegations regarding MGA's history set forth therein and, on that basis,

26   denies them, states that MGA has made conflicting representations, including in

27   sworn statements, that are at odds with the allegations of the Complaint and denies

28   the truth of the remaining allegations set forth in paragraph 8.

9.      Answering paragraph 9 of the Complaint, Mattel admits that MGA filed this action, states that Mattel's web site and corporate governance policies speak for themselves and denies the truth of the remaining allegations set forth in paragraph 9.

10.      Answering paragraph 10 of the Complaint, Mattel admits that it is the world's most successful toy company, states that the first doll in its BARBIE line was publicly introduced in 1959 and that BARBIE-branded dolls have been the world's best-selling toys, states that Mattel's sales and stock price speak for themselves, and denies the truth of the remaining allegations set forth in paragraph 10.

11.      Answering paragraph 11 of the Complaint, Mattel admits that Adrienne Fontanella is the former president for girls' toys at Mattel, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding an alleged statement by Ms. Fontanella, and denies the truth of the remaining allegations set forth in paragraph 11.

12.      Answering paragraph 12 of the Complaint, Mattel is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding alleged statements by unidentified "analysts," states that Mattel's sales and stock price speak for themselves, and denies the truth of the remaining allegations set forth in paragraph 12.

13.      Answering paragraph 13 of the Complaint, Mattel admits that Jill Barad became President and Chief Executive Officer of Mattel in January 1997, that Mattel acquired Tyco Industries, Inc. ("Tyco") in March 1997, that Mattel acquired Pleasant Company in 1998, Mattel acquired the Learning Company in May 1999, that Mattel acquired Purple Moon in 1999, that the MATCHBOX brand was owned by Tyco, that the AMERICAN GIRL line of dolls was made by Pleasant Company at the time of that entity's acquisition, and denies the truth of the remaining allegations set forth in paragraph 13.

14.     Answering paragraph 14 of the Complaint, Mattel states that its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

15.     Answering paragraph 15 of the Complaint, Mattel states that its stock price and its public announcements speak for themselves, and denies the truth of the remaining allegations set forth therein.

16.     Answering paragraph 16 of the Complaint, Mattel states that its stock price speaks for itself, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the alleged views of unnamed "analysts" and "[i]nvestors," and denies the truth of the remaining allegations set forth therein.

17.     Answering paragraph 17 of the Complaint, Mattel admits that Ms. Barad resigned in February 2000.

18.     Answering paragraph 18 of the Complaint, Mattel admits that Robert Eckert became Chairman and Chief Executive Officer of Mattel in May 2000 and that Mr. Eckert previously was employed at Kraft Foods, Inc. for 23 years, is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the views of unnamed "[i]nvestors" and others, and denies the truth of the remaining allegations set forth in paragraph 18.

19.     Answering paragraph 19 of the Complaint, Mattel admits that the *Wall Street Journal* published an article on August 10, 2000 the content of which speaks for itself, and denies the truth of the remaining allegations set forth therein.

20.     Answering paragraph 20 of the Complaint, Mattel admits that it disposed of the Learning Company in October 2000, states that its sales and revenues speak for themselves, states that the remainder of the allegations contained therein are characterizations, not factual assertions, and therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies the truth of any remaining allegations set forth in paragraph 20.

21.     Answering paragraph 21 of the Complaint, Mattel admits that products in plaintiff's "Bratz" line compete with products in Mattel's BARBIE and other product lines and states that the remainder of the allegation contained therein—consisting of a sentence fragment—is unintelligible and on that basis denies the truth of any such remaining allegation set forth therein.

22.     Answering paragraph 22 of the Complaint, Mattel admits that products in plaintiff's "Bratz" line compete with Mattel products, states that the remainder of the allegations contained therein are characterizations, not factual assertions, and that therefore no response is necessary under Fed. R. Civ. P. 8(b) and, to the extent any further response is required, denies the truth of any remaining allegations set forth therein.

23.     Answering paragraph 23 of the Complaint, Mattel states that MGA has made conflicting statements, including in sworn statements, that are inconsistent with the allegations set forth in paragraph 23 of the Complaint and states that it is therefore without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

24.     Answering paragraph 24 of the Complaint, Mattel states that the "look" of the referenced dolls speak for themselves and denies the truth of the remaining allegations set forth therein.  By way of further answer, Mattel states that the photographs and their accompanying caption on page 7 of the Complaint are false and misleading to the extent they are intended to suggest that MGA has produced or used a consistent packaging shape or look or that it has protectible rights in the matters depicted in the photographs.

25.     Answering paragraph 25 of the Complaint, Mattel admits that Bratz dolls are between approximately 9.5 to 10 inches in height, states that the appearances of the dolls speak for themselves, denies that "Bratz" dolls are or "were intentionally shorter" than dolls in Mattel's BARBIE line, denies that the "Bratz"

dolls "looked like no other" and denies the truth of the remaining allegations set forth in paragraph 25.

26.     Answering paragraph 26 of the Complaint, Mattel states that the use of the term "classic" is unintelligible, since Mattel has designed and sold different dolls using different heads and with different fashions and themes over the years, and denies the truth of any remaining allegations.  By way of further answer, Mattel states that the image encaptioned "Mattel's 'Barbie'" on page 8 of the Complaint is misleading in that it depicts one of the doll heads that have been used as part of the BARBIE line for many years, and therefore ignores that Mattel has long designed and sold an array of different BARBIE line dolls that use different doll heads, including doll heads which depict different ethnicities, and that are dressed in different clothing and fashion styles.

27.     Answering paragraph 27 of the Complaint, Mattel admits that MGA has used the line "The Girls With a Passion for Fashion" in some contexts, denies that MGA originated or otherwise has rights to that phrase, admits that one audience for products in the "Bratz" line has been "tweens" and denies the truth of the remaining allegations set forth in paragraph 27.

28.     Answering paragraph 28 of the Complaint, Mattel admits that certain "Bratz" dolls have won certain awards, the terms of which speak for themselves, states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the "awards" MGA claims and, on that basis, denies them, denies that plaintiff has protectible rights and denies the truth of any remaining allegations set forth in paragraph 28.

29.     Answering paragraph 29 of the Complaint, Mattel admits that dolls in the "Bratz" line compete with dolls in Mattel product lines, denies that Mattel has or has ever had a "stranglehold" on any market, states that the market allegations contained in paragraph 29 are vague and ambiguous, including without limitation in that the allegations fail to specify what products among the parties'

1  respective lines are being referred to and what time period is being referred to, and

2  denies the truth of any remaining allegations set forth in paragraph 29.

3       30.   Answering paragraph 30 of the Complaint, Mattel admits that

4  MGA has been a licensee of Mattel, states that the market allegations are vague and

5  ambiguous, including without limitation in that the allegations fail to specify what

6  products are being referred to and what time periods or points in time are being

7  referred to, and states that the remainder of the allegations contained therein are

8  characterizations, not factual assertions, and therefore no response is necessary

9  under <u>Fed. R. Civ. P.</u> 8(b) and, to the extent any further response is required, denies

10  the truth of any remaining allegations set forth in paragraph 30.

11       31.   Answering paragraph 31 of the Complaint, Mattel states that the

12  allegations contained therein are characterizations, not factual assertions, and

13  therefore no response is necessary under <u>Fed. R. Civ. P.</u> 8(b) and, to the extent any

14  further response is required, denies the truth of the allegations set forth in paragraph

15  31.

16       32.   Answering paragraph 32 of the Complaint, Mattel denies the

17  truth of the allegations set forth therein.

18       33.   Answering paragraph 33 of the Complaint, Mattel denies the

19  truth of the allegations set forth therein.

20       34.   Answering paragraph 34 of the Complaint, Mattel states that it

21  has released various MY SCENE dolls, including MY SCENE dolls named

22  "Madison", "Chelsea" and "Barbie," states that the appearance of the Bratz and MY

23  SCENE dolls speak for themselves, denies that Mattel designed its MY SCENE

24  dolls to "evoke" or resemble the alleged "look" of "Bratz" dolls, denies that plaintiff

25  has protectible rights, states that MGA has made conflicting representations that are

26  at odds with the allegations of the Complaint and that it is therefore without

27  knowledge or information sufficient to form a belief as to the truth or falsity of the

28  allegations regarding the "launch" of Bratz dolls set forth therein and, on that basis,

1   denies them, and denies the truth of the remaining allegations set forth therein.  By

2   way of further answer, Mattel states that the photographs and their accompanying

3   captions on page 10 of the Complaint are misleading and false to the extent they are

4   intended to suggest that a particular Mattel doll has been changed over time as

5   purportedly depicted.  Among other things, Mattel has long designed and sold an

6   array of different BARBIE line dolls using different doll heads, and the photographs

7   encaptioned "Mattel's Traditional 'Barbie'" is one of the doll heads that has been

8   used, and continues to be used, as part of the BARBIE line.  In addition, the

9   photographs encaptioned MY SCENE doll "circa 2002" is, in fact, a Mattel doll

10  character called BARBIE that continues to be sold and/or marketed with that head,

11  and the photographs encaptioned MY SCENE doll "circa 2004" depict a MY

12  SCENE doll character separate and apart from the one depicted in the "circa 2002"

13  image (and is not a revised character as plaintiff apparently attempts to imply).

14          35.     Answering paragraph 35 of the Complaint, Mattel admits that

15  Mattel released a product line called FLAVAS, states that the appearance of the

16  FLAVAS dolls speaks for themselves, states that it is without knowledge or

17  information sufficient to form a belief as to the truth or falsity of the allegations

18  regarding the  "rumor" relied upon by plaintiff and the undefined "media"

19  purportedly quoting Isaac Larian and, on that basis, denies them, denies that Mattel

20  has abandoned the FLAVAS line, and denies the truth of the remaining allegations

21  set forth in paragraph 35.

22          36.     Answering paragraph 36 of the Complaint, Mattel denies the

23  truth of the allegations set forth therein.

24          37.     Answering paragraph 37 of the Complaint, Mattel denies the

25  truth of the allegations set forth therein.  By way of further answer, Mattel states that

26  the unnumbered photographs and their accompanying captions on pages 11 through

27  16 of the Complaint -- which apparently were included to purportedly support the

28  allegation that MY SCENE dolls "became 'Bratz,'" which allegation Mattel

1  specifically denies -- are false and misleading.  Among other things, the heads

2  depicted are among an array of different doll heads that Mattel has used, and

3  continues to use, over the course of many years.  Moreover, the images purport to

4  compare different Mattel doll lines to show alleged changes in appearance even

5  though, in fact, each of the heads are currently sold and/or marketed to the public.

6  The "Blonde" series of photographs encaptioned "original" and "recent" MY

7  SCENE is further and specifically misleading in that it purports to compare two

8  differently named and outfitted dolls in the MY SCENE doll line, both of which

9  continue to be sold and/or marketed.

10       38.    Answering paragraph 38 of the Complaint, Mattel states that the

11  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,

12  denies that MGA was the originator of or the first to use the eye shape or makeup

13  depicted as purportedly constituting "the 'BRATZ' eye," denies that Mattel has

14  copied the "the 'BRATZ' eye" and denies the truth of the remaining allegations

15  contained in paragraph 38.  By way of further answer, Mattel states that the

16  unnumbered photographs and accompanying caption on page 13 of the Complaint

17  are false and misleading.  Among other things, the purported "Original Mattel 'My

18  Scene' Eye" is one of the eye and makeup designs that Mattel has used over the

19  course of many years, and Mattel continues to sell and/or market dolls using the eye

20  and makeup design depicted therein.

21       39.    Answering paragraph 39 of the Complaint, Mattel states that the

22  phrase "the 'BRATZ' eye" is unintelligible, denies that MGA has rights therein,

23  denies that MGA was the originator of or the first to use the eye shape or makeup

24  purportedly described as constituting "the 'BRATZ' eye," denies that Mattel has

25  copied "the 'BRATZ' eye," states that the relevant dolls speak for themselves and

26  denies the truth of the remaining allegations contained in paragraph 39.  By way of

27  further answer, Mattel states that the unnumbered photographs and accompanying

28  captions on page 14 of the Complaint are false and misleading.  Among other things,

2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   the purported "New Mattel 'My Scene' Eye" is one of the eye and makeup designs

2   that Mattel has used over the course of many years, and Mattel continues to sell

3   and/or market dolls using the eye and makeup design depicted on page 14 of the

4   Complaint.

5          40.     Answering paragraph 40 of the Complaint, Mattel denies the

6   truth of the allegations therein.  By way of further answer, Mattel states that the

7   unnumbered photographs and their accompanying captions on pages 15 to 16 are

8   false and misleading.  Among other things, the heads depicted are among an array of

9   different doll heads that Mattel has used, and continues to use, over the course of

10  many years.  Moreover, the photographs purport to compare different Mattel doll

11  lines to show alleged changes in appearance even though, in fact, each of the heads

12  are currently sold and/or marketed to the public.  The "Blonde" series of

13  photographs encaptioned "original" and "recent" MY SCENE is further and

14  specifically misleading in that it purports to compare two differently named and

15  outfitted dolls in the MY SCENE doll line, both of which continue to be sold and/or

16  marketed.

17         41.     Answering paragraph 41 of the Complaint, Mattel denies the

18  truth of the allegations set forth therein.

19         42.     Answering paragraph 42 of the Complaint, Mattel admits that the

20  photographs purport to depict two packages that were, among others, part of the MY

21  SCENE line, state that the packages speak for themselves and denies the truth of any

22  remaining allegations set forth therein.

23         43.     Answering paragraph 43 of the Complaint, Mattel admits that the

24  photograph purports to depict one of the packages that were, among others, part of

25  the MY SCENE line, states that the parties' packages speak for themselves, states

26  that MGA has failed to establish that it originated, or has protectible rights in, an

27  "open and transparent style" for packaging and denies the truth of the remaining

28  allegations set forth therein.

44.     Answering paragraph 44 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, "the 'BRATZ' packaging" or in the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

45.     Answering paragraph 45 of the Complaint, Mattel admits that one photograph purports to depict one of the packages that were, among others, part of the MY SCENE line, admits that the other photograph purports to depict one of the packages that were, among others, used as part of the Bratz line, states that the parties' packages speak for themselves, denies that MGA originated, or has protectible rights in, the packaging depicted in the Complaint and denies the truth of any remaining allegations set forth therein.

46.     Answering paragraph 46 of the Complaint, Mattel states that it has utilized a wide variety of packaging styles and shapes over the years, states that the relevant packaging speaks for itself, states that MGA lacks protectible rights in "non-rectangular shaped box" packaging or in the other elements MGA claims in paragraph 46, and denies the truth of the remaining allegations set forth therein.

47.     Answering paragraph 47 of the Complaint, Mattel denies that any alleged "theme" is "MGA's theme," denies that MGA originated or has rights to any theme and denies the truth of the remaining allegations set forth therein.

48.     Answering paragraph 48 of the Complaint, Mattel admits that it released a doll called "Chillin Out!", states that it has released such themed dolls over the course of many years, admits MGA released a "Wintertime Wonderland" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

49.     Answering paragraph 49 of the Complaint, Mattel admits that it released a doll called "Night on the Town", states that it has released such themed dolls over the course of many years, admits MGA released a "Formal Funk" themed doll, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

50.     Answering paragraph 50 of the Complaint, Mattel admits that it released a doll called "Jammin' in Jamaica" and a playset called "Guava Gulch Tiki Lounge", states that it has released such themed dolls and products over the course of many years, admits that MGA released a "Sun-Kissed Summer" themed doll and playset, denies that MGA originated or has rights to such theme, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

51.     Answering paragraph 51 of the Complaint, Mattel admits that it has aired television commercials for its MY SCENE line, states that such commercials speak for themselves, denies the truth of the remaining allegations set forth therein and specifically denies that MGA was the originator of or has rights to commercials "combining live action with animated sequences" set to "pop music and lyrics".

52.     Answering paragraph 52 of the Complaint, Mattel denies the truth of the allegations set forth therein.

53.     Answering paragraph 53 of the Complaint, Mattel admits that it released a MY SCENE "Sound Lounge", admits that MGA released a product called "Runway Disco", states that the relevant products speak for themselves, denies that it "imitated MGA's trapezoidal box," denies that MGA has rights thereto, and denies the truth of the remaining allegations set forth therein.

54.     Answering paragraph 54 of the Complaint, Mattel denies the truth of the allegations set forth therein.

55.     Answering paragraph 55 of the Complaint, Mattel admits that, among the styling heads it has produced and sold over the course of many years, it released a MY SCENE styling head, admits that MGA released a styling head called "Funky Fashion Makeover Head", states that the relevant products speak for themselves, denies that MGA has protectible rights and denies the truth of the remaining allegations set forth in paragraph 55.

56.     Answering paragraph 56 of the Complaint, Mattel is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein because plaintiff fails to identify the alleged instances of confusion, including the source of the unidentified picture titled "Hairstyle practice", and on that basis, denies them, and denies the truth of any remaining allegations set forth in paragraph 56.

57.     Answering paragraph 57 of the Complaint, Mattel admits that it has aired television commercials for its MY SCENE line, states that such commercials speak for themselves and denies the truth of the remaining allegations set forth therein.

58.     Answering paragraph 58 of the Complaint, Mattel admits that MGA has used the line "The Girls With a Passion for Fashion" in some contexts, denies that MGA originated that phrase or otherwise has rights to it, states that Mattel's web site speaks for itself and denies the truth of the remaining allegations set forth therein.

59.     Answering paragraph 59 of the Complaint, Mattel admits that, among the plush products that it has produced and sold over the course of many years, it has released plush dogs as part of its MY SCENE "Miami Getaway" themed product line, states that Mattel has for many years sold plush pets of the type used with its MY SCENE dog, admits that MGA has released various Bratz pets, states that MGA was not the originator of and has no rights to the features and other

elements described therein, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

60.    Answering paragraph 60 of the Complaint, Mattel admits that, among the plush toys that it has released over the course of many years, its MY SCENE dog has been sold in packaging depicted (in part) on page 22 of the Complaint, states that Mattel has for many years sold plush pets and other plush products in packaging of the type used with its MY SCENE dog, admits that MGA has released a "Bratz" dog, states that MGA was not the originator of and has no rights to the packaging described therein, states that the relevant packages speak for themselves and denies the truth of the remaining allegations set forth therein.

61.    Answering paragraph 61 of the Complaint, Mattel denies that it has intended to cause any consumer confusion and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein concerning unnamed retailers, customers and others because plaintiff fails to identify any source for the matters alleged and, on that basis, denies them and denies the truth of any remaining allegations set forth therein.

62.    Answering paragraph 62 of the Complaint, Mattel denies that it has intended to cause any confusion and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein concerning alleged comments and conversations because plaintiff fails to identify any source for the alleged comments and conversations and, on that basis, denies them, and denies the truth of any remaining allegations set forth therein.

63.    Answering paragraph 63 of the Complaint, Mattel denies that it has intended to cause any confusion and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein because plaintiff fails to identify any source for the alleged comments

1  and conversations and, on that basis, denies them, and denies the truth of any

2  remaining allegations set forth therein.

3        64.    Answering paragraph 64 of the Complaint, Mattel denies that it

4  has intended to cause any confusion and states that it is without knowledge or

5  information sufficient to form a belief as to the truth or falsity of the allegations set

6  forth therein because plaintiff fails to identify any source for the alleged comments

7  and conversations and, on that basis, denies them, and denies the truth of any

8  remaining allegations set forth therein.

9        65.    Answering paragraph 65 of the Complaint, Mattel denies the

10  truth of the allegations set forth therein.

11        66.    Answering paragraph 66 of the Complaint, Mattel admits that it

12  sued a competitor in the German courts for unfair competition for copying various

13  Mattel BARBIE line products, states that such claims exclusively arose under and

14  were the subject of German law, states that since that time the Federal Supreme

15  Court has rejected the contention made by MGA in paragraph 66 that

16  "systematically copying and borrowing elements" from competing dolls supports a

17  claim for unfair competition, and denies the truth of the remaining allegations set

18  forth therein.

19        67.    Answering paragraph 67 of the Complaint, Mattel denies the

20  truth of the allegations set forth therein.

21        68.    Answering paragraph 68 of the Complaint, Mattel admits that it

22  has released dolls called "Wee 3 Friends," admits that MGA has released dolls

23  called "4-Ever Best Friends," states that the relevant products speak for themselves,

24  denies that MGA's packaging is distinctive, denies that MGA has protectible rights

25  thereto and denies the truth of the remaining allegations set forth in paragraph 68.

26        69.    Answering paragraph 69 of the Complaint, Mattel admits that its

27  Fisher Price division has released, among other dolls called "Little Mommy," the

28  "Little Mommy Potty Training Baby Doll," admits that MGA has released a

"Mommy's Little Patient" doll and denies the truth of the remaining allegations set forth therein.

70.     Answering paragraph 70 of the Complaint, Mattel admits that it has released die-cast cars and other products called "Acceleracers" as part of its HOT WHEELS line, admits that MGA has released products called "AlienRacers," denies that MGA was the originator of or has rights to the elements and matters described in paragraph 70, states that the relevant products speak for themselves and denies the truth of the remaining allegations set forth therein.

71.     Answering paragraph 71 of the Complaint, Mattel admits that it has aired commercials relating to "Acceleracers," states that such commercials speak for themselves, denies the truth of the remaining allegations set forth therein and specifically denies that MGA originated or has rights to commercials and other matters described therein.

72.     Answering paragraph 72 of the Complaint, Mattel states that its web site speaks for itself, denies the truth of the remaining allegations contained in paragraph 72 and specifically denies that Mattel intended to create confusion in the marketplace.

73.     Answering paragraph 73 of the Complaint, Mattel denies the truth of the allegations set forth therein.

74.     Answering paragraph 74 of the Complaint, Mattel denies the truth of the allegations set forth therein.

75.     Answering paragraph 75 of the Complaint, Mattel admits that it has reminded certain former employees who became employed by MGA by letter of their contractual and fiduciary obligation to maintain the secrecy of all Mattel confidential and proprietary business information, states that such letters were prepared and sent to their recipients in good faith contemplation of litigation, admits that it filed a complaint for declaratory relief against Ronald Brawer in Los Angeles Superior Court, entitled <u>Mattel, Inc. v. Brawer</u>, Case No. BC323381, on October 21,

2004, states that pursuant to the Court's Order of August 25, 2005 it need not respond to the allegations in paragraph 75 relating to that action, and denies the truth of the remaining allegations set forth in paragraph 75.

76.     Answering paragraph 76 of the Complaint, Mattel states that MGA cannot establish subject matter jurisdiction regarding extra-territorial acts, including such acts that are lawful in foreign nations, and denies the truth of allegations set forth therein.

77.     Answering paragraph 77 of the Complaint, Mattel states that MGA cannot establish subject matter jurisdiction regarding extra-territorial acts, including such acts that are lawful in foreign nations, and denies the truth of the allegations set forth therein.

78.     Answering paragraph 78 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding MGA's claimed "shortage of doll hair" and, on that basis, denies them and denies the truth of the remaining allegations set forth therein.

79.     Answering paragraph 79 of the Complaint, Mattel states that MGA cannot establish subject matter jurisdiction regarding extra-territorial acts, including such acts that are lawful in foreign nations, and denies the truth of allegations set forth therein.

80.     Answering paragraph 80 of the Complaint, Mattel denies the truth of the allegations set forth therein.

81.     Answering paragraph 81 of the Complaint, Mattel admits that NPD Funworld ("NPD") supplies sales statistics in *inter alia* the toy, PC games and video games industries, admits that to Mattel's knowledge NPD restricts the use of its subscriber information, states that MGA was sued by NPD and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the need of unspecified "toy companies" for NPD

THIRD AMENDED ANSWER AND COUNTERCLAIMS

2875224.1

statistics and, on that basis, denies them and denies the truth of any remaining allegations set forth therein.

82.     Answering paragraph 82 of the Complaint, Mattel denies the truth of the allegations set forth therein.

83.     Answering paragraph 83 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein because MGA fails to quantify its annual subscription fees and, on that basis, denies them.

84.     Answering paragraph 84 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

85.     Answering paragraph 85 of the Complaint, Mattel states that MGA was sued by NPD, states that it is without knowledge or information sufficient to form a belief as to such nature and grounds for such litigation (to which Mattel was not a party) and, on that basis, denies the allegations relating thereto, and denies the truth of the remaining allegations set forth therein.

86.     Answering paragraph 86 of the Complaint, Mattel denies the truth of the allegations set forth therein.

87.     Answering paragraph 87 of the Complaint, Mattel admits that the Children's Advertising Review Unit ("CARU") is the children's arm of the advertising industry's self-regulation program, states that compliance with CARU's Privacy Program can provide FTC-approved Safe Harbor under the Children's Online Privacy Protection Act ("COPPA"), and denies the truth of the remaining allegations set forth therein.

88.     Answering paragraph 88 of the Complaint, Mattel admits that it is one of dozens of CARU Supporters and denies the truth of the remaining allegations set forth therein.

89.     Answering paragraph 89 of the Complaint, Mattel denies the truth of the allegations set forth therein.

90.     Answering paragraph 90 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the consequences to MGA of MGA's violations of CARU standards and, on that basis, denies them.

91.     Answering paragraph 91 of the Complaint, Mattel states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as to the consequences to MGA of MGA violation of CARU standards and, on that basis, denies them.

92.     Answering paragraph 92 of the Complaint, Mattel admits that the Toy Industry Association, Inc. ("TIA") is a toy industry trade association, admits that at certain times TIA has given awards called the People's Choice Toy of The Year or the Toy of The Year Award, denies that Mattel wrongfully influenced TIA and states that it is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations set forth therein and, on that basis, denies them.

93.     Answering paragraph 93 of the Complaint, Mattel states that the allegations set forth therein are vague and ambiguous, including in that they fail to properly identify the years in which the referenced awards were given and/or the particular product which won such awards, and accordingly lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth therein and, on that basis, denies them.

94.     Answering paragraph 94 of the Complaint, Mattel admits that Neil Freidman was the chairman of TIA from approximately May 2002 to May 2004, states that Fischer Price is a division of Mattel and denies the truth of the remaining allegations set forth therein.

1    95.    Answering paragraph 95 of the Complaint, Mattel admits that

2    Hokey Pokey Elmo won the Toy of the Year Award and denies the truth of the

3    remaining allegations set forth therein.

4    96.    Answering paragraph 96 of the Complaint, Mattel states that it is

5    without knowledge or information sufficient to form a belief as to the truth or falsity

6    of the allegations set forth therein and, on that basis, denies them.

7    97.    Answering paragraph 97 of the Complaint, Mattel denies the

8    truth of the allegations set forth therein.

9    98.    Answering paragraph 98 of the Complaint, Mattel denies the

10   truth of the allegations set forth therein.

11   99.    Answering paragraph 99 of the Complaint, Mattel denies the

12   truth of the allegations set forth therein.

13   100.   Answering paragraph 100 of the Complaint, Mattel denies the

14   truth of the allegations set forth therein.

15   101.   Answering paragraph 101 of the Complaint, Mattel repeats its

16   responses contained in paragraphs 1 through 100 of this Third Amended Answer

17   and incorporates them by reference as though fully and completely set forth herein.

18   102.   Answering paragraph 102 of the Complaint, Mattel denies the

19   truth of the allegations set forth therein and specifically denies that MGA's alleged

20   trade dress is distinctive.

21   103.   Answering paragraph 103 of the Complaint, Mattel denies the

22   truth of the allegations set forth therein and specifically denies that MGA's alleged

23   trade dress is distinctive.

24   104.   Answering paragraph 104 of the Complaint, Mattel denies the

25   truth of the allegations set forth therein.

26   105.   Answering paragraph 105 of the Complaint, Mattel denies the

27   truth of the allegations set forth therein.

28

106.   Answering paragraph 106 of the Complaint, Mattel denies the truth of the allegations set forth therein.

107.   Answering paragraph 107 of the Complaint, Mattel denies the truth of the allegations set forth therein.

108.   Answering paragraph 108 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that plaintiff is entitled to injunctive relief.

109.   Answering paragraph 109 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 108 of this Third Amended Answer and incorporates them by reference as though fully and completely set forth herein.

110.   Answering paragraph 110 of the Complaint, Mattel denies the truth of the allegations set forth therein.

111.   Answering paragraph 111 of the Complaint, Mattel denies the truth of the allegations set forth therein.

112.   Answering paragraph 112 of the Complaint, Mattel denies the truth of the allegations set forth therein.

113.   Answering paragraph 113 of the Complaint, Mattel denies the truth of the allegations set forth therein.

114.   Answering paragraph 114 of the Complaint, Mattel denies the truth of the allegations set forth therein.

115.   Answering paragraph 115 of the Complaint, Mattel denies the truth of the allegations set forth therein.

116.   Answering paragraph 116 of the Complaint, Mattel denies the truth of the allegations set forth therein.

117.   Answering paragraph 117 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that plaintiff is entitled to injunctive relief.

118.   Answering paragraph 118 of the Complaint, Mattel denies the truth of the allegations set forth therein.

119.   Answering paragraph 119 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 118 of this Third Amended Answer and incorporates them by reference as though fully and completely set forth herein.

120.   Answering paragraph 120 of the Complaint, Mattel denies the truth of the allegations set forth therein.

121.   Answering paragraph 121 of the Complaint, Mattel denies the truth of the allegations set forth therein.

122.   Answering paragraph 122 of the Complaint, Mattel denies the truth of the allegations set forth therein.

123.   Answering paragraph 123 of the Complaint, Mattel denies the truth of the allegations set forth therein and specifically denies that plaintiff is entitled to injunctive relief.

124.   Answering paragraph 124 of the Complaint, Mattel repeats its responses contained in paragraphs 1 through 123 of this Third Amended Answer and incorporates them by reference as though fully and completely set forth herein.

125.   Answering paragraph 125 of the Complaint, Mattel denies the truth of the allegations set forth therein.

## General Denial

Unless specifically admitted herein, Mattel denies the truth of each and every allegation set forth in plaintiff's Complaint and specifically denies that plaintiff is entitled to any relief against Mattel.

Affirmative Defenses

By alleging the Affirmative Defenses set forth below, Mattel does not agree or concede that it bears the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.

First Affirmative Defense

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

Second Affirmative Defense

Plaintiff has no valid, enforceable or protectible rights or interest in the alleged trade dress or other matters asserted, including without limitation in that plaintiff has failed to establish that its alleged trade dress is distinctive as to plaintiff.

Third Affirmative Defense

Plaintiff's claims, including without limitation plaintiff's claims based upon alleged extra-territorial acts, are barred in whole or in part by lack of subject matter jurisdiction.

Fourth Affirmative Defense

Plaintiff's claims are barred in whole or in part by plaintiff's unclean hands.

Fifth Affirmative Defense

Plaintiff's claims are barred in whole or in part by virtue of Mattel's prior-creation of the elements and other matters asserted in the Complaint.

Sixth Affirmative Defense

Plaintiff's claims are barred in whole or in part by its lack of standing.

Seventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the applicable statutes of limitation and the doctrine of laches.

Eighth Affirmative Defense

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel, acquiescence, and abandonment.

Ninth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's constitutional rights of free speech, petitioning and association, including without limitation by the litigation privilege as protected by and/or codified in *inter alia* Section 47(b) of the California Civil Code, the *Noerr-Pennington* doctrine, the common interest privilege and by other privileges.

Tenth Affirmative Defense

Plaintiff's claims are barred in whole or in part by Mattel's federal and state constitutional rights of free speech, including without limitation under the First Amendment of the United States Constitution.

Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part by the competitor privilege.

2875224.1

## Twelfth Affirmative Defense

Plaintiff's claims are in whole or in part preempted by the Copyright Act and barred by the *Sears-Compco* doctrine.

## Thirteenth Affirmative Defense

Plaintiff's requested relief, including plaintiff's requests for punitive and/or enhanced damages, are barred in whole or in part because all of Mattel's actions were in good faith.

## Fourteenth Affirmative Defense

Plaintiff's damages, if any, were not caused by Mattel and are not attributable to the acts or omissions of Mattel.

## Fifteenth Affirmative Defense

Plaintiff has failed to mitigate its damages, if any.

## Additional Defenses

Mattel has insufficient knowledge or information upon which to form a belief as to whether additional defenses are available.  Mattel reserves the right to amend this Third Amended Answer to add, delete, or modify additional defenses based on legal theories which may or will be divulged through clarification of the Complaint, through discovery, through change or clarification of the governing law or through further legal analysis of plaintiff's positions in this litigation.

## Prayer for Relief

WHEREFORE, Mattel prays for relief as follows:

1        1.     That the Complaint be dismissed with prejudice;

2        2.     That plaintiff take nothing by reason of the Complaint against

3 Mattel and that judgment be entered in Mattel's favor;

4        3.     That Mattel recover its costs and attorneys' fees; and

5        4.     That this Court award such other and further relief as it deems

6 just and proper.

7 ## COUNTERCLAIMS

8      Pursuant to the Court's Orders of, inter alia, January 12, 2007, and June

9 27, 2007, and incorporating its [Proposed] Amended Complaint dated November 19,

10 2006, Mattel, Inc. alleges as follows:

11 ## Preliminary Statement

12      1.     For years MGA Entertainment, Inc. has engaged in a pattern of

13 stealing and using Mattel, Inc.'s property and trade secrets.  MGA's use of the

14 stolen property and trade secrets caused and continues to cause significant harm to

15 Mattel.  MGA first stole "Bratz," a fashion doll, from Mattel, and then continued

16 stealing Mattel's confidential and proprietary information to fuel MGA's growth.

17 Even after Mattel originally filed this suit, MGA, Isaac Larian and their co-

18 conspirators continued this pattern of wrongdoing, engaging in additional acts of

19 commercial bribery, destruction of evidence, evidence tampering and perjury, and

20 in fraudulent conveyances and bankruptcy fraud.  Indeed, MGA, Larian and their

21 co-conspirators carried out several of these wrongs while the Phase 1 trial was on-

22 going and shortly after it concluded for the specific purpose of thwarting the

23 findings of the jury in Mattel's favor, obstructing the judicial process, and

24 damaging Mattel and its rights.

25      2.     Carter Bryant conceived, created and developed Bratz designs

26 while he was employed by Mattel as a doll designer.  He concealed his Bratz work

27 from Mattel and wrongfully sold Bratz to MGA while he was a Mattel employee.

28 As MGA knows, Mattel owns the Bratz designs that Bryant made.  As the rightful

owner of those Bratz designs, Mattel has registered copyrights for them and seeks damages arising from MGA's repeated infringement of those copyrights.

3.     In 2008, the jury in the Phase 1 trial in this action found that Carter Bryant conceived of and created Bratz, including without limitation Bratz sculpts and prototypes, the Bratz name, the Bratz characters, and more than 70 Bratz design drawings, while working for Mattel and that MGA and Isaac Larian unlawfully aided and abetted that wrongdoing and profited from their wrongful acts.  Specifically, the jury found that MGA and Larian unlawfully infringed Mattel's copyrights in Bratz works created by Bryant while a Mattel employee and owned by Mattel, converted Bratz drawings from Mattel, tortiously interfered with Bryant's contract with Mattel, aided and abetted Bryant's breach of his duty of loyalty to Mattel, and aided and abetted Bryant's breach of his fiduciary duty to Mattel.  The jury further found that MGA had fraudulently concealed its wrongful conduct from Mattel.  Yet MGA's wrongful conduct has not ceased.  Undeterred by the jury's findings, MGA continues to infringe even to this day, and threatens to infringe in the future, Mattel's rights in Bratz.

4.     MGA's illegal conduct in stealing Bratz was also just the beginning.  Emboldened by the success of its earlier illegal conduct, MGA has repeated—and even expanded through this day—its pattern of theft, bribery, evidence destruction and tampering, perjury, obstruction, financial manipulations and other illegal conduct.  For example, in or about 2004, MGA decided to expand into Mexico.  To do so, and operating from its Southern California offices, MGA hired away three key Mattel employees in Mexico, who, on their way out, stole virtually every category of Mattel's sensitive and trade secret business plans and information for the Mexican market, as well as a significant quantity of sensitive and trade secret information for Mattel's U.S. and worldwide businesses, and took them to MGA.  Armed with Mattel's confidential business plans and methods,

1   MGA claimed to have increased its market share in Mexico alone by 90% in a

2   single year.

3          5.     In 2005, MGA needed help in Canada.  So MGA, again

4   operating from its Southern California headquarters, hired Janine Brisbois from

5   Mattel.  At that time, Ms. Brisbois was responsible for Mattel's account with Toys

6   'R Us ("TRU") and Wal-Mart.  MGA gave her responsibility for those same

7   accounts, and she took from Mattel documents containing proprietary advertising,

8   project, sales, customer and strategy information for not only Canada, but for the

9   United States.  Eliminating any doubt that MGA then proceeded to use those stolen

10  materials, Brisbois subsequently accessed and modified certain of those Mattel

11  documents while employed by MGA.

12         6.     Starting no later than 2000, and continuing until at least 2005,

13  MGA bribed Mattel employees in addition to Bryant to work on Bratz and other

14  products for MGA's benefit.  In the face of Court Orders compelling MGA to

15  disclose such evidence, MGA falsely denied under oath that there were such other

16  Mattel employees.  In December 2007, however, the truth came to light—MGA

17  agents had bribed at least three more Mattel employees over a five-year span,

18  including during times even after this suit was filed.  MGA's agents acted to

19  conceal the bribery, including by paying Mattel employees in cash and using false

20  names and false social security numbers.

21         7.     These are not the only instances of such misconduct which MGA

22  orchestrated and carried out from its headquarters in this District.  Counter-

23  defendants have engaged in an ongoing, widespread pattern of illegal acts that

24  continues to this day and that threatens to continue into the future.  Those acts

25  include, without limitation, inducing Mattel employees to steal Mattel's

26  confidential information or other property and take it with them to MGA to further

27  MGA's business interests and to harm Mattel.  They also include, without

28  limitation, continued acts of copyright infringement, evidence destruction and

perjury.  They also include, without limitation, Larian's and MGA's illegal transfer, transport and laundering of their ill-gotten profits, including through their use of sham single-purpose entities created during or immediately after the Phase 1 trial, for the purpose of thwarting the jury's Phase 1 verdict against them, continuing with their acts of infringement, manipulating their financial condition and defrauding Mattel.

### Jurisdiction

8.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 17 U.S.C. §§ 101 *et seq.*, and 18 U.S.C. § 1964(c). This Court has supplemental jurisdiction over Mattel's state law claims pursuant to 28 U.S.C. § 1367.

### Venue

9.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d), 1391(f) and 1400(a) and 18 U.S.C. § 1965.

### Parties

10.     Mattel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in El Segundo, California.

11.     Counter-defendant MGA Entertainment, Inc. ("MGA") is a corporation organized and existing under the laws of the State of California, with its principal place of business in Van Nuys, California.  Mattel is informed and believes, and on that basis alleges, that ABC International Traders, Inc. is a predecessor corporation to MGA and that until September 16, 2002, MGA was incorporated and known as ABC International Traders, Inc.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of MGA Entertainment, Inc.'s involvement and complicity in the conduct alleged therein and having designated MGA Entertainment, Inc. in the Complaint as Doe 1 and having discovered its involvement and complicity, Mattel previously amended its

Complaint by substituting MGA Entertainment, Inc. for the fictitious Doe name Doe 1.

12.    Counter-defendant Carter Bryant ("Bryant") is an individual who formerly was employed by Mattel and has worked for and continues to work as a contractor for MGA.  Mr. Bryant currently resides in the State of Missouri.

13.    Counter-defendant MGA Entertainment (HK) Limited is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region, with its principal place of business in Hong Kong.  Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of MGA Entertainment (HK) Limited in the conduct alleged therein and having designated MGA Entertainment (HK) Limited in the Complaint as Doe 2 and having discovered its involvement and complicity, Mattel previously amended its Complaint by substituting MGA Entertainment (HK) Limited for the fictitious Doe name Doe 2.

14.    Counter-defendant MGAE de Mexico, S.R.L. de C.V. ("MGA de Mexico") is a business entity organized and existing under the laws of Mexico, with its principal place of business in Mexico City, Mexico.

15.    Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is the President and CEO of MGA and an individual residing in the County of Los Angeles.   Upon the filing of the Complaint, Mattel, being ignorant of the nature, extent and scope of involvement and complicity of Larian in the conduct alleged therein and having designated Larian in the Complaint as Doe 3 and having discovered his involvement and complicity, Mattel previously amended its Complaint by substituting Larian for the fictitious Doe name Doe 3.

16.    Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is directly or indirectly principal, owner, member and/or controlling shareholder and alter-ego of IGWT Group, LLC ("IGWT Group") and

IGWT 826 Investments, LLC ("IGWT 826 Investments").  On information and belief, the financial affairs of Larian and these limited liability companies—which were formed during and subsequent to the Phase 1 trial—are significantly intermingled and interconnected, the companies being mere shells which Larian used as conduits for his own business dealings, created and operated pursuant to an unlawful scheme as alleged herein.

17.    Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is directly or indirectly trustee, principal, owner, and/or controlling participant and alter-ego of several trusts devised by or on behalf of Larian for the purpose of manipulating MGA's and Larian's finances, including without limitation The Makabi Living Trust, The Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust, as well as other trusts and similar vehicles presently unknown to Mattel because of their concealment by Larian, MGA and their co-conspirators.

18.    Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian is directly or indirectly principal, owner, member and/or controlling shareholder and alter-ego of several other sham entities devised by or on behalf of Larian for the purpose of manipulating MGA's and Larian's finances, including without limitation Omni 808 Investors, LLC, Vision Capital, LLC and Lexington Financial  Limited (collectively, the "Omni Parties") as well as other entities currently unknown by name to Mattel because of their concealment by Larian, MGA, the Omni Parties and their co-conspirators.

19.    Mattel is informed and believes, and on that basis alleges, that Counter-defendant Larian has employed, directly or indirectly, other co-conspirators to directly and indirectly carry out his intentional wrongdoing, including in order to conceal and manipulate his and MGA's finances and to conduct other fraudulent and illegal conduct, including without limitation Neil

Kadisha, Leon Neman, Fred Mashian, Jahangir Eli Makabi, Shirin Makabi, Farhad Larian, Angela Larian, Veronica Marlow and Peter Marlow, as well as other persons presently unknown to Mattel because of their concealment by Larian, MGA, the Omni Parties and their co-conspirators.

20.   Mattel is informed and believes, and on that basis alleges, that at all relevant times mentioned herein such individuals, trusts, Larian, the Omni Parties, IGWT Group and IGWT 826 Investments, together with their employees, officers, putative owners, members and principals, agents, representatives and attorneys, were acting in concert and in active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other and were acting within the scope and authority of that agency and with the knowledge, consent and approval of each other.

21.   Counter-defendant Carlos Gustavo Machado Gomez is an individual who is employed by Counter-defendant MGA and who resided in this District at the time he was named and served as a Counter-defendant in the Second Amended Answer and Counterclaims and, on information and belief, currently resides in Mexico.

22.   The true names and capacities of Counter-defendants sued herein as DOES 4 through 10, inclusive, are unknown to Mattel, which therefore sues said Counter-defendants by such fictitious names.  Mattel will amend its pleadings to allege their true names and capacities when the same are ascertained.

### Factual Background

### I.   MATTEL

23.   Mattel manufactures and markets toys, games, dolls and other consumer products.  Harold Mattson and Eliot and Ruth Handler founded Mattel in 1945.  The name of the company was created by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating from the Handlers' garage in Southern California, the company greatly expanded its operations following World

1   War II.  During the next several decades, Mattel became famous for producing

2   high-quality products at reasonable prices.

3          24.   Critical to Mattel's success is its ability to design and develop

4   new products.  Mattel invests millions of dollars in product design and

5   development and introduces hundreds of new products each year.  Mattel maintains

6   a 180,000 square-foot design center in El Segundo, California, that houses

7   hundreds of designers, sculptors, painters and other artists, who work exclusively to

8   create the products on which Mattel's business depends.

9          25.   Mattel also has invested substantial amounts over many years to

10  develop its business methods and practices, including, without limitation, its

11  marketing and advertising research, plans, methods and processes; its business

12  research and forecasts; its costs, budgets, pricing, credit terms, deal terms and

13  finances; its manufacturing, distribution, and sales methods and processes; and its

14  inventory methods and processes.  These represent a material part of the intellectual

15  infrastructure of Mattel and are highly valuable.

16  **II.   MGA ENTERTAINMENT**

17         26.   MGA is also a toy manufacturer.  MGA began as a consumer

18  electronics business, but expanded into the toy business with licenses to sell

19  handheld electronic games.  By approximately late 1999 or early 2000, MGA

20  developed a strategy to expand its business and compete directly with Mattel by

21  launching a fashion doll line, so it stole a fashion doll that was owned by Mattel –

22  "Bratz."

23         27.   MGA intentionally stole not just specific Mattel property, such

24  as Bratz designs, prototypes and related materials, but also a vast array of trade

25  secrets and other confidential information that comprise Mattel's intellectual

26  infrastructure.  MGA's rapid growth was not organic, but rather was based upon its

27  theft of Bratz.  As a result, MGA lacked an appropriate intellectual infrastructure

28  for a company of its size and it became increasingly difficult to manage.  To deal

1   with these problems, as detailed below, time and time again MGA simply stole

2   Mattel's proprietary business methods, practices and information.  This not only

3   allowed MGA to avoid expending time, money and effort necessary to build a

4   legitimate business, but also allowed MGA to unfairly compete against Mattel by

5   taking Mattel's playbook.

6   **III.  MGA STEALS A NEW LINE OF FASHION DOLLS FROM MATTEL**

7       28.   Carter Bryant is a former Mattel employee.  Bryant joined Mattel

8   in September 1995, where he worked in Mattel's Design Center as a BARBIE

9   product designer.  In or about April 1998, Bryant resigned his position with Mattel

10  and moved to Missouri to live with his parents.  Late in 1998, Bryant applied to

11  Mattel to be rehired.  On January 4, 1999, he began working at Mattel in Mattel's

12  Design Center, again as a product designer, for Mattel's BARBIE collectibles line.

13      29.   Upon his return to Mattel in January 1999, Bryant executed an

14  Employee Confidential Information and Inventions Agreement (the "Employment

15  Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

16      30.   Pursuant to his Employment Agreement and as a condition of

17  and in consideration for his employment, Bryant agreed, among other things, that

18  he held a position of trust with Mattel, that the designs and inventions he created

19  during his Mattel employment (with certain exceptions not relevant here) were

20  owned by Mattel, and that he would be loyal to the company by agreeing not to

21  assist or work for any competitor of Mattel while he was employed by Mattel.

22      31.   On January 4, 1999, Bryant also executed Mattel's Conflict of

23  Interest Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant

24  certified in the Conflict Questionnaire that, other than as disclosed, he had not

25  worked for any competitor of Mattel in the prior twelve months and had not

26  engaged in any business venture or transaction involving a Mattel competitor that

27  could be construed as a conflict of interest.  Bryant understood what the Conflict

28  Questionnaire required because, among other things, he disclosed on it the

-36-

freelance work he had performed while in Missouri for Ashton-Drake, which is unrelated to the conduct alleged herein.  A true and correct copy of the Conflict Questionnaire executed by Bryant is attached hereto as Exhibit B.

32.    Pursuant to the Conflict Questionnaire, Bryant also agreed that he would immediately notify his supervisor of any change in his situation that would cause him to change any of the foregoing certifications.  Despite this obligation, at no time did Bryant disclose to Mattel that he was engaging in any business venture or transaction with MGA or any other Mattel competitor.

33.    More specifically, while Bryant was employed by Mattel, Bryant and other Counter-defendants misappropriated and misused Mattel property and Mattel resources for the benefit of Bryant and MGA.  Such acts included, but are not limited to, the following:

a.    using his exposure to Mattel development programs to create the concept, design and name of Bratz;

b.    using Mattel resources, and while employed by Mattel, Bryant worked by himself and with other Mattel employees and contractors to design and develop Bratz, including without limitation by creating drawings and three-dimensional models of Bratz dolls, and fashion designs for the dolls' associated clothing and accessories; and

c.    using Mattel resources, and while employed by Mattel, Bryant took steps to assist MGA to produce Bratz dolls.

34.    During the time that he was employed by Mattel and thereafter, Bryant concealed these actions from Mattel, including by failing to notify his supervisor of the conflict of interest he created when he began working on MGA's behalf and when he began receiving payments from MGA.  Bryant additionally enlisted other Mattel employees to perform work on Bratz during the time he was employed by Mattel and, by all indications, in at least some cases led them to believe that they were performing work on a project for Mattel.

35.     Bryant also made affirmative misrepresentations to Mattel management and employees immediately before his departure from Mattel on October 20, 2000.  For example, during his last few weeks at Mattel, Bryant told his co-workers and supervisors that he was going to leave Mattel for "non-competitive" pursuits.  Bryant's representations to his supervisors and his co-workers were false.  Bryant knew at the time that those representations were false and made those false statements to conceal from Mattel the fact that he was already working with MGA and that he had contracted with MGA to assign Bratz works to MGA and to provide design and development services to MGA, a Mattel competitor.

36.     As a result of the efforts of Bryant and other Mattel employees working on Bratz (which were done without Mattel's knowledge), the Bratz dolls had been designed and were far along in development during the time that Bryant was employed by Mattel and prior to the time that Bryant left Mattel on October 20, 2000.  Not only did Bryant create and develop designs for the dolls as well as other aspects of the products such as their fashion accessories during the time he was employed by Mattel, but MGA showed Bratz prototypes and/or product to both focus groups and retailers in November 2000, less than three weeks after Bryant left Mattel.  Bryant, Larian and others at MGA arranged these meetings while Bryant was still employed by Mattel.

37.     Bryant and MGA employees also repeatedly and continuously communicated with employees of MGA Entertainment (HK) Limited on subjects such as design and manufacturing of Bratz.  On information and belief, at all material times, MGA Entertainment (HK) Limited has maintained regular and continuous contacts with persons in the County of Los Angeles; it regularly has shipped products that it manufactures, or that are manufactured for it, to the County of Los Angeles; and such products have been distributed to retailers and sold to consumers in the County of Los Angeles.

38.    Bratz also were shown to retailers at the Hong Kong Toy Fair in January 2001.  By early 2001, only a few months after Bryant resigned from Mattel, MGA began having the Bratz fashion doll line and accessories manufactured and then, shortly thereafter, began selling them at retail.

39.    Since 2001, MGA has distributed and sold Bratz and Bratz-related products throughout the world.  Mattel is informed and believes that MGA also licenses Bratz to third parties.  Mattel is also informed and believes that MGA has derived annual revenue from its sales and licenses of Bratz in excess of $500 million.  Mattel is further informed and believes that MGA and Bryant claim current ownership of Bratz, and all copyrights and copyright registrations attendant thereto.  MGA continues to market, sell and license Bratz and has expressed an intention to continue to do so.

40.    Mattel is informed and believes that MGA and Larian encouraged, aided and financed Bryant to develop Bratz, knowing full well that Bryant was still employed by Mattel at the time and that by performing such work, including design-related work, for his own benefit and/or the benefit of MGA, Bryant would be, and was, in breach of his contractual, statutory and common law duties to Mattel.  Mattel is also informed and believes that MGA proceeded to aid and encourage Bryant to develop Bratz with the goal of obtaining a valuable fashion doll line that would be commercially successful in the competitive, multi-billion dollar market for fashion dolls.

41.    Pursuant to Bryant's contract with Mattel, among other things, Mattel is the true owner of Bratz designs and works, including those specifically that were conceived, created or reduced to practice during Bryant's Mattel employment as well as all designs and works that are or have been derived therefrom.  Counter-defendants' continued use, sale, distribution and licensing of Bratz thus infringes upon Mattel's rights, injures Mattel and unlawfully enriches the Counter-defendants.

42.     Bryant and MGA deliberately and intentionally concealed facts sufficient for Mattel to suspect or to know that it was the true owner of Bratz. Their acts of concealment include, but are not limited to, concealing the fact that Bryant conceived, created, designed and developed Bratz while employed by Mattel, including by tampering with and defacing documents which showed that, in fact, Bryant was a Mattel employee while he was working for and with MGA; concealing the fact that Bryant worked with and assisted MGA during the time Bryant was employed by Mattel and was compensated for that assistance; concealing that Bryant was providing consulting services to MGA; concealing Bryant's role in Bratz by falsely claiming that Larian and others were the creators of Bratz; and concealing the fact that Mattel was the true owner of Bratz by, among other things, filing fraudulent registrations and/or amendments to registrations with the United States Copyright Office claiming MGA as the author of Bratz as a work for hire and altering relevant dates on such documents to further obscure the true facts of when the works were created.

43.     Because of Bryant's and MGA's acts of concealment and Bryant's misrepresentations to Mattel, Mattel had no reason to suspect that Bryant had worked with MGA, or assisted MGA, while he still employed by Mattel until approximately November 24, 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's agreement with MGA which showed that the date of Bryant's agreement with MGA predated Bryant's departure from Mattel.  It was then, as a result, that Mattel learned for the first time that Bryant had secretly aided, assisted and worked for and with MGA while employed at Mattel and in violation of his Mattel Employment Agreement.  Specifically, Bryant's agreement with MGA obligated Bryant to provide product design services to MGA on a "top priority" basis.  Bryant's agreement with MGA also provided that Bryant would receive royalties and other consideration for sales of products on which Bryant provided aid or assistance; that all works and services furnished by Bryant under

the agreement, including those he purportedly provided while still a Mattel employee, purportedly would be considered "works for hire" of MGA; and that all intellectual property rights to preexisting works by Bryant, including Bratz designs, purportedly were assigned to MGA.

## IV.  MGA STEALS MATTEL TRADE SECRETS IN MEXICO

44.    On information and belief, in or about late 2003 or early 2004, MGA decided to open business operations in Mexico.  Faced with the difficult task of developing an overall strategy for expanding into a market in which it had only a nominal presence and no operations, MGA elected to steal Mattel's plans, strategy and business information for the Mexican market and materials related to Mattel's worldwide business strategies.  As detailed below, MGA and Larian approached three employees of Mattel's Mexican subsidiary ("Mattel Mexico"), enticed them to steal Mattel's most sensitive business planning materials, and then hired them to assist in establishing and running MGA's new Mexican subsidiary.

### A.    MGA Hires Three Senior Mattel Employees in Mexico

45.    Carlos Gustavo Machado Gomez ("Machado") was the Senior Marketing Manager, Boys Division, for Mattel Mexico, a position of trust and confidence.  He was employed at Mattel Mexico from April 1, 1997 until April 19, 2004.  His duties included short, medium and long-term marketing planning, generating product sales projections, and assisting in creation of the media plan.  In his position, Machado had access to highly confidential and sensitive marketing and product development information.  Machado had an employment agreement with Mattel in which he agreed to maintain the confidentiality of Mattel's protected information.  Mattel's policies also required Machado to protect Mattel's proprietary information and not to disclose it to competitors.

46.    Mariana Trueba Almada ("Trueba") was the Senior Marketing Manager, Girls Division, for Mattel Mexico, a position of trust and confidence.  She was employed at Mattel Mexico from November 3, 1997 until April 19, 2004.

Like Machado, her duties included short, medium and long-term marketing
planning, generating product sales projections, and assisting in creation of the
media plan.  In her position, Trueba had access to highly confidential and sensitive
marketing and product development information.  Trueba had an employment
agreement with Mattel in which she agreed to maintain the confidentiality of
Mattel's protected information.  Mattel's policies also required Trueba to protect
Mattel's proprietary information and not to disclose it to competitors.

47.    Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
Manager with Mattel Mexico, a position of trust and confidence.  He was employed
at Mattel Mexico from March 29, 2001 until April 19, 2004.  Vargas was
responsible for ensuring that point-of-sale promotions were carried out, analyzing
the results of such promotions, negotiating promotion budgets, and generally
managing promotional activities.  Vargas also had access to highly confidential and
sensitive marketing and product development information.  Vargas had an
employment agreement with Mattel in which he agreed to maintain the
confidentiality of Mattel's protected information.  Mattel's policies also required
Vargas to protect Mattel's proprietary information and not to disclose it to
competitors.

48.    Beginning in late 2003 or early 2004, Machado, Trueba and
Vargas began planning to leave Mattel Mexico to join MGA.  In connection with
that plan, and with the encouragement of Larian and other MGA officers operating
in the United States, they began accessing, copying and collecting proprietary
Mattel documents to take with them.  On April 19, 2004, Machado, Trueba and
Vargas each resigned their positions with Mattel, effective immediately.  They
stated that they had been hired by a Mattel competitor, but refused to identify that
competitor.  In fact, they had been offered and accepted employment by MGA to
establish and run MGA's new operation in Mexico.

**B.      Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

49.     Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations.  The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>.  On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

50.     In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City.  On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA.  This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned.  For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park.  In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing:  "Attached you will find our analysis for future discussion.  We will be available during the nights of the week after 16:30 Los Angeles time . . . ."  In another e-mail message, showing that the

participants intentionally sought to maximize the damage to Mattel from their conduct, Kuemmerle wrote to Larian and Park:  "Gustavo, Mariana and Pablo want to resign (all at the same time, and you can believe my smile!) next Wednesday."

51.    Beginning on April 12, 2004, a week before his resignation and after numerous communications and meetings with Larian and other MGA personnel, Machado began transferring additional Mattel confidential and proprietary information to a portable USB storage device (also know as a "thumb drive") that he connected to his Mattel computer.  On Friday, April 16, 2004, the last business day before he gave notice, Machado copied at least 70 sensitive documents to the portable USB storage device.

52.    Starting on April 12, 2004, Vargas also copied a host of confidential and proprietary materials to a portable USB storage device, including sales plans, sales projections and customer profiles.

53.    On April 16, 2004, Trueba also copied Mattel confidential and proprietary information to a portable USB storage device connected to her Mattel computer.

54.    With full knowledge that she was going to leave Mattel for a competitor, Trueba also took steps to increase further her access to Mattel's confidential information shortly before her resignation.  For example, just four days before leaving, Trueba went out of her way to seek to attend a meeting at which Mattel personnel analyzed BARBIE programs for the United States, Canada and South America.  Two days before her resignation, she contacted both a Mattel employee located in El Segundo, California and Mattel's advertising agency to request updated confidential information about advertising plans for BARBIE.  On information and belief, Trueba acted at the direction of MGA and Larian and did so in order to obtain further information that would allow MGA to obtain unfair competitive advantage over Mattel.

55.     Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

56.     The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

57.     MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

market share by 90 percent over the prior year.  This increase came at the expense of Mattel, which lost market share during 2004 in Mexico and was forced to increase its advertising and promotional spending to offset further losses.

58.    Machado, Trueba and Vargas attempted to conceal their widespread theft of Mattel's proprietary information.  For example, Machado ran a software program on his Mattel personal computer in an attempt to erase information, including information that would reveal the addresses to which he had sent, or from which he had received, e-mail messages.  On information and belief, for the same purpose Machado also damaged the hard drive of the personal computer that he used at Mattel.

59.    On information and belief, on April 19, 2004, immediately after Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico to Los Angeles to meet with MGA personnel, including Larian, in person.

60.    Mattel notified Mexican authorities about the theft of its trade secret and confidential information.  On October 27, 2005, the Mexican Attorney General Office obtained a search warrant from the Mexican Federal Criminal Courts for MGA's facilities in Mexico City.  In that search, the Mexican authorities found and seized from MGA's offices both electronic and paper copies of a large number of documents containing Mattel trade secrets, including those that Mattel discovered through its forensic investigations, plus many others that Mattel had not known had been stolen.

61.    Based on Machado's "performance" in Mexico, Isaac Larian subsequently promoted Machado, and he was transferred to MGA's main office in Van Nuys, California.  When deposed in connection with this case, Machado refused to answer questions about his misconduct and instead invoked the Fifth Amendment over 100 times.  On information and belief, Machado has resided at times relevant hereto in the County of Los Angeles, California, and on information and belief, currently resides in Mexico.

## V.   MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES

62.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

63.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the

-47-

1          information is not likely to be kept secret, such as planes,

2          restaurants and elevators.  The obligation to preserve confidential

3          information continues even after employment ends.

4    The Code of Conduct applied to Brawer and required that he meet his obligations

5    under the Code of Conduct.

6          64.    By 2003, Brawer had advanced within Mattel to a Senior Vice

7    President position over customer marketing, a position of trust and confidence.  In

8    his executive position, Brawer was provided access to information that was both

9    sensitive and confidential, including, but not limited to, detailed information related

10   to development, manufacture, marketing, pricing, shipping, and performance of

11   Mattel's then-current and anticipated future product lines, and other confidential

12   business plans between Mattel and its most significant retail customers.

13         65.    In December 2003, Alan Kaye, Mattel's Senior Vice President of

14   Human Resources, asked Brawer whether he was discussing potential employment

15   with MGA.  Brawer denied that he had been in contact with MGA and represented

16   that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17   its employees, including Brawer, the importance of protecting Mattel's confidential

18   and proprietary materials and information.

19         66.    On March 18, 2004, in response to a survey from the President of

20   Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21   Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22   protection of it's [sic] intellectual property," reflecting Brawer's clear

23   understanding that Mattel required its proprietary information to be kept

24   confidential.

25         67.    In April 2004, Mattel promoted Brawer to Senior Vice

26   President/General Manager.  The General Manager position also is an executive

27   position of trust and confidence.  The role of a General Manager is to lead a cross-

28   functional "Customer Business Team."  Each General Manager is accountable for a

strategic partnership with a key Mattel retailer, covering all aspects of the business, including both traditional toy sales and retail development of licensed products.

68.  In or about late May 2004, Brawer began performing General Manager duties, working with one of Mattel's major retail customer accounts. Thereafter, Brawer began receiving information related not only to the Senior Vice President, Customer Marketing position that he still formally held, but also began receiving detailed information related to his role as General Manager.  Brawer began requesting and analyzing detailed information related to Mattel and its four key retail accounts.

69.  On September 15, 2004, Brawer left work at noon for observance of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders and other materials.  Several hours after his departure, Brawer instructed his assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers and to provide it to him, falsely claiming he needed it for a meeting

70.  On September 17, 2004, Brawer returned to Mattel and immediately informed his supervisor that he was leaving Mattel, effective October 1, 2004, to work for competitor MGA.

71.  On September 20, 2004, Mattel hand-delivered a letter to Brawer reminding him of his continuing obligation to preserve the confidentiality of Mattel's proprietary information and trade secrets not only through October 1, 2004, but continuing beyond the termination of his employment.

72.  At his exit interview on September 29, 2004, Mattel reminded Brawer that he had ongoing duties of confidentiality to Mattel, even after the termination of his employment.  Brawer was given a copy of his Original Confidentiality Agreement, which he had signed on April 22, 1996, and another copy of the Code of Conduct.  During the exit interview, however, Brawer noted that he had not signed the Code of Conduct, which he intended and Mattel understood to mean that Brawer believed he was not bound by Mattel's policy

because he had not signed it.  Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

73.   On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

74.   Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing.  In that role he was responsible for MGA's sales worldwide.  As part of those responsibilities, Brawer had and continues to have responsibility for MGA's accounts with the same retailers that he worked with while at Mattel.

75.   Brawer represented during his Mattel exit interview that he had returned all proprietary information to Mattel.  That representation was false.   On information and belief, Brawer removed proprietary and trade secret information from Mattel that he did not return.  Mattel is informed and believes that Brawer did not return to Mattel, for example, the information contained in his contacts file. The contacts file included contact information for Mattel customers, most notably TRU, and extensive contact information for Mattel employees, including titles, e-mail addresses and telephone numbers.

76.   Brawer has used that contact information on a regular basis. Since leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone and by electronic mail.  Based on his knowledge of Mattel's operations and the roles of certain Mattel employees, he has targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets.  Brawer has done so by promising these Mattel employees salaries 25 percent or more higher than they earn

THIRD AMENDED ANSWER AND COUNTERCLAIMS

1   at Mattel and stating to them that they should not be concerned by legal action

2   taken by Mattel to protect its trade secrets and its rights because such claims are

3   hard to prove and easy to defeat.

4   **VI.  MGA HIRES OTHER KEY PERSONNEL FROM MATTEL IN**

5   **ORDER TO OBTAIN TRADE SECRET AND HIGHLY**

6   **CONFIDENTIAL INFORMATION REGARDING MATTEL'S**

7   **FORECASTING & INVENTORY MANAGEMENT SYSTEMS**

8          77.    On March 13, 2006, MGA recruited Jorge Castilla, Mattel's

9   Planning Specialist for Operations, Planning & Finance.  Before he left Mattel,

10  Castilla stole on behalf of counter-defendants significant Mattel trade secrets and

11  proprietary information.

12         78.    Castilla joined Mattel in November 1999 and, in positions both

13  in Europe and the U.S., played a role in Mattel's development of highly proprietary

14  processes and systems for forecasting and inventory management in which Mattel

15  invested heavily.  In Mattel's European operations, Mr. Castilla was involved in

16  Mattel's development of a pilot program to improve sales forecasting in the United

17  Kingdom, and later, with the potential application of the pilot program to Mattel's

18  world-wide sales forecasting.

19         79.    In late 2004, Castilla worked with the International Planning

20  group at Mattel's headquarters in El Segundo, California, where he was responsible

21  for establishing Mattel's Electronic Data Warehouse system, a proprietary database

22  containing highly confidential business information, such as sales, future/pending

23  orders, product availability and sales forecasts at the stock keeping unit level.

24  Additionally, he was responsible for implementing Mattel's customized sales

25  forecasting system and preparing information for senior financial officers regarding

26  inventory levels, sales demands and related topics.

27         80.    Throughout his tenure at Mattel, Castilla became privy to some

28  of Mattel's most confidential and valuable information.  Castilla acknowledged his

1    position of trust confidence and agreed that he would preserve and would not

2    disclose or misuse Mattel's proprietary or confidential information on numerous

3    occasions.  For example, in Castilla's Employee Confidential Information and

4    Inventions Agreement, which he signed on October 29, 1999, he acknowledged

5    that he would develop and have access to Mattel proprietary information.  Castilla

6    further agreed not to "disclose or use at any time either during or after my

7    employment with [Mattel], any Proprietary Information," and to "cooperate with

8    the Company and use [his] best efforts to prevent the unauthorized disclosure, use

9    or reproduction of all Proprietary Information."  He also agreed that when he left

10   Mattel's employ, he would deliver to Mattel "all tangible, written, graphical,

11   machine readable and other materials (including all copies in [his] possession or

12   under [his] control containing or disclosing Proprietary Information."

13           81.   Castilla had agreed to the terms in Mattel's Code of Conduct to

14   preserve Mattel's confidential and proprietary information and was specifically

15   warned that "the unauthorized use or disclosure of [Mattel's] confidential,

16   proprietary or trade secret information" may result in the termination of his

17   employment.  He further agreed:

18              Employees have an obligation to protect the Company's

19              confidential and proprietary information.  Confidential and

20              proprietary information is any information which is not

21              generally known to the public that is useful to the

22              Company and that would either be useful to the

23              Company's competitors or third parties or harmful to the

24              Company or its customers, if disclosed.  Confidential and

25              proprietary information includes, but is not limited to,

26              trade secrets, revenue and profit information and

27              projections, new product information, sales and marketing

28              plans, design and development plans, manufacturing

1    processes, confidential personnel information and

2    information regarding potential acquisitions, divestitures

3    and/or investments.

4       82.   On Monday, March 13, 2006, Castilla informed Mattel that he

5  was resigning to take a position with MGA, as a Manager of Global Sales Planning,

6  with responsibilities that substantially paralleled those that he had at Mattel.

7       83.   During Castilla's exit interview on March 13, 2006, he was

8  provided with a document reminding him of his obligations to preserve Mattel's

9  confidential and proprietary information, including his obligations under Mattel's

10  Employee Confidential Information and Inventions Agreement, including but not

11  limited to "inventions, marketing plans, product plans, business strategies, forecasts

12  and personnel information." Further, Castilla filled out an exit interview checkout

13  form, in which he acknowledged receiving not only the reminder, but also the

14  Mattel Code of Conduct. Castilla also acknowledged that, during the course of his

15  employment at Mattel, he had received materials containing confidential and

16  proprietary information, and affirmed that he did not copy or disclose any of the

17  listed documents or the information that they contained to anyone outside of

18  Mattel, and denied having possession of any of the listed documents. He also

19  affirmed that he returned to Mattel all of its confidential and proprietary documents

20  by representing that he "brought them in on March 12, 2006, filed them and put

21  together a summary of ongoing projects for supervisor, Brenda [Ray-Martin]."

22       84.   Despite his affirmations to the contrary, as of Friday, March 10,

23  2006, Castilla had created a folder on his Mattel network share drive that he labeled

24  "To Take." The folder contained approximately 56 megabytes of information. The

25  bulk of that information was made up of documents containing Mattel trade secrets

26  and confidential information, including documents related to inventory

27  management and forecasting for Mattel, as well as a highly confidential document

28  prepared by Mattel's senior executives that laid out Mattel's future international

2875224.1

business strategies and marketing priorities not only up to today, but also for the coming years.

85.    Just prior to his resignation, Castilla entered Mattel's headquarters building at approximately 9:30 a.m. on Sunday, March 12, 2006 and departed at approximately 2:00 p.m.  By Monday, March 13, 2006, Castilla had deleted the "To Take" folder and its contents from his network share drive.  Castilla had transferred the information in the "To Take" folder and potentially the folder itself to an e-mail account <hoclau04@gmail.com>, <hoclau04@yahoo.com> and/or to a personal digital assistant device.

86.    When he was later interviewed by the FBI about his theft, on information and belief Castilla turned over to the FBI agents the storage media from his personal digital device which contained Mattel trade secrets.  When deposed in connection with this case, Castilla refused to answer questions about his misconduct and instead invoked the Fifth Amendment nearly 500 times.

87.    Much of the Mattel trade secrets and confidential information that Castilla took from Mattel related to the successful processes for efficient and cost-effective management of inventory and the use of sophisticated forecasting techniques that Mattel, through significant investment, developed to obtain a competitive advantage in the toy industry with its unique order, manufacture and delivery cycles.  The former Mattel employees working at MGA recognized the value of Castilla's knowledge.  MGA was in dire need of improved inventory management and forecasting, and to remedy this problem MGA targeted Castilla— and the Mattel-specific knowledge that he possessed—and lured him to MGA. With the benefit of the information that he brought with him, on information and belief, MGA, including through Castilla, has used that proprietary and confidential information to improve MGA's sales forecasting and inventory planning, thus saving MGA many millions of dollars.

THIRD AMENDED ANSWER AND COUNTERCLAIMS

**VII. MGA STEALS MATTEL TRADE SECRETS IN CANADA**

88.   In an effort to increase its market share and sales in Canada and elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales, projects, advertising and strategy, not only for Canada, but the United States and the rest of the world.

89.   Janine Brisbois was a Director of Sales for the Girls Division in Canada.  Mattel hired her as a National Account Manager in August 1999.  When she was hired as a Mattel employee, Brisbois agreed that she would preserve and would not disclose Mattel's proprietary or confidential information.  For example, Brisbois agreed:

> You must keep Mattel's Proprietary Information confidential, and you may only use or disclose such information as necessary to perform your job responsibilities in accordance with Mattel policies.  Your obligation to keep Mattel's Proprietary Information confidential will continue even after any termination of your employment with your employer.
>
> . . .
>
> Mattel takes steps to maintain the secrecy and confidential nature of Mattel's Proprietary Information and, if a competitor discovered Mattel's Proprietary Information, it could significantly damage Mattel and your Employer.

90.   While with Mattel, Brisbois had responsibility for Mattel's account with TRU and later had responsibility for Mattel's Wal-Mart account.  In her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to Mattel confidential and proprietary information regarding Mattel's future product lines, advertising and promotional campaigns and product profitability.

91.   On September 26, 2005, Brisbois resigned from Mattel to take a position as Vice President of Sales at MGA.  Mattel is informed and believes that

THIRD AMENDED ANSWER AND COUNTERCLAIMS

2875224.1

in that position Brisbois has responsibility for MGA's accounts with both TRU and Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she was "taking anything."  Brisbois responded, "No."  Both during and after her exit interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's confidential and proprietary information.

92.     Mattel is informed and believes that Brisbois spoke with Isaac Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day that she spoke with Mr. Larian and four days before she resigned, Brisbois copied approximately 45 Mattel documents on to a USB or "thumb" drive with the volume label "BACKPACK."  On information and belief, Brisbois removed the thumb drive from Mattel Canada's office by concealing it in her backpack or gym bag the last time that she left that office.  These documents contained Mattel trade secret and proprietary information, and included:

- a document containing the price, cost, sales plan and quantity of every Mattel product ordered by every Mattel customer in 2005 and 2006;
- the BARBIE television advertising strategy and information concerning sales increases generated by television advertisements;
- competitive analysis of Mattel vis-à-vis its competitors in Canada;
- an analysis of Mattel's girls business sales beginning in 2003 and forecasts through 2006;
- profit and loss reviews for Mattel's products being sold in Wal-Mart, including margins and profit in not only Canada, but in the United States and Mexico; and
- a document containing the product launch dates and related advertising for all Mattel new products between Fall 2005 and Spring 2006.

93.     After Mattel discovered that Brisbois had copied these sensitive documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

THIRD AMENDED ANSWER AND COUNTERCLAIMS

2875224.1

Canadian law enforcement authorities recovered from Brisbois a thumb drive with the volume label "BACKPACK" containing the documents that Brisbois had copied from Mattel's computer system.  Mattel later learned that while she was working as a Vice President of Sales at MGA, Brisbois accessed and modified documents on that thumb drive.

94.     After joining MGA, Brisbois repeatedly traveled to MGA's offices in Van Nuys, California and met with Larian and Brawer.  In February, 2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City offices and that at least three MGA employees were under criminal investigation, MGA nonetheless issued a press release trumpeting its 2005 performance, with Larian himself concluding, "Our international teams in Mexico and Canada have done a fantastic job."

## VIII.  AT MGA'S DIRECTION, MATTEL EMPLOYEES IN ADDITION TO BRYANT SECRETLY WORK ON BRATZ FOR YEARS

95.     MGA also knowingly bribed and secretly used Mattel employees in addition to Bryant to work on MGA products such as Bratz while they were Mattel employees and, furthermore, fraudulently concealed such activity.  On December 28, 2007, MGA vendor and agent Veronica Marlow revealed at her deposition that, beginning in 2000 and continuing over a time period spanning at least five years, at least three Mattel employees in addition to Bryant worked on Bratz while employed by Mattel:  Ana Isabel Cabrera, Beatriz Morales and Maria Elena Salazar.  Like Bryant, these Mattel employees all signed agreements assigning Mattel all rights to intellectual property they created while employed by Mattel.  Each of the three Mattel employees worked for MGA through Marlow, to whom MGA and Bryant have paid millions of dollars since 2000.

96.     Following Marlow's December 2007 deposition, Ms. Cabrera and Ms. Morales, who were still Mattel employees,  admitted to being paid for and working on Bratz while Mattel employees and to knowing that such conduct was

wrong.  Both specifically acknowledged that they continued to work on Bratz even after Mattel had made them aware of this litigation involving Bryant's secret, illegal work with MGA and had reiterated the need to protect Mattel's intellectual property.  Both admitted that they tried to conceal their work for MGA.

97.   MGA and Larian knew that their bribery and use of Mattel employees was wrongful and took steps to conceal that misconduct.  Among other things:  (a) MGA and Larian, by and through their agents Peter Marlow and Veronica Marlow, used devices such as paying the Mattel employees in cash and using false names and false social security numbers in tax and other business records; (b) MGA and Larian continued their acts of bribery and other misconduct after this litigation was filed; (c) MGA and Larian failed to disclose their payments to these Mattel employees despite Court Orders compelling them to disclose any such instances; and (d) MGA and Larian hired Maria Elena Salazar after she left Mattel, even though she specifically touted in her employment application to MGA that she worked on the "first patterns for [the] Bratz doll and release;" and (e) in an email from Peter Marlow to Larian and Paula Garcia of MGA dated June 20, 2005, Marlow informed MGA that the pattern and sample makers "have secure day jobs with an outlook of many more years of stability," they "moonlight" to work on Bratz and "[t]hey have more than 100 years total of doll-making experience between them."

## IX.  MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS FOR THE BENEFIT OF MGA

98.   In the past few years, MGA has hired directly, or else induced to secretly work for MGA while still Mattel employees, over 100 Mattel employees, from Senior Vice-President level to lower level employees.  On information and belief, many of these employees were specifically targeted and recruited by MGA, including by Larian and Brawer, based on the Mattel confidential and proprietary

information they could access.  Many of these employees had access to proprietary and confidential Mattel information.  Mattel believes that some of those former Mattel employees may be observing their obligations not to misappropriate, disclose or use Mattel's confidential and proprietary information.  Mattel is informed and believes, however, that certain additional employees accessed, copied and took from Mattel confidential and proprietary information, including Mattel's strategic plans; business operations, methods and systems; marketing and advertising strategies and plans; future product lines; product profit margins; and customer requirements.  The misappropriated confidential and proprietary information included information that these Mattel employees were not authorized to access.  On information and belief, the misappropriated confidential and proprietary information taken from Mattel is being disclosed to and used by MGA for the benefit of MGA and to the detriment of Mattel.

## X.   LARIAN MAKES MISREPRESENTATIONS TO RETAILERS ABOUT MATTEL'S PRODUCTS

99.   Counter-defendants have engaged in other illegal practices in their efforts to compete unfairly with Mattel.  Larian has a practice of sending e-mail messages to a "Bratz News" distribution list that Larian created or that was created for him.  Mattel is informed and believes that the recipients of e-mail messages sent to the "Bratz News" distribution list include members of the media as well as representatives of many of Mattel's most significant customers.

100.  On May 12, 2006, Larian sent an e-mail message to the "Bratz News" distribution list that included a reference to Mattel's updated MY SCENE MY BLING BLING product with real gems.  Mattel had not publicly announced this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel had guarded the identification of this particular product.

101.  Shortly thereafter, Larian engaged in a campaign of calling Mattel's most significant customers, including but not limited to Target and TRU,

1   regarding the MY SCENE MY BLING BLING product with real gems.  In an

2   effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

3   BLING product with real gems, Larian knowingly made false factual statements

4   about that product to each retailer.  As of the writing of this Third Amended

5   Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

6   that each was the only retailer to purchase the product and that Mattel would not be

7   supporting the product with television advertising.  At the time that Larian made

8   these statements, he knew them to be false.  As a result of Larian's

9   misrepresentations, at least one retailer cancelled its order for 75,000 units of the

10   MY SCENE MY BLING BLING product with real gems.  Only after Mattel

11   learned of Larian's misrepresentations and was able to correct them was Mattel able

12   to assure the retailer that Larian's representations were false and to persuade the

13   retailer to reinstate the order.

14          102.  Such conduct is not an isolated incident.  MGA and Larian, in an

15   effort to gain an unfair competitive advantage, repeatedly issued false and

16   misleading press releases and spread false rumors in the marketplace.  In these

17   press releases and in their other statements made in marketplace, MGA and Larian

18   have deliberately misrepresented Bratz's sales, Bratz's market share, Bratz's

19   position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products

20   and the market share of Mattel's BARBIE products.

21   **XI.  LARIAN AND MGA DESTROY DOCUMENTS, ENGAGE IN**

22   **PERJURY, CONSPIRACY TO COMMIT PERJURY AND**

23   **OBSTRUCTION OF JUSTICE**

24          103.  On information and belief, Larian and MGA have themselves,

25   and through their agents and co-conspirators, destroyed, altered and fabricated

26   documents and engaged in other acts of spoliation to conceal the existence, nature

27   and breadth of their wrongful conduct.  For example, and without limitation,

28   Farhad Larian, a former MGA executive and director and Isaac Larian's brother,

1   deliberately destroyed several boxes of documents relevant to Mattel's claims

2   against Bryant and MGA to keep them from Mattel.  Farhad Larian did so while

3   still on MGA's payroll.

4         104.  On information and belief, Larian and MGA have also conspired

5   to commit perjury and engaged in acts of perjury and other acts of obstruction in

6   connection with MGA's theft of Mattel's property and Mattel's claims relating

7   thereto.  These actions include, among others, MGA's submission of false

8   information in sworn applications to the U.S. Copyright Office; Larian's repeated

9   sworn testimony during Phase 1 that Bryant told him, and that Larian believed, that

10   Bryant had not created Bratz while employed by Mattel; MGA's and Larian's

11   submission of false statements regarding MGA's ability to receive outside funding

12   in court pleadings and false statements regarding its financial condition in this

13   action.

14   **XII.  MGA AND LARIAN LAUNDER MONEY, ENGAGE IN**

15          **FRAUDULENT TRANSFERS AND ATTEMPT TO OBTAIN**

16          **PRIORITY OVER MATTEL'S CLAIMS**

17         105.  MGA and Larian have, on information and belief, engaged in a

18   complex scheme to transfer, launder or otherwise hide the ill-gotten funds they

19   have obtained by virtue of their unlawful conduct and have gone to extensive

20   lengths to cover up and obscure such activities.  On information and belief, this

21   scheme was orchestrated and/or commenced no later than 2007, but accelerated

22   during the pendency of trial, especially after the Jury's Phase 1A verdict in Mattel's

23   favor.  This scheme continues to this day and threatens to continue into the future.

24         106.  On information and belief, in concert with various co-

25   conspirators and shell companies controlled by them, acting on their behalf or in

26   which they have an interest, MGA and Larian have transferred or transported, or

27   caused to be transferred or transported, funds obtained through their unlawful

28   conduct in interstate commerce, including without limitation out of the United

States.  At least some of these funds, on information and belief, were later returned to the United States through shell entities that attempt to disguise not only the true owners of the companies, but the origin and source of the funds as well.

107.  These entities have, on information and belief, funded further wrongdoing by MGA and Larian, including the purported purchase, at a substantial discount, of the note held by MGA's then-largest creditor, Wachovia.  By this scheme, Larian and his co-conspirators sought to disguise their identities and to obtain purported priority as an alleged secure creditor (rather than as a shareholder) over Mattel's claims against MGA's assets.  On information and belief, MGA and Larian conducted and participated in this scheme with the purpose of concealing and manipulating their assets and liabilities and the appearance of their financial condition in anticipation of their liability to Mattel, and for the purpose of minimizing any exposure due to that liability.  The scheme has directly assisted MGA and Larian in committing the other wrongs against Mattel identified herein.

## A.    Larian and MGA Create Various Shell and Off-Shore Entities

108.  On information and belief, Larian and MGA and those acting in concert with them have created, affiliated with, employed or purchased one or more shell entities to either transfer or assist in the transfer of proceeds generated by their unlawful conduct and the criminal enterprises.  These include, but are not limited to, the following entities and transactions:

- Lexington Financial Limited, a Nevis Company ("Lexington"), a company based in the Caribbean island nation of Nevis that is notorious for its secrecy laws.  Lexington, whose purported London business address listed in filings with the State of California is nothing more than a virtual office provided by a London company for a few dollars a month, appears to be a non-operating shell corporation.  Lexington was registered on March 3, 2006 by persons who , on information and belief, were acting on behalf of or in concert with Larian, and Larian

and his co-conspirators used and continue to use Lexington to conceal, receive,  hold and transfer funds generated by the wrongful conduct alleged herein.

- Vision Capital, LLC, a Delaware limited liability company ("Vision Capital"), which, on information and belief, was created by persons at the direction or on behalf of Larian on August 19, 2008, just after the Phase 1A verdict in Mattel's favor.  On information and belief, Larian and his co-conspirators used and continue to use Vision Capital to conceal, receive, hold and transfer funds generated by their wrongful conduct alleged herein.

- Omni 808 Investors, LLC, a California limited liability corporation ("Omni 808"), which, on information and belief, was created at the direction or on behalf of Larian on August 12, 2008, just after the Phase 1A verdict in Mattel's favor.  On information and belief, Larian and his co-conspirators used and continue to use Omni 808 to conceal, receive, hold and transfer funds generated by their wrongful conduct alleged herein.  In 2006, Neil Kadisha, the alleged CEO of Omni 808 and a Larian co-conspirator, was found by a court after trial to be "no more than a common thief" and was held liable for stealing millions of dollars as part of a decade-long pattern of fraudulent conduct that included perjury, subornation of perjury, fabrication of financial records, sham transactions, preparation of back-dated documents, fraudulent accountings, acts of looting, embezzlement and other misappropriations of funds, breaches of fiduciary duty, conflicts of interest and illegal self-dealing.

109.  Lexington claims a purported security interest in the assets of Vision Capital.  Vision Capital claims a purported security interest in the assets of Omni 808.

THIRD AMENDED ANSWER AND COUNTERCLAIMS

2875224.1

110.   MGA and Larian, and their co-conspirators, have, on information and belief, used these entities to transfer their ill-gotten funds from the United States and/or to move laundered funds back into the United States, including without limitation in an attempt to obtain purported priority as an alleged secured creditor over Mattel's claims and to deprive Mattel of assets to which it has a legitimate claim.

111.   On information and belief, Lexington, Vision Capital and Omni 808 are alter-egos of each other, the companies being mere shells created and operated pursuant to a fraudulent scheme as alleged herein, and with their financial affairs being significantly intermingled and interconnected.

112.   On information and belief, Larian, either alone or with other co-conspirators, formed or caused to be formed the alter-ego entity IGWT Group on June 26, 2008—during the Phase 1 trial—and registered its place of business as Larian's home address.  On information and belief, Larian, either alone or with other co-conspirators, also formed or caused to be formed an affiliate alter-ego entity called IGWT 826 Investments on August 27, 2008—the day after the Phase 1 trial ended.  IGWT 826 Investments is registered at the home address of Shirin Makabi and Jahangir Eli Makabi.  Shirin Makabi is Isaac Larian's sister, Jahangir Eli Makabi is Isaac Larian's brother-in-law, and both are shareholders or beneficial shareholders of MGA through various trusts.

B.      The Purported Acquisition of the Wachovia Debt

113.   After the Phase 1A verdict, MGA and Larian represented on multiple occasions to both this Court and the Ninth Circuit that MGA was in dire financial straits and might file imminently for bankruptcy.  MGA and Larian represented to the Court that MGA had not obtained and could not obtain credit (a representation that MGA later was forced to retract as false).  At the same time MGA's largest lender, Wachovia, accelerated over $313 million dollars worth of debt that MGA owed it and triggered the lock-box provision of its loan agreements

THIRD AMENDED ANSWER AND COUNTERCLAIMS

2875224.1

1   with MGA, which required the transfer to Wachovia of all, or substantially all, of

2   the revenue that MGA received.

3        114.  On information and belief, Larian and MGA, and their co-

4   conspirators, in order to maintain control over MGA's revenue and to frustrate the

5   jury's verdicts in Mattel's favor, determined to purchase the Wachovia note

6   through various entities affiliated with Larian or with MGA.  On information and

7   belief, Larian intended to use Lexington, Vision Capital and Omni 808 to distance

8   himself from the transaction and thereby conceal the true source of the funds used

9   to purportedly purchase the Wachovia note and to conceal that Larian in fact

10  participated in or controlled the acquisition of the debt, directly or indirectly.  On

11  information and belief, at Larian's urging and acting in concert with Larian, Omni

12  808 purportedly acquired the bulk of that debt at a massive discount.

13       115.  Omni 808 has represented to the Court that its claimed

14  acquisition of the Wachovia note was an arms-length business deal.  Omni 808 has

15  also represented to the Court that the funds used for the purported acquisition did

16  not originate from MGA or Larian.  Wachovia, however, recently produced

17  documents that undermine these claims and representations.  A July 29, 2008 offer

18  letter to Wachovia states that Larian would have a non-voting limited interest in the

19  loan acquisition.  And a Senior Promissory Note between MGA and Wachovia,

20  dated September 3, 2008, specifically identifies Omni 808 as an affiliate of MGA.

21       116.  Moreover, Vision Capital, which claims it holds a purported

22  security interest in Omni 808, is also affiliated with MGA.  Vision Capital has

23  listed its address as 1525 South Broadway, Los Angeles, California.  Mattel has not

24  been able to identify an active business named Vision Capital located there.  Mattel

25  did identify this as the location of Neman Brothers & Associates, a business owned

26  by Leon Neman, Larian's brother-in-law who has served as an MGA director.

27  After Mattel uncovered these facts, Mr. Neman claimed to be an alleged principal

28  of Vision Capital.

117.  On information and belief, the funds Omni 808 used to purportedly purchase the Wachovia note were, in whole or in part, generated by Larian's and MGA's wrongful conduct directed towards Mattel.  On information and belief, Larian has used, at least in part, IGWT Group, IGWT 826 Investments, Lexington, Vision Capital and other shell and alter-ego companies as conduits to transfer funds to Omni 808 and to conceal the source of such funds.

118.  MGA and Larian have now also admitted that Omni 808 provided additional funds to MGA beyond the Wachovia debt purchase, though MGA first denied that was the case.  MGA and Omni 808 entered into a Secured Delayed Draw Demand Note on October 16, 2008.  Pursuant to the terms of that Note, Omni 808 would make available up to $40 million of additional purported credit to MGA.  Pursuant to a written request submitted by MGA on October 17, 2008, Omni 808 loaned MGA an additional $6 million under that Note.  On information and belief, those funds also were, in whole or in part, generated by Larian's and MGA's wrongful conduct towards Mattel and transferred through Larian-controlled conduits to conceal the true source of the funds.  In fact, the Secured Delayed Draw Demand Note between MGA and Omni 808 states that Omni 808's funding came, at least in part, from IGWT 826 Investments.

119.  On information and belief, Omni 808's claimed acquisition of the Wachovia note was not an "arms-length" transaction by an independent investor or investors.  Instead it was, on information and belief, an insider transaction facilitated by Larian and MGA through the use of nominally independent but affiliated entities, for the purpose of maintaining substantial control over MGA's revenues in the near term, continuing with their wrongful activities despite the jury's verdict against them and establishing purported  priority as a secured creditor over Mattel's claims in any eventual bankruptcy.  On information and belief, Larian participated and was involved in the purported

1   acquisition of MGA's debt, though the claimed acquisition was structured to

2   conceal it from Mattel.

3          120.  While the precise mechanisms by which Larian transferred funds

4   and manipulated MGA's and Larian's finances through these conduits is not yet

5   known to Mattel because such information is in the exclusive possession and

6   control of MGA, Larian and their co-conspirators, and they have refused to disclose

7   or misrepresented even basic information such as the alleged owners of the entities,

8   on information and belief Larian and his affiliates have created shell entities for the

9   purpose of obscuring and concealing the true ownership of assets held and origin of

10  funds transferred, while Larian and his family members and affiliates further have

11  engaged in a series of related-party transactions as part of a scheme to convert at

12  least tens of millions of dollars in MGA equity into debt.

13         121.  For example, according to an MGA Lender Update dated

14  November 1, 2007, in approximately August 2007, MGA made purported loans in

15  the amount of 2.5 million euros for investments in another toy company, called

16  Zapf, purportedly on behalf of Larian and his family.  Another 12 million euros

17  were due in November 2007, for which MGA was liable if Larian did not

18  contribute.  As shown in a Master Assignment and Exchange Agreement between

19  Omni 808, MGA, and MGA de Mexico and Wachovia and dated September 3,

20  2008, soon after the Phase 1A verdict and during the Phase 1B trial Larian and his

21  family members (including, without limitation, Jahangir Eli Makabi and Shirin

22  Larian Makabi as Co-Trustees of the Makabi Living Trust, Isaac Larian and Angela

23  Larian as Trustees of the Larian Living Trust, the Angela Larian Qualified Annuity

24  Trust, the Isaac E. Larian Qualified Annuity Trust, the Jahangir Eli Makabi

25  Qualified Annuity Trust, Jahangir Eli Makabi, and the Shirin Larian Makabi

26  Qualified Annuity Trust) executed a series of twenty-two separate transactions (on

27  August 4, 5, 8, 19, 25, 2008) which purported to transfer as loans by shareholders

28  over $13.3 million from U.S. based trust accounts to MGA Entertainment (HK)

1    Limited.  Another series of twenty-two transfers (also on August 4, 5, 8, 19, 25,

2    2008) show that Larian and these same family members, MGA shareholders, have

3    also purported to loan nearly $6 million in funds to MGA.

4        **C.    Larian Loots MGA's Assets by Selling MGA Inventory to Himself**

5              **at Fire Sale Prices**

6              122.  On information and belief, Larian and MGA have transferred and

7    are continuing to transfer assets from MGA by coordinating the sale of significant

8    MGA inventory, at substantial discounts, to companies affiliated with Larian.

9    These transactions have had the effect of denuding MGA of its most valuable

10   inventory, sold to Larian's own companies for pennies on the dollar, while

11   permitting Larian to substantially benefit by reselling MGA's inventory, and while

12   further infringing Mattel's intellectual property.

13             123.  On information and belief, Larian, through the Larian-controlled

14   IGWT entities, is purchasing Bratz products that infringe Mattel's rights and other

15   MGA products for steep discounts and reselling, distributing and offering for sale

16   such products.  MGA has admitted that it sold tens of millions of dollars in Bratz

17   inventory to IGWT entities at a "substantial discount."  Documents show that the

18   discount on this self-dealing transaction was in fact massive.

19             124.  In May of 2008, when MGA was undergoing cash-flow

20   problems for reasons that included Larian's on-going de facto liquidation of MGA

21   assets, Larian arranged to have MGA purportedly sell vast amounts of MGA

22   inventory, including infringing Bratz products, to himself through the IGWT

23   Group.  As shown by an Inventory Purchase Agreement between MGA and IGWT

24   Group, dated July 7, 2008, MGA purportedly agreed to sell hundreds of thousands

25   of inventory items to Larian's IGWT Group.  This agreement was signed by Larian

26   on behalf of both MGA and IGWT Group.  Through this transaction, MGA sold

27   inventory with a retail value of more than $65 million for just $5.3 million.

28

125.   MGA and Larian have claimed that the arrangement was to MGA's benefit because the deal involved obsolete and overstock inventory. However, as the Bill of Sale accompanying the agreement (which shows the SKUs of the products IGWT Group purchased) shows, much of the inventory MGA sold to IGWT Group was actually current inventory, including current Bratz products.

126.  The full extent of this and other transactions by which Larian has arranged the substantially discounted sale of MGA assets to IGWT Group or other Larian-controlled entities or affiliates is not yet known to Mattel because such information is in the exclusive possession and control of MGA, Larian, the IGWT entities and their co-conspirators, and they have refused to disclose information to Mattel.  On information and belief, by arranging this type of transaction with IGWT Group and other similar insider transactions yet unknown to Mattel, Larian has siphoned significant MGA assets for his own personal benefit.  On information and belief, the purported transaction with IGWT Group is only the most recent in a series of insider arrangement facilitated by Larian, which, by May 16, 2008, led Wachovia to conclude that Larian had engaged in a de-facto liquidation of MGA's assets over the course of 2008 and other times.

## CLAIMS FOR RELIEF

### First Counterclaim

### Copyright Infringement

### (Against MGA, MGA Entertainment (HK) Limited,

### Larian, Bryant and Does 4 through 10)

127.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 126, above, as though fully set forth at length.

128.  Mattel is the owner of copyrights in works that are fixed in tangible media of expression and that are the subject of valid, and subsisting, copyright registrations owned by Mattel.  These include, without limitation, the works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-378-660, VAu 715-270, VAu 715-271 and VAu 715-273.  These also include, without limitation, the works that are the subject of Registrations VAu 960-439, VAu 964-304, VAu 964-306, VAu 964-308, VAu 964-309, VAu 964-310, VAu 964-311, VAu 964-315, VAu 964-318, VAu 964-319, VAu 964-320 and VAu 964-321.

129.  Counter-defendants have reproduced, created derivative works from and otherwise infringed upon the exclusive rights of Mattel in its protected works without Mattel's authorization.  Counter-defendants' acts violate Mattel's exclusive rights under the Copyright Act, including without limitation Mattel's exclusive rights to reproduce its copyrighted works and to create derivative works from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

130.  Counter-defendants' infringement (and substantial contributions to the infringement) of Mattel's copyrighted works is and has been knowingly made without Mattel's consent and for commercial purposes and the direct financial benefit of Counter-defendants.  Counter-defendants, moreover, have deliberately failed to exercise their right and ability to supervise the infringing activities of others within their control to refrain from infringing Mattel's copyrighted works and have failed to do so in order to deliberately further their significant financial interest in the infringement of Mattel's copyrighted works.  Accordingly, Counter-defendants have engaged in direct, contributory and vicarious infringement of Mattel's copyrighted works.

131.  By virtue of Counter-defendants' infringing acts, Mattel is entitled to recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of suit and attorneys' fees, and all other relief permitted under the Copyright Act.

1   132.  Counter-defendants' actions described above have caused and

2   will continue to cause irreparable damage to Mattel, for which Mattel has no

3   remedy at law.  Unless Counter-defendants are restrained by this Court from

4   continuing their infringement of Mattel's copyrights, these injuries will continue to

5   occur in the future.  Mattel is accordingly entitled to injunctive relief restraining

6   Counter-defendants from further infringement.

7   **<u>Second Counterclaim</u>**

8   **Violation of the Racketeer Influenced and Corrupt Organizations Act**

9   **18 U.S.C. §§ 1962(c) and 1964(c)**

10   **(Against All Counter-defendants)**

11   133.  Mattel repeats and realleges each and every allegation set forth in

12   paragraphs 1 through 132, above, as though fully set forth at length.

13   134.  Beginning at various times from approximately 1999 through the

14   filing of this Third Amended Answer and Counterclaims, in the Central District of

15   California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

16   Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and

17   Brawer, Trueba, Vargas, Castilla and Brisbois were employed by and associated-in-

18   fact with an enterprise engaging in, and the activities of which affect, interstate and

19   foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal

20   Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK)

21   Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and

22   Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the

23   Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).

24   135.  In addition, beginning at various times from approximately 1999

25   through the filing of this Third Amended Answer and Counterclaims, in the Central

26   District of California and elsewhere, Counter-defendants MGA, MGA

27   Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-

28   defendants, were employed by and associated-in-fact with a second enterprise

1   engaging in, and the activities of which affect, interstate and foreign commerce (the

2   "Bratz Criminal Enterprise").

3         136.  Further, beginning at least as early 2007, and through the filing

4   of this Third Amended Answer and Counterclaims, in the Central District of

5   California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK)

6   Limited and Larian, as well as IGWT Group, IGWT 826 Investments, Lexington,

7   Omni 808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli

8   Makabi, Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The

9   Larian Living Trust, The Angela Larian Qualified Annuity Trust, The Isaac E.

10   Larian Qualified Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust,

11   The Shirin Larian Makabi Qualified Annuity Trust and certain of the Doe Counter-

12   defendants, and others acting in concert with or on behalf of the foregoing, were

13   employed by and associated-in-fact with another enterprise engaging in, and the

14   activities of which affect, interstate and foreign commerce (the "IGWT Criminal

15   Enterprise").

16         137.  MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

17   Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

18   Brisbois, Castilla and the Other Former Employees, and each of them, for the

19   purpose of executing and attempting to execute the scheme to improperly defraud

20   Mattel and steal its trade secret or otherwise confidential and proprietary

21   information and infringe Mattel's rights and conceal such misconduct, by means of

22   tortious, fraudulent and criminal conduct, did and do unlawfully, willfully and

23   knowingly conduct and participate, directly and indirectly, in the conduct of the

24   MGA Criminal Enterprise's affairs and, in the case of MGA, MGA Entertainment

25   (HK) Limited, Larian, Bryant, and certain of the Doe Counter-defendants, the Bratz

26   Criminal Enterprise's affairs, through a pattern of racketeering activity.  Their

27   actions include multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud),

28   18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1503 (influencing or injuring officer or

1   juror generally), 18 U.S.C. § 1512 (tampering with a witness victim, or informant),

2   18 U.S.C. § 1952 (interstate and foreign travel to aid racketeering), and 18 U.S.C. §

3   2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

4           138.  In addition, MGA, MGA Entertainment (HK) Limited, Larian,

5   IGWT Group, IGWT 826 Investments, Lexington, Omni 808, Vision Capital, Leon

6   Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi, Shirin Larian Makabi,

7   Angela Larian, The Makabi Living Trust, The Larian Living Trust, The Angela

8   Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The

9   Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian Makabi Qualified

10  Annuity Trust and Does 4 through 10, and each of them, for the purpose of

11  executing and attempting to execute the scheme to infringe Mattel's rights and

12  transfer, transport or launder the ill-gotten gains from their infringements and the

13  MGA and Bratz Criminal Enterprises' thefts and infringements, and secret MGA

14  assets and purportedly obtain priority over Mattel, by means of tortious, fraudulent,

15  and criminal conduct, did and do unlawfully, willfully, and knowingly conduct and

16  participate, directly and indirectly, in the conduct of the IGWT Criminal

17  Enterprise's affairs through a pattern of racketeering activity.  Their actions include

18  multiple, related acts in violation of:  18 U.S.C. § 1341 (mail fraud), 18 U.S.C.

19  § 1343 (wire fraud), 18 U.S.C. § 1952 (interstate and foreign travel to aid

20  racketeering), 18 U.S.C. § 152(7) (concealment of assets), 18 U.S.C. § 1956

21  (money laundering) and 18 U.S.C. § 1957 (use of unlawful funds) and 18 U.S.C. §

22  2319(a) and 17 U.S.C. § 506(a)(1)(A) (criminal copyright infringement).

23          139.  MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

24  Larian, Bryant, Machado, Does 4 through 10, and the other members of the MGA

25  Criminal Enterprise, Bratz Criminal Enterprise and IGWT Criminal Enterprise, and

26  each of them, shared the common purpose of enabling MGA to defraud Mattel and

27  infringe its rights, and obtain confidential, proprietary and otherwise valuable

28  Mattel property through improper means, and conceal and transfer, transport or

1    launder the ill-gotten gains from such misconduct, and secret MGA assets and

2    purportedly obtain priority over Mattel, in order to assist MGA in illegally

3    competing with Mattel domestically and throughout the world.

4              140.  The MGA Criminal Enterprise, Bratz Criminal Enterprise and

5    IGWT Criminal Enterprise as described herein are and have been at all relevant

6    times continuing enterprises.  The conduct of each enterprise continues through the

7    date of this Third Amended Answer and Counterclaims and is ongoing, including

8    by virtue of MGA's continuing use and infringement of Mattel's information,

9    property and rights, and its use of ill-gotten gains from such thefts, all to the

10   detriment of Mattel.  Said enterprises furthermore threaten to continue such

11   conduct into the future, to the detriment of Mattel.

12             141.  The pattern of racketeering activity, as defined by 18 U.S.C.

13   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

14   of continuing criminal activity.  This activity consists of multiple acts of

15   racketeering by each member of the MGA Criminal Enterprise, Bratz Criminal

16   Enterprise and IGWT Criminal Enterprise, is interrelated, not isolated and is

17   perpetrated for the same or similar purposes by the same persons.  This activity

18   extends over a substantial period of time, up to and beyond the date of this Third

19   Amended Answer and Counterclaims.  These activities occurred after the effective

20   date of 18 U.S.C. §§ 1961 *et seq.,* and the last such act occurred within 10 years

21   after the commission of a prior act of racketeering activity.  These racketeering

22   activities included repeated acts of:

23             (a)    Mail Fraud:  Counter-defendants MGA, MGA Entertainment

24                    (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and

25                    Does 4 through 10, as well as some or all other members of the

26                    MGA and IGWT Criminal Enterprises, aided and abetted by each

27                    other, having devised a scheme or artifice to defraud Mattel of its

28                    confidential trade secret information and property by conversion,

1    false representations, concealment and breaches of fiduciary duty,

2    and transfer, transport or launder the ill-gotten gains from such

3    thefts, and secret MGA assets and purportedly obtain priority

4    over Mattel, did for the purpose of furthering and executing such

5    a scheme or artifice to defraud, deposited or caused to be

6    deposited matters or things to be sent or delivered by the Postal

7    Service, or any private or commercial interstate carrier, or took or

8    received matters or things therefrom, or knowingly caused

9    matters or things to be delivered by mail or such carrier according

10   to the direction thereon, or at the place at which it is directed to

11   be delivered by the person to whom it is addressed, in violation of

12   18 U.S.C. § 1341 and 18 U.S.C. § 2, as alleged with greater

13   particularity in the foregoing paragraphs and as evidenced by,

14   among other acts of mail fraud, the true and correct copies of

15   communications and other evidence included in Exhibit C, D and

16   E;

17   (b)   Wire Fraud:  Counter-defendants MGA, MGA Entertainment

18         (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, and

19         Does 4 through 10, as well some or all other members of the

20         MGA and IGWT Criminal Enterprises, aided and abetted by each

21         other, having devised a scheme or artifice to defraud Mattel of its

22         confidential and trade secret information and property by

23         conversion, false representations, concealment and breaches of

24         fiduciary duty, and transfer, transport or launder the ill-gotten

25         gains from such thefts, and secret MGA assets and purportedly

26         obtain priority over Mattel, did for the purpose of furthering and

27         executing such a scheme or artifice to defraud, transmit and cause

28         to be transmitted by means of wire communications in interstate

1   or foreign commerce, writing, signs, signals, pictures or sound, in

2   violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with

3   greater particularity in the foregoing paragraphs and as evidenced

4   by, among other acts of wire fraud, the true and correct copies of

5   communications and other evidence included in Exhibit C, D and

6   E;

7   (c)   <u>Tampering With a Witness, Victim or Informant</u>:  Counter-

8   defendants MGA, MGA Entertainment (HK) Limited, MGA de

9   Mexico, Larian, Bryant, Machado and Does 4 through 10, aided

10   and abetted by each other and some or all of the remaining

11   members of the MGA Criminal Enterprise, did corruptly alter,

12   destroy, mutilate, or conceal more than one record, document, or

13   other object, or attempted to do so, with the intent to impair the

14   object's integrity or availability for use in an official proceeding,

15   including this action, including without limitation by:

16      i.      altering Bryant's contract with MGA relating to

17   Bratz to conceal evidence that Bryant faxed the contract from the

18   BARBIE COLLECTIBLES department of Mattel, using a fax

19   machine owned by Mattel and while Bryant was employed by

20   Mattel;

21      ii.      altering numerous original Bratz drawings created

22   by Bryant by adding false and misleading date notations of

23   "8/1998" and "© 8/1998" to the drawings even though the

24   drawings were not created in August 1998; and

25      iii.      destroying electronic and other evidence, including

26   by destroying evidence previously contained on Carter Bryant's

27   and Isaac Larian's computer hard drives, and destroying or

28   causing to be destroyed evidence in possession of Farhad Larian;

-76-

iv.     altering tax records and other business documents, including by use of false names and false social security numbers, to conceal the bribery of Mattel employees;

Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)     <u>Influencing or Injuring Officer or Juror Generally</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise, aided and abetted by each other, did seek to corruptly impede, obstruct or influence the due administration of justice, including without limitation by:

i.     Larian's and MGA' submission of false information in sworn applications to the U.S. Copyright Office and the U.S. Patent Office;

ii.     Larian repeatedly giving false testimony during the Phase 1 trial that Bryant told him (and that Larian believed) that Bryant had not created Bratz while employed by Mattel;

iii.     Larian's and MGA's submission of false statements regarding MGA's ability to receive outside funding and numerous false statements regarding its financial condition in this action;

Such actions are in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)     <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited,

MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all of the remaining members of the MGA Criminal Enterprise and IGWT Criminal Enterprise, aided and abetted by each other, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing and following paragraphs; money laundering in violation of 18 U.S.C. § 1956(a), as alleged with greater particularity in the foregoing and following paragraphs; and engaging in monetary transactions involving property derived from unlawful activities in violation of 18 U.S.C. § 1957(a), as alleged with greater particularity in the foregoing and following paragraphs;

(f)  Money Laundering:  Counter-defendants MGA, MGA Entertainment (HK) Limited and Larian and Does 4 through 10, as well as some or all of the remaining members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully engaged in financial transactions which were intended to conceal or disguise the nature, the location, the source, the ownership, or the control of the ill-gotten proceeds of their criminal activities or were intended to further promote the carrying on of their criminal activities, all in violation of 18 U.S.C. § 1956(a), as alleged with greater particularity in the foregoing paragraphs;

(g)     <u>Engaging in Monetary Transactions in Property Derived from Unlawful Activity</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian, and Does 4 through 10, as well as some or all of the remaining members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully engaged in monetary transactions in criminally derived property of a value greater than $10,000 derived from their unlawful criminal activities, all in violation of 18 U.S.C. § 1957(a), as alleged with greater particularity in the foregoing paragraphs;

(h)     <u>Concealment of Assets</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian, and Does 4 through 10, as well as some or all of the remaining members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully sought to transfer or conceal property, and/or concealed, destroyed, mutilated, falsified or made false entries in recorded information relating to such property, in contemplation of a bankruptcy proceeding, all in violation of 18 U.S.C. § 152(7) & (8), as alleged with greater particularity in the foregoing paragraphs;

(i)     <u>Criminal Copyright Infringement</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, as well as some or all other members of the MGA and IGWT Criminal Enterprises, aided and abetted by each other, willfully infringed and continue to willfully infringe Mattel's copyrights, including without limitation with respect to documents containing Mattel trade secret and confidential information and Bratz works created by

-79-

2875224.1

1    Bryant and others while Mattel employees, for purposes of

2    commercial advantage and private financial gain, all in violation

3    of 18 U.S.C. § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged

4    with greater particularity in the foregoing paragraphs.

5    142.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

6    are separate from, though employed by or associated with, MGA, the MGA Group,

7    the Bryant Group, the Mexican Group and the Canadian Group.

8    143.   MGA had a role in the racketeering activity that was distinct

9    from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

10   and did benefit, from the activity of its employees and agents alleged herein, and

11   thus was not a passive victim of racketeering activity, but an active perpetrator.

12   144.   Mattel has been injured in its business or property as a direct

13   and proximate result of the Counter-defendants' and the other enterprise members'

14   violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

15   constituting the pattern of racketeering activity.

16   145.   As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

17   MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

18   Does 4 through 10, Brawer, Trueba, Vargas, Brisbois, Castilla and the Other

19   Former Employees, and IGWT Group, IGWT 826 Investments, Lexington, Omni

20   808, Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli

21   Makabi, Shirin Larian Makabi, The Makabi Living Trust, The Larian Living Trust,

22   The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified Annuity

23   Trust, The Jahangir Eli Makabi Qualified Annuity Trust and The Shirin Larian

24   Makabi Qualified Annuity Trust, Mattel has suffered substantial damages, in an

25   amount to be proved at trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to

26   recover treble its general and special compensatory damages, plus interest, costs

27   and attorneys, fees, incurred by reason of Counter-defendants' violations of 18

28   U.S.C. § 1962(c).

### Third Counterclaim

**Conspiracy To Violate the Racketeer**

**Influenced And Corrupt Organizations Act**

**(18 U.S.C. §§ 1962(d) and 1964(c))**

**(Against All Counter-defendants)**

146.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 145, above, as though fully set forth at length.

147.  Beginning at various times from approximately 1999 through the filing of this Third Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, Castilla and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

148.  These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

149.  Beginning at least as early as 2007 through the filing of this Third Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited,

1  MGA de Mexico, Larian, and Does 4 through 10, and IGWT Group, IGWT 826

2  Investments, Lexington, Omni 808, Vision Capital, Leon Neman, Fred Mashian,

3  Neil Kadisha, Angela Larian, Jahangir Eli Makabi, Shirin Larian Makabi, The

4  Makabi Living Trust, The Larian Living Trust, The Angela Larian Qualified

5  Annuity Trust, The Isaac E. Larian Qualified Annuity Trust, The Jahangir Eli

6  Makabi Qualified Annuity Trust and The Shirin Larian Makabi Qualified Annuity

7  Trust, willfully, knowingly and unlawfully, did conspire, combine, confederate and

8  agree together to violate 18 U.S.C. § 1962(c).

9        150.  These conspirators were employed by and associated-in-fact with

10  the IGWT Criminal Enterprise engaging in, and the activities of which affect,

11  interstate and foreign commerce.  Specifically, MGA, MGA Entertainment (HK)

12  Limited, Larian, and IGWT Group, IGWT 826 Investments, Lexington, Omni 808,

13  Vision Capital, Leon Neman, Fred Mashian, Neil Kadisha, Jahangir Eli Makabi,

14  Shirin Larian Makabi, Angela Larian, The Makabi Living Trust, The Larian Living

15  Trust, The Angela Larian Qualified Annuity Trust, The Isaac E. Larian Qualified

16  Annuity Trust, The Jahangir Eli Makabi Qualified Annuity Trust, The Shirin Larian

17  Makabi Qualified Annuity Trust and certain of the Doe Counter-defendants,

18  constituting a group of individuals associated-in-fact, did unlawfully, willfully, and

19  knowingly participate in and conduct, directly and indirectly, the IGWT Criminal

20  Enterprise's affairs through a pattern of racketeering activity.

21        151.  The pattern of racketeering activity, as defined by 18 U.S.C.

22  §§ 1961(1) and (5), includes acts of mail fraud in violation of 18 U.S.C. § 1341 and

23  18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18 U.S.C.

24  § 2; conspiracy to commit perjury and acts of influencing or injuring officer or

25  juror generally in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 2; acts of

26  tampering with witnesses, victims or informants in violation of 18 U.S.C. § 1512

27  and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of racketeering

28  enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; acts of unlawful

1   concealment of assets in violation of 18 U.S.C. § 152(7) & (8); acts of money

2   laundering in violation of 18 U.S.C. § 1956; acts of engaging in monetary

3   transactions in property derived from unlawful activities in violation of 18 U.S.C.

4   § 1957; and acts of criminal copyright infringement in violation of 18 U.S.C.

5   § 2319(a) and 17 U.S.C. § 506(a)(1)(A).

6          152.  Counter-defendants and the other members of the MGA Criminal

7   Enterprise schemed to improperly defraud Mattel and steal its trade secret or

8   otherwise confidential and proprietary information and infringe Mattel's rights and

9   conceal such misconduct, as more fully set forth in the foregoing paragraphs.

10   Further, counter-defendants and the other members of the IGWT Criminal

11   Enterprise schemed to infringe Mattel's rights and transfer, transport or launder the

12   ill-gotten gains from their infringements and the MGA and Bratz Criminal

13   Enterprises' thefts and infringements, and secret MGA assets and purportedly

14   obtain priority over Mattel, as more fully set forth in the foregoing paragraphs.

15          153.  In furtherance of this unlawful conspiracy, and to effect its

16   objectives, Counter-defendants and various co-conspirators committed numerous

17   overt acts, including but not limited to those set forth in the foregoing paragraphs.

18          154.  Mattel has been injured in its business or property as a direct and

19   proximate result of the Counter-defendants' and the other enterprise members'

20   violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

21   constituting the pattern of racketeering activity.

22          155.  As a result of the conspiracies between and among all Counter-

23   defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

24   suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

25   U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

26   compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

27   of Counter-defendants' violations of 18 U.S.C. § 1962(d).

28

## Fourth Counterclaim

### Misappropriation of Trade Secrets

### (*Cal. Civ. Code* § 3426 *et seq.*)

### (Against Counter-defendants MGA, MGA de Mexico, Larian, Machado and Does 4 through 10)

156.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 155, above, as though fully set forth at length.

157.  As used herein, "Trade Secret Material" shall mean the documents, materials and information stolen by Machado, Trueba, Vargas, Brisbois, Castilla, the Other Former Employees, and other persons acting for, on behalf of or at the direction of MGA and/or Larian.  Prior to their theft by Counter-defendants, the Trade Secret Materials gave Mattel a significant competitive advantage over its existing and would-be competitors, including MGA.  This advantage, as to MGA, has now been compromised as a result of Counter-defendants' unlawful activities.

158.  Mattel made reasonable efforts under the circumstances to maintain the confidentiality of the Trade Secret Materials, including by having employees and consultants who may have access the Trade Secret Materials sign confidentiality agreements that oblige them not to disclose the Trade Secret Materials or characteristics of the Trade Secret Materials; by limiting the circulation of said materials within Mattel; by protecting and limiting access to computers with log-in identifications and passwords; by limiting each employee's access to electronic files to those that the particular employee needs to access; by educating employees on the nature of Mattel's information that is confidential and proprietary; and by reminding employees on a regular and periodic basis of their obligation to protect and maintain Mattel's confidential and proprietary information.

159.  Mattel's Trade Secret Materials derive independent economic value from not being generally known to the public or to other persons who can obtain economic benefit from their disclosure.

160.  Counter-defendants have illegally obtained the trade secret materials, as set forth above, and through other means of which Mattel is presently unaware.

161.  Counter-defendants have used and disclosed Mattel's Trade Secret Materials without Mattel's consent and without regard to Mattel's rights, and without compensation, permission, or licenses for the benefit of themselves and others.

162.  Counter-defendants' conduct was, is, and remains willful and wanton, and was taken with blatant disregard for Mattel's valid and enforceable rights.

163.  Counter-defendants' wrongful conduct has caused and, unless enjoined by this Court, will continue in the future to cause irreparable injury to Mattel.  Mattel has no adequate remedy at law for such wrongs and injuries.  Mattel is therefore entitled to a permanent injunction restraining and enjoining Counter-defendants, and each of them, as well as their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from further using in any manner Mattel's trade secrets.

164.  In addition, as a proximate result of Counter-defendants' misconduct, Mattel has suffered actual damages, and Counter-defendants have been unjustly enriched.

165.  The aforementioned acts of the Counter-defendants were willful and malicious, including in that Counter-defendants misappropriated Mattel's trade secrets with the deliberate intent to injure Mattel's business and improve their own. Mattel is therefore entitled to enhanced damages.  Mattel is also entitled to reasonable attorney's fees.

2875224.1

THIRD AMENDED ANSWER AND COUNTERCLAIMS

## Fifth Counterclaim

### Breach of Contract

### (Against Bryant)

166.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 165, above, as though fully set forth at length.

167.  Pursuant to his Employment Agreement, Bryant agreed that he would not, without Mattel's express written consent, engage in any employment or business other than for Mattel or assist in any manner any business competitive with the business or future business plans of Mattel during his employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further assigned to Mattel all right, title and interest in "inventions," including without limitation "designs" and other works that he conceived, created or reduced to practice during his employment by Mattel.  In addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as disclosed, he had not worked for any competitor of Mattel and had not engaged in any business venture or transaction involving a Mattel competitor that could be construed as a conflict of interest.  Bryant further promised that he would notify his supervisor immediately of any change in his situation that would cause him to change any of the foregoing certifications or representations.

168.  The Employment Agreement and the Conflict Questionnaire are valid, enforceable contracts, and Mattel has performed each and every term and condition of the Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

169.  Bryant materially breached the foregoing contracts with Mattel, in that, among other things, he secretly aided, assisted and worked for a Mattel competitor during his employment with Mattel without the express written consent of Mattel.

170. As a consequence of Bryant's breach, Mattel has suffered and will, in the future, continue to suffer damages in an amount to be proven at trial. Such damages include, without limitation, the amounts paid by the competitor to Bryant during his Mattel employment; the amounts paid by MGA to Bryant during his Mattel employment; the amount that Mattel paid Bryant during the time he wrongfully worked with MGA; the value of information and intellectual property owned by Mattel which Bryant provided to MGA; the value of the benefits that MGA obtained from Bryant during the time he was employed by Mattel; and the value of the benefits that MGA obtained from Bryant as a result of the work he performed for or with MGA during his Mattel employment.

171. Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

### Sixth Counterclaim

### Intentional Interference with Contract

### (Against MGA, Larian and Does 4 through 10)

172. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 171, above, as though fully set forth at length.

173. Valid agreements existed between Mattel and the Mattel employees who MGA induced to steal or was complicit in stealing Mattel trade secrets and other proprietary and confidential information and who MGA bribed or induced to work for or assist MGA while Mattel employees (collectively, the

"Mattel Employees"), including without limitation Bryant, Brawer, Machado, Trueba, Vargas, Brisbois, Castilla, Cabrera, Morales, Salazar, and the Other Former Employees.

174.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees had a duty under their agreements not to work for or assist any competitor of Mattel, such as MGA.  In addition, at all times mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had assigned to Mattel, and was obligated to disclose to Mattel all inventions, including designs and other works, created, conceived or reduced to practice during their employment with Mattel.

175.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

176.  As a direct and proximate result of Counter-defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

177.  As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

178.  Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

## **Seventh Counterclaim**

### **Breach of Fiduciary Duty**

### **(Against Bryant and Machado)**

179.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 178, above, as though fully set forth at length.

THIRD AMENDED ANSWER AND COUNTERCLAIMS

180. Bryant and Machado held positions of trust and confidence with Mattel.  In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties.  In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel.  They confirmed their relationship of trust with Mattel in respective employee agreements.  Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

181. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor.  As alleged above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

182. Machado breached his fiduciary duty to Mattel, in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA.  Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

183. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

184. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an

1   award of exemplary damages against Counter-defendants in an amount to be

2   determined at trial.

3          185.  Furthermore, Counter-defendants' conduct has caused, and unless

4   enjoined will continue to cause, irreparable injury to Mattel that cannot be

5   adequately compensated by money damages and for which Mattel has no adequate

6   remedy at law.  Accordingly, Mattel is entitled to an order restraining further

7   breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants

8   from continuing to benefit from such breach.

9                              **Eighth Counterclaim**

10                  **Aiding and Abetting Breach of Fiduciary Duty**

11                    **(Against MGA, Larian and Does 4 through 10)**

12         186.  Mattel repeats and realleges each and every allegation set forth in

13   paragraphs 1 through 185, above, as though fully set forth at length.

14         187.  At all times herein mentioned, MGA, Larian and Does 4 through

15   10 knew that Bryant held a position of trust and confidence at Mattel.  At all times

16   herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a

17   fiduciary duty to Mattel not to take any action that would be contrary to Mattel's

18   best interests, including but not limited to secretly developing and designing Bratz

19   while employed by Mattel and by secretly assisting Larian and MGA .

20         188.  At all times herein mentioned, MGA, Larian and Does 4 through

21   10 knew that the Mattel Employees (excluding Bryant) held positions of trust and

22   confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4

23   through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary

24   duty to Mattel not to take any action that would be contrary to Mattel's best

25   interests, including but not limited to taking confidential trade secret information

26   from Mattel's premises and providing that information to a competitor.

27         189.  Despite such knowledge, Counter-defendants MGA, Larian and

28   Does 4 through 10 intentionally and without justification solicited, encouraged,

1   aided and abetted and gave substantial assistance to the Mattel Employees to breach

2   their fiduciary duties to Mattel, knowing that their conduct would constitute

3   breaches of their fiduciary duties to Mattel.

4       190.  As a direct and proximate result of Counter-defendants' efforts,

5   the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has

6   incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to

7   recover compensatory damages in an amount to be determined at trial.

8       191.  In taking the aforesaid actions, MGA, Larian and Does 4 through

9   10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

10  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

11  Counter-defendants in an amount to be determined at trial.

## Ninth Counterclaim

### Breach of Duty of Loyalty

### (Against Bryant and Machado)

15      192.  Mattel repeats and realleges each and every allegation set forth in

16  paragraphs 1 through 191, above, as though fully set forth at length.

17      193.  As employees of Mattel, Bryant and Machado owed a duty of

18  undivided loyalty to Mattel.  Pursuant to this duty, Bryant and Machado could not

19  compete with Mattel or assist a competitor of Mattel during their employment with

20  Mattel.  Pursuant to this duty, Bryant and Machado were required to always give

21  preference to Mattel's business over their own, similar interests during the course of

22  their employment with Mattel.

23      194.  Bryant and Machado breached their duty of loyalty to Mattel in

24  that, while employed by Mattel, they secretly aided, assisted and worked for a

25  competitor of Mattel, including without limitation by entering into agreements with

26  a Mattel competitor.  As alleged above, they also breached the aforementioned duty

27  by using Mattel property and resources for the benefit of, and to aid and assist,

28  themselves personally and the competitor of Mattel.

195.  As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

196.  Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against Counter-defendants in an amount to be determined at trial.

197.  Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining further breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

198.  In breaching their duty of loyalty to Mattel, Bryant and Machado acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

## Tenth Counterclaim

### Aiding and Abetting Breach of Duty of Loyalty

### (Against MGA, Larian and Does 4 through 10)

199.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 198, above, as though fully set forth at length.

200.  MGA, Larian and Does 4 through 10 knew that Bryant, as an employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and Does 4 through 10 knew that this duty included an obligation on the part of Bryant not to compete with Mattel or assist a competitor of Mattel during the term of his employment with Mattel.  MGA, Larian and Does 4 through 10 also knew that Bryant was required to give preference to Mattel's business over his own, similar

1  interests or those of Mattel's competitors. or those of Mattel's competitors during

2  the course of his employment with Mattel.

3      201.  MGA, Larian and Does 4 through 10 knew that the Mattel

4  Employees (excluding Bryant) were employed by Mattel, and, as employees of

5  Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and Does 4

6  through 10 knew that these duties included an obligation on the part of the Mattel

7  Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

8  Mattel during their Mattel employment.

9      202.  Despite such knowledge, Counter-defendants MGA, Larian and

10  Does 4 through 10 intentionally and without justification solicited, encouraged,

11  aided and abetted and gave substantial assistance to the Mattel Employees to

12  breach their duties of loyalty to Mattel, knowing that their conduct would constitute

13  breaches of their duties of loyalty to Mattel.

14      203.  As a further consequence of Counter-defendants' efforts, Mattel

15  has suffered injury and is entitled to compensatory damages in an amount to be

16  proven at trial.

17      204.  In taking the aforesaid actions, MGA, Larian and Does 4 through

18  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

19  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

20  Counter-defendants in an amount to be determined at trial.

21                  **Eleventh Counterclaim**

22                      **Conversion**

23              **(Against All Counter-defendants)**

24      205.  Mattel repeats and realleges each and every allegation set forth in

25  paragraphs 1 through 204, above, as though fully set forth at length.

26      206.  Counter-defendants wrongfully converted Mattel property and

27  resources by appropriating and using them for their own benefit and gain and for

28  the benefit and gain of others, without the permission of Mattel.

207.  Mattel was entitled to, among other things, the exclusive right and enjoyment in property and tangible materials owned by Mattel, including without limitation such proper and materials that were created by Bryant while he was a Mattel product designer.  Such property was taken by Bryant from Mattel to further his own interests and, in at least some instances, provided by Bryant to Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

208.  In addition, Counter-defendants wrongfully converted Mattel's property by removing the Trade Secret Materials in electronic and paper form from Mattel's offices.  Counter-defendants did so without Mattel's permission and continue to possess them.

209.  As a direct and proximate result of Counter-defendants' wrongful conversion of Mattel property, including those relating to Bratz and Mattel's Trade Secret Materials, Mattel has incurred damages.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

210.   As a result of Counter-defendants' acts of conversion, Mattel is entitled to damages in an amount sufficient to indemnify Mattel for the loss suffered, which is not measured by the value of the property misappropriated, but includes the lost profits that Mattel suffered as a result of the conversion or, alternatively, the profits generated by the Counter-defendants that would not have been generated but for the conversion.  Only such a measure of damages would fully and fairly compensate Mattel for the injury it suffered due to Counter-defendants' acts of conversion.

211.  Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

212.  Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be

2875224.1

adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining Counter-defendants from further conversion of Mattel property and resources and/or restraining Counter-defendants from continuing to benefit from such conversion.

### Twelfth Counterclaim

### Unfair Competition

### (Common Law and *Cal. Bus. & Prof. Code* § 17200)

### (Against All Counter-defendants)

213.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 212, above, as though fully set forth at length.

214.  Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

215.  By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.*  Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a).  Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

216.  As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial.  No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

## **Thirteenth Counterclaim**

### **Avoidance of Intentional and Constructive Fraudulent Transfers Under**

### **Uniform Fraudulent Transfer Act**

### **(Common Law and *Cal. Civil Code* §§ 3439 *et seq.*)**

### **(Against MGA and Larian)**

217.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 216, above, as though fully set forth at length.

218.  Mattel is a creditor of MGA and Larian, and his alter-egos, because Mattel has substantial claims against MGA and Larian, including but not limited to claims that have already resulted in a jury verdict in this action in Mattel's favor.  *Cal. Civil Code* § 3439.01(b), (c).

219.  After Mattel's claims had been asserted and continuing until the Phase 1A verdict and dates thereafter, MGA and Larian engaged in fraudulent transfers, *Cal. Civ. Code* § 3439.01(i), 3439.04, 3439.05, including, without limitation, by transferring tens of millions of dollars of Bratz inventory from MGA to the Larian-controlled IGWT Group.  These transfers were at massive discounts, and on information and belief MGA did not receive reasonably equivalent value for the Bratz inventory that it transferred.

220.  On information and belief, and based on the foregoing, these fraudulent transfers were made with actual intent to hinder, delay, and/or defraud MGA's and Larian's creditor, Mattel.

221.  MGA has represented that it was on the verge of filing bankruptcy.  If true, on information and belief at the time of the transfers MGA was unable to pay its debts as they became due and was engaged in a transaction, or was about to engage in a business, for which its remaining assets were unreasonably small, and MGA was insolvent.  On information and belief, MGA intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.

222.  By virtue of the foregoing, MGA's and Larian's fraudulent transfers, including without limitation the transfers of Bratz inventory to the IGWT Group, should be avoided, the transferred assets and their proceeds, including without limitation the Bratz inventory and/or and the proceeds of the sales of any Bratz inventory by IGWT Group, should be restored to MGA and attached, and injunctions should issue against any further fraudulent transfers and against any disposition of the transferred assets and/or their proceeds, pursuant to *Cal. Civil Code* § 3439.07.

## Fourteenth Counterclaim

### Declaratory Relief

### (Against All Counter-defendants)

223.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 222, above, as though fully set forth at length.

224.  As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

225.  Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

226.  Mattel seeks a declaration of the Court that any and all agreements between Bryant and/or any other individuals then-employed by Mattel, on the one hand, and MGA, on the other hand, in which Bryant or any of them purport to assign to MGA any right, title or interests in any work or properties that

they conceived, created or reduced to practice while Mattel employees, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant and/or any other such individuals had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

**Prayer for Relief**

WHEREFORE, Mattel respectfully requests judgment:

1.     For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs, works or properties conceived, made, created or reduced to practice by Bryant during the term of his Mattel employment and/or by any others then-employed by Mattel, as well as in all derivatives prepared therefrom, and that Mattel is the true owner of the foregoing;

2.     For a declaration that any agreement between Bryant and/or by any others then-employed by Mattel, on the one hand, and MGA or any person or entity, on the other hand, in which Bryant or such others then-employed by Mattel purported to assign any right, title or interests in any work or properties that they conceived, made, created or reduced to practice while employed by Mattel, including but not limited to the Bratz designs, is void and of no effect;

3.     For an Order enjoining and restraining Counter-defendants, their agents, servants and employees, and all persons in active concert or participation with them, from further wrongful conduct, including without limitation from imitating, copying, distributing, importing, displaying, preparing derivatives from and otherwise infringing Mattel's copyright-protected works;

4.     For an Order, pursuant to 17 U.S.C. § 503(a) and other applicable law, impounding all of Counter-defendants' products and materials that infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles by which copies of the works embodied in Mattel's copyrights may be reproduced or otherwise infringed;

5.      For an Order mandating that Counter-defendants return to Mattel all tangible items, documents, designs, diagrams, sketches or any other memorialization of inventions conceived, created, made or reduced to practice during Bryant's employment with Mattel as well as all Mattel property converted by Counter-defendants;

6.      For an Order mandating specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

7.      That Mattel be awarded, and Counter-defendants be ordered to disgorge, all payments, revenues, profits, monies and royalties and any other benefits derived or obtained as a result of the conduct alleged herein, including without limitation of all revenues and profits attributable to Counter-defendants' infringement of Mattel's copyrights under 17 U.S.C. § 504;

8.      For an accounting of all profits, monies and/or royalties from the exercise of ownership, use, distribution, sales and licensing of Bratz;

9.      For the imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and all profits, monies, royalties and any other benefits derived or obtained from Counter-defendant's exercise of ownership, use, sale, distribution and licensing of Bratz;

10.     That Mattel recover its actual damages and lost profits;

11.     That Counter-defendants be ordered to pay exemplary damages in a sum sufficient to punish and to make an example of them, and deter them and others from similar wrongdoing;

12.     That Counter-defendants be ordered to pay treble its general and special damages, plus interest, costs and attorney's fees incurred by reason of Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

1        13.    That Counter-defendants be ordered to pay double damages due

2    to their willful and malicious misappropriation of Mattel's trade secrets with

3    deliberate intent to injure Mattel's business and improve its own;

4        14.    That Counter-defendants pay to Mattel the full cost of this action

5    and Mattel's attorneys' and investigators' fees;

6        15.    For an Order that Larian is liable for all wrongs of his agents,

7    alter-egos or others committed on his behalf;

8        16.    That Counter-defendants' fraudulent transfers, including their

9    transfers of Bratz inventory, be avoided and set aside; the transferred assets and

10   their proceeds be restored to MGA and attached; and Counter-defendants be

11   enjoined against any further fraudulent transfers and any disposition of the

12   transferred assets and/or their proceeds; and

13       17.    That Mattel have such other and further relief as the Court may

14   deem just and proper.

15

16   DATED:  April 8, 2009              QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
17

18                                      By /s/ John B. Quinn
19                                         John B. Quinn
                                           Attorneys for Defendant and Counter-
20                                         claimant Mattel, Inc.

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  April 8, 2009             QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP


By /s/ John B. Quinn
    John B. Quinn
    Attorneys for Defendant and Counter-claimant Mattel, Inc.