# Exhibit 1

COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 90378)
2       Michael T. Zeller (Bar No. 196417)
      865 South Figueroa Street, 10th Floor
3   Los Angeles, California 90017
      Telephone:    (213) 443-3000
4   Facsimile:    (213) 443-3100

5   Attorneys for Plaintiff
    Mattel, Inc.

6

7

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

APR 2 7 2004

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
        SUE GABB

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware corporation,       )   CASE NO.   BC314398

12                      Plaintiff,              )

13                                             )   COMPLAINT FOR:

14          v.                                  )   (1)   BREACH OF CONTRACT;
                                               )   (2)   BREACH OF FIDUCIARY
15                                             )         DUTY;
    CARTER BRYANT, an individual; and           )   (3)   BREACH OF DUTY OF
16  DOES 1 through 10, inclusive,               )         LOYALTY;
                                               )   (4)   UNJUST ENRICHMENT; AND
17                      Defendants.             )   (5)   CONVERSION

18                                             )

19

20

21

22

23

24

25

26

27

28

**EXHIBIT** 1

**PAGE** 9

209/579342.1

COMPLAINT

Plaintiff Mattel, Inc. ("Mattel") brings this action against defendants Carter Bryant ("Bryant") and Does 1 through 10 (all defendants being collectively referred to as "defendants") and alleges as follows:

### Parties

1.      Mattel is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in El Segundo, California.

2.      Mattel is informed and believes, and on that basis alleges, that defendant Bryant is an individual currently residing in Springfield, Missouri.

3.      The true names and capacities of defendants sued herein as Does 1 through 10, inclusive, are unknown to Mattel, which therefore sues said defendants by such fictitious names. Mattel will amend this Complaint to allege their true names and capacities when the same are ascertained.

4.      Mattel is informed and believes, and on that basis alleges, that at all times relevant herein, defendants, and each of them, were acting in concert and active participation with each other in committing the wrongful acts alleged herein, and were the agents of each other, and in doing the things alleged herein, each defendant was acting within the course and scope of his, her or its agency and was subject to and under the supervision of, and was acting with the knowledge of, his, her or its co-defendants.

### Jurisdiction and Venue

5.      During the time of the acts complained of herein, Bryant was employed by Mattel in, and was a resident of, Los Angeles County. Bryant's contracts with Mattel that are at issue in this action were executed, performed and breached by Bryant in Los Angeles County. In addition, defendants committed the tortious conduct alleged herein while physically located in Los Angeles County, and Mattel felt the effects of Bryant's breach and

EXHIBIT _____

-2-   PAGE _____ 10

COMPLAINT

1  defendants' other wrongful acts in Los Angeles County.  Accordingly, this Court has
2  personal jurisdiction over defendants.

3        6.    Venue is proper pursuant to <u>Code of Civil Procedure</u> §§ 393 and 395(a),
4  as the causes of action arose in Los Angeles County, the contractual obligations at issue were
5  incurred, were to be performed and were breached by Bryant in Los Angeles County, and
6  Bryant does not currently reside in California.

7

8  <u>Factual Background</u>

9

10        7.    Mattel is a long standing and successful independent manufacturer and
11  marketer of toys, dolls, games and stuffed toys and animals.  Mattel was founded in 1945 by
12  Elliot and Ruth Handler and Harold "Matt" Mattson.  The name of the company was created
13  by incorporating the names of two of its founders, "MATT-son" and "EL-liot."  Originating
14  from the Handlers' garage in Southern California, the company greatly expanded its
15  operations following World War II and soon began to thrive as its reputation for producing
16  high-quality toys spread.  During the next several decades, Mattel became world famous for
17  producing high-quality products at reasonable prices.  Today, some of Mattel's most famous
18  brands include BARBIE, HOT WHEELS, MATCHBOX and FISHER-PRICE.

19        8.    Critical to Mattel's success, and to the livelihood of its employees, is
20  Mattel's ability to design and develop new products.  Mattel invests many millions of dollars
21  in product design and development annually, and it introduces hundreds of new products
22  each year.  In El Segundo, California alone, Mattel maintains a 180,000 square-foot design
23  center that houses more than 850 designers, sculptors, painters and other artists, whom
24  Mattel pays to work exclusively and full-time to create the products that Mattel sells and on
25  which Mattel's business depends.

26        9.    Defendant Bryant was employed by Mattel from September 1995
27  through April 1998, and then again from January 1999 through October 2000, as a product
28  designer at Mattel's design center in El Segundo, California. **EXHIBIT** _____ /

'209/579342.1

-3-

**PAGE** _____ 11

COMPLAINT

1           10.    On January 4, 1999, upon starting his second term of employment by

2  Mattel, and as a condition of and in consideration for his employment, Bryant executed an

3  Employee Confidential Information and Inventions Agreement (the "Employee

4  Agreement").  Among other things, Bryant agreed that he would not, without Mattel's

5  express written consent, "engage in any employment or business other than for [Mattel], or

6  invest in or assist (in any manner) any business competitive with the business or future

7  business plans of [Mattel]."  Bryant further acknowledged that he held a position of trust

8  with Mattel.  In addition, Bryant assigned to Mattel all rights, title and interest in

9  "inventions," including without limitation "designs," that he conceived or reduced to practice

10  during his employment by Mattel. A true and correct copy of Bryant's Employee Agreement

11  with Mattel is attached as Exhibit A.

12           11.    Also on January 4, 1999, Bryant executed Mattel's Conflict of Interest

13  Questionnaire (the "Conflict Questionnaire").  Among other things, Bryant certified in the

14  Conflict Questionnaire that, other than as disclosed, he had not worked for any competitor

15  of Mattel in the prior twelve months and had not engaged in any business venture or

16  transaction involving a Mattel competitor that could be construed as a conflict of interest.

17  Bryant specifically agreed that he would immediately notify his supervisor of any change

18  in his situation that would cause him to change any of the foregoing certifications.  The only

19  conflict disclosure that Bryant made on the Conflict Questionnaire (or at any time

20  subsequently) concerned freelance work that is unrelated to the conduct alleged herein.  A

21  true and correct copy of the Conflict Questionnaire executed by Bryant is attached as

22  Exhibit B.

23           12.    In late November 2003, Mattel learned that Bryant had secretly aided,

24  assisted and worked for a Mattel competitor, including without limitation by entering into

25  an agreement with the competitor, during the time Bryant was employed by Mattel pursuant

26  to the above-referenced agreements and was being paid by Mattel as a product designer.

27  Bryant's agreement with the competitor obligated Bryant to provide product design services

28  to the competitor on a "top priority" basis. Bryant's agreement also provided, among other

EXHIBIT _____1_____

PAGE _____12_____  COMPLAINT

1   things, that Bryant would receive royalties and other consideration for sales of products on

2   which Bryant provided aid or assistance; that all work and services furnished by Bryant to

3   the competitor under the agreement purportedly would be considered "works for hire"; and

4   that all intellectual property rights to preexisting work by Bryant purportedly would be

5   assigned to the competitor.  In addition, while Bryant was employed by Mattel, Bryant and

6   the other defendants converted, misappropriated and misused Mattel property and resources

7   for the benefit of, and to aid and assist, Bryant personally and Mattel's competitor.

8           13.     During the time that he was employed by Mattel and thereafter, Bryant

9   concealed these actions from Mattel, including without limitation by failing to notify his

10  supervisor of his conflict of interest regarding the competitor and by making affirmative

11  misrepresentations to Mattel management upon his departure from Mattel.  Because of

12  Bryant's acts of concealment and his misrepresentations to Mattel, Mattel had no reason to

13  suspect that Bryant had worked for the competitor while still employed by Mattel until late

14  November 2003, when Mattel received, through an unrelated legal action, a copy of Bryant's

15  agreement with the competitor and saw that the date of the agreement predated Bryant's

16  departure from Mattel.

17          14.     As a consequence, Bryant breached his contracts with Mattel and

18  violated his duty of loyalty and his fiduciary duties to Mattel; the other defendants have

19  unlawfully aided and abetted his violation of such duties; and each of the defendants has

20  been unjustly enriched and engaged in acts of conversion.

21

22                          FIRST CLAIM FOR RELIEF

23                              (Breach of Contract)

24

25          15.     Mattel repeats and realleges each and every allegation set forth in

26  paragraphs 1 through 14, above, as though fully set forth at length.

27          16.     Pursuant to his Mattel Employment Agreement, and for good and

28  valuable consideration, Bryant agreed that he would not, without Mattel's express written

**EXHIBIT** _____ **1**

7209/579342.1

-5-

**PAGE** _____ **13**

COMPLAINT

1  consent, engage in any employment or business other than for Mattel or assist in any manner

2  any business competitive with the business or future business plans of Mattel during his

3  employment with Mattel.  Pursuant to his Mattel Employment Agreement, Bryant further

4  assigned to Mattel all right, title and interest in "inventions," including without limitation

5  "designs," that he conceived or reduced to practice during his employment by Mattel.  In

6  addition, pursuant to the Conflict Questionnaire, Bryant certified that, other than as

7  disclosed, he had not worked for any competitor of Mattel and had not engaged in any

8  business venture or transaction involving a Mattel competitor that could be construed as a

9  conflict of interest.  Bryant further promised that he would notify his superior immediately

10 of any change in his situation that would cause him to change any of the foregoing

11 certifications or representations.

12        17.    The Employment Agreement and the Conflict Questionnaire are valid,

13 enforceable contracts, and Mattel has performed each and every term and condition of the

14 Employment Agreement and Conflict Questionnaire required to be performed by Mattel.

15        18.    Bryant materially breached the foregoing contracts with Mattel, in that,

16 among other things, he secretly aided, assisted and worked for a Mattel competitor during

17 his employment with Mattel, without the express written consent of Mattel.

18        19.    As a consequence of Bryant's breach, Mattel has suffered and will in

19 the future continue to suffer damages in an amount to be proven at trial.  Such damages

20 include, without limitation, the amounts paid by the competitor to Bryant during his Mattel

21 employment; the amounts paid by the competitor to Bryant as a result of the work he

22 performed for the competitor during his Mattel employment; the amount that Mattel paid

23 Bryant during the time he wrongfully worked for the competitor; the value of information

24 and intellectual property owned by Mattel which Bryant provided to the competitor; the

25 value of the benefits the competitor obtained from Bryant during the time he was employed

26 by Mattel; and the value of the benefits the competitor obtained from Bryant as a result of

27 the work he performed for the competitor during his Mattel employment.

28

EXHIBIT ___1___

PAGE ___14___

COMPLAINT

20. Furthermore, Bryant's conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Bryant specifically acknowledged in his Employment Agreement that his breach of the Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies." Accordingly, Mattel is entitled to orders mandating Bryant's specific performance of his contracts with Mattel and restraining Bryant from further breach.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

21. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 20, above, as though fully set forth at length.

22. Bryant held a position of trust and confidence with Mattel. In his position, Bryant had access to and was entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of his job assignments and duties. In his position, Bryant also represented Mattel in its dealings with third parties and, in his actions in the course and scope of his employment with Mattel, was an agent of Mattel. Bryant confirmed his relationship of trust with Mattel in the Employee Agreement. Bryant thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests or that would deprive Mattel of any opportunities, profit or advantage which Bryant might bring to Mattel.

23. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged

EXHIBIT _____1_____

PAGE _____15_____

'209/579342.1

COMPLAINT

1  above, Bryant also breached the aforementioned duty by using Mattel property and resources

2  for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3        24.    The other defendants, acting with full knowledge of Bryant's obligations

4  to Mattel, aided and abetted Bryant in such conduct.

5        25.    As a direct and proximate result of defendants' wrongful conduct,

6  Mattel has incurred damages in an amount to be determined at trial.

7        26.    Defendants acted with malice, fraud and oppression, and in conscious

8  disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9  against defendants in an amount to be determined at trial.

10        27.    Furthermore, defendants' conduct has caused, and unless enjoined will

11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13  is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or

14  restraining defendants from continuing to benefit from such breach.

15

16  ### THIRD CLAIM FOR RELIEF

17  (Breach of Duty of Loyalty)

18

19        28.    Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 27, above, as though fully set forth at length.

21        29.    As an employee of Mattel, Bryant owed a duty of undivided loyalty to

22  Mattel, his employer. Pursuant to this duty, Bryant could not compete with Mattel or assist

23  a competitor of Mattel during his employment with Mattel. Pursuant to this duty, Bryant

24  was required to always give preference to Mattel's business over his own, similar interests

25  during the course of his employment with Mattel.

26        30.    Bryant breached his duty of loyalty to Mattel in that, while employed

27  by Mattel, he secretly aided, assisted and worked for a competitor of Mattel, including

28  without limitation by entering into an agreement with a Mattel competitor. As alleged

7209/579342.1

-8-

EXHIBIT _____1_____

PAGE _____16_____

COMPLAINT

1   above, Bryant also breached the aforementioned duty by using Mattel property and resources

2   for the benefit of, and to aid and assist, himself personally and the competitor of Mattel.

3          31.    The other defendants, acting with full knowledge of Bryant's obligations

4   to Mattel, aided and abetted Bryant in such wrongful conduct.

5          32.    As a direct and proximate result of defendants' wrongful conduct,

6   Mattel has incurred damages in an amount to be determined at trial.

7          33.    Defendants acted with malice, fraud and oppression, and in conscious

8   disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

9   against defendants in an amount to be determined at trial.

10         34.    Furthermore, defendants' conduct has caused, and unless enjoined will

11  continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

12  money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

13  is entitled to an order restraining further breach of Bryant's duty of loyalty to Mattel and/or

14  restraining defendants from continuing to benefit from such breach.

15

16                        FOURTH CLAIM FOR RELIEF

17                              (Unjust Enrichment)

18

19         35.    Mattel repeats and realleges each and every allegation set forth in

20  paragraphs 1 through 34, above, as though fully set forth at length.

21         36.    Defendants, by the aforementioned conduct, unfairly used and diverted

22  Mattel property, resources and opportunities for the benefit of, and to aid and assist,

23  themselves, all without authorization by or payment to Mattel for the same. Defendants have

24  been unjustly enriched as a result.

25         37.    Mattel is entitled to an award of all such amounts by which defendants

26  have been unjustly enriched in an amount to be determined at trial.

27

28

EXHIBIT _____ l

COMPLAINT

1   38. Defendants acted with malice, fraud and oppression, and in conscious

2 disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages

3 against defendants in an amount to be determined at trial.

4   39. Furthermore, defendants' conduct has caused, and unless enjoined will

5 continue to cause, irreparable injury to Mattel that cannot be adequately compensated by

6 money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel

7 is entitled to an order restraining defendants from any further unjust enrichment.

8

9       <u>FIFTH CLAIM FOR RELIEF</u>

10        (Conversion)

11

12   40. Mattel repeats and realleges each and every allegation set forth in

13 paragraphs 1 through 39, above, as though fully set forth at length.

14   41. Mattel was entitled to, <u>inter alia</u>, Bryant's exclusive services and the

15 exclusive ownership of his inventions as a Mattel product designer. However, Bryant

16 provided such services, and purported to grant rights to such inventions, to a competitor

17 during the time of his exclusive Mattel employment. All such services and the inventions

18 and work product resulting from such services, including without limitation ideas, concepts,

19 rights, designs, proprietary information, and other intellectual property and intangible

20 property created by Bryant during the term of the aforesaid agreements, were the property

21 of Mattel. Such services and property were provided by Bryant to others, including

22 defendants, and used by them.

23   42. Defendants wrongfully converted Mattel property and resources by

24 asserting ownership thereto and by appropriating and using Mattel's property and resources

25 for their own benefit and gain and for the benefit and gain of others, without the permission

26 of Mattel.

27

28

EXHIBIT ____1____

COMPLAINT

43.     As a direct and proximate result of defendants' wrongful conversion of Mattel's property and resources, Mattel has incurred damages.  Mattel is entitled to recover compensatory damages against defendants in an amount to be determined at trial.

44.     Defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights.  Accordingly, Mattel is entitled to an award of punitive damages against defendants in an amount to be determined at trial.

45.     Furthermore, defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law.  Accordingly, Mattel is entitled to an order restraining defendants from further conversion of Mattel property and resources and/or restraining defendants from continuing to benefit from such conversion.

## PRAYER FOR RELIEF

WHEREFORE, Mattel hereby respectfully requests that this Court:

A.     Award Mattel its damages;

B.     Order defendants to disgorge to Mattel all payments, revenue, profits, monies, royalties and any other benefits derived or obtained by defendants as a result of the conduct described herein;

C.     Order specific performance by Bryant to comply with and satisfy Bryant's contractual obligations to Mattel;

D.     Enter an injunction restraining defendants, and all those acting in concert or participation with them, from engaging in further wrongful conduct and/or from continuing to benefit from their wrongful conduct;

E.     Order defendants to pay Mattel the full cost of this action and Mattel's reasonable attorneys' fees;

F.     Award Mattel punitive damages in an amount sufficient to punish defendants and deter such misconduct in the future; and

EXHIBIT _____1_____

PAGE _____19_____

1          G.      Award such other and further relief as this Court deems just and proper.

2

3   DATED:  April 27, 2004           QUINN EMANUEL URQUHART OLIVER &
                                     HEDGES, LLP
4

5                                    By _____
6                                       Michael T. Zeller
                                        Attorneys for Plaintiff
7                                       Mattel, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT _____ 1 _____

PAGE _____ 20 _____   COMPLAINT

**Exhibit A**

EXHIBIT _____ 1_____

PAGE _____ 21_____

# EMPLOYEE CONFIDENTIAL INFORMATION AND INVENTIONS AGREEMENT

I acknowledge that Mattel, Inc. (the "Company") operates in a competitive environment and that it enhances its opportunities to succeed by establishing certain policies, including those included in this Agreement. This Agreement is designed to make clear that: (i) I will maintain the confidentiality of the Company's trade secrets; (ii) I will use those trade secrets for the exclusive benefit of the Company; (iii) inventions that I create will be owned by the Company; (iv) my prior and continuing activities separate from the Company will not conflict with the Company's development of its proprietary rights; and (v) when and if my employment with the Company terminates I will not use my prior position with the Company to the detriment of the Company. In consideration of my employment with the Company and other good and valuable considerations, I agree that:

## 1. Provisions Related to Trade Secrets

(a) I acknowledge that the Company possesses and will continue to develop and acquire valuable Proprietary Information (as defined below), including information that I may develop or discover as a result of my employment with the Company. The value of that Proprietary Information depends on it remaining confidential. The Company depends on me to maintain that confidentiality, and I accept that position of trust.

(b) As used in this Agreement, "Proprietary Information" means any information (including formula, pattern, compilation, device, method, technique or process) that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and includes information on the Company, its customers, suppliers, joint ventures, licensors, licensees, distributors and other persons and entities with whom the Company does business.

(c) I will not disclose or use at any time either during or after my employment with the Company, any Proprietary Information except for the exclusive benefit of the Company as required by my duties for the Company, or as the Company expressly may consent to in writing. I will cooperate with the Company and use my best efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary Information.

(d) Upon leaving employment with the Company for any reason, I immediately will deliver to the Company all tangible, written, graphical, machine readable and other materials (including all copies) in my possession or under my control containing or disclosing Proprietary Information.

## 2. Ownership of Inventions

(a) I agree to communicate to the Company as promptly and fully as practicable all Inventions (as defined below) conceived or reduced to practice by me (alone or jointly with others) at any time during my employment by the Company. I hereby assign to the Company and/or its nominees all my right, title and interest in such Inventions, and all my right, title and interest in any patent, copyrights, patent applications or copyright applications based thereon. I will assist the Company and/or its nominees (without charge but at no expense to me) at any time in every proper way to obtain for its and/or their own benefit, patents and copyrights for all such Inventions anywhere in the world and to enforce its and/or their rights in legal proceedings.

(b) As used in this Agreement, the term "Inventions" includes, but is not limited to, all discoveries, improvements, processes, developments, designs, know-how, data, computer programs and formulae, whether patentable or unpatentable.

(c) Any provision in this agreement requiring me to assign my rights in any Invention does not apply to an Invention which qualifies under the provision of Section 2870 of the California Labor Code. That section provides that the requirement to assign "shall not apply to an Invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities or trade secret information except for those Inventions that either (1) relate at the time of conception or reduction to practice of the Invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer." I understand that I bear the burden of proving that an Invention qualifies under Section 2870.

(d) I hereby irrevocably designate and appoint the Company and each of its duly authorized officers and agents as my agent and attorney-in-fact to act for and in my behalf and stead to execute and file any documents and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyrights and other proprietary rights with the same force and effect as if executed and delivered by me.

## 3. Conflicts with Other Activities

(a) My employment with the Company requires my undivided attention and effort. Therefore, during my employment with the Company, I will fully comply with the Company's Conflict of Interest Policy, as it may be amended from time to time. I shall not, without the Company's express written consent, engage in any employment or business other than for the Company, or invest in or assist (in any manner) any business competitive with the business or future business plans of the Company.

## 4. Miscellaneous

(a) My obligations under this Agreement may not be modified or terminated, in whole or in part, except in writing signed by a Vice-President of the Company. Any waiver by the Company of a breach on any provision of this Agreement will not operate or be construed as a waiver of any subsequent breach.

(b) Each provision of this Agreement will be treated as a separate and independent clause; and the unenforceability of any one provision will in no way impair the enforceability of any other provision. If any provision is held to be unenforceable, such provision will be construed by the appropriate judicial body by limiting or reducing it to the minimum extent necessary to make it legally enforceable.

(c) My obligation under this Agreement will survive the termination of my employment, regardless of the manner of such termination. This Agreement will inure to the benefit of and be binding upon the successors and assigns of the Company.

(d) I understand that the provisions of this Agreement are a material condition to my employment with the Company. I also understand that this Agreement is not an employment contract, and nothing in this Agreement creates any right to my continuous employment by the Company, or to my employment for any particular term.

(e) Any breach of this Agreement likely will cause irreparable harm to the Company for which money damages could not reasonably or adequately compensate the Company. Accordingly, I agree that the Company will be entitled to injunctive relief to enforce this Agreement, in addition to damages and other available remedies.

(f) This agreement will be governed by and interpreted in accordance with the laws of the State of California.

(g) This Agreement contains the complete agreement between the Company and me concerning the subject matter hereof and supersedes all other agreements and understandings. This Agreement may be executed in counterparts. This Agreement will be deemed effective as of the start of Employee's employment with the Company.

**CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS THE EMPLOYEE MAY MAKE DURING HIS OR HER EMPLOYMENT.**

Employee Signature _____

Employee Name (print)  CARTER H. BRYANT

Date  01/04/99

MATTEL, INC.

By _____
Signature

Name of Witness (print)  TERESA NEWCOMB

EXHIBIT **A** PAGE 13

EXHIBIT _____ **1**

PAGE _____ **22**

**Exhibit B**

EXHIBIT _____ 1_____

PAGE _____ 23_____

# CONFLICT OF INTEREST QUESTIONNAIRE

**Name (Last, First, M.I.):** BRYANT, CARTER H.    **Job Title:** PROJECT DESIGNER    **Department:**

**Instructions:** The purpose of this questionnaire is to confirm the propriety of relations between our key employees and our suppliers and competitors. Please read the definitions below and Mattel's policies concerning Conflicts of Interest. Then answer the questions by checking the correct answer. Base your answers on personal knowledge. There is no need to make inquiries or seek additional information since lack of knowledge of a situation indicates that there is no conflict of interest. Your answers to questions 1 through 8 should cover the past twelve months and the term "you" should include members of your immediate family.

**Mattel Supplier** is interpreted broadly for purposes of this questionnaire. A Mattel supplier is any person, partnership, trust, corporation, or other enterprise which during the past twelve months has done business or currently contemplates doing business with Mattel or any Mattel subsidiary.

**Mattel Competitor** is interpreted broadly for purposes of this questionnaire. A Mattel competitor is any person, partnership, trust, corporation, or other enterprise which has done business or contemplates doing business in any field that is in competition with Mattel or any Mattel subsidiary.

**Interest** means direct or indirect ownership of any stock, bond, option or right to purchase any security, share in profits, investment, partnership interest or other profit participation or equity interest whatsoever. Interest also means any agreement to perform services for or consult with or to deliver materials to or to receive compensation of any kind from any supplier or competitor. You may disregard mutual investment trusts and publicly-owned corporations whose securities are traded publicly, in which you own not more than $25,000 in market value, but not to exceed 10% of an individual's net worth.

**Recipient of any commission, etc.,** means receipt of anything of value, in cash or in kind, over $60 on any one occasion or over $300 total during the past twelve months.

○ YES  ● NO    1. Have you owned, directly or indirectly, any interest in a Mattel supplier?

○ YES  ● NO    2. Have you owned, directly or indirectly, and interest in a Mattel competitor?

○ YES  ● NO    3. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel supplier?

● YES  ○ NO    4. Have you been the recipient of any commission, fee, loan, trip, gift, benefit or anything else of value that is derived in any way from a Mattel competitor?

● YES  ○ NO    5. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel competitor in any capacity?

○ YES  ● NO    6. Have you or any relative of yours by blood or marriage been a director, officer, consultant, agent, employee, or representative of or acted for any Mattel supplier in any capacity?

○ YES  ● NO    7. Have you engaged in any activity including the acquisition or ownership of any interest, for personal profit, not expressly within the scope of the foregoing with respect to any supplier or competitor?

○ YES  ● NO    8. Excepting normal everyday transactions (purchase of toys, etc.) have you engaged in any business venture or transaction involving a Mattel supplier or competitor or engaged in any activity which could be objectively construed as being a conflict of interest or allegiance?

○ YES  ● NO    9. Are you aware of any activity of any employee which you believe could be construed as a potential conflict of interest with Mattel?

If your answer to any of the above questions is "yes," please explain in the space below:

_4, 5. freelance design & artwork in 1998,_
_from appx. 5/98 - 11/98 for the Ashton Drake_
_galleries._

I certify that I have read Mattel's policies concerning Conflict of Interest and the answers to the above questions are true. I understand that failure to answer this questionnaire fully and truthfully constitutes grounds for immediate termination of my employment. I agree not to make any company information to unauthorized recipients. I also agree to notify my superior immediately of any changes in my situation that would cause me to answer any of the above questions differently. I further certify that, to the best of my knowledge, neither I nor any member of my immediate family is or has been engaged in any capacity which creates a Conflict of Interest.

**Signature:** _Carter H. Bryant_    **Date:** 01/04/98

EXHIBIT **B** PAGE **14**

EXHIBIT ___1___

PAGE ___24___

# Exhibit 2

1   ROBERT F. MILLMAN, Bar No. CA 062152
    DOUGLAS A. WICKHAM, Bar No. CA 127268
2   KEITH A. JACOBY, Bar No. CA 150233
    LITTLER MENDELSON
3   A Professional Corporation
    2049 Century Park East, 5th Floor
4   Los Angeles, CA 90067.3107
    Telephone:    310.553.0308
5   Facsimile:    310.553.5583

6   Attorneys for Defendant
    CARTER BRYANT
7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware Corporation,      Case No. BC 314398

12              Plaintiff,                      ASSIGNED FOR ALL PURPOSES TO THE
                                               HONORABLE GREGORY W. ALARCON –
13      v.                                     DEPARTMENT 36

14  CARTER BRYANT, an individual; and          DATE ACTION FILED: April 27, 2004
    DOES 1 through 10, inclusive,
15                                             STIPULATION AND [PROPOSED]
                Defendant.                     ORDER GRANTING DEFENDANT
16                                             CARTER BRYANT LEAVE TO FILE
                                               CROSS-COMPLAINT
17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

EXHIBIT _____ *2*

1

2

3

4

5

6

7

8

9

10

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| 11  MATTEL, INC., a Delaware Corporation, | Case No.  BC 314398 |
| 12                    Plaintiff, | ASSIGNED FOR ALL PURPOSES TO THE |
| 13         v. | HONORABLE GREGORY W. ALARCON – DEPARTMENT 36 |
| 14  CARTER BRYANT, an individual; and | DATE ACTION FILED:  April 27, 2004. |
| 15  DOES 1 through 10, inclusive, | **STIPULATION AND ORDER GRANTING** |
| 16                    Defendant. | **DEFENDANT CARTER BRYANT LEAVE TO FILE CROSS-COMPLAINT** |

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT ___*2*___

PAGE ___*26*___

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

1

STIPULATION AND ORDER GRANTING DEFENDANT
CARTER BRYANT LEAVE TO FILE CROSS-COMPLAINT

1    Plaintiff Mattel, Inc. ("Mattel") and Defendant (and proposed Cross-Complainant) Carter

2   Bryant ("Bryant" or "Defendant"), by and through their counsel of record, hereby stipulate and agree

3   as follows:

4    WHEREAS, this case was filed in this Court on April 27, 2004;

5    WHEREAS, on May 14, 2004, Defendant filed his Answer in this Court and removed this

6   case to the U.S. District Court for the Central District of California;

7    WHEREAS, in August 2004, Defendant submitted the parties' stipulation in the federal

8   court, seeking leave to file a Counter-Claim in this case;

9    WHEREAS, on August 20, 2004, the federal court issued an order remanding this case to this

10  Court.  As of the time of the remand order, the federal court had not acted upon the parties'

11  stipulation regarding the Defendant's Counter-Claim and that document was not filed;

12   WHEREAS, now that this case has returned to this Court, Defendant (and proposed Cross-

13  Complainant) Bryant seeks to file his Counter-Claim, which has been converted into a Cross-

14  Complaint in this case, against Mattel, a copy of which is attached hereto and lodged herewith as

15  Exhibit A;

16   WHEREAS, Bryant believes his proposed Cross-Complaint is compulsory under California

17  Code of Civil Procedure Sections 426.10 and 426.50 because it arises out of the same transactions or

18  occurrences that are the subject of Mattel's Complaint in this matter;

19   WHEREAS, the initial time period under California Code of Civil Procedure Section

20  428.50(a) for Bryant to file a Cross-Complaint has passed;

21   WHEREAS, Bryant represents that he is acting in good faith in bringing his proposed Cross-

22  Complaint at this juncture under California Code of Civil Procedure Section 426.50;

23   WHEREAS, Mattel is amenable to the filing of the Cross-Complaint as a procedural matter

24  pursuant to this Stipulation, with the understanding and on the basis that Mattel's Stipulation in this

25  regard is without waiver of, or prejudice to, its rights, defenses or positions in this action or to the

26  Cross-Complaint including, without limitation, Mattel's right to demurrer or otherwise move against

27  the Cross-Complaint in whole or in part;

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA  90067-3107
310.553.0308

2

STIPULATION AND ORDER GRANTING DEFENDANT
CARTER BRYANT LEAVE TO FILE CROSS-COMPLAINT

EXHIBIT **2**

PAGE    **27**

1    WHEREAS, Mattel will not be unduly prejudiced by the filing of Bryant's proposed Cross-

2    Complaint;

3    THEREFORE, subject to the approval of this Court, the Parties hereby stipulate and agree as

4    follows:   (1) Bryant shall be, and hereby is, granted leave to file his Cross-Complaint; and (2)

5    Bryant's Cross-Complaint shall be deemed filed and personally served as of the date that this

6    Stipulation is approved by the Court.

7

8    Dated: August 26, 2004

9    _____

10   MICHAEL T. ZELLER
     QUINN EMANUEL URQUHART OLIVER
11   & HEDGES, LLP
     Attorneys for Plaintiff
12   MATTEL, INC.

13   Dated: August 26, 2004

14   _____

15   KEITH A. JACOBY
     LITTLER MENDELSON
16   A Professional Corporation
     Attorneys for Defendant
17   CARTER BRYANT

18                                            ORDER

19   Upon Stipulation of the Parties and GOOD CAUSE appearing therefor, it is hereby SO

20   ORDERED.

21   DATED:_____, 2004

22                                            _____
                                              HON. GREGORY W. ALARCON
23

24

25

26   Los_Angeles:371665.3 028307.1010

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067.3107
310.553.0308

                                      3                    EXHIBIT ___ 𝒵

─────────────────────────────────────────────
STIPULATION AND ORDER GRANTING DEFENDANT
CARTER BRYANT LEAVE TO FILE CROSS-COMPLAINT     PAGE ___ 28

**EXHIBIT A**

EXHIBIT ____ $\mathcal{2}$

PAGE ____ $\mathcal{B}$

1   ROBERT F. MILLMAN, Bar No. CA 062152
    DOUGLAS A. WICKHAM, Bar No. CA 127268
2   KEITH A. JACOBY, Bar No. CA 150233
    LITTLER MENDELSON
3   A Professional Corporation
    2049 Century Park East, 5th Floor
4   Los Angeles, CA  90067.3107
    Telephone:   310.553.0308
5   Facsimile:   310.553.5583

6   Attorneys for Defendant/Cross-Complainant
    CARTER BRYANT
7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                      FOR THE COUNTY OF LOS ANGELES

10

11  MATTEL, INC., a Delaware Corporation,        Case No.  BC314398

12              Plaintiff,                         ASSIGNED FOR ALL PURPOSES TO THE
                                                   HONORABLE GREGORY W. ALARCON –
13        v.                                       DEPARTMENT 36

14  CARTER BRYANT, an individual; and             DATE ACTION FILED:  April 27, 2004
    DOES 1 through 10, inclusive,
15                                                 DEFENDANT/CROSS-COMPLAINANT
                Defendant.                         CARTER BRYANT'S CROSS-
16                                                 COMPLAINT FOR:

17                                                 (1)  UNFAIR COMPETITION (Business &
                                                   Professions Code  §§ 16600, et seq. and 17200
18                                                 et seq.);
                                                   (2)  RESCISSION;
19                                                 (3)  DECLARATORY RELIEF; AND
                                                   (4)  FRAUD.
20
                                                   DEMAND FOR JURY TRIAL
21
                                                   [Code Of Civil Procedure § 428.10]
22

23  CARTER BRYANT, on behalf of himself,
    all present and former employees of Mattel,
24  Inc., and the general public,

25              Cross-Complainant,

26        v.

27  MATTEL, INC., a Delaware Corporation,

28              Cross-Defendant.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
6th Floor
Los Angeles, CA 90067 3107
310 553 0308

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT   EXHIBIT ____ 2

PAGE ____ 30

1       1.     Defendant and Cross-Complainant Carter Bryant ("Bryant"), for his Cross-

2   Complaint alleges, upon personal knowledge with respect to himself and his own acts, and upon

3   information and belief as to all other matters, as follows:

4                       **OVERVIEW**

5       2.     In this Action, Bryant's former employer, Mattel, Inc. ("Mattel"), has sued

6   Bryant for, among other things, breach of a purported Employee Confidential Information and

7   Inventions Agreement ("Agreement"). The Agreement is a classic contract of adhesion, drafted

8   solely by Mattel, forced upon Bryant on a take-it-or-leave-it basis with no negotiations invited or

9   allowed. Although signing the Agreement was a condition of Bryant's employment, Mattel never

10   explained the terms and conditions of the Agreement to Bryant and Bryant never was given a

11   meaningful opportunity to secure legal advice concerning its meaning or terms. Bryant, who is a

12   high school graduate, did not and could not understand the terms of the Agreement; indeed, no

13   reasonable layperson could understand the legal significance, meaning and terms of the Agreement,

14   which appeared to be written for lawyers with several years of experience as corporate attorneys.

15       3.     Furthermore, the Agreement contains terms and conditions that violate

16   established California law on their face and/or in connection with Mattel's interpretation and threats

17   to enforce this Agreement. For example, the confidentiality provision in the first section of the

18   Agreement (as interpreted by Mattel) purports to require Bryant (and similarly situated present and

19   former Mattel employees) to maintain a cone of silence – on pains of a breach of contract lawsuit by

20   Mattel's lawyers – over such innocuous *and public* information as the identities of Mattel employees

21   and the general skills and knowledge of such employees. Such a provision clearly is unlawful and

22   violates public policy because it *de facto* inhibits the free flow of information regarding employee

23   talents and thereby restricts employee mobility in this State, thus undermining one of California's

24   fundamental public policies.

25       4.     The Agreement also purports to prevent current employees from accepting

26   any other employment or engagement of any nature whatsoever, regardless of whether such work or

27   services could lead to the disclosure of Mattel's proprietary information or trade secrets or otherwise

28   constitute a breach of the employee's duty of loyalty. Thus, if a Mattel employee went to work at a

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

1



1  gas station or a grocery store to earn extra money for his or her family, the Agreement flatly – and

2  unlawfully – prohibits such employment and renders such an employee liable to Mattel for breach of

3  contract.  Such a broad restriction concerning an employee's lawful off-duty conduct violates

4  California Business and Professions Code sections 16600 and 17200 and California Labor Code

5  sections 96(k) and 98.6 and California's broad public policies prohibiting unlawful covenants not to

6  compete.

7          5.      Finally, the Agreement also purports to require each and every Mattel

8  employee, including Bryant, to assign all inventions or creations conceived or reduced to practice

9  during the time period of his or her Mattel employment in direct violation of California Labor Code

10  section 2870.  While the Agreement purports to limit this broad assignment to the extent required

11  under Section 2870, this limitation is shrouded in so much legalese that no employee in Bryant's

12  shoes would know or understand either the inventions assignment or the limit on that assignment.

13  On information and belief, Bryant alleges that Mattel intentionally and purposefully implemented

14  this overly broad and unconscionable Agreement to lure employees to adhere to its unlawful terms

15  and to assign to Mattel inventions and creations that, by law, do not belong to Mattel.

16          6.      With this Cross-Compliant, Bryant alone and on behalf of all present and

17  former Mattel employees within the applicable limitations period and the general public, seeks to put

18  an end to Mattel's unlawful and unconscionable practices, with an injunction barring Mattel from

19  requiring employees to sign such agreements and threatening to enforce them, with a declaration that

20  all such agreements (including the Agreement signed by Bryant and any later, similar agreements)

21  are void and unenforceable because they are unconscionable, and with an order disgorging Mattel of

22  all profits unlawfully obtained by its misconduct.

23                              **THE PARTIES**

24          7.      Bryant is an individual residing in the State of Missouri who was employed by

25  Mattel from 1995 through April 1998 and again from January 1999 to approximately October 20,

26  2000.

27          8.      On information and belief, Bryant alleges that Mattel is a multi-billion dollar,

28  international toy company that, at its El Segundo facility alone, maintains a 180,000 square-foot

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310.553 0308

2
DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT _____2_____

PAGE _____32_____

design center with more than eight hundred fifty (850) employees. On information and belief, Bryant alleges that Mattel also maintains facilities in New York state, Wisconsin, New Jersey and Illinois.

9. Mattel markets numerous lines of toys, but one of its most well-known products is the "Barbie" doll line, which, according to Mattel's website, accounts for more than $3.6 billion in annual retail sales. On information and belief, Bryant alleges that Mattel, either directly or indirectly through subsidiaries or affiliates, markets and sells Hot Wheels toy cars, "ViewMasters" (three-dimensional viewer toys), the Fisher-Price line of toys and a line of dolls named "American Girl."

10. Bryant brings this Cross-Complaint on his own behalf, on behalf of all current and former Mattel employees (identified below) and on behalf of the general public pursuant to California Business and Professions Code sections 16600, 17200, 17203 and 17204 and the California Labor Code sections 98(k), 98.6, and 2699 (the California Labor Code Private Attorneys' General Act of 2004).

## NATURE OF THE ACTION

11. Cross-Complainant Bryant brings this Cross-Complaint to remedy the unfair business practices of his former employer, Mattel.

12. During Bryant's initial employment by Mattel, he was assigned to the "Main Line" Barbie Department, where he designed fashions and hairstyles for Barbie and her toy companions, including "Teen Skipper."

13. Between approximately late April 1998 and January 4, 1999, Bryant was not employed by Mattel. However, commencing on or about January 4, 1999, Bryant returned to work at Mattel and was employed in Mattel's Barbie "Collector" Department, designing clothing fashions and accessories for high-end Barbie dolls for the adult "collector" market.

14. Upon beginning this second term of employment with Mattel, Bryant was required to execute a boilerplate document entitled "Employee Confidential Information And Inventions Agreement" (defined above as the "Agreement").

15. The Agreement was a preprinted, non-negotiable form contract prepared by

3

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT _____ 2

PAGE _____ 33

1   Mattel, printed on Mattel stationery.  The Agreement purports to completely prohibit or, at a
2   minimum, creates a substantial chilling effect on, Bryant's or any other employee's preparations to
3   compete and purports to prevent Bryant and other employees from taking meaningful steps to obtain
4   any other competitive employment while still in the employ of Mattel.  Such an agreement
5   unlawfully restrains Bryant (and similarly situated employees) in his/their business, trade and
6   professions and thus violates well-established rights of employee mobility under California law.

7         16.   The Agreement also purports to effect an assignment of all inventions created
8   or even simply touched by Bryant during the time period of his employment with Mattel, regardless
9   of whether or not they relate to any aspect of Mattel's business and regardless of when or where this
10  occurred.  On its face, Mattel's Agreement theoretically purports to assign to Mattel any "invention"
11  of any kind conceived or reduced to practice by Bryant during the time period of his employment
12  with Mattel.  As Mattel has construed the Agreement, any time Bryant placed pen and pencil to
13  paper during the time period of his Mattel employment, such "works" are owned by Mattel even if
14  such works or inventions were created on his own time with his own materials.

15        17.   As applied here, the Agreement unlawfully infringes on Bryant's right to
16  prepare to compete and to seek other employment and it unlawfully appropriates to Mattel
17  inventions that were created or reduced to practice on Bryant's own time and using his own
18  equipment that are unrelated to his work for Mattel.  Such an invention assignment is overbroad,
19  unconscionable, violates Labor Code section 2870, constitutes an unfair business practice and is
20  therefore unlawful.

21        18.   The Agreement primarily contains a sweeping provision that purports to
22  assign to Mattel each and every invention by Bryant that he created or reduced to practice during the
23  time period of his employment with Mattel.  The Agreement's only attempt to limit the scope of the
24  assignment is a perfunctory reference to California Labor Code section 2870.  That quotation is
25  found in a separate part of the Agreement from the overbroad, illegal clause defining what is
26  covered, appears in fine print, and is stated in language so confusing that no lay person could
27  reasonably understand it.

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

4

*EXHIBIT* ___2___

*PAGE* ___34___

19.  Even considering the language of Mattel's reference to Labor Code section 2870 in the Agreement, the Agreement remains impermissibly overbroad and unenforceable. According to that provision of the Agreement, any invention conceived or reduced to practice by Bryant during his employment with Mattel would belong to Mattel by virtue of the unlawful Agreement, regardless of whether the invention related to the work performed by Bryant for Mattel.

20.  In addition to the unlawful inventions assignment, the Agreement contains several other provisions that are equally unlawful, either on the face of the Agreement or as applied by Mattel, as it seeks to enforce the Agreement. As discussed above, the confidentiality provision in the Agreement is grossly overbroad and purports to prohibit employees from disclosing and using publicly available information and it purports to prohibit employees from engaging in lawful off duty conduct in violation of Business and Professions Code 16600 and 17200, the California Labor Code and this State's public policy.

21.  Furthermore, Mattel's overly broad agreement cannot be saved from illegality by narrow construction. Otherwise, if these sorts of agreements could simply be reformed during litigation, employers would have no disincentive to draft and attempt to enforce such overbroad, illegal agreements that chill employees from exercising their rights.

22.  Due to Mattel's fraudulent and/or negligent misrepresentation of the terms contained within the Agreement (and Mattel's failure to affirmatively disclose its material terms to Bryant when Bryant was instructed to sign the Agreement by Mattel), Bryant did not discover, and would not reasonably be expected to discover, that the Agreement was misleading, unconscionable and unlawful until Mattel instituted the underlying lawsuit on April 27, 2004, attempting to enforce the Agreement. At the time it required Bryant to execute the adhesive Agreement as a condition of his employment, Mattel did not explain the terms of the Agreement to Bryant, give him sufficient time to review it, or permit or encourage him to seek independent counsel regarding its legal effect. Had Bryant been made aware of the full meaning and intent of the Agreement, he would not have signed it.

23.  Furthermore, Bryant is informed and believes that Plaintiff Mattel has been aware that Bryant was involved in designing the "Bratz" line of toys since at least sometime in 2001.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310 553 0308

5

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT _____ 2 _____

PAGE _____ 35 _____

1    Rather than bringing suit at that time, Mattel elected instead to wait until three years later to attempt

2    to enforce the unlawful Agreement in the underlying lawsuit.

3        24.    Even though Bryant conceived the "Bratz" idea when he was not employed by

4    Mattel in 1998 and he, with others, did not reduce that idea to practice until after Bryant left Mattel,

5    Mattel nevertheless is using the Agreement to frivolously sue Bryant, in an attempt to hijack

6    "Bratz."

7        25.    Bryant is informed and believes that all employees of Mattel who were hired

8    between 1999 (and before) and the present were required to execute the same or substantially

9    similar agreements, as a pre-condition of their employment with Mattel. Bryant is informed and

10   believes that his case is representative of a larger pattern and practice of wrongful conduct engaged

11   in by Mattel. Mattel, as a standard business practice, has forced its employees to enter into and has

12   wrongfully enforced similar quasi-non-competition and assignment of inventions contracts with its

13   present and former employees. Bryant is informed and believes that Mattel uses these agreements

14   to prevent or stifle competition in the toy industry and/or to unlawfully inhibit employee mobility.

15   Indeed, Bryant is informed and believes, and based thereon alleges, that Mattel continues to force

16   new and current employees to enter into the same or similarly overbroad and unlawful agreements.

17       26.    Bryant was presented with the form Agreement by Mattel on or about January

18   4, 1999, at the outset of his second term of employment. At that time, he was told that his execution

19   of the Agreement was a condition of his employment with Mattel. The terms of the Agreement were

20   not explained to him, nor was he told that the Agreement would preclude him from maintaining any

21   employment other than with Mattel, despite statutory guarantees to the contrary. Bryant was not

22   informed that by executing the Agreement, he was assigning to Mattel all the inventions and

23   creations he created or simply even touched during the time period of his employment with Mattel

24   regardless of how unrelated they might be to his work at Mattel. Bryant was not advised that Mattel

25   would attempt to claim ownership of any invention he may have conceived prior to employment by

26   Mattel and perfected after he left Mattel. Bryant neither was given a meaningful opportunity to

27   review the Agreement at the time he executed it, nor was he given the opportunity to consult with an

28   attorney before executing it. Mattel did not give Bryant the opportunity to negotiate the

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

6

EXHIBIT _____ 7

PAGE _____ 36

1 Agreement's terms, allow him to review it overnight, or suggest that he consult an attorney before

2 executing it. In essence, the Agreement was a pre-printed form and was presented to Bryant's on a

3 "take it or leave it" basis and Bryant and all present and former Mattel employees in effect were

4 bludgeoned into accepting its terms or not being allowed to work there.

5       27.   At the time Bryant executed the Agreement, he did not understand the scope,

6 breadth or meaning of its terms. Bryant is informed and believes, and on that basis alleges that at the

7 time all other current and former employees of Mattel executed identical or similar agreements with

8 Mattel, they, too, did not understand the scope, breadth or meaning of their terms. As discussed

9 below, the Agreement is both procedurally and substantively unconscionable and thus wholly

10 unenforceable.

11       28.   In this action, Bryant seeks on behalf of himself and the general public the

12 intervention of the Court to obtain remedies to preclude Mattel's unlawful acts. Among other

13 things, Bryant seeks a declaration from this Court that Mattel's Agreements are not enforceable

14 against Bryant and all other present and former similarly situated Mattel employees. Bryant also

15 seeks permanent injunctive relief barring Mattel from forcing present and future employees to sign

16 such agreements, stopping Mattel from threatening to enforce and attempting to enforce illegal non-

17 compete/invention assignment contracts against Bryant and any other current or former Mattel

18 employees, and requiring Mattel to disgorge and/or make restitution for all unlawful profits

19 received and/or costs incurred by virtue of its unlawful and unfair business practices and other legal

20 and/or equitable relief to which Bryant and/or the general public may be justly entitled.

21       29.   Bryant also seeks, through this Cross-Complaint, rescission of the

22 unconscionable and unlawful Agreement signed by Bryant.

### FIRST CAUSE OF ACTION

### (UNFAIR COMPETITION AGAINST DEFENDANT MATTEL)

### (Business & Professions Code § 17200 et seq.)

26       30.   Bryant realleges and incorporates by reference each of the allegations in

27 Paragraphs 1 through 29 of this Cross-Complaint as if fully set forth herein.

28       31.   Bryant brings his claim for unfair competition and unfair business practices

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553.0308

7

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT _____ 2

PAGE _____ 37

1  on behalf of himself, the current and former employees of Mattel and the general public, pursuant

2  to California Business and Professions Code sections 16600, 17200, 17203 and 17204.

3       32.    The non-competition and invention assignment provisions contained in the

4  Agreement, which Mattel forced Bryant to execute as a condition of employment, and which it is

5  now trying to enforce in the underlying action, are illegal pursuant to California Business and

6  Professions Code sections 16600 and 17200. Said provisions constitute an unfair restraint of trade

7  for the following, non-exclusive reasons: they illegally restrict the job mobility of current and even

8  former Mattel employees, they illegally restrict current Mattel employees from seeking other

9  gainful employment, they illegally restrict the use of public information, such as the identity or job

10  functions of current Mattel employees, they specifically prevent or deter Mattel's present and

11  former employees, such as Bryant, from accepting or holding any lawful employment within the

12  State of California or elsewhere other than with Mattel, and they purport to assign for Mattel's

13  unlawful benefit all the inventions of Mattel's current and former employees, with a narrow

14  exception which is the employee's burden to prove.

15       33.    The Agreement is also unlawful in that it violates the provisions of California

16  Labor Code section 96(k), which guarantees the rights of employees to be free in the lawful

17  activities they pursue outside working hours, section 98.6 to the extent Mattel has taken adverse

18  employment actions against employees who have refused to sign the Agreement, and Labor Code

19  section 2699.

20       34.    The Agreement also violates the provisions of California Labor Code section

21  2870 inasmuch as it provides for a far broader assignment of employee inventions than is permitted

22  by applicable law.

23       35.    The Agreement was a contract of adhesion and was procedurally

24  unconscionable because, among other things, Bryant was required to sign it as a condition of his

25  employment with no negotiations allowed, it was presented to him on a preprinted form and on a

26  take-it-or-leave-it basis, he was not allowed to thoroughly review or consider its terms, he was not

27  permitted to review it overnight, he was not provided with the opportunity to consult counsel prior

28  to executing it, and it was never thoroughly and completely explained to him.

EXHIBIT 2

PAGE 38

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553 0308

1        36.    Because of its onerous, unfair, unlawful and one-sided provisions, which are

2  surprising, grossly unfair and shock the conscience, the Agreement is substantively unconscionable.

3        37.    Because it is both procedurally and substantively unconscionable, the

4  Agreement is unenforceable.  Moreover, the Agreement is so permeated by unconscionability that

5  the unlawful provisions cannot be severed.

6        38.    Due to Mattel's fraudulent and/or negligent misrepresentation of the terms

7  contained within the Agreement, Bryant did not discover, and would not reasonably have

8  discovered, that the Agreement, as Mattel attempted to enforce it, was unconscionable and unlawful

9  until Mattel instituted the underlying lawsuit against him to attempt to enforce the Agreement, in

10  approximately April 2004.

11        39.    Even though the quasi-non-competition and invention assignment provisions

12  of the Agreement are not enforceable, Bryant is informed and believes and based thereon alleges

13  that Mattel utilizes these provisions as part of a scheme and device to restrain the business

14  opportunities, both within and outside the State of California, otherwise available to Bryant and

15  other current and former Mattel employees.

16        40.    Bryant is informed and believes and based thereon alleges that, in effect,

17  through its wrongful acts, Mattel is able to create for itself an unfair competitive advantage along

18  with other benefits at the expense of its present and former employees (including Bryant), other

19  competing companies or employers, and members of the public.

20        41.    Mattel's unlawful conduct in requiring Bryant, and its other current and

21  former employees, to sign the Agreement, or other similar Agreements with equally unlawful

22  provisions as a term and condition of employment or continued employment, and then threatening

23  to enforce such unlawful provisions, constitutes unfair competition and an unfair business practice

24  in violation of the California Business and Professions Code sections 16600 and 17200 et seq. and

25  under the common law.

26        42.    As a proximate result of such unlawful acts and/or unfair business acts and

27  practices, Bryant has suffered actual damages, and Mattel has enjoyed unlawful profits, in a sum

28  not yet fully ascertained but in excess of the jurisdictional limits of this Court.  Furthermore, on

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310.553.0308

1  behalf of Bryant and all present and former California employees of Mattel and the general public,
2  Bryant seeks injunctive relief pursuant to Business and Professions Code section 17203, barring
3  Mattel from continuing to engage in such unlawful and unfair business practices, and the remedies
4  of disgorgement and restitution for illicit profits obtained by Mattel from its unlawful and/or unfair
5  business acts and practices pursuant to Business and Professions Code section 17204.

6        43.    In addition, as a result of the illegal and wrongful conduct alleged above, in
7  the absence of injunctive relief prohibiting Mattel from continuing to engage in unfair competition,
8  Cross-Complainant Bryant, the current and former employees of Mattel and the general public have
9  been and will be irreparably harmed.

10       44.    For these reasons, Bryant requests permanent injunctive relief prohibiting
11 Cross-Defendant Mattel from continuing to engage in unfair competition by threatening and
12 attempting to enforce illegal non-compete/invention assignment contracts against Bryant or any
13 other current or former Mattel employees.

14                          **SECOND CAUSE OF ACTION**

15                    **(RESCISSION AGAINST DEFENDANT MATTEL)**

16       45.    Bryant realleges and incorporates by reference each of the allegations in
17 Paragraphs 1 through 44 of this Cross-Complaint as if fully set forth herein.

18       46.    Bryant's consent to the Agreement was given due to mistake, or obtained
19 through duress, menace and/or fraud.

20       47.    The Agreement is unlawful and unconscionable, due to the fault not of
21 Bryant but of Mattel, which exclusively drafted the Agreement's unlawful and unconscionable
22 terms.

23       48.    Due to Mattel's fraudulent misrepresentation and/or concealment of the terms
24 contained within the Agreement, Bryant did not discover, and would not reasonably be expected to
25 discover, that the Agreement was unconscionable and unlawful until Mattel instituted the underlying
26 lawsuit against him to attempt to enforce the agreement, in approximately April 2004.

27       49.    The public interest will be prejudiced by permitting the Agreement or other
28 similar agreements to stand.

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310.553.0308

10.

EXHIBIT 2

50.   By the filing of this Cross-Complaint, Bryant hereby gives notice to Mattel that he seeks rescission of the Agreement, and further offers to restore to Mattel all consideration and everything of value which he received from Mattel under the Agreement, upon condition that Mattel do likewise.

51.   Bryant therefore requests that the Court rescind the Agreement in its entirety.

### THIRD CAUSE OF ACTION

### (FRAUD AGAINST DEFENDANT MATTEL)

52.   Bryant realleges and incorporates by reference each of the allegations in Paragraphs 1 through 51 of this Cross-Complaint as if fully set forth herein.

53.   Mattel required Bryant to execute the Agreement without disclosing to him its true import and terms.

54.   Having drafted the Agreement and all the oppressive, unfair and onerous terms contained therein, Mattel was of course aware of the contents of the Agreement and its import.

55.   Due to Mattel's concealment of its interpretation of the force and effect of the Agreement from Bryant, he did not discover that the Agreement was unconscionable and unlawful until Mattel instituted the underlying lawsuit against him to attempt to enforce the agreement, in late April 2004.

56.   In so failing to disclose to Bryant the true meaning of the terms and the purported legal effect of the Agreement, and Mattel's intent to attempt to enforce it with regard to work he conceived and/or reduced to practice while not employed at Mattel, Mattel misrepresented and suppressed the nature of the Agreement, and in doing so, committed actual fraud against Bryant.

57.   Because of its malicious, oppressive and/or fraudulent conduct, Mattel is subject to punitive damages in an amount necessary and appropriate to punish and deter it and others from engaging in similar conduct in the future.

//

//

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

EXHIBIT   2

PAGE   41

**FOURTH CAUSE OF ACTION**

**(DECLARATORY RELIEF AGAINST DEFENDANT MATTEL)**

58.     Bryant realleges and incorporates by reference each of the allegations in Paragraphs 1 through 60 of this Cross-Complaint as if fully set forth herein.

59.     Mattel's unlawful conduct in requiring Bryant, and its other current and former employees, to sign the Agreement with its unlawful provisions as a term and condition of their employment or continued employment and then threatening to enforce such unlawful provisions and eventually filing a lawsuit to enforce such provisions against Bryant constitutes unfair competition and unfair business practices in violation of the California Business and Professions Code sections 16600 and 17200 et seq. and under the common law.

60.     Moreover, the Agreement is both procedurally and substantively unconscionable.

61.     Through its suit against Bryant, Mattel has demonstrated that a controversy exists concerning the enforceability of the Agreement and its terms.

62.     Bryant therefore requests declaratory relief stating that the Agreement, as well as all similar agreements executed by current and former employees of Mattel, are unlawful and unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, Cross-Complainant Bryant prays for judgment and relief as follows:

1.     For restitution, disgorgement and interest in an amount to be determined at trial;

2.     For an order permanently enjoining and barring Mattel from forcing present and future employees to sign agreements containing quasi-non-compete or invention assignment provisions identical or substantively similar to those in the Agreement, and prohibiting Mattel from threatening and attempting to enforce such agreements or restrictions against Bryant or any other current or former employees;

3.     For an order declaring that the Agreement between Mattel and Bryant (and the agreements between Mattel and all similarly situated present and former employees) are void,

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067 3107
310 553 0308

12

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT



PAGE ____ 42

1   unenforceable and unconscionable;

2         4.   For rescission of the Agreement;

3         5.   For declaratory relief stating that the Agreement is unlawful and

4   unenforceable;

5         6.   For compensatory damages according to proof;

6         7.   For statutory penalties pursuant to Labor Code section 2699;

7         8.   For punitive damages according to proof;

8         9.   For reasonable attorneys' fees incurred in bringing and litigating this action

9            pursuant to the private attorneys general statutes;

10       10.   For costs of suit herein; and

11       11.   For such further or other relief as the Court deems just and proper.

12

13  Dated: August 24, 2004

14                              *C. Wickham*

15                        DOUGLAS A. WICKHAM
                       LITTLER MENDELSON

16                     A Professional Corporation
            Attorneys for Defendant/Cross-Complainant

17                        CARTER BRYANT

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
2049 Century Park East
5th Floor
Los Angeles, CA  90067 3107
310.553.0308

                                13

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT  2

PAGE  43

1

## DEMAND FOR A TRIAL BY JURY

2

Pursuant to Section 592 of the California Code of Civil Procedure, Cross-

3

Complainant Carter Bryant hereby demands that the causes in this matter be tried by a jury to the

4

extent provided for by law.

5

6

7 Dated: August 24, 2004

8

9 _____
C. Wickham

DOUGLAS A. WICKHAM
10 LITTLER MENDELSON
A Professional Corporation
11 Attorneys for Defendant/Cross-Complainant
CARTER BRYANT

12

13

14 Los_Angeles:371607.1 028307.1010

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
2049 Century Park East
5th Floor
Los Angeles, CA 90067-3107
310.553.0308

14

DEFENDANT/CROSS-COMPLAINANT'S CROSS-COMPLAINT

EXHIBIT _____2_____

PAGE _____44_____

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 2049 Century Park East, 5th Floor, Los Angeles, California 90067.3107. On August 27, 2004, I served the within document(s):

**STIPULATION AND [PROPOSED] ORDER GRANTING DEFENDANT CARTER BRYANT LEAVE TO FILE COUNTER-CLAIM**

[X] by facsimile transmission at or about August 27, 2004 on that date. This document was transmitted by using a facsimile machine that complies with California Rules of Court Rule 2003(3), telephone number 310.553.5583. The transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached. The names and facsimile numbers of the person(s) served are as set forth below.

[ ] by placing a true copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a sealed envelope with postage thereon fully prepaid for deposit in the United States mail at Los Angeles, California addressed as set forth below.

[ ] by depositing a true copy of the same enclosed in a sealed envelope, with delivery fees provided for, in an overnight delivery service pick up box or office designated for overnight delivery, and addressed as set forth below.

[ ] by personally delivering a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

I am readily familiar with the firm's practice of collection and processing correspondence for mailing and for shipping via overnight delivery service. Under that practice it would be deposited with the U.S. Postal Service or if an overnight delivery service shipment, deposited in an overnight delivery service pick-up box or office on the same day with postage or fees thereon fully prepaid in the ordinary course of business.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on August 27, 2004, at Los Angeles, California.

*J. Monique McDonald*
J. Monique McDonald

Los_Angeles:372099.1 028307.1010

EXHIBIT 2

PAGE 45

**PROOF OF SERVICE BY MESSENGER**

I am employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is Allstar Messenger Service, 345 South Figueroa Street, Suite 305, Los Angeles, California 90071. On August 27, 2004, I personally served:

**STIPULATION AND [PROPOSED] ORDER GRANTING DEFENDANT CARTER BRYANT LEAVE TO FILE CROSS-COMPLAINT**

by delivering copies thereof to:

Michael T. Zeller, Esq.
Quinn Emanuel Urquhart Oliver &
Hedges LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on August 27, 2004, at Los Angeles, California.

_____
MARCUS ROBINSON

Los_Angeles:372101.1 028307.1010

PROOF OF SERVICE

PAGE ____46

2

# Exhibit 3

1    ROBERT F. MILLMAN, Bar No. 062152
2    DOUGLAS A. WICKHAM, Bar No. 127268
     KEITH A. JACOBY, Bar No. 150233
3    LITTLER MENDELSON
     A Professional Corporation
     2049 Century Park East, 5th Floor
4    Los Angeles, CA 90067.3107
     Telephone: 310.553.0308
5    Facsimile: 310.553.5583
     Attorneys for Plaintiff
6    CARTER BRYANT

7

8

9               UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12    CARTER BRYANT, an individual      Case No.

13            Plaintiff,      **COMPLAINT FOR:**

14      v.      **DECLARATORY RELIEF OF COPYRIGHT NON-INFRINGEMENT**

15    MATTEL, INC., a Delaware corporation

16           Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT    3

PAGE    47

31

EXHIBIT B

1    Plaintiff Carter Bryant ("Bryant") for his complaint against Defendant
2  Mattel, Inc. ("Mattel") alleges as follows:

3                                **PARTIES**

4        1.    Bryant is an individual residing in Springfield-Greene County,
5  Missouri.

6        2.    Bryant is informed and believes, and based thereon alleges, that Mattel
7  is a Delaware corporation with a principal place of business at 333 Continental
8  Boulevard, El Segundo, California.

9                        **JURISDICTION AND VENUE**

10       3.    This is an action under 28 U.S.C. §§ 2201 and 2202 for declaratory
11 relief and further relief based upon a declaratory judgment or decree and the
12 Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* This Court has original subject
13 matter jurisdiction over Bryant's claim pursuant to 28 U.S.C. §§ 1331 and 1338(a)
14 & (b).

15       4.    This Court has personal jurisdiction over Mattel, as it conducts
16 continuous, systematic and routine business within the State of California and the
17 County of Los Angeles.

18       5.    Venue is proper in the United States District Court for the Central
19 District of California pursuant to 28 U.S.C. §§ 1391(b) & (c).

20                        **BACKGROUND FACTS**

21       6.    Bryant is the creative genius and inspiration behind an immensely
22 successful line of fashion dolls called "Bratz."

23       7.    Since its debut on the market in June, 2001, the "Bratz" line has
24 revitalized and invigorated the fashion-doll industry, long dominated by Mattel's
25 "Barbie" dolls.

26       8.    Mattel, however, does not like the competition.

27

28

                                              EXHIBIT __3__

                         2                    PAGE __48__

EXHIBIT B       32

9.   First, Mattel, the world's largest toy company, tried, and failed, to drive "Bratz" out of the market by, *inter alia,* introducing competing products that copy the fresh, new and trendy look of "Bratz."

10.   When this failed, Mattel resorted to other tactics – suing Bryant, three and one half years after the launch of "Bratz," in California state court accusing him, among other things, of the alleged "conversion" of Mattel's "ideas, concepts, rights, designs, proprietary information, and other intellectual property and intangible property."

11.   Recent events discussed herein reveal what Mattel intends by this vague and overly-broad pleading.  Mattel intends to try to obtain control over the rights to "Bratz," apparently based, in whole or in part, on grounds that "Bratz" was allegedly copied from and infringes upon a scrapped Mattel project called "Toon Teens," or some other as yet undisclosed Mattel property, which Bryant was supposedly exposed to during a period of time when he was employed by Mattel.

12.   Bryant did not copy or infringe anything in coming up with "Bratz." Since these copyright issues cannot be resolved in state court, due to federal preemption, Bryant has a reasonable fear that Mattel will bring another lawsuit against him for copyright infringement.

13.   Bryant brings this action, accordingly, for a Declaratory Judgment that his past, present, and continuing contributions to and work on the conception and development of "Bratz" did not and do not violate or infringe any copyrights or intellectual or other property owned by Mattel.

### Carter Bryant's Background

14.   Bryant is a creative, innovative, artistic person who since an early age has had a special interest in dolls and fashion design.

15.   As a young boy, when his family could not afford to buy him toys, Bryant would draw them.  Dolls and puppets were particular favorites.  While still very young, Bryant began constructing marionettes from papier-mache.   **3**

16.     By age nine, Bryant had begun to draw fashions.  Fashion soon became a passion.  He bought books on Hollywood costume design and studied them intensely.  He made designs for his puppets and drew characters and outfits for them.  He even won a contest drawing "Archie" comic book characters and considered becoming a comic book artist.

17.     Bryant took art classes throughout junior high and high school.  He also began reading, and studying, fashion magazines such as "Vogue" and "Harper's Bazaar," thinking he might one day have a career in fashion design.  He began creating his own fashions based on what he saw in such magazines.

18.     After high school, Bryant considered going to design school, but gave up the dream when he realized that his family could not afford to send him.

19.     Instead, he tried songwriting for a while, and even formed a band in 1988.  For several years, he took dead-end jobs to make ends meet, such as stocking shelves at Toys 'R' Us.  But Bryant never let go of his dream, or gave up his interest in drawing and design.

20.     In 1993 he applied and was accepted to Parsons School of Design in Paris.  Based on the information contained in Parsons' website, since its founding in 1896, Parsons has been a forerunner in the field of art and design and was the first art and design school in America to found a campus abroad in 1920.

21.     Unfortunately, despite loans and work programs, attendance was cost-prohibitive.  Bryant went, instead, to Otis College of Art and Design in Los Angeles.  According to its website, Otis began in 1918, when Los Angeles Times founder Harrison Gray Otis bequeathed his MacArthur Park property for a public art college.  Otis is a four-year college offering bachelor's degrees in a variety of art and design-related areas including architecture, fine arts, fashion design and toy design.

22.     On an accelerated track, Bryant finished his entire first year in just 5 months, from January to June of 1994.  He then applied and was accepted to

EXHIBIT _____ 3

4

716  PAGE _____ 50

1   transfer to Parsons, however, again he could not raise enough money to go. **He**

2   stayed one more semester at Otis, but with only a small scholarship and mounting

3   debt, Bryant left the school in December, 1994. He went home to Missouri for

4   Christmas and ended up staying.

5       23.    Realizing that going to Paris and working as a fashion designer was

6   simply not economically feasible, Bryant got the idea that he might be able to

7   combine his love of dolls and fashion by becoming a fashion designer for dolls in

8   the toy industry. Naturally thinking of "Barbie," the fashion doll that had

9   dominated the market for decades, he put together a portfolio of ten or so drawings

10  to send to Mattel, but lacked the confidence to actually send it to such a huge,

11  intimidating company.

12      24.    By 1995, however, he decided he had nothing to lose. Broke and with

13  no real career opportunities in sight, Bryant sent the package to Mattel.

14                **Bryant's Employment by Mattel**

15      25.    Much to his surprise, Mattel called him for an interview. After

16  completing a "trial project" for the company at its request prior to his being

17  considered for formal employment, he was hired as a temporary employee in

18  September, 1995. He was promoted to a full-time position in November, 1995.

19      26.    During his time at Mattel, Bryant worked exclusively on "Barbie"-

20  related projects for the "Barbie" family of dolls, as directed by Mattel's marketers.

21  Mattel told him what they wanted him to design, and he did what he was directed to

22  do.

23      27.    On occasion, Bryant would offer new, original and creative ideas to

24  Mattel, but Mattel discouraged anything non-traditional. No matter what the idea

25  was, Mattel would try to figure out a way to use it for "Barbie," or not at all.

26      28.    Bryant felt that his creativity and originality were being stifled and

27  suppressed at Mattel.

28

EXHIBIT _____3_____

PAGE_____51_____

29.    Within two years at Mattel, Bryant was feeling frustrated.  He simply did not fit Mattel's mold.  He also missed his family, and so decided to return home to Missouri.  With some significant design and work experience under his belt, he thought he might be able to build a career as a freelance design artist.

30.    He left California in approximately January 1998, but continued to work for Mattel from Missouri, on a part-time basis, until April, 1998.

### Bryant's Inspiration: "Bratz"

31.    Bryant continued to live with his parents in Missouri for the rest of the 1998, working exclusively on his own ideas and drawings, with the hopes of building a career as a freelance artist.

32.    Among other things, Bryant created greeting cards, and considered going into the greeting card business.  He even applied for a job at Hallmark. Bryant also did a bit of freelance design and artwork for Ashton Drake Galleries of Chicago.  On information and belief, Ashton Drake is the world's largest direct marketer of limited edition, collectible porcelain dolls, and its dolls have sold at auction for as much as $1200.  It is widely renowned among doll collectors for its top-quality, handcrafted collectible dolls.  Ashton Drake employs artists and freelancers to work on its doll programs and new doll concepts.  Bryant worked on "Angel" and "Wedding" theme projects for the company in 1998.  He supplemented his income by working at a clothing store, Old Navy.  But Bryant also worked on his own ideas for dolls – his lifelong obsession.  One day, while returning home from Old Navy, Bryant drove past a high school and had a "eureka" moment.  Inspired by the "bratty" attitude he had observed, as well as advertisements that he had seen relating to hip-hop fashions and other trends of the time, Bryant started sketching multi-ethnic, urban youth, dressed in trendy fashions. Bryant tried to capture in his sketches the "bratty" attitude he had observed.  Little did he know then that his concept, "Bratz," would become a national, indeed, international, sensation.

EXHIBIT _____ 3

PAGE _____ 52

6

2(6

33.    Bryant was simply trying to figure out a way to make a living doing what he enjoyed.  Unable to support himself as a freelance artist, however, and turning thirty and not wanting to live at home forever, Bryant realized he needed a steady job.  Based on Mattel's comments to him before he left its employ in 1998 indicating an interest in having him remain with the company, he reapplied and secured a position with Mattel starting in January 1999.

34.    Mattel hired Bryant back to work exclusively on Mattel's "collectibles" line, a high-end, expensive line of "Barbie" dolls designed for adult doll collectors, not children.  He began working for the company again on January 4, 1999.  Again, Mattel's marketing department directed Bryant to create the designs it wanted to market.

35.    Bryant never showed Mattel the ideas, drawings, designs and concepts that he had worked on on his own while he had been gone from the company, including the concept for what later became the "Bratz" dolls.  He already knew that Mattel was not receptive to new, creative, innovative ideas.  Besides that, they were his, and he was afraid that Mattel would not give him credit or compensation.

36.    One day he happened to show his concept for "Bratz" dolls to a friend who did freelance work for MGA Entertainment, Inc.  ("MGA").

37.    Bryant's friend thought that MGA might be interested in talking to Bryant, and arranged a meeting.

38.    MGA ultimately offered Bryant a consulting arrangement.  His agreement with MGA was signed on or about October 4, 2000.  Bryant resigned from Mattel immediately, giving two weeks notice, but stayed at the company until October 20 to finish up and transition the projects on which he had been working.

39.    On information and belief, MGA was founded in 1979 as a small consumer electronics business and made its first foray into the toy business in 1987 marketing handheld LCD games featuring licensed "Nintendo" characters, where its initial success allowed it the opportunity to obtain additional licenses for such

1   popular properties as the "Power Rangers" and others.  By the time Bryant started

2   working for MGA in late 2000, the company was selling other kinds of toys and

3   dolls.

4         40.    After leaving Mattel, Bryant began working with a team of MGA

5   employees and freelancers to develop and physically embody Bryant's concept.

6   The development took substantial time, effort, creativity, money, and know-how,

7   but with this effort, Bryant's concept for "Bratz" dolls was reduced to practice and

8   became a reality.

9              **"Bratz" Dolls Revolutionize The Fashion Doll Market**

10        41.    MGA first unveiled the "Bratz" doll concept at the Hong Kong Toy

11   Fair in January 2001.  In June 2001, MGA introduced the line to the market.

12        42.    Unlike Barbie Dolls, the "Bratz" line of dolls and branded products

13   (collectively "Bratz Dolls") sport a hip, multi-ethnic urban look that appeals to

14   contemporary teenage and pre-teen girls.  At approximately 9.5 to 10 inches tall,

15   the Bratz Dolls are intentionally shorter than Barbie Dolls and look notably

16   different, with large heads, big dramatic eyes and lips, small, thin bodies, oversized

17   feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which

18   requires a stand), and up-to-date fashions.

19        43.    Featuring and embodying the slogan "The Girls With a Passion for

20   Fashion!", Bratz Dolls, invigorated, transformed and expanded the fashion doll

21   market, in particular proving popular among "tween" age girls – *i.e.,* those between

22   childhood and adolescence – who Mattel had all but abandoned as a market.

23        44.    On information and belief, the "Bratz" line has been praised by

24   consumers, retailers and toy industry analysts alike.  In 2001, the "Bratz" line won

25   the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the

26   Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award.  In 2002, the

27   "Bratz" line again won the TIA People's Choice Toy of the Year Award, the

28   Family Fun Toy of the Year Award.  LIMA, the licensing industries official arm,

8

EXHIBIT 3

2 8  PAGE _____ 54

1   awarded MGA's "Bratz" the best character license of the year as well as the overall
2   best licensed property of the year for 2003. MGA's "Bratz" also earned the coveted
3   TIA "Property of the Year" and "Girl Toy of the Year," in 2003, as well as the
4   Family Fun Toy of the Year Award. MSNBC named "Bratz" the "Hottest Toy of
5   the Year," and both MGA and "Bratz" received several other accolades.

6       45.    According to media reports and business analysts, this success caught
7   Mattel by surprise, with many Mattel insiders reportedly assuming that Bratz would
8   be a short-lived fad.

9       46.    As it turned out, "Bratz" was not a fleeting fancy among young girls.

10      47.    Beginning in 2002, "Bratz" really gave "Barbie" a run for its money
11  as the top selling fashion doll.

12      48.    Bryant continues to contribute to, and provide ideas, concepts and
13  designs for "Bratz" on an ongoing basis as a designer and consultant for MGA. For
14  example, Bryant designed a wholly original male character for MGA, which was
15  turned into the "Bratz Boyz" line of dolls by MGA.

16                                **Mattel's Market Response to "Bratz"**

17      49.    In response to "Bratz", Mattel, in 2002, rushed to release "My Scene
18  Barbie," a line of fashion dolls under the "Barbie" name that looked much more
19  like "Bratz" than the traditional main line "Barbie" Doll. Like "Bratz," "My Scene
20  Barbie" dolls have oversized heads, artfully made-up almond-shaped eyes, large,
21  overly-lined and lipsticked lips, trendy clothes and hair styles, over-sized feet and a
22  more ethnic look. Like the "Bratz" Dolls, "My Scene" Dolls are packaged with two
23  outfits and an accessory. And, since fall 2003, like the "Bratz, which are
24  introduced with themes, "My Scene" Dolls are introduced with a theme as well.

25      50.    After the success of MGA's "Bratz Boyz" dolls, Mattel also
26  introduced male doll characters to the "My Scene" line, even though for 45 years
27  the "Barbie" line had only included a single male doll – Barbie's boyfriend "Ken"

28  

EXHIBIT _____ 3

PAGE _____ 55

29

EXHIBIT D

1   (whom, after 45 years as her boyfriend, Barbie "dumped" in a 2004 Mattel publicity

2   stunt to revive "Barbie" in the face of the "Bratz" success).

3       51.    On information and belief, the "My Scene" Dolls, however, have not

4   come close to achieving the popularity and acclaim of "Bratz."

5       52.    A year after the debut of "My Scene," Mattel launched "Flavas," a line

6   of urban fashion dolls also intended to appeal to the "tween" market.  "Flavas,"

7   were poorly received by children, parents and the toy industry, and Mattel

8   discontinued the line less than a year after its launch.

9           **Mattel's Accusations of Copyright Infringement Against Bryant**

10      53.    Unable to supplant "Bratz" – the more popular, better quality product

11  – with the inferior and less popular "Flavas" or even "My Scene," Mattel changed

12  tactics.  It turned to disparaging Bryant, and accusing him of copying from Mattel.

13      54.    In or about July 2003, Mattel "sources" told a *Wall Street Journal*

14  reporter that "[I]nside Mattel, some are convinced the BRATZ borrow liberally

15  from a Mattel project that was scrapped at the testing stage in 1998."  Attached

16  hereto as Exhibit A is a true and correct copy of this article.

17      55.    Mattel's thinly veiled accusation of copyright infringement against

18  Bryant took more substantive form when, in April, 2004, Mattel sued Bryant in

19  California state court for, among other things, allegedly "converting" Mattel's

20  intellectual property (the "Bryant Litigation").  Bryant sought discovery from

21  Mattel, accordingly, regarding any Mattel idea, concept, project or product

22  allegedly stolen or copied by Bryant, including "Toon Teens," "Diva Stars," and

23  "My Scene."  Faced with objections from Mattel, Bryant offered to take no further

24  discovery on such issues if Mattel would enter into a fact stipulation that it would

25  not claim that Bryant copied "Bratz" from Mattel's "Toon Teens."  Mattel refused

26  to enter into such a stipulation.  For reasons unknown, Mattel has not yet sued

27  Bryant for copyright infringement.  It has, however, enlisted a surrogate to take a

28

EXHIBIT _____ 3

PAGE _____ 56

EXHIBIT 2          40

1    first-run at attempting to establish infringement, perhaps intending to see what the

2    outcome might be before launching a direct attack itself.

3    56.    Specifically, in 2002, MGA filed suit in Hong Kong against the

4    manufacturers of "Funky Tweenz" (known infringers of intellectual property in the

5    toy industry) (the "Hong Kong defendants"). "Funky Tweenz" is a line of "Bratz"

6    knock-off products. In connection with this lawsuit (the "Hong Kong Lawsuit"),

7    Bryant has been informed that MGA filed various documents substantiating its

8    ownership of "Bratz," including with regard to Bryant's involvement in MGA's

9    development of "Bratz" and in its reduction to practice of Bryant's original

10   inspirational sketches. Bryant has also been informed that in August 2004 the

11   Hong Kong defendants produced to MGA's counsel *unreleased photographs* of,

12   and documents relating to, Mattel's "Toon Teens" project – the same project Mattel

13   had mentioned in the *Wall Street Journal* article as the supposed origin of "Bratz."

14   The Hong Kong defendants initially refused, however, to authenticate these

15   documents, or to divulge the source of these photographs. The defendants also

16   refused to explain the purported relevance of the documents to the Hong Kong

17   Lawsuit.

18   57.    Finally, however, Bryant has been informed that on October 7, 2004,

19   the Hong Kong defendants revealed that Mattel was the source of the "Toon Teens"

20   documents and information. Indeed, the Hong Kong defendants have revealed that

21   they – accused copyright infringers -- have a document-sharing agreement with

22   Mattel. Apparently, Mattel prefers to assist known infringers in Hong Kong in

23   trying to prove that Bryant copied Mattel in coming up with "Bratz", instead of

24   trying to prove it themselves in a United States federal court of law – or at least for

25   the time being, that seems to be Mattel's strategy.

26   58.    On information and belief, Mattel, and the same counsel representing

27   it in the Bryant Litigation, have told the Hong Kong defendants that "Bratz" is not

28   an original design and have provided documents and other information to those

11

EXHIBIT ____ 3

EXHIBIT B    4\ PAGE____ 57

1    defendants in an effort to assist such infringers to evade liability for copyright

2    infringement of "Bratz" in the Hong Kong action.  On information and belief,

3    Matter has told the Hong Kong defendants that the "Toon Teens" documents

4    provided to such defendants prove that Bryant copied and infringed Mattel's "Toon

5    Teens" or other Mattel property.

6        59.    Mattel even rushed to register the copyright for its long-shelved "Toon

7    Teens" during the very same month that it claims to have first learned of Bryant's

8    contract with MGA, November, 2003, and using the same counsel that Mattel is

9    using in the Bryant Litigation.  A true and correct copy of this registration is

10   attached hereto as Exhibit B.  Notably, Bryant is informed that the dates on Mattel's

11   "Toon Teens" drawings and pictures reflect that they were created in 1999, *after*

12   Bryant conceived of "Bratz" in 1998.

13       60.    On information and belief, Mattel's copyright registration of "Toon

14   Teens" is no coincidence; it is a preliminary step necessary for Mattel to sue Bryant

15   for copyright infringement.

16       61.    There is no doubt that Mattel intends to get back at Bryant via false

17   allegations and to try to obtain control of Bryant's brainchild any way it can,

18   including falsely alleging that "Bratz" is nothing more than derivative of Mattel's

19   own work(s). This is wholly untrue.  "Bratz," is an original idea and concept,

20   independently conceived and created during a time when Bryant was not working

21   for Mattel.  The fact that MGA reduced the original designs to practice and further

22   developed "Bratz" into a highly successful product that now competes directly with

23   and has taken market share from Mattel's "Barbie" line of fashion dolls, including

24   as a result of the "Bratz"-inspired and imitating dolls distributed by others, is not to

25   be under-estimated.

26

27

28

EXHIBIT _____ 3

PAGE _____ 58

12

EXHIBIT D    42

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment of Non-infringement)

62.     Bryant repeats and realleges the allegations contained in paragraphs 1 through 61 of this Complaint and incorporates them by reference, as though fully and completely set forth herein.

63.     Bryant has a reasonable apprehension that Mattel will bring an action against him under 17 U.S.C.A. §§ 101, *et seq.* alleging that "Bratz" is not an independent or original work but, rather, is copied, derived from or infringes Mattel's copyrights in "Toon Teens," or some other Mattel work; that Mattel is the rightful owner of his "Bratz" idea, concept or original drawings or works and any copyrights and other intellectual property rights therein; and that Mattel alone possesses the exclusive rights to exploit such rights.

64.     Bryant contends that "Bratz" is his own independent and original idea, concept and work, that "Bratz" dolls were derived from Bryant's original idea, concept and work, and that Mattel has no right in "Bratz" whatsoever.  Bryant denies that he copied any of Mattel's property or work in conceiving and developing "Bratz," and denies that "Bratz" infringes or was derived from any Mattel property or work.

65.     Indeed, "Bratz" and "Toon Teens" are not substantially similar. "Bratz" are sexy, hip, modern fashion dolls with up-to-date fashions, and are designed to look like real teenagers, and the "Bratz" themes and playsets are based on places and activities that real teenagers would go to and do.  Bryant is informed that "Toon Teens," in contrast, appear to be childlike, soft-bodied dolls with "baby-fat" and bright, fantasy-colored hair and are, by Mattel's own statements to the *Wall Street Journal*, "cartoonish."

66.     An actual and justiciable controversy exists between Bryant and Mattel regarding whether Bryant's  ideas, concepts, or designs for, or contributions to,

13

EXHIBIT ___3___

PAGE ___59___

1    "Bratz" were and are original works, or copied from, derivative of or infringing on

2    Mattel's works, be it "Toon Teens," or any other unidentified Mattel work.

3         67.    This actual and justiciable controversy arises under federal copyright

4    law.

5         68.    Bryant seeks Declaratory Judgment of non-infringement; specifically

6    that his ideas, concepts, and designs for, and contributions to, "Bratz" were and are

7    original works, and were and are not copied from, derivative of or infringing on any

8    Mattel work.

9         69.    A judicial declaration of non-infringement is necessary and

10   appropriate at this time pursuant to 28 U.S.C. § 2201, so that Bryant may ascertain

11   his rights and duties with respect to "Bratz," including but not limited to dispelling

12   any potential cloud over his ability to have assigned or otherwise transferred rights

13   to his original works to MGA.  It is also necessary to clear Bryant's name and

14   mitigate the continuing damage to his reputation resulting from Mattel's unfounded

15   representations about Bryant made in the press and to the defendants in the Hong

16   Kong Litigation.

17         WHEREFORE, Bryant hereby prays for relief against Mattel as

18   follows:

19         1.    For a Declaratory Judgment of non-infringement.

20         2.    For a Declaratory Judgment that Bryant's ideas, concepts,

21   drawings and designs for, and contributions to, "Bratz" were and are independent

22   and original works, and were and are not copied from, derivative of or infringing

23   any Mattel work, including, without limitation, Mattel's copyrighted "Toon Teens."

24         3.    For a Declaratory Judgment that Bryant was the sole and true

25   owner of all rights relating to "Bratz" that Bryant heretofore assigned to MGA and

26   that such rights were owned by Bryant free and clear of any ownership claim by

27   Mattel at the time he assigned rights to MGA. .

28         4.    For a Declaratory Judgment that none of Bryant's contributions

EXHIBIT_____3____

14

FXHIRIT A    44 PAGE_____60____

1    to and work on "Bratz" infringes Mattel's copyrighted "Toon Teens" or any other

2    property allegedly owned by Mattel and that all such contributions to and work on

3    "Bratz" by Bryant were independent and original to Bryant.

4            5.      For costs of suit herein, including reasonable attorneys' fees,

5    and such other and further relief as the court may deem just and proper.

6

7    Dated: November 2, 2004              ROBERT F. MILLMAN

8                                         DOUGLAS A. WICKHAM
                                          KEITH A. JACOBY
9                                         LITTLER MENDELSON

10

11

12                                       By
                                             KEITH A. JACOBY
13                                           Attorneys for Plaintiff
                                             CARTER BRYANT
14

15

16   Los_Angeles:381846.1 028307.1010

17

18

19

20

21

22

23

24

25

26

27

28

15

EXHIBIT _____ 3

PAGE _____ 61

Westlaw.

factiva.

7/18/03 WSJ A1

Page 1

7/18/03 Wall St. J. A1
2003 WL-WSJ 3974434

The Wall Street Journal
(Copyright (c) 2003, Dow Jones & Company, Inc.)

Friday, July 18, 2003

Dolled Up: To Lure Older Girls, Mattel Brings In Hip-Hop Crowd

---

It Sees Stalwart Barbie Lose Market Share, So 'Flavas' Will Take on the 'Bratz'

---

Battle of the Big Heads

By Maureen Tkacik

LOS ANGELES -- Tika, 10 inches tall with two-toned hair, is of ambiguous ethnic origin -- maybe she's Asian, maybe Latina -- but her "platinum" medallion, airbrushed jean jacket, shell-toe sneakers and graffiti-streaked packaging make one thing clear.

"She's like . . . hip-hop," said Crystal Audigier, 10 years old, as she rifled through the first crate of "Flavas" dolls to arrive at a Los Angeles FAO Schwarz store last week.

Mattel Inc. hopes the dolls are hip enough to take on the "Bratz." The Flavas (pronounced "Flay-vuhs," like "flavors"), a set of six dolls brought from design to production in just three months, represent a striking gamble for the giant toy company. In the 44 years since it introduced its bombshell Barbie, Mattel has rarely brought out a doll line to compete with her.

But Mattel, which had become accustomed to its buxom blonde dominating the market, has watched in alarm as Barbie has been challenged by a smaller toy maker's Bratz -- a line of big-headed, pouty-lipped characters. While Barbie, which posted about $1.7 billion in sales for Mattel last year, is still queen, her share of the so-called fashion-doll market has fallen, almost entirely due to the Bratz.

After trying -- and failing -- to defeat the Bratz with a trendier Barbie last year, Mattel has come up with a radical battle plan. Among other things, that means curtailing its reliance on, and near-reverence toward, its cash cow. While Barbie is still a plaything of choice for girls 3 to 7 years old, it's been years since she managed to hold the attention of the tweens, or 8- to 12-year-olds. With the Flavas, Mattel is trying to get back into that market -- even if it risks cannibalizing its biggest product.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___3___

PAGE ___62___

EXHIBIT A    16    EXHIBIT D   111.

7/18/03 WSJ A1

Page 2

Mattel has tweaked Barbie many times since she was introduced in 1959: bronzing her skin during the 1970s, introducing black and Hispanic counterparts and giving her a band (the fuchsia-clad "Rockers") during the 1980s. Mattel even shrunk her chest and widened her hips in 1998.

But Mattel now concedes Barbie has gradually lost touch with some young girls' lives. "Barbie began as a great girl who was simply a reflection of popular culture, but in the past few years we had sort of put her on a pedestal," says Matt Bousquette, president of the newly created Mattel Brands unit, which consolidated the boys' and girls' toys divisions. "We're taking her off that pedestal."

While Mr. Bousquette and his team overhaul Barbie, he is also enlisting the Flavas, who wear sweats and heavy chains and have names like "Tre" and "P. Bo," as a second force with which to fight the Bratz. Mattel says hip-hop -- which it defines as "a cultural phenomenon . . . dimensionalized through freestyle dance, street sports, music and fashion" -- has gained sufficient ground in the mainstream to have its own toy line.

"Mattel is recognizing that there are other trends besides Barbie that girls want to play with," says Manny Francione, divisional merchandise manager for Toys "R" Us Inc., Paramus, N.J. "Hip-hop is one of those trends."

The Bratz, developed by a toy maker called MGA Entertainment Inc., North Hills, Calif., were introduced in the summer of 2001. They became a hit with tweens, an age group of girls that the toy industry had almost written off.

For the past decade, toy makers have been grappling with a phenomenon analysts call "age compression," in which media-saturated youngsters are outgrowing dolls and other toys at an earlier age. NPD Group Inc., a market-research firm, says toy spending on children peaks at age 3 and steadily declines after that, with spending on 12-year-olds at about a quarter of the peak level. By attracting tweens, the Bratz bucked that trend.

Bratz "appealed to an older girl . . . who is not necessarily still a Barbie customer," says Sean McGowan, a longtime industry analyst with Gerard Klauer Mattison. "Nothing's ever challenged Barbie like the Bratz." At Barbie's 1997 peak, a year in which Mattel posted $1.9 billion in sales of the doll, her clothing and accessories; she boasted more than a 90% share of the fashion-doll market, Mr. McGowan says. Barbie held at least 85% of the market right before the Bratz were introduced, he says, but her share has now dropped to about 70%.

The history of the Bratz is intertwined with Mattel. MGA says the Bratz were designed by Carter Bryant, a former member of the Barbie team. Inside Mattel, some are convinced the Bratz borrow liberally from a Mattel project that was scrapped at the testing stage in 1998. Mattel declined to comment.

Mr. Bryant didn't work on the line that Mattel scrapped, according to former and current Mattel designers. But most Barbie designers had seen the prototypes, his former colleagues say. Mr. Bryant, through MGA, declined to be interviewed.

The Mattel doll line that was scrapped wasn't exactly like the Bratz, says a longtime Mattel designer who worked on the project. But the Bratz's oversized

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT _____ 3

PAGE _____ 63

ΥΗΙΒΙΤ Α

heads -- with their pursed lips and cartoonish eyes -- are "virtually identical" to the heads of the dolls her team created, says the designer, who left Mattel in 2001.

Lily Martinez, a designer who still works at Mattel, came up with the idea for the big doll heads for Mattel, colleagues say. Mattel declined to comment. She even posted her sketch on her cubicle, colleagues say. "Anyone who passed by her cubicle would see the picture up on the wall," says another designer who also left Mattel in 2001. "The big heads, the big eyes, the big feet -- they were all the same" as the Bratz. Ms. Martinez declined to comment.

The Mattel dolls were scrapped in testing, current and former designers say, because Mattel had strict quotas that allowed only one "flanker brand" -- that is, a brand that would compete with Barbie for shelf space -- on the market at a time. At the time, Mattel chose a product called "What's Her Face" -- a doll with a blank face on which kids could draw expressions. That doll remains on the market; Mattel declined to discuss its sales.

Designers say they often faced a higher bar for non-Barbie projects. And Barbie's image was carefully protected. Bruce Stein, who was president of Mattel until 1998, says that former Chief Executive Jill Barad nixed an idea for "Barbie as Xena" dolls in 1998.

Ms. Barad was replaced in 2000, after Mattel's disastrous $3.5 billion acquisition of a software maker called The Learning Company. Under her successor, Robert Eckert, a former Kraft Foods president, the company has returned to profitability by cutting its work force 10%, streamlining its supply chain and developing international sales, among other things. Mattel, which reported a net loss of $431 million in 2000, reported net income of $230 million last year. Its stock has risen about 76% since Mr. Eckert arrived.

Isaac Larian, chief executive of MGA, says he had never heard of a project similar to the Bratz at Mattel. He says he chose Mr. Bryant's idea for the Bratz over several others after holding a sort of fashion-doll design contest in late 1999.

Mr. Larian, who emigrated to the U.S. from Iran, founded his company in the late 1970s, making a name by picking up the license for hand-held Pac-Man games. Though his company had made baby dolls before, it had never made fashion dolls. He says he was motivated by a challenge from a Wal-Mart Stores Inc. buyer to "give me something that can compete with Barbie."

This year, closely held MGA expects revenue of about $800 million -- with 65% of that coming from the Bratz. The company says it's profitable, but won't discuss specifics. Mr. Bryant still does design work for MGA, Mr. Larian says, and collects royalties on the Bratz line.

Mattel began worrying about the Bratz's momentum during the 2001 holiday season. Barbie sales fell 12% in the U.S. that year, despite a marketing campaign featuring an animated video, "Barbie in the Nutcracker."

By spring of 2002, Adrienne Fontanella, then president of the girls' division, decided to launch what the company termed a more "reality based" Barbie line. Like the Bratz, the "My Scene" Barbies boasted bigger heads and feet and fuller lips,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT _____ 3

PAGE _____ 64

as well as trendier clothes.

Mr. Larian, the head of MGA, calls the My Scene dolls a "cheap imitation" of the Bratz. Mattel declined to comment. Introduced in October 2002, the My Scene Barbies helped Mattel's sales, but still ranked behind the Bratz during the 2002 holiday season, according to NPD. "My Scene has been just OK for us," says Fred Hurley, a longtime girls'-toys buyer for KB Toys Inc., Pittsfield, Mass.

In February, Ms. Fontanella's job, along with others, was eliminated in what Mr. Eckert called a "restructuring" of Mattel's executive ranks aimed at "increasing efficiency."

Mr. Bousquette, the then-head of Mattel's boys' toy division, became the first man to take control of Barbie in more than a decade. "It used to be that whoever ran Barbie ran the company, not the other way around," says Mr. Stein, the former president. "For Matt to be in charge is a major shift."

Mattel no longer has quotas on how many products can compete with Barbie. After sitting through a girls'-design-team presentation in March, Mr. Bousquette seized upon the Flavas as the ideal dolls to compete for the dollars of Bratz buyers. Ivy Ross, head of girls' design, suggested bringing them to market for the spring 2004 season. Mr. Bousquette said the company should aim for this July instead.

"We were stunned," says a designer who worked on the Flavas and left the company in May. Another surprise: Mr. Bousquette asked the team to make the dolls look more hip-hop than the prototypes. "No one had really believed in the concept before that meeting, and it was stuck in this back-and-forth where first they were too edgy, then they weren't edgy enough," says the designer. "Matt came through and cut all of that out." Mr. Bousquette says he told designers to make the dolls "as authentic as possible, as quickly as possible."

Flavas are more complicated to manufacture than most fashion dolls. They are all different heights -- meaning separate molds -- and they have 10 points at which they can move, allowing them to strike a variety of poses. The Flavas design team often slept in their cubicles to get the dolls ready in time for summer shipment. Two designers each clocked 53 hours during Memorial Day weekend to prepare the line for the company's annual toy fair held in the first week of June.

Some buyers have been impressed. Mattel's girls' division "has never been a particularly forward-thinking group, but the Flavas are right on trend," says KB's Mr. Hurley. The six dolls in the Flavas line are certainly edgier than anyone in Barbie's clique. The Flavas girls have highlighted hair, flashier jewelry and wear midriff-baring tops with low-slung pants. Unlike Barbie, they have flat feet and wear sneakers. The two boy Flavas dolls sport earrings and serious expressions. Boxer underwear appears to show from the top of their cargo pants.

The Flavas come in boxes splashed with black-and-white photos of urban scenes shot around Venice Beach. When arranged together, the boxes create a "graffiti" mural that reads: "FA SIZZLE." It is a play on the hip-hop expression "Fa' shizzle," which means "For sure." Marketing director Lisa Tauber explains that it is also an acronym that stands for "Fashion, Attitude and Sizzlin' Style." The dolls, aimed at 9- to 11-year-olds, are "all about fearless self-expression," she says.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___3___

PAGE ___65___

EXHIBIT A  19

EXHIBIT B  49

MGA's Mr. Larian says he isn't scared by the Flavas. "The only thing that's missing is a cocaine vial," he says. "You think of Mattel, you think of Barbie and you think of sweetness. . . . This is like 'gangster' Barbie, and I think it's going to backfire."

Telejah Dean, a nine-year-old from West Los Angeles noticed the Flavas last week, as she was admiring Mattel's Mary-Kate and Ashley dolls. The Flavas are "not as pretty as Barbie," she said. But her older sister, Tiffany, 22, seemed impressed by the blond Happy D. doll. "Look, she's got black [hair] extensions like Christina," she exclaimed, referring to pop singer Christina Aguilera.

In fact, Mattel has hired people to give out Flavas hats, wristbands and decals during Ms. Aguilera's concert tour this summer. Ms. Aguilera, who got her start on the Disney Channel, is now probably as well known for her 11 body piercings and her mud wrestling-themed MTV video called "Dirrty."It's a sign of the changing times, says Mattel spokeswoman Julia Jensen. "The old Mattel probably wouldn't try to tie up with someone like Christina Aguilera."


---- INDEX REFERENCES ----


COMPANY:            KB Holdings LLC (KBTY); Mattel Inc (MATL)


NEWS SUBJECT:      (Marketing (C31); Market Share (C313); Corporate/Industrial News (CCAT); Content Types (NCAT); Page-One Story (NPAG); Editor's Choice – Consumer Products (REQRCP); Editor's Choice – Industry Trends/Analysis (REQR))


INDUSTRY:          (Dolls/Toys/Games (I4941); Retail (I64); Specialty Stores (I654); Hobby/Toy/Game Stores (I6540030); Consumer Products (ICNP); Media (IMED))

REGION:            (North American Countries (NAMZ); United States (USA); United States – California (USCA); Northeast U.S. (USE); United States – Massachusetts (USMA); Western U.S. (USW))

Language:  EN

OTHER INDEXING:    Marketing; Market Share; Page-One Story; Content Types; Corporate/Industrial News; United States – California; United States – Massachusetts; United States; Northeast U.S.; Western U.S.; North American Countries; Dolls/Toys/Games; Retail; Specialty Stores; Hobby/Toy/Game Stores; Consumer Products; Media; Consumer Cyclical; Newswire More Code; Newswire End Code; All Entertainment & Leisure; Limited Product Specialty Retailers; Recreational Products & Services; All Specialty Retailers; Toys; Islamic Index; S&P 500 Index component; Newspapers' Section Fronts; Marketing; Market

Word Count: 2217

7/18/03 WSJ A1
END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT ____3____

PAGE ____66____

Certificate of Registration



This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

Register of Copyrights, United States of America

**FORM VA**
For a Work of the Visual Arts
UNITED STATES COPYRIGHT OFFICE

**VAu 612 – 625**

EFFECTIVE DATE OF REGISTRATION

11 - 28 - 03

Month   Day   Year

---

DO NOT WRITE ABOVE THIS LINE  IF YOU NEED MORE SPACE  USE A SEPARATE CONTINUATION SHEET

**1**

Title of This Work ▼
TOON TEENS

NATURE OF THIS WORK ▼ See Instructions
Doll designs

Previous or Alternative Titles ▼

Publication as a Contribution  If this work was published as a contribution to a periodical serial or collection give information about the collective work in which the contribution appeared  Title of Collective Work ▼

If published in a periodical or serial give  Volume ▼     Number ▼     Issue Date ▼     On Pages ▼

**2**
**a**

NAME OF AUTHOR ▼
Mattel Inc

DATES OF BIRTH AND DEATH
Year Born ▼     Year Died ▼

**NOTE**

Under the law the author of a work made for hire is generally the employer not the employee (see instructions) For any part of this work that was made for hire check Yes in the space provided give the employer (or other person for whom the work was prepared) as Author of that part and leave the space for dates of birth and death blank

Was this contribution to the work a "work made for hire"?
☑ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of
Domiciled in  United States

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes  ☑ No
Pseudonymous?  ☐ Yes  ☑ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship  Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture     ☐ Map          ☐ Technical drawing
☑ 2 Dimensional artwork       ☐ Photograph   ☐ Text
☐ Reproduction of work of art ☐ Jewelry design ☐ Architectural work

**b**

Name of Author ▼

Dates of Birth and Death
Year Born ▼     Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

Author's Nationality or Domicile
Name of Country
OR { Citizen of
Domiciled in

Was This Author's Contribution to the Work
Anonymous?   ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes" see detailed instructions

Nature of Authorship  Check appropriate box(es) See Instructions
☐ 3 Dimensional sculpture     ☐ Map          ☐ Technical drawing
☐ 2 Dimensional artwork       ☐ Photograph   ☐ Text
☐ Reproduction of work of art ☐ Jewelry design ☐ Architectural work

**3**
**a**

Year in Which Creation of This Work Was Completed
1999
This information must be given in all cases

**b**

Date and Nation of First Publication of This Particular Work
Complete this information ONLY if this work has been published
Month     Day     Year
Nation

**4**

See Instructions before completing this space

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2 ▼
Mattel Inc
333 Continental Blvd
El Segundo CA 90245

Transfer If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2 give a brief statement of how the claimant(s) obtained ownership of the copyright ▼

APPLICATION RECEIVED
NOV 2 8 2003
ONE DEPOSIT RECEIVED
NOV 2 8 2003
TWO DEPOSITS RECEIVED
FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

**EXHIBIT B**

EXHIBIT 67

PAGE

MORE ON BACK ▶  Complete all applicable spaces (numbers 5-9) on the reverse side of this page
See detailed instructions        Sign the form at line 8

Page 1 of       pages

EXAMINED BY

CHECKED BY

☐ CORRESPONDENCE
   Yes

FORM VA

FOR
COPYRIGHT
OFFICE
USE
ONLY

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET**

**PREVIOUS REGISTRATION** Has registration for this work, or for an earlier version of this work, already been made in the Copyright Office?
☐ Yes  ☑ No  If your answer is "Yes" why is another registration being sought? (Check appropriate box.) ▼
a. ☐ This is the first published edition of a work previously registered in unpublished form
b. ☐ This is the first application submitted by this author as copyright claimant
c. ☐ This is a changed version of the work, as shown by space 6 on this application
If your answer is "Yes" give Previous Registration Number ▼          Year of Registration ▼

**5**

**DERIVATIVE WORK OR COMPILATION** Complete both space 6a and 6b for a derivative work; complete only 6b for a compilation
a. Preexisting Material Identify any preexisting work or works that this work is based on or incorporates ▼

b. Material Added to This Work Give a brief, general statement of the material that has been added to this work and in which copyright is claimed ▼

**6**
a

See instructions
before completing
this space

b

**DEPOSIT ACCOUNT** If the registration fee is to be charged to a Deposit Account established in the Copyright Office, give name and number of Account
Name ▼                                          Account Number ▼

Mattel Inc                                       DA037842

**CORRESPONDENCE** Give name and address to which correspondence about this application should be sent. Name/Address/Apt/City/State/ZIP ▼

Tania Krebs  Quinn Emanuel Urquhart Oliver & Hedges
865 South Figueroa Street, 10th Floor
Los Angeles  CA 90017 2543

Area code and daytime telephone number  (213) 443 3675          Fax number  (213) 624 0643
Email  taniakrebs@quinnemanuel.com

**7**
a

b

**CERTIFICATION*** I, the undersigned, hereby certify that I am the

check only one ▶

☐ author
☐ other copyright claimant
☐ owner of exclusive right(s)
☑ authorized agent of  Mattel Inc
                        Name of author or other copyright claimant, or owner of exclusive right(s) ▲

of the work identified in this application and that the statements made by me in this application are correct to the best of my knowledge

**8**

Typed or printed name and date ▼ If this application gives a date of publication in space 3, do not sign and submit it before that date
Tania Krebs                                                      Date  11 20-2003

Handwritten signature (X) ▼

X _____  11-20-03

**9**

Certificate
will be
mailed in
window
envelope
to this
address

Name ▼
Tania Krebs  Quinn Emanuel

Number/Street/Apt ▼
865 South Figueroa Street 10th Floor

City/State/ZIP ▼
Los Angeles  CA 90017 2543

*17 U.S.C § 506(e) Any person who knowingly makes a false representation of a material fact in the application for copyright registration provided for by section 409, or in any written statement filed in connection with the application, shall be fined not more than $2,500.

EXHIBIT

PAGE 52

# Exhibit 4

DALE M. CENDALI
(of counsel, not admitted in California)
DIANA M. TORRES (S.B. #162284)
PAULA E. AMBROSINI (S.B. #193126)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
email: dtorres@omm.com

PATRICIA GLASER (S.B. # 55668)
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for Plaintiff
MGA Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV 05 - 02727 CBM (Rz)

| | |
|---|---|
| MGA ENTERTAINMENT, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR FALSE DESIGNATION OF ORIGIN, AFFILIATION, ASSOCIATION OR SPONSORSHIP (15 U.S.C. § 1125 (a)); UNFAIR COMPETITION (15 U.S.C. § 1125 (a), Cal. Bus. & Prof. Code § 17200 *et seq.* and California Common Law); DILUTION (15 U.S.C. § 1125 (c), Cal. Bus. & Prof Code § 14330 and California Common Law); AND UNJUST ENRICHMENT** |
| v. | |
| MATTEL, INC., a Delaware Corporation, and DOES 1-10, | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

EXHIBIT 4

PAGE 69

Plaintiff MGA Entertainment, Inc. for its complaint against
Defendants Mattel, Inc. and DOES 1-10 alleges and avers as follows:

## PARTIES

1.      Plaintiff MGA Entertainment, Inc. ("MGA") is a California
corporation organized and existing under the laws of the State of California, with a
principal place of business in Van Nuys, California.

2.      MGA is informed and believes, and based thereon alleges, that
Defendant Mattel, Inc. ("Mattel") is a Delaware corporation with a principal place
of business in El Segundo, California.

3.      MGA is ignorant of the true names and capacities of the defendants
sued herein under the fictitious names DOES 1 through 10 inclusive.  MGA will
seek leave of court to amend this complaint to allege such names and capacities
when they are ascertained.  MGA is informed and believes, and based thereon
alleges, that each of the fictitiously named DOE defendants is responsible in some
manner for the wrongful conduct alleged herein.  MGA further alleges that each
defendant acted in concert with, as agent or representative for, or at the request or
on behalf of another or Mattel.  Each charging allegation contained herein is,
therefore, also hereby alleged against each fictitiously named DOE defendant.

## JURISDICTION AND VENUE

4.      Through this action MGA asserts claims against Mattel arising under
the Lanham Act, 15 U.S.C. Sections 1125 (a) and (c), California Business and
Professions Code Sections 17200 *et seq.*, California Business and Professions Code
Section 14330 and California common law.  This Court has original subject matter
jurisdiction over MGA's federal claims pursuant to 15 U.S.C. Sections 1116 and
1121, 28 U.S.C. Section 1338(a), and 28 U.S.C. Section 1331, and supplemental

1

EXHIBIT ____4____

PAGE ____70____

1  subject matter jurisdiction over MGA's state law claims pursuant to 28 U.S.C.

2  Section 1367(a).

3      5.    This Court has specific personal jurisdiction over Mattel, as it has

4  purposefully committed, within the State of California, the acts from which these

5  claims arise and/or has committed tortious acts outside California, knowing and

6  intending that such acts would cause injury to MGA within the state.  The Court

7  also has general personal jurisdiction over Mattel, as it conducts continuous,

8  systematic and routine business within the State of California and the County of

9  Los Angeles.

10      6.    Venue is proper in the United States District Court for the Central

11  District of California pursuant to 28 U.S.C. Sections 1391(b) and 1391(c).

12

13  ## FACTUAL BACKGROUND

14      7.    MGA seeks by this action to halt Mattel's habitual and unfair tactics of

15  competition-by-intimidation and serial copycatting of MGA's products, which

16  Mattel has used in an unbridled effort to cause confusion in the market place and

17  eliminate MGA as a competitor in the toy and fashion doll market long dominated

18  and controlled by Mattel.

19      8.    MGA is a privately-held company in the San Fernando Valley that

20  began in 1979 as a small consumer electronics business.  In 1987, the company

21  made its first foray into the toy business when it secured rights to market handheld

22  LCD games featuring licensed Nintendo® characters.  Building on that small

23  success, the company began marketing products for popular licensed properties

24  such as the "Power Rangers"® and "Hello Kitty"®.  This little-known but

25  successful company, however, was propelled into the limelight after its daring

26  release in June 2001 of an innovative line of fashion dolls called "BRATZ".

27  "BRATZ" are multi-ethnic fashion dolls that sport a fresh new urban and

28  contemporary look and fashion.  At the time of the release of "BRATZ", "Barbie"

EXHIBIT _____4_____

PAGE _____71_____

1  sales were in a slump, Mattel was in turmoil, and the market was ripe for something

2  new, exciting and inventive. "BRATZ" fit the bill. It is the first fashion doll that

3  has been able to seriously challenge "Barbie" for market share, and begin to loosen

4  Mattel's 50-year iron-fisted grip on the fashion doll market.

5      9.   Mattel has not taken kindly to the challenge. Either unable or

6  unwilling to compete against "BRATZ" fairly, and on a level-playing field, Mattel

7  has, instead, taken a more expeditious approach, resorting to unfair and anti-

8  competitive business practices. Wielding its substantial clout and influence in the

9  toy industry, Mattel has tried to muscle MGA out of business. MGA is informed

10  and believes that Mattel has intimidated, coerced and threatened retailers, licensees,

11  suppliers and others in the industry · both in the U.S. and internationally · in order

12  to inhibit and stifle MGA's ability to compete with Mattel and to prevent MGA

13  from obtaining licensees, contracts and supplies for its products. Mattel has also

14  serially imitated and copy-catted the look of MGA products, trade dress,

15  trademarks, themes, ideas, advertising and packaging, including for the "BRATZ"

16  line of dolls. MGA brings this action to stop Mattel's tortious, unfair and anti-

17  competitive conduct and to recover the extensive damage that Mattel's illicit

18  behavior has caused, and continues to cause, MGA. Mattel's own website states:

19  "As the global leader in the toy industry, we believe that how we achieve success is

20  just as important as the success itself." It also proclaims that "unwavering integrity

21  defines our corporate culture on every level, guiding how we work and how we do

22  business." Mattel's own corporate governance standards require it to "play by the

23  rules," complete fairly and be a good corporate citizen. Mattel's actions, however,

24  speak louder than its words.

25

26

27

28

3

EXHIBIT ___4___

PAGE _____72_____

## Mattel History and Performance

10.    Mattel is the world's largest toy company, but it owes its immense success chiefly to a single product: "Barbie." Since her debut in 1959, "Barbie" has been the fuel for Mattel's growth and success, turning Mattel into an international powerhouse. By the late 1990's, Mattel's annual sales of the doll approached or topped $1.8 billion and Mattel stock reached a record high of approximately $45.00 a share. At that time, the average American girl had eight "Barbie" dolls, and "Barbie" was the world's best-selling toy.

11.    Mattel's reliance on a single, 40-year old product for as much as 50% of its business turned out to be a risky business model, however. Resting on its laurels, Mattel failed to react to the shifting tastes of consumers, changing dynamics in the industry, and an increasing focus on technologically advanced and interactive toys. "Barbie's" record sales fell into a tailspin. According to one report, Adrienne Fontanella, Mattel's "Barbie" brand president, would later be quoted as saying that, "The world changed very quickly, and we missed a beat. . . Barbie wasn't talking to girls. She just wasn't hitting it."

12.    Sales began to plunge in 1997, and Mattel began posting a series of net income losses. In the first quarter of 1998, sales of the "Barbie" brand dropped 17%. This steep slide was followed by another in the second quarter, when sales fell again, down by 15%. By the end of 1998, Mattel reported an overall 14% decline in "Barbie" sales for the year and analysts were using words such as "devastating" and "a catastrophe" to describe Mattel's earnings. The company's stock fell as much as 27% in a single day. "Barbie" was having a crisis.

13.    Jill Barad, who had taken over as Mattel's chairman and chief executive in January 1997, at the height of Mattel's success, had to do something fast. Instead of focusing on and investing in new product development, however, which would obviously take time, Mattel embarked on a series of acquisitions that were seemingly aimed at quickly diversifying the company's product line and

4

EXHIBIT _____ 4

PAGE _____ 73

1   reducing its reliance on "Barbie" and on traditional retailers, such as Toys-R-Us
2   and Wal-Mart. Mattel spent a reported $881 million in March 1997 to purchase
3   Tyco Toys and acquire the "Matchbox" toy car brand. Just more than a year later,
4   it spent $700 million for the Pleasant Co., a mail-order doll company and maker of
5   the "American Girl" doll collection. And in December 1998, Mattel announced
6   plans to fork out a monumental $3.5 billion to buy the Learning Company,
7   followed quickly by Mattel's purchase, in March 1999, of a software company,
8   Purple Moon.

9       14.    Despite these acquisitions, the company continued to struggle. The
10   retail environment and buying patterns had unquestionably changed, but Mattel had
11   not kept up. Despite Mattel's feverish acquisitions, Mattel's mainstay and primary
12   profit-generator was still "Barbie." But "Barbie" had grown stale, and sales
13   languished. Posting additional losses in the first quarter of 1999, Mattel announced
14   that it would lay off 3,000 employees - 10% of its work force.

15      15.    Mattel's stock plummeted again in late 1999, dropping 30% on
16   Mattel's announcement that it would fall as much as 55% short of analysts' earning
17   estimates for the third quarter. Mattel blamed its troubles primarily on its
18   expensive, $3.5 billion acquisition of the Learning Company, which had turned out
19   to be a disaster fraught with licensing and distribution problems, bad debt, high
20   product returns and high advertising costs.

21      16.    By early 2000, Mattel's stock had crashed to as low as $8 per share,
22   and some analysts considered Mattel vulnerable to a takeover. Investors clamored
23   for Ms. Barad's resignation, and got their wish.

24      17.    Jill Barad resigned from Mattel in February 2000.

25      18.    For three months, the company was without a permanent chief
26   executive until Robert Eckert took the helm in May 2000. Mr. Eckert had spent 23
27   years at Kraft Foods, a subsidiary of Altria Group, Inc., and was widely credited

28

5

EXHIBIT _____ 4
PAGE _____ 74

with reviving its ailing cheese business. Investors looked for him to do the same for Mattel.

19.    Upon his arrival at Mattel, Mr. Eckert's promise, according to *Wall Street Journal* reports, was to deliver a "leaner and meaner" Mattel.

20.    The "leaner" Mattel came quickly. Mr. Eckert laid off hundreds, closed factories in the United States, shipped production to Mexico, and sold off the Learning Company at a fraction of what Mattel had paid for it. It helped Mattel's bottom-line, but did nothing to spur sales growth. Even under Mr. Eckert's "leaner meaner" leadership, domestic "Barbie" sales remained in a slump into 2001. In an industry that had become increasingly driven by consumer whims and fads, and the hot, must-have toys of the moment, Mattel remained disinterested in devoting its resources to searching for or developing a new blockbuster toy. Mr. Eckert's business plan was not to diversify, but to build upon and expand sales of its existing brands. Mattel was, after all, still generating billions in revenue despite the decline of "Barbie." And so, Mattel remained committed to its age-worn icon and its two other core brands, Fisher-Price and Hot Wheels, with each of the three accounting for approximately a third of the company's sales.

21.    Then came the competition – MGA's "BRATZ".

## "BRATZ" Dolls Revolutionize The Fashion Doll Market

22.    "BRATZ" challenged "Barbie's" half-century domination of the fashion-doll market like nothing ever before had been able to do.

23.    MGA unveiled a preliminary sample of the "BRATZ" doll at the Hong Kong Toy Fair in January 2001, while continuing to finalize the product throughout that spring. Finished products were first shipped in May 2001. MGA introduced the line to consumers in June 2001.

EXHIBIT _____4_____

PAGE _____75_____

24.   Unlike "Barbie" dolls, the "BRATZ" line of dolls and branded products sported a hip, multi-ethnic urban look that appealed to contemporary teenage and pre-teen girls.

### MGA's "BRATZ"



   

   

25.   · At approximately 9.5 to 10 inches tall, the "BRATZ" dolls were intentionally shorter than "Barbie" dolls and looked like no other, with disproportionately large heads, big, dramatic eyes and lips, small, thin bodies, oversized feet (to emphasize shoe fashion and to stand on their own, unlike "Barbie," which requires a stand), and up-to-date fashions.

EXHIBIT _____ 4
PAGE _____ 76

26.    Indeed, the classic "Barbie" look was nowhere to be seen in these dolls; they would never be confused with "Barbie".

<div style="display:flex">

**MGA's "BRATZ"**



**Mattel's "Barbie"**



</div>

27.    Featuring and embodying the slogan "The Girls With a Passion for Fashion!", "BRATZ" dolls revitalized, transformed and expanded the fashion doll market, in particular proving popular among "tween" age girls – those between childhood and adolescence – who had been all but abandoned as a market by Mattel.

28.    The "BRATZ" line – with its unique and distinctive look – is well recognized and has been critically acclaimed and praised by consumers, retailers and toy industry analysts alike. In 2001, the "BRATZ" line won the Toy Industry Association ("TIA") People's Choice Toy of the Year Award, the Family Fun Toy of the Year Award and Toy Wishes Hot Pick Award. In 2002, the "BRATZ" line again won the TIA People's Choice Toy of the Year Award and the Family Fun Toy of the Year Award. LIMA, the licensing industry's official arm, awarded MGA's "BRATZ" the best character license of the year as well as the overall best licensed property of the year for 2003. MGA's "BRATZ" also earned the coveted TIA "Property of the Year" and "Girl Toy of the Year" for 2003, as well as the Family Fun Toy of the Year Award. MSNBC named "BRATZ" the "Hottest Toy of the Year," and both MGA and "BRATZ" received several other accolades in

8

EXHIBIT _____ 4
PAGE _____ 77

2004, including the Suppliers Performance Award by Retail Category (the "SPARC" award) in the Girls' Toys category sponsored by DSN Retailing Today/Apparel Merchandising.

29.    Although but a tiny fraction of Mattel's size, with "BRATZ", MGA was able to chip away at Mattel's stranglehold on the fashion doll market, gaining shelf space and market share as "Barbie" sales remained flat or, at times, declined.

30.    The competition that MGA (once a licensee of Mattel!) and "BRATZ" posed to Mattel was unexpected and unwelcomed by Mattel. Where "Barbie" had once enjoyed a 90% share of the fashion doll market in 1997, that share had already slipped to 85% or less by the time of the release of "BRATZ". With the company still struggling under Mr. Eckert to overcome prior years of declining sales and mounting debt, "Barbie," Mattel — and Mr. Eckert — simply could not afford the untimely competition. Mr. Eckert's "leaner" Mattel was not enough to battle more potential erosion in "Barbie's" market share. Mattel had to combat "BRATZ" and MGA, and in the process revealed Mr. Eckert's "meaner" Mattel.

## Mattel's Response to "BRATZ" and Efforts to Thwart MGA's Competition

31.    Mattel was not poised to nimbly respond to "BRATZ" with a new, creative product of its own -- indeed, it had been antithetical to Mattel's corporate culture and mentality for Mattel to even conceive that a product might vie for shelf space with "Barbie", let alone be available for sale to consumers mere months after first being shown to retailers. Mattel had to take a more expeditious route.

32.    Instead of fairly competing, Mattel waged war against MGA using a wide-array of tortious, unfair and anti-competitive practices including systematic, serial copycatting and intellectual property infringement, aided by intimidation, threats and other acts of unfair competition and anti-competitive conduct, all with one goal in mind -- to banish MGA from the market -- or minimize its ability to capture any meaningful share before it could do any real harm to Mattel.

9

EXHIBIT _____ 4

PAGE _____ 78

**Mattel's serial copycatting and intellectual property infringement**

33.     Mattel's serial copycatting of MGA's product lines began with the "BRATZ" dolls themselves, but quickly extended to MGA's packaging, themes, accessories, advertising and even other product lines.

34.     The first four "BRATZ" dolls that MGA launched in 2001, named Jade, Yasmin, Cloe and Sasha, met their wannabe "BRATZ PACK" members in October 2002 with Mattel's launch of three "My Scene" dolls named Madison, Chelsea and "Barbie." This was no ordinary "Barbie", however. Indeed, not even close. Mattel designed its "My Scene" dolls to evoke the unique and distinctive look of the "BRATZ"   also with disproportionately oversized heads, artfully made-up almond-shaped eyes, large, overly-lined and lipsticked lips, trendy, hip clothes and hair styles, and over-sized feet.

| Mattel's Traditional "Barbie" | Mattel's "My Scene" Doll | |
|---|---|---|
| | circa 2002 | circa 2004 |

 

 

EXHIBIT ___4___

PAGE ___79___

35.   These confusingly similar "BRATZ" imitators may have been originally intended to buy Mattel time while it worked to release another product the following summer, called "Flavas". MGA's founder, Isaac Larian, was quoted by the media as having predicted that the move would backfire on Mattel, and it did. Released in July 2003, Mattel's "Flavas" dolls took the urban, "hip-hop" look too far, and were widely viewed as portraying a trampy, "bad-girl" image. The dolls were not well-received, and rumor has it that Mattel had to sell them at below cost prices to get rid of inventory. Most apparently wound up in discount bins, and Mattel has seemingly abandoned the line.

36.   Realizing that "My Scene" was its best bet for riding MGA's successful coattails and capitalizing on the unique and inherently distinctive look that MGA had developed in its "BRATZ" dolls – and MGA's substantial goodwill – Mattel has systematically proceeded to modify the "My Scene" dolls since their original release, particularly their eyes, to increase their similarity to "BRATZ" more and more over time.

37.   Indeed, when Mattel found out that its initial line of "My Scene" dolls had trouble competing with "BRATZ", they simply *became* "BRATZ", in every version, whether blonde, brunette or African American. A few pictures here are worth a thousand words.

### BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|
|  |  |  |

EXHIBIT ____4____

PAGE ____80____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Mattel's
Traditional "Barbie"**

**Mattel's
Original "My Scene"**

**Mattel's
Recent "My Scene"**





**BRUNETTE**

**Mattel's
Traditional "Theresa"**

**Mattel's
Original "My Scene"**

**Mattel's
Recent "My Scene"**









12

EXHIBIT _____ 4 _____

PAGE _____ 81 _____

## AFRICAN AMERICAN

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |
|---|---|---|










38.   The original "My Scene" eye, as shown here, for example, has recently turned into a virtual carbon-copy of the "BRATZ" eye.

### Original Mattel "My Scene" Eye





13

EXHIBIT _____4_____

PAGE _____82_____

39.   The "My Scene" eye pictured above, for instance, has lashes that radiate almost straight out, circumferentially, from the eyelids and, although the eye is more almond shaped than a "Barbie" eye, the eye is not so sleepy and heavy lidded as a "BRATZ" eye and is only lightly shadowed.  The new "My Scene" eye, in contrast, is dramatically more similar to a "BRATZ" eye, as shown below in a side-by-side comparison.  The doe-eyed innocent look of the "My Scene" eye shown above is gone; replaced with a sultrier look, characteristic of "BRATZ."  The new "My Scene" eye, as shown below, boasts lashes that sweep out and away from the outer corner of the eye, just like the "BRATZ" eye.  The new "My Scene" eye is also more heavy lidded and thickly lined, and the make-up is more markedly pronounced and dramatic.

**MGA's "BRATZ" Eye**                          **New Mattel "My Scene" Eye**

                          

40.   Indeed, the progression of the "My Scene" eye, as it has departed from "Barbie" and edged closer and closer to "BRATZ", is readily apparent from virtually every angle, as shown here:

14

EXHIBIT ____4____

PAGE ____83____

## BLONDE

| Mattel's Traditional "Barbie" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |



## BRUNETTE

| Mattel's Traditional "Theresa" | Mattel's Original "My Scene" | Mattel's Recent "My Scene" |



15

EXHIBIT _____ 4

PAGE _____ 84



EXHIBIT _____ 4

PAGE _____ 85

41.   Mattel has not stopped at the eyes, however.  Mattel has also incrementally but steadily modified its "My Scene" packaging, and the manner in which the dolls are displayed, to more closely mimic the packaging, trade-dress and overall look and total image of MGA's "BRATZ".

42.   To illustrate, Mattel's "My Scene" dolls were initially marketed like this:

### Mattel's Early "My Scene" Packaging

 

43.   Little by little, however, the packaging has changed, creeping ever closer and closer to the open and transparent style of the "BRATZ" packaging. First, the panels seen running down each side of the front of the "My Scene" box shown above, framing the doll and giving the packaging a closed-in look, were changed as shown here:

### Intermediate Mattel "My Scene" Packaging



17

EXHIBIT ___4___

PAGE ___86___

44.     Mattel replaced this intermediate packaging style with another that looked even more similar to the "BRATZ" packaging, as shown here in a side-by-side comparison:

MGA's "BRATZ"
"Wintertime Wonderland" Packaging

Mattel's "My Scene"
"Chillin' Out" Packaging





45.     Then later, Mattel changed its packaging and product display yet again to look even more closely and confusingly similar to MGA's packaging and "*tout ensemble*," as shown here

MGA's "BRATZ"
"SPORTZ" Packaging

Mattel's Recent "My Scene"
"MIAMI GETAWAY" Packaging





EXHIBIT ___4___

PAGE ___87___

46.   In this incarnation, Mattel notably abandoned the signature figure-eight style design that had appeared on its prior "My Scene" packaging, making this recent version clearer and more transparent on the front and sides than ever before, and much more like "BRATZ", accordingly.  Mattel also discarded its traditional, rectangular shaped box and, like "BRATZ", adopted an unusual, non-rectangular shaped box.  Mattel even adopted the "flying banner" ribbon-style slogan running across the middle of the box, similar to that used on the "BRATZ" packaging.

47.   As if these pointed and deliberate efforts to confuse and mislead consumers were not enough, Mattel exacerbated the confusion, and furthered the impression that the "My Scene" line and the "BRATZ" line are related, by taking up MGA's practice of regularly releasing new dolls in connection with a theme -- but not just *any* theme, often *MGA's theme.*

48.   For example, when MGA released its "Wintertime Wonderland" theme in Fall 2003, Mattel released its "Chillin Out!" theme.  Each doll in MGA's line came with winter-sports accessories, such as a snowboard or skis and ski boots.  Each doll in Mattel's line featured winter sports accessories, also including snowboards or ski and ski boots.  Even MGA's color schemes and some of the clothing styles seemed to have made their way into the Mattel products.

49.   When MGA released its "Formal Funk" theme, Mattel released its "Night on the Town" theme.  "BRATZ Formal Funk" was an elaborately themed line with its dolls in hip formalwear; so was Mattel's "Night on the Town."

50.   When MGA released its distinctive "Sun-Kissed Summer" theme, Mattel released its confusingly similar "Jammin' in Jamaica" theme.  Each line featured a bright blue-and-orange color scheme, beach accessories, such as surfboards, and beachwear clothing.  Mattel's "Jammin' in Jamaica" "Guava Gulch Tiki Lounge" playset also contained elements remarkably similar to MGA's "Sun-Kissed Summer" playset.

EXHIBIT ___4___

PAGE ___88___

51.     Mattel also began running television commercials for its "My Scene" dolls bearing a remarkable similarity to "BRATZ" commercials, combining live action with animated sequences set to similar sounding pop music and lyrics.

52.     Mattel even stooped so low as to mimic "BRATZ" accessories and related products in order to further create consumer confusion in the marketplace.

53.     For instance, when MGA came up with its distinctive "BRATZ" "Runway Disco", Mattel came out with a "My Scene" Sound Lounge with packaging that imitated MGA's trapezoidal box.

54.     Mattel's conduct cannot be explained by sheer coincidence, nor is it merely fair competition. It is a calculated and intentional effort unquestionably designed to trade off of MGA's hard work and goodwill, create confusion in the marketplace, steal MGA's thunder and momentum, and dilute and blur away the novelty and distinctiveness of MGA's products. Out of the seemingly endless possibilities that Mattel could have chosen for a new line of dolls, packaging, themes, color schemes, commercials, accessories and playsets, Mattel deliberately chose *not* to come out with something unique, new or different and has, instead, focused its efforts and resources on flooding the market with something so close to "BRATZ" that the public will, can, and does, simply mistake it for "BRATZ".

55.     As yet another example of this, when MGA came out with a "BRATZ" "Funky Fashion Makeover Head," Mattel came out with a confusingly similar – indeed, practically identical – "My Scene" styling head.

20

EXHIBIT __4__

PAGE __89__

| MGA's "BRATZ" "Funky Fashion Makeover Head" | Mattel's "My Scene" "Stylin' Head" |
|---|---|

   

   

56.    Indeed, Mattel's "My Scene" styling head is so close to the "BRATZ" styling head that even the press have mistakenly pictured and identified it as MGA's "BRATZ". The picture of Mattel's "My Scene" styling head shown below, for instance, appeared in the press with a caption indicating that the child was trying out different hairstyles "on a *Bratz* hair and makeup doll head."

Hair style practice

21

EXHIBIT _____ 4

PAGE _____ 90

57.   Creating further confusion, Mattel's television commercial for its "My Scene" styling head was like watching a re-run of MGA's commercial for its "Funky Fashion Makeover Head".

58.   At one point in time, Mattel also used a portion of the "BRATZ" dolls' now-famous trademarked tag line "The Girls With a Passion for Fashion" on Mattel's website for its "Diva Starz" dolls, asking its website users: "Do you have a passion for fashion?"

59.   Mattel has even recently come out with a confusingly similar line of "My Scene" plush pets, which adopt the distinctive look of MGA's "BRATZ" line. The "My Scene" pets feature large, humanlike eyes and wear clothing making them remarkably and confusingly similar to "BRATZ" products, including "BRATZ PETZ", as seen in this example where the pets each wear a jacket, a cap and carry a purse:

<u>**MGA's "BRATZ Dogz"**</u>                <u>**Mattel's "My Scene" dog**</u>

          

60.   And here too, Mattel chose to package its pets the same way that MGA packaged its "BRATZ PETZ", sitting in an open box, with no top and with partial side panels that slope from a narrow front panel to a higher back panel.

61.   Indeed, the similarity of the "My Scene" pets to "BRATZ PETZ" has confused even sophisticated retailers who have mistakenly merchandised "My Scene" dogs in the middle of the "BRATZ" section of a retail display, next to and as if they were part of MGA's "BRATZ Petz" line.  It comes as no surprise that

22

EXHIBIT _____4_____

PAGE _____91_____

1   customers too have been confused.

2       62.   Indeed, Mattel's television commercials and "My Scene" products

3   have become so confusingly similar to MGA's that even advertising executives

4   have expressed concern. One went so far as to say that although imitation is the

5   best form of flattery, what the individual had seen at Mattel's showroom, and how

6   its "My Scene" dolls now look so confusingly similar to "BRATZ", was

7   "shocking." This person further opined that it was clear that Mattel is intending to

8   confuse customers and capture "BRATZ" market share, and even asked MGA if it

9   was considering legal action.

10      63.   The press also has taken notice of Mattel's attempts to confuse

11   consumers. On or about February 18, 2005, a visitor to MGA's showroom from a

12   prominent news publication stated, "Oh my, I just came from Mattel's showroom

13   and their new 'My Scene' packaging is just like 'BRATZ' minus the handle."

14   Another member of the press visiting MGA's showroom offered the unsolicited

15   comment, "have you seen the new 'My Scene' dolls eyes are exactly like

16   'BRATZ'?" Yet another opined that Mattel's "My Scene" line was exactly like

17   "BRATZ", indeed, so much so that the reporter confusingly thought that Mattel had

18   bought "BRATZ", and still another has commented on Mattel's imitation of MGA.

19   On or about February 16, 2005, during an interview of a Mattel representative on

20   local network news in New York, "My Scene Barbie" was displayed by a Mattel

21   representative. During conversation about the dolls, the interviewer exclaimed that

22   they looked like "BRATZ". The Mattel representative just laughed -- but this is no

23   laughing matter. This colloquy was available for replay and viewing, and was even

24   transcribed, on the internet.

25      64.   Customers too have been similarly confused. Some actually contacted

26   MGA seeking to purchase "My Scene" dolls.

27      65.   Mattel's conduct is planned, deliberate and intentional. Mattel has

28   systematically, copied, imitated and liberally borrowed many of the distinctive,

EXHIBIT _____ 4

PAGE _____ 92

essential elements that identify and make "BRATZ" dolls "BRATZ" dolls, diluting the brand, creating customer confusion, and unfairly stifling competition.

66.  Ironically, Mattel sued one of its other competitors in Europe for doing much the same thing: "systematically copying and borrowing elements" from "My Scene", on grounds that "this conduct constitutes unfair competition and passing off." Indeed it does.

67.  What is more, Mattel's conduct has reached beyond "BRATZ" and "BRATZ"-related products to include other new MGA toy lines.

68.  For example, MGA's "4-Ever Best Friends" line was the obvious, and well-recognized model for Mattel's "Wee 3 Friends" line. Mattel even adopted changes to the color scheme of its similarly-shaped packaging to create confusion with MGA's distinctive packaging.

**MGA's "4-Ever Best Friends"**    **Mattel's "Wee 3 Friends"**

   

   

24

EXHIBIT  4

PAGE  93

69.   In the second half of 2002, MGA's "Mommy's Little Patient," originally designed as the first in a series of "Mommy's Little . . ." dolls, was followed by Mattel's "Little Mommy" doll.

|   MGA's<br>"Mommy's Little Patient"   |   Mattel's<br>"Little Mommy Potty Training Baby Doll"   |
| --- | --- |
|  |  |

70.   Sparing nothing, Mattel has also extended its monkey-see monkey-do behavior into its boys' line.  When MGA came out with its "Alien Racers" line of toy racing vehicles, for instance, Mattel rushed to revamp and rename one of its "Hot Wheels" lines.  Although well-known and clearly branded for decades as "Hot Wheels", Mattel's answer to MGA's "Alien Racers" was to re-brand and market its Hot Wheels Highway 35 line under an "AcceleRacerS" logo.  MGA's line consists of "extreme" radio controlled racing vehicles marketed in connection with a strong, almost battle-like, science fiction theme.  MGA's logo accentuates the "A", "R", and "S" in compressed block lettering.  Mattel's line also consists of extreme racing vehicles marketed in connection with a strong, almost battle-like, theme.  Mattel's logo too accentuates the "A", "R", and "S" in compressed block lettering.

25

71.    Here, too, Mattel's mimicry has spilled over into Mattel's advertising and thematic presentation and marketing of this toy line. In particular, Mattel has adopted MGA's "other-worldly" theme in its commercials. For instance, in Mattel's commercials, the product, whose logo appears as "AcceleRacerS", now compete against alien-like Cyborgs engaged in a "race to save the world," mimicking MGA's alien theme and commercials in which MGA's "Alien Racers" are engaged in a "race to save the universe."

72.    None of this is coincidence. Mattel has deliberately adopted a pattern and practice of coming out with variations of MGA's products to create confusion in the marketplace, interfere with MGA's business and divert profits away from MGA. Mattel says, on its website, that it is in the business of creating "[t]he world's premier toy brands [of] today and tomorrow." It seemingly does so, however, by borrowing liberally from its competitors, even when it refreshes its own existing brands and products.

73.    MGA has suffered extensive injury from Mattel's conduct. Mattel's habitual, serial simulation of MGA's products, product lines and trade dress has allowed Mattel to take a free ride on the extensive amount of time, expense and creative development MGA expends on developing new products, product packaging and presentation, giving Mattel an unfair advantage, and making it virtually impossible for MGA to compete with Mattel on a level playing field.

**Mattel's additional unfair, manipulative, anti-competitive conduct**

74.    This already substantial injury has been exacerbated by the strong-arm tactics, and other illegitimate, unfair and anti-competitive means that Mattel has used to manipulate the market and ensure that its control and domination of the industry can continue unabated.

EXHIBIT _____ 4

PAGE _____ 95

75.   For example, wielding the litigation privilege as a potential shield for intimidating conduct, Mattel has sent threatening letters to several of its former employees who now work for MGA warning them not to disclose *even publicly available information* about Mattel, including the names and positions of Mattel employees. Mattel even went so far as to sue one of its former senior executives, after he had the temerity to resign and join MGA in October 2004. Not only was Mattel's lawsuit dismissed for failure to state a viable claim, but Mattel thereafter seemingly could not muster up a shred of evidence sufficient to support an amended complaint. As a result, Mattel's case against its former executive was dismissed with prejudice.

76.   Mattel has also warned a number of companies, including the biggest publishing entity in the United Kingdom, not to license MGA products, or risk retribution. The threats are not idle. In May 2004, Mattel terminated one of its licensees, apparently in retribution for licensing "BRATZ". While some companies have been courageous enough to take the risk, others have not, and MGA has lost valuable licensing opportunities as a result.

77.   Mattel has used similar intimidation to pressure distributors and retailers, particularly in foreign countries, not to distribute "BRATZ", to reduce shelf and display space for "BRATZ" and to place "BRATZ" in unfavorable locations at retail outlets.

78.   When MGA faced a shortage of doll hair in October 2002, MGA is informed and believes that the reason for that shortage was that Mattel had locked MGA out by buying up the supply from the two main hair supply companies.

79.   Mattel has also manipulated the retail market. For instance, Mattel merchandisers have been caught tampering with MGA's retail displays, replacing favorably located MGA merchandise with Mattel merchandise instead. MGA is also informed and believes that Mattel has falsely told a major United States retailer that MGA was giving another major United States retailer below-market pricing

27

EXHIBIT _____4_____

PAGE _____96_____

1   and falsely told a United Kingdom retailer that MGA was discontinuing one of its
2   lines, in order to make such line less attractive to buyers and thereby attempt to
3   increase sales of the competitive Mattel product and improve its own sales, at
4   MGA's expense.

5          80.   Even supposedly unbiased and impartial industry organizations have
6   fallen prey to Mattel's abusive wield of power, to MGA's detriment.

7          81.   NPD Funworld ("NPD"), for one, is the leading supplier of sales
8   statistics in the toy industry.  Accurate NPD statistics are essential for efficient
9   product-line management.  Without these statistics, it is difficult, if not impossible,
10  for toy companies to assess and measure the relative success of their products in
11  key categories.  It is, however, a subscription service, and NPD restricts the manner
12  in which its subscribers may use the data it provides.

13         82.   Mattel has regularly ignored the restrictions -- using NPD data about
14  Mattel's comparative standing relative to other companies in press releases and in
15  communications with retailers and financial investors who are not NPD subscribers.

16         83.   Mattel generates substantially more annual subscription revenue for
17  NPD than does MGA, and carries more clout.

18         84.   After MGA had subscribed to the service for more than 12 years, NPD
19  terminated MGA's subscription in 2003 theoretically on the grounds that MGA
20  misused NPD data in a press release.

21         85.   MGA is informed and believes that the termination was the result of
22  pressure from Mattel, notwithstanding Mattel's own frequent violations of NPD's
23  restrictions.

24         86.   In addition to this, the market share numbers that NPD generates are
25  heavily dependent on the category in which NPD places a particular product.  MGA
26  is informed and believes that Mattel also pressured NPD into changing certain
27  product classifications for its "BRATZ" products in order to manipulate the data

28

28

EXHIBIT ___4___

PAGE ___97___

1  and preserve Mattel's market share rankings in the critical fashion doll category –

2  and thereby lower MGA's.

3      87.    The Children's Advertising Review Unit ("CARU") is another

4  organization that, upon information and belief, appears to have been subject to

5  improper influence by Mattel.  CARU is the toy industry's supposedly independent

6  self-regulatory body in charge of maintaining standards in advertising.  CARU's

7  approval is considered critical within the toy industry to avoiding regulatory action

8  by the Federal Trade Commission.

9      88.    CARU is heavily subsidized by Mattel.

10      89.    Upon information and belief, Mattel has used its influence as a major

11  contributor to CARU's budget to induce CARU to place onerous restrictions on

12  MGA advertisements, and require MGA to amend aspects of commercials that have

13  gone unchallenged in other parties' commercials.

14      90.    As a result of CARU's restrictions, MGA has been forced to incur

15  unnecessary costs for reshooting and producing or re-editing its commercials.

16      91.    On several occasions, CARU has also either strongly suggested, if not

17  also required, that MGA respond to inquiries about its website policies and make

18  substantial changes to the "BRATZ" website notably and significantly in excess of

19  restrictions imposed on Mattel and others.

20      92.    Even TIA, the toy industry's trade association, is apparently not

21  untainted by Mattel's influence and power.  Each year, TIA presents the Toy-of-

22  the-Year Awards, the most prestigious of which had been the award for Toy of the

23  Year.  Winning the Toy of the Year Award is a significant achievement that not

24  only very likely increases the sales of the winning toy, but also denotes the winning

25  company as a leader in toy innovation and generates substantial goodwill with

26  retailers, distributors, licensees, and customers.

27      93.    For the years 2000 (the first year of the award), 2001 and 2002, the

28  Toy of the Year award was chosen by consumer vote.  The awards ceremony was

EXHIBIT _____4_____

PAGE _____98_____

then held the following year, at a dinner in New York. (For example, the awards dinner for the year 2000 award was held in February 2001). Leap Frog won the 2000 People's Choice Toy of the Year Award and MGA won the 2001 and 2002 People's Choice Toy of the Year Awards. With the 2003 Toy of the Year Award, however, the rules suddenly changed. Now, the award is selected by members of the industry.

94.    Upon information and belief, this change was orchestrated by a Fisher Price (a Mattel subsidiary) executive who, until recently, served as the Chairman of TIA.

95.    Perhaps not surprisingly given this change in the winner selection procedures, "Hokey Pokey Elmo" ("Elmo"), a Fisher Price toy, won for the year 2003 (awarded in 2004), beating out the other leading nominee, "BRATZ Formal Funk Super Stylin' Runway Disco."

96.    TIA has refused to provide MGA with the vote count procedure and totals for this award, despite repeated requests.

97.    MGA is also informed and believes that Mattel was instrumental in attempting to keep MGA from participating as a sponsor in this year's "Kids' Choice Awards."

98.    Mattel has clearly engaged in tortious, illegal and unethical behavior in its unfettered efforts to disrupt, if not destroy, MGA. Indeed, this is apparently Mattel's current *modus operandi* when it comes to "competing" in the industry. The once immensely successful "LeapFrog" interactive learning product, for example, has apparently been one of Mattel's other recent victims.

99.    Mattel may not shield its illegal, unfair and unethical business practices from the public eye. It is time for the truth to be told, and the world to know of Mattel's unfair, unethical and illegal business practices and unfair competition. "Barbie" does not "play nice" with others (particularly her competitors), and needs to be taught how "to share" (at least in the fashion doll marketplace). She cannot be

EXHIBIT _____4_____

PAGE _____99_____

1    allowed to continue to be the playground bully and trample on the rights of others,

2    including MGA.

3        100.   As a result of Mattel's manipulative, illegal, unfair, unethical and anti-

4    competitive conduct, MGA has suffered and, unless abated, will continue to suffer

5    lost sales, lost licensing fees, lost contracts, lost relationships, lost business

6    opportunities and other damages and harm for which there is no adequate remedy at

7    law. Its ability to enter new markets and product lines has been hampered and

8    delayed. Its production costs have increased, its reputation and relationships with

9    important players in the industry have been negatively impacted, the value of its

10   business has been diminished, and its ability to attract, hire and retain employees

11   has been affected.

12

13   ## FIRST CLAIM FOR RELIEF

14   **(False Designation of Origin or Affiliation in Violation of 15 U.S.C. § 1125 (a))**

15       101.   MGA repeats and realleges the allegations contained in paragraphs 1

16   through 100 of this Complaint and incorporates them by reference as though fully

17   and completely set forth herein.

18       102.   MGA's "BRATZ" line has a unique and distinctive style and

19   distinctive characteristics, such as the disproportionately large head, large dramatic

20   eyes with a distinctive presentation (including the eye shape, make-up and lashes),

21   pouty, plump lips with a distinctive presentation (including the lip shape and make-

22   up), small, thin bodies, oversized feet, and up-to-date fashions. MGA's "BRATZ"

23   line is known for and recognized by the total image that is presented by its product

24   and the style and arrangement of the packaging and display. This *"tout ensemble"*

25   is representatively described and depicted herein. The characteristics of MGA's

26   "BRATZ" line, alone or in combination, have come to identify the "BRATZ" line

27   and its source, MGA, and thus serve as protectable trade dress. MGA's trade dress

28   in its "BRATZ" line is purely aesthetic and non-functional or, if any utility exists, it

31

EXHIBIT _____ 4

PAGE _____ 180

is not essential to the purpose, quality or source identifying attributes of the
aesthetics. MGA's trade dress in its "BRATZ" line is inherently distinctive or has
acquired distinction within the meaning of the Lanham Act.

103. Similarly, MGA's "BRATZ PETZ," part of the "BRATZ" line, also
has its own unique and distinctive characteristics, such as the humanlike eye and
unusual appearance of the animals dressed in clothing. MGA's "BRATZ PETZ"
line has become known for and recognized by the total image that is presented by
the product and the style and arrangement of its packaging. This *"tout ensemble"* is
representatively described and depicted herein. The characteristics of MGA's
"BRATZ PETZ", alone or in combination, have come to identify the "BRATZ
PETZ" line and its source, MGA, and thus serve as protectable trade dress. MGA's
trade dress in its "BRATZ PETZ" line is purely aesthetic and non-functional or, if
any utility exists, it is not essential to the purpose, quality or source identifying
attributes of the aesthetics. MGA's trade dress in its "BRATZ PETZ" line is
inherently distinctive or has acquired distinction within the meaning of the Lanham
Act.

104. Mattel's production, sale and marketing of "My Scene" dolls,
including styling heads and doll heads, and "My Scene" pets that are confusingly
similar to MGA's "BRATZ" line (including its "BRATZ PETZ"), without MGA's
permission or consent, constitutes designation and use of a term, symbol, device or
combination thereof that is false or misleading within the meaning of 15 U.S.C.
Section 1125 and is likely to cause confusion, or to cause mistake, or to deceive as
to the affiliation, connection, or association, or as to the origin, sponsorship, or
approval of Mattel's goods or commercial activities, within the meaning of 15
U.S.C. Section 1125. MGA has been damaged by Mattel's acts.

105. Mattel's conduct has been intentional and willful, and is calculated
specifically to trade off the goodwill that MGA has developed in its successful
"BRATZ" line. By its aforesaid acts, particularly its imitation of the distinctive

32

EXHIBIT 4

PAGE 101

1  features of MGA's "BRATZ" line in connection with goods sold and distributed in

2  interstate commerce, Mattel has infringed and is likely to continue to infringe on

3  MGA's substantial rights in and to the "BRATZ" line trade dress. In so doing,

4  Mattel has falsely represented and designated to the public generally and consumers

5  of fashion doll products specifically the source and origin of Mattel's "My Scene"

6  fashion doll products in violation of 15 U.S.C. § 1125(a).

7      106.  MGA has been damaged by, and Mattel has profited from, Mattel's

8  wrongful conduct in an amount to be proven at trial.

9      107.  For each act of infringement, MGA is entitled to recover its actual

10  damages as well as Mattel's profits from such infringement.

11      108.  Monetary relief alone, however, is not adequate to address fully the

12  irreparable injury that Mattel's illegal actions have caused and will continue to

13  cause MGA, if not enjoined.  MGA is therefore entitled to preliminary and

14  permanent injunctive relief to stop Mattel's ongoing infringement of MGA's trade

15  dress.

16              **SECOND CLAIM FOR RELIEF**

17  **(Unfair Competition in Violation of 15 U.S.C. § 1125 (a) and Unfair**

18  **Competition and Unfair Business Practices in Violation of Cal. Bus. & Prof.**

19  **Code § 17200 *et seq.* and California Common Law)**

20      109.  MGA repeats and realleges the allegations contained in paragraphs 1

21  through 108 of this Complaint and incorporates them by reference as though fully

22  and completely set forth herein.

23      110.  Mattel has deliberately and, indeed, repeatedly adopted, imitated and

24  mimicked the make-up, appearance, features, trade dress, and image of MGA's

25  products, packaging and advertising, including its repackaging and refreshing of

26  older Mattel toys.  Mattel's actions were and are done with the intent to deceive

27  consumers, cause confusion and mistake, and interfere with the ability of

28  consumers to identify the source of goods by appearance and packaging.  By this

EXHIBIT _____ 4

PAGE _____ 102

conduct, Mattel pirates and exploits, by subliminal or conscious association with MGA, the goodwill and reputation of MGA and derives benefit therefrom.

111. Mattel has particularly and deliberately poached upon the commercial magnetism of MGA's "BRATZ" and the success of "BRATZ". Mattel's conduct has been intentional and willful, and is calculated specifically to trade off the goodwill that MGA has developed in its successful "BRATZ" line.

112. By its acts, including its intentional imitation of the distinctive features of MGA's "BRATZ" dolls, which has progressively become closer and closer, as well as its imitation of "BRATZ" themes, packaging and the overall look, feel and total image of the "BRATZ" line, imitation of other MGA products, packaging and advertising, and other conduct alleged herein, Mattel has engaged in unfair competition under both federal and California state law.

113. Mattel has also willfully and maliciously used its power, influence and intimidation to threaten certain retailers, suppliers, licensees, distributors and manufacturers so as to limit, if not prevent, MGA from doing business with these retailers, suppliers, licensees, distributors and manufacturers, using its power and influence to intimidate and manipulate industry bodies. Mattel has further used its power and influence to attempt to, if not actually, intimidate and threaten MGA's current and potential employees so as to cause MGA competitive injury.

114. Alone, in combination, or in totality, Mattel's actions discussed and alleged herein constitute unfair competition and unfair business practices within the meaning of federal law, California statutory law and/or California common law.

115. As a result of its conduct, Mattel has derived substantial monetary and non-monetary benefit and business advantage. Mattel has also wrongfully diverted profits away from MGA and to Mattel and, on information and belief, deprived MGA of the patronage of a large number of actual and potential customers.

116. MGA has been damaged by, and Mattel has profited from, Mattel's wrongful conduct in an amount to be proven at trial.

EXHIBIT _____4_____

34

PAGE _____103_____

1    117. Monetary relief alone, however, is not adequate to address fully the

2    irreparable injury that Mattel's actions have caused and will continue to cause

3    MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent

4    injunctive relief to stop Mattel, and all persons acting in concert with Mattel, from

5    engaging in acts of unfair competition and unfair business practices.

6    118. MGA is further entitled to relief whereby Mattel is ordered to pay

7    restitution for damages resulting from Mattel's unfair competition and unfair

8    business practices.

9    ### THIRD CLAIM FOR RELIEF

10   **(Dilution in Violation of 15 U.S.C. § 1125 (c); Cal. Bus. & Prof. Code § 14330**

11   **and California Common Law)**

12   119. MGA repeats and realleges the allegations contained in paragraphs 1

13   through 118 of this Complaint and incorporates them by reference as though fully

14   and completely set forth herein.

15   120. The look and trade dress of the MGA products referenced herein are

16   distinctive and famous, and have been since before Mattel launched its similar

17   versions. By its aforesaid acts, Mattel caused and continues to cause blurring and

18   dilution of the distinctive look of MGA's products and trade dress, which

19   previously served as a unique source identifier for MGA, within the meaning of the

20   Lanham Act, California Business and Professions Code § 14330 and/or California

21   common law.

22   121. Mattel's conduct has been intentional and willful, calculated

23   specifically to trade on MGA's goodwill and reputation and to cause dilution of

24   MGA's famous marks, particularly those connected with MGA's famous and

25   successful "BRATZ" doll head, "BRATZ" doll product line, "BRATZ Funky

26   Fashion Makeover Head" and "BRATZ PETZ" line.

27   122. MGA has been damaged by, and Mattel has profited from, Mattel's

28   wrongful conduct in an amount to be proven at trial.

35

EXHIBIT ___4___

PAGE ___104___

123. Monetary relief alone, however, is not adequate to address fully the irreparable injury that Mattel's actions have caused and will continue to cause MGA, if not enjoined. MGA is therefore entitled to preliminary and permanent injunctive relief to stop Mattel's ongoing dilution.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment)

124. MGA repeats and realleges the allegations contained in paragraphs 1 through 123 of this Complaint and incorporates them by reference as though fully and completely set forth herein.

125. As a result of the conduct alleged herein, Mattel has been unjustly enriched to MGA's detriment. MGA seeks a worldwide accounting and disgorgement of all ill-gotten gains and profits resulting from Mattel's inequitable activities.

## PRAYER FOR RELIEF

WHEREFORE, MGA prays for relief, as follows:

1. That Mattel, its agents, servants and employees and all persons acting in concert be restrained preliminarily and permanently from directly or indirectly:

    a. using confusingly similar trade dress;

    b. improperly influencing, or attempting to improperly influence, standard-setting and industry organizations;

    c. engaging in unfair competition and unfair business practices; and

    d. diluting MGA's trade dress;

2. For general and actual damages, according to proof at trial but believed to reach or exceed tens of millions of dollars;

3. For the disgorgement of all profits derived by Mattel for its acts of:

    a. false designation of origin or affiliation;

36

EXHIBIT ____4____

PAGE ____105____

1    b. unfair competition and unfair business practices; and

2    c. dilution;

3  4. For costs of suit and reasonable attorneys' fees;

4  5. For punitive and/or exemplary damages as a result of Mattel's willful

5 and malicious conduct to the extent allowable by law; and

6  6. For such other and further relief as the Court deems just and proper.

7

8 Dated:  April 13, 2005    PATRICIA GLASER

9            CHRISTENSEN, MILLER, FINK,
              JACOBS, GLASER, WEIL &
10           SHAPIRO LLP

11           DALE M. CENDALI
              DIANA M. TORRES
12           PAULA E. AMBROSINI
              O'MELVENY & MYERS LLP

13

14

15           By:

16            Diana M. Torres
              Attorneys for Plaintiff
17           MGA ENTERTAINMENT, INC.

18

19

20

21

22

23

24

25

26

27

28

             37

EXHIBIT ___4___

PAGE ___106___

## DEMAND FOR JURY TRIAL

MGA hereby demands a jury trial on all triable issues.

Dated:      April 13, 2005

PATRICIA GLASER
CHRISTENSEN, MILLER, FINK,
JACOBS, GLASER, WEIL &
SHAPIRO LLP

DALE M. CENDALI
DIANA M. TORRES
PAULA E. AMBROSINI
O'MELVENY & MYERS LLP

By: _____
Diana M. Torres
Attorneys for Plaintiff
MGA ENTERTAINMENT, INC.

38

EXHIBIT ____4____

PAGE ____107____