# Exhibit 51

CALENDARED

ENTERED
CLERK, U.S. DISTRICT COURT

JAN 1 2 2006

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION          BY DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(D).

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT,<br><br>                    Plaintiff,<br><br>v.<br><br>MATTEL, INC.,<br><br>                    Defendant.<br><br>and related actions. | CASE NO. CV-04-9049-SGL<br><br>(Consolidated with cases CV-04-9059 and CV-05-2727)<br><br>ORDER REGARDING MATTEL'S MOTION FOR LEAVE TO AMEND |

This case has, increasingly, become one of the proverbial tail wagging the proverbial dog.

Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles County Superior Court against its former employee and the reputed creator of the BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law theories relating to certain agreements Bryant signed while an employee with Mattel, namely, an Employee Confidential Information and Inventions Agreement ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI Questionnaire"). Although couched in state law terms and ostensibly pled as a simple employment action, lurking beneath the allegations in the complaint was whether Bryant had either misappropriated Mattel's intellectual property or

1  resources in creating and/or developing the BRATZ dolls or whether he continued

2  to develop his BRATZ design while still working in Mattel's employ. In either event,

3  the rights to the BRATZ dolls could become the property of Mattel, either through

4  infringement or through operation of the agreements noted above. The case was

5  later removed to this Court and was assigned the case number CV-04-9059. MGA

6  Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7  protect its rights to Bratz dolls" that were at stake in the action. Mattel, Inc. v.

8  Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9  significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10  property, i.e., the Bratz creations, were decided in the absence of MGA").

11       In the interim, Bryant filed a declaratory judgment action in this Court,

12  seeking for the Court to declare that his BRATZ doll creations did not infringe

13  Mattel's copyright in its Toon Teens products. See Court's July 18, 2006, Order at

14  3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15  products,' . . . the substance of his allegations all address the product 'Toon

16  Teens'"). The declaratory judgment action was assigned the case number CV-04-

17  9049.

18       MGA then filed an action against Mattel in this Court broadening the scope

19  of the controversy beyond that concerned with the ownership rights to the BRATZ

20  doll line. MGA's complaint asserted various Lanham Act claims and their California

21  state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22  competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23  ¶ 7). In essence, although the prior actions were concerned with ownership in the

24  rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25  had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26  MGA's complaint did make mention of other products that were affected by Mattel's

27  alleged predatory business practices, but by far the largest portion of its complaint

28  concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

EXHIBIT    51
PAGE    637

line of BRATZ dolls.[1]

By Order dated June 19, 2006, the Court consolidated all three cases "for all purposes" as they "involve[d] a number of common issues of law and fact." As the Court later noted in its August 10, 2006, Order: "At its heart, this case asks the question: Who owns the rights to the Bratz dolls?" Resolution of this question lies at the heart of or, at the very least, affects many of the other claims set forth in each of the three respective cases. For instance, even though the allegations in 05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot many of those allegations. It is hard to imagine how it is unlawful for a company to thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel owned the rights to the BRATZ dolls, many of the allegations in the 05-2727 complaint would become moot. That said, such consolidation did not do away with the distinctions that do exist between the three cases. As the Court highlighted in its consolidation order, when either party files a pleading in the case, "the first paragraph of [that] document . . . shall inform the Court to which case(s) the document relates."

On July 18, 2006, the Court dismissed Bryant's declaratory judgment action, 04-9049, finding there existed no reasonable apprehension of an imminent copyright infringement claim being filed against him by Mattel based on Mattel's Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The Court's Order was predicated entirely upon counsel for Mattel's representation during oral argument that it "will not maintain that Bratz infringes the copyright in Toon Teens." Owing to this representation, the Court, in dismissing the declaratory judgment action, made clear that any future "claim by Mattel of copyright

---

[1] That the marketing of the BRATZ dolls lies at the heart of the issues between the rival doll makers in the 05-2727 case is best illustrated by the Court's discussion of those allegations in its August 26, 2005, Order, Granting in Part and Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3

EXHIBIT ___ 5|
PAGE ___ 629

1   infringement based on the Toon Teens product is barred by counsel's

2   representation." July 18, 2006, Order at 4.

3        Presently before the Court is Mattel's request for leave to file an amended

4   complaint in the 04-9059 action. The complaint broadens considerably the nature

5   of the action from its genesis in state court. Whereas before the complaint simply

6   sought to litigate alleged contractual and fiduciary breaches by Bryant while in the

7   employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay

8   claim to the BRATZ doll line), the amended complaint adds five more defendants

9   and nine new legal claims, alleging a wide range of commercial disputes between

10  the rival doll makers that spans three countries. For instance, the amended

11  complaint now contains RICO claims, a misappropriation of trade secrets claim,

12  and various aiding and abetting claims all stemming from allegations that MGA

13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also

14  named as defendants in the amended complaint) or designers (namely, Bryant),

15  and then enticed or encouraged those same individuals to steal various trade and

16  proprietary secrets (be it sales plans, sales projections, customer profiles, or

17  intellectual property) from Mattel and hand them over to MGA before going to work

18  at MGA.

19       Moreover, the amended complaint expands upon the existing breaches of

20  contract and fiduciary duty claims in the original complaint by expanding the

21  universe of former employees (namely, the cherry-picked executives) to whom

22  those claims now apply.

23       Finally, Mattel now makes plain what was always lurking in its original

24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,

25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.

26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at

27  issue in Bryant's declaratory relief action: "The Amended Complaint does not

28  include a claim for infringement of copyrights in Toon Teens, but rather

4

EXHIBIT 51
PAGE 640

infringement of copyrights in Bratz." (Reply to MGA Opp. at 11).  Toward that end, Mattel has recently filed copyright registrations with the U.S. Copyright Office claiming ownership in various BRATZ doll design drawings penned by Bryant.

A.    ANALYSIS

Federal Rule of Civil Procedure 15(a) provides that, once a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  With no consent to Mattel's proposed filing proffered by MGA and Bryant, determining whether to grant Mattel leave to file an amended complaint is gauged by looking to the familiar formulation of factors set forth by the Supreme Court in Forman v. Davis:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

371 U.S. 178, 182 (1962).

MGA and Bryant offer the following reasons for denying Mattel leave to amend:  (1) Mattel has long known of the factual predicates underlying its copyright and intentional interference claims but delayed in asserting them; (2) the proposed amendment to add the copyright claim and the intentional interference claims (against the new defendants) are futile because they are barred by the applicable statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel because of its prior public disavowal of an intent to assert such a claim; and (4) MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

EXHIBIT ___ 51

PAGE ___ 641

1    suit because of alleged spoilation of evidence issues involving Mattel's ZEUS

2    computer system used by doll designers at Mattel and its e-mail system. None of

3    these arguments are persuasive.

4       1.    Awareness of Factual Predicate for Copyright and Intentional

5            Interference Claims

6       MGA argues that Mattel has long known about the factual predicate for its

7    recently added copyright claim, observing that, "[o]ver four years ago, in August

8    2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant

9    created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'

10   that project — while still employed at Mattel." (MGA Opp. at 9). Similarly, MGA

11   argues that Mattel has long known of the factual predicate for its intentional

12   interference claim with respect to Bryant's contract given that, "[b]y Mattel's own

13   admission, it learned in November 2003 — more than three years ago — that

14   Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at

15   Mattel." (MGA Opp. at 11-12).

16       At the outset it must be observed that "[m]ere delay in proffering an

17   amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.

18   of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,

19   485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988). Seizing upon

20   this point of law, Mattel argues that "only in . . . cases" when "granting leave would

21   require discovery to be reopened after summary judgment motions have been filed"

22   has the Ninth Circuit found the denial of leave "justified" based on the passage of

23   time alone. (Reply to MGA Opp. at 3). That is incorrect. There is a line of cases

24   from the Ninth Circuit finding that, if a "party seeking amendment knows or should

25   know of the facts underlying the amendment when the original complaint is filed,

26   the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan

27   v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)). And, recently, the

28   Ninth Circuit upheld the denial of leave to amend based on the passage of time

6

EXHIBIT 51
PAGE 642

1   even though the requested leave to amend was tendered <u>before</u> the time, as set
2   forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.
3   <u>See</u> <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).
4   The Ninth Circuit observed that, even when a request for leave to amend is timely
5   under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless
6   still deny the request based on any of the <u>Forman</u> factors. <u>Id.</u> at 951-52. The Ninth
7   Circuit then noted that the issue of untimeliness (regardless of whether the
8   amendment is tendered "within the period of time allotted by the district court in a
9   Rule 16 scheduling order") in seeking to amend can constitute a justification for
10  denying leave to amend if "the moving party knew or should have known the facts
11  and theories raised by the amendment in the original pleading." <u>Id.</u> at 953.
12  Toward that end, the Ninth Circuit observed that "an eight month delay between the
13  time of obtaining a relevant fact and seeking a leave to amend is unreasonable."
14  <u>Id.</u> In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,
15  even though the moving party had known of the facts prompting the amendment for
16  a long period of time, there still remained eight more months of discovery for the
17  parties to marshal facts against the allegations raised by the amended pleading:
18  "Even though eight months of discovery remained, requiring the parties to scramble
19  and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was
20  tainted, would have unfairly imposed potentially high, additional litigation costs on
21  Dialysist West that could have easily been avoided had AmerisourceBergen
22  pursued its 'tainted product' theory in its original complaint or reply." <u>Id.</u> Thus,
23  absent "a satisfactory explanation" for the delay in amending the complaint, the
24  Court is well within its rights to deny leave to amend. <u>Id.</u>

25      Mattel proffers the following reasons for taking the time that it did before
26  presenting its amended complaint: (1) Acting out of an abundance of caution to its
27  obligations under Rule 11 to present "factual contentions [that] have evidentiary
28  support," Mattel waited until its claims were better supported by evidence

EXHIBIT ____51____

PAGE ____643____

1   uncovered in discovery; and (2) the delay in the proceedings caused by "the year-

2   long stay and the parties' prior jurisdictional disputes" have left the case still in its

3   "nascent stage." (Reply to MGA Opp. at 2, 4).

4       The first reason is not well-founded. Rule 11 specifically allows parties to

5   aver factual allegations that "are likely to have evidentiary support after a

6   reasonable opportunity for further investigation or discovery" so long as the party

7   makes clear in its pleading that its factual contentions on those points are with the

8   caveat that they are based on a good faith belief that further discovery would

9   unearth evidence to support them. See FED. R. CIV. P. 11(b)(3). Simply put, Rule

10  11 did not stand in the way of Mattel averring the factual contentions it now claims it

11  "merely suspected" as being the case based on the limited information before it.

12  Mattel could have gone ahead and made such suspected factual allegations so

13  long as it caveated those claims with the declaration that it reasonably believed that

14  those allegations would be borne out by further discovery. Perhaps the time by

15  which Mattel could have reasonably believed such allegations would be borne out

16  by further discovery occurred after the dates noted by MGA, but it is hard to fathom

17  that such materialization took three or four years to occur.

18      The second reason would have some merit to it but for the fact that the

19  information that alerted (or should have alerted) Mattel to the existence of its now

20  asserted copyright and intentional interference claims was brought to Mattel's

21  attention well before the case was stayed on May 20, 2005. The stay, therefore,

22  did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the

23  stay does not explain why Mattel waited nearly six months after the stay was lifted

24  on May 16, 2006, to present those claims now.

25      All of that being said, the one thing that gives the Court pause in denying

26  leave based on the tardiness in Mattel's presentation is the lack of any evidence

27  that MGA or Bryant have been prejudiced by the delay. Delay unconnected to

28  some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

EXHIBIT ___ 51

PAGE ___ 644

1   management of the case, does not suffice to deny granting leave to amend.  The

2   Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3   in an amendment to a complaint, there is no serious prejudice to defendant in

4   allowing the amendment" even if it is made tardily.  Sierra Club, 813 F.2d at 1493.

5   Indeed, the denial of leave was proper in the Dialysist case not simply because of

6   the length of the delay, but because the delay itself was "detrimental" in that it

7   would entail the opposing party to have "unfairly" incurred "potentially high,

8   additional litigation costs" that could have been avoided if the moving party had

9   made clear its intentions earlier.  465 F.3d at 953.

10   Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim.  (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls.  Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions.  MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

9

EXHIBIT  51
PAGE  645

1  loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2  is diminished by the fact that (no doubt owing to the sophistication of all counsel

3  involved) discovery on these very issues have been proceeding apace by both

4  sides long before Mattel filed its proposed amendments.  This is simply not a case

5  where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6  allowing the proposed amendments; much of those costs have already been borne

7  by the parties for some time.

8          2.     Spoliation of Evidence

9          MGA next argues that Mattel's delay in bringing the amended complaint has

10  caused it prejudice as, in the interim, critical pieces of evidence have been or are

11  suspected of having become lost.  For instance, MGA asserts that Mattel's Rule

12  30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13  "although Mattel identified and segregated its most relevant backup tapes available

14  for Zeus, Mattel allowed its tape backup system to expire the database for those

15  backup tapes, thereby eliminating all information about what was actually stored on

16  those backup tapes."  (MGA Opp. at 9-10).  Information on the Zeus computer

17  system is critical because of Mattel's assertion that part of its copyright claim rests

18  on Bryant's exposure to Mattel development programs.  (First Am. Compl. ¶ 26(a)).

19  As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20  center personnel are stored on Zeus.  Thus, the electronic documents stored on

21  Zeus – which should include the metadata showing who created, edited and

22  accessed Mattel's concept drawings and designs – during the time Bryant worked

23  in the design center at Mattel is vitally important to defending against Mattel's

24  claims."  (MGA Opp. at 14).  MGA's argument is neither an accurate

25  characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26  claim.

27          Ms. Marine did not testify that the information on the backup tapes (some

28  fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

EXHIBIT    51

PAGE      646

1    that could restore the information still found on those tapes:

2          Q.    So if you wanted to restore that 2002 backup
                 tape[s] then, how would you go about doing that?
3
                            . . . .
4
           A.    You need the hardware so if we don't have the
5                hardware — if [the technology used by the tape
                 is] DLT we don't have the hardware and you've
6                got to buy it and – well, first you have to find a
                 place to put it with adequate power which we
7                don't have in the design center.  You need to
                 have a tape library.  You need to have the tape
8                drives that carried those tapes.  You need a
                 server that has the capability to – that's big
9                enough to handle all of the hardware.  You need
                 the software – the license for the backup
10               software[, Net Backup].  You need the disk space
                 to restore it to and then you have to start reading
11               in all those tapes.

12         Q.    You said that you don't have that in the design
                 center.  Do you have that hardware anywhere
13               else in the company?

14         A.    DLT? No, no.

15         Q.    At what point did you get rid of the hardware?

16         A.    Once the last backups — DLT backups expired
                 so it would have been a couple years ago
17               probably.

18   (Decl. Diana Torres, Ex. K at 118-119).

19         The above testimony clearly denotes the difficulty in restoring what was on

20   Mattel's Zeus computer system during the relevant time frame, but it certainly does

21   not demonstrate that the information on those backup tapes has been "eliminated"

22   or forever lost.  Undoubtedly it will be a costly endeavor to recover that information

23   (not to mention to later search and sort through it); but to argue, as MGA does, that

24   the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25   plight.  Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26   information on the Zeus backup tapes has been present for some time (maybe

27   since 2004 or perhaps even earlier).  This is important because it undermines

28   MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

                                    11

EXHIBIT ___ 5

PAGE ___ 647

1   it to suffer prejudice it otherwise would not have faced if the amendments were
2   brought sooner. Such prejudice has been present for years, and Mattel's failure to
3   bring its amended complaint sooner would not have changed this situation.

4       Similarly, MGA's point that access to what was on the Zeus computer
5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not
6   hack the system to steal other designers work is diminshed to some extent by the
7   fact that Bryant himself testified that he did not use the Zeus computer system and
8   was "pretty much computer illiterate" while employed at Mattel. Admittedly, the
9   ability to point to information on the Zeus system backup tapes to prove that Bryant
10  did not access other designers drawings or to prove the date those drawings were
11  created by those other designers would be useful evidence to negate Mattel's
12  factual claims. Nonetheless, such evidence still would not discount other avenues
13  outside of the Zeus computer system by which Mattel could seek to prove that
14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant
15  saw drawings of the same posted on other designers' cubicles.

16      MGA next surmises that Mattel's e-mail records have disappeared, not
17  because it has any proof on that point, but simply because Mattel has postponed
18  the deposition of the individual most knowledgeable of Mattel's e-mail records until
19  after the hearing on Mattel's motion for leave to amend. (MGA Opp. at 10).
20  Speculation of spoilation does not suffice. That MGA's argumentation on this point
21  is nothing more than speculation is best exhibited by the evidence it has proffered
22  in support of its argument: "[I]f the sole retained backup for Zeus is no longer
23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly
24  out of reach." (MGA Opp. at 15 (emphasis added)). MGA then makes much of a
25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his
26  inbox would be automatically deleted if they had remained there for more than a
27  certain time period. (Decl. Diana Torres, Ex. H at 292-93). MGA takes from this
28  acknowledgment that Mattel has an "automatic email deletion system" that has

12

EXHIBIT 51
PAGE 648

1 compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2 Noticeably absent from MGA's argument is any evidence that the e-mails so

3 deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4 whether such information remains or is otherwise archived on some backup file on

5 Mattel's computer system. Absent concrete proof that spoilation has occurred,

6 nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7 amend.

8      3.   Statute of Limitations

9      MGA next argues that Mattel's copyright and intentional interference claims

10 are futile as both are barred by the applicable statute of limitations. This argument

11 was pressed emphatically at oral argument. With respect to the copyright claim,

12 MGA argues that the applicable statute of limitations is three years, with the

13 limitations period accruing from when a party has knowledge of a violation or when

14 a reasonably diligent person would have been put on inquiry of the infringement.

15 (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16 1994)). MGA argues that Mattel was put on notice about its copyright claim in

17 August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18 had stolen the idea for BRATZ while working at Mattel. Thus, according to MGA,

19 the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20 current copyright claim stale.

21      The problem with MGA's analysis is it fails to take into account the relations-

22 back principles found in Rule 15(c), which provides that "[a]n amendment of a

23 pleading relates back to the date of the original pleading when "the claim . . . in the

24 amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25 in the original pleading," or if such relation back is otherwise permissible by the

26 state "law that provides the statute of limitations applicable to the action." By

27 MGA's own admission Mattel's copyright claim arises out of the same conduct or

28 transaction contained in the original complaint filed in April, 2004, well within the

13

EXHIBIT 51
PAGE 649

1  applicable limitations period.[2]  (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5      MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better.  According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3]  (MGA Opp. at 18

12  (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)) .  Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint.  (Id).  The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20      [2] The same would appear to be true — that the amendments would be timely

21  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to
   MGA's complaint in the 05-2727 case.

22

23      [3] With respect to Mattel's interference with contract claim as to one of its
   former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim

24  on September 17, 2004, when Brawer informed Mattel that he leaving to go to work
   for MGA.  (MGA Opp. at 19-20).  The problem with this argument is that nothing from

25  that simple event — Brawer's declaration of his intent to leave — in any way would
   apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

26  (the stealing of proprietary information) causing Brawer to breach his contract with
   Mattel that he would not do anything to help a competitor while working for them.

27  MGA's contention that Mattel must have known of those misdeeds in mid-September
   is nothing more than speculation.  Futility cannot be founded on what might or might

28  not be the case; either a claim is futile to bring or it is not.

14

EXHIBIT 5
PAGE 648

1   2004, well before the limitations period expired.[4]

2       Accordingly, MGA's futility argument is not well-founded.

3       4.      Prior Disavowals of Asserting a Copyright Claim

4       Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5   this case as to whether or not it is asserting a copyright infringement claim against

6   it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7   bring such a copyright claim as one done in bad faith. No doubt the Court itself has

8   been subjected to Mattel's overly vague statements on this point, but in the end

9   nothing in those statements has ever foreclosed the possibility that such a claim

10  may be in the offing. Indeed, during the oral argument on Mattel's motion to

11  dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12  to whether it would assert such a copyright claim against Bryant as it is currently

13  seeking to do. The most that Mattel's counsel would proffer was that Mattel would

14  not assert a copyright claim against Bryant based on Mattel's copyright rights in

15  TOON TEENS. At that point, the Court directed the parties to engage in a meet

16  and confer based on counsel for Mattel's representation and to provide a report to

17  the Court based on those discussions. The report submitted to the Court made

18  clear that, although Mattel was willing to accede that it would not bring a copyright

19  claim based on TOON TEENS, it refused to accede to Bryant's broader request

20  that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21  to any claim that Mattel has or ever will assert against Bryant." This by itself should

22  have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23  prior statements had foreclosed any potential copyright claim against them.[5]

24

25      [4] Again the relations-back principle would also seem to render its claim timely
26  if it were filed as an amended answer (the original having been filed in May, 2005) in
    the 05-2727 case.

27      [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
28  Larian, for the "Doe" defendants listed in its original complaint is improper because
    Mattel knew of their identity when it filed the original complaint. The argument is

EXHIBIT _51_

PAGE _649_

1    That said, Mattel's allegation in the amended complaint as to how it is

2  seeking to lay claim to the copyright in BRATZ is disconcerting.  Paragraph 26,

3  subsection a, in the amended complaint alleges that Bryant "misappropriated and

4  misused Mattel property" by "using his exposure to Mattel development programs to

5  create the concept, design and name of Bratz." (First Am. Compl. ¶ 26(a)).  Such

6  "exposure" could include Bryant misappropriating the Mattel design concept in

7  TOON TEENS in drawing his inspiration for the BRATZ doll.  Were Mattel's

8  copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9  dismissing Bryant's declaratory judgment action.  Mattel was pressed on this point

10  during oral argument and conceded that such "exposure" to Mattel "development

11  programs" did not include TOON TEENS.  With this representation, nothing in

12  Mattel's proposed copyright claim is barred under the rubric of bad faith.

13    5.    Judicial Economy Considerations

14    In his opposition, Bryant adds an additional reason for denying leave beyond

15  those contained in MGA's papers — the amendment would muddy the waters in the

16  04-9059 by adding "tangential" issues that would only serve to delay resolution of

17  the key issue lying at the heart of the complaint:  Who owns the rights to the

18  BRATZ line of dolls. (Bryant Opp. at 2 ).  Bryant notes that the case has proceeded

19  apace in moving toward resolving that issue, and the amendment would "transform

20

21  misplaced. As made clear by Mattel, California law allows a plaintiff to substitute in a

22  defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
   ignorant of the basis for liability at the time the complaint was filed.  See Miller v.

23  Thomas, 121 Cal.App.3d 440 (1981).  MGA does not dispute this legal contention
   but at oral argument disputed that Mattel did not know the basis for liability against

24  itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in

25  the original complaint and those now proffered against the two in the amended
   complaint.  Specifically, MGA notes that the original complaint spoke of Bryant

26  working for one of Mattel's competitiors and of that employee's theft of Mattel's
   intellectual property before leaving to work for that competitior.  At most, all this

27  shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
   Larian encouraged Bryant's alleged unlawful behavior recited in the original

28  complaint.

16

EXHIBIT ____51

PAGE ____650

1  what Mattel has always claimed was a straightforward employment action against
2  an individual defendant into a global commercial dispute against Mattel's primary
3  competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns
4  BRATZ.[6]  (Bryant Opp. at 2).  Mattel argues that "the law does not deny leave to
5  amend because claims are 'tangential'" and then reiterates its point that some
6  showing of prejudice, namely, seeking leave after expiration of discovery, is
7  necessary.  (Reply to Bryant Opp. at 3).  That is not entirely correct.

8      As noted previously, the Ninth Circuit recently upheld a denial for leave to
9  amend because the amendment would have "drastically changed" the litigation,
10  even though the leave request was tendered before the time, as set forth in a Rule
11  16(b) pre-trial scheduling order, for filing a motion to amend had expired and well
12  before the discovery cut-off. See AmerisourceBergen Corp. v. Dialysist West, Inc.,
13  465 F.3d 946, 953 (9th Cir. 2006).  In justifying its reasoning the Ninth Circuit cited
14  approvingly to the following statement from a well-respected treatise: "If an
15  amendment substantially changes the theory on which the case has been
16  proceeding and is proposed late enough so that the opponent would be required to
17  engage in significant new preparation, the court may deem it prejudicial." Id. at 953
18  n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,
19  FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)).  Thus, Dialysist
20  recognized that the introduction of "different legal theories" and/or proof of
21  materially different facts well into the litigation can itself be a basis for finding
22  prejudice regardless of whether the period for discovery has expired (or is even
23  close to expiring) or the parties have already filed summary judgment motions. Id.
24  at 953-54.

25      Although the parties can safely be said to be at this point well into the

27      [6] Bryant also brings intricate legal arguments about the sufficiency of the
28  allegations Mattel has averred in building its RICO claims against him.  Such
considerations are best left to be resolved on a properly filed motion to dismiss.

17

EXHIBIT 51
PAGE 651

1  litigation in this consolidated action (as evidenced by the protracted discovery
2  disputes contained in the docket sheet that the parties have had before the
3  magistrate judge and now the special master, and the litigation of motions to
4  dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel
5  has made painfully clear in its papers, no scheduling order has been entered in this
6  case.[7] This takes away somewhat from the prejudice <u>Dialysist</u> found to exist when
7  a "drastic change [in a party's] litigation theory" takes place mid-stream in the
8  litigation process. <u>Id.</u> at 953.  Simply put, without a schedule for the filing of pre-trial
9  motions and other matters (<u>e.g.</u>, discovery cutoff), the parties have been given free
10 reign in how to conduct the litigation in this case.

11      That the delay in bringing the proposed amendments and the relative length
12 of time into the litigation when those amendments were brought may not neatly fold
13 into <u>Dialysist</u>'s reasoning does not mean that leave must nonetheless be granted.
14 The 04-9059 action, as it is presently constituted, is not a complex one.  It asks a
15 rather narrow and straightforward question — Did anything from Bryant's
16 employment at Mattel during the 1999-2000 period give Mattel ownership rights to
17 the BRATZ doll line?  The proposed amendments would radically alter the litigation
18 in that case to include far ranging disputes involving multiple parties and concerning
19 events not connected with the BRATZ ownership issue.  That the original action
20 was a relatively simple and straight-forward matter raises another point beyond the
21 change in the action's litigation posture — whether entangling the rival doll makers'
22 other commercial disputes into this particular case would serve to muddy the waters
23 and make the matter that much more difficult to manage from the Court's
24 perspective.

25
26      [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced
   by the fact that the parties only just recently exchanged in initial disclosures is
27 misleading.  The exchange of initial disclosures referred to by Mattel is in the 05-
   2727 case.  With respect to the 04-9059 case it appears that such initial disclosures
28 were completed long ago as evidenced by the fact that discovery disputes appeared
   in that case as far back as January, 2005.

18

EXHIBIT _____ 51

PAGE _____ 652

●                              ●

1    As has long been recognized, equally important in determining whether to

2  grant such leave is what impact such amendments would have on the court's ability

3  to manage the case. See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE

4  § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial

5  economy and its ability to manage the case. . . . The court should also temper the

6  policy favoring freely granting leave to amend with consideration of the ability of the

7  district court to manage the case adequately if amendment is allowed"). As Judge

8  Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,

9  the court should consider judicial economy and whether the amendments would

10  lead to expeditious disposition of the merits of the litigation. Finally, the court

11  should consider whether the amendment adds substance to the original allegations,

12  and whether it is germane to the original case of action." Chitimacha Tribe of

13  Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also

14  Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.

15  1987)("General considerations of judicial economy also justify allowing the

16  amendments. The violations included in the proposed amendment relate to the

17  same subject matter as the original complaint. Allowing the amendment will further

18  the federal policy of 'wrapping in one bundle all matters concerning the same

19  subject matter.'").

20    Mattel's amendments do not add substance to the claims contained in its

21  original complaint. Rather, they would expand the universe of claims and

22  defendants stretching well-beyond the questions raised in the original complaint

23  over whether Bryant's conduct while in the employ of Mattel subjected his later

24  attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions

25  Agreement or otherwise rendered his creation subject to an infringement action.

26  Nowhere does Mattel seek to reconcile the breadth of its present amendments with

27  the narrowness of the allegations contained in its original complaint. In fact, the

28  precise opposite is true. Mattel acknowledges that its proposed amendments bear

19

EXHIBIT ___51___

PAGE ___653___

1  more congruity to the allegations leveled against it in MGA's Lanham Act case than

2  to those in the action to which it seeks to add them:

3              [M]any of the matters raised by Mattel's proposed
4          Amended Complaint are and will remain at issue
           because of MGA's Complaint, whether or not leave to
5          amend is granted. MGA's claims allege that a broad
           array of purported Mattel conduct across the globe,
6          starting at least as early as 1999, has violated the
           Lanham Act and unfair competition law. This includes
7          Mattel's alleged infringement of Bratz and other MGA
           products. As a result, issues in the proposed Amended
8          Complaint are already part and parcel of Mattel's
           defenses to MGA's unfair competition claims, including
9          because they show that MGA and Bryant, and not
           Mattel, are ones who stole the products and other
10          properties involved.

11  (Reply to Bryant Opp. at 7 (emphasis added)). Mattel apparently finds this

12  discongruity unimportant because "all of these matters have been consolidated with

13  the Bryant case." (Id. at 7). As noted earlier, the fact that the cases have been

14  consolidated does not mean that the parties can ignore the distinctions that still

15  exist between them. If, as Mattel acknowledges, the present amendments are

16  nothing more than re-formulated defenses and counterclaims it presently has to

17  MGA's complaint against it in the 05-2727 case, then such amendments should be

18  brought in the form of an amended answer and counterclaim in that case.

19       Consideration of the distinctions between the two cases is wise as it serves

20  as a useful tool in providing the Court a better means to manage the cases now

21  that they have been consolidated. The proverbial dog (ownership in BRATZ)

22  should be wagging the proverbial tail (the remaining commercial disputes), not the

23  other way around. Admittedly, the dog's tail has grown in size both by MGA's filing

24  of its complaint in the 05-2727 action and Mattel's response thereto through its

25  proposed amendments. Nonetheless, it is readily apparent to the Court that the

26  crown jewel in this action still remains the ownership rights to the BRATZ dolls. The

27  parties have engaged in extensive and undoubtedly expensive discovery on this

28  very issue (from hiring world-renowned experts to test the age of Bryant's design

EXHIBIT _____ 51
PAGE _____ 654

1   drawings to technically complex discovery of what is on each other's computers).

2       Indeed the separateness of the two matters is reflected in how the cases are

3   currently structured, namely, the narrowness of the issue involved in 04-9059 and

4   the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court

5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6   off and trial date are set well-ahead of those in 05-2727 makes the most sense. As

7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8   the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to

9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot. By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims. If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment. Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims. However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27      In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

21

EXHIBIT 51

PAGE 655

1   Mattel's request to amend its complaint in the 04-9059 matter is justified. See
2   Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial
3   system can justify a denial of a motion to amend 'even if the amendment would
4   cause no hardship at all to the opposing party'"). Buttressing the Court's decision is
5   the fact that, even with such a denial, Mattel may file (and the Court provides leave
6   to Mattel to so file) an amended answer and counterclaim in the 05-2727 case
7   raising all the new claims and defendants presently sought to be achieved through
8   amendment of its complaint in the 04-9059 action. None of the substantive
9   concerns raised by MGA and Bryant to the present amended complaint, e.g.,
10  statutes of limitations, would appear to be affected if the new claims and
11  defendants were brought as defenses and counterclaims in the 05-2727 case as
12  opposed to the 04-9059 one.

13          Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed
14  amendments, but only insofar as they are pled in the form of an amended answer
15  and counterclaim in the 05-2727 case.

16          Finally, the lack of a scheduling order in this case is problematic; one should
17  have been entered long ago. See Fed. R. Civ. P. 16(b)(noting that a scheduling
18  "order shall issue as soon as practicable but in any event within 90 days after the
19  appearance of a defendant and within 120 days after the complaint has been
20  served on a defendant"). In light of the fact that entry of a scheduling order is
21  woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)
22  scheduling conference be held in this consolidated matter on February 12, 2007, at
23  1:30 p.m. in Courtroom One. The parties are directed to file a Joint Rule 26(f)
24  report with the Court by February 5, 2007.

25          IT IS SO ORDERED.

26  DATE:  _/- //- ○ ゚_

27

28  STEPHEN G. LARSON
    UNITED STATES DISTRICT JUDGE

22

EXHIBIT 51
PAGE 656

# Exhibit 52

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
Priority _____  Send _____
Entered _____  Closed _____
JS-5/JS-6 _____  JS-2/JS-3 _____
Scan Only_____  Docketed on CM _____
_____ THIS CONSTITUTES NOTICE OF
        ENTRY AS REQUIRED BY FRCP 77(d)
        JUN 2 7 2007
EASTERN DIVISION
BY _____  DEPUTY

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY       JIM HOLMES       DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | CASE NO. CV 04-09049 SGL |
| Plaintiff, | |
| v. | CONSOLIDATED WITH<br>CV 04-09059 SGL<br>CV 05-02727 SGL |
| MATTEL, INC., | |
| Defendant, | ORDER RE MOTIONS HEARD ON<br>JUNE 11, 2007 |
| AND CONSOLIDATED ACTIONS | |

Presently before the Court is a multitude of motions filed by a number of parties in these consolidated cases. The factual allegations underlying the present actions are expansive and complex. They are set forth below only to the extent necessary for the Court's consideration of the present motions. At their essence, although involving a number of other legal and factual issues, these cases involve the rights to certain fashion dolls.

The present motions, six in total, focus on four basic issues: Two of the motions, filed by certain counter-defendants, address the sufficiency of the allegations made by Mattel, Inc. ("Mattel") in its counterclaims; most notably, these motions challenge the sufficiency of the allegations which underlie Mattel's claims based on the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

Docket No. 577 52

06/27/07

EXHIBIT

PAGE 657

§§ 1961-1968 ("RICO"). Another motion challenges the Court's exercise of personal jurisdiction over a foreign corporation, MGAE de México, S.R.L. de C.V. ("MGA Mexico"). Two additional motions seek review of a ruling, issued by a court-appointed discovery master, overruling objections made during a party's deposition that were based on the attorney-client and joint-defense privileges. A final motion heard on June 11, 2007, addresses the Court's scheduling order that divided the issues to be tried in these consolidated cases into two phases. This last motion will be addressed in a separate order.

The Court has reviewed the parties' filings regarding these motions and held a hearing on June 11, 2007. For the reasons and in the manner set forth more fully herein, the Court makes the following rulings regarding these motions:

1.    Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189):[1] **GRANTED IN PART AND DENIED IN PART.**

2.    Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

3.    Motion of MGA Mexico to Dismiss Mattel's Amended Answer and Counterclaims (docket # 266): **DENIED.**

4.    Motion of MGA Objecting to Discovery Master's March 7, 2007, Order (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

5.    Motion of Carter Bryant Objecting to Discovery Master's March 7, 2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

---

[1] Joining in this Motion were MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), Carter Bryant ("Bryant"), and MGA Mexico.

2

EXHIBIT    52

PAGE    658

### I. Factual Allegations

The following allegations appear in the Amended Answer and Counterclaims ("AAC"):

A.   **Bryant's Employment by Mattel**

Carter Bryant was hired by Mattel as a Barbie product designer in January 1999. (AAC ¶ 21.) At that time, Bryant signed an "Employee Confidential Information and Inventions Agreement," wherein he agreed not to assist or work for a Mattel competitor while employed by Mattel and that the designs and inventions he created while employed by Mattel were Mattel property. (AAC ¶¶ 22-23.) Bryant also executed a "Conflict of Interest Questionnaire" wherein he certified that, other than as disclosed, he had not worked for a Mattel competitor in the past year, had not engaged in a business transaction with a Mattel competitor that could create a conflict of interest, and that he would inform Mattel immediately if such an event occurred. (AAC ¶¶ 24-25.) While still employed by Mattel, Bryant used Mattel property and resources to develop and design the Bratz concept. (AAC ¶ 26.) Bryant also allegedly enlisted other Mattel employees to perform work on the Bratz line, in some cases, falsely informing those employees that they were working on a Mattel project. (AAC ¶ 27.)

B.   **MGA's Involvement in Bryant's Conduct**

MGA knew of and encouraged Bryant's misappropriation of Mattel property and resources. (AAC ¶ 33). Bryant made affirmative misrepresentations to Mattel, including that he was leaving Mattel for "non-competitive" pursuits. (AAC ¶ 28.) Bryant and MGA concealed from Mattel that Bryant developed Bratz while employed by Mattel, that Bryant worked with MGA during the time he was employed by Mattel, and that Larian and others, not Bryant, were the creators of Bratz. (AAC ¶ 35.) Prior to his departure from MGA, Bryant entered into a contract with MGA to provide design services to MGA on a "top priority" basis. (AAC ¶ 36.) Bryant left Mattel's employ on October 20, 2000; three weeks later, MGA

EXHIBIT _____ 52

PAGE _____ 65

showed the Bratz prototypes to focus groups and retailers. (AAC ¶ 29.) Soon
thereafter, MGA showed the Bratz line to retailers at the Hong Kong Toy Fair in
January, 2001, and then began manufacturing and selling the dolls to retailers for
an annual revenue in the excess of $500 million. (AAC ¶¶ 31-32.)

C.    **Proprietary Information**

      1.    **Mexico**

      Counter-defendant Carlos Gustavo Machado Gomez ("Machado"), nonparty
Mariana Trueba Almada ("Trueba"), and nonparty Pablo Vargas San Jose
("Vargas") were upper-level employees at Mattel Mexico. (AAC ¶¶ 38-40.) In the
three months before all three simultaneously resigned from Mattel Mexico on April
19, 2004, they were in contact with MGA via an email account with the address
"plot04@aol.com". (AAC ¶ 42.) The three former employees allegedly used this
account to supply MGA with confidential and proprietary Mattel information. (AAC
¶ 42.) The three also copied various proprietary Mattel documents onto USB flash
drives prior to resigning. (AAC ¶ 44-46.) Shortly before her departure, Trueba
increased her access to Mattel's confidential information and attended a meeting at
which Mattel personnel analyzed Barbie programs for the United States, Canada,
and South America. (AAC ¶ 47.)

      Among them, Machado, Trueba, and Vargas stole documents containing
information regarding Mattel's future products, production and shipping costs, sales
information, customer information, marketing information, and strategic research
information both in Mexico and worldwide. (AAC ¶ 48.) The stolen data was not
limited to the Mexican market; rather, the information stolen had the potential, and
in fact did, give MGA an unfair competitive advantage in the United States and
around the world. (AAC ¶ 49.)

      In an attempt to conceal his actions, Machado ran a software program on his
Mattel computer in order to erase information pertaining to his contact with MGA.
(AAC ¶ 51.) When Mattel alerted Mexican authorities about the theft, they seized

EXHIBIT _____ 52

PAGE _____ 660

1    from MGA's Mexico City offices, pursuant to a search warrant, a large number of

2    documents containing Mattel trade secrets and confidential information.  (AAC

3    ¶ 53.)

4         Shortly after the theft, Machado, Trueba, and Vargas traveled to Los

5    Angeles to meet face-to-face with MGA personnel.  (AAC ¶ 52.)

6       **2.**    **Canada**

7         Jane Brisbois was the Director of Sales for the Girls Division in Canada.

8    (AAC ¶ 71.)  When she was hired in 1999, she agreed to preserve and not disclose

9    Mattel's proprietary information.  (AAC ¶ 71.)  While still employed by Mattel,

10   Brisbois spoke with Larian on September 22, 2005.  (AAC ¶ 74.)  That same day,

11   Brisbois copied approximately 45 Mattel documents containing Mattel trade secret

12   information into a USB flash drive that she took from the Mattel Canada office.

13   (AAC ¶ 74.)  The files taken by Brisbois included documents regarding Mattel sales,

14   advertising strategies, market analyses, product launch dates, and profit margins in

15   Canada, Mexico, and the United States.  (AAC ¶ 74.)  Four days later, she resigned

16   from Mattel.  (AAC ¶ 74.)

17         When Mattel learned of Brisbois' misappropriation of Mattel documents, it

18   notified Canadian law enforcement officials, who were able to recover the flash

19   drive and the documents from Brisbois.  (AAC ¶ 75.)

20       **3.**    **United States**

21         Ron Brawer was Mattel's Senior Vice President and General Manager.

22   (AAC ¶ 55.)  On September 17, 2004, Brawer informed Mattel that he was leaving

23   Mattel to work for MGA.  (AAC ¶ 63.)  During Brawer's exit interview, he falsely

24   represented that he had returned all proprietary information to Mattel; specifically,

25   Brawer took the information in his contacts file which included contact information

26   for Mattel customers and Mattel employees.  (AAC ¶ 68.)  Brawer has since used

27   the contact information to induce certain Mattel employees to join MGA and

28   misappropriate Mattel trade secrets.  (AAC ¶ 69.)

EXHIBIT _____ 5ᶻ

PAGE _____ 661

1    MGA has also allegedly hired at least 25 other Mattel employees, some of

2    whom have provided MGA with Mattel's confidential information. (AAC ¶ 77.)

3    **D.    Larian's Communications Regarding Mattel's New Product Line**

4        On May 12, 2006, Larian sent an email message to an email distribution list

5    that included a reference to a new Mattel Barbie line ("MY SCENE MY BLING

6    BLING") which Mattel had not yet made public. (AAC ¶ 79.) The distribution of the

7    email included members of the media and many of Mattel's most significant

8    customers. (AAC ¶ 78.) Soon after sending the email, Larian began calling these

9    significant customers and making false representations about the product;

10   specifically, Larian told each that it was the only retailer to purchase the product

11   and that Mattel would not be supporting the product with television advertising.

12   (AAC ¶ 80.)

13   **E.    Exhibit C**

14       In Exhibit C to the AAC, Mattel references a number of communications,

15   numbering well over one hundred, that it contends constitutes predicate acts of mail

16   fraud or wire fraud. Exhibit C does not describe the contents of those

17   communications.

18                              **II. Counterclaims Asserted**

19       Based on these allegations, Mattel asserts the following counterclaims:

20   (1) Copyright Infringement, including willful, vicarious, and contributory

21   infringement, asserted against MGA, MGA Hong Kong, Larian and Bryant;

22   (2) violation of RICO's substantive prohibition, 18 U.S.C. § 1962(c), asserted as

23   authorized by 18 U.S.C. § 1964(c) against all defendants, which alleges predicate

24   acts of, *inter alia*, mail fraud, wire fraud, and criminal copyright infringement; (3) a

25   violation of RICO's prohibition against conspiracies, 18 U.S.C. § 1962(d), asserted

26   against all defendants; (4) state-law misappropriation of trade secrets against MGA,

27   MGA Mexico, Larian, and Machado; (5) breach of contract, asserted against Bryant

28   only and based on certain employment agreements between Bryant and Mattel;

EXHIBIT _____ 52

PAGE _____ 662

6

1  (6) intentional interference with contract, asserted against MGA and Larian and

2  based on Bryant's employment agreements; (7) breach of fiduciary duty, asserted

3  against Bryant and Machado; (8) aiding and abetting breach of fiduciary duty,

4  asserted against MGA and Larian; (9) breach of the duty of loyalty, asserted

5  against Bryant and Machado; (10) aiding and abetting breach of the duty of loyalty,

6  asserted against MGA and Larian; (11) conversion, asserted against all counter-

7  defendants; (12) violation of California's unfair competition law, Cal. Bus. & Prof.

8  Code § 17200, asserted against all counter-defendants; and finally, (13) a claim for

9  declaratory relief.

10     **III. Counter-Defendants' Motions to Dismiss for Failure to State a Claim**

11         The parties have moved to dismiss a number of Mattel's counterclaims on

12  various grounds.  The Court addresses each claim in turn, considering at all times

13  the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6).

14  A.     <u>Standard for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)</u>

15         In lieu of an answer, a party may, as the counter-defendants have here, file a

16  motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which provides that such a

17  motion may be made where the pleader has "fail[ed] to state a claim upon which

18  relief can be granted." <u>Id.</u>  In deciding a Rule 12(b)(6) motion, the Court must also

19  consider the requirements of Fed. R. Civ. P. 8(a), which requires only a "short and

20  plain statement of the claim showing that the pleader is entitled to relief" or, when

21  the claim at issue avers fraud or mistake, the motion must be considered in

22  conformity with Fed. R. Civ. P. 9(b), which requires fraud and mistake to be pleaded

23  with particularity.  <u>See</u> 5A Charles A. Wright & Arthur Miller, <u>Federal Practice and</u>

24  <u>Procedure</u>, §1356 (1990); James Wm. Moore, <u>Moore's Federal Practice</u>, Vol. 2

25  § 12.34[1][c].

26         In bringing a motion pursuant to Rule 12(b)(6), the moving party has the

27  burden of persuading the Court that the complaint has failed to state a claim upon

28  which relief can be granted.  <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406,

7

EXHIBIT ____ 57

PAGE ____ 663

1409 (3d Cir.), cert. denied, 501 U.S. 1222 (1991).  In considering the motion,

"courts must consider the complaint in its entirety," and read it in the light most

favorable to the plaintiff, accepting as true all factual allegations in the complaint, as

well as reasonable inferences to be drawn therefrom.  Tellabs, Inc. v. Makor Issues

& Rights, Ltd., __ U.S. __, No. 06-484,  2007 WL 1773208, at *9 (June 21, 2007);

Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  However, the Court need not

accept any unwarranted deductions of fact, or conclusory legal statements cast in

the form of factual allegations.  See Western Mining Council v. Watt, 643 F.2d 618,

624 (9th Cir.), cert. denied, 454 U.S. 1031 (1981).

Generally, a court cannot consider evidence in deciding a Rule 12(b)(6)

motion; however, a court may consider exhibits attached to the complaint as well as

documents that are not physically attached to the complaint but "whose contents

are alleged in [the] complaint and whose authenticity no party questions."  Branch v.

Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994), cert. denied, 512 U.S. 1219 (1994).

Facts of which a court may take judicial notice pursuant to Fed. R. Evid. 201 are

also properly considered.  Mir v. Little Company of Mary Hospital, 844 F.2d 646,

649 (9th Cir. 1988).

**B.    RICO Claims**

The counter-defendants devote most of their motions to the sufficiency of the

allegations regarding Mattel's RICO claims.  The Court's analysis begins, as it must

when considering a federal statute, with the language of that statute.  The

substantive RICO prohibition at issue is found in 18 U.S.C. § 1962(c):

It shall be unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern

of racketeering activity or collection of unlawful debt.

Id.  Conspiracies to violate this substantive prohibition are themselves prohibited by

EXHIBIT _____ 52

PAGE _____ 664

1   § 1962(d), which states that "[i]t shall be unlawful for any person to conspire to

2   violate any of the provisions of subsection (a), (b), or (c) of this section." Id.  Many

3   of these terms are defined by the statutory language, including "racketeering

4   activity," "enterprise," and "pattern of racketeering activity":

5            (1) "racketeering activity" means . . . (B) any act which is

6       indictable under any of the following provisions of title 18, United

7       States Code: . . . section 1341 (relating to mail fraud), section 1343

8       (relating to wire fraud), . . . section 1512 (relating to tampering with a

9       witness, victim, or an informant), . . . section 1952 (relating to

10      [interstate and foreign travel or transportation in aid of racketeering

11      enterprises]), [and] section 2319 (relating to criminal infringement of a

12      copyright)[.]

13                              . . . .

14            (4) "enterprise" includes any individual, partnership,

15      corporation, association, or other legal entity, and any union or group

16      of individuals associated in fact although not a legal entity;

17            (5) "pattern of racketeering activity" requires at least two acts of

18      racketeering activity, one of which occurred after the effective date of

19      this chapter and the last of which occurred within ten years (excluding

20      any period of imprisonment) after the commission of a prior act of

21      racketeering activity[.]

22   18 U.S.C. § 1961.

23         In considering a Rule 12(b)(6) motion seeking to dismiss a RICO claim, the

24   Court measures the sufficiency of alleged predicate acts of wire fraud and mail

25   fraud by the Rule 9(b) "pleading-with-particularity" standard; however, the Court

26   measures the sufficiency of all other predicate acts by the more lenient standard set

27   forth in Rule 8(a).  Compare Fed. R. Civ. P. 9(b) ("In all averments of fraud or

28   mistake, the circumstances constituting fraud or mistake shall be stated with

9

EXHIBIT ____ 52

PAGE ____ 665

1   particularity. Malice, intent, knowledge, and other condition of mind of a person

2   may be averred generally.") with Fed. R. Civ. P. 8(a) ("A pleading which sets forth a

3   claim for relief, . . . shall contain . . . (2) a short and plain statement of the claim

4   showing that the pleader is entitled to relief . . . ."); see Lancaster Community Hosp.

5   v. Antelope Valley Hosp. Dist., 940 F.2d 397, 405 (9th Cir. 1991) (applying Rule

6   9(b) standard to allegations of mail fraud and noting that "[t]he Ninth Circuit has

7   repeatedly insisted that [Rule 9(b)] be followed in RICO actions alleging the

8   predicate act of mail fraud."), cert. denied, 502 U.S. 1094 (1992).

9        In order to state its claim under § 1962(c), Mattel "must allege (1) conduct

10  (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing

11  injury to [its] business or property." Ove v. Gwinn, 264 F.3d 817, 825 (9th Cir.

12  2001) (internal quotation marks and citation omitted). Here, counter-defendants'

13  motions challenge the first, second, fourth, and fifth elements.

14       1.    "Conduct or Participate"

15       Bryant contends that his role in any alleged scheme or enterprise is too

16  tenuous to constitute the "conduct" necessary to impose RICO liability. In order to

17  have RICO liability imposed upon him, a defendant must "conduct or participate,

18  directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of

19  racketeering activity . . . ." 18 U.S.C. § 1962(c). The United States Supreme Court

20  has elaborated on this statutory language in Reves v. Ernst & Young, 507 U.S. 170,

21  179 (1993), wherein it noted:

22           [T]he word "participate" makes clear that RICO liability is not limited to

23           those with primary responsibility for the enterprise's affairs, just as the

24           phrase "directly or indirectly" makes clear that RICO liability is not

25           limited to those with a formal position in the enterprise, but some part

26           in directing the enterprise's affairs is required.

27  Id. Here, Mattel has alleged that Bryant secretly developed Bratz while employed

28  by Mattel and using Mattel's resources and employees, that he concealed that fact,

10

EXHIBIT 5
PAGE 666

1   when he had a duty to disclose it, and that he did these things in order to facilitate

2   the development of the Bratz concept by Mattel's direct competitor, in violation of,

3   *inter alia*, criminal copyright law.  These allegations, if proven to be true, are

4   sufficient to impose RICO liability on Bryant.

5         **2.**    **Enterprise**

6         Bryant's motion challenges the sufficiency of the allegations regarding a

7   RICO enterprise.  That enterprise is alleged to be an "association-in-fact" enterprise

8   comprised of the counter-defendants, Brawer, Trueba, Vargas, Brisbois, and

9   others.  (AAC ¶ 89.)  Mattel alleges that counter-defendants participated in or

10  conducted the affairs of the association-in-fact enterprise through a pattern of

11  racketeering activities, including, as detailed in the AAC, predicate acts of mail

12  fraud, wire fraud, evidence tampering, interstate and foreign travel to aid

13  racketeering activities, and criminal copyright infringement.  (AAC ¶ 90.)  The

14  counter-defendants' goal is alleged to have been to "execut[e] or attempt to

15  execut[e] [a] scheme to improperly defraud Mattel and steal its trade secret or

16  otherwise confidential and proprietary information . . . ."  (AAC ¶ 90.)

17        A recent *en banc* decision of the Ninth Circuit sets forth a comprehensive

18  analysis of the sufficiency of allegations regarding a RICO enterprise necessary to

19  state a claim.  See Odom v. Microsoft Corp., 486 F.3d 541, 2007 WL 1297249 (9th

20  Cir. 2007) (designated for publication).  That decision provides the blueprint for the

21  Court's present analysis.

22        Odom involved an alleged scheme involving consumers who purchased

23  computers from Best Buy retail stores.  Id. at 543.  The computers would include a

24  Microsoft compact disc that the cashier would scan; the consumer's credit card was

25  also scanned for purchase.  Id.  The credit card information was transmitted to

26  Microsoft, and Microsoft would, at some point, begin making unauthorized charges

27  to the credit card used to purchase the computer, ostensibly for Microsoft's

28  provision of internet services.  Id.  Odom brought substantive RICO and RICO

EXHIBIT _____ 52

PAGE _____ 66

1  conspiracy claims based on these allegations. Id. at 544.

2       The Ninth Circuit first noted the evidenced judicial resistance to RICO in the

3  lower courts, contrasted with the Supreme Court's four reversals of such narrow

4  readings of RICO.  Id. at 545-47 (citing United States v. Turkette, 452 U.S. 576

5  (1981) (rejecting notion that RICO prohibited only the infiltration of legitimate

6  businesses by organized crime); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 481

7  (1985) (rejecting notion that RICO could be used to impose civil liability only where

8  the defendant had been criminally convicted and that such liability was limited to a

9  narrow measure of damages); National Organization for Women v. Scheidler, 510

10  U.S. 249 (1994) (rejecting the notion that RICO liability could be imposed only when

11  the acts of a RICO enterprise had an economic motive); and Cedric Kushner

12  Promotions v. King, 533 U.S. 158 (2001) (reversing lower court's ruling that no

13  RICO claim was stated where president and sole shareholder of a corporation was

14  alleged to have associated with his wholly owned corporation as a RICO

15  "enterprise," and relying on fact that person and corporation were separate legal

16  entities).  In Odom, the Ninth Circuit understandably viewed these four holdings as

17  a "general instruction that we should not read the statutory terms of RICO

18  narrowly."  Odom, 486 F.3d at 547 (internal citation omitted).

19       In Odom, the Ninth Circuit clarified -- and relaxed -- the standard for pleading

20  and proving an "associated-in-fact" enterprise such as the one alleged here:

21          The definition of "enterprise" in the text of RICO is fairly

22       straightforward.  In its entirety, the definition is as follows: "'enterprise'

23       includes any individual, partnership, corporation, association, or other

24       legal entity, and any union or group of individuals associated in fact

25       although not a legal entity."  18 U.S.C. § 1961(4).  As is evident from

26       the text, this definition is not very demanding.  A single "individual" is

27       an enterprise under RICO.  Similarly, a single "partnership," a single

28       "corporation," a single "association," and a single "other legal entity"

EXHIBIT _____ 52

PAGE _____ 668

1    are all enterprises.  At issue in this case is the last kind of enterprise

2    listed in the definition -- a "group of individuals associated in fact."  It is

3    undisputed that a corporation can be an "individual" for purposes of

4    an associated-in-fact enterprise.

5    Id. at 548.

6          The Ninth Circuit acknowledged that "enterprise" must be something greater

7    than merely a pattern of racketeering activity; however, the court rejected the notion

8    that an enterprise must have a particular ascertainable organizational structure.  Id.

9    at 551 ("We take this opportunity to join the circuits that hold that an

10   associated-in-fact enterprise under RICO does not require any particular

11   organizational structure, separate or otherwise.") (citations omitted).  A party need

12   only set forth factual allegations of "a group of persons associated together for a

13   common purpose of engaging in a course of conduct," "evidence of an ongoing

14   organization, formal or informal," and "evidence that the various associates function

15   as a continuing unit."  Id. at 552 (internal citations and quotation marks omitted).

16         As for the common purpose, it was met in Odom, where the plaintiff had

17   alleged the following:

18          [D]efendants had the common purpose of increasing the

19          number of people using Microsoft's Internet Service, and doing so by

20          fraudulent means.  Best Buy furthered this common purpose by

21          distributing Microsoft Internet Trial CD's and conveying its customers'

22          debit and credit card information to Microsoft.  Microsoft then used the

23          information to activate customer accounts.

24   Id.  Here, Mattel has alleged the common purpose of attempting to defraud Mattel

25   and steal its trade secrets.  Mattel's many factual allegations, detailed herein,

26   support this alleged common purpose.

27         As for the "ongoing organization" requirement, the Ninth Circuit in Odom

28   noted that the plaintiffs had met that element, which was met where the

13

EXHIBIT ____ 52

PAGE ____ 667

1   organization was alleged to be "a vehicle for the commission of two or more

2   predicate crimes." Id. (internal quotation marks and citation omitted).  The Ninth

3   Circuit noted the following factual allegations:

4           Microsoft and Best Buy established mechanisms for

5       transferring plaintiffs' personal and financial information from Best Buy

6       to Microsoft. That information then allowed Microsoft to activate

7       plaintiffs' Internet accounts without their knowledge or permission.

8       These mechanisms enabled Microsoft to bill plaintiffs improperly for

9       MSN services in 2001, 2002 and 2003.

10   Id. Here, plaintiffs have alleged that the counter-defendants coordinated their many

11   efforts at depriving Mattel of its proprietary information and its intellectual property.

12   The allegations regarding common use of the "plot04@aol.com" email address to

13   transfer confidential Mattel information to MGA support the finding of an "ongoing

14   organization." So, too, do the allegations regarding the repeated communications

15   between Bryant and MGA.

16       The "continuing unit" requirement does not appear to the Court to mandate

17   that the organization continues to this day;[2] rather, the requirement is related to the

18   notion that RICO was not meant to address discrete instances of fraud or criminal

19   conduct.  "[T]he continuity requirement focuses on whether the associates'

20   behavior was 'ongoing' rather than isolated activity." Id. at 553 (internal quotation

21   marks and citation omitted).  Related to that concern, it is also clear to the Court

22   that this requirement is related to the duration of the racketeering activities. See id.

23   ("An almost two-year time span is far more than adequate to establish that Best

24   Buy and Microsoft functioned as a continuing unit.").  Here, the allegations do not

25   reveal that the conduct complained of was mere isolated activity; rather, Mattel sets

26   forth allegations of racketeering activity that spanned a period of three years. The

27

28       [2] Nevertheless, Mattel alleges that the enterprise exists to this day by virtue
    of its continued use of Mattel's information and property.   EXHIBIT _____ 58

                    14

                    PAGE _____ 670

1  allegations describe a scheme consisting of corporate warfare between competitors
2  that has been waged over a long period of time and waged on a number of fronts,
3  both foreign and domestic. The "continuing unit" requirement is therefore satisfied.
4        Accordingly, the Court finds that Mattel has sufficiently pleaded the existence
5  of a RICO enterprise.
6        **3.    Predicate Acts of Racketeering Activity**
7              **a.    Mail Fraud and Wire Fraud**
8  The criminal prohibition against mail fraud is found at 18 U.S.C. § 1341:
9              *Whoever, having devised or intending to devise any scheme or*
10             *artifice to defraud, . . . for the purpose of executing such scheme or*
11             *artifice or attempting so to do, places in any post office or authorized*
12             *depository for mail matter, any matter or thing whatever to be sent or*
13             *delivered by the Postal Service, or deposits or causes to be deposited*
14             *any matter or thing whatever to be sent or delivered by any private or*
15             *commercial interstate carrier, or takes or receives therefrom, any such*
16             *matter or thing, . . . shall be fined under this title or imprisoned not*
17             *more than 20 years, or both.*
18  Id. The Ninth Circuit has described the elements of mail fraud as "(1) proof of a
19  scheme to defraud; (2) using or causing the use of the mails to further the
20  fraudulent scheme; and (3) specific intent to defraud." United States v. Rogers, 321
21  F.3d 1226, 1229 (9th Cir. 2003) (internal citation omitted).
22       The criminal prohibition against wire fraud is similar:
23             *Whoever, having devised or intending to devise any scheme or*
24             *artifice to defraud, . . . transmits or causes to be transmitted by means*
25             *of wire, radio, or television communication in interstate or foreign*
26             *commerce, any writings, signs, signals, pictures, or sounds for the*
27             *purpose of executing such scheme or artifice, shall be fined under this*
28             *title or imprisoned not more than 20 years, or both.*

15

EXHIBIT 52
PAGE 671

18 U.S.C. § 1343.  The Ninth Circuit has described the elements of wire fraud as

"(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and

(3) a specific intent to deceive or defraud."  United States v. Shipsey, 363 F.3d 962,

971 (9th Cir. 2004) (citations omitted).

        As all parties acknowledge, the predicate acts of mail fraud and wire fraud

must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b).  Specifically,

Mattel must detail "the time, place, and manner of each act of fraud, [and it must

set forth] the role of each defendant in each scheme."  Lancaster Community

Hosp., 940 F.2d at 405.  This standard applies in RICO actions alleging predicate

acts of mail fraud.  Id.

        Here, Mattel sets forth allegations of predicate acts of mail fraud and wire

fraud referenced in Exhibit C to the AAC.  However, these alleged predicate acts

are insufficiently pleaded because they fail to adequately describe the contents of

the communications; specifically, they fail to detail time, place and manner of "each

act of fraud."  The substantive RICO claim is therefore dismissed to the extent it is

premised on those communications.  Mattel is **GRANTED** leave to amend the RICO

claim based on this insufficiency; Mattel must attach to the Second Amended

Answer and Counterclaims ("SAAC") copies of the referenced communications.

The contents of packages referenced in Exhibit C must be described in order to

meet the Rule 9(b) requirements.

        At oral argument, counsel for MGA argued that the substance of many, if not

all of the communications, cannot be read to further a scheme to defraud.  That

argument will be considered another day, after Mattel files the SAAC.  However, the

Court takes the opportunity today to note that, given the broad scope of the alleged

scheme to defraud, including the criminal copyright infringement allegations,

otherwise innocuous and routine communications regarding day-to-day operations

and product development may be found to be in furtherance of that scheme.  See

Tellabs, Inc. v. Makor Issues & Rights, Ltd., __ U.S. __, No. 06-484,  2007 WL

16

EXHIBIT _____ 52

PAGE _____ 672

1  1773208, at *9 (June 21, 2007) (noting that, in considering a Rule 12(b)(6) motion,

2  "courts must consider the complaint in its entirety").

3          Counter-defendants also argue that Mattel failed to plead each defendant's

4  role in furtherance of the scheme to defraud.  As interpreted by the Ninth Circuit,

5  the Rule 9(b) standard clearly requires that a plaintiff so plead.  Lancaster

6  Community Hosp., 940 F.2d at 405.  However, the Court will view the

7  communications alleged to constitute mail and wire fraud in conjunction with all the

8  allegations set forth regarding the alleged scheme in the counterclaims.  See Flood

9  v. Makowski, No. 3:CV-03-1803, 2004 WL 1908221, at *14 (M.D. Pa., Aug. 24,

10 2004) (applying the principle that reasonable inferences in favor of a plaintiff must

11 be made when considering a Rule 12(b)(6) motion and noting that "[a]lthough

12 Plaintiffs' Complaint does not expressly identify how each particular mail or wire

13 communication furthered the scheme, the Complaint clearly alleges facts which

14 create an unquestionable inference that the alleged communications furthered the

15 scheme.").

16         Counter-defendants also argue that, because the emails alleged to

17 constitute wire fraud were sent among individuals physically located in the same

18 state, Mattel will not be able to establish the interstate nature of the

19 communications.  See 18 U.S.C. § 1343 (setting forth the requirement that

20 communications be transmitted "in interstate or foreign commerce").  Mattel has

21 alleged that the communications were transmitted in interstate or foreign

22 commerce.  (AAC ¶ 93(b).)  This suffices at the pleadings stage; however,

23 eventually Mattel will be called upon to support these allegations with evidence.

24 See First Pacific Bancorp, Inc. v. Bro, 847 F.2d 542, 547 (9th Cir. 1988) (implicitly

25 holding that wire fraud must be supported, at the summary judgment stage, by

26 evidence of interstate wire fraud).

27         The Court dismisses the RICO claim to the extent it is based on the alleged

28 predicate acts of mail fraud and wire fraud because those acts are not pleaded with

EXHIBIT _____ 9

PAGE _____ 673

1  particularity as required by Rule 9(b).  Mattel is **GRANTED** ten days' leave to file a

2  SAAC that incorporates and attaches and/or describes the *communications and the*

3  *contents of packages referenced in Exhibit C.*

4          b.    <u>Evidence Tampering</u>

5          Unlike the mail fraud and wire fraud allegations, the allegations regarding the

6  *remaining predicate acts are governed by the more lenient pleading standards of*

7  Rule 8(a).  <u>See</u> <u>Slade v. Gates</u>, No. 01-8244-RMT, 2002 WL 31387263, at *6 (C.D.

8  Cal., Oct. 11, 2002).  The Court considers the sufficiency of those remaining

9  allegations pursuant to this Rule.

10          The criminal prohibition against tampering with evidence is found at 18

11  U.S.C. § 1512:

12              Whoever corruptly . . . alters, destroys, mutilates, or conceals a

13              *record, document, or other object, or attempts to do so, with the intent*

14              to impair the object's integrity or availability for use in an official

15              proceeding . . . shall be fined under this title or imprisoned not more

16              than 20 years, or both.

17  <u>Id.</u>  Mattel's opposition makes clear that its evidence tampering allegations are

18  based upon two categories of documents:  The first category of documents,

19  perhaps composed of only one multi-page document, involves the alleged alteration

20  of Bryant's contract with MGA to remove a fax header showing that the date of its

21  execution, which predated the effective date of Bryant's resignation from Mattel.[3]

22  The second category of documents are those filed with the United States Copyright

23  Office, which are alleged to omit the disclosure that certain Bratz drawings were

24  "works for hire," and which are alleged to have had alterations made to certain

25

26          [3] The AAC merely alleges that counter-defendants Bryant and MGA
27  "tamper[ed] with and defac[ed] documents which showed that . . . Bryant was a
    Mattel employee while he was working for and with MGA . . . ." (AAC ¶ 35.)
28  However, it is clear from other filings by the parties that, at a minimum, this
    allegation refers to MGA's contract with Bryant.

EXHIBIT ____ 52

PAGE ____ 644

1  relevant dates.  (See AAC ¶ 35; Mattel Opp. to MGA's Motion at 9.)

2          As to the first category, a predicate act is sufficiently alleged.  Mattel has

3  alleged that a document was altered in a manner designed to conceal critical

4  evidence, highly relevant to the present official proceeding, regarding the timing of

5  the execution of the document.

6          Conversely, it is unclear whether Mattel has alleged a predicate act with

7  respect to the second category of documents.  The issue of whether submitting

8  fraudulent registrations and "altering relevant dates" on documents submitted to the

9  United States Copyright Office has not been fully briefed by the parties; the issue

10  was framed in this manner only upon the filing of the reply.[4]  Therefore, the Court

11  reserves this issue for a later date, and anticipates that it will be addressed by the

12  parties in a motion to dismiss the SAAC.

13              c.     **Travel Act Violation**

14      Federal criminal law prohibits interstate or foreign travel to aid in

15  racketeering activities.  18 U.S.C. § 1952; see also 18 U.S.C. § 1961 (defining a

16  violation of § 1962 as a RICO predicate act).  In relevant part, the criminal

17  prohibition states:

18          Whoever travels in interstate or foreign commerce or uses the

19          mail or any facility in interstate or foreign commerce, with intent to . . .

20          promote, manage, establish, carry on, or facilitate the promotion,

21          management, establishment, or carrying on, of any unlawful activity,

22          and thereafter performs or attempts to perform . . . [such an act,] shall

23          be fined under this title, imprisoned not more than 5 years, or

24          both . . . .

25                          . . . .

26          As used in this section . . . "unlawful activity" means . . .

27  _____

28      [4] The Court does not view this failure as the fault of any party.

EXHIBIT _____ 52
PAGE _____ 675

1    extortion, bribery, or arson in violation of the laws of the State in which

2    committed or of the United States . . . .

3    Id. Mattel alleges that Bryant and others traveled in interstate commerce to commit

4    commercial bribery in violation of California's prohibition against commercial

5    bribery, which in relevant part provides:

6          (a) Any employee who solicits, accepts, or agrees to accept

7          money or any thing of value from a person other than his or her

8          employer, other than in trust for the employer, corruptly and without

9          the knowledge or consent of the employer, in return for using or

10         agreeing to use his or her position for the benefit of that other person,

11         and any person who offers or gives an employee money or any thing

12         of value under those circumstances, is guilty of commercial bribery.

13   Cal. Penal Code § 641.3. Several allegations support a violation of § 641.3(a),

14   which in turn supports a violation of 18 U.S.C. § 1952. Mattel has alleged that

15   Bryant, while still employed by Mattel, entered into a contract with MGA to provide

16   design services to MGA on a "top priority" basis, and used Mattel property,

17   employees, and resources to develop and design the Bratz concept.

18         Counter-defendants argue that the requirement under California's

19   commercial bribery statute that a violator act "corruptly" is not met because Bryant

20   did not intend to injure Mattel. Such an intent is not required; rather it is sufficient

21   that Bryant is alleged to have intended to defraud Mattel. See Cal. Penal Code

22   § 341.3(d)(3) (defining "corruptly" as involving the intent "to injure *or* defraud")

23   (emphasis added).

24         **d.    Criminal Copyright Violations**

25         The parties dispute the relevant pleading standard that governs the

26   allegations which underlie the criminal copyright violation claim. Counter-

27   defendants would have the Court apply the more exacting Rule 9(b) standards

28   because, in their assessment, the claim "sounds in fraud." Mattel, however,

EXHIBIT ___52___

PAGE_____676

1   contends that there is no reason to depart from the more lenient Rule 8(a) standard

2   generally applied to copyright claims because, in its assessment, the claims "sound

3   in copying, not fraud." (Mattel Opposition to MGA's Motion at 4.)

4        The recent Ninth Circuit case on this issue, cited by both parties, stands for

5   the unremarkable proposition that, consistent with Rule 9(b), all **averments** of fraud

6   must be pleaded with particularity, regardless of whether fraud is an essential

7   element of the claim to which the averment relates. See <u>Vess v. Ciba-Geigy Corp.</u>

8   <u>USA</u>, 317 F.3d 1097, 1103 (9th Cir. 2003); Fed. R. Civ. P. 9(b) ("In all **averments**

9   of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

10   with particularity.") (emphasis added).

11       Considering Rules 8(a), 9(b), and the teachings of <u>Vess</u>, a spectrum

12   emerges. At the left end of this spectrum are claims that do not involve any

13   allegations of fraud. Those need only satisfy Rule 8(a)'s "short and plain

14   statement" standard. At the opposite end of the spectrum are claims based solely

15   on fraud, and the facts underlying such a claim must be alleged with particularity

16   pursuant to Rule 9(b). Lying closer to the Rule 9(b) end of the spectrum is a

17   category of claims discussed in <u>Vess</u>:

18         In cases where fraud is not a necessary element of a claim, a

19         plaintiff may choose nonetheless to allege in the complaint that the

20         defendant has engaged in fraudulent conduct. In some cases, the

21         plaintiff may allege a unified course of fraudulent conduct and rely

22         entirely on that course of conduct as the basis of a claim. In that

23         event, the claim is said to be "grounded in fraud" or to "sound in

24         fraud," and the pleading of that claim as a whole must satisfy the

25         particularity requirement of Rule 9(b).

26   <u>Vess</u>, 317 F.3d at 1103-04 (internal citations omitted). It is into this category MGA

27   contends that the allegations of criminal copyright claims fit, and MGA therefore

28   contends that all allegations regarding the criminal copyright claims must be

EXHIBIT _____ 52

PAGE _____ 677

1  pleaded with particularity.

2  However, <u>Vess</u> sets up another category, lying closer to the Rule 8(a) part of

3  the spectrum (but nevertheless requiring pleading with some particularity):

4          In other cases, however, a plaintiff may choose not to allege a

5  unified course of fraudulent conduct in support of a claim, but rather

6  to allege some fraudulent and some non-fraudulent conduct.  In such

7  cases, only the allegations of fraud are subject to Rule 9(b)'s

8  heightened pleading requirements. . . . The rule does not require that

9  allegations supporting a claim be stated with particularity when those

10  allegations describe non-fraudulent conduct.

11          [In other words,] in a case where fraud is not an essential

12  element of a claim, only allegations ("averments") of fraudulent

13  conduct must satisfy the heightened pleading requirements of Rule

14  9(b).  Allegations of non-fraudulent conduct need satisfy only the

15  ordinary notice pleading standards of Rule 8(a).

16  <u>Id.</u> at 1104-05.

17          Whether fraud is an essential element of criminal copyright infringement

18  must be determined by reference to the statutory language and any interpretative

19  case law.  In relevant part, the prohibition against criminal copyright infringement

20  provides: "Any person who violates section 506(a) (relating to criminal offenses) of

21  title 17 shall be punished as provided [herein] in and such penalties shall be in

22  addition to any other provisions of title 17 or any other law."  18 U.S.C. § 2319.  In

23  turn, the relevant provision in 17 U.S.C. § 506 states that "[a]ny person who willfully

24  infringes a copyright shall be punished as provided under section 2319 of title 18, if

25  the infringement was committed . . . for purposes of commercial advantage or

26  private financial gain . . . ."  17 U.S.C. § 506(a)(1)(A).  The elements of the offense

27  are easily gleaned from the straightforward statutory language: "Criminal

28  infringement of copyright has three elements: (1) infringement of a copyright

EXHIBIT _____ 52

PAGE _____ 678

1    (2) done wilfully (3) for purposes of commercial advantage or private financial gain."

2    United States v. Goss, 803 F.2d 638, 642 (11th Cir. 1986).

3        Clearly, fraud is not an essential element of a criminal copyright claim, taking

4    it out of the category at the far end of the spectrum described above, and

5    necessitating an inquiry into whether Mattel has chosen to incorporate a fraud

6    element into its criminal copyright claim.  The AAC at ¶ 93(e) reveals that the

7    criminal copyright claim is premised upon the "willfull[] infringe[ment of] Mattel's

8    copyrights, including with respect to documents containing Mattel trade secret and

9    confidential information . . . ."  The Opposition fills in more details regarding this

10   claim, noting that the criminal copyright claim is premised upon the Bratz-related

11   works, Bratz-derivative works, and works contained within Mattel's allegedly

12   purloined trade secrets and confidential information.  (Mattel Opposition to MGA's

13   Motion at 5).

14       These allegations do not "allege a unified course of fraudulent conduct and

15   rely entirely on that course of conduct as the basis of a claim" such that the claim

16   could be said to "sound in fraud" and therefore require pleading with particularity as

17   to the entire claim.  The allegations establish that much of the conduct complained

18   of consists of simple copying of the Bratz-related works or the creation of Bratz-

19   derivative works.  Such allegations are unrelated to allegations of fraud.  Therefore,

20   if this claim falls anywhere on the spectrum other than the Rule 8(a) category, it

21   falls in the category described by Vess as those claims in which a claimant chooses

22   to "allege some fraudulent and some non-fraudulent conduct."  Id. at 1104.

23       When one considers that the alleged predicate acts of criminal copyright

24   infringement are but a small part of a larger, and singular, claim brought pursuant to

25   RICO, it is evident that the RICO claim falls neatly into the category of claims that

26   are based partly on fraudulent and partly on non-fraudulent conduct.  The Court

27   has already found that certain fraudulent conduct -- that supporting the alleged

28   predicate acts of mail fraud and wire fraud -- is insufficiently pleaded.  The current

23

EXHIBIT ____ 52

PAGE ____ 679

1   focus, however, is whether the allegations supporting the predicate acts of criminal
2   copyright infringement involve fraudulent conduct.
3        Here, there are two types of works allegedly infringed.  The first type is the
4   Bratz-related and Bratz-derivative works.  The second type is Mattel's other trade
5   secrets and confidential information.  Both types are alleged -- with particularity -- to
6   have been procured by MGA through fraudulent conduct, but the criminal copyright
7   infringement predicate acts do not implicate that fraudulent conduct.  Rather, they
8   implicate only questions of whether counter-defendants wilfully infringed Mattel's
9   works for commercial advantage or private financial gain.  Here, Mattel has
10  sufficiently alleged predicate acts of criminal copyright infringement by alleging that
11  MGA and other counter-defendants willfully infringed its copyrights for purposes of
12  gaining commercial advantage and private financial gain.  As Mattel correctly
13  contends, state of mind, in this instance willfulness, may be pleaded generally. See
14  Ferguson Beauregard/Logic Controls v. Mega systems, LLC, 350 F.3d 1327, 1343
15  (Fed. Cir. 2003).
16        4.    **Injury to Business or Property**
17        "Recovery under RICO is limited to those injuries flowing from predicate
18  acts . . . ." Resolution Trust Corp. v. Keating, 186 F.3d 1110, 1117 (9th Cir. 1999)
19  (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985)).  Here, Mattel
20  has alleged damages flowing from the alleged acts of racketeering activity.  (AAC
21  ¶ 96).  Damages easily flow from theft of trade secrets and confidential information
22  committed by a direct competitor and from infringement of copyrights that are
23  alleged to have been used to make millions -- if not billions -- of dollars.
24        Counter-defendants argue that Mattel lacks standing to sue on behalf of its
25  subsidiaries.  This issue arises because many of the allegations of the thefts of
26  trade secrets involve actions taken in Mexico or Canada by employees of Mattel's
27  foreign subsidiaries.  Mattel argues that it is not attempting to sue for damages
28  incurred by its subsidiaries; rather, Mattel alleges that much of the confidential

24

EXHIBIT 52
PAGE 680

1  information stolen by the employees of Mattel's subsidiaries belonged not to

2  Mattel's subsidiaries, but to Mattel itself.  Based on these allegations, Mattel may

3  sue for damages it sustained.  Mattel may not sue for damages incurred by its

4  foreign subsidiaries.

5         **5.    Ruling on Motions to Dismiss**

6         The Motions to Dismiss the RICO claims are **GRANTED** in part.  As set forth

7  herein, the alleged predicate acts of mail fraud and wire fraud are insufficiently

8  alleged, and Mattel is **GRANTED** leave to amend the AAC.

9  **C.    Trade Secrets**

10        MGA contends that Mattel has failed to plead its trade secrets with sufficient

11  particularity to comply with its duties under Cal. Code Civ. P. § 2019.210, which

12  provides:

13              In any action alleging the misappropriation of a trade secret

14        under the Uniform Trade Secrets Act . . . , before commencing

15        discovery relating to the trade secret, the party alleging the

16        misappropriation shall identify the trade secret with reasonable

17        particularity subject to any orders that may be appropriate under

18        Section 3426.5 of the Civil Code [involving in camera reviews and

19        sealing of court documents].

20  Id.  Based on the unambiguous language of the statute, the Court agrees with

21  Mattel's characterization of this requirement as one related to discovery rather than

22  related to pleading.

23        The Court also agrees that, by identifying documents in discovery by Bates-

24  stamp number, Mattel has complied with the dictates of § 2019.210.  See

25  Advanced Modular Sputtering, Inc. v. Superior Court, 132 Cal.App.4th 826, 835-36,

26  (2005) (internal quotation marks and citations omitted) ("[Reasonable particularity]

27  means that the plaintiff must make some showing that is reasonable, i.e., fair,

28  proper, just and rational[,] . . . under all of the circumstances to identify its alleged

EXHIBIT _____ 5∂

PAGE _____ 681

1  trade secret in a manner that will allow the trial court to control the scope of

2  subsequent discovery, protect all parties' proprietary information, and allow them a

3  fair opportunity to prepare and present their best case or defense at a trial on the

4  merits."). MGA's complaints regarding the volume of documents so identified, and

5  their skepticism of Mattel appropriately attaching such an identification to many of

6  those identified documents, are not properly addressed at this stage of the

7  proceedings.

8      The motion to dismiss the trade secrets claim on this basis is therefore

9  **DENIED**.

10 **D.    Duplicative State-Law Claims**

11     Bryant's motion to dismiss Mattel's duplicative state-law claims is **DENIED**.

12 The state-law counterclaims asserted against Bryant in the AAC admittedly overlap

13 with the claims asserted against him in the 04-9059 case, however, the factual

14 allegations underlying the claims asserted in the AAC are broader in scope than

15 those underlying the claims asserted in the 04-9059 case.

16     **IV. Motion to Dismiss for Lack of Personal Jurisdiction**

17     MGA Mexico challenges this Court's exercise of personal jurisdiction over it.

18 As set forth below, the Court concludes that it may, consistent with California law

19 and the federal Due Process Clause, exercise specific personal jurisdiction over

20 this admittedly foreign corporation.

21 **A.    The Constitutional Exercise of Personal Jurisdiction**

22     Where a party moves to dismiss a claim for lack of personal jurisdiction, the

23 party asserting the claim bears the burden of demonstrating that jurisdiction is

24 appropriate. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir.

25 2004). However, in opposing a motion to dismiss for lack of personal jurisdiction,

26 the party asserting the claim need only make a *prima facie* showing of jurisdictional

27 facts. Id. Disputed facts are to be resolved in favor of the exercise of personal

28 jurisdiction. Id.

EXHIBIT ___ 52
PAGE ___ 682

1       Because there is no applicable federal statute governing personal

2   jurisdiction, the Court applies the law of the state in which the district court sits. Id.

3   (citations omitted). "Because California's long-arm jurisdictional statute is

4   coextensive with federal due process requirements, the jurisdictional analyses

5   under state law and federal due process are the same." Id. at 800-01 (citations

6   omitted).  In order for a court's exercise of personal jurisdiction over a nonresident

7   defendant to be constitutionally permissible, the defendant must have "minimum

8   contacts" with the forum state "such that the exercise of jurisdiction does not offend

9   traditional notions of fair play and substantial justice." Id. at 801 (internal quotation

10  marks and citation omitted).

11      Personal jurisdiction may be either general or specific.  For general personal

12  jurisdiction to apply, a defendant (or here, a counter-defendant) "must engage in

13  continuous and systematic general business contacts . . . that approximate a

14  physical presence in the forum state." Id. (internal quotation marks and citations

15  omitted).

16      To determine whether it has specific personal jurisdiction over a nonresident

17  defendant, the Court employs a three-part test:

18          (1) The non-resident defendant must purposefully direct his

19      activities or consummate some transaction with the forum or resident

20      thereof; or perform some act by which he purposefully avails himself

21      of the privilege of conducting activities in the forum, thereby invoking

22      the benefits and protections of its laws; (2) the claim must be one

23      which arises out of or relates to the defendant's forum-related

24      activities; and (3) the exercise of jurisdiction must comport with fair

25      play and substantial justice, i.e. it must be reasonable.

26  Id. at 802.

27      The party asserting the claim bears the burden of establishing the first two

28  parts of the test. Id. If that party establishes the first two parts, then the burden

27

EXHIBIT _____ 52

PAGE _____ 683

1   shifts to the party resisting the Court's exercise of personal jurisdiction "to present a

2   *compelling case* that the exercise of jurisdiction would not be reasonable." Id.

3   (emphasis added).

4       The first part of the test is satisfied by either "purposeful availment" or

5   "purposeful direction." Id. Purposeful availment is shown when a defendant avails

6   itself of the privilege of doing business in a forum state, usually met when the

7   defendant took some action in the forum, such as executing or performing a

8   contract there. Id. By virtue of such actions, a defendant "purposefully avails itself

9   of the privilege of conducting activities within the forum State, thus invoking the

10  benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

11  When taking advantage of these "benefits and protections," a defendant must also

12  "submit to the burdens of litigation in that forum." Burger King Corp. v. Rudzewicz,

13  471 U.S. 462, 476 (1985).

14      By contrast, purposeful direction, involves actions by the defendant outside

15  of the forum state but that are directed at the forum. Schwarzenegger, 374 F.3d at

16  803. The purposeful direction analysis is derived from a three-part "effects test"

17  that finds its roots in the Supreme Court's decision in Calder v. Jones, 465 U.S. 783

18  (1984). Pursuant to this analysis, the defendant must "have (1) committed an

19  intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

20  defendant knows is likely to be suffered in the forum state." Id.; Schwarzenegger,

21  374 F.3d at 803. All three parts of the test must be satisfied. The second part of

22  the effects test is described by the Ninth Circuit as the "express aiming"

23  requirement, and requires that the counter-defendants "expressly aimed" its

24  intentional act at California. See Schwarzenegger, 374 F.3d at 806. Specifically,

25  "express aiming" is found where the defendant is alleged to have engaged in

26  wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident

27  of the forum state." Bancroft & Masters, Inc. v. Augusta Nat. Inc., 223 F.3d 1082,

28

28

EXHIBIT _____ 50

PAGE _____ 684

1087 (9th Cir. 2000).[5]

Assuming that the party asserting a claim can establish that the party resisting the Court's exercise of personal jurisdiction has met either the purposeful availment or express aiming part of the three-part test regarding the exercise of specific personal jurisdiction, courts next consider whether the claim arises out of or relates to the forum-related activities. In making this determination, the Court considers whether the contacts with the forum gave rise to the claims asserted, employing a "but for" standard. See Doe v. Unocal Corp., 248 F.3d 915, 924 (9th Cir. 2001).

Once the purposeful availment/express aiming and relatedness requirements are established, the burden shifts to the party resisting the Court's exercise of jurisdiction to show that exercise of jurisdiction is unreasonable. In determining reasonableness, the Court considers seven factors:

1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum.

---

[5] What constitutes, or doesn't constitute, "express aiming" is best illustrated by example. For instance, in Pebble Beach Co. v. Caddy, 453 F.3d 1151 (9th Cir. 2006), no express aiming was found where the owner of a bed-and-breakfast in England (overlooking a pebbly beach) used the term "pebblebeach," the name of a famous golf course located in California, on its web site. Id. at 1153, 1156-57. The Ninth Circuit acknowledged that it might be foreseeable that the defendant's use of the web site might have some effect on California, but noted that mere foreseeability of effect in a forum state is not enough to constitute express aiming. Id. at 1157. In contrast to Pebble Beach is the case of Panavision Intern., L.P. v. Toeppen,141 F.3d 1316, 1321 (9th Cir. 1998), in which the Ninth Circuit found that the express aiming requirement was met where the defendant registered plaintiff's marks as Internet domain names in order to force a California plaintiff to pay him money.

EXHIBIT ____ 52
PAGE ____ 685

Roth v. Garcia Marquez, 942 F.2d 617, 623 (9th Cir. 1991) (internal citation omitted).  No factor is dispositive and the Court must balance all seven.  Id. (internal citation omitted).

**B.    MGA Mexico's Contacts with the Forum State**

The AAC alleges that Issac Larian and other MGA officers, while in California, executed a plot to target three high-level employees of Mattel Mexico, and entice them to steal Mattel's trade secrets.  In written offers of employment to these three individuals, Issac Larian held himself out to be the CEO of MGA Mexico.  This plot was facilitated by a number of cross-border communications among the participants as well as travel to the United States by the targeted employees.

**C.    The Court May Exercise Personal Jurisdiction over MGA Mexico**

The AAC repeatedly alleges that Larian, who held himself out to be MGA Mexico's CEO, and who was designated as MGA Mexico's "legal agent" in Mexican registration document actively sought to induce others to access and steal Mattel's trade secrets while located in the California.  See Velázquez Decl. Exs. A-C; Salem Decl. Ex. B.  This constitutes purposeful availment.

To the extent that any of the actions taken in Mexico by the three Mexican employees may be imputed to Mattel Mexico, there is also purposeful direction.  The alleged actions taken on behalf of MGA Mexico were specifically engineered to result in the alleged illegal acquisition of trade secrets belonging to Mattel, a California resident.[6]

The relatedness requirement is also clearly met.  The contacts with California involve actions allegedly taken in order to further the illegal acquisition of Mattel's trade secrets, leading to the present claims against MGA Mexico for misappropriation of trade secrets and the related RICO claims.

---

[6] The AAC alleges the theft of trade secrets belonging not only to Mattel's Mexican subsidiary, but also to Mattel itself, which is a California corporation.

30

EXHIBIT 5a

PAGE 686

1    The burden, therefore, is on MGA Mexico to show that the exercise of

2    jurisdiction is unreasonable.[7]  As noted previously, the Court considers seven

3    factors.  The first factor the Court considers is the defendant's purposeful

4    interjection.  For the reasons the Court has found purposeful availment and

5    purposeful direction, this factor favors the exercise of personal jurisdiction.

6         MGA Mexico argues, without elaboration, that the burden of defending itself

7    in California is "significant."  However, the assumption underlying this argument is

8    that the present action is more properly litigated by MGA's and Mattel's Mexican

9    subsidiaries.  This assumption misses the point of Mattel's claim against MGA

10   Mexico; Mattel, the parent company, was itself injured by MGA's Mexico's alleged

11   misappropriation of its own trade secrets because the alleged misappropriation was

12   not limited to trade secrets belonging to its Mexican subsidiary.  The argument

13   based on this faulty assumption is therefore unconvincing.  In order to show

14   unreasonableness, the burden on the defendant must be great.  See Panavision,

15   141 F.3d at 1323 ("A defendant's burden in litigating in the forum is a factor in the

16   assessment of reasonableness, but unless the inconvenience is so great as to

17   constitute a deprivation of due process, it will not overcome clear justifications for

18   the exercise of jurisdiction.") (internal quotation marks and citation omitted).

19        As to the third and seventh factors, regarding conflicts of law and the

20   ─────────────────

21   [7] In its reply, MGA Mexico declares that it "made a 'compelling case' in
     support of its motion to dismiss that it would be unreasonable to force it to litigate

22   in this forum."  MGA Mexico Reply at 10.  However, MGA Mexico's motion papers
     fail to acknowledge that they bear the burden on this issue.  See MGA Mexico's

23   Memorandum of Points and Authorities at 10 ("Finally, Mattel has failed to satisfy
     the third element required for specific jurisdiction -- that the exercise of jurisdiction

24   over the defendant would be reasonable.").  As Mattel accurately predicted in its
     opposition papers, MGA Mexico implicitly acknowledged its burden in the reply,

25   and used the occasion to improperly present additional arguments for the first
     time.  Although the Court ordinarily would not consider such arguments, it does so

26   here because it does not change the Court's ultimate conclusion.  See In re Intuit
     Privacy Litigation, 138 F.Supp.2d 1272, 1275 n.3 (C.D. Cal. 2001) ("this court

27   does not consider arguments raised anew for the first time in a reply brief as to do

28   so would unfairly deny the non-moving party an opportunity to respond.").

                              31

EXHIBIT ____52___

PAGE ____687___

1  existence of an alternative forum, MGA Mexico makes veiled references to the

2  criminal action in Mexico as constituting a choice of forum made by Mattel,

3  apparently implying that Mattel, having chosen to pursue criminal charges in

4  Mexico, should be precluded from invoking the power of this Court.  It appears to

5  the Court that MGA Mexico has failed to fully and clearly articulate this argument

6  because it is untenable.  Whether Mexican authorities pursue criminal charges

7  based on the same conduct underlying the claims in this action is irrelevant to

8  whether this Court may constitutionally exercise personal jurisdiction over MGA

9  Mexico.  Therefore, MGA Mexico's argument on this issue is unpersuasive.

10        The fourth factor, the interest in adjudicating the dispute, weighs in favor of

11  the exercise of personal jurisdiction, as does the sixth, the plaintiff's interest in

12  convenient and effective relief.

13        MGA Mexico argues that the fifth factor weighs in its favor when the Court

14  considers that the site of injury, which it does not believe is California, is the most

15  efficient forum.  However, this argument is premised on the rejected assumption

16  that the present action is more properly litigated between MGA's and Mattel's

17  Mexican subsidiaries.

18        On balance, a consideration of the reasonableness factors reveals that MGA

19  Mexico has fallen far short of establishing the "compelling case" necessary to

20  render the Court's exercise of personal jurisdiction unreasonable.

21        The Court concludes that Mattel has established the first two parts of the

22  specific personal jurisdiction test, and that MGA Mexico has failed to establish that

23  the Court's exercise of personal jurisdiction over it is otherwise unreasonable.

24  Accordingly, the Court **DENIES** MGA Mexico's motion to dismiss.

25  <div align="center">**V. MGA's and Bryant's Motions Regarding**</div>

26  <div align="center">**the Discovery Master's March 7, 2007, Order**</div>

27        MGA and Bryant seek review of a decision that resolved discovery disputes

28  that arose during Bryant's deposition, and that was rendered by the Court-

EXHIBIT     52

PAGE        688

1   appointed discovery master, Judge Edward A. Infante (Ret.), on March 7, 2007.

2   The Court's order appointing Judge Infante provides that his orders resolving

3   discovery disputes shall be reviewed in the same manner as those made by a

4   magistrate judge of this Court.

5          Pursuant to Fed. R. Civ. P. 72(a), when the parties object to the ruling of a

6   magistrate judge on a non-dispositive manner, such as a discovery dispute, the

7   district judge may modify or set aside only those portions of the magistrate judge's

8   order that are "clearly erroneous or contrary to law." Id.

9          The "clearly erroneous" language refers to factual findings. See e.g.,

10  Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension

11  Trust, 508 U.S. 602, 622 (1993) (discussing the clearly erroneous standard). Here,

12  there were no explicit factual findings or legal conclusions made by Judge Infante

13  regarding the relevant rulings; therefore, the Court reviews the record presented to

14  Judge Infante to determine whether his rulings are contrary to law. See March 7,

15  2007, Order.

16         Questions that do not seek the substance of attorney-client communications

17  generally do not implicate the attorney-client privilege. United States v. Carrillo, 16

18  F.3d 1046, 1050 (9th Cir. 1994) (finding no violation of the attorney-client privilege

19  where prosecutor, who asked whether a criminal defendant had consulted with his

20  attorney during a recess in order to raise an inference of attorney coaching of

21  testimony during the trial, stopped short of asking defendant the substance of

22  defendant's communications with his attorney). Therefore, questions such as the

23  one addressed by objection No. 38, asking whether Bryant talked to counsel for

24  MGA during a break from his deposition, are not subject to objection based on the

25  attorney-client privilege. This conclusion is consistent with Judge Infante's Order.

26         Mattel's question regarding who is paying Bryant's legal fees, addressed by

27  objection No. 42, is likewise not objectionable. MGA and Bryant argue that state

28  law applies; however, because the present consolidated actions involve both

33

EXHIBIT _____ 52

PAGE _____ 687

1   federal and state-law claims, the federal law of privilege applies.  Agster v.

2   Maricopa County, 422 F.3d 836, 839-40 (9th Cir. 2005) ("Where there are federal

3   question claims and pendent state law claims present, the federal law of privilege

4   applies.").  To that end, consistent with federal privilege law, fee-payment

5   arrangements are relevant to credibility and bias, and if asked in discovery, Bryant

6   must disclose who is paying his legal fees.  See United States v. Blackman, 72 F.3d

7   1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the

8   fee arrangement between attorney and client are not protected from disclosure by

9   the attorney-client privilege.").  This conclusion is also consistent with Judge

10  Infante's Order.

11         However, in this case, the joint-defense privilege protects from disclosure the

12  substance of certain statements made by Bryant and his attorneys in the presence

13  of attorneys representing MGA.  "The joint defense privilege protects

14  communications between an individual and an attorney for another when the

15  communications are 'part of an on-going and joint effort to set up a common

16  defense strategy.'"  United States v. Bay State Ambulance and Hosp. Rental

17  Service, Inc., 874 F.2d 20, 28 (1st Cir. 1989) (internal quotation marks and citation

18  omitted).  Generally, to rely on the joint-defense privilege, a party must establish

19  three elements:  "(1) [T]he communications were made in the course of a joint

20  defense effort, (2) the statements were designed to further the effort, and (3) the

21  privilege has not been waived."  Id.

22         The Court finds the first element was met.  The Court, based on its review of

23  the record pending before Judge Infante, is satisfied that the parties had in place at

24  the time of Bryant's deposition, and have in place today, a valid joint-defense

25  agreement.  The Court also finds that the second element was met.  Mattel cannot

26  seriously contend that MGA's interests are not aligned with Bryant's in this action,

27  or that counsels' thorough preparation of Bryant for his deposition was not designed

28  to further the joint defense effort.  Finally, as for the third element, there is no

EXHIBIT _____ 52

PAGE _____ 670

34

suggestion in the record that any party has waived the attorney-client privilege.

Accordingly, the Court holds that Judge Infante's rulings on Objection Nos. 39 and 50 are contrary to law to the extent those rulings require Bryant to divulge the substance of his communications with counsel for MGA.

### VII. Conclusion

In the manner set forth more fully herein, the Court makes the following rulings:

1.      Motion of MGA Entertainment, Inc., ("MGA") and Issac Larian ("Larian") to Dismiss Mattel's Amended Answer and Counterclaims (docket # 189): **GRANTED IN PART AND DENIED IN PART.**

2.      Motion of Carter Bryant to Dismiss Counterclaims II, III, V, VII, IX, and XI (docket # 191): **GRANTED IN PART AND DENIED IN PART.**

3.      Motion of MGA Mexico to Dismiss Mattel's Amended Answer and Counterclaims (docket # 266): **DENIED.**

4.      Motion of MGA Objecting to Discovery Master's March 7, 2007, Order (docket # 308): **GRANTED IN PART AND DENIED IN PART.**

5.      Motion of Carter Bryant Objecting to Discovery Master's March 7, 2007, Order (docket # 306): **GRANTED IN PART AND DENIED IN PART.**

Mattel is **GRANTED** ten days' leave to amend the AAC in conformity with this Order. The Counter-defendants shall answer or otherwise respond to the SAAC no later than thirty days after the filing of the SAAC.

35

EXHIBIT ........ 52
PAGE ......... 691

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Motion Re Trial Structure (docket #462) has been the subject of further briefing by the parties and is set for further oral argument on July 2, 2007.  Ruling on that matter is **DEFERRED** pending oral argument.

DATE:  June 27, 2007

STEPHEN G. LARSON
UNITED STATES DISTRICT JUDGE

EXHIBIT _____ 52

PAGE _____ 692

36

Received: 6/27/07 3:21PM RightFAX -> QUINN E UEL; Page 1

RightFAX 6/27/2007 3:04 PAGE 001/037 Fax Server

'om: Name: United States District Court
312 North Spring Street
Los Angeles, CA 90012
Voice Phone: (213) 894-5474

): Name: Michael Zeller
Company:
865 S Figueroa St, 10th Floor,
City/State: Los Angeles, CA 90017-2543
Fax Number: 213-443-3100

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

# Automated Document Delivery Service

*Notice pursuant to Rule 77(d) FRCiv.P*
*The attached copy is hereby served upon you pursuant to Federal Rule of Civil Procedure 77(d).*

**x Notes:**

se 2:04-CV-09049 : CARTER BRYANT V. MATTEL INC

*rsuant to General Order 06-07, Section F, the following documents shall be submitted in the traditional manner: Pen Registers, Search larrants, Seizure Warrants, Wire Taps, Bond Related Documents, Under Seal and In-Camera Documents, and All Charging Documents (Complaints, Informations, Indictments, and Superseding Charging Documents). All other documents filed in cases unassigned to a judge shall be filed electronically with a copy e-mailed to the criminal intake mailbox for the appropriate division. The proper e-mail address for each division is as follows:*

*Western Division: CrimIntakeCourtDocs-LA@cacd.uscourts.gov*
*Southern Division: CrimIntakeCourtDocs-SA@cacd.uscouts.gov*
*Eastern Division: CrimIntakeCourtDocs-RS@cacd.uscourts.gov*

*For additional information and assistance, please refer to the CM/ECF page on the Court website at www.cacd.uscourts.gov.*

**Switch to e-mail delivery and get these documents sooner!**
**To switch, complete and submit**
**Optical Scanning Enrollment / Update form G-76.**
**Call 213-894-5474 for help and free technical support.**

*you received this document in error because the attorney with whom this document is directed is no longer the attorney on the case, a Notice of Change of Attorney Information, form G-6, must be filed. If there are other cases which you've received documents for hich you are no longer the attorney, separate notices must be filed for each case. Failure to do so will result in the continued sending of documents to you. Form G-6 is available on the court's website at www.cacd.uscourts.gov or at the Clerk's Office.*

te and time of transmission: Wednesday, June 27, 2007 3:04:20 PM
mber of pages including this cover sheet: 37

EXHIBIT 52
PAGE 693

# Exhibit 53

# State of California
## Secretary of State

### CERTIFICATE OF STATUS

**ENTITY NAME:**   OMNI 808 INVESTORS LLC

**FILE NUMBER:**          200822610026
**FORMATION DATE:**    08/12/2008
**TYPE:**                          DOMESTIC LIMITED LIABILITY COMPANY
**JURISDICTION:**            CALIFORNIA
**STATUS:**                     ACTIVE (GOOD STANDING)

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

The records of this office indicate the entity is authorized to exercise all of its powers, rights and privileges in the State of California.

No information is available from this office regarding the financial condition, business activities or practices of the entity.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of December 13, 2008.

**DEBRA BOWEN**
**Secretary of State**

NP-25 (REV 1/2007)
Exhibit 44
Page 692

EXHIBIT 2
PAGE 15

EXHIBIT 53
PAGE 694

## State of California
### Secretary of State



I, DEBRA BOWEN, Secretary of State of the State of
California, hereby certify:

That the attached transcript of _____ 1 page(s) was prepared by and
in this office from the record on file, of which it purports to be a copy, and
that it is full, true and correct.



IN WITNESS WHEREOF, I execute this
certificate and affix the Great Seal of the
State of California this day of

DEC 1 3 2008

*Debra Bowen*

DEBRA BOWEN
Secretary of State

Sec/State Form CE 108 (REV 1/2007)

Exhibit 44
Page 693

EXHIBIT   2
PAGE   19

EXHIBIT   53
PAGE   695

File # 2 0 0 8 2 2 6 1 0 0 2 6



## State of California
### Secretary of State

LLC-1

**FILED**
In the office of the Secretary of State
of the State of California

AUG 1 2 2008

### LIMITED LIABILITY COMPANY
### ARTICLES OF ORGANIZATION

| A $70.00 filing fee must accompany this form. |
| --- |
| **IMPORTANT – Read instructions before completing this form.** |

This Space For Filing Use Only

ENTITY NAME (End the name with the words "Limited Liability Company," or the abbreviations "LLC" or "L.L.C." The words "Limited" and "Company" may be abbreviated to "Ltd." and "Co.," respectively.)

1. NAME OF LIMITED LIABILITY COMPANY

   OMNI 808 Investors LLC

PURPOSE (The following statement is required by statute and should not be altered.)

2. THE PURPOSE OF THE LIMITED LIABILITY COMPANY IS TO ENGAGE IN ANY LAWFUL ACT OR ACTIVITY FOR WHICH A LIMITED LIABILITY COMPANY MAY BE ORGANIZED UNDER THE BEVERLY-KILLEA LIMITED LIABILITY COMPANY ACT.

INITIAL AGENT FOR SERVICE OF PROCESS (If the agent is an individual, the agent must reside in California and both Items 3 and 4 must be completed. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 3 must be completed (leave Item 4 blank).

3. NAME OF INITIAL AGENT FOR SERVICE OF PROCESS

   Corporation Service Company which will do business in California as CSC-Lawyers Incorporating Service

4. IF AN INDIVIDUAL, ADDRESS OF INITIAL AGENT FOR SERVICE OF PROCESS IN CALIFORNIA    CITY          STATE     ZIP CODE

                                                                                                CA

MANAGEMENT (Check only one)

5. THE LIMITED LIABILITY COMPANY WILL BE MANAGED BY:

   ☐ ONE MANAGER

   ☑ MORE THAN ONE MANAGER

   ☐ ALL LIMITED LIABILITY COMPANY MEMBER(S)

ADDITIONAL INFORMATION

6. ADDITIONAL INFORMATION SET FORTH ON THE ATTACHED PAGES, IF ANY, IS INCORPORATED HEREIN BY THIS REFERENCE AND MADE A PART OF THIS CERTIFICATE.

EXECUTION

7. I DECLARE I AM THE PERSON WHO EXECUTED THIS INSTRUMENT, WHICH EXECUTION IS MY ACT AND DEED.

   August 12, 2008
   DATE

   _____
   SIGNATURE OF ORGANIZER

   Tricia A. Church
   TYPE OR PRINT NAME OF ORGANIZER

LLC-1 (REV 04/2007)                                                    APPROVED BY SECRETARY OF STATE

Exhibit 44
Page 694

EXHIBIT 2

PAGE 696

# Exhibit 54

**Filed Under Seal
Pursuant to Protective Order**

# Exhibit 55

1    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
        John B. Quinn (Bar No. 090378)
2        johnquinn@quinnemanuel.com
        Michael T. Zeller (Bar No. 196417)
3        (michaelzeller@quinnemanuel.com)
        Jon D. Corey (Bar No. 185066)
4        (joncorey@quinnemanuel.com)
        Timothy L. Alger (Bar No. 160303)
5        (timalger@quinnemanuel.com)
        865 South Figueroa Street, 10th Floor
6    Los Angeles, California 90017-2543
        Telephone: (213) 443-3000
7    Facsimile:   (213) 443-3100

8    Attorneys for Mattel, Inc.

9

10                    UNITED STATES DISTRICT COURT

11                   CENTRAL DISTRICT OF CALIFORNIA

12                          EASTERN DIVISION

13   CARTER BRYANT, an individual,      CASE NO. CV 04-09049 SGL (RNBx)

14            Plaintiff,                 Consolidated with Case Nos. CV 04-
                                         9059 and CV 05-2727
15        vs.
                                         Hon. Stephen G. Larson
16   MATTEL, INC., a Delaware
     corporation,                        SECOND SUPPLEMENTAL
17                                       RESPONSES TO MGA'S FIRST SET
             Defendant.                  OF INTERROGATORIES TO
18                                       MATTEL, INC.

19   AND CONSOLIDATED ACTIONS.

20

21

22   PROPOUNDING PARTY:      MGA ENTERTAINMENT, INC.

23   RESPONDING PARTY:       MATTEL, INC.

24   SET NO.:                ONE (1)

25

26              __ATTORNEY'S EYES ONLY --__

27           __SUBJECT TO PROTECTIVE ORDER__        55

28                                          EXHIBIT ____
                                            PAGE ____ 718
     07209/2267105.11           5/23
     ──────────────────────────────────────────────────
     SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

1   WM CNN Charity Driver.xls; WM Monday CMN Presentation.ppt; 2003 TRAC -
2   Nilo.doc; 2003 TRAC David Watts.doc; 2003 TRAC-Danielle.doc; 2003 TRAC-
3   Mark.doc; 2003 TRAC-Sharon.doc; 2003TRAC Janine.doc; 2003TRAC
4   WendyWard.doc; CSI Spider Chart.ppt; Evergreen Reco.doc; MAT-
5   1425Presentation2.ppt; WM Volume Driver Fact Sheet.xls;

6            During Ms. Brisbois' exit interview she was specifically asked whether
7   she was "taking anything." Ms. Brisbois responded, "No." Both during and after
8   her exit interview, Ms. Brisbois was advised by Mattel of her obligations to preserve
9   Mattel's confidential and proprietary information. Nevertheless, Ms. Brisbois not
10  only stole Mattel trade secrets, but while Ms. Brisbois was working as a Vice
11  President of Sales at MGA Entertainment Canada, she accessed and used a number
12  of these Mattel documents. Ms. Brisbois and MGA subsequently used these stolen
13  trade secrets to the benefit of MGA Entertainment, Inc. U.S., including its
14  management of MGA's Toys 'R Us and Wal-Mart accounts. Ms. Brisbois'
15  participation in this alleged scheme with MGA has harmed Mattel.

16  **Jorge Castilla Steals Mattel Trade Secrets**

17           Jorge Castilla was also recruited by MGA from Mattel, and when he
18  left Mattel he took with him confidential and proprietary trade secrets that belonged
19  to Mattel. Some of the stolen trade secrets related to his job responsibilities; others,
20  Mr. Castilla was not authorized to access.

21           Mr. Castilla joined Mattel in November 1999, after having previously
22  worked at Mattel for approximately two months in 1995. Mr. Castilla worked in
23  Mattel's offices in Europe, primarily on a pilot program to improve sales forecasting
24  in the United Kingdom. Mr. Castilla played a particularly significant role in
25  preparing, launching and evaluating that pilot program. Mr. Castilla, in particular,
26  performed an analysis of what Mattel would need to do with its world-wide sales
27  forecasting programs to obtain the benefit of the pilot program, in which Mattel had
28  invested heavily.

1    Mr. Castilla returned to the United States in late 2004, and joined the
2 International Planning group at Mattel's headquarters in El Segundo, California. In
3 that group, Mr. Castilla was responsible for setting up Mattel's Electronic Data
4 Warehouse system, a proprietary database containing highly confidential business
5 information, such as sales, future/pending orders, product availability, sales
6 forecasts at the stock keeping unit level. In addition, he was responsible for
7 preparing information for senior financial officers regarding inventory levels, sales
8 demands and related topics. Also, because of the "gap" analysis that Mr. Castilla
9 had performed while in the United Kingdom, he was responsible for implementing
10 Mattel's customized sales forecasting system.

11    On Monday, March 13, 2006, Mr. Castilla informed Brenda Ray-
12 Martin, to whom he reported, that he was resigning to take a position with MGA
13 Entertainment, Inc. When he resigned, Mr. Castilla held the title of Planning
14 Specialist in Mattel's Operations Planning and Finance department. MGA hired him
15 to be a Manager, Sales Planning, with responsibilities that substantially paralleled
16 those that he had at Mattel. MGA hired Mr. Castilla at a salary of $90,000 annually,
17 plus benefits and bonuses.

18    In Mr. Castilla's Employee Confidential Information and Inventions
19 Agreement, which he signed on October 29, 1999, he acknowledged that he would
20 develop and have access to Mattel proprietary information. He further agreed not to
21 "disclose or use at any time either during or after my employment with [Mattel], any
22 Proprietary Information," and to "cooperate with the Company and use [his] best
23 efforts to prevent the unauthorized disclosure, use or reproduction of all Proprietary
24 Information." He also agreed that when he left Mattel's employ, he would deliver to
25 Mattel "all tangible, written, graphical, machine readable and other materials
26 (including all copies in [his] possession or under [his] control containing or
27 disclosing Proprietary Information."

28

1           Mr. Castilla had further agreed to the terms in Mattel's Code of

2  Conduct to preserve Mattel's confidential and proprietary information and was

3  specifically warned that "the unauthorized use or disclosure of [Mattel's]

4  confidential, proprietary or trade secret information" may result in the termination of

5  his employment.  He further agreed:

6                Employees have an obligation to protect the Company's

7                confidential and proprietary information.  Confidential and

8                proprietary information is any infromation which is not

9                generally known to the public that is useful to the

10              Company and that would either be useful to the

11              Company's competitors or third parties or harmful to the

12              Company or its customers, if disclosed.  Confidential and

13              proprietary information includes, but is not limited to,

14              trade secrets, revenue and profit information and

15              projections, new product information, sales and marketing

16              plans, design and development plans, manufacturing

17              processes, confidential personnel information and

18              information regarding potential acquisitions, divestitures

19              and/or investments.

20           During Mr. Castilla's exit interview on March 13, 2006, he was

21  provided with a document reminding him of his obligations to preserve Mattel's

22  confidential and proprietary information, including his obligations under Mattel's

23  Employee Confidential Information and Inventions Agreement, including but not

24  limited to "inventions, marketing plans, product plans, business strategies, forecasts

25  and personnel information."

26           Mr. Castilla filled out an exit interview checkout form, in which he

27  acknowledge receiving not only the reminder, but the Mattel Code of Conduct.  He

28  disclosed that he had accepted a position at MGA Entertainment, as the Manager of

-40-

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

1  Global Sales Planning, with an undetermined start date.  Most significantly, he

2  acknowledged that, during the course of his employment at Mattel, he had received

3  financial plans, financial forecasts, process planning documents, sales forecasts,

4  documents regarding enhancements to ISIS, documents regarding gap analysis

5  between systems, process overviews, inventory reports, sales plans, documents re

6  inventory management, shipping reports, confidential personnel information, market

7  share reports, process maps, order presentation reports, demand planning

8  documents, enterprise and data warehouse information, reports generated from or

9  regarding GRS.  As of March 13, 2006, Mr. Castilla affirmed that he did not copy

10  any of the listed documents, did not disclose any of the documents or the

11  information that they contained to anyone outside of Mattel, and denied having

12  possession of any of the listed documents.  He also affirmed that he returned to

13  Mattel all of its confidential and proprietary documents, by representing that he

14  "brought them in on March 12, 2006, filed them and put together a summary of

15  ongoing projects for supervisor, Brenda [Ray-Martin]."  He further affirmed that he

16  had attended meetings at which Mattel confidential and proprietary information was

17  discussed, denied that he had a copy or disclosed any confidential or proprietary

18  information received at those meetings, and represented that all had been returned to

19  Ms. Ray-Martin.  He then reaffirmed that he had not disclosed Mattel confidential or

20  proprietary information to persons outside of Mattel in the last twelve months.

21        As of Friday, March 10, 2006, Castilla had created a folder on his

22  network share drive that he labeled "To Take."  The folder contained approximately

23  56 megabytes of information.  The bulk of that information was made up of

24  documents containing Mattel confidential and proprietary information.  Mr. Castilla,

25  who rarely worked weekends, entered Mattel's headquarters building at

26  approximately 9:30 a.m. on Sunday, March 12, 2006 and departed at approximately

27  2:00 p.m.  On Monday, March 13, 2006, Castilla had deleted the "To Take" folder

28  and its contents from his network share drive.  Castilla had transferred the

1   information in the "To Take" folder and potentially the folder itself to an e-mail

2   account <hoclau04@gmail.com>, <hoclau04@yahoo.com> and/or to a personal

3   digital assistant device.

4         Castilla took the following documents from Mattel which were

5   primarily related to his work in inventory management and forecasting for Mattel:

6   SP2005 business update.ppt; sales planning IT meeting 2005-10-19.ppt; sales

7   planning updates IGB - Aug05.ppt; sales planning updated July 1205.ppt; testing

8   schedule.xls; testing log 3-01-06.xls; sales intelligence.xls; promotions.doc;

9   marketing process data flow v.1.0.doc; marketing intelligence definitions and

10   calculation; ISIS sales planning enhancements final.xls; GPS enhancement business

11   requirements.doc; forecasting process framework 2005 v.4.0.xls; ISIS enhancements

12   and training w updates.xls; initial concept sales planning v2.doc; sprint

13   strawman.xls; sprint 9 sales planning 2006.xls; SP2005 project plan masterv2.xls;

14   SP2005 project plan master.xls; progress diagram.xls; forecasting -product

15   backlog.xls; notes.docs; international planning organization.xls; 2006

16   TRAC_jorgecastilla_2005_endreview.doc; overview presentation final_Sep_27;

17   TRAC_jorgecastilla_2005 midreview.doc; lottery.xls; inventory

18   template_consolidated0510.xls; 2006 int'l planning calendar and milestones.xls;

19   inventory template_consolidated0509.xls; CAP_jorgecastilla_2005.doc;

20   CAP_blank.doc; inventory template consolidated0507.xls; inventory template

21   consolidated0505.xls; inventory template consolidated0503.xls; QOR_QFR profile

22   and management assessment; TRAC_jorgecastilla_2005.doc; TRAC blank.doc; intl

23   planning calendar.xls; inventory planning consolidated.xls; inventory template

24   consolidated0502.xls; 2004 TRAC jorge castilla.doc; planning calendar mock

25   up.xls; seasonal process mapping.ppt; inventory template-consolidated.xls;

26   inventory report consolidated_110204.xls; oneidw functionality_final.xls;

27   demand_management_utopia_apics.ppt; smape business case.ppt; mapavsmape.xls;

28   idwmod2_handsontraining_HQ.ppt; revised vision fit gap analysis.xls;

-42-

EXHIBIT 55

PAGE 723

1  spuserguide_accountallocations.ppt; spuserguide_accountinginquries.ppt;

2  spuserguide_companyinquiries.ppt; idwmod1_introdcutionandoverview.ppt;

3  idwmod2_handsontraining.ppt; priorities_jorgecastilla.xls;

4  idwmod3_powerplaywindowsworkshop.ppt; idemod2_oneidwexercises.doc;

5  idwmod3_powerusercheatsheet.ppt; idw_trainingworkshopguide.ppt;

6  spuserguide_introduction.ppt; TRAC_jorgecastilla_2003.doc; OMNI to ISIS - FP

7  gap summary.ppt; OMNI ISIS process flow mapping.ppt; OMNI ISIS process flow

8  mapping.xls; ISIS for the U.S. feasibility results.ppt; ISIS presentation.ppt;

9  backcasting.ppt; CAP_jorgecastilla_2003.doc; backcasting_v2.xls; backcasting.xls;

10  demandplanningcycle.ppt; navigation_draft.doc; demanddraft.doc; definitions.doc;

11  TRAC_jorgecastilla_2002.doc; planning roles.ppt; process review kickoff.ppt;

12  mattel international dictionary.xls; neur demand planner.doc.  In addition to

13  documents related to Mattel's inventory planning and sales forecasting system,

14  Castilla also took with him a highly confidential document that lays out the future

15  international business strategies and marketing priorities for the coming years for

16  Mattel's entire international business team that was prepared by senior Mattel

17  executives.

18         The Mattel confidential and proprietary information that Castilla took

19  from Mattel, both in his head and in documentary form, relates primarily to the

20  successful and efficient management of inventory and the use of sophisticated

21  forecasting techniques that Mattel, through significant investment, developed to

22  obtain a competitive advantage in the toy industry with its unique order,

23  manufacture, and delivery cycles.  The former Mattel employees working at Mattel

24  recognized the value of Castilla's knowledge, and was in dire need of improved

25  inventory management in light of the excess and unsold inventory that it had on

26  hand after to 2006 sales season.  To remedy their problem, MGA targeted Castilla--

27  and the Mattel-specific knowledge that he possessed--and lured him to MGA.  With

28  the benefit of the information that he brought with him, on information and belief,

07209/2267105.11

-43-

EXHIBIT _____ 55

1  Castilla has used that proprietary and confidential information to improve MGA's

2  sales forecasting and inventory planning, thus saving MGA millions and millions of

3  dollars.

4          This is just a subset of the vast misconduct committed by MGA and the

5  other defendants to injure Mattel. Other misconduct and relevant evidence has been

6  revealed in discovery in this action, including in depositions, in documents, and in

7  discovery responses. Such matters are the subject of on-going investigation and

8  discovery and will be the subject of future discovery, including discovery that MGA

9  and MGA have refused to disclose and thus are or will be the subject of motions to

10  compel. They include without limitation Larian's false statements about Mattel,

11  MGA, and Bratz, including without limitation his false statements to Wal-Mart and

12  others that (a) MGA did not use the Hua Tai 4K factory that was found to have

13  engaged in gross labor abuses to manufacture Bratz dolls, even though such denials

14  were false and knowingly so; (b) Mattel used the same factories as MGA; and (c)

15  Mattel was the one falsely accusing MGA of using the Hua Tai 4K factory. Larian

16  also made false representations about Mattel products. For example, as a result of

17  Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units

18  of the MY SCENE MY BLING BLING product with real gems. Further, MGA and

19  Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false

20  and misleading press releases about Bratz's sales, Bratz's market share, Bratz's

21  position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products,

22  and the market share of Mattel's BARBIE products. At the time that MGA and

23  Larian made those misrepresentations to retailers and the press, they knew that their

24  statements were false. In addition, MGA stole Mattel properties in connection with

25  MGA's Scooter Samatha product and recruited other Mattel employees, including

26  former Mattel employees whose identities are currently unknown by Mattel and are

27  the subject of on-going or future discovery, to steal additional Mattel properties and

28

07209/2267105.11

EXHIBIT ___55___

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

PAGE _____

1 │ trade secrets.  Mattel reserves its right to rely on and introduce evidence of all such

2 │ misconduct, acts and omissions, and all other relevant evidence.

3 │ 　　　　　By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>

4 │ <u>33(d)</u>, Mattel has produced responsive, non-privileged documents and tangible items

5 │ in its possession, custody or control from which the answer to this Interrogatory may

6 │ be derived.  The documents supporting Mattel's contentions in response to this

7 │ Interrogatory No. 1 and containing additional information responsive to this

8 │ Interrogatory include, but are not limited to, the following: Deposition Transcript of

9 │ Carter Bryant, dated November 4, 5 and 8, 2004; Deposition Transcript of Steven

10 │ Linker, dated September 13, 2006; Deposition Transcript of Anna Rhee, dated

11 │ February 3, 2005; Deposition Transcript of Paula Garcia, dated May 24, 2007, May

12 │ 25, 2007, October 9, 2007 and October 10, 2007; Deposition Transcript of Rene

13 │ Pasko, dated June 13, 2007; Deposition Transcript of Isaac Larian, dated July 18,

14 │ 2006; Deposition Transcript of Brian Armstrong, dated July 18, 2007 and August 1,

15 │ 2007; Deposition Transcript of Sandy Yonemoto, dated May 30, 2007; Deposition

16 │ Transcript of Victoria O'Connor, dated December 6, 2004; Deposition Transcript of

17 │ Sam Khare, dated August 20, 2007; Deposition Transcript of Jill Nordquist, dated

18 │ July 31, 2007; Deposition Transcript of Jacqueline Prince, dated December 21,

19 │ 2004; Deposition Transcript of Liliana Martinez, May 20, 2005; Deposition

20 │ Transcript of Kislap Ongchango, dated April 24, 2007; Deposition Transcript of

21 │ Joni Pratte, dated June 1, 2007; Deposition Transcript of Robert Hudnut, July 13,

22 │ 2007 and August 20, 2007; Deposition Transcript of Rebecca Harris, dated July 20,

23 │ 2007; Deposition Transcript of Kerri Brode, dated August 15, 2007 and January 19,

24 │ 2007; Deposition Transcript of Charnayne Brooks, dated March 2, 2007; Deposition

25 │ Transcript of Janet Bryant, dated September 25, 2007; Deposition Transcript of Tom

26 │ Bryant, dated September 26, 2007; Deposition Transcript of Kenneth Lockhart,

27 │ dated June 14, 2007 and June 15, 2007; Deposition Transcript of Dave Malacrida,

28 │ dated August 30, 2007; Deposition Transcript of Rodney Palmer, dated June 26,

1  forecasting techniques that Mattel, through significant investment, developed to
2  obtain a competitive advantage in the toy industry with its unique order,
3  manufacture, and delivery cycles. The former Mattel employees working at Mattel
4  recognized the value of Castilla's knowledge, and was in dire need of improved
5  inventory management in light of the excess and unsold inventory that it had on
6  hand after to 2006 sales season. To remedy their problem, MGA targeted Castilla--
7  and the Mattel-specific knowledge that he possessed--and lured him to MGA. With
8  the benefit of the information that he brought with him, on information and belief,
9  Castilla has used that proprietary and confidential information to improve MGA's
10  sales forecasting and inventory planning, thus saving MGA millions and millions of
11  dollars.

12        This is just a subset of the vast misconduct committed by MGA and the
13  other defendants to injure Mattel. Other misconduct and relevant evidence has been
14  revealed in discovery in this action, including in depositions, in documents, and in
15  discovery responses. Such matters are the subject of on-going investigation and
16  discovery and will be the subject of future discovery, including discovery that MGA
17  and MGA have refused to disclose and thus are or will be the subject of motions to
18  compel. They include without limitation Larian's false statements about Mattel,
19  MGA, and Bratz, including without limitation his false statements to Wal-Mart and
20  others that (a) MGA did not use the Hua Tai 4K factory that was found to have
21  engaged in gross labor abuses to manufacture Bratz dolls, even though such denials
22  were false and knowingly so; (b) Mattel used the same factories as MGA; and (c)
23  Mattel was the one falsely accusing MGA of using the Hua Tai 4K factory. Larian
24  also made false representations about Mattel products. For example, as a result of
25  Larian's misrepresentations, at least one retailer cancelled its order for 75,000 units
26  of the MY SCENE MY BLING BLING product with real gems. Further, MGA and
27  Larian, in an effort to gain an unfair competitive advantage, repeatedly issued false
28  and misleading press releases about Bratz's sales, Bratz's market share, Bratz's

1  position vis-à-vis Mattel's BARBIE products, sales of Mattel's BARBIE products,

2  and the market share of Mattel's BARBIE products.  At the time that MGA and

3  Larian made those misrepresentations to retailers and the press, they knew that their

4  statements were false.  In addition, MGA stole Mattel properties in connection with

5  MGA's Scooter Samantha product and recruited other Mattel employees, including

6  former Mattel employees whose identities are currently unknown by Mattel and are

7  the subject of on-going or future discovery, to steal additional Mattel properties and

8  trade secrets.  Mattel reserves its right to rely on and introduce evidence of all such

9  misconduct, acts and omissions, and all other relevant evidence.

10         By way of further answer, pursuant to <u>Federal Rule of Civil Procedure</u>

11  <u>33(d)</u>, Mattel has produced responsive, non-privileged documents and tangible items

12  in its possession, custody or control from which the answer to this Interrogatory may

13  be derived.  The documents supporting Mattel's contentions in response to this

14  Interrogatory No. 1 and containing additional information responsive to this

15  Interrogatory include, but are not limited to, the following: the documents listed in

16  Mattel's Supplemental Response to Interrogatory No. 1, Deposition Transcript of

17  Carter Bryant, dated November 4, 5 and 8, 2004; Deposition Transcript of Steven

18  Linker, dated September 13, 2006; Deposition Transcript of Anna Rhee, dated

19  February 3, 2005; Deposition Transcript of Paula Garcia, dated May 24, 2007, May

20  25, 2007, October 9, 2007 and October 10, 2007; Deposition Transcript of Rene

21  Pasko, dated June 13, 2007; Deposition Transcript of Isaac Larian, dated July 18,

22  2006; Deposition Transcript of Brian Armstrong, dated July 18, 2007 and August 1,

23  2007; Deposition Transcript of Sandy Yonemoto, dated May 30, 2007; Deposition

24  Transcript of Victoria O'Connor, dated December 6, 2004; Deposition Transcript of

25  Sam Khare, dated August 20, 2007; Deposition Transcript of Jill Nordquist, dated

26  July 31, 2007; Deposition Transcript of Jacqueline Prince, dated December 21,

27  2004; Deposition Transcript of Liliana Martinez, May 20, 2005; Deposition

28  Transcript of Kislap Ongchango, dated April 24, 2007; Deposition Transcript of

-108-

EXHIBIT _____ 5

SUPPLEMENTAL RESPONSES AND OBJECTIONS TO MGA'S FIRST SET OF INTERROGATORIES

PAGE _____ 108

# Exhibit 56

# Delaware

PAGE  1

### The First State

. I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "VISION CAPITAL, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE NINETEENTH DAY OF AUGUST, A.D. 2008, AT 12:36 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "VISION CAPITAL, LLC".

4589295   8100H

081207227

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 7032931

DATE: 12-17-08

EXHIBIT 3
PAGE 12

EXHIBIT 56

PAGE 729

Exhibit 45
Page 695

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:41 PM 08/19/2008
FILED 12:36 PM 08/19/2008
SRV 080883130 - 4589295 FILE

## CERTIFICATE OF FORMATION

### OF

### VISION CAPITAL, LLC

This Certificate of Formation of VISION CAPITAL, LLC the ("Company"), is being executed by the undersigned for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

1. The name of the Company is VISION CAPITAL, LLC.

2. The address of the registered office of the Company in Delaware is 800 Delaware Avenue, City of Wilmington, New Castle County, 19801. The Company's registered agent at that address is Delaware Corporations LLC.

IN WITNESS WHEREOF, the undersigned, an authorized person, has caused this Certificate of Formation to be duly executed as of the 19th day of August, 2008.

DELAWARE CORPORATIONS LLC,
Authorized Person

By:  _____

Robin G. Brooks, Vice President

EXHIBIT 3
PAGE 19

56
X30

Exhibit 45
Page 696

# Exhibit 57

CALENDARED

FILED

JAN 1 4 2009

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAN 12 2009

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CARTER BRYANT, an individual, | No. 08-57015 |
| Plaintiff - Counter-defendant, | D.C. No. 2:04-cv-09049-SGL |
| MATTEL, INC., a Delaware corporation, | Central District of California, Los Angeles |
| Counter-claimant - Defendant - Appellee, | ORDER |
| v. | |
| MGA ENTERTAINMENT, INC., | |
| Counter-defendant - Intervenor - Appellant, | |
| MGA ENTERTAINMENT (HK) LIMITED; et al., | |
| Counter-defendants - Appellants. | |

Before:  GOODWIN, CLIFTON and BEA, Circuit Judges.

The parties' motions to file documents under seal is granted.  All motions

and exhibits designated as "filed under seal" shall be filed and maintained under

seal.

KS/MOATT

EXHIBIT ___57___

PAGE ___731___

On January 7, 2009, the district court's order modifying the stay found the permanent injunction challenged in this appeal to be non-final. Accordingly, this appeal is dismissed for lack of jurisdiction. *See* 28 U.S.C. §§ 1291, 1292(a); *Miller v. Marriott Int'l, Inc.*, 300 F.3d 1061 (9th Cir. 2002).

Appellants' emergency motion to stay the district court's December 3, 2008 order is denied as moot.

All other pending motions are denied as moot.

The parties shall bear their own costs for this appeal.

**DISMISSED.**

EXHIBIT   57   08-57015

PAGE      730

7/31/08

# Notice regarding Electronic Case Filing

## U.S. Court of Appeals for the Ninth Circuit

On September 2, 2008, the U.S. Court of Appeals for the Ninth Circuit will begin to allow parties and court reporters to file certain documents using the Court's Case Management/Electronic Case Files (CM/ECF) system. Between September 2, 2008, and December 31, 2008, use of the CM/ECF system will be voluntary. Effective January 2, 2009, use of the CM/ECF system will be mandatory for all attorneys and all court reporters filing in this Court, unless they are granted an exemption from using the CM/ECF system.

Use of the CM/ECF system is voluntary for all pro se parties proceeding without counsel.

## Registration

If you would like to begin using the Ninth Circuit's CM/ECF system on September 2, 2008, we strongly encourage you to register in advance.

Starting immediately, you can register at:
http://pacer.psc.uscourts.gov/announcements/general/ea_filer.html

You must register specifically for the Ninth Circuit, even if you are already registered for PACER, for ECF in other courts, or for electronic noticing in the Ninth Circuit. However, during registration for the Ninth Circuit, you may choose the same user login and password that you use for other Circuit courts.

You should receive e-mail confirmation of your CM/ECF registration within 10 business days from the PACER service center. Once you receive this confirmation, you will be able to file documents through the Ninth Circuit's CM/ECF system starting September 2, 2008.

Should you have questions or concerns about CM/ECF in the Ninth Circuit, please notify us at: CMECF_ca9help@ca9.uscourts.gov

If you have any questions about the Appellate ECF Filer Registration, please contact the PACER Service Center at: pacer@psc.uscourts.gov

EXHIBIT ___ 57 ___

PAGE ___ 733 ___

08-57015

John B. Quinn
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
10th Floor, 865 South Figueroa Street
Los Angeles, CA 90017

EXHIBIT ___57___

PAGE ___734___

# Exhibit 58

Nevis LLC | Sovereign Management & Legal, S.A. - Panama Offshore Legal Services          Page 1 of 4



**29 March, 2008**

- En Español
- Home
- Offshore Asset Protection Blog
- About Us
- Why Offshore?
- Contact Us
- Fee Schedule
- Secure Online Order
- Why Panama?
- Panama as a Tax Haven
- Panama Foundation
- Panama Corporation
- Corporation / Foundation Combined
- International Fiduciary Structure
- Panama Charitable Foundation
- Management Services
- Account Signatory Services
- Offshore Banking
- Offshore Debit Card
- E-Commerce Solutions
- Why Belize?
- Belize IBC
- Costa Rica Corporation
- Why Nevis?
- Nevis IBC
- Nevis LLC
- Why Seychelles?
- Seychelles IBC
- Offshore Trust
- Offshore Web Hosting
- Offshore Bank Formations
- Swedish Credit Union
- NZ Offshore Finance Co.
- Uruguay SAFI
- Panama Financial Company
- Internet Banking Software
- Captive Insurance
- Offshore FAQ's
- Mail Forwarding
- Virtual Office Services
- Re-Invoicing Services
- Panama Real Estate
- Real Estate Title / Escrow Services
- Relocation Services
- Panama Immigration/ Panama Passport
- Ship / Yacht Registration Services
- Investments
- Reseller Program
- Panama Links

# Nevis LLC

**DEFINITION:** If your primary goal is not legal tax efficiency but simply access to a low cost way of sheltering assets and providing privacy, a standalone Nevis Limited Liability Company may be ideal. A Limited Liability Company (or LLC) is a form of company or corporation that enjoys some distinctions from "normal" companies. At the most simple level, think of an LLC as a sleek cross between a company and a partnership, with all of the benefits of both.

The general advantages of LLCs are enhanced by the jurisdictional advantage of Nevis, the first offshore financial centre anywhere to enact a Limited Liability Ordinance.



**EXCELLENT PRIVACY:**

- Since the beneficial owners and/or managers are not registered anywhere an LLC provides comp anonymity.
- Nevis has strict privacy oriented laws that forbid any registering, recording, or disclosure of direct and shareholders of exempt companies incorporated there. This means that no annual or other reports by members need to be filed in the public records of Nevis; therefore, there is complete anonymity and their identities are not accessible by any outside party.
- The company's records may be located anywhere in the world

**EXCELLENT ASSET PROTECTION FEATURES:**

- A Nevis LLC enables you to protect your assets and funds from government agencies, creditors, lawsuits.
- As an owner, you are not exposed to personal liability.
- As an owner, you can participate in management without becoming personally liable for the comp debts.
- A Nevis LLC is particularly advantageous for asset protection purposes since there are no shares can be attached by a court of law.
- Members are not liable for obligations of the company.

**OTHER LLC BENEFITS:** LLCs provide these additional advantages:

- LLCs provide a mechanism by which managers can limit the authority of non-managing members
- LLCs have no limitation on the number of members.
- There are no limitations on ownership of an LLC.
- No corporate tax, income tax, withholding tax, stamp tax, asset tax, exchange controls or other f

EXHIBIT

PAGE _____ 730





taxes are levied in Nevis on assets or income originating outside of Nevis.
- Members of Nevis LLCs may be individuals or business entities of any nationality or domicile.
- Nevis LLCs may amend their Articles of Organisation, merge, or consolidate with other domestic foreign LLCs or other business entities.
- Members of Nevis LLCs may assign their interests to other parties unless restricted otherwise.
- Nevis permits sole member LLCs.
- Management of LLCs may be accomplished by the members or by managers designated by the members.
- Nevis LLCs face no stock limitations and can issue preferred interests analogous to preferred stc corporations
- A Nevis LLC is an excellent vehicle if used by a group of investors for a joint venture investment. this respect it functions as if it were a Limited Partnership, but with all the added features and advantages mentioned above of an LLC that Limited Partnerships for the most part do not have.
- A Nevis LLC can be set up within 24 hours and has low initial cost and low annual fees.

**Deeper Understanding on the efficacy of LLC's**

**LLC vs. a "Normal" Corporation:**

The primary distinction between an LLC and a "normal" company such as a "C" corporation (USA) or a P (United Kingdom), is that the LLC is a tax-neutral vehicle because it is taxed as a partnership. rather than corporation. Thus. using an LLC eliminates tax at the corporate level. In this regard, it is somewhat like a "S" corporation or a German GmbH but without all the restrictions and disadvantages. So if the LLC itself no tax payment obligation - then who does? The obligation for any taxes that would otherwise be owed b LLC bypasses the LLC itself and attaches directly to the members of the LLC. Members are to LLCs wha shareholders are to normal companies. Other companies, as well as individuals and trusts. can be memb an LLC. There are no limits on the number of members or the classes of members that an LLC may have important thing to remember is that each member is responsible for his, her or its own pro-rata part of an overall tax obligation of the LLC and that the LLC itself has no tax obligations.

**LLC as Trust Alternative:**

Because of the flexibility available in LLC management structuring and because of the favorable way in w the laws of Nevis are drafted, LLCs can also be used as alternatives to a trust. The manager of the LLC i to the trustee of a trust and the members are akin to the beneficiaries of a trust. Sovereign Management Legal can act as a manager of an LLC on behalf of a client who desires to take advantage of our corpora management services. Substituting an LLC for a trust can change the reporting requirements of taxpayer onshore jurisdictions. Many providers have abandoned the trust as an offshore planning vehicle because trusts have become a target on onshore legislation and unfavourable court decisions (especially in the U. Hence many are instead recommending either an LLC or a Foundation depending on what the client requirements are. The income or capital gain of an LLC is not reportable as trust income or gain or as corporate income or gain but is treated as personal income or gain.

**Multi-National Joint Ventures:**

LLCs are excellent vehicles for structuring joint venture arrangements between project participants from different countries This is so because the venture can enjoy all of the benefits of incorporation. but each member is liable for his own taxation in his own country. Moreover. the membership flexibility allows diffe joint ventures to have different levels of ownership and reward based upon the value that each constituer member brings to the project. The only drawback is that prior to forming LLCs for multi-national joint vent the parties must check to see that this hybrid entity is granted the requisite corporate and pass through (partnership) status in the jurisdictions in which the joint ventures are located. Advice from a local onshor lawyer should be sought.

EXHIBIT _____ 58

_____ 736

Nevis LLC | Sovereign Management & Legal, S.A. - Panama Offshore Legal Services

Page 3 of 4

**Tax Free:**

All LLCs are free from all forms of Nevisian taxation. There are no Nevisian taxes on dividends, income, capital distribution, or wages whatsoever. Moreover, unlike many onshore jurisdictions, Nevis does not ta LLC for accumulated (but undistributed) earnings

**Privacy:**

All of the affairs of the LLC are private and cannot be disclosed except under truly exceptional circumstan such as links to international terrorism. The only document that needs to be filed with the government is t annual corporate license and this contains minimal information. There is no annual report or annual finan return that needs to be made to the government. There is no public inspection of your LLCs' records. Confidentiality is further enhanced if the LLC appoints our company as manager and we perform the mini corporate duties required under Nevisian law.

**Enhanced Confidentiality:**

Nevisian LLC laws contain many requirements related to confidentiality including strict financial secrecy l Strict legal requirements, known as fiduciary duties, would also govern Sovereign Manager Services beh. as a manager of an LLC. These fiduciary duties are imposed on managers by both the equivalent of the l bylaws and by the proper law of the LLC (usually the law of the country where the manager is located, i.e Panama). Many of these fiduciary requirements relate to secrecy and accounting obligations by which the manager must abide. Nevisian LLC and Panamanian law prevent our company from discussing your LLC business with anyone you have not instructed us to talk to.

Other governments' agencies such as the Internal Revenue Service in the United States, Revenue Cana the Inland Revenue in the United Kingdom cannot force us to discuss your business with them unless the obtain a court order against you or us or both ordering us to make disclosure. But a court order from their respective jurisdiction is useless in Nevis or Panama. In accordance with strong Nevisian law, a judgeme from outside of Nevis will not be recognised by Nevisian courts. This means an onshore judgement credit who won a lawsuit against you or your LLC in. for example. the U.S. or Germany cannot take that U.S. or German judgement and require a Nevisian court to enforce it.

In addition to not recognizing the judgements of other countries, Nevisian law and Nevisian courts do not the granting of court orders against LLCs except under truly exceptional circumstances. Nevisian law favi upholding the independence and application of its own law over the enforcement of foreign, onshore laws

To view pricing, the components of our special offshore packages and to order click here.

Top

Home · Offshore Asset Protection Blog · About Us · Why Offshore? · Contact Us
Fee Schedule · Secure Online Order · Why Panama? · Panama as a Tax Haven
Panama Foundation · Panama Corporation · Corporation/Foundation Combined
International Fiduciary Structure · Panama Charitable Foundation · Management Services
Account Signatory Services · Offshore Banking · Offshore Debit Card · E-Commerce Solutions
Why Belize? · Belize IBC · Belize LLP · Belize PCC · Costa Rica Corporation · Why Nevis? · Nevis IBC · Nevis L
Why Seychelles? · Seychelles IBC · Offshore Trust · Offshore Web Hosting · Offshore Bank Formations
Swedish Credit Union · NZ Offshore Finance Company · Uruguay SA · Panama Financial Company
Internet Banking Software · Captive Insurance · Offshore FAQ's · Mail Forwarding · Virtual Office Services

EXHIBIT

PAGE _____ 737

Nevis LLC | Sovereign Management & Legal, S.A. - Panama Offshore Legal Services        Page 4 of 4

Re-Invoicing Services · Panama Real Estate · Real Estate Title / Escrow Services · Relocation Services in Panal
Panama Immigration / Panama Passport · Ship / Yacht Registration Services
Investments · Reseller Program · Panama Links · Sitemap

For optimal viewing and navigation, please enable javascript.

EXHIBIT ___58___

PAGE ___738___

# Exhibit 59



# NEVIS ISLAND ADMINISTRATION

*Ministry of Finance, Statistics & Economic Planning*
*REGULATION AND SUPERVISION DEPARTMENT*

December, 12th 2008

Austin Lescott
Clay Ghaut
St. John's Parish
Nevis

Dear Sir

## RE: INFORMATION REQUESTED ON 12th December, 2008

In connection with the above, we advise as follows:

| | |
|---|---|
| Exact Company Name: | LEXINGTON FINANCIAL LIMITED |
| Date of Incorporation: | 03rd March, 2006 |
| Company Number: | C 29848 |
| Registered Agent & Address: | Trust Services Nevis Limited<br>Springates Building<br>Government Road, Charlestown, Nevis<br>Telephone Number: 1 (869) 469-7270/1<br>Fax Number: 1 (869) 469-7272 |
| Shares: | 100,000 shares with par value USD$1.00 |
| Status (standing, etc.): | The Company is in Good Standing |

Public Record Documents (Art. Of Inc./Org., Amendments, etc): *FILED*

There are no charges, liens, mortgages or encumbrances filed for or on behalf of the company and/or its shareholders. Also note that information on directors, shareholders, officers, beneficial owners, annual returns and financial statements are not required to be filed by law. Consequently, such information is not available.

Should you require any further information, please do not hesitate to contact us.

Yours sincerely,

Clevelan Williams (Mr).
REGISTRAR

NEVIS FINANCIAL
SERVICES DEPARTMENT

P. O. Box 689, Main Street, Charlestown, Nevis, West Indies
Tel: 1(869) 469-1469 • 1(869) 469-5521 Ext. 2150 • Fax: 1(869) 469-7739
Website: www.nevisfinance.com • Email: nevfin@sisterisles.kn

EXHIBIT 57

PAGE 739

EXHIBIT _15_

PAGE _187_

# Exhibit 60

**Filed Under Seal
Pursuant to Protective Order**