# EXHIBIT 4

**THIS EXHIBIT IS FILED UNDER SEAL**

**PURSUANT TO PROTECTIVE ORDER**

# EXHIBIT 5

# THIS EXHIBIT IS FILED UNDER SEAL
# PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 6

Priority ☑
Send ☑
Enter ——
Closed ——
JS-5/JS-6 ——
JS-2/JS-3 ——
Scan Only ——

FILED - EASTERN DIVISION
CLERK, U.S. DISTRICT COURT

**AUG 1 0 2006**

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARTER BRYANT, | |
| Plaintiff, | CASE NO.  CV 04-9049 SGL (RNBx) |
| | (Consolidated with cases CV-04-9059 and CV-05-2727) |
| v. | |
| MATTEL, INC., | ORDER DENYING MOTION FOR APPOINTMENT OF EXPERT WITNESSES |
| Defendant, | |
| and related actions. | |

Presently before the Court is Mattel, Inc.'s ("Mattel") motion for the appointment of expert witnesses pursuant to Federal Rule of Evidence 706, Carter Bryant and MGA Entertainment, Inc.'s ("MGA") opposition and response thereto, and Mattel's reply.  For the reasons set forth below, the Court **DENIES** the motion for the appointment of expert witnesses.

Federal Rule of Evidence 706(a) provides

> The court may . . . on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations.  The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witness of its own selection.  An expert witness shall not be appointed by the court unless the witness consents to act.

DOCKETED ON CM

**AUG 1 1 2006**

BY _____ 044

(73)

EXHIBIT 6
PAGE 134

1           A witness so appointed shall be informed of the witness'
2           duties by the court in writing, a copy of which shall be filed
            with the clerk, or at a conference in which the parties shall
3           have opportunity to participate.

4      The appointment of an expert by a federal court is a rare occurrence. Much of

5 this stems from a concept "[d]eeply ingrained" in the common law "that it is the

6 responsibility of the parties to produce the evidence while the court looks on to assure

7 that the rules are followed." 4 JOSEPH M. MCLAUGHLIN, WEINSTEIN'S FEDERAL EVIDENCE

8 § 706.02[1], at 706-6 (2nd ed. 2006). The reluctance of courts to intrude into the

9 evidence-gathering function normally assigned to counsel is borne out of "the fear of

10 ex parte communications between the court and its expert," as well as the

11 unseemliness of "[c]ollecting a share of the expense [for the work performed by the

12 court appointed expert] from a party who has been damaged by the expert's report."

13 Id. at 706-6, 706-7. As a result of these institutional concerns, "experts are usually

14 appointed only in exceptional cases that present unwieldy, complex, or technical

15 issues" or where "there is a need for an impartial, independent assessment of a

16 disputed issue." Id. § 706.02[3], at 706-8 706-9.

17      Here, Mattel seeks for the court to appoint experts in the fields of questioned

18 document examination, ink chemistry analysis, and paper chemistry analysis in order

19 to "analyze and date (1) the originals of 'BRATZ' design drawings, (2) the faxed-

20 version of the BRATZ-related contract between . . . Carter Bryant and MGA

21 Entertainment, Inc., (3) MGA's internal documents relating to work performed by Anna

22 Rhee on Bryant-related projects in the year 2000, and (4) a facsimile of BRATZ

23 drawings bearing a fax header date of April 10, 2000," as well as "(5) any other

24 documents that cannot be sampled or tested without destroying the sample tested or

25 analyzed." (Mattel's Mot. Appt. Expert, Preface at 2). The reason proffered for such

26 an appointment is two-fold: First, a generalized concern that, because the documents

27 sought to be examined are "highly relevant" to the litigation, having a neutral expert

28 perform the testing on the same may obviate a battle of the experts that would make

EXHIBIT 6
PAGE 135

1   the jury's function of sorting out the truth much more arduous; and second, concerns,

2   deduced during discovery, about the possible spoliation of key documents in the case

3   by MGA/Bryant and their counsel.

4   A.    AVERTING A BATTLE OF THE EXPERTS

5         Mattel's argument that the Court should appoint an expert because otherwise

6   each side will perform "separate, partisan destructive analyses of separate samples of

7   the documents" with "wide divergence" of opinion "virtually assured" is not well-

8   founded. (Mattel's Mot. Appt. Expert at 18, 20). Explicit in Mattel's argument is that

9   this feared divergence in each side's retained expert's opinions has yet to materialize.

10  This is not surprising as it appears that discovery in this case is in its nascent stage,

11  owed largely to the fact that the Court had earlier stayed the case while Mattel

12  appealed the denial of its motion to remand the case to state court.  Mattel's argument

13  instead is that the Court should appoint an expert now to avoid the possibility that

14  there may be such wide divergence in each side's privately retained expert in the

15  future.  Needless to say from the jabs each party took at the credibility and even

16  trustworthiness of the other side's retained expert during the oral argument on this

17  motion (one going so far as to label the competing ink chemistry experts as being the

18  modern day equivalent of one's Hatfield to the other's McCoy), such a possibility may

19  be more easier to imagine occurring here than in ordinary cases. Nevertheless, such

20  divergence, even if likely, is still that – a possibility, not an inevitability.

21        In those cases where an expert has been appointed by a court on account of

22  the excessive partisanship in the expert opinions retained by counsel, the rationale for

23  the appointment was based on the fact that the feared wide divergence in opinion had

24  already materialized.  See Students of California Sch. for the Blind v. Honig, 736 F.2d

25  538, 548 (9th Cir. 1984)("the judge could not decide the merits of the students' seismic

26  safety claims on the basis of evidence presented at trial, so he reopened the case and

27  appointed a neutral expert to evaluate the adequacy of seismic testing at the Fremont

28  site"), vacated on other grounds, 471 U.S. 148 (1985); Eastern Air Lines, Inc. v.

3

EXHIBIT  6
PAGE  136

1   McDonnell Douglas Corp., 532 F.2d 957 (5th Cir. 1976); 4 WEINSTEIN § 706App.100 at

2   706App.-5 (noting that legal commentators' "imprecations against the parties' 'battle of

3   experts'", not the potential for such a battle, "led to the drafting of the Uniform Expert

4   Testimony Act in 1937," the precursor to Federal Rule of Evidence 706).

5       In no instance uncovered by the Court's research (or by Mattel's citation to

6   authority) has a court appointed an expert because of a fear, even one that is well-

7   founded, that such wide divergence in privately-retained expert testimony may

8   materialize in the future.  Were the Court to adopt Mattel's analysis, appointment of

9   experts by courts would expand exponentially, limited only by a court's assessment of

10  how partisan the experts in a given case may become in the future.  Such a

11  proliferation has not occurred precisely because courts generally require that the

12  divergent "horse" be placed before the expert witness "cart."  See FED. R. EVID. 706

13  advisory committee's note ("actual appointment is a relatively infrequent occurrence").

14  Unless and until this feared divergence in opinion becomes reality, the Court finds that

15  the potential (which itself cannot be quantified at this point) for its occurrence does not

16  warrant the Court's intrusion into the adversarial process through the appointment of

17  an expert at this stage.

18  B.    SPOILATION OF EVIDENCE

19      The question is much closer with respect to Mattel's other reason for the Court

20  to appoint an expert in this case:  Concern that opposing counsel or their clients may

21  have destroyed or altered key documents in the case.  Mattel's basis for such concern

22  is predicated on three facts uncovered during discovery.

23      1.    Evidence of spoilation

24      Before being deposed Bryant was asked to bring all his original BRATZ design

25  drawings.  When he arrived at his deposition, however, Bryant only had in his

26  possession a few of the originals. (Decl. Michael T. Zeller ¶ 13).  Among these some

27  "contained holes where plugs apparently had already been removed.  Bryant

28  acknowledged . . . that his drawings had no holes in them when he gave them to his

4



EXHIBIT 6

PAGE 137

1   lawyers." (Mattel's Mot. Appt. Expert at 2; see also Decl. Michael T. Zeller ¶ 14).

2   Specifically, at Bryant's deposition the following exchange took place between Bryant

3   and counsel for Mattel:

4          Q.    (By Mr. Quinn) I wanted to ask you about one of
               these original drawings that were produced today.
5
               . . . .
               – what we're talking about here.  This is – the Post-it
6               says that's Bryant – that's the original of Bryant
               192, Bates number 192, which has the heads on it,
7               and this is one of the originals that your counsel was
               kind enough to have shipped here today for us to
8               look at.

9          A.    Yes

10         Q.    And we were just looking at these this afternoon and
               we notice[d] that there's a bunch of holes on the
11              page, including in the signature, as if somebody
               were taking ink samples.
12
          A.    Uh-huh.
13
          Q.    Do you see that?
14
          A.    Yes.
15
          Q.    Do you know anything about why those holes were
16              made or how or when?

17         A.    I have no idea what those are.

18         Q.    I mean, when you had – when you had possession
               of this document did it have those holes in it?
19
          A.    Not that I remember.
20
          Q.    You certainly never had anything to do with that?
21
          A.    No.  I don't know anything about those holes.
22
          Q.    And, similarly, if you wouldn't mind holding this up to
23              the camera, this is the original of Bryant 210 and it's
               also – if you take a look at it, I think you'll see it has
24              some of those holes in it, although not as many as
               the last one we looked at.  Again, you don't know
25              anything about how or why those holes got put on
               there?
26
          A.    I don't.
27

28   (Decl. Michael T. Zeller, Ex. 7 at 161-163).

5

EXHIBIT 6
PAGE 138

1      Mattel has submitted the declaration of a questioned document analysis expert,

2   Lloyd Cunningham, who has opined that the holes described in the document

3   mentioned above are consistent with those that would be generated by taking

4   microplug samples to perform analysis of the ink found on a document. (Decl. Lloyd

5   Cunningham ¶ 5). Bryant and MGA eventually conceded (although at first refusing to

6   do so under the veil of work-product privilege) that they tested some of the original

7   BRATZ drawings by an expert they retained in the field of forensic chemistry, Erich J.

8   Speckin. (Response to Order to Show Cause ("Response") at 1-2).

9      Mr. Speckin states that in June, 2004, he performed a series of tests "on

10  various 'Bratz' documents" at the request of MGA's counsel.[1]  (Decl. Erich J. Speckin

11  ¶ 8). Those tests included examining the documents in question under an infrared

12  light as well as performing sidelight testing, which involves "visually inspecting a

13  document by holding a side light up to the document at an oblique angel . . . to

14  determine preliminarily whether the document contains impressions, or markings

15  impressed upon the document by drawing and writing done on a sheet of paper laid

16  on top of the document being tested." (Decl. Erich J. Speckin ¶¶ 9, 10). Mr. Speckin

17  also performed an electrostatic detection apparatus to see if there was indented

18  impressions on the documents. (Decl. Erich J. Speckin ¶ 11). Finally, Mr. Speckin

19  "performed ink identifications tests" on the documents. (Decl. Erich Speckin ¶¶ 12-

20  13). Such testing involved Mr. Speckin removing "very small microplug samples from

21  the document at issue and testing the microplug." (Decl. Erich Speckin ¶13).

22  Nowhere is it averred by MGA, Bryant, or Mr. Speckin which or how many of the

23  original BRATZ drawings were subjected to this microplug sampling procedure, nor is

24  it averred from what parts of the documents that were tested was the microplug taken.

25  Instead, Mr. Speckin simply notes that in taking the microplugs he "le[ft] more than

26

27  _____

28  [1] At the time the testing was done by Mr. Speckin, Bryant had already been
    sued by Mattel for violating the terms of the invention agreement he signed when he
    worked for them from 1999 to 2000. (Response at 1).

6


EXHIBIT  6
PAGE  139

1   sufficient material for another expert to test the exact same <u>documents</u>," but admits

2   that "another expert cannot test the very same microplug that I tested . . . ." (Decl.

3   Erich J. Speckin ¶14).

4        Another episode brought to light during discovery causing Mattel concern

5   relates to MGA's handling of the original Bryant/MGA contract before the inception of

6   the instant litigation. At the deposition of a former MGA executive, Victoria O'Connor,

7   testimony was elicited that O'Connor, "on explicit instructions of MGA's [CEO] Isaac

8   Lariam, . . . [made] redact[ions from] the fax header . . . on the BRATZ contract

9   between Bryant and MGA for the year 2000 to conceal the fact that Bryant sent the

10  contract from Mattel's Design Center while he was still employed at Mattel." (Mattel's

11  Mot. Appt. Expert at 3). O'Connor's deposition appears to indicate that such alteration

12  occurred before the present litigation began (indeed, perhaps even before MGA

13  marketed the BRATZ doll).

14              Q.    . . . Was there ever anything that you were asked to
                      do that you -- made you feel kind of uncomfortable?
15
                A.    Yes.
16                             . . . .

17              Q.    And what was that?

18              A.    When the original contract was executed by Carter
                      Bryant, it was sent to me <u>via</u> fax, and on the top of
19                    the fax listed the phone number from where it was
                      faxed, which said "Barbie Collectibles," and at one
20                    point my boss, Isaac Larian, asked me to white that
                      out and send it to a lawyer, Patty Glaser.
21

22  (Decl. Michael T. Zeller, Ex. 19 at 306). Upon further examination, however,

23  O'Connor stated that she did not participate in or have knowledge of any other

24  instances in which any other agreement between Bryant and MGA was directed to be

25  altered:

26              Q.    Were you ever asked to change the date on any
                      agreements between Mr. Bryant and MGA?
27
                A.    No.
28

7

EXHIBIT 6
PAGE 146

1        Q.    Are you aware of anybody being asked to change
2              the date on any of those agreements?

       A.    No.
3
       Q.    I mean, do you have any reason to believe that any
4              agreement that was entered into between Mr. Bryant
             and MGA had a date altered or changed?
5
       A.    No.
6
       Q.    You never heard that from – from any source?
7
       A.    No.
8

9 (Decl. Paula E. Ambrosini, Ex. 3).

10      Finally, Mattel speculates that a drawing of some BRATZ doll accessories

11 faxed on April 10, 2000, had the fax header altered, much in the same manner

12 described in O'Connor's testimony vis-à-vis the MGA/Bryant faxed contract, as the

13 fields on the fax header for the sender's name and the sender's telephone number are

14 missing. (Decl. Michael T. Zeller ¶ 23 & Ex. 24).[2] As explained by Mattel, "Because

15

16      [2] Mattel speculates that the time sheets produced by MGA for one of its
17 employees, Anna Rhee (who did doll face painting work for the BRATZ mock-up), from
"mid-to-late 2000" were altered or recently created by MGA to show that Rhee worked
18 on projects called "Angel" or "Prayer Angel," when in fact she was working at the time
painting faces for BRATZ dolls at the direction of Bryant. (Mattel's Mot. Appt. Expert at
19 3). The basis for this speculation is based on the fact that the initial disclosure by MGA
of Rhee's time sheets comprised only 8 pages. (Decl. Michael T. Zeller ¶ 20). Then,
20 on January 7, 2005, Rhee produced 20 separate invoices of her work at MGA during
21 mid-to-late 2000, indicating that Rhee performed work for MGA prior to Bryant's
departure from Mattel, most notably on June 12, 2000. (Decl. Michael T. Zeller ¶ 21).
22 Within a couple of weeks after Rhee's production of invoices to Mattel, MGA
supplemented its earlier production of Rhee's time sheets showing that during the mid-
23 to-late 2000 period Rhee was working on a MGA project known as "Angel" or "Prayer
24 Angels" and was not involved in any BRATZ-related work until after Bryant's departure
from Mattel. (Decl. Michael T. Zeller ¶ 22). Mattel's surmise that the supplemental time
25 sheets were altered is allegedly bolstered by the fact that Rhee testified during her
deposition that the only work she performed in mid-to-late 2000 was on BRATZ and
26 that the supplemental time sheets reference to the "Angel" and "Prayer Angel" was
27 nothing but a cover or code word for BRATZ-related work. This argument is hard to
accept. First, even the invoices Rhee turned over to Mattel contain the phrase "Angel"
28 for the mid-2000 project she worked on. (Decl. Michael T. Zeller, Ex. 22 at 356-60,
362). It is not until December, 2000, that any of the invoices submitted by Rhee show

EXHIBIT 6
PAGE 141

1  facsimile machines normally insert senders' names and numbers as a matter of

2  course, and indeed is required by law [to do so], it appears likely that the document

3  was altered to conceal the sender's information. See 47 U.S.C. § 227(d)(1)(B)."

4  (Mattel's Mot. Appt. Expert at 10). The premise underlying Mattel's concern on this

5  topic is not unreasonable. The law requires such information to be found on any

6  document, like the one in question, that has been faxed. Additionally, the testimony

7  elicited from Ms. O'Connor that MGA altered the fax header for other documents

8  related to BRATZ from the same time period leads to an obvious inference that other

9  documents where spaces on other fax headers are absent suffered a similar fate.

10      2.    Analysis

11            a.    Microplug Ink Testing

12     Bryant and MGA begin by downplaying the significance of the spoliation issue

13  in this case. With respect to the holes on some of the original BRATZ design

14  drawings produced at Bryant's deposition, they note that, even with these holes,

15  nothing prevents Mattel from performing its own testing on the remaining portions of

16  the drawings on the document. "Indeed, the very fact that Mattel is asking for court-

17  appointed experts to perform ink and paper testing only underscores the fact that

18  nothing has been 'destroyed.'" (Joint Opp. at 2). Mr. Speckin makes similar assertions

19  in his declaration, stating that the fact that the same microplug cannot be tested "is

20  entirely irrelevant because there is more than enough ink on each of the documents I

21  tested to allow numerous microplug samples to be extracted and tested by different

22  experts." (Decl. Erich J. Speckin ¶ 14 (emphasis added); see also Response at 5-6

23  ("While another expert cannot test the very same microplug that Mr. Speckin tested,

24

25  _____

26  her doing work on the BRATZ doll, well after Bryant had left Mattel. (Decl. Michael T.
    Zeller, Ex. 21 at 367, 370, 373). To accept Mattel's argument, not only would MGA
27  have had to alter the invoices it produced in the supplemental production, but the
    documents produced by Rhee would also have to be similarly altered. An alternative
28  and just as plausible explanation is that Rhee is simply mistaken as to when she began
    performing work on the BRATZ project.

9


EXHIBIT 6
PAGE 142

1   that fact is entirely irrelevant because, unlike in a situation where the entire object is

2   destroyed during the testing, there is more than enough ink on each of the <u>documents</u>

3   Mr. Speckin tested to allow numerous microplug samples to be extracted and tested"

4   (emphasis added))). This argument is not persuasive. This is not a case where

5   everyone concedes that the documents in question were created at one point in time,

6   but dispute what that date may have been. In such a circumstance all the ink

7   markings on the documents are comparable to one another as it is conceded that all

8   the marks came from one point in time.

9       Here, however, it is Mattel's theory that Bryant made drawings in 1998 and then

10  periodically touched up or made refinements/additions to those drawings, adding more

11  marks in 1999 and 2000 during the time he was employed by Mattel. An ink mark

12  from one part of the document is not necessarily comparable to another set of ink

13  markings found elsewhere on the document. One ink mark on a drawing could have

14  been made in 1998, for example, while another ink mark found on the same drawing

15  could have been put there sometime later. In taking microplug samples from one of

16  these ink markings without the ability of the other side to test <u>the same mark</u> would

17  forever foreclose a potential avenue of crucial evidence in this case. It is on that point

18  that taking microplug samples of the marks on these drawings is akin to the spoilation.

19  Therefore the fact that another expert could test other parts of the document does not

20  mean that key relevant evidence found on that document has not been destroyed. As

21  MGA and Bryant make clear spoilation of evidence occurs through the "destruction or

22  significant alteration of evidence, or the failure to preserve property for another's use

23  as evidence in pending or reasonably foreseeable litigation." <u>West v. Goodyear Tire &</u>

24  <u>Rubber Co.</u>, 167 F.3d 776, 779 (2nd Cir. 1999).[3]

25      At this point, it should not be lost that the documents in question are not

26  _____

27      [3] The Court does not mean to suggest that Mattel's theory is correct. Instead, the Court simply notes this theory as refuting MGA and Bryant's argument that only the

28  <u>complete</u> destruction of a document would amount to spoilation under the particular circumstances in this case.

10



EXHIBIT 6
PAGE 143

1  peripheral to the case. At its heart, this case asks the question: Who owns the rights
2  to the Bratz dolls? Bryant asserts that he came up with the idea for the Bratz dolls
3  while on a break from his employment at Mattel in 1998, and that he sold his idea to
4  MGA when he went to work for them in October, 2000. Mattel claims, among other
5  things, that Bryant "developed" or "continued to develop" his idea for Bratz dolls while
6  he was working for them from January, 1999, to October, 2000, and that pursuant to
7  an inventions agreement he signed with the Mattel when he went to work for them,
8  that idea now belongs to Mattel. As this clash of factual contentions makes clear, the
9  dating of the original BRATZ drawings and the markings contained thereon is a
10 fundamental, perhaps despositive, issue to this case. That there are serious
11 questions concerning the handling of these critical documents certainly causes the
12 Court much concern about whether the truth seeking functions of the adversarial
13 system have been fundamentally compromised in this case. As Mattel rightly notes,
14 "The adversarial process is not an end in itself; its value is in its ability to promote a
15 search for truth." (Mattel's Reply at 9).

16      Bryant and MGA concede that the sections that were holed out contained
17 markings, be they handwritten dates or other words or letters, that may be crucial to
18 the case. Indeed, one of the drawings – Bryant 192 – had a portion of the signature
19 line sampled. What is left unclear is whether, for those portions of the document
20 where ink or signatures were sampled, enough of the same part of the document in
21 question (meaning the same mark) remains to be sampled by Mattel. For instance, is
22 there enough of the signature line from Bryant 192 left to sample, or has too much of it
23 already been sampled? In that sense, MGA's and Bryant's argument that nothing has
24 been destroyed by the microplug testing procedure because other parts of the
25 document still exist is misplaced. Indeed, MGA and Bryant later admit that the
26 circumstances allowing for "multiple experts [to] remove multiple microplugs and test
27 the exact same paper and ink" is dependent upon there being the same exact paper
28 and ink there to test. (Joint Opp. at 15 ("[a]s long as there is paper and ink to test")).

11

EXHIBIT  6
PAGE  144

1  The continued existence of the "exact same pen stroke" is the very issue that is now

2  left open because of the holes in some of Bryant's original BRATZ design drawings.

3  Is there anything left of that exact same pen stroke that was sampled by Mr. Speckin

4  remaining on the original drawing for Mattel to test? None of these questions have

5  been addressed by MGA, Bryant, or Mr. Speckin in their papers. Instead, they simply

6  make the observation that there remain other ink markings on the same drawings for

7  Mattel to test, a reason which, as explained above, is wholly insufficient to assure the

8  Court that Mattel has not been prejudiced by MGA's actions.

9          Given the absence of any representation by them on this point, the Court

10  pressed MGA's counsel about the same at oral argument:

11                  THE COURT: And part of your argument is that
     while a small portion of the small portion of the page may
12   be gone, as you in your most recent papers concede is
     gone, there are other portions of the page that can be
13   tested. The concern I have, I guess — and maybe you can
     clear this up for me — I've seen some of the drawings and I
14   have a pretty good mental image of what the drawings look
     like. But there is also writing on these drawings,
15   signatures, copyright registration indications; some are
     large, some are small. As I gather from the plaintiff, from
16   Mattel, the concern is that these different drawings or
     writings were done at different times. And I guess I can
17   understand why when those drawings or writings were
     done could be significant from an evidentiary standpoint.
18   So the concern is not so much there's another part of the
     paper that can be tested; it's whether or not the particular
19   marking in question has been so damages as to not permit
     a full further testing on that particular marking. Does my
20   question make sense?

21                  MS. CENDALI: Yes, it does, your Honor. And I
     anticipated that. Significant, we thought, in their papers
22   was that . . . they cited to the fact that Mr. Bryant admitted
     in his deposition that there were holes in some of the
23   documents that he didn't know how they got there
     originally. As an example, if you look at part of Zeller,
24   Exhibit 17, Bates number Bryant 201, that's an example of
     one of the documents that's been tested.

25
                   THE COURT: One second so I have that in front of
26   me. Okay.

27                  MS. CENDALI: There are many many others that were
     submitted that were also submitted to this type of ink
28   testing, but this is just an example of one of them. And if

                                        12


EXHIBIT 6
PAGE 145

1                 you look at the document, you would never know –
2                 granted, this is smaller, so the actual drawing is even larger
                  than this, so there's even more ink on the larger drawing
3                 than there would be available on this reproduction size.

4                   But if you look at it – and I'll represent to you that we
                  didn't test the face; the face is absent before and after the
5                 testing – but if you look at it, you couldn't even see that
                  there were any pin pricks to it. If you look very, very
6                 carefully at the signature at the bottom, you can maybe see
                  where it says "Ramona Prints, 8-26-99"; that maybe there
7                 was like a little tiny hole in one of the little slash marks; that
                  was a teeny little pin prick hole that showed the testing .
8                 There's ample amount of ink to do the testing on all of
                  these documents.  This is the normal course of procedure
9                 that was done.

10        When asked by the Court whether it accepted MGA's representation that there

11 was "ample amount of ink" left on the same marks that the microplugs were taken

12 from for further microplug testing, Mattel, in seeming contradiction to its position in its

13 papers, said it did: "I agree with Ms. Cendali. <u>We do not maintain any portion of the</u>

14 <u>ink on a signature or an image has been so obliterated that you couldn't take a plug</u>

15 <u>now on any of it; that's not our point</u>." (Emphasis added).

16        In light of this concession by Mattel, the Court finds that no colorable claim of

17 spoilation has been established at this time <u>vis-à-vis</u> Mr. Speckin's testing of the

18 documents to warrant the appointment of an expert by the Court to investigate the

19 same. <u>See Sedratl v. Allstate Life Ins. Co.</u>, 185 F.R.D. 388, 393 (M.D. Ga.

20 1998)(sanction warranted where because "defendant's expert has conducted

21 destructive tests on the original documents," plaintiff's expert "cannot duplicate the

22 conditions of the original documents"). If there was any evidence indicating that MGA,

23 Bryant, or their counsel had engaged in acts that could compromise Mattel's ability to

24 discover crucial information in this case, the Court would be sympathetic to the

25 appointment of an expert to investigate the same. Here, no such evidence exists.

26 The tests done by Mr. Speckin have not left the marks that were micro-sampled or the

27 documents that were handled so compromised that Mattel cannot perform the exact

28 same tests on those exact same marks as performed by Mr. Speckin.

13


EXHIBIT __6__
PAGE __146__

1    Indeed, the only basis for spoliation that Mattel has left to argue – that the
2    passage of time has left the ability to perform any meaningful ink testing at this time
3    problematic – is an argument that has nothing to do with MGA's conduct, but much
4    more with Mattel's own dereliction. As the Court understands it, the process of dating
5    when ink was placed on a document has only a limited window of time in which it can
6    be accomplished because, eventually, the ink dries (be it in 2 years or 3 to 4 years),
7    leaving nothing capable of being sampled after that point to test (save to acknowledge
8    that the ink in question was put on the paper some time more than 3 to 4 years ago).
9    Mattel essentially argues that the impossibility of testing ink after a certain period
10   mandates that, if the other side is going to test ink while "fresh" ink remains on the
11   document, that party has an obligation to inform the other side so that they can do the
12   same before the ink "dries out"; failure to do so renders the test performed something
13   that cannot be replicated.[4]  By Mattel's own admission, they knew there had been
14   testing done on the BRATZ original drawings as far back as November, 2004, during
15   Bryant's deposition testimony when they saw some of the original BRATZ drawings
16   (drawings that had been tested by Mr. Speckin five months earlier).  Rather than
17   immediately seeking the production of those documents and having its own expert
18   perform similar tests on them, Mattel sat idly by, waiting until June of this year to do
19   anything, either by way of court-pleadings or formal requests made to MGA and
20   Braynt, related to having ink tests performed on the documents.  Nowhere has Mattel
21

22        [4]  The basic factual assumption in Mattel's argument may indeed be faulty – that
23   when MGA tested the ink there was enough "fresh" ink to test. Mr. Speckin states that
     "[I]nk takes approximately 3 to 4 years to dry on paper. Thus, by testing the ink to
24   determine if it is dry, it can be determined whether the document was created within the
     last [3 to] 4 years, or whether the ink, and thus the drawing, is more than [3 to] 4 years
25   old." (Decl. Erich J. Speckin ¶ 13). Given that Mr. Speckin performed his ink dating
     test in June, 2004, at best he could determine whether the ink had been put on the
26   paper on or after June, 2000. Beyond that time frame his test could not tell when the
     now-dried ink was marked on the document. Given that the relevant period in question
27   in this case is from August, 1998, to October, 2000, Mr. Speckin's test results would
28   appear to be only marginally relevant in adducing proof as to when the BRATZ
     drawings were made.

14

EXHIBIT 6
PAGE 147

1   explained how MGA or Bryant had anything to do with it not having the ability to
2   perform such testing until now. Mattel's allusion to the fact that a stay on discovery
3   was put in place by this Court in 2005 is misguided. If Mattel thought that it was losing
4   valuable time on account of the stay, it could have at any time filed with this Court an
5   emergency request for relief from the stay to have such tests performed. All it needed
6   to do was inform the Court that it had only a short period of time to perform the test on
7   account of the fact that ink dries; something which it never did in this case.
8            Mattel's citation to the case Edwardes v. Southampton Hospital Associates,
9   278 N.Y.S.2d 283 (1967) is equally unhelpful to their argument. In that case, the court
10   was presented with an application to prevent the testing of a intramedullary pin for
11   discovery and testing. Id. at 284. The court held that, "[s]ince the pin is crucial to the
12   action it is not too difficult to appreciate that any change, however slight, assumes an
13   importance magnified proportionately. And undoubtedly tests which would destroy or
14   alter most or all of a particular article ought not be permitted in the first instance
15   without providing adequate safeguards to protect all concerned." Id. at 286. Here,
16   such an argument cannot be made because, for the reasons cited above, Mattel has
17   conceded that even in performing the tests of the original BRATZ drawings Mr.
18   Speckin left enough ink of the same pen stroke for its own experts to test. In short,
19   there has been no alteration, however slight, made to the documents insofar as
20   Mattel's ability to replicate the exact same test is concerned. The only change that
21   has occurred is in Mattel's ability to retrieve any relevant information from such a test
22   on account of the passage of time that has elapsed. The test Mr. Speckin performed
23   is not responsible for this negative occurrence. MGA is similarly not responsible for
24   the passage of time or Mattel's inability to retrieve useful information from the testing
25   process. On that point, Mattel should look itself in the mirror for any finding of fault or
26   blame.
27            Moreover, aside from the potential for "destroying" key portions of the original
28   documents, it is alleged that MGA and Bryant's actions carry other means of

15

EXHIBIT 6
PAGE 148

1   prejudicing Mattel's ability to pursue lines of potential evidence in this case. The

2   expert declaration submitted by Mattel notes another possible spoliation of the original

3   drawings even if there remained enough of the pertinent portion of the document in

4   question to sample: The sampling process itself may have contaminated the

5   document in question by obliterating potential crucial clues that were on the document

6   or otherwise the sampling process led to the introduction of foreign materials onto the

7   documents themselves which may complicate any future analysis. As explained by

8   Mattel's expert:

9           [P]erforming many such types of testing, even if described
            as "non-destructive," on a particular original document
10          carries the risk that potential evidence on it, including
            indentations in the paper fiber, might be contaminated or
11          destroyed in the process. Furthermore, the order of the
            types of testing to be performed on a given document
12          might have an impact on developing potential evidence
            during subsequent examinations. . . .
13
            . . . . [With respect to the original BRATZ drawings
14          containing holes in them,] it is possible that the destructive
            testing performed on the document may have caused
15          some form of contamination and/or alteration, which carries
            the further prospect that subsequent examinations by
16          experts may not enable them to develop potential evidence
            or the same evidence that the other [earlier] expert
17          developed.

18   (Decl. Lloyd Cunningham ¶¶ 4-5).

19          MGA has rebutted this risk of contamination argument by proffering Mr.

20   Speckin's declaration, the expert who actually performed the tests in question. Mr.

21   Speckin states that he "exercised the utmost care in handling the documents [he]

22   tested," that a number of the tests he performed on the documents "has absolutely no

23   effect on the tested document whatsoever," and that with respect to those tests that

24   could effect the document he followed established procedures in carrying out the test

25   in question. (Decl. Erich J. Speckin ¶¶ 8, 9, 10, 11, 12, 13). Nowhere has Mattel

26   proffered any evidence rebutting or calling into question Mr. Speckin's

27   representations. The Court therefore finds that, based on the evidence that is

28   currently before it, Mattel has not established a colorable claim of spoliation by way of

16

EXHIBIT 6
PAGE 149

1   contamination in the tests MGA performed on the documents in question.

2            b.    Alteration of Fax Headers

3        Insofar as O'Connor's deposition testimony relating to the white out of the fax

4   header on the October, 2000, contract between Bryant and MGA, this too is

5   downplayed by MGA and Bryant as being irrelevant because "there is no dispute that

6   Mr. Bryant faxed his signed contract from a fax machine at Mattel and, indeed, Mr.

7   Bryant readily admitted that fact at his deposition, which took place before Ms.

8   O'Connor's deposition." (Joint Opp. at 8 (emphasis in original)). This argument seeks

9   to compare apples to oranges. While it may be true that now there is no dispute by

10  MGA and Bryant that he faxed his portion of the contract to MGA from his office at

11  Mattel, at the time O'Connor did the white out of the fax header such a lack of dispute

12  was not apparent. It is from that perspective in time – the prologue to the litigation —

13  that O'Connor's deposition testimony is to be judged. And from that perspective her

14  testimony calls into question MGA's handling of relevant documents in its possession.

15        When the contract was first executed there is no indication that MGA and/or

16  Bryant would admit to the fact that Bryant negotiated his contract with MGA while he

17  was still working at Mattel; rather, at that point, that issue appeared to be an open one.

18  Indeed, the fact that MGA's CEO would direct O'Connor to tamper with the contract's

19  fax header clearly indicates that they would not admit to the fact. If MGA mistreated

20  this document where an open issue existed, it is not unreasonable to infer that it may

21  have been just as cavalier with its obligations to maintain the other documents in their

22  possession – say, for instance, the original BRATZ drawings – where similar open

23  issues remained. This concern with MGA's handling of documents in its possession at

24  the prologue to this litigation is reinforced by MGA and Bryant's blasé mention in a

25  footnote to their opposition that the original to this contract, the one which they

26  describe as being irrelevant, "has not been found." (Joint Opp. at 15 n.6). Indeed, it

27  has been suggested that MGA and Bryant or their counsel have made representations

28  that they are not sure of the exact whereabouts of a number of the original BRATZ

                                    17

EXHIBIT 6
PAGE 150

1    drawings. (Decl. Shane McKenzie ¶ 3 ("Mr. Bryant's counsel[, at the December 22 to

2    23, 2004, inspection of the originals by counsel for Mattel,] claimed not to have the

3    majority of the originals of BRATZ drawings and sketches, and further claimed not to

4    know where those originals were located")).

5         All that being said, the Court does not find that the alteration of the fax header

6    on the original Bryant/MGA contract warrants the appointment of an expert at this

7    time. Ms. O'Connor testified that, other than this one instance, she is aware of no

8    other documents that were purposefully altered by MGA. While the evidence related

9    to the missing fax header on the April, 2000, BRATZ accessories fax may indicate that

10   more than one document had been tampered with by MGA personnel, the Court has

11   nothing at this time to basis that conclusion on other than speculation and conjecture.

12   Without any tangible, concrete proof that MGA's mishandling of documents was more

13   widespread, the Court is left with what appears simply as an isolated instance of

14   tampering.

15        Accordingly, the motion for appointment of expert witnesses is **DENIED.**

16        IT IS SO ORDERED.

17

18   DATE: _8-9-06_.

19

20                                    STEPHEN G. LARSON

21                                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

EXHIBIT 6
PAGE 151

**EXHIBIT 7**

2610

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                              - - -

4           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                              - - -

6    MATTEL, INC.,                 :   PAGES 2610 - 2707
                                    :
7            PLAINTIFF,             : .
                                    :
8        VS.                        :   NO. ED CV04-09049-SGL
                                    :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,       :   CV04-9059 & CV05-2727]
     ET AL.,                        :
10                                  :
             DEFENDANTS.            :
11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                   FRIDAY, JUNE 13, 2008

18                   JURY TRIAL - DAY 13

19                   AFTERNOON SESSION

20

21

22                            MARK SCHWEITZER, CSR, RPR, CRR
                              OFFICIAL COURT REPORTER
23                            UNITED STATES DISTRICT COURT
                              181-H ROYBAL FEDERAL BUILDING
24                            255 EAST TEMPLE STREET
                              LOS ANGELES, CALIFORNIA 90012
25                            (213) 663-3494

CERTIFIED
COPY

EXHIBIT 1
PAGE 152

2611

 1   Appearances of Counsel:

 2

 3   On Behalf of Mattel:

 4       Quinn, Emmanuel, Urquhart, Oliver & Hedges, LLP
         By John B. Quinn, Esq.
 5           B. Dylan Proctor, Esq.
             Michael T. Zeller, Esq.
 6           Harry Olivar, Esq.
             John Corey, Esq.
 7           Diane Hutnyan, Esq.
             William Price, Esq.
 8       855 South Figueroa Street
         10th Floor
 9       Los Angeles, CA 90017
         (213) 624-7707
10

11

12   On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14           Carl Alan Roth, Esq.
             Jason Russell, Esq.
15           Lauren Aguiar, Esq.
             David Hansen, Esq.
16           Matthew Sloan, Esq.
             Robert Herrington, Esq.
17       300 South Grand Avenue
         Los Angeles, CA 90071-3144
18       (213) 687-5000

19

20   On Behalf of Carter Bryant:

21       Keker & Van Nest
         By Christa Anderson, Esq.
22           Michael H. Page, Esq.
         710 Sansome Street
23       San Francisco, CA 94111-1704
         (415) 391-5400

24

25   (Continued)



EXHIBIT __7__
PAGE __153__

2612

1  **Appearances of Counsel (Continued):**

2  On Behalf of Peter Marlow:

3      Keats McFarland & Wilson
        By Larry W. McFarland, Esq.
4      9720 Wilshire Boulevard
        Penthouse Suite
5      Beverly Hills, CA 90212
        (310) 777-3750
6

7      Law Office of Steven M. Goldsobel
        By Steven M. Goldsobel, Esq.
8      1900 Avenue of the Stars
        Suite 1800
9      Los Angeles, CA 90067
        (310) 552-9291
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 7
PAGE 154

2613

# I N D E X

(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.) ...... 2614

CARTER BRYANT, PREVIOUSLY SWORN........................ 2625

DIRECT EXAMINATION (CONTINUED) BY MR. PRICE:........... 2625

## E X H I B I T S

(Exhibit 1155-C received.)........................... 2638

(Exhibit 13649 received.)........................... 2641

(Exhibit 13627 marked for identification.)........... 2663

(Exhibit 1313-C received.)........................... 2667

(Exhibit 60 received.)............................... 2675

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 7
PAGE 155


2614

1:47 P.M.

(HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

THE COURT: All right, Counsel, we're back on the record outside the presence of the jury. I understand there are some issues.

MR. NOLAN: Your Honor, I just wanted to point out to Mr. Holmes that Larry McFarland and the other attorney, Mr. Goldsobel, I believe it is, he is present now to raise that issue if you wanted to at this time.

THE COURT: Very well. Mr. McFarland, please.

MR. McFARLAND: Thank you, your Honor. I sent an e-mail to Mr. Zeller when he asked -- put Mr. Peter Marlow on the list saying he would call him on Friday. I responded that he was unfortunately not available on Friday. He would be available Tuesday or Wednesday. In addition, I responded that he has obtained independent white collar criminal counsel and is prepared to sit for a deposition and answer the questions ahead of his trial testimony and not assert his Fifth Amendment rights. And we're prepared to make that offer. Mr. Marlow would be available late Monday afternoon.

He, unfortunately, has a last day patent filing that day. So he's not available until about 3:00. But he would make himself available at about 3:00 if Mattel and Quinn would like to do that.



EXHIBIT __1__
PAGE __154__

2683

1  Q.   When you say you guess it was, you know that a couple of
2  experts hired by both sides have determined that?
3  A.   Yes.
4  Q.   And you are familiar with this computer program called
5  Evidence Eliminator; right?
6  A.   Yes, sort of.
7  Q.   Well, you learned about it on the Internet; right?
8  A.   Yes, I think I got like a pop-up ad or something that
9  advertised it.
10 Q.   And what you did is you went onto the website that had
11 Evidence Eliminator; right?
12 A.   Yes.
13 Q.   And you looked at the Evidence Eliminator website;
14 correct?
15 A.   Yes.
16 Q.   You read through it to find out what is this thing which
17 is called Evidence Eliminator; right?
18 A.   I didn't really read it very thoroughly.  But I did, you
19 know, kind of glance through it.
20 Q.   Well, had you some idea of what it did just by its name,
21 Evidence Eliminator; right?
22 A.   Yeah, I mean, I had some kind of an idea.
23 Q.   And it was a program which you downloaded; right?
24 A.   Yes.
25 Q.   And you had to pay to buy that program; right?

EXHIBIT 7
PAGE 157

2684

```
 1              MR. NOLAN:  Your Honor, objection.  Foundation.
 2    Temporal foundation.
 3              THE COURT:  Sustained.
 4    Q.  BY MR. PRICE:  Well, let's talk about when you first
 5    downloaded the program.  Okay?  When you first downloaded
 6    this Evidence Eliminator, was that in 2002?
 7    A.  I believe so, yes.
 8    Q.  Now, at that time frame, were you having discussions
 9    with Mr. Larian about Mattel?
10    A.  I might have been.  I don't recall.
11    Q.  Did he share with you his view that there were rumors
12    that Mattel was going to sue about Bratz?
13    A.  It's possible, but I don't remember hearing -- I don't
14    remember that.
15    Q.  So in any event, you downloaded this program Evidence
16    Eliminator in about 2002; right?
17    A.  Right.
18    Q.  Now, the way this works is once you download it, you
19    actually have to activate the program to make it work; right?
20    A.  I seem to recall that, yes.
21    Q.  That is, just having it downloaded doesn't mean it's
22    going to do what it's supposed to do unless you push a
23    button; right?  Or an icon.
24    A.  Yeah, I don't remember exactly how it worked.
25    Q.  Well, you recall there's something called the safe
```



EXHIBIT 7
PAGE 158

2685

1　shutdown mode?

2　A.　Yes.

3　Q.　And normally when you turn off your computer, you use

4　regular logging off or whatever; right?

5　A.　Are you talking about then or now?

6　Q.　I'm talking about, let's say, in 2004.

7　A.　I don't remember exactly how you normally did it, but I

8　know the safe shutdown took a long time.

9　Q.　That is, if you actually wanted to run this Evidence

10　Eliminator, you had to press this button called safe

11　shutdown; right?

12　A.　I think so.

13　Q.　And from 2002 to 2004, you didn't use this Evidence

14　Eliminator frequently; right?

15　A.　No.

16　Q.　You didn't often push this safe shutdown feature; right?

17　A.　No, just occasionally.

18　Q.　But you did use it two days before you knew people were

19　coming to your house to image your computer to collect

20　evidence for this case.

21　A.　You know, that's possible. I just don't remember doing

22　it.

23　Q.　Well, let's talk about your knowledge of Evidence

24　Eliminator. You said that you went to the website; right?

25　A.　Yes.

EXHIBIT 7
PAGE 159

2686

1    Q.    And in addition to reading what was on the website, once

2    Evidence Eliminator was downloaded, there were files that

3    kind of guided you through how to use it; correct?

4    A.    I don't remember exactly.

5    Q.    I mean, you recall something called a Help Me file which

6    kind of told you what it was that Evidence Eliminator would

7    do when you pushed that button for a safe shutdown?

8    A.    I don't remember that file.

9    Q.    Well, you recall that one thing Evidence Eliminator did

10   or would do is it would delete information from your computer

11   as the name suggests.

12            MR. NOLAN:   Objection.   Lack of foundation.

13            MR. PRICE:   It's a leading question.

14            THE COURT:   Overruled.   You may answer the

15   question.

16            THE WITNESS:   I'm sorry.   Can you ask me again?

17   Q.    BY MR. PRICE:   One thing you knew was that, when you

18   pushed the safe shutdown feature, that Evidence Eliminator

19   would delete information from your computer.

20   A.    Well, what I remember thinking that it was doing in safe

21   shutdown was basically kind of going through my Internet

22   search histories and things like that.

23   Q.    Was it your understanding that Evidence Eliminator

24   permanently erases computer files which you have selected for

25   deletion?

EXHIBIT 7
PAGE 160

2707

1

2

3

4

5

6

7                          C E R T I F I C A T E

8

9

10            I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14            Certified on June 13, 2008.

15

16

17    MARK SCHWEITZER, CSR, RPR, CRR
      Official Court Reporter
18    License No. 10514

19

20

21

22

23

24

25

EXHIBIT __7__
PAGE __161__

# EXHIBIT 8

1976

1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                      - - -

4    HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

5                      - - -

6    MATTEL, INC.,                  :   PAGES 1976 - 2117
                                     :
7              PLAINTIFF,            :
                                     :
8        VS.                        :   NO. ED CV04-09049-SGL
                                     :   [CONSOLIDATED WITH
9    MGA ENTERTAINMENT, INC.,       :   CV04-9059 & CV05-2727]
     ET AL.,                        :
10                                   :
               DEFENDANTS.          :
11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 RIVERSIDE, CALIFORNIA

17                TUESDAY, JUNE 10, 2008

18                JURY TRIAL - DAY 10

19                 AFTERNOON SESSION

20

21

22                              MARK SCHWEITZER, CSR, RPR, CRR
                                OFFICIAL COURT REPORTER
23   **CERTIFIED**               UNITED STATES DISTRICT COURT
                                181-H ROYBAL FEDERAL BUILDING
24   **COPY**                    255 EAST TEMPLE STREET
                                LOS ANGELES, CALIFORNIA 90012
25                               (213) ___ ____

EXHIBIT 8
PAGE 162

EXHIBIT 13
PAGE 337

1977

```
 1  Appearances of Counsel:

 2

 3  On Behalf of Mattel:

 4       Quinn Emanuel
         By John B. Quinn, Esq.
 5          B. Dylan Proctor, Esq.
            Michael T. Zeller, Esq.
 6          Harry Olivar, Esq.
            John Corey, Esq.
 7          Diane Hutnyan, Esq.
            William Price, Esq.
 8       855 South Figueroa Street
         10th Floor
 9       Los Angeles, CA 90017
         (213) 624-7707

10

11

12  On Behalf of MGA Entertainment:

13       Skadden, Arps, Slate, Meagher & Flom LLP
         By Thomas J. Nolan, Esq.
14          Carl Alan Roth, Esq.
            Jason Russell, Esq.
15          Lauren Aguiar, Esq.
            David Hansen, Esq.
16          Matthew Sloan, Esq.
         300 South Grand Avenue
17       Los Angeles, CA 90071-3144
         (213) 687-5000

18

19

20

21

22

23

24

25
```

EXHIBIT 8
PAGE 163

EXHIBIT 13
PAGE 338

1978

1                    I N D E X

2

3   ISAAC LARIAN, PREVIOUSLY SWORN........................ 1992

4   CROSS-EXAMINATION (CONTINUED) BY MR. NOLAN:   .......... 1992

5

6                    E X H I B I T S

7

8   (Exhibit 16925 received.)............................. 2015

9   (Exhibit 4900 received.)............................. 2032

10  (exhibit 16911 received.)............................. 2045

11  (Exhibit 16788 received.)............................. 2074

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT __8__
PAGE __164__

EXHIBIT __13__
PAGE __339__

1979

1       Riverside, California; Tuesday, June 10, 2008

2                      1:15 P.M.

3       (HEARING HELD OUTSIDE THE PRESENCE OF THE JURY.)

4           THE COURT:  For the record, we're going to be

5    bringing into the courtroom Juror No. 3.

6           (Whereupon Juror No. 3 enters.)

7           THE COURT:  We're back on the record in the

8    presence of Juror No. 3, Rhonda Johnstone.  We've received

9    your letter, and I've shared it with counsel.  There's two

10   issues that you raise.  I'll deal with the easier one first.

11          Concerning your doctor appointments, make them

12   whenever you need to make them, and we will accommodate that.

13   Just let us know.  That's fine.

14          JUROR NO. 3  thank you.

15          THE COURT:  I'm a little bit more concerned about

16   the other one, though, concerning the representations that

17   were made to you and then changed.

18          It kind of puts us all in a bit of an awkward

19   position.  We certainly understand your financial position.

20   It's not clear why the school district would not have --

21   would have done what they did.  So what I'd like to do is

22   have the Court or court staff reach out to the appropriate

23   person and find out if that can't be reversed, because we

24   really need you.  And at the same time, I don't want to

25   submit anyone to a financial hardship.  So it puts me between

EXHIBIT 8
PAGE 165

EXHIBIT 13
PAGE 340

1980

1  a rock and a hard place.  Is that all right with you?

2          JUROR NO. 3:  Yeah, that's fine.  I don't know why

3  they did it either.  I thought I did my homework and

4  everything was cool.  And now I'm feeling guilty because I

5  didn't speak out.

6          THE COURT:  Don't you feel guilty at all.  It

7  sounds from your letter like you did everything you were

8  supposed to do.

9          JUROR NO. 3:  Well, I thought I did.

10          THE COURT:  And they changed the rules of the game

11  on you.  So what we're going to do is see if we can't bring

12  them back around to where they were previously and go from

13  there.  What I'd ask you to do is provide appropriate contact

14  information to Mr. Holmes, and then I'll have my staff reach

15  out to whoever that is.  You don't need to do so now.  He'll

16  take that up with you back in the room; all right?  Thank you

17  very much, ma'am.

18          (Whereupon the juror withdraws.)

19          THE COURT:  The juror has left.  The Court has

20  reached a decision -- a final decision with respect to Motion

21  in Limine No. 13, and I've written out my opinion, and I'll

22  want to have this included in the proposed order that's going

23  to be submitted to the Court.

24          The Court finds evidence that Carter Bryant

25  operated the safe exit feature of Evidence Eliminator on July

EXHIBIT 13
PAGE 341

EXHIBIT 8
PAGE 166

1981

1   12th, 2004, over two months after the filing of the lawsuit

2   by Mattel on April 27, 2004, and only two days prior to his

3   counsel's imaging.  Hard drive of his 2000 desktop, which

4   permanently eliminated the residue of previously deleted

5   files and rendered such deleted files unrecoverable is

6   relevant to his credibility as a witness and is admissible of

7   his consciousness of guilt, which in turn is relevant to

8   various elements of liability in this trial.

9          Moreover, the Court has carefully considered and

10  weighed whether the probative value of this clearly relevant

11  evidence is substantially outweighed by the danger of unfair

12  prejudice to MGA or undue delay in the trial and has found

13  that as limited by this order, it does not.

14         The Court will instruct the jury that this evidence

15  may only be considered for purposes of evaluating Carter

16  Bryant's credibility and his consciousness of guilt.

17         The Court further declines to give an adverse

18  inference instruction, believing that the issue was

19  adequately covered by instructions on credibility of

20  witnesses and circumstantial evidence that are already part

21  of the instructions given to the jury.

22         So that is the Court's ruling.  Accordingly,

23  evidence of the July 12th, 2004, use of Evidence Eliminator

24  is permitted not withstanding that MGA's Motion in Limine

25  No. 13 is otherwise granted in full.

EXHIBIT 8
PAGE 167

EXHIBIT 13
PAGE 342

1982

1       I trust that Carter Bryant is going to be

2   testifying tomorrow as scheduled, Mr. Nolan?

3           MR. NOLAN:  Your Honor, I think so.  Although we've

4   been told from time to time that witnesses are coming up, and

5   then they are pulled off.

6           THE COURT:  This is better asked, I suppose, to

7   Mr. Price or Mr. Quinn.

8           MR. QUINN:  That's what we anticipate.  Of course,

9   it depends on how much longer we have Mr. Larian on the

10  stand, but we anticipate Mr. Bryant testifying tomorrow.

11          THE COURT:  Very well.  As discussed, and I know

12  you weren't back in the under seal discussion, but I'm sure

13  Mr. Zeller or Mr. Corey -- who will be doing the examination

14  of Mr. Carter?

15          MR. PRICE:  I will, your Honor.

16          THE COURT:  Mr. Bryant, I mean.  The Court is

17  really trying to limit this to exactly the one piece of

18  evidence that I do think is relevant.  And that's -- it's

19  largely because of the timing of the use of the safe exit

20  function that convinces the Court that for purposes of

21  credibility and consciousness of guilt, that it's admissible.

22          I do not believe the evidence is there for this

23  Court to find spoilation outright.  And that's not what this

24  is being admitted for.  This is simply going to the

25  credibility and for purposes of consciousness of guilt.  And

EXHIBIT  8
PAGE  168

EXHIBIT  13
PAGE  343

2117

7          C E R T I F I C A T E

10          I hereby certify that pursuant to Title 28,

11    Section 753 United States Code, the foregoing is a true and

12    correct transcript of the stenographically reported

13    proceedings in the above matter.

14          Certified on June 10, 2008.


MARK SCHWEITZER, CSR, RPR, CRR
Official Court Reporter
License No. 10514


EXHIBIT ___ 13 ___

EXHIBIT ___ 8 ___
PAGE ___ 169 ___

PAGE ___ 344 ___

# EXHIBIT 9

Product - Evidence Eliminator™                    http://www.ev    e-eliminator.com/product.d2w?p=1#court



# be



## evidence eliminator - the world's #1 PC security utility

- Product
- Buy Now
- Downloads
- Reasons To Buy
- Support
- Dis-Info Centre

Did you know... that the **government** and **police** are installing **black boxes** in ISPs to record your Internet surfing and downloads **for evidence**?

---

**URGENT NEWSFLASH** WEDNESDAY 16 JANUARY 2008 - YOUR INTERNET TRAFFIC IS BEING ROUTED THROUGH **LOS ANGELES, CALIFORNIA UNITED STATES** - YOU ARE AT VERY HIGH RISK OF INVESTIGATION!

---

Deleting "internet cache and history", will not protect you... your PC is storing deadly evidence. Even **FORMATTING** the disk won't work.

All those **Web Pages, Pictures, Movies, Videos, Sounds, E-mail and Everything Else** you have ever viewed could easily be recovered — even many years later.

The Times, London, 3rd December 2004

THE TIMES

"Evidence Eliminator,
the British-made market leader"

Defend yourself! Make your Internet access safer. Get yourself a truly clean and faster "Like New" PC!

Download **Evidence Eliminator™** Now!

EXHIBIT __ 9 ____

PAGE ____ 170 ____

1 of 8

Product - Evidence Eliminator™                          http://www.ev     e-eliminator.com/product.d2w?p=1#court



See more Screenshots

PROTECT YOUR JOB, PROPERTY, FAMILY, CAR, FRIENDS AND YOUR REPUTATION —
BEFORE IT'S TOO LATE!

You are being watched... how about your **Boss**? Do you surf the internet and send **E-mail** at work?
Your work PC will be **full of evidence**. It is becoming common in the workplace for companies to
copy and investigate the contents of workers computers out of hours - without your consent or
knowledge. This is perfectly legal and it is happening **now**! Your job could be at risk, what would
happen to you if you **lost your job**? People like you are losing their jobs right now because of their
Internet activities in America and the UK.

According to an APBNews report, 73.5% of all companies admit they *"record and review their
employees' communications and activities on the job."*

There is no need for you to play Russian roulette with your job, family, car, property and everything
else that depends on it! Act now! We can help, **Evidence Eliminator™** can protect you from the
dangers of the Internet! Download today with no risk, guaranteed. Act now! And transform your
computer into a safe, clean and faster machine!

Get Evidence Eliminator and Be Safe!

Proven in the US Courts!

'Evidence Eliminator ... the data destroyed is "gone forever" and it is impossible to create
mirror images of defendants' hard drives ...'

EXHIBIT __ 9 __

PAGE ___ 17 ( __
2 of 8

1

UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA
CASE NO. CIV S-03-1968 WBS KJM. APRIL 5, 2005

SEE THE PROOF ON THE POLICE EVIDENCE SCANNER

This is the view of a porn-filled hard drive on EnCase police software, both before, and after, the
**Evidence Eliminator™** treatment.



A | CONSUMER SCAM ALERT — Fraud artists target privacy consumers

False advertising has duped many consumers into buying worthless imitation software - "eraser /
internet washers" that do not work - you might as well throw your money away. If you have recently
been the victim of a scam by one of these fly-by-night outfits you are strongly urged to get your money
back as quickly as possible, and not to use the software under any circumstances because it could even
damage your hard disk! You don't have to take risks, make sure you accept only the authentic, original
**Evidence Eliminator™** and be sure you are both 100% safe and secure!

Do you have an ex-spouse or ex-partner with a grudge against you, have you been "Grassed"? Has
anyone ever put a floppy disk in your computer? Is someone after your job? Can you honestly say that
you **really know for sure** what may have been accidentally downloaded or purposefully hidden on
your PC?

Do your **children or their friends** use your computers? What have they downloaded and tried to

EXHIBIT __ 9 ____
3 of 8   PAGE ___ 172 ____

delete?

Did you know for example that every click you make on Windows 98 Start Menu is logged and stored permanently on a hidden encrypted database within your own computer?

If you have a business, protect your workplace and computers with **Evidence Eliminator™**. Don't get investigated - **get protected!**

**Evidence Eliminator™** is proven to defeat the exact same forensic software as used by the US Secret Service, Customs Department and Los Angeles Police Department (LAPD), and the UK Metropolitan Police Scotland Yard.

It is a proven fact... routine Forensic Analysis equipment such as EnCase and F.R.E.D. used by Private and Business Investigators, Law-Enforcement and others, can recover evidence from parts of your hard drive that you thought were empty, **parts that you had cleaned.**

### you need...

Your hard drive might appear clean... but still be full of **'sensitive material'** that you did not want to download in the first place and it might very well be a **Serious Criminal Offence** in your country to have that data stored on your computer even if you didn't know it was still there. **You could go to Jail!** Pressing 'Delete' or emptying your 'Recycle Bin' - or even 'Formatting' your disk - simply **will not work**, the **'sensitive material'** will still remain on your hard drive!

**You will be held responsible** for any data which you allow to remain on your computer, even if it was only by accident. Even files and **Internet Searches** you have made which you thought you had never "saved to disk" can be recorded as **permanent evidence** on your hard drive

Get total protection now... If you do not use **Evidence Eliminator™** your PC is "a ticking **Time Bomb** waiting to go off!" Only with **Evidence Eliminator™** can you get the protection you deserve, only then can you use your PC to explore the Internet with confidence.

The distinctive style and unsurpassed quality of **Evidence Eliminator™** and its rapid ongoing development and success have firmly established **Evidence Eliminator™** as the **world's premier** computer hard drive cleansing system!

**Evidence Eliminator™** is a powerful and easy-to-use program, no other commercially available program can do the same job. Every day, **Evidence Eliminator™** quickly and professionally deep cleans your computer of 'sensitive material', leaving you with a clean PC, a clean conscience and instant **peace of mind**.

We are so confident that you will want **Evidence Eliminator™** protecting you and your interests we can give you this unbeatable **Limited Time Special Offer!** Order and download **Evidence Eliminator™** software now and we will include **free** lifetime Technical Support and **free** extremely valuable lifetime Upgrades! There is no risk, you are protected by our 30 day money-back guarantee.

EXHIBIT __ 9 __

4 of 8   PAGE ___ 173 ___

Start to enjoy the benefits of a truly clean and faster "Like New" PC! Download today with no risk, guaranteed. **This incredible Limited Time Special Offer is guaranteed for today only and may be cancelled at any time!**

Download Now And Protect Yourself!



SPEED-UP YOUR PC AND INTERNET BROWSER - MAKE IT SAFER TO USE THE INTERNET!

Working deep below your Windows operating system... **Evidence Eliminator™** employs the exact same sector analysis technology as available in ultra-high-priced tools available to law-enforcement agencies, for example the **FBI**. After identifying and analyzing the unwanted data hidden in your drives, **Evidence Eliminator™** destroys it with **proven methods of secure disposal** similar to US Department of Defense standards for destruction of classified material.

Award winning... **Evidence Eliminator™** has been featured on TV, Radio shows, many top Magazines and has been decorated with high praise, admiration and awards:

- "I tested the software recently and was astonished at its thoroughness. It did wipe clean a ton of stuff... ...I was truly impressed" Mark A. Kellner, "On Computers" Columnist, THE WASHINGTON TIMES (Full review)
- "performs its stated goal admirably...Short of dousing it with gasoline and setting it ablaze, the only way to keep things spotless and shiny clean is with Evidence Eliminator." Slaughterhouse.com "Pick Of the Day" (Full review)
- "an ultra-powerful application... Evidence Eliminator keeps your system running fast and on the right side of the law... Evidence Eliminator really is an excellent program for protecting your

EXHIBIT __ 9

5 of 8   PAGE _____ 174

privacy." RocketDownload.com "5-Smileys Award" (Full review)
- "it performs secure file wipes, making it all but impossible to recover data within... Evidence Eliminator is thorough yet very easy to set up and use" ZDNet PC Magazine "5-Star Editors Pick" and "ZDNet 7th Annual Awards Finalist" (Full review)

The fact is... your computer is spying on you and is filling up with evidence, only **Evidence Eliminator™** can protect and help you. In tests, **Evidence Eliminator™** defeats EnCase and other Forensic Analysis equipment as used by investigators, police and government agencies. So enjoy the benefits of our unbeatable **Limited Time Special Offer** and download yours now!

To protect and to serve the public... that is our mission! Employers, parents, surfers and Internet professionals from all over the world use, trust and depend upon **Evidence Eliminator™**'s state-of-the-art technology. Even the best Forensic Laboratory Analysis with electron microscopes is no match for **Evidence Eliminator™**'s formidable display of new, innovative, World-Leading data destruction technologies.

Whatever reasons you have... for needing **Evidence Eliminator™**, one thing is for sure - downloading **Evidence Eliminator™** will be the most important thing you have ever done. Act now, try it risk free, and transform your computer into a safe, clean and faster machine!

Easy to use... **Evidence Eliminator™** is the essential one-click user-friendly technology for the security-conscious surfer. If you use just one program on your PC - make it **Evidence Eliminator™** before it's too late!

Download **Evidence Eliminator™** right now!

Webmasters: Click Here

## Testimonials

Just a few of the many letters of thanks we receive daily from satisfied customers around the world:

- Seeing EE going through its comprehensive clean-up made me breathe so much easier. It is still the most worthwhile protection I have ever purchased for the computer. Your team is to be commended for the excellent product, support and upgrading. You haven't abandoned those of us who bought the product in its early stages and continued to use, enjoy and trust EE. RB, USA
- Thank you for making a program that a person of my limited computer knowledge can use and understand... ...makes this something that anyone surfing the net should use. KG, USA
- Wow!! That has to be the best online support I have ever had. A real person answered my mail, quickly. Thanks for making such a great product. KS, USA
- I just downloaded and installed your product today. I love it! My 200 Mhz machine is noticeably faster and now has an additional 100+ meg of hard disk space available. I just ordered Evidence Eliminator this evening. This beats anything I've seen to date. Please keep up the good work!! RR, USA
- ...the program you have designed is simply excellent. nothing like it can compare. JG, USA
- Great product - you need to get the message across more widely! Anyone with teenage sons knows how likely it is that something unwanted is lurking on the h/d... ...Well - most impressive! Somehow the whole product had a certain 'aura of quality' about it and seemed worth buying... Seems I was right - money well spent! SC, UK

EXHIBIT _____ 9

6 of 8   PAGE _____ 175

- Just wanted to say "THANK YOU" for such a GREAT program. EE does an amazing job of finding and removing things I don't really want to leave on the equipment. I Also want to express my appreciation for the rapid response to my registration... ...FAST! I am looking forward to the updated version that is supposed to be released soon. Again, Thank you for an excellent product, quick registration, and ease of mind. RB, USA
- It appears to be as useful as a system cleaner as it is a security program... I appreciate your response and follow-up. I've never seen any company follow up as well as you guys have. Thanks again! GB, USA
- Evidence-Eliminator is the perfect tool for the casual or frequent internet user that makes purchases online. The safe and secure deletion of files that might possibly store financial information on one's hard drive can be wiped clean without fear of it being used or accessed dishonestly. Overall, an OUTSTANDING program and worth every penny. I will spread the word with my colleagues about this fantastic way to make sure their computers are safe on an everyday basis. JG, USA
- Even more amazing, is a software company that has such a positive and rapid trouble shooting team (an all too rare occurrence). I had a response within hours of my last e-mail to you. Congratulations on your professionalism and Customer Services. It is really impressive and appreciated. MM, USA
- Until I tried this unique product I had spent several hours each week manually reducing the size of my registry and trying to eliminate the numerous and bloated entries that had accumulated each time I installed software or just spent time on the internet. GC, USA
- It's about time that someone created software that performs multiple functions from one source and is user friendly. I can now delete all of the various items that were installed on my computer with the push of a button and let Evidence Eliminator do all of the work. I was running three different types of software and still did not get half of the results that were achieved the first time I used your product. Thanks, MW, USA
- Your courtesy, kindness and prompt responses to my emails is wonderful and all too rare these days. Thanks again, sincerely. NC, USA
- This is a great product - it takes care of essential cleanup & important system maintenance with one click. Thanks again. BI, USA
- Hi guys.. for starters, I love this program... ...Not only does it give you peace of mind by deleting garbage that could hang around for months, it also keeps my hard drives clean of unwanted files. JC, USA
- This is to me THE best software program ever introduced to the public!... ... It has been such a pleasure to use. I am telling my family and friends about your wonderful product... ... I was so impressed by the program I purchased mine as soon as I could. Thank you for not only your product, but also for the most actively involved Technical Support anywhere in cyberspace!! My sincere gratitude to you all. DT, USA
- I'm truly amazed that you can provide this sort of quality at the price you charge. Best wishes. JC, USA
- Thank you for everything this is the kind of program that I will use forever. RB, USA
- I have 7 years experience w/computers and have never seen anything even close to EE on the market... ...I would just like the rest of the .Net consumer public know EE is for REAL. JS, USA
- It's a pleasure to be dealing with professional people like you with such a brilliant product. AD, UK
- Appreciate the great technical support and service... please keep up the good work. DB, USA
- In the dubious, treacherous and sometimes ominous world of Internet browsing and all it's legallistic issues, it's reassuring to know that a product like EE is out here to protect the innocent and unwary browser... Bravo..and thanks. VC, USA

EXHIBIT __ 9 __

- EE it is a really wonderful and powerful software. I love it more and more, every day passing by. I have tried different erasers but EE is WOW. DP, USA

Don't miss out! Act now and enjoy the benefits of our unbeatable Limited Time Special Offer!

# BUY NOW - BEFORE IT'S TOO LATE!

About Us | Jobs | Trademarks, Terms and Copyright | Affiliate Programme
Evidence Eliminator recommends alibis.com uncensored newsgroups. Access banned newsgroups now, you'll be amazed what you can find - Click Here

EXHIBIT __ 9

PAGE ___ 177