1   Like Machado, her duties included short, medium and long-term marketing
2   planning, generating product sales projections, and assisting in creation of the
3   media plan. In her position, Trueba had access to highly confidential and sensitive
4   marketing and product development information. Trueba had an employment
5   agreement with Mattel in which she agreed to maintain the confidentiality of
6   Mattel's protected information. Mattel's policies also required Trueba to protect
7   Mattel's proprietary information and not to disclose it to competitors.
8        40.   Pablo Vargas San Jose ("Vargas") was a Senior Trade Marketing
9   Manager with Mattel Mexico, a position of trust and confidence. He was employed
10  at Mattel Mexico from March 29, 2001 until April 19, 2004. Vargas was
11  responsible for ensuring that point-of-sale promotions were carried out, analyzing
12  the results of such promotions, negotiating promotion budgets, and generally
13  managing promotional activities. Vargas also had access to highly confidential and
14  sensitive marketing and product development information. Vargas had an
15  employment agreement with Mattel in which he agreed to maintain the
16  confidentiality of Mattel's protected information. Mattel's policies also required
17  Vargas to protect Mattel's proprietary information and not to disclose it to
18  competitors.
19       41.   Beginning in late 2003 or early 2004, Machado, Trueba and
20  Vargas began planning to leave Mattel Mexico to join MGA. In connection with
21  that plan, and with the encouragement of Larian and other MGA officers operating
22  in the United States, they began accessing, copying and collecting proprietary
23  Mattel documents to take with them. On April 19, 2004, Machado, Trueba and
24  Vargas each resigned their positions with Mattel, effective immediately. They
25  stated that they had been hired by a Mattel competitor, but refused to identify that
26  competitor. In fact, they had been offered and accepted employment by MGA to
27  establish and run MGA's new operation in Mexico.
28

2154363.2

-40-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 5
PAGE 142

**B.    Machado, Trueba and Vargas Stole Dozens of Confidential Trade Secret Marketing and Sales Documents for MGA's Benefit**

42.    Following these resignations, Mattel discovered that Machado, Trueba and Vargas had been in frequent telephonic and e-mail contact with MGA personnel, including Larian, for over three months prior to their resignations.  The primary vehicle for these communications in furtherance of their "plot" was an America Online e-mail account with the address <plot04@aol.com>.  On information and belief, during this time, Machado, Trueba and Vargas supplied Larian with certain Mattel confidential and proprietary information in order to prove their value to MGA and to improve their negotiating position vis-à-vis their respective employment contracts with MGA.

43.    In March 2004, Machado, Trueba and Vargas were making plans to travel from Mexico to Los Angeles to meet with MGA personnel in person prior to resigning their positions at Mattel.  Also, by at least March 3, 2004, Machado, Trueba and Vargas were discussing with MGA personnel, including Larian, specific details regarding setting up MGA offices in Mexico City.  On information and belief, prior to their resignations, Larian and others at MGA directed Machado, Trueba and Vargas to steal virtually all Mattel confidential and proprietary information that they could access and bring it with them to MGA.  This was reflected in, among things, e-mail messages that Mattel had discovered after Machado, Trueba and Vargas had resigned.  For example, on March 22, 2006, approximately one month before they resigned, Machado, Trueba and Vargas wrote an e-mail message from the <plot04@aol.com> e-mail account addressed to Larian, MGA's General Manager Susan Kuemmerle and another MGA officer Thomas Park.  In that e-mail message, Machado, Trueba and Vargas sought to prove their value in this endeavor to MGA by writing:  "Attached you will find our analysis for future discussion.  We will be available during the nights of the week after 16:30 Los Angeles time . . . ."  In another e-mail message, showing that the

EXHIBIT 5
PAGE 143

1  participants intentionally sought to maximize the damage to Mattel from their

2  conduct, Kuemmerle wrote to Larian and Park: "Gustavo, Mariana and Pablo want

3  to resign (all at the same time, and you can believe my smile!) next Wednesday."

4          44.  Beginning on April 12, 2004, a week before his resignation and

5  after numerous communications and meetings with Larian and other MGA

6  personnel, Machado began transferring additional Mattel confidential and

7  proprietary information to a portable USB storage device (also know as a "thumb

8  drive") that he connected to his Mattel computer. On Friday, April 16, 2004, the

9  last business day before he gave notice, Machado copied at least 70 sensitive

10  documents to the portable USB storage device.

11          45.  Starting on April 12, 2004, Vargas also copied a host of

12  confidential and proprietary materials to a portable USB storage device, including

13  sales plans, sales projections and customer profiles.

14          46.  On April 16, 2004, Trueba also copied Mattel confidential and

15  proprietary information to a portable USB storage device connected to her Mattel

16  computer.

17          47.  With full knowledge that she was going to leave Mattel for a

18  competitor, Trueba also took steps to increase further her access to Mattel's

19  confidential information shortly before her resignation. For example, just four days

20  before leaving, Trueba went out of her way to seek to attend a meeting at which

21  Mattel personnel analyzed BARBIE programs for the United States, Canada and

22  South America. Two days before her resignation, she contacted both a Mattel

23  employee located in El Segundo, California and Mattel's advertising agency to

24  request updated confidential information about advertising plans for BARBIE. On

25  information and belief, Trueba acted at the direction of MGA and Larian and did so

26  in order to obtain further information that would allow MGA to obtain unfair

27  competitive advantage over Mattel.

28

2154363.2

-42-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT  5
PAGE  144

48.   Machado, Trueba and Vargas stole virtually every type of document a competitor would need to enter the Mexican market and to unlawfully compete with Mattel in Mexico, in the United States, and elsewhere.  They stole global internal future line lists that detailed anticipated future products, production and shipping costs for Mattel products; daily sales data for Mattel products; customer data; sales estimates and projections; marketing projections; documents analyzing changes in sales performance from 2003 to 2004; budgets for advertising and promotional expenses; strategic research reflecting consumer responses to products in development; media plans; consumer comments regarding existing Mattel products customer discounts and terms of sale; customer inventory level data; assessments of promotional campaign success; market size historical data and projections; marketing plans and strategies; merchandising plans; retail pricing and marketing strategies; and other similar materials.

49.   The stolen data was not limited to the Mexican market.  The information stolen would, and did, give MGA an unfair competitive advantage in the United States and around the world.  Further, the stolen information was not located exclusively in Mexico, but included confidential and proprietary information that resided on Mattel computers in Phoenix, Arizona and El Segundo, California, and/or documents which were originally created by personnel in El Segundo.  Included among these stolen documents was one of Mattel's earliest internal global line lists, which included information for BARBIE products for the upcoming year and included, for each product, the expected profit margin, advertising expenditures, expected volume and marketing strategy.  On information and belief, Machado, Trueba or Vargas delivered that internal line list to Larian or another MGA officer during their negotiations with MGA.

50.   MGA has used the information taken from Mattel to obtain an unfair advantage over Mattel, including in both the United States and Mexico.  In fact, MGA later publicized its claim that, in 2005, it had increased its Mexican

2154363.2

EXHIBIT 5
PAGE 145

1  market share by 90 percent over the prior year. This increase came at the expense

2  of Mattel, which lost market share during 2004 in Mexico and was forced to

3  increase its advertising and promotional spending to offset further losses.

4          51.   Machado, Trueba and Vargas attempted to conceal their

5  widespread theft of Mattel's proprietary information. For example, Machado ran a

6  software program on his Mattel personal computer in an attempt to erase

7  information, including information that would reveal the addresses to which he had

8  sent, or from which he had received, e-mail messages. On information and belief,

9  for the same purpose Machado also damaged the hard drive of the personal

10  computer that he used at Mattel.

11          52.   On information and belief, on April 19, 2004, immediately after

12  Machado, Trueba and Vargas simultaneously resigned, they traveled from Mexico

13  to Los Angeles to meet with MGA personnel, including Larian, in person.

14          53.   Mattel notified Mexican authorities about the theft of its trade

15  secret and confidential information. On October 27, 2005, the Mexican Attorney

16  General Office obtained a search warrant from the Mexican Federal Criminal

17  Courts for MGA's facilities in Mexico City. In that search, the Mexican authorities

18  found and seized from MGA's offices both electronic and paper copies of a large

19  number of documents containing Mattel trade secrets, including those that Mattel

20  discovered through its forensic investigations, plus many others that Mattel had not

21  known had been stolen.

22          54.   Based on Machado's "performance" in Mexico, Isaac Larian

23  subsequently promoted Machado and he was transferred to MGA's main office in

24  Van Nuys, California. On information and belief, Machado currently resides in the

25  County of Los Angeles, California.

26

27

28

2154363.2

-44-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___5___

PAGE __146__

V.   **MGA HIRES MATTEL'S SENIOR VICE PRESIDENT AND GENERAL MANAGER TO FACILITATE ITS THEFT AND USE OF MATTEL'S HIGHLY VALUABLE BUSINESS METHODS AND PRACTICES**

55.   On October 1, 2004, Mattel's Senior Vice President and General Manager, Ron Brawer, left Mattel and joined MGA.  Tyco Toys, Inc. ("Tyco"), a predecessor to Mattel, had hired Brawer on April 22, 1996.  The same day, Brawer entered into an Employee Invention & Trade Secret Agreement with Tyco.  On April 9, 1997, Brawer became a Marketing Director for Mattel in Mount Laurel, New Jersey, and remained bound by his Employee Invention & Trade Secret Agreement.

56.   In January 2003, while Brawer held a position of trust and confidence at Mattel, Mattel's "Code of Conduct" was circulated to all Mattel employees worldwide.  Included in the Code of Conduct were statements that:

> Employees and Directors have an obligation to protect the confidentiality of Mattel's proprietary information.  Proprietary information is any information not generally known to the public that is useful to Mattel, that would be useful to its competitors or other third parties or that would be harmful to Mattel or its customers if disclosed.  Proprietary information includes trade secrets, revenue and profit information and projections, new product information, marketing plans, design and development efforts, manufacturing processes and any information regarding potential acquisitions, divestitures and investments.
>
> We can protect the security of Mattel's proprietary information by limiting access to it.  Confidential information should not be discussed with those who are not obligated to maintain the information in confidence and in public places where the



EXHIBIT __J__
PAGE __147__

1    information is not likely to be kept secret, such as planes,

2    restaurants and elevators.  The obligation to preserve confidential

3    information continues even after employment ends.

4  The Code of Conduct applied to Brawer and required that he meet his obligations

5  under the Code of Conduct.

6         57.   By 2003, Brawer had advanced within Mattel to a Senior Vice

7  President position over customer marketing, a position of trust and confidence.  In

8  his executive position, Brawer was provided access to information that was both

9  sensitive and confidential, including, but not limited to, detailed information related

10  to development, manufacture, marketing, pricing, shipping, and performance of

11  Mattel's then-current and anticipated future product lines, and other confidential

12  business plans between Mattel and its most significant retail customers.

13        58.   In December 2003, Alan Kaye, Mattel's Senior Vice President of

14  Human Resources, asked Brawer whether he was discussing potential employment

15  with MGA.  Brawer denied that he had been in contact with MGA and represented

16  that he would not talk to MGA.  Throughout 2004, Mattel reminded and stressed to

17  its employees, including Brawer, the importance of protecting Mattel's confidential

18  and proprietary materials and information.

19        59.   On March 18, 2004, in response to a survey from the President of

20  Mattel Brands, Matt Bousquette, confirming compliance with Mattel's Code of

21  Conduct, Brawer wrote back that he "applaud[ed] the company's vigorous

22  protection of it's [sic] intellectual property," reflecting Brawer's clear

23  understanding that Mattel required its proprietary information to be kept

24  confidential.

25        60.   In April 2004, Mattel promoted Brawer to Senior Vice

26  President/General Manager.  The General Manager position also is an executive

27  position of trust and confidence.  The role of a General Manager is to lead a cross-

28  functional "Customer Business Team."  Each General Manager is accountable for a

-46-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ___5___

PAGE ___148___

1  strategic partnership with a key Mattel retailer, covering all aspects of the business,

2  including both traditional toy sales and retail development of licensed products.

3        61.  In or about late May 2004, Brawer began performing General

4  Manager duties, working with one of Mattel's major retail customer accounts.

5  Thereafter, Brawer began receiving information related not only to the Senior Vice

6  President, Customer Marketing position that he still formally held, but also began

7  receiving detailed information related to his role as General Manager.  Brawer

8  began requesting and analyzing detailed information related to Mattel and its four

9  key retail accounts.

10        62.  On September 15, 2004, Brawer left work at noon for observance

11  of Rosh Hashanah.  As Brawer left, he carried a large cardboard box with binders

12  and other materials.  Several hours after his departure, Brawer instructed his

13  assistant to print Mattel's 2004 Sales Plan for one of Mattel's significant customers

14  and to provide it to him, falsely claiming he needed it for a meeting

15        63.  On September 17, 2004, Brawer returned to Mattel and

16  immediately informed his supervisor that he was leaving Mattel, effective October

17  1, 2004, to work for competitor MGA.

18        64.  On September 20, 2004, Mattel hand-delivered a letter to Brawer

19  reminding him of his continuing obligation to preserve the confidentiality of

20  Mattel's proprietary information and trade secrets not only through October 1,

21  2004, but continuing beyond the termination of his employment.

22        65.  At his exit interview on September 29, 2004, Mattel reminded

23  Brawer that he had ongoing duties of confidentiality to Mattel, even after the

24  termination of his employment.  Brawer was given a copy of his Original

25  Confidentiality Agreement, which he had signed on April 22, 1996, and another

26  copy of the Code of Conduct.  During the exit interview, however, Brawer noted

27  that he had not signed the Code of Conduct, which he intended and Mattel

28  understood to mean that Brawer believed he was not bound by Mattel's policy

-47-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT ____ 5
PAGE ___ 149

because he had not signed it.  Brawer was unwilling to complete or sign the form that sought to confirm that Brawer understood his ongoing obligations under the Code of Conduct, which included the obligation to preserve the confidentiality of Mattel's proprietary and trade secret information.

66.   On October 1, 2004, Brawer's final day of employment with Mattel, Mattel hand-delivered to Brawer a letter that, among other things, reminded Brawer of his confidentiality obligations to Mattel under the Code of Conduct.

67.   Upon joining MGA, Brawer became its Executive Vice-President of Sales and Marketing.  In that role he was responsible for MGA's sales worldwide.  As part of those responsibilities, Brawer had and continues to have responsibility for MGA's accounts with the same retailers that he worked with while at Mattel.

68.   Brawer represented during his Mattel exit interview that he had returned all proprietary information to Mattel.  That representation was false.   On information and belief, Brawer removed proprietary and trade secret information from Mattel that he did not return.  Mattel is informed and believes that Brawer did not return to Mattel, for example, the information contained in his contacts file.  The contacts file included contact information for Mattel customers, most notably TRU, and extensive contact information for Mattel employees, including titles, e-mail addresses and telephone numbers.

69.   Mattel has recently learned that Brawer has been using that contact information on a regular basis, including within recent months.  Since leaving Mattel, Brawer has had contacts with Mattel employees, both by telephone and by electronic mail.  Based on his knowledge of Mattel's operations and the roles of certain Mattel employees, he has targeted certain Mattel employees who have broad access to Mattel proprietary information in an effort to induce and encourage them to join MGA and to steal or otherwise wrongfully misappropriate Mattel confidential information and trade secrets.  Brawer has done so by

-48-

EXHIBIT 5
PAGE 150

1   promising these Mattel employees salaries 25 percent or more higher than they earn
2   at Mattel and stating to them that they should not be concerned by legal action
3   taken by Mattel to protect its trade secrets and its rights because such claims are
4   hard to prove and easy to defeat.

5   **VI.   MGA STEALS MATTEL TRADE SECRETS IN CANADA**

6        70.   In an effort to increase its market share and sales in Canada and
7   elsewhere, MGA stole Mattel trade secrets regarding Mattel's customers, sales,
8   projects, advertising and strategy, not only for Canada, but the United States and
9   the rest of the world.

10        71.   Janine Brisbois was a Director of Sales for the Girls Division in
11   Canada.  Mattel hired her as a National Account Manager in August 1999.  When
12   she was hired as a Mattel employee, Brisbois agreed that she would preserve and
13   would not disclose Mattel's proprietary or confidential information.  For example,
14   Brisbois agreed:

15        You must keep Mattel's Proprietary Information confidential,
16        and you may only use or disclose such information as necessary
17        to perform your job responsibilities in accordance with Mattel
18        policies.  Your obligation to keep Mattel's Proprietary
19        Information confidential will continue even after any termination
20        of your employment with your employer.

21        . . .

22        Mattel takes steps to maintain the secrecy and confidential nature
23        of Mattel's Proprietary Information and, if a competitor
24        discovered Mattel's Proprietary Information, it could
25        significantly damage Mattel and your Employer.

26        72.   While with Mattel, Brisbois had responsibility for Mattel's
27   account with TRU and later had responsibility for Mattel's Wal-Mart account.  In
28   her capacity as Sales Director-Wal-Mart/CTC/Girls Team, Brisbois had access to

2154363.2

-49-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 5
PAGE 151

1   Mattel confidential and proprietary information regarding Mattel's future product

2   lines, advertising and promotional campaigns and product profitability.

3        73.   On September 26, 2005, Brisbois resigned from Mattel to take a

4   position as Vice President of Sales at MGA.  Mattel is informed and believes that

5   in that position Brisbois has responsibility for MGA's accounts with both TRU and

6   Wal-Mart.  During Brisbois' exit interview she was specifically asked whether she

7   was "taking anything."  Brisbois responded, "No."  Both during and after her exit

8   interview, Brisbois was advised by Mattel of her obligations to preserve Mattel's

9   confidential and proprietary information.

10        74.   Mattel is informed and believes that Brisbois spoke with Isaac

11   Larian, MGA's CEO, on September 22, 2005 at approximately 8:30 p.m., when he

12   called Ms. Brisbois at her home.  Mattel subsequently learned that on the same day

13   that she spoke with Mr. Larian and four days before she resigned, Brisbois copied

14   approximately 45 Mattel documents on to a USB or "thumb" drive with the volume

15   label "BACKPACK."  On information and belief, Brisbois removed the thumb

16   drive from Mattel Canada's office by concealing it in her backpack or gym bag the

17   last time that she left that office.  These documents contained Mattel trade secret

18   and proprietary information, and included:

19       • a document containing the price, cost, sales plan and quantity of every

20         Mattel product ordered by every Mattel customer in 2005 and 2006;

21       • the BARBIE television advertising strategy and information concerning

22         sales increases generated by television advertisements;

23       • competitive analysis of Mattel vis-à-vis its competitors in Canada;

24       • an analysis of Mattel's girls business sales beginning in 2003 and

25         forecasts through 2006;

26       • profit and loss reviews for Mattel's products being sold in Wal-Mart,

27         including margins and profit in not only Canada, but in the United

28         States and Mexico; and

-50-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 5
PAGE 152

1      • a document containing the product launch dates and related advertising

2        for all Mattel new products between Fall 2005 and Spring 2006.

3        75.   After Mattel discovered that Brisbois had copied these sensitive

4  documents to a thumb drive, Mattel notified Canadian law enforcement authorities.

5  Canadian law enforcement authorities recovered from Brisbois a thumb drive with

6  the volume label "BACKPACK" containing the documents that Brisbois had

7  copied from Mattel's computer system.  Mattel later learned that while she was

8  working as a Vice President of Sales at MGA, Brisbois accessed and modified

9  documents on that thumb drive.

10      76.   After joining MGA, Brisbois repeatedly traveled to MGA's

11  offices in Van Nuys, California and met with Larian and Brawer.  In February,

12  2006, knowing that Mattel trade secrets had been seized from MGA's Mexico City

13  offices and that at least three MGA employees were under criminal investigation,

14  MGA nonetheless issued a press release trumpeting its 2005 performance, with

15  Larian himself concluding, "Our international teams in Mexico and Canada have

16  done a fantastic job."

17  **VII. MGA PERSUADES OTHER EMPLOYEES LEAVING MATTEL TO**

18        **JOIN MGA TO MISAPPROPRIATE MATTEL TRADE SECRETS**

19        **FOR THE BENEFIT OF MGA**

20      77.   In the past few years, MGA has hired directly from Mattel's

21  United States operations at least 25 employees, from Senior Vice-President level to

22  lower level employees.  On information and belief, many of these employees were

23  specifically targeted and recruited by MGA, including by Larian and Brawer, based

24  on the Mattel confidential and proprietary information they could access.  Many of

25  these employees had access to information that Mattel considers to be highly

26  proprietary and confidential.  Mattel believes that some of those former Mattel

27  employees may be observing their obligations not to misappropriate, disclose or

28  use Mattel's confidential and proprietary information.  Mattel is informed and

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT J

PAGE 153

1  believes, however, that certain additional employees accessed, copied and took

2  from Mattel confidential and proprietary information, including Mattel's strategic

3  plans; business operations, methods and systems; marketing and advertising

4  strategies and plans; future product lines; product profit margins; and customer

5  requirements.  The misappropriated confidential and proprietary information

6  included information that these Mattel employees were not authorized to access.

7  On information and belief, the misappropriated confidential and proprietary

8  information taken from Mattel is being disclosed to and used by MGA for the

9  benefit of MGA and to the detriment of Mattel.

10  **VIII. LARIAN MAKES MISREPRESENTATIONS TO RETAILERS**

11  **ABOUT MATTEL'S PRODUCTS**

12        78.  Counter-defendants have engaged in other illegal practices in

13  their efforts to compete unfairly with Mattel. Larian has a practice of sending e-

14  mail messages to a "Bratz News" distribution list that Larian created or that was

15  created for him.  Mattel is informed and believes that the recipients of e-mail

16  messages sent to the "Bratz News" distribution list include members of the media

17  as well as representatives of many of Mattel's most significant customers.

18        79.  On May 12, 2006, Larian sent an e-mail message to the "Bratz

19  News" distribution list that included a reference to Mattel's updated MY SCENE

20  MY BLING BLING product with real gems.  Mattel had not publicly announced

21  this product at the time that Larian sent his May 12, 2006 e-mail.  In fact, Mattel

22  had guarded the identification of this particular product.

23        80.  Shortly thereafter, Larian engaged in a campaign of calling

24  Mattel's most significant customers, including but not limited to Target and TRU,

25  regarding the MY SCENE MY BLING BLING product with real gems.  In an

26  effort to dissuade these retailers from purchasing Mattel's MY SCENE MY BLING

27  BLING product with real gems, Larian knowingly made false factual statements

28  about that product to each retailer.  As of the writing of this Second Amended

-52-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT  5

PAGE  154

1    Answer and Counterclaims, Mattel is aware that Larian represented to each retailer

2    that each was the only retailer to purchase the product and that Mattel would not be

3    supporting the product with television advertising.  At the time that Larian made

4    these statements, he knew them to be false.  As a result of Larian's

5    misrepresentations, at least one retailer cancelled its order for 75,000 units of the

6    MY SCENE MY BLING BLING product with real gems.  Only after Mattel

7    learned of Larian's misrepresentations and was able to correct them was Mattel able

8    to assure the retailer that Larian's representations were false and to persuade the

9    retailer to reinstate the order.

10         81.  Such conduct is not an isolated incident.  MGA and Larian, in an

11    effort to gain an unfair competitive advantage, repeatedly issued false and

12    misleading press releases.  In these press releases, MGA and Larian have

13    misrepresented Bratz's sales, Bratz's market share, Bratz's position vis-à-vis

14    Mattel's BARBIE products, sales of Mattel's BARBIE products, and the market

15    share of Mattel's BARBIE products.

**CLAIMS FOR RELIEF**

**First Counterclaim**

**Copyright Infringement**

**(Against MGA, MGA Entertainment (HK) Limited,**

**Larian, Bryant and Does 4 through 10)**

21         82.  Mattel repeats and realleges each and every allegation set forth in

22    paragraphs 1 through 81, above, as though fully set forth at length.

23         83.  Mattel is the owner of copyrights in works that are fixed in

24    tangible media of expression and that are the subject of valid, and subsisting,

25    copyright registrations owned by Mattel.  These include, without limitation, the

26    works that are the subject of Registrations VA 1-378-648, VA 1-378-649, VA 1-

27    378-650, VA 1-378-651, VA 1-378-652, VA 1-378-653, VA 1-378-654, VA 1-

28

2154363.2

-53-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 5

PAGE 155

1 │ 378-655, VA 1-378-656, VA 1-378-657, VA 1-378-658, VA 1-378-659, VA 1-

2 │ 378-660, VAu 715-270, VAu 715-271 and VAu 715-273.

3 │   84.   Counter-defendants have reproduced, created derivative works

4 │ from and otherwise infringed upon the exclusive rights of Mattel in its protected

5 │ works without Mattel's authorization. Counter-defendants' acts violate Mattel's

6 │ exclusive rights under the Copyright Act, including without limitation Mattel's

7 │ exclusive rights to reproduce its copyrighted works and to create derivative works

8 │ from its copyrighted works, as set forth in 17 U.S.C. §§ 106 and 501.

9 │   85.   Counter-defendants' infringement (and substantial contributions

10 │ to the infringement) of Mattel's copyrighted works is and has been knowingly made

11 │ without Mattel's consent and for commercial purposes and the direct financial

12 │ benefit of Counter-defendants. Counter-defendants, moreover, have deliberately

13 │ failed to exercise their right and ability to supervise the infringing activities of

14 │ others within their control to refrain from infringing Mattel's copyrighted works

15 │ and have failed to do so in order to deliberately further their significant financial

16 │ interest in the infringement of Mattel's copyrighted works. Accordingly, Counter-

17 │ defendants have engaged in direct, contributory and vicarious infringement of

18 │ Mattel's copyrighted works.

19 │   86.   By virtue of defendants' infringing acts, Mattel is entitled to

20 │ recover Mattel's actual damages plus Counter-defendants' profits, Mattel's costs of

21 │ suit and attorneys' fees, and all other relief permitted under the Copyright Act.

22 │   87.   Counter-defendants' actions described above have caused and

23 │ will continue to cause irreparable damage to Mattel, for which Mattel has no

24 │ remedy at law. Unless Counter-defendants are restrained by this Court from

25 │ continuing their infringement of Mattel's copyrights, these injuries will continue to

26 │ occur in the future. Mattel is accordingly entitled to injunctive relief restraining

27 │ Counter-defendants from further infringement.

28 │

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT J

PAGE 156

### Second Counterclaim

**Violation of the Racketeer Influenced and Corrupt Organizations Act**

**18 U.S.C. §§ 1962(c) and 1964(c)**

**(Against All Counter-defendants)**

88.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 87, above, as though fully set forth at length.

89.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas and Brisbois were employed by and associated-in-fact with an enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "MGA Criminal Enterprise").  The MGA Criminal Enterprise is made up of the MGA Group (MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, certain of the Doe Counter-defendants and Brawer), the Bryant Group (Bryant and certain of the Doe Counter-defendants), the Mexican Group (Machado, Trueba and Vargas) and the Canadian Group (Brisbois).  In addition, beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, were employed by and associated-in-fact with a second enterprise engaging in, and the activities of which affect, interstate and foreign commerce (the "Bratz Criminal Enterprise").

90.   MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois, and the Other Former Employees, and each of them, for the purpose of executing and attempting to execute the scheme to improperly defraud Mattel and steal its trade secret or otherwise confidential and proprietary information, by

2154363.2

EXHIBIT 5

PAGE 157

1   means of tortious, fraudulent and criminal conduct, did and do unlawfully, willfully

2   and knowingly conduct and participate, directly and indirectly, in the conduct of

3   the MGA Criminal Enterprise's affairs and, in the case of MGA, MGA

4   Entertainment (HK) Limited, Larian, Bryant, and certain of the Doe Counter-

5   defendants, the Bratz Criminal Enterprise's affairs, through a pattern of

6   racketeering activity.  Their actions include multiple, related acts in violation of:

7   18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1512

8   (tampering with a witness victim, or informant), 18 U.S.C. § 1952 (interstate and

9   foreign travel to aid racketeering), and 18 U.S.C. § 2319(a) and 17 U.S.C. §

10   506(a)(1)(A) (criminal copyright infringement).

11        91.    MGA, MGA Entertainment (HK) Limited, MGA de Mexico,

12   Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas,

13   Brisbois, and the Other Former Employees, and each of them, shared the common

14   purpose of enabling MGA to obtain confidential, proprietary and otherwise

15   valuable Mattel property through improper means in order to assist MGA in

16   illegally competing with Mattel domestically and throughout the world.

17        92.    The MGA Criminal Enterprise and Bratz Criminal Enterprise as

18   described herein are and have been at all relevant times continuing enterprises

19   because, among other reasons, each is designed to and did unlawfully acquire the

20   confidential business information and property of Mattel and incorporated this

21   information and property into MGA's ongoing business, marketing strategies and

22   business methods, practices and processes.  The conduct of each enterprise

23   continues through the date of this Second Amended Answer and Counterclaims and

24   is ongoing by virtue of MGA's continuing use of Mattel's information and property,

25   all to the detriment of Mattel.

26        93.    The pattern of racketeering activity, as defined by 18 U.S.C.

27   §§ 1961(1) and (5), presents both a history of criminal conduct and a distinct threat

28   of continuing criminal activity.  This activity consists of multiple acts of

2154363.2

-56-

EXHIBIT  5
PAGE  158

1   racketeering by each member of the MGA Criminal Enterprise and Bratz Criminal
2   Enterprise, is interrelated, not isolated and is perpetrated for the same or similar
3   purposes by the same persons.  This activity extends over a substantial period of
4   time, up to and beyond the date of this Second Amended Answer and
5   Counterclaims.  These activities occurred after the effective date of 18 U.S.C.
6   §§ 1961 *et seq.*, and the last such act occurred within 10 years after the commission
7   of a prior act of racketeering activity.  These racketeering activities included
8   repeated acts of:

9       (a)   Mail Fraud:  Counter-defendants MGA, MGA Entertainment
10      (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and
11      Does 4 through 10, aided and abetted by each other and some or
12      all of the remaining members of the MGA Criminal Enterprise,
13      having devised a scheme or artifice to defraud Mattel of its
14      confidential trade secret information and property by conversion,
15      false representations, concealment and breaches of fiduciary duty,
16      did for the purpose of furthering and executing such a scheme or
17      artifice to defraud, deposited or caused to be deposited matters or
18      things to be sent or delivered by the Postal Service, or any private
19      or commercial interstate carrier, or took or received matters or
20      things therefrom, or knowingly caused matters or things to be
21      delivered by mail or such carrier according to the direction
22      thereon, or at the place at which it is directed to be delivered by
23      the person to whom it is addressed, in violation of 18 U.S.C.
24      § 1341 and 18 U.S.C. § 2, as alleged with greater particularity in
25      the foregoing paragraphs and as evidenced by, among other
26      things, the true and correct copies of communications and other
27      evidence included in Exhibit C;
28

2154363.2

-57-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 5

PAGE 159

(b)  <u>Wire Fraud</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, having devised a scheme or artifice to defraud Mattel of its confidential and trade secret information and property by conversion, false representations, concealment and breaches of fiduciary duty, did for the purpose of furthering and executing such a scheme or artifice to defraud, transmit and cause to be transmitted by means of wire communications in interstate or foreign commerce, writing, signs, signals, pictures or sound, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs and as evidenced by, among other things, the true and correct copies of communications and other evidence included in Exhibit C;

(c)  <u>Tampering With a Witness, Victim or Informant</u>:  Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, did corruptly alter, destroy, mutilate, or conceal more than one record, document, or other object, or attempted to do so, with the intent to impair the object's integrity or availability for use in an official proceeding, including this action, including without limitation by:

i.  altering Bryant's contract with MGA relating to Bratz to conceal evidence that Bryant faxed the contract from the BARBIE COLLECTIBLES department of Mattel, using a fax

-58-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT __5__

PAGE _160_

machine owned by Mattel and while Bryant was employed by Mattel;

    ii.    altering numerous original Bratz drawings created by Bryant by adding false and misleading date notations of "8/1998" and "© 8/1998" to the drawings even though the drawings were not created in August 1998; and

    iii.    destroying electronic and other evidence, including by destroying evidence previously contained on Carter Bryant's and Isaac Larian's computer hard drives.

    Such actions are in violation of 18 U.S.C. § 1512 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(d)    <u>Interstate and Foreign Travel in Aid of Racketeering Enterprises</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by each other and some or all of the remaining members of the MGA Criminal Enterprise, traveled in interstate and foreign commerce, or used the mail or any facility in interstate or foreign commerce, with the intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, *i.e.* bribery, in violation of the laws of the State of California, *Cal. Penal Code* § 641.3, all in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2, as alleged with greater particularity in the foregoing paragraphs;

(e)    <u>Criminal Copyright Infringement</u>: Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado and Does 4 through 10, aided and abetted by

2154363.2

EXHIBIT 5
PAGE 161

1   each other and some or all of the remaining members of the MGA

2   Criminal Enterprise, willfully infringed Mattel's copyrights,

3   including with respect to documents containing Mattel trade

4   secret and confidential information, for purposes of commercial

5   advantage and private financial gain, all in violation of 18 U.S.C.

6   § 2319(a) and 17 U.S.C. § 506(a)(1)(A), as alleged with greater

7   particularity in the foregoing paragraphs.

8       94.   The persons alleged herein to have violated 18 U.S.C. § 1962(c)

9   are separate from, though employed by or associated with, MGA, the MGA Group,

10   the Bryant Group, the Mexican Group and the Canadian Group.

11       95.   MGA had a role in the racketeering activity that was distinct

12   from the undertaking of those acting on its behalf.  MGA also attempted to benefit,

13   and did benefit, from the activity of its employees and agents alleged herein, and

14   thus was not a passive victim of racketeering activity, but an active perpetrator.

15       96.   Mattel has been injured in its business or property as a direct

16   and proximate result of the Counter-defendants' and the other enterprise members'

17   violations of 18 U.S.C. § 1962(c), including injury by reason of the predicate acts

18   constituting the pattern of racketeering activity.

19       97.   As a result of the violations of 18 U.S.C. § 1962(c), by MGA,

20   MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado,

21   Does 4 through 10, Brawer, Trueba, Vargas, Brisbois and the Other Former

22   Employees, Mattel has suffered substantial damages, in an amount to be proved at

23   trial.  Pursuant to 18 U.S.C. § 1964(c), Mattel is entitled to recover treble its

24   general and special compensatory damages, plus interest, costs and attorneys, fees,

25   incurred by reason of Counter-defendants' violations of 18 U.S.C. § 1962(c).

26

27

28

2154363.2

EXHIBIT 5
PAGE 162

### Third Counterclaim

### Conspiracy To Violate the Racketeer

### Influenced And Corrupt Organizations Act

### (18 U.S.C. §§ 1962(d) and 1964(c))

### (Against All Counter-defendants)

98.   Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 97, above, as though fully set forth at length.

99.   Beginning at various times from approximately 1999 through the filing of this Second Amended Answer and Counterclaims, in the Central District of California and elsewhere, Counter-defendants MGA, MGA Entertainment (HK) Limited, MGA de Mexico, Larian, Bryant, Machado, Does 4 through 10, and Brawer, Trueba, Vargas, Brisbois and the Other Former Employees willfully, knowingly and unlawfully, did conspire, combine, confederate and agree together to violate 18 U.S.C. § 1962(c).

100.   These conspirators were employed by and associated-in-fact with the MGA Criminal Enterprise engaging in, and the activities of which affect, interstate and foreign commerce.  Specifically, the MGA Group, the Bryant Group, the Mexican Group and the Canadian Group, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the MGA Criminal Enterprise's affairs through a pattern of racketeering activity.  In addition, MGA, MGA Entertainment (HK) Limited, Larian and Bryant, and certain of the Doe Counter-defendants, constituting a group of individuals associated-in-fact, did unlawfully, willfully, and knowingly participate in and conduct, directly and indirectly, the Bratz Criminal Enterprise's affairs through a pattern of racketeering activity.

101.   The pattern of racketeering activity, as defined by 18 U.S.C. §§ 1961(1) and (5), including acts of mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2; acts of wire fraud in violation of 18 U.S.C. § 1343 and 18

2154363.2

EXHIBIT 5

PAGE 163

1  U.S.C. § 2; acts of tampering with witnesses, victims or informants in violation of

2  18 U.S.C. § 1512 and 18 U.S.C. § 2; acts of interstate and foreign travel in aid of

3  racketeering enterprises in violation of 18 U.S.C. § 1952 and 18 U.S.C. § 2; and

4  acts of criminal copyright infringement in violation of 18 U.S.C. § 2319(a) and 17

5  U.S.C. § 506(a)(1)(A).

6       102.  Counter-defendants and the other members of the MGA Criminal

7  Enterprise schemed to defraud Mattel and steal its property and trade secret

8  information by means of false representation, breaches of fiduciary duty,

9  conversation and concealment, as more fully set forth in the foregoing paragraphs.

10      103.  In furtherance of this unlawful conspiracy, and to effect its

11  objectives, Counter-defendants and various co-conspirators committed numerous

12  overt acts, including but not limited to those set forth in the foregoing paragraphs.

13      104.  Mattel has been injured in its business or property as a direct and

14  proximate result of the Counter-defendants' and the other enterprise members'

15  violations of 18 U.S.C. § 1962(d), including injury by reason of the predicate acts

16  constituting the pattern of racketeering activity.

17      105.  As a result of the conspiracies between and among all Counter-

18  defendants and the other conspirators to violate 18 U.S.C. § 1962(c), Mattel has

19  suffered substantial damages, in an amount to be proved at trial.  Pursuant to 18

20  U.S.C. § 1964(c), Mattel is entitled to recover treble its general and special

21  compensatory damages, plus interest, costs and attorneys, fees, incurred by reason

22  of Counter-defendants' violations of 18 U.S.C. § 1962(d).

23                    **Fourth Counterclaim**

24                **Misappropriation of Trade Secrets**

25         **(Against Counter-defendants MGA, MGA de Mexico,**

26              **Larian, Machado and Does 4 through 10)**

27      106.  Mattel repeats and realleges each and every allegation set forth in

28  paragraphs 1 through 105, above, as though fully set forth at length.

2154363.2                                -62-

XHIBIT  5
PAGE  164

1    107. As used herein, "Trade Secret Material" shall mean the

2    documents, materials and information stolen by Machado, Trueba, Vargas,

3    Brisbois, the Other Former Employees, and other persons acting for, on behalf of or

4    at the direction of MGA and/or Larian. Prior to their theft by Counter-defendants,

5    the Trade Secret Materials gave Mattel a significant competitive advantage over its

6    existing and would-be competitors, including MGA. This advantage, as to MGA,

7    has now been compromised as a result of Counter-defendants' unlawful activities.

8    108. Mattel made reasonable efforts under the circumstances to

9    maintain the confidentiality of the Trade Secret Materials, including by having

10   employees and consultants who may have access the Trade Secret Materials sign

11   confidentiality agreements that oblige them not to disclose the Trade Secret

12   Materials or characteristics of the Trade Secret Materials; by limiting the

13   circulation of said materials within Mattel; by protecting and limiting access to

14   computers with log-in identifications and passwords; by limiting each employee's

15   access to electronic files to those that the particular employee needs to access; by

16   educating employees on the nature of Mattel's information that is confidential and

17   proprietary; and by reminding employees on a regular and periodic basis of their

18   obligation to protect and maintain Mattel's confidential and proprietary

19   information.

20   109. Mattel's Trade Secret Materials derive independent economic

21   value from not being generally known to the public or to other persons who can

22   obtain economic benefit from their disclosure.

23   110. Counter-defendants have illegally obtained the trade secret

24   materials, as set forth above, and through other means of which Mattel is presently

25   unaware.

26   111. Counter-defendants have used and disclosed Mattel's Trade

27   Secret Materials without Mattel's consent and without regard to Mattel's rights, and

28

4363.2

EXHIBIT 5
PAGE 165

1  without compensation, permission, or licenses for the benefit of themselves and

2  others.

3         112. Counter-defendants' conduct was, is, and remains willful and

4  wanton, and was taken with blatant disregard for Mattel's valid and enforceable

5  rights.

6         113. Counter-defendants' wrongful conduct has caused and, unless

7  enjoined by this Court, will continue in the future to cause irreparable injury to

8  Mattel. Mattel has no adequate remedy at law for such wrongs and injuries. Mattel

9  is therefore entitled to a permanent injunction restraining and enjoining Counter-

10  defendants, and each of them, as well as their agents, servants, and employees, and

11  all persons acting thereunder, in concert with, or on their behalf, from further using

12  in any manner Mattel's trade secrets.

13         114. In addition, as a proximate result of Counter-defendants'

14  misconduct, Mattel has suffered actual damages, and Counter-defendants have been

15  unjustly enriched.

16         115. The aforementioned acts of the Counter-defendants were willful

17  and malicious, including in that Counter-defendants misappropriated Mattel's trade

18  secrets with the deliberate intent to injure Mattel's business and improve their own.

19  Mattel is therefore entitled to enhanced damages. Mattel is also entitled to

20  reasonable attorney's fees.

21                        **Fifth Counterclaim**

22                        **Breach of Contract**

23                        **(Against Bryant)**

24         116. Mattel repeats and realleges each and every allegation set forth in

25  paragraphs 1 through 115, above, as though fully set forth at length.

26         117. Pursuant to his Employment Agreement, Bryant agreed that he

27  would not, without Mattel's express written consent, engage in any employment or

28  business other than for Mattel or assist in any manner any business competitive

21542363.2

-64-

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1   with the business or future business plans of Mattel during his employment with

2   Mattel. Pursuant to his Mattel Employment Agreement, Bryant further assigned to

3   Mattel all right, title and interest in "inventions," including without limitation

4   "designs" and other works that he conceived, created or reduced to practice during

5   his employment by Mattel. In addition, pursuant to the Conflict Questionnaire,

6   Bryant certified that, other than as disclosed, he had not worked for any competitor

7   of Mattel and had not engaged in any business venture or transaction involving a

8   Mattel competitor that could be construed as a conflict of interest. Bryant further

9   promised that he would notify his supervisor immediately of any change in his

10   situation that would cause him to change any of the foregoing certifications or

11   representations.

12       118. The Employment Agreement and the Conflict Questionnaire are

13   valid, enforceable contracts, and Mattel has performed each and every term and

14   condition of the Employment Agreement and Conflict Questionnaire required to be

15   performed by Mattel.

16       119. Bryant materially breached the foregoing contracts with Mattel,

17   in that, among other things, he secretly aided, assisted and worked for a Mattel

18   competitor during his employment with Mattel without the express written consent

19   of Mattel.

20       120. As a consequence of Bryant's breach, Mattel has suffered and

21   will, in the future, continue to suffer damages in an amount to be proven at trial.

22   Such damages include, without limitation, the amounts paid by the competitor to

23   Bryant during his Mattel employment; the amounts paid by MGA to Bryant during

24   his Mattel employment; the amount that Mattel paid Bryant during the time he

25   wrongfully worked with MGA; the value of information and intellectual property

26   owned by Mattel which Bryant provided to MGA; the value of the benefits that

27   MGA obtained from Bryant during the time he was employed by Mattel; and the

28

1  value of the benefits that MGA obtained from Bryant as a result of the work he

2  performed for or with MGA during his Mattel employment.

3       121. Bryant's conduct has caused, and unless enjoined will continue to

4  cause, irreparable injury to Mattel that cannot be adequately compensated by

5  money damages and for which Mattel has no adequate remedy at law. Bryant

6  specifically acknowledged in his Employment Agreement that his breach of the

7  Agreement "likely will cause irreparable harm" to Mattel and that Mattel "will be

8  entitled to injunctive relief to enforce this Agreement, in addition to damages and

9  other available remedies." Accordingly, Mattel is entitled to orders mandating

10  Bryant's specific performance of his contracts with Mattel and restraining Bryant

11  from further breach.

12  **Sixth Counterclaim**

13  **Intentional Interference with Contract**

14  **(Against MGA, Larian and Does 4 through 10)**

15       122. Mattel repeats and realleges each and every allegation set forth in

16  paragraphs 1 through 121, above, as though fully set forth at length.

17       123. Valid agreements existed between Mattel and Bryant, Brawer,

18  Machado, Trueba, Vargas, Brisbois and the Other Former Employees (collectively,

19  the "Mattel Employees")

20       124. At all times herein mentioned, MGA, Larian and Does 4 through

21  10 knew that the Mattel Employees had a duty under their agreements not to work

22  for or assist any competitor of Mattel, such as MGA. In addition, at all times

23  mentioned herein, MGA, Larian and Does 4 through 10 knew that Bryant had

24  assigned to Mattel, and was obligated to disclose to Mattel all inventions, including

25  designs and other works, created, conceived or reduced to practice during their

26  employment with Mattel.

27

28

2154363.2

-66-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

125. Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, induced and encouraged the Mattel Employees to breach their contracts with Mattel.

126. As a direct and proximate result of Counter-defendants' efforts and inducements, the Mattel Employees did breach their contracts with Mattel.

127. As a result of said breaches, Mattel has suffered damages and will imminently suffer further damages, including the loss of its competitive position and lost profits, in an amount to be proven at trial.

128. Counter-defendants performed the aforementioned conduct with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

### Seventh Counterclaim

### Breach of Fiduciary Duty

### (Against Bryant and Machado)

129. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 128, above, as though fully set forth at length.

130. Bryant and Machado held positions of trust and confidence with Mattel. In their positions, Bryant and Machado had access to and were entrusted with Mattel's proprietary and confidential information, supervised the work of others, exercised discretion and worked independently in many of their job assignments and duties. In their positions, Bryant and Machado also represented Mattel in its dealings with third parties and, in actions in the course and scope of their employment with Mattel, were agents of Mattel. They confirmed their relationship of trust with Mattel in respective employee agreements. Bryant and Machado thus owed Mattel a fiduciary duty that included, but was not limited to, an obligation not to take any action that would be contrary to Mattel's best interests

SECOND AMENDED ANSWER AND COUNTERCLAIMS

21543363.2

EXHIBIT 5

PAGE 169

or that would deprive Mattel of any opportunities, profit or advantage which Bryant or Machado might bring to Mattel.

131. Bryant breached his fiduciary duty to Mattel in that, while employed by Mattel, he secretly aided and assisted a competitor of Mattel, including without limitation by entering into an agreement with a Mattel competitor. As alleged above, Bryant also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

132. Machado breached his fiduciary duty to Mattel, in that while employed by Mattel, he secretly aided and assisted a competitor of Mattel by, among other things, misappropriating Mattel trade secret and proprietary information and providing said information to officers of MGA. Machado also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, himself personally and MGA.

133. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

134. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of exemplary damages against Counter-defendants in an amount to be determined at trial.

135. Furthermore, Counter-defendants' conduct has caused, and unless enjoined will continue to cause, irreparable injury to Mattel that cannot be adequately compensated by money damages and for which Mattel has no adequate remedy at law. Accordingly, Mattel is entitled to an order restraining further breach of Bryant's fiduciary duty to Mattel and/or restraining Counter-defendants from continuing to benefit from such breach.

SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT 5
PAGE 170

### Eighth Counterclaim

### Aiding and Abetting Breach of Fiduciary Duty

### (Against MGA, Larian and Does 4 through 10)

136.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 135, above, as though fully set forth at length.

137.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant held a position of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that Bryant owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to secretly developing and designing Bratz while employed by Mattel and by secretly assisting Larian and MGA .

138.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) held positions of trust and confidence at Mattel.  At all times herein mentioned, MGA, Larian and Does 4 through 10 knew that the Mattel Employees (excluding Bryant) owed a fiduciary duty to Mattel not to take any action that would be contrary to Mattel's best interests, including but not limited to taking confidential trade secret information from Mattel's premises and providing that information to a competitor.

139.  Despite such knowledge, Counter-defendants MGA, Larian and Does 4 through 10 intentionally and without justification solicited, encouraged, aided and abetted and gave substantial assistance to the Mattel Employees to breach their fiduciary duties to Mattel, knowing that their conduct would constitute breaches of their fiduciary duties to Mattel.

140.  As a direct and proximate result of Counter-defendants' efforts, the Mattel Employees did breach their fiduciary duties to Mattel and Mattel has incurred damages in an amount to be proven at trial.  Mattel, therefore, is entitled to recover compensatory damages in an amount to be determined at trial.

21543632

EXHIBIT __J__

PAGE __171__

141. In taking the aforesaid actions, MGA, Larian and Does 4 through 10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to recover exemplary damages from Counter-defendants in an amount to be determined at trial.

## Ninth Counterclaim

### Breach of Duty of Loyalty

### (Against Bryant and Machado)

142. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 141, above, as though fully set forth at length.

143. As employees of Mattel, Bryant and Machado owed a duty of undivided loyalty to Mattel. Pursuant to this duty, Bryant and Machado could not compete with Mattel or assist a competitor of Mattel during their employment with Mattel. Pursuant to this duty, Bryant and Machado were required to always give preference to Mattel's business over their own, similar interests during the course of their employment with Mattel.

144. Bryant and Machado breached their duty of loyalty to Mattel in that, while employed by Mattel, they secretly aided, assisted and worked for a competitor of Mattel, including without limitation by entering into agreements with a Mattel competitor. As alleged above, they also breached the aforementioned duty by using Mattel property and resources for the benefit of, and to aid and assist, themselves personally and the competitor of Mattel.

145. As a direct and proximate result of Counter-defendants' wrongful conduct, Mattel has incurred damages in an amount to be determined at trial.

146. Counter-defendants acted with malice, fraud and oppression, and in conscious disregard of Mattel's rights. Accordingly, Mattel is entitled to an award of punitive damages against Counter-defendants in an amount to be determined at trial.

SECOND AMENDED ANSWER AND COUNTERCLAIMS

1154363.2

EXHIBIT 5
PAGE 172

1   147.  Furthermore, Counter-defendants' conduct has caused, and unless

2   enjoined will continue to cause, irreparable injury to Mattel that cannot be

3   adequately compensated by money damages and for which Mattel has no adequate

4   remedy at law.  Accordingly, Mattel is entitled to an order restraining further

5   breach of Counter-defendants' duty of loyalty to Mattel and/or restraining Counter-

6   defendants from continuing to benefit from such breach.

7   148.  In breaching their duty of loyalty to Mattel, Bryant and Machado

8   acted with malice, fraud and oppression, and in conscious disregard of Mattel's

9   rights.  Accordingly, Mattel is entitled to recover exemplary damages from

10   Counter-defendants in an amount to be determined at trial.

11   ### Tenth Counterclaim

12   ### Aiding and Abetting Breach of Duty of Loyalty

13   ### (Against MGA, Larian and Does 4 through 10)

14   149.  Mattel repeats and realleges each and every allegation set forth in

15   paragraphs 1 through 148, above, as though fully set forth at length.

16   150.  MGA, Larian and Does 4 through 10 knew that Bryant, as an

17   employee of Mattel, owed a duty of loyalty to his employer.  MGA, Larian and

18   Does 4 through 10 knew that this duty included an obligation on the part of Bryant

19   not to compete with Mattel or assist a competitor of Mattel during the term of his

20   employment with Mattel.  MGA, Larian and Does 4 through 10 also knew that

21   Bryant was required to give preference to Mattel's business over his own, similar

22   interests or those of Mattel's competitors. or those of Mattel's competitors during

23   the course of his employment with Mattel.

24   151.  MGA, Larian and Does 4 through 10 knew that the Mattel

25   Employees (excluding Bryant) were employed by Mattel, and, as employees of

26   Mattel, that they owed duties of loyalty to Mattel.  MGA, Larian and Does 4

27   through 10 knew that these duties included an obligation on the part of the Mattel

28

2154363.2

-71-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT _____
PAGE _173_

1  Employees (excluding Bryant) not to compete with Mattel or assist a competitor of

2  Mattel during their Mattel employment.

3  152. Despite such knowledge, Counter-defendants MGA, Larian and

4  Does 4 through 10 intentionally and without justification solicited, encouraged,

5  aided and abetted and gave substantial assistance to the Mattel Employees to

6  breach their duties of loyalty to Mattel, knowing that their conduct would constitute

7  breaches of their duties of loyalty to Mattel.

8  153. As a further consequence of Counter-defendants' efforts, Mattel

9  has suffered injury and is entitled to compensatory damages in an amount to be

10  proven at trial.

11  154. In taking the aforesaid actions, MGA, Larian and Does 4 through

12  10 acted with malice, fraud and oppression, and in conscious disregard of Mattel's

13  rights.  Accordingly, Mattel is entitled to recover exemplary damages from

14  Counter-defendants in an amount to be determined at trial.

15  **Eleventh Counterclaim**

16  **Conversion**

17  **(Against All Counter-defendants)**

18  155. Mattel repeats and realleges each and every allegation set forth in

19  paragraphs 1 through 154, above, as though fully set forth at length.

20  156. Counter-defendants wrongfully converted Mattel property and

21  resources by appropriating and using them for their own benefit and gain and for

22  the benefit and gain of others, without the permission of Mattel.

23  157. Mattel was entitled to, among other things, the exclusive right

24  and enjoyment in property and tangible materials owned by Mattel, including

25  without limitation such proper and materials that were created by Bryant while he

26  was a Mattel product designer.  Such property was taken by Bryant from Mattel to

27  further his own interests and, in at least some instances, provided by Bryant to

28  Larian and MGA in furtherance of the interests of Bryant, Larian and MGA.

2154363.2

-72-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT  5
PAGE  174

1    158. In addition, Counter-defendants wrongfully converted Mattel's

2  property by removing the Trade Secret Materials in electronic and paper form from

3  Mattel's offices. Counter-defendants did so without Mattel's permission and

4  continue to possess them.

5    159. As a direct and proximate result of Counter-defendants' wrongful

6  conversion of Mattel property, including those relating to Bratz and Mattel's Trade

7  Secret Materials, Mattel has incurred damages. Mattel, therefore, is entitled to

8  recover compensatory damages in an amount to be determined at trial.

9    160.   As a result of Counter-defendants' acts of conversion, Mattel is

10  entitled to damages in an amount sufficient to indemnify Mattel for the loss

11  suffered, which is not measured by the value of the property misappropriated, but

12  includes the lost profits that Mattel suffered as a result of the conversion or,

13  alternatively, the profits generated by the Counter-defendants that would not have

14  been generated but for the conversion. Only such a measure of damages would

15  fully and fairly compensate Mattel for the injury it suffered due to Counter-

16  defendants' acts of conversion.

17    161. Counter-defendants performed the aforementioned conduct with

18  malice, fraud and oppression, and in conscious disregard of Mattel's rights.

19  Accordingly, Mattel is entitled to recover exemplary damages from Counter-

20  defendants in an amount to be determined at trial.

21    162. Furthermore, Counter-defendants' conduct has caused, and unless

22  enjoined will continue to cause, irreparable injury to Mattel that cannot be

23  adequately compensated by money damages and for which Mattel has no adequate

24  remedy at law. Accordingly, Mattel is entitled to an order restraining Counter-

25  defendants from further conversion of Mattel property and resources and/or

26  restraining Counter-defendants from continuing to benefit from such conversion.

27

28

2154363.2

-73-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT ____
PAGE __175__

## Twelfth Counterclaim
### Unfair Competition
### (Common Law and *Cal. Bus. & Prof. Code* § 17200)
### (Against All Counter-defendants)

163. Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 162, above, as though fully set forth at length.

164. Section 17200 of the California Business and Professions Code prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice . . . ."

165. By engaging in the foregoing conduct, Counter-defendants have, individually and in combination, engaged in unlawful, unfair and/or fraudulent acts of unfair competition in violation of both the common law of the state of California and *Cal. Bus. & Prof. Code* § 17200 *et seq.* Such conduct included, without limitation, MGA's commercial bribery of Bryant in violation of *Cal. Penal Code* § 641.3 and misappropriation of trade secrets in violation of 18 U.S.C. § 1832(a). Such conduct also included, without limitation, MGA's and Larian's disparagement of Mattel's products and misrepresentations as alleged above.

166. As a result of the aforementioned conduct, Mattel has suffered damages and will imminently suffer further damages, including but not limited to lost profits in an amount to be proven at trial. No adequate remedy at law exists for the wrongs and injuries Mattel has suffered and will continue to suffer, and Mattel is entitled to an injunction enjoining Counter-defendants' continued wrongful acts. Mattel is also entitled to recover compensatory and exemplary damages pursuant to the doctrine of common law unfair competition and *Cal. Civ. Code* § 3294.

EXHIBIT 5
PAGE 176

**Thirteenth Counterclaim**

**Declaratory Relief**

**(Against All Counter-defendants)**

167.  Mattel repeats and realleges each and every allegation set forth in paragraphs 1 through 166, above, as though fully set forth at length.

168.  As shown in the foregoing paragraphs above, an actual controversy exists between Mattel and Counter-defendants regarding Counter-defendants' lack of ownership interests in Bratz and Mattel's rights in the same.

169.  Accordingly, Mattel seeks a declaration of the Court that Counter-defendants have no valid or protectable ownership rights or interests in Bratz, and that Mattel is the true owner of the same, and further seeks an accounting and imposition of a constructive trust over Bratz, including without limitation registrations and applications for registrations relating thereto made or filed by Counter-defendants and third parties, and over all revenues and other monies or benefits derived or obtained from MGA's and Bryant's purported ownership, use, sale, distribution and licensing of Bratz.

170.  Mattel seeks a declaration of the Court that any and all agreements between Bryant, on the one hand, and MGA, on the other hand, in which Bryant purports to assign to MGA any right, title or interests in any work that he conceived, created or reduced to practice while a Mattel employee, including but not limited to the Bratz designs, is void and of no effect, including without limitation because Bryant had previously assigned said right, title or interest to Mattel and because Mattel was otherwise the owner of said right, title or interest.

**Prayer for Relief**

WHEREFORE, Mattel respectfully requests judgment:

1.    For a declaration that Counter-defendants have no valid or protectable ownership interests or rights in Bratz designs and works conceived,

-75-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

2154363.2

EXHIBIT ___5___

PAGE ___177___

1  created or reduced to practice by Bryant during the term of his Mattel employment

2  and/or by any others then-employed by Mattel, as well as in all derivatives

3  prepared therefrom, and that Mattel is the true owner of the foregoing;

4         2.    For a declaration that any agreement between Bryant, on the one

5  hand, and MGA or any person or entity, on the other hand, in which Bryant

6  purported to assign any right, title or interests in any work that he conceived,

7  created or reduced to practice while a Mattel employee, including but not limited to

8  the Bratz designs, is void and of no effect;

9         3.    For an Order enjoining and restraining Counter-defendants, their

10  agents, servants and employees, and all persons in active concert or participation

11  with them, from further wrongful conduct, including without limitation from

12  imitating, copying, distributing, importing, displaying, preparing derivatives from

13  and otherwise infringing Mattel's copyright-protected works;

14         4.    For an Order, pursuant to 17 U.S.C. § 503(a) and other

15  applicable law, impounding all of Counter-defendants' products and materials that

16  infringe Mattel's copyrights, as well as all plates, molds, matrices and other articles

17  by which copies of the works embodied in Mattel's copyrights may be reproduced

18  or otherwise infringed;

19         5.    For an Order mandating that Counter-defendants return to Mattel

20  all tangible items, documents, designs, diagrams, sketches or any other

21  memorialization of inventions created or reduced to practice during Bryant's

22  employment with Mattel as well as all Mattel property converted by Counter-

23  defendants;

24         6.    For an Order mandating specific performance by Bryant to

25  comply with and satisfy Bryant's contractual obligations to Mattel;

26         7.    That Mattel be awarded, and Counter-defendants be ordered to

27  disgorge, all payments, revenues, profits, monies and royalties and any other

28  benefits derived or obtained as a result of the conduct alleged herein, including

2154363.2

-76-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT 5
PAGE 178

1  without limitation of all revenues and profits attributable to Counter-defendants'

2  infringement of Mattel's copyrights under 17 U.S.C. § 504;

3         8.   For an accounting of all profits, monies and/or royalties from the

4  exercise of ownership, use, distribution, sales and licensing of Bratz;

5         9.   For the imposition of a constructive trust over Bratz, including

6  without limitation registrations and applications for registrations relating thereto

7  made or filed by Counter-defendants and third parties, and all profits, monies,

8  royalties and any other benefits derived or obtained from Counter-defendant's

9  exercise of ownership, use, sale, distribution and licensing of Bratz;

10        10.  That Mattel recover its actual damages and lost profits;

11        11.  That Counter-defendants be ordered to pay exemplary damages

12 in a sum sufficient to punish and to make an example of them, and deter them and

13 others from similar wrongdoing;

14        12.  That Counter-defendants be ordered to pay treble its general and

15 special damages, plus interest, costs and attorney's fees incurred by reason of

16 Counter-defendants' violations of 18 U.S.C. §§ 1962(c)-(d).

17        13.  That Counter-defendants be ordered to pay double damages due

18 to their willful and malicious misappropriation of Mattel's trade secrets with

19 deliberate intent to injure Mattel's business and improve its own;

20        14.  That Counter-defendants pay to Mattel the full cost of this action

21 and Mattel's attorneys' and investigators' fees; and

22

23

24

25

26

27

28

2154363.7

SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT   J
PAGE   171

1       15.   That Mattel have such other and further relief as the Court may

2  deem just and proper.

3

4  DATED:  July 12, 2007         QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

5

6                        By  _____

7                          John B. Quinn

8                          Attorneys for Defendant and Counter-claimant Mattel, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-78-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT   J

PAGE   180

## DEMAND FOR JURY TRIAL

Mattel, Inc. respectfully requests a jury trial on all issues triable thereby.

DATED:  July 12, 2007                    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

                                         By_____
                                         John B. Quinn
                                         Attorneys for Defendant and Counter-claimant Mattel, Inc.

2154363.2

-79-
SECOND AMENDED ANSWER AND COUNTERCLAIMS

EXHIBIT_____5_____

PAGE _181_



CONFORMED COPY

1   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
      John B. Quinn (Bar No. 090378)
2     johnquinn@quinnemanuel.com
      Michael T. Zeller (Bar No. 196417)
3     (michaelzeller@quinnemanuel.com)
      Jon D. Corey (Bar No. 185066)
4     (joncorey@quinnemanuel.com)
      Timothy L. Alger (Bar No. 160303)
5     (timalger@quinnemanuel.com)
    865 South Figueroa Street, 10th Floor
6   Los Angeles, California  90017-2543
    Telephone:  (213) 443-3000
7   Facsimile:   (213) 443-3100

8   Attorneys for Plaintiff
    Mattel, Inc.

9

FILED
2007 JUL 12  PM 3: 03
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                   EASTERN DIVISION

13  CARTER BRYANT, an individual,      CASE NO. CV 04-9049 SGL (RNBx)

14          Plaintiff,                 Consolidated with Case No. CV 04-
                                       09059 and CV 05-02727
15      vs.
                                       PROOF OF SERVICE
16  MATTEL, INC., a Delaware
    corporation,                       Discovery Cut-Off: October 22, 2007
17                                     Pre-Trial Conference: January 14, 2008
            Defendant.                 Trial Date:   February 12, 2008
18

19  AND CONSOLIDATED CASES

20

21

22

23

24

25

26

27

28

07209/2146457.1

EXHIBIT __J__
PAGE __182__

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is Now Legal Service, 1301 W. 2nd Street, Suite 206, Los Angeles, CA 90026.

On July 12, 2007, I served true copies of the following document(s) described as

**1.** MATTEL, INC.'S SECOND AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR:

1.   COPYRIGHT INFRINGEMENT;
2.   VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
3.   CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
4.   MISAPPROPRIATION OF TRADE SECRETS;
5.   BREACH OF CONTRACT;
6.   INTENTIONAL INTERFERENCE WITH CONTRACT;
7.   BREACH OF FIDUCIARY DUTY;
8.   AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
9.   BREACH OF DUTY OF LOYALTY;
10.  AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
11.  CONVERSION;
12.  UNFAIR COMPETITION; AND
13.  DECLARATORY RELIEF.
     **VOLUME I AND II**

**3.** [PUBLIC REDACTED] MATTEL, INC.'S SECOND AMENDED ANSWER IN CASE NO. 05-2727 AND COUNTERCLAIMS FOR:

14.  COPYRIGHT INFRINGEMENT;
15.  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
16.  CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT;
17.  MISAPPROPRIATION OF TRADE SECRETS;
18.  BREACH OF CONTRACT;
19.  INTENTIONAL INTERFERENCE WITH CONTRACT;
20.  BREACH OF FIDUCIARY DUTY;
21.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;
22.  BREACH OF DUTY OF LOYALTY;
23.  AIDING AND ABETTING BREACH OF DUTY OF LOYALTY;
24.  CONVERSION;
25.  UNFAIR COMPETITION; AND
26.  DECLARATORY RELIEF.
     **VOLUME I AND II**

**3.** MATTEL, INC'S APPLICATION TO FILE UNDER SEAL CERTAIN ATTACHMENTS TO MATTEL, INC.'S SECOND AMENDED ANSWER AND COUNTERCLAIMS; [PROPOSED ORDER]

on the parties in this action as follows:

EXHIBIT 5

PAGE 183

1   John W. Keker, Esq.                          Diane M. Torres, Esq.
    Michael H. Page, Esq.                        O'Melveny & Meyers, LLP
2   Christa M. Anderson, Esq.                    400 S. Hope Street
    Keker & Van Nest, LLP                        Los Angeles, CA 90071
3   710 Sansome Street
    San Francisco, CA 94111
4
    Patricia Glaser, Esq.
5   Christensen, Glaser, Fink, Jacobs, Weil
     & Shapiro, LLP
6   10250 Constellation Blvd., 19th Floor
    Los Angeles, CA  90067
7

8

9

10  **BY PERSONAL SERVICE:**  I delivered such envelope(s) by hand to the office of the person(s) being served.

11
        I declare under penalty of perjury under the laws of the State of California that the
12  foregoing is true and correct.

13      Executed on July 12, 2007, at Los Angeles, California.

14

15  _____

16  NOW LEGAL -- Dave Quintana

17

18

19

20

21

22

23

24

25

26

27

28

-2-

EXHIBIT J
PAGE 184