# EXHIBIT A

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 2 of 109   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4443   Filed 12/03/2008   Page 1 of 11
#:174280

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant. | CASE NO. CV 04-9049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>ORDER GRANTING MATTEL, INC.'S MOTION FOR PERMANENT INJUNCTION |
| AND CONSOLIDATED ACTIONS | |

Exhibit A, p. 4a

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 3 of 109   Page ID
#:174234
Case 2:04-cv-09049-SGL-RNB      Document 4443      Filed 12/03/2008     Page 2 of 11

1
<u>ORDER</u>

2        Having considered Mattel, Inc.'s Motion for Permanent Injunction (the

3   "Motion"), the opposition thereto, and all other papers, evidence and arguments

4   submitted in connection therewith, as well as the evidence admitted at trial and the

5   jury's verdicts in the Phase 1 trial, the Court hereby GRANTS Mattel's Motion

6   against MGA Entertainment Inc. ("MGA"), MGA Entertainment (HK) Ltd. ("MGA

7   Hong Kong"), and Isaac Larian ("Larian") (MGA, MGA Hong Kong, and Larian

8   are, collectively, "Defendants"), and hereby ORDERS as follows:

9        1.      MGA, MGA Hong Kong, and Larian, along with their respective

10  officers, directors, principals, agents, representatives, servants, employees, affiliates,

11  successors or assigns, and any person or entity acting on their behalf or in concert or

12  participation with them, are hereby PERMANENTLY ENJOINED from

13  manufacturing, procuring the manufacture of, making, producing, reproducing,

14  copying, distributing, transferring, displaying, marketing, advertising, shipping,

15  importing, exporting, licensing, offering to license, selling or offering to sell:

16            (a)     Any doll, product or other item that embodies or depicts in whole

17                    or in part, or incorporates or uses in any manner, the head and/or

18                    body sculpt shown in Exhibit 1 (sometimes known as the "core

19                    Bratz fashion doll production sculpt"), which is incorporated

20                    herein by this reference.

21            (b)     Any doll, product or other item that embodies or depicts in whole

22                    or in part, or incorporates or uses in any manner, the head and/or

23                    body sculpt shown in Exhibit 2 (sometimes known as the "Bratz

24                    Movie sculpt"), which is incorporated herein by this reference.

25            (c)     Any doll shown in Exhibits 3 to 4, inclusive, which are

26                    incorporated herein by this reference, except Cloe's younger

27                    sister depicted at Exhibit 3, page 277; the younger version of

28                    Yasmin depicted at Exhibit 3, page 278; and the younger Alicia

Case 2:04-cv-09049-DOC-RNB Document 5340-2 Filed 05/04/09 Page 4 of 109 Page ID
#:174232
Case 2:04-cv-09049-SGL-RNB Document 4443 Filed 12/03/2008 Page 3 of 11

1        depicted at Exhibit 4, page 379, if those dolls are packaged

2        separately from a doll that includes a doll incorporating the core

3        Bratz fashion doll production sculpt or Bratz Movie sculpt

4        (Exhibits 1 and 2).

5    (d)   Any doll or portion of a doll shown in Exhibits 5 to 6, inclusive,

6        which are incorporated herein by this reference, except the dolls

7        depicted at Exhibit 5, pages 551 through 555, inclusive, and the

8        dolls depicted at Exhibit 6, pages 556, 557, 558, and 565.

9    (e)   Any product, packaging or other item that embodies or depicts in

10       whole or in part, or incorporates or uses in any manner, the

11       artwork shown on the packaging set forth in Exhibit 7, which is

12       incorporated herein by this reference.

13    (f)   Any doll, product, packaging or other item that embodies or

14       depicts in whole or in part, or incorporates or uses in any

15       manner, any of the Jade, Cloe, Yasmin and Sasha Bratz

16       characters, including without limitation the items shown in

17       Exhibits 3 and 5, which are incorporated herein by this reference.

18    (g)   Any marketing or advertising materials that embody or depict in

19       whole or in part, or incorporate or use in any manner, any of the

20       dolls, products, items or other matter described in paragraphs (a)

21       through (f) above, including without limitation the marketing or

22       advertising materials shown in Exhibits 8 (screen captures from

23       television commercials) to 9 (print advertisements depicting any

24       dolls incorporating the core Bratz fashion doll production sculpt

25       or Bratz Movie sculpt (Exhibits 1 and 2), inclusive, which are

26       incorporated herein by this reference.

27    (h)   Any doll, product, packaging, advertising or other item or

28       materials that counterfeits, copies or is substantially similar to

07209/2650992.1

-3-

Exhibit A, p. 6

1                      Mattel's copyright protected head and/or body sculpt shown in

2                      Exhibit 10, which is incorporated herein by this reference,

3                      including without limitation the Bratz fashion dolls known as

4                      Cloe, Yasmin, Sasha, Jade, Ciara, Dana, Diona, Felicia, Fianna,

5                      Katia, Kiana, Krysta, Kumi, Lana, Leah, Lela, Liliana, Lilee,

6                      Lina, Maribel, May Lin, Meygan, Nevra, Nevaeh, Nona, Nora,

7                      Oriana, Peyton, Phoebe, Rina, Roxxi, Sharidan, Sierrna, Sorya,

8                      Sunya, Tess, Tiana, Trinity, Vinessa, and Valentina, and any and

9                      all other dolls employing a sculpt which is substantially similar

10                      to Exhibit 10.

11        (i)      Any doll, product, packaging, advertising or other item or

12                      materials that embodies or depicts in whole or in part, or

13                      incorporates or uses in any manner, any of the Jade, Cloe,

14                      Yasmin and Sasha Bratz characters depicted or described in

15                      Exhibit 11, which is incorporated herein by this reference; and

16        (j)      Any doll, product, packaging, advertising or other item or

17                      materials that counterfeit, copy or are substantially similar to

18                      Mattel's Bratz-related copyrighted works, including without

19                      limitation such works in Exhibits 11 and 12, inclusive, which are

20                      incorporated herein by this reference.

21        2.      MGA, MGA Hong Kong, and Larian, along with their respective

22 officers, directors, principals, agents, representatives, servants, employees, affiliates,

23 successors or assigns, and any person or entity acting on their behalf or in concert or

24 participation with them, are further hereby PERMANENTLY ENJOINED from

25 engaging in any of the following acts:

26        (a)      Copying, imitating, selling, offering to sell, marketing,

27                      distributing, importing, displaying or making any use of the

28

1    copyrighted works shown in Exhibits 10 to 12, inclusive, which
2    works are owned by Mattel.

3    (b)  Engaging in any and all further acts of infringement of the
4         copyrighted works shown in Exhibits 10 to 12, inclusive, which
5         works are owned by Mattel.

6    (c)  Asserting any ownership of rights or any right, title or interest in
7         the copyrighted works shown in Exhibits 10 to 12, inclusive,
8         which works are owned by Mattel.

9    (d)  Transferring, disposing of, destroying, spoliating or secreting any
10        documents, records, recordings or materials, whether in
11        electronic or non-electronic form, that evidence, relate to or
12        pertain to any aspect of the dolls, products, packaging, items or
13        other materials referred to in paragraphs 1(a) through 1(k) above,
14        inclusive, including without limitation any and all agreements,
15        contracts, correspondence, communications, invoices, purchase
16        orders, sales orders, manufacturing records, import or export
17        records, sales records, ledgers, inventory records and shipping
18        records relating thereto.

19   (e)  Transferring, disposing of, destroying, spoliating or secreting any
20        documents, records, recordings or material, whether in electronic
21        or non-electronic form, that in any manner evidence, relate to or
22        pertain to any products, services or activities using or displaying
23        any simulation, counterfeit, reproduction or copy of, or are
24        derived from, Mattel's copyrighted works shown in Exhibits 10
25        to 12, inclusive, which are incorporated herein by this reference.

26   (f)  Transferring, disposing of, destroying, spoliating, secreting or
27        exporting any products, product packaging, labels, signs, prints,
28        dies, wrappers, receptacles, advertisements or any other tangible

ORDER GRANTING MATTEL, INC.'S MOTION FOR PERMANENT INJUNCTION

**Exhibit A, p. 8**

1           items (including without limitation computer files) that in any

2           manner utilize, contain, evidence, reproduce, display, or relate to

3           any simulation, counterfeit, reproduction or copy of, or are

4           derived from, (i) the dolls, products, packaging, items or other

5           materials referred to in paragraphs 1(a) through 1(k) above,

6           inclusive, or (ii) Mattel's copyrighted works shown in Exhibits

7           10 to 12, inclusive, which are incorporated herein by this

8           reference.

9      (g)    Transferring, disposing of, destroying, spoliating, secreting or

10          exporting any plates, molds, matrices, and other means of

11          making or manufacturing (i) the dolls, products, packaging,

12          items or other materials referred to in paragraphs 1(a) through

13          1(k) above, inclusive, or (ii) any reproduction, counterfeit, copy,

14          substantially similar likeness, or derivative of Mattel's

15          copyrighted works shown in Exhibits 10 to 12, inclusive.

16      (h)    Assisting, aiding or abetting any other entity or person in

17          engaging in or performing any of the activities referred to in

18          paragraphs 1(a) through 1(k), inclusive, and/or in paragraphs 2(a)

19          through 2(h), inclusive.

20      3.    At Defendants' expense, Defendants shall deliver to Mattel's

21 counsel for impoundment, at such location in the Central District of California as

22 Mattel's counsel may direct, all dolls, products, product packaging, labels, signs,

23 prints, dies, wrappers, receptacles and advertisements, in the direct or indirect

24 possession, custody or control of Defendants, their officers, directors, principals,

25 agents, servants, employees, successors or assigns, or any person or entity acting on

26 their behalf or in concert or participation with them, that are referred to in

27 paragraphs 1(a) through 1(k), inclusive, and/or in paragraphs 2(a) through 2(h),

28

1  inclusive, together with all plates, molds, matrices and other means of making the

2  same.  Mattel's counsel is hereby appointed substitute custodian for all such items.

3          4.      Defendants are hereby ORDERED to procure the return, and to

4  withdraw and recall, from any and all channels of trade and distribution, including

5  without limitation from retail shelves and from on-line retailers, all of the dolls and

6  doll products that are referred to in paragraphs 1(a) through 1(k), inclusive, and/or in

7  paragraphs 2(a) through 2(h), inclusive.  As to each entity or person returning such

8  dolls and doll products, Defendants shall refund all monies paid by each entity or

9  person in connection with such dolls and doll products and shall reimburse each

10  such entity or person for all associated shipping charges.

11          5.      Defendants shall hand serve upon Mattel's counsel a declaration,

12  made under oath, that sets forth fully and completely the following information:  (a)

13  the identity of each and every doll, product, package or other item manufactured,

14  marketed, displayed, distributed, imported, exported, sold or offered for sale by or

15  for Defendants that are referred to in paragraphs 1(a) through 1(k), inclusive, and/or

16  in paragraphs 2(a) through 2(h), inclusive; (b) for each such doll, product, package

17  or other item, the number of units manufactured, marketed, displayed, distributed,

18  shipped, imported, exported, sold or offered for sale by or for Defendants; (c) for

19  each unit of each such doll, product, package or other item, the purchaser, transferee

20  or recipient of each such unit(s), the quantities acquired by such purchaser,

21  transferee or recipient and complete contact information (including limitation the

22  address, telephone number, fax number and email address where known) for each

23  such purchaser, transferee or recipient; (d) for each unit of such doll, product,

24  package or other item, the current or last known location of each such unit,

25  including without limitation the location of all such dolls, products, package or other

26  items in Defendant's inventory; and (v) for each person or entity to whom or which

27  Defendants have promoted, advertised, marketed or offered to sell any doll, product,

28  package or other item that is the subject of this Order, the identity of, and complete

-7-

ORDER GRANTING MATTEL, INC.'S MOTION FOR PERMANENT INJUNCTION

**Exhibit A, p. 10**

1 | contact information for (including limitation the address, telephone number, fax

2 | number and email address where known), each such person or entity.

3 |       6.    At Defendants' expense, Defendants shall make written contact

4 | (either through fax or electronic mail) with (i) each retailer, distributor, wholesaler,

5 | importer, exporter, customer, licensee or any other person and entity to or through

6 | whom Defendants have shipped, transferred, imported, exported or sold any doll,

7 | product or other item that is the subject of this Order; and (ii) each retailer,

8 | distributor, wholesaler, licensee, potential licensee, customer, potential customer or

9 | any other person and entity who Defendants have contacted (whether by mail,

10 | electronic mail, orally or otherwise) within the past ninety (90) days in marketing,

11 | promoting or advertising any doll, product or other item that is the subject of this

12 | Order, and shall provide each such person and entity with a copy of this Order and

13 | with a verbatim copy of the following notice, in legible and conspicuous print, in its

14 | entirety (hereinafter, the "Notice"):

15 | NOTICE PUBLISHED PURSUANT TO

16 | ORDER OF THE UNITED STATES DISTRICT COURT

17 | YOU ARE HEREBY ADVISED as follows:

18 | Recently you may have bought, seen, or been contacted regarding, the

19 | sale of Bratz dolls or other Bratz products.

20 | Pursuant to the rulings of the United States District Court, Mattel is the

21 | owner of Bratz-related copyrights that are infringed by Bratz dolls,

22 | products and packaging manufactured by or for MGA.

23 | The Court has ordered MGA to immediately cease any further

24 | manufacture, sale, promotion, shipment or distribution of Bratz dolls,

25 | products and packaging.

26 | In addition, the Court has ordered that Bratz dolls must be returned

27 | immediately to the following address:  MGA Entertainment, Inc., Attn: Customer Service, 163000 Roscoe Blvd., Suite 150, Van Nuys, CA

28 | 91406.

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 10 of 109   Page ID
#:172238
Case 2:04-cv-09049-SGL-RNB   Document 4443   Filed 12/03/2008   Page 9 of 11

1

2      MGA will refund to you all monies paid by you for these dolls and
       reimburse you for all associated shipping charges.
3

4          7.      At Defendants' expense, Defendants shall post in legible and

5      conspicuous print a verbatim copy of the entire Notice set forth in Paragraph 6,

6      above, upon the home page of MGA's web site at www.mgae.com beginning within

7      twenty-four hours of receipt of notice of this Order and continuing for a period of no

8      less than one hundred and twenty (120) days.

9          8.      Defendants, and any person or entity acting on their behalf or in

10     concert or participation with Defendants, shall fully comply with Paragraphs 1 and 2

11     of this Order immediately, shall fully comply with Paragraph 6 of this Order within

12     two (2) calendar days of the date of this Order, shall fully comply with Paragraph 5

13     of this Order within seven (7) calendar days of the date of this Order and shall fully

14     comply with Paragraphs 3 and 4 of this Order within thirty (30) days of this Order.

15     In the event that any additional doll, product or item that is the subject of this Order

16     subsequently is delivered to or comes within the direct or indirect possession,

17     custody or control of Defendants, Defendants shall deliver such additional doll,

18     product or item to Mattel's counsel within two (2) calendar days in accordance with

19     the terms of Paragraph 3, above.

20         9.      Within forty (40) calendar days of the date of this Order,

21     Defendants shall file with the Court, and personally serve on counsel for Mattel, a

22     report in writing under oath setting forth the actions taken to comply with the terms

23     herein pursuant to 15 U.S.C. § 1116(a).  Such Report shall have appended to it

24     complete, true and accurate copies of each communication ordered to be sent

25     pursuant to Paragraph 6 of this Order.

26         10.     Pursuant to Federal Rule of Civil Procedure 53, the Court hereby

27     appoints a special master to supervise implementation of the requirements of this

28     Order (the "Special Master").

07209/2650992.1

1           11.    Any and all disputes arising out of this Order and/or motions or
2   applications seeking to enforce the terms of this Order shall be presented to the
3   Special Master for resolution in the first instance, once the Special Master is
4   appointed. The Special Master shall have the authority to set the time, place and
5   manner of hearings and other proceedings he or she will conduct; to preside over
6   hearings, whether telephonic or in person; to take evidence in connection with
7   disputes before the Special Master; to make inspections in connection with the
8   requirements of this Order, including inspections of Defendants' facilities and
9   warehouses; to issue orders resolving motions, applications and matters arising out
10  of this Order and/or seeking to enforce the terms of this Order; to issue orders
11  awarding non-contempt sanctions, including, without limitation, the award of
12  attorney's fees; and to issue reports and recommendations on matters for which the
13  Special Master lacks jurisdiction to issue an order, including, without limitation,
14  reports and recommendations regarding contempt sanctions. In addition to any
15  other filing procedures the Special Master may permit, the Special Master shall
16  permit the filing of *ex parte* applications to enforce the terms of this Order, which
17  must be heard and adjudicated within ten (10) calendar days of filing. A party may
18  bring an *ex parte* application for relief pursuant to this provision only upon
19  certifying, as an officer of the Court, that such expedited adjudication is required
20  and could not be avoided in due course. The parties shall file with this Court,
21  contemporaneously, the original of all submissions made to the Special Master such
22  that the Court's Docket shall be complete and include all pertinent submissions.
23  Third parties shall be bound by the Special Master's orders to the same extent as
24  Orders of this Court.

25          12.    The Special Master's orders, reports and recommendations shall
26  be treated as rulings made by a Magistrate Judge of this Court and may be reviewed
27  in the same manner and pursuant to the same procedures as this Court reviews such
28  orders, reports and recommendations of a Magistrate Judge. A court reporter shall

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 12 of 109   Page ID
#:172443
Case 2:04-cv-09049-SGL-RNB   Document 4443   Filed 12/03/2008   Page 11 of 11

1 transcribe all hearings and proceedings held before the Special Master.  The Special

2 Master's fees, and other costs incurred in connection with proceedings before the

3 Special Master, including the fees of court reporters, shall be paid one-half by

4 Mattel, Inc. and one-half by MGA Entertainment, Inc. unless, consistent with the

5 Federal Rules of Civil Procedure, the Special Master orders otherwise.  The Special

6 Master shall not have *ex parte* communications with a party or counsel.

7         13.    The Special Master shall be authorized to receive information

8 designated "CONFIDENTIAL" and "CONFIDENTIAL--ATTORNEY'S EYES

9 ONLY" pursuant to the protective order dated January 4, 2005.

10         14.    This Court shall have jurisdiction to interpret and enforce the

11 terms of this Permanent Injunction and to determine any issues which may arise

12 concerning this Permanent Injunction.

13         **IT IS SO ORDERED**.

14 DATED:  December 03, 2008

                           Hon. Stephen G. Larson
15                            United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2650992.1

-11-

# EXHIBIT B

O

1

2

3

4

5

6

7

8      UNITED STATES DISTRICT COURT

9      CENTRAL DISTRICT OF CALIFORNIA

10      EASTERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><hr>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-09049 SGL (RNBx)<br>Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727<br><br>ORDER GRANTING DECLARATORY JUDGMENT |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER

1.     The Court hereby DECLARES that Mattel owns all right, title and interest, including any and all copyright rights, in and to the Bratz-related works, ideas, and concepts that Carter Bryant conceived or created while employed by Mattel, as found by the jury in this case, including the idea for the name "Bratz" and the idea for the "Bratz" characters, which are protectible property interests as a matter of California state law, and the following works (identified by Trial Exhibit (TX) numbers):

| |
|---|
| TX 5-52, 62-1, 624, 5-74, 62-11, 10537, 15180, 5-75, 62-12, 10538, 15181, 5-111, 708, 5-112, 62-13, 5-113, 5-114, 62-14, 62-15, 1152-1, 1152-2, 10613, 1328, 10033-3, 10033-4 |
| TX 5-88, 35-1, 35-3, 5-101, 1327, 10153-3, 10153-4 |
| TX 5-35, 757 |
| TX 5-36, 701, 702 |
| TX 5-37, 703 |
| TX 5-38, 762 |
| TX 5-43, 709 |
| TX 5-46, 710 |
| TX 5-49, 704 |
| TX 5-50, 705 |
| TX 5-53, 1152-5, 1152-6, 10534, 15175 |
| TX 5-54, 62-2, 620, 774, 775 |
| TX 5-55, 62-3, 785, 1152-9 |
| TX 5-56, 764, 15176 |
| TX 5-57, 776, 777 |
| TX 5-58, 765, 15177 |
| TX 5-59, 739, 740 |
| TX 5-60, 761 |
| TX 5-61, 62-4, 782, 796-1, 1748 |

07209/2641997.3

[PROPOSED] ORDER

Exhibit B, p. 16

Case 2:04-cv-09049-DOC-RNB  Document 5340-2  Filed 05/04/09  Page 16 of 109  Page ID
#:174244
Case 2:04-cv-09049-SGL-RNB  Document 4442  Filed 12/03/2008  Page 3 of 5

| |
|---|
| TX 5-62, 62-5, 621, 767, 768, 5-71, 62-10, 770, 1752-1 |
| TX 5-63, 758, 759, 760 |
| TX 5-64, 62-6, 795, 1152-14, 1750 |
| TX 5-65, 1152-7, 1152-8, 11789 |
| TX 5-66, 794, 1152-13 |
| TX 5-67, 62-7, 784, 1152-11, 1152-12, 10535 |
| TX 5-68, 62-8, 781, 786, 790, 1751-4 |
| TX 5-69, 11788, 5-70, 62-9, 623, 783 |
| TX 5-72, 1152-15, 1152-16, 10536, 15179 |
| TX 5-73, 741, 742 |
| TX 5-76, 706 |
| TX 5-77, 707 |
| TX 5-78, 10539, 18501 |
| TX 5-136, 711 |
| TX 10579, 18281 |
| TX 15172 |
| TX 3-1, 779, 780, 1-1, 2-1, 778 |
| TX 3-2, 726, 727, 728, 1-4, 2-5 |
| TX 3-3, 1152-19, 1152-20, 11838, 15182, 1-6, 2-10, 5-104, 10544 |
| TX 3-5, 791, 1-8, 2-2 |
| TX 3-6, 11837, 15184, 1-7, 2-8, 743, 744, 5-107, 1152-17, 1152-18, 10547 |
| TX 3-8, 789, 1-11, 2-9, 734, 5-106, 10546 |
| TX 3-9, 788, 1-10, 2-6, 746, 5-103, 10543 |
| TX 3-10, 735, 736 |
| TX 3-12, 792, 1-3, 2-7, 5-102, 10542 |
| TX 3-13, 793, 1-5, 2-3, 10-3 |
| TX 5-79, 1-9, 2-4, 737, 10545, 5-105 |
| TX 1-2 |
| TX 3-11, |

[PROPOSED] ORDER

**Exhibit B, p. 17**

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 17 of 109   Page ID
#:174245
Case 2:04-cv-09049-SGL-RNB   Document 4442   Filed 12/03/2008   Page 4 of 5

| |
|---|
| TX 5-26, 712 |
| TX 5-27, 713 |
| TX 5-81, 720 |
| TX 5-82, 715 |
| TX 5-83, 723 |
| TX 3-4, 5-84, 716, 717 |
| TX 3-7, 5-85, 718, 719, 10-2, 63-1 |
| TX 5-80, 721, 722, 5-86 |
| TX 5-87, 5-108, 724, 725 |
| TX 5-34 |
| TX 5-89, 35-2, 323-32, 323-33 |
| TX 1107, 10638 |
| TX 1108, 10639 |
| TX 1109, 771 |
| TX 1110, 773 |
| TX 5-14, 10515 |
| TX 5-18, 10518 |
| TX 5-19, 10519 |
| TX 5-28, 10526 |
| TX 5-30 |
| TX 5-95 |
| TX 5-96 |
| TX 5-99 |
| TX 323-18 |
| TX 323-19 |
| TX 323-26 |
| TX 1136 |
| The Three Dimensional Item Presented at the Meeting where Mr. Bryant Pitched Bratz to MGA Entertainment, Inc. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[PROPOSED] ORDER

**Exhibit B, p. 18**

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 18 of 109   Page ID
#:174246
Case 2:04-cv-09049-SGL-RNB   Document 4442   Filed 12/03/2008   Page 5 of 5

1     2.     The Court further hereby DECLARES that MGA Entertainment Inc.

2  ("MGA"), MGA Entertainment (HK) Ltd. ("MGA Hong Kong") and Isaac Larian do

3  not have any right, title or interest in or to the works, ideas and/or concepts listed

4  above.  Any purported assignment from Carter Bryant to MGA of the rights to the

5  works, ideas or concepts listed above, including any purported assignment of such

6  rights in the agreement between MGA and Mr. Bryant dated "as of" September 18,

7  2000, was invalid, ineffectual and void ab initio.

8     3.     In addition, the Court hereby ORDERS that all copyright registrations

9  MGA has obtained in and for the Bratz works listed above, including Registration

10  Nos. VA 1-218-487 (Trial Exhibit 505), VA 1-218-488 (Trial Exhibit 507), VA 1-

11  218-489 (Trial Exhibit 513), VA 1-218-490 (Trial Exhibit 509), VA 1-218-491

12  (Trial Exhibit 511), are subject to a constructive trust in favor of Mattel and have

13  been held by MGA for Mattel's benefit.  Mattel is the beneficial owner of such

14  registrations.

15     4.     The Court further hereby ORDERS that all Bratz-related works listed

16  in Paragraph 1 above are subject to a constructive trust in favor of Mattel and that

17  Defendants shall deliver the originals of such works to Mattel forthwith.

18          IT IS SO ORDERED.

19

20

21  DATED:  December 3, 2008

22                                      Hon. Stephen G. Larson
                                        United States District Judge
23

24

25

26

27

28

-5-

# EXHIBIT C

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 20 of 109   Page ID
#:174240
Case 2:04-cv-09049-SGL-RNB   Document 4481   Filed 12/03/2008   Page 1 of 3

O

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

| | |
|---|---|
| 11  CARTER BRYANT, an individual, | CASE NO. CV 04-09049 SGL (RNBx) |
| 12            Plaintiff, | Consolidated with<br>Case Nos. CV 04-09059 & CV 05-2727 |
| 13      vs. | |
| 14  MATTEL, INC., a Delaware<br>corporation, | **ORDER GRANTING MATTEL'S<br>MOTION FOR CONSTRUCTIVE<br>TRUST AND FOR FINDING** |
| 15 | **LIABILITY AND INJUNCTIVE<br>RELIEF PURSUANT TO CAL. BUS. &** |
| 16            Defendant. | **PROF CODE § 17200** |
| 17  AND CONSOLIDATED ACTIONS | |

18

19

20

21

22

23

24

25

26

27

28

1

# ORDER

2    Having considered Mattel, Inc.'s ("Mattel") Motion for Constructive

3  Trust and for a Finding of Liability and Injunctive Relief Pursuant to <u>California</u>

4  <u>Business & Professional Code</u> § 17200, and all other papers and arguments

5  submitted in connection therewith, as well as the evidence admitted at trial and the

6  jury's verdicts in the Phase 1 trial, the Court hereby GRANTS the Motion against

7  MGA Entertainment Inc. ("MGA"), MGA Entertainment (HK) Ltd. ("MGA Hong

8  Kong"), and Isaac Larian ("Larian") (collectively the "MGA Defendants"):

9    1.    A constructive trust in favor of Mattel on all rights to trademarks,

10  service marks and domain names held by MGA or Larian, or any person or entity

11  acting on their behalf or for their benefit, anywhere in the world that include the

12  terms "Bratz" or "Jade," including all such trademark registrations and trademark

13  applications (including, without limitation, United States Trademark Registrations

14  identified by Registration Nos. 3206114, 3327385, 3150045, 3087710, 3055465,

15  3072141, 3127890, 3024713, 2989052, 2911097, 3080450, 2921772, 3071614,

16  2803235, 2848386, 2795675, 2776558, 2848281, 2751890, 2671473, 2787942,

17  2789216 and 2836780 and United States Trademark Applications identified by

18  Serial Nos. 78530196, 78571028, 78706504, 78706502, 78819868, 78857100,

19  78490324, 77443372 and 77575881), and the good will inhering therein, as well as

20  all such domain name registrations, is HEREBY ORDERED and all rights therein

21  are ORDERED transferred to Mattel.

22    2.    MGA and Larian are HEREBY ORDERED to (a) identify all

23  trademark registrations and applications held by them, or any person or entity acting

24  on their behalf or for their benefit, anywhere in the world that include the terms

25  "Bratz" or "Jade," (b) identify all marks that include the terms "Bratz" or "Jade" in

26  which they, or any person or entity acting on their behalf or for their benefit, claim

27  to own trademark rights, whether or not such marks are subject to existing

28  trademark registrations or pending trademark applications, (c) identify all domain

1   names and domain name registrations held by them, or any person or entity acting

2   on their behalf or for their benefit, anywhere in the world that include the terms

3   "Bratz" or "Jade," and (d) execute any and all documents necessary to effect the

4   transfer and/or assignment of such marks and domain names and associated

5   applications and registrations to Mattel.  MGA shall fully comply with (a), (b) and

6   (c) of this paragraph within fourteen (14) calendar days of the date of this Order.

7         3.    The Court HEREBY FINDS that the MGA Defendants violated

8   California Business and Professions Code § 17200 and are liable to Mattel on its

9   twelfth claim for relief for unfair competition.

10         4.    The MGA Defendants, along with their respective officers,

11   directors, principals, agents, representatives, servants, employees, affiliates,

12   successors or assigns, and any person or entity acting on their behalf or in concert or

13   participation with them, are HEREBY PERMANENTLY ENJOINED from (a)

14   using the terms "Bratz" or "Jade," either alone or in combination and whether as a

15   trademark, domain name or otherwise, in connection with the manufacture,

16   promotion, advertising, distribution, offering for sale or sale of any goods or

17   services anywhere in the world and (b) taking any action to preclude Mattel from

18   using the terms "Bratz" or "Jade" in any such manner, including without limitation

19   as a mark in connection with goods and services.

20        **IT IS SO ORDERED.**

21

22   DATED:  December 3, 2008

                                   _Hon. Stephen G. Larson_

23                               United States District Judge

24

25

26

27

28

# EXHIBIT D

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                          Date: December 3, 2008
Title:      MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==========================================================================
PRESENT:    HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

            James Holmes                          None Present
            Courtroom Deputy Clerk                Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                             None Present

PROCEEDINGS:

**ORDER FINDING IN FAVOR OF MATTEL AS TO THE MGA PARTIES' AFFIRMATIVE
DEFENSES**

**ORDER GRANTING MATTEL'S MOTION FOR DECLARATORY JUDGMENT (DOCKET #4303)**

**ORDER GRANTING MATTEL'S MOTION FOR CONSTRUCTIVE TRUST AND § 17200
INJUNCTIVE RELIEF (DOCKET #4305)**

**ORDER GRANTING MATTEL'S MOTION FOR PERMANENT INJUNCTION (DOCKET #4306)**

**ORDER DENYING AS MOOT MOTION TO STRIKE PORTIONS OF HUTNYAN DECLARATIONS
AND EXHIBITS THERETO (DOCKET #4351)**

**ORDER DENYING MOTION TO STRIKE THE PROCTOR, KEISER, AND HOLLANDER
DECLARATIONS (DOCKET #4352)**

**ORDER DENYING AS MOOT MOTION TO STRIKE MEYER DECLARATION (DOCKET #4377)**

**ORDER STAYING COURT'S ORDER PENDING CONSIDERATION OF THE PARTIES' POST-**

MINUTES FORM 90                                   Initials of Deputy Clerk: jh
CIVIL -- GEN                        1

Exhibit D, p. 23

Case 2:04-cv-09049-DOC-RNB Document 5340-2 Filed 05/04/09 Page 25 of 109 Page ID
Case 2:04-cv-09049-SGL-RNB Document 4439 Filed 12/03/2008 Page 2 of 17
#:174239

**TRIAL MOTIONS**

**ORDER SETTING FORTH FURTHER BRIEFING SCHEDULE**

**ORDER REGARDING DISCOVERY MASTER PROPOSALS FOR PHASE 2**

**ORDER REGARDING JOINTLY LODGED LAPTOP COMPUTER**

**ORDER REGARDING SERVICE OF PERMANENT INJUNCTION**

**FILED CONCURRENTLY HEREWITH:**

**(1) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING
DECLARATORY JUDGMENT**

**(2) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING MATTEL'S
MOTION FOR CONSTRUCTIVE TRUST AND FOR FINDING LIABILITY AND INJUNCTIVE
RELIEF PURSUANT TO CAL. BUS. & PROF. CODE § 17200**

**(3) MATTEL'S PROPOSED ORDER (AS MODIFIED BY THE COURT) GRANTING MATTEL'S
MOTION FOR PERMANENT INJUNCTION**

These matters were heard on November 10, 2008, after extensive briefing by the parties.
After a two-phase jury trial, the Court considers certain equitable issues (referred to as Phase 1C
of the trial) and enters the following Order. Filed concurrently herewith are: (1) Mattel's Proposed
Order (as modified by the Court) Granting Declaratory Judgment; (2) Mattel's Proposed Order (as
modified by the Court) Granting Mattel's Motion for Constructive Trust and for Finding Liability and
Injunctive Relief Pursuant to Cal. Bus. & Prof. Code § 17200; and (3) Mattel's Proposed Order (as
modified by the Court) Granting Mattel's Motion for Permanent Injunction.

In reaching the rulings set forth herein, the Court has considered the parties' briefs and
exhibits submitted during Phase 1C of the trial, the arguments of counsel, as well as the entire
record (including the evidence properly submitted in Phase 1A and Phase 1B of the trial) and its
previous Orders.

The Court refers collectively to all defendants herein, including MGA CEO Isaac Larian
("Larian"), as "the MGA parties". MGA Entertainment, Inc., is referred to as "MGAE".

The Court has carefully and deliberately considered the parties' well-presented legal and
equitable arguments, authorities, and evidence concerning the motions identified above. In its
final analysis, the Court finds, as did the jury, that the preponderance of evidence establishes that
Carter Bryant ("Bryant") created and developed the name, the concept, and, together with
Margaret Leahy, the prototypical sculpt for the hugely-successful Bratz brand of female fashion

MINUTES FORM 90
CIVIL -- GEN                                    2                    Initials of Deputy Clerk: jh

dolls while working as an employee of Mattel and while bound by the terms of an Inventions Agreement, which provided that all rights to such property, and the property itself, belong to Mattel. Moreover, the Court further finds, as did the jury, that the preponderance of the evidence establishes that Isaac Larian and MGAE intentionally interfered with Bryant's contractual relations with Mattel, aided and abetted Bryant's breach of fiduciary duty to Mattel, aided and abetted Bryant's breach of his duty of loyalty to Mattel, and unlawfully converted certain property of Mattel. Finally, the Court finds, as did the jury, that the preponderance of the evidence establishes that the MGA parties, in further developing, producing, and marketing its Bratz brand of female fashion dolls, are liable to Mattel for copyright infringement.

## I. The MGA Parties' Affirmative Defenses

Through its "Statement of Position Regarding Phase 1C Issues" (docket #4308), the MGA parties seek the Court's verdict in their favor as to their affirmative defenses of laches, estoppel, and waiver. As set forth below, the Court rules in favor of Mattel, and against the MGA parties as to these three remaining affirmative defenses.[1]

### A.   Laches

Laches is an equitable defense that may bar a claim where a defendant establishes "(1) lack of diligence by the plaintiff, and (2) prejudice to the defendant." Grand Canyon Trust v. Tucson Elec. Power Co., 391 F.3d 979, 987 (9th Cir. 2004). The MGA parties establish neither element.

Because the Court has already found that all the claims asserted against the MGA parties were filed within the applicable limitations periods, the Court starts with the presumption that laches is inapplicable. Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002).

Mattel has not delayed in bringing its claims against the MGA parties. The Court has already found, based on the undisputed evidence, that Mattel had no reason to know of its claims against Bryant until November 23, 2003, and that it had no knowledge of its claims against MGA and Larian until Bryant was deposed approximately a year later on November 4, 2004. MGAE intervened in Mattel's suit against Bryant approximately one month later on December 7, 2004. See Dec. 7, 2004, Stip. & Order (04-9059 docket #36) ("MGA[] believes . . . that it has a significantly protectable interest relating to the subject matter of the action, . . . and that MGA's interest is not adequately represented by the existing parties."). Thereafter, the parties briefed Mattel's motion to remand (filed on December 1, 2004, and denied on March 4, 2005), before a stay was entered in the case on May 20, 2005, pending the Ninth Circuit's consideration of an

---

[1] By advancing only the affirmative defenses of laches, estoppel, and waiver in their Phase 1C brief, the MGA parties have implicitly waived the right to pursue any other affirmative defenses that they have not already expressly waived.

MINUTES FORM 90
CIVIL -- GEN                                    3                    Initials of Deputy Clerk: jh

interlocutory appeal. After MGAE's intervention and before the stay was entered, the parties, including MGAE, engaged in discovery, and the Court considered certain discovery motions, including a motion to compel the deposition of Isaac Larian filed on March 17, 2005. The stay remained in place until after the Ninth Circuit affirmed the Court's denial of the motion to remand; it was lifted on May 16, 2006. Six months later, on November 17, 2006, Mattel sought leave to file its claims against the MGA parties. On this record, the Court finds no lack of diligence by Mattel.

Nor have the MGA parties shown they suffered resulting prejudice. MGAE was permitted to intervene in the lawsuit filed by Mattel against Carter Bryant only one month after it became evident that its rights could potentially be affected, and it did so with the express purpose of protecting its own rights. The other MGA parties have not shown that they suffered any prejudice unique to them or that the intervention by MGAE was not designed to protect their rights.

Moreover, the record does not support the evidentiary prejudice claimed by the MGA parties, and the record is devoid of any expectation-based prejudice (i.e., evidence of what MGA would have done differently had the claims against them been asserted sooner). Indeed, to the contrary, the record reveals that the MGA entities have continued to promote (and profit from) the Bratz brand during the entire pendency of the current litigation.

Because of the presumption that laches will not bar timely claims, and because the Court finds that the MGA parties have failed to establish either element of laches, the Court finds in favor of Mattel as to the affirmative defense of laches.

## B.   Estoppel

For equitable estoppel to preclude Mattel's claims here, the MGA parties must establish four elements:

> (1) [T]he party to be estopped must be apprised of the facts; (2) he
> must intend that his conduct shall be acted upon, or must so act that
> the party asserting the estoppel has a right to believe it was so
> intended; (3) the other party must be ignorant of the true state of facts;
> and (4) he must rely upon the conduct to his injury.

Strong v. County of Santa Cruz, 15 Cal.3d 720, 725 (1975).

The MGA parties cannot establish the first element because, as noted above, the Court has already found, based on the undisputed evidence, that Mattel had no reason to know of its claims against Bryant until November 23, 2003, and that it had no knowledge of its claims against MGA and Larian until Bryant was deposed almost a year later.

The MGA parties have produced no evidence that Mattel intended them to act upon any apparent intention to refrain from asserting any claims against them. To the contrary, MGAE quickly intervened in Mattel's suit against Bryant to protect its interests.

MINUTES FORM 90                                               Initials of Deputy Clerk: jh
CIVIL -- GEN                                   4

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 28 of 109   Page ID
#:174359
Case 2:04-cv-09049-SGL-RNB   Document 4469   Filed 12/03/2008   Page 5 of 17

Moreover, the MGA parties had no basis upon which to rely on Mattel's conduct. As found by the jury, they had superior knowledge regarding Bryant's creation of the Bratz drawings (and the timing of that creation).

Because the Court finds that the MGA parties cannot establish all the elements of estoppel, the Court finds in favor of Mattel as to the affirmative defense of estoppel.

### C.   Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." United States v. King Features Entertainment, Inc., 843 F.2d 394, 399 (1988).

Here, the MGA parties contend that Mattel's tolerance of its employees' "moonlighting" for its competitors was so widespread as to constitute such a relinquishment. Although such implied waivers may be found where a plaintiff's conduct "is so inconsistent with the intent to enforce the right in question as to induce a reasonable belief that such right has been relinquished," Medico-Dental etc. Co. v. Horton & Converse, 21 Cal.2d 411, 432 (1942), no such conduct is present here.

No evidence of record suggests that Mattel tolerated the type of conduct in which Bryant engaged. The Court has previously addressed, and will not belabor here, the distinctions to be made between the limited evidence regarding "moonlighting" in the record and the conduct in which Bryant engaged. The evidence establishes, and the jury found, that while employed by Mattel as a fashion designer, Bryant preliminarily developed designs for and pitched a line of fashion dolls to Mattel's direct competitor. There is no evidence that Mattel has ever tolerated this type of conduct. Instead, several witness testified to their belief that such conduct would result in immediate termination of the offending employees. Indeed, the record is replete with details of the steps taken by Bryant, the MGA parties, and MGA employees to conceal the extent of Bryant's involvement in the Bratz project while he was employed by Mattel.

The Court finds in favor of Mattel as to the affirmative defense of waiver.

### II. Declaratory Relief Motion (docket #4303)

In its motion for declaratory judgment, Mattel seeks, pursuant to its thirteenth cause of action, a declaration of its rights (and the MGA parties' lack of rights) regarding the Bratz-related works, including certain drawings, sculpts, and ideas.[2] Mattel also seeks imposition of a

---

[2]  The parties and the Court are all equally aware that ideas are not copyrightable. However, they are, as set forth in the Court's summary judgment order, assignable under California state law. As noted in the Court's summary judgment order, such an assignment was made by Bryant to Mattel.

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN                          5

constructive trust as to MGA's copyright registrations in certain Bratz drawings. As detailed in the concurrently filed Order, the Court **GRANTS** Mattel's Motion for Declaratory Judgment (docket #4303).

In opposition, the MGA parties contend that the relief sought by Mattel should not be granted because it is preempted by the Copyright Act. The Court rejects this argument. The Court's ruling regarding preemption is set forth in the Court's summary judgment order, which the Court does not here modify.

Declaratory relief is generally granted "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (1984).

Here, considering this legal standard and based on the relationship among the parties, the jury's verdicts, the Court's previous Orders, and the entire record, the Court finds that the declaratory relief sought by Mattel is appropriate.[3]  Concurrently herewith, the Court has entered, as modified, Mattel's proposed order for declaratory relief.

### III.  Motion for Constructive Trust and § 17200 Injunctive Relief (docket #4505)

As set forth more fully in its Motion, Mattel seeks, pursuant to California state law, imposition of a constructive trust over the trademarks "Bratz" and "Jade." Mattel also seeks, pursuant to its twelfth cause of action, a finding that the MGA parties violated Cal. Bus. & Prof. Code § 17200 on the basis of the jury's findings that the MGA parties converted Mattel's property, tortiously interfered by Mattel's contractual relations, and aided and abetted Bryant's breaches of his fiduciary duty and the duty of loyalty. Pursuant to this finding, and in addition to imposition of a constructive trust as to the Bratz and Jade marks, Mattel seeks an injunction prohibiting the MGA parties from using these marks. As detailed in the concurrently filed Order, the Court **GRANTS** Mattel's Motion for Constructive Trust and § 17200 Injunctive Relief (docket #4305).

### A.    Constructive Trust

Cal. Civ. Code § 2223 provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Cal. Civ. Code § 2224 explicitly addresses things gained by wrongful acts: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." The parties agree on the resulting elements, which may be stated as

---

[3]  The appropriateness of the constructive trust remedy is discussed below, in a separate section, but applies equally here.

follows: "(1) the existence of a *res* (property or some interest in property); (2) the right of a complaining party to that *res*; and (3) some wrongful acquisition or detention of the *res* by another party who is not entitled to it. Communist Party v. 522 Valencia, Inc., 35 Cal.App.4th 980, 990 (1995).

Significantly, because the purpose of a constructive trust is to prevent unjust enrichment, enhancement of value is given to the beneficiary of the constructive trust. Haskel Engineering & Supply Co. v. Hartford Acc. & Indem. Co., 78 Cal.App.3d 371, 375 (1978)

Here, the jury found that the MGA parties wrongfully acquired the idea for the name "Bratz" along with the idea and preliminary drawings for a line of fashion dolls. The same is true for the one Bratz character who retained the name given her by Carter Bryant: "Jade."[4]  In addition to wrongfully acquiring them, the MGA parties continue to wrongfully retain them. The MGA parties enhanced the value of the names by acquiring trademark rights to them. California law requires, in this instance, that a constructive trust be imposed as to these marks. Mattel is the beneficiary of the constructive trust and MGA's trademarks in "Bratz" and "Jade" inure to Mattel's benefit.

In making this conclusion, the Court has considered, and rejected, the MGA parties' argument that Mattel has disavowed an intention to seek this remedy or waited too long to seek it. Mattel has conceded that it is not asserting a trademark infringement claim. It cannot, because it has not used the relevant marks in commerce, and one must do so to acquire trademark rights. Conversive, Inc. v. Conversagent, Inc., 433 F.Supp.2d 1079, 1089 (C.D. Cal. 2006) (citing Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1046 (9th Cir. 1999)). However, Mattel has not disavowed its intent to seek a constructive trust over the marks that were created by Bryant, with rights thereto acquired by the MGA parties through registration and use in commerce. This remedy is well within the scope of relief that is sought in Mattel's second amended answer and counterclaims, see SAAC at 73 ¶ 9 (Prayer for Relief) (seeking "imposition of a constructive trust over Bratz, including without limitations registrations and applications for registrations relating thereto made or filed by [the MGA parties] and third parties, and all profits, monies, royalties and any other benefits derived or obtained from [the MGA parties'] exercise of ownership, use, sale, distribution and licensing of Bratz"), and the Court has rejected all timeliness challenges to Mattel's claims.

## B.    § 17200 Violation

The record reveals sufficient evidence of injury-in-fact to Mattel to confer standing upon it to assert its § 17200 claim. Specifically, as testified to by Mattel officers (and acknowledged by MGAE officers and attorneys), Mattel has suffered lost market share as a result of the sales of the Bratz dolls. Moreover, the jury was instructed that "harm" to Mattel was a necessary element of a number of state law claims. See Final Jury Instructions as Given [Phase 1A], docket #4115, at

---

[4]    Bryant's other characters were re-named before they were marketed: Zoe became the now-familiar Cloe, Hallidae became Sasha, and Lupe became Yasmin.

MINUTES FORM 90
CIVIL – GEN                                7                Initials of Deputy Clerk: jh

Instruction Nos. 22, 25-27, and 29 (intentional interference with contractual relations, aiding and abetting breaches of fiduciary duty and the duty of loyalty, and conversion). The jury's finding in favor of Mattel as to those claims necessarily implies a factual finding by the jury as to the specified element of harm to Mattel and, as explained in more detail below, the Court is bound by that implicit factual finding. Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993) (finding that by awarding damages on a specific claim, the jury implicitly found that the plaintiff had proven one particular element of that claim).

As set forth in a previous Order, this claim is only partially preempted by the Copyright Act. The preempted portion of Mattel's § 17200 claim did not survive summary judgment and is not at issue here.

Based on the jury's findings that the MGA parties converted Mattel's property, tortiously interfered with its contractual relations, and aided and abetted Bryant's breaches of his fiduciary duty and the duty of loyalty, the Court finds that the MGA parties also violated Cal. Bus. & Prof. Code § 17200.

## C.      § 17200 Injunctive Relief

Where a Court finds violation of § 17200, it has broad powers to shape appropriate injunctive relief:

> Any person who . . . has engaged . . . in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, . . . as may be necessary to prevent the use or employment by any person of any practice which [either] constitutes unfair competition, . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

Cal. Bus. & Prof. § 17203.

The injunction sought by Mattel's proposed order (as modified by the Court) is necessary to restore to Mattel the property acquired as a result of the MGA parties' unfair competition.

For the reasons set forth above, concurrently herewith, the Court has entered, as modified, Mattel's proposed order for constructive trust and § 17200 injunctive relief.

### IV. Motion for Permanent Injunction (docket #4306)

## A.      Facts Supporting Injunctive Relief

The present motions, to varying degrees, implicate the question of to what extent a Court trying equitable claims is bound by a jury's factual findings related to the same underlying conduct.

Exhibit D, p. 30

The question comes into sharpest focus in Mattel's Motion for Permanent Injunction.

"[W]here legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are based on the same facts, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1473 (9th Cir. 1993) (internal quotation marks and citation omitted). In the absence of an express finding, a court must determine whether implicit factual determinations by the jury can be inferred, and should consult the jury's verdict and the jury instructions to make this determination. Id. (finding, based on an examination of the jury instructions and the jury's verdict awarding damages as to a specific claim, that the jury implicitly found that plaintiff had proven one particular element of that claim).

The Court is certainly aware that the jury returned an award of damages that was far less than that sought by Mattel. Moreover, the Court is aware that a controversy exists as to the actual amount of the jury's verdict. See Mattel's Submission Regarding Email from Juror No. 7 and Request to Recall the Jury, docket #4288 (denied by Order dated September 3, 2008, docket #4295).

MGA has argued that the jury has found that only the so-called "first generation" Bratz dolls were infringing. The jury made no express finding on this issue; the general verdict form they were provided did not request such a detailed finding. Thus, in accordance with Gates, the Court looks to the jury instructions to determine any implicit findings.

The jury was instructed that "Mattel is entitled to recover any profits attributed to the infringement." MGA attempts to equate the $10 million figure awarded by the jury for copyright infringement to the amount of profits related to the first generation Bratz dolls. The difficulty with this "equation" is that it is woefully unbalanced. To be sure, MGA's damages expert presented evidence that the first generation Bratz dolls netted approximately $4 million in profits; had the jury awarded this amount as copyright damages, then the Court might be persuaded that the jury implicitly found that the infringement was limited to the first generation Bratz dolls. But that is not the case. The factual finding advanced by MGA cannot be inferred from the jury award.

In making this ruling, the Court is mindful of the jury's note that queried whether they could find infringement as to the first generation dolls and no other dolls. The Court, without objection from counsel, answered that question affirmatively. Although this note reveals that the jury considered limiting their finding of infringement to the first generation, it does not reveal that they ultimately chose that conclusion. Again, had the jury awarded an amount equal to the amount of profits generated by the first generation Bratz dolls, the Court would find, based on the award and the jury's note, that the jury implicitly found infringement as to the first generation Bratz dolls only.

Alternatively, counsel posited at oral argument, that the jury found that a large portion of the

MINUTES FORM 90
CIVIL -- GEN

9

Initials of Deputy Clerk: jh

Bratz dolls infringed Mattel's copyrights, but only in very minute ways.[5]  Counsel likened the jury's
damage award to a rug that, no matter which way one moved it, simply would not cover the floor.
See Nov. 10, 2008, Tr. at 100-101.  Counsel explained that the jury's findings led to one conclusion
or the other and, regardless of which conclusion was chosen, the jury's finding did not support an
injunction:

> The rug is too small for an injunction, regardless of how you allocate
> that money.  You either come up with a vanishingly small subset of
> infringing products, or you come up with a vanishingly small percentage
> of infringement by all of the products.  And the jury has put that cap for
> us.

Id.  Although colorful, counsel's metaphor is not helpful.  Assuming that the Court would be bound
by a jury's factual finding in a case where only two possible inferences -- both of which would lead
the Court to the same conclusion -- were possible, this is not that case.

Where a jury returns a monetary award based on a particular piece of evidence such as an
expert report, the Court will infer the factual findings that necessarily flow from it.  But where, as
here, the Court and the parties are left to hazard various guesses as to the jury's intentions, the
Court can make no principled inferences and must therefore engage in its own fact-finding.[6]

The Court has carefully examined each of the exhibits attached to the proposed preliminary
injunction, as well as the actual exhibits being stored in Courtroom Four of the U.S. Courthouse in
Riverside, and finds that the dolls depicted in Exs. 3 and 4, and the products depicted in Exs. 5 and
6, are, pursuant to the standard set forth in the Court's Orders dated July 24, 2008, and August 15,
2008, substantially similar to Mattel's registered copyrighted drawings and are embodiments of the
sculpts depicted in Exs. 1 and 2.  In doing so, the Court has first examined the specific expressive
elements of the works at issue and has compared them to those found in the exhibits referenced

---

[5]  This argument was not raised in the opposition papers filed by the MGA parties, and is
rejected for that reason as well.  See Opp. at 21 ("Here, the circumstances clearly show that the
only reasonable conclusion to draw is that the jury's infringement finding was limited to a small
universe of products, specifically the first generation Bratz dolls as clothed and packaged.")
(emphasis added).

[6]  The MGA parties hazard such a guess in their opposition, wherein they attempt to
explain how, in the jury's mind, $4 million in first-generation profits could equate to $10 million total
copyright infringement award: "The jury's decision to award $6 million against MGA[E] (and $10
million total) rather than simply the $4 million] argued by MGA as profits for the first generation
may be due to the jury believing that MGA's proffer of $4 million in profits on nearly $80 million
revenue was a bit low."  Opp. at 21 n.30.  This guessing game illustrates why no factual findings
can be inferred from the jury's copyright infringement award and why the Court is obligated to
make its own factual findings.

Exhibit D, p. 32

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 34 of 109   Page ID
#:174269
Case 2:04-cv-09049-SGL-RNB   Document 4459   Filed 12/03/2008   Page 11 of 17

above, and the Court has then further examined the overall similarity of the expression in various works from the perspective of the ordinary observer. Although the Court recognizes that there are differences between the works, the Court ultimately finds that those dolls and products set forth in the above-referenced exhibits are **substantially similar** to Mattel's registered copyrighted drawings and are embodiments of the sculpts depicted in Exs. 1 and 2. Especially important to the Court's conclusion is the consistency of the particularized expression of the dolls' heads, lips, eyes, eyebrows, eye features, noses, as well as the particularized expression of certain anatomical features relative to others (most notably the doll lips, doll eyes, doll eyebrows, and certain other doll eye features) and de-emphasis of certain anatomical features (most notably the minimalized doll nose and thin, small doll bodies). Also important to the Court is the particularized, synergistic compilation and expression of the human form and anatomy that quite clearly expresses a unique style and conveys a distinct look or attitude, especially as perceived by the intended consumer market (7-12 year old girls). The evidence on this latter point is particularly compelling, supported by both analytical and market analysis. Together, these features clearly give each of the dolls the particularized expression to which the Court referred in its July 24, 2008, and August 15, 2008, Orders.

**B.    Standard for Awarding Permanent Injunctive Relief**

The Supreme Court recently announced the standard for granting a permanent injunction:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

**1.    Irreparable Injury**

The Court begins, then, by looking to whether Mattel has established that it will suffer irreparable injury if an injunction is not granted.

Prior to the eBay decision, where a plaintiff sought a preliminary injunction, irreparable injury was presumed in intellectual property cases; in light of the eBay decision, some doubt has been cast on whether courts should continue to apply that presumption. See Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 702 (Fed. Cir. 2008) (noting that the continuing viability of the presumption is "an open question").

Mattel has established its exclusive rights to the Bratz drawings, and the Court has found

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

that hundreds of the MGA parties' products -- including all the currently available core female fashion dolls Mattel was able to locate in the marketplace -- infringe those rights. The MGA parties have evinced an intention to continue marketing those dolls. This represents a wholesale inability on the part of Mattel to enforce its exclusive rights under the Copyright Act, amounting to irreparable harm. <u>Taylor Corp. v. Four Seasons Greetings, LLC</u>, 403 F.3d 958, 968 (8th Cir. 2005).

MGA criticizes Mattel's reliance on <u>Taylor</u>, citing <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 518 F.Supp.2d 1197, 1211 n.13 (C.D. Cal. 2007) (Wilson, J.). The <u>Grokster</u> case holds that, in copyright permanent injunction cases, a presumption of irreparable injury is not permitted in light of <u>eBay</u>. In <u>Grokster</u>, the court rejected the rationale of <u>Taylor</u>, stating:

> [T]his Court is not persuaded by the Eighth Circuit's pre-<u>eBay</u> conclusion in <u>Taylor Corp. v. Four Seasons Greetings, LLC</u>, 403 F.3d 958, 968 (8th Cir. 2005), that because "[a plaintiff] certainly has the right to control the use of its copyrighted materials, . . . irreparable harm inescapably flows from the denial of that right." In substance, such language is nothing more than a disguised presumption, particularly with the use of the word "inescapably." After <u>eBay</u>, Plaintiffs cannot rely on the pure fact of infringement in order to establish irreparable harm.

<u>Grokster</u>, 518 F. Supp.2d at 1211 n.13. Judge Wilson's point is well-taken. Although the <u>Taylor</u> court did not purport to apply a presumption of irreparable harm, its use of the word "inescapably" in this phrase certainly could indicate that it was merely presuming irreparable harm. However, a review of the <u>Taylor</u> case makes clear that the Eighth Circuit considered the implications of allowing an infringer to continue to infringe: "[I]n copyright infringement actions, the denial of a request for injunctive relief could otherwise "amount to a forced license to use the creative work of another." <u>Taylor Corp.</u>, 403 F.3d at 967-68. This rationale removes <u>Taylor</u> further from the application of a "disguised presumption" of irreparable harm and closer to an actual finding of irreparable harm.

At least one district court within the Ninth Circuit is in accord with the Court's decision today, as it has decided, post-<u>eBay</u>, that a plaintiff who establishes past infringement and the threat of future infringement amounts to irreparable harm. <u>Designer Skin, LLC v. S & L Vitamins, Inc.</u>, 2008 WL 4174882 at *5 (D. Ariz. 2008) (Teilborg, J.). Judge Teilborg's rationale is well articulated:

> Whatever else might be said against the propriety of a rule that holds that past infringement plus the threat of future infringement equals irreparable harm, it seems clear to this Court that such a rule would not run afoul of <u>eBay</u>'s directives. First of all, the <u>eBay</u> Court did not address the showing necessary to establish "irreparable harm." It merely held that the plaintiff has the burden of proving it. Second, this two-part test does not resurrect the presumption of irreparable harm impliedly laid to rest by the <u>eBay</u> court. It simply recognizes that a

MINUTES FORM 90                                                    Initials of Deputy Clerk: jh
CIVIL -- GEN                                12

> plaintiff meets the burden of proving irreparable harm by making this
> two-part showing. And finally, the two-part test does not represent a
> rule [prohibited by eBay] that an injunction automatically follows a
> determination that a copyright has been infringed. . . . In exercising
> their equitable discretion, courts would still have the freedom to deny
> injunctive relief when the public interest or the balance of hardships
> weighs against such relief.

Designer Skin, 2008 WL 4174882 at *5 (citation omitted).

Indeed, this is not so complex an issue as applied to the facts of this particular case. The statutory directive to the Court is clear: "Any court having jurisdiction of a civil action arising under this title may, . . . grant temporary and final injunctions on such terms as it may deem reasonable *to prevent or restrain infringement of a copyright*." 17 U.S.C. § 502 (emphasis added). The Court can envision no case more appropriate for a finding of irreparable harm. Here, as the record shows and as the jury found, an employee bound by contract and fiduciary duty to communicate to his employer (and keep confidential from all others) all copyrightable works he creates during the term of his employment, not only fails to so communicate but actually secretly purports to convey the rights thereto to a direct competitor of his employer. The rights to those works are actively concealed from their true owner (by both the employee and the competitor) for years while the competitor exploits the works, reaping profits therefrom totaling hundreds of millions of dollars. After millions of pages of discovery are produced, thousands of filings are submitted, scores and scores of motions are decided by the Court, and after months of trial and two jury verdicts in favor of the plaintiff, defendants remain steadfast in their intention to continue to produce their infringing products. Viewed in this light, Mattel has established irreparable injury on the basis of the MGA parties' past infringement and the high probability of continued acts of infringement.

## 2.   Inadequate Legal Remedies

Unless MGA is enjoined, Mattel would be forced to sue each retailer and distributor to stop the sale and distribution of the infringing dolls; therefore, the legal remedies are inadequate. See Continental Airlines, Inc. v. Intra Brokers, Inc., 24 F.3d 1099, 1105 (9th Cir. 1994).

## 3.   Balance of Equities

Factually, the hardship on MGA weighs very heavily upon the Court. The Court has expressed its concerns in this regard on the record. The evidence at trial showed that, at least historically, Bratz is the brand that has made MGA profitable. And the proposed injunction addresses the core of that brand -- most notably, the female fashion dolls.

However, where, as here, the only hardship that will be suffered is lost profits from the cessation of its infringing activities, the Court, in the final analysis, must afford this very little -- if any -- weight. Triad Systems Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has

MINUTES FORM 90
CIVIL -- GEN                                        13                Initials of Deputy Clerk: jh

Exhibit D, p. 35

been shown likely to be infringing, such an argument in defense merits little equitable consideration
. . . .") (internal quotation marks and citations omitted), accord, Cadence Design Systems, Inc. v.
Avant! Corp., 125 F.3d 824, 829-30 (9th Cir. 1997) (collecting cases). The balance of equities
favor Mattel.

### 4.    Public Interest

There is a strong economic interest, especially in these troubled economic times, in
maintaining a profitable enterprise as a going concern. However, there is also a strong public
interest in enforcing copyright laws in a uniform manner. Indeed, nothing is more essential to long-
term economic prosperity than the stability provided by the rule of law. Although the MGA parties
raise excellent points in their opposition, in the end, the public interest is served by precluding
defendants from engaging in copyright infringement. The injunction issued by the Court does no
more than that.

### C.    Scope of Injunction

The scope of the permanent injunction is set forth in a separate order. Four issues raised in
the parties' papers warrant the brief discussion that follows.

### 1.    Impoundment and Destruction

As set forth more fully in its motion, Mattel seeks impoundment of Bratz dolls and
destruction of the specialized plates, molds, and matrices used to make them. Impoundment of
existing infringing products and the destruction of the means to make those products are clearly
remedies contemplated by the Copyright Act. See 17 U.S.C. § 503(a). The MGA parties argue
that these remedies are inappropriate because there is no ongoing infringement or, at the very
least, its products infringe very little. In its findings supporting the issuance of a permanent
injunction, the Court has rejected this premise, and the Court finds that the requested
impoundment and destruction is an appropriate remedy.[7]

### 2.    Recall

In light of the scope of infringement found by the Court, and in light of the fact that the
injunction addresses products that directly compete with Mattel's products, the Court has ordered
the recall of infringing products from retailers. See CyberMedia, Inc. v. Symantec Corp., 19
F.Supp.2d 1070, 1079 (N.D. Cal.1998); Patry on Copyright, § 22:81.

---

[7]   No party shall destroy any of the implements used to make the Bratz dolls that are the
subject of the permanent injunction absent a specific order of this Court authorizing such
destruction.

MINUTES FORM 90
CIVIL -- GEN                           14                    Initials of Deputy Clerk: jh

### 3. Royalty

The MGA parties argue that the more appropriate remedy to be imposed here is for the Court to order a royalty instead of an injunction. The difficulty in this proposal is that it is premised on the idea that the ongoing infringement, if any, is minute. See Opp. at 29-32 (suggesting a royalty of .3% would be appropriate). As noted above, the Court has rejected this premise. Moreover, although the Court has been hopeful that an out-of-court resolution involving such a remedy may have been obtained, and has gone to great lengths to encourage both sides to pursue such a resolution in good faith, their failure so far to do so underscores the Court's present view, which is based on the evidence and argument of record, that the hostility between these parties is such that this form of remedy is unworkable.

### 4. Appointment of a Special Master

Mattel suggests that the Court appoint a special master to "monitor implementation of the relief granted by the Court." Motion at 28. The MGA parties have not indicated their position on this issue. The appointment of a special master to monitor implementation of the permanent injunction is warranted; this task could easily overwhelm the Court's resources. Subject to the Court's consideration of any in camera objections submitted to the Court by the parties, the Court will select a Special Master from the list submitted below.

### V. Motion to Strike Portions of Hutnyan Declarations and Exhibits Thereto (docket #4351)

The MGA parties move to strike certain evidence offered by Mattel on the issue of harm suffered by Mattel, contending the evidence is inadmissible. This motion is **DENIED AS MOOT.** Although Mattel has offered additional evidence of harm, the Court has found the evidence of harm to Mattel offered during Phases 1A and 1B sufficient to resolve the issues presented in the current motions.

### VI. Motion to Strike the Proctor, Keiser, and Hollander Declarations (docket #4352)

The motion is **DENIED** as to the Proctor declaration. The declaration is a helpful presentation of appropriate argument and/or observations of counsel for the Court's consideration.

The motion is **DENIED** as to the Keiser declaration. The Keiser declaration authenticates two-dimensional depictions of three-dimensional models he scanned using a sophisticated scanning machine.

The motion is **DENIED** as to the Hollander declaration. This declaration was the subject of extensive briefing in MGA's motion in limine 8, which the Court has reviewed. Hollander's declaration, which presents survey evidence of the target market, is relevant to application of the

MINUTES FORM 90
CIVIL -- GEN
                                        15                          Initials of Deputy Clerk: jh

intrinsic test. The Court, in fact, instructed the jury to consider how girls 7 to 12 would view the Bratz dolls. Hollander's survey attempts to determine just that. The Court has considered the methodological flaws pointed out by MGA in weighing the evidence Hollander presents.

## VII. Motion to Strike Meyer Declaration (docket #4377)

Mattel moves to strike the Meyer declaration. This motion is **DENIED AS MOOT**. This declaration sets forth a calculation justifying the proposed .3% royalty. The Court has rejected the proposal that a royalty be imposed.

## VIII. Stay of this Order

This Order, and the three concurrently filed orders, are stayed pending the Court's consideration of the parties' post-trial motions. This stay shall remain in place until lifted by further Order of this Court.

## IX. Briefing Schedule for Post-Trial Motions

Notwithstanding the Court's earlier order, the motions referred to in ¶ 3 of the Court's September 2, 2008, Order may be filed no later than December 22, 2008. Response briefs may be filed no later than January 12, 2009. Replies may be filed no later than January 19, 2009. A hearing on this matter is set for Wednesday, February 11, 2009, at 10:00 a.m., in Courtroom One of the above-referenced Court.

## X. Discovery Master Proposals for Phase 2

The Court previously stated that it would submit for counsel's consideration the names of potential Discovery Masters for Phase 2 that possess both the resources to handle the scope of the anticipated discovery disputes as well as the personal confidence of this Court. The Discovery Master would serve pursuant to the same terms and conditions of the Phase 1 Discovery Master. In addition, as noted above, the Court also intends to appoint a Special Master to oversee implementation of the permanent injunction. The Court provides for counsels' consideration the following individuals who meet the Court's requirements, and have indicated to the Court a willingness and an ability to serve in one or both of these roles. Counsel are directed to file any objections to any or all of the proposed Masters on or before December 22, 2008. Any such objections are to be submitted *in camera* and under seal with the Court. After considering any objections, as well as any preferences expressed by the parties, the Court will make an appointment at the appropriate time.

MINUTES FORM 90
CIVIL -- GEN                                   16                    Initials of Deputy Clerk: jh

Exhibit D, p. 38

Patrick A. Fraioli, Jr.
Moldo Davidson et al LLP
2029 Century Park East, 21st Fl.
Los Angeles, CA  90067
310-551-3100
pfraioli@mdfslaw.com

Jan L. Handzlik
Howrey LLP
550 S. Hope Street, Suite 1100
Los Angeles, CA  90071
213-892-1802
handzlikj@howrey.com

Kendall H. MacVey
Best Best & Krieger LLP
P.O. Box 1028
Riverside, CA  92502-1028
951-686-1450

David G. Moore
Reid & Hellyer
P.O. Box 1300
Riverside, CA  92502
951-682-1771
dmoore@rhlaw.com

Robert C. O' Brien
Arent Fox LLP
555 W. 5th Street, 48th fl.
Los Angeles, CA  90013
213-629-7400
obrien.robert@arentfox.com

C. Michael Zweiback
Alston & Bird LLP
333 S. Hope Street, 16th Fl.
Los Angeles, CA  90071
213-576-1000
michael.zweiback@alston.com

## XI. Jointly Lodged Laptop Computer

The Court is in possession of a jointly lodged laptop computer used to access the Phases 1A and 1B trial transcripts maintained by the parties.  The Court will retain possession of the laptop computer until after its ruling on the motions referred to in section IX, above, and the parties are directed to follow the procedure outlined in the Court's September 9, 2008, Order regarding the e-filing of excerpts of transcripts cited in their anticipated motions.

## XII. Service of Permanent Injunction

The service of Mattel's proposed permanent injunction by the Clerk presents challenges given the limited resources of the Court.  The permanent injunction, for reasons explained by Mattel on the record, attaches to it approximately 900 color copies.  Accordingly, although the Court directs the Clerk to serve on all parties a copy of the permanent injunction, the Court directs Mattel, no later than ten days after the entry of this Order, to serve a copy of the permanent injunction, together with the color exhibits, on all parties.

**IT IS SO ORDERED.**

Exhibit D, p. 39

# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                    Date: January 7, 2009

Title:    MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==============================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

        Jim Holmes                          None Present
        Courtroom Deputy                    Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:    ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                          None Present

PROCEEDINGS:  **ORDER MODIFYING STAY OF PERMANENT INJUNCTION**

**ORDER APPOINTING FORENSIC AUDITOR**

        After an initial hearing on December 30, 2008, and a sealed hearing on January 5, 2009,
and after consideration of the parties' papers relating to the MGA parties' motion for stay pending
appeal (which specific relief the Court denied for the reasons stated on the record), and after
consideration of the parties' papers relating to Mattel's ex parte application to appoint a receiver,
the Court issues the following Order modifying the stay set forth in the Court's December 3, 2008,
Order, and appointing a forensic auditor.

**MODIFYING STAY OF PERMANENT INJUNCTION**

        Notwithstanding any previous Order of the Court, the December 3, 2008, Order Granting
Mattel, Inc.'s Motion for Permanent Injunction (docket #4439), shall remain **STAYED**, ineffective
and non-final, until further order of the Court.  Specifically, retailers and distributors will be
permitted to purchase the Spring and Fall 2009 lines of Bratz and Bratz-related products from
MGA and MGA licensees, up to and including December 31, 2009.

        In the event that the Court awards control over the rights to the Bratz products referenced in
the Court's December 3, 2008, Order and the January 7, 2009 Stipulation and Order (regarding

MINUTES FORM 90                                        Initials of Deputy Clerk __jh_____
CIVIL -- GEN                           1

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 43 of 109   Page ID
#:174271
Case 2:04-cv-09049-SGL-RNB   Document 4657   Filed 01/07/2009   Page 2 of 10

the Spring and Fall 2009 lines) to a Court-appointed receiver or to Mattel, Inc., that award will be subject to a requirement that retailers and distributors be permitted to purchase the Spring and Fall 2009 lines up to and including December 31, 2009.

## APPOINTMENT OF FORENSIC AUDITOR

As discussed on the record, the Court **HOLDS IN ABEYANCE** Mattel's ex parte application for appointment of a receiver pending a forensic audit of MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong.

For good cause shown, the Court hereby **APPOINTS** Ronald L. Durkin to serve as the Court's forensic auditor (hereinafter referred to as "the Auditor"). Mr. Durkin's qualifications appear in an attachment to this Order. The Court has provided the Auditor with the parties' attorneys' contact information. The Auditor shall direct his initial communications to counsel.

Defendants MGA Entertainment, Inc., Isaac Larian, and MGA Entertainment Hong Kong, shall provide the Auditor with access to any and all MGA records, regardless of the medium or media of the maintenance of those records, **including but not limited to the "Document/Information Request List" attached to this Order,** that the Auditor deems necessary to enable him to provide the Court with a report, in camera, regarding MGA's finances sufficient to enable the Court to determine whether or not appointment of a receiver is warranted. The audit shall extend to any and all related entities as the Auditor deems necessary. Defendants shall also make available for interview individuals identified to them by the Auditor. Defendants shall make its computer systems, physical premises, and offices, available to the Auditor upon his reasonable request during normal business hours. Defendants shall permit the Auditor's reasonable use of its office machines, such as copiers and fax machines, as may be necessary to complete the audit.

The Auditor shall have the authority to seek the services of fellow professionals (as well as para-professionals and support staff) necessary to accomplish the Court-appointed audit. The provisions of this Order extend to the Auditor's delegatees as he so directs. The Auditor and his delegatees shall be compensated at their reasonable customary hourly rates.

The expense of the forensic audit shall be borne, in the first instance, by Mattel. After the Court considers the Auditor's report[s], the Court will consider whether the audit expenses should be shared with, or shifted completely to, defendants, based on the equities. The Auditor and his team shall submit periodic billing statements to Mattel to an address specified by Mattel's counsel.

All parties (and individuals and entities under their control) shall cooperate with the Auditor so that he may report to the Court in an expeditious manner.

**IT IS SO ORDERED.**

MINUTES FORM 90                                      Initials of Deputy Clerk __jh_____
CIVIL -- GEN                        2

Exhibit E, p. 41

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 44 of 109   Page ID
#:174262
Case 2:04-cv-09049-SGL-RNB   Document 4667   Filed 01/07/2009   Page 3 of 10

**FORENSIC AUDITOR**
**DOCUMENT/INFORMATION REQUEST LIST**
**January 7, 2009**

1.      Audited financial statements for the last three years.  If audited financial statements are not available, then the most current draft of financial statements for the last three years.

2.      Quarterly financial statements for the last three years.

3.      Detailed electronic monthly general ledgers and trial balances for the last three years. If electronic files are not available, then please produce in hard copies.

4.      Detailed electronic revenue or sales subsidiary ledgers for the last three years.  If electronic files are not available, then please produce the request in hard copies.

5.      Detailed electronic receipts or cash subsidiary ledgers for the last three years.  If electronic files are not available, then please produce in hard copies.

6.      Detailed electronic accounts payables and disbursements subsidiary ledgers for the last three years.  Details should include, but should not be limited to, vendor/payee ID, vendor/payee name, check/payment number, payment date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), payment amount, currency indicator (if other than US dollars), foreign exchange rate (if other than US dollars), invoice number, invoice date (Standard Mask, i.e. MM/DD/YY, MM/DD/YYYY; not Jan 1, 2005), invoice amount, comment or description, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

7.      Detailed electronic vendor master files of all active and inactive vendors for the last three years.  Details should include, but not be limited to, vendor ID, vendor name, status (active/inactive), vendor address (including City, State, Zip, Country), date created, created by user ID.  If electronic files are not available, then please produce in hard copies.

8.      Detailed electronic payroll files for the last three years. Details should include, but not be limited to, employee ID, employee name, payment date, payment number, deductions (e.g. tax, contributions, etc.), gross payment amount, net payment amount, and any other information contained in the file.  If electronic files are not available, then please produce in hard copies.

9.      Any and all records that substantiate transfers of assets to other entities, individuals, and/or parties, within the US and outside of the US.

10.     Copies of all bank statements, canceled checks, wire instructions, and all other information and notices sent with bank statements for the last three years.

MINUTES FORM 90                                    Initials of Deputy Clerk ___jh_____
CIVIL -- GEN                          3

**Exhibit E, p. 42**

11. Federal and state tax returns for the last three years.

12. A summary of all contributions, loans and any sources of funding during the last twelve months. Copies of agreements and/or contracts supporting these transactions.

13. A summary of all related party transactions detailing any compensation, loans, advances, payments, fees or any other form of consideration paid to Isaac Larian, family members, or affiliates, or any other related party.

14. Detail of all loan facilities with an indication of creditor and relevant terms.

15. Copies of any notices from federal or state tax authorities regarding audits or audit adjustments during the last 3 years.

16. All detailed corporate credit card statements for the last three years. If electronic files are not available, then please produce in hard copies.

17. Information and documents regarding expense reimbursement of owners, officers, employees, family members, or affiliates.

18. Detailed human resources files (electronic) of all employee information (for all current and terminated employees to date) including but not limited to employee name, employee number, address, phone number, start date, termination date, status, position, social security number, and any other information contained in the files. If electronic files are not available, then please produce in hard copies.

19. Electronic files of all emails including attachments to the emails from the network server and from backup tapes (please identify dates of backup tapes in order for selection of time period).

20. Forensic images of personal computer hard drives and PDAs of selected individuals.

Exhibit E, p. 43





Ronald L. Durkin
CPA/CFF, CFE, CIRA

## Senior Managing Director

619 481 5201

rdurkin@durkinforensic.com

701 B Street Suite 1310
San Diego, CA 92101

Ronald L. Durkin is a CPA with over 30 years combined experience in public accounting and as a Special Agent with the FBI. He has testified in accounting, financial, and bankruptcy matters in U.S. District Court, U.S. Bankruptcy Court, U.S. Tax Court and in various State courts. During his tenure with the FBI, Ron was responsible for investigations involving white collar crime, political and public corruption, money laundering, organized crime, labor racketeering, racketeer-influenced and corrupt organization statute (RICO) violations, and narcotics matters. Since leaving the FBI, he has assisted clients in matters involving fraud prevention, detection, and internal investigations. He has worked on cases involving Foreign Corrupt Practices Act, employee embezzlement, management fraud, financial statement fraud, conflict-of-interest, check kiting, bankruptcy fraud, money laundering, and Ponzi schemes.

In 2008 Ron retired from KPMG. While at KPMG, Ron was the National Partner in Charge of the Fraud and Misconduct Investigations practice and served as the Western Region's forensic practice leader as well as the office coordinating partner for the Los Angeles office's forensic practice.

**Exhibit E, p. 44**



## Service Lines

Fraud & Misconduct Investigations
Fraud Risk Management
Forensic in the Audit/Shadow Procedures

## Education and Certifications

Bachelor of Science, Accounting,
California State University, Sacramento

Masters of Business Administration
(Emphasis in Accounting), California
State University, Sacramento

Certified Public Accountant,
licensed in California, Arizona,
Nevada, and Washington

Certified in Financial Forensics

Certified Fraud Examiner

Certified Insolvency and
Restructuring Advisor

He is a frequent speaker at the FBI Academy and at the AICPA National Fraud Conference, California and other State CPA Societies, and he has made presentations to the IRS Criminal Investigative Division and the U.S. Postal Inspectors CPA seminars. He is a member of the AICPA National Accreditation Commission and a former member of the Business Valuation and Forensic Litigation Services Executive Committee. He is the former chair of the AICPA Anti-Fraud Programs and Controls Task Force and past chair of the AICPA Litigation and Dispute Resolution Services Subcommittee. Ron is also the Chair of the California Society of CPA's Litigation Services Steering Committee and the past Chair of the California Society of CPAs Fraud Section.

Ron was a 2003 AICPA Volunteer of the Year. Ron was also honored with the Distinguished Achievement Award by the AICPA in 2006 for his long time commitment to the AICPA. In 2007, Ron was awarded the first-ever FLS Lifetime Achievement Award by the AICPA.

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 48 of 109   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4067   Filed 01/07/2009   Page 7 of 10
#:174266



| **Professional Associations** | **Investigative and Integrity Advisory Experience** |
|---|---|

American Institute of Certified Public Accountants (Immediate Past Chair of Litigation & Dispute Resolution Services Subcommittee) – member since 1995

On an International level, he has worked on a number of matters involving alleged Foreign Corrupt Practices Act (FCPA) violations. Working on behalf of U.S. based companies, Ron investigated allegations that members of management of foreign subsidiaries were involved in either bribing foreign officials, diverting corporate opportunities and funds, or conspiring with others to defraud U.S. based victims.

California Society of Certified Public Accountants (member of Steering Committee for statewide Litigation Services Sections and Chair of Fraud Section)

Conducted an investigation of certain allegations of political and public corruption surrounding an international sporting event that was to be held in the US. The allegations involved FCPA, bribery, and public corruption.

Association of Certified Fraud Examiners (Member of Faculty since 1995)

Conducted an investigation of an alleged kickback scheme on the part of a purchasing manager of a global technology company.

Association of Insolvency and Restructuring Advisors

Society of Former Special Agents of the FBI

Conducted an internal investigation with a multi-national corporation regarding corruption involving a former manager in the accounts receivable department. The case was referred to the United States Attorney's Office and the FBI for prosecution.

Institute of Internal Auditors

**Exhibit E, p. 46**



Conducted an internal investigation, on behalf of a publicly traded company, regarding alleged diversion of funds with the accounts payable department. The case was referred to the United States Attorney's Office and the FBI for prosecution.

Investigated allegations of fraud in the real estate industry, including new construction projects, as well as management and operation of office buildings, apartment buildings and shopping centers.

Investigated allegations of corruption by certain members of a County Board of Supervisors who were indicted by a Federal Grand Jury.

Served as an undercover agent in a case involving 35 State Court judges who were indicted and convicted of public corruption.

Conducted a number of investigations of cases involving Pyramid and Ponzi schemes. He also has testified in U.S. District Court, State Court, and Bankruptcy Court in several of these cases.

During career with the FBI and as a bankruptcy trustee, investigated allegations of fraud, corruption and organized crime within the solid waste industry.



As the Chapter 11 Trustee of two failed insurance agencies,
he conducted investigations into allegations of fraud and mis-
management on the part of senior management.

As a Chapter 7 Trustee, Chapter 11 Trustee, and Examiner in
bankruptcy matters, has conducted hundreds of investigations
where allegations of fraud have been alleged.

Served as a "keeper" for the Department of Corporations,
investigated a State securities fraud matter.

Served as trustee of the parent of one of the largest financial
institutions in California where securities fraud and other ac-
tions were alleged against senior management.



## **Publications**

One of the principal authors of the AICPA Practice Aid 07-1 – "Forensic Accounting – Fraud Investigations" (2007)

Chair of the AICPA Forensic Procedures Task Force responsible for the writing of the "Forensic Procedures and Specialists: Useful Tools and Techniques" – AICPA Special Report, 2006

Chair of the AICPA Antifraud Programs and Controls Task Force responsible for the writing of "Management Override of Internal Controls: The Achilles' Heel of Fraud Prevention" – AICPA Practice Aid, 2005

Principal author – AICPA Technical Consulting Practice Aid 97-1 "Fraud Investigations in Litigation and Dispute Resolution Services"

Co-author – California Society of CPA "The Witness Chair" – SAS 99 – Is It Enough To Help Close the Expectation Chasm? (2003)

Author – "A Systematic Approach to Fraud Investigation" – The CPA Expert, Spring 2000 (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Co-author – "Defining the Practice of Forensic Accounting" The CPA Expert, 1999 Special Issue (AICPA Newsletter for providers of Business Valuation and Litigation Services)

Contributing and Reviewing author to Guide to Fraud Investigations published by Practitioners Publishing Company

Contributing author to Handbook of Litigation Services for John Wiley and Sons. The chapter written by Mr. Durkin is entitled "Criminal Cases and the Investigative Accountant."

Book review of Investigating White Collar Crime: Embezzlement and Financial Fraud for "CPA Management Consultant".

# EXHIBIT F

Case 2:04-cv-09049-DOC-RNB  Document 5340-2  Filed 05/04/09  Page 53 of 109  Page ID
Case 2:04-cv-09049-SGL-RNB  Document 5273  Filed 04/27/2009  Page 1 of 25
#:174261

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                    Date: April 27, 2009
Title:     MATTEL, INC. V. MGA ENTERTAINMENT, INC., et al.
==================================================================
PRESENT:  HONORABLE STEPHEN G. LARSON, U.S. DISTRICT JUDGE

        Cindy Sasse                          None Present
        Courtroom Deputy                     Court Reporter

ATTORNEYS PRESENT FOR                    ATTORNEYS PRESENT FOR
PLAINTIFFS:                              DEFENDANTS:

None Present                             None Present

PROCEEDINGS:   **ORDER DENYING MATTEL'S MOTION FOR JUDGMENT AS A
               MATTER OF LAW (DOCKET #4498)**

                **ORDER GRANTING IN PART AND DENYING IN PART MGA'S
               MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET
               #4496)**

                **ORDER AMENDING IN PART ORDER RE FINDING OF
               LIABILITY PURSUANT TO CAL. BUS. & PROFS. CODE § 17200
               (DOCKET #4441);**

                **ORDER GRANTING IN PART AND DENYING IN PART MGA'S
               MOTION FOR REMITTITUR (DOCKET #4495, #4523)**

                **ORDER LIFTING STAY ON PERMANENT INJUNCTION (#4443)**

                **ORDER FOR ACCOUNTING OF PROFITS OF
               BRATZ PRODUCTS**

                **ORDER REGARDING RETRIEVAL OF PREVIOUSLY LODGED**

MINUTES FORM 90                                  Initials of Deputy Clerk __cls_____
CIVIL -- GEN                      1

Case 2:04-cv-09049-DOC-RNB  Document 5340-2  Filed 05/04/09  Page 54 of 109  Page ID
#:174323
Case 2:04-cv-09049-SGL-RNB  Document 5273  Filed 04/27/2009  Page 2 of 25

LAPTOP COMPUTER WITH PHASE 1A AND 1B TRIAL
TRANSCRIPT

ORDER REGARDING UNSEALING OF DOCUMENTS FILED
UNDER SEAL FROM MAY 28, 2008, THROUGH FEBRUARY 11,
2009

ORDER RE PHASED, UNDER SEAL RELEASE OF FORENSIC
AUDITOR'S REPORT TO COUNSEL AND PARTIES

ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO INTERVENE (DOCKET #4761)

ORDER APPOINTING TEMPORARY RECEIVER

ORDER SETTING HEARING ON APPOINTMENT OF
PERMANENT RECEIVER

## I. MATTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW
(DOCKET #4498)

A motion for judgment as a matter of law after trial is granted only when there is
not a "legally sufficient evidentiary basis [for a reasonable jury] to find for that party on
[an] issue." Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002). Sufficient evidence is
"evidence adequate to support the jury's conclusion, even if it is also possible to draw a
contrary conclusion." Id.

Mattel, Inc. ("Mattel") moves for judgment as a matter of law on the issue of the
scope of infringement of the Bratz dolls. Specifically, Mattel argues that "[e]ach core
Bratz fashion doll sold by MGA infringes Mattel's copyrights." Motion at 4. Mattel
acknowledges that the judgment it seeks would alter neither the jury's damages award
nor the Court-awarded equitable relief; however, Mattel seeks this judgment as an
alternative basis for the relief it has already been awarded. Without ruling on the merits
of the argument, the Court declines to adopt this alternative basis because it is not
necessary to support the relief awarded to Mattel. The jury, in the Phase 1B verdict,
found that the Bratz dolls infringed Mattel's copyrights, but the scope of that
infringement was not explicitly found by the jury. Even if the Court were to grant the
relief sought by Mattel, the amount the jury awarded for copyright infringement, $10
million, would be unchanged. Moreover, the Court, sitting in equity, made an express
factual finding, set forth more fully in its December 3, 2008, Order that the core Bratz
fashion dolls infringed Mattel's copyrights. This portion of Mattel's motion is therefore
**DENIED**.

MINUTES FORM 90
CIVIL -- GEN                                    2                  Initials of Deputy Clerk __cls_____

In a similar fashion, Mattel seeks judgment as a matter of law on the issue that sculptor Margaret Leahy's contributions cannot, as a matter of law, support a claim of independent creation of the Bratz fashion doll sculpt, TX 1136A.[1]  In Phase 1A of the trial, the jury found that the sculpt was "'conceived or reduced to practice' -- that is, created -- by Carter Bryant, alone or jointly with others," during his employment with Mattel.  Phase 1A Verdict Form at 5.  This finding, when viewed in conjunction with the Court's summary judgment order, was sufficient to place the sculpt within the assignment clause of the Inventions Agreement which, in turn, conferred the rights to the sculpt to Mattel.  Therefore, as with the previous issue, this judgment is sought merely as an alternative basis for the relief Mattel has been awarded, which the Court, without deciding the merits, declines to adopt.  This portion of Mattel's motion is therefore similarly **DENIED**.

Finally, Mattel seeks judgment as a matter of law that both Isaac Larian and MGA HK engaged in acts of fraudulent concealment.  As to Isaac Larian, although there was evidence suggesting that he engaged in a cover-up as to *who* created Bratz (and later, as to *when* Bratz was created), he testified at trial that he did nothing to keep Carter Bryant's *role* in the creation of Bratz hidden.  Even in the face of evidence to the contrary, the jury could have believed him; thus, judgment as a matter of law on this point is not appropriate.  Credibility determinations are for the jury, and the jury could have made this credibility determination in favor of Isaac Larian.  Winarto v. Toshiba America Electronics Components, Inc., 274 F.3d 1276, 1294 (9th Cir. 2001).  As for MGA HK, Mattel did not cite any evidence that suggests that MGA HK should be found to have fraudulently concealed the basis for Mattel's claims, and therefore judgment as a matter of law is not appropriate.  This portion of Mattel's motion is therefore also **DENIED**.

For the reasons set forth above, Mattel's Motion for Judgment as a Matter of Law is **DENIED** in its entirety.

## II. MGA'S MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET #4496)

The MGA parties[2] seek judgment as a matter of law that federal copyright law

---

[1]  For their part, the MGA parties seek judgment as a matter of law of the mirror image of Mattel's claim; specifically, as discussed more fully below, the MGA parties seek judgment as a matter of law that Margaret Leahy's contribution to the creation of the sculpt amounted to independent creation.

[2]  The Court herein refers to all three MGA parties collectively and individually as follows:  MGA Entertainment, Inc., is referred to as "MGAE."  MGA Entertainment (HK) Limited (also referred to in the record as "MGA Hong Kong") is referred to herein as "MGA HK."  All three defendants, Isaac Larian, MGAE, and MGA HK are collectively referred to as "the MGA parties."  When necessary to distinguish them further, the subset of entity defendants, MGAE and MGA HK, are collectively referred to as "the MGA entities."

Initials of Deputy Clerk __cls_____

**Exhibit F, p. 52**

preempts Mattel's claims for aiding and abetting breach of fiduciary duty and the duty of loyalty. Relatedly, they also seek judgment as a matter of law that the damages awarded as to the state-law claims are precluded as preempted because they represent damages awarded under the theory of disgorgement, which was also awarded as part of copyright damages. The Court has previously rejected the argument that copyright law preempts the two aiding and abetting claims, and the Court leaves undisturbed its previous holding on this issue. As for the related argument regarding damages, to accept the MGA parties' argument, the Court would have to reject the current, firmly established standard for determining if a state-law claim is preempted in favor of a new standard that would find preemption any time the relief sought by the state-law claim is also redressable by a copyright claim. This Court must follow the enunciated standard for copyright law preemption, and it therefore rejects the MGA parties' argument regarding this issue. This portion of the motion is **DENIED.**

The MGA parties seek judgment as a matter of law that Mattel's claims for aiding and abetting breach of fiduciary duty and the duty of loyalty is preempted by the California Uniform Trade Secrets Act. This issue was not raised in the parties' pretrial conference order and, accordingly, was waived. See e.g., El-Hakem v. BJY Inc., 415 F.3d 1068, 1077 (9th Cir. 2005). This portion of the motion is **DENIED.**

The MGA parties seek judgment as a matter of law that Mattel failed to prove its damages as to each of its state-law claims. Mattel proceeded on a theory of recovery that sought disgorgement of the MGA parties' profits rather than another measure of damages; there was ample evidence presented by both sides regarding the MGA parties' profits. The Court has previously rejected, and does not now revisit, the MGA parties' contention that the proper measure of damages for aiding and abetting Carter Bryant's breaches of fiduciary duty and the duty of loyalty should be measured by Carter Bryant's profits, rather than the MGA parties' profits. As for the conversion claim, as set forth infra, the Court has remitted the monetary damages awarded by the jury in favor of the equitable relief awarded by the Court in the form of return of the original drawings.[3] This portion of the motion is **DENIED.**

The MGA parties seek judgment as a matter of law that Mattel failed to prove that the MGA parties had actual knowledge of Carter Bryant's fiduciary duty or breach thereof. Admittedly, there is an absence of direct evidence, such as an admission by Isaac Larian, that any of the MGA parties had actual knowledge of Carter Bryant's fiduciary duty or breach thereof. But the indirect evidence relevant to this issue admitted at trial clearly supports the jury's verdict that both MGAE and Isaac Larian had an understanding that Carter Bryant had such an obligation as well as the parameters of such an obligation. This portion of the motion is **DENIED.**

---

[3] Those original drawings are currently in the custody of the Court as part of the Court record.

MINUTES FORM 90
CIVIL -- GEN

4

Initials of Deputy Clerk __cls_____

Exhibit F, p. 53

The MGA parties seek judgment as a matter of law as to MGA HK's liability for unfair competition. The Court's summary judgment Order held that Mattel had raised a triable issue of fact as to whether the MGA parties tortiously interfered with Bryant and Mattel's contractual relationship and whether they engaged in commercial bribery. However, the tortious interference claim was not asserted against MGA HK, and there was no evidence presented at trial to support a statutory unfair competition claim against MGA HK for commercial bribery. See Court's June 4, 2009, Final Pretrial Conference Order. Accordingly, the Court **GRANTS** the motion on this issue, and the Court **ORDERS** that the following **AMENDMENTS** be made to its Order Granting Mattel's Motion for Finding Liability and Injunctive Relief Pursuant to Cal. Bus. & Profs. Code § 17200, filed December 3, 2008 (docket #4441):

- At page 1, line 6:  Delete "GRANTS" and substitute "GRANTS IN PART AND DENIES IN PART"

- At page 3, line 7:  Delete "the MGA Defendants" and substitute "MGA and Larian"

The MGA parties seek judgment as a matter of law that Mattel is not entitled to base any claims on ownership to the name "Bratz." To the extent that the MGA parties' argument is based on the construction of the Inventions Agreement, it was not raised in the Rule 50(a) motion for judgment as a matter of law and, therefore, may not be raised for the first time in a Rule 50(b) motion for judgment as a matter of law.[4] The Court finds wavier.

In any event, the argument fails on its merits. The name "Bratz," which the jury found Carter Bryant conceived of during the period of his employment with Mattel, is within the scope of the assignment clause of the Inventions Agreement. California law allows the assignment of an idea; thus, the name "Bratz" is, by virtue of the Inventions Agreement, the Court's summary judgment order construing that Agreement, and the jury's finding regarding the origin of the name, Mattel's property (even if it was not a proper trademark at the time it was conveyed and even though it is not subject to being copyrighted). This portion of the motion is **DENIED**.

The MGA parties seek judgment as a matter of law that copyright infringement is limited to the first-generation Bratz dolls. Essentially, the MGA parties seek a ruling that no reasonable jury could have found that any Bratz dolls, other than the first-generation

---

[4] The Court rejects the MGA parties' contention that this issue was raised in the Rule 50(a) motion and that the Rule 50(b) motion merely expands upon the argument.  The MGA parties' point in the Rule 50(a) motion was that there was a lack of intellectual property protection for the name Bratz (because it was not a valid trademark because it had not ever been used in commerce and because it could not be copyrighted); conversely, their point here is that the name "Bratz" is not within the scope of the Inventions Agreement.

MINUTES FORM 90
CIVIL -- GEN

5

Initials of Deputy Clerk __cls_____

Exhibit F, p. 54

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 58 of 109   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 8293   Filed 04/27/2009   Page 6 of 25
#:174893

Bratz dolls, infringe Mattel's copyrights. The Court has already found that this is not the case; specifically, the Court has found, for the reasons set forth in its December 3, 2008, Order, that hundreds of Bratz female fashion dolls infringe Mattel's copyrights. This portion of the motion is **DENIED.**

The MGA parties seek judgment as a matter of law that Bryant was not an author of the Bratz sculpt. The Court previously observed, at trial, that this is an affirmative defense that was not asserted and was therefore waived. Moreover, this issue was not raised in the pretrial conference order; thus, it was waived for that reason as well. Furthermore, it was not raised in the MGA parties' Rule 50(a) motion, and therefore may not be raised for the first time in the Rule 50(b) motion.

In fact, this issue was not raised until **_after_** the jury's verdict in Phase 1A, in which the jury determined that Bryant created the sculpt (alone, or jointly with others). Recognizing this fact as a potential impediment to the relief they now seek, the MGA parties contend that in Phase 1A, the jury was not instructed on how to determine – and thus its express factual finding does not address – authorship as a matter of copyright law. Nevertheless, the Phase 1A verdict established the jury's finding that the sculpt was "'conceived or reduced to practice' – that is, created – by Carter Bryant, alone or jointly with others," during his employment with Mattel. Phase 1A Verdict Form at 5. This finding, when viewed in conjunction with the Court's summary judgment order, was sufficient to place the sculpt within the assignment clause of the Inventions Agreement which, in turn, conferred the rights to the sculpt to Mattel.

In any event, this argument also fails on its merits. A reasonable jury could have readily found that Carter Bryant was the author of the sculpt based on Paula Garcia's testimony that Margaret Leahy was tasked with creating the three-dimensional object equivalent of Carter Bryant's two-dimensional drawings. Trial Tr. at 800. When asked if she looked back to Carter Bryant's two-dimensional drawings during her review of the sculpt, Ms. Garcia stated that it was possible (although she had no specific recollection of doing so), "because the exercise was to create a 3D version of those 2D drawings, it was very likely that those drawings were there to then compare its 3D version with those relationships." Id.; see also Trial Tr. at 797 (Garcia's testimony as to the purpose of the sculpt, which was to determine how the "2D image" would "translate" to "3D"). This final portion of the motion is therefore **DENIED.**

As set forth herein, the Court **GRANTS** that portion of the MGA parties' Motion for Judgment as a matter of law that challenges the Court's finding of a violation of §§ 17200 et seq. on the part of MGA HK. The Court **DENIES** the remainder of the MGA parties' Motion for Judgment as a matter of law.

MINUTES FORM 90
CIVIL -- GEN

6

Initials of Deputy Clerk __cls_____

Exhibit F, p. 55

## III. MGA'S MOTION FOR REMITTITUR
## (DOCKET #4495, #4523)

On its face, the jury's Phase 1 verdict awards Mattel $100,031,500.00. The jury verdict was a round $100 million (allocated among a total of four claims and three defendants) except for $31,500, which was awarded to Mattel as damages for conversion of the original Bratz drawings. The MGA parties seek remittitur of this amount, arguing that, at most, Mattel should be awarded $20 million.

The Ninth Circuit enunciated its remittitur standard in 1982, when it noted that other circuits "consistently approve remitting the judgment to the maximum amount sustainable by the proof," before stating, "[w]e adopt this standard." D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982). One of the cases cited with approval by the Redi-Mix court stated the standard in greater detail:

> The defendants' final contention is that the verdict was excessive, justifying a new trial or, in the alternative, a remittitur. Our review of this issue is limited to an examination of the plaintiff's injuries to determine whether the damage award is beyond the maximum possible award supported by the evidence in the record.

Keyes v. Lauga, 635 F.2d 330, 336 (5th Cir. 1981)

Since 1981, the Ninth Circuit has elaborated on this standard:

> Even a total inadequacy of proof on isolated elements of damages claims submitted to a jury will not undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of the evidence. If we find that a jury's damages award exceeds the maximum amount sustainable by the probative evidence, we will not hesitate to order a remission of the excess by the plaintiff or, in the alternative, a new trial. . . . But where, as here, the jury's verdicts find substantial support in the record and lie within the range sustainable by the proof, we will not "play Monday morning quarterback" and supplant the jury's evaluation of the complex and conflicting evidence with our own.

Los Angeles Memorial Coliseum Com'n v. National Football League, 791 F.2d 1356,

Exhibit F, p. 56

1366 (9th Cir. 1986) (internal citations omitted).[5] Cf. In re First Alliance Mortg. Co., 471 F.3d 977, 1001 (9th Cir. 2006) (using the above-quoted standard, but noting that before the Court was "the rare case in which it is sufficiently certain that the jury award was not based on proper consideration of the evidence" but was instead "based on improperly considered evidence, directly traceable to an error that was cured too little, too late"). Generally, courts are cautioned to "undertake only limited review of jury damages awards, in order to avoid encroaching upon the jury's proper function under the Constitution." Memorial Coliseum at 1365. The standard is exceptionally deferential to the jury's findings. If the damages award is supported by the evidence, it must be upheld even if the Court would have awarded a different amount of damages.

It is through this very narrowly focused lens that the Court must consider the present motion.

The MGA parties argue that Mattel had a singular theory of recovery – disgorgement of profits – and the amounts set forth by the jury as to each of the three state-law claims are duplicative. This is not a completely unappealing argument. For each of three state law claims – intentional interference with contractual relations, aiding and abetting breach of fiduciary duty, and aiding and abetting the duty of loyalty – the jury indicated that Mattel should be awarded $20 million as to MGAE and $10 million as to Isaac Larian. Totaled, this award is $90 million. Viewed pursuant to the MGA parties' theory, it would be the same $30 million awarded three times. Relatedly, the MGA parties contend that the copyright damages of $10 million (allocated among three defendants) are also duplicative of this $30 million, even though the number is not exactly the same.[6]

However, these explanations as to what the jury intended are purely speculative. The remittitur standard is exceptionally deferential to the jury's verdict, and the Court cannot disturb it based on speculation. The fact is the evidence not only supported a verdict of $100 million, this Court could have, under the remittitur standard, easily sustained a verdict many times this amount. The jury may have meant to award only a total of $30 million, or they may have simply decided they could all agree on a round figure of $100 million and then set about allocating that $100 million among multiple claims and defendants.

---

[5] A number of district court cases in the Ninth Circuit have recently applied this standard. Paul v. Asbury Automotive Group, LLC 2009 WL 188592, at *2 (D. Ore. 2009); Hall v. North American Indus. Services, Inc., 2008 WL 789895, at *2 (E.D. Cal. 2008); Lucky Break Wishbone Corp. v. Sears, Roebuck and Co., 2008 WL 4742206, at *4 (W.D. Wash. 2008); Eldorado Stone, LLC v. Renaissance Stone, Inc., 2007 WL 2403572, at *1 (S.D. Cal. 2007).

[6] The MGA parties' explanation for why these damages are duplicative even though they are not exactly the same is that the jury reduced the $30 million for apportionment based on the expert testimony of Professor Joachimsthaler, who testified that MGA's branding efforts could be responsible for approximately 50% to 70% of Bratz-related profits.

In any event, the Court must return to the standard by which its conclusion is governed. Here, a district court **must** leave undisturbed jury's verdict that is "reasonable in light of the totality of the evidence," where the verdict does not "exceed[] the maximum amount sustainable by the probative evidence," and where the verdict "lie[s] within the range sustainable by the proof." The jury's verdict of $100 million is well within the range of possible awards based on the evidence of record, and therefore the Court must leave it undisturbed.

What the MGA parties are careful not to encroach upon, but what they in essence really seek, is an inquiry into what the jury **meant** by its verdict. As the Court and the parties to this case are aware, this inquiry is squarely within that which is prohibited by Fed. R. Evid. 606(b):

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

Id. Of course, if that inquiry were permissible in this instance, the results seem clear. Counsel for the MGA parties has not thus far denied that at least one juror, possibly more, stated to them that the jury in fact intended a $100 million award of damages.

Separately, the MGA parties contend that, of that $100 million award, the $1 million awarded as defendant MGA HK's liability for copyright infringement is duplicative because of certain consolidated financial reporting that occurs between MGAE and MGA HK. This evidence was not before the jury; the jury made its award based on the evidence before it. In any event, because the evidence presented supports the $1 million award made against MGA HK, under the Memorial Coliseum standard, it must be left undisturbed.

The MGA parties also contend that the damages against Mr. Larian for intentional interference with contractual relations is barred by the statute of limitations. The Court previously held that the intentional interference with contractual relations claim was not subject to the discovery rule, so unless Mattel was able to establish a sufficient period of fraudulent concealment, the interference claim would be time barred. June 2, 2008, Order at 3. In its Phase 1B verdict, the jury answered in the negative a specific interrogatory regarding whether a requisite period of fraudulent concealment could be attributed to Mr. Larian.[7]  Therefore, a combination of the Court's June 2, 2008,

---

[7] Conversely, the jury answered the same question regarding MGAE affirmatively.

Initials of Deputy Clerk __cls_____

Exhibit F, p. 58

Order and the jury's specific findings supports the MGA parties' position that the $10 million awarded as to Isaac Larian for the claim of intentional interference with contractual relations should be remitted because, in the absence of a fraudulent concealing finding by the jury, the claim is time barred.

However, at the hearing on this issue, counsel for Mattel suggested to the Court that its legal conclusion regarding the non-application of the discovery rule to tortious interference claims was in error and was, in fact, not an argument advanced by the parties in their summary judgment papers. Only very rarely will a court entertain an oral motion for reconsideration; rarer still are those occasions when such a motion is granted. However, such a result is warranted here where the Court's previous legal conclusion was simply wrong.

In their summary judgment motion, the MGA parties argued that a claim for "intentional interference with a contract accrues no later than the date of the contract's breach," implying – at least in the Court's view at the time of its review of the motion – that the discovery rule did not apply. See MGA SJ Mot. at 21 (docket #2572). The authority they cite supports the general rule regarding the accrual date of a tortious interference claim, but the authority does not support the Court's more specific conclusion that the discovery rule is inapplicable to claims for tortious interference. See Knoell v. Petrovich, 76 Cal.App.4th 164, 168 (1999) (refusing to apply the discovery rule to a tortious interference claim but doing so on the basis that the plaintiff made judicial admissions that were inconsistent with the application of the rule); Trembath v. Digardi, 43 Cal.App.3d 834, 836 (1974) (refusing to hold that the accrual of a claim for tortious interference claim as to an attorney-client contingency fee contract extended beyond the date of the breach to the suggested accrual date of the client's actual recovery, but not discussing the discovery rule); Forcier v. Microsoft Corp., 123 F.Supp.2d 520, 531 (N.D. Cal. 2000) (refusing to apply the discovery rule to a tortious interference claim because the facts presented in the case did not warrant it); Charles Lowe Co. v. Xomox Corp., 1999 WL 1293362 at *9 (N.D. Cal. 1999) (defining accrual of a tortious interference claim in relation to when damages are incurred and when a plaintiff may seek a legal remedy, but not discussing the discovery rule); Menefee v. Ostawari, 228 Cal.App.3d 239, 245 (1991) (discussing neither tortious interference claims nor the discovery rule).

At best, these cases represent examples of cases in which courts refuse to apply the discovery rule because the facts of the case do not warrant it; these cases do not stand for the broader conclusion reached by the Court in its prior order that the discovery rule is inapplicable to **all** tortious interference claims, regardless of the factual circumstances related to the claim's discovery. Cf. AmerUS Life Ins. Co. v. Bank of America, N.A., 143 Cal.App.4th 631, 639 (2006) (explicitly stating, regarding conversion claims, that "[t]o the extent our courts have recognized a 'discovery rule' exception to toll the statute, it has only been when the defendant in a conversion action fraudulently conceals the relevant facts or where the defendant fails to disclose such facts in

Exhibit F, p. 59

violation of his or her fiduciary duty to the plaintiff."). Indeed, by examining the facts of the case and discussing the discovery rule standard before concluding the rule does not apply in that instance, rather than noting a wholesale rejection of the application of the discovery rule to tortious interference claims, these courts have implicitly held that the discovery rule may, in certain undefined instances, permit otherwise time-barred claims to proceed.[8]

The Court has previously discussed at length why the discovery rule delayed the accrual of Mattel's claims in this case. That rationale applies with equal force to the intentional interference with contractual relations claim, which was timely asserted against Mr. Larian. Thus, it becomes irrelevant that the jury failed to attribute any fraudulent concealment to Mr. Larian, and the Court **DENIES** the motion on issue of timeliness of the tortious interference claim.

Finally, the MGA parties correctly contend that the damages awarded for conversion, totaling $31,500, should be remitted because the Court's declaratory judgment orders the MGA parties to return the drawings. The Court **GRANTS** the motion on this issue. However, the drawings shall remain in the Court's custody pending completion of Phase 2, pending appeal, and/or pending further order of this Court.

## IV. LIFTING STAY, AS MODIFIED AND SUPPLEMENTED, ON PERMANENT INJUNCTION (#4443)

Subject to the modification set forth in the Court's January 7, 2009, Order (docket #4657) (relating to distributors and retailers), the Court **VACATES** the stay on enforcement of its December 3, 2008, Order Granting Mattel, Inc.'s Motion for Permanent Injunction (docket #4443) ("Permanent Injunction Order"). Specifically, the Court **VACATES** the stay set forth in its Omnibus Order of December 3, 2008 (docket #4439) at 16 (which was imposed pending resolution of the three post-trial motions upon which the Court today rules); however, the Court leaves undisturbed the more limited stay set forth in the Court's January 7, 2009, Order, which relates to the purchase of Bratz products by retailers and distributors up to and including December 31, 2009. This limited stay is supplemented as set forth below.

---

[8] Had those courts not wished to make this implication, they could have, but did not, set forth a qualification that the court was assuming without deciding that the discovery rule could be applied to a tortious interference claim. Cf. Grisham v. Philip Morris U.S.A., Inc., 40 Cal.4th 623, 634 n.7 (2007) ("We assume for purposes of this discussion that the delayed discovery rule applies to unfair competition claims. We note that this point is currently not settled under California law . . . and we do not address it.") (citations omitted).

Initials of Deputy Clerk __cls_____

Exhibit F, p. 60

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 64 of 109   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 5293   Filed 04/27/2009   Page 12 of 25
#:174293

The Permanent Injunction Order contemplates the Court's appointment of a
Special Master to resolve issues and disputes relating to the enforcement of the
Permanent Injunction Order. At this point, in the absence of any such disputes, the
Court reserves such an appointment.

## V. ACCOUNTING OF BRATZ PROFITS SINCE AUGUST 26, 2008

In light of the Court's interpretation of what has been referred to in this litigation
as the Inventions Agreement (especially the Court's April 25, 2008, summary judgment
Order), in light of the two jury verdicts returned in this case on July 17, 2008, and on
August 26, 2008, in light of the Court's December 3, 2008, Orders regarding the parties'
equitable claims and equitable relief (especially the Court's Omnibus Order defining the
parameters of the scope of copyright infringement, the Court's Order Granting Mattel's
Motion for Permanent Injunction, and the Court's Order Granting Mattel's Motion for
Constructive Trust), and in light of this Order rejecting in all material respects the MGA
parties' post-trial challenges to the jury's findings, the Court's findings, and the Court's
legal and equitable rulings, the Court **ORDERS** the MGA entities to file with the Court,
and serve on all parties, no later than thirty days from the entry of this Order, a full
accounting of all profits that have resulted from all sales, occurring after August 26,
2008, of all products that fall within any of the Court's December 3, 2008, Orders
referenced above.

Within ten days of the filing of that accounting, the interested parties shall file a
joint status report setting forth the position of all interested parties on how they wish to
proceed on this issue.

## VI. ORDER RE RETRIEVAL OF JOINTLY LODGED LAPTOP COMPUTER

On September 11, 2008, for the Court's convenience and pursuant to its Order,
Mattel and the MGA parties jointly lodged a laptop computer from which the Court could
easily access the Phase 1A and 1B trial transcripts. Counsel are advised to contact the
courtroom deputy clerk to arrange to retrieve the computer from the Court.

## VII. ORDER RE REVIEW OF UNDER SEAL FILINGS

On June 24, 2008, this Court ordered unsealed vast portions of the previously
sealed record in these consolidated cases. That Order related only to documents filed
on or before May 27, 2008. Certain specific documents, identified by the parties by
docket number and found by the Court to have good cause to remain sealed, were not
unsealed; similarly, certain Orders of this Court were not unsealed.

Counsel for all the parties are **ORDERED** to engage in a review and meet and
confer process to significantly narrow, if not eliminate the under seal nature of the filings

Exhibit F, p. 61

Case 2:04-cv-09049-DOC-RNB  Document 5340-2  Filed 05/04/09  Page 65 of 109  Page ID
#17:8223
Case 2:04-cv-09049-SGL-RNB  Document 5273  Filed 04/27/2009  Page 13 of 25

dated May 28, 2008, through the date of the lifting of the stay on Phase 2 discovery, which occurred on February 11, 2009. The parties are **ORDERED** to file with the Court, no later than forty-five days from the entry of this Order, a joint report that identifies by docket number and pinpoint citation all materials the parties agree should remain under seal, as well as the materials any party contends should remain under seal. In all instances, all materials that are contemplated by any party to be maintained by the Court under seal shall specify the reasons therefor.

Counsel should anticipate the narrowest possible information to be maintained under seal. For example, if there is good cause for maintaining under seal only a small portion of an attachment, counsel should anticipate that they may be required to e-file a public redacted version of that document.

## VIII. ORDER RE PHASED, UNDER SEAL RELEASE OF FORENSIC AUDITOR'S REPORT TO COUNSEL AND PARTIES

The Court received *in camera* on April 23, 2009, and has since reviewed, the Forensic Auditor's Report. Concurrently served, under seal, on each parties' counsel of record, is a copy of the Forensic Auditor's preliminary report to the Court. The Court reserves at this time release of the supporting documentation that is attached to the report. This document is, until further Order of the Court, designated as a highly restricted attorney-eyes-only document. It may be reviewed, and its contents shared, only with *counsel of record* in this case and the Court-appointed Temporary Receiver appointed below; it may not be shared with either the parties or attorneys who are not counsel of record, including in-house counsel for the parties.

The parties are advised that they must file any objections on the basis of privilege within forty-eight hours of the entry of this Order. Failure to do may result in waiver of that privilege. After the expiration of this forty-eight hour period, the Court will make further Orders regarding the scope of the release of the report, including its attachments.

The Court understands that certain requested information has only recently been produced to the Forensic Auditor. For that reason, and because he has represented to the Court that certain analyses are ongoing, the Court continues the appointment of the Forensic Auditor until further Order of this Court.

## IX. ORDER GRANTING IN PART AND DENYING IN PART MOTION TO INTERVENE (DOCKET #4761)

Non-party Omni 808 Investors, LCC ("Omni 808"), has filed an ex parte application to intervene for the limited purposes of responding to Mattel's ex parte application for a receiver for MGA and to address "all other issues related to Omni's

Exhibit F, p. 62

status as a secured creditor of MGA." See Ex Parte Application to Intervene (docket
#4761) at 1. This motion was heard on February 11, 2009, at which time the Court
expressly held the motion in abeyance, along with the Mattel's ex parte application for
appointment of a receiver (docket #4540), which is addressed in the following section,
to allow the preparation of an audit report by the Court-appointed Forensic Auditor.

For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN
PART** the motion to intervene.  The motion is granted to the extent it seeks intervention
to address the potential receivership issues; the motion is **HELD IN ABEYANCE** as to
the other, broader, but unspecified issues raised by Omni 808.

In the absence of a federal statute conferring a right to intervene, Rule 24(a)(2)
provides as follows:

> (a) Intervention of Right. On timely motion, the court
> must permit anyone to intervene who: . . . (2) claims an
> interest relating to the property or transaction that is the
> subject of the action, and is so situated that disposing of the
> action may as a practical matter impair or impede the
> movant's ability to protect its interest, unless existing parties
> adequately represent that interest.

Id.  The Ninth Circuit has identified four separate elements that must be met in order to
qualify for intervention under this rule; specifically, a would-be intervenor must show the
following:

> (1) [I]t has a significant protectable interest relating to the
> property or transaction that is the subject of the action;
> (2) the disposition of the action may, as a practical matter,
> impair or impede the applicant's ability to protect its interest;
> (3) the application is timely; and (4) the existing parties may
> not adequately represent the applicant's interest.

United States Alisal Water Corp., 370 F.3d 915, 919 (9th Cir. 2004).

Omni 808 has met both the first and second elements.  Where a party has a non-
speculative economic interest that is both concrete and related to the underlying subject
matter of the action, this element is met. Id.  Mattel has correctly argued that, generally,
the issues regarding the collectability of a party's debt does not confer an interest on the
part of the creditor to justify intervention pursuant to Rule 24(a)(2). See id. (denying
intervention where the interest of the would-be intervenor was "several degrees
removed from the overriding public health and environmental policies that are the
backbone of this litigation.").  However, this particular request for intervention is not one
that falls into this general category.  Rather, it is an intervention for a very limited

MINUTES FORM 90
CIVIL -- GEN

14

Initials of Deputy Clerk __cls_____

Exhibit F, p. 63

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 67 of 109   Page ID
#:174295
Case 2:04-cv-09049-SGL-RNB      Document 5273    Filed 04/27/2009    Page 15 of 25

purpose – to address the issue of the appointment of a receiver – which is directly related to debt collectability. By virtue of this case, Mattel claims a significant interest in the assets of the MGA parties, including both money damages and rights to intellectual property previously held by the MGA parties. Omni 808 now claims a superior interest by virtue of a transaction that occurred after the jury returned its verdict as to ownership of certain Bratz property. This interest is directly related to this litigation.

The second element is met because the relief sought by Mattel is to take control of the Bratz assets, as that term is at length defined by its proposed order submitted with its motion for appointment of a receiver. According to the testimony the Court heard at trial, the Bratz assets are, at least historically, the most significant ones owned by the MGA parties. Resolution of the disputes over the priority to these assets may have to take into account the claimed superiority of Omni 808's interest in MGAE.

The third element is met, at least as to the receivership issue, which is the only ground upon which the Court grants the motion to intervene at this time.

The fourth element has been described as presenting a "minimal burden." Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n.10 (1972). It is sufficient that the would-be intervenor shows that the representation "may be inadequate." Id. Here, although both the MGA parties and Omni 808 may oppose in general the appointment of a receiver, their positions could differ significantly because MGAE is Omni 808's debtor. Because all that is required is a minimal showing, and because Omni 808 has represented that it is an MGAE secured creditor, the Court finds that the fourth element is met because of the vastly different roles played by MGAE and Omni 808 vis-à-vis Mattel: One is an anticipated judgment debtor and the other is a competing creditor.

Accordingly, the Court **GRANTS IN PART** the motion to intervene. Omni 808 is a party to these consolidated cases for the limited purpose of addressing the receivership issues. As such, it may file briefing in accordance with the schedule set forth below, and it may appear and argue at the hearing set as specified below.

For just cause and in order to preserve the status quo and address the allegations set forth in Mattel's application for the appointment of a receiver and in its opposition to the present motion to intervene, the Court **ORDERS** that Omni 808 and its counsel are restrained and enjoined, absent further order from this Court, from taking any action to assert or enforce any purported rights against the MGA parties, including but not limited to commencing an action against the MGA parties, taking any action to foreclose on any collateral of the MGA parties, committing any act that interferes with the Temporary Receiver's possession, control or use of the assets of the MGA entities, or commencing or participating in any involuntary bankruptcy proceedings against any MGA party pending further hearing on this matter on May 18, 2009, at 1:30 p.m. At that hearing, the Court will consider whether, as counsel for Omni 808 represented to this

Exhibit F, p. 64

Court, "Omni's purchase of the Senior Bank Credit Facility from Wachovia was a straightforward, arms-length business deal between non-parties to this action," or whether, as counsel for Mattel contends, the purchase was by entities formed for "the improper purpose of attempting to leapfrog over Mattel's claims and shield their assets from creditors and other rights-holders such as Mattel." Counsel for all parties, including the intervenors, are afforded leave to file a final position on this issue no later than May 14, 2009.

## X. ORDER RE APPOINTMENT OF TEMPORARY RECEIVER PENDING HEARING ON APPOINTMENT OF PERMANENT RECEIVER

Mattel has filed an application for the appointment of a receiver or for alternative relief. The Court has considered all papers submitted in support of the application and all opposition and reply papers thereto, the arguments of counsel at the hearing on the application, and the entire record in this action, and finds that just cause exists for the appointment of a Temporary Receiver purusant to L.R. 66.[9] Specifically, the Court finds as follows:

1.  The MGA entities, MGAE and MGA HK, are domiciled in California, have their principal place of business in the Central District of California, and have the majority of their assets located within the Central District of California;

2.  As the Court has previously found, the Bratz Assets (as defined below and in that order) are and have been the property of Mattel and not any of the MGA parties;

3.  Good cause exists to believe that the MGA parties, defined as MGAE, MGA HK, and Isaac Larian, and each of them, have engaged in, are engaging in, or are about to engage in transactions, acts, practices and courses of business that constitute fraudulent transfers of assets and violations of Mattel's ownership and other rights in and to the Bratz Brand and Bratz Assets, as defined below;

4.  Mattel has demonstrated the possibility of dissipation of assets and, from the entire record herein, it appears likely that the MGA parties, agents,

---

[9] The interim report of the Court-appointed Forensic Auditor recommends, for the reasons stated in the report, the appointment of a Receiver. Although the report is fully consistent with the findings made herein, the Court is not relying upon this recommendation, or the information set forth in the Forensic Auditor's report, in making these findings because the parties have not yet had an opportunity to object or otherwise respond to the report. The Court will consider the Forensic Auditor's report, and any objections or responses thereto, in determining whether or not to extend the appointment of the Temporary Receiver after the OSC hearing scheduled for May 18, 2009.

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk __cls_____

16

Exhibit F, p. 65

and related entities (as defined below) are engaged in a course of conduct with related parties designed to frustrate the Court's Orders, Findings and Injunction herein;

5.  Good cause exists to believe that the MGA parties, agents, and related entities (as defined below) will continue to engage in such transactions, acts, practices, and courses of conduct and business to the immediate and irreparable loss and damage to Mattel, and contrary to the interests of justice, unless restrained and enjoined.

6.  It is appropriate and in the interests of justice that, pursuant to L.R. 66, that a Temporary Receiver be appointed and that an Order to Show Cause be issued why a permanent receiver should not be appointed.

Accordingly, the Court **ORDERS** as follows:

1.  Patrick A. Fraioli, Jr., is hereby appointed Temporary Receiver pursuant to L.R. 66 for the MGA entities to manage, supervise and oversee the assets of the MGA entities and the Bratz Brand and all Bratz Assets as these terms are defined herein (the "Temporary Receiver").

2.  The Temporary Receiver is appointed and is hereby directed and ordered to take full and exclusive control over, and to manage, preserve, and maximize the profits of, the MGA entities and the Bratz Brand and Bratz Assets as of the date hereof, including, without limitation, by locating, taking possession and ownership of, preserving, protecting, managing, supervising and overseeing the Bratz Assets.

3.  The Temporary Receiver is further directed to investigate the financial affairs of the MGA entities, and specifically investigate transfers and transactions made by the MGA entities from and after July 17, 2008.

4.  The Temporary Receiver shall have the power to take any and all action which may be necessary, appropriate or advisable to effectuate the purposes of the Temporary Receivership, including, but not limited to, the power to:

    a.  take custody, control and possession of the assets of the MGA entities and Bratz Assets in the possession, custody or control of the MGA entities, and/or any person or entity acting at their behest or direction or pursuant to their control, including, but not limited to, Isaac Larian and any successor-in-interest, subsidiary, corporate affiliate, agent, servant, attorney, accountant, officer, director, employee or other confederate (collectively, "the MGA parties,

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk __cls_____

**Exhibit F, p. 66**

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 70 of 109   Page ID
#:174299
Case 2:04-cv-09049-SGL-RNB   Document 5273   Filed 04/27/2009   Page 18 of 25

agents, and related entities") whether or not claimed to be encumbered by any security interest;

b.  preserve, hold and manage the assets of the MGA entities and the Bratz Assets and perform all acts necessary or advisable to preserve and/or enhance the value of these assets;

c.  exploit, license, distribute and sell the assets of the MGA entities and the Bratz Assets and products for profit, including, without limitation, by selling Bratz-branded dolls and other goods through appropriate channels of trade and distribution;

d.  market, promote and/or advertise the assets of the MGA entities and the Bratz Assets and/or Bratz-branded products;

e.  hire and employ individuals and entities as necessary or advisable to carry out the Temporary Receiver's mandate under this order;

f.  disburse funds as needed to satisfy and pay the reasonable and ordinary expenses incurred by the receivership, provided, however, that the Temporary Receiver shall maintain and shall not distribute, disburse or pay to anyone any receivership funds except as needed to satisfy the reasonable and ordinary expenses incurred by the receivership;

g.  open bank accounts in the name of the Temporary Receiver and transfer funds to, from and/or between those accounts;

h.  collect and maintain, and take all necessary or advisable actions to collect and maintain, monies owed by virtue of the sale, licensing, or other exploitation of the Bratz Assets;

i.  sell, compromise or assign debts for purposes of collection upon such terms and conditions as the Temporary Receiver deems necessary or advisable to carry out the Temporary Receiver's mandate under this order;

j.  enter into such agreements or contracts, and seek and enter into modifications to or amendments of such agreements and contracts, as the Temporary Receiver deems necessary or advisable to carry out the Temporary Receiver's mandate under this order;

k.  prepare, execute, acknowledge and deliver any and all deeds, assignments or other instruments necessary or advisable to carry

MINUTES FORM 90
CIVIL -- GEN

18

Initials of Deputy Clerk __cls_____

Exhibit F, p. 67

out the Temporary Receiver's mandate under this Order;

l.    protect and preserve all Bratz-related intellectual property, including, without limitation, by commencing, prosecuting, and/or renewing intellectual property registrations and/or filings of any type and in any jurisdiction or forum;

m.    retain and/or engage the services of advisors and/or professionals, including, without limitation, accountants, attorneys, consultants and experts to assist the Temporary Receiver in carrying out the Temporary Receiver's mandate under this Order. The Temporary Receiver, without further order of this Court, is authorized to employ Ervin, Cohen & Jessup LLP, Dr. Lynne Phillips and the firm of Reinventures, Inc., to assist the Temporary Receiver in carrying out the Temporary Receiver's mandate under this Order;

n.    retain and/or engage the services of vendors, suppliers, distributors and other persons and/or entities to assist the Temporary Receiver in carrying out the Temporary Receiver's mandate under this Order;

o.    record this Order in any jurisdiction;

p.    the Temporary Receiver may for any lawful purpose use any federal or state taxpayer identification number previously used by the MGA parties, agents, and related entities;

q.    take all actions the Temporary Receiver deems necessary or advisable to marshal, collect, preserve or protect the Bratz Assets, including, without limitation, the institution of inquiries and investigations into the conduct of any of the MGA parties, agents, and related entities to uncover concealed Bratz Assets and/or fraudulent conveyances and/or attempts to dispose of Bratz Assets;

r.    institute, defend, intervene in and/or substitute as, and/or otherwise become a party to any or all actions in local, state, federal or foreign courts, including, without limitation, bankruptcy court, and any other proceedings before any governmental tribunal or arbitration panels, and take any and all necessary or advisable steps and measures in such actions as necessary or advisable to carry out the Temporary Receiver's mandate under this Order; provided, however, notwithstanding the foregoing, the MGA parties have all the requisite authority to assert all rights in this ongoing litigation between Mattel and the MGA parties in this action and the Temporary Receiver shall not assert a position in such litigation,

Exhibit F, p. 68

except insofar as the Court orders or invites the Temporary Receiver to do so; and,

s.  perform such further and additional acts as the Temporary Receiver deems necessary or advisable to preserve the Bratz Assets, maximizing the profits derived therefrom, ensure the successful manufacture, delivery and marketing of Bratz-branded dolls and products for the spring and fall 2009 seasons and otherwise carry out the Temporary Receiver's mandate under this Order, including, without limitation, any acts which could be lawfully carried out by a corporation in the state of California.

5.  The Temporary Receiver, the Temporary Receiver's employees and agents as well as any and all of the professionals employed by the Temporary Receiver, are entitled to compensation for services rendered at their normal hourly rates and reimbursement for all expenses incurred by them on behalf of the receivership estate. The Temporary Receiver shall serve written notice upon counsel of record for the parties of the amount to be paid to each payee, with an itemization of the services rendered or expenses incurred. Upon service of said notice, the itemized fees and expenses may be paid by the Temporary Receiver on an interim basis. In the event that extraordinary services are performed by the Temporary Receiver, he shall be entitled to extraordinary compensation according to proof and approval of this Court. All interim fees paid shall be subject to final review and approval by this Court. This Court retains jurisdiction to award a greater or lesser amount as the full, fair and final value of such services. In the event there are insufficient funds in the receivership estate to fully compensate the Temporary Receiver and his professionals, the Court retains jurisdiction to allocate the costs and expenses of this receivership against Mattel, as the party who sought the appointment of the Temporary Receiver, and/or Isaac Larian, as the principal owner and beneficiary of the MGA entities.

6.  Upon service of a copy of this Order, all banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, or other financial institutions shall cooperate with all reasonable requests of the Temporary Receiver regarding implementation of this Order, including transferring funds at his direction and producing records related to the assets of the MGA entities.

7.  The Bratz Assets include all tangible or intangible assets, including,

MINUTES FORM 90
CIVIL -- GEN

20

Initials of Deputy Clerk __cls_____

Exhibit F, p. 69

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 73 of 109   Page ID
#:174873
Case 2:04-cv-09049-SGL-RNB   Document 5273   Filed 04/27/2009   Page 21 of 25

without limitation, all intellectual property necessary or materially useful for the design, manufacture, marketing, distribution and sale of any Bratz doll or other Bratz-branded product in the possession, custody or control (whether or not claimed to be encumbered by any security interest) of any of the MGA parties, agents, and related entities. The Bratz Assets include, without limitation:

a.   All Bratz-related intellectual property rights, including, without limitation, copyrights (whether or not registered); copyright registrations; moral rights; design rights; patents (issued and pending); service marks; trademarks; trade dress; designs; slogans; characters; product packaging in any medium; product names; product illustrations; product designs; product concepts; conceptual drawings; engineering drawings; engineering specifications; processes; methods; trade secrets; know-how; product ideas; prototypes; line extensions; domain names; marketing and advertising materials; commercials; style guides; theme songs; soundtracks; scripts; screenplays; computer programming; digital and internet rights; video games; theatrical, television, video and DVD rights and masters; and rights in future technologies.

b.   All Bratz-related tooling for all past, current and future lines, including without limitation tools, tooling, in process tools, molds, sculptures, models, dies, and mock-ups, as well as other Bratz-related tangible items.

c.   All Bratz-related marketing and sales assets for all past, current and future lines, including, without limitation, consumer lists, marketing plans, account plans, focus group studies, marketing databases, and other consumer and marketing research.

d.   All Bratz-related records, including, without limitation, contracts, manufacturing records, inventory records and data, sales records and data, product testing data and records, vendor list and records, customer communications, and invoices and purchase orders.

e.   All Bratz-related contracts and agreements, including, without limitation, assignments, work-for-hire agreements and licensing agreements.

f.   All other Bratz-related rights, including, without limitation, distribution rights, licensing rights, exploitation rights, accounts receivable, and all choses in action relating to Bratz or the Bratz

Case 2:04-cv-09049-DOC-RNB   Document 5340-2   Filed 05/04/09   Page 74 of 109   Page ID
#:174802
Case 2:04-cv-09049-SGL-RNB   Document 5273   Filed 04/27/2009   Page 22 of 25

brand.

g.   All Bratz-related items referenced at Paragraph 3 and Paragraph 8 (at lines 15-19) of the Court's Order granting Mattel's Motion for Permanent Injunction (docket #4443).

8.   The Temporary Receiver shall hereby be vested with, and is authorized, directed and empowered to exercise, all of the rights, powers or authorizations of the MGA entities, their officers, directors, general partners or persons who exercise similar powers and perform similar duties, including without limitation the sole authority and power to file or cause to be filed any suit or action in any court or arbitration tribunal other than this court, and filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. for the MGA entities, their officers, agents, employees, representatives, directors, successors-in-interest, attorneys in fact and all persons acting in concert or participating with them are hereby divested of, restrained, enjoined, and barred from exercising, any of the rights, powers or authorities vested herein in the Temporary Receiver, including but not limited to filing, or causing to be filed, any suit or action in any court or arbitration tribunal other than this court, and/or filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. for the MGA entities, except as otherwise specified herein or by further order of this Court.

9.   As set forth above, the Court leaves undisturbed the stay set forth in the Court's January 7, 2009, Order.  Moreover, the stay is hereby supplemented (a) to enable the Temporary Receiver to take the actions specified herein, and (b) to permit retailers who receive Bratz products pursuant to the authority of the Temporary Receiver, and who pay the Temporary Receiver monies due and owing for such Bratz products, to not remove such products from the shelves until January 10, 2010, at which time the mandatory provisions of Paragraphs 4, 6 and 7 of the Court's December 3, 2008, Order granting Mattel's Motion for Permanent Injunction (docket #4443) shall become effective as to such retailers.  The supplemental stay provisions shall not eliminate, alter or amend the obligations of any retailer, distributor, seller or other person or entity, including, without limitation, the MGA parties, who do not meet the foregoing requirements, to earlier recall or earlier obtain the recall of Bratz products as required by the mandatory provisions of Paragraphs 4, 6 and 7 the Court's Order granting Mattel's Motion for Permanent Injunction (docket #4443).  The supplemental stay provisions shall not apply to permit, enable or authorize enjoined conduct by any enjoined party, except as to actions taken by the Temporary Receiver and/or any

Exhibit F, p. 71

authorized agents working for and under the auspices of the Temporary
Receiver pursuant to the terms of this Order.

10. Additional Provisions.

    a.   In the event that any person or entity or fails to refuses to deliver or
transfer any of the assets of the MGA entities or Bratz Assets or
otherwise fails to comply with any provision of this Order, the
Temporary Receiver is instructed to file ex parte an affidavit setting
forth the failures. Upon the filing of such affidavit, the Court may
authorize repossession or sequestration or other equitable relief as
requested by Temporary Receiver.

    b.   The Temporary Receiver shall maintain and shall not disburse,
distribute or pay anyone any receivership funds or proceeds earned
from exploitation of Bratz-branded dolls and products except as
needed to satisfy the reasonable and ordinary cost and expenses
incurred by the receivership.

    c.   The Temporary Receiver shall have the status of officers and
agents of this Court, and as such shall be vested with the same
immunities as vested with this Court. Neither the Temporary
Receiver nor any person or entity acting at the direction of the
Court or pursuant to agreements with the Temporary Receiver
(whether employees, vendors, contractors or otherwise) may be
held liable to the MGA parties whether for claims of alleged
copyright infringement, trademark infringement, or other alleged
causes of action for any acts taken in good faith in compliance with
this Order.

    d.   During the course of the receivership, and pending further order of
the Court, the MGA parties shall not have any right, title, or interest
and/or power as to the Bratz Assets or Bratz brand. All ownership
of all Bratz Assets, Bratz Brands and Bratz-related copyrights and
other intellectual property are hereby vested in the Temporary
Receiver and the MGA parties are divested of all such ownership.
Nothing herein shall alter or affect the right of Mattel to take any
and all actions relating to the Bratz Assets or the Bratz brand which
it otherwise lawfully could take, including, without limitation, the
institution, maintenance and prosecution of legal proceedings
anywhere in the world or other proceedings before any
governmental or tribunal or arbitration panel.

    e.   Effective as of the date of this Order, the MGA parties, agents, and

MINUTES FORM 90
CIVIL -- GEN

23

Initials of Deputy Clerk __cls_____

Exhibit F, p. 72

related entities shall turn over to the Temporary Receiver any and all revenues they receive or obtain relating to the MGA entities and Bratz in any manner and for any reason, including, without limitation, in connection with any sale, distribution and/or licensing thereof. These revenues shall not be released pending further order of the Court. The MGA entities shall account for all such revenues and interest paid thereon, and shall present to the Court, the Temporary Receiver and Mattel reports reflecting such accounting every ten days, commencing ten days from the date of this Order.

f.    To the extent that the proceeds are insufficient at any point to fund the cost of the receivership, the MGA entities are ordered to provide the Temporary Receiver with such additional funds as the Temporary Receiver requires to accomplish the purposes of the receivership.

g.    The Court shall retain jurisdiction over the receivership for the duration of its existence.

h.    No bond shall be required in connection with the appointment of the Temporary Receiver. Except for acts of gross negligence, the Temporary Receiver, and his agents and employees shall not be liable for loss or damage incurred by the MGA entities, its officers, agents, servants, employees, attorneys or others by virtue of any act performed or omitted to be performed by the Temporary Receiver in connection with the discharge of his duties and responsibilities.

i.    It is further ordered that no officer, director, agent, servant, employee or attorney of the MGA entities shall take any action in the name of or on behalf of the MGA entities before any court of any jurisdiction without the prior written consent of the Temporary Receiver or Order of the Court. However, notwithstanding the foregoing, nothing herein shall be deemed to deny the MGA parties the right to appeal from the Order Granting Preliminary Injunction or this Order. Moreover, this provision is subject to the right of the MGA parties with respect to the current litigation, as set forth in ¶ 4.r.

j.    In light of the appointment of a Temporary Receiver, the MGA entities, their officers, directors, agents, employees and attorneys are hereby prohibited from filing, or causing to be filed, a petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101

et seq. for the MGA entities without prior permission of this Court.

k.   The MGA entities are ordered to cooperate fully with the Temporary Receiver, including without limitation providing all   financial and other documentation requested by the Temporary Receiver.

l.   The Temporary Receiver is authorized to contact the Court-appointed Forensic Auditor, Ronald Durkin, and may utilize the findings and conclusions reached by Mr. Durkin as the Temporary Receiver deems appropriate.

m.   The Temporary Receiver is hereby ordered and directed to prepare and provide to this court a report setting forth preliminary conclusions, findings and recommendations in accordance with the schedule set forth below.

11.   Order to Show Cause.  All interested parties, and any interested creditor, shall appear before this Court on Monday, May 18, 2009, at 2:00 p.m. to show cause, if there be any, why a permanent receiver should not be appointed in the same scope and manner as the Court's appointment of the Temporary Receiver.  Any declarations, affidavits, points and authorities or other submissions in support of, or in opposition to, the appointment of a Permanent Receiver shall be filed with the Court and served on all parties no later than May 14, 2009.

12.   Pursuant to L.R. 66-4, Mattel is **ORDERED** to cause this Order to be served on all known creditors of the MGA entities within three days of the date of this Order.

13.   The Temporary Receiver shall file a report and recommendation concerning all actions taken as well as recommendations for further action no later than Monday, May 11, 2009.  This report shall be filed with the Court and served on all parties.

**IT IS SO ORDERED THIS 27th DAY OF APRIL, 2009**

*S.G. Larson*

**STEPHEN G. LARSON**
**UNITED STATES DISTRICT JUDGE**

MINUTES FORM 90
CIVIL -- GEN

25

Initials of Deputy Clerk __cls_____

Exhibit F, p. 74

# EXHIBIT G

P. Send



1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10    CARTER BRYANT,

11                                              CASE NO. CV-04-9049-SGL
                        Plaintiff,
12                                              (Consolidated with cases CV-04-9059 and
                                                CV-05-2727)
13    v.

14    MATTEL, INC.,                             ORDER REGARDING MATTEL'S
                                                MOTION FOR LEAVE TO AMEND
15                        Defendant.

16    and related actions.

17

18          This case has, increasingly, become one of the proverbial tail wagging the

19    proverbial dog.

20          Back in April, 2004, Mattel, Inc., ("Mattel") filed a complaint in Los Angeles

21    County Superior Court against its former employee and the reputed creator of the

22    BRATZ dolls, Carter Bryant. The complaint pressed five separate state-law

23    theories relating to certain agreements Bryant signed while an employee with

24    Mattel, namely, an Employee Confidential Information and Inventions Agreement

25    ("Inventions Agreement") and a Conflict of Interest Questionnaire ("COI

26    Questionnaire"). Although couched in state law terms and ostensibly pled as a

27    simple employment action, lurking beneath the allegations in the complaint was

28    whether Bryant had either misappropriated Mattel's intellectual property or

**Exhibit G, p. 75**

1    resources in creating and/or developing the BRATZ dolls or whether he continued

2    to develop his BRATZ design while still working in Mattel's employ.  In either event,

3    the rights to the BRATZ dolls could become the property of Mattel, either through

4    infringement or through operation of the agreements noted above.  The case was

5    later removed to this Court and was assigned the case number CV-04-9059.  MGA

6    Entertainment, Inc. ("MGA"), the maker of the BRATZ doll line, then intervened "to

7    protect its rights to Bratz dolls" that were at stake in the action.  Mattel, Inc. v.

8    Bryant, 446 F.3d 1011, 1012 (9th Cir. 2006); see also id. at 1013 ("Mattel argues, 'a

9    significant risk of prejudice' to MGA [exists] if the ownership of rights to intellectual

10   property, i.e., the Bratz creations, were decided in the absence of MGA").

11         In the interim, Bryant filed a declaratory judgment action in this Court,

12   seeking for the Court to declare that his BRATZ doll creations did not infringe

13   Mattel's copyright in its Toon Teens products.  See Court's July 18, 2006, Order at

14   3 (noting that, although "Bryant's complaint . . . makes reference to 'other Mattel

15   products,' . . . the substance of his allegations all address the product 'Toon

16   Teens'").  The declaratory judgment action was assigned the case number CV-04-

17   9049.

18         MGA then filed an action against Mattel in this Court broadening the scope

19   of the controversy beyond that concerned with the ownership rights to the BRATZ

20   doll line.  MGA's complaint asserted various Lanham Act claims and their California

21   state law equivalent arising out of Mattel's alleged "habitual and unfair tactics of

22   competition-by-intimidation and serial copycatting of MGA's products." (Compl.

23   ¶ 7).  In essence, although the prior actions were concerned with ownership in the

24   rights to the BRATZ doll line, the allegations in 05-2727 concerned whether there

25   had been unlawful efforts to block the marketing of those rights in the BRATZ dolls.

26   MGA's complaint did make mention of other products that were affected by Mattel's

27   alleged predatory business practices, but by far the largest portion of its complaint

28   concerned Mattel's conduct in undermining (or seeking to undermine) MGA's rival

2

1 line of BRATZ dolls.[1]

2    By Order dated June 19, 2006, the Court consolidated all three cases "for all
3 purposes" as they "involve[d] a number of common issues of law and fact." As the
4 Court later noted in its August 10, 2006, Order: "At its heart, this case asks the
5 question: Who owns the rights to the Bratz dolls?" Resolution of this question lies
6 at the heart of or, at the very least, affects many of the other claims set forth in
7 each of the three respective cases. For instance, even though the allegations in
8 05-2727 concern Mattel's alleged efforts at defeating the marketing of the BRATZ
9 dolls, resolution of who owned the rights to the BRATZ dolls could serve to moot
10 many of those allegations. It is hard to imagine how it is unlawful for a company to
11 thwart or otherwise undermine the marketing of a product it owns. Thus, if Mattel
12 owned the rights to the BRATZ dolls, many of the allegations in the 05-2727
13 complaint would become moot. That said, such consolidation did not do away with
14 the distinctions that do exist between the three cases. As the Court highlighted in
15 its consolidation order, when either party files a pleading in the case, "the first
16 paragraph of [that] document . . . shall inform the Court to which case(s) the
17 document relates."

18    On July 18, 2006, the Court dismissed Bryant's declaratory judgment action,
19 04-9049, finding there existed no reasonable apprehension of an imminent
20 copyright infringement claim being filed against him by Mattel based on Mattel's
21 Toon Teen intellectual property. See Court's July 18, 2006, Order at 4. The
22 Court's Order was predicated entirely upon counsel for Mattel's representation
23 during oral argument that it "will not maintain that Bratz infringes the copyright in
24 Toon Teens." Owing to this representation, the Court, in dismissing the declaratory
25 judgment action, made clear that any future "claim by Mattel of copyright

26

27    [1] That the marketing of the BRATZ dolls lies at the heart of the issues
between the rival doll makers in the 05-2727 case is best illustrated by the Court's
28 discussion of those allegations in its August 26, 2005, Order, Granting in Part and
Denying Part Mattel's Motion to Strike portions of MGA's complaint.

3

Exhibit G, p. 77

1  infringement based on the Toon Teens product is barred by counsel's
2  representation." July 18, 2006, Order at 4.

3      Presently before the Court is Mattel's request for leave to file an amended
4  complaint in the 04-9059 action. The complaint broadens considerably the nature
5  of the action from its genesis in state court. Whereas before the complaint simply
6  sought to litigate alleged contractual and fiduciary breaches by Bryant while in the
7  employ of Mattel (no doubt geared toward procuring a legal basis for Mattel to lay
8  claim to the BRATZ doll line), the amended complaint adds five more defendants
9  and nine new legal claims, alleging a wide range of commercial disputes between
10  the rival doll makers that spans three countries. For instance, the amended
11  complaint now contains RICO claims, a misappropriation of trade secrets claim,
12  and various aiding and abetting claims all stemming from allegations that MGA
13  cherry-picked certain high-ranking Mattel executives in foreign markets (many also
14  named as defendants in the amended complaint) or designers (namely, Bryant),
15  and then enticed or encouraged those same individuals to steal various trade and
16  proprietary secrets (be it sales plans, sales projections, customer profiles, or
17  intellectual property) from Mattel and hand them over to MGA before going to work
18  at MGA.

19      Moreover, the amended complaint expands upon the existing breaches of
20  contract and fiduciary duty claims in the original complaint by expanding the
21  universe of former employees (namely, the cherry-picked executives) to whom
22  those claims now apply.

23      Finally, Mattel now makes plain what was always lurking in its original
24  complaint — a copyright claim, but one directed not only to Bryant but also to MGA,
25  MGA's Hong Kong subsidiary, and MGA's President and CEO Isaac Larian.
26  Moreover, Mattel characterizes its copyright claim somewhat differently from that at
27  issue in Bryant's declaratory relief action: "The Amended Complaint does not
28  include a claim for infringement of copyrights in Toon Teens, but rather

4

1 infringement of copyrights in Bratz." (Reply to MGA Opp. at 11). Toward that end,

2 Mattel has recently filed copyright registrations with the U.S. Copyright Office

3 claiming ownership in various BRATZ doll design drawings penned by Bryant.

4 A. ANALYSIS

5 Federal Rule of Civil Procedure 15(a) provides that, once a responsive

6 pleading has been served, "a party may amend the party's pleading only by leave of

7 court or by written consent of the adverse party; and leave shall be freely given

8 when justice so requires." With no consent to Mattel's proposed filing proffered by

9 MGA and Bryant, determining whether to grant Mattel leave to file an amended

10 complaint is gauged by looking to the familiar formulation of factors set forth by the

11 Supreme Court in Forman v. Davis:

12

13 In the absence of any apparent or declared
reason—such as undue delay, bad faith or dilatory
motive on the part of the movant, repeated failure to
14 cure deficiencies by amendments previously allowed,
undue prejudice to the opposing party by virtue of
15 allowance of the amendment, futility of amendment,
etc.—the leave sought should, as the rules require, be
16 'freely given.' Of course, the grant or denial of an
opportunity to amend is within the discretion of the
17 District Court, but outright refusal to grant the leave
without any justifying reason appearing for the denial is
18 not an exercise of discretion; it is merely abuse of that
discretion and inconsistent with the spirit of the Federal
19 Rules.

20 371 U.S. 178, 182 (1962).

21 MGA and Bryant offer the following reasons for denying Mattel leave to

22 amend: (1) Mattel has long known of the factual predicates underlying its copyright

23 and intentional interference claims but delayed in asserting them; (2) the proposed

24 amendment to add the copyright claim and the intentional interference claims

25 (against the new defendants) are futile because they are barred by the applicable

26 statute of limitations; (3) the copyright claim had been brought in bad faith by Mattel

27 because of its prior public disavowal of an intent to assert such a claim; and (4)

28 MGA and Bryant would incur undue prejudice were the copyright claim added to the

5

1  suit because of alleged spoilation of evidence issues involving Mattel's ZEUS
2  computer system used by doll designers at Mattel and its e-mail system.  None of
3  these arguments are persuasive.

4       1.    Awareness of Factual Predicate for Copyright and Intentional
5             Interference Claims

6       MGA argues that Mattel has long known about the factual predicate for its
7  recently added copyright claim, observing that, "[o]ver four years ago, in August
8  2002, Mattel CEO Bob Eckert received an anonymous letter stating that Bryant
9  created the project that became the 'Bratz' dolls — and worked with MGA to 'steal'
10  that project — while still employed at Mattel." (MGA Opp. at 9). Similarly, MGA
11  argues that Mattel has long known of the factual predicate for its intentional
12  interference claim with respect to Bryant's contract given that, "[b]y Mattel's own
13  admission, it learned in November 2003 — more than three years ago — that
14  Bryant had signed a contract with MGA 'dated as of' a month prior to his final day at
15  Mattel." (MGA Opp. at 11-12).

16       At the outset it must be observed that "[m]ere delay in proffering an
17  amendment does not justify denying leave to amend." Sierra Club v. Union Oil Co.
18  of California, 813 F.2d 1480, 1493 (9th Cir. 1987), vacated on other grounds by,
19  485 U.S. 931 (1988), and reinstated by, 853 F.2d 667 (9th Cir. 1988).  Seizing upon
20  this point of law, Mattel argues that "only in . . . cases" when "granting leave would
21  require discovery to be reopened after summary judgment motions have been filed"
22  has the Ninth Circuit found the denial of leave "justified" based on the passage of
23  time alone. (Reply to MGA Opp. at 3). That is incorrect. There is a line of cases
24  from the Ninth Circuit finding that, if a "party seeking amendment knows or should
25  know of the facts underlying the amendment when the original complaint is filed,
26  the motion to amend may be denied." Sierra Club, 813 F.2d at 1493 (citing Jordan
27  v. County of Los Angeles, 669 F.2d 1311, 1324 (9th Cir. 1982)). And, recently, the
28  Ninth Circuit upheld the denial of leave to amend based on the passage of time

6

Exhibit G, p. 80

1   even though the requested leave to amend was tendered <u>before</u> the time, as set

2   forth in a Rule 16(b) pre-trial scheduling order, for amending pleadings had expired.

3   See <u>AmerisourceBergen Corp. v. Dialysist West, Inc.</u>, 465 F.3d 946 (9th Cir. 2006).

4   The Ninth Circuit observed that, even when a request for leave to amend is timely

5   under a Rule 16(b) schedule for pretrial motions, the district court may nonetheless

6   still deny the request based on any of the <u>Forman</u> factors. <u>Id</u>. at 951-52. The Ninth

7   Circuit then noted that the issue of untimeliness (regardless of whether the

8   amendment is tendered "within the period of time allotted by the district court in a

9   Rule 16 scheduling order") in seeking to amend can constitute a justification for

10   denying leave to amend if "the moving party knew or should have known the facts

11   and theories raised by the amendment in the original pleading." <u>Id</u>. at 953.

12   Toward that end, the Ninth Circuit observed that "an eight month delay between the

13   time of obtaining a relevant fact and seeking a leave to amend is unreasonable."

14   <u>Id</u>. In this regard, the Ninth Circuit in <u>Dialysist</u> was unpersuaded by the fact that,

15   even though the moving party had known of the facts prompting the amendment for

16   a long period of time, there still remained eight more months of discovery for the

17   parties to marshal facts against the allegations raised by the amended pleading:

18   "Even though eight months of discovery remained, requiring the parties to scramble

19   and attempt to ascertain whether the Procrit purchased by AmerisourceBergen was

20   tainted, would have unfairly imposed potentially high, additional litigation costs on

21   Dialysist West that could have easily been avoided had AmerisourceBergen

22   pursued its 'tainted product' theory in its original complaint or reply." <u>Id</u>. Thus,

23   absent "a satisfactory explanation" for the delay in amending the complaint, the

24   Court is well within its rights to deny leave to amend. <u>Id</u>.

25        Mattel proffers the following reasons for taking the time that it did before

26   presenting its amended complaint: (1) Acting out of an abundance of caution to its

27   obligations under Rule 11 to present "factual contentions [that] have evidentiary

28   support," Mattel waited until its claims were better supported by evidence

7

**Exhibit G, p. 81**

1  uncovered in discovery; and (2) the delay in the proceedings caused by "the year-
2  long stay and the parties' prior jurisdictional disputes" have left the case still in its
3  "nascent stage." (Reply to MGA Opp. at 2, 4).

4        The first reason is not well-founded. Rule 11 specifically allows parties to
5  aver factual allegations that "are likely to have evidentiary support after a
6  reasonable opportunity for further investigation or discovery" so long as the party
7  makes clear in its pleading that its factual contentions on those points are with the
8  caveat that they are based on a good faith belief that further discovery would
9  unearth evidence to support them. See FED. R. CIV. P. 11(b)(3). Simply put, Rule
10 11 did not stand in the way of Mattel averring the factual contentions it now claims it
11 "merely suspected" as being the case based on the limited information before it.
12 Mattel could have gone ahead and made such suspected factual allegations so
13 long as it caveated those claims with the declaration that it reasonably believed that
14 those allegations would be borne out by further discovery. Perhaps the time by
15 which Mattel could have reasonably believed such allegations would be borne out
16 by further discovery occurred after the dates noted by MGA, but it is hard to fathom
17 that such materialization took three or four years to occur.

18        The second reason would have some merit to it but for the fact that the
19 information that alerted (or should have alerted) Mattel to the existence of its now
20 asserted copyright and intentional interference claims was brought to Mattel's
21 attention well before the case was stayed on May 20, 2005. The stay, therefore,
22 did not operate as an obstacle to Mattel asserting its claims; nor even if it did, the
23 stay does not explain why Mattel waited nearly six months after the stay was lifted
24 on May 16, 2006, to present those claims now.

25        All of that being said, the one thing that gives the Court pause in denying
26 leave based on the tardiness in Mattel's presentation is the lack of any evidence
27 that MGA or Bryant have been prejudiced by the delay. Delay unconnected to
28 some showing of prejudice, be it prejudice to the parties or disruption in judicial

8

Exhibit G, p. 82

1    management of the case, does not suffice to deny granting leave to amend. The

2    Ninth Circuit has noted that, "where a defendant is on notice of the facts contained

3    in an amendment to a complaint, there is no serious prejudice to defendant in

4    allowing the amendment" even if it is made tardily. Sierra Club, 813 F.2d at 1493.

5    Indeed, the denial of leave was proper in the Dialysist case not simply because of

6    the length of the delay, but because the delay itself was "detrimental" in that it

7    would entail the opposing party to have "unfairly" incurred "potentially high,

8    additional litigation costs" that could have been avoided if the moving party had

9    made clear its intentions earlier. 465 F.3d at 953.

10       Here, as well demonstrated in Mattel's papers, it is readily apparent from the

11   pleadings filed by MGA and Bryant in this case that both have been aware for some

12   time of the factual predicates now underlying Mattel's copyright claim and

13   intentional interference claim. (See MGA Opp. at 5 ("As Bryant and MGA

14   suspected at the time of filing — and Mattel now concedes by conduct — those

15   deceptively-pled state-law claims [in 04-9059] were copyright infringement claims all

16   along")(emphasis added)).  The parties have engaged in meaningful discovery

17   regarding many of the facts touched upon by these new claims, be it tracking down

18   experts in various forensic fields or taking depositions of various of the key players

19   to those claims.   In point of fact, in their papers filed with this Court before this

20   present motion, both Bryant and MGA have made it abundantly clear that they have

21   long suspected that a copyright infringement claim was in the offing as evidenced

22   by Bryant's filing of the declaratory judgment action and MGA's intervention in the

23   05-9059 matter to protect its rights to the BRATZ dolls. Similarly, MGA and Bryant

24   have been on notice to the facts comprising the interference claim concerning

25   Bryant's contract as evidenced by the identity of the individuals who have been

26   deposed by Mattel, as well as the nature of the questions posed and the testimony

27   proffered at those depositions. MGA's argument that, with the amendments, it

28   faces the prospect of defending "against stale claims" owing to faded memories and

9

1 loss of documents caused by the great passage of time, (see MGA Opp. at 3, 13),

2 is diminished by the fact that (no doubt owing to the sophistication of all counsel

3 involved) discovery on these very issues have been proceeding apace by both

4 sides long before Mattel filed its proposed amendments. This is simply not a case

5 where "additional litigation costs" will be "unfairly" visited upon Bryant and MGA by

6 allowing the proposed amendments; much of those costs have already been borne

7 by the parties for some time.

8      2.   Spoilation of Evidence

9      MGA next argues that Mattel's delay in bringing the amended complaint has

10 caused it prejudice as, in the interim, critical pieces of evidence have been or are

11 suspected of having become lost. For instance, MGA asserts that Mattel's Rule

12 30(b)(6) witness concerning its Zeus computer system, Julia Marine, testified that,

13 "although Mattel identified and segregated its most relevant backup tapes available

14 for Zeus, Mattel allowed its tape backup system to expire the database for those

15 backup tapes, thereby eliminating all information about what was actually stored on

16 those backup tapes." (MGA Opp. at 9-10). Information on the Zeus computer

17 system is critical because of Mattel's assertion that part of its copyright claim rests

18 on Bryant's exposure to Mattel development programs. (First Am. Compl. ¶ 26(a)).

19 As explained by MGA: "[C]oncept data and drawings created by [Mattel] design

20 center personnel are stored on Zeus. Thus, the electronic documents stored on

21 Zeus – which should include the metadata showing who created, edited and

22 accessed Mattel's concept drawings and designs – during the time Bryant worked

23 in the design center at Mattel is vitally important to defending against Mattel's

24 claims." (MGA Opp. at 14). MGA's argument is neither an accurate

25 characterization of Ms. Marine's testimony nor of the nature of Mattel's exposure

26 claim.

27      Ms. Marine did not testify that the information on the backup tapes (some

28 fifty in total) was lost, but rather that Mattel no longer carried the type of hardware

10

Exhibit G, p. 84

1    that could restore the information still found on those tapes:

2        Q.    So if you wanted to restore that 2002 backup
3              tape[s] then, how would you go about doing that?

. . . .

4        A.    You need the hardware so if we don't have the
5              hardware — if [the technology used by the tape
              is] DLT we don't have the hardware and you've
6              got to buy it and – well, first you have to find a
              place to put it with adequate power which we
7              don't have in the design center. You need to
              have a tape library. You need to have the tape
8              drives that carried those tapes. You need a
              server that has the capability to – that's big
9              enough to handle all of the hardware. You need
              the software – the license for the backup
10             software[, Net Backup]. You need the disk space
              to restore it to and then you have to start reading
11             in all those tapes.

12        Q.    You said that you don't have that in the design
              center. Do you have that hardware anywhere
13             else in the company?

14        A.    DLT? No, no.

15        Q.    At what point did you get rid of the hardware?

16        A.    Once the last backups — DLT backups expired
              so it would have been a couple years ago
17             probably.

18    (Decl. Diana Torres, Ex. K at 118-119).

19       The above testimony clearly denotes the difficulty in restoring what was on

20    Mattel's Zeus computer system during the relevant time frame, but it certainly does

21    not demonstrate that the information on those backup tapes has been "eliminated"

22    or forever lost. Undoubtedly it will be a costly endeavor to recover that information

23    (not to mention to later search and sort through it); but to argue, as MGA does, that

24    the information is "unavailable" or "lost", (MGA Opp. at 9, 14), exaggerates its

25    plight. Indeed, Ms. Marine's testimony indicates that the difficulty in retrieving the

26    information on the Zeus backup tapes has been present for some time (maybe

27    since 2004 or perhaps even earlier). This is important because it undermines

28    MGA's claim that Mattel's undue delay in bringing its amended complaint will cause

11

1   it to suffer prejudice it otherwise would not have faced if the amendments were
2   brought sooner. Such prejudice has been present for years, and Mattel's failure to
3   bring its amended complaint sooner would not have changed this situation.

4       Similarly, MGA's point that access to what was on the Zeus computer
5   system is vital in demonstrating that Bryant was not exposed to or otherwise did not
6   hack the system to steal other designers work is diminshed to some extent by the
7   fact that Bryant himself testified that he did not use the Zeus computer system and
8   was "pretty much computer illiterate" while employed at Mattel. Admittedly, the
9   ability to point to information on the Zeus system backup tapes to prove that Bryant
10  did not access other designers drawings or to prove the date those drawings were
11  created by those other designers would be useful evidence to negate Mattel's
12  factual claims. Nonetheless, such evidence still would not discount other avenues
13  outside of the Zeus computer system by which Mattel could seek to prove that
14  Bryant was exposed to its copyrighted works, e.g., witness testimony that Bryant
15  saw drawings of the same posted on other designers' cubicles.

16      MGA next surmises that Mattel's e-mail records have disappeared, not
17  because it has any proof on that point, but simply because Mattel has postponed
18  the deposition of the individual most knowledgeable of Mattel's e-mail records until
19  after the hearing on Mattel's motion for leave to amend. (MGA Opp. at 10).
20  Speculation of spoilation does not suffice. That MGA's argumentation on this point
21  is nothing more than speculation is best exhibited by the evidence it has proffered
22  in support of its argument: "[I]f the sole retained backup for Zeus is no longer
23  available, it is not hard to imagine that Mattel's electronic mail archives are similarly
24  out of reach." (MGA Opp. at 15 (emphasis added)). MGA then makes much of a
25  deposition from a Mattel executive, Alan Kaye, who testified that e-mails in his
26  inbox would be automatically deleted if they had remained there for more than a
27  certain time period. (Decl. Diana Torres, Ex. H at 292-93). MGA takes from this
28  acknowledgment that Mattel has an "automatic email deletion system" that has

12

**Exhibit G, p. 86**

1    compromised Mattel's "duty to preserve documents." (MGA's Opp. at 14).

2    Noticeably absent from MGA's argument is any evidence that the e-mails so

3    deleted from a Mattel employee's inbox are forever lost or, as is far more likely,

4    whether such information remains or is otherwise archived on some backup file on

5    Mattel's computer system.  Absent concrete proof that spoilation has occurred,

6    nothing in MGA's argument forms a basis for denying Mattel its requested leave to

7    amend.

8        3.    Statute of Limitations

9        MGA next argues that Mattel's copyright and intentional interference claims

10   are futile as both are barred by the applicable statute of limitations.  This argument

11   was pressed emphatically at oral argument.  With respect to the copyright claim,

12   MGA argues that the applicable statute of limitations is three years, with the

13   limitations period accruing from when a party has knowledge of a violation or when

14   a reasonably diligent person would have been put on inquiry of the infringement.

15   (MGA Opp. at 16 (citing Roley v. New World Pictures, 19 F.3d 479, 481 (9th Cir.

16   1994)).  MGA argues that Mattel was put on notice about its copyright claim in

17   August, 2002, upon the receipt of the anonymous letter to Mattel's CEO that Bryant

18   had stolen the idea for BRATZ while working at Mattel.  Thus, according to MGA,

19   the limitations period on Mattel's claim expired in August, 2005, rendering Mattel's

20   current copyright claim stale.

21       The problem with MGA's analysis is it fails to take into account the relations-

22   back principles found in Rule 15(c), which provides that "[a]n amendment of a

23   pleading relates back to the date of the original pleading when "the claim . . . in the

24   amended pleading arose out of the conduct, transaction, or occurrence set forth . . .

25   in the original pleading," or if such relation back is otherwise permissible by the

26   state "law that provides the statute of limitations applicable to the action."  By

27   MGA's own admission Mattel's copyright claim arises out of the same conduct or

28   transaction contained in the original complaint filed in April, 2004, well within the

1  applicable limitations period.[2] (MGA Opp. at 12 ("These very same allegations

2  [contained in the original complaint] underlie the copyright infringement and

3  intentional interference contract claims Mattel now seeks to allege against MGA,

4  Mr. Larian and Bryant")).

5      MGA's statute of limitations argument with respect to the intentional

6  interference claims fares no better. According to MGA, the applicable statute of

7  limitations is two years for an intentional interference with contract claim and Mattel

8  was aware of the facts alerting it to this claim (insofar as Bryant's contract is

9  concerned) on November 24, 2003, when it learned "that Bryant worked with MGA

10  to develop the 'Bratz' dolls prior to his last day of employment by Mattel and, hence,

11  prior to the expiration of his contractual relationship with Mattel."[3] (MGA Opp. at 18

12  (citing Knoell v. Petrovich, 76 Cal. App.4th 164, 168 (1999)). Such a time line

13  would, according to MGA, mean that the applicable limitations period expired on

14  Mattel's interference with Bryant's contract claim on November 24, 2005, well

15  before Mattel sought leave to file its amended complaint. (Id). The problem again

16  with MGA's argument is that it ignores that through Rule 15(c) Mattel's intentional

17  interference claim would relate back to when it filed its original complaint in April,

18

19

20      [2] The same would appear to be true — that the amendments would be timely

21  — if the amendments related back to Mattel's answer (filed on May 13, 2005) to
   MGA's complaint in the 05-2727 case.

22

23      [3] With respect to Mattel's interference with contract claim as to one of its
   former executives, Ron Brawer, MGA claims Mattel was put on notice of that claim

24  on September 17, 2004, when Brawer informed Mattel that he leaving to go to work
   for MGA. (MGA Opp. at 19-20). The problem with this argument is that nothing from

25  that simple event — Brawer's declaration of his intent to leave — in any way would
   apprise Mattel that MGA had encouraged Brawer to engage in nefarious conduct

26  (the stealing of proprietary information) causing Brawer to breach his contract with
   Mattel that he would not do anything to help a competitor while working for them.

27  MGA's contention that Mattel must have known of those misdeeds in mid-September
   is nothing more than speculation. Futility cannot be founded on what might or might

28  not be the case; either a claim is futile to bring or it is not.

14

1    2004, well before the limitations period expired.[4]

2            Accordingly, MGA's futility argument is not well-founded.

3        4.    Prior Disavowals of Asserting a Copyright Claim

4    Finally, MGA takes umbrage with the cageyness to which Mattel has taken in

5    this case as to whether or not it is asserting a copyright infringement claim against

6    it. To MGA, such ducking and weaving on Mattel's part renders its effort to now

7    bring such a copyright claim as one done in bad faith. No doubt the Court itself has

8    been subjected to Mattel's overly vague statements on this point, but in the end

9    nothing in those statements has ever foreclosed the possibility that such a claim

10   may be in the offing. Indeed, during the oral argument on Mattel's motion to

11   dismiss Bryant's declaratory judgment action, the Court pressed Mattel's counsel as

12   to whether it would assert such a copyright claim against Bryant as it is currently

13   seeking to do. The most that Mattel's counsel would proffer was that Mattel would

14   not assert a copyright claim against Bryant based on Mattel's copyright rights in

15   TOON TEENS. At that point, the Court directed the parties to engage in a meet

16   and confer based on counsel for Mattel's representation and to provide a report to

17   the Court based on those discussions. The report submitted to the Court made

18   clear that, although Mattel was willing to accede that it would not bring a copyright

19   claim based on TOON TEENS, it refused to accede to Bryant's broader request

20   that "Bryant 'never copied anything' and that no Mattel product has any 'relevance'

21   to any claim that Mattel has or ever will assert against Bryant." This by itself should

22   have dispelled any illusion either Bryant or MGA was operating under that Mattel's

23   prior statements had foreclosed any potential copyright claim against them.[5]

24

25        [4] Again the relations-back principle would also seem to render its claim timely
     if it were filed as an amended answer (the original having been filed in May, 2005) in
26   the 05-2727 case.

27        [5] MGA also argues that Mattel's effort to substitute MGA and its CEO, Isaac
28   Larian, for the "Doe" defendants listed in its original complaint is improper because
     Mattel knew of their identity when it filed the original complaint. The argument is

                                       15

                                                        Exhibit G, p. 89

1      That said, Mattel's allegation in the amended complaint as to how it is

2  seeking to lay claim to the copyright in BRATZ is disconcerting. Paragraph 26,

3  subsection a, in the amended complaint alleges that Bryant "misappropriated and

4  misused Mattel property" by "using his exposure to Mattel development programs to

5  create the concept, design and name of Bratz." (First Am. Compl. ¶ 26(a)). Such

6  "exposure" could include Bryant misappropriating the Mattel design concept in

7  TOON TEENS in drawing his inspiration for the BRATZ doll. Were Mattel's

8  copyright claim so predicated it would be barred by this Court's July, 2006, Order,

9  dismissing Bryant's declaratory judgment action. Mattel was pressed on this point

10  during oral argument and conceded that such "exposure" to Mattel "development

11  programs" did not include TOON TEENS. With this representation, nothing in

12  Mattel's proposed copyright claim is barred under the rubric of bad faith.

13     5.   Judicial Economy Considerations

14      In his opposition, Bryant adds an additional reason for denying leave beyond

15  those contained in MGA's papers — the amendment would muddy the waters in the

16  04-9059 by adding "tangential" issues that would only serve to delay resolution of

17  the key issue lying at the heart of the complaint: Who owns the rights to the

18  BRATZ line of dolls. (Bryant Opp. at 2 ). Bryant notes that the case has proceeded

19  apace in moving toward resolving that issue, and the amendment would "transform

20

21  misplaced. As made clear by Mattel, California law allows a plaintiff to substitute in a
22  defendant for a "Doe" if the plaintiff was ignorant of that defendant's identity or
    ignorant of the basis for liability at the time the complaint was filed. See Miller v.
23  Thomas, 121 Cal.App.3d 440 (1981). MGA does not dispute this legal contention
24  but at oral argument disputed that Mattel did not know the basis for liability against
    itself or Mr. Larian due to the "uncanny" similarity between the allegations averred in
25  the original complaint and those now proffered against the two in the amended
    complaint. Specifically, MGA notes that the original complaint spoke of Bryant
26  working for one of Mattel's competitiors and of that employee's theft of Mattel's
    intellectual property before leaving to work for that competitior. At most, all this
27  shows is that Mattel knew that Bryant went to work for MGA, not that MGA or Mr.
28  Larian encouraged Bryant's alleged unlawful behavior recited in the original
    complaint.

16

1  what Mattel has always claimed was a straightforward employment action against

2  an individual defendant into a global commercial dispute against Mattel's primary

3  competitor, MGA," that "will last years" thereby "delay[ing]" resolution of who owns

4  BRATZ.[6] (Bryant Opp. at 2). Mattel argues that "the law does not deny leave to

5  amend because claims are 'tangential'" and then reiterates its point that some

6  showing of prejudice, namely, seeking leave after expiration of discovery, is

7  necessary. (Reply to Bryant Opp. at 3). That is not entirely correct.

8      As noted previously, the Ninth Circuit recently upheld a denial for leave to

9  amend because the amendment would have "drastically changed" the litigation,

10 even though the leave request was tendered before the time, as set forth in a Rule

11 16(b) pre-trial scheduling order, for filing a motion to amend had expired and well

12 before the discovery cut-off. See AmerisourceBergen Corp. v. Dialysist West, Inc.,

13 465 F.3d 946, 953 (9th Cir. 2006). In justifying its reasoning the Ninth Circuit cited

14 approvingly to the following statement from a well-respected treatise: "If an

15 amendment substantially changes the theory on which the case has been

16 proceeding and is proposed late enough so that the opponent would be required to

17 engage in significant new preparation, the court may deem it prejudical." Id. at 953

18 n.2 (quoting 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE,

19 FEDERAL PRACTICE AND PROCEDURE § 1487 (2nd ed. 1990)). Thus, Dialysist

20 recognized that the introduction of "different legal theories" and/or proof of

21 materially different facts well into the litigation can itself be a basis for finding

22 prejudice regardless of whether the period for discovery has expired (or is even

23 close to expiring) or the parties have already filed summary judgment motions. Id.

24 at 953-54.

25     Although the parties can safely be said to be at this point well into the

27  [6] Bryant also brings intricate legal arguments about the sufficiency of the
28 allegations Mattel has averred in building its RICO claims against him. Such
considerations are best left to be resolved on a properly filed motion to dismiss.

17

1  litigation in this consolidated action (as evidenced by the protracted discovery

2  disputes contained in the docket sheet that the parties have had before the

3  magistrate judge and now the special master, and the litigation of motions to

4  dismiss in both the 04-9049 and 04-9059 cases), the fact remains that, as Mattel

5  has made painfully clear in its papers, no scheduling order has been entered in this

6  case.[7] This takes away somewhat from the prejudice Dialysist found to exist when

7  a "drastic change [in a party's] litigation theory" takes place mid-stream in the

8  litigation process. Id. at 953. Simply put, without a schedule for the filing of pre-trial

9  motions and other matters (e.g., discovery cutoff), the parties have been given free

10  reign in how to conduct the litigation in this case.

11  That the delay in bringing the proposed amendments and the relative length

12  of time into the litigation when those amendments were brought may not neatly fold

13  into Dialysist's reasoning does not mean that leave must nonetheless be granted.

14  The 04-9059 action, as it is presently constituted, is not a complex one. It asks a

15  rather narrow and straightforward question — Did anything from Bryant's

16  employment at Mattel during the 1999-2000 period give Mattel ownership rights to

17  the BRATZ doll line? The proposed amendments would radically alter the litigation

18  in that case to include far ranging disputes involving multiple parties and concerning

19  events not connected with the BRATZ ownership issue. That the original action

20  was a relatively simple and straight-forward matter raises another point beyond the

21  change in the action's litigation posture — whether entangling the rival doll makers'

22  other commercial disputes into this particular case would serve to muddy the waters

23  and make the matter that much more difficult to manage from the Court's

24  perspective.

25

26  [7] Mattel's repeated refrain that the matter is in its nascent stage as evidenced by the fact that the parties only just recently exchanged in initial disclosures is misleading. The exchange of initial disclosures referred to by Mattel is in the 05-2727 case. With respect to the 04-9059 case it appears that such initial disclosures were completed long ago as evidenced by the fact that discovery disputes appeared in that case as far back as January, 2005.

27

28

18

Exhibit G, p. 92

1    As has long been recognized, equally important in determining whether to
2  grant such leave is what impact such amendments would have on the court's ability
3  to manage the case. See 3 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE
4  § 15.15[1] at 15-42.1 to 15-43 (3rd ed. 2006)("A court should also consider judicial
5  economy and its ability to manage the case. . . . The court should also temper the
6  policy favoring freely granting leave to amend with consideration of the ability of the
7  district court to manage the case adequately if amendment is allowed"). As Judge
8  Clark for the Fifth Circuit once observed: "In keeping with the purposes of the rule,
9  the court should consider judicial economy and whether the amendments would
10 lead to expeditious disposition of the merits of the litigation. Finally, the court
11 should consider whether the amendment adds substance to the original allegations,
12 and whether it is germane to the original case of action." Chitimacha Tribe of
13 Louisiana v. Harry L. Laws Co., 690 F.2d 1157, 1163 (5th Cir. 1982); see also
14 Sierra Club v. Union Oil Co. of California, 813 F.2d 1480, 1493 (9th Cir.
15 1987)("General considerations of judicial economy also justify allowing the
16 amendments. The violations included in the proposed amendment relate to the
17 same subject matter as the original complaint. Allowing the amendment will further
18 the federal policy of 'wrapping in one bundle all matters concerning the same
19 subject matter.'").

20    Mattel's amendments do not add substance to the claims contained in its
21 original complaint. Rather, they would expand the universe of claims and
22 defendants stretching well-beyond the questions raised in the original complaint
23 over whether Bryant's conduct while in the employ of Mattel subjected his later
24 attributed creation of the BRATZ dolls to the provisions in Mattel's Inventions
25 Agreement or otherwise rendered his creation subject to an infringement action.
26 Nowhere does Mattel seek to reconcile the breadth of its present amendments with
27 the narrowness of the allegations contained in its original complaint. In fact, the
28 precise opposite is true. Mattel acknowledges that its proposed amendments bear

19

1    more congruity to the allegations leveled against it in MGA's Lanham Act case than

2    to those in the action to which it seeks to add them:

3
4                    [M]any of the matters raised by Mattel's proposed
                 Amended Complaint are and will remain at issue
                 because of MGA's Complaint, whether or not leave to
5                amend is granted.  MGA's claims allege that a broad
                 array of purported Mattel conduct across the globe,
6                starting at least as early as 1999, has violated the
                 Lanham Act and unfair competition law.  This includes
7                Mattel's alleged infringement of Bratz and other MGA
                 products.  As a result, issues in the proposed Amended
8                Complaint are already part and parcel of Mattel's
                 defenses to MGA's unfair competition claims, including
9                because they show that MGA and Bryant, and not
                 Mattel, are ones who stole the products and other
10               properties involved.

11   (Reply to Bryant Opp. at 7 (emphasis added)).  Mattel apparently finds this

12   discongruity unimportant because "all of these matters have been consolidated with

13   the Bryant case." (Id. at 7).  As noted earlier, the fact that the cases have been

14   consolidated does not mean that the parties can ignore the distinctions that still

15   exist between them.  If, as Mattel acknowledges, the present amendments are

16   nothing more than re-formulated defenses and counterclaims it presently has to

17   MGA's complaint against it in the 05-2727 case, then such amendments should be

18   brought in the form of an amended answer and counterclaim in that case.

19         Consideration of the distinctions between the two cases is wise as it serves

20   as a useful tool in providing the Court a better means to manage the cases now

21   that they have been consolidated.  The proverbial dog (ownership in BRATZ)

22   should be wagging the proverbial tail (the remaining commercial disputes), not the

23   other way around.  Admittedly, the dog's tail has grown in size both by MGA's filing

24   of its complaint in the 05-2727 action and Mattel's response thereto through its

25   proposed amendments.  Nonetheless, it is readily apparent to the Court that the

26   crown jewel in this action still remains the ownership rights to the BRATZ dolls.  The

27   parties have engaged in extensive and undoubtedly expensive discovery on this

28   very issue (from hiring world-renowned experts to test the age of Bryant's design

                                        20

**Exhibit G, p. 94**

1   drawings to technically complex discovery of what is on each other's computers).

2          Indeed the separateness of the two matters is reflected in how the cases are

3   currently structured, namely, the narrowness of the issue involved in 04-9059 and

4   the expansiveness of the facts at issue in 05-2727. In light of this fact, the Court

5   believes a two-track scheduling order wherein the 04-9059 matter's discovery cut

6   off and trial date are set well-ahead of those in 05-2727 makes the most sense. As

7   noted earlier, many of the legal claims being pressed in 05-2727 will be affected by

8   the result of the litigation in 04-9059. If, for instance, Mattel does own the rights to

9   the BRATZ dolls (either owing to Bryant's stealing his idea from one of Mattel's

10  "development programs" or by way of the Inventions Agreement because he

11  continued to work on his designs while at Mattel), then large portions of MGA's

12  Lanham Act infringement claims may become moot. By the same token, if Mattel

13  does not own rights to BRATZ, then some of the defenses and counterclaims set

14  forth as independent claims in the present amended complaint may become moot,

15  including Mattel's copyright infringement claim as well as portions of its remaining

16  RICO, misappropriation, and aiding and abetting claims. If, however, the Court

17  were to allow the amended complaint to be filed in the 04-9059 action, such case

18  management would be difficult, if not impossible as many of the issues being

19  litigated in the 05-2727 case would have been poured into the 04-9059 case by the

20  amendment. Due to this substantial overlap in claims and facts, a two-track

21  scheduling order utilizing the case number distinctions would be impossible to craft.

22  When pressed by the Court at oral argument as to which of its proposed claims it

23  believed would not undermine the BRATZ ownership posture of the 04-9059 case,

24  Mattel cited to its copyright and RICO claims. However, upon further questioning

25  by the Court, counsel for Mattel acknowledged that much of those claims were, like

26  the claims at issue in 05-2727, dependent upon resolution of the ownership issue.

27          In light of the burden allowing Mattel's amendment to proceed would have on

28  this Court's ability to efficiently manage these consolidated matters denial of

21

1   Mattel's request to amend its complaint in the 04-9059 matter is justified. See

2   Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992)("The burden to the judicial

3   system can justify a denial of a motion to amend 'even if the amendment would

4   cause no hardship at all to the opposing party"). Buttressing the Court's decision is

5   the fact that, even with such a denial, Mattel may file (and the Court provides leave

6   to Mattel to so file) an amended answer and counterclaim in the 05-2727 case

7   raising all the new claims and defendants presently sought to be achieved through

8   amendment of its complaint in the 04-9059 action. None of the substantive

9   concerns raised by MGA and Bryant to the present amended complaint, e.g.,

10   statutes of limitations, would appear to be affected if the new claims and

11   defendants were brought as defenses and counterclaims in the 05-2727 case as

12   opposed to the 04-9059 one.

13        Accordingly, the Court GRANTS Mattel's motion for leave to file its proposed

14   amendments, but only insofar as they are pled in the form of an amended answer

15   and counterclaim in the 05-2727 case.

16        Finally, the lack of a scheduling order in this case is problematic; one should

17   have been entered long ago. See Fed. R. Civ. P. 16(b)(noting that a scheduling

18   "order shall issue as soon as practicable but in any event within 90 days after the

19   appearance of a defendant and within 120 days after the complaint has been

20   served on a defendant"). In light of the fact that entry of a scheduling order is

21   woefully overdue in this case, the Court hereby ORDERS that a Rule 16(b)

22   scheduling conference be held in this consolidated matter on February 12, 2007, at

23   1:30 p.m. in Courtroom One. The parties are directed to file a Joint Rule 26(f)

24   report with the Court by February 5, 2007.

25        IT IS SO ORDERED.

26   DATE: _/- //- o 7_

27

28                       STEPHEN G. LARSON
                                UNITED STATES DISTRICT JUDGE

22

# EXHIBIT H

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
CIVIL MINUTES -- GENERAL

Case No.    CV 04-09049 SGL(RNBx)                             Date: April 25, 2008
Title:      CARTER BRYANT -v- MATTEL, INC.

Consolidated With Related Actions:
CASE NO. CV 04-09059 SGL(RNBx): MATTEL, INC., v. CARTER BRYANT,
CASE NO. CV 05-02727 SGL (RNBx): MGA ENTERTAINMENT, INC., v. MATTEL, INC.,
================================================================================

PRESENT:  HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

          Jim Holmes
          Courtroom Deputy Clerk

ATTORNEYS PRESENT FOR CARTER BRYANT:       ATTORNEYS PRESENT FOR MATTEL:

None Present                               None Present

ATTORNEYS PRESENT FOR MGA AND
ISAAC LARIAN:

None Present

PROCEEDINGS:   ORDER GRANTING IN PART, DENYING IN PART, AND DEFERRING IN
               PART THE PARTIES' MOTIONS FOR PARTIAL SUMMARY JUDGMENT
               (IN CHAMBERS)

        This matter is before the Court on the parties' motions for partial summary judgment. The
motions were heard on April 22, 2008, and the Court has set the motions for further hearing on
May 19, 2008, at 1:30 p.m. As set forth below, the Court rules on a number of issues presented
by the motions for partial summary judgment and reserves ruling on other issues until after further
hearing on the motions for partial summary judgment and, in the case of MGA's affirmative
defenses, until after the Phase 1 trial.

        The parties have made hundreds of objections to evidence offered in support of and in
opposition to the motions for partial summary judgment. Although counsel for Bryant requested

MINUTES FORM 90                                              Initials of Deputy Clerk: jh
CIVIL -- GEN                         Page 1

Exhibit H, p. 97

explicit rulings on the objections raised by Bryant, the Court declines to do so. To the extent that this Order necessarily relies on evidence subject to any party's objections, the objections are implicitly overruled.

## PREEMPTION

MGA and Bryant seek summary judgment in their favor as to Mattel's claims for intentional interference with contractual relations, conversion, and unfair competition, arguing that these claims are preempted by the Copyright Act. They are partially correct.

A state law is preempted by the Copyright Act where (1) the work at issue comes within the subject matter of copyright, and (2) the state law rights are "equivalent to rights within the general scope of copyright[.]" Del Madera Properties v. Rhodes and Gardner, Inc., 820 F.2d 973, 977 (9th Cir.1987). "If a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." Altera Corp. v. Clear Logic, Inc., 424 F.3d 1079, 1089 (9th Cir. 2005). Generally the Copyright Act does not preempt the enforcement of contractual rights. Id.

As to the first element, the intentional interference with contractual relations claim addresses generally an issue within the subject matter of copyright – the underlying wrong upon which the claim is premised is Mattel's deprivation of rights to intellectual property.

As to the second element, it is clear that the tort of intentional interference with contractual relations is neither categorically preempted or categorically saved from preemption; rather, the Court must engage in a determination of whether the substance of the tort claim differs qualitatively from the copyright claim at issue. Compare Altera, 424 F.3d at 1089 (holding that a intentional interference claim was not preempted because it was based not on copyrights but on a contractual provision) with Laws v. Sony Music Entertainment, Inc., 448 F.3d 1134, 1144 (9th Cir. 2006) (holding preempted a singer's voice misappropriation claim was not qualitatively different from her copyright claim).

Here, to the extent that the tortious interference is premised upon MGA's alleged interference with any copyrights that Mattel may have under the Inventions Agreement, it is preempted. Such a claim is not qualitatively different from Mattel's copyright claim. However, to the extent that the claim is based on MGA's acts that may be found to have aided and abetted the breach or induced the breach of Bryant's fiduciary duty, the claim is not preempted. That claim is qualitatively different from Mattel's copyright claim.

Therefore, the tortious interference with contractual relations is preempted to the extent that it is based on Mattel's rights to Bratz. It is not preempted as to Mattel's claims for breach of fiduciary duty.

The parties' arguments regarding the conversion claim address two distinct issues: Conversion of ideas and conversion of tangible things. The Court addresses each in turn.

Initials of Deputy Clerk: jh

Exhibit H, p. 98

Both sides acknowledge, as this Court certainly agrees, that one cannot copyright an idea. Thus, it would seem, a claim for conversion of ideas is not subject to preemption because it is not "within the subject matter of copyright." Del Madera, 820 F.2d at 977. MGA argues that ideas are not subject to a claim of conversion, to which Mattel responds that such rights in ideas may be created by contract. Mattel relies on Desny v. Wilder, 46 Cal.2d 715, 733 (1956) which, remarkably, so holds. However, that case does not support the proposition that a breach of such rights may be remedied by the tort claim of conversion rather than a breach of contract claim. The law in California regarding the tort of conversion's applicability to ideas remains the same today as in 1956: "The tort of conversion does not apply to ideas." Melchior v. New Line Productions, Inc., 106 Cal.App.4th 779 (2003). Therefore, although this claim is not preempted, it is not actionable as a tort claim. Accordingly, summary judgment in favor of MGA and Bryant is granted as to this particular claim.

Mattel also argues that its conversion claim is not preempted to the extent that it seeks the return of tangible things, most notably the original Bratz drawings. This claim is "within the subject matter of copyright," but the state rights go beyond the rights protected by the Copyright Act by allowing for the return of property.

At oral argument, counsel for MGA argued that Mattel seeks the rights that the drawings represent, not the "paper and ink" of which those drawings are comprised. Mattel disagreed with that interpretation, noting that it seeks the return of the original drawings and certain sculpts to which it may have rights under the Inventions Agreement.

The items to which Mattel lays claim are not like the manuscript at issue in Dielsi v. Falk, 916 F.Supp. 985, 992 (C.D. Cal. 1996), or the government documents at issue in Idema v. Dreamworks, Inc., 162 F.Supp.2d 1129, 1192-93 (C.D. Cal. 2001), both of which had value merely for their ability to hold and convey their contents. Rather, the materials Mattel seeks are works of art that may have value apart from the copyrights they represent or the "paper and ink" and other materials of which they are comprised. Given the role of the drawings and sculpts in developing a new, commercially successful line of fashion dolls, and given the role of these items in the present litigation, the Court discerns a possible inherent value to the materials themselves.

MGA and Bryant also pressed at oral argument that Mattel had not advanced such a claim for return of tangible items. The Court disagrees. Citing to its Complaint at ¶ 157, Mattel contends it has long sought the return of tangible items.[1] An examination of Mattel's claim for conversion reveals that it encompasses such a claim. Therefore, the conversion claim seeking the return of tangible items is not preempted. MGA and Bryant's motions for summary judgment on this issue are therefore denied.

To the extent that Mattel's statutory unfair competition claim, discussed more fully below, is

---

[1]  From a review of the record, it is clear to the Court that Mattel intended to cite ¶ 157 of its Amended Answer and Counterclaims, not its Complaint.

based on copyright infringement, it is preempted, and the Court grants summary judgment in favor of MGA on this issue.

## STATUTE OF LIMITATIONS

The Court heard argument at length on the statute of limitations issue. Although it is not entirely clear, it appears to the Court from the hearing and from MGA's Rule 56(f) affidavit, that there remain outstanding discovery matters that may have the potential, if resolved in MGA's favor, to factor into the inquiry into the determination of the date of the accrual of any claims against Bryant and/or MGA. Accordingly, the Court defers ruling on the issue of statute of limitations at this time.

## INVENTIONS AGREEMENT

The Court addressed many issues of the enforceability of the Employee Confidentiality and Inventions Agreement in its July 17, 2006, Order. The Court finds no good reason to revisit or revise that Order.

Bryant argues that the Inventions Agreement is ambiguous on the issue of whether it covered anything other than "inventions" as that term is used in patent law. Here, Bryant was a fashion designer. He signed an agreement that assigned his "inventions" to Mattel. "Inventions" is defined by the agreement to include "designs," which was undeniably the focus of Bryant's employment with Mattel. In addition to assigning all rights to Bryant's "inventions" (i.e., "designs") to Mattel, the agreement also assigned to Mattel "all [Bryant's] right, title, and interest in any . . . copyrights . . . and copyright applications based [on those inventions]".

In order to conclude that the Inventions Agreement is ambiguous on the issue of whether it would include any copyrightable drawings or doll designs developed by an employee, the Court would have to read out of the agreement explicit terms assigning to the employer the rights to "designs," "copyrights," and "copyright applications." The Court is required to read the contract as a whole and, where possible, give effect to all its terms. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). To accept the interpretation advanced by Bryant, the Court would have to disregard this bedrock principle of contract construction by ignoring an explicit assignment by the employee to the employer of copyrights. The interpretation advanced by Bryant is therefore not reasonable, and the Court finds that the Inventions Agreement is not ambiguous on the issue of its scope with respect to copyrightable materials.

The Inventions Agreement explicitly conveys to Mattel an employee's interest in any copyrights or copyright applications. Assuming copyrightability and the resolution of certain (as yet unresolved) issues of timing of creation and/or alteration in Mattel's favor, the original Bratz drawings clearly fall within the scope of the Inventions Agreement.

Moreover, the Inventions Agreement incorporates, and therefore does not violate, Cal.

MINUTES FORM 90
CIVIL – GEN

Page 4

Initials of Deputy Clerk: jh

**Exhibit H, p. 100**

Labor Code § 2870.  Pursuant to that statute (and its incorporation in the Inventions Agreement), because the subject matter at issue -- the Bratz dolls -- relate to Mattel's business of marketing fashion dolls, the factual question of whether Bryant worked on them on his own time, rather during his working hours at Mattel, is not relevant.

MGA argues that contracts of adhesion are unenforceable if they are either outside the scope of the parties' expectations or they are substantively unconscionable.  The Court previously determined that the Inventions Agreement was not substantively unconscionable, and now determines that it is not outside the scope of the parties' expectations.  As noted above, Bryant was a designer, and the plain language of the Inventions Agreement assigns his "designs" to his employer.  Objectively, therefore, it would not be surprising that Mattel would lay claim to Bryant's rights to any doll or doll fashions he designed during the period of his employment with Mattel.  Moreover, undisputed evidence establishes that Bryant's subjective understanding of the contract was that it transferred at least some of his rights to Mattel.

Bryant also argues that his actions went no further than lawful preparations to compete with his employer.  The undisputed facts, however, tell a different story:  Bryant directly competed with Mattel by entering into a contract with its competitor to produce a competing product while still employed by Mattel.

The Court grants summary judgment in favor of Mattel on the issue of the enforceability of the Inventions Agreement and the issue of applicability of the Inventions Agreement to any Bratz-related "inventions" (including any designs, improvements, ideas, concepts, and copyrightable subject matter) that he is found to have created during the period of his employment with Mattel.

## DUTY OF LOYALTY AND FIDUCIARY DUTY

Carter Bryant, like all other California employees, owed a duty of loyalty to Mattel while employed there.  See Cal. Labor Code § 2863.  The undisputed facts establish that he breached this duty by entering into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.  See Huong Que, Inc. v. Luu, 150 Cal.App.4th 400, 414 (2007) ("The duty of loyalty is breached, and the breach may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer.") (internal quotation marks and citation omitted).

Bryant also owed a fiduciary duty to Mattel by virtue of the language set forth in ¶ 1(a) of the Inventions Agreement. Id. ("The value of the Proprietary Information depends on it remaining confidential.  The Company depends on me to maintain that confidentiality, and I accept that position of trust.").  Under California law, a confidential relationship that gives rise to a fiduciary duty is created "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed . . . voluntarily accepts or assumes to accept the confidence . . . ." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050-51 (N.D. Cal. 2002).  The Inventions Agreement imposed such a duty on Bryant.

Initials of Deputy Clerk: jh

**Exhibit H, p. 101**

At the hearing on this matter, counsel contended that a required element for imposing a fiduciary duty -- that the party with the duty be in a superior position to the party to whom the duty is owed -- was missing. That element is described as follows: "[T]he essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." City Solutions, Inc. v. Clear Channel Communications, Inc., 201 F.Supp.2d 1048, 1050 (N.D. Cal. 2002) (internal quotation marks and citation omitted). The "superior position" to which California courts refer in this context is not superior bargaining power -- a position on which Mattel would apparently have the edge -- but rather it refers to a superior position vis-à-vis the duty imposed. Here, because the duty imposed upon Bryant was essentially to police his own actions by maintaining Mattel's confidentiality and communicating his own "inventions" to Mattel, Bryant was "in a superior position to exert unique influence over" Mattel because he was in the best position, arguably the only one in a position, to know of and police his actions.

As with the duty of loyalty, the undisputed facts establish that Bryant breached his fiduciary duty to communicate his inventions to Mattel when, rather than doing so, he secretly entered into a contract with Mattel's competitor, while still employed by Mattel, to produce a line of fashion dolls to be marketed in direct competition with Mattel's products.

Accordingly, the Court grants Mattel's motion for summary judgment on the issues of the existence and breach of the duty of loyalty. The Court grants Mattel's motion for summary judgment and denies Bryant's motion for summary judgment on the issue of the existence and breach of a fiduciary duty.

In its motion, MGA argued that there can be no liability for aiding and abetting a breach of fiduciary duty in the absence of a fiduciary duty. Because the Court has rejected this argument, the Court denies MGA's motion for summary judgment on this issue.

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

MGA moved for summary judgment as to Mattel's claim for intentional interference with contractual relations.

The elements of a claim for intentional interference with contractual relations are stated as (1) a valid contract between a plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp., 461 F.Supp.2d 1188, 1193 (C.D. Cal. 2006) (citing Pac. Gas & Elec. Co. v. Bear Stearns Co., 50 Cal.3d 1118, 1126 (1990)).

The undisputed facts show that the first, third, and fifth elements are met. Mattel has raised a triable issue of fact as to the second. The fourth element may be resolved after the

# NOTICE PARTY SERVICE LIST

Case No. __CV 04-09049 SGL(RNBx)__   Case Title __Carter Bryant v. Mattel, Inc.__

Title of Document __Minute Order of April 25, 2008__

| | |
|---|---|
| Atty Sttlmnt Officer Panel Coordinator | |
| BAP (Bankruptcy Appellate Panel) | |
| Beck, Michael J (Clerk, MDL Panel) | |
| BOP (Bureau of Prisons) | |
| CA St Pub Defender (Calif. State PD) | |
| CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) | |
| Case Asgmt Admin (Case Assignment Administrator) | |
| Catterson, Cathy (9th Circuit Court of Appeal) | |
| Chief Deputy Admin | |
| Chief Deputy Ops | |
| Clerk of Court | |
| Death Penalty H/C (Law Clerks) | |
| Dep In Chg E Div | |
| Dep In Chg So Div | |
| Federal Public Defender | |
| Fiscal Section | |
| Intake Section, Criminal LA | |
| Intake Section, Criminal SA | |
| Intake Supervisor, Civil | |
| PIA Clerk - Los Angeles (PIALA) | |
| PIA Clerk - Riverside (PIAED) | |
| PIA Clerk - Santa Ana (PIASA) | |
| PSA - Los Angeles (PSALA) | |
| PSA - Riverside (PSAED) | |
| PSA - Santa Ana (PSASA) | |
| Schnack, Randall (CJA Supervising Attorney) | |
| Statistics Clerk | |

| | |
|---|---|
| US Attorneys Office - Civil Division -L.A. | |
| US Attorneys Office - Civil Division - S.A. | |
| US Attorneys Office - Criminal Division -L.A. | |
| US Attorneys Office - Criminal Division -S.A. | |
| US Bankruptcy Court | |
| US Marshal Service - Los Angeles (USMLA) | |
| US Marshal Service - Riverside (USMED) | |
| US Marshal Service -Santa Ana (USMSA) | |
| US Probation Office (USPO) | |
| US Trustee's Office | |
| Warden, San Quentin State Prison, CA | |

✓ **ADD NEW NOTICE PARTY** (if sending by fax, mailing address must also be provided)

Name: Ambassador Pierre-Richard Prosper

Firm:

Address (include suite or floor): P.O. Box 581103

Salt Lake City, UT  84158

*E-mail: Prosper.Pierre@Arentfox.com

*Fax No.:

* For CIVIL cases only

**JUDGE / MAGISTRATE JUDGE (list below):**

Initials of Deputy Clerk __jh__

G-75  (03/07)                NOTICE PARTY SERVICE LIST

Exhibit H, p. 103

## NOTICE PARTY SERVICE LIST

**Case No.**   CV 04-09049 SGL(RNBx)   **Case Title** Carter Bryant v. Mattel, Inc.

**Title of Document**   Minute Order of April 25, 2008

| | |
|---|---|
| | Atty Sttlmnt Officer Panel Coordinator |
| | BAP (Bankruptcy Appellate Panel) |
| | Beck, Michael J (Clerk, MDL Panel) |
| | BOP (Bureau of Prisons) |
| | CA St Pub Defender (Calif. State PD) |
| | CAAG (California Attorney General's Office - Keith H. Borjon, L.A. Death Penalty Coordinator) |
| | Case Asgmt Admin (Case Assignment Administrator) |
| | Catterson, Cathy (9th Circuit Court of Appeal) |
| | Chief Deputy Admin |
| | Chief Deputy Ops |
| | Clerk of Court |
| | Death Penalty H/C (Law Clerks) |
| | Dep In Chg E Div |
| | Dep In Chg So Div |
| | Federal Public Defender |
| | Fiscal Section |
| | Intake Section, Criminal LA |
| | Intake Section, Criminal SA |
| | Intake Supervisor, Civil |
| | PIA Clerk - Los Angeles (PIALA) |
| | PIA Clerk - Riverside (PIAED) |
| | PIA Clerk - Santa Ana (PIASA) |
| | PSA - Los Angeles (PSALA) |
| | PSA - Riverside (PSAED) |
| | PSA - Santa Ana (PSASA) |
| | Schnack, Randall (CJA Supervising Attorney) |
| | Statistics Clerk |

| | |
|---|---|
| | US Attorneys Office - Civil Division -L.A. |
| | US Attorneys Office - Civil Division - S.A. |
| | US Attorneys Office - Criminal Division -L.A. |
| | US Attorneys Office - Criminal Division -S.A. |
| | US Bankruptcy Court |
| | US Marshal Service - Los Angeles (USMLA) |
| | US Marshal Service - Riverside (USMED) |
| | US Marshal Service -Santa Ana (USMSA) |
| | US Probation Office (USPO) |
| | US Trustee's Office |
| | Warden, San Quentin State Prison, CA |

| ✓ | ***ADD NEW NOTICE PARTY*** (if sending by fax, mailing address must also be provided) |
|---|---|

Name: Hon. Edward A. Infante (Ret.)

Firm:

Address (include suite or floor):  Two Embarcadero Center, Suite 1500, San Francisco, CA 94111

*E-mail:

*Fax No.:
* For CIVIL cases only

| ***JUDGE / MAGISTRATE JUDGE (list below):*** |
|---|
| |
| |
| |
| |

**Initials of Deputy Clerk** jh

**Exhibit H, p. 104**