1   Robert C. O'Brien (SBN 154372)
    ARENT FOX LLP
2   555 West Fifth Street, 48th Floor
    Los Angeles, CA 90013-1065
3   Telephone: 213.629.7400
    Facsimile: 213.629.7401
4   obrien.robert@arentfox.com

5   Discovery Master

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        EASTERN DIVISION

11

12  CARTER BRYANT, an individual,          Case No. CV 04-09049 SGL (RNBx)

13              Plaintiff,
                                           Consolidated with
14        v.                               Case No. CV 04-09059
                                           Case No. CV 05-2727
15  MATTEL, INC., a Delaware
    corporation,                           **PHASE 2 DISCOVERY MATTER**

16              Defendant.                 **ORDER NO. 33, REGARDING:**

17
                                               **(1) MOTION TO DE-DESIGNATE**
18                                             **MATERIALS DESIGNATED RAEO;**

19                                             **(2) MOTION TO DE-DESIGNATE**
                                               **CERTAIN PLEADINGS;**
20
                                               **(3) MOTION TO QUASH**
21  CONSOLIDATED WITH                          **SUBPOENAS; and**
    MATTEL, INC. v. BRYANT and
22  MGA ENTERTAINMENT, INC. v.                 **(4) MOTION TO COMPEL** *IN*
    MATTEL, INC.                               *CAMERA* **REVIEW OF NON-**
23                                             **ATTORNEY COMMUNICATIONS**

24  **CONFIDENTIAL – FILED**
    **UNDER SEAL PURSUANT TO**
25  **COURT ORDER**

26

27

28

This Order sets forth the Discovery Master's ruling on the following discovery matters:  (1) the motion to de-designate documents designated as third tier by MGA Entertainment, Inc. ("MGA") and accompanying request for sanctions filed by Mattel, Inc. ("Mattel") ("Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only") [Docket No. 5207]; (2) the motion to de-designate the opposition to Mattel's motion to compel deposition of Vargas and Trueba as well as the Kuemmerle declaration filed by Mattel ("Motion To De-Designate Certain Pleadings") [Docket No. 5250]; (3) the motion to quash and/or for a protective order regarding subpoenas issued by Mattel to non-parties Leon Neman, Fred Mashian and Neil Kadisha ("Motion to Quash") [Docket No. 5007]; and (4) the motion to compel an *in camera* review and production of non-attorney or non-legal communications listed on MGA and Isaac Larian's privilege logs filed by Mattel ("Motion to Compel") [Docket No. 5104] (collectively, the "Motions").

The Discovery Master, having considered the papers filed in support of and in opposition to the Motions, and having determined that oral argument is not necessary, rules as set forth below.

# I.   <u>MATTEL'S MOTION TO DE-DESIGNATE DOCUMENTS IDENTIFIED BY MGA AS RESTRICTED ATTORNEYS' EYES ONLY</u>

The Discovery Master first addresses Mattel's Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only.

## A.   **Designations Established By The Protective Order**

On or about January 4, 2005, the Court, acting through the Honorable Robert N. Block Magistrate Judge, entered a protective order in this case ("Protective Order").  (Declaration of Diane C. Hutnyan in Support of Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only ("Hutnyan Decl."), Ex. 1, p. 17).  The Protective Order applies "to trade secrets, confidential and proprietary information, documents and things that are produced or disclosed in

any form during the course of the Action by any Party or any nonparty." (*Id.*, Ex. 1 at p. 3).

To protect such information, the Protective Order initially established two confidentiality designations. The first level of protection is the CONFIDENTIAL designation, which applies to all

> information which the disclosing Party or nonparty believes in
> good faith contains, constitutes or reveals confidential design,
> engineering or development information, confidential commercial
> information, non-public financial information, confidential or
> private information about current or former employees,
> contractors or vendors (including employee, contractor and
> vendor personnel records), or other information of a confidential,
> proprietary, private or personal nature.

(*Id.*, Ex. 1 at p. 4).

The second level of protection set forth in the Protective Order is the CONFIDENTIAL-ATTORNEYS' EYES ONLY ("AEO") designation. This heightened level of protection applies to

> trade secrets or other confidential commercial information,
> including without limitation non-public designs and drawings,
> which the disclosing Party or nonparty in good faith believes will
> result in competitive disadvantage or harm if disclosed to another
> Party to this Action without restriction upon use or further
> disclosure.

(*Id.*).

Materials designated AEO are subject to strict limitations under the Protective Order. (*Id.*, Ex. 1 at pp. 4, 10 and 11). Besides the Court and its personnel, a document designated as AEO may only be disclosed to the following individuals:

(a)  the attorneys for the Parties (but not including in-house counsel for the Parties or any attorney who is an officer, director, shareholder or employee of any Party or its corporate affiliates) and their partners, shareholders, associates, document clerks and paralegals who are assigned to and necessary to assist such attorneys . . . ; (b) secretaries, stenographers, and other office or clerical personnel employed  by said attorneys and who assist them with respect to litigation; (c) the authors, senders, addressees and designated copy recipients of any document or thing which has been designated [AEO] information; (d) such other persons as may be consented to by the Party designating such information as [AEO] information; (e) outside litigation support vendors, coders and keyboard operators; (f) independent outside consultants or experts retained by the attorneys to the extent deemed necessary by said attorneys for the purposes of litigation; and (g) professional court reporters engaged to transcribe deposition testimony, professional videographers engaged to videotape deposition testimony and translators.

(*Id*., Ex. 1 at pp. 10 – 11).

Early in 2007, MGA asserted that the CONFIDETIAL and AEO designations under the Protective Order were inadequate to protect certain highly sensitive information regarding its unreleased products under development, which MGA characterized as "among its most highly valuable trade secrets."  (*Id*., Ex. 2 at p. 2 and Exs. 3 – 6).  MGA therefore sought an order from the prior discovery master (1) ruling that such documents were not discoverable or, in the alternative, (2) modifying the Protective Order to create a third level of protection for such documents.  (*Id*., Exs. 3 – 6).

Following extensive briefing and after conducting oral argument on MGA's

1   motion for clarification, the prior discovery master ultimately accepted a stipulation

2   from the parties and entered an order that modified the Protective Order to create a

3   third protective designation.  (*Id.*, Ex. 5 at p. 12 and Ex. 6).  This new designation,

4   HIGHLY CONFIDENTIAL – RESTRICTED ATTORNEYS' EYES ONLY

5   ("RAEO"), was to be used for a narrow category of information known as the

6   "Subject Documents."  As defined, the Subject Documents involved all documents

7   "created after January 1, 2006 that pertain to products which are currently

8   scheduled for public release in 2007 or 2008 and that constitute highly sensitive

9   trade secrets of the producing party."  (*Id.*, Ex. 6 at p. 3).

10          Materials designated as RAEO are subject to even more stringent disclosure

11   requirements than material designated AEO.  Specifically,

12          [d]ocuments designated as [RAEO] shall not be disclosed in any

13          way to, nor their contents summarized or discussed in substance

14          with, any person other than:  (i) *up to three attorneys at the*

15          *receiving Party's outside law firm*; (ii) such independent, outside

16          expert(s) for the receiving Party who outside counsel deems

17          necessary to show such documents for purposes of providing

18          expert opinion or expert testimony; (iii) *one assistant or*

19          *paralegal for each Party* (for the purposes of photocopying and

20          maintaining files as set forth . . . below . . . ; (iv) the Court,

21          including the Discovery Master, and other personnel identified in

22          Paragraphs 6(g) and 7 of the Protective Order; (v) the authors,

23          senders, addressees and designated copy recipients of any

24          document designated [RAEO]; and (vi) such other persons as

25          may be consented to in writing or on the record by the Party

26          designating such documents [RAEO]."

27   (*Id.*, Ex. 6 at pp. 4 – 5 [emphasis added]).

28          Since the RAEO designation was established on April 23, 2007, MGA has

1    designated more than 116,000 pages as RAEO.  (Motion to De-Designate

2    Documents Identified by MGA as Restricted Attorneys' Eyes Only, p. 5).

3    **B.    The Relief Sought By Mattel**

4    Mattel requests that the Discovery Master issue an order de-designating all

5    materials designated by MGA as RAEO.  (*Id.*, p. 1).  It further requests that the

6    Discovery Master eliminate the RAEO designation as an available designation

7    under the Protective Order.[1]  (*Id.*, p. 8).

8    Mattel claims that such relief is warranted for three reasons.  First, Mattel

9    argues that because it is now 2009 and documents designated as RAEO must

10    pertain to products "scheduled for public release in 2007 or 2008," it is impossible

11    for any information to fall within the RAEO designation.  (*Id.*, p. 5).  Put another

12    way, Mattel argues that "none of the documents in MGA's massive batch of

13    [RAEO] documents can possibly fall under the limited scope of the third-tier

14    designation" because "products scheduled for release last year or the year before

15    last are, by definition, no longer 'unreleased.'"  (*Id.*).

16    Second, Mattel argues that the protections afforded by the AEO designation

17    are sufficient to protect MGA's trade secret information.  (*Id.*, p. 6).

18    Finally, Mattel argues that the RAEO designation "imposes a heavy burden

19    on Mattel's counsel, since only three Quinn Emanuel attorneys are permitted to

20    even see [such documents] and since such materials must be segregated from other

21    materials."  (*Id.*, p. 1).

22    **C.    MGA's Opposition**

23    MGA opposes Mattel's motion on five grounds.  First, MGA argues that any

24    assertion that the RAEO designation expired after 2008 is baseless because

25    documents designated for third-tier protection "may still be protected if they were

26    previously scheduled for release, but were in fact never released."  (Opposition to

27

28    _____
[1] Mattel also requests sanctions.  (*Id.*, p. 8).

1  Motion to De-Designate Documents Identified by MGA as Restricted Attorneys'
2  Eyes Only, p. 7 [emphasis omitted]).  Second, MGA argues that Mattel is not
3  burdened by the RAEO designation because it has had more than two years to
4  review the materials.  (*Id.*, p. 7).  Third, MGA argues that Mattel's request for de-
5  designation burdens MGA because it will have to review the materials to determine
6  if another category of protection is warranted.  (*Id.*, pp. 7 – 8).  Fourth, MGA
7  argues that it never refused to de-designate the documents at issue but rather that its
8  counsel "asked Mattel for a single week to review" the materials so that they could
9  determine if the materials "include documents and designs for unreleased
10 products." (*Id.*, p. 8).  Finally, MGA argues that Mattel has not cited a single
11 RAEO material where the product has been released.[2]  (*Id.* p. 1).

**D.      Analysis**

**1.      MGA Has The Burden Of Showing The Materials It Designated As RAEO Are Appropriately Classified**

As a preliminary matter, MGA argues that it is Mattel's burden to
demonstrate that materials designated as RAEO have been misclassified.  (*Id.*, p. 7
["Mattel fails to cite a singe instance where either of [the events necessary to trigger
a de-designation] has occurred."] and p. 1 ["Mattel fails to point to a single product
design among the 'RAEO' materials that was shipped or disseminated."]).
However, it is well settled that a party invoking a protective designation has the
burden of showing that the designation is proper.  (*See, e.g., Holsinger v. Wolpoff &
Abramson, LLP*, 2006 WL 1523243, *1 (N.D.Cal. May 17, 2006) ["once Plaintiff
challenged the confidentiality designation of the subject documents, the burden was
on Defendants as the designating parties to establish that protection is warranted."];
*Google, Inc. v. American Blind & Wallpaper Factory, Inc.*, 2006 WL 5349265, *2
(N.D.Cal. February 8, 2006) ["It is the designating party's burden to show that the

[2] Like Mattel, MGA also seeks an award of sanctions.  (*Id.*, pp. 9 – 10).

1  documents it seeks to keep confidential are entitled to protection from disclosure."];

2  *Verizon California Inc. v. Ronald A. Katz Technology Licensing, L.P.*, 214 F.R.D.

3  583, 586 (C.D.Cal. 2003); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121

4  (3rd Cir. 1986)).  Accordingly, the Discovery Master finds that, to prevail on this

5  motion, MGA must demonstrate the more than 116,000 pages it designated as

6  RAEO are appropriately classified.

7  **2.    MGA Has Not Satisfied Its Burden**

8  Having determined that MGA bears the burden of justifying its RAEO

9  designations, the Discovery Master now turns to whether MGA met its burden.

10  Mattel argues that MGA cannot make such a showing because documents

11  designated as RAEO must, by definition, pertain to unreleased products "scheduled

12  for public release in 2007 or 2008," and it is now 2009.  (Motion to De-Designate

13  Documents Identified by MGA as Restricted Attorneys' Eyes Only, p. 5).  MGA

14  counters that "Mattel's argument ignores the basic fact that products may have been

15  scheduled for public release in 2007 or 2008 and may remain unreleased to this

16  day."  (Opposition to Motion to De-Designate Documents Identified by MGA as

17  Restricted Attorneys' Eyes Only, p. 7 [emphasis in original]).

18  While MGA is correct that the release date for products scheduled to be

19  unveiled in 2007 or 2008 could theoretically have been delayed, the fact that a

20  product "*may* remain unreleased to this day" does not mean that the product was in

21  actuality never released.  MGA has not established that the products relating to the

22  subject RAEO documents were, as a matter of fact, not released.  To the contrary,

23  MGA stated in its Opposition to the Motion to De-Designate Documents Identified

24  by MGA as Restricted Attorneys' Eyes Only as well as the Declaration of Amman

25  Khan "that unreleased products *might* remain unreleased and thus qualified for the

26  'RAEO' designation."  (*Id.*, p. 5; Declaration of Amman Khan in Support of

27  Opposition to Motion to De-Designate Documents Identified by MGA as Restricted

28  Attorneys' Eyes Only ("Khan Decl."), ¶ 9 [emphasis added]).  MGA also declared

in its opposition and supporting papers that it needed "time to review the documents before agreeing to de-designate any to make sure that the documents did not contain information and designs concerning unreleased products that were scheduled for release in 2007 and 2008 and that remain unreleased."  (Opposition to Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only, p. 5; Khan Decl., ¶ 9).  Taken together, these statements demonstrate that MGA's current attorneys do not know whether the materials that MGA previously marked as RAEO are properly classified as RAEO.  Accordingly, MGA has not met its burden of establishing that the RAEO designation has any continuing applicability.

### 3.   Even If MGA Had Met Its Burden, The AEO Designation Is An Adequate Safeguard

Even assuming MGA had demonstrated that the materials at issue remain properly designated RAEO, the Discovery Master finds that the second designation created by the Protective Order (i.e., the AEO designation) affords sufficient protection for MGA's trade secrets related to unreleased products.  The only significant differences between the RAEO designation and the AEO designation are the number of Mattel's outside attorneys (i.e., lawyers at Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel")) and their staff who can access the information.[3]  Specifically, the AEO designation allows any Quinn Emanuel attorney, secretary or paralegal to view the information, (Hutnyan Decl., Ex. 1, pp. 10 – 11), whereas the RAEO designation limits disclosure to just three Quinn Emanuel attorneys and one assistant or paralegal, (*Id.*, Ex. 6 at pp. 4 – 5).  However, *all* attorneys and staff working at Quinn Emanuel work in the legal

---

[3] There are also limitations on the manner in which RAEO documents may be copied and archived.  (Hutnyan Decl., Ex.6, pp. 5 – 6).  However, the Discovery Master does not find these restrictions significant given that 4 copies of the materials may be made immediately upon being received by Mattel (i.e., one archival copy and three working copies for the designated attorneys permitted to view such materials) and other copies may be made for use at depositions and expert discovery.

1    profession and routinely handle confidential information.  Those who work on this

2    case are further precluded from disclosing any trade secret information that is

3    deemed AEO by MGA to Mattel's in-house counsel, its employees or anyone else

4    except for a few individuals specified in the Protective Order.  (*Id*., Ex. 1 at pp. 10 –

5    11).  Since they are already entrusted with certain MGA trade secret information

6    and expected to keep that information confidential, the Discovery Master sees no

7    reason to prevent Quinn Emanuel's attorneys and staff who are working on this

8    case from viewing documents related to unreleased products as well.  Put another

9    way, if the Court and the parties, including MGA, believe the AEO designation is

10    sufficient for *some* trade secrets, it should be (and is) sufficient for *all* trade secrets.

          **4.     The RAEO Designation Provides Little, If Any, Benefit To**

                **MGA While Imposing Substantial Burdens On Mattel**

13    Eliminating the RAEO designation is also justified because the burden it

14    imposes on Mattel far outweighs any benefit the designation may provide to MGA.

15    While the RAEO designation admittedly limits the number of Quinn Emanuel

16    attorneys and staff who can access the information, (*Id*., Ex. 6 at pp. 4 – 5), the

17    Discovery Master finds that preventing additional Quinn Emanuel attorneys and

18    staff from viewing the information is of little practical benefit to MGA.  Those

19    Quinn Emanuel attorneys and staff members who cannot view RAEO materials are

20    either officers of the Court or work for officers of the Court and are not likely to

21    disclose the information in violation of the Protective Order.  As explained above,

22    such individuals also routinely work with confidential information, including

23    possibly trade secret materials that MGA has designated AEO as part of this case.

24    Consequently, the Discovery Master finds that the RAEO designation provides, at

25    most, a minimal benefit to MGA.

26    On the other hand, the burden imposed by the RAEO designation on Mattel

27    is substantial.  This is an extremely complex case, involving millions of documents,

28    numerous witnesses and a myriad of facts, including allegations by Mattel that

MGA stole "a vast array of trade secrets . . . that comprise Mattel's intellectual infrastructure."  (Second Amended Answer and Counterclaim ("SAAC"), ¶ 20). Therefore, limiting information and knowledge to just three attorneys hamstrings Mattel by denying it the opportunity to have as many legal minds (i.e., attorneys) as it wants or needs to analyze the more than 116,000 pages designated RAEO by MGA for facts and statements that may support Mattel's Phase 2 claims as well as for Mattel's attorneys to collectively discuss the import of their findings.

The RAEO designation also imposes a heavy burden on the three Quinn Emanuel attorneys currently permitted to see such material because they must, among other things, (1) review the 116,000 pages of materials without the assistance of any other attorney, (2) conduct all depositions where such materials will be used, (3) remember which information is disclosed only in the RAEO materials, and (4) refrain from disclosing the restricted information in discussing case strategy and other issues with fellow Quinn Emanuel attorneys or staff members who are not permitted to view the information, including refraining from telling such individuals why a particular argument or litigation approach may (or may not) be a good idea as a result of the RAEO materials.

For all of these reasons, the Discovery Master finds that the respective burdens and benefits provided by the RAEO designation weigh heavily in favor of eliminating it.

### 5.    MGA Is Not Unfairly Burdened By The Request For De-Designation

MGA next argues that it is unfairly burdened by Mattel's request for de-designation because it will have to review the materials to determine if another category of protection is warranted.  (Opposition to Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only, pp. 7 – 8). While the Discovery Master understands that MGA's lead counsel for Phase 2 (Glaser, Weil, Fink, Jacobs, Howard & Shapiro, LLP ("Glaser Weil")) was not

involved in the *initial* designation of the subject documents and may not have been familiar with them during Phase 1, that fact does not displace the *continuing* obligation incumbent upon MGA (and its current counsel) to evaluate whether the designations MGA attached to certain documents in Phase 1 remain appropriate. Indeed, the Protective Order specifically states that RAEO material must be re-designated or de-designated "within fourteen days of" the date the unreleased "product is first shipped" or "disclosed to a third party without an express confidentiality agreement." (Hutnyan Decl., Ex. 6 at p. 6). Because it already had a duty under the Protective Order to monitor the continuing viability of any RAEO designation, MGA cannot claim that is burdened by fulfilling that Court-ordered duty. This is especially true where, as here, MGA stipulated to undertake this obligation. (*Id.*, Ex. 6 at p. 7).

> **6.     MGA's Claim That It Only Needed One More Week To Review The RAEO Materials Is Not Supported By The Record**

MGA's final argument is that it has not refused to de-designate the documents at issue but instead simply requested "a single week to review" the materials to determine if they should be de-designated. (Opposition to Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only, p. 8). This argument is unpersuasive for three reasons.

First, MGA's counsel should have already been aware of the status of the RAEO materials when Mattel's counsel raised the designation issue on April 3, 2009, because MGA had a continuing obligation to evaluate any materials designated as RAEO under the Protective Order.

Second, as a matter of fact, MGA could not state two weeks after its counsel was first contacted about the RAEO designations whether the documents at issue remained appropriately classified. Specifically, MGA admitted as follows:

On April 3, 2009, Diane Hutnyan (counsel for Mattel)

1        contacted Glaser Weil to discuss 'RAEO' designations for

2        the first time. . . . Ms. Hutnyan then demanded that MGA

3        de-designate or re-designate all the documents designated

4        'RAEO.'  On April 10, 2009, Amman Khan of Glaser

5        Weil responded to Ms. Hutnyan's April 3 letter. . . . Mr.

6        Khan asked Ms. Hutnyan to specify . . . the documents

7        that Mattel believes to be improperly designated as

8        'RAEO' in order to narrow the issues before the Parties.

9        On that same day, Ms. Hutnyan sent another letter to

10       Richard Stoll of Glaser Weil, demanding that MGA de-

11       designate all the 'RAEO' designated documents . . . . On

12       April 14, 2009, Ms. Hutnyan and Mr. Khan met and

13       conferred via telephone. . . . Mr. Kahn explained . . .

14       that . . . MGA wanted to review the documents before

15       agreeing to de-designate any . . . Mr. Khan initially told

16       Ms. Hutnyan that he thought MGA might need a few days

17       to conduct this review . . . . [O]n April 16, Mr. Khan

18       contacted Ms. Hutnyan and explained to her that because

19       Phase 2 counsel was not involved in designating the

20       disputed documents, they would need time to review the

21       documents to determine whether they should be de-

22       designated or re-designated, as requested by Mattel. . . .

23       Mr. Khan . . . agreed to expeditiously review the

24       documents and respond to Mattel in one week, on April

25       24.

26  (*Id*., pp. 5 – 6).  Because MGA failed to provide Mattel with its position regarding

27  the applicability of the RAEO designations within the two-week time period

28  established by the Protective Order and that time period applies independent of

1  whether Mattel raised the designation issue, MGA's argument that it was entitled to
2  additional time to determine the status of the RAEO materials is not supported by
3  the plain language of the Protective Order.

4      Regardless, MGA has still not set forth its position regarding which
5  documents are appropriately classified and which are not.  This is true even though
6  it stated that it could make this determination "by April 24."  Indeed, MGA's
7  Opposition to the Motion to De-Designate Documents Identified by MGA as
8  Restricted Attorneys' Eyes Only, which was filed on April 24, 2009, is silent as to
9  which documents challenged by Mattel remain properly classified as RAEO and
10  which are not.  Accordingly, the Discovery Master finds that MGA's request for
11  additional time to conduct the review of the RAEO materials is unwarranted.

12  **E.**     **Summary Of Ruling Regarding Mattel's Motion To De-Designate**
13          **Documents Identified By MGA As Restricted Attorneys' Eyes**
14          **Only**

15      The Discovery Master concludes that MGA has not established that the
16  documents at issue are properly classified as RAEO.  Nor does the Discovery
17  Master believe that a RAEO designation is warranted for any document at this time.
18  Accordingly, all of the documents currently designated as RAEO are hereby re-
19  designated as AEO.  This new designation shall remain in place for forty-five days
20  (45) days from the date of this Order at which point MGA must provide Mattel with
21  a list identifying, by Bates numbers, all documents that should (1) remain AEO,
22  (2) be re-designated CONFIDENTIAL, or (3) be de-designated.

23  **F.**     **Mattel's Request For Sanctions**

24      Having granted Mattel's Motion to De-Designate Documents Identified by
25  MGA as Restricted Attorneys' Eyes Only, the Discovery Master next addresses
26  Mattel's request for sanctions.[4]  Mattel is only entitled to an award of sanctions if

27

28  ─────────────
[4] The Discovery Master denies MGA's request for sanctions on the ground that it did not prevail on the motion.

1  MGA opposed the motion without substantial justification.  That standard is not

2  satisfied here.

3  　　　　In ruling against MGA, the Discovery Master has concluded that the RAEO

4  designation did not automatically expire on January 1, 2009 as Mattel alleges.

5  Further, while the Discovery Master disagrees with the conclusion to do so, the

6  prior discovery master found that the RAEO designation was warranted and signed

7  an order creating it.  (Hutnyan Decl., Ex. 6 p. 7).  Therefore, at the very least, MGA

8  had some justification for opposing the present motion and the Discovery Master

9  declines to award Mattel sanctions under such circumstances.

10  **II.  MATTEL'S MOTION TO DE-DESIGNATE CERTAIN PLEADINGS**

11  　　　**A.  Factual Background**

12  　　　　　**1.  Mattel Files The Underlying Motion Under Seal, and MGA**

13  　　　　　　**Opposes It By Filing Its Own Brief Under Seal**

14  　　　　On or about February 9, 2009, Mattel filed a motion (the "Deposition

15  Motion") to compel MGA de Mexico to produce Pablo Vargas San Jose ("Vargas")

16  and Mariana Trueba Almada ("Trueba") (collectively, the "Deponents").  In the

17  Deposition Motion, Mattel cited, among other things, passages from the transcript

18  of the deposition of Susana Kuemmerle taken on January 28, 2008 (the

19  "Kuemmerle Tr."), an employee of MGA de Mexico.[5]  Some of those passages had

20  been previously designated as confidential by the MGA Parties pursuant to the

21  Court's protective order.  Accordingly, Mattel filed its moving papers and

22  supporting documents related to the Deposition Motion under seal, with the

23  following notice on the face page: "Confidential – Attorneys' Eyes Only."  Mattel

24  has never disputed the confidential designation affixed to the relevant passages of

25  the underlying Kuemmerle Tr. or made a motion to de-designate those passages.

26

27  [5] Both the Motion to De-Designate Certain Pleadings and the Opposition to the Motion to De-Designate Certain

28  Pleadings also cite an April 11, 2004 e-mail from Isaac Larian which was previously designated AEO (the "Larian E-mail").

On or about February 13, 2009, the MGA Parties filed their Opposition to the Deposition Motion ("Opposition"), which they marked "Confidential – Attorneys' Eyes Only / Filed Under Seal Pursuant to Protective Order."  In support of their Opposition, the MGA Parties submitted, among other things, the Declaration of Susan Kuemmerle dated February 12, 2009 (the "Kuemmerle Decl."), the face page of which bore the same confidential designation as did the Opposition.

### 2.      Relevant Provisions Of The Protective Order

As explained in Section I.A above, the Court entered a Protective Order in this case on January 4, 2005.  Among other designations previously available, the Protective Order permits the parties to designate information produced in discovery as subject to one of two levels of confidentiality:  (1) CONFIDENTIAL; and (2) AEO.  (Protective Order, ¶ 2).  Each of these designations triggers different restrictions regarding the scope of disclosure by the receiving party and applies to different types of information.

For example, the Protective Order provides that the AEO designation is "limited to trade secrets or other confidential commercial information, including without limitation non-public designs and drawings, which the disclosing Party or nonparty in good faith believes will result in competitive disadvantage or harm if disclosed to another Party to this Action without restriction upon use or further disclosure."  (*Id.*).

By contrast, the Protective Order permits the parties to designate as CONFIDENTIAL information any material which "constitutes or reveals confidential design, engineering or development information, confidential commercial information, non-public financial information, confidential or private information about current or former employees, contractors or vendors . . . or other information of a confidential, proprietary, private or personal nature."  (*Id.*).  As explained in Section I.D.1. above, the burden of proving the propriety of a designation is on the designating party.

### 3.      Mattel Challenges MGA's Designation

The Discovery Master heard oral argument on the Deposition Motion on March 19, 2009 and subsequently issued an order (i.e., Amended Order No. 11) denying the Deposition Motion.

One month later, on April 17, 2009, Mattel filed the present motion to de-designate MGA's Opposition to the Deposition Motion, together with the supporting Declaration of Ms. Kuemmerle.

### B.      Relief Sought By Mattel

Mattel requests that, pursuant to Paragraph 5 of the Court's order appointing a discovery master dated December 6, 2006 and Paragraphs 5 and 10 of the Protective Order, the Opposition to the Deposition Motion and Kuemmerle Decl. (collectively, the "Opposition Papers") be de-designated on the ground that the material designated as confidential in those documents does not meet the criteria for such designation under the Protective Order.  (Mattel's Notice of Motion, p. 1).

### C.      Analysis

### 1.      Summary Of The Parties' Contentions

Mattel's Motion To De-Designate Certain Pleadings is based on a single argument:  none of the information in the Opposition Papers qualifies as AEO or CONFIDENTIAL information under the applicable provisions of the Protective Order.

MGA counters with two arguments, one procedural and one substantive. First, MGA argues that Mattel's attempt to de-designate the Opposition Papers is procedurally defective.  MGA asserts that the only proper way to challenge the AEO designation is for Mattel to file a motion to change the original designation, (rather than attempting – as Mattel does here – to de-designate a subsequently filed brief which happens to refer to that information).  Second, MGA argues that the subject information is in fact confidential and should continue to be restricted from disclosure pursuant to the Protective Order.

1    In their briefs, both parties overlook a crucial distinction, namely the fact that

2   the Opposition Papers actually rely on two different types of information allegedly

3   entitled to AEO protection:  (1) evidence *previously designated* by MGA as AEO

4   (the Kuemmerle Tr. and Larian E-mail); and (2) evidence newly submitted by

5   MGA in support of its Opposition (i.e., the Kuemmerle Decl.).  For instance, in its

6   brief, Mattel lumps together both previously designated and newly designated facts,

7   arguing that they should collectively be de-designated:

8    • MGA redacted from the Opposition Papers references to Vargas' and

9     Trueba's job titles but routinely publicly files declarations from its

10     employees which include the employee's job title, including a

11     declaration from Trueba herself with her job title at MGA Mexico.

12     While MGA redacted Vargas' and Trueba's job titles from the

13     Kuemmerle Declaration, it did not redact Kuemmerle's job title.  In

14     addition, Ms. Kuemmerle testified at her deposition about Vargas' and

15     Trueba's job titles and that testimony is not designated under the

16     Protective Order.

17    • MGA redacted from the Opposition the statement that Trueba "handles

18     media and public relations" but MGA did not designate this same

19     information from Ms. Kuemmerle's deposition under the Protective

20     Order.

21    • MGA redacted from the Opposition and the Kuemmerle Declaration

22     information about who Vargas and Trueba report to and who reports to

23     them but did not designate as confidential Ms. Kuemmerle's

24     deposition testimony on this same subject.

25    • MGA redacted from its Opposition a description of the "day-to-day

26     operations of MGA Mexico," yet the redacted language is taken

27     verbatim from a prior, publicly filed declaration from Ms. Kuemmerle.

28

- MGA redacted an assertion in its Opposition that a 2004 e-mail from Isaac Larian explained that Vargas, Trueba and Carlos Machado would be responsible for running the "day-to-day operations in Mexico" yet publicly filed a declaration from Larian in which he admits that he recruited Vargas, Trueba and Machado "to start up the sales and marketing operation of MGA Mexico."

- MGA redacted from the Kuemmerle Declaration the assertion that Trueba is a "Mexican citizen and resident" but made this same assertion without any confidentiality designation in its objection to Mattel's deposition notice for Ms. Trueba.  Nor did MGA designate as confidential Ms. Kuemmerle's deposition testimony that both Vargas and Trueba are citizens of Mexico.

- MGA redacted from the Kuemmerle Declaration the assertion that Vargas and Trueba are purportedly not "directors, officers, or managing agents" of MGA Mexico yet publicly made this same assertion in its objections to Mattel's notices of their depositions.

(*Id.*, pp. 2 – 4 [citations omitted]).

In addition to conflating these two distinct categories (information previously designated as confidential and information newly designated as confidential in connection with the Opposition Papers), the parties also fail to consistently distinguish between the differing levels of protection afforded by the Protective Order.  Often the parties use the same arguments to address several individual pieces of information as a collective unit, arguing that the entire unit is (or is not) entitled to AEO protection, without separately addressing whether certain individual items might be entitled to intermediate protection as CONFIDENTIAL even if they fall short of warranting protection as AEO.

Lastly, the Discovery Master notes that Mattel seeks only to de-designate the Opposition Papers, thereby leaving intact the AEO designation on Mattel's own

1   motion and reply papers, which reference much of the same information as the

2   Opposition Papers.  Mattel does not address the differences (if any) between the

3   motion and reply, on the one hand, and the Opposition Papers, on the other hand,

4   that would warrant de-designating the latter, but not the former.

5        Against this backdrop, Mattel's request that the Discovery Master de-

6   designate the Opposition Papers in their entirety – without reference to the

7   underlying evidence (e.g., the Kuemmerle Tr.) or other briefs that may contain

8   references to that underlying evidence – is untenable.  Given the procedural context

9   and other considerations discussed above, the Discovery Master will fashion a

10  remedy that grants some of the relief Mattel seeks, and preserves Mattel's right to

11  seek further relief consistent with the reasoning below.

12      **2.**       **Information Designated As AEO Prior To The Filing Of The**

13         **Opposition Papers**

14       In its Reply in Support of the Motion to De-Designate Certain Pleadings,

15  Mattel argues that "the substance of most of the designated information in the

16  Opposition brief is already a matter of public record and, in many instances, has

17  previously been disclosed by MGA itself."  (Reply in Support of Motion to De-

18  Designate Certain Pleadings, p. 2 – 4).  Mattel argues that this information is not

19  entitled to protection, either because:  (1) the designation was improper *at the outset*

20  due to MGA's prior public disclosure of those facts; or (2) any legitimate interest in

21  the confidentiality of the previously designated information was subsequently

22  waived by MGA's public disclosure of the facts.  However, instead of seeking to

23  oppose the underlying material, Mattel seeks to de-designate only MGA's

24  Opposition.

25       As noted above, MGA opposes this approach as procedurally deficient, and

26  the Discovery Master agrees.  As MGA points out, the better approach, for

27  information previously designated as AEO, is for Mattel to challenge the AEO

28  designation in its original form (e.g., the Kuemmerle Tr.) rather than seeking to de-

designate a single brief that is part of an integrated exchange of documents, all of which were marked AEO.  Among other things, requesting de-designation of the underlying evidence (together with a list of all subsequent references to that evidence contained in subsequent discovery responses, deposition testimony or briefs) will permit the Discovery Master to issue an order that applies not only to that underlying evidence but all briefs and papers subsequently citing the evidence, thereby avoiding confusion and the piecemeal adjudication of multiple motions addressing the same evidence cited in different briefs.

In reaching this conclusion, the Discovery Master emphasizes that this ruling is entirely procedural, and should not be construed as addressing in any way the merits of Mattel's arguments that particular items of evidence marked by MGA as AEO are not entitled to such protection.

### 3.    Information MGA Designated As AEO At The Time It Filed Its Opposition

The procedural analysis above is necessarily different with respect to the Kuemmerle Decl. that accompanied the Opposition.  Unlike the Kuemmerle Tr. and other evidence cited in MGA's Opposition (as well as in Mattel's moving papers), the Kuemmerle Decl. was first  designated by MGA as AEO at the time MGA filed its Opposition, and therefore Mattel's Motion constitutes the procedurally appropriate method to challenge the designation.  Accordingly, having determined that the issue is properly before me, I will proceed to consider the merits of Mattel's challenge.

As stated above, Mattel contends that the Kuemmerle Decl. does not constitute evidence entitled to AEO protection pursuant to the Protective Order.  Specifically, Mattel notes that the AEO designation is "limited to trade secrets or other confidential commercial information, including without limitation non-public designs and drawings, which the disclosing Party or nonparty in good faith believes will result in competitive disadvantage or harm if disclosed . . ."  (Protective Order,

¶ 2).  According to Mattel, the Kuemmerle Decl. "do[es] not discuss any sort of trade secret or "confidential commercial information" that would result in "competitive disadvantage or harm if disclosed."  (Motion to De-Designate Certain Pleadings, p. 3).

In response, MGA advances three reasons supporting its designation of the Kuemmerle Decl. as AEO.  First, MGA argues that the Kuemmerle Decl. "contain[s] private and personal details concerning Mr. Vargas and Ms. Trueba." (Opposition to Motion to De-Designate Certain Pleadings, p. 5).  Specifically:

- "[T]he Kuemmerle Declaration discusses personal information with respect to Mr. Vargas' and Ms. Trueba's respective families, including their children. (*See e.g.*, Kuemmerle Decl., 2:27-3:2 ('[Mr. Vargas] has two young children, ages four and eight approximately, who reside with him in Mexico.')."  (*Id.*)

- "The [Kuemmerle Declaration] also discusses criminal proceedings against Mr. Vargas and Ms. Trueba.  (*See e.g.*, … Kuemmerle Decl., ¶ 8 ('Before Mr. Vargas or Ms. Trueba travel, I am required to submit a written request to the Court in Mexico seeking permission for either of them to travel outside of Mexico for business and they must await the Court's written permission.')."  (*Id.*, pp. 5 -6).

Second, MGA asserts that the Kuemmerle Decl. "provide[s] confidential and proprietary information with respect to Mr. Vargas' and Ms. Trueba's employment and job responsibilities."  (*Id.*, p. 6).  Specifically, Paragraphs 3 and 4 of the Kuemmerle Decl. contain the Deponents' job titles and a short, conclusory statement regarding whom they report to and whether they supervise any other MGA de Mexico employees.

Third, MGA argues that the Kuemmerle Decl. "discuss[es] MGA Mexico's business structure and set-up, which should be kept confidential from competitors like Mattel."  (*Id.*, p. 6, citing Kuemmerle Decl., 2:11-3:9 ['I supervise Mr. Vargas

1   with respect to all of MGA De Mexico's corporate matters.']).

2       Mattel disputes the notion that these three categories of information are

3   entitled to AEO protection, arguing that, on their face, none involves trade secrets.

4   The Discovery Master agrees.  The first category (personal information regarding

5   the Deponents) cannot, by definition, constitute a trade secret of MGA de Mexico.

6   With respect to the second category (the Deponents' job titles and place in the

7   corporate chain of command), MGA fails to articulate any rationale for

8   characterizing such information as a trade secret likely to damage MGA's position

9   vis-à-vis competitors.  Turning to the third and final category, while it may be true

10  as an abstract proposition that certain information regarding "MGA Mexico's

11  business structure and set-up . . . should be kept confidential from competitors like

12  Mattel" (Opposition to the Motion to De-Designate Certain Pleadings, p. 6), the

13  extremely generalized, conclusory statements in the Kuemmerle Decl. regarding

14  who reports to whom reveals no specifics whatsoever regarding MGA's business

15  structure or set-up and hence is not a trade secret entitled to AEO protection.

16      Apparently aware that it cannot establish trade secret status for any of the

17  three categories at issue, MGA's Opposition to the Motion to De-Designate Certain

18  Pleadings conflates the two levels of confidentiality protection set forth in the

19  Protective Order, asserting that the "private and personal details concerning Mr.

20  Vargas and Ms. Trueba" fall within the Protective Order's provision permitting a

21  'Confidential' designation for such information."  (*Id*. ["Contrary to Mattel's

22  assertion, the plain language of the Protective Order provides that 'confidential

23  proprietary, private or personal' information, like that contained in the Opposition

24  Documents, may be filed under seal.").

25      Although it falls short of establishing the propriety of MGA's AEO

26  designation, this argument does, in the Discovery Master's view, warrant affording

27  the subject information a lesser level of protection.  The Deponents have a

28  legitimate interest in maintaining the confidentiality of certain personal family

1  information, such as the number and age of their children.  Accordingly, the

2  Discovery Master finds that Paragraphs 6 and 7 of the Kuemmerle Decl. should be

3  designated as CONFIDENTIAL despite the fact that they are not entitled to AEO

4  protection.

5         The Discovery Master also finds that the information regarding the criminal

6  proceedings pending against the Deponents (see Kuemmerle Decl., ¶ 8) should also

7  be deemed CONFIDENTIAL.  Mattel argues that such information is public

8  because it can be found on the Internet:

9         A simple internet search will disclose both the fact of the pending

10        criminal action against Trueba and Vargas as well as the penalties

11        they face.  As for the restrictions on travel being confidential, Mr.

12        Machado, who is being prosecuted in Mexico along with Vargas

13        and Trueba, publicly filed a brief in this matter referring to these

14        very same travel restrictions, and MGA has argued for its

15        advantage that Mattel is 'well aware' of them.  Nor, in any case,

16        has MGA shown that 'travel restrictions' as to its employees

17        merit disclosure restrictions under the Protective Order.

18  (Reply in Support of the Motion to De-Designate Certain Pleadings, pp. 5 – 6

19  [citations omitted]).  However, the fact that information regarding the criminal

20  proceedings can be readily found by someone who already knows all of the details

21  regarding the proceedings, including the case number, location of the court, and so

22  forth and who can therefore enter the correct search criteria is not the same as

23  demonstrating that the information could be easily or readily accessed by English

24  speaking members of the general public.[6]  Accordingly, the Discovery Master finds

25  that with respect to the first category (personal information regarding the Deponents

26

27  ─────────────

[6] The Supplemental Declaration of Dianne Hutnyan filed in support of the Reply attaches pages of Google-translated web pages referencing the criminal charges (marked as Exhibits 7 and 8), but does not specify which search terms Ms. Hutnyan used to locate those pages.

28

1   contained in Paragraphs 6 – 8 of the Kuemmerle Decl.) a CONFIDENTIAL level of

2   protection is warranted.

3       With respect to the second and third categories of information alleged to be

4   confidential by MGA de Mexico, the Discovery Master finds that Mattel has

5   established that no protection whatsoever is warranted.  The information

6   Kuemmerle provides on these topics is extremely generalized and includes legal

7   conclusions (i.e., that neither of the Deponents is a "director, officer or managing

8   agent" of MGA de Mexico).  MGA has failed to demonstrate that disclosure of such

9   information "contains, constitutes or reveals confidential design, engineering or

10  development information, confidential commercial information [or] non-public

11  financial information" within the meaning of the Protective Order.  Thus,

12  Paragraphs 3 – 5 of the Kuemmerle Decl. discussing the Deponents' job duties and

13  position in the MGA de Mexico corporate chain of command should be de-

14  designated in their entirety.

15      **D.    Summary Of Ruling Regarding The Motion To De-Designate**

16          **Certain Pleadings**

17      The Discovery Master concludes that Mattel has not properly sought to de-

18  designate the underlying AEO evidence requested to be de-designated in the

19  Opposition (together with a list of all subsequent references to that evidence

20  contained in subsequent discovery responses, deposition testimony or briefs) that

21  will enable the Discovery Master to issue an order that efficiently resolves the

22  status of the materials.  Regarding the Kuemmerle Decl., the Discovery Master

23  finds that it has been properly presented for resolution and strikes the AEO

24  designation made by the MGA Parties with respect to Paragraphs 3 – 5 and re-

25  designates Paragraphs 6 – 8 CONFIDENTIAL.

26      **E.    The Parties' Respective Requests For Sanctions**

27      Both parties contend that the other failed to meet and confer in good faith and

28  engaged in a variety of unprofessional and discourteous conduct.  Since each side

1   disputes the other's version of events, the Discovery Master is unable to determine,

2   based on the four corners of the relevant declarations, whose version is more

3   accurate.  Moreover, although the Discovery Master will issue (and has issued)[7]

4   sanctions where a party advocates a position without a colorable basis in law and/or

5   fact, the present Motion to De-Designate Certain Pleadings and corresponding

6   Opposition to the Motion to De-Designate Certain Pleadings do not present such a

7   case.  As demonstrated by the Discovery Master's ruling today, each side advanced

8   some meritorious arguments and prevailed in part.  Accordingly, the Discovery

9   Master concludes that an award of sanctions against either side is inappropriate.

10  **III.   MOTION TO QUASH**

11          **A.     Factual Background**

12                  **1.      The Subpoenas Directed To The Financing Entities**

13          On January 9 and 13, 2009, Mattel served subpoenas seeking the production

14  of documents on Omni 808 Investors, LLC ("Omni 808"), OmniNet Capital, LLC

15  ("OmniNet") and Vision Capital, LLC ("Vision Capital") (collectively, the

16  "Financing Entities").  The information sought by the subpoenas to the Financing

17  Entities included, among other things, documents evidencing their internal

18  ownership and operations and their role in providing financing to MGA

19  ("Financing Discovery"), namely Omni 808's purchase of the Wachovia Bank

20  ("Wachovia") debt (the "Debt Acquisition").

21                  **2.      The Subpoenas Directed To Leon Neman, Fred Mashian**
22                          **And Neil Kadisha**

23          Near the end of February, 2009, Mattel served three more subpoenas in an

24  effort to depose non-parties Leon Neman, Fred Mashian and Neil Kadisha

25  ("Deposition Subpoenas").  The deposition subpoena directed to Mr. Kadisha also

26  included 44 document requests ("Kadisha Document Requests").

27

28

---

[7] See Order No. 17 awarding sanctions against the MGA Parties for opposing discovery without substantial justification.

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 33
[Case No. CV 04-09049 SGL (RNBx)]

The non-parties served with the Deposition Subpoenas are all affiliated with the Financing Entities in some capacity. "Mr. Neman is a principal of Vision Capital." (Motion to Quash, p. 2). "Mr. Mashian is a business attorney that has on occasion provided legal services for Vision Capital." (*Id*.). Mr. Kadisha is a "principal of OmniNet Capital and Omni 808." (*Id*.).

### 3.    Order No. 3

Several weeks before Mattel served the Deposition Subpoenas on Messrs. Neman, Mashian and Kadisha (the "Witnesses"), the MGA Parties filed a motion to quash the subpoenas served on the Financing Entities, and Mattel simultaneously moved to compel the Financing Entities to produce responsive documents. On March 10, 2009, the Discovery Master denied MGA's motion to quash the subpoenas served on the Financing Entities, and denied in part and granted in part Mattel's corresponding motion to compel ("Order No. 3"). Specifically, the Discovery Master denied Mattel's motion with respect to OmniNet and Vision Capital in its entirety. (Order No. 3, p. 28). The Discovery Master further limited the documents Mattel could obtain from Omni 808 to Request Nos. 1 through 3, 13, 15, and 17 to the extent they related to (1) the existence of any debt owed by MGA to Omni 808, and (2) any communications between Omni 808 and MGA Parties regarding that debt, but otherwise denied the motion. (*Id*., pp. 28 – 29). The Discovery Master's ruling was premised on, among other things, Mattel's failure to "sufficiently articulate the necessary connection between most of the Financing Discovery and any Phase 2 issue." (*Id*., p. 25).

### 4.    The Motion To Quash At Issue

Relying heavily on Order No. 3, the Witnesses moved to quash the Deposition Subpoenas and accompanying Kadisha Document Requests on March 12, 2009. (Motion to Quash, p. 1). Specifically, the Witnesses claim that Order No. 3 "affirmed that the information Mattel is seeking from the Financing Entities, and the individuals related thereto [i.e., from the Witnesses], is irrelevant to the

1    Phase 2 proceedings between Mattel and MGA."  (*Id.*)

2            **5.      Mattel's Motion For Reconsideration Of Order No. 3**

3            Twelve days after the Witnesses filed their Motion to Quash, Mattel

4    requested that the Discovery Master reconsider Order No. 3 as it pertained to the

5    Financing Entities.  Specifically, Mattel cited new evidence it had obtained from

6    Wachovia plus one other document and claimed that these documents established

7    that the Financing Entities were being used by the MGA Parties to divert revenues

8    from MGA and then funnel them back into the company disguised as debt.

9            **6.      The Court's April 27, 2009 Order**

10           While Mattel's motion for reconsideration was pending but before it was

11   decided, the Court issued its April 27, 2009 Order (the "April 27 Order") which,

12   among other things, (1) granted in part Omni 808's motion to intervene in this case

13   as a party on a limited basis, and (2) found that the MGA Parties may be engaged in

14   certain transactions constituting a fraudulent transfer of assets involving Bratz

15   products owned by Mattel.  The latter finding was an apparent reference to the

16   transactions whereby MGA allegedly sold Bratz products to an Isaac Larian

17   ("Larian") controlled entity, IGWT 826 Investments, LLC ("IGWT 826"), at a deep

18   discount which then converted the assets into cash and funneled that cash back to

19   MGA through Omni 808 in the form of a loan, namely the credit facility

20   represented by a "Secured Delayed Draw Demand Note" between MGA and Omni

21   808 (the "Note").

22           **7.      The Forensic Auditor's Interim Report**

23           Although the Court did not rely on it, the Confidential *In Camera* Summary

24   Report of Forensic Auditor dated April 23, 2009 (the "Auditor's Report") is fully

25   consistent with the Court's April 27 Order.  Indeed, the Auditor's Report concludes

26   that "[i]t appears from the evidence that [MGA] has regularly engaged in related

27   party transactions . . . involving Omni 808 . . .and IGWT 826 . . ."  (Auditor's

28   Report, p. 4).

1

### 8.    Oder No. 27

2      On May 6, 2009, the Discovery Master concluded that, based on the new

3  evidence presented by Mattel in its motion for reconsideration, the findings in the

4  Auditor's Report and the Court's April 27 Order, Mattel was entitled to discover

5  some additional documents from the Financing Entities ("Order No. 27").

6  Specifically, the Discovery Master found that Mattel had come forward with new

7  evidence in support of its Motion for Reconsideration "that may tend to prove that

8  MGA intended to manipulate its net worth."  (Order No. 27, p. 12).  Accordingly,

9  the Discovery Master held that Omni 808 must produce "all non-privileged

10  documents responsive to Request Nos. 4, 6, 7, 10, 14, 16 and 18, as well as any

11  additional non-privileged documents that it ha[d] not already produced that [were]

12  responsive to Requests 1 through 3, 13, and 15."  (*Id*., p. 39).  The Discovery

13  Master further modified "Order No. 3 to enforce Mattel's subpoenas to OmniNet

14  and Vision Capital for the limited purpose of permitting Mattel to obtain

15  agreements, e-mails, correspondence or other non-privileged documents related to

16  the Debt Acquisition."  (*Id*., pp. 14 – 15).

17      ### 9.    The Witnesses Have Not Narrowed Their Motion To Quash

18      Although their Motion to Quash is premised in large part on an order that has

19  been modified (i.e., Order No. 3) by a subsequent ruling from the Discovery Master

20  (i.e., Order No. 27), the Witnesses have not withdrawn any aspect of their Motion

21  to Quash the Deposition Subpoenas or accompanying Kadisha Document Requests.

22      ### B.    The Relief Sought By The Witnesses

23      The Witnesses request that the Discovery Master "issue a protective order

24  and/or quash [the Deposition Subpoenas and accompanying Kadisha Document

25  Requests] in their entirety."  (Motion to Quash, p. 16).  As support for their

26  position, the Witnesses first argue that Order No. 3 confirms that the information

27  sought is not relevant to any Phase 2 issue.  (*Id*., pp. 1 – 3 and 8 – 12).  Next, the

28  Witnesses argue that the Deposition Subpoenas and accompanying Kadisha

1    Document Requests are "abusively drawn for the purpose of annoying, harassing,

2    and exerting pressure on" them.  (*Id.*, p. 2; *see also id.* at pp. 12 – 13).  Third, the

3    Witnesses argue that, even if the information sought is relevant, the Discovery

4    Master "should forbid the depositions from going forward [and burdening the

5    Witnesses] until Mattel has exhausted its ability to obtain the information from

6    actual parties to the litigation."  (*Id.*, p. 3; *see also id.* at pp. 14 – 15).  Finally, the

7    Witnesses argue that the Discovery Master should "quash the subpoenas because

8    Mattel unilaterally noticed the depositions without extending the most basic

9    professional courtesy of contacting counsel for MGA or the [Witnesses] before

10   scheduling the depositions and refused to respond to . . . written requests to

11   withdraw or reschedule the depositions."  (*Id.*, p. 3; *see also id.* at pp. 15 – 16).

12       **C.**     **Legal Standard**

13           Federal Rule of Civil Procedure 45(c)(3)(A) sets forth the bases for a court to

14   quash or modify a subpoena.  In pertinent part, Rule 45 provides "[o]n timely

15   motion, the court by which a subpoena was issued shall quash or modify the

16   subpoena if it . . . (iii) requires disclosure of privileged or other protected matter

17   and no exception or waiver applies, or (iv) subjects a person to undue burden."

18   Fed. R. Civ. P. 45(c)(3)(A).

19           "[T]he party who moves to quash a subpoena has the 'burden of persuasion'

20   under Rule 45(c)(3)."  (*Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal.

21   2005).  "Although irrelevance is not among the litany of enumerated reasons for

22   quashing a subpoena found in Rule 45, courts have incorporated relevance as a

23   factor when determining motions to quash a subpoena."  (*Id.* [citation omitted]).

24   "Specifically, under Rule 45(c)(3)(A), '[a]n evaluation of undue burden requires the

25   court to weigh the burden to the subpoenaed party against the value of the

26   information to the serving party[.]'"  (*Id. quoting Travelers Indem. Co. v.*

27   *Metropolitan Life Insur. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005).

28           As the Discovery Master has previously explained, the Federal Rules of Civil

1  Procedure also distinguish between discovery from non-parties to a lawsuit and

2  discovery from parties.  (*See*, *e.g.*, *Solarex v. Arco Solar, Inc.*, 121 F.R.D. 163, 179

3  (E.D.N.Y. 1988) [The status of a non-party is significant when determining whether

4  compliance with a discovery demand would constitute an undue burden]; *Katz v.*

5  *Batavia Marine and Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)

6  [The fact that discovery is sought from a non-party is one factor that the Court may

7  weigh in determining whether the discovery requested is necessary, relevant, or

8  burdensome]).  Indeed, courts afford non-parties special heightened protection

9  against burdensome discovery.  (*See*, *e.g.*, *Exxon Shipping Co. v. U.S. Dept of*

10  *Interior*, 34 F.3d 774, 779 (9th Cir. 1994)).  Accordingly, requests for documents

11  that can be more easily and inexpensively obtained in some other manner may be

12  found to impose an undue burden.  (*Moon*, *supra*, 232 F.R.D. at 637).

13  **D.    Analysis**

14  **1.    The Deposition Subpoenas Seek Discoverable Information**

15  The Witnesses' Motion to Quash is based primarily on an argument that the

16  Deposition Subpoenas are barred by Order No. 3.[8]  Among other things, Order No.

17  3 concluded that any information sought from Vision Capital was not related to any

18  Phase 2 issue.  (Order No. 3, p. 28).  Therefore (Neman and Kadisha argue), Order

19  No. 3 precludes Mattel from taking their depositions because the former is a

20  principal of Vision Capital and the latter is an attorney who occasionally provided

21  legal services to Vision Capital.  (Motion to Quash, p. 2).

22  Mr. Kadisha also argues that there is "no basis on which to depose or obtain

23  documents" from him even though he is a principal of OmniNet and Omni 808.

24  (*Id.*).  Mr. Kadisha asserts that he cannot be deposed as a result of his affiliation

25  with OmniNet because "[t]he Discovery Master already found that information

26

---

27  [8] Mr. Kadisha also argues that "each of the 44 broad categories of documents requested by Mattel from [him] is either irrelevant or duplicative" in light of the ruling set forth in Order No. 3.  The Discovery Master addresses the

28  Kadisha Document Requests in Section III.D.6 below.

relating to OmniNet Capital is not relevant to this action" as part of Order No. 3. (*Id.*).  Mr. Kadisha further argues that any information that the Discovery Master found to be discoverable in Order No. 3 concerning Omni 808 will be produced, thereby obviating any need to depose him.  (*Id.*)

Each of these arguments is unavailing.

### a.    The Deposition Subpoenas Served On Messrs. Neman And Mashian Relate To Phase 2 Issues[9]

As explained in Section III.A.8 above, Order No. 27 issued by the Discovery Master modified Order No. 3 and held that any documents related to the Debt Acquisition must be produced by *Vision Capital*.  (Order No. 27, pp. 14 – 15).  It, therefore, follows that a principal of Vision Capital and one of its attorneys may have substantive knowledge of Vision Capital's involvement (or lack of involvement) in the Debt Acquisition.  Accordingly, the proposed depositions of Messrs. Neman and Mashian are relevant to a Phase 2 issue and may be taken in the absence of some other valid objection.

### b.    The Depositions Subpoena Served On Mr. Kadisha Relates To Phase 2 Issues[10]

The deposition subpoena propounded on Mr. Kadisha also relates to Phase 2 issues.  The Discovery Master previously concluded in Order No. 27 that OmniNet (like Vision Capital) must produce certain categories of non-privileged documents to the extent they relate to the Debt Acquisition.  Therefore, Mr. Kadisha may be deposed because he is a principal of OmniNet.

The Discovery Master further previously determined in connection with Order Nos. 3 and 27 that Omni 808 must produce documents evidencing its internal

---

[9] In its Opposition to the Motion to Quash, Mattel argues that Messrs. Neman and Mashian's objections to the document requests were untimely and therefore waived.  (Opposition to Motion to Quash, p. 7).  However, the document requests referenced by Mattel are not part of the present motion.  (Reply in Support of Motion to Quash, p. 4).  Accordingly, the Discovery Master does not address Mattel's contention.

[10] The Discovery Master addresses the relevancy of the Kadisha Document Requests in Section III.D.6. below.

ownership, operations, and role in providing financing to MGA.  Mr. Kadisha concedes that he is a principal of Omni 808.  (Motion to Quash, p. 2).  In fact, Mr. Kadisha may be Omni 808's Chief Executive Officer ("CEO"), (Opposition to Motion to Quash, p. 10), and founder, (Auditor's Report, p. 5 ["Mr. Kadisha established Omni 808"]).  As the purported CEO of Omni 808, Mr. Kadisha presumably has a great deal of knowledge regarding the Debt Acquisition and any additional funding Omni 808 has provided to MGA, including with respect to the Note.  In fact, the Auditor's Report found that Mr. Kadisha may be directly involved in the Debt Acquisition:

> MGA[] entered into a loan agreement credit facility with Wachovia Bank in October 2006 . . . . As of December 2007, the principal balance was $313 million.  After the jury announced its verdict in favor of Mattel [in Phase 1] Wachovia called the note. . . . Addressing this financial situation, Mr. Larian, the controlling shareholder of MGA[], sought the assistance of Neil Kadisha ('Mr. Kadisha') . . . . Mr. Kadisha negotiated a deal to acquire the Wachovia Loan at a greatly reduced price.  In order to complete the transaction with Wachovia, Mr. Kadisha also established Omni 808 as a special purpose entity.  On or about September 3, 2009, Omni 808 purchased the note on the Wachovia Loan for approximately $109.7 million. As an integral part of this transaction, Mr. Kadisha required Mr. Larian to put cash into the deal, but only as a lender, not as an investor.  Therefore, Isaac and Angela Larian, Shirin and Jahangir Eli Makabi, and the rest of the Larian Parties – their assorted trusts and special purpose entities . . . pulled together $60 million for Omni 808 to

1   use for the purchase of the Wachovia note.  To fund the

2   remaining $50 million for the purchase of the Wachovia

3   note, both Mr. Kadisha and Mr. Larian obtained funds

4   from their friends [with Mr. Kadisha personally

5   contributing $10,000,000]. . . . On September 3, 2008,

6   Omni 808 finalized the transaction with Wachovia and

7   paid $109,723,845 for the note. . . .

8   (Auditor's Report, pp. 4 – 6).

9        The Auditor's Report also found that Mr. Kadisha may be directly involved

10  in the Note entered into by MGA and Omni 808:

11       In the fall of 2008, MGA[] was short of cash and needed a

12       cash infusion to fund operations.  MGA[] approached

13       Omni 808, the special purpose entity formed by Mr.

14       Kadisha. Omni 808 arranged for a $40 million Secured

15       Delayed Draw Demand Note.  Omni 808 also purported

16       to loan $6 million to MGA[]. Based on a review of the

17       evidence, however, the funds for this purported loan were

18       provided to Omni 808 by the Larian Parties through

19       IGWT 826.  In an email dated October 17, 2008, Mr.

20       Kadisha . . . stated as follows: 'Isaac, MGA is requesting

21       a $6M draw from Omni 808 for Monday.  In order for

22       Omni 808 to accommodate this request, we need to

23       receive at least $6M from you.'

24  (Auditor's Report, p. 12).  In light of these statements in the Auditor's Report and

25  given the impact the Debt Acquisition and Note may have on (1) MGA's net worth,

26  (2) Mattel's damages, and (3) the Court's December 3, 2008 Order, the Discovery

27  Master finds that Mattel is entitled to depose Mr. Kadisha regarding, among other

28  things, whether MGA legitimately owes any funds to Omni 808 as well as the

1   source of Omni 808's funding.[11]

2          For all of the foregoing reasons, Mr. Kadisha is subject to being deposed

3   absent some other valid objection.

4          **2.       The Deposition Subpoenas Are Not Duplicative,[12]**

5                  **Overbroad Or Abusively Drawn**

6          Because they are relevant to a variety of Phase 2 issues, any objections that

7   the Deposition Subpoenas are "overbroad and abusively drawn," (Motion to Quash,

8   p. 12) are overruled.  Nor is the claim that the Deposition Subpoenas are duplicative

9   of other discovery well-taken.  Mattel has not previously deposed the Witnesses and

10  it is entitled to take their depositions absent a valid objection to the contrary.[13]

11         **3.       Mattel Asked The Witnesses To Propose Dates When They**

12                 **Could Be Deposed**

13         The Witnesses next argue that the Deposition Subpoenas "should be quashed

14  and/or a protective order should be issued because Mattel failed to meet and confer

15  with counsel and the [Witnesses] before scheduling the deposition dates." (Motion

16  to Quash, p. 15).  However, none of the cases cited by the Witnesses support such a

17  result.  At best, they stand for the proposition that a protective order may be issued

18  to require the deposition proceed on a date the deponent is available.[14] (*See*

19  _____

20  [11] This conclusion is supported by the Court's April 27 Order, which found the Debt Acquisition to be relevant to Phase 2 issues.  Indeed, the Court set a hearing for May 18, 2009 and stated:

21          At that hearing, the Court will consider whether, as counsel for Omni 808 represented to this Court, 'Omni's purchase of the Senior Bank Credit Facility from Wachovia was a straightforward, arms-length business deal between non-parties to this action,' or whether,

22          as counsel for Mattel contends, the purchase was by entities formed for 'the improper purpose of attempting to leapfrog over Mattel's claims and shield their assets from creditors

23          and other rights-holders such as Mattel.'

    (April 27 Order, pp. 15 – 16).

24
    [12] Whether the Kadisha Document Requests are duplicative of prior subpoenas propounded on the Financing Entities
25  is addressed in Section III.D.6 below.

26  [13] As explained in Section III.D.6 below, the analysis regarding whether the Kadisha Document Requests are duplicative of other discovery served on the Financing Entities is somewhat different.

27
    [14] Of course, the Discovery Master encourages the parties to work with each other to arrange mutually agreeable
28  dates for all depositions in this matter.

1   *Seabrook Medical Systems, Inc. v. Baxter Healthcare Corp.*, 164 F.R.D. 232, 233

2   (S.D. Ohio 1995) [holding that "[t]he deposition subpoena issued by defendant

3   REMAINS IN FORCE and is NOT QUASHED" and ordering the parties to agree

4   upon a date for the deposition (bold-type omitted)]; *Ray v. BlueHippo Funding,*

5   *LLC*, 2008 WL 3399392, *2 (N.D. Cal. August 11, 2008 [district court did not

6   quash the deposition but rather scheduled it for September 5 instead of September

7   6]; *Valvida v. Kmart Corp.*, 2000 WL 1739215, *2 (D.Virgin Islands 2000)

8   [ordering parties to confer and agree on dates for depositions of witnesses]);

9   *Koninklike Phillips Electronics N.V. v. KXD Technology, Inc.*, 2007 WL 3101248,

10  *17 (D. Nev. October 16, 2007) [addressing whether to sanction a party who failed

11  to appear at a deposition and noting that "Rule 30 does not, by its terms, require

12  that the noticing party confer with opposing counsel before scheduling a

13  deposition."]).

14      In any event, Mattel made several efforts to accommodate the Witnesses,

15  including asking their counsel (Bingham McCutchen LLP) and the MGA Parties'

16  counsel on March 9, 2009 to "provide proposed dates for the depositions of Messrs.

17  Kadisha, Neman and Mashian." (Declaration of Jon D. Corey in Support of Mattel,

18  Inc.'s Opposition to Motion to Quash, Ex. 14).  Accordingly, any argument that

19  Mattel acted unilaterally in scheduling the depositions is not accurate.

20  **4.    The Witnesses' Undue Burden Objection**

21      The Witnesses next argue that Mattel should initially be required "to seek the

22  information from MGA or other parties to this action before burdening non-

23  parties."  (Reply in Support of Motion to Quash, p. 13).  Put another way, the

24  Witnesses argue that the Deposition Subpoenas impose an undue burden because

25  the information sought can be just as easily obtained from the parties in this case.

26  (*Moon*, *supra*, 232 F.R.D. at 637).  This argument is unpersuasive for three reasons.

27      First, "nothing in the Federal Rules of Civil Procedure requires a litigant to

28  rely solely on discovery obtained from an adversary instead of utilizing subpoenas.

(*State Farm Mut. Auto Ins. Co. v. Accurate Medical, P.C.*, 2007 WL 2993840, *1 (E.D.N.Y. October 10, 2007)).

Second, although a request for discovery may be improper if it "can be obtained from some other source that is *more* convenient, *less* burdensome or *less* expensive," (Fed. R. Civ. Proc. 26(b)(2) [emphasis added]), there has been no showing by the Witnesses that the information sought is available from others more economically.  (*See In re Bergeson*, 112 F.R.D. 692, 695 (D. Mont. 1986).  Rather, the Witnesses merely argue that the information can be obtained directly from the parties in this case.  Because they do not demonstrate that the parties can provide the requested information in a more cost effective manner, Rule 26(b)(2) is not applicable.

Finally, the Discovery Master notes that Omni 808 has now become a party to this action (at least for limited purposes) due to the Court's April 27 Order. Because its request to intervene as a party was granted, Omni 808 is no longer entitled to any heightened protection as a non-party and its managing agents, including perhaps Mr. Kadisha, may be deposed pursuant to Federal Rule of Civil Procedure 30(b)(1) at least on certain issues.

For all of the above reasons, the Witnesses' undue burden objection is overruled and the depositions of Messrs. Kadisha and Neman may be taken.[15]  The deposition of Mr. Mashian, on the other hand, is denied for the reasons set forth in Section III.D.5 below.

### 5.     The Attorney-Client Privilege

It is undisputed that Mr. Mashian "is a business attorney that has on occasion provided legal services for Vision Capital."  (Motion to Quash, p. 2; *see also* Opposition to Motion to Quash, p. 1 ["Fred Mashian (the attorney who helped structure the deals)"]).  Although no privilege objection is asserted directly by Mr.

---

[15] Again, the validity of the Kadisha Document Requests is discussed in Section III.D.6 below.

1    Mashian in his Motion to Quash, the fact that he is an attorney for Vision Capital

2    inherently implicates attorney-client privilege issues.  Moreover, Rule 45(c)(3)

3    specifically states that where, as here, a Motion to Quash has been filed "the issuing

4    court must quash or modify a subpoena that: . . . (iii) requires disclosure of

5    privileged or protected matter."  Therefore, even though Mr. Mashian may have

6    knowledge relevant to Mattel's Phase 2 claims, the Discovery Master must balance

7    "the relevance of the discovery sought, the requesting party's need, and the

8    potential hardship to the party subject to the subpoena."  (*Heat & Control, Inc.*, 785

9    F.2d 1017, 1024 (Fed. Cir. 1986)).

10        Applying that standard here, the Discovery Master finds that, based on the

11   record presented, many, if not most, of the questions that Mr. Mashian is likely to

12   be asked at his deposition will concern attorney-client communications which

13   should not be discoverable.  In describing the relevancy of the information it seeks

14   to obtain from Mr. Mashian, Mattel first mentions that he is "[l]isted as the contact

15   person in documents relating to Vision Capital's purported loan from Lexington,

16   and the person who prepared the UCC statement."  (Opposition to Motion to

17   Quash, p. 10).  But Mr. Mashian performed those legal tasks in his capacity as a

18   lawyer for Vision Capital and Lexington Financial Limited.  Indeed, in a

19   declaration submitted as part of a prior *ex parte* application, Mr. Mashian stated as

20   follows:

21            I am an attorney certified to practice law in the State of California

22            . . . I am a business attorney with a focus on international and

23            domestic tax and estate planning.  From time to time I have been

24            retained to provide legal services for LEXINGTON FINANCIAL

25            LIMITED. . . In 2008, LEXINGON FINANCIAL LIMITED

26            made a loan to Vision Capital, LLC, a Delaware Limited Liability

27            Company.  I prepared the loan documents in connection with that

28            loan transaction, and I filed a UCC Statement.

1  (Declaration of Fred Mashian in Opposition to Mattel, Inc.'s *Ex Parte* Application

2  for an Order Deeming Lexington Financial, LLC Served, ¶¶ 1, 2, 3 and 6).

3  Therefore, any deposition of Mr. Mashian is likely to be replete with refusals to

4  answer due to the attorney-client privilege.

5      The Discovery Master further finds that the information Mattel seeks to

6  acquire from Mr. Mashian could potentially be obtained from other "less

7  burdensome" sources, (Fed. R. Civ. Proc. 26(b)(2), including possibly from, among

8  others, Neil Kadisha and Leon Neman (the depositions subpoenas to whom the

9  Discovery Master is enforcing as part of this Order).

10      Because Mr. Mashian should not be burdened by having to attend a

11  deposition where he will likely repeatedly assert the attorney-client privilege, and

12  because the benefit of any such deposition is likely to be of only minimal value to

13  Mattel (and Mattel may be able to obtain any non-privileged information from other

14  sources), the Discovery Master, at this juncture, quashes the deposition subpoena

15  directed to Mr. Mashian in its entirety rather than modify it under Federal Rule of

16  Civil Procedure 45.[16]

17  ### 6.    The Kadisha Document Requests

18      Having determined that Mattel may depose Messrs. Kadisha and Neman but

19  not Mr. Mashian, the Discovery Master now turns to the Kadisha Document

20  Requests.

21  ### a.    The Requests Are Not Barred By Order No. 3

22      Mr. Kadisha first argues that the documents Mattel seeks to obtain from him

23  are irrelevant because they are the exact same documents that it sought from the

24  Financing Entities and the Discovery Master concluded as part of Order No. 3 that

25  the requests to the Financing Entities were not relevant to the Phase 2 proceedings.

26  (Reply in Support of Motion to Quash, p. 10 [emphasis in original]).  However, the

27

28  ---
[16] Because the Motion to Quash does not involve any document requests propounded upon Mr. Mashian, this ruling is without prejudice to any document requests that may have been served on him by Mattel.

Discovery Master recently issued Order No. 27, which, among other things, modified Order No. 3 by requiring the Financing Entities to produce additional documents to Mattel.  Accordingly, Mr. Kadisha's argument that the document requests "are *completely subsumed* by Order No. 3" is unpersuasive.

> **b.**     **Many Of The Kadisha Document Requests Are Duplicative Of The Documents Requested From Omni 808 And OmniNet, And Therefore Impose An Undue Burden On Mr. Kadisha To The Extent He Has Already Produced Such Materials**

Mr. Kadisha next argues that the document requests served on him are duplicative of requests Mattel propounded on the Financing Entities.  (Motion to Quash, pp. 11 – 12; Reply in Support of Motion to Quash, p. 10).  While this argument was also admittedly linked to Order No. 3, (Reply in Support of Motion to Quash, p. 10), it is not automatically negated by the issuance of Order No. 27.  The argument may still have some application because Mr. Kadisha is a principal of both Omni 808 and OmniNet and any requests that were served on those entities have by extension been directed to him, since both entities have access to the documents within his possession, custody or control.  Accordingly, to the extent it overlaps with the prior subpoenas served on Omni 808 or OmniNet, the requests served on Mr. Kadisha are unnecessary and burdensome if Mr. Kadisha has produced all responsive materials within his possession, custody or control relating to any such duplicative requests.

Notably, Mattel does not dispute that the Kadisha Document Requests seek essentially the same categories of documents as those previously requested from Omni 808 and OmniNet, presumably because the requests are largely duplicative of the requests served on those entities.  Indeed, the Discovery Master finds that Request Nos. 1, 2, 8 (regarding transactions between Wachovia and Omni 808), 9, 10 (regarding financial information provided by MGA to Omni 808 and OmniNet),

11, 14, 17 through 21, 24, 25, 27, 28, 30 through 33, 36, 39 (regarding communications with Vision Capital, Lexington Financial, LLC, Mattel, MGA, Larian, Fred Mashian and/or Bratz), 40 (regarding only the relationship between Omni 808 or OmniNet, on the one  hand, and Larian or his family members, on the other hand) and 41 are substantively the same as, if not identical to, the documents requests propounded on Omni 808 and OmniNet (the relevance of which were addressed in Order Nos. 3 and 27).

Because the Kadisha Document Requests overlap to some degree with the subpoenas previously issued to Omni 808 and OmniNet, the documents sought have already been requested once from Mr. Kadisha due to his status as a principal of both entities.  More importantly, to the extent the Discovery Master found that Mattel cannot obtain the requested information from Omni 808 or OmniNet, any request for similar information from Mr. Kadisha in his personal capacity should be overruled.  If the information sought is not relevant to Phase 2 when requested from Omni 808 or OmniNet (and by extension Mr. Kadisha), it is still irrelevant when requested from Mr. Kadisha in his personal capacity.

Conversely, to the extent that one of the Kadisha Document Requests is the same as a request in one of subpoenas issued to Omni 808 or OmniNet (and assuming the Discovery Master concluded that such a request is reasonably calculated to lead to the discovery of admissible evidence in either Order No. 3 or Order No. 27), Mattel should be entitled to obtain that information from Omni 808 or OmniNet (and by extension Mr. Kadisha) directly without forcing Mr. Kadisha to produce the documents for a second time in connection with the Kadisha Document Requests.  In fact, the Discovery Master has already addressed the document requests set forth in the subpoenas directed to Omni 808 and OmniNet, and ordered certain information to be produced, including information from Mr. Kadisha because he is principal of both Omni 808 and OmniNet.  It is therefore unnecessary for Mr. Kadisha to produce the same documents to Mattel again if he

has already produced all documents within his possession, custody or control that are responsive to the requests the Discovery Master enforced concerning Omni 808 and OmniNet.[17]   For all of the foregoing reasons, Requests Nos. 1, 2, 8 (in part), 9, 10 (in part), 11, 14, 17 through 21, 24, 25, 27, 28, 30 through 33, 36, 39 (in part), 40 (in part) and 41, impose an undue burden on Mr. Kadisha and are quashed if he has already produced all responsive documents to those requests as part of the productions by Omni 808 and OmniNet.  (*See* Fed. R. Civ. Proc. 45(c)(1) ["A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."] and 45(c)(3)(A)(iv) ["issuing court must quash or modify a subpoena that . . . subjects a person to undue burden."]).   Of course, if Mr. Kadisha has non-privileged documents within his possession, custody or control that are responsive to one of these requests and have not been produced by him in connection with subpoenas directed to Omni 808 or OmniNet, then he must produce those documents at the time of his deposition.

### c.   Many Of The Kadisha Document Requests Seek Documents From An Entity That Does Not Exist

In addition to those requests that the Discovery Master has concluded are substantively the same as, if not identical to, requests propounded on Omni 808 and OmniNet, there are 19 document requests directed to Mr. Kadisha that relate in whole or in part to documents involving "Lexington Financial, LLC."[18]   However the Discovery Master has previously stated that there is no such entity by that name that relates to this litigation.  (*See* Order No. 8 denying the *Ex Parte* Application to

---

[17] Order No. 27's modifications to Order No. 3 do not change this result.  Mattel will not need to obtain the documents ordered to be produced by Omni 808 and OmniNet as part of Order No. 27 from Mr. Kadisha personally because Mattel will have received the information from him through the Omni 808 and OmniNet subpoenas. Likewise, to the extent Order No. 3 was affirmed, any similar information Mattel requested from Mr. Kadisha should not be discoverable.

[18] The Kadisha Document Requests define Lexington Financial, LLC as "Lexington Financial" in Request No. 3.

Deem Lexington Financial Limited Served dated March 16, 2009, pp. 5 – 6).  The correct name of the entity is Lexington Financial Limited.  (*Id*.).  Accordingly, the Discovery Master finds that all of the Kadisha Document Requests that reference Lexington Financial, LLC are irrelevant and must be quashed.  Specifically, the Discovery Master quashes Requests Nos. 3, 5, 6 (regarding transactions between Omni 808 and Lexington Financial, LLC), 7 (regarding transactions between OmniNet and Lexington Financial, LLC), 8 (regarding transactions between Wachovia and Lexington Financial, LLC), 10 (regarding financial information provided by MGA to Lexington Financial, LLC), 13, 16, 18 (regarding the relationship between Omni 808 and Lexington Financial, LLC), 19 (regarding the relationship between OmniNet and Lexington Financial, LLC), 22 (regarding the relationship between MGA and Lexington Financial, LLC), 23, 26 (regarding the relationship between Lexington Financial, LLC and Larian or his family members), 27 (regarding the source of funding for Lexington Financial, LLC), 31, (regarding detail of loan facilities for Omni 808 that relate to Lexington Financial, LLC), 35, 38, 39 (regarding communications with Lexington Financial, LLC), and 40 (regarding the relationship between Lexington Financial, LLC, on the one  hand, and Larian or his family members, on the other hand).[19]

> ### d.    Document Requests Seeking Information Concerning Vision Capital Must Either Be Limited Or Quashed

A large number of the Kadisha Document Requests also seek documents related to Vision Capital.  However, the Discovery Master found in Order No. 27 that there has been no showing that Vision Capital is controlled by the MGA Parties, that it participated in any transactions involving the Bratz products, or that it is otherwise involved in conduct related to any of Mattel's Phase 2 claims. (Order No. 27, pp. 12 – 13).  Nevertheless, in light of the possibility that Vision

---

[19] Many of the requests that reference Lexington Financial, LLC are also irrelevant for other reasons and/or overbroad.

Capital could possess some additional documents regarding the Debt Acquisition (e.g., communications between Vision Capital and MGA regarding the Debt Acquisition) and in light of the Court's April 27 Order indicating that it would consider the validity of the Debt Acquisition at the May 18, 2009 hearing, the Discovery Master modified Order No. 3 and ordered Vision Capital to produce specific categories of documents related to the Debt Acquisition.  (*Id.*, pp. 14 – 15 and 39 – 40 ).  Specifically, the Discovery Master ordered Vision Capital to produce documents relating to (1) all transactions between MGA and Vision Capital related to the Debt Acquisition, (2) all transactions between Omni 808 and Vision Capital related to the Debt Acquisitions, (3) any financial information provided by MGA to Vision Capital related to the Debt Acquisition, (4) the relationship between Omni 808 and Vision Capital related to the Debt Acquisition, (5) the source of funding or credit for Omni 808 related to the Debt Acquisition, (6) the source of funding or credit for MGA related to the Debt Acquisition, and (7) all documents showing detail of all loan facilities with an indication of creditor and relevant terms for MGA, Omni 808, Larian or his family members related to the Debt Acquisition.

Because the Discovery Master previously ruled that documents concerning Vision Capital are not relevant unless they relate to certain categories of documents related the Debt Acquisition, I apply the same standard to the Kadisha Document Requests and find that Request Nos. 4 (in part), 6 (in part), and 10 (in part) are the same as, if not identical to, the categories of documents that Vision Capital was ordered to produce as part of Order No. 27.[20]  I further find that Request No. 8 (regarding transactions between Wachovia and Vision Capital) may be relevant to

---

[20] The Discovery Master notes that Request Nos. 18 (regarding the relationship between Omni 808 and Vision Capital), 28 and 31 are also similar to document requests that Vision Capital was ordered to respond to as part of Order No. 27.  However, any documents responsive to those requests should have already been (or must shortly be) produced by Mr. Kadisha as part of the production from Omni 808.  Accordingly, for the reasons set forth above in Section III.D.6.b., the Discovery Master finds that Request Nos. 18, 28 and 31 are duplicative of earlier requests propounded on Omni 808 (and by extension Mr. Kadisha).

1   the extent such documents relate to the Debt Acquisition.  Accordingly, all non-

2   privileged documents responsive to Request Nos. 4 (as it pertains to Vision Capital

3   but not True Vision Capital Management, LLC), 6 (regarding transactions between

4   Omni 808 and Vision Capital), 8 (regarding transactions between Wachovia and

5   Vision Capital), and 10 (regarding financial information provided by MGA to

6   Vision Capital) must be produced by Mr. Kadisha to the extent such documents

7   relate to the Debt Acquisition.

8          Mattel has not demonstrated that the remaining Kadisha Document Requests

9   that reference Vision Capital are relevant to any Phase 2 issue.  Accordingly,

10  Request Nos. 5, 7 (regarding transactions between OmniNet and Vision Capital),

11  12, 15, 19 (regarding the relationship between OmniNet and Vision Capital), 22

12  (regarding the relationship between MGA and Vision Capital), 23, 26 (regarding

13  the relationship between Vision Capital and Isaac Larian or his family members),

14  27 (regarding the source of funding for Vision Capital), 34, 35 (regarding

15  compensation paid by Lexington Financial, LLC to Vision Capital), 37, 39

16  (regarding communications with Vision Capital), and 40 (regarding the

17  relationship between Vision Capital, on the one  hand, and Larian or his family

18  members, on the other hand) are quashed pursuant to Rule 45(c).

19                    **e.      Document Request Nos. 4, 29, 39, 40, 42, 43 And 44**

20         The only remaining Kadisha Document Requests that are not addressed by

21  the foregoing are Request Nos. 4 (as it pertains to True Vision Capital

22  Management, LLC), 29, 39 (relating to all communication with Omni 808 or

23  OmniNet), 40 (relating to any transaction between Omni 808 and OmniNet, on the

24  one hand, and Larian or his family members on the other hand), 42, 43 and 44.

25  Each of these requests is addressed below.

26         With respect to Request No. 4, there has been no showing by Mattel that

27  True Vision Capital Management, LLC may possess any documents that relate to a

28  Phase 2 issue.  Therefore, the request is not enforceable to the extent it relates to

1   that entity.[21]

2       By contrast, Request No. 29 does relate to Phase 2 issues because it seeks all

3   documents within Mr. Kadisha's possession, custody or control regarding "the

4   source of funding or credit for MGA."  As the Discovery Master has previously

5   ruled, information relating to any debt MGA allegedly owes Omni 808, Mr.

6   Kadisha or anyone else, is reasonably calculated to lead to the discovery of

7   admissible evidence concerning Phase 2 issues, including the calculation of MGA's

8   net worth for purposes of calculating punitive damages.  While Mr. Kadisha has

9   been previously ordered as part of Order Nos. 3 and 27 to produce information

10  regarding any debt MGA owes Omni 808, it is possible that Mr. Kadisha could

11  have documents involving other loans to MGA (e.g., loans from Mr. Kadisha

12  directly) that have not been required to be produced.  Accordingly, any such

13  additional documents must be produced in response to Request No. 29.

14      As for Request No. 39, it is overbroad because it seeks "all communications"

15  relating to Omni 808 and OmniNet.  Not every communication concerning these

16  entities is relevant to a Phase 2 issue.  That is one of the reasons why the Discovery

17  Master refused to enforce, among other requests, Mattel's demand that Omni 808

18  produce "all documents referring or relating to the formation and governance of

19  Omni 808 . . ."  Order No. 27 similarly limited the requests directed to OmniNet to

20  certain categories of documents related to the Debt Acquisition.  Because not "all

21  communications" relating to Omni 808 and OmniNet are relevant to a Phase 2

22  issue, the Discovery Master finds that Request No. 39 is overbroad.

23      Request Nos. 42, 43 and 44 are even broader in scope than Request No. 39.

24  These requests seek documents sufficient to show every business in which Mr.

25  Kadisha and Larian or his family members both have an interest (Request No. 42),

26  ─────────────────

27  [21] Because Mattel defined "Vision Capital" to include True Vision Capital Management, LLC and its affiliates, any other Kadisha Document Request that references Vision Capital likewise seeks irrelevant information.  Accordingly, all such requests are quashed to the extent they seek any documents related to True Vision Capital Management, LLC.

28

1   all documents relating to any payment or indebtedness from Larian or his family

2   members or any of their businesses that involve Mr. Kadisha or any of his

3   businesses (Request No. 43), and documents sufficient to show the nature, extent

4   and timing of Mr. Kadisha's relationship with Larian, his family members or any of

5   their businesses (Request No. 44).  Such broad requests are not sufficiently linked

6   to Phase 2 issues. Rather, they include all of Mr. Kadisha's businesses and dealings

7   with Larian or his family members and their businesses even if those transactions

8   have no connection whatsoever to this case.  Accordingly, Request Nos. 39, 42, 43

9   and 44 are quashed pursuant to Federal Rule of Civil Procedure 45.

10          **E.      Summary Of Ruling Regarding The Motion To Quash**

11          With respect to the Deposition Subpoenas, the Discovery Master finds that

12   Mattel may depose Messrs. Neman and Kadisha but not Mr. Mashian.  Further, all

13   of the Kadisha Document Requests are quashed, except for the following:  (1) all

14   non-privileged documents responsive to Request No. 29 not previously produced

15   by Mr. Kadisha in connection with the subpoena Mattel propounded on Omni 808,

16   and (2) all non-privileged documents within Mr. Kadisha's possession custody or

17   control relating to Request Nos. 4 (as it pertains to Vision Capital but not True

18   Vision Capital Management, LLC), 6 (regarding transactions between Omni 808

19   and Vision Capital), 8 (regarding transactions between Wachovia and Vision

20   Capital), and 10 (regarding financial information provided by MGA to Vision

21   Capital) to the extent such documents relate to the Debt Acquisition.

22   **IV.   MATTEL'S MOTION TO COMPEL**

23          **A.      Factual Background**

24                  **1.      Mattel's August 9, 2007 Motion To Compel Production Of**

25                          **Documents Withheld As Privileged**

26          On August 9, 2007, Mattel brought a motion to compel production of all

27   documents withheld by MGA and Larian (collectively the "MGA Parties") as

28   privileged on the ground that the MGA Parties had not produced a privilege log

identifying those documents ("August 9, 2007 Motion").  (Declaration of B. Dylan Proctor in Support of Motion to Compel ("Proctor Decl."), Ex. 23).  Mattel made a single argument in that motion:  That MGA had waived its right to withhold documents by failing to produce a privilege log.  (*Id.*, Ex 23 at pp. 6-10).  Based on that argument alone, Mattel requested that the Court compel the production of all such documents.  (*Id.*).

## 2.     The Privilege Logs Provided By The MGA Parties

In response to the August 9, 2007 Motion, the MGA Parties served the first of several privilege logs on Mattel on or about August 14, 2007.  Thereafter, the MGA Parties served additional privilege logs (e.g., on September 5 and November 15, 2007), which supplemented the August 14, 2007 privilege log but addressed many of the same documents.  The parties' ongoing meet and confer efforts resulted in the production of further supplemental or revised privilege logs, as well as the disclosure of some documents that the MGA Parties had previously withheld under claim of privilege.  (Opposition to Motion to Compel, pp. 2 – 4).  Mattel attached as appendices to its moving papers tables containing the most recent privilege log entries for the documents in question, (Motion to Compel, p. 1, fn. 1), and the MGA Parties do not dispute that the information presented in Mattel's appendices represents the most up-to-date iteration of the privilege logs as to the documents at issue in this Motion to Compel.

## 3.     The Prior Discovery Master's December 19, 2007 Order

On December 19, 2007, the prior discovery master issued an order denying Mattel's August 9, 2007 Motion.  The prior discovery master denied the motion because the MGA Parties had produced privilege logs shortly after Mattel filed the motion (i.e., on August 14, September 5 and November 15, 2007).[22]  (*Id.*)

---

[22] The December 19, 2007 Order reflected that it was based on a number of factors, "including the period of delay, the number of documents involved, the magnitude of the document production, and the other circumstances involved in this case, as well as the factors identified in *Burlington Northern R.R. Co. v. United States Dist. Court for Dist. Of Montana*, Ninth Cir. 2005, 408 F.3d 1142 . . . ."  (*Id.*)

### 4. Mattel's January 21, 2008 Motion And Its February 2008 Supplemental Brief

After the prior discovery master denied Mattel's August 9, 2007 Motion, Mattel filed a Motion to Compel Production of Previously Withheld Documents Only Portions Of Which Are Allegedly Privileged[23] ("January 21, 2008 Motion") with the Court.  (Proctor Decl., Ex. 15).  Mattel argued that the MGA Parties, having now served privilege logs, should be compelled to produce redacted versions of all documents listed in those logs that are only partially privileged.  (*Id.*, Ex. 15 at pp. 5-6).

Shortly after Mattel filed its January 21, 2008 Motion, the MGA Parties again served additional privilege logs (e.g., the privilege logs dated January 25, 28 and 30, 2008).  Mattel then filed a supplemental brief in support of its motion dated February 5, 2008, wherein it reiterated that its argument applied to these new privilege logs as well, arguing that the MGA Parties should be required to produce documents withheld under claim that portions are privileged in redacted form.  (Proctor Decl., Ex. 26 at p. 3).

In opposing the motion, the MGA Parties represented that, contrary to Mattel's assertions, the MGA Parties had already produced any and all documents listed in its privilege logs that were partially privileged, with redactions, and that any documents that had been entirely withheld by them were completely privileged.  (June 5, 2008 Order at p. 1, ¶ 3).

Notably, the substance of the January 21, 2008 Motion was not whether documents listed in the MGA Parties' privilege logs were actually privileged or whether the information contained in the privilege logs that had been served at that time was sufficient to satisfy the MGA Parties' burden to invoke the privilege.  (Proctor Decl., Ex. 15).  Indeed, Mattel's January 21, 2008 Motion did not request

---

[23] This January 21, 2008 Motion was supplemented by Mattel through a three-page supplemental brief filed on February 5, 2008.  (*Id.*, p. 1).

1    that the Court compel production of any information that MGA characterized as

2    privileged.  (*Id.*, Ex. 15 at p. 2).

3         Further, while Mattel did advance a one-sentence argument in its February 5,

4    2008 supplemental briefing that "these communications likely contain substantial

5    portions which are not privileged and should be produced at least in redacted form,"

6    the Court in its June 5, 2008 Order did not rule on that argument, nor did it address

7    in its order the merits of the MGA Parties' claims of privilege.  (*See* Proctor Decl.,

8    Ex. 26 at p. 2; *see also* the Court's June 5, 2008 Order).  Instead, the Court denied

9    Mattel's January 21, 2008 Motion on June 5, 2008 based on representations to the

10   Court by counsel for the MGA Parties that the documents at issue had been

11   reviewed by counsel and had either been determined to be entirely privileged or

12   redacted and produced.  (*See* June 5, 2008 Order at p. 1, ¶ 3).  The Court made no

13   determination as to whether the MGA Parties' counsel's determinations regarding

14   the claim of privilege were proper.  (*Id.*)

15        Nevertheless, the MGA Parties argue that the Court's June 5, 2008 Order

16   precludes Mattel from seeking the relief sought in the Motion to Compel at issue.

17   Specifically, the MGA Parties assert that that the arguments made by Mattel in its

18   January 21, 2008 Motion concerning the MGA Parties' privilege logs are the same

19   arguments it is asserting here.

20        **B.    Relief Sought By Mattel**

21        In its Motion to Compel, Mattel seeks an order compelling the MGA Parties

22   "to provide to the Discovery Master for *in camera* review and, if appropriate based

23   on such review, produce to Mattel specified documents and communications

24   improperly withheld on MGA's and Larian's privilege logs under a claim of

25   privilege . . . ."  (Motion to Compel, p. 1).  The documents specified in the Motion

26   to Compel fall within five categories, none of which, according to Mattel, are

27   privileged:

28        •    Category No. 1:  Communications between non-lawyers on non-legal

issues, (*Id.*);

- Category No. 2:  Communications where no author or recipient is identified in the MGA Parties' privilege logs, (*Id.*, pp. 1-2);

- Category No. 3:  Communications where the author or recipient is incorrectly identified as an attorney, (*Id.*, p. 2);

- Category No. 4:  Communications "involving" attorneys, but relating to non-legal issues (*Id.*); and

- Category No. 5:  Communications where an attorney was sent a "blind carbon copy."  (*Id.*).

C.   **Analysis**

1.   **The Issues And Arguments Raised In Mattel's Present Motion Have Not Previously Been Ruled On By The Court**

The MGA Parties' primary argument opposing the motion is that the Court's June 5, 2008 Order already addressed all of the issues presented herein and that the Discovery Master is, therefore, precluded from granting Mattel's Motion to Compel.  (Opposition to Motion to Compel, pp. 5 – 7).  In support of this argument, the MGA Parties make several points.

The MGA Parties first characterize the Motion to Compel as a request that the Discovery Master reconsider the Court's June 5, 2008 Order and argue that the Discovery Master lacks authority to do so.  (*Id.*, p. 7).  Second, the MGA Parties argue that reconsideration would be improper even if the Discovery Master had authority to do so because the Motion to Compel fails to meet the standards necessary for reconsideration.  (*Id.*, p. 8).  Third, the MGA Parties argue that the Court's June 5, 2008 Order constitutes the law of the case and precludes consideration here of those issues or any issues "decided by necessary implication" therein.  (*Id.*).  Finally, the MGA Parties address each of the five categories of documents referenced by Mattel and repeat that the Court has already ruled on these issues previously.  (*Id.*, pp. 10 – 14).

Contrary to the MGA Parties' assertions, however, the Court did not rule on the issues or arguments presented in the present motion on June 5, 2008.  Nor did the Court decide the issues at that time by necessary implication.  In fact, none of Mattel's prior motions or supplemental briefing, which the MGA Parties refer to in their opposition, ever raised the question of whether or not *individual documents* listed in the MGA Parties' *current privilege logs* are properly withheld.  Nor did those motions address the question of whether an *in camera* review is appropriate for the specific documents in question here.

Mattel's January 21, 2008 Motion did not ask the Court to analyze the validity of any of the MGA Parties' assertions of privilege in withholding documents.[24]  Mattel merely requested by way of that motion that the Court compel production of *redacted* copies of documents that MGA had identified as partially privileged and withheld in their entirety.  (Proctor Decl., Ex. 26 at p. 2 ["[T]hese communications likely contain substantial portions which are not privileged and should be produced at least in redacted form."]).  Therefore, Mattel's January 21, 2008 Motion focused on information that even the MGA Parties conceded was not privileged but that Mattel alleged had not been produced by the MGA Parties.

Further, when Mattel filed its supplemental briefing in support of the January 21, 2008 Motion (i.e., the supplemental brief dated February 5, 2008), the only hint of any argument related to the sufficiency of the logs themselves or to the question of whether the MGA Parties had improperly designated as privileged documents to which the privilege should not be applied was a single sentence: "On both the January 28, 2008 and January 30, 2008 privilege logs, nearly twenty percent of the

---

[24] The Discovery Master also notes that Mattel's August 9, 2007 Motion sought production of the withheld documents only on the ground that no privilege log had been produced.  (Proctor Decl., Ex. 23 at p. 2).  There was no argument at that time regarding whether the documents were properly withheld under claim of privilege, whether the asserted privilege actually applied to the documents, or whether a privilege log provided adequate information to support the claim of privilege.  (*Id.*)  Therefore, the prior discovery master's denial of that motion did not include any analysis regarding the propriety or applicability of the asserted privileges, but was premised solely on the fact that, shortly after the motion was filed, the MGA Parities produced a series of privilege logs.  (December 19, 2007 Order at p. 1).

ARENT FOX LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER NO. 33
[Case No. CV 04-09049 SGL (RNBx)]

entries on each log are communications between non-lawyers which appear to have been withheld in their entirety." (Proctor Decl., Ex. 25 at p. 2). But the very next sentence in that brief confirms that the question being considered by the Court was whether the MGA Parties had an obligation to produce redacted versions of partially-privileged documents: "As before, these communications likely contain substantial portions which are not privileged and should be produced at least in *redacted form*." (*Id*. [emphasis added]).

Regardless, the Court's June 5, 2008 Order did not rule that the documents withheld by the MGA Parties were privileged and properly withheld. To the contrary, the Court denied the January 21, 2008 Motion and supplemental February 2008 briefing based on the fact that (1) Mattel did not seek production of documents or portions of documents that the MGA Parties had determined were privileged, and (2) counsel for the MGA Parties represented to the Court that they had already determined that any documents withheld had either been determined by them to be "privileged in their entirety or, to the extent they are only partially privileged, [had] already been produced in redacted form such that all non-privileged information is revealed." (June 5, 2008 Order at p. 1, ¶ 3.)

Even if the Court had previously considered similar issues as those set forth in the pending Motion to Compel (which it did not), Mattel correctly argues that "a later motion that seeks an *in camera* review remedy is sufficiently different than a prior categorical remedy to render it a 'new motion.'" (Reply in Support of Motion to Compel, p. 8 [citing *Fed. Sav. & Loan Ins. Corp. v. Ferm*, 909 F.2d 372, 375 (9th Cir. 1990)]).

## 2.    Mattel's Previous Motions And The Court's June 5, 2008 Order Do Not Have Any Preclusive Effect Regarding Mattel's Present Motion To Compel And Request For *In Camera* Review

While the MGA Parties argue that the present Motion to Compel involves

1  "entries on identical or near-identical privilege logs," they do not appear to contend

2  that the Court expressly or impliedly ruled that the attorney-client privilege

3  otherwise applied to any specific documents.  Indeed, the very passages from the

4  hearing transcript of June 2, 2008 cited by the MGA Parties confirm that the Court

5  at that time merely acknowledged the possibility that certain categories of

6  documents *could be* privileged.  Specifically, the MGA Parties cited the Court's

7  statements that "legal advice being discussed (by non-lawyers) *could be*

8  privileged," and that "it is *conceivable* 'that an entire e-mail or an entire document

9  is devoted to a discussion of that opinion.'"  (Opposition to Motion to Compel, p. 6

10  [quoting June 2, 200-8 Hearing Transcript, p. 22:5-10 and p. 22:16-18 (emphasis

11  added)]).  But, as explained above, the Court did not rule on whether the attorney-

12  client privilege had been properly asserted as to the individual documents at issue in

13  this Motion to Compel.  Nor did it address whether an *in camera* review of those

14  documents is appropriate.

15        To the contrary, Mattel requests via this Motion to Compel that the

16  Discovery Master analyze, for the first time, the applicability of the privileges

17  asserted by the MGA Parties to the individual documents withheld by MGA to

18  determine whether they have been properly withheld as privileged.  No such

19  argument or issue was ever presented to the Court previously, let alone ruled upon

20  by the Court.  Even if such issues had been addressed by the Court, Mattel never

21  requested that the Court review the documents individually *in camera*.

22  Accordingly, the Motion to Compel, seeks, at the very least, new relief.  (Reply in

23  Support of Motion to Compel, p. 8 [citing *Fed. Sav. & Loan Ins. Corp. v. Ferm*,

24  909 F.2d 372, 375 (9th Cir. 1990)]).

25        Because the Court has not previously considered or determined the issues

26  presented by the pending Motion to Compel, nor been asked previously to rule on

27  the applicability of the attorney-client privilege to the documents at issue via an *in*

28  *camera* review, no preclusion exists.  The law of the case doctrine only applies if

1  "an issue . . . has already been decided by the same court, or a higher court in the

2  identical case."  (*United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997)).

3  No such situation exists here.

4          **3.      *In* Camera Review Of Documents Withheld Under Claim Of**

5                    **Privilege Is Appropriate**

6          *In camera* review of documents that a party contends are protected by the

7  attorney-client privilege is a well-established and legitimate discovery procedure.

8  (See, e.g., *In re Grand Jury Witness,* 695 F.2d 359, 362 (9th Cir. 1982) ["The

9  proper procedure . . . would have been . . . to submit [documents] *in camera* for the

10  court's inspection, providing an explanation of how the information fits within the

11  privilege."]).  Even in cases where there is a risk of due process violations in

12  connection with the crime-fraud exception to the attorney-client privilege (an issue

13  not raised by the parties in the present motion), the courts recognize the legitimacy

14  and utility of *in camera* review, and provide a procedure whereby, after the party

15  requesting the review meets a "low threshold," *in camera* review may be employed.

16  (*In re Grand Jury Investigation*, 974 F.2d 1068, 1072 (9th Cir. 1992) [citing *U.S. v.*

17  *Zolin*, 491 U.S. 554, 568 (1989) ("*Zolin*")]).

18          The Ninth Circuit has repeatedly "affirmed the propriety of *in camera* review

19  to preserve privileged information, stating 'it is clear that *in camera* review does

20  not destroy the privileged nature of the contested communications' where that

21  review is necessary to determine whether the communications themselves are

22  privileged."  (*Federal Sav. And Loan Ins. Corp. v. Ferm,* 909 F.2d 372, 374 (9th

23  Cir. 1990) [quoting *Zolin,* 491 U.S. 554, 569 (1989)]; *see also In Re Napster, Inc.*

24  *Copyright Litigation*, 479 F.3d 1078, 1091-92 (9th Cir. 2007)).  *In camera* review

25  protects the attorney's private thoughts from "intrusion by opposing parties and

26  their counsel" and hence protects those interests which lie at the heart of the

27  attorney work product doctrine.  (*Id.* [citation omitted]).

28          While the Court correctly observed on June 2, 2008 that the attorney-client

privilege *could* apply to various types of communications, including, possibly, some of the documents for which Mattel now seeks an *in camera* review, the Court did not engage in an analysis at that time of whether the specific documents at issue are protected by the privilege. (Mankey Decl., Ex. C [June 2, 2008 Hearing Transcript, pp. 22:1-10, 12, 18]).

Furthermore, there is plainly a dispute between the parties both as to the sufficiency of the information set forth in MGA Parties' privilege logs and as to the applicability of the asserted privileges to the documents at issue. Mattel argues that, as to the specific documents listed in the appendices filed with its moving papers, the MGA Parties have either provided insufficient information to establish that the claimed privileges apply or that, based on the information provided in the privilege logs, the claimed privileges do not apply. (Motion to Compel, p. 11). In response, MGA predominantly argues in its Opposition to the Motion to Compel that Mattel is precluded from raising the issue at all and then makes some blanket assertions regarding why the documents are privileged. (Opposition to Motion to Compel, pp. 10 – 14). Indeed, the MGA Parties' arguments that its assertions of privilege are proper rely largely on a repetition of its argument claiming that the issue is not properly before the Court rather than on the merits of their withholding of the documents.[25] (*Id.*).

As the court recognized in *In re Grand Jury Witness*, 695 F.2d 359 (9th Cir. 1982), where the parties dispute whether documents that would otherwise be subject to discovery are protected from disclosure by the attorney-client privilege, blanket assertions of privilege "are extremely disfavored" and "[t]he proper procedure for asserting the attorney-client privilege as to particular documents, or portions thereof, would [be] for [the party resisting disclosure] to submit them *in*

---

[25] The MGA Parties also argue that Mattel has produced privilege logs in connection with this matter that suffer from deficiencies similar to those that Mattel points out in the present Motion, and that "MGA's similar descriptions should be adequate for Mattel." (*Id.*, p. 11). But the adequacy of Mattel's privilege logs and Mattel's assertions of privilege are not before the Court on this motion.

*camera* for the court's inspection, providing an explanation of how the information fits within the privilege."  (*Id.* at 362).  Consequently, *in camera* review of the 520 documents listed in Appendices A through E to Mattel's moving papers is appropriate (and well within the Discovery Master's discretion) in order to resolve the dispute between the parties.

### 4. The MGA Parties Bear The Burden Of Presenting Information Sufficient To Permit The Discovery Master To Determine Whether Or Not Any Privilege Applies To The Documents To Be Reviewed *In Camera*

In general, the elements of the attorney-client privilege are as follows: "(1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived."  (*U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002)).

In determining whether the attorney-client privilege protects a document from disclosure, "[t]he burden is on the party asserting the privilege to establish all the elements of the privilege."[26]  (*U.S. v. Martin*, 278 F.3d 988, 999 -1000 (9th Cir. 2002) [citing *United States v. Munoz,* 233 F.3d 1117, 1128 (9th Cir.2000)]).  Hence, the MGA Parties bear the burden to "provid[e] an explanation of how the information fits within the privilege."  (*Id.*)  The MGA Parties also bear the burden to "provide enough information to permit the court to review the applicability of the privilege to the documents at issue."  (*Coleman v. Schwarzenegger*, 2008 WL 2732182, at *3 (E.D. Cal., July 8, 2008)).  While it is not strictly necessary for the

---

[26] To the extent that the MGA Parties contend that some of the documents to be reviewed *in camera* are protected by some privilege or doctrine other than the attorney-client privilege (such as the attorney work product doctrine), they must provide the Discovery Master with sufficient information to establish the elements of that privilege or doctrine as well.

1   MGA Parties to provide a document-by-document showing of the applicability of
2   the asserted privilege, "the detail offered cannot be so minimal as to prevent the
3   court from evaluating the privilege claim." (*Id.,* at *3-4.)  Because the MGA
4   Parties have the burden of explaining to the Discovery Master the reasons why the
5   privilege asserted is applicable, in a manner sufficient for the Discovery Master to
6   evaluate the privilege claim as to each document, and because the nature of the
7   MGA Parties' arguments in their opposition brief as to the merits of its privilege
8   assertions were primarily procedural (i.e., the Court already addressed these issues),
9   the Discovery Master anticipates that the MGA Parties may wish to submit to the
10  Discovery Master a log, together with the documents submitted for *in camera*
11  review, that contains a column with a detailed explanation of why the documents
12  are privileged (the "Log").  The sole purpose of this Log, should the MGA Parties
13  choose to submit such a document, shall be to facilitate the Discovery Master's
14  evaluation of the privilege claims asserted by the MGA Parties.

15      **D.      Summary Of Ruling Regarding Mattel's Motion To Compel**

16      For the foregoing reasons, the Discovery Master finds that the Court has not
17  previously considered or ruled on the issues before the Discovery Master in
18  Mattel's Motion to Compel.  Further, based on the ongoing dispute between Mattel
19  and the MGA Parties as to the propriety of any privilege concerning the 520
20  documents identified by Mattel in Appendices A through E, the Discovery Master
21  finds that MGA Parties must submit those documents to the Discovery Master for
22  *in camera* review along with an explanation, if it so chooses as to how the
23  information fits within the privilege or privileges asserted.  Upon reviewing the
24  documents *in camera*, the Discovery Master will order MGA and/or Larian to
25  produce to Mattel any and all documents that the Discovery Master determines are
26  not properly withheld under the privilege or privileges asserted.

27  **V.    DISPOSITION**

28      **A.      Mattel's Motion to De-Designate Documents Identified by MGA as**

Restricted Attorneys' Eyes Only is **GRANTED**, as follows:

  1. The prior discovery master's order creating the RAEO designation (i.e., the Stipulation To Modify the Protective Order And Order Thereon dated April 23, 2007) is hereby ordered stricken.  Accordingly, no additional materials may be designated RAEO by any party.

  2. All documents previously designated RAEO by any party are ordered re-designated as AEO.

  3. Within forty-five (45) days of this Order, MGA shall provide Mattel with a list identifying, by Bates stamp numbers, all documents (which were previously designated RAEO by MGA) that should (1) remain AEO, (2) be re-designated CONFIDENTIAL, or (3) be de-designated.

  4. Mattel's request for sanctions in connection with the Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only is **DENIED**.

  5. MGA's request for sanctions in connection with the Motion to De-Designate Documents Identified by MGA as Restricted Attorneys' Eyes Only is **DENIED**.

 **B.** Mattel's Motion to De-Designate Certain Pleadings is **GRANTED** in part and **DENIED** in part, as follows:

  1. The Discovery Master strikes the AEO designation made by the MGA Parties with respect to Paragraphs 3 – 5 of the Kuemmerle Decl.  The information contained in those paragraphs is not entitled to protection under the Protective Order and may be quoted or otherwise disclosed without restriction.

  2. The Discovery Master strikes the AEO designation made by the MGA Parties with respect to Paragraphs 6 – 8 of the Kuemmerle Decl., but rules that the information contained in those paragraphs is nonetheless to be treated, and protected as, CONFIDENTIAL under the Protective Order.

  3. Except as expressly set forth above, the Motion is **DENIED**

1   without prejudice to any future request by Mattel to de-designate the underlying

2   evidence referenced in the Opposition.

3   **C.**    The Witnesses' Motion to Quash is **GRANTED** in part and **DENIED**

4   in part.

5        1.    The Discovery Master quashes the deposition subpoena directed

6   to Mr. Mashian but finds the depositions of Messrs. Neman and Kadisha may be

7   taken.  The Discovery Master orders Messrs. Neman and Kadisha to sit for their

8   respective depositions within forty-five (45) days of this Order and to promptly

9   provide dates to Mattel's counsel on which they are available to be deposed.

10       2.    Regarding the Kadisha Document Requests, the Discovery

11  Master quashes all of the requests with the exception of the following.  First, Mr.

12  Kadisha is ordered to produce at the time of his deposition all non-privileged

13  documents responsive to Request Nos. 1, 2, 8 (regarding transactions between

14  Wachovia and Omni 808), 9, 10 (regarding financial information provided by MGA

15  to Omni 808 and OmniNet), 11, 14, 17 through 21, 24, 25, 27, 28, 30 through 33,

16  36, 39 (regarding communications with Vision Capital, Lexington Financial, LLC,

17  Mattel, MGA, Larian, Fred Mashian and/or Bratz), 40 (regarding only the

18  relationship between Omni 808 or OmniNet, on the one  hand, and Larian or his

19  family members, on the other hand) and 41 that have not already been produced in

20  connection with the subpoenas propounded by Mattel on Omni 808 or OmniNet.

21  Second, Mr. Kadisha is ordered to produce at the time of his deposition all non-

22  privileged documents responsive to Request No. 29 that have not already been

23  produced in connection with the subpoena propounded by Mattel on Omni 808.

24  Finally, Mr. Kadisha is ordered to produce at the time of his deposition all non-

25  privileged documents relating to Request Nos. 4 (as it pertains to Vision Capital but

26  not True Vision Capital Management, LLC), 6 (regarding transactions between

27  Omni 808 and Vision Capital), 8 (regarding transactions between Wachovia and

28  Vision Capital), and 10 (regarding financial information provided by MGA to

1   Vision Capital) to the extent such documents relate to the Debt Acquisition.

2       **D.**    Mattel's Motion to Compel is **GRANTED**, as follows:

3       1.    MGA and Larian are ordered, within forty-five days (45) days of

4   this Order, to produce to the Discovery Master for *in camera* review all documents

5   listed in Appendices A through E to Mattel's Motion to Compel.

6       2.    MGA and Larian are further hereby permitted to provide to the

7   Discovery Master, together with the documents referred to in the foregoing

8   paragraph, a Log explaining how the information contained in those documents fits

9   within any privileges asserted.

10       3.    Upon reviewing the documents submitted *in camera*, the

11   Discovery Master will order produced any and all documents that the Discovery

12   Master determines are not properly withheld under the privileges asserted by the

13   MGA Parties.

14

15   Dated:    May 18, 2009

16

17       By:    /s/ Robert C. O'Brien

18       ROBERT C. O'BRIEN
    Discovery Master

19

20

21

22

23

24

25

26

27

28