1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                     EASTERN DIVISION

4                         - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                         - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9            vs.                     )  No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al.,)
                                     )
11                   Defendants.     )  TRIAL DAY 17
    _____ )  AFTERNOON SESSION
12  AND CONSOLIDATED ACTIONS,        )  pages 3589-3689
    _____ )

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                  Riverside, California

17                 Tuesday, June 24, 2008

18                      2:55 P.M.

19

20

21

22

23            THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24            3470 12th Street, Rm. 134
              Riverside, California  92501
25                  951-274-0844
                WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

     On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                            TIMOTHY ALGER
                         865 S. FIGUEROA STREET,
 7                       10TH FLOOR
                         LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL SLOAN
13                            LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17   On behalf of third-party defendant peter marlow:

18                       Law office of steven m. Goldsobel
                         By:  Steven m. Goldsobel
19                       1900 avenue of the stars
                         Suite 1800
20                       Los angeles, ca  90067
                         310-552-4848
21

22

23

24

25
```

tuesday, june 24, 2008                    trial day 17, afternoon session

3591

```
 1                      I N D E X

 2                                              Page

 3    Defense CASE (continued)......................... 3592

 4    PLAINTIFF WITNESS................................ 3619

 5

 6    DEFENSE
      WITNESS          DIRECT     CROSS     REDIRECT     RECROSS
 7    Jacqueline Prince (via video deposition)

 8    BY MR. ZELLER    3592

 9

10    PLAINTIFF
      WITNESS          DIRECT     CROSS     REDIRECT     RECROSS
11    Peter Marlow

12    BY MR. ZELLER     3619
      BY Ms. Aguiar                  3658
13

14

15
              EXHIBITS          RECEIVED
16
                 61              3618
17               62              3618
                 5723 (pp. 1,2)  3632
18               10034           3678

19

20

21

22

23

24

25
```

```
 1        RIVERSIDE, CALIFORNIA; TUESDAY, JUNE 24, 2008; 2:55 P.M.

 2                              -oOo-

 3        (WHEREUPON, JURORS ENTER COURTROOM.)

 4        THE COURT:  GOOD AFTERNOON, MEMBERS OF THE JURY.

 5        COUNSEL, ARE WE READY TO PROCEED?                        00:02

 6        MR. NOLAN:  WE ARE, YOUR HONOR.

 7        THE COURT:  VERY WELL.

 8        MR. NOLAN:  WE'LL RESUME WITH THE DEPOSITION PLAYING

 9  OF JACQUELINE PRINCE.

10        (WHEREUPON, VIDEO DEPOSITION PLAYS;                      00:02

11        EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS: )

12        Q.  Would you please turn to the page of Exhibit 60.

13             That pertains to the notarization that you did

14        for Carter Bryant.

15        You'll see that those are basically the last two

16        Pages of this document that have written entries in

17        your journal.

18        A.  Yes.

19        Q.  Let me ask first with respect to the entries

20             Pertaining to Carter Bryant's drawings that you

21        Notarized, is all of that your handwriting?

22        A.  Yes.

23        Q.  And I'm talking about on both of those pages,

24             Excluding of course Mr. Bryant's signature.

25        A.  Yes.
```

```
1        Q.  And so the record is clear, it's your
2            Handwriting in the following boxes where it's the
3        first one on the far left:  Month, day, year, time of
4        Notarization; is that correct?
5        A.  Yes.
6        Q.  The same is true of kind or type of
7            Notarization?
8        A.  Yes.
9        Q.  The same is true of document date?
10       A.  Yes.
11       Q.  The same is true of document kind or type?
12       A.  Right.
13       Q.  The same is true of name and address?
14       A.  Yes.
15       Q.  Although it's a little hard to tell from this
16           Photocopy, we could perhaps get the original out
17       if it needs to be, you'll see that there's the
18       certification of signer box?
19       A.  I see it.
20       Q.  And it looks like personally known by the notary
21           Is the one that was checked off?
22       A.  Yes.  Well, that would be what I would check
23           Off.
24       Q.  And that -- you made that mark in that box?
25       A.  Yes.
```

```
 1        Q.  And then you also made the entry in the
 2            Additional information?
 3        A.  Yes.
 4        Q.  And that's Mr. Bryant's signature under
 5            Signature of signer?
 6        A.  Yes.
 7        Q.  And then did you write all of these words that
 8            Are on these boxes that we've just talked about
 9        with respect to the Carter Bryant entry --
10        A.  Yes.
11        Q.  -- at the same time?
12        A.  Right.  The same time.
13        Q.  (By Mr. Zeller)   And did Mr. Bryant sign the
14            Book before or after you wrote those entries into
15        the other boxes?
16        A.  After.
17        Q.  So you wrote the entries in first and then
18            Mr. Bryant signed it?
19        A.  Yes.
20        Q.  And did you write these entries into your
21            Journal before or after you actually stamped any
22        Drawings?
23        A.  After I stamped the drawings.
24        Q.  And then so if I understand it correctly, the
25            First thing you did was -- with respect to the
```

1           Notarization itself, we'll talk about the other

2           Circumstances in a bit of course.  But with respect to

3           The notarization itself, the first thing you did was

4           Notarize all of the drawings?

5      A.   Right.

6      Q.   And so with that notarization on the drawings,

7           You signed them and Mr. Carter Bryant signed them

8           as well?

9      A.   Yes.

10     Q.   And that was -- and then the next thing that

11          Happened was, is that you wrote the entries into

12          your journal?

13     A.   Right.

14     Q.   And then Mr. Carter Bryant signed the journal?

15     A.   Right.  That's how I remember it.

16     Q.   Directing your attention to the box where it

17          Says document kind or type?

18     A.   Yes.

19     Q.   And for the record, we're referring to Exhibit

20          60, and specifically the entries that pertain to

21          the notarization of Carter Bryant's drawings.  And

22          you'll see the words here:  Original sketches of doll

23          idea hyphen characters, six total, equal sign, names

24          are colon, Zoe, Lupe, L-u-p-e, Hallidae,

25          H-a-l-l-i-d-a-e, Jay, two males, and then there's an

```
 1        additional notation:  From 1998, Missouri.
 2        Do you see that?
 3        A.  Yes.
 4        Q.  And you wrote all those words in there?
 5        A.  Yes.
 6        Q.  Did you choose to put this particular
 7             Information down?
 8        A.  This is information he gave me that he thought
 9             Would be helpful, so I wrote it -- tried to
10        squeeze it in.
11        Q.  My question is a little bit different.  In terms
12             Of the information that's -- I understand that
13        Mr. Bryant's the source of the information --
14        A.  Yes.
15        Q.  -- but were you the one who chose to put that
16             Information down?  The particular information
17        that's reflected here?
18        A.  Yes.
19        Q.  Now, the names that are listed here, did you get
20             Those names from the drawings?
21        A.  He told me the names and I believe the names
22             Were on the drawings as well, but I remember he
23        told me the names.
24        Q.  Did you look at the drawings --
25        A.  Yes.
```

```
1          Q.  -- in order to get the names?
2          A.  I must have.
3          Q.  It's your best recollection that you got the
4              Names from the drawings; right?
5          A.  Yes.
6          Q.  And let me try it this way.  How is it that you
7              Knew how to spell the particular character's name?
8          Like for example Zoe, you have Z-o-e.  How do you know
9          it wasn't Z-o-e-y?
10         A.  Right.  It --
11         Q.  Did you get that from the drawings?
12         A.  Yes, from the drawings.
13         Q.  Did Carter Bryant actually tell you the names
14             Of any of these characters?
15         A.  I remember him talking about them.
16         Q.  Do you remember him using the names?
17         A.  Yes.
18         Q.  Do you remember him talking about Hallidae?
19         A.  I thought he pronounced it Hallyday.
20         Q.  Hallyday?
21         A.  I think so.
22         Q.  Did Mr. Bryant tell you to spell Hallidae this
23             Way?
24         A.  Yes.
25         Q.  He did?
```

```
 1        A.  Yes.

 2        Q.  You didn't get that from the drawing?

 3        A.  Oh.  I don't remember.

 4        Q.  Let me ask this.  Was Hallidae a name that you

 5            Were familiar with or had ever heard prior to the

 6        time that you had this conversation with Carter

 7        Bryant?

 8        A.  No.

 9        Q.  It's not -- it wasn't a name that you'd ever

10            Heard of before?

11        A.  No.

12        Q.  What I would like to do is ask a little bit

13            About the circumstances under which you came to

14        notarize the drawings that are reflected here.

15        What's your understanding as to how Carter

16        Bryant was aware that you were a notary?

17        A.  I don't remember.

18        Q.  Is that something that you mentioned, you know,

19            In the course of conversations at Mattel?

20        A.  I don't think I ever mentioned it to him.  I

21            Think somebody else may have told him that I was

22        notary, but I didn't particularly mention it to him.

23        I don't remember that.

24        Q.  How is it that Mr. Bryant came to your apartment

25            And had these drawings notarized?  And what I'm
```

```
1              Asking about is, is what were the circumstances that
2              led to it?  Was it something that he asked in advance
3              you to do and scheduled an appointment or did he drop
4              by?  If you could please just explain for us the
5              circumstances.
6       A.  He asked if he could have my phone number, he
7              Wanted to call me at home and talk to me about
8       something and I said, Sure.  Then when I was at home,
9       I don't remember if it was the same day or the next
10      day he called me and asked if he could come by and I
11      said, Sure.  He said are you -- and asked if I was a
12      notary and if I could notarize some documents for him.
13      And I said, Sure, come on over.
14      Q.  Is there anything else you can recall about that
15              Conversation?
16      A.  That was it.
17      Q.  And the -- when he asked for your home phone or
18              Excuse me -- I take it when you said that he asked
19      for your phone number, it was your home phone number?
20      A.  Yes.
21      Q.  And did he -- you mentioned that he called a day
22              Or so after you gave him the number?
23      A.  I don't remember if it was the next day.
24      Q.  But it was soon after?
25      A.  Yeah, soon after.
```

```
 1        Q.  And then was it soon after that that he actually
 2            Came by and did -- and had the drawings notarized?
 3        A.  Yes.
 4        Q.  So it's fair to say that when you had this
 5            Conversation with him first, when he asked for your
 6            phone number and then when he called you, that was
 7            within a couple of days of August 26th, 1999?
 8        A.  I would say yes.
 9        Q.  When Mr. Bryant asked for your home phone
10            Number, was that there in the Mattel design center
11            that he asked you?
12        A.  Yes.
13        Q.  Did he come by your cubicle to do that?
14        A.  Yes.
15        Q.  And were -- were you sitting in your cubicle
16            When he came by to ask for it?
17        A.  Yes.
18        Q.  And then you said that he called you at home?
19        A.  Right.
20        Q.  At the time when Mr. Bryant showed up, do you
21            Have a recollection as to whether, when he first
22            showed up, you knew by then he wanted some drawings or
23            other things notarized?
24        A.  I didn't know until he got inside and we sat
25            Down in my living room and started talking.
```

```
 1        Q.   Was there anyone else in your apartment when he
 2             Showed up?
 3        A.   My two little boys.
 4        Q.   Was anyone else around at anytime when you and
 5             Mr. Bryant were there?
 6        A.   No.
 7        Q.   And so the drawings themselves were actually
 8             Notarized all on that -- on that same occasion?
 9        A.   Right.
10        Q.   Did Mr. Bryant tell you why it is that he wanted
11             To document that he did the drawings before he
12        worked for Mattel?
13        A.   Yes.  Because he said he didn't want anyone to
14             Think that he did those while he was at Mattel.
15        Q.   Did you have any understanding as to why
16             Mr. Bryant didn't want anyone to think that he
17        came up with the drawings when he was at Mattel?
18        A.   No.
19        Q.   Do you have any expectation or understanding
20             From any source as to why Mr. Bryant wanted that?
21        A.   No. I would just think that he just wanted to
22             Make sure that it was understood that he did those
23        when he wasn't there.
24        Q.   But it was clear to that you that that's what he
25             Was concerned about?
```

```
 1        A.   Yeah.  He seemed a little concerned.
 2        Q.   During the course of the conversation that you
 3             Had with Mr. Bryant when he was there at your home
 4        having the drawings notarized, did he ever use the
 5        word Bratz, B-r-a-t-z?
 6        A.   No.
 7        Q.   Did you see it on any of the drawings?
 8        A.   No.
 9        Q.   If you could turn back for a moment to Exhibit
10             60 and in particular, the document kind or type
11        entry where it talks about original sketches?
12        A.   Okay.  Document kind or type, yeah.
13        Q.   You'll see here the word Bratz isn't included;
14             Right?
15        A.   Right.
16        Q.   And there's no other entry pertaining to the
17             Carter Bryant notarization that uses the word
18        Bratz?
19        A.   Right.
20        Q.   It's your recollection that then you
21             Were the one who suggested that one way of doing
22        -- of documenting the -- that at least the date as of
23        the time you were doing the notarization was you?
24        A.   Yes.
25        Q.   That wasn't something that Mr. Bryant came up
```

```
 1              With that you recall?
 2   A.  No.
 3   Q.  Or that Mr. Bryant brought up I should say?
 4   A.  No.
 5   Q.  And did Mr. Bryant comment on that idea at all?
 6   A.  No.
 7   Q.  He just said --
 8   A.  He just said, Well, let's do that.
 9   Q.  Had Mr. Bryant pulled out the drawings prior to
10       The time that you had that discussion or any part
11   of that discussion?
12   A.  Yes.
13   Q.  Yeah.  Mr. Bryant came into your house --
14   A.  Uh-huh.
15   Q.  -- or excuse me, your apartment, and sat down in
16       Your living room; right?
17   A.  Right.
18   Q.  And did he pull out the drawings at that time or
19       Did you -- did you chat first?
20   A.  We chatted first.
21   Q.  Was it about the drawings or about the dolls?
22   A.  He was explaining what he wanted, which was
23       To -- that he had worked on some drawings while he
24   was in Minnesota I think it was, and that he was
25   trying to figure out a way to document that they had
```

1          been done before he came from Minnesota.

2          And I said, Well, I don't know what to do except

3          We -- I mean, the only thing I can do as far as being

4          a notary is just acknowledge your signature, this date

5          and time.  If you want to do that, put those on there.

6          He said, Okay, let's do that, and that was that.

7      Q.  Was it actually Missouri instead of Minnesota?

8      A.  I don't know if it was Missouri or Minnesota.  I

9          Always forget which one.

10     Q.  If you take a look back at Exhibit 60 in your

11         Journal entry, you'll see it has the word

12     Missouri?

13     A.  Oh, okay.  I'm sure it's Missouri.

14       **MR. ZELLER:**  Let's please mark as Exhibit 61 a

15     One-page document which consists of a letter from

16     Charlotte McCluskey to Jacqueline Ramona Prince,

17     Dated July 21st, 2004.

18     Q.  (By Mr. Zeller)  For the record this is a letter

19         That was just produced today?

20     A.  Yeah.

21     Q.  And you recognize that as the letter that you

22         Were referring to earlier in your testimony --

23     A.  Yes.

24     Q.  -- relating to the original of your notary

25         Journal?

```
1        A.  Yes.

2        Q.  And the stamp as well?

3        A.  Yes.

4        Q.  You'll see that this letter is July 21st, 2004?

5        A.  Yes.

6        Q.  And the letter references that the attorney,

7            Charlotte McCluskey, took possession of the

8        original notary book and the stamp on that day?

9        A.  Right.

10       Q.  Was that the same day that she met with you?

11       A.  Yes.

12       Q.  And seeing this letter, does that refresh your

13           Recollection that it was Charlotte McCluskey who

14       visited you at your home?

15       A.  Yes.  It was Charlotte McCluskey.

16       Q.  Now, are your initials somewhere on this

17           Document?

18       A.  Yes.  The top set of initials and date are mine.

19       Q.  And the date there is 7/21/04?

20       A.  Right.

21       Q.  And who are the initials of the person below?

22       A.  Charlotte McCluskey, 7/21/04.

23       Q.  Now, you'll see it says by hand-delivery.  Did

24           She actually bring the letter with her to the

25       meeting or did she send it by messenger later on?
```

```
 1       A.   I believe she brought this with her.  And I
 2            Handed it to her, yes.
 3       Q.   And so you both initialed the letter at the same
 4            Time while you were there in the house?
 5       A.   Yes.
 6       Q.   And then there's some handwritten notation
 7            There.  It says to the effect, and stamp enclosed
 8       in case?
 9       A.   Yes, that's my handwriting because she had just
10            Put regarding notary book and I said, Well, the
11       stamp is in there, too, so I wrote that on there.
12       Q.   Returning to the time when Mr. Bryant came to
13            Your apartment when you notarized the drawings, we
14       were talking about when Mr. Bryant showed you the
15       drawings.
16       Do you recall how many drawings there were?
17       A.   No.  Several, but I don't recall exactly how
18            Many sheets of paper.  I wrote it in my notary
19       book at the time.
20       Q.   Did you eventually notarize all of the drawings
21            That Mr. Bryant brought with him?
22       A.   Yes.  I notarized every sheet of paper he had.
23       Q.   So there were no other additional drawings that
24            Mr. Bryant brought with him that you did not
25       notarize?
```

```
1        A.  No.

2        Q.  My statement is correct?

3        A.  Your statement's correct.

4        Q.  Do you recall drawings having to be unfolded

5            When you were in the process of notarizing them?

6        A.  Unfolded, no.

7        Q.  Were all the drawings that you were shown in

8            Black and white?

9        A.  Yes.

10       Q.  You weren't shown any big color drawings --

11       A.  No.

12       Q.  -- is that correct?

13       A.  No.  I don't remember seeing color.

14       Q.  My statement's correct?

15       A.  Your statement's correct.

16       Q.  Just to follow up on that point, you put in your

17           Notary journal that you notarized 13 drawings in

18       total?

19       A.  Yes.  Yes.

20       Q.  Those were the total number of drawings, these

21           13 drawings, that Mr. Bryant brought with him and

22       that you notarized; is that correct?

23       A.  Yes.

24       Q.  If you could return to your journal entry for a

25           Moment where it says document kind or type, the
```

```
 1              Carter Bryant entry?
 2         A.  Yes.
 3         Q.  It says original sketches of doll idea.
 4              Do you see that part of it?
 5         A.  Yes.
 6         Q.  And then later on it says "FROM 1998, MISSOURI"?
 7         A.  Right.
 8         Q.  Was it your understanding that Mr. Bryant was
 9              Telling you that the doll ideas were "FROM 1998,
10         MISSOURI", or that the sketches were?
11         A.  The sketches.  That was my understanding.
12         Q.  Do you have an understanding as to why you wrote
13              Down doll idea?
14         A.  No.  I don't remember why I wrote doll idea.
15         Q.  Are those words that Mr. Bryant used?
16         A.  I don't remember.
17         Q.  Did you have any reaction when Mr. Bryant showed
18              You the drawings?
19         A.  Yes.
20         Q.  What was your reaction?
21         A.  I thought they were great.
22         Q.  Did you tell him that?
23         A.  Yeah.
24         Q.  Did you say anything else to Mr. Bryant about
25              The drawings?
```

```
1        A.  The only thing I really said is I thought they
2            Were really hip looking and I thought it was a
3        great idea but other than that, no.  Just that he's
4        really talented.
5        I always told him he was really talented when he
6        Sketches.
7        Q.  Did you tell Mr. Bryant that you thought that
8            They were original or very original?
9        A.  Yeah, I told him what a great idea.
10       Q.  At that time, would you consider yourself to be
11           Somebody who could determine whether or not
12       drawings were original or not?
13        THE WITNESS:  They looked original to me.
14       Q.  I take it you don't have any personal knowledge
15           As to the date when Carter Bryant came up with
16       what he says was his doll idea; correct?
17       A.  No, no.
18       Q.  I -- my statement's correct?
19       A.  Correct.
20       Q.  The only information that you received was based
21           Upon information from Mr. Bryant; is that correct?
22       A.  Correct.
23       Q.  My question is:  You don't have any direct
24           Personal knowledge --
25       A.  No.
```

tuesday, june 24, 2008                    trial day 17, afternoon session

1     Q.   -- that Mr. Bryant came up with the doll idea or

2          Did the sketches when he was in Missouri in 1998;

3     is that correct?

4     A.   Correct.

5     Q.   (By Mr. Zeller)  Did Mr. Bryant say to you at

6          Anytime words to the effect that he was

7     considering pitching the doll idea or contacting

8     somebody to try and have it made?

9     A.   No.

10    Q.   Let's please mark as Exhibit 62 a multi-page

11    Exhibit that consists of a compilation of drawings.

12    I'll read you the Bates numbers for the record:

13    Bryant 00192, 194, 195, 201, 202, 204, 207, 208, 210,

14    241, 214, 215, 301, 1003, and 1243.

15    Q.   (By Mr. Zeller)  Do you recognize the pages here

16          That we've marked as Exhibit 62 as including the

17    13 drawings that Mr. Bryant had you notarize?

18    A.   Yes.

19    Q.   For the record, there are more than 13 drawings

20          In here and I wanted to go through some of these

21    Individually.

22    With respect to the first page which is marked

23    Bryant 192?

24    A.   Yes.

25    Q.   Is this a drawing you recall notarizing?

```
 1         A.  Yes, I recall this one.

 2         Q.  The next one is Bryant 202.

 3         A.  I definitely remember that.

 4         Q.  And when you say definitely remember, is there

 5             Something about the drawing that prompts you to

 6       have --

 7         A.  Yeah.  Just that --

 8         Q.  -- a clearly striking memory of it?

 9         A.  Because she has shoes on and no hair.  That's

10             Why.

11         Q.  Anything else?

12         A.  No.

13         Q.  Next one, which is Bryant 211?

14         A.  Yes.  Isn't that the same as this one?

15         Q.  Do you have any recollection of the words 90

16             Percent being on the drawing that you notarized of

17       this particular figure?

18         A.  I don't recall.

19         Q.  Turning to Bryant 214 --

20         A.  Uh-huh.

21         Q.  -- part of Exhibit 62, do you see the words 85

22             Percent?

23         A.  Yes.

24         Q.  Do you know if that writing was on the drawing

25             That you notarized?
```

3612

```
 1          A.  I don't remember.
 2          Q.  Turning to Bryant 301, did you notarize a
 3              Drawing that had these faces and heads on them
 4          along with the additional handwriting?
 5          A.  I don't recall seeing that.
 6          Q.  And so the record is clear, the markings that
 7              You're referring to are the words that say, Please
 8          see Jay's glamour drawing for more accurate lip shape
 9          basic actual size three/four view heads?
10          A.  Yeah.  That wasn't on anything I notarized.
11              There were just drawings, the ones I notarized.
12          They didn't have -- I don't know if you'd call that
13          specs or what, but it didn't have all that.
14          Q.  You don't recall there being written words other
15              Than the individual character names on the
16          drawings?
17          A.  I don't recall this.  I don't recall this.
18          Q.  And so the record's clear --
19          A.  I don't recall this.
20           MR. WARREN:  You have to use the numbers.
21           THE WITNESS:  Okay.  On page -- on drawing 301,
22          I don't recall this and all these markings showing
23          The sizes and the -- and this.
24          Q.  (By Mr. Zeller)  And the this you're referring
25              To is that an additional drawing of a -- of a
```

```
 1          head?
 2          A.   Right.  And the markings with the arrows.
 3          Q.   And then the handwriting as well?  Again setting
 4               Aside the character names, the individual
 5          character names.
 6          A.   Yeah, I don't remember seeing that.
 7          Q.   Do you recall handwriting of any kind other than
 8               The individual character names being on the
 9          drawings that you saw?
10          A.   I don't remember any handwriting.
11          Q.   And so the record is clear, when you're
12               Referring to the drawings that you don't recall
13          seeing in that form, you're referring to Bryant 301?
14          A.   Right.  Let me go back to that other one.
15          Q.   And Bryant 1003, which is the next one?
16          A.   Right.  I don't recall seeing all of those
17               Markings and writing.
18          Q.   Do you have knowledge or information from any
19               Source as to whether any changes were made to the
20          Drawings after you notarized them?
21          A.   I wouldn't know.
22          Q.   Turning to the next page, Bryant 194, you'll see
23               That the word Bratz is on this drawing?
24          A.   Uh-huh.  Yes.
25          Q.   Do you have a specific recollection of that word
```

```
1              Being on this drawing when you notarized it?
2      A.   No.
3      Q.   There's at least one entry for Ron Longsdorf?
4      A.   Yeah.
5      Q.   Did Ron actually come to your house and sign
6           This?
7      A.   He met me at lunch one day, I believe.  Let's
8           See; if I look at it I'll remember.
9      Q.   This is an entry for the record that -- there's
10          One that I'm looking at anyway.  There may be
11     others, but the one that I'm looking at is --
12     A.   Number -- oh, I see, power of attorney
13          International trade.
14     Q.   Right.  For the record, this is an entry that's
15          Dated August 11th, 1998 as the date of
16     notarization.
17     A.   Yeah.  I didn't do it at Mattel.  I don't
18          Remember where I met him to do this.  I remember
19     he asked me at work, but I had to do it later.  But I
20     don't remember the details.
21     Q.   Was there a particular reason you didn't want to
22          Bring the notary journal into Mattel?
23     A.   I just never had it with me.  I mean, I had no
24          Reason to lug it around.
25     Q.   (By Mr. Zeller)  Once you've had an opportunity
```

1          To the look at the pages that we've marked as

2     Exhibit 63, please let me know.

3     A.   Okay.  I looked at everything.

4     Q.   Have you ever seen any of these colorized

5          Drawings that we've marked as Exhibit 63?

6     A.   No.

7      THE WITNESS:  I remember the faces, but I don't

8     Remember the color and the -- or some of the

9     Costumes.

10      MR. ZELLER:  I'm sorry, you --

11      THE WITNESS:  I've never seen these with

12     Color and costumes on them.

13    Q.   (By Mr. Zeller)  Did Mr. Bryant say to you at

14          Any time as to whether or not he had done drawings

15     for this doll idea other than the ones he had shown

16     you?

17    A.   He didn't talk to me about it.

18    Q.   You didn't notarize drawings that were in color

19          Like the ones that we've marked here as Exhibit

20     63; is that correct?

21    A.   I don't remember seeing color on anything.

22    Q.   You don't recall notarizing any; correct?

23    A.   Right.

24    Q.   (By Mr. Zeller)  What I would like to do is just

25          Kind of make an inventory here of the originals of

```
 1          some of the documents and materials that have been

 2          brought to the deposition today.  We won't mark these,

 3          but what would appreciate, if you can do it, is just

 4          hold up to the video camera a bit so we'll have a

 5          record of what it is.

 6     A.   Okay.

 7     Q.   Let me first hand you what appears to be a

 8          Notary stamp.

 9     A.   Uh-huh.  So am I supposed to confirm it?

10     Q.   Yeah.  If you could also just hold it up, I'd

11          Appreciate it.

12     And and I take it that's your notary stamp from

13     When you were a notary --

14     A.   Right.

15     Q.   -- in California?

16     A.   Yes.

17     Q.   And that's for when -- that's the stamp that

18          Pertained to your commission that expired at the

19     end of 1999?

20     A.   Yes.

21     Q.   And so the record is clear, this stamp says that

22          Your commission expired as of December 25th, 1999?

23     A.   Yes.

24     Q.   And that's consistent with your recollection?

25     A.   Yes.
```

3617

```
 1          Q.  And the last item I have to hand to you is an
 2              Original, is the notary journal?
 3          A.  Right.
 4          Q.  And that's the original -- the notary journal
 5              That we have photocopied pages from as part of
 6          Exhibit 60 that we talked about?
 7          A.  Yes.  Correct.
 8          Q.  Did Mr. Bryant ever say to you -- and I'm
 9              Talking about any time, that he planned or
10          intended to show the drawings to anybody?
11          A.  No.
12          Q.  I think this is reflected by your notary book,
13              But let's just confirm this.  I take it you didn't
14          charge Mr. Bryant for your notary services in
15          connection with the drawings; is that correct?
16          A.  Correct.  I would have written down an amount if
17              I had.
18          Q.  Have you ever received any money or anything of
19              Value of any kind from Mr. Bryant --
20          A.  No.
21          Q.  -- directly or indirectly?
22          A.  No.
23          Q.  Since the time that you turned over the
24              Original -- I need to ask this first.
25          You had mentioned you didn't have any
```

```
 1            Photocopies of the journal, right?

 2       A.  Correct.

 3       Q.  So I take it that you hadn't seen the entries

 4            From your journal in between the time that you

 5       gave it to one of the Littler attorneys back in July

 6       up until today?

 7       A.  Right.

 8       Q.  Do you have any reason to believe that anyone at

 9            Any time altered in any way the entry in your

10       journal dated August 26th, 1999 from Mr. Bryant?

11       THE WITNESS:  No.

12       (End of excerpt provided.)

13       MR. NOLAN:  YOUR HONOR, THAT CONCLUDES THE

14  PRESENTATION OF OUR VIDEO BY MS. PRINCE.

15       WE WOULD OFFER INTO EVIDENCE TRIAL EXHIBIT NUMBERS 61   00:33

16  AND 63.

17       THE COURT:  ANY OBJECTION?

18       MR. ZELLER:  NO OBJECTION.

19       THE COURT:  VERY WELL.  BOTH ARE ADMITTED.

20       (EXHIBITS 61 AND 63 RECEIVED.)

21       THE COURT:  I THINK WE'RE GOING TO CALL A WITNESS OUT

22  OF ORDER, SO WE'RE GOING TO GO BACK TO THE PLAINTIFF AT THIS

23  TIME.

24       MR. ZELLER:  YES, YOUR HONOR.  THAT WAS PETER MARLOW.

25       MATTEL CALLS PETER MARLOW.                                00:33
```

```
 1              THE COURT:  VERY WELL.

 2              THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

 3   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

 4   BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

 5   HELP YOU GOD?

 6              THE WITNESS:  YES.

 7              THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

 8   YOUR LAST NAME FOR THE RECORD.

 9              THE WITNESS:  PETER ANDREW MARLOW, M-A-R-L-O-W.

10                      DIRECT EXAMINATION                        00:34

11   BY MR. ZELLER:

12   Q    GOOD AFTERNOON, MR. MARLOW.

13         YOU'RE HERE TODAY BECAUSE MATTEL SUBPOENAED YOU; IS

14   THAT RIGHT?

15   A    YES.                                                    00:34

16   Q    YOU KNOW A VERONICA MARLOW; IS THAT CORRECT?

17   A    YES.

18   Q    VERONICA MARLOW PERFORMED WORK FOR MGA FROM TIME TO TIME,

19   FROM THE 2000 TO 2005 TIME PERIOD; IS THAT TRUE?

20   A    YES.                                                    00:35

21   Q    MS. MARLOW IS YOUR WIFE?

22   A    YES.

23   Q    SHE'S ALSO YOUR BUSINESS PARTNER?

24   A    YES.

25   Q    AND SHE HAS DONE WORK FOR MGA THROUGH VARIOUS COMPANY    00:35
```

```
 1    NAMES THAT HAVE INCLUDED DOLL BAG?

 2    A    YES.

 3    Q    MARLOW TECHNOLOGIC?

 4    A    YES.

 5    Q    SHE'S ALSO DONE WORK FOR MGA UNDER HER OWN NAME          00:35

 6    INDIVIDUALLY, VERONICA MARLOW?

 7    A    CORRECT.

 8    Q    SINCE THE 2000 TIME PERIOD, YOU WERE THE ONE WHO HAS HAD

 9    PRINCIPAL RESPONSIBILITY FOR THE FINANCES AND THE RECORDKEEPING

10    FOR VERONICA MARLOW'S BUSINESSES AS THEY RELATE TO MGA WORK; IS  00:35

11    THAT CORRECT?

12    A    YES.

13    Q    YOU'RE PERSONALLY FAMILIAR WITH THE OPERATIONS OF

14    VERONICA MARLOW'S BUSINESSES AS THEY RELATE TO MGA WORK?

15    A    YES.                                                    00:35

16    Q    AND YOU YOURSELF PERSONALLY HAVE PERFORMED WORK FOR MGA

17    FROM TIME TO TIME, STARTING IN ABOUT THE 2001 TIME PERIOD UP

18    UNTIL THE 2005 TIME PERIOD; IS THAT RIGHT?

19         MS. AGUIAR:  OBJECTION.  RELEVANCE TO TIME FRAME,

20    YOUR HONOR.                                                  00:36

21         THE COURT:  I'LL PERMIT IT AS BACKGROUND.

22         OVERRULED.

23         THE WITNESS:  REPEAT THE QUESTION.

24    BY MR. ZELLER:

25    Q    YOU YOURSELF HAVE PERSONALLY PERFORMED WORK ON BEHALF OF  00:36
```

1   MGA FROM TIME TO TIME, STARTING IN ABOUT THE 2001 TIME PERIOD

2   UNTIL ABOUT THE 2005 TIME PERIOD; IS THAT RIGHT?

3   A    YES.

4   Q    YOU NEVER WORKED FOR MATTEL; IS THAT TRUE?

5   A    CORRECT.                                                     00:36

6   Q    VERONICA MARLOW DID WORK FOR MATTEL PREVIOUSLY.

7   A    YES.

8   Q    AND SHE LEFT MATTEL IN ABOUT MARCH OF 2000.

9   A    YES.

10  Q    THEN RIGHT AFTER THAT, SHE BEGAN WORKING WITH MGA.           00:36

11  A    YES.

12  Q    DO YOU KNOW A MARIA SALAZAR?

13  A    YES.

14  Q    SHE WORKED FOR MATTEL IN THE 2000 AND 2001 TIME PERIOD; IS

15  THAT TRUE?                                                        00:37

16  A    I BELIEVE SO.  I DON'T KNOW.

17  Q    WELL, TAKE A LOOK AT YOUR DEPOSITION TRANSCRIPT.  THERE

18  SHOULD BE TWO VOLUMES OF DEPOSITIONs UP THERE.  IF YOU COULD

19  LOOK AT THE SECOND VOLUME OF YOUR DEPOSITION TRANSCRIPT; THERE

20  SHOULD BE A VOLUME I AND A VOLUME II.  SPECIFICALLY, IF YOU       00:37

21  COULD TAKE A LOOK AT PAGE 409, STARTING AT LINE 19.

22          DO YOU HAVE THAT?

23  A    YES.

24          MS. AGUIAR:  YOUR HONOR, I DON'T KNOW IF MR. ZELLER

25  IS PLANNING TO READ THIS OR HAVE MR. MARLOW READ IT, BUT I HAVE  00:37

tuesday, june 24, 2008                    trial day 17, afternoon session

```
 1    AN OBJECTION IF THAT'S THE CASE.
 2            THE COURT:  WELL, LET'S FIND OUT.
 3            COUNSEL?
 4            MS. AGUIAR:  I JUST WANTED TO GET THAT IN THERE
 5    BEFORE HE ACTUALLY SAID SOMETHING.                          00:38
 6            THE COURT:  PROCEED WITH CAUTION, counsel.
 7            MR. ZELLER:  MY INTENTION WAS JUST TO SEE IF IT
 8    REFRESHED HIS RECOLLECTION.
 9            THE COURT:  VERY WELL.
10    BY MR. ZELLER:                                              00:38
11    Q    SO IF YOU COULD LOOK AT PAGE 409, LINE 19, DOWN TO
12    PAGE 410, LINE 5.
13    A    YES.
14    Q    AND BY THE WAY, DO YOU RECALL HAVING YOUR DEPOSITION TAKEN
15    IN THIS CASE PREVIOUSLY?                                    00:38
16    A    YES.
17    Q    IN FACT, THE MOST RECENT SESSION WAS JUST A FEW DAYS AGO.
18    A    RIGHT.
19    Q    AND THAT'S VOLUME II THAT YOU HAVE THERE FROM A FEW DAYS
20    AGO.                                                        00:38
21    A    RIGHT.
22    Q    HAVING LOOKED AT THIS TESTIMONY FROM A FEW DAYS AGO, DOES
23    THAT REFRESH YOUR RECOLLECTION THAT MARIA SALAZAR WORKED FOR
24    MATTEL IN THE 2000 AND 2001 TIME PERIOD?
25            MS. AGUIAR:  OBJECTION.  LACK OF FOUNDATION.         00:38
```

1          THE COURT:  SUSTAINED.  THAT'S NOT WHAT TRIGGERED

2   YOUR REQUEST TO REFRESH RECOLLECTION, COUNSEL.

3          MR. ZELLER:  I APOLOGIZE.  I COULDN'T HEAR ALL OF

4   THAT.

5          THE COURT:  THAT'S NOT WHAT TRIGGERED YOUR REQUEST TO      00:39

6   REFRESH RECOLLECTION.  IT WAS A DIFFERENT QUESTION, I BELIEVE.

7          MR. ZELLER:  I APOLOGIZE, YOUR HONOR.  I THOUGHT I

8   WAS ASKING ABOUT THE TIME PERIOD WHEN MARIA SALAZAR WAS WORKING

9   AT MATTEL.

10         THE COURT:  I MAY BE MISTAKEN.  ONE SECOND, COUNSEL.      00:39

11         I'M SORRY.  YOU ARE CORRECT.  YOU MAY ASK THE

12  QUESTION AGAIN.

13         MS. AGUIAR:  BUT I HAVE AN OBJECTION.  IT'S STILL

14  LACK OF FOUNDATION.  THERE'S NO TIME FRAME IN THIS TESTIMONY

15  HERE.                                                            00:39

16         THE COURT:  THE ORIGINAL QUESTION WAS the 2000, 2001

17  TIME PERIOD.

18         Is THAT STILL YOUR --

19         MR. ZELLER:  YES; the 2000 AND 2001 TIME PERIOD.

20         MS. AGUIAR:  I STILL HAVE AN OBJECTION.  IT'S TOO         00:39

21  BROAD A TIME FRAME.

22         THE COURT:  OVERRULED.

23         CAN YOU NARROW IT DOWN, COUNSEL?

24         MR. ZELLER:  I CAN, YOUR HONOR.  AND MAYBE I CAN

25  POINT MR. MARLOW TO ANOTHER DOCUMENT.                           00:39

**BY MR. ZELLER:**

Q    IF YOU COULD PLEASE TAKE A LOOK AT THE DOCUMENTS IN THAT

BOOK, THE BINDER.   THERE SHOULD BE AN EXHIBIT 10034 IN THERE.

       **MS. AGUIAR:**  I DON'T HAVE ONE.

       (COUNSEL IS PROVIDED DOCUMENT.)

**BY MR. ZELLER:**

Q    WITHOUT TALKING ABOUT THIS DOCUMENT OR SAYING ANYTHING

ALOUD ABOUT IT, IF YOU COULD PLEASE TAKE A LOOK AT IT; AND

SPECIFICALLY LOOK AT THE SECOND PAGE OF THIS EXHIBIT.   AND

YOU'LL SEE SOME ENTRIES THAT REFER TO SOME EMPLOYMENT PERIODS

IN THERE.

       DO YOU SEE THAT?

A    YES.

Q    AND THEN THERE'S A BOX 2 THAT GIVES SOME DATES.

A    RIGHT.

Q    AND DOES THAT HELP REFRESH YOUR RECOLLECTION AS TO WHETHER

OR NOT MARIA SALAZAR WAS WORKING AT MATTEL IN THE 2000 AND 2001

TIME PERIOD?

A    I SEE THAT SHE SAYS SHE WAS.

Q    AND THAT REFRESHES YOUR RECOLLECTION THAT WAS A TIME

PERIOD WHEN SHE WAS WORKING FOR MATTEL; IS THAT CORRECT?

A    YES.

Q    NOW, MS. SALAZAR WORKED ON BRATZ, THE BRATZ PROJECT,

BEFORE OCTOBER 20, 2000; IS THAT TRUE?

       **MS. AGUIAR:**  OBJECTION.   RELEVANCE; LACK OF

00:40

00:40

00:41

00:41

00:41

```
 1   FOUNDATION.
 2           THE COURT:  OVERRULE THE FIRST OBJECTION; SUSTAIN THE
 3   SECOND OBJECTION.
 4           LAY A FURTHER FOUNDATION AS TO HOW HE KNOWS.
 5   BY MR. ZELLER:                                                00:41
 6   Q    MR. MARLOW, AS WE TALKED ABOUT BEFORE, YOU WERE SOMEONE
 7   WHO PERSONALLY HANDLED, ON YOUR WIFE'S BEHALF AND HER COMPANY'S
 8   BEHALF, PAYMENTS AND OTHER RECORDKEEPING; IS THAT RIGHT?
 9   A    YES.
10   Q    AND THIS WAS BACK IN THE 2000 TO 2005 TIME PERIOD.       00:42
11   A    YES.
12   Q    AND IN THOSE INSTANCES WHERE YOU AND YOUR WIFE WERE
13   INVOLVED IN HAVING PEOPLE, THIRD PARTIES, WORK ON BRATZ BACK IN
14   THIS TIME PERIOD, 2000 TO 2005, YOU WERE THE PERSON WHO
15   PERSONALLY HANDLED PAYMENTS MADE TO THOSE INDIVIDUALS FOR THAT 00:42
16   KIND OF WORK; IS THAT CORRECT?
17   A    YES.
18   Q    AND YOU WOULD GENERATE RECORDS THAT WOULD SHOW THOSE
19   PAYMENTS; IS THAT TRUE?
20   A    CORRECT.                                                 00:42
21   Q    AND SO YOU'RE SOMEONE WHO IS PERSONALLY FAMILIAR WITH THE
22   THIRD-PARTY VENDORS WHO YOU AND YOUR WIFE USED IN CONNECTION
23   WITH THE BRATZ PROJECT BACK IN 2000; IS THAT CORRECT?
24   A    CORRECT.
25   Q    AND ONE OF THOSE PEOPLE WHO WORKED ON THE BRATZ PROJECT  00:42
```

1    PRIOR TO OCTOBER 20, 2000 WAS MARIA SALAZAR; IS THAT TRUE?

2         **MS. AGUIAR:**  MAY I REQUEST A SIDE-BAR?

3         **THE COURT:**  SURE.

4         (WHEREUPON, THE FOLLOWING PROCEEDINGS

5         WERE HELD AT SIDE-BAR:)

6         **Ms. AGUIAR:**  The RELEVANcy OBJECTION is BECAUSE WE'RE

7    GETTING IN INFORMATION REGARDING WHEN MS. SALAZAR WORKED FOR

8    MATTEL AND WHEN Ms. Salazar WORKED FOR THE MARLOWS.  AND THE

9    IMPLICATION IS CLEARLY THERE THAT THEY ARE GOING to ARGUE SHE

10   WAS WORKING FOR MATTEL AND THEN, THEREFORE...                    00:43

11        **THE COURT:**  HE'S ASKING the question WHETHER SHE

12   WORKED on the BRATZ.

13        **MR. ZELLER:**  CORRECT.  THAT'S WHAT I'VE ASKED SO FAR.

14        **MS. AGUIAR:**  HE HASN'T MENTIONED MGA.  AND WHAT I

15   UNDERSTOOD YOUr ruling TO BE IS THAT THE THRESHOLD QUESTION,    00:43

16   AND WHETHER THIS TESTIMONY IS RELEVANT, IS WHETHER MGA KNEW; SO

17   HE'S VERY ARTFULLY LAYING the FOUNDATION that SHE WAS WORKING

18   FOR MATTEL, she was WORKING ON BRATZ, she was WORKING FOR YOU,

19   SHE WAS DOING THAT AT THE SAME TIME; THAT'S NOT RELEVANT.

20        **THE COURT:**  I AGREE IT'S ARTFUL.  IT'S AN INTERESTING   00:44

21   APPROACH.  TO GET AROUND THE OBJECTION TO LACK OF FOUNDATION AS

22   TO WHETHER HE WAS WORKING FOR MATTEL OR MGA, HE'S now SAYING

23   BRATZ.  AND THERE'S ALREADY EVIDENCE BEFORE THE JURY --

24   CONFLICTING EVIDENCE, admittedly -- AS TO WHO WAS WORKING ON

25   BRATZ AND WHEN.  AND THE JURY CAN FIGURE IT OUT.               00:44

```
 1              I THINK IT'S actually -- I'M IMPRESSED.
 2         MS. AGUIAR:  WHAT I'M SAYING, THOUGH, IS WE HAVE
 3    DISCUSSED THIS ISSUE NUMEROUS TIMES.
 4         THE COURT:  I THINK HE'S TAKEN YOUR COUNSEL TO HEED.
 5         MS. AGUIAR:  BUT MY UNDERSTANDING OF YOUR RULING WAS        00:44
 6    THAT INFORMATION REGARDING WHEN THESE EMPLOYEES WERE EMPLOYED
 7    BY WHOM AND WHEN IS ONLY RELEVANT IF THEY CAN SHOW MGA KNEW
 8    THAT.  NOW THIS IS PREJUDICIAL BECAUSE THE IMPLICATION IS GOING
 9    TO BE, 'WELL, THEY KNEW,' BECAUSE HE'S TESTIFIED THEY WORKED
10    FOR THE MARLOWS AND THEY WORKED FOR MATTEL AT THE SAME TIME.    00:45
11    AND WHILE i appreciate MR. ZELLER IS A GOOD ADVOCATE AND just
12    BACK-DOORING THIS, I THINK HE'S TOTALLY DOING A RUNAROUND
13    around YOUR RULING, YOUR HONOR.
14         THE COURT:  I THINK A REASONABLE INFERENCE CAN BE
15    MADE.  I OVERRULE THE OBJECTION.                                00:45
16         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)
17    BY MR. ZELLER:
18    Q    ISN'T IT TRUE THAT MARIA SALAZAR WORKED ON BRATZ BEFORE
19    OCTOBER 20, 2000?
20    A    THAT'S NOT TRUE.                                           00:45
21    Q    IF YOU COULD PLEASE TAKE A LOOK AT EXHIBIT 606.  IT'S IN
22    YOUR BOOK.
23         MR. ZELLER:  THIS IS IN EVIDENCE, YOUR HONOR.
24         THE COURT:  VERY WELL.
25    / / /                                                          00:46
```

1    **BY MR. ZELLER:**

2    Q    SPECIFICALLY, I DIRECT YOUR ATTENTION TO EXHIBIT 606;

3    YOU'LL SEE AT THE BOTTOM THERE'S DASH 0005.

4    A    YES.

5    Q    AND FIRST, LET'S ASK THIS:  YOU RECOGNIZE THIS AS AN          00:46

6    INVOICE THAT YOU WERE INVOLVED IN GENERATING IN CONNECTION WITH

7    THE BRATZ PROJECT BACK IN NOVEMBER OF 2000; IS THAT TRUE?

8    A    YES.

9    Q    AND YOU'LL SEE THERE IN THE DESCRIPTION, IT SAYS, "BRATZ

10   DOLLS THIRD-PARTY SERVICES FROM 10-13-2000 TO 10-20-2000."      00:46

11           DO YOU SEE THAT?

12   A    CORRECT.

13   Q    AND THEN THERE ARE TWO ENTRIES, ONE FOR 49 HOURS AND

14   ANOTHER FOR 32 HOURS.

15           IT TALKS ABOUT THIRD-PARTY SEWING AND PATTERN-MAKING     00:46

16   SUPPORT SERVICES; RIGHT?

17   A    RIGHT.

18   Q    AND THIS IS ALL WORK THAT WAS DONE ON THE BRATZ PROJECT

19   PRIOR TO OCTOBER 20, 2000; CORRECT?

20   A    YES.                                                        00:47

21   Q    AND THAT TOTALS UP TO 81 HOURS?

22   A    CORRECT.

23   Q    AT LEAST ONE OF THE PERSONS DOING THIS THIRD-PARTY SEWING

24   AND PATTERN-MAKING SUPPORT WORK THAT'S REFLECTED HERE IN THIS

25   INVOICE WAS A MATTEL EMPLOYEE AT THE TIME; CORRECT?             00:47

```
 1   A     I BELIEVE SO.

 2              MS. AGUIAR:  OBJECTION.  FOUNDATION; RELEVANCE.

 3              THE COURT:  SUSTAINED ON FOUNDATION.  LAY A FURTHER

 4   FOUNDATION.

 5              OVERRULED ON RELEVANCE.                              00:47

 6   BY MR. ZELLER:

 7   Q     YOU PERSONALLY PREPARED THIS INVOICE; TRUE?

 8   A     YES.

 9   Q     AND YOU PREPARED IT FROM INFORMATION THAT WAS RECORDED IN

10   CONNECTION WITH THE BUSINESS THAT YOU AND YOUR WIFE RUN.        00:47

11   A     YES.

12   Q     IN FACT, THERE ARE TIME SHEETS THAT CORRESPOND TO THIS

13   THIRD-PARTY SEWING AND PATTERN-MAKING SUPPORT SERVICES; RIGHT?

14   A     YES.

15   Q     AND WHAT YOU DID IS, YOU TOOK THOSE TIME RECORDS OF THE   00:47

16   PEOPLE WHO PROVIDED THOSE SERVICES, YOU PUT THEM TOGETHER, YOU

17   ADDED THEM UP, AND YOU PUT THEM INTO THIS INVOICE THAT WENT TO

18   MGA; RIGHT?

19   A     RIGHT.

20   Q     AND SO YOU YOURSELF KNOW WHAT UNDERLIES THIS THIRD-PARTY  00:48

21   SEWING AND PATTERN-MAKING SUPPORT REFERENCE; IS THAT TRUE?

22   A     YES.

23   Q     AND YOU KNOW THAT ONE OF THE PEOPLE, AT LEAST ONE OF THE

24   PEOPLE WHO PROVIDED THAT 81 HOURS OF SERVICE, AT LEAST PART OF

25   IT, WAS A MATTEL EMPLOYEE AT THE TIME; IS THAT TRUE?           00:48
```

3630

```
 1   A    I DON'T RECALL ALL OF THE DETAILS THAT WENT INTO THAT

 2   PARTICULAR INVOICE, BUT I BELIEVE SO.

 3   Q    AND WHO WAS IT YOU BELIEVE DID THAT, THE NAME OF THE

 4   PERSON?

 5   A    MARIA ELANA SALAZAR.                                        00:48

 6   Q    THE PERSON WE WERE TALKING ABOUT?

 7   A    YES.

 8   Q    AND SO THEN GO BACK TO MY ORIGINAL QUESTION.

 9        HAVING SEEN THIS INVOICE, YOU'LL AGREE WITH ME THAT

10   MARIA SALAZAR PROVIDED SERVICES; SHE DID WORK ON THE BRATZ        00:48

11   PROJECT, WHILE SHE WAS A MATTEL EMPLOYEE, AT SOME POINT PRIOR

12   TO OCTOBER 20, 2000; IS THAT TRUE?

13   A    YES.

14   Q    AND BY THE WAY, THIS INVOICE WE WERE TALKING ABOUT,

15   EXHIBIT 606, THAT WAS AN INVOICE THAT WAS SENT TO MGA AND PAID    00:49

16   BY MGA; IS THAT TRUE?

17   A    YES.

18   Q    IF YOU COULD LOOK AT EXHIBIT 5723 THAT'S THERE IN YOUR

19   BINDER.

20            MR. ZELLER:  AND THIS IS FOR IDENTIFICATION.            00:49

21   BY MR. ZELLER:

22   Q    IF YOU COULD LET US KNOW WHEN YOU'VE HAD AN OPPORTUNITY TO

23   LOOK AT THESE PAGES.

24   A    HOW MANY PAGES ARE THERE?

25   Q    IT'S 5723.                                                  00:50
```

```
 1   A    ALL RIGHT.

 2   Q    YOU'VE HAD A CHANCE TO LOOK AT EXHIBIT 5723 FOR

 3   IDENTIFICATION?

 4   A    YES.

 5   Q    AND YOU GENERALLY RECOGNIZE THESE AS RECORDS RELATING TO      00:50

 6   SERVICES THAT MARIA SALAZAR PERFORMED ON THE BRATZ PROJECT

 7   STARTING ON OR ABOUT OCTOBER 13, 2000.

 8   A    YES.

 9   Q    AND THESE ARE RECORDS FROM YOUR FILES; IS THAT RIGHT?

10   A    YES.                                                         00:51

11   Q    AND YOU RECOGNIZE THESE AS RECORDS THAT RELATE, AT LEAST

12   IN PART, TO THOSE SERVICES THAT WERE REFLECTED ON THAT INVOICE

13   WE JUST TALKED ABOUT TO MGA, EXHIBIT 606.

14   A    YES.

15           MR. ZELLER:  AT THIS TIME, YOUR HONOR, I'D MOVE           00:51

16   EXHIBIT 5723 INTO EVIDENCE.

17           THE COURT:  ANY OBJECTION?

18           MS. AGUIAR:  I HAVE NO OBJECTION TO THE FIRST TWO

19   PAGES OF THE EXHIBIT.  THE REST OF IT IS IRRELEVANT.

20           THE COURT:  VERY WELL.                                    00:51

21           COUNSEL, THOSE ARE THE TWO PAGES THAT YOU COVERED

22   HERE.  WHAT'S YOUR POSITION?

23           MR. ZELLER:  I THINK THE REST IS RELEVANT,

24   YOUR HONOR.  I WILL CONNECT THESE THINGS UP.  I WON'T GO INTO

25   THE DETAILS OF THE FOLLOWING PAGES AT THIS POINT, BUT I WILL      00:51
```

```
 1   CONNECT UP THE RELEVANCE TO IT BY THE END.

 2         THE COURT:  AT THIS POINT IN TIME, I'M ONLY ADMITTING

 3   PAGES 1 AND 2.

 4         MR. ZELLER:  WHAT I WOULD ALSO ASK, YOUR HONOR, IS

 5   THAT BASED ON THE TEMPORAL ISSUES HERE, THAT PAGE 3 BE ADMITTED      00:52

 6   AS WELL; THAT ALSO COVERS, APPROXIMATELY, THAT SAME TIME

 7   PERIOD.

 8         THE COURT:  ACTUALLY, IT SEEMS TO GO BEYOND IT,

 9   COUNSEL.

10         MR. ZELLER:  I UNDERSTAND THAT IT INCLUDES PARTS OF       00:52

11   IT.  IT GOES INTO SLIGHTLY AFTER, BUT FOR REASONS --

12         THE COURT:  WE'RE LOOKING AT 5723; RIGHT?

13         MR. ZELLER:  YES.  5723-0003.

14         THE COURT:  COUNSEL?

15         MS. AGUIAR:  I THINK IT'S ALL OUTSIDE THE TIME         00:52

16   PERIOD, YOUR HONOR.

17         THE COURT:  I'LL ADMIT 1 AND 2 AT THIS TIME, COUNSEL.

18         THANK YOU.

19         MR. ZELLER:  THANK YOU.

20         (EXHIBIT 5723, PAGES 1 AND 2, RECEIVED.)

21         MR. ZELLER:  MAY I PUBLISH?

22         THE COURT:  YOU MAY.

23         MR. ZELLER:  IF WE COULD PULL UP THE FIRST PAGE OF

24   EXHIBIT 5723.

25   / / /
```

1   **BY MR. ZELLER:**

2   Q    MR. MARLOW, PLEASE TELL US, GENERALLY SPEAKING, WHAT IS

3   THIS DOCUMENT?

4   A    IT WAS A RECORD KEPT BY -- I BELIEVE BY PEDRO SALAZAR OR

5   MARIA ELANA SALAZAR, REGARDING WORK THAT WAS DONE BY ONE OR          00:53

6   BOTH OF THOSE PARTIES DURING THE PERIOD OF 10-13 TO 10-23-2000.

7   Q    THE TIME CARD REFLECTS THE NAME OF MARIA ELANA SALAZAR.

8   A    YES.

9   Q    AND YOU DON'T HAVE ANY REASON TO DOUBT THAT SOME OR ALL OF

10  THIS TIME WAS TIME ACTUALLY PERFORMED OR EXPENDED BY                 00:53

11  MARIA SALAZAR ON THE BRATZ PROJECT IN THOSE TIMES IN OCTOBER OF

12  2000; IS THAT TRUE?

13  A    THAT'S TRUE.

14  Q    THIS IS BASICALLY A TIMEKEEPING RECORD OF THE HOURS THAT

15  SHE SPENT ON THE BRATZ PROJECT BACK IN OCTOBER OF 2000.              00:54

16  A    YES.

17  Q    AND THIS IS THE TIME CARD THAT RELATES TO SOME OF THAT

18  WORK THAT WAS ON THAT INVOICE, EXHIBIT 606, THAT YOU SENT TO

19  MGA FOR SERVICES PRIOR TO OCTOBER 20, 2000.

20  A    CORRECT.                                                        00:54

21  Q    AND I THINK IN TOTAL, IT SHOWS ABOUT 70 HOURS BEING DONE.

22        DO YOU HAVE ANY REASON TO DOUBT THAT WAS A CORRECT

23  FIGURE OF ABOUT THE AMOUNT OF TIME THAT SHE SPENT ON BRATZ?

24  A    IT LOOKS RIGHT.

25  Q    IN OTHER WORDS, YOU DON'T HAVE ANY REASON TO DOUBT THE          00:54

```
 1   TRUTH OR ACCURACY OF THIS; RIGHT?

 2   A    CORRECT.

 3   Q    IN FACT, YOU'LL SEE THAT THERE'S A REFERENCE HERE.  IT

 4   SAYS "INVOICE G-000626" AT THE BOTTOM.

 5   A    RIGHT.                                                    00:54

 6   Q    THAT CORRESPONDS TO AN INVOICE NUMBER ON THAT EXHIBIT 606

 7   THAT YOU SENT TO MGA THAT WE JUST TALKED ABOUT.

 8   A    RIGHT.

 9   Q    THE SERVICES THAT MS. SALAZAR PROVIDED ON BRATZ WHEN SHE

10   WAS A MATTEL EMPLOYEE WAS SOMETHING THAT WAS CALLED "SAMPLE    00:55

11   MAKING."

12   A    RIGHT.

13   Q    AND THAT'S BASICALLY MAKING DOLL CLOTHES; RIGHT?

14        MS. AGUIAR:  OBJECTION.  LACK OF FOUNDATION.

15        THE COURT:  SUSTAINED.                                    00:55

16   BY MR. ZELLER:

17   Q    PLEASE TELL US WHAT SAMPLE MAKING IS.

18   A    SEWING THE PIECES TOGETHER TO MAKE THE DOLL CLOTHES.

19   Q    ISN'T IT TRUE THAT MS. SALAZAR WAS PAID FOR THIS WORK THAT

20   SHE DID ON BRATZ WHEN SHE WAS A MATTEL EMPLOYEE?               00:55

21   A    YES.

22   Q    AND MGA REIMBURSED YOU AND VERONICA MARLOW FOR THOSE

23   PAYMENTS MADE TO MS. SALAZAR FOR HER WORK ON BRATZ WHEN SHE WAS

24   A MATTEL EMPLOYEE; IS THAT TRUE?

25   A    YES.                                                      00:56
```

```
 1   Q    AND AT SOME POINT AFTER MS. SALAZAR WAS A MATTEL EMPLOYEE,

 2   MS. SALAZAR GOT A JOB AS AN MGA EMPLOYEE; IS THAT TRUE?

 3   A    YES.

 4   Q    AND THAT WAS BACK IN 2003 WHEN SHE BECAME AN MGA EMPLOYEE?

 5          MS. AGUIAR:  OBJECTION.  RELEVANCE; 403.              00:56

 6          THE COURT:  2003, YOU'RE ASKING, COUNSEL?

 7          MR. ZELLER:  CORRECT.

 8          THE COURT:  SUSTAINED.

 9   BY MR. ZELLER:

10   Q    WELL, AT SOME POINT, MARIA SALAZAR BECAME AN MGA EMPLOYEE;   00:56

11   RIGHT?

12          MS. AGUIAR:  SAME OBJECTION.

13          THE COURT:  LET'S MOVE ALONG, COUNSEL.

14          NEXT QUESTION.

15   BY MR. ZELLER:                                               00:57

16   Q    AT ANY POINT DID VERONICA MARLOW PROVIDE ANY REFERENCE FOR

17   MS. SALAZAR IN CONNECTION WITH GETTING A JOB AT MGA?

18          MS. AGUIAR:  OBJECTION.  FOUNDATION; HEARSAY.

19          THE COURT:  SUSTAINED.

20          LAY A FOUNDATION, COUNSEL.                            00:57

21   BY MR. ZELLER:

22   Q    YOU DO KNOW THAT AT SOME POINT, AS WE WERE TALKING ABOUT,

23   MS. SALAZAR AT LEAST APPLIED TO BECOME AN MGA EMPLOYEE?

24          MS. AGUIAR:  OBJECTION.  RELEVANCE; 403.

25          SAME OBJECTIONS AS THE LAST TWO TIMES.                00:57
```

```
 1          THE COURT:  COUNSEL, LET ME SEE YOU AT SIDE-BAR ON

 2   THIS.

 3               (WHEREUPON, THE FOLLOWING PROCEEDINGS

 4               WERE HELD AT SIDE-BAR:)

 5          THE COURT:  HOW IS WHAT SHE DOES IN 2003 REFLECT BACK     00:58

 6   on 2000?  I ACCEPT the PROPOSITION THAT an INference can be

 7   MADE; THAT'S WHY I said at the LAST SIDE-BAR THAT a jury, BASED

 8   ON ALL OF THE EVIDENCE, MIGHT BE ABLE TO INFER FROM OTHER

 9   EVIDENCE THEY HAVE OF WHAT was GOING ON IN SEPTEMBER AND

10   OCTOBER OF 2000; THE TESTIMONY of MR. LARIAN ABOUT BRATZ;       00:58

11   PAULA GARCIA ABOUT BRATZ, and WHO WAS WORKING on it; all of

12   that.  I UNDERSTAND the INference.

13               BUT NOW YOU'RE getting INto 2003 when SHE GOES TO

14   WORK FOR MGA.  And i'm not following.

15          MR. ZELLER:  WHAT I will SAY IS that SOME OF IT IS --    00:58

16   I CAN only do THIS ONE STEP AT A TIME.  I CAN ONLY PUT in SO

17   MUCH AT A TIME.  BUT WHAT I WOULD SAY IS THIS:  THAT

18   ISAAC LARIAN DENIED, IN THE FACE OF THAT 2005 E-MAIL, KNOWING,

19   CERTAINLY, EVIDENCE THAT TWO YEARS BEFORE THAT -- BECAUSE HE'S

20   CLAIMED HE HAS NOT KNOWN the ENTIRE TIME PERIOD; HE DIDN'T KNOW  00:59

21   IN 2000; he DIDN'T KNOW ALL OF THE WAY UP THROUGH 2005.

22               THAT'S THE STATE OF THE RECORD.

23               THAT ONE OF THESE EMPLOYEES actually went OVER TO MGA

24   AND IS AN agent there, OBVIOUSLY, IN 2003; THAT IS SOMETHING

25   THAT I THINK IS VERY POWERFUL EVIDENCE to GIVE RISE TO an        00:59
```

1    INference THAT --

2            **THE COURT:**  I'M GOING TO SUSTAIN THE OBJECTION.

3            MOVE ALONG TO THE NEXT AREA.  WE'RE STAYING AWAY FROM

4    THE 2005 E-MAIL AS WELL.

5            **MR. ZELLER:**  I UNDERSTAND.  I'M STAYING AWAY FROM THE      00:59

6    2005 E-MAIL.  BUT THIS IS THE LINKAGE, YOUR HONOR.  THIS

7    CREATEs REAl PROBLEMS TO eSTABlish.  THEY ARE GOING TO ARGUE IN

8    CLOSING THERE'S NO EVIDENCE THAT mga KNEW, EVEN THOUGH

9    ISAAC LARIAN ON THE STAND DENIED HE KNEW that IN 2005 AND THEY

10   HAD AT LEAST AN EMPLOYEE THERE FOR TWO, THREE YEARS.              01:00

11           **THE COURT:**  HE DENIED IT.  THAT'S WHY YOU'RE ABLE TO

12   USE THAT E-MAIL, AND THAT'S COME IN TO IMPEACH HIS CREDIBILITY.

13           **MR. ZELLER:**  I UNDERSTAND.  BUT THIS IS GUILTY

14   KNOWLEDGE; THIS IS INTENT.  IT'S classic PATTERN EVIDENCE.  YOU

15   CAN'T SAY WE DID THIS THREE, FOUR TIMES BY ACCIDENT.             01:00

16           I THINK THAT'S ultimately THE arguMENT.

17           **THE COURT:**  BUT AT THIS POINT -- AND THE DIFFERENCE

18   IS IN 2000 SHE WAS WORKING FOR MATTEL.  IN 2003 SHE'S NOT.

19   WHEN SHE ACTUALLY MAKES THE claim.  AND THAT'S WHAT'S

20   DIFFERENT.  IF SHE WAS STILL -- IF SHE MADE A CROSSOVER FROM     01:00

21   MATTEL TO MGA IN 2003, EVEN THOUGH IT'S THREE YEARS AWAY, THEN

22   you'd have AN ARGUment.  SHE'S free AND CLEAR.

23           I'm GIVING YOU free reign to explore WHAT WAS GOING

24   ON IN 2000.  BUT 2003, I THINK WE'RE TOO FAR AWAY.

25           **MR. ZELLER:**  I'LL MAKE ONE MORE POINT, YOUR HONOR,     01:00

1    WHICH IS THAT ALSO, I MEAN, AND THIS GOES TO THE AGENCY POINT.

2    PART of WHAT I DO WANT TO MAKE CLEAR THROUGH THIS EXAMINATION

3    IS THAT VERONICA MARLOW -- and this IS KNOWN TO peter marlow --

4    MADE EFFORTS to GET ALL THREE of them JOBS THERE AT MGA.

5             THE COURT:  WHEN?                                      01:01

6             MR. ZELLER:  CERTAINLY AT SOME POINT PRIOR TO 2005.

7    AND WITH MARIa SALAZAR, WE KNOW IT WAS NO LATER THAN 2003.

8    THIS GOES, AGAIN, TO THE AGENCY RELATIONSHIP; THIS GOES TO

9    THEIR RELATIONSHIP BETWEEN MGA AND THE MARLOWS.

10            THE COURT:  YOU CAN EXPLORE THAT IN THE context OF      01:01

11   WHAT WAS GOING ON IN 2000, COUNSEL.  I'M going to hold YOU TO

12   THAT TIME PERIOD.

13            MS. AGUIAR:  I want to RESERVE the right to STRIKE

14   THE TESTIMONY THAT HAS BEEN RELATED TO THIS MOST RECENT EXHIBIT

15   BECAUSE HE HAS NOT TIED UP THAT MGA EVER GOT THAT TIME SHEET.    01:01

16            THE COURT:  THIS IS THE -- WE'RE --

17            MS. AGUIAR:  WE'RE ON THE TIME SHEET.

18            THE COURT:  IT DOESn't NEED TO GO TO MGA.  I'M

19   allowing INFERENCE ON THAT; SO I'LL OVERRULE THAT objection.

20   BUT I'M KEEPING THE 2003 STUFF OUT.                             01:02

21            MR. ZELLER:  THANK YOU.

22            (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

23   BY MR. ZELLER:

24   Q    MR. MARLOW, MS. SALAZAR WAS NOT THE ONLY MATTEL EMPLOYEE

25   WHO WAS SECRETLY WORKING ON BRATZ, THE BRATZ CLOTHING, BACK IN  01:02

```
 1    2000; IS THAT TRUE?
 2              MS. AGUIAR:  OBJECTION.  FOUNDATION; RELEVANCE; 403;
 3    ARGUMENTATIVE.
 4              THE COURT:  OVERRULED.
 5              YOU MAY ANSWER.                                    01:02
 6              THE WITNESS:  THERE WAS ANOTHER MATTEL EMPLOYEE
 7    WORKING ON BRATZ.
 8    BY MR. ZELLER:
 9    Q    ANA CABRERA WAS ANOTHER MATTEL EMPLOYEE WHO WAS WORKING ON
10    THE BRATZ PROJECT, WHILE A MATTEL EMPLOYEE, BACK IN 2000; IS    01:03
11    THAT RIGHT?
12    A    YES.
13    Q    AND SHE STARTED WORKING ON THE BRATZ PROJECT NO LATER THAN
14    THE NOVEMBER 2000 TIME PERIOD.
15    A    CORRECT.                                                01:03
16    Q    AND IT MIGHT HAVE BEEN EARLIER; YOU CAN'T ACTUALLY EXCLUDE
17    THAT IT WAS A LITTLE EARLIER; RIGHT?
18    A    I THINK I CAN.
19    Q    I'M SORRY?
20    A    I CAN EXCLUDE THAT IT WAS EARLIER.                      01:03
21    Q    HOW LONG DID MS. CABRERA WORK ON THE BRATZ PROJECT?
22    A    UNTIL ABOUT JUNE OF 2005.
23    Q    THE WORK THAT MS. CABRERA DID ON BRATZ WHEN SHE WAS A
24    MATTEL EMPLOYEE WAS SAMPLE MAKING.
25    A    YES.                                                    01:03
```

```
 1   Q    AND THE WORK THAT MS. CABRERA DID ON BRATZ WHEN SHE WAS A

 2   MATTEL EMPLOYEE, SHE WAS PAID FOR THAT WORK.

 3   A    YES.

 4   Q    AND MGA REIMBURSED YOU AND VERONICA MARLOW FOR THOSE

 5   PAYMENTS THAT WERE MADE TO HER FOR THAT WORK; IS THAT RIGHT?        01:03

 6   A    PART OF IT, YES.

 7   Q    AND THOSE WERE CHARGES YOU PASSED ON THROUGH INVOICES TO

 8   MGA.

 9   A    PARTIALLY.

10   Q    WHY DO YOU SAY PARTIALLY?                                      01:04

11   A    BECAUSE LATER ON, WE DIDN'T INVOICE SEPARATELY FOR

12   THIRD-PARTY SERVICES.

13   Q    IN ADDITION TO MS. SALAZAR AND MS. CABRERA, THERE WAS AT

14   LEAST ANOTHER MATTEL EMPLOYEE WHO AT SOME POINT WAS SECRETLY

15   WORKING ON BRATZ WHILE A MATTEL EMPLOYEE; IS THAT TRUE?            01:04

16           MS. AGUIAR:  OBJECTION.  RELEVANCE.

17           THE COURT:  OVERRULED ON RELEVANCE.

18           YOU'RE TALKING ABOUT THE 2000 TIME FRAME?

19           MS. AGUIAR:  NO, HE'S NOT.

20           MR. ZELLER:  2001, YOUR HONOR.                             01:04

21           THE COURT:  SUSTAINED.

22           THANK YOU, COUNSEL.

23   BY MR. ZELLER:

24   Q    TO YOUR KNOWLEDGE, DURING THE TIME THAT MS. SALAZAR WAS A

25   MATTEL EMPLOYEE, MATTEL WAS NOT AWARE THAT MS. SALAZAR WAS         01:05
```

```
 1   WORKING ON BRATZ AS A MATTEL EMPLOYEE; IS THAT CORRECT?

 2           MS. AGUIAR:  OBJECTION.  FOUNDATION; CALLS FOR

 3   SPECULATION.

 4           THE COURT:  LAY A FOUNDATION, COUNSEL.

 5   BY MR. ZELLER:                                             01:05

 6   Q    DID YOU EVER TELL MATTEL THAT MS. SALAZAR WAS WORKING ON

 7   BRATZ WHEN SHE WAS A MATTEL EMPLOYEE?

 8   A    NO.

 9   Q    TO YOUR KNOWLEDGE, DID ANYONE?

10   A    NO.                                                   01:05

11   Q    DID YOU EVER TELL MATTEL THAT MS. CABRERA WAS WORKING ON

12   BRATZ WHILE A MATTEL EMPLOYEE?

13   A    NO.

14   Q    TO YOUR KNOWLEDGE, DID ANYONE ELSE?

15   A    NO.                                                   01:05

16   Q    AT SOME POINT, ISN'T IT TRUE THAT IN THESE RECORDS THAT

17   YOU CREATED FOR WORK THAT MS. SALAZAR DID AND ANA CABRERA DID,

18   YOU USED FAKE NAMES FOR THEM, FOR THEIR WORK?

19           MS. AGUIAR:  OBJECTION.  RELEVANCE; 403.

20           THE COURT:  OVERRULED.                             01:06

21           THE WITNESS:  I'M SORRY.  REPEAT THE QUESTION.

22   BY MR. ZELLER:

23   Q    AT SOME POINT IN CONNECTION WITH THE RECORDS THAT YOU

24   CREATED FOR THE WORK THAT MARIA SALAZAR AND ANA CABRERA DID ON

25   THE BRATZ PROJECT WHILE THEY WERE STILL EMPLOYED BY MATTEL,   01:06
```

1    SOME OF THOSE RECORDS YOU CREATED USED FAKE NAMES TO COVER UP

2    THE FACT THAT THEY WERE WORKING ON THE BRATZ PROJECT; IS THAT

3    TRUE?

4              **MS. AGUIAR:**  OBJECTION.  RELEVANCE AS TO TIME FRAME.

5              **THE COURT:**  SUSTAINED.                              01:06

6              AT LEAST MORE AMBIGUOUS AS TO TIME FRAME, COUNSEL.

7              REPHRASE.

8    **BY MR. ZELLER:**

9    Q    YOUR LAWYER IN THIS CASE IS LARRY MCFARLAND; IS THAT TRUE?

10   A    YES.                                                        01:06

11   Q    HE'S SOMEONE WHO'S REPRESENTED MGA FOR A LONG TIME; IS

12   THAT CORRECT?

13             **MS. AGUIAR:**  OBJECTION.  RELEVANCE.

14             **THE COURT:**  OVERRULED.

15             **THE WITNESS:**  HE REPRESENTED WHO?                  01:07

16   **BY MR. ZELLER:**

17   Q    MR. MCFARLAND IS SOMEONE WHO HAS REPRESENTED MGA FOR SOME

18   PERIOD OF TIME; IS THAT CORRECT?

19   A    I DON'T KNOW.

20   Q    YOU DON'T KNOW ONE WAY OR ANOTHER?                         01:07

21   A    THAT'S RIGHT.

22   Q    MGA IS PAYING YOUR ATTORNEY'S FEES, RIGHT, FOR YOU AND

23   VERONICA MARLOW, IN THIS CASE?

24   A    NO.

25   Q    YOU MET ON MORE THAN ONE OCCASION WITH MGA'S ATTORNEYS; IS  01:07

```
 1   THAT TRUE?

 2   A    YES.

 3   Q    AND BY THE WAY, WHEN YOU SAY, NO, THAT MGA IS NOT PAYING

 4   FEES FOR YOU AND YOUR WIFE, HAVE THEY EVER?

 5   A    NOT TO MY KNOWLEDGE.                                       01:07

 6   Q    WHO IS PAYING THEM?

 7   A    CARTER BRYANT.

 8   Q    AND WHAT DO YOU BASE THAT ON?

 9   A    ON WHAT I'VE SEEN.

10   Q    SO ARE YOU DENYING HERE TODAY UNDER OATH THAT MGA HAS EVER  01:07

11   PAID YOUR LEGAL FEES AND THE LEGAL FEES OF YOUR WIFE?

12   A    I'M NOT AWARE THAT THEY HAVE EVER PAID ANY OF MY LEGAL

13   FEES.

14   Q    IS IT TRUE THAT YOU ULTIMATELY CLAIM NOT TO KNOW WHO'S

15   PAYING YOUR ATTORNEY'S FEES?                                    01:08

16   A    I SAID CARTER BRYANT.

17   Q    SO YOU CAN EXCLUDE, YOU CAN TELL US FOR A FACT, THAT MGA

18   IS NOT PAYING YOUR ATTORNEY'S FEES OR THE ATTORNEY'S FEES FOR

19   YOUR WIFE; IS THAT TRUE?

20        MS. AGUIAR:  OBJECTION.  ASKED AND ANSWERED;               01:08

21   MISCHARACTERIZES HIS TESTIMONY.

22        THE COURT:  SUSTAINED.

23   BY MR. ZELLER:

24   Q    WELL, OTHER THAN CARTER BRYANT, HAS ANYONE ELSE OR ANY

25   COMPANY EVER PAID ANY OF YOUR ATTORNEY'S FEES?                  01:08
```

```
 1   A     I DON'T KNOW.

 2   Q     DO YOU KNOW IF CARTER BRYANT PASSES THOSE PAYMENTS FOR

 3   YOUR ATTORNEY'S FEES ON TO MGA?

 4   A     NO.

 5   Q     YOU DON'T KNOW ONE WAY OR THE OTHER?                        01:08

 6   A     I DON'T KNOW.

 7   Q     I COULDN'T HEAR THAT.

 8   A     I DON'T KNOW.

 9   Q     NOW, YOU HAVE MET ON MORE THAN ONE OCCASION WITH MGA'S

10   ATTORNEYS; IS THAT CORRECT?                                      01:09

11   A     CORRECT.

12   Q     IN FACT, THE WEEKEND BEFORE LAST, YOU AND VERONICA MARLOW

13   MET WITH MR. NOLAN AT SKADDEN'S OFFICES; IS THAT TRUE?

14   A     YES.

15   Q     AND YOU MET WITH HIM FOR TWO TO TWO AND A HALF HOURS; IS   01:09

16   THAT RIGHT?

17   A     NO.

18   Q     YOU DID SAY IN YOUR DEPOSITION THAT IT WAS THAT LONG,

19   DIDN'T YOU?

20   A     THAT WAS A MISTAKE; I CORRECTED THAT.                      01:09

21   Q     SO YOU CHANGED YOUR TESTIMONY.

22   A     I WAS MISTAKEN.

23   Q     WELL, LET'S TAKE A LOOK AT YOUR DEPOSITION TRANSCRIPT.

24         IF YOU COULD PLEASE LOOK AT VOLUME II, STARTING AT

25   PAGE 442, STARTING AT LINE 2.                                    01:09
```

```
 1              DO YOU HAVE THAT BEFORE YOU?

 2   A    YES.

 3          MR. ZELLER:  YOUR HONOR, I'D LIKE THE TRANSCRIPT FROM

 4   LINE 2 THROUGH 12 ON PAGE 442.

 5          THE COURT:  ANY OBJECTION?                              01:10

 6          MS. AGUIAR:  OBJECTION.  RELEVANCE.  AND

 7   SPECIFICALLY, THIS PART OF THE DEPOSITION WAS CORRECTED BY

 8   MR. MARLOW AFTER THE DEPOSITION.

 9          THE COURT:  COUNSEL?

10          MR. ZELLER:  WE GET TO COMMENT ON THAT HE CHANGED HIS   01:10

11   TESTIMONY WITHIN A MATTER OF -- THIS DEPOSITION WAS JUST TAKEN

12   A FEW DAYS AGO.

13          THE COURT:  VERY WELL.  I'LL LET BOTH IN, BOTH THE

14   ORIGINAL AND THE CORRECTED.  I THINK IT'S MORE THAN FAIR THAT

15   THEY BOTH BE READ AT THE SAME TIME.                           01:10

16          DO YOU HAVE BOTH, COUNSEL?  THE ORIGINAL AND THE

17   CORRECTED?

18          MR. ZELLER:  I DO.  MR. NOLAN HAS HANDED ME THE

19   CORRECTED.  I DO HAVE THE ORIGINAL.

20          THE COURT:  LET'S READ BOTH.                           01:11

21          MR. ZELLER:  SO I GUESS, THEN, YOUR HONOR, I WOULD

22   ASK THAT I BE ABLE TO START AT LINE 2 THROUGH LINE 12 ON

23   PAGE 442, AND THEN SUBJECT TO READING THE ERRATA.

24   BY MR. ZELLER:

25   Q    SO DIRECTING YOUR ATTENTION, THEN, TO YOUR TESTIMONY HERE, 01:11
```

```
 1   WHICH, BY THE WAY, I THINK WAS JUST LAST WEEK; RIGHT?

 2   A    RIGHT.

 3   Q    A FEW DAYS AGO.

 4        AND YOU TALK ABOUT THIS MEETING THAT YOU HAD WITH

 5   MR. NOLAN, LIKE, LITERALLY TWO DAYS BEFORE YOU HAD YOUR          01:11

 6   DEPOSITION LAST TAKEN; RIGHT?

 7   A    RIGHT.

 8   Q    SO THAT WAS ON, LIKE, THE SATURDAY BEFORE THE MONDAY.

 9   A    RIGHT.

10   Q    AND YOU WERE ASKED THESE QUESTIONS:                        01:11

11        QUESTION:  "GOING BACK TO THIS MEETING THAT YOU HAD

12   TWO DAYS AGO WITH MR. NOLAN, THE LEAD LAWYER FOR MGA -- DO YOU

13   HAVE THAT IN MIND?"

14        ANSWER:  "YES."

15        QUESTION:  "WHY DID YOU GO TO HIS OFFICES?"                01:12

16        ANSWER:  "WE WERE INVITED.  I THINK WE -- HE WANTED

17   MOSTLY TO GET TO KNOW MY WIFE; DISCUSS SCHEDULING FOR THE COURT

18   APPEARANCES."

19        QUESTION:  "AND HOW LONG, AGAIN, DID YOU MEET WITH

20   MR. NOLAN FOR ON SATURDAY?"                                     01:12

21        ANSWER:  "TWO TO TWO AND A HALF HOURS."

22   BY MR. ZELLER:

23   Q    AND THOSE WERE THE QUESTIONS YOU WERE ASKED AND THE

24   ANSWERS YOU GAVE JUST A FEW DAYS AGO; RIGHT?

25   A    RIGHT.                                                     01:12
```

```
 1   Q    AND THEN AFTER YOU RECEIVED THE TRANSCRIPT, YOU MADE

 2   CHANGES TO THE TRANSCRIPT; CORRECT?

 3   A    CORRECT.

 4   Q    AND IN BETWEEN THE TIME THAT YOU RECEIVED THIS TRANSCRIPT

 5   AND YOU SAW THIS TESTIMONY AND THE TIME THAT YOU MADE THE          01:12

 6   CHANGES TO THE TRANSCRIPT, YOU TALKED TO YOUR LAWYERS; RIGHT?

 7   A    YES.

 8   Q    SO THE CHANGE THAT YOU MADE, ACCORDING TO THE ERRATA

 9   SHEET, SAYS, "THE SENTENCE THAT READS TWO TO TWO AND A HALF

10   HOURS SHOULD BE MODIFIED TO READ, QUOTE, THE MEETING WITH          01:13

11   MR. MCFARLAND, MR. GOLDSOBEL, AND MR. DOWELL LASTED FOR TWO TO

12   TWO AND A HALF HOURS; BUT MR. NOLAN WAS ONLY IN ATTENDANCE AT

13   THAT MEETING FOR APPROXIMATELY 45 MINUTES TO ONE HOUR," END

14   QUOTE.

15        DO YOU SEE THAT?                                             01:13

16   A    YES.

17   Q    THAT WAS THE CHANGE YOU MADE IN YOUR TESTIMONY AFTER

18   TALKING TO YOUR LAWYER; RIGHT?

19   A    YES.

20        MR. GOLDSOBEL:  OBJECTION.  PRIVILEGE.                       01:13

21        THE COURT:  I BELIEVE IT'S BEEN WAIVED.  IT'S IN THE

22   DEPOSITION TRANSCRIPT.

23        IS THAT CORRECT, COUNSEL?  IS IT IN THE DEPOSITION

24   TRANSCRIPT?

25        MS. AGUIAR:  YES.                                            01:13
```

```
 1              MR. NOLAN:  THE ERRATA SHEET IS PART OF THE

 2    TRANSCRIPT.

 3              THE COURT:  IT'S OVERRULED.

 4    BY MR. ZELLER:

 5    Q    ALSO, YOUR LAWYER CLAIMED, AS RECENTLY AS THIS DEPOSITION    01:13

 6    YOU JUST HAD, THAT YOU AND MGA HAD SOMETHING THAT WAS CALLED A

 7    JOINT DEFENSE.

 8              DO YOU REMEMBER THAT?

 9              MS. AGUIAR:  OBJECTION.  RELEVANCE; CALLS FOR A LEGAL

10    CONCLUSION.                                                      01:14

11              MR. ZELLER:  CREDIBILITY, YOUR HONOR.

12              THE COURT:  I KNOW.

13              OVERRULED.

14              WATCH THE SUBJECT MATTER, COUNSEL.

15              MR. ZELLER:  I CAN SHARPEN IT UP, YOUR HONOR.          01:14

16    BY MR. ZELLER:

17    Q    DURING THE COURSE OF YOUR DEPOSITION, DO YOU RECALL THAT

18    YOUR LAWYER FROM TIME TO TIME OBJECTED AND SAID, 'MR. MARLOW,

19    DON'T ANSWER THOSE QUESTIONS BECAUSE YOU HAVE SOMETHING CALLED

20    A JOINT DEFENSE.'                                                01:14

21              DO YOU REMEMBER THOSE WORDS BEING USED?

22    A    YES.

23    Q    AND YOU UNDERSTOOD THAT MEANT YOUR LAWYER WAS SAYING THAT

24    YOU AND MGA HAVE SIMILAR INTERESTS; IS THAT RIGHT?

25    A    I DON'T UNDERSTAND IT.                                      01:14
```

1   Q    WELL, YOU HAD NO UNDERSTANDING OF WHAT A JOINT DEFENSE IS

2   BETWEEN YOU AND MGA?

3          **MS. AGUIAR:**  OBJECTION.  RELEVANCE.  AND IT WAS

4   WITHDRAWN.

5          **THE COURT:**  WAS IT WITHDRAWN, COUNSEL?                      01:15

6          **MR. GOLDSOBEL:**  YES.

7          **MR. ZELLER:**  THIS IS, AGAIN, CREDIBILITY.  IT TIES TO

8   MGA.

9          **THE COURT:**  WAS THE OBJECTION WITHDRAWN?

10         **MR. GOLDSOBEL:**  YES, YOUR HONOR, IT WAS WITHDRAWN.         01:15

11         **THE COURT:**  LET'S MOVE ALONG.

12  **BY MR. ZELLER:**

13  Q    AND BY THE WAY, THAT MEETING THAT YOU HAD WITH MR. NOLAN

14  JUST THIS WEEKEND BEFORE LAST, HE TOLD YOU TO KEEP THOSE

15  DISCUSSIONS CONFIDENTIAL, DIDN'T HE?                                 01:15

16  A    YES.

17  Q    YOU AND VERONICA MARLOW HAD, APPROXIMATELY, A SEVEN-YEAR

18  BUSINESS RELATIONSHIP WITH CARTER BRYANT; IS THAT TRUE?

19  A    YES.

20  Q    AND YOU AND VERONICA MARLOW HAVE RECEIVED MILLIONS OF          01:15

21  DOLLARS FROM MGA AND CARTER BRYANT OVER THE YEARS; IS THAT

22  TRUE?

23  A    YES.

24  Q    IN FACT, YOU'VE RECEIVED AT LEAST $2 TO $3 MILLION; IS

25  THAT TRUE?                                                          01:15

```
 1   A     YES.

 2   Q     YOU AND YOUR WIFE LAST RECEIVED A PAYMENT FOR BRATZ AS

 3   RECENTLY AS THREE OR FOUR MONTHS AGO.

 4   A     A LITTLE LONGER.  I THINK ABOUT FOUR OR FIVE MONTHS AGO.

 5   Q     AND YOU CERTAINLY HOPE YOU'LL GET MORE MONEY FROM THEM IN   01:16

 6   THE FUTURE; IS THAT RIGHT?

 7         MS. AGUIAR:  OBJECTION.  VAGUE AND AMBIGUOUS AS TO

 8   WHO WAS MAKING THOSE PAYMENTS.

 9         THE COURT:  SUSTAINED.

10   BY MR. ZELLER:                                                   01:16

11   Q     DO YOU HAVE AN EXPECTATION THAT YOU'LL RECEIVE MONEY IN

12   THE FUTURE FROM THEM?

13         MS. AGUIAR:  OBJECTION.  SAME OBJECTIONS.

14         THE COURT:  FROM WHO, COUNSEL?  IT'S NOT CLEAR.

15         SUSTAINED.                                                 01:16

16   BY MR. ZELLER:

17   Q     ISN'T IT TRUE THAT DURING THE TIME THAT YOU AND

18   VERONICA MARLOW HAVE PROVIDED SERVICES TO MGA, YOU'VE DONE THAT

19   UNDER THE DIRECTION OF MGA AND CARTER BRYANT?

20         MS. AGUIAR:  OBJECTION.  FOUNDATION; ASSUMES FACTS         01:16

21   NOT IN EVIDENCE.

22         THE COURT:  LAY A FOUNDATION, COUNSEL.

23   BY MR. ZELLER:

24   Q     I TAKE IT THAT YOU HAVE PERSONALLY BEEN INVOLVED IN

25   COMMUNICATIONS WITH CARTER BRYANT AND MGA INSOFAR AS THEY        01:17
```

1   PERTAIN TO WORK PERFORMED ON THE BRATZ PROJECT GOING BACK TO

2   2000; RIGHT?

3   A    CORRECT.

4   Q    YOU HAVE PERSONAL KNOWLEDGE AS TO WHERE THOSE DIRECTIONS

5   AND INSTRUCTIONS HAVE COME FROM; RIGHT?                          01:17

6   A    SOMETIMES.

7   Q    AND THE ONES THAT YOU'RE AWARE OF, THOSE DIRECTIONS AND

8   INSTRUCTIONS AS TO WHAT WORK TO DO, WHAT SERVICES TO PERFORM,

9   THOSE HAVE COME FROM MGA AND CARTER BRYANT; IS THAT TRUE?

10  A    YES.                                                        01:17

11  Q    AND CARTER BRYANT AND MGA HAVE HAD THE POWER TO APPROVE OR

12  DISAPPROVE THE WORK THAT YOU AND YOUR WIFE HAVE DONE ON BRATZ;

13  IS THAT TRUE?

14  A    YES.

15  Q    AND YOU AND VERONICA MARLOW HAVE, FROM TIME TO TIME, HELD   01:17

16  YOURSELVES OUT AS ACTING FOR MGA; IS THAT RIGHT?

17            **MS. AGUIAR:**  OBJECTION.  VAGUE; LACK OF FOUNDATION.

18            **THE COURT:**  EXPLAIN YOUR TERM, COUNSEL.

19  **BY MR. ZELLER:**

20  Q    HAVE YOU EVER TOLD ANYONE, OR HAS YOUR WIFE, TO YOUR        01:18

21  KNOWLEDGE, EVER TOLD ANYONE, THAT YOU AND SHE WERE WORKING OR

22  ACTING ON MGA'S BEHALF; IN OTHER WORDS, DOING SOMETHING FOR

23  MGA?

24  A    NO.

25  Q    THAT'S NEVER HAPPENED?                                      01:18

```
1    A    NO.

2    Q    WERE THERE INSTANCES IN WHICH YOUR WIFE TOLD THOSE MATTEL

3    EMPLOYEES WHO WERE SECRETLY WORKING ON BRATZ WHILE MATTEL

4    EMPLOYEES THAT YOU COULD GET THEM JOBS AT MGA?

5    A    NO.                                                          01:18

6    Q    YOU NEVER SAID THAT?

7    A    NO.

8              MR. ZELLER:  YOUR HONOR, THIS SOMEWHAT GOES BACK TO

9    THE SIDE-BAR.  I THINK THIS NOW BECOMES IMPEACHMENT.

10             THE COURT:  LET'S TAKE A BREAK AT THIS POINT,          01:18

11   COUNSEL.

12             MR. ZELLER:  THANK YOU.

13             (WHEREUPON, JURORS DEPART COURTROOM.)

14             THE COURT:  COUNSEL, BRIEFLY ON THIS MATTER.

15             MR. ZELLER:  YES, YOUR HONOR.                          01:20

16             I DON'T KNOW IF MR. MARLOW IS STILL IN THE COURTROOM.

17             THE COURT:  NO, HE'S NOT.

18             YOU MAY PROCEED.

19             MR. ZELLER:  THE POINT THAT I AM ATTEMPTING TO

20   ESTABLISH IS, OF COURSE, AGENCY, AND THEIR WORK AND THEIR       01:20

21   RELATIONSHIP WITH MGA.  IT GOES TO BIAS.  IT ALSO GOES TO

22   WHETHER OR NOT THEIR KNOWLEDGE CAN BE IMPUTED.

23             THE COURT:  I UNDERSTAND.

24             MR. ZELLER:  SO THE PARTICULAR QUESTION I'M NOW

25   ASKING MR. MARLOW IS, DID YOU EVER SAY TO ANYONE 'YOU CAN DO    01:20
```

1   THINGS FOR MGA, OR ON BEHALF OF IT'?  THERE'S EVIDENCE THAT

2   THEY SPECIFICALLY DID THAT IN CONNECTION WITH OFFERING JOBS TO

3   THOSE MATTEL EMPLOYEES.

4           **THE COURT:**  LAY A FOUNDATION TO IMPEACH THIS.

5           WHY ARE YOU STOPPING WITH THIS AT THIS POINT?                01:20

6   THERE'S NO OBJECTION PENDING, I DON'T THINK, TO YOUR LAST

7   QUESTION.

8           **MR. ZELLER:**  BECAUSE IT GETS US INTO THE 2005 E-MAIL;

9   THAT'S WHY.

10          THE TESTIMONY THAT HE GAVE AT DEPOSITION TIED IT UP          01:20

11  INTO THE 2005 E-MAIL.  AND THAT'S WHY I DIDN'T WANT TO RAISE IT

12  WITHOUT RAISING IT WITH THE COURT FIRST.

13          **THE COURT:**  I SEE.

14          **MR. ZELLER:**  BECAUSE HIS DEPOSITION TESTIMONY DOES

15  SAY THAT, YES, IN EFFECT, THIS IS REFLECTED IN THE 2005 E-MAIL.    01:21

16          **THE COURT:**  REFER ME TO THE DEPOSITION TESTIMONY.

17          **MR. ZELLER:**  YES, YOUR HONOR.

18          ONE REFERENCE IS PAGE 259, WHICH, I BELIEVE, IS

19  VOLUME I.  THIS BEGINS AT LINE 13.  AND THE FULL TESTIMONIAL,

20  ALTHOUGH I WOULDN'T USED ALL OF THIS, GOES ALL OF THE WAY DOWN     01:21

21  TO APPROXIMATELY THE BOTTOM OF PAGE 260, REALLY, LINE 23.

22          **THE COURT:**  WHAT DID YOU ASK HIM?

23          **MR. ZELLER:**  I ASKED HIM -- THE MORE GENERAL

24  QUESTION, WHICH I WAS HOPING WOULD SHORT-CIRCUIT THIS, IS, DID

25  YOU EVER HOLD YOURSELVES OUT AS REALLY HAVING ANY AUTHORITY FOR    01:22

1    MGA?

2              AND THEN HE DENIED THAT.

3              I GOT MORE PARTICULAR, AND I BASICALLY SAID, WELL,

4    DIDN'T YOU SAY TO THESE MATTEL EMPLOYEES THAT YOU COULD GET

5    THEM JOBS AT MGA, OR SUGGEST TO THEM THAT YOU COULD GET THEM        01:22

6    JOBS?

7              **THE COURT:**  BUT THE E-MAIL DOESN'T PROVE THAT,

8    COUNSEL.  THE E-MAIL IS DIRECTED TOWARDS MGA.  IT DOESN'T PROVE

9    IT.

10             **MR. ZELLER:**  WELL, HIS ANSWER TO THIS QUESTION IS --     01:22

11   HE'S SAYING IT'S ALSO REFLECTED IN THAT E-MAIL, BUT HE'S

12   INDEPENDENTLY SAYING THAT THAT'S THE CASE.

13             HE SAYS HERE, IN RESPONSE TO THE QUESTION, "DID

14   VERONICA MARLOW MAKE ANY SUGGESTION TO ANY MATTEL EMPLOYEE IN

15   2004 THAT THEY MIGHT BE ABLE TO GAIN EMPLOYMENT AT MGA?"            01:23

16             ANSWER:  "IT'S POSSIBLE.  I DON'T HAVE -- IT SOUNDS

17   RIGHT."

18             QUESTION:  "IT SOUNDS RIGHT ABOUT THAT -- OR WHAT

19   SOUNDS RIGHT TO YOU ABOUT THAT?"

20             THEN THERE'S AN OBJECTION.                                01:23

21             ANSWER:  "WELL, I RECALL, YES."

22             QUESTION:  "WHAT DO YOU RECALL?"

23             AND THEN HE STARTS GIVING THE RECOLLECTION, BASED ON

24   THAT E-MAIL.

25             **THE COURT:**  RIGHT.  I UNDERSTAND THAT.                  01:23

1          BUT THE E-MAIL ITSELF AND THIS ANSWER DOESN'T

2     INDICATE THAT -- I SEE YOUR ARGUMENT.  I DON'T KNOW WHY THAT

3     E-MAIL IS CAUSING HIM TO RECALL THAT.  THERE'S NOTHING ABOUT

4     THE E-MAIL WHICH SUGGESTS THAT THEY'RE GOING TO BE HIRED FOR

5     MGA.                                                          01:23

6          IT'S JUST NOT THERE, COUNSEL.

7          MR. ZELLER:  WHAT THE E-MAIL SAYS, YOUR HONOR, IS --

8     THE E-MAIL DOES REFLECT THE FACT THAT SIX MONTHS BEFORE IT, THE

9     MARLOWS HAD MADE EFFORTS TO HIRE THOSE EMPLOYEES TO WORK APART

10    FROM MATTEL.                                                  01:24

11         THE COURT:  THAT'S RIGHT.

12         NOT NECESSARILY FOR MGA.  JUST FOR THEM.

13         MR. ZELLER:  I THINK HIS TESTIMONY IS --

14         THE COURT:  YOU CAN USE THIS -- I MEAN, OBVIOUSLY,

15    THIS REFRESHED HIS RECOLLECTION.  YOU CAN USE THE HAM SANDWICH, 01:24

16    AS MR. PRICE POINTED OUT, TO REFRESH RECOLLECTION, AND HE'S

17    CORRECT ON THAT.

18         YOU CAN HAVE HIM READ THIS, BUT THIS IS NOT COMING IN

19    BEFORE THE JURY RIGHT NOW.

20         MR. ZELLER:  YES, YOUR HONOR.  THANK YOU.               01:24

21         MR. GOLDSOBEL:  COULD I BE HEARD FOR ONE MINUTE?

22         IT'S NOW 4:15.  AND I UNDERSTOOD THAT COUNSEL HAD

23    15 MINUTES OF EXAMINATION.  I DON'T KNOW WHERE THIS EXAMINATION

24    IS GOING, BUT THIS IS OUR THIRD DAY BACK.

25         YOUR HONOR PROMISED THAT THIS WOULD BE MR. MARLOW'S     01:24

```
 1   LAST DAY HERE.
 2            THE COURT:  IT WILL BE.
 3            MR. GOLDSOBEL:  AND I'M VERY CONCERNED ABOUT THE
 4   TIMING.
 5            THE COURT:  I APPRECIATE THAT.                        01:25
 6            MR. ZELLER, HOW MUCH LONGER DO YOU HAVE WITH THIS
 7   WITNESS?
 8            MR. ZELLER:  I BELIEVE THIS IS THE LAST SUBJECT.
 9   WHENEVER I GET THROUGH THAT QUESTION, THAT IS LITERALLY THE
10   LAST QUESTION I HAVE FOR MR. MARLOW.                          01:25
11            THE COURT:  VERY WELL.  THANK YOU, COUNSEL.
12            COURT IS IN RECESS.
13            (WHEREUPON, A BRIEF RECESS WAS HELD.)
14            (WHEREUPON, JURORS ENTER COURTROOM.)
15   BY MR. ZELLER:                                               01:44
16   Q    MR. MARLOW, IF YOU COULD LOOK AT VOLUME I OF YOUR
17   DEPOSITION; AND IN PARTICULAR, TAKE A LOOK AT PAGE 259,
18   STARTING AT LINE 13.
19            DO YOU HAVE THAT IN FRONT OF YOU?
20   A    YES.                                                    01:44
21   Q    PLEASE JUST READ TO YOURSELF, NOT ALOUD, ON TO PAGE 260,
22   DOWN TO LINE 23.
23   A    ALL RIGHT.
24   Q    YOU'VE HAD A CHANCE TO READ THAT?
25   A    YES.                                                    01:45
```

```
 1   Q    DOES THAT REFRESH YOUR RECOLLECTION THAT VERONICA MARLOW

 2   SUGGESTED TO THESE MATTEL EMPLOYEES WHO WERE SECRETLY WORKING

 3   ON BRATZ WHILE MATTEL EMPLOYEES THAT THEY MIGHT BE ABLE TO GET

 4   JOBS AT MGA?

 5   A    THAT THEY MIGHT BE ABLE TO GET JOBS WITH HER AT MGA.        01:45

 6   Q    AND THAT REFRESHES YOUR RECOLLECTION THAT THAT HAPPENED;

 7   IS THAT RIGHT?

 8   A    NO.

 9        MS. AGUIAR:  OBJECTION.  VAGUE.

10   BY MR. ZELLER:                                                   01:45

11   Q    IN OTHER WORDS, THAT SHE DID --

12        THE COURT:  WAIT A SECOND.

13        MS. AGUIAR:  I HAD AN OBJECTION AS TO VAGUE.  WHEN HE

14   SAYS "THAT THAT HAPPENED," I DON'T KNOW WHAT "THAT" MEANS.

15        MR. ZELLER:  I'LL CLARIFY, YOUR HONOR.                      01:45

16        THE COURT:  VERY WELL.

17   BY MR. ZELLER:

18   Q    WHAT I WAS ASKING IS THAT THIS PASSAGE REFRESHES YOUR

19   RECOLLECTION THAT YOUR WIFE ACTUALLY DID MAKE THAT SUGGESTION;

20   IS THAT TRUE?                                                    01:46

21   A    WHAT SUGGESTION?

22   Q    THE SUGGESTION THAT THESE MATTEL EMPLOYEES COULD GET WORK

23   AT MGA.

24   A    I DON'T RECALL ANY SUCH SUGGESTION.

25   Q    WELL, DIDN'T YOUR WIFE SUGGEST AT SOME POINT THAT THESE     01:46
```

1    MATTEL EMPLOYEES WHO WERE SECRETLY WORKING ON BRATZ COULD LEAVE

2    THEIR JOBS AT MATTEL AND WORK FOR MGA?

3    A    I DIDN'T HEAR ANY SUCH CONVERSATIONS.  I WASN'T AWARE OF

4    ANY SUCH CONVERSATIONS.

5    Q    NOW, VERONICA MARLOW IS THE ONE WHO BROUGHT                           01:46

6    PAULA TREANTAFELLES AND MGA TOGETHER WITH CARTER BRYANT;

7    CORRECT?

8    A    YES.

9    Q    AND VERONICA MARLOW IS THE ONE WHO BROUGHT ANA CABRERA TO

10   THE BRATZ PROJECT; IS THAT TRUE?                                          01:47

11   A    YES.

12   Q    AND SHE'S ALSO THE ONE WHO BROUGHT MARIA SALAZAR TO THE

13   BRATZ PROJECT; IS THAT CORRECT?

14   A    YES.

15        **MR. ZELLER:**  NOTHING FURTHER AT THIS TIME,                       01:47

16   YOUR HONOR.

17        **THE COURT:**  VERY GOOD.

18        CROSS-EXAMINATION, OR DIRECT EXAMINATION.

19                    **CROSS-EXAMINATION**

20   **BY MS. AGUIAR:**                                                        01:47

21   Q    GOOD AFTERNOON, MR. MARLOW.

22   A    GOOD AFTERNOON.

23   Q    LAUREN AGUIAR, COUNSEL FOR MGA.

24        MR. ZELLER ASKED YOU A NUMBER OF QUESTIONS THIS

25   AFTERNOON.  I'M NOT SURE HE ASKED YOU THIS ONE.                           01:47

```
 1          DID YOU EVER INFORM ANYONE AT MGA THAT YOUR WIFE

 2   EMPLOYED A SEAMSTRESS OR SEAMSTRESSES ON THE BRATZ PROJECT WHO

 3   WERE ALSO EMPLOYED AT MATTEL?

 4   A    NO.

 5   Q    TO YOUR KNOWLEDGE, DID YOUR WIFE EVER TELL ANYONE AT MGA    01:47

 6   THAT SEAMSTRESSES FROM MATTEL WERE MOONLIGHTING FOR YOUR WIFE,

 7   DOING SEAMSTRESS WORK?

 8   A    NO.

 9   Q    TO YOUR KNOWLEDGE, DOES ANYBODY AT MGA KNOW THAT YOUR WIFE

10   WAS USING MATTEL EMPLOYEES TO DO SEWING WORK ON BRATZ?          01:48

11   A    NO.

12   Q    WHAT IS THE BASIS FOR YOUR STATEMENT THAT YOU BELIEVE THAT

13   NO ONE AT MGA KNEW THAT?

14   A    BECAUSE I NEVER TOLD THEM AND MY WIFE NEVER TOLD THEM.

15   Q    DID YOU EVER TELL ISAAC LARIAN THAT YOU WERE EMPLOYING     01:48

16   SEAMSTRESSES WHO WERE MOONLIGHTING FROM MATTEL?

17   A    NO.

18   Q    DID YOU EVER HAVE A BUSINESS MEETING OF ANY SORT WITH

19   MR. LARIAN?

20   A    NO.                                                        01:48

21   Q    DID YOU EVER TELL PAULA GARCIA THAT YOU OR YOUR WIFE WERE

22   EMPLOYING SEAMSTRESSES WHO WERE MOONLIGHTING FROM MATTEL?

23   A    NO.

24   Q    IF I ASKED YOU THE SAME QUESTION AS TO CARTER BRYANT, WHAT

25   WOULD YOUR ANSWER BE?                                           01:49
```

```
1   A    WE NEVER TOLD CARTER BRYANT.

2   Q    I WANT TO TAKE A LOOK AT AN EXHIBIT THAT MR. ZELLER SHOWED

3   YOU EARLIER.  I BELIEVE IT WAS 606.

4        I BELIEVE YOU TESTIFIED THIS IS AN INVOICE THAT YOU

5   RECOGNIZE AS BEING ONE THAT WAS SENT TO MGA FOR THE WORK ON        01:49

6   BRATZ; IS THAT RIGHT?

7   A    CORRECT.

8   Q    HOW DID YOU DESCRIBE ON THESE INVOICES THE WORK THAT WAS

9   BEING DONE BY THE SEAMSTRESSES?

10  A    I DESCRIBED IT AS THIRD-PARTY SEWING AND PATTERN-MAKING       01:49

11  SUPPORT.

12  Q    SO LOOKING AT THIS INVOICE THAT WAS SENT TO MGA, DID YOU

13  EVER IDENTIFY THE NAMES OF THE SEAMSTRESSES THAT WERE WORKING

14  FOR YOU?

15  A    NO.                                                          01:50

16  Q    ARE YOU AWARE OF ANY DOCUMENT THAT YOU OR YOUR WIFE EVER

17  PROVIDED TO MGA THAT REVEALED THE IDENTITY OF THE SEAMSTRESSES

18  THAT WERE WORKING FOR YOU?

19  A    WE DID NOT.

20  Q    DID YOU EVER SPECIFICALLY INFORM MGA THAT A WOMAN NAMED       01:50

21  ANA ISABEL CABRERA WAS WORKING FOR YOU MOONLIGHTING FROM

22  MATTEL?

23  A    NO.

24  Q    DID YOU EVER INFORM MGA THAT A WOMAN NAMED BEATRIZ MORALES

25  WAS WORKING FOR YOU MOONLIGHTING FROM MATTEL?                     01:50
```

```
 1   A    NO.

 2   Q    AND WHAT ABOUT MS. SALAZAR?  WOULD YOUR ANSWER BE THE

 3   SAME?

 4   A    WE DID NOT.

 5   Q    I'D LIKE TO TAKE A LOOK AT EXHIBIT 5723.  IF YOU'LL        01:50

 6   RECALL, I BELIEVE YOU TESTIFIED THAT THIS WAS ESSENTIALLY A

 7   TIME SHEET.

 8          I'LL WAIT FOR YOU TO GET THAT.

 9   A    I HAVE IT.

10   Q    YOU DESCRIBED IT AS A TIME SHEET, WHERE MS. SALAZAR WOULD  01:51

11   RECORD THE HOURS THAT SHE WORKED FOR YOUR WIFE.

12   A    CORRECT.

13   Q    TO YOUR KNOWLEDGE, WAS THIS TIME SHEET PROVIDED TO MGA?

14   A    IT WAS NOT.

15   Q    WERE ANY OF THE BACKUP TIME SHEETS EVER PROVIDED TO MGA,   01:51

16   TO YOUR KNOWLEDGE?

17   A    THEY WERE NOT.

18   Q    WHERE WAS THE WORK PERFORMED THAT THE SEAMSTRESSES DID FOR

19   YOUR WIFE?

20   A    IN THE GARAGES OF THE SEAMSTRESSES.                        01:51

21   Q    I TAKE IT, THEN, THAT THE WORK WAS NOT PERFORMED AT

22   MATTEL?

23   A    IT WAS NOT.

24          MR. ZELLER:  OBJECTION.  LACKS FOUNDATION.

25          THE COURT:  SUSTAINED.                                   01:52
```

```
 1    BY MS. AGUIAR:

 2    Q    WAS THE WORK PERFORMED AT MATTEL?

 3    A    IT WAS NOT.

 4            MR. ZELLER:  SAME OBJECTION.

 5            THE COURT:  SUSTAINED.                          01:52

 6            LAY A FOUNDATION HOW HE WOULD KNOW.

 7    BY MS. AGUIAR:

 8    Q    DO YOU KNOW WHERE THE GARAGES WERE THAT THESE WOMEN DID

 9    THE WORK IN?

10    A    THE GARAGES WERE AT THEIR HOMES.                  01:52

11    Q    AND I TAKE IT THOSE GARAGES AND THEIR HOMES WERE NOT

12    INSIDE THE MATTEL DESIGN CENTER; IS THAT RIGHT?

13    A    THAT'S CORRECT.

14    Q    WHEN WAS THIS WORK PERFORMED, TEMPORALLY?  DURING THE DAY?

15    NIGHTS?                                                01:52

16    A    IN THE EVENINGS AND ON WEEKENDS.

17    Q    IN 2000, DID MS. SALAZAR OR MS. CABRERA KNOW THAT THEY

18    WERE SEWING ON A PROJECT FOR MGA?

19    A    NO.

20            MR. ZELLER:  QUESTION LACKS FOUNDATION.        01:52

21            THE COURT:  SUSTAINED.

22            MR. ZELLER:  I ASK THAT THE ANSWER BE STRICKEN.

23            THE COURT:  THE ANSWER IS STRICKEN.

24    BY MS. AGUIAR:

25    Q    DID YOU EVER TELL MS. SALAZAR AND MS. CABRERA THAT THEY   01:52
```

```
 1   WERE SEWING ON A PROJECT FOR MGA?

 2   A    NO.

 3   Q    TO YOUR KNOWLEDGE, DID YOUR WIFE EVER TELL EITHER ONE OF

 4   THOSE WOMEN THAT THEY WERE SEWING ON A PROJECT FOR MGA?

 5   A    SHE DID NOT.                                          01:53

 6   Q    TO YOUR KNOWLEDGE, DID ANYONE EVER TELL THEM THAT THEY

 7   WERE WORKING ON A PROJECT FOR MGA IN 2000?

 8   A    NO.

 9   Q    WERE THEY EVEN AWARE THAT THEY WERE WORKING IN THE 2000

10   TIME PERIOD ON THE BRATZ PROJECT?                         01:53

11           MR. ZELLER:  FOUNDATION.

12           THE COURT:  SUSTAINED, AS PHRASED.

13   BY MS. AGUIAR:

14   Q    DID YOU EVER TELL MS. SALAZAR AND MS. CABRERA IN 2000 THAT

15   THEY WERE WORKING ON THE BRATZ PROJECT?                   01:53

16   A    NO.

17   Q    WAS YOUR WIFE AN INDEPENDENT CONTRACTOR, WORKING FOR MGA?

18   A    YES.

19   Q    DO YOU KNOW IF SHE DID WORK FOR ANY OTHER COMPANIES OTHER

20   THAN MGA?                                                 01:53

21   A    SHE DID.

22   Q    AND YOU MENTIONED THAT YOUR WIFE PREVIOUSLY WORKED FOR

23   MATTEL; IS THAT RIGHT?

24   A    YES.

25   Q    DID YOU KNOW AS A FORMER MATTEL EMPLOYEE WHETHER SHE WAS  01:54
```

```
 1   PROHIBITED FROM THEN DOING VENDOR WORK FOR OTHER TOY COMPANIES?

 2           MR. ZELLER:  QUESTION LACKS FOUNDATION.

 3           THE COURT:  THE QUESTION IS, DO YOU KNOW?  IT'S A YES

 4   OR NO QUESTION.

 5           THE WITNESS:  I DON'T KNOW.                              01:54

 6   BY MS. AGUIAR:

 7   Q    WERE YOU EVER AN EMPLOYEE OF MGA?

 8   A    NO.

 9   Q    IN THE 2000 TIME PERIOD, DID YOU DO ANY WORK ON THE BRATZ

10   PROJECT OTHER THAN PREPARING THE INVOICES THAT YOUR WIFE SENT    01:54

11   TO MGA?

12   A    NO.

13   Q    DO YOU HAVE ANY KNOWLEDGE REGARDING WHETHER CARTER BRYANT

14   PERFORMED ANY WORK RELATED TO THE BRATZ PROJECT IN SEPTEMBER,

15   LET'S SAY, OF 2000?                                             01:54

16   A    I DON'T KNOW.

17   Q    AND WHAT IF I ASKED YOU THE SAME QUESTION ABOUT WHETHER

18   CARTER BRYANT PERFORMED ANY WORK ON BRATZ IN OCTOBER OF 2000?

19   A    I DON'T KNOW.

20   Q    DID YOU EVER GO ON ANY SHOPPING TRIPS WITH YOUR WIFE OR     01:54

21   CARTER BRYANT REGARDING THE FASHIONS FOR BRATZ?

22   A    NO.

23   Q    THE INVOICE THAT WE PUT UP BEFORE, EXHIBIT 606, WHICH IS

24   FOR THE WORK THAT WAS PERFORMED IN OCTOBER, DO YOU RECALL THAT?

25   A    YES.                                                        01:55
```

1  Q    DID YOU PERSONALLY SUPERVISE OR PERFORM ANY OF THE WORK

2  LISTED ON THE INVOICE?

3  A    NO.

4  Q    DO YOU HAVE ANY PERSONAL KNOWLEDGE REGARDING THE AMOUNT OF

5  TIME, IF ANY, MR. BRYANT SPENT ON THE BRATZ PROJECT IN 2000?      01:55

6  A    NO.

7  Q    JUST A COUPLE OF BRIEF QUESTIONS ABOUT YOUR MEETING -- I

8  GUESS IT WAS A COUPLE OF SATURDAYS AGO -- THAT YOU TOLD

9  MR. ZELLER ABOUT, WITH MR. NOLAN.

10          DO YOU RECALL THAT?                                      01:55

11  A    YES.

12  Q    DID YOU DISCUSS AT THAT MEETING WITH MR. NOLAN ANYTHING

13  ABOUT YOUR TESTIMONY THAT YOU WERE GOING TO GIVE IN COURT?

14  A    I DID NOT.

15  Q    HAD YOU MET WITH MR. NOLAN AT ANY TIME PRIOR to THAT        01:55

16  MEETING?

17  A    NO.

18  Q    DID YOU MEET WITH HIM AT ANY TIME AFTER THAT MEETING?

19  A    NO.

20  Q    WHEN YOU CORRECTED YOUR DEPOSITION TRANSCRIPT TO            01:56

21  ACCURATELY STATE THAT THE PORTION OF THE MEETING THAT MR. NOLAN

22  ATTENDED WAS 45 MINUTES TO AN HOUR, DID YOU SPEAK WITH

23  MR. NOLAN PRIOR TO MAKING THAT CORRECTION?

24  A    NO.

25  Q    WAS YOUR CORRECTION THAT YOU MADE ACCURATE?                 01:56

3666

1    A    YES.

2    Q    DID YOU OR YOUR WIFE EVER RECEIVE MONEY FROM MGA FOR

3    ANYTHING OTHER THAN COMPENSATION FOR SERVICES THAT YOU HAD

4    PERFORMED FOR MGA?

5    A    NO.                                                          01:56

6              MS. AGUIAR:  NOTHING FURTHER.

7              THE COURT:  VERY WELL.

8              ANY FURTHER EXAMINATION BY MR. ZELLER?

9              MR. ZELLER:  YES, YOUR HONOR.  I WOULD ASK THAT I BE

10   ALLOWED TO GO INTO THOSE AREAS THAT WE HAD DISCUSSED            01:57

11   PREVIOUSLY.  THE QUESTIONS THAT WERE ASKED WERE 'EVER,'

12   'NEVER.'  THIS WAS WITHOUT LIMITATION AS TO THESE TIMES, AND I

13   THINK AT THIS POINT IT'S IMPEACHMENT AND CREDIBILITY.

14             THE COURT:  WITH RESPECT TO THE E-MAIL?

15             MR. ZELLER:  CORRECT, YOUR HONOR.  AS WELL AS THE     01:57

16   EMPLOYMENT.

17             THE COURT:  THE EMPLOYMENT, I COULD SEE THE DOOR

18   BEING OPEN FOR; BUT NOT THE E-MAIL, COUNSEL.

19             MR. ZELLER:  THE QUESTIONS WERE HABITUALLY 'EVER.'

20   THOSE WERE THE QUESTIONS THAT SHE ASKED TIME AND TIME AGAIN:    01:57

21   DID YOU 'EVER' INFORM MGA?  DID THEY 'EVER' KNOW?

22             THE COURT:  COUNSEL?

23             THE TIME FRAMES ARE OF AN OPEN BRACKET, BASED ON YOUR

24   QUESTIONS.

25             THE COURT STILL HAS A CONCERN ABOUT THE E-MAIL.       01:57

```
 1          MS. AGUIAR:  I DID TRY TO BE PRETTY CLEAR THAT WE
 2    WERE TALKING ABOUT THE 2000 TIME FRAME.  IF I SAID 'EVER,' I
 3    CERTAINLY DID NOT INTEND TO OPEN THE DOOR FOR THINGS THAT YOU
 4    PREVIOUSLY RULED WERE OUT OF BOUNDS.
 5          THE COURT:  THAT WASN'T THE COURT'S QUESTION.         01:58
 6          LET'S GO TO SIDE-BAR.
 7          (WHEREUPON, THE FOLLOWING PROCEEDINGS
 8          WERE HELD AT SIDE-BAR:)
 9          THE COURT:  I'M TRYING TO MOVE THINGS ALONG, BECAUSE
10    I AM MINDFUL THAT COUNSEL WANTS TO GET OUT OF HERE.         01:58
11          THERE'S NO QUESTION THAT YOU OPENED THE DOOR.  YOU
12    SAID "EVER" MULTIPLE TIMES.  I WROTE THE WORD "OPEN" DOWN AS
13    YOU WERE SAYING IT; SO THE TIME BRACKETS ARE OFF.
14          BUT I'M STILL HAVING TROUBLE with THIS E-MAIL,
15    BECAUSE I UNDERSTAND WHAT'S IN THAT DEPOSITION TRANSCRIPT.  I  01:58
16    JUST DON'T READ THAT E-MAIL AS TALKING ABOUT MATTEL.
17          MR. ZELLER:  HERE'S WHAT I WOULD PROPOSE, YOUR HONOR,
18    IS, THAT I BE ALLOWED TO ASK ABOUT THE 2003 EMPLOYMENT; THAT, I
19    THINK, IS QUITE RELEVANT.
20          WHAT I WOULD ALSO ASK IS AT LEAST SOME LATITUDE ON    01:59
21    THE E-MAIL.  AND HERE'S WHAT I WOULD SUGGEST SPECIFICALLY,
22    WHICH IS, THERE IS A REFERENCE IN THERE TO OVER 100 YEARS OF
23    DOLL-MAKING EXPERIENCE.  THAT'S WHAT I WOULD LIKE TO ASK HIM
24    ABOUT.  AND i would SAY, 'MR. MARLOW, WHAT OTHER COMPANY OTHER
25    THAN MATTEL HAS THIS?'                                      01:59
```

```
 1            THE COURT:  COUNSEL?

 2            MS. AGUIAR:  YOUR HONOR, I THINK THAT YOU RULED AS TO

 3   THAT E-MAIL A COUPLE OF DIFFERENT TIMES.  AND IT CAME IN

 4   INITIALLY, REDACTED, FOR ISAAC LARIAN'S CREDIBILITY.

 5            THE COURT:  I UNDERSTAND.  ON THIS VERY ISSUE,          01:59

 6   THOUGH --

 7            MS. AGUIAR:  MR. LARIAN SAID -- HIS TESTIMONY -- HE'S

 8   TRYING TO CREATE A FACT ISSUE WHERE THERE ISN'T ONE.

 9   MR. LARIAN SAID HE DIDN'T KNOW.

10            THE COURT:  THEY DON'T HAVE TO ACCEPT MR. LARIAN'S     01:59

11   TESTIMONY.

12            MS. AGUIAR:  WELL, NOW THIS WITNESS HAS SAID HE

13   DIDN'T TELL ANYONE.

14            THE COURT:  RIGHT.  BUT IT'S CONFLICTED.  THAT'S THE

15   WHOLE QUESTION IS 'DID HE TELL SOMEBODY?'  AND THEIR ARGUMENT   02:00

16   IS THAT E-MAIL DOES -- BOY, THAT DEPOSITION TRANSCRIPT, I

17   ALMOST FELL OUT OF MY SEAT WHEN I SAW IT.  THIS WITNESS IS THE

18   ONE THAT LINKED THAT E-MAIL IN THAT DEPOSITION TO A STATEMENT.

19            YOU'VE GOT TO LAY A FOUNDATION FOR IT.

20            DO YOU UNDERSTAND WHAT I MEAN BY THAT?                 02:00

21            MR. ZELLER:  I BELIEVE I DO.

22            THE COURT:  LAY A FOUNDATION WITH THIS WITNESS THAT

23   HE UNDERSTANDS THAT E-MAIL TO BE TALKING ABOUT MATTEL.  AND

24   YOU'VE GOT TO DO THAT WITHOUT EVER DISCLOSING THAT TO THE JURY

25   IN ADVANCE OF IT.                                              02:00
```

```
 1              I'LL BE LOOKING FOR FOUNDATIONAL OBJECTIONS.

 2              MR. ZELLER:  SO THE COURT KNOWS, WHAT I WOULD --

 3    MAYBE IF I START WITH THE EMPLOYMENT, BECAUSE THAT MAY BE

 4    THAT --

 5              THE COURT:  YOU CAN START WHEREVER YOU WANT.  I'M      02:00

 6    JUST SAYING, BEFORE YOU GET TO THAT E-MAIL --

 7              MR. ZELLER:  INTO THE 2005 ONE.

 8              THE COURT -- IT'S GOT TO BE THIS WITNESS'S

 9    UNDERSTANDING THAT THAT'S WHAT HE WAS COMMUNICATING TO MGA.

10              MR. ZELLER:  AND THIS, OF COURSE, GOES TO            02:00

11    CREDIBILITY.  SHE ASKED THOSE QUESTIONS.

12              THE COURT:  I UNDERSTAND WHAT IT GOES TO, COUNSEL.

13              MR. ZELLER:  THANK YOU.

14              (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

15              THE COURT:  YOU MAY PROCEED, COUNSEL.               02:01

16    BY MR. ZELLER:

17    Q    YOU SAID, IN RESPONSE TO MGA'S COUNSEL'S QUESTIONS, IN

18    VARIOUS WAYS, THAT NEITHER YOU NOR YOUR WIFE EVER TOLD OR EVER

19    INFORMED MGA, IN WORDS OR SUBSTANCE, THAT THESE OTHER MATTEL

20    EMPLOYEES WERE SECRETLY WORKING ON BRATZ WHILE MATTEL          02:01

21    EMPLOYEES; IS THAT CORRECT?

22    A    CORRECT.

23    Q    SO THE RECORD IS CLEAR HERE AS WELL, THERE WAS ACTUALLY A

24    THIRD MATTEL EMPLOYEE WHO WAS SECRETLY WORKING ON BRATZ WHILE A

25    MATTEL EMPLOYEE AND WORKING ON THE BRATZ CLOTHING; IS THAT      02:01
```

1    TRUE?

2    A    CORRECT.

3    Q    AND THAT WAS BEATRIZ MORALES?

4    A    CORRECT.

5    Q    SO WE HAVE THE TIME FRAMES CLEARLY IN MIND, MARIA SALAZAR,     02:02

6    WHILE A MATTEL EMPLOYEE, WORKED ON THE BRATZ CLOTHING FROM AT

7    LEAST THE 2000 AND 2001 TIME PERIOD; CORRECT?

8    A    CORRECT.

9    Q    ANA CABRERA DID THAT AS WELL, FROM THE 2000 TO 2005 TIME

10   PERIOD; IS THAT CORRECT?     02:02

11   A    CORRECT.

12   Q    AND BEATRIZ MORALES DID THAT FROM AT LEAST THE 2001

13   THROUGH THE 2005 TIME PERIOD; CORRECT?

14   A    CORRECT.

15   Q    SO THERE WERE AT LEAST ANOTHER THREE MATTEL EMPLOYEES WHO     02:02

16   WORKED FOR YEARS, SECRETLY, ON BRATZ AND WERE PAID BY YOU AND

17   YOUR WIFE AND REIMBURSED BY MGA TO WORK ON BRATZ; IS THAT TRUE?

18   A    CORRECT.

19   Q    IF I UNDERSTAND IT, THIS WENT ON FOR YEARS AND YEARS, WITH

20   ALL THREE OF THEM, WITHOUT ANY INKLING, ANY HINT, TO MGA AS TO     02:02

21   WHAT WAS GOING ON; IS THAT RIGHT?

22   A    CORRECT.

23   Q    NOW, ISN'T IT TRUE THAT MARIA SALAZAR, IN FACT, BECAME

24   EMPLOYED BY MGA BACK IN 2003?

25   A    CORRECT.     02:03

```
 1   Q    AND CERTAINLY, SHE KNEW THAT SHE HAD BEEN SECRETLY WORKING

 2   ON BRATZ WHILE A MATTEL EMPLOYEE; CORRECT?  SO SHE HAD TO HAVE

 3   KNOWN.

 4             MS. AGUIAR:  OBJECTION AS TO TIME FRAME, YOUR HONOR.

 5             THE COURT:  SUSTAINED.                                02:03

 6             REPHRASE YOUR QUESTION.  JUST CLARIFY AS TO THE TIME

 7   PERIOD IN QUESTION.

 8             MR. ZELLER:  YES, YOUR HONOR.

 9   BY MR. ZELLER:

10   Q    PRIOR TO THE TIME THAT MARIA SALAZAR ACTUALLY BEGAN AS AN  02:03

11   EMPLOYEE THERE AT MGA IN THE 2003 TIME PERIOD, OBVIOUSLY SHE

12   HAD ALREADY KNOWN SHE HAD BEEN SECRETLY WORKING ON BRATZ AS A

13   MATTEL EMPLOYEE FOR A COUPLE OF YEARS BEFORE THAT; RIGHT?

14             MS. AGUIAR:  OBJECTION.  MISSTATES THE TESTIMONY AND

15   INACCURATE TIME FRAME.                                         02:03

16             THE COURT:  REPHRASE, COUNSEL.

17   BY MR. ZELLER:

18   Q    MARIA SALAZAR, OF COURSE, BY YOUR UNDERSTANDING, KNEW WHAT

19   SHE HAD DONE ON BRATZ; THAT IS, SECRETLY WORK ON IT WHILE A

20   MATTEL EMPLOYEE; RIGHT?                                        02:04

21   A    CORRECT.

22   Q    AND SHE KNEW THAT PRIOR TO 2003; IS THAT TRUE?

23   A    CORRECT.

24   Q    AND SHE KNEW THAT, THEREFORE, WHEN SHE BEGAN AS AN

25   EMPLOYEE AT MGA.                                               02:04
```

```
 1   A    CORRECT.

 2   Q    SO CERTAINLY, SOMEBODY -- WHEN YOU TOLD US NO ONE AT MGA

 3   KNEW, AT LEAST MARIA SALAZAR, AN MGA EMPLOYEE FROM 2003 ON, SHE

 4   KNEW WHAT HAD HAPPENED; RIGHT?

 5   A    CORRECT.                                                     02:04

 6   Q    NOW, AS FAR AS YOU KNOW, MARIA SALAZAR, TO THIS DAY, IS AN

 7   MGA EMPLOYEE; IS THAT TRUE?

 8   A    I DON'T KNOW.

 9   Q    WELL, LAST YOU KNEW, SHE WAS AN MGA EMPLOYEE; RIGHT?

10   A    RIGHT.                                                       02:04

11   Q    DIRECTING YOUR ATTENTION TO EXHIBIT 10034.  I THINK IN

12   RESPONSE TO -- SOME OF THE QUESTIONS YOU WERE ASKED WERE

13   BASICALLY, 'DID MARIA SALAZAR EVER KNOW?  DID YOU EVER TELL HER

14   THAT SHE HAD WORKED ON BRATZ, THAT THE PRODUCT SHE WAS WORKING

15   ON WAS BRATZ WHILE SHE WAS A MATTEL EMPLOYEE?'                    02:05

16        MS. AGUIAR:  OBJECTION.  MISSTATES THE QUESTION AND

17   THE TESTIMONY.

18           THE COURT:  SUSTAINED.

19        MR. ZELLER:  I'LL REPHRASE IT, THEN.

20   BY MR. ZELLER:                                                    02:05

21   Q    IT'S TRUE, THEN, AT SOME POINT, MARIA SALAZAR BECAME AWARE

22   THAT THE PROJECT SHE WAS SECRETLY WORKING ON WHILE A MATTEL

23   EMPLOYEE WAS A MGA PROJECT CALLED "BRATZ"?

24   A    YES.

25   Q    AND ALSO ANA CABRERA LEARNED THAT AT SOME POINT; IS THAT     02:05
```

```
 1   TRUE?

 2   A    YES.

 3   Q    AND BEATRIZ MORALES LEARNED THAT AT SOME POINT AS WELL?

 4   A    YES.

 5   Q    ISN'T IT TRUE THAT YOU USED PHONY NAMES IN DOCUMENTS TO      02:05

 6   COVER UP THE FACT THAT THESE MATTEL EMPLOYEES WERE SECRETLY

 7   WORKING ON BRATZ WHILE MATTEL EMPLOYEES?

 8   A    IT WASN'T MY INTENT TO COVER ANYthing UP.

 9   Q    WHETHER YOU INTENDED TO OR NOT, THAT IS WHAT YOU DID; IS

10   THAT NOT TRUE?                                                   02:06

11   A    CORRECT.

12   Q    AND IN AT LEAST SOME OF THOSE DOCUMENTS THAT YOU

13   PROVIDED -- AND ALSO WHAT YOU DID IS, NOT ONLY USED PHONY NAMES

14   FOR PEOPLE IN THESE DOCUMENTS; YOU USED PHONY SOCIAL SECURITY

15   NUMBERS; CORRECT?                                                02:06

16   A    I WASN'T AWARE THAT THEY WERE PHONY.

17   Q    I'M SORRY?

18   A    I WASN'T AWARE OF THAT AT THE TIME.

19   Q    YOU CERTAINLY BECAME AWARE OF IT AT SOME POINT THAT THAT'S

20   WHAT YOU WERE DOING; RIGHT?                                      02:06

21   A    RIGHT.

22   Q    IN FACT, BACK IN 2003, YOU GOT A NOTICE FROM THE I.R.S.

23   TELLING YOU THAT THOSE SOCIAL SECURITY NUMBERS FOR THE WORK

24   THAT WAS BEING DONE AND THE PAYMENTS THAT WERE BEING MADE WERE

25   WRONG.                                                           02:06
```

```
 1   A    RIGHT.

 2   Q    SO YOU CERTAINLY HAD AN INKLING OR AN UNDERSTANDING BY

 3   THAT POINT THAT THE SOCIAL SECURITY NUMBERS THAT WERE BEING

 4   USED WERE PHONY.

 5            MS. AGUIAR:  OBJECTION.  RELEVANCE.                     02:06

 6            THE COURT:  OVERRULED.  THIS IS IMPEACHMENT.

 7            THE WITNESS:  THAT'S RIGHT.

 8   BY MR. ZELLER:

 9   Q    AND WHAT DID YOU DO ONCE YOU RECEIVED THAT NOTICE FROM THE

10   I.R.S. THAT THERE WAS SOMETHING WRONG WITH THOSE TAX DOCUMENTS   02:07

11   BECAUSE YOU WERE USING PHONY SOCIAL SECURITY NUMBERS TO COVER

12   UP THE FACT THAT THESE MATTEL EMPLOYEES WERE WORKING ON BRATZ

13   SECRETLY?

14   A    I ASKED THE MATTEL EMPLOYEES TO PLEASE GIVE ME CORRECT

15   SOCIAL SECURITY NUMBERS.                                        02:07

16   Q    WHEN DID YOU DO THAT, SIR?

17   A    AFTER RECEIVING THE NEXT NOTICE.

18   Q    YOU DID THAT RIGHT WITHIN THE LAST COUPLE OF WEEKS.

19   A    WELL, ACTUALLY, IT WAS IN 2005.

20   Q    SO YOU WAITED THREE YEARS?  TWO YEARS?                      02:07

21   A    THAT WAS THE TIME I RECEIVED THE NEXT NOTICE.

22   Q    SO DIRECTING YOUR ATTENTION, THEN, TO EXHIBIT 10034.

23   A    RIGHT.

24   Q    YOU RECOGNIZE THIS, GENERALLY SPEAKING, AS AN EMPLOYMENT

25   APPLICATION THAT MARIA SALAZAR FILLED OUT FOR MGA BACK IN THE    02:07
```

```
 1   2003 TIME PERIOD; IS THAT TRUE?
 2           MS. AGUIAR:  OBJECTION.  FOUNDATION.
 3           THE COURT:  ASK THE QUESTION, COUNSEL..
 4           MR. ZELLER:  LET ME TRY IT THIS WAY, YOUR HONOR:  THE
 5   DOCUMENT IS IN EVIDENCE.                                          02:08
 6           THE COURT:  RELEVANCY HAS BEEN ESTABLISHED.
 7           YOU MAY PUBLISH IT, COUNSEL.
 8           MR. ZELLER:  THANK YOU, YOUR HONOR.
 9           IF WE COULD SHOW, PLEASE, EXHIBIT 10034.
10           THE COURT:  I'M SOMEWHAT CONCERNED ABOUT THE TIME AT      02:08
11   THIS POINT.  I KNOW THIS WITNESS HAS BEEN WAITING NUMEROUS
12   DAYS, AND THE ATTORNEYS HAVE BEEN WAITING.  WE'RE AT THE 5:00
13   HOUR.
14           BEFORE I ASK THE JURY IF THEY WILL WAIT FOR A FEW
15   MORE MINUTES, HOW MUCH LONGER DO YOU ANTICIPATE THAT YOU HAVE?    02:08
16           MR. ZELLER:  I WOULD ANTICIPATE THAT IT IS PROBABLY
17   TEN MINUTES, YOUR HONOR.
18           THE COURT:  MEMBERS OF THE JURY, ARE YOU ABLE TO
19   WAIT?  Is ANYONE NOT ABLE TO WAIT?
20           YOU NEED TO LEAVE?                                        02:09
21           VERY GOOD.
22           WE'RE GOING TO HAVE TO RESUME WITH THIS ON JULY 1ST,
23   WHEN WE RESUME TESTIMONY.
24           YES, COUNSEL?
25           MR. GOLDSOBEL:  I'LL BE OUT OF TOWN, YOUR HONOR, ON A     02:09
```

3676

```
 1   VACATION.
 2           THE COURT:  LET ME SEE YOU AT SIDE-BAR.
 3           THE JURY IS EXCUSED.  THANK YOU.
 4           I'LL SEE YOU TUESDAY, JULY 1ST, AT 9:00 A.M. SHARP.
 5           (WHEREUPON, THE FOLLOWING PROCEEDINGS                  02:09
 6           WERE HELD AT SIDE-BAR:)
 7           MR. GOLDSOBEL:  I'M REPRESENTING HIM IN HIS
 8   TESTIMONY.
 9           I HAVE A PLANNED family VACATION; i'm LEAVING ON
10   THURSDAY and COMING BACK THE FOLLOWINg TUESDAY EVENING.       02:10
11           THE COURT:  THIS IS a SERIOUS problem, BECAUSE WE are
12   IN THE MIDDLE OF TESTIMONY.
13           COUNSEL, DO YOU HAVE AN OBJECTION TO WAITING UNTIL
14   COUNSEL returns to FINISH YOUR CROSS-EXAMINation?
15           MR. QUINN:  AND I GUESS, JUST FOR CLARIFICATION, WHEN  02:10
16   WOULD WE EXPECT THAT TO BE, YOUR HONOR?
17           THE COURT:  WHEN WOULD YOU BE BACK?
18           MR. GOLDSOBEL:  I NEED TO CHECK MY calendar.  I DON'T
19   THINK I HAVE ANY appearances --
20           THE COURT:  THIS WOULD TRUMP ANY appearance; THIS IS   02:10
21   A WITNESS ON LIVE TESTIMONY IN a FEDERAL COURTROOM.
22           MR. GOLDSOBEL:  I HAVE THIS PLANNED FAMILY vacation.
23           I'm coming back TUESDAY; i'm COMING BACK TUESDAY
24   EVENING.
25           THE COURT:  JULY 1ST?                                 02:10
```

1          **Mr. Goldsobel:**  YES.

2          **THE COURT:**  SO THIS WOULD BE tuesday, JULY 2nd.

3          **MR. ZELLER:**  I THINK THAT'S FINE, YOUR HONOR.

4          **THE COURT:**  I'M going TO hold you to YOUR TEN to

5    15-MINUTE ESTIMATE, BECAUSE I DON'T WANT THIS TO BE --          02:11

6          **MR. ZELLER:**  I UNDERSTAND.  I'M TRYING TO BE AS BRIEF

7    as POSSIBLE.

8          **THE COURT:**  I UNDERSTAND that THIS IS important to

9    both SIDES.  AND THEN OF COURSE COUNSEL HAS AN OPPORTUNITY -- I

10   DON'T WANT TO RUSH THE RECROSS OR REDIRECT, WHATEVER YOU call    02:11

11   IT.

12         I'LL order YOUR client to RETURN JULY 2nd, 9:00 A.M.

13   AND WE WILL call HIM FIRST OUT OF ORDER, BECAUSE THIS IS

14   SOMETHING WHICH HAS TO GO TO THE HEAD OF THE LINE.

15         **MR. GOLDSOBEL:**  Just to CONFIRM, JULY 2ND IS a          02:11

16   wednesday?

17         **THE COURT:**  YES june 30 is a MONDAY, JULY 2ND is a

18   WEDNESDAY; WE'LL RESUME AT THAT TIME AND DEFENSE WILL HAVE TO

19   CALL ANOTHER WITNESS ON TUESDAY MORNING.

20         **MR. ZELLER:**  AND I WOULD ASK YOUR HONOR THAT WHEN WE    02:11

21   RECONVENE NEXT THAT PERHAPS THE COURT JUST inform THE JURY THAT

22   MR. MARLOW WILL BE COMING BACK.

23         **THE COURT:**  I WILL.

24         IS THERE ANY OBJECTION FROM THE DEFENSE?

25         **MS. AGUIAR:**  NO.                                       02:11

1          **THE COURT:**  ALL RIGHT.  VERY GOOD.

2          (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

3          **THE COURT:**  WE'RE GOING TO TAKE A RECESS IN THIS

4    MATTER, ALTHOUGH THE COURT IS GOING TO RECALL -- I HAVE ANOTHER

5    MATTER THAT I'M WORKING ON THIS AFTERNOON THAT I NEED TO TAKE          02:12

6    UP AT THIS TIME.  SO I'LL JUST ASK COUNSEL TO STAND BACK AND

7    COUNSEL IN THE DUROVILLE MATTER TO COME FORWARD.

8          WE'LL TAKE A BRIEF RECESS BEFORE WE CALL DUROVILLE.

9          (Brief recess taken.)

10         **THE COURT:**  I REGRET THAT THE COURT HAS TO TAKE THESE         02:31

11   NEXT FEW DAYS OFF, BUT THAT'S THE WAY IT IS, UNFORTUNATELY.

12         WE WILL RESUME ON JULY 1ST.  THE COURT IS

13   ACCOMMODATING COUNSEL'S SCHEDULE, AND WE'LL RESUME WITH

14   MR. MARLOW ON JULY 2ND AT 9:00.  AS I INDICATED AT SIDE-BAR,

15   WHEREVER WE ARE AT THAT TIME, I THINK IT'S IMPORTANT THAT WE          02:31

16   TAKE MR. MARLOW AND BE DONE WITH THAT.

17         I THINK I'VE ALREADY INDICATED ON THE RECORD THAT

18   10034 IS ADMITTED.

19         I NEED AN OPPOSITION TO THIS MOTION THAT WAS FILED

20   TODAY BY MATTEL CONCERNING THE WAIVER ARGUMENT ON THE                 02:32

21   ATTORNEY-CLIENT PRIVILEGE.

22         LET ME ASK MGA HOW MUCH TIME THEY NEED TO RESPOND TO

23   THAT.

24         **MR. NOLAN:**  WE JUST WERE HANDED IT THIS AFTERNOON.

25         YOUR HONOR, IS IT POSSIBLE TO FILE IT FIRST THING ON            02:32

```
 1   MONDAY MORNING?
 2          THE COURT:  I'D LIKE TO GET IT BY THE END OF THE
 3   WEEK, JUST SO I HAVE SOME TIME WITH IT OVER THE WEEKEND.
 4          CAN WE DO IT BY THE END OF THE DAY FRIDAY?
 5          MR. NOLAN:  OF COURSE.                              02:32
 6          THE COURT:  TODAY IS TUESDAY; THAT'S WEDNESDAY,
 7   THURSDAY, FRIDAY.
 8          IF YOU WOULD FAX IT TO CHAMBERS ON FRIDAY BEFORE
 9   CLOSE OF BUSINESS, AND THEN IT CAN BE FORWARDED ON TO THE
10   COURT.                                                    02:32
11          MR. NOLAN:  OKAY.
12          THE COURT:  ANY OTHER ISSUES?
13          MR. NOLAN:  IS THERE ANY POSSIBILITY THAT WE COULD
14   GET THE RULINGS ON GALVANO?  IT'S THE LAST VIDEO.
15          THE COURT:  YES.
16          MR. NOLAN:  AND THEN WE COULD HAVE THAT ALL READY TO
17   TEE UP ON TUESDAY.
18          AND THEN DOES THE COURT STILL WANT TO HAVE THE
19   MEETING ON MONDAY?
20          THE COURT:  NO.  THANK YOU.  THAT WAS THE OTHER      02:33
21   THING.  I KNEW THERE WAS SOMETHING ELSE.
22          NO, WE'RE NOT GOING TO HAVE THAT MEETING ON MONDAY.
23   I'LL ADVISE YOU ON TUESDAY MORNING WHEN WE WILL HAVE IT.
24          I WOULD LIKE TO GET THOSE BINDERS IN, THOUGH, AS SOON
25   AS THOSE ARE -- ON THE JURY INSTRUCTION THAT I REQUESTED.  IF  02:33
```

```
 1    THOSE COULD -- I DON'T THINK THEY'VE BEEN TURNED IN YET.

 2              DO WE HAVE AN ESTIMATE ON WHEN THOSE WILL BE READY?

 3         MR. PROCTOR:  ON MATTEL'S SIDE, WE DID SUBMIT A

 4    BINDER, BUT THEN BOTH SIDES, FRANKLY, HAVE REVISED THEIR

 5    SUBMISSIONS, SO WE'LL GET NEW BINDERS TO THE COURT.          02:33

 6         THE COURT:  I'M JUST NOT GOING TO HAVE A CHANCE TO

 7    LOOK AT THEM BEFORE MONDAY.  I'M NOT GETTING BACK UNTIL LATE

 8    SUNDAY, SO I'LL REVIEW THESE MYSELF.

 9         MR. NOLAN:  SURE.  I UNDERSTAND.

10              I THOUGHT WE HAD SUBMITTED BINDERS, BUT WE'LL MAKE   02:33

11    CERTAIN THAT --

12         THE COURT:  I HAVEN'T SEEN THEM YET MYSELF.

13              AS LONG AS EVERYTHING IS IN BY THE END OF THE WEEK --

14         MR. NOLAN:  YOUR HONOR, I DO HAVE A COUNT ON PRINCE.

15    IT'S, I BELIEVE, 27 MINUTES FOR MGA AND 18 MINUTES FOR MATTEL.  02:34

16         THE COURT:  ALL RIGHT.  SO I HAVE TO SUBTRACT HOW

17    MUCH FROM --

18         MR. NOLAN:  18 MINUTES FOR MATTEL.

19         THE COURT:  18 MINUTES FOR MATTEL.

20         MR. NOLAN:  AND 27 FOR MGA.                            02:34

21         THE COURT:  OKAY.

22              SO I'LL TAKE 18 OFF OF MGA.

23              THE DEFENSE HAS GONE AROUND TWICE; THAT'S 24 HOURS;

24    so 29 HOURS AND 37 MINUTES.

25              AND MATTEL HAS GONE AROUND THREE TIMES, AND THEY ARE  02:35
```

1  ON -- THAT'S 36 PLUS 6 IS 42 HOURS AND 10 MINUTES.

2        **MR. NOLAN:**  YOUR HONOR, THEN THE LAST QUESTION THAT I

3  RAISED WITH MR. HOLMES IS, WE WOULD LIKE TO RETRIEVE THE

4  ORIGINAL SEALED ENVELOPE THAT CONTAINED THE DOCUMENT THAT WAS

5  SUBJECT TO THE MOTION FOR ADDITIONAL DISCOVERY.                    02:35

6        **THE COURT:**  THIS RIGHT HERE?

7        **MR. NOLAN:**  YES.

8        COULD WE HAVE THAT BACK, YOUR HONOR?

9        **THE COURT:**  SURE.

10       **MR. NOLAN:**  I THINK THE COURT HAS COPIES FOR THE        02:36

11  RECORD ON BOTH.

12       **THE COURT:**  I'LL HAVE MR. HOLMES RUN A COPY, AND THEN

13  YOU CAN HAVE THE ORIGINAL BACK.

14       **MR. NOLAN:**  THANK YOU, YOUR HONOR.

15       **THE COURT:**  ANYTHING ELSE FROM MATTEL?              02:36

16       **MR. QUINN:**  NO, YOUR HONOR.

17       **THE COURT:**  SEE YOU A WEEK FROM TODAY.

18       **MR. NOLAN:**  YOUR HONOR, YOU HAD ASKED MATTEL TO GIVE

19  A LIST TODAY OF THE CONDITIONAL WITNESSES.

20       **THE COURT:**  YES, I DID WANT TO SEE THAT.           02:36

21       **MR. NOLAN:**  RIGHT.

22       **MR. QUINN:**  THE WITNESSES ARE MS. GRONICH,

23  FARHAD LARIAN, MR. KAMARCK, MS. LEAHY, AND ANYONE ELSE

24  MIKE ZELLER THINKS UP.  JUST KIDDING.

25       **THE COURT:**  I'VE GOT TO DO THE GALVANO OBJECTION AS     02:37

1   WELL.

2         SO THOSE ARE THE FOUR:  GRONICH, MR. FARHAD LARIAN,

3   MR. KAMARCK, AND MS. LEAHY.

4         **MR. NOLAN:**  SO THERE ARE NO OTHER EXPERTS,

5   YOUR HONOR, THAT MATTEL IS CALLING.                          02:37

6         **THE COURT:**  YOU WANT TO PUSH THE ENVELOPE HERE,

7   MR. NOLAN.  DO YOU WANT MORE MATTEL WITNESSES?

8         **MR. NOLAN:**  NO.  I JUST WANT SOMETHING THAT I CAN

9   READ ON -- THAT'S THE STAMP; RIGHT?

10        **THE COURT:**  THAT'S IT.                              02:37

11        4210, 2937, GRONICH, LARIAN, KAMARCK, AND LEAHY.

12   THAT'S IT.

13        **MR. QUINN:**  THERE'S ALSO a pending STIPULATION ABOUT

14   THE ZIP DRIVE AND RECIPROCAL BRIEFING.  AND DEPENDING UPON THE

15   OUTCOME OF THAT, THERE COULD BE EXPERT TESTIMONY ON THAT, AS I  02:37

16   UNDERSTAND IT.

17        **MR. NOLAN:**  I UNDERSTAND.  BUT THERE WAS A MENTION

18   BEFORE ABOUT INK EXPERTS AND THINGS LIKE THAT, AND I ASSUME

19   THAT THAT'S NOT PART OF THIS CASE ANYMORE.

20        **THE COURT:**  THAT'S MY ASSUMPTION AS WELL, COUNSEL.   02:37

21        **MR. QUINN:**  NOT PART OF OUR CASE-IN-CHIEF.

22        **THE COURT:**  IT'S their CASE-IN-CHIEF, COUNSEL.  THEY

23   DON'T HAVE TO DISCLOSE THEIR REBUTTAL AT THIS POINT.  IT'S

24   THEIR CASE-IN-CHIEF.

25        **MR. PROCTOR:**  YOUR HONOR --                         02:38

1              **THE COURT:**  YOU HAVE AN OBJECTION TO MY OBJECTION?

2              **MR. PROCTOR:**  NO.

3              THERE IS ALSO A STIPULATION RELATING TO THE TESTIMONY

4   OF MS. CLOONAN WHICH RELATES TO THE ZIP DISK AND EXPERT

5   TESTIMONY.                                                              02:38

6              **THE COURT:**  SO IN ADDITION TO THE FOUR WITNESSES,

7   THERE are STIPULATIONS THAT NEED TO BE READ INTO THE RECORD?

8              **MR. PROCTOR:**  CORRECT.

9              **THE COURT:**  VERY GOOD.

10             LET'S GO THROUGH THIS AS QUICKLY AS WE CAN.               02:38

11             THE FIRST OBJECTIONS ARE ON PAGE 18; AND THEY ARE

12  OVERRULED.  38, OVERRULED; 43, SUSTAINED; 45, OVERRULED;

13  46, OVERRULED; 47, SUSTAINED.

14             56, LINES 1 THROUGH 11, IS OVERRULED; LINES 19

15  THROUGH 25 ARE SUSTAINED, AS ARE, ON PAGE 57, LINES 1 THROUGH   02:39

16  13.

17             PAGE 61, OVERRULED.

18             PAGE 66, OVERRULED FROM LINES 3 THROUGH 6 AND 15

19  THROUGH 23.  I'LL SUSTAIN LINES 24 AND 25.

20             WAIT A SECOND.                                           02:39

21             YES.  SUSTAINED ON HEARSAY, 24 THROUGH 25, AND

22  LINES 1 THROUGH 8 OF 67; BUT THEN I'LL PERMIT 9 THROUGH 12 ON

23  67.  I'LL OVERRULE THE OBJECTION AT THE BOTTOM OF 67.

24             69, SUSTAIN THE OBJECTION.

25             I'M CONFUSED ON 82, BECAUSE THE DESIGNATION SEEMS TO   02:40

```
 1    ENCOMPASS JUST ONE LINE OF AN ANSWER.

 2              IS THAT CORRECT, MR. PROCTOR?

 3              MR. PROCTOR:  THAT IS CORRECT, YOUR HONOR.  AND THE

 4    REASON FOR THAT IS, THE BALANCE OF THE ANSWER IS BASED ON

 5    HEARSAY AND LACKS FOUNDATION.                                    02:41

 6              THE COURT:  THAT KIND OF KNOCKS OUT THE FIRST PART,

 7    THOUGH, TOO, DOESN'T IT?  I ASSUME THAT'S WHAT THE FIRST ONE

 8    IS -- WHAT'S THE FOUNDATION FOR THAT FIRST ONE?

 9              I THINK IT ALL GOES DOWN.

10              MR. PROCTOR:  THAT'S FAIR.

11              THE COURT:  SUSTAINED; THAT'S LINES 19 THROUGH 22.

12              86, I HAVE A QUESTION.

13              ON 85, THERE SEEMS TO BE A QUESTION FROM LINES 22 TO

14    25.  THE QUESTION CONTINUES ON THE TOP OF PAGE 86 ON LINES 1

15    AND 2.  THE ANSWER IS NOT DESIGNATED, AND THEN THERE'S A        02:41

16    QUESTION AGAIN BY MR. ZELLER.

17              DID YOU MEAN TO INCLUDE THE ANSWER, OR DID YOU MEAN

18    TO ASK TWO QUESTIONS IN A ROW?

19              MR. PROCTOR:  LINE 10 IS THE ANSWER TO THE QUESTION

20    ON LINE --                                                      02:41

21              THE COURT:  OH, I'M SORRY.  YOU'RE RIGHT.  MY

22    MISTAKE.  I MISSED THAT.  THANK YOU.

23              PAGE 106 IS OVERRULED.

24              PAGE 109 IS SUSTAINED, AS IS 110.

25              SKIPPING TO 132.                                      02:42
```

```
 1              MR. PROCTOR:  YOUR HONOR, JUST IN CASE YOU MISSED IT,
 2     ON PAGE 107, THERE IS AN OBJECTION.
 3              THE COURT:  PAGE 107.  I'M SORRY.
 4              THAT'S OVERRULED AS WELL.
 5              MR. PROCTOR:  AND THE RULING ON PAGE 109?                02:42
 6              THE COURT:  109 IS SUSTAINED.
 7              132 IS SUSTAINED.
 8              133 IS SUSTAINED; HEARSAY.
 9              MR. PROCTOR:  YOUR HONOR, FOR CLARIFICATION, THE
10     RULING ON PAGE 109, DOES THAT ALSO APPLY TO 110?                 02:42
11              THE COURT:  YES.
12              IT CONTINUES ON.
13              YES, 110 IS SUSTAINED AS WELL.
14              MR. PROCTOR:  YOU SAID 132 IS SUSTAINED?
15              THE COURT:  YES, 132 IS SUSTAINED.                      02:43
16              133 IS SUSTAINED.
17              MOVING TO 146, THE OBJECTIONS THERE ARE OVERRULED.
18              156 IS SUSTAINED; 157 IS SUSTAINED; 158 IS SUSTAINED.
19              163 IS SUSTAINED, AS IS 164, 165, AND 166.
20              MOVING FORWARD TO 180, I'LL OVERRULE THE OBJECTION.     02:43
21     IT GOES TO CREDIBILITY.
22              182 IS OVERRULED, AS IS 183.
23              224, I THINK I SUSTAINED THIS.
24              WAIT A SECOND.
25              SUSTAINED THROUGH 17.  NO.  SORRY.  SUSTAINED           02:44
```

1    THROUGHOUT.

2            PAGE 247, IT'S OVERRULED.

3            270 IS THE NEXT ONE.  THAT'S SUSTAINED.

4            I THINK THAT'S IT.

5            DID I MISS ANY OBJECTIONS, FROM ANYONE'S PERSPECTIVE?      02:45

6            MR. PROCTOR?  MR. HERRINGTON?

7            **MR. PROCTOR:**  NOT AS FAR AS I CAN TELL.

8            **THE COURT:**  MR. HERRINGTON?

9            **MR. HERRINGTON:**  I DON'T FIND ANYTHING YOU MISSED.

10           **THE COURT:**  VERY GOOD.

11           **MR. HERRINGTON:**  CAN I ASK ONE QUESTION?

12           **THE COURT:**  SURE.

13           **MR. HERRINGTON:**  ON PAGE 224, YOUR HONOR SUSTAINED

14   THE OBJECTION?

15           **THE COURT:**  YES, I DID.                                02:46

16           **MR. HERRINGTON:**  WHAT SHE'S DOING IS READING FROM HER

17   CALENDAR.

18           **THE COURT:**  RIGHT.

19           **MR. HERRINGTON:**  AND IT'S NOTES THEY SHE MADE ON HER

20   CALENDAR.                                                         02:46

21           **THE COURT:**  BUT THEN SHE GOES TO THE AIRLINES.

22           **MR. HERRINGTON:**  AND THERE'S ACTUALLY NOTES ON HER

23   CALENDAR.  THOSE NUMBERS, 48288 AND 45456, ARE AIRLINE MILES

24   SHE'S ACTUALLY NOTING ON HER CALENDAR.  IT ACTUALLY IS THE

25   BASIS FOR HER RECOLLECTION THAT SHE TOOK A TRIP TO HARRISBURG,    02:46

tuesday, june 24, 2008                    trial day 17, afternoon session

```
 1   PENNSYLVANIA, FROM ALASKA, AND THEN THROUGH SPRINGFIELD,

 2   MISSOURI, IN AUGUST OF 1998.  THOSE NOTATIONS APPEAR ON THAT

 3   CALENDAR, AND SHE'S IDENTIFYING THEM.

 4           THE COURT:  MR. PROCTOR?

 5           MR. PROCTOR:  THAT'S CORRECT, YOUR HONOR, THE                02:46

 6   NOTATIONS DO APPEAR ON THE CALENDAR.

 7           CAN I ASK, IS THE COURT'S CONCERN ON THIS -- THE

 8   BASIS FOR THE COURT'S INITIAL RULING, AT LEAST, IS IT 403 OR

 9   802?

10           THE COURT:  IT WAS 802.                                     02:47

11           I'M GOING TO PERMIT LINES 3 THROUGH 22, BUT I'M GOING

12   TO KEEP OUT THE CALL TO THE AIRLINES AS HEARSAY.  SO I'LL

13   OVERRULE THE OBJECTIONS ON LINES 3 THROUGH 22 OF PAGE 224;

14   SUSTAIN THE OBJECTIONS FOR THE REMAINDER.

15           MR. HERRINGTON:  LET ME JUST MAKE A PITCH.  I DON'T         02:47

16   THINK IT IS HEARSAY.  THERE'S A NUMBER THAT ACTUALLY APPEARS ON

17   HER CALENDAR.  IT'S A 1-800 NUMBER.  IT'S ACTUALLY 1-888.  IT

18   IS FOR ALASKA AIRLINES.

19           THE COURT:  YES.

20           MR. HERRINGTON:  AND SHE CHECKS IT.  SHE CHECKS THAT        02:47

21   NUMBER.  AND THAT'S WHAT SHE'S TESTIFYING TO HERE, WHICH

22   SHE'S -- IT'S THE HEARSAY EXCEPTION OF IDENTIFICATION.  SHE'S

23   BASICALLY IDENTIFYING THE NUMBER.

24           THE COURT:  THIS WAS SOMETHING I THOUGHT --

25           MR. HERRINGTON:  THERE'S A NOTATION SPECIFICALLY ON         02:48
```

```
1   HER CALENDAR OF "AA," AND THEN THE 1-800 NUMBER.  AND WE CAN

2   EVEN CALL IT HERE IN COURT.  IT IS THE 1-800 NUMBER FOR ALASKA

3   AIRLINES.

4            THE COURT:  THAT'S FINE, AS FAR AS IT GOES.  BUT THEN

5   SHE DISCUSSES THIS COMMUNICATIONS WITH THE AIRLINES.          02:48

6            MR. HERRINGTON:  SHE'S CALLING THE AIRLINES TO TRY

7   TO -- THIS, AGAIN, GOES TO THE IDEA -- SHE'S TRYING TO TRACK

8   DOWN WHETHER SHE COULD GET ANY ADDITIONAL INFORMATION.  AND

9   ACTUALLY, WE BELIEVE IT GOES TO CREDIBILITY.  SHE WAS TRYING TO

10  GET ADDITIONAL INFORMATION TO PROVE THAT SHE DID ACTUALLY TAKE 02:48

11  THIS TRIP.

12           THE COURT:  FAIR ENOUGH.  AND CALLING THE AIRLINES

13  AND CALLING THE TRAVEL AGENT IS FINE.  BUT IT'S THE CONTENT,

14  WHERE THEY SAID THEY DIDN'T THINK THEY COULD...

15           THAT'S MORE OF AN ACTION THAN IT IS...              02:48

16           MR. PROCTOR?  DO YOU CARE TO RESPOND?

17           MR. PROCTOR:  I DO THINK THE CONTENTS OF IT, YOU

18  KNOW, THAT THEY DIDN'T THINK THEY COULD...

19           THE COURT:  BUT THEY'RE SAYING THEY DIDN'T THINK THEY

20  COULD DO SOMETHING.  IT'S NOT REALLY BEING INTRODUCED FOR THE  02:49

21  TRUTH OF WHETHER, IN FACT, ALASKA AIRLINES COULD DO THAT OR NOT

22  DO THAT.  IT'S BASICALLY TO DEMONSTRATE HER CONDUCT IN TRYING

23  TO CORROBORATE HER STORY.

24           I'M GOING TO CHANGE MY RULING ON THAT.  THIS ONE GOES

25  TO MGA.  224, 225 IS IN.  OBJECTIONS ARE OVERRULED.           02:49
```

1          HAVE A GOOD WEEK.   I'LL SEE YOU NEXT TUESDAY.

2              **THE CLERK:**   COURT STANDs ADJOURNED.

3

4

5

6

7

8

9

10                          CERTIFICATE

11

12   I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
13   the stenographically recorded proceedings held in the
     above-entitled matter and that the transcript page format is in
14   conformance with the regulations of the judicial conference of
     the united states.

15

16

     _____          _____
17   THERESA A. LANZA, RPR, CSR                          Date
     Official COURT Reporter
18

19

20

21

22

23

24

25