1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                    - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9          vs.                       )  No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al., )  trial day 21
                                     )  MORNING session
11                   Defendants.     )  Pages 4518-4641
    _____ )
12  AND CONSOLIDATED ACTIONS,        )
    _____ )
13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, California

17               Tuesday, July 8, 2008

18                    8:52 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
          Federal Official Court Reporter
24           3470 12th Street, Rm. 134
          Riverside, California  92501
25               951-274-0844
             WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              Dylan proctor
 6                            TIMOTHY ALGER
                              William price
 7                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                       LOS ANGELES, California  90017
                         213-624-7707
 9


10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                       BY:  THOMAS J. NOLAN
                              JASON RUSSELL
13                            Lauren aguiar
                              Carl roth
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

tuesday, july 8, 2008                    trial day 21, morning session

```
1                          I N D E X

2                                                      Page

3      Defense Case................................    4537

4      Voir dire examination of cassidy park.........  4616

5

6

7      DEFENSE
       WITNESS          DIRECT        CROSS      REDIRECT        RECROSS
8      KIM GOHATA

9      BY MR. Nolan      4537

10

11     DEFENSE
       WITNESS          DIRECT        CROSS      REDIRECT        RECROSS
12     Jeanne karen galvano (via video deposition)

13                       4556

14

15     WITNESS          DIRECT        CROSS      REDIRECT        RECROSS
       Cassidy park
16
       BY MR. Zeller     4616                    4629
17     BY MR. NOLAN                    4619                      4632

18

19

20          EXHIBITS            RECEIVED

21            4436               4552
             16002               4552
22           18429               4555
              1177               4599
23

24

25
```

tuesday, july 8, 2008                    trial day 21, morning session

1        RIVERSIDE, CALIFORNIA; tuesday, july 8, 2008; 8:52 A.M.

2                              -oOo-

3        **THE CLERK:**  CALLING THE CASE NUMBER CV04-09049-SGL,

4   MATTEL, INC., V. MGA, INC., ET AL.

5        MAY WE HAVE COUNSEL PLEASE STATE YOUR APPEARANCES FOR

6   THE RECORD.

7        **MR. QUINN:**  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

8   MATTEL.

9        **MR. NOLAN:**  TOM NOLAN, JASON RUSSELL, AND

10  LAUREN AGUIAR FOR MGA.                                          08:52

11       **THE COURT:**  GOOD MORNING, COUNSEL.  JUST GIVE ME A

12  MINUTE.  THERE'S A FEW SMALL CHANGES TO MAKE, AND THEN THE JURY

13  INSTRUCTIONS WILL BE DONE.  I'VE ALREADY DONE THE INTEGRATION

14  OF ALL OF THEM, SO IT'S A MATTER OF YOU READING THEM, REVIEWING

15  THEM, AND MAKING ANY FINAL OBJECTIONS.  JUST GIVE ME A MINUTE   08:52

16  HERE.

17       OKAY.  I'M PRINTING OUT IN CHAMBERS RIGHT NOW THE

18  JURY INSTRUCTIONS FOR PHASE 1-A, BASED ON THE COURT'S

19  CONSIDERING THE VARIOUS OBJECTIONS MADE YESTERDAY, THE PARTIES'

20  SUBMISSIONS; AND WHAT I'M GOING TO ASK YOU TO DO THIS MORNING   08:54

21  IS REVIEW THOSE AND BE PREPARED AT LUNCHTIME TO REGISTER ANY

22  OBJECTIONS.  AND I ENCOURAGE COUNSEL -- I MEAN, SPELLING,

23  GRAMMATICAL ERRORS, ANYTHING AT ALL; I'M SURE THERE'S A NUMBER

24  OF THOSE IN THERE AS I'VE GONE THROUGH AND PUT THESE TOGETHER.

25  SO WHATEVER YOU CAN POINT OUT TO THE COURT, FROM THE MUNDANE TO 08:54

1   THE MORE SIGNIFICANT AND SUBSTANTIVE, WOULD BE APPRECIATED.

2          I FIND THAT NO MATTER HOW MANY TIMES YOU REVIEW A SET

3   OF JURY INSTRUCTIONS -- I HAVE NEVER HAD A TRIAL THAT IN THE

4   FINAL READING TO THE JURY, THERE'S NOT SOME NIT SOMEPLACE IN

5   THE INSTRUCTIONS.  BUT WE DO THE BEST WE CAN.                08:55

6          ALL RIGHT.  SO THAT WILL TAKE CARE OF THE

7   INSTRUCTIONS.

8          HOW ARE WE ON THE VERDICT FORM?  BECAUSE THE ONE

9   CONCERN THE COURT HAD AT THE END OF THE DAY YESTERDAY WAS AN

10  EFFORT TO TRY TO JUST MAKE THE EXHAUSTIVE LIST OF POTENTIAL   08:55

11  DRAWINGS, SKETCHES, ET CETERA, THAT MR. BRYANT MAY HAVE DONE

12  WHILE HE WAS AT MATTEL, REDUCED TO A MANAGEABLE FORM FOR THE

13  JURY.

14         MS. AGUIAR?

15         **MS. AGUIAR:**  AS YOU KNOW, I HANDED YOU THE THREE    08:55

16  LISTS LAST NIGHT BEFORE WE LEFT.  I ALSO SENT THOSE OVER TO

17  MATTEL LAST NIGHT, AND I KNOW THAT YOU HAD DIRECTED US TO

18  CONFER LAST NIGHT.

19         I DIDN'T HEAR BACK FROM THEM LAST NIGHT.

20         MR. PROCTOR APPROACHED ME ABOUT FIVE MINUTES AGO AND   08:55

21  SAID HE WANTED TO TALK TO ME ABOUT IT.  I SAID, 'DO YOU HAVE A

22  RESPONSE?'  AND HE SAID -- I THINK I'M QUOTING HIM ACCURATELY

23  -- THAT IT WOULD AT LEAST BE SEVERAL MORE HOURS.

24         BUT AT THIS POINT, I HAVE TO SAY, WE'RE TALKING ABOUT

25  CHARGING THE JURY THIS AFTERNOON.  YOU ASKED US TO CONFER LAST  08:56

1    NIGHT.  I SENT THEM THE LIST.  I HEARD NOTHING.  I THINK THE

2    LISTS THAT I SENT, THAT I PROVIDED TO YOU YESTERDAY, ARE FAIR

3    AND ACCURATE LISTS OF THE THREE BUCKETS --

4          **THE COURT:**  YOU SAID THREE, BUT I ONLY HAVE TWO.

5          **MS. AGUIAR:**  THE THIRD ONE IS EXHIBIT A.                    08:56

6          **THE COURT:**  GOT IT.  VERY GOOD.

7          **MS. AGUIAR:**  THAT'S MY POSITION AT THIS POINT, THAT

8    WE UNDERTOOK A SERIOUS EFFORT TO PUT THEM INTO THESE THREE

9    CATEGORIES.  I THINK IT'S RIGHT.  I THINK AT THIS POINT WE

10   SHOULD GO WITH THOSE LISTS.                                        08:56

11         **THE COURT:**  YOU PROVIDED THESE TO ME, BUT IT'S NOT

12   ENTIRELY CLEAR TO ME WHAT THESE ARE.

13         **MS. AGUIAR:**  OKAY.

14         YESTERDAY WE TALKED ABOUT THREE TIME PERIODS, THE

15   FIRST ONE BEING 1998, AS MGA CONTENDS.                            08:56

16         **THE COURT:**  RIGHT.

17         **MS. AGUIAR:**  AND YOUR HONOR AGREED THAT, AS YOU PUT

18   IT, IF THE JURY KNOWS HOW IT'S GOING TO COME OUT, THEN THEY

19   SHOULD HAVE A WAY TO SAY, 'THESE ARE THE DRAWINGS WE BELIEVE

20   WERE DONE IN 1998.'  THAT WOULD BE THE FIRST SO-CALLED FIRST      08:57

21   BUCKET.  I DON'T KNOW WHAT THE TITLE IS ON THE DOCUMENT THAT

22   YOU HAVE, BUT GROUP ONE --

23         **THE COURT:**  THIS IS 1998.

24         THAT MAY BE A LITTLE BIT TOO ROUGH.

25         **MS. AGUIAR:**  I WAS GIVING YOU MY COPY.  THE VERSION      08:57

1    THAT I SENT TO MATTEL LAST NIGHT JUST SAYS "GROUP ONE."

2         THE COURT:  FAIR ENOUGH.

3         MS. AGUIAR:  AND THEN THE ONE THAT YOU HAVE THAT MAY

4    SAY SOMETHING LIKE "POST MATTEL" OR --

5         THE COURT:  "AFTER OCTOBER 19TH."                    08:57

6         MS. AGUIAR:  -- "AFTER OCTOBER 19TH," AGAIN, AND THE

7    ONE THAT I SENT OVER LAST NIGHT, THE HEADING SIMPLY SAYS "GROUP

8    THREE."  AND THEN THE GROUP IN THE MIDDLE, WHICH IS DURING

9    MATTEL EMPLOYMENT, IS EXHIBIT A TO OUR PROPOSED VERDICT FORM,

10   AND THAT WOULD BE THE MIDDLE GROUPING OF 1999 THROUGH          08:57

11   OCTOBER 19, 2000.

12        THE COURT:  VERY GOOD.

13        LET ME HEAR FROM MATTEL.

14        MR. PROCTOR:  I WASN'T HERE YESTERDAY.  I'M COMING IN

15   A TOUCH LATE.

16        AS THE COURT KNOWS, MATTEL'S PREFERENCE IS TO HAVE AN

17   INDIVIDUAL LIST OF DRAWINGS.  IN THINKING THIS THROUGH AND IN

18   TRYING TO ADDRESS THE COURT'S CONCERN THAT THE LIST IS SO LONG,

19   THERE MAY BE A WAY, WHICH WE ARE TRYING TO GET INTO THE

20   DETAILS, TO SEPARATE OUT INTO GROUPS, WORKS, DRAWINGS, FOR       08:58

21   WHICH THERE IS NO EVIDENTIARY BASIS TO DISTINGUISH THEM.  AND

22   THERE ARE SOME SUCH DRAWINGS.  THERE'S THE EVENING WEAR

23   DRAWINGS.  THERE'S A SERIES OF FOUR OR SIX OF THOSE.

24   MR. BRYANT SAID HE DID THEM ALL IN 2000.  THERE'S NO WAY A JURY

25   COULD REASONABLY FIND MATTEL OWNS SOME BUT NOT ALL OF THEM; AND   08:58

1    SO THOSE TYPES OF WORKS CAN BE GROUPED TOGETHER.

2            WE'VE COME UP WITH, TENTATIVELY, A LIST OF

3    APPROXIMATELY SEVEN OR EIGHT CATEGORIES WHICH WOULD CAPTURE

4    THIS.  AND I DON'T THINK IT CAN BE -- AND I STILL DON'T

5    UNDERSTAND -- I'D ASKED MS. AGUIAR FOR SOME EXPLANATION OF HER          08:59

6    LIST, AS THE COURT DID, AND I DIDN'T RECEIVE IT.  I DON'T FULLY

7    UNDERSTAND IF WHAT MGA IS CONTEMPLATING WOULD BE THREE CHECK

8    BOXES, YOU KNOW, A GROUP ONE, CHECK BOX YES, NO, MATTEL OWNS

9    IT; GROUP TWO, CHECK BOX YES, NO; OR IF THE JURY --

10           **THE COURT:**  WHAT I'M GETTING FROM IT IS JUST             08:59

11   CATEGORIZING THEM AS THEY ARE LAYING THEM OUT.  RIGHT NOW, AS

12   PROPOSED BY MATTEL, WE JUST HAVE THIS LONG LIST OF DIFFERENT

13   EXHIBITS.

14           **MR. PROCTOR:**  YES.

15           **THE COURT:**  AND THE JURY WILL CHECK THOSE THAT THEY        08:59

16   THINK WERE DURING THE TIME PERIOD AND NOT CHECK THOSE THAT WERE

17   OUTSIDE THE TIME PERIOD, EITHER PRE-MATTEL EMPLOYMENT OR WHEN

18   HE WAS NOT WORKING FOR MATTEL OR POST-MATTEL EMPLOYMENT.

19           THAT MAY BE THE BEST WE CAN DO.  I DON'T KNOW.

20           WHAT I WAS SUGGESTING YESTERDAY TO MR. ZELLER AND           08:59

21   MS. AGUIAR IS, LET'S GET TOGETHER AND SEE IF THERE'S SOME WAY

22   WE CAN COME UP WITH SOMETHING WHICH IS MORE MANAGEABLE FOR THE

23   JURY.

24           **MR. PROCTOR:**  RIGHT.

25           **THE COURT:**  SOMETHING ALONG THE LINES YOU'RE            09:00

1    DISCUSSING HERE WOULD BE GREAT.  I WAS HOPING YOU WOULD DO THIS

2    LAST NIGHT.  I UNDERSTAND WE WERE ALL BUSY LAST NIGHT, AS WAS

3    THE COURT, BUT...

4         **MR. PROCTOR:**  I APOLOGIZE FOR THAT, YOUR HONOR.  WE

5    DO HAVE PEOPLE DILIGENTLY WORKING ON IT.  IT'S ALSO A                09:00

6    CONCEPTUAL ISSUE; IT IS TRYING TO FIGURE OUT CONCEPTUALLY HOW

7    THIS CAN BE DONE.

8         WHAT I THINK IS PREFERABLE ABOUT THE CONCEPTUAL LIST

9    THAT I'M TRYING TO DESCRIBE NOW -- I DON'T HAVE A PIECE OF

10   PAPER TO HAND YOU -- IS WHAT THE JURY WOULD HAVE.  THE JURY'S       09:00

11   BURDEN WOULD BE SOMETHING THAT'S MANAGEABLE.  THE JURY WOULD GO

12   THROUGH AND LOOK AT THESE CATEGORIES, AND THERE WOULD BE, AS I

13   SAID, ABOUT SIX, SEVEN, OR EIGHT CATEGORIES, AND THERE WOULD BE

14   A LIST OF EXHIBITS OR DRAWINGS LISTED UNDER EACH CATEGORY.  AND

15   THEN AS TO THAT CATEGORY, THE JURY COULD CHECK YES OR NO AS TO      09:00

16   THAT CATEGORY, BECAUSE IT'S BASED ON THE EVIDENCE AND IT WOULD

17   BE UNDISPUTED EVIDENCE SHOWING THAT NO MATTER WHAT, NO MATTER

18   WHAT DISPUTES MGA AND MATTEL HAVE, NO JURY COULD REASONABLY

19   FIND ONE OF THESE WORKS WAS DONE IN 1998 AND NOT THE OTHER.

20        **THE COURT:**  AND I CAN SEE THAT.  ASSUMING THAT THE         09:01

21   PARTIES AGREE ON THAT, THAT'S GREAT.  BUT THIS SOUND LIKE YOU

22   HAVE SOME WORK TO DO.

23        THIS ALSO DOESN'T REALLY ADDRESS -- I'D LIKE TO BE

24   ABLE TO DO THIS IN SUCH A WAY THAT THE JURY IS ABLE TO MORE

25   READILY REACH THE VERDICT THAT THEY WANT TO REACH, IF THAT         09:01

```
 1   MAKES SENSE.

 2          MR. PROCTOR:  SURE.

 3          AND I DO THINK THIS ACCOMPLISHES THAT GOAL, BECAUSE

 4   THE CATEGORIES ARE GROUPED BY TIME.

 5          THE COURT:  I'M GOING TO STOP YOU, MR. PROCTOR,        09:01

 6   BECAUSE THE DIFFICULTY IS THAT WE'RE TALKING IN THE ABSTRACT

 7   NOW.  I DON'T HAVE ANYTHING IN FRONT OF ME.

 8          MR. PROCTOR:  THAT'S FAIR ENOUGH.

 9          THE COURT:  IT'S 9:00.  THE JURY IS READY HERE.  I

10   WANT TO GET THIS CASE COMPLETED AS QUICKLY AS WE CAN.         09:02

11          THE COURT HAS FINISHED ITS WORK, WHAT IT SAID IT WAS

12   GOING TO DO ON THE JURY INSTRUCTIONS; THAT'S IN YOUR HANDS.  I

13   WILL TAKE THAT UP FIRST AT NOONTIME.  I WILL THEN TAKE UP THE

14   VERDICT FORM.  I EXPECT TO HAVE WHATEVER THE PARTIES ARE

15   PROPOSING AT THAT TIME.  THE COURT WILL TAKE OVER THE VERDICT  09:02

16   FORM AT THAT TIME, AND WE'LL GO FROM THERE.

17          MR. PROCTOR:  UNDERSTOOD.  THANK YOU.

18          MR. NOLAN:  YOUR HONOR, TWO QUICK MATTERS BEFORE WE

19   BRING THE JURY IN.

20          THE COURT:  YES.                                      09:02

21          I RECEIVED THIS OPPOSITION TO MATTEL'S MOTION TO

22   PRECLUDE VIDEO TESTIMONY IN CLOSING ARGUMENT.

23          MR. ZELLER MADE REFERENCE TO IT, BUT I HAVE NOT SEEN

24   THE ACTUAL MOTION ITSELF, SO I HAVE AN OPPOSITION TO A MOTION

25   THAT I DON'T HAVE.                                           09:02
```

1          IS THERE A MOTION?

2              **MR. NOLAN:**  THEY DID FILE A MOTION.

3              **MR. ZELLER:**  THERE IS, YOUR HONOR.  I SAW IT WAS

4    E-FILED.

5              **THE COURT:**  DO YOU HAVE AN EXTRA COPY?                    09:03

6              **MR. ZELLER:**  I DON'T THINK I HAVE ONE WITH ME, BUT I

7    CAN GET ONE.

8              **THE COURT:**  I THINK ONE IS COMING FROM THE BACK.

9              **MR. ZELLER:**  MAY I APPROACH WITH IT?

10             **MR. NOLAN:**  I WASN'T GOING TO ADDRESS THAT RIGHT NOW,   09:03

11   YOUR HONOR.

12             **THE COURT:**  I'LL TAKE THIS UP AT NOONTIME AS WELL.

13         I GATHER, BY THE FACT THAT THE MOTION HAS NOW BEEN

14   FILED AND AN OPPOSITION HAS BEEN LODGED, THAT THERE IS A

15   POTENTIAL TO USE --                                                 09:03

16             **MR. NOLAN:**  YES, SIR.

17             **THE COURT:**  VERY GOOD.

18             **MR. NOLAN:**  YOUR HONOR, SOME CLEAN-UP MATTERS,

19   BECAUSE WE INTEND TO REST, AS I'VE TOLD YOU SINCE LAST

20   THURSDAY.                                                           09:03

21         ONE OF THE HALLMARKS OF THIS CASE HAS BEEN THAT THE

22   COURT HAS TRIED TO BALANCE THE RULES OF ENGAGEMENT, AND

23   ALTHOUGH BOTH SIDES HAVE DISAGREED SOMETIMES WITH THE

24   APPLICATION OF THOSE RULES -- AND I LISTENED TO SOME ZEN TAPES

25   OVER THE WEEKEND TO CALM DOWN AFTER A LONG DAY ON THURSDAY, FOR    09:03

1    WHICH, AGAIN, I APOLOGIZE IF IT GOT TOO HEATED -- BUT YESTERDAY

2    AT THE CLOSE, YOU AGAIN INSTRUCTED MATTEL TO NOTIFY US BY 7:00

3    LAST NIGHT AS TO THE WITNESS THAT THEY INTEND TO CALL, IF THEY

4    DO INTEND TO CALL A WITNESS.

5              AT 7:00 WE GOT AN E-MAIL THAT BASICALLY SAID MATTEL    09:04

6    MAY CALL A WITNESS, MAY CALL A WITNESS, REGARDING THE RAINY DAY

7    RASCALS.  NOTHING MORE.

8              THREE MORE E-MAILS FROM MS. AGUIAR TO MR. ZELLER.  I

9    WENT TO BED AT 11:00.  NO NOTICE -- WE HAVE NEVER BEEN TOLD --

10   TO-DATE, RIGHT NOW, I DO NOT KNOW OF THE IDENTITY OF THE MATTEL   09:04

11   WITNESS.

12             YOUR HONOR, THAT'S JUST NOT FAIR, BECAUSE AS THE

13   COURT KNOWS -- I MEAN, I WAS NOT HERE, BUT THE COURT DID SAY

14   THAT THE 48-HOUR RULE WOULDN'T APPLY FOR A REBUTTAL.  THAT'S

15   OKAY.  I ACCEPT THAT.  THAT'S FINE.                              09:04

16             BUT THE 7:00 WOULD HAVE ALLOWED US LAST NIGHT TO DO

17   WHAT YOU NORMALLY DO IN A CASE LIKE THIS, WHICH IS TO SEARCH

18   YOUR RECORDS, TO PREPARE FOR CROSS-EXAMINATION.  THIS IS

19   AMBUSH, AND IT'S A LITTLE BIT OF GAME-PLAYING ON THE LAST DAY

20   OF A CASE THAT I THINK WE REMARKABLY HAVE GOTTEN TOGETHER ON      09:04

21   MOST THINGS.

22             I WOULD JUST ASK, A, TO CONFIRM THAT THERE IS NO

23   REBUTTAL WITNESS.  BUT IF THEY DO WANT TO OFFER A REBUTTAL

24   WITNESS THIS MORNING, THEY'VE VIOLATED THE COURT'S SPECIFIC

25   RULE.  THEY HAVE NOT TOLD US THE IDENTITY OF THE WITNESS TODAY.   09:05

1      **MR. ZELLER:**  YOUR HONOR, THE ONLY ISSUE WAS WHETHER

2   OR NOT WE IDENTIFIED THIS PERSON BY NAME.  WE TOLD THEM WHAT

3   THE SUBJECT WAS POTENTIALLY GOING TO BE.  I ASKED THEN FOR AN

4   ASSURANCE THAT IF I THEN SAID WHO THE WITNESS WAS, THAT WE HAD

5   THE SAME AGREEMENT AS WE HAD LAST WEEK.  BECAUSE THE COURT WILL        09:05

6   RECALL, THERE WAS A RATHER EXTENSIVE DISCUSSION ABOUT WHEN WE

7   WOULD HAVE TO DISCLOSE REBUTTAL.  AND IT WOULDN'T BE BEFORE

8   THEY'VE ENDED THEIR CASE.

9            SO I SENT THAT E-MAIL, AND NO SUCH ASSURANCE WAS

10  FORTHCOMING.                                                          09:05

11           WE DON'T WANT A SITUATION WHERE THEY ARE GOING TO

12  TURN AROUND AND SAY, 'WE'RE GOING TO CALL THAT PERSON INSTEAD'

13  IN ORDER TO GET AROUND THE IDEA THAT THEY WOULD BE LIMITED IN

14  THEIR EXAMINATION TO WHAT WAS RAISED IN REBUTTAL.

15      **THE COURT:**  BUT, COUNSEL, THE PROBLEM WITH THAT IS, I          09:05

16  RECEIVED A COMMITMENT FROM MGA THAT THEY WERE NOT GOING TO CALL

17  ANYBODY ELSE.  FOR THEM TO TURN AROUND AND DO THAT WOULD BE IN

18  VIOLATION OF THE REPRESENTATIONS TO THE COURT; SO THAT'S NOT A

19  CONCERN.

20           WHAT'S YOUR OTHER CONCERN?                                   09:06

21      **MR. ZELLER:**  THAT WAS THE CONCERN.  I SENT AN E-MAIL

22  IN RESPONSE TO IT, AND I DIDN'T GET A RESPONSE.

23           I DID NOT UNDERSTAND THE COURT TO BE SAYING WE HAD TO

24  SAY THE WITNESS'S NAME.  I TOLD THEM WHAT THE REBUTTAL WAS

25  GOING TO BE OVER.                                                     09:06

1    **THE COURT:**  I WAS ONLY GOING TO REQUIRE YOU TO DO

2    THIS ONCE I RECEIVED A FIRM REPRESENTATION THAT THERE'S NOTHING

3    MORE TO THEIR CASE.  AND I RECEIVED THAT.

4    **MR. NOLAN:**  I WOULD SAY, YOUR HONOR, I GAVE YOU THAT

5    COMMITMENT ON THURSDAY, BECAUSE AS YOU'LL RECALL, THAT WAS THE          09:06

6    PREDICATE FOR THEN THE EXCHANGE OF THE UNSEALING OF THE

7    DECLARATION WITH RESPECT TO MR. BRYANT.

8    **THE COURT:**  I DO RECALL THAT.  THAT'S PRECISELY WHY

9    MR. QUINN'S DECLARATION WAS TURNED OVER, BECAUSE THE

10   REPRESENTATION WAS GIVEN THAT THERE WILL BE NOBODY ELSE.  AND I         09:06

11   FULLY INTEND TO ENFORCE THAT.

12   **MR. ZELLER:**  WELL, THEN THAT'S FINE, YOUR HONOR, BUT

13   I DID NOT GET A RESPONSE TO THAT E-MAIL WHERE I ASKED THEM TO

14   CONFIRM THAT THAT WAS THEIR UNDERSTANDING THAT IT APPLIED HERE

15   AS WELL.  THAT WAS NOT CLEAR TO ME.                                     09:07

16   I UNDERSTOOD, AND I RECALL, OF COURSE, VERY WELL,

17   THAT EXCHANGE LAST WEEK, THAT REPRESENTATION THAT WAS MADE.

18   AND I WANTED TO MAKE SURE THAT IT APPLIED TO THE SAME

19   DISCLOSURE.  AND I SENT AN E-MAIL.  I DIDN'T GET A RESPONSE.

20   **MS. AGUIAR:**  I USUALLY DON'T DO THIS, AND I DON'T              09:07

21   WANT TO INTERRUPT MR. ZELLER, BUT WE STARTED OUR E-MAIL

22   EXCHANGES AT 7:00 LAST NIGHT.  I E-MAILED HIM AT 7:20, AT 8:00,

23   AT 9:00, AND HIS REQUEST TO ME FOR THIS SUPPOSED THIRD-TIME

24   AROUND REPRESENTATION CAME AFTER MIDNIGHT LAST NIGHT.  I MUST

25   ADMIT, I HAD SHUT OFF MY BLACKBERRY AT THAT POINT AND GONE TO          09:07

```
 1   SLEEP.

 2           SO FOR HIM TO STAND HERE THIS MORNING AND SAY HE DID

 3   NOT GET A RESPONSE TO AN E-MAIL THAT HE SENT AFTER MIDNIGHT,

 4   FRANKLY, ENRAGES ME.  SO I'M SORRY IF I'M BEING A LITTLE BIT

 5   UPSET HERE, BUT I FIND IT OUTRAGEOUS.                          09:07

 6           MR. ZELLER:  YOUR HONOR, THIS IS A WITNESS WHO THEY

 7   KNOW ABOUT.  IT IS A WITNESS WHO HAS BEEN ON THE WITNESS LIST.

 8           THE COURT:  WHO IS IT?  LET'S REMOVE THE MYSTERY

 9   HERE.

10           MR. ZELLER:  IT'S CASSIDY PARK.                        09:08

11           THE PROFFER THAT WE --

12           THE COURT:  YOU'VE GOT TO BE KIDDING ME.

13           MR. ZELLER:  NO.

14           THE COURT:  DIDN'T YOU vociferously ARGUE THAT SHE

15   SHOULD NOT BE RECALLED JUST A FEW DAYS AGO?                    09:08

16           MR. ZELLER:  THE PROFFER I'LL MAKE, YOUR HONOR, SHE'S

17   BEING CALLED ON ONE ISSUE, WHICH IS THAT ONE DRAWING THAT THE

18   COURT KNOWS IS AT ISSUE.  SHE RECOGNIZES THE HANDWRITING OF IT;

19   SHE CAN OFFER LAY OPINION UNDER 901; AND IT CAN BE ADMITTED ON

20   THAT BASIS.                                                    09:08

21           THEY ARE DISPUTING THE AUTHENTICITY.  THE COURT HEARD

22   IT YESTERDAY.  THAT IS A BASIS FOR ESTABLISHING THE

23   AUTHENTICITY OF THAT DOCUMENT.  THAT'S THE ONE SUBJECT SHE

24   WOULD BE --

25           THE COURT:  YOU NOT ONLY HAD THE REPRESENTATION THAT   09:08
```

```
 1   THAT WAS ALL THE CASE THAT THEY WERE GOING TO CALL, BUT YOU
 2   ALSO HAD A FURTHER SPECIFIC REPRESENTATION FROM MR. NOLAN ABOUT
 3   CASSIDY PARK, THAT THEY WERE NOT GOING TO CALL HER.  THERE'S NO
 4   WAY THAT MR. NOLAN COULD STAND UP THIS MORNING AND SAY, 'I'M
 5   CALLING CASSIDY PARK.'  SO I CAN'T SEE, MR. ZELLER, HOW THAT
 6   COULD HAVE BEEN YOUR GOOD-FAITH BASIS FOR NOT DOING WHAT THE
 7   COURT ASKED YOU TO DO LAST NIGHT, AND THAT IS NOTIFY THEM OF
 8   YOUR REBUTTAL CASE BEFORE 7:00.
 9        MR. ZELLER:  I TOLD THEM THE SUBJECT, YOUR HONOR.
10   AND I APOLOGIZE IF I MISUNDERSTOOD ABOUT THE IDENTITY PART,
11   BUT, IN FACT, THE FACT THAT IT WAS CASSIDY PARK IS EXACTLY WHAT
12   WAS CAUSING ME CONCERN.  MR. NOLAN COULD VERY WELL COME IN
13   TODAY AND SAY, 'WELL, NOW THEY ARE GOING TO CALL HER ANYWAY;
14   GIVE ME LEAVE, JUDGE, SO THAT I CAN CALL HER IN MY CASE AND I
15   CAN EXAMINE HER ON THOSE ADDITIONAL SUBJECTS.'
16        THE COURT:  MY RESPONSE WOULD HAVE BEEN THE SAME
17   RESPONSE THAT I ULTIMATELY DECIDED I WAS GOING TO DECIDE WITH
18   CASSIDY PARK, WHAT I INDICATED ON THE RECORD LAST WEEK:  THAT
19   SHE HAD BEEN EXCUSED.  AND THE SAME RESPONSE THAT I HAD WITH
20   RESPECT TO CARTER BRYANT TO YOU YESTERDAY.
21        I'M TRYING TO BE AS CONSISTENT AS I CAN HERE,
22   COUNSEL.  I DON'T UNDERSTAND WHY -- I'D LIKE TO TAKE A LOOK --
23   IF SOMEONE COULD DIG UP WHAT I SAID YESTERDAY IN TERMS OF WHAT
24   I WAS ASKING FOR BY 7:00, BECAUSE PERHAPS MY RECOLLECTION IS
25   NOT CONSISTENT WITH WHAT I SAID.
```

09:09

09:09

09:09

09:09

09:10

1        **MR. ZELLER:**  AGAIN, I APOLOGIZE IF I MISUNDERSTOOD.

2        **THE COURT:**  THERE'S NOTHING TO APOLOGIZE FOR,

3    COUNSEL.  THERE'S NOTHING TO APOLOGIZE FOR.

4        **MR. NOLAN:**  YOUR HONOR, WE'LL GET THAT TRANSCRIPT

5    REFERENCE.

6        THE OTHER POINT THAT I WILL MAKE IS THAT THE SUBJECT

7    MATTER IS NOT TRUE REBUTTAL.  SETTING ASIDE THE 7:00 RULE, THIS

8    ISSUE ABOUT RAINY DAY RASCALS WAS WELL COVERED IN OUR BRIEF; IT

9    IS NOT REBUTTAL EVIDENCE FOR TACTICAL REASONS, WHICH I WILL NOT

10   REARGUE WITH YOU.  THEY MADE A DECISION.  IT WAS RAISED IN        09:10

11   THEIR CASE.  THEY COULD HAVE CALLED CASSIDY PARK IN THEIR

12   CASE-IN-CHIEF.  THERE WAS NO SURPRISE.  THEY ELECTED NOT TO.

13   SO ON THE SUBSTANTIVE ISSUE, IN ADDITION TO THE 7:00 VIOLATION,

14   THIS IS NOT PROPER REBUTTAL, YOUR HONOR.

15       **THE COURT:**  VERY WELL.  LET'S BRING THE JURY IN AND        09:11

16   LET'S GET THROUGH THE DEFENDANT'S CASE-IN-CHIEF, AND THEN THE

17   COURT WILL TAKE UP THIS ISSUE OF A REBUTTAL WITNESS.  I WOULD

18   LIKE TO SEE WHAT EXACTLY I SAID YESTERDAY.

19       **MR. NOLAN:**  YOUR HONOR, WE'LL CALL THE CUSTODIAN OF

20   RECORDS.  IT WILL BE VERY SHORT.  WE'LL PLAY THE GALVANO          09:11

21   DEPOSITION, WHICH IS ABOUT AN HOUR.  AND THEN THERE IS -- THEY

22   WERE SUPPOSED TO DETERMINE WHETHER OR NOT THE WALL STREET

23   JOURNAL ARTICLE WAS EVER CORRECTED WITH RESPECT TO THEIR TYPO.

24   WE GOT THE FIRST PART OF THE STIPULATION.  MR. ZELLER

25   REPRESENTED THAT HE WOULD LOOK INTO WHETHER OR NOT THE WALL        09:11

```
 1   STREET JOURNAL WAS EVER NOTIFIED AND ASKED TO CORRECT THAT
 2   ARTICLE.  THAT PART HAS NEVER BEEN REPORTED BACK TO US, AND
 3   WE'D LIKE TO COMPLETE THAT BEFORE WE REST.
 4         THE OTHER POINT IS, YOU'LL RECALL THAT THERE WAS A
 5   CHART THAT HAD PAYMENTS TO ANNA RHEE, THE FACE PAINTER; AND THE     09:11
 6   COURT ASKED MATTEL TO GO BACK AND DETERMINE WHETHER OR NOT THAT
 7   DOCUMENT WAS ACCURATE WITH RESPECT TO THOSE PAYMENTS.
 8         WITH THAT, YOUR HONOR, WE INTEND TO REST.
 9         THE COURT:  THERE'S THAT STIPULATION THAT WE ENTERED
10   INTO REGARDING PALMER.                                             09:12
11         IS THAT COMING IN AS WELL?
12         MR. NOLAN:  THAT'S CORRECT, YOUR HONOR.  WE NEED
13   THAT.  AND THEN WE WOULD REST.
14         THE COURT:  ALL RIGHT.  I'M GOING TO TAKE A VERY
15   BRIEF RECESS BEFORE WE BRING THE JURY IN.                          09:12
16         MR. RUSSELL?
17         MR. RUSSELL:  WOULD IT BE ACCEPTABLE FOR YOU TO
18   E-MAIL US THE JURY INSTRUCTIONS SO THAT IF WE WANTED TO MAKE
19   ANY CHANGES OR PROPOSALS OR CATCH TYPOS -- IT WOULD BE SO MUCH
20   EASIER IF WE HAD AN ELECTRONIC VERSION FOR BOTH SIDES.             09:12
21         THE COURT:  YES.  I SUPPOSE I COULD.
22         WHO DO YOU WANT ME TO E-MAIL THIS TO?
23         I'LL E-MAIL IT TO SOMEONE FROM MATTEL AND SOMEONE
24   FROM MGA.
25         (OFF-THE-RECORD DISCUSSION.)                                 09:15
```

```
1          THE COURT:  OKAY.

2          WE HAVE A JUROR WHO'S NOT FEELING WELL TODAY,

3  JUROR NUMBER 7, MS. Dome.  ALL SHE'S ASKED AT THIS POINT IS THE

4  NEED TO TAKE ADDITIONAL BREAKS.  I'M GOING TO LET HER KNOW,

5  THOUGH, WE DO NOT ANTICIPATE THIS BEING A FULL DAY AND THAT SHE   09:20

6  CAN CERTAINLY TAKE WHATEVER BREAKS SHE WANTS, JUST TO LET THE

7  COURT KNOW.

8          (WHEREUPON, JURORS ENTER COURTROOM.)

9          THE COURT:  GOOD MORNING, MEMBERS OF THE JURY.

10          I RECEIVED WORD -- I GUESS MS. DOME, YOU'RE NOT          09:21

11  FEELING TOO WELL THIS MORNING.

12          FORTUNATELY, TODAY IS NOT GOING TO BE A FULL DAY.  WE

13  ANTICIPATE TO MOVE TO THE NEXT PHASE OF THIS PROCEEDING BY

14  WRAPPING UP, BY HAVING -- THE DEFENSE PLANS TO REST, AND THE

15  PLAINTIFF WILL BE FINALLY RESTING AS WELL.                      09:22

16          THE COURT IS GOING TO HAVE TO DO SOME WORK WITH

17  COUNSEL IN TERMS OF FINISHING UP THE JURY INSTRUCTIONS AND THE

18  VERDICT FORM FOR YOU, AND THEN WE WERE PLANNING TO START WITH

19  THAT TOMORROW MORNING FIRST THING.

20          BUT, MS. DOME, IF YOU NEED ANY BREAKS -- YOU            09:22

21  INDICATED TO THE CLERK THAT YOU MAY WANT TO TAKE SOME BREAKS --

22  JUST LET ME KNOW.  THIS APPLIES TO ALL JURORS.  JUST RAISE YOUR

23  HAND AND SAY THAT YOU NEED TO TAKE SOME TIME.  BUT WE DO HOPE

24  TO BE ABLE TO GET THROUGH THE DAY RATHER QUICKLY.

25          THANK YOU FOR LETTING US KNOW.                          09:22
```

```
 1              MGA MAY CALL ITS NEXT WITNESS.

 2         MR. NOLAN:  THANK YOU, YOUR HONOR.

 3              MGA CALLS AS ITS NEXT WITNESS THE DESIGNATED

 4  CUSTODIAN OF RECORDS FOR MATTEL.

 5         THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

 6  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

 7  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

 8  HELP YOU GOD?

 9         THE WITNESS:  I DO.

10         THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

11  YOUR LAST NAME FOR THE RECORD.

12         THE WITNESS:  KIM GOHATA, G-O-H-A-T-A.

13                    DIRECT EXAMINATION

14  BY MR. NOLAN:

15  Q    GOOD MORNING.                                      09:23

16  A    GOOD MORNING.

17  Q    I'M MR. NOLAN.  I REPRESENT MGA.  I HAVE A COUPLE OF

18  QUESTIONS.

19              I UNDERSTAND, AS WE'RE PASSING UP A NOTEBOOK OF

20  DOCUMENTS TO YOU, THAT YOU HAVE BEEN DESIGNATED AS THE        09:23

21  CUSTODIAN OF RECORDS FOR MATTEL; IS THAT CORRECT?

22  A    YES.

23  Q    AND COULD YOU TELL THE JURY WHAT YOUR CURRENT POSITION IS

24  AT MATTEL.

25  A    I'M IN-HOUSE COUNSEL IN MATTEL'S LAW DEPARTMENT.        09:24
```

4538

1    Q    HOW LONG HAVE YOU HELD THAT POSITION?

2    A    I'VE BEEN WITH MATTEL FOR EIGHT AND A HALF YEARS.

3    Q    DURING THOSE EIGHT AND A HALF YEARS, HAVE YOU ALWAYS BEEN

4    ASSIGNED TO THE LEGAL DEPARTMENT?

5    A    YES.                                                      09:24

6    Q    AND IN CONNECTION WITH YOUR ASSIGNMENT TO THE LEGAL

7    DEPARTMENT, HAVE YOU BECOME FAMILIAR WITH THE MANNER IN WHICH

8    MATTEL MAINTAINS ITS BUSINESS RECORDS WITHIN ITS VARIOUS

9    DIVISIONS?

10   A    YES.                                                      09:24

11   Q    HAVE YOU BEEN FAMILIAR WITH PRODUCTION IN VARIOUS

12   LITIGATION MATTERS, INCLUDING THIS ONE, IN TERMS OF HOW BATES

13   NUMBERS ARE ASSIGNED TO DOCUMENTS PRODUCED BY MATTEL?

14   A    PRODUCTION IN GENERAL, YES.

15   Q    I DON'T THINK WE'VE EVER DONE THIS BEFORE, BUT WE'VE      09:24

16   REFERRED TO SOMETHING CALLED BATES NUMBERS.  WHAT'S YOUR

17   UNDERSTANDING OF WHAT A BATES NUMBER SIGNIFIES IN CONNECTION

18   WITH THE PRODUCTION OF DOCUMENTS IN LITIGATION?

19   A    IT'S HOW PARTIES NUMBER DOCUMENTS, GENERALLY SEQUENTIALLY,

20   AS THEY PRODUCE DOCUMENTS, IDENTIFYING WHICH PARTY PRODUCED    09:25

21   WHICH DOCUMENTS.

22   Q    AND YOU'RE FAMILIAR WITH THE BATES NUMBERS USED BY THE

23   PARTIES IN PRODUCING DOCUMENTS IN THIS LITIGATION?

24   A    MATTEL, YES.

25   Q    SO YOU UNDERSTAND THAT A MATTEL PRODUCTION DOCUMENT, THAT  09:25

| | |
|---|---|
| 1 | IS, A DOCUMENT THAT IS PRODUCED FROM WITHIN MATTEL'S OWN |
| 2 | RECORDS, BEARS AN "M" IN FRONT OF A SERIES OF NUMBERS; IS THAT |
| 3 | CORRECT? |
| 4 | **MR. ZELLER:**  FOUNDATION. |
| 5 | **THE COURT:**  SUSTAINED. |
| 6 | **BY MR. NOLAN:** |
| 7 | Q    HAVE YOU REVIEWED ANY DOCUMENTS IN PREPARATION FOR TODAY'S |
| 8 | TESTIMONY? |
| 9 | A    YES. |
| 10 | Q    WERE THEY PROVIDED TO YOU BY COUNSEL FOR MATTEL? |
| 11 | A    YES. |
| 12 | Q    WHICH COUNSEL PROVIDED THEM TO YOU? |
| 13 | A    I DON'T -- ON THURSDAY, I DON'T REMEMBER.  STEVE? |
| 14 | Q    OKAY. |
| 15 | A    I'M SORRY. |
| 16 | Q    THAT'S OKAY. |
| 17 | A    I MET HIM FOR THE FIRST TIME ON THURSDAY. |
| 18 | Q    BUT IN ANY EVENT, STEVE WAS A LAWYER -- OUTSIDE COUNSEL |
| 19 | FOR MATTEL? |
| 20 | A    YES. |
| 21 |      AND THEN AGAIN THIS MORNING WITH MR. ZELLER. |
| 22 | Q    YOU MET WITH MR. ZELLER THIS MORNING? |
| 23 | A    YES. |
| 24 | Q    DURING THOSE MEETINGS, DID YOU GO OVER VARIOUS DOCUMENTS |
| 25 | WITH STEVE AND THEN AGAIN THIS MORNING WITH MR. ZELLER? |

09:25

09:25

09:25

09:26

1    A    YES.

2    Q    AND DURING THAT TIME, DID YOU HAVE AN OPPORTUNITY TO LOOK

3    TO DETERMINE WHETHER OR NOT THE DOCUMENTS THAT WERE SHOWN TO

4    YOU HAD PRODUCTION NUMBERS THAT STARTED WITH THE LETTER "M," AS

5    IN 'MATTEL'?                                                    09:26

6    A    YES.

7    Q    DIRECTING YOUR ATTENTION, THEN, TO WHAT'S MARKED IN THE

8    WHITE NOTEBOOK AS TRIAL EXHIBIT 1286.

9            FIRST OF ALL, ONE OTHER FOUNDATIONAL POINT.

10           HAS IT BEEN YOUR EXPERIENCE, WITH EIGHT AND A HALF       09:26

11   YEARS OF EMPLOYMENT AT MATTEL, THAT MATTEL GENERALLY KEEPS AND

12   MAINTAINS E-MAIL -- OR THEY COMMUNICATE BUSINESS ISSUES THROUGH

13   THE USE OF E-MAILS?

14   A    COULD YOU RESTATE THAT.

15   Q    MATTEL HAS AN E-MAIL SYSTEM; CORRECT?                      09:27

16   A    CORRECT.

17   Q    AND IT'S BEEN YOUR EXPERIENCE THAT PEOPLE WITHIN MATTEL

18   COMMUNICATE BY E-MAIL DURING THE COURSE OF BUSINESS; CORRECT?

19   A    CORRECT.

20   Q    AND THOSE E-MAILS ARE MAINTAINED IN THE ORDINARY COURSE OF  09:27

21   BUSINESS BY MATTEL; CORRECT?

22           **MR. ZELLER:**  QUESTION IS VAGUE; LACKS FOUNDATION.

23           **THE COURT:**  GO AHEAD AND ASK THE FOUNDATIONAL

24   QUESTION, AND WE'LL DOUBLE BACK WITH THE FOLLOW-UP.

25           YOU MAY ANSWER THE QUESTION, WHETHER THEY'RE KEPT IN     09:27

1    THE COURSE OF BUSINESS.

2            BUT I WANT TO KNOW HOW SHE KNOWS THAT AS WELL.

3    **BY MR. NOLAN:**

4    Q    ARE THEY KEPT IN THE ORDINARY COURSE OF BUSINESS?

5    A    I BELIEVE SO.                                        09:28

6    Q    HOW DO YOU KNOW THAT?

7    A    JUST FROM WORKING AT MATTEL.  I SEND E-MAILS AND RECEIVE

8    E-MAILS AS PART OF THE BUSINESS.

9    Q    AND THOSE E-MAILS ARE KEPT FOR SOME PERIOD OF TIME;

10   CORRECT?                                                  09:28

11   A    CORRECT.

12   Q    NOW DIRECTING YOUR ATTENTION TO 1286.

13           FIRST OF ALL, IS THIS A DOCUMENT THAT WAS PRODUCED

14   FROM THE BUSINESS RECORDS OF MATTEL?

15   A    IT HAS THE MATTEL BATES NUMBER, SO IT WAS PRODUCED AS PART  09:28

16   OF THIS LITIGATION.

17   Q    COULD YOU READ FOR THE RECORD THE BATES NUMBER THAT

18   APPEARS ON THIS DOCUMENT.

19   A    M-0079797.

20   Q    AND DO YOU RECOGNIZE THIS AS AN E-MAIL EXCHANGE WITH       09:29

21   ATTACHMENTS, BEARING THE DATE APRIL 5, 2002, AT 2:05 P.M.?

22   A    YES.

23   Q    THANK YOU.

24           **MR. NOLAN:**  YOUR HONOR, I'D OFFER EXHIBIT 1286.

25           **THE COURT:**  ANY OBJECTION?                    09:29

```
 1          MR. ZELLER:  YES.  402, 403; AND IT'S HEARSAY.

 2          I'M TALKING ABOUT FOUNDATION AS WELL AS FOR

 3     RELEVANCE.

 4          THE COURT:  I'M STRUGGLING WITH THIS, COUNSEL.  LET

 5     ME SEE YOU AT SIDE-BAR.                                    09:29

 6          (WHEREUPON, THE FOLLOWING PROCEEDINGS

 7          WERE HELD AT SIDE-BAR:)

 8          THE COURT:  I'M FINE WITH THE HEARSAY, BECAUSE IT'S

 9     FROM MATTEL'S; BUT RELEVANCE --

10          MR. NOLAN:  WE OFFER IT FOR IMPEACHMENT; THAT THE    09:30

11     THIRD PARAGRAPH IN THE BODY ARTICULATION TALKS ABOUT 'WE KNOW

12     WE WANT TO USE ARMS SIMILAR TO THE BRATZ.'

13          AND DURING THE COURSE OF QUESTIONING EARLIER

14     WITNESSES AT MATTEL, THEY DID NOT RECALL THAT BRATZ PUBLICLY

15     AVAILABLE BRATZ MATERIAL WAS USED IN ARTICULATION, WHICH REALLY  09:31

16     IS JUST THE MOVEMENT PART ON DOLLS.  THERE WAS TESTIMONY THAT

17     MATTEL OPENED THE DOOR ON THE SUBJECT BY SHOWING TO MR. LARIAN

18     E-MAILS WITH RESPECT TO THE USE OF PUBLICLY AVAILABLE BARBIE

19     RELATED MATERIALS WITH RESPECT TO THE ARTICULATION OF THE BODY

20     MODE.  AND WE JUST BELIEVE NOW THEY OPENED THAT DOOR.       09:31

21          THE FACT OTHER WITNESSES COULD NOT IDENTIFY; THE FACT

22     THAT THEY THEMSELVES USED BRATZ; JUST TO LEVEL THE PLAYING

23     FIELD, TO SHOW THERE'S NOTHING WRONG WITH USING THAT.

24          MS. AGUIAR:  THERE IS ALSO, IN ADDITION TO THE

25     PARAGRAPH MR. NOLAN IDENTIFIED, IN THE FIRST PARAGRAPH, IT    09:31
```

```
 1   SAYS:  "Hi paul, cassandra sent out to you TODAY THREE OF THE
 2   DOLL's SOFTGOODs PACKAGES, ONE fast CAST BODY FOR FITTING,
 3   APPEARANCE DEFINITION FOR ALL FOUR DOLLS, AND ONE BRATZ DOLL
 4   FOR YOUR REFERENCE."  SO IT MAKES CLEAR THAT MATTEL HAS, ON AT
 5   LEAST ONE OCCASION, DONE THE SAME THING.                        09:32
 6          THE COURT:  I CAN SEE HOW THIS GOES TO A LACHES
 7   DEFENSE.  I'M NOT SEEING HOW IT COMES IN IN 1-A.  BASICALLY
 8   YOU'RE -- MATTEL DID THE SAME THING THING; YOU'RE ACCUSING MGA
 9   OF DOING AND IT GOES TO THAT AFFIRMATIVE DEFENSE.  I DON'T SEE
10   IT COMING IN IN THIS PHASE.                                     09:32
11          MR. NOLAN:  YOUR HONOR, I UNDERSTAND THAT POINT.
12          MY ONLY ISSUE IS THAT HAVING OPENED THE DOOR WITH
13   RESPECT TO IT IN THIS PHASE AGAINST MGA ON THIS LIMITED POINT
14   -- WE'RE NOT GOING TO OFFER ANY TESTIMONY TO SHOW -- JUST TO
15   CLOSE OUT THEY LOOP.  THEY OPENED IT.  WE DIDN'T THINK IT WAS   09:32
16   RELEVANT.
17          THE COURT:  I DO RECALL THE TESTIMONY HE IS REFERRING
18   TO; IT WAS THE SKIPPER.
19          MS. AGUIAR:  EXACTLY.
20          THE COURT:  THIS IS THE SKIPPER TESTIMONY.              09:32
21          MR. ZELLER:  BUT IT HAS NOTHING NOTHING TO DO WITH --
22   SKIPPER HAD TO DO WITH THE FACT IT WAS AN E-MAIL THAT WAS
23   COMING IN ANYWAY, AND IT WAS ALSO PART OF THE TIME PERIOD.
24   THIS WAS GOING ON DURING THE TIME PERIOD.  IT'S PART OF THE
25   DEVELOPMENT E-MAILS.  IT HAD ATTACHED TO IT A BRATZ SCULPT.     09:33
```

 1    THAT'S WHY THE E-MAIL CAME IN.

 2            THE OTHER CONNECTION IS ALSO --

 3        **THE COURT:**  THIS WAS THE E-MAIL THAT HAS THE BRATZ

 4    SCULPT ATTACHED TO IT AND THE SKIPPER?

 5        **MR. ZELLER:**  RIGHT.                                  09:33

 6            WE AREN'T MAKING A CLAIM IN THIS CASE, AND HAVEN'T

 7    MADE A CLAIM, THAT THEY COPIED SKIPPER.

 8            AND ALSO, MR. NOLAN SAYS THIS IS TO IMPEACH THE

 9    CREDIBILITY OF SOME WITNESSES, BUT NOT WHO THAT WOULD BE.

10            FIRST OF ALL, THIS IS EXTRINSIC.                    09:33

11        **THE COURT:**  THIS COMES IN IN 1-B; IT'S NOT 1-A.

12        **MR. NOLAN:**  JUST WHILE WE'RE HERE, THERE IS ONE OTHER

13    ISSUE.

14        **THE COURT:**  LET'S GO.

15        **MR. NOLAN:**  THE ONE ISSUE THAT I WANTED TO BRING UP    09:33

16    IS A SERIES OF COPYRIGHT APPLICATIONS THAT BEAR THE --

17        **THE COURT:**  BRAZILIAN.

18        **MR. NOLAN:**  YOUR HONOR, THESE ARE PRODUCED NOT BY

19    MGA; THEY WERE WITHIN THE RECORDS OF MATTEL.  AND OUR POINT IS

20    THAT THE FACT THAT MATTEL HAS THEM IN ITS BUSINESS RECORDS AND  09:34

21    HAS NOT PRODUCED THEM IN THIS CASE FOR US DEMONSTRATES THESE

22    DOCUMENTS WERE AVAILABLE PUBLICLY.  AND THAT'S WHY WE WOULD ASK

23    THEM TO BE --

24        **THE COURT:**  THE PROBLEM WE HAVE WITH MR. LARIAN WAS

25    NOT THE -- NO ONE SPEAKS PORTUGUESE.                         09:34

1    **MR. NOLAN:** THE NAME OF CARTER BRYANT IS INCLUDED IN

2    ENGLISH RIGHT ON THE DOCUMENT, FOLLOWED BY A SECOND DUPLICATE

3    OF THE COPYRIGHT REGISTER; AND THIS ONE IS IN ENGLISH; THESE

4    ARE IN THE FILES AT MATTEL.

5    **THE COURT:**  BUT WE'RE HAVING THE SAME PROBLEM AS WE          09:34

6    DID BEFORE, WHERE, IS THIS AN ACCURATE TRANSLATION?  THAT WAS

7    THE ONLY REASON WHY I -- I RULED ON IT BEFORE.  I'M NOT

8    CHANGING MY RULING AT THIS POINT ON THAT, JUST BECAUSE IT'S A

9    CUSTODIAN OF RECORDS.

10   **MR. ZELLER:**  IT'S THE SAME ISSUE.  AND MR. NOLAN          09:35

11   REPRESENTS IT IS OUT OF MATTEL'S LITIGATION FILES.

12   **THE COURT:**  MR. LARIAN WAS ABLE TO RECOGNIZE IT.  IT

13   WAS JUST A MATTER OF NOT HAVING A TRANSLATION OR AN AUTHENTIC,

14   VERIFIED, ENGLISH TRANSLATION.

15   **MR. NOLAN:**  I ACCEPT THAT, YOUR HONOR.  THERE IS A          09:35

16   TRANSLATION.  BUT I THINK THAT IT'S IMPORTANT TO NOTE --

17   **THE COURT:**  YOU ALL HAVE HAD A LOT OF NOTICE ON THIS.

18   YOU JUST NEED A VERIFIED TRANSLATION.

19   MY CONCERN IS WE HAVE A PORTUGUESE JUROR IN THERE,

20   AND I'M NOT GOING TO SEND BACK A FOREIGN LANGUAGE DOCUMENT;          09:35

21   THAT'S JUST A MATTER OF --

22   **MR. NOLAN:**  YOUR HONOR, WHAT IF I REDACTED THE

23   SPANISH OUT OF IT AND JUST LEFT THE NAME "CARTER H. BRYANT"?

24   THAT IS NOT TRANSLATED; IT'S IN ENGLISH.  ANYBODY WOULD KNOW

25   IT'S AVAILABLE IN PUBLIC RECORDS.  THAT'S THE IMPORT OF ALL OF          09:35

1    THIS.

2            **THE COURT:**  COULD YOU DO THAT, WITH ALL THE

3    PORTUGUESE, AND JUST HAD HIS NAME ON A PIECE OF PAPER?

4            WHAT IS THAT?

5            **MR. NOLAN:**  THAT WOULD SHOW THAT THE NAME CARTER        09:35

6    BRYANT WAS OUT THERE IN THE PUBLIC, ALIGNED TO BRATZ, AND THAT

7    IT WAS NO EFFORT TO CONCEAL IT; IT WAS AVAILABLE IN THE PUBLIC

8    RECORD.  THEY WERE ABLE TO PULL IT DOWN.  THAT'S THE IMPORT.

9            **THE COURT:**  WHAT YEAR?

10           **MR. ZELLER:**  2002.

11           **THE COURT:**  SEPTEMBER OF 2002.

12           **MR. NOLAN:**  WHICH IS DURING THE SAME PERIOD OF THE

13   ALLEGED CONCEALMENT BY THEM, YOUR HONOR.

14           **THE COURT:**  I SEE.

15           **MR. NOLAN:**  AND I WOULD SAY THAT WE WOULD REDACT,      09:36

16   EVERYTHING ABOUT -- IF THE CONCERN IS ABOUT THE PORTUGUESE

17   TRANSLATION, THE KEY IS THE NAMES, AND IT'S CARTER BRYANT AND

18   IT'S IN 2002 AND IT'S FILED PUBLICLY.

19           **THE COURT:**  I'VE LAID OUT THE SCRIPT AS MUCH AS I CAN

20   AS TO HOW YOU GET THIS IN.  I MADE MY RULING BEFORE.             09:36

21           **MR. NOLAN:**  WE COULDN'T FIND ANYBODY WHO SPEAKS

22   PORTUGUESE.

23           **THE COURT:**  YOU'RE JUST NOT THERE YET.

24           MY RULING IS THE SAME AS BEFORE.

25           **MR. NOLAN:**  OKAY.  IT GETS BETTER, MEANING IT'S A     09:37

tuesday, july 8, 2008                    trial day 21, morning session

1    LITTLE BIT EASIER.

2         **THE COURT:**  IF IT'S ANY CONSOLATION, THEY HAD NO LUCK

3    WITH YOUR CUSTODIAN.

4         **MR. NOLAN:**  THIS IS THE MY SCENE 360 DOCUMENT.  THIS

5    IS A BUSINESS RECORD THIS COMES IN.  THIS IS THE ONE THAT TALKS          09:37

6    ABOUT -- THIS IS THE MY SCENE 360 THAT I'M GOING TO OFFER.

7    THIS IS, AGAIN, 2002.  THIS IS THE ONE WHERE IT TALKS ABOUT

8    LILY; THE NAME OF BRATZ; "BRYANT CLEARED WORLDWIDE"; "LILY

9    POINTED OUT THE FORMER MATTEL DESIGNER WHO WAS APPROVED..."

10        **THE COURT:**  WE'VE HAD TESTIMONY ON THIS ALREADY.              09:37

11        **MR. NOLAN:**  IT GOES TO IMPEACHMENT.  WE DIDN'T GET IT

12   IN THROUGH HER, SO WE WANTED TO GET THE BUSINESS RECORDS IN.

13        **THE COURT:**  COUNSEL?

14        **MR. ZELLER:**  THAT'S IMPERMISSIBLE AS EXTRINSIC

15   IMPEACHMENT EVIDENCE.  THEY SHOWED IT TO LILY MARTINEZ.  SHE          09:38

16   SAID SHE HADN'T SEEN IT BEFORE.  THERE'S ABSOLUTELY NO EVIDENCE

17   IN THIS CASE ABOUT --

18        **THE COURT:**  WHO PREPARED THIS DOCUMENT?

19        **MR. ZELLER:**  THAT WE DO NOT KNOW.  THERE ARE MEETING

20   NOTES OF SOME SOURCE, PROBABLY FROM WITHIN MATTEL; WE'RE NOT          09:38

21   DISPUTING THAT THESE ARE MATTEL RECORDS.  BUT WHAT THE

22   STATEMENT IS IS THAT SUPPOSEDLY THAT LILY MARTINEZ SAID

23   SOMETHING.  SHE DOESN'T HAVE ANY RECOLLECTION OF IT.  SHE'S

24   ALREADY BEEN CONFRONTED WITH THIS DOCUMENT.  NOW WE'RE JUST

25   ATTEMPTING TO DO SOMETHING EXTRINSIC, AND THAT'S NOT --            09:38

1            **THE COURT:**  IS IT STRICTLY FOR THE IMPEACHMENT OF

2    LILY MARTINEZ, OR IS THERE ANOTHER BASIS?

3            **MR. NOLAN:**  ALSO TO SHOW KNOWLEDGE THAT CARTER WAS

4    THE DESIGNER WHO CREATED BRATZ.  WHICH GOES EXACTLY TO THE

5    IMPEACHMENT DURING 2002 THAT THE CONCEALMENT, THE ALLEGED          09:38

6    CONCEALMENT, THEY KNEW WHO THE DESIGNER WAS.  CARTER BRYANT.

7    IT'S IN THESE RECORDS.  THEY ARE MAINTAINED BY MATTEL IN THE

8    ORDINARY COURSE OF BUSINESS.

9            **MR. ZELLER:**  IT'S 403.  THIS IS GETTING VERY

10   COLLATERAL AND EXTRINSIC AT THIS POINT.  THIS IS A MY SCENE        09:39

11   DOCUMENT.

12            **MS. AGUIAR:**  HOW IS IT COLLATERAL?

13            **MR. ZELLER:**  THEY ATTEMPTED TO GET IT IN BEFORE.

14           **THE COURT:**  I THINK THE POINT THAT -- I MEAN, THERE'S

15   EVIDENCE -- YOU'VE GOT TO BE ABLE TO FIGURE OUT WHO DID THIS       09:39

16   DOCUMENT.

17            **MR. QUINN:**  LILY MARTINEZ, WHO'S IN THIS GROUP, WAS

18   SHOWN THIS DOCUMENT.  SHE DOESN'T KNOW WHO DID IT; SHE DOESN'T

19   KNOW WHO PREPARES THEM.  SHE SAYS SHE DOES NOT REMEMBER SAYING

20   THAT.  PUTTING THE DOCUMENT IN I DON'T THINK IS PROPER.            09:39

21           **THE COURT:**  WHAT'S YOUR OTHER ONE?

22            **MR. NOLAN:**  THIS IS AN ORGANIZATIONAL CHART OF THE

23   GIRLS' DIVISION AS OF JUNE OF 2001.  THIS IS SIMPLY AN

24   ORGANIZATIONAL CHART.

25           **THE COURT:**  OKAY.                                      09:39

```
 1              ANY OBJECTION TO THAT?

 2         MR. ZELLER:  I DON'T KNOW WHAT THE PURPORTED

 3   RELEVANCE IS.  IF THERE'S A PROFFER, MAYBE WE WOULD HAVE AN

 4   UNDERSTANDING.

 5         MR. NOLAN:  THOSE ARE THE TWO --                      09:40

 6         MS. AGUIAR:  AND THE ANNA RHEE ISSUE.

 7         MR. NOLAN:  THOSE ARE THE TWO.  AND THEN THAT LAST

 8   DOCUMENT, YOUR HONOR, WAS THE ANNA RHEE LIST OF PAYMENTS FOR

 9   $200,000.

10         THE COURT:  RIGHT.

11              HAVE YOU FOUND OUT ABOUT THAT?

12         MR. ZELLER:  WE'VE LOOKED INTO IT.  WE DON'T HAVE ANY

13   OBJECTION TO IT COMING IN.

14         THE COURT:  VERY WELL.

15         MR. ZELLER:  WE'RE NOT GOING TO AGREE THAT IT'S       09:40

16   CORRECT, BUT IT'S A RECORD OF SOME SORT.

17         THE COURT:  THIS ONE HERE -- BRYANT, CREATOR OF

18   BRATZ --

19         MR. NOLAN:  IT'S AN AUTHENTIC DOCUMENT AND IT'S

20   COMPLETELY RELEVANT, YOUR HONOR.  IT ALSO GOES TO THE WHOLE  09:40

21   QUESTION -- IT'S NOT COLLATERAL -- THE WHOLE ISSUE OF WHETHER

22   OR NOT THEY KNEW CARTER BRYANT WAS AFFILIATED WITH BRATZ.

23         MS. AGUIAR:  ON THE FACE OF IT, I THINK THIS DOCUMENT

24   HAS AN INDICAE OF BEING A BUSINESS RECORD.  IT CLEARLY HAS A

25   HEADER OF "MY SCENE 360" ON IT.  IT SAYS --                 09:40
```

1      **THE COURT:**  UNLIKE THE PHOTOGRAPH WHICH I EXCLUDED.

2      **MR. ZELLER:**  SURE.

3      **THE COURT:**  THAT WAS IN A DIFFERENT CATEGORY.  THIS

4  IS CLEARLY A MATTEL DOCUMENT; IT'S CLEARLY A BUSINESS RECORD.

5      **MR. ZELLER:**  WE'RE NOT DISPUTING THAT.  WE'RE NOT                09:41

6  DISPUTING THE AUTHENTICITY ON THAT.  WE JUST THINK IT'S

7  IRRELEVANT AND IT'S EXTRINSIC EVIDENCE THAT'S BEING OFFERED FOR

8  IMPEACHMENT.

9      THEY ALREADY CONFRONTED THE WITNESS WITH THIS VERY

10  DOCUMENT.  THE CASE LAW IS VERY CLEAR THAT IF THAT'S YOUR SHOT,   09:41

11  YOU TRY AND IMPEACH SOMEBODY ON THAT.

12      **THE COURT:**  YOU'RE RIGHT, IF IT WAS STRICTLY FOR

13  IMPEACHMENT.  I SEE THE RELEVANCE AS RELATED TO THE ISSUE OF

14  CONCEALMENT, AT LEAST AS OF 2002, THAT IT WAS KNOWN, BASED ON

15  BUSINESS RECORDS AT MATTEL.                                      09:41

16      NOW, YOU CAN RESPOND TO THAT IN ARGUMENT, BUT I DO

17  THINK IT'S MARGINALLY RELEVANT.  ITS PROBATIVE VALUE IS NOT

18  GREAT.  I DON'T SEE A PREJUDICIAL EFFECT.  I'M GOING TO

19  OVERRULE THE OBJECTION ON THAT, AND THE REST STAYS OUT.

20      **MR. NOLAN:**  WHAT ABOUT THE ORGANIZATIONAL CHART?           09:41

21      **THE COURT:**  WHAT IS THE RELEVANCE OF THAT

22  ORGANIZATIONAL CHART?

23      **MR. NOLAN:**  IT SHOWS A LOT OF PEOPLE WORKING ON --

24      **THE COURT:**  I AGREE.  FINE.  HAVE YOUR CHART.

25      **MR. ZELLER:**  I DO OBJECT.                                  09:42

| | |
|---|---|
| 1 | **THE COURT:**  OBJECTION OVERRULED. |
| 2 | (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.) |
| 3 | **THE COURT:**  YOU MAY PROCEED, COUNSEL. |
| 4 | **BY MR. NOLAN:** |
| 5 | Q    I WOULD ASK YOU TO TURN TO TRIAL EXHIBIT 4436 IN YOUR |
| 6 | BOOK. |
| 7 | DO YOU HAVE THAT? |
| 8 | A    YES. |
| 9 | Q    AND ALTHOUGH IT'S HARD TO READ -- I MEAN, IT'S PRETTY |
| 10 | SMALL -- DO YOU SEE IN THE LOWER RIGHT-HAND CORNER A BATES |
| 11 | NUMBER? |
| 12 | A    YES. |
| 13 | Q    AND IT'S "M," AS IN MATTEL, 0155946. |
| 14 | DO YOU SEE THAT? |
| 15 | A    YES. |
| 16 | Q    AND THIS DOCUMENT IS ENTITLED "MY SCENE 360," AND IT BEARS |
| 17 | THE DATE OF OCTOBER 24, 2002. |
| 18 | A    YES. |
| 19 | Q    AND THIS WAS PRODUCED FROM THE BUSINESS RECORDS OF MATTEL; |
| 20 | CORRECT? |
| 21 | A    CORRECT. |
| 22 | **MR. NOLAN:**  YOUR HONOR, WE'D OFFER EXHIBIT 4436. |
| 23 | **THE COURT:**  ANY OBJECTION, OTHER THAN WHAT WAS STATED |
| 24 | AT SIDE-BAR? |
| 25 | **MR. ZELLER:**  NOTHING IN ADDITION. |

09:42 (lines 5-6)
09:42 (lines 10-11)
09:43 (line 15)
09:43 (line 20)
09:43 (line 25)

```
 1              THE COURT:  VERY WELL.

 2              IT'S ADMITTED.

 3              (EXHIBIT 4436 RECEIVED.)

 4    BY MR. NOLAN:

 5    Q    THE LAST DOCUMENT I'D LIKE TO SHOW YOU THIS MORNING, SO      09:43

 6    YOUR TIME WON'T BE TOO LONG ON THE STAND, IS AN EXHIBIT MARKED

 7    AS 16002.

 8    A    YES.

 9    Q    DO YOU RECOGNIZE THIS DOCUMENT AS BEARING A BATES NUMBER

10    ON THE LOWER RIGHT-HAND CORNER OF "M," AS IN MATTEL, 0254181?     09:43

11    A    YES.

12    Q    AND YOU SEE THE TITLE OF THAT IS "GIRLS/BARBIE."

13              DO YOU SEE THAT?

14    A    YES.

15    Q    DOES THIS APPEAR TO BE AN ORGANIZATIONAL CHART WITH          09:44

16    RESPECT TO THE GIRLS/BARBIE DIVISION?

17    A    YES, IT DOES.

18              MR. NOLAN:  YOUR HONOR, WE'D OFFER TRIAL

19    EXHIBIT 16002.

20              THE COURT:  ANY OBJECTION, OTHER THAN WHAT WAS STATED    09:44

21    PREVIOUSLY?

22              MR. ZELLER:  NO, YOUR HONOR.

23              THE COURT:  VERY WELL.

24              IT'S ADMITTED.

25              (EXHIBIT 16002 RECEIVED.)
```

1          **MR. NOLAN:**  NOW THAT IT'S IN EVIDENCE, WITH RESPECT

2     TO EXHIBIT 4436, COULD WE PUBLISH THAT, YOUR HONOR?

3          **THE COURT:**  YOU MAY.

4     **BY MR. NOLAN:**

5     Q    YOU SEE, UP IN THE RIGHT-HAND CORNER OF THIS DOCUMENT THAT          09:44

6     WAS PRODUCED BY MATTEL, IT'S DATED OCTOBER 24, 2002.

7     A    YES.

8     Q    IT'S MY SCENE 360; IS THAT CORRECT?

9     A    YES.

10    Q    MY SCENE IS A SUB BRAND OF BARBIE; IT'S A DOLL; CORRECT?          09:45

11         **MR. ZELLER:**  FOUNDATION.

12         **MR. NOLAN:**  I'LL LAY THE FOUNDATION.

13    **BY MR. NOLAN:**

14    Q    IN THE LEGAL DEPARTMENT, HAVE YOU HAD THE OCCASION TO

15    BECOME FAMILIAR WITH THE VARIOUS PRODUCTS THAT ARE OFFERED FOR         09:45

16    SALE AT RETAIL BY MATTEL?

17    A    YES; SOME OF THEM, YES.

18    Q    AND ARE YOU FAMILIAR WITH A DOLL BY THE NAME OF "MY

19    SCENE"?

20    A    YES.                                                              09:45

21    Q    DO YOU KNOW IF IT'S A DOLL THAT IS OFFERED FOR SALE BY

22    MATTEL?

23    A    YES.

24    Q    AND IS IT OFFERED FOR SALE?

25    A    YES.                                                              09:45

1    Q    I ASK YOU TO NOTE HERE ON THE DATE AND TIME; IT SAYS

2    "ATTENDEES FOR THURSDAY, OCTOBER 24, 2002," AND IT HAS THE NAME

3    "LILY" IN THE SECOND CORNER UNDER "DESIGN."

4         DO YOU SEE THAT?

5    A    YES.                                                      09:45

6    Q    AND THEN IF YOU DROP DOWN TO JUST UNDER NUMBER ONE, "MY

7    SCENE BRAND UPDATE," AND RIGHT UNDER PRODUCT, THE SECOND BULLET

8    POINT, IT SAYS "BRYANT," IN QUOTES, "CLEARED WORLDWIDE AS WELL,

9    BUT LILY POINTED OUT THAT THE FORMER MATTEL DESIGNER WHO IS THE

10   CREATOR OF BRATZ WAS NAMED BRYANT."                           09:46

11        DID I READ THAT CORRECT?

12   A    YES.

13   Q    AND THEN JUST FOR COMPLETION HERE, IF WE GO TO 16002 THAT

14   IS NOW IN EVIDENCE, JUST SO THE JURY CAN SEE THIS.

15        **MR. NOLAN:**  MAY WE HAVE THE FRONT PAGE.               09:46

16   **BY MR. NOLAN:**

17   Q    THAT'S THE FRONT PAGE OF THE DOCUMENT THAT WAS WITHIN THE

18   RECORDS OF MATTEL; CORRECT?

19   A    CORRECT.

20   Q    AND THEN IF YOU WOULD JUST GO THROUGH THE FIRST THREE     09:46

21   PAGES SLOWLY.

22        THESE ARE ORGANIZATIONAL CHARTS MAINTAINED WITHIN THE

23   RECORDS OF MATTEL; CORRECT?

24   A    THEY APPEAR TO BE, YES.

25   Q    THANK YOU.                                               09:47

1        **MR. NOLAN:**  I HAVE ONE QUESTION FOR MR. ZELLER,

2   YOUR HONOR, BEFORE I GO ON.

3            (OFF-THE-RECORD DISCUSSION.)

4        **MR. NOLAN:**  YOUR HONOR, IF I MIGHT, WITH THE WITNESS

5   STILL ON THE STAND, WE HAVE A STIPULATION WITH RESPECT TO THE        09:47

6   DOCUMENT THAT WE DISCUSSED EARLIER HAVING TO DO WITH -- IT'S

7   TRIAL EXHIBIT 18429, AND IT'S A LIST OF VENDORS FOR 2002.

8            WE'D OFFER THAT INTO EVIDENCE.

9        **THE COURT:**  ANY OBJECTION?

10       **MR. ZELLER:**  NO OBJECTION.                                  09:47

11       **THE COURT:**  IT'S ADMITTED.

12           (EXHIBIT 18429 RECEIVED.)

13       **MR. NOLAN:**  MAY WE PUBLISH, YOUR HONOR?

14       **THE COURT:**  YOU MAY.

15  **BY MR. NOLAN:**

16  Q    THIS IS NOW IN EVIDENCE AS EXHIBIT 18429, AND THIS IS A

17  LIST OF VENDORS FOR 2002.  THERE'S A LIST UNDER "FACE,"

18  PRESUMABLY FACE PAINTERS, AND --

19       **MR. NOLAN:**  AARON, DO YOU MIND HIGHLIGHTING THE

20  SECOND ONE, WHICH IS ALSO THE HIGHEST AMOUNT, "ANNA RHEE,           09:48

21  $200,000."

22       **THE COURT:**  THIS IS THE BUDGETED AMOUNT; CORRECT?

23       **MR. NOLAN:**  CORRECT, FOR 2002.

24       **THE COURT:**  VERY WELL.

25       **MR. NOLAN:**  I HAVE NOTHING FURTHER OF THIS WITNESS,         09:48

 1   YOUR HONOR.

 2           **THE COURT:**  VERY WELL.

 3           ANY CROSS-EXAMINATION?

 4           **MR. ZELLER:**  NO, YOUR HONOR.

 5           **THE COURT:**  VERY WELL.                          09:48

 6           YOU'RE EXCUSED, MA'AM.  THANK YOU.

 7           YOUR NEXT WITNESS, COUNSEL.

 8           **MR. NOLAN:**  THANK YOU.

 9           OUR NEXT WITNESS IS BY VIDEO.  IT IS THE DEPOSITION

10   OF JEANNE GALVANO, TAKEN BY MR. ZELLER ON DECEMBER 18, 2007, IN   09:48

11   ANCHORAGE, ALASKA.  THE LENGTH OF IT, FOR PURPOSES OF THE

12   JURY'S CONVENIENCE, IS ONE HOUR AND TWO MINUTES.

13           **THE COURT:**  VERY WELL.

14           MS. DOME, SHOULD WE TAKE A BREAK?

15           **JUROR:**  NO.

16           **THE COURT:**  ARE ALL OF THE OTHER JURORS FINE FOR THE

17   NEXT HOUR?

18           OKAY.  VERY WELL.

19           (WHEREUPON, THE VIDEO DEPOSITION OF

20           JEANNE KAREN GALVANO WAS PLAYED;                    09:49

21           EXCERPTS PROVIDED BY COUNSEL AS FOLLOWS:)

22                        JEANNE KAREN GALVANO,

23   Called as a witness herein, being first duly sworn to

24   State the truth, the whole truth and nothing but the truth

25   By the Notary, testified under oath as follows:

tuesday, july 8, 2008                    trial day 21, morning session

1       Q     If you could please tell us your full name for

2  The record.

3       A     Jeanne Karen Galvano.

4       Q     If you could please tell us your -- your

5  Employment background briefly.

6       A     I'm currently employed in a behavioral health

7  Center in Seward where I'm a program manager for a

8  Disability services program.  And I also work as a

9  Consultant for a federal 8(a) company that has a contract

10  To provide technical assistance and training to American

11  Indians and Alaska Natives in grant writing, economic

12  Development, language preservation and healthy marriage

13  Initiatives.

14       Q     And are those separate jobs or --

15       A     Yes.

16       Q     So with respect to the first one, the behavioral

17  Health position that you mentioned, do you work for a

18  Particular organization?

19       A     Yes.

20       Q     And what's that?

21       A     SeaView Community Services.

22       Q     And how long have you held that position?

23       A     A year and a half.

24       Q     And then you mentioned that you were working as

25  A consultant in some capacity for federal aid [sic].  How

```
 1   Long have you been doing that?
 2       A    Since 2002 or '3.
 3       Q    What job did you have prior to the time you had
 4   These two most recent jobs?
 5       A    I was a tribal administrator for a Native
 6   Organization.
 7       Q    What time period did you have that job?
 8       A    February 2000 to May or June of 2002.
 9       Q    What was the name of the organization you were
10   Working for?
11       A    Qutekcak, Q-U-T-E-K-C-A-K.
12       Q    And you said your position was travel
13   Administrator?
14       A    Tribal administrator.
15       Q    Oh, tribal.  And generally speaking, what was
16   Your -- what were your responsibilities in that position?
17       A    It was an equivalent of being a director,
18   Overseeing the operations of the organization.
19       Q    And what kind of operations?
20       A    Most of it had to do with grant administration.
21       Q    Prior to holding that tribal administrator
22   Position, what job did you have?
23       A    Probation officer for the State of Alaska.
24       Q    And what time period did you have that job?
25       A    July -- July of '92 to 2000.
```

1        Q     Until May of 2000?

2        A     Until -- no.  July of '92 until February of

3    2000, I believe.  I think the '92 is correct.  It might

4    Have been '93.  It was only about seven years.  So I'm

5    Sorry.  It was probably '93.

6        Q     So your best testimony is is that you were a

7    Probation officer for the State of Alaska from

8    Approximately the July 1993 to the February 2000 time

9    Period?

10       A     Yes.

11       Q     Did you have a particular title, or was it just

12   Probation officer?

13       A     Adult Probation Officer II.

14       Q     Do you know a person named Janet Bryant?

15       A     Yes, I do.

16       Q     And when did you meet Janet?

17       A     In Alaska shortly after we got there, I think in

18   The spring then.  It would have been '81.  If I'm correct

19   About the time frames, it would have been spring of the

20   Year we got there.  We moved up there in February, and I

21   Believe it was February of '81.  So we met her in the

22   Spring.

23       Q     And was that when you moved to Soldotna?

24       A     Yes.

25       Q     And was it your understanding that when you

tuesday, july 8, 2008                    trial day 21, morning session

```
 1   Moved to Soldotna Janet Bryant was already living there?

 2        A    Yes.

 3        Q    And how is it you met Janet?

 4        A    My husband met her, and he thought we would be

 5   Good friends, and he set up a play date for her to come to

 6   The house and meet me.

 7        Q    And was that your best recollection, in about

 8   The spring of 1981?

 9        A    Yeah.  It was in the spring.  I'm pretty sure it

10   Was '81.  The latest it would have been would be '82.

11   That's a long time ago.

12        Q    And what's your husband's name?

13        A    Salvatore, with an E on the end.  Salvatore.

14        Q    Are you still married to him?

15        A    Yes.

16        Q    And at some point, then, did you also meet Janet

17   Bryant's husband?

18        A    Yes.

19        Q    And when did you meet him?

20        A    Shortly after.  We went to her house.

21        Q    Did you have an understanding as to how your

22   Husband met Janet?

23        A    Uh-huh.

24        Q    That's a yes?

25        A    Yes.
```

```
 1        Q     If you could please tell us what that
 2   Understanding is.
 3        A     He was a carpet installer at that time, and he
 4   Installed the carpet in her home.  She made him cookies.
 5        Q     During the time when you were living there in
 6   Soldotna and Janet and Tom Bryant were living in Soldotna,
 7   Did you ever meet Carter Bryant?
 8        A     Yes.
 9        Q     And when did you first meet Carter?
10        A     At some time when I was at her home.
11        Q     In Soldotna?
12        A     Yes.
13        Q     And when you say "her home," you mean Janet's?
14        A     Yes.
15        Q     Do you recall, generally speaking, what Carter
16   Bryant was doing at the time?
17        A     He was in high school.
18        Q     Was he going to high school in Soldotna?
19        A     Yes.
20        Q     And back in that time period when all of you
21   Were living in Soldotna, namely the Bryants and you, did
22   You see Carter fairly frequently or infrequently?
23        A     Fairly frequently.
24        Q     And I take it at some point the Bryants moved
25   Away from Soldotna?
```

```
 1      A    Yes.

 2      Q    And you moved away from Soldotna?

 3      A    In -- ten years later in '89 we started

 4   Traveling back and forth, and then we moved over to Seward

 5   In '91.

 6      Q    Is it -- who is it who moved away from Soldotna

 7   First?  Was it you and your family or the Bryants?

 8      A    The Bryants.

 9      Q    When was the last time you saw Carter?

10      A    July 4th, but I don't remember the years.  2000

11   Something.  Maybe '3, maybe '2.

12      Q    Where were you?

13      A    In Springfield, I think.  It was either Nixa or

14   Springfield.

15      Q    Nixa or Springfield, Missouri?

16      A    Yeah.  Then -- it was probably -- it was the

17   House on Elderberry because I get mixed up with their post

18   Office stuff, whether it was Nixa or Springfield.  I'm

19   Pretty sure it was the house on Elderberry.

20      Q    Do you know if at that time he was building

21   Another house to live in?

22      A    He was building a studio there, and he had

23   Bought a mansion of sorts in another place that we visited

24   A couple times that he was beginning to renovate.

25      Q    You mentioned that apart from this July 4th
```

```
 1   Trip, whether it was in 2002 or 2003, that there were
 2   Several occasions over the past 20 years when you have
 3   Visited the Bryants at their home?
 4        A    Yes.
 5        Q    Are there other locations that you can recall
 6   Visiting them at?
 7        A    In California I visited them in Apple Valley, in
 8   L.A., but I'm not sure where, in -- California.  And then
 9   In Missouri in the -- Kimberling, when they lived in
10   Kimberling several times, and then in Nixa, and then if
11   There -- if the street is Elderberry and that's
12   Springfield, then there.
13        Q    And setting aside the trip that we have already
14   Talked about, which was that July 4th trip, on any of
15   These other trips that you -- you made to visit Janet
16   Where she was living at that particular time, did you see
17   Carter?
18        A    I believe the Apple Valley because he was in
19   High school, so he would have still been home.
20        Q    Any other trips?
21        A    Oh, one of the times in '98 I believe that --
22   Let me work backwards.  Kimberling.  I did see him, but
23   I'm not sure about the time frames, if there were more
24   Between those years because he was living in California.
25   I'd be confused about the California thing.
```

```
 1        Q    Well, let me try it this way, then:  Do you have
 2   A recollection of seeing Carter Bryant on one of your
 3   Visits to Missouri prior to the July 4, 2002 or 2003 trip
 4   That you described previously?
 5        A    Yes.
 6        Q    So you are certain that you saw him there, but
 7   You are not sure of the year, is that correct?
 8        A    I believe it was around -- it was in the '98
 9   Year.
10        Q    Are you able to tell me whether it was 1997
11   Versus 1998 versus 1999?
12        A    It would have had to be in '98.
13        Q    And why do you say it had to have been in '98?
14        A    Because of the circumstances of my traveling
15   There and traveling back and Janet coming to me.  And also
16   In '99 I was changing jobs.  And I think Carter would have
17   Been back in California by then, so if -- when I went to
18   See her, I wouldn't have seen him.  And in '97 I'm not
19   Sure when -- when he actually got -- went over there,
20   So -- the best I can remember is because of those
21   Circumstances I -- I wouldn't have seen him then.  It
22   Would had to have been the other time.
23        Q    Did you say in 1999 you were changing jobs?
24        A    I changed at 2000 in February so, you know, I
25   Was using up either leave or whatever, so I'd have to look
```

1    At my calendars to see what I was doing.

2         Q    Let me try it this way:  Did you visit Janet

3    Bryant wherever she was living in the year 1997?

4         A    I think so.

5         Q    Was that true in 1998?

6         A    Yes.

7         Q    Was that true in 1999?

8         A    I think so.

9         Q    Is it your recollection that 1995 to 2003 time

10   Period, with the exception of the year 2000 when you did

11   Not visit her, that your visits to Janet Bryant were to

12   Missouri?

13        A    Or California.  Oh, I'm sorry.  '87 was

14   California.  That's right.  '87 was California.  So it was

15   Probably Missouri, yes.

16        Q    Focusing on that time period, the 1995 to 2003

17   Time period, on those visits that you made to Janet Bryant

18   There in Missouri, how many times did you -- on how many

19   Of those trips did you see Carter?

20        A    Maybe one or two, maybe one.  I think he was in

21   California at that time.

22   Different.  Janet had come up and visited you in -- in

23   Seward in the 1998 time period, right?

24        A    Yes.

25        Q    Did she fly up to visit you?

```
 1       A     Yes.

 2       Q     And subsequent to that you visited Janet in

 3  Missouri.

 4       A     Yes.

 5       Q     And I take it you flew on that trip, as well?

 6       A     Yes.

 7       Q     And part of my question is:  Did you fly back

 8  Together from Alaska to the Lower 48, or did you travel

 9  Separately?

10       A     Separately.  She only stayed a week.

11       Q     I see.  So Janet stayed approximately a week

12  With you in Seward, Alaska in 1998.  She went back to

13  Missouri, as far as you knew, and then you subsequently

14  Made a trip to -- to the Lower 48 --

15       A     Yes.

16       Q     -- is that right?  Where did you go first, then,

17  On that trip?

18       A     It would have had to have been my mother's.

19       Q     So you went to Harrisburg, Pennsylvania first?

20       A     Yes.

21       Q     And then on the way back to Alaska is when

22  You -- you flew by way of --

23       A     Memphis.

24       Q     -- Missouri?

25       A     And Missouri, yes.
```

1      Q     And on that trip, how long did you stay with the

2    Bryants?

3      A     The best I -- I could remember and what I

4    Believe would have happened is that I went to my mother's

5    First, and then would have come back and through Janet to

6    Visit her before I went home.  So it would have only been

7    A few days.

8      Q     Are you able to tell me more precisely how long

9    That trip -- or how long you stayed with them on that

10   Trip?

11     A     No.  I -- I did that so many times, to know

12   Specifically how many days I stayed, I would not know.  It

13   Wouldn't have been less than a weekend or I wouldn't have

14   Done it.

15     Q     When you said that you did that so often, did

16   You do that in 1999, as well?

17     A     I think so.

18     Q     Do you know one way or another whether Carter

19   Bryant made trips to Missouri in 1999?

20     A     I wouldn't know that.

21     Q     Has Carter Bryant ever shown you any of his

22   Drawings of any kind?

23     A     Not directly, no.

24     Q     And then just to clarify, then -- I know you

25   Said that Carter had never shown you anything directly,

```
 1    But my question is is whether or not Carter ever showed
 2    You anything.  So let me -- let me try it this way:  Did
 3    Carter Bryant ever show you any drawings that he had ever
 4    Done?
 5         A    No.
 6         Q    Well, let me -- let me clarify that, then.
 7    There are no instances in which Carter Bryant ever showed
 8    You a drawing that he had done when he was there, is that
 9    True?
10         A    That's correct.
11         Q    Did he at some point give you a drawing?
12         A    Yes.
13         Q    When did that happen?
14         A    For my birthday.
15         Q    What year was that?
16         A    '98.
17         Q    And when was your birthday in 1998?
18         A    August 1, 1998; that year, '98.
19         Q    I'm sure it's August 1st every year, right?
20         A    You betcha.
21              THE WITNESS:  Well, I didn't want you to
22    Think I was born in '98.  We are on -- we are on tape here.
23    BY MR. ZELLER:
24         Q    So if I understand you correctly, on or about
25    August 1, 1998 Carter Bryant gave you a drawing?
```

1       A     No.  His mother brought the drawing with her and

2   Gave it to me from Carter.

3       Q     And that occurred on or about August 1, 1998?

4       A     On August 1, 1998.

5       Q     On your birthday itself?

6       A     On my birthday.

7       Q     Fair enough.  So what was the drawing?

8       A     It was a large drawing of a carousel.

9       Q     If you could maybe describe it a little bit more

10  In terms of --

11      A     I think it was about a --

12      Q     -- what it looked like.

13      A     -- 16 by 20.  It was colored.  I'm not sure if

14  It was pastels.  I think it might have been.  I still have

15  It.  I can picture it.  It was framed.  Janet brought it

16  In her suitcase.

17      Q     So Janet brought it to you in Alaska?

18      A     Yes.

19      Q     And you said that you still have that drawing?

20      A     Yes.

21      Q     Other than on that occasion, have you ever been

22  Given to keep or been shown any drawing that Carter Bryant did?

23              THE WITNESS:  I don't believe so.

24              MR. PAGE:  Sorry.  Could you read that

25  Back?  The question, not the answer.

1           THE WITNESS:  Oh.  Yeah.  I was thinking

2  About just that time.  So yes.

3       Q    On what other occasions?

4       A    There were two.  There was an earlier one, and

5  That's why I think I was confused because I was trying to

6  Remember something he might have given me or been given to

7  Me.  So I was thinking of more given.  When he shipped

8  That one doll that I bought, I think he put in a sketch

9  That he had done of the doll or a copy of that -- of a

10 Sketch he had done for me, one of the early sketches.  And

11 The other was when Janet showed me the sketches of the

12 Dolls he was working on that he wanted to -- you know,

13 That -- the line he wanted to create for himself.

14      Q    And when is it you received that sketch?

15      A    I don't remember the time frames.  It was -- it

16 Had to have been while he was working for Mattel.

17      Q    And then you mentioned that there was the other

18 Occasion in which Janet showed you sketches that Carter

19 Bryant had done?

20      A    Yes.

21      Q    How many sketches did she show you?

22      A    I believe there were three papers.

23      Q    And when you say "three papers," do you mean

24 Three pages?

25      A    Yes.

tuesday, july 8, 2008                    trial day 21, morning session

1      Q     And when is it that Janet showed you those

2  Drawings?

3      A     When I was out there in '98.  That's when I

4  Believe it was.

5      Q     You say that's when you believe it was.  Are you

6  Sure it was 1998 versus 1999?

7      A     It couldn't have been in '99.  It would have had

8  To be in '98.

9      Q     So your testimony is you are now sure that it

10 Was 1998?

11     A     Yes.

12     Q     And what did these drawings look like?

13     A     There were -- on onethere were several.

14 They didn't seem to have heads.  They had big feet.  There

15 Wasn't a lot of detail on one of them.  And on the others

16 I remember them being more head -- more heads, but not

17 Faces.  And -- or just eyes and mostly just figures in

18 Poses.  Very little detail, if any detail.

19     Q     Did you see drawings of any other kind at that

20 Time?

21     A     No.

22     Q     So you didn't see --

23     A     Excuse me.  Yeah.  Greeting cards.

24     Q     So you saw drawings relating to the one line of

25 Dolls and drawings that related to greeting cards?

1       A       Yes.

2       Q       Did you see any other drawings at that time?

3       A       I don't believe so.

4       Q       What did the greeting card drawings look like?

5       A       They were a lot like the carousel that he had

6    Drawn for me, that kind of -- that kind of card, more of a

7    Fanciful.

8       Q       What is it that it depicted?

9       A       I think one -- they were childlike figures,

10   Children.  You know, there is a line that I would have

11   Equated them to, but now I don't remember that.  Like a

12   Holly Hobby type of thing.  And -- and I thought she had

13   Shown me the carousel card that he made, the carousel --

14   The carousel that he made for me large was also a card.

15      Q       Were any of the drawings that were shown to you,

16   Whether for the dolls or the greeting cards, shown to you

17   On what looked like some kind of transparent paper?

18      A       No.  I remember it as being just drawing paper.

19      Q       I'm sorry.  What kind?

20      A       Drawing paper, like a sketch pad, but smaller,

21   More like an eight-and-a-half by eleven, something like

22   That.  It was folded.

23      Q       Did you see any that were on notebook paper?

24      A       No.  You mean, like, with lines?

25      Q       Right.

```
 1        A     No.

 2        Q     Or spiral bound kind of notebook?

 3        A     No.

 4        Q     You were mentioning that in this approximately

 5   1998 time period, that Janet had shown you three pages of

 6   Drawings that related to a doll that you understood Carter

 7   Bryant was working on?

 8        A     Dolls.

 9        Q     Dolls.  And why do you say "dolls"?

10        A     Because they seemed to be different.  There were

11   Several on onethat looked like they were different.

12   They didn't have different -- they didn't have heads, but

13   It was maybe the stances.  It looked like there were going

14   To be several.  And then -- I think it was three pages.

15   I'm not positive.  It could have been more.  I don't think

16   It was less.  So it seemed like there was more than one,

17   That it wasn't just one doll.

18        Q     And when you say at the time that you saw them

19   That there was no name for them, you are saying that the

20   Bratz' name was not being used for those drawings at the

21   Time you saw them?

22        A     Yeah, that's correct.

23        Q     Other than what you have told me, can you recall

24   Anything else regarding either how these drawings appeared

25   About any of the dolls that you saw at that time or
```

1    Anything that you and Janet discussed on that subject?

2        Q    At that time.

3        A    Like I said, I remember they were on several

4    Pieces of paper.  I remember what they looked like in that

5    They had specific, very -- very identifiable poses.  The

6    Feet were really big.  The group of the dolls I saw didn't

7    Have -- it didn't have a head.  The other pages had heads

8    On them.  But -- I'm not sure they had faces, or they

9    Might have just had eyes.  There wasn't a lot of detail to

10   Them.  They were just sketches.

11       Q    Anything else that you can remember?

12       A    No.  To -- to my best recollection, we talked

13   About -- I remember that at that time, and we talked about

14   Those things at that time.

15       Q    Was anyone else present when you and Janet had

16   This conversation and she showed you the drawings?

17       A    I don't believe so.

18       Q    And where were you?

19       A    In her -- in my bedroom.  I believe it was in my

20   Room.  She was showing me them.  I believe so.

21       Q    When you say "in my room," are you talking about

22   The room that you were staying in at the Bryants'?

23       A    Yeah.

24       Q    And where were they living at that time?

25       A    Kimberling.

1      Q     And I take it Carter is someone who you like?

2      A     I've known him since he was a little kid.  Yeah.

3  Sure.  He went to high school with my daughter.  We have

4  Been friends a long time.

5      Q     And you have been friends with Janet for a long

6  Time?

7      A     Yes.

8      Q     I take it you have been in contact with lawyers

9  About the lawsuit.

10      A     Intermittently.

11      Q     When was the first time you had some contact

12  With -- with lawyers about the lawsuit?

13      A     Maybe a year ago October or middle of the year.

14  Somewhere between October and January.

15      Q     Of 2006?

16      A     Yes.

17      Q     Focusing on that first time that you can recall

18  Someone calling you, one of the lawyers calling you about

19  The lawsuit, did that lawyer ask you questions?

20      A     Yes.

21      Q     Focusing on that conversation, we had started to

22  Talk about what you and Ms. Torres had discussed during

23  That conversation.  Please tell me what it is that you and

24  She had discussed in addition, if anything, to what you

25  Have already told me.

```
 1      A    I don't -- we talked about me seeing the
 2  Drawings and I told her about what I've told you, that I
 3  Saw them in August of that month, that I thought that
 4  Either Janet had brought them out with her or I saw them
 5  In her home, but then I realized I couldn't have seen
 6  Them -- she wouldn't have brought them with her, so I had
 7  To have seen them in her home.  That was the basis of our
 8  Conversation.
 9      Q    So it's the case that initially you told
10  Ms. Torres back in the fall of 2006 that you weren't sure
11  Whether or not Janet Bryant had shown you those drawings
12  That you later known -- you later knew became Bratz at
13  Your home in Alaska versus whether you saw them at Janet's
14  Home in Missouri?
15      A    Right.  I knew it was the time frame, but it was
16  Early, so I, you know, hadn't much been thinking about it.
17  We had just started talking about it.
18      Q    You understood that she was a lawyer for MGA when she
19  Called you?
20      A    Actually, no.  I kept thinking it had to do with
21  Carter because Janet called me and said this person might
22  Be calling and is it -- would you speak to them, and I
23  Said yes.  So I never really knew whose lawyer was calling
24  Me.  I just always hoped it was Carter's side.
25      Q    And I take it that the call that you received
```

1   From Janet Bryant was prior to the time that you got the

2   Call from Diana Torres?

3       A    It was after a conversation she had had -- she

4   And I had had -- when we were talking about it, I was

5   Asking how Carter was doing.  She said Carter was

6   Stressed.  And I said something like, well, you know, I

7   Wish they would just ask me.  I saw the drawings.  And

8   Then she and I both -- she remembered, the ones I showed

9   You.  And I said yes.  And she said, let me talk to Carter

10  And I'm going to call you back or let me talk to somebody.

11      And then she called me back and asked me if I would

12  Talk to the lawyer, and I said sure.  And then I -- Diana

13  Torres was the second one who called me.  I don't remember

14  The first name.  And that was just to leave a message that

15  Diana Torres would be calling me.

16      Q    Was it your impression from the call that you

17  Had with Janet Bryant where you mentioned to her that you

18  Had seen the drawings, that Janet had forgotten that she

19  Had shown you the drawings?

20      A    Yeah.  It was not even something we had been

21  Thinking about because she and I had talked over this

22  Period of time.  It was just I was sad for Carter and

23  That's what I said.  I wish I could tell them I saw the

24  Drawings.  You showed me them.  And she said, yes, that's

25  Right, I showed you his drawings.

```
1      Q    Is it fair to say that you understood, prior to
2  The time that you had that conversation with Janet Bryant
3  In which you said that you had seen the drawings back in
4  1998, that Carter's position in this lawsuit was that he
5  Had created the drawings in 1998 and therefore they were
6  Not owned by Mattel?
7                  THE WITNESS:  Yes.
8      Q    Well, you say "or."  It was your understanding
9  As of that telephone conversation that Janet had not
10 Remembered showing you the drawings, is that true?
11     A    It didn't seem like it when she said -- when she
12 Answered me when I said that.
13     Q    That was your impression from the call?
14     A    Yes.
15     Q    What is it that happened next, then, in
16 Relationship to the lawsuit?
17     A    I was getting -- I guess it was getting closer
18 To this time, so I got a call from John Trinidad.
19     Q    Is it your understanding that he works with
20 Mr.here?
21     A    Yes.  I found that out yesterday.
22     Q    Mr.is your lawyer?
23     A    Yes.
24     Q    Is it fair to say that it's your understanding
25 That someone else is paying Mr. Page's legal fees and not
```

1    You?

2         A    Yes.

3         Q    You had mentioned that during that time period,

4    1998, Janet Bryant had visited you in Alaska, right?

5         A    Yes.

6         Q    And then subsequent to that you visited her in

7    Missouri?

8         A    Yes.

9         Q    How much time elapsed between those two visits?

10        A    Probably about five weeks.

11        Q    Was there a particular reason why you went and

12   Visited Janet there in Missouri after you had just been

13   With her recently for a whole week in Alaska?

14             THE WITNESS:  I didn't go to visit Janet.

15   I went to my mother and then just did a triangle up.  My

16   Mother and my stepfather were ill.  He had Alzheimer's.

17   She had broken her hip.  They are very elderly, and I just

18   Went there to calm down before I went home, have her bake

19   Me cookies.  So I didn't go to see her.  I went because I

20   Believe at that time I was going back east.

21        Q    Let me perhaps sharpen up the question a little

22   Bit.  You went and visited your parents in the Harrisburg,

23   Pennsylvania area, right?

24        A    Uh-huh, I believe so, yes.

25        Q    In order to go and visit Janet in Missouri, you

1    Had to go out of your way to do that?

2         A    Oh, yeah.

3         Q    So it wasn't as though you already had a stop

4    Over in Missouri.

5         A    No.  Detroit, Memphis, Springfield.

6         Q    So it took some effort to get there?

7         A    Always effort.  And you remember effort.

8         Q    Do you have Exhibit 1171 in front of you?

9         A    Yes.

10        Q    Have you ever seen this before?

11        A    No.

12        Q    Does what we marked as Exhibit 1171 look in any

13   Way like any of the Bratz sketches that Janet Bryant

14   Showed you?

15             THE WITNESS:  Not really, except it has

16   Big shoes.

17        Q    Does what is depicted here on Exhibit 1171 look

18   Like Bratz to you?

19        A    No.

20        Q    Do you have Exhibit 1172 in front of you?

21        A    Yes.

22        Q    Have you ever seen this before?

23        A    No.

24        Q    Does anything in this picture we have marked as

25   Exhibit 1172 look like the Bratz sketches that you saw

```
 1   Back at the time when Janet Bryant showed them to you?

 2        A     No.

 3        Q     You have Exhibit 1173 in front of you?

 4        A     Yes.

 5        Q     Have you ever seen this before?

 6        A     No.

 7        Q     Is there anything in Exhibit 1173 that looks

 8   Like the Bratz sketches that Janet Bryant showed you?

 9                   THE WITNESS:  I don't think so.

10   BY MR. ZELLER:

11        Q     Is there anything that you see in Exhibit 1173

12   That looks like Bratz as you know it now?

13                   THE WITNESS:  I don't think so.

14        Q     Do you have Exhibit 1174 in front of you?

15        A     Yes.

16        Q     Is there anything about the appearance of this

17   Advertisement of the Dixie Chicks Wide Open Spaces CD that

18   Looks to you like the drawings that you saw of Bratz that

19   Janet Bryant showed you?

20                   THE WITNESS:  It would be such a stretch.

21   No.

22   BY MR. ZELLER:

23        Q     Is there anything in this advertisement that we

24   Have marked as Exhibit 1174 that looks like Bratz as you

25   Know it today?
```

1              THE WITNESS:  No.

2       Q     Did anyone say to you in that time period that

3    Any of the characters were named Zoe, Z-O-E?

4       A     No.

5       Q     Were named Lupe, L-U-P-E?

6       A     No.

7       Q     Were named Holiday?

8       A     No.

9       Q     Were named Fiona?

10      A     No.

11      Q     You have been through Exhibit 1155?

12      A     Yes.

13      Q     Is there anything in there that you recognize?

14      A     No.

15      Q     Are any of the drawings that you saw in Exhibit

16   1155 drawings that Janet Bryant ever showed you?

17      A     I don't believe so.

18      Q     Have you seen what we have marked as Exhibit

19   1107 before today?

20      A     No.

21      Q     Do you recognize what it is?

22      A     It's a Bratz doll.  I mean --

23      Q     But you know that from looking at it?

24      A     I know that from looking at it.

25      Q     Have you had an opportunity to look at Exhibits

1    701 through 716?

2         A    Yes.

3         Q    Are any of these drawings that we have marked or

4    Any of these materials that we have marked as Exhibits 701

5    Through 716 drawings or materials that Janet Bryant showed

6    You?

7         A    I don't believe so.

8         Q    Have you seen before today any of the drawings

9    Or materials that we have marked as Exhibits 701 through

10   716?

11        A    No.

12        Q    Show you what was previously marked as Exhibits

13   738 through 758.

14             (Exhibit Nos. 738 through 758 referenced.)

15        Q    Have you had a chance to look at Exhibits 738

16   Through Exhibits 758?

17        A    Yes.

18        Q    So let's, then, be clear about the other ones

19   For a moment.  With respect to Exhibits 738 through

20   Exhibit 757, those are -- those are not drawings that you

21   Saw from Janet Bryant, is that correct?

22        A    That's correct.

23        Q    Had you ever seen prior to today Exhibits 738

24   Through 757?

25        A    No.

1     Q    Okay.  So the record is clear, then, Janet

2  Bryant didn't show you any of the drawings that we have

3  Marked as Exhibit 759 through 776, is that correct?

4     A    I don't believe so -- yes.  I believe that's

5  Correct.

6     Q    You have reviewed Exhibits 759 through 776,

7  Right?

8     A    Yes.

9     Q    Are any of these drawings that Janet Bryant

10  Showed you?

11     A    I don't believe so.

12     Q    The drawings that Janet Bryant showed you, did

13  Any of them include what looked like boy figures?

14              THE WITNESS:  I -- I don't believe so, but

15  Without hair and heads -- now, the -- they had figures

16  Of -- they had a female sense to them, but I don't know.

17  BY **MR. ZELLER:**

18     Q    You'd mentioned earlier that back when Janet

19  Bryant showed you those drawings, you didn't know that

20  They were called Bratz, right?

21     A    They weren't called Bratz.  They didn't have a

22  Name.

23     Q    So when is it that you became aware that it was

24  A relevant fact in this lawsuit with Mattel as to when

25  Carter Bryant created Bratz sketches?

```
 1              THE WITNESS:  I would have assumed
 2   Something like that from the time I understood that the
 3   Lawsuit was about when he created them and who -- who he
 4   Was working for when he created them.  I'm not exactly
 5   Sure when that was.  Maybe when the lawsuit came out.
 6       Q    Did you first learn about the lawsuit by reading
 7   About it in the paper?
 8       A    No.  Janet told me there was going to be a
 9   Lawsuit.
10       Q    So, then, if I understand the chronology, at
11   Some point you recognized through the combination of
12   Circumstances you talked about earlier, from reading it in
13   The paper, talking with Janet and others, that an
14   Important issue in the case was when Carter Bryant created
15   Bratz, right?
16       A    Yes.
17       Q    And then a couple of years passed and you had
18   That conversation in October of 2006 that you described
19   Earlier with Janet Bryant where you had reminded her about
20   The fact that, as you say, she had shown you the Bratz
21   Sketches back in 1998, is that correct?
22       A    Yes.
23       Q    And as you talked about earlier, those drawings
24   That you saw didn't have faces, right?
25       A    That's correct.
```

1        Q      Some of them did not have heads, correct?

2        A      Yes.

3        Q      They did not have clothing?

4        A      Some did not, yeah.

5        Q      Some had clothing?

6        A      It was very simple sketch lines.  I thought most

7   Of them did not, but they were simple sketch lines.

8        Q      And then subsequent at some point, you knew that

9   There was a doll line that was called Bratz that was going

10  To come out, right?

11       A      Yes.

12       Q      Was it Janet who told you at some point, those

13  Drawings that I had shown you back in 1998 were for

14  Bratz?

15       A      Yes.

16       Q      Other than Janet telling you, was there any

17  Other source of information that you had for you for you

18  To figure out that what you had seen back in 1998, those

19  Simple line drawings without a name, in fact, related to

20  Bratz?

21       A      No.

22       Q      Do you have any documents, any e-mails, any

23  Calendar notation, any diary notation, to corroborate that

24  You saw Bratz drawings or those particular drawings you

25  Have been talking about back in 1998?

```
 1        A     No.
 2        Q     You have had an opportunity review Exhibit
 3   1177?
 4        A     Yes.
 5        Q     Do you recognize these as calendar pages of
 6   Yours from the 1998 time period?
 7        A     Yes.
 8        Q     Directing your attention to the month of July
 9   1998, which is JG0018B --
10        A     Yes.
11        Q     -- directing your attention to the entry for the
12   30th of July 1998, you see that?
13        A     Yes.
14        Q     Do you see where it says "Janet in at 11 p.m."?
15        A     Yes.
16        Q     That's your handwriting?
17        A     Yes.
18        Q     Is that a reference to Janet Bryant?
19        A     Yes, it is.
20        Q     Is that when she arrived and visited you in
21   That -- on that occasion in 1998 in Alaska?
22        A     Yes.
23        Q     Further down on the 31st you will see there are
24   Entries for "Matt in 2 to 4 p.m., Danielle in at 9 p.m."
25        A     Yes.
```

```
 1        Q    What are those referring to?
 2        A    It's Matthew, my son, flew in -- came in at
 3   Between 2:00 and 4:00.  And Danielle, my daughter, came in
 4   At 9:00 p.m. that night.
 5        Q    And did all of you stay together; that is,
 6   Namely, your son, your daughter, Janet and yourself on
 7   That trip?
 8              THE WITNESS:  Janet and I stayed together
 9   In a room.  My daughter Danielle stayed in the same hotel.
10   My son and his -- I'm not sure if they were married at
11   That time.  '98.  My son and his girlfriend stayed in a
12   Different one.
13   BY MR. ZELLER:
14        Q    Was there -- were these related in the sense
15   That Janet was coming in for a particular reason that your
16   Son and daughter were coming in for?
17        A    My 50th birthday.  Big party.
18        Q    Directing your attention to the entry for August
19   9, 1998, do you see that entry there?
20        A    Yes.
21        Q    It says "Janet home" with a question mark, and
22   Then arrows across the 9th and the 10th of August 1998?
23        A    Yes.
24        Q    What's that referring to?
25        A    This was made -- these were made before she
```

1    Came, so it might have been that I wasn't sure which day

2    She was going to go home.

3        Q    Based upon your review of the remainder of the

4    August 1998 calendar, that is, namely after the 9th and

5    10th of 1998, is it your belief, your understanding or

6    Recollection that you remained in Alaska for the rest of

7    August 1998?

8        A    No.

9        Q    Where did you -- what other trip did you take?

10       A    At the end of the month I -- where -- 28th, 29th

11   I left.  I was -- it looks like I was gone through Labor

12   Day.

13       Q    So if I understand you correctly, you went on a

14   Trip from August 28, 1998 through September 7, 1998?

15       A    Yes.  It could have been also the 27th.  The

16   "8/27 at 10:00 a.m." might have been my flight.

17       Q    And please, for the record, tell us what part

18   You are referring to.

19       A    On August 1998 on the 27th there is an "8/27 at

20   10:00 a.m." notation.

21       Q    And that's a reference to a flight you were

22   On?

23       A    I believe it was.

24       Q    You will see a little further down there are

25   References to AA?

1      A    Yes.

2      Q    Is that anything to do with your trip?

3      A    That's a telephone number of Alaska Airlines.

4      Q    On that trip that we have been talking about

5   When you left Alaska on or about August 27, 1998 and then

6   You returned on or about September 7, 1998, where did you

7   Visit?

8      A    I believe -- that's the trip I believe that was

9   To my mother's, and then to Janet on the way back.

10     Q    Are there any entries on your calendar during

11   That time period from August 27, 1998 to September 7, 1998

12   That references your trip to visit Janet?

13     A    No.

14     Q    So let's just make sure the record is clear on

15   This.  You took a trip to the Lower 48 states during the

16   Time period of August 27, 1998 to September 7, 1998,

17   Right?

18     A    Yes.

19     Q    You know on that trip you visited Harrisburg,

20   Pennsylvania?

21     A    Yes.

22     Q    You also visited Janet Bryant on that trip, is

23   That true?

24     A    Yes.

25     Q    Is that the trip in which you saw the Bratz and

```
 1   The other drawings that you talked about earlier?

 2       A    Yes.

 3       Q    As we talked about, there is nothing in your

 4   Calendar that references your visit to Janet at that time,

 5   Is that true?

 6       A    That's correct.

 7       Q    Do you have any documents of any kind to

 8   Corroborate or support your statements that you visited

 9   Janet Bryant during that time period?

10                    MR. HERRINGTON:  You mean other than her

11   Calendar?

12                    THE WITNESS:  Other than this, no.

13   BY MR. ZELLER:

14       Q    Please direct me to where in your calendar it

15   Substantiates that you took a trip and visited Janet

16   Bryant during that time period.

17                    THE WITNESS:  It doesn't state it, no.

18   BY MR. ZELLER:

19       Q    It's not reflected on your calendar, right?

20       A    No.

21       Q    That's correct?

22       A    That's correct.

23       Q    Let me try this way:  Are you aware of any

24   Document of any kind that references this trip to Janet

25   Bryant in the August/September 1998 time period?
```

```
 1              THE WITNESS:  No.
 2    When you took that trip
 3    That you testified about in August and September of 1998,
 4    Did you actually buy the plane ticket or did you get it in
 5    Some other way, such as exchanging miles?
 6        A    I don't remember if I did.  I know I checked the
 7    Miles.  That's the notation, the 48 and 45, how many did
 8    My husband have, how many did I have.
 9        Q    And please tell us what notation you are
10    Referring to.
11        A    On-- in August of 1998 under 26, on the
12    26th, the 25,288 and -- I'm sorry.  48,288 and 45,456, I
13    Believe those were mine and my husband's air mileage.
14        Q    And those were miles on Alaska?
15        A    Alaska.
16        Q    Now, with respect to all the handwritten entries
17    In this exhibit, which are your 1998 calendar pages that
18    We have marked as Exhibit 1177, did you make all these
19    Notations back in the 1998 time period?
20        A    Oh, yes.
21        Q    Have you made any notations on this calendar or
22    Any of these calendar pages since the year 2003?
23        A    No.
24        Q    Did you do anything to try and find out whether
25    Or not you still had any records of any kind to show that
```

```
 1    You took a trip to Missouri in the August or September
 2    1998 time period?
 3         A    Yes.
 4         Q    What did you do?
 5         A    I called the airlines.  I called my travel agent
 6    And asked her how long she kept records.  They only kept
 7    Them a couple years.  I called Alaska Airlines, the credit
 8    Card, to see if they could go back to that time and get me
 9    Anything.  And they said that was too far back, and
10    They -- they didn't think that they could.  She went back
11    As far as she could while she was on the phone with me
12    Because I was looking for the charge.  I called -- the
13    Only one that said they would put in a search was my
14    Citibank card, and they said they would search to see if
15    There was a charge to that.  But I never heard from them.
16         Q    Did you follow up with them?
17         A    Yes.  And they didn't know what I was talking
18    About and would have to start a search over.
19         Q    Other than what you just described, did you do
20    Anything else to try and determine whether or not there
21    Were any records that still existed that showed that you
22    Had made a trip to Missouri in August or September 1998?
23         A    I went back and looked at my -- my checks,
24    Canceled checks, but I hadn't kept that -- I only had
25    About three or four years back, so I didn't have them.
```

1       Q      Did you do anything else?

2       A      No.

3       Q      Do you recognize what we have marked as Exhibit

4   1179 as certain months from a calendar of yours from

5   1999?

6       A      Yes.

7       Q      You recognize that your calendar pages from

8   June, July, August, and December of 1999 are not among the

9   Pages that you provided in this case, is that correct?

10      A      Yes.

11      Q      Do you have any knowledge or information as to

12  What happened to your June 1999 calendar page?

13      A      No.

14      Q      Is the same true for the July 1999 page?

15      A      Yes.

16      Q      Is the same true for the August 1999 page?

17      A      Yes.

18      Q      I'll show you what was previously marked as

19  Exhibit 1152.  This is a group exhibit of various

20  Drawings.

21              MR. PAGE:  This was previously marked?

22              **MR. ZELLER:**  It was, 1152.

23          (Exhibit No. 1152 referenced.)

24  BY **MR. ZELLER:**

25      Q      Have you had an opportunity to review that

```
 1    Exhibit?
 2         A     Yes.
 3         Q     Are there any drawings in there that you
 4    Recognize as drawings that Janet Bryant showed you?
 5         A     No, I don't.  Didn't I look at these before?
 6         Q     So the record is clear, then, you've looked at
 7    Exhibit 1152?
 8         A     Yes.
 9         Q     Do you recognize any of those drawings as
10    Drawings that Janet Bryant had shown you at any time?
11         A     Not those specific drawings, no.
12         Q     Have you seen any of those drawings before
13    Today?
14         A     Drawings that looked like them, but not those.
15         Q     Which drawings in Exhibit 1152 did you see that
16    Looked like drawings that you had seen?
17         A     I saw something like this with heads, but it
18    Didn't have faces.
19         Q     You are referring to the firstof Exhibit
20    1152?
21         A     But it didn't have faces.  It was more just
22    Bodies and heads.  That was one of them.  I saw shapes,
23    But not in such detail like these and the other two pages.
24    The firsthad four very thin sketches, and the -- the
25    Other two pages had dolls like the ones in the back and
```

1    Shapes, but not as much detail.  And then there was a

2    Of a couple heads, but it didn't have the eyes or -- it

3    Didn't have full faces.

4        Q    With respect to Exhibit 1152, you saw -- and I'm

5    Talking, of course, the time Janet Bryant showed you

6    Drawings.  You saw head shapes that did not have facial

7    Features?

8        A    Yes.

9        Q    And the head shapes looked like the head shapes

10   On the firstof Exhibit 1152?

11       A    Yes.

12       Q    And, then, so the record is clear, were you

13   Referring to the other drawings that you saw that you

14   Think are similar --

15       A    Yes.

16       Q    -- to what Janet Bryant showed you as the last

17   Two pages of Exhibit 1152?  I may have given you three

18   Inadvertently, but --

19       A    Yeah, probably closer to this [indicating], but

20   Not so much detail.

21            **MR. ZELLER:**  And for the record, the

22   Witness has identified a photograph of the drawing that

23   Was produced as Bryant 00227.

24            THE WITNESS:  It didn't have color.  It

25   Was -- and it was less -- much, much less detailed, but it

```
 1   Was a single -- it was a single one.
 2   BY MR. ZELLER:
 3       Q    Directing your attention to this photograph that
 4   We just identified as part of Exhibit 1152, are there --
 5   If you could, please, point out for me, what do you see in
 6   That drawing that was the same or largely the same as the
 7   Drawings that you saw?
 8       A    The stance of the arms, the set of the hips.  I
 9   Do not believe it -- it didn't have a face.  It didn't
10   Have this much detail.  It had minimum clothes, just
11   Sketched clothes.
12       Q    Anything else?
13       A    This didn't look like that.  No.
14       Q    Well, let's just break this up into little
15   Pieces, then.  You reviewed Exhibit 1152, right?
16       A    Yes.
17       Q    You identified some drawings that you believed
18   Were not the same but similar to drawings that Janet
19   Bryant showed you, right?
20       A    Yes.
21       Q    So far we talked about the firstof Exhibit
22   1152, right, and then we talked about the other
23   That's a photograph of this drawing with the stamp on it
24   At the bottom that says Bryant 00227, right?
25       A    Yes.
```

1    Q    Are there any other pages in Exhibit 1152 that

2    You believe or you recall being similar to the drawings

3    That Janet Bryant showed you?

4    A    No.

5    Q    It was those two?

6    A    Yes.

7    Q    We talked earlier about how at the time when you

8    First saw the Bratz drawings they didn't have a name, they

9    Didn't have faces, and some of them did not have heads,

10   Right?

11   A    Yes.

12   Q    At some point you eventually realized that those

13   Drawings that you had seen that Janet Bryant had shown you

14   Were part of Bratz, right?

15   A    Yes.

16   Q    How is it that you figured that out?

17                THE WITNESS:  Janet told me.

18   BY **MR. ZELLER:**

19   Q    Janet told you that the drawings that you had

20   Seen previously were -- were part of Bratz?

21   A    Yes.

22   Q    Do you know what work Carter Bryant did on

23   Bratz, if any, when he was employed by Mattel?

24   A    No.

25   Q    Of the various drawings that I've shown you here

tuesday, july 8, 2008                    trial day 21, morning session

```
 1    Today, do you know for a fact as to whether any of them
 2    Were worked on or created when he was employed by Mattel?
 3        A    No.
 4             (EXCERPTS CONCLUDED.)
 5        MR. NOLAN:  YOUR HONOR, THAT CONCLUDES THE VIDEO          10:51
 6    PRESENTATION OF JEANNE GALVANO.  WE WOULD MOVE INTO EVIDENCE
 7    TRIAL EXHIBIT 1177, WHICH IS MRS. GALVANO'S 1998 CALENDAR THAT
 8    WAS REFERENCED IN THE VIDEO.
 9             THE COURT:  ANY OBJECTION?
10             MR. ZELLER:  NO OBJECTION.                           10:51
11             THE COURT:  IT'S ADMITTED.
12             (EXHIBIT 1177 RECEIVED.)
13             THE COURT:  YOUR NEXT WITNESS, COUNSEL?
14        MR. NOLAN:  YOUR HONOR, SUBJECT TO THE STIPULATIONS
15    THAT WE MENTIONED BEFORE ON BEHALF OF MGA, WE HAVE CONCLUDED  10:51
16    OUR PRESENTATION OF EVIDENCE, AND WE REST.
17             THE COURT:  VERY WELL.
18             LET'S TAKE OUR MORNING RECESS AT THIS TIME.
19             (WHEREUPON, JURORS DEPART COURTROOM.)
20             THE COURT:  MR. NOLAN, WHEN DO YOU PLAN ON PUBLISHING 10:52
21    THE STIPULATIONS TO THE JURY?
22        MR. NOLAN:  AS SOON AS MR. ZELLER CONFIRMS THAT --
23    WHEN I REACHED OVER -- WHEN I LEANED OVER TO ASK HIM WHETHER OR
24    NOT WE COULD ANNOUNCE THE STIPULATION, HE SAID THERE WAS
25    SOMETHING ABOUT THE VERBIAGE THAT HE NEEDED TO TALK ABOUT.    10:52
```

```
1              THEN, OF COURSE, THERE'S THE PALMER STIPULATIONS THAT

2     WE HAD TALKED ABOUT BEFORE.  THOSE WERE THE TWO STIPULATIONS

3     THAT I REFERRED TO YOUR HONOR.

4          THE COURT:  I TRUST YOU CAN WORK THOSE OUT AMONGST

5     YOURSELVES DURING THE BREAK.                                      10:53

6          MR. NOLAN:  YOUR HONOR, WHEN I SAID THE STIPULATION

7     WITH RESPECT TO THE REDACTION, I WAS REFERRING TO THE WALL

8     STREET JOURNAL ARTICLE, TRIAL EXHIBIT 1-A.

9          THE COURT:  SO THE STIPULATION WITH RESPECT TO

10    EXHIBIT 1-A AND THE STIPULATION WITH RESPECT TO EXHIBIT 472?      10:53

11         MR. NOLAN:  CORRECT.

12         THE COURT:  ANY OTHER STIPULATIONS?

13         MR. NOLAN:  THE ONLY OTHER REMAINING ISSUE WAS THE

14    ANNA RHEE DOCUMENT THAT CAME INTO EVIDENCE.

15         THE COURT:  OKAY.                                            10:53

16         WE'LL WORK THOSE OUT DURING THE RECESS.

17         THAT LEAVES THIS DIFFICULT QUESTION ABOUT THE

18    REBUTTAL WITNESS.

19         ANYTHING FURTHER AT THIS TIME ON THAT, MR. ZELLER,

20    BEFORE THE COURT --                                              10:53

21         MR. ZELLER:  WELL, I DON'T KNOW IF THE COURT HAS HAD

22    THE OPPORTUNITY TO LOOK AT THE TRANSCRIPT.

23         THE COURT:  I HAVE NOT YET.  COULD I LOOK AT THAT.

24         MR. ZELLER:  I HAVE A MARKUP THAT I HAVE UNDERLINED.

25         (THE COURT is handed THE DOCUMENT.)                         10:54
```

1          **MR. ZELLER:**  YOU'LL SEE WHAT SETS THIS OFF IS EVEN

2     SAYING --

3          **THE COURT:**  Just a moment.

4          **MS. AGUIAR:**  IF YOU COULD JUST TELL US WHAT PAGE

5     YOU'RE READING FROM.                                              10:54

6          **MR. ZELLER:**  IT'S THE ROUGH.  IT'S PAGE 115.

7          **MR. NOLAN:**  WE HAVE PAGE 115, YOUR HONOR.

8          **THE COURT:**  115, 116 OF SOMETHING.

9          **MR. ZELLER:**  THOSE ARE THE TWO.

10         **THE COURT:**  OKAY.                                        10:55

11         **MR. ZELLER:**  I WAS A LITTLE CONFUSED.  IT IS

12    PAGE 115, BUT IT'S OF THE ACTUAL FINAL TRANSCRIPT FOR THIS

13    SESSION.

14         **THE COURT:**  VERY WELL.

15         ACTUALLY, THERE IS A CORRECTION ON THE TRANSCRIPT.          10:55

16    ON LINE 22, IT SAYS, "MR. ZELLER, I'M SURE THIS WILL NOT BE THE

17    ANSWER THAT WILL MAKE ANYBODY HAPPY."  THE COURT SAID, "I'M

18    USED TO YOU DOING THAT."  ACTUALLY, WHAT I SAID IS, "I'M USED

19    TO DOING THAT," COUNSEL.

20         I'M THE ONE WHO MAKES STATEMENTS THAT DON'T MAKE           10:55

21    ANYBODY HAPPY.

22         I ASKED YOU TO GIVE THEM A DEFINITIVE STATEMENT OF

23    WHATEVER IT IS THAT YOU ARE PLANNING ON DOING TOMORROW,

24    SUBJECT, OF COURSE, TO THE COURT'S RULINGS.

25         **MR. ZELLER:**  AND I WILL SAY IN MY DEFENSE,             10:56

1  YOUR HONOR, IT STARTS OFF -- COUNSEL FOR MGA REITERATES THAT

2  THERE WAS A REPRESENTATION FROM MR. QUINN ON JULY 3RD THAT

3  REBUTTAL WOULD POTENTIALLY BE CARTER BRYANT AND CASSIDY PARK.

4      **THE COURT:**  RIGHT.  THAT WAS BACK ON JULY 3RD.  BUT I

5  ASKED YOU LAST NIGHT TO SAY WHAT YOU'RE GOING TO DO THIS          10:56

6  MORNING.

7      WHAT DID YOU TELL MS. AGUIAR BY 7:00?

8      **MR. ZELLER:**  I TOLD HER THAT WE WOULD POTENTIALLY

9  CALL A REBUTTAL WITNESS TO DESCRIBE OR TO TALK ABOUT -- TO

10  AUTHENTICATE THAT ONE DOCUMENT.                                  10:57

11      **THE COURT:**  DO YOU HAVE A COPY OF THE E-MAIL,

12  MS. AGUIAR?

13      **MS. AGUIAR:**  SINCE THE FIRST DAY OF TRIAL, WHEN WE

14  WERE IDENTIFYING WITNESSES FOR ONE ANOTHER, BOTH SIDES SENT

15  E-MAILS TO ONE ANOTHER WITH THE NAMES OF THE WITNESSES.          10:57

16      **THE COURT:**  RIGHT.

17      **MS. AGUIAR:**  WE NEVER SAID "A WITNESS WHO WILL TALK

18  ABOUT WHEN CARTER BRYANT MADE THE DRAWINGS," OR "A WITNESS WHO

19  WILL DISCUSS THE JEWEL BARBIE PROJECT," OR "A WITNESS WHO WILL

20  TALK ABOUT THE FACE PAINTING THAT SHE DID ON BRATZ."             10:57

21      **THE COURT:**  RIGHT.

22      **MS. AGUIAR:**  THERE WAS NEVER A PRACTICE OF DESCRIBING

23  WITNESSES BY SUBJECT MATTER.

24      MR. ZELLER SENT ME AN E-MAIL.  I RESPONDED TO HIM

25  APPROXIMATELY 20 MINUTES LATER, AT 7:06 P.M. LAST NIGHT,         10:58

```
 1   SAYING, "THE JUDGE REQUIRED MATTEL TO IDENTIFY ANY REBUTTAL

 2   WITNESSES BY 7:00.  WHAT IS THE NAME/IDENTITY OF YOUR WITNESS?"

 3           THEN ABOUT A HALF AN HOUR LATER, WHEN THEY HAD NOT

 4   WRITTEN BACK, I WROTE, "I'M FOLLOWING UP.  PLEASE SEND THE

 5   INFORMATION THAT THE COURT REQUIRED MATTEL TO PROVIDE."          10:58

 6           THEN I SENT ANOTHER E-MAIL AT 11:00, "HAVING RECEIVED

 7   NO RESPONSE TO YOU AS TO THE IDENTITY OF THE WITNESS, AND GIVEN

 8   THE RECORD ON THIS ISSUE, WE WILL TAKE THE POSITION THAT ANY

 9   ATTEMPT BY MATTEL TO CALL A REBUTTAL WITNESS IS UNTIMELY AND

10   INAPPROPRIATE."                                                 10:58

11           WE'VE NEVER EXCHANGED SUBJECT MATTERS.

12           THE COURT:  WHAT DID HE TELL YOU, THOUGH?

13           MS. AGUIAR:  WHAT HE SAID TO YOU JUST NOW, WHICH I'LL

14   READ IT EXACTLY:  "WE CURRENTLY EXPECT THAT WE MAY CALL A

15   MATTEL WITNESS IN REBUTTAL TO AUTHENTICATE AND ADDRESS THE 1999 10:58

16   RAINY DAY RASCALS DRAWINGS."

17           AND, YOU KNOW, IN ORDER FOR US TO PREPARE FOR WHO

18   THAT WITNESS WAS -- WE HAD ABSOLUTELY NO IDEA.  THEY DIDN'T

19   GIVE US ANY CLUE WHO IT WAS.  WE COULDN'T LOOK THROUGH OUR

20   DATABASES OF DOCUMENTS TO DO SEARCHES AND PREPARE QUESTIONS.    10:59

21   WE FOUND OUT IT WAS GOING TO BE CASSIDY PARK, WHICH IS FAIRLY

22   SURPRISING -- THIS IS RAINY DAY RASCALS -- AT THE SAME TIME

23   THAT YOU FOUND out THIS MORNING.

24           SO I THINK WHAT MR. NOLAN WOULD LIKE TO ADDRESS IS

25   NOT ONLY -- AND I'M SURE HE DOESN'T USE THE WORD "AMBUSH"       10:59
```

```
 1   LATELY -- THAT WE PLEADED WITH THEM THAT IF THERE WAS GOING TO
 2   BE A WITNESS -- I ASKED THEM THREE TIMES; NO RESPONSE, BY THE
 3   WAY, BETWEEN 7:06 AND AFTER MIDNIGHT.  NOTHING.  RADIO SILENCE
 4   FROM MR. ZELLER.  NOT A QUESTION SAYING TO ME, 'WELL, I'VE TOLD
 5   YOU THE SUBJECT MATTER, BUT I'M NOT GOING TO TELL YOU THE            10:59
 6   NAME'; OR 'I'LL TELL YOU THE NAME IF YOU REPRESENT TO ME FOR
 7   THE THIRD TIME THAT YOU'RE GOING TO REST YOUR CASE AFTER TWO
 8   MORE WITNESSES.'  NOTHING.  SILENCE BETWEEN 7:00 AND AFTER
 9   MIDNIGHT.
10            I THINK WHAT MR. NOLAN WANTED TO ADDRESS IS THAT EVEN       11:00
11   IF YOUR HONOR WERE INCLINED TO LET THEM PUT UP A REBUTTAL
12   WITNESS AT THIS POINT ON THIS RECORD, THIS IS NOT PROPER
13   REBUTTAL, FOR MANY OF THE REASONS THAT WE BRIEFED TO YOU.
14            THE COURT:  I'LL HEAR FROM MR. NOLAN, BUT I'M NOT
15   GOING TO HEAR A REPEAT OF THE EXTENSIVE ARGUMENTS THAT I HEARD       11:00
16   ON THIS YESTERDAY.
17            MR. NOLAN:  I CAN DO THIS IN ONE MINUTE, YOUR HONOR.
18            THE COURT:  OKAY.
19            MR. NOLAN:  THE ORDER OF WITNESSES:  CARTER BRYANT
20   TESTIFIED; MR. CUNNINGHAM TESTIFIED.  CASSIDY PARK WAS CALLED       11:00
21   BY MATTEL AFTER BOTH OF THOSE WITNESSES HAD TESTIFIED.  THEY
22   CLEARLY WERE AWARE, WHEN CASSIDY PARK WAS ON THE STAND, ABOUT
23   THE IMPORTANCE OF RAINY DAY RASCALS IN THIS CASE.  THEY COULD
24   HAVE, AND SHOULD HAVE, BECAUSE THE ISSUE WAS FRAMED BY THEIR
25   OWN ADMISSION IN THE PAPERS AT THAT POINT IN TIME.                  11:01
```

1        AND THAT, YOUR HONOR, REGARDLESS OF THE 7:00 DEADLINE

2    LAST NIGHT, WHICH WE STAND ON, CLEARLY DEMONSTRATES THAT THIS

3    ISSUE WAS CLEARLY ANTICIPATED.  THEY HAD EVERY OPPORTUNITY TO

4    ASK CASSIDY PARK.  THE ISSUE WAS WELL FRAMED BY CARTER BRYANT;

5    CERTAINLY BY CUNNINGHAM.  THEY HAD THE OPPORTUNITY WITH          11:01

6    CASSIDY PARK.  AND THEN THEY FOUGHT vociferously FOR ME NOT TO

7    CALL CASSIDY PARK.

8        THIS JUST SHOULD NOT BE ALLOWED AS REBUTTAL.

9        **THE COURT:**  VERY WELL.

10        MR. ZELLER, IF YOU WOULD ADDRESS THAT LAST POINT.          11:01

11        I AGREE WITH MS. AGUIAR THAT YOU SHOULD HAVE LET THEM

12    KNOW THE NAME LAST NIGHT IN ORDER FOR THEM TO PREPARE, GIVEN

13    THE PRACTICE IN THIS.  AND BEFORE I WOULD ALLOW YOU TO CALL ANY

14    REBUTTAL, I'M GOING TO LEAVE IT AT THEIR OPTION AS TO WHETHER

15    OR NOT THEY WANT ANOTHER DAY TO PREPARE FOR THIS OR THEY WANT    11:01

16    AN AFTERNOON TO PREPARE FOR THIS.  I'M GOING TO GIVE MGA

17    SUFFICIENT TIME TO PREPARE FOR THIS.

18        YOU SHOULD HAVE DONE THIS LAST NIGHT.  IT WAS THE

19    CLEAR PRACTICE IN THIS TRIAL.  AND THAT CAN easily BE RIGHTED

20    BY THE COURT BY GIVING MGA THE TIME THAT THEY NEED TO PROPERLY  11:02

21    PREPARE.

22        A MORE SUBSTANTIVE ISSUE -- THIS IS DIFFERENT THAN

23    CARTER BRYANT YESTERDAY.  I INDICATED YESTERDAY, AFTER an

24    EXTENSIVE HEARING, THAT THIS WAS A VERY CLOSE CALL.  I

25    UNDERSTAND THE REBUTTAL NATURE OF THIS.  BUT THE POINT THAT     11:02

1    MR. NOLAN JUST MAde PUTS THIS IN A SLIGHTLY DIFFERENT POSTURE,

2    EVEN IN MORE THAN A SLIGHTLY DIFFERENT POSTURE THAN CARTER

3    BRYANT.

4          YOUR ARGUMENTS REGARDING CARTER BRYANT WAS THAT THIS

5    REALLY DIDN'T COME TO BE CLEAR TO YOU AND MR. PRICE AND                11:02

6    MR. QUINN UNTIL AFTER MR. CUNNINGHAM SPOKE, AND THAT'S WHAT

7    MAKES THIS REBUTTAL.

8          IF IT WAS CLEAR TO YOU AFTER MR. CUNNINGHAM'S

9    TESTIMONY, THEN IT WAS AFTER MR. CUNNINGHAM'S TESTIMONY THAT

10   YOU HAD CASSIDY PARK, AND YOU CERTAINLY COULD HAVE ASKED AT           11:02

11   THAT POINT.

12         **MR. ZELLER:**  WELL, ONE THING -- AND BY THE WAY,

13   YOUR HONOR, AGAIN, I APOLOGIZE IF I MISUNDERSTOOD WHAT WAS

14   GOING ON YESTERDAY, BUT I WOULD DIRECT THE COURT'S ATTENTION TO

15   WHAT SHE SAYS, LINES 12 THROUGH 14, ON PAGE 115.  SHE'S LOOKING       11:03

16   FOR CONFIRMATION THAT THERE WILL BE NO REBUTTAL WITNESSES.

17   FRANKLY, WHETHER IT'S MY CONFUSION, I APOLOGIZE, BUT THAT IS

18   WHAT I WAS KEYING OFF OF.

19         SHE WAS SAYING THEY ALREADY HAVE A REPRESENTATION AS

20   TO THESE TWO WITNESSES; SO, I MEAN, IN MY DEFENSE, RIGHT OR          11:03

21   WRONG, YOUR HONOR, THAT'S WHAT I WOULD ASK THAT THE COURT JUST

22   TAKE INTO ACCOUNT.

23         **THE COURT:**  THE FURTHER PROBLEM, COUNSEL, IS WHAT

24   MS. AGUIAR DESCRIBES AS THE RADIO SILENCE.  IF THAT IS YOUR

25   DEFENSE, IF THAT IS YOUR EXPLANATION, IF YOUR RESPONSE IS,           11:03

```
 1   'WELL, LISTEN, WE'VE ALREADY TOLD YOU ABOUT THE TWO POTENTIAL
 2   WITNESSES' -- YOU REALLY SHOULD HAVE GOTTEN BACK TO HER.
 3           MR. ZELLER:  AND I APOLOGIZE FOR NOT DOING THAT.
 4   THAT'S A SEPARATE ISSUE.  AND THE REASON FOR THAT IS,
 5   YOUR HONOR, WE WERE SCRAMBLING YESTERDAY.  THE COURT DENIED OUR     11:03
 6   MOTION ON CARTER BRYANT.  I WAS HERE IN COURT UNTIL PAST 7:00
 7   ON THE JURY INSTRUCTIONS.  AFTER I HAD AN OPPORTUNITY TO EAT,
 8   BECAUSE I HADN'T EATEN ALL DAY, I TRACKED DOWN CASSIDY PARK TO
 9   SEE IF SHE COULD BE HERE TODAY.  THAT TOOK SOME TIME AND
10   EFFORT.  SO WHILE I WOULD LIKE TO BE -- AND I THINK WE             11:04
11   CERTAINLY HAVE A RECORD OF BEING MORE RESPONSIVE TO THESE
12   THINGS -- I MEAN, THE FACT IS THAT WE HAVE OUR OWN SET OF
13   CIRCUMSTANCES.  AND I APOLOGIZE.
14           THE COURT:  LET'S ADDRESS THE SUBSTANTIVE ISSUE.
15           MR. ZELLER:  SUBSTANTIVELY, YOUR HONOR, I THINK IT IS      11:04
16   DIFFERENT.  WHEN WE CALLED HER, WE DIDN'T KNOW SHE COULD
17   AUTHENTICATE THIS DOCUMENT.  WE DIDN'T KNOW THAT THIS WAS GOING
18   TO BE WHAT WAS REALLY LEFT IN TERMS OF WHAT THEY ARE ARGUING
19   ABOUT OVER THIS DOCUMENT.  I MEAN, YESTERDAY, OF COURSE, FOR
20   THE FIRST TIME, THE COURT WILL RECALL, IT TOOK SOME PERIOD OF      11:04
21   TIME BEFORE THERE WAS AN ARTICULATION OF SOME
22   AUTHENTICITY-BASED OBJECTION TO THIS DOCUMENT.  THAT'S WHAT
23   CASSIDY PARK CAN OVERCOME.  SHE CAN BE PUT UP ON THE STAND.
24   THIS IS PURE 901 TYPE STUFF.  SHE DOESN'T KNOW THE RAINY DAY
25   RASCALS CARD, OR DRAWING, OR WHATEVER IT IS.  SHE RECOGNIZES       11:05
```

```
1   CARTER BRYANT'S HANDWRITING.  SHE KNOWS IT BECAUSE SHE DEALT

2   WITH HIM ON A DAILY BASIS FOR YEARS.  AND THIS IS THE KIND OF

3   TESTIMONY THAT CAN COME IN TO AUTHENTICATE THIS DOCUMENT.

4        THAT'S REALLY THE OBJECTION THAT THEY HAVE TO THIS

5   DOCUMENT AT THIS POINT.  AND THAT WAS ARTICULATED --            11:05

6        THE COURT:  ARE YOU TAKING THE POSITION THAT AFTER

7   HEARING MR. CUNNINGHAM'S TESTIMONY, AFTER HEARING

8   CARTER BRYANT'S TESTIMONY, AFTER BEING CLEARLY AWARE THAT THIS

9   WAS A RELEVANT ISSUE -- BECAUSE BY THE TIME MR. CUNNINGHAM

10  STOOD DOWN, EVERYBODY IN HERE UNDERSTOOD WHERE MGA WAS GOING    11:05

11  WITH THIS.

12       CORRECT?

13       MR. ZELLER:  AFTER MR. CUNNINGHAM STEPPED DOWN,

14  ABSOLUTELY.

15       THE COURT:  OKAY.  SO AFTER HE STEPS DOWN AND BEFORE       11:05

16  CASSIDY PARK TAKES THE STAND, YOU ABSOLUTELY KNOW WHAT'S GOING

17  ON.  SO AT THAT POINT, YOU ALSO HAVE DESIGNATED THIS EXHIBIT ON

18  YOUR WITNESS LIST.  TO THE EXTENT THAT IT HAS THE RELEVANCE --

19  AND I UNDERSTAND THE BASIS, THE RELEVANCE OF THE DOCUMENT.

20  AGAIN, I DON'T THINK IT'S QUITE, PERHAPS, AS MUCH AS YOU MAKE   11:06

21  IT, BUT IT'S RELEVANT, FOR WHATEVER IT'S WORTH.

22       HOW DID YOU THINK YOU WERE GOING TO GET IT IN, IF NOT

23  THROUGH CASSIDY PARK?

24       MR. ZELLER:  THROUGH CARTER BRYANT, YOUR HONOR.

25       THE COURT:  CARTER BRYANT WAS EXCUSED.  YOU KNEW HE        11:06
```

1    WAS GONE.

2         **MR. ZELLER:**  I UNDERSTAND.  WE BROUGHT A MOTION.  WE

3    BROUGHT A MOTION TO GET CARTER BRYANT BACK; THAT WAS WHAT WE

4    EXPECTED TO DO.

5         THE FACT IS THAT THE ONLY OBJECTION THAT THEY HAVE AT        11:06

6    THIS POINT TO THAT PAGE, TO THAT DOCUMENT, IS AUTHENTICITY.

7    AND THAT WAS ARTICULATED YESTERDAY.

8         SO, I MEAN, CERTAINLY, I UNDERSTAND THAT -- AND WE'RE

9    NOT TRYING TO REARGUE THE WHOLE CUNNINGHAM SITUATION; THAT'S

10   WATER UNDER THE BRIDGE; THE COURT HAS RULED ON THAT.  WHAT        11:06

11   WE'RE TALKING ABOUT HERE IS A VERY NARROW THING.  WE'RE TALKING

12   ABOUT A WITNESS GETTING UP ON THE STAND and SAYING, 'I'M

13   FAMILIAR WITH CARTER BRYANT'S HANDWRITING.  THIS IS HIS

14   HANDWRITING.'  THAT OVERCOMES THE AUTHENTICITY OBJECTION.  IT'S

15   RELEVANT ON ITS FACE.  IT SHOULD COME IN.                        11:07

16         THAT'S WHAT WE'RE PROPOSING TO DO, YOUR HONOR.

17         **THE COURT:**  LET ME ASK MGA.

18         AND I'M NOT SURE HOW I'M GOING TO DECIDE THIS.  I'M

19   GOING TO TAKE SOME TIME TO THINK ABOUT THIS, BUT JUST SO THAT I

20   HAVE ALL OF THE VARIABLES NARROWED DOWN, YOU'VE HEARD THE        11:07

21   LIMITED PURPOSE OF WHAT CASSIDY PARK WILL BE CALLED FOR.

22         HOW MUCH TIME WOULD YOU NEED TO PREPARE FOR THAT, TO

23   RESPOND TO THAT, IF THE COURT WERE TO DECIDE TO PERMIT HER FOR

24   THAT NARROW PURPOSE?

25         **MR. NOLAN:**  YOUR HONOR, I'M NOT GOING TO ASK THE        11:07

 1    COURT TO DELAY THIS MATTER.

 2         IT SEEMS TO ME THAT BASED ON THE PROFFER THAT'S BEEN

 3    MADE -- IT IS BEYOND MY BELIEF THAT SHE CAN LAY THE FOUNDATION

 4    FOR A DOCUMENT.  SHE'S NOT A HANDWRITING EXPERT.  SHE HASN'T

 5    SEEN CARTER BRYANT'S SIGNATURE IN A NUMBER OF YEARS.  THE        11:07

 6    STATEMENTS THEMSELVES ARE HEARSAY THAT ARE CONTAINED ON THAT

 7    DOCUMENT ANYWAY.

 8         I THINK THIS IS SOMETHING THAT I WOULD NOT -- THE

 9    JURY HAS ALREADY BEEN TOLD THAT THIS CASE IS GOING TO END.

10         **THE COURT:**  EXCUSE ME one minute.                       11:08

11         (OFF-THE-RECORD DISCUSSION. )

12         **THE COURT:**  THIS MAKES MOOT THE QUESTION I WAS ASKING

13    YOU.

14         WE HAVE JUST SUMMONED MEDICS FOR OUR SICK JUROR, AS

15    APPARENTLY SHE'S DOWN ON ALL FOURS on the floor RIGHT NOW;      11:08

16    SHE'S DOING VERY POORLY, AND SHE WANTS TO GO HOME IMMEDIATELY.

17    SO THE PARAMEDICS ARE ON THE WAY.  WE'RE NOT GOING TO HAVE

18    ANYTHING FURTHER BEFORE THE JURY AT THIS TIME.

19         THIS KIND OF VITIATES THE TIME ISSUE.  WE'LL HAVE TO

20    RESUME WITH THIS TRIAL TOMORROW MORNING.                        11:08

21         WHAT I'M GOING TO DO, THOUGH, IS i'm going to TAKE A

22    BREAK MYSELF.  I'M GOING TO give the PARTIES A CHANCE to WORK

23    OUT THOSE STIPULATIONS SO that THAT'S DEFINITELY WORKED OUT.  I

24    WANT TO HEAR THE LANGUAGE OF THAT.

25         THE COURT WILL CONSIDER THE ADMISSIBILITY OF             11:09

1  CASSIDY PARK'S TESTIMONY.

2          IS SHE HEre TODAY, YOUR HONOR?

3          **MR. ZELLER:**  YES, YOUR HONOR.

4          **THE COURT:**  JUST SO I CAN HEAR -- LET'S CALL HER

5  AFTER THE BREAK.  I WANT TO HEAR IT.  WE'LL DO THIS AFTER THE          11:09

6  BREAK, AND THEN THE COURT WILL MAKE ITS DECISION BASED ON WHAT

7  IT HEARS.  BECAUSE IT MAY ALL BE MOOT IF YOU'RE CORRECT,

8  MR. NOLAN.  IF THERE'S NO WAY THAT SHE CAN EVEN LAY THAT

9  FOUNDATION, THEN WE'RE JUST SPINNING.

10          IT SOUNDS LIKE WE HAVE A LOT OF TIME TO SPIN TODAY.          11:09

11          WE'LL DO THAT, AND THEN THE COURT WILL MAKE A

12  DECISION ON CASSIDY PARK.

13          THEN WHAT WE'LL DO THIS AFTERNOON IS THE VERDICT

14  FORM, THE JURY INSTRUCTIONs FORM.  WE'LL HAVE THAT READY TO GO.

15  AND THEN YOU CAN GO THROUGH EXHIBITS WITH MR. HOLMES AND MAKE          11:09

16  SURE THAT ALL OF THE EXHIBITS ARE LINED UP SO THAT WE CAN BE

17  DONE.  AND THEN TOMORROW MORNING, ALL WE WILL DO, IF ANYTHING,

18  WOULD BE THE ONE REBUTTAL CASE, ANY SURREBUTTAL, AND

19  INSTRUCTIONS AND CLOSING ARGUMENTS.  BUT THERE WON'T BE

20  ANYTHING FURTHER BEFORE THE JURY TODAY.          11:10

21          **MR. NOLAN:**  THANK YOU, YOUR HONOR.

22          **MR. ZELLER:**  IF I MAY RAISE A POINT OF ORDER, FOR THE

23  WITNESS'S CONVENIENCE.  SHE HAS AN APPOINTMENT WITH HER

24  DAUGHTER IN THE AFTERNOON.  SO IF THERE'S ANYTHING WE CAN DO TO

25  EXPEDITE HER BEING OUT OF HERE --          11:10

```
 1          THE COURT:  CASSIDY PARK?

 2          MR. ZELLER:  YES.

 3          THE COURT:  WE'LL TAKE IT UP -- I'M GOING TO TAKE A

 4  TEN-MINUTE BREAK, JUST FOR THE COURT REPORTER.

 5          MR. ZELLER:  I JUST WANTED TO ALERT THE COURT; THERE      11:10

 6  WAS SOME HARDSHIP IN GETTING HER HERE.

 7          THE COURT:  AND SHE CAN'T TESTIFY TODAY BECAUSE OF

 8  THE JUROR, SO IF SHE'S GOING TO TESTIFY AT ALL, IT'S GOING TO

 9  BE TOMORROW MORNING.  AND THE COURT WILL HEAR THE TESTIMONY

10  THIS MORNING.                                                    11:10

11          MS. AGUIAR:  FOR PURPOSES OF FINALIZING THE VERDICT

12  FORM, I DO NOT HAVE ANYTHING FROM MATTEL YET REGARDING THESE

13  LISTS.  AND AT THIS POINT, IT'S VERY DIFFICULT FOR US TO

14  RESPOND, OBVIOUSLY.  WE'VE PREPARED LISTS.  YOU HAVE THEM.  I

15  WOULD RESPECTFULLY SUBMIT THAT IF YOU'RE CONSIDERING THIS OVER   11:10

16  THE NEXT HOUR OR TWO, WE GO WITH THE LIST THAT YOU WERE

17  PROVIDED BY US.

18          THE COURT:  IN THE NEXT TEN MINUTES, I'M not GOING TO

19  THINK ABOUT THIS CASE.  RIGHT NOW, I WANT TO TAKE A BREAK.

20          WHEN I COME BACK, WE'LL DEAL WITH THOSE STIPULATIONS,     11:10

21  THE EVIDENCE.  THEN WHAT WE'LL DO IS, I'LL SET A SCHEDULE FOR

22  TODAY FOR DEALING WITH THE VERDICT FORM, THE INSTRUCTIONS, AND

23  THE EVIDENCE.

24          MS. AGUIAR:  THANK YOU.

25          THE COURT:  LET'S TAKE A BREAK.                           11:11
```

1          I'M VERY SORRY TO HEAR ABOUT THE JUROR.

2          (WHEREUPON, A BRIEF RECESS WAS HELD.)

3          (WHEREUPON, JURORS ENTER COURTROOM.)

4          **THE COURT:**  WE'RE BACK ON THE RECORD IN THE PRESENCE

5    OF THE JURY.                                                  11:26

6          ONE OF YOUR COLLEAGUES HAS TAKEN ILL, SO WE'RE GOING

7    TO SUSPEND COURT PROCEEDINGS FOR THE DAY.  I'LL ASK YOU TO BE

8    BACK HERE AT 9:00 TOMORROW MORNING.

9          WE HAVE VERY LITTLE, IF ANYTHING -- WE HAVE A FEW

10   MINOR THINGS TO GET THROUGH, POINTS OF EVIDENCE THAT WE NEED TO   11:26

11   PRESENT TO YOU.  I WAS HOPING TO HAVE ALL OF THAT DONE TODAY,

12   BUT IT REALLY IS NOT GOING TO TAKE US VERY LONG TO DO IT

13   TOMORROW, SO I STILL THINK WE'LL BE ABLE TO GET THROUGH

14   INSTRUCTIONS, THE VERDICT FORM, AND CLOSING ARGUMENTS TOMORROW.

15         THERE IS A FEW STIPULATED PIECES OF EVIDENCE AND          11:26

16   THERE MAY BE ONE VERY SHORT WITNESS, AND I'LL WORK THAT OUT

17   WITH THE LAWYERS THIS AFTERNOON.  WE'LL BE ALL READY TO GO VERY

18   PROMPTLY AT 9:00.  AND HOPEFULLY, YOUR COLLEAGUE WILL BE WELL,

19   AT LEAST WELL ENOUGH TO PARTICIPATE.  I'LL SEE YOU AT 9:00

20   TOMORROW MORNING.                                             11:26

21         (WHEREUPON, JURORS DEPART COURTROOM.)

22         **THE COURT:**  LET'S TAKE UP THESE ISSUES.

23         HOW ARE WE ON THE STIPULATIONS, THE TWO STIPULATIONS?

24   DO WE HAVE THE LANGUAGE ON THAT?

25         **MR. NOLAN:**  MR. QUINN CAME TO ME WHEN WE WERE IN A    11:27

1    MEETING, AND I SAID i'd TAKE A FEW MINUTES; JUST AS I STEPPED

2    OUT TO TALK TO MR. QUINN, WE WERE SUMMONED BACK IN HERE; SO I

3    NEED JUST A FEW MORE MINUTES to talk to him.  UNLESS

4    MR. ZELLER HAS --

5           **MR. ZELLER:**  I ALSO JUST -- I NEED SOME LANGUAGE TO            11:27

6    work with.

7           **MR. NOLAN:**  ALL I WANT TO DO IS SAY THAT THE

8    TYPOGRAPHICAL ERROR APPEARING IN THE JULY 18TH WALL STREET

9    JOURNAL ARTICLE, TRIAL EXHIBIT 1-A, PERTAINING TO WHEN THE

10   TOON TEENS PROJECT WAS SCRAPPED, WAS NEVER CORRECTED BY MATTEL,        11:28

11   OR THEY NEVER SOUGHT TO CORRECT THE TYPOGRAPHICAL ERROR

12   APPEARING IN THAT PUBLICATION.

13          **MR. ZELLER:**  AND ON THAT SUBJECT, YOUR HONOR, I'VE

14   EXPRESSED A WILLINGNESS TO CONSIDER A STIPULATION, BUT I NEED

15   PARTICULAR LANGUAGE.  I DIDN'T HAVE IT UNTIL NOW.                       11:28

16          **THE COURT:**  RIGHT.

17          **MR. ZELLER:**  I MEAN, WE CAN CERTAINLY SAY THAT

18   MATTEL'S PR DEPARTMENT DIDN'T DO THAT, AND MOREOVER, THAT THEY

19   DIDN'T KNOW.  THEY DIDN'T HAVE ANY REASON TO KNOW THAT THAT WAS

20   WRONG.  SO I THINK THERE HAS TO BE SOME LANGUAGE BUILT INTO            11:28

21   THIS AS TO WHAT THE EXACT, PRECISE FACTS ARE.  BUT WE NEED TO

22   HAVE the PROPOSED LANGUAGE TO DO IT.

23          **MR. NOLAN:**  YOUR HONOR, THAT'S FINE.  BUT I'M NOT

24   GOING TO AGREE TO FACTS THAT WE'VE NEVER TAKEN DISCOVERY ON.

25          I THINK THE SIMPLE ISSUE THAT WE ADDRESSED AT                    11:28

```
 1   SIDE-BAR -- AND I CAN SHOW YOU -- "WAS IT EVER CORRECTED?"  AND
 2   THE COMMENT WAS, 'WE'LL LOOK INTO IT, BUT NOT THROUGH THIS
 3   WITNESS.  THIS WITNESS WOULDN'T HAVE DONE IT.'
 4           THE COURT:  RIGHT.
 5           MR. NOLAN:  NOW IT SEEMS TO ME THAT WE'RE STILL      11:29
 6   TRYING -- I HAVEN'T HAD A PROFFER THAT THEY'VE TALKED TO
 7   SOMEONE SPECIFICALLY.
 8           I THINK THE FACT IS, IT WAS NEVER CORRECTED.
 9           THE COURT:  WELL, THIS SOUNDS LIKE SOMETHING WHICH
10   SHOULD BE DEALT WITH BY STIPULATION.  IF IT CAN'T be, I WILL   11:29
11   GIVE MGA LEAVE TO CALL A WITNESS TO BRIEFLY ADDRESS THAT ISSUE
12   AND THAT ISSUE ALONE.  SO LET'S SEE IF WE CAN WORK OUT A
13   STIPULATION.
14           THE COURT ALREADY HAS IN MIND THE STIPULATION WITH
15   RESPECT TO EXHIBIT 472, WHICH THE PARTIES AGREED TO, SO I DON'T 11:29
16   THINK THAT'S OF MUCH MOMENT.
17           THE THIRD ISSUE IS CASSIDY PARK.  WHY DON'T WE CALL
18   HER NOW AND SEE IF THERE'S GOING TO BE LEAVE FOR HER TO MAKE
19   SOME BRIEF TESTIMONY.
20           MR. ZELLER:  I GUESS WE DIDN'T TALK ABOUT THE FORMAT.  11:30
21   I PRESUME WE'LL DO THE PROFFER FIRST.
22           THE COURT:  ACTUALLY, JUST DO THE EXAMINATION FIRST.
23   LET'S PRETEND LIKE THE JURY WAS HERE.  AND THEN I'LL HEAR
24   CROSS-EXAMINATION, AND WE'LL GO FROM THERE.
25           (WITNESS TAKES STAND.)
```

1      **THE COURT:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

2   YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

3   BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

4   HELP YOU GOD?

5          **THE WITNESS:**  I DO.

6          **THE COURT:**  PLEASE STATE YOUR FULL NAME AND SPELL

7   YOUR LAST NAME FOR THE RECORD.

8          **THE WITNESS:**  CASSIDY PARK, P-A-R-K.

9          **THE COURT:**  COUNSEL, YOU MAY PROCEED.

10         **MR. ZELLER:**  THANK YOU.

11                   **DIRECT EXAMINATION**
                 (OUTSIDE THE PRESENCE OF THE JURORS)
12  **BY MR. ZELLER:**

13  Q    MS. PARK, YOU SUPERVISED CARTER BRYANT FOR A PERIOD OF

14  TIME WHEN HE WAS THERE AT MATTEL; IS THAT RIGHT?

15  A    I DID.                                                      11:31

16  Q    AND APPROXIMATELY WHAT TIME PERIOD WAS THAT?

17  A    MID TO LATE '95, THROUGH EARLY '98.

18  Q    DURING THAT TIME PERIOD, DID YOU HAVE DAILY INTERACTION

19  WITH HIM?  WEEKLY INTERACTION?  MONTHLY?  IF YOU COULD,

20  PERHAPS, PUT A TIME PERIOD on THE FREQUENCY OF YOUR DEALINGS    11:31

21  WITH CARTER BRYANT DURING THAT TIME PERIOD.

22  A    DAILY INTERACTION WITH CARTER.

23  Q    DURING THE COURSE OF YOUR WORKING WITH CARTER BRYANT, DID

24  YOU EVER SEE HIS WRITTEN MATERIALS?

25  A    OH, YES.                                                    11:31

1    Q    AND HOW OFTEN DID THAT OCCUR?

2    A    DAILY.

3    Q    IF YOU COULD JUST TELL US THE CATEGORIES OF WRITTEN

4    MATERIALS; AND THAT IS MATERIALS THAT HAD CARTER BRYANT'S

5    HANDWRITING, AS YOU UNDERSTOOD IT.                                    11:32

6    A    DRAWINGS; PREPARED DOCUMENTS THAT WE WERE WORKING ON;

7    ANYTHING AND EVERYTHING, YOU KNOW, THAT WOULD HAVE HAD HIS

8    SCRIPT ON IT.

9    Q    DURING THE TIME PERIOD WHEN YOU WERE CARTER BRYANT'S

10   SUPERVISOR THERE AT MATTEL, DID YOU EVER HAVE OCCASION TO SEE         11:32

11   HIS SIGNATURE?

12   A    OH, YES.

13   Q    AND HOW OFTEN, JUST GENERALLY SPEAKING, DID THAT OCCUR?

14        **MR. NOLAN:**  FOUNDATION, YOUR HONOR, ON THE TYPE OF

15   DOCUMENTS.                                                            11:32

16        **THE COURT:**  SUSTAINED.

17   **BY MR. ZELLER:**

18   Q    WELL, LET'S TRY IT THIS WAY.

19        YOU MENTIONED THAT ONE CATEGORY OF DOCUMENTS THAT YOU

20   SAW WERE DRAWINGS THAT CARTER DID.                                    11:32

21   A    CORRECT.

22   Q    AND DID YOU EVER SEE DRAWINGS THAT CARTER BRYANT DID THAT

23   HAD THE SIGNATURE "CARTER H. BRYANT" OR "CARTER BRYANT" ON IT?

24   A    YES.

25   Q    CAN YOU GIVE US A SENSE OF HOW OFTEN THAT OCCURRED.              11:32

1    A    PROBABLY DAILY.

2    Q    FOCUSING AGAIN ON THESE DRAWINGS THAT YOU SAW DURING THE

3    COURSE OF YOUR WORK WITH CARTER BRYANT THERE AT MATTEL, DID YOU

4    EVER SEE ANY DRAWINGS THAT HAD DATES ON THEM?

5    A    OH, YES.                                                        11:33

6    Q    AND THOSE WERE HANDWRITTEN DATES?

7    A    YES.

8    Q    DIRECTING YOUR ATTENTION TO THAT PAGE THAT MR. GRANT PUT

9    IN FRONT OF YOU, WHICH IS EXHIBIT 10624.

10             DO YOU HAVE THAT?                                          11:33

11   A    YES.

12   Q    LET ME ASK this FIRST:  YOU DON'T RECALL SEEING THIS

13   SPECIFIC DRAWING, DO YOU?

14   A    NO.

15   Q    DO YOU RECOGNIZE THE WRITING THAT'S DEPICTED HERE ON           11:33

16   EXHIBIT 10624?

17   A    YES.

18   Q    WHOSE DO YOU RECOGNIZE IT AS?

19   A    CARTER BRYANT'S.

20   Q    AND TO BE MORE PARTICULAR ABOUT IT, DO YOU RECOGNIZE THE       11:33

21   SIGNATURE THERE AT THE BOTTOM RIGHT?

22   A    I DO.

23   Q    AND WHOSE DO YOU RECOGNIZE THAT AS?

24   A    AS CARTER BRYANT'S.

25   Q    YOU'LL SEE THAT THERE'S A HANDWRITTEN DATE OF APRIL 4,         11:33

1    1999.

2    A    YES.

3    Q    DO YOU RECOGNIZE THAT HANDWRITING?

4    A    YES.

5    Q    AND WHOSE DO YOU RECOGNIZE IT AS?                          11:34

6    A    CARTER BRYANT'S.

7    Q    AND THEN DIRECTING YOUR ATTENTION TO THIS PORTION, THE

8    UPPER PART OF THIS EXHIBIT, WHICH IS THE DRAWING AND THE BANNER

9    AND THE INITIALS THERE.

10         DO YOU RECOGNIZE THAT HANDWRITING?                         11:34

11   A    YES.

12   Q    AND WHOSE WRITING DO YOU RECOGNIZE THIS AS?

13   A    CARTER BRYANT'S.

14         **THE COURT:**  YOU'RE REFERRING TO THE "BLUE SKIES

15   COMING SOON"?                                                    11:34

16         **THE WITNESS:**  I'M REFERRING TO THE "BLUE SKIES COMING

17   SOON," AS WELL AS THE ENTIRE PIECE, the IMAGE.

18         **THE COURT:**  ALL RIGHT.

19         **MR. ZELLER:**  THAT'S OUR PROFFER, YOUR HONOR.

20         **THE COURT:**  CROSS-EXAMINATION?                         11:34

21         **MR. NOLAN:**  THANK YOU.

22                     **CROSS-EXAMINATION**

23         (OUTSIDE THE PRESENCE OF THE JURORS)

24   **BY MR. NOLAN:**

25   Q    I JUST WANT TO ESTABLISH FOUNDATION.                        11:34

```
 1            DO YOU HAVE ANY TRAINING IN HANDWRITING ANALYSIS?

 2     A    NO.

 3     Q    AS I UNDERSTAND YOUR TESTIMONY, YOU WERE THE CORPORATE

 4     SUPERVISOR FOR CARTER BRYANT THROUGH EARLY 1998; is that

 5     CORRECT?                                                            11:35

 6     A    CORRECT.

 7     Q    BUT YOU DID NOT SUPERVISE MR. BRYANT AFTER EARLY 1998;

 8     CORRECT?

 9     A    CORRECT.

10     Q    AND SO IT WOULD BE CORRECT TO SAY THAT OVER THE LAST TEN       11:35

11     YEARS, YOU HAVE NOT HAD EXPOSURE TO ANY OF CARTER BRYANT'S WORK

12     OR HANDWRITING; CORRECT?

13     A    CORRECT.

14     Q    DURING THE TIME YOU WERE SUPERVISING CARTER BRYANT, IS IT

15     YOUR TESTIMONY UNDER OATH THAT YOU SAW CARTER BRYANT ON A DAILY     11:36

16     BASIS PLACING HIS SIGNATURE ON DRAWINGS WHILE DONE AT MATTEL?

17     A    I DON'T THINK THAT'S EXACTLY WHAT I SAID.

18     Q    LET ME ASK YOU THIS:  DID YOU SEE CARTER BRYANT PLACE HIS

19     SIGNATURE ON DRAWINGS THAT HE DID IN THE ORDINARY COURSE OF THE

20     SCOPE OF HIS WORK AT MATTEL?                                        11:36

21     A    YES.

22     Q    ON APPROXIMATELY HOW MANY OCCASIONS?

23     A    HUNDREDS.

24     Q    IS THAT A REQUIREMENT OF AN EMPLOYEE AT MATTEL; THAT IS,

25     TO PLACE THEIR SIGNATURES AND DATES ON DRAWINGS DONE WITHIN        11:36
```

1   MATTEL?

2   A    YES.

3   Q    DO YOU KNOW LILY MARTINEZ?

4   A    YES.

5   Q    SHE WAS WITHIN YOUR DIVISION; CORRECT?                    11:37

6   A    YES.

7   Q    DO YOU KNOW THAT SHE TESTIFIED IN THIS CASE THAT SHE DID

8   NOT SIGN AND DATE HER DRAWINGS WHILE AT MATTEL?

9   A    NO.

10         **MR. ZELLER:**  ASSUMES FACTS NOT IN EVIDENCE.         11:37

11         **THE COURT:**  AS PHRASED, YES.

12  **BY MR. NOLAN:**

13  Q    IS IT YOUR TESTIMONY THAT YOU BELIEVE YOU'VE SEEN

14  LILY MARTINEZ'S DRAWINGS, WHILE AT MATTEL, UNDER YOUR

15  SUPERVISION, THAT ARE SIGNED AND DATED?                        11:37

16  A    NO.

17  Q    BUT YOU HAVE A DISTINCT RECOLLECTION -- DURING THE PERIOD

18  OF TIME THAT YOU WERE THE SUPERVISOR OF CARTER BRYANT, WHICH

19  WOULD HAVE BEEN 1995 THROUGH EARLY 1998, COULD YOU GIVE THE

20  COURT AN ESTIMATE AS TO THE NUMBER OF EMPLOYEES THAT YOU       11:38

21  SUPERVISED.

22  A    PROBABLY 15; 15 TO 20.

23  Q    OVER THE LAST TEN YEARS -- YOU'RE NOT WORKING AT MATTEL

24  NOW, ARE YOU?

25  A    YES, I AM.                                                11:38

1    Q    DO YOU HAVE AN OFFICE AT MATTEL?

2    A    I HAVE A PART-TIME OFFICE.

3    Q    WHAT'S YOUR EXTENSION?

4    A    3451.

5    Q    AND HOW LONG HAVE YOU BEEN A PART-TIME EMPLOYEE?          11:38

6    A    SINCE LAST APRIL.

7    Q    WELL, DURING THE PERIOD OF TIME THAT YOU HAVE EITHER BEEN

8    A FULL-TIME EMPLOYEE OR A PART-TIME EMPLOYEE AT MATTEL, SINCE

9    EARLY 1998, HOW MANY EMPLOYEES HAVE YOU SUPERVISED?

10   A    UP TO 200.                                                11:38

11   Q    DIRECTING YOUR ATTENTION TO THE DOCUMENT THAT'S IN FRONT

12   OF YOU, EXHIBIT 10264.

13            DO YOU HAVE THAT?

14   A    YES.

15   Q    WHEN WAS THE FIRST TIME YOU SAW THIS DOCUMENT?           11:39

16   A    THIS MORNING.

17   Q    AND WHO SHOWED IT TO YOU?

18   A    TAMMY.

19   Q    AND TAMMY IS AN ATTORNEY FOR MATTEL?

20   A    SHE'S WITH COUNSEL.                                       11:39

21   Q    IN-HOUSE COUNSEL AT MATTEL?

22   A    NO.  OUTSIDE COUNSEL.

23   Q    OUTSIDE COUNSEL.

24            WHAT DID SHE SAY TO YOU ABOUT THIS DOCUMENT?

25            **MR. ZELLER:**  PRIVILEGED, YOUR HONOR.              11:39

1              **THE COURT:**  IT IS.

2     **BY MR. NOLAN:**

3     Q     WHEN WAS THE FIRST TIME YOU RECEIVED A PHONE CALL ASKING

4     YOU TO RETURN TO TESTIFY IN THIS CASE?

5     A     LAST NIGHT AT ABOUT 10:20, 10:30.                              11:39

6     Q     AND WHO WAS THAT FROM?

7     A     MR. ZELLER.

8     Q     AND PRIOR TO THAT PHONE CALL WITH MR. ZELLER, DID YOU HAVE

9     A COPY OF EXHIBIT 10624?

10    A     NO.                                                            11:40

11    Q     LOOKING NOW AT 10624, AND DIRECTING YOUR ATTENTION, FIRST

12    OF ALL, TO THE DATE OF APRIL 4, 1999.

13          DO YOU SEE THAT?

14    A     YES.

15    Q     JUST COVER UP FOR A MOMENT, IF YOU COULD, CARTER BRYANT'S    11:40

16    SIGNATURE.

17    A     YES.

18    Q     IS IT YOUR TESTIMONY THAT AFTER NEARLY TEN YEARS, LOOKING

19    AT "APRIL 4, 1999," IF YOU DIDN'T KNOW THE NAME 'CARTER BRYANT'

20    BEFOREHAND, YOU WOULD SAY the "APRIL 4, 1999" is                    11:40

21    CARTER BRYANT'S HANDWRITING'?

22    A     NO.

23    Q     OKAY.

24          THEN, WITHOUT REFERENCE TO APRIL 4, 1999, AND

25    ASSUMING THAT -- and THIS IS JUST AN ASSUMPTION, IF YOU COULD     11:41

```
 1   MAKE THIS, OKAY, IN YOUR MIND -- HAD I NOT MET YOU IN
 2   CONNECTION WITH THIS LITIGATION, AND YOU WEREN'T TESTIFYING FOR
 3   MATTEL AS A WITNESS THIS MORNING, BUT WE MET SOMEWHERE, AND I
 4   JUST SHOWED YOU THE SIGNATURE LINE, AS I'M SHOWING IT TO YOU
 5   NOW, FOLDED OVER, WHICH IS THE NAME "CARTER BRYANT," AND I        11:41
 6   ASKED YOU, 'IS THAT A TRUE AND CORRECT COPY OF HIS SIGNATURE
 7   TEN YEARS AFTER YOU LAST SUPERVISED HIM,' WHAT WOULD YOU SAY?
 8           MR. ZELLER:  ASSUMES FACTS; HYPOTHETICAL.
 9           THE COURT:  IT'S NOT A QUESTION I WOULD PERMIT FOR
10   THE JURY, BUT I'LL LET YOU ANSWER IT.                            11:42
11           THE WITNESS:  I PROBABLY WOULD SAY IT LOOKED LIKE HIS
12   SIGNATURE TO ME.
13   BY MR. NOLAN:
14   Q    HOW WOULD YOU KNOW THAT?
15   A    HOW WOULD I KNOW THAT?                                      11:42
16   Q    IN YOUR MEMORY, WHAT'S THE LAST --
17           THE COURT:  LET HER ANSWER THE QUESTION YOU ASKED,
18   COUNSEL.
19           THE WITNESS:  I WOULD USE MY MEMORY.  IT LOOKED
20   FAMILIAR TO ME.  IT WOULD STRIKE A CORD IN MY MEMORY.           11:42
21   BY MR. NOLAN:
22   Q    BUT YOU'RE NOT CERTAIN.
23   A    I'M SAYING IT LOOKS FAMILIAR.
24   Q    BUT YOU WOULDN'T BE ABLE TO SAY WITH CERTAINTY THAT --
25   ANYTHING ELSE OTHER THAN 'IT'S FAMILIAR; IT COULD BE            11:42
```

1    CARTER BRYANT'S SIGNATURE'?

2    A    IT CERTAINLY LOOKS LIKE CARTER BRYANT'S SIGNATURE TO ME.

3    Q    LOOKING AT THIS DOCUMENT -- FIRST OF ALL, DO YOU KNOW WHAT

4    "APRIL 4, 1999" REFERS TO?

5    A    IT REFERS TO THE DATE OF THE DRAWING.                         11:42

6    Q    WHAT BASIS DO YOU HAVE TO BELIEVE -- FIRST OF ALL, WHEN

7    WAS THE DATE of APRIL 4, 1999 PUT ON THIS DOCUMENT?

8         MR. ZELLER:  YOUR HONOR, IF I MAY JUST INTERJECT.

9    THIS IS BEYOND THE SCOPE OF THE PROFFER.  I GUESS I DON'T HAVE

10   ANY PARTICULAR OBJECTION TO HIM ASKING THESE QUESTIONS, BUT     11:43

11   I'LL REPRESENT TO THE COURT THAT THESE ARE NOT THE KINDS OF

12   QUESTIONS WE WOULD BE -- WE HAVE NOT CALLED THIS WITNESS FOR

13   THAT KIND OF INFORMATION.

14        THE COURT:  YOU MAY ANSWER THE QUESTION.

15        AGAIN, THIS IS NOT NECESSARILY A RULING THAT THIS          11:43

16   WOULD GO BEFORE THE JURY.

17        THE WITNESS:  COULD YOU RESTATE THE QUESTION.

18   BY MR. NOLAN:

19   Q    DO YOU KNOW WHEN CARTER BRYANT -- IF THIS IS HIS SIGNATURE

20   AND DATE, DO YOU KNOW, do you HAVE PERSONAL KNOWLEDGE, OF WHEN  11:43

21   THIS PARTICULAR DOCUMENT WAS DATED AND SIGNED WITH THE

22   SIGNATURE "CARTER BRYANT"?

23   A    ARE YOU ASKING ME IF I BELIEVE THIS IS CARTER BRYANT'S

24   SIGNATURE, OR ARE YOU ASKING ME WHEN HE DATED THIS?

25   Q    I'M ASKING YOU WHETHER OR NOT YOU KNOW WHEN HE PUT WHAT    11:44

1    YOU CONTEND IS HIS HANDWRITING, "APRIL 4, 1999, CARTER H.

2    BRYANT."

3    A    DO I KNOW?  I ASSUME IT WAS APRIL 4, 1999.

4    Q    DO YOU HAVE ANY BASIS FOR ASSUMING THAT HE ACTUALLY PUT

5    THAT HANDWRITING ON THIS DOCUMENT ON APRIL 4, 1999?          11:44

6    A    NO.

7    Q    AND DO YOU HAVE ANY KNOWLEDGE OF WHAT WAS INTENDED BY

8    PLACING, WHENEVER IT WAS PLACED, THE DATE APRIL 4, 1999 ON THIS

9    DRAWING?

10   A    TO DATE THE DRAWING.                                   11:44

11   Q    DO YOU HAVE ANY PERSONAL KNOWLEDGE OF THAT?

12   A    NO.

13   Q    NOW, YOU SAID "TO DATE THE DRAWING."  I WANT YOU TO TAKE A

14   REALLY CLOSE LOOK AT THIS DOCUMENT, MA'AM.

15        THE DRAWING THAT YOU ARE REFERRING TO IS CONTAINED IN    11:45

16   A BOX; CORRECT?

17   A    CORRECT.

18   Q    JUST NOW FOCUSING ON THE BOX OF THE DOCUMENT THAT HAS THE

19   DRAWING IN IT, CAN YOU SEE ANY DATE ON THE ACTUAL DRAWING

20   ITSELF?                                                     11:45

21   A    NO.

22   Q    DO YOU SEE ANY SIGNATURE OF CARTER BRYANT ON THE DRAWING

23   ITSELF?

24   A    WELL, I SEE --

25        **MR. Zeller:**  'THE DRAWING ITSELF' IS RIDICULOUS.   11:45

1      **MR. NOLAN:**  I APOLOGIZE.  I'M JUST TALKING ABOUT

2    THE --

3          **THE COURT:**  WITHIN THE RECTANGLE?

4          **MR. NOLAN:**  WITHIN THE RECTANGLE.

5          **THE COURT:**  WITHIN THIS RECTANGULAR --                    11:45

6          **THE WITNESS:**  YES.

7          I SEE HIS LITTLE INITIALS; THAT LITTLE OVAL DOWN AT

8    THE RIGHT CORNER, I SEE THAT.

9    **BY MR. NOLAN:**

10   Q    DO YOU HAVE ANY PERSONAL KNOWLEDGE OF WHEN CARTER BRYANT,    11:45

11   OR WHOMEVER, PUT IN THE LOWER RIGHT-HAND CORNER THE INITIALS

12   "CB"?

13   A    NO.

14   Q    BUT LOOKING AT THIS DEPICTION OF THE EXHIBIT, WHICH NOW

15   JUST FOCUSES ON THE DRAWING, DO YOU SEE ANYWHERE A DATE AS TO    11:46

16   WHEN THIS WAS CREATED?

17   A    ARE WE STILL TALKING ABOUT THE RECTANGLE?

18   Q    THE SMALLER RECTANGLE.

19   A    NO.

20   Q    AND YOU IDENTIFIED IN THE PROFFER "BLUE SKIES COMING SOON"   11:46

21   AS BEING THAT OF CARTER BRYANT; IS THAT CORRECT?

22   A    YES.

23   Q    PRIOR TO THIS MORNING, HAD YOU EVER SEEN THE PHRASE "BLUE

24   SKIES COMING SOON"?

25   A    NO.                                                          11:46

1  Q    DO YOU RECALL TEN YEARS AGO, WHEN YOU WERE SUPERVISING

2  MR. BRYANT, EVER SEEING A PROJECT WHERE MR. BRYANT HAD ACTUALLY

3  WRITTEN DOWN "BLUE SKIES COMING SOON"?

4  A    NO.

5  Q    YOU DON'T HAVE ANY KNOWLEDGE WHEN THE FIGURINE DEPICTED IN      11:47

6  THE RECTANGULAR BOX IN EXHIBIT 10624 WAS DRAWN BY

7  CARTER BRYANT, DO YOU?

8  A    OTHER THAN APRIL 4, 1999, NO.

9  Q    BUT AGAIN, THE LINE THAT YOU'RE SHOWING ME AS "APRIL 4,

10  1999, CARTER H. BRYANT" IS JUST A DATE THAT APPEARS ON THE       11:47

11  OUTSIDE OF THE FIGURINE; CORRECT?

12  A    CORRECT.

13  Q    FOR ALL YOU KNOW, CARTER BRYANT DID THE DRAWING AND

14  AFFIXED HIS INITIALS IN THE BOX IN KIMBERLING CITY IN 1998;

15  CORRECT?                                                         11:48

16  A    I SEE APRIL 4, 1999; THAT'S THE ONLY DATE I SEE.

17  Q    I KNOW.  BUT I'M ASKING YOU, YOU HAVE NO EVIDENCE WHEN

18  CARTER BRYANT DID THE ACTUAL DRAWING IN THE RECTANGLE HERE AND

19  PLACED HIS INITIALS IN THE LOWER RIGHT-HAND CORNER OF THE

20  DRAWING.  YOU DON'T KNOW ONE WAY OR THE OTHER WHETHER OR NOT HE   11:48

21  DID IT IN 1998 OR 1999, DO YOU?

22        MR. ZELLER:  ASSUMES FACTS OUTSIDE THE SCOPE OF THE

23  PROFFER.

24        MR. NOLAN:  GOES TO HER COMPETENCE TO TESTIFY,

25  YOUR HONOR.                                                      11:48

1    **THE COURT:**  YOU MAY ANSWER THE QUESTION FOR PURPOSES

2    OF THIS AREA.

3    **THE WITNESS:**  THE ONLY DATE INFORMATION WE HAVE IS

4    APRIL 4, 1999.  THAT'S THE ONLY DATE I HAVE ON A DATE.

5    **BY MR. NOLAN:**

6    Q    MAY I HAVE AN ANSWER TO MY QUESTION.

7         YOU HAVE NO PERSONAL KNOWLEDGE AS TO WHETHER OR NOT

8    CARTER BRYANT DREW THE ARTISTIC WORK DEPICTED IN THE RECTANGLE

9    IN 1998; CORRECT?

10   A    CORRECT.                                            11:49

11   **THE COURT:**  ANYTHING FURTHER, MR. ZELLER?

12                **FURTHER DIRECT EXAMINATION**

13   **BY MR. ZELLER:**

14   Q    IS THERE ANY CONVENTION, THAT YOU'RE AWARE OF AS A RESULT

15   OF YOUR WORK THERE AT MATTEL, AS TO A CONVENTION AMONG         11:49

16   DESIGNERS OR ARTISTS ABOUT WHAT THE DATE ON A DRAWING REFLECTS?

17   A    I'M SORRY.  COULD YOU -- I'M NOT CLEAR.

18   Q    IT'S PROBABLY A LITTLE TOO CONVOLUTED.

19        I TAKE IT THAT EVEN BEYOND THE DRAWINGS THAT YOU'VE

20   SEEN OF CARTER BRYANT, YOU'VE SEEN DRAWINGS FROM ANY NUMBER OF  11:50

21   DESIGNERS AND ARTISTS OVER YOUR YEARS THERE AT MATTEL.

22   A    CORRECT.

23   Q    AND IS THERE A CONVENTION THAT DESIGNERS USE, TO YOUR

24   KNOWLEDGE, ABOUT WHAT THE DATE ON A DRAWING REFLECTS?

25   A    WELL, THE DATE ON THE DRAWING USUALLY REFLECTS THE DATE    11:50

1   THE DRAWING WAS CREATED.  THAT'S STANDARD PRACTICE.

2          **MR. NOLAN:**  WE WOULD IMPOSE THE BEST EVIDENCE

3   OBJECTION.  IF THERE IS A PROTOCOL, THERE SHOULD BE A DOCUMENT

4   THAT REFLECTS THAT.  THERE'S NO FOUNDATION.

5          **THE COURT:**  WHAT DO YOU MEAN BY "CONVENTION"?          11:50

6          I'M GOING TO SUSTAIN THE OBJECTION.  REPHRASE YOUR

7   QUESTION.

8          ARE YOU REFERRING TO AN ACTUAL CONVENTION IN THE

9   SENSE OF A PROTOCOL THAT'S BEEN DRAWN UP AND ADOPTED?

10         **MR. ZELLER:**  NO, YOUR HONOR.          11:50

11         **THE COURT:**  EXPLAIN.

12         **MR. ZELLER:**  HER GENERAL UNDERSTANDING OF A PRACTICE.

13         **THE COURT:**  WHY DON'T YOU PHRASE IT THAT WAY.  IF

14  IT'S ABOUT THE PRACTICE OR CUSTOM, IT DOESN'T NEED ANYTHING.

15  IF IT'S ABOUT A CONVENTION PROTOCOL...          11:51

16  **BY MR. ZELLER:**

17  Q   SO YOU'LL KNOW, MY QUESTION THAT I'M ABOUT TO ASK YOU, I'M

18  NOT ASKING ABOUT A FORMAL POLICY OR A FORMAL PROTOCOL THAT YOU

19  HAD EXPERIENCE WITH.

20         BUT JUST GENERALLY SPEAKING, TO YOUR UNDERSTANDING,          11:51

21  WHEN YOU HAVE SEEN DATED DRAWINGS DONE BY DESIGNERS, DO YOU

22  HAVE AN UNDERSTANDING AS TO WHAT THAT DATE, AS A MATTER OF

23  PRACTICE OR CUSTOM, REFLECTS?

24         **MR. NOLAN:**  OBJECTION.  LACK OF FOUNDATION.

25         **THE COURT:**  SUSTAINED ON FOUNDATION.          11:51

1    **BY MR. ZELLER:**

2    Q    WE TALKED EARLIER ABOUT THE FACT YOU'VE SEEN MANY DRAWINGS

3    OVER THE COURSE OF YEARS DONE BY DESIGNERS.

4    A    CORRECT.

5    Q    AND HOW LONG HAVE YOU BEEN IN THE POSITION WHERE YOU'VE          11:51

6    BEEN LOOKING AT OR REVIEWING THE WORK BY DESIGNERS OR OTHER

7    ARTISTS?

8    A    16 YEARS.

9    Q    AND OVER THE COURSE OF THOSE 16 YEARS, APPROXIMATELY HOW

10   FREQUENTLY HAVE YOU SEEN DRAWINGS DONE BY DESIGNERS AND OTHER        11:52

11   ARTISTS?

12            **MR. NOLAN:**  YOUR HONOR, LACK OF FOUNDATION, BECAUSE

13   IN --

14            **THE COURT:**  THIS IS A FOUNDATIONAL QUESTION.

15            **MR. NOLAN:**  CAN I JUST REFINE IT A LITTLE BIT.  I       11:52

16   KNOW THE JURY IS NOT HERE, SO CAN I BE ALLOWED -- MS. PARK WAS

17   NOT THE SUPERVISOR IN BARBIE COLLECTIBLES IN 1999 WHERE CARTER

18   BRYANT WAS WORKING AS OF APRIL OF 1999.

19            **THE COURT:**  I DON'T KNOW IF THIS QUESTION NEEDS quite

20   THAT FINE A POINT.                                                    11:52

21            OVERRULED.

22            **THE WITNESS:**  YOU'RE GOING TO HAVE TO REASK THE

23   QUESTION.

24            **THE COURT:**  FRANKLY, WE'VE ALREADY HAD TESTIMONY FROM

25   NUMEROUS WITNESSES IN THIS TRIAL FROM BOTH SIDES IN RESPONSE,        11:52

```
 1    BOTH SETS OF LAWYERS, ABOUT THE SIGNIFICANCE OF THESE DATES; SO
 2    THIS IS CUMULATIVE TO A CERTAIN EXTENT.
 3              BUT GO AHEAD, MR. ZELLER.
 4              MR. ZELLER:  JUST SO THE RECORD IS CLEAR, YOUR HONOR,
 5    IN TERMS OF OUR PROFFER, WE'RE OUTSIDE THE SCOPE OF THE          11:53
 6    PROFFER.  THIS IS JUST SIMPLY IF THE COURT WANTS FURTHER
 7    EVALUATION OF THE TESTIMONY IN LIGHT OF THE CROSS-EXAMINATION.
 8    WE DO NOT INTEND TO HAVE MS. PARK OFFER ANY TESTIMONY BEYOND
 9    THE LAY OPINION TESTIMONY THAT'S PERMITTED BY RULE 901.
10              THE COURT:  ANYTHING FURTHER?                          11:53
11              MR. ZELLER:  UNLESS THE COURT HAS ANY QUESTIONS OF
12    ME.
13              THE COURT:  ANYTHING FURTHER, MR. NOLAN?
14              MR. NOLAN:  JUST SOME BRIEF ARGUMENT, YOUR HONOR.
15              THE COURT:  ANY FURTHER QUESTIONS?                     11:53
16                   FURTHER CROSS-EXAMINATION
17    BY MR. NOLAN:
18    Q    WHEN MR. BRYANT RETURNED TO MATTEL ON JANUARY 4, 1999,
19    FROM THEN ON, HE WAS ASSIGNED TO BARBIE COLLECTIBLES; is that
20    CORRECT?                                                         11:53
21    A    CORRECT.
22    Q    YOU WERE NOT THE SUPERVISOR OF BARBIE COLLECTIBLES.
23    A    CORRECT.
24              MR. NOLAN:  THANK YOU.  NOTHING FURTHER.
25              THE COURT:  YOU'RE EXCUSED FOR THE DAY.  YOU MAY BE    11:53
```

1    RECALLED TOMORROW, DEPENDING ON HOW THE COURT RULES.

2            **THE WITNESS:**  THANK YOU.

3        **THE COURT:**  LET ME HEAR ARGUMENT FROM BOTH SIDES.

4        **MR. ZELLER:**  I'LL BE BRIEF, YOUR HONOR.

5            AS THE COURT SAW FROM THE PROFFER, WE INTEND TO BE          11:54

6    VERY STRAIGHTFORWARD, VERY BRIEF.  THIS IS UNDER 901.  THERE

7    ARE CASES SAYING A LAY WITNESS CAN OFFER OPINIONS AS TO

8    HANDWRITING.  THAT'S WHAT SHE'S DOING.  AND THEN THE JURY IS

9    ENTITLED TO MAKE A COMPARISON.  THEY CAN ULTIMATELY MAKE THAT

10   EVALUATION.

11           IF THEY WANT TO ARGUE, STILL IN THE FACE OF THIS,

12   THAT -- I MEAN, FRANKLY, IT'S A DRAWING BY CARTER BRYANT,

13   SIGNED BY CARTER BRYANT, PRODUCED BY CARTER BRYANT.  IF THEY

14   WANT TO TAKE THE POSITION AND ARGUE THAT THERE'S SOME REAL

15   QUESTION ABOUT ITS AUTHENTICITY, THAT'S WHY WE HAVE MS. PARK.    11:54

16   BUT AT THE END OF THE DAY, THE JURY CAN MAKE THAT COMPARISON.

17   THEY'RE ENTITLED TO DO THAT AS WELL.  AND THAT'S WELL WITHIN

18   THE SCOPE AND THE REALM OF TRADITIONAL 901-TYPE TESTIMONY AND

19   THE WAY THAT THIS PROCESS SHOULD WORK.

20           **THE COURT:**  MR. NOLAN?                                  11:55

21       **MR. NOLAN:**  YOUR HONOR, FIRST OF ALL, THIS WITNESS IS

22   WHOLLY INCOMPETENT TO TESTIFY AS TO WHAT THEY ARE GOING TO

23   PROFFER HER FOR.  SHE'S NEVER SEEN THIS DOCUMENT UNTIL

24   CONVENIENTLY TEN YEARS AFTER SHE LAST SAW A SUPPOSED DOCUMENT

25   THAT MAY HAVE BORNE THE SIGNATURE OF CARTER BRYANT.            11:55

1          SHE HAS NOT SEEN THE ACTUAL EXHIBIT ITSELF.  SHE

2     CANNOT AUTHENTICATE THE EXHIBIT.  SHE CANNOT PROVIDE ANY

3     INFORMATION WITH RESPECT TO THE MEANING OF OR THE IMPORT OF THE

4     SIGNATURE.  THE SIGNATURE AND DATE ITSELF, I SUBMIT, YOUR HONOR

5     IS HEARSAY.                                                       11:55

6          WHAT'S INTERESTING IS THAT THE DOCUMENT IS A COPY OF

7     A FIGURINE OF THE RAINY DAY RASCALS THAT IS NOT DATED.  WE DO

8     NOT KNOW, UNDER ANY OF THE CIRCUMSTANCES, WHY, BECAUSE THIS,

9     OBVIOUSLY, WASN'T THE FORM OF THE ARTISTIC WORK.  IT'S JUST A

10    COPY THAT WAS PRODUCED DURING THE COURSE OF PRODUCTION HERE.      11:56

11         **THE COURT:**  IT APPEARS TO BE -- I GUESS I'M NOT

12    FOLLOWING YOU -- IT APPEARS TO THE COURT TO BE A SKETCH -- AND

13    I'M NOT USING THAT IN A PEJORATIVE SENSE -- OF A GREETING CARD.

14         **MR. NOLAN:**  IT DOES, YOUR HONOR.  THE IMPORT OF MY

15    ARGUMENT IS THAT THE RELEVANCE OF THIS EXHIBIT IS WHEN THE        11:56

16    DRAWING WAS DONE.  NOT WHEN THIS COPY WAS MADE AND DATED.

17         THE SIGNATURE DOES NOT APPEAR WITHIN THE BOX OF THE

18    DRAWINGS.

19         **THE COURT:**  AND I AGREE.  AND THAT'S WHY I THINK THE

20    WEIGHT OF THIS EVIDENCE IS NOT VERY STRONG, FOR THE REASONS       11:56

21    THAT YOU'VE POINTED OUT IN CROSS-EXAMINATION.  WHETHER THIS WAS

22    DRAWN ON APRIL 4, 1999, OR WHETHER IT'S A COPY ON APRIL 4, 1999

23    OF SOMETHING THAT WAS DONE EARLIER, I THINK THAT'S A GOOD

24    ARGUMENT, JUST PERSONALLY.  I AGREE WITH YOU THERE.

25         **MR. NOLAN:**  I KNOW, YOUR HONOR.                          11:57

1    **THE COURT:**  BUT THE POINT, MR. ZELLER, that YOU NEED

2  TO ADDRESS IS THIS AUTHENTICITY ARGUMENT.  THERE ARE AT LEAST

3  TWO CASES THAT THE COURT CAN VERY QUICKly reference, JUST BY

4  LOOKING AT WEINSTEIN'S EVIDENCE, WHERE COURTS HAVE CONSISTENTly

5  HELD THAT A FORMER CO-WORKER'S IDENTIFICATION OF A SIGNATURE                11:57

6  BASED ON FAMILIARITY IS SUFFICIENT FOR PURPOSES OF 901 TO

7  ADMIT; THAT'S THE ONLY ISSUE BEFORE me NOW.

8    YOU CAN PROBABLY CONVINCE ME of this IN ARGUMENT, BUT

9  THAT'S NOT THE ISSUE BEFORE THE COURT.

10    **MR. NOLAN:**  I AGREE.                                               11:57

11    IF MR. PRICE AND MR. QUINN WANT TO END THEIR CASE

12  BASED ON THAT, THAT'S A WHOLE DIFFERENT ISSUE.  BUT WHAT I'M

13  LOOKING AT HERE, YOUR HONOR, IS THAT -- I DON'T KNOW THOSE TWO

14  CASES, BUT I --

15    **THE COURT:**  THE CASES I'M REFERRING TO, FOR THE              11:57

16  RECORD, are U.S. V. TIPTON -- I DON'T HAVE THE CASE BEFORE ME;

17  ALL I HAVE IS WEINSTEIN'S PARENTHETICAL -- U.S. V. TIPTON, 964

18  F.2D AT 654, 655.  IT'S A SEVENTH CIRCUIT CASE IN 1992, "the

19  TESTIMONY OF DEFENDANT'S CO-WORKER THAT HE HAD SEEN DEFENDANT'S

20  SIGNATURE ON MANY DOCUMENTS AND THAT QUESTIONED SIGNATURE WAS        11:58

21  DEFENDANT'S WAS ADEQUATE TO AUTHENTICATE the EXHIBIT."

22    AND THERE'S AN ELEVENTH CIRCUIT CASE, UNITED STATES

23  V. BARKER, 735 F.2D AT 1283, A 1984 CASE, THAT "CHECKS WERE

24  SUFFICIENTLY AUTHENTICATED BY TESTIMONY OF DEFENDANT'S

25  CO-WORKERS WHO WERE FAMILIAR WITH DEFENDANT'S HANDWRITING AND        11:58

1    TESTIFIED THAT IT WAS SIMILAR TO HANDWRITING ON CHECKS."

2              THEY SEEM TO BE KIND OF WHAT WE HAVE HERE.

3              **MR. NOLAN:**  RIGHT.

4              AND I CERTAINLY, KNOWING THAT THOSE ARE UNITED STATES

5    CASES, AS A PLAINTIFF, AS A PROSECUTOR, REMEMBER THOSE KINDS OF          11:58

6    CASES, AND CERTAINLY HAVE DEALT WITH THESE KINDS OF ISSUES;

7    BUT, YOUR HONOR, THIS IS A WHOLLY DIFFERENT ANIMAL THAT WE'RE

8    TALKING ABOUT.

9              IF MS. PARK WAS ALLOWED TO TESTIFY, AS SHE HAS

10   TESTIFIED TODAY, TO FORM THE BASIS FOR THE AUTHENTICITY AND            11:59

11   RELEVANCE OF THIS PARTICULAR DOCUMENT --

12             **THE COURT:**  AUTHENTICITY ONLY.  NOT RELEVANCE.  I'M

13   NOT GOING TO PERMIT HER TO TESTIFY TO RELEVANCE.  IF I PERMIT

14   HER TO TESTIFY, IT'S SIMPLY -- THE ONLY QUESTION HERE WAS

15   AUTHENTICITY.                                                          11:59

16             **MR. NOLAN:**  BUT, YOUR HONOR, I THINK ALL SHE CAN --

17   AND I RESPECTFULLY SUBMIT THIS, YOUR HONOR -- ALL SHE CAN

18   AUTHENTICATE IS THAT SHE RECOGNIZES THE SIGNATURE.  BUT THAT

19   SIGNATURE CANNOT BE THEN USED TO AUTHENTICATE THE FIGURINE.

20             IF ALL THEY WANTED TO DO WAS TO GET IN THE SIGNATURE,        11:59

21   I ASSUME THAT THE CONTENT, OR THOSE CASES THAT YOU TALK ABOUT,

22   WOULD ACTUALLY PERMIT THIS.

23             IN THIS CASE, THE AUTHOR WAS ON THE STAND AND WAS

24   SUBJECT TO CROSS-EXAMINATION AND COULD HAVE BEEN RECALLED IN

25   THEIR CASE-IN-CHIEF.                                                   12:00

1          WE ARE COMPLETELY SANDBAGGED AND BLINDSIDED BY THIS,

2     BECAUSE UNDER 403, WE HAVE NO BASIS TO ESTABLISH WHEN THIS

3     SIGNATURE WAS PLACED ON THERE, WHAT THE SIGNIFICANCE OF THE

4     APRIL 4, 1999 DATE IS, WHEN HE ACTUALLY DID THESE DRAWINGS.

5          THESE ARE THE TYPE OF QUESTIONS, KNOWING THE                    12:00

6     SIGNIFICANCE OF THIS ISSUE, THAT WAS WHOLLY IN THE CONTROL OF

7     MATTEL, YOUR HONOR.  TO NOW ALLOW THEM TO CIRCUMVENT THE

8     COURT'S VERY CAREFUL AND REASONED DECISION YESTERDAY ABOUT --

9     THIS ISN'T REBUTTAL, THEY SHOULD NOT BE ALLOWED TO DO AN

10    END-RUN BASED ON FAMILIARITY THAT'S TEN YEARS DATED, ON A       12:00

11    SIGNATURE WHICH DOES NOT APPEAR WITHIN THE ACTUAL FIGURED

12    DRAWING THAT HAS RELEVANCE TO THIS JURY.

13         **THE COURT:**  BUT, COUNSEL, SHE DID IDENTIFY THE

14    WRITING WITHIN THE ACTUAL DRAWING.  IT WASN'T JUST THE

15    SIGNATURE.                                                      12:01

16         **MR. NOLAN:**  BUT, YOUR HONOR, AGAIN, she DID NOT

17    IDENTIFY THE DRAWING ITSELF.  NOR CAN SHE OFFER ANY COMPETENT

18    TESTIMONY AS TO WHEN THIS HANDWRITING WAS PLACED ON THIS

19    DOCUMENT.

20         **THE COURT:**  AND YOU'RE ABSOLUTELY CORRECT ON THAT.     12:01

21         **MR. NOLAN:**  ALL OF THAT, FOR 403 PURPOSES,

22    YOUR HONOR, PUTS ME IN A HORRIBLE POSITION, BECAUSE THEY GET

23    THE LAST WORD ON THIS.  AND THE JURY IS GOING TO SAY, 'WELL,

24    GEE, WHY DIDN'T MR. NOLAN BRING THIS UP?'

25         **THE COURT:**  NOT NECESSARILY.  IF THE COURT ALLOWS      12:01

```
 1   THIS IN, I WILL GIVE YOU FULL LEAVE TO BRING IN A SURREBUTTAL

 2   WITNESS, INCLUDING -- IF YOU WANT TO RESOLVE THIS ISSUE AND PUT

 3   IT TO REST, WE CAN DO A HOOKUP AND DO THE VIDEO DEPOSITION OF

 4   CARTER BRYANT HIMSELF, IF YOU WANT.

 5          MR. NOLAN:  YOUR HONOR, THIS ISSUE WAS DEALT -- I        12:01

 6   JUST DON'T -- YOU KNOW, LET ME JUST END ON THIS BASIS:  THIS IS

 7   TOO CUTE BY ABOUT A MILE WHAT MATTEL IS TRYING TO DO TO

 8   CIRCUMVENT WHAT SHOULD HAVE BEEN DONE IN THEIR CASE-IN-CHIEF.

 9   THEY HAD THE ABILITY TO ASK CARTER BRYANT.  THEY HAD THE

10   ABILITY EVEN TO ASK CASSIDY PARK.  THAT'S THE SIGNIFICANCE IN    12:02

11   THIS CASE.

12          WE'VE ALREADY TOLD THE JURY THAT TOMORROW WE'RE GOING

13   TO BE DOING THE CLOSING ARGUMENTS.  WE'RE RUNNING OUT OF TIME.

14   HAD THIS ISSUE BEEN FRAMED PROPERLY UNDER THE RULES OF

15   ENGAGEMENT, NOT only IMPOSED IN THIS CASE, BUT IMPOSED IN EVERY  12:02

16   CASE -- PUT in YOUR CASE-IN-CHIEF WHAT YOU ANTICIPATE, DEAL

17   WITH IT, SO YOU DON'T GET CAUGHT IN REBUTTAL.

18          THIS IS TOO LATE.  IT'S NOT PROPER REBUTTAL.  THIS

19   WAS WELL WITHIN THEIR SCOPE.  THEY MADE A STRATEGIC DECISION.

20   I DON'T REMEMBER THE NAME OF THE CASE THAT WAS CITED YESTERDAY,  12:02

21   and I'M NOT GOING TO REPEAT THE LONG ARGUMENTS.  REBUTTAL IS

22   NOT AN OPPORTUNITY TO DO A DO-OVER.

23          AND I'LL SUBMIT ON THAT.

24          MR. ZELLER:  IF I MAY JUST BRIEFLY, YOUR HONOR.

25          THE OBJECTIONS AS TO HEARSAY, 403, THOSE WERE NEVER       12:02
```

```
 1    MADE TO THIS DOCUMENT.  THE OBJECTION ON THE TABLE, AND THE
 2    COURT HEARD IT YESTERDAY, IS AUTHENTICITY.  THAT'S WHAT THIS
 3    OVERCOMES.  SO IT'S A VERY STRAIGHTFORWARD ISSUE.
 4            I UNDERSTAND MR. NOLAN HAS A LOT OF THINGS THAT HE
 5    WANTS TO SAY ABOUT THIS.  AND THAT'S FAIR ENOUGH.  HE CAN MAKE    12:03
 6    THOSE ARGUMENTS.  HE CAN CROSS-EXAMINE CASSIDY PARK.  BUT I
 7    DON'T THINK THERE'S REALLY A BASIS, AS MR. NOLAN WAS INITIALLY
 8    SAYING, THAT SHE CAN'T AUTHENTICATE THIS DOCUMENT.
 9            I THINK SHE CAN.  AND I THINK THE PROFFER AND HER
10    TESTIMONY HAS SHOWN THAT SHE CAN.                               12:03
11            THE COURT:  OKAY.
12            I WILL CONSIDER THIS DURING THE LUNCH HOUR.
13            I WILL RENDER A DECISION AT 1:30 WHEN WE GET BACK
14    TOGETHER TO GO OVER THE JURY INSTRUCTIONS AND THE VERDICT
15    FORMAT.
16            AT 1:30, I REALLY WILL EXPECT ANY FINAL OBJECTIONS TO
17    THE JURY INSTRUCTIONS.  I WILL EXPECT THE PARTIES' POSITIONS ON
18    THE VERDICT FORM, AS BEST THEY CAN ARTICULATE THEM.  AND THEN
19    FINALLY, I'LL TAKE UP THIS ISSUE OF THE RAINY DAY RASCALS.
20            I WOULD ALSO LIKE TO KNOW WHAT IS GOING ON WITH THE      12:04
21    STIPULATION on the WALL STREET JOURNAL, BECAUSE IF THERE'S NOT
22    A STIPULATION, what I'LL WANT TO HEAR FROM MR. NOLAN OR
23    MS. AGUIAR is WHAT WITNESS THEY WOULD LIKE TO CALL.  BECAUSE I
24    AM GOING TO GIVE THEM LEAVE TO CALL THAT WITNESS.  BECAUSE I DO
25    BELIEVE, BASED ON MY RECOLLECTION OF WHAT TOOK PLACE AT         12:04
```

tuesday, july 8, 2008                    trial day 21, morning session

```
 1   SIDE-BAR, THAT THIS IS CERTAINLY FAIR GAME FOR MGA.

 2            MR. NOLAN:  THANK YOU, YOUR HONOR.

 3            THAT EXCHANGE OCCURRED, FOR THE RECORD, AT 3531, AND

 4   IT SAID --

 5            THE COURT:  I DON'T NEED TO GO OVER IT, COUNSEL.  I'M        12:04

 6   GIVING YOU FULL LEAVE TO DO THIS.  JUST TELL ME WHAT YOU WANT

 7   DONE, EITHER THE STIPULATION OR WHAT WITNESS YOU WANT TO CALL.

 8            MR. NOLAN:  LET'S TRY TO WORK OUT THE STIPULATION.

 9   I'LL SEE WHAT MATTEL IS WILLING TO DO.

10            THE COURT:  LET ME KNOW AT 1:30.                            12:04

11            I'M WITH YOU A HUNDRED PERCENT ON THIS ONE.

12            MR. NOLAN:  THANK YOU, YOUR HONOR.

13            MR. PROCTOR:  IF I MAY HAND UP THE DOCUMENT THAT WE

14   PROMISED WOULD BE FORTHCOMING.

15            THE COURT:  THANK YOU, MR. PROCTOR.                         12:05

16            COURT IS IN RECESS.

17            (WHEREUPON, A LUNCH RECESS WAS HELD.)

18            (MORNING SESSION CONCLUDED.)

19

20

21

22

23

24   / / /

25   / / /
```

1                              CERTIFICATE

2

3       I hereby certify that pursuant to section 753, title 28, united
        states code, the foregoing is a true and correct transcript of
4       the stenographically recorded proceedings held in the above-
        entitled matter and that the transcript page format is in
5       conformance with the regulations of the judicial conference of
        the united states.

6

7       _____              _____
        THERESA A. LANZA, CSR, RPR                              Date
8       FEDERAL Official COURT Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

tuesday, july 8, 2008                        trial day 21, morning session