1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3          EASTERN DIVISION

4          - - -

5     HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6          - - -

7  MATTEL, INC.,                    )
                                    )
8               Plaintiff,    )
                                    )
9          vs.                 )  No. CV 04-09049
                                    )
10  MGA ENTERTAINMENT, inc., et. Al.,  )  Trial Day 27
                                    )  Morning Session
11               Defendants.  )  Pages 5324-5477
   _____)
12  AND CONSOLIDATED ACTIONS,        )
   _____)
13

14

15     REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16          Riverside, California

17          Wednesday, July 23, 2008

18          8:17 A.M.

19

20

21

22

23          THERESA A. LANZA, RPR, CSR
            Federal Official Court Reporter
24          3470 12th Street, Rm. 134
            Riverside, California  92501
25          951-274-0844
            WWW.THERESALANZA.COM

```
 1    APPEARANCES:

 2
      On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                            TIMOTHY ALGER
                              William price
 7                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 8                       LOS ANGELES, California  90017
                         213-624-7707
 9


10
      ON BEHALF OF MGA ENTERTAINMENT:
11
                         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                       BY:  THOMAS J. NOLAN
                              DAVID HANSEN
13                            Lauren aguiar
                              Carl roth
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

WEDNESDAY, JULY 23, 2008                    TRIAL DAY 27, MORNING SESSION

1                          I N D E X

2                                                        Page

3      BENCH CONFERENCE................................. 5327

4      OPENING STATEMENT - PLAINTIFF.................... 5410

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        RIVERSIDE, CALIFORNIA; WEDNESDAY, JULY 23, 2008; 8:17 A.M.

 2                              -oOo-

 3        THE CLERK:  CALLING CASE NUMBER CV04-09049-SGL,

 4   MATTEL, INC., V. MGA ENTERTAINMENT, INC., ET AL.

 5             COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

 6   RECORD.

 7        MR. QUINN:  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

 8   MATTEL.

 9        MR. NOLAN:  TOM NOLAN, LAUREN AGUIAR, AND

10   DAVID HANSEN ON BEHALF OF MGA.                            08:17

11        THE COURT:  GOOD MORNING TO YOU ALL.

12             COUNSEL, WE HAD A FEW MORE MOTIONS TO COVER FROM OUR

13   HEARING ON MONDAY.  IN NO PARTICULAR ORDER, LET'S BEGIN WITH

14   MGA'S MOTION IN LIMINE NUMBER SIX.  THIS IS THE MOTION TO

15   EXCLUDE REFERENCE TO AND USE OF PHASE 2 EVIDENCE.           08:17

16             I'VE READ THE MOTIONS, THE OPPOSITION, AND THE REPLY

17   AGAIN, AND REFLECTED ON YOUR ARGUMENT.  I THINK THE PROBLEM --

18   AND THIS IS A SIMILAR PROBLEM THAT I THINK THE COURT TRIED TO

19   IDENTIFY IN REFERENCE TO DELIBERATE CONCEALMENT OR INTENTIONAL

20   CONCEALMENT -- IS THAT WE'VE BEEN ADOPTING SHORTHAND AND       08:18

21   PROBABLY LOST SIGHT OF EXACTLY WHAT IT IS THAT THE SHORTHAND

22   REPRESENTS.  THERE'S REALLY NO SUCH THING AS PHASE 2 EVIDENCE.

23   THERE ARE PHASE 2 ISSUES AND PHASE 2 CLAIMS, OR PHASE 1-A

24   CLAIMS AND THERE'S 1-B CLAIMS.  EVIDENCE IS EVIDENCE.  IT

25   EITHER GOES TO AN ISSUE OR IT DOESN'T GO TO AN ISSUE.         08:18
```

1      WHAT THE COURT HAS TRIED TO KEEP OUT ARE PHASE 2

2  ISSUES FROM PHASE 1, KEEP OUT PHASE 1-B ISSUES FROM PHASE 1-A,

3  BUT EVIDENCE IS NOT -- WE END UP BASICALLY STATING A TAUTOLOGY

4  IF WE EXCLUDE EVIDENCE SIMPLY BECAUSE WE CHARACTERIZE IT AS

5  PHASE 2 EVIDENCE.                                              08:19

6      SO THE MOTION IS WELL TAKEN TO THE EXTENT THAT IT

7  WANTS TO EXCLUDE PHASE 2 ISSUES FROM PHASE 1-B.  IT IS NOT WELL

8  TAKEN IF IT'S A CATEGORICAL PRESCRIPTION OR IS TAKEN AS A

9  CATEGORICAL PRESCRIPTION OF EVIDENCE THAT RELATES TO, OR WILL

10 ALSO BE USED TO RELATE TO, AN ISSUE IN PHASE 2.               08:19

11     SO WHERE DOES THAT LEAVE US?

12     TO THE EXTENT THAT MGA INTRODUCES EVIDENCE THAT -- ON

13 ANY NUMBER OF TOPICS THAT THEY IDENTIFY IN THE MOTION

14 *IN LIMINE*, MATTEL HAS A RIGHT TO REBUT THAT EVIDENCE OR IMPEACH

15 THAT EVIDENCE.  I CANNOT AT THIS POINT, WITHOUT SEEING IN THE    08:19

16 CONTEXT OF THE TRIAL ITSELF, RULE IN THE ABSTRACT ON PHASE 2

17 EVIDENCE OR PHASE 1 EVIDENCE.  THE MORE I THOUGHT ABOUT THIS,

18 THE MORE I REALIZE THAT IT REALLY DOESN'T LEND ITSELF TO AN

19 EXCLUSIONARY RULE AS FRAMED IN THE MOTION *IN LIMINE*.  IT'S

20 SOMETHING THAT THE COURT IS GOING TO HAVE TO CONSIDER IN THE     08:20

21 CONTEXT OF THE TRIAL.  QUITE FRANKLY, IT'S SOMETHING THAT MGA

22 CONTROLS THE DOOR ON.

23     I CERTAINLY AGREE THAT NONE OF THE EVIDENCE REFERRED

24 TO BY MGA WOULD BE APPROPRIATE FOR MATTEL TO BRING IN IN ITS

25 CASE-IN-CHIEF IN PHASE 1-B.  I CAN CERTAINLY SEE MGA OPENING     08:20

```
 1    THE DOOR FOR ANY NUMBER OF THESE PIECES OF EVIDENCE; CERTAINLY

 2    NOT ALL OF THEM, BUT SOME OF THEM.  AND DEPENDING ON HOW THE

 3    EVIDENCE IS PRESENTED, THE COURT WILL ENTERTAIN AND EITHER

 4    SUSTAIN OR OVERRULE APPROPRIATE OBJECTIONS TO THE EVIDENCE.

 5         BUT I THINK WE NEED TO MOVE BEYOND DESCRIBING              08:20

 6    EVIDENCE AS PHASE 1 OR PHASE 2 EVIDENCE AND FOCUS ON THE FACT

 7    THAT WE ARE LIMITING OURSELVES TO PHASE 1 AND PHASE 2 ISSUES OR

 8    CLAIMS OR COUNTERCLAIMS, OR WHAT HAVE YOU.

 9         THAT'S MY INITIAL SENSE, AFTER READING ALL OF THE

10    BRIEFS AGAIN ON THIS POINT AND CONSIDERING THE ARGUMENT ON BOTH  08:21

11    SIDES.  LET ME HEAR FROM THE PARTIES, IN LIGHT OF THE COURT'S

12    TENTATIVE THOUGHTS, THEN I'LL ISSUE A RULING.

13         MR. NOLAN:  YOUR HONOR, I WOULD JUST MAKE THE

14    OBSERVATION THAT THE DISTINCTION THAT THE COURT MAKES BETWEEN

15    PHASE 2 ISSUES AND PHASE 2 DISCOVERY BLURS A COUPLE OF POINTS.   08:21

16         THE COURT:  I DIDN'T WANT TO USE THE WORD

17    "DISCOVERY."

18         MR. NOLAN:  EVIDENCE.  I APOLOGIZE, YOUR HONOR.

19         BECAUSE THE PHASE 2 DISCOVERY ISSUES IN THIS CASE

20    HAVE BEEN STAYED BY THE COURT AT OUR REQUEST, SOMETIME, I        08:21

21    BELIEVE, IN JANUARY OR FEBRUARY OF THIS YEAR --

22         THE COURT:  RIGHT.

23         MR. NOLAN:  -- IN AN EFFORT TO ALLOW FOR THIS PHASE

24    OF THE CASE TO BE FULLY DEVELOPED AND TO BE PREPARED TO TRY AS

25    WE'RE TRYING IT NOW.                                            08:22
```

1          MANY OF THE ISSUES THAT MATTEL WOULD CLAIM THAT WE

2     OPENED THE DOOR ON, ON APPORTIONMENT AND THAT TYPE OF EVIDENCE,

3     WAS FULLY BEFORE THE COURT, AND THAT ARGUMENT WAS MADE AT THE

4     TIME OF THE PHASE 2 DISCOVERY ORDER THAT WAS PUT INTO PLACE.

5     AND I BELIEVE -- AND I CAN GO BACK ON THE RECORD -- I BELIEVE          08:22

6     THAT CERTAIN OF THESE ISSUES WERE BROUGHT TO THE DISCOVERY

7     MASTER'S ATTENTION, AS WELL AS WITH RESPECT TO THE SCOPE OF

8     DISCOVERY ON THESE ISSUES THAT WOULD BE ALLOWED.

9          WHERE MGA FINDS ITSELF IS THAT, OF COURSE, HAVING

10    COME INTO THE CASE MOST RECENTLY AND TRYING TO FOCUS ALL OF THE        08:22

11    EFFORTS ON GETTING THIS ISSUE OR THESE ISSUES READY TO TRY, AND

12    WITH THE PHASE 2 DISCOVERY IN PLACE, WE DID NOT DEVELOP THE

13    DISCOVERY THAT MIGHT OTHERWISE BE AVAILABLE TO COUNTER SOME OF

14    THE EVIDENCE THAT MATTEL WOULD LIKE TO WHOLESALE PUT INTO THIS

15    ISSUE.  AND THAT'S A REAL CONCERN FOR US, IN LIGHT OF THE STAY,        08:23

16    YOUR HONOR.

17          **THE COURT:**  GIVE ME AN EXAMPLE.

18          **MR. NOLAN:**  I CAN DO IT IN BROAD STROKES.

19          **THE COURT:**  THIS IS PART OF THE PROBLEM THAT I HAVE

20    WITH THIS MOTION AS PHRASED, BECAUSE IT'S SO BROADLY WORDED;           08:23

21    AND I KNOW IT CITES EXAMPLES, BUT IT'S NOT CLEAR TO ME WHICH OF

22    THESE ARE ACTUALLY IN PLAY AND WHICH ARE NOT IN PLAY.

23          **MR. NOLAN:**  LET ME TRY IT WITH SOME BROAD STROKES AND

24    GIVE YOU AN EXAMPLE; AND ALSO GET THE COURT'S GUIDANCE WITH

25    RESPECT TO WHETHER OR NOT THIS EVIDENCE WOULD OPEN THE DOOR.           08:23

```
 1              AS MR. ROTH FRAMED THE ISSUE YESTERDAY, THIS LARGELY

 2   COMES UP IN THE SENSE OF APPORTIONMENT OF DAMAGES.  WHAT

 3   PORTION OF THE PROFITS SHOULD BE ATTRIBUTED TO THE INFRINGING

 4   PRODUCT.  AND TO DO SO, WE GO THROUGH, THE EXPERTS HAVE GONE

 5   THROUGH, AN ELABORATE EXERCISE OF THE VALUE OF ADVERTISING,        08:24

 6   BRANDING, AND A SERIES OF THEM.

 7              IF MATTEL IS -- AND BASED SIMPLY ON THAT, WITHOUT

 8   HAVING AN EMPLOYEE FROM MGA COMING UP AND SAYING, I CREATED

 9   THIS IDEA, IT WAS MY IDEA, VERSUS MGA HAD GREAT PACKAGING; WE

10   WON AWARDS.  THAT APPEALS TO A CONSUMER THAT ATTITUDE, GROSS      08:24

11   REVENUE -- IF MATTEL IS THEN ALLOWED TO COME IN AND SAY, 'OH,

12   THERE'S ALL THIS EVIDENCE THAT ALLEGEDLY CERTAIN THINGS

13   WERE' --

14              THE COURT:  LET ME STOP THERE.

15              YOU GLOSSED OVER THE CRITICAL POINT, BECAUSE HOW MGA    08:24

16   PRESENTS THAT EVIDENCE WILL AFFECT WHETHER OR NOT MATTEL IS

17   ABLE TO IMPEACH THAT.

18              TO USE YOUR EXAMPLE THERE, IF A MATTEL EMPLOYEE COMES

19   UP AND CLAIMS, 'I DEVELOPED ON MY OWN, WITHOUT ANY REFERENCE TO

20   ANYTHING ELSE, THIS UNIQUE MARKETING OR THIS UNIQUE BRANDING     08:25

21   THING,' AND THAT'S A LIE, I'M GOING TO ALLOW MGA TO IMPEACH ON

22   THAT LIE.

23              IF.  I DON'T KNOW.  IF, HOWEVER, IT'S CAST IN AN

24   ENTIRELY DIFFERENT WAY WHICH DOESN'T CALL INTO QUESTION WHETHER

25   OR NOT IT WAS DONE UNIQUELY OR ON THEIR OWN, THAT'S A DIFFERENT   08:25
```

```
1   SCENARIO.  I MEAN, THOSE ARE TWO DIFFERENT SCENARIOS.  I'M NOT
2   GOING TO GROUP THEM TOGETHER.  IT'S LARGELY GOING TO TURN ON
3   HOW THE TESTIMONY COMES UP.  I'M NOT GOING TO HANDCUFF EITHER
4   SIDE AND SAY THAT YOU CAN'T IMPEACH BECAUSE THIS EVIDENCE ALSO
5   HAPPENS TO RELATE -- THE IMPEACHMENT EVIDENCE ALSO HAPPENS TO        08:25
6   RELATE TO AN ISSUE IN PHASE 2.
7            MR. NOLAN:  THAT ADDS TO THE CLARITY, YOUR HONOR.
8            THE COURT:  IT REALLY DEPENDS LARGELY ON HOW THE
9   EVIDENCE IS PRESENTED.  THAT'S WHY I SAID AT THE OUTSET THAT
10  MGA BASICALLY CONTROLS THE DOOR THROUGH WHICH THIS IS.  SO I'M      08:26
11  DISINCLINED TO GRANT A CATEGORICAL -- I THINK IT WOULD BE A
12  TAUTOLOGY FOR THE COURT TO SAY, 'NO PHASE 2 EVIDENCE IN PHASE
13  1-A OR 1-B.'  I THINK THAT DOESN'T PROVIDE ANY GUIDANCE AT ALL.
14  IT BEGS THE QUESTION AS TO -- IT ASSUMES -- THERE'S A FAULTY
15  PREMISE THERE THAT EVIDENCE IS EXCLUSIVELY 1-A OR 1-B OR            08:26
16  PHASE 2, AND EVEN WHEN WE WERE DISCUSSING THE DISCOVERY
17  LIMITATIONS, THERE WAS A RECOGNITION -- AND I REMEMBER THIS
18  COMING UP SEVERAL TIMES, AT LEAST IN THE DISCOVERY MATTERS THAT
19  THIS COURT DECIDED, THAT CERTAIN EVIDENCE APPLIES TO BOTH
20  PHASE 1 AND PHASE 2.  I REMEMBER SEVERAL INSTANCES OF THAT.        08:26
21  AND WHEN THAT WAS THE CASE, THE COURT PERMITTED IT TO GO
22  FORWARD.  I THINK I EVEN EXPRESSED IT AT THE OUTSET, BEFORE
23  ANYTHING WENT TO JUDGE INFANTE, THAT IF THERE WAS A WITNESS
24  THAT WAS TO BE DEPOSED THAT HAD BOTH PHASE 1 AND PHASE 2
25  EVIDENCE, THAT THAT DEPOSITION COULD GO FORWARD.                   08:26
```

1        I'VE LEFT IT TO THE VERY SOPHISTICATED COUNSEL ON

2   BOTH SIDES OF THIS CASE TO DETERMINE WHAT EVIDENCE WAS NEEDED

3   FOR PHASE 1-A AND PHASE 1-B.  THE COURT HAS NOT SET ANY

4   RESTRICTIONS OR PARAMETERS ON THAT, AND I'M NOT GOING TO DO SO

5   NOW.                                                          08:27

6        IN TERMS OF IMPEACHMENT EVIDENCE -- AND THAT REALLY

7   IS THE BASIS THAT I SEE ANY OF THIS COMING IN, IF AT ALL --

8   WILL LARGELY TURN ON THE TESTIMONY OF THE MGA WITNESSES.  IT'S

9   CERTAINLY NOT GOING TO COME IN IN MATTEL'S CASE-IN-CHIEF IN

10  THIS PHASE OF THE TRIAL.                                      08:27

11        **MR. NOLAN:**  THANK YOU, YOUR HONOR.

12        **THE COURT:**  MR. ZELLER?

13        **MR. ZELLER:**  THANK YOU, YOUR HONOR.

14        WE DO AGREE WITH THE COURT'S APPROACH TO THIS, AND

15  THERE'S NO QUESTION -- WE DON'T INTEND TO BRING THIS STUFF IN  08:27

16  AFFIRMATIVELY AS PART OF OUR CASE-IN-CHIEF.  IT'S GOING TO BE

17  RESPONSIVE.  WHEN WE ARE TALKING ABOUT THE TRADE SECRET THEFTS

18  OR THE ORIGINS OF CERTAIN INFORMATION THAT THEY ARE GOING TO

19  SAY -- OR ELEMENTS THAT THEY ARE GOING TO SAY CONTRIBUTED TO

20  THE SUCCESS --                                                08:28

21        **THE COURT:**  ONE CONCERN I HAVE IS THE ONE THAT

22  MR. NOLAN -- IF THERE'S ANY EVIDENCE THAT MGA WAS BARRED FROM

23  EXPLORING BY JUDGE INFANTE, OR EVEN BY THIS COURT -- I'M NOT

24  BEING PRESENTED WITH ANY -- NO ONE IS CITING TO ANYTHING RIGHT

25  NOW; I'M NOT REALLY AWARE OF WHAT THAT WOULD BE -- THAT WOULD  08:28

1    BE A CONCERN, THOUGH.

2            **MR. ZELLER:**  I UNDERSTAND THE POINT.

3            TO MAYBE BE A LITTLE MORE EXPANSIVE ABOUT THE COURT'S

4    POINTS A LITTLE EARLIER, BECAUSE I THINK THE COURT IS

5    ABSOLUTELY CORRECT.  I MEAN, THE COURT DID NOT STAY DISCOVERY        08:28

6    AS TO MATTERS OR ISSUES WHERE THERE WAS AN OVERLAP BETWEEN

7    PHASE 1 AND 2.  THE COURT'S ORDERS WERE ABSOLUTELY EXPLICIT

8    ABOUT THAT.  IN FACT, THE PARTIES LITIGATED, IN FRONT OF JUDGE

9    INFANTE ON SEVERAL MOTIONS, IS THIS SOMETHING THAT WAS PHASE 1

10   VERSUS PHASE 2?                                                     08:29

11           SO THOSE ADJUDICATIONS WERE MADE.  I MEAN, IF A PARTY

12   THOUGHT THAT IT NEEDED THIS EVIDENCE FOR PHASE 2, BECAUSE THERE

13   WAS THAT OVERLAPPING KIND OF EVIDENCE, THEY HAD THE ABILITY,

14   AND IN MANY CASES DID, TO BRING THAT TO JUDGE INFANTE'S

15   ATTENTION FOR A RULING, TO THE EXTENT THAT A PARTY THOUGHT THAT     08:29

16   IT WAS WRONGED OR AGGRIEVED BY THE RULING.

17           WELL, THE COURT, OF COURSE, HERE IS THE ONE THAT ONE

18   HAD TO TAKE AN APPEAL TO.  SO I THINK THE DAY FOR THOSE

19   COMPLAINTS ABOUT DISCOVERY HAS PASSED.  I DON'T THINK THAT

20   THAT'S A PROPER BASIS FOR SAYING THAT A CERTAIN ISSUE CANNOT BE     08:29

21   -- OR CERTAIN EVIDENCE CANNOT BE ADMITTED, BECAUSE THE COURT

22   HAD THAT CONSTRUCT AND NO ONE WAS DEPRIVED OF ANYTHING UNDER

23   THAT CONSTRUCT.  AND IF SOMEONE DOES BELIEVE IT, THEY WERE --

24   WELL, THEY NEEDED TO COME TO THE COURT AND SAY SO.

25           SO I THINK THE PROCEDURE AND THE MECHANISMS THAT THE        08:29

1  COURT HAD IN PLACE REALLY RESOLVED THIS ISSUE.  AND, OF COURSE,

2  AS MR. NOLAN POINTS OUT, MGA WAS THE PARTY WHO ASKED FOR THE

3  STAY IN THE FIRST INSTANCE.  SO IT'S ALSO A LITTLE HARD TO

4  UNDERSTAND HOW MGA CAN REALLY CLAIM, UNDER ANY CIRCUMSTANCE, TO

5  HAVE SOMEHOW BEEN DENIED ANYTHING.                          08:30

6        **THE COURT:**  IF I RECALL, THERE WAS NO STAY UNTIL A

7  FEW MONTHS AGO; IS THAT CORRECT?

8        **MR. ZELLER:**  THAT'S CORRECT.

9        **THE COURT:**  WHEN ALL OF THE MILLIONS OF DOCUMENTS

10  WERE GOING BACK AND FORTH AS BEEN DESCRIBED IN DETAIL, THAT WAS   08:30

11  PHASE 1 AND PHASE 2.

12        **MR. ZELLER:**  THAT'S CORRECT.  IN FACT, THE STAY WAS

13  NOT EFFECTIVE UNTIL -- I BELIEVE IT WAS APPROXIMATELY JANUARY

14  OF THIS YEAR.  SO THERE WAS CERTAINLY CONSIDERABLE PERIODS OF

15  DISCOVERY, AND, IN FACT, CONSIDERABLE DISCOVERY AND MOTION     08:30

16  PRACTICE AND THE LIKE OVER -- UNDER ANY CHARACTERIZATION OF

17  EVEN PURE PHASE 2 ISSUES.

18        **THE COURT:**  VERY GOOD.

19        IT'S STILL A CONCERN OF MINE, AND IF AT ANY POINT IN

20  TIME DURING THIS PHASE OF THE TRIAL MGA BELIEVES THAT A       08:30

21  PARTICULAR ITEM OF DISCOVERY OR EVIDENCE HAS BEEN DENIED TO

22  THEM BECAUSE OF THE WAY OF THE DISCOVERY PHASING, AND IF THAT

23  CAN BE IDENTIFIED WITH SPECIFICITY, NOT IN GENERAL, BROAD

24  STATEMENTS, BUT IN TERMS OF SPECIFICITY, THE COURT WILL GIVE

25  MGA LEAVE TO ADDRESS THAT AND RAISE THAT AS PART OF AN        08:31

1    OBJECTION TO ANY LINE OF IMPEACHMENT.

2         **MR. NOLAN:**  YOUR HONOR, MY LAST COMMENT IS, I ACCEPT

3    THE COURT'S CLARIFICATIONS.  I APPRECIATE THAT.  AND I ALSO

4    ASSUME, THOUGH, YOUR HONOR, THAT IF WE'RE IN THIS SITUATION,

5    APPLYING THE GOOSE-GANDER RULE -- AND THAT IS THAT IN PHASE          08:31

6    1-A, WHEN WE WERE TRYING TO IMPEACH, THE COURT WAS ADAMANT

7    ABOUT THE IMPEACHMENT COULD NOT BE GENERAL OR SWEEPING; IT HAD

8    TO BE SPECIFIC --

9         **THE COURT:**  ABSOLUTELY.

10        **MR. NOLAN:**  -- SO THAT IF AN EMPLOYEE OF MGA WHO'S A        08:31

11   FORMER MATTEL EMPLOYEE IS ON THE STAND, IT CAN'T BE WITH A

12   SWEEPING BACK OF THE HAND, 'OH, AND YOU TOOK THAT FROM MATTEL,'

13   THAT THERE WOULD BE A PROFFER TO THE COURT AHEAD OF TIME AS TO

14   THE SPECIFIC FORM OF THE IMPEACHMENT, BECAUSE I DON'T WANT TO

15   HAVE TO DO THAT IN FRONT OF A JURY.                                  08:31

16        **THE COURT:**  ABSOLUTELY.  THAT APPLIES TO THEM AS

17   WELL.  THE BIG CONCERN THAT I HAD WITH SOME OF THE IMPEACHMENT

18   THAT MGA ATTEMPTED, THAT APPLIES JUST AS MUCH TO MATTEL.

19        I BELIEVE I'VE ALREADY RECEIVED A REPRESENTATION FROM

20   MR. ZELLER ON MONDAY THAT THIS IS NOT GOING TO BE AN EXPANSIVE       08:32

21   EFFORT ON THE PART OF MATTEL, BUT LIMITED TO PINPOINT INSTANCES

22   OF IMPEACHMENT.

23        IS THAT CORRECT, MR. ZELLER?

24        **MR. ZELLER:**  THAT'S CORRECT, YOUR HONOR.

25        **THE COURT:**  THAT'S WHAT I TOOK YOUR STATEMENT AT            08:32

```
 1   MONDAY'S HEARING TO BE.

 2            SO THE MOTION IN LIMINE AS PHRASED IS DENIED.

 3   HOWEVER, THE COURT BASICALLY REPHRASES THE MOTION TO LIMIT THE

 4   EVIDENCE TO BE INTRODUCED TO ESSENTIALLY IMPEACHMENT EVIDENCE

 5   OF MGA APPORTIONMENT EVIDENCE, ASSUMING, OF COURSE, THAT IT'S     08:32

 6   FRAMED IN SUCH AND THE IMPEACHMENT EVIDENCE IS SUCH THAT IT

 7   CAN, IN FACT, SERVE THAT PURPOSE.  I REALLY WANTED TO GET OFF

 8   OF THIS MOTION OF REFERRING TO -- AND THE COURT WILL TRY --

 9   BECAUSE THE COURT HAS BEEN JUST AS GUILTY OF THIS AS ANYBODY

10   ELSE -- OF REFERRING TO THIS AS PHASE 1 EVIDENCE AND PHASE 2     08:32

11   EVIDENCE.  IT'S PHASE 1 ISSUES AND PHASE 2 ISSUES.  EVIDENCE,

12   OF COURSE, CAN SUPPORT BOTH.  I SUSPECT A LOT OF THE EVIDENCE

13   THAT WE'VE HEARD IN PHASE 1 WOULD BE IN A PHASE 2 TRIAL, AND

14   VICE VERSA.

15            SO THAT'S MGA'S MOTION NUMBER SIX.                      08:33

16            I NEXT HAVE TO DEAL WITH THE NEXT QUESTION THAT I

17   HAVE, JUST IN ORDER, IS MATTEL'S MOTION IN LIMINE NUMBER 11.

18   THIS RELATES TO -- SPECIFICALLY, WHAT THIS BOILS DOWN TO AT

19   THIS POINT IS MR. GRUCA'S -- THE REBUTTAL REPORT OF MR. GRUCA.

20            LET ME ASK MGA TO RESPOND TO THIS THOUGHT THAT I HAD,   08:33

21   ACTUALLY AS I WAS LYING DOWN LAST NIGHT.  THE GRUCA REPORT, AS

22   I UNDERSTAND IT, IS INDICATED TO BE A REBUTTAL REPORT TO

23   CAROL SCOTT.  THE COURT HAS ALREADY GRANTED MGA'S MOTION

24   IN LIMINE, LIMITING WHAT CAROL SCOTT CAN TESTIFY TO.  NAMELY,

25   SHE'S NOT GOING TO BE ABLE TO TESTIFY TO THE POINTS THAT IT      08:34
```

```
 1    APPEARS THAT MR. GRUCA'S BRAND WEAR RESEARCH SURVEY IS

 2    DIRECTED; NAMELY, MS. SCOTT'S STATEMENTS CONCERNING THE DESIGN

 3    OF BRATZ AND ALL OF THAT.

 4           SO MY QUESTION IS, IS IT REALLY NECESSARY AT THIS

 5    POINT?  AND IF IT IS, IF THAT REBUTTAL IS GOING TO COME IN, IF      08:34

 6    IT'S GOING TO OTHER THINGS SUCH AS APPORTIONMENT STANDING BY

 7    ITSELF, THEN THE QUESTION BECOMES WHETHER WE NOW ALLOW A

 8    SURREBUTTAL.

 9           MR. ROTH?

10           MR. ROTH:  GOOD MORNING, YOUR HONOR.                         08:35

11           THIS IS AN ISSUE THAT WAS RAISED BY MR. KIDMAN TOWARD

12    THE END OF THE HEARING ON MONDAY.  AS YOU MAY RECALL, WE MADE,

13    IN BOTH HEARINGS, TWO ARGUMENTS VIS-À-VIS MR. GRUCA'S REPORT.

14    ONE WAS -- IT REALLY WAS -- THE SECONDARY ARGUMENT WAS THAT IT

15    WAS IN REBUTTAL TO CAROL SCOTT'S REPORT, VIS-À-VIS BRATZ,          08:35

16    PARAGRAPHS 12 AND 13 OF HER FEBRUARY 11TH REPORT.  I WOULD

17    AGREE WITH YOUR HONOR, THAT'S NOT AN ISSUE IN THE CASE ANYMORE,

18    AS THAT PIECE OF MS. SCOTT'S TESTIMONY HAS BEEN EXCLUDED BY THE

19    COURT.

20           HOWEVER, YOUR HONOR JUST PUT HIS FINGER ON THE REAL          08:35

21    REASON WHY WE THINK IT'S APPROPRIATE THAT THE REPORT PROCEED

22    AND BE PERMITTED INTO EVIDENCE HERE.  AND THAT IS THAT WE

23    THINK, BASED ON THE STRAUS CASE, APPORTIONMENT EVIDENCE WAS NOT

24    REQUIRED TO BE SET FORTH AS AN INITIAL REPORT.

25           THE COURT:  I'VE TAKEN A CAREFUL LOOK AT STRAUS,             08:36
```

1   BECAUSE IT HAD -- I'VE READ IT AGAIN, AND CLEARLY, STRAUS IS A

2   DISTRICT COURT CASE OUT OF TEXAS.  AND IT REPEATS THE

3   WELL-ESTABLISHED PRINCIPLE THAT THE BURDEN, THE INITIAL BURDEN,

4   ON A COPYRIGHT INFRINGEMENT IS FOR THE PLAINTIFF, THE PARTY

5   ALLEGING INFRINGEMENT, TO COME FORWARD WITH THE GROSS REVENUES.   08:36

6        CORRECT?

7        **MR. ROTH:**  CORRECT.

8        **THE COURT:**  AND THEN, AND ONLY THEN, DOES THE BURDEN

9   SHIFT, ESSENTIALLY, TO THE DEFENSE, OR THE ALLEGEDLY -- OR THE

10  INFRINGING PARTY, ASSUMING THAT INFRINGEMENT HAS BEEN            08:36

11  ESTABLISHED, TO NET OUT THE COSTS, AND TO, IF THEY WISH, ARGUE

12  APPORTIONMENT.  AND I CLEARLY UNDERSTAND THAT.

13       ALL OF THE CASES SUPPORT THAT.

14       AND IT'S REFERRED TO AS A REBUTTAL, AND IN THE TEXAS

15  CASE, YES, THE COURT DID ALLOW A REBUTTAL REPORT TO COME IN.     08:36

16  AND THAT MAKES SENSE, BECAUSE IT IS, IN A SENSE, A REBUTTAL.

17       BUT CERTAINLY, THERE'S NOTHING IN STRAUS THAT I CAN

18  SEE -- AND THIS IS THE AUTHORITY THAT I'D LIKE TO FIND, AND I

19  HAVE NOT BEEN ABLE TO FIND ANYTHING ALONG THESE LINES -- THAT

20  SOMEHOW WHEN YOU BRING OUT APPORTIONMENT FOR THE FIRST TIME IN   08:37

21  A REBUTTAL EXPERT REPORT, THAT THE OTHER SIDE DOES NOT HAVE A

22  CHANCE, OR CANNOT BE AFFORDED A CHANCE, TO REBUTTAL THAT NEW

23  ARGUMENT WHICH HAS BEEN INTRODUCED.

24       CERTAINLY, YOU'RE NOT SUGGESTING THAT JUST BECAUSE

25  THERE'S A BURDEN-SHIFTING ANALYSIS HERE, FROM A LEGAL           08:37

1  EVIDENTIARY STANDPOINT, THAT SOMEHOW FOR DISCOVERY PURPOSES,

2  THAT ENTITLES THE INFRINGER TO THROW OUT AN APPORTIONMENT

3  EXPERT AND THE PLAINTIFF OR THE PARTY ALLEGING THE INFRINGEMENT

4  HAS NO RIGHT FOR THEIR EXPERT TO RESPOND.

5      DO YOU UNDERSTAND?                                08:37

6      **MR. ROTH:**  I UNDERSTAND WHERE YOU'RE GOING.  IT SEEMS

7  TO ME WHERE YOU'RE HEADING TOWARD IS THE ISSUE OF WHETHER WE

8  OUGHT TO RELY ON MR. KIVITZ' REPORT, WHICH WOULD BE --

9      **THE COURT:**  I'M GOING THERE, BUT BEFORE I GET THERE,

10  I WANT TO MAKE SURE THAT I UNDERSTAND, BECAUSE THE STRAUS CASE   08:38

11  HAS BEEN OFFERED UP NOW NUMEROUS TIMES AS SUGGESTING THAT THE

12  PROPER PLACE TO BRING UP APPORTIONMENT IS IN THE REBUTTAL.  YOU

13  COMBINE THAT, THEN, LINK THAT UP, WITH CASES WHICH SAY THAT A

14  SURREBUTTAL IS NOT NECESSARILY APPROPRIATE, THEN THAT WOULD

15  SEEM TO SUGGEST THAT THE COURT IN TEXAS IS SAYING THAT         08:38

16  BASICALLY THE PLAINTIFF IS JUST STUCK.  AND I THINK WE'RE

17  CONFLATING BURDEN-SHIFTING WITH THE REQUIREMENT THAT EXPERT

18  REPORTS BE DISCLOSED UP FRONT.

19      I MEAN, THERE'S NO QUESTION THAT THE TEXAS COURT DID

20  WHAT IT DID.  I THINK, FIRST OF ALL, IT WAS NOT A TRIAL; IT WAS  08:38

21  A SUMMARY JUDGMENT.  THERE'S A NUMBER OF DIFFERENCES BETWEEN

22  THE STRAUS CASE AND THIS CASE AND THE POSTURE THAT WE FIND

23  OURSELVES AT, AND THERE'S NO QUESTION THAT ANY TRIAL -- IT IS

24  NOT INCUMBENT UPON THE INFRINGER TO COME FORWARD WITH

25  APPORTIONMENT UNTIL AND UNLESS THE PLAINTIFF HAS COME FORWARD   08:38

1    WITH THE REQUISITE SHOWING OF GROSS REVENUES ATTRIBUTABLE TO

2    THE INFRINGEMENT.  BUT THAT DOES NOT SPEAK TO WHAT IS REQUIRED

3    BACK IN THE DISCOVERY PHASE IN TERMS OF DISCLOSING ANY EXPERT

4    TESTIMONY THAT ANY PARTY INTENDS TO RELY ON IN THEIR INITIAL

5    DISCLOSURE OF EXPERTS AND AFFORDING THE OTHER SIDE A CHANCE TO   08:39

6    REBUT IT.

7           **MR. ROTH:**  THAT IS TRUE, YOUR HONOR, AND WE WOULD NOT

8    CONTEND THAT MATTEL DOES NOT HAVE AN OPPORTUNITY TO RESPOND TO

9    OUR APPORTIONMENT ARGUMENT IN GENERAL.

10          **THE COURT:**  IF THAT'S TRUE, THEN, MR. ROTH, THEN YOU   08:39

11   SHOULD HAVE DISCLOSED THIS APPORTIONMENT IN YOUR INITIAL EXPERT

12   REPORT AND NOT IN A REBUTTAL.

13         **MR. ROTH:**  YOUR HONOR, WE CONTEND, BASED ON THE

14   STRAUS CASE, ON A VARIETY OF CASES, THAT WE HAD -- SINCE WE DID

15   NOT HAVE THE INITIAL BURDEN OF PROOF, THE FUNDAMENTAL RULE HERE   08:39

16   WAS, 'WHERE YOU DON'T HAVE THE INITIAL BURDEN OF PROOF, IT WAS

17   NOT REQUIRED TO BE DISCLOSED IN YOUR INITIAL REPORT.'

18         **THE COURT:**  IS THERE ANY CASE -- I KNOW STRAUS

19   PERMITTED -- MY SENSE WAS, OUT OF A MATTER OF EQUITY -- AND

20   THIS COURT IS INCLINED TO DO THE SAME THING, MIND YOU -- TO   08:40

21   ALLOW THAT REBUTTAL TO COME IN TO, IN THAT CASE, THE SUMMARY

22   JUDGMENT.  BUT IS THERE ANY AUTHORITY AT ALL, ANY CASE, WHICH

23   STANDS FOR THE PROPOSITION THAT YOU'RE NOW ASSERTING, THAT IT

24   IS PROPERLY BECAUSE THE BURDEN ONLY SHIFTS TO THE INFRINGER

25   AFTER THE GROSS REVENUES HAS BEEN PUT IN?   08:40

```
 1          IS THERE ANYTHING WHICH SUGGESTS THAT BECAUSE OF

 2  THAT, THERE'S NO NEED IN THE EXPERT DISCLOSURE -- WHICH, OF

 3  COURSE, FOLLOWS ALL OF THE DISCOVERY AND WHICH YOU'VE ALREADY

 4  RECEIVED ALL OF THE EVIDENCE OR THE EVIDENCE HAS BEEN -- I

 5  MEAN, DISCOVERY HAS GONE BACK AND FORWARD IN TERMS OF THE GROSS    08:40

 6  REVENUE ISSUE, AND CLEARLY, THE PLAINTIFF HAS BEEN ASSERTING

 7  GROSS REVENUE PROFITS FOR QUITE SOME TIME NOW -- YOU'RE STILL

 8  ABLE TO SIT AND WAIT UNTIL YOU ACTUALLY SEE THE EXPERT REPORT

 9  BEFORE YOU SUBMIT THE APPORTIONMENT EVIDENCE IN THE REBUTTAL

10  EXPERT REPORT?                                                    08:40

11          IS THERE ANY CASE THAT STANDS FOR THAT?

12          MR. ROTH:  YOUR HONOR, THE BEST I HAVE IS THE STRAUS

13  CASE.

14          THE COURT:  RIGHT.  IN STRAUS, SIMPLY, THE COURT LET

15  IT IN; IT DIDN'T SAY THAT WAS NECESSARILY THE PROPER WAY OF       08:41

16  DOING IT, UNLESS I'M MISSING SOME LANGUAGE IN THERE.

17          MR. ROTH:  WELL, I THINK IMPLICIT THE COURT DID NOT

18  SAY THAT WAS -- DID NOT EXPLICITLY SAY THAT'S THE PROPER WAY TO

19  DO IT.

20          THE COURT:  IT WAS IMPLICIT, AND I RECKON THAT.          08:41

21          MR. ROTH:  THE FACTS WERE AS PRECISELY AS THEY ARE

22  HERE, AND THE EXACT SAME ARGUMENT WAS MADE BY THE PLAINTIFF.

23  THE COURT ALLOWED THE REPORT IN AS A REBUTTAL REPORT.  SO I

24  WOULD SAY, YOUR HONOR, THAT THE HOLDING OF STRAUS IS DIRECTLY

25  ON POINT ON THIS QUESTION.                                       08:41
```

1    **THE COURT:**  DO YOU WISH TO ADDRESS NOW -- WHERE THIS

2    TAKES ME, THEN, IS TO -- IS EXACTLY TO WHERE YOU'RE SUGGESTING,

3    IS THAT IF THE COURT, AS THE COURT DID IN STRAUS, FOR A MATTER

4    OF EQUITY, ALLOWS IN THE -- IN THIS CASE THE SURVEY, THEN

5    CERTAINLY, THE OTHER SIDE SHOULD BE ALLOWED TO SUBMIT THE          08:41

6    REBUTTAL TO THAT.

7    **MR. ROTH:**  YOUR HONOR, AS A MATTER OF FUNDAMENTAL

8    FAIRNESS -- CERTAINLY, AS WE ARGUED IN THE CONTEXT OF THE MEYER

9    REPORT, I WOULD AGREE WITH YOU HERE.  I THINK THERE ARE

10   PARTICULAR FACTS HERE THAT WEIGH AGAINST THAT, HOWEVER, AND       08:42

11   THAT IS THAT THE MANNER IN WHICH MATTEL HANDLED THE KIVITZ

12   REPORT -- AS THE COURT WILL RECALL, THIS WAS AN ISSUE THAT WAS

13   SQUARELY PRESENTED TO MATTEL WHEN WE SERVED MR. GRUCA'S REPORT

14   ON MARCH 17TH.  THEY IMMEDIATELY BEGAN A SURVEY.  THAT WAS FOUR

15   MONTHS AGO.  THEY WAITED FOUR MONTHS.  APPARENTLY, THE RESULTS,   08:42

16   AS INDICATED BY MR. KIDMAN TOWARD THE END OF THE HEARING, WERE

17   AVAILABLE TO MR. KIDMAN AS OF LATE MAY, EARLY JUNE.  IT IS NOW

18   LATE JULY.  I WOULD CONTRAST THAT WITH THE WAY WE HANDLED THE

19   MEYER REPORT.  WE UNDERSTOOD, GIVEN THE TIMING OF THE TRIAL,

20   THAT THE SUPPLEMENTAL REPORT SHOULD BE DISCLOSED IMMEDIATELY.     08:43

21   WE DID NOT WAIT FOR THE HEARING ON THE MATTER.  WE IMMEDIATELY

22   DISCLOSED THE REPORT.

23   THEY HAVE HAD THAT REPORT NOW FOR THREE WEEKS.  THEY

24   HAVE HAD AN OPPORTUNITY TO REVIEW IT AND RESPOND, AND THE COURT

25   HAS NOW PROVIDED THEM AN OPPORTUNITY TO RESPOND.                  08:43

1       THAT'S NOT THE WAY MATTEL HANDLED IT.

2       MATTEL DECIDED TO WAIT.  THEY DECIDED TO WAIT THROUGH

3  JUNE, THROUGH THE 1-A TRIAL, GET TO THE STAGE OF A VERDICT IN

4  1-B, AND THEN TELL US ABOUT THE REPORT.  WE THEN ASKED FOR THE

5  REPORT.  THEY SAID WE COULD HAVE IT.  WE HAVE ASKED A SECOND        08:43

6  TIME FOR THE REPORT.  WE FINALLY GOT IT YESTERDAY.

7       NOW WE'VE READ THE REPORT.  THE REPORT IS 37-40

8  PAGES.  IT'S PRIMARILY -- I'D SAY 29 OF THE 37 PAGES ARE A

9  CRITIQUE BY MR. KIVITZ OF WHAT MR. GRUCA DID.  IT IS A CRITIQUE

10  THEY COULD HAVE MADE THREE MONTHS AGO.  WE COULD HAVE HAD THE      08:44

11  OPPORTUNITY TO TAKE THE DEPOSITION OF MR. KIVITZ AND BE

12  PREPARED TO DEAL WITH IT.

13       NOW WE COULD BE SEEING THIS REPORT IMMEDIATELY; NOT

14  HAVE THE OPPORTUNITY TO TAKE A DEPOSITION, HAVE AN OPPORTUNITY

15  TO REVIEW WHAT IS A FAIRLY COMPLEX ISSUE.  SO I AGREE WITH THE     08:44

16  FUNDAMENTAL PRINCIPLE, AND I THINK HAD MATTEL COME FORTH, AS WE

17  DID WITH MR. MEYER -- THEY'VE HAD THREE WEEKS TO LOOK AT IT.

18  HAVE THEY OPERATED FAIRLY?  I WOULD AGREE WITH YOUR HONOR'S

19  PROPOSITION, THAT THEY LOST THAT CHANCE BY THE WAY THEY HANDLED

20  THE KIVITZ REPORT.                                                08:44

21       SO, YOUR HONOR, I THINK, IN THIS CONTEXT, IT SIMPLY

22  IS NOT FAIR TO ALLOW THEM TO SERVE THAT REPORT.

23       **THE COURT:**  THANK YOU, COUNSEL.

24       **MR. ZELLER:**  FUNDAMENTALLY, IN THIS WHOLE REBUTTAL

25  ARGUMENT, MGA IS CONFUSING THE REQUIREMENTS OF THE COURT'S        08:44

```
 1   SCHEDULING ORDER AND DISCLOSURE REQUIREMENTS WITH THE BURDEN OF
 2   PRODUCTION AND GOING FORWARD.  THOSE ARE VERY DIFFERENT
 3   ANIMALS, AS THE COURT IS AWARE.  THE COURT'S SCHEDULING ORDER
 4   REQUIRED A PARTY TO PUT IN ITS EXPERT REPORT AS THE MATTERS ON
 5   WHICH IT BORE THE BURDEN OF PROOF.  NOT GOING FORWARD.          08:45
 6        SO, I MEAN, WHATEVER THE COURT DID IN TEXAS -- I
 7   MEAN, WE DON'T HAVE THE COURT'S SCHEDULING ORDER, NECESSARILY.
 8   IT'S THE COURT'S OWN INTERPRETATION OF ITS SCHEDULING ORDER,
 9   BASED UPON ALL OF THE CIRCUMSTANCES OF THE FACTS.  WE HAVE A
10   PARTICULAR SCHEDULING ORDER, THIS COURT'S ORDER, THAT QUITE     08:45
11   CLEARLY REQUIRED THE DISCLOSURE OF THIS MATTER AT THAT TIME.
12        AND I DO THINK THAT IN MANY RESPECTS, MGA IS TRYING
13   TO PLAY BOTH SIDES OF THIS.  AND I SAY THAT BECAUSE THE COURT
14   WILL RECALL WITH THE HOLLANDER REPORT, THEY MOVED TO EXCLUDE
15   IT, CLAIMING UNDER EXACTLY THE SAME CIRCUMSTANCES THAT WE       08:45
16   SHOULD NOT BE ALLOWED TO PUT IN THE HOLLANDER SURVEY.  AND THE
17   COURT AGREED WITH THAT POINT.  THIS IS JUST A CLASSIC
18   APPLICATION OF THE SAME RULING.  AND UNDER THAT RULING, THIS
19   REPORT IS OUT.  I JUST DON'T THINK THAT THERE'S ANY OTHER
20   ALTERNATIVE.                                                    08:46
21        NOW, IF THE COURT IS GOING TO LET IT IN, THEN
22   CERTAINLY WE'VE SAID, AS A MATTER OF FAIRNESS, 'PLEASE ALLOW US
23   TO PUT IN OUR RESPONSIVE EXPERT REPORT.'
24        AND WHILE I HEARD MR. ROTH TAKE ISSUE WITH HOW HE
25   THINKS WE HANDLED IT, I DON'T AGREE WITH THE COMPLETE           08:46
```

1    CHARACTERIZATION, BUT I'M NOT GOING TO QUIBBLE ABOUT SOME OF

2    THIS STUFF.  BUT LET ME PUT IT THIS WAY:  WE MOVED BEFORE THE

3    CLOSE OF 1-A FOR PERMISSION TO DO THIS, AS WE NEEDED TO.  I

4    DIDN'T HEAR MR. ROTH ARTICULATE ANY PREJUDICE, SO IF THEIR

5    REPORT COMES IN, CERTAINLY OUR EXPERT OUGHT TO.                08:46

6         **THE COURT:**  HE DID INDICATE THAT THEY WOULD BE

7    PREJUDICED BY NOT BEING ABLE TO ADEQUATELY INVESTIGATE,

8    PROPOSE, PREPARE TO RESPOND TO THIS REPORT.

9         **MR. ZELLER:**  WE'RE OFF NEXT WEEK.  HE CAN BE DEPOSED.

10   THIS IS NOT EXACTLY THE WORLD'S MOST COMPLICATED ISSUE.  I     08:46

11   THINK THE RESOURCES OF SKADDEN AND MGA CAN MORE THAN ADEQUATELY

12   DEAL WITH THIS PARTICULAR EXPERT IN THE COURSE OF NEXT WEEK.

13   WHATEVER DISCOVERY THEY THINK THEY NEED, THEY CAN SEEK; WE'LL

14   PROVIDE; AND THEY CAN TAKE HIS DEPOSITION.

15        SO THAT'S WHY I SAY I DON'T REALLY HEAR AN              08:47

16   ARTICULATION OF PREJUDICE.  THEY CLAIM THAT THEY NEED MORE

17   INFORMATION TO RESPOND, BUT BECAUSE OF THE SCHEDULE, THEY HAVE

18   ALL OF NEXT WEEK TO DO THAT.

19        **THE COURT:**  MR. ROTH?  MR. ZELLER DID RAISE A POINT

20   THAT I HAD WRITTEN DOWN HERE ON MY 'CON' SIDE ON THIS.  I KEEP  08:47

21   TWO -- AND I PUT DOWN 'HOLLANDER.'

22        HOW DO I RULE IN YOUR FAVOR ON THE HOLLANDER REPORT,

23   WHERE I EXCLUDED IT BECAUSE IT WAS NOT PROPERLY DISCLOSED, AND

24   NOT DO SO HERE?

25        **MR. ROTH:**  YOUR HONOR, I THINK BECAUSE OF THE         08:47

```
 1   FUNDAMENTAL POINT MADE AGAIN IN STRAUS.  THE OPINION
 2   ARTICULATED IN MR. GRUCA'S REPORT IS PROPER REBUTTAL.  THAT'S
 3   THE POINT OF STRAUS.
 4            THE OPINION ARTICULATED IN MR. HOLLANDER'S HAD
 5   SEVERAL DEFECTS, INCLUDING WHETHER OR NOT IT'S AN APPROPRIATE      08:48
 6   SORT OF EVIDENCE TO ADDRESS THE COPYRIGHT ISSUE PRESENTED BY
 7   THAT REPORT.  BUT BEYOND THAT, THEY CITED NO AUTHORITY THAT
 8   THAT REPORT IS PROPER REBUTTAL.  THEY DIDN'T TRY TO ARGUE THAT
 9   IN RESPONSE.  SO I THINK THERE IS A FUNDAMENTAL DISTINCTION IN
10   THAT REGARD.                                                      08:48
11            IN TERMS OF THE SCHEDULING ORDER -- YOU KNOW, I
12   ACTUALLY READ, BECAUSE IT SETS FORTH IN THE STRAUS CASE WHAT
13   THE SCHEDULING WAS IN THAT CASE.  IT'S THE SAME THING THERE AS
14   HERE.
15            AND, FINALLY, THE COURT HAS INDICATED THERE IS          08:48
16   PREJUDICE HERE.  THE PREJUDICE IS FORCING US AT THE LAST MINUTE
17   TO DEAL WITH THIS REPORT.  AND IT'S PREJUDICE INTENTIONALLY
18   CREATED BY THEM, INTENTIONALLY.  THEY'VE HAD THE REPORT, THE
19   RESULTS, SINCE THE END OF MAY, EARLY JUNE.  THEY WAITED ON
20   PURPOSE FOR THIS PRECISE REASON.                                 08:48
21            I THINK, FOR THAT REASON, THEY SHOULD NOT BE
22   PERMITTED TO SUBMIT THE REPORT.
23            THE COURT:  THEY WAITED, BUT ALSO SINCE THE END OF
24   MAY, THERE HAS BEEN A PENDING MOTION IN LIMINE BEFORE THIS
25   COURT TO EXCLUDE THE GRUCA REPORT.  SO THAT'S...                  08:49
```

1    **MR. ROTH:**  YOUR HONOR, AGAIN, CONTRAST.  WITH RESPECT

2    TO MR. MEYER, WE DID NOT HAVE A RULING FROM THE COURT THAT WE

3    WOULD BE PERMITTED TO SUBMIT THAT REPORT.  NEVERTHELESS, GIVEN

4    THE TIMING CONCERN, WE IMMEDIATELY GAVE IT TO THEM.

5            **THE COURT:**  AND YOU'RE TO BE COMMENDED FOR DOING SO.    08:49

6            THANK YOU, COUNSEL.

7            MR. ZELLER, ANYTHING FURTHER?

8            **MR. ZELLER:**  THERE IS NO DISTINCTION BETWEEN THE

9    HOLLANDER SITUATION AND THIS ONE.

10           WHAT MR. ROTH IS ARTICULATING IS EXACTLY THE ARGUMENT    08:49

11    THAT MR. KIDMAN ARGUED IN OPPOSITION TO THEIR MOTION *IN LIMINE*

12    TO EXCLUDE THE HOLLANDER REPORT.  GRUCA REBUTS NOTHING NOW.  HE

13    SAYS IN HIS REPORT QUITE EXPLICITLY WHAT HE IS REFUTING ARE

14    MATTERS RAISED BY SCOTT THAT THIS COURT HAS NOW SAID SHE'S NOT

15    GOING TO TESTIFY ON.  IT'S EXACTLY THE SAME SCENARIO.  WHAT    08:50

16    GRUCA PURPORTS TO REBUT IS NOW OUT OF THE CASE.  AND THAT MEANS

17    HE'S NO LONGER A -- IT'S NO LONGER PROPER TESTIMONY.

18           IT'S EXACTLY THE SAME ARGUMENT.

19           NOW, IN TERMS OF THE -- WE'LL CALL IT THE EQUITY OF

20    THE SITUATION ABOUT OUR REPORT -- THE FACT IS THAT MR. ROTH IS    08:50

21    REALLY TALKING ABOUT SURVEY RESULTS.  AS THE COURT IS AWARE,

22    SURVEY RESULTS ARE RAW DATA.  I MEAN, THAT'S NOT THE END OF THE

23    REPORT.  IT'S NOT LIKE WHEN YOU CONDUCT A SURVEY, YOU END UP

24    WITH ONE PIECE OF INFORMATION AND THAT'S YOUR REPORT.  I MEAN,

25    YOU HAVE TO ANALYZE THE DATA; YOU HAVE TO PUT TOGETHER THE    08:50

1  REPORT.  AND THERE WAS NOT DELAY.  I THINK THE COURT KNOWS WHAT

2  THE CHRONOLOGY IS HERE.  AND WE DID MOVE TO EXCLUDE GRUCA, AND

3  WE MOVED THEN, PRIOR TO THE CLOSE OF PHASE 1-A, TO SERVE THIS

4  REPORT.  AND THE COURT CAN EVEN SEE FROM THE DATING OF IT -- I

5  MEAN, THE REPORT ITSELF WAS ONLY DONE RECENTLY, BECAUSE IT DOES      08:51

6  TAKE TIME TO DO THESE THINGS.

7        SO I ALSO DID NOT HEAR FROM MGA SOME INABILITY TO GET

8  WHATEVER INFORMATION THEY NEED ABOUT OUR EXPERT NEXT WEEK.

9        **THE COURT:**  ALL RIGHT.  I'M GOING TO COME BACK TO

10  THIS ONE.                                                           08:51

11        THE LAST ONE IS THE MIDDLETON; AND THAT IS MOTION

12  *IN LIMINE* NUMBER 13.

13        GOING THROUGH THE MIDDLETON REPORT, IT IS CLEAR THAT

14  DEBORAH MIDDLETON SHOULD BE ABLE TO TESTIFY.  I AM DISINCLINED

15  TO ALLOW HER TO TESTIFY AS AN EXPERT.  I BELIEVE SHE'S MORE         08:51

16  APPROPRIATELY CHARACTERIZED AS A FACT WITNESS.

17        I HAVE CONCERNS AS TO WHAT THIS WOULD DO BY

18  DESIGNATING HER AS AN EXPERT.

19        AT THE SAME TIME -- AND THIS IS BASED ON MY READING

20  OF THE REPORT -- I WILL GIVE MGA LEAVE, IF THEY WISH, TO CALL       08:52

21  MS. MIDDLETON OUTSIDE THE PRESENCE OF THE COURT, AND THROUGH

22  EXAMINATION, TRY TO ESTABLISH HER CREDENTIALS AS AN EXPERT.

23  BUT I THINK THE TESTIMONY THAT SHE OFFERS IS ESSENTIALLY

24  FACT-BASED.  AND ANY MORE THAN ANY OF THE OTHER WITNESSES IN

25  THIS CASE WHO HAVE BEEN CALLED BY MATTEL AND MGA COULD BE           08:52

1    CHARACTERIZED AS EXPERTS IN THEIR RESPECTIVE FIELDS -- I DON'T

2    MEAN TO SUGGEST THAT AS AN MGA EMPLOYEE SHE'S NOT A VERY

3    EXTRAORDINARILY TALENTED EMPLOYEE ANY MORE THAN BOB ECKERT, FOR

4    EXAMPLE, OR ISAAC LARIAN, ARE EXTREMELY TALENTED CEO'S.  BUT

5    THEY DON'T GET TO BE DESIGNATED AS EXPERTS IN BUSINESS AND          08:53

6    OPINE WHETHER THEIR BUSINESS PRACTICES ARE GOOD OR BAD OR RIGHT

7    OR WRONG OR ANYTHING ELSE SIMPLY BECAUSE OF THEIR REMARKABLE

8    CREDENTIALS.

9         I THINK THAT'S BASICALLY WHERE WE'RE GOING WITH

10   DEBORAH MIDDLETON.  I THINK IT'S BEST THAT SHE IS BEST CALLED       08:53

11   AS A FACT WITNESS.  BUT I WILL GIVE LEAVE, IF VOIR DIRE WANTS

12   TO BE CONDUCTED, BY BOTH SIDES OUTSIDE THE PRESENCE OF THE

13   JURY.

14        **MR. HANSEN:**  GOOD MORNING, JUDGE.

15        WHAT WE WOULD ASK IS -- I THINK WE'LL BE ABLE TO               08:53

16   ESTABLISH TO YOUR HONOR'S SATISFACTION HER EXPERTISE.  I GUESS

17   THE ONLY THING THAT WE WOULD REQUEST IS THAT MR. LOETZ, THEIR

18   COUNTER EXPERT ON THIS PACKAGE ART ISSUE, ALSO BE VOIR DIRED IN

19   ADVANCE FOR HIS EXPERTISE.

20        **THE COURT:**  WELL, LET ME ASK YOU ABOUT -- IN THE AREA      08:53

21   OF PACKAGING; IS THAT CORRECT?

22        **MR. HANSEN:**  YES.

23        **THE COURT:**  ADDRESS THE COURT'S CONCERN ABOUT HER

24   STATUS AS AN EMPLOYEE AT MGA AND HER -- THIS IS NOT YOUR

25   TRADITIONAL EXPERT, SOMEBODY HIRED TO RETAIN AN EXPERT,            08:54

1  UNASSOCIATED, AND, AT LEAST THEORETICALLY, UNCONNECTED TO THE

2  LITIGATION, WHO IS CALLED IN TO HELP EDUCATE THE JURY ON A

3  PARTICULAR POINT.  THIS IS AN MGA EMPLOYEE.  NO QUESTION, VERY

4  TALENTED.  AND THE VOIR DIRE THAT I'M FOCUSING ON IS NOT HER

5  CREDENTIALS.

6       LIKE I SAY, ISAAC LARIAN IS AN EXTRAORDINARILY

7  TALENTED CEO.  BOB ECKERT IS AN EXTRAORDINARILY TALENTED CEO.

8  I WOULDN'T PERMIT THEM TO BE QUALIFIED AS EXPERTS IN BUSINESS.

9       AND I COULD GO DOWN THE LIST.  LILY MARTINEZ, AN

10  EXTREMELY TALENTED DESIGNER.  CARTER BRYANT, AN EXTREMELY          08:54

11  TALENTED DESIGNER.  WE'RE NOT DESIGNATING THOSE INDIVIDUALS AS

12  EXPERTS.  THOSE ARE PEOPLE INTIMATELY INVOLVED IN THE

13  LITIGATION.  THEY WORK FOR THE COMPANIES AND THEY ARE CERTAINLY

14  ABLE TO OFFER THEIR FACTUAL OPINION -- NOT THE FACTUAL

15  OPINION -- THEIR FACTUAL TESTIMONY CONCERNING WHAT HAPPENED.      08:55

16       BUT I THINK IT'S A VERY DANGEROUS ROAD TO GO DOWN TO

17  DESIGNATE AN EMPLOYEE OF ONE PARTY OR THE OTHER AS AN EXPERT

18  UNDER THESE CIRCUMSTANCES.

19       **MR. HANSEN:**  I THINK THE LAW THAT WE CITE IS FAIRLY

20  CLEAR THAT THE FACT THAT SOMEONE IS AN EMPLOYEE DOES NOT          08:55

21  PRECLUDE THEM FROM OFFERING EXPERT TESTIMONY AS WELL.  I REALLY

22  DON'T THINK THAT'S DISPUTED.

23       MS. MIDDLETON HAS, AS I MENTIONED ON THE PHONE ON

24  MONDAY, YOUR HONOR -- MS. MIDDLETON HAS AN ART DEGREE FROM

25  COLLEGE.  SHE ALSO SPENT EXTENSIVE TIME WORKING IN THE            08:55

ANIMATION INDUSTRY, AND THEN WITH AN AGENCY SPECIFICALLY IN THE

AREA OF PACKAGE ART FOR A NUMBER OF YEARS, BEFORE COMING TO MGA

TO WORK IN PACKAGE ART.  SO HER EXPERTISE IN TERMS OF

UNDERSTANDING PACKAGE ART IS NOT JUST SOMETHING SHE LEARNED IN

HER FACT CAPACITY AT MGA.  SHE ALSO HAS A GENERAL AREA OF                   08:56

EXPERTISE IN TERMS OF PACKAGE ART, IN TERMS OF ART, IN TERMS OF

THE TYPE OF THINGS THAT SHE WOULD BE DOING HERE, WHICH IS

TAKING A LOOK AND MAKING SORT OF ARTIST TYPE OF COMPARISONS

THAT THEIR EXPERT, MR. LOETZ, ALSO MAKES.  MR. LOETZ HAS A VERY

SIMILAR -- WE CAN DEBATE WHO'S BETTER OR WHO'S WORSE --          08:56

     **THE COURT:**  I UNDERSTAND THAT, BUT THE CONCERN I HAVE

IS THE EMPLOYEE.  AND I UNDERSTAND THAT THERE'S NO LEGAL

PROHIBITION AGAINST IT.  I JUST THINK IN THE CONTEXT OF THIS

CASE, IN THE CONTEXT OF THE ACTUAL REPORT AND HER ROLE AT MGA,

THE COURT HAS -- THIS IS MORE OF A DAUBERT CONCERN THAN                   08:56

ANYTHING ELSE.

     **MR. HANSEN:**  IN TERMS OF THE DAUBERT ISSUES, I THINK

THAT THE STANDARDS THAT ARE BEING IMPLIED IN TERMS OF HOW THE

TWO EXPERTS, LOETZ AND MIDDLETON, GO ABOUT DOING THINGS -- I

THINK ONCE YOU LOOK AT THE ACTUAL STANDARDS THAT ARE BEING                   08:56

USED, BOTH BY MS. MIDDLETON AND MR. LOETZ, YOU WILL FIND -- I,

FRANKLY, THINK THAT MR. LOETZ'S STANDARD IS MORE SUBJECT TO A

DAUBERT MOTION THAN MS. MIDDLETON'S, BUT WE CAN LEAVE THAT FOR

ANOTHER DAY.

     **THE COURT:**  AGAIN, I'M NOT SO MUCH FOCUSING ON                   08:57

```
1    THEIR -- LET ME HEAR FROM MATTEL.

2           MR. HANSEN:  ALL I WOULD SAY, YOUR HONOR, IS THAT I

3    THINK THE FACT THAT SHE'S AN EMPLOYEE WOULD GO, PERHAPS, TO

4    CROSS-EXAMINE AND THE WEIGHT THAT SHE HAS SOME BIAS, BUT NOT

5    HER EXPERTISE.                                                08:57

6           THE COURT:  MR. ZELLER?

7           MR. ZELLER:  I THINK WE'VE SAID -- AND I THINK THE

8    BASE LINE HERE IS, SHE CAN TESTIFY AS A FACT WITNESS.  AND THE

9    VERY FACT THAT MGA FIGHTS ON THIS, AND THE WAY THAT IT IS,

10   SUGGESTS THAT THE VERY THING THAT WE'RE CONCERNED ABOUT, WHICH  08:57

11   IS THAT THE COURT IS GOING TO BASICALLY GIVE IT SOME IMPRIMATUR

12   TO A FACT WITNESS AS AN EXPERT AND TELL THE JURY THAT THIS

13   PERSON IS AN EXPERT AND THEN THEY'RE GOING TO ARGUE

14   MS. MIDDLETON, AN EXPERT.  I MEAN, THAT IS THE WHOLE CRUX OF

15   THIS.  THAT'S OUR VERY CONCERN.                               08:57

16          THE COURT:  BUT ADDRESS MR. HANSEN'S -- THE LAW IS

17   CLEAR THAT IT'S NOT REQUIRED BUT PERMISSIBLE FOR THE COURT, IN

18   ITS DISCRETION, TO ALLOW AN EMPLOYEE THAT'S NOT

19   DISQUALIFYING -- WHY SHOULDN'T THIS JUST GO TO THE WEIGHT?  YOU

20   CAN STAND UP IN CLOSING ARGUMENT OR MR. QUINN OR MR. PRICE CAN,  08:58

21   AND SAY, 'YOU HEARD THEIR EXPERT.  THEY DIDN'T EVEN FIND THEIR

22   OUTSIDE EXPERT.  THEY GO TO AN EMPLOYEE WHO WORKS FOR THE

23   COMPANY, WHO HAS A VESTED INTEREST IN THE OUTCOME OF HER

24   TESTIMONY.'

25          ISN'T THAT A VERY -- THAT MIGHT BE A VERY POWERFUL      08:58
```

1   ARGUMENT TO MAKE, BUT IS THAT A REASON TO EXCLUDE HER AS AN

2   EXPERT?

3          **MR. ZELLER:**  I THINK THOSE ARE SOMEWHAT DISTINCT

4   POINTS.  BECAUSE ON THE ONE HAND, I COMPLETELY AGREE, THERE IS

5   NO DISPUTE THAT AN EXPERT CAN BE AN EMPLOYEE.  THERE'S NO          08:58

6   PROHIBITION AGAINST IT.  AND THAT IS NOT OUR CONCERN.  OUR

7   CONCERN IS, HOW IS THAT PERSON CHARACTERIZED TO THE JURY BY THE

8   COURT?  AND THERE'S NO QUESTION THAT WHEN WE'RE IN THAT AREA,

9   THAT'S A MATTER OF THE COURT'S DISCRETION.  THAT'S TRUE, EVEN

10  IF, SAY, FOR EXAMPLE, THERE'S AN INDEPENDENT EXPERT APPOINTED     08:58

11  BY THE COURT UNDER RULE 706.  THE COURT CAN TELL THE JURY THAT

12  PERSON IS AN INDEPENDENT EXPERT.  THE COURT CAN TELL THEM

13  NOTHING.

14         **THE COURT:**  ISN'T IT OBVIOUS, THOUGH, BASED ON

15  WHOEVER DOES THE EXAMINATION OF MS. MIDDLETON, THAT SHE'S         08:59

16  CLEARLY NOT AN OUTSIDE RETAINED EXPERT OR A COURT-APPOINTED

17  EXPERT OR ANY OTHER KIND OF EXPERT, THAT SHE IS SIMPLY AN

18  EMPLOYEE WHO, BECAUSE OF HER EXPERIENCE AND BACKGROUND, IS

19  BEING PERMITTED TO OFFER OPINIONS, AND THE JURY WILL BE

20  INSTRUCTED, LIKE ANY OTHER EXPERT, TO ASSIGN WHAT WEIGHT THEY     08:59

21  BELIEVE IS APPROPRIATE TO THAT OPINION?

22         **MR. ZELLER:**  I THINK, WHILE THE DEVIL IS IN THE

23  DETAILS OF THAT KIND OF MESSAGE TO THE JURY -- I THINK THAT

24  IS -- I THINK THAT MAKES A LOT OF SENSE.  IF THE COURT IS GOING

25  TO SIMPLY SAY, 'LOOK, SHE'S ALLOWED TO OFFER AN OPINION, BUT      08:59

```
 1   NOT SAYING SHE IS DESIGNATED AS AN EXPERT' -- I MEAN,

 2   OBVIOUSLY, EVEN LAY OPINION CAN BE ALLOWED UNDER CERTAIN

 3   CIRCUMSTANCES.  I MEAN, THE COURT DOESN'T HAVE TO CHARACTERIZE

 4   IT.  NEITHER DOES MGA.

 5        THE COURT:  THE COURT HAS REALLY NOT DONE -- I'VE        08:59

 6   TRIED NOT TO BE TOO OVER DRAMATIC IN DESIGNATING ANYBODY IN

 7   THIS CASE.  SIMPLY HOW IT'S BEEN DONE IS, COUNSEL HAS

 8   INDICATED, 'YOUR HONOR, WE DESIGNATE THIS PERSON AS AN EXPERT,'

 9   STATE THE SUBJECT MATTER, AND THE COURT ASKS IF THERE'S AN

10   OBJECTION, AND IF THERE'S NOT, WE MOVE FORWARD.  IT'S NOT LIKE  09:00

11   I'M MAKING A GRAND ANNOUNCEMENT OR AN IMPRIMATUR OF ANY SORT.

12        MR. ZELLER:  I THINK THAT'S FAIR ENOUGH.  WHAT I

13   THINK IS THE DIFFERENCE HERE, HOWEVER, IS THAT IN MOST OF THESE

14   INSTANCES, AND CERTAINLY THE INSTANCES THAT HAVE BEEN FACED SO

15   FAR, THERE IS NO DISPUTE ABOUT THAT PERSON'S ABILITY TO BE AN   09:00

16   EXPERT.  THAT ISN'T ANYTHING -- NO ONE HAD SAID, 'I WANT TO

17   VOIR DIRE THE EXPERT.  I'M GOING TO CHALLENGE HIS CREDENTIALS.'

18        THE COURT:  WE HAVE HAD CHALLENGES TO EXPERTS OFFERED

19   IN THIS CASE.

20        MR. ZELLER:  ABSOLUTELY.  BUT NOT IN FRONT OF A JURY.   09:00

21   I'M SAYING, ONCE SOMEONE IS UP ON THE STAND -- BUT THE PRACTICE

22   IN THIS CASE SO FAR IS, ONCE AN EXPERT IS UP ON THE STAND --

23   AND YOU'RE RIGHT, THE COURT ISN'T MAKING SOME GRAND

24   ANNOUNCEMENT.  BUT CERTAINLY, IN THOSE INSTANCES, IT'S JUST NOT

25   THAT DISPUTED.  WE'RE NOT GETTING INTO A SITUATION WHERE WE ARE  09:01
```

1  HAVING THOSE FIGHTS IN FRONT OF THE JURY.  THAT'S OUR CONCERN.

2  OUR CONCERN IS DRIVEN ENTIRELY BY THE COURT'S IMPRIMATUR ON

3  THIS PARTICULAR EMPLOYEE AND BASICALLY SAYING, 'WELL, HERE'S

4  SOMEBODY FROM MGA WHO IS AN EXPERT.'

5       **THE COURT:**  BUT YOUR CONCERN IS NOT BEING DRIVEN BY A    09:01

6  CONCERN ABOUT HER CREDENTIALS.

7       **MR. ZELLER:**  NO, THAT'S NOT CORRECT, YOUR HONOR.  WE

8  ARE CONCERNED ABOUT THAT.  AND WE DO WANT A DAUBERT HEARING, IN

9  ADDITION, IF THE COURT IS INCLINED TO GIVE SOME SORT OF

10  INDICATION THAT SHE IS EITHER AN EXPERT OR, PERHAPS, EVEN JUST    09:01

11  THAT SHE'S ALLOWED TO OFFER OPINIONS BEYOND WHAT A NORMAL

12  WITNESS WOULD BE, BECAUSE WE THINK HER ANALYSIS IS EXTREMELY

13  FUZZY AND WE DON'T THINK THAT IT HAS THE KIND OF RIGOR THAT

14  REALLY IS WARRANTED.

15       I THINK THE COURT'S INITIAL REACTION HERE IS THE    09:01

16  RIGHT ONE, WHICH IS, WE CAN HAVE A HEARING; WE CAN HEAR FROM

17  HER; WE CAN SEE WHAT HAPPENS.  THE COURT DID THAT EVEN WITH LAY

18  OPINION, IN THE CASE OF CASSIDY PARK, FOR EXAMPLE; AND I THINK

19  THAT'S REALLY A FAIR PROCEDURE OF DOING IT.  IN THIS PARTICULAR

20  CASE, WE CAN HEAR WHAT SHE HAS TO SAY; WE CAN HEAR WHAT HER    09:02

21  ANALYSIS IS; AND THEN I THINK WE CAN GO FROM THERE AS TO WHAT

22  SHE IS ALLOWED TO TESTIFY ON AND HOW SHE IS CHARACTERIZED TO

23  THE JURY.

24       **THE COURT:**  VERY WELL.  THANK YOU, COUNSEL.

25       I AM CONVINCED BY MR. HANSEN THAT THIS IS MORE    09:02

1    APPROPRIATE FOR ARGUMENT THAN IT IS FOR A MATTER OF THE COURT

2    TO PRECLUDE IT OUTRIGHT, SO THE MOTION *IN LIMINE* IS DENIED.

3            HOWEVER, I WILL GIVE LEAVE TO MATTEL TO -- AS I WILL

4    TO MGA, TO BOTH PARTIES -- WITH RESPECT TO ANY OF THE EXPERTS

5    HEREIN, TO THE EXTENT THAT THEY WANT TO CONDUCT A VOIR DIRE          09:02

6    EITHER IN THE MORNING OR DURING THE LUNCH BREAK OR AT THE END

7    OF THE DAY, HAVE YOUR EXPERT HERE, COORDINATE WITH THE OTHER

8    SIDE, AND THE COURT WILL DO WHAT IT DID WITH MR. TONNER, WITH

9    MS. PARK, AND WE'LL HAVE -- I'LL ALLOW THAT VOIR DIRE TO GO ON

10   OUTSIDE THE PRESENCE OF THE JURY.                                    09:02

11           IT'S 9:00.  I TRUST THE JURORS ARE HERE.  I DID WANT

12   TO INTERVIEW THE ONE JUROR IN CHAMBERS CONCERNING THAT NOTE.

13   I'M ALSO GOING TO BE MAKING AN INQUIRY OF THE OTHER JURORS IN

14   TERMS OF HARDSHIP.  I'M HOPING THAT WE STILL HAVE ALL TEN

15   TOGETHER WITH US AS OF THIS MORNING.  AND THEN WE'LL PROCEED        09:03

16   WITH THE TRIAL.  BOTH SIDES ARE LIMITED TO -- BOTH SIDES HAD

17   INDICATED THE OPENING STATEMENTS WOULD BE ABOUT TWO HOURS, AND

18   I'D REALLY LIKE TO KEEP TO THAT, IF POSSIBLE.

19           WHAT I'D LIKE TO DO IS HAVE THE -- WE'LL GO STRAIGHT

20   THROUGH WITH AN OPENING STATEMENT FOR TWO HOURS, THEN WE'LL        09:03

21   TAKE A BREAK; AND THEN WE'LL DO THE OTHER OPENING STATEMENT.

22   I'LL GET YOU THE RULING ON THE GRUCA MOTION *IN LIMINE* AT THE

23   BREAK, PROBABLY.

24           **MR. ZELLER:**  ONE THING WE WOULD LIKE THE COURT TO

25   RESOLVE PRIOR TO OPENING STATEMENTS IS THE MOST RECENT            09:03

1    HONG KONG MOTION.

2           **THE COURT:**  YES.

3           I'VE RECEIVED MATTEL'S OPPOSITION, BUT FOR WHATEVER

4    REASON, I HAVEN'T RECEIVED MGA'S.

5           IF SOMEONE COULD GIVE ME A...                           09:04

6           **MR. NOLAN:**  WE FAXED THAT TO CHAMBERS YESTERDAY AT

7    NOON.

8           **THE COURT:**  WHAT I HAVE -- I RECEIVED THE REPORTS --

9    OH, WAIT A SECOND.  I'M SORRY.  I DO.

10          **MR. NOLAN:**  OKAY.                                    09:04

11          **THE COURT:**  I DO HAVE THEM.  I HAVEN'T READ THEM.

12   I'M GOING TO HAVE TO TAKE A LOOK AT THEM.

13          **MR. NOLAN:**  YOUR HONOR, WITH RESPECT TO THAT AND A

14   COUPLE OF OTHER MATTERS IN -- THE RULES OF PROTOCOL IN THE

15   FIRST TRIAL WITH OPENING STATEMENTS WAS THAT IF THERE WERE      09:04

16   OBJECTIONS TO VARIOUS SLIDES --

17          **THE COURT:**  IT'S NOT GOING TO BE USED, THAT'S

18   CORRECT.

19          **MR. NOLAN:**  BECAUSE WE DID LODGE OBJECTIONS THIS

20   MORNING WITH MR. PRICE WITH RESPECT TO THE USE OF A NUMBER      09:04

21   GRAPHICS AND EXHIBITS.  AND HE HAS ALSO OBJECTED TO OURS.  AND

22   SO FOR PURPOSES OF OPENING STATEMENT, WE'LL BE FREE TO USE

23   THOSE WHERE THERE'S NO OBJECTION, AND THEN DEAL WITH THESE

24   LATER ON.

25          **THE COURT:**  THAT'S CORRECT.                         09:04

1          **MR. PRICE:**  YOUR HONOR, FIRST, I'D LIKE TO CONSULT

2    MR. NOLAN AS TO SPECIFIC SLIDES, BUT MOST OF THEM RELATE TO A

3    VERY IMPORTANT ARGUMENT IN THE CASE.  THAT IS THE HONG KONG

4    ISSUE.

5          IT RELATES TO DOCUMENTS WHICH WILL BE COMING INTO           09:05

6    EVIDENCE.  IT'S A KEY PART OF OUR CASE.

7          **THE COURT:**  THESE ARE NOT LENGTHY BRIEFS BY DESIGN.

8    I ASKED -- LET ME TAKE THESE UP -- LET'S TAKE CARE OF THIS

9    JUROR ISSUE FIRST, AND THEN I'LL TAKE THESE UP.

10          **MR. NOLAN:**  DO YOU WANT TO DO THAT IN CHAMBERS,         09:05

11    YOUR HONOR?

12          **THE COURT:**  YES, WE'RE GOING TO DO THE JUROR ISSUE IN

13    CHAMBERS.

14          WE'RE GOING TO RECESS NOW.  WE'LL TAKE THE JUROR

15    ISSUE UP IN CHAMBERS.  I'LL TAKE A LOOK AT THESE TWO BRIEFS.     09:05

16    I'LL RULE ON THIS.  I DO UNDERSTAND THAT YOU WANTED TO HAVE

17    THAT FOR YOUR OPENING STATEMENT.

18          ARE THERE ANY OTHER ISSUES?

19          **MR. PRICE:**  THERE'S ONE OTHER ISSUE WE WANTED TO

20    FRONT WITH THE COURT, AND MR. NOLAN POINTED OUT WHEN WE SHOWED   09:06

21    HIM THE SLIDES.  ONE OF THE THINGS WE DISCUSSED IN THE OPENING

22    IS MR. LARIAN'S NET WORTH, OR WE THINK WE NEED TO DISCUSS THAT,

23    BECAUSE WE'RE IN A PHASE NOW WHERE PUNITIVE DAMAGES IS AN

24    ISSUE.  I THINK THERE ARE CASES SAYING IT'S ERROR NOT TO PUT IN

25    THE NET WORTH OF THE PERSON AGAINST WHOM YOU'RE TRYING TO GET    09:06

1    PUNITIVE DAMAGES.

2         **THE COURT:**  YOU'VE RECEIVED THE FINANCIAL INFORMATION

3    YOU REQUESTED; CORRECT?

4         **MR. PRICE:**  I DON'T BELIEVE WE HAVE.  WE'RE BASING

5    THE EVIDENCE ON AN EXHIBIT WHICH WE RECEIVED IN DISCOVERY,                    09:06

6    WHICH DOES PURPORT TO STATE MR. LARIAN'S NET WORTH.

7         SO AT THIS POINT, WE'RE RELYING ON THAT.

8         **MR. ZELLER:**  THAT'S CORRECT.

9         **THE COURT:**  I THOUGHT I INDICATED THAT I WANTED TO

10   HAVE THOSE EXHIBITS TODAY.                                                    09:06

11        VERY GOOD.  ALL RIGHT.  FAIR ENOUGH.

12        **MR. NOLAN:**  COULD I BE HEARD ON THAT POINT?

13        **THE COURT:**  YOU MAY.

14        **MR. NOLAN:**  BECAUSE IT'S NOT AS SIMPLE AS MR. PRICE

15   HAS SAID.  THOSE CASES DO NOT INCLUDE UNIQUE SITUATIONS THAT                  09:06

16   ARE PRESENT HERE.  AND THESE ARE ISSUES THAT WE'VE ADDRESSED IN

17   THE JMOL MOTION.  TO THE EXTENT THAT MR. LARIAN HAS ANY

18   EXPOSURE TO A PUNITIVE DAMAGE AWARD, WE RESPECTFULLY SUBMIT --

19   AND I THINK THIS IS PRETTY CLEAR UNDER THE LAW -- THAT IT ONLY

20   GOES TO THE STATE LAW CLAIMS, AND THAT THE POTENTIAL DAMAGE                   09:07

21   AMOUNT IN THE STATE LAW CLAIMS CANNOT BE DUPLICATIVE OR SIMILAR

22   TO THE COPYRIGHT DAMAGES.  OTHERWISE, IT WOULD HAVE BEEN

23   SUPERSEDED OR PREEMPTED BY THE COPYRIGHT ACT.

24        THOSE DAMAGES, THEN, ARE REALLY LIMITED IN FASHION

25   AND AMOUNT TO AN EXTENT THAT WE WOULD SUGGEST -- IN FACT TO                   09:07

1    SUCH A DE MINIMIS AMOUNT, THAT IN RESISTING REMOVAL TO THE

2    FEDERAL COURT, MATTEL CONTENDED THAT THOSE DAMAGES COULD NOT

3    EXCEED $75,000.

4         **THE COURT:**  THAT'S WITH RESPECT TO COMPENSATORY

5    DAMAGES.  AND I UNDERSTAND YOUR ARGUMENT THERE.                    09:07

6         HOW DOES THAT RELATE TO THE PUNITIVE DAMAGE AWARD?

7         I UNDERSTAND THE SUPREME COURT HAS SPOKEN TO THIS

8    QUITE RECENTLY, BUT STILL, AS I UNDERSTAND IT, THERE'S NO LIMIT

9    ON PUNITIVE DAMAGES.  THERE'S NO SET LIMIT GOING INTO THE

10   ARGUMENT.  I KNOW IT HAS TO BE BASED ON EVIDENCE AND THE          09:08

11   FACTORS SET FORTH.

12        **MR. NOLAN:**  RIGHT.  BUT UNDER THE STATE FARM ANALYSIS

13   AND OTHER SUPREME COURT CASES, INCLUDING ONES THAT I'M SURE THE

14   COURT IS WELL FAMILIAR WITH, THE DUE PROCESS CONCERNS ARE

15   EXPRESSED IN MULTIPLES.  AND MY POINT HERE IS THAT IF THE BASE    09:08

16   AMOUNT THAT YOU'RE GOING TO BE USING AS A MEASURING DEVICE FOR

17   THE MULTIPLE THAT MIGHT BE ALLOWED, WE ARE STILL NOT TALKING

18   ABOUT A SIGNIFICANT SUM OF MONEY, SUCH THAT WE BELIEVE --

19        **THE COURT:**  I UNDERSTAND THAT.  THAT'S IN TERMS OF

20   THE AMOUNT OF THE AWARD ITSELF.  BUT ONE OF THE IMPORTANT         09:08

21   FACTORS FOR ANY JURY TO CONSIDER IN AWARDING PUNITIVE DAMAGES

22   IS THE NET WORTH OF WHATEVER ENTITY OR PERSON IT IS THAT

23   THEY'RE CONSIDERING IMPOSING THE PUNITIVE DAMAGES ON.

24        REGARDLESS OF WHERE THEY COME OUT, THAT IS, FROM ALL

25   OF THE AUTHORITY THAT I'VE SEEN, CONSISTENTLY A RELATIVE          09:09

```
 1   FACTOR.

 2           MR. NOLAN:  YOUR HONOR, RESPECTFULLY -- AND I'D LIKE

 3   TO MAYBE BRIEF THIS ISSUE WITH THE COURT -- THOSE CASES DO TALK

 4   ABOUT WHERE THERE'S A SITUATION WHERE THE RANGE OF A PERSON'S

 5   NET WORTH FAR EXCEEDS ANY AWARD THAT COULD POSSIBLY --              09:09

 6           THE COURT:  DO YOU HAVE ANY AUTHORITY ON THAT POINT?

 7           MR. NOLAN:  I'M GOING TO TRY TO PULL CASES ON THAT.

 8           BECAUSE, OTHERWISE, YOUR HONOR --

 9           THE COURT:  DO YOU HAVE ANY AUTHORITY RIGHT NOW?

10           NOW WOULD BE THE TIME.                                      09:09

11           MR. NOLAN:  I DO NOT HAVE AUTHORITY ON THAT POINT,

12   YOUR HONOR.

13           BUT I CAN SAY THAT A SITUATION WHERE WE COULD

14   STIPULATE THAT MR. LARIAN'S NET WORTH WOULD BE SUFFICIENT TO

15   COVER --                                                           09:09

16           THE COURT:  THAT'S NOT THE POINT, COUNSEL.

17           THE POINT IS FOR A JURY, IN A PUNITIVE DAMAGES

18   CASE -- I'M PRETTY SURE YOU WILL SEE THAT THE LAW IS IN ACCORD

19   WITH THIS -- IT'S THE OBLIGATION OF A JURY TO CONSIDER THE

20   TOTAL NET WORTH OF THE ENTITY OR THE DEFENDANT IN WHICH THEY        09:09

21   ARE CONSIDERING THE PUNITIVE DAMAGES AND THEY MUST MEASURE THAT

22   AS A PERCENTAGE.  IT MAY BE ONE PERCENT.  IT MAY BE A HALF A

23   PERCENT.  IT MAY BE 80 PERCENT.  BUT WHATEVER IT IS, THEY NEED

24   TO CONSIDER THAT NOW.  IT'S NOT SUFFICIENT SIMPLY TO SAY,

25   'DON'T WORRY; HE CAN PAY IT, WHATEVER YOU COME UP WITH,' OR         09:10
```

1    'DON'T WORRY; WHATEVER YOU COME UP WITH THAT WOULD BE

2    REASONABLE AS DETERMINED BY THE COURT AFTER IT REDUCES YOUR

3    PUNITIVE DAMAGE AWARD, IT CAN BE PAID.'

4         THAT'S NOT THE STANDARD.  UNLESS THERE'S SOME

5    AUTHORITY THAT I'M NOT FAMILIAR WITH.                          09:10

6         **MR. NOLAN:**  YOUR HONOR, MY POINT IS VERY CLEAR -- AND

7    THAT IS THAT THERE'S A HIGH RISK OF CONCERN THAT THIS JURY --

8    AND THIS IS WHY MATTEL WANTS TO DO IT -- IS TO PUT IN A HIGH

9    NET WORTH NUMBER FOR MR. LARIAN PERSONALLY TO PREJUDICE THE

10   JURY ON OTHER ISSUES THAT FLOW OVER WITH RESPECT TO THE        09:10

11   COPYRIGHT INFRINGEMENT CASE.

12        AND THE DANGER HERE, YOUR HONOR, WHERE -- AND MAYBE

13   THIS IS THE 403 ASPECT OF IT -- WHERE THERE IS NO DISPUTE THAT

14   THE DAMAGE AMOUNT THAT MATTEL IS SEEKING IS DE MINIMIS ON THOSE

15   CLAIMS WHERE PUNITIVE DAMAGES ARE ALLOWED, AND WHERE THE       09:11

16   SUPREME COURT, I BELIEVE IN THE CAMPBELL CASE AND OTHER CASES,

17   AND RECENTLY THE EXXON VALDEZ CASE, RULED THAT A MULTIPLE OF

18   MAYBE NINE WOULD BE ACCEPTABLE UNDER THE CIRCUMSTANCES.

19        ASSUMING THAT CARTER BRYANT'S LOST SALARY TO MATTEL

20   FOR HIS LOYAL SERVICES DURING THE PERIOD OF SEPTEMBER 1ST      09:11

21   THROUGH OCTOBER 19TH WOULD AMOUNT TO $7,000 -- AND LET'S ASSUME

22   THAT THE VALUE TO BE ATTACHED TO THE "TANGIBLE PROPERTY," THE

23   SO-CALLED FRANKENSTEIN DOLL, IS DE MINIMIS.  WE DON'T EVEN HAVE

24   A VALUE ON IT, WHERE A JURY IS BEING PRESENTED WITH THE

25   POTENTIAL OF AWARDING, LESS THEN --                           09:12

```
 1          AS I'M SITTING HERE, YOUR HONOR, I CAN'T EVEN
 2   CALCULATE $10,000 -- TO -- AND THEN HAVE THE MAXIMUM AMOUNT
 3   THAT POSSIBLY WOULD BE SUSTAINED BY A COURT, WOULD BE A
 4   MULTIPLE OF THAT OF $90,000.  TO THEN ALLOW A NET WORTH, WHICH
 5   IS, BY A MULTIPLE, SUBSTANTIALLY MORE THAN THAT, I RESPECTFULLY   09:12
 6   SUBMIT, UNDER 403 AND FOR DUE PROCESS CONCERNS, IT REALLY GOES
 7   TO WHAT MATTEL IS OBVIOUSLY TRYING TO DO, IS SHOCK THE JURY
 8   INTO SUCH A WAY, NOT FOR THE TORT CLAIMS, BUT TO HAVE IT COME
 9   BACK TO THE COPYRIGHT CLAIMS.  AND THAT IS THE CONFUSION, YOUR
10   HONOR, THAT I BELIEVE COULD CREEP INTO THIS CASE, AND WHY I      09:12
11   WOULD RESPECTFULLY SUBMIT THAT THE COURT TAKE THAT INTO
12   CONSIDERATION AND NOT VIEW THIS AS A STRAIGHT PUNITIVE DAMAGE
13   ANALYSIS CASE WHERE ONLY THAT ONE ASPECT IS CONSIDERED.  I'M
14   ASKING FOR THE POTENTIAL CONTAMINATION TO THE PUNITIVE DAMAGE
15   AWARD.  THEY JUST SIMPLY DON'T NEED IT, YOUR HONOR.  THEY WANT   09:13
16   TO EMBARRASS MR. LARIAN.  WE ALL KNOW IT.  THERE'S NO REASON TO
17   PUT THAT NET WORTH --
18          THE COURT:  COUNSEL, HOW IS IT THAT SOMEONE'S WEALTH
19   IS AN EMBARRASSMENT?
20          MR. NOLAN:  IT IS AN EMBARRASSMENT BECAUSE IT IS A        09:13
21   PRIVATE MATTER AND IT'S ONLY RELEVANT IF RELEVANT TO ISSUES
22   THAT ARE GOING TO BE TRIED IN THE CASE.  AND IN THIS SENSE,
23   YOUR HONOR, MR. LARIAN'S NET WORTH DOES NOT HAVE A RELEVANCY
24   BEYOND WHAT THE POTENTIAL CLAIM COULD BE IN THIS CASE AGAINST
25   HIM INDIVIDUALLY ON A PUNITIVE DAMAGE CLAIM.                     09:13
```

1        **THE COURT:**  THANK YOU, COUNSEL.

2        **MR. ZELLER:**  IT WAS A LITTLE STARTLING TO HEAR THAT

3   THIS WOULD BE AN EMBARRASSMENT.  THE COURT WILL RECALL THAT

4   WHEN CASSIDY PARK WAS TESTIFYING, HE ASKED HER THINGS LIKE HER

5   SALARY, AN EMPLOYEE WHO, OF COURSE, EVERYONE KNOWS IS AN        09:13

6   EMPLOYEE OF MATTEL.

7        SO WHAT OTHER PURPOSE DID THAT HAVE?

8        BUT THEY ARGUED IT GOES TO BIAS.

9        **THE COURT:**  IT WAS VALID IMPEACHMENT.

10       **MR. ZELLER:**  EXACTLY.  IMPEACHMENT.  AND THAT'S AN --   09:14

11       **THE COURT:**  THAT'S NOT THE PURPOSE FOR WHICH YOU'RE

12   INTRODUCING THIS.

13       **MR. ZELLER:**  NO.  I UNDERSTAND.  BUT IT IS A PURPOSE

14   FOR WHICH IT CAN BE INTRODUCED, AND WE THINK IT'S RELEVANT TO

15   THAT TOO.                                                      09:14

16       BUT THIS IDEA THAT IT'S PRIVATE, I THINK, IS A RED

17   HERRING, AND NOT TO MENTION THE FACT THAT IT IS NOT ONLY

18   RELEVANT TO PUNITIVE DAMAGES; IT IS REQUIRED.  MR. NOLAN DOES

19   NOT CITE ANY CASE THAT SAYS, 'WELL, IT'S REQUIRED, EXCEPT, OF

20   COURSE, WHERE THE OTHER SIDE, THE DEFENDANT, CHARACTERIZES THE  09:14

21   COMPENSATORY DAMAGES AS DE MINIMIS.'

22       **THE COURT:**  I'M NOT FAMILIAR WITH THAT AUTHORITY

23   EITHER.  I CERTAINLY INVITE MGA TO SUBMIT IT TO THE COURT IF

24   THERE IS SUCH AUTHORITY FOR THAT; BUT I THINK THE AUTHORITY IS

25   TO THE CONTRARY.                                               09:14

```
 1              MR. ZELLER:  WE DO CERTAINLY TAKE ISSUE WITH

 2   MR. NOLAN'S AND MGA'S STATEMENT HERE THAT THERE'S NO DISPUTE

 3   OVER WHAT THE STATE LAW DAMAGES ARE.  FAR FROM AGREEING THAT

 4   THEY ARE DE MINIMIS, WE HAVE MADE VERY CLEAR THAT OUR

 5   PERSPECTIVE IS THAT UNDER THE STATE LAW CLAIMS, AND          09:15

 6   PARTICULARLY THE AIDING AND ABETTING OF BREACH OF FIDUCIARY

 7   DUTY, WE ARE ENTITLED TO DISGORGEMENT OF ALL BENEFITS THAT MGA

 8   EVER RECEIVED FROM BRATZ.  AND THAT'S ACTUALLY VERY WELL

 9   FOUNDED LAW.  IT GOES BACK TO THE STATEMENT OF RESTITUTION,

10   STARTING IN 1937.  SO THIS IS A VENERABLE DOCTRINE.  THE LAW IS  09:15

11   VERY CLEAR THAT IF A PARTY AIDS AND ABETS OR INDUCES THE BREACH

12   OF FIDUCIARY DUTY AND IT CAUSES THE FIDUCIARY TO DISCLOSE

13   CONFIDENTIAL INFORMATION, PROPRIETARY INFORMATION, AND THEN IT

14   IS USED, ALL BENEFITS FROM THAT CAN BE DISGORGED.

15              MR. NOLAN'S PREEMPTION ARGUMENT -- WE CAN GET INTO  09:15

16   THIS AT SOME POINT ON THE RIGHT DAY, AT THE RIGHT TIME, TO

17   DISCUSS PREEMPTION IN MORE DETAIL, IF THEY REALLY WANT TO RUN

18   WITH THIS, BUT THE REALITY IS THAT PREEMPTION IS NOT BASED ON

19   RELIEF.  THAT IS NOT THE TEST.  AND THAT HAS NEVER BEEN THE

20   TEST.

21              AND ALL HE WANTS TO SAY IS, 'WELL, BECAUSE IT'S THE

22   KIND OF RELIEF YOU CAN GET UNDER THE COPYRIGHT ACT, NECESSARILY

23   YOU CAN'T GET IT UNDER THE STATE LAW CLAIMS.'  AND THAT'S JUST

24   NOT THE LAW OF PREEMPTION WHATSOEVER.

25              BUT JUST SO IT'S VERY CLEAR, THE FACT IS, OUR STATE  09:16
```

```
 1    LAW CLAIM DAMAGES ARE NOT DE MINIMIS.  AND THIS EVIDENCE

 2    CONCERNING NET WORTH IS DIRECTLY RELEVANT TO PUNITIVE DAMAGES.

 3    IT'S REQUIRED ON THAT FRONT.  AND CERTAINLY, UNDER THE

 4    GOOSE-AND-GANDER RULE, IT CERTAINLY IS RELEVANT TO IMPEACHMENT

 5    AND FOR THE JURY'S ASSESSMENT OF MR. LARIAN'S CREDIBILITY.      09:16

 6           THE COURT:  THANK YOU, COUNSEL.

 7           MR. NOLAN:  MY ONLY LAST POINT IS THAT WITH RESPECT

 8    TO THE NET WORTH, OBVIOUSLY IT GOES BEYOND WHAT MR. LARIAN

 9    DERIVED FROM THE SALE OF BRATZ.

10           I WILL SAY THAT THE FIRST SLIDE, THE FINANCIAL          09:16

11    BENEFIT FROM BRATZ, THAT THEY INTEND TO SHOW IN THE CASE SHOWS

12    PROFITS THROUGH JUNE OF 2008 OF $815,895,883.  LARIAN'S

13    FINANCIAL BENEFIT -- THAT'S MR. LARIAN'S FINANCIAL BENEFIT --

14    THAT THEY'RE GOING TO INTRODUCE EVIDENCE ON IS $987,000[SIC], A

15    LITTLE BIT MORE THAN THAT.                                     09:17

16           WHY THEY SHOULD THEN BE ALLOWED TO GO ON AND PRODUCE

17    ADDITIONAL INFORMATION WHICH --

18           THE COURT:  I SUSPECT YOU MISSPOKE.  I DOUBT THAT

19    MATTEL IS SIMPLY SAYING THAT ALL MR. LARIAN MADE WAS $970,000.

20           MR. NOLAN:  I APOLOGIZE.  IT'S $987 MILLION.           09:17

21           BUT, YOUR HONOR, THAT'S, I THINK -- MAYBE I WAS

22    THINKING FREUDIAN, BUT THAT'S ABOUT THE AMOUNT OF DAMAGES THAT

23    THEY COULD GET ON THEIR STATE LAW CLAIM.

24           BUT ALL I'M SAYING IS, YOUR HONOR, THEY HAVE

25    FINANCIAL INFORMATION THAT'S COMING IN ON THE COPYRIGHT CLAIMS. 09:17
```

```
 1   TO THEN GO AND BROADEN IT TO NET WORTH, I THINK THAT'S WHERE
 2   THE PREJUDICE COMES IN.  I ASK FOR 403 CONSIDERATIONS ON THAT.
 3          THE COURT:  THANK YOU, COUNSEL.
 4          ARE THERE OTHER ANY OTHER ISSUES THAT THE COURT NEEDS
 5   TO TAKE UP BEFORE TRIAL?                                        09:17
 6          MR. NOLAN:  YOUR HONOR, THERE IS ONE ISSUE.
 7          MR. PRICE HAS A SLIDE IN HERE OF COMMENTS IN CLOSING
 8   ARGUMENT IN PHASE 1-A, CONTENDING THAT IS RELEVANT IN PHASE 2.
 9   WE WOULD SUBMIT THAT ARGUMENTS OF COUNSEL, OBVIOUSLY, ARE NOT
10   EVIDENCE.  IN FACT, THE COURT INSTRUCTED THE JURY ON THAT       09:18
11   POINT.
12          THE ISSUES IN THE FIRST PHASE ARE SUBSTANTIALLY
13   DIFFERENT THAN THE ISSUES WITH RESPECT TO PHASE 1-B.
14          THE COURT:  BUT YOU DO AGREE -- THIS JURY -- THE
15   REASON WHY WE'RE HAVING THE SAME JURY DECIDE THIS IS BECAUSE    09:18
16   EVERYTHING THAT HAPPENED IN 1-A CAN BE USED AND ARGUED IN
17   CLOSING ARGUMENTS IN 1-B.
18          YOU'RE NOT SUGGESTING THAT YOU'RE GOING TO LIMIT
19   YOURSELF IN YOUR 1-B ARGUMENTS ONLY TO EVIDENCE THAT WAS
20   ADDUCED IN 1-B?                                                 09:18
21          MR. NOLAN:  NO, YOUR HONOR.  BUT I'M GOING JUST
22   SAYING THAT STATEMENTS OF COUNSEL --
23          THE COURT:  I TEND TO AGREE NORMALLY, BUT BOTH SIDES
24   HAVE USED STATEMENTS OF COUNSEL -- BOTH SIDES USED STATEMENTS
25   OF COUNSEL IN THEIR CLOSING ARGUMENTS.                          09:18
```

1    **MR. NOLAN:**  BUT, YOUR HONOR, THOSE STATEMENTS WERE

2    MADE IN THE CONTEXT OF THE PHASE THAT WAS BEING TRIED AND THE

3    ARGUMENTS THAT WERE BEING PROFFERED AT THAT POINT IN TIME SO

4    THAT THEY COULD BE PUT INTO CONTEXT.

5         IN THE FIRST PHASE, THE COURT WILL RECALL THAT WE                09:19

6    TRIED THE TIMING PORTION OF THE CASE.  THERE WAS AN ISSUE AT

7    SOME POINT IN TIME WHERE WE THOUGHT OWNERSHIP WAS ALSO GOING TO

8    BE DETERMINED, AND THAT WAS CLARIFIED AT THE END WHEN WE

9    STARTED WORKING ON JURY INSTRUCTIONS.

10        HOWEVER, MUCH OF THAT TESTIMONY GOING IN ABOUT                   09:19

11   DRAWINGS AND THE TIMING OF THE DRAWINGS AND WHETHER OR NOT

12   COLOR CHANGED THE CONCEPT OF IT, I SUBMIT, YOUR HONOR, WITHOUT

13   THE INSTRUCTIONS THAT WE'VE ASKED TO BE CONSIDERED IN TERMS OF

14   COPYRIGHT AREAS OF LAW, USING OUT OF CONTEXT COMMENTS OF

15   COUNSEL IN THE FIRST PHASE COULD BE MISLEADING.  THEY'RE NOT          09:19

16   GOING TO BE PREJUDICED BY IT.  THEY CAN DEVELOP THE EVIDENCE

17   THROUGH THE WITNESSES AT TRIAL IN PHASE 1-B.

18        **THE COURT:**  DO YOU HAVE A COPY OF THE STATEMENTS?  I

19   DON'T KNOW WHAT WE'RE TALKING ABOUT.

20        **MR. NOLAN:**  I CAN HAND UP THIS ONE, YOUR HONOR.              09:20

21        **THE COURT:**  WHILE YOU'RE DOING THAT, DO WE HAVE -- I

22   INVITED THE PARTIES TO SUBMIT TO THE COURT A JOINT INSTRUCTION

23   CONCERNING THE OVERVIEW OF THE ISSUES TO BE TRIED IN PHASE 1-B.

24   IT'S SOMEWHAT RELATED TO THIS ISSUE HERE.

25        HAVE THE PARTIES BEEN ABLE TO AGREE ON SUCH AN                   09:20

1   INSTRUCTION?

2           MR. NOLAN:  NO, YOUR HONOR.

3           THE COURT:  I'LL RELY ON YOUR OPENING STATEMENTS,

4   THEN, TO PROVIDE CLARIFY TO THE JURY AS TO WHAT THIS CASE IS

5   ABOUT.                                                          09:20

6           MR. NOLAN:  MAY I HAND THIS UP TO YOU?

7           THE COURT:  PLEASE.

8           MR. PRICE?

9           MR. PRICE:  OUR POINT, YOUR HONOR, IS THAT WE CAN

10  POINT OUT IF THE PARTY CHANGES ITS POSITION.                    09:21

11          THE COURT:  YOUR POINT IS WELL TAKEN.

12          IS THERE ANYTHING ELSE WE NEED TO TAKE UP?

13          MR. ZELLER:  NOT BEFORE THE JURY COMES OUT,

14  YOUR HONOR.  WE DO HAVE THE MOTION PERTAINING TO MR. MCFARLAND.

15  THERE ARE SOME OTHER ISSUES CONCERNING SOME WITNESSES.  BUT     09:21

16  THAT IS PROBABLY BEST SUITED TO SOMETHING OVER LUNCH OR ANOTHER

17  BREAK.

18          THE COURT:  VERY WELL.

19          ANYTHING FURTHER FROM MGA AT THIS TIME?

20          MR. NOLAN:  NO, YOUR HONOR.                             09:21

21          THE COURT:  VERY WELL.

22          SO I DO NEED TO RESOLVE THE HONG KONG ISSUE.  WE NEED

23  TO RESOLVE THE JURY ISSUE.

24          LET'S TAKE A RECESS AT THIS TIME.

25          (WHEREUPON, A BRIEF RECESS WAS HELD.)

1          **THE COURT:**  THE COURT HAS HAD A CHANCE NOW TO READ

2    MGA'S BENCH MEMORANDUM SUBMITTED IN CONNECTION WITH MATTEL'S

3    INTENT TO OFFER INTO EVIDENCE HONG KONG PLEADINGS DURING THE

4    PHASE 1-B TRIAL.  THE COURT HAS ALSO RECEIVED THE OPPOSITION TO

5    MGA PARTIES' BENCH MEMORANDUM REGARDING HONG KONG PLEADINGS AND          09:58

6    THE DECLARATION OF MR. PROCTOR THAT WAS FILED CONCURRENTLY.

7          THE COURT WANTS TO HEAR ORAL ARGUMENT ON THIS, JUST

8    TO GET SOME CLARIFICATION.

9          FIRST OF ALL, THE PROCEDURAL OBJECTION RAISED BY

10   MATTEL IS NOT WELL TAKEN.  THE COURT DID PROVIDE LEAVE FOR THIS          09:59

11   BENCH MEMORANDUM TO BE FILED.  I DO UNDERSTAND THAT IT WAS

12   ADDRESSED BY THE COURT'S RULING ON MGA'S MOTION *IN LIMINE*

13   NUMBER THREE, IN WHICH THE COURT ONLY GRANTED THE MOTION

14   INSOFAR AS RULINGS BY THE HONG KONG COURTS WERE CONCERNED, BUT

15   OTHERWISE, DEFERRED RULING ON THAT MOTION.                              09:59

16         I THINK IT'S APPROPRIATE TO TAKE THAT UP AT THIS

17   POINT IN TIME.

18         MY GENERAL SENSE, IN GOING THROUGH THIS, IS PROBABLY,

19   THE BEST WAY TO ADDRESS THE CONCERNS IS TO PERMIT FACT-BASED

20   ADMISSIONS OR STATEMENTS INTO EVIDENCE, BUT NOT LEGAL ARGUMENTS         09:59

21   BASED ON FOREIGN LAW INTO EVIDENCE.  AND I KNOW THE DIVISION

22   WILL NOT ALWAYS BE NEAT AND TIDY, AND THE COURT MAY HAVE TO

23   CONSIDER SOME OF THIS IN THE CONTEXT OF THE TRIAL ITSELF.

24         I CAN GIVE CLEAR EXAMPLES OF ONE OR THE OTHER, BUT

25   THAT'S WHERE I THINK I COME OUT ON THIS.                                10:00

1           ONE POINT, THOUGH -- AND THIS IS -- I WOULD LIKE TO

2    HEAR FURTHER ARGUMENT ON THIS.  I HAVE A GENERALIZED STATEMENT

3    THAT IS REPEATED NUMEROUS TIMES BY MGA THAT HONG KONG LAW IS

4    DRAMATICALLY DIFFERENT THAN NINTH CIRCUIT LAW.  BUT THE ONLY

5    EVIDENCE OF THAT POINT IS THE STANDARD FOR COPYRIGHT, THIS        10:00

6    MATERIAL COPYING STANDARD.  MATTEL CITES NUMEROUS CASES

7    SUGGESTING THAT HONG KONG DOES ADOPT THE SUBSTANTIAL SIMILARITY

8    TEST.  NOW, IT'S NOT FLUSHED OUT TO THE EXTENT THAT IT DOESN'T

9    INDICATE HOW THE SUBSTANTIAL SIMILARITY TEST IS APPLIED,

10   EXTRINSIC, INTRINSIC, ET CETERA, SO I DON'T KNOW WHERE THAT      10:00

11   ULTIMATELY GOES.  I'LL HEAR ARGUMENT ON THAT.

12           BUT MY TENTATIVE THOUGHT WOULD BE TO TRY TO SPLIT

13   THIS INTO LEGAL -- AND I THINK THIS IS CONSISTENT WITH THE

14   COURT'S EARLIER RULING ON MGA'S MOTION *IN LIMINE* NUMBER THREE,

15   TO EXCLUDE LEGAL FINDINGS AND LEGAL ARGUMENTS AS NOT ONLY        10:01

16   INAPPROPRIATE BECAUSE THEY'RE BASED ON HONG KONG LAW, BUT

17   BECAUSE ALSO 403 GROUNDS, THAT IT WOULD BE VERY CONFUSING TO

18   THE JURY.  BUT AT THE SAME TIME, CERTAIN FACTUAL STATEMENTS,

19   FOR INSTANCE, STATEMENTS ABOUT THE SOURCE OF THE DOLLS OR THE

20   SOURCE OF THE PRODUCTS OR THEIR CONNECTION BETWEEN THE DOLLS      10:01

21   AND THE PRODUCTS, SIMPLY FACT-BASED STATEMENTS OF THAT SORT, I

22   DON'T SEE HOW A DIFFERENT LEGAL STANDARD IN HONG KONG COMES

23   ANYWHERE CLOSE TO VITIATING THE RELIABILITY OF THOSE

24   STATEMENTS.

25           BUT THAT'S WHERE I AM AFTER READING THE TWO BRIEFS.       10:01

| | |
|---|---|
| 1 | MR. HANSEN? |
| 2 | **MR. HANSEN:** I'M WORKING ON LEARNING HONG KONG LAW. |
| 3 | I THINK THE BEST PLACE TO START ON THE ISSUE IS THE |
| 4 | CASES THAT THEY PROVIDED TO YOU LAST NIGHT. IF YOU TAKE, FOR |
| 5 | EXAMPLE, THE FOSSIL CASE, WHICH IS IN 2000, OUT OF THE COURT OF |
| 6 | FIRST INSTANCE, AND IF YOU LOOK AT PAGE -- I HAVE PAGE 7 IN |
| 7 | MINE. I'M NOT SURE -- IT'S STAR 21; SO IT'S THE SEVENTH PAGE |
| 8 | OF THE WEST LAW DECISION. |
| 9 | **THE COURT:** YES. |
| 10 | **MR. HANSEN:** SO IF YOU DROP DOWN, IT TALKS ABOUT |
| 11 | GUIDANCE IN THIS RESPECT. IT'S TALKING ABOUT HONG KONG |
| 12 | COPYRIGHT LAW AND WHAT YOU'RE SUPPOSED TO DO. |
| 13 | "GUIDANCE ON THIS ASPECT TO BE FOUND IN THE RECENT |
| 14 | AND IMPORTANT HOUSE OF LORDS DECISION IN DESIGNER'S GUILD V. |
| 15 | RUSSELL FROM WHICH MR. YAN EXTRACTS FOUR PROPOSITIONS." |
| 16 | AND I WOULD DROP DOWN, YOUR HONOR, TO POINT C, WHICH |
| 17 | STATES, QUOTE, "IT IS WRONG TO DISSECT THE PLAINTIFF'S WORK, |
| 18 | TAKING EACH PART WHICH HAS BEEN COPIED AND ASKING WHETHER EACH |
| 19 | PART COULD HAVE BEEN SUBJECT OF COPYRIGHT IF IT STOOD ALONE." |
| 20 | SO WE'LL START THERE. |
| 21 | I THINK IF -- WE AGREE THAT THIS IS NOT A MOTION TO |
| 22 | RECONSIDER BY US -- AND, FRANKLY, I THINK IF IT'S A MOTION TO |
| 23 | RECONSIDER, IT'S BY MATTEL OF YOUR HONOR'S RULING ON MONDAY. |
| 24 | AS YOU KNOW, MATTEL'S BEEN ARGUING THROUGHOUT THE CASE, ALL THE |
| 25 | WAY UP UNTIL MONDAY, THAT DISSECTION AND FILTERING OF ART |

10:02
10:02
10:02
10:02
10:03
10:03

1    WORKS, LIKE MR. BRYANT'S DRAWING, IS INAPPROPRIATE.  ON MONDAY,

2    YOUR HONOR HELD, WE THINK CORRECTLY, THAT THE ANALYTICAL

3    DISSECTION AND FILTERING IS REQUIRED DURING THE NINTH CIRCUIT

4    TEST; THE EXTRINSIC PART OF THE TEST IS APPROPRIATE.

5         UNDER HONG KONG LAW, IT'S NOT.  SO I THINK THAT IS A          10:03

6    FUNDAMENTAL DIFFERENCE.  THE GIST OF THIS IS, YOUR HONOR, WHAT

7    THEY'RE TRYING TO DO IS TAKE VARIOUS DOLLS THAT WERE ACCUSED OF

8    INFRINGEMENT IN HONG KONG AND COMPARE THEM TO DOLLS AND/OR

9    DRAWINGS -- IT'S NOT ENTIRELY CLEAR -- AND BASICALLY SKIP THE

10   ENTIRE EXTRINSIC PART THAT YOUR HONOR HAS RULED IS APPROPRIATE     10:04

11   AND SAY, 'TAKE A LOOK.'

12        NOW, WHETHER THAT'S EVEN THE PROPER STANDARD OF THE

13   INTRINSIC TEST IS FOR ANOTHER DAY, BUT IT'S CLEAR THAT WHAT

14   THEY'RE ATTEMPTING TO DO IS CIRCUMVENT YOUR HONOR'S RULING INTO

15   THE PROPER ANALYSIS, THAT YOUR HONOR RULED ON MONDAY.             10:04

16        **THE COURT:**  THAT ACTUALLY GOES TO THE CONCERN THAT I

17   HAVE, BECAUSE THE REFERENCES MADE IN MATTEL'S BRIEF WERE SIMPLY

18   TO SUBSTANTIAL SIMILARITY.  BUT WHAT DOES THAT MEAN IN THE

19   CONTEXT OF HONG KONG LAW?  AND YOU'VE SHED SOME LIGHT ON THAT.

20        GO BACK TO THE DISTINCTION THAT THE COURT -- TO BE           10:04

21   REINFORCED IS MY INITIAL INCLINATION THAT LEGAL ARGUMENTS AND

22   LEGAL CONCLUSIONS -- AND THIS IS WHERE I WAS, BASICALLY, MONTHS

23   AGO ON MGA'S MOTION NUMBER THREE -- DO NOT COME IN FOR THESE

24   VERY REASONS.

25        BUT PURELY FACTUAL STATEMENTS THAT ARE DIVORCED FROM         10:05

```
 1   ANY PARTICULAR LEGAL FRAMEWORK ARE ADMISSIONS AND WOULD BE

 2   ADMITTED.

 3           MR. HANSEN:  WE'RE NOT SEEKING TO RECONSIDER ON THAT

 4   AT THIS POINT.

 5           THE COURT:  VERY WELL.                                      10:05

 6           MR. HANSEN:  I THINK AN ILLUSTRATION OF THAT IS

 7   PART C OF THEIR BRIEF.  AND I JUST GOT THIS LATE, SO I HAVE NOT

 8   FULLY DIGESTED IT.  BUT IF YOU GO TO --

 9           THE COURT:  YOU AND I BOTH.

10           MR. HANSEN:  -- PAGE 6 OF THE MATTEL BRIEF, IT TALKS       10:05

11   ABOUT THE HONG KONG PLEADINGS.  THE BIG HEADING C ON LINE 19,

12   IT TALKS 'THE BRATZ DOLLS DERIVE SALES OF OTHER BRATZ-RELATED

13   PRODUCTS."

14           THESE ARE FACT-BASED STATEMENTS, AND WE'RE NOT --

15   THIS IS NOT THE SUBJECT OF WHAT WE'RE TALKING ABOUT.              10:05

16           THE COURT:  VERY GOOD.

17           MR. HANSEN:  SO THAT'S NOT AN ISSUE.

18           I THINK JUST A LITTLE FURTHER CLARIFICATION ON THE

19   LEGAL POINT -- AND THE DIFFICULTIES HERE -- THE DIFFICULT

20   WATERS THAT YOU'RE GOING INTO IN TERMS OF THE LEGAL ASPECT IS    10:06

21   THE OTHER CASE THAT THEY CITE IN THEIR BRIEF.  AND I HAVEN'T

22   LOOKED AT ALL OF THE HONG KONG CASES, BUT THEY TALK ABOUT THE

23   BG LIGHTING COMPANY, LIMITED CASE.  THIS ONE IS THE

24   SUPREME COURT OF HONG KONG, WHICH I ASSUME IS THE TOP COURT,

25   BUT I DON'T KNOW.  THIS CASE DEALS WITH A COPYRIGHT              10:06
```

```
 1    INFRINGEMENT OF A LIGHT BULB DESIGN.  THEY BASICALLY GO THROUGH

 2    THE FULL COPYRIGHT ANALYSIS OF WHETHER OR NOT THIS LIGHT BULB

 3    INFRINGES THIS LIGHT BULB.  AND IN THE UNITED STATES, LIGHT

 4    BULBS -- YOUR HONOR RULED THAT DOLL FASHIONS ARE NOT USEFUL

 5    ARTICLES.  LIGHT BULBS ARE.                                      10:06

 6          THE COURT:  RIGHT.  I UNDERSTAND.

 7          MR. HANSEN:  AND THE NINTH CIRCUIT HAS HELD THAT.

 8          SO THIS CASE IS BASICALLY BASING INFRINGEMENT ON

 9    ISSUES THAT SHOULD BE UNDER THE EXTRINSIC PART OF YOUR HONOR'S

10    CORRECT INTERPRETATION OF THE NINTH CIRCUIT TEST, FILTERED OUT.  10:06

11          SO IT SORT OF ILLUSTRATES THE PROBLEM OF GETTING INTO

12    HONG KONG LAW, BECAUSE IN TERMS OF EXACTLY -- SUBSTANTIAL

13    SIMILARITY IS ONE THING, AND IF YOU'LL RECALL, IN PART OF OUR

14    BRIEF, MATTEL HAD SOUGHT TO EXCLUDE PROFESSOR MENELL ON THE

15    GROUNDS THAT, 'MY GOD, HE'S USING SECOND CIRCUIT LAW,' WHICH IS  10:07

16    AN ENTIRELY DIFFERENT THING.

17          THE COURT:  YOUR POINT IS WELL TAKEN, MR. HANSEN.

18    THANK YOU.

19          MR. HANSEN:  WOULD A SPECIFIC EXAMPLE THAT'S BEING

20    USED IN THE OPENING HELP?                                        10:07

21          THE COURT:  SURE.

22          MR. HANSEN:  IF YOU LOOK AT -- I THINK AN EXAMPLE OF

23    THE TYPE OF LEGAL ISSUE -- IT IS -- I JUST GOT THE COREY

24    DECLARATION ABOUT 20 MINUTES AGO, AND IT IS IN MY BINDER.

25          THE COURT:  YOU MEAN MR. PROCTOR'S DECLARATION?           10:07
```

1          **MR. HANSEN:**  I'M SORRY.  I JUST GOT IT.  YES, THE

2   DYLAN PROCTOR DECLARATION.

3          IT'S IN HIS DECLARATION, EXHIBIT 7.

4          THIS IS AN AFFIDAVIT OF MR. LARIAN THAT WAS FILED IN

5   THE CITY WORLD CASE.                                          10:08

6          I THINK THIS IS A PERFECT ILLUSTRATION OF

7   YOUR HONOR'S POINT.  IF YOU GO TO -- I THINK THE MONEY SHOT

8   THAT THEY WANT TO USE HERE WOULD BE ON PARAGRAPH 12 OF THAT,

9   THE ONE THAT STARTS, 'I FAIL TO UNDERSTAND'...

10         **THE COURT:**  YES.                                   10:08

11         **MR. HANSEN:**  SO THIS AFFIDAVIT, YOUR HONOR, WAS IN

12  THE PHASE 1 TRIAL, AND IT WAS ALLOWED IN UNDER YOUR HONOR'S

13  RULING IN TERMS OF FACTUAL THINGS.

14         SO AT THE BOTTOM OF THAT PARAGRAPH -- IT WON'T LEAP

15  OUT, BECAUSE THIS REALLY WAS USED WITH MR. LARIAN TO REFRESH  10:08

16  HIS RECOLLECTION AS TO ANOTHER EXHIBIT.  AND AT THE BOTTOM, IT

17  TALKS ABOUT LSC-3.

18         **THE COURT:**  YES.

19         **MR. HANSEN:**  MR. LARIAN WAS REFRESHED ON THAT BY

20  MR. PRICE.  AND I DON'T KNOW IF IT'S IN MR. COREY'S          10:09

21  DECLARATION, BUT THE BOTTOM LINE IS THAT REFERRED, THEN, TO

22  TRIAL EXHIBIT 10, WHICH ALSO CAME IN.  AND TRIAL EXHIBIT 10

23  HAD, AT THE BOTTOM, MR. LARIAN'S SIGNATURE, AND IT HAD THE

24  STATEMENT, 'CONTRACT DATE, 9-18-2000.'  SO THAT WAS ADMITTED BY

25  YOUR HONOR FOR PURPOSES OF A FACTUAL ISSUE IN THE FIRST PHASE  10:09

1    OF THE TRIAL.

2            THIS SAME PARAGRAPH NOW -- AND MR. PRICE STOPPED IN

3    THE TRANSCRIPT WHEN THIS DOCUMENT CAME IN WITH MR. LARIAN.  HE

4    STOPPED AT THE SENTENCE IN PARAGRAPH 12 WHERE THE LSC-3 QUOTE

5    IS.  IF YOU READ THE TRANSCRIPT, IT'S AT --                          10:09

6            **THE COURT:**  AND THE NEXT STATEMENT, THE CONCLUSION,

7    ABOUT HAVING -- INFRINGED BASED ON HONG KONG LAW.

8            **MR. HANSEN:**  THE INFRINGEMENT ISSUE IS EXACTLY THE

9    CASE THAT WE CITE.

10           **THE COURT:**  I UNDERSTAND.                                 10:09

11           **MR. HANSEN:**  THAT'S JUST AN ILLUSTRATION.

12           **THE COURT:**  VERY WELL.

13           LET ME HEAR FROM MATTEL ON THE COURT'S DISTINCTION.

14           **MR. ZELLER:**  BEFORE GETTING INTO THE SPECIFICS, IF I

15   MAY, YOUR HONOR, THEIR VERY ARGUMENT HIGHLIGHTS WHY THEIR          10:10

16   MOTION *IN LIMINE* IS EXACTLY THE WRONG CONSTRUCT AND WHY IT IS

17   THAT THE COURT SHOULD GO BACK TO MATTEL'S SUMMARY JUDGMENT

18   MOTION IN WHICH WE ARGUED THEY ARE JUDICIALLY ESTOPPED FROM

19   MAKING ARGUMENTS TO THE CONTRARY.  THAT'S WHAT RESOLVES THIS

20   ISSUE.

21           BECAUSE IF THEY'RE REALLY GOING TO ARGUE, 'WELL, THE

22   COURT HAS TO MAKE SOME SORT OF LEGAL INTERPRETATION BEFORE THE

23   JURY CAN FULLY UNDERSTAND THE IMPORT OF THOSE STATEMENTS, OF

24   THOSE ADMISSIONS THEY MADE IN OTHER LITIGATION...' IT MEANS

25   THIS IS A MATTER OF JUDICIAL ESTOPPEL.  IT'S SOMETHING THAT THE    10:10

```
 1   COURT OUGHT TO SIMPLY RULE ON AND RESOLVE THOSE LEGAL ISSUES.
 2   INSTRUCT THE JURY THAT MGA IS JUDICIALLY ESTOPPED FROM DENYING
 3   THAT SUBSTANTIAL SIMILARITY -- JUDICIALLY ESTOPPED FROM MAKING
 4   ARGUMENTS ABOUT 2-D TO 3-D.
 5           THIS HIGHLIGHTS EXACTLY THE MOTION THAT MATTEL          10:11
 6   BROUGHT, BECAUSE THE COURT WILL RECALL HOW WE ENDED UP HERE.
 7   WE SAY THAT THEY ARE BOUND BY THESE PRIOR JUDICIAL STATEMENTS.
 8   THEY BASICALLY -- THE COURT HAS OBVIOUSLY NOT RULED ON THAT
 9   ISSUE, OR AT LEAST, I GUESS, IMPLICITLY, I THINK HAS DENIED THE
10   MOTION WITH RESPECT TO JUDICIAL ESTOPPEL BY DENYING THE MOTION  10:11
11   ON SUBSTANTIAL SIMILARITY.
12           THE COURT:  YES.
13           MR. ZELLER:  SO TAKING IT AT THAT POINT -- SO, WHERE
14   ARE WE NOW?  WELL, IT'S NOW A JURY ISSUE, FOR THAT REASON.
15           AND THEY ARE GOING TO, OF COURSE, TRY AND DISPUTE       10:11
16   THAT THEIR STATEMENTS TO OTHER COURTS, INCLUDING FACTUAL
17   STATEMENTS, REALLY MEANT ANYTHING, AND THEY ARE GOING TO, OF
18   COURSE, TRY AND SAY THAT IT'S BASED UPON THIS LEGAL
19   DISTINCTION.
20           THAT'S A LEGAL ARGUMENT.  THAT'S NOT SOMETHING THAT     10:11
21   THEY SHOULD THEN BE ABLE TO TURN AGAINST US AND SAY, WELL, THAT
22   MEANS THAT OUR ADMISSIONS NEVER HAPPENED AND THE JURY SHOULDN'T
23   BE AWARE OF THEM.
24           THAT DOES NOT FOLLOW, AND I THINK THEIR VERY ARGUMENT
25   SHOWS THAT THEY ARE IN THE WRONG CONSTRUCT AND WE ARE IN THE    10:12
```

```
 1   RIGHT ONE TO BRING WITH.  THE COURT OUGHT TO JUST RULE ON THESE
 2   THINGS AS A MATTER OF LAW AND SAY THAT THEY ARE JUDICIALLY
 3   ESTOPPED.  SO THAT'S THE FIRST POINT.
 4        THE SECOND POINT, YOUR HONOR, IS THAT THE
 5   DISTINCTIONS THAT THEY ARE TRYING TO RAISE HERE ARE STILL            10:12
 6   AMORPHUS, ARE STILL COMPLETELY UNPROVEN.  THEY BEAR THE BURDEN
 7   OF PROVING THAT THE LAW IS SOMEHOW DIFFERENT.
 8        THE COURT:  THERE HAVE BEEN CITATIONS MADE TO THE
 9   INTRINSIC TEST NOT BEING APPLIED IN HONG KONG LAW.  THAT'S A
10   SIGNIFICANT DIFFERENCE.                                              10:12
11        MR. ZELLER:  BUT THE CONTEXT IN WHICH THESE THINGS
12   ARE BEING TALKED ABOUT ARE NOT ISSUES OF -- LIKE, FOR EXAMPLE,
13   THE LIGHT BULB EXAMPLE THAT WAS GIVEN.  THAT'S CLEARLY AN ISSUE
14   OF PROTECTABILITY.  AND ALSO IT'S NOT TRUE THAT YOU COULDN'T
15   PROTECT A DRAWING OR A TWO-DIMENSIONAL REPRESENTATION OF A           10:12
16   LIGHT BULB UNDER U.S. COPYRIGHT LAW EITHER.  BUT THAT'S A
17   COMPLETE RED HERRING.  WE'RE TALKING ABOUT WHAT THE LEGAL
18   STANDARD IS.
19        WHAT I WOULD SUBMIT TO THE COURT IS THAT TO THE
20   EXTENT -- AND THIS GOES BACK TO, IN FACT, MONDAY'S RULING -- TO     10:13
21   THE EXTENT THAT ANY OF THIS IS ACTUALLY GOING TO BE AIRED IN
22   FRONT OF THE JURY -- WE GET BEYOND THE JUDICIAL ESTOPPEL
23   ARGUMENT -- WHAT I WOULD SUGGEST IS THAT THE COURT, AT THE END
24   OF THE CASE, AS IT SEEMED INCLINED TO DO, IS INSTRUCT ON HONG
25   KONG LAW.  WE CAN HAVE THE NORMAL KINDS OF PRESENTATIONS THAT        10:13
```

1    WOULD ALLOW THE COURT TO MAKE A FULL DETERMINATION UNDER 441 AS

2    TO WHAT THE FOREIGN LAW IS.

3            THE COURT CAN INSTRUCT THE JURY, 'THIS IS WHAT

4    SUBSTANTIAL SIMILARITY IS.  IT'S THE SAME OR IT'S DIFFERENT

5    UNDER HONG KONG LAW,' AND THE JURY CAN TAKE THAT INTO ACCOUNT      10:13

6    IN DETERMINING WHAT EFFECT TO GIVE THEIR PRIOR JUDICIAL

7    STATEMENTS.

8            BECAUSE THE THING THAT'S VERY TROUBLING, YOUR HONOR,

9    ABOUT THEIR ENTIRE POSITION ON THIS IS THAT THEY ARE BASICALLY

10   SAYING, WELL, IF WE MAKE A JUDICIAL ADMISSION THAT ANY OTHER       10:14

11   JURISDICTION, WHICH IS ALMOST BY DEFINITION GOING TO HAVE

12   DIFFERENCES IN LAW, THAT IT HAS NO EFFECT.  IT MEANS THAT OUR

13   JUDICIAL ADMISSIONS, ONLY THOSE WE MAKE IN THE NINTH CIRCUIT --

14   WELL, NOT EVEN IN THE NINTH CIRCUIT, BECAUSE WE MADE THAT IN

15   OREGON AND THEIR LOCAL RULES ARE DIFFERENT.                        10:14

16           I MEAN, ANYONE CAN POINT TO ANY NUMBER OF DIFFERENCES

17   BETWEEN JURISDICTIONS.  AND THAT'S JUST NOT THE LAW.  YOU CAN'T

18   JUST SIMPLY SAY THAT ADMISSION NEVER HAPPENED BECAUSE SOME

19   DIFFERENT LEGAL STANDARD WAS EMPLOYED.

20           SO I THINK, FRANKLY, A LARGE PART OF THIS CAN BE            10:14

21   RESOLVED BY THE COURT INSTRUCTING ON WHAT THAT LAW IS, AND THEN

22   THE JURY CAN MAKE THE DETERMINATION AS TO, WELL, WHEN THEY SAID

23   IN HONG KONG THAT THE DRAWINGS AND THESE DOLLS, THESE

24   THREE-DIMENSIONAL DOLLS THAT THEY SUED UPON, ARE SUBSTANTIALLY

25   SIMILAR.  WELL, EITHER IT'S ENTITLED TO GREAT WEIGHT, MAYBE NO     10:14

1   WEIGHT, LITTLE WEIGHT, WHATEVER THE CASE IS; BUT THAT'S A

2   DETERMINATION THE JURY CAN MAKE, BASED UPON THE COURT'S

3   INSTRUCTIONS OF WHAT THE LAW IS.

4          THAT'S WHERE THE COURT, I THINK, SEEMED TO BE ON

5   MONDAY, AND I THINK THAT'S ONE WAY OF ALSO RESOLVING THIS.      10:15

6          BUT FUNDAMENTALLY, WHAT WE DO WANT TO SAY TO THE

7   JURY, YOUR HONOR -- AND WE THINK IT'S IMPORTANT WE BE ABLE TO

8   SAY TO THE JURY -- IS THAT MGA IN THE PAST USED THOSE VERY

9   DRAWINGS THAT THE JURY HAS NOW SAID BELONG TO MATTEL TO PREVENT

10  OTHERS TO SEEK -- IN FACT, TO PREVENT AND TO SEEK TO PREVENT    10:15

11  OTHERS FROM MANUFACTURING DOLLS, BECAUSE THEY ARE GOING TO BE

12  MAKING THIS --

13         **THE COURT:**  THAT GOES TO A FACTUAL ISSUE MORE THAN IT

14  DOES A LEGAL ARGUMENT.  I'M MORE CONCERNED ABOUT THE LEGAL

15  ARGUMENTS THAT ARE MADE BASED ON THAT.  THAT'S A FACT THAT MGA  10:15

16  TREATED THE DRAWINGS AS A BASIS TO IS THIS RIGHT?  PROCEED IN

17  COPYRIGHT INFRINGEMENT UNDER WHATEVER LAW.  BUT HOW THAT

18  ACTUALLY PLAYS OUT UNDER HONG KONG LAW -- I UNDERSTAND YOUR

19  POINT, BUT I THINK THAT GOES TO THE TRIAL-WITHIN-A-TRIAL

20  CONCERN OF MR. HANSEN.                                         10:16

21         I MEAN, THIS IS GOING TO BE SOMETHING WHICH THE COURT

22  -- I MEAN, I THINK THERE'S SOME CLEAR THINGS THAT WE CAN

23  IDENTIFY FOR THE BENEFIT OF OPENING STATEMENTS THAT ARE GOING

24  TO CLEARLY COME IN, AND MR. PRICE MAY REFERENCE THOSE, BUT THEN

25  THERE'S OTHERS THAT ARE MORE OF A LEGAL NATURE THAT I'M         10:16

1    CONCERNED ABOUT.

2         **MR. PRICE:**  TO GIVE CONTEXT, SO WE'RE CLEAR, AND LET

3    ME TELL YOU AND SHOW YOU AN EXAMPLE OF WHAT I PLAN TO DO.

4         **THE COURT:**  GO AHEAD.  YOU'RE NOW ADDRESSING WHAT

5    YOU'RE PLANNING TO DO IN OPENING?                          10:16

6         **MR. PRICE:**  YES, SO THAT WE CAN DECIDE WHICH SIDE OF

7    THE LINE THIS GOES ON.

8         ONE OF THE THINGS I PLAN TO TELL THE JURY IS THAT MGA

9    HAS NOT ONLY BASED THEIR DOLL ON THESE DRAWINGS, THEY'VE USED

10   THESE DRAWINGS TO PREVENT OTHERS FROM MAKING DOLLS THAT LOOK  10:16

11   LIKE BRATZ.  THEY FILED THOSE SUITS IN HONG KONG.  AND WE CAN

12   SHOW THESE 18 DRAWINGS, AND THEY'RE THE DRAWINGS WHICH THE JURY

13   HAS FOUND MATTEL OWNS.

14        AND THEN ANOTHER STEP OF THAT AND SAYING THEY'RE

15   USING THESE DRAWINGS IS TO SAY, 'LET'S LOOK AT THOSE DOLLS.'  10:17

16        **THE COURT:**  AND THAT'S THE CONCERN I HAVE, IS WHEN WE

17   GET INTO THAT SECOND LEVEL.  THE FACT THAT THEY PURSUED

18   COPYRIGHT BASIS, THE FACT THAT THEY USED THE DRAWINGS TO DO SO,

19   THE FACT THAT -- AND OTHER FACTUAL STATEMENTS CONCERNING THE

20   CONNECTION BETWEEN THE DRAWINGS AND THE DOLLS AND THE DOLLS AND  10:17

21   MARKETING, I BELIEVE THAT'S ALL FAIR GAME.

22        IT'S WHEN YOU GET INTO THE ACTUAL LEGAL ARGUMENTS

23   THAT ARE USED UNDER HONG KONG LAW.  THAT WOULD TRIGGER WHAT

24   MR. ZELLER HAD SUGGESTED, THIS INSTRUCTION FROM THE COURT, AND

25   THAT -- WHILE I'M NOT SAYING IT DOESN'T HAVE SOME RELEVANCE, I  10:17

```
1   THINK IT BECOMES VERY CONFUSING TO THE JURY TO HAVE

2   INSTRUCTIONS UNDER HONG KONG LAW AND INSTRUCTIONS UNDER NINTH

3   CIRCUIT LAW IN TERMS OF COPYRIGHT INFRINGEMENT.

4          MR. PRICE:  TWO THINGS, YOUR HONOR.  ONE IS, IT IS A

5   FACT IN THE SENSE THAT THEY ARE USING THESE DRAWINGS AND THESE       10:17

6   ARE THE DOLLS THEY'RE TRYING TO STOP FROM MANUFACTURING.  AN

7   EXAMPLE WOULD BE -- COULD WE PUT UP FOR THE COURT AN -- AN

8   EXAMPLE WOULD BE, YOUR HONOR -- PUT UP 33.3.  IT WOULD JUST BE

9   TO ILLUSTRATE THAT -- THEY SAID, FOR EXAMPLE, IN THIS

10  PARTICULAR EXAMPLE, THAT THE DOLL WHICH THEY SUED AGAINST WAS        10:18

11  THIS DOLL HERE ON THE RIGHT.  THIS IS THE BLOWUP OF THAT DOLL.

12  AND IN THEIR ARGUMENTS, THEY MAKE FACTUAL ARGUMENTS THAT THE

13  EYES ARE THE SAME, THAT THE LIPS ARE THE SAME, THAT THE

14  EYEBROWS -- THOSE ARE FACTUAL ARGUMENTS THAT THEY'RE MAKING IN

15  COMPARING THOSE DOLLS.                                              10:18

16         SO WE THINK WE SHOULD BE ENTITLED TO SAY, 'THEY'RE

17  USING THE DRAWINGS TO PREVENT DOLLS FROM BEING MANUFACTURED,

18  AND YOU CAN SEE, THESE ARE THE DOLLS THEY'RE TRYING TO PREVENT

19  FROM BEING MANUFACTURED.'  AND THEY MAKE FACTUAL STATEMENTS

20  CONCERNING THAT.                                                    10:19

21         SO IT'S TO GIVE THIS JURY CONTEXT AS TO HOW IMPORTANT

22  THESE DRAWINGS ARE, OBVIOUSLY.

23         THE COURT:  VERY WELL.

24         LET ME HEAR MORE FROM MR. HANSEN.

25         MR. HANSEN, IF YOU WOULD, BEGIN BY ADDRESSING              10:19
```

```
 1   MR. ZELLER'S FIRST POINT.  MAYBE NOT HIS FIRST POINT, BUT THE
 2   JUDICIAL ESTOPPEL POINT, THE FUNDAMENTAL -- I'M WITH YOU ON THE
 3   LEGAL DISTINCTION AND THE DANGERS, THE 403 DANGERS, OF HAVING
 4   TO INSTRUCT THE JURY ON HONG KONG LAW AND GETTING INTO WHAT I
 5   THINK MIGHT VERY WELL BE A QUAGMIRE IF WE WENT DOWN THIS ROAD      10:19
 6   TOO FAR.
 7        BUT THERE'S A FUNDAMENTAL UNFAIRNESS THAT MR. ZELLER
 8   HAS IDENTIFIED THAT RESONATES WITH THE COURT.  FOR MGA TO BE
 9   ABLE TO GO IN ONE COURT, WHETHER IT'S HONG KONG OR OREGON OR
10   WHEREVER IT IS, AND SAY, 'AHA, YOU'RE INFRINGING OUR DRAWINGS;    10:19
11   YOU'RE INFRINGING OUR DOLLS,' AND THEN TURN AROUND AND MAKE ALL
12   OF THE ARGUMENTS IN TERMS OF SIMILARITY OF EYES, SIMILARITY OF
13   WHATEVER, AND THEN TURN AROUND IN ANOTHER COURT AND SAY, 'NOW
14   WE'RE GOING TO BRING IN EXPERTS AND SAY THEY DON'T LOOK
15   ANYTHING LIKE THE DRAWINGS AND THE DOLLS DON'T EVEN LOOK ALIKE,   10:20
16   LET ALONE THE DRAWINGS AND THE DOLLS AND SOME OTHER DOLL,' THIS
17   REALLY STRIKES THE COURT AS A FUNDAMENTALLY UNFAIR POSITION FOR
18   MGA TO BE TAKING.
19        MR. HANSEN:  IF YOU'RE SPEAKING, YOUR HONOR, TO THE
20   NOTION THAT'S IN THEIR BRIEF OF WHETHER OR NOT WE'RE ARGUING      10:20
21   THAT A THREE-DIMENSIONAL ITEM CANNOT INFRINGE A TWO-DIMENSIONAL
22   DRAWING, THAT'S THE RED HERRING.
23        WE'RE NOT ARGUING THAT.
24        SO PART OF WHAT THEY'RE SAYING IS WE CAN'T COME IN
25   HERE AND SAY --                                                  10:20
```

```
 1        THE COURT:  ADDRESS WHAT MR. PRICE -- IN THE CONTEXT
 2   OF MR. PRICE.
 3        IN ANOTHER COURT, MGA, THROUGH MR. LARIAN, HAS STOOD
 4   UP AND SAID THESE EYES LOOK ALIKE; AND NOW WE'RE GOING TO HEAR
 5   EVIDENCE FROM MGA'S EXPERT SAYING THEY DON'T LOOK ANYTHING        10:20
 6   ALIKE.
 7        THERE'S A FUNDAMENTAL INCOHERENCE TO THAT POSITION,
 8   WHICH I THINK THE DOCTRINE OF JUDICIAL ESTOPPEL DOES SPEAK TO.
 9        MR. HANSEN:  WHAT WE HAVE, YOUR HONOR, IS -- THE
10   REASON IT DOESN'T SPEAK TO IT IS THAT -- WHAT WE'RE TALKING       10:21
11   ABOUT OVER IN HONG KONG IS -- WE HAVE -- I DON'T KNOW WHAT DOLL
12   THAT IS, SAY THE TRENDY TEENS OR --
13        THE COURT:  TRENDY TEENS.
14        MR. HANSEN:  I DON'T KNOW THE NAMES EXACTLY, BUT
15   LET'S SAY TRENDY TEENS, ONE OF THE ONES THAT THEY TALK ABOUT.     10:21
16        SO WHAT'S BEING DISCUSSED OVER THERE IS THAT A BRATZ
17   DOLL LOOKS LIKE A TRENDY TEENS DOLL.  SO THE ANALYSIS OF THAT
18   IS BASED ON -- THE THINGS THAT ARE BEING SAID ARE BEING SAID
19   UNDER THE APPLICABLE HONG KONG LEGAL PRINCIPLES; SO THE
20   ARGUMENTS ARE INTERTWINED WITH THE HONG KONG LAW.                 10:21
21        WHAT'S AT ISSUE IN THIS CASE IS NOT WHETHER BRATZ
22   LOOKS LIKE TRENDY TEENS --
23        THE COURT:  WE'VE GOT TO BREAK THIS DOWN, BECAUSE I
24   CAN'T ACCEPT A BROAD-BASED GENERALITY.
25        IN THE CONTEXT OF THE SPECIFIC EYE COMMENT, HOW IS           10:21
```

```
 1   THAT MORE A FUNCTION OF LEGAL HONG KONG PRINCIPLES VERSUS A
 2   FACTUAL STATEMENT OF -- LET'S SAY -- THE EXTRINSIC TEST IS OUT
 3   IN HONG KONG.  WE'VE ESTABLISHED THAT.  IT'S JUST INTRINSIC.
 4   THEY'RE JUST LOOKING AT ORDINARY SIMILARITIES.  AND THAT'S PART
 5   OF WHAT IS GOING TO BE GOING ON HERE.                          10:22
 6         WHY SHOULD MGA BE ABLE, IN A HONG KONG SITUATION,
 7   WHICH IS STRICTLY LIMITED TO INTRINSIC ANALYSIS, BE ABLE TO SAY
 8   THE EYES LOOK EXACTLY THE SAME, AND THEN TURN AROUND HERE --
 9   WHAT'S REALLY TROUBLESOME ABOUT THIS IS, IN HONG KONG, MGA WAS
10   SAYING THE DRAWINGS AND THE DOLLS, GROUPED TOGETHER            10:22
11   ESSENTIALLY, LOOK JUST LIKE THESE OTHER DOLLS.  AND HERE,
12   THEY'RE TRYING TO DRAW THE DISTINCTION THAT THE DRAWINGS DON'T
13   LOOK ANYTHING LIKE THE DOLLS.
14         I REALLY THINK THAT THERE'S SOME SERIOUS PROBLEM WITH
15   THAT POSITION.                                                 10:22
16         MR. HANSEN:  THE WAY I UNDERSTAND HONG KONG LAW
17   WORKS, THE DRAWINGS ARE THERE, ESSENTIALLY, AS A STAKE IN THE
18   GROUND FROM THE BEGINNING; IT'S A NECESSARY PART OF HONG KONG
19   LAW THAT BUILDS THE CHAIN OF TITLE UP TO THE DOLLS SO THAT YOU
20   CAN MAKE THE DOLL-TO-DOLL COMPARISON.  I CAN'T SAY THAT WITH    10:23
21   DEFINITIVE HONG KONG KNOWLEDGE, BUT YOU'RE REALLY BUILDING UP
22   THE CHAIN OF TITLE.
23         IF YOU LOOK THROUGH A LOT OF THE DECLARATIONS THEY
24   ARE SUBMITTING, IT HAS THE DRAWINGS IN THE INITIAL PART; THEN
25   THEY BUILD IT UP INTO THE SCULPT THROUGH MS. LEAHY; THEN THEY   10:23
```

```
 1   HAVE A WAX MODEL; AND THEN THEY HAVE VARIOUS COLOR CHARTS AND
 2   VARIOUS OTHER THINGS THAT ULTIMATELY GETS TO THE DOLL; AND THEN
 3   YOU HAVE THIS DOLL-TO-DOLL COMPARISON.  SO THERE IS NEVER ANY
 4   STATEMENT THAT THE DRAWINGS ARE, AS THEY SAY, A DERIVATIVE WORK
 5   OF THE DOLLS, WHICH IS --                                        10:23
 6        THE COURT:  WE'RE GOING TO STAY AWAY FROM DERIVATIVE
 7   WORKS.  I PRESSED THAT ON MONDAY, AND EVERYONE JUMPED BACK FROM
 8   THAT, SO WE'RE NOT GOING TO BE TALKING ABOUT -- THOSE ARE THE
 9   TYPES OF LEGAL CONCLUSIONS THAT WE'RE NOT GOING TO BE GETTING
10   INTO.                                                            10:23
11        MR. HANSEN:  AND THAT'S ONE OF THE ARGUMENTS.
12        AND I WANT TO GET BACK TO YOUR POINT, YOUR HONOR, BUT
13   THE BASED ON -- AND ONE OF THE THINGS THEY CITE IS 'BASED ON'
14   -- AND AS YOU KNOW FROM THE SUPERBOY DECISION, YOU KNOW
15   DERIVATIVE WORKS, AND 'BASED ON' IS JUST ONE LITTLE PIECE --     10:23
16        THE COURT:  RIGHT.
17        MR. HANSEN:  IT'S A MUCH MORE COMPLICATED -- IT
18   SAYS -- ESSENTIALLY WHAT THEY WANT TO ARGUE IS THAT IN HONG
19   KONG, WE SAID THAT THIS IS BASED ON THAT, WHICH WE DON'T
20   DISPUTE THAT THE BRYANT DRAWINGS WERE AN INSPIRATION AND PEOPLE  10:24
21   LOOKED AT THEM, BUT THEY WANT TO TAKE THAT SINGLE WORD "BASED
22   ON" THAT WAS USED IN THE DECLARATION IN HONG KONG --
23        THE COURT:  AND GIVE IT A LEGAL IMPORT.
24        MR. HANSEN:  AND SAY IT MEANS IT'S A DERIVATIVE WORK.
25        THE COURT:  AND THE COURT IS NOT GOING TO LET THEM DO       10:24
```

1   THAT.  THAT'S PART OF THE REASON I DECLINE TO GO DOWN AND

2   ACCEPT MR. ZELLER'S INVITATION EARLIER ON JUDICIAL ESTOPPEL,

3   BECAUSE I THINK THERE'S TOO MANY COMPLICATING FACTORS FOR THE

4   COURT TO DO THAT.

5            AT THE SAME TIME, THIS INFORMS MY DECISION AND I --          10:24

6   IT'S BECOMING CLEARER TO ME AS WE GO THROUGH THIS

7   DISCUSSION THAT FACTUAL STATEMENTS, FACTUAL ASSERTIONS,

8   PROVIDED THAT THEY ARE DIVORCED OF LEGAL LANGUAGE IN WHICH THEY

9   REFLECT LEGAL CONCLUSIONS OR THEY REFLECT LEGAL PRINCIPLES, ARE

10  GOING TO BE ADMITTED.                                                 10:25

11       **MR. HANSEN:**  LET ME ADDRESS YOUR SPECIFIC QUESTION ON

12  THE EYELASH AND THE EYE.

13           THE EXHIBIT THAT'S PUT UP -- IF WE'RE TALKING EYE TO

14  EYE, THAT'S ONE THING.  AND THAT IS PROBABLY THE BEST EXAMPLE

15  OF SOMETHING THAT COULD BE ARGUABLY FACT-BASED.                       10:25

16       **THE COURT:**  I THINK IT IS, YES.

17       **MR. HANSEN:**  OKAY.  BUT THAT'S NOT WHAT THE REST OF

18  THEM ARE.

19       **THE COURT:**  I DON'T KNOW -- I MEAN, PART OF THIS --

20  WE'VE GOT A JURY NOW WAITING, AND I'M GOING TO BRING THE JURY         10:25

21  IN IN ABOUT FIVE MINUTES, BUT I THINK THE STANDARD THAT I'M

22  ARTICULATING IS CLEAR.  MR. PRICE SHOULD PROBABLY ERR ON THE

23  SIDE OF CAUTION IN OPENING STATEMENT.  THIS IS NOT GOING TO BE

24  THE ENTIRE TRIAL, THESE NEXT TWO HOURS.

25           I WILL ENTERTAIN OBJECTIONS IF ANYTHING GOES UP             10:25

1    THERE, WHICH -- LIKE I SAID, THE STANDARD THAT I AM GOING TO

2    ARTICULATE HERE AND HOW I'M RULING ON THIS IS THAT IF IT'S A

3    LEGAL CONCLUSION, IF IT'S BASED ON A LEGAL CONCEPT, IF IT'S NOT

4    STRICTLY FACTUAL-BASED, IT'S GOING TO STAY OUT.

5            IF IT IS A FACT-BASED STATEMENT, EVEN IF IT IS IN THE        10:26

6    CONTEXT OF A LEGAL ARGUMENT, IT'S GOING TO COME IN.  I KNOW

7    THAT MAY NOT BE AS CLEAR GUIDANCE AS YOU'D LIKE, BUT THAT'S THE

8    BEST I CAN DO RIGHT NOW.

9            MR. HANSEN:  YOUR HONOR, IF YOU LOOK AT THE OTHER

10   PLEADINGS, WHAT THE STARTING POINT IS FOR THE 'THIS DOLL LOOKS    10:26

11   LIKE THIS DOLL' IS NOT FACTUAL STATEMENTS AS TO EYELASHES AND

12   LIPS AND THINGS LIKE THAT.  IT'S THE GENERAL STATEMENT THAT

13   THIS DOLL INFRINGES THIS DOLL.  THAT'S IT.  THERE IS NO --

14   WE'RE NOT GETTING INTO DECLARATIONS OF -- IN ALMOST ALL OF THE

15   SITUATIONS, IT IS NOT --                                          10:26

16           THE COURT:  THOSE ARE TWO DIFFERENT STATEMENTS.  A

17   STATEMENT THAT THIS DOLL LOOKS LIKE ANOTHER DOLL, THAT IS A

18   COMMON LAY STATEMENT.  AND I DON'T THINK IT'S FAIR FOR MGA TO

19   RUN FROM THAT STATEMENT.

20           TO SAY THAT THIS DOLL INFRINGES ANOTHER DOLL, THAT IS      10:27

21   A STATEMENT THAT HAS A LEGAL CONCLUSION.  SO TO USE THE EXAMPLE

22   YOU JUST GAVE ME, I THINK THOSE ARE -- ONE WOULD BE IN AND ONE

23   WOULD BE OUT.

24           MR. HANSEN:  AND THE STATEMENTS IN THE MATERIALS --

25   AS YOU COULD IMAGINE, WHEN YOU'RE SUBMITTING THE PLEADINGS IN      10:27

1    HONG KONG, YOU'RE NOT SAYING IT LOOKS LIKE; YOU'RE SAYING

2    THAT -- IT COULD BE SUBSTANTIAL SIMILARITY.  IT IS INFRINGEMENT

3    TERMS OF ART UNDER HONG KONG LAW OFF THAT FROM WHICH THEY ARE

4    BASING THE GENERAL COMPARISON.

5            **THE COURT:**  TERMS OF LEGAL ART ARE NOT GOING TO COME      10:27

6    IN.

7            I'M SAYING THAT GENERALLY.  AGAIN, I'M BEING ASKED TO

8    RULE IN THE ABSTRACT ABOUT THE SPECIFICS BEFORE ME, SO IT MAY

9    VERY WELL BE THAT A STATEMENT THAT MATTEL IS OFFERING CONTAINS

10   A PARTICULAR LEGAL TERM.  BUT IT'S SO CLEAR FROM THE STATEMENT   10:27

11   THAT IT IS ESSENTIALLY A FACT-BASED ASSERTION THAT I'M GOING TO

12   HOLD THAT IT IS ADMISSIBLE AS AN ADMISSION OF A PARTY OPPONENT.

13           ON THE OTHER HAND, A STATEMENT MAY APPEAR ON THE

14   SURFACE TO BE JUST A FACTUAL STATEMENT, BUT IT IS CLEAR THAT IT

15   IS RELATED TO A LEGAL CONCEPT, AND THAT'S WHAT I WILL EXCLUDE.   10:28

16   I'M SURE I WILL ANNOY BOTH SIDES MANY TIMES DURING THE COURSE

17   OF THIS TRIAL.  BUT THAT'S THE STANDARD THAT I'M GOING TO TRY

18   TO IMPOSE ON BOTH SIDES, AND I'LL DO THE BEST I CAN.

19           **MR. HANSEN:**  THE DIFFICULTY FOR PURPOSES OF

20   OPENING -- AND MAYBE A GOOD PORTION IS -- WHAT'S HAPPENING IS    10:28

21   THIS DOLL TO DOLL, DOLL TO DOLL, DOLL TO DOLL, DOLL TO DOLL,

22   THIS DOLL, VARIOUS NAMES, AGAINST THE BRATZ.  AND THE BASIS

23   UPON WHICH THE COMPARISON IS BEING MADE WOULD BE A PLEADING, OR

24   MR. LARIAN'S DECLARATION, WHERE HE SAYS THIS INFRINGES THAT.

25   THAT'S THE ONLY BASIS UPON WHICH THEY MAKE THE COMPARISON.  IT   10:28

```
 1   IS NOT A FACTUAL STATEMENT ANYWHERE WHERE WE GO THROUGH THE

 2   'THIS PUPIL LOOKS LIKE THIS.  THIS EYELASH HAS THIS' --

 3        THE COURT:  I UNDERSTAND THAT ALL OF THIS IS TAKING

 4   PLACE IN THE CONTEXT OF A LEGAL DISPUTE IN HONG KONG.  I HAVE

 5   PREVIOUSLY RULED IN RESPONSE TO MGA'S MOTION IN LIMINE NUMBER     10:28

 6   THREE THAT THE MERE FACT ALONE DOES NOT DISQUALIFY THESE

 7   STATEMENTS AS ADMISSIONS OF A PARTY OPPONENT.

 8        AGAIN, WHAT I'M TRYING TO AVOID HERE IS A LEGAL TRIAL

 9   WITHIN A TRIAL, THE 403 ISSUE CONCERN OF CONFUSING THE JURY

10   WITH VARYING LEGAL STANDARDS.  OTHERWISE, FOR THE REASONS --     10:29

11        MR. HANSEN:  ALL I'M TRYING TO GET AT IS THAT IT'S

12   NOT THE STATEMENTS THAT ARE GOING TO BE SHOWN TO THE JURY, AND

13   IT'S NOT A MATTER OF PUTTING UP A STATEMENT OF THE

14   INFRINGEMENT.  WHAT'S HAPPENING IS, IN THE DEMONSTRATIVE --

15   BECAUSE THAT'S NOT INTERESTING.  IT MAY BE; IT MAY NOT BE.  I    10:29

16   MEAN, IT'S PREJUDICIAL IN AND OF ITSELF.  BUT WHAT'S BEING DONE

17   IN THE OPENING ARE GRAPHICS OF THE DOLLS TO DOLLS, WHERE THERE

18   IS NOTHING IN THE CASE UNDERLYING THAT COMPARISON THAT MAKES

19   THE SORT OF FACTUAL ALLEGATIONS THAT YOUR HONOR IS TALKING

20   ABOUT.  SO THE PREJUDICE COMES IN FROM THE COMPARISON, WITHOUT   10:29

21   ANY OF THE UNDERLYING MGA STATEMENTS THAT YOUR HONOR WOULD SAY

22   WOULD MAKE THAT, PERHAPS, PROBATIVE.

23        THE COURT:  LIKE I SAY, I DON'T KNOW WHAT MR. PRICE

24   IS GOING TO DO OR NOT DO.  I'LL HAVE TO WAIT AND SEE ON THAT.

25   BUT I WILL GIVE YOU LEAVE TO MAKE OBJECTIONS TO THE EXTENT THAT  10:30
```

1  THIS INFRINGES ON LEGAL CONCLUSIONS.

2      **MR. PRICE:**  I'M NOT GOING TO PUT UP EVERY PART IN

3  THESE PLEADINGS WHERE THEY SAY THE EYES ARE SIMILAR, THE NOSES

4  ARE SIMILAR, ET CETERA.  I WILL TELL THE JURY THAT'S WHAT THEY

5  SAID.                                                          10:30

6      **THE COURT:**  KEEP IN MIND, THIS IS OPENING STATEMENT,

7  NOT CLOSING ARGUMENT.  YOU'RE GOING TO HAVE A CHANCE TO MAKE

8  YOUR ARGUMENT, DEPENDING ON WHAT EVIDENCE COMES IN.  IT WOULD

9  CERTAINLY BE FAIR GAME TO TELL THE JURY THAT YOU ANTICIPATE

10  THAT EVIDENCE WILL INDICATE THAT STATEMENTS WERE MADE, FACTUAL  10:30

11  STATEMENTS, AND I'M GOING TO ADMIT THOSE.

12      **MR. PRICE:**  WHAT I DO PLAN TO PUT UP ARE THAT THEY'RE

13  BASING ALL OF THESE CASES ON CORE DRAWINGS WHICH WE NOW OWN.

14  THERE ARE STATEMENTS -- AND IT'S A FACTUAL STATEMENT, YOUR

15  HONOR -- WHERE THEY SAY -- THEY DESCRIBE KIND OF THE PROCESS.   10:30

16  THEY SAY MR. BRYANT'S DRAWINGS, THESE DRAWINGS, ARE THEN

17  REFERRED TO BY THE SCULPTOR.  ACTUALLY, IN A, B, C, D, AND E,

18  THEY ACTUALLY IDENTIFY -- THESE ARTISTS ALWAYS REFER TO THE

19  DRAWINGS IN DOING THEIR WORK.  THAT'S A FACTUAL STATEMENT.  AND

20  IT'S AN IMPORTANT FACTUAL STATEMENT.                           10:31

21      **THE COURT:**  THAT IS AN EXAMPLE OF A FACTUAL

22  STATEMENT, YES.

23      **MR. PRICE:**  AND THEN WE'RE GOING TO SAY, 'THESE ARE

24  THE DOLLS THAT WE'RE SUING ON.'  SAYING THAT THEY ARE SIMILAR

25  BECAUSE OF THE SHAPE OF EACH DOLL'S HEAD, BECAUSE OF THE SIZE   10:31

```
 1   OF EACH DOLL'S HEAD, COMPARISON TO THE REMAINDER OF THE DOLL IS

 2   THE SAME, THE SHAPE AND SIZE OF THE NOSE, THE SHAPE OF THE

 3   EYES -- THESE ARE VERY SPECIFIC FACTUAL ALLEGATIONS.

 4           THE COURT:  VERY WELL.

 5           MR. NOLAN:  YOUR HONOR, MY ONLY POINT WITH RESPECT TO     10:31

 6   WHAT MR. PRICE SAID -- I UNDERSTAND THE COURT'S DISTINCTION

 7   BETWEEN LEGAL ARGUMENTS AND FACTUAL STATEMENTS.

 8           THE COURT:  MY INITIAL RULING WAS ON LEGAL

 9   CONCLUSIONS BY THE COURT.  WHAT I CERTAINLY DON'T WANT TO HAVE

10   THIS JURY TOLD IS THAT A JUDGE IN HONG KONG HAS FOUND, UNDER     10:31

11   HONG KONG LAW, THAT THERE'S BEEN INFRINGEMENT.  THAT IS

12   VERBOTEN.  IF ANYONE COMES CLOSE TO THAT, THERE WILL BE A

13   SERIOUS SANCTION FROM THE COURT.  THAT IS A CLEAR PARAMETER

14   HERE.

15           ON A SECONDARY LEVEL, WHERE IT'S GOING TO BE A LITTLE    10:32

16   TOUGHER IS THIS DISTINCTION BETWEEN FACTUAL ASSERTIONS OF MGA'S

17   CONDUCT, WHAT THEY HAVE DONE; WHAT THEY HAVE BASED THEIR

18   ACTIONS ON; WHAT ASSERTIONS, FACTUAL ASSERTIONS, THEY HAVE MADE

19   IN THE COURSE OF THAT LITIGATION, VERSUS LEGAL ARGUMENTS AND

20   LEGAL CONCLUSIONS THAT ARE BASED ON HONG KONG LAW.  THAT'S WHAT  10:32

21   I'M TRYING TO DIVIDE HERE.

22           MR. NOLAN:  I UNDERSTAND.

23           BUT I JUST WANT TO MAKE CERTAIN THAT I'M CLEAR ABOUT

24   SOMETHING.

25           WHAT WILL HAPPEN IS THAT THEY WILL USE THE FACTUAL       10:32
```

```
 1   STATEMENT -- THEY WILL USE THE OFFENDING PRODUCT, THAT IT IS
 2   ASSERTED AGAINST, AND THEY WILL SKIP YOUR WELL-REASONED VIEW
 3   THAT WE'RE NOT GOING TO GET INTO THE LAW IN HONG KONG.  BUT BY
 4   THE DIRECT COMPARISON TO THIS JURY, THEY ARE THEN GOING TO
 5   CREATE THE PREJUDICIAL LINK TEST THAT CANNOT BE TAKEN BACK          10:32
 6   WITHOUT THEN HAVING THE TRIAL WITHIN THE TRIAL.  EVERY LITIGANT
 7   MAKES FACTUAL STATEMENTS IN A LAWSUIT IN THE CONTEXT OF
 8   LEGAL --
 9        THE COURT:  THE JURY IS NOT GOING TO KNOW HOW THAT
10   WAS RESOLVED.  THEY ARE JUST GOING TO HAVE THE FACTUAL              10:33
11   STATEMENTS THAT WERE MADE.
12        MR. NOLAN:  BUT THEY ARE GOING TO HAVE THE FACTUAL
13   STATEMENT THAT WAS MADE, AND APPARENTLY, THE 3-D INFRINGING
14   PRODUCT, OR THE ALLEGED INFRINGING PRODUCT, OVER IN HONG KONG.
15        THE COURT:  THAT'S PART OF THE FACTUAL STATEMENT.             10:33
16        MR. NOLAN:  BUT WITHOUT THE BENEFIT OF UNDERSTANDING,
17   A, WHETHER OR NOT IT WAS BEING TESTED BY A DIFFERENT TEST THAN
18   THEY WERE GOING TO BE ASKED -- AND THAT'S THE CONFUSING PART OF
19   IT.
20        THE COURT:  I APPRECIATE YOUR ARGUMENT, COUNSEL.             10:33
21        MR. NOLAN:  THE LAST POINT I WOULD MAKE, YOUR HONOR,
22   IT WOULD BE -- AND MAYBE WE SHOULD DO THIS -- IT WOULD BE AS
23   THOUGH, NOW, WE TAKE -- BECAUSE MATTEL, OF COURSE, CLAIMS
24   COPYRIGHT OWNERSHIP ON THESE DRAWINGS -- FOR US TO GO TO THE
25   VARIOUS LITIGATIONS THAT MATTEL HAS BEEN ENGAGED IN, WHERE THEY    10:33
```

1    HAVE ASSERTED COPYRIGHT INFRINGEMENT AGAINST PRODUCTS THAT WE

2    MIGHT BELIEVE IS EQUALLY REMOVED FROM THE ORIGINAL ARTISTIC

3    WORK.  AND WE SHOULD BE ABLE TO DO THAT, BECAUSE THEY ARE

4    ASSERTING THAT SAME ISSUE, AND WE WOULD SAY THAT THAT'S AN

5    INCONSISTENT POSITION.  IF YOU'RE SAYING THAT THESE DRAWINGS          10:34

6    ARE SIMILAR -- I'M JUST SAYING THAT THE OPPOSITE IS TRUE FOR

7    MATTEL, AS WELL, WITH RESPECT TO POSITIONS THAT THEY HAVE TAKEN

8    IN OTHER LITIGATIONS THAT MAY BE INCONSISTENT WITH WHAT THEY

9    ARE ARGUING HERE.

10           **THE COURT:**  AT THIS POINT, I DON'T KNOW WHAT YOU ARE       10:34

11   REFERRING TO IN TERMS OF OTHER POSITIONS MATTEL HAS TAKEN.  I'M

12   JUST NOT FOLLOWING YOU AT THIS POINT.

13           **MR. NOLAN:**  WELL, YOUR HONOR, THE COURT HAD EVIDENCE

14   IN THE GOLDBERGER CASE, FOR INSTANCE.  WE'VE SUBMITTED IN

15   PREVIOUS HEARINGS THAT MATTEL TOOK INCONSISTENT POSITIONS IN          10:34

16   THE SECOND CIRCUIT THAN THEY ARE ASSERTING HERE WITH RESPECT TO

17   PROTECTABILITY.

18           **THE COURT:**  I'M NOT ALLOWING --

19           **MR. NOLAN:**  WHY WOULD I BE PROHIBITED FROM USING

20   MATTEL'S FACTUAL STATEMENTS IN FRONT OF JUDGE RAYKOFF IN THE          10:35

21   GOLDBERGER CASE AGAINST THE POSITIONS THAT THEY ARE ASSERTING

22   HERE?

23           **THE COURT:**  WHAT FACTUAL STATEMENT ARE YOU REFERRING

24   TO?

25           **MR. NOLAN:**  IN COMPARING BARBIE CEO TO THE ROCKETTE       10:35

1   CASE, AND OTHER INSTANCES WHERE --

2        **THE COURT:**  WHAT FACTUAL STATEMENT WOULD YOU WANT TO

3   USE IT FOR AND TO IMPEACH WHAT POSITION?

4        THESE STATEMENTS THAT MATTEL HAS IDENTIFIED ARE

5   SPECIFIC STATEMENTS THAT ARE BEING USED TO IMPEACH PARTICULAR         10:35

6   POSITIONS, PARTICULAR EVIDENCE BEING OFFERED BY MGA.  IF YOU

7   CAN FIND SOMETHING WHERE THEY ARE JUDICIALLY ESTOPPED FROM

8   TAKING A POSITION, THE COURT WILL CONSIDER THAT.

9        THIS APPLIES TO -- JUDICIAL ESTOPPEL DOESN'T APPLY

10  JUST TO MGA.  IT APPLIES TO BOTH SIDES.  I'M TRYING TO ADDRESS        10:35

11  THE JUDICIAL ESTOPPEL ISSUE, WHICH I'M NOT PREPARED -- AND I

12  WAS NOT PREPARED TO ENGAGE IN AT -- OR RULE ON ON A MOTION FOR

13  SUMMARY JUDGMENT, BECAUSE I DID NOT THINK THERE WAS A

14  SUFFICIENT BASIS BEFORE THE COURT AT THAT TIME TO MAKE THAT

15  RULING, BECAUSE IT DID NOT HAVE BEFORE IT WHAT IT WOULD HAVE          10:36

16  NEEDED TO MAKE THE JUDICIAL ESTOPPEL ARGUMENT.

17       AT THE SAME TIME, I COME BACK TO THE POINT THAT I

18  THINK IS WELL MADE BY MR. ZELLER ABOUT THE FUNDAMENTAL FAIRNESS

19  OF TAKING A -- MAKING FACTUAL STATEMENTS AND INTRODUCING

20  EVIDENCE THROUGH THE COMPANY THAT IS AT ODDS WITH PREVIOUS            10:36

21  STATEMENTS IN THIS PARTICULAR LITIGATION, IN THIS PARTICULAR

22  SUBJECT MATTER, IN THIS PARTICULAR DOLL, NAMELY BRATZ.  AND IF

23  THERE'S SOMETHING SIMILAR THAT YOU WANT TO INTRODUCE, PROFFER

24  IT TO THE COURT AND THE COURT WILL CONSIDER THAT ARGUMENT.

25       **MR. NOLAN:**  ALL RIGHT.  BUT THE RECORD WILL CLEARLY          10:36

1    REFLECT THAT PARTIES HAVE TAKEN POSITIONS IN THIS CASE AND MADE

2    FACTUAL ARGUMENTS THAT MAY OR MAY NOT BE INCONSISTENT --

3         **THE COURT:**  YOU NEED TO SPECIFY.  YOU'RE BEING VERY

4    GENERAL NOW.  GIVE ME A SPECIFIC INSTANCE -- AND IF YOU'RE

5    ASKING TO USE THAT EVIDENCE, I'LL GIVE YOU LEAVE TO USE IT, BUT          10:36

6    I'M NOT GOING TO SIT HERE AND HAVE YOU JUST MAKE GENERAL

7    STATEMENTS ABOUT WHAT THE COURT HAS OR HAS NOT DONE WITHOUT

8    GIVING ME A SPECIFIC REFERENCE, COUNSEL.

9         **MR. NOLAN:**  WE HAVE SUBMITTED, AS PART OF THE SUMMARY

10   JUDGMENT RECORD, STATEMENTS WITH RESPECT TO SIMILARITIES OR          10:37

11   DISSIMILARITIES BETWEEN DRAWINGS AND DOLLS.  WE DID THAT IN

12   SUPPORT OF VARIOUS --

13        **THE COURT:**  WHAT DOLLS?  WHAT SIMILARITIES?  WHAT

14   SPECIFICALLY ARE YOU REFERRING TO?

15        **MR. NOLAN:**  LET'S SAY THE FIRST GENERATION AND          10:37

16   CERTAIN ASPECTS OF THE FIRST GENERATION DOLLS.  LET'S SAY THE

17   EYES.  LET'S JUST FOCUS ON EYES FOR JUST A MOMENT.

18        **THE COURT:**  ALL RIGHT.

19        **MR. NOLAN:**  AND I'LL BE SPECIFIC.  I'LL SAY WITH

20   RESPECT TO JADE.          10:37

21        **THE COURT:**  OKAY.

22        **MR. NOLAN:**  SO WITH RESPECT TO THAT, YOUR HONOR,

23   THOSE ARGUMENTS AND THOSE POSITIONS WERE BEING TAKEN, URGING

24   THE COURT TO ADOPT A CERTAIN POSITION UNDER NINTH CIRCUIT LAW.

25        **THE COURT:**  WHAT POSITION?          10:37

1          **MR. NOLAN:**  WHETHER OR NOT THEY ARE ENTITLED TO BROAD

2    OR THIN PROTECTION.

3          **THE COURT:**  OKAY.

4          **MR. NOLAN:**  SO THEY ARE MADE IN THE CONTEXT.

5          WHERE AN ADVOCATE, WHICH THEY ARE ENTITLED TO DO,          10:37

6    MAKES AN ARGUMENT TO THE COURT TO URGE THE COURT TO ADOPT WHAT

7    WE THOUGHT WAS THE PREVAILING NINTH CIRCUIT STANDARD.

8          THE COURT NOW YESTERDAY RULED, IN ADVANCE OF THE

9    TRIAL, WHAT YOU BELIEVE TO BE THE APPROPRIATE TEST, CITING THE

10   SATAVA CASE.                                                   10:38

11         **THE COURT:**  YES.

12         **MR. NOLAN:**  NOW HAVING THAT RULING, AND UNDERSTANDING

13   THE SCOPE OF THAT RULING, TO GO FORWARD NOW ON THE TRIAL,

14   LETTING US ADJUST TO THAT RULING NOW THAT IT'S BEEN MADE ON THE

15   EVE OF TRIAL -- AND I'M NOT CRITICIZING; I'M JUST SAYING THAT'S  10:38

16   THE WAY IT WAS FRAMED -- WHY SHOULD ANOTHER PARTY BE ALLOWED TO

17   TAKE OUT OF LEGAL ARGUMENT CONTEXT A POSITION THAT WAS BEING

18   ADVOCATED BY A PARTY UNDER A STANDARD?  THAT'S THE POINT THAT

19   I'M MAKING.

20         **THE COURT:**  YOU'RE BACK TO THE SAME ARGUMENT THAT WAS  10:38

21   VERY WELL MADE IN THE BRIEF.  I'VE RULED ON THAT.  WE'RE NOW

22   GOING IN CIRCLES.

23         MR. ZELLER, MR. PRICE, ANYTHING FURTHER?

24         **MR. ZELLER:**  UNLESS THE COURT HAS ANY FURTHER

25   QUESTIONS ON THE SPECIFICS HERE, THE ONLY THING I WANT TO --    10:38

1          **THE COURT:**  I DON'T.

2          AND JUST FOR THE RECORD, I STILL DIDN'T GET ANYTHING

3    FROM MR. NOLAN WITH RESPECT TO A SPECIFIC EXAMPLE OF JUDICIAL

4    ESTOPPEL ARGUMENT OR STATEMENTS THAT MGA WISHES TO INTRODUCE

5    VIS-À-VIS MATTEL.  THAT'S NOT BEFORE THE COURT, AND THERE'S          10:39

6    NOTHING FOR ME TO RULE ON.  MGA HAS LEAVE TO BRING THAT TO THE

7    COURT'S ATTENTION IF AND WHEN THEY DECIDE TO DO SO.

8          **MR. ZELLER:**  WHAT I WOULD LIKE TO PROPOSE,

9    YOUR HONOR, IS AN ALTERNATIVE FOR ANY STATEMENTS THAT WERE MADE

10   IN MGA'S OTHER LITIGATION THAT FALL WITHIN THE AMBIT OF WHAT          10:39

11   THE COURT BELIEVES IS MORE THE LEGAL CONCLUSION AND THAT,

12   THEREFORE, IS NOT REALLY THE SUBJECT OF PROPERLY BEING PUT

13   BEFORE THE JURY, AT LEAST BY US.

14         WHAT I WOULD REQUEST, YOUR HONOR, FOR ANY STATEMENTS

15   SUCH AS THOSE, THAT WE BE GIVEN AN OPPORTUNITY TO BASICALLY          10:39

16   UNPACK THAT, INCLUDING BY MAKING SUBMISSIONS UNDER EXACTLY WHAT

17   HONG KONG LAW IS, AND THEN HAVE THE COURT TELL THE JURY THAT'S

18   WHAT THE IMPORT OF THE STATEMENT IS, POTENTIALLY.

19         THAT AVOIDS THE ISSUE OF GIVING THEM A GENERAL

20   INSTRUCTION ON HONG KONG LAW.                                        10:40

21         ON THE OTHER HAND, IT ENSURES THAT WE DON'T

22   ESSENTIALLY JUST GUT THE DOCTRINE OF JUDICIAL ESTOPPEL.

23   BECAUSE THAT IS REALLY FUNDAMENTALLY WHAT THEY ARE SUGGESTING,

24   IS 'WHETHER LEGAL DIFFERENCES, IT WOULD BE CONFUSING TO THE

25   JURY; YOU, JUDGE, SHOULDN'T RULE ON JUDICIAL ESTOPPEL,' BUT          10:40

5401

1    WHAT THAT MEANS IS THAT THEY ESSENTIALLY ARE BEING ALLOWED TO

2    TAKE INCONSISTENT POSITIONS BETWEEN COURTS, WHICH IS PRECISELY

3    WHY THAT DOCTRINE EXISTS.

4           SO WE FALL INTO THIS LIMBO.

5        **THE COURT:**  I UNDERSTAND YOUR ARGUMENT, AND THIS IS         10:40

6    WHERE I'M -- I'M WITH MGA ON THIS ARGUMENT.  I THINK THE 403

7    CONCERNS PRECLUDE EITHER THE INSTRUCTION OR THE UNPACKING THAT

8    YOU'RE SUGGESTING RIGHT NOW.

9           IN A PERFECT WORLD, I WISH -- IT WOULD BE GREAT TO BE

10   ABLE TO UNPACK ALL OF THIS BEFORE THE JURY.  UNDER THE TIME        10:40

11   CONSTRAINTS OF THIS TRIAL -- AND MY CONCERNS ABOUT THE

12   MULTIPLICITY OF COPYRIGHT ISSUES THAT THIS JURY IS GOING TO

13   HAVE TO GRAPPLE WITH AND THEIR COMPLEXITY -- I'M CONCERNED ON

14   403 GROUNDS TO GIVE FULL EFFECT TO THIS.  THE RELEVANCE OF THAT

15   IS OUTWEIGHED BY THE CONFUSING NATURE OF THAT INSTRUCTION,         10:41

16   UNPACKING AND UNPACKAGING.

17          AT THE SAME TIME, I UNDERSTAND THE ARGUMENT, AND I'M

18   ATTEMPTING TO STRIKE A BALANCE HERE BETWEEN ENSURING THE

19   JUDICIAL ESTOPPEL EFFECT BY PERMITTING THE FACT-BASED

20   STATEMENTS IN, WHILE PRECLUDING THE LEGAL ARGUMENTS, THE LEGAL     10:41

21   CONCLUSIONS, MOST IMPORTANTLY, IN, WHICH WOULD REQUIRE A TRIAL

22   WITHIN A TRIAL.

23          THAT'S THE BALANCE I'M TRYING TO ACHIEVE HERE.

24       **MR. ZELLER:**  I UNDERSTAND THAT BALANCE, YOUR HONOR.

25          WHAT I THINK I WAS -- WHAT I'M SUGGESTING, HOWEVER,         10:41

```
 1   IS THAT IF THE JURY IS TOLD -- THOSE STATEMENTS ARE PUT INTO
 2   PLAIN ENGLISH AND TOLD TO THE JURY -- THAT'S WHAT I'M
 3   SUGGESTING.
 4        THIS IS REALLY A LEGAL INTERPRETATION OR CONSTRUCTION
 5   POINT, WHICH, TO THE EXTENT OF WHAT THOSE STATEMENTS FALL INTO.   10:42
 6   I MEAN, THE FACT IS THAT THEY SAY -- AND THEY USE THE LEGAL
 7   TERMINOLOGY, WHICH IS INEVITABLE, OBVIOUSLY, IN LITIGATION IN
 8   HONG KONG, BUT THAT'S TRUE FOR ANYTHING WHERE THERE'S JUDICIAL
 9   ESTOPPEL.
10        THE COURT:  WE'RE NOT GOING TO GO THERE.   10:42
11        THANK YOU, COUNSEL.
12        MR. ZELLER:  THANK YOU.
13        MR. PRICE:  YOUR HONOR, I THINK THERE WERE TWO OTHER
14   ISSUES.
15        THE COURT:  I UNDERSTAND.  I'M GOING TO GET TO THEM   10:42
16   AS SOON AS I'M DONE WITH THIS ISSUE, COUNSEL.
17        MR. PRICE:  I THOUGHT WE WERE DONE.
18        THE COURT:  MR. HANSEN, ANYTHING FURTHER?
19        MR. HANSEN:  THE DIFFICULTY IS --  JUST TO MAKE IT
20   CLEAR -- WHAT'S HAPPENING IS THAT THIS LOOKS LIKE THIS -- IN   10:42
21   HONG KONG, WHAT'S ACCUSED OF INFRINGEMENT IS THE STATEMENT --
22   WHAT'S HAPPENING IS THAT IT'S BYPASSING ALL OF THE FILTRATION
23   THAT IS GOING ON IN THIS TRIAL TO MAKE THE DETERMINATION
24   BETWEEN WHETHER THE BRATZ DOLL LOOKS LIKE THIS DRAWING.  SO THE
25   PREJUDICE IS THAT THE JURY IS GOING TO HAVE ALL OF THESE, 'LOOK   10:42
```

1    AT THIS; DON'T THEY LOOK THE SAME OR DON'T THEY LOOK

2    DIFFERENT.'

3            **THE COURT:**  THAT'S PART OF THE INTRINSIC ANALYSIS.

4            **MR. HANSEN:**  THAT'S THE INTRINSIC ANALYSIS.  AND

5    THAT'S THE POINT.  YOU DON'T DO THE INTRINSIC ANALYSIS IN          10:43

6    HONG KONG.

7            **THE COURT:**  I UNDERSTAND THAT.  AND THAT'S WHY THE

8    CONCLUSIONS IN THE HONG KONG COURT DON'T COME IN, BECAUSE THEY

9    ARE LACKING THAT EXTRINSIC ANALYSIS.  THAT'S MY VERY POINT AND

10   WHY I'M NOT GOING DOWN THE JUDICIAL ESTOPPEL ROAD BEING INVITED    10:43

11   BY MR. ZELLER.

12           IN TERMS OF THE INTRINSIC ANALYSIS, THE WHOLE ISSUE

13   OF SIMILARITY, IT WOULD BE ENTIRELY UNFAIR, FROM THIS COURT'S

14   PERSPECTIVE, FOR -- WHEN YOU GET TO THE COMPARISON PART, THAT

15   IS, THE INTRINSIC ANALYSIS UNDER NINTH CIRCUIT LAW, AND           10:43

16   SUBSTANTIAL SIMILARITY UNDER HONG KONG LAW -- WHICH APPARENTLY,

17   AT LEAST BASED ON WHAT WE'VE SEEN HERE, IS NOTHING BUT

18   INTRINSIC ANALYSIS -- FOR THE PARTIES TO SAY -- FOR MGA TO SAY

19   ON THE ONE HAND, THE EYES LOOK DISSIMILAR, AND ON THE OTHER

20   HAND, THEY DON'T, OR THAT THEY ARE BASED ON THE DRAWINGS OR        10:43

21   THEY ARE NOT.

22           THAT'S ALL I'M GOING ON.  I'M TRYING TO CAPTURE THAT

23   WHICH IS APPROPRIATE FOR JUDICIAL ESTOPPEL PURPOSES, WITHOUT

24   GOING THE FULL MEASURE AND DOING THE -- PRESENTING THE LEGAL

25   ARGUMENTS AND THE LEGAL CONCLUSIONS TO THE JURY.                   10:44

1    **MR. HANSEN:**  WHAT'S BEING DONE IN HONG KONG IS THE

2   INTRINSIC PART OF THE TEST.  SO WHEN YOU GET TO THE END GAME,

3   ASSUMING THIS ALL COMES IN, WHAT THE JURY IS GOING TO HAVE TO

4   DO TO ACTUALLY MAKE IT PROBATIVE IN THIS CASE IS TO TAKE A LOOK

5   AT THE HONG KONG DOLLS THAT ARE BEING PUT UP, DO THE FILTERING    10:44

6   ANALYSIS THAT THEY ARE REQUIRED TO DO IN CONNECTION WITH THE

7   BRATZ DOLLS.  SO WE HAVE --

8    **THE COURT:**  THEY ARE NOT BEING CALLED UPON TO DO AN

9   INFRINGEMENT ANALYSIS OF THOSE DOLLS.  I DISAGREE WITH YOU.

10    **MR. HANSEN:**  THAT'S EXACTLY THE POINT, IS THAT WHAT'S    10:44

11   HAPPENING IS THAT YOU'RE SUGGESTING WHAT THE JURY IS SEEING IS

12   AN INFRINGEMENT ANALYSIS THAT'S DONE WITHOUT THE EXTRINSIC --

13    **THE COURT:**  THEY ARE NOT GOING TO BE DOING AN

14   INFRINGEMENT ANALYSIS.  THIS IS SIMPLY GOING TO THE ISSUE OF

15   STATEMENTS OR POSITIONS TAKEN BY MR. LARIAN AND MGA IN TERMS OF    10:44

16   WHETHER THESE DOLLS LOOK ALIKE OR NOT.

17    **MR. HANSEN:**  AND WHAT THEY ARE USING TO SAY LOOKS

18   ALIKE IS SOMETHING THAT WE CLAIM INFRINGED UNDER A DIFFERENT

19   STANDARD WHERE THE LOOK-ALIKE TEST DOESN'T FILTER OUT THE

20   ELEMENTS THAT ARE GOING TO BE FILTERED OUT HERE --    10:45

21    **THE COURT:**  I UNDERSTAND THAT.

22    **MR. HANSEN:**  -- WHERE THE INFRINGEMENT STANDARD HERE

23   IS DIFFERENT, SO THE DOLLS THERE ARE REALLY NOT PROBATIVE,

24   BECAUSE THE COMPARISON IS NOT APPLES AND APPLES.  BECAUSE IN

25   ORDER TO MAKE AN APPLES-TO-APPLES COMPARISON, YOU HAVE TO    10:45

```
 1   FILTER OUT THE HONG KONG DOLLS TO SEE WHAT'S LEFT FOR THE --
 2            THE COURT:  I DO UNDERSTAND YOUR ARGUMENT, COUNSEL.
 3            MR. HANSEN:  OKAY.  THANK YOU, YOUR HONOR.
 4            THE COURT:  VERY WELL.
 5            AGAIN, BEFORE WE GET STARTED HERE, IS THERE ANYTHING      10:45
 6   FROM MGA IN TERMS OF JUDICIAL ESTOPPEL ISSUES THAT YOU'RE
 7   LOOKING FOR FROM THIS COURT?  BECAUSE I WILL CERTAINLY
 8   ENTERTAIN THAT.
 9            I DON'T WANT TO HAVE THIS RECORD LEFT IN THE CURRENT
10   STATE THAT IT'S IN, WITHOUT ONE, ONE WAY OR THE OTHER.            10:45
11            MR. NOLAN:  I UNDERSTAND, YOUR HONOR.  WHAT I'D ASK
12   TO DO IS -- WE UNDERSTAND THE COURT'S RULING AS OF NOW.  WITH
13   RESPECT TO THAT, I WANTED TO BE OPEN FOR CONSIDERATION.  LET ME
14   GO BACK -- LET ME GET THE CASES.  I DON'T HAVE THEM READILY
15   AVAILABLE, NOR THE STATEMENTS, FOR INSTANCE, FROM GOLDBERGER.     10:45
16            THE COURT:  VERY WELL.
17            MR. NOLAN:  I HAVE ENOUGH ISSUES WITH MY OWN OPENING
18   STATEMENT.
19            THE COURT:  SO IT WON'T BE PART OF OPENING STATEMENT.
20   WE CAN TAKE THAT UP IN THE COURSE OF THE TRIAL.                   10:46
21            WITH RESPECT TO THE -- BASICALLY, WHERE I AM ON --
22   I'M GOING TO PERMIT BOTH THE GRUCA AND THE KIVITZ REPORTS IN.
23   I'M GOING TO DENY MATTEL'S MOTION IN LIMINE TO EXCLUDE THE
24   GRUCA REPORT.  AND BASICALLY, I'M ADOPTING THE EQUITABLE
25   ANALYSIS ON THAT.  I JUST THINK THAT BASED ON THE TOTALITY OF     10:46
```

1    THE CIRCUMSTANCES HERE, BOTH REPORTS SHOULD COME IN.

2           THERE'S NO QUESTION THAT MGA SHOULD HAVE DISCLOSED

3    THE SURVEY IN THEIR INITIAL REPORT, AND THERE'S NO QUESTION

4    THAT MATTEL SHOULD HAVE PROBABLY DISCLOSED THIS A COUPLE OF

5    WEEK AGO; BUT IN ANY EVENT, I'M ALLOWING BOTH IN FOR PURPOSES          10:47

6    OF PHASE 1-B.

7           WITH RESPECT TO THE NET PROFITS, ALL LEGAL AUTHORITY

8    THAT THE COURT IS FAMILIAR WITH SUGGESTS THAT IS A REQUIRED

9    FACTOR FOR THE JURY TO CONSIDER; SO NET PROFITS [SIC] ARE

10   COMING IN.                                                            10:47

11          AND THEN I'VE GIVEN YOU MY RULING ON THE HONG KONG

12   CASES.

13          MR. ROTH?

14          MR. ROTH:  VERY BRIEFLY ON THE ISSUE WITH RESPECT TO

15   MR. KIVITZ.  OBVIOUSLY, GIVEN THE FACT --                            10:47

16          THE COURT:  YES.  YOU MAY TAKE HIS DEPOSITION NEXT

17   WEEK.

18          MR. ROTH:  THANK YOU, YOUR HONOR.

19          MR. PRICE:  YOU SAID PROFITS; I THINK YOU MEANT

20   MR. LARIAN'S NET WORTH.                                              10:47

21          THE COURT:  YES.  WHAT DID I SAY?

22          MR. PRICE:  NET PROFITS.

23          THE COURT:  HIS NET WORTH.

24          MR. PRICE:  AND THE OTHER ISSUE THAT WAS RAISED WAS

25   WHETHER OR NOT WE COULD REFER TO MR. NOLAN'S -- WHAT WE SAY IS       10:47

1  A CONTRARY ARGUMENT HE MADE IN 1-A.

2         **THE COURT:**  I THINK I ALREADY RULED ON THAT.  I SAID

3  YOUR POINT WAS WELL TAKEN, COUNSEL.

4         **MR. PRICE:**  I INFERRED FROM THAT THAT IT WAS OKAY.

5         **THE COURT:**  VERY WELL.                                    10:48

6         I'M GOING TO BRING THE JURY IN.  I'M GOING TO

7  QUESTION THEM ABOUT HARDSHIP, EXPLAIN THE PARAMETERS, AND THEN

8  WE'LL BE BEGINNING AT 11:00 WITH THE OPENING STATEMENTS.  THEY

9  WILL GO FROM 11:00 TO 1:00.  WE'LL THEN TAKE A ONE-HOUR LUNCH

10  BREAK, AND THEN WE'LL HAVE MGA'S OPENING STATEMENT FROM 2:00    10:48

11  UNTIL 4:00.  AND THEN WE SHOULD HAVE ABOUT ONE HOUR'S WORTH OF

12  TESTIMONY BEFORE THE END OF THE DAY.

13         **MR. QUINN:**  YOU ALSO WANTED TO TELL THE JURY,

14  YOUR HONOR, THAT THE COURT IS DARK TOMORROW.

15         **THE COURT:**  YES.  THANK YOU.                          10:48

16         BRIEF RECESS WHILE WE BRING IN THE JURY.

17         (WHEREUPON, A BRIEF RECESS WAS HELD.)

18         (JURORS ENTER COURTROOM.)

19         **THE COURT:**  GOOD MORNING, MEMBERS OF THE JURY.  WE

20  ARE READY TO PROCEED WITH THE OPENING STATEMENTS AT THIS TIME.  10:52

21         I DID RECEIVE A NOTE FROM ONE JUROR AFTER THE END OF

22  THE DAY LAST TIME CONCERNING AN URGENT MATTER THAT THE JUROR

23  NEEDS TO ATTEND TOMORROW; SO TO ACCOMMODATE THAT JUROR, WE'RE

24  NOT HAVING COURT TOMORROW.  SO JUST THIS WEEK, IT WILL BE

25  WEDNESDAY AND FRIDAY.                                           10:53

```
 1              AS I INDICATED, THE COURT IS GOING TO BE ATTENDING A

 2   NINTH CIRCUIT MATTER NEXT WEEK; SO WE'LL NOT HAVE TRIAL NEXT

 3   WEEK.  WE'LL THEN RESUME ON AUGUST 5TH AND GO CONTINUOUSLY

 4   UNTIL THE TRIAL IS DONE.

 5              BUT BECAUSE OF THE HIATUS NEXT WEEK AND TOMORROW, I    10:53

 6   ANTICIPATE THAT THE TRIAL ITSELF WILL GO INTO THE WEEK OF

 7   AUGUST 11TH.  BUT BASED ON THE NUMBER OF HOURS BOTH SIDES HAVE

 8   AVAILABLE, IT WILL END THAT WEEK, BARRING SOME UNFORESEEN

 9   DISRUPTION IN THE TRIAL.  THEN IT WILL BE IN YOUR HANDS TO

10   DELIBERATE.  YOU'VE GONE THROUGH THAT PROCESS, SO YOU HAVE A    10:53

11   GOOD IDEA HOW THAT OPERATES.

12              WHAT I WANTED TO ASK -- AND I ASKED ONE OF YOUR

13   COLLEAGUES EARLIER THIS MORNING, JUST BASED ON A NOTE SHE HAD

14   SUBMITTED TO THE COURT -- I WANT TO ASK THIS TO ALL OF YOU,

15   THOUGH.  I KNOW THIS HAS BEEN A TREMENDOUS BURDEN ON ALL OF     10:54

16   YOU.  I SAID THAT THE LAST TIME.  I UNDERSTAND ALSO THAT

17   CONTINUING ON IS GOING TO BE A BURDEN AND A HARDSHIP.

18              IF ANYONE HAS ANY PARTICULAR HARDSHIP GOING FORWARD,

19   GIVEN THE COURT'S PROJECTION OF WHERE WE GO, I'D LIKE TO KNOW

20   ABOUT IT.  I'M GOING TO GIVE YOU THAT OPPORTUNITY TO LET THE    10:54

21   COURT KNOW ABOUT IT.  WE'LL DO THE SAME THING AS WITH THE OTHER

22   JUROR; THAT IS, WE'LL MET WITH YOU AND DISCUSS IT.

23              I'M NOT SUGGESTING THAT EVEN IF YOU DO, THAT WE'RE

24   GOING TO BE ABLE TO LET YOU GO AT THIS POINT, BUT I'D LIKE TO

25   KNOW ABOUT ANY HARDSHIP AT THIS POINT BEFORE WE BEGIN.         10:54
```

1      SO I GUESS MY QUESTION TO YOU IS, IS THERE ANYONE

2 THAT DOES ENVISION A HARDSHIP THAT YOU'D LIKE TO DISCUSS WITH

3 THE COURT AND THE LAWYERS OUTSIDE OF THE PRESENCE OF EVERYBODY

4 ELSE AND THE PUBLIC?

5      I SEE NO HANDs.  WE WILL PROCEED.                      10:54

6      AND I GUESS I SHOULD MENTION, ALL OF THE PRELIMINARY

7 INSTRUCTIONS THAT I READ AT THE BEGINNING OF THIS CASE, AND I

8 REREAD SEVERAL OF THEM A FEW WEEKS AGO, CONTINUE TO APPLY.

9 MOST NOTABLY, DURING OPENING STATEMENTS.  OPENING STATEMENTS

10 ARE NOT EVIDENCE.  THIS IS SIMPLY COUNSEL'S OPPORTUNITY TO      10:55

11 EXPLAIN TO YOU WHAT THEY EXPECT THE EVIDENCE IS GOING TO SHOW

12 IN THIS FINAL PHASE OF THE TRIAL.  YOU ARE NOT TO TAKE ANYTHING

13 THAT THEY SAY AS EVIDENCE.

14      COUNSEL MAY MAKE OBJECTIONS.  OF COURSE, THE COURT'S

15 RULINGS ON THOSE OBJECTIONS SHOULD NOT INFLUENCE ANYTHING, AND    10:55

16 ANYTHING THAT THE COURT SUSTAINS AS AN OBJECTION IS NOT TO BE

17 CONSIDERED IN ANY EVENT.

18      SO WITH THOSE ADMONITIONS IN MIND, MR. PRICE, I

19 UNDERSTAND YOU'RE GOING TO BE MAKING THE OPENING STATEMENT FOR

20 MATTEL.                                                         10:55

21      **MR. PRICE:**  YES.

22      **THE COURT:**  THE ESTIMATE OF BOTH PARTIES IS THAT

23 THEIR OPENINGS WILL BE ABOUT TWO HOURS IN LENGTH EACH.  WE'LL

24 TAKE A LUNCH BREAK IN-BETWEEN THE OPENINg STATEMENTS.  SO WE'LL

25 START NOW AT FIVE TO 11:00.  AT FIVE TO 1:00 MR. PRICE WILL BE    10:56

5410

```
 1   DONE.  WE'LL THEN TAKE A LUNCH BREAK AND MR. NOLAN WILL BE

 2   MAKING HIS TWO-HOUR OPENING STATEMENT.

 3              VERY WELL, COUNSEL.  YOU MAY PROCEED.

 4              OPENING STATEMENT - PLAINTIFF

 5         MR. PRICE:  GOOD MORNING, LADIES AND GENTLEMEN OF THE   10:56

 6   JURY.

 7              I GUESS THE KEY QUESTION IN THIS PART OF THE CASE

 8   THAT YOU'RE GOING TO BE DECIDING IS SORT OF A VARIANCE OF THAT

 9   QUESTION:  DOES CRIME PAY?

10              BECAUSE THE QUESTION --                            10:56

11         MR. NOLAN:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

12         THE COURT:  OVERRULED.  YOU MAY PROCEED.

13         MR. PRICE:  THE QUESTION YOU'RE GOING TO BE ASKED IN

14   THIS PROCEEDING IS WHETHER OR NOT MGA AND MR. LARIAN GET TO

15   KEEP THE PROFITS THAT THEY HAVE MADE, TO THE TUNE OF HUNDREDS  10:56

16   OF MILLIONS OF DOLLARS, AS A RESULT OF THE WRONGDOINGS THAT YOU

17   HAVE ALREADY FOUND THAT THEY HAVE COMMITTED.

18              YOU SPENT A LONG TIME SITTING HERE LISTENING TO

19   EVIDENCE AND YOU SPENT A LONG TIME DELIBERATING, AND AT THE END

20   OF ALL THAT -- IF WE COULD PUT UP 11.4 -- YOU DELIVERED A      10:57

21   VERDICT LAST WEEK.  THE VERDICT CONCLUDED THAT MGA AND

22   MR. LARIAN HAD BASICALLY BOTH DONE THE SAME THING IN TERMS OF

23   THE VERDICT YOU CAME BACK WITH, WHICH IS THAT THEY

24   INTENTIONALly INTERFERED WITH CONTRACTUAL RELATIONS AND AIDED

25   AND ABETTED THE BREACH OF FIDUCIARY DUTY, AIDED AND ABETTED THE  10:57
```

```
 1   BREACH OF THE DUTY OF LOYALTY, AND ENGAGED IN CONVERSION.

 2           AND ONE OF THE THINGS YOU FOUND, IN SAYING THAT BOTH

 3   OF THEM AIDED AND ABETTED THE BREACH OF THE FIDUCIARY DUTY, FOR

 4   EXAMPLE, IS THAT THERE WAS CONFIDENTIAL INFORMATION THAT CARTER

 5   BRYANT HAD WHILE HE WAS AT MATTEL, THE CREATION OF BRATZ,          10:57

 6   COMING UP WITH THE BRATZ IDEA, CREATING THE BRATZ CHARACTERS,

 7   GIVING THEM LIFE, PUTTING THEM ON PAPER.  AND WITH THE AID OF

 8   MR. LARIAN AND MGA, ALL OF THAT CONFIDENTIAL INFORMATION WAS

 9   DELIVERED TO MGA.

10           AS A RESULT OF THAT WRONGFUL CONDUCT, AS I SAID, MGA       10:58

11   AND ISAAC LARIAN HAVE REAPED THE BENEFITS.  THEY HAVE BASICALLY

12   MADE HUNDREDS OF MILLIONS OF DOLLARS.  AND THE QUESTION IS

13   WHETHER OR NOT THEY GET TO KEEP THAT ILL-GOTTEN GAINS.

14           NOW, LET ME GIVE YOU A LITTLE CONTEXT SO YOU CAN KIND

15   OF UNDERSTAND WHAT THE EFFECT OF THESE WRONGDOINGS WAS.           10:58

16           REMEMBER MGA, IN THE 2000 AND 2001 TIME FRAME, YOU

17   RECALL MR. LARIAN'S TESTIMONY THAT IN 2000 THEY HAD LOST MONEY.

18   MR. LARIAN HIMSELF HAD NOT TAKEN DISTRIBUTIONS OUT, I THINK HE

19   SAID, FROM MGA -- HE WAS A SHAREHOLDER AND YOU'RE ENTITLED TO

20   TAKE OUT PROFITS.  BUT HE HAD NOT DONE THAT AS OF 2000/2001.      10:58

21   HE SAID HE HAD A $500,000 SALARY.  NOT A BAD SALARY.  BUT

22   THAT'S WHERE MGA WAS BEFORE BRATZ, BEFORE THE WRONGDOING THAT

23   YOU HAVE FOUND.

24           NOW, WHAT HAPPENED SINCE THEN?

25           AND YOU'RE GOING TO HEAR TESTIMONY FROM A GENTLEMAN        10:59
```

1   NAMED MIKE WAGNER, A CPA, WHO HAS TESTIFIED AS AN EXPERT IN

2   COURT MORE THAN ONE HUNDRED TIMES.  HE LOOKED AT MGA'S RECORDS

3   AND HE MADE SOME CONCLUSIONS FROM THEM, AND ONE OF THEM IS HE

4   LOOKED AT MGA'S GROSS REVENUES FROM 1999 TO 2006.  AND YOU

5   REMEMBER IN 2000 THAT WAS THE YEAR WHERE, ALTHOUGH WE HAVE          10:59

6   THOSE GROSS REVENUES, MGA DIDN'T MAKE MONEY.  THEY LOST MONEY.

7   AND IN 2001 THEIR REVENUES GO UP A LITTLE.

8         AND YOU RECALL THE TESTIMONY IS THAT BRATZ CAME OUT

9   IN THE UNITED STATES TOWARDS THE END OF THAT YEAR.  SO IT WAS

10  JUST GETTING STARTED.  SO THIS IS REALLY MGA PRIOR TO THE          10:59

11  WRONGDOING THAT YOU HAVE FOUND OCCURRED, PRIOR TO THEM INDUCING

12  MR. BRYANT TO GIVE OVER THIS CONFIDENTIAL INFORMATION, THIS

13  MARKETABLE IDEA, THE BRATZ.

14        THEN WHAT HAPPENS IS BETWEEN 2001 AND 2002, YOU SEE

15  THAT THE GROSS REVENUES ALMOST DOUBLE; WE'RE NOW OVER $200         11:00

16  MILLION.  AND THEN BETWEEN 2002 AND 2003, IT ALMOST QUADRUPLES,

17  BETWEEN TWO HUNDRED MILLION AND SIX HUNDRED MILLION DOLLARS.

18  AND YOU CAN SEE, HERE IS PRE-BRATZ, PRE-WRONGDOING, AND THIS IS

19  WHAT HAPPENS AFTER THE WRONGDOING, BETWEEN 2002 AND 2006, WHERE

20  THE REVENUES PER YEAR APPROACH $800 MILLION.                       11:00

21        NOW, YOU MIGHT ASK YOURSELF, I'VE BEEN SAYING PRE-

22  BRATZ VERSUS BRATZ.  WELL, IS THIS REALLY THE EFFECT OF BRATZ,

23  THIS GROWTH IN REVENUE?

24        ANOTHER WAY TO LOOK AT IT IS TO LOOK AT REVENUE BY

25  PRODUCT.  WHAT KIND OF PRODUCT WAS MGA SELLING IN THESE YEARS?     11:00

1          MR. WAGNER DID THAT AS WELL.  HE CALCULATED WHAT WAS

2     THE SOURCE OF MGA'S REVENUE IN THE YEARS FROM 2001 TO 2007.

3     AND IF YOU LOOK HERE, YOU'LL SEE, THERE'S THINGS LIKE

4     SPIDERMAN, SHREK; THAT'S WHERE MGA IS LICENSED TO MAKE CERTAIN

5     PRODUCTS.  YOU SEE LITTLE TIKES HERE AT 5.2 PERCENT; THAT'S A          11:01

6     LITTLE BLIP HERE; THAT WAS A COMPANY THAT WAS BOUGHT BY MGA IN

7     2006 WITH THE PROFITS THAT MGA HAD MADE.

8          NOW, WHAT HAS BEEN DRIVING ALL OF THOSE PROFITS?

9          WHAT IS RESPONSIBLE FOR THE CHANGE IN MGA SINCE 2001?

10          WELL, HERE YOU CAN SEE THAT ALMOST 80 PERCENT OF THE          11:01

11     REVENUE THAT MGA HAS HAD SINCE THE WRONGDOING THEY COMMITTED,

12     ALMOST 80 PERCENT OF THAT, IS AS A RESULT OF BRATZ.

13          BY THE WAY, I'M NOT TALKING ABOUT, AT THIS POINT,

14     JUST THE BRATZ DOLLS.  BECAUSE HAVING GOTTEN BRATZ WRONGFULLY,

15     THERE ARE INDIRECT PROFITS YOU ALSO GET WHEN YOU GET SOMETHING          11:02

16     LIKE THAT.  YOU CAN ALSO DO BRATZ PILLOWCASES.  YOU CAN DO

17     BRATZ TVS.  MGA LICENSES OTHER COMPANIES TO MAKE BRATZ RELATED

18     PRODUCTS BECAUSE MGA SAYS IT HAS THE RIGHTS TO BRATZ.

19          IT GOES TO A COMPANY AND SAYS 'I'M GOING TO LET YOU

20     MAKE A BRATZ BICYCLE, BUT YOU WILL HAVE TO PAY ME REVENUES          11:02

21     BECAUSE I, MGA, HAVE THE RIGHT TO MAKE THAT BRATZ BICYCLE.'

22     AND THEY MAY EARN MONEY THAT WAY AS WELL, THROUGH ALL OF THE

23     BRATZ PRODUCTS; SO THERE'S BOTH DIRECT PROFITS FROM THE DOLLS

24     AND THE INDIRECT PROFITS.  AND WE'RE TALKING ABOUT 80 PERCENT.

25          NOW, IF YOU WANT TO LOOK AT MGA, THE EFFECT OF THE          11:02

1    WRONGDOING ON THIS COMPANY, YOU CAN LOOK AT NOT JUST THE

2    REVENUE PERCENTAGES, BUT ALSO WHAT HAS MADE THE COMPANY

3    PROFITABLE; THAT IS, WHERE THE PROFITS COME FROM.

4         MR. WAGNER ANALYZED THAT AS WELL.  IF YOU LOOK AT

5    MGA'S PROFITS AND COMPARE THE BRATZ PROFITS TO THE PROFITS --      11:02

6    NOT THE REVENUE, BUT THE PROFITS -- OF ALL OF THE OTHER

7    PRODUCTS MGA MAKES OR HAS MADE, YOU CAN SEE IN 2001, THERE'S A

8    SLIGHT PROFIT HERE IN THE BLUE PART HERE, WHICH IS THE BRATZ

9    PROFITS, AND THERE'S A LOSS FOR ALL OTHER ITEMS THAT MGA MAKES.

10        IN 2002, YOU SEE THE BRATZ PROFITS ARE BETWEEN 50 AND      11:03

11   100 MILLION.  OUT OF ALL OF THE OTHER PRODUCTS THEY MAKE,

12   THERE'S A LOSS.  YOU CAN SEE THE TREND, EACH AND EVERY YEAR.

13   EXCEPT FOR 2005.  IN 2005, THERE IS SOME PROFIT MADE ON NON

14   BRATZ PRODUCTS.  BUT IF YOU LOOK CLOSER AT 2001, 2006, IN

15   TOTAL, THEY LOST SOMEWHERE AROUND $60 MILLION ON NON BRATZ      11:03

16   PROFITS AND NON BRATZ PRODUCTS.  ALL OF THEIR PROFITS IN THIS

17   TIME FRAME, ALL OF THEIR PROFITS, IS FROM EXPLOITING THE

18   WRONGDOING WHICH YOU HAVE FOUND THAT THEY ENGAGED IN.

19        AS TO MR. LARIAN HIMSELF, HOW HAS HE BENEFITED FROM

20   THE WRONGDOING?      11:04

21        WELL, REMEMBER, WE'RE SAYING THE EVIDENCE WAS THAT

22   PRIOR TO BRATZ, HE WAS MAKING $500,000 A YEAR.  HE WASN'T

23   REALLY GETTING DISTRIBUTIONS FROM THE COMPANY.  WE'VE LOOKED AT

24   DISTRIBUTIONS THAT HE HAS GOTTEN FROM THE COMPANY.  HE'S A

25   SHAREHOLDER.  HE GETS TO TAKE PROFITS OUT OF THE COMPANY.  HE'S      11:04

1    AN 81.8 PERCENT SHAREHOLDER, I BELIEVE, CURRENTLY.

2         AND IF YOU LOOK AT THE BRATZ RELATED DISTRIBUTIONS,

3    MONEY HE HAS TAKEN OUT OF MGA, IT AMOUNTS TO $381,696,604;

4    ALMOST $382 MILLION, SINCE BRATZ.

5         IN FACT, IF YOU LOOK OVERALL WHAT HAD BEEN MGA'S           11:05

6    PROFITS AS A RESULT OF BRATZ AND WHAT HAS BEEN MR. LARIAN'S

7    FINANCIAL BENEFIT, MGA'S PROFITS THROUGH JUNE 2008 -- AND SOME

8    OF THIS IS BASED ON PROJECTION BECAUSE WE HAVE ACTUALS UP TO A

9    CERTAIN AMOUNT AND THEN YOU HAVE TO PROJECT -- THEIR PROFITS

10   FROM BRATZ ARE SOMEWHERE IN THE NEIGHBORHOOD OF $816 MILLION.  11:05

11        MR. LARIAN'S FINANCIAL BENEFITS, THERE ARE TWO

12   COMPONENTS; ONE COMPONENT IS THE MONEY HE HAS ACTUALLY TAKEN

13   OUT; THAT IS, THE $381 MILLION OR SO HE HAS TAKEN OUT.  BUT HE

14   HAS ANOTHER BENEFIT, AND THAT IS HE'S AN OWNER OF THIS COMPANY

15   WHICH IS ONGOING, AND THE COMPANY HAS A VALUE.  YOU CAN SELL    11:05

16   THE COMPANY RIGHT NOW FOR A CERTAIN AMOUNT OF MONEY.  AND THE

17   QUESTION IS WHAT'S 81.2 PERCENT OF THAT?  WHAT'S THE VALUE

18   THAT'S BEEN CREATED AT MGA BECAUSE OF THEIR EXPLOITATION OF

19   BRATZ?

20        THAT NUMBER IS SOMEWHERE IN THE SIX HUNDRED MILLION        11:06

21   RANGE, AND MR. WAGNER WILL TESTIFY ABOUT THAT IN MORE DETAIL

22   LATER.

23        BUT MR. LARIAN'S OVERALL FINANCIAL BENEFIT AS A

24   RESULT OF EXPLOITING BRATZ, EXPLOITING MR. BRYANT'S IDEA, THE

25   CONFIDENTIAL IDEA AND CONCEPT HE CAME UP WITH, THE CHARACTERS,  11:06

```
 1   IS ABOUT $987,245,824.

 2         MR. NOLAN:  YOUR HONOR, I'M GOING TO ASSERT AN

 3   OBJECTION TO THIS LINE OF ARGUMENT.

 4         THE COURT:  WHAT'S YOUR OBJECTION?

 5         MR. NOLAN:  MAY WE APPROACH SIDE-BAR?              11:06

 6         THE COURT:  YOU MAY.

 7         (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

 8         MR. NOLAN:  YOUR HONOR, MR. PRICE IS INTENTIONALLY

 9   CONFLATING THE WRONGDOING DISCUSSION WITH COPYRIGHT DAMAGES.

10   THIS IS THE VERY POINT THAT WE URGED THE COURT TO BE CAREFUL  11:07

11   ABOUT WITH RESPECT TO THE MEASURE OF DAMAGES.  HE IS ARGUING

12   THAT THIS JURY SHOULD IGNORE, BASED ON WRONGDOING FINDINGS ON

13   THE STATE LAW CLAIMS -- THAT THEY SHOULD BE AWARDING THIS AND

14   THAT THIS IS A PROPER MEASURE OF DAMAGES.

15         THESE ARE COPYRIGHT DAMAGES, YOUR HONOR.  IF THIS IS  11:07

16   THE ROUTE THEY ARE GOING, THIS IS PREEMPTED BY THE COPYRIGHT

17   ACT.  THIS IS CREATING A VERY FALSE AND VERY MISLEADING

18   PRESENTATION TO THIS JURY.

19         HE STARTS OFF BY MAKING THE REFERENCE TO THE TERM

20   'CRIME DOESN'T PAY.'  THIS IS WHAT THEY ARE TRYING TO INFLUENCE  11:07

21   THE JURY ON.  IT'S PREEMPTED BY COPYRIGHT EMPHASIS.  IT'S

22   TOTALLY INAPPROPRIATE, ARGUING BASED ON FINDINGS OF THE JURY,

23   CONTEMPLATING THE STATE TORT CLAIMS.

24         IF THIS IS GOING TO CONTINUE, YOUR HONOR, I'M GOING

25   TO MAKE A MOTION FOR A MISTRIAL.                         11:08
```

1        **THE COURT:**  COUNSEL?

2        **MR. PRICE:**  THAT'S WRONG.  WE ARE ENTITLED TO THESE

3   DAMAGES FOR BREACH OF FIDUCIARY CLAIMS.  THAT'S WHAT I'M

4   SAYING -- BECAUSE OF THE CONFIDENTIAL INFORMATION WHICH CARTER

5   BRYANT GAVE TO MGA AND LARIAN ABOUT BRATZ, ABOUT THE CONCEPT,         11:08

6   ABOUT THE CHARACTERS; INCLUDING THE DOLLS, BUT MAINLY

7   CONFIDENTIAL INFORMATION -- AS A RESULT OF THAT, THEY HAVE BEEN

8   ABLE TO EXPLOIT THAT INFORMATION AND MAKE ALL OF THIS MONEY.

9        THAT IS NOT PREEMPTED BECAUSE THERE'S ADDITIONAL

10  ELEMENTS OF FIDUCIARY DUTY THAT IS -- THIS INFORMATION WAS         11:08

11  CONFIDENTIAL.  THEY AIDED AND ABETTED BREACH OF THAT FIDUCIARY

12  DUTY.  IT IS OUR POSITION THAT THEY MUST DISGORGE THEIR PROFITS

13  AS A RESULT OF THAT.

14        **THE COURT:**  THAT WAS THE ARGUMENT MADE THIS MORNING.

15  IT SEEMS TO MAKE SENSE.  MY SENSE IS IT SHOULD NOT CONTAIN --         11:09

16  GIVEN THAT -- I SENSE YOUR CALCULATION OF DAMAGES, THE

17  $10,000 -- I THINK MR. PRICE IS CORRECT THAT THE BREACH OF

18  FIDUCIARY DUTY COULD CONCEIVABLY INCLUDE DAMAGES THAT

19  ENCOMPASSED ALL OF THE MONEY MADE AND ALL OF THE BENEFITS TO

20  MR. LARIAN IN THE ENSUING YEARS.         11:09

21        I'M NOT SEEING HOW THIS IS IMPROPER AT ALL.

22        AND THE REFERENCE TO CRIME, HE IS SUGGESTING THAT

23  BREACHING A FIDUCIARY DUTY AND COPYRIGHT INFRINGEMENT ARE

24  CRIMES.  IT'S A CHARACTERIZATION.

25        IT'S A LITTLE ARGUMENTATIVE, BUT IT'S NOT --         11:09

1    **MR. NOLAN:**  I UNDERSTAND THE COURT'S RULING.  I'VE

2  MADE MY OBJECTION.  I'VE PRESERVED THE ISSUE, I THINK.

3         **THE COURT:**  THE MOTION FOR MISTRIAL IS DENIED.

4         (SIDE-BAR PROCEEDINGS CONCLUDED.)

5         **MR. PRICE:**  WE WERE TALKING ABOUT MGA PROFITS AND          11:10

6  MR. LARIAN'S FINANCIAL BENEFIT.  WHAT WE'LL BE ASKING YOU TO DO

7  IN THIS PHASE IS TO SAY YOU CAN'T BENEFIT FROM THE WRONGDOING

8  THAT YOU, THE JURORS, HAVE FOUND THEY COMMITTED IN GETTING THE

9  BRATZ CONCEPTS, THE CONFIDENTIAL INFORMATION ABOUT BRATZ, THE

10  BRATZ CHARACTERS, THE BRATZ DRAWINGS.                              11:10

11         THEY CANNOT PROFIT FROM THAT, OR ELSE CRIME PAYS.

12         THAT'S ONE OF THE BIG ISSUES IN THIS PHASE.

13         NOW, IN ADDITION TO MAKING YOUR FINDINGS ABOUT

14  MR. LARIAN AND MGA AIDING AND ABETTING THE BREACH OF FIDUCIARY

15  DUTY, AIDING AND ABETTING THE BREACH OF LOYALTY AND CONVERSION   11:10

16  AND INTERFERENCE WITH THE CONTRACT, IN ADDITION, YOU HAD TO

17  SPEND A LOT OF TIME CHECKING YES OR NO TO WHETHER OR NOT

18  CERTAIN DRAWINGS WERE DONE WHILE MR. BRYANT WAS AT MATTEL AND,

19  THEREFORE, WHETHER OR NOT THEY ARE MATTEL DRAWINGS.  I'M SURE

20  YOU SPENT A LOT OF TIME TALKING ABOUT THIS, BECAUSE THERE WERE   11:11

21  A LOT OF BOXES TO CHECK.

22         THE REASON YOU WERE ASKED TO DO THAT IS THAT THERE IS

23  ANOTHER CLAIM THAT WE'RE MAKING HERE, WHICH REQUIRED, FIRST OF

24  ALL, THAT FACTUAL DETERMINATION BY YOU; AND THAT IS A CLAIM

25  THAT IN ADDITION TO MGA AND LARIAN AIDING AND ABETTING THESE     11:11

```
 1    BREACHES OF FIDUCIARY DUTY AND DUTY TO LOYALTY, IN ADDITION TO

 2    THESE WRONGS, THERE'S ANOTHER WRONG, AND THAT IS THAT THEY ARE

 3    SELLING DOLLS AND HAVE SOLD DOLLS WHICH INFRINGE MATTEL'S

 4    RIGHTS IN THE DRAWINGS THAT YOU HAVE FOUND THAT MATTEL NOW

 5    OWNS.                                                              11:11

 6          BASICALLY THE QUESTION YOU'RE GOING TO BE ASKED TO

 7    ANSWER IN THIS PHASE IS WHETHER OR NOT THE BRATZ DOLLS, IN

 8    SUBSTANCE, OR ARE SUBSTANTIALLY SIMILAR TO THE BRATZ DOLLS

 9    WHICH MGA MADE.

10          THE QUESTION IS, YOU LOOK AT THE DRAWINGS, AND YOU        11:12

11    DECIDE, DO THESE BRATZ DOLLS -- ARE THEY SUBSTANTIALLY SIMILAR

12    TO THE DRAWINGS?  NOT SUBSTANTIALLY IDENTICAL OR IDENTICAL,

13    BECAUSE YOU CAN ALWAYS MAKE CHANGES.

14          NOW, WE SPENT -- I LOST COUNT OF THE WEEKS -- A LOT

15    OF WEEKS HERE, PRESENTING EVIDENCE ON THE ISSUE OF THESE         11:12

16    DRAWINGS AND WHEN THEY WERE MADE AND WHO OWNED THEM.  WE DID

17    THAT FOR A REASON; BECAUSE OF THEIR VALUE, BECAUSE MATTEL WILL

18    SHOW THAT THE DOLLS LOOKED LIKE THOSE DRAWINGS, OR

19    SUBSTANTIALLY SIMILAR.

20          HOWEVER, AFTER SPENDING ALL THAT TIME AND MGA SAYING      11:12

21    NO, THE DRAWINGS ARE THEIRS, WHAT THEY WILL TELL YOU IN THIS

22    PHASE -- AND ACTUALLY THERE HAS ALREADY BEEN SOME TESTIMONY

23    ABOUT THAT -- IS THAT, OH, THOSE DRAWINGS ARE WORTHLESS BECAUSE

24    OUR DOLLS DON'T LOOK LIKE THEM AT ALL.

25          IN FACT, THEY ARE GOING TO TESTIFY -- IN FACT, THEY       11:12
```

```
 1   ALREADY HAVE TESTIFIED -- FOR EXAMPLE, MR. LARIAN, IF YOU
 2   RECALL, SAID THAT CARTER BRYANT'S NOT THE CREATOR OF BRATZ.
 3   HE'S NOT THE INVENTOR OF BRATZ.  HE ALSO TESTIFIED -- HE WAS
 4   ASKED, IS THERE ANY OF THE DRAWINGS THAT YOU SEE HERE IN
 5   EXHIBIT 302 -- THAT WAS THE PITCH MATERIALS, DO YOU RECALL,     11:13
 6   THAT MR. BRYANT -- THAT COLLECTION OF DRAWINGS MR. BRYANT GAVE
 7   TO MGA AND MR. LARIAN -- ARE ANY OF THE DRAWINGS SIMILAR IN THE
 8   OVERALL LOOK TO ANY BRATZ DOLL THAT YOU ARE FAMILIAR WITH?
 9        AND HIS ANSWER WAS NO.
10        THAT IS, IN FACT, MGA'S POSITION IN THIS PHASE; THAT     11:13
11   THOSE DRAWINGS HAVE NO VALUE WHATSOEVER BECAUSE THE BRATZ DOLLS
12   DON'T HAVE ANYTHING TO DO WITH THEM.
13        IN FACT, YOU HEARD THE INTERROGATORIES IN THE FIRST
14   PHASE, THAT'S WRITTEN QUESTIONS WE WRITE UNDER OATH TO THE
15   OTHER SIDE, AND THE OTHER SIDE GIVES YOU AN ANSWER UNDER OATH     11:13
16   IN WRITING -- THEY HAVE ACTUALLY ANSWERED INTERROGS WHERE MGA'S
17   POSITION IS THAT NEITHER THE FIRST GENERATION OF BRATZ DOLLS
18   NOR ANY SUBSEQUENT BRATZ PRODUCTS WERE BASED ON ANY
19   CARTER BRYANT DESIGNS CREATED ON OR BEFORE OCTOBER 19, 2000.
20        THAT WAS MR. BRYANT'S LAST DAY AT MATTEL.     11:14
21        SO MGA'S POSITION HERE IS THAT ALL THOSE DRAWINGS YOU
22   SAW, EVERY CHECKMARK YOU MADE, THAT NONE OF THOSE DRAWINGS HAVE
23   REALLY ANYTHING TO DO WITH ANY BRATZ DOLLS OR BRATZ PRODUCTS.
24        WHAT WE'RE GOING TO SHOW YOU IS NOT ONLY ARE THE
25   BRATZ DOLLS SUBSTANTIALLY SIMILAR AND BASED ON THESE DRAWINGS,     11:14
```

1   THE DRAWINGS YOU HAVE FOUND MATTEL OWNS, BUT MGA HAS SUED OTHER

2   COMPANIES TO PREVENT THOSE COMPANIES FROM MAKING DOLLS THAT

3   LOOKED LIKE BRATZ BASED ON THE VERY DRAWINGS THAT YOU HAVE SAID

4   THAT MATTEL NOW OWNS.

5          NOW, PART OF WHAT YOU'RE GOING TO BE DOING IN THIS          11:14

6   PHASE IS LOOKING AT THE DRAWINGS.  YOU'RE GOING TO SEE A LOT OF

7   DOLLS; WE HAVE 12 AND A HALF HOURS IN THIS PHASE, OF EVIDENCE,

8   SO ALL THAT'S NOT GOING TO BE PUT IN NICE LITTLE PINK BOWS.

9   THE EVIDENCE WILL COME IN SOMEWHAT HAPHAZARDLY AND PERHAPS

10  SOMETIMES WITHOUT A GREAT DEAL OF EXPLANATION.  BUT WE ARE          11:15

11  GOING TO PUT IN THE EVIDENCE WE NEED TO, INCLUDING THESE DOLLS.

12  AND THERE ARE A LOT OF THEM; THERE ARE 800, 900, DOLLS AND

13  ACCESSORIES, AND THINGS LIKE THAT, AND IT'S GOING TO BE LIKE A

14  TOY STORE BACK THERE IN THE JURY ROOM IN THIS.

15         SO YOU'RE GOING TO SEE SOME WITNESSES UP THERE JUST          11:15

16  TO SAY 'YES, THIS IS A DOLL; YES, THIS IS A DOLL.'  AND IT'S

17  NOT GOING TO BE TERRIBLY EXCITING, I'M AFRAID.  AND BECAUSE WE

18  HAVE A SHORT AMOUNT OF TIME, WE'LL TRY TO DO IT AS

19  EXPEDITIOUSLY AS POSSIBLE.  BUT ONE THING YOU'RE GOING TO SEE

20  ARE THE DOLLS THEMSELVES.  AND YOU'RE GOING TO SEE NOT JUST THE    11:15

21  DOLLS BUT YOU'LL ALSO SEE THE DRAWINGS WHICH YOU HAVE SAID WE

22  OWN.  AND ONE THING YOU'LL BE ASKED IS ARE THESE DOLLS SIMILAR

23  OR SUBSTANTIALLY SIMILAR TO THE DRAWINGS?

24         I'LL JUST SHOW YOU A FEW EXAMPLES OF THIS.

25         FOR EXAMPLE, YOU MIGHT REMEMBER THE SASHA DOLL.  THIS        11:16

```
 1   WAS ORIGINALLY CALLED HALLIDAE.  AND WE'RE GOING TO PRESENT
 2   EVIDENCE OF THE DRAWING, WHICH MATTEL OWNS, AND YOU'LL COMPARE
 3   THAT TO THE DOLL ITSELF.  AND RIGHT HERE WE HAVE A SLIDE WHERE
 4   WE HAVE THE DOLL IN ITS PACKAGING.  BUT IF YOU TAKE IT OUT OF
 5   ITS PACKAGING, YOU'LL SEE, HERE IS THE SASHA DOLL, AND HERE IS      11:16
 6   THE DRAWING, AND YOU CAN COMPARE THE LIPS, THE NOSE, THE EYES,
 7   THE SHAPE OF THE FACE.
 8           IN FACT, IN THIS FIRST WAVE OF BRATZ DOLLS, NOT ONLY
 9   WERE THEY BASED ON THE DRAWINGS, BUT EVEN THE MASCOTS WERE
10   BASED ON THE DRAWINGS.  YOU REMEMBER, THERE'S THE RABBIT           11:16
11   HIP-HOP AND THERE'S A RABBIT HIP-HOP RIGHT THERE.  THIS IS THE
12   HIP-HOP DOLL.  AND THE DOLL THAT WAS MADE FROM THE SASHA
13   DRAWING, YOU SEE ALSO THE HIP-HOP WITH THE RABBIT.  YOU SEE THE
14   HIP-HOP HERE.
15           AND THE QUESTION ISN'T, IF I'M AN ENGINEER ASSIGNED        11:17
16   DOING MEASUREMENTS, ARE THESE SUBSTANTIALLY SIMILAR.
17           THE QUESTION IS WOULD A CONSUMER -- AN AVERAGE
18   PERSON, MAYBE A LITTLE GIRL LOOKING AT THIS -- SAY THAT THESE
19   TWO THINGS LOOK SUBSTANTIALLY SIMILAR.
20           AND I BELIEVE THE CONCLUSION IS GOING TO BE YES.           11:17
21           LET'S LOOK AT THE JADE DOLL.
22           HERE I'M GOING TO SHOW YOU -- BEFORE THAT, HERE WE
23   HAVE A COMPARISON OF TWO OF THE DRAWINGS WITH THE SASHA DOLL.
24   WE HAVE THE PITCH DRAWING, WHICH, WE HAVE A DRAWING WHICH YOU
25   SAID WE OWN ALSO, WHICH WAS THE FINAL FASHION DRAWING.  YOU        11:17
```

1    RECALL THAT.  AND THEN LATER MGA COMES OUT WITH SASHA, WHICH IT

2    SAYS IS NOT BASED AT ALL ON THOSE DRAWINGS AND LOOKS NOTHING

3    LIKE IT.

4            WE'RE GOING TO ASK YOU TO CONCLUDE THEY ARE

5    SUBSTANTIALLY SIMILAR.                                              11:17

6            LET'S GO TO THE JADE DOLL.

7            HERE ON THE FAR RIGHT IS THE JADE DOLL, OUT OF ITS

8    PACKAGING.  IT'S EXHIBIT 504.  AND WHAT YOU'LL SEE IS

9    MR. BRYANT'S PITCH MATERIALS.  REMEMBER, THIS IS THE DRAWING HE

10   PRESENTED, HE SAYS, IN SEPTEMBER OF 2000.  THIS IS A DRAWING HE    11:18

11   DID LATER, SOMETIME IN OCTOBER, BEFORE OCTOBER 19, 2000.  OF

12   COURSE, YOU DETERMINED THAT WAS DONE IN THAT TIME FRAME.

13   MATTEL OWNS THESE DRAWINGS.  THIS IS THE DOLL THEY COME OUT

14   WITH.

15           AGAIN, MGA SAYS NO SIMILARITY; IT'S NOT BASED ON           11:18

16   THESE DRAWINGS.  AND WE'RE GOING TO ASK YOU TO CONCLUDE THE

17   OBVIOUS, WHICH IS THAT THEY ARE SUBSTANTIALLY SIMILAR AND THAT

18   THERE'S COPYRIGHT INFRINGEMENT HERE.

19           LET'S LOOK AT CLOE.

20           CLOE, AGAIN, WE'RE SHOWING YOU THE PITCH DRAWING, THE      11:18

21   DRAWING MR. BRYANT DID SOMEWHAT LATER IN OCTOBER OF 2000,

22   BEFORE OCTOBER 19TH, AND THEN THE DOLL ITSELF, THE FIRST CLOE

23   DOLL, THE FIRST WAVE.  AND YOU CAN SEE, AGAIN, THE SHAPE OF THE

24   FACE.

25           DO YOU REMEMBER THE UNIQUE THING ABOUT THESE BRATZ         11:18

1    DOLLS IS THE OVERSIZED HEAD, THE OVERSIZED EYES, THE RELATIVELY

2    SMALL NOSE, THE OVERSIZED LIPS, THE BIG FEET.  WE'RE GOING TO

3    ASK YOU TO CONCLUDE THAT THEY ARE, IN FACT, SUBSTANTIALLY

4    SIMILAR.  AND NOT, AS MGA SUGGESTS, THAT THIS DOLL ON THE RIGHT

5    IS NOT BASED AT ALL ON THESE DRAWINGS WHICH WE FOUGHT SO HARD      11:19

6    OVER, OVER THE LAST FEW WEEKS.

7            LET'S LOOK AT YASMINE.

8            YASMINE WAS ORIGINALLY LUPE.  NOW, THESE LOOK

9    SOMEWHAT DIFFERENT BECAUSE OF THE HAIR STYLES, BUT IF YOU LOOK

10   AT THE SHAPE OF THE FACE, THE EYES, THE LIPS, THE PROPORTIONS.    11:19

11   YOU'LL SEE THAT, AGAIN, THE DOLL IS SUBSTANTIALLY SIMILAR TO

12   WHAT MR. BRYANT PUT DOWN ON PAPER.

13           NOW, WHEN YOU HAVE DOLLS, BY THE WAY, YOU CAN CHANGE

14   THE COLOR OF THEIR HAIR, YOU CAN CHANGE THEIR COLORING, YOU CAN

15   CHANGE THEIR CLOTHES.  BUT THAT DOESN'T CHANGE THE FACT THAT      11:19

16   IT'S SUBSTANTIALLY THE SAME DOLL.  IT'S SUBSTANTIALLY SIMILAR

17   TO THE DRAWING.

18           IN FACT, IN THE FIRST PHASE, YOU RECALL MR. NOLAN,

19   WHEN HE WAS TALKING ABOUT THE COLORING AND STUFF -- IF WE CAN

20   PUT UP 25.0 -- SAID, WITH RESPECT TO THE MASTER DRAWINGS, HE      11:20

21   SAID THAT WHETHER OR NOT YOU ADD COL {SIC} -- THIS IS SUPPOSED

22   TO BE COLOR, I BELIEVE -- OR A DIFFERENT DRESS OR YOU PUT THEM

23   IN EVENING WEAR, IT DOESN'T CHANGE THE ATTITUDE; IT DOESN'T

24   CHANGE THE CHARACTER; IT DIDN'T CHANGE THE POSE.  YOU KNOW

25   WHAT, ADDING COLOR TO ZOE DID NOT CHANGE ZOE.  ADDING COLOR TO    11:20

1    SASHA OR JADE OR YASMINE DIDN'T CHANGE THE CHARACTERS.

2         THE SAME IS TRUE HERE.  YOU'RE GOING TO BE SEEING

3    DOLLS WHERE THEY HAVE DIFFERENT CLOTHES, THEY HAVE A DIFFERENT

4    COLOR, THEY MAY HAVE DIFFERENT HAIR.  BUT IF YOU LOOK AT THE

5    FACE, IF YOU LOOK AT THE EYES, LOOK AT THE LIPS...  IF YOU LOOK        11:20

6    AT THE DISTINGUISHING BRATZ CHARACTERISTICS, YOU ARE GOING TO

7    CONCLUDE THAT ALTHOUGH THERE MAY BE MINOR DIFFERENCES, THAT THE

8    DOLLS ARE SUBSTANTIALLY SIMILAR TO THESE DRAWINGS AND, IN FACT,

9    WERE BASED ON THESE DRAWINGS.

10         IN FACT, IF YOU RECALL, MR. BRYANT'S PITCH MATERIALS        11:21

11   ACTUALLY TALKED ABOUT THIS.

12         THIS IS FROM THE 2000 PITCH MATERIAL WHERE HE SAYS,

13   'YOU CAN GIVE ZOE A NEW LOOK AT NIGHT BY CHANGING HER HAIRSTYLE

14   OR CHANGING HER PANTS OR HER SNEAKERS TO PLATFORM SANDALS;

15   THAT'S PART OF THE BRATZ DOLL EXPERIENCE.'        11:21

16         THEY ENDED UP NOT CHANGING THE HAIR, YOU RECALL, BUT

17   PART OF IT WAS YOU'RE GOING TO BE ABLE TO PUT ON DIFFERENT

18   COSTUMES AND PUT ON DIFFERENT SHOES, BUT IT'S STILL THE SAME

19   DOLL.  JUST LIKE A HUMAN BEING, YOU CAN PUT ON DIFFERENT SHOES

20   AND OUTFITS, ALTHOUGH YOU MAY THINK YOU LOOK BETTER IN ONE THAN        11:21

21   THE OTHER, IT'S STILL -- YOU'RE STILL SUBSTANTIALLY SIMILAR TO

22   YOURSELF.

23         SO THESE ARE JUST SOME QUICK COMPARISONS AND YOU'RE

24   GOING TO HAVE TIME TO LOOK AT THESE.  IF YOU WOULD JUST FOCUS

25   ON THE HEADS NOW, OF THE DOLLS, COMPARED TO MR. BRYANT'S        11:21

1    DRAWINGS.  IN FACT, YOU CAN COMPARE THOSE, ALTHOUGH WE DON'T

2    HAVE THE PHYSICAL EVIDENCE, TO THE PROTOTYPE MR. BRYANT DID,

3    WHICH YOU SAID WE OWNED.

4           THE PROTOTYPE HE DID, REMEMBER, IN 2000, WHICH YOU

5    DON'T HAVE BECAUSE IT NO LONGER EXISTS.  WELL, YOU REMEMBER,       11:22

6    MS. O'CONNOR TESTIFIED ABOUT THAT PROTOTYPE, AND WHEN SHE WAS

7    TESTIFYING, SHE WAS ACTUALLY LOOKING AT A CLOE DOLL.  IT WAS

8    EXHIBIT 1369.  IT WAS THIS DOLL THAT SHE WAS LOOKING AT.  AND

9    MR. NOLAN WAS ASKING HER QUESTIONS, AND HE ASKED HER:

10          "QUESTION:  THE BRATZ DOLL YOU'RE LOOKING AT, THE          11:22

11   FACE, IS THAT THE SAME FACE YOU SAW IN YOUR FIRST MEETING WITH

12   MR. BRYANT?"

13          HE WAS ASKING HER ABOUT THIS PROTOTYPE, WHICH

14   MR. BRYANT DESCRIBES AS FRANKENSTEIN.  AND THE ANSWER WAS:

15          "IT'S VERY SIMILAR.  I COULDN'T SAY EXACTLY THAT THE       11:22

16   COLORS WERE THE SAME, BUT IT WAS VERY SIMILAR."

17          "YOU'RE SAYING IN TERMS OF THE PAINTING ON THE FACE?"

18          SHE SAYS 'YES'; SHE SAYS 'VERY SIMILAR.'

19          THE FIRST DOLL HE PRESENTED TO THEM, WHICH WE OWN,

20   WAS VERY SIMILAR, SUBSTANTIALLY SIMILAR, IN LOOK TO THE VERY       11:23

21   FIRST CLOE DOLL.

22          SO WITH RESPECT TO CLOE, THAT INFRINGES THE PROTOTYPE

23   WHICH WE CAN ONLY RELY ON TESTIMONY BECAUSE OF IT BEING

24   SUBSTANTIALLY SIMILAR.  BUT ALSO, THOSE FACES ARE SUBSTANTIALLY

25   SIMILAR TO THE DRAWINGS.  LET'S LOOK AT CLOE, FOR EXAMPLE.        11:23

1        WHAT WE HAVE UP HERE ARE THE TWO DRAWINGS WHICH WE

2    SHOWED YOU BEFORE.  JUST FOCUS ON THE FACE.  IF YOU LOOK AT THE

3    OVERSIZED EYES, THE SHAPE OF THE EYES, THE LITTLE NOSE; THE

4    SHAPE OF THE LIPS; THE SHAPE OF THE HEAD...

5        WE'RE GOING TO ASK YOU TO CONCLUDE THAT THOSE ARE                   11:23

6    SUBSTANTIALLY SIMILAR AND THAT THOSE DOLLS INFRINGE OUR RIGHTS

7    IN THESE DRAWINGS.

8            IF YOU LOOK AT JADE.  AGAIN, I'M SHOWING YOU THE SAME

9    TWO DRAWINGS WITH THE JADE DOLL'S HEAD.  IF YOU LOOK AT THE

10   SHAPE OF THE LIPS, THE EYES, EVEN THE BANGS IN THIS CASE, WE'RE      11:23

11   GOING TO ASK YOU TO CONCLUDE WHAT I THINK YOU WILL THINK IS

12   OBVIOUS, WHICH IS THAT, YES, THESE DOLLS ARE BASED ON THESE

13   DRAWINGS AND ARE SUBSTANTIALLY SIMILAR AND WERE INTENDED TO BE

14   SUBSTANTIALLY SIMILAR.  WHICH IS ONE OF THE REASONS YOU WOULD

15   PAY CARTER BRYANT, FOR EXAMPLE, OVER $30 MILLION.                     11:24

16           LET'S GO TO SASHA, WHICH WAS PREVIOUSLY HALLIDAE.  IF

17   YOU LOOK AT THE SHAPE OF THE FACE, THE LIPS, THE EYES, THE

18   EYEBROWS, THE OVERSIZED EYES, THE OVERSIZED LIPS.  AGAIN, WE'RE

19   GOING TO ASK YOU TO CONCLUDE THEY ARE SUBSTANTIALLY SIMILAR AND

20   THAT THEY INFRINGE MATTEL'S RIGHTS TO THESE DRAWINGS AND WERE,        11:24

21   IN FACT, BASED ON THESE DRAWINGS.

22           THEN WE HAVE YASMINE.  SHE HAS A CHANGING HAIR COLOR.

23   BUT AGAIN, IF YOU LOOK AT THE SHAPE OF THE EYES, THE NOSE, THE

24   LIPS, EVEN DOWN TO THE MOLE HERE FOR YASMINE, WE'RE GOING TO

25   ASK YOU TO CONCLUDE THAT THEY ARE SUBSTANTIALLY SIMILAR AND          11:24

WEDNESDAY, JULY 23, 2008                    TRIAL DAY 27, MORNING SESSION

```
 1   INFRINGE MATTEL'S RIGHTS OF THESE DOLLS.  THESE DOLLS WERE

 2   BASED ON THE DRAWINGS AND THEY ARE SUBSTANTIALLY SIMILAR.

 3            DURING THE TRIAL, WE'LL ASK YOU TO FURTHER EXAMINE

 4   THE FACES.  IF YOU LOOK AT ONE OF THE DRAWINGS THAT MR. BRYANT

 5   DID -- IT WAS NOTARIZED IN AUGUST '99, YOU REMEMBER THAT -- IF   11:25

 6   YOU COMPARE THOSE FACE DRAWINGS TO AN ACTUAL DOLL -- LIKE, HERE

 7   WE HAVE LUPE, WHICH LATER WAS CHANGED TO YASMINE, THIS IS THE

 8   FACE DRAWING IN THE AUGUST 1999 NOTARIZED DRAWING.  THIS IS NOT

 9   A DRAWING.  THIS IS AN ACTUAL PICTURE OF THE DOLL'S HEAD.  BUT

10   WE DIGITIZED IT AND TOOK AWAY THE HAIR; SO YOU CAN COMPARE       11:25

11   APPLES TO APPLES HERE.  YOU CAN SEE THAT THIS IS MR. BRYANT'S

12   DRAWING.

13            WHEN YOU FIRST LOOKED AT IT, YOU MIGHT HAVE THOUGHT

14   THAT THE THING ON THE RIGHT WAS A DRAWING.  IT IS SUBSTANTIALLY

15   SIMILAR TO HIS DRAWING, FOR SURE.  IT IS ALMOST IDENTICAL.      11:25

16            SO THAT'S THE FACES.

17            NOW IF YOU LOOK AT THE BODY PROPORTIONS OF THESE

18   DOLLS -- LET'S LOOK AT THIS EXHIBIT SLIDE 3014.  ON THE RIGHT

19   HERE, YOU HAVE THE ACTUAL BRATZ DOLL.  BY THE WAY, THIS BRATZ

20   BODY DID NOT CHANGE.  THERE'S ONE EXCEPTION TO THAT.  THERE WAS  11:26

21   A BRATZ MOVIE THAT CAME OUT LAST YEAR THAT SOME OF YOU MIGHT

22   HAVE SEEN IN THE THREE DAYS IT WAS IN THEATERS, AND FOR THAT

23   THEY MADE SPECIAL BRATZ DOLLS WITH DIFFERENT PROPORTIONS.  BUT

24   OTHERWISE, THIS MOLE, THIS BODY STYLE, HAS BEEN THE SAME SINCE

25   THE FIRST BRATZ DOLL.                                           11:26
```

1          AND HERE WE'RE COMING SIDE-BY-SIDE TO THE DRAWING

2    MR. BRYANT DID WHILE HE WAS WORKING FOR MATTEL.  IF YOU LOOK AT

3    THE PROPORTIONS, WHERE THE CHIN IS, WHERE THE SHOULDERS ARE,

4    THE CHEST, THE WAIST, WHERE THE CROTCH IS, THE KNEES, AND THE

5    ANKLES -- AGAIN, I THINK YOU'LL CONCLUDE THAT THEY ARE          11:26

6    SUBSTANTIALLY SIMILAR.  THE DRAWINGS AND THE DOLLS ARE

7    SUBSTANTIALLY SIMILAR.

8          NOW, YOU REMEMBER MS. LEAHY TESTIFIED THAT YOU DO

9    HAVE TO MAKE SOME ACCOMMODATIONS TO MAKE THIS MASS PRODUCIBLE,

10   RIGHT.  AND ONE OF THE ACCOMMODATIONS IS, YOU SEE THE CROTCH    11:27

11   AREA, IT'S MORE SQUARE HERE SO THAT THOSE LEGS CAN ACTUALLY

12   MOVE.  AND THAT'S WHAT HAPPENS WHEN YOU GO FROM THE DESIGN TO

13   ACTUALLY MAKING ENOUGH OF THESE TO MAKE HUNDREDS OF MILLIONS OF

14   DOLLARS.  BUT IF YOU LOOK AT THE OVERALL LOOK, AGAIN, I THINK

15   YOU'LL CONCLUDE THEY ARE SUBSTANTIALLY SIMILAR.                 11:27

16         THEY WERE SUBSTANTIALLY SIMILAR, THESE FIRST BRATZ

17   DOLLS, NOT JUST IN THE FACIAL LOOK, IN THE BODY, THE

18   PROPORTIONS, BUT IN THE FIRST PHASE, DOWN TO THE DETAILS OF THE

19   CLOTHES AND THE SHOES.  LET'S PUT UP, FOR EXAMPLE, 3019.

20         THIS IS ONE OF MR. BRYANT'S DRAWINGS, WHICH MATTEL        11:27

21   OWNS, OF BOOTS, AND THIS IS ON THE FIRST WAVE OF THE BRATZ

22   DOLLS, THE BOOTS THAT WERE AVAILABLE.  AND YOU CAN SEE THEY ARE

23   SUBSTANTIALLY SIMILAR.  THEY ARE BASED ON THE DRAWINGS.

24         IF YOU LOOK AT -- THERE WERE SOME SHOES AS WELL.  DO

25   YOU REMEMBER, HE DREW THESE SHOES, AND YOU SEE WHERE THE LITTLE 11:28

1    ROUND PART HERE AND THEY ARE KIND OF PURPLISH.  AND, SURE

2    ENOUGH, THAT'S WHAT THEY MANUFACTURED, EVEN WITH THE ROUND HOLE

3    HERE.  I DON'T KNOW IF YOU CAN SEE THAT, IN EXHIBIT 504; SO

4    THEY HAD, LIKE, IDENTICAL SHOES.  OTHER IDENTICAL FOOTGEAR FOR

5    30.22.                                                          11:28

6            DO YOU REMEMBER, ONE OF THE THINGS HE TALKED ABOUT

7    WAS THAT YOU COULD REMOVE THE FEET TO HAVE THE INTERCHANGEABLE

8    FOOTWEAR.  THAT'S ALSO IN THE FIRST MOVIE, THE BRATZ DOLLS, AND

9    MANY WAVES THEREAFTER.  THIS IS HIS DRAWING ON THE LEFT, AND

10   HERE WE HAVE AN EXAMPLE OF THE FOOT GEAR THAT COMES OFF.        11:28

11           NOT JUST THE OVERALL LOOK, THE FACE, THE BODY, AND

12   SOMETIMES RIGHT DOWN TO THE DETAIL OF THE CLOTHING, BUT ALSO,

13   THEY CAME UP WITH A LOGO DESIGN FOR THE BRATZ, AND ON THE LEFT

14   YOU SEE MR. BRYANT'S DRAWING.  YOU SAW THIS A LOT OF TIME IN

15   1-A.  IT WAS CALLED THE HERO POSE.  COMPARE THAT TO            11:29

16   EXHIBIT 504; THIS IS THE LOGO ON MOST BRATZ PACKAGING, AT LEAST

17   FOR THE FIRST SEVERAL YEARS.

18           IF YOU COMPARE, FOR EXAMPLE, YOU SEE LUPE -- THEY

19   CHANGED THE HAIR COLOR.

20           BY THE WAY, ON THE RIGHT, THEY ARE ALL WEARING HATS    11:29

21   AND STUFF ON THEIR HEADS.  IT WILL BE EXPLAINED TO YOU THAT'S

22   BECAUSE YOU DIDN'T WANT GIRLS WHO WANT TO BUY A DOLL WITH A HAT

23   TO JUST BUY ONE DOLL; SO THEY ARE PUTTING HEAD GEAR ON ALL OF

24   THESE FOR THE LOGO.  THE HAIR IS DIFFERENT, YES, BUT IF YOU

25   LOOK AT THE EYES, THE LIPS, THE POSE FOR ALL OF THESE DOLLS,   11:29

1    YOU SEE THE HAND COMING OUT, YOU SEE HERE -- AND MR. BRYANT'S

2    DRAWING THE HANDS LIKE THIS AND THE ESSENTIAL LOGO.  IT'S LIKE

3    THIS.  YOU SEE THE POSING.

4          AGAIN, THESE ARE BASED ON MR. BRYANT'S DRAWINGS.

5    THAT'S THE REASON THEY DREW THIS.  IT'S SUBSTANTIALLY SIMILAR          11:30

6    TO MR. BRYANT'S DRAWINGS, THE DRAWINGS WHICH NOW BELONG TO

7    MATTEL.

8          AND NOT JUST THE LOGO.  NOT JUST THE CLOTHING.  BUT

9    THE MASCOTS.  DO YOU REMEMBER, I MENTIONED BRIEFLY ABOUT THE

10   MASCOTS FOR THESE BRATZ DOLLS.  DID THAT HAVE ANYTHING TO DO          11:30

11   WITH MR. BRYANT'S DRAWINGS?

12         WELL, IF WE LOOK AT 30.25 HERE, HERE WE HAVE THE

13   ANGEL MASCOT IN THE DRAWING.  DO YOU RECALL THAT?

14         THIS IS FOR CLOE.  HAIR COLOR CHANGE, HAIR CHANGE.

15   BUT SHE HAS THE ANGEL MASCOT AS WELL, TAKEN FROM MR. BRYANT'S         11:30

16   DRAWINGS.  LET'S GO TO THE NEXT ONE, WHERE WE HAVE YASMINE.

17   AND DO YOU RECALL SHE HAD THIS PRINCESS MASCOT ON HER LITTLE

18   BAG HERE, AND MR. BRYANT'S DRAWINGS.  AND, OF COURSE, WHEN THEY

19   WENT TO MANUFACTURE THIS LINE ON MR. BRYANT'S DRAWINGS, THEY DO

20   THE SAME MASCOT HERE.  THE PRINCESS.  IT'S SUBSTANTIALLY              11:31

21   SIMILAR.

22         IF WE GO FURTHER, WE MENTIONED THIS BEFORE, THIS IS

23   THE HIPPITY-HOP BUNNY.  THIS IS WHAT MR. BRYANT DREW.  THIS IS

24   WHAT ACTUALLY WENT TO MARKET.  AND THEN WE GO FINALLY TO THE

25   CAT HERE, AND YOU SEE WHAT MR. BRYANT DREW AND YOU SEE WHAT IS        11:31

1    ACTUALLY ON THE PACKAGING ITSELF.  YOU CAN JUST COMPARE THESE.

2    THEY USE THE EXACT SAME FOUR MASCOTS ON THIS INITIAL WAVE OF

3    BRATZ DOLLS.

4           THESE PRODUCTS WERE BASED ON MR. BRYANT'S DRAWINGS.

5           THE ARTIST THAT CREATED THEM TRIED TO STAY TRUE TO       11:32

6    MR. BRYANT'S DRAWINGS AND HIS VISION.  AND BEFORE THERE WAS A

7    CASE, WHEN MGA THOUGHT IT OWNED THESE DRAWINGS, WHEN IT THOUGHT

8    IT COULD GET AWAY WITH THE WRONGDOING THAT YOU FOUND, MGA WOULD

9    ADMIT THIS.

10          FOR EXAMPLE, MS. GARCIA TOLD THE WORLD -- THIS IS AN      11:32

11   E-MAIL BETWEEN HER AND A REPORTER, IF YOU RECALL; THIS WAS

12   ADMITTED IN THE FIRST PHASE OF THE CASE -- WHERE SHE TALKED

13   ABOUT 'THE FOUR GIRLS WERE ALREADY CONCEPTED AND PRESENTED BY

14   THE INVENTOR AT OUR FIRST MEETING.  I THOUGHT THEY WERE

15   INCREDIBLE AND I TRIED TO STAY TRUE TO THIS INVENTOR'S          11:32

16   CREATOR'S VISION.'

17          THAT'S WHAT MGA WAS ATTEMPTING TO DO, WHICH IS TAKE

18   THESE DRAWINGS AND MAKE THEM DOLLS THAT LOOKED LIKE THE

19   DRAWINGS.  OF COURSE, NOW THEY SAY THEY DON'T LOOK ANYTHING

20   LIKE THEM.  MS. GARCIA TELLS YOU THAT'S WHAT THEY WERE TRYING   11:33

21   TO DO.

22          IN FACT, YOU RECALL THE TESTIMONY SHOWING THAT AS FAR

23   AS MGA WAS CONCERNED, THE BRATZ, THE KEY LEGALLY RELEVANT DATES

24   FOR THE BRATZ DATES, THE DATE OF CREATION OF BRATZ -- NOT

25   DISTINGUISHING BETWEEN BRATZ DOLLS AND BRATZ DRAWINGS, BUT OF   11:33

1    THE BRATZ -- WAS SEPTEMBER 18, 2000.

2         THERE'S ANOTHER DOCUMENT YOU RECALL WHERE MR. LARIAN

3    SAID THAT THE BRATZ WERE BORN -- NOT DISTINGUISHING BETWEEN A

4    DRAWING AND THE DOLL BASED ON THE DRAWING -- WERE BORN IN

5    SEPTEMBER OF 2000.                                          11:33

6         IN FACT, DO YOU REMEMBER, MR. LARIAN WAS ON THE STAND

7    AND MR. NOLAN WAS EXAMINING HIM, AND HE WAS EXAMINING HIM ABOUT

8    A PRESENTATION MR. LARIAN HAD MADE TO FOX.  AND IN EXAMINING

9    ABOUT THAT PRESENTATION, HE SHOWED HIM A DOCUMENT AND MR. NOLAN

10   SAID THIS DOCUMENT SAYS 'TAKING THE TOY WORLD BY SURPRISE,     11:33

11   LIKE, TOTALLY, FOUR BRATZ DOLLS, CLOE, SASHA, JADE AND YASMINE,

12   ALSO KNOWN AS THE BRATZ PACK, WERE LAUNCHED AT TOY FAIR 2001.'

13   AND YOU WILL RECALL THAT MR. LARIAN SAID THAT HE MADE A CHANGE

14   TO THAT PRESENTATION; HE CHANGED IT SO THAT HE TOOK OUT 'AT TOY

15   FAIR 2001' AND PUT 'OCTOBER 2000.'                          11:34

16        NOW, THE DOCUMENT THEY WERE TALKING ABOUT -- AND WE

17   DON'T HAVE THE CHANGED DOCUMENT, BUT THIS IS WHAT MR. LARIAN

18   SAID HE CHANGED TO -- THE DOCUMENT WE'RE TALKING ABOUT WAS

19   EXHIBIT 16914-A.  THIS WAS THE DOCUMENT.  AND WHAT MR. LARIAN

20   SAID HE CHANGED THIS TO WAS THAT THESE DOLLS WERE LAUNCHED --   11:34

21   HE CHANGED THIS, HE SAID, TO OCTOBER OF 2000.

22        NOW, OCTOBER 2000 YOU DIDN'T HAVE PHYSICAL BRATZ

23   DOLLS.  THE EVIDENCE IS THAT THOSE DIDN'T COME UNTIL A LITTLE

24   LATER.  WHAT YOU HAD WERE CARTER BRYANT'S DRAWINGS OF THE BRATZ

25   DOLLS.  AND MR. LARIAN WAS TELLING THE WORLD -- TELLING FOX,    11:34

1    ANYWAY -- THAT THE BRATZ DOLLS WERE LAUNCHED THEN.

2         WHY WOULD YOU SAY THE BRATZ DOLLS WERE LAUNCHED WHEN

3    YOU DIDN'T HAVE THE DOLLS THEMSELVES?  IT'S BECAUSE YOU HAD THE

4    DRAWINGS THEY WERE BASED ON; THE DRAWINGS TO WHICH THEY ARE

5    SUBSTANTIALLY SIMILAR.                                          11:35

6         AND BY THE WAY, AGAIN, WHEN MGA SAID IT OWNED THEM,

7    THESE DRAWINGS, WHEN IT WAS IN THE SHOES WE ARE NOW IN, IT TOLD

8    THE COPYRIGHT OFFICE THAT THE DOLLS WERE BASED ON THESE

9    DRAWINGS; THAT THE DOLLS WERE DERIVED FROM THESE VERY DRAWINGS

10   THAT MATTEL NOW OWNS.                                           11:35

11        LET ME RUN YOU THROUGH THIS.  I'LL USE THE JADE DOLL

12   AS AN EXAMPLE.

13        MGA FILED A COPYRIGHT APPLICATION FOR THE JADE DOLL

14   IN JUNE OF 2000.  AND THE INTERESTING THING ABOUT THIS

15   PARTICULAR DOCUMENT IS THAT -- THIS IS THE FIRST PAGE WHICH     11:35

16   TALKS ABOUT THE CONFIGURATION -- IF WE CAN GO TO THE CREATION

17   DATE -- AT THIS POINT THEY SAY THE JADE DOLL WAS CREATED IN

18   2000, THE DOLL ITSELF.

19        NOW, YOU REMEMBER MR. BRYANT WORKED FOR MATTEL UP TO

20   OCTOBER 19, 2000, BUT THIS IS THE COPYRIGHT APPLICATION THEY    11:36

21   FILE.  AND IF YOU LOOK AT PAGE 5, IT HAS A PICTURE OF THE DOLL.

22   IT'S NOT A GREAT PICTURE, BUT WHAT THEY ARE REGISTERING HERE IS

23   THE DOLL THAT I SHOWED YOU EARLIER; THE PICTURE.

24        NOW, AFTER THAT, I THINK IT'S IN 2003, MGA REGISTERS

25   ONE OF MR. BRYANT'S DRAWINGS OF JADE; THAT'S EXHIBIT 505.  YOU  11:36

1    SEE, THEY ARE REGISTERING THE JADE DRAWING HERE.  THEY ARE

2    SAYING THE CREATION DATE OF 1998.

3           NOW, OF COURSE, YOU DETERMINED THAT'S NOT CORRECT.

4    THIS WAS MADE WHILE HE WAS AT MATTEL.  AND, IN FACT, THE

5    DRAWING, WE'LL SHOW IT TO YOU, THIS IS THE JADE DRAWING, PART          11:37

6    OF THE PITCH MATERIALS.

7           AT THIS POINT MGA HAS SAID THE DOLL WAS CREATED IN

8    2000, THE DRAWING IN 1998.  THEY KNOW MR. BRYANT WORKED FOR

9    MATTEL IN 2000.  SO THEY FILED AN AMENDMENT TO CHANGE THAT 2000

10   TO 2001 SO THEY CAN PUT IT OUTSIDE OF ANY MATTEL ASSOCIATION;         11:37

11   THAT'S EXHIBIT 558.

12          WHAT THEY DID WHEN THEY FILED THIS WAS -- THIS IS,

13   AGAIN, THE JADE DOLL, AND IT'S AN AMENDMENT TO THEIR ORIGINAL

14   APPLICATION -- IF WE GO TO THE LAST PAGE, THE SECOND PAGE, IT

15   TALKS ABOUT HOW THEY ARE AMENDING THE YEAR OF COMPLETION:  NO,        11:37

16   IT'S NOT 2000, IT'S 2001.

17          SO NOW THEY HAVE TWO REGISTRATIONS; THEY HAVE THE

18   DRAWING OF JADE, SAYING IT WAS CREATED IN 1998, AND THE DOLL IN

19   2001, SO THAT THEY CAN CLAIM TO THE WORLD THIS HAS NOTHING TO

20   DO WITH MATTEL, NEITHER THE DRAWING NOR THE DOLL.                     11:38

21          SO COMFORTABLE THINKING THEY COULD TELL THE WORLD

22   THAT, THEY ALSO PUT SOMETHING ELSE ON HERE.  THEY AMENDED THIS

23   TO SAY SOMETHING ELSE.  AND THAT WAS THAT THAT JADE DOLL WAS

24   DERIVED FROM THE DRAWING.

25          IF WE GO TO THE FIRST PAGE HERE, IT TALKED ABOUT THE           11:38

```
 1    BASIC REGISTRATION -- AND IT GIVES THIS NUMBER FOR THE JADE
 2    DOLL CONFIGURATION, ETC., SHOULD CITE TO REGISTRATION VA218487.
 3    THAT'S THE JADE DRAWING WHICH IS REGISTERED AFTER THIS BASIC
 4    REGISTRATION, AND IT'S AMENDED TO SAY THAT THIS JADE DRAWING IS
 5    THE DERIVATIVE WORK.  IT'S WHAT THAT DOLL IS BASED ON.        11:38
 6         AND THEY DID THE SAME THING FOR EACH OF THESE
 7    ORIGINAL BRATZ CHARACTERS.  THEY AMENDED THE REGISTRATIONS WITH
 8    THE COPYRIGHT OFFICE TO SAY THAT THE DOLL THAT WE MADE IS BASED
 9    ON THE CARTER BRYANT DRAWING OF THAT DOLL.
10         SO, FOR EXAMPLE, LET'S GO TO 55705 -- THIS IS THE       11:38
11    JADE DOLL -- THIS DRAWING, THIS DOLL, IS A DERIVATIVE BASED ON
12    THIS DRAWING.
13         LET'S GO TO THE NEXT ONE.
14         MR. NOLAN:  OBJECTION, YOUR HONOR, ON THE USE OF
15    'DERIVATIVE.'                                                11:39
16         THE COURT:  THAT'S ARGUMENT, COUNSEL.  REPHRASE.
17         SUSTAINED.
18         MR. PRICE:  THEY AMENDED THEIR COPYRIGHT APPLICATION
19    TO SAY THIS DOLL IS BASED ON THIS DRAWING.
20         NEXT SLIDE.
21         THIS DOLL, THEY CLAIM COPYRIGHT OFFICE WAS DERIVED
22    FROM THIS DRAWING.  AND THEN FINALLY --
23         MR. NOLAN:  SAME OBJECTION, YOUR HONOR.
24         THE COURT:  REPHRASE.
25         MR. PRICE:  AGAIN, THIS DOLL WHICH IS BASED ON THIS     11:39
```

1    DRAWING.

2          THAT'S WHAT THEY ARE TELLING THE WORLD WHEN THEY ARE

3    TELL THE WORLD 'WE OWN THE DRAWINGS BECAUSE THEY WERE MADE IN

4    1998.'

5          AND NOW MATTEL AGREES THOSE DOLLS ARE BASED ON THE          11:40

6    CARTER BRYANT DRAWINGS.  THEY ARE SUBSTANTIALLY SIMILAR TO

7    THEM, AND THEY INFRINGE OUR COPYRIGHT.  THEY ARE NOT ENTITLED

8    TO KEEP ANY PROFITS, ANY REVENUES, AS A RESULT OF THE BRATZ

9    DOLLS WHICH ARE SUBSTANTIALLY SIMILAR TO THE DRAWINGS THEY ARE

10   BASED ON.                                                        11:40

11         NOW, I JUST WENT THROUGH FOUR OF THE BRATZ CHARACTERS

12   AND SHOWN YOU THE DRAWINGS.  I'VE SHOWN YOU THE COPYRIGHT

13   REGISTRATIONS THAT EXPLAINED THE RELATIONSHIP.  ONE OTHER THING

14   I TOLD YOU I'D TALK ABOUT IS THAT MGA NOT ONLY BASED THESE

15   DOLLS ON THE DRAWINGS THAT MATTEL OWNS, BUT THEY HAVE USED       11:40

16   THOSE DRAWINGS TO PREVENT OTHERS FROM MAKING DOLLS WHICH LOOK

17   LIKE BRATZ.  THE SAME DRAWINGS.

18         THERE'S A CASE THEY FILED IN THE UNITED STATES CALLED

19   MGA VERSUS MULTI-TOY, AND YOU'LL SEE THE COMPLAINT IN THAT

20   CASE, IT'S EXHIBIT 13738, WHERE THEY ARE SUING MULTI-TOY AND     11:41

21   SOME OTHERS, SAYING 'YOU'RE VIOLATING OUR COPYRIGHT BY MAKING

22   DOLLS THAT LOOK LIKE BRATZ.'

23         AND ONE OF THE THINGS WHICH THEY SAY THAT THEY HAVE A

24   COPYRIGHT IN THAT'S BEING INFRINGED ARE THE CARTER BRYANT

25   DRAWINGS.  YOU'RE GOING TO SEE AN EXHIBIT -- THIS IS THE         11:41

```
 1   ALLEGATION IN THE COMPLAINT IN THE UNITED STATES -- WHICH IS
 2   THAT DEFENDANTS HAVE INFRINGED THE BRATZ COPYRIGHTS BY DOING
 3   VARIOUS THINGS AND MAKING PRODUCTS WHICH ARE COPIES OF OR BEAR
 4   A SUBSTANTIAL SIMILARITY TO BRATZ.
 5            WHAT ARE THEY REFERRING TO WHEN THEY ARE REFERRING TO    11:42
 6   THE BRATZ COPYRIGHT?
 7            THERE'S A DECLARATION YOU'LL SEE OF SUSAN GRONICH,
 8   WHO YOU SAW EARLIER AND I BELIEVE YOU'LL SEE IN THIS NEXT
 9   PHASE, WHICH ATTACHED WHAT MGA IS SAYING IS COPYRIGHTED WORK
10   WHICH IS INFRINGED.  IT ATTACHES THINGS LIKE THE DOLLS          11:42
11   THEMSELVES.
12            THIS IS A VERY BAD PICTURE OF SASHA HERE, I THINK.
13   YOU CAN KIND OF TELL WHAT IT IS.  THE ACTUAL EXHIBIT IS A
14   LITTLE CLEARER.  SHE ATTACHES ALSO SOME OF THE PACKAGING WHICH
15   HAS THE BRATZ HERO POSE.  AND HERE'S THE CLOSEUP OF THE HERO    11:42
16   POSE, WHICH IS SUBSTANTIALLY SIMILAR TO WHAT MR. BRYANT DREW.
17   WE'VE GOT JASMINE, I THINK -- SHOW THAT DOLL.
18            BUT HERE'S WHAT ELSE SHE INCLUDES, WHAT ELSE IS
19   INCLUDED IN THIS LAWSUIT, TO PREVENT OTHER COMPANIES FROM
20   MAKING DOLLS THAT LOOK LIKE BRATZ:  MR. BRYANT'S DRAWING OF THE 11:43
21   FOUR CHARACTERS, ALSO INCLUDED IS MR. BRYANT'S DRAWING OF THE
22   INDIVIDUAL CHARACTERS -- IF WE CAN GO THROUGH THIS, KEN.
23            REMEMBER, THESE ARE OF DRAWINGS WHICH MATTEL NOW
24   OWNS.
25            SO MGA, IN PREVENTING OTHER COMPANIES FROM MAKING      11:43
```

```
 1   DOLLS THAT LOOK LIKE THEIR DOLLS, SAY THESE DRAWINGS ARE
 2   IMPORTANT.  YOU ARE INFRINGING -- IN THE UNITED STATES --
 3   INFRINGING ON OUR DRAWINGS BY MAKING DOLLS THAT LOOK LIKE
 4   BRATZ.
 5        NOW, THEY HAVE ALSO FILED LAWSUITS ELSEWHERE.  A LOT    11:43
 6   OF DOLLS ARE MANUFACTURED, AS ARE THE BRATZ DOLLS, IN HONG
 7   KONG, AND THERE ARE A NUMBER OF LAWSUITS THERE WHERE, AGAIN,
 8   MGA FILES A SUIT, AND WHAT IT LISTS AS A FACTUAL MATTER AS TO
 9   WHAT IT IS BASING IT ON, IT LISTS THE DRAWINGS.
10        IN FACT, LET ME SHOW YOU THAT, THERE'S A CASE, MGA      11:44
11   VERSUS CITY WORLD, AND THIS IS CITY WORLD AND SOME OTHERS --
12   ABC INTERNATIONAL TRADERS, DOING BUSINESS AS MGA
13   ENTERTAINMENT -- IF WE GO TO I THINK THE THIRD PARAGRAPH, IT
14   TALKS ABOUT -- WHAT'S BEING TALKED ABOUT HERE ARE 17 DESIGN
15   DRAWINGS OF VARIOUS FASHION DOLLS MADE BETWEEN THE YEARS 1998  11:44
16   AND 2000.  AND YOU'LL RECALL, I THINK IN THE EARLIER PHASE OF
17   THIS CASE, WE CALLED YOUR ATTENTION TO THE ALLEGATION THAT
18   CARTER BRYANT WAS COMMISSIONED TO MAKE THESE DESIGN DRAWINGS.
19        THESE DRAWINGS THAT ARE BEING REFERRED TO ARE
20   REFERRED TO IN I THINK SIX LAWSUITS IN HONG KONG, AND THERE'S A  11:44
21   CORE OF 15 DRAWINGS WHICH ARE REFERRED TO.  THIS SAYS 17
22   BECAUSE THERE'S ALSO A DRAWING OF, I THINK, OF A PURSE OR
23   SOMETHING ELSE, BUT THERE'S A CORE OF 15 THAT ALWAYS INCLUDED
24   IN THESE.
25        IF WE CAN SHOW THOSE, KEN.                              11:45
```

1           AND THEY ARE THESE:  IF YOU RECALL THESE DRAWINGS

2    FROM THE FIRST PHASE; THAT WHEN WE'RE TALKING ABOUT THE 17

3    DRAWINGS THAT THEY ARE SUING ON, SAYING YOU CAN'T MAKE THESE

4    DOLLS BECAUSE THEY LOOK LIKE BRATZ -- WE'VE GOT INDIVIDUAL

5    CHARACTERS, WE'VE GOT THE HEAD DRAWING, WE'VE GOT THE WHAT'S          11:45

6    CALLED THE HERO POSE, WE'VE GOT SOME MORE OF THE DRAWINGS OF

7    THE INDIVIDUAL CHARACTERS, INCLUDING DRAWINGS IN EVENING GOWNS

8    AND DRESSES, WHICH I BELIEVE THERE WAS TESTIMONY, THE BRATZ

9    DOLLS ACTUALLY WERE NEVER MADE WITH THESE EVENING GOWNS.

10           THESE ARE THE DRAWINGS WHICH WERE USED IN EACH ONE OF          11:45

11    THESE LAWSUITS WHERE THEY SUE IN HONG KONG AND SAY YOU CAN'T

12    MAKE A DOLL THAT LOOKS LIKE BRATZ.

13           THERE'S ANOTHER LAWSUIT I WANT TO TALK TO YOU ABOUT

14    IN HONG KONG CALLED UNI-FORTUNE.  THAT WAS A COMPLAINT FILED --

15    IF WE CAN SHOW THAT VERY QUICKLY -- THAT'S 13572001 -- AND          11:46

16    AGAIN, HERE, IF YOU LOOK AT IT, THEY TALK ABOUT THERE ARE 18

17    DESIGN DRAWINGS, WAX MODELS, RUBBER MOLDS...

18           ANOTHER THING THEY SAY IN THESE HONG KONG LAWSUITS IS

19    THEY EXPLAIN THE RELATIONSHIP OF THE DRAWINGS TO WHAT CAME

20    AFTER IT.  THERE'S A MANUFACTURING PROCESS.  YOU HEARD          11:46

21    MS. LEAHY TALK ABOUT IT.  YOU GET A DRAWING.  YOU THEN CREATE A

22    SCULPT.  YOU HEARD HER TESTIFY ABOUT HOW SHE WORKED WITH

23    MR. CARTER IN CREATING THE SCULPT.  YOU MAKE A MOLD.  YOU GET

24    SOMEBODY LIKE ANNA RHEE TO DO A FACE PAINT.

25           AND WHAT THEY EXPLAINED IN THE HONG KONG CASE IS THAT          11:46

```
 1   THIS IS BASED ON THESE STEPS, WHICH ARE NECESSARY STEPS, AND
 2   YOU HAVE TO PUT EFFORT IN -- ARE BASED ON THE ARTIST'S VISION
 3   IN THAT DRAWING.
 4          SO, FOR EXAMPLE, HERE, THEY LIST THESE WORKS OF ART.
 5   AND IF YOU GO TO THE NEXT PAGE, THEY EXPLAIN HOW THEY RELATE TO     11:47
 6   EACH OTHER.  IT SAYS "AS FAR AS PLAINTIFF IS AWARE, THERE ARE
 7   NO ANTECEDENT DESIGNS, PRODUCTS, DRAWINGS OR ARTICLES," WHICH
 8   MEANS THESE DRAWINGS ARE THE FIRST ONES.  AND THEN IT GOES ON
 9   IN PARAGRAPH A, B,C, D, E, AND F --
10          MR. NOLAN:  OBJECTION.  THIS IS LEGAL ARGUMENT.            11:47
11          THE COURT:  VERY WELL.
12          MR. PRICE:  THE AUTHOR OF THE ARTISTIC WORKS PLEADING
13   IN SUB-PARAGRAPHS B, D, E AND F, OF THE PARTICULARS OF THE
14   ORIGINAL WORKS REFERRED TO THE DRAWINGS IN SUB-PARAGRAPH A OF
15   THE PARTICULARS OF THE ORIGINAL WORKS.                            11:47
16          NOW, IF YOU REMEMBER THAT LIST, A IS THE DRAWINGS; A
17   IS THOSE DRAWINGS WE JUST SHOWED YOU; SO WHAT THIS SAYS IS THAT
18   THE AUTHOR OF THE ARTISTIC WORKS PLEADING IN B, D, E AND F --
19   AND THOSE ARE THE SCULPTS -- THOSE AUTHORS -- AND YOU'LL SEE
20   THIS IN MORE DETAIL, IT ACTUALLY IDENTIFIES THE AUTHORS; IT      11:48
21   SAYS THAT, FOR EXAMPLE, MARGARET LEAHY DID THE SCULPT; IT SAYS
22   ANNA RHEE DID THE FACE PAINTING FROM THE HEAD SCULPT -- BUT
23   THOSE AUTHORS REFERRED TO, THEY SAY, THE COURT IN HONG KONG,
24   REFERRED TO THE DESIGN DRAWINGS, THOSE 15 DRAWINGS, IN CREATING
25   THAT WORK.  AND THEY ARE QUITE SPECIFIC WITH RESPECT TO          11:48
```

1    ANNA RHEE, ACTUALLY.

2         THERE WAS A CASE CALLED DOUBLE GRAND IN HONG KONG --

3    YOU'LL SEE THE EXHIBITS PERTAINING TO THAT -- THIS IS THE SUIT

4    WITH DOUBLE GRAND CORPORATION.  IF WE GO TO PARAGRAPH 16, THEY

5    DESCRIBE WHAT ANNA RHEE DID.  YOU'LL SEE THAT IT SAYS THAT      11:48

6    "BASED ON AND ORIGINATED FROM THE INITIAL CONCEPT DRAWINGS OF

7    MR. BRYANT, ANNA RHEE DREW SOME DECORATION DIRECTIONS FOR THE

8    FACIAL DECORATIONS FOR DIFFERENT SETS OF DOLLS"; AND THEN TALKS

9    ABOUT HOW SHE CREATED DECO MASTERS, HAND PAINTED, AND HOW, WITH

10   THE INPUT OF MR. BRYANT, SHE REVISED THOSE MASTERS UNTIL THEY   11:49

11   WERE PERFECTED, BEING THE FINAL VERSION THAT WERE USED TO SERVE

12   AS THE BENCHMARK AND TEMPLATE FROM WHICH THE ORIGINAL FOUR

13   DIFFERENT BRATZ DOLLS INDIVIDUAL FACE DECORATIONS ARE MASS

14   PRODUCED BY SPRAY MASKING.

15        SO THEY ARE EXPLAINING TO THE COURT HOW THE PROCESS        11:49

16   WORKS IN DOING THIS.  AND WHAT YOU DO IS BASED ON THESE

17   DRAWINGS, AN ARTIST COMES IN, LIKE MS. RHEE, AND SHE TRIES TO

18   CAPTURE THAT LOOK.  AND THAT'S WHAT HAPPENED IN THIS CASE.  AND

19   YOU CAN TELL IT JUST BY LOOKING AT THE FACES OF THE DOLLS AND

20   THE DRAWINGS.                                                   11:49

21        IT IS SIMPLY WRONG, IT'S SIMPLY MISLEADING, TO SAY

22   THAT THOSE BRATZ DOLLS HAVE NOTHING TO DO WITH THE DRAWINGS FOR

23   WHICH CARTER BRYANT WAS PAID $30 MILLION.

24        NOW, IF YOU LOOK AT THIS HONG KONG CASE, YOU'LL ALSO

25   SEE THAT MGA MAKES ALLEGATIONS CONCERNING HOW THE PRODUCTS THAT  11:50

```
 1   ARE BEING MADE LOOK SIMILAR TO THE DRAWINGS IN PARTICULARS.

 2   AND, FOR EXAMPLE, IF WE CAN GO TO 33.0, ONE OF THE CASES IS A

 3   CASE OF THE GLAMMAJAMMAS DOLL, AND THE GLAMMAJAMMAS DOLL -- ON

 4   THE LEFT, WE HAVE THE JADE DOLL.

 5        MR. NOLAN:  YOUR HONOR, SAME OBJECTION AS STATED          11:50

 6   BEFORE.

 7        THE COURT:  YOUR OBJECTION IS...

 8        MR. NOLAN:  REFERRING TO THE COMMENTS AND ARGUMENTS

 9   WE MADE BEFORE WITH RESPECT TO THE DIRECT COMPARISON IN OTHER

10   JURISDICTIONS.                                                11:50

11        THE COURT:  OVERRULED.  YOU MAY PROCEED.

12        MR. PRICE:  HERE ON THE RIGHT IS THE DOLL THEY SAID

13   LOOKS SIMILAR TO THE DRAWINGS.  THIS IS THE GLAMMAJAMMAS DOLL

14   HERE.  ON THE RIGHT, WE HAVE THE ACTUAL JADE DOLL AND THE

15   ACTUAL GLAMMAJAMMAS DOLL.  IF YOU LOOK AT WHAT THEY SAID TO THE  11:51

16   COURT, THEY SAID THAT THIS DOLL LOOKS SIMILAR TO THE DRAWINGS

17   IN THE FOLLOWING RESPECT -- IN FACT, MAYBE WE CAN PUT UP 33.5

18   WHICH SHOWS YOU THE DRAWING.

19        THIS IS THE JADE DRAWING.  THEY SAID THIS LOOKS

20   SIMILAR TO THE JADE DRAWING IN THAT BOTH THE HEAD AND THE FEET  11:51

21   WERE OUT OF PROPORTION.  THE FACE HAD THE OVERALL SHAPE; THE

22   NOSE SHAPE WAS THE SAME; THE LIP SHAPE WAS THE SAME; THE EYES

23   ARE THE SAME; AND THE FACE PAINTING IS THE SAME.

24        THAT'S HOW THEY USE THE DRAWING IN THE GLAMMAJAMMAS

25   CASE.  THEY ARE SAYING WE OWN THIS DRAWING, WHICH MATTEL NOW   11:51
```

1    OWNS, AND YOU CAN'T PRODUCE THIS DOLL BECAUSE OF THE FACTUAL

2    SIMILARITIES WHICH I JUST READ TO YOU.  YOU'LL SEE THAT.

3            ANOTHER CASE, THEY HAD A CASE CALLED A TRENDY TEENS

4    DOLL WHICH THEY FILED A LAWSUIT AGAINST, AGAIN, USING THE

5    DRAWINGS.  RIGHT HERE I'M SHOWING, COMPARING, THE ACTUAL CLOE            11:52

6    DOLL TO THE TRENDY TEENS DOLL TO GIVE SOME IDEA OF PROPORTION.

7    YOU MAY SEE THE ACTUAL TRENDY TEENS DOLL WHEN YOU'RE BACK

8    THERE.

9            SO THE LAWSUIT WAS FILED, AGAIN, LISTING THESE SAME

10   BASIC DRAWINGS, THE CARTER BRYANT DRAWINGS, THE MATTEL            11:52

11   DRAWINGS.  AND THE ALLEGATIONS IN THAT LAWSUIT WERE, WITH

12   RESPECT TO THE TRENDY TEENS, IS THAT THIS COPIED THE CARTER

13   BRYANT DRAWING, THE MATTEL DRAWING.  AND, IN PARTICULAR, WHAT

14   WERE COPIED WERE THE EYES AND THE LIPS.

15           MGA OWNED THE DRAWINGS.            11:53

16           AND BY THE WAY, WHAT WE HAVE ON THE TOP HERE IS THE

17   ACTUAL BRATZ DOLL.

18           AND WE, OF COURSE, ARE HERE SAYING THAT THE BRATZ

19   DOLL IS SUBSTANTIALLY SIMILAR TO THAT DRAWING.

20           IN ADDITION TO THE TRENDY TEENS DOLLS, SOMETHING            11:53

21   CALLED A MINI TRENDY TEENS DOLL, AND MAYBE WE HAVE ONE.  I

22   DON'T KNOW HOW WELL YOU CAN SEE THIS -- I DIDN'T WANT TO GET

23   RID OF THE PACKAGING HERE OR DISTURB THE PACKAGING.

24           BUT YOUR HONOR, IF I MAY GET A LITTLE CLOSER TO THE

25   JURY.            11:53

1          **THE COURT:**  YOU MAY.

2          MR. NOLAN, YOU'VE SEEN THIS?

3          **MR. NOLAN:**  NO.

4          **MR. PRICE:**  I'LL SHOW IT TO YOU.

5          THIS IS THE MINI TRENDY TEENS DOLL, WHERE MGA, IN          11:53

6    HONG KONG, CITES THE DRAWINGS, THE CARTER BRYANT DRAWINGS, THE

7    MATTEL DRAWINGS NOW.  AND THIS IS THE DOLL THAT IS THE SUBJECT

8    OF THE LAWSUIT, WHICH THEY ARE SAYING YOU CAN'T BUILD THIS

9    DOLL.

10          AND I'VE GOT A PICTURE HERE THAT GIVES YOU AN IDEA OF          11:54

11   THE SCALE OF THE MINI, BECAUSE IT'S MINI TRENDY TEENS COMPARED

12   TO THE CLOE BRATZ DOLL.

13          THE NEXT ONE; HERE WE HAVE ON THE LEFT THE DRAWING.

14   THIS IS THE DRAWING WHICH, ONE OF THOSE 15 DRAWINGS, WHICH ARE

15   USED IN EVERY ONE OF THESE HONG KONG SUITES.  AND ON THE RIGHT          11:54

16   WE HAVE THAT MINI TRENDY TEENS DOLL.  AND WHAT MGA SAID WITH

17   RESPECT TO THIS DOLL IS SAYING 'YOU CAN'T MAKE THIS DOLL

18   BECAUSE WE OWN THIS DRAWING.'  THEY SAID THAT THIS MINI TRENDY

19   TEEN DOLL HAD THE SAME SHAPE, HEAD, AS THE DRAWING; THAT THE

20   SHAPE OF THE HEAD IN COMPARISON WITH THE REST OF THE BODY, IT'S          11:55

21   A LITTLE OVERSIZED -- WAS THE SAME AS THE DRAWING; THAT THE

22   SHAPE AND SIZE OF THE NOSE WAS SIMILAR; THAT THE SHAPE OF THE

23   EYES WAS SIMILAR; THAT THE SHAPE OF THE LIPS WAS SIMILAR; AND

24   THAT THE SHAPE OF THE FEET, THE FEET WERE A LITTLE LARGER.

25          SO MGA BASES THE BRATZ DOLLS ON THESE DRAWINGS.  AND          11:55

```
 1   WHEN IT OWNED THE DRAWINGS, IT USES THOSE DRAWINGS TO SAY YOU
 2   CAN'T MAKE THESE OTHER DOLLS.  AND YOU CAN SEE THE DIFFERENCES
 3   BETWEEN THE DOLLS.  BUT THAT WASN'T THE POINT.  THE POINT IS
 4   THEY WERE SAYING THERE WERE SIMILARITIES.  THERE WERE FACTUAL
 5   SIMILARITIES.  WHICH MEANS YOU SHOULDN'T BE ABLE TO MAKE THOSE       11:55
 6   DOLLS BECAUSE WE OWNED THE DRAWINGS.
 7          AND NOW WE'RE IN THAT PLACE.
 8          SO YOU HAVE TO ASK YOURSELF, IF MGA OWNED THE
 9   DRAWINGS, THE CARTER BRYANT DRAWINGS, AND MATTEL WAS MAKING
10   THOSE BRATZ DOLLS, EVERY BRATZ DOLL THEY SHOW YOU, YOU KNOW         11:56
11   THEY WOULD PROPERLY, APPROPRIATELY, BE SAYING YOU CAN'T DO THAT
12   BECAUSE WE OWN THE DRAWINGS.  THEY ARE SUBSTANTIALLY SIMILAR.
13          NOW, I SHOWED YOU SOME COMPARISONS OF THE ORIGINAL
14   WAVE OF BRATZ DRAWINGS, THE FOUR CHARACTERS.  THERE WERE LATER
15   WAVES AS WELL.  THERE HAVE BEEN LATER WAVES.  AND THEY HAVE         11:56
16   CHANGED SOME THINGS.  THEY CREATE THEMED DOLLS WHERE THEY PUT
17   COWBOY CLOTHES ON THE DOLL OR THEY CREATE FUNK DOLLS WHICH HAVE
18   DIFFERENT CLOTHING.  THEY HAVE MINOR PAINT CHANGES.  BUT IT IS
19   LITERALLY THE SAME DOLL; IT'S THE SAME MOLD; IT'S THE SAME
20   FACIAL MOLD; SAME FACIAL SHAPE.  THEY ALL HAVE THE BRATZ           11:56
21   CHARACTERISTICS; THE OVERSIZED HEAD, OVERSIZED EYES, OVERSIZED
22   LIPS.
23          JUST TO GIVE YOU SOME EXAMPLES OF THE LATER
24   GENERATION DOLLS -- IF WE COULD GO TO 3.1 -- THIS, FOR EXAMPLE,
25   IS A LATER CLOE DOLL.  YOU'VE GOT CLOE ON THE LEFT, THE FIRST      11:57
```

1    WAVE.  ON THE RIGHT YOU'VE GOT THE SECOND WAVE.  AND THE

2    CLOTHING HAS CHANGED.  AND YOU LOOK AT THE FACES, AND THEY ARE

3    SUBSTANTIALLY SIMILAR.  IT'S A SUBSTANTIALLY SIMILAR LOOKING

4    DOLL.

5            AND I'M GOING TO SHOW YOU -- TO MAKE THE POINT -- AND      11:57

6    I'M NOT TRYING TO BE -- IF YOU TOOK OFF THE CLOTHES, YOU'D SEE

7    IT IS THE SAME DOLL, THE SAME SCULPT, THE SAME FACE IN THE

8    LATER WAVE.  IF WE LOOKED AT THE HEADS OF THOSE TWO DOLLS CLOSE

9    UP -- ACTUALLY THIS IS THE HEAD OF THE CLOE DOLL COMPARED TO

10   THE OTHER CLOE DOLLS BETWEEN 2002 AND 2005, ON THIS SLIDE.      11:58

11   THIS IS THE ONE IN 2001.  AND YOU CAN SEE, IF YOU LOOK AT THE

12   FACE OF THAT DOLL, OVER THE YEARS, IT IS SUBSTANTIALLY SIMILAR,

13   BOTH TO THE FIRST DOLL AND TO THE DRAWINGS.

14           LET'S GO TO 34.5.  THIS IS IN 2006, 2007, 2008.

15           YOU CAN SEE THE SUBSTANTIAL SIMILARITY, ALL BASED ON      11:58

16   THE SAME CONCEPT, THE SAME DRAWINGS, THAT MR. BRYANT DID.

17           THE JADE DOLL, LET'S GO THROUGH THE SAME PROCESS.

18           ON THE LEFT WE HAVE THE 2001 JADE DOLL.  WE HAVE THE

19   2002 JADE DOLL.  YOU CAN SEE THE FACE IS SUBSTANTIALLY THE

20   SAME.  AND AGAIN, THE CLOTHING IS DIFFERENT, BUT, YOU KNOW, AS    11:58

21   MR. NOLAN SAYS, YOU CAN CHANGE THE CLOTHING, YOU CAN CHANGE THE

22   COLOR, IT DOESN'T MATTER.  IT'S STILL JADE.

23           AGAIN, IF YOU LOOK AT THE SCULPT ITSELF, YOU'D SEE

24   IT'S SUBSTANTIALLY IDENTICAL.  IF YOU COMPARE THE IMPORTANT

25   PART OF THE DOLLS, THE FACE, IF YOU COMPARE THAT OVER THE        11:59

1    YEARS, YOU CAN SEE THAT, AGAIN, IT'S SUBSTANTIALLY SIMILAR.

2              THEY ARE ALL BASED ON THE CARTER BRYANT DRAWINGS.

3    THEY ARE SUBSTANTIALLY SIMILAR TO THOSE DRAWINGS.

4              LET'S LOOK AT YASMINE.

5              HERE WE HAVE 2001 VERSUS 2002, AND SEE WHERE IT SAYS          11:59

6    'XPRESS' IT, THAT'S KIND OF A THEME FOR THAT DOLL.  IT'S

7    SUBSTANTIALLY SIMILAR.  THE SCOPE DOESN'T CHANGE AT ALL.

8    OVERSIZED EYES, OVERSIZED LIPS.  IF YOU COMPARE THE YASMINE

9    FACE TO THE FACES OVER THE YEARS, YOU'LL SEE, AGAIN, THEY ARE

10   SUBSTANTIALLY SIMILAR.                                               11:59

11             NOW, YOU'RE GOING TO BE BACK THERE IN THE JURY ROOM,

12   AND THESE ARE GOING TO BE IN BOXES AND YOU'RE NOT GOING TO HAVE

13   THE PRETTY PICTURES.  YOU'RE JUST GOING TO HAVE TO LOOK AT THE

14   DOLLS AND DECIDE FOR YOURSELF:  IS THIS BASED ON

15   CARTER BRYANT'S WORK?  IS IT SUBSTANTIALLY SIMILAR?                  12:00

16             WE GO TO THE SASHA DOLL.

17             AGAIN, YOU SEE THE CLOTHING CHANGES BETWEEN 2001 AND

18   2002.  BUT IF YOU LOOK AT THE FACIAL CHARACTERISTICS, IF YOU

19   LOOK AT THE SCULPT, THE HEAD, PARTICULARLY IF YOU LOOK AT THE

20   FACE OVER THE YEARS, YOU'LL AGAIN SEE THE SUBSTANTIAL              12:00

21   SIMILARITY, WITH OVERSIZED EYES, THE ARCHED EYEBROWS, THE BIG

22   LIPS, THE TINY NOSE.

23             NEXT SLIDE.

24             NOW, IN ADDITION TO CHANGING THESE CHARACTERS, THEY

25   HAVE COME OUT WITH OTHER CHARACTERS; THAT IS, WE HAVE THE FIRST    12:00

1   FOUR BRATZ CHARACTERS.  BUT NOW THAT THEY HAVE THE BRATZ IDEA,

2   THE BRATZ CONCEPT, MR. BRYANT HAS DELIVERED THAT TO THEM -- HAS

3   DELIVERED THE IDEA OF THIS HIP DOLL WITH THE OVERSIZED HEAD,

4   OVERSIZED FEET, OVERSIZED EYES, LIPS, ET CETERA, THEY HAVE

5   CREATED OTHER CHARACTERS.                                        12:00

6        IF WE CAN GIVE YOU ONE EXAMPLE, FOR EXAMPLE, AT 38.8.

7   THIS IS A NEW CHARACTER, YASMINE.  AND IF YOU ARE LOOKING AT

8   THIS, YOU CAN SEE, AGAIN, THE SUBSTANTIAL SIMILARITY -- I'M

9   SORRY -- OF THE 'NEVRA' DOLL TO THE YASMINE DOLL.  YASMINE WAS

10  ONE OF THE FIRST CHARACTERS.

11       THIS IS THE NEVRA CHARACTER THAT CAME OUT LATER.  YOU

12  CAN SEE THE SAME OVERSIZED EYES, OVERSIZED LIPS.  I THINK WE

13  ALSO HAVE A COMPARISON OF YASMINE AND DANA, THAT CAME OUT IN

14  2003, FORMAL FUNK.  YOU CAN SEE THE COMPARISON WITH THE

15  ORIGINAL YASMINE DOLL.                                           12:01

16       IN THE TOY INDUSTRY WHAT YOU DO HERE IS VERY CLEAR.

17  EVERY YEAR, YOU PUT A NEW OUTFIT ON THEM.  YOU CAN GIVE THEM

18  NEW NAMES TO TRY AND CREATE INTEREST.  BUT IF YOU LOOK AT THE

19  DOLLS, IF YOU LOOK AT THOSE DRAWINGS BY CARTER BRYANT, THE

20  CONCEPT DRAWINGS FOR THE BRATZ, YOU CAN SEE THE SUBSTANTIAL     12:01

21  SIMILARITIES BETWEEN ALL OF THESE CHARACTERS.

22       AND THEY CREATED A LOT OF THEM, THERE'S NO QUESTION

23  ABOUT IT, AND THE DRAWINGS WHICH MATTEL OWNS.

24       NOW, ONE OTHER THING WE'RE SEEKING IN THIS PHASE IS

25  NOT JUST THE PROFITS FROM THE BRATZ CHARACTERS THEMSELVES, BUT  12:02

 1    ALSO THE PROFITS -- THAT IS, HOW MR. LARIAN AND MGA HAVE

 2    PROFITED FROM BRATZ -- FROM THINGS THAT WOULD NEVER HAVE BEEN

 3    SOLD IF NOT FOR BRATZ, IF NOT FOR INDUCING CARTER BRYANT TO

 4    GIVE THEM THAT CONFIDENTIAL INFORMATION:  THE IDEA FOR BRATZ,

 5    THE BRATZ CHARACTERS, THE BRATZ CONCEPTS, THE BRATZ DRAWINGS.          12:02

 6          IF NOT FOR THAT, IF MGA HADN'T CREATE BRATZ, THEN

 7    THEY WOULD NEVER HAVE MADE MONEY CREATING A BRATZ PILLOW OR A

 8    BRATZ TV OR ACCESSORIES.  AND MGA KNEW THAT.  ITS BUSINESS PLAN

 9    TOOK THAT INTO ACCOUNT; THAT BECAUSE WE HAVE THE BRATZ DOLLS,

10    WE'RE GOING TO HAVE A STEADY STREAM OF REVENUE FROM                     12:03

11    ACCESSORIES, AGAIN, WHICH WE WOULD NOT HAVE HAD IF NOT FOR THE

12    WRONGDOING THAT MGA AND LARIAN COMMITTED.

13          SO, FOR EXAMPLE, IN ONE OF THEIR EARLY MARKETING

14    PLANS IN MARCH OF 2001 -- THIS IS ONE OF THEIR EARLY BUSINESS

15    PLANS -- IF WE GO TO PAGE 16, THERE'S A DISCUSSION UNDER             12:03

16    UNEXPLORED OPPORTUNITIES ABOUT THIS.  ABC IS MGA ENTERTAINMENT,

17    AND IT TALKS ABOUT ABC CAN EFFECTIVELY LEVERAGE THE BRATZ

18    BRAND -- THAT IS IN EARLY 2001; THEY HAVEN'T EVEN COME OUT WITH

19    THE DOLLS YET -- BY INTRODUCING NOT ONLY APPAREL BUT

20    ACCESSORIES SUCH AS HANDBAGS, BOOK BAGS, FOOTWEAR, EYEWEAR,          12:03

21    HEAD WEAR, JEWELRY, WATCHES, LUGGAGE.  THIS OPPORTUNITY WILL BE

22    EXPLORED FURTHER WITH THE LICENSING SHOW.  AND IT TALKS AGAIN

23    ABOUT HOW LICENSING IS MINIMAL.  IT'S IMPERATIVE THAT THIS

24    INTRODUCTION IS DONE SIMULTANEOUSLY WITH THE RELEASE OF THE

25    DOLLS ON THE SHELF.  IT SAYS THE ONLY RISK INVOLVED IS THAT THE      12:04

1    BRATZ DOLLS DO NOT SELL THROUGH AT RETAIL.  HOWEVER,

2    PRELIMINARY RESEARCH WITH YOUNG GIRLS INDICATES THIS WILL NOT

3    BE THE CASE."

4           SO MGA RECOGNIZES, AS YOU SHOULD RECOGNIZE, THAT

5    THESE ACCESSORIES -- THE FOOTWEAR, THE BAGS, THE JEWELRY, THE          12:04

6    WATCHES, THE LUGGAGE -- THAT ARE LINKED TO THE BRATZ DOLLS,

7    SELL FOR ONE REASON ONLY, AND THAT'S BECAUSE OF THE BRATZ

8    DOLLS.  THAT'S THE ONLY RISK.

9           YOU SEE HERE WHERE IT TALKS ABOUT LICENSING BEING

10   MINIMAL.  MGA DOESN'T MAKE THESE PRODUCTS, OR MANY OF THESE           12:04

11   PRODUCTS.  IT LICENSES SOMEONE TO DO THEM.  IT LICENSES SOMEONE

12   TO MAKE A BOOK BAG THAT HAS THE BRATZ LOGO ON IT.  THE BRATZ

13   LOGO, BY THE WAY, WHICH IS SUBSTANTIALLY SIMILAR TO THE HERO

14   DRAWING MR. BRYANT DREW; SO IT'S A DIRECT INFRINGEMENT.  BUT

15   THIS TALKS TO ALSO INDIRECT PROFITS RESULTING FROM                    12:05

16   INFRINGEMENTS.

17          AND THEN MGA SAYS YOU MAKE IT AND YOU PAY US A FEE

18   FOR THAT.  YOU PAY US A FEE BECAUSE WE'RE THE ONES THAT HAVE

19   THE RIGHT TO DO THAT.  NOT YOU.  YOU CAN'T DO IT WITHOUT US.

20   IF YOU TRIED TO DO IT WITHOUT US, WE WOULD POINT TO ONE OF            12:05

21   THESE DRAWINGS AND SAY YOU'RE INFRINGING IT.

22          SO THE MONEY IS MADE DOING THAT.  STANDING IN THE

23   SHOES OF OWNING THESE RIGHTS ARE INDIRECT PROFITS FROM THE

24   WRONGDOING WHICH YOU HAVE FOUND OCCURRED; WHICH IS THE

25   WRONGDOING FIRST OF AIDING AND ABETTING AND INDUCING MR. BRYANT       12:05

```
 1   TO BREACH HIS DUTY OF GOOD FAITH, AND ALSO WRONGDOING WE'RE

 2   ASKING YOU TO FIND HERE, WHICH IS THAT THERE'S A COPYRIGHT

 3   VIOLATION BECAUSE THEY ARE USING DOLLS WHICH LOOK SUBSTANTIALLY

 4   SIMILAR TO THOSE DRAWINGS.

 5              NOW, THIS IS THE BUSINESS PLAN.  THIS WAS FURTHER        12:06

 6   STATED IN THESE HONG KONG LAWSUITS.  THERE WERE AFFIDAVITS

 7   FILED IN THOSE LAWSUITS -- WHAT'S CALLED AN AFFIRMATION -- ON

 8   BEHALF OF MGA BY LEE CHU CHEUNG -- THIS AFFIRMATION IN THE CITY

 9   WORLD CASE IS THAT -- IT TALKS ABOUT SHOWING THIS 17 CONCEPT OF

10   DESIGN DRAWINGS OF THE BRATZ DOLLS MADE BY MR. BRYANT.  THOSE     12:06

11   ARE THE DRAWINGS THEY WE NOW OWN, THAT YOU HAVE DECIDED.  AND

12   IT TALKED ABOUT HOW, FURTHERMORE, AS A RESULT OF THESE DRAWINGS

13   AND THE DOLLS CREATED BECAUSE OF THEM, YOU'VE GOT --

14   FURTHERMORE, THERE WOULD BE A LUCRATIVE BUSINESS OF SUPPLYING

15   ACCESSORIES TO THE OWNERS OF BRATZ DOLLS, THUS ENSURING A        12:06

16   STEADY STREAM OF REVENUE.

17              THIS STEADY STREAM OF REVENUE IS OCCURRING BECAUSE OF

18   THE BRATZ DOLLS.  OTHERWISE, NO ONE IS GOING TO BUY A BRATZ

19   HAND BAG OR A BRATZ BOOK BAG.  IT'S INDIRECT PROFIT WHICH YOU

20   GET FROM THE FACT THAT YOU HAVE THE BRATZ DOLLS.                 12:07

21              AT THE FIFTH PAGE, SAME DECLARATION, SAYS "THERE'S

22   ANOTHER MAJOR SOURCE GENERATED BY BRATZ DOLLS IS INCOME DERIVED

23   FROM MERCHANDISING RIGHTS BY GRANTING NONEXCLUSIVE LICENSES TO

24   OTHER COMPANIES WORLDWIDE."  HE TALKS ABOUT SO FAR THERE ARE --

25   "27 MERCHANDISING LICENSING AGREEMENTS THAT HAVE BEEN GRANTED    12:07
```

1    WITH A WIDE RANGE OF PRODUCTS, INCLUDING PAPER NAPKINS, GIRLS'

2    CLOTHING, JEWELRY, BEDDING, HOME FURNISHINGS STATIONERY,

3    TOILETRIES, VIDEO GAMES, FOOTWEAR, ET CETERA."

4         THIS REVENUE STREAM DEPENDS UPON MGA BEING ABLE TO

5    HAVE THE BRATZ DOLLS AND HAVE EXCLUSIVITY FOR THAT.  IN FACT,          12:07

6    THERE'S ANOTHER AFFIDAVIT WHICH WAS FILED, I THINK IT'S

7    EXHIBIT 13718, THIS IS IN THE HUNGLAM TOY COMPANY CASE, MR.

8    CHEUNG AGAIN.  GO TO PARAGRAPH 50.  "IT'S ALREADY ADVERTED TO

9    IN HEREIN ABOVE.  ONE OF THE MAIN REVENUE STREAMS OF THE BRATZ

10   DOLLS ARE LICENSE FEES.  THE DEMAND AND PRICE OF THE BRATZ           12:08

11   LICENSE DEPENDS ON EXCLUSIVITY AND POPULARITY OF THE PRODUCT

12   WHICH IS THE BRATZ DOLLS."

13        SO ONE OF THE THINGS YOU'RE GOING TO BE ASKED TO

14   CONSIDER IN THIS CASE IN DECIDING, CAN YOU PROFIT FROM YOUR

15   WRONG, MUCH OF THE PROFIT, MUCH OF THE PROFIT THAT MGA AND           12:08

16   LARIAN HAVE GOTTEN, HAVE OBTAINED AS A RESULT OF THEIR

17   WRONGDOING, IS THAT IN ADDITION TO BRATZ DOLLS, THEY HAVE BEEN

18   ABLE TO LEVERAGE THAT.  IT WAS THEIR BUSINESS PLAN FROM THE

19   BEGINNING.  AND IT'S A TYPICAL BUSINESS PLAN.  THE BUSINESS

20   PLAN ITSELF, THERE'S NOTHING WRONG WITH IT, IF YOU HAVE THE         12:08

21   RIGHT TO THE DOLLS TELLS THEMSELVES, IF YOU HAVE NOT OBTAINED

22   THE IDEA FOR THE DOLLS, THE CONCEPT, WRONGFULLY.

23        NOW, AGAIN, CRIME DOESN'T PAY.  YOU DON'T GET TO KEEP

24   THOSE PROFITS THAT YOU LEVERAGE.

25        SO MR. NOLAN IS GOING TO GET UP HERE AND SHOW YOU,            12:09

1    LOOK AT ALL THESE THINGS THAT HAVE BRATZ ON THEM WHICH LOOK

2    NOTHING LIKE THE DRAWINGS, THE INITIAL DRAWINGS.  AND THAT'S

3    TRUE.  I MEAN, A BRATZ HAND BAG DOESN'T LOOK MUCH LIKE CLOE.

4    BUT THE SALE OF THOSE PRODUCTS IS INDIRECT PROFIT, INDIRECT

5    GAIN, AND A VERY REAL GAIN FROM THE WRONGDOING THAT YOU FOUND          12:09

6    THAT HAS OCCURRED IN THIS CASE.

7            WITH RESPECT TO THAT, THESE LICENSEES -- WHEN YOU GO

8    TO SOMEONE AND SAY I'M LICENSING YOU TO MAKE A BRATZ HAND BAG

9    OR A BRATZ KLEENEX, OR WHATEVER -- THESE LICENSEES HAVE STYLE

10   GUIDES THEY ARE GIVEN; STYLE GUIDES WHICH SAY YOU'VE GOT TO           12:09

11   MAKE WHATEVER YOU MAKE LOOK LIKE BRATZ.  IT'S GOT TO HAVE THE

12   BRATZ LOOK TO IT.

13           AND THESE STYLE GUIDES THEMSELVES ARE REGISTERED WITH

14   THE COPYRIGHT OFFICE.  AND YOU KNOW WHAT, UNTIL RECENTLY --

15   I'LL GIVE YOU AN EXAMPLE; EXHIBIT 567 IS A STYLE GUIDE.  THIS         12:10

16   IS FOR FASHION PACKAGING FOR THE BRATZ, COMPLETED IN 2005.  AND

17   WHEN YOU REGISTER THESE AGAIN, YOU SAY WHAT IS THIS DERIVATIVE

18   FROM?  WHERE DOES IT COME FROM?

19           AND IF YOU LOOK AT THIS, IT LISTS PRIOR

20   REGISTRATIONS.  IT LOOKS LIKE THERE'S A LOT OF REGISTRATIONS          12:10

21   HERE.  REALLY, THERE ARE ONLY FIVE.  IT'S FIVE REGISTRATIONS

22   THAT WERE THEN AMENDED.  AND WHAT THEY ARE SAYING HERE, THE

23   PREEXISTING ARTWORK FROM WHICH THESE STYLE GUIDES COME FROM,

24   WHAT ART IS IDENTIFIED?

25           LET'S GO TO SLIDE 106.                                        12:10

 1          THESE DRAWINGS, DONE BY CARTER BRYANT WHILE HE WAS AT

 2    MATTEL, OWNED BY MATTEL.  THAT'S WHAT MGA TELLS THE COPYRIGHT

 3    OFFICE IS THE DERIVATIVE WORK OF THESE STYLE GUIDES THAT GIVES

 4    THE LICENSEES WHO THEN ARE ENTITLED TO MAKE BRATZ RELATED

 5    PRODUCTS.  IT ALL STEMS FROM MR. BRYANT'S WORK DONE WHILE HE          12:11

 6    WAS AT MATTEL.

 7          NOW, LET ME TALK TO YOU A LITTLE NOW ABOUT DAMAGES IN

 8    GENERAL.  AND DO YOU REMEMBER -- IF WE CAN PUT UP 11.4 -- WE'VE

 9    ALREADY GONE THROUGH THE CASE WHERE YOU HAVE DECIDED ON MANY OF

10    WHAT ARE CALLED THE TORT CAUSES OF ACTION, THE WRONGFUL CONDUCT      12:11

11    OF MGA AND ISAAC LARIAN.

12          NOW, BEFORE GETTING INTO EXPLAINING HOW DAMAGES ARE

13    CALCULATED, HOW WE'RE GOING TO SUGGEST THAT YOU CALCULATE THEM,

14    I WANT TO TALK ABOUT A SUB ISSUE HERE, AND THAT IS, WITH

15    RESPECT TO TWO OF THESE CAUSES OF ACTION, INTENTIONAL               12:12

16    INTERFERENCE WITH CONTRACTUAL RELATIONS AND CONVERSION.  WITH

17    RESPECT TO THOSE TWO, MGA HAD A STATUTE OF LIMITATIONS DEFENSE,

18    AND WHAT THAT MEANS IS THAT THERE ARE CERTAIN PERIODS OF TIME

19    WHEN YOU HAVE TO BRING A LAWSUIT.  AND IT'S UNDISPUTED THAT

20    WITH RESPECT TO THOSE TWO CAUSES OF ACTION, MATTEL BROUGHT THE      12:12

21    LAWSUIT TOO LATE.

22          BUT THERE'S AN EXCUSE FOR THAT.  AND THAT IS IF

23    THERE'S FRAUDULENT CONCEALMENT OF THE WRONGDOING, THEN THAT

24    KIND OF MEANS WE CAN BRING IT A LITTLE LATER.  SO ONE OF THE

25    ISSUES YOU MAY BE ASKED TO DECIDE, ON JUST THESE TWO CAUSES OF      12:12

```
 1   ACTION, NOT ON THE AIDING AND ABETTING AND BREACH OF FIDUCIARY

 2   DUTY, THAT IS, MR. BRYANT GIVING CONFIDENTIAL INFORMATION TO

 3   MGA OR AIDING AND ABETTING THE BREACH OF DUTY OF LOYALTY, BUT

 4   JUST ON CONVERSION AND THE INTENTIONAL INTERFERENCE, YOU MAY BE

 5   ASKED TO DECIDE WHETHER OR NOT THERE WAS FRAUDULENT CONCEALMENT    12:12

 6   FROM MATTEL OF THE FACT THAT CARTER BRYANT, WHILE HE WAS AT

 7   MATTEL, WHILE HE WAS AT MATTEL, WAS WORKING WITH MGA ON THE

 8   BRATZ PRODUCT.  NOT WHETHER HE WAS WORKING AT MGA, BUT WAS

 9   THERE FRAUDULENT CONCEALMENT OF THE FACT THAT WHILE MR. BRYANT

10   WAS AT MATTEL HE WAS WORKING WITH MGA TO CREATE BRATZ?           12:13

11        YOU RECALL, FOR INSTANCE, THAT WHEN MR. BRYANT LEFT

12   MATTEL, HE WAS ASKED WHERE HE WAS GOING, AND HE SAID HE WASN'T

13   WORKING FOR A COMPETITOR.  AND YOU HEARD MS. GARCIA SAY THAT IF

14   YOU SAY YOU'RE GOING TO WORK FOR A COMPETITOR, WHAT HAPPENS?

15   YOU'RE SHOWN THE DOOR RIGHT AWAY.  YOU'RE NOT GIVEN TWO WEEKS    12:13

16   TO STICK AROUND.

17        SO WE HAVE MR. BRYANT CONCEALING THE FACT HE'S

18   WORKING WITH MGA AT THE VERY TIME HE'S AT MATTEL.  AND THEN YOU

19   HAVE MS. RACHEL HARRIS' TESTIMONY THAT PAULA GARCIA, IN OCTOBER

20   OF 2000, WAS TELLING PEOPLE, 'DON'T TELL; WE HAVE TO KEEP THIS   12:13

21   QUIET THAT CARTER BRYANT IS COMING OVER HERE AND WORKING AT MGA

22   WHILE HE'S WORKING AT MATTEL.'

23        SO THAT'S THE ISSUE ON THIS, WHETHER THERE WAS

24   FRAUDULENT CONCEALMENT ON MR. BRYANT WORKING WITH MGA WHILE

25   HE'S AT MATTEL WORKING ON BRATZ.                                12:14
```

```
 1              SO THAT ISSUE IS IN THE CASE.

 2              IT DOESN'T AFFECT THE DAMAGES ONE WAY OR ANOTHER

 3    REALLY, BECAUSE THESE TWO CAUSES OF ACTION, THESE TWO TORTS YOU

 4    HAVE FOUND, REGARDLESS OF WHETHER OR NOT IT'S FRAUDULENT

 5    CONCEALMENT, ARE TIMELY BROUGHT, AND THAT'S AIDING AND ABETTING   12:14

 6    THE BREACH OF FIDUCIARY DUTY AND AIDING AND ABETTING THE BREACH

 7    OF THE DUTY OF LOYALTY, THAT WRONGFUL CONDUCT.

 8              AND ON THESE TORTS, AS A RESULT OF THE CONDUCT OF MGA

 9    AND MR. LARIAN -- AND I'M JUST FOCUSING ON THIS WRONGDOING

10    NOW -- AS A RESULT OF THAT WRONGDOING, MGA HAS BEEN ABLE TO       12:14

11    SELL BRATZ DOLLS, BRATZ ACCESSORIES, BRATZ PRODUCTS THAT IT

12    WOULD NOT HAVE BEEN ABLE TO SELL BUT FOR THAT MISCONDUCT.  AND

13    THEY CANNOT BE ALLOWED TO DO THAT.  THEY CANNOT BE ALLOWED TO

14    KEEP THOSE PROFITS THAT THEY WOULD NOT HAVE OTHERWISE HAD BUT

15    FOR THEIR CONDUCT.                                                12:15

16              AS I SAID, YOU'RE GOING TO HEAR FROM MIKE WAGNER.

17    HE'S A CPA; AT ONE POINT HE WAS A PARTNER AT PRICE WATERHOUSE;

18    THEY ARE THE ONES WHO COUNT THE OSCAR VOTES.  HE HAS BEEN AN

19    EXPERT WITNESS MANY TIMES.  HE HAS TESTIFIED IN COURT AT TRIAL

20    AS AN EXPERT I THINK AROUND 105 TIMES.  HE'S A CPA.  AND HE'S     12:15

21    GOING TO COME IN HERE AND TALK TO YOU ABOUT THE PROFITS, THE

22    BRATZ PROFITS THAT HAVE RESULTED THAT MGA HAS RECEIVED AS A

23    RESULT OF THIS CONDUCT.

24              IF WE COULD PUT UP 53.

25              THESE ARE HIS CALCULATIONS.  HE LOOKED AT THE           12:15
```

1   REVENUES FROM BRATZ, AND THAT COMES TO OVER THREE BILLION

2   DOLLARS REVENUE FROM BRATZ, FROM BRATZ PRODUCTS.  FROM THAT HE

3   CALCULATED THE COSTS ASSOCIATED WITH GENERATING THAT REVENUE,

4   BECAUSE YOU HAVE TO PAY FOR ANNA RHEE AND MARGARET LEAHY AND

5   OTHERS; SO HE CAME UP WITH A COST NUMBER ON THAT OF ABOUT 2.3        12:16

6   BILLION; SO HE CALCULATES THE BRATZ PROFITS ARE AROUND

7   $815,895,883.

8           NOW, YOU'RE GOING TO HEAR FROM THEIR EXPERT AS WELL.

9   AND I'M GOING TO ASK YOU TO LISTEN CAREFULLY TO THE EXPERTS

10  WHEN THEY TESTIFY.  ONE OF THE THINGS -- THERE'S PRETTY MUCH        12:16

11  AGREEMENT ON THE REVENUE, ON THE 3.1 BILLION REVENUE.  BUT WHAT

12  THEIR EXPERT DOES IS HE SUBTRACTS FROM THAT REVENUE ALL THE

13  BRATZ LICENSING FEES BECAUSE HE SAYS THAT'S NOT A DOLL ITSELF;

14  ALL FEES FOR NEW CHARACTERS, EVEN THOUGH YOU WOULDN'T HAVE BEEN

15  SELLING THOSE NEW CHARACTERS IF YOU HAD NOT GOTTEN THE             12:16

16  INFORMATION FROM MR. BRYANT IN THE FIRST PLACE.  IF IT'S A

17  DIFFERENT NAME OF A DOLL, YOU DON'T GET THE REVENUE.  IF IT'S

18  ACCESSORIES, IF IT'S A HAND BAG, IF IT'S A -- YOU DON'T GET

19  THAT, EVEN THOUGH IT'S THE BRATZ PRODUCT.

20          SO HE SUBTRACTS ALL OF THAT FROM THERE AND SAYS ALL        12:17

21  OF THAT MONEY, ALL OF THOSE LICENSE FEES, ET CETERA, MGA AND

22  LARIAN GET TO KEEP, CRIME PAYS, HERE'S THE AMOUNT THAT IT PAYS.

23          I THINK HIS FIGURES -- AND THEY MAY CHANGE BECAUSE

24  FIGURES ARE SOMETIMES CHANGING, DEPENDING UPON THE INFORMATION

25  YOU GET ON A WEEKLY BASIS -- BUT I THINK HIS FIGURE IS THAT THE    12:17

```
 1   PROFIT IS SOMEWHERE BETWEEN 108 AND 152 MILLION.  WHICH MEANS
 2   THAT SOMEWHERE BETWEEN 707 MILLION OR 664 MILLION, MGA GETS TO
 3   KEEP AND LARIAN GETS TO KEEP, BECAUSE IT'S NOT SPECIFICALLY THE
 4   DOLLS, IT'S LEVERAGING THE DOLLS, AND HIS CALCULATIONS ASSUME
 5   THEY GET TO KEEP THE PROFITS FROM LEVERAGING THE DOLLS.  THEY       12:17
 6   GET TO PROFIT FROM THAT.
 7            SO THAT'S THE BRATZ PROFITS.
 8            I'M JUST GOING TO ASK YOU TO LISTEN VERY CAREFULLY TO
 9   THE TWO EXPERTS.
10            NOW, THERE'S ALSO MR. LARIAN'S BENEFIT, AND HE'S          12:18
11   TAKEN DISTRIBUTIONS FROM THE COMPANY RELATED TO BRATZ.
12            NOW, THERE ARE A COUPLE OF WAYS TO FIGURE OUT WHAT
13   THOSE DISTRIBUTIONS ARE.  YOU CAN ASK MR. LARIAN.
14   UNFORTUNATELY, HE DOESN'T TELL YOU THE TRUTH WHEN YOU ASK HIM.
15   THERE IS SWORN TESTIMONY FROM MR. LARIAN IN ANOTHER CASE, BUT      12:18
16   IT IS SWORN TESTIMONY, HE WAS ASKED IN 2002:  DID YOU RECEIVE
17   BONUS?
18            "AGAIN, I DON'T THINK WE TAKE BONUSES AS OWNERS OF
19   THE COMPANY.  WE INVEST WHATEVER PROFIT WE MAKE IN THE COMPANY
20   BACK INTO THE COMPANY."                                            12:18
21            THAT'S WHAT HIS TESTIMONY WAS.
22            HE WAS ASKED ABOUT 2004, ALSO:
23            "IN 2004 DID YOU TAKE A BONUS?"
24            "I DON'T RECALL IF I TOOK A BONUS IN 2004 OR NOT."
25            WELL, MR. WAGNER HAD TO GO THROUGH THE FINANCIAL          12:18
```

1   RECORDS TO SEE WHETHER OR NOT MR. LARIAN TOOK DISTRIBUTIONS IN

2   2003 AND 2004 AND OTHER TIMES.

3          IN 2003 THERE'S EXHIBIT 656.  IT'S A FINANCIAL

4   STATEMENT.  IT'S AUDITED.  IT'S FOR THE YEAR ENDING 2003;

5   THAT'S THE YEAR WHERE MR. LARIAN SAID THEY PUT EVERYTHING BACK        12:19

6   INTO THE COMPANY.  AND IF YOU LOOK AT THAT, MR. WAGNER WILL

7   POINT THIS OUT TO YOU, IT'S ON PAGE 7, THERE'S A SECTION HERE

8   WHICH IS DIVIDENDS.  WE'VE GOT ADVANCES OF STOCKHOLDERS,

9   DISTRIBUTIONS TO STOCKHOLDERS -- THIS IS CASH FLOW GOING OUT OF

10  THE COMPANY -- AND THAT COMES CLOSE TO $78 MILLION OR SOMETHING      12:19

11  LIKE THAT.

12          NOW, MR. LARIAN IS ONLY AN 81-PERCENT SHAREHOLDER, SO

13  THE AMOUNT HE GOT IN 2003 WAS SOMEWHERE AROUND $65 MILLION OUT

14  OF THE COMPANY, EVEN THOUGH HIS TESTIMONY WAS EVERYTHING WAS

15  PLOWED BACK IN.  AND THEN FOR 2004, THE YEAR HE FORGOT WHETHER       12:19

16  OR NOT HE GOT ANYTHING OUT OF THE COMPANY, WELL, THERE'S A

17  FINANCIAL STATEMENT FOR DECEMBER 2004 AND 2003, AND IF YOU LOOK

18  AT JUST THE 2004 DISTRIBUTIONS -- AND THIS IS ON PAGE 7 HERE --

19  YOU'VE GOT THE DISTRIBUTION TO STOCKHOLDERS HERE, AND IT'S

20  83 MILLION -- THIS IS IN 2004 -- 83.9 MILLION, BASICALLY.           12:20

21  AGAIN, HE'S ONLY AN 81-PERCENT SHAREHOLDER, SO THE DISTRIBUTION

22  THAT HE DID NOT RECALL IN 2004 WAS AROUND $68,666,000 IN THOSE

23  TWO YEARS.

24          SO MR. LARIAN'S BENEFIT HAS BEEN PARTLY, AGAIN, MONEY

25  HE'S GETTING OUT OF THE COMPANY AS A RESULT OF THE MONEY COMING      12:20

1    IN, THE REVENUE COMING IN, BECAUSE OF THE BRATZ PRODUCTS.

2         IF YOU TOTAL HIS DISTRIBUTIONS RELATED TO THE BRATZ

3    PRODUCTS, IT COMES TO APPROXIMATELY $381,696,000.

4         NOW, THIS DOES NOT INCLUDE DISTRIBUTIONS TO -- THERE

5    WAS SOME TALK EARLIER -- FAMILY WHO WERE ON THE PAYROLL, OR          12:21

6    ANYTHING OF THAT NATURE.  THESE ARE DISTRIBUTIONS TO MR. LARIAN

7    PERSONALLY.  YOU'VE DECIDED HE ENGAGED IN THE WRONGDOING THAT

8    YOU FOUND.

9         REMEMBER EARLIER I TOLD YOU THAT THERE'S ALSO A VALUE

10   WHICH YOU HAVE TO PUT TO THE MGA STOCK.  AND HERE, MR. WAGNER       12:21

11   CALCULATES THAT AS $605 MILLION.  AND THAT MEANS BASICALLY,

12   OKAY, AS A RESULT OF BRATZ, MGA HAS SOME VALUE.  IT COULD BE

13   SOLD RIGHT NOW.  YOU OWN 81.8 PERCENT OF IT.  WHAT IS THAT

14   VALUE?

15        AND AGAIN, MR. WAGNER SAYS 605 MILLION.  AND YOU'LL           12:21

16   HEAR HIS TESTIMONY.  THEIR EXPERT, ON THE OTHER HAND, SAYS,

17   WELL, I'VE LOOKED TO SEE THE VALUE ATTRIBUTED TO BRATZ OF MGA,

18   AND IT'S ONLY ABOUT TWO HUNDRED MILLION.

19        NOW FOLKS, YOU'RE GOING TO SEE TESTIMONY OF INTERNAL

20   DOCUMENTS AT MGA THAT VALUES MGA THAT SAYS WHAT IS MGA'S WORTH?     12:22

21   I'M GOING TO SHOW YOU SLIDE 51.2, IF I COULD.  YOU'RE GOING TO

22   SEE -- THESE ARE DOCUMENTS WHICH ARE EITHER MGA'S DOCUMENTS OR

23   THEY HIRE SOMEONE TO VALUE THE COMPANY TO SEE WHAT IT IS WORTH,

24   WHAT COULD YOU SELL IT FOR.

25        AND YOU GET SOME VARYING NUMBERS.  YOU GET A NUMBER           12:22

1   WHICH WAS PUT IN AN EMPLOYMENT LETTER OF TWO BILLION.  THERE'S

2   A PRICE EARNINGS RATIO ANALYSIS DONE FOR MGA, WHICH PUTS IT AT

3   2.7 BILLION.  THERE'S AN INTERNAL ANALYSIS DONE IN MAY OF 2005,

4   1.4 BILLION.  IN JULY 2005 THERE'S AN EVALUATION DONE BY

5   OUTSIDE COMPANY THAT MGA COMMISSIONS SAY, WE'RE THINKING MAYBE          12:23

6   PUTTING THE COMPANY ON THE MARKET.  COULD YOU GIVE US AN IDEA,

7   WHAT'S THE COMPANY WORTH?  AND THEY PUT IT AT 2.5 BILLION.

8          MR. LARIAN HAS A LIST OF ASSETS FROM WHERE HE HIMSELF

9   ESTIMATES WHAT MGA IS WORTH.  HE PUT IT AT TWO BILLION; SO

10  THOSE ARE THE VALUATIONS THAT MGA PUTS ON MGA; SOMEWHERE              12:23

11  BETWEEN -- WELL, IF YOU TAKE OUT THE 1.4, THEY ARE ALL OVER TWO

12  BILLION.

13         SO OF THAT TWO BILLION WORTH, MR. MEYER CONCLUDES

14  THAT MR. LARIAN'S BENEFIT FROM MGA'S WORTH AS A RESULT OF BRATZ

15  IS ABOUT $200 MILLION.                                              12:23

16         BY THE WAY, IF WE GO BACK TO 51.1, THE DISTRIBUTIONS,

17  MR. MEYER, THEIR EXPERT, MAY ADDRESS THOSE DISTRIBUTIONS.  IT'S

18  NOT -- THERE'S A REPORT THAT GIVES YOU AN IDEA.  IT'S NOT IN

19  THERE.  WE'LL HAVE TO SEE WHAT IT SAYS, BECAUSE THAT'S

20  UNADDRESSED, I BELIEVE, BY MR. MEYER AT THIS POINT.                  12:24

21         SO I'VE BEEN LOOKING NOW AT THE BENEFIT TO MGA IN

22  TERMS OF PROFITS AND TO MR. LARIAN AS A RESULT OF BRATZ.  AND

23  BY THE WAY, WAS THIS AS A RESULT OF BRATZ?

24         WELL, YOU RECALL WHEN WE LOOKED AT THE ANALYSIS OF

25  THE REVENUE, THE TOP REVENUE, WHAT PRODUCTS ACTUALLY              12:24

```
 1    CONTRIBUTED TO REVENUE AND TO PROFITS.  YOU REMEMBER 50.5?
 2           WHY IS MGA WHERE IT IS TODAY?  IS IT BECAUSE OF BRATZ
 3    OR SOMETHING ELSE?
 4           DO YOU REMEMBER LOOKING AT THE PERCENTAGE OF REVENUE
 5    FROM THEIR TOP TEN GROSSING PRODUCT LINES?                     12:25
 6           IT'S ABOUT 80 PERCENT BRATZ.
 7           THAT'S REALLY AN UNDERSTATEMENT, BECAUSE WE'RE
 8    INCLUDING IN THIS LITTLE TIKES, BOUGHT BY MR. LARIAN, AS WELL
 9    AS I THINK ZAPS -- YOU RECALL WE SHOWED YOU EXHIBIT 51.8 WHICH
10    ARE THE PROFITS; THIS IS WHAT HAS MADE MGA SINCE THE BRATZ ERA, 12:25
11    AND THE PROFITS ARE BRATZ.  THE PROFITS ARE BRATZ.
12           THE VALUE OF MGA IS BECAUSE OF BRATZ.
13           SO I'VE TALKED TO YOU ABOUT WHAT BASICALLY HAVE MGA
14    AND MR. LARIAN GAINED BECAUSE OF THE WRONGDOING, BECAUSE OF
15    BRATZ.  BUT THERE'S ANOTHER DAMAGE CALCULATION, BUT IT'S       12:25
16    RELATED, AND THAT IS WHAT WOULD THE DAMAGES BE FOR THE
17    COPYRIGHT?  NOT FOR WHAT YOU'VE ALREADY FOUND, BUT FOR THE
18    BREACH OF COPYRIGHT; THAT IS, FOR SELLING DOLLS THAT ARE
19    SUBSTANTIALLY SIMILAR IN APPEARANCE TO THE DRAWINGS THAT MATTEL
20    OWNS, AND THEN SELLING ACCESSORIES, ETC., AS A RESULT OF THAT.  12:26
21           WELL, AGAIN, THE BASIC RULE IS THAT YOU HAVE TO
22    DISGORGE YOUR PROFITS FROM ANY SUCH KIND OF VIOLATION.  IF YOU
23    MAKE MONEY BECAUSE YOU INFRINGE A COPYRIGHT, YOU'RE NOT
24    ENTITLED TO KEEP THAT MONEY.  IT'S A COMMON SENSE RULE.  IT'S
25    THE SENSE THAT YOUR MOM PROBABLY TAUGHT YOU WHEN YOU WERE       12:26
```

1    YOUNG:  YOU CAN'T PROFIT FROM YOUR WRONGDOING.

2         SO YOU LOOK AT THE PROFITS MGA MADE.  YOU LOOK AT THE

3    BENEFITS TO MR. LARIAN.  AND YOU LOOK NOT JUST AT THE DIRECT

4    PROFIT, WHICH IS, FOR EXAMPLE, WHAT WERE THE ROYALTIES OF JUST

5    SELLING CLOE, WHAT DID YOU MAKE FROM THAT; BUT YOU ALSO LOOK AT   12:26

6    THE INDIRECT PROFIT; THAT IS, WHAT DOES THAT ALLOW YOU TO MAKE.

7         SO WHEN YOU SEE DIFFERENT PRODUCTS WHICH YOU LOOK AT

8    AND YOU GO, WELL, THAT LINEN SHEET DOESN'T LOOK VERY MUCH LIKE

9    CLOE, EVEN THOUGH IT HAS A BRATZ LOGO ON IT, YOU'VE GOT TO ASK

10   YOURSELF WOULD THAT PROFIT HAVE BEEN MADE, WOULD THAT SALE HAVE   12:27

11   BEEN MADE, IF NOT FOR THE BRATZ DOLLS?

12        YOU SIMPLY CANNOT PROFIT FROM YOUR WRONGDOING.

13        AND WITH RESPECT TO THESE, THERE'S A CONCEPT CALLED

14   APPORTIONMENT; THAT IS -- AND HERE'S THE IDEA.  LET'S SAY THAT

15   I'M SELLING A CD WITH TEN SONGS ON IT, AND I WROTE NINE OF THEM   12:27

16   AND YOU WROTE ONE OF THEM, AND I DON'T GET PERMISSION FROM YOU

17   TO USE IT.  YOU'VE GOT A COPYRIGHT ON IT.  I GO AND SELL THAT

18   CD WITH TEN SONGS; ONE IS YOURS; AND I MAKE ONE HUNDRED BUCKS

19   BY SELLING IT.

20        THE IDEA OF APPORTIONMENT IS YOU DON'T GET THE WHOLE   12:27

21   ONE HUNDRED BUCKS, BECAUSE I HAD NINE SONGS THAT I COULD HAVE

22   SOLD.  I SHOULDN'T HAVE SOLD YOURS.  YOU GET THE VALUE OF

23   SELLING YOUR SONG.  THAT'S THE IDEA OF APPORTIONMENT IF YOU'RE

24   DOING SOMETHING LEGITIMATE AT THE SAME TIME.

25        NOW, AS MR. WAGNER WILL EXPLAIN, THAT ANALYSIS DOES   12:28

```
 1   NOT APPLY HERE, BECAUSE ALL THAT MGA IS SELLING IS BRATZ.  IT'S
 2   SELLING THINGS RELATED TO BRATZ.  IT'S SELLING THINGS IT WOULD
 3   NOT HAVE SOLD BUT FOR BRATZ.
 4        IN THE TEN-SONG EXAMPLE I GAVE YOU, IF I DID NOT SELL
 5   ANY OF MY NINE SONGS WITHOUT YOUR TENTH SONG, THEN YOU WOULD          12:28
 6   GET ALL OF THE MONEY BECAUSE I WOULD HAVE MADE ZERO WITHOUT
 7   YOUR SONG.  THAT'S THE SITUATION HERE.
 8        BRATZ ISN'T BEING SOLD ALONG WITH PRAYER ANGELS.
 9   IT'S NOT LIKE IT'S A GIFT PACK; YOU GET A BRATZ, YOU GET A
10   PRAYER ANGEL, AND YOU GET A TALKING TABATHA.  WE'RE TALKING AND       12:28
11   BRATZ BEING SOLD AS BRATZ AND BEING LEVERAGED WITH BRATZ
12   ACCESSORIES.  SO THE TESTIMONY YOU'RE GOING TO HEAR FROM OUR
13   EXPERT IS THAT THAT WOULD MEAN YOU WOULDN'T GET ANY
14   APPORTIONMENT GIVEN THAT SORT OF ANALYSIS.
15        SO WHENEVER YOU HEAR THAT THIS WAS SOLD BECAUSE THIS            12:29
16   HAPPENED, THE QUESTION THAT I ASK IS, WOULD IT HAVE BEEN SOLD
17   AT ALL IF NOT FOR BRATZ?
18        WHAT MR. MEYERS SAYS IS THERE'S A LOT OF THINGS THAT
19   WENT INTO SELLING BRATZ.  WE DID GREAT PACKAGING; THE BEST
20   PACKAGING EVER.  BY THE WAY, THE PACKAGING ITSELF INFRINGES THE      12:29
21   COPYRIGHT, BECAUSE IT HAS THE PICTURES ON THE BOTTOM OF THAT
22   FOUR HERO POSE WHICH LOOKS SUBSTANTIALLY SIMILAR TO WHAT CARTER
23   BRYANT DID.  BUT LET'S IGNORE THAT.  WE HAD GOOD PACKAGING.  WE
24   HAD GREAT THEMES TO SELL THIS BRATZ DOLL.  WE HAD GREAT
25   FASHIONS WHICH SOLD THE BRATZ DOLL.  AND WE GAVE THEM               12:29
```

1    CHARACTERS WHICH SOLD THE BRATZ DOLLS AND THE BRATZ

2    ACCESSORIES.

3           AND THE EVIDENCE YOU'RE GOING TO HEAR IS, YES, BUT

4    YOU MIGHT HAVE DONE A GREAT JOB SELLING IT, BUT IT WASN'T YOURS

5    TO SELL.  IF IT'S NOT YOURS TO SELL, YOU DON'T KEEP THE          12:30

6    PROFITS.

7           I MEAN, IF YOU STEAL SOMEONE'S CAR AND DO A GREAT JOB

8    AT SELLING IT BECAUSE YOU DO A GREAT AD AND MARKETING, YOU

9    STILL DON'T GET TO KEEP THAT PROFIT.

10          SO WHAT WE'RE GOING TO SUGGEST TO YOU IS NO              12:30

11   APPORTIONMENT IS APPROPRIATE HERE BECAUSE ALL MGA IS SAYING IS

12   THEY DID A GREAT JOB STEALING A PRODUCT THAT DID NOT BELONG TO

13   THEM.  AND THEREFORE THEY DON'T GET A CUT JUST BECAUSE THEY DID

14   A GOOD JOB DOING IT.

15          IN FACT, YOU'RE GOING TO BE SHOWN EVIDENCE AS TO THE     12:30

16   EFFECT OF THE BRATZ CONCEPT, THE BRATZ DOLL, VERSUS THESE OTHER

17   EFFORTS, BECAUSE YOU'RE GOING TO HEAR TESTIMONY AS TO HOW WELL

18   THIS MARKETING WORKED WITH ALL OF THEIR OTHER PRODUCTS; THAT

19   IS, IF YOU HAVE A PRAYER ANGEL DOLL IN HERE INSTEAD OF A BRATZ

20   DOLL, IF YOU WERE SELLING SOME OTHER PRODUCT, WHAT WERE THE      12:30

21   PROFITS AS A RESULT OF THE GREAT MARKETING ON THAT WITH THE

22   SAME STAFF, FOR EXAMPLE, THE SAME PEOPLE.

23          THE PROFITS WERE ZERO ON THE NON BRATZ PRODUCTS.

24   BRATZ PROFITS EXIST BECAUSE OF THE INFRINGEMENT OF THE

25   COPYRIGHT AND BECAUSE OF THE SALE OF THESE ACCESSORIES WHICH     12:31

```
 1   ARE INDIRECT PROFITS.

 2         THE BOTTOM LINE NUMBER WHICH THEIR EXPERT COMES UP

 3   TO, I THINK, ON THE PROFIT THAT MGA HAS MADE AS A RESULT OF THE

 4   COPYRIGHT INFRINGEMENT IS SOMEWHERE BETWEEN 28 AND 50 MILLION.

 5   IT MIGHT EVEN BE LOWER THAN THAT.  AND YOU'RE GOING TO BE ASKED    12:31

 6   TO JUDGE THAT ANALYSIS AND COMPARE THAT NEXT TO WAGNER'S

 7   ANALYSIS.  ON THE COMPANY'S WORTH -- I'M SORRY, THAT WAS FOR

 8   THE COMPANY'S WORTH.  THAT'S THE VALUE TO MGA.

 9         ON REVENUE, I THINK MR. MEYERS SAYS THAT THE REVENUE

10   IS ATTRIBUTABLE TO BRATZ IS SOMEWHERE AROUND 15.5 TO 38          12:32

11   MILLION.

12         AND THEN, WHAT HE DOES THEN IS HE SAYS, WELL, LET'S

13   THEN APPORTION THAT.  AND I BELIEVE HIS FIGURES ARE SOMETHING

14   THAT WITH ALL THAT REVENUE WITH THESE DOLLS HE SAYS -- ASSUMING

15   THIS IS A COPYRIGHT VIOLATION, ASSUMING THESE DOLLS LOOK          12:32

16   EXACTLY LIKE CARTER BRYANT'S DRAWINGS, NOT JUST SUBSTANTIALLY

17   SIMILAR BUT THEY LOOK EXACTLY LIKE THEM, HIS FIGURE IS THAT,

18   WELL, EVEN IF THAT'S TRUE, ONLY ABOUT 14 PERCENT OF THAT

19   REVENUE AND PROFIT IS DUE TO THE FACT THAT IT'S BRATZ AS

20   OPPOSED TO SOMETHING ELSE.                                        12:32

21         SO EVEN IF IT'S AN IDENTICAL DOLL, THE DOLL IS

22   IDENTICAL IN EVERY WAY TO THE DRAWING, MGA STILL GETS TO KEEP

23   IT, CRIME STILL PAYS, IN THE NEIGHBORHOOD OF 75, 80 PERCENT.

24   SO WE'RE GOING TO ASK YOU TO EVALUATE THAT AND SEE WHETHER THAT

25   IS FAIR AND WHETHER OR NOT THAT MAKES SENSE.                      12:33
```

1      THERE IS A FINAL ISSUE THAT YOU WILL BE ASKED TO

2  DECIDE, AND THAT IS THE ISSUE OF WHAT ARE CALLED PUNITIVE

3  DAMAGES.  THAT IS, WE GET TO SHOW YOU THE PROFITS THAT SHOULD

4  BE DISGORGED; THAT IS, THE PROFITS THAT MGA -- THE BENEFITS MGA

5  AND LARIAN RECEIVED, OBTAINED FROM THE WRONGFUL CONDUCT, AND          12:33

6  WE'RE ENTITLED TO ASK YOU TO TAKE THAT AWAY FROM THEM BECAUSE

7  IT WAS WRONGFULLY OBTAINED.

8      WE'RE ALSO ENTITLED TO ASK YOU FOR PUNITIVE DAMAGES;

9  THAT IS, TO SET AN EXAMPLE.  I'M NOT GOING TO TALK ABOUT

10  NUMBERS IN TERMS OF WHAT WE'RE GOING TO ASK FOR TODAY, BUT THE      12:33

11  FACTORS THAT YOU GET TO ASK TO LOOK AT.  ONE, YOU HAVE TO SEE

12  WHETHER THERE WAS MALICE, OPPRESSION AND FRAUD IN COMMITTING

13  THOSE ACTIONS WHICH YOU'VE ALREADY SAID THEY HAVE COMMITTED,

14  AND WE SAY IN COMMITTING THE COPYRIGHT VIOLATIONS, AND YOU WILL

15  HEAR EVIDENCE ON THAT.  YOU'VE ALREADY HEARD EVIDENCE RELATED      12:34

16  TO THAT.

17      THEN YOU HAVE TO LOOK AT THE VARIOUS FACTORS FOR

18  PUNITIVE DAMAGES, SUCH AS HOW WILL IT AFFECT THE PERSON?

19      ONE OF THE PURPOSES OF PUNITIVE DAMAGES IS TO DETER

20  CONDUCT IN THE FUTURE.  SO, FOR EXAMPLE, IF YOU MAKE $50,000 A    12:34

21  YEAR, AN AWARD OF 50,000 WOULD BE PRETTY MUCH A GOOD DETERRENT.

22  BUT IT MIGHT NOT BE A GOOD DETERRENT IF YOU MAKE THREE MILLION

23  A YEAR, FOR EXAMPLE.

24      SO ONE THING YOU'RE ENTITLED TO LOOK AT IS THE NET

25  WORTH OF THE DEFENDANT, OF THE COMPANY THAT ENGAGED IN THE         12:34

1    WRONGFUL CONDUCT, SO YOU CAN DECIDE WHAT AMOUNT IS NECESSARY TO

2    DETER THEM FROM EVER DOING THIS.

3         WITH THAT RESPECT, MR. WAGNER HAS LOOKED AT THE NET

4    WORTH OF MR. LARIAN AND THE NET WORTH OF MGA.  FOR MR. LARIAN,

5    THE NUMBERS ARE STILL COMING IN.  I KID YOU NOT, WE'RE GOING TO    12:35

6    BE GETTING MORE DOCUMENTS ON THIS.  BUT THERE IS A DOCUMENT

7    WHICH MR. LARIAN PRODUCED, WHICH IS SORT OF A FINANCIAL

8    STATEMENT OF HIM AND HIS COMPANY, AND IT STATES, AS OF

9    OCTOBER 2007 AT LEAST, WHAT HIS NET WORTH IS.

10         IF WE COULD PUT UP 51.3.                                     12:35

11         MR. LARIAN'S NET WORTH IS SOMEWHERE AROUND 1.9

12    BILLION DOLLARS.

13         SO IF YOU DETERMINE THERE SHOULD BE PUNITIVE DAMAGES,

14    ONE THING YOU HAVE TO TAKE INTO ACCOUNT IS WHAT AMOUNT WOULD

15    HAVE AN EFFECT ON MR. LARIAN SO THAT IT WOULD DETER HIM IN THE    12:35

16    FUTURE, AS OPPOSED TO SOMEONE MAKING 50,000 A YEAR.

17         FOR MGA'S NET WORTH, YOU'LL HEAR, IS A LITTLE LOWER.

18    MGA'S NET WORTH IS ABOUT 438 BILLION; THAT'S WHAT'S REMAINING

19    IN THE COMPANY AND LOOKING AT THE COMPANY GOING FORWARD.

20         SO WE'LL BE INTRODUCING THAT EVIDENCE.  IT'S               12:36

21    SOMETHING YOU'LL HAVE TO TAKE INTO ACCOUNT.  AND YOU'LL BE

22    ASKED THE QUESTION ABOUT WHETHER OR NOT MGA AND MR. LARIAN

23    UNDERSTAND AND ACKNOWLEDGE, ADMIT THAT WHAT THEY DID WAS WRONG

24    AND THAT THEY ARE NOT TRYING TO KEEP WHAT'S THEIRS.  IT'S NOT

25    THEIRS.                                                          12:36

1           AT THE END OF THIS CASE, WE'LL BE ASKING YOU FOR

2   PUNITIVE DAMAGES BASED IN PART PERHAPS ON WHAT YOU'RE GOING TO

3   SEE IN THIS PHASE OF THE CASE.  AND WHAT I THINK WE'LL PROVE TO

4   YOU IS THAT MR. LARIAN AND MGA SEE THIS AS A GAME IN WHICH THEY

5   SAY WHAT THEY HAVE TO SAY TO KEEP WHAT THEY THINK THEY CAN;          12:36

6   THAT THEY SAY WHAT THEY HAVE TO SAY TO GET AWAY WITH WHAT THEY

7   CAN.

8           AND IF YOU CONCLUDE THAT'S WHAT'S HAPPENING, THAT'S

9   SOMETHING YOU CAN TAKE INTO ACCOUNT IN DECIDING WHETHER THERE

10  SHOULD BE PUNITIVE DAMAGES AND TO DECIDE WHETHER MGA AND LARIAN     12:37

11  HAVE TO BE TAUGHT THAT THIS IS NOT A GAME AND IT SHOULDN'T BE

12  TREATED LIKE A GAME.

13          SO AS I SAID, WE ONLY HAVE 12.5 HOURS.  WE'RE GOING

14  TO TRY -- WE HAVE TO DO THIS AS QUICKLY AS POSSIBLE.  AND DON'T

15  WORRY IF THINGS COME IN QUICKLY.  WE GET A CLOSING ARGUMENT AS      12:37

16  WELL WHERE WE CAN TRY TO SHOW YOU THE EVIDENCE AND PUT IT

17  TOGETHER SO THAT IT'S IN KIND OF A LINEAR FORM SO YOU CAN

18  UNDERSTAND IT.  SO I'M GOING TO ASK YOU TO BEAR WITH US, AS

19  YOU'VE DONE BEFORE.

20          I THANK YOU FOR YOUR SERVICE SO FAR, AND WE OBVIOUSLY       12:37

21  APPRECIATE THE FACT THAT YOU'RE GOING TO PROVIDE THE SAME

22  SERVICE FOR THE NEXT COUPLE OF WEEKS.

23          **THE COURT:**  WE'RE GOING TO TAKE OUR LUNCH BREAK AT

24  THIS TIME.  SINCE WE ARE NOT ORDERING IN LUNCH TODAY, YOU'RE

25  GOING TO BE ON YOUR OWN, I'M GOING TO GIVE YOU UNTIL 2:00; AN       12:38

1   HOUR AND 20 MINUTES.  BUT LET'S BE BACK A FEW MINUTES BEFORE

2   2:00 SO WE CAN START RIGHT AT 2:00 WITH MR. NOLAN'S OPENING

3   STATEMENT.

4          JUST REMEMBER AT THIS PHASE -- YOU'RE NO LONGER IN

5   DELIBERATION MODE -- DON'T DISCUSS THE CASE.  DON'T DISCUSS          12:38

6   ANYTHING YOU'VE HEARD IN OPENING STATEMENTS.  GO BACK TO THAT

7   MODE YOU WERE IN WHEN YOU WERE HEARING EVIDENCE BEFORE.

8          YOU'RE NOT GOING TO HAVE A MARSHAL KEEPING YOU

9   TOGETHER, OR ANYTHING OF THAT SORT.  DON'T SPEAK TO ANYBODY

10  ABOUT THE CASE.  JUST MIND YOUR OWN BUSINESS THERE AND EVERYONE     12:38

11  ELSE WILL MIND THEIRS AND WE'LL BE FINE.

12         THANK YOU VERY MUCH.  I'LL SEE YOU BACK HERE AT 2:00.

13         (WHEREUPON, JURORS DEPART COURTROOM.)

14     **MR. NOLAN:**  YOUR HONOR, COULD I JUST TAKE A FEW

15  MINUTES BEFORE THE LUNCH HOUR.                                     12:39

16         TWO QUICK POINTS, YOUR HONOR.

17         BASED ON MR. PRICE'S ARGUMENT, ESPECIALLY WITH THE

18  ISSUES NOW WHERE WE BELIEVE HE'S CONFLATED THE WRONGFUL CONDUCT

19  DAMAGES ON THE INTENTIONAL TORT WITH THE COPYRIGHT DAMAGES.  I

20  DO WANT TO GO BACK AND REVISIT A MOTION *IN LIMINE* THAT WAS       12:39

21  ADDRESSED BY THE COURT EARLIER, AND THAT HAS TO DO WITH THIS

22  WHOLE NOTION -- MR. PRICE ARGUING TO THE JURY THAT IF YOU STEAL

23  A CAR AND THEN YOU SELL THE CAR FOR A GREAT PRICE, THEN YOU

24  DON'T GET TO KEEP THE PROFITS.

25         INHERENTLY, THE WEAKNESS IN THAT ARGUMENT IS THAT THE       12:39

1    CAR HAS EXTRINSIC VALUE AND IT WAS RECOGNIZED BY THE OWNER THAT

2    LOST IT.

3            HERE, THE EVIDENCE IS -- AND WE'VE MADE THIS PROFFER

4    BEFORE -- THAT MATTEL WOULD NEVER HAVE MADE BRATZ IN THE FIRST

5    PLACE; WOULD NEVER HAVE MADE BRATZ.  AND SO WHEN YOU ARE NOW          12:40

6    FACED WITH AN ARGUMENT TO A JURY WHERE HE'S ASKING FOR PUNITIVE

7    DAMAGES -- AND I WOULD SUBMIT THIS ARGUMENT IS IN PARALLEL WITH

8    THE PUNITIVE DAMAGE ARGUMENT -- THAT CLEARLY, ONE OF THE TESTS

9    THAT A JURY SHOULD BE ALLOWED TO MEASURE AS TO SENDING A

10   WARNING THROUGH PUNITIVE DAMAGES -- CLEARLY HE'S POINTED TO NET      12:40

11   WORTH -- IS THE OTHER BALANCE IN SAYING, ALL RIGHT, WAIT A

12   MINUTE, THIS THING, THIS IDEA, THAT THEY ARE ALLEGED TO HAVE

13   TAKEN, THESE DRAWINGS, THESE 16 DRAWINGS, HAD NO EXTRINSIC

14   VALUE TO MATTEL.  MATTEL, THE EVIDENCE WOULD SHOW, WOULD NOT

15   HAVE MADE IT.  IT WOULD NEVER HAVE BEEN LAUNCHED IN THE PUBLIC       12:41

16   DOMAIN.

17           SO IN EFFECT, WHAT THE COPYRIGHT ACT WOULD NEVER

18   PERMIT, AND THAT IS A MONOPOLY BY SOMEONE LIKE MATTEL -- WHAT

19   MATTEL HAS DONE, THROUGH THE GUISE OF A TORT ACTION, WHICH THEY

20   ARGUED TO JUDGE MANELLA HAD NO VALUE IN EXCESS OF $75,000 --         12:41

21   THEY ARE NOW COMING BACK IN UNDER THE GUISE OF THE INTELLECTUAL

22   VALUE REVENUES OF THREE BILLION DOLLARS AND SAYING, WOW, YOU

23   SHOULDN'T STEAL THAT; CRIME DOESN'T PAY.

24           THIS JURY MUST KNOW IN FAIRNESS, YOUR HONOR, THAT THE

25   PERSON WHO CLAIMS TO HAVE OWNERSHIP OF THIS, A, WOULD NOT HAVE       12:41

1   DEVELOPED BRATZ; B, WITH RESPECT TO THE APPORTIONMENT ARGUMENT,

2   YOUR HONOR, WHERE HE'S PUSHED ASIDE ALL OF THE ARGUMENTS WITH

3   APPORTIONMENT -- I WOULD ASK THE COURT TO NOW REALLY FOCUS ON

4   ALLOWING US TO INTRODUCE THE VARIOUS DOCUMENTS THAT SHOW THAT

5   MATTEL THEMSELVES LOOKED TO PLAY THEMES AS THE IMPORTANCE OF      12:42

6   DRIVING A BRAND.

7           ALL OF THAT INFORMATION I THINK IS COMPLETELY

8   RELEVANT IN LIGHT OF MR. PRICE'S ARGUMENT THAT NONE OF THAT

9   MATTERS BECAUSE CRIME DOESN'T PAY.

10          THOSE ARE HIS WORDS.  THAT'S THEIR THEORY, YOUR          12:42

11  HONOR.

12          AGAIN, WE UNDERSTOOD YOUR RULING, BUT THEY CAN'T

13  FLAUNT YOUR RULINGS, YOUR HONOR, AND HAVE US HANDCUFFED IN SUCH

14  A WAY THAT WE CAN'T MAKE A FAIR PRESENTATION TO THE JURY.

15          **THE COURT:**  LET ME MAKE SURE I UNDERSTAND YOUR        12:42

16  ARGUMENT.

17          TO USE THE CAR EXAMPLE, WHETHER OR NOT A PERSON USES

18  A CAR, WHETHER IT STAYS IN THE GARAGE, PARKED, WITH A COVER ON

19  TOP OF IT, IS THEIR BUSINESS.  RIGHT?  AND IT DOESN'T AFFECT

20  THE VALUE OF THE CAR.                                            12:43

21          **MR. NOLAN:**  I RESPECTFULLY THINK IT DOES AFFECT THE

22  VALUE OF THE CAR, BECAUSE EACH YEAR -- AND WE'RE USING THIS AS

23  AN ANALOGY -- THE KELLY BLUE BOOK WOULD STILL ATTACH THEIR

24  INTRINSIC VALUE TO THAT OBJECT.

25          HERE, THE IDEA WAS NEVER DEVELOPED AT MATTEL; NEVER      12:43

1    PRESENTED TO MATTEL.  THERE WAS NOTHING.

2            IF YOU WANT TO LOOK AT THE BEST ANALOGY, YOUR HONOR,

3    WE SHOULD BE TALKING ABOUT, ALL RIGHT, MY SCENE OR FLAVAS.

4            **THE COURT:**  I THINK I UNDERSTAND YOUR ARGUMENT,

5    COUNSEL.  I'LL HEAR FROM MATTEL.                              12:43

6            **MR. PRICE:**  IT'S AN ARGUMENT THAT DOES NOT MAKE

7    SENSE.

8            THE ARGUMENT I MADE IS YOU HAVE TO DISGORGE YOUR

9    PROFITS.  NOT THE HARM TO MATTEL.  IT IS THAT YOU TAKE

10   SOMETHING, YOU BENEFIT FROM IT, YOU HAVE TO DISGORGE THAT.    12:43

11           IT DOES NOT MATTER WHETHER YOU DID A GREAT JOB OR A

12   LOUSY JOB OF BENEFITTING FROM IT, YOU HAVE TO DISGORGE THE

13   BENEFIT THAT YOU GET FROM THAT.  THAT HAS NOTHING TO DO WITH

14   HOW MATTEL WOULD HAVE TREATED THE SAME RESOURCE.

15           IT'S A VERY SIMPLE RULE.                              12:44

16           IF YOU TAKE SOMETHING -- LIKE THE TEN CD EXAMPLE.  IF

17   I TAKE YOUR SONG AND I SELL IT AND MAKE $100 MILLION, I CAN'T

18   COME AND ARGUE, HEY, ANOTHER PERSON WOULD HAVE ONLY MADE 50, SO

19   I GET TO KEEP 50.

20           **THE COURT:**  AND JUST TO BE CLEAR, I THINK I ELICITED  12:44

21   A CLEAR STATEMENT FROM MATTEL, YOU ARE SEEKING DISGORGEMENT OF

22   PROFITS AND REVENUES WITH RESPECT TO THE STATE TORT CLAIMS AS

23   WELL AS THE COPYRIGHT CLAIMS?

24           **MR. PRICE:**  ABSOLUTELY.

25           THERE'S A LOGICAL DISCONNECT IN THE ARGUMENT THAT'S    12:44

```
 1   BEING MADE.

 2          THEN THE ARGUMENT THAT BECAUSE WE ASKED FOR PUNITIVE

 3   DAMAGES -- THEY HAVE KNOWN WE'RE ASKING FOR PUNITIVE DAMAGES

 4   FOR A LONG TIME.  AND ALL WE DISCUSSED IN THAT RESPECT IS WHAT

 5   DO YOU HAVE TO DO TO DETER THEIR CONDUCT?                          12:44

 6          AGAIN, THAT HAS NOTHING TO DO WITH HOW MATTEL WOULD

 7   HAVE TREATED THE SAME PROPERTY.

 8          THE COURT:  MR. NOLAN, I'LL GIVE YOU THE LAST WORD,

 9   BECAUSE I GUESS I DON'T SEE HOW THIS CHANGES ANYTHING WE

10   DISCUSSED.                                                         12:45

11          MR. NOLAN:  FIRST, ON THE PUNITIVE DAMAGE ARGUMENT,

12   THEY ARE ASKING FOR DAMAGES UNDER THE TORT CLAIMS FOR HARM.

13          THE COURT:  A SPECIFIC TYPE OF HARM; A SPECIFIC TYPE

14   OF DAMAGE.  THEY HAVE ELECTED A DAMAGE TO PURSUE WHICH IS

15   DISGORGEMENT OF PROFITS AND REVENUE.  THAT'S IT.  IT'S NOT THE     12:45

16   TRADITIONAL DAMAGES WHERE THIS ARGUMENT, AS I PREVIOUSLY RULED,

17   WOULD HAVE COME IN.  AND IF MR. PRICE WOULD HAVE STOOD UP AND

18   ARGUED FOR TRADITIONAL COMPENSATION, THAT WOULD HAVE BEEN A

19   DIFFERENT BALL GAME.

20          MR. NOLAN:  OUR POINT IS THAT THE DISGORGEMENT OF           12:45

21   PROFITS UNDER THAT TORT CLAIM COUPLED WITH THE CLAIM OF THE

22   COPYRIGHT DAMAGES -- DISGORGEMENT OF PROFITS IS NOT A

23   RECOGNIZED -- IT'S NOT THE RIGHT MEASURE OF DAMAGES FOR TORTS,

24   BECAUSE IT ALLOWS --

25          THE COURT:  YOU'RE GOING TO HAVE TO GIVE ME SOME            12:46
```

1    AUTHORITY ON THIS.

2            WHERE IS IT?

3            **MR. NOLAN:**  I THINK IT'S IN THE JMOL MOTION WHERE

4    WE'RE TALKING ABOUT THIS ISSUE.

5            **THE COURT:**  I'LL LOOK AT THIS.  I INVITED THIS                12:46

6    AUTHORITY ON MONDAY DURING THE HEARING.  MATTEL CITED THE

7    AUTHORITY.  I LOOKED AT THE CITE THEY MADE REFERENCE TO.

8            SO YOU'RE TAKING THE POSITION THAT LOSS OF REVENUES

9    IS NOT AN APPROPRIATE REMEDY FOR THESE TORT VIOLATIONS.

10           **MR. NOLAN:**  YES, YOUR HONOR.                                  12:46

11           RESPECTFULLY, MAYBE THEY CITED YOU TO A PARTICULAR

12   CASE.  I RAISED ON FRIDAY --

13           **THE COURT:**  THEY CITED ME TO THE STATEMENT.

14           **MR. NOLAN:**  BUT I CITED YOU TO THE ISSUES BRIEFED IN

15   OUR JMOL MOTION.  I SAID THAT AT THE FRIDAY HEARING WHEN YOU        12:46

16   ASKED IS THERE ANYTHING ELSE.  AND THEN YOU SAID OKAY.  THEN

17   YESTERDAY I MADE THE SAME COMMENT WITH RESPECT TO THE JMOL.

18           **THE COURT:**  VERY GOOD.  I'LL SEE COUNSEL BACK HERE AT

19   1:30.

20           **MR. NOLAN:**  THANK YOU.                                        12:47

21           (WHEREUPON A BRIEF RECESS WAS HELD.)

22           (MORNING SESSION CONCLUDED)

23

24   / / /

25   / / /

1                              CERTIFICATE

2

3     I hereby certify that pursuant to section 753, title 28, united
      states code, the foregoing is a true and correct transcript of
4     the stenographically recorded proceedings held in the above-
      entitled matter and that the transcript page format is in
5     conformance with the regulations of the judicial conference of
      the united states.

6

7     _____          _____
      THERESA A. LANZA, CSR, RPR                        Date
8     FEDERAL Official COURT Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WEDNESDAY, JULY 23, 2008                    TRIAL DAY 27, MORNING SESSION