1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3                 EASTERN DIVISION

4                    - - -

5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                    - - -

7   MATTEL, INC.,                    )
                                     )
8                    Plaintiff,      )
                                     )
9            vs.                     )  No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al.,  )
                                     )
11                   Defendants.     )  TRIAL DAY 30
    _____)   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )  pages 5965-6047
    _____)

13

14

15      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                Riverside, California

17             Wednesday, August 6, 2008

18                   8:31 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
             Federal Official Court Reporter
24            3470 12th Street, Rm. 134
             Riverside, California  92501
25                951-274-0844
             WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                            MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                            TIMOTHY ALGER
                         865 S. FIGUEROA STREET,
 7                       10TH FLOOR
                         LOS ANGELES, California  90017
 8

 9

10   ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL KENNEDY
13                            LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16
     ALSO PRESENT:       MARY SO,
17                       CANTONESE INTERPRETER

18

19

20

21

22

23

24

25
```

WEDNESDAY, AUGUST 6, 2008                    TRIAL DAY 30, MORNING SESSION

```
1                           I N D E X

2

3

4   PLAINTIFF
    WITNESS           DIRECT      CROSS      REDIRECT      RECROSS
5   KEN LEUNG

6   BY MR. QUINN     5992                    6037
    BY MR. HANSEN                6019
7

8   PLAINTIFF
    WITNESS           DIRECT      CROSS      REDIRECT      RECROSS
9   EDMOND YEUNG

10  BY MR. QUINN     6039

11

12

13

14        EXHIBITS          RECEIVED

15        13865            6041
          13866            6041
16        13868            6041
          13721            6042
17        13867            6043
          13718            6043
18         4207            6045

19

20

21

22

23

24

25
```

WEDNESDAY, AUGUST 6, 2008                    TRIAL DAY 30, MORNING SESSION

5968

1          RIVERSIDE, CALIFORNIA; WEDNESDAY, AUGUST 6, 2008; 8:31 A.M.

2                              -oOo-

3          **THE CLERK:**  CALLING CASE NUMBER CV04-09049-SGL,

4     MATTEL, INC., V. MGA, INC., ET AL., OUTSIDE THE PRESENCE OF THE

5     JURY.                                                              08:31

6          COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

7     RECORD.

8          **MR. QUINN:**  JOHN QUINN, BILL PRICE, JON COREY,

9     MIKE ZELLER FOR MATTEL.

10         **MR. NOLAN:**  TOM NOLAN, LAUREN AGUIAR, CARL ROTH,        08:31

11    RAOUL KENNEDY ON BEHALF OF MGA AND ISAAC LARIAN.

12         **THE COURT:**  GOOD MORNING, COUNSEL.

13         THE FIRST ISSUE TO TAKE UP THIS MORNING WAS THIS

14    ISSUE WITH RESPECT TO PUNITIVE DAMAGES.  I HAVE RECEIVED AND

15    READ THE MEMORANDUM REGARDING PUNITIVE DAMAGES SUBMITTED BY      08:31

16    MGA.  I DIDN'T RECEIVE ANYTHING FROM MATTEL.  I DON'T KNOW IF

17    MATTEL WISHES TO SPEAK TO THAT.

18         **MR. PRICE:**  YES, YOUR HONOR.  WE THOUGHT YOU HAD

19    ASKED SPECIFICALLY IF THERE WERE CASES WHICH ADDRESS THE

20    SPECIFIC ISSUES BEFORE YOU.                                      08:32

21         **THE COURT:**  RIGHT.

22         **MR. PRICE:**  I THINK WE'VE DECIDED TO TELL YOU ORALLY

23    WHAT SKADDEN TOOK FOUR WRITTEN PAGES TO TELL YOU, WHICH IS THAT

24    WE COULDN'T FIND ANY CASES WHICH DEALT WITH THE SPECIFIC ISSUE

25    THAT'S BEFORE YOU.                                               08:32

1          WE ALL KNOW THAT COURTS BIFURCATE PUNITIVE DAMAGES

2    FROM LIABILITY.  WE ALL KNOW THERE ARE GOOD REASONS FOR THAT,

3    USUALLY THE PREJUDICE AGAINST THE DEFENDANT.  WE ALL KNOW THERE

4    ARE CASES THAT SAY THAT YOU LOOK AT THE TIME OF TRIAL AT THE

5    DEFENDANT'S NET WORTH.                                          08:32

6          THE QUESTION IS WHETHER OR NOT YOU CAN THEN USE THE

7    EFFECT OF THE VERDICT IN THE FIRST PHASE IN THE SECOND PHASE.

8          **THE COURT:**  RIGHT.

9          THERE WERE THREE LINES IN MGA'S BRIEFS WHICH WOULD

10   SEEM TO SUGGEST THAT YOU CAN.  THE FIRST ONE WAS ON PAGE 3, THE  08:32

11   VADDEN V. DOWNTOWN L.A. MOTOR DISTRIBUTIONS CASE; IT SPEAKS

12   ABOUT A DEFENDANT'S NET WORTH AT THE TIME OF TRIAL.  I SUPPOSE

13   THAT DOES BEG THE QUESTION OF WHETHER WE'RE TALKING ABOUT THE

14   BEGINNING OF TRIAL OR THE END OF TRIAL.  BUT THEY ALSO QUOTE

15   FROM THIS CLINIC V. HITCH, OUT OF NEW ENGLAND SOMEPLACE, ABOUT   08:33

16   A RECENT LOSS OF CAPITAL ASSETS DUE TO ADVERSE ECONOMIC

17   CIRCUMSTANCES.

18         WHILE A VERDICT IS NOT NECESSARILY AN ADVERSE

19   ECONOMIC CIRCUMSTANCE, I THINK THE ARGUMENT COULD BE MADE IN

20   THIS CASE THAT THERE HAS BEEN AN ADVERSE ECONOMIC CIRCUMSTANCE  08:33

21   AS A RESULT OF THE VERDICT.

22         **MR. PRICE:**  AGAIN, THAT BEGS THE QUESTION.  I THINK

23   THE LAW IS CLEAR THAT AS OF THE TIME OF TRIAL -- AND I THINK IN

24   EVERY CASE I'VE BEEN INVOLVED IN -- YOU CAN PUT IN THE

25   DEFENDANT'S FINANCIAL INFORMATION, AND IF PRIOR TO TRIAL THEY    08:33

```
 1   HAD AN ADVERSE FINANCIAL TURN, THEN THAT WOULD COME IN AS ALL.

 2        THE COURT:  YOU ADD THE ADJECTIVE "PRIOR."  WHY NOT

 3   DURING TRIAL OR POST VERDICT?

 4        MR. PRICE:  THE REASON, YOUR HONOR, IS, WE ARE --

 5   IT'S SORT OF A CATCH-22 WHEN YOU'RE LOOKING AT THE VERDICT.      08:33

 6   THIS VERDICT ISN'T OVER.  I MEAN, THE MARKETS REACT ACCORDING

 7   TO WHAT HAPPENS DAY TO DAY.  SO WE HAD A VERDICT ON LIABILITY

 8   IN PHASE 1.  THAT MAY HAVE HAD SOME EFFECT ON MGA OR ON

 9   MR. LARIAN.

10        BUT LET'S SAY THE VERDICT IN THIS PHASE COMES BACK         08:34

11   WITH DAMAGES OF WHAT THEIR EXPERT SUGGESTS, WHICH IS A FEW

12   HUNDRED THOUSAND DOLLARS.  THEN ALL OF A SUDDEN, THE MARKET

13   REACTS TO THAT, AND WE'RE GOING TO HAVE A NET WORTH THAT'S

14   GOING TO BE INCREASED.

15        THE EFFECT OF THE VERDICT IS SIMPLY TOO SPECULATIVE         08:34

16   TO SUGGEST WHAT THE EFFECT IS ON THE DEFENDANTS.

17        THE COURT:  ARE YOU SUGGESTING THAT I PRECLUDE

18   INFORMATION AS TO WHAT THE NET WORTH IS OF MGA AND ISAAC LARIAN

19   AT THIS POINT?

20        MR. PRICE:  I SUGGEST THAT YOU CAN PERMIT INFORMATION       08:34

21   AS TO THEIR NET WORTH AS OF THE TIME TRIAL STARTED AND NOT AS

22   AFFECTED BY THE VERDICT, BECAUSE THAT IS AN UNUSUAL

23   CIRCUMSTANCE WHICH ISN'T COMPLETE YET.

24        AND THE REASON FOR THE BIFURCATION --

25        THE COURT:  I TAKE IT THERE'S NO AUTHORITY -- AND I'M       08:35
```

1   SURE YOU WOULD HAVE -- IF IT WAS OUT THERE, I HAVE EVERY

2   CONFIDENCE THAT YOU WOULD HAVE FOUND IT.

3           **MR. PRICE:**  WELL, WE DIDN'T FIND IT.  LET ME PUT IT

4   THAT WAY.  AND WE HAVE PRETTY HIGH CONFIDENCE THAT IF IT'S OUT

5   THERE, WE WOULD HAVE, JUST AS WE'RE PRETTY CONFIDENT THAT IF          08:35

6   THERE WAS A CASE GOING THE OTHER WAY, SKADDEN WOULD HAVE FOUND

7   A CASE.

8           BIFURCATION IS FOR AN ADMINISTRATIVE PURPOSE AND TO

9   PROTECT SUBSTANTIVE RIGHTS.  THAT'S THE REASON YOU BIFURCATE

10  PUNITIVE DAMAGES FROM LIABILITY.                                      08:35

11          **THE COURT:**  BUT THERE'S ANOTHER LEVEL.  I SAID THREE

12  CASES.  AND THE THIRD CASE IS THIS ROBBINS CASE, WHICH IS NOT,

13  I SUPPOSE, AN UNUSUAL CIRCUMSTANCE; IT COMES OUT OF ALABAMA.

14  BUT I SUPPOSE THIS WOULD MAKE SENSE, EVEN IN LIGHT OF THE

15  SUPREME COURT'S MOST RECENTLY FINDING THAT PUNITIVE DAMAGES CAN       08:35

16  BE VIEWED AS EXCESSIVE WHERE A COMPENSATORY DAMAGES AWARD

17  RESULTED IN DEFENDANT HAVING A NEGATIVE NET WORTH.

18          IF THAT'S THE CASE, THEN IT WOULD BE IMPORTANT FOR

19  THE JURY TO HAVE, AT THE TIME THEY ARE AWARDING THE DAMAGES,

20  THE MOST RECENT CALCULUS OF NET WORTH SO THAT THEY ARE NOT IN A       08:36

21  POSITION -- YOU'VE SUGGESTED THAT ISAAC LARIAN IS WORTH

22  $1.9 BILLION.  THEY'RE NOW CLAIMING HE'S WORTH $400 MILLION;

23  MGA IS CLAIMING HE'S WORTH $400 MILLION, SOMETHING LIKE THAT.

24          THAT'S A BIG SWING.

25          I'M NOT SUGGESTING THE JURY SHOULD OR WOULD DO                08:36

```
 1   ANYTHING, BUT CONCEIVABLY, THE JURY, IF THEY PREDICATED A
 2   PUNITIVE DAMAGES AWARD OFF OF $1.9 BILLION, THAT COULD SWALLOW
 3   UP AND EXCEED THE $400 MILLION THAT HE'S WORTH.  AGAIN, I'M NOT
 4   SUGGESTING FOR A MOMENT THAT THAT WOULD BE APPROPRIATE OR THAT
 5   THAT IS WHAT'S BEING CALLED FOR.  JUST BECAUSE THAT IS            08:36
 6   THEORETICALLY POSSIBLE, THAT CAUSES CONCERN.
 7          I WOULD THINK THAT THE JURY NEEDS TO KNOW, WHEN THEY
 8   ARE CALCULATING A PUNITIVE DAMAGES AWARD, ASSUMING THAT THEY
 9   GET TO THAT AND THAT THEY FIND THAT, WHAT THE ACTUAL NET WORTH
10   IS, SO THAT WE'RE NOT IN A SITUATION OF AN AWARD BEING           08:37
11   NECESSARILY EXCESSIVE BY BANKRUPTING THE DEFENDANT OR THE
12   DEFENDANT'S COMPANY.
13          MR. PRICE:  IN THIS CASE, THE EFFECT ON NET WORTH,
14   WHICH THEY WANT TO PUT EVIDENCE IN ON, IS REALLY THE EFFECT OF
15   THE MARKET AS A RESULT OF THE VERDICT.  AND IT'S AN EFFECT       08:37
16   WHICH HAS A LIFE SPAN OF TWO WEEKS, BECAUSE THAT WILL CHANGE,
17   DEPENDING UPON WHAT THIS JURY DOES.  AND IN RESPONSE TO
18   DISCOVERY, OF COURSE WE ASKED, 'WHAT'S YOUR NET WORTH,' AND
19   THEY GAVE US WHAT THEY DID.
20          THE COURT:  I'M NOT SUGGESTING THAT YOU DID ANYTHING      08:37
21   WRONG BY USING THE $1.9 BILLION FIGURE.  YOU BASED THAT, AS FAR
22   AS I KNOW, ON INFORMATION THAT YOU HAD.  AND THAT'S NOT MGA'S
23   CONTENTION EITHER.  IT'S JUST -- THIS IS FLUID.
24          MR. PRICE:  THAT'S EXACTLY WHY IT SHOULD NOT BE
25   PERMISSIBLE, BECAUSE WHAT WILL HAPPEN HERE IS, YOU HAVE A FLUID  08:37
```

```
 1   SITUATION, WHICH IS GOING TO BE AFFECTED BY WHAT THE JURY DOES,
 2   AND I DON'T THINK THE LAW CONTEMPLATES PUTTING IN EVIDENCE OF A
 3   SITUATION WHERE WE ARE IN A TWO-WEEK SPAN, WHERE THE MARKET HAS
 4   REACTED; AND THAT WILL LAST EXACTLY TWO WEEKS, AND THEN THAT
 5   WILL CHANGE, ONLY BECAUSE OF THE FACT THAT WE ARE IN THIS       08:38
 6   TRIAL.
 7           THE COURT:  AND THAT'S AN ARGUMENT TO BE MADE, AND I
 8   HAVE NO QUESTION THAT BOTH SIDES SHOULD BE ABLE TO ARGUE WHAT
 9   IS THE APPROPRIATE MEASURE OF PUNITIVE DAMAGES.  MY
10   INCLINATION, THOUGH, IS THAT THE JURY SHOULD HAVE ALL OF THE    08:38
11   FINANCIAL INFORMATION, INCLUDING THE MARKET FLUCTUATIONS,
12   INCLUDING THESE MARKET SWINGS, BEFORE THEM SO THAT THEY CAN
13   HOPEFULLY MAKE THE BEST DECISION THAT THEY CAN.
14           I'M NOT SUGGESTING THAT YOUR ARGUMENT IS NOT PROPER
15   AND MAY, IN THE END, CONVINCE THE JURY TO AWARD SOMETHING BASED 08:38
16   ON SOMETHING SUBSTANTIALLY HIGHER THAN THE NET WORTH RESULTING
17   FROM THE MOST RECENT SWING.
18           WHAT I'M HAVING DIFFICULTY WITH, MR. PRICE, IS
19   ACCEPTING THE NOTION THAT I SHOULD PRECLUDE OR EXCLUDE
20   INFORMATION, SINCE THE BEGINNING OF THE TRIAL, OF RECENT NET    08:39
21   WORTH DEVELOPMENTS.
22           MR. PRICE:  I THINK THE ARGUMENT IS A BASIC 403
23   ARGUMENT.  IT'S OF LIMITED PROBATIVE VALUE, BECAUSE WE KNOW IT
24   IS FLEETING.  WE KNOW, AS A MATTER OF ECONOMICS, THAT THIS IS
25   GOING TO LAST A TOTAL OF TWO WEEKS.                             08:39
```

```
 1          THE COURT:  YOU DON'T KNOW IT'S FLEETING.  IT MAY BE

 2   THE WAY IT IS.  HE MAY ONLY HAVE $400 MILLION.

 3          MR. PRICE:  WELL, THERE'S A DIFFERENT SITUATION AS TO

 4   WHETHER OR NOT WE'RE TALKING ABOUT CASH IN THE BANK.  BUT THE

 5   BIG ELEMENT WE'RE TALKING HERE ABOUT NET WORTH IS THE PROJECTED    08:39

 6   VALUE OF MGA.  AND THE COURT KNOWS THAT WHAT IT IS, AS A RESULT

 7   OF THE FIRST PHASE OF THIS VERDICT, HAS VERY LITTLE PROBATIVE

 8   VALUE ON THAT.

 9          THE COURT:  YOU'VE HAD A LOT OF NOTES TO CATCH UP

10   WITH.                                                              08:39

11          MR. PRICE:  I KNOW.  I'M GLANCING DOWN.

12          AND I CAN'T READ IT ANYWAY.

13          IN ADDITION, THE ONLY TESTIMONY I THINK YOU'RE GOING

14   TO GET IS THE TESTIMONY OF MR. LARIAN ABOUT THE ACTIONS OF

15   WACHOVIA, BECAUSE I UNDERSTAND THERE'S AN ISSUE AS TO WHETHER      08:40

16   OR NOT THEY CAN USE THE MOSS ADAMS INFORMATION WHICH EXISTED

17   BACK IN OCTOBER.  AND I THINK MR. COREY IS GOING TO ADDRESS

18   THAT WHEN YOU GET TO THAT ISSUE.  SO YOU HAVE TO LOOK AT THE

19   PROBATIVE VALUE AND WHAT EVIDENCE IS ACTUALLY GOING TO COME IN

20   TO SAY WHAT'S HAPPENED IN THE LAST TWO WEEKS.                      08:40

21          AND THE QUALITY OF THAT EVIDENCE IS GOING TO BE

22   SOMETHING TO THE EFFECT OF 'THE BANKS HAVE EXERCISED THEIR

23   RIGHTS; THEY HAVE ASKED US TO PUT THE MONEY IN THEIR

24   ACCOUNT' -- I'M NOT SURE WHAT THE DETAIL OF THAT IS GOING TO

25   BE -- WITHOUT ANY EVIDENCE, REALLY, OF HOW THAT AFFECTS ONGOING    08:40
```

1    VALUE.

2            AND YOU KNOW THAT WHATEVER THAT EFFECT IS, IT IS

3    TEMPORARY, SO IT'S OF LIMITED PROBATIVE VALUE.  SO THEN YOU

4    HAVE TO WEIGH THE PREJUDICE AND ASK THIS JURY TO UNDERSTAND THE

5    ECONOMICS OF THE MARKET IN A FLUID MARKET SITUATION.  I THINK                08:41

6    IT'S MUCH MORE PREJUDICIAL THAN PROBATIVE, AND LIKELY TO BE

7    EXCEEDINGLY CONFUSING.

8            AND THE COURT, OBVIOUSLY, IS THE ONE WHO, AFTER ALL

9    OF THIS, DECIDES WHETHER OR NOT THE PUNITIVE DAMAGES AWARD IS

10   EXCESSIVE.  AND CERTAINLY, THAT PROTECTS MGA IN ANY WAY THAT                 08:41

11   THEY NEED TO BE PROTECTED IN THIS SITUATION.  SO IT'S THE

12   COMBINATION OF -- AND THE JURY WILL UNDERSTAND THIS; THE COURT

13   KNOWS IT'S OF MINIMAL PROBATIVE VALUE.  THE QUALITY OF THE

14   EVIDENCE THAT THEY'RE GOING TO PRESENT PROBABLY IS NOT EVEN

15   ENOUGH TO SHOW A CHANGE IN NET WORTH AS A RESULT OF THE                      08:41

16   VERDICT, IF IT CAN SHOW THINGS HAVE CHANGED.

17           BUT WHAT EVIDENCE ARE THEY GOING TO COME FORWARD WITH

18   TO SAY, 'WELL, THAT ESTIMATE OF' -- I THINK MR. LARIAN'S

19   PORTION OF MGA WAS VALUED AT $1.6 BILLION IN OCTOBER OF 2007 --

20   WHAT EVIDENCE ARE THEY GOING TO PUT IN OF THINGS THAT HAPPENED               08:41

21   IN THE LAST TWO WEEKS AND HOW THAT AFFECTS THAT?

22           ALL WE KNOW IS, MR. LARIAN IS GOING TO SAY THAT THE

23   BANKS HAVE TAKEN CERTAIN ACTIONS.

24           **THE COURT:**  VERY WELL.

25           LET ME HEAR FROM MGA.                                               08:42

WEDNESDAY, AUGUST 6, 2008              TRIAL DAY 30, MORNING SESSION

1        **MR. ROTH:**  GOOD MORNING, YOUR HONOR.

2        I THINK YOUR HONOR PUT HIS FINGER ON THE KEY ISSUE

3    HERE, WHICH IS, ESSENTIALLY, THE BURDEN IS ON MATTEL, BECAUSE

4    WHAT THEY ARE SEEKING HERE IS TO PRECLUDE EVIDENCE REGARDING

5    ONGOING FINANCIAL STATUS OF MGA AS IT RELATES TO ITS POTENTIAL      08:42

6    FUTURE PROFITS.

7        SO GIVEN THAT THE BURDEN, I BELIEVE, IN THIS CONTEXT,

8    WAS ON MATTEL, AND THEY COULDN'T COME FORWARD WITH A SINGLE

9    CASE THAT SAYS THAT YOU MUST ESSENTIALLY STOP THE ANALYSIS AS

10   SOON AS PLAINTIFF STANDS UP AND GIVES THEIR OPENING STATEMENT,      08:42

11   THEY FAILED TO SATISFY THEIR BURDEN.  I THINK, GIVEN THAT, THE

12   INFORMATION SHOULD COME IN.

13       THE OTHER THING THAT I WOULD SAY, YOUR HONOR, IS,

14   THIS ISSUE OF THE FUTURE VALUE OF MGA AND PORTIONS OF MGA AND

15   ITS PERFORMANCE IS GOING TO COME IN ANYWAY, FRANKLY, BECAUSE        08:43

16   THEY HAVE A COMPENSATORY DAMAGES THEORY WHICH IS PREMISED UPON

17   THE VALUE OF A MAJOR PIECE OF THE COMPANY.  AND THAT PIECE OF

18   THE COMPANY OBVIOUSLY NEEDS TO BE VALUED IN TERMS OF LOOKING

19   FORWARD, WHAT THE EXPECTED FUTURE PROFITABILITY OF THE COMPANY

20   WILL BE.                                                            08:43

21       AS I INDICATED, MR. PRICE, IN HIS OPENING STATEMENT,

22   AFTER THE 1-A VERDICT, SAID THAT -- IF I COULD JUST PUT IT UP

23   ON THE SCREEN AND HAVE THE LANGUAGE HIGHLIGHTED, STARTING ON

24   LINE 14 -- "HE IS AN OWNER OF THIS COMPANY, WHICH IS ONGOING."

25   HE'S TALKING NOW AFTER THE 1-A VERDICT.  "AND THE COMPANY HAS A     08:44

VALUE.  YOU CAN SELL THE COMPANY RIGHT NOW" -- THAT'S RIGHT

NOW, AS OF THE TIME OF THE OPENING STATEMENT, FOLLOWING THE 1-A

VERDICT -- "FOR A CERTAIN AMOUNT OF MONEY.  AND THE QUESTION

IS, WHAT IS 81.2 PERCENT OF THAT?  WHAT'S THE VALUE THAT'S BEEN

CREATED AT MGA BECAUSE OF THEIR EXPLOITATION OF BRATZ?"          08:44

CONTINUING ON.

"THAT NUMBER IS SOMEWHERE IN THE $600 MILLION RANGE."

I KNOW WHERE HE GETS THAT NUMBER.  HE GETS THAT

NUMBER FROM HIS EXPERT, MR. WAGNER, WHO HE'S REFERRING TO IN

HIS OPENING STATEMENT.  MR. WAGNER'S CONCLUSION IS THAT AS OF   08:44

DECEMBER 2007, THE VALUE WAS $605 MILLION.  THAT'S HIS REVISED

NUMBER THAT WE GOT A FEW WEEKS AGO.  SO WHAT HE'S SAYING IS,

'RIGHT NOW, TODAY, AS I'M STANDING HERE GIVING OPENING

STATEMENT, THE VALUE IS THE VALUE IF YOU WOULD LOOK BACK TO SIX

MONTHS AGO.'  SO THEY'VE ALREADY INTERJECTED INTO THE CASE THE  08:44

ISSUE OF THE VALUE NOW.

SO WE THINK, YOUR HONOR, IN LIGHT OF THE FACT THAT

GIVEN THAT IN THE COMPENSATORY DAMAGES PHASE THE INFORMATION

REGARDING THE ONGOING VALUE OF MGA IS GOING TO BE IN FRONT OF

THIS JURY, ESSENTIALLY, WHAT THEY ARE ASKING FOR IS A           08:45

PRECLUSION ORDER THAT WE MAY NOT PRESENT EVIDENCE REGARDING THE

CURRENT VALUE OF THE COMPANY.

WE THINK, RESPECTFULLY, THAT MATTEL HAS NOT SATISFIED

THEIR BURDEN.

**THE COURT:**  THANK YOU, COUNSEL.                            08:45

1      **MR. PRICE:**  YOUR HONOR, THIS IS AN INTERESTING FORM

2   OF SANDBAGGING, BUT HERE'S THE SITUATION WE'RE IN:  WE BOTH

3   HAVE EXPERTS.  WE TOOK THE DEPOSITION OF THEIR EXPERT ON

4   SATURDAY, I BELIEVE, OR FRIDAY, AND HE CRITIQUED OUR EXPERT AND

5   OUR EXPERT'S VALUATIONS.  WE ASKED, 'RIGHT NOW WHAT DO YOU SAY          08:45

6   THE VALUE IS OF MGA?'  AND HE HADN'T DONE THE CALCULATIONS.

7          I THINK HE SAID THAT HE WAS USING -- AND MR. COREY

8   CAN SPEAK TO THIS -- SAID THAT HE MAY END UP SAYING THAT THEY

9   HAVE A VALUE WHICH IS NEGATIVE.  BUT HE HADN'T EVEN DONE THE

10  WORK YET.                                                              08:46

11         SO WE'RE NOW IN A SITUATION WHERE WE OBVIOUSLY HAVE

12  TO PUT ON OUR CASE.  WE PUT ON OUR CASE BASED UPON INFORMATION

13  UP TO THE DATE OF THE TRIAL WHICH WE HAD.  WE HAVE OUR EXPERT

14  GIVING OPINIONS ON THAT, WHICH IS APPROPRIATE.  HE IS SCHEDULED

15  TO TAKE THE STAND PROBABLY LATER TODAY, KNOCK ON WOOD.  AND HOW        08:46

16  IS HE GOING TO RESPOND TO SOMETHING WHICH MR. MEYER HASN'T EVEN

17  DONE?  AND THE REASON MR. MEYER, I'M SURE, HASN'T DONE IT IS

18  BECAUSE THIS IS SUCH A FLUID SITUATION THAT IT'S IMPOSSIBLE TO

19  DO.  IT'S SIMPLY NOT PROBATIVE ENOUGH.

20         **THE COURT:**  WELL --                                        08:46

21      **MR. ROTH:**  YOUR HONOR, IF I COULD.  THAT'S A

22  MISSTATEMENT.  I WAS AT THE DEPOSITION.  THAT'S NOT WHAT

23  MR. MEYER SAID.  MR. MEYER DIDN'T SAY, 'I'M PLANNING TO DO SOME

24  WORK.  I'LL LET YOU KNOW WHAT IT IS LATER.'  WHAT MR. MEYER

25  SAID IS, 'IT IS A FLUID SITUATION, AND IT IS DIFFICULT TODAY,         08:46

1    AS I'M SITTING HERE IN THE DEPOSITION, TO GIVE A VALUE.  THE

2    VALUE COULD BE ZERO.  WE DON'T KNOW.'

3              THAT IS WHAT HE WOULD SAY.

4              HE WOULDN'T SAY, 'WELL, NEXT WEEKEND, I'LL CERTAINLY

5    COME UP WITH A NUMBER.'  THAT'S NOT WHAT HE SAID.                08:47

6              **THE COURT:**  I APPRECIATE THAT.

7              THANK YOU, MR. ROTH.

8              I AGREE WITH MGA THAT IT WOULD BE IMPROPER FOR THE

9    COURT TO CATEGORICALLY PRECLUDE EVIDENCE OF RECENT NET WORTH.

10   THAT IS PRECISELY WHAT THIS JURY NEEDS TO HEAR TO MAKE A PROPER  08:47

11   DECISION ON PUNITIVE DAMAGES.

12             HOWEVER, I UNDERSTAND THAT THIS IS A FLUID SITUATION,

13   AND I'M GOING TO GIVE LEAVE TO BOTH PARTIES, THROUGH THEIR

14   EXPERTS, TO ADDRESS THE EVOLVING SITUATION.  NEITHER SIDE IS

15   GOING TO BE LOCKED IN.  AND IF IT IS A FLUID SITUATION AND IT'S  08:47

16   CHANGING AND MATTEL'S EXPERT WISHES TO ADDRESS THAT AND EXPLAIN

17   TO THE JURY HOW ANY DIPS THAT MAY HAVE OCCURRED BECAUSE OF THE

18   VERDICT -- IT MIGHT BE ONLY TEMPORARY OR FLEETING, I THINK IS

19   THE WORD, MR. PRICE, THAT YOU USED -- AND EXPLAIN THE ECONOMIC

20   RATIONALE BEHIND THAT, THAT IS APPROPRIATE.  AND, OF COURSE, IF  08:48

21   MGA'S EXPERT WANTED TO EXPLAIN HOW THIS IS A PERMANENT,

22   LASTING -- I THINK WE NEED TO DO THAT IN THIS CASE.

23             I UNDERSTAND, IN AN IDEAL WORLD, IN AN IDEAL TRIAL,

24   EVERYTHING IS COMPLETELY ADDRESSED BY THE EXPERTS IN ADVANCE OF

25   TRIAL.  THE TRUTH IS THAT CASES OF THIS NATURE, THEY ARE FLUID;  08:48

```
  1   THEY ARE DYNAMIC.  WHENEVER YOU'RE TALKING ABOUT THE VALUE OF A

  2   COMPANY AS LARGE AS MGA, THERE'S ANY NUMBER OF THINGS THAT CAN

  3   BE AFFECTING IT.  WHEN WE'RE TALKING IN THE CONTEXT OF PUNITIVE

  4   DAMAGES, IT IS CLEAR, I THINK, JUST BASED ON THE LAW THAT MGA

  5   HAS SUBMITTED AND THE COURT'S OWN UNDERSTANDING OF THE NATURE        08:48

  6   OF PUNITIVE DAMAGES, THAT THE CALCULATION BY THE JURY NEEDS TO

  7   BE BASED OFF OF THE CURRENT FINANCIAL STATUS AND THAT WE DON'T

  8   FREEZE-FRAME SOMETHING BACK IN MAY WHICH -- I JUST DON'T THINK

  9   THAT WOULD BE APPROPRIATE.

 10        BUT AT THE SAME TIME, I WILL GIVE LEAVE TO MATTEL AND          08:49

 11   THEIR EXPERTS AND THEIR WITNESSES TO ADDRESS THAT, EITHER GOING

 12   FORWARD IN THEIR CASE-IN-CHIEF OR, IF NECESSARY, IN A REBUTTAL

 13   CASE.  THAT'S SOMETHING THEY CAN TREAT AS THEY WANT TO.  AND

 14   I'LL CERTAINLY GIVE THE SAME LEAVE TO MGA.  BUT I THINK THAT'S

 15   THE BEST WAY TO DEAL WITH THIS, IS NOT TO PRECLUDE ANYTHING.        08:49

 16        NOW, OF COURSE, BOTH SIDES HAVE THEIR OBJECTIONS THAT

 17   THEY CAN MAKE TO INDIVIDUAL PIECES OF EVIDENCE.  WE'RE TALKING

 18   SOMEWHAT THEORETICALLY HERE.  I DON'T KNOW WHAT LETTERS OR WHAT

 19   BANK STATEMENTS OR WHAT IS ACTUALLY GOING TO BE OFFERED.  I'VE

 20   GIVEN GUIDANCE IN TERMS OF THE TIMING.  CERTAINLY, IF ANYTHING      08:49

 21   WAS CREATED AND WAS ORDERED TO BE TURNED OVER AND WASN'T TURNED

 22   OVER, IT'S NOT COMING IN NOW.  BUT I THINK WHAT WE'RE TALKING

 23   ABOUT ARE DOCUMENTS THAT HAVE COME TO LIGHT IN THE LAST TWO

 24   WEEKS.

 25        NOW, WHETHER OR NOT THERE ARE FOUNDATIONAL ISSUES             08:50
```

1   WITH THEM, WHETHER THERE'S RELEVANCY OBJECTIONS TO THEM,

2   WHETHER THERE'S 403 ISSUES WITH THOSE DOCUMENTS, ALL OF THAT

3   REMAINS TO BE DECIDED IN THE CONTEXT OF THE TRIAL.

4         ALL I AM DECIDING RIGHT NOW IS THAT I'M NOT GOING TO

5   PRECLUDE CATEGORICALLY EVIDENCE OF RECENT FINANCIAL                08:50

6   DEVELOPMENTS AS IT RELATES TO MR. LARIAN OR TO MGA.

7         **MR. PRICE:**  YOUR HONOR, IF THEIR EXPERT IS GOING TO

8   GIVE AN OPINION ON THIS, IT SEEMS LIKE IT WOULD BE FAIR FOR US

9   TO GET NOTICE IN ADVANCE, BECAUSE IT MAY NOT MEET THE

10  REQUIREMENTS OF DAUBERT.                                           08:50

11        **THE COURT:**  YOU JUST TOOK THE DEPOSITION ON FRIDAY,

12  YOU SAID?

13        **MR. PRICE:**  WE TOOK A DEPOSITION ON FRIDAY, WHERE HE

14  SAID -- I'LL HAVE MR. COREY -- I DON'T WANT TO MISQUOTE WHAT HE

15  SAID, SO I'LL HAVE MR. COREY TELL YOU WHAT HE SAID.  OBVIOUSLY,    08:50

16  WE KNOW THAT MUCH.

17        **THE COURT:**  VERY WELL.

18        MR. COREY?

19        **MR. COREY:**  THIS IS KIND OF WHERE THE RUBBER HITS THE

20  ROAD.                                                             08:50

21        AS WE STAND HERE TODAY, WE DON'T HAVE AN ARTICULATION

22  FROM MGA AS TO WHAT THEY CONTEND IS MGA'S NET WORTH AND

23  MR. LARIAN'S NET WORTH.  WE DON'T HAVE A NUMBER.  WE DON'T EVEN

24  HAVE A RANGE.  THAT WAS THE QUESTION THAT WAS ASKED AT THE

25  DEPOSITION ON FRIDAY:  'MR. MEYER, WHAT DO YOU BELIEVE THE        08:51

1    VALUE OF MGA IS?'  BECAUSE, IN FACT, HE HAS NOT EVEN CALCULATED

2    THE VALUE.  ALL THAT HE HAS DONE TO THIS POINT IS CRITIQUE

3    MR. WAGNER'S CALCULATION; SO WE DON'T HAVE A NUMBER.

4            WHAT WE'RE EXPECTED TO DO, I THINK, AS WE SIT HERE

5    TODAY, IS TO PUT MR. WAGNER ON THE STAND, WITHOUT HAVING ANY          08:51

6    IDEA OF WHAT MGA'S POSITION IS GOING TO BE WITH RESPECT TO THE

7    VALUATION EITHER OF MR. LARIAN OR OF MGA.

8            THE COURT:  IT'S NOT MGA'S BURDEN TO ESTABLISH THE

9    VALUE OF THEIR COMPANY.

10           MR. COREY:  I UNDERSTAND THAT.  BUT THIS IS THE              08:51

11   THING:  MR. WAGNER HAS ESTABLISHED THE VALUATION OF THE COMPANY

12   BASED ON INFORMATION THAT HE RECEIVED FROM MGA AT A POINT IN

13   TIME.

14           THE COURT:  AND I PRESUME, IN YOUR CASE-IN-CHIEF,

15   YOU'LL PRESENT THAT.                                                 08:51

16           MR. COREY:  AND THE CROSS IS GOING TO BE, 'WELL, DID

17   YOU CONSIDER THIS,' WHICH MR. WAGNER HAS NEVER SEEN; 'DID YOU

18   CONSIDER THIS,' WHICH MR. WAGNER HAS NEVER SEEN; 'DID YOU

19   CONSIDER THIS,' WHICH MR. WAGNER HAS NEVER SEEN.  AND THAT

20   SEEMS TO ME TO BE PATENTLY UNFAIR.  GRANTED, IT'S A FLUID           08:52

21   SITUATION.

22           THE COURT:  TO ADDRESS THAT PARTICULAR POINT, TO THE

23   EXTENT THAT ANYTHING WAS CREATED LAST WEEK THAT MGA PLANS ON

24   USING, I ASSUME THEY HAVE TURNED IT OVER.

25           MR. COREY:  I RECEIVED INFORMATION --                       08:52

1       **THE COURT:**  AND I ASSUME THAT YOU PROVIDED IT TO

2    MR. WAGNER.

3       **MR. COREY:**  THAT'S THE THING.  I AM RECEIVING THINGS

4    ON A DAILY BASIS.  I RECEIVED NEW INFORMATION YESTERDAY.  AND

5    GRANTED -- I'M GETTING THINGS ON A PERIODIC BASIS, AND THEY'RE          08:52

6    GIVEN TO MR. WAGNER.  BUT THIS IS NOT LIKE BEING GIVEN

7    INFORMATION THAT YOU CAN LOOK AT AND SAY, 'OH, YEAH, THAT'S

8    RIGHT.'  I MEAN, IT REQUIRES ANALYSIS; YOU HAVE TO LOOK AT IT.

9    I THINK IT'S PATENTLY UNFAIR, WITHOUT MAKING -- TO HAVE

10   MR. WAGNER TAKE THE STAND, WITHOUT THEM HAVING TO TAKE A              08:52

11   POSITION AS TO WHAT THE VALUE OF MGA IS, OR MR. LARIAN.

12       **THE COURT:**  VERY WELL.

13       LET ME HEAR FROM MR. ROTH ON THIS POINT.

14       **MR. ROTH:**  YOUR HONOR, A POINT I THINK THAT

15   YOUR HONOR JUST ALLUDED TO:  WE HAVE RECENTLY PRODUCED              08:53

16   FINANCIAL INFORMATION TO MATTEL.  MATTEL ELECTED NOT TO

17   DISCLOSE IT TO MR. WAGNER.  IN FACT, MR. WAGNER'S TEAM HAS IT;

18   HE'S AWARE OF THE FACT THAT THE INFORMATION IS THERE; HE

19   WONDERED WHETHER HE SHOULD LOOK AT IT AND WAS TOLD NOT TO LOOK

20   AT IT.  SO THE INFORMATION IS THERE, BUT HE DOESN'T KNOW            08:53

21   WHAT -- HE DOESN'T EVEN REALLY KNOW PRECISELY THE FORM OF THE

22   INFORMATION, OTHER THAN JUST A GENERAL UNDERSTANDING THAT IT'S

23   THE TYPE OF INFORMATION THAT WE PROVIDED PREVIOUSLY, RELATING

24   TO THE OPERATIONS, THE PROFITS, THE LOSSES OF THE CORPORATION.

25       SO MR. WAGNER MAY STAND UP AND SAY, 'I'VE NEVER SEEN            08:53

1   THIS.'  THE REASON?  THEY DIDN'T SHOW IT TO HIM.  THEY MADE

2   THAT CHOICE.

3          **THE COURT:**  WHAT ABOUT YOUR EXPERT?  TO THE EXTENT

4   THAT YOUR EXPERT IS GOING TO COME IN -- WELL, IS YOUR EXPERT

5   GOING TO ATTEMPT TO EVALUATE THE COMPANY?                          08:54

6          **MR. ROTH:**  OUR EXPERT IS GOING TO GIVE THE BEST

7   ANSWER THAT HE CAN.

8          **THE COURT:**  THAT'S NOT MY QUESTION.

9          **MR. ROTH:**  AND THE BEST ANSWER IS, 'I'VE EVALUATED IT

10  BASED ON 2007 DATA, AND SOME DATA REGARDING 2008, WHICH PUTS A     08:54

11  POSITIVE NUMBER ON IT.'

12         THAT IS BASED ON DATA PRIOR TO TRIAL.  I UNDERSTAND

13  THERE ARE FURTHER --

14         **THE COURT:**  LET ME STOP YOU THERE BEFORE YOU GO

15  FORWARD.                                                           08:54

16         THAT NUMBER HAS BEEN DISCLOSED, I ASSUME, TO MATTEL.

17         **MR. ROTH:**  THAT NUMBER HAS BEEN DISCLOSED, VIS-À-VIS

18  THE COMPENSATORY DAMAGES ISSUE, WHICH IS THE VALUE --

19         **THE COURT:**  WHAT IS THAT NUMBER?

20         **MR. ROTH:**  I BELIEVE IT'S A RANGE BETWEEN $197 AND      08:54

21  $225 MILLION.

22         **THE COURT:**  $197 TO $225 MILLION.

23         **MR. ROTH:**  THAT'S ON THE COMPENSATORY DAMAGES ISSUE.

24         **THE COURT:**  WHATEVER ISSUE IT'S ON, THAT'S THE VALUE

25  OF THE COMPANY, ACCORDING TO YOUR EXPERT; CORRECT?                 08:54

1      **MR. ROTH:**  NO.  I'M OBVIOUSLY NOT BEING CLEAR.

2          THAT'S THE VALUE OF THE BRATZ FRANCHISE.

3      **THE COURT:**  CLARIFY FOR THE RECORD, WHAT IS THE VALUE

4   OF MGA, ACCORDING TO YOUR EXPERT?

5      **MR. ROTH:**  OUR EXPERT HAS NOT TAKEN A POSITION AND          08:55

6   WILL NOT TAKE ANY ADDITIONAL SPECIFIC NUMBERS AND PUT IN A

7   NUMBER REGARDING A VALUE.

8      **THE COURT:**  THEN HE WON'T DO SO AT TRIAL.

9      **MR. ROTH:**  HE'S NOT GOING TO STAND UP AND DO

10  SOMETHING THAT HE HASN'T ALREADY DONE; THAT'S CORRECT.  HE      08:55

11  MIGHT SAY IT WOULD BE DIFFICULT TO VALUE IT RIGHT NOW.  HE

12  MIGHT SAY THAT.  HE MIGHT SAY THAT THE WAY YOU'D HAVE TO LOOK

13  AT FUTURE PROFITABILITY -- AND THERE'S CERTAIN QUESTIONS

14  REGARDING FUTURE PROFITABILITY.  HE MIGHT SAY THAT.

15          MR. WAGNER, I THINK, WOULD AGREE TO THAT.              08:55

16          BUT ANY HONEST BROKER AT THIS MOMENT WOULD SAY THAT

17  IT'S VIRTUALLY IMPOSSIBLE TO VALUE THE COMPANY RIGHT NOW.

18      **THE COURT:**  VERY WELL.

19          MR. COREY?

20          YOU'VE HEARD YOUR ANSWER.  THERE IS NOT GOING TO BE A   08:55

21  VALUE PLACED ON THE COMPANY BY MGA.  AND BASED ON THAT

22  REPRESENTATION, THE COURT WILL NOT PERMIT IT.

23      **MR. COREY:**  THAT'S FINE, YOUR HONOR.

24      **THE COURT:**  ANYTHING FURTHER ON THIS POINT?

25          LET'S SEE IF THE JURY IS READY.                        08:55

1          IS THERE ANYTHING ELSE WE NEED TO TAKE UP?

2          **MR. NOLAN:**  YOUR HONOR, I WANT TO REPORT THAT

3    MS. GRONICH, WHO WAS ON THE STAND LAST EVENING, SHE'S NOT GOING

4    TO COME BACK THIS MORNING.

5          **THE COURT:**  SHE'S NOT?                                    08:56

6          **MR. NOLAN:**  AND IT'S NO DISRESPECT INTENDED.

7          **THE COURT:**  I'M SURE IT'S NOT.

8          **MR. NOLAN:**  SHE HAS A SERIOUS PARENT ISSUE, HEALTH

9    ISSUE.

10         **THE COURT:**  I'M SORRY.                                    08:56

11         **MR. NOLAN:**  IT'S JUST LONG-LASTING, AND IT HAPPENS.

12         IN ANY EVENT, MR. QUINN -- WE TALKED.  WE ONLY HAD A

13   COUPLE MORE MINUTES.  THEY HAD A COUPLE MORE MINUTES.  I THINK

14   WE'VE WORKED OUT A STIPULATION.  BUT WE JUST WANTED TO MAKE IT

15   CLEAR TO YOUR HONOR THAT -- AND SHE WAS VERY CONCERNED ABOUT      08:56

16   THIS.  SHE'S AN ATTORNEY.  SHE DID NOT WANT YOU TO THINK IT WAS

17   DISRESPECTFUL TO THE COURT, BUT WE JUST THINK IT'S THE EASIEST

18   WAY TO HANDLE IT.

19         **THE COURT:**  WHAT I'D LIKE TO SAY TO THE JURY, THEN,

20   BECAUSE THEY HEARD THE EXCHANGE AT THE END OF THE DAY, IS, 'AS    08:56

21   WE'VE HEARD, BOTH SIDES HAD SOME ADDITIONAL INFORMATION TO GET

22   INTO.  MS. GRONICH HAS A PERSONAL ISSUE TO ATTEND TO, AND THE

23   PARTIES HAVE WORKED OUT A STIPULATION WITH RESPECT TO THE

24   ADDITIONAL QUESTIONS THAT THEY HAVE.'  AND THE JURY WILL HEAR

25   THAT STIPULATION.                                                 08:56

1          **MR. NOLAN:**  GREAT.  THANK YOU VERY MUCH, YOUR HONOR.

2          **MR. PRICE:**  ONE OTHER ADMINISTRATIVE MATTER, YOUR

3    HONOR.

4          FOR ANOTHER WITNESS LATER TODAY, MR. LARIAN, WE'D

5    LIKE TO GET SOME ITEMS FROM THE ROOM UPSTAIRS.                08:57

6          **THE COURT:**  WE HAVE TIME.

7          **MR. QUINN:**  YOUR HONOR, THE FIRST WITNESS WE'LL BE

8    CALLING, THEN, IS KEN LEUNG FROM HONG KONG.  HIS ENGLISH IS

9    PRETTY GOOD, BUT TO BE ON THE SAFE SIDE, WE DO HAVE AN

10   INTERPRETER HERE.                                            08:57

11         **THE COURT:**  IS THE INTERPRETER COURT-CERTIFIED?

12         **MR. ZELLER:**  YES.

13         **THE COURT:**  VERY WELL.

14         **MR. QUINN:**  SO I ASSUME WE SWEAR THE INTERPRETER

15   FIRST?                                                       08:57

16         **THE COURT:**  YES; AN OATH WILL BE GIVEN TO THE

17   INTERPRETER.

18         MR. PROCTOR, YOU WERE ABSENT YESTERDAY.  I ASSUME YOU

19   WERE OFF WORKING ON SOMETHING.

20         **MR. PROCTOR:**  NO.  I WAS JUST VACATIONING.          08:57

21         I'M WONDERING WHEN WE COULD GET RULINGS ON THE VIDEO

22   DESIGNATIONS.  WE DO INTEND TO POSSIBLY PLAY THEM THIS

23   AFTERNOON.

24         **THE COURT:**  I HAVE RULED ON THEM.  THEY'RE READY TO

25   GO.  THERE WAS AN INDICATION YESTERDAY THAT WE WOULDN'T HAVE  08:57

1  ANY OF THOSE TODAY, BUT, YES, I CAN DO THAT DURING THE LUNCH

2  HOUR.

3          **MR. PROCTOR:**  OKAY.

4          **THE COURT:**  VERY GOOD.

5          MS. AGUIAR?                                            08:58

6      **MS. AGUIAR:**  WE DON'T NEED TO ADDRESS THIS NOW,

7  YOUR HONOR.  ON THE ISSUE REGARDING THE PHOTOGRAPHS, I WANTED

8  TO GIVE YOU AN UPDATE AND ADDRESS THE ASSERTIONS THAT WERE MADE

9  YESTERDAY.  WE CAN DO THAT AT A BREAK.

10         **THE COURT:**  VERY GOOD.  I WAS KIND OF HOPING THAT HAD  08:58

11  BEEN RESOLVED AND WAS GOING AWAY.

12         **MS. AGUIAR:**  IT VIRTUALLY IS, BUT I JUST WANTED TO

13  LET YOU KNOW WHAT HAPPENED.

14         **THE COURT:**  EXCELLENT.

15         ALL RIGHT.  WE'RE GOING TO TAKE A BRIEF RECESS FOR       08:58

16  ABOUT FIVE MINUTES.

17             (BRIEF RECESS TAKEN.)

18             (WHEREUPON, JURORS ENTER COURTROOM.)

19         **THE COURT:**  GOOD MORNING, LADIES AND GENTLEMEN OF THE

20  JURY.                                                          09:22

21             AS YOU HEARD AT THE END OF THE DAY YESTERDAY, BOTH

22  SIDES HAD A FEW MORE QUESTIONS FOR MS. GRONICH.  IT TURNS OUT

23  THAT A COMPLETELY UNRELATED PERSONAL MATTER DEVELOPED THIS

24  MORNING, AND SHE CAN'T BE HERE.  THE PARTIES HAVE GOTTEN

25  TOGETHER AND THEY'VE BEEN ABLE TO STIPULATE TO THE EVIDENCE AND  09:22

1   TESTIMONY THAT SHE WOULD HAVE GIVEN IF SHE HAD COME BACK THIS

2   MORNING.

3           SO I'M GOING TO INVITE COUNSEL AT THIS TIME TO PUT

4   THAT STIPULATION ON THE RECORD, IF THEY ARE PREPARED TO DO SO.

5           **MR. QUINN:**  ACTUALLY, YOUR HONOR, WE HAVE NOT                        09:22

6   FORMALIZED IT.  WE HAVE AN AGREEMENT, WHICH IS MEMORIALIZED IN

7   E-MAIL MESSAGES, BUT WE'RE NOT IN A POSITION TO PUT IT ON THE

8   RECORD.

9           **THE COURT:**  ALL RIGHT.  WE HAVE EVERY CONFIDENCE THAT

10  YOU WILL.                                                              09:22

11          **MS. AGUIAR:**  YES.

12          **THE COURT:**  ALL RIGHT.  YOU'LL HEAR THAT LATER.

13          WE'RE GOING TO MOVE ON TO THE NEXT WITNESS.

14          PLAINTIFF MAY CALL THEIR NEXT WITNESS.

15          **MR. QUINN:**  THE NEXT WITNESS WILL BE KEN LEUNG.             09:22

16          MR. LEUNG IS FROM HONG KONG.  HIS ENGLISH IS PRETTY

17  GOOD, BUT JUST IN CASE, WE HAVE A TRANSLATOR, WHO IS MARY SO,

18  WHO WILL BE HERE TO HELP, IF NECESSARY.

19          **THE COURT:**  WOULD YOU LIKE TO HAVE THE TRANSLATOR

20  SWORN IN AND STANDING BY?                                              09:23

21          **MR. QUINN:**  YES, YOUR HONOR.

22          **THE COURT:**  MR. HOLMES, IF YOU COULD SWEAR IN THE

23  TRANSLATOR.

24          **THE CLERK:**  MR. QUINN, CAN YOU IDENTIFY THE LANGUAGE

25  OF INTERPRETATION THIS MORNING.                                        09:23

```
 1              MR. QUINN:  IT'S MANDARIN.

 2              THE INTERPRETER:  CANTONESE.

 3              MR. QUINN:  MY APOLOGIES.

 4          I HAD A ONE-IN-TWO CHANCE THERE.

 5              THE CLERK:  MA'AM, COULD WE HAVE YOU STATE YOUR NAME

 6   FOR THE RECORD, AND FOR THE BENEFIT OF THE COURT REPORTER,

 7   SPELL THE LAST NAME.

 8              THE INTERPRETER:  MARY SO, S-O.

 9              THE CLERK:  DO YOU SOLEMNLY SWEAR THAT YOU WILL WELL

10   AND TRULY INTERPRET FROM THE CANTONESE LANGUAGE INTO THE          09:24

11   ENGLISH LANGUAGE AND FROM THE ENGLISH LANGUAGE INTO THE

12   CANTONESE LANGUAGE IN THE CAUSE NOW BEFORE THE COURT ACCORDING

13   TO THE BEST OF YOUR KNOWLEDGE AND ABILITY, SO HELP YOU GOD?

14              THE INTERPRETER:  YES.

15              THE CLERK:  THANK YOU, MA'AM.                          09:24

16              THE COURT:  JUST TO INSTRUCT THE JURY, I'LL RETURN TO

17   THIS AT THE END.  I DON'T KNOW IF ANY OF YOU SPEAK CANTONESE.

18          DO ANY MEMBERS OF THE JURY SPEAK CANTONESE?

19          EXCELLENT; SO THIS IS REALLY OF NO MOMENT.

20          YOU ARE TO BE GOVERNED JUST BY THE OFFICIAL              09:24

21   TRANSLATION AND NOT BY YOUR OWN INTERPRETATION OF THE LANGUAGE;

22   BUT IT SOUNDS LIKE THAT'S NOT AN ISSUE.

23          VERY GOOD.

24          COUNSEL, YOU MAY CALL YOUR WITNESS.

25              MR. QUINN:  WE'D CALL KEN LEUNG, YOUR HONOR.          09:24
```

1          **THE COURT:**  SIR, IF YOU WOULD COME FORWARD.

2          **THE WITNESS:**  MY NAME IS LEUNG WAI HUNG, BUT MY

3     ENGLISH NAME IS KEN.

4          **THE CLERK:**  KEN IS THE FIRST NAME THAT YOU PREFER TO

5     USE THIS MORNING?                                                    09:25

6          **THE WITNESS:**  YES.

7          **THE CLERK:**  AND THE LAST NAME?

8          **THE WITNESS:**  LEUNG, L-E-U-N-G.

9          **THE CLERK:**  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY

10    YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

11    BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

12    HELP YOU GOD?

13         **THE WITNESS:**  I DO.

14         **THE COURT:**  COUNSEL, YOU MAY PROCEED.

15         **MR. QUINN:**  WITH THE COURT'S PERMISSION, I THOUGHT WE    09:25

16    WOULD TRY TO SEE IF WE CAN DO THIS IN ENGLISH, AND ONLY USE THE

17    TRANSLATION IF IT TURNS OUT TO BE NECESSARY, TO SAVE TIME.

18         **THE COURT:**  THAT'S FINE.

19         **THE WITNESS:**  I'LL TRY TO SPEAK IN ENGLISH, AND IF

20    NECESSARY, I'LL USE YOUR INTERPRETATION.  HOWEVER, I DO HAVE A    09:26

21    REQUEST THAT WHEN THEY SPEAK IN ENGLISH, WHETHER OR NOT YOU

22    COULD INTERPRET FOR ME INTO CANTONESE.

23         **MR. QUINN:**  INTERPRET THE QUESTION INTO CANTONESE?

24         **THE COURT:**  I THINK IT'S BEST TO JUST STRICTLY GO

25    THROUGH THE INTERPRETATION.                                        09:26

1      **MR. QUINN:**  VERY WELL, YOUR HONOR.  WE WILL DO THAT.

2      **THE COURT:**  THAT WAY WE MAKE SURE THERE'S NO

3   CONFUSION AT ALL.

4          I UNDERSTAND THAT TAKES A BIT MORE TIME, BUT I THINK,

5   FOR THE BENEFIT OF THE JURY, THAT'S HOW WE'LL PROCEED.                09:26

6                        **DIRECT EXAMINATION**

7   BY MR. QUINN:

8   Q    MR. LEUNG, YOU ARE A BUSINESSMAN IN HONG KONG?

9   A    YES.

10  Q    AND YOU ARE ONE OF THE OWNERS OF A COMPANY CALLED                09:27

11  DOUBLE GRAND?

12  A    YES.

13  Q    AND THAT COMPANY, YOUR COMPANY, WAS SUED BY MGA BACK IN

14  2003, IN THE COURTS IN HONG KONG?

15  A    YES.                                                             09:27

16  Q    AFTER THAT SUIT STARTED, YOU COULD NOT AFFORD A LAWYER, SO

17  YOU REPRESENTED YOUR COMPANY IN THAT SUIT; IS THAT CORRECT?

18  A    MAY I ANSWER THIS QUESTION IN ENGLISH?

19         **THE COURT:**  WE'RE JUST GOING TO STICK TO THE

20  CANTONESE, IF WE CAN.                                                 09:27

21         **THE WITNESS:**  OKAY.

22         IN THE BEGINNING, I RETAINED AN ATTORNEY, BUT THEN

23  AFTER SPENDING A LOT OF MONEY, I STARTED TO DEFEND MYSELF.

24  BY MR. QUINN:

25  Q    AND IN THE ALLEGATIONS IN THAT CASE THAT MGA BROUGHT, WAS        09:28

1    IT YOUR UNDERSTANDING THAT MGA WAS ALLEGING THAT DOUBLE GRAND

2    HAD COPIED CARTER BRYANT'S DRAWINGS IN MAKING CERTAIN DOUBLE

3    GRAND PRODUCTS?

4    A    YES.

5    Q    AND WAS THAT SAID TO YOU, THAT DOUBLE GRAND'S PRODUCTS        09:28

6    COPIED CARTER BRYANT'S DRAWINGS -- WAS THAT SAID TO YOU BY THE

7    ATTORNEYS FOR MGA IN HONG KONG?

8            MR. HANSEN:  OBJECTION, YOUR HONOR.  HEARSAY.

9            THE COURT:  COUNSEL, WILL YOU REPHRASE, OR AT LEAST

10   LAY A FOUNDATION.                                                09:29

11   BY MR. QUINN:

12   Q    DID YOU ATTEND HEARINGS IN COURT YOURSELF?

13   A    YES.

14   Q    DID YOU HEAR MGA'S ATTORNEYS MAKE STATEMENTS IN COURT

15   ABOUT THE NATURE OF MGA'S ALLEGATIONS?                           09:29

16           MR. HANSEN:  OBJECTION, YOUR HONOR.  HEARSAY.

17           THE COURT:  IT'S AN ADMISSION OF A PARTY OPPONENT,

18   COUNSEL.

19           MR. HANSEN:  NO WAY TO CROSS-EXAMINE HIM.

20           THE COURT:  I'M SORRY?

21           MR. HANSEN:  HE HAS NOT BEEN DEPOSED IN THIS CASE.

22   WE HAVE NO WAY TO CROSS-EXAMINE HIM ON ANY OF THIS.

23           THE COURT:  LET'S GO TO SIDE-BAR.

24           (WHEREUPON, THE FOLLOWING PROCEEDINGS

25           WERE HELD AT SIDE-BAR:)                                  09:30

```
 1          THE COURT:  COUNSEL, TRY TO AVOID THOSE TYPES OF

 2   SPEAKING OBJECTIONS.  I DON'T WANT YOU INSTRUCTING THE JURY.

 3          YOU HAVEN'T HAD A CHANCE TO DEPOSE THIS WITNESS?

 4          THAT'S NOT A LEGAL OBJECTION.

 5          MR. HANSEN:  CAN I ASK HIM THAT ON my QUESTIONING?     09:30

 6          I PLAN TO ASK HIM THAT IN CONNECTION WITH MY

 7   QUESTIONS OF HIM; THAT 'WE'VE NEVER MET; WE'VE NEVER HAD A

 8   CHANCE TO...'

 9          THE COURT:  OF COURSE, BUT DON'T --

10          MR. HANSEN:  IT WAS MY UNDERSTANDING THIS WITNESS WAS   09:30

11   COMING IN TO AUTHENTICATE DOCUMENTS AND DOLLS THAT THEY HAVE

12   NOT BEEN -- NOW WE'RE GETTING INTO ALL SORTS OF DISCUSSIONS.

13          WE HAVE NOT HAD A CHANCE TO DEPOSE THIS PERSON.

14          MR. NOLAN:  ALSO --

15          THE COURT:  FIRST OF ALL, THAT'S NOT THE STANDARD FOR   09:30

16   A HEARSAY OBJECTION.

17          MR. HANSEN:  I APOLOGIZE.

18          MR. NOLAN:  YOUR HONOR, ALTHOUGH HE CLAIMS THAT THE

19   STATEMENT WAS MADE BY AN ATTORNEY REPRESENTING MGA IN A COURT

20   PROCEEDING, THERE'S NO TRANSCRIPT FROM WHICH WE COULD VERIFY   09:31

21   THE TRUTHFULNESS OF THIS ISSUE.

22          THIS IS AN ADVERSE PARTY.  HE WAS SUED IN HONG KONG.

23   THE BASIS IS HEARSAY.  IT REMAINS AN OUT OF COURT STATEMENT.

24   THE FACT THAT IT MAY BE AN ADMISSION BY THE PARTY, THEY HAVE

25   NOT LAID FOUNDATION TO GIVE REQUISITE, I THINK, CREDIBILITY    09:31
```

1  THAT, IN FACT, THE STATEMENT WAS ACTUALLY EVER MADE.

2      THE PLEADINGS, YOUR HONOR, ARE WHAT THEY ARE WITH

3  RESPECT TO THE CONTENTIONS.  IF WE HAVE TO GO BEHIND WHAT THE

4  PLEADINGS SAY WITHOUT THE BENEFIT OF A TRANSCRIPT -- WE HAVE NO

5  WAY TO CROSS-EXAMINE THIS PERSON WITH RESPECT TO THE          09:31

6  TRUTHFULNESS OF THIS.

7      **THE COURT:**  FIRST OF ALL, YOU'RE CORRECT ABOUT THE --

8  I UNDERSTAND HE'S ADVERSE TO YOU.  THE OBJECTION I WAS

9  EXPECTING TO HEAR WAS LEADING.  I NEVER HEARD THAT.  THAT'S AN

10 OBJECTION YOU CAN MAKE.  AND I TRUST I DON'T NEED TO INSTRUCT   09:32

11 SKADDEN ARPS ON THAT OBJECTION.

12     PUTTING ASIDE THE LEADING ASPECT, IT'S AN ADMISSION

13 OF A PARTY OPPONENT.  BUT ATTORNEYs CAN, IN ANY COURT,

14 ANYWHERE, HAVE AN ADMISSION OF A PARTY OPPONENT.  THE HEARSAY

15 OBJECTION IS OVERRULED.                                        09:32

16     NOW, GETTING BACK TO -- ITS BASICALLY A DISCOVERY

17 OBJECTION THAT YOU DIDN'T HAVE -- AGAIN, THAT'S -- THERE'S NO

18 STATUTORY RIGHT, AS I UNDERSTAND IT, TO HAVE A DEPOSITION OR A

19 TRANSCRIPT FOR EVERYTHING THAT'S CALLED AT TRIAL.

20     **MR. NOLAN:**  NO, YOUR HONOR, BUT THE RULES OF          09:32

21 DISCOVERY, ESPECIALLY IN A CASE LIKE THIS, WHERE SOMEBODY HAS

22 BEEN OFFERED TESTIMONY LIKE THIS -- WE DO NOT -- THIS IS THE

23 FIRST WE'VE HEARD, I'VE HEARD, ABOUT CONTENTIONS THAT LAWYERS

24 HAVE ARGUED SOMETHING IN COURT.  THAT WAS NEVER BROUGHT TO OUR

25 ATTENTION; IT'S NEVER BEEN DISCLOSED OR RESPONDED TO IN         09:32

1    INTERROGATORIES, RESPONSES FROM MATTEL.  THIS IS A COMPLETE

2    SURPRISE ON OUR PART.

3         WE HAVE NO ABILITY TO EFFECTIVELY CROSS-EXAMINE HIM

4    WITH RESPECT TO WHERE THIS STATEMENT WAS MADE, OTHER THAN

5    GETTING THE COURT TRANSCRIPT.  IT'S A LAST-MINUTE SURPRISE, I          09:33

6    THINK, IS THE LARGEST CONCERN.

7         WE WERE TOLD THAT THIS IS SIMPLY GOING TO BE FOR

8    AUTHENTICATION.

9         **MR. QUINN:**  THIS IS JUST PRELIMINARY TO GETTING INTO

10   THE DOCUMENTS THAT HE WILL AUTHENTICATE, YOUR HONOR.  AND WHAT        09:33

11   HE IS SAYING IS NOT INCONSISTENT.  IT'S HIS UNDERSTANDING OF

12   THE DOCUMENTS AND THE ALLEGATIONs THAT WERE MADE AS FLESHED OUT

13   BY STATEMENTS MADE BY MGA'S COUNSEL.

14        **THE COURT:**  LET'S REVERSE THE ORDER.  LET'S GET THE

15   DOCUMENTS IN FIRST.  AND IF YOU BELIEVE HE NEEDS TO BE EXAMINED       09:33

16   ON THE DOCUMENTS TO PLACE THEM IN THE CONTEXT OF THE TRIAL,

17   THAT'S ANOTHER BASIS.  BUT WATCH THE LEADING QUESTIONS.

18        **MR. QUINN:**  I AM WORKING THROUGH A TRANSLATOR.

19        **THE COURT:**  I DO UNDERSTAND THAT; SO YOU WILL HAVE A

20   LITTLE LEEWAY, BUT NOT --                                            09:33

21        **MR. QUINN:**  BUT NOT WHOLE HOG.

22        **THE COURT:**  ONE LAST THINg.

23        I KNOW MR. LARIAN HAS LEFT.

24        YOU UNDERSTAND THAT THE JURY WAS SPECIFIC -- AND I

25   DIDN'T INDICATE WHICH SIDE; IT WAS AN ATTORNEY; IT WAS NOT           09:34

1   MR. LARIAN.

2          **MR. NOLAN:**  NO.  I ASKED HIM TO SIT DOWN, TO CALM

3   DOWN.  HE'S GOING TO BE TESTIFYING NEXT AND SO HE'S JUST IN THE

4   CONFERENCE ROOM.

5          **THE COURT:**  I DIDN'T KNOW.  WHEN I SAW HIM LEAVE          09:34

6   AFTER WE HAD THAT EXCHANGE AT SIDE-BAR, I THOUGHT THAT HE

7   THOUGHT HE WAS THE PERSON.  AND HE IS NOT.

8          **MR. NOLAN:**  WE TOOK HIM OUTSIDE SO HE COULD REST AND

9   COLLECT HIS THOUGHTS.

10         **THE COURT:**  THAT'S ENTIRELY UP TO HIM.          09:34

11         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

12         **THE COURT:**  COUNSEL, YOU MAY PROCEED.

13         **MR. QUINN:**  THANK YOU, YOUR HONOR.

14   **BY MR. QUINN:**

15   Q   WERE SOME OF THE DOLLS THAT DOUBLE GRAND MADE, THAT MGA          09:34

16   SUED ON -- WERE THEY CALLED "TRENDY TEENS"?  WAS THAT ONE OF

17   THE DOLLS?

18   A   ONE OF THE STYLES WAS TRENDY TEENS.

19         **MR. QUINN:**  IF I MAY APPROACH THE WITNESS,

20   YOUR HONOR, WITH EXHIBIT 13703.          09:35

21         **THE COURT:**  YOU MAY.

22         **THE WITNESS:**  THIS IS NOT THE ONE.

23         **MR. NOLAN:**  WE DIDN'T HEAR THAT.

24         **THE COURT:**  LET ME INSTRUCT THE WITNESS.

25         DON'T STATE ANYTHING WITHOUT A QUESTION BEING ASKED.          09:35

1   BY MR. QUINN:

2   Q    THAT'S WHAT I WAS GOING TO ASK YOU, SIR.

3        I'VE SHOWN YOU EXHIBIT 13703.

4        THE NAME ON IT IS "TRENDY TEENS"; CORRECT?

5   A    YES.                                                09:36

6   Q    BUT IS THAT A DOLL THAT DOUBLE GRAND MADE, THAT EXHIBIT?

7   A    NO.

8   Q    DO YOU KNOW WHETHER OR NOT MGA EVER SUED ANYONE BASED ON

9   THIS DOLL, EXHIBIT 13703?

10       MR. HANSEN:  OBJECTION TO THE FORM.  SPECULATION AS      09:36

11  TO ANYONE.  ALSO FOUNDATION.

12       THE COURT:  SUSTAINED.

13       LAY FURTHER FOUNDATION.

14  BY MR. QUINN:

15  Q    WELL, CERTAINLY, DOUBLE GRAND WAS NEVER SUED ON THIS DOLL,  09:36

16  WITH RESPECT TO THIS DOLL; IS THAT TRUE?

17       MR. HANSEN:  OBJECTION, YOUR HONOR.  LEADING.

18       THE COURT:  REPHRASE, COUNSEL.  YOU NEED TO GET BACK

19  TO FOUNDATION.

20       MR. QUINN:  RIGHT.                                   09:37

21  BY MR. QUINN:

22  Q    DID IT EVER COME TO YOUR ATTENTION, IN THE COURSE OF THE

23  TRENDY TEENS LITIGATION THAT DOUBLE GRAND WAS INVOLVED IN, THAT

24  MGA HAD SUED SOME OTHER PARTY ON A DOLL CALLED "TRENDY TEENZ,"

25  WHICH DOUBLE GRAND DID NOT MAKE?                          09:37

1        **MR. KENNEDY:**  OBJECTION TO THE FORM, YOUR HONOR.

2   FOUNDATION AND HEARSAY.

3        **THE COURT:**  SUSTAINED.

4   **BY MR. QUINN:**

5   Q   LET'S LOOK AT THE DOUBLE GRAND PRODUCTS THAT YOU KNOW MGA        09:37

6   DID SUE ON.

7        AND I WOULD ASK YOU, PLEASE, TO -- YOU'VE GOT SOME

8   BLACK BINDERS THERE, AND IN VOLUME -- IT SHOULD BE VOLUME I --

9   PLEASE TURN TO EXHIBIT 13561.  IF YOU WOULD LOOK AT 13561-0002,

10  PLEASE.        09:38

11       CAN YOU IDENTIFY THIS EXHIBIT, 13561, AS BEING AN

12  AFFIDAVIT OF RAYMOND DAVID BLACK THAT WAS FILED IN THE MGA

13  VERSUS DOUBLE GRAND LITIGATION?

14  A   YES.

15  Q   IS THAT AN AFFIDAVIT THAT WAS FILED BY MGA IN THAT CASE?        09:39

16  A   YES.

17       **MR. QUINN:**  WE'D OFFER EXHIBIT 13561, YOUR HONOR.

18       **THE COURT:**  ANY OBJECTION?

19       **MR. HANSEN:**  NO, YOUR HONOR.

20       **THE COURT:**  IT'S ADMITTED.        09:39

21       YOU MAY PUBLISH.

22       (EXHIBIT 13561 RECEIVED.)

23       **MR. QUINN:**  PUT ON THE SCREEN JUST THE DASH TWO, TO

24  SHOW THE CAPTION.

25  **BY MR. QUINN:**

6000

1    Q    IF YOU COULD TURN, PLEASE, TO PAGES 153 AND 166.

2         MR. QUINN:  AND IF WE COULD PUT ON THE SCREEN 154,

3    PLEASE.

4         THE WITNESS:  WHAT'S THE NUMBER, AGAIN?

5    BY MR. QUINN:

6    Q    IT STARTS WITH 154, THROUGH 166.  IT'S 154 THROUGH 166,

7    ALL WITHIN EXHIBIT 13561.

8         MR. QUINN:  YOUR HONOR, I ASSUME WE'RE GOING TO

9    FOLLOW THE SAME PROCEDURE WITH THESE DOCUMENTS AS YESTERDAY,

10   THAT ONLY WHAT'S GOING TO BE ADMITTED IN THESE LENGTHY                09:41

11   DOCUMENTS IS WHAT'S ACTUALLY SHOWN OR CALLED TO THE ATTENTION

12   OF THE WITNESS.

13        THE COURT:  EXACTLY.

14        MR. NOLAN:  THANK YOU, YOUR HONOR.

15        THE COURT:  VERY WELL.                                          09:42

16   BY MR. QUINN:

17   Q    IF YOU WOULD LOOK THERE AT PAGE 154, WHICH WE HAVE ON THE

18   SCREEN, MR. LEUNG, AND THE FOLLOWING PAGES, 155, 156, 157.

19        CAN YOU TELL US, WHAT WAS YOUR UNDERSTANDING AS TO

20   WHAT THESE DRAWINGS WERE?                                            09:42

21   A    THESE ARE THE DRAWINGS OF THEIR DESIGNER, CARTER BRYANT.

22   Q    AND IF WE LOOK, THEN, WITHIN THE SAME DOCUMENT AT 194, CAN

23   YOU IDENTIFY WHAT THIS IS A PHOTOGRAPH OF.

24   A    THIS WAS A PRODUCT THAT MY COMPANY HAD MANUFACTURED, BUT I

25   WAS SUED BY MGA ON.                                                  09:43

1    Q    SO THIS IS ONE OF THE PRODUCTS THAT YOU WERE SUED ON IN

2    THIS CASE?

3    A    YES, CORRECT.

4    Q    AND THIS IS A MINI TRENDY TEENS?

5    A    YES, CORRECT.                                          09:43

6         MR. QUINN:  IF I COULD APPROACH THE WITNESS,

7    YOUR HONOR --

8         THE COURT:  YOU MAY.

9         MR. QUINN:  -- WITH EXHIBITS 13699, 13697, AND 13695.

10        MR. HANSEN:  YOUR HONOR, WE'VE NEVER BEEN PROVIDED     09:44

11   THESE.

12        THE COURT:  PROVIDE THEM NOW, COUNSEL.

13        MR. HANSEN:  WE'VE NEVER SEEN THESE BEFORE.

14        MR. QUINN:  IF THE COURT WOULD LIKE US TO RESPOND TO

15   THE COMMENT, WE'RE PREPARED TO DO THAT, YOUR HONOR.        09:44

16        THE COURT:  WELL, NO.  I'D RATHER DO IT AT SIDE-BAR.

17        (WHEREUPON, THE FOLLOWING PROCEEDINGS

18        WERE HELD AT SIDE-BAR:)

19        THE COURT:  COUNSEL, THROUGHOUT THIS TRIAL, THERE

20   HAVE BEEN DOLLS ON BOTH SIDES SHOWN TO EACH OTHER MINUTES  09:45

21   BEFOREHAND.

22        WHAT'S THE ISSUE WITH THESE DOLLS?

23        MR. HANSEN:  MY UNDERSTANDING THAT THE DOLLS -- WE

24   HAD PRODUCTION FROM MR. LEUNG WHEN HE CAME IN.  THESE WERE NOT

25   INCLUDED IN THE MATERIALS THAT WE WERE SHOWN.  THERE WAS AN  09:45

1    AGREEMENT THAT THE MATERIALS WOULD BE SHOWN MONDAY.  THESE WERE

2    NOT PART OF THAT.  THAT'S ALL.

3         WE'RE NOT GOING TO STOP THEM FROM COMING IN.

4         **MR. ZELLER:**  I THINK MR. HANSEN IS JUST NOT ON THE

5    SAME PAGE WITH THIS.                                        09:45

6         THESE DOLLS ARE THE ONES WE ACQUIRED.  WE BOUGHT THEM

7    FROM THE OPEN MARKET AND MASKED THEM UP; BECAUSE, AS THE COURT

8    KNOWS, ABOUT THE PROBLEMS WE'VE HAD.

9         **THE COURT:**  YES.

10        **MR. ZELLER:**  WE MADE THOSE THINGS AVAILABLE TO THEM   09:45

11   PRIOR TO DISCOVERY, AND AGAIN IN APRIL.  THIS IS DOCUMENTED IN

12   A LETTER.  MOREOVER, WE MADE THEM -- AND THEY ACTUALLY CAME

13   OVER AND LOOKED AT THEM MOST RECENTLY LAST FRIDAY.

14        **THE COURT:**  THEY PHYSICALLY LOOKED AT THOSE DOLLS ON

15   FRIDAY?                                                     09:46

16        **MR. ZELLER:**  THESE PHYSICAL EXACT DOLLS.

17        **THE COURT:**  Ms. AGUIAR, YOU'RE SHAKING YOUR HEAD.

18        YOU DID NOT LOOK AT THESE DOLLS ON FRIDAY?

19        **MS. AGUIAR:**  THE ATTORNEY FROM OUR OFFICE HAS PHOTOS

20   OF WHAT HE LOOKED AT ON MONDAY.  IT'S NOT THAT.             09:46

21        YOUR HONOR, THESE CAN BE USED.

22        MR. HANSEN IS MAKING THE POINT, THOUGH, THAT I

23   SPECIFICALLY REQUESTED, IF YOU'RE GOING TO BRING SOMEONE FROM

24   HONG KONG AND SHOW THESE TANGIBLE ITEMS, WE'D LIKE THE

25   OPPORTUNITY TO SEE THEM AHEAD OF TIME.  WE HAVE PHOTOS OF WHAT  09:46

1    WE WERE SHOWN.  THEY DON'T INCLUDE THESE.  THEY ARE JUST

2    DIFFERENT DOLLS.

3              **MR. HANSEN:**  THIS IS FOR THE NEXT WITNESS.

4              **MS. AGUIAR:**  SO WE'RE TRYING TO COME TO --

5              **MR. ZELLER:**  WE MADE MULTIPLE ITEMS AVAILABLE TO THEM      09:46

6    YET AGAIN ON FRIDAY.  THAT IS NOT THE RECORD, A COMPLETE SET OF

7    WHAT WAS MADE AVAILABLE, BY ANY STRETCH.

8              **THE COURT:**  THESE ARE DIFFERENT?

9              **MR. ZELLER:**  THEY ARE DIFFERENT.  BUT SHE HASN'T

10   BROUGHT YOU ALL OF THE PHOTOS THEY TOOK, YOUR HONOR.                    09:47

11             **THE COURT:**  DID YOU PROVIDE PHOTOS OF THESE MINI

12   TRENDY TEENZ?

13             **MR. ZELLER:**  I WILL PUT IN A DECLARATION WITH E-MAILS

14   ATTACHED, SPECIFICALLY CALLING OUT THESE ISSUES.  THEY WERE THE

15   ONES WHO GENERATED LISTS.  WE GENERATED LISTS.  WE MADE THEM           09:47

16   AVAILABLE.  WHETHER THEY CHOSE TO TAKE PHOTOGRAPHS OF THEM OR

17   NOT IS NOT OF ANY MOMENT.

18             THE FACT IS, THIS IS JUST SIMPLY NOT CORRECT, WHAT

19   THEY ARE SAYING.  AND THEY HAVE NOW SAID IT IN FRONT OF THE

20   JURY.  THEY HAVE NOW SAID THAT WE DIDN'T ALLOW THIS WITNESS TO         09:47

21   BE DEPOSED; THAT WE'RE SPRINGING DOLLS ON THEM.

22             **THE COURT:**  WE'VE GOT TO STOP DOING THAT.  THE COURT

23   HAS VERY LIBERALLY GIVEN SIDE BARS DURING THE TRIAL.  AND I

24   KNOW YOU HAVEN'T BEEN HERE FOR ALL OF THE TRIAL.  BUT ON BOTH

25   SIDES, LET'S NOT EDUCATE THE JURY ABOUT THIS.  I DON'T LIKE           09:47

1    HAVING TO GIVE THESE INSTRUCTIONS TO THE JURY.

2              **MR. HANSEN:**  OKAY.

3              **THE COURT:**  MS. AGUIAR HAS BEEN VERY GOOD AT THIS;

4    MR. NOLAN, MR. QUINN AND MR. PRICE TOO.  IF THERE'S SOMETHING

5    YOU NEED TO TELL ME, ASK FOR A SIDE-BAR.                          09:47

6              **MR. HANSEN:**  IT WAS MY UNDERSTANDING WE HAD NOT SEEN

7    THEM.

8              **THE COURT:**  WHETHER YOU'VE SEEN THEM OR NOT, THAT'S

9    NOT THE POINT.  THE POINT I'M MAKING HERE IS NOT TO SAY THAT TO

10   THE JURY.  BECAUSE WHAT YOU'RE DOING IS YOU'RE THROWING AN       09:48

11   ATTACK AT MATTEL AND THEIR ATTORNEYS IN FRONT OF THE JURY.

12             **MR. HANSEN:**  OKAY.

13             **MS. AGUIAR:**  WE DON'T HAVE AN OBJECTION TO THEM

14   COMING IN.

15             **THE COURT:**  VERY WELL.  IF THERE'S NO OBJECTION, THEN  09:48

16   WE'RE PROCEEDING.

17             **MR. QUINN:**  CAN I ASK THAT THE SIDE-BAR BE CHARGED TO

18   MGA?

19             **THE COURT:**  I'LL CONSIDER THAT, COUNSEL.  THANK YOU.

20             (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)        09:48

21             **THE COURT:**  MR. QUINN, YOU MAY PROCEED.

22             I UNDERSTAND THE OBJECTION HAS BEEN WITHDRAWN.

23             **MR. QUINN:**  THANK YOU, YOUR HONOR.

24   **BY MR. QUINN:**

25   Q    MR. LEUNG, I'VE HANDED YOU EXHIBITS 13695, 13697, AND       09:48

1    13699.

2            CAN YOU IDENTIFY THOSE PRODUCTS FOR US, PLEASE.

3    A    THESE ARE THE PRODUCTS, OUR COMPANY'S PRODUCTS, THAT MGA

4    SUED US ON.

5            **MR. QUINN:**  WE'D OFFER THESE IN EVIDENCE, YOUR HONOR.  09:49

6            **THE COURT:**  ANY OBJECTION?

7            **MR. KENNEDY:**  NO OBJECTION, YOUR HONOR.

8            **THE COURT:**  IT'S ADMITTED.

9            (EXHIBITS 13695, 13697, AND 13699 RECEIVED.)

10   **BY MR. QUINN:**

11   Q    IF I COULD ASK YOU TO TURN TO TAB 13696.  I'M GOING TO ASK

12   YOU ABOUT THREE PHOTOGRAPHS, 13696, 13698, AND 13700.  IF YOU

13   COULD LOOK AT THOSE.

14           MY QUESTION TO YOU WILL BE WHETHER THOSE ARE

15   PHOTOGRAPHS OF THOSE TRENDY TEENS DOLLS THAT WERE JUST RECEIVED  09:50

16   INTO EVIDENCE.

17           **MR. QUINN:**  YOUR HONOR, COULD WE HAVE AN ASSISTANT GO

18   UP TO THE STAND AND HELP WITH THE VOLUMES?

19           **THE COURT:**  YES.

20   **BY MR. QUINN:**

21   Q    SO WE'RE LOOKING AT 13696, 13698, AND 13700.

22           MY QUESTION IS WHETHER YOU CAN IDENTIFY THOSE AS

23   PHOTOGRAPHS OF THOSE MINI TRENDY TEENS THAT WERE JUST RECEIVED

24   INTO EVIDENCE.

25   A    YES.                                                       09:52

1          **MR. QUINN:**  AND IF WE COULD JUST DISPLAY THOSE TO THE

2     JURY, KEN, JUST THOSE THREE, ONE AFTER ANOTHER, IF YOU WOULD,

3     PLEASE.

4          COULD WE MOVE THOSE INTO EVIDENCE, YOUR HONOR, THOSE

5     PHOTOGRAPHS, 13696, 13698, AND 13700?                        09:52

6          **MR. HANSEN:**  THE ONLY CLARIFICATION I WOULD ASK, YOUR

7     HONOR, IS THAT THE PHOTOS ARE NOT THINGS IN THE BOX.  BUT I

8     HAVE NO OBJECTION OTHERWISE.

9          **MR. QUINN:**  THE PRODUCTS WERE PHOTOGRAPHED OUTSIDE

10    THE BOX.                                                     09:52

11         **MR. HANSEN:**  I DON'T KNOW IF THEY'RE THE SAME

12    PRODUCTS, BUT I HAVE NO OBJECTION, OTHER THAN WHAT YOU'RE GOING

13    TO SEE IS NOT WHAT'S UP ON THE STAND.  OTHER THAN THAT, I HAVE

14    NO OBJECTION.

15         **THE COURT:**  VERY WELL.  NOTED FOR THE RECORD.        09:52

16         THEY'RE ADMITTED.

17         (EXHIBITS 13696, 13698, AND 13700 RECEIVED.)

18         **MR. QUINN:**  THANK YOU, YOUR HONOR.

19         IF WE COULD SHOW THOSE NOW, PLEASE.

20    **BY MR. QUINN:**

21    Q    THESE ARE PHOTOGRAPHS OF THOSE MINI TRENDY TEENS THAT WERE

22    JUST RECEIVED INTO EVIDENCE, THAT ARE IN THE BOXES THERE?

23    A    YES.

24    Q    AND WAS THERE ALSO A FULL-SIZED TRENDY TEENS DOLL?

25    A    YES.                                                     09:53

1    Q    IF I COULD ASK YOU TO GO BACK TO THAT AFFIDAVIT OF

2    MR. BLACK, EXHIBIT 13561, AND TURN TO PAGE 0124.

3         CAN YOU IDENTIFY THIS PRODUCT THAT WE HAVE A

4    PHOTOGRAPH OF, AT 0124.

5    A    YES.                                                        09:54

6    Q    WHAT IS THAT?

7    A    THIS IS ONE OF THE PRODUCTS THAT MGA SUED US ON, BUT THIS

8    IS A LARGER PRODUCT, AND IT'S CALLED A TRENDY TEENS DOLL.

9    Q    AND WOULD YOU TURN, PLEASE, TO PAGE 208 IN THAT SAME

10   AFFIDAVIT.                                                       09:55

11   A    OKAY.

12   Q    CAN YOU IDENTIFY THAT PHOTOGRAPH.

13   A    THIS IS ALSO A STYLE OF ONE OF THE PRODUCTS.  IT'S A PEN

14   WITH A BOBBLEHEAD.

15   Q    AND WAS THIS A PEN THAT WAS MADE BY DOUBLE GRAND?          09:55

16   A    YES.

17   Q    DID MGA SUE DOUBLE GRAND OVER THIS PRODUCT IN THE LAWSUIT

18   ALSO?

19   A    YES.

20   Q    CAN YOU TELL US APPROXIMATELY HOW LARGE THE PEN IS.        09:55

21   A    APPROXIMATELY EIGHT INCHES.

22   Q    WOULD YOU PLEASE TURN FORWARD TWO PAGES TO 210.

23         CAN YOU IDENTIFY WHAT THIS IS A PICTURE OF.

24   A    IT'S ONE STYLE OF MY PRODUCTS THAT THEY SUED ON.

25   Q    WHAT WAS THIS PRODUCT?                                     09:56

WEDNESDAY, AUGUST 6, 2008              TRIAL DAY 30, MORNING SESSION

1    A    IT'S PURELY A BOBBLEHEAD, THE HEAD SHAPES.

2    Q    CAN YOU TELL US APPROXIMATELY WHAT THE SIZE OF THIS DOLL

3    WAS.

4    A    AROUND TEN INCHES OR SO, APPROXIMATELY.

5    Q    LET'S LOOK AT WHAT MGA SAID WAS COPIED.  IF YOU WOULD TURN    09:57

6    TO PAGE 00022 IN THE SAME DOCUMENT.

7         CAN YOU TELL US WHAT THIS DOCUMENT IS.

8    A    THIS IS A DOCUMENT THAT I RECEIVED FROM MGA GREAT BRITAIN.

9    IT'S REGARDING THIS AFFIDAVIT.  IT STATES SOME ALLEGATIONS THAT

10   THE SHAPE, THE EYES, THE MOUTH ARE SIMILAR TO SOME OF THEIR    09:58

11   PRODUCTS.

12        **MR. QUINN:**  IF WE COULD ENLARGE THE TOP THERE, THE

13   ADDRESS, WHERE IT SAYS "PARTNER, RAY BLACK."

14   **BY MR. QUINN:**

15   Q    DO YOU KNOW WHETHER OR NOT MR. BLACK WAS A LAWYER FOR MGA    09:58

16   IN GREAT BRITAIN?

17   A    I DO NOT KNOW, BECAUSE IN THE END, THE ENTIRE CASE WAS

18   HANDLED BY THE LAWYERS OF MGA HONG KONG.

19   Q    ALL RIGHT.

20        IT SAYS THERE IN THE FIRST SENTENCE, "WE HAVE BEEN    09:59

21   INSTRUCTED BY MGA ENTERTAINMENT, INC."

22        DO YOU SEE THAT?

23   A    YES.

24   Q    DOES THAT REFRESH YOUR RECOLLECTION THAT MR. BLACK WAS A

25   LAWYER WHO HAD BEEN HIRED BY MGA IN GREAT BRITAIN?    09:59

1    A    ACCORDING TO MY UNDERSTANDING AT THAT TIME, YES, BECAUSE

2    HERE'S AN E-MAIL WITH AN S. J. BERWIN, AND THIS IS A LAW OFFICE

3    IN GREAT BRITAIN.

4    Q    IF WE LOOK AT THE LAST PARAGRAPH ON THIS PAGE, IT SAYS,

5    "WE ALSO CONSIDER THAT THE MINI TRENDY TEENS DOLLS INFRINGE OUR    10:00

6    CLIENT'S COPYRIGHT IN THE SURFACE DECORATION OF THE BRATZ

7    DOLLS.  WE ENCLOSE COLOR COPIES OF THE ORIGINAL DRAWINGS AND

8    WOULD DRAW YOUR ATTENTION IN PARTICULAR TO" -- AND WERE COPIES

9    OF THOSE CARTER BRYANT DRAWINGS INCLUDED WITH THIS LETTER WHEN

10   YOU RECEIVED IT?                                                  10:00

11   A    YES.

12   Q    THE NEXT PAGE, IT SAYS, "WOULD CALL YOUR ATTENTION IN

13   PARTICULAR TO" -- AND THEN THERE'S A LIST OF FOUR ITEMS.

14         **MR. QUINN:**  THE FIRST A, B, C, D, KEN.

15   **BY MR. QUINN:**

16   Q    IT SAYS, "THE EYELASHES OF BOTH BRATZ AND THE MINI TRENDY

17   TEENS DOLLS, IN PARTICULAR, THE DISTINCT LASHES ABOVE THE EYE;

18   THE TWO-TONE EYE SHADOW USED ON BOTH THE BRATZ AND MINI TRENDY

19   TEENS DOLLS, BOTH IN STYLE, SHAPE, AND COLOR; THE SHAPE OF THE

20   EYES; THE SHAPE OF THE LIPS" -- WAS IT YOUR UNDERSTANDING THAT    10:01

21   THIS LAWYER WAS TELLING YOU THAT THESE PARTICULAR FEATURES ON

22   CARTER BRYANT'S DRAWINGS WERE VERY SIMILAR TO THE FEATURES ON

23   THE MINI TRENDY TEENS DOLLS THAT DOUBLE GRAND MADE?

24   A    YES.

25   Q    COULD I ASK YOU NOW TO TURN TO EXHIBIT 13691, WHICH IS IN    10:03

1    EVIDENCE, THE AFFIDAVIT OF LEE SHIU CHEUNG.

2           **MR. QUINN:**  IF WE COULD JUST SHOW THE FIRST PAGE OF

3    THAT, 01.

4    **BY MR. QUINN:**

5    Q    THIS IS IN EVIDENCE, BUT CAN YOU IDENTIFY THIS AS AN                10:03

6    AFFIRMATION OF MR. CHEUNG WHICH YOU RECEIVED IN THE LITIGATION

7    THAT DOUBLE GRAND HAD WITH MGA?

8    A    YES.

9    Q    AND IF WE COULD TURN TO PAGE 7, PARAGRAPH 16.

10          IT SAYS THERE IN THE FIRST PARAGRAPH OF THE                        10:04

11   AFFIDAVIT, "BASED ON AND ORIGINATED FROM THE INITIAL CONCEPT

12   DRAWINGS OF MR. BRYANT, ANNA RHEE DREW SOME DECORATIONS

13   DIRECTIONS FOR THE FACIAL DECORATIONS FOR DIFFERENT SERIES OF

14   DOLLS."

15          DO YOU SEE THAT?                                                   10:04

16   A    YES.

17   Q    AND THEN THOSE ARE ATTACHED AT -28.

18          I'M SORRY.  AT 7.

19          NO, THAT'S NOT IT EITHER.

20          I'M SORRY.  WE'LL COME BACK TO THAT.                               10:05

21          IT'S 49 OF THE SAME DOCUMENT, BEGINNING AT 73; 49

22   THROUGH 73, IN THAT SAME DOCUMENT, SAME EXHIBIT, 13691.

23          THEN COPIES OF THOSE ANNA RHEE DECORATION DIRECTIONS

24   ARE BEHIND THAT.

25          **MR. QUINN:**  IF WE COULD JUST GO THROUGH THOSE QUICKLY          10:06

6011

```
 1   ON THE SCREEN, KEN.
 2   BY MR. QUINN:
 3   Q    SO WAS IT YOUR UNDERSTANDING THAT THESE WERE THE
 4   ANNA RHEE -- LET'S JUST BACK UP FOR A SECOND.
 5           LET'S MOVE ON.                                        10:07
 6           IF WE COULD GO BACK TO MR. CHEUNG'S DECLARATION,
 7   13691, AT PAGE 8, PARAGRAPH 20, WHERE IT SAYS, "INSOFAR AS THIS
 8   ACTION IS CONCERNED, THE DEFENDANT HAS COPIED THE FACIAL
 9   DECORATION OF" -- AND THEN IT GOES TO THE NEXT PAGE -- "THE
10   FULL AND MINI VERSIONS OF CHLOE, AND THE HEAD, BODY PARTS, AND   10:08
11   SHOES OF THE MINI VERSION OF CHLOE."
12           WAS IT YOUR UNDERSTANDING THAT MGA WAS ALLEGING THAT
13   ONE OF YOUR PRODUCTS HAD COPIED CHLOE?
14   A    YES.
15   Q    IF YOU WOULD TURN TO 14 IN THE SAME DOCUMENT,             10:09
16   PARAGRAPH 37, "TWO LITTLE EYES."  IT SAYS, "BRATZ IS POPULAR
17   BECAUSE OF ITS UNIQUE FUNKY AND SASSY IMAGE.  I ALSO REFER TO
18   PARAGRAPH 18 HEREIN BEFORE, EXPLAINING THE UNIQUE FACIAL
19   FEATURES OF THE DOLLS.  THE TRENDY TEENS ROCKERHEADZ BOBBLEHEAD
20   FASHION DOLLS AND ROCKERHEADZ FASHION DOLL BOBBLE PEN HAVE      10:10
21   COPIED BRATZ'S IMAGE, IN PARTICULAR THE EYES AND LIPS."
22           DO YOU SEE THAT?
23   A    I SEE THAT.
24   Q    WAS IT YOUR UNDERSTANDING THAT MGA WAS SAYING THAT YOUR
25   PRODUCTS HAD COPIED FEATURES FROM THE BRATZ DOLLS?             10:10
```

1    A    YES.

2    Q    IF I COULD NOW GO BACK TO A QUESTION I WAS ASKING YOU

3    BEFORE, SIR.

4         IN THE COURSE OF YOUR ATTENDANCE AT HEARINGS OR YOUR

5    COMMUNICATIONS WITH MGA'S LAWYERS IN HONG KONG, DID THEY EVER      10:11

6    TELL YOU THAT YOUR PRODUCTS WERE TOO SIMILAR TO CARTER BRYANT'S

7    DRAWINGS?

8         MR. HANSEN:   SAME OBJECTION, YOUR HONOR.   OBJECTION

9    TO FORM.

10        THE COURT:   LET'S REPHRASE THE QUESTION, COUNSEL.            10:12

11   BY MR. QUINN:

12   Q    WE'VE LOOKED AT SOME DOCUMENTS WHERE MGA'S LAWYERS

13   INCLUDED COPIES OF MR. BRYANT'S DRAWINGS AND MADE REFERENCE TO

14   THE DRAWINGS IN COMPARISON TO YOUR COMPANY'S PRODUCTS.

15   A    YES.                                                          10:12

16   Q    WAS THAT ISSUE EVER DISCUSSED IN YOUR PRESENCE WITH THE

17   LAWYERS FOR MGA, AS TO THE COMPARISON BETWEEN YOUR COMPANY'S

18   PRODUCTS AND MR. BRYANT'S DRAWINGS?

19   A    WHAT I HEARD WAS THAT THEY HAD AN OWNERSHIP OF THIS

20   COPYRIGHT.   THAT'S REGARDING THE DRAWINGS FROM CARTER BRYANT.     10:13

21   Q    AND DID THEY TELL YOU ANYTHING ABOUT THE SIMILARITY OR

22   DISSIMILARITY OF THOSE DRAWINGS AND YOUR COMPANY'S PRODUCTS?

23        MR. KENNEDY:   OBJECTION TO FORM, YOUR HONOR.

24   LEADING.

25        THE COURT:   OVERRULED.                                      10:14

```
1              THE QUESTION IS A YES OR NO QUESTION.  IT SHOULD BE
2    ANSWERED AS SUCH.  IT'S A FOUNDATIONAL QUESTION.
3              THE WITNESS:  YES.
4    BY MR. QUINN:
5    Q    WHAT DID THEY TELL YOU?                                    10:14
6    A    THEY SAID THAT OUR PRODUCTS WERE INFRINGING ON THEIR
7    COPYRIGHT AND THEY WERE RELYING ON THE COPYRIGHT SUBSISTING AN
8    ORIGINAL ARTISTIC WORK; THAT'S THEIR CLAIM.
9              MR. QUINN:  NOTHING FURTHER, YOUR HONOR.
10             THE COURT:  BEFORE CROSS-EXAMINATION, WE'RE GOING TO   10:15
11   TAKE OUR MORNING RECESS.  THE COURT HAS A CRIMINAL MATTER TO
12   ATTEND TO.
13             (WHEREUPON, JURORS DEPART COURTROOM.)
14             (WHEREUPON, A BRIEF RECESS WAS HELD.)
15             (WHEREUPON, JURORS ENTER COURTROOM.)                  10:57
16             THE COURT:  COUNSEL, YOU MAY PROCEED.
17             MR. QUINN:  YOUR HONOR, WE HAVE A STIPULATION.
18             THERE WERE SOME DOCUMENTS WE TRIED TO SHOW ON THE
19   SCREEN -- THE RULE THAT THINGS NEED TO BE SHOWN -- AND THERE'S
20   A CORRUPTION IN OUR DATA BASE; SO WE HAVE A STIPULATION THAT    10:57
21   EXHIBIT 13691-4 THROUGH 13691-73 ARE TO BE RECEIVED.
22             THE COURT:  SO STIPULATED?
23             MS. AGUIAR:  SO STIPULATED, SUBJECT TO THE --
24             THE COURT:  RIGHT.  AND HOW WE ARE GOING TO DO THAT
25   IS -- I TRUST THE PARTIES WILL BOTH GET TOGETHER AND WE'LL      10:58
```

1   STIPULATE TO THOSE PORTIONS THAT WILL BE ACTUALLY FORMALLY

2   INTRODUCED TO THE JURY.

3           **MR. QUINN:**  YES, YOUR HONOR.

4           **THE COURT:**  VERY WELL.

5           **MR. HANSEN:**  MAY I HAVE A SIDE-BAR BEFORE WE PROCEED?    10:58

6           **THE COURT:**  YES.

7           (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

8           **MR. HANSEN:**  IT'S MY UNDERSTANDING THAT THE COURT HAS

9   RULED IN TERMS OF ORDERS THAT ARE ISSUED BY COURTS, LIKE

10  HONG KONG COURTS, THAT THESE ORDERS ARE NOT ABLE TO COME IN.    10:59

11          **THE COURT:**  THE ORDERS DO NOT COME IN, IS WHAT I'VE

12  RULED.

13          **MR. HANSEN:**  SO ONE OF THE THINGS TO CLARIFY IS THAT

14  THIS COMPANY, THIS GENTLEMAN'S --

15          **THE COURT:**  PROVIDING THAT THE ORDERS DO NOT    10:59

16  CONTAIN FACTUAL -- I MEAN, THE INFORMING PRINCIPLE IS THE

17  FACTUAL AVERMENT VERSUS LEGAL CONFUSION.

18          **MR. HANSEN:**  SO THE LEGAL CONFUSION WOULD BE THAT THE

19  COURT IN HONG KONG FOUND THEM LIABLE FOR COPYRIGHT INFRINGEMENT

20  AS TO ALL FOUR PRODUCTS THAT WERE SHOWN ON THE SCREEN -- THAT    10:59

21  WE'RE NOT CRAZY FOR HAVING BROUGHT THE ACTION; WE SUCCEEDED IN

22  SHOWING THEY WERE LIABLE.

23          **THE COURT:**  BECAUSE WE DON'T HAVE BEFORE THE

24  COPYRIGHT STANDARD THAT THE COURT WAS USING, I WOULD NOT ALLOW

25  INTRODUCTION OF EVIDENCE OR I WOULD SUSTAIN AN OBJECTION IF IT    11:00

1    WERE TO BE MADE CONCERNING THE CONCLUSION OF THE FOREIGN COURT.

2         **MR. HANSEN:**  ONE OF THE OTHER -- THERE'S A NUMBER OF

3    ASPECTS OF THE ORDER, AND I JUST WANT TO BE CLEAR, BECAUSE I

4    DON'T WANT TO GO AFOUL.  SO YOU HAVE, FOR EXAMPLE, THE ARTISTIC

5    WORKS THAT WERE THE SUBJECT OF THE INFRINGEMENT FINDING ARE THE        11:00

6    CIRCUMSCRIBED TWO DRAWINGS; THEY ARE LISTED IN THE ORDER, THE

7    SPECIFIC THINGS THAT THE COURT USED.

8         **THE COURT:**  WELL, THE FINDINGS ARE NOT -- IT'S THE

9    PROFFERS OF THE PARTIES THAT ARE COMING IN, BECAUSE THEY ARE

10   COMING IN AS HEARSAY.  THE EXCEPTION IS CONCERNING THE               11:00

11   ADMISSION OF A PARTY OPPONENT.  SO IF MGA MAKES A STATEMENT IN

12   ANOTHER LITIGATION, AND MATTEL ALSO, THEY ARE STUCK WITH THAT

13   STATEMENT.

14        **MR. HANSEN:**  NOW ON THAT POINT, ONE OF THE DEFENSES

15   THAT THEY MADE -- IT WAS SPECIFICALLY THIS GENTLEMAN'S --            11:01

16   MR. LEUNG MADE THE STATEMENTS TO THE COURT -- THEIR DEFENSE WAS

17   THAT IT WAS INDEPENDENTLY CREATED BASED ON HEAD MOLDS THAT WERE

18   DONE PRIOR TO THE BRATZ DOLLS COMING OUT.

19        **THE COURT:**  OKAY.

20        **MR. HANSEN:**  AND I GUESS IT DOESN'T GO ANYWHERE            11:01

21   BECAUSE THE COURT REJECTED THAT AS BEING MERITLESS.  I CAN'T GO

22   TO THE FACT THAT THE COURT BASICALLY FOUND HIS DEFENSE TO HAVE

23   NO BASIS.

24        **THE COURT:**  I DON'T KNOW HOW HIS DEFENSE WOULD BE

25   RELEVANT TO ANYTHING.                                               11:01

WEDNESDAY, AUGUST 6, 2008              TRIAL DAY 30, MORNING SESSION

1        **MR. HANSEN:**  IT GOES HIS CREDIBILITY, FOR ONE, THAT

2  HE MADE AN ARGUMENT --

3        **THE COURT:**  IF YOU WANT TO IMPEACH HIM --

4        WAS THAT FINDING BASED ON LEGAL ANALYSIS, OR WAS

5  IT --                                                              11:01

6        **MR. HANSEN:**  A DECLARATION THAT HE SUBMITTED.  THEY

7  MADE ARGUMENTS TO THE COURT.  THE COURT REJECTED IT.  I REALIZE

8  THE PROBLEM IS THAT WE'RE BEING ACCUSED OF -- IT'S NOT BEING --

9  MGA IS ASSERTING MERITLESS CLAIMS BASED ON PEN AND BOBBLE HEAD

10  DOLLS AND OTHER THINGS THAT THE COURT FOUND.                       11:02

11        **THE COURT:**  THE COURT THERE FOUND WHAT THE JURY FOUND

12  IN THIS CASE.

13        **MR. HANSEN:**  IN TERMS OF...

14        **THE COURT:**  WELL, THAT THE DEFENSE WAS MISTAKEN.

15        **MR. HANSEN:**  BUT IT ALSO GOES TO THE VERY SPECIFIC       11:02

16  BASIS ON WHICH CLAIMS WERE DETERMINED.  IT IS NOT THE DRAWINGS

17  THAT MR. QUINN HAS DISCUSSED, AND I CAN'T GET THERE WITHOUT THE

18  COURT'S ORDER, AND I CAN'T SUGGEST THEY RAISE AN INDEPENDENT

19  DEFENSE THAT SAYS WE HAD HEAD MOLDS IN ANOTHER --

20        **THE COURT:**  AND YOU WANT TO INTRODUCE THIS TO IMPEACH    11:02

21  HIS CREDIBILITY?

22        **MR. HANSEN:**  YES.

23        **MR. QUINN:**  I DON'T THINK THAT GOES TO THE ISSUE

24  HERE, THE STATEMENTS ABOUT SIMILARITY THAT ARE MADE.

25        **THE COURT:**  IT DOESN'T.  BUT THIS IS A CREDIBILITY       11:02

```
 1   ISSUE; THIS IS AN IMPEACHMENT ISSUE.

 2           MR. QUINN:  IT SOUNDS PRETTY COLLATERAL TO ME, YOUR

 3   HONOR.

 4           THE COURT:  SOMETIMES IMPEACHMENT IS.  I'VE ALLOWED

 5   MATTEL TO INTRODUCE IMPEACHMENT MATERIAL THAT'S BEEN QUITE     11:03

 6   COLLATERAL.

 7           MR. NOLAN:  THAT WAS A GOOD ONE.

 8           THE COURT:  I'M SURE MR. QUINN RECALLS THAT; I KNOW

 9   MR. NOLAN DOES.

10           SO I'M SYMPATHETIC TO THE POSITION THAT IT'S          11:03

11   IMPEACHMENT PROVIDED.  I HAVE NOT SEEN THE PAPERS, BUT IF THE

12   COURT DID FIND THAT A DEFENSE BASED ON HIS DECLARATION WAS

13   REJECTED BECAUSE THE COURT DID NOT BELIEVE IT, THEN THAT --

14           MR. HANSEN:  WELL, I DON'T WANT TO MISSTATE.

15           THE COURT:  PERHAPS THE BEST WAY TO DO THIS IS TO ASK  11:03

16   QUESTIONS ABOUT THAT AND LEAVE IT AT THAT.

17           ASK HIM IN A LEADING FASHION:  YOU TOOK THE POSITION

18   THAT...

19           MR. HANSEN:  THE DEFENDANT WAS NOT SHOWN FAIR AND

20   REASONABLE POSSIBILITIES; HAVING REASONABLE DEFENSE, THE COURT 11:03

21   SAID...

22           THE COURT:  THAT'S FAIR ENOUGH.

23           MR. HANSEN:  THERE'S NOTHING TO EXPLAIN AWAY THE

24   POINTS OF SIMILARITY.  IT'S IN A COURT ORDER.

25           YOU UNDERSTAND WHY I WANT --                           11:04
```

```
 1              THE COURT:  I APPRECIATE THAT.

 2              THOSE ARE FACTUAL FINDINGS BY A COURT, ASSUMING THAT

 3      THEY ARE WHAT YOU PRESENT THEM TO BE --

 4              MR. HANSEN:  IF THEY ARE NOT, THEN I --

 5              THE COURT:  -- THAT RELATE TO CREDIBILITY, THIS ONE      11:04

 6      HERE.

 7              MR. HANSEN:  BOTH YEUNGS WE ENDED UP WITH WERE -- I'M

 8      NOT SURE, BUT THE BROTHERS MADE THE CLAIMS IN THE COURT AND THE

 9      COURT GOES THROUGH AND DISCUSSES THE CLAIMS.

10              THE COURT:  IT'S NOT ENTIRELY CLEAR THAT HIS           11:04

11      CREDIBILITY IS REALLY EVEN AN ISSUE IN THIS TRIAL.  BUT, THAT

12      COULD BE DEALT WITH IN ARGUMENT.

13              MR. HANSEN:  SUCH AS A DEFENDANT WOULD NOT PRODUCE

14      DRAWINGS IN THE SAME WAY A LARGE COMPANY LIKE MGA.  IT IS

15      IMPOSSIBLE TO IMAGINE DOLLS COULD BE MASS PRODUCED WITHOUT      11:04

16      DESIGN DRAWINGS.

17              THE COURT:  TO THE EXTENT THE COURT FOUND HIM NOT TO

18      BE CREDIBLE, YOU CAN GET INTO THAT.

19              MR. HANSEN:  I'LL BE CAREFUL.

20              MR. QUINN:  BUT I DON'T UNDERSTAND, YOUR HONOR.        11:04

21              THIS IS A HEARSAY DOCUMENT HERE.

22              THE COURT:  IT IS.

23              MR. QUINN:  THE COURT IS SAYING -- OR WHAT IT SAYS

24      HERE --

25              THE COURT:  WE'RE NOT GETTING INTO THE SUBSTANCE SO    11:05
```

```
 1   MUCH AS THE FACT THAT A COURT FOUND THAT -- A COURT IN THIS
 2   PROCEEDING ULTIMATELY REJECTED HIS --
 3            MR. QUINN:  PRIOR CREATION.
 4            THE COURT:  YEAH, HIS ALLEGATION.  IT'S IMPEACHMENT.
 5   YOU CAN ASK THE QUESTION ABOUT IT.                              11:05
 6            MR. HANSEN:  THIS IS NOT GOING TO TAKE UP THE
 7   ENTIRE --
 8            MR. ZELLER:  I WILL INTERJECT ONE POINT, WHICH IS, I
 9   DON'T KNOW IF THIS HAS BEEN PRODUCED.
10            MR. HANSEN:  IT'S IN YOUR BINDERS.                     11:05
11            MR. ZELLER:  I KNOW.  BUT I'M ASKING BEFORE TODAY.
12            MR. HANSEN:  IT'S EXHIBIT 10176.  THIS IS IN YOUR
13   BINDERS YOU GAVE US.  IT'S IN YOUR BINDERS.
14            MR. ZELLER:  I APOLOGIZE.  I DIDN'T REMEMBER SEEING
15   IT.                                                             11:05
16            MR. HANSEN:  THERE'S TWO JUDGMENTS, BUT I'M ONLY
17   USING ONE.
18            THE COURT:  THERE'S BEEN A LOT OF STUFF.
19            MR. HANSEN:  I DON'T FAULT ANYBODY.
20            THE COURT:  LET'S PROCEED.
21            (SIDE-BAR PROCEEDINGS CONCLUDED.)
22            THE COURT:  MR. HANSEN, YOU MAY PROCEED.
23                         CROSS-EXAMINATION
24   BY MR. HANSEN:
25   Q    GOOD MORNING, MR. LEUNG.                                   11:07
```

```
 1    A    GOOD MORNING.

 2    Q    I'M DAVID HANSEN, ONE OF THE COUNSELS FOR MGA.

 3         YOU AND I HAVE NOT MET BEFORE; IS THAT CORRECT?

 4    A    NO.  NO.  WE'VE NEVER MET.

 5    Q    IN TERMS OF THE -- HAVE YOU DISCUSSED THIS LAWSUIT WITH     11:07

 6    ANYONE FROM MGA?

 7    A    NO.

 8    Q    AND YOU HAVE NOT DISCUSSED IT WITH ANY OF THE COUNSEL FOR

 9    MGA THAT ARE HERE; IS THAT RIGHT?

10    A    I HAVE NOT.                                                 11:07

11    Q    I'D LIKE TO FIRST -- IF YOU COULD GO BACK TO THE BINDER

12    THAT YOU WERE LOOKING AT WHEN MR. QUINN WAS QUESTIONING YOU;

13    IT'S THE EXHIBIT 13561; IF YOU WOULD LOOK AT THAT, PLEASE.

14         COULD YOU TURN TO EXHIBIT PAGE 3, IT HAS THE 0003 AT

15    THE RIGHT ON THE BOTTOM.                                         11:09

16         DO YOU HAVE THAT IN FRONT OF YOU, SIR?

17    A    YES.

18    Q    COULD YOU LOOK AT PARAGRAPH THREE NEAR THE BOTTOM.

19         DO YOU SEE THE PARAGRAPH WHERE IT TALKS ABOUT A CEASE

20    AND DESIST LETTER THAT WAS SENT TO TOY DEPOT ON MARCH 7, 2003?   11:09

21    A    YES.

22    Q    DO YOU KNOW, DID YOU TALK TO TOY DEPOT ABOUT THE MGA

23    CLAIMS AGAINST TRENDY TEENZ AND MINI TRENDY TEENZ?

24    A    I HAVE DISCUSSED WHAT REGARDING MGA?

25    Q    THE FACT THAT A -- DID YOU DISCUSS THAT A LETTER HAD BEEN    11:10
```

1    SENT TO TOY DEPOT TO CEASE AND DESIST?

2    A    FROM WHAT I CAN RECALL, NO.  BUT THE MAIN REASON BEING

3    THAT IT WAS A HONG KONG LAWYER WHO WAS SUING US.

4    Q    EXHIBIT 13561, THE EXHIBIT THAT YOU'RE LOOKING AT, IF YOU

5    COULD LOOK AT THE FIRST PAGE -- AND I'D LIKE TO ESTABLISH, THIS    11:11

6    IS FROM THE UK LAWYER, RAYMOND BLACK.

7         DO YOU RECALL TESTIFYING ABOUT THAT?

8    A    CORRECT.

9    Q    AND THAT'S ON THE SECOND PAGE, IF YOU LOOK TO THE SECOND

10   PAGE, THAT CONFIRMS THESE MATERIALS ARE FROM AN AFFIDAVIT OF    11:11

11   RAYMOND BLACK.

12   A    YES.

13   Q    AND IN TERMS OF TOY DEPOT, WERE THEY A DISTRIBUTOR IN THE

14   UK OF THE TRENDY TEENZ PRODUCT?

15   A    CORRECT.    11:11

16   Q    AND AGAIN, THE THIRD PARAGRAPH ON THE THIRD PAGE OF THIS

17   EXHIBIT WE WERE JUST TALKING ABOUT, DO YOU KNOW WHETHER A CEASE

18   AND DESIST LETTER WAS SENT TO TOY DEPOT BEFORE MGA FILED SUIT

19   AGAINST YOUR COMPANY IN HONG KONG?

20   A    IT WAS MGA WHO SENT THE LETTER?    11:12

21   Q    DO YOU KNOW WHETHER OR NOT THE TOY DEPOT WAS ASKED TO STOP

22   SELLING TRENDY TEENZ BEFORE YOU WERE SUED, YOUR COMPANY WAS

23   SUED, IN HONG KONG?

24   A    I'M NOT SURE.  I CAN'T RECALL THIS.

25   Q    BUT TOY DEPOT WAS A DISTRIBUTOR OF YOUR PRODUCTS IN THE    11:13

```
 1    UK.
 2    A    CORRECT.
 3    Q    COULD YOU TURN, PLEASE, IN THAT SAME EXHIBIT, TO THE PAGE
 4    MARKED PAGE 17, 0017.  CAN YOU TELL ME -- THIS IS THE BOX FOR
 5    YOUR MINI TRENDY TEENZ PRODUCT?                                   11:13
 6    A    YES.
 7    Q    IF YOU WOULD GO TO THE NEXT PAGE, PLEASE.  WHAT'S SHOWN
 8    HERE, THIS IS ONE OF THE DOUBLE GRAND'S MINI TRENDY TEENZ
 9    DOLLS?
10    A    YES.                                                         11:14
11    Q    AND DO YOU HAVE ANY TROUBLE TELLING THAT THIS IS ONE OF
12    YOUR MINI TRENDY TEENZ DOLLS FROM THIS PICTURE?
13    A    I HAVE NO TROUBLE.
14    Q    IF YOU WOULD TURN, PLEASE, TO NOW PAGE 22 OF
15    EXHIBIT 13561.                                                    11:14
16          MR. QUINN ASKED YOU DURING THE QUESTIONING ABOUT THE
17    LIST, THIS IS THE MARCH 7, 2003 MEMO FROM RAY BLACK.
18          DO YOU SEE THAT?
19    A    I SEE THAT, YES.
20    Q    AND MR. QUINN ASKED YOU ON YOUR OPENING QUESTIONING ABOUT   11:15
21    THE LETTERED ITEMS NEAR THE BOTTOM OF THIS; A, B, C, D, AND F.
22          DO YOU SEE THAT?
23          MR. QUINN:  I OBJECT TO THE PREAMBLE, YOUR HONOR.  IT
24    MISSTATES.
25          THE COURT:  SUSTAINED.  REPHRASE YOUR QUESTION.            11:15
```

1    **BY MR. HANSEN:**

2    Q    LET ME ASK IT DIFFERENTLY.

3          DO YOU SEE THE A THROUGH F THAT IT LISTED ON PAGE 22

4    OF EXHIBIT 13561?

5    A    I SEE THEM.                                                  11:15

6    Q    THE CLAIMS THAT WERE BROUGHT AGAINST DOUBLE GRAND BY MGA

7    AND HONG KONG, I THINK YOU SAID THEY WERE COPYRIGHT CLAIMS; IS

8    THAT CORRECT?

9          THE INTERPRETER:  COULD THE INTERPRETER PLEASE HAVE

10   THE QUESTION AGAIN.                                               11:16

11   **BY MR. HANSEN:**

12   Q    THE CLAIMS AGAINST DOUBLE GRAND IN HONG KONG WERE BASED ON

13   COPYRIGHTS; IS THAT CORRECT?

14   A    CORRECT.

15   Q    DO YOU SEE IN THE THIRD PARAGRAPH -- THIS IS SHOWN ON THE    11:16

16   SCREEN; IT'S THE BOTTOM OF THE THIRD PARAGRAPH OF PAGE 22 THAT

17   WE'RE LOOKING AT -- WHERE IT TALKS ABOUT REGISTERED DESIGNS;

18   CAPITAL "R" CAPITAL "D."

19          DO YOU SEE THAT?

20   A    YES.

21   Q    AND THE SENTENCE STATES THAT "IN PARTICULAR, WE DRAW YOUR

22   ATTENTION TO THE FOLLOWING WHICH ARE IDENTICAL OR EXTREMELY

23   SIMILAR IN BOTH THE REGISTERED DESIGNS AND MINI TRENDY TEENZ

24   DOLLS."

25          DO YOU SEE THAT?                                           11:17

1    A    YES.

2    Q    ARE YOU AWARE THAT -- DID MGA EVER SUE YOUR COMPANY IN

3    HONG KONG BASED ON REGISTERED DESIGN VIOLATIONS?

4    A    THEY SUED US AT -- MGA SUED A COMPANY IN HONG KONG BASED

5    ON THE DRAWINGS; SOME OF THE DRAWINGS WERE OF CLOE AND ZOE          11:18

6    BASED ON THESE TWO DESIGNS.

7    Q    WHAT I'M TRYING TO GET AT IS, THE LAST SENTENCE AT THE

8    BOTTOM OF THIS PAGE 22 TALKS ABOUT, IT SAYS, QUOTE, "WE ALSO

9    CONSIDER THAT THE MINI TRENDY TEENZ DOLLS INFRINGE OUR CLIENT'S

10   COPYRIGHTS IN THE SURFACE DECORATION OF THE BRATZ DOLLS."         11:18

11        DO YOU SEE THAT SENTENCE?

12   A    YES, I SEE THIS PARAGRAPH.

13   Q    AND ON THE NEXT PAGE THAT YOU WERE SHOWN, THERE'S A LIST

14   OF, AGAIN, A THROUGH D, THAT LISTS VARIOUS ITEMS RELATING TO

15   THE COPYRIGHT CLAIM.                                              11:19

16        DO YOU SEE THAT?

17   A    YES.

18   Q    ARE YOU AWARE THAT THERE WERE CLAIMS MADE BASED ON

19   COPYRIGHT AND REGISTERED DESIGNS IN UK AND THAT THOSE ARE

20   SEPARATE CAUSES OF ACTION?                                        11:19

21        MR. QUINN:  ASSUMES FACTS AND A LEGAL CONCLUSION.

22        THE COURT:  SUSTAINED.

23   BY MR. HANSEN:

24   Q    WERE REGISTERED DESIGN CLAIMS EVER ASSERTED AGAINST YOU,

25   DOUBLE GRAND, IN HONG KONG?                                       11:20

1    A    I DON'T RECALL.  I DON'T RECALL THAT THESE WORDS WERE

2    USED, REGISTERED DESIGN.  I'M VERY SENSITIVE TO THESE TERMS,

3    BUT WHAT THEY STATED WAS THAT WE HAVE COPIED THEIR DRAWINGS.

4    Q    AS FAR AS YOU UNDERSTAND IT, THE CLAIMS IN HONG KONG

5    AGAINST DOUBLE GRAND WERE COPYRIGHT CLAIMS?                    11:20

6    A    CORRECT.

7    Q    IF WE COULD GO BACK JUST FOR A MOMENT TO PAGE 22, THE

8    LIST.  IF YOU COULD LOOK AGAIN AT ITEMS A THROUGH F ON THAT

9    PAGE.  IT WAS YOUR OPINION, WASN'T IT, SIR, THAT ALL OF THESE

10   ITEMS WERE PRESENT IN OTHER DOLLS?                            11:21

11          MR. QUINN:  OBJECTION.  RELEVANCE; FOUNDATION.

12          THE COURT:  SUSTAINED.

13   BY MR. HANSEN:

14   Q    IN DEFENDING AGAINST THE CLAIM THAT WAS BROUGHT BY MGA IN

15   HONG KONG, DIDN'T YOU TAKE THE POSITION THAT THE SHAPE OF THE   11:21

16   DOLL'S HEAD WAS NOT UNIQUE?

17          MR. QUINN:  OBJECTION.  RELEVANCE.

18          THE COURT:  IS THIS GOING TO THE ISSUE WE DISCUSSED

19   AT SIDE-BAR, COUNSEL?

20          MR. HANSEN:  THIS IS GOING TO FILTERING.              11:22

21          THE COURT:  SUSTAINED.

22          MR. HANSEN:  I ASSUME IT'S THE SAME OBJECTION AS FOR

23   THE REST, IN TERMS OF --

24   BY MR. HANSEN:

25   Q    DID YOU BELIEVE THAT THE SHAPE OF THE MOUTH ON THE MGA    11:22

```
 1    DOLLS WAS SOMETHING THAT WAS NEW AND UNIQUE?

 2           MR. QUINN:  SAME OBJECTION.

 3           THE COURT:  SUSTAINED.

 4           YES, COUNSEL.  THIS LINE OF QUESTIONING, I DON'T SEE

 5    THE RELEVANCE HERE.                                          11:22

 6           MR. HANSEN:  OKAY.

 7    BY MR. HANSEN:

 8    Q    MR. LEUNG, IF YOU COULD TURN TO EXHIBIT 13691, PLEASE.

 9           THIS IS THE AFFIRMATION OF LEE SHIU CHEUNG THAT YOU

10    WERE SHOWN DURING YOUR DIRECT.                               11:23

11           DO YOU REMEMBER THAT?

12    A    YES.

13    Q    IF YOU WOULD, I THINK YOU MENTIONED THAT YOU WERE BEING

14    SUED ON A COPYRIGHT RELATING TO ARTISTIC WORKS; ISN'T THAT

15    RIGHT?                                                       11:23

16    A    YES.

17    Q    COULD YOU TURN, PLEASE, TO PAGE 4, PARAGRAPH NINE.  THIS

18    PARAGRAPH TALKS ABOUT DRAWINGS.

19           DO YOU SEE THAT?

20           LET ME BACKUP FOR A SECOND.                           11:24

21           IF YOU WOULD GO TO PAGE 3.

22           DO YOU SEE WHERE IT SAYS COPYRIGHT WORKS?

23    A    YES.

24    Q    AND THEN ON THE NEXT PAGE, UNDER COPYRIGHT WORKS,

25    PARAGRAPH NINE LISTS SOME BRYANT DRAWINGS.                   11:24
```

1    A    YES.

2    Q    IF YOU WOULD LOOK, PLEASE, TO PARAGRAPH 11 ON THE NEXT

3    PAGE WHERE IT TALKS ABOUT WAX MODELS.  DO YOU SEE THAT?

4    A    YES.

5    Q    THAT'S ALSO PART OF THE COPYRIGHT WORKS, TO YOUR                    11:25

6    UNDERSTANDING?

7    A    YES.

8    Q    DO YOU HAVE ANY IDEA, MR. LEUNG, WHEN THE WAX MODELS

9    LISTED IN PARAGRAPH 11 WERE MADE?

10           MR. QUINN:  FOUNDATION; CALLS FOR SPECULATION.              11:25

11           THE COURT:  IT IS A FOUNDATIONAL QUESTION.  IT'S YES

12   OR NO.  YOU MAY ANSWER.

13           THE WITNESS:  I'D LIKE TO HEAR THE QUESTION AGAIN.

14   BY MR. HANSEN:

15   Q    DO YOU HAVE ANY KNOWLEDGE, MR. HUNG OF WHEN THE WAX MOLDS   11:25

16   REFERENCED IN PARAGRAPH 11 WERE MADE?

17   A    THIS IS WHAT THEY STATED.

18   Q    MY QUESTION IS, DO YOU HAVE ANY IDEA WHEN THESE WAX MOLDS

19   WERE MADE?

20   A    NO.                                                         11:26

21   Q    AND THIS IS WHAT THEY STATED, MGA STATED, THESE WERE PART

22   OF THE COPYRIGHT WORKS; ISN'T THAT RIGHT?

23           MR. QUINN:  THE DOCUMENT SPEAKS FOR ITSELF, YOUR

24   HONOR; IT MISSTATES THE DOCUMENT.

25           THE COURT:  OVERRULED.                                   11:26

1          YOU MAY ANSWER.

2          WHAT'S THE QUESTION, COUNSEL?

3          RESTATE YOUR QUESTION.

4   **BY MR. HANSEN:**

5   Q    THE WAX MOLDS THAT ARE REFERRED TO IN PARAGRAPH 11, THESE          11:27

6   ARE ITEMS, COPYRIGHT ITEMS, THAT MGA WAS ASSERTING AGAINST

7   DOUBLE GRAND; RIGHT?

8          **MR. QUINN:**  OBJECTION.  CALLS FOR A LEGAL CONCLUSION;

9   THE DOCUMENT SPEAKS FOR ITSELF.

10          **THE COURT:**  IT'S THE PHRASE "COPYRIGHT."  I THINK          11:27

11  IT'S A LEGITIMATE AREA, GIVEN THE QUESTIONS ASKED BY MR. QUINN,

12  BUT LET'S REPHRASE YOUR QUESTION YET AGAIN.

13          **MR. HANSEN:**  THANK YOU.

14  **BY MR. HANSEN:**

15  Q    PARAGRAPH 11, THE WAX MODELS REFERRED TO IN PARAGRAPH 11,          11:27

16  THAT'S ONE OF THE ITEMS THAT IS LISTED IN THE AFFIRMATION AS

17  COPYRIGHT WORKS; IS THAT RIGHT?

18          **MR. QUINN:**  OBJECTION.  VAGUE AS TO WHERE.

19          **THE COURT:**  COUNSEL, I'M STILL AT A LOSS AS WELL.

20  **BY MR. HANSEN:**

21  Q    IN TERMS OF THE AFFIRMATION WE'RE TALKING ABOUT,

22  EXHIBIT 13691, THE HEADING ON PAGE 3, IF YOU WOULD JUMP BACK

23  FOR A SECOND.  THAT HEADING IS TITLED COPYRIGHT WORKS.

24          DO YOU SEE THAT?

25  A    YES.                                                              11:28

```
 1   Q    AND THE PARAGRAPH WE WERE JUST LOOKING AT, 11, REFERS TO

 2   WAX MODELS.

 3   A    YES.

 4   Q    DO YOU KNOW WHO MARGARET LEAHY IS?

 5   A    SHE SHOULD BE -- HERE IT'S MENTIONED SHE'S THE PERSON WHO        11:29

 6   MADE THE WAX MODEL.

 7   Q    HAVE YOU EVER SPOKEN WITH HER?

 8   A    I DON'T KNOW HER.

 9   Q    DO YOU HAVE ANY IDEA WHEN SHE MADE THE WAX MODELS THAT ARE

10   REFERENCED IN PARAGRAPH 11?                                          11:29

11            MR. QUINN:  OBJECTION.  ASKED AND ANSWERED.

12            THE COURT:  OVERRULED.

13            YOU MAY ANSWER.

14            THE WITNESS:  I'M VERY CONFUSED.  I'D LIKE TO HEAR

15   THE QUESTION AGAIN.                                                  11:30

16   BY MR. HANSEN:

17   Q    DO YOU KNOW WHEN MARGARET LEAHY MADE THE WAX MODELS IN

18   PARAGRAPH 11?

19   A    BASED ON WHAT THEY SAY, WHICH IS STATED ON THIS

20   AFFIRMATION, IT WAS CREATED IN 2000 TO 2001.                        11:30

21   Q    DO YOU HAVE ANY INFORMATION AS TO EXACTLY WHEN IN 2000 OR

22   2001?

23            MR. QUINN:  OBJECTION.  ASSUMES FACTS.  THE WITNESS

24   INDICATED HE WAS JUST REPEATING BACK WHAT THE DOCUMENT SAYS.

25            THE COURT:  IT DOES.                                        11:30
```

WEDNESDAY, AUGUST 6, 2008                    TRIAL DAY 30, MORNING SESSION

```
 1            YOU'RE GOING TO HAVE TO LAY A FOUNDATION, COUNSEL, IF

 2    YOU WANT TO GET DIRECT TESTIMONY.

 3            MR. HANSEN:  I'M TRYING TO ESTABLISH AS TO WHETHER HE

 4    HAS ANY KNOWLEDGE.

 5            THE COURT:  THEN ASK THAT QUESTION.                      11:31

 6    BY MR. HANSEN:

 7    Q    DO YOU HAVE ANY KNOWLEDGE AS TO THE CREATION DATE OF THE

 8    WAX MODELS REFERENCED IN PARAGRAPH 11?

 9    A    THEIR CREATION DATE?

10    Q    YES.                                                       11:31

11    A    I DON'T KNOW.

12    Q    IF YOU LOOK AT PARAGRAPH 12, PLEASE, MR. LEUNG, RIGHT

13    BELOW IT, THIS PARAGRAPH SAYS "THE WAX MODELS WERE THEN USED TO

14    MAKE SILICONE RUBBER MOLDS OF THE HEAD, BODY PARTS, AND SHOES

15    OF THE BRATZ DOLLS."                                            11:31

16            DO YOU SEE THAT?

17    A    YES.

18    Q    AND THE NEXT SENTENCE:  "THE SILICONE RUBBER MOLDS WERE

19    MADE UNDER COMMISSION BY JESSIE RAMIREZ UNDER VALUABLE

20    CONSIDERATION IN OR ABOUT WINTER 2000/2001."                    11:32

21            DO YOU SEE THAT?

22    A    I DON'T SEE THAT.

23    Q    LET ME ASK YOU THIS, MR. LEUNG.

24            DO YOU HAVE ANY KNOWLEDGE AS TO THE RUBBER MOLDS THAT

25    ARE MENTION HERE, DO YOU HAVE ANY IDEA WHEN THEY WERE ACTUALLY  11:32
```

1   CREATED?

2   A   ARE YOU REFERRING TO WHEN MGA MADE THEM?

3   Q   WHEN MR. RAMIREZ MADE THEM.

4   A   BASED ON WHAT THEY SAY, BASED ON WHAT THEY STATED IN THIS

5   AFFIRMATION, IT'S APPROXIMATELY 2000 TO 2001.                    11:33

6   Q   OTHER THAN WHAT YOU'RE READING HERE, YOU HAVE NO

7   INDEPENDENT KNOWLEDGE, THOUGH.

8   A   NO.  BECAUSE I DO NOT KNOW THAT PERSON AND I WOULD NOT BE

9   ABLE TO HAVE CONTACT WITH HIM.

10  Q   THANK YOU.                                                   11:33

11      COULD YOU TURN, PLEASE, TO PAGE 140 OF THIS SAME

12  EXHIBIT.

13      IF YOU WOULD TURN TO PAGE 141, ACTUALLY, MR. LEUNG.

14      HAVE YOU EVER SEEN THE LETTER -- CAN YOU IDENTIFY THE

15  LETTER FOR ME THAT STARTS AT PAGE 141 AND RUNS THROUGH 143 AS A  11:34

16  LETTER THAT YOU RECEIVED IN OR ABOUT MAY 6TH, 2003?

17  A   YES.

18  Q   COULD WE PUT IT UP ON THE SCREEN?

19      (OFF THE RECORD DISCUSSION.)

20  BY MR. HANSEN:

21  Q   IN THE LETTER, THEN -- I'M NOT ABLE TO PUT UP -- THIS IS A

22  LETTER FROM THE WILLIAM FAN COMPANY.

23      DO YOU SEE THAT?

24  A   YES.

25  Q   AND THIS IS A LETTER THAT WAS WRITTEN TO DOUBLE GRAND        11:35

1    CONCERNING INFRINGEMENT OF BRATZ COPYRIGHTS; IS THAT RIGHT?

2    A    CORRECT.

3    Q    AND IF YOU LOOK AT THE SECOND PAGE, PLEASE, IT SAYS,

4    QUOTE, "IT HAS COME TO OUR CLIENT'S ATTENTION THAT YOU HAVE

5    BEEN MANUFACTURING, OFFERING FOR SALE, SELLING, ADVERTISING,          11:35

6    AND/OR OTHERWISE DEALING WITH SERIES OF DOLLS CALLED 'TRENDY

7    TEENZ DOLLS, MINI TRENDY TEENZ DOLLS, ROCKERHEADZ FASHION DOLL

8    BOBBLE PEN, AND ROCKERHEADZ FASHION DOLLS,' COLLECTIVELY, THE

9    INFRINGING ARTICLES."

10            DO YOU SEE THAT?                                              11:36

11   A    I SEE THAT.

12   Q    DO YOU REMEMBER ACTUALLY RECEIVING THIS LETTER?

13   A    YES.

14   Q    AND THAT SENTENCE GOES ON TO SAY, QUOTE, "THE DESIGN OF

15   WHICH ARE SUBSTANTIALLY SIMILAR TO MGA'S BRATZ DOLLS."               11:36

16            DO YOU SEE THAT?

17   A    YES.

18   Q    AND ALSO THAT IT'S INFRINGING -- THE LETTER GOES ON --

19   "AND INFRINGING MGA'S COPYRIGHT IN THE DESIGN AND DRAWINGS OF

20   THE BRATZ DOLLS."                                                     11:37

21   A    YES.

22   Q    AND IT REFERENCES -- THE NEXT SENTENCE SAYS THAT A PICTURE

23   OF EACH OF THE INFRINGING ARTICLES ENCLOSED HEREWITH AND MARKED

24   "A."

25            DO YOU SEE THAT?                                             11:37

1    A    I SEE THE WORDINGS HERE.

2    Q    YOU SEE THAT.

3         CAN YOU LOOK, PLEASE -- THE LETTER ACTUALLY HAS

4    ATTACHED TO IT SOME PICTURES, STARTING AT PAGE 144.

5    A    CORRECT.                                              11:38

6    Q    DO YOU SEE THAT?

7    A    YES.

8    Q    THIS IS THE FIRST PICTURE THAT'S SHOWN ON PAGE 144 OF THAT

9    EXHIBIT.

10        DO YOU SEE THAT?                                      11:38

11   A    YES.

12   Q    THIS IS ONE OF THE TRENDY TEENZ DOLLS; RIGHT?

13   A    YES.

14   Q    DO YOU HAVE ANY TROUBLE IDENTIFYING THAT AS A TRENDY TEEN

15   DOLL?                                                      11:39

16   A    I RECOGNIZE IT.

17   Q    DO YOU HAVE ANY TROUBLE TELLING THAT'S A TRENDY TEENZ

18   DOLL?

19   A    THESE ARE PRODUCTS THAT MY COMPANY MANUFACTURED

20   PREVIOUSLY.  I HAVE ABSOLUTELY NO PROBLEMS WITH IDENTIFYING    11:39

21   THEM.

22        BUT PLEASE TELL HIM THAT IF YOU HAVE SUCH A QUALITY

23   OF A PICTURE AND YOU WANT ME TO IDENTIFY IT, IT'S NOT FAIR TO

24   ME.

25   Q    BUT IT IS A TRENDY TEENZ DOLL; IS THAT RIGHT?         11:39

1    A    YES.

2    Q    AND THE NEXT PAGE, PAGE 145, THIS IS ALSO A TRENDY TEENZ

3    DOLL?

4    A    CORRECT.

5    Q    AND THIS PICTURE WAS SENT TO YOU AS PART OF THE LETTER                    11:39

6    FROM WILLIAM FAN, MGA'S COUNSEL?

7    A    YES.

8    Q    AND THEN THE NEXT PAGE, THIS IS ALSO A TRENDY TEENZ DOLL;

9    CORRECT?

10   A    CORRECT.                                                                  11:40

11   Q    THESE ARE THE DOLLS THAT WERE THE SUBJECT OF THE SUIT THAT

12   MGA BROUGHT AGAINST YOU IN HONG KONG.

13   A    CORRECT.

14   Q    AND THE LETTER WE WERE TALKING ABOUT THAT IS SHOWN,

15   STARTING AT PAGE 141 THAT THESE PICTURES WERE ATTACHED TO, THAT        11:40

16   LETTER WAS WRITTEN BEFORE THE SUIT WAS FILED; IS THAT CORRECT?

17   A    YES.

18   Q    SO MGA GAVE YOU AN OPPORTUNITY TO STOP MANUFACTURING THE

19   PRODUCTS BEFORE THEY FILED SUIT; RIGHT?

20   A    ACCORDING TO MY RECOLLECTION, THEY HAD AN INJUNCTION               11:41

21   AGAINST US.

22   Q    BEFORE THIS LETTER WAS WRITTEN?

23   A    THAT SHOULDN'T HAVE BEEN THE CASE.

24        FROM MY RECOLLECTION, IT WAS AFTER THIS LETTER.

25   Q    SO THE LETTER WAS WRITTEN BEFORE THE INJUNCTION ISSUED.           11:42

1    A    YES.

2    Q    IN FACT, IF YOU WOULD TURN TO PAGE 143, PLEASE, THE LAST

3    SENTENCE OF THE LETTER SAYS, QUOTE, "IN THE PREMISES, WE HOPE

4    YOU WOULD COOPERATE WITH OUR CLIENTS AND ACCEDE TO OUR CLIENT'S

5    DEMAND HEREIN AND ENTERING INTO THE REQUESTED UNDERTAKING TO          11:42

6    AVOID ANY UNNECESSARY LITIGATION."

7            DO YOU SEE THAT?

8    A    I SEE THAT.

9    Q    CAN YOU TELL ME WHEN YOU FIRST SPOKE WITH SOMEONE -- HAVE

10   YOU SPOKEN WITH ANYONE FROM MATTEL ABOUT THIS LAWSUIT?            11:42

11   A    NO.

12   Q    HAVE YOU SPOKEN WITH ANYONE FROM MATTEL'S COUNSEL OF

13   QUINN EMANUEL?

14   A    NO.

15   Q    SO PRIOR TO -- HOW DID YOU COME HERE TODAY?              11:43

16   A    BECAUSE THEY HAD CONTACTED MY PREVIOUS ATTORNEY WHO WAS

17   REPRESENTING ME IN THAT LAWSUIT, AND I RECEIVED A CALL FROM

18   THAT LAW OFFICE AND THAT'S WHY I CAME; THAT I HAD TO COME TO

19   THE HEARING.

20   Q    QUINN EMANUEL JUST CALLED YOUR -- WHO WAS YOUR ATTORNEY     11:44

21   THAT YOU ARE REFERENCING?

22   A    PHILLIPS.

23   Q    PHILLIPS WAS YOUR LAWYER IN HONG KONG?

24   A    HE HAD REPRESENTED ME IN THIS CASE PREVIOUSLY; HE WAS MY

25   FIRST ATTORNEY.                                              11:44

1   Q    AND MR. PHILIPS TOLD YOU THAT YOU HAD TO COME HERE TODAY?

2   A    IT WAS THURSDAY.  IT SHOULD HAVE BEEN LAST THURSDAY THAT

3   PHILLIPS RECEIVED A CALL AND WE WERE CALLED AND ASKED WHETHER

4   WE WANTED TO COME TO COURT.

5   Q    AND DID YOU SAY YOU WANTED TO COME TO COURT?          11:45

6   A    I SAID I WAS WILLING BECAUSE I TELL THE TRUTH.

7   Q    AND HAD YOU KNOW IF MR. PHILIPS HAD BEEN CONTACTED

8   PREVIOUSLY BY MATTEL OR ITS COUNSEL?

9   A    I GUESS THEY HAVE HAD CONTACTED PHILLIPS; THAT'S WHY

10  PHILLIPS HAD CONTACTED ME.                                11:45

11  Q    DO YOU KNOW IF THERE WAS CONTACT WITH MR. PHILLIPS PRIOR

12  TO THE RECENT CONTACT YOU'RE TALKING ABOUT?

13  A    I DO NOT KNOW.

14  Q    DO YOU KNOW WHAT THE ISSUES ARE IN THIS CASE?

15  A    I ONLY KNOW THAT MATTEL IS IN A LAWSUIT WITH MGA.       11:46

16  Q    IN TERMS OF -- LET ME JUST ASK, IN CLOSING.  THE MINI

17  TRENDY TEENZ DOLLS THAT ARE IN FRONT OF YOU, DO YOU SEE THAT?

18  A    I SEE THEM.

19  Q    DOES DOUBLE GRAND STILL MAKE THOSE DOLLS?

20          **MR. QUINN:**  OBJECTION.  RELEVANCE.             11:46

21          **THE COURT:**  WHAT ISSUE IS THIS GOING TO, COUNSEL?

22          (NO AUDIBLE RESPONSE.)

23          **THE COURT:**  SUSTAINED.

24  **BY MR. HANSEN:**

25  Q    DO YOU HAVE ANY -- I NOTICE -- DO YOU HAVE ANY OF THE   11:46

```
 1   REGULAR TRENDY TEENZ DOLLS?

 2           WE DON'T HAVE ANY OF THOSE IN COURT.  DO YOU HAVE

 3   ANY?

 4           MR. QUINN:  WITH HIM?

 5           MR. HANSEN:  PERIOD.                                11:47

 6           MR. QUINN:  AMBIGUOUS.

 7   BY MR. HANSEN:

 8   Q   WERE YOU ASKED TO BRING ANY DOLLS WITH YOU?

 9   A   NO.

10   Q   IS YOUR COMPANY STILL IN BUSINESS?                      11:47

11   A   NO.

12           MR. HANSEN:  NOTHING FURTHER.

13           THE COURT:  ANYTHING FURTHER, MR. QUINN?

14           MR. QUINN:  YES.

15                   REDIRECT EXAMINATION                        11:47

16   BY MR. QUINN:

17   Q   SIR, BY THE WAY, HAVE YOU AND I EVER SPOKEN BEFORE I

18   STARTED ASKING YOU QUESTIONS THIS MORNING?

19   A   NO.

20   Q   IF YOU COULD LOOK AT THAT CEASE AND DESIST LETTER AT    11:47

21   EXHIBIT 13691-014 THAT MR. HANSEN WAS ASKING YOU ABOUT.

22   A   YES.

23           MR. QUINN:  THIS IS PART OF THE CORRUPTED DATA BASE

24   YOUR HONOR; WE CAN'T DISPLAY IT.

25   BY MR. QUINN:
```

```
 1   Q    COUNSEL CALLED YOUR ATTENTION TO A PARAGRAPH AT THE BOTTOM

 2   OF THE FIRST PAGE THAT SAYS "MGA IS THE OWNER OF THE COPYRIGHT

 3   SUBSISTING IN THE DESIGNS AND DRAWINGS OF ITS FASHION DOLLS AND

 4   THEIR ACCESSORIES UNDER THE NAME OF BRATZ."

 5        DO YOU SEE THAT IN THE LAST PARAGRAPH ON THE FIRST        11:48

 6   PAGE?

 7   A    YES.

 8   Q    IT REFERS TO DESIGNS AND DRAWINGS.

 9   A    CORRECT.

10   Q    IN THIS LETTER THAT MGA WROTE YOU, WHERE THEY'RE ASKING   11:49

11   YOU TO STOP AND THEY ARE INFORMING YOU OF THEIR RIGHTS, DO YOU

12   SEE ANY REFERENCE TO MARGARET LEAHY?

13   A    WITHIN THIS LETTER?

14   Q    YES.

15   A    I DON'T SEE IT.                                          11:49

16   Q    DO YOU SEE ANY REFERENCE TO WAX MODELS?

17   A    NO.

18   Q    DO YOU SEE ANY REFERENCE IN THIS LETTER WHERE THEY ARE

19   INFORMING YOU OF THEIR RIGHTS AND ASKING YOU TO STOP, DO YOU

20   SEE ANY REFERENCE TO SILICONE RUBBER MOLDS?                   11:50

21   A    NO.

22   Q    THEY REFER ONLY TO DRAWINGS AND DESIGNS; CORRECT?

23   A    YES.

24        MR. QUINN:  THANK YOU.

25        THE COURT:  MR. HANSEN?                                  11:50
```

```
 1           MR. HANSEN:  NOTHING FURTHER, YOUR HONOR.

 2           THE COURT:  VERY WELL.

 3           YOU'RE EXCUSED, SIR.  THANK YOU VERY MUCH.

 4           MATTEL'S NEXT WITNESS?

 5           MR. QUINN:  OUR NEXT WITNESS, YOUR HONOR, IS          11:50

 6  EDMOND YEUNG.

 7           THE CLERK:  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

 8  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

 9  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

10  HELP YOU GOD.

11           THE WITNESS:  YES, I DO.

12           THE CLERK:  PLEASE STATE YOUR FULL NAME AND SPELL

13  YOUR LAST NAME FOR THE RECORD.

14           THE WITNESS:  EDMOND YEUNG; Y-E-U-N-G; FIRST NAME,

15  E-D-M-O-N-D.                                                 11:52

16                    DIRECT EXAMINATION

17  BY MR. QUINN:

18  Q    GOOD MORNING.  YOU'RE AN ATTORNEY IN HONG KONG?

19  A    YES, I AM.

20  Q    AND YOU HAVE REPRESENTED CLIENTS IN LAWSUITS WHERE YOUR  11:52

21  CLIENTS HAVE BEEN SUED BY MGA.

22  A    YES.  SEVERAL.

23  Q    AND THAT INCLUDES UNIFORTUNE?

24  A    YES.

25  Q    UNION TOP?                                              11:52
```

1   A    YES.

2   Q    HUNGLEM?

3   A    YES.

4   Q    LET ME ASK FIRST, AS A PRELIMINARY MATTER, IN YOUR

5   EXPERIENCE AND LITIGATING INTELLECTUAL PROPERTY MATTERS IN HONG          11:52

6   KONG, DOES THE CONSEPT OF WHEN YOU ALLEGE SOMETHING IS A

7   REPRODUCTION IN A PLEADING, DOES THAT HAVE SOME TECHNICAL

8   MEANING, MEANING UNDER HONG KONG LAW?

9         DON'T TELL ME WHAT IT DOES, IF IT DOES.  JUST YES OR

10  NO, WHETHER OR NOT IT HAS SOME TYPE OF TECHNICAL MEANING WHEN           11:53

11  YOU SAY SOMETHING IS A "REPRODUCTION" OF SOMETHING ELSE?

12  A    NOT TECHNICAL AS SUCH.  REPRODUCTION IS REPRODUCTION.

13  Q    DOES IT CONNOTE SORT OF LIKE COPYING?

14  A    YES.

15  Q    LET ME FIRST ASK YOU ABOUT THE UNIFORTUNE MATTER.               11:53

16        DO YOU RECALL THE PRODUCTS THAT WERE AT ISSUE IN THAT

17  CASE?

18  A    GLITTER GIRLS.

19  Q    LET ME SHOW YOU EXHIBITS 13865, 13866 AND 13868.

20        **MR. QUINN:**  IF I MAY APPROACH THE WITNESS, YOUR            11:53

21  HONOR.

22        **THE COURT:**  YOU MAY.

23        I ASSUME MGA HAS SEEN THESE?

24        **MR. HANSEN:**  WE HAVE, YOUR HONOR.

25        **THE COURT:**  ARE THESE ALREADY IN?                          11:54

1      **MR. QUINN:**  NO, THEY ARE NOT.

2      **THE COURT:**  OKAY.

3  **BY MR. QUINN:**

4  Q    WE'RE JUST USING THESE AS DEMONSTRATIVES.

5      CAN YOU IDENTIFY WHAT THOSE EXHIBITS ARE?                    11:54

6  A    THOSE EXHIBITS ARE SAMPLES OF GLITTER GIRLS.

7  Q    IF YOU COULD LOOK IN THE BOOK BEFORE YOU AND FIND EXHIBITS

8  13865, 13866 AND 13868, AND I WILL ASK YOU IF YOU CAN IDENTIFY

9  WHAT'S BEHIND THOSE TABS.

10  A    13866 AND WHICH NUMBER?                                     11:55

11  Q    13868, -66, AND -65.

12  A    YES.

13  Q    ARE THOSE PHOTOGRAPHS OF THE GLITTER GIRLS DOLLS WHICH

14  WERE THE SUBJECT OF THE LAWSUIT THAT MGA BROUGHT AGAINST YOUR

15  CLIENTS UNIFORTUNE?                                             11:55

16  A    YES.

17      **MR. QUINN:**  I'D MOVE THOSE INTO EVIDENCE, YOUR HONOR.

18      **THE COURT:**  ANY OBJECTION?

19      **MR. HANSEN:**  NO OBJECTION.

20      **THE COURT:**  ADMITTED.  YOU MAY PUBLISH.                 11:56

21      **MR. QUINN:**  IF WE COULD PUT UP ON THE SCREEN 13865.

22  **BY MR. QUINN:**

23  Q    THESE ARE THE GLITTER GIRLS DOLLS THAT MGA ALLEGED WERE

24  REPRODUCTIONS OF THE BRATZ DRAWINGS?

25  A    YES.                                                       11:56

```
 1   Q    NOW LET ME ASK YOU ABOUT THE CASE BROUGHT AGAINST YOUR

 2   CLIENT HUNGLEM.  DO YOU RECALL WHAT THE DOLL WAS THAT WAS THE

 3   SUBJECT OF THAT CASE?

 4   A    IT WAS SCAMPZ.

 5          MR. QUINN:  IF I COULD APPROACH THE WITNESS, YOUR          11:56

 6   HONOR.

 7          THE COURT:  YOU MAY.

 8   BY MR. QUINN:

 9   Q    THE DOLL I'VE HANDED YOU HAS BEEN MARKED AS EXHIBIT 13721.

10   CAN YOU IDENTIFY THAT?                                           11:57

11   A    YES.

12   Q    WHAT IS IT?

13   A    IT'S A SAMPLE OF A SCAMPZ DOLL.

14   Q    THAT WAS THE SUBJECT OF THAT LAWSUIT?

15   A    YES.

16          MR. QUINN:  I'D OFFER EXHIBIT 13721, YOUR HONOR.

17          THE COURT:  ANY OBJECTION?

18          MR. HANSEN:  NO OBJECTION, YOUR HONOR.

19          THE COURT:  IT'S ADMITTED.

20   BY MR. QUINN:

21   Q    AND THEN 13867 IS A PHOTOGRAPH IN THE BOOK, IF YOU COULD

22   TURN TO THAT, PLEASE, 13867.

23   A    YES.

24   Q    CAN YOU IDENTIFY THAT PHOTOGRAPH?

25   A    YES.  IT'S ALSO SCAMPZ DOLLS.                               11:57
```

1          **MR. QUINN:**  I'D OFFER THAT, YOUR HONOR.

2          **THE COURT:**  ANY OBJECTION?

3          **MR. HANSEN:**  NO, YOUR HONOR.

4          **THE COURT:**  IT'S ADMITTED.

5          **MR. QUINN:**  MAY WE PUBLISH, YOUR HONOR?                    11:57

6          **THE COURT:**  YES.

7   **BY MR. QUINN:**

8   Q    IS THIS THE SCAMPZ DOLL THAT MGA BROUGHT THE LAWSUIT OVER?

9   A    YES.

10  Q    AND THEN IF WE COULD LOOK AT EXHIBIT 13718, THE AFFIDAVIT    11:58

11  OF LEE SHIU CHEUNG; 13718.

12  A    YES

13  Q    CAN YOU IDENTIFY EXHIBIT 13718?

14  A    YES.

15  Q    WHAT IS IT?                                                   11:58

16  A    IT'S AN AFFIRMATION OF LEE SHIU CHEUNG.

17  Q    WAS THAT SOMETHING MGA FILED IN THE LAWSUIT THAT WAS

18  BROUGHT AGAINST YOUR CLIENT HUNGLEM?

19  A    YES.

20         **MR. QUINN:**  I'D OFFER EXHIBIT 13718, YOUR HONOR.       11:58

21         **THE COURT:**  ANY OBJECTION?

22         **MR. HANSEN:**  SUBJECT TO THE SAME PROCEDURE, NO

23  OBJECTION, YOUR HONOR.

24         **THE COURT:**  VERY WELL.  YOU MAY PROCEED.

25  **BY MR. QUINN:**

1  Q    AND IF YOU COULD TURN TO PAGE -16, 13718-16; AND I'D CALL

2  YOUR ATTENTION TO PARAGRAPH 40.

3  A    YES.

4  Q    WHERE IT SAYS "I'VE EXAMINED THE SCAMPZ DOLLS AS

5  EXHIBITED" -- BY THE WAY, THIS IS AN AFFIRMATION OF MR. CHEUNG          11:59

6  WHO IDENTIFIES HIMSELF AS MANAGING DIRECTOR OF MGA HONG KONG;

7  CORRECT?

8  A    IT SHOULD BE MR. LEE.

9  Q    I'M SORRY.  I THINK HE HAS AN ENGLISH NAME THAT HE USES AS

10  MR. LEE.                                                              11:59

11  A    LEE IS A SURNAME.

12  Q    LEE IS HIS SURNAME?

13  A    YES.

14  Q    OKAY.  MY IGNORANCE.

15       BUT MR. LEE IS A MANAGING DIRECTOR -- THE PERSON WHO            11:59

16  DID THIS AFFIDAVIT IS A MANAGING DIRECTOR OF MGA HONG KONG?

17  A    YES

18  Q    AND HE SAYS IN THIS PARAGRAPH "I HAVE EXAMINED THE SCAMPZ

19  DOLLS AS EXHIBITED HEREIN ABOVE, AND IN LAM YOUNG CHAK'S

20  AFFIRMATION AND FIND THAT THEY ARE OBVIOUSLY SLAVISH COPY OF          12:00

21  THE BRATZ DOLLS."

22       DO YOU SEE THAT?

23  A    YES.

24  Q    AND THEN ON THE LAST LINE, IT SAYS "THE SCAMPZ DOLLS ARE

25  VIRTUALLY THE SAME AS THE BRATZ DOLLS IN ALL MATERIAL                 12:00

6045

1    RESPECTS."

2            DO YOU SEE THAT?

3    A    YES.

4    Q    THEN AT THE BOTTOM OF PARAGRAPH 42, HE SAYS "THE

5    SIMILARITY BETWEEN THE BRATZ AND SCAMPZ DOLLS IS EVEN MORE          12:00

6    OBVIOUS WHEN ONE LOOKS AT THEM, INCLUDING THE FACIAL DECORATION

7    OR MAKEUP OF EACH DOLL'S FACE."

8    A    YES.

9    Q    AND THEN IT GOES ON TO TALK ABOUT THE PATTERN, STYLE, AND

10   A COMBINATION OF DIFFERENT LAYERS AND COLORS OF THE FACIAL          12:00

11   DECLARATION.  DO YOU SEE THAT?

12   A    YES.

13   Q    I'VE HANDED YOU A DOCUMENT WHICH HAS BEEN MARKED AS

14   EXHIBIT 4207.

15           CAN YOU IDENTIFY THIS DOCUMENT?                             12:01

16   A    THIS IS AN AFFIRMATION OF THE SAME MR. LEE.

17   Q    AND WAS THIS FILED IN THE LAWSUIT BROUGHT AGAINST HUNGLEM

18   BY MGA?

19   A    YES; SAME ACTION.

20           **MR. QUINN:**  WE'D OFFER THIS DOCUMENT, YOUR HONOR.       12:01

21           **MR. HANSEN:**  NO OBJECTION.

22           **THE COURT:**  ADMITTED.

23           **MR. QUINN:**  IF WE COULD PUBLISH THE FIRST PAGE?

24           **THE COURT:**  YOU MAY.

25   / / /                                                              12:01

1   BY MR. QUINN:

2   Q    IF I COULD ASK YOU TO TURN TO PAGE 8 AND LOOK AT

3   PARAGRAPH 17 AT THE TOP.

4   A    YES.

5   Q    WHERE THE MANAGING DIRECTOR OF MGA HONG KONG SAYS "THE          12:01

6   BRATZ DOLLS ARE UNIQUE IN A VARIETY OF WAYS, INCLUDING THEIR

7   OVERSIZED HEADS AND INDIVIDUAL FACIAL DECORATIONS.  ONE THING

8   THAT HAS CONTRIBUTED TO THE SUCCESS OF BRATZ IS THE OVERSIZED

9   EYES AND THE PROTRUSIVE MOUTH THAT ARE CAPABLE OF BEING

10  DECORATED WITH MAKEUP AND THE DIMINISHED SIZE OF THE NOSE THAT     12:02

11  SERVES NO DECORATIVE PURPOSES.  THUS, THE ELEMENTS OF THE FACE

12  THAT CAN BE MADE UP, THE EYES AND MOUTH, ARE EXAGGERATE, WHILE

13  THE ELEMENTS OF THE FACE THAT CANNOT BE MADE UP, THE NOSE, IS

14  REDUCED."

15         DO YOU SEE THAT?                                            12:02

16  A    YES.

17  Q    AND THESE WERE ALLEGATIONS THAT MGA MADE IN THE LAWSUIT

18  AGAINST YOUR CLIENT, HUNGLEM; CORRECT?

19  A    YES.

20         MR. QUINN:  NOTHING FURTHER.                                12:02

21         THE COURT:  IT'S A MINUTE PAST THE NOON HOUR.  WE'LL

22  PICK UP WITH YOUR CROSS-EXAMINATION AT 1:30.

23         I'LL SEE THE JURY AT 1:30 AND COUNSEL ARE TO BE BACK

24  AT 1:15.

25         (MORNING SESSION CONCLUDES.)

1

2                                  CERTIFICATE

3

4    I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
5    the stenographically recorded proceedings held in the
     above-entitled matter and that the transcript page format is in
6    conformance with the regulations of the judicial conference of
     the united states.

7

8    _____          _____
9    THERESA A. LANZA, RPR, CSR                     Date
     Official COURT Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WEDNESDAY, AUGUST 6, 2008                    TRIAL DAY 30, MORNING SESSION