1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    EASTERN DIVISION

4                        - - -

5         HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                        - - -

7   MATTEL, INC.,                    )
                                     )
8                      Plaintiff,    )
                                     )
9           vs.                      )  No. CV 04-09049
                                     )
10  MGA ENTERTAINMENT, inc., et. Al., )
                                     )
11                     Defendants.   )  TRIAL DAY 31
    _____)   MORNING SESSION
12  AND CONSOLIDATED ACTIONS,        )  pages 6191-6350
    _____)

13

14

15        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                 Riverside, California

17               Thursday, August 7, 2008

18                     8:13 A.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
              Federal Official Court Reporter
24              3470 12th Street, Rm. 134
              Riverside, California  92501
25                   951-274-0844
                 WWW.THERESALANZA.COM

```
 1  APPEARANCES:

 2
    On behalf of MATTEL, INC.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              JON COREY
 5                             MICHAEL T. ZELLER
                              HARRY OLIVAR
 6                             TIMOTHY ALGER
                         865 S. FIGUEROA STREET,
 7                       10TH FLOOR
                         LOS ANGELES, California  90017
 8

 9

10  ON BEHALF OF MGA ENTERTAINMENT:

11                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
12                            JASON RUSSELL
                              RAOUL KENNEDY
13                             LAUREN AGUIAR
                              CARL ROTH
14                       300 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071-3144
15                       213-687-5000

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3

4    PLAINTIFF
     WITNESS          DIRECT       CROSS      REDIRECT      RECROSS
5    ISAAC LARIAN (CONTINUED)

6    BY MR. PRICE     6236                    6271
     BY MR. NOLAN                  6246                     6280
7

8

9    PLAINTIFF
     WITNESS          DIRECT       CROSS      REDIRECT      RECROSS
     MICHAEL WAGNER
10
     BY MR. QUINN     6281
11

12

13

14          EXHIBITS           RECEIVED

15            655               6236
              656               6237
16            657               6237
              658               6238
17            659               6238
            10188               6239
18          10722               6239
             4947               6243
19          10195               6243
            10219               6286
20          13931               6293
            13932               6304
21          13908               6312

22

23

24

25
```

THURSDAY, AUGUST 7, 2008              TRIAL DAY 31, MORNING SESSION

1    RIVERSIDE, CALIFORNIA; THURSDAY, AUGUST 7, 2008; 8:13 A.M.

2                              -oOo-

3        **THE COURT:**  THERE'S A COUPLE OF MOTIONS I WANT TO

4    TAKE UP TO BEGIN WITH THAT THE COURT HAS WORKED ON OVERNIGHT.

5    THAT'S THE MOTION FOR CLARIFICATION OR RECONSIDERATION OF THE       08:13

6    COURT'S JULY 24, 2008 ORDER CONCERNING THE SCOPE OF THE

7    COPYRIGHT PROTECTION; THAT'S MGA'S MOTION, AS WELL AS MGA'S

8    MOTION FOR SANCTIONS.

9    BEGINNING WITH MGA'S MOTION FOR CLARIFICATION, I WANT TO

10   PROVIDE THE PARTIES WITH AS MUCH GUIDANCE AT THIS POINT AS I       08:13

11   CAN, UNDERSTANDING THAT WE MAY REVISIT A LOT OF THIS IN THE

12   CONTEXT OF THE JURY INSTRUCTIONS.  AND THE COURT IS ALSO

13   MINDFUL THAT THERE IS STILL ADDITIONAL EVIDENCE TO BE HEARD

14   WHICH THE COURT MIGHT HEAR BOTH DURING TRIAL AND AT A HEARING

15   OUTSIDE THE PRESENCE OF THE JURY.  WE'LL JUST SEE HOW THAT        08:14

16   PLAYS OUT.  BUT I DO THINK THAT GIVEN ALL THAT THE COURT HAS

17   HEARD AND CONSIDERED SO FAR, BOTH IN THE SUMMARY JUDGMENT STAGE

18   AND IN THE TRIAL, THE COURT IS ABLE TO FURTHER ELABORATE ON THE

19   ORDER THAT IT ISSUED ON JULY 24TH, AND AT LEAST CLARIFY WHAT

20   THE COURT THOUGHT IT HAD MADE CLEAR IN THE ORDER OF JULY 24TH.    08:14

21   LET ME SET FORTH -- I SUPPOSE THE EASIEST WAY FOR ME TO DO IS

22   SET FORTH MY LIST OF FINDINGS OR CLARIFICATIONS, AND THEN I'LL

23   CERTAINLY ENTERTAIN RESPONSES TO THAT.

24   FIRST, I THINK IT'S QUITE CLEAR FROM THE LAW, WHETHER IT'S

25   APPLE COMPUTER OR ANY OF THE OTHER CASES THAT HAVE BEEN          08:15

1    REFERENCED BY BOTH SIDES, THAT THE SCOPE OF COPYRIGHT

2    PROTECTION IS FOR THE COURT TO DECIDE AND NOT FOR THE JURY.  AT

3    VARIOUS TIMES, BOTH SIDES HAVE AGREED TO THIS.  ALTHOUGH MGA

4    SEEMS TO TAKE ISSUE WITH THIS IN THE MOST RECENT MOTION FOR

5    CLARIFICATION, THERE ARE NUMEROUS PREVIOUS OCCASIONS WHERE MGA          08:15

6    HAS AGREED WITH THAT PROPOSITION.

7    I CAN'T FIND ANY LAW WHICH SUGGESTS OTHERWISE.

8    IF IT'S OUT THERE, I EXPECT MGA WILL POINT IT OUT TO THE COURT.

9    SECOND, IN ACCORD WITH THAT PRINCIPLE, IT IS FOR THE COURT TO

10   DETERMINE THE APPROPRIATE DISSECTION OR FILTRATION OF THE               08:15

11   COPYRIGHTED DRAWINGS, AND THEREBY DETERMINE THE PROTECTABLE

12   ELEMENTS OF THE COPYRIGHTED MATERIALS.  AGAIN, THIS IS A

13   QUESTION OF LAW; THEREFORE, THERE IS GOING TO BE NO NEED TO

14   INSTRUCT THE JURY ON HOW TO DO THE FILTRATION DISSECTION; ONLY

15   ON WHAT THE PROTECTABLE ELEMENTS ARE AND WHAT THEY ARE TO DO           08:16

16   WITH THOSE IN APPLYING THE EXTRINSIC/INTRINSIC TEST OF THE

17   NINTH CIRCUIT.  BUT THE IDENTIFICATION OF THE PROTECTABLE

18   ELEMENTS IS FOR THE COURT.

19   NOW, THE JURY WILL BE INSTRUCTED ON THE EXTRINSIC AND INTRINSIC

20   TEST AND ASKED TO CONSIDER BOTH THE PROTECTABLE ELEMENTS               08:16

21   INDIVIDUALLY AS WELL AS THE WORK AS A WHOLE, THE EXTRINSIC AND

22   THE INTRINSIC TEST.  BUT AS I INDICATED, THE PROTECTABLE

23   ELEMENTS WILL BE IDENTIFIED BY THE COURT.  I'M REPEATING

24   MYSELF, AND THAT'S THE DANGER OF MAKING NOTES LATE AT NIGHT,

25   BECAUSE YOU DO THAT.                                                   08:16

```
 1   I'M GOING TO SET FORTH -- AND THIS WILL BE -- I'LL BE ISSUING
 2   THIS IN AN ORDER IN FINAL FORM AT SOME POINT IN TIME.  I HAVE
 3   THIS WRITTEN OUT, TYPED OUT, WHICH I JUST DID RIGHT NOW; AND I
 4   THINK THIS WILL PROVIDE A GUIDELINE, ALTHOUGH, AGAIN, THIS IS
 5   NOT DEFINITIVE; THIS IS TENTATIVE.  AND ADDITIONAL EVIDENCE          08:17
 6   THAT MIGHT BE PRESENTED TO THE COURT MIGHT CAUSE THE COURT TO
 7   EXPAND, RETRACT, OR REVISE THIS LIST.  BUT THIS IS BASED ON
 8   EVERYTHING THAT'S BEFORE ME SO FAR IN TERMS OF WHAT ARE THE
 9   PROTECTABLE ELEMENTS OF THE COPYRIGHTED CARTER BRYANT DRAWINGS
10   AND WHAT ARE THE NONPROTECTABLE ELEMENTS OF THE COPYRIGHTED         08:17
11   CARTER BRYANT DRAWINGS.  AND WHAT I HAVE TRIED TO DO IS CONSULT
12   NOT ONLY WITH THE EVIDENCE THAT WE'VE HAD PRESENTED SO FAR, BUT
13   I'VE REVIEWED THE JURY INSTRUCTIONS THAT WERE SUBMITTED LAST
14   WEEK, AND I'VE TRIED TO MAKE THE BEST ASSESSMENT I CAN.
15   IN TERMS OF NONPROTECTABLE ELEMENTS OF THE COPYRIGHTED CARTER       08:17
16   BRYANT DRAWINGS, FIRST, THE RESEMBLANCE OR SIMILARITY TO HUMAN
17   FORM AND HUMAN PHYSIOLOGY, THE MERE RESEMBLANCE OF FORM AND
18   ANATOMY AND PHYSIOLOGY BETWEEN THE DOLLS AND THE HUMAN FORM,
19   JUST LIKE MOUNTAIN LIONS AND JELLYFISH AND EVERYTHING ELSE,
20   THAT'S CLEARLY NOT PROTECTABLE.  SECOND, THE PRESENCE OF           08:18
21   CERTAIN ANATOMICAL OR PHYSIOLOGICAL FEATURES; A HEAD, HAIR, TWO
22   EYES, EYEBROWS, LIPS, NOSE, CHIN, MOUTH, OR OTHER FEATURES THAT
23   TRACK HUMAN PHYSIOLOGY AND HUMAN ANATOMY ARE NOT PROTECTABLE.
24   THIRD, HUMAN CLOTHES, SHOES, ACCESSORIES ARE NOT PROTECTABLE AS
25   HUMAN {SIC} CLOTHES, SHOES, AND ACCESSORIES.                       08:18
```

```
1   AGE, RACE, ETHNICITY, AN URBAN LOOK VERSUS A RURAL LOOK; THESE
2   ARE ALSO ELEMENTS THAT ARE NOT PROTECTABLE.  COMMON OR STANDARD
3   TREATMENTS OF THE SUBJECT MATTER -- AND I'M NOT EVEN GOING TO
4   ATTEMPT TO PRONOUNCE THE FRENCH -- MR. NOLAN, DID YOU TAKE
5   FRENCH BACK IN HIGH SCHOOL?                                        08:19
6        MR. QUINN:  SCENES-A-FAIRE.
7        THE COURT:  I'LL TYPE THAT OUT IN ITALICS AND I'LL
8   LEAVE IT AT THAT.  BUT I THINK EVERYONE UNDERSTANDS, AT LEAST I
9   HOPE THEY DO, WHAT I'M REFERRING TO.
10       SO THOSE ARE ALL NONPROTECTABLE ELEMENTS.  AND THERE        08:19
11  MAY BE MORE THAT MIGHT BE HELPFUL TO IDENTIFY GOING FORWARD.
12       WHAT IS PROTECTABLE?  WHAT ARE THE PROTECTABLE
13  ELEMENTS OF THE COPYRIGHTED CARTER BRYANT DRAWINGS?
14       FIRST, PARTICULARIZED SYNERGISTIC COMPILATIONS AND
15  EXPRESSIONS OF THE HUMAN FORM AND ANATOMY THAT EXPRESS A UNIQUE   08:19
16  STYLE AND/OR CONVEY A DISTINCT LOOK OR ATTITUDE ARE
17  PROTECTABLE.
18       SECOND, PARTICULARIZED EXPRESSIONS OF THE DOLL'S
19  HEAD, THE LIPS, EYES, EYEBROWS, EYE FEATURES, NOSE, CHIN,
20  HAIRSTYLE, AND BREASTS, INCLUDING THE ACCENTUATION OR            08:20
21  EXAGGERATION OF CERTAIN ANATOMICAL FEATURES RELATIVE TO OTHERS,
22  DOLL LIPS, EYES, EYEBROWS, AND EYE FEATURES, AS WELL AS THE
23  DEEMPHASIS OF CERTAIN ANATOMICAL FEATURES RELATIVE TO OTHERS,
24  THE DOLL NOSE, RELATIVELY THIN SMALL BODIES, ARE ALL
25  PROTECTABLE ELEMENTS OF THE CARTER BRYANT DRAWINGS.              08:20
```

1         THIRD, PARTICULARIZED NONFUNCTIONAL DOLL CLOTHES,

2    DOLL SHOES, AND DOLL ACCESSORIES THAT EXPRESS AGGRESSIVE,

3    CONTEMPORARY, YOUTHFUL STYLE ARE PROTECTABLE ELEMENTS.

4         THAT'S WHAT I HAVE SO FAR.

5         HAVING CONSIDERED THE VERY WIDE RANGE, ALMOST                08:20

6    LIMITLESS, OF POSSIBLE EXPRESSIONS FOR THESE PARTICULARIZED

7    EXPRESSIONS OF THE PROTECTABLE ELEMENTS, THE COURT FINDS, AS I

8    BELIEVE I ALREADY MADE CLEAR, BUT PERHAPS NOT CLEAR ENOUGH,

9    THAT THOSE ELEMENTS ARE TO BE AFFORDED BROAD PROTECTION.

10        THE COURT HAS ALREADY FOUND THAT THE VIRTUAL IDENTITY        08:21

11   STANDARD DOES NOT APPLY.  RATHER, THE ONLY OTHER STANDARD, OR

12   THE REGULAR STANDARD, TO BE APPLIED TO THESE PROTECTABLE

13   ELEMENT IS THE EXTRINSIC/INTRINSIC SUBSTANTIAL SIMILARITY TEST

14   OF THE NINTH CIRCUIT, AFFORDING BROAD PROTECTION TO THOSE

15   PARTICULARIZED PROTECTABLE ELEMENTS.                              08:21

16        GOING THROUGH THE BRIEFS THEMSELVES, IN MGA'S BRIEF,

17   THE FIRST SUBSTANTIVE ARGUMENT IS MADE ON PAGE 2.  THEY TAKE

18   ISSUE WITH AN ARGUMENT MADE IN MATTEL'S PROPOSED JURY

19   INSTRUCTIONS, WITH WHICH I AGREE.  ON PAGE 2, LINES 13 THROUGH

20   18, MGA IS QUOTING AN OBJECTION MADE BY MATTEL IN WHICH MATTEL    08:21

21   STATES, "THE COURT HAS REJECTED MGA'S REPEATED ASSERTIONS THAT

22   BRYANT'S DESIGNS ARE SUBJECT TO ONLY THIN PROTECTION, AND

23   INSTEAD HELD, AS DEFENDANTS ACKNOWLEDGE, THAT THEY ARE SUBJECT

24   TO BROAD PROTECTION."

25        THE TWIST ON THAT IS, IT'S SUBJECT TO BROAD                  08:22

1    PROTECTION ONLY AS TO THE PROTECTABLE ELEMENTS, AS I JUST SAID

2    FORTH.

3                MATTEL GOES ON TO WRITE THAT "HENCE, THERE'S NOTHING

4    TO FILTER OUT WHEN PERFORMING A SUBSTANTIAL SIMILARITY ANALYSIS

5    UNDER THE EXTRINSIC TEST."  I DISAGREE WITH THAT.  THE COURT          08:22

6    MUST CONDUCT THE FILTERING OUT OF THE NONPROTECTABLE ELEMENTS

7    AND IDENTIFY FOR THE JURY THE PROTECTABLE ELEMENTS THAT ARE TO

8    BE COMPARED.

9                THAT'S THE LIST THAT I'M COMING UP WITH HERE IN TERMS

10   OF PROTECTABLE ELEMENTS.                                            08:22

11               SO THERE IS A NEED FOR FILTERING, AS THE COURT HAS

12   PREVIOUSLY HELD, AND I WOULD TAKE ISSUE WITH THE STATEMENT THAT

13   THERE'S NO NEED FOR FILTERING.  BUT CERTAINLY, MATTEL IS

14   CORRECT THAT THE JURY IS NOT GOING TO BE CONDUCTING THIS

15   FILTERING ANALYSIS AND THE JURY IS NOT GOING TO BE HEARING          08:23

16   EVIDENCE OF THE FILTERING.  THAT'S SOMETHING WHICH IS FOR THE

17   COURT.

18               IF MGA OR MATTEL BELIEVES THAT THE COURT NEEDS TO

19   HEAR FURTHER TESTIMONY OR EVIDENCE TO PROPERLY CONDUCT THE

20   FILTERING, THE COURT AFFORDS LEAVE TO BOTH SIDES TO DO SO; BUT      08:23

21   AT THE END, IT IS GOING TO BE FOR THE COURT TO DO THAT

22   FILTRATION, AND THE COURT WILL BE INSTRUCTING, AS A MATTER OF

23   LAW, THE JURY AS TO WHAT PROTECTABLE ELEMENTS THEY ARE TO FOCUS

24   ON IN CONDUCTING THEIR EXTRINSIC ANALYSIS.

25               TURNING TO PAGE 3, TOWARDS THE BOTTOM, CERTAINLY -- I    08:23

1    CAN'T DISAGREE WITH MGA'S QUOTING OF THE COURT'S JULY 24TH

2    ORDER, BUT THE CONCLUSION THAT THEY REACH, I THINK, IS

3    MISTAKEN.

4          THEY WRITE, BEGINNING ON LINE 24, THAT "THUS,

5    CONTRARY TO THE ARGUMENTS MADE BY MATTEL, THE COURT'S ORDER          08:24

6    CLEARLY HELD THAT THE JURY WILL BE INSTRUCTED TO ANALYTICALLY

7    DISSECT THE BRYANT DRAWINGS AND FILTER OUT ELEMENTS NOT

8    PROTECTED BY COPYRIGHT LAW."

9          THAT'S NOT WHAT THE ORDER SAID.

10          ALL THE ORDER SAID IS THAT, APPLYING THE EXTRINSIC          08:24

11   TEST, THE COURT MUST FIRST EXAMINE THE SPECIFIC EXPRESSIVE

12   ELEMENTS OF THE WORKS AT ISSUE.  I DIDN'T INDICATE THAT THE

13   JURY MUST CONSIDER.

14          THAT'S ON LINES 10 AND 11 OF THE QUOTATION, OR THE

15   EXCERPT, THAT IS MADE BY MGA.  IT'S ONLY AFTER THE COURT HAS          08:24

16   CONDUCTED THE FILTRATION ANALYSIS THAT THE JURY WILL BE

17   INSTRUCTED AS TO WHAT THE PROTECTABLE ELEMENTS ARE, AS I

18   PREVIOUSLY INDICATED.

19          TURNING TO PAGE 4, MGA ASKS THE COURT TO CLARIFY, IN

20   LIGHT OF ITS LANGUAGE, THAT THE COURT CANNOT GO SO FAR AS TO          08:24

21   FIND THAT THE REGISTERED DRAWINGS ARE SUBJECT TO ONLY THIN

22   PROTECTION; THAT THE COURT DID NOT EXPRESSLY FIND THAT THEY ARE

23   ENTITLED TO BROAD PROTECTION.  BUT READING APPLE COMPUTER,

24   READING THE OTHER CASES ASSOCIATED WITH THAT, THOSE ARE THE

25   ONLY TWO OPTIONS THAT THERE ARE.  YOU EITHER APPLY THIN          08:25

1   PROTECTION AND YOU APPLY THE VIRTUAL IDENTICAL ANALYSIS, OR YOU

2   AFFORD THE PROTECTABLE ELEMENTS BROAD PROTECTION AND YOU APPLY

3   THE INTRINSIC TEST ANALYSIS.

4           AND CLEARLY, WHAT WE'RE TALKING ABOUT HERE, WHEN

5   WE'RE TALKING ABOUT THESE PARTICULARIZED EXPRESSIONS OF THE        08:25

6   DOLL FACIAL FEATURES, FOR EXAMPLE -- AND THIS HAS REALLY BEEN

7   BORNE OUT TO THE COURT AS I'VE SEEN ALL OF THESE DOLLS -- IT

8   REALLY DOES MATTER.  AND I CAN SEE WHY CERTAIN DOLL LINES ARE

9   EXTRAORDINARILY SUCCESSFUL AND MANY, MANY OTHER DOLL LINES ARE

10  NOT.  BECAUSE GETTING THAT JUST PERFECT LOOK -- WE'VE HEARD        08:25

11  TESTIMONY OFFERED FROM WITNESSES FROM BOTH SIDES THAT EXPLAIN

12  JUST HOW IMPORTANT FACE PAINTING AND GETTING THAT RIGHT STROKE

13  IS.  ANNA RHEE, A FEW OTHERS, HAVE EXPLAINED IT IN CONVINCING

14  DETAIL; THAT IT'S REALLY A PARTICULARIZED EXPRESSION THAT CAN

15  CAPTURE THE IMAGINATION OF THAT EIGHT, NINE, TEN-YEAR-OLD          08:26

16  LITTLE GIRL OR BOY.  AND SOMETHING WHICH MAY LOOK TO US ADULTS

17  AS JUST ANOTHER DOLL DOESN'T QUITE DO IT.

18          AND THE MATTEL CASE QUOTED BY MGA, THE GOLDBERGER

19  DOLL MANUFACTURING CASE, I THINK REALLY CAPTURES THAT ELEMENT.

20  THERE'S THAT LINE -- I THINK IT'S QUOTED ON PAGE 7 OF MGA'S        08:26

21  BRIEF.  IT'S NOT IN THAT BRIEF.  IT'S IN A CASE ITSELF.

22          THERE'S A LINE THAT REALLY CAPTURES THIS IDEA.  HERE

23  IT IS.  IT'S FOOTNOTE NUMBER 5 IN MATTEL'S BRIEF, QUOTING FROM

24  THE SAME CASE, MATTEL V. GOLDBERGER.  IT'S ON PAGE 7,

25  FOOTNOTE 5.

1           "IN THE HIGHLY COMPETITIVE, BILLION-DOLLAR DOLL

2    INDUSTRY, GETTING THE DOLL'S FACE AND EXPRESSION EXACTLY RIGHT

3    IS CRUCIAL TO SUCCESS."

4           AND THAT FACT HAS BEEN CLEARLY ESTABLISHED FOR THIS

5    COURT, AND THAT'S WHAT CARTER BRYANT DID IN HIS DRAWINGS, AND     08:28

6    THAT'S WHAT MGA SUCCEEDED IN DOING IN THEIR DEVELOPMENT OF THE

7    BRATZ LINE.  THEY CLEARLY GOT THE LOOK JUST RIGHT.  AND THAT

8    ELEMENT IS PROTECTABLE.  THERE'S NO QUESTION THAT THAT IS --

9    AND, PERHAPS, THE WORDS I'M USING IN THESE TENTATIVE

10   PROTECTABLE ELEMENTS ARE NOT DOING JUSTICE TO IT, BUT THAT'S     08:28

11   THE STRUGGLE THAT I WANT ALL COUNSEL TO HELP THE COURT ENGAGE

12   IN, IS PRESENTING THAT PROTECTABLE ELEMENT TO THE JURY, BECAUSE

13   IT'S CLEARLY THERE; IT'S CLEARLY WHAT COPYRIGHT LAW IS DESIGNED

14   TO PROTECT.

15          ON PAGE 5 OF MGA'S BRIEF, AND THEN MOVING FORWARD        08:28

16   ONTO THE TOP OF PAGE 6, BOTTOM OF PAGE 5, TOP PAGE 6, THERE'S

17   THIS PRIOR ART ARGUMENT THAT THERE'S ELEMENTS OF THE BIG FEET,

18   THE OVERSIZED HEAD, ET CETERA, IN THE PARIS BLUES, COKE, AND

19   STEVE MADDEN ADS, AS WELL AS THE ADDITIONAL EVIDENCE, BEARING

20   ON LACK OF ORIGINALITY.  BUT THE COURT HAS ALREADY RULED ON      08:29

21   ORIGINALITY.  THIS HAS NOT EVEN BEEN SERIOUSLY CONTESTED UP

22   UNTIL THIS POINT BY ANY PARTY IN THIS CASE.  THE THRESHOLD FOR

23   ORIGINALITY, PARTICULARLY WHEN THE COURT IS AFFORDING BROAD

24   EXPRESSION, IS VERY LOW.  WHILE THE CASES THAT MGA CITES,

25   TALKING ABOUT ORIGINALITY REMAINING THE SINE QUA NON OF          08:29

```
 1   COPYRIGHT, IS OBVIOUSLY SOMETHING OF CRITICAL IMPORTANCE.

 2   THAT, TO ME, IS A NON ISSUE AT THIS POINT.  MGA, ISAAC LARIAN,

 3   BELIEVES THESE WORKS ARE ORIGINAL.  THEY WENT AND HAD THEM

 4   COPYRIGHTED.  THEY WENT AND DEFENDED THESE COPYRIGHTS.  MATTEL

 5   RECOGNIZES THAT THEY ARE ORIGINAL.  THAT IS BEYOND DISPUTE AT      08:29

 6   THIS POINT, AND THE COURT IS PREPARED TO FIND THAT AS A MATTER

 7   OF LAW.

 8           THE SERIES OF CASES THAT MGA CITES IN ADDITION TO

 9   SATAVA JUST EXTENDS WHAT IS DONE IN THE CONTEXT OF JELLYFISH TO

10   DOLPHINS, MOUNTAIN LIONS, PLASTIC BREAKABLE TURKEYS, PLUMERIA     08:30

11   PLANT FLOWERS, AND OTHER PHYSIOLOGY OF ANIMALS; THOSE ARE

12   DISTINCT FOR THE SAME REASON THAT THE COURT DISTINGUISHED

13   SATAVA.  ALL OF THESE ARE ANIMAL PHYSIOLOGICAL AND

14   NATURED-BASED PHYSIOLOGICAL AND STRUCTURAL CASES, AND THEY JUST

15   DON'T APPLY TO THE CONTEXT OF DOLLS.                              08:30

16           THE ONE THAT APPLIES TO DOLLS IS THE NEXT CASE THAT

17   MGA CITES, MATTEL V. GOLDBERGER; AND THAT, TO ME, IS DEAD-ON.

18   COPYRIGHT DOES NOT PROTECT IDEAS; IT PROTECTS ONLY THE AUTHOR'S

19   PARTICULARIZED EXPRESSION OF THE IDEA.

20           AND THAT IS EXACTLY WHAT THE COURT IS TRYING TO            08:30

21   IDENTIFY HERE, THROUGH ITS PARTICULARIZED ELEMENTS THAT ARE SET

22   FORTH.

23           I HOPE THAT ADDRESSES THE REQUEST FOR CLARIFICATION

24   FROM MGA ON THE ORDER.  I WILL ISSUE THIS IN WRITTEN FORM, AND

25   I ENCOURAGE BOTH COUNSEL TO ADVISE THE COURT IN TERMS OF          08:31
```

1  HELPING THE COURT BETTER IDENTIFY THESE PROTECTABLE ELEMENTS

2  AND DISTINGUISH THEM FROM THE NONPROTECTABLE ELEMENTS.  THAT'S

3  GOING TO BE AN ONGOING PROCESS THROUGH THE JURY INSTRUCTION

4  FORMULATION AND THE VERDICT FORM COMPILATION.

5       THAT'S WHERE I AM AT THIS POINT IN MY THINKING, SO I   08:31

6  INVITE COUNSEL FOR BOTH SIDES TO RESPOND NOW.  AND I WILL ALSO

7  INVITE YOU TO RESPOND LATER.  BUT THAT'S WHERE I AM ON THIS

8  MOTION.

9       **MR. NOLAN:**  THANK YOU, YOUR HONOR.

10       I'LL PROBABLY TAKE UP THE INVITATION TO RESPOND   08:31

11  BRIEFLY NOW, AND I'M SURE WE'LL REVISIT IT FROM TIME TO TIME.

12       I GUESS THE ONE QUESTION THAT I WANTED TO JUST FOCUS

13  ON FOR A MOMENT IS THE TREATMENT WITH RESPECT TO PRIOR ART.

14  MAYBE IT WASN'T AS CLEAR IN OUR BRIEF AS WE SHOULD HAVE MADE

15  IT, BUT WE CERTAINLY ARE NOT LOOKING AT PRIOR ART SIMPLY IN THE   08:32

16  CONTEXT OF ORIGINALITY OF THE WORK ITSELF, BUT RATHER TO TURN

17  IT OVER NOW AND TAKE A LOOK AT, AS GOLDBERGER TALKS ABOUT, THE

18  CENTRALIZED -- YOU CITE TO THE FOOTNOTE IN MATTEL'S BRIEF, BUT

19  ON PAGE 6, WE TALK ABOUT HOW -- NOT PAGE 6; IT'S PAGE 7 OF OUR

20  BRIEF -- THAT IT IS THE CENTRAL EXPRESSIVE FEATURES OF THE DOLL   08:32

21  FACE WHERE BARBIE'S FACE WAS ENTITLED TO COPYRIGHT PROTECTION.

22       NOW, IT'S IN THAT CONTEXT OF TRYING TO IDENTIFY

23  PROTECTABLE AND NOT PROTECTABLE AND WHAT PROTECTION SHOULD BE

24  AFFORDED.  WE DO THINK THAT PRIOR ART DOES PLAY A ROLE IN TERMS

25  OF -- FOR INSTANCE, IS THE EXPRESSIVE FEATURE THAT IS CLAIMED   08:33

1    IN THE COPYRIGHT REGISTRATION ENTITLED TO PROTECTION IN AN

2    INFRINGEMENT ACTION?  IN OTHER WORDS, IS IT REALLY THE

3    CENTRALIZED EXPRESSIVE FEATURES IN THE EYES THAT ARE ORIGINAL,

4    OR ARE THOSE FEATURES IN PRIOR ART?  AND IF THEY ARE IN PRIOR

5    ART, THOSE PARTICULAR FEATURES MAY NOT BE ENTITLED TO THE BROAD        08:33

6    PROTECTION.

7           AND I THINK IT'S AN ATTENTION BETWEEN THE PRIOR ART

8    AND THE PROTECTABILITY ELEMENTS, AS OPPOSED TO THE ORIGINALITY.

9    AND THAT'S WHERE I JUST WANT TO MAKE CERTAIN THAT --

10          **THE COURT:**  IF IT'S IN THAT CONTEXT, THAT'S FINE, AND        08:34

11   THE COURT WILL ENTERTAIN WHATEVER EVIDENCE YOU WANT.  IT'S NOT

12   BEING PRESENTED TO THE JURY.  AND YOU CAN PRESENT THAT FURTHER

13   EVIDENCE TO THE COURT, IF YOU WANT, IN REFINING THESE.

14          I HAVE SEEN THE PRIOR ART FROM THE BLUES AD, PARIS

15   BLUES, COKE, STEVE MADDEN, SEVENTEEN MAGAZINE IN GENERAL.  IF        08:34

16   THERE'S ANY ADDITIONAL PRIOR ART THAT YOU WANT TO PRESENT TO

17   THE COURT TO DETERMINE -- THERE IS A PARTICULARIZED LOOK FROM

18   CARTER BRYANT THAT IS DISTINCT FROM THOSE ADS THAT THE COURT

19   CAN READILY DISCERN FOR PURPOSES OF INSTRUCTING THE JURY ON

20   PROTECTABLE ELEMENTS.                                                08:34

21          HOWEVER, IF THERE'S ADDITIONAL EVIDENCE THAT YOU WANT

22   THE COURT TO HEAR, EITHER ON THOSE PARTICULAR PRIOR ART OR ON

23   ADDITIONAL PRIOR ART, I'M HAPPY TO DO SO.  WHAT I'M SAYING THIS

24   MORNING IS, THAT'S NOT GOING TO THE JURY.  THAT'S PART OF THE

25   FILTRATION ANALYSIS THAT IS TO BE PRESENTED TO THE COURT.            08:34

1      **MR. NOLAN:**  CORRECT.

2          JUST FOR CLARIFICATION, WE COULD DO IT, AND THAT WAS

3  GOING TO BE MY NEXT FOLLOW-UP POINT, THAT WE MIGHT SEEK LEAVE

4  OF THE COURT TO PRESENT THIS EVIDENCE OUTSIDE THE PRESENCE OF

5  THE JURY, AS SUGGESTED IN THE BRIEFS.  AND WE SHOULD THINK AND          08:35

6  CONSIDER THE BEST WAY TO DO IT.

7          BUT THE LAST POINT I WANT TO GET TO IS THAT -- I

8  REALLY THINK --

9      **THE COURT:**  AND MY THOUGHT ON THAT, JUST SO I DON'T

10  FORGET, IS THAT IN THE CONTEXT OF THE VILPPU DAUBERT HEARING          08:35

11  THAT WE'VE ALREADY TALKED ABOUT DOING, IT WOULD PROBABLY BE THE

12  BEST, TO THE EXTENT THAT MR. VILPPU IS GOING TO BE PRESENTING

13  THAT EVIDENCE, WE CAN DO THAT AT THE SAME TIME THAT WE DO THE

14  DAUBERT HEARING ON MR. VILPPU.

15      **MR. NOLAN:**  CORRECT, YOUR HONOR.          08:35

16          ON A DIFFERENT ISSUE, MR. LUTZ, IN HIS DEPOSITION,

17  WHICH IS PART OF THE RECORD OF THE -- I THINK WE SUPPLEMENTED

18  THE SUMMARY JUDGMENT PLEADINGS -- I THINK THE DEPOSITION WAS

19  ACTUALLY TAKEN AFTER WE FILED BUT I THINK BEFORE WE MADE THE

20  ARGUMENT -- THE COURT HAD ALL OF THOSE DEPOSITIONS IN FRONT OF          08:35

21  IT.

22      **THE COURT:**  YES.

23      **MR. NOLAN:**  MATTEL HAS INDICATED THEY ARE NOT GOING

24  TO PRESENT MR. LUTZ.  WE'VE ACTUALLY SUBPOENAED MR. LUTZ,

25  BECAUSE WE THINK THAT MR. LUTZ MADE --          08:36

1      **THE COURT:**  NOW THERE'S A MOTION TO QUASH THAT, WHICH

2  IS A NEW MOTION THAT WAS NOT ON MY RADAR SCREEN; BUT I SAW THAT

3  WHEN I WENT BACK IN CHAMBERS YESTERDAY.

4      **MR. NOLAN:**  THIS IS A FLUID SITUATION, OBVIOUSLY.

5      WE BELIEVE THAT MR. LUTZ MADE COMMENTS AND ADMISSIONS      08:36

6  IN HIS TESTIMONY WITH RESPECT TO HIS VIEW ON CERTAIN OF THESE

7  EXPRESSIONS.  ONE THAT COMES TO MY MIND IS THE FACE PAINT OR

8  THE COMPLEXION.  THE WOMEN WOULD CALL IT MAKEUP, OR THE FACE

9  PAINT, THE ROUGE THAT WOULD BE ON THE CHEEKS.  A LOT OF THOSE

10 STYLES, HE WOULD SAY, COULD BE FOUND READILY OUTSIDE OF THE      08:36

11 STAPLE CENTER.

12      **THE COURT:**  I DISTINCTLY DID NOT INCLUDE THAT IN A

13 PROTECTABLE ELEMENT.  I DON'T DISAGREE WITH THAT.

14      **MR. NOLAN:**  RIGHT.

15      AND THEN, AS WE SEE THE ORDER, WE'LL GET A BETTER      08:36

16 SENSE AND REFINE IT.  WE'RE JUST TRYING TO PROCESS IT.

17      **THE COURT:**  THAT IS SOMETHING WHICH I WOULD HAVE TO

18 BE CONVINCED FURTHER BY MATTEL TO INCLUDE AS A PROTECTABLE

19 ELEMENT.  THAT WAS NOT ONE OF THE FEATURES THAT I IDENTIFIED,

20 THE -- THAT ASPECT.      08:37

21      THE FACE PAINTING ON THE EYES, YES, THERE'S A

22 SUFFICIENT BASIS FOR THE COURT TO FIND THAT AS A PROTECTABLE

23 ELEMENT; BUT IF YOU'RE NOW TALKING ABOUT THE MAKEUP, THE SKIN

24 TONE, THE ETHNICITY, THAT, I THINK, IS OF A DIFFERENT ORDER.

25      NOW, IT WOULD PLAY IN, OF COURSE, IN THE INTRINSIC      08:37

1    ANALYSIS, IN TERMS OF THE OVERALL LOOK; BUT IN TERMS OF THE

2    EXTRINSIC ANALYSIS, WHERE WE'RE JUST EVALUATING THE PROTECTABLE

3    ELEMENTS, AT LEAST AT THIS POINT, I'M NOT CONVINCED.

4            KEEP IN MIND, ALL OF THIS IS SUBJECT TO PERMUTATION.

5        **MR. NOLAN:**  AND WE APPRECIATE THE COURT'S GUIDANCE ON    08:37

6    THIS.  WE KNOW IT'S WELL INFORMED, BUT THERE STILL WILL BE

7    ADDITIONAL EVIDENCE.

8            FOR EXAMPLE, I THINK THE OTHER POINT IS -- IT MAY BE

9    MY LAST POINT -- I THINK THE COURT REALLY PUT ITS FINGER ON IT,

10   AND I CERTAINLY HAVE BEEN EDUCATED, I THINK ALL OF US HAVE      08:37

11   BEEN, WITH RESPECT TO DOLLS OVER THE COURSE OF THIS TRIAL, AND

12   CERTAINLY THE EXPRESSION AND HOW YOU NEED TO REALLY NAIL IT IN

13   ORDER TO BE SUCCESSFUL.

14           YOU KNOW, WHEN YOU LOOK AT MYSCENE AND FLAVAS VERSUS

15   BRATZ AND OTHER DOLLS THAT WE SEE HERE, SOME ARE SUCCESSFUL;    08:38

16   SOME ARE NOT.  SOME HAVE TO DO WITH BRANDING, BUT ALSO HAVE TO

17   DO WITH THE EXPRESSION.  I THINK IT'S IN THAT CONTEXT, YOUR

18   HONOR -- FOR INSTANCE, WHERE THE CHANGES THAT WERE MADE -- AND

19   YOU NOTED THIS IN YOUR RULING -- FOR INSTANCE, MARGARET LEAHY'S

20   TESTIMONY OR PAULA GARCIA'S TESTIMONY, EXPECTED TESTIMONY,      08:38

21   WHERE THEY'RE TALKING ABOUT LOOKING AT CARTER BRYANT'S DRAWINGS

22   AND THEN DECIDING, 'ALL RIGHT, LET'S REALLY LOOK AT

23   CARTER BRYANT'S DRAWINGS, AND THEN LET'S SEE WHETHER OR NOT THE

24   EXPRESSION OF CARTER BRYANT'S DRAWINGS WOULD MAKE IT IN THE

25   MARKETPLACE,' AND WHAT CHANGES, THEN, MGA MADE TO THOSE.        08:38

1         THE COURT:  WELL, THIS IS THE SUBSTANTIAL SIMILARITY.

2  I MEAN, THIS IS PRECISELY THE ARGUMENT THAT I EXPECT MGA TO BE

3  MAKING, IS FOCUSING ON THAT.  ARE CARTER BRYANT'S -- IS THAT

4  THE EXPRESSION THAT ULTIMATELY ENDED UP IN THE DOLL?  THAT

5  CARTER BRYANT DIDN'T MAKE THE DOLL; HE DID THE DRAWINGS.  AND          08:39

6  THAT'S WHAT'S AFFORDED THE COPYRIGHT PROTECTION.

7         NOW, OF COURSE, HERE, WE'RE TALKING STRICTLY ABOUT

8  THE COPYRIGHT CLAIM.  I'M NOT TALKING ABOUT THE STATE TORT

9  CLAIMS, WHERE THE IDEA AND THE OTHER THINGS COME INTO PLAY, AND

10 TO THE EXTENT THAT THERE ARE DAMAGES ASSOCIATED WITH THAT.          08:39

11 THIS IS JUST THE COPYRIGHT INFRINGEMENT CLAIM.  SO I DON'T

12 WANT -- ONE OF THE THINGS THAT I'M GOING TO BE REALLY LOOKING

13 OUT FOR IN THE JURY INSTRUCTIONS IS THAT WE DON'T MISTAKENLY

14 CONFLATE THESE ISSUES, BECAUSE THE COPYRIGHT INFRINGEMENT IS

15 ONE TRACK, THE STATE TORT CLAIMS AND THE DAMAGES RELATED TO          08:39

16 THAT IS ANOTHER TRACK.  IDEAS HAVE NO PLACE IN COPYRIGHT LAW,

17 BUT WITH RESPECT TO THE CONTRACT LAW CLAIMS, THEY DO.

18         MR. NOLAN:  YOUR HONOR, YES.  AND I DON'T WANT TO

19 ARGUE THOSE INSTRUCTIONS RIGHT NOW, BUT I DO -- IN DRAWING THE

20 DISTINCTION RIGHT NOW, I WOULD MAKE THIS NOTE:  THAT WITH          08:39

21 RESPECT TO THE IDEA OF FOUR ETHNIC, HIP GIRLS NAMED BRATZ --

22         THE COURT:  RIGHT.

23         MR. NOLAN:  -- WHETHER OR NOT THAT IS SO UNIQUE AND

24 SO CONFIDENTIAL TO MATTEL, OTHER THAN AS EXPRESSED BY

25 CARTER BRYANT, IS STILL, I THINK, RELEVANT ON THE STATE TORT          08:40

1   CLAIMS.

2         THE COURT:  THAT'S A SEPARATE ISSUE.

3         MR. NOLAN:  RIGHT.  SO I WASN'T TRYING TO CONFLATE

4   THOSE TWO ISSUES, YOUR HONOR.

5         THE COURT:  LET'S KEEP THOSE SEPARATE, RIGHT.  VERY       08:40

6   GOOD.

7         LET ME HEAR FROM MATTEL.

8         MR. ZELLER:  WHEN MR. NOLAN SAYS, ON MGA'S BEHALF,

9   THAT SOMEHOW COPYRIGHT PROTECTION IS LIMITED TO -- AND HE WAS

10  QUOTING FROM THE GOLDBERGER CASE -- CENTRAL EXPRESSIVE          08:40

11  FEATURES -- AND THEN HE EVEN WENT SO FAR AS TO INCLUDE THE

12  LANGUAGE OF THE FACE -- THAT'S, OBVIOUSLY, NOT WHAT IS THE

13  BEGINNING AND END OF COPYRIGHT PROTECTION.  WHAT HE'S QUOTING

14  IS WHAT WAS THE EXACT CLAIM THAT MATTEL WAS MAKING IN THAT

15  CASE, WHICH IS, THAT IS WHAT WAS COPIED.                        08:41

16        SO THIS IS NOT SOMEHOW A -- THE SECOND CIRCUIT WASN'T

17  BEING EXCLUSIVE --

18        THE COURT:  I UNDERSTAND.

19        MR. ZELLER:  -- EXCLUSIVE ASPECTS OF PROTECTION.

20        THE COURT:  THEY WERE FOCUSING ON THOSE                   08:41

21  PARTICULARIZED EXPRESSIVE ELEMENTS.  AND THAT'S WHY, IN THE

22  COURT'S FINDINGS, OR THE COURT'S TENTATIVE ELEMENTS, I INCLUDE

23  THINGS WELL BEYOND THE FACE.

24        MR. ZELLER:  AND WHAT I WOULD -- BEYOND THAT, YOUR

25  HONOR, I THINK WE LARGELY SUBMIT ON THIS.  I THINK THAT THE     08:41

```
 1   COURT'S TENTATIVE IN TERMS OF PROTECTABILITY,

 2   NONPROTECTABILITY -- OBVIOUSLY, THERE WILL HAVE TO BE FURTHER

 3   DISCUSSIONS AND WORDSMITHING, AND EXPANDING, CONTRACTING, AS

 4   THE EVIDENCE COMES IN AND THE PARTIES SUBMIT MORE EVIDENCE.

 5           CERTAINLY, I WOULD EXPECT IT IN A SUBMISSION THAT        08:41

 6   MATTEL WOULD MAKE -- WOULD BE THAT WE WOULD SAY, AND WE WOULD

 7   WANT AN INSTRUCTION, THAT SAYS, OF COURSE, THE NEW

 8   CONFIGURATION, WE'LL CALL IT, OF WHAT WOULD OTHERWISE BE

 9   UNPROTECTABLE ELEMENTS.  THAT, TOO, CAN BE PROTECTED.  AND, OF

10   COURSE, THE COURT HAS SEEN, IN MGA'S OWN CASES, THAT IS        08:42

11   FREQUENTLY THE ROUTE THAT THEY HAVE GONE.  I MEAN, THEY HAVE

12   SAID, 'HERE IS THIS COMBINATION OF THESE FEATURES:  BIG HEAD,

13   BIG FEET...'  I'M NOT TRYING TO CHARACTERIZE IT.  THEY HAVE

14   VERY SPECIFIC LANGUAGE THAT THEY HAVE USED IN THESE CASES.

15           THE COURT:  WHAT ADDRESSES THAT IS THE FIRST           08:42

16   PROTECTABLE ELEMENT THAT I INDICATED, THE PARTICULARIZED

17   SYNERGISTIC COMPILATION AND EXPRESSION OF THE HUMAN FORM AND

18   ANATOMY THAT EXPRESSES A UNIQUE STYLE, CONVEYS A DISTINCT LOOK

19   OR ATTITUDE.  SO THE DOLL, TAKEN AS A WHOLE -- THE CONCERN I

20   HAVE WITH THAT IS, AM I CONFLATING EXTRINSIC AND INTRINSIC?    08:42

21   AND I DON'T THINK SO.  BECAUSE I THINK THAT THERE'S A CLEARLY

22   PARTICULARIZED EXPRESSIVE LOOK OF THE BRATZ DOLL AS IT

23   EXPRESSES THE HUMAN FORM THAT IS PROTECTABLE, SEPARATE AND

24   APART FROM THE INTRINSIC ANALYSIS THAT IS TO BE DONE IN THE

25   SECOND PHASE OF THAT TEST.  I THINK I'M AGREEING WITH YOU.  I'M  08:43
```

1    NOT SURE.

2         **MR. ZELLER:**  I THINK WE DO AGREE ON THIS.

3         I THINK TO HARKEN BACK TO WHAT MR. LARIAN HAS BEEN

4    TESTIFYING -- THEY HAVE MADE THESE CLAIMS -- AND ALSO IT

5    DOVETAILS WITH WHAT MGA HAS SAID WAS THE SUCCESS OF THESE        08:43

6    DOLLS, AND THAT IT'S REALLY THIS COMBINATION OF FEATURES.  WHAT

7    I GUESS -- I HEAR THE COURT IN TERMS OF THAT FIRST DESCRIPTION,

8    OF THE PROTECTABLE ELEMENTS MAYBE CAPTURING ONE PART OF IT.

9    WHAT I GUESS I'M ALSO RAISING IS THAT THERE'S A PARTICULAR

10   CONFIGURATION THAT MGA ITSELF IN THE PAST HAS SAID THAT THESE    08:43

11   ARE THE PROTECTABLE COMBINATIONS:  YOU KNOW, OVERSIZED HEAD,

12   PRONOUNCED LIPS -- AGAIN, I'M NOT TRYING TO QUOTE IT, BUT IT'S

13   JUST THAT THEY HAVE A PARTICULAR KIND OF FORMULATION THAT IS

14   MADE.  AND THEY'VE EVEN MADE IT IN THIS CASE, AS THE COURT WILL

15   RECALL, IN THEIR OWN CLAIMS AGAINST MATTEL.                      08:44

16        THAT'S WHY, I THINK, WE WOULD EXPECT AND WE WOULD

17   LIKE TO PUT IN EVIDENCE -- AND WE CERTAINLY CAN, I THINK,

18   INCLUDING FROM DEPOSITIONS -- I THINK THERE'S BEEN TRIAL

19   EVIDENCE OF THIS ALREADY, THAT IT'S THAT COMBINATION.  AND EVEN

20   IF TAKEN IN ISOLATION, OVERSIZED LIPS OR OVERSIZED EYES, TAKEN   08:44

21   IN ISOLATION, MAYBE THAT WOULD BE TOO MUCH OF AN IDEA AND WOULD

22   NOT BE SUFFICIENTLY PARTICULARIZED EXPRESSION TO BE

23   PROTECTABLE, BUT EVEN ASSUMING THAT, ONCE YOU HAVE A

24   COMBINATION OF THOSE FIVE, SIX ELEMENTS TOGETHER, THAT WOULD BE

25   SOMETHING THAT WOULD AMOUNT TO PROTECTABLE EXPRESSION.          08:44

```
 1          THE COURT:  I TEND TO AGREE, BUT UNDERSTAND, IT'S NOT
 2   SIMPLY AN OVERSIZED HEAD.
 3          MR. ZELLER:  CORRECT.
 4          THE COURT:  THAT WOULD FALL TOO GENERIC.  IT'S THIS
 5   PARTICULAR OVERSIZED HEAD THAT WE'RE TALKING ABOUT IN THE          08:44
 6   CONTEXT OF THE INTRINSIC ANALYSIS.
 7          MR. ZELLER:  WELL, I THINK MAYBE WE DO DEPART A
 8   LITTLE BIT, BECAUSE I THINK THAT IT CAN STILL BE A PARTICULAR
 9   COMBINATION OF FEATURES, BECAUSE ABSOLUTELY, THERE'S NO
10   QUESTION THAT THE PARTICULARIZED EXPRESSION OF IT IS KIND OF       08:45
11   ONE SIDE OF IT.  IT COULD BE THAT IT'S THE FACE.  YOU'RE NOT
12   LOOKING, NECESSARILY, AT THE OVERALL COMBINATION.  BUT JUST
13   FOCUSING ON PROTECTABILITY, YOU HAVE PARTICULARIZED WAYS IN
14   WHICH IT'S PUT.  THAT'S KIND OF ONE TRACK OF PROTECTION.  BUT
15   THEN ALSO ANOTHER TRACK OF PROTECTION OR PROTECTABILITY THAT'S     08:45
16   RECOGNIZED BY THE CASES IS THAT IF YOU TAKE ELEMENTS AND YOU
17   COMBINE THEM IN A NEW WAY -- I MEAN, THIS GOES BACK TO
18   ECCLESIASTES; THERE WAS NOTHING NEW UNDER THE SUN.
19          THE COURT:  I AGREE.  AND THAT'S -- WHAT YOU'RE
20   DESCRIBING THERE IS WHAT I'M TRYING TO CAPTURE IN THAT FIRST       08:45
21   ELEMENT.  I USE THE WORD "SYNERGISTIC" AS OPPOSED TO
22   "COMBINATION."  BUT TO ME, SYNERGISTIC CAPTURES IT MORE BECAUSE
23   IT IMPLIES THE WORKING TOGETHER OF THE ELEMENTS, AS OPPOSED TO
24   SIMPLY THE AMALGAMATION OF THE ELEMENTS.  BECAUSE IT'S THE WAY
25   THE OVERSIZED HEAD WORKS WITH THE OVERSIZED -- I DON'T WANT TO     08:46
```

```
 1   SAY FEET -- SHOES -- THAT WORKS WITH THE THIN BODY AND THE
 2   ACCENTUATED AND DEACCENTUATED OTHER FEATURES.  IT'S THAT --
 3   LIKE I SAY, I COULDN'T THINK OF A BETTER WORD LAST NIGHT THAN
 4   "SYNERGISTIC," BECAUSE IT'S NOT JUST AN AMALGAMATION OR A
 5   COMBINATION, BUT IT'S A WORKING TOGETHER OF THESE DIFFERENT         08:46
 6   ELEMENTS IN A PARTICULARIZED WAY.  AND I THINK THAT AFTER
 7   SEEING ENOUGH OF THESE BRATZ DOLLS, THAT BECOMES ALMOST
 8   SELF-EVIDENT.  THERE IS A BRATZ LOOK.  AND WHETHER THAT BRATZ
 9   LOOK MANIFESTS ITSELF IN THE FORM OF A BRATZ BOYS OR A BRATZ
10   PETS OR A BRATZ WHATEVER, YOU CAN LOOK AT IT -- WHEN YOU          08:46
11   COMPARE IT TO MANY OF THE ALLEGEDLY INFRINGING PRODUCTS, FROM
12   THE HONG KONG LITIGATION OR WHATEVER, I MEAN, YOU CAN READILY
13   SEE THAT ONE IS THE REAL MCCOY AND ONE IS NOT, PRECISELY
14   BECAUSE OF THESE PARTICULARIZED ELEMENTS.
15          AND I HAVE IT BROKEN DOWN INTO THREE PROTECTED            08:47
16   ELEMENTS.  THE FIRST ONE ATTEMPTS TO CAPTURE THAT SYNERGISTIC
17   LOOK OR ATTITUDE, WHICH IN A PARTICULARIZED FORM, CLEARLY UNDER
18   THE CASE LAW, CAN BE PROTECTED.  THE SECOND BREAKS IT DOWN INTO
19   PARTICULAR ELEMENTS THAT ARE PROTECTABLE:  THE OVERSIZED DOLL'S
20   HEAD, THE LIPS, THE EYES, THE EYEBROWS.  I DESCRIBE SOME AS      08:47
21   EXAGGERATED ANATOMICAL FEATURES, OTHERS AS DEEMPHASIZED
22   ANATOMICAL FEATURES.  BUT I THINK THIS CAPTURES THAT OVERSIZED
23   HEAD, AS YOU INDICATED, OR THAT NONEXISTENT NOSE, WHICH WE'VE
24   HEARD SO MUCH ABOUT IN PHASE 1-A.  AND THEN, FINALLY, THE THIRD
25   CATEGORY ARE PARTICULARIZED EXPRESSIONS SET FORTH IN THE        08:47
```

```
 1    ACCESSORIES THAT ARE CAPTURED ON THE DRAWINGS.

 2            BUT IN EACH CASE, IT HAS TO BE THE PARTICULARIZED

 3    FORM OR EXPRESSION THAT IS PROTECTED, NOT THE GENERIC FORM.

 4    AND THAT'S WHAT IS FILTERED OUT.  THAT'S WHAT CAN'T BE

 5    PROTECTED.

 6            THAT'S WHY SIMPLY SAYING AN OVERSIZED HEAD -- AND

 7    MAYBE WE'RE MINCING WORDS HERE -- BUT IT'S THE OVERSIZED BRATZ

 8    HEAD, AS OPPOSED TO SIMPLY ANY OVERSIZED HEAD, BECAUSE LOTS OF

 9    DOLLS HAVE OVERSIZED HEADS, AND THAT DOESN'T GO FAR ENOUGH TO

10    CAPTURE THE PARTICULARIZED EXPRESSION THAT IS PROTECTED IN THE

11    BRATZ DRAWING.

12            MR. ZELLER:  ONE OTHER ISSUE, YOUR HONOR, THAT I SEE

13    HERE IS THAT WE ARE, OF COURSE, GOING TO HAVE -- I WOULD ASK

14    FOR SOME GUIDANCE, PERHAPS, IN WHAT WOULD BE MOST USEFUL FOR

15    THE COURT TO RECEIVE SOME OF THIS EVIDENCE -- BUT OBVIOUSLY,

16    THE VILPPU HEARING, THE DAUBERT HEARING, WOULD BE A GOOD

17    VEHICLE FOR SOME OF THAT.  PRESUMABLY SOME OF IT -- AND

18    CERTAINLY, I KNOW ADDITIONAL EVIDENCE WE WOULD WANT TO PUT IN

19    OFFHAND IS GOING TO BE FROM THE WRITTEN RECORD, TO SORT OF

20    EXPAND AND SUPPLEMENT, PERHAPS, ON SOME OF THE EVIDENCE THAT

21    WE'VE ALREADY PUT IN THE RECORD.  I DON'T KNOW IF ADDITIONAL

22    BRIEFING, SOME SORT OF, PERHAPS, INTERIM SUBMISSION OF

23    ADDITIONAL DECLARATION WITH THAT KIND OF EVIDENCE, BEFORE OR

24    AFTER THE HEARING THAT WE WOULD HAVE WITH VILPPU -- IT MAY BE

25    HELPFUL IF WE HAD A LITTLE BIT OF GUIDANCE AS TO WHAT WOULD BE
```

08:48

08:48

08:48

08:49

08:49

```
 1   MOST USEFUL FOR THE COURT.

 2         THE COURT:  WELL, TIMING IS SOMEWHAT OF THE ESSENCE.

 3   THIS HAS TO WRAP UP NEXT WEEK.  WE'LL BE DOING THESE TYPES OF

 4   HEARINGS OFF JURY TIME, EITHER IN THE MORNING OR IN THE

 5   EVENING, OR DURING LUNCH.  I DON'T HAVE A SENSE, I GUESS -- I'M   08:49

 6   GOING TO HAVE TO RELY ON THE PARTIES TO TELL ME HOW MUCH OF

 7   THIS EVIDENCE YOU THINK I NEED TO HEAR.  SO MAYBE YOU CAN GET

 8   TOGETHER SOMETIME TODAY AND GET A SENSE OF HOW MUCH TESTIMONY

 9   TIME WE'RE TALKING ABOUT, AND THEN I CAN SCHEDULE THAT FOR YOU.

10         MR. ZELLER:  AND THEN, PERHAPS, THE LAST ISSUE I           08:50

11   WANTED TO MAKE, ALTHOUGH I DON'T KNOW THAT THERE'S A NEED TO

12   FULLY RESOLVE IT, BECAUSE IT'S A LITTLE BIT OF AN ABSTRACT

13   ISSUE, BUT MR. NOLAN RAISED IT IN HIS REMARKS.  HE WAS TALKING

14   ABOUT THE CHANGES THAT WERE MADE BY LEAHY OR GARCIA, OR WHOEVER

15   THE CASE MAY BE, AND THAT BEING, YOU KNOW, RELEVANT.            08:50

16         AND CERTAINLY, AT SOME LEVEL IT IS RELEVANT, AS THE

17   COURT HAS POINTED OUT.

18         THE COURT:  ULTIMATELY, WHAT THE JURY IS GOING TO BE

19   COMPARING TO DETERMINE SUBSTANTIAL SIMILARITY IS THE DRAWINGS

20   TO THE DOLLS.                                                   08:50

21         MR. ZELLER:  CORRECT.  AND PART OF WHAT, I GUESS, I

22   WANTED TO RAISE -- AND, AGAIN, WITHOUT NECESSARILY DOING A FULL

23   BLOWN ARGUMENT ABOUT IT AT THIS POINT -- BUT, YOU KNOW, FROM MY

24   PERSPECTIVE, PRECISELY BECAUSE OF WHAT THE COURT JUST SAID, ALL

25   OF THE MECHANICS OF HOW ALL OF THESE CHANGES ARE MADE, AS FAR   08:50
```

1    AS WE'RE CONCERNED, ARE IRRELEVANT AND PROBABLY CONFUSING.

2    THAT'S REALLY CONFUSING THE LABOR THAT WENT INTO THIS, WHICH

3    CASES SAY OVER AND OVER AND OVER IS NOT PARTICULARLY RELEVANT

4    TO WHAT IS GOING TO BE THE JURY'S TASK AT THE END OF THE DAY.

5         IT'S ALMOST -- THE ANALOGY WOULD BE SOMETHING LIKE        08:51

6    THIS:  IF I TOOK A BOOK AND I PHOTOCOPIED IT, AND IT'S

7    IDENTICAL, PEOPLE CAN TELL THAT FROM LOOKING AT, ME PUTTING ON

8    A TWO-MONTH SERIES OF WITNESSES, TALKING ABOUT, IN GORY DETAIL,

9    THE MECHANICS OF HOW A PHOTOCOPIER WORKS, AND SOMEHOW ACTING

10   LIKE THAT'S A DEFENSE.                                          08:51

11        **THE COURT:**  YOU'RE CORRECT IN THE CONTEXT OF THE

12   SUBSTANTIAL SIMILARITY TEST ITSELF, BUT NOT WITH RESPECT TO

13   DAMAGES.

14        **MR. ZELLER:**  WELL, YOU SEE, THAT'S WHERE I DISAGREE.

15   BECAUSE I DON'T THINK THAT THE MECHANICS OF HOW IT'S DONE       08:51

16   EITHER -- AGAIN, THIS THREATENS TO CREATE CONFUSION WITH THE

17   JURY, THINKING THAT SOMEHOW THEY GET CREDIT FOR THEIR LABOR, IN

18   ADDITION TO THE DEDUCTION FOR COSTS, FOR EXAMPLE.

19        I MEAN, A LOT OF THAT WORK, THAT COMES OFF BECAUSE

20   THEY'RE ENTITLED TO MAKE DEDUCTIONS FOR COSTS.                  08:52

21        **THE COURT:**  IF I HEARD YOU CORRECTLY, MR. ZELLER, YOU

22   JUST CONCEDED THAT THEY ARE ENTITLED TO BRING IN THEIR COSTS.

23        **MR. ZELLER:**  ABSOLUTELY THEY ARE.  BUT THAT DOES NOT

24   MEAN THAT THEY SAY, 'WELL, HERE'S ALL OF THE SWEAT THAT WENT

25   BEHIND IT.'  BECAUSE THE FACT IS, THAT'S A NUMBER.  THE NUMBER  08:52

```
 1   IS, WE SPENT X AMOUNT ON THIS PARTICULAR KIND OF COST.  THAT'S

 2   A NUMBER.  THAT'S A CALCULATION.  THAT IS NOT --

 3          THE COURT:  I UNDERSTAND YOUR CONCERN.  IT CAN BE

 4   ADDRESSED THROUGH A JURY INSTRUCTION, I SUPPOSE.  I DON'T KNOW

 5   IF IT WOULD BE PROPER FOR THE COURT TO SAY, 'YOU CANNOT              08:52

 6   INTRODUCE WHAT COSTS' -- THEY CAN PRESENT THAT HOWEVER THEY

 7   WANT.

 8          MR. ZELLER:  THEY CAN CERTAINLY PRESENT IT HOWEVER

 9   THEY WANT, BUT IT STILL HAS TO BE A NUMBER.

10          THE COURT:  RIGHT.                                           08:52

11          MR. ZELLER:  THEY JUST CAN'T COME IN AND SAY, 'WELL,

12   MARGARET LEAHY PUT IN 1,000 HOURS OF WORK,' AND SOMEHOW THAT'S

13   REALLY RELEVANT.  THAT'S A NUMBER, ULTIMATELY; BUT HAVING HER

14   DESCRIBE THE 1,000 HOURS OF WORK SHE DID IS NOT PERTINENT,

15   BECAUSE IN SOME WAYS, THE END PRODUCT IS WHAT YOU HAVE.             08:53

16          YOU HAVE THAT TO COMPARE.  SHE CAN COME IN HERE AND

17   TALK FOR TWO HOURS ABOUT, 'HERE ARE ALL OF THE THINGS I DID

18   WHEN I MADE ALL OF THESE CHANGES,' ALLEGED CHANGES, BUT AT THE

19   END OF THE DAY, DESCRIPTION OF THEM IS BESIDE THE POINT ON

20   SUBSTANTIAL SIMILARITY.  THE JURY IS GOING TO COMPARE THE END       08:53

21   PRODUCT TO WHAT MATTEL OWNS AND IS ASSERTING A COPYRIGHT

22   INFRINGEMENT CLAIM OVER.

23          THE COURT:  BUT DOESN'T THAT HELP THE JURY UNDERSTAND

24   AND HELP THEM FOCUS ON WHAT DIFFERENCES EXIST?

25          MR. ZELLER:  I DON'T AGREE WITH THAT.  I THINK IT'S A        08:53
```

```
 1   SITUATION THAT'S JUST RIPE FOR POTENTIAL CONFUSION, BECAUSE

 2   WE'RE TALKING ABOUT, YOU KNOW, WHAT IS THE END PRODUCT, AND

 3   WE'RE TALKING ABOUT EXPRESSION; HOW DO THESE THINGS LOOK?

 4        BUT IT CAUSES POTENTIAL CONFUSION FOR THE JURY TO

 5   THINK THAT SOMEHOW, 'WELL, MAYBE IT'S NOT REALLY INFRINGEMENT    08:53

 6   IF YOU SPEND AN AWFUL LONG TIME DOING YOUR COPYING.'  I MEAN,

 7   THIS IS NOT A LEGALLY PERTINENT INQUIRY.  AND IT, I THINK,

 8   POTENTIALLY WILL CAUSE CONFUSION.

 9        AND ONE THING THAT MGA HAS ALREADY BEEN SAYING

10   THROUGHOUT THIS CASE, AND DOING IT IN THE CONTEXT OF EVEN        08:54

11   OPENING, IS TALKING OVER AND OVER ABOUT, 'WELL, WHAT WAS THE

12   IMPORTANCE OF THE DRAWINGS TO THE PROJECT?'

13        THAT IS JUST ABSOLUTELY IRRELEVANT.  IT IS ABSOLUTELY

14   IRRELEVANT TO SUBSTANTIAL SIMILARITY.

15        THE COURT:  ANYTHING ELSE, MR. ZELLER, BEFORE I TURN        08:54

16   THIS OVER TO MGA?

17        MR. ZELLER:  NO, YOUR HONOR.

18        THE COURT:  THANK YOU VERY MUCH.

19        MR. NOLAN:  YOUR HONOR, I DON'T KNOW WHAT IS MORE

20   FUNDAMENTALLY KEY IN THIS CASE IN DETERMINING WHETHER OR NOT     08:54

21   THERE ARE SUBSTANTIAL SIMILARITIES OR DISSIMILARITIES BETWEEN

22   THE DRAWINGS AND THE DOLLS THAN -- AND GO BACK TO THE COURT'S

23   ORDER, WHERE THE COURT CITED TO THE VERY TESTIMONY IN THE

24   RECORD WITH RESPECT TO THE CHANGES THAT WERE MADE FROM THE

25   DRAWINGS TO THE DOLL TO MAKE IT HIT THAT MARK THAT YOU PUT YOUR  08:54
```

1    FINGER ON, THAT IT HAS TO BE SUCH IN ORDER TO MAKE IT SO

2    SUCCESSFUL AND SO APPEALING TO THE MARKETPLACE.

3            WHAT MATTEL SEEMS TO WANT TO DO IS JUST HANDCUFF US

4    IN PRODUCING ANY EVIDENCE THAT WOULD ESTABLISH THE CHANGES.

5            IF THIS WAS A CASE WHERE WE PUT CARTER BRYANT'S                08:55

6    DRAWINGS ON A COPY MACHINE AND THEN IT PRODUCED A DOLL, THEN I

7    COULD ARGUE THAT -- I COULD MAYBE ACCEPT HIS ARGUMENT THAT WE

8    SHOULDN'T BE ALLOWED TO SHOW HOW THE PHOTOCOPY MACHINE WORKS.

9    BUT THAT'S NOT WHAT HAPPENED IN THIS CASE.  WE ALL KNOW IT.

10           I THINK THE CONCERN THAT MATTEL HAS IS PREVENTING         08:55

11   EVIDENCE COMING INTO THIS CASE.  WE JUST CANNOT HAVE THIS

12   EVIDENCE EXCLUDED.

13           **THE COURT:**  LET'S EXPLORE YOUR ANALOGY, COUNSEL,

14   BECAUSE I AGREE WITH YOU THAT IF IT WAS A MATTER OF

15   PHOTOCOPYING, YOU WOULD NOT BE ABLE TO EXPLAIN -- IT WOULD BE     08:55

16   POTENTIALLY CONFUSING AND PREJUDICIAL FOR THE JURY TO HEAR HOW

17   THE PHOTOCOPY MACHINE OPERATES.

18           YOU COULD IMAGINE A SITUATION WHERE SOMEONE ACCUSED

19   OF PHOTOCOPYING -- I HAVE ANOTHER CASE.  IT'S ALL PART OF THE

20   PUBLIC RECORD; IT'S DOWN THE STREET, UNIVERSITY OF CALIFORNIA,    08:56

21   RIVERSIDE, WHERE THERE'S A PHOTOCOPY STORE THAT -- ALLEGEDLY,

22   THE OWNER OF THE PHOTOCOPY STORE IS MAKING COPIES OF TEXTBOOKS

23   AND SELLING THEM FOR AN EIGHTH OF WHAT THEY GO FOR ACROSS THE

24   STREET AT THE UNIVERSITY BOOKSTORE.  THAT WOULD BE --

25   OBVIOUSLY, IF TRUE, THAT'S ACTUAL COPYING, AND HE WOULDN'T BE     08:56

```
 1   ABLE TO STAND UP BEFORE A JURY AND SAY, 'OH, WELL, I PUT
 2   TOGETHER THIS INTRICATE COPY MACHINE AND I SPENT ALL OF THIS
 3   MONEY ON A COPY MACHINE, AND THIS IS HOW I OBTAINED THIS COPY,
 4   SO I SHOULD BE GIVEN SOME CREDIT FOR WHAT I PUT INTO THE COPY.'
 5           IT'S STEALING THE WORK, SO IT'S WRONG.                    08:57
 6           UNDER MATTEL'S THEORY, YOU DIDN'T USE A COPY MACHINE.
 7   BUT UNDER MATTEL'S THEORY, WHAT YOU DID DO IS YOU USED A VERY
 8   INTRICATE PROCESS, A HUMAN PROCESS, AS OPPOSED TO A MECHANICAL
 9   PROCESS, TO ACHIEVE, ESSENTIALLY, FROM THEIR PERSPECTIVE, THE
10   SAME EFFECT.                                                      08:57
11           AND I THINK WHAT MR. ZELLER IS ARGUING IS THAT
12   PROCESS BY WHICH YOU ACHIEVED THE EFFECT IS NO MORE RELEVANT TO
13   THE ULTIMATE DETERMINATION OF WHETHER THERE'S A COPYRIGHT
14   INFRINGEMENT THAN THE WORKINGS OF THE PHOTOCOPY MACHINE.
15   THAT'S THE ANALOGY, I THINK, THAT MR. ZELLER IS PRESSING.        08:57
16           MR. NOLAN:  I UNDERSTAND THAT'S THE ANALOGY THAT HE
17   IS PRESSING.  BUT START FROM THE PROPOSITION THAT WE HAVE
18   CONTENDED THROUGHOUT THIS LAWSUIT, THAT THE DOLLS DO NOT
19   INFRINGE THE DRAWINGS -- THAT'S THE ARGUMENT THAT WE'RE MAKING.
20           THE COURT:  RIGHT.  I UNDERSTAND THAT.                   08:58
21           MR. NOLAN:  IN SUPPORT OF THAT, USING THE TEST THAT
22   THE COURT WILL APPLY, WE'LL MEET THAT TEST; BUT IN ORDER TO
23   MEET THE TEST AND TO SHOW THE DIFFERENCES THAT ARE
24   SUBSTANTIALLY -- THAT MAKE THE FEATURES ON THE DOLL
25   SUBSTANTIALLY DIFFERENT IN THE DOLL WORLD, IN SELLING THE DOLL   08:58
```

1    WORLD, IT IS ABSOLUTELY ESSENTIAL THAT WE BE ABLE TO ESTABLISH,

2    FOR INSTANCE, THE CHANGES THAT WERE MADE BY MGA TO THE

3    EXPRESSION REFLECTED IN THE DRAWINGS AND HOW THOSE CHANGES WERE

4    MADE, WHETHER OR NOT -- LET'S USE MARGARET LEAHY FOR AN

5    EXAMPLE.  IT'S NOT SO MUCH THAT SHE PUT IN A LOT OF TIME.  THE        08:59

6    FACT OF THE MATTER IS THAT HER TESTIMONY WILL BE THAT SHE MADE

7    MATERIAL AND SUBSTANTIAL CHANGES.

8              **THE COURT:**  TO THE LOOK.

9              **MR. NOLAN:**  TO THE LOOK.

10             **THE COURT:**  YOU JUST HIT UPON IT.  IT'S NOT SO MUCH      08:59

11   WHETHER SHE SPENT 1,000 HOURS, 10,000 HOURS, OR ONE HOUR; IT'S

12   THE CHANGE, THE DIFFERENCE, THAT SHE MADE.  YOU'RE ABSOLUTELY

13   CORRECT, MR. NOLAN.  AND THAT'S, I THINK, THE POINT -- AND THIS

14   IS A GOOD WAY, PERHAPS, TO RESOLVE THIS ISSUE.  IT'S NOT HOW;

15   IT'S WHAT.  IT'S WHAT THE DIFFERENCES ARE.  AND CERTAINLY,           08:59

16   MARGARET LEAHY IS PROBABLY IN AN EXCELLENT POSITION TO EXPLAIN

17   TO THE JURY WHAT THOSE DIFFERENCES ARE, BECAUSE AS YOU JUST

18   INDICATED, SHE'S THE ONE THAT MADE THOSE DIFFERENCES.

19             HOW SHE DID IT, WHETHER SHE USED A PHOTOCOPY MACHINE

20   OR WHETHER SHE SPENT 1,000 HOURS WORKING IN HER STUDIO, AS YOU       09:00

21   JUST INDICATED, IS NOT -- THAT'S NOT THE CRITICAL QUESTION.

22   THE QUESTION IS, WHAT IS THE DIFFERENCE OR THE SIMILARITY, THE

23   SIMILARITY FROM MATTEL'S PERSPECTIVE, THE DIFFERENCE FROM MGA'S

24   PERSPECTIVE, BETWEEN THE DOLL AND THE PROTECTABLE ELEMENTS OF

25   THE DRAWINGS?                                                        09:00

1     **MR. NOLAN:**  IT'S NOT OUR INTENT TO ASK MS. LEAHY IF

2   SHE PUT IN 1,000 HOURS, AND SAY, 'BOY, THAT'S A LOT OF TIME,

3   AND IT MUST MAKE A DIFFERENCE.'

4        THE EVIDENCE IS GOING TO BE WHAT HAS BEEN PRESENTED

5   OVER AND OVER TO THIS COURT ALREADY, WHICH, I BELIEVE, LED TO      09:00

6   THE REJECTION OF THE SUMMARY JUDGMENT AS TO WHAT THE CHANGES

7   WERE THAT WERE MADE.  WE'RE NOT TRYING TO PUT THIS AS A VALUE;

8   JUST THE CHANGES AND HOW THOSE CHANGES WERE MADE.

9        OTHERWISE, YOUR HONOR, I THINK WHAT MATTEL IS TRYING

10  TO AVOID IS THE SUGGESTION THAT THESE CHANGES MATTER.             09:00

11       **THE COURT:**  THAT'S NOT -- YOU'RE RIGHT ON THAT.

12       **MR. NOLAN:**  AND THAT'S OUR KEY.

13       **THE COURT:**  YOU'RE RIGHT ON THAT.

14       **MR. NOLAN:**  OKAY.  THANK YOU.

15       **THE COURT:**  ABSOLUTELY.                                  09:01

16      **MS. AGUIAR:**  I NEED TO ADD SOMETHING.

17       I JUST WANT TO MAKE SURE THAT WE'RE CLEAR ON A

18  DISTINCTION THAT YOU MADE REGARDING WHAT THE DIFFERENCES ARE

19  AND HOW IT HAPPENED.

20       **THE COURT:**  RIGHT.                                       09:01

21      **MS. AGUIAR:**  THIS IS NOT A CASE OF PHOTOCOPYING.

22  THIS IS NOT A CASE -- I REJECT HIS ANALOGY WHOLEHEARTEDLY.

23  THIS IS NOT A CASE WHERE WE TOOK A BOOK AND PHOTOCOPIED IT AND

24  ARE MAKING TEXTBOOKS FROM A PHOTOCOPY MACHINE.

25       **THE COURT:**  I UNDERSTAND THAT.                           09:01

1      **MS. AGUIAR:**  WE NEED TO BE ABLE TO EXPLAIN THAT THERE

2   WAS CREATIVE INPUT INTO THIS PROCESS.

3      **THE COURT:**  LET ME STOP YOU THERE.

4      THERE'S A TREMENDOUS AMOUNT OF SCIENTIFIC AND

5   CREATIVE INPUT INTO THE PHOTOCOPYING.  IT'S NOT A PERFECT          09:01

6   ANALOGY, BECAUSE OBVIOUSLY, THE PHOTOCOPYING IS EVEN MORE

7   EGREGIOUS, BUT THE HOW IS NOT AS RELEVANT AS THE WHAT.

8      **MS. AGUIAR:**  BUT I DISAGREE.  LET ME EXPLAIN WHY.

9      **THE COURT:**  DO YOU HAVE AUTHORITY TO DISAGREE ON

10  THAT?  BECAUSE THE CONFUSING ASPECT -- THE 403 CONCERN IS THAT     09:02

11  THE ARGUMENT THAT'S BEING PITCHED IS, 'LADIES AND GENTLEMEN, WE

12  WORKED REALLY, REALLY HARD ON THIS, AND WE DESERVE TO KEEP THE

13  MONEY ON THIS.'

14     **MS. AGUIAR:**  ABSOLUTELY NOT.  IT'S NOT THAT WE WORKED

15  REALLY HARD TO COPY IT.                                           09:02

16     THEIR ARGUMENT IS THAT WE COPIED.

17     **THE COURT:**  RIGHT.

18     **MS. AGUIAR:**  WE'RE ABOUT TO START PUTTING ON OUR CASE

19  TO THIS JURY AS TO WHY THIS IS NOT A COPY --

20     **THE COURT:**  RIGHT.                                         09:02

21     **MS. AGUIAR:**  -- AND WHY WE DIDN'T JUST AIM TO TAKE A

22  TWO-DIMENSIONAL DRAWING AND COPY IT.  WE NEED TO BE ABLE TO

23  EXPLAIN, NOT THAT WE WORKED HARD, BUT THAT WE DIDN'T ACTUALLY

24  COPY; THAT WE SPECIFICALLY MADE CHANGES.  AND IT'S RELEVANT HOW

25  WE MADE THEM, BECAUSE MARGARET HAS TO BE ABLE TO EXPLAIN HOW      09:03

```
 1   THE SCULPT EVOLVED, BECAUSE THAT DRAWING DID NOT SHOW HER HOW

 2   TO MAKE A SCULPT.  SHE NEEDS -- WE NEED TO BE ABLE TO PUT ON A

 3   DEFENSE, YOUR HONOR.  AND I CAN APPRECIATE THAT MR. ZELLER IS A

 4   CREATIVE ADVOCATE, BUT MR. ZELLER IS TRYING TO SUGGEST TO YOU

 5   THAT WE SHOULD NOT BE ABLE TO EXPLAIN TO THIS JURY THAT WE        09:03

 6   DIDN'T USE A PHOTOCOPY MACHINE.

 7          THE COURT:  DON'T MAKE THIS PERSONAL.

 8          MS. AGUIAR:  I'M NOT MAKING IT PERSONAL, BUT HE'S

 9   TRYING TO PREVENT US FROM PUTTING ON OUR CASE.  HE'S TRYING TO

10   SAY THAT WE SHOULDN'T BE ABLE TO PUT UP PAULA GARCIA AND         09:03

11   MARGARET LEAHY AND LOTS OF OTHER PEOPLE AT MGA -- NOT TO SAY,

12   'I WORKED REALLY HARD.'  THAT'S NOT THE POINT.

13          FRANKLY, I'LL REPRESENT TO YOU RIGHT NOW THAT WE'RE

14   NOT GOING TO ASK ONE WITNESS, 'HOW MANY HOURS DID YOU WORK ON

15   THIS?'  WE'RE GOING TO ASK THE WITNESSES, 'WHEN YOU LOOKED AT    09:03

16   THAT DRAWING AND YOU WERE ABOUT TO EMBARK ON THE PROCESS OF

17   MAKING A THREE-DIMENSIONAL DOLL FROM THAT DRAWING, WHAT PROCESS

18   DID YOU GO THROUGH TO DETERMINE WHETHER THOSE FEATURES IN THAT

19   DOLL WERE GOING TO BE MARKETABLE AND SELLABLE, AND WHETHER YOU

20   NEEDED TO MAKE CHANGES IN ORDER TO DO THAT?  AND WHEN YOU        09:04

21   LOOKED AT THAT DRAWING, COULD YOU TELL WHAT MR. BRYANT IMAGINED

22   THAT BODY WOULD LOOK LIKE?'  AND THEY'RE GOING TO SAY, 'NO, I

23   DIDN'T.  AND THAT'S WHY I NEEDED TO USE MY OWN CREATIVITY,

24   BECAUSE I WASN'T COPYING.'  WE WERE USING OUR OWN INTERNAL

25   CREATIVE SKILLS AND PROCESSES.  SO IT GOES TO THE CORE QUESTION  09:04
```

1  OF WHETHER WE WERE USING A PHOTOCOPY MACHINE OR WHETHER, IN

2  FACT, WE WERE NOT USING A PHOTOCOPY MACHINE.

3       SOMEONE WENT OUT AND CREATED THE PAPER.  SOMEONE WENT

4  OUT AND THOUGHT, 'GEE, THAT STORY THAT THEY WROTE IN THAT BOOK,

5  WAS THAT REALLY A GOOD STORY, DO WE LIKE THAT STORY, OR DO WE          09:04

6  WANT TO CHANGE THAT STORY?'  AND SOMEONE WENT OUT AND BOUGHT

7  THE INK TO PUT ON THE PAGE.  AND THEN WE ACTUALLY MADE A

8  TOTALLY NEW BOOK.  WE NEED TO BE ABLE TO PUT ON THAT CASE.

9       **THE COURT:**  I UNDERSTAND YOUR ARGUMENT, COUNSEL.

10       I WANT TO HEAR MR. ZELLER'S RESPONSE TO THAT.          09:04

11       **MR. ZELLER:**  A NUMBER OF DISTINCTIONS ARE BEING

12  BLURRED IN THE ARGUMENTS THAT ARE BEING MADE.

13       AT END OF THE DAY, WHAT MATTERS IS, ARE THE WORKS

14  SUBSTANTIALLY SIMILAR, THE BRATZ DOLLS?

15       **THE COURT:**  I AGREE WITH YOU, BUT COUNSEL'S POINT IS          09:05

16  THAT HOW YOU GOT THERE IS PROBATIVE OF WHETHER OR NOT THERE ARE

17  THOSE SIMILARITIES.

18       **MR. ZELLER:**  AND THAT IS WHAT I ACTUALLY REJECT,

19  YOUR HONOR, AND THAT IS THE ABSOLUTE DANGER OF ALLOWING THEM TO

20  MAKE THESE ARGUMENTS TO THE JURY.  WHAT THEY WANT TO DO IS          09:05

21  EFFECTIVELY CONTRACT THE LEGAL STANDARD OF SUBSTANTIAL

22  SIMILARITY BY PUTTING WITNESSES ON TO BASICALLY SAY, 'THE

23  CHANGES I MADE, HERE THEY ARE AND THEY ARE IMPORTANT.'

24       IT'S THE IMPORTANT PART.  AND THEY ARE COMMUNICATING

25  TO THE JURY THAT THEY ARE IMPORTANT, BECAUSE IT TOOK A LOT OF          09:05

```
1   LABOR OR EFFORT, OR CREATIVITY EVEN, TO MAKE THOSE CHANGES.

2   BUT THAT IS NOT THE LEGAL STANDARD.

3        THE COURT:  I LIKE THE ANALOGY THAT MS. AGUIAR USED.

4   OKAY.  YOU KNOW, YOU'RE COPYING A STORY -- AND, AGAIN, I

5   KNOW -- NONE OF THESE ANALOGIES ARE PERFECT ON EITHER SIDE, SO        09:06

6   I DON'T WANT ANYONE GETTING WORKED UP OVER THE ANALOGIES.  BUT

7   IF YOU'RE COPYING A STORY -- I SUPPOSE THAT'S ENTIRELY

8   DIFFERENT, BECAUSE THAT IS -- LET'S USE IT IN A VISUAL WORK.

9        MR. ZELLER:  IF I MAY.

10       ANOTHER WAY OF THINKING ABOUT THIS, FROM MY                       09:06

11  PERSPECTIVE, IS, WHY CHANGES WERE MADE ARE IRRELEVANT.  WHAT

12  MATTERS IS, DID THEY TAKE YOU OUTSIDE THE SUBSTANTIAL

13  SIMILARITY STANDARD?

14       THE COURT:  LET ME ASK YOU THE SAME QUESTION I ASKED

15  MS. AGUIAR.  DO YOU HAVE ANY AUTHORITY ON THIS?  IS THERE           09:06

16  ANYTHING WHICH DESCRIBES -- ANY OTHER CASES THE COURTS HAVE

17  COME UP WITH THAT EXCLUDED TESTIMONY OF THE 'HOW' AND SAID 'ALL

18  WE FOCUS ON IS WHAT WE HAVE AT THE END OF IT'?

19       MR. ZELLER:  ABSOLUTELY, YOUR HONOR.  I CAN GET THE

20  COURT AUTHORITY ON THIS VERY POINT.                                09:07

21       COURTS HAVE SAID OVER AND OVER -- ISSUES LIKE THE

22  AMOUNT OF LABOR THAT GOES INTO IT, THE SWEAT, ALL OF THESE

23  OTHER THINGS THAT THEY WANT TO POINT TO SUGGEST TO THE JURY,

24  LIKE -- THERE MUST BE SOME CHANGE.

25       THIS IS WHAT IS THE MOST PROBLEMATIC --                         09:07
```

```
 1          THE COURT:  MS. AGUIAR JUST SAID SHE'S NOT GOING TO

 2   ASK A SINGLE QUESTION ABOUT HOW MANY HOURS, HOW MUCH SWEAT.

 3   THAT CLEARLY IS NOT THE APPROPRIATE MEASURE, AND I CAN SEE HOW

 4   THAT'S CONFUSING.

 5          MR. ZELLER:  BUT THAT'S WHAT'S BEING COMMUNICATED.        09:07

 6   YOU PUT MARGARET LEAHY ON THE STAND, AND THEY GO THROUGH THE

 7   PROCESS OF, 'WHAT DID YOU DO?' -- THAT'S GOING TO COMMUNICATE

 8   TO THE JURY THAT THERE WAS A LOT OF THAT EFFORT.  WHETHER YOU

 9   ASK THE ULTIMATE QUESTION, 'HOW MANY HOURS?' -- I MEAN, I'M

10   USING THAT, PERHAPS, AS AN OVERSIMPLIFICATION, BUT THAT GETS     09:07

11   COMMUNICATED TO THE JURY IN MANY WAYS, THAT THERE MUST HAVE

12   BEEN SOMETHING IMPORTANT SHE DID.  'I WENT THROUGH THIS

13   ELABORATE PROCESS, TO TAKE THE HEAD THAT MATTEL NOW OWNS, AND

14   SOMEHOW TURNED IT INTO THIS FINAL PRODUCT.  I CHANGED IT FROM

15   CLAY TO WAX.  I SPENT HOURS OR' -- EVEN IF SHE NEVER            09:08

16   COMMUNICATES THE TIME --

17          THE COURT:  THAT'S NOT WHAT MS. AGUIAR IS SAYING.

18   SHE'S SAYING THAT -- AND THIS IS THE PART THAT, I THINK, IS

19   PARTICULARLY -- MIGHT BE PARTICULARLY COMPELLING.  IF MARGARET

20   LEAHY SAYS, 'YES, I HAVE THE DRAWINGS' -- AND SHE'S GOING TO -- 09:08

21   I THINK BASED ON THE EVIDENCE I'VE ALREADY SEEN, SHE HAS TO

22   ADMIT THAT SHE SAW THE DRAWINGS.  BUT CERTAINLY, YOU WOULD

23   AGREE THAT IT'S PROPER FOR HER TO SAY, 'I COULDN'T AND I DIDN'T

24   INCORPORATE THAT FEATURE.  I CAME UP WITH A DIFFERENT FEATURE

25   FOR...WHATEVER.'                                                09:08
```

1    **MR. ZELLER:**  WELL, THE "FOR WHATEVER" IS TROUBLING,

2    BUT WHAT I AGREE WITH -- AND I DON'T KNOW THAT THERE'S ANY

3    DISPUTE AT ONE LEVEL, WHICH IS THAT CERTAINLY PEOPLE CAN TALK

4    ABOUT DIFFERENCES.  THEY WANT TO PUT MARGARET LEAHY UP THERE TO

5    SAY -- AND AS THE COURT HAS SAID, MAYBE THERE'S FOUNDATION;        09:08

6    MAYBE SHE'S UNIQUELY SITUATED.  WHATEVER THE CASE MAY BE, WE'LL

7    FIND OUT FROM HER TESTIMONY.  BUT TO HAVE HER UP THERE AND

8    TESTIFY AND SAY, 'WELL, I CHANGED X, I CHANGED Y,' THAT'S NOT

9    WHAT I'M ARGUING AGAINST.  WHAT I'M ARGUING AGAINST IS HER

10   GOING THROUGH THIS PROCESS OF, 'I'M A SCULPTOR.  I'M AN ARTIST.   09:09

11   LET ME TELL YOU ABOUT ALL OF THE THINGS I DO WHEN I GO THROUGH

12   TO CHANGE SOMETHING FROM A CLAY TO A WAX.  AND THEN WHAT DO I

13   DO WHEN I DO A WAX.'

14          I MEAN, INHERENT IN THIS LONG --

15          **THE COURT:**  PART OF THAT IS FOUNDATIONAL.  SHE'S        09:09

16   ALREADY EXPLAINED WHAT SHE DOES.  I ASSUME SHE'S GOING TO DO SO

17   AGAIN, TO REMIND THE JURY OF WHAT SHE DOES, WHAT HER ROLE IS.

18   WHAT'S CERTAIN ABOUT THAT IS, IT'S BASIC FOUNDATIONAL

19   BACKGROUND.

20          IF I HEAR YOU CORRECTLY, YOU'RE CONCEDING -- YOU'RE        09:09

21   NOT DISPUTING THAT SHE CAN CERTAINLY EXPLAIN HOW SHE

22   DIFFERENTLY DID THE DOLL THAT SHE MADE, DISTINGUISHED FROM THE

23   DRAWINGS, INSTEAD OF HAVING, 'WHEN I DID THE EYES, OR WHEN I

24   DID THE NOSE, THERE WAS' -- 'THE DRAWINGS DIDN'T HAVE A NOSE.

25   I WANTED TO PUT A NOSE IN.  I HAD TO PUT A NOSE IN BECAUSE WE     09:10

1    NEEDED TO HAVE A NOSE.'

2         THAT TYPE OF TESTIMONY GOES TO -- AND TO THE EXTENT

3    THAT THE ABSENCE OF A NOSE OR A PARTICULARIZED NOSE IN A

4    DRAWING IS A PROTECTABLE ELEMENT, THAT SEEMS CLEARLY RELEVANT

5    TESTIMONY.  THE PERMUTATIONS THAT TOOK PLACE, THE CREATIVE                09:10

6    PERMUTATIONS THAT TOOK PLACE, AFTER THE DRAWINGS DO SEEM

7    RELEVANT TO THE ISSUE OF WHETHER OR NOT THE DRAWINGS ARE

8    SUBSTANTIALLY SIMILAR TO THE DOLL, AT LEAST ON THE EXTRINSIC

9    TEST.

10        **MR. ZELLER:**  I DON'T THINK THAT'S --- I WOULDN'T               09:10

11   AGREE WITH THAT ENTIRELY, YOUR HONOR.

12        ONE THING THAT'S PROBLEMATIC ABOUT THIS IS THAT

13   THERE'S REALLY AT LEAST TWO THINGS GOING ON.  NUMBER ONE IS

14   HAVING SOMEBODY TESTIFY ABOUT WHY THEY MADE PURPORTED CHANGES.

15   THAT UNDULY, POTENTIALLY, EMPHASIZES AND CREATES THE IMPRESSION         09:11

16   IN THE JURY'S MIND THAT THE CHANGES ARE SUBSTANTIAL.  IN OTHER

17   WORDS, THAT IS AN ALTERATION OF WHAT IS REALLY A SET LEGAL

18   STANDARD THE COURT IS GOING TO BE INSTRUCTING THE JURY ON.  AND

19   THAT'S WHAT'S TROUBLING TO ME, IS THAT IT'S GOING TO -- SO

20   THAT'S ONE ISSUE, IS THAT IT'S GOING TO OVERSTATE THE                   09:11

21   IMPORTANCE OF ANY ALLEGED CHANGES, EVEN THOUGH WHEN SOMEONE

22   APPLYING THE LAW, THE INTRINSIC AND EXTRINSIC TESTS, HAS TWO

23   THINGS TO COMPARE.  SO IT IS GOING TO MAGNIFY DIFFERENCES

24   BEYOND WHAT THE LAW PERMITS, BECAUSE YOU HAVE AN END PRODUCT.

25   IF YOU SAY, 'YOU KNOW, I MADE THAT SMALL CHANGE RIGHT HERE              09:11

```
 1    BECAUSE IT WAS JUST THE MOST VITAL THING, FOR REASONS X, Y, AND
 2    Z,' THAT IS ESSENTIALLY CHANGING THE LEGAL STANDARD, FROM MY
 3    PERSPECTIVE.
 4           SO I THINK THAT'S WHERE IT'S SOMEWHAT PROBLEMATIC.
 5           THEN THE SECOND ASPECT OF WHAT'S TROUBLING ABOUT ANY        09:12
 6    OF THIS IS THE IDEA THAT IT GETS COMMUNICATED TO THE JURY, AT
 7    LEAST IMPLICITLY, THAT THERE WAS SO MUCH EFFORT, THAT ALL THIS
 8    LABOR WENT INTO IT, ALL THIS WORK BY ALL THESE OTHER PEOPLE.
 9    IF IT DIDN'T AMOUNT TO CHANGING THE PRODUCT FROM BEING
10    SUBSTANTIALLY SIMILAR TO THE DRAWINGS, IT'S IRRELEVANT.            09:12
11           THE COURT:  I AGREE WITH YOU ON THE SECOND POINT; I
12    TEND TO AGREE WITH MGA ON THE FIRST POINT; BUT I'D LIKE TO SEE
13    SOME AUTHORITY FROM BOTH SIDES.  I NEED TO EDUCATE MYSELF A
14    LITTLE BETTER ON THIS PARTICULAR AREA, AND I INVITE COUNSEL, IN
15    SHORT ORDER, TO GET ME APPROPRIATE LEGAL AUTHORITY ON THE         09:12
16    EVIDENCE, THE ADMISSIBLE EVIDENCE, THE RELEVANT EVIDENCE GOING
17    TO THE SUBSTANTIAL SIMILARITY TEST, ABOVE AND BEYOND THE
18    COMPARATIVE ASPECTS.
19           MR. ZELLER:  THANK YOU, YOUR HONOR.
20           THE COURT:  DO YOU UNDERSTAND WHAT I'M LOOKING FOR,        09:13
21    MR. ZELLER?
22           MR. ZELLER:  I DO, YOUR HONOR.
23           THE COURT:  MS. AGUIAR, DO YOU UNDERSTAND WHAT I'M
24    LOOKING FOR?
25           MS. AGUIAR:  I DO.  AND I DO JUST WANT TO ADD THAT TO      09:13
```

```
1    THE EXTENT THEY'RE ARGUING THAT WE COPIED, WE NEED TO BE ABLE

2    TO SHOW WHY WE DIDN'T COPY.  IN OTHER WORDS, IT'S AN IDEA OF

3    INDEPENDENT CREATION AND INDEPENDENT CREATIVITY.

4         THE COURT:  RIGHT.  BUT THIS IS NOT -- YOU'RE

5    CORRECT, THIS IS NOT A COPYING CASE LIKE THE ONE THAT I USED,      09:13

6    AND, PERHAPS, WAS A POOR ANALOGY TO USE.  I WAS TRYING TO GET

7    TO THE XEROX MACHINE AS OPPOSED TO THE PHOTOCOPY MACHINE.  I

8    DON'T WANT TO TRADEMARK THE PHOTOCOPY MACHINE.

9         (LAUGHTER.)

10        THE COURT:  BUT IT'S NOT A VIRTUAL IDENTITY STANDARD.      09:13

11   IF THIS WAS A VIRTUAL IDENTITY CASE, THEN YOU'D BE ABSOLUTELY

12   CORRECT.  IT'S A SUBSTANTIAL SIMILARITY CASE, ALTHOUGH I DON'T

13   KNOW HOW MUCH THAT CHANGES THE CALCULUS.  I REALLY WOULD

14   WELCOME -- YOU BOTH MAKE VERY STRONG ARGUMENTS.  I REALLY --

15   BUT THEY'RE BOTH, QUITE FRANKLY, NOW BEING DIVORCED FROM ANY --    09:13

16   AND I HAVE TO BELIEVE THAT THIS IS NOT THE FIRST COURT TO HAVE

17   TO GRAPPLE WITH THIS PARTICULAR ISSUE.

18        MS. AGUIAR:  I APPRECIATE THAT, YOUR HONOR.  AND WHEN

19   YOU COMMENTED BEFORE THAT MAYBE WHEN YOU STARTED THIS CASE, YOU

20   WERE THINKING, 'YOU KNOW, A BIG EYE IS A BIG EYE, OR BIG LIPS      09:14

21   ARE BIG LIPS,' AND NOW YOU'VE SEEN DOLLS, AND YOU'VE SEEN SOME

22   THAT HAVE BIG EYES AND BIG LIPS AND THEY'RE REALLY KIND OF

23   FREAKY LOOKING AND THEY'RE NOT SUCCESSFUL AND THEY'RE A LITTLE

24   SCARY.

25        THE COURT:  RIGHT.                                            09:14
```

1    **MS. AGUIAR:**  AND IT WOULD NOT APPEAL TO A

2  NINE-YEAR-OLD GIRL IN GREEN BAY, WISCONSIN.

3         SO IN ORDER FOR THE JURY TO UNDERSTAND THAT --

4    **THE COURT:**  I THINK THE JURY -- I THINK EVERYONE IN

5  THIS COURTROOM HAS FIGURED THAT OUT.                          09:14

6    **MS. AGUIAR:**  THEY NEED TO HEAR TESTIMONY.  WE NEED TO

7  BE ABLE TO PUT ON OUR CASE AND EXPLAIN WHY, WHEN YOU'RE

8  MARKETING TO A NINE-YEAR-OLD GIRL, IT DOES MATTER, AND THERE

9  ARE STANDARDS AND IDEAS IN THE INDUSTRY IN TERMS OF WHY THAT

10 EYE, SPECIFICALLY THIS PARTICULARIZED EYE ON THE DOLL, IS NOT  09:14

11 THAT PARTICULARIZED EYE FROM THE DRAWING.

12    **THE COURT:**  WELL, THAT PART YOU'RE FREE TO MAKE.

13 THIS PARTICULARIZED EYE IS NOT THAT PARTICULARIZED EYE, OR IS

14 NOT SUBSTANTIALLY SIMILAR TO THAT PARTICULARIZED EYE.  THAT

15 ARGUMENT AND THAT EVIDENCE COMES IN.                          09:15

16    **MS. AGUIAR:**  I UNDERSTAND.  BUT THE THOUGHT PROCESS

17 FROM THESE PEOPLE AS TO WHY THAT IS AND HOW THEY WENT THROUGH

18 THEIR PROCESS OF DETERMINING THAT AND DECIDING THAT AND PUTTING

19 THAT DOLL TOGETHER, OBVIOUSLY THIS IS A HUGE PART OF OUR CASE,

20 AND WE HAVE A SIGNIFICANT APPORTIONMENT ARGUMENT; SO THE        09:15

21 DIFFERENT ASPECTS OF WHAT GOES INTO MAKING A THREE-DIMENSIONAL

22 DOLL, WE CAN'T FORGET THAT OTHER PART OF THE CASE.

23    **THE COURT:**  I UNDERSTAND.

24    **MS. AGUIAR:**  THIS IS SERIOUSLY AND FUNDAMENTALLY PART

25 OF OUR APPORTIONMENT ARGUMENT, WHICH I DON'T THINK ANYONE WOULD  09:15

1    SUGGEST WE'RE NOT ENTITLED TO PUT ON.

2           THE COURT:  AND THAT'S WHAT I WAS REFERRING TO

3    EARLIER.  WHEN I MENTIONED DAMAGES, I DIDN'T USE THE WORD

4    "APPORTIONMENT."  THAT'S PRECISELY WHAT I'M REFERRING TO.

5           MS. AGUIAR:  SO LET'S NOT FORGET THAT IT'S NOT JUST          09:15

6    REGARDING THE DIFFERENCES AND THAT INDEPENDENT CREATIVE PROCESS

7    THAT WENT INTO DEVELOPING THIS DOLL; IT'S ALSO THE

8    APPORTIONMENT ARGUMENT.

9           THE COURT:  I RAISED THAT QUITE EARLY.  THAT'S WHAT I

10   MEANT WHEN I REFERRED TO DAMAGES.                                  09:16

11          WHY DON'T YOU ADDRESS THAT POINT, MR. ZELLER, HOW --

12          MR. ZELLER:  THAT IS JUST NOT THE LAW.  IT IS NOT THE

13   LAW THAT YOU CAN BASICALLY TALK ABOUT THOSE SORT OF THINGS AS

14   APPORTIONMENT.  IN FACT, THAT'S EXACTLY THE REASON WHY WE'RE

15   CONCERNED ABOUT JURY CONFUSION.                                    09:16

16          APPORTIONMENT BASICALLY SAYS -- I MEAN, IT'S

17   STATUTORY LANGUAGE.  IT DOESN'T SAY YOU GET TO PARSE OUT

18   DESIGN.  IT SAYS, IF YOU HAVE A -- LET'S ASSUME IT'S A CD,

19   WHICH IS SOMEWHAT OF A SIMPLER, EASIER ANALOGY.

20          THE COURT:  I UNDERSTAND; THAT THE CD, SEVEN TRACKS         09:16

21   NOT COPYRIGHTED; ONE THAT IS; YOU APPORTION THE DAMAGE BASED

22   ON THE --

23          MR. ZELLER:  RIGHT; SO THE WORK IS INFRINGING OR IT'S

24   NOT.  BUT YOU DON'T GET TO PARSE OUT HOW INFRINGING IS THE

25   WORK.  THAT'S WHAT THEY'RE REALLY TRYING TO SUGGEST.  YOU DON'T    09:16

GET TO APPORTION YOUR DESIGN.  THAT'S EXACTLY WHY I'M VERY

CONCERNED ABOUT THIS WHOLE ARGUMENT ABOUT RELATIVE WORTH OF THE

DRAWINGS.  I MEAN, THEY'RE TRYING TO MAKE THIS KIND OF

PROCEDURAL ARGUMENT IN A WAY.  I DON'T MEAN LEGAL PROCEDURE,

BUT DOLL-MAKING PROCEDURE, WHICH IS, 'WELL, YOU KNOW, YOU COULD       09:17

HAVE DRAWINGS; YOU MIGHT NOT.  AND YOU MAKE A DOLL, AND IT

TAKES ALL THIS EFFORT AND LABOR AND 1,000 PEOPLE, OR WHATEVER

THE CASE MAY BE, TO COME UP WITH THE DOLL.'

     **THE COURT:**  AND WHAT YOU STATED THERE, YOU DON'T GET

APPORTIONMENT OF THE DESIGN.  I UNDERSTAND THAT.       09:17

     LET'S CONTINUE THIS CONVERSATION WITH THE BENEFIT OF

SOME LEGAL AUTHORITY.

     **MR. ZELLER:**  THANK YOU.

     **THE COURT:**  I DIDN'T HAVE TIME TO GET TO THE OTHER

MOTION.  I'LL TAKE THAT UP AT THE BEGINNING OF THE LUNCH HOUR.       09:17

     LET'S GET THE JURY IN HERE.  LET'S CONTINUE WITH

MR. LARIAN'S TESTIMONY, AND THEN WE'LL TAKE A BREAK.  THE COURT

HAS OTHER MATTERS TO ATTEND TO DURING THE BREAK.  I'LL TAKE UP

THE MOTION FOR SANCTIONS AT THE BEGINNING OF LUNCH.

     LET'S BRING THE JURY IN.       09:17

     WHEREUPON, JURORS ENTER COURTROOM.)

     **THE CLERK:**  CALLING ITEM NUMBER ONE ON CALENDAR, CASE

NUMBER CV04-09049-SGL, MATTEL, INC., V. MGA, INC., ET AL.

     COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

RECORD.       09:21

1          **MR. QUINN:**  JOHN QUINN, BILL PRICE, MIKE ZELLER FOR

2     MATTEL.

3          **MR. NOLAN:**  TOM NOLAN, LAUREN AGUIAR,

4     JONATHAN USLANER ON BEHALF OF MGA AND ISAAC LARIAN.

5          **THE COURT:**  GOOD MORNING, COUNSEL.                    09:22

6          MR. PRICE, YOU MAY PROCEED.

7               **DIRECT EXAMINATION** (CONTINUED)

8     **BY MR. PRICE:**

9     Q    MR. LARIAN, I'VE PROVIDED YOU WITH A SMALLER BINDER, SO

10    YOU CAN GET TO SOME DOCUMENTS FAIRLY EASILY.  I JUST NEED TO   09:22

11    GET SOME DOCUMENTS IDENTIFIED HERE.  IN THAT SMALL BINDER,

12    THERE'S AN EXHIBIT 655.

13         HAVE YOU FOUND IT?

14    A    YES.

15    Q    DO YOU RECOGNIZE THAT AS AN AUDITED CONSOLIDATED FINANCIAL  09:22

16    STATEMENT FOR MGA ENTERTAINMENT, INC., FOR THE YEARS ENDED

17    DECEMBER 31, 2002, AND 2001?

18    A    THAT'S WHAT IT SAYS, YES.

19         **MR. PRICE:**  MOVE EXHIBIT 655 INTO EVIDENCE.

20         **MR. NOLAN:**  NO OBJECTION.                             09:23

21         **THE COURT:**  IT'S ADMITTED.

22         YOU MAY PUBLISH.

23         (EXHIBIT 655 RECEIVED.)

24    **BY MR. PRICE:**

25    Q    WE'RE GOING TO GO THROUGH THESE QUICKLY.                  09:23

1          IF YOU'LL LOOK AT 656, DO YOU RECOGNIZE THAT AS

2    CONSOLIDATED FINANCIAL STATEMENTS FOR MGA ENTERTAINMENT, YEAR

3    ENDED DECEMBER 31, 2003, ALONG WITH THE REPORTED INDEPENDENT

4    AUDITORS?

5    A    YES.                                                        09:23

6          MR. PRICE:  MOVE EXHIBIT 656 INTO EVIDENCE,

7    YOUR HONOR.

8          MR. NOLAN:  NO OBJECTION.

9          THE COURT:  IT'S ADMITTED.

10          YOU MAY PUBLISH.                                          09:23

11          (EXHIBIT 656 RECEIVED.)

12   BY MR. PRICE:

13   Q    DO YOU RECOGNIZE EXHIBIT 657 AS MGA'S AUDITED CONSOLIDATED

14   FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2004, AND

15   2003?                                                            09:23

16   A    YES.  THAT'S WHAT IT SAYS.

17          MR. PRICE:  MOVE EXHIBIT 657 INTO EVIDENCE,

18   YOUR HONOR.

19          MR. NOLAN:  NO OBJECTION.

20          THE COURT:  IT'S ADMITTED.                                09:23

21          YOU MAY PUBLISH.

22          (EXHIBIT 657 RECEIVED.)

23   BY MR. PRICE:

24   Q    DO YOU RECOGNIZE EXHIBIT 658 AS MGA'S AUDITED CONSOLIDATED

25   FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2005, AND  09:23

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

1    2004?

2    A    YES.

3         MR. PRICE:  MOVE EXHIBIT 658 INTO EVIDENCE,

4    YOUR HONOR.

5         MR. NOLAN:  NO OBJECTION.                    09:24

6         THE COURT:  IT'S ADMITTED.

7         YOU MAY PUBLISH.

8         (EXHIBIT 658 RECEIVED.)

9    BY MR. PRICE:

10   Q    AND THEN IF YOU'LL LOOK AT 659.              09:24

11        DO YOU RECOGNIZE THAT AS MGA'S AUDITED CONSOLIDATED

12   FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2006, AND

13   2005?

14   A    YES.

15        MR. PRICE:  MOVE EXHIBIT 659 INTO EVIDENCE,   09:24

16   YOUR HONOR.

17        MR. NOLAN:  NO OBJECTION.

18        THE COURT:  IT'S ADMITTED.

19        YOU MAY PUBLISH.

20        (EXHIBIT 659 RECEIVED.)                       09:24

21   BY MR. PRICE:

22   Q    THEN IF YOU'LL LOOK AT 10188.

23        DO YOU RECOGNIZE THIS AS THE AUDITED CONSOLIDATED

24   FINANCIAL STATEMENTS FOR THE YEARS ENDED 1999 AND 2000?

25   A    YES.                                          09:24

1        **MR. PRICE:**  MOVE EXHIBIT 10188 INTO EVIDENCE,

2   YOUR HONOR.

3            **THE COURT:**  IT'S ADMITTED.

4            YOU MAY PUBLISH.

5            (EXHIBIT 10188 RECEIVED.)                          09:24

6   **BY MR. PRICE:**

7   Q    THEN IF YOU'LL LOOK AT EXHIBIT 10722.

8            DO YOU RECOGNIZE THIS AS MGA'S AUDITED CONSOLIDATED

9   FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2001, AND

10  2000?                                                        09:25

11  A    IT DOESN'T HAVE A LOT OF PAGES, BUT THAT'S WHAT IT SAYS ON

12  THE DOCUMENT, SO I'D SAY YES.

13           **MR. PRICE:**  MOVE EXHIBIT 10722 INTO EVIDENCE,

14  YOUR HONOR.

15           **MR. NOLAN:**  NO OBJECTION.                       09:25

16           **THE COURT:**  IT'S ADMITTED.

17           YOU MAY PUBLISH.

18           (EXHIBIT 10722 RECEIVED.)

19  **BY MR. PRICE:**

20  Q    MR. LARIAN, WHAT WE JUST WENT THROUGH, WE'VE DESCRIBED  09:25

21  THESE AS AUDITED FINANCIAL STATEMENTS.

22           FOR THESE STATEMENTS, IT'S TRUE THAT AN AUDITOR, A

23  THIRD PARTY, CAME IN AND AUDITED MGA'S FINANCIAL RECORDS;

24  CORRECT?

25  A    I'M NOT AN ACCOUNTANT, BUT I THINK THAT'S WHAT THEY DO.  09:25

1   Q    IN OTHER WORDS, THESE AREN'T JUST THE NUMBERS AS YOU

2   REPRESENTED THEM; THEY WERE THE NUMBERS AS AUDITED BY AN

3   OUTSIDE AUDITOR; CORRECT?

4   A    AGAIN, I'M NOT AN ACCOUNTANT, BUT MY UNDERSTANDING IS THAT

5   THAT'S WHAT THE AUDITORS DO.                                    09:25

6   Q    ONE THING THAT MGA DOES IN ITS BUSINESS IS TO GET

7   FINANCING TO FINANCE ITS OPERATIONS; CORRECT?

8   A    AT WHAT TIME?

9   Q    WELL, THROUGHOUT MGA'S HISTORY.

10  A    I BELIEVE AT CERTAIN TIMES, WE DIDN'T HAVE -- AGAIN, I     09:26

11  DON'T REMEMBER.  I DON'T -- I'M MORE OF A CREATIVE PERSON THAN

12  A FINANCE PERSON.  BUT MY RECOLLECTION IS, MOST OF THE TIME WE

13  HAVE, BUT AT CERTAIN TIMES, I DON'T THINK WE HAD FINANCING

14  NEEDS.

15  Q    WELL, IT'S TRUE THAT, SAY, FOR EXAMPLE, FOR THE LAST FEW   09:26

16  YEARS, AT CERTAIN TIMES, MGA HAS HAD TO BORROW MONEY, AS ALL

17  BUSINESSES DO, TO FINANCE OPERATIONS?

18  A    THAT'S CORRECT.

19  Q    AND ONE OF THE THINGS THAT THESE OUTSIDE FINANCING

20  COMPANIES, SOMETIMES BANKS, REQUIRE IS THAT MGA HAVE AUDITED    09:26

21  FINANCIAL RECORDS AS OPPOSED TO JUST THE NUMBERS AS MGA WOULD

22  REPRESENT THEM?

23  A    SOMETIMES THEY DO; SOMETIMES THEY DON'T.  AGAIN, I'M

24  NOT -- I CANNOT SAY FOR SURE THAT THEY ALL REQUIRE THIS.

25  Q    SO IF YOU CAN'T SAY ALL, THEN YOU CAN'T SAY THE SUM OF THE  09:27

1    FINANCIAL INSTITUTIONS HAVE REQUIRED THAT MGA PRESENT AUDITED

2    FINANCIAL STATEMENTS RATHER THAN JUST MGA'S OWN

3    REPRESENTATIONS?

4    A    TO THE BEST OF MY KNOWLEDGE, THAT'S CORRECT.

5    Q    AND IT'S YOUR UNDERSTANDING THAT WHAT THE AUDITORS DO IS          09:27

6    GIVE AN INDEPENDENT OPINION OF MGA'S FINANCIAL SITUATION?

7    A    I BELIEVE THAT'S WHAT THEY DO.

8    Q    I'D ALSO LIKE YOU TO LOOK AT EXHIBIT 10195.

9    A    YES.

10   Q    HAVE YOU FOUND THAT?                                             09:27

11   A    YES.

12   Q    AND AT SOME POINT, YOU WERE GOING TO MAKE AN OFFER TO

13   MR. TOM PARKS FOR THE POSITION OF CHIEF OPERATIONS OFFICER OF

14   MGA; CORRECT?

15   A    YES.                                                             09:28

16   Q    AND DID MR. PARKS BECOME THE CHIEF OPERATIONS OFFICER?

17   A    I BELIEVE HE DID, YES.

18   Q    SO HE ACCEPTED YOUR OFFER?

19   A    I BELIEVE HE DID.

20   Q    AND DO YOU RECOGNIZE EXHIBIT 10195 AS A LETTER THAT WAS          09:28

21   DRAFTED WITH RESPECT TO THE OFFER TO MR. PARKS?

22   A    IT'S JUST A LETTER.  I DON'T RECALL THIS DOCUMENT.  I SEE

23   IT THE WAY YOU SEE IT.  I DON'T RECALL THIS DOCUMENT, NOR IS IT

24   ON MGA'S LETTERHEAD, SO...

25   Q    YOU SEE IT CAME FROM MGA'S PRODUCTION; YOU SEE IT HAS            09:28

```
 1    MGA'S BATES NUMBER ON IT?

 2    A    YES, I DO.

 3    Q    AND IT HAS YOUR NAME AT THE END OF IT?

 4    A    MY NAME IS TYPED IN THERE, YES.

 5         MR. PRICE:  YOUR HONOR, MOVE EXHIBIT 10195 INTO          09:28

 6    EVIDENCE.

 7         MR. NOLAN:  OBJECTION.  LACK OF FOUNDATION.

 8         THE COURT:  MOVE ALONG, COUNSEL.  COME BACK TO IT.

 9         DO YOU HAVE QUESTIONS ON THIS PARTICULAR DOCUMENT?

10         MR. PRICE:  I DO HAVE QUESTIONS ON THIS DOCUMENT.          09:29

11    THERE'S ONE OTHER DOCUMENT I NEED TO GET IN, BUT I CAN COME

12    BACK TO IT AFTER THAT.

13         THE COURT:  GO TO THAT, PLEASE.

14    BY MR. PRICE:

15    Q    FINALLY, MR. LARIAN, AT SOME IN THIS LITIGATION, YOU WERE   09:29

16    REQUESTED TO PROVIDE DOCUMENTS WHICH REFLECTED YOUR NET WORTH.

17         DO YOU RECALL THAT?

18    A    PRECISELY, NO.  BUT I TURNED EVERYTHING OVER TO MY

19    ATTORNEYS TO PROVIDE.

20    Q    THERE'S A WOMAN WHO WORKS AT MGA CALLED LISA TONNU?         09:29

21    A    YES.

22    Q    THERE CAME A TIME WHEN YOU ASKED MS. TONNU, OR SOMEONE

23    ELSE WITHIN MGA, TO PUT TOGETHER CERTAIN FINANCIAL INFORMATION

24    FOR YOU IN CONNECTION WITH THIS CASE; CORRECT?

25    A    I BELIEVE SO, YES.                                         09:29
```

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

1   Q    AND IF YOU WOULD LOOK AT EXHIBIT 4947.  IT SHOULD HAVE, I

2   BELIEVE, FOUR PAGES.

3   A    I SEE ONLY THREE PAGES.

4   Q    IT'S FRONT AND BACK.

5   A    THAT'S CORRECT.  I'M SORRY.                                    09:30

6   Q    IT'S YOUR UNDERSTANDING THAT EXHIBIT 4947 IS ONE OF THE

7   DOCUMENTS THAT WAS PUT TOGETHER BY MS. TONNU AS A RESULT OF

8   YOUR REQUEST; CORRECT?

9   A    I DON'T KNOW, BUT I HAVE NO REASON TO DOUBT IT.

10  Q    AND YOU RECALL THIS WAS PROVIDED TO MATTEL SOMETIME IN        09:30

11  JANUARY OF 2008?

12  A    I DON'T KNOW WHEN IT WAS OR IF IT WAS.  I DON'T KNOW.

13          MR. PRICE:  MOVE EXHIBIT 4947 INTO EVIDENCE.

14          MR. NOLAN:  NO OBJECTION.

15          THE COURT:  IT'S ADMITTED, AS IS 10195.                    09:31

16          YOU MAY PUBLISH BOTH.

17          (EXHIBITS 4947 AND 10195 RECEIVED.)

18  BY MR. PRICE:

19  Q    LET'S GO BACK TO 10195.

20          THE DATE OF THIS DOCUMENT IS OCTOBER 2003; CORRECT?        09:31

21  A    YES.

22          EXHIBIT WHAT?

23  Q    10195.

24  A    THAT'S CORRECT, OCTOBER 26, 2003.

25  Q    AND ONE OF THE METHODS OF COMPENSATION YOU WERE GOING TO      09:31

1    USE WITH MR. PARKS WAS TO GIVE HIM STOCK OPTIONS; CORRECT?

2    A    THAT'S CORRECT.

3    Q    AND IN CONNECTION --

4    A    THAT'S WHAT THE DOCUMENT SAYS.

5    Q    AND IN CONNECTION WITH THE STOCK OPTIONS, THERE WAS A            09:31

6    VALUE PUT ON THE COMPANY, OF MGA, OF APPROXIMATELY $1.95

7    BILLION; CORRECT?

8    A    THAT'S WHAT THE DOCUMENT SAYS, YES.

9    Q    IF WE COULD TURN YOUR ATTENTION TO THE OTHER DOCUMENT THAT

10   WE JUST DISCUSSED BRIEFLY, 4947.                                     09:32

11        YOU RECOGNIZE THIS PREPARED BY MGA WHICH HAS YOUR NET

12   WORTH ON 2006 AND 2007?  DO YOU SEE THAT?

13   A    WHERE DO YOU SEE THAT?  MARCH, 2006.

14   Q    THAT'S THE FIRST FEW PAGES.

15   A    MY CONFUSION WAS THAT YOU SAID 2007.                            09:32

16   Q    I'M GOING TO ASK YOU TO LOOK AT THE LAST PAGE.

17   A    YES.  IT SAYS 2006.

18   Q    SEE THE LAST PAGE, WHICH IS THE FOURTH PAGE.  THIS WAS

19   YOUR LIST OF ASSETS AS OF -- IF WE CAN LOOK AT THE BOTTOM DATE

20   THERE -- IT'S DATED OCTOBER 25, 2007.                               09:33

21   A    I SEE THAT, YES.

22   Q    AND AMONG THE ASSETS LISTED ARE -- THERE'S A SECTION HERE

23   CALLED MARKETABLE SECURITIES FOR LARIAN LIVING TRUST AND

24   QUALIFIED ANNUITY TRUST.

25        THESE WERE ASSETS AS OF OCTOBER 25, 2007; CORRECT?             09:33

1   A    I AM NOT ONE HUNDRED PERCENT SURE, BUT I THINK SO, AGAIN.

2   Q    AND THESE TOTAL SOMEWHERE OVER $200 MILLION, JUST THE

3   MARKETABLE SECURITIES; CORRECT?

4   A    CORRECT.

5   Q    BY "MARKETABLE," WHAT YOU'RE SAYING IS, IF YOU WANTED TO     09:33

6   CASH OUT -- THIS WAS AT THE TIME, THE AMOUNT YOU COULD HAVE

7   RECEIVED FOR THESE SECURITIES?

8   A    I BELIEVE SO, YES.

9   Q    AND THEN WE HAVE HERE MGA ENTERTAINMENT.  WE HAVE A FIGURE

10  OF $1,636,380,000 AS PRORATED SHARE OF INVESTMENT.               09:34

11       DO YOU SEE THAT?

12  A    I DO.

13  Q    AND BY "PRORATED SHARE," YOU OWN -- YOUR OWNERSHIP OF MGA

14  ENTERTAINMENT IS 81.82 PERCENT; CORRECT?

15  A    THAT'S CORRECT.                                             09:34

16  Q    AND THEN WE HAVE TOTAL ASSETS HERE OF OVER $1.9 BILLION.

17       DO YOU SEE THAT?

18  A    YES.

19  Q    FROM THAT, YOU SUBTRACT LIABILITIES, SO THAT WE END UP

20  WITH NET ASSETS IN EXCESS OF $1.9 BILLION AS OF OCTOBER 25,      09:34

21  2007; CORRECT?

22  A    THAT'S WHAT THAT DOCUMENT SAYS.  I DON'T AGREE WITH THE

23  NUMBERS, BUT THAT'S WHAT THE DOCUMENT SAYS.

24  Q    THESE ARE THE NUMBERS THAT WERE PROVIDED TO MATTEL BY MGA

25  IN RESPONSE TO A REQUEST FOR ANY DOCUMENTS PERTAINING TO YOUR    09:34

```
 1   NET WORTH; CORRECT?

 2   A    AGAIN, TO THE BEST OF MY KNOWLEDGE, YES.

 3   Q    AND THIS IS THE ONLY CALCULATION PROVIDED TO MATTEL PRIOR

 4   TO THE START OF THIS TRIAL; CORRECT?

 5   A    I DO NOT KNOW THAT.                                        09:35

 6   Q    BY THE WAY, I WAS PREVIOUSLY ASKING ABOUT AUDITED

 7   FINANCIAL RECORDS, AND I THINK THE LAST YEAR WE HAD WAS

 8   EXHIBIT 659, WHICH WAS THE YEAR 2006.

 9        THAT IS THE LAST INDEPENDENTLY-AUDITED FINANCIAL

10   RECORD THAT MGA HAS; IS THAT CORRECT?                          09:35

11   A    I WOULD NOT KNOW IF THAT'S CORRECT OR NOT.  AGAIN, I DO

12   MOST OF THE CREATIVE WORK, AND WE HAVE AN ACCOUNTING

13   DEPARTMENT, SO I DON'T KNOW IF WE HAVE AN AUDITED FINANCIAL

14   STATEMENT AFTER THIS OR NOT.  I DO NOT KNOW.

15   Q    THANK YOU, MR. LARIAN.                                    09:36

16        MR. PRICE:  NO FURTHER QUESTIONS, YOUR HONOR.

17        THE COURT:  CROSS-EXAMINATION?

18                   CROSS-EXAMINATION

19   BY MR. NOLAN:

20   Q    GOOD MORNING, MR. LARIAN.                                 09:36

21        I WANT TO GO BACK TO WHAT MR. PRICE JUST SHOWED YOU.

22   THAT WAS EXHIBIT 4947, A LIST OF YOUR PERSONAL ASSETS.

23        DO YOU HAVE THAT?

24   A    GO AHEAD.

25   Q    DO YOU HAVE THAT IN FRONT OF YOU?                         09:37
```

```
 1    A    I DO.

 2    Q    4947 WAS PRODUCED AS PART OF THIS LITIGATION; CORRECT?

 3    A    I DON'T KNOW IF IT WAS OR NOT.

 4    Q    DID YOU PERSONALLY PREPARE THIS LIST OF ASSETS?

 5    A    I DID NOT.                                              09:37

 6    Q    I WANT TO DRAW YOUR ATTENTION, IF I MIGHT, TO THE LINE

 7   ITEM ON THIS REFERRING TO THE VALUE OF MGA.

 8         DO YOU SEE THAT?

 9    A    I DO SEE IT ON MY PAPER.

10    Q    WE'LL HIGHLIGHT THAT.                                   09:38

11         NOW, FIRST OF ALL, IT REFERS TO MGA ENTERTAINMENT AS

12   AN S-CORP.

13         DO YOU SEE THAT?

14    A    YES, I DO.

15    Q    AND THEN THE VALUE THAT'S ATTACHED IS $1.2 BILLION;     09:38

16   CORRECT?

17    A    YES.

18    Q    TOTAL ASSETS OF ABOUT $1,347,000,000.

19         DO YOU SEE THAT?

20    A     I DO.                                                  09:39

21    Q    SO THE GREATEST PERCENTAGE OF YOUR NET WORTH IS TIED TO

22   THE VALUE OF MGA; CORRECT?

23    A    CORRECT.

24    Q    NOW, DO YOU NOW HAVE KNOWLEDGE -- WELL, FIRST OF ALL, IS

25   THAT WHAT YOUR VALUE OF MGA WAS AS OF 2007?                   09:39
```

1    A    I WOULD NOT KNOW.

2    Q    HAVE YOU HAD CONVERSATIONS WITH LISA TONNU ABOUT WHAT

3    INFORMATION WAS USED TO PREPARE THIS CALCULATION?

4    A    YES.

5    Q    AND DO YOU KNOW NOW WHAT THE $1.2 BILLIONS VALUE OF MGA          09:39

6    WAS BASED ON, WHAT YEAR?

7              MR. PRICE:  OBJECTION.  THAT'S HEARSAY.

8              THE COURT:  LAY A FOUNDATION, COUNSEL.

9    BY MR. NOLAN:

10   Q    I'LL GO BACK IN TIME.                                           09:39

11             IS IT TRUE, MR. LARIAN -- LET'S APPROACH IT THIS WAY:

12   THE FINANCIAL PERFORMANCE OF THE BRATZ LINE --

13   A    YES.

14   Q    -- AT THE END OF 2007, WAS IT YOUR UNDERSTANDING THAT THE

15   BRATZ LINE WAS PERFORMING, THAT IS SELLING, AS PROFITABLY AS IT      09:40

16   HAD IN THE YEAR 2005?

17   A    IT WAS NOT.

18   Q    AND CAN YOU EXPLAIN THE DIFFERENCE BETWEEN THE PERFORMANCE

19   OF BRATZ IN 2005 AND 2007.

20   A    TO THE BEST OF MY KNOWLEDGE, THE BRATZ LINE DROPPED ABOUT       09:40

21   30 TO 40 PERCENT IN 2007, DUE TO SEVERAL FACTORS.

22   Q    WHAT WERE THOSE FACTORS?

23             MR. PRICE:  OBJECTION.  SPECULATION; LACK OF

24   FOUNDATION.

25             THE COURT:  SUSTAINED.                                     09:40

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

1           LAY A FURTHER FOUNDATION, COUNSEL.

2    **BY MR. NOLAN:**

3    Q    AS THE CEO AND THE LARGEST MAJOR SHAREHOLDER OF AN

4    S CORPORATION KNOWN AS MGA, DO YOU HAVE INFORMATION WITH

5    RESPECT TO THE FINANCIAL PERFORMANCE AT VARIOUS TIMES?                09:41

6    A    I DO.

7    Q    AND DO YOU RECEIVE REGULAR REPORTS WITH RESPECT TO

8    REVENUES BY MGA, AND IN PARTICULAR, THE BRATZ LINE?

9    A    I DO.

10   Q    AND YOU REVIEW THAT INFORMATION?                                 09:41

11   A    SOMETIMES I DO.

12   Q    AND DO YOU MAKE ANY ATTEMPT TO DETERMINE WHETHER OR NOT

13   THE BRATZ LINE IS SELLING AT A CERTAIN LEVEL OR DECLINING OR

14   INCREASING?

15   A    I DO THAT REGULARLY.                                             09:41

16   Q    SO BASED ON YOUR REVIEW OF AVAILABLE FINANCIAL REPORTS, DO

17   YOU ALSO TRY TO ANALYZE WHAT IS CONTRIBUTING EITHER TO THE

18   SUCCESS OF THE LINE OR TO THE DECLINING NATURE OF THE LINE?

19   A    I DO ON A REGULAR BASIS.

20   Q    AND CAN YOU EXPLAIN TO THE JURY WHAT YOU DO IN THAT              09:42

21   REGARD.  WHAT DO YOU DO TO TRY TO FIGURE OUT WHAT'S AFFECTING

22   YOUR BUSINESS?

23   A    I LOOK AT COMPETITION, WHAT COMES IN THE MARKET.  I LOOK

24   AT WHAT WE CALL POS, RATE OF SALES AT RETAIL.  I LOOK AT THOSE

25   REGULARLY, AND THEN COMPARE IT TO THE YEAR BEFORE.  I LOOK AT         09:42

```
 1   WHAT OTHER COMPETITORS ARE DOING WITH THE PRODUCT.  THOSE ARE
 2   SOME OF THE THINGS I DO.  I LOOK AT OUR PRODUCT LINE VERSUS
 3   WHAT WE HAVE DONE IN THE PAST, HOW SUCCESSFUL THEY WERE OR NOT.
 4   Q   NOW, BASED ON THE INFORMATION THAT YOU WERE RECEIVING
 5   REGARDING THE PERFORMANCE OF MGA AND BRATZ, AND YOUR REVIEW OF      09:42
 6   COMPETITIVE AND INDUSTRY DATA, WERE YOU ABLE TO DETERMINE WHAT
 7   FACTORS WERE LEADING TO A DECLINE IN OVERALL SALES FOR BRATZ?
 8   A   YES, I WAS.
 9   Q   AND WHAT WERE THE FACTORS THAT YOU BELIEVED WERE LEADING
10   TO THE DECLINE OF THE BRATZ SALES?                                 09:43
11          MR. PRICE:  OBJECTION.  LACK OF FOUNDATION.  BEST
12   EVIDENCE AS TO WHAT THOSE NUMBERS ARE.  AND IT'S IRRELEVANT.
13          THE COURT:  IT'S HARD TO RULE WITHOUT KNOWING THE
14   FACTORS.
15          LET'S TALK AT SIDE-BAR.                                     09:43
16          (WHEREUPON, THE FOLLOWING PROCEEDINGS
17          WERE HELD AT SIDE-BAR:)
18          THE COURT:  CAN YOU PROFFER WHAT THE FACTORS ARE HE'S
19   GOING TO GET INTO?  IT'S HARD FOR ME TO RULE WITHOUT KNOWING
20   WHAT THE FACTORS ARE.                                              09:44
21          MR. NOLAN:  SURE.
22          THE FOUNDATION HE'S LAID ABOUT LOOKING AT COMPETITIVE
23   INDUSTRY STANDARDS, WHAT'S GOING ON, HE TALKED ABOUT THE
24   DECLINING MARKET SHARE FOR BRATZ IS AFFECTED BY, FOR INSTANCE,
25   NEW PRODUCTS COMING TO THE LINE, HANNAH MONTANA, HIGH SCHOOL       09:44
```

```
 1   MUSICAL, A CHANGING GENRE OF WHAT GIRLS ARE LOOKING AT AND
 2   PLAYING WITH; THE DECLINE OF THE TOY INDUSTRY IN GENERAL SINCE
 3   1998, WHICH I DON'T THINK CAN BE DISPUTED BY MATTEL.  IF IT IS,
 4   MAYBE I SHOULD PUT ON MR. ECKERT BECAUSE HE MAKES REGULAR
 5   STATEMENTS WITH RESPECT TO THE DECLINE OF THE SALE OF FASHION     09:44
 6   DOLLS, AGE COMPRESSION OF THE TARGET MARKET; THAT'S A PHENOMENA
 7   THAT CONTINUES TO GO ON.  THE INCREASING POPULARITY OF VIDEO
 8   GAMES, JUST THE SWITCHING OF THE GIRLS, AND EVEN BOYS, AWAY
 9   FROM STATIC DOLLS LIKE THIS TO MORE OF VIDEO INTERACTIVE GAMES.
10           THIS IS WHAT HE DID AS A CEO, ANALYZING TRENDS ON        09:45
11   WHAT'S GOING ON IN THE INDUSTRY.
12           THE COURT:  MR. PRICE?
13           MR. PRICE:  I THINK THERE'S AN ADEQUATE FOUNDATION
14   FOR IT.  IN FACT, I THOUGHT HE SAID HE DIDN'T PAY ATTENTION;
15   THAT HE WAS CREATIVE.  AND SECOND, THIS IS JUST IMPROPER LAY      09:45
16   OPINION ABOUT WHAT --
17           THE COURT:  HE'S A CEO.  BOB ECKERT STOOD UP THERE
18   AND TALKED ABOUT THE TOY -- WHO BETTER TO KNOW WHAT'S GOING ON
19   IN THE TOY INDUSTRY THAN A CEO OF A TOY COMPANY.
20           MR. PRICE:  ONE WOULD THINK.  EXCEPT FOR WHAT HE SAID     09:45
21   WHEN I WAS EXAMINING HIM, WHICH IS HE DOES NOT PAY ATTENTION TO
22   THESE THINGS; HE'S CREATIVE; SO I THINK SOME CEOS ARE INVOLVED,
23   SOME ARE NOT.
24           THE COURT:  THAT GOES MORE TO THE WEIGHT OF THE
25   EVIDENCE.  I'M MORE CONCERNED ABOUT THE RELEVANCE OF ALL OF       09:46
```

```
 1   THIS.   THE BOTTOM LINE IS CERTAINLY SIGNIFICANT, I SUPPOSE.

 2   THE VALUE OF MGA AND THE PROJECTED VALUE OF MGA IS RELEVANT.

 3           MY INCLINATION IS TO OVERRULE THE OBJECTION.  IT'S

 4   IMPEACHABLE; YOU HAVE OTHER EVIDENCE TO BRING IN IN TERMS OF

 5   THE VALUE.                                                        09:46

 6           MR. PRICE:  ON RELEVANCE, YOUR HONOR, THE JURY CANNOT

 7   MAKE ANY CONCLUSIONS ON THIS AS TO WHETHER THEY ARE GOING TO

 8   CONTINUE USING -- OR WHETHER THEY ARE TO GET BETTER.

 9           THE COURT:  YOU'RE RIGHT.

10           MR. PRICE:  THEY HAVE EXPERTS COME IN AND TESTIFY         09:46

11   ABOUT THAT, ABOUT FUTURE VALUE, AND IF THE EXPERT DOESN'T

12   CONNECT THIS UP, THEN THIS REALLY HAS NO RELEVANCE TO THE JURY.

13   IT'S JUST GENERAL OPINIONS.

14           THE COURT:  IT DOESN'T, AND AT THAT POINT IN TIME, I

15   WILL -- LET'S DO THIS VERY BRIEFLY.  THIS SHOULD NOT BE A        09:46

16   LONG -- I'M GOING TO OVERRULE THE OBJECTION.

17           (SIDE-BAR PROCEEDINGS CONCLUDED.)

18   BY MR. NOLAN:

19   Q   MR. LARIAN, GOING BACK TO MY QUESTION, COULD YOU EXPLAIN

20   TO THE JURY, BASED ON YOUR REVIEW, SOME OF THE FACTORS THAT      09:47

21   WERE CAUSING A DECLINE IN, AND ARE CAUSING A DECLINE IN, THE

22   BUSINESS OF BRATZ.

23   A   THERE WERE SEVERAL FACTORS, ESPECIALLY LAST YEAR.  A

24   PRODUCT CALLED "HANNAH MONTANA" CAME TO THE MARKET AS A FASHION

25   DOLL.  IT WAS VERY SUCCESSFUL.  IT TOOK BUSINESS AWAY FROM US.   09:48
```

1          ANOTHER PROPERTY, ANOTHER DOLL, CAME CALLED "HIGH

2    SCHOOL MUSICAL."  THAT WAS VERY SUCCESSFUL.  IT TOOK BUSINESS

3    AWAY.

4          ANOTHER PRODUCT THAT BECAME IN THE TOY MARKET FOR THE

5    SAME AGE GROUP THAT HAS BEEN VERY, VERY SUCCESSFUL IS CALLED          09:48

6    "WEBKINZ."  THAT HAS TAKEN THOSE DOLLARS AWAY FROM BRATZ

7    FASHION DOLLS.  KIDS ARE NOW COLLECTING WEBKINZ, WHICH IS A

8    PIECE OF PLUSH THAT YOU PLAY AT HOME, BUT YOU ALSO COLLECT

9    THEM.  BUT YOU CAN ALSO GO ON THE COMPUTER.

10          ANOTHER PROPERTY THAT BECAME VERY SUCCESSFUL FOR THAT          09:48

11   AGE GROUP IS CALLED "LITTLEST PET SHOP."  THAT'S BY A COMPANY

12   CALLED HASBRO.  IT'S BEEN VERY SUCCESSFUL.  KIDS IN GENERAL ARE

13   BUYING LESS FASHION DOLLS, WHETHER IT'S BRATZ OR BARBIE.  I

14   THINK BARBIE SALES HAVE DECLINED ALSO.  BECAUSE THE MONEY THAT

15   THE KIDS HAVE BASICALLY IS GOING TO OTHER PRODUCTS.          09:49

16          THE OTHER THING THAT ATTRIBUTED TO THE DECLINE OF

17   BRATZ DOLL WAS THAT WE LOST FOCUS ON WHAT IS THE CORE ESSENCE

18   OF THE BRATZ DOLL.  THAT WAS DIFFERENT FASHIONS FOR EACH

19   CHARACTER.  WE LOST FOCUS OF THAT.

20   Q    MR. LARIAN, ADDRESSING THAT LAST POINT, YOU LOST FOCUS,          09:49

21   THIS LAWSUIT HAS BEEN GOING ON FOR HOW MANY YEARS?

22   A    AT LEAST FOUR YEARS.

23          **MR. PRICE:**  OBJECTION.  THE LAWSUIT IS IRRELEVANT.

24          **THE COURT:**  I THINK THE JURY IS WELL AWARE OF WHEN

25   THE LAWSUIT WAS FILED.          09:49

1        **MR. NOLAN:**  IN FACT, I BELIEVE THERE WAS A

2   STIPULATION TO THAT.

3        **THE COURT:**  I THINK THERE WAS A STIPULATION FOR THE

4   FILING OF THE LAWSUIT.

5        **MR. NOLAN:**  THANK YOU.                                  09:50

6        **THE WITNESS:**  MATTEL SUED CARTER BRYANT IN 2004 AND

7   SUED MGA IN 2007.  THEY SUED ME IN 2007 PERSONALLY, SEVERAL

8   YEARS.

9   **BY MR. NOLAN:**

10  Q    MR. LARIAN, DO YOU CONSIDER YOURSELF, OVER THE YEARS OF   09:50

11  THE BRATZ LINE, TO HAVE BEEN A CREATIVE FORCE IN PUSHING THE

12  BRAND?

13  A    I DO.

14  Q    DURING THE LAST FEW YEARS, HAVE YOU SPENT A CONSIDERABLE

15  AMOUNT OF TIME DEVOTED TO THIS LITIGATION?                    09:50

16       **MR. PRICE:**  OBJECTION.  RELEVANCE.

17       **THE COURT:**  SUSTAINED.

18  **BY MR. NOLAN:**

19  Q    HOW MANY EMPLOYEES DOES MGA HAVE?

20  A    I THINK WE HAVE --                                       09:50

21       **MR. PRICE:**  OBJECT TO THE RELEVANCE.

22       **THE COURT:**  SUSTAINED.

23  **BY MR. NOLAN:**

24  Q    HAS MGA BEEN FORCED TO LAY OFF EMPLOYEES AS A RESULT OF

25  THE DECLINE IN THE MARKET?                                    09:51

1    A    YES.

2            **MR. PRICE:**  OBJECTION.  THERE'S A MOTION *IN LIMINE* ON

3    THIS, I'M TOLD IN MY RIGHT EAR.

4            **THE COURT:**  SIDE-BAR, COUNSEL.

5            (WHEREUPON, THE FOLLOWING PROCEEDINGS

6            WERE HELD AT SIDE-BAR:)

7            **THE COURT:**  MR. ZELLER?

8            **MR. ZELLER:**  THERE WAS A MOTION *IN LIMINE*, YOUR

9    HONOR, WHERE WE DISCUSSED, BASICALLY, TO EXCLUDE EVIDENCE

10   ARGUMENT, COMMENTARY, ABOUT BASICALLY CONSEQUENCES OF THE          09:52

11   LAWSUIT, THE VERDICT, TO MGA.  THIS IS RIGHT IN THE HEART OF

12   IT.  THEY HAVE SOMEBODY SAY MATTEL {SIC} BASICALLY, THROUGH

13   LITIGATION, HAD THESE LAYOFFS, I THINK IS EXACTLY THE CONCERN

14   THAT WE WERE EXPRESSING THROUGH THIS MOTION.  AND OF COURSE

15   IT'S IRRELEVANT; IT'S 403; IT DOES NOT HAVE ANY BEARING ON ANY     09:52

16   ISSUE IN THIS CASE.

17           **THE COURT:**  THE ONLY ISSUE I CAN SEE IT BEARING ON IS

18   THIS WHOLE ECONOMIC DOWNTURN IN THE DOLL MARKET.  BUT THE

19   QUESTION IS, ARE WE ABLE TO FACTOR OUT THE OTHER FACTORS THAT

20   MIGHT INFLUENCE THAT?  AND DOES THE PROBATIVE VALUE OUTWEIGH       09:52

21   THE PREJUDICIAL EFFECT FOUND IN THE MOTION *IN LIMINE*?

22           **MR. NOLAN:**  TWO, AT LEAST, MAYBE THREE RESPONSES,

23   YOUR HONOR.

24           FIRST OF ALL, MR. PRICE QUESTIONED MR. LARIAN

25   SUGGESTING THAT BECAUSE 2007 AND 2008 ARE NOT AUDITED FINANCIAL    09:52

1    RESULTS; HE CALLED THEM -- I SUGGEST HE INFUSED INTO THIS CASE

2    A SUGGESTION THAT MAYBE THOSE NUMBERS ARE NOT ACCURATE.

3            IN VIEW OF THAT, I THINK WE SHOULD BE ABLE TO SAY

4    THAT IN RESPONSE TO THOSE MARKET CONDITIONS WE'VE IDENTIFIED,

5    MGA WAS FORCED TO LAYOFF EMPLOYEES; THAT'S NUMBER ONE.          09:53

6            NUMBER TWO, I DO THINK THAT IN ADDITION TO THIS

7    FINANCIAL ASPECT, IT GOES TO THE NOTION OF HOW MANY EMPLOYEES

8    WORLDWIDE CONTRIBUTE TO ALL OF THE ACTIVITIES THAT GO ON TO

9    MAKE THE BRAND, WHAT IT IS; SO I BELIEVE IT'S RELEVANT IN THAT

10   RESPECT TO SHOW THAT THIS IS NOT JUST ONE PERSON DOING THIS    09:53

11   JOB; SO I THINK TO HOLD US OFF FROM HOW MANY EMPLOYEES MGA HAS

12   JUST --

13           **THE COURT:**  YOU SAID THERE MAY BE A THIRD, BUT I'LL

14   GIVE YOU LEAVE TO MAKE THAT THIRD ARGUMENT.

15           THE SECOND ONE ACTUALLY TIES DIRECTLY INTO THE        09:53

16   ARGUMENT THAT MR. ZELLER WAS HAVING -- NOT ARGUMENT -- WITH

17   MS. AGUIAR HAVING WITH THE COURT CONCERNING THE -- THAT MAKES

18   THIS AN EASY DECISION TO SUSTAIN THE OBJECTION.  THAT'S

19   PRECISELY WHERE YOU CANNOT GO IN THIS CASE, AND WHERE YOU'RE

20   NOT GOING TO GO IN THIS PHASE, IS DESCRIBING ALL THESE PEOPLE  09:54

21   THAT ARE WORKING ON IT, LABORING SO HARD TO DO THIS WORK.  THIS

22   IS PRECISELY -- THAT IS THE PRECISE POINT MR. ZELLER WAS MAKING

23   THIS MORNING; SO THAT'S NOT COMING IN.

24           I CAN SEE SOME MARGINAL RELEVANCE ON YOUR FIRST

25   POINT, BUT I THINK THE PREJUDICIAL EFFECT OUTWEIGHS WHATEVER   09:54

1    PROBATIVE VALUE, BECAUSE LAYOFFS CAN HAPPEN FOR A VARIETY OF

2    REASONS.  AND WITHOUT HAVING A MINI TRIAL TO DETERMINE WHAT

3    FACTORS CAUSED THE LAYOFFS AND WHETHER OR NOT THEY ARE RELATED

4    TO THIS MARKET DOWNTURN OR RELATED TO OTHER FACTORS -- I SEE

5    THIS GOING NOWHERE.  I'M GOING TO SUSTAIN THE OBJECTION.          09:54

6            WE'RE GOING TO COME BACK TO THAT SECOND POINT,

7    BECAUSE THIS IS PRECISELY THE PROBLEM.  THE COURT HAS TO COME

8    UP WITH A WAY TO CLEARLY ARTICULATE THE DIVIDING LINE.  I'LL BE

9    LOOKING TO COUNSEL FOR ASSISTANCE ON THAT.

10           **MR. PRICE:**  THANK YOU.                                 09:55

11           (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)

12           **MR. PRICE:**  MOVE TO STRIKE THE ANSWER MR. LARIAN

13    GAVE.

14           **THE COURT:**  IT'S STRICKEN.

15           YOU MAY PROCEED.                                          09:55

16    **BY MR. NOLAN:**

17    Q    MR. PRICE ASKED YOU ON DIRECT EXAMINATION WHETHER OR NOT

18    AT VARIOUS TIMES, MGA HAS SOUGHT FINANCING ARRANGEMENTS WITH

19    BANKS.

20           DO YOU RECALL THAT LINE OF QUESTIONS?                     09:55

21    A    I DO.

22    Q    ARE YOU AWARE OF A FINANCING ORGANIZATION KNOWN AS

23    WACHOVIA SECURITIES?

24    A    I DO.

25    Q    COULD YOU IDENTIFY FOR THE JURY WHAT RELATIONSHIP MGA HAS   09:56

```
 1   WITH WACHOVIA SECURITIES.
 2   A    WACHOVIA -- I DON'T KNOW IF IT'S CALLED WACHOVIA
 3   SECURITIES OR WACHOVIA BANK, BUT THEY ARE -- THE BEST I CAN
 4   DESCRIBE IT, WE HAVE A SYNDICATED -- THEY'RE HEAD OF
 5   SYNDICATION OF A CREDIT LINE THAT THEY PROVIDED TO MGA.  AND SO    09:56
 6   BASICALLY, WHAT THEY DO IS, THEY GIVE YOU -- THEY SAY, 'WE'RE
 7   GOING TO GIVE YOU A $300, $400 MILLION LOAN TO RUN YOUR
 8   COMPANY,' BUT THEN THEY GO AHEAD AND GET OTHER BANKS AND THEY
 9   DIVIDE THAT LOAN BETWEEN THOSE BANKS, AND THEN THEY PROVIDE THE
10   FINANCING TO THE COMPANY.                                          09:57
11        I DON'T KNOW IF I DESCRIBED IT...
12   Q    AS PART OF THE LOAN ARRANGEMENTS WITH WACHOVIA SECURITIES,
13   ARE THERE CERTAIN CONDITIONS BY WHICH WACHOVIA IS ALLOWED TO
14   ACCELERATE ITS LOANS TO MGA?
15        MR. PRICE:  YOUR HONOR, OBJECTION.  SIDE-BAR ON THIS.        09:57
16   THIS CONCERNS PRODUCTIONS.
17        THE COURT:  VERY WELL.
18        (WHEREUPON, THE FOLLOWING PROCEEDINGS
19        WERE HELD AT SIDE-BAR:)
20        THE COURT:  WHERE ARE WE ON THIS?                            09:58
21        MR. NOLAN:  TO THE WACHOVIA LETTERS.
22        THE COURT:  I KNEW THIS WAS GOING TO BE A POINT OF
23   CONTENTION; THEY EVEN BROUGHT IN MR. COREY FOR THIS ONE.
24        MR. NOLAN:  AND I HAVE MR. ROTH, SO...
25        MR. COREY:  THE ISSUE HERE IS WE SOUGHT DISCOVERY.          09:58
```

```
 1   WE ASKED FOR INFORMATION REGARDING CREDIT AGREEMENT

 2   SPECIFICALLY WITH RESPECT TO THE 2006 CREDIT AGREEMENT AND THEY

 3   OBJECTED, THIS MOTION PRACTICE, AND WE LOST.

 4           SO NOW THEY WANT TO BRING IN THE AGREEMENT; BRING IN

 5   WHAT HAPPENED RECENTLY.  WE DON'T KNOW, AND ALL WE HAVE ARE       09:58

 6   THESE LETTERS, AND WE DON'T KNOW WHAT ELSE HAS HAPPENED.

 7           THE COURT:  I THOUGHT ALL THAT WAS ORDERED TURNED

 8   OVER.

 9           MR. ROTH:  WE TURNED OVER LETTERS AND THE LOAN

10   AGREEMENT.                                                       09:58

11           MR. COREY:  WE HAVE THE LOAN AGREEMENT.  WE GOT IT

12   TWO DAYS AGO.  IT WAS DESIGNATED THE HIGHEST TIER, AND THERE

13   ARE REFERENCES TO LETTERS TO AMENDMENT; THERE'S NO OTHER

14   CORRESPONDENCE THAT WE HAVE, OTHER THAN DEMAND LETTERS FROM

15   WACHOVIA; SO WE HAVE ABSOLUTELY NO IDEA WHAT REALLY IS THE       09:59

16   STATE OF PLAY WITH RESPECT TO THE DEMAND LETTERS.

17           THE COURT:  WHAT DO YOU WANT TO GET INTO HERE?

18           MR. NOLAN:  RECEIPT OF THE LETTERS.

19           THE COURT:  AND THE LETTERS SAY 'WE'RE CUTTING YOU

20   OFF.'                                                            09:59

21           MR. NOLAN:  YES.

22           MR. COREY:  THE LETTERS SAY WE WANT $300 MILLION

23   BACK.  AND THEY INVOKED THE LOCK BOX PROVISION.  ONE OF THE

24   REVENUES JUST FLOW THROUGH THE WACHOVIA; THEY DON'T GO TO MGA.

25           THE COURT:  LET ME HEAR YOUR ARGUMENT.                   09:59
```

```
 1           MR. NOLAN:  YOUR HONOR, WE'VE RAISED THIS.  WE
 2   PRODUCED THIS.  WE BROUGHT IT TO THE COURT'S ATTENTION TEN DAYS
 3   AGO.  WE PRODUCED THE DOCUMENTS TO THEM.  THEY HAVE THE
 4   LETTERS.  THEY HAVE THE LOAN AGREEMENTS.  WE SHOULD BE ENTITLED
 5   TO SHOW RIGHT NOW THE EFFECT THE RECEIPT OF THESE LETTERS FROM      09:59
 6   WACHOVIA THAT ENFORCE THE LOCK BOX AGREEMENT SUCH THAT ANYTHING
 7   HAVING TO DO WITH THE OPERATIONS OF MGA ARE NOW SUBJECT TO
 8   THESE CONDITIONS.  IT GOES TO THE IMMEDIATE VALUATION AND
 9   FINANCIAL CONDITION OF MGA AND ITS BEARING ON MR. LARIAN'S NET
10   WORTH.                                                             10:00
11           THE COURT:  PART OF THE CONCERN I HAVE FOR THIS IS
12   REPRESENTATIONS WERE MADE TO THE COURT THAT -- I ASSUME WE'RE
13   NOW -- YOU ASKED FOR CERTAIN THINGS REMAIN IN CHAMBERS; I
14   ASSUME THIS IS ALL NOW OUT IN THE OPEN?
15           MR. NOLAN:  YES.                                          10:00
16           THE COURT:  JUST WANTED TO MAKE SURE BEFORE I SAID
17   ANYTHING.
18           YOU HAD MADE AN INDICATION THAT ACCOUNTS HAD BEEN
19   FROZEN AND THERE'S BEEN AN ATTEMPT TO NEGOTIATE A RESOLUTION.
20           THIS IS SOMETHING WHICH IS AWKWARD, BECAUSE OBVIOUSLY     10:00
21   AT THIS POINT MR. LARIAN AND MGA HAS INCENTIVE NOT TO --
22   THERE'S A CONCERN HERE IN TERMS OF TRANSPARENCY.
23           I'M NOT SUGGESTING ANYBODY IS DOING ANYTHING WRONG.
24   BUT MATTEL IS IN A POSITION NOT TO KNOW WHAT IS GOING ON.  MGA
25   HAS EVERY INCENTIVE RIGHT NOW, AT LEAST FOR THE NEXT WEEK, TO     10:01
```

1  PORTRAY THEMSELVES IN THE WORST POSSIBLE LIGHT TO THIS JURY,

2  FINANCIALLY.  AND THE ONLY WAY TO ENSURE EVERYTHING IS ABOVE

3  BOARD IS TO HAVE COMPLETE DISCLOSURE OF ALL FINANCIAL RECORDS

4  RELATE TO WACHOVIA.

5          I ASSUME THAT'S WHAT YOU'RE --                          10:01

6          **MR. COREY:**  YES.  FOR EXAMPLE, THE CREDIT AGREEMENT

7  HAS A $200 MILLION CAP ON THE ACCELERATION AMOUNT.

8          **THE COURT:**  YOU DON'T HAVE A COPY OF THAT?

9          **MR. COREY:**  I DO BUT IT HAS A $200 MILLION CAP.

10  THERE ARE THREE HUNDRED MILLION DOLLARS OF INDEBTEDNESS.  WHERE    10:01

11  DOES THAT COME FROM?

12          THAT'S THE KIND OF ISSUE WE'RE DEALING WITH.

13          **THE COURT:**  I LET YOU, MGA, GET IN ANY INFORMATION

14  LEGITIMATELY THAT SHOWS A FINANCIAL PROBLEM.  BUT THERE NEEDS

15  TO BE A FULL DISCLOSURE AT THIS POINT; THAT'S THE CONCERN I       10:01

16  HAVE GOING FORWARD.

17          **MR. PRICE:**  IF I COULD SUGGEST.  MR. NOLAN SAID HE

18  WAS GOING TO CALL MR. LARIAN IN THE CASE.  AGAIN, WE NEED TO

19  GET ALL OF THE DOCUMENTS, THE CORRESPONDENCE THAT'S BEEN GOING

20  ON.  THERE WAS A REPRESENTATION THEY ARE TRYING TO WORK THIS      10:02

21  OUT.  WE KNOW NOTHING ABOUT THAT.  WE NEED TO KNOW.

22          **THE COURT:**  YOU'RE GOING TO BE RECALLING MR. LARIAN

23  IN YOUR CASE.

24          **MR. NOLAN:**  I DIDN'T KNOW IF I COULD, BECAUSE I TRIED

25  TO ALERT YOU TO THIS ISSUE.                                       10:02

```
 1            THE COURT:  I'LL PERMIT YOU TO DO THAT.

 2            LET'S PUT THIS ISSUE OFF UNTIL YOU CALL MR. LARIAN IN

 3   YOUR CASE.  AND THEN, IN THE MEANTIME, MR. ROTH AND MR. COREY

 4   CAN GET TOGETHER ON THIS AND PROVIDE EVERYTHING THAT'S NEEDED.

 5   BUT I AGREE WITH MR. COREY'S POINT, THEY NEED TO HAVE        10:02

 6   EVERYTHING.

 7            I'M NOT SUGGESTING ANYONE IS DOING ANYTHING WRONG.

 8   IT'S JUST THE PROCESS.  WE NEED TO HAVE -- EVERYBODY NEEDS TO

 9   HAVE ALL OF THE INFORMATION ABOUT THIS BEFORE WE GET INTO THIS

10   ANY FURTHER.                                                10:02

11            MR. NOLAN:  BACK TO ONE THING, YOUR HONOR.

12            THERE IS NO INCENTIVE ON OUR PART TO DELAY A

13   RESOLUTION OF THIS FOR TRANSPARENCY PURPOSES FOR THIS COURT OR

14   FOR THIS JURY.  AND I CAN'T STRESS THAT ENOUGH.  IT'S NOT IN

15   OUR BEST INTERESTS YOUR HONOR.  WE'RE TRYING TO SURVIVE.     10:03

16            AS THE COURT POINTED OUT YESTERDAY, THE COURT

17   APPOINTED MEDIATOR HAD A CHECK BOUNCE ON AN ACCOUNT THAT'S BEEN

18   LOCKED.  THAT'S NOT OUR DESIGN.

19            THE COURT:  I UNDERSTAND.  THAT'S WHY I BACKED AWAY

20   FROM THE COMMENTS.  I'M NOT SUGGESTING ANYTHING IS GOING ON.  10:03

21   IT'S JUST THAT, IF IT WAS THE OTHER WAY AROUND -- YOU JUST NEED

22   TO HAVE TRANSPARENCY HERE.  AND THE WAY TO DO THAT IS TO HAVE

23   ALL OF THE DOCUMENTS OUT ON THE TABLE AND HAVE EVERYONE SEE

24   WHAT'S GOING ON.  AND THEN I'LL LET YOU GET INTO IT.  IT'S A

25   LEGITIMATE AREA TO GET INTO.  MR. COREY'S POINT IS LEGITIMATE 10:03
```

1   AS WELL.  WE JUST NEED TO HAVE IT, SO THERE'S NO QUESTION.

2          **MR. NOLAN:**  JUST SO.

3          **THE COURT:**  AND SUBJECT TO APPROPRIATE PROTECTIVE

4   ORDERS, OF COURSE, BECAUSE THIS IS ALL --

5          **MR. NOLAN:**  JUST SO I CAN ROUND OFF THIS AND MOVE OFF     10:03

6   THE STAGE GRACEFULLY; I'D LIKE TO FINISH OFF WITH A SPIKE HERE.

7          **THE COURT:**  I'LL TAKE CARE OF IT.  I'LL TELL THE JURY

8   THERE ARE CERTAIN MATTERS -- THAT MR. LARIAN IS GOING TO BE

9   RECALLED AGAIN IN THE MGA CASE, AND THERE ARE CERTAIN MATTERS

10  THAT I'M RESERVING FOR THAT.  I'LL TAKE THE FALL FOR THAT.        10:04

11         **MR. NOLAN:**  I APPRECIATE THAT.

12         THEY MAY NOT BELIEVE IT TO BE HONEST WITH YOU, BUT

13  WHAT I WOULD LIKE TO DO IS MAYBE ASK THREE OR FOUR DIFFERENT

14  QUESTIONS, AND THEN SIT DOWN.

15         **THE COURT:**  ABSOLUTELY.  BUT I DON'T WANT THE JURY TO    10:04

16  BE -- BECAUSE YOU'VE ALREADY ASKED THAT QUESTION, I DON'T WANT

17  THEM TO THINK WE'RE SHUTTING YOU DOWN; WE'RE JUST PUTTING IT

18  OFF FOR ANOTHER TIME, AND THEN YOU GUYS CAN WORK OUT WHAT NEEDS

19  TO BE DONE.

20         (WHEREUPON, SIDE-BAR PROCEEDINGS WERE CONCLUDED.)          10:05

21         **THE COURT:**  MEMBERS OF THE JURY, THIS IS AN AREA THAT

22  MR. NOLAN IS GOING TO GET INTO WITH MR. LARIAN WHEN HE RECALLS

23  HIM IN HIS CASE-IN-CHIEF.  THE COURT HAS REQUESTED THE PARTIES

24  TO PUT OFF THIS PARTICULAR AREA UNTIL THAT TIME SO THAT CERTAIN

25  OTHER MATTERS CAN BE ADDRESSED.                                  10:05

1          **MR. NOLAN:**  THANK YOU, YOUR HONOR.

2          **THE COURT:**  MR. NOLAN, I UNDERSTAND YOU DO HAVE A FEW

3    OTHER QUESTIONS.

4          **MR. NOLAN:**  I DO.  THEN I'LL RESERVE THE RIGHT TO

5    CALL MR. LARIAN BACK IN OUR CASE-IN-CHIEF.                        10:05

6          THANK YOU FOR THAT.

7          **THE COURT:**  YES.

8    **BY MR. NOLAN:**

9    Q    MR. LARIAN, I WANT TO GO BACK TO A COUPLE OF OTHER MATTERS

10   THAT WERE TOUCHED UPON YESTERDAY WITH MR. PRICE.                 10:05

11         CAN YOU EXPLAIN TO THE JURY THE IDEA OF A BRATZ LIFE

12   BRAND.  WHEN THAT TERM IS USED BY MGA AND YOU, CAN YOU EXPLAIN

13   THE COMPONENTS OF THAT MGA BRATZ LINE, BRAND LINE.

14   A    BRATZ, WE LAUNCHED IT IN 2001 WITH FOUR DOLLS.  IT HAS

15   BECOME A MAJOR BRAND, FRANKLY THE ONLY BRAND THAT'S BEEN ABLE    10:06

16   TO COMPETE WITH THE MONOPOLY THAT BARBIE HAS HAD FOR 48 YEARS.

17         **MR. PRICE:**  MOVE TO STRIKE THE ANSWER AS

18   NONRESPONSIVE AT THIS POINT.  IT'S WITHOUT FOUNDATION.

19         **THE COURT:**  IT'S STRICKEN.  LET'S DO IT AGAIN.

20   **BY MR. NOLAN:**

21   Q    I WANT TO JUST FOCUS ON THE BRATZ LIFE BRAND AND THE

22   VARIOUS COMPONENTS OF IT, WITHOUT REFERENCE TO ANY OTHER

23   COMPETITIVE PRODUCTS.

24   A    I UNDERSTAND.

25         BRATZ, WE LAUNCHED IT IN 2001 WITH FOUR DOLLS, AND WE      10:06

1    EXPANDED IT WITH OTHER PRODUCTS AS YEARS WENT ON.  WE SPENT A

2    LOT OF MONEY IN MARKETING AND ADVERTISING.  WE GOT NEW

3    LICENSEES.  IT BECAME A LIFESTYLE BRAND, BASICALLY, IN THE

4    INDUSTRY.  AND IT BECAME A PHENOMENON SUCCESS FOR OVER SEVEN

5    YEARS ALL OVER THE WORLD.                                    10:07

6            SO NOW, FOR EXAMPLE, SOMEBODY WHO BOUGHT A DOLL

7    FIRST; LATER ON, THEY WENT AHEAD AND BOUGHT OTHER DOLLS.  THEY

8    BOUGHT ACCESSORIES.  THEY WENT AHEAD AND BOUGHT BEDDING, FOR

9    EXAMPLE, TO DECORATE THEIR ROOMS, LIKE BRATZ.  THEY HAD

10   BIRTHDAY PARTIES, BRATZ CAKES.  AND THEY WORE BRATZ SHOES,    10:07

11   LITTLE GIRLS.  I'M SURE YOU HAVE -- YOUR GRANDDAUGHTERS.  AND

12   IT BASICALLY BECAME A LIFESTYLE BRAND, INSTEAD OF JUST BEING

13   THE FOUR DOLLS THAT WERE ORIGINALLY LAUNCHED.

14   Q    DEVELOPING THE BRATZ LINE, DID IT REQUIRE YOU TO MAKE

15   FINANCIAL INVESTMENTS?                                       10:08

16   A    WE MADE MAJOR FINANCIAL INVESTMENTS OVER SEVEN YEARS, FROM

17   2001 UNTIL 2007, WHEN MATTEL FINALLY SUED US, SUED ME, TO MAKE

18   THIS BRAND WHAT IT IS NOW, BOTH IN FINANCIAL RISK AND MONEY,

19   BOTH IN PEOPLE --

20           **MR. PRICE:**  OBJECTION, YOUR HONOR.  AT THIS POINT,   10:08

21   IT'S NONRESPONSIVE.

22           **THE COURT:**  IT IS.

23           NEXT QUESTION, COUNSEL.

24   **BY MR. NOLAN:**

25   Q    WHAT TYPE OF INVESTMENTS HAVE YOU MADE, FOR INSTANCE, IN   10:08

```
 1   PRODUCT DEVELOPMENT?
 2   A    FIRST OF ALL, WE HIRED A LOT OF PEOPLE TO MAKE NEW
 3   PRODUCTS, NEW MARKETING, LICENSING.  WE CAME UP WITH -- ONE OF
 4   THE THINGS WE DID, WE CREATED A BRATZ TV SERIES.  THAT WAS ON
 5   FOX FOR A WHILE.  AND THAT COST A LOT OF MONEY TO DO IT.  WE          10:09
 6   CAME UP WITH THE BRATZ HOME MOVIES.  THAT WAS DISTRIBUTED BY
 7   FOX, AND NOW BY LIONS GATE.  WE MADE MAJOR, MAJOR INVESTMENTS,
 8   MILLIONS AND MILLIONS OF DOLLARS, IN TOOLING, IN TV COMMERCIAL
 9   PRODUCTION, IN ADVERTISING, IN PACKAGING, IN CREATING NEW SUB
10   BRANDS.                                                              10:09
11            THOSE ARE SOME OF THE THINGS WE HAVE DONE.
12            OPENING UP OFFICES IN OTHER COUNTRIES SO WE CAN
13   DISTRIBUTE IT.
14   Q    MR. PRICE WAS ASKING YOU ABOUT THE EARLY MEETINGS WITH
15   MR. BRYANT IN SEPTEMBER.  I JUST WANT TO TAKE YOU BACK TO THE        10:09
16   PITCH MEETING FOR A MINUTE.
17            PRIOR TO MEETING CARTER BRYANT, MGA WAS IN THE TOY
18   BUSINESS; YES?
19   A    WE WERE.
20   Q    AND PRIOR TO MEETING CARTER BRYANT, HAD MGA OR YOU             10:10
21   RECEIVED ANY ACCOMMODATIONS OR AWARDS FOR PRODUCTS THAT YOU HAD
22   MANUFACTURED?
23            MR. PRICE:  OBJECTION.  IT WAS AWHILE AGO THIS WAS
24   ASKED AND ANSWERED.  AND I THINK BOTH PHASES ARE --
25            THE COURT:  OVERRULED.                                     10:10
```

```
 1          YOU MAY ANSWER.

 2          THE WITNESS:  YES.  WE'VE RECEIVED MANY, MANY AWARDS

 3   FOR THE TOYS THAT WE CREATED.  FOR EXAMPLE, IN 1997, WE HAD A

 4   DOLL CALLED "SINGING BOUNCY BABY."  THAT WON FAMILY FUN TOY OF

 5   THE YEAR AWARD.  IT WAS A DOLL -- FAMILY FUN IS REFERRED TO IN      10:10

 6   THE TOY INDUSTRY AS THE OSCARS OF THE TOY BUSINESS.  SO THAT

 7   WAS VERY REWARDING.

 8          AND WE HAVE WON MANY, MANY OTHER AWARDS FOR PRODUCTS

 9   AND PACKAGING BEFORE BRATZ AND SINCE.

10   BY MR. NOLAN:

11   Q   MR. LARIAN, MR. PRICE WAS ASKING YOU DIRECT QUESTIONS

12   ABOUT CARTER BRYANT, AND WE WELL KNOW THAT CARTER BRYANT

13   ENTERED INTO A CONTRACT WITH MGA PURSUANT TO WHICH HE HAD A

14   ROYALTY RATE.

15          WHAT I WANT TO ASK YOU IS, SIR, WAS CARTER BRYANT THE      10:11

16   FIRST DESIGNER THAT MGA EVER MET WITH?

17   A   NO.  IN THE TOY INDUSTRY, ONE OF THE THINGS YOU DO IS, YOU

18   GET DESIGNS FROM OTHER DESIGNERS WHO BRING YOU IDEAS TO MAKE A

19   TOY.  IT'S NOT ONLY TO MGA.  IT'S TO MATTEL.  EVERYBODY.  AND

20   WE HAVE MANY OF THEM; MANY, MANY OF THEM.      10:12

21   Q   AND HAVE YOU ALWAYS, AFTER MEETING WITH THE DESIGNERS,

22   ENTERED INTO ROYALTY AGREEMENTS WITH THEM?

23   A   IF WE LIKE THE PRODUCT, WE HAVE.  IF WE LIKE THE IDEA THAT

24   THEY HAVE FOR THE PRODUCT, WE HAVE.  AND IF WE DIDN'T, WE DID

25   NOT.  NOT WITH ALL OF THEM, NO.      10:12
```

1    Q    CAN YOU TELL THE JURY WHAT THE RANGE OF THE ROYALTY RATE

2    WAS THAT YOU ENTERED INTO WITH VARIOUS DESIGNERS.

3              **MR. PRICE:**  OBJECTION.  RELEVANCE, YOUR HONOR.

4              ALSO OBJECT TO BEST EVIDENCE.

5              **THE COURT:**  COUNSEL, IT'S NOT CLEAR WHAT THE                    10:12

6    RELEVANCE IS.

7              IS THIS GOING TO SOME FINANCIAL CALCULATION?

8              **MR. NOLAN:**  YES, YOUR HONOR.  IF I COULD AT SIDE-BAR,

9    RATHER THAN DOING IT IN FRONT OF THE JURY.

10             **THE COURT:**  WE'LL TAKE IT UP AT THE NEXT SIDE-BAR.        10:12

11             **MR. NOLAN:**  OKAY.

12             CAN WE MAKE A RESERVATION?

13             I APOLOGIZE.

14             **THE COURT:**  MOVE ALONG.

15             **MR. NOLAN:**  I HAVEN'T HAD A CHANCE TO MAKE A JOKE IN        10:13

16   AWHILE, SO...

17             **THE COURT:**  FAIR ENOUGH.

18   **BY MR. NOLAN:**

19   Q    I WANT TO TAKE A MOMENT AND ASK YOU, WHAT SIZE DOLL IS

20   BRATZ?                                                                  10:13

21   A    IT'S ABOUT NINE AND A HALF -- IT GOES -- WE HAVE SOME AT

22   NINE AND A HALF INCHES.  IT GOES UP TO ABOUT TEN AND A HALF.

23   Q    AND WAS THERE A PARTICULAR SIGNIFICANCE, IN YOUR VIEW,

24   WITH RESPECT TO THE SIZE OF BRATZ, THE LENGTH OF BRATZ?

25   A    YES.  TRADITIONALLY, FASHION DOLLS HAVE BEEN KNOWN AS           10:13

```
 1   BARBIE, AND BARBIE IS ELEVEN AND A HALF INCHES TALL.  AND WHEN
 2   WE LAUNCHED BRATZ, WE WANTED TO MAKE SURE THAT IT HAD DIFFERENT
 3   PROPORTIONS THAN BARBIE, BECAUSE OTHERWISE, TRADITIONALLY,
 4   BARBIE WAS SUCH A BIG PORTION OF THE BUSINESS THAT THEY WOULD
 5   USE THE FASHIONS THAT WERE ON BARBIE TO PUT ON OTHER FASHION      10:14
 6   DOLLS.  AND WE WANTED TO HAVE SPECIAL FASHIONS THAT OUR DOLLS
 7   WORE.
 8             AND THE OTHER THING THAT WE DIDN'T WANT TO DO IS --
 9   WE WANTED BRATZ TO APPEAL TO GIRLS BETWEEN THE AGES OF 6 TO 11,
10   AND FOR THEM TO LOOK AT IT AS THEIR OLDEST SISTER, RATHER THAN    10:14
11   SOMEBODY -- I DON'T KNOW WHAT'S THE WORD THAT YOU WERE USING
12   YESTERDAY -- VOLUPTUOUS OR VAVAVOOM.  I DON'T KNOW WHAT THAT
13   WAS.
14   Q    EITHER ONE OF THEM HAVE BEEN USED.
15             MY QUESTION IS THIS, SIR:  THIS IDEA WITH RESPECT TO    10:14
16   THE COMPETITION FOR FASHION DOLLS AND THE PARTICULAR HEIGHT, IS
17   THAT SOMETHING THAT CAME SOLELY FROM CARTER BRYANT, OR WAS THAT
18   AN IDEA THAT YOU HAD ALSO BEEN THINKING ABOUT AND CONSIDERING?
19   A    WE HAD BEEN THINKING ABOUT A PRODUCT THAT WOULD BECOME A
20   FASHION DOLL FOR QUITE A WHILE.                                   10:15
21   Q    YESTERDAY YOU REFERENCED A WOMAN BY THE NAME MS. PANZERA.
22             DO YOU RECALL THAT?
23   A    YES.  MAUREEN.
24   Q    MAUREEN PANZERA?
25   A    YES.                                                         10:15
```

1    Q    COULD YOU REMIND THE JURY WHO MAUREEN PANZERA WAS, OR IS.

2    A    MAUREEN PANZERA IS ANOTHER DESIGNER, AGAIN SIMILAR TO

3    CARTER BRYANT.

4            **MR. PRICE:**  YOUR HONOR, OBJECT ON RELEVANCE.

5            **THE COURT:**  COUNSEL?                                          10:15

6            **MR. NOLAN:**  YOUR HONOR, IT GOES TO -- IT WAS OPENED

7    UP IN DIRECT EXAMINATION, AND IT WOULD BE OUR INTENT TO FOLLOW

8    UP AND SHOW THE ACTUAL PRESENTATION THAT WAS MADE.

9            **THE COURT:**  I'M SORRY?  MAUREEN?

10           **MR. NOLAN:**  MAUREEN PANZERA, P-A-N-Z-E-R-A.              10:16

11           **THE COURT:**  MR. PRICE REFERRED TO HER?

12           **MR. NOLAN:**  YES.  IT CAME OUT ON DIRECT EXAMINATION.

13           **MR. PRICE:**  MR. LARIAN SOMETIMES VOLUNTEERS STUFF.  I

14   DIDN'T ASK ABOUT THIS AT ALL.

15           **MR. NOLAN:**  THE ANSWER WAS NOT STRICKEN, YOUR HONOR.   10:16

16           **THE COURT:**  SUSTAIN THE OBJECTION.

17           LET'S MOVE ALONG.

18           REVISIT THIS IN YOUR RECALL.

19   **BY MR. NOLAN:**

20   Q    THERE WERE DOCUMENTS SHOWN TO YOU, MR. LARIAN, CONCERNING   10:16

21   HONG KONG LITIGATION.

22           DO YOU RECALL THAT?

23   A    I DO.

24   Q    NOW, DID BRATZ FACE A COMPETITIVE THREAT IN HONG KONG

25   THROUGH KNOCKOFFS?                                              10:17

1    A    YES.

2    Q    AND IN CONNECTION WITH TRYING TO ADDRESS THAT BUSINESS

3    RISK, DID YOU RETAIN LAWYERS?

4    A    WE DID.

5    Q    WAS WILLIAM FAN ONE OF THOSE LAWYERS?                    10:17

6    A    YES, HE WAS.

7    Q    AND HE WAS LOCATED IN HONG KONG; CORRECT?

8    A    STILL IS LOCATED IN HONG KONG.

9    Q    AND DID YOU HIRE ANYBODY IN THE UK TO ALSO ASSIST YOU?

10   A    YES, WE DID.                                              10:17

11   Q    WHO DID YOU RETAIN THERE?

12   A    RAY BLACK.  I THINK HE'S WITH THE LAW FIRM CALLED

13   SJ BERWIN, OR SOMETHING LIKE THAT.

14   Q    DO YOU HAVE ANY EXPERIENCE IN HONG KONG OR UK LITIGATION?

15   A    I DO NOT.                                                 10:17

16         MR. NOLAN:  YOUR HONOR, WE'LL COME BACK TO THE OTHER

17   ISSUES WHEN WE RECALL MR. LARIAN, AND ALSO HAVE AN ABILITY TO

18   MAYBE ADDRESS SOME OF THESE ISSUES AT SIDE-BAR WITH YOU.

19         THE COURT:  VERY WELL.  LET'S TAKE THOSE UP WHEN YOU

20   RECALL HIM.                                                    10:18

21         ANYTHING FURTHER FROM MATTEL?

22              RE**DIRECT EXAMINATION**

23   BY MR. PRICE:

24   Q    YOU WERE ASKED ABOUT THESE CASES IN HONG KONG, AND YOU

25   SAID THAT THERE WERE INSTANCES OF PEOPLE THAT WERE KNOCKING OFF  10:18

```
 1    BRATT.

 2            DO YOU RECALL THAT?

 3    A    YES.

 4    Q    AND CERTAINLY, YOU WOULDN'T MAKE A CHARGE LIKE THAT

 5    LIGHTLY; THAT IS, YOU WOULDN'T SAY SOMEONE IS KNOCKING OFF    10:18

 6    BRATT OR MAKING SOMETHING SIMILAR TO BRATZ OR COPYING BRATZ

 7    UNLESS YOU HAD INFORMATION THAT WAS ACTUALLY HAPPENING; RIGHT?

 8    A    PERSONALLY, ME?

 9    Q    EITHER THROUGH YOU OR YOUR AGENTS OR SOMEONE TELLING YOU

10    ABOUT IT AND SHOWING YOU PHOTOGRAPHS; IS THAT RIGHT?    10:18

11    A    I THINK OUR HONG KONG OFFICE AND THE HONG KONG LAWYERS IN

12    THAT CASE, IN THE UK, THEY HANDLED IT, YES.  AND I WAS MADE

13    AWARE OF THOSE, THAT'S CORRECT.

14    Q    AND AS I SAID, YOU WOULD NOT MAKE ALLEGATIONS OF COPYING

15    OR REPRODUCING OR KNOCKING OFF LIGHTLY; YOU WOULD WANT TO MAKE    10:19

16    SURE THERE WAS SOMETHING TO SUPPORT IT; RIGHT?

17    A    YES.

18    Q    BY THE WAY, HOW MANY HONG KONG AND UK CASES WERE THERE

19    THAT WERE FILED?

20    A    I KNOW OF ONE IN THE UK.  I DON'T KNOW OF ALL OF THE ONES    10:19

21    IN HONG KONG.  MORE THAN THREE OR FOUR.

22    Q    IN ANY OF THOSE CASES, OR IN ANY CASE THAT YOU'RE AWARE

23    OF, HAS MGA EVER CONTENDED THAT THE CARTER BRYANT DESIGNS ARE

24    NOT PROTECTABLE BY COPYRIGHT?

25            MR. NOLAN:  OBJECTION.    10:19
```

```
 1              UNDER WHAT JURISDICTION, YOUR HONOR?

 2         MR. PRICE:  ANY JURISDICTION.

 3         MR. NOLAN:  LACK OF FOUNDATION.

 4         THE COURT:  REPHRASE, COUNSEL.

 5    BY MR. PRICE:

 6    Q   HAS MGA EVER TAKEN THE POSITION IN ANY COURT, OTHER THAN

 7    THIS CASE, THAT THE CARTER BRYANT DRAWINGS AREN'T PROTECTABLE

 8    BY COPYRIGHT?

 9         MR. NOLAN:  OBJECTION.  ALSO CALLS FOR A LEGAL

10    CONCLUSION; AND 403.                                         10:20

11         THE COURT:  SUSTAINED.

12    BY MR. PRICE:

13    Q   ARE YOU AWARE OF MGA, IN ANY COURT, TAKING THE POSITION

14    THAT THE CARTER BRYANT DRAWINGS ARE NOT PROTECTABLE IN ANY

15    RESPECT?  ARE YOU AWARE OF MGA EVER TAKING THAT POSITION?    10:20

16         I'M NOT ASKING FOR YOUR LEGAL OPINION, BUT WHETHER

17    YOU'RE AWARE WHETHER MGA HAS EVER TAKEN THAT POSITION.

18         MR. NOLAN:  YOUR HONOR, LACK OF FOUNDATION.  ALSO

19    403.  CALLS FOR A LEGAL CONCLUSION.

20         THE COURT:  LIMIT THAT, COUNSEL, TO AMERICAN COURTS.    10:20

21    BY MR. PRICE:

22    Q   YOU'VE FILED CASES IN AMERICAN COURTS FOR KNOCKOFFS;

23    CORRECT?

24    A   I THINK WE HAVE, YES.

25    Q   HOW MANY CASES HAVE YOU FILED IN AMERICAN COURTS?       10:20
```

6274

1    A    I CAN JUST RECALL ONE IN LOS ANGELES AGAINST A COMPANY

2    CALLED MULTITOY.  THAT'S THE ONE I CAN RECALL.

3    Q    AND IN THAT CASE, DO YOU KNOW WHETHER MGA EVER TOOK THE

4    POSITION THAT CARTER BRYANT'S DRAWINGS WEREN'T PROTECTED BY

5    COPYRIGHT?                                                        10:21

6    A    I DON'T KNOW.  I'M NOT A LAWYER.  I JUST HAND THIS OVER TO

7    THE LAWYERS TO HANDLE.

8    Q    BY THE WAY, TALKING ABOUT NOT BEING A LAWYER, YOU WERE

9    ASKED QUESTIONS BY MR. NOLAN ABOUT THE FINANCIAL SITUATION OF

10   MGA AND BRATZ SINCE YOUR LAST AUDITED FINANCIAL STATEMENT OF     10:21

11   2006.

12           DO YOU RECALL THOSE QUESTIONS?

13   A    YES.

14   Q    AND DO YOU RECALL I WAS ASKING YOU QUESTIONS ABOUT THE

15   AUDITED FINANCIAL STATEMENTS, AND YOU SAID THAT YOU WERE A        10:21

16   CREATIVE GUY, NOT REALLY A FINANCIAL GUY; IS THAT RIGHT?

17   A    NO.  YOUR QUESTION WAS DIFFERENT.  YOU WERE ASKING ME

18   ABOUT AUDITED FINANCIAL STATEMENTS.  MR. NOLAN WAS ASKING ME

19   QUESTIONS ABOUT THE FINANCIAL STATUS AND SALES AND

20   PROFITABILITY OF BRATZ.  I DO FOLLOW AND MONITOR THE SALES AND    10:22

21   PROFITABILITY AND CREATIVITY OF BRATZ ON A REGULAR, ALMOST

22   DAILY, BASIS.  I DO NOT MONITOR THE WHOLE COMPANY -- OVERALL

23   FINANCES OF THE COMPANY.  SO THEY WERE TWO DIFFERENT QUESTIONS,

24   MR. PRICE.

25   Q    WHEN YOU WERE TELLING THE JURY ABOUT THE INDUSTRY           10:22

```
 1   TRENDS -- WHEN DID YOU BECOME AWARE OF THOSE TRENDS?  ABOUT

 2   WHAT TIME FRAME?

 3   A    I'M SORRY?

 4   Q    YOU WERE TALKING ABOUT THE TRENDS AND THE REASONS FOR

 5   TRENDS.

 6            WHEN DID YOU FIRST FIGURE THAT OUT AND BECOME AWARE

 7   OF THAT?

 8   A    SINCE WE BECAME A FORCE IN THE TOY BUSINESS, SOMETIME

 9   SINCE 1993.  WE TALKED ABOUT IT YESTERDAY, THAT THERE IS A

10   SERVICE THAT WE USE CALLED THRIFT TOY DATA SALES DATA, THAT      10:22

11   SHOWS THE MARKET SHARE OF SALES OF DIFFERENT BRANDS, DIFFERENT

12   PRODUCTS.  WE HAVE BEEN A SUBSCRIBER TO -- AND THE NAME OF THE

13   COMPANY WHO SELLS THAT -- IT'S CALLED NPD.  AND WE HAVE BEEN A

14   SUBSCRIBER TO THAT SERVICE FOR MANY, MANY YEARS, MORE THAN 10,

15   15 YEARS.  THAT'S ONE OF THE WAYS THAT I MONITORED THE TREND.    10:23

16   Q    MY QUESTION WASN'T CLEAR.  I APOLOGIZE.

17            YOU GAVE SPECIFIC CONCLUSIONS TO THE JURY ABOUT THE

18   MARKET DOWNTURNING, ABOUT FASHION DOLLS NOT HAVING AS MUCH

19   IMPACT IN THE MARKET.

20            MY QUESTION IS, CAN YOU GIVE ME A TIME FRAME WHEN YOU   10:23

21   FIRST CAME TO THAT CONCLUSION?

22   A    WELL, AGAIN, I HAVE BEEN MONITORING THE TOY BUSINESS, THE

23   FASHION DOLL, FOR MANY YEARS.  FOR EXAMPLE, IN --

24            MR. PRICE:  MOVE TO STRIKE AS NONRESPONSIVE.

25            THE COURT:  THE FIRST PART WAS.                         10:23
```

1    BY MR. PRICE:

2    Q   I'M NOT ASKING ABOUT 2000.  I JUST WANT A DATE.  YOU TOLD

3    HIM YOU CAME TO THESE CONCLUSIONS ABOUT THERE'S REASONS WHY THE

4    FASHION MARKET IS DECREASING.

5            DO YOU HAVE A DATE WHERE YOU FIRST FIGURED THAT OUT?    10:24

6    2004?  2005?

7    A   EVERY YEAR I'VE BEEN MONITORING IT.  SINCE 2001, BARBIE

8    HAD OVER 90 PERCENT MARKET SHARE; SO I MONITORED THAT IN 2001.

9    AND I MONITORED IT EVER SINCE.  BARBIE HAD THE MONOPOLY.

10           MR. PRICE:  YOUR HONOR, MOVE TO STRIKE.                 10:24

11           THE COURT:  IT'S STRICKEN.

12   BY MR. PRICE:

13   Q   MR. LARIAN, YOU TOLD THE JURY THAT THE FASHION DOLL MARKET

14   WAS DECREASING BECAUSE OF HANNAH MONTANA, BECAUSE OF ALL OF

15   THESE THINGS.  I'M TRYING TO FIND OUT WHEN YOU FIGURED THAT     10:24

16   OUT.  JUST GIVE ME DATE.

17   A   I'M TRYING TO GIVE YOU -- THAT HANNAH MONTANA, IT

18   SPECIFICALLY STARTED --

19   Q   MR. NOLAN ASKED YOU ABOUT THESE FACTORS, AND YOU SAID YOU

20   FIGURED OUT A BUNCH OF FACTORS THAT RESULTED IN MGA NOT MAKING  10:24

21   AS MUCH AS IT HAD.  I'M TRYING TO ASK WHEN YOU FIGURED THAT

22   OUT.

23   A   MR. NOLAN, TO THE BEST OF MY RECOLLECTION, ASKED IN 2007

24   WHAT WERE THE REASONS FOR THE DECLINE IN BRATZ, IF I UNDERSTOOD

25   HIS QUESTIONS CORRECTLY.  AND MY ANSWER WAS, IN 2007 OTHER      10:25

```
 1   COMPETITIVE PRODUCTS BECAME SUCCESSFUL IN THE U.S.A. THAT TOOK

 2   AWAY FROM BRATZ.  HANNAH MONTANA DOLL WAS ONE.  HIGH SCHOOL

 3   MUSICAL WAS ANOTHER ONE.  WEBKINZ, WHO --

 4          MR. PRICE:  YOUR HONOR, BEYOND THE SCOPE OF THE

 5   QUESTION, WHICH WAS A DATE.                                    10:25

 6          THE COURT:  LISTEN CAREFULLY TO THE QUESTION.  LET'S

 7   NOT ADD ADDITIONAL INFORMATION.

 8          THE WITNESS:  I THINK I DID SAY 2007.

 9          THE COURT:  THANK YOU.

10   BY MR. PRICE:                                                  10:25

11   Q   NOW THAT WE'VE GOT THE DATE, I'D LIKE YOU TO LOOK AT

12   EXHIBIT 4947.

13   A   YES.

14   Q   AND IF WE TURN TO THE LAST PAGE OF THIS, 4947, PAGE 4,

15   THIS WAS INFORMATION THAT WAS CREATED ON OCTOBER 25TH OF 2007; 10:25

16   CORRECT?

17   A   THAT'S THE DATE OF THAT DOCUMENT, YES.

18   Q   AND THIS WAS CREATED BY SOMEONE AT MGA AT YOUR REQUEST SO

19   MGA COULD RESPOND TO MATTEL AND GIVE US ALL DOCUMENTS RELATING

20   TO YOUR NET WORTH; CORRECT?                                    10:26

21   A   I KNOW THAT AT MY DEPOSITION, MR. ZELLER ASKED ME THAT

22   QUESTION.  I THOUGHT THAT WAS PREPARED IN REGARDS TO THIS

23   LITIGATION.  I SUBSEQUENTLY FOUND OUT THAT WAS NOT THE CASE,

24   AND I ALSO SUBSEQUENTLY FOUND OUT THAT SOME OF THIS INFORMATION

25   IN THIS PAPER IS INACCURATE AND RELATES BACK TO YEARS BEFORE.  10:26
```

1   Q    IN ANY EVENT, THIS WAS WHAT WAS PRODUCED BY MGA IN

2   RESPONSE TO THAT REQUEST FOR INFORMATION CONCERNING YOUR NET

3   WORTH; CORRECT?

4   A    TO THE BEST OF MY RECOLLECTION, YES.

5   Q    AND ON THIS DATE, OCTOBER 25, 2007 -- AND THIS IS FAR          10:26

6   ALONG INTO 2007 THAT YOU HAD NOTICED TRENDS AND WHAT WAS

7   HAPPENING WITH THE MARKET; CORRECT?

8   A    YES.

9   Q    SO AS OF THIS DATE, WHAT YOU GAVE TO MATTEL, IN JANUARY OF

10  2008, WAS THIS FIGURE HERE OF A NET WORTH OF $1.9 BILLION AND       10:27

11  THE VALUE OF MGA ENTERTAINMENT, YOUR PORTION, OF $1.6 BILLION;

12  CORRECT?

13          MR. NOLAN:  OBJECTION.  AND ALSO THE CHARACTERIZATION

14  THAT THIS WAS PREPARED FOR PURPOSES OF THIS LITIGATION.

15          THE COURT:  REPHRASE YOUR QUESTION.                         10:27

16          MR. NOLAN:  IT'S ARGUMENTATIVE AND IT'S LACK OF

17  FOUNDATION.

18  BY MR. PRICE:

19  Q    WHAT WAS GIVEN TO MATTEL IN RESPONSE TO A REQUEST FOR

20  DOCUMENTS CONCERNING YOUR NET WORTH IN JANUARY OF 2008 WAS THIS     10:27

21  DOCUMENT, CORRECT, WHICH LISTED MGA'S VALUE -- YOUR PERCENTAGE

22  AS $1.6 BILLION AND YOUR NET ASSETS AS $1.9 BILLION?  THAT'S

23  WHAT YOU GAVE US; RIGHT?

24  A    YES.  AND I SAID THAT FIGURE IS A MISTAKE.

25          MAY I EXPLAIN?                                              10:27

1   Q    YOU WANT TO EXPLAIN SOMETHING NOW AS TO WHY THIS IS

2   INACCURATE.

3            HAVE YOU EXPLAINED TO MATTEL PRIOR TO 10:25 A.M. THIS

4   DATE WHY THE DOCUMENT YOU GAVE US, WHICH REFLECTED YOUR NET

5   WORTH, IS NOT ACCURATE?                                         10:28

6   A    I BELIEVE OUR ATTORNEYS HAVE; AND YOU KNOW ABOUT IT.

7   Q    SIR, I'M TALKING ABOUT EVENTS OCCURRING PRIOR TO THE START

8   OF THIS TRIAL -- LET ME ASK YOU, YOU'RE SAYING THAT THIS IS NOT

9   ACCURATE AS OF OCTOBER 25, 2007; RIGHT?

10  A    I'M SAYING THAT DOCUMENT, THAT VALUE OF MGA ENTERTAINMENT,   10:28

11  INC., AS OF 2007, IS INACCURATE.

12           AND IF YOU WANT THE JURY TO KNOW WHY, I WILL BE HAPPY

13  TO EXPLAIN IT.

14  Q    LET ME GIVE YOU A PRECISE QUESTION.

15           PRIOR TO RIGHT NOW, HAVE YOU EVER GIVEN ANY             10:29

16  EXPLANATION AS TO WHY, AS OF OCTOBER 25, 2007, THE DOCUMENT YOU

17  PREPARED, OR WAS PREPARED AT MGA, IS NOT ACCURATE?

18  A    I BELIEVE AUDITOR GAVE YOU FULL EXPLANATION AND

19  DOCUMENTATION WHY THAT THING IS NOT ACCURATE.  AND THOSE

20  HAPPENED WAY PRIOR TO 10:25 OR 10:30 TODAY.                     10:29

21  Q    I'M SAYING NOT ACCURATE AS OF OCTOBER 25, 2007, NOT

22  CHANGES SINCE THEN.

23           I'M SAYING, HAVE YOU EVER, IN WRITING OR UNDER OATH

24  OR IN A PAPER, SAID ANYTHING AS TO WHY THIS NUMBER, AS OF THIS

25  DATE, WAS NOT ACCURATE?                                         10:29

1    A    BESIDES WHAT I TESTIFIED, I CANNOT ADD ANYTHING MORE.

2    AND, AGAIN, I WOULD LIKE TO GIVE AN EXPLANATION SO THE JURY

3    KNOWS THE FACTS.

4    Q    AND MR. NOLAN CAN ASK YOU, AND I CAN EXAMINE YOU ON THAT.

5         THE COURT:  MR. PRICE, WE'RE GOING TO TAKE A BREAK        10:29

6    HERE FOR THE COURT REPORTER.

7         (BRIEF RECESS TAKEN.)

8         (WHEREUPON, JURORS ENTER COURTROOM.)

9         THE COURT:  COUNSEL, YOU MAY CONTINUE.

10        MR. PRICE:  I'VE RUN OUT OF TIME, SO YOU CAN HIT        10:59

11   MGA'S SIDE NOW.

12        THE COURT:  MR. NOLAN.

13        MR. NOLAN:  THANK YOU.

14                   **RECROSS-EXAMINATION**

15   **By MR. NOLAN:**

16   Q    JUST VERY BRIEFLY, MR. LARIAN.

17        THE LIST OF ASSETS, NET WORTH, THAT MR. PRICE WAS

18   ASKING YOU ABOUT, DO YOU BELIEVE THAT IS AN ACCURATE REFLECTION

19   OF YOUR NET WORTH AS OF TODAY?

20   A    IT IS NOT.                                               11:00

21        MR. NOLAN:  THANK YOU.  NOTHING FURTHER.

22        THE COURT:  ANYTHING FURTHER?

23        MR. PRICE:  NO.

24        THE COURT:  YOU MAY STEP DOWN.

25        PLAINTIFF'S NEXT WITNESS?                               11:00

6281

1       **MR. QUINN:**  YOUR HONOR, MATTEL CALLS MIKE WAGNER.

2       (CLERK GIVES OATH.)

3       **THE CLERK:**  DO YOU SOLEMNLY STATE THAT THE TESTIMONY

4  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT SHALL

5  BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, SO

6  HELP YOU GOD.

7       **THE WITNESS:**  YES, I DO.

8       **THE CLERK:**  PLEASE STATE YOUR FULL NAME AND SPELL

9  YOUR LAST NAME FOR THE RECORD.

10      **THE WITNESS:**  MICHAEL JOSEPH WAGNER, W-A-G-N-E-R.          11:01

11                    **DIRECT EXAMINATION**

12  BY MR. QUINN:

13  Q    GOOD MORNING, MR. WAGNER.

14  A    GOOD MORNING.

15  Q    WHAT IS IT THAT YOU DO?          11:01

16  A    I'M A MANAGEMENT CONSULTANT SPECIALIZING IN ANALYZING

17  FINANCIAL ISSUES, MATTERS THAT ARE IN DISPUTE.

18  Q    AS A FINANCIAL EXPERT, LITIGATION CONSULTANT, WHAT KINDS

19  OF THINGS DO YOU DO?

20  A    THE THINGS I NORMALLY DO ARE CALCULATE COMMERCIAL DAMAGES          11:02

21  IN CIVIL LITIGATION OR I VALUE BUSINESSES IN CASES THAT ARE IN

22  DISPUTE.

23  Q    HOW LONG HAVE YOU BEEN A FINANCIAL EXPERT?

24  A    FOR 31 YEARS.

25  Q    HAVE YOU TESTIFIED IN COURT AS AN EXPERT IN FINANCIAL          11:02

1    ANALYSIS?

2    A    BEFORE TODAY I'VE TESTIFIED 107 TIMES AT TRIAL.

3    Q    AND DO YOU TESTIFY JUST FOR PLAINTIFFS OR JUST FOR

4    DEFENDANTS OR FOR BOTH?

5    A    I TESTIFY FOR BOTH PLAINTIFFS AND DEFENDANTS.          11:02

6    Q    NOW, WERE YOU RETAINED BY MATTEL TO BE A FINANCIAL EXPERT

7    IN THIS CASE?

8    A    I WAS.

9    Q    CAN YOU BRIEFLY DESCRIBE WHAT YOUR ASSIGNMENT WAS, WHAT

10   YOU WERE ASKED TO DO, IN CONNECTION WITH THIS CASE?          11:02

11   A    I WAS ASKED TO CALCULATE DAMAGEs TO MATTEL, ASSUMING THEY

12   PROVED THEIR CASE ON LIABILITY.

13   Q    WHAT INFORMATION DID YOU CONSIDER IN DOING THAT WORK?

14   A    I CONSIDERED ALL OF THE FINANCIAL INFORMATION PROVIDED BY

15   MGA TO UNDERSTAND THE SALES AND PROFITS THEY EARNED ON THEIR    11:03

16   PRODUCTS.  I OR MY STAFF READ THE DEPOSITIONS OF THE PEOPLE

17   DEPOSED IN THE CASE THAT DEALT WITH FINANCIAL ISSUES.  I

18   REVIEWED PUBLIC INFORMATION ABOUT THE TOY INDUSTRY TO

19   UNDERSTAND WHAT WAS HAPPENING DURING THE DAMAGE PERIOD.

20   Q    CAN YOU GIVE THE JURY AN ESTIMATE, APPROXIMATELY, OF THE    11:03

21   NUMBER OF PAGES OF INFORMATION THAT YOU AND YOUR STAFF REVIEWED

22   IN CONNECTION WITH THIS ASSIGNMENT?

23   A    IT WOULD BE OVER 50,000 PAGES.

24   Q    AND WHEN DID THIS PROCESS BEGIN?

25   A    IT BEGAN AROUND JANUARY OF THIS YEAR.                  11:03

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

1    Q    AND WHEN DID IT CONCLUDE?

2    A    LAST NIGHT, AFTER I RECEIVED ABOUT 40,000 NEW PAGES OF

3    DOCUMENTS WITHIN THE LAST TWO WEEKS.

4    Q    WHO DID YOU RECEIVE THOSE 40,000 NEW PAGES OF DOCUMENTS

5    FROM?                                                              11:03

6    A    WELL, FROM YOUR FIRM, BUT THEY WERE PRODUCED TO YOU BY

7    MGA.

8    Q    NOW, YOU OBVIOUSLY REVIEWED THESE ADDITIONAL 40,000 PAGES

9    OF DOCUMENTS.

10   A    I DIDN'T PERSONALLY, BUT I OR MY STAFF LOOKED AT ALL OF      11:03

11   THEM, YES.

12   Q    AS A RESULT OF THESE ADDITIONAL DOCUMENTS THAT MGA

13   PROVIDED WITHIN THE LAST COUPLE OF WEEKS, DID YOU ADJUST ANY

14   CONCLUSION THAT YOU HAD REACHED BEFORE?

15   A    YES, I DID.  IT CAUSED ME TO CHANGE MY OPINION OF DAMAGES    11:04

16   IN THIS CASE AND IT LOWERED THEM CONSIDERABLY.

17   Q    CAN YOU TELL US WHERE YOU WENT TO SCHOOL, WHAT DEGREES YOU

18   HAVE?

19   A    YES.  COLLEGE, I WENT TO THE UNIVERSITY OF SANTA CLARA; I

20   RECEIVED AN ENGINEERING DEGREE IN 1969.  I THEN WENT TO UCLA      11:04

21   AND GOT A MASTER'S IN BUSINESS ADMINISTRATION FROM THE GRADUATE

22   SCHOOL THERE IN 1971; THEN I WENT TO WYOMING UNIVERSITY SCHOOL

23   OF LAW AND RECEIVED MY JURIS DOCTORATE DEGREE.

24   Q    DO YOU HOLD ANY PROFESSIONAL LICENSES?

25   A    CURRENTLY I HAVE TWO; ONE, I'M A CERTIFIED PUBLIC            11:04

1    ACCOUNTANT, STATE OF CALIFORNIA; I'M ALSO A LICENSED ATTORNEY

2    IN THE STATE OF CALIFORNIA.

3    Q    I THINK A LOT OF PEOPLE KNOW, BUT SOME PEOPLE MAY NOT.

4    WHAT IS A CERTIFIED PUBLIC ACCOUNTANT?  WHAT DO THEY DO?

5    A    IT IS A CERTIFICATION BY THE STATE THAT ALLOWS YOU AS AN          11:05

6    ACCOUNTANT TO EXPRESS AN OPINION ON THE FINANCIAL STATEMENT OF

7    OTHERS; THAT IS THE MAIN JOB YOU'RE ENABLED TO DO BEING A

8    CERTIFIED PUBLIC ACCOUNTANT.  BUT MOST CERTIFIED PUBLIC

9    ACCOUNTANTS DO WORK BESIDES THAT.  THEY ARE VERY WELL KNOWN IN

10   PREPARING TAX RETURNS FOR COMPANIES AND INDIVIDUALS AND ALSO          11:05

11   DOING MANAGEMENT CONSULTING SERVICES.

12   Q    DO YOU BELONG TO ANY PROFESSIONAL ORGANIZATIONS?  ARE YOU

13   INVOLVED IN ANY PROFESSIONAL ACTIVITIES IN THOSE ORGANIZATIONS?

14   A    YES.  I AM ACTIVE IN BOTH THE CALIFORNIA SOCIETY OF CPA'S

15   AND ALSO THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC                    11:05

16   ACCOUNTANTS, WHICH IS THE GOVERNING BODY FOR CPA'S IN OUR

17   COUNTRY.

18   Q    HAVE YOU DONE ANY PARTICULAR WORK IN CONNECTION WITH THE

19   AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS?

20   A    YES.  I'VE BEEN VERY ACTIVE IN THAT.                             11:05

21   Q    CAN YOU GIVE US SOME EXAMPLES OF WHAT YOU'VE DONE WITH

22   THAT INSTITUTE?

23   A    YES.  I SERVED ON THE PRACTICE STANDARDS COMMITTEE OF THAT

24   ORGANIZATION AND ACTUALLY HELPED DRAFT THE STANDARDS FOR CPA

25   WHO DO MANAGEMENT CONSULTING SERVICES IN THE UNITED STATES.  I       11:06

1    ALSO SERVED ON THE NATIONAL LITIGATION SERVICES COMMITTEE,

2    WHICH IS THE COMMITTEE THAT ACTUALLY GIVES GUIDANCE AND

3    EDUCATION TO CPA'S WHO DO THE TYPE OF WORK I DO, WHICH IS

4    PROVIDE FINANCIAL CONSULTING ADVICE IN MATTERS THAT ARE IN

5    LITIGATION.

6            FOR A NUMBER OF YEARS, I WAS THE EDITOR OF THE CPA

7    EXPERT, WHICH IS THE PUBLICATION OF THE AICPA FOR CPA'S WHO DO

8    BOTH BUSINESS EVALUATIONS AND LITIGATION-SERVICES TYPE WORK.  I

9    WAS ON THE COMMITTEE THAT SET THE AGENDA FOR THE NATIONAL

10   CONFERENCE ON LITIGATION FOR FIVE YEARS.  AND CURRENTLY, I'M ON          11:06

11   A COMMITTEE THAT IS DEVELOPING A NEW CERTIFICATE OF THE

12   ORGANIZATION CALLED 'CERTIFICATE IN FINANCIAL FORENSICS.'  WE

13   ARE GOING TO SET STANDARDS FOR CPA'S WHO DO THE TYPE OF WORK I

14   DO.

15   Q    HAVE YOU AUTHORED ANY PUBLICATIONS THAT ARE REGARDED AS          11:07

16   AUTHORITATIVE IN YOUR FIELD?

17   A    I HAVE.  I HAVE 25 PROFESSIONAL PUBLICATIONS; AND MY

18   LEADING PUBLICATION IS A BOOK CALLED THE LITIGATION SERVICES

19   HANDBOOK; AND IT IS CONSIDERED AUTHORITATIVE BECAUSE IT IS

20   REFERENCED IN THE FEDERAL JUDICIAL CENTERS TREATISES AND          11:07

21   SCIENTIFIC EVIDENCE IN THEIR CHAPTER IN ECONOMIC DAMAGES.

22   Q    WE ARE ON A CLOCK, BUT IT'S IMPORTANT TO HAVE IT ALL IN

23   THE RECORD.

24            YOU SHOULD HAVE A BINDER THERE BEFORE YOU,

25   MR. WAGNER, AND I'D ASK YOU TO PLEASE TURN TO EXHIBIT 10219.          11:07

1    I'LL ASK YOU IF YOU CAN IDENTIFY THIS.

2    A    YES.  THIS IS MY CURRICULUM VITAE, OR RESUMÉ WHICH I

3    SUBMITTED IN CONNECTION WITH MY ORIGINAL REPORT IN THIS CASE.

4         MR. QUINN:  WE'D OFFER EXHIBIT 10219 INTO EVIDENCE,

5    YOUR HONOR.                                              11:08

6         MR. KENNEDY:  NO OBJECTION, YOUR HONOR.

7         THE COURT:  ADMITTED.

8         (EXHIBIT 10219 RECEIVED.)

9         MR. QUINN:  AT THIS POINT, WE'D TENDER MR. WAGNER TO

10   THE COURT AS AN EXPERT IN FINANCIAL ANALYSIS.            11:08

11        THE COURT:  ANY OBJECTION?

12        MR. KENNEDY:  NO, YOUR HONOR.

13        THE COURT:  SO DEDICATED.

14   BY MR. QUINN:

15   Q    MR. WAGNER, YOU'RE AWARE THAT THE JURY HAS MADE CERTAIN   11:08

16   DETERMINATIONS REGARDING LIABILITY FOR CERTAIN CLAIMS IN THIS

17   CASE.  YOU'RE AWARE OF THAT?

18   A    I AM.

19   Q    AND YOU'RE AWARE THAT DETERMINATIONS HAVE BEEN MADE ABOUT

20   AIDING AND ABETTING BREACH OF DUTY OF LOYALTY, AIDING AND      11:08

21   ABETTING BREACH OF FIDUCIARY DUTY CONVERSION, AND INTENTIONAL

22   INTERFERENCE WITH CONTRACT.

23        YOU'RE AWARE OF THAT?

24   A    YES.

25   Q    AND THERE'S ALSO, AS YOU KNOW, A COPYRIGHT CLAIM IN THIS   11:08

6287

1    CASE AS WELL.

2    A    THAT IS WHAT I UNDERSTAND IS BEING TRIED IN THIS PHASE OF

3    THE TRIAL.

4    Q    NOW, LET ME BEGIN BY SETTING ASIDE, IF WE CAN, THE

5    COPYRIGHT CLAIM AND TALK ABOUT THOSE OTHER CLAIMS, THE DAMAGES        11:08

6    OR THE BENEFITS RECEIVED BY MGA AND MR. LARIAN UNDER THOSE

7    CLAIMS.  ARE YOU WITH ME?

8    A    YES.

9    Q    I'D LIKE TO ASK YOU FIRST, DID YOU REACH ANY CONCLUSION

10   CONCERNING WHAT MATTEL IS ENTITLED TO RECOVER ON THOSE CLAIMS?        11:09

11   A    I DID.

12   Q    HAVE YOU PREPARED SOME SLIDES THAT WILL HELP ILLUSTRATE

13   THE WORK YOU'VE DONE AND THE CONCLUSIONS YOU'VE REACHED?

14   A    YES.

15   Q    IF WE COULD DISPLAY ON THE SCREEN SLIDE NUMBER ONE.              11:09

16        WHAT CONCLUSION HAVE YOU REACHED ABOUT THE BENEFIT TO

17   WHICH MATTEL IS ENTITLED TO RECOVER ON THESE INITIAL CLAIMS

18   THAT WE'RE GOING TO BE SPEAKING ABOUT?

19   A    I HAVE DETERMINED THAT AS FAR AS MGA IS CONCERNED, MGA HAS

20   EARNED PROFITS BEFORE TAX OF $777.9 MILLION BETWEEN 2000 AND          11:09

21   JUNE 30, 2008 IN THEIR SALE OF BRATZ PRODUCTS.

22   Q    HOW ABOUT MR. LARIAN, THE FINANCIAL BENEFIT THAT

23   MR. LARIAN HAS RECEIVED.  DID YOU REACH ANY CONCLUSIONS

24   REGARDING THAT?

25   A    YES.                                                             11:10

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

6288

1    Q    WHAT CONCLUSION DID YOU REACH IN THAT REGARD?

2    A    THAT HE HAS TWO TYPES OF FINANCIAL BENEFITS.  FIRST, HE

3    HAS RECEIVED DISTRIBUTIONS, CHECKS WRITTEN TO HIM BY MGA; AND I

4    HAVE INFORMATION ON THAT SUBJECT THROUGH DECEMBER 31, 2007.

5    AND THEN I ALSO CALCULATED THE VALUE THAT HE HAS IN HIS STOCK          11:10

6    OWNERSHIP OF MGA IN THE PROPORTION OF MGA THAT IS CONSIDERED TO

7    BE THE BRATZ PRODUCT LINE.  THE TOTAL AMOUNT OF THOSE TWO

8    BENEFITS I HAVE CALCULATED AT $696 MILLION.

9    Q    NOW, THE JURY HAS SEEN SOME SLIGHTLY HIGHER NUMBERS BEFORE

10   THIS WITH BRATZ PROFITS OF ABOUT $815 MILLION.                        11:10

11           IN THE RECENT PAST, HAVE YOU ADJUSTED YOUR NUMBER

12   DOWNWARDS?

13   A    YES.  WHEN I PREPARED MY ORIGINAL CALCULATIONS, I ONLY HAD

14   INFORMATION THROUGH OCTOBER OF 2007; I HAD TO ESTIMATE WHAT

15   WOULD OCCUR AT MGA IN THE WAY OF SALES AND PROFITS FOR THE            11:11

16   PERIOD NOVEMBER OF 2007 THROUGH JUNE 2008.

17           I NOW HAVE ACTUAL INFORMATION, SO I HAVE UPDATED MY

18   ANALYSIS WITH THE ACTUAL INFORMATION.

19   Q    WHEN DID YOU GET THAT ACTUAL INFORMATION?

20   A    WITHIN THE LAST TWO WEEKS.                                       11:11

21   Q    SO THESE NUMBERS THAT THE JURY SEES ON THE SCREEN HERE ARE

22   YOUR BOTTOM LINE NUMBERS CONCERNING THE BENEFITS THAT HAVE BEEN

23   RECEIVED AND WHAT MATTEL IS ENTITLED TO RECOVER FROM MGA AND

24   MR. LARIAN WITH RESPECT TO THE BRATZ BUSINESS?

25   A    YES.  BASED ON THE INFORMATION I HAVE UNTIL TODAY.               11:11

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION

1   Q    LET'S TALK ABOUT HOW YOU CALCULATED THAT FIRST NUMBER

2   THERE, THE $777,900,000 NUMBER.  IF WE COULD TURN TO SLIDE TWO.

3   COULD YOU PLEASE EXPLAIN TO THE JURY HOW YOU CALCULATED THAT

4   NUMBER.

5   A    WELL, THE FIRST THING I HAD TO DETERMINE WAS THE AMOUNT OF        11:12

6   SALES OR REVENUES THAT MGA EARNED FROM THE SALE OF BRATZ

7   PRODUCTS FROM THE DATE IT WAS INTRODUCED THROUGH JUNE OF 2008.

8   I OBTAINED THAT INFORMATION FROM INTERNAL RECORDS AT MGA.  THEY

9   HAVE A DATABASE THAT THEY CALL THE TARGET DATA BASE WHICH

10  SUMMARIZES ALL THEIR SALES BY PRODUCTS, AND I USED THAT SOURCE        11:12

11  AND A REPORT CALLED THE SALES BY SKEW REPORT TO DETERMINE THE

12  TOTAL AMOUNT OF THEIR SALES.

13  Q    NOW, SALES BY SKEW REPORT, WHAT IS THAT?

14  A    THAT IS A REPORT FROM THE TARGET DATE BASE THAT SUMMARIZES

15  SALES BY PERIOD BY EACH PRODUCT THAT MGA SELLS.                       11:13

16  Q    SO IN TERMS OF BRATZ SALES, THE $3.1 BILLION NUMBER

17  REPRESENTS WHAT?

18  A    THE TOTAL AMOUNT OF REVENUES MGA EARNED FROM THE SALE OF

19  BRATZ PRODUCTS.

20  Q    AND THAT TARGET DATA BASE, IS THAT SOMETHING THAT MGA            11:13

21  PROVIDED TO MATTEL IN CONNECTION WITH PRETRIAL DISCOVERY IN

22  THIS MATTER?

23  A    IT IS.

24  Q    AND YOU'RE AWARE THAT MGA HAS ALSO RETAINED A FINANCIAL

25  EXPERT TO DO A SIMILAR TYPE OF ANALYSIS?                              11:13

6290

1    A    I DO.

2    Q    A MR. MEYER?

3    A    YES.

4    Q    HAVE YOU REVIEWED THE REPORT THAT HE HAS PREPARED?

5    A    I HAVE.                                                      11:13

6    Q    AND DO YOU KNOW WHETHER OR NOT HE USES THAT SAME TARGET

7    DATABASE IN DOING HIS CALCULATIONS?

8    A    HE USES THE SAME SOURCE OF INFORMATION THAT I DO.

9    Q    AFTER YOU DETERMINED WHAT THE TOTAL REVENUES WERE FOR

10   BRATZ, WHAT DID YOU DO NEXT?                                      11:14

11   A    I THEN HAVE TO SUBTRACT ALL OF THE COSTS THAT MGA INCURRED

12   IN ORDER TO MAKE THOSE SALES SO I CAN CALCULATE THE PROFITS,

13   WHICH IS THE REVENUES LESS THE COSTS.

14   Q    AND CAN YOU GIVE US SOME IDEA WHAT THOSE COSTS WOULD

15   INCLUDE?                                                          11:14

16   A    THEY INCLUDE ALL OF THE COSTS TO MAKE THESE PRODUCTS THAT

17   THEY SELL; SO IT WOULD BE ALL OF THE MATERIAL USED TO MAKE THE

18   PRODUCTS; THE LABOR INVOLVED IN PUTTING THE PRODUCTS TOGETHER;

19   ALL OF THE OVERHEAD; THE EQUIPMENT THAT'S USED TO MAKE THE

20   PRODUCTS; THOSE ARE CALLED COST OF GOODS SOLD.                    11:14

21          AND FROM THE SAME SOURCE MGA REPORTS THOSE COSTS.

22          I ALSO SUBTRACT ALL OF THE PRODUCT DEVELOPMENT COSTS

23   TO DEVELOP THESE PRODUCTS, AND ALL OF THE ADVERTISING AND

24   MARKETING EXPENSES TO SELL THESE PRODUCTS.  THEN I ALLOCATE THE

25   GENERAL AND ADMINISTRATIVE TYPE EXPENSES; THINGS LIKE SALARIES    11:14

```
 1   AND RENTS AND PROFESSIONAL FEES THEY ALSO INCUR IN ORDER TO DO

 2   BUSINESS.

 3   Q    WHAT THAT INCLUDE COSTS INCURRED IN DEVELOPING AND

 4   PROMOTING THE BRAND, LIKE ADVERTISING AND THINGS LIKE THAT?

 5   A    YES.  AND MGA REPORTS THAT AND ACTUALLY CATEGORIZES IT BY     11:15

 6   PRODUCTS; SO I JUST USED THE INFORMATION THAT MGA HAS COMPILED

 7   OF THOSE TYPES OF COSTS.

 8   Q    SO IS IT TRUE THAT IN CALCULATING THE BRATZ PROFITS, YOU

 9   GIVE THEM CREDIT FOR ALL THOSE EXPENSES AND COSTS INCURRED IN

10   DEVELOPING THE BRAND?                                             11:15

11   A    I DO.

12   Q    AND WHAT IS THE SOURCE OF THIS COST INFORMATION?

13   A    IT IS THE INTERNAL RECORDS OF THE COMPANY THAT THEY CREATE

14   INCOME STATEMENTS FOR EACH PERIOD THEY SELL PRODUCT.

15   Q    IS THERE A PARTICULAR DATA BASE THAT'S COLLECTED UNDER AT     11:15

16   MGA?

17   A    I THINK IT ALL DERIVES FROM THIS ORIGINAL DATABASE, THE

18   TARGET DATABASE, AND THEN OTHER SYSTEMS WHERE THEY HAVE OTHER

19   COSTS.

20   Q    AND ONCE YOU'VE GOT THE REVENUES AND YOU'VE GOT THE COSTS,    11:15

21   WHAT DID YOU DO?

22   A    WELL, I THEN SUBTRACTED THE COSTS FROM THE REVENUES TO

23   DERIVE THE PROFITS OF $777,900,000.

24   Q    IN DOING THIS, DID YOU PREPARE SOME WORKSHEETS THAT

25   REFLECTED THE WORK YOU DID IN DOING THIS CALCULATION?             11:16
```

```
 1   A    YES.  I HAVE A FINANCIAL MODEL THAT I USED TO CREATE THESE
 2   NUMBERS; I THINK IT'S 243 PAGES IN LENGTH; IT'S JUST A BUNCH OF
 3   EXCEL SPREADSHEETS THAT ACTUALLY CALCULATE THE NUMBERS.
 4   Q    COULD WE TAKE A LOOK IN THE BOOK THERE, TAB 13931.
 5        CAN YOU IDENTIFY THAT DOCUMENT THAT'S BEEN MARKED AS        11:16
 6   EXHIBIT 13931?
 7             MR. KENNEDY:  WE DON'T SEEM TO HAVE A 13931.
 8             THE COURT:  CONSULT WITH COUNSEL, PLEASE.
 9             MR. KENNEDY:  WE FOUND IT YOUR HONOR.  THANK YOU.
10   BY MR. QUINN:
11   Q    I THINK I ASKED YOU, WHAT IS EXHIBIT 13931?
12   A    YES.  THIS IS A PRINTOUT OF THE 243 PAGES OF SCHEDULES;
13   AND THANK YOU FOR DOUBLE-SIDING IT TO SAVE PAPER.
14   Q    AND THE SCHEDULE, CAN YOU GIVE US SOME IDEA OF THE VOLUME
15   OF DATA IS OR THE DOCUMENTS UNDERLYING THESE SCHEDULES?        11:17
16   A    YES.  THIS IS JUST A SUMMARY OF THE SCHEDULES.  THERE ARE
17   HUNDREDS OF THOUSANDS OF PAGES THAT SUPPORT THIS THAT ARE NOT
18   PART OF THIS.  THE UNDERLYING DATA WOULD FILL A NUMBER OF
19   BANKER'S BOXES AS WELL.
20   Q    IN DOING YOUR WORK IN PREPARING THE SUMMARY THAT YOU DID,   11:18
21   DID YOU ACTUALLY DO SUMMARIES BY REVENUE AND COST INFORMATION
22   FOR EACH PRODUCT?
23   A    YES.
24   Q    ALL RIGHT.
25        TO GO BACK TO EXHIBIT 13931, DOES THIS ACCURATELY          11:18
```

```
 1    SUMMARIZE THE UNDERLYING DATA AND INFORMATION THAT YOU REFERRED
 2    TO?
 3    A    IT DOES.
 4              MR. QUINN:  WE'D OFFER THAT INTO EVIDENCE, YOUR
 5    HONOR.
 6              MR. KENNEDY:  NO OBJECTION.
 7              THE COURT:  IT'S ADMITTED.  YOU MAY PUBLISH.
 8              MR. QUINN:  WE WON'T PUBLISH ALL 243 PAGES, JUST THE
 9    FIRST PAGE, TO GIVE FOLKS THE FLAVOR OF WHAT THE DOCUMENT LOOKS
10    LIKE.
11              (EXHIBIT 13931 RECEIVED.)
12    BY MR. QUINN:
13    Q    I'M SURE WE'RE ALL ENLIGHTENED NOW.
14              THERE'S HOW MANY OF THESE PAGES?
15    A    243.
16    Q    THANK YOU FOR NOT BRINGING ALL OF THE UNDERLYING DATA.
17              IF WE COULD GO BACK TO THAT LAST SLIDE, THE SLIDE
18    NUMBER TWO.
19              IN ARRIVING AT MGA'S PROFITS FOR BRATZ, DID YOU
20    DEDUCT ANY AMOUNT FOR TAXES?
21    A    I DID NOT.
22    Q    WHY NOT?  WE ALL HAVE TO PAY TAXES; RIGHT?
23    A    WE DO.
24              ACTUALLY I SHOULD NOT SAY THAT.
25              I SUBTRACTED THE ONE AND A HALF PERCENT TAX THEY PAY
```

11:18

11:18

11:19

11:19

```
 1   TO THE STATE OF CALIFORNIA, BUT NOT THE NORMAL TAXES THE
 2   COMPANIES PAY.  AND THE REASON I DID NOT SUBTRACT TAXES IS
 3   BECAUSE THIS IS WHAT'S CALLED A SUBCHAPTER S-CORPORATION, AND
 4   THEY DO NOT PAY TAXES; THE TAXES ARE PAID BY THE SHAREHOLDERS
 5   OF THE COMPANY, NOT THE COMPANY ITSELF.                          11:19
 6   Q    SO MR. LARIAN WOULD PAY THOSE TAXES?
 7   A    HE AND THE OTHER SHAREHOLDER.
 8   Q    TURN NOW TO SLIDE NUMBER THREE, DID YOU DO A CALCULATION
 9   OF THE BENEFITS THAT MR. LARIAN RECEIVED FROM BRATZ?
10   A    YES.                                                        11:19
11   Q    COULD YOU BACKUP FOR A SECOND.
12          IS A DAMAGE AWARD TAX DEDUCTIBLE?
13   A    IT IS TAX DEDUCTIBLE TO THE PARTY THAT PAYS THE DAMAGE
14   AWARD.
15   Q    AND DID THAT ENTER INTO YOUR CALCULATIONS AT ALL?  DID YOU  11:20
16   TAKE THAT INTO ACCOUNT?
17   A    I DID; JUST LIKE EVERY DAMAGE CLAIM I'VE EVER PRESENTED AT
18   TRIAL, I'VE DONE IT PRE-TAX.
19   Q    SO IF WE COULD GO BACK TO SLIDE THREE HERE, WHAT DOES THIS
20   REPRESENT?                                                       11:20
21   A    THIS BREAKS OUT TWO PIECES OF THE BENEFITS I'VE CALCULATED
22   TO MR. LARIAN FROM THE SALE OF BRATZ PRODUCTS.
23   Q    WHAT ARE THOSE TWO PIECES?
24   A    THE FIRST IS WHAT I CALL DISTRIBUTIONS, AND THAT IS THE
25   CHECKS THAT ARE WRITTEN TO MR. LARIAN OR THE TRUSTS HE CONTROLS  11:20
```

```
1   THAT ARE RELATED TO THE PROFITS EARNED BY THE COMPANY FROM THE

2   SALE OF BRATZ PRODUCTS.

3   Q    HOW CAN YOU TELL WHICH CHECKS HE RECEIVES RELATES TO BRATZ

4   PRODUCTS?

5   A    YOU CAN'T.  I HAVE TO MAKE THAT DETERMINATION BASED ON MY      11:21

6   ESTIMATE OF THE PROFITS EARNED BY MGA EACH YEAR FROM THE SALE

7   OF BRATZ PRODUCTS VERSUS OTHER PRODUCTS.

8   Q    WE'RE GOING TO GET TO THAT?

9   A    YES.  IF YOU ASK ME.

10  Q    THE SECOND ITEM THERE, WHAT DOES THAT REPRESENT?              11:21

11  A    THAT REPRESENTS MY ESTIMATE OF THE VALUE AS OF JUNE 30,

12  2008, THAT MR. LARIAN HAS IN THE MGA CORPORATION THAT IS

13  RELATED TO THE BRATZ BUSINESS.

14  Q    HOW DID YOU ARRIVE AT THAT?

15  A    I PERFORMED A TRADITIONAL EVALUATION OF THE BRATZ             11:21

16  BUSINESS, AND I USED THREE GENERALLY ACCEPTED APPROACHES TO

17  ARRIVE AT THAT VALUE.

18  Q    DO YOU HAVE A SLIDE THAT ILLUSTRATES THIS?

19  A    YES.

20  Q    WHICH SLIDE WOULD THAT BE?  SLIDE NUMBER SIX?                 11:21

21  A    I DON'T HAVE MY SLIDES WITH ME.

22       THAT IS THE ONE.

23  Q    SO WE'RE GOING TO COME TO THAT DOWN THE ROAD.

24       GO BACK TO SLIDE NUMBER THREE.

25       IF WE COULD LOOK AT SLIDE NUMBER FOUR, WHAT DOES THIS        11:22
```

1    SHOW?

2    A    THIS SHOWS THE DISTRIBUTIONS I HAVE CALCULATED BY YEAR

3    BETWEEN 2001 AND 2007.

4    Q    WHAT IS THE TOTAL AMOUNT OF BRATZ PROFIT DISTRIBUTIONS

5    THAT MR. LARIAN RECEIVED?                                    11:22

6    A    $385,220,741.

7    Q    IT'S OBVIOUS THERE'S RATHER A MARKET DECLINE IN THE

8    DISTRIBUTIONS THAT YOU IDENTIFIED IN 2007.  DO YOU SEE THAT?

9    A    YES.

10   Q    AND DO YOU KNOW WHY THERE IS THAT DECLINE?             11:22

11   A    YES.

12   Q    WHY IS THAT?

13   A    THAT IN LATE 2006, THE MGA COMPANY BORROWED MONEY FROM

14   WACHOVIA BANK PRINCIPALLY TO BUY THE LITTLE TIKES BUSINESS, AND

15   THERE WAS A CONDITION IN THAT LOAN AGREEMENT THAT THERE COULD   11:23

16   BE NO DISTRIBUTIONS TO THE SHAREHOLDERS EXCEPT FOR THE TAXES

17   THEY WOULD PAY ON THE PROFITS FROM MGA CORPORATION GOING

18   FORWARD.

19   Q    SO THE LENDER LOANED SOME MONEY WHICH WAS USED TO BUY

20   ANOTHER TOY COMPANY?                                        11:23

21   A    THAT, AND OTHER REASONS.

22   Q    AND THEY PUT A RESTRICTION IN THERE ABOUT THE AMOUNT OF

23   MONEY THAT COULD BE DISTRIBUTED TO MR. LARIAN IN THE CREDIT

24   AGREEMENT?

25   A    YES.                                                   11:23

1    Q    IS THAT SOMETHING THAT'S COMMON OR UNUSUAL?  HAVE YOU SEEN

2   THAT BEFORE?

3    A    THAT IS COMMON; I'VE SEEN IT BEFORE IN COMPANIES LIKE

4   THIS.

5    Q    AND WHY WOULD A LENDER WANT TO PLACE SUCH A RESTRICTION ON    11:23

6   THE AMOUNT OF MONEY GOING OUT TO SHAREHOLDERS?

7             **MR. KENNEDY:**  OBJECTION.  SPECULATION.

8             **THE COURT:**  LAY A FOUNDATION, COUNSEL.

9   **BY MR. QUINN:**

10   Q    YOU INDICATED THAT YOU'VE SEEN THIS TYPE OF PROVISION    11:23

11  BEFORE.

12   A    MANY TIMES.

13   Q    AND HAVE YOU HAD OCCASION TO INVESTIGATE WHY IT'S INCLUDED

14  OR GET AN UNDERSTANDING ABOUT WHAT WHY LENDERS ASK FOR THESE

15  PROVISIONS?    11:24

16   A    YES.

17   Q    BASED ON THAT, WHAT'S YOUR UNDERSTANDING ABOUT WHY LENDERS

18  WANT TO RESTRICT THE AMOUNT OF MONEY THAT IS GOING OUT TO

19  SHAREHOLDERS?

20   A    THAT THEY WANT TO MAKE SURE THE CORPORATION RETAINS ENOUGH    11:24

21  EARNINGS TO PAY BACK THEIR LOAN.

22   Q    THE SECOND COMPONENT OF MR. LARIAN'S FINANCIAL BENEFIT

23  FROM BRATZ IS THE VALUE -- IF WE GO BACK TO SLIDE 3 -- IS THE

24  VALUE OF MR. LARIAN'S STOCK ATTRIBUTABLE TO BRATZ; IS THAT

25  CORRECT?    11:24

1   A    YES.

2   Q    AND WHAT ARE YOU REFERRING TO THERE, EXACTLY?

3   A    THAT MR. LARIAN OWNS APPROXIMATELY 82 PERCENT OF MGA, AND

4   BRATZ IS ONE OF THEIR PRINCIPAL, IF NOT THE PRINCIPAL, PRODUCT

5   LINE OF THE COMPANY; SO A LOT OF THE VALUE OF THE COMPANY IS          11:24

6   RELATED TO THE PROFITS THAT HAVE BEEN EARNED AND WILL BE EARNED

7   FROM THE BRATZ PRODUCT LINE.

8   Q    DID YOU UNDERTAKE SOME ANALYSIS TO DETERMINE WHAT THE

9   VALUE OF BRATZ IS FOR MGA AS OPPOSED TO OTHER PRODUCTS THAT MGA

10  SELLS?                                                                11:25

11  A    YES.

12  Q    IF WE COULD TAKE A LOOK AT SLIDE NUMBER FIVE, COULD YOU

13  TELL US WHAT THIS REFLECTS?

14  A    YES.  THIS IS A COMPILATION OF THE SALES OF THE TOP TEN

15  PRODUCTS THAT MGA SELLS OR SOLD BETWEEN 2001 AND 2007.  AND I'M      11:25

16  SURE THAT JUST AS I CAN'T READ IT, THE JURORS CAN'T READ THAT

17  EITHER, BUT YOU CAN SEE ONE LARGE BAR THAT IS ABOUT 80 PERCENT

18  OF THE SALES OF MGA DURING THAT PERIOD, AND THOSE ARE THE BRATZ

19  PRODUCT LINES.  THE NEXT NINE BIGGEST PRODUCTS ARE ALL LESS

20  THAN 10 PERCENT.                                                     11:25

21  Q    IF WE COULD ENLARGE THAT BOTTOM THERE.

22       YOU CAN'T SEE IT, BUT THE FIRST ONE, THAT'S

23  SPIDERMAN?

24  A    YES.

25  Q    AND SHREK, LITTLE TIKES, AND THEN BRATZ.                        11:26

1   A    THOSE FOUR PRODUCTS ARE THE FIRST FOUR ON THAT CHART.

2   Q    ALL RIGHT.

3        THERE'S BEEN TESTIMONY THAT AT ABOUT THE TIME THAT

4   BRATZ CAME OUT MGA WAS DEVELOPING ANOTHER PRODUCT CALLED PRAYER

5   ANGEL.  DO YOU KNOW WHERE THAT FALLS IN TERMS OF MGA'S                    11:26

6   SUCCESSFUL PRODUCTS OR HOW SUCCESSFUL IT WAS COMPARED TO OTHER

7   ONES?

8   A    IT DIDN'T MAKE THE TOP TEN.  WHAT IT DID IS, OF ALL OF THE

9   SALES IN THAT TIME PERIOD, WHICH IS 100 PERCENT, IT GENERATED

10  2/10TH OF ONE PERCENT OF THOSE SALES; SO IT IS HALF AS                    11:26

11  SUCCESSFUL AS THE 10TH MOST SUCCESSFUL PRODUCT ON THIS CHART

12  HERE.

13  Q    TO MAKE THE TOP TEN, WHAT PERCENTAGE OF SALES DID A

14  PRODUCT HAVE TO REACH IN THESE YEARS?

15  A    4/10THS OF ONE PERCENT OF THEIR SALE DURING THAT PERIOD.            11:27

16  Q    WE'VE ALSO HEARD ABOUT ANOTHER MGA DOLL CALLED SINGING

17  BOUNCY BABY.  WHERE DOES THAT FALL IN THE TOP TEN?

18  A    THAT WAS ONLY -- WELL, IT ISN'T IN THE TOP TEN AT ALL.  IT

19  IS ACTUAL ONLY HALF AS SUCCESSFUL AS PRAYER ANGELS; IT'S ONLY

20  1/10TH OF ONE PERCENT OF THE SALES DURING THAT PERIOD.                   11:27

21  Q    SO WOULD IT BE FAIR TO SAY BRATZ WAS FAR AND AWAY, BY

22  ORDERS OF MAGNITUDE, THE MOST SUCCESSFUL PRODUCT THAT MGA HAD

23  IN THIS TIME PERIOD?

24  A    YES.

25  Q    HOW DID YOU DETERMINE THE VALUE OF MR. LARIAN'S MGA STOCK         11:27

6300

```
 1   WHICH IS ATTRIBUTABLE TO BRATZ?

 2   A    I MODELED THE BRATZ PRODUCT LINE AND THEN USED THREE

 3   GENERIC ACCEPTED APPROACHES TO VALUE IT.

 4   Q    THIS IS THE SLIDE I THINK WE LOOKED AT EARLIER, SLIDE

 5   NUMBER SIX.                                                    11:27

 6        CAN YOU EXPLAIN WHAT WE'RE LOOKING AT ALONG THE LEFT

 7   HAND SIDE HERE, WHERE IT SAYS "INCOME APPROACH," "COMPARABLE

 8   COMPANIES," AND "COMPARABLE TRANSACTIONS."

 9   A    THESE ARE THE THREE APPROACHES I USED TO VALUE THE

10   COMPANY.  THE INCOME APPROACH LOOKS AT THE CASH THAT WILL BE   11:28

11   GENERATED BY THIS PRODUCT LINE INTO THE FUTURE AND BRINGS IT

12   BACK TO A PRESENT VALUE AS OF JUNE 30, 2008.

13   Q    HOW DO YOU THAT?  HOW DO YOU VALUE SOMETHING THAT'S IN THE

14   FUTURE AND BRING IT BACK TO PRESENT VALUE?

15   A    WELL, I HAVE TO MAKE A PROJECTION OF THE FUTURE, AND I DO  11:28

16   THAT BASED ON THE PAST AND MY EXPECTATION OF WHAT WILL HAPPEN

17   IN THE FUTURE.

18   Q    SO THAT'S THE FIRST APPROACH THAT YOU USED?

19   A    YES.

20   Q    WHAT'S THE SECOND ONE?                                    11:28

21   A    THE SECOND IS WHAT'S CALLED MARKET APPROACH AND IT'S

22   CALLED COMPARABLE COMPANIES.  I LOOKED AT SIX OF THE LARGEST

23   PUBLICLY TRADED TOY COMPANIES AND LOOKED AT HOW THEY ARE VALUED

24   AND THEN USED THOSE SIX COMPANIES TO VALUE THE BRATZ PRODUCT

25   LINE.                                                          11:28
```

1   Q    WHY DID YOU CHOOSE PUBLICLY TRADED COMPANIES?

2   A    TWO, BECAUSE THEY ARE SIMILAR OR LARGER SIZE THAN MGA; AND

3   ALSO, I HAVE INFORMATION THAT I CAN USE, BECAUSE THEY HAVE TO

4   REPORT THEIR RESULTS.

5   Q    WHAT'S THE THIRD APPROACH THERE?                                    11:29

6   A    IT'S ANOTHER MARKET APPROACH, AND IT'S CALLED COMPARABLE

7   TRANSACTIONS.  I LOOKED AT 22 TRANSACTIONS DURING THIS TIME

8   PERIOD OF FIVE YEARS BEFORE THIS VALUATION DATE IN THE TOY

9   INDUSTRY TO SEE HOW THESE TYPES OF COMPANIES WERE VALUED AND

10  USED METRICS FROM THOSE TRANSACTIONS TO VALUE BRATZ.                    11:29

11  Q    SO YOU LOOKED AT THE PRICES THAT WERE PAID, AND FROM THAT

12  YOU DERIVED VALUATION INFORMATION FOR COMPANIES IN THE TOY

13  INDUSTRY?

14  A    YES.  I COMPARE THE PRICES PAID TO THINGS LIKE REVENUES

15  AND EARNINGS TO DETERMINE HOW TO VALUE BRATZ BASED ON THIS             11:29

16  INFORMATION.

17  Q    DID THIS THIRD APPROACH OF COMPARABLE TRANSACTIONS INCLUDE

18  TRANSACTIONS WHERE MATTEL WAS INVOLVED AND WHERE MGA WAS

19  INVOLVED?

20  A    YES.  BOTH THOSE COMPANIES MADE ACQUISITIONS DURING THIS          11:30

21  PERIOD THAT I HAVE USED.

22  Q    THE NEXT COLUMN IS VALUE.  CAN YOU EXPLAIN WHAT THAT

23  REFLECTS?

24  A    THESE ARE THE VALUE THAT I ESTIMATE THAT THE BRATZ PRODUCT

25  LINE IS AS OF JUNE 30, 2008, BASED ON THESE DIFFERENT                  11:30

1   APPROACHES.

2   Q    SO USING THOSE APPROACHES, YOU ARRIVE AT SOME NUMBERS OR

3   FACTORS WHICH YOU THEN APPLY TO THE BRATZ PROFITABILITY

4   INFORMATION THAT YOU HAVE.

5   A    RIGHT.  THESE THREE APPROACHES GIVE ME DIFFERENT ANSWERS,    11:30

6   AND I HAVE TO COME UP WITH A POINT ESTIMATE; SO I HAVE TO

7   WEIGHT THEM TO COME UP WITH A SINGLE VALUE.

8   Q    AND THAT'S THE NEXT COLUMN THAT SAYS WEIGHT.

9   A    IT IS.

10  Q    NOW, WHY ARE YOU WEIGHING THESE DIFFERENT APPROACHES?    11:30

11  A    WELL, I HAVE TO DETERMINE IN MY OWN JUDGMENT AND

12  EXPERIENCE WHICH IS THE BEST OF THESE APPROACHES, WHICH GIVES

13  ME THE BEST INFORMATION; SO I WEIGHT THEM ACCORDINGLY.

14  Q    WHAT'S THE SOURCE OF THAT WEIGHT?

15  A    JUST MY EXPERIENCE AND JUDGMENT.    11:30

16  Q    AND BASED ON THIS ANALYSIS, WHAT DID YOU CONCLUDE WAS THE

17  WEIGHTED VALUE OF THE BRATZ BUSINESS?

18  A    WELL, I MULTIPLY EACH VALUE IN THAT COLUMN BY THE WEIGHT,

19  THE PERCENTAGE, TO GET THE WEIGHT VALUE.  YOU THEN ADD UP THOSE

20  THREE WEIGHTED VALUES TO GET WHAT I BELIEVE IS THE TOTAL VALUE    11:31

21  OF 100 PERCENT OF THE BRATZ BUSINESS, AND THAT IS $379,800,000.

22  Q    I THINK YOU INDICATED THAT MR. LARIAN DOES NOT OWN ALL OF

23  MGA'S STOCK; IS THAT TRUE?

24  A    TRUE.

25  Q    SO DO YOU HAVE TO DO SOMETHING TO TAKE THAT INTO ACCOUNT    11:31

1    IN DESCRIBING THE VALUE OF MR. LARIAN'S PORTION OF THIS

2    BUSINESS?

3    A    YES.  I HAVE TO USE THIS VALUE AND MULTIPLY BY HIS

4    INTEREST IN THE COMPANY.

5    Q    LET'S TAKE A LOOK AT THE NEXT SLIDE, SLIDE NUMBER SEVEN.    11:31

6    WHAT DOES THIS REFLECT?

7    A    THE CALCULATION OF THE TOTAL BRATZ VALUE THAT IS OWNED BY

8    MR. LARIAN.  WHAT I DID WAS I MULTIPLIED THE 379.8 MILLION BY

9    HIS 81.82 PERCENT INTEREST TO THEN GET HIS VALUE OF

10   $310,800,000.    11:32

11   Q    SO WHAT IS YOUR CONCLUSION REGARDING THE FINAL FINANCIAL

12   BENEFITS MR. LARIAN RECEIVED FROM BRATZ?

13   A    THAT IS THE $310,800,000.

14   Q    IF WE COULD GO BACK TO SLIDE THREE.

15        SO TAKING BOTH DISTRIBUTIONS AND THE VALUE OF THE    11:32

16   STOCK INTO ACCOUNT, WHAT'S YOUR CONCLUSION REGARDING THE TOTAL

17   BENEFITS THAT MR. LARIAN RECEIVED FROM BRATZ?

18   A    $696 MILLION.

19   Q    IN YOUR BOOK THERE, WOULD YOU PLEASE TAKE A LOOK AT

20   EXHIBIT 13932.  CAN YOU IDENTIFY THIS DOCUMENT FOR US?    11:33

21   A    YES.  THIS IS THE FINANCIAL MODEL THAT I USED TO CREATE

22   THE NUMBERS THAT WE'VE JUST BEEN TALKING ABOUT.

23   Q    WHO PREPARED THIS DOCUMENT?

24   A    IT WAS PREPARED BY MY STAFF, UNDER MY DIRECTION AND

25   CONTROL.

1  Q    THE SOURCE DOCUMENTS, THE UNDERLYING DATA THAT'S REFLECTED

2  HERE, THAT CAME FROM WHERE?

3  A    FROM MGA TO GET THE INFORMATION FOR MGA'S SUCCESS, BUT IT

4  ALSO CAME TO FROM PUBLIC RECORDS FOR THE COMPARABLE

5  TRANSACTIONS, THE COMPARABLE COMPANIES, THAT I AND MY STAFF        11:33

6  CHECKED.

7  Q    DOES IT ALSO INCLUDE SUMMARIES OF SOME PORTIONS OF THE

8  TENS OF THOUSANDS OF PAGES WHICH YOU AND YOUR HAVE STAFF

9  REVIEWED?

10  A    YES.

11          MR. QUINN:  WE'D OFFER, YOUR HONOR, EXHIBIT 13932.

12          MR. KENNEDY:  NO OBJECTION.

13          THE COURT:  ADMITTED.  YOU MAY PUBLISH.

14          (EXHIBIT 13932 RECEIVED.)

15  BY MR. QUINN:

16  Q    YOU'VE ALSO IN YOUR REPORT REFERRED TO PREJUDGMENT

17  INTEREST.  WHAT IS PREJUDGMENT INTEREST?

18          MR. KENNEDY:  OBJECTION, YOUR HONOR.  PREMATURE

19  QUESTION OF LAW.  IN ADDITION, WE WERE JUST GIVEN THESE NUMBERS

20  THIS MORNING AND HAVE NOT HAD A CHANCE TO --                      11:34

21          MR. QUINN:  OBJECTION TO THE COMMENTS.

22          THE COURT:  COUNSEL, SIDE-BAR.

23          (SIDE-BAR PROCEEDINGS AS FOLLOWS:)

24          THE COURT:  THE CONCERN?

25          MR. ROTH:  ONE, AS A MATTER OF LAW, WE DON'T THINK        11:35

1    THEY, UNDER DISGORGEMENT THEORY, THEY GET IN PREJUDGEMENT

2    INTEREST ON ANY CLAIM.  THIS IS NOT A CLAIM WHERE THEY CLAIM

3    WE'VE TAKEN ANYTHING FROM THEM.  THEY HAVE LOST MONEY AND

4    PROPERTY.

5            NUMBER TWO, EVEN IF YOU ACCEPT IT AS A MATTER OF LAW,    11:35

6    THEY GET PREJUDGMENT INTEREST.  THIS IS A CALCULATION THEY GOT

7    TWO DAYS AGO AFTER MR. WAGNER'S DEPOSITION.  THEY IDENTIFIED IN

8    THE REPORT A CALCULATION THEY WERE GOING TO USE FOR

9    PREJUDGMENT INTEREST -- THEY IDENTIFIED IN THEIR EARLIER

10   REPORTS THE PROCESS THEY WERE GOING TO USE TO CALCULATE    11:35

11   PREJUDGMENT INTEREST.  FOLLOWING HIS DEPOSITION, INCLUDING THE

12   MOST RECENT DEPOSITION --

13           **THE COURT:**  ON FRIDAY.

14           **MR. ROTH:**  -- THEY FINALLY PROVIDED A SCHEDULE OF

15   WHAT THAT CALCULATION WAS.  IT'S DIFFERENT.  WE DIDN'T HAVE AN    11:35

16   OPPORTUNITY TO EXAMINE MR. WAGNER ABOUT THE CALCULATIONS THEY

17   USED TO COME UP WITH THESE NUMBERS.

18           **MR. COREY:**  I'LL ADDRESS THE FIRST COMMENT FIRST.

19           WHETHER OR NOT MATTEL'S ENTITLED TO PREJUDGEMENT

20   INTEREST SHOULD NOT BE AN ADMISSIBILITY QUESTION.  IT'S NOT AN    11:36

21   ADMISSIBILITY QUESTION.  IT'S A QUESTION WE CAN RESOLVE THROUGH

22   JURY INSTRUCTIONS.  WE'VE MADE A CLAIM FOR PREJUDGEMENT

23   INTEREST STARTING WITH THE VERY FIRST COMPLAINT.  THE ISSUE

24   WITH US BEING ENTITLED TO IT UNDER ADMISSIBILITY PERSPECTIVE

25   SHOULD HAVE BEEN RAISED BEFORE NOW.  ITS BEEN AN ISSUE IN OUR    11:36

1    JURY INSTRUCTIONS FOR MONTHS AND THE ARTICULATION OF A CLAIM

2    FOR PREJUDGEMENT INTEREST HAS BEEN IN MR. WAGNER'S REPORT FROM

3    THE TIME THAT HE SUBMITTED HIS FIRST REPORT.

4         **THE COURT:**  I'M NOT SO CONCERNED ABOUT THE FIRST

5    ISSUE, BECAUSE I'LL PROBABLY GIVE THE JURY A VERY QUICK          11:37

6    INSTRUCTION THAT SAYS YOU'RE GOING TO HEAR A LOT OF INFORMATION

7    ABOUT DAMAGES AND DIFFERENT TYPES OF DAMAGES.  THE COURT WILL

8    BE INSTRUCTING YOU ON DAMAGES AND THAT'S WHAT YOU'RE GOING TO

9    FOLLOW.

10        I'M MORE CONCERNED ABOUT THE SECOND ISSUE, THAT THEY         11:37

11   HAVE NOT HAD AN OPPORTUNITY TO EVALUATE THE CALCULATION OR THE

12   CHANGE IN THE CALCULATION.

13        **MR. COREY:**  THE CHANGE IS SOMETHING THEY SHOULD BE

14   ABLE TO EXAMINE MR. WAGNER ON.  MR. WAGNER IN HIS INITIAL

15   REPORT SAID HE WAS GOING TO USE A PRIME INTEREST RATE FOR         11:37

16   CALCULATION.  AFTER THE RULING CAME DOWN, IT'S JUST THE

17   PREJUDGEMENT INTEREST ON THE STATE COURT CLAIMS.  BY STATUTE,

18   WE HAVE TO USE 7 PERCENT INTEREST RATE; SO THAT'S A CHANGE.  IF

19   THEY WANT TO CROSS-EXAMINE HIM ON THAT, THEY CAN DO THAT.

20        **THE COURT:**  IS THAT THE ONLY CHANGE MADE IN THE          11:37

21   PREJUDGEMENT INTEREST IS THE CHANGE FROM PRIME RATE TO THE

22   STATE STATUTORY RATE?

23        **MR. COREY:**  YES.

24        **THE COURT:**  IS THAT IT?

25        **MR. COREY:**  NO.  THERE WAS A CHANGE BECAUSE HE           11:38

1    APPLIED THE RATE TO MR. LARIAN'S DISTRIBUTIONS BEFORE TAXES

2    WERE TAKEN OUT; THAT WAS A CHANGE HE HAD MADE TO HIS REPORT AND

3    THAT WAS PROVIDED TO MR. ROTH.  HE'S TAKEN MR. WAGNER'S

4    DEPOSITION AND HAD THE OPPORTUNITY TO ASK MR. WAGNER ABOUT THAT

5    CHANGE.  HE DID NOT DO THAT.                                    11:38

6         THE METHODOLOGY DID NOT CHANGE.

7         **THE COURT:**  ANY OTHER CHANGES?

8         **MR. ROTH:**  COMPOUNDING.

9         **MR. COREY:**  AND MR. ROTH THINKS THERE'S AN ISSUE

10   BECAUSE MR. WAGNER SAID IN HIS REPORT HE WAS GOING TO COMPOUND   11:38

11   MONTHLY BUT NOW IT'S YEARLY, WHICH IS ACTUALLY A BENEFIT TO

12   MGA; SO I DON'T SEE THAT AS BEING AN ISSUE.

13        **THE COURT:**  ANY OTHER CHANGES?

14        **MR. COREY:**  NOT THAT I KNOW.

15        **THE COURT:**  I'M GOING TO INSTRUCT THE JURY, AS I        11:38

16   INDICATED, ON THE ISSUE OF DAMAGES AND THEY WILL THEN RECEIVE

17   FURTHER INSTRUCTIONS.  I'LL GIVE YOU LEAVE, YOU'LL HAVE AN

18   OPPORTUNITY TO CROSS-EXAMINE HIM.  IF THERE IS SOME ADDITIONAL

19   NEED TO RECALL HIM ON THIS POINT, I'LL GIVE THAT TO YOU.

20        **MR. ROTH:**  PERHAPS I COULD PREVIEW AN ISSUE.           11:39

21        THERE ARE A NUMBER OF SLIDES WE'RE GOING TO BE SEEING

22   COMING UP IN THE PRESENTATION WHICH REFLECT, WE BELIEVE, NEW

23   ANALYSIS, INCLUDING NEW APPORTIONMENT ANALYSIS, THE NEW

24   ANALYSIS WE GOT LAST NIGHT.  WE THINK WE NEED AN OPPORTUNITY TO

25   EXAMINE MR. WAGNER ABOUT THOSE.  NOT TO TAKE DISCOVERY WHILE     11:39

```
 1   HE'S ON THE STAND, BUT ACTUALLY HAVE A RENEWED DEPOSITION.

 2          WHAT WE WOULD PROPOSE WITH RESPECT TO THOSE IS HAVE

 3   THE ABILITY TO RECALL HIM IN OUR CASE AFTER WE'VE HAD THE

 4   OPPORTUNITY TO EXAMINE THE DEPOSITION CONTENTS ABOUT WHAT WE

 5   BELIEVE TO BE NEW ANALYSIS.                                       11:39

 6          THE COURT:  I'M DEBATING WHETHER TO -- IS THERE ANY

 7   OTHER NEW STUFF?

 8          MR. COREY:  THIS IS THE FIRST TIME I'VE HEARD ABOUT

 9   THIS.

10          THE COURT:  LET'S TAKE THIS UP AT THE END OF THE          11:40

11   EXAMINATION.  I'LL GIVE YOU LEAVE FOR THAT ARGUMENT; I'LL JUST

12   MAYBE DELAY YOUR CROSS-EXAMINATION UNTIL YOU HAVE HAD A CHANCE

13   TO TAKE APPROPRIATE DISCOVERY, IF I'M CONVINCED THERE'S BEEN

14   NEW INFORMATION THAT'S BEEN PRODUCED.

15          WOULD THAT ADDRESS YOUR CONCERN?                          11:40

16          MR. ROTH:  IT MAY NOT, BECAUSE THEY HAVE A WITNESS

17   WHO'S PUTTING IN SOME LARGE NUMBERS RIGHT NOW.  WE FEEL IN

18   TERMS OF THE PRESENTATION OF THE CASE WE NEED THE OPPORTUNITY

19   NOW TO ADDRESS SOME OF THOSE FUNDAMENTAL ISSUES; SO WE BELIEVE

20   WE CANNOT --                                                     11:40

21          THE COURT:  DO YOU WANT ME TO STOP THE WITNESS NOW?

22          MR. ROTH:  NO.  WE WANT THE OPPORTUNITY TO RECALL

23   HIM, TO BE ABLE TO CROSS-EXAMINE HIM NOW.

24          THE COURT:  LET ME TAKE THAT UP AT THE END.  LET'S

25   GET THROUGH THE DIRECT AND THEN WE'LL ADDRESS THIS.  BUT I'M     11:40
```

1    GOING TO LET THE PREJUDGMENT GO FORWARD.

2            **MR. COREY:**  THANK YOU, YOUR HONOR.

3            (SIDE-BAR PROCEEDINGS CONCLUDED.)

4        **THE COURT:**  LADIES AND GENTLEMEN OF THE JURY, BOTH

5    SIDES ARE GOING TO HAVE FINANCIAL EXPERTS, DAMAGES EXPERTS;            11:41

6    YOU'RE GOING TO BE HEARING FROM THEM.

7            AT THE END OF THE TRIAL, THE COURT IS GOING TO BE

8    GIVING YOU INSTRUCTION ON DAMAGES, ON THE ISSUE OF DAMAGES.

9    YOU SHOULD NOT TAKE ANYTHING THAT EITHER EXPERT IS PRESENTING

10   AS SUGGESTING WHAT DAMAGES ARE, UNDER THE LAW, REQUIRED TO BE         11:41

11   GIVEN OR NOT.  THAT'S SOMETHING WHICH IS GOING TO BE REFLECTED.

12   THIS IS SIMPLY A FINANCIAL CALCULATION.  AND I DON'T WANT YOU

13   TO TAKE ANYTHING THAT EITHER SIDE GIVES AS INDICATING WHAT THE

14   LAW IS WITH RESPECT TO THE DAMAGES.

15           **MR. QUINN:**  THANK YOU, YOUR HONOR.                         11:42

16       **THE COURT:**  YOU MAY PROCEED.

17   **BY MR. QUINN:**

18   Q    I THINK YOU WERE TELLING US WHAT PREJUDGMENT INTEREST IS,

19   MR. WAGNER.

20           WOULD YOU PLEASE CONTINUE.                                    11:42

21   A    PREJUDGMENT INTEREST IS A CALCULATION THAT IS DESIGNED TO

22   MAKE THE PLAINTIFF HERE WHOLE ECONOMICALLY.

23           THESE PROFITS HAVE BEEN EARNED BY MGA IN THE PAST.

24           **MR. KENNEDY:**  OBJECTION.  NOW HE'S GETTING INTO LEGAL

25   -- IT DID NOT CALL FOR A LEGAL CONCLUSION, BUT WE'RE GETTING          11:42

1    ONE.

2              **THE COURT:**  SUSTAINED AS PHRASED.

3              REPHRASE THE QUESTION.

4    **BY MR. QUINN:**

5    Q    JUST FROM AN ECONOMIC ANALYSIS STANDPOINT, CAN YOU EXPLAIN    11:42

6    WHAT PREJUDGMENT INTEREST IS, TIME VALUED MONEY, HOWEVER YOU

7    CAN EXPLAIN IT FROM AN ECONOMIC STANDPOINT.

8    A    IT IS TO BRING BOTH DISTRIBUTIONS TO MR. LARIAN AND THE

9    PROFITS RECEIVED TO MGA UP TO A PRESENT VALUE AS OF TODAY.

10   Q    AND HAVE YOU CALCULATED PREJUDGMENT INTEREST ON MGA'S    11:42

11   PROFITS FROM BRATZ?

12   A    I HAVE.

13   Q    LOOK AT SLIDE NUMBER EIGHT.  WHAT DOES THIS REFLECT?

14   A    THIS REFLECTS THE AMOUNT OF PREJUDGEMENT INTEREST THAT I

15   HAVE CALCULATED ON BOTH THE PROFITS THAT MGA HAS EARNED FROM    11:43

16   THE SALE OF BRATZ AND THE DISTRIBUTIONS MADE TO MR. LARIAN FROM

17   THE DATES THEY RECEIVED THEM UP UNTIL AUGUST 15TH OF 2008.

18   Q    SO THOSE TOP LINE DAMAGES NUMBERS, THOSE ARE NUMBERS WE'VE

19   ALREADY LOOKED AT.

20   A    CORRECT.    11:43

21   Q    AND THEN BASICALLY YOU APPLY INTEREST RATES FROM THE TIME

22   THAT MONEY WAS RECEIVED OR DISTRIBUTED TO BRING IT UP TO DATE;

23   IS THAT RIGHT?

24   A    CORRECT.

25   Q    WHAT INTEREST RATE DID YOU USE?    11:43

1   A    7 PERCENT, COMPOUNDED ANNUALLY.

2   Q    WHY DID YOU CHOOSE 7 PERCENT?

3   A    IT'S THE STATUTORY RATE IN THE STATE OF CALIFORNIA FOR

4   NON-CONTRACT ACTIONS.

5   Q    WHY DID YOU COMPOUND THAT ANNUALLY?                        11:44

6   A    BECAUSE THAT IS ECONOMICALLY CORRECT.

7   Q    SO SUPPOSE YOU HAD COMPOUNDED IT MONTHLY, WOULD THAT HAVE

8   RESULTED IN HIGHER INTEREST OR LOWER INTEREST?

9   A    HIGHER.

10  Q    SO COMPOUNDING IT LOW ANNUALLY, THE WAY YOU DID, IT       11:44

11  ACTUALLY RESULTED IN A LOWER NUMBER.

12  A    THAN IF I USED A SHORTER PERIOD TO DO MY COMPOUNDING.

13  Q    SO WHAT IS THE AMOUNT OF INTEREST THAT YOU CALCULATED ON

14  THE $779,900,000?

15  A    YOU MISSTATED; IT'S $777.9 MILLION, AND THE AMOUNT OF     11:44

16  PREJUDGEMENT INTEREST IS $226.2 MILLION.

17  Q    SO THE TOTAL BENEFIT TO MGA INCLUDING THE PREJUDGMENT

18  INTEREST IS WHAT?

19  A    $1,004,100,000.

20  Q    ON THE RIGHT SIDE, DO WE HAVE A PREJUDGMENT INTEREST WITH  11:44

21  RESPECT TO THE BENEFITS RECEIVED BY MR. LARIAN FROM BRATZ?

22  A    YES.

23  Q    AND HOW DO YOU ARRIVE AT THAT?

24  A    I DID THE CALCULATION THE SAME WAY; 7 PERCENT INTEREST,

25  COMPOUNDED ANNUALLY, UP UNTIL AUGUST 15, 2008.                 11:45

1   Q    WOULD YOU TAKE A LOOK AT EXHIBIT 13908.

2        CAN YOU IDENTIFY EXHIBIT 13908?

3   A    YES.  THIS IS A 2-PAGE SCHEDULE WHERE I MAKE THE

4   PREJUDGMENT INTEREST CALCULATIONS ON BOTH BRATZ PROFITS AND THE

5   LARIAN DISTRIBUTIONS.                                                  11:45

6   Q    SO THAT SETS FORTH THE CALCULATION WE JUST LOOKED AT ON

7   THE SLIDE NUMBER EIGHT?

8   A    THESE ARE THE UNDERLYING CALCULATIONS.

9        MR. QUINN:  WE'D OFFER EXHIBIT 13908, YOUR HONOR.

10       MR. KENNEDY:  NO OBJECTION.                                       11:45

11       THE COURT:  ADMITTED.  YOU MAY PUBLISH.

12       (EXHIBIT 13908 RECEIVED.)

13  BY MR. QUINN:

14  Q    IF WE COULD GO BACK TO SLIDE EIGHT.

15       I DON'T THINK I PUT IN THE RECORD WHAT -- IN THE CASE          11:46

16  OF MR. LARIAN -- ADDING THE BENEFIT RECEIVED BY MR. LARIAN AND

17  THE PREJUDGMENT INTEREST; THAT CAME OUT TO A TOTAL OF WHAT FOR

18  THE BENEFIT FOR MR. LARIAN?

19  A    A TOTAL AMOUNT OF PREJUDGMENT INTEREST OF 93.5 MILLION,

20  FOR A TOTAL OF DAMAGES PLUS PREJUDGMENT INTEREST OF               11:46

21  $789,500,000.

22  Q    THANK YOU.

23       UP TO THIS POINT WE'VE BEEN TALKING ABOUT THE CLAIMS

24  I TOLD YOU WE WERE GOING TO BEGIN WITH; THE AID AND ABETTING,

25  BREACH OF FIDUCIARY DUTY, INTERFERENCE WITH A CONTRACT, DUTY OF   11:46

1   LOYALTY, AND CONVERSION.  I'D LIKE TO CHANGE GEARS NOW AND TALK

2   ABOUT THAT COPYRIGHT CLAIM.

3              DID YOU CALCULATE THE AMOUNT THAT MATTEL SHOULD

4   RECEIVE WITH RESPECT TO THE COPYRIGHT CLAIM?

5   A    I DID.                                                    11:47

6   Q    AND WHY DID YOU CALCULATE THAT NUMBER SEPARATELY?

7   A    BECAUSE UNDER THE CLAIM FOR COPYRIGHT, UNDER CERTAIN

8   CIRCUMSTANCES, IT MAY BE APPROPRIATE TO APPORTION THE PROFITS

9   EARNED BY MGA ON THE SALE OF BRATZ PRODUCTS BETWEEN THE ALLEGED

10  INFRINGING ACTIVITY AND OTHER FACTORS OR OTHER VALUE THAT MGA   11:47

11  BROUGHT TO THE SALE OF THAT PRODUCT, AND LIKEWISE FOR

12  MR. LARIAN'S DISTRIBUTIONS.

13  Q    WHAT DO YOU MEAN BY APPORTION?

14  A    THAT INSTEAD OF AWARDING 100 PERCENT OF THE PROFITS EARNED

15  ON BRATZ, THAT YOU DIVIDE THAT UP BETWEEN THE COPYRIGHT, THE    11:47

16  VALUE GENERATED BY THE COPYRIGHT INFRINGEMENT, VERSUS OTHER

17  THINGS.

18  Q    AND IS THIS APPORTIONMENT ANALYSIS SOMETHING THAT APPLIES

19  TO THE OTHER CLAIMS THAT WE JUST WENT THROUGH?

20  A    NO.                                                       11:47

21  Q    IT APPLIES ONLY TO THE COPYRIGHT CLAIM?

22  A    THAT IS MY UNDERSTANDING.

23  Q    AND YOU INDICATE THAT IT MAY APPLY UNDER CERTAIN

24  CIRCUMSTANCES.

25  A    I DID.                                                    11:48

1    Q    THAT'S A LEGAL QUESTION ON WHICH THE COURT WILL INSTRUCT

2    THE JURY?

3    A    I BELIEVE THAT'S CORRECT.

4    Q    IS THE APPORTIONMENT THAT YOU REFER TO, IS THAT SOMETHING

5    THAT'S DIFFERENT FROM DEDUCTING THE COSTS THAT WE LOOKED AT?        11:48

6    A    YES.  IT'S AFTER YOU DEDUCTED THE COSTS.

7    Q    RIGHT.

8         CAN YOU DESCRIBE FOR US HOW YOU WENT ABOUT THIS

9    APPORTIONMENT ANALYSIS OR THE POTENTIAL APPORTIONMENT ANALYSIS

10   THAT MIGHT APPLY TO A COPYRIGHT CLAIM?                              11:48

11   A    YES.  I LOOKED AT A NUMBER OF WHAT I WOULD CALL YARDSTICKS

12   OR BENCHMARKS THAT I COULD USE TO DETERMINE WHAT IS THE NORMAL

13   AMOUNT OF PROFITS THAT TOY COMPANIES EARNED WHEN THEY SELL

14   THEIR PRODUCTS.

15   Q    WHAT'S YOUR OBJECTIVE IN DOING THAT?  WHY ARE YOU DOING        11:48

16   THAT?

17   A    TO TRY TO DETERMINE WHAT PROFITS ARE EARNED NORMALLY BY

18   COMPANIES THAT PROMOTE THEIR PRODUCTS, THAT DO QUALITY

19   MANUFACTURING, THAT HAVE GOOD BRAND IMAGE, TO DETERMINE THE

20   VALUE THAT THE COMPANIES RECEIVE FROM THOSE TYPES OF              11:49

21   ACTIVITIES.

22   Q    AND DID YOU USE JUST ONE BENCHMARK OR MORE THAN ONE

23   BENCHMARK IN TRYING TO ARRIVE AT THAT CALCULATION?

24   A    I DID MORE THAN ONE.

25   Q    CAN YOU EXPLAIN WHAT YOU DID.                                 11:49

1    A    WELL, THE TWO ONES THAT I THINK MOST SIGNIFICANT, FIRST I

2    LOOKED AT WHAT THE TOY INDUSTRY, ON AVERAGE, EARNED DURING THIS

3    PERIOD BETWEEN 2001 AND 2007, AND I HAD INFORMATION FROM THE

4    ELEVEN PURE TOY COMPANIES THAT ARE PUBLIC THAT ACTUALLY PUBLISH

5    THEIR FINANCIAL RESULTS.                                              11:49

6    Q    THAT'S ALL OF THEM?

7    A    THAT'S ALL OF THEM IN THE WORLD.  I USED THAT TO DETERMINE

8    WHAT TO TOY COMPANIES NORMALLY EARN WHEN THEY SELL TOYS.

9    Q    AND AGAIN, YOU'RE OBJECTIVE TO TRY TO FIND OUT WHAT TOY

10   COMPANIES NORMALLY EARN IS WHAT?                                      11:49

11   A    IT IS TO THEN SUBTRACT THAT OUT AND LEAVE MGA WITH THAT

12   PORTION OF THEIR PROFITS AND THEN ONLY AWARD THE AMOUNT ABOVE

13   THAT TO THE ALLEGED COPYRIGHT INFRINGEMENT.

14   Q    AND WHY WOULD YOU THEN AWARD THE AMOUNT ABOVE THAT?

15   YOU'RE ATTRIBUTING THAT TO WHAT?                                      11:50

16   A    TO SOMETHING THAT IS UNEXPLAINED THAT IS DIFFERENT AND

17   UNIQUE TO THIS PRODUCT.

18   Q    AND THAT WOULD BE PRESUMABLY WHAT'S ATTRIBUTABLE TO THE

19   INFRINGING ACTIVITY UNDER THIS THEORY.

20   A    CORRECT.                                                         11:50

21   Q    THEN YOU SAID YOU HAD A SECOND BENCHMARK.

22   A    YES.  A SECOND BENCHMARK I USED IS I LOOKED AT THE THREE

23   MOST SUCCESSFUL AND PROFITABLE TOY COMPANIES THAT REPORT

24   PUBLICLY; AND THAT'S MATTEL, THE PLAINTIFF HERE; HASBRO; AND

25   JAKKS; THAT'S J-A-K-K-S.                                             11:50

6316

1   Q   YOU SAY THESE ARE THE MOST SUCCESSFUL COMPANIES.  IN WHOSE

2   OPINION?  WHAT'S THE STANDARD YOU'RE USING TO MAKE THAT

3   JUDGMENT?

4   A   MY OWN JUDGMENT AND THE JUDGMENT OF ANYONE I HAVE SEEN

5   WHO'S REPORTED ON THIS INDUSTRY.                                    11:50

6   Q   SO WHAT DID YOU DO WITH THAT BENCHMARK WITH THE THREE TOP

7   COMPANIES?

8   A   I LOOKED AT THE RETURNS, THE PROFITABILITY OF THESE THREE

9   COMPANIES DURING THIS DAMAGE PERIOD.

10  Q   AND WHY ARE YOU WORKING WITH TWO DIFFERENT BENCHMARKS?        11:51

11  A   WELL, BECAUSE THE JURY MUST DETERMINE WHAT THEY THINK MGA

12  WOULD HAVE BEEN BUT FOR USING THE DESIGNS THAT ARE AT ISSUE IN

13  THIS CASE.  AND IF THEY BELIEVE THEY WOULD JUST BE ONE OF AN

14  AVERAGE COMPANIES, THEY SHOULD AT LEAST LEAVE THAT AMOUNT OF

15  MONEY WITH MGA.                                                    11:51

16  Q   THAT IS, THE INDUSTRY STANDARD AMOUNT?

17  A   CORRECT.  AND IF THEY BELIEVE THIS COMPANY REALLY DOES

18  HAVE THE SAME TALENT AND THE SAME ABILITY AS THE TOP THREE TOY

19  COMPANIES, EVEN WITHOUT THIS BRATZ DESIGN, THEN THEY SHOULD

20  LEAVE THAT AMOUNT OF PROFITS WITH MGA.                             11:51

21  Q   ALL RIGHT.

22      AND YOU SAID THE JURY SHOULD DETERMINE -- YOU'RE

23  ASSUMING NOW AT THIS POINT IN THIS DISCUSSION THAT THE JURY

24  DECIDES OR THE COURT INSTRUCTS THAT APPORTIONMENT IS

25  APPROPRIATE.                                                       11:51

1    A    CORRECT.

2    Q    YOU'RE NOT EXPRESSING ANY OPINION AS TO WHETHER THIS IS IN

3    FACT ONE OF THOSE CIRCUMSTANCES WHERE YOU WOULD DO THIS

4    APPORTIONMENT EXERCISE; IS THAT TRUE?

5    A    I HAVE NO OPINION ON THAT SUBJECT.                          11:52

6    Q    LET'S LOOK AT SLIDE NINE.

7         DOES THIS REFLECT THE ANALYSIS WHICH YOU JUST

8    DESCRIBED?

9         MR. KENNEDY:  OBJECTION, YOUR HONOR, TO THE BOTTOM

10   LINE.                                                           11:52

11        THE COURT:  COUNSEL?

12        MR. QUINN:  YOUR HONOR, I'M NOT SURE I KNOW WHAT THE

13   OBJECTION IS.

14        MR. KENNEDY:  NEW ANALYSIS?

15        MR. QUINN:  I DON'T THINK IT IS.                           11:52

16        THE COURT:  I'LL TAKE THIS UP ALONG WITH THE OTHER

17   ISSUES.  YOU MAY PROCEED.

18   BY MR. QUINN:

19   Q    THE BOTTOM LINE, WHAT DOES THAT REFLECT IN TERMS OF

20   APPORTIONMENT?                                                  11:52

21   A    THAT IS REALLY NO APPORTIONMENT.  IT IS THE SAME NUMBER I

22   GAVE BEFORE THE TOTAL PROFITS EARNED BY BRATZ OF

23   $777.9 MILLION.  IF YOU WOULD DETERMINE THAT ALL OF THAT PROFIT

24   IS ATTRIBUTABLE TO THE INFRINGEMENT, THAT IS THE NUMBER.

25   Q    SO THAT IS JUST THE CASE WHERE THERE WOULD BE NO           11:53

1    APPORTIONMENT AT ALL.

2    A    CORRECT.  IF YOU WOULD ASSUME THAT BASICALLY ALL OF THIS

3    PROFIT IS DUE TO THE ALLEGED INFRINGING ACTIVITY.

4         **MR. KENNEDY:**  WITHDRAW THE OBJECTION.

5         **THE COURT:**  VERY WELL.  YOU UNDERSTAND NOW.  OKAY.      11:53

6    **BY MR. QUINN:**

7    Q    THEN THE NEXT COLUMN UP, THE TOY INDUSTRY AVERAGE.  COULD

8    YOU EXPLAIN THAT TO US.

9    A    YES.

10        OUT OF THAT TOTAL PROFITS OF 777.9 MILLION, IF YOU       11:53

11   LEFT THE NORMAL RETURN THAT THE ELEVEN PUBLICLY TRADED PURE TOY

12   COMPANIES EARNED DURING THIS TIME, WHICH IS BETWEEN ONE AND TWO

13   PERCENT PROFITABILITY, YOU SHOULD LEAVE 74.8 MILLION, WHICH IS

14   THAT MIDDLE NUMBER ON THE BENCHMARK PROFITABILITY COLUMN WITH

15   MGA AND ONLY AWARD $703.1 MILLION TO MATTEL FOR THE ALLEGED     11:53

16   COPYRIGHT INFRINGEMENT.

17   Q    SO UNDER THAT CASE YOU'RE LEAVING THE TOY INDUSTRY AVERAGE

18   PROFITABILITY WITH THE COMPANY AND APPORTIONING THE REST TO THE

19   INFRINGEMENT IF THE JURY WOULD WERE TO DETERMINE THAT THAT'S

20   THE TYPE OF COMPANY THAT MGA IS, IN ESSENCE.                   11:54

21   A    YES.

22   Q    AND THEN THE TOP CASE THERE; MATTEL, HASBRO, JAKKS.

23   A    THAT IF YOU LOOK AT THE AVERAGE PROFITABILITY OF THOSE

24   THREE COMPANIES, WHICH IS BETWEEN 11 AND 12 PERCENT DURING THIS

25   TIME PERIOD, YOU WOULD LEAVE, OF THE $777,900,000 WORTH OF     11:54

```
 1   PROFITS, 354.9 MILLION WITH MGA, AND AWARD $423 MILLION WORTH
 2   OF DAMAGES TO MATTEL.
 3   Q    IN EACH CASE YOU'RE TRYING TO DECIDE HOW TO ALLOCATE THIS
 4   $777,900,000 BASED UPON DIFFERENT ASSUMPTIONS AS TO WHAT TYPE
 5   OF COMPANY OR HOW SUCCESSFUL A COMPANY MGA IS; IS THAT          11:55
 6   ESSENTIALLY IT?
 7   A    YES, OUT USING THE BRATZ DESIGN.
 8   Q    AND ASSUMING IT'S DETERMINED THIS IS A CASE WHERE IT'S
 9   APPROPRIATE TO DO APPORTIONMENT, HOW WOULD THE JURY DECIDE
10   WHICH ONE OF THESE THREE SCENARIOS WOULD APPLY TO MGA?         11:55
11   A    IT WOULD BE BASED ON THE EVIDENCE THEY HAVE HEARD AS TO
12   THE SUCCESS OF MGA BASED ON OTHER THINGS MGA HAS DONE.
13   Q    LET'S TALK ABOUT OTHER THINGS MGA HAS DONE, NON BRATZ
14   PRODUCTS.
15        HAVE YOU DONE ANYTHING TO DETERMINE WHETHER OR NOT        11:55
16   MGA MAKES PROFITS ON ITS NON BRATZ PRODUCTS?
17   A    YES.
18   Q    WHAT DID YOU CONCLUDE?
19   A    WELL, FIRST OFF, I LOOKED AT -- THAT WOULD BE WHAT I THINK
20   YOU PUT UP AS CHART NUMBER FIVE.                               11:55
21   Q    LET'S PUT THAT UP.
22   A    THE SUCCESS MGA HAS HAD WITH THEIR TOP TEN PRODUCTS, AND
23   THEY HAVE ALL OF THE SAME PEOPLE, WITH ALL OF THE SAME SKILL
24   SET, TRYING TO SELL AND PROMOTE THESE OTHER PRODUCTS.  WHAT
25   THESE OTHER PRODUCTS DON'T HAVE IS THE BRATZ DESIGN.           11:56
```

1           YOU CAN SEE THEY ARE VERY UNSUCCESSFUL AT SELLING

2    ANYTHING ELSE BUT --

3           **MR. KENNEDY:**  OBJECTION, YOUR HONOR.  LACK OF

4    FOUNDATION.

5           **THE COURT:**  SUSTAINED.                          11:56

6    **BY MR. QUINN:**

7    Q    THIS DATA THAT'S REFLECTED HERE, WHERE DID YOU GET THIS

8    DATA FROM?

9    A    FROM THE INTERNAL RECORDS OF MGA.

10   Q    FOR EXAMPLE, THE FIRST COLUMN THERE, "SPIDERMAN," IT SAYS  11:56

11   1.3 PERCENT.  THAT'S 1.3 PERCENT OF THE TOTAL REVENUE?

12   A    FROM 2001 TO 2007.

13   Q    AND YOU DERIVED THAT FROM MGA'S OWN RECORDS?

14   A    YES.

15   Q    IS THAT TRUE FOR EVERY OTHER OF THE TEN PRODUCTS LISTED  11:56

16   THERE?

17   A    YES.

18   Q    NOW, OF THESE PRODUCTS LISTED HERE -- AND I APPRECIATE

19   THAT FOLKS CAN'T READ THEM; I'LL JUST READ THE NAMES ALONG THE

20   BOTTOM:  SPIDER-MAN, SHREK, LITTLE TIKES, BRATZ, RESCUE PETS,  11:57

21   4-EVER BEST FRIENDS, YUMMI-LAND, ZAPF, MIUCHIZ, SCOOTER

22   SAMANTHA.

23           LET'S FOCUS ON THE FIRST FOUR THERE, SPIDER-MAN,

24   SHREK, LITTLE TIKES, AND BRATZ.

25           WHICH OF THOSE DID MGA ITSELF ORIGINATE?          11:57

1    A    NONE OF THOSE FOUR.

2    Q    HOW ABOUT SPIDER-MAN?  DO YOU KNOW WHERE THAT COMES FROM?

3    A    THAT'S LICENSED FROM ANOTHER COMPANY.

4    Q    HOW ABOUT SHREK?

5    A    THAT WOULD BE THE SAME FOR SHREK.                          11:57

6    Q    HOW ABOUT LITTLE TIKES?

7    A    LITTLE TIKES WAS ACQUIRED BY MGA NEAR THE END OF 2006.

8    Q    SO THAT REPRESENTS ANOTHER COMPANY THAT THEY ACQUIRED?

9    A    IT DOES.

10   Q    THEN BRATZ, YOU'RE AWARE THAT SOME DESIGNS WERE LICENSED   11:58

11   FROM MR. BRYANT?

12   A    I DO.

13   Q    THE REMAINING SIX, THEIR BEST PRODUCT THERE -- DO YOU KNOW

14   WHETHER THOSE SIX ARE INTERNALLY-DEVELOPED MGA PRODUCTS?

15   A    IT IS MY UNDERSTANDING THAT THEY WERE.                     11:58

16   Q    THE BEST OF THE LAST SIX, THEIR BEST PRODUCT -- DO ANY OF

17   THEM ACCOUNT FOR EVEN ONE PERCENT OF MGA'S SALES?

18   A    NOT DURING THAT TIME PERIOD.

19   Q    LET'S GO BACK NOW AND LOOK AT SLIDE 10.

20        WHAT DOES THIS SHOW?                                       11:58

21   A    THIS SHOWS MY CALCULATION OF WHAT I BELIEVE THE PROFITS

22   ARE EARNED BY BRATZ, WHICH ARE THE BLUE BARS, AND BY ALL OTHER

23   PRODUCTS, THE NON BRATZ PRODUCTS, DURING EACH YEAR BETWEEN 2001

24   AND 2006.

25   Q    AGAIN, WHERE DID YOU GET THIS INFORMATION?                 11:58

1    A    THE UNDERLYING INFORMATION I RECEIVED FROM MGA.  BUT I HAD

2    TO MAKE MY OWN CALCULATIONS.

3    Q    IN TERMS OF THE NON BRATZ PRODUCTS, WHAT DOES IT SHOW IN

4    TERMS OF WHETHER OR NOT MGA HAS MADE PROFITS IN THESE YEARS ON

5    NON BRATZ PRODUCTS?                                              11:59

6    A    FIVE OUT OF THE SIX YEARS, I BELIEVE THEY LOST MONEY ON

7    THESE PRODUCTS.  IN ONE YEAR, 2005, I BELIEVE THEY MADE MONEY.

8    Q    SO IN TERMS OF THOSE RANKINGS THAT WE WERE LOOKING AT, IF

9    YOU TAKE BRATZ OUT OF THE MIX, DOES MGA PERFORM -- HAS IT

10   PERFORMED ON ITS PRODUCTS LIKE LEADING TOY COMPANIES SUCH AS     11:59

11   MATTEL, HASBRO, OR JAKKS.

12   A    THEY HAVE NOT.

13   Q    IF WE COULD GO BACK TO SLIDE NUMBER 9.

14        FOCUSING ON THE EXPERIENCE, THEN, WITH THE NON BRATZ

15   PRODUCTS, DO YOU HAVE AN OPINION AS TO WHICH CATEGORY MGA WOULD   11:59

16   BELONG IN?

17   A    I BELIEVE THEY WOULD BELONG IN THE BOTTOM CATEGORY.

18   Q    IF WE COULD GO NOW TO --

19        **THE COURT:**  COUNSEL, IF YOU'RE GOING TO ANOTHER AREA,

20   LET'S TAKE OUR LUNCH BREAK.                                      12:00

21        (WHEREUPON, JURORS DEPART COURTROOM.)

22        **THE COURT:**  THE MOTION FOR SANCTIONS.  I RECEIVED THE

23   MOTION AND THE OPPOSITION.  I INDICATED THAT THE REPLY COULD BE

24   MADE IN COURT, SO WE'LL START WITH MGA.

25        **MS. AGUIAR:**  AARON, IF YOU COULD PUT UP FOR ME ON THE    12:02

1    SCREEN ONE OF THE SLIDES THAT WAS USED BY MATTEL IN ITS OPENING

2    STATEMENT.  THE FIRST ONE IS 33-2.

3         YOUR HONOR, I DON'T THINK THAT THERE'S ANY DOUBT AT

4    THIS POINT THAT A DOLL THAT WAS SHOWN IN TWO DIFFERENT SLIDES

5    TO THE JURY DURING OPENING STATEMENT WAS THE WRONG DOLL.  IT          12:02

6    WILL ULTIMATELY BE UP TO YOUR HONOR TO DETERMINE, BASED ON OUR

7    BRIEF AND THE BRIEF SUMMARY THAT I'M GIVING YOU NOW, WHETHER

8    MATTEL ACTUALLY HAD A GOOD FAITH BASIS TO PRESENT THAT EVIDENCE

9    TO THE JURY IN OPENING STATEMENT, WHICH WE BELIEVE SET THE TONE

10   FOR THIS PHASE OF THE CASE BY UNFAIRLY PREJUDICING MGA AND           12:02

11   GIVING THE JURY A VERY CLEAR MESSAGE FROM MATTEL THAT MGA HAS

12   MADE INCONSISTENT AND UNREASONABLE ARGUMENTS AND POSITIONS IN

13   HONG KONG LITIGATIONS.

14         I THINK THE EVIDENCE IS VERY CLEAR THAT MATTEL HAD

15   ACCESS TO THE RIGHT INFORMATION IN ORDER TO HAVE PROVIDED THIS       12:03

16   JURY, IF MATTEL SO WISHED, WITH THE CORRECT IMAGES.  THEY CHOSE

17   NOT TO DO THAT.

18         THE TESTIMONY FROM MR. LEUNG YESTERDAY, IN

19   MR. QUINN'S EXAMINATION OF HIM, IS EXHIBIT A.

20         MATTEL HAD -- THIS IS JUST -- I WANTED TO REMIND YOUR          12:03

21   HONOR OF THE SLIDE, AT LEAST ONE OF THE SLIDES, THAT THEY USED

22   IN OPENING STATEMENT.  WE'LL PUT THAT BACK UP IN A SECOND.

23         LET ME TURN TO THE PLEADING THAT THEY HAD.

24         **THE COURT:**  YOU RAISE A VERY IMPORTANT POINT TO ME.

25   YOU SAID THAT THIS MR. LEUNG THAT THEY HAD YESTERDAY -- HE WAS       12:03

1   CONTACTED LAST FRIDAY.

2          **MS. AGUIAR:**  HE WAS CONTACTED LAST FRIDAY.

3          LET ME TIE IT UP FOR YOUR HONOR.

4      **THE COURT:**  WE NEED TO BACK UP TO WHERE WE WERE WHEN

5   MR. PRICE MADE HIS OPENING STATEMENT.                        12:04

6          **MS. AGUIAR:**  ABSOLUTELY.  LET ME DO THAT.

7          I WAS JUST TRYING TO USE HIS TESTIMONY AS A WAY OF

8   SHOWING THAT THEY HAD THE INFORMATION, BUT YOU'RE ABSOLUTELY

9   RIGHT.

10          EXHIBIT 13561.                                       12:04

11      **THE COURT:**  YES.

12          **MS. AGUIAR:**  EXHIBIT 13561 IS A DOCUMENT SUBMITTED IN

13   THE DOUBLE GRAND CASE.  THAT EXHIBIT WAS PROVIDED TO MATTEL

14   MONTHS AGO.

15      **THE COURT:**  OKAY.                                    12:04

16          **MS. AGUIAR:**  AND IF YOU LOOK, FOR EXAMPLE, AT

17   PAGE 0124 OF THAT EXHIBIT, THERE'S A PHOTOGRAPH ATTACHED TO

18   THAT SUBMISSION WHICH WAS MADE IN THE HONG KONG LITIGATION, IN

19   THE DOUBLE GRAND CASE, SHOWING THE TRENDY TEENZ DOLL.

20      **THE COURT:**  WHY DOESN'T THE COPY THAT I HAVE HAVE     12:05

21   PAGE NUMBERS?  I HAVE 13561, BUT I DON'T HAVE PAGE NUMBERS.

22          **MS. AGUIAR:**  I CAN PROVIDE YOU MY COPY.

23      **THE COURT:**  IS THAT THE SAME PICTURE?

24      **MS. AGUIAR:**  YES, IT IS.

25          WOULD YOU LIKE A HARD COPY?                          12:05

1          **THE COURT:**  PLEASE.

2          **MS. AGUIAR:**  IT'S PAGE 124.

3          THE OTHER FLAGGED PAGES THERE, YOUR HONOR, AND THE

4    HARD COPY THAT YOU HAVE ARE OTHER IMAGES OF THE ALLEGEDLY

5    INFRINGING PRODUCTS IN THAT CASE.                              12:06

6          THE ONLY REASON THAT I WAS REFERENCING MR. LEUNG'S

7    TESTIMONY IS THAT HE WAS EASILY AND READILY ABLE, THROUGH THOSE

8    PHOTOGRAPHS, TO IDENTIFY THEM AS DOLLS THAT WERE MANUFACTURED

9    BY HIS COMPANY AND THAT WERE AT ISSUE IN THAT CASE.

10          WE PRODUCED THAT DOCUMENT THAT YOU HAVE IN FRONT OF        12:06

11    YOU MONTHS AGO.

12          **THE COURT:**  THIS WAS NOT THE ONLY DOLL THAT WAS

13    REFERENCED AS INFRINGING IN THIS CASE.

14          **MS. AGUIAR:**  THAT'S CORRECT.  THERE WAS A MINI TRENDY

15    TEENZ.  AND THERE'S ALSO A PHOTOGRAPH OF THAT THERE.  THERE WAS  12:06

16    A PEN, A BOBBLEHEAD PEN, THAT WAS ALLEGING INFRINGING.  HE ALSO

17    IDENTIFIED THAT.  THOSE ARE ATTACHED AS EXHIBITS TO THAT

18    SUBMISSION THAT WAS MADE IN THE HONG KONG CASE.

19          **THE COURT:**  THE ONE THAT MR. PRICE PUT UP WAS THE --

20    WHAT WAS THE NAME OF IT?                                       12:07

21          **MS. AGUIAR:**  YOU'RE ASKING WHICH ONE HE USED IN

22    OPENING?

23          **THE COURT:**  THE ONE THAT YOU'RE COMPARING THIS

24    ONE TO.

25          **MS. AGUIAR:**  I'M HOLDING UP, YOUR HONOR,             12:07

1    EXHIBIT 13703, WHICH IS ABOUT A FOOT TALL PLUSH DOLL.

2           THE COURT:  WHAT'S THE NAME OF IT?

3           MS. AGUIAR:  THE NAME ON IT IS TRENDY TEENZ, AND IT'S

4    MANUFACTURED -- THE FRONT OF IT, ACTUALLY RIGHT ON THIS

5    EXHIBIT, SAYS "WEST COVINA, CALIFORNIA, FUN TOYS," SO I KNOW          12:07

6    THAT YOUR HONOR --

7           THE COURT:  SO THIS IS ANOTHER TRENDY TEENZ THAT'S --

8           MS. AGUIAR:  APPARENTLY.

9           AND I KNOW THAT YOUR HONOR HAS BEFORE LOOKED TO THE

10   ACTUAL PACKAGE FOR INDICIA OF WHAT IS IT ABOUT THE DOLL, AND         12:08

11   THIS ONE SAYS IT'S A COMPANY BASED IN WEST COVINA, CALIFORNIA,

12   APPARENTLY.

13          MY POINT IS THAT THE PLEADING OR THE SUBMISSION THAT

14   WAS MADE IN THE DOUBLE GRAND CASE --

15          THE COURT:  COULD I SEE THE DOLL?                            12:08

16          MS. AGUIAR:  SURE.  OF COURSE.

17          THE COURT:  BUT IT'S MADE IN CHINA.

18          MS. AGUIAR:  YES.  BUT THE NAME OF THE COMPANY --

19          THE COURT:  FUN TOYS.

20          MS. AGUIAR:  -- IS FUN TOYS.                                 12:08

21          THERE'S NOTHING ON THERE THAT INDICATES THAT WAS MADE

22   BY ANY OF THE PARTIES THAT WERE INVOLVED IN THIS LITIGATION.

23   THAT WAS THE ONLY POINT THAT I WAS MAKING.  IN OTHER WORDS,

24   THERE'S NO INDICATION ON -- MANY DOLLS, I BELIEVE, ARE -- WE'VE

25   SEEN IN THIS CASE -- MANY OF THEM ARE MADE IN CHINA.               12:09

```
 1          THERE ARE ALSO, WHICH HAVE BEEN PRODUCED TO MATTEL,

 2   PHOTOGRAPHS OF THE TRENDY TEENZ DOLLS THAT WERE AT ISSUE, AND

 3   THERE'S ALSO A MINI ONE; THERE'S A MINI TRENDY TEENZ, LIKE I

 4   SAID, AND THERE'S A PEN.  THOSE ARE NOT JUST ATTACHED TO THAT

 5   ONE SUBMISSION, YOUR HONOR.  THERE ARE OTHERS.  THERE'S AN       12:09

 6   AFFIRMATION OF LEE SHIU CHEUNG IN THAT CASE.  AND THAT'S

 7   EXHIBIT NUMBER 13691.  AND ATTACHED TO THAT SUBMISSION, THERE

 8   ARE ALSO PHOTOGRAPHS OF VARIOUS TRENDY TEENZ DOLLS.

 9          MATTEL ALSO POINTS TO THE DEPOSITION OF

10   MITCHELL KAMARCK.                                                12:10

11          THE COURT:  THAT WAS RATHER EQUIVOCAL, BUT IT DID

12   GIVE SOME INDICATION.  HE WAS KIND OF --

13          MS. AGUIAR:  WELL, YOUR HONOR, I HAVE TO SAY HIS

14   FIRST ANSWER WAS, 'I HONESTLY CAN'T TELL ONE WAY OR THE OTHER,'

15   AND THEN HE SAID -- THE QUESTION WAS -- LET ME READ THE WHOLE    12:10

16   ANSWER: "I HONESTLY CAN'T SAY ONE WAY OR THE OTHER.  IF YOU

17   HAVE THE LITIGATION PAPERS, I COULD PROBABLY RESPOND TO THAT.

18   BUT I DON'T KNOW WHETHER THIS HAPPENED WHILE I WAS AT MGA OR

19   NOT.  I DO VAGUELY RECALL THAT COMING IN."

20          AND THEN THE QUESTION:  "THAT COMING IN, MEANING YOU      12:10

21   SAW A COPY OF THAT DOLL?"

22          ANSWER:  "YEAH.  I SAW -- I THINK SO."

23          MS. AGUIAR:  AND I HAVE TO SAY THAT DEPOSITION WAS IN

24   JANUARY, AND THEN THERE WAS MOTION PRACTICE, AND THEN WE MADE A

25   PRODUCTION TO MATTEL IN MAY.  THAT WAS SEVERAL MONTHS BEFORE     12:11
```

1   MR. PRICE STOOD UP HERE AND SHOWED THE JURY THAT BIG PLUSH

2   DOLL.

3          LET ME JUST WALK THROUGH THE TIMELINE TOO.

4          WE MADE THE PRODUCTION IN MAY.  MR. PRICE STOOD UP

5   AND MADE HIS OPENING STATEMENT ON JULY 23RD.  SEVERAL DAYS      12:11

6   AFTER JULY 23RD, ON JULY 25TH, WE GOT A SUBPOENA ASKING US FOR

7   COPIES OF THE ORIGINAL DOLLS FROM HONG KONG.

8          SO TO ME, THE TIME FRAME HERE IS COMPLETELY FLIPPED.

9          IF MATTEL IS GOING TO STAND UP, MAKE ARGUMENTS TO THE

10  JURY, AND PRESENT EVIDENCE TO THEM ON JULY 23RD -- THINGS LIKE   12:11

11  SUBPOENAS AND REQUESTS FOR ORIGINAL DOLLS SHOULD HAVE COME

12  BEFORE JULY 23RD, NOT AFTER JULY 23RD.

13         **THE COURT:**  THERE WERE REQUESTS EARLY ON IN

14  LITIGATION --

15         **MS. AGUIAR:**  YES.  AND BY THE WAY, IN MAY, THEY DID    12:12

16  HAVE THAT DECLARATION WHICH I'VE SHOWN TO YOU, PLUS OTHER

17  PLEADINGS FROM THIS CASE.  I'M JUST MAKING THE POINT THAT IF

18  THEY WANTED TO CONFIRM IT, THEY COULD HAVE ASKED US PRIOR TO

19  JULY 23RD.  WE GOT AN E-MAIL ON JULY 28TH, WHICH WAS FIVE DAYS

20  AFTER THE OPENING STATEMENT.  SO MY POINT IS, WHEN YOUR HONOR    12:12

21  IS INQUIRING INTO -- I DON'T KNOW HOW YOU DETERMINE THIS, BUT

22  WHETHER THEY HAD A BASIS FOR DOING THIS --

23         **THE COURT:**  I'LL TELL YOU HOW I DETERMINE THIS.  I'VE

24  NEVER HAD THIS ISSUE COME UP LIKE THIS BEFORE, BECAUSE I'VE HAD

25  A RULE EVER SINCE I STARTED HEARING TRIALS EIGHT YEARS AGO      12:12

1    THAT -- I REPEAT THE MANTRA EVERY TIME AT THE PRETRIAL

2    CONFERENCE; I KNOW I SAID IT SEVERAL TIMES IN THIS CASE --

3    NOTHING IS SHOWN TO THE JURY IN OPENING STATEMENT UNLESS THE

4    OTHER SIDE DOES NOT OBJECT.  IF THERE'S ANY OBJECTION, IT DOES

5    NOT COME IN; IT'S WAIVED.                                    12:13

6            THAT IS MY MANTRA.  I USE IT TO AVOID THIS VERY

7    PROBLEM.

8            THE ONE ISSUE THAT YOU HAVE NOT ADDRESSED SO FAR IN

9    YOUR REPLY IS THAT PRIMARY ISSUE.  I HAVE A REPRESENTATION FROM

10   MATTEL THAT THEY ASKED COUNSEL FOR MGA WHETHER OR NOT THERE WAS   12:13

11   ANY OBJECTION TO IT AND THE ANSWER WAS NO.

12           **MS. AGUIAR:**  THEY ARE PARSING THE NATURE -- WE

13   GENERALLY OBJECTED TO THESE SLIDES -- WELL, LET ME START BY

14   CUTTING RIGHT TO THE CHASE.

15           DID WE SAY, AT 8:30 OR 8:45 A.M. ON THE MORNING --    12:13

16   BECAUSE THAT'S WHEN WE SAW THEIR SLIDES -- DID WE SAY, 'OH, I

17   NOTICED A THIRD OF THE WAY THROUGH YOUR PRESENTATION THERE IS A

18   SLIDE, AND THAT PARTICULAR DOLL WE KNOW RIGHT NOW ON THE SPOT

19   IS THE WRONG DOLL'?

20           WE DID NOT.  AND I'M NOT GOING TO TRY TO SUGGEST THAT    12:13

21   WE DID.

22           BUT, YOUR HONOR, I MYSELF TOOK THE BINDER THAT THEY

23   GAVE TO US, AND I FLAGGED THE ONES THAT WE HAD OBJECTIONS TO.

24   SO AS AN OFFICER OF THE COURT, I'LL REPRESENT TO YOU THAT THEY

25   WERE AWARE THAT MORNING THAT WE OBJECTED TO THESE SLIDES.  AND    12:14

| | |
|---|---|
| 1 | WE OBJECTED ON THE BASIS THAT THIS IS PREJUDICIAL AND CONFUSING |
| 2 | TO THE JURY, AND WE HAD ARGUMENTS THAT WE WERE MAKING THAT THIS |
| 3 | WAS AN AREA -- I GUESS MY POINT IS, THIS WAS AN AREA -- |
| 4 | **THE COURT:**  DID YOU EXPRESS THIS TO ME? |
| 5 | YOU CAN'T MAKE OBJECTIONS -- MY QUESTION IS, IS THERE |
| 6 | ANYTHING ON THE RECORD THAT THIS WAS OBJECTED TO EITHER BEFORE |
| 7 | THE OPENING STATEMENT OR DURING THE OPENING STATEMENT?  BECAUSE |
| 8 | I CAN'T -- I DON'T KNOW WHAT YOU PLEDGED TO EACH OTHER.  I |
| 9 | CAN'T GO DOWN THAT ROAD.  THAT WOULD BE A REALLY DANGEROUS ROAD |
| 10 | TO GO DOWN AT THIS POINT. |
| 11 | **MS. AGUIAR:**  UNDERSTOOD. |
| 12 | **THE COURT:**  IS THERE ANYTHING ON THE RECORD?  BECAUSE |
| 13 | I DON'T RECALL IT. |
| 14 | **MS. AGUIAR:**  I BELIEVE MR. NOLAN MADE AN OBJECTION. |
| 15 | **THE COURT:**  BUT YOU HAVE DAILIES, SO I KNOW THAT YOU |
| 16 | COULD CALL UP THE TRANSCRIPT. |
| 17 | **MS. AGUIAR:**  PERHAPS WHAT WE'LL DO IS, MR. PRICE CAN |
| 18 | MAKE HIS COMMENTARY, AND IF I CAN GET THE SPECIFIC CITE FOR |
| 19 | YOU -- I KNOW, YOUR HONOR, THAT DURING THE OPENING -- AND I |
| 20 | BELIEVE HE DID, AND I WILL GET THE PAGE CITATION FOR YOU, THAT |
| 21 | WE MADE AN ARGUMENT TO YOUR HONOR THAT THESE SLIDES REGARDING |
| 22 | THE COMPARISONS FROM OTHER JURISDICTIONS -- |
| 23 | **THE COURT:**  I UNDERSTAND YOUR OBJECTION TO THAT, AND |
| 24 | THAT GOES BACK TO THE MOTION *IN LIMINE*.  YOU MADE THAT ARGUMENT |
| 25 | FOUR TIMES.  I'M REJECTING THAT. |

12:14
12:14
12:14
12:15
12:15

1          THE OBJECTION I'M TALKING ABOUT IS REALLY SIMPLE;

2    IT'S REALLY STRAIGHTFORWARD, BECAUSE I WOULD BE SURPRISED AT

3    MYSELF IF AN OBJECTION WAS MADE ON AUTHENTICITY GROUNDS OR ON

4    THE GROUNDS THAT YOU'RE MAKING NOW -- IF THAT WAS MADE, I WILL

5    BE DISAPPOINTED IN MYSELF THAT I DIDN'T THROW IT OUT, BECAUSE          12:15

6    THAT'S JUST WHAT I DO IN TRIALS.

7          MS. AGUIAR:  AGAIN, THE DISTINCTION -- I'M NOT

8    SUGGESTING THAT WE SAID THE WRONG DOLL IS IN THIS SLIDE.  WE

9    GENERALLY OBJECTED.  NO, NOT JUST GENERALLY; WE OBJECTED TO

10   SPECIFIC SLIDES, INCLUDING THIS ONE, ON THE GROUNDS THAT          12:16

11   SHOWING THESE KINDS OF COMPARISONS WAS, IN THIS AREA, JUST

12   REALLY RIPE FOR PREJUDICING US AND CONFUSING THE JURY.

13         NOW --

14         THE COURT:  I REJECTED THAT OBJECTION.  THAT'S NOT

15   THE BASIS FOR THIS MOTION.          12:16

16         MS. AGUIAR:  I WOULD SAY, YOUR HONOR, HONESTLY,

17   THAT -- I UNDERSTAND YOUR RULE, AND YOUR RULE IS A FAIR ONE,

18   BUT TO IMPOSE ON MGA, OR ANY PARTY, THE BURDEN OF HAVING TO

19   POLICE POTENTIAL MISREPRESENTATIONS IN SOMEONE'S OPENING

20   SLIDES, I, FRANKLY -- I'M JUST NOT SURE THAT THAT'S FAIR.          12:16

21         WE LOOKED THROUGH THE SLIDES.

22         THE COURT:  I DO, COUNSEL, BECAUSE OF THE WAY I

23   ENFORCE THE RULE.  IF THERE IS ANY OBJECTION, I SUSTAIN IT, IN

24   TERMS OF WHETHER IT'S AUTHENTIC, WHETHER THERE'S A FOUNDATIONAL

25   OBJECTION, OR ANYTHING ELSE.  THAT IS -- I DON'T LIKE SEEING          12:16

```
 1   EVIDENCE SHOWN -- DON'T SHAKE YOUR HEAD AT ME, COUNSEL.  I

 2   REALLY HAVE GOT TO COUNSEL YOU ON YOUR DEMEANOR WITH THE COURT;

 3   AND IT'S NOT THE FIRST TIME.

 4            I'M GOING TO EXPLAIN MY RULING HERE.  IT IS NOT

 5   UNFAIR.                                                          12:17

 6            THE COURT DOES NOT LIKE SHOWING EVIDENCE TO THE JURY

 7   IN OPENING STATEMENT.

 8            WHAT I COUNSEL COUNSEL TO DO IS TO DESCRIBE WHAT THEY

 9   BELIEVE THE EVIDENCE IS GOING TO SHOW.

10            IF THERE IS A STIPULATION, IF THERE IS AN AGREEMENT     12:17

11   BETWEEN THE PARTIES THAT EVIDENCE CAN BE SHOWN, I PERMIT IT.

12   IF THERE IS A DISAGREEMENT ON IT, I DO NOT PERMIT IT.  ALL YOU

13   HAVE TO SAY, ALL MR. NOLAN HAS TO SAY, ALL YOU HAVE TO SAY, ALL

14   ANYONE HAS TO SAY IS, 'WE DO NOT STIPULATE.  WE OBJECT TO

15   THAT.'                                                          12:17

16            THE GENERAL OBJECTION -- AND IT WAS A GENERAL

17   OBJECTION -- TO THE ENTIRE REIGN -- AND AS YOU POINTED OUT IN

18   YOUR BRIEF, IT WAS MADE THREE OR FOUR DIFFERENT TIMES, TO THE

19   IDEA OF FOREIGN EVIDENCE COMING IN.  THAT, I REJECT.  I RULED

20   ON THE MOTION IN LIMINE.  THAT HAS BEEN REMOVED AS A BASIS.     12:18

21            BUT IN TERMS OF 'THIS IS THE WRONG EVIDENCE, THIS IS

22   NOT THE RIGHT DOLL, THIS IS THE WRONG DOLL,' ANYTHING OF THAT

23   NATURE, THE WAY TO POLICE THIS, THE WAY THE COURT POLICES THIS,

24   I EXPECT COUNSEL TO OBJECT TO THE OTHER SIDE.

25            NOW, WHEN MR. NOLAN GOT UP AND WRONGLY STATED THAT     12:18
```

1   MATTEL HAS VALUED THEIR CASE AT $75,000, THAT IS SOMETHING THAT

2   COULD NOT BE CURED THROUGH THAT PROCESS, BECAUSE THAT WAS NOT A

3   PHYSICAL PIECE OF EVIDENCE.  THAT WAS JUST AN ASSERTION THAT

4   WAS STATED.  IT WAS OBJECTED TO, THE COURT SUSTAINED THE

5   OBJECTION, AND I INSTRUCTED.                                12:18

6        WHEN MATTEL HAS MADE ERRORS IN PRESENTATION, THE

7   COURT HAS GIVEN INSTRUCTION TO THE JURY.  WE CAN'T CONTROL

8   THAT.  BUT THE PHYSICAL STUFF, THE STUFF THAT GOES UP THERE,

9   THE DIAGRAMS, THE GRAPHS, ALL OF THAT, I DO EXPECT COUNSEL TO

10  POLICE THAT.  AND IF YOU HAVE AN OBJECTION TO IT, I EXPECT YOU  12:18

11  TO STATE IT.  IF THERE'S SOMETHING IN THE RECORD THAT GOES

12  BEYOND THE GENERAL BROAD-BASED OBJECTION TO THE ENTIRE CATEGORY

13  OF EVIDENCE, BECAUSE THAT -- I RULED ON THE MOTION *IN LIMINE*

14  BEFORE TRIAL -- THAT'S WHAT I WANT TO SEE.

15       IF IT'S NOT THERE, IT'S WAIVED, AND WE'RE GOING TO    12:19

16  MOVE ON.  IF YOU WANT TIME TO LOOK THROUGH THE TRANSCRIPTS AND

17  SEE WHAT YOU CAN FIND, THAT'S OKAY AS WELL.

18       **MS. AGUIAR:**  I THINK MR. NOLAN WILL ADDRESS THAT, AND

19  SOMEONE HAS PROVIDED HIM WITH THE TRANSCRIPT.  I WOULD JUST SAY

20  THAT FOR US TO HAVE TO ASSUME THAT THE IMAGES MAY NOT HAVE BEEN  12:19

21  CORRECT AND SOMEHOW VERIFY WHAT WERE PROBABLY 150 SLIDES PRIOR

22  TO THIS AND POLICE THAT IN THAT AMOUNT OF TIME AND ASSUME THAT

23  THEY WERE TRYING TO PUT EVIDENCE IN FRONT OF THE JURY THAT WAS

24  WRONG, I THINK AT THAT POINT IN TIME WAS NOT -- TO PUT THAT

25  TYPE OF BURDEN -- AND I UNDERSTAND; I'M NOT DISPUTING WHAT   12:19

1   YOU'RE SAYING -- THAT GENERALLY SPEAKING, IF THERE'S A PIECE OF

2   EVIDENCE, WE LOOKED AT IT, WE TRIED TO MAKE WHATEVER OBJECTIONS

3   WE COULD IN THE TIME THAT WE HAD, BUT TO ASSUME THAT THEY WERE

4   ACTUALLY GOING TO PUT THE WRONG DOLL IN THERE, WE DIDN'T GO

5   INTO THIS WITH THAT MINDSET.  SO I GUESS WE SHOULD HAVE.        12:20

6           **THE COURT:**  NEITHER DOES THE COURT.

7           IS THERE ANY EVIDENCE AT ALL THAT MR. PRICE

8   INTENTIONALLY PUT UP THE WRONG DOLL?  ANY EVIDENCE?

9           I UNDERSTAND YOUR ARGUMENT.  I UNDERSTAND YOU SAY

10  THIS IS A DIFFERENT TRENDY TEENZ.  BUT WE HAVE SOMEONE FROM --  12:20

11  A COUNSEL FOR MGA SAYING THAT IT MIGHT VERY WELL BE.  HE THINKS

12  THAT -- I ASSUME THAT WAS THE DOLL THAT WAS SHOWN TO HIM IN THE

13  DEPOSITION, THE ONE THAT MR. NOLAN HAS IN HIS HANDS RIGHT NOW.

14          **MS. AGUIAR:**  I BELIEVE IT WAS.

15          **THE COURT:**  SO COUNSEL FOR MGA SAYS THAT 'I THINK    12:20

16  THAT MIGHT BE THE DOLL THAT WAS THE SUBJECT OF THE LITIGATION.'

17  THERE ARE A BUNCH OF DIFFERENT PHOTOGRAPHS IN EXHIBIT 13561-B;

18  ADMITTEDLY, NONE OF THEM OF THAT PARTICULAR DOLL.  IT'S

19  DESCRIBED AS TRENDY TEENZ, AND THAT IS THE TRENDY TEENZ.  NO

20  QUESTION A MISTAKE WAS MADE HERE.  AND THERE'S NO QUESTION THAT  12:21

21  YOU CAN CAPITALIZE ON THAT MISTAKE IN CLOSING ARGUMENT BY

22  REVISITING WHAT MR. PRICE SAID IN OPENING STATEMENT AND

23  INDICATING THAT THE EVIDENCE DID NOT BEAR THAT OUT.  BUT IS

24  THERE ANY EVIDENCE THAT MR. PRICE DID THAT INTENTIONALLY?

25          **MS. AGUIAR:**  ALL I CAN TELL YOU -- I CAN'T GET INSIDE 12:21

```
 1   HIS MIND.  I DON'T KNOW.  ALL I CAN TELL YOU IS, TWO MONTHS
 2   BEFORE HE STOOD UP HERE TO MAKE OPENING STATEMENT, THEY HAVE
 3   THE PLEADING WITH ALL OF THE PHOTOGRAPHS ATTACHED, AND THAT
 4   DOLL WAS NOT IN THERE.  AND THAT DOLL IS SO DIFFERENT FROM THE
 5   OTHER DOLLS THAT BEFORE MR. QUINN EVER ASKED MR. LEUNG EVEN A      12:21
 6   QUESTION ABOUT THE DOLL, MR. LEUNG BLURTED OUT, 'THIS IS NOT
 7   THE ONE.'  THAT'S HOW OBVIOUS IT WAS TO HIM.
 8          LOOK, I UNDERSTAND YOUR HONOR'S RULING, AND I ACCEPT
 9   IT.
10          I DID WANT TO JUST MENTION --                              12:21
11          THE COURT:  I'M NOT THERE YET.
12          IS THERE AN OBJECTION THAT WAS MADE?
13          MR. NOLAN:  YOUR HONOR, IF I MIGHT, BECAUSE I WAS THE
14   ONE WHO HAD THE CONVERSATION.
15          BEFOREHAND, WE FLAGGED A NUMBER OF THEM.  A LOT OF         12:22
16   THEM WENT TO THE GENERAL OBJECTION THAT YOU'VE REFERRED TO.
17          THE COURT:  YES.
18          MR. NOLAN:  THAT'S THE ONLY BASIS THAT I MADE THE
19   OBJECTION ON ON THE RECORD.
20          HOWEVER, YOUR HONOR, WHAT'S IMPORTANT IS, IN THIS         12:22
21   SITUATION, WE HAVE OPERATED UNDER CERTAIN RULES OF ENGAGEMENT,
22   IN THE SENSE THAT WHEN WE OBJECT, IT'S USUALLY HONORED.  THAT
23   HAPPENED IN THE FIRST PHASE.
24          ON THIS PARTICULAR DOLL, WHEN IT WAS SHOWN AT THE
25   LAST MINUTE, WHEN I LOOKED AT IT, IT JUST DIDN'T EVEN SEEM       12:22
```

1    PLAUSIBLE TO ME.  AND I SAID, 'THIS IS THE ONE?'  BECAUSE I

2    WAS, LIKE, 'OH, YOU KNOW' -- NOT TO DISCLOSE ANYTHING -- I WAS

3    SAYING, 'OH, MY GOD, THIS IS GOING TO BE TOUGH TO DEAL WITH.'

4    AND I WAS SPECIFICALLY TOLD, 'YES, THIS IS THE ONE THAT WAS

5    USED IN HONG KONG.'  AND I THINK THAT MR. PRICE SAID, 'THAT'S          12:22

6    WHAT I'VE BEEN TOLD.'

7         BUT, YOUR HONOR, I GUESS MY ONLY POINT, TO MAKE A

8    FINER POINT ON THIS, IS THAT WHEN WE ARE WORKING LIKE WE ARE, I

9    ACCEPT A REPRESENTATION, JUST LIKE I THINK MR. PRICE AND

10   MR. QUINN ACCEPTS A REPRESENTATION WHEN WE MAKE IT, THAT AT          12:23

11   LEAST I'VE HAD A FAIR BASIS UPON WHICH I AM MAKING THAT FACTUAL

12   REPRESENTATION, ESPECIALLY WITH RESPECT TO SUCH AN IMPORTANT

13   MATTER AS, 'ARE YOU GOING TO PUT SOME EVIDENCE IN?'

14        SO, LISTEN, THIS IS AN UNCOMFORTABLE --

15        **THE COURT:**  MR. NOLAN, DO YOU BELIEVE THAT MR. PRICE        12:23

16   INTENTIONALLY DID WHAT MS. AGUIAR IS SAYING HE DID?

17        **MR. NOLAN:**  NO.

18        **THE COURT:**  I DON'T EITHER.

19        **MR. NOLAN:**  PARDON ME?

20        **THE COURT:**  I DON'T EITHER.                                 12:23

21        **MR. NOLAN:**  I'M JUST SAYING THAT I DON'T BELIEVE THAT

22   MATTEL HAD A GOOD FAITH POSITION TO PUT MR. PRICE IN THE

23   POSITION OF BASICALLY SAYING, TO ME, 'THIS IS THE ONE THAT WAS

24   USED IN HONG KONG.'  THAT'S THE POINT WE'RE TRYING TO GO BACK

25   TO.  AND I THINK THAT REALLY UNDERSCORES THE IMPORTANCE OF           12:24

1    ENFORCING YOUR RULES.

2         YOU EXPECT US TO OBJECT.  WE DO.  BUT WHEN WE'RE

3    LOOKING AT PRODUCT IMMEDIATELY AND WE'RE BEING TOLD THAT IT IS

4    THE ONE THAT'S BEING USED OVER THERE, OUR ONLY POINT IS THAT

5    THEY WELL KNEW THAT IT WASN'T THE ONE.  THAT'S THE POINT I'M          12:24

6    MAKING.

7         **THE COURT:**  MR. NOLAN, THE SAME ARGUMENT COULD HAVE

8    BEEN MADE ABOUT YOUR TELLING THE JURY THAT MATTEL HAS SAID

9    THEIR CASE IS ONLY WORTH $75,000.

10        DID YOU HAVE A GOOD FAITH BASIS TO SAY THAT?                      12:24

11        IF WE WENT BACK THROUGH THE RECORD -- I DON'T KNOW

12   HOW LONG IT WAS IN ADVANCE THAT YOU HAD DECIDED TO MAKE THAT

13   STATEMENT TO THE JURY, BUT -- YOU KNOW, I'M GIVING LEEWAY TO --

14   I AM EXPECTING AND I AM ASSUMING, AND I CONTINUE TO ASSUME,

15   THAT I HAVE ATTORNEYS BEFORE ME THAT HAVE NOTHING BUT THE           12:24

16   HIGHEST OF ETHICAL QUALITIES.  AND I SAY THAT ABOUT YOU AND

17   MR. AGUIAR AND MR. ROTH AND MR. KENNEDY, MR. QUINN, MR. ZELLER,

18   MR. COREY, MR. PRICE.  THERE'S NOTHING THAT'S HAPPENED -- THIS

19   IS A HARD-FOUGHT TRIAL, AND THERE IS A LOT AT STAKE, AND I

20   REALLY APPRECIATE THAT.  BOTH SIDES ARE PUSHING THE ENVELOPE.       12:25

21   YOU'RE REPRESENTING YOUR CLIENTS ZEALOUSLY, AS YOU SHOULD.  BUT

22   BEFORE ONE SIDE GETS UP AND SAYS THAT THE OTHER SIDE IS LYING

23   OR CHEATING, THAT'S -- IN LIGHT OF THE MISTAKES THAT BOTH SIDES

24   HAVE MADE AT VARIOUS TIMES, THAT'S A PRETTY SERIOUS ALLEGATION.

25        **MR. NOLAN:**  WELL, YOUR HONOR, ONE THING I REALLY FEEL       12:25

1    COMFORTABLE SAYING IS, IF THIS WAS OUR SITUATION, AND I HAD

2    DONE THIS, THIS WOULD HAVE BEEN CALLED TO YOUR ATTENTION.

3         I'M NOT IN ANY WAY TRYING TO ENFORCE A DIFFERENT RULE

4    OF ENGAGEMENT HERE.  AND THE JURY WAS TOLD THAT I MADE A

5    MISTAKE WITH RESPECT TO THE REFERENCE TO $75,000.                    12:25

6         ALL I'M SAYING HERE, YOUR HONOR, IS THAT I STILL HAVE

7    NOT HEARD --

8         **THE COURT:**  ARE YOU SUGGESTING THAT QUINN EMANUEL

9    KNEW ABOUT THE MISTAKE AND THEY DIDN'T CALL IT TO MY ATTENTION?

10        **MR. NOLAN:**  YOUR HONOR, I BELIEVE THAT NO ONE AT              12:26

11   QUINN EMANUEL HAD A GOOD FAITH BASIS TO BELIEVE THAT THIS DOLL

12   WAS, IN FACT, THE ONE THAT WAS BEING USED IN THE HONG KONG

13   LITIGATION.  THAT'S THE ISSUE.

14        **THE COURT:**  I CAN DECIDE THIS CASE ON WAIVER BY

15   ITSELF, BUT THERE IS -- IF IT WASN'T FOR THE DEPOSITION OF YOUR      12:26

16   OWN COUNSEL -- MGA'S OWN COUNSEL, MR. KAMARCK, MADE THE SAME

17   MISTAKE IN HIS DEPOSITION.  HE SAW THAT DOLL, I ASSUME -- AND

18   NO ONE IS DISPUTING THE FACT THAT THAT IS THE DOLL THAT WAS

19   SHOWN TO MR. KAMARCK.  AND WHEN BEING QUESTIONED ON THE DOUBLE

20   GRAND LITIGATION, HE SAID, 'I THINK SO.'                            12:26

21        DID HE EVER COME AROUND AND CORRECT HIS MISTAKE?  IS

22   THERE ANY LETTER FROM MGA SAYING, 'OH, MR. KAMARCK SAID THAT HE

23   THOUGHT THAT WAS THE DOLL THAT WE'VE NOW CHECKED, AND IT'S

24   NOT'?  IS THERE ANY RECORD INDICATING THAT YOU'VE COME FORWARD

25   TO CORRECT THAT ERROR?                                              12:26

1          **MR. NOLAN:**  NO, YOUR HONOR.  BUT I DON'T THINK THAT

2    THAT'S ACTUALLY THE TRUE TESTIMONY OF MR. KAMARCK.

3          **THE COURT:**  AM I TO ASSUME, TO SPECULATE, THAT YOU'RE

4    TRYING TO SET A TRAP FOR QUINN EMANUEL BY HAVING YOUR CORPORATE

5    COUNSEL SAY 'I THINK THAT MIGHT BE THE DOLL' AND YOU NEVER          12:27

6    CORRECTED IT?  OF COURSE I DON'T THINK THAT.  I DON'T THINK

7    THAT FOR A MOMENT.  I DON'T THINK THAT FOR A MOMENT ANY MORE

8    THAN I THINK BILL PRICE STOOD UP HERE AND LIED TO THE JURY, OR

9    I THINK THAT TOM NOLAN STOOD UP AND MADE A MISREPRESENTATION.

10   I DON'T THINK ANY OF THAT.  I THINK YOU'RE ALL IN A VERY TOUGH      12:27

11   SITUATION, FIGHTING HARD FOR YOUR RESPECTIVE CLIENTS, AND

12   MISTAKES HAPPEN.  WHEN MISTAKES HAPPEN, YOU PAY A PENALTY FOR

13   THAT.  AND YOU'RE GOING TO MAKE SURE THAT BILL PRICE PAYS A

14   PENALTY FOR THAT IN YOUR CLOSING ARGUMENT, JUST LIKE BILL PRICE

15   IS GOING TO MAKE SURE YOU PAY A PENALTY FOR A MISTAKE THAT YOU      12:27

16   MADE.  IT'S AN ADVERSARIAL PROCESS.

17          NOT IDEAL.  BUT IT'S THE BEST WE GOT.

18          **MR. NOLAN:**  I ACCEPT THAT, YOUR HONOR.

19          WE'LL SUBMIT.  THANK YOU.

20          **MS. AGUIAR:**  YOUR HONOR, WE HAVE PREPARED A SHORT          12:27

21   INSTRUCTION.  I KNOW YOU GAVE ONE WITH REGARD TO THE $75,000.

22   AND I GATHER BY WHAT YOU'RE SAYING THIS IS WHERE YOU WOULD GO

23   WITH THIS AS WELL; TO INSTRUCT THE JURY THAT STUFF HAD BEEN

24   EITHER SHOWN OR SAID TO THEM IN OPENING THAT WAS NOT CORRECT.

25   SO WE CAN -- I CAN SUBMIT THAT TO YOU, AND YOU CAN CONSIDER IT      12:28

1    OVER LUNCH.

2         THE COURT:  WHY DON'T YOU RESPOND TO QUINN EMANUEL'S

3    ARGUMENT ON THAT, AS TO WHY THIS IS DIFFERENT.  THEY SET THAT

4    FORTH IN THEIR BRIEF.

5         MS. AGUIAR:  I DON'T THINK IT'S DIFFERENT AT ALL,        12:28

6    YOUR HONOR.  I THINK IT'S THE SAME SITUATION.

7         THE COURT:  THEIR ARGUMENT IS THAT, UNLIKE THE

8    $75,000 STATEMENT THAT MR. NOLAN MADE, WHICH WAS NEVER GOING TO

9    COME UP IN THE COURSE OF TRIAL, BECAUSE IT'S TOTALLY

10   INADMISSIBLE AND COULD NEVER BE ADDRESSED THROUGH THE EVIDENCE,   12:28

11   THIS HAS BEEN ADDRESSED THROUGH THE EVIDENCE.  YOU NOW HAVE

12   EVIDENCE THAT YOU CAN USE TO SHOW THAT MR. PRICE MADE A

13   MISTAKE, BY THEIR OWN WITNESS.  SO IT'S BETTER ADDRESSED IN

14   THAT PROCESS, AND, THEREFORE, DOESN'T REQUIRE THE INSTRUCTION.

15   THAT WAS THEIR ARGUMENT, I THINK, IN THEIR OPPOSITION.  AND     12:28

16   THAT NEEDS TO BE ADDRESSED.

17        MS. AGUIAR:  WE THINK AN INSTRUCTION WOULD BE

18   APPROPRIATE.  BUT IF YOUR HONOR DOESN'T, WE'LL SUBMIT ON THIS.

19        THE ONE OTHER THING I WAS GOING TO SAY WITH REGARD TO

20   THIS MOTION, BECAUSE WE DID SAY THAT WE THINK THE ROAD WE'RE    12:29

21   GOING DOWN IN HONG KONG IN GENERAL IS CONFUSING, IS THAT IN THE

22   LAST DAY AND A HALF, THERE HAS BEEN -- I CAN POINT YOUR HONOR

23   TO EXAMPLES OF TESTIMONY WHERE WE'RE WELL BEYOND FACTUAL

24   ASSERTIONS AT THIS POINT.  AND YOUR HONOR MADE A COMMENT AT THE

25   HEARING ON JULY 23RD.  YOU SAID, "IT'S BECOMING CLEARER TO ME   12:29

1    AS WE GO THROUGH THIS DISCUSSION THAT FACTUAL STATEMENTS,

2    FACTUAL ASSERTIONS, PROVIDED THAT THEY ARE DIVORCED OF LEGAL

3    LANGUAGE IN WHICH THEY REFLECT LEGAL CONCLUSIONS, OR THAT THEY

4    REFLECT LEGAL PRINCIPLES, ARE GOING TO BE ADMITTED."

5            **THE COURT:**  WHAT ARE THOSE TWO EXAMPLES, COUNSEL?          12:29

6            **MS. AGUIAR:**  DURING MR. KAMARCK'S TESTIMONY, AT

7    TRANSCRIPT AT 5705, WE GOT INTO A DISCUSSION OF REPRODUCTION OF

8    A SUBSTANTIAL PART OF AN ARTISTIC WORK.

9            **THE COURT:**  THE OTHER EXAMPLE IS...

10           **MS. AGUIAR:**  THE OTHER EXAMPLE IS TESTIMONY FROM          12:30

11   MR. KAMARCK, AND ALSO FROM MR. LEUNG, REFERENCING ANTECEDENT

12   DESIGNS AND THE CONNECTION BETWEEN ANTECEDENT DESIGNS AND

13   ORIGINAL WORKS.

14           **THE COURT:**  REGARDING THE FIRST ONE, WE HAD A

15   SIDE-BAR OVER THE WORD "REPRODUCTION," AND I THINK AT THAT TIME   12:30

16   I INDICATED THAT I WAS CONCERNED ABOUT IT.  AND THE QUESTION

17   WAS WHETHER OR NOT "REPRODUCTION" WAS BEING USED IN A LEGAL

18   SENSE, IN WHICH I WOULD BLOCK IT PURSUANT TO MGA'S REQUEST, OR

19   IF IT WAS BEING USED IN A CONVENTIONAL SENSE.  I SAID, 'WELL,

20   LET'S PUT THAT OFF.'                                              12:30

21           AND THEN THERE WAS UNREBUTTED TESTIMONY SO FAR BY THE

22   ATTORNEY YESTERDAY FROM HONG KONG INDICATING THAT

23   'REPRODUCTION' IS USED IN THAT VERNACULAR, NONLEGAL SENSE.

24   THAT'S ALL I HAVE ON IT IN EVIDENCE AT THIS POINT.  IT'S AN

25   OPEN ISSUE, AS FAR AS I'M CONCERNED, AND WE CAN CIRCLE BACK TO   12:31

1    IT.

2         WITH RESPECT TO ANTECEDENT DESIGNS, I THOUGHT THERE

3    WAS -- I THOUGHT I DID ADDRESS THAT ONE AS WELL ON THE RECORD.

4    I JUST CAN'T REMEMBER RIGHT NOW WHAT I SAID.

5         **MS. AGUIAR:**  IT CAME UP WITH MR. KAMARCK, AND IT CAME    12:31

6    UP, I BELIEVE -- I JUST DON'T HAVE THE CITE FOR YOU -- I

7    BELIEVE IT CAME UP WITH MR. LEUNG AGAIN, WHEN HE WAS TALKING

8    ABOUT ANTECEDENT DESIGNS.

9         I GUESS MY POINT IS, WE FEEL A LITTLE BIT LIKE OUR

10   HANDS ARE TIED HERE, FRANKLY; THAT THE EVIDENCE REGARDING OUR    12:31

11   FACTUAL STATEMENTS IS COMING IN.  AND UNDERSTANDABLY, THOSE

12   FACTUAL STATEMENTS ARE ALMOST INEXTRICABLY INTERTWINED WITH

13   LEGAL PHRASEOLOGY AND THEY RELATE TO LEGAL CONCEPTS.  AND

14   YOUR HONOR'S RULING THAT NO LAW IS COMING IN, I FEEL LIKE THE

15   WAY THAT THAT'S DEVELOPING, AS THE EVIDENCE COMES OUT, IS,    12:31

16   WE'RE A BIT HAMSTRUNG, BECAUSE IF YOU CAN'T EXPLAIN TO THE JURY

17   ANYTHING ABOUT SOME OF EVEN THE BASIC LEGAL CONCEPTS, THEN THEY

18   ARE JUST LEFT HANGING THERE WITH FACTUAL STATEMENTS BUT YOU

19   CAN'T PUT THEM INTO CONTEXT.

20        **THE COURT:**  I DID PERMIT THE TESTIMONY CONCERNING    12:32

21   REPRODUCTION, AND I'LL CERTAINLY INVITE MGA TO DO THE SAME

22   THING.

23        YOU'RE GOING TO HAVE TO REFRESH -- DON'T PAINT WITH A

24   BROAD BRUSH HERE, BECAUSE I DO RECALL THAT THE COURT ADDRESSED

25   THE ANTECEDENT ISSUE AS WELL.  I'VE REALLY BEEN TRYING TO BE    12:32

```
 1   ATTUNED TO ANYTHING WHICH BORDERS ON A LEGAL -- POTENTIALLY
 2   CONCEIVABLY LEGAL ISSUE.  WHAT I'M NOT GOING TO PERMIT IS MGA
 3   TO SIMPLY SAY, 'WELL, THIS IS ALL IN A LEGAL CONTEXT; IT'S ALL
 4   INEXTRICABLY INTERTWINED; THEREFORE, ANYTHING THAT WE SAID
 5   BEFORE DOESN'T COUNT.'  THAT, I'VE REJECTED FOUR OR FIVE TIMES      12:32
 6   NOW.
 7           MS. AGUIAR:  I UNDERSTAND.
 8           THE COURT:  AT THE SAME TIME, I DO RECOGNIZE THE
 9   DANGERS THAT YOU CONTINUE TO BRING TO THE COURT'S ATTENTION.
10   AND THOSE ARE THE ONLY TWO INSTANCES THAT I CAN THINK OF THAT      12:33
11   CAME CLOSE.  AND REPRODUCTION, I KNOW I DEALT WITH AT SIDE-BAR.
12   MR. NOLAN WAS PRESENT.  IT'S ON THE RECORD.  WE NOW HAVE
13   EVIDENCE ON IT.  ANTECEDENT, I JUST CAN'T REMEMBER.  I KNOW AN
14   OBJECTION WAS MADE, OR THE COURT INTERVENED.  I JUST CAN'T
15   REMEMBER WHAT HAPPENED THERE.  SO, PERHAPS, SOMEONE COULD BRING    12:33
16   THAT -- DOES SOMEBODY HAVE THAT?
17           MS. AGUIAR:  NO, I'M SPECIFICALLY NOT TRYING TO PAINT
18   WITH A BROAD BRUSH, YOUR HONOR.  I WAS GIVING YOU SPECIFIC
19   EXAMPLES, AND WE CAN LOOK AT IT.
20           I THINK REPRODUCTION OF ALL OR A SUBSTANTIAL PART OF       12:33
21   A WORK -- I HAVE A SECTION OF THE HONG KONG COPYRIGHT
22   ORDINANCE, AND WHILE THE WORD "REPRODUCTION" IS NOT IN THERE,
23   THIS CATCH PHRASE ABOUT "SUBSTANTIAL PART" IS RIGHT OUT OF THE
24   ACTUAL ORDINANCE.
25           THE COURT:  WHAT DOES IT MEAN UNDER HONG KONG LAW?        12:33
```

1           MS. AGUIAR:  AS I SAID, THE WORD "REPRODUCTION" IS

2    NOT IN THERE.

3           THE COURT:  I ASKED YOU ABOUT "SUBSTANTIAL PART."

4           THE PART THAT'S IN THE CODE, WHAT DOES IT MEAN?

5           MS. AGUIAR:  IT TALKS ABOUT REFERENCES IN THIS PART,          12:34

6    "THE DOING OF AN ACT, RESTRICTED BY THE COPYRIGHT IN A WORK,

7    ARE TO THE DOING OF IT IN RELATION TO THE WORK AS A WHOLE OR

8    ANY SUBSTANTIAL PART OF IT."

9           ALL I'M SAYING IS, THESE WORDS THAT KEEP APPEARING IN

10   THE PLEADINGS ARE WORDS OUT OF THE COPYRIGHT ORDINANCE; SO THE     12:34

11   ONLY POINT I'M MAKING IS THAT THESE ARE -- IT SEEMS TO ME, THEY

12   HAVE SOME LEGAL MEANING.  AND I GUESS --

13          THE COURT:  THERE'S LOTS OF WORDS THAT ARE USED IN

14   LEGAL STATUTES, COUNSEL.  JUST BECAUSE A WORD IS USED IN A

15   LEGAL STATUTE DOESN'T MEAN THAT IT DOESN'T HAVE -- IF THE LEGAL    12:34

16   STATUTE DEFINES IT IN A CERTAIN WAY, AND YOU CAN SHOW ME THAT,

17   AND IT DISTINGUISHES IT FROM THE COMMON UNDERSTANDING OF THE

18   WORD -- YOU HAVE AN ONGOING LEAVE TO BRING THAT TO MY

19   ATTENTION.

20          MS. AGUIAR:  DO I ALSO UNDERSTAND YOUR HONOR THAT IF        12:34

21   WE, IN OUR CASE-IN-CHIEF, WANT TO CALL SOMEONE TO PUT THESE

22   STATEMENTS -- THAT WITH REGARD TO EVIDENCE THAT HAS ALREADY

23   COME IN, PUT THEM INTO CONTEXT, WE WOULD BE ALLOWED TO DO THAT?

24          THE COURT:  AS LONG AS THERE IS A SEPARATE LEGAL

25   CONTEXT FOR THAT, YES.                                            12:35

1          I PERMITTED MR. QUINN TO ASK HIS ATTORNEY ABOUT THE

2   WORD "REPRODUCTION," AND IF THAT ATTORNEY IS WRONG, AND IF YOU

3   HAVE SOMEONE WHO CAN COME IN AND SAY, 'WELL, NO, IN HONG KONG

4   LAW, THE WORD "REPRODUCTION" HAS A PARTICULAR MEANING AND IT

5   REQUIRES AN EXTRINSIC OR AN INTRINSIC TEST,' OR SOMETHING WHICH     12:35

6   REALLY CHANGES THE MEANING OF THAT STATEMENT, ABSOLUTELY.

7          THAT'S WHAT I SAID AT SIDE-BAR, I THOUGHT.

8          **MS. AGUIAR:**  IT WASN'T TOTALLY CLEAR.  NOT BECAUSE OF

9   YOU; I JUST NOW WANTED TO MAKE SURE THAT WE WOULD BE ABLE TO DO

10  THAT IF WE NEED TO.                                                 12:35

11         **THE COURT:**  I UNDERSTAND THIS IS A DIFFICULT AREA TO

12  NAVIGATE, AND WHAT I'M TRYING TO DO IS BALANCE THE INTEREST OF

13  MGA, NOT TO HAVE SOMETHING WHICH IS IN A DIFFERENT CONTEXT USED

14  AGAINST THEM, AND WITH THE INTEREST OF MATTEL, NOT ALLOWING MGA

15  TO ESCAPE THE NATURAL CONSEQUENCES OF COMMON LANGUAGE AND           12:35

16  STATEMENTS THAT HAVE BEEN MADE IN ANOTHER FORUM.

17         IT'S NOT AN EASY TIGHTROPE.

18         **MR. NOLAN:**  IT'S WAY PAST OUR LUNCH BREAK.  ONE LAST

19  POINT.

20         THIS MORNING, FOR THE FIRST TIME, MR. QUINN AND             12:36

21  MR. PRICE BOTH HAVE COMMENTED IN FRONT OF THE JURY, YOU KNOW,

22  'WE'RE ON THE CLOCK, SO LET'S PICK UP THE PACE.'

23         **THE COURT:**  I HAVEN'T GIVEN MATTEL A CHANCE TO

24  RESPOND TO ANYTHING THAT WE'VE HEARD.  BEFORE WE GET INTO

25  ANOTHER ISSUE, WE'LL COME BACK TO THAT.                            12:36

1          BEFORE WE MOVE ON -- I HAVEN'T GIVEN YOU A CHANCE TO

2    RESPOND ON THE MOTION FOR SANCTIONS, OR NOW THIS SOMEWHAT

3    RELATED ISSUE OF HONG KONG LAW.

4          **MR. PRICE:**  OF COURSE, I WOULD LIKE TO SAY A LOT

5    ABOUT THE MOTION ON SANCTIONS.  I THINK, GIVEN WHAT THE COURT          12:36

6    SAID, I DON'T KNOW IF I NEED TO; BUT I THINK THE REASON

7    MR. NOLAN SAID HE DOESN'T THINK I INTENTIONALLY LIED IS BECAUSE

8    HE'S AN EXPERIENCED TRIAL ATTORNEY AND HE KNOWS THE SITUATION A

9    MISTAKE HAS NOW PUT ME IN, WHICH IS THAT HE CAN EMBARRASS ME IN

10   HIS CLOSING ARGUMENT.  AND THAT'S NOT A POSITION A GOOD TRIAL          12:36

11   ATTORNEY EVER WANTS TO BE IN.  THAT'S THE POSITION I'M IN NOW,

12   BECAUSE WE MADE A MISTAKE; I MADE A MISTAKE.  I WOULD NEVER

13   HAVE SHOWN THAT TO THE JURY IF I DIDN'T THINK IT WAS GOING TO

14   COME INTO EVIDENCE.

15          **THE COURT:**  I UNDERSTAND THAT.                              12:37

16          **MR. PRICE:**  SO GETTING OFF THAT AND JUST ONTO WHETHER

17   A JURY INSTRUCTION IS REQUIRED OR APPROPRIATE.  AGAIN, PEOPLE

18   MAKE MISTAKES IN OPENING STATEMENTS WHICH CAN BE CURED BY WHAT

19   COMES INTO EVIDENCE.  WHAT MR. NOLAN SAID COULD NOT, AS THE

20   COURT RECOGNIZED.  WHAT I SAID CAN.  AND, IN FACT, WE PUT THE          12:37

21   WITNESS ON, AND WE WERE GOING TO HAVE HIM SAY, 'NO, THAT WAS

22   NOT SOMETHING WHICH WE SUED ON.  WE SUED ON THESE INSTEAD,'

23   BECAUSE WE WANTED TO CONFRONT THAT MISTAKE.

24          THE WITNESS, OF COURSE, BLURTED OUT THE ANSWER BEFORE

25   MR. QUINN EVEN ASKED HIM THE QUESTION.  I THINK IT WOULD BE           12:37

1   PREJUDICIAL TO INSTRUCT THE JURY, BECAUSE IT'S KIND OF A DOUBLE

2   WHAMMY HERE.  IF AFTER THE EVIDENCE HAS COME IN THAT THIS DOLL

3   WAS NOT THE SUBJECT OF AN INFRINGEMENT ACTION, THEN TO HAVE THE

4   COURT COMMENT ON THAT TESTIMONY WOULD BE PREJUDICIAL.

5            YOUR HONOR, WE DO HAVE THE SECTION, BY THE WAY, ON          12:38

6   THE SIDE-BAR ON ANTECEDENT DESIGNS.

7            DO YOU WANT TO SEE THAT?

8            **THE COURT:**  PLEASE.

9            THIS IS AT SIDE-BAR; THIS IS THE COURT SPEAKING:

10           "I DIDN'T WANT TO GET INTO THIS ON THE RECORD, BUT         12:38

11  WHAT I THINK HE'S DOING IS PLACING INTO CONTEXT WHAT THESE

12  STATEMENTS MEAN.  OTHERWISE, THIS JURY IS GOING TO BE CONFUSED.

13  IT'S NOT SO MUCH GETTING INTO HONG KONG LAW AND PROCEDURE, AS

14  OPPOSED TO SUBSTANTIVE LAW.  WHAT I ABSOLUTELY WON'T BE

15  ALLOWING IN IS THE SUBSTANTIVE COPYRIGHT LAW.  THIS WAS MORE      12:38

16  TRYING TO EXPLAIN WHAT THESE DOCUMENTS MEAN, AND I THINK I'M

17  GOING TO GIVE SOME LEEWAY ON THAT, BUT I WANTED TO HEAR YOUR

18  POINT."

19           "MR. HANSEN:  ONE OF THE ISSUES THAT WE HAVE IS THE

20  USE OF 'BASED ON,' WHICH IS SORT OF PERMEATING A LOT OF ISSUES     12:38

21  IN THIS CASE.  'BASED ON,' AS YOU KNOW, IS PART OF THE

22  DERIVATIVE WORK DEFINITION, AND I AM NOT CERTAIN THAT THAT'S

23  WHERE THEY ARE GOING.  BUT THEY ARE ATTEMPTING TO BOOTSTRAP."

24           AND THEN MR. NOLAN PICKS UP A FEW PARAGRAPHS

25  LATER:  "THE LAST PROBLEM IS REFERENCE TO THE ANTECEDENT WORKS.    12:39

1    I THINK THAT'S THE ISSUE WHERE WE GOT INTO."

2            "**THE COURT:**  WHY DON'T YOU HAVE HIM EXPLAIN WHAT THAT

3    MEANS, OR LET'S TRY TO AVOID -- WHENEVER EITHER SIDE HEARS

4    LEGAL WORDS, IF IT CAN'T BE EXPLAINED -- IF IT CAN BE EXPLAINED

5    WITHOUT GETTING INTO THE LAW OF COPYRIGHT."                    12:39

6            MR. NOLAN SAYS, "I DON'T THINK IT CAN, YOUR HONOR.

7    MY POINT IS THAT THAT'S THE REASON WHY WE REALLY OBJECTED ON

8    THIS BASIS.  I WOULD NOT WANT HIM TO EXPLORE WHAT ANTECEDENT

9    WORKS ARE, BECAUSE WE HAVE NO REASON TO BELIEVE THAT HE

10   WOULDN'T BE INCLUDING AN ANALYSIS UNDER HONG KONG LAW."        12:39

11           "**THE COURT:**  THAT'S WHAT WAS KIND OF OPENED UP WITH.

12   MR. HANSEN'S QUESTIONING IS WHAT THE CLAIM IS BASED ON; SO THAT

13   DOOR HAS ALREADY BEEN OPENED TO A CERTAIN EXTENT, AND I THINK I

14   HAVE TO GIVE MR. QUINN AN OPPORTUNITY TO TRY TO EXPLAIN THAT.

15   WE'RE FINE RIGHT NOW.  OBJECTION IS OVERRULED."               12:39

16           AND THEN WE GOT BACK INTO MR. QUINN BACK ON THE

17   RECORD:  "WHEN YOU ASKED FOR PARTICULARS OF ANTECEDENT WORKS,

18   WHAT DID YOU MEAN?"

19           "ANY WORK OR MATERIALS THE AUTHOR BASED ON IN

20   CREATING HIS PARTICULAR WORK."                                12:40

21           "SO IF AN AUTHOR'S WORK WAS BASED ON PREVIOUS WORK,

22   THAT WOULD BE AN ANTECEDENT WORK?"

23           "YES."

24           **THE COURT:**  SO WE GET THAT DEFINITION.  THAT

25   DEFINITION IS WRONG.  IT DOES SEEM TO BE WHAT ANTECEDENT WORK   12:40

1   IS, AS COMMONLY UNDERSTOOD.  MGA MAY INTRODUCE EVIDENCE TO

2   CONTRADICT THAT.  BUT I THINK ON BOTH THOSE POINTS, ON

3   "REPRODUCTION" AND "ANTECEDENT," WE HAVE SIMPLE DEFINITIONS FOR

4   THE JURY.  IF THERE'S ANY CONCERN THAT THOSE DEFINITIONS ARE

5   INADEQUATE, BOTH SIDES ARE AFFORDED LEAVE TO SUPPLEMENT THE          12:40

6   EVIDENCE IN THE RECORD.

7           MR. QUINN:  YOUR HONOR, I WILL SAY THAT I THINK WE

8   DID TRY TO AVOID USE OF THE WORD "INFRINGEMENT," BUT IT WAS

9   MENTIONED A COUPLE OF TIMES BY BOTH --

10          THE COURT:  IT WAS.  AND THERE WAS NO OBJECTION BY          12:40

11  EITHER SIDE.

12          MR. QUINN:  AND, ALSO, MR. HANSEN ELICITED TESTIMONY

13  REGARDING INFRINGEMENT.

14          THE COURT:  HE DID.  BOTH SIDES DID THAT, AND THERE

15  WAS NO OBJECTION.  I'M NOT GOING TO START MAKING SUA SPONTE        12:41

16  OBJECTIONS AT THIS POINT.  I TRUST THAT BOTH SIDES ARE MORE

17  THAN CAPABLE OF DOING THAT ON THEIR OWN.

18          IS THERE ANYTHING FURTHER ON ANY OF THESE POINTS?

19          ALL RIGHT.  THE MOTION FOR SANCTIONS IS DENIED.

20          I'LL SEE YOU AT 1:30.                                       12:41

21

22

23  /   /   /

24  /   /   /

25                          CERTIFICATE

1

2    I hereby certify that pursuant to section 753, title 28, united
     states code, the foregoing is a true and correct transcript of
3    the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
4    conformance with the regulations of the judicial conference of
     the united states.

5

6    _____          _____
     THERESA A. LANZA, CSR, RPR                     Date
7    FEDERAL Official COURT Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

THURSDAY, AUGUST 7, 2008                    TRIAL DAY 31, MORNING SESSION