# EXHIBIT M

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MATTEL, INC.,<br><br>        Plaintiff,<br><br>    vs.<br><br>MGA ENTERTAINMENT,<br><br>        Defendant.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br>Case No. CV 04-09059<br>Case No. CV 05-02727<br><br>Hon. Stephen G. Larson<br><br>**FINAL VERDICT FORM AS GIVEN** |

# VERDICT FORM

We answer the questions submitted to us as follows:

## **Timing of Tangible Items**

1.    For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

| Yes | No | |
|-----|-----|---|
| ☒ | ☐ | TX 5-52, 62-1, 624/5-74, 62-11, 10537, 15180/5-75, 62-12, 10538, 15181/5-111, 708/5-112, 62-13/5-113./5-114/62-14/ 62-15, 1152-1, 1152-2, 10613/1328/10033-3/10033-4 |
| ☒ | ☐ | TX 5-88, 35-1, 35-3, 5-101, 1327, 10153-3, 10153-4 |
| ☒ | ☐ | TX 5-35, 757 |
| ☒ | ☐ | TX 5-36, 701, 702 |
| ☒ | ☐ | TX 5-37, 703 |
| ☒ | ☐ | TX 5-38, 762 |
| ☐ | ☐ | TX 5-39, 523, 752 |
| ☐ | ☐ | TX 5-40, 753, 754, 13583 |
| ☐ | ☐ | TX 751-2, 751-3, 5-41, 755 |
| ☐ | ☐ | TX 5-42, 756 |
| ☒ | ☐ | TX 5-43, 709 |
| ☒ | ☐ | TX 5-46, 710 |
| ☒ | ☐ | TX 5-49, 704 |
| ☒ | ☐ | TX 5-50, 705 |

07209/2554627.7

Exhibit M, p. 166

| Yes | No | |
|-----|-----|-----|
| ☒ | ☐ | TX 5-53, 1152-5, 1152-6, 10534, 15175 |
| ☒ | ☐ | TX 5-54, 62-2, 620, 774, 775 |
| ☒ | ☐ | TX 5-55, 62-3, 785, 1152-9 |
| ☒ | ☐ | TX 5-56, 764, 15176 |
| ☒ | ☐ | TX 5-57, 776, 777 |
| ☒ | ☐ | TX 5-58, 765, 15177 |
| ☒ | ☐ | TX 5-59, 739, 740 |
| ☒ | ☐ | TX 5-60, 761 |
| ☒ | ☐ | TX 5-61, 62-4, 782, 796-1, 1748 |
| ☒ | ☐ | TX 5-62, 62-5, 621, 767, 768, 5-71, 62-10, 770, 1752-1 |
| ☒ | ☐ | TX 5-63, 758, 759, 760 |
| ☒ | ☐ | TX 5-64, 62-6, 795, 1152-14, 1750 |
| ☒ | ☐ | TX 5-65, 1152-7, 1152-8, 11789 |
| ☒ | ☐ | TX 5-66, 794, 1152-13 |
| ☒ | ☐ | TX 5-67, 62-7, 784, 1152-11, 1152-12, 10535 |
| ☒ | ☐ | TX 5-68, 62-8, 781, 786, 790, 1751-4 |
| ☒ | ☐ | TX 5-69, 11788, 5-70, 62-9, 623, 783 |
| ☒ | ☐ | TX 5-72, 1152-15, 1152-16, 10536, 15179 |
| ☒ | ☐ | TX 5-73, 741, 742 |
| ☒ | ☐ | TX 5-76, 706 |
| ☒ | ☐ | TX 5-77, 707 |
| ☒ | ☐ | TX 5-78, 10539, 18501 |
| ☒ | ☐ | TX 5-136, 711 |
| ☒ | ☐ | TX 10579, 18281 |
| ☒ | ☐ | TX 15172 |

Case No. CV 04-9049 SGL (RNBx)
FINAL PROPOSED VERDICT FORM FOR PHASE 1A

07209/2554627.7

Exhibit M, p. 167

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 5 of 103   Page ID
#:180425
Case 2:04-cv-09049-SGL-RNB   Document 4125   Filed 07/17/2008   Page 4 of 8

2.    For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

| Yes | No | |
|-----|-----|---|
| ☒ | ☐ | TX 3-1, 779, 780, 1-1, 2-1, 778 |
| ☒ | ☐ | TX 3-2, 726, 727, 728, 1-4, 2-5 |
| ☒ | ☐ | TX 3-3, 1152-19, 1152-20, 11838, 15182, 1-6, 2-10, 5-104, 10544 |
| ☒ | ☐ | TX 3-5, 791, 1-8, 2-2 |
| ☒ | ☐ | TX 3-6, 11837, 15184, 1-7, 2-8, 743, 744, 5-107, 1152-17, 1152-18, 10547 |
| ☒ | ☐ | TX 3-8, 789, 1-11, 2-9, 734, 5-106, 10546 |
| ☒ | ☐ | TX 3-9, 788, 1-10, 2-6, 746, 5-103, 10543 |
| ☒ | ☐ | TX 3-10, 735, 736 |
| ☒ | ☐ | TX 3-12, 792, 1-3, 2-7, 5-102, 10542 |
| ☒ | ☐ | TX 3-13, 793, 1-5, 2-3, 10-3 |
| ☒ | ☐ | TX 5-79, 1-9, 2-4, 737, 10545, 5-105 |
| ☒ | ☐ | TX 1-2 |
| ☒ | ☐ | TX 3-11 |
| ☒ | ☐ | TX 5-26, 712 |
| ☒ | ☐ | TX 5-27, 713 |
| ☒ | ☐ | TX 5-81, 720 |
| ☒ | ☐ | TX 5-82, 715 |
| ☒ | ☐ | TX 5-83, 723 |
| ☒ | ☐ | TX 3-4, 5-84, 716, 717 |
| ☒ | ☐ | TX 3-7, 5-85, 718, 719, 10-2, 63-1 |
| ☒ | ☐ | TX 5-80, 721, 722, 5-86 |
| ☒ | ☐ | TX 5-87, 5-108, 724, 725 |
| ☒ | ☐ | TX 5-34 |

07209/2554627.7

Exhibit M, p. 168

3.     For each of the items listed below, has Mattel proven by a preponderance of the evidence that the item was "conceived or reduced to practice" — that is, created — by Carter Bryant, alone or jointly with others, during the period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

| Yes | No | |
|-----|-----|---|
| ☒ | ☐ | TX 5-89, 35-2, 323-32, 323-33 |
| ☒ | ☐ | TX 1107, 10638 |
| ☒ | ☐ | TX 1108, 10639 |
| ☒ | ☐ | TX 1109, 771 |
| ☒ | ☐ | TX 1110, 773 |
| ☒ | ☐ | TX 5-14, 10515 |
| ☒ | ☐ | TX 5-18, 10518 |
| ☒ | ☐ | TX 5-19, 10519 |
| ☒ | ☐ | TX 5-28, 10526 |
| ☒ | ☐ | TX 5-30 |
| ☒ | ☐ | TX 5-95 |
| ☒ | ☐ | TX 5-96 |
| ☒ | ☐ | TX 5-99 |
| ☒ | ☐ | TX 323-18 |
| ☒ | ☐ | TX 323-19 |
| ☒ | ☐ | TX 323-26 |

07209/2554627.7

Case No. CV 04-9049 SGL (RNBx)
FINAL PROPOSED VERDICT FORM FOR PHASE 1A

Exhibit M, p. 169

1       4.      For each of the items listed below, has Mattel proven by a

2  preponderance of the evidence that the item was "conceived or reduced to practice"

3  — that is, created — by Carter Bryant, alone or jointly with others, during the

4  period in which he was employed by Mattel (January 4, 1999, to October 19, 2000)?

5

6                          **Trial Exhibit No.**              YES      NO

7          The Three Dimensional Item Presented at Pitch        X    _____

8                              Meeting

9

10                        Trial Exhibit 1136                    X    _____

11

12                          **Timing of Ideas**

13

14      5.      Has Mattel proven by a preponderance of the evidence that Carter

15  Bryant conceived the "Bratz" characters while employed by Mattel?

16          Yes    X

17          No    _____

18

19

20      6.      Has Mattel proven by a preponderance of the evidence that Carter

21  Bryant conceived the name "Bratz" while employed by Mattel?

22              Yes    X

23              No    _____

24

25

26

27

28

**Intentional Interference with Contractual Relations**

7.   Is MGA Entertainment, Inc. ("MGA") liable to Mattel for intentional interference with contractual relations?

    Yes   _X_

    No   ____

8.   Is Isaac Larian liable to Mattel for intentional interference with contractual relations?

    Yes   _X_

    No   ____

**Aiding and Abetting Breach of Fiduciary Duty**

9.   Is MGA liable to Mattel for aiding and abetting breach of fiduciary duty?

    Yes   _X_

    No   ____

10.   Is Isaac Larian liable to Mattel for aiding and abetting breach of fiduciary duty?

    Yes   _X_

    No   ____

**Aiding and Abetting Breach of the Duty of Loyalty**

11.   Is MGA liable to Mattel for aiding and abetting breach of the duty of loyalty?

    Yes   _X_

    No   ____

07209/2554627.7

Case No. CV 04-9049 SGL (RNBx)
FINAL PROPOSED VERDICT FORM FOR PHASE 1A

**Exhibit M, p. 171**

12.   Is Isaac Larian liable to Mattel for aiding and abetting breach of the duty of loyalty?

    Yes   _X_

    No   ____

## Conversion

13.   Is MGA liable to Mattel for conversion?

    Yes   _X_

    No   ____

14.   Is Isaac Larian liable to Mattel for conversion?

    Yes   _X_

    No   ____

15.   Is MGA Entertainment (HK) Limited liable to Mattel for conversion?

    Yes   _X_

    No   ____

Once this verdict form is completed, the foreperson of the jury should sign and date on the lines below.

DATED: _July 17_, 2008

_____
Presiding Juror

Exhibit M, p. 172

# EXHIBIT N

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 11 of 103   Page ID
#:180217
Case 2:04-cv-09049-SGL-RNB   Document 4238   Filed 08/08/2008   Page 1 of 12

O

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
<u>CIVIL MINUTES -- GENERAL</u>

Case No.     CV 04-09049 SGL(RNBx)                    Date:  August 8, 2008

Title:     CARTER BRYANT -v- MATTEL, INC.
                 AND CONSOLIDATED ACTIONS
===============================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

Jim Holmes                                         None Present
Courtroom Deputy Clerk                             Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:     ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                                        None Present


PROCEEDINGS:     **ORDER DENYING MOTION FOR MISTRIAL**

This matter is before the Court on MGA's motion for a mistrial.[1]  The matter was heard on August 4, 2008, at which time the Court announced its ruling.  This Order reiterates that ruling and sets forth the rationale for the Court's ruling.

### I. BACKGROUND

After the verdict in Phase 1(a) had been rendered, on July 25, 2008, and the day after opening arguments in Phase 1(b) trial, Juror No. 6 delivered to the Court a note, stating:

HEY, JUDGE LARSON, THERE IS AN ISSUE THAT CONCERNS
ME THAT I'D LIKE TO TALK TO YOU ABOUT.  THE THING IS, I DON'T FEEL

---

[1] Herein, the Court refers collectively to the MGA entities defendants and Isaac Larian as "MGA."

MINUTES FORM 90                                    Initials of Deputy Clerk: jh
CIVIL -- GEN

1

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 12 of 103   Page ID
#:180218
Case 2:04-cv-09049-SGL-RNB   Document 4238   Filed 08/08/2008   Page 2 of 12

COMFORTABLE TALKING ABOUT IT IN FULL COURT.  COULD I SPEAK WITH
YOU AT SIDE-BAR WITH THE LAWYERS AND COURT REPORTER PRESENT?
OTHERWISE, I'LL KEEP THIS TO MYSELF.  THANKS, [JUROR] NUMBER 6.

July 25, 2008, Unsealed Tr. at 4.  After a preliminary interview with Juror No. 6 in the presence of
counsel, counsel agreed that the Court should interview Juror No. 6 in camera, outside the
presence of counsel.  Unsealed Tr. at 12-13.

The Court's interview with Juror No. 6 revealed that Juror  No. 8 made inappropriate
remarks regarding defendant Isaac Larian's ethnicity.  As a result of this interview, the Court
determined that interviews of additional jurors was necessary; counsel consented to the additional
interviews.  Thereafter, the Court interviewed in chambers each juror individually.

The transcripts of the juror interviews shall remain in camera and under seal; nevertheless,
those interviews may be summarized as follows:  All ten jurors were interviewed, including Juror
No. 8.  All jurors except one, Juror No. 2, were able to confirm that comments regarding the
ethnicity and/or national origin of Isaac Larian were made in the jury room.  Juror No. 8 herself
confirmed that she made comments regarding Mr. Larian's ethnicity and/or national origin.  Of
those nine jurors, six (including Juror No. 8 herself) recounted that the remarks at issue were
attributed by Juror No. 8 to her attorney-husband and that the remarks represented his
assessment of individuals of Persian ethnicity and/or Iranian national origin.[2]  Of the remaining nine
jurors, four of those independently recalled that Juror No. 8 used the word "stubborn" in recounting
her husband's assessment of Persians and/or Iranians.  One juror specifically recalled a remark
to the effect that Persians and/or Iranians "stole ideas."  Another juror attributed the adjective "stingy"
being used; yet another recalled the adjective "rude"; and finally, another recalled the verb "lie"
being used.  Juror No. 8's account differed:  She explained her remark was about immigrants and
the potential for a language barrier problem.

As a result of those interviews, the Court made certain factual findings, which were set forth

---

[2] Although the distinction is not of any particular relevance to the Court's current inquiry, and is one that neither
the Court nor the parties have focused upon thus far, for the sake of precision, the Court must take note of the exact
nature of the improper remarks.  Notably, it is unclear from the record whether the remarks were directed toward what
the Court understands to be Mr. Larian's ethnicity (Persian) or his national origin (Iranian), or both.  It appears to the
Court that either they were directed toward both or that the speaker was unaware of any distinction to be made.
Regardless, this point does not bear on the Court's analysis and these remarks were inappropriate in any event.
Having taken note as to what the remarks were directed, the Court also takes note of to what the remarks were not
directed:  Clearly, from the record, the remarks were not directly reflective of a broader group of ethnicities and/or
national origins generically described as those from "the Middle East," although it is clear that Persians and/or Iranians
fall into this broader category.  Compare Tr. at 317 (MGA and Mr. Larian's counsel's reference to Mr. Larian having left
"the Middle East" at an early age).  Similarly, the remarks were not directed toward Mr. Larian's race (Caucasian) rather
than his ethnicity or national origin, as suggested by MGA.  See Motion at 25 (referring to Juror No. 8's "racial bias").
Finally, it is also clear from the record (and no party has suggested otherwise), that although Mr. Larian revealed his
religion during his testimony (Jewish), the remarks were not directed toward his religion.

MINUTES FORM 90                                                                    Initials of Deputy Clerk: jh
CIVIL -- GEN

Exhibit N, p. 174

in detail in the Court's July 25, 2008, Order.[3]  The Court found that specific inappropriate comments based on Mr. Larian's ethnicity were made during jury deliberations; that the jury foreperson and other jurors immediately admonished Juror No. 8 that there was no room in the deliberation process for such remarks; that the remarks were made toward the end of the deliberation process while the jury was attempting to reach a unanimous verdict on four specific drawings that were the subject of dispute among the jurors;[4] that the remarks did not influence the jury's verdict in Phase 1(a); that some jurors believed that Juror No. 8 should be removed from the jury; and that all jurors indicated that the remarks would have no effect on any deliberations or decision to be made in Phase 1(b) of this trial.  See docket # 4155 at ¶¶ 1-7.

After interviewing the jurors, the Court met with counsel, who agreed with the Court's assessment that Juror No. 8 should be excused.  Thereafter, the Court met with Juror No. 8 in chambers with counsel present.  The Court explained to Juror No. 8 that she would be excused from further service in this case based on the statements she had made and ordered her to refrain from speaking about this case until the conclusion of Phase 1(b) of this trial.

In a letter to the Court dated July 29, 2008, Juror No. 8 reiterated her denial of wrongdoing and, in her view, the "neutral context" in which she posited certain statements relating to Isaac Larian's ethnicity and/or national origin.  The letter also delves into Juror No. 8's subjective beliefs regarding the responsible approach she believes she took in the jury's deliberations.  She also conveyed her personal negative reaction to the Court's factual findings and decision to dismiss her from the jury.

Based on the Court's findings, MGA made an oral motion for a mistrial on July 25, 2008.  The Court granted leave to MGA to file its motion in written form and set an expedited briefing schedule for that motion.  It is MGA's written motion that is presently before the Court.

## II.  AMENDMENT TO COURT'S JULY 25, 2008, ORDER

### A.    Improper Remarks

Upon review of the transcript of the juror interviews, the Court finds that it must amend the factual findings set forth in its July 25, 2008, Order.  Specifically, the Court previously found, in ¶ 1 of that Order, that Juror No. 8 remarked to the other jurors that her husband has told her about a "client or clients who are Iranian and who are stubborn, rude, stingy, are thieves, and have stolen other person's ideas."  Id.

---

[3]  Upon a more deliberated and comprehensive review of the transcript of the juror interviews, the Court finds that it must make a slight amendment the factual findings set forth in its July 25, 2008, Order.  That amendment, and the reasons therefor, are set forth infra, section II.

[4]  The jury was ultimately unable to reach a verdict on these four drawings.

MINUTES FORM 90                                                                Initials of Deputy Clerk: jh
CIVIL -- GEN

3

Exhibit N, p. 175

Although only one juror specifically recounted the remark regarding stealing another's ideas, the Court finds that the remark was made. It does so based on the fact that the juror recounting this fact was the same juror who brought this incident to the Court's attention, and who therefore had ample time to reflect upon his recollection before reporting it. Moreover, the content of this juror's interview and his demeanor throughout leads the Court to conclude that he not only recalled the details of this incident but that he also understood at the time the remarks were made that the notion of the theft of ideas was an important issue in Phase 1(a) of the trial. Finally, his recollection is supported by another juror's recollection that the term "lie" was used.

Relatedly, however, although the Court previously found that the term "thieves" was used, a review of the transcript of the interviews reveals that no juror recounted the use of that term.

The Court finds that Juror No. 8 used the term "stubborn" because it was specifically recalled, without prompting by the Court, by four of the eight jurors who heard the remarks.

The Court does not find that the adjective "stingy" was used. Only one juror recalled use of that term and, by her own admission, her recollection was not clear on this issue. In fact, the juror stated that she didn't remember the term Juror No. 8 used, but stated that she thought it was "stingy or something" or "[s]omething on that order."

The Court finds that Juror No. 8 used the term "rude" as recounted by one juror. Based on her statements during the Court's interview and her demeanor during the interview, the Court finds that the juror who recounted the use of the term "rude" was not equivocal in her recollection of the use of that term. The juror who recounted the use of the term "rude" was also personally involved in the immediate admonishment given to Juror No. 8 that there was no room in the deliberation process for such remarks and thus was, in the Court's view, fully engaged in this incident.

Accordingly, the Court **AMENDS** the factual findings set forth in the July 25, 2008, Order, by **VACATING** the second sentence of ¶ 1 and **SUBSTITUTING** the following sentence: "Specifically, Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas."

## B. Effect of Remarks on Jury

The Court does not find it necessary to amend its factual findings regarding the effect of the remark on the other jurors, set forth at ¶ 5 of the Court's July 25, 2008, Order. Specifically, the Court found that "the remarks did not, in any way, effect or influence the decision made by the jury."

At the time of the juror interviews, the Court inquired of a number of the remaining jurors (and all jurors asked responded in the negative) whether Juror No. 8's comments affected their deliberations. The Court previously expounded upon the finding of fact set forth in ¶ 5 by noting

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

4

Exhibit N, p. 176

that "[a]ll the jurors clearly indicated, by both their verbal and non-verbal response to the Court's
questioning, that the remarks had no impact on their decision in Phase 1(a)."

As acknowledged by both parties in connection with the present motion, Rule 606(b) of the
Federal Rules of Evidence bars consideration of the jury's mental processes.[5]  Therefore, the
Court finds it appropriate to more fully articulate the basis for its finding of fact that the remarks had
no impact on the jury's decision in Phase 1(a).  The Court has re-examined the transcript of its
juror interviews and reconsidered whether this factual finding should be made if the Court does not
consider any juror's answer that may have been based on his or her mental processes.  Excising
such evidence, the Court reaffirms the finding set forth in ¶ 5 on an alternative, independent basis.
Specifically, the Court finds that the improper remarks had no effect on the jury's decision based
on the reaction of the individual jurors to the remarks and based on the timing of the remarks.

## III. FED. R. EVID. 606(b)

Both sides take positions on the Court's interviews of the jurors and how the fruits thereof
may be considered. Mattel contends that the information obtained from the juror interviews may
not, consistent with Fed. R. Evid. 606(b), be considered at all in connection with the current
motion. MGA, for its part, contends that although information may be used to establish the
existence of bias, the Court's inquiry must end there and a mistrial must be declared based on that
limited inquiry. In the Court's view, neither side is correct about how the Court must apply Rule
606(b) and, in any event, both sides consented to the Court's interviews of the jurors without any
limitation on how the results thereof could be used, thereby waiving the objections they now raise.

The Court's analysis begins with the language of the relevant Federal Rule of Evidence:

(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a
verdict or indictment, a juror may not testify as to any matter or statement occurring
during the course of the jury's deliberations or to the effect of anything upon that or
any other juror's mind or emotions as influencing the juror to assent to or dissent from
the verdict or indictment or concerning the juror's mental processes in connection
therewith. But a juror may testify about (1) whether extraneous prejudicial information
was improperly brought to the jury's attention, (2) whether any outside influence was
improperly brought to bear upon any juror, or (3) whether there was a mistake in
entering the verdict onto the verdict form. A juror's affidavit or evidence of any
statement by the juror may not be received on a matter about which the juror would
be precluded from testifying.

Fed. R. Evid. 606(b).

---

[5] See Motion at 18; Opp. at 3; Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co., 206 F.3d 900, 908
(9th Cir. 2000) (citing Rushen v. Spain, 464 U.S. 114, 120 n.5 (1983)).

Initials of Deputy Clerk: jh

5

Exhibit N, p. 177

At issue here are Juror No. 8's recounting of statements made by her attorney-husband. These statements clearly were not part of the evidence submitted to the jury. Therefore, the Court concludes that the statements constituted "extraneous prejudicial information" into which the Court may inquire.

In cases in which extraneous information has been received by the jury, the Ninth Circuit directs the trial court to consider the following factors to determine whether a new trial is warranted:

> (1) [W]hether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).

As to the first factor, it is clear that the material was actually received in the jury room.

As to the second and fourth factors, the Court found, as set forth in the July 25, 2008, Order, that the remarks were made toward the end of the deliberation and after the jury had reached agreement on the Verdict Form questions that were ultimately returned unanimously. All remaining jurors who heard the remark were in agreement that the remarks came very near the end of their deliberations, and four of them specifically recalled that the remarks were made after agreement had been reached on all subjects upon which the jury ultimately reached a verdict.

As to the third factor, the Court notes that all remaining jurors who heard the remark were either involved in or witnessed an immediate admonishment of Juror No. 8 that a jury room was no place to express such remarks. By all accounts, there was no discussion or consideration of the substance of Juror No. 8's remarks.

As to the fifth factor, the Court can discern no other issues that suggest in any way that the extrinsic material affected the verdict. In fact, the Court is very confident, based on both the verbal and, even more importantly, non-verbal responses to the Court's questioning that the extrinsic material had no effect on the verdict.

Thus, application of the Estrada factors clearly compel the conclusion that MGA's motion for mistrial be denied.

In any event, prior to the Court's interview of the jurors, both sides consented thereto without limitation, and thereby have waived any objection to the Court's inquiry or use of the

Exhibit N, p. 178

information from those interviews.

## IV. VOIR DIRE OF JUROR NO. 8

MGA also argues that the motion for mistrial should be granted because Juror No. 8 was dishonest in her responses – or more accurately, in her failure to respond -- to certain questions during voir dire. Claims of this type of juror misconduct are evaluated in accordance with McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984). The Ninth Circuit has articulated the relevant inquiry as follows: "(1) [W]hether 'a juror failed to answer honestly a material question on voir dire;' and (2) whether 'a correct answer would have provided a valid basis for a challenge for cause.'" Price v. Kramer, 200 F.3d 1237, 1254 (9th Cir. 2000) (quoting McDonough Power Equip.)).

At the outset, the Court must again note its factual finding is not that Juror No. 8 was biased in the legal sense, see section VI, infra, or even that she herself held certain preconceptions regarding Persians and/or Iranians. Rather, the Court found that "Juror No. 8 indicated that her husband, an attorney, has told her about a client or clients who are Persian and/or Iranian and who are stubborn, rude, and who have stolen other people's ideas." MGA's argument regarding dishonesty in voir dire is based on an unsound premise -- that the Court has found Juror No. 8 held the views expressed by her statements. See e.g., Motion at 21 ("Where a potential juror does not truthfully disclose biases or prejudices that would render them unable to be impartial and then participates in the verdict, a civil litigant has a right to a mistrial.").

Nevertheless, the Court is mindful of the Ninth's Circuit's suggestion that those who use racial slurs – and thus, by extension, statements regarding ethnocentric bias – generally subscribe to the views that the use of such terms imply. See e.g., United States v. Henley, 238 F.3d 1111, 1121 (9th Cir. 2001). Assuming, however, that the Court were to make the factual finding upon which MGA's argument is premised, MGA's argument would still be unpersuasive.

Counsel for MGA and Mr. Larian did not, in voir dire, ask any specific questions about Mr. Larian's ethnicity and/or national origin. The closest reference in voir dire related to Mr. Larian's experience as an "immigrant" from the "Middle East" and disclosure that the claims at issue involved allegations of dishonesty on his part. Motion at 24. Counsel for MGA and Mr. Larian failed to ask questions designed to ferret out preconceptions regarding Persians and/or Iranians (or even Middle Easterners in general), nor did he ask any questions regarding the jury panel's personal experiences or business dealings – or those of their family or friends – with other individuals who share Mr. Larian's ethnicity and/or national origin. MGA simply cannot fault a juror for failing to answer a question during voir dire that it did not ask. See e.g., Sanders v. Lamarque, 357 F.3d 943, 949 (9th Cir. 2004) (no juror dishonesty in failure to disclose past gang-related issues where questions were posed to jury panel in present tense); Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1460 (9th Cir. 1989) (no duty to disclose past employment where juror was questioned regarding present but not past employment); U.S. v. Aguon, 851 F.2d 1158, 1170 (9th

Exhibit N, p. 179

Cir. 1988) (no duty to disclose juror was under investigation for crime similar to the one at issue in the case in which he served as a juror).

The question wasn't asked; therefore, there was no answer to all, let alone a dishonest answer. Therefore the first part of the McDonough Power Equip. test has not been met. Moreover, in the absence of an answer, the Court cannot consider whether that answer would have provided a basis for a challenge for cause. The second part of the McDonough Power Equip. test has not been met.

The Court accordingly rejects MGA's contention that Juror No. 8 was dishonest in her voir dire answers.

## V. APPLICABILITY OF SIXTH AMENDMENT PRECEDENT TO CIVIL TRIALS

The Sixth Amendment to the United States Constitution guarantees an accused the right to a fair trial. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."). Pursuant to the Sixth Amendment, the Ninth Circuit has held that "[t]he bias . . . of even a single juror would violate [an accused's] right to a fair trial." Estrada v. Scribner, 512 F.3d 1227, 1239 (9th Cir. 2008) (internal quotation marks and citation omitted). MGA contends that this principle should be applied to the current civil trial because a fair trial by jury is also guaranteed to civil litigants by virtue of the Seventh Amendment. See U.S. Const. amend. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.").

MGA argues because both the Sixth and Seventh Amendments guarantee the right to a fair trial, "the standards governing the Sixth and Seventh Amendment rights to a fair and impartial jury are the same." Motion at 12 n.4. It makes this contention in support of its overarching argument that the presence of one biased juror violates this right and, therefore, the Court should declare a mistrial without further inquiry. Id. at 12-13. However, this argument is unpersuasive both on the facts as found by the Court and on the authority cited by MGA in support of its argument.

As a factual matter, the Court has not found, and there is not evidence before the Court to support a finding, that Juror No. 8 was biased in the legal sense of that term. See section VI, infra.

Moreover, in support of its argument, MGA cites authority that does not support the broad proposition it advances. Specifically, MGA cites Sea Hawk Seafoods v. Alyeska Pipeline Service

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

8

Exhibit N, p. 180

Co., 206 F.3d 900, 906 n.4 (9th Cir. 2000); Rinker v. County of Napa, 724 F.2d 1352, 1354 (9th Cir. 1983); and Caterpillar, Inc. v. Sturman Indus., Inc., 387 F.3d 1358, 1371 n.2 (Fed. Cir. 2004) .

A reading of the relied-upon footnote in the Sea Hawk case, as well as the text to which it is appended, reveals only the Ninth Circuit applies precedent on a specific Rule 606(b) issue developed in criminal cases (which implicate the Sixth Amendment) to civil cases (which implicate the Seventh Amendment). 206 F.3d at 906 ("Our precedents distinguish between introduction of 'extraneous evidence' to the jury, and ex parte contacts with a juror that do not include the imparting of any information that might bear on the case. Our precedents are mostly in criminal cases, but we have applied the same rules in civil cases."). Absent from this case is any articulation of the wholesale incorporation of Sixth Amendment principles in cases implicating the Seventh Amendment.

In Rinker, the Ninth Circuit considered the issue of an unauthorized communication between a party and a juror regarding the jury's ongoing deliberations. 724 F.2d at 1353. It appears that MGA cites this case for the unremarkable proposition that "the integrity of the jury system is no less to be desired in civil cases." Id. (internal quotation marks and citation omitted). This proposition, like that stated in Sea Hawk, stops well short of the wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh Amendment that MGA advances.

However, MGA's position is supported, at least up to a point, by the Ninth Circuit's reliance in Rinker, on a criminal case that sets up a rebuttable presumption of prejudice in cases in which a jury is presented with an outside influence such as a party's unauthorized communication with a juror. 724 F.2d at 1354 (citing United States v. Armstrong, 654 F.2d 1328, 1332 (9th Cir. 1981)). Nevertheless, this case severely undercuts MGA's overarching argument that the presence of one biased juror violates this right and therefore the Court should declare a mistrial without further inquiry. In Rinker, the Ninth Circuit specifically noted that the district court failed to undertake an extensive enough investigation into the jury incident. Rinker, 724 F.2d at 1354 ("Given the added fact that in questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendant's trial, we conclude that the question of prejudicial effect deserved more consideration.") (internal quotation marks, alteration mark, and citations omitted).

Finally, the cited-to portion of Caterpillar, when read in conjunction with the authority upon which it relies, Skaggs v. Otis Elevator Co., 164 F.3d 511, 514 (10th Cir. 1998), again stands only for the unremarkable proposition that both the Sixth and the Seventh Amendments guarantee the right to a fair trial, and that, therefore, juror issues arising in criminal cases are "germane" to civil cases. The Caterpillar case, like Sea Hawk and Rinker, does not suggest that there has been a wholesale incorporation of Sixth Amendment principles to cases implicating the Seventh Amendment.

None of the cases cited by MGA support the contention that the mere presence of a juror

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

9

**Exhibit N, p. 181**

who makes improper remarks based on a party's ethnicity compels the Court to grant a mistrial without further inquiry. Therefore, as set forth in section III, supra, the Court has applied the test set forth in Estrada and denied the motion.

Related to MGA's argument discussed in this section is its argument that it is entitled to the unanimous verdict of all ten jurors. Implicit in this argument is that because Juror No. 8 was biased, her verdict should be treated as having been, more or less, excised from the jury's verdict, and thus MGA is left with a unanimous verdict of nine jurors although ten jurors deliberated. For support, MGA relies upon Parker v. Gladden, 385 U.S. 363 (1966).

In Parker, an accused was convicted of second-degree murder in a state-court proceeding. Id. at 363. During the jury's sequestration, a bailiff made statements on two occasions to two different jurors regarding his opinion of defendant's guilt, as well as his opinion that if the defendant was not guilty, the Supreme Court, through the appeal process, would "correct" the verdict. Id. The Supreme Court rejected the argument that, although a jury of twelve deliberated, the verdict could stand on the untainted verdict of the remaining ten jurors, as a jury of ten was permissible under the laws of the state in which the defendants was convicted. Id. at 365. The Supreme Court's decision was influenced, however, by a number of concerns not at issue here.

First, the Court was concerned with the weight of authority statements of the bailiff, as "an officer of the State" carried. Second, the Court was also concerned with the defendant's right to cross-examination. Neither of those issues are implicated here. The statements in the instant case were made not by any authority figure but by a peer. Certainly, there is no indication here that the other jurors accorded any additional weight to her statements because they were attributed to her attorney-husband. To the contrary, the record is clear that the other jurors gave no weight to her statements and, beginning with the foreperson, other jurors strongly rebuked Juror No. 8 for making the remarks. Accordingly, the concern of the lack of the opportunity to cross examine Juror No. 8 regarding her statements is of no moment because the remaining jurors could not have given any less weight to her statements.

In addition to the concerns regarding the appearance of official imprimatur on and lack of the right of cross-examination as to the remarks at issue in Parker, the Court was also concerned with the defendant's Confrontation Clause rights. That right is not implicated here. Austin v. United States, 509 U.S. 602, 608 n.4 (1993) (Confrontation Clause does not apply in civil cases).

Accordingly, the Court does not read Parker as requiring the Court to grant MGA's motion.

## VI. PRECONCEPTIONS AND PARTIALITY

In the events that gave rise to the present motion and in the proceedings that followed on the heels of those events, the term "bias" has been used, sometimes by the Court, without regard to the term's specific legal meaning in this particular context. When the Court and the parties use

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

10

Exhibit N, p. 182

the term "bias," what is implicated is a juror's impartiality – or more precisely, lack thereof. Cases decided under the Sixth Amendment jury trial right in a criminal case, cited by MGA, indeed conclude that the right is violated where just one biased juror participates in a verdict. See Motion at 3 (citing, e.g., United States v. Henley, 238 F.3d 1111, 1120 (9th Cir. 2001)). However, this rule invites the inquiry of what is meant by the term "bias."

Supreme Court precedent establishes what is not required of jurors. Courts do not require that jurors who are called upon to serve be without preconceived notions. Irvin v. Dowd, 366 U.S. 717, 723 (1961). Specifically, in the cited case, the Court did not require that the jurors be without preconceived notions of the guilt or innocence of a criminal defendant, which was the ultimate issue in the case. Id. ("To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.") (citation omitted). In a human system, we cannot expect perfection. Truly, perfect justice is not of this world. Our legal system and precedent take into account our inherent imperfections. Indeed, as has been observed before, and this Court today concurs, if a standard of perfection on jury verdicts were to be imposed, "[i]t is doubtful whether more than one in a hundred verdicts would stand such a test." Jorgensen v. York Ice, 160 F.2d 432, 435 (2d Cir.1947) (Hand, J.).

MGA contends that "'[d]oubts regarding bias must be resolved against the juror.'" United States v. Gonzalez, 214 F.3d 1109, 1114 (9th Cir. 2000) (quoting Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991)). The case upon which MGA relies was decided at the voir dire stage when the question at issue was whether a juror who was unable to state on the record that she was able to serve fairly and impartially. See id. ("When a juror is unable to state that she will serve fairly and impartially despite being asked repeatedly for such assurances, we can have no confidence that the juror will 'lay aside' her biases or her prejudicial personal experiences and render a fair and impartial verdict."). Juror No. 8 had no such difficulty here. This Court repeatedly asked the venire, including Juror No. 8, whether each could be fair and impartial, and Juror No. 8 responded affirmatively. Notwithstanding MGA's protestations to the contrary, prospective jurors are presumed to be impartial. See Irvin, 366 U.S. at 723.

With this standard in mind, the Court cannot, and reiterates that it has not, found that Juror No. 8 is biased -- i.e., not impartial -- in the legal sense. Instead, as more fully set forth elsewhere, the Court has found only that Juror No. 8 introduced into the jury inappropriate comments attributed to her attorney-husband.

As explained at length herein, the jury's verdict in Phase 1(a) need not be set aside on the basis of a juror's bias.

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

11

Exhibit N, p. 183

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 22 of 103   Page ID
#:180288
Case 2:04-cv-09049-SGL-RNB   Document 4288   Filed 08/08/2008   Page 12 of 12

## VII. CONCLUSION

Nothing is more important to this Court than providing a fair trial to all parties. The right to trial by jury is certainly among the greatest contributions to the rule of law in the last millennium; nevertheless, this human system, as recognized by the Supreme Court, it is not a perfect system, nor could it survive if such was the standard. See e.g., Tanner v. United States, 483 U.S. 107, 120 (1987) (O'Connor, J.) ("There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it.").

The Court deeply regrets that Juror No. 8 introduced remarks into the jury room that have no place in any courthouse, as evidenced by Juror No. 8's dismissal from the jury. At the same time, the Court is encouraged, and deeply so, by the swift and decisive response of the foreperson and other jurors who heard the extraneous remarks, a response that demonstrates that this jury fully shares the Court's commitment to fairness and justice for all of the parties.[6] This jury reacted to extraneous, potentially prejudicial information exactly as a just society would have them react. They are to be commended, not disbanded.

After careful and deliberate consideration of the circumstances present, the Court finds that a mistrial is not required.

The motion for mistrial is **DENIED**.

**IT IS SO ORDERED.**

---

[6] Defendants complain that the jury failed to report the incident to the Court in a timely manner. However, it is clear from the record that the jurors acted very promptly. Immediately after the remarks were made, the foreperson and several other jurors immediately admonished Juror No. 8. Juror No. 10 submitted a note to the Court on the same day of the remarks indicating her discomfort with jury service (which she subsequently revealed to the Court was prompted by her disgust with Juror No. 8's remarks.) Juror No. 6 submitted his note to the Court, quoted in the opening paragraph of this Order, the second trial day after the remarks were made. His delay was due in part to his mistaken assumption that Juror No. 10's note reported the remark to the Court. His delay was also due to, and the foreperson's failure to report the remark was due to, the Court's own jury instruction on July 10, 2008. See docket # 4115 at 35. As such, the limited delay in bringing the matter to the Court's attention does not strike the Court as in any way indicating the jurors' acquiescence to the remarks; to the contrary, the jurors were rightfully outraged. Rather, their delay was due to the uncertainty about the propriety of submitting such information to the Court. This sentiment is borne out in Juror No. 6's remark.

Exhibit N, p. 184

# EXHIBIT O

O

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA 92501
### CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                               Date:  July 24, 2008

Title:    CARTER BRYANT -v- MATTEL, INC.
          AND CONSOLIDATED ACTIONS
=========================================================================
=

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

        Jim Holmes                                  None Present
        Courtroom Deputy Clerk                      Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:       ATTORNEYS PRESENT FOR DEFENDANTS:

John B. Quinn                           Thomas J. Nolan
B. Dylan Proctor                        Carl Alan Roth
Michael T. Zeller                       Jason Russell
Jon Corey                               Lauren Aguiar
William Price                           David Hansen
Scott B. Kidman

PROCEEDINGS:   **POST-PHASE1A ORDER RE MOTION FOR PARTIAL SUMMARY
               JUDGMENT ON THE ISSUE OF SUBSTANTIAL SIMILARITY;**

               **ORDER RE PROCEEDINGS REGARDING LACHES AND OTHER
               EQUITABLE DEFENSES**

               **ORDER RE FRAUDULENT CONCEALMENT JURY ISSUE**

        These matters were heard on Friday, July 18, 2008, and again on Monday, July 21, 2008, at
which time the Court announced its rulings.  This Order sets forth those rulings and the rationale
therefor.

MINUTES FORM 90                                          Initials of Deputy Clerk: jh
CIVIL -- GEN

Exhibit O, p. 185

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 25 of 103   Page ID
#:180254
Case 2:04-cv-09049-SGL-RNB   Document 4154   Filed 07/24/2008   Page 2 of 9

## I. SUBSTANTIAL SIMILARITY AND SCOPE OF PROTECTABILITY

At a post-Phase 1A hearing on remaining legal issues to be addressed prior to commencement of the Phase 1B trial, counsel for MGA raised an issue regarding the scope of the protection to be given to the copyrighted drawings. This issue, in turn, implicates the arguments raised by the parties in the motions for partial summary judgment regarding originality and protectability (raised by MGA) and substantial similarity (an element of copyright infringement upon which Mattel seeks summary judgment).

To address these issues, the Court begins its analysis with a recitation of the elements of copyright infringement, which are (1) ownership of a valid copyright, (2) access by the defendant to the original, and (3) substantial similarity of the original and allegedly infringing works. North Coast Industries v. Jason Maxwell, Inc., 972 F.2d 1031, 1033 (9th Cir. 1992).

The first element, although not amenable to resolution on summary judgment, was decided by the jury's verdict in Phase 1A. The second element was not contested by MGA, and in any event, was also decided by virtue of the jury verdict. Thus, although the Court previously deferred the issue of substantial similarity, it is now appropriate to consider whether the record on summary judgment allows the Court to adjudicate the final element of copyright infringement in favor of Mattel.

To determine substantial similarity, the Court must apply both the extrinsic test and the intrinsic test.

To apply the extrinsic test, the Court must first examine the specific expressive elements of the works at issue and compare them to those found in the allegedly infringing work. Dr. Seuss Enterprises v. Penguin Books, Inc., 109 F.3d 1394, 1398 (9th Cir. 1997). This involves analytically dissecting works into their components in order to determine whether some – or all – similarities are attributable to unprotected elements, which must be filtered out of the analysis before a conclusion regarding substantial similarity is reached. Id. To apply the extrinsic test to visual works, such as the drawings at issue here, "[t]he basic mode of analysis for comparison of the literary elements applies . . . [, and] unprotect[a]ble elements should not be considered when applying the extrinsic test to art work." Cavalier v. Random House, Inc., 297 F.3d 815, 825-26 (2002). However, "[t]he precise factors evaluated for literary works do not readily apply to art works. Rather, a court looks to the similarity of the objective details in appearance." Id. at 826.

To apply the intrinsic test, the Court examines the overall similarity of expression in the two works from the perspective of the ordinary observer. Olson v. National Broadcasting Co., 855 F.2d 1446, 1448-49 (9th 1988).

In applying both the extrinsic and intrinsic tests, the Court must be mindful of the so-called "inverse ratio rule" which states that where, as here, a high degree of access to the original works

MINUTES FORM 90
CIVIL -- GEN

Initials of Deputy Clerk: jh

2

**Exhibit O, p. 186**

is shown, the burden to show substantial similarity is reduced.  Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir.2000).

In applying these principles, the Court cannot conclude that Mattel has shown that it is entitled to summary judgment on the issue of substantial similarity.  On summary judgment, MGA offered evidence from its doll design expert pointing out a number of differences between the Bratz dolls and the registered drawings.  Additionally, it offered the evidence of Paula Garcia regarding the changes that MGA wished to make in the process of creating the dolls from the drawings to make them less "edgy" and to better appeal to the "tween" market.  MGA also offered evidence that its sculptor was given a certain amount of artistic freedom in creating the sculpt.  All these combine to create a triable issue of fact regarding whether the dolls are substantially similar to the drawings.

Related to this issue is the one raised by MGA at Friday's hearing:  What is the scope of the protectability of the copyrighted drawings?  The Court cannot conclude that the scope is, as MGA contends, limited to the "thin" protection that would prohibit little more than virtual copying.

The Court's analysis begins with a presumption of protectability conferred by the registration of the drawings.  Where, as here, the relevant works have registered copyrights, registration is prima facie evidence of the validity of a copyright.  See 17 U.S.C. § 410(c).  This presumption can be rebutted by the defendant's showing that the plaintiff's work is not original, that is, that it is unworthy of copyright protection.  Three Boys Music Corp. v. Bolton, 212 F.3d 477, 489 (9th Cir. 2000) (citation omitted).  "Originality in this context means little more than a prohibition of actual copying."  Id.  (internal quotation marks and citation omitted).

In this vein, the Supreme Court described the low threshold for copyrightability:

The sine qua non of copyright is originality. To qualify for copyright protection, a work must be original to the author. . . . Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.

Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345 (1991).  The Court elaborated:  The "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be."  Id. (internal quotation marks omitted).

Based on the record before the Court, it does not appear that MGA has contended that the registered drawings are unworthy of any protection; rather, it contends that it is worthy only of "thin" protection.  The Court is guided on this point by the case of Satava v. Lowry, 323 F.3d 805 (9th Cir. 2003).

MINUTES FORM 90                                                          Initials of Deputy Clerk: jh
CIVIL -- GEN

3

Exhibit O, p. 187

Case 2:04-cv-09049-DOC-RNB  Document 5587-4  Filed 05/26/09  Page 27 of 103  Page ID
#:180333
Case 2:04-cv-09049-SGL-RNB  Document 4184  Filed 07/24/2008  Page 4 of 9

In that case, an artist (Satava) began making glass-in-glass jellyfish sculptures. Id. at 807. When a second artist (Lowry) began making extremely similar sculptures, Satava sued for copyright infringement. Id. at 808-09. The idea to do such a sculpture was held to be beyond copyright protection. Id. at 810. Also outside the scope of copyright protection were the "elements of expression that naturally follow from the idea." Id. Thus, the Ninth Circuit held that Satava's sculptures were unprotected to the extent the physiology of jellyfish drove the presentation of the sculptures. Id. Relatedly, to the extent that traditional methods of glass-in-glass sculpture also influenced the presentation, the sculptures were also unprotected. Id.

Certain features did warrant protection, however. For instance, although the Court found unprotectable depiction of jellyfish swimming vertically, with bright colors, or with tendril-like tentacles attached to rounded bells, the Court found protectable Satava "distinctive curls of particular tendrils; the arrangement of certain hues [of color]; [and] the unique shape of the jellyfishes' bells." Id. at 811-12.

After this analysis, the Ninth Circuit did not place a high qualitative value on Satava's copyright. The Court stated it this way:

> Satava's copyright on these original elements (or their combination) is "thin,"
> however, comprising no more than his original contribution to ideas already in the
> public domain. Stated another way, Satava may prevent others from copying the
> original features he contributed, but he may not prevent others from copying
> elements of expression that nature displays for all observers, or that the
> glass-in-glass medium suggests to all sculptors. Satava possesses a thin copyright
> that protects against only virtually identical copying.

Id. at 812.

The drawings at issue here, however, are not like Satava's jellyfish sculptures. Jellyfish anatomy is much simpler than human anatomy. Correspondingly, in general, there are far more variations in humans (at least that we humans discern). For instance, we regularly take notice of a vast number of particularized differences in facial features, ethnicity, size, shape, proportions, hair color, and hair texture and, of course, various particularized combinations and permutations thereof. Specifically, in the context of the content of the copyrighted drawings at issue, we can also observe the many details of the clothing which adorn the depicted figures.[1] Moreover, an

---

[1] As noted by the Court at Monday's conference, the Court rejects the argument raised by MGA, stated elsewhere in the record, that the protectability of doll clothing is limited in the same manner as is human clothing. Briefly stated, "[a]s a general rule, items of clothing are not entitled to copyright protection. . . . This is because items of clothing are generally considered useful articles, and useful articles are not entitled to protection under the Copyright Act." Express, LLC v. Fetish Group, Inc., 424 F.Supp.2d 1211, 1224 (C.D. Cal. 2006) (citations omitted). This general rule is tempered by a limited protection extended to "pictorial, graphic, or sculptural features" even when incorporated into useful articles. 17 U.S.C. § 101. The doll clothing at issue here -- as well as the clothing depicted in the

Exhibit O, p. 188

artistic expression based on a drawing is much less limited than a glass-in-glass sculpture.

Accordingly, although the Court has denied the motion for summary judgment on the substantial similarity issue, the Court cannot go so far as to find that the registered drawings are subject to only the "thin" protection -- the protection against copying -- referred to in Satava. The relevant test to be employed on this issue in this case -- and upon which the jury will ultimately be instructed -- is the test regarding the extrinsic and intrinsic analyses set forth above.

## II. LACHES AND OTHER EQUITABLE DEFENSES

At the hearing on Friday, July 18, 2008, three separate issues regarding the affirmative defense of laches were raised: (1) Whether there is, as MGA contends, a presumption that laches applies when, as here, a copyright claim would be time-barred but for the relation-back doctrine;[2] (2) whether the Court should grant Mattel's summary judgment motion as to MGA's laches defense; and (3) whether the defense is legal (and must be presented to a jury) or equitable (and therefore should be decided by the Court, perhaps outside the presence of the jury). In the ensuing discussion, the Court addresses each of these issues in turn.

The Court first considers whether there is, as MGA contends, a presumption that laches applies where, as here, a copyright claim would be time-barred but for the relation-back doctrine.

This argument is clearly based on the Jarrow Formulas case, cited at footnote 27 of MGA's opposition to Mattel's motion for partial summary judgment, which MGA relies upon to argue that, notwithstanding any contention that Mattel's copyright claim is timely based on the relation-back doctrine, there is a presumption that claims filed outside the limitations period are time barred. MGA reads Jarrow Formulas far too broadly. That case did not consider how laches should apply when a claim that was otherwise outside the limitations period was saved by the relations-back doctrine. Therefore, its discussion regarding a "reversal" of the presumption of nonapplicability of laches is of little relevance here.[3]

---

copyrighted drawings -- are not useful articles. The clothing is part of a toy, and the proposition that toys are unprotectable because they are "useful articles" as that term is used in copyright law has been rejected by courts. See, e.g., Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 974 (6th Cir. 1983); Spinmaster, Ltd. v. Overbreak LLC, 404 F.Supp.2d 1097, 1103 (N.D. Ill. 2005).

[2] The Court previously held that Mattel's copyright claim was timely as to MGA Entertainment because it was brought within the relevant statute of limitations. As to the remaining defendants, the claim was timely in light of the relation-back doctrine.

[3] The court's discussion regarding this issue states:

In sum, we presume that laches is not a bar to suit if the plaintiff files within the limitations period for the analogous state action; the presumption is reversed if the plaintiff files suit after the analogous limitations period has expired. For purposes of laches, the limitations period may expire even though

Exhibit O, p. 189

The Court, in its own research, has been unable to locate any authority that suggests that a related-back claim would be especially vulnerable to the defense of laches. To the contrary, to the extent that such authority is found, it suggests the contrary. See e.g., In re Prempro Products Liability Litigation, 417 F.Supp.2d 1058, 1061 (E.D. Ark. 2006) (dismissing certain plaintiffs from a case, allowing them to re-file their claims in a separate complaint, and clarifying that "for application of . . . laches . . . the filing date of [the new complaint] will be deemed to relate back to the date [of the dismissed complaint]"); Bush v. Sumitomo Bank and Trust Co., Ltd., 513 F.Supp. 1051, 1054 (D.C.Tex., 1981) (noting that the court would consider the related-back date of an amended claim to assess the merits of a laches defense); E.I. duPont de Nemours & Co. v. Phillips Petroleum Co., 621 F.Supp. 310, 313 (D.C. Del.,1985) (noting that the applicability of laches did not need to be addressed in light of the fact that the proposed complaint related back to the original pleading pursuant to Fed. R. Civ. P. 15(c)).

The language of the rule allowing relation-back is in accord because it suggests that an amendment that relates back should be treated as if it was filed on the date of the original pleading. See Fed. R. Civ. P. 15(c) ("[a]n amendment to a pleading relates back to the date of the original pleading").

Therefore, in the absence of persuasive authority, the Court is unwilling to apply the "reversed" presumption suggested by MGA. Instead, the Court will continue to be guided by the touchstones of the doctrine of laches: Unreasonable delay and resulting prejudice.

The Court next considers whether the Court should grant Mattel's summary judgment motion as to MGA's laches defense. The Court previously deferred, as it does now, the motion for summary judgment on the remaining affirmative defenses. The Court will consider those at the close of Phase B of the trial as set forth below.

Finally, the Court considers whether the defense of laches is legal (and must be presented to a jury rather than the Court) or equitable (and therefore should be decided by the Court, perhaps outside the presence of the jury).

At Friday's hearing, counsel for MGA stated that MGA had argued in written briefs before the Court that laches, at least insofar as it is applied to a claim of copyright infringement, is a legal defense that must be submitted to the jury. Tr. at 96. When questioned as to the source of the authority, counsel eventually identified the case of Haas v. Leo Feist, 234 F. 105 (S.D.N.Y. 1916). Tr. 102, 106. Referring to this case, counsel contended that "most courts agree that was the first time that laches was applied as a legal defense to copyright." Tr. at 102. However, this case does not address the defense of laches. It does not address what, if any, affirmative defenses to a

part of the defendant's conduct occurred within the limitations period.

Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 838 (9th Cir. 2002).

MINUTES FORM 90                                                      Initials of Deputy Clerk: jh
CIVIL -- GEN

Exhibit O, p. 190

copyright claim should be presented to a jury. The case does not even involve a trial by jury. This case was cited in MGA's opposition to Mattel's motion for partial summary judgment, but for an entirely different proposition, relating to the merits of the laches defense.

At Monday's hearing, the Court articulated its ruling on this issue on the record in much the same form that it appears herein. The Court referred specifically to the representations of counsel set forth above, noting that the Haas case did not involve a trial by jury and further did not address the defense of laches. Tr. at 5303.

After the Court articulated its ruling, counsel for MGA revealed that perhaps he "wasn't as clear as [he] should have been" regarding this argument, explaining that Haas was "the case from which most courts agree the doctrine of laches could apply to a copyright case." Tr. at 5306. This contention was clear from counsel's argument the previous Friday. What was not clear, however, and what ultimately became clear during Monday's hearing after the Court articulated its ruling, was the source of MGA's briefing on this issue, which was MGA's opposition to Mattel's motion in limine #4 and not MGA's summary judgment papers (which the Court had reviewed at length and in vain in its attempt to locate counsel's argument on this issue). Tr. at 5306.

Although the Court informed counsel that the briefing to which he referred was not included in the materials that the Court instructed the parties to prepare in advance of the Friday hearing, counsel nevertheless asked that the Court to "take another look" at its opposition to the motion in limine, citing specifically the cases of Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc., 106 F.3d 894, 896 (9th Cir. 1997), and United States Fidelity & Guar. Co. v. Lee Investments LLC, 551 F.Supp.2d 1114, 1128 (E.D. Cal. 2008).[4]  Both these cases, as well as a third case cited in MGA's opposition to Mattel's motion in limine #4, San Francisco Bay Area Rapid Transit Dist. v. Spencer, No. C-04-04632 SI, 2007 WL 1450350 at *10 (N.D.Cal., May 14, 2007), merely represent examples of cases in which trial courts submitted resolution of certain equitable affirmative defenses to the jury. These cases do not stand for the proposition that a Court must submit for the jury's consideration the ultimate conclusion regarding equitable affirmative defenses.[5]

The defense of laches to a copyright claim is clearly an equitable defense. See, e.g., Kling v. Hallmark Cards Inc., 225 F.3d 1030, 1036 (9th Cir. 2000) (beginning its analysis of whether

---

[4] Despite counsel's contention that his argument is based on authority derived from the Haas case, that case is not cited in MGA's opposition to Mattel's motion in limine #4.

[5] MGA's other concern, that the jury's role as factfinder not be usurped, is a valid one. Notwithstanding Mattel's contention that there are no facts that are relevant to both the legal claims and the equitable affirmative defenses, see Mattel's reply to motion in limine #4 at 7-9, the Court will consider MGA's timely proposal for any special interrogatories it deems appropriate to address this concern. As previously indicated by the Court, the parties' proposed jury instructions (which should include any proposed special interrogatories) and verdict forms must be filed no later than July 24, 2008, with indexed and tabbed courtesy copies (in a three-ring binder) provided to the Court.

Exhibit O, p. 191

laches applied to a copyright claim by noting that laches is an "equitable defense"); Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996) (distinguishing the defense of statute of limitations as "legal" defense from the defense of laches an "equitable" defense). As such, it will be tried to the Court. See e.g., Danjaq LLC v. Sony Corp., 263 F.3d 942, 962 (9th Cir. 2001) (noting that although the plaintiff had a jury trial right as to his copyright infringement claims, he did not have a right to a jury on the equitable defense of laches); accord Granite State Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1027 (9th Cir.1996) ("A litigant is not entitled to have a jury resolve a disputed affirmative defense if the defense is equitable in nature.").

The Court previously suggested that it was inclined to seek an advisory jury verdict on the affirmative defenses; however, the Court is now disinclined to do so based on the risk of jury confusion. The Court is of the opinion that this jury's attention should be focused on the narrow range of issues it is being asked to decide in Phase B.

Therefore, the Court will have the parties present to the jury evidence relevant only to the remaining claims, the issue of fraudulent concealment (as discussed below), and any legal defenses to the remaining claims.

## III. FRAUDULENT CONCEALMENT JURY ISSUE

Also discussed at Friday and Monday's hearing was the issue of fraudulent concealment and its relationship with the previously-adjudicated statute of limitations issue. From the Court's perspective, two issues need to be resolved.

First is the jury's role with respect to a finding of fraudulent concealment. Both parties agree that the issue of whether Mattel has established a period of fraudulent concealment should be submitted to the jury. However, at Friday's hearing, Mattel suggested that the Court's findings as a matter of law on summary judgment regarding the statute of limitations places limitations on the time period during which the jury may find fraudulent concealment. Tr. at 100. Specifically, Mattel attempted to link the Court's findings regarding the earliest possible accrual date of Mattel's claims -- other than conversion and intentional inference with contractual relations -- with the period of fraudulent concealment to be determined by the jury regarding these two claims.

The Court's conclusion regarding the narrow range of possible accrual dates for Mattel's state-law claims, other than the conversion and intentional interference with contractual relations claims, was linked to a specific test relating to California's so-called "discovery rule," which the Court will not repeat here. See May 27, 2008, Order re Statute of Limitations Defense at 4 - 8. In the Court's June 2, 2008, Further and Final Order Re Statute of Limitations Defense, the Court noted that, because the claims for conversion and intentional interference with contractual relations are not subject to the discovery rule, "the conclusions drawn by the Court regarding the possible accrual dates for the remaining state-law claims do not apply to" these claims. Id. at 3. As noted by the Court in that Order, "[w]hether a period of fraudulent concealment exists, as well as the

Exhibit O, p. 192

duration of any such period, . . . are . . . questions of fact for the jury." Id. If Mattel believes that this approach is erroneous, then it may file, in an introductory statement to its proposed jury instructions, a short statement of legal argument in support of its position, to which, of course, MGA may respond.

Second is the scope of the relevant evidence regarding fraudulent concealment. As articulated by the Court at Monday's hearing (and before that, in its statute of limitations summary judgment orders cited above), the relevant issues -- or, stated otherwise, the ultimate facts -- are whether and for what time period the MGA defendants fraudulently concealed from Mattel the fact that Carter Bryant worked on the Bratz drawings during his period of employment with Mattel. See Tr. at 5317-19. The relevant evidence, of course, may extend beyond that boundary. See Fed. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") (emphasis added). For instance, evidence of Mattel's knowledge of (and evidence regarding MGA's concealment of) the fact that Carter Bryant was involved at some point with the Bratz project in general is relevant to -- but by no means dispositive of -- the ultimate facts of whether and for what time period the MGA defendants fraudulently concealed from Mattel the fact that Carter Bryant worked on the Bratz drawings during his period of employment with Mattel.

This distinction is in accord with that made by the Court yesterday regarding the admission of "Phase 2 evidence" in Phase 1B. Although the relevant issues have been, more or less, neatly dissected into various phases to facilitate efficient adjudication, the relevant evidence is not as conducive to any surgical cuts and has thus far managed to allude such neat dissection. Therefore, although counsel should conduct themselves in accordance with the general principles articulated herein and elsewhere on the record, relevancy, and other limits thereon placed on admissibility of evidence, most notably Fed. R. Evid. 403, will continue to be determined by the Court as objections are raised at trial.

**IT IS SO ORDERED.**

Exhibit O, p. 193

# EXHIBIT P

Case 2:04-cv-09049-DOC-RNB  Document 5587-4  Filed 05/26/09  Page 34 of 103  Page ID
#:180249
Case 2:04-cv-09049-SGL-RNB  Document 4259  Filed 08/15/2008  Page 1 of 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
3470 Twelfth Street, Riverside, CA  92501
CIVIL MINUTES -- GENERAL

Case No.   CV 04-09049 SGL(RNBx)                                    Date:  August 15, 2008
Title:       CARTER BRYANT -v- MATTEL, INC.
               AND CONSOLIDATED ACTIONS
=============================================================================

PRESENT:   HONORABLE STEPHEN G. LARSON, UNITED STATES DISTRICT JUDGE

         Jim Holmes                                      None Present
         Courtroom Deputy Clerk                          Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:        ATTORNEYS PRESENT FOR DEFENDANTS:

None Present                                     None Present

PROCEEDINGS:    **ORDER RE MGA'S MOTION FOR CLARIFICATION/RECONSIDERATION**

        The Court has received and reviewed defendant MGA's motion for
clarification/reconsideration and plaintiff Mattel's response thereto.

        As clearly set forth in the case law and previously agreed to by both plaintiff and defendants,
the scope of copyright protection is for the Court to decide.  See Apple Computer, Inc. v. Microsoft
Corp., 35 F.3d 1435, 1443 (9th Cir. 1994).  The Court shall determine the appropriate dissection and
filtration of the copyrighted drawing and, through that process, determine the protectable elements
of the copyrighted materials.  Id.  Because this process is a question of law, there is no need, and
it would be unduly confusing, to instruct the jury on how to do the filtration and dissection; rather,
the jury will be instructed as to the protectable elements of the copyrighted materials as well as the
extrinsic and intrinsic test and asked to consider whether the copyright-protectable elements
(extrinsic) of Carter Bryant's drawings and copyright-protected Carter Bryant's drawings as a whole
(intrinsic) are substantially similar to the allegedly infringing Bratz dolls and Bratz products.

        Based on all of the evidence submitted to date, the Court is able to tentatively identify the
following protectable and non-protectable elements of the copyrighted Carter Bryan drawings:

MINUTES FORM 90                                          Initials of Deputy Clerk: cls for jh
CIVIL -- GEN

1

Exhibit P, p. 194

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 35 of 103   Page ID
#:180243
Case 2:04-cv-09049-SGL-RNB   Document 4259   Filed 08/15/2008   Page 2 of 3

| Protectable elements of the copyrighted CB drawings | Non-protectable elements of the copyrighted CB drawings |
|---|---|
| 1.    Particularized, synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude.<br><br>2.    Particularized expression of the doll's head, lips, eyes, eyebrows, eye features, nose, chin, hair style and breasts, including the accentuation or exaggeration of certain anatomical features relative to others (doll lips, eyes, eyebrows, and eye features) and de-emphasis of certain anatomical features relative to others (doll nose and thin, small doll bodies).<br><br>3.    Particularized, non-functional doll clothes, doll shoes, and doll accessories that express aggressive, contemporary, youthful style. | 1.    The resemblance or similarity to human form and human physiology.<br><br>2.    The mere presence of hair, heads, two eyes, eyebrows, lips, nose, chin, mouth, and other features that track human anatomy and physiology.<br><br>3.    Human clothes, shoes, and accessories.<br><br>4.    Age, race, ethnicity, and "urban" or "rural" appearances.<br><br>5.    Common or standard anatomical features relative to others (doll nose and relatively thin, small bodies).<br><br>6.    Scenes a faire, or common or standard treatments of the subject matter. |

It is well-established that particularized expressions of human forms and human features as well as non-functional clothing are protectable. Mattel v. Goldberger Doll, 365 F.3d 133, 136 (2d Cir. 2004) ("One artist's version of a doll face with upturned nose, bow lips, and widely spaced eyes will be irresistible to an eight-year-old collector. Another artist's version, which to a grownup may look very like the first, will be a dud to the eight-year-old. . . . We can surmise that in the highly competitive, billion-dollar industry, getting the doll's face and expression exactly right is crucial to success."); Mattel, Inc. v. Azrak-Hamway Intern., Inc., 724 F.2d 357, 360 (2d Cir. 1983) ("[t]he rendering of such an idea [of a muscleman crouching] is not in itself protectable; only the particularized expression of that idea, for example, the particular form created by the decision to accentuate certain muscle groups relative to others, can be protected."). Having considered the very wide range (almost limitless) of possible expressions for the particularized expressions of the protectable elements, the Court finds that they are to be afforded broad protection. McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 321 (9th Cir. 1987) ("Works that are not factual receive much broader protection under the copyright laws because of the endless variations of expression available to the artist.").

Exhibit P, p. 195

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 36 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB    Document 4259    Filed 08/15/2008    Page 3 of 3
#:180242

The Court has already found that the "virtual identity" standard does not apply; rather, the standard to be applied to the protectable elements is the extrinsic/intrinsic substantial similarity test of the Ninth Circuit.  See July 24, 2008, Order at 2.

**IT IS SO ORDERED.**

Exhibit P, p. 196

# EXHIBIT Q

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| MATTEL, INC.,<br><br>                    Plaintiff,<br><br><br>           vs.<br><br><br>MGA ENTERTAINMENT, INC., et al.,<br><br><br>Defendants.<br><br>AND CONSOLIDATED ACTIONS | CASE NO. CV 04-9049 SGL (RNBx)<br><br>Consolidated with<br><br>CASE NO. CV 04-9059 SGL (RNBx)<br><br>CASE NO. CV 05-2727 SGL (RNBx)<br><br>Hon. Stephen G. Larson<br><br><br><br>**COURT'S PHASE B JURY**<br>**INSTRUCTIONS AS GIVEN** |

# JURY INSTRUCTION NO. 1

Members of the Jury:

Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you as to the law of the case.

A copy of these instructions will be sent with you to the jury room when you deliberate.

You must not infer from these instructions or from anything I may say or do as indicating that I have an opinion regarding the evidence or what your verdict should be.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

In following my instructions, you must follow all of them and not single out some and ignore others; they are all important.

Exhibit Q, p. 198

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 40 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 3 of 56
#:180246

## JURY INSTRUCTION NO. 2

You should decide the case as to each party separately. Unless otherwise stated, the instructions apply to all parties.

3

Exhibit Q, p. 199

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 41 of 103   Page ID
#:190267
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 4 of 56

## JURY INSTRUCTION NO. 3

Whether or not you have taken notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

4

Exhibit Q, p. 200

### JURY INSTRUCTION NO. 4

The evidence you are to consider in deciding what the facts are consists of:

1.  the sworn testimony of any witness;

2.  the exhibits which are received into evidence; and

3.  any facts to which the lawyers have agreed or stipulated.

5

Exhibit Q, p. 201

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 43 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4287   Filed 08/20/2008   Page 6 of 56
#:180428

## JURY INSTRUCTION NO. 5

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1)    Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2)    Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3)    Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

(4)    Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

6

Exhibit Q, p. 202

**JURY INSTRUCTION NO. 6**

1

2          Evidence may be direct or circumstantial.  Direct evidence is direct proof of a

3

4     fact, such as testimony by a witness about what that witness personally saw or heard or

5     did.  Circumstantial evidence is proof of one or more facts from which you could find

6     another fact.  You should consider both kinds of evidence.  The law makes no distinction

7     between the weight to be given to either direct or circumstantial evidence.  It is for you to

8     decide how much weight to give to any evidence.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

**Exhibit Q, p. 203**

## JURY INSTRUCTION NO. 7

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I have ordered that evidence be stricken from the record. That means that when you are deciding the case, you must not consider that evidence.

Exhibit Q, p. 204

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 46 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB     Document 4287     Filed 08/20/2008     Page 9 of 56
#:180258

**JURY INSTRUCTION NO. 8**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

9

Exhibit Q, p. 205

### JURY INSTRUCTION NO. 9

I will now say a few words about your conduct as jurors.

First, you are not to discuss this case with anyone, including members of your family, people involved in the trial, or anyone else; this includes discussing the case in internet chat rooms or through internet "blogs," internet bulletin boards or e-mails. Nor are you allowed to permit others to discuss the case with you. If anyone approaches you and tries to talk to you about the case, please let me know about it immediately;

Second, do not read or listen to any news stories, articles, radio, television, or online reports about the case or about anyone who has anything to do with it;

Third, do not do any research, such as consulting dictionaries, searching the Internet or using other reference materials, and do not make any investigation about the case on your own;

Fourth, if you need to communicate with me simply give a signed note to the bailiff to give to me; and

Fifth, do not make up your mind about what the verdict should be until after you have gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence. Keep an open mind until then.

Finally, until this case is given to you for your deliberation and verdict, you are not to discuss the case with your fellow jurors.

10

Exhibit Q, p. 206

**JURY INSTRUCTION NO. 10**

During deliberations, you will have to make your decision based on what you

recall of the evidence. You will not have a transcript of the trial.

11

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 49 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 12 of 56
#:180255

1

## JURY INSTRUCTION NO. 11

2

You must not make any assumptions about a witness based solely upon the use of

3

an interpreter to assist that witness.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12

Exhibit Q, p. 208

## JURY INSTRUCTION NO. 12

From time to time during the trial, it became necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom, or by calling a recess. Please understand that while you were waiting, we were working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we have done what we could to keep the number and length of these conferences to a minimum. I did not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

13

Exhibit Q, p. 209

# JURY INSTRUCTION NO. 13

The parties have agreed to certain facts. You should therefore treat these facts as having been proved.

14

**Exhibit Q, p. 210**

**JURY INSTRUCTION NO. 14**

     A deposition is the sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person, including a videotaped deposition, may be used at the trial.

15

**Exhibit Q, p. 211**

1

## JURY INSTRUCTION NO. 15

2

Some witnesses, because of education or experience, are permitted to state

3

opinions and the reasons for those opinions.

4

5

Opinion testimony should be judged just like any other testimony. You may

6

accept it or reject it, and give it as much weight as you think it deserves, considering the

7

witness's education and experience, the reasons given for the opinion, and all the other

8

evidence in the case.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

Exhibit Q, p. 212

1

## JURY INSTRUCTION NO. 16

2    Certain charts and summaries not received in evidence have been shown to you

3
4    in order to help explain the contents of books, records, documents, or other evidence in

5    the case. They are not themselves evidence or proof of any facts. If they do not correctly

6    reflect the facts or figures shown by the evidence in the case, you should disregard these

7    charts and summaries and determine the facts from the underlying evidence.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit Q, p. 213

**JURY INSTRUCTION NO. 17**

Other charts and summaries have been received into evidence to illustrate

information brought out in the trial. Charts and summaries are only as good as the

underlying evidence that supports them. You should, therefore, give them only such

weight as you think the underlying evidence deserves.

18

Exhibit Q, p. 214

## JURY INSTRUCTION NO. 18

You have heard evidence that both Mattel and MGA purchased and evaluated

each other's existing products and had those products in their respective facilities. In this

trial, there is no allegation that it is illegal or improper for a company or person to

purchase, possess, or evaluate the publicly available product of a competitor.

19

Exhibit Q, p. 215

1

## JURY INSTRUCTION NO. 19

2

When a party has the burden of proof on any claim by a preponderance of the

3

4

evidence, it means you must be persuaded by the evidence that the claim is more probably

5

true than not true.

6

You should base your decision on all of the evidence, regardless of which party

7

presented it.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

Exhibit Q, p. 216

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 58 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 21 of 56
#:180426

## JURY INSTRUCTION NO. 20

Mattel claims that the defendants, MGA Entertainment, Inc. ("MGA"), Isaac Larian and MGA Entertainment (HK) Ltd. ("MGA Hong Kong"), engaged in copyright infringement of certain items that you found in Phase A of this trial were created by Carter Bryant when he worked at Mattel. The defendants deny that claim.

Copyright is the exclusive right to copy.

This right to copy includes the exclusive rights to:

(1)    Authorize, or make additional copies, or otherwise reproduce the copyrighted work;

(2)    Recast, transform, or adopt the work, that is, to prepare derivative works based upon the copyrighted work;

(3)    Distribute copies of the copyrighted work to the public by sale or other transfer of ownership; and

(4)    Display publicly a copyrighted work.

It is the owner of a copyright who may exercise these exclusive rights to copy.

As a matter of law, Mattel is the owner, by assignment, of the Bratz-related items that you found were created by Carter Bryant, alone or jointly with others, while employed by Mattel, which items have been registered by Mattel at the U.S. Copyright Office. In general, copyright law protects against production, adaptation and distribution of substantially similar copies of the owner's copyrighted work without the owner's permission. An owner may enforce these rights to exclude others in an action for copyright infringement.

21

1    You must consider each defendant's acts separately to determine whether that

2    defendant has engaged in an act that is an infringement of Mattel's copyright.

22

Exhibit Q, p. 218

**JURY INSTRUCTION NO. 21**

Copyright law allows the author of an original work to prevent others from copying the way or form the author used to express the ideas in the author's work. Only the particular way of expressing an idea can be copyrighted. Copyright law does not give the author the right to prevent others from copying or using the underlying ideas contained in the work, such as any procedures, processes, systems, methods of operation, concepts, principles or discoveries.

The right to exclude others from copying extends only to how the author expressed the ideas in the copyrighted work. The copyright is not violated when someone uses an idea from a copyrighted work, as long as the particular way of expressing that idea in the work is not copied.

Exhibit Q, p. 219

## JURY INSTRUCTION NO. 22

Anyone who copies original elements of a copyrighted work without the owner's permission infringes the copyright.

Mattel claims that the defendants have infringed copyrights for the Bratz-related items described above. On Mattel's copyright infringement claim, Mattel has the burden of proving both of the following by a preponderance of the evidence:

1. Mattel is the owner of a valid copyright; and

2. The defendants copied original elements from the copyrighted work.

If you find that Mattel has proved both of these elements, your verdict should be for Mattel.

If, on the other hand, Mattel has failed to prove either of these elements, your verdict should be for the defendants.

As a matter of law, the first element is satisfied because Mattel is the owner of each of the items you found were created by Carter Bryant, alone or jointly with others, while employed by Mattel and which Mattel has registered with the U.S. Copyright Office.

Whether or not the second element is satisfied is for you to decide.

24

Exhibit Q, p. 220

**JURY INSTRUCTION NO. 23**

A copyright owner is entitled to exclude others from creating derivative works based upon the owner's copyrighted work. The term derivative work refers to a work based on one or more pre-existing works. Accordingly, Mattel is entitled to exclude others from recasting, transforming, or adapting, without Mattel's permission, the copyrighted works you found were created by Carter Bryant, alone or jointly with others, while he was employed by Mattel.

25

Exhibit Q, p. 221

1

## JURY INSTRUCTION NO. 24

2
3
4
5
6

An owner is entitled to copyright protection of a compilation.  A compilation is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

7
8

The owner of a compilation may enforce the right to exclude others in an action for copyright infringement.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26

Exhibit Q, p. 222

## JURY INSTRUCTION NO. 25

As explained above, Mattel has the burden of proving that the defendants copied original elements from Mattel's copyrighted work.  There are two ways in which Mattel may meet that burden.

First, Mattel may show the defendants copied from the work by showing by a preponderance of the evidence that the defendants actually copied a significant amount of protectable expression from the work.

Second, in the alternative, Mattel may also show the defendants copied from the work by showing by a preponderance of the evidence that the defendants had access to Mattel's copyrighted works and that there are substantial similarities between the defendants' works and original elements of Mattel's works.

It is undisputed in this case that defendants had access to Mattel's copyrighted works.  Whether there are substantial similarities between the defendants' works and original elements of Mattel's works is for you to decide.

27

Exhibit Q, p. 223

**JURY INSTRUCTION NO. 26**

You are to make a determination regarding substantial similarity according to a two-step process, which includes application of the "extrinsic test" and the "intrinsic test." To prevail on its claims for copyright infringement, Mattel must satisfy both of these tests.

First, you must apply the extrinsic test. Under the extrinsic test, Mattel must establish that specific ideas and expressive elements of the works Mattel owns and the Bratz-related products that Mattel claims are infringing are substantially similar.

The Court has determined what elements of the works that you found were created by Carter Bryant, solely or jointly while working at Mattel, are protectable under copyright law. These are the elements that you should consider for the purpose of your comparisons to each of the allegedly infringing products under the extrinsic test:

First, the particularized, synergistic compilation and expression of the human form and anatomy that expresses a unique style and conveys a distinct look or attitude;

Second, the particularized expression of a doll's head, lips, eyes, eyebrows, eye features, nose, chin, hair style and breasts, including the accentuation or exaggeration of certain anatomical features relative to others (doll lips, eyes, eyebrows, and eye features) and de-emphasis of certain anatomical features relative to others (doll nose and thin, small doll bodies); and

Third, the particularized doll clothes, doll shoes, and doll accessories that express aggressive, contemporary, youthful style.

In contrast, certain basic elements of Carter Bryant's works are not protectable. Specifically, copying of protected expression or ideas cannot be established by the mere

28

Exhibit Q, p. 224

1   fact that both Carter Bryant's works and the allegedly infringing designs bear a

2   resemblance or similarity to human form and human physiology; have hair, heads, two

3
    eyes, eyebrows, lips, nose, chin, mouth, and other features that track human anatomy and
4
5   physiology; wear or have human clothes, shoes, and accessories; depict a certain age,

6   race, ethnicity, or have an "urban" appearance; possess common or standard anatomical

7   features relative to others or depict common or standard treatment of fashion doll  subject

8   matter. Nevertheless, particular compilations or combinations of these otherwise non-
9
    protectable elements in the works which express a particular style or convey a distinct
10
11  look or attitude, are protectable.

12          You should consider only the elements I have just listed for purposes of the

13  extrinsic test. Focusing on the protectable elements of the works by Carter Bryant as

14  compared to those elements in the allegedly infringing Bratz-related works, you must

15  determine whether Mattel has proven by the preponderance of the evidence that the works
16
17  are substantially similar. If you so find, you must next consider the intrinsic test. If you

18  do not so find, you must find for the defendants.

19          The intrinsic test looks at the overall similarity of ideas and expression in the

20  works from the perspective of an ordinary observer. You should ask yourself whether the

21  ordinary, reasonable audience, in this case girls between the ages of 7 and 12, would
22
23  determine or recognize the defendants' products as reflecting the total concept and feel, or

24  as a "picturization," of the Bratz-related works that you have found Carter Bryant created

25  alone or jointly with others while employed by Mattel.

26          Mattel does not need to establish that the works it alleges are infringing are

27  identical or virtually identical to the works it owns, nor that the allegedly infringing
28

29

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 67 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4287   Filed 08/20/2008   Page 30 of 56
#:180278

1   works do not contain any non-infringing material.  However, Mattel does need to

2   establish that, focusing on the protectable elements of Carter Bryant's designs which I

3   have identified under the extrinsic test, and the overall look and feel of the works under

4

5   the intrinsic test, there are substantial similarities between the copyright-protected works

6   and the allegedly infringing works.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit Q, p. 226**

1

**JURY INSTRUCTION NO. 27**

2

The degree of similarity required to support a finding of substantial similarity is

3

affected by the degree of access MGA, Isaac Larian and MGA Hong Kong had to Carter

4

Bryant's works. The greater the level of access, the lower the showing of similarity

5

required to support a finding of substantial similarity. However, the burden of proving

6

substantial similarity by a preponderance of the evidence always remains with Mattel.

7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

31

1

## JURY INSTRUCTION NO. 28

2

3        Copyright law protects distinctive characters.  Defendants' works infringe

4    Mattel's copyrights if they copy recognizable and distinctive traits, attributes, and

5    elements of the personalities of the characters portrayed in Carter Bryant's works.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32

Exhibit Q, p. 228

## JURY INSTRUCTION NO. 29

If you find that defendants had access to the copyrighted works and substantial similarity between the copyrighted works and allegedly infringing works, you must find that defendants infringed Mattel's copyrights.  Defendants contend that certain Bratz-related works were created independently, that is, that defendants did not actually copy or prepare derivative works from Carter Bryant's works when they created these Bratz-related works, notwithstanding their admitted access to these works.  A claim of independent creation applies where a defendant can prove that he or she created the allegedly infringing work without copying or adapting or preparing derivative works from the original to which he or she had access.

Defendants bear the burden of proof on the issue of independent creation.

If you find that Mattel has shown the elements of infringement and defendants have not established independent creation by a preponderance of the evidence, then you must find for Mattel on its claim of copyright infringement.

33

Exhibit Q, p. 229

**JURY INSTRUCTION NO. 30**

A two-dimensional work, such as a drawing, can be infringed by a three-dimensional work, such as a doll. A doll, which consists of different materials or includes aspects that are not visible in a copyrighted drawing, nevertheless will infringe the drawing when the works are substantially similar in their appearance under the extrinsic and intrinsic tests. A three-dimensional work is not an independent creation merely because it includes or is a result of artistic or non-artistic work not included in the copyrighted work. Rather, the question is whether the three-dimensional work is substantially similar to the two-dimensional work as a whole using the extrinsic/intrinsic test described above.

34

Exhibit Q, p. 230

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 72 of 103   Page ID
#:180278
Case 2:04-cv-09049-SGL-RNB     Document 4267     Filed 08/20/2008     Page 35 of 56

**JURY INSTRUCTION NO. 31**

A copyright can be infringed by intermediate or preparatory works, including works prepared in the product development or marketing stage, that are substantially similar to a copyrighted work, regardless of whether the end product of the copying also infringes the copyright.

35

Exhibit Q, p. 231

## JURY INSTRUCTION NO. 32

Mattel has presented evidence concerning certain copyright infringement lawsuits brought by MGA in Hong Kong pursuant to Hong Kong law.

The Court has excluded, and you may not consider, any reference to any legal arguments or legal conclusions associated with those lawsuits.

You may, however, consider any factual statements or factual representations that MGA made in those lawsuits.

It is for you to decide how much weight, if any, to give to those factual statements or factual representations.

36

## JURY INSTRUCTION NO. 33

If you find that MGA infringed Mattel's copyright in the Bratz works, you may consider Mattel's claim that Isaac Larian vicariously infringed that copyright. Mattel has the burden of proving each of the following by a preponderance of the evidence:

1.   Isaac Larian profited directly from the infringing activity of MGA;

2.   Isaac Larian had the right and ability to supervise/control the infringing activity of MGA; and

3.   Isaac Larian failed to exercise that right and ability.

If you find that Mattel proved each of these elements, your verdict should be for Mattel if you also find that MGA infringed Mattel's copyright. If, on the other hand, Mattel has failed to prove any of these elements, your verdict should be for Isaac Larian on Mattel's claim for copyright infringement, unless you find that Isaac Larian is liable for contributory infringement under the instruction that follows.

37

### JURY INSTRUCTION NO. 34

A defendant may be liable for copyright infringement engaged in by another if he/it knew or had reason to know of the infringing activity and intentionally materially contributes to that infringing activity.

If you find that MGA infringed Mattel's copyright in Bratz works, but that MGA Hong Kong and/or Isaac Larian did not directly or vicariously engage in acts of infringement, you should proceed to consider Mattel's claim that MGA Hong Kong and Isaac Larian contributorily infringed that copyright. To prove contributory copyright infringement, Mattel must prove both of the following elements by a preponderance of the evidence:

1.     Isaac Larian and/or MGA Hong Kong knew or had reason to know of the infringing activity of MGA; and

2.     Isaac Larian and/or MGA Hong Kong intentionally materially contributed to MGA's infringing activity.

If you find that MGA infringed Mattel's copyright and you also find that Mattel has proved both of these elements, your verdict should be for Mattel. If, on the other hand, Mattel has failed to prove either or both of these elements as against MGA Hong Kong and/or Isaac Larian, and also failed to prove direct or vicarious infringement by MGA Hong Kong and/or Isaac Larian, your verdict should be for those defendants.

Exhibit Q, p. 234

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 76 of 103   Page ID
#:180292
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 39 of 56

**JURY INSTRUCTION NO. 35**

Mattel claims that defendants fraudulently concealed the facts underlying Mattel's claims of intentional interference with contract and conversion. Defendants deny these allegations.

To prove fraudulent concealment, Mattel must show the following by a preponderance of the evidence

(1)   the defendants took affirmative steps to conceal the facts that could have led Mattel to discover that Carter Bryant created Bratz-related works while employed by Mattel or that Carter Bryant entered into a contract with and worked with MGA while he was still employed by Mattel; and

(2)   Mattel was not aware of such facts that either did or would have, with diligence, led Mattel to discover that Carter Bryant created Bratz works while employed by Mattel or that Carter Bryant entered into a contract with and worked with MGA while he was still employed by Mattel.

If you so find by the preponderance of the evidence, you should find for Mattel on its allegations of fraudulent concealment. If not, you should find for defendants on the allegations of fraudulent concealment.

39

Exhibit Q, p. 235

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 77 of 103   Page ID
#:180283
Case 2:04-cv-09049-SGL-RNB   Document 4287   Filed 08/20/2008   Page 40 of 56

## JURY INSTRUCTION NO. 36

It is the duty of the Court to instruct you about the measure of damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

It is for you to determine what damages, if any, have been proved.

Your award must be based upon evidence and not upon speculation, guesswork or conjecture.

40

Exhibit Q, p. 236

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 78 of 103   Page ID
#:180284
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 41 of 56

**JURY INSTRUCTION NO. 37**

In Phase A, you determined that Mattel had proved its claim for intentional interference with contractual relations against the defendants MGA and Isaac Larian. You must now decide how much money, if any, should be awarded as damages.

The amount of damages must include an award for each item of harm that was caused by MGA's and Isaac Larian's wrongful conduct, even if the particular harm could not have been anticipated.

Mattel must prove the amount of damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1) Compensatory and general damages, including disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful conduct;

(2) Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's claim arose;

(3) Punitive damages.

41

Exhibit Q, p. 237

**JURY INSTRUCTION NO. 38**

In Phase A, you determined that Mattel had proved its claims against the defendants MGA and Isaac Larian for aiding and abetting Carter Bryant's breach of fiduciary duty and breach of the duty of loyalty. You must now decide how much money, if any, should be awarded as damages.

The amount of damages must include an award for each item of harm that was caused by MGA's and Isaac Larian's wrongful conduct, even if the particular harm could not have been anticipated.

Mattel must prove the amount of its damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1)  Compensatory and general damages, including disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful conduct;

(2)  Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's claim arose;

(3)  Punitive damages.

42

Exhibit Q, p. 238

**JURY INSTRUCTION NO. 39**

Mattel is entitled to obtain disgorgement of profits as an element of its damages for the wrongful acts of aiding and abetting breach of fiduciary duty and duty of loyalty that you have found. Accordingly, if you find that MGA and/or Isaac Larian obtained profits or advantages because of these specific wrongful acts, those profits and advantages should be awarded to Mattel.

43

Exhibit Q, p. 239

## JURY INSTRUCTION NO. 40

In Phase A of this trial, you found that Mattel had proved its claims for conversion of tangible property against MGA, Isaac Larian and MGA Hong Kong. You must now decide how much money will reasonably compensate Mattel for the harm. This compensation is called damages.

Mattel must prove the amount of its damages. However, Mattel does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by Mattel:

(1)    The fair market value of the tangible Bratz works created by Carter Bryant while he was employed by Mattel; and

(2)    Prejudgment interest at the maximum rate, which is 7%, calculated from the date Mattel's property was converted;

(3)    Punitive damages.

Fair market value is measured as of the time the tangible item was converted. Fair market value is the highest price that a willing buyer would have paid to a willing seller assuming that there is no pressure on either one to buy or sell, and that the buyer and seller know all the uses and purposes for which the tangible items are reasonably capable of being used.

Exhibit Q, p. 240

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 82 of 103   Page ID
#:180286
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 45 of 56

**JURY INSTRUCTION NO. 41**

1

2          If you find for the plaintiff, Mattel, on any of its copyright infringement claims

3    against the defendants, you must determine Mattel's damages.  Mattel is entitled to

4    recover any profits of the defendants attributable to the infringement.  Mattel must prove

5    damages by a preponderance of the evidence.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit Q, p. 241

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 83 of 103   Page ID
#:180298
Case 2:04-cv-09049-SGL-RNB   Document 4287   Filed 08/20/2008   Page 46 of 56

## JURY INSTRUCTION NO. 42

You may make an award of the defendants' profits only if you find that the plaintiff showed a causal relationship between the infringement and the defendants' gross revenue.

The defendants' profit is determined by deducting expenses from the defendants' gross revenue.

The defendants' gross revenue is all of the defendants' receipts from sale of a product containing or using the copyrighted work or associated with the infringement. Mattel has the burden of proving the defendants' gross revenue by a preponderance of the evidence.

Expenses are all operating costs and production costs incurred in producing the defendants' gross revenue. The defendants have the burden of proving the defendants' expenses by a preponderance of the evidence.

Indirect profits are the defendants' profits with a less direct connection or link to the infringement. A plaintiff such as Mattel may be entitled to indirect profits in addition to direct profits. To recover indirect profits, Mattel must establish a causal relationship between the infringement and the profits generated indirectly from such infringement.

In other words, Mattel must offer some evidence that the infringement at least partially caused the profits that the infringer generated as a result of the infringement.

Unless you find that a portion of the profit from the sale of a product containing or using the copyrighted work is attributable to factors other than use of the copyrighted work, all of the profit is to be attributed to the infringement. The defendants have the

Exhibit Q, p. 242

1     burden of proving the portion of the profit, if any, attributable to factors other than

2     infringing the copyrighted work.

3          Defendants are not required to prove with precision the percentage of its profits

4 attributable to factors other than infringement, so long as the apportionment is reasonable

5

6 and just. However, in determining what portion of the defendants' profits are attributable

7 to copyright infringement, the benefit of the doubt should be given to Mattel and not

8 defendants.

9          If the copyrighted portions are so intermingled with the rest of the infringing

10 work that they cannot well be distinguished from it, the entire profits realized by the

11

12 defendants are to be given to the plaintiff. At the same time, defendants do not need to

13 demonstrate that the profits not attributable to infringement are completely free of

14 infringing material.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

47

**Exhibit Q, p. 243**

### JURY INSTRUCTION NO. 43

Mattel also claims that defendants engaged in willful infringement of Mattel's copyrights.  An infringement is considered willful when the plaintiff has proved both of the following elements by a preponderance of the evidence:

1.    The defendants engaged in acts that infringed the copyright; and

2.    The defendants knew that those acts infringed the copyright.

A defendant cannot deduct overhead expenses, operating expenses, or taxes from his/its gross revenue when the copyright infringement is willful.

Exhibit Q, p. 244

## JURY INSTRUCTION NO. 44

Mattel seeks damages under more than one legal claim or theory and as to three defendants.  In awarding damages as to any particular claim or defendant, you should not consider or discount your award based on amounts, if any, that you award as to any other claim or defendant.  That is, you should award the full amount of damages you find appropriate, if any, as to each separate claim against each defendant.  The Court will ensure, once your verdict has been reached, that the plaintiff does not obtain duplicative damages.

Exhibit Q, p. 245

**JURY INSTRUCTION NO. 45**

If you decide that Isaac Larian's, MGA's or MGA Hong Kong's conduct caused Mattel harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

You may award punitive damages against Isaac Larian only if Mattel proves by clear and convincing evidence that Isaac Larian engaged in that conduct with malice, oppression, or fraud.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

You may award punitive damages against MGA or MGA Hong Kong only if Mattel proves that MGA or MGA Hong Kong acted with malice, oppression, or fraud. To do this, Mattel must prove one of the following by clear and convincing evidence:

1.    That the malice, oppression, or fraud was conduct of one or more officers, directors, or managing agents of MGA or MGA Hong Kong, who acted on behalf of MGA or MGA Hong Kong; or

2.    That an officer, a director, or a managing agent of MGA or MGA Hong Kong had advance knowledge of the unfitness of another officer, director, or managing

50

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 88 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB   Document 4267   Filed 08/20/2008   Page 51 of 56
#:180267

1   agent of MGA or MGA Hong Kong and employed that person with a knowing disregard

2   of the rights or safety of others; or

3       3.   That the conduct constituting malice, oppression, or fraud was authorized by

4   one or more officers, directors, or managing agents of MGA or MGA Hong Kong; or

5

6       4.   That one or more officers, directors, or managing agents of MGA or MGA

7   Hong Kong knew of the conduct constituting malice, oppression, or fraud and adopted or

8   approved that conduct after it had occurred.

9       "Malice" means that a defendant acted with intent to cause injury or that a

10  defendant's conduct was despicable and was done with a willful and knowing disregard of

11  the rights or safety of another.  A defendant acts with knowing disregard when the

12  defendant is aware of the probable dangerous consequences of his or its conduct and

13

14  deliberately fails to avoid those consequences.

15      "Oppression" means that a defendant's conduct was despicable and subjected

16  Mattel to cruel and unjust hardship in knowing disregard of its rights.

17      "Despicable conduct" is conduct that is so vile, base, or contemptible that it

18  would be looked down on and despised by reasonable people.

19

20      "Fraud" means that a defendant intentionally misrepresented or concealed a

21  material fact and did so intending to harm Mattel.

22      An employee is a "managing agent" if he or she exercises substantial independent

23  authority and judgment in his or her corporate decision making such that his or her

24  decisions ultimately determine corporate policy.

25

26      There is no fixed formula for determining the amount of punitive damages, and

27  you are not required to award any punitive damages.  If you decide to award punitive

28

51

1   damages, you should consider all of the following separately for each defendant in

2   determining the amount:

3       a.   How reprehensible was that defendant's conduct?

4       b.   Is there a reasonable relationship between the amount of punitive damages

5
6   and Mattel's harm or between the amount of punitive damages and potential harm to

7   Mattel that the defendant knew was likely to occur because of his or its conduct?

8   Punitive damages may not be used to punish a defendant for the impact of its alleged

9   misconduct on persons other than Mattel.

10       c.   In view of that defendant's financial condition, what amount is necessary to

11
12   punish him or it and discourage future wrongful conduct?  You may not increase the

13   punitive award above an amount that is otherwise appropriate merely because a defendant

14   has substantial financial resources.  Any award you impose may not exceed that

15   defendant's ability to pay.

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 2:04-cv-09049-DOC-RNB   Document 5587-4   Filed 05/26/09   Page 90 of 103   Page ID
Case 2:04-cv-09049-SGL-RNB      Document 4267      Filed 08/20/2008      Page 53 of 56
#:180296

## JURY INSTRUCTION NO. 46

You have heard testimony regarding the prospect of an injunction being issued in this case. It is for the Court to decide what, if any, injunctive relief to order.

53

## JURY INSTRUCTION NO. 47

When you begin your deliberations, your foreperson will preside over the deliberations and will speak for you here in Court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Exhibit Q, p. 250

**JURY INSTRUCTION NO. 48**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

Exhibit Q, p. 251

**JURY INSTRUCTION NO. 49**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

Exhibit Q, p. 252

# EXHIBIT R

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    EASTERN DIVISION

11

12   MATTEL, INC.,                    | CASE NO. CV 04-9049 SGL (RNBx)

13              Plaintiff,            | Consolidated with
                                      | Case No. CV 04-09059 SGL (RNBx)
14        vs.                         | Case No. CV 05-02727 SGL (RNBx)

15   MGA ENTERTAINMENT, INC., et al., | Honorable Stephen G. Larson

16              Defendant.            | **PHASE B VERDICT FORM AS
                                      | GIVEN**
17   _____
                                      
18   AND CONSOLIDATED ACTIONS

19

20

21

22

23

24

25

26

27

28

07209/2609529.2209/260
584.2

Exhibit R, p. 253

|   | |
|---|---|
| 1 | **VERDICT FORM - PHASE B** |
| 2 | We answer the questions submitted to us as follows: |
| 3 | |
| 4 | **I.  Damages for Phase A Claims** |
| 5 | (Answer all four questions in this section.) |
| 6 | |
| 7 | **Intentional Interference With Contractual Relations** |
| 8 | 1.    In Phase A of this trial, you found that MGA Entertainment, Inc. |
| 9 | ("MGA") and Isaac Larian are liable to Mattel for intentional interference with |
| 10 | contractual relations.  What amount of damages, if any, should be awarded to |
| 11 | Mattel? |
| 12 | As to MGA:        $    20 MILLION |
| 13 | As to Mr. Larian:  $     10   MILLION |
| 14 | |
| 15 | **Aiding and Abetting Breach of Fiduciary Duty** |
| 16 | 2.    In Phase A of this trial, you found that MGA and Isaac Larian are liable |
| 17 | to Mattel for aiding and abetting Carter Bryant's breach of fiduciary duty.  What |
| 18 | amount of damages, if any, should be awarded to Mattel? |
| 19 | As to MGA:        $   20 MILLION |
| 20 | As to Mr. Larian:  $   10  MILLION |
| 21 | |
| 22 | **Aiding and Abetting Breach of the Duty of Loyalty** |
| 23 | 3.    In Phase A of this trial, you found that MGA and Isaac Larian are liable |
| 24 | to Mattel for aiding and abetting Carter Bryant's breach of the duty of loyalty.  What |
| 25 | amount of damages, if any, should be awarded to Mattel? |
| 26 | As to MGA:        $   20 MILLION |
| 27 | As to Mr. Larian:  $   10  MILLION |
| 28 | |

07209/2609529.2608584

-2-

## Conversion

4. In Phase A of this trial, you found that MGA, Isaac Larian and MGA
Entertainment (HK) Limited ("MGA Hong Kong") are liable to Mattel for
conversion. What amount of damages, if any, should be awarded to Mattel?

As to MGA: $ _31,500 PLUS 7% INTEREST_

As to Mr. Larian: $ _∅_  CALCULATED FROM

As to MGA Hong Kong: $ _∅_  THE DATE MATTEL'S

PROPERTY WAS

CONVERTED.

PHASE B VERDICT FORM AS GIVEN

Exhibit R, p. 255

## II. Copyright Infringement

5.    Has Mattel proven by a preponderance of the evidence that MGA is liable to Mattel for copyright infringement?

Yes      _X_

No      ____

If your answer is "yes," then answer Question 6.

If your answer is "no," then answer Question 7.

6.    Was MGA's copyright infringement willful?

Yes      ___

No      _X_

Answer Question 7.

7.    Has Mattel proven by a preponderance of the evidence that Isaac Larian is liable to Mattel for copyright infringement?

Yes      _X_

No      ____

If your answer is "yes," then answer Question 8.

If your answer is "no," then answer Question 9.

8.    Was Mr. Larian's copyright infringement willful?

Yes      ____

No      _X_

Answer Question 9.

9.    Has Mattel proven by a preponderance of the evidence that MGA Hong Kong is liable to Mattel for copyright infringement?

Yes      _X_

07209/2609529.2608584

PHASE B VERDICT FORM AS GIVEN

**Exhibit R, p. 256**

1     No _____

2     If your answer is "yes," then answer Question 10.

3     If your answer is "no," then answer Question 11.

4

5     10.    Was MGA Hong Kong's copyright infringement willful?

6            Yes _____

7            No   X

8     Answer Question 11.

9

10    11.    What amount of damages, if any, should be awarded to Mattel for the

11    defendants' copyright infringement?

12    (a)    Copyright Infringement by MGA

13            $   6 Million

14    (b)    Copyright Infringement by Isaac Larian

15           Distributions Mr. Larian received from MGA attributable to Bratz-

16           related works:

17            $   3 Million

18           Value of Mr. Larian's ownership percentage of MGA attributable to

19           Bratz-related works:

20            $   0

21    (c)    Copyright Infringement by MGA Hong Kong:

22            $   1 Million

23

24

25

26

27

28

PHASE B VERDICT FORM AS GIVEN

Exhibit R, p. 257

### III.  Punitive Damages

1

2      12.    Has Mattel proven by clear and convincing evidence that MGA acted

3  with malice, oppression, or fraud?

4           Yes  _____

5           No   X

6  If your answer is "yes," then answer Question 13.

7  If your answer is "no," then answer Question 14.

8

9      13.    What amount of punitive damages, if any, should be awarded against

10  MGA?

11           $ _____ 0 _____

12  Answer Question 14.

13

14      14.    Has Mattel proven by clear and convincing evidence that Isaac Larian

15  acted with malice, oppression, or fraud?

16           Yes  _____

17           No   X

18  If your answer is "yes," then answer Question 15.

19  If your answer is "no," then answer Question 16.

20

21      15.    What amount of punitive damages, if any, should be awarded against

22  Mr. Larian?

23           $ _____ 0 _____

24  Answer Question 16.

25

26      16.    Has Mattel proven by clear and convincing evidence that MGA Hong

27  Kong acted with malice, oppression, or fraud?

28           Yes  _____

-6-

1    No    ✗

2    If your answer is "yes," then answer Question 17.

3    If your answer is "no," then answer Question 18.

4

5    17.    What amount of punitive damages, if any, should be awarded against

6    MGA Hong Kong?

7          $ _____ ⊖ _____

8    Answer Question 18.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

PHASE B VERDICT FORM AS GIVEN

**Exhibit R, p. 259**

## IV.  Fraudulent Concealment

(Answer all five questions in this section.)

18.    Has Mattel proven by a preponderance of the evidence that MGA fraudulently concealed the bases for Mattel's claim of intentional interference with contract against it until at least April 27, 2002?

Yes    X

No    ____

19.    Has Mattel proven by a preponderance of the evidence that Isaac Larian fraudulently concealed the bases for Mattel's claim of intentional interference with contract against him until at least April 27, 2002?

Yes    ____

No    X

20.    Has Mattel proven by a preponderance of the evidence that MGA fraudulently concealed the bases for Mattel's claim of conversion against it until at least April 27, 2001?

Yes    X

No    ____

21.    Has Mattel proven by a preponderance of the evidence that Mr. Larian fraudulently concealed the bases for Mattel's claim of conversion against him until at least April 27, 2001?

Yes    ____

No    X

07209/2609529.2608584.2

-8-

PHASE B VERDICT FORM AS GIVEN

Exhibit R, p. 260

1      22.   Has Mattel proven by a preponderance of the evidence that MGA Hong

2  Kong fraudulently concealed the bases for Mattel's claim of conversion against it

3  until at least April 27, 2001?

4         Yes  _____

5         No   _X_

6

7      Once this verdict form is completed, the foreperson of the jury should sign

8  and date on the lines below.

9

10  DATED: _August 26, 2008_         /s/

11                          Jury Foreperson

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

07209/2609529.2608584.2

PHASE B VERDICT FORM AS GIVEN

Exhibit R, p. 261