1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               EASTERN DIVISION

4                  - - -

5       HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                  - - -

7    MATTEL, INC.,                    )
                                      )
8                    Plaintiff,       )
                                      )
9            vs.                      )  No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, inc., et. Al., )  Trial Day 34
                                      )  morning session
11                   Defendants.      )  Pages 7047-7162
     _____)
12   AND CONSOLIDATED ACTIONS,        )
     _____)
13

14

15       REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16               RIVERSIDE, CALIFORNIA

17           WEDNESDAY, AUGUST 13, 2008

18                8:39 A.M.

19

20

21

22

23           THERESA A. LANZA, RPR, CSR
           Federal Official Court Reporter
24            3470 12th Street, Rm. 134
           Riverside, California  92501
25                951-274-0844
             WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of MATTEL, INC.:
 3
                           QUINN EMANUEL
 4                         By:  JOHN QUINN
                               JON COREY
 5                              MICHAEL T. ZELLER
                               HARRY OLIVAR
 6                              TIMOTHY ALGER
                               WILLIAM PRICE
 7                         865 S. FIGUEROA STREET,
                           10TH FLOOR
 8                         LOS ANGELES, CALIFORNIA  90017
                           213-624-7707
 9

10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                         BY:  THOMAS J. NOLAN
                               JASON RUSSELL
13                              RAOUL KENNEDY
                               LAUREN AGUIAR
14                              CARL ROTH
                           300 SOUTH GRAND AVENUE
15                         LOS ANGELES, CALIFORNIA  90071-3144
                           213-687-5000
16

17

18

19

20

21

22

23

24

25
```

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

```
 1                         I N D E X

 2

 3   DEFENSE
     WITNESS          DIRECT        CROSS        REDIRECT       RECROSS
 4   PAULA TREANTAFELLES GARCIA (CONTINUED)

 5   BY MS. AGUIAR      7065                      7158
     BY MR. PRICE                    7084                        7159
 6

 7

 8
             EXHIBITS           RECEIVED
 9
                ??
10            18821               7075
              10,001              7088
11            11171               7099
              11844               7114
12            11178               7115
               1320               7136
13            11179               7137
               1321               7139
14

15

16

17

18

19

20

21

22

23

24

25
```

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1        RIVERSIDE, CALIFORNIA; WEDNESDAY, AUGUST 13, 2008; 8:39 A.M.

2                              -oOo-

3              (Hearing outside the presence of the jury.)

4              **THE CLERK:**  Calling Case Number CV04-09049-SGL,

5    Mattel, Inc., v. MGA, Inc., et al.                              08:39

6              Counsel, please state your appearances for the

7    record.

8              **MR. QUINN:**  John Quinn, Bill Price, Mike Zeller for

9    Mattel.

10             **MR. NOLAN:**  Tom Nolan and Lauren Aguiar on behalf of    08:39

11   MGA and Isaac Larian.

12             **THE COURT:**  Good morning, Counsel.

13             There are a couple of matters I wanted to take up;

14   and then the parties, I know, have a few matters.

15             I received from the parties the week before last,        08:40

16   now, the two binders with respect to the jury instructions.

17   Since then, particularly from MGA, I've received some

18   additional filings.  I want to consult with the parties to see

19   the best way to kind of get that up to date, because I'm

20   starting to go through it, and as I'm going through it, I want    08:40

21   to make sure I'm reading the most current proposed jury

22   instructions.

23             **MR. NOLAN:**  Right.

24             At least from MGA's perspective, I was just on the

25   phone with ten, 15 minutes ago with Mr. Russell, asking him      08:40

```
 1    that exact question.
 2             THE COURT:  Okay.
 3             MR. NOLAN:  Because what we're doing, Your Honor,
 4    obviously, is trying to adjust to developments that are going
 5    on, and rulings; and so if this is possible, I think we're          08:41
 6    shooting to try to get everything by the end of the day
 7    gathered.
 8             THE COURT:  Okay.
 9             Should I give you back the binder that I have and
10    then have you resubmit that binder with the most updated?          08:41
11             MR. NOLAN:  That would be great.
12             THE COURT:  Why don't we do that, to make sure that I
13    have everything.
14             MR. NOLAN:  Right.  I know that we're circulating an
15    updated version of the verdict form; and that will be included     08:41
16    in that today, Your Honor.
17             THE COURT:  Okay.  Very good.
18             From Mattel's perspective?
19             MR. ZELLER:  That all makes sense.  We can take back
20    the binders.  We will get something over to you, I would           08:41
21    expect, by the end of today.
22             THE COURT:  All right.  That sounds great.  I'll
23    provide those to you.
24             We have stacks of empty binders now on the side.
25    We've recycled the paper from the submissions to the court.  I     08:41
```

 1    don't return that, because it has my notes and comments on it.

 2    But the binders, I wanted to return to you for reuse.  So

 3    during the break, or whenever, if someone from each side could

 4    come up and remove those binders, that would be great.

 5            I've now received the Kevin Farr designations.  It's        08:42

 6    gone from three binders down to one, so that was definitely a

 7    productive use of time there.  I'll take a look at that.

 8            And I have the Jill Lindquist binder.

 9            Is there any other video designation, deposition,

10    that is intended at this time?                                      08:42

11        **MS. AGUIAR:**  Your Honor, consistent with the

12    discussion yesterday morning about Ms. Martinez, we designated

13    sections from her deposition, sent them over to Quinn Emanuel;

14    so we'll go through the normal procedure and get those to you

15    as soon as possible.                                                08:42

16        **THE COURT:**  Excellent.  So that will be the third.

17        **MS. AGUIAR:**  There may be some very short ones

18    represented from Mr. Bryant's deposition that were our counters

19    that were not played during Mattel's case-in-chief.

20        **THE COURT:**  Very good.                                      08:43

21            You'll resubmit those to the Court before you play

22    them; correct?

23        **MR. NOLAN:**  Yes.

24        **THE COURT:**  Because now they're not your counters

25    anymore; they're your designations?                                 08:43

1           **MS. AGUIAR:**  Yes.

2           **THE COURT:**  Okay.

3           Do the parties have anything?

4           That's all I have on my list.

5           **MR. NOLAN:**  One thing, just for, I guess, guidance

6  and clarification, but, more importantly, because it was framed

7  as an issue as a Motion to Quash originally, and the Court said

8  maybe we don't have to deal with this until we get to the

9  custodian of records.  It all depends on the documents

10  coming --

11          **THE COURT:**  Today, right.

12          **MR. NOLAN:**  -- through the witnesses.

13          Mr. Quinn and I and Ms. Aguiar have been exchanging

14  e-mails about the potential need for calling Mr. Eckert back to

15  the stand, and we proposed a stipulation which would eliminate

16  the necessity, because it would be simply to try to get in some

17  documents, some statements, that he made.

18          I believe Mattel takes the position that the

19  documents are irrelevant; and I just thought that, perhaps, I

20  could frame this rather than going through it in front of the

21  jury and wasting time.

22          **THE COURT:**  Sure.

23          **MR. NOLAN:**  Your Honor, under the question of

24  apportionment and the importance of the various components that

25  make up how the doll line and the brand is developed, including

08:43
08:43
08:43
08:44
08:44

the development of themes -- and there's been some testimony on

this -- Mattel itself, in marketing Barbie and its other brands

in the year 2002, switched its marketing approach to a heavier

emphasis on themes.  Their introduction was called World

Themes.                                                      08:45

        Mr. Kilpin, for example, has given testimony that --

and it's quoted in the Wall Street Journal -- which I would

intend to ask him about, where he says, 'There was a time when

I would ask, show me the product.  Now I ask, show me the play

pattern.'                                                    08:45

        Mattel is comparing Barbie and Bratz in terms of

research that Mattel is doing with respect to Bratz's

development and what is making Bratz successful.  And there's

comments about our themes, our packaging, "innovative,"

"creative," and how they perceive the success of our branding  08:45

efforts, which we believe is relevant to confirm exactly what

we've been saying all along about an apportionment approach to

how these damages should be sorted out by the jury if they

elect to award damages.

        THE COURT:  Are you talking about packaging, or are   08:46

you talking about branding?

        MR. NOLAN:  Both.

        THE COURT:  Branding becomes more complicated,

because branding is so wrapped up in the depiction of the dolls

and the name of the dolls and the idea of the dolls.  Packaging  08:46

```
 1    is more easily apportioned, as it were.

 2             Anyway, that's just a --

 3          MR. NOLAN:   Now I understand better the Court's

 4    question.   Let me break it down.

 5             It's not so much that Mattel is commenting about our      08:46

 6    branding; it's that Mattel is commenting about fashions, our

 7    fashions, our themes, our packaging, that type thing, those

 8    attributes.

 9          THE COURT:   Those are the apportionable elements.

10          MR. NOLAN:   Right.                                          08:46

11             So those are going to be a lot of the documents that

12    we're going to be trying to get in through these witnesses.

13             Now, with Mr. Eckert -- let me just specifically go

14    to him -- in various analyst reports -- and he was deposed on

15    these issues -- there are, of course, a lot of financial         08:47

16    information contained in both the 10Q's, 10K's; and his

17    comments made to the analyst --

18          THE COURT:   About Mattel and about -- right.

19          MR. NOLAN:   About Mattel.

20             But we've proposed to redact all of the irrelevant       08:47

21    information regarding the financial performance of the company,

22    but to just leave in the portion where Mattel is saying that

23    with respect to their approach to marketing, their adoption of

24    themes, and, in particular, the World Themes, and that they're

25    expecting, in 2002 and beyond, great success in the themes.  It   08:47
```

```
 1   again, we believe, goes to support the very notion that it's
 2   the development of the themes that really are driving the
 3   market sales in so many of these products.  And since Mattel is
 4   the single largest competitor by a factor of so much, from a
 5   credibility point of view -- we're not in any way dealing with      08:48
 6   the issues in Motion in Limine Number 9.  It's not intended to
 7   trash Barbie or go to motivation.  It goes simply to the fact
 8   that it is credible, when Paula Garcia and Mr. Larian are
 9   talking about the development of themes, the development of
10   packaging, play themes, in particular, that these documents are     08:48
11   relevant.
12         THE COURT:  Very well.
13         Let me hear from Mattel.
14         MR. ZELLER:  I think the approach has to be very
15   different on this, as to whether these documents are talking        08:48
16   about Mattel products, and which ones, of course, and MGA's
17   products.
18         Probably, the simpler point would be, if a document
19   goes to MGA's products -- I mean, if foundation can be laid, if
20   they relate to the factors that are at issue in this case and       08:49
21   there's some substance to it, well, I think that has to be
22   dealt with on a document-by-document approach.
23         THE COURT:  Would you concede, Mr. Zeller, that --
24   the way I see the bigger problem is -- certainly, in the
25   category you just described, that's self-evident.  I'm speaking     08:49
```

```
 1    kind of hypothetically here, because I don't have the documents

 2    in front of me, so just based on what you're describing, but if

 3    Mattel believes, if Bob Eckert believes, if Mattel is taking

 4    the position, that themes, packaging, accounts for some

 5    percentage or is an important factor or is a factor to be        08:49

 6    considered in the value of a doll line, for the same reasons

 7    that I have not permitted MGA to come in and distance

 8    themselves from other positions that they're taking, I think

 9    Mattel is -- that's admissible evidence, as a general

10    principle.                                                       08:50

11            Now, I see the danger, the bigger problem, when you

12    get into particular packaging and particular themes or

13    particular additional characters, or additional mechanical

14    maneuverability, or particular features of Mattel dolls, and

15    then try to juxtapose them to Bratz to say, Well, because our    08:50

16    introduction of a Winter Wonderland theme for Barbie generated

17    X percentage of the increase in profit, that's, somehow,

18    evidence of what the Winter Wonderland theme for Bratz

19    generated, I agree, that's apples and oranges, absent a whole

20    lot of foundation that's not before the Court.                  08:50

21            But general principles, getting back to what I think

22    is beyond what you started with, that packaging and accessories

23    and promotions and additional characters, et cetera, that's

24    what I'd like you to address.

25            MR. ZELLER:  If I understand the Court's question        08:51
```

1    correctly, we're on Mattel's products.

2         **THE COURT:**  I understand.

3         **MR. ZELLER:**  If it's some sort of general statement

4    about, The reason why people buy Mattel products is because of

5    Reason X, because of the packaging, I still think that's very          08:51

6    much apples to oranges.  And I think at a minimum -- and let's

7    set aside for a moment, perhaps, there's some argument about

8    relevance -- but it's certainly 403 material, because what

9    we're talking about is -- you know, not only do you have a

10   problem --                                                             08:51

11        **THE COURT:**  I agree with you.  There's a 403 analysis

12   that the Court will have to look at with the particular

13   evidence, because the more tied it is, the more tied the

14   statement or the evidence is to a particular Mattel product,

15   the less relevance it has to prove up anything with respect to        08:51

16   a Bratz product.  And then conversely, the less it's tied to a

17   specific Mattel product and deals with the concept in general,

18   I think the more Mattel is stuck with whatever position they

19   might have taken.

20        **MR. ZELLER:**  I think that is a sensible starting             08:52

21   point for the analysis, but I also have concerns about more

22   general statements.  If it's a statement that says something

23   like this, Mattel's last ten years of research show that across

24   the entire industry, you know, consumers buy dolls for Reasons

25   A, B, and C, that is something, I think, closer to the scenario      08:52

```
 1    the Court is looking at.  But the statements that we're talking
 2    about are the ones, for example, that Mr. Nolan gave, which is
 3    that, In 2002, Mattel announced that it was going to move more
 4    towards this World Themes kind of approach.
 5            THE COURT:  But let me stop you there.                      08:52
 6            If that is predicated on an internal -- and someone
 7    like Bob Eckert might know this; I don't know if the foundation
 8    can be laid; that's always a separate issue; but assuming
 9    foundation can be laid -- and the reason for that decision was
10    because Mattel's market research led them to the conclusion       08:53
11    that World Themes, or the development of World Themes, was
12    essential to promote a doll line, that seems to be along the
13    general lines that you just referenced a moment ago.
14            MR. ZELLER:  I think it depends on what the document
15    says.                                                             08:53
16            THE COURT:  It does.  We're talking hypothetically
17    here, because I don't have documents.  But like in these other
18    areas, the difficult areas that we've navigated in recent days,
19    I want to have kind of a working standard in which to determine
20    what comes in and what comes out.                                 08:53
21            MR. ZELLER:  Understood.
22            And just to sort of play out this World Themes issue,
23    I mean, what we're talking about was an approach that Mattel
24    took for a period of time in 2002, which are not -- it actually
25    bears very little resemblance to what MGA has done.  MGA has      08:54
```

```
 1   taken what has long been the Mattel model, in any event, which
 2   is that you have -- they've really just taken the entire
 3   architecture of what it is that Barbie does:  You continue to
 4   put out dolls with different themes, Winter Wonderland,
 5   whatever, and you release these, basically, twice a year,          08:54
 6   spring, fall.  There may be special releases, but that's the
 7   basic structure.
 8           THE COURT:  That's precisely why this evidence that
 9   Mr. Nolan is suggesting has a two-edged sword.  To the extent
10   that all MGA is doing is looking to Mattel and saying, Well,       08:54
11   they said these themes were important, and we did the same
12   thing, that undercuts the apportionment, at least in the mind
13   of the jury.  Whether it does legally or not, that's a separate
14   issue.
15           MR. ZELLER:  It leads us right into trade secret           08:54
16   theft, MGA's trade secret theft in Mexico and Canada and other
17   places.
18           THE COURT:  We're not quite going there yet.
19           MR. ZELLER:  I understand.
20           THE COURT:  I will be watching for that door to be         08:55
21   opened, but we're nowhere near that based on this evidence.
22           MR. ZELLER:  I think the fact that they have been
23   promoting these themes and they've talked about the importance
24   of themes -- what they stole from Mattel were things like line
25   lists that specifically were those themes in advance, so they      08:55
```

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1    mirrored what Mattel did during periods of time.  And if they

2    put Mr. Kilpin up on the stand, or Mr. Eckert, and start asking

3    these questions, I think that is opening the door.  But I think

4    maybe we are getting a little bit ahead of ourselves, but I do

5    want to flag that issue, because the Court knows it's coming.        08:55

6         **THE COURT:**  I would hope not.  We have two and a half

7    days, Counsel.

8         **MR. ZELLER:**  But what I would say is, in terms of the

9    differences with the World Themes kind of approach that Mattel

10   took during that particular time period, just to use                 08:55

11   Mr. Nolan's example, that was actually a cluster.  You didn't

12   have just, Okay, we're going to have a winter theme doll; we're

13   going to have the following nine themes that are going to be

14   released.  Rather, they were kind of a grouping so that you

15   could kind of dig down into it.                                       08:55

16        **THE COURT:**  To be honest, from my perspective, what's

17   relevant about that is not so much what Mattel did as why they

18   did it, and the recognition that the themes are important.

19   Because that's the element that's arguably transferable from

20   Mattel to MGA, what Mattel actually did.                             08:56

21        I suppose it provides some context, but the critical

22   question is why.  If Bob Eckert can stand up and say, I did it

23   because I recognized themes are important, packaging is

24   important, how this is presented is even more important than

25   the doll itself, based on our market research, that goes to          08:56

```
 1    apportionment.
 2            MR. QUINN:  And I think the Court is -- as I'm saying
 3    it, I think the Court is aware -- I mean, we certainly are
 4    going to say, yes, themes are important and that's why they
 5    stole them.  I mean, that's the consequence, I think, of their      08:56
 6    playing up this issue.  Because, I mean, they want credit for
 7    it.  I think the jury has to know what the truth is.  And
 8    they're going to get up there -- and, frankly, I guess, even if
 9    it isn't actually damages for Phase 1, it certainly proves our
10    damages for Phase 2.                                                 08:57
11            THE COURT:  Thank you, Mr. Zeller.
12            MR. ZELLER:  Thank you.
13            MR. NOLAN:  Very briefly.
14            THE COURT:  Please.
15            MR. NOLAN:  First of all, I just need to say             08:57
16    this:  This record is burdened with closing arguments by
17    Mr. Zeller every time he stands up about us stealing this and
18    stealing that, lines, themes, and everything else.
19            THE COURT:  The jury is not hearing this, Counsel.
20            MR. NOLAN:  But, Your Honor, if I have to, in front      08:57
21    of my client, sit here without having to respond to that, there
22    will be a trial.
23            THE COURT:  You may respond.
24            MR. NOLAN:  What I'm saying is, today, and repeatedly
25    throughout this case, it's always about, Oh, Mexico; we stole    08:57
```

```
 1   this; we stole that.  There's going to be a second phase trial
 2   where that evidence is going to be presented, and we haven't
 3   been convicted of that, except in Mr. Zeller's mind.  That's my
 4   point.
 5           THE COURT:  And the point is well taken, Counsel.      08:58
 6           MR. NOLAN:  I understand the Court's -- I believe
 7   that I understood the Court's clear indications.  I'm not going
 8   to say that we did better because of Winter Wonderland versus
 9   Barbie's Winter Wonderland, or we came out with it three months
10   earlier.  That's not what I'm talking about.                   08:58
11           I think the Court understood that if Mattel is
12   viewing these general things -- but this threat that, Oh, I
13   feel like the sword is over my head; the minute I try to do
14   something, Mr. Zeller is going to run through and say, Oh, they
15   stole it from Mexico; they stole it through this.              08:58
16           This is an apportionment issue.  We want to show that
17   these things are important in how they drive sales.  That's the
18   general import of how we're going to approach this, Your Honor.
19           THE COURT:  Very well.
20           We'll take this up as we go forward.                   08:58
21           Mr. Nolan, through whom do you plan on getting this
22   evidence in, or exploring this particular evidence, vis-à-vis
23   Mattel, and the theme?
24           MR. NOLAN:  I think primarily Tim Kilpin.  Maybe
25   Mr. Eckert.  I'll have to talk to Mr. Quinn about that.  But   08:59
```

```
 1   certainly, Mr. Kilpin.

 2           And the Court might recall that during the relevant

 3   period of time, he was the marketing manager for the Barbie

 4   girls division.

 5           THE COURT:  Right.                                        08:59

 6           And when do you plan on calling Mr. Kilpin?

 7           MR. NOLAN:  We think it will either be after

 8   Paula Garcia is through -- we may have one witness before that,

 9   Debbie Middleton, but she'll be very short.  I think Mr. Kilpin

10   could go on later this morning, probably after the break.       08:59

11           THE COURT:  As uncomfortable as it's going to be, we

12   are going to have to revisit this issue of trade secret at some

13   point in time, because I -- from a purely trial management

14   perspective, Mr. Zeller, I'm suggesting this.  I don't want to

15   get into this, but at the same time, we need to proceed with    09:00

16   some caution, and we need to have some grounds rules on that.

17   And I'm not suggesting that I accept or don't accept the

18   argument.  You both have made accusations about each other.

19   That literally flies off the Court.  I really have not --

20   that's not -- whether any of this is true all depends on what    09:00

21   the evidence shows at the end of the day.  And none of this has

22   gone before the jury.

23           We're missing two jurors, so we have some time here.

24           But I want to think about this a little bit.  We just

25   can't ignore this argument, Mr. Nolan, that Mr. Zeller is        09:00
```

1   making.  As distasteful as it might be to your client and to

2   you, there is a serious danger of -- we need to think this

3   through.

4           **MR. NOLAN:**  Okay.

5           **THE COURT:**  And I ask you to do that, and I'll          09:01

6   revisit it during the break.

7           We'll take a brief recess while we're waiting for the

8   two jurors, and then we'll get started with Ms. Garcia.

9           **MR. NOLAN:**  Your Honor, there is another housekeeping

10  matter that we could raise right now with respect to Mr. --    09:01

11  we'll wait on it, Your Honor.

12          **THE COURT:**  All right.

13          Court is in recess.

14          (Whereupon, a brief recess was held.)

15          (Whereupon, jurors enter courtroom.)                     09:12

16          **THE COURT:**  Good morning, members of the jury.

17          Ms. Aguiar, you may proceed when you're ready.

18          **MS. AGUIAR:**  Thank you.

19                  **DIRECT EXAMINATION** (continued)

20  BY MS. AGUIAR:

21  Q    Good morning.

22  A    Good morning.

23  Q    I want to talk about two or three subjects before we

24  finish off this morning.  The first one is branding.

25          Can you tell the jury what is meant by branding in      09:12

1    the toy industry.

2    A    Generally, branding is the intangible association that you

3    assign to your brand.  It's like the personality of your brand.

4    Q    Okay.

5         As a consumer products company, in other words, as a          09:13

6    company that makes products like toys, is MGA attempting,

7    through branding, to create some sort of emotional bond with

8    the consumer?

9    A    Absolutely.

10   Q    Can you tell us a little bit about that.                       09:13

11   A    Sure.

12        Branding is very, very important, because brands and

13   the emotions that you assign to your brand, in a sense, becomes

14   the extension that the consumer feels or sees when they

15   purchase your product.  So Bratz brand, the emotion or the         09:13

16   personality that we assign to Bratz, is fashionable, attitude,

17   funky, cool, trendy.  So in a sense, if you're strong enough

18   with your brand, then when you buy a product of that brand, you

19   sort of assign those emotions to the consumer.

20   Q    Do you consider MGA to have created a Bratz brand?            09:14

21   A    Absolutely.

22   Q    Do you have involvement in either developing or overseeing

23   the Bratz brand?

24   A    Yes.

25   Q    And you started to talk about it a little bit, about          09:14

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

```
 1    personality and how brands have personality.
 2              Can you get a little bit more specific about the
 3    Bratz brand itself?
 4    A    Yeah.  No, absolutely.  I think that --
 5              MR. PRICE:  Your Honor, object.  Vague as to time.    09:14
 6              THE COURT:  Clarify, Counsel.
 7    BY MS. AGUIAR:
 8    Q    When did MGA begin to develop the Bratz brand?
 9    A    Development of the Bratz brand started in our first
10    release of our product.  And it continues to be something that  09:14
11    we work on, we establish, even seven or eight years later.
12    Q    How would you describe the personality of that brand?
13    A    As I mentioned, it's, you know -- I would say -- and I'd
14    like to term so many relationships to the Bratz brand, but if I
15    had to name a few, it would be fashionable, edgy, cool,          09:15
16    attitude, to name a few.
17    Q    What are some of the ways that MGA executes on those
18    attributes, or those words that you just used?
19    A    As it relates to branding, with anything associated to
20    brand, it's important to be consistent to those attributes; so   09:15
21    it's absolutely important, just starting with your product and
22    your package, that those pieces or those components represent
23    or exude trendy, cool, fashionable, and whatnot.  But even
24    outside of the product, anything else associated to your brand,
25    such as website, TV advertising, licensed products, all of       09:16
```

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1   those pieces, if associated to the brand, if assigned the brand

2   logo, must exude or must represent that same personality so

3   that you're consistent, and so that you can sort of drill that

4   personality deeper.

5   Q    You just mentioned logo.  Talk to me about the logo -- and      09:16

6   not the name Bratz, so divorce the name from it, if you would,

7   and talk about the logo itself and if that is connected to the

8   brand.

9   A    The logo is absolutely critical.  Because if we were to

10  assign Bratz outside of toys, that logo pretty much represents     09:16

11  our definition of Bratz assigned to anything outside toys; so

12  say we're selling up a Bratz umbrella, it's very, very

13  important that you have that logo association assigned to that

14  umbrella so it differentiates your umbrella from anybody else's

15  umbrella and assigns those cool, funky, fashionable attributes.    09:17

16  So the logo is very critical to establishing the brand.

17  Q    On the box, if you want to pull one of those to your left

18  there -- can you describe for the jury what a tag line means

19  and then explain how the tag line that MGA created is related

20  to the branding.                                                   09:17

21  A    Our tag line is *The Only Girls With a Passion For

22  Fashion!™*  It's kind of our statement to the consumer.  If you

23  had to use one sentence to sort of define Bratz to all

24  consumers, whether they're familiar with the brand or not, we

25  use the very simple statement *The Only Girls With a Passion For*  09:17

1    *Fashion!™*

2         And I think it's important to define that statement.

3    *The Only Girls With a Passion For Fashion!™* really means the

4    only girls with passion for self-expression.  And as mentioned

5    yesterday, our dolls cannot talk.  So we use statements like          09:18

6    that -- well, excuse me, we use fashions to express --

7    fashions, face, hair, to express individuality.  So, actually,

8    the tag line *The Only Girls With a Passion For Fashion!™* really

9    means the only girls with passion for self-expression.

10   Q    Who came up with the tag line *The Only Girls With a*            09:18

11   *Passion For Fashion!™*?

12   A    Charles O'Connor.

13   Q    Who's Charles O'Connor?

14   A    Charles O'Connor was a former copyrighter that worked at

15   MGA.                                                                  09:18

16   Q    Did MGA get anything from Mr. Bryant's original pitch book

17   drawings in relation to the creation of this tag line?

18         **MR. PRICE:**  Objection.  Lack of foundation.

19         **MS. AGUIAR:**  Let me ask a different question.

20         **THE COURT:**  Very well.                                     09:19

21   **BY MS. AGUIAR:**

22   Q    In Mr. Bryant's original drawings, did he have a tag line?

23   A    No.

24   Q    Did MGA develop a tag line independent from Mr. Bryant's

25   drawings?                                                            09:19

Wednesday, August 13, 2008                      Trial Day 34, Morning Session

1    A    Yes.

2    Q    You mentioned the Internet, I believe, as part of how you

3    developed the brand.

4          How was that?  How did you do that?  Or can you talk

5    for a minute about how you used the Internet in that regard.        09:19

6    A    Sure.

7          We have a Bratz website; and it's pretty amazing.  We

8    have up to or nearly three million Bratz fan members who are

9    registered in the fan site.

10          **MS. AGUIAR:**  These were used in opening.                   09:19

11   **BY MS. AGUIAR:**

12   Q    Can you tell us what we're looking at here.

13   A    This is a version of the home page for our Bratz website.

14          Website is very, very important, because it's

15   actually an extension of our brand.                                 09:19

16          **MR. PRICE:**  Objection.  It's beyond the scope of the

17   question, Your Honor.  And I don't believe this is in evidence.

18          **MS. AGUIAR:**  It was used during opening statement.

19   It's a graphic we used during opening.

20          **THE COURT:**  Sustained.                                    09:20

21          You can lay a foundation, if you wish, Counsel.

22   **BY MS. AGUIAR:**

23   Q    Does Bratz have a website?

24          **THE COURT:**  Unless I'm mistaken.

25          Was there a stipulation concerning admission of the          09:20

```
 1    exhibit?
 2           MS. AGUIAR:  My understanding is, graphics that were
 3    not objected to and were used during opening have been used by
 4    both parties during the course of trial.
 5           THE COURT:  Pursuant to stipulation.                      09:20
 6           Is there a stipulation, Counsel?
 7           MR. PRICE:  Not as to admissibility, Your Honor.
 8           THE COURT:  Very well.
 9           Lay a foundation.
10    BY MS. AGUIAR:
11    Q    Does MGA have a Bratz website?
12    A    Yes.
13    Q    Do you know what it looks like?
14    A    Yes.
15    Q    If you looked at an image of it, could you confirm what    09:20
16    the home page looks like?
17    A    Yes.
18    Q    Do you know how it's graphically represented?
19    A    Yes.
20           MS. AGUIAR:  Your Honor, I'd like to publish the         09:20
21    graphic of the home page of the Bratz website.
22           THE COURT:  Lay a foundation, counsel.
23           Present it to the witness; have her authenticate it;
24    then move for its admission.
25           MS. AGUIAR:  I understand.                               09:21
```

1    BY MS. AGUIAR:

2    Q    Do you recognize what you are seeing in front of you?

3    A    Yes.

4    Q    What is it?

5    A    This is pages or sections of our Bratz website.    09:21

6    Q    What you're looking at in front of you -- can you tell us

7    what you're looking at.

8    A    These are printouts of some pages or sections of our Bratz

9    website.

10   Q    And do you have an understanding as to whether those are    09:22

11   current representations of the Bratz website?

12   A    I believe so.  I'm not a hundred percent sure.

13   Q    Okay.

14        Looking at them, do you see anything in them that

15   would suggest that they are outdated or they're not current?    09:22

16   A    You know, on the second page, there's a photo of Bratz

17   Yasmin, the movie doll; and Bratz Yasmin, the movie doll, is a

18   collection that we had launched a season or two earlier.  So it

19   might be that this information might not be as current.  It may

20   be also that the website just hasn't been updated.    09:23

21   Q    Do you want to just look at the home page?  Does the home

22   page look like the current home page?

23   A    I believe so, yes.

24        MS. AGUIAR:  Your Honor, I can assign a trial exhibit

25   to it, if there's no objection, and move it into evidence.    09:23

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1      **MR. PRICE:**  No objection to the first page.

2      **THE COURT:**  It's admitted.

3      (Exhibit ?? Is received.)

4      **MS. AGUIAR:**  Let's just put up the first page.

5  **BY MS. AGUIAR:**

6  Q    Can you just describe to us what we're looking at here,

7  and describe generally what elements are included in the Bratz

8  website.

9  A    This is our home page, and the home page allows -- the

10  individual boxes themselves can be clicked on by the user to      09:24

11  extend deeper into the website contents.  So you might have a

12  chance to look at cool videos; you can look at what's new for

13  the brand; you can click in the game section and play games.

14  Some examples.

15      **MS. AGUIAR:**  Your Honor, the page that's been moved      09:24

16  in is Exhibit 18928.

17      **THE COURT:**  Very well.

18      (Exhibit 18928 is received.)

19  **BY MS. AGUIAR:**

20  Q    Did MGA develop this Bratz website?      09:24

21  A    Yes.

22  Q    Does MGA have another website in addition to this URL for

23  Bratz?  Do you have another website?  Is there a Be-Bratz

24  website?

25  A    Yes.      09:24

1  Q    Can you describe to the jury what the Be-Bratz website is.

2  A    Be-Bratz is actually a site related to a toy product that

3  we released last Christmas.  Be-Bratz is a doll that allows you

4  special entrance into a special website that allows you to

5  customize or create your own Bratz doll by personality and                09:25

6  individuality, sort of define your own girl, if you had the

7  chance to sort of create a Bratz your way.  It was sort of a

8  separate community, exclusive only to the purchase of a

9  Be-Bratz.com doll.

10 Q    How does the website, and specifically the fan section of       09:25

11 the website, play into the marketing and the branding of Bratz?

12 A    Fans are very, very important to Bratz.  And, again,

13 proudly to say, we have nearly almost three million fan club

14 members.  We wanted to find a way to reach out to those guys,

15 always make them feel that we recognize them and find them to        09:25

16 be very important to us.  And to keep them excited or

17 interested, we use the website and their fan section to keep

18 them abreast of new information, what might be coming, tease

19 them about new introductions, that kind of thing.

20 Q    Has Bratz also developed things like games and movies?         09:26

21 A    Absolutely.  Yes.

22 Q    Can you briefly describe what MGA has done regarding Bratz

23 in those areas.

24 A    In the sense for movies, we actually have a team, an

25 entertainment team, at MGA.  The entertainment team is             09:26

 1    responsible to develop entertainment, our movies.  We've had a

 2    series of DVDs that relate to and tell a story about some of

 3    our really important releases.  Like, in fact, one of our new

 4    releases is *Girlz Really Rock*.  And we'll have a DVD associated

 5    to that, so you can actually watch a movie about the doll you            09:27

 6    might have just purchased.  We even had a live action movie,

 7    which would be in theatres as well, using -- as opposed to the

 8    DVD, who uses CGI characters, we used real girls and real

 9    talent to represent the characters.

10    Q    Can you tell the jury what Exhibit 18821 is that's there            09:27

11    in front of you.

12    A    This is the new coming release of *Bratz: Girlz Really Rock*

13    DVD.

14            **MS. AGUIAR:**  Your Honor, I wanted to move in 18821.

15            **MR. PRICE:**  No objection.                                    09:27

16            **THE COURT:**  It's admitted.

17            You may publish.

18            (Exhibit 18821 is received.)

19            **MS. AGUIAR:**  It's a tangible item.  It's a DVD.  So I

20    just wanted to make sure it was identified and put into                  09:27

21    evidence.

22    **BY MS. AGUIAR:**

23    Q    Before we wrap, I want to touch on some of the other

24    products.

25            We started talking yesterday about the first              09:27

1    generation dolls.

2         And those were launched in 2001; is that correct?

3    A    That's right.

4    Q    And then we spent some time talking about all of the

5    different lines of the Bratz dolls after that time.                  09:28

6         Are those all considered core fashion dolls; for

7    example, the Slumber Party or the Genie Magic that we spoke

8    about?

9    A    Yes.

10   Q    If we move beyond -- not only beyond the first generation,     09:28

11   but move beyond the fashion dolls, has MGA made other products

12   or other sub-brands related to Bratz?

13   A    Yes.

14   Q    The jury has seen a number of these in an exhibit room,

15   and we have some here on the table, but I just want to run          09:28

16   through with you a little bit about how they were developed and

17   what the target audience is for some of these products.

18         Let's start with Bratz Boyz.

19         Can you tell us when it was developed and what the

20   thought was behind developing Bratz Boyz.                           09:29

21   A    I believe Bratz Boyz was developed in the 2002 year; and

22   Bratz Boyz, as a brand, was meant primarily for the Bratz

23   consumer, so that she might have the chance to collect further

24   characters or maybe use a boy to build story lines or

25   experiences with.                                                   09:29

1    Q    There's also something called Little Bratz; is that

2    correct?

3    A    Correct.

4    Q    Can you describe to the jury what Little Bratz was or how

5    it was created?                                                    09:29

6    A    Definitely.

7         Little Bratz is actually a small doll.  It's

8    probably, I'm going to estimate, about four inches in height.

9    It's interesting with Little Bratz, because Little Bratz

10   actually is a brand that is meant to target a younger consumer.    09:29

11   So yesterday, I mentioned Bratz was deliberately built for the

12   seven- to ten-year-old consumer.  Little Bratz was built for

13   the younger consumer, for the four- to six-year-olds.

14        With a smaller doll, we actually have the opportunity

15   to use that doll within a play set context.  So you can          09:30

16   actually -- it's meant to use that doll within a play set

17   environment.  For example, if I might, you might use -- and we

18   would have been interested in making Little Bratz so that we

19   could create a little Bratz mall.  And it's intended that you

20   take your Little Bratz and play within that little mall.  We      09:30

21   call it, in very unprofessional toy terms, doinky-doink play,

22   which means you can kind of doink the doll around the play set

23   environment.

24   Q    Okay.

25        Is there another product line called Bratz Kidz?            09:31

1    A     Yes.

2    Q     And, again, briefly, can you just describe how that came

3    into being, the Bratz Kidz concept.

4    A     Yep.

5          Bratz Kidz is also built and was designed specific to        09:31

6    the younger consumer as well.  But Kidz is, unlike Little

7    Bratz, a fashion doll, like Bratz is a fashion doll.  So if

8    Bratz, the mainline, is appropriate to seven- to ten-year-olds,

9    Kidz was really meant to be the fashion doll for the younger

10   consumer, four to six.  So they, as characters, are younger       09:31

11   than Bratz.  It would be taking Yasmin and making her younger,

12   looking at her almost back in time, almost sort of reflecting

13   the age of the consumer who we hope would be purchasing them.

14   Q     Let me ask you -- and I didn't ask you this for the Boyz,

15   but in creating the Bratz Boyz, did MGA make changes from the     09:31

16   characters that were expressed in that particular way in

17   Mr. Bryant's original concept drawings?

18         Are there differences between the Bratz Boyz products

19   and the original concept drawings that Mr. Bryant did and

20   brought to MGA in September of 2000?                              09:32

21   A     Yes.  And to be clear, there were no Bratz Boyz sketches

22   in Carter Bryant's portfolio drawings.

23   Q     And the same question for Little Bratz.

24   A     Yes.  Carter Bryant's portfolio drawings did not include

25   any design references for Little Bratz.                           09:32

1    Q    Now, let's talk about Bratz Lil' Angelz.

2         Can you tell the jury what that is and how that's

3    different than the doll that you started with.

4    A    Lil' Angelz -- even Lil' Angelz has its own unique

5    purchase for -- or reason for being.                    09:33

6         Lil' Angelz is like taking, again, the core

7    characters of Bratz and even making them younger than Kidz,

8    sort of looking at Yasmin when she was a newborn.  So it

9    definitely would make references to precious or cuddly and

10   sweet.  They still have an edge and attitude, if newborns can   09:33

11   have attitude and edge; but certainly, they're the sweeter,

12   softer side of Bratz.

13        And they're meant to be collected.  They're sold and

14   associated with Petz.  So in each pack, you might get one

15   newborn, maybe Yasmin as a newborn, with two individual Petz.   09:33

16   Q    And without getting into the details, I just want to

17   confirm, has MGA also developed a line of products called

18   Itsy Bitsy Bratz?

19   A    Yes.

20   Q    And has MGA also developed a line called Bratz Petz?   09:34

21   A    Yes.

22   Q    And Bratz Babyz?

23   A    Yes.

24   Q    And are these different concepts from the ones that were

25   embodied in Mr. Bryant's pitch book drawings?   09:34

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1    A    Yes.

2         In fact, none of these brands were in any way

3    represented in the portfolio pitch book drawings.

4    Q    I mean, certainly, they incorporate the name Bratz;

5    correct?                                                        09:34

6    A    Correct.

7    Q    So what would you say to the argument that, Well, they all

8    stem from the drawings, because they all have Bratz in the

9    name?

10        MR. PRICE:  Objection.  The question is                    09:34

11   argumentative.

12        THE COURT:  Sustained.

13   BY MS. AGUIAR:

14   Q    Do you believe that they're all -- because they have the

15   name Bratz in them, they all stem from the drawings?            09:34

16        MR. PRICE:  Objection.  Her understanding is

17   irrelevant.

18        THE COURT:  Sustained.

19   BY MS. AGUIAR:

20   Q    Are all of these products, because they have the name      09:35

21   Bratz in them -- do they come from the ideas that were

22   expressed in Mr. Bryant's drawings?

23        MR. PRICE:  Objection.  Vague; improper opinion.

24        THE COURT:  All of them come from -- it is vague.

25        Sustained.                                                 09:35

1    BY MS. AGUIAR:

2    Q    Let me ask you this:  In creating the first generation

3    Bratz dolls, did MGA use the particular look and feel that was

4    expressed by Mr. Bryant in his concept drawings?

5    A    No.                                                              09:35

6    Q    Did MGA change the look and feel of the dolls that they

7    created?

8    A    Yes.

9    Q    In creating the first generation Bratz dolls in 2001, did

10   MGA use the particular eyes and the particular lips that          09:35

11   Mr. Bryant expressed in his concept drawings?

12          MR. PRICE:  Asked and answered yesterday.

13          THE COURT:  Sustained.

14   BY MS. AGUIAR:

15   Q    Did you change, in making the dolls, the particular eyes    09:36

16   and the particular lips that Mr. Bryant expressed in his

17   original drawings?

18          MR. PRICE:  Same objection.  Asked and answered

19   yesterday.

20          THE COURT:  I think we went over this in detail           09:36

21   yesterday.

22   BY MS. AGUIAR:

23   Q    In creating each of the different lines of Bratz dolls

24   after 2001, again, like Genie Magic, for example, and the

25   Las Vegas dolls, did MGA use the particular expression of the    09:36

1  facial features and the particular look and feel that was

2  expressed in Mr. Bryant's first drawings?

3          **MR. PRICE:**  Objection.  Legal conclusion.

4          **THE COURT:**  I'm sorry?

5          **MR. PRICE:**  Objection.  Calls for a legal conclusion.   09:36

6          **MS. AGUIAR:**  I asked did they use those particular

7  features.

8          **THE COURT:**  Are you referring to the particular

9  features outlined by the Court?

10         **MS. AGUIAR:**  I said particular --                      09:36

11         **THE COURT:**  It's not clear what -- the mere fact that

12 I have to ask the question, I suppose, means you need to

13 rephrase it.

14 **BY MS. AGUIAR:**

15 Q   In creating these different lines of dolls after 2000, did   09:37

16 MGA use the particular eye, for example, that Mr. Bryant

17 expressed in his original drawings?

18 A   No.

19 Q   Did you use the particular lips that he chose to express

20 that way in his drawings?                                       09:37

21 A   No.

22 Q   And did you use the overall look and feel that he was

23 conveying in his drawings, in these later generation dolls?

24         **MR. PRICE:**  Objection.  That calls for a legal

25 conclusion.                                                     09:37

```
 1              THE COURT:  Rephrase, Counsel.
 2    BY MS. AGUIAR:
 3    Q    Did MGA change the look of the doll from the look in the
 4    drawing?
 5    A    Yes.                                                    09:37
 6    Q    And, again, that question was directed to the later
 7    generation of dolls.
 8              Would your answer still be the same?
 9    A    Yes.
10    Q    And in creating and developing the products that we've  09:37
11    just been discussing, like the Petz and the Kidz and the Boyz,
12    did MGA use the particular facial expressions that were
13    expressed by Mr. Bryant in his drawings?
14    A    No.
15              MS. AGUIAR:  Your Honor, I don't have anything     09:38
16    further.
17              Mr. Price handed me a note that says there's no
18    objection if the graphic is of admitted exhibits, so I wanted
19    to move into evidence the one that I used yesterday with
20    Ms. Garcia, which is Trial Exhibit Number 18874.            09:38
21              MR. PRICE:  Your Honor, I still object to the
22    demonstrative.  I don't object to displaying the demonstrative,
23    if it is a demonstrative comparing admitted exhibits.  That was
24    the issue that came up this morning with --
25              THE COURT:  Why don't you confer and get on the same 09:38
```

7084

```
 1    sheet of music there, Counsel.

 2              MS. AGUIAR:  Nothing further, Your Honor.

 3              We'll work it out later.

 4              THE COURT:  Very well.

 5              Cross-examination.                                09:38

 6                        CROSS-EXAMINATION

 7    BY MR. PRICE:

 8    Q    Ms. Garcia, I believe one of the first things you were

 9    asked when you took the stand yesterday -- if we could look at

10    Page 6860 -- was the following by Ms. Aguiar:  "At the time   09:39

11    Mr. Bryant brought those drawings to MGA and showed them to

12    you, pitched them to MGA, did you believe those drawings

13    belonged to Mr. Bryant?"

14              And your answer to that was, "Yes, I did"; correct?

15    A    That's correct.                                         09:39

16    Q    At the time Mr. Bryant came and showed you his drawings,

17    you had been a former Mattel employee; correct?

18    A    Yes.

19    Q    You knew that Mattel's agreements provided that if he was

20    a Mattel employee and created drawings while he was a Mattel   09:40

21    employee, they belonged to Mattel; right?

22    A    Yes.

23              However, Mr. Price, let me please be very clear that

24    in the last seven years, I did not know that those drawings

25    belonged to Mattel.                                          09:40
```

1  Q    And that's because you earlier testified in an earlier

2  phase -- if we can look at Page 593 of your trial testimony --

3  that "you didn't know he was a Mattel employee as of

4  September 1st; you didn't know that until sometime in 2004; is

5  that right?"                                                          09:40

6          And you told this jury that that was correct; that at

7  the time he came to show you those drawings, and for three

8  years thereafter, you didn't know he was a Mattel employee, as

9  of September; correct?  That's what you told the jury?

10 A    I believe other testimony that I gave confirmed that          09:40

11 during the September 1st meeting, it is possible that

12 Carter Bryant made reference to his employment at Mattel.  I

13 simply don't remember.

14         **MR. PRICE:**  Move to strike as nonresponsive.

15         **THE COURT:**  It's stricken.                               09:41

16 **BY MR. PRICE:**

17 Q    You're still telling this jury that until 2004, you had no

18 idea that Carter Bryant was a Mattel employee when he showed

19 you his drawings, Mattel's confidential information; is that

20 right?                                                                09:41

21 A    That's right.

22 Q    So you deny, for example, telling Rachel Harris in October

23 that she had to keep it quiet that Mr. Bryant was at MGA

24 because he was coming over during his lunch break at Mattel?

25 You deny that; correct?                                               09:41

1    A    I absolutely deny that.

2    Q    So you understand that in this phase, one of the things

3    the jury might be asked to decide is whether or not MGA acted

4    with malice, fraud, or oppression, and whether punitive damages

5    might be necessary to deter future conduct?  You understand          09:41

6    those are issues; correct?

7    A    Correct.

8    Q    Certainly, the jury's verdict has not changed your belief

9    that you bear no responsibility for MGA intentionally,

10   knowingly using Mattel's confidential information?                    09:42

11   A    I'll just say again that I understand and I accept the

12   jury's decision that Carter Bryant's portfolio drawings belong

13   to Mattel and are confidential information.  I'll just say

14   again that for the last seven years, I was not aware that those

15   drawings were Mattel's confidential information.                      09:42

16   Q    My question is this:  So you have no responsibility for

17   the fact that MGA knowingly, with knowledge, used Mattel's

18   confidential information?

19   A    And I will say again that me -- my representation is that

20   MGA did not knowingly -- that MGA did not know that we were          09:43

21   using Mattel's confidential information.

22   Q    And that testimony and the testimony you gave in

23   Phase 1-B, about not knowing Carter Bryant was a Mattel

24   employee until sometime in 2004, that testimony is as truthful

25   as the testimony you gave to this jury in the last day or so;       09:43

1    correct?

2    A    Absolutely.

3    Q    Certainly, you'll agree that after Mr. Bryant came to MGA

4    and showed them Mattel's property, MGA was transformed as a

5    company?                                                          09:43

6    A    I don't know what you mean by "transformed."

7    Q    Well, for one thing, let's talk about you.

8         You're the Bratz project manager; right?

9    A    Yes.

10   Q    And it's fair to say that from 2001 to the present, you've   09:43

11   spent almost all of your time on Bratz?

12   A    Yes.

13   Q    And your job was to make Bratz successful; right?

14   A    Yes.

15   Q    I'd like to show you Exhibit 10,001-A .                      09:44

16        **MR. PRICE:**  This is already in evidence, Your Honor,

17   the redacted version.

18   **BY MR. PRICE:**

19   Q    This is an e-mail between you and one of the reporters,

20   where you typed in answers to questions; and if we could go to    09:44

21   the next page.

22        **MS. AGUIAR:**  Your Honor, can we go to side-bar,

23   because I'd like the unredacted version to be shown to her now.

24        **MR. PRICE:**  I have no objection to that.  We redacted

25   this at their request.                                            09:44

```
 1              MS. AGUIAR:  I understand.  We're in a different

 2    phase now.

 3              THE COURT:  You want the whole version?

 4              Very well.

 5              MR. PRICE:  I'll move Exhibit 10,001 into evidence.      09:45

 6              MS. AGUIAR:  No objection.

 7              THE COURT:  Very well.

 8              It's fully admitted.

 9              You may publish the entire document.

10              (Exhibit 10,001 received.)                              09:45

11              THE COURT:  Does this witness have the unredacted

12    version?

13              MR. PRICE:  She has the redacted version, because

14    that's what's in evidence.

15              MS. AGUIAR:  The unredacted version is in her white     09:45

16    binder.

17              THE COURT:  Let's refer to that exhibit, then.

18              MS. AGUIAR:  10,001-A.

19              MR. PRICE:  The only problem with that is, Your

20    Honor, because 10,001-A is in evidence, we didn't have 10,001.    09:45

21    I request that we be able to show what is in evidence; and if

22    Ms. Aguiar wants to show the remainder, or if Ms. Garcia wants

23    to look at the unredacted version, she can.

24              THE COURT:  The one in the white binder is redacted

25    as well.                                                          09:46
```

1         **MS. AGUIAR:**  There's an A, Your Honor.

2         **THE COURT:**  Very well.

3         Let's refer to that one, Counsel.

4         **MR. PRICE:**  And, again, the redacted is in evidence.

5    It's what's on our system that I can display, and I would ask          09:46

6    that I be able to display that; and she can look at the

7    unredacted, or Ms. Aguiar can use the unredacted, if she wants

8    to.

9         **THE COURT:**  Can we call up -- I'd rather have the --

10        **MS. AGUIAR:**  I did give him the full version.          09:46

11        **MR. PRICE:**  He's found it now.

12        **THE COURT:**  Very well.

13        **MR. PRICE:**  Let's put up 10,001, then, the first

14   page.

15   **BY MR. PRICE:**

16   Q    And you see that you were responding here to Mr. Haynes, a

17   reporter, to certain questions in May of 2001; correct?

18   A    Correct.

19   Q    Let's go to the second page.

20        And there's a question, "How did MGA design the four          09:47

21   different girls, both inspiration for the overall design and

22   the look of each girl?"

23        That was the question that you were asked by the

24   reporter; correct?

25   A    That's correct.          09:47

1   Q    And you responded, "The four girls were already concepted

2   when presented by the inventor during our first meeting";

3   correct?

4   A    Yes.

5   Q    And what was concepted in Mattel's property were these                09:47

6   four Bratz characters, which were cool; had lots of tude; had

7   far-out fashion; ultra hip, trendy designs; correct?

8   A    Yes.

9   Q    And you mentioned to the jury a second ago that the Bratz

10  brand was ultra trendy, cool, far-out fashion; correct?                    09:47

11  A    Yes.

12  Q    That was part of the confidential information for this

13  concept; that was what was given to you by Carter Bryant in

14  August or September of 2000; right?

15  A    Carter Bryant, in his portfolio drawings, represented a               09:48

16  concept, as I mentioned, a vision.  That concept and vision was

17  very similar to something that I saw even prior to meeting

18  Carter Bryant.  The concept and vision was about four girls --

19        MR. PRICE:  Move to strike as nonresponsive.

20        THE COURT:  As the question is phrased, it is                        09:48

21  nonresponsive.

22        If the reporter would read back the question.

23        (Whereupon, the last question was read back by the

24  court reporter.)

25        THE COURT:  Your answer, ma'am?  It's a yes or no                    09:49

```
 1    question.
 2           THE WITNESS:  Mr. Price, can you please rephrase your
 3    question.
 4    BY MR. PRICE:
 5    Q    Do you not understand the question I asked?              09:49
 6    A    No.  I'd like you, please, if you could, to rephrase the
 7    question.
 8    Q    In the materials that Carter Bryant showed you, Mattel's
 9    property, it described in the materials themselves characters
10    that were cool, had lots of tude, were trendy, had far-out    09:49
11    fashions, were ultra hip; correct?
12    A    Yes.  I recognize that to be the concept, the vision, the
13    overall concept and vision of his portfolio; but certainly...
14    Q    And what you told the reporter was that this vision of
15    Mr. Bryant's -- of these characters that were hip, trendy, had  09:50
16    lots of tude, far-out fashion, the phrase you used is that
17    those were "already concepted" and presented during the first
18    meeting; correct?
19    A    Yes.
20    Q    The look of each girl was already concepted at that first  09:50
21    meeting, correct, the overall look?
22    A    The overall look was not already concepted in his
23    portfolio.  I did not make reference to the overall look.  I
24    meant the tone and concept of the girls.
25           And if I might -- excuse me.  I'm sorry.               09:50
```

THE COURT:  Your counsel will have a chance to ask you questions.

BY MR. PRICE:

Q    By the way, this is the answer you gave before there was a lawsuit; correct?

A    Yes.

Q    And you said that you thought "they" were incredible.

By "they" were incredible, you're talking about the Mattel property that you saw in August and September of 2000; correct?

A    The overall concept of the portfolio drawings, the vision, yes.

Q    And what you tried to stay true to was the inventor/creator's vision; that is, what you tried to stay true to was what you saw in Mattel's property?

A    First, I think it's important to point out that I said I tried to stay true to the inventor/creator's vision, I tried, meaning that I absolutely loved Carter Bryant's overall vision and concept of four multi-ethnic individual fashionable girls. And though I tried then, and I continue today, to stay very true to that concept, that in no way suggests, Mr. Price, that I also today or then try to stay true to the individual portfolio drawings that he presented on September 1st.

Q    So you weren't trying to mislead the reporter, were you?

A    Absolutely not.

1   Q     So when he said, How did they design the girls, both the

2   inspiration for the overall design and the look, you know, why

3   didn't you say, I tried to stay true to his vision but I

4   failed?

5   A     First of all, I didn't fail.  In fact, we succeeded.          09:52

6         And I will say again that I stated very clearly that

7   I tried to stay true to the inventor and creator's vision, but

8   I didn't.  I had to make changes to those portfolio drawings,

9   Mr. Price, in order to ensure that this product was appropriate

10  and, therefore, successful in the marketplace.                      09:52

11  Q     Actually, you also testified that in reviewing the sculpt

12  designs, that at no time did you make reference to

13  Carter Bryant's drawings?  Do you recall saying that?

14  A     Yes, I do.

15        **MR. PRICE:**  Your Honor, I'd like to put up, if we          09:53

16  could, from the trial -- this is May 29, 2003 -- Page 800, Line

17  6 through 17, while Ms. Garcia was being questioned by

18  Mr. Nolan.

19        **THE COURT:**  Any objection?

20        **MS. AGUIAR:**  No, not any longer.  That's fine.            09:53

21        **THE COURT:**  Very well.

22  **BY MR. PRICE:**

23  Q     QUESTION:  "During any of the reviews of the sculpts, did

24  you refer back to Mr. Bryant's initial drawings?"

25        ANSWER:  "It's possible that his portfolio drawing            09:53

```
 1   may have been present.  I don't remember."
 2           MR. NOLAN:  I'm going to object, Your Honor.
 3           He referenced questions that I asked Ms. Garcia.
 4   This is not questions that I asked.
 5           Is this the testimony you're intending to use?        09:54
 6           It's by Ms. Aguiar.
 7           MR. PRICE:  I apologize.
 8           THE COURT:  Mr. Nolan, you made the record quite
 9   clear.  These are not your questions.  These are Ms. Aguiar's
10   questions.                                                    09:54
11           MR. PRICE:  I agree, you're not substantially
12   similar.  It was MGA's attorney, Ms. Aguiar.
13           MS. AGUIAR:  To Mr. Price, everything is similar.
14   BY MR. PRICE:
15   Q    "During any of the reviews of the sculpts, did you refer 09:54
16   back to Mr. Bryant's initial drawings?"
17           ANSWER:  "It's possible that his portfolio drawing
18   may have been present.  I don't remember."
19           QUESTION:  "If you had to refer back to it, why would
20   you have been looking at the drawing in the process of        09:54
21   reviewing the sculpt?"
22           ANSWER:  "Because the process -- because the exercise
23   was to compare, because the exercise was to create a 3-D
24   version of those 2-D drawings, it was very likely that those
25   drawings were there to then compare its 3-D version with those 09:55
```

7095

```
 1  relationships."
 2  BY MR. PRICE:
 3  Q     You testified about the Bratz brand.  After receiving
 4  those 2-D drawings that you were trying to use to create 3-D
 5  dolls, before you even started that process, MGA, based just on      09:55
 6  receiving Mattel's confidential information, had decided it was
 7  going to spend millions of dollars to create a brand; right?
 8          MS. AGUIAR:  Objection.  Assumes facts not in
 9  evidence, Your Honor.  Also lacks foundation.
10          THE COURT:  Overruled on both counts.                        09:55
11          THE WITNESS:  Can I please have the question
12  repeated.
13          (Whereupon, the last question was read back by the
14  court reporter.)
15          THE WITNESS:  Mr. Price, I think that it's very              09:56
16  important to identify what I was making reference to in the
17  testimony that you picked out from May 29th.
18          My reference --
19          MR. PRICE:  Move to strike as nonresponsive to my
20  question.                                                           09:57
21          THE COURT:  It's stricken.
22          Answer the question, please.
23          THE WITNESS:  The sculpt exercise that was referenced
24  in the projector --
25          MR. PRICE:  Move to strike as unresponsive.                 09:57
```

1     **MS. AGUIAR:**  Your Honor, it's on the screen; and then

2   he just put it up there, and then he asked a question; so how

3   is this nonresponsive?

4     **MR. PRICE:**  We can have the question repeated.  It

5   was about --                                                    09:57

6     **THE COURT:**  It's not responsive, Counsel.

7     **THE WITNESS:**  I'm not sure that I understand your

8   question.  Could you please rephrase your question.

9   **BY MR. PRICE:**

10  Q    Before you even started the process of converting those    09:57

11  2-D drawings into a 3-D doll, before you started that, MGA had

12  made the decision, based just on the drawings, Mattel's

13  property, to create a Bratz brand; correct?

14  A    No, that is not correct.

15  Q    Look at Exhibit 16788, which is in evidence.               09:58

16        Were you aware that in September of 2000, September

17  13, 2000, Isaac Larian had already committed to risking and

18  spending millions to make the brand and line happen?

19  A    May I have the opportunity to find this document in my

20  folder, please.                                                 09:58

21  Q    I don't know if it's in that different binder.  It's in a

22  different binder.  This is Mr. Larian's document.  I'm showing

23  you the entire thing.

24  A    May I have the opportunity to read the document, please.

25        (Witness reviews document.)                               09:59

1      I don't believe I have a document that you put up on

2   the overhead projector that suggests that MGA was absolutely

3   sure that this was going to be very successful.

4   Q    Well, you had worked at Mattel; correct?

5   A    Yes.                                                      09:59

6   Q    And you understood that if you wanted to create a brand,

7   you would probably have line extensions; correct?

8   A    Sure.  If it was successful, yes.

9   Q    That you would have accessories; correct?

10  A    Sure.                                                     10:00

11  Q    That you would have themes; correct?

12  A    Yes.

13  Q    That you would create packaging to try to develop that

14  brand; correct?

15  A    Yes.                                                      10:00

16  Q    That you would have a webpage?

17  A    Sure.

18  Q    That you would do DVDs, things of that nature?  Those are

19  the things you do to create a brand; correct?

20  A    To add and contribute to the brand, yeah, absolutely.    10:00

21  Q    I mean, if you want to exploit the idea, the concept,

22  those are the things you do to exploit it so that you can make

23  a good living and profit off of it; correct?

24  A    I'm not sure what you mean by "exploit," but there are

25  certainly contributions and additions that you do to fuel and  10:00

1    feed your brand so it remains successful.

2    Q    And the core of this brand was what MGA had in its

3    possession in September, which was Mattel's confidential

4    information, those drawings?

5    A    In September of 2000?  I guess I just don't understand          10:01

6    your question.

7    Q    I'll move on.

8         By the way, with respect to the sculpt, one of the

9    things that you mentioned was that there had to be -- the

10   actual mechanics of the sculpt had to be done to make sure the       10:01

11   doll moved in the correct way; correct?

12   A    Yes.

13   Q    And you said that Mr. Bryant is not an engineer; he didn't

14   design those joints; correct?

15   A    Correct.                                                         10:01

16   Q    And if you would look at Exhibit 11171 in the big binder.

17        Do you recognize this as an e-mail string from

18   Mercedeh Ward to you, among others?

19   A    Yes.

20        **MR. PRICE:**  I'd move Exhibit 11171 into evidence,           10:02

21   Your Honor.

22        **MS. AGUIAR:**  No objection.

23        **THE COURT:**  It's admitted.

24        You may publish.

25        (Exhibit 11171 is admitted.)                                    10:02

1          **MR. PRICE:**  And if we could just blow up the first

2     part here.

3     **BY MR. PRICE:**

4     Q    You see there's a third paragraph here, "I have provided

5     HK with the Skipper doll.  All Bratz production armatures that          10:02

6     go into assembling the doll for production will be just like

7     that product.  As an engineer, I've always provided engineering

8     drawings drawn on a CAD system.  I do not have the tools to do

9     so at this time."

10         Ms. Ward was in charge of interfacing with Hong Kong          10:03

11    to get this doll produced; correct?

12    A    Yes.

13    Q    She had just come from Mattel; right?

14    A    Yes.

15    Q    And at the time, MGA didn't have the sort of tools that          10:03

16    she was used to using at Mattel to do her job; correct?

17    A    Seems so from her document.

18    Q    So what she did was, she just told Hong Kong, for the

19    production armatures, make it just like the Skipper doll;

20    correct?                                                               10:03

21    A    Yes.

22    Q    And the Skipper doll is Mattel's doll; correct?

23    A    Yes.  But if I might please explain.

24         The armatures --

25    Q    On their time.                                                   10:03

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

7100

1        **THE COURT:**  Next question, Counsel.

2    **BY MR. PRICE:**

3    Q    Now, during your examination, do you recall you were

4    comparing certain of the drawings to some of the dolls?  Do you

5    recall that?  Ms. Aguiar showed you a drawing of Mr. Bryant's    10:03

6    and then showed you a doll.  Do you recall that?

7    A    Yeah.

8        **MR. PRICE:**  If we could put 18874-002 up.

9    **BY MR. PRICE:**

10   Q    This is one of the comparisons you made; correct?          10:04

11   A    Yes.

12   Q    And you'll agree that blowing it up like this literally

13   magnifies the differences?

14   A    Yeah.

15   Q    Because the doll is about that big; right?                 10:04

16   A    Nor is the sketch.

17   Q    And in doing a comparison, it might make a difference what

18   angle you photograph the doll; correct?

19   A    No.  Not necessarily.

20   Q    Well, you chose this Hallidae Carter Bryant drawing to      10:04

21   compare Sasha MGA doll to; correct?

22   A    Yes.

23   Q    Now, you know that there are Carter Bryant drawings of

24   Hallidae which, in fact, have been registered, copyright

25   registered, by MGA; correct?                                    10:05

1    A    I actually don't know.  I'm not a lawyer.  I don't know

2    those things.

3    Q    For this picture, why didn't you use, for example, the

4    picture --

5              MR. PRICE:  If we can put up 1874-002-B501.          10:05

6    BY MR. PRICE:

7    Q    -- why didn't use the photograph that MGA had actually

8    registered with the copyright office that Carter Bryant had

9    drawn?

10   A    I don't know.  There wasn't any particular reason that I   10:05

11   chose not to use this as a comparison.

12             I can compare this one, too, if you'd like.

13   Q    Is there a reason why you didn't use, for example, the

14   fashion drawings?

15             Do you remember the fashion drawings Mr. Bryant did?  10:05

16   A    Sure.

17   Q    There was one of Holiday Sasha; correct?

18             Is there a reason why you did not select this one?

19   A    No, absolutely not.

20             And, again, if you'd like, I can make comparisons of  10:05

21   the differences to these two drawings, if you would like, as

22   well.

23   Q    Well, did you do comparisons of the dolls and drawings in

24   full; that is, showing the entire doll, for example, for the

25   first generation doll?                                         10:06

1    A    Had I yesterday?

2    Q    Yes.

3    A    No.

4    Q    For example, if we could look at TX-13975.

5         For example, this is one of Mr. Bryant's drawings you        10:06

6    got in August or September; correct?

7    A    Correct.

8    Q    This is another one he did before he left Mattel; correct?

9    A    Yes.

10   Q    And this is the doll that went to market; correct?        10:06

11   A    Yes.

12   Q    Okay.

13        And, again, that's a really blown-up version of that

14   doll; right?

15   A    A blown-up version?        10:06

16   Q    That is, it's not really that size.

17   A    Sure.  Yeah.

18   Q    And your testimony, just so we know, is that the doll

19   doesn't have the overall same look and feel of any of

20   Mr. Bryant's drawings?  Is that your testimony?        10:07

21   A    No, that's not my testimony.  My testimony is that there

22   are some similarities between our manufactured Sasha doll and

23   the Carter portfolio drawings, but there are some differences,

24   some very important differences.

25   Q    You'll agree that they look substantially the same?        10:07

 1   A      I don't know what you mean by "substantially the same,"

 2   and I don't feel comfortable answering that question because I

 3   know that that's a legal term; but I can tell you what I mean

 4   in my comparison from an anesthetic standpoint.

 5   Q      Didn't Ms. Aguiar ask you whether or not they had the same          10:07

 6   look and feel?

 7             MS. AGUIAR:   I'm sorry, Your Honor.   Can I just get a

 8   clarification whether this is in evidence.

 9             MR. PRICE:   The underlying documents are.

10             MS. AGUIAR:   The graphic is not in evidence?                    10:07

11             MR. PRICE:   No, the graphic is not in evidence.   It

12   will not go to the jury.

13             MS. AGUIAR:   Okay.

14             THE COURT:   Very well.

15   BY MR. PRICE:

16   Q      Let me ask you this:   You did some side-by-side

17   comparisons.   Were you involved in -- I'm going to show you

18   Exhibit 13695.

19             MR. PRICE:   That's in evidence, Your Honor.   In fact,

20   we have a photograph of that in evidence as well, which is, I   10:09

21   think, 14637 -- let's put up 13695 -- the one you just said.

22             I think we have a photo of just the face, 14637.

23   BY MR. PRICE:

24   Q      You've got the doll in front of you.

25             Do you see that?                                                 10:10

1    A    Yes.

2    Q    And on the right, you recognize that as a Cloe doll;

3    correct?

4    A    Yes.

5    Q    Okay.                                                    10:10

6          And if you can blow these up and compare them, first,

7    would you agree that, quote, "the facial decoration of the doll

8    head is a reproduction of the facial decoration of Cloe?"

9          Would you agree, as MGA has alleged, that the facial

10   decoration of the doll head here is a reproduction of the        10:10

11   facial head decoration of Cloe?

12   A    A reproduction?  I believe there's some similarities.  I

13   think there's some big differences as well.

14   Q    And if you wanted to, you could spend quite a bit of time

15   explaining to the jury what those differences are; correct?      10:11

16   A    Sure.

17   Q    But overall, you would agree with MGA's statement that the

18   facial decoration of the doll head is a reproduction of the

19   facial decoration of Cloe?

20        **MS. AGUIAR:**  Objection, to the extent "reproduction"    10:11

21   may be a legal term.

22        **THE COURT:**  It's already been defined for the jury.

23   It's in evidence.

24        Overruled.

25        You may answer.                                             10:11

7105

1           **THE WITNESS:**  I would be uncomfortable making any

2   comments as it relates specifically to the term "reproduction."

3           Again, as I mentioned -- and I'm not a lawyer -- I

4   can definitely --

5   **BY MR. PRICE:**

6   Q    I'll define it for you:  A copy.

7           Would you agree that the facial declaration is a copy

8   of Cloe's facial decoration?

9   A    Is it a literal copy?  No.

10          Do they have some similarities?  Yes.                    10:11

11          And they absolutely have some differences as well.

12  Q    You would agree --

13          **MR. PRICE:**  Let's put up 14643.

14  **BY MR. PRICE:**

15  Q    You see, we've added here the Carter Bryant drawing of    10:12

16  Cloe.

17          Do you see that?

18  A    Yes.

19  Q    Would you agree that the facial decoration on

20  Carter Bryant's drawing is more similar to this Cloe doll than   10:12

21  this Trendy Teenz doll, which MGA said was a copy of the facial

22  declaration of Cloe?

23  A    I would say that the Carter Bryant portfolio sketch, the

24  2-D sketch, has some similarities to the Cloe manufactured

25  doll.  It also has some important differences.                   10:13

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

7106

1          **MS. AGUIAR:**  Can we just get a clarification that

2     this -- I mean, she said "portfolio sketch."  I don't believe

3     that that's what's on the right.

4          **THE WITNESS:**  Oh, excuse me.

5          **THE COURT:**  Mr. Price, why don't you do that.          10:13

6          **MR. PRICE:**  This is one of the fashion doll sketches.

7     It's 1107 to 1110 series.

8     **BY MR. PRICE:**

9     Q    So you won't agree that Carter Bryant's drawing is more

10    similar to Cloe than the Trendy Teenz doll?          10:13

11    A    I definitely say that there are some similarities between

12    Carter Bryant's sketch as it compares to the Bratz manufactured

13    Cloe.  They have some similarities because I helped to

14    art-direct that sketch, specific art direction; that certainly

15    became part of the assets or the characteristics of our          10:14

16    manufactured doll.

17         I'll also say that there are differences, important

18    differences.

19         **MR. PRICE:**  Move to strike as nonresponsive.

20         **THE COURT:**  You're asking for the comparative?          10:14

21         **MR. PRICE:**  Yes.

22         **THE COURT:**  It's not responsive.

23         He's asking if it's comparative.  Is it more or less?

24    **BY MR. PRICE:**

25    Q    Is the Carter Bryant drawing more similar to the Cloe doll          10:14

1    than the doll that was the subject of the MGA Double Grand

2    suit, the mini Trendy Teenz doll?

3    A    I think that Carter Bryant's portfolio sketch is -- excuse

4    me.  Let me be clear.

5         I'm sorry.  It is not a portfolio sketch.                10:14

6         Carter Bryant's sketch, fashion sketch, is probably

7    more similar to the Bratz manufactured doll than the mini

8    Trendy Teenz is to the Bratz manufactured doll.

9    Q    It would be difficult, in the production process, to make

10   a doll that looked exactly, millimeter by millimeter, like the    10:15

11   drawing?  You'll agree with that?

12   A    Certainly, to make something manufacturable, it's

13   difficult to arrive at all of the individual intricacies and

14   details of a 2-D sketch.  There's a lot of interpretation that

15   has to happen to convert something from 2-D to 3-D, if that's    10:15

16   what you mean.

17   Q    But you can still try to stay true to the vision in that

18   drawing; correct?

19         Let me rephrase that.

20         You're always going to have some differences; right?    10:15

21   A    Yes, especially if they're made very deliberately.

22   Absolutely.

23   Q    And you'll agree that if MGA is saying that mini

24   Trendy Teenz is a copy of Cloe, Carter Bryant's drawing is a

25   better copy of Cloe?                                            10:16

1    A    In this relationship, it's difficult to compare a 2-D

2    drawing, the drawing on the right, as it is to the manufactured

3    Cloe; but there are similarities.  And the reason why there are

4    some similarities is because I art-directed that particular

5    sketch.                                                          10:16

6              MR. PRICE:  Move to strike as nonresponsive.

7              THE COURT:  Just answer the question the best you

8    can.

9    BY MR. PRICE:

10   Q    If mini Trendy Teenz is a copy of Cloe, this drawing is a   10:16

11   better copy of that look; correct?

12   A    Do you mean in the legal sense, Mr. Price, or do you mean

13   just from my kind of layman's creative assessment.

14   Q    Well, first let me ask you, have all of the assessments

15   you've given to the jury, in the testimony in the last day or    10:16

16   so, been just a layman's assessment, your personal opinion?

17   A    It's my assessment based on my almost ten years of

18   experience in doll design and development.

19   Q    Well, then, why did you just ask me if I was asking for

20   your layman's assessment?                                        10:17

21   A    Because I'm not a lawyer and I'm sitting in a courtroom,

22   and I realize that there are lawyers asking me questions about

23   key words that might mean something different in copyright

24   infringement or in any kind of context to law.  And I'm just

25   very careful to separate the difference between my use of words  10:17

1    and my comparisons and my assessments and my expertise in the

2    creative role.

3    Q    Did you have a problem when Ms. Aguiar asked you questions

4    like this?

5    A    No, because I was, again, using my experience as a                    10:17

6    creative expert.

7    Q    Then when I say "copy," I mean the way we all mean "copy."

8         So the question was, if the mini Trendy Teenz is a

9    copy of the Cloe doll, is the drawing of Mr. Carter Bryant a

10   better copy of the look of that doll?                                      10:18

11        MS. AGUIAR:   Object to the premise that this was

12   introduced through a Hong Kong litigation, Your Honor.   That's

13   how he started bringing this up through Ms. Garcia.

14        MR. PRICE:   Sounds like a speaking objection.

15        THE COURT:   It is.   And both sides have been guilty        10:18

16   of speaking objections.   And I'm going to say to both sides to

17   stop the speaking objections.

18        I've said that several times to you, Mr. Price, and

19   to counsel for MGA at side-bar.   It's got to stop.   And it's

20   going to stop now.                                                         10:18

21        Objection is overruled.

22        Proceed.

23   BY MR. PRICE:

24   Q    That means you can answer.

25   A    I believe that the Carter sketch on the right-hand side     10:18

1    that I art-directed has probably more similarities to the

2    manufactured Cloe doll.

3    Q    If I could show you Exhibit 13721, which is in evidence;

4    this is a doll called Scamps.

5            Now, Ms. Garcia, would you agree that this Scamps          10:19

6    doll, the head sculpt and facial decorations, is a substantial

7    reproduction of the Bratz doll?

8    A    Do you mean in my, again, creative nonlegal sense?

9    Q    In the sense that it's a reproduction; a copy; something

10   which someone shouldn't be selling because it's too similar to    10:19

11   Bratz.

12   A    I think there are some strong similarities between these

13   two images.

14   Q    But even though there are some strong similarities, you

15   could sit up here and probably talk for a long time about the      10:20

16   differences; correct?

17   A    Yes.  A long time?  I can definitely talk about the

18   differences, yes.

19   Q    And you could talk about the shape of the lips, the shape

20   of the head, the shape of the eyes, the eyebrows; you could go     10:20

21   on for as long as you went yesterday in making comparisons and

22   saying there are differences; correct?

23           MS. AGUIAR:  Objection.  Argumentative.

24           THE COURT:  Sustained.

25           MR. PRICE:  Let's put up the --                            10:20

1    BY MR. PRICE:

2    Q    Would you agree, however, that the doll here is more

3    similar to Carter Bryant's drawing than it is to the Scamps

4    doll?

5    A    It depends on which Carter Bryant drawings you're          10:20

6    referring to.

7    Q    The one for that character.

8    A    Could you please be more specific.

9    Q    Any that you had that belonged to Mattel.

10   A    There are some drawings that I helped to art-direct that I   10:21

11   believe the jury found -- and, again, I'm not a lawyer, so I

12   don't know.  Let me back up.

13        I don't believe that this doll is similar to

14   Carter Bryant's portfolio drawings.  Maybe similar to

15   Carter Bryant's drawings which I helped and I art-directed; so,   10:21

16   yes, absolutely, there will be some similarities.

17        MR. PRICE:  Your Honor, move to strike "I helped

18   art-direct" as irrelevant, nonresponsive.

19        THE COURT:  That is stricken.

20        Just answer the question, ma'am.                           10:22

21        Next question, Counsel.

22        MR. PRICE:  Let's put up 1110.

23   BY MR. PRICE:

24   Q    My question is, is the doll more similar to

25   Carter Bryant's drawing than to the Scamps doll?               10:22

1    A    I think that there are some similarities between the

2    Yasmin manufactured Bratz doll and the sketch on the right.

3    And the reason for that is because I helped to create the --

4          **MR. PRICE:**  Objection.  Move to strike anything after

5    what she just said.                                              10:22

6          **THE COURT:**  Just answer the question.

7          **THE WITNESS:**  I'm sorry.

8          I believe there are some similarities between the

9    manufactured Bratz doll and the sketch on the right, and there

10   are some differences.  And I believe there are some            10:22

11   similarities between the Bratz doll and the doll on its left,

12   and there are some differences.

13   **BY MR. PRICE:**

14   Q    But my question was, which is more similar to the doll?

15   A    It's difficult to say which is more similar.  I think that 10:23

16   they have some similarities, both of them.  It's really

17   difficult for me to say which one is more similar, because they

18   have some similarities; they also have important differences.

19   Q    Let me show you, then -- we'll do the photograph of the

20   Glamajamas, which I think is 13731.  I'm not going to take the  10:23

21   time to bring the doll up to you.  I'm going to ask you to

22   compare this doll side-by-side with a Bratz character.

23         **MS. AGUIAR:**  Your Honor, can she have the doll to

24   make the comparison?

25         **MR. PRICE:**  Yes.                                      10:24

1          **THE COURT:**  Thank you, Counsel.

2    **BY MR. PRICE:**

3    Q    Would you say that the doll on the left here, the

4    Glamajamas doll, has similarities to the Bratz production doll?

5    A    A few.  But sitting here today, I would say that they're          10:24

6    not very similar.

7    Q    Now, you talked about themes; and it's true, is it not,

8    that, as you said, a standard way to try to extend your brand,

9    is to do themes; right?

10   A    Yes.                                                              10:25

11   Q    And by the way, with respect to doing that, it was

12   important that you hired people who had been trained at Mattel;

13   that's all you wanted working on the Bratz dolls and their

14   development; correct?

15   A    I'm sorry.  Can I have the question repeated.                     10:25

16   Q    It was important to you that in doing this development,

17   themes and some of the branding that you described -- it was

18   important that the person be trained at Mattel, or you didn't

19   want to hire them.

20   A    Important to be trained at Mattel?  It is not a              10:25

21   requirement to be trained at Mattel.  Certainly, Mattel at the

22   time, especially at the beginning of development, was the

23   largest and most successful at developing fashion dolls; so it

24   would be great to have somebody that skilled in such a

25   successful environment, sure.                                          10:25

1   Q   Look at Exhibit 11844.  And, in particular, if you would

2   look at the second page.

3        Do you see that that's an e-mail from you to

4   Mr. Larian?

5   A   Yes.                                                         10:26

6        **MR. PRICE:**  Move the second page of Exhibit 11844

7   into evidence.

8        **MS. AGUIAR:**  No objection.

9        **THE COURT:**  It's admitted.

10       You may publish.                                            10:27

11       (Exhibit 11844 is admitted.)

12  **BY MR. PRICE:**

13  Q   This is an e-mail from you to Mr. Larian; correct?

14  A   Yes.

15  Q   And the first paragraph, you wrote, "As you know, we have    10:27

16  been seeking support for benefits and development of Bratz doll

17  for four months.  We have been very critical of applicants,

18  because to be perfectly honest, we are seeking employees that

19  only Mattel grooms in their workplace; but now I think we might

20  have found one."                                                 10:27

21       In addition to personnel for these themes, throughout

22  the time that you were developing themes for Bratz, you were

23  looking at Mattel for inspiration for themes; correct?

24  A   That is absolutely incorrect.  I was seeking Mattel

25  employees for their skills and abilities in making fashion       10:27

7115

```
 1    dolls.  I was in no way interested in their proprietary

 2    information or any inspiration for themes.

 3    Q    That wasn't my question.  I was saying, in doing things,

 4    though, you were looking at what Mattel was doing to develop

 5    themes.                                                           10:28

 6    A    No, that is not the case.

 7    Q    Look at Exhibit 11178.

 8         Do you recognize that as an e-mail from Mr. Larian to

 9    you?

10    A    Yes.                                                         10:28

11         MR. PRICE:  Move it into evidence, Your Honor.

12         THE COURT:  Any objection?

13         MS. AGUIAR:  No objection.

14         THE COURT:  Admitted.

15         You may publish.                                            10:28

16         (Exhibit 11178 is admitted.)

17    BY MR. PRICE:

18    Q    It's dated August 24, 2001; "Subject:  Amazon.com buying

19    info, Barbie makeover magic deluxe styling head.  This is the

20    tenth best-selling toy for Mattel at TRU.com" -- is "TRU"       10:29

21    Toys"R"Us?

22    A    Yes.

23    Q    "Let's do the Bratz version for 2002.  I believe it would

24    do well."

25         If you would also look at Exhibit 1320.                     10:29
```

7116

1          **MS. AGUIAR:**  I'm sorry, Your Honor.  Was there a

2    question?

3          **MR. PRICE:**  I published it to the jury and read it,

4    Your Honor.

5          **THE COURT:**  Is there an objection?                    10:29

6          **MS. AGUIAR:**  I guess not.  He just didn't ask a

7    question.

8          **THE COURT:**  Very well.

9    **BY MR. PRICE:**

10   Q    Look at Exhibit 1320, Ms. Garcia.                         10:29

11        Do you recognize that as an e-mail exchange between

12   Mr. Larian and you, among others?

13   A    Is it 111320?

14   Q    Just 1320; so it's in the four digits.

15   A    I'm sorry.  What was the question?                        10:30

16   Q    Do you recognize this as an e-mail string among you and

17   Mr. Larian and others, concerning spring '07 gymnastics?

18   A    Yes.

19        May I have a chance to read this document, please.

20        (Witness reviews document.)                              10:30

21   Q    The question is, is this an e-mail string with you,

22   Mr. Larian and others?

23   A    Yes.

24        **MR. PRICE:**  Move it into evidence, Your Honor.

25        **THE COURT:**  Any objection?                           10:31

1          **MS. AGUIAR:**  May we have a side-bar, Your Honor?

2          **THE COURT:**  Yes.

3          Well, actually, it's 10:30.  Let's take our morning

4     break.

5          (Whereupon, jurors depart courtroom.)                    10:32

6          **MR. NOLAN:**  Your Honor, could we possibly do this at

7     side-bar since there are potential witnesses in the courtroom?

8          **THE COURT:**  Sure.

9          (Side-bar proceeding as follows:)

10         **THE COURT:**  What is the objection?                   10:32

11         **MS. AGUIAR:**  My objection is that going back to a

12    ruling I believe you made earlier regarding whether or not

13    these kinds of documents would come in, you said that MGA might

14    open the door if we made specific allegations that a particular

15    product of ours was a unique product.  In other words, if we    10:33

16    made an allegation that, you know, whatever the specific doll

17    was, was unique.  We did not make those kinds of arguments, and

18    I specifically was guided by your prior ruling in doing that.

19         As I understood your prior ruling, if we kept it to

20    general themes and general differences, that we would not open   10:33

21    the door to their allegations that we were taking this idea or

22    taking that idea.

23         So this is where we're going now.  This is not

24    relevant.  This document is not relevant, based on the way I

25    did the examination.                                           10:33

1          **THE COURT:**  So your objection is to 1320?

2          **MS. AGUIAR:**  Yes.

3          And the last document -- I didn't know where he was

4    going with this, and we didn't object to the last one, but

5    clearly, this is where we're going.                          10:34

6          **THE COURT:**  What is the point of 1320?  I haven't

7    read all of it.

8          **MR. PRICE:**  1320 is a gymnastics doll which -- they

9    said "Don had done one at Mattel; he'll know how to do this."

10         We're not saying they stole -- they did anything        10:34

11   wrong.  This is the standard game plan.  This is what we're

12   saying here.  She's saying we did some unique creative -- they

13   are going to argue this should be taken into account, the

14   unique creativity.

15         **THE COURT:**  How is it not impeachment?  Because she  10:34

16   did testify at length in response to your questions that --

17   your theory is this is unique and this is something you did.

18   To the extent that there's no allegation of trade theft here --

19   I'm going to try very hard, again for case management reasons

20   -- I'm not saying that to keep it out, because I'm afraid of    10:34

21   where that goes, where that takes this trial -- but just for

22   impeachment -- she says she came up with this on her own, and

23   this seems to suggest they looked at Mattel's --

24         **MS. AGUIAR:**  I would disagree.  I think the way I

25   asked her the questions, I was asking her in comparison to the  10:35

1    sketches, and you kept saying, Look, you have to ask about the

2    doll and ask whether it was different from the sketch.  I did

3    not elicit testimony from her where, Were you guys the only

4    ones to do a gymnastics doll?  I did not ask that.

5         THE COURT:  Not that specific, but I did -- and maybe          10:35

6    this is something you can just check the transcripts on -- my

7    recollection seems to be there were questions generally about

8    unique contributions in terms of theme development that were

9    attributed strictly to MGA and were distanced from Mattel.

10   Maybe I'm mistaken, but...                                         10:35

11        MR. PRICE:  There was a question, she said, Can you

12   say no one ever did this before?  And she said, No, but we did

13   it in a unique, wonderful, creative way.

14        THE COURT:  Give me your best stuff, and you can do

15   the same.  Let me see what this is.  I seem to recall a series   10:36

16   of questions.  It's fair impeachment to say that, without

17   getting into specific trade secret thefts or allegations that

18   there was a copyright infringement or trade secret or any of

19   that phase two stuff.  I think, at least the impression created

20   in my mind, based on her responses, is that MGA by itself         10:36

21   developed certain themes -- not specific, but certain just

22   thematic aspects to the apportionment parts.

23        If you didn't then, there's no evidence support a

24   finding of apportionment.  So it's kind of a -- I suspect

25   there's something there.  If there's not something there, if      10:36

1    I'm wrong, show me where I'm wrong.

2         **MR. NOLAN:**  Where I think this is going -- and I just

3    want to lay this out on the record -- is that if Mr. Price is

4    going to take this approach, then we know that -- Mattel's own

5    documents talk about going out and getting competitive buying          10:37

6    and bringing Bratz products into the design center.

7         **THE COURT:**  That would go to unclean hands; that's an

8    affirmative defense, and I'm going to consider that post trial.

9         **MR. NOLAN:**  Okay.  But then there's the other

10   document that Mr. Kilpin is the author of.  If the court will          10:37

11   remember where Mr. Kilpin, the person in charge of marketing,

12   says that they were out thought and out executed by Bratz on

13   this product, on this execution of themes and this whole

14   marketing plan, so...

15        **THE COURT:**  Depending on what that means, that may           10:37

16   open the door for that.

17        **MR. NOLAN:**  Thank you.

18        **THE COURT:**  I don't know what it means.  I'm not

19   ruling now.  I'm just saying that's fair game.

20        **MR. PRICE:**  What Mr. Kilpin will also say is 'I don't         10:37

21   believe that now, because the reason we were' --

22        **THE COURT:**  Let's not play this out.  You both are

23   sophisticated enough to know how doors open up and close.  But

24   what I want to see during this break are the transcripts.  Give

25   me your best, the best you got.  Let me see it, and then I'll         10:38

 1   rule.

 2            (Brief recess taken.)

 3            **THE COURT:**   We're back on the record, outside of the

 4   presence of the jury.

 5            I received a couple of notes; one is easy to deal          11:00

 6   with.   Juror number two asked if she can use her inhaler in

 7   court.   Of course, I'll say yes.

 8            Juror number six is back with us.   He says, "Hello,

 9   Judge Larson, again.   Question:  If we get the case by Monday

10   afternoon, is it possible to delay deliberations for a week       11:00

11   until I get back from vacation?   The jury is okay with it, if

12   you are!  Paul, number six."   And then each juror has signed

13   the note:   Juror number four says okay; juror number one says

14   okay; juror number nine, ten, two, three, five --

15            Juror number seven wrote her name backwards, but this     11:00

16   gets back to that whole issue that we had before; I gather she

17   needs the light box.

18            Yeah, that's all of them.

19            And then I have a sub note for juror number seven

20   saying, "I have a job interview with the DA's office on           11:01

21   Thursday as well"; that's juror number seven.

22            So that's the note.

23            I wanted to take this up with you before I brought

24   the jury in, because i know this is something which has been on

25   their minds, because the courtroom deputy came to me this         11:01

 1   morning saying that there was a lot of talk about this.  And I

 2   said I don't want to hear talk, I want it in writing; and this

 3   is what I got.

 4         I had decided earlier this morning or yesterday that

 5   we are going to have closing arguments on Wednesday and then          11:01

 6   have this go to the jury.  I've got a full court day on Monday,

 7   which I suppose I could cancel if I had to.  I was looking

 8   forward, frankly, to having the opportunity to work on the jury

 9   instructions some more, but I want to accommodate the jury as

10   best we can.                                                          11:02

11         Tuesday, as I indicated, I have another jury to

12   select.

13         What are counsel's thoughts?

14         We're certainly going to be done with the evidence by

15   close of the day Friday, so we need to have one day to give          11:02

16   closing arguments and jury instructions.  I suppose I could do

17   this Monday, if I had to.

18         I don't know if I really like the idea of -- and I'm

19   just speaking out loud here -- of having a jury take a week

20   off; this would be the second week off that they would have         11:02

21   taken.  It was one thing kind of between phases; it's another

22   thing now between closing arguments and deliberations.  I don't

23   know if that's really a healthy thing to do, but I'll hear your

24   thoughts.

25         **MR. NOLAN:**  Your Honor, I think MGA shares the             11:03

```
 1   concern about the delay, but I would prefer not to put off

 2   closing arguments any further.  I think that even makes it more

 3   problematic.

 4        I know that the jury is all in agreement that juror

 5   number six could take off.  I thought that the juror had          11:03

 6   indicated in a previous note, though, yesterday or the day

 7   before, that he had a prepaid vacation and that he was willing

 8   to postpone it.

 9        THE COURT:  That's what -- yeah, and just not go.

10   Yes, he did say that.                                             11:03

11        MR. NOLAN:  Right.

12        As far as moving the closing arguments to Monday,

13   that's obviously your schedule, Judge.  We're completely

14   flexible in terms of when you want to do this.  It might be

15   that, all things considered, it would be best to do the closing  11:03

16   arguments on Monday rather than delaying them even further.

17   I'd have a concern that we would be so far out from the

18   presentation of evidence.

19        THE COURT:  Thank you.

20        MR. QUINN:  We share that concern, Your Honor, about        11:04

21   having a week off between closing and the commencement of

22   deliberations.  I don't know whether you can revisit that issue

23   with juror number six and the comments that he made about his

24   vacation.

25        THE COURT:  Right.                                          11:04
```

```
 1           Quite frankly, we're sitting in a situation here
 2    where we're days away from the end of this trial.  We have more
 3    jurors than we need.  All I need is six jurors for this case to
 4    go to deliberations.  We have nine.  If this is a financial
 5    hardship on juror number six and he is seeking to be excused,      11:04
 6    the Court would consider that.  I'll consult with counsel,
 7    obviously, before I did that.
 8           At the same time, I think we need to more forward at
 9    this point in time and have closing arguments and deliberations
10    next week.  That's my sense.  Whether we do that on Monday or      11:05
11    Wednesday -- my concern right now, quite frankly, about doing
12    it Monday is I don't want this jury -- because they are
13    obviously jelling together as a jury, as you would expect any
14    group of people who get along to do after being together for
15    three months.  I would not want them to race through their        11:05
16    deliberates trying to let juror number six get on his vacation.
17    I'm almost concerned about that.  And I don't want to be over-
18    thinking this, but I kind of think that it might be just be
19    better to stick with the plan that we had and have closing
20    arguments on Wednesday; that gives us the opportunity to make      11:05
21    that sure we have our jury instructions in line and go forward
22    with the closing argument and deliberations.
23           Certainly, accommodating an interview next Thursday
24    is one thing; but postponing this for an entire week, I think,
25    is a mistake.                                                      11:06
```

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1          **MR. QUINN:**  We share the Court's concerns.

2          **MR. NOLAN:**  We do as well, Your Honor.

3          I would just propose this, that maybe just talking to

4    juror number six, so that it doesn't seem as though the Court

5    is insensitive or counsel or the parties are insensitive.          11:06

6          **THE COURT:**  I'll certainly bear that.  I'll make this

7    clear that this is not counsel, that this is a Court decision.

8    This is not going to be borne by the parties.  I'll be the bad

9    guy on this.

10         **MR. NOLAN:**  The obvious point, and we're all coming          11:06

11   to it, is that, it's not only the delay, but, you know, things

12   happen.

13         **THE COURT:**  Yes.

14         **MR. NOLAN:**  And that's always the danger.  Somebody

15   gets sick; somebody gets hurt; it's life.  And all of a          11:06

16   sudden -- so I would not want to in any way see this as a

17   request to be excused from the jury, because I think juror

18   number six has continually tried to change his schedule to stay

19   on this.

20         **THE COURT:**  I won't do that unless he comes back and          11:07

21   says it's a financial hardship.

22         **MR. NOLAN:**  Yes.

23         **THE COURT:**  Absolutely.

24         **MR. NOLAN:**  Thank you.

25         **THE COURT:**  I was only making that point that -- I'd          11:07

```
 1    be more sensitive to these kinds of requests if we were down to

 2    six jurors where saying no ran the risk of losing our jury.

 3                Let's bring the jury in.

 4          MS. AGUIAR:  We have the pending objection on the

 5    exhibit.                                                         11:07

 6          THE COURT:  I have not seen -- do we have the

 7    transcript available?

 8                Have you shown this to counsel?

 9                Do that now.

10                Counsel, this is precisely the testimony that I     11:10

11    recall.

12                Ms. Garcia indicates using the particular example of

13    the Genie theme that you used, is that the difference is not

14    that other people have used common themes, but the unique way

15    that, quote, "MGA approached the concept of that theme in        11:11

16    particular," closed quote.  And that can be impeached broadly

17    with evidence that MGA was not, in developing their themes, was

18    actually looking to Mattel and not coming up with any

19    particular unique way on their own.

20          MS. AGUIAR:  Right.                                        11:11

21          THE COURT:  But just that and nothing further.

22                You're not planning to go much beyond this exhibit,

23    are you?

24          MR. PRICE:  There are a few things.

25          THE COURT:  Which themes in particular?                    11:11
```

1    **MR. PRICE:**  There's a gymnastics theme; there's a big

2  head theme that I tried to do with Mr. Larian but he could not

3  authenticate the document, which is like the big Barbie head

4  and then there's the big Bratz head; there's Polly Pocket for a

5  theme.                                                          11:12

6        **THE COURT:**  How is the big head thing a theme?

7        **MR. PRICE:**  That's how they characterize it; it's a

8  makeup theme.

9        **THE COURT:**  I'm sorry.  Right, very good.

10       **MR. PRICE:**  Not just the over-sized head.            11:12

11       And I said the western, the spring, the big head.

12  And then I just have a few on -- I think this is a little

13  different, this is just on packaging.

14       **THE COURT:**  And you're not making any allegation that

15  this is a theft or an infringement or anything else; you're     11:12

16  simply indicating this is to impeach Garcia's contention that

17  these were unique developments, particularized developments

18  that MGA made.

19       **MR. PRICE:**  Right.

20       **THE COURT:**  And then the jury can decide whether to    11:12

21  believe one or the other.

22       **MR. PRICE:**  Yes.  Because what I'm dealing with is

23  all public; that is, all western themes, et cetera.

24       **MS. AGUIAR:**  Here's my point.  My point is it's

25  exactly the opposite, and let me explain why.                  11:13

1        I did not elicit testimony from her that, for

2   example, we did a gymnastics theme that had never been done

3   before.

4        **THE COURT:**  I understand that.

5        **MS. AGUIAR:**  So my question and her answer that she                11:13

6   gave to my question was, Yes, you know what, there are Genie

7   themes out there; so there's actually nothing -- these are not

8   impeaching.  In fact, they are totally supporting what she's

9   said.

10       He wants to put documents in front of her that                         11:13

11  generally show that Mattel has done a gymnast theme or a

12  western theme.  That's precisely what she said, that there are

13  fashion dolls that have done the same theme.

14       If he were to put in front of her a document that

15  showed that the way we executed the Genie theme was a rip off          11:13

16  of Mattel, that's what would be relevant.  So in fact, the

17  stuff that he is trying to show her is totally supportive of

18  what he said, and it's 403, Your Honor.

19       So I respectfully submit that her testimony is

20  consistent with these documents, but to bring them in now to           11:14

21  try to impeach her and to show that we were -- it's absolutely

22  that they are trying to show that we copied.  And I think it's

23  jury confusion and it's 403.

24       **THE COURT:**  Thank you, counsel.

25       1320, and what are the other exhibits, Counsel?                     11:14

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1          **MR. PRICE:**  11179.

2          **THE COURT:**  And the other one?

3          **MR. PRICE:**  1321.

4          **THE COURT:**  That's it?

5          **MR. PRICE:**  Finally, 13970; it's about packaging.          11:15

6          **THE COURT:**  Can you direct me to where the relevant

7    portion is, as you see it?

8          **MR. PRICE:**  If you look at the last page, Your Honor,

9    it's number 5, Lil' Bratz Tote, where it says "repack similar

10   to Polly Pockets under a new theme; (don't call them tote for          11:16

11   fall 2005; Polly Pockets and Mattel product.

12          It's number 5 on Page 4.

13          **THE COURT:**  I'm going to overrule the objection, but

14   I think an instruction might be important just to make it clear

15   that there's no allegation of copyright infringement on any of          11:17

16   these elements; that this is simply going to an issue of

17   impeachment.

18          **MR. PRICE:**  It's actually an issue of this is what

19   companies do.  What we're going to be arguing is their branding

20   is what any company would do with this information; it's a          11:17

21   standard play book.

22          **THE COURT:**  Yes, but I don't know if the evidence

23   goes as far as that, Counsel.

24          My reading of the testimony that was elicited and

25   particularly in light of that being relevant for apportionment,          11:18

```
 1   is that this is something which MGA added to the product

 2   uniquely that they should basically have deducted from the

 3   profits that were generated by the allegedly infringing

 4   product.  And to the extent that you can demonstrate that MGA

 5   did not do that uniquely, but rather simply borrowed, whether      11:18

 6   it's Mattel or anybody else, products or ideas that were out

 7   there on the market, that goes into that calculus.  It lessens

 8   that; it impeaches that; that is the purpose for which I'm

 9   permitting this in.  Nothing further on that.  No allegation of

10   infringement or trade secret theft, or anything of that sort.      11:18

11   So as long as that is clear, what I'll do is I'll reserve

12   deciding on an instruction until I hear how the testimony plays

13   out.  If you go to far, Counsel, I'm going to cut you off and

14   I'm going to instruct; so keep in mind the limited purpose for

15   which I'm permitting this.                                         11:19

16           MR. ZELLER:  I'm concerned if the court is going to

17   call out trade secret theft, because we have not crossed that

18   bridge.

19           THE COURT:  I'm not.  I'm saying we're not there at

20   this point.  I understand.                                         11:19

21           MS. AGUIAR:  What I would say Your Honor, just again,

22   I specifically did not ask Ms. Garcia questions in order to

23   open this door.

24           THE COURT:  I'm sure that was not your intent,

25   Counsel.                                                           11:19
```

1          **MS. AGUIAR:**  I refrained from asking questions that

2     opened the door.  I did not ask 'Did you do a theme that had

3     never been done before,' so they would impeach her and say.

4     'Wait a second, Mattel has done this theme before.'

5          In fact, I did the exact opposite.                              11:19

6          **THE COURT:**  I've made a ruling at this point.

7          If you're moving for reconsideration, I'll consider

8     it in the proper form.  It's not so much your question as it

9     was her answer, and you can't always control the answer of your

10    client.                                                             11:20

11         Particularly, you can't always control the answer of

12    Ms. Garcia.

13         **MS. AGUIAR:**  I understand that, and I think her

14    answer was not -- she did not contend that we have been the

15    only ones to do a Genie theme.  She said exactly the opposite.       11:20

16    She said, sure, there have been fashion dolls who have done the

17    Genie them.

18         That is what they are trying to show.

19         They are trying to show that Mattel has done themes

20    that we have also done.  That does not impeach what she said.        11:20

21    In fact, she said precisely the opposite.

22         **THE COURT:**  I'll try to explain it one more time, and

23    then I'm going to have to insist that I have made a ruling and

24    I'm not entertaining any further argument.

25         The argument that she seems to be making goes further          11:20

```
 1    than what you're suggesting.  We all understand these themes

 2    are out there.  What she's essentially saying is that MGA'S

 3    unique particularized take on that theme is what makes it

 4    special.  And she would have to do.  And you need that evidence

 5    for apportionment.                                              11:21

 6            What this responds to is that, no, the particularized

 7    take by MGA was not a particularized take that they developed

 8    that was actually borrowed from Mattel.  Not the idea generally

 9    but actually the particularized take.

10            That's my ruling, Counsel.                              11:21

11        MS. AGUIAR:  I appreciate that.  I would say that I

12    don't think that documents Mr. Price has pointed us to show

13    that our take was not unique, I think those actual specific --

14    now that I know -- and I did make my argument before, and I'm

15    not --                                                          11:21

16        THE COURT:  And you're correct, they are not

17    dispositive of the issue.  But they are relevant towards the

18    argument they are making.  They are relevant documents.

19        MS. AGUIAR:  On a separate note, Your Honor,

20    cognizant of the time issues that both parties have, we're      11:21

21    going to be facing these same issues with witnesses like

22    Mr. Kilpin and Mr. Eckert, and I would only ask, Your Honor,

23    that because we have been able to extend the courtesy to Mattel

24    to do this off the record and off the clock, and not have

25    20 minutes take away while we decide these issues, we should be 11:22
```

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

```
 1   extended the same courtesy; that if there are certain documents
 2   we want in with Mr. Kilpin, for example, or Mr. Eckert, that
 3   our precious few hours left, that we be allowed to do it either
 4   outside of the presence of the jury or at a time --
 5        THE COURT:  I would encourage you, if there's a                11:22
 6   particular issue that you know, lets take it up before the
 7   trial, outside of the presence of the jury.
 8        This is a much more productive way of dealing with it
 9   than at side bar.
10        MS. AGUIAR:  Right.                                            11:22
11        THE COURT:  I appreciate that.
12        MS. AGUIAR:  That's why we raised it this morning.  I
13   didn't want the witnesses come up on the stand later this
14   morning and have all this be done on our time.
15        Thank you.                                                     11:22
16        THE COURT:  Thank you, counsel.
17        (JURORS ENTER COURTROOM.)
18        THE COURT:  Before resuming with the
19   cross-examination, I wanted to address a couple of notes that I
20   received from the jury.                                             11:24
21        First of all, juror number two, please, by all
22   means -- and this applies to all of the jurors -- if there's
23   something you need to bring in for your comfort or certainly
24   for medical purposes or whatever, that's fine.
25        The more difficult note is the note from juror six            11:25
```

1   concerning the vacation, and I understand that this is a

2   problem.  Let me start by saying counsel for both parties or

3   all parties urged the court to be as accommodating as possible.

4   Unfortunately, I can't break up deliberations for a week.  Once

5   they go to -- it's one thing to certainly accommodate -- I know        11:25

6   somebody has a job interview on Thursday -- to take an hour off

7   or a couple of hours off, or even an afternoon if necessary,

8   that's something I would give you discretion to do.  To break

9   up, to have a week interjected between the close of the case

10  and the commencement of deliberation, that would not be proper        11:25

11  for the Court and I would run the risk of infecting the process

12  there; so I'm not going to permit that.

13          If this poses a hardship, I'll expect to hear from

14  juror number six.  I received your note yesterday indicating

15  that you would be willing to forgo that, and that would be             11:26

16  tremendous on your part.  The Court and the parties want this

17  jury to stay together as presently constituted.

18          **JUROR:**  I understand.

19          **THE COURT:**  We would still be able to go forward

20  without you.  We don't want to do that.  You've invested a            11:26

21  tremendous amount of your time to do this, and we greatly value

22  your participation.  I regret that this is backing up against

23  your vacation in the way that it is.  But unfortunately, I

24  can't change that; so I'm reluctant to do this, but I have to

25  deny that request.                                                     11:26

1        We'll finish up with the evidence this week.  We are

2   going to take Thursday afternoon off so Mr. Nickels can attend

3   his friend's funeral, and then we'll have the closing arguments

4   and the instruction next week.  Whether it's going to be Monday

5   or Wednesday, largely is going to be a court issue.  I've got a          11:27

6   solid day of hearings on Monday that I'm considering moving,

7   but that raises a number of issues; and there's a criminal jury

8   that I must pick on Tuesday on account of the speedy trial act,

9   and that's why we can't hold it on Tuesday; so it may very well

10  be on Wednesday.  But once you've heard and received the                 11:27

11  evidence, that's when we appoint this bailiff, and the bailiff

12  needs to keep the jury together and we really can't have a

13  one-week hiatus.  I really apologize for that.

14        I will entertain, though -- if it's truly a hardship,

15  let me know.  But otherwise we're going to have to go forward.           11:27

16        **JUROR:**  Would it be possible for him to get a note to

17  maybe try to get a refund on his ticket?

18        **THE COURT:**  Absolutely.  If the court can do anything

19  in that regard.  I'll make that as dramatic as -- your

20  involvement is critical; you're under compulsion of a court             11:28

21  order to attend.  Whatever I can do to assist you, I'm more

22  than happy to do; so just provide that information to the

23  courtroom deputy.

24        **JUROR:**  Thank you.

25        **THE COURT:**  As I indicated to you previously, the             11:28

```
 1    attention that you have paid and the duration and everything,

 2    it's greatly appreciated by the Court, and I know it's greatly

 3    appreciated by counsel and their clients.  This is an important

 4    matter to everybody involved in this, and I really appreciate

 5    your service.  It's really been above and beyond the call.        11:28

 6              With that addressed, Mr. Price, if you would continue

 7    your examination.

 8              MR. PRICE:  I think I had just moved in Exhibit 1320.

 9              THE COURT:  Very well.

10              MR. PRICE:  Is that now moved into evidence,

11    Your Honor?

12              THE COURT:  The objection is overruled.  You may

13    publish.

14              (Exhibit 1320 is received.)

15    BY MR. PRICE:

16    Q    This is regarding spring '07 gymnastics.  If we could go

17    to the third page, Paula Garcia here:  "You know that the

18    Barbie version will be feature driven; they have done gymnastic

19    dolls before; I know that Joe worked on them while he was

20    there."                                                           11:29

21              Perhaps you can tell us, Joe is referring to whom?

22    A    Joe is Joe Feldman.

23    Q    He was a former Mattel employee?

24    A    Yes.

25    Q    And then you write "I know he can put something together   11:29
```

1    in the way of a prototype fast for us; need it in time for

2    HKTF; that's the Hong Kong Toy Fair?

3    A    Yes.

4    Q    Showing you what's been marked as -- it's in evidence --

5    it's 18740.                                                        11:30

6         Is that one of the themes, that gymnast doll?

7    A    Yes.

8    Q    And I'd like you to turn your attention now, Ma'am, if you

9    could, to Exhibit 11179.  I think it's misplaced in there; it's

10   after 11110; it's after 1110-B.                                   11:30

11        Have you found it?

12   A    Yes.

13   Q    Is that an E-mail string between you and an Elly

14   Shinohara?

15   A    Yes.                                                          11:31

16        **MR. PRICE:**  Move Exhibit 11179 into evidence.

17        **MS. AGUIAR:**  Subject to our off-the-record

18   discussion, Your Honor, no objection.

19        **THE COURT:**  It's admitted.

20        (Exhibit 11179 is received.)                                 11:31

21        **MR. PRICE:**  If we could show that.

22   **BY MR. PRICE:**

23   Q    This refers to a "Bratz convertible and big head."

24        Do you see that?

25   A    Yes.                                                          11:31

1    Q    And it says "On both the Barbie samples you gave us..."
2    and that is written by Elly Shinohara.  Could you tell us who
3    that is, or Elly?
4    A    She's a free-lancer that worked for a company called
5    Gentle Giant that MGA employed.                                    11:31
6    Q    Showing you what's in evidence 17533.
7         It's not called a Bratz big head, right?  That's the
8    not the title to it.
9    A    Correct.
10   Q    Is that what you are referring to, that sort of theme in   11:32
11   this E-mail?
12   A    Yes.
13   Q    If we look at 11179-008, this was a PDF attached to the
14   e-mails?
15   A    Yes.                                                        11:32
16   Q    And that's a Barbie?
17   A    Yes.
18   Q    And incidentally, it's not unusual, is it, for companies
19   to look at other company's products in making marketing
20   decisions or things of that nature; correct?                    11:32
21   A    Correct.
22   Q    Because you're competing with these other companies;
23   correct?
24   A    Right.
25   Q    If you would look at Exhibit 1321.                          11:33

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1           Do you recognize that as an E-mail string between you

2    and Mr. Larian and Mr. Bryant?

3    A    Yes.

4           MR. PRICE:  Move 1321 into evidence, Your Honor.

5           MS. AGUIAR:  No objection, with the same comments,          11:33

6    Your Honor.

7           THE COURT:  It is admitted.

8           (Exhibit 1321 is received.)

9    BY MR. PRICE:

10   Q    It starts here with Jasmine Larian to Isaac regarding         11:33

11   western.

12          Was there a western themed Bratz?

13   A    Yes.

14   Q    It says "I'm surprised Carter designed these.  I like the

15   western theme idea.  I really think you could do a way better      11:34

16   job on this."

17          If we could go to the response.

18          And this is the response which you're copied on?

19   A    Yes.

20   Q    And that's Mr. Larian who says, "I agree with her.  Please    11:34

21   see competition and fix it."

22          Do you see that?

23   A    Yes, I do.

24   Q    And the competition there refers to Mattel; right?

25   A    It is not clear here.  It's possible.  Certainly, it's        11:34

Wednesday, August 13, 2008                    Trial Day 34, Morning Session

1    possible.

2    Q    That was your main fashion doll competition?

3    A    Yeah.  I believe so at the time.  I mean, it was certainly

4    the most powerful or successful, yeah.

5    Q    And they had a western themed Barbie?                    11:34

6    A    It's possible.

7    Q    If you would look at 13970.  Do you recognize that as an

8    E-mail string between you and Mr. Larian and others?

9    A    Yes.

10        MR. PRICE:  Move 13970 into evidence, Your Honor.        11:35

11        MS. AGUIAR:  No objection.

12        THE COURT:  It's admitted.

13        (Exhibit 13970 is received.)

14   BY MR. PRICE:

15   Q    Let's go to the third page.  You see, Ms. Garcia, there is 11:36

16   an E-mail from Mr. Larian to you and others concerning, it

17   says, "Bratz excess plan."  Do you see that?

18   A    Yes.

19   Q    And if we turn to the next page, there's a section here,

20   "Five Lil' Bratz Tote."  Do you see that?                     11:36

21   A    Yes.

22   Q    And it says "Repack similar to Polly Pocket under a new

23   theme; don't call them totes for fall 2005."

24   A    Yes.

25   Q    Polly Pocket, what was that?                             11:36

1    A    Polly Pocket is a small doll line.

2    Q    Made by...

3    A    Mattel.

4         Mr. Price may I have --

5         **THE COURT:**  Your attorney will have a chance to ask        11:37

6    you questions.

7    **BY MR. PRICE:**

8    Q    You were talking about development of the Bratz brand, the

9    trendy, funky, far-out fashion, cool, hip.

10        Do you recall that?                                             11:37

11   A    Yep.

12   Q    You would agree that the core of the brand was, is, the

13   dolls.

14   A    I actually believe that the Bratz dolls, the fashion

15   dolls, are a component of the brand, but the brand has actually      11:37

16   grown much bigger and beyond the fashion dolls.

17   Q    So you would disagree with any documentation or anything

18   that said that the core of the brand was the dolls?

19   A    Yes.  It would be important for you to show me a document

20   so I could --                                                        11:37

21   Q    No.  We've already had evidence for the jury.

22        I'm asking whether you would disagree with that

23   statement, that the core of the brand is the dolls.

24   A    I would say a huge portion, a big portion of the brand

25   resides in the dolls.  But it is not the exclusive, you know,        11:38

1    size of the brand.

2    Q    I'd like to show you -- I don't believe it's in your

3    binder; it is in evidence -- it's Exhibit 13520; that's the

4    business plans, March 2001.

5           Maybe we can show the front page.                          11:38

6           **MS. AGUIAR:**   Is this in evidence?

7           **MR. PRICE:**   Yes.

8    **BY MR. PRICE:**

9    Q    If we could go to Page 15, I believe.

10          **THE COURT:**   Do we have a copy of the document?       11:38

11          I think the witness should have this before her.

12          **MR. PRICE:**   Sure.

13   **BY MR. PRICE:**

14   Q    Ms. Garcia, while we're waiting for the hard copy, you'd

15   agree with the statement that the Bratz brand started with the   11:39

16   dolls.

17   A    Yes.

18   Q    And you'll agree that the plans for that branding started

19   in September, October of 2000, when MGA saw Carter Bryant's

20   fully concepted Bratz dolls.                                      11:40

21   A    That is not true.

22   Q    I have a copy of 13520 for you, Ma'am.

23          My first question is, were you involved in the

24   development of that plan?

25   A    No, I was not.                                               11:40

1    Q    Let me ask you to look at Page 15, where it says

2    "strengths," do you agree that the Bratz are unique in many

3    ways; their eyes are big with hints of anime style; their lips

4    are more pronounced; their feet and heads are oversized; and

5    there's no fashion doll on the market that bears resemblance to        11:40

6    the Bratz."

7            This was written actually in 2001.

8            Would you have agreed with that as of 2001?

9    A    Yes.  And I'll agree that the fully concepted dolls that

10   Carter Bryant put down in writing that you had seen in

11   September/October, that those drawings had eyes that are big            11:41

12   with a hint of anime style; lips are more pronounced; feet and

13   heads were oversized."  You would agree that?

14           MS. AGUIAR:  Objection.  Lacks foundation; assumes

15   facts; argumentative.                                                   11:41

16           THE COURT:  Sustained.  Rephrase, Counsel.

17   BY MR. PRICE:

18   Q    The drawings that Mr. Bryant brought to MGA and the

19   drawings he did while he was at Mattel, that drew the Bratz --

20   are you with me so far?                                                 11:41

21           THE COURT:  Counsel, reformulate your question with

22   that modification.

23   BY MR. PRICE:

24   Q    Carter Bryant's drawings, you'll agree that they show

25   characters called Bratz, where the eyes are big with a hint of         11:42

1   anime style; their lips were more pronounced; their feet and

2   heads were oversized.  You'll agree that was portrayed in

3   Carter Bryant's drawings.

4           **MS. AGUIAR:**  Objection.  He's talking about dolls;

5   he's talking about drawings and dolls.  It's not --                11:42

6           **THE COURT:**  Overruled.

7           **THE WITNESS:**  Carter Bryant's portfolio drawings had

8   big eyes, lips that were pronounced, feet and head that were

9   oversized.  However, we revised -- certainly, MGA made

10  conscious decisions to make revisions from those portfolio       11:42

11  drawings.

12  Q   While overall trying to, in your words, stay true to

13  Mr. Bryant's vision; correct?

14  A   If the definition of vision is the concept, the concept of

15  four girls who are individual and fashionable with attitude,     11:43

16  with trends, that's my definition of a vision.

17          **MR. PRICE:**  Let's put up 10,001, Page 2.

18  **BY MR. PRICE:**

19  Q   In designing the four different girls to get the look of

20  each girl, to get that look you tried to stay true to            11:44

21  Mr. Bryant's vision; correct?

22  A   No, that is not correct.  I stayed true -- I tried to stay

23  true to the inventory's concept and vision, but in no way does

24  that suggest that I also stayed true to the individual

25  portfolio drawings that Carter Bryant presented on               11:44

```
 1   September 1st.

 2            MR. PRICE:  Nothing further, Your Honor.

 3   BY MS. AGUIAR:

 4   Q    Did you ever say to this reporter that those drawings were

 5   so absolutely perfect that you made no changes to them?          11:44

 6   A    No.  I did not.

 7   Q    Did you ever tell the reporter that in creating the actual

 8   3-dimensional doll, that you did not change the look of

 9   Mr. Bryant's drawings at all?

10   A    No.                                                          11:45

11   Q    Did you, in fact, change the look from what was depicted

12   and expressed by Mr. Bryant in his drawings, to the doll that

13   MGA made?

14   A    Yes.

15   Q    Was the doll that was depicted in his drawings, the        11:45

16   particular way he chose to draw it, marketable, in your view,

17   to the tween market that you wanted to address?

18   A    No.  And actually, Lauren, if I might just refer to a

19   different place in the document, you will see, in fact that

20   the --                                                           11:45

21            MR. PRICE:  Your Honor, object.  This is now going

22   beyond the scope of the question.

23   BY MS. AGUIAR:

24   Q    Is there another portion of this document?

25            THE COURT:  You're withdrawing your question,           11:45
```

1    Counsel, or are you going to wait for the Court to rule on the

2    objection?

3           **MS. AGUIAR:**  There wasn't a pending question, so I'll

4    ask one.

5           **THE COURT:**  Very well.                                    11:45

6    **BY MS. AGUIAR:**

7    Q    Is there another part of the document that you wanted to

8    point the jury to?

9    A    Yes.

10   Q    What part is that?                                             11:46

11   A    It is in the top most part and there is a reference that I

12   say that "I challenged the inventor in terms of designing of

13   the fashion and the dolls."

14          That is a very important statement as I think it goes

15   back to my point that in later developing the Bratz dolls, I     11:46

16   had challenged the designer and his fashions and the creation

17   of his dolls, especially in relation to the portfolio.

18   Q    Is this also an answer that you gave to the reporter in

19   the same E-mail?

20   A    Yes, it is.                                                    11:46

21   Q    In the E-mail Mr. Price showed you in your testimony, did

22   he point this -- did Mr. Price point out this section of the

23   E-mail when he was questioning you a few minutes ago?

24   A    No.

25   Q    I want to go back to a couple of the topics Mr. Price        11:47

1    discussed, one of the recent ones.

2          He was asking you about the fact that Mattel had done

3    some themes that MGA has also done.

4          Do you recall that area of testimony?

5    A    Yes.                                                       11:47

6    Q    Are there themes that MGA has done that then Mattel has

7    done?

8    A    Yes.

9    Q    Those products that you were referencing in those e-mails,

10   were those products that were internal or confidential to       11:47

11   Mattel at the time that you were referencing them?

12   A    No, they were not.

13   Q    Were they products that were in the public, on the market?

14   A    Absolutely.

15   Q    Did MGA copy Mattel's western doll, let's say, just as an   11:47

16   example?

17   A    Absolutely not.

18   Q    Did MGA do a western doll differently than Mattel did it?

19   A    Absolutely.  A western theme is not exclusive to any

20   single one manufacturer.  And certainly, it's possible that we   11:48

21   may have come up with a western theme.  It's possible that

22   other toy manufactures even outside of Mattel may have come up

23   with a western theme.  Western theme is relevant for the

24   consumer because, frankly, they love horses.

25          But I will say that the way that we approached our        11:48

1    western doll, I assert, I am certain, is far different than any

2    western doll that our competition would have ever done before.

3    Q    Do you believe that MGA executed better on that idea?

4    A    Yes.

5    Q    Let me go to another area of testimony that Mr. Price                     11:48

6    elicited.

7         He made a number of comparisons or asked you to make

8    a number of comparisons regarding dolls like I believe they

9    were called -- one was called Funky Tweens and one was called

10   Scamps.  Do you recall that area of testimony?                                11:49

11   A    Yes.

12   Q    Is it your understanding that those dolls, and allegations

13   by MGA regarding those dolls were made in Hong Kong under Hong

14   Kong law?

15        **MR. PRICE:**  Your Honor, I'll object.  Irrelevant as               11:49

16   to the statement presented.

17        **THE COURT:**  Sustained.

18   **BY MS. AGUIAR:**

19   Q    Do you have an understanding as to where those litigation

20   comparisons were made?                                                       11:49

21   A    Yes.

22   Q    What is your understanding?

23   A    That they were made in Hong Kong.

24   Q    Do you have an understanding whether U.S. copyright law

25   was applicable?                                                              11:49

1          **MR. PRICE:**  Objection.  Irrelevant.

2          **THE COURT:**  Sustained.

3    BY MS. AGUIAR:

4    Q    Mr. Price asked you about the connection that he was

5    trying to draw between the drawings, those pitch book drawings,        11:49

6    a copy of which are sitting right there on the table.

7          Do you see that?

8    A    Yes.

9    Q    Those 14 or 16 drawings.

10   A    Yes.                                                              11:50

11   Q    Does that package of drawings right there guarantee that

12   MGA was going to have a successful Bratz brand?

13         **MR. PRICE:**  Objection.  Calls for speculation;

14   improper opinion.

15         **THE COURT:**  Overruled.                                      11:50

16   BY MS. AGUIAR:

17   Q    You can answer?

18   A    Absolutely not.

19   Q    Why?  Why is it not necessarily true that from that stack

20   of drawings, MGA was guaranteed a successful Bratz brand?            11:50

21   A    There's no -- first of all, there's never any guarantee

22   when a company pursues a brand new product.  Certainly, those

23   documents did not represent what MGA felt to be comfortable in

24   the first place, so much that MGA made the decision to revise

25   those drawings in the manufacturing of the Bratz dolls.             11:50

1   Q    Did Carter Bryant build the Bratz brand or did MGA build

2   the Bratz brand?

3   A    MGA built the Bratz brand.

4   Q    Mr. Price also asked you about looking at the pitch book

5   drawings and asking you whether a doll could have been made                    11:51

6   that looked basically just like the pitch book drawings.

7        Do you recall that?

8   A    Yes.

9   Q    Putting aside whether the doll would have been marketable,

10  and putting aside what information the sculptor would need,                     11:51

11  could MGA have made a doll that looked exactly like those

12  drawings?

13       If you wanted to and you were putting everything else

14  aside, whether it was marketable or not, could you have made a

15  doll that looked like those drawings?                                           11:51

16       **MR. PRICE:**  Asked and answered in my examination.

17       **THE COURT:**  Overruled.

18  **BY MS. AGUIAR:**

19  Q    What was your answer?

20  A    Yes.                                                                        11:51

21  Q    Yes, MGA could have made a doll that looked just like

22  those drawings?

23  A    Yes.

24  Q    Would that doll the doll that you made?  The Bratz doll?

25  A    No.                                                                         11:52

7151

1    Q    Who made the doll?  Did Carter Bryant make the doll, or

2    did MGA make the doll?

3    A    MGA.  And amongst a collection of 1,700 people helped

4    build that doll.

5         **MR. PRICE:**  Objection.  Move to strike; irrelevant.        11:52

6         **THE COURT:**  Stricken.

7         Ms. Garcia, just answer the questions.

8    **BY MS. AGUIAR:**

9    Q    Did Carter Bryant make the doll or did MGA make the doll?

10   A    MGA made the doll.                                            11:52

11   Q    Ms. Garcia, you were asked questions by Mr. Price

12   regarding whether MGA acted, I believe the words he used were

13   with malice and with fraud, when you met with Carter Bryant and

14   you had the drawings pitched to you.

15        Do you recall that?                                          11:52

16   A    Yes.

17   Q    When you were meeting with Carter Bryant in the fall of

18   2000, did you intend to steal anything from Mattel?

19   A    Absolutely not.

20   Q    At the time you met with him, did you think those drawings  11:53

21   that you were looking at belonged to Mattel?

22   A    Absolutely not.

23   Q    Given the jury's verdict now and what they have found

24   regarding when they believe those drawings were done, do you

25   accept responsibility for the actions that you took at the       11:53

1    time?

2    A    I absolutely accept responsibility.

3    Q    My last question for you is whether the jury's verdict

4    from the first phase of this trial has had an impact on you?

5              MR. PRICE:  Objection.  Irrelevant.                    11:53

6              THE COURT:  Counsel, what does this go to?

7              MS. AGUIAR:  To damages, Your Honor; punitives.

8              MR. PRICE:  In that case, it's overbroad.

9              THE COURT:  Side-bar, counsel.

10             (Side-bar proceedings as follows:)                     11:54

11             MR. NOLAN:  Your Honor, on their examination

12   Mr. Price asked her whether or not she was aware this jury was

13   going to be asked to make a finding as to MGA --

14             THE COURT:  My question is how does the verdict

15   affect her going to the issue of punitive damages?              11:54

16             MR. NOLAN:  Because one of the elements of punitive

17   damages is whether or not it's necessary to award damages to

18   punish the defendant.  And accepting responsibility --

19             THE COURT:  I see.  Okay.  It's a pretty open-ended

20   question.  I was concerned where it might go; so you're         11:54

21   basically limited to the issue of whether or not a further

22   award of punitive damages is necessary for her to realize that

23   she can't do this anymore.

24             MR. NOLAN:  Right.  Or that is she thumbing her nose

25   at the jury.                                                    11:54

1      **THE COURT:**  You're going to have to use leading

2  questions.  Because I think with this particular witness, who

3  has blurted out a number of things -- she's got issues and

4  statements they want to get before this jury -- I'm going to

5  give you license to lead during this area.                    11:55

6      **MS. AGUIAR:**  Can I get guidance in terms of what you

7  would think is appropriate?

8      **THE COURT:**  What the elements of punitive damages

9  are; you can go through --

10     **MR. NOLAN:**  We'll work it out.                          11:55

11     **THE COURT:**  You know what -- punitive damages are.

12     **MS. AGUIAR:**  I do.  I want to make sure we're on the

13  same page.

14     **MR. PRICE:**  I'm wondering if a proffer might be

15  appropriate to the jury.                                      11:55

16     **THE COURT:**  I trust counsel.

17     You can make your objections.

18     (Side-bar proceedings concluded. )

19  **BY MS. AGUIAR:**

20  Q   Ms. Garcia, can you explain your personal reaction as it   11:56

21  relates to your professional dealings at MGA to the jury

22  verdict?

23     **MR. PRICE:**  Objection.  Irrelevant; overbroad.

24     **THE COURT:**  Be more narrow, Counsel.  This is

25  overbroad.                                                    11:56

BY MS. AGUIAR:

Q    In reaction to the jury's verdict, what impact did that have on how you think about and approach work that you do at MGA?

             MR. PRICE:  I still object.  It's overbroad.                    11:56

             THE COURT:  You may answer.

             MR. PRICE:  Objection; nonleading.

             THE WITNESS:  Well, I --

             THE COURT:  Counsel, I'm giving you license to lead on this.  Why don't you ask leading questions on this.           11:56

      This is the opportunity to do those leading questions.

             MS. AGUIAR:  Okay.  I've just been trained so well by the two of them over there, that I just got it beaten out of me.                                                                       11:57

             THE COURT:  I understand.  You may lead in this delicate area.

BY MS. AGUIAR:

Q    Did the jury's verdict in the first phase of the trial affect you personally?                                             11:57

A    Yes, it did.

Q    How did it affect you personally?

             MR. PRICE:  Objection.  Nonleading; overbroad.

             THE COURT:  Now you can't help yourself but ask nonleading questions.                                             11:57

```
 1              Lead, counsel.
 2   BY MS. AGUIAR:
 3   Q    Did the verdict in the first phase have an impact on how
 4   you will conduct yourself in the future?
 5   A    Yes, it will.                                              11:57
 6   Q    And can you explain to us how that is the case.
 7              MR. PRICE:  Objection.  Nonleading.
 8              THE COURT:  Counsel, confer with counsel.
 9   BY MS. AGUIAR:
10   Q    What was your emotional reaction to the jury's verdict in 11:58
11   1-A?
12              MR. PRICE:  Same objections.
13              THE COURT:  Sustained.
14   BY MS. AGUIAR:
15   Q    Did the jury's verdict in 1-A make you think differently  11:58
16   about dealing with inventors who bring their ideas and concept
17   drawings to MGA?
18   A    Absolutely.  In the future dealings of any inventor and
19   their concept dealings -- concept submissions, I am certain
20   that I will be far more cautious in those future dealings.     11:58
21   Q    Do you feel you took steps to be cautious back in 2000
22   when you were dealing with Mr. Bryant?
23   A    Yes.
24   Q    And do you feel that in light of the jury's verdict,
25   you've understood that it's necessary for you to be even more  11:59
```

1    so?

2    A    100 percent.

3         **MS. AGUIAR:**  Nothing further.

4    **BY MR. PRICE:**

5    Q    In 2000, you knew that if Carter Bryant was a Mattel          11:59

6    employee BRINGING you designs, that you shouldn't have been

7    looking at the DESIGNS; right?

8    A    No.

9    Q    So in 2000 if you had known Carter Bryant was a Mattel

10   employee working at the Mattel design center and bringing you    11:59

11   DESIGNS, you thought it was perfectly okay to look at those,

12   without further investigation?

13        **MS. AGUIAR:**  Objection.  Assumes facts; misstates

14   testimony.

15        **THE COURT:**  Rephrase, Counsel.                           11:59

16   **BY MR. PRICE:**

17   Q    You testified how you were going to be acting differently.

18   I want you to tell the jury what you thought was appropriate in

19   the year 2000, at that time that you knew that if Carter Bryant

20   were a Mattel employee, working at the Mattel Design Center,     12:00

21   coming to you with designs, it would have been inappropriate

22   for you to look at those designs.

23        You knew that at the time; right?

24   A    It is -- I find it not inappropriate to have even

25   communicated with Carter Bryant, given that he worked at        12:00

1    Mattel; the inappropriate part is when he had developed those

2    portfolio drawings.

3    Q    If a designer came to you in 2000, working for a

4    competitor, and said, Here, I have some designs, you would have

5    looked at those without any further inquiry; is that right?                    12:00

6    A    Knowing now and learning now --

7    Q    I'm talking about in 2000.

8         At the time in 2000, if a designer from a competitor

9    came to you with doll designs, you knew that you should have

10   had some kind of inquiry into, 'Well, are these your employers?         12:01

11   When did you do them?"  Right?

12   A    Yes.

13   Q    And you didn't make any such inquiry in 2000, did you?

14   A    I didn't personally.

15   Q    Well, in fact, the reason you say you didn't do anything      12:01

16   wrong is because until 2004, you didn't know Carter Bryant was

17   a Mattel employee; right?

18   A    I testified earlier that I did not believe Carter Bryant

19   was a Mattel employee at the time.  It's possible.  I just

20   don't remember.                                                     12:01

21   Q    Until 2004, is what you told the jury; right?

22   A    That's right.

23   Q    And the jury's verdict certainly has had no impact at all

24   in your position on that issue; that is, you still maintain

25   that it wasn't until 2004 that you had any idea Carter Bryant      12:01

1   was a Mattel employee when he came to MGA in September of 2000;

2   right?

3   A    Mr. Price, I still have to stand with my earlier testimony

4   that I do not remember Carter Bryant suggesting that he worked

5   at Mattel during September 1st.  Frankly, sometimes I think it          12:02

6   might have just been easier to have just agreed that Carter

7   Bryant worked at Mattel during September 1st of 2000.  But I

8   simply can't give that information because my memory is that I

9   don't remember him working at Mattel.  I just simply don't

10  remember.  It's possible.  I just don't remember hearing that          12:02

11  information at the September 1st meeting.

12  Q    Even in light of the jury's verdict you still maintain you

13  never told anyone at MGA, including Rachel Harris, that they

14  had to keep it quiet that Carter Bryant is coming to MGA during

15  his lunch hours while he was working at Mattel.  You still deny        12:02

16  that; correct?

17  A    That's correct.  I do not believe I said that information

18  to Rachel Harris.

19            MR. PRICE:  Nothing further.

20            THE COURT:  Very well.                                       12:03

21                    REDIRECT EXAMINATION

22  BY MS. AGUIAR:

23  Q    You said that back in September of 2000, you personally

24  did not take any steps.  Did you have an understanding that

25  Carter Bryant had represented to others at MGA that he had made        12:03

```
 1    those drawings while he was not employed by Mattel?

 2    A    That's right.  I trusted what Carter Bryant had said.

 3            I just want to be clear.  I trusted what Carter

 4    Bryant had confirmed to MGA.  I trusted him.

 5    Q    Did you understand that attorneys had spoken with each   12:03

 6    other and confirmed that was also the case?

 7            MR. PRICE:  Objection.  Irrelevant.

 8            THE COURT:  Sustained.

 9    BY MS. AGUIAR:

10    Q    Did you understand MGA signed a contract with Carter      12:03

11    Bryant in which Mr. Bryant made representations to MGA that

12    those drawings were his to assign to MGA?

13    A    Yes.

14            MS. AGUIAR:  No further questions.

15                      RECROSS-EXAMINATION                          12:03

16    BY MR. PRICE:

17    Q    Now I'm confused.

18            You just told us that you understood in 2000 that

19    Carter Bryant had told someone, "I didn't create these while I

20    was employed by Mattel; I created them at some other time."     12:04

21            Isn't that what you just told us?

22    A    Mr. Price, my understanding is that what I was told by

23    Carter Bryant was that he made those drawings outside of Mattel

24    during his different tenures at Mattel.  And I understood

25    during that September 1st meeting that he owned those drawings,  12:04
```

1    and I trusted what he told me.

2    Q    You just changed your testimony, didn't you, because

3    previously you had been telling the jury that until 2004, you

4    didn't know he worked for Mattel?

5    A    I never said that I never believed Carter didn't work at        12:04

6    Mattel.  I believed that Carter worked at Mattel.  I just

7    believed -- I didn't believe that Carter Bryant worked at

8    Mattel during the pitch of September 1st.

9    Q    What you told the jury was that you didn't know that

10   Carter Bryant worked for Mattel until 2004; right?                  12:04

11   A    Excuse me?

12   Q    You told the jury in the first phase that you didn't know

13   that Bryant was a Mattel employee until some time in 2004;

14   right?

15          MS. AGUIAR:   Objection, Your Honor.  It says that he        12:05

16   was a Mattel employee as of September 1st, which is exactly

17   what she said.

18          THE COURT:   Counsel, one more speaking objection like

19   that and you're going to be off this witness.  The jury can see

20   what it says and what it doesn't say.                               12:05

21          I've instructed both sides to stop with the speaking

22   objections.  Now the jury has heard me instruct both sides to

23   that, and you continue to do so.

24          Stop it.

25          MS. AGUIAR:   I'm sorry.                                     12:05

1          **THE COURT:**  Counsel, continue.

2          **THE WITNESS:**  I think that maybe I can just -- I

3    actually believe that my testimony is correct.  I believed, I

4    understood September 1st of 2000 that Carter Bryant was in the

5    past a Mattel employee.  I did not believe on the September 1st                12:06

6    meeting that Carter was employed at Mattel during the

7    September 1st meeting.  It's possible he said it at the

8    September 1st meeting.  I simply don't remember him saying so.

9    **BY MR. PRICE:**

10   Q    Ma'am, isn't it true that in deposition testimony we                     12:06

11   played to the jury, when you were testifying under oath, you

12   said you didn't know until 2004 that he had been a Mattel

13   employee?

14   A    No.  And let me just be clear.  I did not know -- it

15   wasn't until September 1st that I understood that Carter Bryant             12:06

16   was a Mattel employee during the September 1st meeting.

17          **MR. PRICE:**  Your Honor, no further questions.

18          **THE COURT:**  Anything further from the defense?

19          **MS. AGUIAR:**  No, thank you.

20          **THE COURT:**  You're excused, Ma'am.  Thank you.                    12:07

21          Defense next witness?  I'm sorry it's after 12:00.

22          I'll see the jury at 1:15.

23          (WHEREUPON JURORS DEPART COURTROOM.)

24          **THE COURT:**  I want to take up one issue just to help

25   the Court during the lunch break.  Mattel lodged an objection             12:07

1   to the MGA party's phase 1-B designations of Jill Nordquist.  I

2   don't think there's been a written response from MGA.  I want

3   to give MGA a chance to respond to that.

4           MS. AGUIAR:  I do believe we would have one.

5           Could we take this up at the end of the lunch hour?          12:08

6           THE COURT:  Yes.  You have one coming forward?

7           MS. AGUIAR:  Yes.  And we're not going to be playing

8   it today; so could we respond even at the end of the day?

9           THE COURT:  Yes.  Thank you.

10          That solves my problem.                                       12:08

11          I'll continue through lunch with the Farr

12  designations and hopefully have those ready for you before the

13  lunch break ends.

14          I'll see counsel in an hour.  Court is in recess.

15          (Morning session concludes. )                                12:08

16

17

18                              CERTIFICATE

19

20  I hereby certify that pursuant to section 753, title 28, United
    States code, the foregoing is a true and correct transcript of
21  the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
22  conformance with the regulations of the judicial conference of
    the United States.

23

24  _____          _____
    THERESA A. LANZA, CSR, RPR                      Date
25  Federal Official Court Reporter