7548

1                   UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                         EASTERN DIVISION

4                            - - -

5           HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                            - - -

7    MATTEL, INC.,                    )
                                      )
8                     Plaintiff,      )
                                      )
9              vs.                    )  No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, inc., et. Al., )  Trial Day 36
                                      )  Morning Session
11                    Defendants.     )  Pages 7548-7627
     _____)
12   AND CONSOLIDATED ACTIONS,        )
     _____)
13

14

15         REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

16                    RIVERSIDE, CALIFORNIA

17                  FRIDAY, AUGUST 15, 2008

18                        8:36 A.M.

19

20

21

22

23                THERESA A. LANZA, RPR, CSR
                  Federal Official Court Reporter
24                3470 12th Street, Rm. 134
                  Riverside, California  92501
25                    951-274-0844
                  WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2

     On behalf of MATTEL, INC.:
 3
                            QUINN EMANUEL
 4                          By:  JOHN QUINN
                                 JON COREY
 5                                MICHAEL T. ZELLER
                                 HARRY OLIVAR
 6                                TIMOTHY ALGER
                                 WILLIAM PRICE
 7                          865 S. FIGUEROA STREET,
                            10TH FLOOR
 8                          LOS ANGELES, CALIFORNIA  90017
                            213-624-7707
 9


10
     ON BEHALF OF MGA ENTERTAINMENT:
11
                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
12                          BY:  THOMAS J. NOLAN
                                 JASON RUSSELL
13                                RAOUL KENNEDY
                                 LAUREN AGUIAR
14                                CARL ROTH
                            300 SOUTH GRAND AVENUE
15                          LOS ANGELES, CALIFORNIA  90071-3144
                            213-687-5000
16

17

18

19

20

21

22

23

24

25
```

Friday, August 15, 2008                    Trial Day 36, morning session

```
1                          I N D E X

2

3  DEFENSE
   WITNESS          DIRECT      CROSS      REDIRECT      RECROSS
4  ISAAC LARIAN

5  BY MR. NOLAN      7581                   7617
   BY MR. PRICE                 7611
6

7

8
           EXHIBITS          RECEIVED
9
            18819             7597
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Friday, August 15, 2008                    Trial Day 36, morning session

1          RIVERSIDE, CALIFORNIA; FRIDAY, AUGUST 15, 2008; 8:36 A.M.

2                               -oOo-

3                     (Outside the presence of the jury.)

4               **THE CLERK:**  Calling Case Number CV04-09049-SGL,

5     Mattel, Inc., v. MGA, Inc., et al.                              08:36

6               **THE COURT:**  Counsel, please make your appearances.

7               **MR. QUINN:**  John Quinn, Bill Price, Mike Zeller for

8     Mattel.

9               **MR. NOLAN:**  Tom Nolan, Lauren Aguiar, Raoul Kennedy,

10    Jordan Feirman, Carl Roth, Patrick Hammon on behalf of MGA and   08:37

11    Isaac Larian.

12              **THE COURT:**  Good morning, Counsel.

13              There are a couple of things that I wanted to take up

14    before trial.

15              Do I have the Mattel diskette?                         08:37

16              **MR. QUINN:**  It's on the way over.  I'll have it

17    shortly.

18              **THE COURT:**  Very good.

19              As far as the jury instructions, the Court will give

20    the standard introductory instructions from the Ninth Circuit   08:37

21    model rules.  Those were not submitted and I didn't want them

22    to be submitted.  But just to make sure that I'm covering

23    everything that you want to have included, let me just state

24    for the record what I'm planning to give, and then if there's

25    anything else that you think I need to give, just let me know.   08:37

```
 1   And I am going to reread some of the instructions that I've
 2   already read once or twice, maybe even three times, just
 3   because it's been a long trial and I want the jury to have the
 4   instructions for this deliberation all together.
 5           1.1, duty of the jury.  1.3, burden of proof related      08:38
 6   to preponderance of the evidence.  I'll also give 1.4, burden
 7   of proof on clear and convincing evidence, because that
 8   standard does play into these instructions.  1.5, two or more
 9   parties.  1.6, what is evidence.  1.7, what is not evidence.
10   1.8, evidence for a limited purpose.  1.9, direct and          08:38
11   circumstantial evidence.  1.10, ruling on objections.  1.11,
12   credibility of witnesses.  1.12, conduct of the jury.  1.13, no
13   transcript available to the jury.  1.14, taking notes.  1.17, I
14   guess, use of interpreters in court; we did have an
15   interpreter.  1.18, bench conferences and recesses.  2.1,       08:39
16   stipulation of testimony.  2.2, stipulations of fact.  2.4,
17   deposition in lieu of live testimony.  2.11, expert opinions.
18   2.12, charts and summaries not received in evidence.  2.13,
19   charts and summaries in evidence.
20           I'll then go through the substantive copyright           08:39
21   instructions; I'll then go through the damages instructions;
22   and then we will end with 3.1, duty to deliberate; 3.2,
23   communication with the Court; and 3.3, return of verdict.
24           Take a look at these this morning.  If there's any
25   other standard instructions that you think I need to give, let   08:39
```

me know.  If you object to any of these standard instructions
that I have proposed, let me know.

        I heard extensively from the parties yesterday, and I
have read all of the objections and responses thereto last
evening.  I still have some questions; but they're very narrow            08:40
questions, so I'd ask counsel to keep their remarks tailored to
the Court's questions.

        Let me start with Mattel on the inverse ratio rule.

        Mr. Zeller, my sense is that the inverse ratio rule
is proper under Ninth Circuit law.  It's problematic because             08:40
of -- frankly, it's kind of confusing the way it plays out.  I
mean, to tell the jury that the burden is lowered -- it's hard
enough for the Court to understand how that plays vis-à-vis
burden and burden of proof, and how that fits into the
substantial similarity test, let alone just leaving it out               08:41
there to the jury.

        My concern is that it's not only confusing in its own
right, but I don't want it to be taken that somehow the burden
of proof -- that the preponderance of the evidence is somehow
lowered.  I just think, notwithstanding being an accurate              08:41
statement of the law, that it is so confusing to the jury that
I think it's problematic.

        **MR. ZELLER:**  I guess I would start with the
proposition that, as I think everyone agrees, it is the Ninth
Circuit law.                                                              08:41

1          **THE COURT:**  Yes.

2          **MR. ZELLER:**  And I think that's really the playing

3    field we have to deal with this issue on.  And I certainly

4    understand that it does have its esoteric aspects, and

5    obviously, it's been criticized by commentators; some people          08:42

6    don't think it should be the law at all.  But that's where we

7    are.  It is the law.  So I do think it's important for the jury

8    to have that concept conveyed to them.  And I think, really,

9    the struggle is, how is it done clearly, and how is it done

10   without making it sound like it infects the burden of proof?          08:42

11         And I think that can be done, and maybe it's a matter

12   of us going through and parsing the language more precisely

13   than where we, perhaps, are.  But I think that really getting

14   across the concept that it doesn't affect the burden of proof,

15   what it does is, it affects, What do you view as being          08:42

16   substantially similar --

17         **THE COURT:**  That's not how it's phrased right now.

18   And maybe it was just too late last night and I wasn't able to

19   come up with language that made that clear, because the way

20   it's worded right now, it's confusing.          08:42

21         How would you suggest we address that?

22         **MR. ZELLER:**  Maybe, rather than -- you know, in this

23   format, maybe the best thing for us to do is see if we can come

24   up with a more precise instruction today, share it with the

25   other side, see if some back and forth on that can help at          08:43

```
 1   least sharpen up the language, and submit it to the Court.
 2   That may be the best way, just someone really sitting down and
 3   seeing what we can come up with as some sort of clarifying
 4   language, to make sure that it's as clear as it can possibly
 5   be.                                                               08:43
 6        THE COURT:  What does, for example, it mean to say,
 7   There's a lower standard of proof of substantial similarity?
 8   Standard of proof remains the same in terms of preponderance of
 9   the evidence.
10        MR. ZELLER:  Right.
11        THE COURT:  So that's really confusing.
12        I mean, you don't have to show as much similarity, or
13   as much substantial similarity; but to say that there's a lower
14   standard of proof...
15        MR. ZELLER:  I think the Court's absolutely right.     08:43
16   I'm not going to disagree with the Court that interjecting that
17   word in that way, particularly to lay people, is going to be
18   potentially confusing; so I think it may be a matter of not
19   framing it or even talking about proof.
20        I assume that the particular language that was chosen   08:44
21   is because that's what comes out of the cases, because that's
22   what the Ninth Circuit says.  In many instances, we were trying
23   to track as closely as possible the language of the Court's for
24   our special instructions.  So what I would suggest is that we
25   be given the opportunity to tinker with that, take out that    08:44
```

```
 1   language, making it perfectly clear that what it does is, it
 2   has that affect on, really, what is substantial similarity, not
 3   the burden of proof.
 4        They still have to find that it's substantially
 5   similar, of course.  But it really bears on the question of,      08:44
 6   Has that -- it's not a question of proof, because, of course,
 7   the burden of proof is always going to remain the same, which
 8   is by a preponderance of the evidence; and if it requires an
 9   additional sentence to get that across, that it doesn't change
10   the overall burden of proof.  That may be of assistance too.      08:45
11        THE COURT:  I'll hear from MGA.
12        MR. NOLAN:  I'll pinch-hit for Mr. Hansen.  He had a
13   medical procedure again today.  It's fine.  But it wasn't meant
14   as disrespect or not interested in this issue.
15        THE COURT:  I'm sorry to hear that.                          08:45
16        MR. NOLAN:  It's just in a series of tests that he
17   has to go through; and he lives up in San Francisco, so he left
18   last night.
19        Here's the point, and I think that, actually, the
20   Court has identified the real issue here:  And that is, jury      08:45
21   instructions should be ways of clarifying issues for the jury.
22        This inverse ratio rule is something that courts are
23   struggling with, law reviews are being written about.  Even if
24   you look at the way it is being applied by the learned panels
25   that have dealt with this issue -- for instance, in the Sid and   08:45
```

1    Marty Krofft case, where they went through the analysis first

2    of substantial similarity and then, kind of as -- not in dicta,

3    of course, but just as a side note, also dealt with the inverse

4    ratio rule, but never really applied the two.  The most recent

5    case I think that we've cited in this regard is the Ben's                     08:46

6    Bargain case that talks about it as well.  And I would just

7    submit, Your Honor, this is not -- we believe the inverse ratio

8    rule goes to a question in a situation where there's factual

9    copying; it has better application in those kinds of

10   circumstances.                                                                08:46

11        **THE COURT:**  It has an easier application in those

12   types of circumstances.  But I think Mr. Zeller or Mattel's

13   analysis on the factual versus legal copying aspect is correct.

14        I do think it applies.  I think it's confusing,

15   though.

16        **MR. NOLAN:**  Your Honor, I think this is a true

17   statement -- and I know because Mr. Hansen and I have talked

18   about this; I argued this point in the summary judgment; that's

19   why I'm somewhat familiar with it:

20        We have not found a case -- there may be one, but we        08:47

21   have not found one -- where the inverse ratio instruction was

22   actually provided to a jury in a similar situation like this.

23   And the concern that I have here --

24        **THE COURT:**  I suspect that's because courts have

25   probably run into the same issue that I have, is how to        08:47

Friday, August 15, 2008                    Trial Day 36, morning session

```
 1   articulate it.  I guess I'm reluctant to tinker with it,
 2   because if I tinker with what the language -- all of the
 3   courts, when they are talking about it, they want to use this
 4   same language, because it's really a dangerous area to try to
 5   depart from that language.  But yet, if we don't depart from          08:47
 6   it, we really have this issue of conflating this with the
 7   burden of proof, the preponderance of the evidence.
 8            MR. NOLAN:  And I think that's the real concern,
 9   Your Honor.  I think that the jury could understand exactly
10   what the role was in burden of proof.  And also then, on that,        08:47
11   it's just really -- I don't think it provides the
12   clarification.
13            THE COURT:  Thank you.
14            MR. ZELLER:  While I wouldn't disagree with
15   Mr. Nolan's comments in terms of the struggle that's gone on          08:48
16   with the concept, that's true of lots of issues that juries
17   have to be instructed on; so I don't think that's really an
18   argument as to why the jury shouldn't be instructed.  It just
19   means that, obviously, the challenge is bigger in coming up
20   with sufficiently precise language.                                   08:48
21            One thing I could suggest -- and we just did this
22   now -- we could say something like, If Mattel shows that the
23   defendants had a high degree of access to the Bratz drawings or
24   works that Mattel owns, less similarity is needed to show that
25   the allegedly infringing works are substantially similar to          08:48
```

1    those drawings or works.

2         **THE COURT:**  Less similarity is needed to show

3    similarity?

4         **MR. ZELLER:**  Right.  But that is what it does.

5         I mean, it means --                                    08:48

6         **THE COURT:**  Less similarity is needed to meet the

7    element of substantial similarity.

8         It becomes circular, doesn't it?

9         **MR. ZELLER:**  No.  It's just that less similarity is

10   required.  I guess that's the way I view the concept.       08:49

11        **THE COURT:**  That's fine for the Court.  I mean,

12   that's a great standard to have in summary judgment, when the

13   Court may have the experience of saying, Well, I'm going to

14   require less similarity in this case, as opposed to the 17

15   other copyright cases that I've done.                       08:49

16        But this is this jury's first and probably only

17   copyright case that they will have; so to say -- less than

18   what?  Less than they applied the last time they considered the

19   issue of copyright?

20        That's where this becomes unworkable.                  08:49

21        When you use terms like "less" or "more" or

22   "greater," you need to have some reference point.  And that's

23   what I'm having trouble with.  There's no reference point in

24   this relative standard.

25        **MR. ZELLER:**  Well, we could stay with the language we   08:49

```
 1   had before, where we do say, Mattel's burden of proving --
 2   which then we clarify it by an additional sentence which says,
 3   However, Mattel still bears the burden of proving the elements
 4   of copyright infringement by a preponderance of the evidence.
 5           That would be another way of doing it.                      08:50
 6           I hear the Court's comments in terms of, yes, less
 7   than the last time, which they, of course, will have no
 8   reference point to, necessarily.  But then the alternative is
 9   some sort of comparative language.  Then it's, Well, it's a
10   lower burden.  And then that gets us right back into the burden  08:50
11   of proof issues.  Maybe it's just a matter of adding that
12   sentence to clarify it.
13           As I say, we can try and come up with some options,
14   some additional options.
15       THE COURT:  I'll give you leave to do so this                   08:50
16   morning, Counsel; but I'd like to have something before noon.
17           We have ten minutes before I want to start with the
18   jury.
19           Do we need to do Lily Martinez now?  Because I
20   haven't gone through it.  Is that something that we're going to  08:50
21   do now?  Can we do it during the break or lunch?
22       MR. NOLAN:  We can make it to the break without it.
23   Whatever is the most convenient for the Court.
24       THE COURT:  There's a dissenting voice in the back.
25       MR. NOLAN:  I've been overruled,                               08:51
```

1          If it's okay with the Court, we'll do it now.

2          **THE COURT:**  Juror Number 1 wants to thank us for

3     letting him attend the tribute to his friend yesterday,

4     including a copy of the tribute.

5          Okay.  Let's go through this here.                    08:52

6          Page 43 is the first one.  This is a 2-D, 3-D thing.

7          The Court is mindful that this was testimony that was

8     given in 2005, and the Court will permit this in.  I will

9     overrule the objection, just on the one page here.  The timing

10    of this has a lot to do with the Court's ruling on allowing    08:53

11    this particular 2-D, 3-D discussion in.

12          Going forward, I have a lot of questions about the

13    relevance of a lot of these designations, so I'd like to hear

14    from MGA.  Let's begin with the first series of discussions

15    concerning Cool Skating Barbie dolls, because the objections on  08:53

16    Pages 49, 51, 62, et cetera -- well, at least 49 and 51 were

17    the Cool Skating dolls.

18          Does anyone from MGA wish to address this?

19          **MR. HERRINGTON:**  Robert Herrington on behalf of MGA.

20          **THE COURT:**  What is the relevance of these?          08:53

21          **MR. HERRINGTON:**  The comparison that Your Honor is

22    letting in between 2-D and 3-D is a specific reference to the

23    Cool Skating decal versus the Cool Skating Barbie; so this is

24    provided principally for context so that there's a complete

25    understanding of what the testimony is about.               08:54

1           **THE COURT:**  Where is that?  Where are those

2   comparisons?  Because we get into the Toon Teens comparisons

3   and -- so that's context for what she just testified previously

4   to.

5           **MR. HERRINGTON:**  That's right, Your Honor.                    08:54

6           **THE COURT:**  I see.

7           **MR. HERRINGTON:**  Which already has come into

8   evidence.

9           **THE COURT:**  I see.  Got it.  All right.

10          257 is the -- I see.                                             08:54

11          Okay.  I don't think that's necessary.  You can

12   certainly show Exhibit 257 when you're playing the testimony on

13   Page 43, and I'll permit that in.

14          I'm going to sustain the objections on 49 and 51.

15          Now, getting to 62 and going forward, all of this         08:55

16   testimony about Lily Martinez using -- or Mattel using other

17   people's works to inspire, this all goes to laches, unclean

18   hands.

19          **MR. HERRINGTON:**  No, Your Honor.  Actually, what it

20   goes to specifically is putting into context some of the        08:55

21   testimony that's been taken from MGA witnesses, including

22   Paula Garcia and others, where there has been at least the

23   suggestion that by looking at, A, the Skipper doll, B, certain

24   themes from Barbie and My Scene, that there was something

25   improper that was being done.                                    08:55

1      **THE COURT:**  The Court has addressed this at length at

2  side-bar.  We're not going to get into this *You did it too; we*

3  *did it too*.  If you believe that there's some improper

4  suggestion that's been made, something illegal, the Court will

5  give an instruction on that point.  But the way to cure that is      08:55

6  not by *You too; you did it too*, because implicit in that is

7  taking something which has no relevance before the jury,

8  suggesting that there was anything wrong in doing that, and

9  magnifying it, as opposed to eliminating it.

10      **MR. HERRINGTON:**  If I understand the Court correctly,      08:56

11  what you're saying is that you wouldn't entertain an

12  instruction --

13      **THE COURT:**  Yes.

14      **MR. HERRINGTON:**  -- specifically that looking at

15  other people's themes, looking at other people's products is      08:56

16  not illegal and that no claims --

17      **THE COURT:**  It's not even an issue in this case.

18      Something that you can come up with.  I mean, I'm not

19  committing to any particular language right now.  But the way

20  to cure that -- and I know you weren't present for this      08:56

21  discussion, and I think we had it at side-bar -- and mind you,

22  some of this might be admissible evidence for the equitable

23  defenses -- and I'm not ruling that it is or it isn't -- but

24  it's certainly not before the jury.

25      And if it's only being brought to restore balance,      08:56

```
 1   the way to restore balance is through a direct instruction to

 2   the jury that certain things are relevant or not relevant,

 3   legal or not legal, or have nothing to do with copyright.  Not

 4   by just introducing more evidence that other people were out

 5   doing other things that everyone agrees are not illegal.          08:57

 6            I'll hear from you on that, if you want.

 7        MR. HERRINGTON:  Your Honor, may we have leave, then,

 8   to submit a proposed instruction on Monday?  We'll send it to

 9   Mattel first.

10        THE COURT:  Do so.  Try to work out something             08:57

11   together.  Because I think this is something, I hope, that

12   would be in both sides' interest.  And do that this morning.

13        MR. HERRINGTON:  Yes, Your Honor.

14        THE COURT:  So I'm going to sustain the objections

15   on Pages 62, 63, 64, 65 -- counter designations would then fall  08:57

16   out -- 70.

17            And part of my ruling is that -- there's a whole ton

18   of this stuff.

19            The same thing.  Say, 72, Do you have any MGA

20   products at Mattel?  Yes.                                        08:58

21            And both sides have each other's products.  We heard

22   testimony from a senior executive at Mattel yesterday that,

23   yes, they go out and buy; they look at them; they track them;

24   they do monthly tracking.  I don't think this is of any moment,

25   quite frankly, to the jury.  To bring in more evidence of this  08:58
```

```
 1   and then suggest that there's something wrong with that, I
 2   think, is counterproductive.
 3            72, sustained.  73, sustained.
 4            And 73 and 74, where you get into the sculpting of
 5   Toon Teens, again this is sweat-of-the-brow on an entirely      08:58
 6   separate work.  This isn't even the works in question.  So this
 7   is, again, afield.
 8            74, sustained.  77, sustained; Ms. Martinez's
 9   involvement in making Toon Teens plush or not plush.
10            Now, the next is 128, I think, unless I've skipped      08:59
11   something.  I'm gathering that this is going to the issue of
12   conversion.  I'm trying to think what the relevance of this is.
13   This is a question, What did you do with Toon Teens materials
14   when Toon Teens was not selected?  And she indicated that they
15   just put it in a box and put it away.                            08:59
16            Is that just to suggest this is of no value if it
17   doesn't go anywhere?
18            MR. HERRINGTON:  What we have had so far is a
19   suggestion that Carter Bryant took or used something from the
20   Toon Teens project in creating Bratz.  And it goes directly to   08:59
21   the conversion point.
22            THE COURT:  The damages of conversion.  Okay.
23            Overruled.  I'll permit 128 in.
24            The next one is on Page 161.  I didn't get the
25   orange-hair doll, pink-hair doll thing at all.  I just have a    08:59
```

1    big question mark on my page.

2            What does this go to?

3        **MR. HERRINGTON:**  Your Honor, this is a section that

4    actually introduces the physical dolls that became Toon Teens.

5    They are the Toon Teens dolls.                                    09:00

6        **THE COURT:**  Very well.

7            I'm going to sustain the objections there.  That's

8    just more foundation, then, to portions that the Court has

9    sustained objections on.

10       **MR. HERRINGTON:**  May I be heard?                          09:00

11       **THE COURT:**  Sure.

12       **MR. HERRINGTON:**  Part of what this is going to is --

13   and, again, we had a suggestion here -- that Carter Bryant took

14   materials from the Toon Teens project.  And part of what we are

15   showing in Phase 1-B of this case is that just because you have  09:00

16   access to certain design drawings doesn't mean that you are

17   going to create -- that may be similar to other design

18   drawings -- take the Toon Teens drawings versus the Bratz

19   drawings -- doesn't mean that you're going to have a doll that

20   ends up looking substantially similar to what similar concept    09:00

21   drawings look like.

22           So what we have here are dolls that were created from

23   Ms. Martinez's design drawings, which are already in evidence,

24   the design drawings themselves, which there has been a

25   suggestion that Carter Bryant was inspired by, possibly a        09:01

```
 1   belief by the jury that he was inspired by; and then we have

 2   the Bratz dolls, which they're claiming are an infringement.

 3           What we also have, and we would like to be able to

 4   show to the jury, are the actual dolls that were created from

 5   Lily Martinez's design drawings.  And we'd like to be able to        09:01

 6   show that, because if there is a suggestion of similarity --

 7   not a suggestion -- an allegation of similarity between -- at

 8   least insofar as inspiration, between Lily Martinez's design

 9   drawings and the Bratz drawings, we'd like to be able to show

10   that those concept drawings lead to very different results when       09:01

11   they are turned into a 3-D object.

12           THE COURT:  That's interesting.

13           MR. HERRINGTON:  The other point, Your Honor, is that

14   these types of questions were asked of the gentleman who was on

15   the stand earlier this week, who is another designer at MGA,          09:02

16   named Louis Domingo.  And these types of questions, in terms of

17   similar concept drawings -- if you remember, Mr. Domingo

18   actually presented some concept drawings that he had actually

19   done of the Bratz dolls.  He created them himself.

20           THE COURT:  Right.                                            09:02

21           I guess the 403 concern that I'm having with this is,

22   it's one thing -- one of the lines, as you know, that I've

23   tried to draw is keeping this focused on Bratz and not get into

24   other items, whether it be Shrek or something else.  Toon Teens

25   kind of falls somewhere in the middle ground here, because it's       09:02
```

1    not Bratz; but then there is, as you say, the suggestion in 1-A

2    that there was some inspiration -- there was evidence that was

3    introduced for timing purposes by Mattel that there was

4    something about Toon Teens that led...

5           Now, of course, Mattel is not suing on copyright                09:03

6    infringement on Toon Teens.

7           **MR. HERRINGTON:**  Of course not.

8           **THE COURT:**  And that's where the potential confusion

9    issue comes in.  To introduce a bunch of comparisons between

10   Bratz and Toon Teens, or even Toon Teens 3-D and Toon Teens --          09:03

11          **MR. HERRINGTON:**  And that's the point.  Actually, I

12   think Your Honor just hit on it.  What we have here is

13   testimony from several witnesses about the changes that do

14   happen when you go from 2-D to 3-D.  Not just changes, but

15   substantial changes.                                                    09:03

16          **THE COURT:**  Let me hear from Mattel on this.

17          **MR. ZELLER:**  Certainly, there is a significant danger

18   of confusion here.  I mean, what they are saying is that the

19   jury should make some sort of comparison between

20   Lily Martinez's drawings and then a prototype, or prototypes,          09:04

21   that were developed with Lily Martinez on that particular

22   project.  And really, in order to have the relevance that they

23   are arguing about, they're going to have to make some

24   comparison.  Is it substantially similar, or is it not?

25          That just is not the task at hand.  It's just not              09:04

 1   probative of really anything.  I mean, whether those dolls --

 2        **THE COURT:**  The concern I have is that the similarity

 3   or lack of similarity between Martinez's Toon Teens drawings

 4   and the ultimate doll is not necessarily dispositive, or even

 5   relevant, to the similarities between Carter Bryant's drawings      09:04

 6   and the Bratz doll.

 7        I can see a situation where someone does a creative

 8   drawing and you look at the drawing and you look at the doll

 9   and say, Boy, they look nothing alike.  And you can have

10   another situation where you look at the creative drawing and       09:05

11   the doll and say, Wow, they're dead-on.  And that is the

12   substantial similarity test.  That's part of the substantial

13   similarity test, to determine whether or not there is a close

14   enough relationship between the drawings and the doll.

15        I mean, the law clearly suggests that a 3-D creation           09:05

16   can, but not necessarily does, infringe on a 2-D drawing.  The

17   question is whether this particular 3-D doll, namely the Bratz

18   dolls, infringes, or is substantially similar, to

19   Carter Bryant's 2-D drawings, not whether another 2-D drawing

20   is substantially similar to yet another 3-D.                       09:06

21        Now, I do think the evidence, the initial evidence,

22   that's proffered, just about Lily Martinez's statements, which

23   seem to be more categorical that you cannot compare 2-D and

24   3-D, it's --  it is what it is.  She's an MGA employee.  She's

25   been your face piece for this case.  I think that comes in,        09:06

 1   Counsel.  I think you're stuck with that.

 2           **MR. ZELLER:**  I honestly think it's legally

 3   irrelevant, just to be blunt about it.  It's no different

 4   than -- it's a descriptive matter.  Clearly, there's 2-D and

 5   there's 3-D, but that does not bear on substantial similarity.        09:06

 6   It just doesn't, as an inherent matter.  It would be no

 7   different than, say, if this was an infringement case where

 8   someone had created a movie based upon a novel and they say,

 9   Well, what's the difference between the novel and the movie,

10   and one says, One's a novel, one's a movie.                            09:06

11           I mean, that just does not, in itself, bear on the

12   substantial similarity test.  Transforming one thing from one

13   medium to another doesn't escape infringement if it's

14   substantially similar.  And in many respects, I'm concerned

15   that it will cause confusion.                                          09:07

16           At a bear minimum, we think there has to be a very

17   explicit instruction to the jury.

18           **THE COURT:**  I was just going to say -- you took the

19   words out of my mouth -- there is an instruction that the Court

20   does plan to give on 2-D/3-D comparisons that I think cures any       09:07

21   of the concerns that you have.

22           If this was somebody else saying it, certainly if

23   this was an expert saying it, it would raise all kinds of

24   issues.  This is Lily Martinez saying this back in 2005.

25           Counsel, this comparison stuff between Toon Teens            09:07

```
 1   drawings and Toon Teens dolls, that's just too confusing.
 2             MR. NOLAN:  Your Honor, if I might just try to put
 3   this into the context on how I think this is, first of all,
 4   relevant.
 5             One is that Mattel already put in photographs of the        09:08
 6   doll.
 7             THE COURT:  Yes.
 8             MR. NOLAN:  The doll itself -- there's no secret
 9   here.  The doll was displayed to the jury in its 3-D version,
10   albeit on a two-dimensional presentation.                            09:08
11             But here's the other point that I wanted to make, and
12   I think this is really the strongest point:  There is so much
13   effort in the cross-examination of Margaret Leahy, and, in
14   fact, even Louis Domingo, our designer, about her credibility,
15   frankly, as to whether or not she was tasked to do an exact          09:08
16   replica and capture the essence and the image of
17   Carter Bryant's drawings, or, according to MGA's story,
18   Carter Bryant's --
19             THE COURT:  It had no connection to the Bratz
20   drawings.  She put it on a shelf and she didn't look at it and       09:09
21   she didn't consult with it.
22             MR. NOLAN:  She referred to it.  She worked with
23   Carter Bryant in the beginning, and he told her to create her
24   magic; so I'm just focusing on magic.  We've never contested,
25   Your Honor, that it's the inspiration.                              09:09
```

1        **THE COURT:**  She was pretty dramatic in her statements

2  in terms of that those drawings had absolutely nothing to do --

3  I mean, you came back several times and asked that particular

4  question, and she says, No, I guess it's a pure coincidence

5  that the Bratz doll, to the extent that there is any       09:09

6  substantial similarity, happens to look like the Bratz

7  drawings.

8        **MR. NOLAN:**  I think what you have is an artist, a

9  sculptor, who is incredibly proud and has had a lot of

10  accolades for coming up with the Bratz sculpt.       09:09

11        **THE COURT:**  And that's a valid point.  I don't mean

12  to be critical of Ms. Leahy.  It came across clear to the Court

13  that she strongly believes that Bratz is her doll because of

14  the effort that she put into it.  I think from a matter of

15  whether or not that -- well, anyway...       09:10

16        **MR. NOLAN:**  It goes to the weight.  That's why we

17  have the jury.

18        **THE COURT:**  But here we have -- all of that, we're

19  comparing -- it's all within the Bratz line.  It's whether

20  it's -- it's drawings, it's sculpts, it's dolls; and that all       09:10

21  is fair game for both sides to do what they want.  This is

22  different.

23        **MR. NOLAN:**  But respectfully, Your Honor, I think

24  what's interesting is, it is the exact exercise -- you have a

25  drawing, which is not irrelevant to the case.  I mean, the       09:10

```
 1    drawings in Toon Teens have been described as the inspiration

 2    for Carter Bryant's drawings.  That's what they argued in the

 3    first instance.  All we want to do is -- not introduce new

 4    evidence; we just want a better presentation of the evidence

 5    that's already been shown to the jury, to show that when          09:10

 6    Ms. Martinez turned it over to the sculptors at Mattel, that

 7    the end product that came out was different and not

 8    substantially similar.

 9         THE COURT:  That may be the case, but how is the fact

10    that it came out different with some other product relevant to    09:11

11    whether it came out different with this product?

12         I can certainly see that Margaret Leahy could have

13    sculpted a product that looked very different from Bratz, from

14    the Bratz drawings, from Carter Bryant's drawings, and you

15    would probably be in a much stronger position with this jury to   09:11

16    argue substantial dissimilarity.  That could have happened.

17    And maybe that did happen in Toon Teens.  I don't know what

18    happened there.

19         There are times when concept drawings are produced

20    and what comes out the other end looks exactly the same; there    09:11

21    are times when it comes out and it looks substantially similar;

22    and there are times when it comes out and it looks

23    substantially dissimilar.  That's the relevant question to the

24    jury.

25         The fact that with some other product -- because            09:12
```

```
 1    remember, what Mattel was arguing was that the inspiration was

 2    the drawings, the Toon Teens drawings, and I suppose to a

 3    lesser -- I'll have to go back to that testimony.  I'm not sure

 4    exactly what it was.  But whatever it was, that was done for a

 5    timing call, and the jury made whatever decision -- well, they    09:12

 6    made the decision that they did.

 7            But now, to introduce evidence that drawings for this

 8    other product produced a sculpt or didn't produce a sculpt or

 9    produced a doll or didn't produce a doll that was or was not

10    similar or dissimilar, not only is it not relevant, but I can    09:12

11    see that being really -- really mixing in -- because what it

12    does is, it begs the -- it places before the jury now, Does

13    Bratz look like Toon Teens?  And that, at this point, at least

14    for Phase 1-B, is wholly irrelevant.

15        MR. NOLAN:  Your Honor, about three sentences or four    09:12

16    sentences back in your comment, you said that you can have a

17    sculptor copy something exactly, you can have a sculptor use

18    their own magic, or some variation of it.

19            The only example that this jury has physically in

20    front of it is the product of Carter Bryant's 2-D drawings into    09:13

21    a 3-D model.  And that's the test.  There's no confusion.

22    They're going to be told that that's the one.

23        THE COURT:  You want to give them another example.

24        MR. NOLAN:  No.  I want to go back to the issue of,

25    Is there any other reference point, without making the    09:13
```

similarities, but goes to the credibility of MGA's

presentation, goes to the weight of it, Your Honor, I submit.

I respectfully agree that the jury can reject the comparison,

and Mattel is free to argue all of the differences and why the

3-D version of Toon Teens is not the issue and there's reasons       09:14

why it turned out that way.  But in order to have another

example of sculpting turning into a 3-D object, that's the

relevance, Your Honor.

        And I think that when you said earlier, you know,

there are ways that sculptors can do it -- all we're asking for       09:14

is, since it's already in the evidence -- the picture has

already been shown of the dolls; that's not a secret anymore --

that we be allowed to have the doll itself or the depiction in

the videotape shown, so they have another example of the

sculpting process that came out with another project.                09:14

        **THE COURT:**  But in this testimony, you're going to be

comparing the two dolls.

        **MR. NOLAN:**  Yes, Your Honor.  That's the testimony

that's in there.  But I just wanted to add the context of why

-- respectfully, I don't think the 403 concern -- they can          09:14

argue it.  You're going to give the jury instruction with

respect to 2-D/3-D.  Everybody knows what the issue in the case

is.

        I just think, for the trier of fact in this case to

be able to see what it turned out to be -- I mean, I could show      09:15

1    it on the picture, I guess right now, the evidence; but it's

2    sitting down in a little chair and it's hard on the L-squared

3    board that was presented at Mattel, these same very comparisons

4    that they make.

5         That's why I think the -- what's the term? -- the                09:15

6    horse is out of the barn on this one; that's another legal term

7    we can use on this argument.

8         **THE COURT:**  Thank you, Counsel.

9         **MR. ZELLER:**  I don't agree that the horse is out of

10   the barn.  The whole predicate for this is that MGA wants to         09:15

11   make an argument this is not appropriate.  It's not an

12   appropriate comparison.  It's not supported by any factual

13   basis.  There's no connection, factual connection, between

14   Leahy and this other Mattel project, in the sense that they

15   want to use it for.  And what another designer did, using          09:16

16   different people under different circumstances, on another

17   project at another company, just can't be relevant.  And the

18   potential for confusion is going to be substantial.

19        **THE COURT:**  That's what it is.

20        I don't entirely reject Mr. Nolan's argument.  I can           09:16

21   see some relevance there.  I just think that the 403 balancing

22   outweighs it.

23        On Page 201, there's a question that's asked again

24   about whether the Bratz dolls -- the design center at Mattel.

25   I'll overrule the objections there, but the balance of the         09:16

1   objections are sustained in terms of the comparisons.  I think

2   the balance of the questions in this go to those comparisons,

3   and the Court is not going to permit that in.

4        If I missed any objections that go to something other

5   than that, Counsel, bring it to my attention; but I believe the     09:16

6   remainder of the designations go to the issue of the

7   comparisons.

8        All of the jury is here, so I do plan on bringing

9   them in.

10       I trust we're ready to go with witnesses and the               09:17

11  like?

12       **MR. NOLAN:**  Yes, Your Honor.

13       I wanted to raise one issue with you; and that is the

14  custodian of records with respect to Mattel.

15       We have a subpoena outstanding.  We intend to call            09:17

16  the custodian of records this morning to get some documents in.

17       I don't think there's any issue with respect to

18  authenticity.  What we've done -- and the Court will see it and

19  Mattel has seen it -- in light of the earlier rulings, taking

20  the benefit of the earlier rulings, the clarity from the           09:17

21  earlier rulings, we've redacted out everything other than

22  Bratz-related material when we're calling the custodian of

23  records.  You'll see that in the notebook, but I just wanted to

24  alert the Court that that's why there's so many redactions in

25  particular documents that we're introducing.                       09:17

Friday, August 15, 2008                    Trial Day 36, morning session

1          **THE COURT:**  Very good.

2          And the process that we'll use on this is somewhat

3    similar to the one that we used before.  We'll have the

4    custodian lay authenticity, move it into evidence.  If there's

5    a relevancy objection -- now, I'm not going to hear about          09:18

6    foundational objections because the witness can't speak to it,

7    because I assume these are all Mattel-produced documents.

8          **MR. NOLAN:**  Yes, Your Honor.

9          **THE COURT:**  I'll consider the relevancy objections.

10   If there needs to be a discussion, we'll take a side-bar and     09:18

11   the Court will then rule whether it comes in or not.

12         **MR. NOLAN:**  Thank you, Your Honor.

13         **THE COURT:**  I'll take up the remaining questions the

14   Court has on jury instructions at the break.

15         **MR. ZELLER:**  Just on the last point, Your Honor, I       09:18

16   believe that there are some authenticity objections to at least

17   some of the documents.  We have a little -- I'm not sure we

18   know exactly what documents are at issue.

19         **THE COURT:**  And you certainly can make those with the

20   custodian of records.                                             09:18

21         **MR. ZELLER:**  Yes.  Thank you.

22         **THE COURT:**  If the custodian -- I assume you're going

23   to at least have the custodian of records lay the authenticity.

24         Right, Mr. Nolan?

25         **MR. NOLAN:**  I would think so, Your Honor.                09:18

1          **THE COURT:**  If they can't do that, then it goes

2     nowhere.

3          **MR. ZELLER:**  I'm not sure if we have the redacted

4     versions of these at this point.

5          **THE COURT:**  I trust you'll be receiving them shortly.    09:19

6          **MS. AGUIAR:**  Your Honor, just because I have

7     mentioned this twice before and never done it, if you don't

8     mind if I move in a couple of products that were discussed

9     during Mr. DiGerian's exam the other day.  Mr. Price and I have

10    agreed that they can come in, and those are Trial Exhibit       09:19

11    Numbers 18875 through 18879; and there's a stipulation that

12    those can come in.

13         **THE COURT:**  Excellent.

14         **MS. AGUIAR:**  Thank you.

15         **MR. COREY:**  There is one last thing I'd like to        09:19

16    raise, Your Honor.

17         We had raised the other day the prospect of

18    challenging some of Mr. Meyer's opinions based on some of the

19    rulings that the Court had made and some of the positions that

20    MGA had taken.  We had asked to file the motion.  The Court had  09:19

21    put that over and said, Let's just treat it as a Daubert

22    hearing.  We would like to do that at some point before

23    Mr. Meyer testifies.

24         **THE COURT:**  He'll be this afternoon?

25         **MS. AGUIAR:**  Meyer or Larian?                          09:20

```
 1              MR. COREY:  Mr. Meyer.

 2              MR. ROTH:  It is likely that he'll go this afternoon.

 3              THE COURT:  Excellent.  We'll do that during

 4      lunchtime.

 5              MR. COREY:  Thank you, Your Honor.                    09:20

 6              THE COURT:  I've got the disks.

 7              We'll take a brief recess now.

 8              (Brief recess taken.)

 9              (Whereupon, jurors enter courtroom.)

10              THE CLERK:  Calling Case Number CV04-09049-SGL,      09:43

11      Mattel, Inc., v. MGA, Inc., et al.

12              Counsel, please state your appearances for the

13      record.

14              MR. QUINN:  John Quinn, Bill Price, Mike Zeller for

15      Mattel.                                                      09:43

16              MR. NOLAN:  Tom Nolan, Lauren Aguiar, Raoul Kennedy

17      on behalf of MGA and Isaac Larian.

18              THE COURT:  Counsel, good morning.

19              We're going to try to keep the lights a little down

20      for the entire day.                                          09:44

21              Counsel, you may proceed.

22              MR. NOLAN:  Thank you, Your Honor.

23              MGA calls Isaac Larian.

24

25
```

1        **THE CLERK:**  Mr. Larian, please be advised that you're

2    still under oath.

3        **THE COURT:**  You may proceed.

4                    **DIRECT EXAMINATION**

5    **BY MR. NOLAN:**

6    Q   Good morning, Mr. Larian.  I want to turn to a document

7    that Mr. Price showed you.

8            Could you turn to 13520; that is the business plan.

9        **MR. NOLAN:**  This is in evidence, Your Honor.

10       **THE COURT:**  Very well.  Yes, it is.                        09:45

11   **BY MR. NOLAN:**

12   Q   Mr. Larian, I'd like to direct your attention to

13   Exhibit 13520.

14           First of all, do you see the date, March 2001?

15   A   I do.                                                          09:45

16   Q   And this is "Business plan, copy number one"; correct?

17   A   Correct.

18   Q   And it's for MGA?

19   A   Yes.  ABC International, which was MGA.

20   Q   Now, Mr. Price asked you whether or not this business plan    09:45

21   had been prepared before you even sold the Bratz doll to the

22   public.

23           Do you recall that?

24   A   I do.

25   Q   I want to ask you a different question.                       09:46

1              By March of 2001, had you presented prototypes of

2    dolls to retailers?

3    A    Yes.

4    Q    Had you presented prototypes of the 3-D rendition of the

5    3-D dolls at toy fairs?                                          09:46

6    A    Yes, we did.

7    Q    All by March of 2001?

8    A    Sorry?

9    Q    All before March of 2001?

10   A    Yes.                                                        09:46

11   Q    Could you tell the jury which toy shows you had already

12   presented the prototype doll to.

13   A    We first showed it in January of 2001 in Hong Kong; then

14   in February 2001, in New York.  And also our distributor told

15   me he showed that in Tokyo toy show in February.  I don't      09:47

16   remember the exact date.

17   Q    By March of 2001, had you already met with retailers?

18   A    Yes, we had.

19   Q    Let me ask you, does MGA sell Bratz dolls directly to the

20   public?                                                         09:47

21   A    At what time?  Now?

22   Q    Yes.

23   A    Now we do so, yes.

24   Q    But in 2001, did you?

25   A    We did not.                                                09:47

Friday, August 15, 2008                    Trial Day 36, morning session

1    Q    Were you selling any out of the back of your offices?

2    A    I'm sorry?

3    Q    Were you selling Bratz to the public outside of the

4    offices of MGA?

5    A    We were only selling it to retailers and distributors in          09:47

6    other countries.

7    Q    By March of 2001, had you already received orders from

8    retailers?

9    A    Yes, we had.

10   Q    I'm going to ask you to turn to Page 14 of the business          09:48

11   plan, market analysis.

12            Do you see that, sir?

13   A    Yes.

14   Q    I want to read the first sentence to you:  "The target

15   audience for the Bratz are tween girls from 7 to 11 years old."      09:48

16            Do you see that?

17   A    I do.

18   Q    Was that Carter Bryant's idea?

19   A    No, it was not.

20   Q    Whose idea was that?                                             09:48

21   A    MGA Entertainment.

22   Q    It goes on to say, "Tweens consist of three markets in

23   one:  The primary market, spending money on their own wants and

24   needs; the influence market, directing the spending of the

25   parents' money on their wants and needs; and the future market,    09:48

1   for all goods and services who have all of their purchases

2   ahead of them.  All three markets combined, tweens have more

3   market potential than any other demographic group."

4           Did I read that right?

5   A    Yes, you did.                                          09:49

6   Q    Sir, did you ever discuss with Carter Bryant the potential

7   of these three primary market opportunities available for a

8   doll?

9   A    No.

10  Q    Prior to meeting Carter Bryant, had you identified any    09:49

11  business opportunities in the fashion doll industry as

12  presenting an opportunity for a new doll entrant?

13  A    Yes.

14  Q    And how did you go about doing that, sir?

15  A    By, frankly, looking at my own family; my daughter        09:49

16  Jasmine, who at the time was about 11, and her friends; looking

17  at information available publicly.  Girls and kids were more

18  and more on the computer at that age, 7 to 11.  They did not

19  want to play with the ordinary fashion dolls that were out at

20  that time.                                                    09:50

21  Q    I want to turn to Page 15 for a moment and look at

22  "strengths."

23           It says, "In terms of product strength, Bratz" -- and

24  it has a TM on that.

25           What does that stand for?                            09:50

1          **MR. PRICE:**  Objection.  Irrelevant, Your Honor.

2          **MR. NOLAN:**  I'll withdraw the question.

3          **THE COURT:**  Very well.

4  **BY MR. NOLAN:**

5  Q    "In terms of product strength, Bratz has several distinct          09:50

6  advantages over the competition."

7          First of all, when you're referring to Bratz, are you

8  referring to the doll or the drawings?

9  A    We were referring to the trademark, the brand.

10         **MR. PRICE:**  Move to strike "trademark."  It's          09:50

11  irrelevant.

12         **THE COURT:**  Sustained.

13         "Trademark" is stricken, but "brand" is not stricken.

14  **BY MR. NOLAN:**

15  Q    Were you referring to the 2-D drawings?          09:51

16  A    No, we were not.

17  Q    "First, it is marketed advancement in the physical

18  appearance of the dolls."

19         Do you see that?

20  A    Yes.          09:51

21  Q    Then it goes on, "The Bratz are unique in many ways.

22  Their eyes are big, with a hint of anime style.  Their lips are

23  more pronounced.  Their feet and heads are oversized."

24         Did I read that correctly?

25  A    You did.          09:51

1   Q    Was Bratz the first doll that you had ever seen that had

2   big eyes with a hint of anime style, lips that were more

3   pronounced, and feet and heads that were oversized?

4            MR. PRICE:  Objection.  Irrelevant.

5            MR. NOLAN:  We can have a quick side-bar, if        09:51

6   necessary.

7            THE COURT:  You can impeach your own witness.

8            You're calling into question what was stated there;

9   correct?

10           MR. NOLAN:  Not at all, Your Honor.                 09:52

11           THE COURT:  Well, then, I need to have a side-bar.

12           MR. NOLAN:  Okay.

13           (Whereupon, the following proceedings were held at

14   side-bar:)

15           THE COURT:  Maybe I misunderstood, because Mr. Larian 09:53

16   indicated that these are unique elements.  "Unique" meaning

17   unique.

18           MR. NOLAN:  Right.  To the doll.  I was then going to

19   go back and ask him whether or not he believed --

20           THE COURT:  Oh, okay.  I thought you were then going  09:53

21   to get him to say, No, that's not a true statement; they are

22   not unique.

23           You can impeach your own witness, but if that's not

24   what you're doing --

25           MR. NOLAN:  I'm not.  But I --                       09:53

1          Respectfully -- and this is the first time I've ever

2     done it -- I thought the Court's comment about impeaching my

3     own witness in front of the jury was prejudicial.

4          I was not in any way attempting to try to impeach my

5     own witness.                                                          09:53

6          **THE COURT:**  I completely misunderstood what you were

7     doing.  There's a statement that he previously testified to

8     that they were unique, and when you said "you've seen it

9     before" suggested that they are not unique.  That's fine to do.

10         And I mean "impeachment" in the legal sense.                     09:53

11         I'll make it clear to the jury.

12         **MR. NOLAN:**  I appreciate that.  Thank you.

13         **THE COURT:**  I'll make it abundantly clear to the

14    jury.

15         **MR. NOLAN:**  I'm worried about the impression.               09:53

16         **THE COURT:**  Right.  Very well.

17         But then I'm going to sustain the objection.  You

18    have to rephrase the question.  I'll make it clear that you

19    were not --

20         **MR. PRICE:**  After the next question, I think, in            09:53

21    effect, that he's trying to get Mr. Larian to say there were

22    other dolls out there with these features, which then he begins

23    to do --

24         **MR. NOLAN:**  No.  Let's not anticipate where I'm

25    going.

Friday, August 15, 2008                    Trial Day 36, morning session

```
 1              (Whereupon, side-bar proceedings were concluded.)

 2         THE COURT:  Just to be clear to the jury, the jury

 3    should disregard, obviously, any comments that counsel or the

 4    Court makes when we're having our discussions.  The impeachment

 5    reference was a misinterpretation of Mr. Nolan's last question.     09:54

 6    Completely disregard that exchange.

 7              Counsel, you may proceed.

 8         MR. NOLAN:  Thank you, Your Honor.

 9              Let me rephrase.

10    BY MR. NOLAN:

11    Q    Mr. Larian, in the sentence that you say "The Bratz are

12    unique in many ways.  Their eyes are big with the hint of anime

13    style.  Their lips are more pronounced.  Their feet and heads

14    are oversized" -- do you see that?

15    A    Yeah.                                                          09:54

16    Q    You were referring to the dolls?

17    A    I'm sorry?

18    Q    Were you referring to the Bratz dolls?

19    A    Yes.

20    Q    Were you referring to Carter Bryant's drawings?              09:55

21    A    No.

22    Q    As the CEO of MGA, did you have an understanding as to

23    whether or not differences were made and imputed into the doll

24    that did not exist in the drawings?

25    A    Yes.  Many.                                                   09:55
```

1  Q    If you look for a moment under "strengths," do you see

2  anywhere a mention that Carter Bryant's drawings were the

3  driving force of the Bratz doll?

4  A    I do not.

5  Q    Did you believe, sir, when you saw Carter Bryant's                    09:55

6  drawings, the concept drawings, that those drawings were

7  appropriate for the tween market?

8  A    The way they were drawn by itself, they were not.  We had

9  to make many changes to them.

10  Q    I want to look at Page 17 for a moment, under "elements of          09:56

11  risk."

12       Sir, there's been a lot of references to your early

13  enthusiasm about the Bratz dolls.

14       Do you remember that testimony?

15  A    Yes.                                                                09:56

16  Q    And your projections of making millions of dollars?

17  A    Yes.

18  Q    Millions of sales?

19  A    And sales, yes.

20  Q    Even in the first year?                                            09:56

21  A    Yes.

22  Q    Even though you had never achieved those kind of sales on

23  any other product that you had ever made?

24  A    To the best of my recollection, we had not.

25  Q    But you still --                                                   09:56

1   A    You know what?  I'm sorry.  I think we had made those kind

2   of sales on other products.

3   Q    In any event, Mr. Larian, did you understand that there

4   were risks in introducing Bratz into the marketplace?

5   A    Yes.  Absolutely.                                          09:57

6   Q    I want to turn to Page 17.  It says, "Since the initial

7   introduction of ABC International Traders, Inc., into the

8   fashion doll market, ABC runs the risk of failure from trade

9   acceptance by retailers."

10          Do you see that?                                        09:57

11  A    I do.

12  Q    And it says, "This is being overcome already by the orders

13  placed from the top five major retailers."

14          Correct.

15  A    I do.                                                      09:57

16  Q    And then on Page 18, you start talking about the marketing

17  plan.

18          Do you see that?

19  A    Yes, I do.

20  Q    And then you talk about sales strategy.                    09:57

21  A    Yes.

22  Q    And I see here under "sales strategy," there's some bullet

23  points.  It says, "The Bratz should be treated as a long-term

24  brand with future line extensions."

25  A    Yes, I do see that.                                        09:58

1    Q    Was there a reason why, in March of 2001, you were already

2    thinking about line extensions for the next year?

3    A    We wanted to build Bratz as a brand, and in order to do

4    that, you had to do many steps; one of them was to build line

5    extensions just for dolls.                                            09:58

6    Q    And then under "sales strategy," there's bullets point of

7    "securing end caps," "free-standing inserts, "floor minders,"

8    "point-of-purchase displays."

9         Do you see that?

10   A    Yes.                                                             09:58

11   Q    And then you have "positioning."

12        You're talking about positioning there; is that

13   correct?

14   A    Yes.

15   Q    Then on Page 19, you talk about direct sales.  And I want       09:58

16   to go to the third paragraph there.

17        It says, "We have chosen to use a direct sales force

18   because our products require considerable customer education

19   and post-sales support directly from the company.  Our

20   price-point pricing structure and profits are such that our          09:59

21   costs of sales warrants person-to-person selling strategy."

22        Do you see that?

23   A    I do.

24   Q    Mr. Larian, why was it necessary to engage in all of this

25   to try to sell Bratz?                                                 09:59

1   A    We used to have what we call manufacturer reps, who go and

2   sell to customers, many, many products.  And since we wanted to

3   build this brand, we believed that we should have our own sales

4   force, rather than having a manufacturer rep sales force, to go

5   to retailers to explain why it's important for them to buy the      10:00

6   product, what are we going to do with it, what kind of

7   advertising we're going to send, et cetera.

8   Q    I want to go back to Page 15 for just a moment, under

9   "strengths."  It says here in the last paragraph, "The

10  Bratz will be offered to retailers at a price point close to        10:00

11  that of Barbie's.  ABC is confident that girls will purchase

12  the Bratz over Barbie because they are not defined by race or

13  ethnicity.  This was a conscious decision, so the consumer can

14  choose the doll that reflects their own fashion, style, or

15  appearance."                                                        10:01

16  A    Yes.

17  Q    Whose idea was it to make Bratz dolls not defined by race

18  or ethnicity?

19  A    It was MGA's, because we didn't want to have divisions.

20  We didn't want somebody to say, This is an African-American         10:01

21  doll, or this is a Brazilian doll, or have any religious or any

22  race attached to it.  It was a conscious decision that we made

23  as a company.

24  Q    Did Carter Bryant come up with that idea?

25  A    He did not.                                                     10:01

1   Q    Was that decision based on your own experiences in

2   America?

3   A    America; and where I came from, yes.

4   Q    Yesterday, we had a branding expert testify.

5        Were you here then?                                        10:02

6   A    I was.

7   Q    Mr. Larian, did you attend Harvard University?

8   A    I'm sorry.

9   Q    Did you attend Harvard University?

10  A    I have not.                                                 10:02

11  Q    Do you have a degree in branding?

12  A    I do not.

13  Q    Has Bratz won awards for branding?

14  A    Yes, it has.

15        **MR. PRICE:**  Objection.  Irrelevant.                   10:03

16        **THE COURT:**  It's already been covered.

17        Oh, for branding?

18        **MR. NOLAN:**  Yes.

19        **THE COURT:**  Overruled.

20        **MR. NOLAN:**  Thank you.                                 10:03

21        May I approach?

22        **THE COURT:**  You may.

23  BY MR. NOLAN:

24  Q    Mr. Larian, I've placed in front of you a large book.

25        Do you recognize that book?                               10:03

1    A    I do.

2    Q    What is it?

3    A    This is a publication called *Superbrands, 10th Anniversary*

4    *Edition*.  This is a publication that looks at brands worldwide

5    and what is their essence and how they were built, and they                    10:04

6    identify them as Superbrands.  And we got the -- we won the --

7    this is the year.  For year 2005, we were on the cover of the

8    *Superbrand*.

9         MR. NOLAN:  Your Honor, we'd offer Exhibit 18819 into

10   evidence.                                                                        10:04

11        MR. PRICE:  Objection.  First, it's irrelevant.

12   Second, I've only seen the first cover page.  That's all I

13   have.

14        THE COURT:  Counsel, what portion of this do you want

15   to introduce?                                                                    10:04

16        MR. NOLAN:  The cover, as well as the page on Bratz,

17   as well as the back cover, which shows the listing of just the

18   names of the other brands.

19        THE COURT:  What is the page on Bratz?

20        MR. NOLAN:  Page 34 through 35, Your Honor.                                 10:05

21        And I can respond to one of the objections at

22   side-bar, if necessary.

23        THE COURT:  Let's do that.

24        (Whereupon, the following proceedings

25        Were held at side-bar:)                                                     10:05

Friday, August 15, 2008                    Trial Day 36, morning session

1              **THE COURT:**  The cover, the back cover, and these two

2    pages?

3              **MR. NOLAN:**  Yes.

4              **THE COURT:**  The concern I have -- I'm just reading

5    this for first time -- but there's information that is going to          10:06

6    be problematic.

7              I agree with you that, I mean, winning the award

8    shows strength of the brand or the importance of -- it's

9    relevant, I think.  But I'm concerned --

10             **MR. NOLAN:**  How about just the front and the back          10:06

11   covers?

12             **THE COURT:**  That may be the easiest thing to do.

13             Is it 7 to 12 years old?  You've taken the position

14   it's 8 to 12; they have taken the position that it's 6 to 12;

15   and then --                                                              10:06

16             **MR. NOLAN:**  It's sometimes defined a little

17   differently.

18             **THE COURT:**  I have to give a jury instruction on

19   this.

20             **MR. NOLAN:**  I think the range is 6 to 12.                  10:06

21             **THE COURT:**  You're saying 8 to 12.

22             **MR. PRICE:**  Their instruction said --

23             **THE COURT:**  I thought it was the other way.

24             **MR. NOLAN:**  It changes.  I'll go back to the jury

25   instruction.                                                            10:07

1          **THE COURT:**  In your substantial similarity

2    instruction, one side said -- I see this is 7 to 12.

3          **MR. PRICE:**  The document just used said 7 to 11.

4          **THE COURT:**  It's a minor point.

5          **MR. PRICE:**  My objection is, one, I don't know if          10:07

6    this is an award or if it's just articles about a strong brand,

7    "Britain's strongest brand, 2005."  It seems to be of minimal

8    relevance, talking about "Britain's strongest brand," because

9    it sounds like it's an award.  And I've never even seen the

10   book.                                                              10:07

11         **MR. NOLAN:**  Your Honor, this book was made --

12         **THE COURT:**  "Superbrand investigates over 90 of the

13   strongest brands to establish how they managed to achieve such

14   phenomenal success."

15         I mean, it is what it is.                                    10:07

16         **MR. NOLAN:**  Mr. Price may not have seen it.  It was

17   available to Mattel.  I'll represent to you that they took

18   pictures of it --

19         **MR. PRICE:**  This is what I got today in my exhibit

20   book.  We're supposed to be given exhibits.                       10:08

21         **THE COURT:**  The front and back cover can come in.

22   That's fine.

23         **MR. NOLAN:**  Thank you.

24         (Whereupon, side-bar proceedings were concluded.)

25         **MR. NOLAN:**  Your Honor, we'd offer Exhibit 18819, the   10:08

7597

```
 1    front and back cover.
 2              THE COURT:  Very well.
 3              It's in evidence.
 4              (Exhibit 18819 received.)
 5              MR. NOLAN:  Let's put that on the screen.        10:08
 6    BY MR. NOLAN:
 7    Q    Mr. Larian, are those Carter Bryant's concept drawings?
 8              MR. PRICE:  I object.  This on the screen doesn't
 9    show the entire cover.  You can't read --
10              THE COURT:  What's the objection?
11              MR. PRICE:  The picture doesn't show everything on
12    the cover, so I object to that display.
13              THE COURT:  Can we enhance that at all?
14              MR. NOLAN:  I think it's just a reproduction copy.  I
15    apologize for the poor quality.                            10:09
16              THE COURT:  Let's proceed, Counsel.
17              MR. NOLAN:  Thank you.
18    BY MR. NOLAN:
19    Q    I want to turn to the name Bratz.
20    A    I don't think I answered your last question.          10:09
21    Q    Were Carter Bryant's concept drawings on the cover?
22    A    These are not Carter Bryant's concept drawings.
23    Q    Mr. Larian, I want to turn to the name Bratz.
24              You understand that the jury has found that Carter
25    Bryant conceived of the idea of Bratz while employed at Mattel? 10:10
```

Friday, August 15, 2008                    Trial Day 36, morning session

1    Do you understand that?

2    A    Yes.

3    Q    Mr. Larian, at some point in time, were you sued for the

4    use of the name *Bratz*?

5            MR. PRICE:  Objection.  Relevance; move to strike.          10:10

6            THE COURT:  What does this go to, Counsel?

7            MR. NOLAN:  It goes to intentional acts, conduct.

8            THE COURT:  You're asking if --

9            MR. NOLAN:  And in the ultimate acquisition of the

10   name rights.                                                        10:10

11           THE COURT:  Let's lay a foundation for that.  I'm

12   going to sustain it for the time being.

13           MR. NOLAN:  Lay a foundation, you said?

14           THE COURT:  Yes.  I guess I'm not seeing how this

15   goes to -- I'm going to sustain the objection for the time          10:11

16   being.

17   BY MR. NOLAN:

18   Q    Mr. Larian, when you started to use the name *Bratz*, did

19   you know that Carter Bryant had come up with the name *Bratz*

20   while employed at Mattel?                                           10:11

21   A    No.

22   Q    Did you have any reason to believe the name *Bratz* was

23   confidential to Mattel?

24   A    No.

25   Q    Sometime after launching the name *Bratz*, associated with     10:11

1    the 3-D dolls, did you come to learn that the name *Bratz* was

2    actually owned by another person?

3            **MR. PRICE:**  Objection.  Move to strike; irrelevant.

4            **THE COURT:**  As phrased.

5            Sustained.                                          10:12

6    **BY MR. NOLAN:**

7    Q    At some point in time, Mr. Larian, did you acquire,

8    through the purchase of money, the right to use the name *Bratz*?

9            **MR. PRICE:**  Objection.  Irrelevant.  Move to strike.

10           **THE COURT:**  Counsel, side-bar on this.          10:12

11           (Whereupon, the following proceedings

12           Were held at side-bar:)

13           **THE COURT:**  Where are we going with this?

14           Who sued who for the name *Bratz*?

15           **MR. NOLAN:**  Curt Loven, trademark owner of the name   10:14

16   *Bratz*, sued Mr. Larian in a lawsuit by using the name Bratz.

17   Mr. Larian had to acquire and purchase the name.  Curt Loven

18   worked out a deal with Mr. Larian where Mr. Loven actually uses

19   the name Bratz -- they are available at Costco.

20           **THE COURT:**  Who's Loven?                        10:14

21           **MR. NOLAN:**  A third party.

22           **THE COURT:**  So this is not Mattel?

23           **MR. NOLAN:**  No.  Clearly not Mattel, your Honor.

24           And they are asking for punitive damages on

25   intentional conduct on the part of Mr. Larian.  This goes to    10:14

 1    his good faith.

 2              **THE COURT:**  It seems to, Mr. Price.

 3              **MR. PRICE:**  Your Honor, just because you enter into a

 4    settlement with someone to get rid of a pesky allegation, which

 5    has nothing do with whether or not Carter Bryant came up with          10:14

 6    the name Bratz.  That's the issue.  He was using Mattel's

 7    confidential information.

 8              **THE COURT:**  Mr. Larian is certainly able to testify,

 9    "I did not get it from Carter Bryant, and I did not get it

10    from..."                                                               10:14

11              **MR. PRICE:**  That's not what he's saying.  Bratz was

12    presented to him, that's undisputed, in September.  This is

13    after Carter Bryant gave him the Bratz concept.

14              **THE COURT:**  Then somebody else came along and sued

15    him for --                                                            10:14

16              **MR. PRICE:**  Yes.

17              **THE COURT:**  How is that irrelevant?

18              **MR. NOLAN:**  It goes to his good faith belief he was

19    using confidential information at Mattel or whether or not it

20    was even proprietary.  Mattel could have no claim -- could not         10:14

21    be harmed by the use of the name *Bratz*, because it wasn't even

22    available to the public, to Mattel.

23              **THE COURT:**  That's a different argument.

24              But getting back to the one you just made, let's

25    assume Mr. Larian stole the name *Bratz* from Mattel by getting        10:14

```
 1   it from Carter Bryant; somebody else sues; he settles with

 2   them.  How does that show that he did or did not steal it from

 3   Mattel to begin with, given the time frame that has now been

 4   exchanged.

 5        MR. NOLAN:  It goes to whether or not he was acting        10:14

 6   intentionally.

 7        THE COURT:  How?  What's the argument?  How do you

 8   make that argument?

 9        MR. NOLAN:  If you have damages -- the purpose is if

10   it injured Mattel, and how could it be --                       10:14

11        THE COURT:  That's a separate argument.  We'll get to

12   that.  Go back to this.  It doesn't explain the damages.

13        MR. NOLAN:  It now goes to the question of whether or

14   not he should be punished for use of the name Bratz when he

15   didn't know that it was being claimed -- some proprietary       10:15

16   information.  It couldn't be proprietary to Mattel because they

17   didn't own it.  They did not have a right to that name at that

18   time.

19        THE COURT:  That Mattel did not have a right to that

20   name?                                                           10:15

21        MR. NOLAN:  They could not have used the name without

22   acquiring the rights from Curt Loven.

23        THE COURT:  That's a separate issue.

24        You can ask Mr. Larian all you want about whether he

25   obtained this from Carter Bryant, whether he took this from     10:15
```

```
 1    Mattel, when he intentionally took it from Mattel.  But I'll

 2    sustain the objection on this lawsuit.

 3              MR. ZELLER:  One thing to also clarify in terms of

 4    the Loven suit, there's also 403 problems because of the fact

 5    there's no showing.  And as far as I know about that case from     10:15

 6    the public file, they are not comparable products.  As

 7    Mr. Nolan alluded to, we're talking about bed clothing, or

 8    pajamas; that's what is at issue as to what MGA was sued over.

 9    The circumstances of it, all that is going to cause multiple

10    layers of confusion.                                               10:16

11              THE COURT:  I'll sustain the objection.

12              MR. NOLAN:  The clock is running, Your Honor.  I want

13    to get back to the question.

14              MR. PRICE:  Move to strike the answer.

15              THE COURT:  Yes.                                         10:16

16              (Whereupon, side-bar proceedings were concluded.)

17              THE COURT:  Members of the jury, please disregard the

18    testimony about the trademark lawsuit.

19    BY MR. NOLAN:

20    Q    Mr. Larian, did you ever, before the return of the jury's    10:16

21    verdict, ever know that Carter Bryant conceived the name *Bratz*

22    while an employee at Mattel?

23    A    No.

24    Q    If you had known that, would you have ever used the name

25    *Bratz*?                                                          10:16
```

1    A    No.

2    Q    Please turn to Exhibit 18844 through 45, 001 through 045.

3    A    I have it.

4    Q    Do you recognize these?

5    A    Yes.                                                              10:17

6    Q    What are they, sir?

7    A    These are checks that we paid for taxes to I.R.S.

8    Q    Is MGA an "S" corporation?

9    A    Yes.

10   Q    Are these the checks that were paid and distributed to you    10:17

11   in order to pay U.S. taxes?

12   A    That's correct.

13        **MR. NOLAN:**  Your Honor, we'd offer Exhibits 18844

14   -001 through 045.

15        **THE COURT:**  Any objection?                                  10:18

16        **MR. PRICE:**  Yes, Your Honor.  Transparency.

17        **THE COURT:**  I'm sorry?

18        **MR. PRICE:**  I'm trying to use a code word, so as not

19   to use a speaking objection.

20        **THE COURT:**  I assume you'll address those later,           10:18

21   Counsel?

22        **MR. PRICE:**  Objection.  Production issue.

23        **THE COURT:**  What exhibit number?

24        **THE WITNESS:**  18844.

25        **MR. PRICE:**  18844.                                          10:18

Friday, August 15, 2008                    Trial Day 36, morning session

```
1        THE COURT:  Let me see you all at side-bar, Counsel.

2        (Whereupon, the following proceedings

3        Were held at side-bar:)

4        THE COURT:  What's your concern?

5        MR. PRICE:  My concern is, these were produced to us        10:19

6   after opening statements of 1-B, tax returns.  Any examination

7   in the case of discovery on those documents, they weren't

8   produced until after we both sat down; so it's sandbagging.

9        MR. ROTH:  These documents are confirmatory of

10  payments that are set out in the schedule that was produced       10:19

11  from Mattel.

12       THE COURT:  So you produced the schedule which has

13  all these documents; these are just the checks that back that

14  up?

15       MR. ROTH:  These checks back that up, yes, the             10:19

16  payments.

17       MR. PRICE:  We're not disputing that the schedule

18  shows the payments --

19       MR. ZELLER:  The Court will recall we had issues over

20  their production of tax credit.  They refused to provide it.      10:20

21  We did not have any opportunity for discovery on these things.

22  They produced it late.  Our position was at that time, and it

23  still remains, that having failed to produce it, they should

24  not get credit for it now.  And we have had no opportunity to

25  test any of this in discovery.  That was the choice they made,   10:20
```

```
 1   and we made that point even at the time, that if they were not
 2   going to produce that tax information, then they should not
 3   be --
 4           THE COURT:  Did you produce the documents they
 5   requested?
 6           MR. ROTH:  We produced the schedules which show
 7   disbursements made to Mr. Larian for purposes of paying his
 8   taxes.
 9           MR. NOLAN:  The motion practice for production
10   regarding production of the tax returns, I think was both
11   before you and an appeal from the magistrate judge.
12           THE COURT:  Judge Infante.
13           MR. NOLAN:  Yes.  With respect to the actual tax
14   returns, some summaries were provided that -- they all add up
15   to the same payments; these are just the actual checks.
16           THE COURT:  So your position is you can't test any of
17   this?
18           MR. ZELLER:  That's right.  And it was produced
19   after -- I don't think there's any dispute about that -- if I'm
20   wrong about the timing of the production, certainly I would
21   take a different viewpoint; but as far as I know, as of the
22   time when the court had that motion in front of it --
23           THE COURT:  What is the dispute?
24           The taxes were paid.  Unless they found willful
25   infringement, the taxes could offset the damages.
```

10:20
10:20
10:20
10:21
10:21

1        **MR. ZELLER:**  Our point is they were taking their

2    chances by not putting that cost information in.  They

3    shouldn't get to produce it now.

4        **THE COURT:**  I understand.  What is the dispute?  Is

5    there any question that he paid these taxes?                    10:21

6        **MR. ZELLER:**  We can't raise questions about it

7    because we were denied the discovery in the first instance.  We

8    put those in front of him and asked him questions:  "Are these

9    the complete..."

10       To use Mr. Price's words, there's no transparency.         10:21

11       I don't want to make it sound like we have an

12   investigation that has uncovered some activity.  The problem

13   is, they were obligated to provide discovery and allow us to

14   take discovery, and we just were not ever given that

15   opportunity.                                                    10:22

16       **THE COURT:**  I don't have presently in mind the

17   rulings of Judge Infante on tax records, so I can't say

18   really -- you're disputing that?

19       **MR. NOLAN:**  Your Honor --

20       **THE COURT:**  What are you saying about the rules of     10:22

21   Judge Infante?

22       **MR. NOLAN:**  That our tax returns -- his tax returns,

23   his personal tax returns were not ever required to be turned

24   over.

25       We provided summaries of the relevant information          10:22

```
 1    from those tax returns in the form of the amount of money that

 2    was being paid.  We now are just introducing the checks to

 3    avoid any issue with respect to them saying that the summaries

 4    are inaccurate.  Here are the checks; it adds up to the amount

 5    of the summaries.                                                   10:22

 6         THE COURT:  You're saying there's something in

 7    Judge Infante's ruling or this Court's ruling which suggests

 8    that if he didn't turn over the tax returns, that you weren't

 9    going to get the tax payments in?

10         MR. ZELLER:  No.  I was stating what our position was   10:22

11    in that we made it very clear that we were not being given that

12    transparency.

13         THE COURT:  That's not part of any ruling at this

14    point.

15         MR. ZELLER:  What I'm saying is, all of that is post    10:23

16    all of that, post-discovery.  We were not given the opportunity

17    to take discovery on it.  That's our point.

18         MR. ROTH:  They were given the opportunity.  They had

19    the schedules with the distribution amounts.  Their expert

20    relied on that.  They had taxation in the deposition.          10:23

21         THE COURT:  You're representing the amounts here are

22    consistent with the amounts that were submitted through his

23    expert?

24         MR. ROTH:  Yes.  They are consistent with those

25    amounts.                                                        10:23
```

1        **THE COURT:**  Is there any reason why we can't just use

2   what was produced already?

3        **MR. NOLAN:**  We were concerned they would be arguing

4   that we didn't put the actual checks in.

5        **THE COURT:**  Your expert did take this into account in          10:23

6   the tax payments; that's in evidence already.

7        **MR. PRICE:**  I think our expert said as a matter of

8   law the tax payments should not be deducted because it's a tax

9   credit.

10       **THE COURT:**  But you didn't do that calculation.          10:23

11       **MR. PRICE:**  Right.  But we're not --

12       **THE COURT:**  If the jury finds it's willful, it comes

13  out anyway; if they don't find it's willful, it's relevant.

14  It's been produced.  Come up with a stipulation.  Let's do it

15  by stipulation on the total amount.  Otherwise, they come in.          10:24

16       (Whereupon, side-bar proceedings were concluded.)

17       **THE COURT:**  Ladies and gentlemen of the jury, the way

18  we're going to deal with these tax payments is, the parties are

19  going to work on a stipulation on the amount, instead of

20  getting into the actual documents themselves; that will avoid a          10:24

21  lot of problems.  So we'll see how that all works out.

22       Counsel, you may proceed.

23  **BY MR. NOLAN:**

24  Q   Mr. Larian, the last document I want to show you is

25  Exhibit 18837.

Friday, August 15, 2008                    Trial Day 36, morning session

7609

1          Do you have that, sir?

2    A    Yes, I do.

3    Q    Do you know what these are?

4    A    Yes, I do.

5    Q    What are they?                                          10:25

6    A    This is a projection income statement for the year 2008.

7    Q    For whom?

8    A    For our company, MGA Entertainment.

9    Q    And when are they done?

10   A    These were done in March of this year.                  10:25

11   Q    Now, in the lower right-hand corner, there's a print date

12   of August.

13          Do you see that?

14   A    Yes, I do.

15   Q    That print date is just a date that is put on            10:25

16   automatically when you print it off of the electronic version;

17   correct?

18   A    Every time you print something from the computer, it gives

19   a time stamp on the bottom when it was printed.

20   Q    So these projections were done in March?                 10:26

21   A    Correct.

22   Q    Of 2008; correct?

23   A    2008.

24          **MR. NOLAN:**  Your Honor, we'd offer 18837.

25          **MR. PRICE:**  Objection.  Lacks foundation; relevance.   10:26

Friday, August 15, 2008                    Trial Day 36, morning session

1          **THE COURT:**  Lay a further foundation, Counsel.

2          **MR. NOLAN:**  Your Honor, in light of the time, I'm

3   going to move on and see if we can just handle it by

4   stipulation.

5          **THE COURT:**  Very well.                                    10:27

6          **MR. NOLAN:**  Thank you.

7   **BY MR. NOLAN:**

8   Q    Mr. Larian, do you understand that Mattel is asking this

9   jury to award punitive damages against you individually?

10  A    I do.                                                        10:27

11  Q    And do you understand that Mattel is arguing that you

12  acted with malice and oppression and fraud?

13         Do you understand that?

14  A    I understand that's what they contend, yes.

15  Q    Sir, when you met with Carter Bryant on September 1, 2000,   10:28

16  through the time that he left Mattel in October 20th, did you

17  ever intend to harm Mattel in meeting with Mr. Bryant?

18  A    Absolutely not.

19  Q    Did you ever intend to cause injury to Mattel in meeting

20  with Carter Bryant during that period of time?                   10:28

21  A    Absolutely not.

22  Q    Did you ever intend to prevent Mattel from introducing

23  into the marketplace fashion dolls that could compete with

24  Bratz?

25  A    No.                                                          10:28

1      **MR. PRICE:**  Objection.  Irrelevant.  Move to strike.

2      **MR. NOLAN:**  Element of harm.

3      **THE COURT:**  Overruled.

4      You may answer.

5      **THE WITNESS:**  No.                                    10:31

6   BY MR. NOLAN:

7   Q    Did Mattel come out with a fashion doll called My Scene?

8   A    They did.

9   Q    Did you compete with My Scene?

10      **MR. PRICE:**  Objection.  Irrelevant.              10:31

11      **THE COURT:**  Sustained.

12  BY MR. NOLAN:

13  Q    Mr. Larian, when you were meeting with Carter Bryant, did

14  you believe that he was presenting to you confidential

15  information belonging to Mattel?                           10:31

16  A    Absolutely not.

17  Q    If you knew that, sir, would we be sitting here in court

18  today?

19  A    No.

20      **MR. NOLAN:**  No further questions.                 10:31

21      **THE COURT:**  Cross-examination.

22                **CROSS-EXAMINATION**

23  BY MR. PRICE:

24  Q    Mr. Larian, is it your testimony today that you did not

25  knowingly induce Carter Bryant to share Mattel's confidential  10:31

Friday, August 15, 2008                    Trial Day 36, morning session

7612

1  information with MGA?  Is that your testimony?

2  A    I don't understand your question.  Can you please rephrase

3  it.

4  Q    Is it your testimony you did not knowingly cause Carter

5  Bryant to share Mattel's confidential information with MGA?  Is     10:34

6  that your testimony?

7  A    Yes.

8  Q    So again, I think Mr. Nolan said you --

9        Do you understand there's a punitive damages element

10  of this phase?                                                     10:34

11        Do you understand that?

12  A    I'm sorry.

13  Q    You understand there is a punitive damages issue in this

14  phase of the trial; correct?

15  A    Yes.                                                          10:34

16  Q    And you understand that one of the issues is whether or

17  not you have sort of learned that you'll behave differently as

18  a result of the jury's verdict?  Do you understand that?

19  A    I don't understand your question.

20  Q    Do you understand one of the issues of punitive damages is   10:34

21  whether or not you will be deterred in the future from the

22  conduct which the jury has found has taken place?

23  A    Yes.

24  Q    And so despite the jury's verdict, you still maintain that

25  you did not knowingly cause Carter Bryant to share confidential    10:34

1  information with you and MGA; correct?

2  A    In 2000, when he came to show us those drawings, we did

3  not know that he had done those at Mattel, and we went further

4  to verify, through his lawyer and our lawyers, that he had not

5  done that.                                                        10:34

6        Had I known what I know now, I would have never let

7  him in my office.

8  Q    So you're maintaining that same position despite the

9  jury's verdict; correct?

10  A    I respect the jury's verdict.                               10:34

11  Q    And you recall that in phase -- first, do you recall the

12  following testimony -- and I'll put it up -- trial testimony at

13  page 2251, Line 23 to 2252, line six.  "Would it have been a

14  problem if Carter Bryant had created or made any of his

15  drawings while employed by Mattel, in your view?"               10:43

16        ANSWER:  "No."

17        QUESTION:  "That was your testimony under oath as of

18  the date of your deposition; correct?"

19        ANSWER:  "As it is today, yes."

20        **THE WITNESS:**  Yes.  But you did not show me the        10:43

21  previous five pages of that deposition.

22  **BY MR. PRICE:**

23  Q    You told the jury that you did not know Carter Bryant came

24  up with the name *Bratz* while he was at Mattel; correct?

25  A    Correct.                                                    10:43

1   Q    And if you would look at the first page of Exhibit 302,

2   which the jury has seen.

3        This is a presentation Mr. Bryant made to you when he

4   met with you; correct?

5   A    Correct.                                                    10:43

6   Q    You also said that prior to Mr. Bryant, you had already

7   begun investigating the tween market.

8        Do you recall that testimony?

9   A    I did.

10  Q    But you have not presented any documentation, any e-mail,   10:43

11  any note, anything, to support that statement, have you, sir?

12  A    We tried, but you objected.

13  Q    Prior to meeting with Carter Bryant in September, you had

14  not found an idea that you liked for a fashion doll; is that

15  true?                                                            10:43

16  A    True.

17  Q    Sir, after Carter Bryant met with you, from that point on,

18  MGA was focused just on Bratz; right?

19  A    I'm sorry?

20  Q    The focus of MGA was just on Bratz?                         10:43

21  A    No.

22  Q    MGA didn't really attempt to diversify, did it?

23  A    It did.

24  Q    You mean MGA spent some significant efforts trying to

25  produce products that were not related to Bratz?                 10:43

7615

1    A    Yes.

2    Q    Significant effort?

3            Come on, how much of MGA's time was spent on products

4    that did not relate to Bratz in any way?

5            **MR. NOLAN:**  Objection, Your Honor.  Relevance.                    10:43

6            **THE COURT:**  Rephrase, Counsel.

7    BY MR. PRICE:

8    Q    After you met with Carter Bryant, going forward, what

9    percentage of MGA's efforts were focused on anything other than

10   Bratz?                                                                        10:43

11   A    I cannot put a percentage on it because it was fluid; it

12   was from 2001 until now, so you have to tell me an exact date,

13   and I can tell you.

14   Q    Okay.

15           Year 2001.                                                            10:43

16   A    Yes.

17   Q    What percentage was nonBratz effort?

18   A    I would say 50 percent.

19   Q    50 percent.

20           In 2002, what percentage was nonBratz effort?                        10:43

21   A    About at least 50 percent.

22   Q    50?

23   A    Yes.

24           I'm estimating these numbers.

25   Q    2003, how much of MGA's efforts was not related to Bratz        10:43

1    in any way?

2    A    I cannot judge -- I cannot just put a number.  I don't

3    remember.

4    Q    Estimate.

5    A    30, 40, 50 percent.                                          10:43

6    Q    2004?

7    A    Probably the same.

8    Q    30, 40, 50 percent?

9    A    Yes.

10   Q    2005?                                                        10:43

11   A    Same.

12   Q    30, 40, 50 percent?

13   A    Yes.

14   Q    Closer to 50 or closer to 30?

15   A    Somewhere in that range.                                     10:43

16   Q    2006?

17   A    2006, we put more effort in other brands.

18   Q    So in 2006, how much of MGA's efforts was in products

19   totally unrelated to Bratz?

20   A    I would say about 60, 70 percent.                            10:43

21   Q    So 60, 70 percent of time and effort went to products

22   other than Bratz, you're saying.

23   A    Yes.

24   Q    Okay.

25             How about 2007?                                         10:43

1    A    Again, a lot of time went into nonBratz.

2    Q    About how much?

3    A    About 50, 60 percent.

4    Q    You realize, of course, that your damages expert has

5    assumed that only 20 percent of MGA's overhead costs should go          10:43

6    to nonBratz products?  You understand that, don't you?

7    A    I have not read the damage expert report.

8    Q    Anyway, that would be wrong, because what you've just told

9    us is that for every year, between 30 and 70 percent of MGA's

10   general overhead costs should be allocated to nonBratz                  10:43

11   products; right?

12   A    That was not your question, and that was not my testimony.

13   Q    Well, that's how much MGA's effort went, you say, to

14   nonBratz products; 50 percent some years; 30 to 50 percent some

15   years; up to 60 percent other years; right?                            10:43

16   A    Up to 60 or 70 in other years in other brands, such as

17   Little Tikes, such as Rescue Petz; other products that we have.

18   Q    I said totally nonBratz related.

19        You understood my question, didn't you?

20   A    Little Tikes and Rescue Petz are not Bratz related.                10:43

21            **MR. PRICE:**  No further questions.

22                        **REDIRECT EXAMINATION**

23   **BY MR. NOLAN:**

24   Q    Mr. Larian, on this last series of questions, have you

25   undertaken a study of the allocation of expenses between the           10:43

Friday, August 15, 2008                    Trial Day 36, morning session

1    various product lines that were being manufactured at the same

2    time Bratz was being manufactured?

3    A    No.

4    Q    Is it true that during the time you were working on Bratz

5    at MGA, there were other products also being manufactured at          10:43

6    MGA?

7    A    Yes.

8    Q    And the production and the support of those other products

9    also caused expenses to be attached to those efforts; correct?

10   A    Absolutely.                                                       10:43

11   Q    Mr. Larian, Mr. Price has showed a deposition portion, and

12   I want to ask you --

13           **MR. NOLAN:**  Can we have that up, Aaron.

14   **BY MR. NOLAN:**

15   Q    QUESTION:  "So would it have been a problem if Carter           10:43

16   Bryant had created or made any of these drawings while employed

17   by Mattel, in your view?"

18           ANSWER:  "No."

19           QUESTION:  "Why not?"

20           ANSWER:  "Because I don't think, whether it's MGA or         10:43

21   Mattel, that we own the people, especially the creative people,

22   forever."

23           What did you mean by that answer, sir?

24   A    What I meant is that if somebody has said to you that they

25   came up with something in 1998, which is what Carter Bryant          10:43

1    said, and then later on, he was working on the weekends and in

2    the evenings enhancing what he was doing, I didn't see anything

3    wrong with it.

4            And that's what we believed when he came to us, that

5    he had done these in 1998.  He represented that.  His lawyers          10:43

6    confirmed that in writing, and that's what we believed.

7            So after that -- maybe Mattel is different, but I

8    don't think I own people's evenings and nights when they are

9    not on my payroll.

10   Q    Mr. Larian, did you believe Carter Bryant when he told you       10:43

11   that he did the concept for Bratz in 1998?

12   A    Can you repeat that?

13   Q    Did you believe Carter Bryant when he told you that he did

14   the concept drawings in 1998?

15   A    I believed him, but we went further and looked into it to        10:43

16   make sure that he was telling the truth.

17   Q    Now, just prior to the portion of the deposition that they

18   showed you -- I want to put up from Page 445, Line 25 through

19   446, Line 9.

20   A    I don't have that deposition here.                               10:43

21   Q    Can you see it on the screen?

22   A    Yes.  Go ahead.

23           **MR. PRICE:**  I object to this.  This is not in

24   evidence.  This was not played in Phase 1-A.

25           **MR. NOLAN:**  We're offering it now for completeness,       10:43

1   in light of the portions he just played.

2          THE COURT:  What page, Counsel?

3          MR. NOLAN:  Page 445, Line 25.

4          THE COURT:  Do I have the deposition here someplace?

5          Let's have a side-bar, counsel.

6          (Whereupon, the following proceedings

7          Were held at side-bar:)

8          THE COURT:  Counsel?

9          MR. NOLAN:  This is just before the portion they've

10  now played when MGA entered into the agreement with          10:43

11  Carter Bryant relating to Bratz:

12          QUESTION:  "Did you think it possible that Mattel

13  might have rights to the Carter Bryant drawings?

14          ANSWER:  "That Mattel might have -- I think we did."

15          THE COURT:  This is the part that you played?          10:43

16          MR. PRICE:  What I showed him was a transcript of the

17  prior phase of trial.  We didn't play anything new.  What I

18  showed was a transcript of the trial, when at that time they

19  played what they thought was different; so all I was saying in

20  my examination was that "you still believe what you said in the          10:43

21  first phase of the trial?"

22          I'm not playing the testimony.  I'm playing what he

23  already said at trial.

24          THE COURT:  Fair enough.  It needs to be

25  characterized properly.          10:43

 1          Is there any reason why he can't play this, from your

 2   perspective?

 3          **MR. PRICE:**  If it was going to be played in context,

 4   it should have been done in the first phase of the trial.  And

 5   the jury already decided this issue.  The issue is --                10:43

 6          **MR. NOLAN:**  This goes to the willfulness

 7   characterization, and that's what they were using it for.  The

 8   testimony they are referring to was actually deposition

 9   testimony that was imported into 1-A.  This is a different

10   issue.  These are different elements.                                10:43

11          **MR. PRICE:**  Plus, in 1-A, he played --

12          **THE COURT:**  As long as it's being characterized

13   accurately, I don't have a problem with either side bringing in

14   from 1-A; it's all the same product.  As long as it's not going

15   to unseat the jury's decision.                                       10:43

16          **MR. PRICE:**  And this is.

17          **THE COURT:**  All you have is liability -- I think I

18   made reference to this the other day.  Some of these issues

19   were brought up again on punitive damages, and I don't think

20   it's proper for the Court to find findings of intentional acts       10:43

21   that were required for the tort to serve as a basis for the

22   punitive damages.  It is separate.  This is not like the

23   copyright or the findings on the timing of the drawings; so I'm

24   going to give you latitude to do that.

25          I'm concerned about how this is being characterized,          10:43

Friday, August 15, 2008                    Trial Day 36, morning session

```
 1   whether it was a transcript from 1-A or a deposition; so just
 2   make that clear.  The objection is overruled.
 3            (Whereupon, side-bar proceedings were concluded.)
 4            THE COURT:  Okay, Counsel, the objection is
 5   overruled.
 6            You may proceed; but why don't you clarify for the
 7   record what we discussed.
 8            MR. NOLAN:  Your Honor, I'm now displaying from the
 9   same deposition transcript conducted March 26, 2008, at
10   Page 445, Line 25, running over to Line 9, on Page 446.        10:44
11   BY MR. NOLAN:
12   Q    Mr. Larian, you recall that your testimony was taken on
13   days in depositions; correct?
14   A    Yes.
15   Q    And this portion of the deposition is in the same session  10:44
16   where the testimony that Mr. Price showed you earlier; is that
17   correct?
18   A    Yes.
19   Q    That question was asked of you, and that was your answer
20   given in the deposition on March 26, 2008.                     10:44
21   A    Correct.
22   Q    Mr. Larian, has the jury verdict had an impact on you?
23   A    Yes, it has.
24   Q    Has it had an impact on MGA?
25   A    Yes, it has.                                               10:45
```

1          **MR. NOLAN:**  Nothing further.

2          **THE COURT:**  We're going to take a break at this time,

3     and we'll resume with further examination after the break.

4          (Whereupon, jurors depart courtroom.)

5          **THE COURT:**  Mr. Price, you said you had another                    10:46

6     objection to take up; or Mr. Zeller, or somebody.

7          Mr. Quinn?

8          You weren't at the side-bar.

9          **MR. QUINN:**  Your Honor, we've now gotten back into

10    what the lawyers told the lawyers and the representations that      10:46

11    were made; that subject has now been opened up.

12         In 1-A, that issue was always paired, from my

13    understanding, with the e-mails to Ms. Glazier about nine

14    months later, where Mr. Larian makes the statements that he

15    makes.                                                              10:46

16         Now the one has been opened up, and we had multiple

17    emphatic denials from the stand from Mr. Larian that he ever

18    knew that Mr. Bryant did this work at Mattel.  In fairness now,

19    we should be able to use that e-mail to Ms. Glazier.

20         There's been a waiver here.                                    10:47

21         Your Honor, those two were always paired.  And the

22    Court cautioned --

23         **THE COURT:**  Let me look at the actual testimony.

24         Let me see what was displayed.

25         This is Page 445, Line 25, through Line 9 at                   10:47

```
 1    Page 446.

 2              Could I see that again.

 3         MR. NOLAN:  Your Honor, this is the same testimony

 4    that was given in 1-A repeatedly.

 5         THE COURT:  Can you compare it to the testimony in       10:48

 6    1-A?

 7              That's what I asked you to clarify at side-bar.

 8              Do we have that?

 9         MR. NOLAN:  He testified on numerous occasions with

10    respect to receiving information through --                   10:48

11         THE COURT:  It's not that I don't believe your

12    recollection, but it's been a long time for all of us.  I want

13    to see what was actually stated from 1-A.

14         MR. NOLAN:  Your Honor, I believe we have it on the

15    screen.  This is what -- in 1-A -- if I could play from 459,   10:50

16    Line 12, through 460, Line 3.  And then I said we would ask

17    that we continue through to Line 20.

18              "Absolutely.  Very well."

19              So we played it.

20         THE COURT:  That's 459, then.                            10:50

21              Was 445 and 446 not played?

22         MR. NOLAN:  Not in the first phase of the trial.  But

23    now the issue comes up here, Your Honor, that -- the next

24    question comes up, and we asked the same thing.

25         THE COURT:  Let me see.                                  10:50
```

1      **MR. NOLAN:**   The question was, "Does the fact that

2  Carter Bryant's lawyer represented to MGA that Carter Bryant

3  had done the drawings in 1998 in Missouri when he was not a

4  Mattel employee have any significance to you at that time?"

5      ANSWER:  "It confirmed what Carter Bryant had told        10:51

6  us."

7      QUESTION:  "Did you find some comfort in this?"

8      ANSWER:  "Of course."

9      QUESTION:  "And why was that?"

10     ANSWER:  "Because, you know, I hoped the lawyers in       10:51

11  court, in your profession, tell the truth."

12     We did not make reference --

13     **THE COURT:**   That came in in 1-A; is that accurate?

14     **MR. NOLAN:**   Yes.  And there was no objection to it at

15  the time, Your Honor.                                       10:51

16     **THE COURT:**   I'm going to take a recess here.   I'm

17  going to make sure we have a clear record before us.  I'll give

18  you some time amongst yourselves.

19     Ms. Aguiar, you had something entirely unrelated to

20  any of this?                                                10:51

21     **MS. AGUIAR:**   If Your Honor wouldn't mind giving us a

22  few minutes before the jury comes back in.  I think in terms of

23  an efficient use of the jury's time, our next witness is going

24  to be the custodian of records.  And if we could deal with some

25  of those issues regarding those documents, because I know      10:51

1    there's going to be a series of objections regarding relevance

2    and whatnot.  If we could do that prior to --

3            THE COURT:  Could you hand those documents up to the

4    Court, so I can look at them during the recess?

5            MS. AGUIAR:  We can give you that binder, Your Honor;   10:52

6    and Mr. Nolan and I will talk about whether it's the next

7    witness or the one after that.  But we do just want to make

8    sure that the issues are dealt with, rather than having the

9    jury sit there for 20 minutes while we go through the

10   documents.                                                      10:52

11           THE COURT:  I agree.

12           MS. AGUIAR:  Okay.  Thank you.

13           THE COURT:  These are the documents?

14           MS. AGUIAR:  Yes.

15           THE COURT:  I'll take a look at this.

16           Let's figure out what came in in 1-A, because I do

17   recall the issue and how we -- based on what came in in 1-A,

18   the Court was unprepared to go to the e-mail.

19           I understand your argument now, Mr. Quinn, is that

20   we've gone further and that we've now --                        10:52

21           MR. QUINN:  Exactly.  The testimony that prior to the

22   jury's verdict in 1-A, Mr. Larian says, "I don't -- punitive

23   damages don't need to be imposed.  I did not know prior to the

24   jury's verdict in 1-A that Mr. Bryant had done this at Mattel."

25           That's his testimony.                                   10:52

1          The e-mail to Ms. Glazier says what it says.

2          **THE COURT:**  I still want to see what was precisely

3   before the jury in 1-A and what the Court's previous ruling

4   was.

5          Let me take a break here.                                    10:53

6          **MS. AGUIAR:**  In your binder, I just want you to know

7   that the "A" documents are the ones that we redacted; so I

8   didn't want you to see the unredacted one and get upset.

9          **THE COURT:**  Thank you, Counsel.

10          (Whereupon, a brief recess was held.)                        09:20

11          (Morning session is concluded; subsequent

12           further morning proceedings are sealed.)

13

14

15

16

17                          CERTIFICATE

18

19   I hereby certify that pursuant to section 753, title 28, United
    States code, the foregoing is a true and correct transcript of
20   the stenographically recorded proceedings held in the above-
    entitled matter and that the transcript page format is in
21   conformance with the regulations of the judicial conference of
    the United States.

22

23   _____          _____

    THERESA A. LANZA, CSR, RPR                        Date
24   Federal Official Court Reporter

25

Friday, August 15, 2008                    Trial Day 36, morning session