1  THOMAS J. NOLAN (Bar No. 66992)
   (tnolan@skadden.com)
2  JASON D. RUSSELL (Bar No. 169219)
   (jrussell@skadden.com)
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   300 South Grand Avenue, Suite 3400
4  Los Angeles, CA  90071-3144
   Tel.: (213) 687-5000/Fax: (213) 687-5600
5

6  Attorneys for Counter-Defendants,
   MGA ENTERTAINMENT, INC., ISAAC LARIAN,
7  and MGA ENTERTAINMENT (HK) LIMITED

8
                  UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10
                        EASTERN DIVISION
11

12  CARTER BRYANT, an individual,           )  CASE NO. CV 04-9049 SGL (RNBx)
                                            )
13                            Plaintiff,    )  Consolidated with Case No. 04-9059
                                            )  and Case No. 05-2727
14           v.                             )
                                            )  Honorable Stephen G. Larson
15  MATTEL, INC., a Delaware corporation,   )
                                            )
16                            Defendant.    )  MGA PARTIES' STATEMENT OF
                                            )  POSITION REGARDING APPROPRIATE
17  _____     )  ESCROW OF BRATZ PROFITS
    AND CONSOLIDATED CASES                  )
18                                          )

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**PAGE:**

3    TABLE OF AUTHORITIES ...............................................................................................ii

4    PRELIMINARY STATEMENT................................................................................ 1

5    ARGUMENT ............................................................................................................ 3

6       I.    THE SCOPE OF THE COURT'S DECEMBER 3 ORDERS ........................ 3

7             A.    The December 3 Orders Granted Mattel Very Limited Rights To
                     Bratz .......................................................................................................... 4
8
              B.    The December 3 Orders Did Not Become Effective Until April 27,
9                    2009 ............................................................................................................ 6

10      II.   MATTEL IS ONLY ENTITLED TO ESCROW OF A SMALL
              PORTION OF MGA'S BRATZ PROFITS ....................................................... 8
11
              A.    Mattel's Rights To Profits Under The Permanent Injunction
12                   Should Be Limited By The Jury's Copyright Verdict .............................. 8

13            B.    Alternatively, The Apportionment Calculations Presented At Trial
                     May Serve As An Absolute Maximum..................................................... 9
14
              C.    Mattel Is Not Entitled To Escrow Any Additional Profits Based
15                   On The Bratz And Jade Trademarks......................................................... 10

16            D.    As An Absolute Maximum, The Jury's Total Damages Award
                     Should Be Used To Calculate The Profits Attributable To All Of
17                   MGA's Purported Wrongdoing ............................................................... 11

18   CONCLUSION ........................................................................................................ 13

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2 **CASES**                                                                                    **PAGE:**

3 Dam Things from Denmark v. Russ Berrie & Co.,
        290 F.3d 548 (3d Cir. 2002) ......................................................................................5

4

5 Eden Toys, Inc. v. Florelee Undergarment Co.,
        697 F.2d 27 (2d Cir. 1982) ........................................................................................5

6 **MISCELLANEOUS**

7 4-13 Melville B. & David Nimmer, Nimmer on Copyright § 13.03 (2009) ........................5

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA Parties' Statement Of Position Regarding Appropriate Escrow Of Bratz Profits
Case No. CV 04-9049 SGL (RNBx)

# PRELIMINARY STATEMENT

In its May 21, 2009 Order, this Court requested that the MGA Parties submit a statement on "the scope of the profits that must be turned over by MGA" and held in escrow during the limited stay of the Court's December 3 Orders.[1]  (5/21/09 Order (Dkt 5565) at 7-8.)  The answer to the question posed by the Court can be found by looking to what the Phase I jury told the parties.  The Phase I jury awarded Mattel $10 million in historical damages from MGA's alleged infringement of Mattel's ownership interests in Bratz spanning from 2001 to 2008 – a minute fraction of the damages sought by Mattel.  Any escrow of profits, assuming one is appropriate at all, should follow the contours of what the jury decided, i.e., it should be at most a small percentage of the total profits earned by MGA from the exploitation of Bratz.

At the threshold, two circumstances bear noting.  First, neither the original stay of the December 3 Orders issued therein, nor the Court's January 7, 2009 Order granting the modified stay in response to the MGA Parties' request, nor the April 27, 2009 order vacating all but the limited stay ordered on January 7, conditioned that stay on an accounting of profits, much less an escrow of profits.  (See 12/3 Omnibus Order at 16; 1/7/09 Order (Dkt 4657) at 1-2; 4/27/09 Order at 11.)  In its opposition to the MGA Parties' December motion for stay, Mattel specifically requested an escrow of profits, and the MGA Parties countered with a proposed bond.  (See 12/23/08 Opp'n to Ex Parte Appl. & Motion for Stay (Dkt 4552) at 22-23; 12/29/08 Reply ISO Ex Parte Appl. & Mot. for Stay (Dkt 4577) at 11-12.)  The Court did not make its January 7, 2009 Order contingent upon any escrow or accounting; indeed, the Court did not provide for any security whatsoever.

---

[1]  The December 3 Orders are the Order Granting Mattel, Inc.'s Motion for Permanent Injunction ("Permanent Injunction Order") (Dkt 4443), the Order Granting Mattel, Inc.'s Motion for Declaratory Judgment ("Declaratory Judgment Order") (Dkt 4442), and the Order Granting Mattel, Inc.'s Motion for Constructive Trust and For Finding Liability and Injunctive Relief Pursuant to Cal. Bus. & Prof. Code § 17200 ("Constructive Trust Order") (Dkt 4441), as supported by the Court's Order Finding In Favor of Mattel As to The MGA Parties' Affirmative Defenses etc. ("12/3 Omnibus Order") (Dkt 4439), and modified by the Court's Order Denying Mattel's Motion for Judgment As A Matter Of Law etc. ("4/27/09 Order") (Dkt 5273).

MGA Parties' Statement Of Position Regarding Appropriate Escrow Of Bratz Profits
Case No. CV 04-9049 SGL (RNBx)

1  (1/7/09 Order at 1-2.)   Presumably, the Court did not impose such a security as the

2  December 3 Orders were not "final" and the MGA Parties had no meaningful opportunity to

3  seek appellate review of those orders until April 27, 2009.  Accordingly, there is no basis

4  for imposing such a requirement retroactively and any escrow should begin, if at all, only as

5  of the date that the December 3 Orders became "final," i.e., April 27, 2009.

6         Second, the Court's April 27, 2009 Order contemplated a jointly filed written

7  statement of position from all interested parties concerning the appropriate treatment of

8  Bratz profits, to follow ten days after an accounting of Bratz profits was submitted to the

9  Court.  (4/27/09 Order at 12.)  The accounting itself was due to be filed May 27, 2009,

10 making the statement of position due June 10, 2009.  (Id.)  Although there is no apparent

11 urgency, and none identified in any of the Court's orders, the Court accelerated the schedule

12 for this statement by two weeks, and left the MGA Parties with only the Memorial Day

13 holiday weekend to prepare.  As such, the MGA Parties respectfully note that their ability to

14 submit expert analyses was effectively taken away.  While the MGA Parties firmly believe

15 that the most appropriate guide in answering the Court's question is the jury's damages

16 award, the MGA Parties' ability to offer alternative calculations and analysis has been

17 limited to alternatives already in the record.[2]

18        Substantively, should this Court believe that an escrow of some portion of the profits

19 earned by MGA from the sale of Bratz products is appropriate, the starting point for the

20 analysis must be the jury's verdict and damages award, as they provide the best evidence of

21 the portion of profits derived from infringement of Mattel's interests in Bratz.  The jury was

22 asked to consider what portion of MGA's profits could be attributed to MGA's infringing

23

24 [2]      This schedule also means that MGA has not had the opportunity to complete its review of its
revenues and costs over the past several months to determine the proper allocation of expenses and
25 profits.  Thus, this statement of position is provided without the benefit of actual profits numbers.
MGA reserves all rights with respect to the accounting which is now scheduled to be delivered to
26 the Monitor on June 22, 2009.  Likewise, by taking a position on the proper percentage of profits to
be escrowed for Mattel, the MGA Parties do not concede that there have been *any* profits earned on
27 Bratz products since the jury's verdict in August 2008 or since the injunction orders went into
effect on April 27, 2009.
28

MGA Parties' Statement Of Position Regarding Appropriate Escrow Of Bratz Profits
Case No. CV 04-9049 SGL (RNBx)

1   activities, after listening to extensive evidence and expert testimony on the issue from both

2   sides.  The jury concluded that $10 million of MGA's Bratz profits from 2001 through trial

3   (August 2008) was attributable to copyright infringement.  The jury awarded an additional

4   $90 million in tort damages.  Mattel presented evidence that MGA's total Bratz profits were

5   $777.9 million, while MGA presented evidence that Bratz profits were actually $405

6   million.  Using these numbers, as described below, the proper portion of Bratz profits to

7   place in escrow is 1.3%, based on the jury's copyright damages and Mattel's calculation of

8   profits.  Should the Court choose to use the MGA Parties' profits calculation, as well as the

9   entire damages award, the amount should be 24.7%.  As detailed more fully below, the

10  MGA Parties respectfully submit that the 1.3% figure is the most appropriate, but under no

11  circumstances should the amount be more than 24.7% of profits earned.  Moreover, any

12  escrow of profits should begin no earlier than April 27, 2009, when the December 3 Orders

13  became "final" and effective.[3]

## ARGUMENT

## I.   THE SCOPE OF THE COURT'S DECEMBER 3 ORDERS

16      Any approach to escrow of MGA's Bratz profits must be considered in the context of

17  two vitally important limitations:  (1) although, as the MGA Parties stipulated, all 2009

---

[3]     The MGA Parties have based this statement of position on the assumption that the December 3 Orders are intended to be consistent with the jury's verdict, despite the Court's decision to undertake its own substantial similarity analysis.  If Mattel proposes or the Court finds that the jury's determination of historical damages is irrelevant to Mattel's damages going forward under the December 3 Orders, the MGA Parties respectfully submit that an evidentiary hearing is required so that both Mattel and the MGA Parties can make the appropriate showings.  At the evidentiary hearing, as at trial, Mattel should be required to put forth evidence establishing a causal relationship between infringing conduct and the profits it claims, and the MGA Parties should be permitted to put forth evidence of the appropriate apportionment.  (See Phase B Jury Inst. As Given (Dkt 4267) at Inst. 42 ("You may make an award of defendants' profits only if you find the plaintiff showed a causal relationship between the infringement and the defendants' gross revenue. … In other words, Mattel must offer some evidence that the infringement at least partially caused the profits that the infringer generated as a result of the infringement. … The defendants have the burden of proving the portion of the profit, if any, attributable to factors other than infringing the copyrighted work.  Defendants are not required to prove with precision the percentage of its profits attributable to factors other than infringement, so long as the apportionment is reasonable and just.").)

1 products fall within the scope of the December 3 Orders to the extent they are labeled
2 "Bratz," only a very limited portion of the products themselves are enjoined, and none are
3 the exclusive property of Mattel, which dramatically limits the scope of Bratz-related items
4 as to which Mattel would have any conceivable claim for profits; and (2) as noted in this
5 Court's repeated admonitions, the December 3 Orders did not go into effect until April 27,
6 2009.

7               **A.**       **The December 3 Orders Granted Mattel Very Limited Rights To Bratz**

8          Under the December 3 Orders, the MGA Parties are only enjoined from producing a
9 subset of the products that constitute the universe of the Bratz brand.  More importantly,
10 those orders awarded Mattel intellectual property rights to an even smaller subset of Bratz
11 property.  Mattel was granted the copyrights to Carter Bryant's original works and MGA's
12 "Bratz" and "Jade" trademarks, however, Mattel was **not** granted the rights to produce the
13 products MGA is enjoined from producing.  (<u>Compare</u> Declaratory Judgment Order at 2-5
14 (awarding the Bratz drawings and preliminary sculpt purportedly created by Bryant in 1999-
15 2000); Constructive Trust Order at 2 (awarding trademarks, service marks, and domain
16 names containing the terms "Bratz" or "Jade"), <u>with</u> Injunction Order at 2-7 (enjoining
17 MGA use, providing for recall and impoundment).)  Mattel owns the rights to Bryant's
18 original concept drawings of four dolls.  (Declaratory Judgment Order at 2-5.)  Mattel may
19 design their own dolls based on those drawings and call them "Bratz."  (Constructive Trust
20 Order at 2.)

21          Critically, Mattel is <u>not</u> entitled to use those original protectible elements that the
22 MGA Parties added to Carter Bryant's drawings and the original sculpt.  Mattel's response
23 to the MGA Parties' defense of their protectible contribution – namely, that Mattel is free to
24 produce MGA's Bratz dolls because those dolls are substantially similar to the Bryant
25 works owned by Mattel – confuses the standards for substantial similarity and originality.
26 (<u>See</u> 5/18/09 Hearing Tr. 110:13-18 ("[MR. ZELLER:] And I simply don't get the argument
27 repeatedly made by MGA that Mattel cannot make the dolls that MGA has produced.
28 <u>Mattel has the right to make the dolls; anything that is substantially similar to those</u>

4

1  drawings; or the sculpt. And if that includes product that looks like the product that MGA

2  has introduced, Mattel's entitled to do that." (emphasis added)).) As Nimmer explains,

3      The standards for originality and for substantial similarity should not be confused.

4      While a mere "distinguishable variation" will constitute a sufficient quantum of

5      originality so as to support a copyright in such variation, that same

6      "distinguishable variation" in the work may not sufficiently alter its substantial

7      similarity to another so as to negate infringement.

8  4-13 Melville B. & David Nimmer, Nimmer on Copyright § 13.03 (2009); see also Dam

9  Things from Den. v. Russ Berrie & Co., 290 F.3d 548, 565 (3d Cir. 2002) ("The distinction

10 between the tests for infringement and for originality may be nuanced, but it does exist and

11 must be carefully considered by the court," citing Nimmer and Eden Toys); Eden Toys, Inc.

12 v. Florelee Undergarment Co., 697 F.2d 27, 34 (2d Cir. 1982) ("The difference between

13 these two tests is not merely academic. A work which makes non-trivial contributions to an

14 existing one may be copyrighted as a derivative work and yet, because it retains the 'same

15 aesthetic appeal' as the original work, render the holder liable for infringement of the

16 original copyright if the derivative work were to be published without permission from the

17 owner of the original copyright."). Contrary to Mattel's suggestion, the fact that the core

18 female fashion dolls have been found to be substantially similar to Bryant's works does not

19 mean that they belong to Mattel. The MGA Parties have a protectible interest in their own

20 contributions to the Bratz world.

21     The MGA Parties have put forth extensive evidence of the specific, identifiable, non-

22 trivial contributions that they made to the core female Bratz dolls, as well as evidence of

23 their independent development of the plethora of Bratz products not enjoined under the

24 Court's Permanent Injunction Order. (See, e.g., Tr. 6725:13-22 (Leahy) (describing specific

25 changes between the preliminary body sculpt and the later body sculpt); 6729:10-6730:2

26 (Leahy) (describing specific changes between preliminary body sculpt and later body

27 sculpts); 6934:5-6936:4 (Garcia) (pointing out differences in head proportion, ear placement,

28 length of torso, length and thickness of legs, and foot proportion); 6963:3-6969:7 (Garcia)

1  (describing changes in face paint); 7204:21-7216:20 (Djiguerian) (Bratz Boyz, Lil Brat,

2  Bratz Babyz, Bratz Big Babyz, Bratz Kidz, Bratz Big Kidz, Bratz Lil Angelz, Bratz Star

3  Singerz, Bratz Movie Star, Bratz Pixiez, Talking Bratz all distinct, original sculpts); 5763:4-

4  25 (Pembleton) (Bratz Babyz, Micro Bratz, Meygan, Bratz Babyz Sitter all designed by

5  MGA independently).)  Indeed, the Court clearly recognized the MGA Parties' independent

6  development of such products as the Bratz Pixiez, which the Court carved out from Mattel's

7  proposed order.  (See, e.g., Tr. 5756:14-20 (Pembleton) (Bratz Fashion Pixiez were a

8  "fairies" theme and were "a doll that MGA designed and developed and manufactured

9  itself"); Injunction Order ¶ 1(d) (excluding Pixiez (Exs. 5-551-555, 6-556-558, & 6-565).)

10     This is not an insignificant distinction that may simply be overlooked.  At trial,

11  MGA's expert, Paul Meyer, broke down the Bratz revenues and profits into different

12  product categories.  Agreeing with Mattel's expert Michael Wagner that total Bratz

13  revenues prior to trial were $3.1 billion, Meyer found that the first generation dolls

14  accounted for only 2.5% of that revenue, or $77.9 million, and later generation dolls

15  accounted for 37.9%, or $1.2 billion.  (Tr. 7709:7-7710:14, 7710:25-7711:24; TX 18923-

16  015; TX 18923-016.)  The remaining 59.6% of Bratz revenues derived from Bratz products

17  other than the core fashion dolls (such as play sets, clothing, and electronics, as well as

18  other product lines such as the Bratz Boyz and the Bratz Kidz), as to which MGA's

19  independent contributions cannot be ignored or taken away.  (Id.)  And that does not even

20  account for the MGA Parties' independent contributions to the dolls themselves.

21     The MGA Parties' contributions to the core female Bratz dolls, as well as the many

22  Bratz products that are not enjoined, remain MGA's own intellectual property, and Mattel

23  has no rights to the profits derived therefrom, nor to any future use of MGA's original work.

24  As a result, under no circumstances should Mattel be permitted to claim all Bratz profits,

25  nor should Mattel be permitted to produce MGA's Bratz products absent MGA's consent

26  and adequate compensation for MGA's contributions.

27     **B.     The December 3 Orders Did Not Become Effective Until April 27, 2009**

28     After the Court issued its December 3 Orders, the MGA Parties sought immediate

6

1   appeal of those injunctive orders as was their right under 28 U.S.C. § 1292(a)(1).  The

2   MGA Parties likewise sought a stay of those injunctive orders until their appeal could be

3   resolved.  In response, the Court stated that the entire exercise was "premature" because the

4   Court's December 3 Orders were not yet final or operative.  (See 12/30/08 Hearing Tr. 8:25-

5   11:2.)  Specifically, the Court noted that the Court's December 3 Orders, as well as the jury

6   verdicts themselves, were "subject to challenge not before the Ninth Circuit, but before this

7   Court in the post-trial motions, which not only have been scheduled for February 11th,

8   which the Court has already received.  …  And then and only then, in a normal case, do we

9   have an appeal to the Ninth Circuit if you believe that the Court still has it wrong."  (Id. at

10  9:19-10:11.)  This conclusion was reflected in the Court's January 7 Order, which stated

11  that the injunctions shall remain "stayed, **ineffective and non-final,** until further order of

12  the Court."  (1/7/09 Order at 1 (emphasis added).)  The Ninth Circuit in turn relied upon the

13  Court's analysis and dismissed the MGA Parties' appeal.  (Order from the 9th Cir. (Dkt

14  4687) at 2 ("On January 7, 2009, the district court's order modifying the stay found the

15  permanent injunction challenged in this appeal to be non-final.  Accordingly, this appeal is

16  dismissed for lack of jurisdiction.").)

17      At the February 11, 2009 hearing, the Court again noted that the December 3rd

18  Orders would not become effective until the Court resolved the issues then before it.

19      THE COURT:  For example, if the Court were to lift the stay imposed on

20      December 3rd and basically remodify its permanent injunction so as to permit the

21      injunction to proceed, striking from the injunction, of course, anything which

22      would interfere with the 2009 season of sales, holding, I would suppose, those

23      sales or the infringing portion of those sales or those sales attributed to infringing

24      portions, in trust for Mattel or require an accounting to Mattel; that is something

25      which could, once these motions have been resolved, go into [e]ffect and be final

26      for purposes of appeal so that MGA can then appeal those to the Ninth Circuit

27      and, in the interim, have [e]ffect.

28  (2/11/09 Hearing Tr. 86: 3-14 (emphasis added).)

1    As a result, it was only upon issuance of the Court's April 27, 2009 Order on the

2  Phase I post-trial motions that the MGA Parties were able to pursue a stay pending appeal

3  before this Court and the Ninth Circuit, and it was only then that the MGA Parties could

4  begin their appeal.  To use the Court's terms, it was only then that the December 3 Orders

5  became final and effective.  <u>Equity and due process therefore demand that, just as the MGA</u>

6  <u>Parties were precluded from challenging the December 3 Orders until April 27, Mattel was</u>

7  <u>precluded from enforcing them during that period.</u>  To hold otherwise would mean that

8  these orders were, in fact, in "effect" when the MGA Parties initially appealed, and they

9  should have properly been permitted to proceed.  As they were not permitted to proceed

10  with their appeal or seek a stay, the MGA Parties should likewise not be required to account

11  for or hold in escrow any profits earned prior to April 27, 2009.

12  **II.    MATTEL IS ONLY ENTITLED TO ESCROW OF A SMALL PORTION OF MGA'S BRATZ PROFITS**

13

14        **A.    Mattel's Rights To Profits Under The Permanent Injunction Should Be Limited By The Jury's Copyright Verdict**

15        There is no basis for awarding Mattel post-trial damages (for a period of only a few

16  months) in a greater amount than those the jury awarded for pre-trial infringement (a period

17  that spanned seven years).  The jury was instructed to award Mattel "any profits of the

18  defendants attributable to the infringement."  (Phase B Jury Instructions As Given at Inst.

19  41.)  They were directed to determine the amount of profits directly or indirectly "generated

20  as a result of the infringement" and were instructed that "[u]nless you find that a portion of

21  the profit from the sale of a product containing or using the copyrighted work is attributable

22  to factors other than the use of the copyrighted work, all of the profit is to be attributed to

23  the infringement."  (<u>Id.</u> at Inst. 42.)  They were further told that "[i]f the copyrighted

24  portions are so intermingled with the rest of the infringing work that they cannot well be

25  distinguished from it, the entire profits realized by the defendants are to be given to the

26  plaintiff."  (<u>Id.</u>)

27        Following these instructions, the jury determined what portion of the MGA Parties'

28  profits was derived from infringement on Mattel's copyrights, and awarded $10 million on

8

1 Mattel's copyright claims for infringement from 2001 through 2008. (Phase 1B Verdict

2 Form (Dkt 4279), Nos. 5, 7, 9, 11.) This number should therefore form the basis for

3 determining what percentage of MGA's profits may be escrowed under the Permanent

4 Injunction. The MGA Parties submit that the copyright damages are the appropriate

5 baseline, because it is Mattel's copyrights – not its other tort claims – that form the basis of

6 its claim to ongoing rights against MGA's profits under the Permanent Injunction Order.

7 (12/3 Omnibus Order at 8-14.) As discussed below, Mattel's rights to the Bratz and Jade

8 trademarks should not form the basis for any rights to profits. (See Section II.C, infra.)

9       At trial, Mattel and the MGA Parties presented different figures for MGA's total

10 Bratz profits. Mattel's expert, Michael Wagner, argued that MGA's Bratz profits were

11 $777.9 million. (Tr. 6286:15-6287:21.) MGA's expert, Mr. Meyer, calculated MGA's

12 Bratz profits to be $405 million. (Tr. 7692:11-15, 7693:19-25.) While the MGA Parties

13 believe their figure is more accurate, there is logic in binding Mattel to its own accounting.

14 Using Mattel's figure, the jury's award of $10 million constitutes 1.3% of profits, thus,

15 1.3% of MGA's profits should be escrowed for Mattel. Using MGA's figure, the jury's

16 award constitutes 2.5% of profits, and thus 2.5% of MGA's profits should be escrowed.

17       The MGA Parties therefore respectfully submit that between 1.3 and 2.5% of MGA's

18 profits earned since April 27, 2009 should be held in escrow for Mattel pursuant to the

19 Permanent Injunction Order.

20      **B.**    **Alternatively, The Apportionment Calculations Presented At Trial May**
          **Serve As An Absolute Maximum**

21

22       Although the jury's verdict is by far the best measure of the appropriate

23 compensation for the MGA Parties' use of the Bryant works, as the MGA Parties indicated

24 in their May 8, 2009 Motion for Stay Pending Appeal, the apportionment analysis presented

25 at trial may also serve as a useful metric – albeit one that was clearly rejected by the jury as

26 overreaching. However, as the MGA Parties argued at trial, it is Mr. Meyer's

27 apportionment analysis, not Mr. Wagner's, that should be applied. As Mr. Meyer explained,

28 Mr. Wagner's approach compared metrics from the Bratz product line to metrics from the

entire product lines of Hasbro, Jakks Pacific, and Mattel – three highly diversified companies that produce a wide array of children's products beyond fashion dolls. (Tr. 7739:21-7740:16.)  This approach was not merely a comparison of apples to oranges, it was comparing apples to an entire gift basket of mixed fruits.  Mr. Meyer's apples-to-apples approach, on the other hand, compared the Bratz product line metrics to those for Barbie or Mattel's girls' brands, which includes Barbie, My Scene, Diva Starz, Flavas and non-fashion doll related products. (Tr. 7740:17-7743:11.)  Mr. Meyer's calculations yielded an apportionment percentage ranging from 5.2% to 11.9% of Bratz profits. (Tr. 7742:1-4, 7743:7-11, TX 13861-011.)  Using Mr. Meyer's numbers, the MGA Parties submit that, as alternative to the percentages defined by the jury verdict, an escrow of 5.2-11.9% of Bratz profits would be the maximum defensible amount.

**C.**    **Mattel Is Not Entitled To Escrow Any Additional Profits Based On The Bratz And Jade Trademarks**

Because Mattel did not pursue any damages for trademark infringement, and because the value of Bratz as a brand is based on MGA's own brand-building efforts (including the ability to sell the entire line of products comprising the Bratz "brand"), not MGA's use of the name "Bratz," Mattel should not now be permitted to claim any additional portion of MGA's profits based on the Bratz and Jade trademarks.

As the Court is aware, Mattel never sought damages for trademark infringement, and there is no reason to award Mattel such damages now for MGA's ongoing use of the Bratz or Jade trademarks.  Mattel's counterclaims against the MGA Parties make no mention of any claim for trademark infringement, even in their most recent iteration. (See Mattel's 3rd Am. Ans. & Counterclaims, filed May 22, 2009.)[4]  In Mattel's request for a constructive

---

[4]    They certainly did not include any such claim at the time of the Phase 1 trial.  The morning of the opening statements in Phase 1A, the MGA Parties confirmed that Mattel was not pursuing a claim for trademark infringement. (Tr. 39:22-40:3 ("[MR. NOLAN:]  I think that at the last hearing and a few hearings back, what they were saying is they are not dealing with the trademark of BRATZ; they are dealing with the idea of BRATZ, the name itself, just to be clear, again, for the record.  THE COURT: Yes.  And I understand the distinction.  It's not a trademark claim because it was never put into use by Mattel during the time period.").)  As Mattel's counsel's stated: "[MR. ZELLER:]  [W]e have not said that the name BRATZ is, quote, proprietary, end quote, to

*(cont'd)*

MGA Parties' Statement Of Position Regarding Appropriate Escrow Of Bratz Profits
Case No. CV 04-9049 SGL (RNBx)

1  trust and injunction, it made no request for profits from the trademarks, nor did Mattel

2  request the sweeping recall or impoundment of products bearing the enjoined trademarks

3  that it did based on its copyright claims.  (See Mattel's Mot. for Const. Trust & Injunctive

4  Relief (Dkt 4305); Mattel's Proposed Order Granting Mot. for Const. Trust & Injunctive

5  Relief (Dkt 4305-6).)  Indeed, Mattel did not even seek its injunction pursuant to trademark

6  law, but rather pursuant to its unfair competition claim.  (Id.)  As a result, there is no basis

7  for awarding trademark infringement damages to Mattel going forward, and thus Mattel is

8  entitled to no additional profits beyond those attributable to its copyrights.

9
10

**D.** **As An Absolute Maximum, The Jury's Total Damages Award Should Be Used To Calculate The Profits Attributable To All Of MGA's Purported Wrongdoing**

11  For the reasons discussed above, the MGA Parties firmly believe that Mattel is not

12  entitled to any escrow of profits beyond those purportedly attributable to copyright

13  infringement.  However, should the Court find it appropriate to escrow profits from MGA's

14  use of "Bratz" and "Jade," the MGA Parties respectfully submit that the appropriate escrow

15  amount is again determined by the jury's damages award.  The jury awarded $100 million

16  for all of the MGA Parties' misdeeds – which, Mattel argued, included misappropriation of

17  the Bratz and Jade names.  That Mattel believes this issue was addressed in the jury's

18  verdict is beyond dispute.  Mattel's motion requesting a constructive trust opens as follows:

19  As the jury found, Bryant was a Mattel employee when he conceived of the

20  "Bratz" name for the doll designs, concepts and characters that he also created

21  while a Mattel employee.  The jury further found that Bryant conceived the

22  original Bratz character "Jade" – which is also an individual doll name disclosed

23  to and used by MGA – and three other characters while he was a Mattel employee.

24  Bryant not only had assigned the rights to the "Bratz" and "Jade" names (and

25  other Bratz-related property) to Mattel under his Inventions Agreement, but those

26  names constituted part of Mattel's proprietary, confidential information that this

27
_____

28  Mattel.  That is not the basis of our theory."  (5/23/08 Tr. 79:20-22.)

11

1    Court has ruled Bryant had a fiduciary duty to protect.  In violation of his duties

2    to Mattel, Bryant disclosed and purported to transfer the names and other Bratz-

3    related properties to MGA.  As the jury found, MGA and Isaac Larian knowingly

4    aided and abetted Bryant in his breach of duties to Mattel.  …  Furthermore, the

5    jury's verdict entitles Mattel to a finding of liability on its claim for violation of §

6    17200 of the California Business and Professions Code. California's Unfair

7    Competition Law expressly authorizes the Court to enjoin MGA's continued

8    exploitation of the confidential information it took from Mattel.  Pursuant to that

9    authority, the Court should enjoin MGA from any continued use of the "Bratz"

10   and "Jade" names.

11 (Mattel's Mot. for Const. Trust & Injunctive Relief at 1-2 (emphasis added).)

12       The jury was instructed that "if you find that MGA and/or Isaac Larian obtained

13 profits or advantages because of these specific wrongful acts [aiding and abetting breach of

14 fiduciary duty and duty of loyalty], those profits and advantages should be awarded to

15 Mattel."  (Phase B Jury Instructions As Given at Inst. 39.)  The jury was likewise instructed

16 that "disgorgement of profits earned by MGA and Isaac Larian as a result of their wrongful

17 conduct" was an appropriate measure of damages for the intentional interference with

18 contract claim as well as the aiding and abetting claims.  (Id. at Inst. 37, 38.)  Mattel argued

19 to the jury that it should consider the value added by the Bratz name in determining Mattel's

20 damages.  (See, e.g., Tr. 8161:18-24 (Plaintiff's Closing) ("In fact, one of the things that

21 MGA wants credit for here, the packaging, is itself infringing.  The packaging itself is

22 infringing.  It's primarily designed, in the first place, just to show the dolls; it's basically

23 clear and it shows off the dolls, which are infringing.  Then it's got the name all over it,

24 which was brought over by Mr. Bryant from Mattel.").)  Whatever ongoing benefits are

25 attributable to the MGA Parties' use of the names "Bratz" and "Jade" (as opposed to some

26 other names) were therefore included in the jury's award, as is every benefit attributable to

27 the MGA Parties' purported wrongs.

28       Using Mattel's and MGA's respective calculations of Bratz profits and the jury's

12

1  verdict of $100 million, the percentage of Bratz profits attributable to all of Mattel's

2  property interests is either 12.9% ($100 million divided by $777.9 million) or 24.7% ($100

3  million divided by $405.4 million).   No escrow amount beyond this maximum is

4  appropriate under any circumstances.  According to the jury's verdict, this is indisputably

5  the totality of MGA's liability to Mattel.

6                                    **CONCLUSION**

7        As described above, the MGA Parties respectfully submit that the appropriate sum to

8  place in escrow is between 1.3% and 24.7% of Bratz profits earned after April 27, 2009.

9

10  DATED:  May 27, 2009              SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

11                                   By:  _____/s/ Thomas J. Nolan_____

12                                          Thomas J. Nolan
                                            Attorneys for the MGA Parties

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA Parties' Statement Of Position Regarding Appropriate Escrow Of Bratz Profits
Case No. CV 04-9049 SGL (RNBx)