1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3                          EASTERN DIVISION

4                             - - -

5          HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

6                             - - -

7    MATTEL, INC.,                    )
                                      )
8                    Plaintiff,       )
                                      )
9             vs.                     )  No. CV 04-09049
                                      )
10   MGA ENTERTAINMENT, inc., et. Al., )
                                      )
11                   Defendants.      )
     _____)  MOTION HEARING
12   AND CONSOLIDATED ACTIONS,        )
     _____)

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                     Riverside, California

17                   Monday, November 10, 2008

18                         1:05 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                    951-274-0844
                WWW.THERESALANZA.COM

```
 1   APPEARANCES:

 2
     On behalf of Mattel, Inc.:
 3
                         QUINN EMANUEL
 4                       By:  JOHN QUINN
                              MICHAEL T. ZELLER
 5                       865 S. FIGUEROA STREET,
                         10TH FLOOR
 6                       LOS ANGELES, California  90017
                         213-624-7707
 7

 8

 9   On behalf of MGA Entertainment:

10                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:  THOMAS J. NOLAN
11                            JASON RUSSELL
                              LAUREN AGUIAR
12                            RAOUL KENNEDY
                         300 SOUTH GRAND AVENUE
13                       LOS ANGELES, CALIFORNIA  90071-3144
                         213-687-5000
14

15

16

17

18

19

20

21

22

23

24

25
```

Monday, November 10, 2008                    CV 04-09049

1                          I N D E X

2                                                    Page

3    MOTION HEARING...............................    4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Monday, November 10, 2008                    CV 04-09049

```
 1      RIVERSIDE, CALIFORNIA; MONDAY, NOVEMBER 10, 2008; 1:05 P.M.

 2                              -oOo-

 3           THE CLERK:  Calling calendar item number 13,

 4    Mattel, Inc., versus MGA Entertainment, Inc., Case Number

 5    ED CV 04-9049-SGL.                                            01:05

 6           Counsel, please state your appearances for the

 7    record.

 8           MR. QUINN:  John Quinn, Mike Zeller, Dylan Proctor

 9    for Mattel.

10           MR. NOLAN:  Tom Nolan, Raoul Kennedy, Lauren Aguiar,   01:05

11    and Jason Russell on behalf of MGA and Isaac Larian.

12           THE COURT:  Good afternoon to you all.

13           We're on calendar this afternoon for a variety of

14    motions that have been filed, which the Court has received and

15    reviewed.  The Court is going to go through these in the       01:05

16    following order:  I'd like to begin with the affirmative

17    defenses motion, then go to the declaratory relief motion, the

18    constructive trust motion, and then the permanent injunction

19    motion.

20           So I'd like to start with those four motions; and     01:06

21    then, of course, there's some other issues that need to be

22    taken up as well as we go through this.  There's motions to

23    strike that the Court has received and reviewed.  There's

24    auxiliary motions, for lack of a better phrase, which we'll

25    take care of as we go through this.                          01:06
```

1          The Court has certainly reached certain tentative

2     thoughts in reviewing the motions, although nothing is final;

3     and what I plan on doing over the course of the next week is

4     hopefully issuing an omnibus order which will basically provide

5     a road map in terms of how the Court's findings are going to          01:06

6     take place; and then by reference, perhaps, include certain

7     other orders as well.  But a lot of that will depend on how

8     events play out this afternoon.

9          Let's begin with the motion regarding the affirmative

10    defenses.                                                             01:07

11         **MR. NOLAN:**  Your Honor, as has been the practice in

12    the past, we divided responsibilities for specific motions.  If

13    you don't mind, we're not going to be jumping up and down; but

14    Mr. Russell will be addressing the first two matters, I'll be

15    addressing the constructive trust matter, and Mr. Kennedy will       01:07

16    be arguing the preliminary injunction, as well as myself on

17    certain portions.

18         **THE COURT:**  Very well.  Since we're not before a

19    jury, I'm not really concerned about that; however you want to

20    handle that.                                                          01:07

21         On the affirmative defenses motion, I'll invite the

22    defense to proceed first.

23         **MR. RUSSELL:**  Thank you, your Honor.

24         As I believe we've laid out in our papers, there are

25    three defenses that we're talking about today.                       01:07

1          **THE COURT:**  Laches, waiver, and estoppel.

2          **MR. RUSSELL:**  Correct.  And we're really only talking

3     about those claims as they effect the claims that are pending

4     today.  That's the declaratory relief, copyright, and unfair

5     competition claims.  And I think the key point to be made --                01:08

6     I'd like to start off with laches -- is simply that we are now

7     in a different place than we were with respect to statute of

8     limitations.  This is a defense that applies without respect to

9     the relation-back tolling doctrines that obviously were so

10    critical to the statute of limitations analysis.                            01:08

11          And so, perhaps just to start with, the easiest

12    claim, if you look at the claim for constructive trust that is

13    before the Court, that has a two-year limitations period,

14    because it's based off of the state law aiding and abetting

15    claims.  If you take as a given, as I think we should, that the             01:08

16    Court has found notice as early as July of 2003, from The Wall

17    Street Journal article -- but I'll take an even later date, the

18    date that Carter Bryant was deposed in November of 2004.  The

19    claims here weren't filed until November of 2006, more than two

20    years later.  There is no tolling by virtue of the fact that               01:08

21    the action was filed against Carter Bryant or by virtue of the

22    fact that MGA intervened, and accordingly, under Jarrow

23    Formulas, the constructive trust form of relief is

24    presumptively barred.  So it would be up to Mattel to show some

25    sort of justifiable reason why it delayed in seeking the relief            01:09

 1   that it does.  And I don't think that there's any way that it

 2   can, for many of the reasons that we showed in our papers, not

 3   the least of which is that they have repeatedly eschewed much

 4   of the relief that they seek now.

 5          In fact, as we lay out in our constructive trust                01:09

 6   brief, they told this Court and told MGA to their detriment

 7   that they were not seeking ownership over trademarks and the

 8   like, weren't seeking rights, proprietary rights, over the name

 9   "Bratz."  And so I don't think there can be much question but

10   that there was a conscious delay, mindful of the effect that it        01:09

11   would have on MGA.  And I think equally obvious -- -

12          **THE COURT:**  Not seeking a trademark is not the same

13   as not seeking a constructive trust over the name or the

14   benefits derived from the name.

15          **MR. RUSSELL:**  I think the difficulty is that there is       01:09

16   no right separate and apart, in our view, from the trademark.

17   You can't protect a copyright -- there's no copyright in a

18   name.  And so the only protection that one can have -- what

19   right that one can have over the name "Bratz" is if there's a

20   trademark.  And as we cite, and I believe that Your Honor's           01:10

21   decision in Conversive makes clear, the value in a trademark is

22   by virtue of use.  It doesn't matter who invented it.  It

23   doesn't matter -- anything else.  It's simply, who puts the

24   value into it here?

25          The evidence, I think, would be undisputed that if             01:10

1    there was any value in Bratz, and certainly there is, that was

2    all created by MGA at the time that Mr. Bryant came up with the

3    name "Bratz" -- and there's a parenthetical there -- but at the

4    time he came up with the name "Bratz," it had no value to

5    anyone.  Indeed, the only person who might argue it had value          01:10

6    was Lovins, for whom MGA purchased rights to utilize the

7    trademark name.

8        **THE COURT:**  We can take this up, of course, when we

9    get into the constructive trust motion itself.  That kind of

10   begs the question of whether or not, assuming, as the Court          01:10

11   does, frankly, at this point, that Bryant did come up with the

12   name "Bratz" while he was at Mattel, and that Mattel,

13   therefore, owns that name.

14       And I'm also accepting the fact that the value to

15   Bratz was certainly developed while MGA used and marketed            01:11

16   Bratz.  That fits somewhat well into this constructive trust

17   theory, that the benefit that was developed is held in trust

18   for Mattel.

19       **MR. RUSSELL:**  The problem we have with that is that

20   there was no value at the time.  It would be one thing --            01:11

21       **THE COURT:**  Why is that a prerequisite?

22       **MR. RUSSELL:**  Because to the extent that there were

23   damages associated with the taking of any trade secrets and the

24   like, any value in trade secrets, that was covered by the

25   damages award by the jury.  That's already been dealt with.  So     01:11

1  now we're talking about the right to use the name "Bratz," and

2  more importantly, to exclude others from using the name

3  "Bratz."

4         THE COURT:  Exactly.

5         MR. RUSSELL:  Here, at the time that the name was

6  developed -- and, again, we can quarrel.  Even though the jury

7  found Mr. Bryant came up with the name "Bratz" while at Mattel,

8  the evidence in the record is undisputed that that name "Bratz"

9  was already in the public domain, because Lovins was using it

10 many, many years before Mr. Bryant ever even went to Mattel.

11        THE COURT:  In a different context, though; correct?

12        MR. RUSSELL:  He was using it for children's

13 clothing.

14        THE COURT:  As opposed to dolls, right.

15        MR. RUSSELL:  Now, there's additional evidence that

16 we could put forth for your Honor that internationally, the

17 name was also used and MGA purchased it for international

18 purposes from preexisting rights holders.

19        But for purposes of the analysis of the constructive

20 trust, the key fact is -- and you have to look at the cases

21 that talk about this -- because there was no value and because

22 the only way that you can have value in a name is by transfer

23 of the trademark, you have to look at the use.  And since it's

24 true that based on the jury's findings, Mattel could have, at

25 that time, put into use the name "Bratz," the evidence actually

01:12
01:12
01:12
01:12
01:13

1  shows that they considered it and decided affirmatively not to

2  use it, for whatever reason.

3          THE COURT:  And I understand how that's detrimental

4  from a trademark perspective, not necessarily from a

5  constructive trust perspective.                          01:13

6          MR. RUSSELL:  If what you're saying is, they have the

7  right to name "Bratz," that doesn't answer any questions, I

8  think, as far as all of the parties are concerned.  Having the

9  name "Bratz" without any rights to exploit it, or to prevent

10 MGA from exploiting it, doesn't answer any questions.      01:13

11         And that's why Mattel, in its papers, is asking for a

12 constructive trust, not of just the name "Bratz," but more

13 importantly, of the trademarks to the name "Bratz."

14         THE COURT:  Let me get you back to your argument on

15 the affirmative defenses, though, vis-à-vis the constructive   01:13

16 trust.  You got a little off course, but this is important, and

17 I'm sure we'll revisit it.

18         MR. RUSSELL:  Because that is the starting point,

19 your Honor.  The constructive trust is, I believe, most

20 susceptible to the laches argument.  So I've laid out for you   01:14

21 the delay.  And we are presumptively in the land where there is

22 inexcusable delay, because we are more than the limitations

23 period for the constructive trust claim.

24         I would say you are many years more, but taking the

25 most pessimistic view, the date that Carter Bryant was deposed,   01:14

```
 1    the date that even Mattel in its own papers argues it had
 2    perfect knowledge of all of its claims, that was on November 4,
 3    2004.  They didn't file claims with respect to the name, ever.
 4    In fact, I would argue they still have yet to file those
 5    claims.  But they never even made an argument for your Honor to      01:14
 6    impose a constructive trust until this fall.  So almost six
 7    years, almost twice the limitations period, almost three times
 8    the limitations period.
 9            So then the only question left is, was there any
10    prejudice to MGA?                                                    01:14
11            And, again, we can show both forms of prejudice.  The
12    first evidentiary prejudice -- your Honor sat through the
13    trial.  I hardly need to remind you, and I think it's a point
14    that can't be disputed, that much of a passage of time affected
15    witnesses's recollections.  Many witnesses -- in fact,             01:15
16    virtually every witness had difficulty recalling something that
17    happened that long ago.
18            We also have an additional form of evidentiary
19    prejudice; and that is that Mattel, for reasons that the Court
20    has already found were not intentional -- but Mattel failed to     01:15
21    preserve e-mails that would have been relevant, in our view,
22    dispositive of some of these points.  Those were not preserved.
23    And had their claims been filed earlier, it is likely that MGA
24    would have had access to those e-mails; so that's an additional
25    form of evidentiary prejudice.                                     01:15
```

1        We can also show the economic prejudice, because the

2   facts are, again, undisputed, in reliance on the fact that

3   Mattel, at every step, refused to take any steps, not only to

4   enforce whatever rights it might have as to "Bratz," but even

5   to assert that it had rights to the name "Bratz."  In reliance     01:16

6   on that, MGA has poured tens, and even hundreds of millions of

7   dollars into building the name "Bratz" into an extremely

8   valuable trademark and brand, one that is known worldwide.  And

9   at this point -- and we cite many cases that say this,

10  your Honor -- having built up that value and having had Mattel    01:16

11  sit on its right and effectively speculate on the value would

12  be inequitable.  This is the perfect case to apply a laches.

13  It couldn't be more hand-in-glove than that.

14        Now, turning to the copyright claim, as your Honor

15  would recall, based on Your Honor's rulings, Mattel's copyright    01:16

16  claims were timely by three days.

17        Now, it is true that under Jarrow Formulas, that

18  would give them a presumption that laches shouldn't apply.  I

19  would argue, your Honor, that unlike the statute of limitations

20  analysis for copyright infringement, the analysis for laches is    01:17

21  slightly different.  They should be on a slightly -- there's a

22  slightly more relaxed standard for MGA to establish the

23  beginning of the notice period.  And I would argue, your Honor,

24  that based on the July 2003 article, which said that Mr. Bryant

25  was showing works in 1999 to MGA, that should have placed          01:17

1  Mattel on notice of potential infringement of ideas that they

2  would own.  And they didn't do so.

3          But even if I'm stuck with the later date, the one

4  that misses by three days, in light of the fact that there can

5  be no dispute that Mattel was on notice and chose to sit back          01:17

6  for almost a full three years while MGA poured an undisputed

7  hundreds and hundreds of millions of dollars into developing

8  the Bratz line, the Bratz dolls, again it would be inequitable

9  for them to prevail on their copyright claim.

10          And that same analysis would apply with respect to          01:18

11  the declaratory relief claim, because it is essentially a

12  mirror image of their copyright claim.  I would argue, there is

13  no distinction, and that's one of the reasons we argue that

14  it's preempted.

15          **THE COURT:**  Very well, Counsel.          01:18

16          Anything further on waiver?

17          **MR. RUSSELL:**  Your Honor, I think on the waiver

18  points, we fairly well set it forth -- I don't know that I can

19  add much to our papers.

20          **THE COURT:**  Fair enough.

21          And estoppel?

22          **MR. RUSSELL:**  Your Honor, again, estoppel is

23  essentially just the mirror image of our laches argument.  I

24  think the only difference is that you take a little bit more

25  look at the conduct of Mattel than you would with laches.          01:18

1    Laches just looks at delay.  Estoppel looks somewhat to the

2    reasoning behind the actions of Mattel.  But I think, again, we

3    would meet the standards for estoppel quite easily.

4            **THE COURT:**  Very well.

5            Let me hear from Mattel on the affirmative defenses.    01:18

6            Mr. Zeller?

7            **MR. ZELLER:**  Good afternoon, your Honor.

8            Obviously, if there are any particular questions -- I

9    think we have addressed a lot of these arguments in our briefs.

10           I would, I think, remind the Court on a couple of        01:19

11   points that MGA has just now raised, which is -- I mean, we,

12   frankly, have a whole series of conflicting statements about

13   how long we supposedly delayed.

14           At one point, I think we were even accused of waiting

15   six years, which is just inconceivable based on this record.     01:19

16   In fact, it is precluded by the jury verdict, which says that

17   there was fraudulent concealment at least up to 2002.  And

18   that's even setting aside the rulings that the Court has

19   already made about when it was that we were, in fact, on

20   notice, and when, really, that laches clock would have started.  01:19

21           I don't think there's any dispute at this point that

22   what we're talking about is a situation that we were within the

23   limitations period, even setting aside relation-back; and that,

24   therefore, we're into this standard formulation that we are

25   presumed to be timely.                                           01:20

```
 1        THE COURT:  Fair enough.

 2        The one point that Mr. Russell emphasizes is with

 3   respect to the constructive relief that you're seeking, and

 4   when, if ever, that constructive relief was expressly sought.

 5        MR. ZELLER:  Yes, your Honor.  That was actually one      01:20

 6   point I did want to address.

 7        The Court will recall that during the course of

 8   trial, this was actually raised with respect to the name.  And

 9   what the Court ruled was -- specifically, it says, quote, "With

10   respect to the "Bratz" name, the Court is inclined to overrule    01:20

11   MGA's objection as to the Court finds no surprise or prejudice

12   to MGA.  The naming of "Bratz" is properly within the scope of

13   Mattel's breach of contract claims and was fully explored in

14   discovery," end quote.

15        And, in particular, the constructive trust remedy was       01:20

16   sought from the very beginning.  That was actually in the

17   Bryant complaint, where we asked that our property be returned

18   to us.  And we asked for all manner of equitable relief for

19   anything that was created.

20        THE COURT:  You talk about property being returned.         01:21

21   It would appear -- the way that MGA has taken that is, you're

22   seeking the return of physical property, not the name.  The

23   name is somewhat different.  And the argument, as I understand

24   it, is that nowhere do you specifically come out and say that

25   you're seeking, on some theory, the name itself, "Bratz."        01:21
```

1        **MR. ZELLER:**  That I don't think is correct.  In fact,

2   I think what we also refer to -- and I will find the exact

3   language that we had; I believe we cited it in our papers -- I

4   believe we actually directed the Court to particular provisions

5   of our prayer, where we asked for things like benefits.  I                  01:21

6   mean, it was very broad.

7        **THE COURT:**  It was very broad.  The argument is that

8   it wasn't very specific.

9        **MR. ZELLER:**  Sure.

10       I would, first of all, respectfully, your Honor,                       01:21

11   suggest that certainly if one is looking to the complaint as to

12   whether or not it encompasses relief -- I mean, breadth is an

13   advantage to us, not something that they can claim, Well, we

14   were surprised.  I mean, we were seeking everything that we

15   were legally entitled to.                                                  01:22

16       But second, your Honor, the Court will recall, of

17   course, the general rule that the pretrial conference order is

18   a pleading that supersedes the operative pleadings.  And

19   there's no question that the Court has already ruled that we

20   properly raised that in connection with the pretrial order; so            01:22

21   I think there's no question that it's in play, and there's no

22   question that we have been asking for the return of all of the

23   benefits.

24       And I understand the Court's point about property and

25   that sort of distinction, but the fact is that the use that                01:22

1   they were allowed to make of the name that indisputably, per

2   the jury's verdict, belongs to Mattel was a benefit to MGA and

3   that that use (unintelligible) to our benefit under the

4   constructive trust theory.

5          So I think that it is something that's been fairly at      01:22

6   issue in the case.  And the kinds of statements that MGA has

7   pointed to in its briefs, and what it's saying here today about

8   Mattel supposedly waiving ownership of trademark and everything

9   else, that's just not what we said.  We were very clear that we

10  were saying -- and, certainly, the Court will recall, we were    01:23

11  talking about, Is an infringement claim being made?  That, we

12  have not been making here.  That is not part of this case.

13         But, certainly, we have said, over and over and over

14  in this case, anything that Carter Bryant created while he was

15  employed by Mattel, ideas, concepts, names, designs, and so on,  01:23

16  belonged to Mattel.

17         And the Court will recall that was even an issue on

18  summary judgment, when MGA tried to argue that under the

19  inventions agreement, it was only very narrowly-defined types

20  of inventions.  And the Court, of course, rejected that on       01:23

21  summary judgment.

22         **THE COURT:**  Thank you, Counsel.

23         **MR. ZELLER:**  If I may just make one additional point,

24  your Honor, which is, this whole -- it's really -- I think,

25  really, all they have -- or the only argument they make would    01:24

```
 1   be on prejudice.  And I don't think that there's, first of all,
 2   any evidence connecting the expenditures that they made to any
 3   kind of reliance.
 4        If the Court looks at their brief, there is no
 5   citation whatsoever to evidence of that.  And they didn't                01:24
 6   submit any here, either.  They didn't say Mattel's inaction is
 7   what actually drove these expenditures and why they were doing
 8   it.
 9        THE COURT:  Their argument is, obviously, if Mattel
10   had asserted these rights, that would have caused them to                01:24
11   pause, perhaps to stop and pursue, in their pursuit of this
12   development.
13        MR. ZELLER:  Well, I would say, first of all, it's
14   their obligation to prove it, which they have not done.
15   There's absolutely no evidence in the record saying what it is          01:24
16   that they would have done.
17        And, number two, the only evidence that does exist
18   shows the opposite.  The Court will recall that when MGA
19   intervened in this case in December of 2004, they explicitly
20   said it was because they were going to defend their rights to           01:25
21   Bratz, that the rights to Bratz were at stake.
22        What did they do the following year?  They actually
23   increased their expenditures to Bratz.  So even if one looks at
24   what it is that MGA did -- just even looking solely at the
25   expenditures that they made, it shows that there's no causal            01:25
```

```
 1    connection between the times that they were fully aware, even

 2    indisputably aware, that Mattel was asserting this.  You'll see

 3    that there's no correlation even between what they're claiming

 4    they knew, when they knew it, and when they first understood

 5    it, and their expenditures.  And I would submit, particularly      01:25

 6    in the absence of any evidence from MGA, which clearly is

 7    within their control, that that kind of argument just simply

 8    fails.

 9              THE COURT:  Mr. Russell?

10              MR. RUSSELL:  Thank you, your Honor.                     01:25

11              Let me try to take the points Mr. Zeller raised, in

12    their order.

13              First, with respect to the vacillating time period,

14    or whatever it is that he was talking about, I think our briefs

15    are fairly clear.  The difference we're talking about is          01:26

16    starting in July of 2003 to as late as November of 2003; so

17    that's the time period we're talking about.  We do lay out

18    history leading up to that, which is relevant to statute of

19    limitations, because we think that puts context -- since this

20    is, in effect, an equitable trial on those defenses, it puts      01:26

21    into context the knowledge that Mattel had.  It isn't as if

22    they woke up on July --

23              THE COURT:  I think Mr. Zeller's point was that

24    what's changed is, how long did they wait from that time

25    period, say, November of 2003 until --                            01:26
```

```
 1          MR. RUSSELL:  Again, your Honor, I would argue it's
 2    July of 2003, because I didn't hear Mr. Zeller take issue with
 3    me, and I think that's because he can't with respect to the
 4    fact that notice for laches is more liberal for MGA.  And so I
 5    would argue, when you put the context of the knowledge that      01:26
 6    Mattel had -- that is to say, they had to be on notice of
 7    potential possible actions by MGA affecting their intellectual
 8    property -- we've got that.  They knew in March of 2002.  They
 9    were investigating Mr. Larian and MGA for allegedly pilfering
10    employees and taking Mattel designs; so they certainly          01:27
11    suspected well before The Wall Street Journal article that
12    that's what was going on.
13          THE COURT:  Right.  And I do have this jury finding,
14    though, with respect to fraudulent concealment.
15          MR. RUSSELL:  And let me address that, because that's     01:27
16    easily swept aside.  That would matter if we were arguing that
17    they were on notice in 2002.  I didn't argue that to
18    your Honor, and our papers don't argue that.
19          The jury's finding of fraudulent concealment ended
20    April of 2002.  Now, I don't know why they chose that date, but 01:27
21    they chose that date; but I get to take the benefit of the
22    knowledge that Mattel had from that point forward.  And when
23    you get to July of 2003, given their investigation --
24          THE COURT:  Forward to what point?  Address
25    Mr. Zeller's argument that at least in their initial complaint  01:27
```

1    that it is -- the relief sought is broad enough to certainly

2    encompass the notion of constructive trust.

3              **MR. RUSSELL:**  I think I'll just take Mr. Zeller at

4    his word.  On May 23rd of this year, Mr. Zeller said, We have

5    not -- this is with respect to this exact argument.  We were          01:28

6    asking, Are you trying to argue for the rights to exclude with

7    respect to the name "Bratz"?  And Mr. Zeller said, and I quote,

8    "We have not said that the name "Bratz" is, quote,

9    'proprietary'," end quote, to Mattel.  That is not the basis of

10   our theory.                                                           01:28

11             That's May 23, 2008, Page 79, Lines 20 to 22.

12             Now, Mr. Nolan, the very next Monday, came back and

13   said, I think that at the last hearing, and a few hearings

14   back, what they were saying is that they are not dealing with

15   the trademark of "Bratz"; they are dealing with the idea of          01:28

16   Bratz, the name itself, just to be clear again for the record.

17             And then the Court noted, 'Yes, and I understand the

18   distinction; it's not a trademark claim, because it was never

19   put into use by Mattel during the time period.'

20             That's at Page 39, 20 through 43.                           01:29

21             So it is true that we had knowledge that they were

22   arguing that the name was relevant to their claims, much like

23   Diva Starz was relevant to their claims.  It put timing on

24   their claims to the extent that they had rights to damages from

25   those claims.  Those were put to the jury; and in my view, the       01:29

```
 1   jury awarded whatever it is that they attributed a value to

 2   using the name.  But Mattel has specifically and repeatedly

 3   said, We are not seeking to have proprietary -- that's

 4   Mr. Zeller's word -- proprietary right to the name "Bratz."

 5         THE COURT:  But go back to my question.                         01:29

 6         You concede, I trust, that much earlier than May of

 7   2008, going back to the initial complaint, that the relief

 8   sought is broad enough to encompass this notion of constructive

 9   trust.

10         MR. RUSSELL:  It would be broad enough to capture the          01:30

11   notion of the right to the name "Bratz," but not the right to

12   exclude others from the name "Bratz."

13         I would argue, your Honor, that if they had wanted to

14   exclude MGA from using the name "Bratz," or to take the value

15   of the trademark -- and that is what we are talking about --        01:30

16   they were obligated to file a trademark claim.

17         You don't get to take someone's trademark --

18   your Honor wrote in Conversive -- and I think Brookline also

19   had the same language -- it doesn't matter who invented a name;

20   that's not relevant at all.  So I will give them that              01:30

21   Mr. Bryant invented it, for want of a better term, while at

22   Mattel.  But in the language of trademark, so what?  The facts

23   are, it is use and the value that is created through that use

24   that is at issue now.

25         THE COURT:  So it's not relevant who invented the            01:30
```

```
 1    name.
 2          MR. RUSSELL:  It's not relevant to excluding others
 3    from the right to the name "Bratz."
 4          THE COURT:  That's assuming that there's not an
 5    intervening contract which awards proprietaryship ownership.         01:31
 6    That's a distinguishing feature, Counsel.
 7          MR. RUSSELL:  Even if it were the case -- and I don't
 8    think it is the case -- but even if it were the case that one
 9    could argue, they have the name, they have it, they could have
10    developed it, they didn't.  There are many cases out there         01:31
11    where someone takes a name invented by someone else and puts
12    value to it and then the original inventor comes forth and
13    says, I'd like the name, please; and the courts say "no."
14          THE COURT:  Right.  But, again, what you just
15    described there is different than the situation that we have        01:31
16    here, because Mattel's argument, the critical difference is, is
17    that there was that employment inventorship agreement which
18    gave the rights to Mattel.
19          MR. RUSSELL:  I don't actually think that's a
20    distinction with any difference, because as the cases cite --       01:31
21    and I think Brookline deals with this issue, though I'm not
22    100% sure -- but the cases talk about the fact, you can't
23    assign a right to a name unless there's value in the name.
24    That is to say, there is no value in the word "Bratz," because
25    you can't copyright it, you can't protect it; it has no             01:32
```

```
 1   protectable value until it's put into use.
 2          So even if we assume that the fact that Mr. Bryant
 3   invented it while at Mattel had some relevance, okay, they
 4   would have had the right at the time to exploit it.  By virtue
 5   of the fact that they did not, they gave up the right to          01:32
 6   exclude others from it, because Mr. Bryant has no right to
 7   assign to them a valueless asset under trademark law.  And I
 8   would argue this would also be true with respect to the state
 9   law constructive trust theories.  It's valueless.
10          I mean, your Honor dealt with the Disney case.  We       01:32
11   talked about that awhile ago.  California does give a
12   contractual right to protect things.  That is true.  But it can
13   be given up.  And here, it was given up explicitly.  They chose
14   not to use it, and they chose at every turn not to seek the
15   monetary value of the name "Bratz."                              01:33
16          They certainly know how to seek trademarks.  They're
17   doing it now.  Where were they for all of these years?  It's
18   not like they woke up yesterday and discovered there's this new
19   thing called a trademark.  They knew what a trademark was.
20   They knew what a copyright was.  They certainly knew in 2004     01:33
21   that Bratz was developed while he was at Mattel.  That's why
22   they say they filed.  It's more than two years ago.  I think
23   I'm in good shape there.  Again, we're talking about laches for
24   the current purposes.
25          THE COURT:  Thank you, Counsel.                          01:33
```

```
 1              Is there anything further?
 2         MR. RUSSELL:  That's really the point.  I just wanted
 3    to make one other point, which is, they say that we didn't put
 4    forth for you any nexus between our prejudice and the delay;
 5    and I think that is really a tough argument for them to make.        01:33
 6         The fact is, your Honor heard ample evidence from
 7    Mr. Larian and others that MGA was keenly concerned about
 8    Mattel filing suit against them and pursuing them.  And when
 9    they intervened, what did Mattel do for an additional two and a
10    half years?  Nothing.  They didn't file any affirmative claims     01:34
11    against MGA.
12         THE COURT:  But Mr. Zeller's point is, what did MGA
13    do?  And I think the evidence indicates, actually --
14         MR. RUSSELL:  Danjaq, which is the leading Black's
15    case in the Ninth Circuit, says that's okay.  In fact, Danjaq      01:34
16    was the case where they got sued on the rights, and they
17    continued to pour money into the James Bond franchise, even
18    after being sued; and the court looked at that very prejudice
19    and said that's good enough.
20         Here, we're in a stronger position.  We intervened,          01:34
21    expecting, Okay, we've said we have the right.  The natural
22    reaction is, Mattel is going to come back and say, We're going
23    to sue you; we own it.  They certainly knew all of the facts
24    they know now.  They didn't.  They waited two and a half years
25    with no explanation whatsoever.                                    01:34
```

```
 1            And I think it's certainly a fair inference, if not
 2    an outright indisputable fact, that MGA had the right to rely
 3    upon the failure of Mattel to file claims to further develop
 4    its product.  And I think that's what Danjaq would say.
 5            I actually think that's what Jarrow Formulas said.   01:35
 6    Jarrow Formulas was a case where you had somebody told seven
 7    years earlier, I'm going to sue you; I'm going to sue you;
 8    don't continue to make those claims with respect to your
 9    probiotic product.  They poured money in.  That's sufficient
10    nexus.                                                       01:35
11            THE COURT:  Thank you, Counsel.
12            Mr. Zeller, I'm going to limit you to the argument
13    that Mr. Russell made concerning whether or not Mr. Bryant
14    could ever have even assigned anything that did not have value
15    to Mattel.                                                   01:35
16            MR. ZELLER:  Yes, your Honor.
17            If I may say for the record, obviously, he's made a
18    number of arguments that have led into the merits of
19    constructive trust and the like that I have not addressed, and
20    I assume that we'll have an opportunity at some point.  I was  01:35
21    focusing more on, of course, the equitable defenses at this
22    point.
23            With respect to the argument about a valueless asset,
24    number one, that's not supported by any authority.  There's
25    nothing that says it has to be valued -- it has value in the   01:35
```

```
 1   way that it appears MGA is talking about.
 2          Number two, the fact is that there is evidence that
 3   it had value.  MGA paid for it.  MGA entered into a contract
 4   with Bryant to acquire those rights.
 5          THE COURT:  But not specifically the name "Bratz."    01:36
 6          MR. ZELLER:  It included everything.
 7          THE COURT:  It included it, but was there ever a
 8   value placed on the name "Bratz" at that point in time?
 9          MR. ZELLER:  I would have to double-check,
10   your Honor.  Nothing occurs to me as to whether --          01:36
11          THE COURT:  Was there any value to the name "Bratz"
12   at that particular time?
13          MR. ZELLER:  I think there was.
14          THE COURT:  What was the value?
15          MR. ZELLER:  Well, number one --                     01:36
16          THE COURT:  In its undeveloped state.
17          MR. ZELLER:  I'm not sure I can give you a
18   quantification of it, but what I can say is this:  That, number
19   one, MGA entered into an agreement where it paid money to
20   Bryant for intellectual property that included the name.     01:36
21   Number two, the fact is, MGA, soon after that, filed intent to
22   use applications.  That shows MGA itself understood and
23   believed that it had value.
24          THE COURT:  Or that it would have value.
25          MR. ZELLER:  No.  That the name had value.           01:37
```

Monday, November 10, 2008                          CV 04-09049

1        **THE COURT:**  The name would have value.  They wanted

2   to protect what they were about to invest in.

3        **MR. ZELLER:**  Well, your Honor, yes.  But that proves

4   my point, that the use was going to acquire -- I mean, that was

5   going to be an investment that would potentially lead to -- or        01:37

6   actions that would lead to trademark rights.  The name itself

7   had value, because it was part of the bundle of proprietary

8   information that Carter Bryant took from Mattel and sold to

9   MGA.  The name itself had value.  And it also has value because

10  Bryant had breached his duty, aided and abetted by MGA, not          01:37

11  disclosing it to Mattel.

12        And the one thing that he is conflating, MGA is

13  conflating in its argument, is this notion that the name

14  "Brats," B-R-A-T-S, is what we are claiming we derive rights

15  from.  That is not correct.  Brats, B-R-A-T-S, as used in the        01:37

16  context or considered as part of the Diva Starz project, that

17  was an issue of timing, like the Toon Teens evidence.

18        **THE COURT:**  I understand that.

19        **MR. ZELLER:**  It's not the basis of our rights.

20        But I don't think that MGA has cited any authority          01:38

21  that said somehow, because the full value of the name had not

22  been realized at the time that Bryant wrongfully assigned it,

23  sold it, gave MGA some permission to use it, that that somehow

24  means that there could be no constructive trust over it.

25        In fact, what Mr. Russell has pointed out that I            01:38

1    think is quite significant here is that he concedes that absent

2    a constructive trust remedy, they continue to have the right to

3    exclude others from using that name; and that's Mattel

4    included.

5          So what, essentially, MGA is saying is that if this          01:38

6    Court does not grant a constructive trust remedy, they can

7    continue to use the wrongfully-acquired property, the name.

8    And we couldn't, and we were never given that opportunity to

9    use it.

10          The last point I would make, your Honor, is just          01:39

11   simply that Mr. Russell concedes that they understood a

12   constructive trust was at least a remedy encompassed within our

13   first complaint.  But the constructive trust remedy necessarily

14   implies the right to exclude others.  He's trying to make this

15   distinction that somehow they didn't know that we would be          01:39

16   asking to exclude them, in some respect, through a constructive

17   trust or other kinds of remedies.  But inherently, when you're

18   asking for a constructive trust, or an injunction, which we

19   also asked for, that is the right to exclude.

20          **THE COURT:**  Thank you, Counsel.          01:39

21          Let's move on to the declaratory relief motion.

22          I also want to begin with MGA on this motion, even

23   though it's not their motion, because I want clarification on a

24   couple of other points.

25          **MR. RUSSELL:**  Yes, your Honor.          01:39

 1          **THE COURT:**  On the one hand, you seem to be arguing

 2    in your opposition to the motion that the verdict, the

 3    decision, is self-evident; there's no need for declaratory

 4    relief.  But then on the other hand, you argue that the verdict

 5    is confused, essentially, and that it doesn't render or lead to          01:40

 6    the relief being sought by Mattel.

 7          Do you understand --

 8          **MR. RUSSELL:**  I understand the argument.

 9          **THE COURT:**  There appears to be an internal

10    inconsistency, taking your briefs in whole on this and other          01:40

11    issues; and I'm going to give you an opportunity to make that

12    clear for the record.

13          **MR. RUSSELL:**  Thank you, your Honor.

14          This is the argument that Mattel was making in their

15    briefs, and I think there's a little bit of -- to borrow a word          01:40

16    from Mr. Zeller -- conflation here.  There are four distinct

17    points I would argue within the declaratory relief motion.

18          The first two are the drawings and the sculpts.  With

19    respect to those, our point was, the verdict is clear, there is

20    no argument, and what they're seeking is moot.          01:40

21          **THE COURT:**  And to be clear, the verdict clearly

22    found that the drawings and the sculpts, at least the sculpts

23    referred to on the verdict form, were created by Carter Bryant

24    while he worked for Mattel.

25          **MR. RUSSELL:**  Correct.          01:41

```
 1              THE COURT:  At least in part, solely or jointly.

 2              MR. RUSSELL:  Correct.

 3              So given that, and given Your Honor's prior rulings

 4  with respect to the legal import, there is nothing left with

 5  respect to the first half.                                        01:41

 6              THE COURT:  Okay.

 7              MR. RUSSELL:  Now, there are two other components:

 8  The name, which, obviously, we hotly contest.  And I would

 9  argue the failure by Mattel to put that in play before the jury

10  is dispositive there.  But, yes, we argue that; but that has     01:41

11  nothing to do with this.

12              THE COURT:  The same verdict form rendered a decision

13  on that issue as well.

14              What's not clear about that?

15              MR. RUSSELL:  The only thing that it rendered was the 01:41

16  timing of the name.  But that's distinct, because with the

17  drawings and the sculpts, the jury was specifically asked, What

18  is the value?  $31,500, if memory serves.  But they chose not

19  to do that for the name, because they had specifically eschewed

20  taking the value of the name.  We said that repeatedly.          01:42

21  Mr. Zeller -- I quoted him to you -- it's in the discourse that

22  you had with Mr. Nolan.  They chose not to put that in front of

23  the jury.  That was their tactical decision.  And we pressed

24  them at every point to make that clear.

25              So that is totally distinct from the drawings and the 01:42
```

1    sculpts.  They could have put that on there, and we could have

2    fought about that, and the jury might or might not have awarded

3    them something on that and we would have had a different

4    discussion.  But we don't have that discussion.  They didn't

5    file trademark claims, and they didn't ask the jury to assess,        01:42

6    under state law theories -- although I think it would be

7    inappropriate -- but they didn't ask the jury, under state law

8    theories, to assess a value in the name "Bratz."  That was

9    their choice.

10          So "yes" with respect to that.  So I don't see any          01:42

11   inconsistency there.

12          And with respect to the last category, the

13   characters, I think what's happening here is, there's a little

14   bit of an argument behind the argument.  If what we're talking

15   about is the ideas for the characters, which is literally what    01:43

16   their motion asks for, the jury did find that the ideas for the

17   characters were conceived while Mr. Bryant was at Mattel.  That

18   is what the verdict form says.  But I think we all know that's

19   not what we're talking about.

20          What Mattel is trying to do is take it a step further      01:43

21   and get the value of those characters.  And what we're saying

22   is, the jury has spoken on that issue.  Again, you don't need

23   to go there.  They asked for the full value of the exploitation

24   of Bratz in every possible formulation.  They asked for

25   $1.47 billion.  If that didn't capture it -- and what did they     01:43

```
 1   get?  $10 million.  So they asked for that relief, and they
 2   didn't get it.
 3        Nothing your Honor could do by way of declaratory
 4   relief would add anything permissibly; and I would argue would
 5   very much undercut and infringe on our Seventh Amendment right,
 6   and put into dispute and lack of clarity what happened.
 7   There's no reason for that relief to be granted here.
 8        So the only thing, in our view, that really is at
 9   issue here is the name.  The rest of it is moot, and your Honor
10   should simply not take up their invitation to go down that
11   road.
12        THE COURT:  What about the affect of this on the
13   assignment of rights by Carter Bryant?
14        MR. RUSSELL:  I'm not sure I understand that
15   question.
16        THE COURT:  Well, Carter Bryant purported to assign
17   any rights that he had to MGA.
18        MR. RUSSELL:  Correct.
19        THE COURT:  The jury finding in the first phase
20   arguably indicates that those rights were properly with Mattel
21   and that efforts to transfer that were fraudulent, were
22   interference in contractual relations, et cetera.
23        Is it self-evident, then, all of those rights rest
24   with Mattel?
25        MR. RUSSELL:  I'd say "no" is the answer to that,
```

01:43

01:44

01:44

01:44

01:44

 1   your Honor.  I mean, the rights that they have are the rights

 2   that the jury awarded.  The jury found infringement and awarded

 3   them $10 million.

 4        **THE COURT:**  Those are two separate things.  We'll be

 5   discussing this, I'm sure, later in terms of what the jury          01:45

 6   awarded and not.  They awarded the value, the damages, that

 7   they believed were associated with what they found to have been

 8   copyrighted, something to that effect.  That's not an awarding

 9   of rights.

10        You have a position to argue that arguably on the             01:45

11   jury award that the lion's share of the value related to the

12   Bratz dolls was not the characters, it was not the dolls

13   themselves, but rather, all of the other things that were

14   lumped into it.

15        **MR. RUSSELL:**  Correct.                                    01:45

16        **THE COURT:**  What Mattel is seeking now is just those,

17   from the jury's perspective, relatively nonvaluable dolls

18   themselves.

19        **MR. RUSSELL:**  They're not even seeking that,

20   your Honor.  I think that's part of the mischief here.              01:45

21        If you look at what they're seeking, they're seeking

22   declarations they own, the ideas for the characters, which is,

23   I think we can agree under any formulation, not protectable.

24   There are no rights in the ideas for the characters.  We don't

25   even know what that is.  It's not as if we're talking about 70     01:46

```
 1   specific drawings, two specific sculpts.  We're talking about

 2   this amorphus ideas for characters.

 3           I suggest, respectfully, they're inviting you to a

 4   place you shouldn't go, by, if you were to do so, granting

 5   declaratory relief on essentially something meaningless.        01:46

 6           THE COURT:  So it's not self-evident, then, that it's

 7   anything, to you, more than the ideas?

 8           MR. RUSSELL:  That's what they asked for in their

 9   motion.

10           THE COURT:  Not what they asked for.  In terms of       01:46

11   your argument as to what he is -- you're saying that

12   declaratory relief is not required because certain things are

13   self-evident.  I want a clear understanding, from your

14   perspective, of what is self-evident.

15           MR. RUSSELL:  I will just take them at their word.       01:46

16   What they asked for was a declaration from you that they own

17   all of the rights to the ideas for characters found on the

18   verdict form.  The verdict form has a question saying, Did he

19   conceive the ideas for the characters while at Mattel?

20           Yes, that happened.                                     01:46

21           But ideas for characters, unlike specific drawings or

22   unlike sculpts, that does not have -- there's nothing that we

23   can wrap our hands around and say, We're talking about 'X'.

24   Ideas for characters -- I think the reason that was put on the

25   form, respectfully, was, it allowed them, again for timing      01:47
```

1    purposes -- they're trying to tie things for timing purposes.

2    But now they're trying to turn it into something else and say,

3    This is essentially an asset, a valuable property, that they

4    own.  And I think, again, because it's so nebulous, they got

5    what they were entitled to on the verdict form; they got the            01:47

6    benefit they wanted.

7            But for you to go further and try to guess what the

8    jury intended by that, and try to guess what that means, is

9    going to result in a series of bad things, not the least of

10   which is, we're going to be fighting again, I assure you, about        01:47

11   what that means in the future.  And there's no reason to do

12   that.  They got the value that the ideas embodied by virtue of

13   the copyright damages and by virtue of the state law damages

14   claims.

15           **THE COURT:**  Let me hear from Mattel.                        01:47

16           **MR. ZELLER:**  Respectfully, I would submit that the

17   argument, just like MGA's papers, actually shows why we needed

18   declaratory relief here.  It's anything far from clear.

19           We're asking the Court simply to connect the dots as

20   to its rulings, the jury's findings.  This was always what was        01:48

21   anticipated that would be done under declaratory relief.  And

22   MGA, on the one hand, wants to basically say, Well, we lost the

23   trial, so now it's moot.

24           That's just not the law.  It's quite the contrary.

25           In order to make a declaratory relief claim moot,             01:48

```
 1   once there's been a live controversy, once there was ever one,

 2   which is undisputed here, they have to stand up here, in a

 3   binding way, and say, We agree, Mattel owns these.

 4          THE COURT:   That's what I was attempting to do there

 5   a moment ago, Counsel, though unsuccessfully.   Because I think       01:48

 6   there's still a dispute over the characterization of what it is

 7   that you're seeking.   So let me do the same thing with you.

 8          Clearly, what is it that you're seeking?

 9          MR. ZELLER:   Your Honor, we do lay that out, I hope

10   with sufficient precision, in the papers.   I will attempt to        01:49

11   summarize it in a way, but obviously, we were very careful in

12   exactly what we set forth in our papers.

13          Let me first address the characters issue, since

14   Mr. Russell appeared to be struggling with that one.

15          The character issue is Mattel --                              01:49

16          THE COURT:   The Court is struggling as much as

17   Mr. Russell, so let's --

18          MR. ZELLER:   Fair enough, your Honor.

19          The character issue is, in fact, with the copyright.

20   The Court will recall that in Phase B, the Court instructed the      01:49

21   jury that, in fact, copyright in a character can be infringed.

22   That's what we're asking for, is the copyright ownership in the

23   characters, the distinctive attributes of characters that are

24   protectable under the Court's prior rulings.

25          So it's not this -- ironically enough, when                   01:49
```

```
 1   Mr. Russell says it's all nebulous, of course that just
 2   confirms the crying need for declaratory relief.  But as to the
 3   merits of our request, we are asking for the Court to connect
 4   the dots, whether it's the drawings, the sculpt, the
 5   characters, and the other works that Mattel owns, and putting          01:50
 6   it forth in a single order that makes very clear, This is what
 7   Mattel owns.  Because, otherwise, we're going to be reduced to
 8   piecing together, in front of some foreign court, in
 9   particular -- here was the verdict, here was the Court's
10   summary judgment ruling; and, of course, then having MGA              01:50
11   dispute in those jurisdictions what we think is already settled
12   here.
13           But with respect to the mootness point, your Honor,
14   which is really their main argument, that mootness argument
15   simply fails under any standard.  The courts have been very          01:50
16   clear that once there is a live controversy, they have to say,
17   in a binding way, that they are no longer disputing what is
18   actually at issue.
19           THE COURT:  Counsel, I'm with you on the need for a
20   declaratory relief order.  I'm going to issue one.  But I want       01:51
21   to make sure -- what I'm really concerned about is the point
22   that Mr. Russell made about -- I don't want to be sitting here
23   six months from now having another debate or disputation over
24   what is meant by the terms.
25           Take, for example, number three on your proposed            01:51
```

1   order, under the inventions agreement, "Mattel owns the rights

2   to all inventions in Mattel's line of business that Mr. Bryant

3   conceived or reduced to practice while employed at Mattel."

4          What do you mean by that?

5          **MR. ZELLER:**  I think, your Honor, that that is                01:51

6   preparatory language to help explain the basis for the Court's

7   ruling.  It is to our -- and, honestly, your Honor, the reason

8   we have done this is the reason I was just alluding to, that if

9   we have to go into foreign courts and seek relief based upon

10  our ownership rights, we want to have an order that we can        01:51

11  present to a court that will be sufficiently self-contained

12  that it explains what the basis is.

13         **THE COURT:**  To say "the rights," are we talking --

14  obviously, we're not talking about trademark rights.

15         **MR. ZELLER:**  Not at that particular point, no.          01:52

16         But, your Honor, that is not intended to say that

17  that would be the delineation of the rights; those are

18  elsewhere as well.

19         What we're saying is, that's an explanation; that's

20  the rationale for the judgment, for the ruling itself.  It's     01:52

21  not meant to be that.  And we can certainly clarify that,

22  your Honor, if you want.  It's not intended to be, you know,

23  some other open-ended invitation for us to guess about a whole

24  variety of other things that may have been created.

25         **THE COURT:**  That's the concern I have.  I think it's   01:52

```
 1  legitimate.
 2          MR. ZELLER:  And that's not its purpose.  Its purpose
 3  is to explain -- whether it's the copyright office, the
 4  trademark office, foreign courts, third parties, whoever else
 5  is out there in the world -- the explanation.                    01:52
 6          THE COURT:  If this is simply a matter of connecting
 7  the dots between the Court's pretrial rulings and the verdict
 8  findings of the jury, that's one thing.  It's another thing if
 9  this is being used as a platform to expand upon the rights.
10          And you're disavowing the latter?                        01:53
11          MR. ZELLER:  That is correct.  Absolutely,
12  your Honor.
13          There are, obviously -- some of the implications of
14  the Court's rulings will -- and I think they're probably one
15  area where --                                                    01:53
16          THE COURT:  I know that I want to be aware; I love
17  knowing the implications --
18          MR. ZELLER:  The implication, I would say, really
19  goes to, of course, the validity, or invalidity, from our
20  perspective, of the assignment that MGA purportedly received.    01:53
21          But that's also spelled out.  There's no hidden
22  implication in that respect, your Honor.  It's all there.
23  We're not asking for some open-ended invitation.
24          THE COURT:  It's all there, and then some.
25          All right.  Very well.                                   01:53
```

```
 1              Is there anything further on this, from your
 2     perspective?
 3              MR. ZELLER:  The one thing I do want to say,
 4     your Honor, on this particular issue, too, is that -- and, of
 5     course, this whole issue about the name has come up again.     01:54
 6     And, again, I'm hoping that we'll have an opportunity to fully
 7     address the various things that have come up in the context of
 8     the motions that we've made, where that's at issue, which is
 9     the constructive trust and the UCL injunction.
10              THE COURT:  You have until 5:00, Counsel.            01:54
11              MR. ZELLER:  Thank you.
12              THE COURT:  Just briefly.
13              MR. RUSSELL:  First, I just can't help but note to
14     myself -- I mean, Mr. Zeller now wants to connect the dots that
15     we asked your Honor and they fought so hard against connecting  01:54
16     awhile ago.  I mean, it seems pretty clear to me, if they had
17     wanted this to be even clearer, they could have had a specific
18     verdict form for these things; they could have put on their
19     order what they're talking about.
20              We're not -- the first category, there could be no    01:54
21     question that it's moot, the 70 drawings and the two sculpts.
22     Your Honor's order is how many sentences long there?  The
23     verdict form is one question with a hundred subparts.
24              I don't know that that requires you to do much, and I
25     do think it's fraught with peril.  I do think it invades our    01:55
```

1  constitutional rights under the Seventh Amendment.  There's no

2  reason to go there for the first two.  I don't even hear

3  Mr. Zeller really arguing that.  There's no dispute.  We've

4  said in our briefs, the verdict form says what it says, they

5  have whatever rights that conveys.                                01:55

6        To come back and ask your Honor to put more gloss on

7  this, it doesn't seem like there's any reason for it.

8        And with respect to the characters, he's certainly

9  not elucidating what he's talking about.  Again, he can't tell

10 you what he's talking about.  He can't put precision on it.       01:55

11 And it's because he doesn't know what he wants.  What he wants

12 is an order that gives him the right to do mischief in the

13 future.  I think there's little question of that.  And I think

14 that's one of the reasons why -- and we cite your Honor to

15 these cases.  I think (unintelligible) is a noted authority on    01:55

16 this.  This is one of the reasons why declaratory relief

17 actions are frequently held preempted.  You don't want to have

18 courts ruling in a declaratory fashion.  We already had a jury,

19 asked these very questions; render a fairly detailed -- maybe

20 not detailed enough -- but a fairly detailed verdict form; and    01:56

21 now they want to come back for a second bite, and say, You

22 know, gosh, I wish I could tweak this, I wish I could tweak

23 that.  It's not needed for the first part.  And for the second

24 part, they didn't ask for it.  They had their shot at it.  And

25 all they want to do now is expand the rights that they were       01:56

```
 1   never given.
 2          So I would submit that this claim, with respect to
 3   ownership over the ideas, is preempted.  There's no need for a
 4   declaration from the Court.
 5          THE COURT:  Thank you, Counsel.                              01:56
 6          I want to move on to the constructive trust motion.
 7   I know we've already delved into this to some extent, but I
 8   think the merits of the constructive trust need to be developed
 9   as well.  I'll permit Mattel to proceed first on this.
10          MR. ZELLER:  I think the Court is familiar with our         01:57
11   basic theory here, which, as briefly put, is that, as the jury
12   found, Carter Bryant created the name "Bratz," B-R-A-T-Z, so
13   that there's no ambiguity here, the name "Bratz" itself that
14   was used by MGA subsequently while he was employed by Mattel;
15   that was part of this bundle of proprietary information,         01:57
16   because Bryant created it, that was improperly transferred and
17   then used by MGA.
18          The constructive trust that we are asking for goes to
19   the uses that they made of that name that subsequently gave
20   rise to trademark rights and trademark registrations.  And      01:58
21   that, under our point, is part and parcel of the wrongdoing.
22   And the point I was making earlier is that absent this kind of
23   relief, literally MGA will be allowed to continue to use, for
24   its benefit, something that the jury found Bryant created when
25   he was employed by Mattel, and continue to exclude Mattel from  01:58
```

```
 1   the right to use it.
 2          And that, we think, is exactly the kind of situation
 3   that the constructive trust, as well as the UCL injunction,
 4   remedies were designed to cure and to avoid, as this kind of
 5   situation.                                                        01:58
 6          The one thing that MGA just never really comes to
 7   dispute -- and I don't think they can, in light of the jury
 8   verdict, as well as the Court's rulings -- is that
 9   Carter Bryant created the name "Bratz," B-R-A-T-Z, while he was
10   a Mattel employee and that he wrongfully gave it, disclosed it,  01:59
11   to MGA.
12          The Court is familiar with the authorities, including
13   under the restatement, that makes it very clear that the scope
14   of relief that we're entitled to as a result of that also goes
15   to the benefits of what it is that MGA obtained.  And from our   01:59
16   perspective, all of those uses -- and there's no question that,
17   of course, it took the use by MGA of the name for trademark
18   rights to arise, at least in the United States.  Foreign
19   jurisdictions are different.  But our perspective is, just like
20   in the licensor-licensee situation, the fact is that it          01:59
21   (unintelligible) to our benefit, and those are the rights that
22   we should have had and that we should have been given.
23          Mr. Russell, on more than one occasion, has said,
24   basically, Mattel knew and just basically decided not to use
25   the name "Bratz."  But he is again conflating the different      02:00
```

```
 1   names and the different evidence that's here in this case.
 2   There is no evidence that Mattel knew about Bryant's creation
 3   of the name "Bratz," B-R-A-T-Z, before his deposition in
 4   November of 2004.  What is certainly the case is that what he's
 5   talking about, Mr. Russell is citing to, are instances about          02:00
 6   the name Brats, B-R-A-T-S, within Diva Starz.  That's neither
 7   here nor there.  It doesn't have anything to do with our theory
 8   here.
 9            THE COURT:  I understand that, Counsel.
10            MR. ZELLER:  Yes.                                            02:00
11            Now, one thing that MGA really does not come to grips
12   with either is, even with their whole use argument, which we
13   actually think supports our constructive trust theory -- but
14   even apart from that, in foreign jurisdictions, the
15   registration is what gave rise to the rights.                        02:00
16            So, I mean, it was simply the act of MGA taking the
17   "Bratz" name from Bryant that belonged to Mattel and then doing
18   a foreign registration, and blocking Mattel right then and
19   there before it even knew that it had the rights to that name.
20   So even these kind of use arguments that they make to try and       02:01
21   escape the consequences of the constructive trust just have no
22   application in that situation.
23            The one thing that Mr. Russell has also alluded to
24   more than once was the Lovins registration.
25            In many respects, it's not really an argument that I       02:01
```

```
 1   think gets them very far, if anywhere.  I mean, first of all,
 2   as the Court has pointed out, and the Court knows, Lovins was
 3   for a very particular use.  It wasn't even for dolls.  It
 4   wasn't for toys.  So whatever implication or impact that
 5   particular situation has, it's extremely narrow and doesn't        02:01
 6   really go to the heart of what it is that we're asking for
 7   here.
 8           Number two, the fact is that the tort had already
 9   been done.  They were already beginning to use the trademark
10   when the Lovins situation came in.  This is pure happenstance      02:02
11   that they then had to acquire rights from Lovins.  Whatever
12   rights they acquired also falls under the same theory of
13   constructive trust.  I mean, the fact is, they never had the
14   right to use the "Bratz" name, because Bryant created it when
15   employed by Mattel, MGA aided and abetted in his breach of         02:02
16   fiduciary duty, tortuously interfered with his contract in
17   taking that name and proceeding to use it.
18           THE COURT:  Let me ask you a question.
19           These arguments are flushed out in the briefs.
20   There's one argument that's not as flushed out.  I'd like to       02:02
21   hear your response in greater detail.  And I certainly want to
22   give Mr. Russell, or MGA, a chance.
23           It's the basis of the Court to actually extend
24   injunctive relief to these intellectual property cases.
25   There's that last footnote in the opposition from MGA,            02:03
```

```
 1   Footnote 11 on Page 17, which attempts to distinguish Mattel's
 2   cases about the Court's authority to do this.  I'm somewhat
 3   concerned about this lurking issue about the underlying basis
 4   to even extend a constructive trust.
 5           Can you address that?                                     02:03
 6       MR. ZELLER:  The footnote the Court is referring to
 7   is the one --
 8       THE COURT:  On Page 17 of the opposition.
 9       MR. ZELLER:  And that's talking about an injunction?
10       THE COURT:  Right.  "Mattel's cases are not to the           02:03
11   contrary, since none of them extend injunctive relief under the
12   UCL to lawful activities related to the UCL violations at
13   issue."
14           MR. ZELLER:  I don't think that is a correct
15   statement of our cases, your Honor, and let me find the          02:03
16   authority.
17           THE COURT:  Page 17 of the opposition.
18           MR. ZELLER:  This is -- for example, Hewlett was a
19   case -- I believe we cited this in our papers, but just in
20   case, for the record, it's 54 Cal. App. 4th 499, specifically    02:04
21   Pages 538 through 542; and that was a situation where the Court
22   'affirmed an injunction that was prohibiting otherwise lawful
23   activities, following a finding of liability under the UCL.'
24           Now, from our perspective, of course, that's an even
25   further situation out than what we have here.  This was a        02:04
```

1    direct consequence of the wrongdoing; and so they continue to

2    benefit and they continue to be able to exclude us.

3         **THE COURT:**  It was wrongdoing followed by lawful

4    activity.

5         **MR. ZELLER:**  Arguably, that always happens in this          02:04

6    kind of situation.  Even in the more very traditional,

7    straightforward situations --

8         **THE COURT:**  And the question was whether or not the

9    constructive trust can be used to basically hold in trust the

10   lawful activity in an intellectual property situation.          02:04

11        **MR. ZELLER:**  Right.  Exactly.

12        And so I don't think it's a distinction that's really

13   supported by the cases, first and foremost.  But to me, in some

14   respects, the argument is proof far too much.  I mean, that

15   would basically be saying, Well, you don't really get all of          02:05

16   the benefits of the initially illegal conduct; it all has to be

17   illegal.

18        I'm unaware of anything in the cases that suggest

19   that.  And, in fact, it would run counter to really the

20   equitable principles that underline both constructive trusts as          02:05

21   well as UCL injunctions.  I mean, it's to put a stop to illegal

22   activity.

23        And as a matter of fact, I would hazard to say that

24   in many doctrines, that kind of equitable relief can still be

25   granted, even if it includes and sweeps within it something          02:05

```
 1   that someone could arguably say is lawful behavior or something

 2   that arose later and was lawful.  I mean, this is part and

 3   parcel.

 4           THE COURT:  And your best authority for that would be

 5   what?                                                              02:05

 6           MR. ZELLER:  I believe, for example, there's the

 7   Hewlett case that I was referring to in the injunction context.

 8           THE COURT:  Right.

 9           MR. ZELLER:  And then with respect to constructive

10   trust -- let me just find this here, your Honor.  I believe      02:06

11   that among our best cases would be the Haskell Engineering

12   case, where what we're talking about is that there was

13   initially illegal activity and embezzling of funds, but then,

14   of course, those were applied to basically acquire other

15   property.

16           And, obviously, even the enhanced value of the

17   property was something that was recoverable.  No one argued

18   that that in itself was illegal.  It's obviously the root

19   cause; it's the underlying part of it.  And anything that's

20   traceable -- also in terms of the authority for this            02:06

21   proposition, your Honor, I mean, it's commonly stated as the

22   rule that basically any benefits that are traceable to that

23   wrongdoing are what we can obtain.  It's not whatever is

24   traceable and was in itself independently tortious and

25   actionable.                                                      02:07
```

1      **THE COURT:**  From your perspective, the basis for the

2  17200 claim is Mr. Larian's interference in the contractual --

3  his tortious interference?

4      **MR. ZELLER:**  That's one aspect of it, yes.  There's

5  also aiding and abetting breach of fiduciary duty.  In fact, in          02:07

6  some respects, I think that's the most straightforward one, is

7  the aiding and abetting claim, because as the Court will

8  recall, under section one of Carter Bryant's agreement, things

9  that he created while employed by Mattel were Mattel's

10 proprietary information.  The Court already ruled he had a              02:07

11 fiduciary obligation to protect that information.  MGA acquired

12 it wrongfully, as the jury verdict confirms, and took that name

13 and then subsequently put it to use.

14      And that is, I think, the most direct basis for

15 finding, basically, part of a course of wrongful conduct by            02:08

16 MGA.  And that was really the genesis of it.  I mean, there's

17 no question, and I don't think there's any dispute, that MGA

18 acquired that name from Bryant.  There's just no evidence, and

19 I don't even hear any argument from MGA, that that name came

20 from anywhere other than Bryant, which pursuant to the jury's          02:08

21 verdict is Mattel's property.

22      **THE COURT:**  Very well.

23      Mr. Russell?

24      **MR. RUSSELL:**  Your Honor, if we're going to talk

25 about the unfair competition claim, I think the best place to           02:08

```
 1   start with is the fact that Mattel lacks standing to even
 2   assert rights under this claim.  They have repeatedly and
 3   undeniably -- I think every member at the table to my right has
 4   said they are not seeking damages for any harm to Mattel; they
 5   simply seek to force MGA to disgorge ill-gotten benefits.  We     02:09
 6   cite your Honor to the Madrid v. Perot Systems Corp. case, and
 7   there are many other cases that so hold.  That's not going to
 8   give them standing.
 9        THE COURT:  This is an issue that appears in several
10   of these briefs, this question of whether there was sufficient   02:09
11   evidence of any damages to Mattel during the trial, or up to
12   this point.
13        There seems to be some.
14      MR. RUSSELL:  I struggle with that only because,
15   your Honor, if we hadn't heard from Mattel that they were not    02:09
16   seeking to put in evidence, and, indeed, forcing the exclusion
17   of evidence about the harm to them, the exclusion of
18   evidence -- then we would be in a very different place right
19   now.
20        THE COURT:  I say "some" only because notwithstanding       02:09
21   their best efforts to keep that evidence out, some made its way
22   into the trial.  And in any event, it was kept out on 403
23   grounds, basically, not to confuse the jury for what they were
24   deciding in those phases.  It's hard for the Court not to
25   consider why I should not -- and this is wrapped up in the       02:10
```

```
 1    motion to strike -- why I should not consider that evidence at

 2    this point.

 3          MR. RUSSELL:  I think you should consider it because

 4    they told you that they weren't going to put in any evidence

 5    and they weren't going to rely on that as a theory for          02:10

 6    recovery.  We were estopped in taking discovery that we wanted;

 7    expert reports were cut back.  I mean, a lot of our efforts to

 8    craft our case, jury instructions, verdict forms, their entire

 9    theory --

10          THE COURT:  We're mixing a lot together here.  It's       02:10

11    one thing to talk about jury forms or instruction during the

12    earlier phases of the trial.

13          MR. RUSSELL:  I think at the end of the day --

14          THE COURT:  Were you precluded in the discovery phase

15    from ever --                                                    02:10

16          MR. RUSSELL:  I think the answer is "no" in the early

17    phases.  I mean, there was some discovery at the end when there

18    was still some expert discovery, but I don't want to tarry

19    there long.  I think the more important point is at trial and

20    in the verdict and jury instructions.  There's no question that 02:11

21    that was their repeated position.  And if some evidence of harm

22    to Mattel inadvertently spilled in, it was certainly made clear

23    by Your Honor's rulings and by the arguments that that was not

24    something the jury should properly consider.

25          THE COURT:  Sure.  But why should I not consider that     02:11
```

```
 1    evidence at this point?

 2         MR. RUSSELL:  Why would they not be bound by their

 3    own judicial admissions at various stages?  They have taken the

 4    position and prevailed upon it.  Their specifically saying,

 5    We're not seeking damages; we're not putting in evidence of       02:11

 6    harm, precluded us from doing so, and prevailed.  So all of the

 7    elements for judicial estoppel are met, for judicial

 8    statements --

 9         THE COURT:  But they were not seeking a constructive

10    trust in Phase 1-A or 1-B.                                        02:11

11         MR. RUSSELL:  Well, what they were doing was, they

12    were trying to prevail on claims on which constructive trust is

13    a form of relief.  Perhaps, they would not have prevailed had

14    we had a trial on what the harm to Mattel was.  If we had been

15    allowed to try the harm to Mattel case, maybe the jury would     02:12

16    have concluded that there were no damages.

17         I mean, it's tough for me to speculate in the

18    abstract, but what I can do is say, they made a tactical

19    decision that has been consistent -- I think this is

20    Mr. Proctor's word -- consistent from day one.                   02:12

21         THE COURT:  At this point, this is only a standing

22    argument you're making; correct?

23         MR. RUSSELL:  That's the first place, I think, we

24    have to start on an unfair competition claim.

25         THE COURT:  So the question is whether or not there         02:12
```

```
 1    is standing for them to bring this?

 2          MR. RUSSELL:  Correct.  And we've already cited

 3    your Honor -- this is -- yes, Prop 64 in California -- I mean,

 4    this is not an idle issue.  17200, California courts, in

 5    particular -- and that is the Madrid v. Perot Systems case.     02:12

 6    It's not enough, as Madrid says, to talk about ill-gotten gain.

 7    You've got to talk about harm to the plaintiff.  And they have

 8    said there was none.  So we don't even need to get to the fine

 9    distinctions that Mr. Zeller was trying to get to.  They can't

10    come to grips with their own admissions.  There's no standing,  02:13

11    so the UCL claim should just go right out the window.

12          But even if that weren't the case -- and this is why

13    I think -- tied up with the arguments in Footnote 11 -- the

14    facts are, they can't show a nexus for purposes of unfair

15    competition.                                                    02:13

16          THE COURT:  The theory in Footnote 11, am I right in

17    reading more into that?

18          MR. RUSSELL:  Yes.

19          THE COURT:  I thought that just kind of jumped out at

20    me as being a little bit more than Footnote 11.                 02:13

21          MR. RUSSELL:  Sometimes there are space constraints

22    and the like.  But I think the point to be made is that they

23    have to show a nexus between the unlawful conduct and the

24    remedy.  And they can't do that.  It's not simply enough to

25    say, Mr. Bryant conceived the name while at Mattel; and,        02:13
```

1   therefore, we have rights.  Because under your Honor's decision

2   in Conversive, Mr. Bryant had no right to transfer to the name

3   "Bratz" at that time.  There was no valuable property.  A

4   constructive trust cannot exist in a vacuum.  Property must

5   have value.  It didn't.  And Mr. Zeller stood here, in response     02:14

6   to your question, and basically conceded that there was no

7   value at the time.  It's farcical to suggest otherwise.

8          THE COURT:  Prospective value.

9          MR. RUSSELL:  Correct.  If Mattel had been told,

10  Would you like $5 for the name "Bratz" back in 2000, I think        02:14

11  they would have said, I'll take the $5.

12         THE COURT:  They probably would have asked you, What

13  are you going to do with the name "Bratz"?

14         MR. RUSSELL:  That's probably true.  But in any

15  event, there is little question that there wasn't much going       02:14

16  on.

17         THE COURT:  That conversation may have avoided this

18  whole thing.

19         MR. RUSSELL:  Perhaps.  But in any event, there was

20  no value, certainly none that can be quantified by Mattel; so      02:14

21  there was no rest for a constructive trust to even exist over.

22  The only time value was created was through lawful activities.

23  Mr. Zeller conceded that.  There's no argument -- value in the

24  name "Bratz" was created through lawful activity.  That's one

25  of the reasons why the cases we're talking about in that           02:15

```
 1   footnote are so critical.  Most of the time, you're enjoining

 2   the unlawful conduct.  Here, what they want to enjoin is

 3   something that happened that's irrelevant.

 4           Mr. Bryant invented the name.  Again, we dispute

 5   that.  The name "Bratz" was in the public domain.  I don't       02:15

 6   think they have any rights, protectable rights, at all.  I

 7   think to the extent they argue that there's some --

 8           THE COURT:  Address the argument that Mr. Zeller

 9   makes.  When something has -- it's kind of like the fruit of

10   the poisonous tree, as it were.  I mean, this was a house.  The  02:15

11   house of Bratz, so the argument goes, was built on a foundation

12   that a jury has found was unlawful.

13           MR. RUSSELL:  It's more like we came across a tree,

14   cut it down, made it into boards and built a house, and now

15   they want my house.  That's, I think, more analogous.  We're     02:15

16   not talking about something where there was a house and now I

17   want to paint it -- I painted it blue, and I want the value.

18   That's the problem they have here, is you can't divorce the

19   name "Bratz" from its value right now.  That's one of the

20   reasons we cited your Honor to the Tillamook case.               02:16

21           Tillamook Country Smoker is a Ninth Circuit case that

22   talks about how inequitable it is for a plaintiff -- it's 311

23   F.Supp.2d 1023 -- it talks about the fact that it would be

24   inequitable to divest a defendant of a trademark name after

25   years of investment.  And that really, I think, bottom line,     02:16
```

 1   sort of implicates the policy we're talking about.

 2          And that's where your Honor's decision in <u>Conversive</u>

 3   really dovetails.  If there had been value at the time and they

 4   had pursued it, this would be a different case.  There was no

 5   value, so there was nothing that could be transferred, and,          02:16

 6   hence, nothing over which a constructive trust at that time

 7   could have been rendered.

 8          Now the only thing that has value is the trademark,

 9   and they're precluded either because they needed to seek a

10   trademark claim, or if they are contending that the name          02:16

11   "Bratz" had some proprietary value, something Mr. Zeller

12   specifically said they're not seeking, then they should have

13   gone for a trade secret claim on that.  So it would be

14   preempted as a matter of trade secret preemption; and we

15   briefed that as well.                                             02:17

16          The problem here is, the value was created lawfully.

17   There was no value when it was taken.  The value was all

18   created by MGA.  And it would certainly -- since this is an

19   equitable remedy, I think you have to look at the equity.  What

20   would the equity be when they were certainly aware of this name     02:17

21   very early on and sat on their hands forever, to letting them

22   speculate on MGA's investment?

23          MGA should have the right to exclude them.  It

24   developed the "Bratz" name.  It developed the marks.  It's the

25   one that spent the money.  They knew as early as 2001 that the      02:17

1    "Bratz" name was out there.  They certainly knew by 2004, when

2    they deposed Mr. Bryant, everything; and yet, here we are four

3    years later, for the first time, hearing, Give us the

4    trademarks.

5          And that's exactly the reason why the UCL claim is            02:17

6    limited to unlawful activity.  If we were talking about the

7    unlawful expansion of the mark -- it's hard to imagine that

8    would happen, but if that were the case, this might be

9    different.  But every single thing done by MGA since it got the

10   name is lawful.  There's no dispute about that.  And that's      02:18

11   what distinguishes all of their cases.

12          **THE COURT:**  Very well.

13          Anything further, Mr. Zeller?

14          **MR. ZELLER:**  Yes.

15          Mr. Russell continues to basically mix together            02:18

16   different concepts, but in particular, one thing that he said

17   to the Court just now was that MGA developed the name "Bratz."

18   That is just demonstratively inconsistent.

19          **THE COURT:**  What I understand him to mean by that is,

20   there's no question that Carter Bryant came up with the idea     02:18

21   for the name "Bratz" while he was at Mattel; and, therefore, it

22   is owned by Mattel.

23          What Mr. Russell is saying is, starting with that

24   which Mr. Russell puts no value on, MGA took that name and gave

25   it value.  It cut down the tree, to use his analogy, and ran it   02:19

```
 1    through the lumber mill and built a house.
 2              Before, it was just a tree; now it's a house.
 3              Before, it was a name; now it's a brand.
 4         MR. ZELLER:  But the fundamental point, your Honor,
 5    is that they do not contest that brand came only as a result of      02:19
 6    taking the name from Mattel.
 7         THE COURT:  But the value for the brand did not come
 8    from taking it from Mattel.
 9         MR. ZELLER:  That's where I disagree, your Honor.
10    Mr. Russell is incorrect when he says that I conceded there was      02:19
11    no value.  Quite to the contrary.  I said that we couldn't
12    quantify it.  But there's no requirement under the law that
13    somehow there has to be a particular value to something.
14         THE COURT:  If you can't quantify, can you give me a
15    qualitative -- how could we -- what value is there or was            02:19
16    there?
17         MR. ZELLER:  Your Honor, we can --
18         THE COURT:  I know what the value there is.  What
19    value was there?  Back up to 2000, 1999, when Carter Bryant
20    came up with this name "Bratz."  What value was there?  Don't        02:20
21    put a dollar number on it.  What's the value of the name?
22         MR. ZELLER:  The value of the name -- and we can get
23    deposition testimony from -- in fact, I believe Mr. Larian, to
24    support this -- is that in the toy industry, having a project,
25    having a great toy idea with a great name is critical.  And, in      02:20
```

 1   fact, it's something that you protect.  It's something that MGA

 2   has protected prior to the time it is put on the market.

 3        Bear in mind what it is that Carter Bryant did.  He

 4   took a bundle of rights over to MGA, that he did not own, and

 5   that Mattel, in fact, owns.  Part of that bundle, this project,   02:20

 6   was these doll designs, along with the name that, in fact --

 7   and there's evidence in the record -- that MGA liked, that

 8   girls liked.  And this is all before it was developed into a

 9   trademark.

10        In fact, MGA, during the time right after Bryant           02:21

11   brought the name over to MGA, did internal focus groups, and

12   the girls said, 'Oh, yeah we love the name.'  That was not a

13   mark at that point.  That was a name.  Because they weren't

14   even using it in commerce.  And, in fact, these things were

15   before December of 2000, before they even started.              02:21

16        **THE COURT:**  That was a name for a doll; right?  It

17   was in that context that it was being described?

18        I don't want to get ahead of myself, because this is

19   going to come up again in the permanent injunction motion.  But

20   we might as well start addressing this now, because this is one  02:21

21   of the tough things that I'm -- you know, the Court is sitting

22   in equity at this point, to a large extent.  And this is the

23   struggle that I have with this case fundamentally, is that the

24   measurable value, the measurable value to Bratz, the brand

25   Bratz, to the dolls Bratz, to everything that came of it, is so  02:22

 1   much a function of what Isaac Larian and his team at MGA put

 2   into it.

 3          At the same time, I recognize and respect the jury's

 4   finding that the idea for Bratz, the name "Bratz," the concept

 5   drawings for Bratz, were improperly obtained, based on the          02:22

 6   tortious interference claims.

 7          That creates a struggle, Counsel.

 8          **MR. ZELLER:**  And I will say, your Honor -- and I

 9   think that is, in many respects, certainly going to be the

10   heart of the issue here.                                           02:22

11          **THE COURT:**  And to take everything that is of value

12   and to, from your perspective, return it to its rightful owner,

13   that's quite a leap.

14          **MR. ZELLER:**  Well, I wouldn't call it a leap,

15   your Honor.  What I would suggest is that, certainly, it's         02:23

16   going to -- it is applying the law, is what I would suggest,

17   your Honor.  The fact is, the enormity of the wrong here really

18   shouldn't be a reason the Court should shirk from ordering the

19   property back.

20          **THE COURT:**  Just how you responded to me there, it's    02:23

21   applying the law.  I understand.  That's why I prefaced this by

22   saying we're sitting in equity.  And I understand that even in

23   equity, of course, I'm required to follow the law.

24          **MR. ZELLER:**  Yes.

25          **THE COURT:**  But I need you to address the equities of   02:23

```
 1   this.

 2          MR. ZELLER:  I will, your Honor.  And I also think

 3   that --

 4          THE COURT:  I'll certainly want to hear from MGA in

 5   the same regard, but it's something that I -- in reviewing          02:23

 6   these papers, that has been kind of in the back of my mind

 7   throughout these last several weeks.  I've had any number of

 8   people come up to me in the last month or so and say, Aren't

 9   you glad to have that Bratz case all over with?  Now we're at

10   the critical point.                                                 02:23

11          MR. ZELLER:  I would say this, your Honor:  The Court

12   has, of course, seen the evidence during the course of trial;

13   and, certainly, there is a base line, obviously, on this

14   particular issue that the Court needs to be consistent with, of

15   course, with the jury verdict; the timing of the name; the fact    02:24

16   that there was, in fact, intentional torts that were committed

17   by MGA here; that there was fraudulent concealment.  And I

18   think, frankly, when you start looking at those issues, I mean,

19   that helps, I think, really set the equities.

20          The fact is, MGA is not going to be walking out empty       02:24

21   handed.  The fact is, they have been given -- and unfortunately

22   had the right to exploit these things when Mattel was unaware

23   of its rights.

24          Now Mattel is aware of its rights.  It's here in

25   court to protect the rights that it, in fact, owns.  To allow      02:24
```

1    MGA, going forward -- that's really the issue here, is what are

2    we going to allow MGA to continue to do into the future?

3           These are Mattel rights.  MGA is excluding Mattel, as

4    we speak, from any right to use the name "Bratz" in connection

5    with dolls, even though those were Mattel's rights.  You can          02:25

6    rest assured, when Mr. Russell poses his hypothetical about,

7    why wasn't Mattel using it, well, obviously, once we knew about

8    our claims here with respect to the name from Carter Bryant's

9    deposition -- I mean, I don't know what it is that MGA

10   realistically thought we were supposed to do.  Produce dolls         02:25

11   with the name "Bratz" so we could be sued for trademark

12   infringement?

13          It's really the equities that they're talking about,

14   your Honor.  I think fairness, fairness to talk about equity

15   that way really is to put us back to where we should have been,      02:25

16   absent Carter Bryant, with MGA and Mr. Larian's participation

17   in breaching his obligations to Mattel.  That's what caused all

18   of this, your Honor.  And the fact is that MGA -- there's no

19   question -- and I don't think that they can argue -- that they

20   have not already gained some benefit from doing this; so I           02:26

21   don't think that it is a matter of equity.

22          The other thing to bear in mind, your Honor -- and

23   this is why it's also critically so important.  And it's not a

24   matter of just saying, Well, am I going to deny Mattel what it

25   should get?  MGA has sued us.  MGA has claims against us going        02:26

1    forward.  So for the Court to allow them to walk out of this

2    courtroom still asserting these rights will not only deprive

3    Mattel of the rights that it should have had, allow MGA to

4    benefit from its tortious conduct, but it will allow MGA to

5    continue to pursue claims against Mattel.  And that's just not      02:26

6    right.

7              Any way that you look at fairness, or equity, the

8    equities here are to put everybody back where we belong, and

9    where we should have been in the first instance.

10             The fact is, they claim that we're the ones who          02:26

11   ripped off all of this stuff.  And that's not what the jury

12   found.  That's not what the facts are.  And to allow MGA to

13   pursue those kinds of claims, that in itself is an injury.

14             I would also say, your Honor, with respect to this

15   whole issue about the value, I will find the testimony where       02:27

16   Mr. Larian said the effect of what I was talking about earlier.

17   It was some other MGA executive that, in fact, having -- you

18   know, developing internally, within a toy company, a project

19   like doll designs with a great name to go with it, that's

20   valuable; that's proprietary.                                      02:27

21         **THE COURT:**  And that's your argument with respect to

22   the standing issue as well?

23         **MR. ZELLER:**  That's correct.

24             And also on that point, your Honor, with respect to

25   the standing, there's a judicial admission here that Bratz has     02:27

```
 1   taken away market share from Mattel.   That is something that's

 2   in MGA's own papers.   That's even in their 1-C opening brief,

 3   where they make quite clear that there's been damage and harm

 4   and everything else.

 5              So, I mean, to sort of suggest that somehow because      02:28

 6   Mattel did not seek damages, its own quantifiable damages from

 7   the jury, somehow precludes us now, that just does not really

 8   add up.

 9              Then, of course, finally, on that point of harm,

10   your Honor, the Court will recall that I stood here and I          02:28

11   basically asked the Court not to even instruct the jury on the

12   element of harm for those torts.   And in particular -- because

13   our understanding was, it was something that had been resolved

14   on summary judgment.   And, of course, I think it was even

15   Mr. Russell who convinced the Court that that element should go    02:28

16   into each of our claims.   The jury found in our favor on those

17   claims.   They necessarily found that MGA's conduct caused us

18   harm.

19              So I would respectfully submit that with respect to

20   the standing issue, the jury's findings on that are               02:29

21   dispositive.   There's no question that we have been harmed.

22   And that's embedded in the jury findings, along with the

23   evidence of market loss.

24              And then just briefly, your Honor, on the point that

25   we tried to exclude that kind of evidence about market loss,      02:29
```

```
 1   certainly we tried to do that in front of the jury.  But that
 2   was because it's an equitable issue.  It goes to equitable
 3   issues here.  But that has nothing to do with whether or not
 4   this Court should consider this evidence.  And there is, in
 5   fact, at a bare minimum, a judicial admission of it in MGA's     02:29
 6   own brief.
 7            THE COURT:  Very well.
 8            I'm going to hear briefly from Mr. Russell, and then
 9   we're going to take a 15-minute break.
10            MR. RUSSELL:  Thank you, your Honor.                    02:29
11            It's difficult to know where to start with that
12   lengthy list with him, but I guess what I would say is, if we
13   took ourselves back to the question -- he's saying to return
14   ourselves to where we were.  There can be no denial that the
15   jury was asked to assess sort of the measure of the             02:30
16   wrongfulness.  This is an argument that Mr. Kennedy is going to
17   make at --
18            THE COURT:  I know that we're going to be hearing
19   this --
20            MR. RUSSELL:  I don't want to take his math from him,   02:30
21   but I'm going to do it for a second.  The jury found, under
22   claim damages, that they were going to award less than one
23   percent to wrongful conduct.  I'll let him explain how that
24   comes down.  But the fact is, the jury's findings are
25   completely consonant with what I'm asking you to do today.      02:30
```

1    That is to say, the equities are all in MGA's favor, especially

2    with respect to the name.  There's no argument that the name

3    was built up by MGA.  They didn't have any rights at the time.

4    I've said to you that they had no copyright in a name; there

5    was no trademark in the name.                                    02:30

6          **THE COURT:**  You mean that it wasn't built up by

7    Mattel.

8          **MR. RUSSELL:**  Yes.  Because if there's no value in

9    the name, there's no rest.  Mr. Zeller cannot respond with any

10   value, other than to say there is, without pointing to          02:30

11   anything.  There was no value.  There was nothing for

12   Mr. Bryant to transfer to Mattel at the time he came up with

13   that name.  MGA lawfully and appropriately built up the name

14   "Bratz," and everything it did from the time it took possession

15   of that name forward was lawful and was a result of its hard    02:31

16   work, its investment, and its business acumen.  And it would be

17   completely unfair, in the grossest possible sense, and I

18   believe unprecedented, if your Honor were to hold that MGA

19   could be stripped of that trademark and all of the value that

20   was created in it, simply because the jury awarded less than    02:31

21   one half of one percent.  That's what it's finding was of the

22   claim damages.  That's the wrongfulness here.  This miniscule

23   vanishing puff in the area on the copyright claim, it's

24   nothing.  And what they're asking you to do is to take away

25   marks and brand rights that are worth billions of dollars.      02:31

1    They had their day in court on a billion-dollar claim.  They

2    lost it.

3           The facts are, under straightforward law, MGA

4    developed this mark, developed the value; and now, having sat

5    back on their rights, they want to take it.  They ask, What       02:31

6    could they have done?  It's such a simple answer.

7           The day that they deposed Carter Bryant, they should

8    have run into court, slapped an injunction motion in front of

9    your Honor, or whoever the court was, and said, Stop using our

10   property.

11          Did they do that?  No.

12          Why?  Because they recognized they had no right in

13   the value to the name "Bratz."  Instead, they sat back, and

14   even after they filed affirmative claims for the dolls and the

15   drawings, they sat back and let that brand continue to grow,      02:32

16   continue to become more valuable, every day.  They even

17   eschewed the rights to the name "Bratz" before trial, during

18   trial, and after trial.

19          As we point out in our briefs, even on the judgments

20   as a matter of law, we challenged them and said, Are you taking   02:32

21   the position you're seeking the rights to the value in the name

22   "Bratz"?  And they have no answer.

23          So what could they have done?

24          They could have done a lot.  But they didn't do

25   anything.  And to say that for them to have the equities, with    02:32

```
 1   respect to this issue, is just simply out of line with all
 2   reason, I would submit, your Honor.  MGA clearly has the rights
 3   to the name.  I think your Honor sitting in equity must give
 4   the name to where it belongs, the rightful owner, the one who
 5   put the work in, the one who had the vision and the foresight      02:33
 6   to build it into the brand that it is.  And that is MGA.
 7           THE COURT:  Thank you, Counsel.
 8           We're going to take a recess for 15 minutes, and then
 9   we'll resume with the motion for permanent injunction.
10           (Whereupon, a brief recess was held.)                      02:55
11           THE COURT:  We're back on the record.
12           The Court at this point would like to take up the
13   Mattel motion for a permanent injunction.
14           MR. QUINN:  Thank you, your Honor.  Good afternoon.
15           THE COURT:  Good afternoon.                                02:56
16           MR. QUINN:  Your Honor, I take it from the briefing
17   that there is no dispute that the Court is, in this proceeding
18   at this point, bound by factual findings that the jury
19   necessarily and actually made in reaching its verdict.
20           We submit, your Honor, it's also the law, and we          02:56
21   think MGA has not been able to find a case to the contrary;
22   that the Court is only bound by findings that were actually and
23   necessarily made.  And for that, your Honor, we would cite the
24   Court to the Roberts decision, as well as the Burton decision.
25   In those instances, there were general verdicts, and the Court    02:56
```

```
 1   addressed the question, Well, what was necessarily and actually
 2   made?  A court, sitting in equity, addressing potential
 3   equitable relief following a jury verdict is only bound as to
 4   those things that are actually and necessarily -- were decided
 5   or inherent in the verdict.                                    02:57
 6       MGA relies on cases arguing that while the Court has
 7   an obligation to reconcile the verdict, but those cases all
 8   arise in the context of new trial motions, where we submit, the
 9   Court's task is really very different.  At that point, the
10   Court is faced with a task of, Is there any reasonable         02:57
11   interpretation that can be placed on these verdicts in order to
12   preserve the result rather than grant a new trial?  Is there
13   any rational explanation?
14       At this point, your Honor, sitting as the court in
15   equity after a jury verdict, the Court really -- it's more like 02:57
16   a collateral estoppel analysis.  The Court is not charged with
17   the duty of trying to reconcile it and come up with a result
18   that's consistent.
19       THE COURT:  The Court should try to infer what it
20   reasonably can from the jury's verdict, should it not?         02:58
21       MR. QUINN:  I don't think so, your Honor.  And that's
22   what those cases indicate; that it's only -- it's a collateral
23   estoppel-like test:  What did the jury necessarily and actually
24   find?
25       And that's what those cases that we've cited to the        02:58
```

```
 1   Court say.

 2           THE COURT:  But the findings can be implicit as well

 3   as explicit, can they not?

 4           MR. QUINN:  I suppose.  Findings are certainly

 5   subject to interpretation.                                      02:58

 6           THE COURT:  Right.

 7           MR. QUINN:  And MGA has offered four different

 8   interpretations concerning the jury's verdict on the

 9   infringement damages.

10           They have suggested that, 'Well, this must have been   02:58

11   just for the first generation dolls.'  They've suggested that

12   -- Mr. Meyer says, 'Well, they may have found some small amount

13   of ongoing infringement; the number of infringing products

14   might have been small'; that's the third.  And, finally, that

15   the contribution of the drawings, the copyrighted drawings, was  02:59

16   small.

17           These are all efforts to try to understand how the

18   jury reached the decision that it did.

19           There are other possible explanations, your Honor.

20   The jury may have been influenced by the testimony that the    02:59

21   Phase 1-A verdict was devastating; that it was now impossible

22   to place any value on Mr. Larian's stock.  And Mr. Kennedy,

23   bless his heart, even blurted out the possibility of an

24   injunction and that he would be shut down.  I'm sure we all

25   remember that.                                                 02:59
```

1        I think it's an equally-plausible interpretation that

2   that kind of testimony, your Honor, struck home with the jury.

3   It's equally plausible to think they thought, 'These folks have

4   been punished enough.  Mr. Larian's stock may now be worth

5   nothing.  The Court may shut them down; there may be an                    02:59

6   injunction.'

7        The point is, we don't know.  We simply don't know.

8        **THE COURT:**  This was a general verdict, but it wasn't

9   a wholly general verdict.  It wasn't simply like, 'If you find

10  liability, fill in this dollar amount.'  The jury was asked                03:00

11  specific questions, and the dollar amounts they came up with

12  were reflected -- they essentially answered those questions in

13  dollars and cents.  And, certainly, the Court is bound by

14  whatever explicit or implicit logical conclusions are to be

15  reached by those answers.                                                  03:00

16       **MR. QUINN:**  Your Honor, if the Court goes down that

17  road, I submit the Court would be speculating as to how they

18  got to that.  I mean, it was a general verdict in terms of what

19  was infringing.  The dollar amount, how they got there, from

20  one to the other, we'll never know.                                        03:00

21       And there's a case that tells us that the dollar

22  amount can't constrain the Court in terms of implicit findings

23  in framing subsequent equitable relief, unless it can tell to a

24  mathematical certainty that in reaching that dollar amount,

25  they must have made the implicit conclusion.  And that's the              03:01

1    Ohio-Sealy case, your Honor.

2            So one thing is clear at this point.  We're

3    speculating, we're all speculating, about how they got from

4    here to there.  And once we're speculating, we're outside the

5    realm of the Court being bound as to findings, in terms of          03:01

6    jury's findings, antecedent findings; as to what was infringing

7    or what wasn't infringing, or how they got there.

8            So we're at a stage which I think the Court

9    anticipated at the time we talked about the verdict form.  The

10   Court recognized at the time -- the Court may remember going       03:01

11   back and forth on this -- the Court said, 'At the end of the

12   day, the Court recognizes there's no way I'm going to ever

13   avoid the situation, or, going through this exercise that we're

14   going through right now of determining what is infringing and

15   what the infringement was, in framing the proper scope of         03:02

16   equitable relief.'  The Court recognized that at the time,

17   because it didn't have all of the dolls in front of it.

18           Now, MGA seeks to trivialize the award.  We hear

19   1 percent; we hear 1/2 of 1 percent.  Your Honor, today,

20   $10 million, I think, is still a substantial amount of money.     03:02

21   If you look at what the profits after tax on the dolls were,

22   the Bratz dolls, cumulatively -- their Exhibit 13931 said that

23   they were $200 million after taxes on the core Bratz dolls; so

24   $10 million is not a trivial amount in comparison to that.

25   It's 1/20th.  It's not nominal.  It's not $1.  It's not          03:03

 1    nothing.  It's a substantial award.

 2           Moreover, your Honor, there's a case in the

 3    Ninth Circuit that says that in trying to understand what the

 4    jury intended, the Court can look at the award on other causes

 5    of action.  That's the Banes case.  And in that case, there was          03:03

 6    an award on a 1983 claim, and the jury found no damages, no

 7    economic damages, but awarded punitive damages.  And then on

 8    another cause of action, breach of contract, the jury found

 9    $50,000 damages.  It went up to the Ninth Circuit; the Ninth

10    Circuit said the trial court appropriately looked at the award          03:03

11    on the other causes of action in trying to determine the jury's

12    intent and that it was proper to uphold the award of the

13    punitive damages.

14           Interestingly, your Honor, it occurred to us, in that

15    case, was the jury instructed, like ours, that on each cause of         03:03

16    action, they should make a determination as if that cause of

17    action was standing alone, and enter an award that they thought

18    was appropriate for that cause of action?  And it was.  In that

19    case, the jury was instructed the same way.  Yet, the Ninth

20    Circuit said it was entirely appropriate for the Court                  03:04

21    post-trial to try to understand the jury's intention, framing

22    equitable relief, to look at all of the awards on all of the

23    claims.

24           Of course, if you do that here, your Honor, you have

25    a $100 million total amount under all of the awards, if you             03:04

```
 1    look at the other claims.  So this is a substantial award,
 2    however you look at it.
 3         Moreover, I think there's an idea that somehow got
 4    into the briefs, or has gotten into the discussion here, that
 5    if there was a comparatively low infringement award, damages      03:04
 6    award, in relation to what was sought by the plaintiff, that
 7    that somehow argues for no injunction.
 8         Your Honor, there's no case that supports that
 9    proposition.  There is no case that says if the damages are
10    low -- the damages awarded are low; therefore, you don't get an   03:05
11    injunction.
12         THE COURT:  That's not the argument.  That's an over
13    simplification of what MGA is saying.  As I read what they are
14    saying it's that what we don't have is a clear delineation by
15    the jury of what they found to actually be an infringement.       03:05
16    And the best measure of that is, from MGA's perspective, the
17    damages that were awarded, suggesting that what they found to
18    infringe was a relatively small portion.
19         And then that impacts what should be subject to the
20    permanent injunction, suggesting that it should be just the       03:05
21    original four dolls, or what have you.  There are different
22    permutations.
23         MR. QUINN:  If I've oversimplified it, the argument,
24    and that's not really an argument they're making, fine.
25         THE COURT:  I think you need to address the argument        03:06
```

```
 1    that they are making, which is a little more sophisticated than

 2    simply saying just because it's a low damages award, there is

 3    not much of a grounds for injunctive relief.

 4         What they are suggesting is that that is a measure of

 5    the copyright infringement.                                        03:06

 6         MR. QUINN:  Your Honor, I would submit, there's no

 7    case law to support that; and implicit in that is a conclusion

 8    as to how much copyright infringement the jury found.  And we

 9    get back to something that we can't tell from the jury verdict.

10    That's going to be your Honor's privilege to resolve.             03:06

11         If you look at the Dr. Seuss case, just because it's

12    a relatively small infringement in the work does not mean you

13    don't get an injunction.  In the Seuss case, it was just the

14    back cover that was infringing; yet the Court enjoined the

15    entire book.                                                      03:07

16         In the Kaden case coming out of the Ninth Circuit,

17    your Honor, a software case, the determination was that only

18    5 percent of the software was infringing.  The Ninth Circuit

19    said it was error not to grant an injunction reverse.

20         So first off, I don't think it's a trivial award.  I        03:07

21    think it's a significant award.  $10 million is a significant

22    amount.  Banes tells us we can look at the entire amount of the

23    verdict in assessing what the jury intended in their assessment

24    of the economic damages.  That's $100 million.

25         But in any event, even if it's a small amount,              03:07
```

```
 1    there's ample authority that an injunction should still issue.

 2    So we get to the point now, what's the Court's role when you've

 3    got a jury verdict which is kind of a black box.  I mean, we're

 4    not going to know how they got there.  And there's ample

 5    authority that it's the Court's task now, as this Court                    03:08

 6    anticipated at the time of the conference when the jury verdict

 7    was settled, that this Court is going to have to make a

 8    determination, based upon its own view of the evidence, as to

 9    the proper scope of injunctive relief.  That's what happened in

10    the Burton case and the Roberts case and the L.A. Protective         03:08

11    League case, where the Court afterwards, after the verdict,

12    made an assessment.

13            Now, let me just talk briefly before I begin

14    discussing the infringement issues -- your Honor, if I may

15    discuss the election of remedies.                                         03:08

16            THE COURT:  Yes.

17            MR. QUINN:  MGA raised -- it was actually their first

18    point in their brief.  The argument is that we decided to

19    pursue damages for future infringement.

20            THE COURT:  And that substitutes for the --                      03:09

21            MR. QUINN:  And that substitutes and, therefore, we

22    made an election there.

23            They first say that the argument, as framed, only

24    applies to Mr. Larian and not MGA or Hong Kong, because what

25    they are referring to is the analysis that was done by Mattel's        03:09
```

1    damages expert, trying to arrive at a present value for the

2    benefit that Mr. Larian has received from infringing activity.

3            So there is no even argument that can be made as to

4    MGA or MGA Hong Kong.  We tried to deduce evidence concerning

5    future damages.  But even as to Mr. Larian, we didn't seek          03:09

6    future damages.  We were trying to assess -- the expert was

7    trying to assess as of the point in time that he did his

8    analysis --

9            **THE COURT:**  The present value.  I understand that,

10   Counsel.                                                            03:09

11           **MR. QUINN:**  Okay.

12           In any event, you'll recall Mr. Meyer's testimony,

13   your Honor, that you can't value it.  They make much about the

14   fact that the value the jury assigned to Mr. Larian's benefit

15   was zero.  Apparently, they agreed; they accepted Mr. Meyer's      03:10

16   testimony that you simply couldn't value it, given the 1-A

17   verdict, and given what happened.

18           So I turn now, your Honor, to infringement.

19           The Court identified for the jury, as it was required

20   to, the protectable elements in Mattel's copyrighted works in      03:10

21   Exhibit 26.  And I think you don't have to look any further

22   than the sculpt that Mattel owns.  That's Exhibit 1136.

23           **THE COURT:**  Yes.  But some of what you're seeking

24   goes well beyond the sculpt, Counsel.

25           **MR. QUINN:**  Yes.  But I'm starting with the sculpt.     03:10

```
 1          THE COURT:  All right.

 2          MR. QUINN:  The sculpt, your Honor, the question is

 3   whether the dolls that are on sale today, and that they say

 4   they are going to continue to sell, incorporate those

 5   protectable elements which the Court identified, such that          03:11

 6   there is substantial similarity.

 7          And the Court has to do this analysis, bearing in

 8   mind the rule in the Ninth Circuit that our burden in proving

 9   substantial similarity is lowered by the fact that MGA had

10   unfettered access to Mattel's copyrighted works.                    03:11

11          The Court also has to, I suggest, bear in mind -- and

12   I won't walk through the extrinsic test and the intrinsic test.

13   I know the Court is very familiar with that.  But just one

14   special application rule here which is important in the

15   intrinsic test in assessing substantial similarity from the        03:11

16   overall look and feel of the alleged infringing work.  The

17   Court has to look at it from the standpoint of the intended

18   audience, 7 to 12-year-olds.  And we submitted some evidence on

19   that.

20          The Court has seen the evidence as it played out in          03:12

21   the trial, and when you consider the fact that the test of

22   substantial similarity is lowered in this case and that the

23   audience is 7 to 12-year-olds, I think it's very difficult to

24   reach any conclusion other than the fact, other than the

25   conclusion, that all of these works are infringing.  They are       03:12
```

 1    substantially similar.  It's undisputed that the sculpt was

 2    always the same.  Virtually, there are a couple of instances,

 3    but for the core Bratz dolls -- and MGA does not dispute

 4    this -- the sculpt never changed, to this day.  Even in the

 5    couple of instances where they used a different body, they used     03:12

 6    the same head, the same features.

 7         Ms. Leahy took the sculpt that Mattel owns and she

 8    made some changes, and she testified about the changes that she

 9    made at length.  To do that, she had to blow it up on an

10    eight-foot screen.  She, as a professional sculptress, had to       03:13

11    explain it.  Most of the changes, the Court will recall, or at

12    least many of them, were to make the doll more manufacturable.

13    But at the end, it is substantially similar, that sculpt, the

14    body, the face, the head.  That sculpt is used to this day.

15    That production sculpt is substantially similar to the sculpt       03:13

16    that Mattel owns.  And that sculpt embodies the elements and

17    the particular style which the Court identified as being

18    protectable.

19         I submit, your Honor -- what does MGA say in response

20    to this?  They don't really address the sculpt issue.  They         03:14

21    talk in terms of, 'Well, the face paint.'

22         Your Honor, the appearance of the doll is driven by

23    the sculpt, the spacing of the eyes, the features that are

24    there, that are accented or not accented.  You can't paint it

25    to make it look like Shrek or Superman.  Or maybe you could,        03:14

```
 1   but they didn't try.

 2           We've got a slideshow and we can walk through the

 3   papers we've submitted.  If you compare the facial images of

 4   the Bratz dolls, including right down to the ones that are sold

 5   today, with Mr. Bryant's drawings, they are substantially          03:14

 6   similar.  Those unique forms of expression that the Court

 7   identified, the accentuation of some features, the

 8   deaccentuation of others.  They're there.  They have not

 9   changed.  The painted sculpt infringes.  The fact that they

10   paint it doesn't change the result, that it is our sculpt, it      03:15

11   is substantially similar to our sculpt.

12           Just in terms of fairness, the question the Court

13   raised, to permit them to use a sculpt which is substantially

14   similar to ours, going forward into the future, I submit -- and

15   to sue us for allegedly having knocked it off with My Scene,       03:15

16   just simply is not fair.

17           They talk about the skill of their designers in face

18   painting and in coming up with fashions and clothes for dolls.

19   Fine.  Let them put those on some other sculpt.  Let them do it

20   on some other image, where the eyes aren't the way those eyes      03:15

21   are, the nose isn't the way that nose is, and that

22   configuration isn't the way it is.  That's fine.  If they say,

23   'We've got some unique things that we did here and we do here,'

24   that's fine.  Let them do that on some other sculpt.

25           The characters, your Honor -- character and copyright      03:16
```

1   is protectable.  These characters -- and we're talking here

2   just about the original four characters -- they have certain

3   attributes; they have mascots; they have symbols.  Those have

4   not changed.  Those characters are identifiable; they were

5   created by Carter Bryant while he worked for Mattel; they are          03:16

6   owned now by Mattel; they should not be able to continue to use

7   those characters.

8           Your Honor, the order has got more exhibits attached

9   to it than any order I've ever seen.

10          **THE COURT:**  I could say the same thing.                    03:16

11          **MR. QUINN:**  The problem here, from our standpoint,

12  the challenge here, was that an injunction can't cross

13  reference any other documents.  It's all got to be

14  self-contained.  So the effort there, your Honor, was to try to

15  eliminate doubt, to identify the sculpts, to give images of all        03:17

16  of the different Bratz dolls, the four main characters, as well

17  as those which have come since, which use the same sculpt.

18          The two-dimensional images which we own, the

19  packaging art -- it includes screen shots of television ads

20  which we contend are infringing.  It also uses those same              03:17

21  two-dimensional images.  Print ads as well.  Registrations of

22  the works that we own.  And, basically, it was an effort to try

23  to eliminate doubt and to be as clear as we could about what

24  would be covered by this injunction.

25          So I apologize for the length of it, your Honor, but           03:17

1    we had a hard time coming up with a different way, some way

2    that would not just invite another lawsuit about whether this

3    next product is being sold in contempt of a court order or

4    whether it infringes rights or not.

5          I submit, your Honor, there's no question that these      03:18

6    products infringe.

7          So now we get to the question of, is it appropriate

8    under the other tests, under the tests for permanent

9    injunction, for an injunction to issue here?

10         Most of the discussion in the briefing on this           03:18

11   subject has focused on the element of irreparable harm,

12   including, in particular, the potential impact of the eBay

13   decision.

14         The eBay decision has not been with us all that long,

15   and different courts have interpreted it in different ways.    03:18

16         **THE COURT:**  Just so you understand, that will, of

17   course, govern this Court's decision in this case.

18         **MR. QUINN:**  Of course, your Honor.

19         What we understand eBay to mean is that it is no

20   longer a per se rule that if there's an infringement, an       03:19

21   injunction should automatically issue.  The Court is required,

22   post-eBay, to do an analysis.  It's not enough to have found

23   infringement.

24         But since eBay, in the vast majority of cases, courts

25   continue to enter injunctions when you have past and ongoing   03:19

1    infringement, like we have here.

2         At the end of the day, it's an equitable remedy, of

3    course, and the Court must do equity.  And I think it's

4    important to focus on one of the attributes or elements or

5    rights of copyright; that is, the right to exclude others.          03:19

6         In their concurring opinion in the eBay decision,

7    Justices Roberts, Ginsburg, and Scalia noted the continuing

8    importance of the right to exclude.

9         We have not been able to find any case where there

10   has been past infringement, a threat of ongoing infringement,       03:20

11   and an impact on the right to exclude, where a court has denied

12   an injunction.  In the Grokster case, which MGA relies on,

13   Judge Wilson was careful to note that where the right to

14   exclude others would be impaired, that weighs heavily in favor

15   of granting an injunction.                                          03:20

16        It's hard to imagine a case where the right to

17   exclude is not impacted more than this case, your Honor.  It's

18   not just impacted.  It's annihilated if an injunction does not

19   issue here.

20        We were not told about this history for years.  It            03:20

21   was hidden from us about the existence of our rights.  And we

22   are being sued today for marketing a product which they contend

23   infringes their rights in Bratz.  It's kind of a reverse right

24   to exclude.  They want to exclude us.  The world believes that

25   Bratz is MGA's copyrighted work.  It's impossible for us to         03:21

```
 1    control that work, to exclude others.  This is like the end of
 2    the continuum in terms of the right to exclude.  There is no
 3    relief for us; there is no way for Mattel to exercise its
 4    rights or to protect its rights without an injunction here.
 5         THE COURT:  Counsel, I understand your arguments on          03:21
 6    the first three elements.  The one I'd like you to focus on,
 7    the one I have the biggest difficulty with, is the fourth, the
 8    public interest, and how that would be impacted by a permanent
 9    injunction.  MGA contends that not only would consumers be
10    denied an important product, but that Mattel would end up with   03:22
11    essentially a monopoly on the fashion doll market; the chilling
12    effect on competition and the other various arguments they
13    make; and particularly the timing of this.  You're asking me to
14    do this -- it's now November.
15         MR. QUINN:  I think we made an ex-parte application          03:22
16    to move this up, your Honor, for the precise reason that that's
17    mostly history.  The material is shipped, by and large -- my
18    understanding of the way the industry works, by November, the
19    stuff is either in the stores or on the way to the stores.
20         THE COURT:  It still would have -- even if we would          03:22
21    have moved it up to October, it would still have destroyed the
22    Bratz sales for the Christmas season.  That's largely why I
23    denied your ex-parte application to move it up.  And then we're
24    still here -- the timing of this does not necessarily seem
25    appropriate.                                                     03:23
```

```
 1          That, of course, is a secondary issue to these larger

 2   arguments about the chilling effect that this would have on

 3   competition, competition in the fashion doll industry and the

 4   rest.  These are pretty significant public interest arguments

 5   that MGA makes.                                                    03:23

 6          MR. QUINN:  Right.

 7          In terms of this Christmas, your Honor, there are

 8   certain major retailers in this industry, Toys-R-Us -- and

 9   there's some other obvious candidates.  Mattel needs to have

10   good relations with those folks.  And I think if I had a moment   03:23

11   to confer with counsel, I could confirm my understanding that

12   Mattel would not do something that might damage its relations

13   with those retailers who have already made commitments for this

14   Christmas, if the Court understands what I'm saying.  Mattel

15   would be shooting itself in the foot to try to disrupt things     03:23

16   that could happen in that near-term time frame.

17          Again, I would want to confirm that with my client,

18   but that's my understanding of my client's position,

19   your Honor, in terms of this Christmas.

20          THE COURT:  Going forward, we have these larger            03:24

21   issues of competition.

22          MR. QUINN:  Your Honor, we submitted a declaration --

23   there are a number of fashion dolls out there.  Mr. Larian

24   identified a bunch of them on the stand when he testified.

25   We've submitted a declaration of Ms. Koda, where she identifies   03:24
```

```
 1    the other fashion dolls that are out there; so it's not as if
 2    there aren't any alternatives.
 3              And this is not a situation where --
 4         THE COURT:  How many other dolls have entire aisles
 5    of a Toys-R-Us or a Wal-Mart devoted to them?                    03:24
 6         MR. QUINN:  The reality, Hannah Montana is eating
 7    some folks' lunch, including folks present here in the
 8    courtroom.  Hannah Montana, High School Musical, there are new
 9    things that come up.  Bratz, whoever owns it, probably isn't
10    forever.  Barbie, Barbie may not be forever.  But you have new   03:25
11    ideas and new dolls that come to market.
12              Mr. Larian -- you'll recall Mr. Larian's testimony,
13    your Honor:  'If we hadn't done Bratz, we would have done
14    something else.  We would have been successful.  What
15    Carter Bryant brought wasn't that important.  We were           03:25
16    determined to do a fashion doll.  We would have done a fashion
17    doll.  We have all of these talented people.  We have these
18    unique octagonal shaped boxes.'  Put some other doll in there.
19    Put your face painters to work, painting some other sculpt.  Do
20    something else.                                                  03:25
21              But I think it would give the folks here in this
22    courtroom too much credit to conclude that the innovation that
23    another doll, another Hannah Montana, isn't just around the
24    corner next year.
25              And I think we also have to bear in mind and assess    03:26
```

```
 1    this public interest.  Is it relevant -- I think we have to ask

 2    ourselves, is it relevant that this brand that we're talking

 3    about protecting as a competitor began with a theft?  That was

 4    the genesis of it.

 5            In terms of the public interest, is that not              03:26

 6    something that factors in?

 7            I submit that it is something that does factor in.

 8            There's a discussion of the Abend case concerning the

 9    great Hitchcock movie "Rear Window."  They rely on that as a

10    case to indicate that even though there was infringement, the   03:26

11    Court said an injunction shouldn't issue.  I think that's

12    readily distinguishable.  The Court said in that case that was

13    a special case; the movie maker had done nothing wrong; they

14    were the victim of what the court characterized as a legal

15    technicality; that it was based on a short story; the author of  03:27

16    the short story passed away, and the rights under the old

17    copyright act reverted to the heirs, and they were able to hold

18    up a classic motion picture.

19            The two times the Ninth Circuit has been asked to

20    apply Abend and declined to give an injunction since then, both  03:27

21    times it declined to do so -- the two published cases, I should

22    say -- that's the A&M case and the Kaden case.  The case we're

23    talking about now is not a case where -- you can't say, as you

24    could say of the motion picture company in Abend, that the

25    defendant did nothing wrong.                                     03:27
```

1           We own the drawings.  We own the sculpt.  The Court

2    has seen the evidence.  We have submitted additional evidence,

3    which we understood all along that the Court was going to

4    entertain at this stage of the proceeding, as, indeed, the

5    courts in the cases I cited also entertained.                     03:28

6           I'd point out, your Honor, if we were here -- and

7    they raise an issue about whether it's appropriate for the

8    Court to consider this additional evidence -- if we were here

9    just on an injunction proceeding, if Mattel had only sought

10   injunction, there would be no jury trial.  I can provide the     03:28

11   Court with authority.  That's true in patent cases, and it's

12   true in copyright cases.  The Court is entitled to consider

13   this additional evidence.

14          I'd be happy to address any other questions the Court

15   has.                                                              03:28

16          **THE COURT:**  You made allusion to evidence that you

17   wanted to present to the Court, or you may want to present to

18   the Court, or you had available for the Court.  This afternoon

19   is the time to present anything further.

20          I want to hear from Mr. Kennedy before you get into       03:29

21   that, but if there is anything that you need to present to the

22   Court, now would be the time to do it.

23          **MR. QUINN:**  Is your Honor referring to what I

24   mentioned about conferring with my client?  Because of the

25   other evidence, we have submitted everything, your Honor.        03:29

1          **THE COURT:**  You mentioned some slideshow or

2    something.

3          **MR. QUINN:**  Oh.  Those are copies of things that the

4    Court already has.

5          **THE COURT:**  They're already before the Court?        03:29

6          **MR. QUINN:**  Yes, your Honor.

7          **THE COURT:**  Thank you, Mr. Quinn.

8          Mr. Nolan?

9          **MR. NOLAN:**  Before Mr. Kennedy addresses what will be

10   the affect and the scope of the relief Mattel is seeking, the    03:29

11   one point I wanted to touch on first is last -- and maybe the

12   reason I'm jumping ahead is, I gave Jason Russell part of my

13   argument and he took the whole thing.  I was fully prepared on

14   Footnote 11, at Page 17.  That was my idea.

15         **THE COURT:**  You're relegated to a footnote,           03:30

16   Mr. Nolan.

17         **MR. NOLAN:**  It happens, even at the house.

18         Here's the point, your Honor.

19         I know time is short and Mr. Kennedy is the primary

20   word.  I was struck by Mr. Quinn's arguments, though, in        03:30

21   inviting you, in a sense, to sit now, under equity, to, in

22   effect, have a redo of a very lengthy trial that we had in

23   front of the jury with respect to the substantial similarities

24   of products.

25         **THE COURT:**  So you don't think I should be conducting 03:30

1    the extrinsic/intrinsic copyright analysis of each of these

2    dolls that I have up in courtroom four?

3            **MR. NOLAN:**  Respectfully not, your Honor.  The reason

4    for that is quite clear; and the record, I think, is also clear

5    on this.  This was an unusual jury deliberation setting, and I    03:30

6    think it best presents why you should, frankly, avoid the

7    invitation.

8            This Court set up the courtroom upstairs as a doll

9    room.  There are stipulations that were read to the jury to the

10   effect by Mr. Quinn -- because it was their stipulation that we    03:31

11   agreed to -- that the dolls that were contained in that

12   courtroom were representative samples of the entire breadth of

13   the Bratz brand; there were core dolls, there were licensed

14   products, and so on and so forth.

15           The jury physically deliberated in a jury room which    03:31

16   was directly outside of the jury room.  We were, not

17   surprisingly, not allowed to go up to the fourth floor and peer

18   through the window of the courtroom to see whether or not they

19   were, in fact, looking at all of these dolls.  But I did not

20   hear from Mr. Quinn one single argument that differed from the    03:31

21   same impassioned argument that Mattel made to this jury.  In

22   fact, to the point, when Mr. Quinn says, 'While you're looking

23   at this, your Honor, remember you should be looking at it

24   through the eyes of a 7- to 10-year-old,' that was the

25   standard.    03:32

```
 1          THE COURT:  A girl.

 2          MR. NOLAN:  A girl.

 3          THE COURT:  That makes it even more --

 4          MR. NOLAN:  I think that all of us who have daughters

 5   still can kind of look through that prism.                      03:32

 6          And the Court noted at the time that, you know, as an

 7   adult you look at this and you might walk away with one

 8   impression; but through the prism of the eyes and the

 9   wonderment of a young girl, it is different.

10          THE COURT:  It's different and it's difficult; and       03:32

11   you make a good point.  What I want you to address, though,

12   Mr. Nolan is this:  And you're right, I'm hearing the same

13   arguments, to a certain extent, now for several times.

14   Mr. Quinn made those arguments to the jury.  The jury did have

15   this unique access that you described.  They assessed, based on 03:33

16   the Court's instructions, conducting the extrinsic and the

17   intrinsic analysis in terms of substantial similarity; and they

18   reached the conclusion that there was infringement; and then

19   they placed a dollar value, also pursuant to the Court's

20   instructions, on that.                                          03:33

21          At this point, what the Court has to do is determine

22   whether or not, based on their finding of infringement --

23   whether there should be any injunctive relief imposed, above

24   and apart from the dollar value of that.

25          MR. NOLAN:  I understand.                                03:33
```

1          **THE COURT:**  In order for me to decide about that --

2     I've got two binders full of exhibits that are the actual

3     photographs of the merchandise that Mattel is seeking the

4     injunction to.  I can't tell from the verdict form which of

5     these the jury found infringement on.                          03:34

6          How else can I decide whether or not there should be

7     an injunction without going and conducting that same extrinsic

8     and intrinsic analysis that we presume that the jury did?

9          **MR. NOLAN:**  Correct.

10         And I'm not going to lateral, but I'm getting the       03:34

11    high sign that I should lateral to Mr. Kennedy, because he'll

12    address how I think the Court can, consistent with the jury's

13    finding, address that particular issue.

14         The point that I want to make, though, before I sit

15    down, your Honor, is this:  That in making that determination   03:34

16    in the first instance, why should you go through the exercise

17    that Mr. Quinn invited the jury to do, that a jury deliberated

18    and must, by its very verdict and its answer, have rejected the

19    argument that he wants to make that the scope --

20         **THE COURT:**  Wait a second.                          03:35

21         How did they reject that?

22         **MR. NOLAN:**  With respect to the breadth.

23         **THE COURT:**  With the breadth.

24         **MR. NOLAN:**  That's the only point.  So all I want to

25    do is address the sweeping comment that Mr. Quinn makes that    03:35

1    everything is the same, they're substantially similar.  Because

2    I think the overwhelming record of evidence is that they are

3    dissimilar, and, in fact, that was the success of why young

4    girls saw or perceived a difference between one version of the

5    doll versus another.  There are differences.                    03:35

6         THE COURT:  Let me ask you this:  You're able to make

7    this argument now because we had a general verdict form.  If I

8    would have accepted your invitation to have a more specific

9    jury verdict form, where we would have listed some -- although,

10   I guess, we would never have all of the exhibits at the time,   03:36

11   or all of the permutations of the dolls; we had the

12   representative --

13        MR. NOLAN:  Representative samples.

14        THE COURT:  Yes.

15        -- and the jury would have found substantial              03:36

16   similarity with respect to most or all of those representative

17   samples and still come back with the damage award that they

18   did, you wouldn't be able to make this argument; correct?

19        MR. NOLAN:  No.  I disagree, your Honor, because I

20   think that we would be informed by the amount of money that     03:36

21   they found.  And then you would also be able to -- and, again,

22   I'm stealing some thunder here.

23        THE COURT:  Do you understand the question, though?

24   Let's say they find a particular doll -- just pick any one of

25   these at random, Exhibit 3, Page 216 -- if they were to find    03:36

```
 1   that this was an infringement, along with, perhaps, hundreds of
 2   other dolls that they were to find substantially similar to
 3   this, but yet only award -- and I say "only" loosely, because
 4   it is a lot of money; ten million or one hundred million,
 5   however we want to characterize the verdict in this case -- how    03:37
 6   is it that you could have argued then that I should not impose
 7   an injunction on the infringed products?
 8            MR. NOLAN:  If the verdict form had been filled out
 9   that way and the jury had answered it that way, we could not be
10   making that argument.                                              03:37
11            THE COURT:  Okay.
12            MR. NOLAN:  But the argument that we are allowed to
13   make -- and I don't know which picture you're holding up.
14            THE COURT:  It's just a random picture of a doll.
15            MR. NOLAN:  Right.                                        03:37
16        So, your Honor, I agree with that point.  But let me
17   ask Mr. Kennedy to address the other issues.
18            THE COURT:  Let's bring Mr. Kennedy in.
19            MR. KENNEDY:  Good afternoon, your Honor.
20        Like Mr. Quinn, back at my desk, I have a long and,          03:38
21   perhaps, eloquent argument that I wrote out.  In light of the
22   Court's questions, it's still back where I was sitting; so what
23   I lose in eloquence during the next few minutes, hopefully I
24   will make up for in helpfulness.
25            THE COURT:  Very well.                                    03:38
```

1        **MR. KENNEDY:**  If I could, your Honor, we prepared

2    three graphs that I think visually depict some of the concerns

3    that you have been expressing here.  And those two got

4    shortened down dramatically.

5            Aaron, can we go to the first one.                      03:38

6            Your Honor, you'll recall this was one of Mattel's

7    exhibits -- I think it came up first in connection with

8    Mr. Wagner's testimony, and then we saw it again during final

9    argument, that in terms of the total Bratz profits, MGA had

10   $778 million, Mr. Larian had $696 million.  Combine those      03:38

11   together, it's something just south of $1.5 billion.  Against

12   that background, if we go to the next chart, we get to

13   Question 11 from the jury verdict, where the jury was asked

14   what amount of damages were to be awarded.

15           And just to digress for a moment, in arriving at       03:39

16   that, the jury, of course, was instructed that they were to

17   give full amounts and not be concerned about duplication.

18   Mr. Quinn referred to the Banes case from the Ninth Circuit,

19   said there was a similar instruction in that case.  We at least

20   cannot find it in our copy of Banes.  I'm sure the Court will   03:39

21   be able to determine whether, in fact, any of the other cases

22   deal with a "don't worry about awarding duplicative damages

23   instructions."  And, of course, the jury was also told to

24   disregard any possible injunction.

25           Now, against those two, let's go to graph three -- as  03:40

1   your Honor has said, there's no way, looking at the answer to

2   Question 11, we can tell exactly how the jury got to the

3   $6 million or $7 million or $10 million figure.  However, it

4   had to be in some combination of the following:  Either the

5   jury found that some very small subset of Bratz products, such        03:40

6   as, for example, the first generation dolls, infringed, or the

7   jury concluded that some larger subset of products, perhaps

8   every Bratz product, infringed.

9          The difficulty is, you've only got $10 million worth

10  of yellow, and you can either allocate that back to some small       03:40

11  subset of products, in which case the Court, doing equity,

12  says, 'Well, just a second, the infringement stops way over on

13  the left, and you're asking me to enjoin all of the blue space

14  up above,' or, alternatively, if you went through the exercise

15  and looked at all of those dolls up in the room and actually         03:41

16  concluded that every one infringed, we then have to take,

17  whether it's Mattel's $1.5 billion, or even coming all of the

18  way down to Mr. Meyer's $405 million in profits -- as

19  your Honor will recall, that's the lowest profit figure this

20  jury was ever given for the entire Bratz line.  So $10 million       03:41

21  of that -- and, of course, only $6 million is what they found

22  for MGA -- we're talking about 3 percent.

23         So the more widespread you might find the

24  infringement to be, the more vanishingly small would become the

25  contribution that's being made by Mattel's intellectual              03:42

```
 1    property.

 2              THE COURT:   What about factoring in apportionment?

 3    Let's say you have a product; pick any exhibit, and we'll call

 4    it product X; and it's found to be an infringing product.

 5    However, the dollar value -- let's say that's worth $100;        03:42

 6    that's a product value of $100.  But the jury finds that, under

 7    the apportionment instruction, only 10 percent or 5 percent of

 8    that is attributable to the infringing elements of that doll

 9    and 95 percent of it is to noninfringing.

10              Can't that account for a lot of the blue space you're   03:42

11    talking about?

12              MR. KENNEDY:   It could very well, your Honor.

13              THE COURT:   You don't know?

14              MR. KENNEDY:   We don't.  But my point is this:  For

15    purposes of an injunction, I submit it would be totally          03:42

16    pointless for your Honor to go through that exercise since, of

17    necessity, either -- you aren't going to be able to identify

18    it, but let's assume you are able to do it.  You're either

19    going to find there's some small subset of these products that

20    generated four hundred or six hundred million or a billion      03:43

21    dollars in profits that have 5 or 10 or 20 percent

22    infringement, or 1 or 2 percent infringement.  What you're

23    going to come out at the end is with either a small subset,

24    because you've only got $10 million to play with.  I use that

25    phrase advisedly.                                                03:43
```

```
1              So regardless of whether you find --

2         THE COURT:  I'm sorry.  I'm not following you on that

3    response.  Because if I find that there is a portion of

4    infringement on each of the products that, for example, Mattel            03:43

5    has submitted in their proposed order, a product infringes or

6    it does not infringe, and if you have a portion of your product

7    infringing, it's subject to an injunction.

8         MR. KENNEDY:  It would have been if we were here in

9    2005, your Honor; but the eBay case, we submit, put another

10   knob, another choice, on the dial.  Just because there's       03:44

11   infringement, you're no longer --

12        THE COURT:  I'm not suggesting that by itself is

13   sufficient.  I'm saying there are other factors as well.  I've

14   read eBay several times now, and it's certainly going to guide

15   my analysis in terms of deciding whether to enjoin.  But in       03:44

16   terms of the question of whether or not --

17             You're trying to use the copyright damages to

18   convince the Court that the jury really didn't find a copyright

19   infringement to a lot of these products.

20        MR. KENNEDY:  Not at all, your Honor.  The jury, as       03:44

21   we point out on this graph, could have found that every single

22   Bratz product infringes.

23        THE COURT:  If that's the case, why should at least

24   that factor in eBay weigh in favor of the injunction?

25        MR. KENNEDY:  For this reason, your Honor:  The jury,       03:44
```

```
 1   if they found all of the products, then they found at least

 2   $405 million in total sales, or if they believed Mattel, $800

 3   million, a billion four of those, the contributing factor in

 4   the profitability of the infringing products totaled $10

 5   million.  So if it's for every single product, even using the      03:45

 6   $405 million, best case for them, that says they found

 7   2.5 percent of the reason for the success for the profitability

 8   of the product was the use of the intellectual property, which

 9   says the other 97.5 percent came from Mr. Larian or his staff.

10            THE COURT:  Okay.                                          03:45

11            MR. KENNEDY:  My point is that would -- perhaps,

12   pre-eBay, it would have been a different world.  But in the

13   eBay world, where you're now allowed to truly do traditional,

14   old-fashioned equity, is it really appropriate to set out and

15   bar the sale of a product, 97.5 percent of which was in no way     03:46

16   Mattel's doing?

17            THE COURT:  Under that, what I have to ask are the

18   four questions, or the four factors, that eBay sets out.

19            MR. KENNEDY:  Correct, your Honor.  Starting with --

20   assuming we have 2.5 percent of every product, that every         03:46

21   product infringes and you divide the $10 million up, and --

22            When I first got married, we had a rug that was too

23   small, and we kept trying to move it around, and there wasn't

24   any way -- the damn thing would not cover the floor.  And you

25   have the same thing here with the $10 million.  The rug is too     03:46
```

```
 1   small for an injunction, regardless of how you allocate that
 2   money.  You either come up with a vanishingly small subset of
 3   infringing products, or you come up with a vanishingly small
 4   percentage of infringement by all of the products.  And the
 5   jury has put that cap for us.                                      03:46
 6        I submit, this is a classic case for looking for
 7   another remedy under eBay, which gets to your dilemma, because
 8   I can't make the yellow go away.  That's still there.  The jury
 9   found it.  Maybe we get it down to $6 million, you could talk
10   about a remittitur.  But there still clearly is infringement,     03:47
11   and our clients are profiting from that infringement, which is
12   why, when we came time to write our opposition to the
13   injunction in this case, we toyed with whether we ought to say
14   injunction -- excuse me.  Mattel hasn't mentioned the word
15   "royalty"; so, therefore, it's a gotcha; they've waived it for    03:47
16   all time, and on further thought, we said no, we ought to talk
17   about all of the remedies, and that's why we broached the idea
18   of a royalty, particularly in this case, where Mattel has never
19   commercialized the product; Mattel has never claimed that they
20   are trying to conduct other licensed negotiations and that        03:47
21   we're somehow holding down what they can charge.
22        The only harm -- and I put "harm" in quotes -- they
23   claim they suffered during trial was that they did not get
24   their cut of our profits.  And the royalty -- the jury has
25   given it to them retroactively -- the royalty provides a way to   03:48
```

```
 1    do it prospectively.  And they, of course, came back and said,
 2    Don't even mention royalties; we don't want to talk about that.
 3            My own theory is, that's because this is not a case
 4    that they have pursued on principled economic reasons all
 5    along.  As your Honor pointed out the day after the verdict          03:48
 6    came in, we can all agree, we have a profitable product that's
 7    in everybody's interest.
 8            What Mattel should be doing, if you're looking at it
 9    from economics, is saying, We want to get as much of that
10    2.5 percent as we can; go sell Bratz.  The last thing they          03:48
11    should be wanting to do is cut it off.  But we submit, the
12    reason is, they have never been here for the economics; they've
13    been here to destroy a competitor.
14            There's no reason why your Honor has to agree with me
15    on that one.  The point is --                                       03:49
16         THE COURT:  The royalty you propose, if I'm reading
17    your expert correctly, is 3/10ths of 1 percent.
18            MR. KENNEDY:  In that range, your Honor.
19            THE COURT:  Plus or minus a 10th of a percent.
20            MR. KENNEDY:  Correct, your Honor.  Even if we go and       03:49
21    apply the Georgia Pacific factors -- and, interestingly, the
22    district court in Georgia Pacific's analysis went to pains to
23    make sure that the infringer would still make a profit after
24    paying the royalty in that case, saying nobody would ever
25    license technology unless they were going to make money off of      03:49
```

1   it.

2          So here, even if you use the $405 million, there's a

3   max of 2.5 percent in benefit that we're getting.  So under

4   Georgia Pacific, rational people sitting down across the table

5   are going to be talking about something south of 2.5 percent.        03:50

6          Interestingly, the judge in Georgia Pacific got

7   reversed because the court of appeal found he had not allowed

8   for enough of a profit and concluded what you really needed to

9   do was have a royalty that would guarantee the infringer their

10  average profit from other lines of business.                         03:50

11         That's all, obviously, vested in your Honor's

12  discretion.  And the 2.5 percent, that's a best case.  That's

13  assuming you find they use Mr. Meyer's numbers.  If you use

14  that $1.4 million, you come out with an intellectual property

15  contribution of something like .67 percent, according to          03:50

16  Mattel's figures; and then the royalty has to be some portion

17  of the .67 percent.

18         So I know your Honor is chuckling when you mention

19  the .3 percent, but there's no secret, any Georgia Pacific

20  royalty here will be incredibly small, because Mattel's           03:51

21  contribution to the profitability is incredibly small.  And I

22  think I understand why they don't want to talk about a royalty

23  and why they don't want you to exercise your discretion in that

24  regard.

25         But in terms of the dilemma you described, that             03:51

```
 1   Larian and MGA should not get a freebie, you have a tool
 2   available to keep that from happening.  I guess Mattel can
 3   refuse to cash the royalty checks when we send them and feel
 4   good about it.  But you do have an alternative.
 5         I believe -- it has not been asked for yet, but at        03:51
 6   least for today, the only thing that's before you, by Mattel's
 7   choice, is, are we going to have an injunction, or shouldn't
 8   we?
 9         And I would be glad if the Court wants to talk about
10   the other factors, but I don't think we need to go very far     03:51
11   beyond just this one to say that that's not the stuff that
12   injunctions are made of.
13         THE COURT:  I'll certainly hear your arguments with
14   respect to the other factors, Counsel.
15         MR. KENNEDY:  We heard about -- I've already alluded       03:52
16   briefly to the fact that this is somewhat of an unusual case,
17   in that unlike Kaden, the case cited by Mr. Quinn, we don't
18   have two competitors in the same software business going head
19   to head for competition and the sale by one is a loss by the
20   other.  This is not that kind of a case.  In fact, it wasn't    03:52
21   even until post-trial that Mattel first suggested that somehow
22   Barbie might be losing market share on the basis of Bratz.
23   This gets into our challenges to some of their declarations.
24         I think just going to the Pittway v. Black & Decker
25   case that they place heavy reliance on, there, the parties     03:52
```

 1   seeking the injunction documented they had a 30 percent decline

 2   in market share.  Hardware stores that used to stock just their

 3   flashlight were now giving equal shelf space to Black & Decker.

 4          You've been presented nothing of that sort to suggest

 5   that's happening here; and if you were, there would be the          03:53

 6   further question, is that loss of market share due to the

 7   2.5 percent that Mattel has contributed to Bratz, or is it due

 8   to the other 97.5 percent that other people have contributed,

 9   and maybe that's the reason Barbie is losing market share?

10          In any event, this is not that kind of a case.  You        03:53

11   have not been offered any evidence there.  I've already said,

12   this isn't even like the University of California that could

13   say, 'We don't commercialize, but we do license on a

14   nonexclusive basis and somehow we're prejudicing your rights in

15   that regard.'                                                       03:53

16          That isn't the case here.

17      **THE COURT:**  The courts have certainly held that the

18   loss of the ability to market your own property, or protect

19   your own property, is an injury, sufficient for eBay purposes.

20      **MR. KENNEDY:**  No question about it.  But that's why I       03:54

21   said I think we need to go further beyond that and say, what is

22   really the harm here from Mattel's, as you say --

23      **THE COURT:**  But that is the harm, is it not?

24      **MR. KENNEDY:**  Conceptually only in this case, because

25   there is no exhibit showing:  Here's how Mattel would have         03:54

1    commercialize and marketed Bratz.

2         THE COURT:  Isn't that conceptual harm sufficient for

3    purposes of the irreparable harm factor?

4         MR. KENNEDY:  I don't believe so in these facts,

5    your Honor; and this is one of those where I don't have a case,      03:54

6    particularly since eBay, that I can point you to.  They don't

7    have a case since eBay going the other way.  But when you talk

8    about the combination of a very, very minor contribution to the

9    products -- one of the things Justice Kennedy focused in on his

10   concurring opinion in eBay as to whether injunctive relief is       03:55

11   appropriate -- but to take the combination of a miniscule

12   contribution and a copyright holder who has not commercialized

13   and is not licensing otherwise and whose sole identified harm

14   so far has been that they aren't getting the cut of certain

15   profits, I'm not even sure there's a balancing there.  As           03:55

16   your Honor pointed out the day after the verdict, both sides

17   are really on the same side of the equation.  They are arguing

18   over how to divide up the Golden Goose, why either one would

19   want to kill the Golden Goose.

20        Going beyond that, also in this case, your Honor has           03:55

21   alluded to the public interest angle that's going on here.

22        And then, finally, as the 3M v. Pribyl case, among

23   others, makes clear, an injunction is not a punitive tool, but

24   the goal is not to try to do Old Testament justice by smiting

25   somebody with an injunction; it's supposed to try to prevent        03:56

```
 1    future harm that can't be prevented in some less onerous way.
 2            And, yes, the satisfaction that Mattel can go home
 3    each night knowing they have the right to market Bratz might
 4    warm the cockles of their heart, but I submit, balanced against
 5    everything else in this case, a royalty clearly emerges as what     03:56
 6    the remedy should be, assuming anybody wanted one.
 7            THE COURT:  A linchpin of your argument -- and I
 8    certainly understand it -- is the damages award, and the
 9    relatively small amount of the damages award, vis-à-vis the
10    profits that were brought in.  Mr. Quinn suggests that there        03:56
11    are other explanations for that, other than the one that you
12    suggest the Court must infer, as illustrated in your chart.
13            MR. KENNEDY:  Well, he has.  I don't think his other
14    suggested alternatives, though, are consistent first with the
15    fact that we are bound by both the explicit and implicit           03:57
16    findings; and that's Gates --
17            THE COURT:  That case is what the Court is going to
18    be relying on, the L.A. Police Department Protective; it does a
19    very good job of explaining what the Court needs to consider.
20            But what Mr. Quinn is suggesting is that there are         03:57
21    other implicit findings, that there's ambiguity there in terms
22    of what is implicit by the damages award.
23            MR. KENNEDY:  And there certainly is uncertainty as
24    to how they arrived -- there's uncertainty as to the precise
25    components of the $10 million.  And as we've talked about,         03:57
```

```
 1   there are a lot of different allocations that could be done

 2   there.  I don't believe Mr. Quinn -- I'm sure you'll remind me

 3   if I missed any -- identified anything -- any other explanation

 4   for the gross $10 million or the gross $6 million that is

 5   consistent with the jury following its instructions.  He said      03:58

 6   maybe they just thought they piled on enough and they had done

 7   enough damage to MGA.

 8            THE COURT:  Aaron, can I impose upon you to bring

 9   back -- I think it was the verdict form that you had up there.

10            I frequently look to Aaron in other trials, wishing       03:58

11   that he was here.  Unfortunately, he's not.  But I do have him

12   now.

13            So 11-B, copyright infringement by Mr. Larian, the

14   distributions Mr. Larian received from MGA attributable to

15   Bratz-related works:  $3 million.                                  03:58

16            I'm not sure how they came up with that figure, and

17   that was not a figure that was being urged by anyone, that I

18   recall.

19            Then the value of Mr. Larian's ownership percentage

20   of MGA attributable to Bratz-related works:  Zero.                 03:59

21            MR. KENNEDY:  Yes, your Honor.

22            THE COURT:  What was that work for them to come to

23   that conclusion?

24            MR. KENNEDY:  I have to be honest, I think there were

25   two things going on.  One was a finding on their part that         03:59
```

 1   there really aren't any future infringing products out there.

 2   Because remember all of Mr. Wagner's --

 3           THE COURT:  That's not what I mean.

 4           "The value of Mr. Larian's present ownership

 5   attributable to Bratz-related works now."  That's not talking          03:59

 6   about the future.  It's zero.

 7           MR. KENNEDY:  But, your Honor, two things.  One, I

 8   assume the jury read that -- I think they are required to

 9   grammatically -- they went to the first sentence that said "as

10   a result of defendant's copyright infringement," and that they        03:59

11   didn't interpret B, the second paragraph, as just being what's

12   the appraised value of his interest.  It's, what's the value of

13   his interest that's due to defendant's copyright infringement?

14   If that was not the case, I think we have a real question of,

15   why was it on the verdict form?  Who would care about a                04:00

16   question like that?

17           As your Honor will recall, though, plaintiff's

18   attempts to establish his ownership interests were all based on

19   discounted future cash flows, based on the assumption that

20   everything MGA does infringes and that --                              04:00

21           THE COURT:  Just about any number would make more

22   sense, though, than zero.

23           MR. KENNEDY:  Unless this jury concluded that the

24   only thing that infringed, for example, were the original first

25   generation dolls, and that by time of trial, MGA isn't making         04:00

1  anything that infringes any longer, which is why they came up

2  with all of those small numbers.

3       If I might, your Honor, the only evidence that was

4  ever presented in this case, suggesting that those total

5  hundreds and hundreds of millions of dollars of profits could          04:01

6  be gotten down to a single digit, a million dollar number, was

7  by focusing in on the first generation dolls.

8       **THE COURT:**  Right.  That number, if I recall, was

9  about $4 million.  Again, none of the numbers that either side

10 were advocating are reflected on the jury's verdict; so             04:01

11 something else -- their own calculus was engaged in this.  And

12 I'm not suggesting that there was anything wrong with their

13 calculus or anything right about their calculus.  But it is

14 what it is.  But trying to make implicit findings per Gates is

15 a bit of a challenge.                                              04:01

16      **MR. KENNEDY:**  Well, on the zero, it seems to me, if

17 you come to the conclusion, 'I'm just mystified by that,' that

18 sort of cuts in Mattel's favor.  I don't see any way that

19 identifying the source of the zero is going to help Mattel.  It

20 seems to me it's either a total neutral that the jury just         04:02

21 bought Meyer's statement that you can't value this at this

22 point in time and this is just uncertain, or the jury went

23 through an analysis and concluded that there were no longer any

24 products that were infringing and, therefore, there weren't any

25 future profits that fit in there.  Two alternative                 04:02

1    explanations.  I don't see any way, though, that the zero can

2    be tortured into something that helps Mattel and militates in

3    favor of the issuance of an injunction.

4          THE COURT:  Or they just thought you did a brilliant

5    closing argument.                                              04:02

6          MR. KENNEDY:  We can pretty well eliminate that one;

7    that's totally farfetched.

8          I would like to place more -- I'd love to place more

9    emphasis on the zero and say that's dispositive, that shows

10   they found there were no currently infringing products.  And  04:02

11   that is certainly an explanation.  However, I think we've got

12   good enough grounds here, I don't have to take a risk like that

13   with you and have you laugh at that particular argument.

14   Because the $10 million, your Honor, that cap, given the

15   totality of the profits that were involved, just cuts across   04:03

16   any equitable enjoining of the entire line.

17         THE COURT:  Thank you, Counsel.

18         Mr. Quinn, I'll give you a chance to reply.

19         MR. QUINN:  Thank you, your Honor.

20         THE COURT:  And particularly in terms of this           04:03

21   financial argument.

22         MR. QUINN:  Yes, your Honor.

23         If I could just briefly respond to Mr. Nolan's

24   remarks about the additional dolls.

25         The Court may remember, we didn't have all of the       04:03

```
 1   dolls at the time.

 2           THE COURT:  I do.

 3           MR. QUINN:  And MGA had been ordered to provide them.

 4   We didn't have them, so we went with a representative sample.

 5   But there was never any stipulation or agreement that we would      04:03

 6   not bring additional dolls in.  The additional dolls we brought

 7   in are dolls that are on sale now.

 8           The key -- the whole crux of Mr. Kennedy's argument

 9   here proceeds -- he assumes -- he connects -- we talk about

10   connecting the dots -- he connects the dots between the damages     04:04

11   number and what must have been Mattel's small contribution to

12   the product.

13           I'm telling you, your Honor, that flies in the face

14   of the authorities.  That's not an assumption this Court can

15   make.  That is not something that the jury necessarily decided,     04:04

16   that Mattel only made a small contribution to the product.

17           It simply does not follow.

18           The jury may have been struck by sympathy.  They may

19   have been struck by the evidence they heard in that regard.  I

20   think that's the most logical explanation for why                   04:04

21   Mr. Larian's -- the value of what he had was -- why they gave

22   him a goose egg.  We simply do not know.  We're in the realm of

23   speculating here.  And that's what the courts say we cannot do.

24           The Court simply cannot speculate and defer to a

25   jury's decision based on speculation about how they must have       04:05
```

 1   gotten there.

 2        We're asking the Court to decide.  We believe the

 3   Court must decide, must make its own judgment on these things,

 4   as it anticipated that it would.  But the Court is not

 5   constrained, except by things that the jury necessarily        04:05

 6   decided.  We have that Sealy Mattress case that says -- the

 7   words are "mathematical certainty."  In a subsequent equitable

 8   proceeding, "The judge's discretion is not constrained by the

 9   amount of the award, unless it can be determined to a

10   mathematical certainty that the jury must necessarily have      04:05

11   reached that conclusion."

12        So that's the premise of their argument, and it flies

13   in the face of the authorities that we've cited to the Court.

14   They have cited no contrary authority.  The only thing they

15   rely on are these new trial cases, which I think we can all     04:06

16   agree at this point, I hope, are a different circumstance,

17   where the court is trying to reconcile verdicts to see if it

18   can preserve a verdict and not have to do a new trial.

19        **THE COURT:**  You do understand the challenge the Court

20   faces, though, with the damages award; the rug, to use         04:06

21   Mr. Kennedy's analogy, and the space that you're trying to

22   cover with that rug?

23        **MR. QUINN:**  Your Honor, we're confident in this

24   Court.  This Court has heard the evidence.  It sounds like I'm

25   trying to -- let me withdraw.                                   04:06

1          We're asking the Court to exercise its judgment.  MGA

2     is telling you it must be a small contribution.  The Court has

3     heard the evidence.  It's the sculpt.  That's not a small

4     contribution.  The Court can make that judgment.  The Court has

5     seen the evidence.  That's the Court's job.                    04:07

6          **THE COURT:**  But it's not the Court's job to

7     substitute its judgment for the jury on findings of fact,

8     explicit or implicit.

9          **MR. QUINN:**  I agree with that.  But absent a

10    necessary finding, something that the jury actually and        04:07

11    necessarily had to have found, this Court is free to exercise

12    its judgment.  And that, your Honor, is what we're asking the

13    Court to do.

14         We come back to, again, they trivialize the amount of

15    the award.  The evidence was that they put in that the profits 04:07

16    on the core Bratz dolls was $200 million; that $400 million was

17    Meyer's number for all profits, for all products.  We have a

18    $10 million award of infringement.  If you haven't followed the

19    numbers, it's $100 million; it's one quarter of the total.

20    They say that they don't -- we actually have a copy of the     04:08

21    Westlaw printout of the jury instruction in that Banes case, if

22    I could provide a copy of that to the Court.

23         **THE COURT:**  You may.

24         **MR. QUINN:**  It's Instruction Number 20.

25         In that case, the jury was instructed -- not in the      04:08

```
 1    same words, but conceptually the same as the jury was in this

 2    case -- that you're to make damage determinations with respect

 3    to each of the claims individually and separately as if there

 4    weren't any other claims.  Nonetheless, the Ninth Circuit said,

 5    in trying to understand what the jury did, the trial court         04:08

 6    properly took into account the total damages award on all

 7    claims.

 8            If we do that here, we're looking at a $100 million

 9    award.  It's not a trivial amount.  This Court is not bound to

10    any conclusion that Mattel's contribution was small or minor.      04:09

11    We submit, the Court has evidence before it that that simply

12    was not true.

13            THE COURT:  Your argument, then, is that the rug is

14    larger?

15            MR. QUINN:  I'm sorry.

16            THE COURT:  If the jury adopted MGA's damage figures,

17    then the rug is larger.

18            Mr. Kennedy suggests that this small 2.5 percent area

19    is small, using the $1.4 billion that you suggest.

20            MR. QUINN:  We're saying the rug is larger and the         04:09

21    room is smaller, perhaps; but yes.  There's ample room, to the

22    extent we're going to get into analysis.

23            THE COURT:  And I understand your argument that the

24    Court should not engage in that.  I can't ignore that finding,

25    because it is pretty compelling.                                   04:10
```

1       **MR. QUINN:**  The law is absolutely clear that unless a

2    jury finding is explicit or necessary to the decision, the

3    Court is not bound by it.  And what we're saying, your Honor --

4    I probably made this clear already -- we're asking this

5    Court -- we're telling this Court that the Court has the                04:10

6    ability and discretion to exercise its judgment.  That's what

7    we're asking the Court to do.

8       **THE COURT:**  Thank you, Counsel.

9       **MR. QUINN:**  Your Honor, I had a couple more points I

10   had hoped to make.                                                      04:10

11      **THE COURT:**  Very well.

12      **MR. QUINN:**  I laid down a challenge for them to

13   identify a single copyright case post-<u>eBay</u> where there was

14   ongoing infringement and the court did not issue an injunction,

15   and we have not been cited such a case.                                 04:11

16      **THE COURT:**  That argument suggests that I should just

17   have this presumption which <u>eBay</u> basically rejected.  I need to

18   evaluate this.  This may be that first case.  I don't know.  I

19   don't know if that's --

20      **MR. QUINN:**  If you take into account --                          04:11

21      **THE COURT:**  That argument seems to suggest that there

22   should be a presumption.

23      **MR. QUINN:**  Well, my argument is just based on what

24   the state of the law is now, what courts have done post-<u>eBay</u>.

25   If you focus in on the language and the concurring opinion, the         04:11

```
 1   cases they cited, Grokster, about the importance of the right
 2   to exclude -- this, I submit, your Honor, on the present record
 3   would be the first case where an injunction was not entered.
 4   We don't know -- no case has been cited.
 5           If the contribution is so small, if it were true that    04:11
 6   Mattel had contributed something very, very minor to this, it
 7   would be an easy thing for them to change, and they would be
 8   free to go their way and come out with a new doll that was not
 9   infringing.
10           On the issue of damages, your Honor, loss of market     04:12
11   share, loss of sales, the Court knows the reasons we thought
12   that was not appropriate to come before the jury.  We never
13   took the position that there were no lost sales or there was no
14   lost market share.
15           The Court has MGA's admissions.  They stated in their   04:12
16   brief, on affirmative defenses, their pretrial brief -- this is
17   at Page 7, Footnote 5 -- that Bratz has taken market share from
18   Barbie.  That's what the Court has before it on that.
19           You asked the question of Mr. Kennedy, Isn't it harm
20   not to be able to market your own copyrighted product?  And     04:12
21   Mr. Kennedy said, Well, conceptually, theoretically, that might
22   be harm.
23           We're being sued right now over My Scene's theory,
24   that it infringes Bratz.  That's not conceptual.  We're
25   defending that case.  That's all part of Phase 2 in this case.  04:13
```

 1    It's not conceptual.  It's not theoretical.  We not only can't

 2    market Bratz, we can't market our own products without being

 3    sued and being charged with infringing Bratz.

 4            With respect to monopoly, the public interest of

 5    monopoly, there's a case, the Mortgage Market Guide case, 2008,      04:13

 6    Westlaw 299, where the court said that courts recognize no

 7    monopoly -- there is not a monopoly if MGA can continue to

 8    compete just with noninfringing products.  I'm substituting

 9    "MGA" in there for the language in the opinion.  But they are

10    not unable to compete.  They are still free to, as Mr. Larian      04:14

11    said he would, come out with a new fashion doll.

12            With respect to royalty, there's a motion with

13    respect to Mr. Meyer's declaration, your Honor, that there is

14    no evidence before the Court from which the Court could derive

15    what a market royalty would be, what would be the result of a      04:14

16    negotiation between these two parties.  And it's all

17    hypothetical, and it's premised on an assumption about what the

18    jury must have decided.  No evidence about what prevailing

19    royalties are.  No evidence on what arrangements MGA or Mattel

20    have entered into.                                                 04:14

21            We've submitted a declaration of Ms. Willis about how

22    she said, If there were hypothetical negotiations between these

23    parties, for a lot of different reasons, it would not make any

24    sense to license MGA.

25            And then, just on a very practical level, in terms of      04:14

 1   royalty, your Honor, the Court has a very good sense of these

 2   parties and the individuals involved.  That would put these

 3   parties in an ongoing relationship, with royalty payments to be

 4   made, to be questioned, to be audited.  The trust that would be

 5   required whenever you have a licensing arrangement with a          04:15

 6   royalty, I submit, this is not an appropriate case for that.

 7            Thank you, your Honor.

 8            **THE COURT:**  Mr. Quinn, Mr. Kennedy, is there anything

 9   further?

10            **MR. KENNEDY:**  Just one minute, your Honor.           04:15

11            In addition to all of the other jury instructions

12   we've talked about, the Court gave Instruction Number 42, which

13   read, in part, "However, in determining what portion of the

14   defendant's profits are attributable to copyright infringement,

15   the benefit of the doubt should be given to Mattel and not        04:15

16   defendants.  If the copyrighted portions are so intermingled

17   with the rest of the infringing work that they cannot well be

18   distinguished from it, the entire profits realized by the

19   defendants are to be given to the plaintiff."

20            And against that, and all of the other jury             04:16

21   instructions, these folks came up with $10 million for

22   everybody and $6 million for MGA; so we have both explicit and

23   implicit findings that they were accepting only some very, very

24   small portion of total profits.

25            Against that, obviously, your Honor has a very           04:16

1    weighty decision; and this probably is going to be new law

2    whichever way you go.  As Mr. Quinn correctly pointed out,

3    eBay hasn't been with us that long.  But I've got a

4    responsibility for something like 800 people's jobs.  If

5    there's any question I have not answered today that you think I          04:16

6    might be able to answer, I'd really appreciate the opportunity,

7    if there's something further that's on your Honor's mind that I

8    just have not been able to cover.

9            THE COURT:  I appreciate that, Counsel.  I appreciate

10   your argument and the outstanding argument of everyone this          04:17

11   afternoon.  The briefs are of the standard that I have come to

12   expect in this case, as are the oral arguments; so I thank you.

13           Those were the four motions I wanted to cover.  I

14   know there are three motions to strike.  There are a number of

15   additional issues which the Court will address, based on the          04:17

16   well-written papers.

17           Mr. Zeller, is there something further?

18           MR. ZELLER:  Yes, your Honor.  I wanted to direct the

19   Court's attention to a couple of pieces of evidence

20   particularly concerning this issue that was raised during oral          04:17

21   argument about the value of the name.  In particular,

22   Rachel Harris testified -- this is actually in the trial

23   transcript, Page 4208 through Page 4209.  And she was asked

24   about the circumstances about the Bratz name, and she said,

25   basically, that Bratz, B-R-A-T-Z, was one of about 20 that MGA          04:17

 1   considered, and that they ultimately went with Bratz.  And the

 2   following question was asked:

 3        Question:  "And do you know why the name "Bratz" was

 4   ultimately selected?"

 5        We're talking about the name here.  This is October          04:18

 6   of 2000, before any use was made of this, in commerce, or any

 7   kind of trademark rights could have attached under U.S. law.

 8        Answer:  "It was the most edgy.  It was just a cool

 9   name."

10        Question:  "That was the consensus of the MGA              04:18

11   committee?"

12        Answer:  "Yes."

13        Question:  "Of which you were a member?"

14        Answer:  "Yes."

15        **MR. ZELLER:**  So MGA itself recognized that there was    04:18

16   an inherent value in this name, because it was edgy, it was

17   cool.

18        And also, as Paula Garcia testified at deposition,

19   this coalesced -- it basically matched up, it fit, with the

20   concept of the dolls.                                           04:18

21        So this is a name in itself that people perceived as

22   having value.  And actually, the decision was made to go

23   forward with it, for that very reason, because MGA itself

24   perceived and understood that the very name that Carter Bryant

25   came up with and that MGA took had value.                       04:19

```
 1            THE COURT:  Thank you, Counsel.

 2            Anything further from Mattel?

 3            MR. QUINN:  No, your Honor.

 4            THE COURT:  Very well.

 5            Anything further from MGA?                          04:19

 6            MR. RUSSELL:  I think all I would point out is the

 7   obvious, which is, it's true that at that time, the evidence he

 8   just showed showed MGA had a vision.  There's no evidence that

 9   there was any value to it, other than it sounded good to MGA,

10   they devoted their resources to it, and they created something  04:19

11   that was valueless at the time.  He's now had a chance; he's

12   scoured the record; and he came up with nothing.  So that

13   property was worthless at the time.

14            THE COURT:  Gentlemen, that's enough.  Everyone sit

15   down.  The Court has before it enough; the Court has the entire  04:19

16   record before it.  I appreciate everyone's good efforts.

17            The Court has already spent a lot of time on these

18   various motions, and I think with the benefit of today's oral

19   argument, I should be able to issue an order later this week, I

20   hope, certainly within the next two weeks.  That will, of       04:20

21   course, pursuant to the September 2nd order, trigger the

22   ten-day filing for renewed JMOLS, motions for new trial, and

23   any other motions; 14 days after that, oppositions; seven days

24   after that, replies.  The Court will thereafter set a hearing.

25   This will probably put us into the middle to the end of         04:20
```

1   December; so what I will do is set a hearing most likely in

2   early January, the first, second or third Monday in January.

3   That will then be the final hearing, from the Court's

4   perspective, on Phase 1 collectively.

5           In addition to whatever motions are submitted after          04:20

6   the Court has issued its orders as a result of this hearing,

7   and after it addresses those motions, the Court will also want

8   to take up issues of whether or not to enter judgment at the

9   end of Phase 1 for purposes of appeal or whether or not the

10  judgment should be held in abeyance until the second phase, and     04:21

11  I'll expect counsel to be prepared to argue to that effect.

12          I also intend to appoint a Discovery Master for

13  Phase 2 and lift the stay on Phase 2 discovery at that time.

14  In the order that I issue shortly, I will indicate three

15  potential Discovery Masters that the Court has confidence in,       04:21

16  and I'll be expecting you, come January, or whenever we have

17  this hearing, to be in the position to indicate to the Court if

18  you have any objection to one or all of those proposed Masters.

19  And then also, at the January hearing, I will have further

20  scheduling for Phase 2; so bring your calendars and be prepared     04:22

21  to conduct a scheduling conference at that time as well.

22          Regardless of what the Court orders after today, any

23  order related to declaratory relief or injunction will be

24  stayed pending that hearing in January.  I want retailers to

25  understand -- they have had a bad enough year -- that there's       04:22

1    nothing that is going to happen with respect to this between

2    now and that January hearing; that any order the Court issues

3    in the next week or two will go into effect come January, after

4    the holiday season has been completed.

5          That is all I have for right now.                    04:22

6          Are there any questions on how we're proceeding at

7    this point?  From Mattel?

8          **MR. QUINN:**  No, your Honor.

9          **THE COURT:**  From MGA?

10         **MR. NOLAN:**  No, your Honor.                       04:22

11         **THE COURT:**  Very well.  Court is in recess.

12

13

14

15

16                          CERTIFICATE

17

18   I hereby certify that pursuant to section 753, title 28, United
     States Code, the foregoing is a true and correct transcript of
19   the stenographically recorded proceedings held in the above-
     entitled matter and that the transcript page format is in
20   conformance with the regulations of the Judicial Conference of
     the United States.

21

22   _____          _____
     THERESA A. LANZA, CSR, RPR                      Date
23   Federal Official Court Reporter

24

25

Monday, November 10, 2008                    CV 04-09049