```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                       EASTERN DIVISION

 4                          - - -

 5        HONORABLE STEPHEN G. LARSON, JUDGE PRESIDING

 6                          - - -

 7   MATTEL, INC.,                  )
                                    )
 8                    Plaintiff,    )
                                    )
 9            vs.                   )   No. CV 04-09049
                                    )
10   MGA ENTERTAINMENT, INC., ET. Al.,  )
                                    )
11                    Defendants.   )   MOTIONS
     _____)
12   AND CONSOLIDATED ACTIONS,      )
     _____)
13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                   RIVERSIDE, CALIFORNIA

17                  MONDAY, MAY 18, 2009

18                      1:52 P.M.

19

20

21

22

23              THERESA A. LANZA, RPR, CSR
                Federal Official Court Reporter
24              3470 12th Street, Rm. 134
                Riverside, California  92501
25                    951-274-0844
                  www.theresalanza.com
```

```
1   APPEARANCES:

2
    On behalf of Mattel, Inc.:
3
                         QUINN EMANUEL
4                        By:   JOHN QUINN
                               MICHAEL T. ZELLER
5                              DYLAN PROCTOR
                               SCOTT B. KIDMAN
6                        865 S. FIGUEROA STREET,
                         10th Floor
7                        Los Angeles, California  90017
                         213-624-7707
8
                         KLEE, TUCHIN, BOGDANOFF & STERN LLP
9                        BY:   DAVID M. STERN
                         1999 Avenue of the Stars
10                       Thirty-Ninth Floor
                         Los Angeles, CA  90067
11                       310-407-4025

12

13  On Behalf of MGA Entertainment/Isaac Larian:

14                       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                         BY:   THOMAS J. NOLAN
15                             JASON RUSSELL
                               CARL ROTH
16                       300 South Grand Avenue
                         Los Angeles, California  90071-3144
17                       213-687-5000

18                       GLASER, WEIL, FINK, JACOBS
                          HOWARD & SHAPIRO, LLP
19                       BY:   PATRICIA GLASER
                         BY:   JOEL N. KLEVENS
20                       10250 Constellation Blvd.
                         Los Angeles, CA  90067
21                       310-553-3000

22                       MITCHELL SILBERBERG & KNUPP LLP
                         BY:   RUSSELL J. FRACKMAN
23                       11377 West Olympic Blvd.
                         Los Angeles, CA  90064-1683
24                       310-312-2000

25  /  /  /
    /  /  /
```

```
 1   APPEARANCES (cont'd):

 2

     On Behalf of MGA Entertainment/Isaac Larian:
 3
                              PACHULSKI STANG ZIEHL & JONES
 4                            BY:  JAMES I. STANG
                              BY:  RICHARD PACHULSKI
 5                            10100 Santa Monica Blvd.,
                              11th Floor
 6                            Los Angeles, CA  90067-4100
                              310-277-6910
 7

 8   On Behalf of Isaac Larian:

 9                            JEFFER MANGELS BUTLER & MARMARO LLP
                              BY:  JOSEPH A. EISENBERG
10                            1900 Avenue of the Stars
                              7th Floor
11                            Los Angeles, CA  90067-4308
                              310-203-8080
12

13   On Behalf of Defendants Omni 808:

14                            BINGHAM McCUTCHEN LLP
                              BY:  TODD E. GORDINIER
15                            BY:  PETER N. VILLAR
                              600 Anton Boulevard,
16                            18th Floor
                              Costa Mesa, CA  92626-1924
17                            714-830-0622

18
     On Behalf of Crum & Forster:
19
                              MUSICK, PEELER & GARRETT LLP
20                            BY:  JENNIFER M. KOKES
                              One Wilshire Boulevard
21                            Los Angeles, CA  90017
                              213-629-7618
22

23   ALSO PRESENT:        Patrick A. Fraioli, Jr.,
                          Ambassador Pierre Prosper
24                        Robert O'Bryan
                          Michael J. Bidart
25
```

1                              I N D E X

2                                                        PAGE

3   MOTIONS...................................      5

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | Riverside, California; Monday, May 18, 2009; 1:52 P.M. |
| 2 | -oOo- |
| 3 | **THE CLERK:**  Calling calendar item number 18, |
| 4 | Case Number CV 04-09049-SGL, Mattel, Inc., v. MGA |
| 5 | Entertainment, Inc., et al. |
| 6 | Counsel, please state your appearances for the |
| 7 | record. |
| 8 | **MR. QUINN:**  John Quinn, Mike Zeller, Dylan Proctor |
| 9 | for Mattel. |
| 10 | **MS. GLASER:**  Patricia Glaser for MGA. |
| 11 | **MR. KLEVENS:**  Joel Klevens for MGA. |
| 12 | **MR. FRACKMAN:**  Russell Frackman for MGA and |
| 13 | Mr. Larian. |
| 14 | **MR. EISENBERG:**  Joseph Eisenberg appearing on behalf |
| 15 | of Mr. Larian. |
| 16 | **MR. NOLAN:**  Tom Nolan on behalf of MGA and |
| 17 | Isaac Larian. |
| 18 | **MR. STANG:**  James Stang and Richard Pachulski |
| 19 | appearing for MGA. |
| 20 | **MR. GORDINIER:**  Todd Gordinier appearing for |
| 21 | Omni 8 Oasis, with my partner Peter Villar. |
| 22 | **THE COURT:**  Good afternoon to you all. |
| 23 | We have several matters on calendar this afternoon |
| 24 | that the Court wants to get through. |
| 25 | The first matter that I'd like to take up is Mattel's |

01:52
01:52
01:52
01:53
01:53

1   motion to review the discovery master's order.  The Court has

2   received and reviewed the papers.  I'll hear further argument

3   at this time.

4           **MR. KIDMAN:**  Good afternoon, Your Honor.

5           Scott Kidman for Mattel.

6           I think we've pretty well covered what we think the

7   fundamental errors were with the discovery master's order in

8   our papers, but I'd like to focus on what I think "the"

9   fundamental error was.  And that is, the discover master

10  concluded that there's no evidence that these two witnesses

11  currently exercise broad general powers.  And based on that

12  conclusion, which I think itself was erroneous -- but even if

13  you assume the correctness of that assumption, from that he

14  concluded that they therefore could not be managing agents of

15  MGA Mexico.

16          The problem with that conclusion is that it ignores

17  that a witness or an employee can be a managing agent for a

18  specific purpose, as long as that purpose is relevant to the

19  issues in the lawsuit.

20          And here, these two witnesses, Mr. Vargas and

21  Ms. Trueba, clearly do exercise authority with respect to

22  certain areas of the business that are relevant to the issues

23  in this lawsuit.  In fact, the discovery master himself

24  concluded that Mr. Vargas is responsible for sales, Ms. Trueba

25  is responsible for media and public relations, and that those

01:53

01:53

01:54

01:54

01:54

1    are areas that are relevant to the issues in this lawsuit,

2    because Mattel contends that the stolen trade secrets were used

3    to operate those aspects of the business.

4         **THE COURT:**  The concern I have, though, is that the

5    interests at present are somewhat potentially divergent.  We          01:55

6    have ongoing criminal investigations concerning those

7    individuals.  They have their own lawyers, as I understand it.

8         Can they truly be said at this point to be speaking

9    for the company, even in those more limited areas that you

10   reference?                                                            01:55

11        **MR. KIDMAN:**  I think that's a separate issue, whether

12   they can be speaking for the company.  And that is something

13   that will be determined -- whether their testimony will bind

14   the company, that's something that's determined under Rule 32.

15   And that's a separate issue.                                          01:55

16        It is a factor.  Whether their interests are aligned

17   is a factor in the Court's determining managing agent status,

18   for purposes of taking the deposition, of getting the

19   discovery.  And the case law there is clear that current

20   employment is sufficient to show an alignment of interest.           01:55

21   There, the discovery master said, 'Well, it was a little too

22   close to call,' or he said he couldn't tell whether that factor

23   weighed in favor of Mattel or against Mattel.

24        That gets to another point, Your Honor.  And that is,

25   the law is clear that for purposes of determining whether you        01:56

```
 1   get the discovery in the first place, not whether the testimony
 2   is going to ultimately bind the corporation, but whether you
 3   get discovery.  Close calls are resolved in favor of discovery.
 4   Any doubt is resolved in favor of discovery.  It's a modest
 5   burden.                                                              01:56
 6          THE COURT:  But those are not the only two factors.
 7   There's five factors in total.
 8          MR. KIDMAN:  Yes.
 9          THE COURT:  I understand the respective arguments on
10   what standard was actually employed, whether it was an           01:56
11   alternative standard, and to what extent the discovery master
12   went down each of the five factors.  But they do all seem to be
13   addressed.
14          MR. KIDMAN:  I think if you get to the application of
15   the factors, I think there are also errors there.  And we can    01:56
16   go through the factors.
17          It is true that courts look at five factors.
18   However, I think two of the factors are sort of alternatives.
19   One is, does the witness exercise broad general powers, such
20   that he or she is a managing agent for all purposes?             01:57
21          THE COURT:  That's clearly not the case, as the
22   discovery master found.
23          MR. KIDMAN:  If you look at evidence about what they
24   currently do, the discovery master found that they don't
25   exercise those broad general powers.  However, as I said, you    01:57
```

```
 1   can exercise more limited functions within the corporation,

 2   such that you're a managing agent for those purposes.  It's

 3   kind of like the difference between general jurisdiction and

 4   specific jurisdiction.

 5          THE COURT:  Right.  But with respect to that factor,     01:57

 6   there's no argument to be made that the discovery master was

 7   not correct.

 8          MR. KIDMAN:  As to what factor?  The general powers?

 9          THE COURT:  Yes.

10          MR. KIDMAN:  I think the evidence shows that these       01:57

11   individuals were hired to run MGA.  Mr. Larian admitted that he

12   recruited them to start the marketing and sales functions at

13   MGA.  There's been no evidence --

14          THE COURT:  I understand there's an argument to be

15   made here, but there's also an argument to be made that they    01:58

16   didn't have those broad functions.  I mean, the standard being

17   employed here is whether either the factual findings are

18   clearly erroneous or if the discovery master was mistaken as a

19   matter of law.

20          As a matter of law, he employed the right standard;      01:58

21   correct?  We all agree that the typical standards are the

22   standards to be employed?

23          MR. KIDMAN:  He articulated the correct standard.  I

24   don't think he applied the factors correctly.

25          And let's put aside the general powers issue.            01:58
```

```
 1            The discovery master himself found that these
 2   individuals are responsible for areas that are at issue in this
 3   lawsuit, in addition to the fact that they manage sales, or are
 4   responsible for sales, responsible for public relations and
 5   media.  And the allegation is that the stolen trade secrets are      01:58
 6   used to run those aspects of the business.  So, clearly, these
 7   are people who are knowledgeable, most knowledgeable, and
 8   exercise corporate power over the use of the stolen trade
 9   secrets.  So there's the use issue.
10            But also, these are the people who are alleged to          01:59
11   have taken the trade secrets themselves and delivered them to
12   MGA.  So for the narrow purpose of, you know, do they exercise
13   responsibility for issues that are at issue in this lawsuit,
14   even the discovery master found, yes, that factor satisfies
15   Mattel.                                                              01:59
16            So then if you look at the remaining three factors,
17   one, can they be relied upon to give testimony at the request
18   of MGA Mexico?  The discovery master said that factor weighs in
19   Mattel's favor.  There was no dispute on that.
20            That leaves you with two factors.  One is this            01:59
21   alignment of interest.  As we said, I think he misapplied the
22   law there.  The case law is clear that current employment is
23   sufficient.
24            The discovery master's conclusion was, 'Well, at some
25   point down the road, MGA may seek to distance itself from these     01:59
```

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

1    employees.'  But that's speculation at this point.  And it

2    certainly doesn't undercut your current alignment with the MGA

3    parties by virtue.

4         **THE COURT:**  Or vice versa.  The employees might want

5    to distance themselves from MGA, given the criminal                    02:00

6    investigation.

7         **MR. KIDMAN:**  But that hasn't happened.  They're

8    currently employed.  The case law is clear that current

9    employment -- I would suggest that the Dubai Islamic Bank case

10   is right on point there.  The witnesses there were involved in        02:00

11   the fraud that was at issue in the lawsuit.  They were demoted

12   as a result, but they continued to be employed; and the Court

13   found that their continued employment was sufficient to show a

14   current alignment of interest.

15        The last factor is whether there are people with              02:00

16   higher authority within the corporation with respect to the

17   areas for which the information is sought, by way of the

18   deposition.  And there, there was no evidence from MGA that

19   there are individuals higher in the corporation with respect to

20   these areas.  The only evidence was that they both report to        02:00

21   somebody else.  But that can't be the test; otherwise, only

22   CEO's could be managing agents; and that's clearly not the law.

23        The test is whether there's anyone with higher

24   authority with respect to these matters for which the testimony

25   is sought.  And there was no evidence that they weren't.  In        02:01

```
 1    fact, as the discovery master found, they are responsible for

 2    sales; that's Mr. Vargas.  Ms. Trueba is responsible for pubic

 3    relations and media.  And those clearly are areas that are

 4    relevant, given the allegations here, that the company is using

 5    Mattel's stolen trade secrets to operate those aspects of the      02:01

 6    business.

 7            At a minimum, when you consider all of that, at a

 8    minimum, it's a close call.  We don't even think it's a close

 9    call when you apply the factors correctly.  But the law is, for

10    purposes of determining whether you get the discovery, not        02:01

11    whether the testimony binds the corporation, close calls are

12    resolved in favor of discovery.

13            THE COURT:  Thank you, Counsel.

14            Who's responding on behalf of MGA?

15            MR. KLEVENS:  Joel Klevens.                                02:02

16            I don't have a lot to add to what I think were the

17    appropriate questions that Your Honor asked.  I think the

18    discovery master focused on what was important, the one thing

19    that Mattel didn't mention:  Who had the burden?

20            That was Mattel.  The law is clear on that.  Mattel        02:02

21    doesn't dispute it.

22            THE COURT:  It is true that Mattel has the burden on

23    the discovery master.  But there is this -- I don't want to say

24    it's a shifting burden -- but there is this presumption, if

25    there is a close call, as counsel was alluding to, that you err   02:02
```

```
 1   on the side of the discovery.

 2          MR. KLEVENS:  Absolutely.  But Mattel has the burden

 3   to show it's, at the very least, a close call.

 4          They didn't meet that burden.

 5          The other important factor that the discovery master     02:02

 6   focused on correctly is, what's a relevant time?

 7          The only evidence that Mattel offered was evidence

 8   that went back to 2004.  And they said, 'Well, these people

 9   were hired back in 2004 to run the company.'

10          Of course, the fact that now there are dozens of         02:02

11   employees in the company, and they don't run the company, and

12   they -- Ms. Trueba supervises no one and answers to

13   Mr. Machado, who answers to the vice president Kuemmerle, and

14   that Vargas, who's a director of sales, also answers to

15   Kuemmerle, those were undisputed facts which were very         02:03

16   important, correctly, to the discovery master, because the

17   question is, when?

18          THE COURT:  The timing issue is interesting.  And

19   there seems to be some mixed law on that as to what the

20   relevant time period is.  But I suppose that would favor in    02:03

21   finding that it's not -- regardless of what the discovery

22   master found, that it's not contrary to clearly established

23   law.

24          MR. KLEVENS:  Clearly.  And also, I think when one

25   looks at the case as Mattel seriously overstated the holding of  02:03
```

1    the Philadelphia case, which when you look at that case -- it

2    was Philadelphia Indemnity against Federal Insurance, I

3    believe -- it stands in no way for the proposition they cited.

4    And, indeed, they include a quotation from that decision, which

5    is nowhere to be found in it.  And that decision does not stand          02:04

6    for the proposition that the appropriate time to determine the

7    deponents, whether the deponents are managing agents, is at

8    some earlier time when the event occurs, as opposed to when the

9    notice of deposition is served, which the cases that we cited

10   clearly stand for and were clearly and appropriately quoted for         02:04

11   that proposition.

12           And I think Your Honor is also correct to be

13   concerned about the alignment issue.  And this is an issue that

14   comes up right now.  In other words, what happens in this case,

15   at least as we are concerned, is that because Trueba and Vargas         02:04

16   are being prosecuted in Mexico, and have their own counsel.  If

17   and when their depositions are taken, no matter where they are

18   taken, whether in Mexico or in Los Angeles, they're going to

19   take the Fifth Amendment.  That is a position which is contrary

20   to MGA's interest, because that will prevent them from giving           02:04

21   exculpatory evidence regarding -- assuming they took something

22   that they should not have, that MGA told them to bring nothing,

23   and that they made no essential use of any of these alleged

24   trade secrets.  That testimony will not be available to MGA

25   when they take the Fifth, and their interests will be clearly          02:05

```
 1    divergent at the very time that these depositions take place.

 2            So I think the discovery master was very correct to

 3    focus on that alignment issue, as well as on the timing issue,

 4    and also on the general powers issue.

 5            If Mattel is correct, Your Honor, every witness who's      02:05

 6    capable of giving relevant testimony is a managing agent,

 7    because the argument is, 'Well, he's a managing agent for this

 8    subject that we're going to talk to him about.'  And that is

 9    clearly not the law, Your Honor.

10            The only issue before the Court is whether these          02:05

11    people can be compelled to testify by virtue of a notice to the

12    company, without a subpoena to the individual.  And the only

13    individuals who should be required to testify in response to

14    such a notice are people who in some way can be said to stand

15    in the shoes of the company, who have sufficient authority that  02:06

16    they could bind the company.

17        THE COURT:  Are there any such individuals presently

18    who are not under criminal investigation?

19        MR. KLEVENS:  Are there any individuals...

20        THE COURT:  Are there any such individuals with              02:06

21    MGA Mexico that could stand in these shoes, other than the

22    individuals that they issued the notices of deposition to?

23        MR. KLEVENS:  Suzanna Kuemmerle is a vice president

24    of the company.  She wrote the declaration that's before

25    Your Honor.  She indicated that she supervises these people      02:06
```

1    with respect to corporate matters.  She supervises Vargas with

2    respect to corporate matters.  Machado supervises Trueba.  So

3    Kuemmerle is a person who arguably would be a managing agent of

4    the company, as opposed to these people.

5            And I think, as the discovery master pointed out,                    02:07

6    what we're really looking at here are mid-level employees who

7    would never be contended to be managing agents but for the fact

8    that Mattel doesn't want to go through the procedural

9    necessities that this Court told Mattel a year ago would be

10   applied, if they were appropriate.  Namely, that if these                   02:07

11   people are not managing agents, then, of course, Mattel has to

12   subpoena them and deal with whatever Hague Convention

13   requirements there are, if those people are in Mexico.

14           And it is only because they want to avoid that clear

15   procedural obligation that this issue is before the Court; not              02:07

16   because there's any evidence presented by Mattel that these

17   people are managing agents.

18           **THE COURT:**  Thank you, Counsel.

19           **MR. KLEVENS:**  Thank you.

20           **THE COURT:**  This is Mattel's motion.  I'll give you a            02:07

21   chance for a brief rebuttal.

22           **MR. KIDMAN:**  Let me quickly respond to two issues,

23   Your Honor.  The first one is the timing issue.

24           We don't need to get into a debate about what the

25   correct law is on the timing issue.                                         02:08

```
1           When you look at -- not the general powers --

2           THE COURT:  But you can see that it's mixed.  There

3  are certainly divergent opinions with respect to the timing

4  issue.

5           MR. KIDMAN:  There are cases that suggest that even      02:08

6  for purposes of taking the deposition, you look at

7  responsibilities at the time of the deposition.

8           Even if you apply that law, Your Honor, there's no

9  dispute that these individuals are responsible for, in

10  Mr. Vargas's case, sales, in Ms. Trueba's case, media and      02:08

11  public relations, now.  Not four years ago, not five years ago.

12  Now.  So the timing issue is not really dispositive with

13  respect to that factor:  Do they exercise responsibility for

14  areas that are relevant to the issues in this lawsuit?

15           The answer is yes, and the answer is yes currently.    02:08

16           As far as the alignment --

17           THE COURT:  But their positions have changed.

18           MR. KIDMAN:  I haven't seen any evidence of that,

19  Your Honor.  There's lots of discussion in the papers and

20  accusations and characterizations of these people being        02:09

21  mid-level employees.  There's been no evidence presented that

22  their position has changed from their position four years ago

23  or five years ago.

24           THE COURT:  You said yourself they were demoted.

25           MR. KIDMAN:  No, no, no.  I was referring to one of    02:09
```

```
 1    the cases we cited, the Dubai Islamic Bank case, where the

 2    employees there, like the employees here, were accused of being

 3    part of the misconduct that was at issue in the lawsuit.  And

 4    they were demoted.  They continued to be employed, and their

 5    interests were found to still be aligned with the corporation.      02:09

 6            THE COURT:  But what's not clear to the Court,

 7    though, is exactly what role they play at present.

 8            MR. KIDMAN:  Well, I think what the record shows is,

 9    Mr. Vargas is still responsible for sales and Ms. Trueba is

10    still responsible for marketing and public relations.  But        02:09

11    there's been no evidence that their positions have changed,

12    other than characterizations of these people as being mid-level

13    employees by mere virtue of the fact that they happen to report

14    to somebody else.  As we submit, that's true of everyone but

15    the CEO.                                                           02:10

16            On the alignment of interests issue, Mr. Klevens

17    referred to the fact that these individuals are represented by

18    separate counsel in Mexico.  We've been attempting to get --

19    and I believe there's court orders requiring them to produce

20    information as to who's paying those legal fees.  That            02:10

21    information hasn't been produced, despite court orders.

22            We think we know what the information will show.  But

23    the point being, they have not been deposed.  They have not

24    asserted the Fifth Amendment.  Speculation about what they

25    might do in the future, whether MGA may toss these people aside   02:10
```

```
 1   in the future and distance themselves, whether the witnesses

 2   may choose to distance themselves, is not relevant for the

 3   purposes of the inquiry today:  Are their interests aligned?

 4   Their continued employment is sufficient on that point.

 5            As I've mentioned, the law is clear that the                    02:11

 6   burden -- and Mr. Klevens talked about burden -- the burden is

 7   a modest one for purposes of getting the deposition, which is a

 8   different issue than under Rule 32, whether that testimony will

 9   ultimately bind.

10            THE COURT:  I understand.                                        02:11

11       Very well.  Thank you, Counsel.

12            The Court next wants to take up the motion -- again,

13   this is Mattel's motion -- for leave to file a third amended

14   answer and counterclaim.

15            I'm going to start with the defense on this.                     02:11

16            The Court is tentatively of the mind, based on the

17   papers, that leave should be freely given in this case for the

18   amendment.  The Court, probably on its own oversight, although

19   nobody else raised it at the time of the scheduling conference

20   on this phase of the litigation, did not set a cutoff for         02:11

21   amending or adding parties.  We probably should have set a

22   cutoff, but looking back at the scheduling conference order, we

23   didn't.  So it would seem that the Rule 15 standard applies.

24            The defense does a very good job of explaining how

25   unquestionably the addition of the claims, the parties, and      02:12
```

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

1    then, arguably, the necessary parties that would have to flow

2    from that would exceedingly complicate an already exceedingly

3    complicated case.

4            I don't know if that's really relevant to the issue

5    of whether or not amendments should be afforded.  It's a        02:12

6    complicated case to begin with.  It will be more complicated.

7    As much as I might like there to be, there's not a cutoff in

8    terms of complication, where I could just say, 'This is too

9    much; we're stopping here.'

10           So that's kind of where I am right now, Ms. Glaser.      02:12

11           I'm going to give you the first opportunity to

12   respond, given my tentative thoughts.

13       **MS. GLASER:**  Your Honor -- and I don't want to be

14   glib, because obviously, these are serious allegations being

15   made, which we believe 95 percent of them have no basis in fact  02:13

16   or law.

17           But, Your Honor, under your theory, if Mr. Larian

18   runs a stop sign out here in front of the courthouse tomorrow,

19   can we amend the complaint and include that as well, simply

20   because we have a Rule 15 and that rules -- the Court wishes     02:13

21   to --

22       **THE COURT:**  Well, no.  The Court doesn't have

23   jurisdiction over a stop sign out in front of the courthouse.

24       **MS. GLASER:**  My point is this -- and, again, let's

25   start with the RICO -- the predicate acts.                      02:13

1          **THE COURT:**  The Court does have jurisdiction over

2    RICO.

3          **MS. GLASER:**  Thank you, Your Honor.

4          Under the rubric of a fraudulent conveyance, we have

5    a whole new theory, a whole new theory.  There is no legitimate          02:13

6    reason to add these claims to the lawsuit.  This is a separate

7    and distinct counterclaim, with 17 new individuals.  And to

8    blindly come in and tell Your Honor, in a reply brief, 'not to

9    worry, it's all alter ego anyway, so what's the problem,' is

10   offensive to everybody in this courtroom.  That is not the          02:14

11   appropriate standard.  And that is not the law.  And it's

12   certainly not the truth.

13         Again, each one of these people are entities; they

14   have to be served.  A number of them, presumably -- I don't

15   know that for a fact -- are going to object to jurisdiction.          02:14

16   There are alter-ego issues, by Mattel's own description.  At

17   least ten different entities are going to have to be litigated.

18   The 2008 financial transactions have no relationship whatsoever

19   to Mattel's other claims of predicate acts and RICO, et cetera.

20   There are no damages yet.  There is a contingent final          02:15

21   judgment, and there's an appeal.

22         It is no surprise to Your Honor that MGA doesn't

23   agree with the verdict, and we'll be appealing.

24         **THE COURT:**  I understand.

25         **MS. GLASER:**  That's contingent.          02:15

```
 1            Our view -- and I don't say this lightly; I'm
 2   certainly not addressing this to the Court -- we think the
 3   purpose of this, quote, big new conspiracy, this big new RICO,
 4   is to throw around foreign-sounding names and character
 5   assassinations when there is no basis, in fact, for this.          02:15
 6            You're going to hear from Omni's counsel.  Before we
 7   even get -- I've given you eight reasons; I've tried to give
 8   you eight reasons -- before you even get to the merits of the
 9   claim -- Omni's counsel is going to address that part of it --
10   but these, Your Honor, if I'm understanding the claims being      02:15
11   made in, I guess, new proposed Paragraph 136, there is no
12   basis, in fact, for the Omni claims.  And Omni will address
13   that separately.
14            With respect to the IGWT, the buying back of
15   merchandise, that's been addressed.  There's no nefarious thing   02:16
16   going on here.  Our papers address that.  We haven't heard
17   anything on the merits that would justify expanding the case
18   geometrically.
19            THE COURT:  But is this the time to address that,
20   Counsel?  I understand in the context of the receivership         02:16
21   issue -- and the Court certainly wants to take up those
22   allegations -- but putting that aside, in terms of where we
23   are, applying the standard -- and you haven't addressed the
24   standard, and I really wish you would, because I do want to
25   make sure that I'm correct in that.                               02:16
```

```
 1          MS. GLASER:  You're talking about the Rule 15
 2   standard?
 3          THE COURT:  Right.  Right.
 4          And given the law of this Circuit, in terms of how
 5   the Court is to treat amendments under that standard; that's      02:16
 6   point one.  And then point two, you may be 100 percent correct
 7   that we're going to add all of these alter-ego issues, a number
 8   of the service problems.  There's all kinds of -- these are the
 9   complications that I'm referring to.
10          There's the part of me that would just love to see         02:17
11   that go away, because I know that's a tremendous amount of work
12   and a tremendous amount of paper and a tremendous amount of
13   trees.  But putting that aside, I don't know how, under the
14   law, that figures into the Rule 15 analysis.
15          MS. GLASER:  And I want to address that in two             02:17
16   respects.
17          THE COURT:  We're not at 12(b)6; we're not at summary
18   judgment.  We're simply at a pleading stage.
19          MS. GLASER:  Well into this litigation.
20          THE COURT:  That's true.  And I have particular            02:17
21   concerns about one of the allegations that could have been
22   brought in the second amended answer and counterclaim.  But
23   putting that one aside, all of these others are ones that have
24   emerged since the filing of that particular answer.
25          MS. GLASER:  Your Honor, your scheduling order of          02:17
```

```
1    this Court, which is dated February 27, 2007, closed further

2    amendments over two years ago.  You say it's an oversight.  We

3    say not true.

4            You stayed Phase 2 discovery.  You did not stay the

5    motion to amend.

6            You did not stay anybody's ability to file a motion

7    to amend.

8            THE COURT:  So your position is that that was not

9    stayed in Phase 2; it was just staying certain -- because at

10   the time --

11           MS. GLASER:  You stayed discovery.

12           THE COURT:  You weren't involved at that time.

13           MS. GLASER:  I think so.

14           THE COURT:  We set a scheduling conference, and

15   that's where we came up with this Phase 1, Phase 2; and we set

16   a scheduling for Phase 1, and we put Phase 2 off.

17           Now your position is that the cutoff there for

18   amending the pleadings wasn't just a reference to the Phase 1

19   pleadings, but to the Phase 2 pleadings as well?

20           MS. GLASER:  Absolutely.  You stayed discovery.  Your

21   order is clear.  Your Phase 2 discovery order -- you stayed it.

22   But you did not stay the right to seek to amend the complaint.

23   You just didn't.

24           And that, in our view, triggers not Rule 15, but a

25   much bigger standard, which is, they have to show -- no longer
```

02:18

02:18

02:18

02:18

02:19

```
 1   is it just, quote, liberal policy is applicable.

 2           And, Your Honor, I think we have a right to rely on

 3   that not only because of what I call entirely new RICO claims,

 4   which have nothing to do with the prior claims -- and that is

 5   important, because these are all post; some of them were          02:19

 6   actually during the trial -- but I do want to go on, because it

 7   will be apparent -- the RICO predicate acts alleged under the

 8   rubric of Isaac Larian's perjurious testimony.

 9           Perjury is not a predicate act, we believe, under the

10   statute.  But even if it were, even if it were an               02:19

11   obstruction of justice, number one -- the last time I checked,

12   Mattel won the case -- Mattel's damages flow from the alleged

13   theft of Bratz, theft of trade secrets and employees, not what

14   Mr. Larian testified to.

15           Phase 1 is going to have to be retried in Phase 2,      02:20

16   just because they are claiming that Mr. Larian did not tell the

17   truth.

18           Now, Your Honor, losses occur all of the time, and

19   nobody accuses anybody of perjury.  There is no link between

20   what he did and damages, and what he did and perjury.           02:20

21           Number three, RICO has predicate acts alleged under

22   the rubric of Mr. Larian, Fred Larian, witness, evidence

23   tampering.

24           This is actually one of the most egregious examples,

25   not so much because it has no basis, in fact, at all, but if    02:20
```

```
 1    you recall, Your Honor, they're claiming that Mr. Larian,
 2    Fred Larian, destroyed documents -- "destroyed" is sort of a
 3    pejorative word -- but they destroyed documents.
 4           He got rid of documents after he had a full-fledged
 5    arbitration with his brother.  He did it, and then they're          02:21
 6    saying, "Well, but there's a link,' because he sent an e-mail,
 7    saying, 'Oh, my gosh, what can I do to help against Mattel?'
 8    They don't tell Your Honor that it's a year before, a year
 9    before the documents are destroyed.
10           They also don't -- either they don't emphasize or          02:21
11    they aren't being forthright with you.  They looked at these
12    documents.  These documents that Mr. Larian, Fred Larian,
13    purported to have destroyed, they were looked at, shown,
14    voluntarily, by Fred Larian's then counsel, to Mattel.  There's
15    no prejudice even.                                                  02:21
16           But in any event, these are all facts that they knew
17    before, and they were referenced in the first phase of the
18    trial.
19           Let's go to the bribery of the three seamstresses.
20           Put aside the fact that MGA had nothing to do with          02:21
21    that and there's no evidence to the contrary.  There's no
22    evidence whatsoever that MGA was even aware of the Marlows'
23    activity, these secret payments to three moonlighting Mattel
24    seamstresses, who had apparently concealed, allegedly, illegal
25    payments through false names and false ID's.                       02:22
```

1              Your Honor, this is relitigating what was in the

2    first phase.  This was in the first phase.  Why are we doing it

3    again?

4              By the way, in the second amended answer and

5    counterclaim, it doesn't allege, nor can it, that any of the                    02:22

6    three used their positions at Mattel to benefit MGA.  They just

7    didn't.  There's not even a suggestion to the contrary.  It's

8    just raising, again, an aura that MGA's done something wrong,

9    when, indeed, not only has MGA not done anything wrong, nothing

10   happened as a result of it.                                                     02:23

11             Let's go to the adding of Mr. Castilla, his alleged

12   theft of trade secrets.  Misappropriation of trade secrets and

13   tortious interference, I believe, is the claim.

14             I want to say this baldly to Your Honor, this is

15   knowingly baseless.  They have absolutely nothing, and they're                 02:23

16   not suggesting anything, to substantiate MGA's supposed

17   involvement in Mr. Castilla's alleged wrongful conduct.  They

18   have clearly not been diligent.  These are facts known since

19   March of 2006, by their own acknowledgement.  They had forensic

20   images of the hard drive of this gentleman taken, we now know,                 02:23

21   on March 10th and March 13th of 2006.  Mattel even got FBI

22   involved no later than March 23, 2006.  We are in May of 2009.

23   And if you will recall, the FBI actually visited Mr. Castilla's

24   home in March of 2006.

25             THE COURT:  And this was all before the second                       02:24

```
 1   amended answer?

 2          MS. GLASER:  Absolutely.  This is highly prejudicial

 3   material, intended to be inflammatory.

 4          And again, MGA enters no evidence to the contrary --

 5   and there has to be something, Your Honor -- no evidence to the      02:24

 6   contrary that MGA had any role in this whatsoever.

 7          Then let's get to -- if you look at -- there's 103

 8   pages of the proposed third amended answer and counterclaim.

 9   And they want to add some copyright infringement claims.

10   But -- and there's a big but -- the copyright infringement         02:24

11   claims were part of Phase 1, part of Phase 1.  And if

12   Your Honor -- we actually pointed out in our opposition, there

13   was no effort to even justify this in their moving papers.

14   They put something in -- and the reply papers -- something that

15   we, obviously, haven't even had a chance to respond to in          02:25

16   writing.

17          THE COURT:  Do so now, if you would.

18          It strikes the Court as kind of a catchall.  I'm not

19   really clear on what the claim involves as contradistinct from

20   what was litigated in Phase 1.                                     02:25

21          MS. GLASER:  That's two of us.  And I'm not being

22   flippant.

23          The Phase 1 jury found infringement was not willful

24   also.  And willfulness is a requirement of criminal copyright.

25   That's what they're trying to allege here, criminal copyright.     02:25
```

1            The post verdict sales, after December 3, 2008, could

2      not have been willful, because Your Honor stayed the injunction

3      and allowed MGA to sell.  We don't think there is a factual

4      basis, a legal basis, or a timeliness basis for these claims in

5      this part of the lawsuit.                                          02:25

6            Your Honor, I'll be glad to answer any other

7      questions you may have, but I think, in whole, it should be

8      denied, for the reasons articulated; but certainly, in large

9      part, this should be denied.  And I urge Your Honor to wait to

10     rule on the whole new RICO enterprise until you've heard from     02:26

11     the Omni party in connection with that.

12            **THE COURT:**  Thank you, Counsel.

13            **MS. GLASER:**  Thank you.

14            **MR. PROCTOR:**  I thought I'd start off with the

15     financial transactions.  And the starting point of this           02:26

16     analysis is, we clearly can and are entitled to bring these

17     claims somewhere.  MGA has not identified any basis to immunize

18     itself from these claims.

19            There's no allegation as to the financial

20     transactions.  There's no allegation of delay.  There is no       02:26

21     challenge to the pleading of the RICO claim at all, whether the

22     new enterprise or the predicate acts that have been alleged,

23     the laundering, the other predicate acts that have been

24     alleged.  The only merits challenge at all, to the extent the

25     merits challenge is even appropriate now, is a standing           02:27

```
 1    challenge.  And that one -- I'm happy to elaborate if the Court
 2    would like, but I think it's clearly wrong.
 3             So the question is -- and I think this is where the
 4    Court was starting -- the question is, where should this be
 5    brought?                                                           02:27
 6             We can bring the claims.  Rule 15(d) is designed
 7    precisely to enable the Court to bring claims such as this into
 8    a case that's ongoing already.  These are transactions which,
 9    contrary to counsel's suggestions, have been alleged, and are,
10    in fact, intimately connected with the matters already before    02:27
11    the Court.  They are expressly alleged to be attempts to flout
12    the Court's rulings.  They are a part of an ongoing RICO
13    conspiracy, which is not distinct and separate, but unified.
14             In that circumstance, it would make no sense, I would
15    submit, to force Mattel to bring these claims in some separate   02:28
16    action, where they clearly are already at issue in this case;
17    and there's a pending RICO claim in this case that is yet to go
18    to trial.  And I'd refer the Court to the Keith case, the
19    Griffin case, the Raduga case.  Courts permit supplemental
20    pleadings in situations such as this, and particularly where    02:28
21    there's an allegation that it is an effort to flout a prior
22    court ruling, even post judgment.  That's the Supreme Court in
23    Griffin.
24             THE COURT:  We'll take up, Counsel, a few of the
25    particulars in a moment, but let's return to the standard       02:28
```

```
 1    issue, what standard the Court should employ in considering
 2    your motion.
 3            Counsel suggests that back in 2007, the Court did set
 4    a cutoff for amending pleadings or adding parties.  Admittedly,
 5    that was not my recollection.  I had it more in mind that we     02:29
 6    severed Phase 1 and Phase 2, and separated them for purposes of
 7    scheduling.
 8            I'm certainly going to take another look at this
 9    before I decide.
10            What is your sense?                                      02:29
11       MR. PROCTOR:  A couple of points.
12            First, as to the financial transactions and the
13    perjury, these are events which occurred, by and large, if not
14    entirely, after the filing of the second amended answer and
15    counterclaims.  They fall under the rubric of 15(d), which is    02:29
16    designed to permit supplemental pleadings.
17            Even if there were a cutoff, Rule 16 just doesn't
18    apply.  It doesn't apply to a motion to bring in claims based
19    on later-occurring events.  And if you look at the cases that
20    discuss Rule 15(d), none of them are considering Rule 16 issues  02:29
21    even post judgment.  And we've cited authorities which state
22    expressly that Rule 16 does not apply where you're talking
23    about a supplemental pleading.
24            As to whether there was a cutoff, at one point in
25    time the Court did set a cutoff.  The Court then vacated that     02:30
```

```
 1   order.  And it did so -- and this part, actually, I don't think

 2   made it into our papers, so I did want to make it clear.  You

 3   might recall, you might not, at the time of the final pretrial

 4   conference order and arguments about the final pretrial

 5   conference order prior to the Phase 1 trial, there was a                02:30

 6   dispute about whether doe defendants should be dismissed for

 7   Phase 2.  And this was litigated, and the Court's ruling was

 8   not to dismiss doe defendants for Phase 2.  And then the Court

 9   issued a new scheduling order for Phase 2, with no cutoff for

10   amendments.  So I do think Rule 15 is the land in which we're       02:30

11   in, or in which we find ourselves.

12          But as to supplemental pleadings, it doesn't matter

13   one way or the other, really, because Rule 16 doesn't apply to

14   a Rule 15 motion.

15          THE COURT:  What about those allegations that are         02:31

16   clearly not supplemental pleadings, and that took place, if not

17   -- well, well before the second amended answer and

18   counterclaim?

19          MR. PROCTOR:  There's a few of these.  There's the

20   Castilla issue, and then there's the Farhad Larian destruction   02:31

21   of evidence and the commercial bribery.

22          THE COURT:  All you essentially argue on the Castilla

23   issue is that there has not been any undue delay?

24          MR. PROCTOR:  These are housekeeping issues, from our

25   perspective.                                                      02:31
```

1          **THE COURT:**  Housekeeping?

2          **MR. PROCTOR:**  These are issues which have long been

3     at issue in this case.  These are issues on which discovery has

4     been repeatedly compelled.  The Court has itself compelled

5     Mr. Castilla's deposition, because this is already at issue.          02:31

6          Discovery has been taken into the Castilla theft

7     issues for years by both sides.  The Farhad Larian evidence

8     destruction is something which the former discovery master

9     found to be crucial to our Phase 2 claims; so these are issues

10    which MGA has had notice of since we discovered them.          02:32

11         And there's one caveat there that I do want to

12    discuss.  But, by and large, MGA has had notice since we

13    discovered them, and they have long been at issue in the case.

14         We sought leave expressly to amend to avoid an

15    argument by MGA that by amending anyway, which is what we are          02:32

16    seeking to do, to amend and supplement our complaint, and by

17    not now specifying these events, we've somehow abandoned them.

18         But they are already at issue, and because they are

19    already at issue and discovery has already been taken into

20    them, there's clearly no prejudice to MGA in allowing us to, as          02:33

21    a formal matter, specify these details.

22         This is a notice pleading regime.  This is Rule 8.

23    The Farhad Larian destruction of evidence, we have alleged

24    destruction of evidence as a RICO predicate act as part of

25    Phase 2.  This falls under that rubric.  The commercial          02:33

```
 1   bribery, we have alleged commercial bribery and travel act
 2   violations in furtherance of commercial bribery as a RICO
 3   predicate act in Phase 2.  This falls under that rubric.  And
 4   we were discussing the fact that this was at issue as early
 5   as -- well before trial last year.                                  02:33
 6           Also, the Farhad Larian destruction and the
 7   commercial bribery is evidence which we discovered only after
 8   we last amended our complaint, in 2006; so there was no
 9   opportunity whatsoever for us to bring it in earlier.
10           The one situation which is somewhat different is the    02:34
11   Castilla situation, because we did have some knowledge of
12   Mr. Castilla's wrongdoing prior to the time that we last
13   amended the complaint.  We did not expressly allege anything
14   about Mr. Castilla at that time, although it is, again, clearly
15   encompassed within the second amended complaint.  And I would   02:34
16   refer the Court to Paragraph 77 of the second amended
17   counterclaim, in particular, which specifies that there have
18   been other thefts associated with MGA, causing thefts of trade
19   secrets, causing damage to Mattel.
20           We did not expressly allege it because there was, at    02:34
21   that time, an ongoing criminal investigation into this matter;
22   and it was our understanding that this was something that was
23   supposed to remain confidential.  And that is why the name was
24   not used, although the allegations generally, certainly, were
25   made.  And this is, again, Rule 8.  It falls under the existing  02:34
```

```
 1   complaint.  And both the Court and the discovery master have
 2   already so held.
 3            THE COURT:  Thank you, Counsel.
 4            Ms. Glaser, I'll give you an opportunity to respond.
 5            MS. GLASER:  Thank you, Your Honor.                      02:35
 6            Again, the financial transaction -- and Your Honor is
 7   correct, there are two different things we're talking about;
 8   the things that arose since the complaint was amended before,
 9   and the things that have arisen after.
10            There's no question, Castilla, Fred Larian,            02:35
11   commercial bribery were issues that were litigated in the first
12   phase.  In fact, my recollection --
13            THE COURT:  They weren't fully litigated in the first
14   phase, but they have been raised in the first phase.
15            MS. GLASER:  And, indeed, my recollection -- and I'm   02:35
16   going on -- I clearly was not there, but I read the transcript,
17   painfully read a lot of the transcripts.  And I will say to
18   Your Honor that it is my recollection there was even a request
19   of Your Honor to have an adverse implication instruction to the
20   jury with respect to the purported destruction of documents by  02:36
21   Mr. Larian.  And I believe that was turned down.
22            THE COURT:  It was declined.
23            MS. GLASER:  That's my recollection of reading the
24   transcript.
25            Again, the Castilla, Larian, commercial bribery,       02:36
```

1    those things were all -- had an opportunity to be -- the other

2    side had knowledge in advance, had an opportunity to litigate

3    it, indeed did litigate it.  I'm not suggesting to the nth

4    degree or to the first degree, but they had an opportunity to

5    litigate it.  This is information they had, and they should        02:36

6    have brought it to the Court's attention before.

7         THE COURT:  But Mr. Proctor's point, I think, is that

8    to a certain extent, some of that had bearing on Phase 1.  Some

9    of that has clearly already been severed aside as part of

10   Phase 2.  The commercial bribery, for example, that's part of    02:36

11   the predicate RICO act that is teed up for trial in Phase 2.

12   And his argument is that some of these are part and parcel to

13   that.

14        MS. GLASER:  And we're saying, the commercial

15   bribery -- and I'll use that one as an example -- commercial      02:37

16   bribery -- he calls it a cleanup of detail.  I consider it a

17   pretty serious thing to be alleging.  And there's, again, not

18   one ounce of evidence -- and I'm not asking Your Honor -- I'm

19   not asking for summary judgment; I'm asking for a motion to

20   dismiss.  They don't have an ability to give you one shred of     02:37

21   evidence that MGA had any knowledge whatsoever.  They are

22   throwing these allegations around, the brothers are feuding,

23   those kinds of allegations around, because they dirty the

24   record, they try to sully Mr. Fred Larian and Mr. Isaac Larian;

25   and it has no place in this litigation.                           02:37

1          Thank you, Your Honor.

2          **THE COURT:**  Thank you, Counsel.

3          The third matter the Court wants to take up is the

4     issue of the receivership.  I have an application from Mattel

5     to continue the receivership.                                    02:38

6          I suppose procedurally I should back up on this, just

7     to make sure the record is clear.  There was initially an

8     application for a receivership brought in December.  The Court

9     received full briefing at that time.  There was a hearing at

10    that time.  The Court appointed a forensic auditor, Mr. Durkin,  02:38

11    to evaluate certain of the allegations.  There has been

12    supplemental briefing since the time of hearing, several rounds

13    of supplemental briefing.

14         When the Court issued its order in April appointing a

15    temporary receiver -- to be clear, the Court has never          02:38

16    appointed a permanent receiver -- but when it took the first

17    step to appoint the temporary receiver, in Footnote 9 of the

18    Court's order, I tried to make it abundantly clear that I was

19    not relying on the report of the forensic auditor.  The Court

20    awaited the report of the forensic auditor before taking the    02:39

21    step of appointing a temporary receiver, and confirmed, in

22    reading that report, that there was nothing contrary to the

23    findings that the Court made in light of the earlier briefing,

24    the earlier hearing, and the earlier supplemental briefing.

25         But to be clear -- because there's several due             02:39

1  process issues raised in various parts of the briefs from

2  different parties -- the Court did not make that decision, and

3  it expressly did not make that decision, predicated on the

4  forensic auditor's report.

5          The report itself, the response to the report -- and                02:39

6  I've just received yesterday a supplemental report from the

7  forensic auditor, which I'll be disclosing to the parties -- is

8  something which is on a separate track from the appointment of

9  the temporary receiver.  But pursuant to the local rule, the

10 Court appointed the temporary receiver for what, in the view of       02:40

11 the Court, was just cause.

12         The Court has received the report of the temporary

13 receiver.  I think it's here someplace.  There it is.  I've

14 received the report of the temporary receiver.  The Court is

15 now faced with the question of whether or not to make the              02:40

16 temporary receiver a permanent receiver, as urged by Mattel, or

17 not to pursue a permanent receiver, as urged by MGA and

18 Omni 808, the intervening parties.

19         The Court thought I should probably start this with

20 giving you my tentative thoughts, and then allowing the parties      02:40

21 to respond.

22         The Court has had the benefit of the reports from the

23 receiver.  I've had the benefit of extensive briefing on this

24 issue from the parties.

25         I think, at the end of the day, the suggestion, the           02:41

1    alternative suggestion, made by MGA and joined in by others, of

2    appointing a monitor with sufficient authority to ensure the

3    Court that the constructive trust established by the Court's

4    December 3rd order is, in fact, preserved and sufficiently

5    accounts for the financial profits, the inventory, and various         02:41

6    other aspects that are relevant to Mattel's concerns that they

7    have identified in light of the Court's ruling, is appropriate.

8            I do not believe -- and I don't even think Mattel at

9    this point is seeking the full-blown receivership.  What Mattel

10   essentially proposed in its papers is a receivership over the         02:42

11   Bratz assets, as they define them, refer to them.  As the Court

12   defines them in the Court's orders, the assets that the Court

13   has ruled, based on the jury's findings and its own substantial

14   similarity analysis, are the intellectual property of Mattel.

15           The Court doesn't view a receivership in that regard         02:42

16   as a workable solution.  There can't be two heads to one

17   company.  It's clear to the Court that MGA needs to be run by

18   Isaac Larian.  At the same time, the Court believes that there

19   is a sufficient basis in the record -- the history of the case,

20   particularly since the conclusion of the trial, justifies a         02:43

21   monitor.  So what the Court is tentatively inclined to do is

22   translate the temporary receivership into a longer-term

23   monitor.

24           The question comes up of duration.

25           One of the issues that I've been concerned about is         02:43

1    making this transition, transitioning what the Court has found

2    to be Mattel's intellectual property from MGA to Mattel, in an

3    efficient and nondisruptive way.

4            My thoughts go back to Mr. Zeller's admonition back

5    in October that this needed to be addressed soon before it went          02:43

6    too long.  The bottom line is, the Court was not in a position

7    to make the decision it made until December 3rd.  I had a

8    courtroom full of product to review; the substantial similarity

9    analysis took the time it did; and the Court found itself

10   essentially in the middle of the 2009 season by the time it got          02:44

11   around to making its decision.  And out of concern for the

12   contractual commitments that had been made to retailers and

13   distributors and licensees and the rest, the Court afforded a

14   stay for the 2009 season.

15           Now we find ourselves further into that season, and            02:44

16   the Court, at this point, sitting in equity, has to determine

17   what is the best way to get through the 2009 season, while at

18   the same time, at the end of that season, transition that

19   property which the Court has determined to be Mattel's back to

20   Mattel.                                                                   02:44

21           I think a monitor is probably the best approach to do

22   that; certainly a monitor who has sufficient authority to

23   ensure that the constructive trust is being preserved, with the

24   ability to return to the Court should additional steps need to

25   be taken.                                                                 02:45

1          And, frankly, I just don't see, at this point, any

2     other way of doing it, because the outlays for the production

3     of the 2009 season need to be taken now.  It would be unfair to

4     MGA to require them to pay for the outlays, and then not allow

5     them to essentially offset the revenue and deduct the expenses          02:45

6     from that.

7          Certainly, the profits from that go to this

8     constructive trust, but not the expenses of producing the line.

9          I gather, trying to read as best I can between the

10    lines, that Mattel is not in a position to take over the line          02:45

11    presently, particularly given the fact that there are -- when

12    we speak of the line, there are portions of the line that are

13    the intellectual property of MGA; there are other significant

14    portions of the line that are the intellectual property of

15    Mattel.                                                                 02:46

16         This is a very messy divorce in many ways.  It

17    strikes the Court that the time to effectuate the divorce is at

18    the end of the 2009 season.  In the meantime, Mattel has raised

19    some very compelling arguments as to why there needs to be some

20    assurance in the interim.  And that's the role that I foresee a        02:46

21    monitor playing.

22         That's where I am on all of this, in terms of the

23    receivership going forward.  That's my tentative thoughts.  I

24    thought it best just to lay it out there, and then have your

25    responses and concerns and all of the rest.                            02:46

```
 1              MR. GORDINIER:  Todd Gordinier for the Omni 808

 2    parties.

 3              Let me say, for my party's position, as you know,

 4    from our submission, what you have just articulated is fine

 5    with us.  That is something we are fine with.                    02:47

 6              What I want to do today -- and you didn't address it,

 7    and I hope I didn't cut you off -- but what I want to do today

 8    is address the transactions that my client has been involved in

 9    and make the record clear.

10              THE COURT:  You didn't cut me off, but let me cut you  02:47

11    off right now.

12              MR. GORDINIER:  Okay.

13              THE COURT:  Because I think this might be premature,

14    because, quite frankly, those transactions and the allegations

15    associated with them are the subject matter of the proposed     02:47

16    third amended answer and counterclaim.  And I'm not really sure

17    exactly where I'm going to go on that at this point.

18              They are also the subject matter of a supplemental

19    report that has just been received by the Court from the

20    forensic auditor, as of yesterday.  And, quite frankly, they're 02:47

21    not dispositive one way or the other of the issue of the

22    monitor or the receiver or where we're going on this; so I

23    don't know if this is something which needs to be addressed.

24              MR. GORDINIER:  I'm happy not to address it,

25    Your Honor.  I'm here today because you said one of the things   02:48
```

1   you wanted to address today is whether, as I represented to

2   you, this was a straightforward transaction or whether, as

3   Mattel has alleged, it was something else.

4          If the Court is still pondering that and wants to

5   come back at a different time and hear argument about that, I'm          02:48

6   fine with that.  But I don't want this issue festering anymore,

7   and --

8          **THE COURT:**  Well, let me say a few things to,

9   perhaps, address that festering aspect of it.

10          I've read the parties' extensive pleadings on this          02:48

11   particular issue.  I would hope that everybody concerned

12   understands what the Court is saying or is not saying.

13          The Court has never suggested, as I think maybe some

14   people have taken, that there is any criminal act with respect

15   to the transaction.  First of all, it's not a criminal case,          02:49

16   and the Court has not concluded in any sense that anything

17   criminally has taken place.  In fact, each and every one of the

18   individual transactions which make up what has come to be

19   referred to as the "Omni 808 transaction" may in itself be

20   completely legal.          02:49

21          Whether or not a series of legal transactions can

22   have the effect of undermining or frustrating, or defeating

23   even, a court order, is an entirely separate matter from

24   whether or not any of those transactions are unlawful, or even

25   unethical.          02:49

```
 1              So it's important to keep in mind that, even though

 2      the language used with respect to these allegations might be

 3      quite broad, from the Court's perspective anyway, the concern

 4      has been and remains only whether or not any of these financial

 5      transactions are in any way obstructing or affecting the        02:50

 6      Court's orders.  That's my only concern.

 7              My only concern here, with respect to Mr. Larian,

 8      with respect to Omni 808, with respect to any of these

 9      entities, is whether or not what the Court has found and what

10      the Court has ordered can be effectively implemented.  If       02:50

11      something is frustrating that, the Court is of concern.  If

12      it's not frustrating that, that is for other entities and other

13      authorities to be concerned with.

14              Do you understand what I'm saying?

15              MR. GORDINIER:  I do understand what you're saying,      02:50

16      Your Honor.  But Mattel has called it unlawful, and the Court

17      has expressed a concern about whether something that Omni 808

18      was involved in was intended to or have the effect of

19      frustrating any of the Court's orders.  And I want to assure

20      the Court today that it did not.                                 02:50

21              And I'm prepared here to describe to the Court, in

22      however much detail the Court wants to hear, about how that

23      transaction was prepared, executed, and is operating today, to

24      satisfy yourself.

25              The short answer, Your Honor, is, it doesn't            02:51
```

```
 1    implicate the IP at all.  And I don't think that's something

 2    that's been made clear.

 3            What happened was that Omni stepped into the shoes of

 4    Wachovia.  It got nothing more and nothing less.  And that did

 5    not include the IP; that did not include the intellectual       02:51

 6    property.

 7            THE COURT:  I think the concern is not so much -- I

 8    don't think anybody disputes what you just said, other than --

 9            MR. GORDINIER:  Actually, Mattel does.

10            THE COURT:  Well, the question, I think, that Mattel     02:51

11    raises is, first of all, who is Omni 808?

12            MR. GORDINIER:  They do raise that.

13            THE COURT:  Right.

14            And the second question is not so much that

15    directly -- that the IP, including part of their intellectual   02:51

16    property, is part and parcel of the security that has been

17    encumbered by that transaction.

18            MR. GORDINIER:  That's what I'm just telling you,

19    Your Honor.  It is not.  The security did not include the

20    intellectual property.                                          02:52

21            THE COURT:  Okay.  Well --

22            MR. GORDINIER:  I mean, that's -- so there was

23    nothing involved in that transaction that either was intended

24    to or had the effect of either trying to evade or alter or

25    obstruct any of the Court's orders.                             02:52
```

```
 1          THE COURT:  I appreciate your statements, Counsel.

 2   The Court is not prepared -- I literally just received the

 3   supplemental report, which responds to the reports that were

 4   made last week.  Again, this is the subject of potentially a

 5   third amended answer and counterclaim.  The Court is not going       02:52

 6   to make a definitive statement.

 7          I'm not going to fall into the mistake of prejudging

 8   an issue which may very well be the subject of a trial; it may

 9   be the subject of summary judgment motions.  I'm not prepared

10   to go there, given where this fits in to the litigation at this      02:53

11   point.

12          Do you understand that?

13          MR. GORDINIER:  I do understand it.  And I appreciate

14   it, Your Honor.

15          THE COURT:  We probably need to take -- the Court --          02:53

16   particularly with respect to the report, the forensic auditor's

17   report, I tried to take great care to keep that under seal.

18   And MGA, in responding to it, filed under seal; and Mattel did

19   as well.  You didn't.  Omni 808 did not place -- so I take it,

20   from your perspective, you're waiving any confidential issues        02:53

21   with respect to the contents of the forensic auditor's report.

22          MR. GORDINIER:  My brief speaks for itself.

23          We have nothing to hide.  I did not, as part of that,

24   attach the auditor's brief.  I read the Court's order, in fact,

25   to restrict me from even showing it to an expert or two that I       02:53
```

```
 1    would have liked to have shown it to.  But I don't have

 2    anything to hide, Your Honor; and I didn't feel it appropriate,

 3    necessary, or desirable to file my brief under seal.  And I

 4    don't have any problem with the Court or anybody reading what I

 5    have to say, because I gave it a lot of thought, and I gave it     02:54

 6    a lot of consideration.

 7           Many hundreds of thousands of dollars have been, in

 8    my judgment, wasted with irresponsible allegations.  There is

 9    no factual support for either the allegation that Mattel has

10    made to Mr. O'Bryan that my client gifted $50 million to MGA,      02:54

11    or the allegation that they're making here, that somehow

12    Mr. Larian controls my client and can get all of that funding.

13    Neither is true.

14           THE COURT:  I understand that you are vociferously

15    objecting to those allegations, Counsel.                           02:54

16           MR. GORDINIER:  I am.  And I think the more they get

17    the light of day, the better they are.

18           And my concern today, Your Honor -- and I appreciate

19    it; I did not know that -- though I'm not surprised -- that

20    Mr. Durkin felt compelled to respond.                              02:55

21           THE COURT:  He didn't feel compelled to respond.  He

22    was directed by the Court to respond.

23           MR. GORDINIER:  All right.

24           Well, it doesn't surprise me that a response was

25    necessary.  Because my client's transaction had no impact on       02:55
```

1    the balance sheet of MGA; and Mr. Durkin knew better; and had

2    no impact on the solvency of MGA.  If anything, it had a

3    positive impact on the cash position of MGA.  And Mr. Durkin

4    knew better.  And Mr. Durkin chose not to tell the Court,

5    apparently, about either the financial surroundings of the                02:55

6    transaction or the nature of the transaction that was engaged

7    in.  And that was not right.

8             And, Your Honor, I just want to make sure that the

9    Court, going forward, doesn't have any concerns about Omni 808

10   that are going to prejudice my client going forward until we              02:55

11   resolve this.  Because, for example, as I was driving here

12   today, I understand that Mr. O'Bryan, the discovery master,

13   issued an order, in part, in reliance on what Mr. Durkin said

14   about my client.  So that's having a real and substantial,

15   immediate impact on my clients, who deserve to have their name           02:56

16   cleared.

17            So I don't want to rush the Court, and I'm perfectly

18   happy to have the Court release this supplemental report and

19   we'll work through all of this, because I am very confident

20   that when you understand what happened and why, not only will            02:56

21   you be satisfied that my client didn't do anything wrong,

22   you'll understand that MGA would not have survived, Your Honor,

23   MGA would not have survived to even see the order that you

24   issued in December.  It was going to be dismantled and

25   liquidated by Wachovia, who had its own problems, and ended up           02:56

```
 1    disappearing altogether.

 2            So I do want to drill down on this, Your Honor, and I

 3    know you'll give me as much of an opportunity as I need to

 4    respond to what Mr. Durkin is saying and to retain experts, if

 5    necessary.  I just want to assure the Court that this is --          02:57

 6    people can make whatever allegations, but this is a frolic in

 7    detour.  This is not what Phase 2, at least as I understood it,

 8    was about.  If Mattel wants to make it into this, fine.  But I

 9    can tell the Court, it's baseless.

10            I can tell the Court, Omni put up its money in a very       02:57

11    difficult situation.  As I told the Court on February 11th,

12    $50 million, and we expect to and hope to make a profit on it.

13    And most fundamentally, Your Honor, my client -- and I urge you

14    to talk to Mr. Fraioli about this -- is part of the solution to

15    this, not part of the problem.  We have ways we can help solve      02:57

16    this problem.

17            If Mattel truly wants to work through this transition

18    and truly wants to effect a smooth transition of the IP, and

19    let the parties divorce and go their ways, we can help that.

20    And we should be allowed to help that.                              02:57

21            If, on the other hand, Mattel is intent on destroying

22    MGA, then it's not surprising they object to our involvement

23    and they're calling us names that aren't appropriate.

24            I apologize, and I appreciate the Court's indulgence.

25    And what I'm taking from the Court's sense is that we're going      02:58
```

1    to defer the issue of these things until another day.

2          **THE COURT:**  Well, given its presence in the proposed

3    third amended answer and counterclaim, I think for the Court to

4    rule at this point, based on the information that it has before

5    it, which, from your report, is incomplete -- you're telling me          02:58

6    that I don't have the complete information before me.

7          **MR. GORDINIER:**  That's correct.

8          **THE COURT:**  I just literally received a supplemental

9    report from the forensic auditor yesterday afternoon.  I have

10   not even heard Mattel's response to any of that.  I think it          02:58

11   would be grossly premature for the Court to rule on this issue.

12         **MR. GORDINIER:**  I don't disagree.  I just want to

13   make sure that I'm going to be given an opportunity here.  And

14   I know I will.  I just --

15         **THE COURT:**  Mr. Quinn and Mr. Nolan will assure          02:59

16   you -- they've had the experience -- that this Court gives

17   everyone an opportunity to say whatever they want, even at the

18   risk of going on for -- until you get put on the clock.  And

19   then --

20         **MR. GORDINIER:**  Well, I'm going to sit down before          02:59

21   you put me on the clock.

22          Thank you, Your Honor.

23         **MS. GLASER:**  Your Honor, because we believe, MGA

24   believes, that this has absolutely no merit at all, putting

25   aside Omni's position, which I don't minimize at all, we would          02:59

1    like to be heard on this, and we would like, before Your Honor

2    puts everybody through the rigors of -- if the Court were to

3    allow an amendment, for example, in connection with this

4    transaction, what that would mean in terms of going off on a

5    frolic, when there, indeed, is no basis, in fact, for the                    02:59

6    allegation, is something that we would like the Court to

7    address before there's an amendment; certainly, after everybody

8    has an opportunity to look at Mr. Durkin's supplemental report

9    that was requested by the Court.

10          We're not trying to ask you to do something                           03:00

11   prematurely; we're asking you to do something maturely.  But

12   before there's an amendment, when there is going to be a

13   ridiculous amount of legal fees expended on something that has

14   absolutely no merit whatsoever.

15          **THE COURT:**  I'll definitely try to act as maturely as            03:00

16   possible, Ms. Glaser.

17          **MR. GORDINIER:**  We have no doubt, Your Honor.

18          **THE COURT:**  Thank you.  I appreciate the validation.

19          I understand what you're saying, Ms. Glaser.

20          My concern, I guess -- and this is just an                            03:00

21   immediate reaction -- is, procedurally what you're asking for,

22   if I'm hearing you correctly, is almost an -- I do these in

23   criminal cases sometimes, where we get a presentence report

24   before we get the plea -- you want a 12(b)6 or a summary

25   judgment motion before we have the complaint filed.               03:00

```
 1              MS. GLASER:  No, Your Honor.

 2              Actually, what I had in mind -- and my analogy, which

 3     may not be a good one, is essentially like a preliminary

 4     injunction hearing, or an injunction hearing.

 5              THE COURT:  To enjoin them from bringing --                03:01

 6              MS. GLASER:  No, no, no.  I'd like that result, and

 7     it would be appropriate.  But the problem here is simply

 8     saying, 'Oh, heck, let's just have an amended pleading, and

 9     we'll work it all out then.'

10              These are serious allegations hanging over MGA and        03:01

11     Omni, which, in our view, which I acknowledge is our view -- I

12     have no idea what Mr. Durkin's supplemental report says -- has

13     no merit.  None.  And if there were -- you know, reasonable

14     people can disagree, or you're looking through one prism and

15     I'm looking -- not you, Your Honor, but Mattel is looking       03:01

16     through one prism and MGA is looking through another prism,

17     and, 'Gosh, let's litigate it.'

18              That's not what we're talking about here.  We're

19     talking about something that's really very serious, and is

20     having a very negative impact on Omni; but also, much more        03:01

21     importantly, from our standpoint, MGA.

22              THE COURT:  I appreciate that.

23              Mr. Gordinier, anything further?

24              MR. GORDINIER:  Yes, Your Honor.

25              One of the things I'd like you to dissolve today is      03:02
```

1    the order you entered against my client, enjoining my client,

2    before any finding of fact or anything else, from taking action

3    that it was entitled to do under contract.

4           And one of the things you'll notice that we said in

5    our statement of position is, I think you ought to continue the    03:02

6    monitor, but I don't think it's appropriate to enjoin or

7    continue an injunction against Omni.  As I've said, and I will

8    say, and the transcript can repeat, we very much oppose a

9    bankruptcy filing right now.  We very much do not think it's

10   appropriate.  We don't think it's in order.  We don't think     03:02

11   it's even inevitable.

12          But that's different than saying it's appropriate to

13   enter an order enjoining us from exercising our contractual and

14   lawful rights.  And I don't think any showing has been made,

15   and I don't think anything showing could be made, to enjoin us.    03:02

16       **THE COURT:**  Well, that was done, as were many of the

17   measures in the 20-day temporary receivership, to basically try

18   to freeze the status quo.

19       **MR. GORDINIER:**  I understand.  I just don't want to

20   get lost -- as the Court is moving forward from today, I just    03:03

21   don't want it to get lost, and I think it should get dissolved.

22   But I appreciate Your Honor's thoughts.

23       **THE COURT:**  The only thing that the Court is probably

24   inclined to do at this point with respect to the issue of

25   bankruptcy, which I understand that nobody is seeking at this    03:03

1    point, is that if there should be a bankruptcy, just for the

2    sake of judicial economy, I'm going to require that bankruptcy

3    take place in the Central District of California.  The last

4    thing I want to have is have multiple districts involved in

5    litigating these various matters.  That was implemented to            03:03

6    preserve a status quo for a very limited period of time.

7              MR. GORDINIER:  I understand, Your Honor.

8              We're talking about a lot of different issues, and I

9    just didn't want it to be lost in the shuffle here.  And God

10   willing, we'll be back here on other issues before and apart         03:03

11   from any bankruptcy filing.

12             THE COURT:  Thank you, Counsel.

13             MR. GORDINIER:  Thank you.

14             THE COURT:  Well, I certainly want to hear from

15   Mattel on all of this.  I'm sure you have a few things to say         03:04

16   about all of this, Mr. Zeller.  I can tell you're ready to

17   talk.  But let me just say a few more things in terms of the

18   Court's tentative thoughts, so that when you do respond -- and

19   I'll certainly give MGA the same chance to respond -- that you

20   have all of this in mind.                                            03:04

21             In addition to the monitor, and in addition to the

22   important issue raised by Mr. Gordinier with respect to the

23   Omni 808 issue, there appears, from the Court's reading of all

24   of the papers in this, to be another white elephant in the

25   room.  And that is Moxie, and the new lines of dolls that            03:04

1    Mr. Larian is considering bringing on line, or is in the

2    process of bringing on line.  I'm not sure exactly where that

3    is.

4           I get the impression, or the distinct impression,

5    from Mattel's perspective, that they have a view that these new    03:04

6    lines, which all I have seen was the one black-and-white

7    photograph or copy that was submitted in the papers -- and,

8    like, Omni 808, I'm certainly not expressing any view on this

9    at this point -- I gather, though, that Mattel takes the

10   position that these may or may not be infringing their          03:05

11   copyright, not just in terms of a potential copyright, but in

12   terms of the Court's actual December 3, 2008 order.

13          I describe that as kind of the white elephant in the

14   room, because I certainly can see that as a potential roadblock

15   to any resolution of this matter.  I can see that just as this   03:05

16   big issue looming out there that needs to be addressed at some

17   point in time.  I'd like to see that issue addressed sooner as

18   opposed to later, and that would be all part of this.

19          And the last thing -- and this is going to pick up on

20   something Mr. Gordinier pointed out -- he characterized the      03:05

21   appointment of the forensic auditor as a waste of money.  And I

22   understand from his perspective why he says that.  From other

23   perspectives, that might not be the case.  But in any event,

24   the Court has attempted, through making its various court

25   appointments, whether it has been a settlement officer or a      03:06

1    discovery master, to split the costs as appropriate.

2              With respect to the temporary receiver and

3    Mr. Fraioli, I impose those costs on MGA.  As far as the

4    monitor, I will probably impose those costs on Mattel.  I want

5    all of the parties to know that when the dust finally settles          03:06

6    in this case, and we have a clear sense of whether or not

7    Mr. Gordinier or Mr. Zeller is right on Omni 808, whoever is

8    right on all of this, the Court will be affording leave to all

9    of the parties to file motions related to potential cost

10   shifting, for any of the costs that were incurred as a result         03:06

11   of court appointments, when we can kind of sit back in

12   hindsight and assess the equities of who paid what and when.

13             And I mention that now -- obviously, for

14   court-appointed officials, whether it be a temporary receiver

15   or a discovery master, they need to have the certainty, of            03:07

16   course, of where to submit their bills.  But at the end of the

17   day, the Court will certainly afford leave to revisit those

18   decisions and ensure that equity governs an appropriate

19   allocation of those resources.

20             All right.  Those are my thoughts on this general           03:07

21   issue of receivership.  I've heard from Omni 808.  I'd like to

22   hear from Mattel and MGA.

23             So whoever would like to go first.  I think my

24   tentative is probably someplace in the middle between both of

25   you, so I don't think it necessarily favors one side.  So            03:07

```
 1    whoever wishes to speak first.

 2            Why don't we take a 10-minute break for the court

 3    reporter.

 4            (Brief recess taken.)

 5            THE COURT:  We're back on the record.          03:19

 6            Counsel?

 7            MR. ZELLER:  Thank you, Your Honor.

 8            I guess I see three general issues as to where we are

 9    at the moment.  There at least appears to be general agreement,

10    and I think the evidence supports this amply, that MGA simply   03:22

11    cannot be left to its own devices with respect to Bratz going

12    forward.  This is Mattel's property.  Contrary to what

13    Mr. Gordinier is suggesting, there is, in fact, evidence that

14    Isaac Larian made efforts to incumber the Bratz property after

15    it was determined to be Mattel's.  That is in writing.  That is  03:23

16    in writing with Isaac Larian, in an e-mail, saying in September

17    of 2008.

18            Now, it's certainly gratifying to hear OMNI 808

19    concede that there in fact, is no security interests over Bratz

20    that they have, or, frankly, that anyone could have at this     03:23

21    juncture.  But to suggest that somehow it's no harm, no foul

22    because it wasn't an accomplished, I think misses the mark.  It

23    is documented there was this effort to thwart the Court's

24    rulings, the jury's verdict, and Mattel's rights; and I don't

25    think there can be any reasonable dispute about that, and I     03:23
```

```
 1   have not heard one.

 2          There is also concern -- and this gets us to the

 3   elephant in the room, as the Court has noted -- which is Moxie.

 4   There's ample evidence that, whether deliberate or simply

 5   because they are unable to, MGA is in the process of tanking                03:24

 6   the Bratz line.  I mean, there are now documents we have -- and

 7   the Court has already seen evidence we have already put in --

 8   Mr. Meier admits that the two top retailers aren't even going

 9   to be carrying Bratz in the second half of 2009, or at least

10   ordering; we have Wal-Mart documents showing that they are not               03:24

11   even going to be carrying Bratz after July.

12          THE COURT:  There is conflicting evidence on that,

13   though.

14          MR. ZELLER:  On Wal-Mart?

15          THE COURT:  Yes.                                                      03:24

16          MR. ZELLER:  I submit, Your Honor, the declaration

17   from Wal-Mart confirms it.

18          We have documents from Wal-Mart, publicly displayed

19   signs and publicly displayed documents, telling consumers that

20   Bratz is going to be discontinued as of July 2009; and on                   03:24

21   reply, Wal-Mart puts in a declaration consisting of two

22   sentences, all of which simply says, we may carry it.  It

23   doesn't even say new product.  And there's a reason why it

24   doesn't say new product, and it's because they are not carrying

25   any new product.                                                            03:25
```

1           If the Court recalls, going back to December and

2    January, MGA made a big point about how the timetable here

3    means that orders for fall of this year had to have been

4    placed, planograms were being set as we speak, in January and

5    February of this year.  There would be evidence, they could          03:25

6    come forward with evidence showing 'here is the quantity of

7    Bratz' fall 2009 line that Target or Wal-Mart or anyone else

8    has order.  They have not done it.

9           And, of course, I will make my pitch here for the

10   ex-parte here, Your Honor, which I know the Court has not ruled      03:25

11   on, but we think getting that kind of evidence will really help

12   clarify the situation, because certainly there's a component

13   here -- and I'm talking about the ex-parte to get the

14   information about Bratz and Moxie -- there's certainly an issue

15   here as to whether or not Moxie is infringing.  But infringing      03:26

16   or not, what it also shows is that MGA's focus is changing; it

17   is shifting the very few resources it has; the company is

18   already insolvent; shifting its resources into another brand.

19          Why on earth would a company have any incentive to

20   support Bratz when, first of all, there's already been a            03:26

21   judicial termination that the core of it is owned by its

22   competitor; and it doesn't really have additional resources at

23   its disposal to pursue other -- it has other properties that it

24   believes that it owns; so it's going to, of course, naturally,

25   pursue those.  So we think that certainly even the motivation       03:26

1    is such that there's not going to be the pursuit of Bratz.

2          And where I was headed with this is IGWT produced

3    documents -- and they continue to do this, they have been

4    ordered to do it -- we have found in there an extensive

5    spreadsheet; this document itself is something like 62,000

6    pages long, lists of products -- what it shows is interesting.

7    It shows exactly five Bratz doll SKUs for fall of 2009; five.

8    That's what it shows.

9          For comparison's sake, MGA had 72 SKUs for the core

10   female fashion dolls alone for the fall of 2006.  And for the

11   fall of 2007, the same thing, the core Bratz female fashion

12   dolls, there were 67 SKUs.  Also, this document from IGWT, it

13   lists 44 SKUS for Moxiez for the fall of 2009; so there is

14   certainly the issue of infringement, which we think is very

15   troubling and really needs to be dealt with.  But even if it's

16   as different as night and day, and no reasonable person could

17   think that it's infringing, what we have here is a company that

18   has shifted its focus.  And that is one of the many reasons why

19   we're very concerned that Bratz is in the process of being

20   killed by MGA.

21          And come the end of 2009, if Bratz is gone, we'll be

22   getting handed to us nothing.

23          **THE COURT:**  Mr. Zeller, let me try to address this,

24   because I understand your argument in terms of why it is less

25   than ideal from Mattel's perspective to have their property

1    essentially managed by a competitor.  I get that.

2              We're in the middle of the 2009 line.  Ideally, from

3    an enforcement of the Court's order perspective, it would be

4    better, more efficient, to turn over that line tomorrow to

5    Mattel.                                                          03:29

6              Am I reading Mattel's papers correctly that they are,

7    understandably, not in a position to essentially pick up the

8    line mid season?

9              **MR. ZELLER:**  Well, let me try and parse through an

10   answer on this.  Because, I mean, the short answer is that      03:29

11   Mattel can and will do a line.  There is no question about

12   that.  Part of it has to do with the fact that the auspices --

13   and this really gets us into the powers issue of what does this

14   person look like?  Call him a receiver; call him a monitor;

15   whatever title is ascribed to this person --                    03:29

16             **THE COURT:**  There's a significance in titles, which

17   I'm sure is not lost on anyone in this courtroom.

18             **MR. ZELLER:**  Certainly MGA and OMNI suggested that

19   somehow it was better calling the person a monitor.  But to us,

20   label is not as important as what that person's powers are.     03:30

21   And certainly, part of the powers of that monitor or receiver

22   is that --

23             **THE COURT:**  That's because you're not a creditor or

24   a --

25             **MR. ZELLER:**  We are a creditor.                    03:30

```
 1          THE COURT:  You are a creditor, but you are not in a

 2   contractual relationship with MGA.

 3          MR. ZELLER:  Yes.

 4          What I would submit is, setting aside the label part

 5   of it, part of the reason why I'm raising this issue about what      03:30

 6   is MGA, in fact, doing for 2009, is because I think that is a

 7   key component as to what the scope of the powers of this person

 8   ought to be, the Court appointed officer who is going to be

 9   handling --

10          THE COURT:  You know I'm going to insist that you             03:30

11   answer my question at some point in time.

12          MR. ZELLER:  I'm getting to that.

13          What Mattel needs is a court-appointed officer,

14   receiver, monitor, to provide license rights to Mattel.  This

15   is something that was addressed in Mr. Fraioli's report; it was      03:31

16   something we addressed back in our ex-parte.  If Mattel is

17   going to do a line -- otherwise, at the end of the day it's

18   just opening itself up to infringement claims by MGA, which

19   doesn't accomplish anything; so that's kind of part one of what

20   it is that needs to be dealt with.  And that would be really         03:31

21   for any time.

22          THE COURT:  You want the Court to place somebody in

23   MGA who would then have the authority to license you the

24   intellectual property that is not Mattel's so you can do the

25   2009 line?                                                           03:31
```

1          **MR. ZELLER:**  No.  That's not what I'm saying.

2          **THE COURT:**  Then I'm misunderstanding you.

3          **MR. ZELLER:**  I'm suggesting that the rights that

4    belong to Mattel, that the purported rights that MGA claims to

5    have, should be put under the control of a receiver.          03:31

6          Again, I don't want to fight over the label, but I'll

7    call him a receiver for present purposes.  We put him in the

8    hands of a receiver.  That receiver should have the power and

9    should have the mandate of preserving the brand during the

10   course of appeal.  Because if it's not made or if MGA          03:32

11   discontinues it or is unable to continue to sell Bratz, it will

12   die.  Mattel will be handed nothing at the end of the day.

13         This was, in fact, the construct that we were

14   suggesting in the first place in the first instance for the

15   receivership is that those rights would be held essentially in  03:32

16   trust by a receiver who would then be able to ensure that the

17   brand survives.  And that's why there's also powers.  And

18   certainly it was already in the temporary receiver's power, but

19   we would say that this would be part of the receiver's powers

20   going forward is have the right to license them to ensure they  03:32

21   are manufactured.

22         Mattel absolutely can manufacture a spring of 2010

23   line under those circumstances.

24         **THE COURT:**  You still have not answered the question

25   of the 2009 line.  But even about the 2010 line, the Court is   03:33

1    not real inclined to create essentially a separate toy company

2    to run the Bratz line while this case spends X number of

3    months, years, on appeal.

4         This Court is going to order that the property, the

5    intellectual property that this Court has determined belongs to   03:33

6    Mattel, goes to Mattel.  The only reason that transition has

7    not taken place so far are for the reasons that I have stated

8    with respect to the stay for the 2009 year.

9         At the end of the 2009 year, from this Court's

10   perspective, that intellectual property will be in your hands.   03:33

11   What you do with it beyond then is going to be your client's

12   business.

13        My question is, between now and then -- and this is

14   the question that I really need to have answered, because my

15   take -- I'm reading this into what you're telling me right now,   03:33

16   is that Mattel is not, understandably -- and this is not a

17   criticism, because I understand the difficulty of producing a

18   line which includes not just the core dolls themselves that are

19   based on what the Court has found, based on the jury's

20   decision, to being predicated on an infringing mold and an   03:34

21   infringing design -but all of the other, for lack of a better

22   phrase -- stuff that goes with those dolls, that are the

23   intellectual property of MGA.

24        I understand how that's difficult and how Mattel does

25   not want to be selling or in any way responsible for something   03:34

1    made by a competitor.  I get all of that.  And it's for those

2    reasons, as I understand it, you are not in the position,

3    Mattel is not in a position, to take over the 2009 line.

4            Is that correct?

5            MR. ZELLER:  Yes.                                      03:34

6            And believe it or not, I was headed towards that,

7    Your Honor.  I was trying to parse out the spring of 2010 as to

8    being able to do it under the auspices of the receiver.

9            There are circumstances -- to be clear, however,

10   there are circumstances under which Mattel could do a fall of   03:35

11   2009 Bratz line under the auspices of a receiver.  That's what

12   I wanted to also make very clear.

13           THE COURT:  But when you say under the auspices of a

14   receiver, that would require, essentially, the forced

15   assignment of rights beyond just the intellectual properties    03:35

16   that Mattel has been found to possess.

17           MR. ZELLER:  Well, arguably, that would be correct;

18   arguably.

19           THE COURT:  Arguably.

20           MR. ZELLER:  But let me put it this way.  And part of   03:35

21   this has to do with the fact that MGA constantly confuses what

22   it is that we own versus what they can do.

23           THE COURT:  I tried to be as clear in my order, and I

24   will certainly try to be more clear in the next order, as to

25   what that is, what that includes, the full parameters of that.  03:35

```
 1    And if there's going to be a dispute on that, the Court is
 2    happy to hear a dispute on that.  And that may be the dispute
 3    the Court hears with respect to Moxie, and whether it falls or
 4    does not fall within the order; whether components of the
 5    manufacturing process falls or does not fall within the order.     03:36
 6    I'll try to be as clear as I can.  But ultimately I understand
 7    there may be a need to litigate some of this, and we'll take
 8    that up at the appropriate time.
 9           But the transition, the divorce, as it were, needs to
10    start now.                                                          03:36
11           MR. ZELLER:  And part of it --
12           THE COURT:  I don't want to be in a position with
13    these types of discussions circulating around the 2010 line.
14           MR. ZELLER:  That's a huge concern of ours as well.
15    Not to talk about October again, but, I mean, this is exactly     03:36
16    what we were concerned about.  Even back in January, I was
17    saying, this is just a precursor to them coming back and saying
18    'we need to take it to 2010 now.  And that is what they are
19    doing.  They are arguing that they now need to do it in 2010,
20    because otherwise Bratz is going to slip away.                     03:36
21           The fact is they are not pursuing it in any event in
22    any material way for the fall of 2009.
23           THE COURT:  It can't be both.
24           MR. ZELLER:  I'm sorry?
25           THE COURT:  It can't be both, that they are trying to      03:37
```

1    do a 2010 line and they are trying to destroy the line this

2    year.

3          **MR. ZELLER:**  I understand.  My point is that they are

4    not even doing the 2009, let alone the 2010.

5          I'm saying they came back and asked for it, and                     03:37

6    that's exactly what they did, even though there's no reason to

7    think they are doing it in 2009, let alone 2010, in any sort of

8    material way.  But certainly they have not put forward the

9    evidence, like the evidence that we have, are things like the

10   survey that we did from the investigators.  Over 80 percent of     03:37

11   the Bratz product now on the shelf is pre-2009 product.

12         They came to this court to get the initial exception

13   to the stay because they claimed they needed to do it to save

14   2009.  And it appears that was not followed through with.

15   Which is another reason why we think this is a very serious         03:37

16   issue.  Certainly, if they are not even following through with

17   any material way for 2009, the idea they could come in and ask

18   for a stay pending appeal into 2010, we think that really is

19   highly material to that evaluation.

20         **THE COURT:**  Very well.                                            03:38

21         **MR. ZELLER:**  And what I would say in terms of these

22   concerns that we have is that -- I mean, if MGA is allowed to

23   essentially let the brand die, by basically not carrying it in

24   the fall of 2009, I mean, in extending the injunction even

25   through the end of the stay, I should say, or the exceptions to    03:38

```
 1    the injunction even through the end of 2009, that seems to be
 2    leaving Mattel without meaningful relief.
 3            MGA is insolvent.  It cannot pay even the damages
 4    award that we have now, let alone the profits from 2009.  And
 5    there's, of course, an argument that is being made now by MGA          03:38
 6    that, of course, they should be allowed to use the 2009
 7    revenues from Bratz and from the rest of the company and put it
 8    back into the company, which means that we will have been
 9    effectively denied an injunction during this time period; the
10    Bratz brand will be devalued further and perhaps to oblivion;          03:39
11    and we'll have no monetary relief at the end of the day.  And
12    these are our concerns.  This is why we thought there needed to
13    be something that has some teeth to it for 2009.
14            And that's why we think there have to be these powers
15    that this monitor or receiver has to ensure that MGA is not            03:39
16    going to do what it is that we're concerned about doing.  And
17    part of the resolve requires the resolution of Moxiez as well.
18            THE COURT:  On that point, how does Mattel envision
19    proceeding on Moxiez?
20            MR. ZELLER:  What I would suggest, Your Honor, is              03:39
21    that the Court order the information that we ask for in the
22    ex-parte to be delivered to us.
23            THE COURT:  I thought I saw something somewhere about
24    MGA making available to Mattel --
25            MR. NOLAN:  That's correct, Your Honor.                        03:40
```

1          **MR. ZELLER:**  It offered to make a limited subset of

2     the materials available, number one, for us to look at the

3     dolls; we could not photograph them.  And, number two, we

4     couldn't even have copies of the documents; we could look at

5     them.  And also it was even then it was a subset of what we had      03:40

6     asked for.  So it wasn't even all of the dolls.  It was, you

7     know, whatever they picked as among the Moxie dolls.  So we

8     don't have that information.  And it has not been ordered.

9     They made these limited offers, but we don't have it.

10          And we, of course, pointed out in our papers, we need      03:40

11     copies of the documents; we need the order information; we

12     should be able to photograph the dolls so we can obviously

13     analyze them and show them to the Court.  I mean, these kinds

14     of restrictions on the information and even being able to

15     document it, there's really no basis for it.      03:40

16          But what I would suggest, Your Honor, is that we deal

17     with that issue, we get the information, we can analyze it, we

18     come to the Court; and maybe in the context of seeking some new

19     injunction, motion, it may be in the context of enforcing the

20     prior one.  I can't prejudge exactly the procedural flavor this      03:41

21     would come in until we see what the information is.

22          But rest assured, Your Honor, if we get this

23     information, we can make a determination relatively quickly,

24     and think we would, to determine what it is that should happen

25     with this.      03:41

1          But even apart from the infringement aspect, this is

2     a company that has clearly shifted over to Moxiez.

3     Particularly the idea that somehow they should take the Bratz

4     revenues, such as they are, which the Court, of course, has

5     seen that they have plummeted, just even over the course of                03:41

6     last year versus now, that they should be able to take that

7     money and put it into Moxiez or something else.

8          **THE COURT:**  That would be the role of the monitor to

9     make sure that any revenues coming in on the Bratz 2009 line is

10    used to first and foremost take care of the expenses for                    03:42

11    putting out the 2009 line, and then any profits would be held

12    in the constructive trust pending the turnover.

13         I don't disagree for a moment that ideally, again, an

14    immediate transition would be the best way to deal with the

15    situation.  And believe me, the Court has tried to explore the             03:42

16    idea of having some separate receivership set up to kind of

17    take it as a midwife, basically, between MGA and Mattel; that

18    does not seem to be practical either, in part, for many of the

19    same reasons almost in reverse as Mattel is concerned with.

20         So the default position, as I see it, is to leave it               03:42

21    with MGA, with an appropriate monitor, who, if your worse fears

22    are being realized, would be in a position to come back to the

23    Court and change the situation.

24         Right now, I'm being told by the receiver that at

25    least through July, perhaps through September, we have a                    03:43

```
 1   solvent institution, potentially solvent institution.  Again, I
 2   don't know; that is depending on a number of different
 3   variables.
 4            A lot of it has to do with this litigation.  Probably
 5   one of the biggest costs that MGA is facing is this continued          03:43
 6   litigation.  And I'm going to take up the issue of resolution
 7   shortly.  So I understand there's a lot of variables at play
 8   here.  The Court wants to adopt the least restrictive or least
 9   burdensome path, which at the same time affords protection for
10   Mattel's intellectual property and maintains respect for MGA's         03:44
11   position as a company and their intellectual property.
12            As it stand right now, the Court has no basis to make
13   any decision with respect to Moxie.
14            MR. ZELLER:  That's certainly true, Your Honor.
15            THE COURT:  And I can see, either way, that being a           03:44
16   very important issue.  An important issue to MGA's solvency,
17   for them to have a successful doll line that essentially
18   replaces Bratz, or, on the other hand, if it is infringing, as
19   you're alleging, obviously that's a critical issue to Mattel.
20   I just don't know right now.  That's certainly one of the             03:44
21   variables involved.  The continued litigation of Phase Two is
22   another variable.  And then, of course, there are other
23   variables that I won't get into.
24            MR. ZELLER:  And there are a few things I'd like to
25   circle back on.  But if I could just mention something that we        03:44
```

```
 1    do think is important for the preservation of the Bratz line,

 2    which is the bankruptcy restrictions.

 3            Clearly, as the Court has said, and apparently MGA

 4    has agreed, any bankruptcy would have to be filed here in the

 5    central district.                                                03:45

 6            We also want it made very clear that the bankruptcy

 7    estate should not include Mattel's rights to Bratz.

 8            THE COURT:  Well, now we're getting way ahead of

 9    ourselves.

10            That's an appropriate issue.  I've received            03:45

11    assurances from MGA today that that's not what they are seeking

12    at this point.  We will cross that bridge if and when we get to

13    it in terms of what is or what is not in the bankruptcy estate.

14            MR. ZELLER:  What I would ask, though, is that the

15    Court require at least a threshold showing as to these kinds of  03:45

16    bankruptcy issues.

17            MGA has already agreed that the reference should be

18    listed as to Mattel matters; so there's no question; they have

19    already conceded that.

20            This Court, having already invested years in this        03:45

21    case and, of course, three months of trial, should not allow

22    MGA to spend time and money and effort -- they claim they

23    critically need their money -- fighting about what should be in

24    the bankruptcy.

25            This doesn't strike us as efficient at all.  The         03:46
```

```
1    Court is the one that should properly be deciding what is part

2    of the bankruptcy estate, at least in the negative since, of

3    what it is that Mattel owns.

4         THE COURT:  The Court has decided what Mattel owns;

5    that was in the December 3rd order.                                03:46

6         But to do that in the context of a bankruptcy --

7    again, I think, just like MGA was asking for the Court to

8    reverse the rules of procedure when it comes to the answer, I

9    think you're asking me to do the same thing now.  This is

10   premature.                                                         03:46

11        MR. ZELLER:  Well, let me, I guess, explain at least

12   one very stark concern we have, which is, MGA's imminently

13   going to file for bankruptcy.  In fact, the receiver says in

14   his report that MGA is going to run out of money in July, by

15   July.  I would suspect that the Court is actually looking at a     03:47

16   fairly imminent bankruptcy filing by MGA.  Which means we're

17   going to have delay and expense and then we're going to have to

18   fight about Moxie.  And we're going to be fighting about Moxie

19   in front of a different judge; we're going to be fighting about

20   what this Court intended in front of a different judge.  And I     03:47

21   just don't see how there would be any reason for that to be

22   allowed whatsoever, other than to create yet more delay in

23   Mattel being able to obtain its rights.

24        That's just the bottom line, Your Honor.  We are

25   quite concerned that there will be, very imminently, a            03:47
```

```
 1    bankruptcy filing.  And somehow then they will be allowed to

 2    keep Moxie on the shelves, or even launch Moxie, be immunized

 3    in some way from a recall because they will argue that the

 4    bankruptcy stay somehow would preclude them from having to call

 5    this back and then they, of course, keep our money.                   03:48

 6              This is creating our fear is -- this is creating a

 7    situation as the worst of all possible worlds:  They will kill

 8    Bratz; they won't carry forward with it; we'll have some other

 9    infringing line; we won't be able to get effective relief; and

10    then we'll have arguments what this Court gave us and what the         03:48

11    jury found that we had, after four years plus of litigation

12    over it.

13              And I submit, Your Honor, that there's no

14    justification for that.  It's not a matter of it being

15    premature; it's a matter of who in the first instance should be       03:48

16    making those decisions?

17              And we don't have a mechanism, other than, I guess,

18    trying to argue it out in bankruptcy court and then coming back

19    to you and then having a fight as to which of the two judges

20    should be deciding the very issues that have already been in          03:48

21    front of and that should continue to be in front of you.

22    That's the bottom line of our concern.

23              I don't make predictions, as you know, but this may

24    happen very soon.  And then we're going to be right back in

25    this court arguing about these very, very similar issues.  And        03:49
```

```
 1    I think some guidance in putting some restrictions on MGA's it
 2    ability to file for bankruptcy that will simply create a delay.
 3    Because there could be no good faith for such a bankruptcy
 4    filing that attempted to basically circumvent this Court's
 5    prior orders and the jury's verdict.                                  03:49
 6         THE COURT:  Certainly, you're not suggesting that if
 7    a company -- and I'm not saying that they are or they are
 8    not -- is in a position which is in the interests of the
 9    company from a purely financial perspective to file bankruptcy,
10    that they should be impeded from filing bankruptcy?                   03:49
11         MR. ZELLER:  No.  Absolutely not.
12         What we're suggesting is that they not be allowed to
13    relitigate or even attempt to argue that they should be allowed
14    to relitigate directly or indirectly, in the bankruptcy
15    proceedings what's already in front of this Court.                    03:49
16         And I go back, Your Honor, to the fact that MGA
17    itself recognized in its papers that was proper.  And there's
18    no question that under the authorities that have been cited in
19    the papers, that this Court has the authority to at least
20    require MGA to come in the first instance to the Court to            03:50
21    ensure that this bankruptcy filing, to the extent that they are
22    even going to argue that anything relating to Mattel should go
23    in to that bankruptcy, should be determined by this court in
24    the first instance.
25         And that is well supported by the authorities.  They           03:50
```

1    don't have anything that has ever shown the reversal of a

2    district judge putting that kind of a proper limitation on a

3    bankruptcy filing.

4            **THE COURT:**  Thank you, counsel.

5            **MR. STANG:**  Good afternoon.  My name is James Stang,        03:50

6    and I represent MGA.  If you have questions about bankruptcy,

7    I'm the one to ask, because I've been doing it for 28 years.

8    I've given a lot of thought to it, to what an MGA bankruptcy

9    would look like.  But Mr. Larian tells me to stop thinking

10   about that, because the company has no intention today to file   03:51

11   a bankruptcy.  Mr. Larian does not think that would be a good

12   idea.  He has spent enormous time and effort and lots of

13   dollars in attorneys' fees to try to get things worked out with

14   creditors; not just Wachovia, then OMNI, but unsecured

15   creditors, foreign and domestic licensees, the list goes on and  03:51

16   on.

17          But if we were to file a bankruptcy, we would file it

18   in the central district.  Frankly, there's probably no other

19   place we could do it.  But we would agree that if we were to

20   file, we would file it here; here meaning the central district.  03:51

21          All these concerns about Moxie and whether it's an

22   asset or not an asset to the estate are going to be determined

23   by a judge.  But, frankly -- and I don't know if you've

24   withdrawn the reference in any bankruptcy proceeding -- but the

25   bankruptcy judge enjoys the jurisdiction by order of a            03:52

1    reference from the district court to the bankruptcy court.

2    That reference can be withdrawn.  That reference is withdrawn

3    by a motion to you.

4           **THE COURT:**  Yes.  I'm well aware of the procedure.

5           Not that we particularly like taking on bankruptcy      03:52

6    matters.  We're very grateful to our colleagues in the

7    bankruptcy court to handle the core bankruptcy matters.

8           **MR. STANG:**  To the extent that there are discreet

9    issues that you feel, by virtue of your familiarity with this

10   case and the years you've spent on it, make you better able to  03:52

11   handle it, then you can withdraw the reference and you'll be

12   taking care of those things; so counsel's concerns are really,

13   I think, misplaced.

14          I have not heard anything that counsel said that I

15   think is new.  You certainly seem to be staying with the       03:52

16   tentative thoughts that you announced before we took the break,

17   so I'm not going to hash over those things.  Except I would

18   like to visit the issue of what the monitor is monitoring.

19          You said something at the very beginning of your

20   tentative thoughts, as you described them, that, of course,     03:53

21   resonated with our side, which is that Isaac Larian is the one

22   who should be operating this company.  And to me, a monitor is

23   someone who has eyes and ears; it watches what's going on; it

24   listens to what's going on.

25          And because you made the distinction earlier about       03:53

1    the intellectual property, some of which Mattel has and some of

2    which MGA still has, it is our belief that the monitor should

3    be monitoring the Bratz assets as defined in your December

4    order.  And that the preservation of the construct trust and

5    the enforcement of the injunctions for that December order are          03:53

6    what that person is monitoring.

7           So I don't know how you intend to go about fleshing

8    out the concept of the monitor beyond what you derived from the

9    comments that are being made to you today.  I suspect there

10   will be some order that you'll come up with, and maybe you'll         03:54

11   give us a chance to comment on it or maybe not, but, our view

12   is that it's Bratz assets and that person is there to observe,

13   to be given full access to things that relate to the Bratz

14   assets.  It's a little bit like the canary and the mind.  When

15   the canary stops twittering, you'll note the absence of sound        03:54

16   and something will happen; so that's our view of the monitor's

17   function.

18          And as I said in our papers, when we were talking

19   about the receiver, it's easy to say you shall preserve, you

20   shall operate.  And I think the receiver's report and your own       03:54

21   observations are that that's easier said than done; so

22   hopefully we can be as clear as possible as to what this

23   monitor is actually going to do.

24          **THE COURT:**  What about Moxie?

25          **MR. STANG:**  In what sense, Your Honor?                     03:55

1          **THE COURT:**  What is MGA's position as to what this

2  Court should do at this point, at this juncture, regarding

3  Moxie?

4          You understand the issue that it's creating for

5  Mattel.                                                                    03:55

6          Is there somebody else who will be arguing that?

7          **MR. STANG:**  I'm going to get hooked here in a minute.

8          **THE COURT:**  Very well.

9          Hold on, Mr. Nolan, and let counsel here get through

10  his thoughts, and then we'll take that up.                                03:55

11          **MR. STANG:**  Well, Your Honor, from an operating

12  perspective, the Court shouldn't do anything about Moxie.

13  Isaac Larian should be the one running the company.

14          From the issue of whether it's substantially similar

15  or not, I think I'm about to get hooked, because I'm aware of             03:55

16  its existence; I have read Mattel's papers regarding it.  The

17  company is very concerned that the monitor be really restricted

18  to what was awarded to Mattel in December and not have rights

19  beyond that.

20          I want to make one other comment, and then I'll let              03:56

21  counsel come up.

22          You talked about the allocation of costs and that

23  that should get resolved at some point as to who bears the

24  costs of the receiver beyond what you've already ordered;

25  whether there would be a reallocation of those costs.                     03:56

1          The receiver process has probably cost in excess of

2    six to $700,000 to date, based on what amounts have been paid

3    over to a receivership and an administration account.

4          I'm not asking you to rule on anything today, but it

5    may be that we would ask that from the receivership cost          03:56

6    perspective, that that be re-allocated sooner than later.

7          It seems like just driving down here, I think there

8    were motions being filed by Blackberry -- my Blackberry nearly

9    died of exhaustion.  It's something like I've rarely seen in my

10   28 years of practice.  So I know we can file whatever we want     03:56

11   to file.  That is something of a discreet matter and defined

12   now in terms of its costs -- it may be something we will bring

13   to you on the basis earlier at the end of this litigation.

14         THE COURT:  The concern I would have of doing that

15   earlier as opposed to later is that, to me, doing it later, the   03:57

16   Court will have the benefit of reflecting on what actually has

17   happened, what actually has played out.  I've received a lot of

18   representations; I've received a lot of statements as to what

19   things are, what things aren't.  But I don't know at this

20   point.  And I would think that would be a better decision.        03:57

21         At the same time, I'm not setting a time for that at

22   this point.  I'm just suggesting that, too, might be premature.

23         MR. STANG:  Then I'm going to surrender the

24   microphone and let counsel talk about the Moxie issue.

25         THE COURT:  Very well.                                      03:57

```
 1            Mr. Nolan?

 2            MR. NOLAN:  Good afternoon.

 3            Part of this will also deal, in responding to certain

 4  assertions that Mr. Zeller made, we think without any support,

 5  that may touch upon the stay request that's filed.              03:58

 6            THE COURT:  That's the last issue I was going to take

 7  up.

 8            MR. NOLAN:  So if the Court wants, I think I can

 9  compartmentalize Moxie and deal with it right now.

10            THE COURT:  Why don't you deal with Moxie now, and    03:58

11  let me get into the stay issue.  Again, you can hear my

12  thoughts on that, which might make moot, or not, some of that.

13            MR. NOLAN:  Okay.

14            Your Honor, I came in here today and I was reminded

15  of the Verizon commercial, where you turn around and you have a 03:58

16  whole group of people supporting you.  Let me make it really

17  clear on the record.  MGA does not want to file bankruptcy.

18  Isaac Larian does not want to file bankruptcy.  Isaac Larian

19  intends to compete against Mattel, day in and day out, for the

20  conceivable future, whether or not it is with Bratz after the  03:59

21  dust settles, as the Court described it earlier, or in a

22  completely different fashion line that does not compete with

23  Bratz and does not infringe upon any copyrights owned by

24  Mattel.

25            I was particularly struck that Mr. Zeller made a     03:59
```

1   representation to you that there is ample evidence that Moxie

2   infringes Mattel copyright interests in the Bratz.  He has not

3   even seen Moxie.

4          In a meet and confer that was conducted before the

5   ex-parte was filed, Mr. Russel offered a monopolist who has a          03:59

6   monopoly position in the fashion doll industry to take a look

7   at the Moxie dolls in the offices of Skadden Arps before they

8   were introduced into the market, before they are sold in the

9   marketplace.  We made that offer.  It was not restricted to

10  just a selected few of dolls.  We suggested that we would show          04:00

11  him the line, I think it represented 80 percent, dealing with

12  the retailers that have looked at the Moxie.  And we're

13  prepared to do that immediately.

14         I believe we were prepared to do this Wednesday

15  afternoon.                                                              04:00

16         **THE COURT:**  Mr. Zeller is suggesting that you are

17  placing certain limitations on that.

18         **MR. NOLAN:**  The only limitations we are placing are

19  the practical limitations, Your Honor, that are imposed by the

20  relationship of these two competitors in the marketplace.  We          04:00

21  are not going to offer up to Mattel a free look, if you would,

22  into the trade secrets that went into Moxie.  We are going to

23  allow them to look at Moxie, make an examination.

24         Mr. Zeller was quite capable of making an examination

25  between Bratz and Toon Teens and determined that Bratz did not          04:01

```
 1   violate or infringe on Toon Teens.

 2           I am certain that he has not lost that skill and that

 3   he can sit in a conference room and look at Moxie, which I'll

 4   represent to the Court is directed not to the 'tween market; it

 5   is to a younger market; and it's not in competition of Bratz.      04:01

 6           We're comfortable, Your Honor, that it does not

 7   infringe.  We have opinion letters with respect to that.

 8           But I think we should take this step by step.

 9           It's a little bit like when Mr. Stang was saying in

10   his response, that all of a sudden during Mr. Zeller's            04:01

11   argument, we were swept into bankruptcy court and we were

12   talking about what are the assets of the bankruptcy court.

13           I'm saying with Moxie, all of a sudden we're in to an

14   infringement case and they have not seen Moxie.

15           Let's take this step by step.  We will make Moxie         04:02

16   available.

17           THE COURT:  I think there's a difference, though,

18   between the bankruptcy -- I agree with you on the bankruptcy

19   issue, particularly given the representations that have been

20   made.                                                             04:02

21           The Moxie issue, to my thinking, regardless of how

22   it's evaluated or how the Court ultimately comes out -- it's a

23   benefit to both sides to have an answer sooner as opposed to

24   later.  Assuming that it is not infringing, it would be good to

25   have this cloud that has been introduced over it eliminated so    04:02
```

```
 1    if Mr. Larian, dealing with all of the people that he has to
 2    deal with to get this brand up and running, which would
 3    contribute to the solvency of MGA, and actually I think it
 4    benefits Mattel in some way to not have this bankruptcy
 5    concern.                                                        04:03
 6              On the flip side, assuming for a moment that it does
 7    infringe, it is certainly in the interests of everybody to have
 8    that resolved sooner as opposed to later and to have that
 9    identified; so it's the one issue that I don't think is
10    premature.  But I'd like your further thoughts on that.         04:03
11              To me, that almost seems ripe for a decision,
12    assuming that we have enough of -- I don't know how much the
13    line has been developed or whatever the Court would be in a
14    position to make the kind of assessment, substantial similarity
15    assessment -- we'd have to bring out the jellyfish and          04:03
16    Mr. Russell and go through the whole process -- but assuming
17    that we have enough of a line here, this one actually does seem
18    to be ripe.
19         MR. NOLAN:  I'm not suggesting it's not ripe.  I'm
20    just suggesting a process by which to address the issue.        04:03
21         THE COURT:  Okay.
22         MR. NOLAN:  And we think that the first step should
23    be that competitor who's claiming that it infringes the rights
24    that they own should first look at the doll, the physical doll,
25    and examine it.  And we are and continue to be willing to do    04:04
```

```
 1    that and make it available tomorrow.

 2          THE COURT:  Is it necessary for me to rule on this

 3    discovery motion, or are you telling me that you are going to

 4    make available to Mattel essentially what they are seeking?

 5          Is there a value in you further meeting and             04:04

 6    conferring in light of the Court's remarks today, or should I

 7    go ahead and resolve that by simply issuing an order?

 8          Because I do think that Mattel needs to have enough

 9    to be able to litigate the issue.

10          MR. NOLAN:  We completely agree.                        04:04

11          If Mattel outside counsel in good faith, after

12    looking at the Moxie dolls, believes that they have a good

13    faith basis to come to the court and make whatever motions and

14    ask you to make whatever determinations, we will deal with it.

15          We don't believe, Your Honor, that in good faith,      04:05

16    that's going happen.  But the one restriction that we will ask,

17    Your Honor, is that the examination be restricted to Mattel's

18    outside counsel.  As good as they are, I don't believe they

19    have started to sell fashion dolls yet at Quinn Emanuel, but I

20    feel comfortable that they can make -- although, God knows they  04:05

21    could do one from the back of their hands -- but our point is

22    this, Your Honor.  We don't want Mattel executives to come in

23    and take a look at a product which they may be fearful of

24    competing against.  We want them to come in; we respect them,

25    if they believe they have a good faith basis to make an        04:05
```

1    allegation that's infringing, we'll have the hearing before

2    you.

3              Their discovery requests, Your Honor -- and with all

4    of the volume of paper, I still do not understand how you and

5    your staff get through all of this paper -- but on this                    04:06

6    particular one, the discovery request is incredibly broad, and

7    it's way too broad for a competitor right now.  What I propose

8    is that we have a meet and confer and we work it out between

9    us.

10             You agree that the first step would be an examination         04:06

11   of the Moxie dolls.  We'll show that to Mattel.  Then we'll

12   have a meet and confer with respect to what's the best way to

13   present it to you in the most efficient way.  Because I could

14   not agree more, and Isaac Larian could not agree more, that we

15   want to remove the cloud on Moxie and we want to be selling it        04:06

16   to a different market than is intended for the Bratz dolls.

17             **THE COURT:**  Very well.  Thank you, counsel.

18             Before I move on for the motion for stay, Mr. Zeller,

19   I will give you a chance to respond to both counsel, if there's

20   anything further on this issue.  This is the issue of the                04:06

21   receiver/monitor -- and this ex-parte for discovery related to

22   Moxie, because I think it's tied in with this issue.

23             I am inclined, I think, to simply order -- given what

24   appears to be a greater concession at this point in terms of

25   sharing the information with at least outside counsel, I think       04:07

1    there's room for discussion.  You may want something beyond

2    that; they may want something less than that; but I think

3    there's a value for you in the next few days to meet and confer

4    on that point and take a look and then move forward on this

5    issue.                                                                    04:07

6              MR. ZELLER:  If I could maybe make a couple of

7    comments on that.  Number one, I did not accuse the dolls of

8    infringing.  Our papers said we don't know because we asked to

9    see them and were not provided with them.

10             THE COURT:  I think when you used the phrase 'ample     04:07

11   evidence,' it's in reference to Mr. Gordinier.  But I'm not

12   going to say that for sure, because I don't want to have to go

13   through that whole process again; so we'll leave it at that for

14   now.

15             MR. ZELLER:  If there was any misunderstanding --       04:07

16   there is ample evidence that MGA is effectively only proceeding

17   with a shadow of a Bratz line for the fall of 2009, and,

18   instead, has shifted over to Moxie.  We don't know beyond that

19   what these dolls look like; so we certainly are not commenting

20   on whether they are infringing or not.                           04:08

21             Obviously, it would be worse, from our perspective,

22   if they are infringing.  We think that it's material,

23   infringing or not, for purposes of what the court ought to be

24   determining today.

25             Also, what I would say is, obviously, if they believe   04:08

1    they are entitled to designate things under the protective

2    order, that's fine.  But I'm perplexed by Mr. Nolan's comment

3    that what we've asked for is way too broad.

4         What we've asked to see is a sample of each of the

5    Moxie dolls.  We've asked to see a sample of each of the 2009    04:08

6    Bratz dolls.  We've asked for summary order information for the

7    2009 products, Bratz and Moxiez, and we've asked for planograms

8    and we've asked for a list of what those products are for 2009.

9    This is actually very narrow, very focused.  They can actually

10   come up with these things very quickly.                          04:09

11        In particular, for example, the order information.

12   We put in samples of this kind of thing from the retailers.  It

13   is literally an online website or an online service that

14   manufacturers have with these retailers.  They can go on there

15   and tell exactly what they have ordered and print it off.        04:09

16        THE COURT:  Lets not belabor this, because now we're

17   just arguing something that you're going to meet and confer on;

18   and then if there's still dispute, you know where I am.

19        MR. ZELLER:  And what I would suggest, Your Honor, is

20   that --                                                          04:09

21        THE COURT:  And this would be a discovery matter that

22   I would want to come to this Court, because it relates to the

23   Court's monitoring of the receivership.

24        MR. ZELLER:  I would request some clarification,

25   Your Honor, is that earlier, the Court made the remark that, at  04:09

```
 1    least as part of the tentative, that this is a company that
 2    Isaac Larian should continue to run.
 3              I assume that the Court is not making any commentary
 4    on whether or not a Chapter 11 trustee should be appointed in
 5    bankruptcy or whether or not Mr. Larian should remain in         04:10
 6    control of the company in a bankruptcy, consistent with all of
 7    the --
 8              THE COURT:  Absolutely not.  I'm certainly not
 9    prejudging those issues.  What I'm speaking to is in terms of
10    managing a toy company.  I have tremendous respect for the      04:10
11    receiver, Mr. Fraioli, but that is not his specialty.  The toy
12    aspect, the creative aspect, is something which if there is
13    going to be an MGA toy company, an entertainment company, that
14    Mr. Larian is the first to run that; that makes the most
15    creative sense; it makes the most economic sense.               04:10
16              The last thing the Court wants to do -- and this is
17    with respect to any company that appears before this Court, in
18    any litigation -- is in any way contribute to its demise.
19              At the same time, of course, I must do all I can to
20    effective preserve rights, preserve property, of those who have 04:11
21    had their rights or property compromised.  And it's in striking
22    that balance that the Court thinks that at this point, after
23    the 20-day temporary receiver, that a monitor is more
24    appropriate.  But it's entirely in that context that I made
25    that remark, counsel.                                           04:11
```

1          Certainly, with respect to if the company does go

2    into bankruptcy where it has declared, itself or through on

3    involuntary action brought by a creditor, been termed to be

4    insolvent, that places it in an entirely different category,

5    and appropriate action will be taken by the bankruptcy court or          04:11

6    the appropriate court handling the case.

7          MR. ZELLER:  And if I may, then, comment on the

8    proffered restriction that somehow the monitor should only be

9    able to look, apparently, at the Bratz assets; that strikes me

10   as far too artificial under the circumstances.          04:12

11         THE COURT:  I have to think about that as well.

12         I understand the concern about limiting the role of

13   the monitor to that which is necessary.  I also understand the

14   interconnectedness of some of these issues; the devil is always

15   in the details.  I'm going to have to take a careful look at          04:12

16   how that is structured.  I understand the concern.

17         MR. ZELLER:  And particularly in light of the

18   evidence that we have put in as to that interconnectedness, as

19   well as it would seem to potentially encourage some

20   circumvention of the monitoring.  So the monitor ought to be in          04:12

21   place and have sufficient power and authority to really look

22   anywhere.  I mean, otherwise there would seem to be very little

23   deterrent effect.

24         THE COURT:  The deterrent effect lies in the fact

25   that -- I want to take this as incrementally as possible.  To          04:12

```
 1   the extent that the monitor who will be simply a monitor, but
 2   will also have the ability to come to this Court if it believes
 3   that it needs more power or more authority to effectively do
 4   what the Court has asked it to do.  It's not a static
 5   appointment; it's something which is dynamic.  And I'm sure       04:13
 6   that would be understood by everybody on both sides.
 7          Thank you, counsel.
 8          MR. ZELLER:  That's all I have.
 9          THE COURT:  Very well.
10          The last issue for the day is the motion to stay.           04:13
11   There is basically a motion to stay Phase 1 pending appeal and
12   a motion to stay Phase 2.  I want to, again, give you my
13   thoughts, in having read your papers and the various documents,
14   and I suspect that some of what I've already said has given you
15   some indication as to where I'm going with this.                  04:13
16          Given the Court's inclination to impose a monitor and
17   to ensure that the Bratz 2009 line is, in fact, fulfilled by
18   MGA Entertainment, that has the effect, I suppose, de facto, of
19   delaying the implementation of the December 3rd order as long
20   as it does.                                                       04:14
21          Now, it's not a complete stay because the Court does
22   envision -- I don't want to be in a situation in December or
23   January, like I was last December or January, and we're already
24   into the 2010 line -- that come October, come November, that
25   certain transitions need to take place.  I'm hoping that I can    04:14
```

1   impose on the monitor perhaps to work with the parties in that

2   regard in effectuating that transition.  So there may very well

3   be aspects of the injunctive order that was articulated by the

4   Court back in December that would need to be implemented.

5        And everyone should understand, when the Court issued       04:15

6   its December 3rd order, it issued it with a mind towards

7   immediate implementation.  The Court imposed a stay in January,

8   and that has altered the landscape somewhat.

9        I'm going to be imposing on the monitor to make

10  representations to the Court in terms of how this transition       04:15

11  should play out between now and the end of the 2009 line, and

12  we'll be responding accordingly.  It's going to take some

13  cooperation between the parties to effectively do this, but I

14  think it's in everyone's interest to do this.

15       I know that Mr. Larian has an interest in maintaining       04:15

16  relationships with the people that he's selling to now.  Even

17  though the people that he's selling the Bratz line to, that

18  they may very well be customers down the road.  I know he has

19  no interest, or I would assume that he has no interest, in

20  compromising those contracts and maintaining those              04:15

21  relationships.  At the same time, of course, Mattel has their

22  interests in maintaining the Bratz line itself; so I'm hoping a

23  monitor will play some role in that.  I'll try to spell that

24  out more specific in my order.

25       Otherwise, I'm denying the motion or the application       04:16

```
 1    for a stay pending the appeal of Phase 1.  I don't know how
 2    long that appeal is going to take.  I have, once again,
 3    revisited each -- I think there were seven different issues
 4    that you identified as raising substantial issues of law.  The
 5    Court certainly understands that it may have gotten one or all      04:16
 6    of those seven issues wrong, but I don't think there's a
 7    substantial issue there.
 8              There are certainly competing damages, arguably
 9    irreparable damages, but at the end of the day, I think they
10    favor Mattel, given the Court's rulings; so for reasons I've        04:16
11    stated previously with respect to these issues on staying
12    Phase 1, my tentative -- and I'll certainly hear any further
13    argument on this -- but a strong tentative is to deny the
14    motion to stay Phase 1, recognizing that the way the Court is
15    now implementing its injunctive relief in Phase 1 achieves         04:17
16    somewhat of a de facto stay.
17              With respect to Phase 2, one of the things that the
18    receiver has made clear is the tremendous impact that the
19    litigation of Phase 2 has had on MGA's financial viability.  At
20    the end of the day, or at the end of some period of time,          04:17
21    there's little that the Court can do about that.  Attorneys'
22    fees are what attorneys' fees are.  The litigation will
23    proceed.
24              I have said this before that I believe that there is
25    a business resolution to this matter.  I think we're once again    04:17
```

1   at a juncture where a serious effort to try to globally try to

2   resolve this case is in order.  I've been in touch with my

3   settlement officer, the court-appointed settlement officer,

4   Ambassador Prosper, and I will want to hear from him briefly

5   just to place on the record briefly what he reported to me   04:18

6   earlier today in terms of the status of settlement discussions.

7        I've been very clear with Ambassador Prosper not to

8   disclose the substance of those, but I have asked him from time

9   to time to disclose the status procedurally of where those are.

10   And he believes, and I'll let him speak for himself, that this   04:18

11   might be something that might be worth taking another look at.

12   And so I might be inclined to impose a very limited stay on

13   Phase 2, just to give everyone a breathing opportunity and

14   perhaps try to resolve it.

15        The other thing I wanted to raise is that -- and I   04:18

16   don't do this very often -- but this might very well be the

17   case where, assuming I received ironclad waivers from everybody

18   and their attorney and their attorney's attorney, that the

19   Court might be willing to oversee a settlement effort itself.

20   But that would require massive waivers and confidentiality and   04:19

21   all of the stuff that goes with it.

22        But that's where I am on the stays at this point.

23        I want to hear from both parties.

24        I would like, as I mentioned, Ambassador Prosper, if

25   you would briefly report just on the record essentially what   04:19

```
 1   you told me earlier today concerning the procedural status of

 2   settlement discussions.

 3            AMBASSADOR PROSPER:   Thank you, Your Honor.

 4            Well, Your Honor, I too agree that I believe this is

 5   a critical time in the case in the settlement discussions.  But      04:19

 6   I also believe there is a business settlement out there.

 7            I have to say that in the past few weeks, I've been

 8   encouraged by some movement in the process in that both parties

 9   have been communicating to me various ideas and have suggested

10   ways forward.  I think by taking the two sets of suggestions          04:20

11   from what I received from Mattel and from what I received from

12   MGA, I think we have a sufficient basis for some real

13   conversations here and potentially we can begin to work through

14   some of the core issues that may allow us to settle this case.

15            So while we are still far apart, I think we're, in a         04:20

16   sense, closer than we've ever been, at least since the start of

17   the trial.  And I'm not sure what that means, but we'll figure

18   that out.

19            I do want to add, though, after listening to some of

20   the discussion on Moxie, that I would ask that whole process be       04:20

21   expedited, because it does influence the settlement

22   conversations; so I would ask the Court to encourage the

23   parties to have a meet and confer as soon as possible, because,

24   again, it influences our conversations.

25            I've spoken with the parties, and what we are seeking        04:21
```

 1    to do now is to hold a settlement conference on or about

 2    June 1st.  I think it will be critical to have the CEOs of both

 3    companies at least present in the same building for

 4    conversations.  I think it will be important to have the

 5    relevant business leaders in the companies also present with          04:21

 6    the CEO, as well as, of course, the attorneys; because, again,

 7    this is a critical juncture where that if we don't move,

 8    everyone begins to lose value.

 9          Regarding the Court being involved, I personally

10    would welcome your involvement.  It may be something to the          04:21

11    effect that we hold our conference on or about June 1st; make

12    as much progress as possible; if we resolve it, so be it; if

13    not, then it will be teed up to the point where you could play

14    a critical role; so I personally would invite your involvement.

15          Thank you.                                                      04:22

16          **THE COURT:**  Thank you.

17          Let me hear from the parties.  All parties are

18    invited.

19          Mr. Nolan?

20          **MR. NOLAN:**  Your Honor, we concur with                      04:22

21    Ambassador Prosper's comments, and we pledge to continue to

22    work exploring whether or not a global resolution can be

23    achieved, and the timeline that the Ambassador has suggested is

24    consistent with what we understood he was going to recommend to

25    the Court.  We're prepared to have the meet and confer on Moxie      04:22

```
 1   tomorrow.
 2           THE COURT:  One concern I have about implementing a
 3   stay of any sort on the ongoing litigation is that I have
 4   learned a lesson the hard way the last time.  The last time I
 5   implemented a stay in this case, it seemed to come back again        04:23
 6   and again, cited as a reason for delay in the litigation.
 7           I would not want to do that.  I guess I'd want to
 8   have some assurance, get some indication, that if we were to
 9   stay the case, for a period of weeks or a month, that we could
10   then resume.                                                         04:23
11           And I suppose you may not be the right person to be
12   asking; you're primarily responsible for Phase 1.
13       MR. NOLAN:  I was going to say I could answer this
14   with a pure heart and say that there's nothing strategic in my
15   agreements --                                                        04:23
16           THE COURT:  No, I'm not suggesting that.
17       MR. NOLAN:  But Ms. Glaser, you're right, she perhaps
18   should address the Phase 2 stay.
19           I wanted to address the request for extension of the
20   stay.  I understand the Court's ruling with respect to that,        04:23
21   but I just want to come back to that, and that's the stay of
22   the injunction pending an outcome of the appeal.
23           THE COURT:  Go ahead and do that now, counsel.
24       MR. NOLAN:  First of all, for the record, the request
25   for the additional stay, subject to a lot of briefing, the         04:24
```

```
1    Court has seen many of the cases we cited back earlier on that
2    led to the Court's order.  I do want to go back and, at least
3    in my own recollection of the facts, we were only dealing with
4    2009 at that time.  We raised with the Court the prospect of
5    and implication of a 2010 issue with respect to sales, and the       04:24
6    Court said that you would revisit that after the Court had
7    ruled on the post-trial motions that were still pending at the
8    time.
9            THE COURT:  Right.
10           MR. NOLAN:  So as a result of that and after the             04:24
11   Court rulings came down, we again sought a continuance of this
12   stay.  And I think that today's discussion, frankly,
13   crystalizes in the record why a continuation of the stay should
14   be allowed, because it's not a stay for an appeal of Phase 1,
15   which could take months or years.                                   04:25
16           The parties, remarkably, have come to agreement with
17   respect to the appeal and the briefing schedule.  We have
18   filed -- Sidley Austin and Skadden Arps have filed, on behalf
19   of MGA and Isaac Larian, on May 4th, a notice of appeal from
20   the entry of the permanent injunction.  We have sought through     04:25
21   a motion to the Ninth Circuit a request for expedited treatment
22   of that appeal.
23           We reached out to Mattel and asked for an expedited
24   briefing schedule for that, and we have agreed and have
25   presented to the Ninth Circuit a briefing schedule which will      04:26
```

complete all of the briefing on the injunction issues by the
end of September of 2009, and have asked the panel jointly to
set a hearing as quickly as possible on that appeal.

This, mind you, Your Honor -- and as Ms. Glaser says,
I don't want to be glib.  I don't want to be glib.  I want to
be very sincere.  This is from a company that Mattel is
claiming that we're trying to tank Bratz.  We are seeking stays
of orders; we're going to the Ninth Circuit for an emergency
expedited appeal.

If the Court, after I make a couple of additional
points, still holds to the view that there should not be a stay
past 2009, we would ask the Court, recognizing as busy as it
is, to perhaps deal in a written fashion and in an order the
denial of the stay so that we could seek a request to the Ninth
Circuit to review the stay.

I apologize for saying it that way, but I know
there's so many issues we've been talking about, and I know the
Court is busy, but every day is important.  And let me tell you
why it's important, and that will tie in why a stay is even
warranted here.

It's clear that this is such an unusual case.

You know, the verdict for Mattel gives them certain
assets, and the Court's orders confirm that.  But they don't
have everything to the Bratz brand.  They are not prepared to
sell the 2009 line now, and they have made a representation to

```
 1    you that they could possibly -- it was not possibly; they could
 2    do a line by spring of 2010, and that is consistent with the
 3    declaration submitted by Tim Kilpin.
 4            The ironies of all ironies is that Mr. Kilpin is the
 5    author of many of the documents that we attempted to get before    04:28
 6    the jury in the first phase about how Bratz out-executed Mattel
 7    and how it was encroaching on Barbie and they had to develop a
 8    war plan, so to speak; that the house was on fire, and that
 9    they needed to kill Bratz.  This is the gentleman who
10    Mr. Eckert admitted in his deposition was removed from the head    04:28
11    of the girls' division and moved over to the boys' division,
12    because Mr. Eckert was not comfortable or satisfied with
13    Mr. Kilpin's efforts in promoting the brand.
14            I don't say that in any way to disparage Mr. Kilpin
15    or, frankly, Mattel --                                             04:29
16            THE COURT:  That doesn't sound like much of a praise
17    for him.
18            MR. NOLAN:  -- except to make this point:  If the 2010
19    line that Mattel is prepared to introduce into the marketplace
20    resembles in any way or fashion the creativity that they          04:29
21    implemented with My Scene and Flavas and the other failures in
22    the 'tween market, the Bratz brand at the end when the dust
23    settles and we're assigning costs and someone is going to be a
24    victor and someone is going to be a loser.
25            THE COURT:  Right.                                         04:29
```

```
 1         MR. NOLAN:  We all know that.  We've all been through

 2    it.  Cases get reversed on appeal.  It happens, even to the

 3    best of judges; even with rulings that -- I finished second

 4    place on most of those that are going to be argued before the

 5    Ninth Circuit.                                                          04:30

 6         But this motion, Your Honor, this stay motion starkly

 7    puts before you, respectfully, this issue:  Can MGA exercise

 8    its rights to seek the Ninth Circuit's view with respect to the

 9    rulings that support the Court's injunction?

10         The standards, we've set them forth.  There's a          04:30

11    difference as to whether or not there's a continuum.  But we

12    don't believe you even need to get to that continuum of whether

13    or not I should convince you that I've got a great argument on

14    appeal, and we're going to reverse you.

15         I don't need to do that, because I think the evidence    04:30

16    is overwhelming of the irreparable harm that MGA faces if we

17    are not allowed to continue to sell Bratz.

18         We're showing the 2010 line right now.  Mr. Fraioli

19    will, hopefully -- and correct me if I'm wrong -- the very

20    first meeting, the temporary receiver order comes in I think   04:31

21    about 2:00 in the afternoon; Mr. Fraioli gives me a call and

22    asks me whether or not we can meet that evening; I couldn't

23    because of a family commitment, so we met the next morning.

24         The very first question -- general counsel was there

25    from MGA; Mr. Isaac Larian was there; Jason Russell; myself; a  04:31
```

1   number of other lawyers were there as well -- the single

2   question we wanted to address with him, in addition to pledging

3   our cooperation was, there were showings that were scheduled

4   for the new 2010 line and could we have the receiver's

5   permission to go forward and at least display the 2010 line to          04:31

6   prospective buyers.  Mr. Fraioli said yes; gave us instructions

7   so we could do that.

8          We are prepared, Your Honor, to produce a 2010 line

9   which will be the creativity of MGA.  It has the full support

10  of MGA.  If we wanted to tank, if we wanted to tank the Bratz        04:32

11  line, Your Honor, we had the best excuse possible, and that was

12  that, Boy, the Court seems to be inclined to enforce this 2009

13  deadline.  But nevertheless, we developed the 2010 line in the

14  hopes that we could convince you that there will be a quick

15  resolution with the Ninth Circuit.  At least we'll get to the        04:32

16  Ninth Circuit, the briefing.  We're going to move heaven and

17  earth to get these briefs filed.  With the extensive record we

18  have here, it's a monumental task, but we're going to do it,

19  because we want this review as quickly as possible.

20         In the meantime, Your Honor, we also said,                    04:33

21  practically, I can't come in and ask Judge Larson to do this;

22  Mattel is going to scream; Mr. Zeller is going to say -- so

23  what we decided and we put forth in our papers is to say, all

24  right, that's a reasonable request.

25         What we're prepared to do -- and we made the proposal         04:33

```
 1   to Mr. Fraioli first -- Skadden Arps has a conflict as a result
 2   of Mr. Fraioli's appointment in this case, and we have
 3   respected that; and so that's why we have not taken the
 4   position with respect to the receiver or the monitor or
 5   anything else like that.  But we did submit to Mr. Fraioli a    04:33
 6   proposal, which would be, don't be Solomon; don't divide this
 7   baby in half; nobody is going to be the victor in this case.
 8   The Bratz brand that might possibly be manufactured and sold by
 9   Mattel in 2010, according to Mr. Kilpin and Mr. Zeller, has a
10   huge footnote attached to that, and that is, if we believe --   04:34
11   and this is in Paragraph five of Mr. Kilpin's declaration -- if
12   we believe the brand has not been destroyed so the decision to
13   whether or not to sell in 2010 is going to be in the hands of
14   Mattel.  They don't get the whole brand.  We have that.  We
15   have the rights.                                                04:34
16         Despite their great efforts, despite Mr. Zeller's
17   great efforts, he cannot move over on that verdict form
18   different answers to certain of those questions.  They did not
19   get everything that they wanted.  They did not get the willful
20   infringement, plus they did not get from the jury the ownership 04:34
21   of the products.
22         Now, we have made, I believe, a very compelling
23   record by Mr. Yackenstaller, the branding expert the Court
24   observed, and I think that even Mattel would agree, in talking
25   to the jury, I know that they would -- that he was very         04:35
```

```
 1    impressive, very impressive and very skilled, very educated
 2    man, who's being sought out by major companies in this world
 3    about combining brands.  In his declaration -- and I invite the
 4    Court to look at it again, if it doesn't come to mind -- but he
 5    talked about the efforts of major companies to bring brands          04:35
 6    together through acquisitions and how some companies just
 7    cannot bring it together.
 8            Mattel has not really countered that effectively.
 9            What we would suggest, Your Honor, is that we be
10    allowed to have this stay continue for the duration of the          04:35
11    appeal of the injunction only.  And, God willing, with the
12    speed of the Ninth Circuit and knowing the importance of this,
13    that there will be a ruling in 2010, possibly by the middle of
14    2010; we might be only talking about six months; but that would
15    allow us to continue to sell Bratz; no disruption with our          04:36
16    customers to the Bratz creativity that the Court recognized at
17    the time of the original stay, or I guess when we were arguing
18    the injunction.
19            Much of the genius of Bratz is Isaac Larian.  Let us
20    sell this.  We will post a bond, and in that regard,                04:36
21    Your Honor, this bond could be monitored by the Court-appointed
22    monitor.  It would be put up by Isaac Larian, using non-MGA
23    assets.  We made the presentation in our papers.  We suggested
24    what the percentage of the bond would be and what it would
25    cover.                                                              04:37
```

1          What we did, Your Honor, is we took the projection of

2   revenues and profits for the Bratz line from the sales, and we

3   said, Okay, well, we will bond the amount of the profit such

4   that if we are still in second place after the Ninth Circuit,

5   then Mattel hasn't lost anything because they will have the                    04:37

6   bond and they will have had the profits.

7          The monitor will be in place and can determine for

8   himself whether or not we are really pushing the Bratz doll or

9   we're tanking it, as Mattel has suggested.

10          Mattel cannot be harmed in this situation, because                     04:37

11   this is the way to maximize the revenues that can be brought by

12   an entity that can sell the entire brand to the marketplace,

13   without any disruption, without any confusion in the Bratz

14   brand.

15          And just two more quick points, and you have been so                   04:38

16   kind to let me go on.

17          **THE COURT:**  You need to wrap up, counsel.

18          **MR. NOLAN:**  I know.

19          Mattel has already admitted that the Bratz doll that

20   they are going to sell is not going to be the MGA Bratz doll.              04:38

21   They have said that, because it's included in the

22   recommendation of the court receiver that Mattel wants to, at

23   the end of 2009, take all of the unsold inventory of Bratz

24   products and destroy it.  These are products that could be

25   sold; could be resold by Sears and other people.                             04:38

```
 1            We put that in our declarations.

 2            So, Your Honor, I don't believe there's any harm to

 3    Mattel.  Mattel's financial position is going to be protected.

 4    The monitor will be on us in terms of whether or not we're

 5    really pursuing the Bratz brand; can report immediately to the      04:38

 6    Court if we're not.  The bond will protect Mattel on any

 7    downside with respect to financials.  And at the end of the

 8    day, when the appeal court rules, we will be able to give them

 9    a product that was sold in 2010 without any disruption in the

10    marketplace.                                                        04:39

11            And it's not a long stay we're asking for,

12    Your Honor.  It's very tight.

13            THE COURT:  Counsel, I just want to correct one

14    thing.  And I believe you understand this.  You made several

15    references to continue the stay beyond 2009.                        04:39

16            You understand the stay that's in place is not a

17    complete stay on the Court's preliminary injunction; rather,

18    it's a stay to the extent necessary to ensure that the

19    retailers obtain the 2009 line.

20            As it stands right now, and in my discussions with          04:39

21    respect to the monitor earlier, is I would envision certain

22    transitions to be taking place even before the end of 2009

23    pursuant to the Court's order.

24            I just wanted to make it clear that there's not a

25    stay presently, complete stay, through the end of 2009.             04:40
```

```
 1          MR. NOLAN:  If any of my comments were suggesting to

 2    think that I was misinterpreting that order, I understand the

 3    Court's position.

 4          THE COURT:  I assume you understand that.

 5           I'm going to hear very briefly from Ms. Glaser with      04:40

 6    respect to the Phase 2 issue, and then we'll hear from Mattel

 7    and then we'll call it a day.

 8          MS. GLASER:  Thank you, Your Honor.

 9          We would request a stay of 120 days.  We think that

10    120 days for two reasons.  One, the one you mentioned, which is  04:40

11    a financial drain, a huge financial drain.  It may be -- it's a

12    fact that many of the issues in Phase 2 are impacted by

13    Phase 1.

14          I don't think the Ninth Circuit will act that

15    quickly, but it could; and that would be helpful in some        04:40

16    meaningful way.

17          Number two, and most importantly, if there is going

18    to be an effort, and I think there should be, I am in favor of

19    that too, purposefully pursue a business resolution.  We don't

20    live in a perfect world, and there's going to be an exchange.   04:40

21    I'm sure Ambassador Prosper will be very effective in this

22    regard, but it's going to take some work.  And hopefully

23    Your Honor will be involved, but it will take some work.  And

24    we all have schedules; so I'm trying to be realistic, and I

25    think 120 days is realistic.                                    04:41
```

```
 1              THE COURT:  Thank you, counsel.

 2         I'll hear from Mattel.

 3              MR. QUINN:  Thank you, Your Honor.

 4         My children are grown now, but I'm reminded of the

 5    conversations we would have sometimes when it's time to go to      04:41

 6    bed; it was Dad, please, just to 7:30; just to 7:30; that's all

 7    I'm asking, Dad.  And then it gets to 7:30, and, you know, it's

 8    8:00, it's in the middle of the program, Dad.

 9              THE COURT:  I heard that last night, an "I Dream of

10    Jeanie" rerun.  It would have been so hypocritical for me to      04:41

11    say no, you can't watch it.

12              MR. QUINN:  But before, it was, 'we have to have the

13    2009 line or the relationships with retailers are history.'

14    And that, as I think we anticipated, is the thin end of the

15    wedge, and now it needs to be 2010 too.                           04:42

16         I understand why they argue that and why they take

17    that position.  But the fact of the matter is, this has been

18    determined to be Mattel's property.  There's a question about

19    whether we have any remedy available to us at all, if an

20    injunction isn't put in place; the real question about whether    04:42

21    we'll ever be able to collect any damages.

22         If we don't have an injunction, what have we got?

23         Mattel needs to start work on a line for 2010 now.

24    And I submit to the Court, it would be inappropriate for the

25    Court to enter any more of a stay than what the Court has         04:42
```

1   already entered.

2         And by the way, it's our understanding -- if I

3   understood the Court correctly -- that the stay that's in

4   effect is -- and I think the Court is explicit about this --

5   it's only with respect to the spring 2009 and fall 2009 lines.          04:42

6   And that's important, Your Honor, because as we've indicated in

7   the papers, there is evidence that inventory is being dumped,

8   historic inventory; and this is something we may be bringing to

9   the attention of the Court, that right now, inventory is being

10  sold that is not spring 2008 {sic} line.                                04:43

11        **THE COURT:**  2009 line.

12        **MR. QUINN:**  And Your Honor, Bratz now constitutes

13  15 percent, according to Mr. Meier, MGA's expert, constitutes

14  15 percent of MGA's sales.  At least that's what's projected

15  for this year.  And he says that's optimistic and that number          04:43

16  is trending down.  This simply is not a material part of MGA's

17  business anymore.  They cannot credibly say that if the stay

18  isn't in place, that the survival of MGA is threatened because

19  of that.

20        The survival of MGA may very well be threatened.  We             04:43

21  noticed in the report of the receiver that there's a question

22  about whether we've run out of cash in July.  There's a lot of

23  reason to think that MGA's survival may be threatened.  But

24  it's not threatened because of the potential loss of some 10 or

25  $12 million, viewed optimistically, according to Mr. Meier in         04:44

1    profits for Bratz.

2              Mr. Nolan makes the comment about Mattel, Mattel's

3    creativity, and we're heard about how we're bureaucratic and

4    we've never come up with a new idea before.  There's evidence

5    before the Court that was introduced during the trial that                    04:44

6    Mattel introduced thousands of new products every year.  The

7    Court has seen ample evidence of the creativity that exists at

8    Mattel.

9              I don't think there's any cause for concern.  It's

10   utter speculation to think that somehow Mattel would bungle the               04:44

11   introduction of Bratz once it launches the product.  There's

12   simply no reason to believe that's true.

13             And I simply don't get the argument repeatedly made

14   by MGA that Mattel cannot make the dolls that MGA has produced.

15   Mattel has the right to make the dolls; anything that is                      04:45

16   substantially similar to those drawings; or the sculpt.  And if

17   that includes product that looks like the product that MGA has

18   introduced, Mattel's entitled to do that.

19             The point is that MGA is not entitled to sell that

20   because it's been found to be infringing.                                     04:45

21             We can sell anything that is substantially similar to

22   those drawings, which we own.  We can sell anything that is

23   substantially similar to the sculpt, which we own.  What they

24   have been selling has been determined to be substantially

25   similar; so I don't really understand what the dispute is here,               04:45

1    or the argument, that Mattel is incapable of making the Bratz

2    that's on the market.

3          There's a suggestion that, Well, we can't come up

4    with themes; they don't have our themes; they don't have our

5    accessories.  Mattel has been making themes and accessories for    04:46

6    decades for dolls, Your Honor, scores of dolls.  This is not

7    something that the Court needs to be concerned that Mattel

8    would not be able to do.

9          Mr. Nolan said that MGA was showing its 2010 line

10   right now?                                                          04:46

11         Your Honor, I don't think there was any stay of the

12   injunction that permitted MGA to show anyone a 2010 line.

13         If my understanding of the Court's order is correct,

14   that was utterly inappropriate, if they have done that.  That

15   stay only applied by its terms to the spring 2009 and the fall     04:46

16   2009 lines.

17         **THE COURT:**  This raises an interesting question,

18   counsel, because it puts all of this -- it underscores the need

19   for the transition that the Court envisions -- the transition

20   to be somewhat supervised by what the Court proposes to impose     04:47

21   in terms of a monitorship.

22         There are, as I understand it -- and this is all new

23   to me; I have not been involved in the toy industry before this

24   case -- that there are things that need to be done for the 2010

25   line now.  Not a month from now or even two months from now,       04:47

1    but literally now.  And that's what I trust, given the Court's

2    perspective ruling today -- and I'll try to have this ruling

3    out as soon as I can -- what Mattel will be doing on a

4    going-forward basis, is getting ready for that 2010 line.

5           I would assume it's going to be Mattel who is going    04:47

6    to be making these showings and that Mattel is preparing this

7    product line for the 2010 season.  That's something which you

8    are going to have to work with MGA, perhaps through the

9    monitor, and certainly under court order.  But that's what we

10   need to be doing now.                                          04:48

11        MR. QUINN:  That's certainly Mattel's intention,

12   Your Honor.

13          But there should not be two parties working up 2010

14   lines.

15        THE COURT:  No.  This needs to be coordinated.  And I     04:48

16   intend to make it abundantly clear that it is the 2009 line to

17   which the Court's stay applied.  2010, Bratz goes -- and when I

18   say Bratz, the Court has found to be the property of Mattel,

19   based on the jury's decision and the Court's injunctive order,

20   goes to Mattel's for the 2010 line.                            04:48

21        MR. QUINN:  Am I correct, Your Honor, that the stay

22   does not apply to some historical product that's in inventory?

23   It's not within the scope of that order that they continue to

24   be able to sell that; that was never the justification.

25        THE COURT:  That's an interesting question.               04:48

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

1        The stay envisioned the 2009 line being serviced, or

2   the 2009 retailers' orders being serviced.  Now, I understand

3   that some of that is being serviced, perhaps based on your

4   obligations from existing inventory.

5        Provided that the profits from any of those sales of          04:49

6   infringing products are being held in constructive trust for

7   Mattel, I believe there are no damages to Mattel.

8        I suspect it would be better for Mattel to have a

9   doll that's in inventory right now, sold on the market at

10  Target tomorrow, than to have it sit in a warehouse where at     04:49

11  the end of the season it's going to be burned, so you get the

12  profit.

13       **MR. QUINN:**  Our concern is, Your Honor, whether it's

14  really feasible to capture all of that.  I mean, the Court is

15  aware of --                                                      04:49

16       **THE COURT:**  Well, that's one of the reasons why I

17  think you need to have a monitor in place, to make sure that

18  anything that's being sold in the service of the 2009 line,

19  that the profit of that is being held in constructive trust for

20  Mattel.                                                          04:50

21       **MR. QUINN:**  Well, as the Court knows, there was an

22  issue about an inventory -- a substantial quantity of Bratz

23  merchandise that was sold to Mr. Larian; and there's a question

24  about whether that was for fair value or whether that was some

25  sweetheart deal, and then what became of that.                  04:50

1          That was a very, very large volume of merchandise.

2          THE COURT:  I understand that.

3          MR. QUINN:  I don't know whether the Court envisions

4    that the monitor would have any visibility into that sort of

5    thing.                                                              04:50

6          THE COURT:  Well, certainly, the monitor is going to

7    be overseeing all of the Mattel property that is being held by

8    Bratz at this point, as determined by the Court; so certainly,

9    that would.  And that underscores the need for a monitor and

10   the need for that monitor to be aggressive in bringing any of    04:50

11   those types of issues to the Court.

12         But right now, the issue that you're referring to,

13   while it is certainly something that the Court is relying upon

14   in terms of appointing a monitor, that's not before the Court

15   to resolve right now.                                            04:50

16         MR. QUINN:  All right.

17         And, Your Honor, if I could just defer to Mr. Zeller

18   with respect to the issue of the stay on Phase 2, and what

19   particular issues that might raise.

20         THE COURT:  Very well.                                     04:51

21         I take it, Mr. Zeller, you don't want to take a

22   four-month vacation.

23         MR. ZELLER:  As much as I'm sure my wife would be

24   happy to do that, and I'm sure would be horrified to hear what

25   I'm about to say...                                              04:51

1           Certainly, we are very troubled by the notion of a

2    stay.  I won't belabor the history, of course.  We have just

3    ended a year-long stay.  We have fought since January over the

4    fact that there already was a stay; arguments about what that

5    deadlines were as a result of the impact of the prior stay; the          04:51

6    argument that, in fact, on January 6th, when this Court lifted

7    the Phase 2 stay, it was actually imposing another stay the

8    following day.

9           We have argued repeatedly, just in the last five

10   months alone, about stays.  And for the Court to then impose          04:51

11   one means that we will go through all of this again.  We have

12   multiple deadlines, including under court orders, that are

13   currently due.  An example is the interrogatories that we've

14   been asking for answers for 16 months.  Discovery Master

15   O'Bryan has ordered responses.  MGA has sought and obtained          04:52

16   multiple extensions, now through the end of this month.  These

17   are interrogatories about their own claims, and we have been

18   asking for information for about 16 months.  And we know what's

19   going to happen.  That was a date certain for those

20   interrogatories to be answered now.  And, in fact, Discovery          04:52

21   Master O'Bryan made it very clear that only absent

22   extraordinary circumstances, that deadline would hold.

23          Now what we're going to have is the stay, and we're

24   going to have arguments about what that new deadline was,

25   because the Court will recall that when Judge Infante issued an          04:52

```
 1   order that had a date certain in it, and then stayed it,

 2   pending the Court's stay of Phase 2, they basically took the

 3   position, there was no deadline at all now; whenever it is that

 4   MGA felt like answering it.  And that led to -- I mean, talk

 5   about wasted money.  That was easily tens of thousands of        04:53

 6   dollars on both sides, arguing over that issue.  There's a

 7   multiplicity of this.  So we have history that causes grave

 8   concern here.

 9           But, also, let me say that we have financial

10   transactions that -- I don't need to paint the picture for the   04:53

11   Court.  The Court has seen all of this evidence.  We have

12   multiple third parties who are involved.  We have some orders

13   already outstanding that will require discovery to be produced,

14   more discovery, by Omni 808 and IGWT.  We do not even know, to

15   this day, all of the third parties who are involved such that    04:53

16   we can serve them with subpoenas.

17           Simultaneously, Omni, MGA, IGWT, and the like are

18   taking the position that third parties need not preserve

19   documents until served with a subpoena.  So you can see, of

20   course, the quandary that we're in.  We don't know the identity  04:54

21   of all of these people, so we can't serve them with a subpoena;

22   and meanwhile, they're taking the position, well, but they're

23   free not to preserve documents.  That's prejudice to us.  I

24   mean, there's no question that that's prejudice.

25           So what I would suggest is that at a bare minimum, if    04:54
```

1    there's going to be any sort of stay on discovery, it not apply

2    to third parties, or to the obligations of these third parties

3    to produce to us the remaining documents that we're owed, under

4    these orders, so that we can figure out who the remainder of

5    these relevant third parties are with respect to the financial          04:54

6    transactions.  So that's a concern we have.

7         We also, of course, have the concern about what's

8    this going to mean if we're required to go under the

9    Hague Convention for some of this discovery.

10        The Court, of course, has heard about Trueba and          04:54

11   Vargas here today.  I mean, if the Court denies or doesn't

12   sustain our objections, and there's a four-month stay, that

13   means that it still going to -- effectively will have been

14   denied a year and a half, if not more, to pursue these

15   depositions.          04:55

16        And I submit, at some point, Your Honor, we really

17   have a recipe here where we're being prejudiced.  We can't get

18   to the evidence; we have stops and starts.  And as the Court

19   has pointed out, at the end of the day, this money is --

20   there's very little the Court can do about this in the scheme          04:55

21   of things.  MGA is fighting this case tooth and nail.  They

22   fight over every single piece of discovery in this case.

23   That's their prerogative, I guess, if that's what they think

24   they need to do.  But to argue that somehow this is a drain on

25   them, and that means that things should be stayed, that,          04:55

1    frankly, seems to be rewarding that kind of behavior.

2         But even setting all of that aside, there's really

3    very little the Court can do.  A four-month stay?  The fact is,

4    then they'll be spending that same money four months from now;

5    and meanwhile, we'll have been prejudiced.  We'll have more          04:55

6    arguments and more disputes.  And I respectfully submit that

7    there shouldn't be any stay, let alone for something as lengthy

8    as 120 days.

9         **THE COURT:**  Neither you nor Mr. Quinn have addressed

10   the settlement issue.                                               04:56

11        **MR. ZELLER:**  I apologize.  I thought Mr. Quinn was

12   going to.

13        We are fine with that.  We have talked to

14   Ambassador Prosper; we will be available June 1st.  We agree

15   to, I guess sight unseen, the onerous waiver that the Court is      04:56

16   envisioning.  I understand that that's acceptable to us as

17   well.  So we would proceed on that basis.

18        But I also don't think that the settlement should be

19   any reason to stay things.  I obviously don't want to go into

20   the substance of it, but there's a lot of work, at a bare          04:56

21   minimum, for us even to be close.  So I just think that it

22   would -- if the parties were very close, you might hear a

23   different position from us on whether a stay is appropriate or

24   not, but we just don't think that should have an influence on

25   it at this stage, because we're just not there.                    04:57

 1          **THE COURT:**  Do any other counsel wish to weigh in on

 2   this issue?

 3          Mr. Bidart?

 4          **MR. BIDART:**  Thank you, Your Honor.

 5          I'm technically not part of the underlying case, but          04:57

 6   when I hear the date June 1st and the remarks of Mr. Prosper, I

 7   wanted to speak to that, if I may.

 8          **THE COURT:**  You may.

 9          **MR. BIDART:**  First of all, I agree with what

10   Ambassador Prosper recommended, and we would like to be          04:57

11   included in that process.

12          I wanted to simply remind the Court that on June 1st,

13   we have the cross motions in the insurance-related litigation

14   set at 1:30 p.m.  So if could keep that on calendar.  I think

15   it's in everybody's best interesting, based on everything that          04:57

16   I heard here today, to have those matters go forward, because I

17   think that would be helpful to the process.

18          Ms. Kokes is here for Crum & Forster; she's one of

19   the lawyers involved in the insurance litigation.  And I handed

20   her a note before I came up here saying that I would like to          04:57

21   address the Court.

22          So, number one, we're happy to participate in that.

23   We'd like to be invited to that process, on behalf of MGA and

24   Isaac Larian, who we represent in the insurance litigation.  We

25   would certainly waive any of the issues that the Court raised          04:58

```
 1    regarding the Court's involvement, and we'd like to simply see

 2    to it that the motions, if at all possible, go forward on that

 3    date.

 4               THE COURT:  Thank you, Counsel.

 5               Attorney for Crum & Forster?  Who's this?                    04:58

 6               Please come forward for a second.

 7               MS. KOKES:  Jennifer Kokes on behalf of

 8    Crum & Forster.

 9               THE COURT:  Are there any other counsel from any of

10    the other insurance companies present, that you know of?              04:58

11               MS. KOKES:  I don't believe so, Your Honor.

12               THE COURT:  All right.  Very well.

13               You join in Mr. Bidart's statement?

14               MS. KOKES:  Yes, Your Honor.  We would like to go

15    forward with the motions on the 1st, if that's possible.              04:58

16               THE COURT:  Okay.  Very good.

17               I appreciate that perspective.  Thank you, Counsel.

18               Mr. Gordinier, on behalf of the intervenors, do you

19    have anything to weigh in on the stay issue?

20               MR. GORDINIER:  Briefly, Your Honor.                        04:59

21               I don't know at this point -- I have some clients --

22    one client who is a party, some clients who are third parties.

23    As I said to you when I was here before, we are part of the

24    solution, not part of the problem; and when the Court and the

25    relevant folks that are helping the Court understand what went        04:59
```

1    on in this transaction, everybody will understand that.

2         I talked to Mr. Prosper briefly.  My view is that,

3    representing the most substantial creditor to the company right

4    now, a breathing space needs to occur.  I'm not going to get

5    involved in 120 days, but some -- if the Court is not inclined          04:59

6    to go 120 days, I think at least 30 to 60, to let all of the

7    parties and everybody sit down and try to sort this out before

8    another burn occurs, hurts nobody.  Hurts nobody.  There's no

9    prejudice.  Every time that we have an issue about an

10   extension, Mr. Zeller gets up and talks about destruction of          05:00

11   documents.  I was not here before, but Your Honor knows me well

12   enough to know that my clients are well advised, my clients are

13   not destroying documents.  Nobody is going to lose any

14   information here.  And the repetitious false assertion that

15   that's a concern should have no role in this issue of stay.          05:00

16        My suggestion is that the Court split the baby here

17   and have a stay of something less than 120 days; but do, in

18   fact, shut it down, so that we can focus with

19   Ambassador Prosper and get this thing over, before everybody

20   loses everything.  Because if this continues to fight, the          05:00

21   Bratz dolls that Mattel want to sell will be gone, because they

22   will burn them, or whatever; MGA will not be able to move on

23   and do whatever it wants to do.  I think the Court is exactly

24   right, what we need to do is get this litigation behind us.

25   And part of that is transferring what the Court has ordered to          05:00

1   be transferred.  Part of it is shutting down and spending some

2   time productively talking with the Court, with

3   Ambassador Prosper, and anybody else, including Mr. Fraioli,

4   that can bring some perspective to this and bring a close to

5   what is tremendously unproductive.                                05:01

6           **THE COURT:**  Thank you, Counsel.

7           The one thing that I'm definitely not going to stay

8   is the discovery issue that I want you to meet and confer on,

9   with respect to Moxie.  That needs to go forward, in any event.

10          We've reached the 5:00 hour.  I appreciate everyone's    05:01

11  arguments this afternoon.  The Court has to think itself

12  tonight about what to do, but I do plan to make a ruling

13  tomorrow; I will try to make a ruling tomorrow, just because I

14  think a number of these issues need to be addressed promptly.

15          I'll give you guidance, hopefully, on all of these       05:01

16  issues, certainly address and resolve the motions that are

17  pending before the Court; but also provide the framework for

18  going forward.  I do want to spend some time thinking about it

19  this evening, and we'll go forward tomorrow.

20          The temporary receivership expires with this hearing,    05:02

21  but I do, at a minimum, intend to appoint Mr. Fraioli as a

22  monitor going forward.  And to avoid a disruption in that,

23  consider him provisionally appointed at this point.  The

24  parameters of his responsibilities and authorities will be set

25  forth in the order that I issue tomorrow.  But it certainly is   05:02

Monday, May 18, 2009                    Mattel vs. MGA, et. Al.

```
 1    the intention of this Court for him to continue in that role.

 2              I think that's all I need to address specifically

 3    right now.  The rest will be set forth in the order that I

 4    issue as soon as I can.

 5              MR. NOLAN:  May I just have one minute?              05:02

 6              THE COURT:  Just one minute, Counsel.

 7              MR. NOLAN:  I understand.

 8              I made a citation to the briefs that I would just ask

 9    the Court to take another look at.  And that is the declaration

10    of Timothy Kilpin, Paragraph 5, where Mr. Kilpin is clearly    05:03

11    saying that Mattel would be prepared to make a special

12    road show of presentations to retailers to highlight the spring

13    2010 Bratz line, if the brand has not already been irrevocably

14    damaged.

15              THE COURT:  You made that reference before.  I do    05:03

16    recall reading that.

17              MR. NOLAN:  But, Your Honor, in the opposition that

18    Mr. Zeller filed and submitted to the Court, he says that the

19    Bratz brand is worth hundreds of millions of dollars.  If

20    Mr. Kilpin makes an unfettered decision that the brand has been  05:03

21    irrevocably harmed and they don't have to produce a spring 2010

22    line, and we happen to win, we get back a box, I guess, and the

23    brand has been destroyed -- and I would ask the Court to look

24    at the Standard Havens case and the Isley v. Craft case, which

25    deal specifically with that type of issue -- the economic harm  05:04
```

```
 1    that would be foisted on all of us, if we were to prevail on

 2    the appeal and Bratz has been killed --

 3              THE COURT:  I understand that MGA does not trust

 4    Mattel with the Bratz line, and I understand that Mattel does

 5    not trust MGA with the Bratz line.  That's well understood by        05:04

 6    the Court.

 7              MS. GLASER:  Your Honor, one last thing.

 8              I understand that we're bearing the costs of

 9    Mr. Fraioli now until there's a later order down the line.

10              THE COURT:  I will address that in the order               05:04

11    tomorrow.

12              MS. GLASER:  In any event, could there be -- you

13    addressing in the order the amount of money -- and I say this

14    respectfully -- that is taken out of MGA without court approval

15    in advance?  There have been -- and, again --                       05:04

16              THE COURT:  I'm not following right now.

17              MS. GLASER:  Mr. Fraioli -- there has been

18    $1.3 million in three weeks out of MGA.  And they may have a

19    great explanation, maybe not; but we would like there to be

20    something in your order monitoring how much money can be taken      05:05

21    out of MGA unless there's a court order.

22              THE COURT:  What the Court has done is instructed --

23    and the practice of Mr. Fraioli has been to submit his very

24    detailed itemization of all bills to the Court prior to taking

25    any money out.                                                      05:05
```

1        **MS. GLASER:**  And we haven't had the benefit of that.

2    I think if we're paying -- at least temporarily, we at least

3    ought to see --

4        **THE COURT:**  Part of what will occur at this point is

5    a complete accounting of all money spent during the 20-day          05:05

6    temporary receivership.  You will be receiving that shortly

7    from Mr. Fraioli, which will account for all of the money

8    spent.  And on a going-forward basis, the Court will specify

9    how future payments are to be made.

10        And as I indicated before, at the end of the day,          05:05

11    everyone will have the opportunity to revisit the issue of cost

12    sharing.

13        **MS. GLASER:**  Thank you very much.

14        **THE COURT:**  Is there anything further?

15        **MR. QUINN:**  No, Your Honor.          05:06

16        **THE COURT:**  Have a good evening.

17        (Court is adjourned.)

18                    CERTIFICATE

19

20    I hereby certify that pursuant to section 753, title 28, United
      States Code, the foregoing is a true and correct transcript of
21    the stenographically recorded proceedings held in the above-
      entitled matter and that the transcript page format is in
22    conformance with the regulations of the Judicial Conference of
      the United States.

23

24    _____          _____
      THERESA A. LANZA, CSR, RPR                    Date
25    Federal Official Court Reporter